No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXXII of LVII | ER-8938 to ER-9235

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

MOSLEY CROSS BY MR. WADE (RES.)                                    5319

12:49PM   1      Q.   AND WAS THAT A SIMILAR KIND OF MEETING?

12:49PM   2      A.   YES.

12:49PM   3      Q.   OKAY.  DO YOU RECALL WHETHER YOU SENT MR. TAYLOR A COPY OF

12:49PM   4      THE "FORTUNE" ARTICLE IN ADVANCE?

12:49PM   5      A.   I DON'T RECALL.

12:49PM   6      Q.   OKAY.  AND DO YOU RECALL WHETHER YOU SENT A COPY OF THE

12:49PM   7      "FORTUNE" ARTICLE EITHER TO MR. PENNER OR MR. WALTON?

12:49PM   8      A.   I DON'T REMEMBER, BUT I SUSPECT THAT THEY HAD ALREADY READ

12:49PM   9      THE ARTICLE.

12:49PM  10      Q.   OKAY.  DO YOU KNOW, DO YOU KNOW THAT MANY OF THOSE PEOPLE,

12:49PM  11      THOSE CLIENTS WHO PARTICIPATED IN THOSE MEETINGS CAME OUT OF

12:49PM  12      THOSE MEETINGS VERY INTERESTED IN INVESTING IN THERANOS?

12:50PM  13      A.   I COULDN'T TELL YOU EXACTLY WHAT THEY WERE THINKING, BUT I

12:50PM  14      WOULD SUSPECT THAT THEY WERE VERY IMPRESSED, AS WAS I

12:50PM  15      OBVIOUSLY.

12:50PM  16      Q.   OKAY.  AND YOU HAD THE -- YOU CONTINUED TO HAVE

12:50PM  17      INTERACTIONS DURING THE FALL WITH THOSE CLIENTS RELATING TO

12:50PM  18      THERANOS; CORRECT?

12:50PM  19      A.   YOU KNOW, I DON'T REMEMBER SPECIFICALLY, BUT I SUSPECT

12:50PM  20      GIVEN THAT I WAS TALKING TO THESE INDIVIDUALS FROM TIME TO TIME

12:50PM  21      THAT THEY WOULD SAY, WE'RE DOING OUR WORK ON THERANOS OR -- AND

12:50PM  22      THEY MAY HAVE TOLD ME THINGS FROM TIME TO TIME.  BUT I DON'T

12:50PM  23      HAVE ANY SPECIFIC RECOLLECTION.

12:51PM  24      Q.   AND IF I COULD JUST ORIENT US A BIT.

12:51PM  25           YOUR HONOR, MAY I PASS UP A DEMONSTRATIVE WHICH I'VE

MOSLEY CROSS BY MR. WADE (RES.)                          5320

12:51PM   1    SHARED WITH THE GOVERNMENT?  AND I THINK THE GOVERNMENT HAS NO

12:51PM   2    OBJECTION TO MY USING IT WITH THE WITNESS.

12:51PM   3            THE COURT:  YES.

12:51PM   4            MR. SCHENK:  THAT'S CORRECT.

12:51PM   5            THE COURT:  ALL RIGHT.

12:51PM   6            MR. WADE:  (HANDING.)

12:51PM   7        IF I COULD USE THE ELMO?

12:51PM   8            THE COURT:  SURE.

12:51PM   9    BY MR. WADE:

12:51PM  10    Q.  DO YOU SEE HERE, MR. MOSLEY, I SET ON THE SCREEN JUST A

12:51PM  11    CALENDAR THAT SETS FORTH THE MONTHS FROM JULY 2014 TO

12:51PM  12    DECEMBER 2014?

12:51PM  13    A.  YES.

12:51PM  14    Q.  OKAY.  AND I JUST WANT TO NOTE, I THINK WE SAID YOUR

12:51PM  15    INITIAL CALL WITH MS. HOLMES WAS ON JULY 21ST; IS THAT RIGHT?

12:52PM  16    A.  YOU KNOW, I DON'T REMEMBER THE EXACT DATE, BUT THAT'S --

12:52PM  17    IT'S IN THAT RANGE.

12:52PM  18    Q.  I'LL CIRCLE THAT.

12:52PM  19        BUT IT WAS IN ABOUT THAT RANGE IF IT WASN'T PRECISELY THAT

12:52PM  20    RANGE?

12:52PM  21    A.  I THINK THAT'S RIGHT.

12:52PM  22    Q.  AND I THINK YOU SAID YOU REVIEWED, YOU REVIEWED THE

12:52PM  23    MATERIALS OVER THE WEEKEND BEFORE YOU FINALIZED THAT OUTLINE ON

12:52PM  24    SEPTEMBER 2ND; CORRECT?

12:52PM  25    A.  I THINK THAT'S CORRECT.

MOSLEY CROSS BY MR. WADE (RES.)                                    5321

12:52PM    1    Q.   OKAY.  SO SEPTEMBER 2ND IS HERE (INDICATING).

12:52PM    2         AND THEN THE BDT CONFERENCE THAT YOU WERE AT, THAT WAS A

12:52PM    3    THREE-DAY CONFERENCE, WAS IT NOT?

12:52PM    4    A.   I DON'T REMEMBER SPECIFICALLY, BUT IT WAS AT LEAST TWO

12:52PM    5    DAYS.

12:52PM    6         BUT IT MAY HAVE BEEN THREE DAYS.  I WASN'T IN CHARGE.

12:52PM    7    Q.   YOU DON'T RECALL.  YOU WEREN'T WORKING THAT?

12:52PM    8    A.   I WAS JUST AN ATTENDEE.

12:53PM    9    Q.   AND THIS WAS BEFORE YOU WERE WORKING AT BDT; CORRECT?

12:53PM   10    A.   YES, IT WAS.

12:53PM   11    Q.   BUT IT WAS ABOUT FROM SEPTEMBER 15TH TO SEPTEMBER 17TH.

12:53PM   12         DO YOU RECALL THAT?

12:53PM   13    A.   IT WAS IN THAT RANGE BECAUSE I THINK ELIZABETH SPOKE ON

12:53PM   14    THE 16TH.

12:53PM   15    Q.   OKAY.

12:53PM   16    A.   AND I MAY BE WRONG, BUT I THINK THAT WAS THE DATE.

12:53PM   17    Q.   OKAY.  AND WHY DON'T I CIRCLE IT.

12:53PM   18         AND DO YOU RECALL IN THIS WINDOW HERE THERE WERE ALSO SOME

12:53PM   19    MEETINGS WITH MR. -- WITH YOUR CLIENTS?

12:53PM   20         DO YOU RECALL THAT?

12:53PM   21    A.   THAT -- YOU KNOW, WE HAD JUST GONE THROUGH THAT.  I

12:53PM   22    INTRODUCED HER TO SEVERAL OF MY CLIENTS, YES.

12:53PM   23    Q.   YES, YES.

12:53PM   24         AND I THINK ON DIRECT YOU HAD TALKED ABOUT THE FACT THAT

12:53PM   25    YOUR PERSONAL INVESTMENT DECISION WAS MADE AT THE END OF

MOSLEY CROSS BY MR. WADE (RES.)                              5322

12:53PM   1    OCTOBER; CORRECT?

12:53PM   2    A.   IN THAT -- SOMEWHERE BETWEEN DURING LATE SEPTEMBER AND

12:53PM   3    OCTOBER.

12:53PM   4    Q.   OKAY.  AND WE CAN COME BACK AND REFRESH THAT, BUT DO YOU

12:53PM   5    RECALL THAT THE WIRE TRANSFER THAT MR. SCHENK SHOWED YOU WENT

12:54PM   6    OUT ON OR ABOUT HALLOWEEN OF 2014?

12:54PM   7    A.   I THINK THAT'S RIGHT.  I'D HAVE TO LOOK BACK AT IT AGAIN

12:54PM   8    TO PICK THE EXACT DATE.

12:54PM   9    Q.   I'LL CIRCLE THAT FOR NOW AND WE CAN GO BACK THROUGH THAT.

12:54PM   10   A.   OKAY.  OKAY.

12:54PM   11   Q.   AND SO AFTER THIS POINT IN TIME WHERE YOU PREPARED THE

12:54PM   12   MEMO, YOU CONTINUE TO GET INFORMATION AND LEARN MORE ABOUT

12:54PM   13   THERANOS; RIGHT?

12:54PM   14   A.   I DID.

12:54PM   15   Q.   OKAY.  AND I'M GOING TO GO THROUGH AND SHOW YOU SOME

12:54PM   16   DOCUMENTS.

12:54PM   17        IN THIS PERIOD HERE BETWEEN, BETWEEN THE 2ND AND YOUR

12:54PM   18   INVESTMENT, THERE WERE -- THERE WERE A COUPLE OF TRIPS TO

12:54PM   19   THERANOS AS WELL?

12:54PM   20   A.   THERE WERE.

12:54PM   21   Q.   AND YOU WERE LEARNING MORE KIND OF THROUGHOUT THIS

12:54PM   22   PROCESS; CORRECT?

12:54PM   23   A.   INCREMENTALLY, YES.

12:54PM   24   Q.   OKAY.  LET'S GO TO EXHIBIT 4221.

12:55PM   25   A.   IS THAT IN THE SAME VOLUME?

MOSLEY CROSS BY MR. WADE (RES.)                                      5323

12:55PM   1    Q.   IT SHOULD BE IN VOLUME ONE OF THE MATERIALS THAT I'VE

12:55PM   2    PROVIDED --

12:55PM   3    A.   OH, I HAVE IT.  I HAVE IT.

12:55PM   4    Q.   -- AND I BELIEVE IT'S IN EVIDENCE.

12:55PM   5         COULD WE PUBLISH THAT?

12:55PM   6         YOU MAY NEED TO FLIP THE SWITCH, MS. KRATZMANN.  THANK

12:55PM   7    YOU.

12:56PM   8         OKAY.  AND IF WE CAN GO TO THE SECOND PAGE AND BLOW UP THE

12:56PM   9    EMAIL AT THE TOP.

12:56PM  10         THIS -- HERE THERE'S A NOTE THAT YOU HAD FOLLOWED UP TO

12:56PM  11    GET THE CDA SIGNED WITH THE COX AND DEVOS FAMILIES; CORRECT?

12:56PM  12    A.   I'M TRYING TO FIND THE REFERENCES TO THE CONFIDENTIAL

12:56PM  13    DISCLOSURE AGREEMENTS.

12:56PM  14         YOU'RE TALKING IN THE FIRST, THE TOP EMAIL ON --

12:56PM  15    Q.   I'M FOCUSSED ON THE SCREEN, SIR, BUT IF YOU PREFER THE

12:56PM  16    PAPER --

12:56PM  17    A.   OKAY.

12:56PM  18    Q.   -- IT'S ON THE SECOND PAGE.

12:57PM  19    A.   OKAY.

12:57PM  20    Q.   AND DO YOU SEE THERE'S AN EMAIL SEPTEMBER 18TH, 2014?

12:57PM  21    A.   YES, I DO.

12:57PM  22    Q.   AND THAT'S FROM YOU TO MS. HOLMES.

12:57PM  23         DO YOU SEE THAT?

12:57PM  24    A.   YES.

12:57PM  25    Q.   AND THIS IS JUST WITHIN A DAY OR SO AFTER THE BDT

MOSLEY CROSS BY MR. WADE (RES.)                    5324

12:57PM  1    CONFERENCE; CORRECT?

12:57PM  2    A.   THAT'S CORRECT.

12:57PM  3    Q.   AND AFTER THE MEETINGS THAT WE JUST DISCUSSED; CORRECT?

12:57PM  4    A.   THAT'S CORRECT.

12:57PM  5    Q.   OKAY.  AND HERE IT SAYS -- YOU LET MS. HOLMES KNOW THAT

12:57PM  6    YOU'RE FOLLOWING UP TO GET THE CDA SIGNED BY THE COX, TUBERGEN,

12:57PM  7    AND DEVOS FAMILIES; CORRECT?

12:57PM  8    A.   THE COX AND THE DEVOS FAMILIES.  JERRY TUBERGEN JUST

12:57PM  9    WORKED FOR THE DEVOS FAMILY.

12:57PM  10   Q.   THANK YOU.

12:57PM  11        AND IT NOTES THAT YOU'VE SUGGESTED THAT BOTH SIGN AND GET

12:57PM  12   IT FORWARDED TO HER; CORRECT?

12:57PM  13   A.   YES.

12:57PM  14   Q.   OKAY.  AND DOES THIS INDICATE THAT, TO YOU AT THIS TIME

12:57PM  15   THAT THERE HADN'T BEEN A LOT OF DETAILED CONFIDENTIAL

12:57PM  16   INFORMATION THAT WAS SHARED YET, THOSE MEETINGS WERE JUST

12:58PM  17   PRELIMINARY MEET AND GREETS; RIGHT?

12:58PM  18   A.   THEY WERE JUST INTRODUCTIONS.

12:58PM  19   Q.   OKAY.  AND DO YOU SEE THE NEXT SENTENCE THERE, IT SAYS,

12:58PM  20   "THEY HAVE BOTH CALLED TO SAY HOW EXCITED THEY ARE TO BE

12:58PM  21   CONSIDERED AS POSSIBLE INVESTORS IN THERANOS."

12:58PM  22        DO YOU SEE THAT?

12:58PM  23   A.   I DO SEE THAT.

12:58PM  24   Q.   OKAY.  AND COMING OUT OF THE BDT CONFERENCE -- AND, AGAIN,

12:58PM  25   I DON'T WANT THE SUBSTANCE -- BUT YOU HAD SOME TELEPHONIC

MOSLEY CROSS BY MR. WADE (RES.)                                    5325

12:58PM   1      COMMUNICATIONS WITH CLIENTS; CORRECT?

12:58PM   2      A.   WELL, BASED ON THIS, I ASSUME THEY CALLED ME AND SAID,

12:58PM   3      YES, WE WOULD LIKE TO TAKE A LOOK AT THIS.

12:58PM   4      Q.   OKAY.  AND I DON'T WANT TO GO BEYOND WHAT IS IN THE

12:58PM   5      EMAIL --

12:58PM   6      A.   RIGHT.

12:58PM   7      Q.   -- BUT THERE WAS SOME FOLLOW-UP THAT YOU PARTICIPATED IN

12:58PM   8      COMING OUT OF THOSE MEETINGS; CORRECT?

12:58PM   9      A.   YEAH.  IT INDICATES THAT THEY BOTH HAD CALLED ME AND SAID

12:58PM   10     THAT THEY WERE EXCITED ABOUT THE OPPORTUNITY.

12:58PM   11     Q.   OKAY.  AND YOU SEE THERE IT SAYS, "I HOPE YOUR TRIP TO

12:58PM   12     CLEVELAND IS GOING WELL."

12:58PM   13     A.   RIGHT.

12:58PM   14     Q.   AND WAS THAT YOUR UNDERSTANDING, THAT MS. HOLMES WAS GOING

12:59PM   15     TO THE CLEVELAND CLINIC?

12:59PM   16     A.   I DON'T RECALL.

12:59PM   17     Q.   OKAY.  FAIR ENOUGH.

12:59PM   18          LET'S GO UP TO THE NEXT EMAIL IN THE CHAIN.

12:59PM   19          JUST QUICKLY.  SHE ACKNOWLEDGES THIS AND OFFERS TO HAVE

12:59PM   20     YOU OUT TO CALIFORNIA AND SAYS THAT YOU'RE WELCOME THERE;

12:59PM   21     CORRECT?

12:59PM   22     A.   YES.

12:59PM   23     Q.   OKAY.  LET'S GO UP AND LOOK AT YOUR RESPONSE.

12:59PM   24          AND DO YOU SEE THERE'S A REFERENCE IN THE FIRST PARAGRAPH

12:59PM   25     ABOUT SETTING UP A MEETING WITH ANDREAS AND THE NIARCHOS

MOSLEY CROSS BY MR. WADE (RES.)                                      5326

12:59PM   1    FOUNDATION?

12:59PM   2    A.   YES.

12:59PM   3    Q.   AND SO YOU WERE WORKING WITH THOSE FOLKS TO GET SOMETHING

12:59PM   4    SET UP TO GO OUT TO CALIFORNIA?

12:59PM   5    A.   I WAS WORKING TO MAKE AN INTRODUCTION TO THEM SINCE THEY

12:59PM   6    HADN'T OBVIOUSLY BEEN INTRODUCED AT THE BDT CONFERENCE.

12:59PM   7    Q.   RIGHT.   RIGHT.   AND THEN IN THE NEXT SENTENCE -- I'M

01:00PM   8    SORRY, THE NEXT PARAGRAPH YOU NOTE THAT GREG PENNER IS WORKING

01:00PM   9    ON ANOTHER DATE WITH HIS TEAM AS WELL.

01:00PM  10        DO YOU SEE THAT?

01:00PM  11    A.   I DO SEE THAT.

01:00PM  12    Q.   AND YOU NOTE THAT JERRY TUBERGEN HAS A DATE WITH THE DEVOS

01:00PM  13    FAMILY; CORRECT?

01:00PM  14    A.   YES.

01:00PM  15    Q.   AND THEN IN THE NEXT SENTENCE YOU REFER TO THE COX FAMILY,

01:00PM  16    AND YOU DON'T KNOW IF THEY HAVE A DATE, BUT YOU'VE BEEN HAVING

01:00PM  17    SOME DISCUSSIONS WITH THE COX FAMILY ABOUT THERANOS; CORRECT?

01:00PM  18    A.   YEAH.

01:00PM  19    Q.   AND, AGAIN, I DON'T WANT TO KNOW THE SUBSTANCE.

01:00PM  20    A.   WELL, IT SAID I HAD A DISCUSSION ABOUT THEM COMING OUT TO

01:00PM  21    SEE ELIZABETH IN CALIFORNIA.

01:00PM  22    Q.   FAIR ENOUGH.

01:00PM  23        AND THEN YOU MENTION THAT YOU HAD ALSO, YOU SEE, TALKED

01:00PM  24    WITH DR. KISSINGER ABOUT A COUPLE OF OTHER FAMILIES --

01:01PM  25    A.   YES.

MOSLEY CROSS BY MR. WADE (RES.)                                        5327

01:01PM   1    Q.   -- WHO MIGHT BE INTERESTED IN INVESTING.

01:01PM   2         DO YOU SEE THAT?

01:01PM   3    A.   YES, I DO SEE THAT.

01:01PM   4    Q.   OKAY.  AND YOU MENTION WITHIN THERE THE POSSIBILITY THAT

01:01PM   5    YOU MIGHT SHARE A MEMO THAT YOU PREPARED?

01:01PM   6    A.   THAT'S THE MEMO THAT WE ALREADY DISCUSSED.

01:01PM   7    Q.   RIGHT.  AND YOU JUST WANTED TO ASSURE MS. HOLMES THAT IF

01:01PM   8    YOU WERE GOING TO DISCLOSE THE MEMO, THAT YOU'D GET A CDA

01:01PM   9    BEFORE YOU SHARED IT; CORRECT?

01:01PM  10    A.   THIS WAS A QUESTION ABOUT DR. KISSINGER SENDING THAT MEMO

01:01PM  11    ON TO OTHER FAMILIES.

01:01PM  12    Q.   RIGHT.  AND YOU WERE JUST --

01:01PM  13    A.   AND HE SAID -- HE HAD ASKED ME WHETHER I WAS COMFORTABLE

01:01PM  14    WITH IT.

01:01PM  15         AND THEN I SAID, YES, IF THEY FIRST HAD BEEN CLEARED BY

01:01PM  16    THERANOS AND ELIZABETH.

01:01PM  17    Q.   RIGHT.  AND AS YOU SIT HERE, YOU DON'T KNOW WHETHER HE

01:01PM  18    ACTUALLY COMMUNICATED THAT TO OTHER PEOPLE?

01:01PM  19    A.   I DON'T.

01:01PM  20    Q.   OKAY.  AND IF WE JUST GO UP THE CHAIN, THIS IS

01:02PM  21    SEPTEMBER 28TH, DO YOU SEE THERE'S A NOTE THAT GREG WAS GOING

01:02PM  22    TO BE GOING TO THERANOS THAT WEEK?

01:02PM  23    A.   YES.  THIS IS ELIZABETH TELLING ME THAT I GUESS SHE HAD

01:02PM  24    SET UP A TIME FOR GREG TO GO TO THERANOS THAT WEEK.

01:02PM  25    Q.   RIGHT.  AND THAT IS GREG PENNER YOU UNDERSTAND HER TO BE

MOSLEY CROSS BY MR. WADE (RES.)                                      5328

01:02PM  1    REFERRING TO?

01:02PM  2    A.   I UNDERSTOOD IT TO BE A REFERENCE TO GREG PENNER.

01:02PM  3    Q.   AND THEN JERRY WAS GOING TO BE SETTING UP A DATE SHORTLY

01:02PM  4    AS WELL.

01:02PM  5         DO YOU SEE THAT?

01:02PM  6    A.   THAT'S WHAT ELIZABETH SAID IN THE EMAIL, AND I UNDERSTOOD

01:02PM  7    THAT TO BE JERRY TUBERGEN.

01:02PM  8    Q.   OKAY.  IF I CAN NEXT DRAW YOUR ATTENTION ON VOLUME TWO TO

01:03PM  9    EXHIBIT 14149.

01:03PM 10    A.   I'M THERE.

01:03PM 11    Q.   DO YOU SEE THAT?

01:04PM 12         AND DO YOU RECOGNIZE THIS TO BE EMAIL CORRESPONDENCE IN

01:04PM 13    LATE SEPTEMBER BETWEEN YOU AND MS. HOLMES WITH RESPECT TO

01:04PM 14    THERANOS INVESTMENT MATTERS?

01:04PM 15    A.   YES, IT IS A SERIES OF EMAILS IN LATE SEPTEMBER.

01:04PM 16    Q.   I THINK WE LOST YOUR MIKE.  IF YOU COULD JUST PULL IT?

01:04PM 17    A.   I'M SORRY.

01:04PM 18         YES, IT IS -- IT DOES APPEAR TO BE A SERIES OF EMAILS

01:04PM 19    BETWEEN ME AND ELIZABETH, AND THEY ALL APPEAR TO BE SEPTEMBER

01:04PM 20    THE 25TH THROUGH SEPTEMBER THE 29TH.

01:04PM 21              MR. WADE:  MOVE THE ADMISSION OF 14149.

01:04PM 22              MR. SCHENK:  NO OBJECTION.

01:04PM 23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:04PM 24         (DEFENDANT'S EXHIBIT 14149 WAS RECEIVED IN EVIDENCE.)

01:04PM 25              MR. WADE:  IF WE CAN GO TO THE BOTTOM EMAIL ON THE

                        MOSLEY CROSS BY MR. WADE (RES.)                    5329

01:04PM   1    FIRST PAGE.

01:04PM   2              THE WITNESS:  YES.

01:05PM   3              MR. WADE:  AND BLOW THAT UP.

01:05PM   4    Q.   THIS IS AN EMAIL WHERE YOU'RE TRYING TO ARRANGE A TRIP FOR

01:05PM   5    MEMBERS OF THE NIARCHOS FOUNDATION TO MEET WITH MS. HOLMES?

01:05PM   6    A.   THAT'S CORRECT.

01:05PM   7    Q.   AND HER TEAM; CORRECT?

01:05PM   8    A.   YES.

01:05PM   9    Q.   OKAY.  AND THEN YOU SEE THAT MR. DRACOPOULOS --

01:05PM  10    A.   DRACOPOULOS.

01:05PM  11    Q.   DRACOPOULOS -- THANK YOU -- MAY NOT BE ABLE TO MAKE THE

01:05PM  12    TRIP, BUT IF NOT, HE'LL TRY TO DO IT ANOTHER TIME.

01:05PM  13         DO YOU SEE THAT?

01:05PM  14    A.   LET'S SEE.  LET'S SEE.  THAT WAS -- YES, IN THE, IN THE

01:06PM  15    SORT OF SECOND -- WELL, THE TOP EMAIL, OR NEXT TO THE TOP

01:06PM  16    EMAIL.

01:06PM  17    Q.   OKAY.  AND SO THE IDEA WAS THEN GOING TO BE THAT YOU WERE

01:06PM  18    GOING TO ATTEND THE MEETING WITH OTHER MEMBERS OF THE

01:06PM  19    FOUNDATION, AND YOU COULD LOOP BACK WITH MR. DRACOPOULOS?

01:06PM  20    A.   YES.

01:06PM  21    Q.   OKAY.  LET ME BRING YOU TO EXHIBIT 4221, WHICH IS IN

01:06PM  22    VOLUME ONE.

01:06PM  23         OH, I'M SORRY.  WRONG DOCUMENT.

01:06PM  24         14 -- GO BACK TO THE OTHER BINDER.  14 --

01:06PM  25    A.   BACK TO VOLUME ONE.

MOSLEY CROSS BY MR. WADE (RES.)                              5330

01:06PM   1     Q.   VOLUME TWO.  14124.

01:07PM   2     A.   I'M THERE.

01:07PM   3     Q.   AND THIS IS A COMMUNICATION IN EARLY OCTOBER OF 2014 WITH

01:07PM   4     RESPECT TO THERANOS INVESTMENT MATTERS; CORRECT?

01:07PM   5     A.   YES.

01:07PM   6     Q.   AND BETWEEN YOU AND MS. HOLMES; CORRECT?

01:07PM   7     A.   THAT'S CORRECT.

01:07PM   8     Q.   OKAY.

01:07PM   9          MOVE THE ADMISSION OF 14124.

01:07PM   10             MR. SCHENK:  NO OBJECTION.

01:07PM   11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:07PM   12         (DEFENDANT'S EXHIBIT 14124 WAS RECEIVED IN EVIDENCE.)

01:07PM   13    BY MR. WADE:

01:07PM   14    Q.   IF WE CAN START WITH THE EMAIL ON THE BOTTOM OF THE FIRST

01:07PM   15    PAGE.

01:07PM   16         YOU NOTE SHE SAYS, "I AM HAPPY THAT EACH OF THE POTENTIAL

01:08PM   17    INVESTORS FROM THE WALTON, COX, DEVOS, AND NIARCHOS FAMILIES

01:08PM   18    ARE PROCEEDING VERY WELL AS I WOULD EXPECT."

01:08PM   19         DO YOU SEE THAT?

01:08PM   20    A.   THAT'S WHAT I STATE, YES.

01:08PM   21    Q.   YEP.  AND THEN THERE'S SOME REFERENCES THERE, THERE'S AN

01:08PM   22    INDICATION THAT MR. PENNER BROUGHT YOU UP TO SPEED.

01:08PM   23         DO YOU SEE THAT?

01:08PM   24    A.   YES, I DO SEE IT.

01:08PM   25    Q.   AND DO YOU BELIEVE THAT YOU WERE HAVING TELEPHONIC

MOSLEY CROSS BY MR. WADE (RES.)                                    5331

01:08PM   1    COMMUNICATIONS WITH MR. PENNER?

01:08PM   2    A.   YOU KNOW, I'M SURE I TALKED TO HIM PERIODICALLY.

01:08PM   3    Q.   OKAY.  AND DO YOU SEE IT NOTES, THERE ARE A COUPLE OF OPEN

01:08PM   4    QUESTIONS THAT MR. PENNER HAD FLAGGED FOR YOU AND YOU INTENDED

01:08PM   5    TO RAISE THOSE WITH MS. HOLMES.

01:08PM   6         DO YOU SEE THAT?

01:08PM   7    A.   YES.

01:08PM   8    Q.   OKAY.  AS YOU SIT HERE TODAY, DO YOU RECALL WHAT THOSE

01:08PM   9    ISSUES WERE?

01:08PM   10   A.   I DON'T.

01:08PM   11   Q.   OKAY.  AND THEN THE NEXT PARAGRAPH MENTIONS THAT YOU WERE

01:08PM   12   AWARE THAT MR. TUBERGEN HAD SET THE MEETING IN PALO ALTO ON THE

01:09PM   13   14TH.

01:09PM   14        DO YOU SEE THAT?

01:09PM   15   A.   YEAH.

01:09PM   16   Q.   AND YOU NOTED THAT HE'S BRINGING SEVERAL FAMILY MEMBERS,

01:09PM   17   INCLUDING DOUG DEVOS, WHO IS THE CEO OF AMWAY; CORRECT?

01:09PM   18   A.   I SEE.

01:09PM   19   Q.   OKAY.  AND YOU HAD BEEN IN CONTACT WITH MR. TUBERGEN AS

01:09PM   20   WELL DURING THIS PERIOD?

01:09PM   21   A.   I'M ASSUMING JERRY TOLD ME THAT HE HAD SET UP THIS MEETING

01:09PM   22   FOR THE MEMBERS OF THE DEVOS FAMILY AND ELIZABETH.

01:09PM   23   Q.   OKAY.  AND THEN YOU NOTE THAT YOU'RE GOING TO SEE

01:09PM   24   MS. HOLMES ON THE 17TH WITH AT LEAST TWO MEMBERS OF THE

01:09PM   25   FOUNDATION?

MOSLEY CROSS BY MR. WADE (RES.)                                    5332

01:09PM   1    A.   TO INTRODUCE THE NIARCHOS FOUNDATION, YES.

01:09PM   2    Q.   AND THEN ON THE COX FAMILY, YOU GIVE A REPORT BACK ON THAT

01:09PM   3    MEETING.

01:09PM   4         DO YOU SEE THAT?

01:09PM   5    A.   I SAID, "IT SOUNDS LIKE YOU HAD A VERY GOOD MEETING WITH

01:10PM   6    ALEX TAYLOR."

01:10PM   7    Q.   RIGHT.  SO BY THE POINT OF THIS MEETING, THERE HAD ALREADY

01:10PM   8    BEEN A MEETING BETWEEN MS. HOLMES AND ALEX TAYLOR?

01:10PM   9    A.   I ASSUME THAT'S CORRECT.  I WASN'T KEPT UP TO SPEED ON ALL

01:10PM   10   THE MEETINGS, BUT THIS IS CERTAINLY AN INDICATION THAT I KNEW

01:10PM   11   ABOUT THAT MEETING.

01:10PM   12   Q.   AND AGAIN, WITHOUT REVEALING THE SUBSTANCE, THAT YOU HAD

01:10PM   13   BEEN IN COMMUNICATION WITH MR. TAYLOR ABOUT THE MEETING;

01:10PM   14   CORRECT?

01:10PM   15   A.   COULD YOU ASK THAT AGAIN?  I DIDN'T QUITE UNDERSTAND IT.

01:10PM   16   Q.   YEAH, I DON'T WANT THE SUBSTANCE OF THE COMMUNICATIONS

01:10PM   17   BECAUSE OF YOUR RELATIONSHIP.

01:10PM   18   A.   RIGHT.

01:10PM   19   Q.   BUT IN THIS TIME PERIOD YOU WERE IN COMMUNICATION WITH

01:10PM   20   MR. TAYLOR ABOUT THE THERANOS MATTERS; CORRECT?

01:10PM   21   A.   WELL, IT OBVIOUSLY -- IT WOULD APPEAR HE CERTAINLY TOLD ME

01:10PM   22   THAT HE HAD A GOOD MEETING WITH ELIZABETH.

01:10PM   23   Q.   AND DO YOU SEE IN THE EMAIL CHAIN ABOVE, MS. HOLMES JUST

01:10PM   24   GIVES YOU A REPORT BACK ON THE STATUS OF THESE CONTACTS AS WELL

01:11PM   25   AND THE FACT THAT SHE HAD BEEN IN COMMUNICATION WITH SOME OF

MOSLEY CROSS BY MR. WADE (RES.)                               5333

01:11PM  1    YOUR CLIENTS.

01:11PM  2        DO YOU SEE THAT?

01:11PM  3    A.  YES.

01:11PM  4    Q.  AND DO YOU RECALL THAT DURING THE -- THIS TIME PERIOD

01:11PM  5    THAT -- LET ME HAVE YOU LOOK AT 14125.

01:12PM  6        YOUR HONOR, I WOULD MOVE THE ADMISSION OF 14125 FOR THE

01:12PM  7    NONHEARSAY PURPOSE OF MY CLIENT'S STATE OF MIND, AND IN PART SO

01:12PM  8    THAT I CAN ALLOW THE WITNESS TO KNOW WHAT HE CAN TALK ABOUT

01:12PM  9    WITHOUT GOING INTO PRIVILEGE MATTERS.

01:12PM 10        (PAUSE IN PROCEEDINGS.)

01:12PM 11            MR. SCHENK:  FOUNDATION AND HEARSAY, YOUR HONOR.

01:12PM 12            THE COURT:  I'M NOT SURE I UNDERSTAND THE CONNECTION

01:12PM 13    THAT YOU JUST SPOKE TO, MR. WADE.

01:12PM 14            MR. WADE:  WELL, THE INVOLVEMENT OF MR. MOSLEY IN

01:12PM 15    THESE COMMUNICATIONS WITH HIS CLIENT IS KNOWN TO MS. HOLMES,

01:13PM 16    AND SO I OFFER THE DOCUMENT FOR THAT PURPOSE.

01:13PM 17        AS A PRACTICAL MATTER, I WOULD ASSUME THAT MR. MOSLEY

01:13PM 18    WOULD WANT TO BE CAUTIOUS ABOUT THE COMMUNICATIONS HE WAS

01:13PM 19    HAVING WITH MR. TAYLOR.

01:13PM 20        BUT TO THE EXTENT THAT THOSE COMMUNICATIONS ARE

01:13PM 21    COMMUNICATED BY MR. TAYLOR TO MS. HOLMES, I THINK HE COULD BE

01:13PM 22    COMFORTABLE DISCUSSING THEM WITHOUT CONCERN ABOUT PRIVILEGE.

01:13PM 23            THE COURT:  CAN YOU JUST ASK HIM QUESTIONS ABOUT IF

01:13PM 24    THIS GOES TO AN ISSUE ABOUT THE INVESTMENT OR AN ISSUE ABOUT

01:13PM 25    THE --

MOSLEY CROSS BY MR. WADE (RES.)                                    5334

01:13PM   1              MR. WADE:  YEAH, IT'S ALL ABOUT THE INVESTMENT.

01:13PM   2              THE COURT:  OKAY.  JUST ASK HIM QUESTIONS.

01:13PM   3              MR. WADE:  OKAY.

01:13PM   4    Q.   DO YOU RECALL THAT YOU WERE HAVING COMMUNICATIONS WITH

01:13PM   5    MR. TAYLOR FROM COX AND JOHN DYER ABOUT THE THERANOS INVESTMENT

01:13PM   6    IN EARLY OCTOBER 2014?

01:13PM   7    A.   YOU KNOW, I SUSPECT I HAD HAD ONE OR MORE CONVERSATIONS

01:13PM   8    WITH THEM.

01:13PM   9         I DON'T REALLY HAVE ANY PARTICULAR MEMORY OF IT OR

01:14PM  10    HONESTLY WHAT IT WAS REALLY ABOUT, BUT I SUSPECT I HAD SOME

01:14PM  11    CONVERSATIONS DURING THAT PERIOD.

01:14PM  12    Q.   AND DO YOU RECALL THAT MEMBERS OF THE COX FAMILY WANTED

01:14PM  13    YOU TO COME OUT AND PARTICIPATE IN THE MEETING WITH THEM AT

01:14PM  14    THERANOS?

01:14PM  15    A.   AT SOME POINT THEY DID SUGGEST AND ASK ME WHETHER I WAS

01:14PM  16    AVAILABLE TO ATTEND.

01:14PM  17    Q.   AND DO YOU RECALL THAT -- AND YOU DID, IN FACT, ATTEND;

01:14PM  18    CORRECT?

01:14PM  19    A.   YES, I DID.

01:14PM  20    Q.   OKAY.  AND DID A MEETING HAPPEN IN A CONFERENCE ROOM?

01:14PM  21    A.   I DON'T REMEMBER.

01:14PM  22    Q.   OKAY.  AND I GUESS WHAT I'M ASKING IS, WERE THE PARTIES

01:14PM  23    SITTING ACROSS FROM ONE ANOTHER HAVING A DISCUSSION?

01:14PM  24    A.   I CERTAINLY REMEMBER SITTING IN A CONFERENCE TABLE.

01:14PM  25    Q.   OKAY.  AND DO YOU REMEMBER WHETHER YOU WERE SITTING NEXT

MOSLEY CROSS BY MR. WADE (RES.)                              5335

01:14PM  1    TO MR. TAYLOR OR NEXT TO MS. HOLMES?

01:14PM  2    A.   I DON'T.

01:14PM  3    Q.   OKAY.  DO YOU RECALL ONE OF THE ISSUES THAT WAS -- SOME OF

01:15PM  4    THE ISSUES THAT WERE UNDER DISCUSSION WAS EXECUTION OF THE 2015

01:15PM  5    GROWTH PLAN?

01:15PM  6    A.   I DON'T SPECIFICALLY REMEMBER.

01:15PM  7    Q.   DO YOU RECALL AN AREA THAT YOU WERE INTERESTED IN

01:15PM  8    DISCUSSING WITH MR. TAYLOR WAS THE WALGREENS AND SAFEWAY

01:15PM  9    CONTRACTS AND THEIR TERMS, DURATION, AND REVENUE ISSUES?

01:15PM  10   A.   YOU KNOW, I DON'T.  I DON'T SPECIFICALLY REMEMBER.

01:15PM  11   Q.   DOES LOOKING AT 14125 REFRESH YOUR RECOLLECTION THAT THE

01:15PM  12   WALGREENS AND SAFEWAY EXECUTION IN 2015 WAS ONE OF THE ISSUES

01:16PM  13   THAT YOU WERE DISCUSSING WITH MR. TAYLOR IN OCTOBER OF 2014?

01:16PM  14   A.   I MEAN, THIS IS OBVIOUSLY AN EMAIL WHICH I WASN'T A PARTY

01:16PM  15   TO.  IT, IT DOESN'T SPECIFICALLY -- I DON'T HAVE ANY PARTICULAR

01:16PM  16   MEMORY OF THAT.

01:16PM  17   Q.   OKAY.  AND DOES LOOKING AT THIS EMAIL REFRESH YOUR

01:16PM  18   RECOLLECTION THAT THE WALGREENS AND SAFEWAY CONTRACTS IN THEIR

01:16PM  19   TERMS, DURATION, AND REVENUE SPLIT WERE ISSUES THAT YOU WERE

01:16PM  20   INTERESTED IN?

01:16PM  21   A.   UM, GIVEN THAT WALGREENS IN PARTICULAR WAS EXPECTED TO BE

01:16PM  22   A MAJOR SOURCE OF REVENUE, I WAS CERTAINLY INTERESTED IN IT.

01:16PM  23   Q.   OKAY.  AND DO YOU RECALL THAT THAT WAS AN ISSUE THAT YOU

01:17PM  24   WERE COMMUNICATING WITH MR. TAYLOR?

01:17PM  25   A.   I DON'T.

MOSLEY CROSS BY MR. WADE (RES.)                                5336

01:17PM   1    Q.   OKAY.  IF I CAN BRING YOU TO DOCUMENT 14151.

01:17PM   2         DO YOU HAVE THAT IN FRONT OF YOU?

01:17PM   3    A.   I DO.

01:17PM   4    Q.   AND DO YOU SEE THAT TO BE AN EMAIL BETWEEN YOU AND

01:18PM   5    MS. HOLMES ABOUT THERANOS INVESTMENT MATTERS IN OCTOBER OF

01:18PM   6    2014?

01:18PM   7    A.   THERE -- I THINK THERE ARE TWO EMAILS HERE, BUT THEY DO

01:18PM   8    SEEM -- CERTAINLY ABOUT THAT SUBJECT, YES.

01:18PM   9              MR. WADE:  MOVE THE ADMISSION OF 14151.

01:18PM  10              MR. SCHENK:  NO OBJECTION.

01:18PM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:18PM  12         (DEFENDANT'S EXHIBIT 14151 WAS RECEIVED IN EVIDENCE.)

01:18PM  13    BY MR. WADE:

01:18PM  14    Q.   AND I'M FOCUSSED JUST ON THE EMAIL ON THE TOP.

01:18PM  15    A.   OKAY.

01:18PM  16    Q.   THE WHOLE THING THERE.  THANK YOU.

01:18PM  17         AND DO YOU SEE HERE THAT YOU NOTE THAT YOU WERE PLANNING

01:18PM  18    TO MAKE A TRIP WITH ALEX TAYLOR ON FRIDAY, THE 10TH?

01:18PM  19         DO YOU SEE THAT?

01:18PM  20    A.   I DO SEE THAT.

01:18PM  21    Q.   AND THAT YOU WERE THEN GOING TO MAKE ANOTHER TRIP ON

01:19PM  22    OCTOBER THE 17TH WITH THE NIARCHOS FOUNDATION?

01:19PM  23    A.   I SEE THAT.

01:19PM  24    Q.   OKAY.  AND YOU DID, IN FACT, MAKE THOSE TRIPS ON THOSE

01:19PM  25    DATES; CORRECT?

MOSLEY CROSS BY MR. WADE (RES.)                          5337

01:19PM  1    A.  UM, I CAN'T -- YOU KNOW -- I ASSUME -- YOU'RE TELLING ME

01:19PM  2    IT WAS ON THE 10TH, FRIDAY WAS THE 10TH, THEN IT WAS FRIDAY THE

01:19PM  3    10TH.  BUT, YOU KNOW, I DON'T HAVE A CALENDAR IN FRONT OF ME.

01:19PM  4    Q.  I'M JUST INFERRING FROM FRIDAY IS ALSO THE 17TH.

01:19PM  5        DO YOU SEE THAT?

01:19PM  6    A.  OKAY.  THAT'S A FAIR INFERENCE.

01:19PM  7    Q.  IS IT A FAIR INFERENCE THAT THE PRIOR FRIDAY IS THE 10TH?

01:19PM  8    A.  I THINK SO.

01:19PM  9    Q.  OKAY.  AND YOU DID, IN FACT, ATTEND THOSE MEETINGS?

01:19PM 10    A.  YES, I DID.

01:19PM 11    Q.  OKAY.  AND LET'S GO TO -- DO YOU RECALL HOW LONG THE

01:19PM 12    MEETINGS WERE?

01:19PM 13    A.  I DON'T REMEMBER.

01:20PM 14    Q.  APPROXIMATELY?

01:20PM 15    A.  IT WAS CERTAINLY MORE THAN AN HOUR, MAYBE A COUPLE OF

01:20PM 16    HOURS.  I DON'T KNOW.  SOMETHING IN THAT RANGE.

01:20PM 17    Q.  OKAY.  AND DURING THAT THERE WAS DISCUSSION ABOUT A

01:20PM 18    VARIETY OF DIFFERENT THERANOS MATTERS?

01:20PM 19    A.  YES.

01:20PM 20    Q.  AND DO YOU HAVE ANY SPECIFIC RECOLLECTION OF WHAT WAS

01:20PM 21    DISCUSSED AS YOU SIT HERE TODAY?

01:20PM 22    A.  YOU KNOW, I DON'T.

01:20PM 23    Q.  AND DO YOU KNOW WHETHER YOU TOOK ANY NOTES DURING THOSE

01:20PM 24    MEETINGS?

01:20PM 25    A.  YOU KNOW, I HAVE A, I HAVE A NORMAL HABIT OF TAKING NOTES,

5338
MOSLEY CROSS BY MR. WADE (RES.)

01:20PM   1    SO I SUSPECT THAT I DID.  BUT I ALSO HAVE A NORMAL HABIT OF

01:20PM   2    THROWING AWAY MY NOTES.

01:20PM   3    Q.   OKAY.  FAIR ENOUGH.

01:20PM   4         IF I COULD GO TO THE ELMO FOR JUST A SECOND,

01:20PM   5    MS. KRATZMANN.

01:20PM   6         I JUST WANT TO ADD IN -- I BELIEVE WE SAID THE FIRST

01:20PM   7    MEETING WAS ON THE 10TH, AND THE NEXT MEETING WAS ON THE 17TH;

01:20PM   8    CORRECT?

01:20PM   9    A.   CORRECT.

01:20PM   10   Q.   IF I COULD DRAW YOUR ATTENTION TO 14152.

01:21PM   11        AND DO YOU SEE THAT TO BE AN EMAIL BETWEEN YOU AND

01:22PM   12   MS. HOLMES IN ADVANCE OF THE NIARCHOS FAMILY?

01:22PM   13   A.   ON THE 17TH?  YES.

01:22PM   14   Q.   OKAY.  AND YOU HAD SENT, YOU HAD SENT SOME QUESTIONS THAT

01:22PM   15   THEY HAD IN ADVANCE SO SHE COULD PREPARE FOR THE MEETING; IS

01:22PM   16   THAT RIGHT?

01:22PM   17   A.   I'M NOT SURE I SEE REFERENCES TO IT.  BUT IS THERE A

01:22PM   18   REFERENCE TO HAVING SENT SOMETHING TO HER IN ADVANCE?

01:22PM   19   Q.   DO YOU SEE THE ATTACHMENT ON THE NEXT PAGE?

01:22PM   20   A.   OH, YES, IT SAYS THERANOS QUESTIONS.

01:22PM   21        YEAH, SO I -- I'M ASSUMING I SENT THIS AND IT WAS PREPARED

01:22PM   22   BY, A LIST OF QUESTIONS PREPARED BY THEIR INVESTMENT STAFF,

01:23PM   23   WHICH INCLUDED THE COO, THE CHIEF INVESTMENT OFFICER, AND

01:23PM   24   ANOTHER MEMBER OF THE INVESTMENT GROUP.

01:23PM   25   Q.   OKAY.  AND THIS IS --

MOSLEY CROSS BY MR. WADE (RES.)                                    5339

01:23PM   1            I MOVE THE ADMISSION OF 14152.

01:23PM   2                 MR. SCHENK:  NO OBJECTION.

01:23PM   3                 THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:23PM   4            (DEFENDANT'S EXHIBIT 14152 WAS RECEIVED IN EVIDENCE.)

01:23PM   5       BY MR. WADE:

01:23PM   6       Q.   AND THIS IS THE COMMUNICATION.  YOU SEE THE REFERENCE TO

01:23PM   7       THOSE QUESTIONS THERE?

01:23PM   8       A.   YES.

01:23PM   9       Q.   AND THOSE HAD BEEN SHARED WITH YOU BY MEMBERS OF THE

01:23PM  10       NIARCHOS FOUNDATION; CORRECT?

01:23PM  11       A.   YES.

01:23PM  12       Q.   OKAY.

01:23PM  13       A.   THEY'RE CERTAINLY NOT QUESTIONS THAT I PUT TOGETHER.

01:23PM  14       Q.   OKAY.  IF YOU GO TO THE SECOND PAGE, YOU SEE A LIST OF

01:23PM  15       THOSE QUESTIONS; RIGHT?

01:23PM  16       A.   I DO.

01:23PM  17       Q.   OKAY.  LET'S GO BACK TO THE FIRST PAGE FOR JUST A SECOND.

01:23PM  18            DO YOU SEE THERE'S A REFERENCE THERE ACTUALLY AT THE START

01:23PM  19       OF THIS EMAIL TO A GREAT REPORT FROM JERRY TUBERGEN AFTER YOUR

01:23PM  20       MEETING, WHICH OBVIOUSLY WENT VERY WELL.

01:23PM  21            DO YOU SEE THAT?

01:23PM  22       A.   YES.

01:24PM  23       Q.   AND THAT MEETING WAS RIGHT AROUND THAT VERY TIME PERIOD;

01:24PM  24       RIGHT?

01:24PM  25       A.   I DON'T KNOW THE EXACT DATE OF THEIR MEETING.  YOU KNOW, I

                       MOSLEY CROSS BY MR. WADE (RES.)                      5340

01:24PM   1    WASN'T PRESENT AND DIDN'T HAVE ANY PART IN SETTING IT UP.

01:24PM   2    Q.   OKAY.  AND WITHOUT REVEALING THE SUBSTANCE, DO YOU RECALL

01:24PM   3    MR. TUBERGEN GIVING YOU A CALL TO GIVE YOU A REPORT?

01:24PM   4    A.   I DON'T RECALL SPECIFICALLY, BUT THIS WAS CERTAINLY AN

01:24PM   5    INDICATION THAT SAID I GOT A GREAT REPORT FROM JERRY, SO I

01:24PM   6    ASSUME THAT HE CALLED ME AND SAID WE HAD A NICE TIME.

01:24PM   7    Q.   UNDERSTOOD.  BUT BEYOND THAT --

01:24PM   8    A.   I DON'T SPECIFICALLY REMEMBER THE CALL.

01:24PM   9    Q.   UNDERSTOOD.

01:24PM  10         CAN I DRAW YOUR ATTENTION TO 14153?

01:24PM  11    A.   OKAY.

01:24PM  12    Q.   DO YOU SEE THAT TO BE ANOTHER EMAIL BETWEEN YOU AND

01:25PM  13    MS. HOLMES RELATING TO THE THERANOS INVESTMENT?

01:25PM  14    A.   IT LOOKS LIKE IT'S THREE EMAILS.

01:25PM  15    Q.   AN EMAIL CHAIN IN OCTOBER OF 2014?

01:25PM  16    A.   CORRECT.

01:25PM  17    Q.   OKAY.

01:25PM  18         MOVE THE ADMISSION OF 14153.

01:25PM  19              MR. SCHENK:  NO OBJECTION.

01:25PM  20              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM  21         (DEFENDANT'S EXHIBIT 14153 WAS RECEIVED IN EVIDENCE.)

01:25PM  22    BY MR. WADE:

01:25PM  23    Q.   AND IF WE GO TO THE TOP EMAIL THERE.

01:25PM  24         DO YOU SEE THAT YOU COMMUNICATE ABOUT SEEING MS. HOLMES ON

01:25PM  25    IT LOOKS LIKE OCTOBER 17TH, 2014?

MOSLEY CROSS BY MR. WADE (RES.)                                    5341

01:25PM   1      A.   I THINK THAT'S CORRECT.

01:25PM   2      Q.   AND YOU NOTE THAT ANDREAS IS UNABLE TO ATTEND?

01:25PM   3      A.   YES.

01:25PM   4      Q.   AND THEN YOU NOTE IN THE SECOND LINE, "FORTUNATELY,

01:26PM   5      ANDREAS TRUSTS MY JUDGMENT (AS WELL AS DR. KISSINGER'S) AND I

01:26PM   6      AM KEEPING HIM FULLY UP TO SPEED."

01:26PM   7          DO YOU SEE THAT?

01:26PM   8      A.   I DO SEE THAT.

01:26PM   9      Q.   OKAY.  SO YOU WERE GIVING BRIEFINGS TO MR. DRACOPOULOS

01:26PM  10      ABOUT WHAT WAS HAPPENING AT THESE MEETINGS?

01:26PM  11      A.   I HADN'T EVEN HAD THE MEETING YET, SO -- THIS WAS BEFORE

01:26PM  12      THE MEETING.

01:26PM  13      Q.   OKAY.  AND YOU SAY THAT "I AM KEEPING HIM FULLY UP TO

01:26PM  14      SPEED."

01:26PM  15          IS THAT WITH RESPECT TO THERANOS MATTERS GENERALLY?

01:26PM  16      A.   PROBABLY AT THIS POINT IT WAS ABOUT THE TIME OF THE

01:26PM  17      MEETING.

01:26PM  18      Q.   OKAY.  AND LET'S GO TO 2110.

01:26PM  19      A.   IS THAT IN THE OTHER VOLUME?

01:26PM  20      Q.   THAT SHOULD BE IN THE FRONT, TOWARD THE FRONT OF

01:26PM  21      VOLUME ONE, SIR.

01:27PM  22      A.   WHAT WAS THAT NUMBER AGAIN?

01:27PM  23      Q.   2110.

01:27PM  24      A.   OKAY.

01:27PM  25      Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND

| | | |
|---|---|---|
| 01:27PM | 1 | MS. HOLMES ON OCTOBER 21ST, 2014 RELATING TO THERANOS? |
| 01:27PM | 2 | A.   I DO. |
| 01:27PM | 3 | MR. WADE:  MOVE THE ADMISSION OF 2110. |
| 01:27PM | 4 | MR. SCHENK:  I BELIEVE IT WAS ADMITTED, YOUR HONOR. |
| 01:27PM | 5 | MR. WADE:  OH.  I STAND CORRECTED. |
| 01:27PM | 6 | THE COURT:  WOULD YOU LIKE IT PUBLISHED? |
| 01:27PM | 7 | MR. WADE:  I DON'T SEE IT AS ADMITTED.  MAYBE A |
| 01:28PM | 8 | DIFFERENT VERSION? |
| 01:28PM | 9 | MR. SCHENK:  NO OBJECTION. |
| 01:28PM | 10 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 01:28PM | 11 | (GOVERNMENT'S EXHIBIT 2110 WAS RECEIVED IN EVIDENCE.) |
| 01:28PM | 12 | BY MR. WADE: |
| 01:28PM | 13 | Q.   AND THIS IS JUST THE DATE OF THE EMAIL? |
| 01:28PM | 14 | DO YOU SEE THAT? |
| 01:28PM | 15 | AND DO YOU SEE THE REFERENCE, THE SUBJECT IS MEETING LAST |
| 01:28PM | 16 | FRIDAY? |
| 01:28PM | 17 | A.   I SEE THAT. |
| 01:28PM | 18 | Q.   AND THAT REFERS TO YOUR MEETING OF OCTOBER 17TH WITH THE |
| 01:28PM | 19 | NIARCHOS FOUNDATION? |
| 01:28PM | 20 | A.   I BELIEVE IT DOES. |
| 01:28PM | 21 | Q.   WITH MS. HOLMES AND THE NIARCHOS FOUNDATION? |
| 01:28PM | 22 | A.   YES, AND THE INVESTMENT PEOPLE FROM THE NIARCHOS |
| 01:28PM | 23 | FOUNDATION. |
| 01:28PM | 24 | Q.   AND DO YOU SEE IT STARTS IN THE SECOND PARAGRAPH THERE, IT |
| 01:28PM | 25 | SAYS, "OVER THE WEEKEND, I HAD A CHANCE TO FILL ANDREAS IN ON |

MOSLEY CROSS BY MR. WADE (RES.)                                    5343

01:28PM    1      THE MEETING."

01:28PM    2           DO YOU SEE THAT?

01:28PM    3      A.   I DO.

01:28PM    4      Q.   AND THAT'S MR. DRACOPOULOS?

01:28PM    5      A.   YES, IT IS.

01:28PM    6      Q.   OKAY.  AND IT NOTES THAT BEFORE YOU HAD A CHANCE TO FILL

01:28PM    7      HIM IN, HE STATED THAT HE THOUGHT SOME OF THE FOUNDATION

01:29PM    8      MEMBERS HAD SOME ISSUES OR SOMETHING.

01:29PM    9           DO YOU SEE THAT?

01:29PM   10      A.   YES.

01:29PM   11      Q.   AND DO YOU RECALL THAT SOME OF THE FOUNDATION MEMBERS

01:29PM   12      SEEMED TO BE FOCUSSED ON WHAT WERE TECHNICAL, CONSIDERED TO BE

01:29PM   13      SORT OF TECHNICAL ISSUES?

01:29PM   14      A.   I THINK THEY WANTED, YOU KNOW, WANTED TO BE ABLE TO GET

01:29PM   15      INTO A LOT MORE INFORMATION THAN THEY HAD AVAILABLE AT THE

01:29PM   16      TIME.

01:29PM   17      Q.   OKAY.  AND DO YOU SEE A COUPLE LINES DOWN THERE, HE SAYS,

01:29PM   18      "HE ASKED ME TO APOLOGIZE FOR NOT BEING THERE TO CUT THROUGH

01:29PM   19      THE NONSENSE"?

01:29PM   20      A.   YES.

01:29PM   21      Q.   AND HE THEN -- LATER IN THE EMAIL, OR IN THE -- YEAH, THAT

01:29PM   22      PARAGRAPH RIGHT THERE.  IF WE CAN BLOW THAT UP.

01:29PM   23           YOU SAY IN THE SECOND SENTENCE, "HOWEVER, ANDREAS WANTED

01:29PM   24      ME TO ASK IF YOU WOULD BE AGREEABLE TO HIS MAKING A PERSONAL

01:30PM   25      INVESTMENT OF $25 MILLION."

                              5344
                  MOSLEY CROSS BY MR. WADE (RES.)

01:30PM   1          DO YOU SEE THAT?

01:30PM   2     A.   I DO SEE THAT.

01:30PM   3     Q.   AND NOTES THAT HE CAN CLOSE BY THE END OF THE MONTH.

01:30PM   4          DO YOU SEE THAT?

01:30PM   5     A.   I DO SEE THAT.

01:30PM   6     Q.   AND SO MR. DRACOPOULOS WAS MAKING THIS INVESTMENT DECISION

01:30PM   7     WITHOUT HAVING VISITED THERANOS; CORRECT?

01:30PM   8     A.   HE HAD OBVIOUSLY DEBRIEFED WITH HIS INVESTMENT TEAM AND

01:30PM   9     OBVIOUSLY, AS STATED IN THE FIRST PARAGRAPH, STATED THAT HE

01:30PM  10     DIDN'T THINK THAT THEY WERE GOING TO GET TO THE POINT WHERE THE

01:30PM  11     FOUNDATION WOULD BE COMFORTABLE INVESTING.

01:30PM  12          BUT THEN HE OBVIOUSLY ASKED ME IF I WOULD ASK ELIZABETH,

01:30PM  13     WOULD SHE BE COMFORTABLE TAKING A $25 MILLION INVESTMENT FROM

01:30PM  14     HIM PERSONALLY.

01:30PM  15     Q.   RIGHT.  AND YOU RECALL THAT YOU, IN THE PRIOR EMAIL, YOU

01:30PM  16     HAD COMMITTED TO KEEPING -- YOU TOLD MS. HOLMES THAT YOU WERE

01:30PM  17     KEEPING HIM FULLY BRIEFED ON WHAT WAS GOING ON?

01:30PM  18     A.   WE DISCUSSED THAT THAT WAS BEFORE THE MEETING --

01:31PM  19     Q.   YES.

01:31PM  20     A.   -- AND SO I THINK THE ONLY THING I WAS KEEPING HIM BRIEFED

01:31PM  21     ON WAS THAT WE WERE GOING TO HAVE A MEETING.

01:31PM  22     Q.   WELL, YOU SAID HE TRUSTED YOUR JUDGMENT; RIGHT?

01:31PM  23     A.   HE'D BEEN A LONG-TERM CLIENT OF MINE.

01:31PM  24     Q.   OKAY.  AND SO DID YOU ENCOURAGE HIM TO MAKE THE

01:31PM  25     INVESTMENT?

MOSLEY CROSS BY MR. WADE (RES.)                                5345

01:31PM  1    A.   I DID NOT.

01:31PM  2    Q.   OKAY.  IF YOU, IF YOU GO DOWN, YOU SEE THE PARAGRAPH

01:31PM  3    STARTING "JERRY TUBERGEN"?

01:31PM  4    A.   YES.

01:31PM  5    Q.   AND AT THIS POINT, OCTOBER 21ST, 2014, YOU LEARNED THAT

01:31PM  6    THERE WAS AN AGREEMENT FOR THEM TO INVEST $100 MILLION;

01:31PM  7    CORRECT?

01:31PM  8    A.   WELL, I SAY THAT JERRY SENT ME AN EMAIL OBVIOUSLY THAT

01:31PM  9    THEY HAD, BETWEEN ELIZABETH AND JERRY, AGREED TO A $100 MILLION

01:31PM  10   INVESTMENT, YES.

01:31PM  11   Q.   RIGHT.  AND YOU WERE RELAYING THAT THEY WERE EXCITED ABOUT

01:31PM  12   IT; RIGHT?

01:31PM  13   A.   YES, THAT THEY WERE VERY EXCITED.

01:31PM  14   Q.   AND THEN YOU ALSO GAVE AN UPDATE ON THE WALTON INVESTMENT

01:32PM  15   IN THAT SAME PARAGRAPH.

01:32PM  16        DO YOU SEE THAT?

01:32PM  17   A.   I THINK ALL I SAY IS, YOU KNOW, AS I SAID, THERE WERE -- I

01:32PM  18   THINK GREG AND HIS TEAM WERE LOOKING AT THE COMPANY, AND ALL I

01:32PM  19   SAY IS THAT I SPOKE WITH GREG AND UNDERSTAND THE WAL-MART GROUP

01:32PM  20   IS NOT COMING UNTIL THE 29TH.

01:32PM  21        I DON'T THINK I GIVE ANY OTHER INFORMATION OTHER THAN

01:32PM  22   THAT.

01:32PM  23   Q.   RIGHT.  AND THAT THEY MIGHT MAKE AN INVESTMENT AFTER THE

01:32PM  24   FIRST CLOSING AT THE END OF OCTOBER; RIGHT?

01:32PM  25   A.   IT SAYS WITH THE POSSIBILITY OF THEIR COMING IN AFTER YOUR

MOSLEY CROSS BY MR. WADE (RES.)                              5346

01:32PM   1    FIRST CLOSING, YES, I SAY THAT.

01:32PM   2    Q.   OKAY.  AND I THINK MR. SCHENK HAD SHOWN YOU THIS EMAIL ON

01:32PM   3    DIRECT EXAMINATION, BECAUSE IN THIS EMAIL YOU ALSO COMMUNICATED

01:32PM   4    YOUR HOPE TO INVEST $6 MILLION; RIGHT?

01:32PM   5    A.   YES.

01:32PM   6    Q.   OKAY.  AND THIS IS WHEN YOU COMMUNICATED THAT HOPE TO

01:32PM   7    MS. HOLMES; CORRECT?

01:32PM   8    A.   THAT IS CORRECT.

01:32PM   9    Q.   OKAY.

01:33PM  10            MR. WADE:  YOUR HONOR, I DON'T RECALL WHEN YOU SAID

01:33PM  11    WE WERE GOING TO TAKE A BREAK.

01:33PM  12            THE COURT:  YOU SAID THAT WE WERE GOING TO FINISH

01:33PM  13    WITH THIS WITNESS BY THE END OF TODAY.

01:33PM  14            MR. WADE:  YEAH, I THINK MY HOPE IS THAT WE WILL BE

01:33PM  15    IN A POSITION TO DO THAT.

01:33PM  16            THE COURT:  AND WHEN YOU SAY "WE," THAT MEANT YOU

01:33PM  17    AND THE GOVERNMENT AND THE GOVERNMENT'S REDIRECT AND RECROSS

01:33PM  18    THAT NEEDED TO BE ACCOMPLISHED.

01:33PM  19        ARE WE STILL ON TASK FOR THAT?

01:33PM  20            MR. WADE:  YEAH.  MY HOPE IS THAT WE ARE, YEAH.

01:33PM  21            THE COURT:  ALL RIGHT.  SO LET'S TAKE OUR RECESS

01:33PM  22    NOW, LADIES AND GENTLEMEN.  30 MINUTES, LADIES AND GENTLEMEN,

01:33PM  23    30 MINUTES, PLEASE.

01:33PM  24            (LUNCH RECESS TAKEN AT 1:33 P.M.)

         25

MOSLEY CROSS BY MR. WADE (RES.)                        5347

```
01:33PM    1                      AFTERNOON SESSION

02:05PM    2              (JURY IN AT 2:05 P.M.)

02:05PM    3                  THE COURT:  PLEASE BE SEATED.  OUR JURY IS PRESENT

02:05PM    4      AND ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

02:05PM    5              OUR WITNESS WILL BE HERE IN JUST A MOMENT.

02:05PM    6              (PAUSE IN PROCEEDINGS.)

02:05PM    7                  THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

02:05PM    8              MR. MOSLEY IS ON THE STAND.

02:05PM    9              YOU'D LIKE TO CONTINUE WITH YOUR EXAMINATION, MR. WADE?

02:05PM   10                  MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU.

02:05PM   11      Q.   MR. MOSLEY, IF I COULD DRAW YOUR ATTENTION TO

02:06PM   12      EXHIBIT 14169.

02:06PM   13      A.   IS THAT IN VOLUME TWO?

02:06PM   14      Q.   IT IS, SIR.

02:06PM   15                  THE CLERK:  THAT EXHIBIT NUMBER AGAIN, COUNSEL,

02:06PM   16      PLEASE?

02:06PM   17                  MR. WADE:  14169.

02:06PM   18                  THE CLERK:  THANK YOU.

02:06PM   19                  THE WITNESS:  OKAY.

02:06PM   20      BY MR. WADE:

02:06PM   21      Q.   DO YOU HAVE THAT IN FRONT OF YOU?

02:06PM   22      A.   I DO.

02:06PM   23      Q.   AND DO YOU SEE IN THIS EMAIL IN NOVEMBER OF 2014 YOU WERE

02:07PM   24      TRANSMITTING A CONFIDENTIAL DISCLOSURE AGREEMENT RELATING TO

02:07PM   25      THERANOS FROM MR. HANK SLACK TO MS. HOLMES?
```

MOSLEY CROSS BY MR. WADE (RES.)                                      5348

| | | |
|---|---|---|
| 02:07PM | 1 | A.   YES, YES IT IS. |
| 02:07PM | 2 | MR. WADE:  I MOVE THE ADMISSION OF 14169. |
| 02:07PM | 3 | MR. SCHENK:  NO OBJECTION. |
| 02:07PM | 4 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:07PM | 5 | (DEFENDANT'S EXHIBIT 14169 WAS RECEIVED IN EVIDENCE.) |
| 02:07PM | 6 | BY MR. WADE: |
| 02:07PM | 7 | Q.   IF WE CAN FOCUS -- THIS IS, AGAIN, NOVEMBER 19TH, 2014. |
| 02:07PM | 8 | DO YOU SEE THAT? |
| 02:07PM | 9 | A.   YES. |
| 02:07PM | 10 | Q.   AND IF WE CAN FOCUS ON THE FIRST SENTENCE IN THE SECOND |
| 02:07PM | 11 | PARAGRAPH. |
| 02:07PM | 12 | HERE YOU CONVEY TO MS. HOLMES THAT MR. SLACK HAD MENTIONED |
| 02:08PM | 13 | TO YOU THAT HE SAW MS. HOLMES SPEAK AT THE BDT CONFERENCE. |
| 02:08PM | 14 | DO YOU RECALL THAT? |
| 02:08PM | 15 | A.   THAT'S WHAT IT SAYS, YES. |
| 02:08PM | 16 | Q.   OKAY.  AND YOU'RE GIVING THIS AS BACKGROUND TO HER SO |
| 02:08PM | 17 | SHE'S AWARE OF IT IN ADVANCE OF ANY COMMUNICATIONS SHE MAY HAVE |
| 02:08PM | 18 | WITH MR. SLACK? |
| 02:08PM | 19 | A.   YES. |
| 02:08PM | 20 | Q.   OKAY. |
| 02:08PM | 21 | A.   I GUESS. |
| 02:08PM | 22 | Q.   OKAY.  AND AGAIN, MR. SLACK IS A REPRESENTATIVE OF THE |
| 02:08PM | 23 | OPPENHEIMER FAMILY? |
| 02:08PM | 24 | A.   HE IS A, YOU KNOW -- NEVER BEEN A CLIENT OF MINE, AND I |
| 02:08PM | 25 | DON'T KNOW HANK VERY WELL, BUT HE WAS A MEMBER OF THE |

MOSLEY CROSS BY MR. WADE (RES.)                                    5349

02:08PM   1      OPPENHEIMER FAMILY.  I THINK HE'S DIVORCED FROM HIS SPOUSE, WHO

02:08PM   2      WAS THE MEMBER OF THE FAMILY.  SO I DON'T KNOW WHETHER THAT

02:08PM   3      MAKES HIM A MEMBER OF THE FAMILY OR NOT.

02:08PM   4      Q.   AND HE WAS ALSO A FRIEND OF DR. KISSINGER'S; CORRECT?

02:08PM   5      A.   YES, HE WAS.

02:08PM   6      Q.   OKAY.  AND IF WE CAN GO TO 14168.

02:09PM   7           DO YOU HAVE THAT STRING OF EMAILS IN FRONT OF YOU, SIR?

02:09PM   8      A.   I DO.

02:09PM   9      Q.   AND DO YOU SEE THAT WITHIN THIS EMAIL YOU'RE PROVIDING

02:09PM  10      MS. HOLMES WITH AN INTRODUCTION TO MR. SLACK AND VICE VERSA?

02:09PM  11      A.   YES.

02:09PM  12              MR. WADE:  MOVE THE ADMISSION OF 14168.

02:09PM  13              MR. SCHENK:  YOUR HONOR, OBJECTION.  RELEVANCE BASED

02:09PM  14      ON THE DATE.

02:09PM  15              MR. WADE:  I THINK IT'S RELEVANT WITHIN THE BROADER

02:09PM  16      COUNT ONE, YOUR HONOR.

02:09PM  17              THE COURT:  BROADER COUNT ONE?

02:10PM  18              MR. WADE:  WITHIN THE DURATION OF COUNT ONE.  I'D BE

02:10PM  19      HAPPY TO APPROACH AND EXPLAIN IT TO THE COURT.

02:10PM  20         I DON'T HAVE MANY QUESTIONS ON THIS.

02:10PM  21              THE COURT:  WHY DON'T YOU MOVE ON TO SOMETHING ELSE,

02:10PM  22      AND THEN WE'LL SAVE THIS UNTIL THE END OF YOUR EXAMINATION, IF

02:10PM  23      YOU CAN.

02:10PM  24         CAN YOU DO THAT?

02:10PM  25              MR. WADE:  SURE.

MOSLEY CROSS BY MR. WADE (RES.)                                    5350

02:10PM   1         WELL, I HAVE TWO MORE DOCUMENTS THAT ARE SIMILAR TO THIS

02:10PM   2    THAT PROBABLY RAISE THE SAME ISSUE.

02:10PM   3              THE COURT:  THE SAME TIME PERIOD?

02:10PM   4              MR. WADE:  YEAH.  FOR THE COURT'S BENEFIT, 14138 AND

02:10PM   5    14139, AND FOR COUNSEL'S BENEFIT.

02:10PM   6              THE COURT:  LET ME TAKE A LOOK AT THOSE.

02:11PM   7         (PAUSE IN PROCEEDINGS.)

02:11PM   8              THE COURT:  MR. SCHENK, DO YOU WANT TO BE HEARD ON

02:11PM   9    THE OTHERS?

02:11PM  10              MR. SCHENK:  SAME OBJECTION, I THINK.

02:11PM  11              THE COURT:  IS IT POSSIBLE FOR YOU TO CONTINUE YOUR

02:11PM  12    EXAMINATION ON OTHER TOPICS AND THEN WE CAN TAKE A BREAK AND

02:11PM  13    TALK ABOUT THESE?

02:11PM  14              MR. WADE:  SURE.

02:11PM  15              THE COURT:  I JUST DON'T WANT TO DISRUPT THINGS.

02:11PM  16              MR. WADE:  UNDERSTOOD, YOUR HONOR.

02:12PM  17    Q.   MR. MOSLEY, DO YOU RECALL GIVING TESTIMONY ON DIRECT

02:12PM  18    EXAMINATION WITH RESPECT TO THAT SIDE LETTER THAT YOU

02:12PM  19    NEGOTIATED RELATING TO THE REDEMPTION ISSUE?

02:12PM  20    A.   YES, I DO.

02:12PM  21    Q.   AND IT WAS -- IF WE CAN JUST GO QUICKLY TO DOCUMENT 2172.

02:12PM  22    A.   IS THAT IN VOLUME ONE?

02:12PM  23    Q.   IT SHOULD BE, YES, OR IT'S IN THE GOVERNMENT'S BINDER.

02:12PM  24    WHICHEVER IS EASIER FOR YOU, SIR.

02:12PM  25    A.   OH, I'VE GOT THE GOVERNMENT'S BINDER RIGHT HERE, SO IF YOU

MOSLEY CROSS BY MR. WADE (RES.)                                    5351

02:12PM   1        COULD GIVE ME THE CITE, THE --

02:12PM   2        Q.   2172, PLEASE.

02:12PM   3        A.   OKAY.  I HAVE IT.

02:12PM   4        Q.   AND IT'S IN EVIDENCE.  I HAVE IT ON THE SCREEN.  IT'S JUST

02:13PM   5        A PARAGRAPH DOCUMENT IF THAT'S EASIER.

02:13PM   6        A.   OKAY, I HAVE IT.

02:13PM   7        Q.   OKAY.  DO YOU SEE THAT DOCUMENT?

02:13PM   8        A.   YES.

02:13PM   9        Q.   AND THIS IS ACTUALLY LANGUAGE THAT YOU PROPOSED TO

02:13PM  10        MS. HOLMES OR TO THE COMPANY.

02:13PM  11             DO YOU RECALL THAT?

02:13PM  12        A.   I DO NOT RECALL HAVING PROPOSED THIS LANGUAGE.  IT'S

02:13PM  13        POSSIBLE, BUT I DON'T RECALL THAT.

02:13PM  14        Q.   OKAY.  AND YOU SEE THE REFERENCE IN THAT FIRST SENTENCE

02:13PM  15        WHERE IT REFERS TO A CONFIRMATION WHICH YOUR CLIENTS ARE

02:13PM  16        SUBSCRIBING.

02:13PM  17             DO YOU SEE THE LANGUAGE RELATING TO YOUR CLIENTS?

02:13PM  18        A.   I DO SEE THAT.

02:13PM  19        Q.   AND I THINK YOU TALKED BEFORE ABOUT THIS WAS SOMETHING

02:13PM  20        THAT HAD COME UP IN CONNECTION WITH SOME OF YOUR CLIENTS, AS

02:13PM  21        WELL AS YOU PERSONALLY; CORRECT?

02:13PM  22        A.   I'M NOT SURE IT EVER CAME UP.  YOU KNOW, OBVIOUSLY MY

02:13PM  23        CLIENTS HAD A LOT OF DEALINGS WITH THE COMPANY AND ELIZABETH

02:13PM  24        THAT I WASN'T A PARTY TO.

02:13PM  25             I DON'T KNOW WHETHER IT EVER CAME UP FROM A CLIENT.

MOSLEY CROSS BY MR. WADE (RES.)                                      5352

02:13PM  1        IT CERTAINLY CAME UP IN MY OWN PERSONAL LOOK AT THE

02:14PM  2   COMPANY.

02:14PM  3   Q.   OKAY.  IN ANY EVENT, YOU RECALL, AS YOU'RE NEGOTIATING

02:14PM  4   THIS, THIS WAS SOMETHING THAT WAS BEING ADDRESSED ON BEHALF OF

02:14PM  5   ALL OF YOUR CLIENTS; RIGHT?

02:14PM  6   A.   I, I ASKED FOR IT FOR MYSELF PERSONALLY, AND I'M NOT SURE

02:14PM  7   WHETHER ANY -- I DON'T THINK ANY OF MY CLIENTS INVESTED, AND I

02:14PM  8   DIDN'T KNOW WHETHER THEY WOULD.

02:14PM  9        BUT AS A LAWYER WITH A DUTY TO CLIENTS, I WANTED TO BE

02:14PM 10   SURE THAT IF I OBTAINED THE BENEFIT OF A PROVISION SUCH AS THIS

02:14PM 11   ON MY PERSONAL BEHALF, THAT IT WOULD ALSO APPLY TO ANY OF MY

02:14PM 12   CLIENTS THAT MIGHT HAPPEN TO ALSO INVEST.

02:14PM 13   Q.   OKAY.  BECAUSE YOU UNDERSTOOD THAT YOU HAD CERTAIN ETHICAL

02:14PM 14   OBLIGATIONS WITH RESPECT TO YOUR CLIENTS; IS THAT RIGHT?

02:14PM 15   A.   SITTING HERE, I DON'T KNOW WHETHER IT WOULD BE COVERED BY

02:14PM 16   ETHICAL OBLIGATIONS.

02:14PM 17        BUT IT WOULD CERTAINLY BE COVERED BY THE WAY THAT I FELT

02:14PM 18   ABOUT MY CLIENTS.

02:14PM 19   Q.   OKAY.  AND DO YOU RECALL IN YOUR DIRECT TESTIMONY YOU WERE

02:15PM 20   ALSO ASKED WHETHER YOU ENCOURAGED ANY OF YOUR CLIENTS TO INVEST

02:15PM 21   AND YOU SAID THAT YOU HAD NOT?

02:15PM 22   A.   THAT'S CORRECT.

02:15PM 23   Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO PAGE --

02:15PM 24   DOCUMENT 14135.

02:15PM 25   A.   OKAY.

UNITED STATES COURT REPORTERS

ER-8972

MOSLEY CROSS BY MR. WADE (RES.)                                  5353

02:15PM  1    Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:15PM  2    A.   I DO.

02:15PM  3    Q.   AND DO YOU RECALL IN CONNECTION WITH THIS REDEMPTION

02:15PM  4    RIGHTS ISSUE THAT YOU WERE DEALING WITH THE BOIES,

02:15PM  5    DAVID BOIES'S LAW FIRM?

02:15PM  6    A.   I DO REMEMBER HAVING CONVERSATIONS AND DEALING WITH DAVID

02:15PM  7    ON THIS ISSUE.

02:15PM  8    Q.   AND ALSO WITH HIS SON, CHRIS BOIES?

02:16PM  9         DO YOU RECALL THAT?

02:16PM  10   A.   I THINK I DO REMEMBER HAVING SOME INTERACTION WITH

02:16PM  11   CHRIS BOIES AS WELL.

02:16PM  12   Q.   AND THEY WERE INVOLVED IN WORKING WITH YOU TO FIND THE

02:16PM  13   LANGUAGE THAT WOULD ADDRESS YOUR CONCERN; CORRECT?

02:16PM  14   A.   YES.

02:16PM  15   Q.   OKAY.  AND THIS EMAIL RELATES TO THAT ISSUE; CORRECT?

02:16PM  16   A.   WELL, THERE ARE A NUMBER OF -- WHICH PARTICULAR EMAIL ARE

02:16PM  17   YOU REFERRING TO?

02:16PM  18   Q.   THIS STRING OF EMAILS RELATES TO THAT ISSUE; IS THAT

02:16PM  19   CORRECT?

02:16PM  20   A.   YEAH, IT CERTAINLY APPEARS THAT THESE, ALL OF THESE EMAILS

02:16PM  21   RELATE TO THAT QUESTION.

02:16PM  22          MR. WADE:  MOVE THE ADMISSION OF 14135.

02:16PM  23          MR. SCHENK:  NO OBJECTION.

02:16PM  24          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:16PM  25          (DEFENDANT'S EXHIBIT 14135 WAS RECEIVED IN EVIDENCE.)

MOSLEY CROSS BY MR. WADE (RES.)                                    5354

02:16PM   1              MR. WADE:  AND IF WE CAN BLOW UP THE EMAIL, YOUR

02:16PM   2    EMAIL ON OCTOBER 30TH.

02:17PM   3    Q.   DO YOU SEE THAT?

02:17PM   4         AND THIS IS AN EMAIL WITH RESPECT TO WHETHER OR NOT THAT

02:17PM   5    ISSUE IS GOING TO BE GIVEN UP BY THE COMPANY; CORRECT?

02:17PM   6    A.   YES, IT IS, CORRECT.

02:17PM   7    Q.   AND YOU WRITE, "I AM MORE THAN OKAY WITH THIS AND HOPE

02:17PM   8    ELIZABETH DOES NOT THINK IT IS NECESSARY."

02:17PM   9         DO YOU SEE THAT?

02:17PM  10    A.   I DO SEE IT.

02:17PM  11    Q.   AND YOU WRITE, "IF I DID NOT HAVE DEEP TRUST AND FAITH IN

02:17PM  12    ELIZABETH, I WOULD NOT BE INVOLVED WITH THERANOS AND

02:17PM  13    RECOMMENDING AN INVESTMENT BY MY CLIENTS."

02:17PM  14    A.   I SEE THAT.

02:17PM  15    Q.   BLESS YOU.

02:17PM  16              THE REPORTER:  THANK YOU.

02:17PM  17              THE COURT:  IT SAYS "CLIENTS."  IT DIDN'T SAY "BY MY

02:17PM  18    CLIENTS."

02:17PM  19              MR. WADE:  SORRY.  THANK YOU.

02:17PM  20    Q.   YOU SEE IT IS "BY CLIENTS."  THE COURT HAS THE BENEFIT OF

02:18PM  21    THE TRANSCRIPT.

02:18PM  22    A.   THAT'S CORRECT.

02:18PM  23    Q.   AND BY "CLIENTS," DID YOU MEAN BY YOUR CLIENTS?

02:18PM  24    A.   I PROBABLY MEANT THAT.

02:18PM  25    Q.   OKAY.  THE -- YOU HAD SOME OTHER CONVERSATIONS WITH

MOSLEY CROSS BY MR. WADE (RES.)                                      5355

02:18PM   1        MR. BOIES RELATING TO THERANOS; CORRECT?

02:18PM   2    A.   YES, I BELIEVE I DID.

02:18PM   3    Q.   AND JUST FOR CONTEXT, DAVID BOIES IS A PROMINENT LAWYER;

02:18PM   4    CORRECT?

02:18PM   5    A.   YES, HE IS.

02:18PM   6    Q.   HE WAS, HE WAS ACTUALLY A PARTNER AT YOUR LAW FIRM FOR A

02:18PM   7    COUPLE OF DECADES; RIGHT?

02:18PM   8    A.   YES.

02:18PM   9    Q.   AND AT SOME POINT HE LEFT YOUR LAW FIRM, CRAVATH, AND

02:18PM   10   STARTED HIS OWN LAW FIRM?

02:18PM   11   A.   THAT'S CORRECT.

02:18PM   12   Q.   AND YOU CAME TO LEARN THAT HE WAS REPRESENTING THERANOS;

02:18PM   13   CORRECT?

02:19PM   14   A.   I DID.

02:19PM   15   Q.   AND IN CONNECTION WITH THIS, WITH YOUR DEALINGS WITH

02:19PM   16   THERANOS, YOU HAD A COUPLE OCCASIONS TO INTERACT WITH MR. BOIES

02:19PM   17   ON THERANOS MATTERS?

02:19PM   18   A.   YES.

02:19PM   19   Q.   IS THAT RIGHT?

02:19PM   20   A.   I BELIEVE -- YES.

02:19PM   21   Q.   AND IN ADVANCE OF YOUR INVESTMENT, YOU -- AND IN THE

02:19PM   22   SUMMER OF 2014, YOU CONTACTED MR. BOIES; CORRECT?

02:19PM   23   A.   I CERTAINLY CONTACTED HIM.  I DON'T REMEMBER THE EXACT

02:19PM   24   TIMING.

02:19PM   25   Q.   OKAY.  AND DO YOU RECALL THAT YOU CONTACTED HIM BECAUSE

MOSLEY CROSS BY MR. WADE (RES.)                        5356

```
02:19PM   1    YOU WANTED TO GET A LITTLE BIT OF HIS READ ON THE COMPANY?

02:19PM   2    A.   YES.

02:19PM   3    Q.   BECAUSE YOU HAD KNOWN MR. BOIES FOR DECADES?

02:19PM   4    A.   YES.

02:20PM   5    Q.   MAYBE 30 YEARS OR SO?

02:20PM   6    A.   WELL, I BECAME A PARTNER AT CRAVATH IN 1987, AND I DON'T

02:20PM   7    REMEMBER -- AND DAVID WAS ALREADY A PARTNER AT THAT TIME, SO I

02:20PM   8    KNEW HIM FROM 1987 ON.

02:20PM   9    Q.   OKAY.

02:20PM  10    A.   AND I PROBABLY KNEW HIM BEFORE I WAS PARTNER.

02:20PM  11    Q.   UNDERSTOOD.  SO YOU HAD KNOWN HIM FOR A LONG, LONG TIME?

02:20PM  12    A.   I HAD KNOWN HIM FOR A LONG TIME.

02:20PM  13    Q.   OKAY.  AND YOU RECALL THAT -- WELL, YOU MAY NOT KNOW AT

02:20PM  14    THE TIME, BUT YOU CALLED HIM TO GET HIS TAKE ON THE COMPANY IN

02:20PM  15    ADVANCE OF MAKING AN INVESTMENT PERSONALLY?

02:20PM  16    A.   YES, I DID.

02:20PM  17    Q.   AND WHEN YOU DID THAT, MR. BOIES TOLD YOU THAT HE THOUGHT

02:20PM  18    THAT THE TECHNOLOGY THE COMPANY HAD DEVELOPED WAS GOOD;

02:20PM  19    CORRECT?

02:20PM  20    A.   YES.

02:20PM  21    Q.   AND -- BUT HE THOUGHT THAT THE LARGEST RISK THAT THE

02:20PM  22    COMPANY FACED WAS WITH RESPECT TO THE ROLLOUT OF THE COMPANY;

02:20PM  23    CORRECT?

02:20PM  24    A.   HE DID TELL ME THAT, YES.

02:21PM  25    Q.   OKAY.  AND DO YOU RECALL -- AND YOU DON'T RECALL WHEN HE
```

MOSLEY CROSS BY MR. WADE (RES.)                                5357

02:21PM   1     TOLD YOU THAT?

02:21PM   2     A.    I DON'T REMEMBER THE TIMING OF IT --

02:21PM   3     Q.    OKAY.

02:21PM   4     A.    -- OF THE TELEPHONE CONVERSATION.

02:21PM   5          IT WAS A TELEPHONE CONVERSATION THAT I DON'T REMEMBER

02:21PM   6     EXACTLY WHAT DAY.

02:21PM   7     Q.    OKAY.

02:21PM   8     A.    BUT IT WAS BEFORE I INVESTED.

02:21PM   9     Q.    OKAY.  AND PART OF WHAT MR. BOIES WAS GOING TO WAS -- TO

02:21PM  10     TELL YOU, AS YOU SCALE UP A COMPANY THAT HAS NEW TECHNOLOGY,

02:21PM  11     THERE'S SOME RISK THAT IS ASSOCIATED WITH HOW THE TECHNOLOGY

02:21PM  12     WILL PERFORM; CORRECT?

02:21PM  13     A.    TO BE MORE PRECISE, HE SAID THAT HE THOUGHT THE TECHNOLOGY

02:21PM  14     WAS ABSOLUTELY SOUND AND WAS PERFORMING WELL, BUT THERE WOULD

02:21PM  15     ALWAYS BE A QUESTION OF WHETHER IT WOULD PERFORM AT THE SAME

02:21PM  16     LEVEL WHEN IT WAS COMPLETELY ROLLED OUT IN MULTIPLE -- MANY,

02:21PM  17     MANY LOCATIONS.

02:21PM  18     Q.    OKAY.  AND THE INFORMATION THAT MR. BOIES IMPARTED TO YOU,

02:22PM  19     WAS THAT INFORMATION THAT YOU SHARED WITH ALL OF YOUR CLIENTS?

02:22PM  20     A.    YOU KNOW, I DON'T REMEMBER SPECIFICALLY, BUT, YOU KNOW, IT

02:22PM  21     CERTAINLY WOULD BE MY PRACTICE, IF I HEARD ANYTHING FROM

02:22PM  22     ANYBODY THAT I THOUGHT WOULD BE RELEVANT TO SOMEBODY WHO

02:22PM  23     WOULD -- A CLIENT OF MINE WHO IS CONSIDERING AN INVESTMENT, I

02:22PM  24     CERTAINLY WOULD HAVE RELAYED THAT INFORMATION.

02:22PM  25          SO I SUSPECT I DID.

MOSLEY CROSS BY MR. WADE (RES.)                                    5358

02:22PM  1    Q.   OKAY.  AND SO IT WOULDN'T NECESSARILY BE SPECIFIC TO

02:22PM  2    MR. BOIES; CORRECT?  IF YOU LEARNED SOMETHING DURING THE COURSE

02:22PM  3    OF YOUR INTERACTIONS WITH THERANOS THAT YOU THOUGHT WAS

02:22PM  4    RELEVANT, YOU WOULD HAVE RELAYED THAT TO YOUR CLIENTS?

02:22PM  5    A.   THAT IS CORRECT.

02:22PM  6    Q.   OKAY.  I THINK YOU TESTIFIED ON DIRECT THAT YOU WEREN'T

02:23PM  7    CERTAIN WHETHER YOU KNEW OR WHEN YOU LEARNED ABOUT THE COMPANY

02:23PM  8    DOING VENOUS DRAWS.

02:23PM  9         DO YOU RECALL THAT?

02:23PM  10   A.   I DON'T RECALL THAT.

02:23PM  11   Q.   OKAY.  DO YOU RECALL WHETHER, IN CONNECTION WITH YOUR DUE

02:23PM  12   DILIGENCE AT THE COMPANY, WHETHER YOU LOOKED AT ALL AT THE

02:23PM  13   COMPANY'S WEBSITE?

02:23PM  14   A.   YOU KNOW, I'M SURE I -- IT'S LIKELY THAT I DID, BUT I

02:23PM  15   DON'T SPECIFICALLY REMEMBER IT.

02:23PM  16        BUT I CAN'T IMAGINE THAT I DIDN'T LOOK AT THEIR WEBSITE.

02:23PM  17   Q.   OKAY.  AND DO YOU RECALL WHETHER YOU LOOKED AT THE

02:23PM  18   WALGREENS WEBSITE AT ALL?

02:23PM  19   A.   I DON'T REMEMBER.

02:23PM  20   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 14207.

02:24PM  21   A.   OKAY.

02:24PM  22   Q.   DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:24PM  23   A.   I DO.  IT'S TWO PAGES.

02:24PM  24   Q.   RIGHT.  AND, AND DO YOU RECOGNIZE THIS TO BE A SNAPSHOT OF

02:24PM  25   A WALGREENS WEBSITE RELATING TO THERANOS SERVICES?

MOSLEY CROSS BY MR. WADE (RES.)                                    5359

02:24PM  1    A.   THAT'S WHAT IT APPEARS TO BE, YES.

02:25PM  2              MR. WADE:  I MOVE THE ADMISSION OF 14207.

02:25PM  3              MR. SCHENK:  FOUNDATION.

02:25PM  4              THE COURT:  WOULD YOU LAY A LITTLE FOUNDATION FOR

02:25PM  5    THIS?

02:25PM  6              MR. WADE:  CERTAINLY.

02:25PM  7    Q.   DO YOU RECALL -- I THINK WE TALKED ABOUT SOME OF YOUR

02:25PM  8    GOOGLE SEARCHES BEFORE.

02:25PM  9         DO YOU RECALL THAT?

02:25PM 10    A.   YES.

02:25PM 11    Q.   AND I THINK YOU SAID THAT YOU LOOKED -- YOU PROBABLY

02:25PM 12    LOOKED AROUND ON THE INTERNET, MAYBE AT THE THERANOS WEBSITE.

02:25PM 13         DO YOU RECALL?

02:25PM 14    A.   I CERTAINLY WOULD HAVE LOOKED FOR ANYTHING THAT I COULD

02:25PM 15    FIND AND I, YOU KNOW, MAY HAVE WELL LOOKED AT THIS WEBSITE.

02:25PM 16    BUT I CAN'T TELL YOU IF I DID OR DIDN'T.

02:25PM 17              MR. WADE:  YOUR HONOR, I WOULD ASK THAT THE DOCUMENT

02:25PM 18    BE CONDITIONALLY ADMITTED.  WE HAVE A DECLARATION WITH RESPECT

02:25PM 19    TO ITS AUTHENTICITY, AND I HAVE NO DOUBT THAT A NUMBER OF

02:25PM 20    WITNESSES COULD AUTHENTICATE THIS DOCUMENT.  BUT I WOULD LIKE

02:25PM 21    TO ASK THIS WITNESS ABOUT IT.

02:25PM 22              THE COURT:  ALL RIGHT.  WE'LL ADMIT IT AND YOU CAN

02:26PM 23    ASK THIS WITNESS.

02:26PM 24              MR. WADE:  THANK YOU, YOUR HONOR.

02:26PM 25         (DEFENDANT'S EXHIBIT 14207 WAS RECEIVED IN EVIDENCE.)

MOSLEY CROSS BY MR. WADE (RES.)                                    5360

02:26PM   1                    MR. WADE:  MAY I PUBLISH?

02:26PM   2                    THE COURT:  YES.

02:26PM   3      BY MR. WADE:

02:26PM   4      Q.  IF YOU LOOK AT THE TOP, DO YOU SEE THAT THIS IS THE

02:26PM   5      WALGREENS WEBSITE?

02:26PM   6      A.  YES.

02:26PM   7      Q.  AND AGAIN, YOU UNDERSTOOD THAT WALGREENS WAS OFFERING

02:26PM   8      THERANOS SERVICES THROUGH ITS -- SOME OF ITS PHYSICAL

02:26PM   9      LOCATIONS; CORRECT?

02:26PM   10     A.  I DID.

02:26PM   11     Q.  OKAY.  AND THIS PROVIDES SOMEWHAT OF AN OVERVIEW -- THESE

02:26PM   12     WEB PAGES KIND OF PROVIDE AN OVERVIEW OF SOME OF THOSE

02:26PM   13     SERVICES.

02:26PM   14          DO YOU SEE THAT?

02:26PM   15     A.  UM, THAT'S WHAT IT SEEMS TO BE DOING, YES.

02:26PM   16     Q.  OKAY.  AND IF WE -- IF I CAN GO UP TO THE HEADER, DO YOU

02:26PM   17     SEE THE DATE IN THE UPPER RIGHT-HAND CORNER, OCTOBER 9TH, 2014?

02:26PM   18          DO YOU SEE THAT?

02:26PM   19     A.  YES.  THERE'S ANOTHER DATE ON THE LEFT-HAND SIDE THAT IS

02:27PM   20     SOMETHING -- MARCH 30TH, 2014.  THERE ARE A LOT OF DATES ACROSS

02:27PM   21     THE TOP OF THIS.

02:27PM   22     Q.  YES.  AND DO YOU SEE THIS DATE OVER HERE, OCTOBER 9TH,

02:27PM   23     2014?

02:27PM   24     A.  I DO.

02:27PM   25     Q.  AND CAN I DRAW YOUR ATTENTION TO THE SECOND PAGE, THE NEXT

MOSLEY CROSS BY MR. WADE (RES.)                    5361

02:27PM  1    WEBSITE, AND IF WE CAN BLOW UP THE TOP WHERE IT SAYS "GOODBYE,

02:27PM  2    BIG BAD NEEDLE"?

02:27PM  3    A.   IS THIS A DIFFERENT WEBSITE OR IS IT THE SAME WEBSITE?

02:27PM  4    Q.   SAME WEBSITE, JUST A SCROLL DOWN.

02:27PM  5    A.   THE SECOND PAGE.

02:27PM  6    Q.   OR MAYBE, AS IT APPEARS ON THE INTERNET, YOU WOULD BE ABLE

02:27PM  7    TO SCROLL DOWN ON YOUR COMPUTER TO LOOK AT IT.

02:27PM  8    A.   RIGHT, RIGHT.  I UNDERSTAND.

02:27PM  9    Q.   AND YOU SAW AN IMAGE OF THIS CUTE LITTLE BOY IN SOME OF

02:27PM  10   THE MATERIALS THAT MR. SCHENK SHOWED YOU; RIGHT?

02:27PM  11   A.   I DID.

02:27PM  12   Q.   AND THE PHRASE "GOODBYE, BIG BAD NEEDLE"?

02:27PM  13   A.   RIGHT.

02:27PM  14           JUROR:  WE HAVE A PICTURE OF THE COURTROOM

02:27PM  15   OVERLAYING WHAT YOU'RE SHOWING.

02:28PM  16           THE COURT:  OKAY.

02:28PM  17           THE CLERK:  OKAY?

02:28PM  18           JUROR:  IT'S REMOVED.

02:28PM  19           MR. WADE:  THE WEBSITE IS BACK UP?

02:28PM  20           JUROR:  YES.

02:28PM  21   BY MR. WADE:

02:28PM  22   Q.   AND DO YOU SEE UNDER THIS IT SAYS, "INSTEAD OF A HUGE

02:28PM  23   NEEDLE, THERANOS-TRAINED TECHNICIANS CAN USE A TINY FINGERSTICK

02:28PM  24   OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW"?

02:28PM  25           DO YOU SEE THAT?

MOSLEY CROSS BY MR. WADE (RES.)                                    5362

02:28PM   1    A.   I DO SEE THAT.

02:28PM   2    Q.   AND DO YOU SEE THAT THERE'S -- AND IT SAYS THAT "IT'S

02:28PM   3    PRACTICALLY PAINLESS AND A LOT LESS SCARY."

02:28PM   4    A.   I SEE THAT.

02:28PM   5    Q.   OKAY.  AND IF WE GO DOWN TO FOOTNOTE TWO, WHICH WAS

02:28PM   6    REFERENCED THERE.  IF WE CAN PUT THAT UP TOWARDS THE TOP?

02:28PM   7         DO YOU SEE THERE IT SAYS, "BLOOD MAY BE DRAWN BY A

02:28PM   8    FINGERSTICK OR VENOUS DRAW BY A THERANOS-TRAINED TECHNICIAN FOR

02:28PM   9    THERANOS TESTING PERFORMED IN THEIR CLIA-CERTIFIED LABORATORY."

02:29PM  10         DO YOU SEE THAT?

02:29PM  11    A.   I DO.

02:29PM  12    Q.   DO YOU RECALL, WHEN YOU WERE DOING SOME OF YOUR RESEARCH

02:29PM  13    ON THERANOS, WHETHER YOU SAW OR NOTICED THIS LANGUAGE?

02:29PM  14    A.   NOT THAT I CAN REMEMBER.

02:29PM  15    Q.   OKAY.  CAN I DRAW YOUR ATTENTION TO 14208.

02:29PM  16    A.   OKAY.

02:29PM  17    Q.   AND DO YOU RECOGNIZE THIS TO BE A THERANOS WEB PAGE?

02:29PM  18    A.   IT LOOKS LIKE THAT'S WHAT IT IS.

02:29PM  19         MR. WADE:  I MOVE THE ADMISSION OF 14208.

02:29PM  20         MR. SCHENK:  SAME OBJECTION.

02:29PM  21         MR. WADE:  WITH THE SAME CONDITIONAL REQUEST.

02:29PM  22         THE COURT:  MEANING THAT YOU'RE GOING TO CALL A

02:29PM  23    WITNESS AT SOME POINT IN TIME, CERTAINLY NOT TODAY BECAUSE WE

02:29PM  24    DON'T HAVE TIME FOR IT, BUT AT SOME TIME IN THE FUTURE YOU'LL

02:29PM  25    CALL A WITNESS WHO WILL AUTHENTICATE THIS?

MOSLEY CROSS BY MR. WADE (RES.)                                    5363

02:29PM   1            MR. WADE:  YEAH, WE HAVE AN AFFIDAVIT OF

02:29PM   2   AUTHENTICITY WHICH WE CAN PROFFER TO THE COURT.

02:30PM   3            THE COURT:  ALL RIGHT.  THANK YOU.

02:30PM   4        IT WILL BE ADMITTED CONDITIONALLY FOR THAT PURPOSE.  THANK

02:30PM   5   YOU.

02:30PM   6            (DEFENDANT'S EXHIBIT 14208 WAS RECEIVED IN EVIDENCE.)

02:30PM   7            MR. WADE:  MAY I PUBLISH?

02:30PM   8            THE COURT:  YES.

02:30PM   9            MR. WADE:  THANK YOU.

02:30PM  10   Q.   AND IF WE CAN JUST LOOK UP AT THE TOP, YOU SEE IN BLACK,

02:30PM  11   AUGUST 19TH, 2014?

02:30PM  12   A.   I SEE THAT.

02:30PM  13   Q.   OKAY.  AND LET'S GO DOWN.  DO YOU SEE THEY TALK ABOUT --

02:30PM  14        LET'S BLOW UP THAT FIRST SECTION.

02:30PM  15        IT SAYS, "SAME TESTS.  SMALLER SAMPLE."

02:30PM  16   A.   I SEE THAT.

02:30PM  17   Q.   AND IT GIVES SOME COMMENTARY ON THE SERVICES THAT THEY

02:30PM  18   PROVIDE.

02:30PM  19        DO YOU SEE THAT?

02:30PM  20   A.   I DO.

02:30PM  21   Q.   OKAY.  AND IF, IF WE GO TO THE LEFT, DO YOU SEE WHERE IT

02:30PM  22   SAYS "NO BIG NEEDLES" THERE?

02:30PM  23        CAN WE BLOW THAT UP?

02:30PM  24   A.   I SEE THAT.

02:30PM  25   Q.   AND IT LOOKS LIKE THERE'S A PICTURE THERE THAT MAYBE

MOSLEY CROSS BY MR. WADE (RES.)                                      5364

02:30PM   1    DIDN'T CATCH IN THE ARCHIVE.

02:30PM   2        BUT DID YOU EVER COME TO LEARN THAT THERANOS, WHEN IT

02:30PM   3    WOULD DO ITS VENOUS DRAWS, WOULD OFTEN USE A MUCH SMALLER

02:31PM   4    NEEDLE AND DRAW MUCH -- A MUCH SMALLER AMOUNT OF BLOOD IN MANY

02:31PM   5    CASES?

02:31PM   6    A.   I DON'T REMEMBER, YOU KNOW, WHEN I LEARNED THAT, OR IF I

02:31PM   7    LEARNED IT HONESTLY.

02:31PM   8    Q.   OKAY.  AND IF WE CAN GO DOWN TO THE BOTTOM OF THAT PAGE,

02:31PM   9    "THE ONLY THING WE WANT YOU TO FEEL IS BETTER."

02:31PM  10        DO YOU SEE THAT?

02:31PM  11    A.   I DO.

02:31PM  12    Q.   AND DO YOU SEE THE LANGUAGE THERE, IT SAYS, "INSTEAD OF A

02:31PM  13    BIG, INTIMIDATING NEEDLE, OUR CERTIFIED PHLEBOTOMISTS CAN USE A

02:31PM  14    TINY FINGERSTICK OR A MICRO-SAMPLE FROM A VENOUS DRAW"?

02:31PM  15        DO YOU SEE THAT?

02:31PM  16    A.   I DO, UH-HUH.

02:31PM  17    Q.   AND THE MICRO-SAMPLE FROM THE VENOUS DRAW, THAT SUGGESTS

02:31PM  18    THAT THE AMOUNT OF BLOOD WOULD BE A SMALLER AMOUNT?

02:31PM  19    A.   I'M ASSUMING THAT'S WHAT IT MEANS.

02:31PM  20    Q.   AND THEN IT GOES ON TO SAY, "OCCASIONALLY, A VENIPUNCTURE

02:32PM  21    MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

02:32PM  22    AND OUR AIM IS TO ELIMINATE THAT SCENARIO," ALTOGETHER.

02:32PM  23        DO YOU SEE THAT?

02:32PM  24    A.   I DO.

02:32PM  25    Q.   AND DO YOU RECALL WHETHER YOU LEARNED THIS INFORMATION

MOSLEY CROSS BY MR. WADE (RES.)                                    5365

02:32PM    1    BETWEEN AUGUST AND OCTOBER WHEN YOU WERE MAKING YOUR INVESTMENT

02:32PM    2    WITH THERANOS?

02:32PM    3    A.    I DON'T BELIEVE I KNEW THIS AT THE TIME.

02:32PM    4            MR. WADE:  THE COURT'S INDULGENCE FOR ONE MOMENT?

02:32PM    5            THE COURT:  YES.

02:32PM    6        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:32PM    7            MR. WADE:  YOUR HONOR, APART FROM THOSE DOCUMENTS, I

02:32PM    8    DON'T HAVE ANY FURTHER QUESTIONS OF MR. MOSLEY AT THIS TIME.

02:32PM    9            THE COURT:  ALL RIGHT.  LET ME MEET WITH COUNSEL.

02:32PM   10        THE RECORD SHOULD REFLECT THAT IT'S 2:32 P.M.  WE'RE GOING

02:32PM   11    TO FINISH AT 3:00 TODAY.

02:33PM   12        LET ME SEE COUNSEL AT THE SIDE-BAR.

02:33PM   13        FOLKS, JUST REMAIN HERE, PLEASE, AND DON'T DISCUSS THE

02:33PM   14    CASE OR TALK TO ANYONE.  YOU CAN STAND AND STRETCH, OF COURSE.

02:33PM   15    AND WE'LL JUST BE A COUPLE OF MINUTES.

02:33PM   16        LIKEWISE, MR. MOSLEY.

02:33PM   17            THE WITNESS:  THANK YOU.

02:45PM   18        (SIDE-BAR CONFERENCE ON THE RECORD.)

02:45PM   19            THE COURT:  WE'RE ON THE RECORD.  WE'RE OUTSIDE OF

02:45PM   20    THE PRESENCE OF THE JURY.

02:45PM   21        MR. SCHENK IS PRESENT AND MR. WADE IS PRESENT.

02:45PM   22        WE'RE TALKING ABOUT 14168, 14139, AND 14138.

02:45PM   23        MR. SCHENK, YOUR OBJECTION?

02:45PM   24            MR. SCHENK:  YES, YOUR HONOR.  THE EXHIBITS ARE

02:45PM   25    AFTER MR. MOSLEY'S INVESTMENT.

MOSLEY CROSS BY MR. WADE (RES.)

02:45PM  1      WE DISCUSSED YESTERDAY THE IDEA OF THE KNOWLEDGE INSIDE AN

02:45PM  2   INVESTOR'S HEAD BEING RELEVANT UP UNTIL THE POINT OF

02:45PM  3   INVESTMENT, AND CONSISTENT WITH THAT, I ENDED MY DIRECT EXAM AT

02:45PM  4   THE MOMENT OF MR. MOSLEY'S WIRE.

02:45PM  5      THESE ARE AFTER THE WIRE, AND IT IS FOR THAT REASON THAT I

02:45PM  6   QUESTION THEIR RELEVANCE.

02:45PM  7           MR. WADE:  IF YOUR HONOR NOTES THE THREE DOCUMENTS,

02:45PM  8   I BELIEVE 14169, 14168, AND 14138 --

02:45PM  9           THE COURT:  I HAVE 14138, 14139, AND 14168.

02:45PM 10           MR. WADE:  OH, I'M SORRY.  CORRECT.

02:45PM 11           THE COURT:  THOSE ARE THE THREE DOCUMENTS?

02:45PM 12           MR. WADE:  CORRECT.

02:45PM 13           THE COURT:  THEY'RE EMAILS THAT ARE POST INVESTMENT

02:45PM 14   OF THIS WITNESS, AND THEY'RE INTRODUCTORY EMAILS TO MS. HOLMES

02:45PM 15   FOR VARIOUS PEOPLE.  THEY SAY FLATTERING THINGS ABOUT

02:45PM 16   MS. HOLMES AND THAT TYPE OF THING.

02:45PM 17      BUT I'M INCLINED TO SUSTAIN THE OBJECTION.  THEY'RE

02:45PM 18   OUTSIDE THE PERIOD.

02:45PM 19           MR. WADE:  THEY'RE NOT OUTSIDE THE PERIOD OF THE

02:45PM 20   CONSPIRACY, YOUR HONOR.  AND IN PARTICULAR, THE WALTON

02:45PM 21   INVESTMENT IS AN INVESTMENT WHERE THE -- 14139 IS A MEMBER OF

02:45PM 22   THE WALTON FAMILY WHO HAD BEEN IN COMMUNICATIONS WITH

02:45PM 23   MR. MOSLEY THROUGHOUT THE TIME PERIOD STARTING AS EARLY AS

02:45PM 24   AUGUST OF 2014.

02:45PM 25      AND SO THEY'RE DIFFERENT MEMBERS OF THE WALTON FAMILY.

MOSLEY CROSS BY MR. WADE (RES.)                                    5367

02:45PM   1        EARLY IN HIS TESTIMONY, MR. MOSLEY TESTIFIED THAT

02:45PM   2   ALICE WALTON WAS SOMEONE WHO HE INTERACTED WITH ON THE

02:45PM   3   INVESTMENT, AND THERE ARE, ON MR. MOSLEY'S PRIVILEGE LOG, I

02:45PM   4   BELIEVE ABOUT 60 PRIVILEGED COMMUNICATIONS WITH MEMBERS OF THE

02:45PM   5   WALTON FAMILY THROUGHOUT THE TIME PERIOD WHERE HE'S INTERACTING

02:45PM   6   AND OBTAINING INFORMATION.

02:45PM   7        AND THEN THE LAST BIT OF THAT FOR THE WALTON INVESTMENT IS

02:45PM   8   TO LOOP IN MS. WALTON.

02:45PM   9        THE INVESTOR CONSPIRACY GOES WELL PAST 2015, AND I BELIEVE

02:45PM  10   THIS -- IT GOES UNTIL THE END OF 2015, AND I BELIEVE THIS

02:45PM  11   EVIDENCE IS RELEVANT TO OUR DEFENSE IN THAT CONSPIRACY, AND

02:45PM  12   THIS IS THE WITNESS WHO PROVIDES THE INTRODUCTION.  HE'S

02:45PM  13   SOMEONE WHO IS INTERACTING EXTENSIVELY WITH A NUMBER OF PEOPLE

02:45PM  14   THROUGHOUT A PERIOD.  THERE'S BEEN A LOT OF TESTIMONY ABOUT

02:45PM  15   THAT.

02:45PM  16        AND HE CONTINUES TO PROVIDE, TO ENCOURAGE PEOPLE TO INVEST

02:45PM  17   IN THE COMPANY.

02:45PM  18        THE COURT:  WELL, HE'S NEGOTIATING HERE

02:45PM  19   INTRODUCTIONS.  HE'S FACILITATING INTRODUCTIONS IN THESE THREE

02:45PM  20   EMAILS.

02:45PM  21        MR. WADE:  HE IS IN THESE THREE EMAILS, WHO ARE

02:45PM  22   PEOPLE WHO INVEST.

02:45PM  23        I DON'T INTEND TO ASK -- TO BE HONEST, YOUR HONOR, I DON'T

02:45PM  24   INTEND TO ASK HIM ANY QUESTIONS ABOUT IT.  I JUST INTEND TO

02:45PM  25   ADMIT THE DOCUMENTS THAT SHOW THAT HE IS THE ONE WHO PROVIDED

02:45PM   1    THE INTRODUCTION TO MS. HOLMES.

02:45PM   2         THE COURT:  CAN'T YOU ASK HIM ABOUT THAT?  DIDN'T

02:45PM   3    YOU INTRODUCE HANK?  DIDN'T YOU INTRODUCE NOAM?  DIDN'T YOU

02:45PM   4    INTRODUCE ALICE?

02:45PM   5         MR. WADE:  I CERTAINLY CAN.

02:45PM   6    I JUST THINK THE DOCUMENTS ARE RELEVANT.  I THINK THE

02:45PM   7    DOCUMENTS TO THE END OF 2015 ARE RELEVANT TO THE INVESTOR

02:45PM   8    CONSPIRACY AND I THINK THEY'RE FAIR GAME.

02:45PM   9    I'M NOT -- I HOPE THE COURT KNOWS, I TRIED TO ADHERE TO

02:45PM  10    MR. SCHENK'S REQUEST.  I DIDN'T GO INTO ANY OF THE EMAILS FROM

02:45PM  11    2015 RELATING TO MR. SLACK IN MORE DETAILED INTERACTIONS

02:45PM  12    BECAUSE THAT WOULD HAVE BEEN MORE INTO THE SUBSTANCE OF WHAT

02:45PM  13    WAS GOING ON WITH MR. SLACK.

02:45PM  14    I THINK THERE'S AN ARGUMENT THAT IT'S RELEVANT, BUT JUST

02:45PM  15    IN THE INTEREST OF EFFICIENCY I STOPPED.

02:45PM  16    AND I'M NOT EVEN GOING INTO THE BLOOD TESTS.

02:45PM  17    SO I'VE TRIED TO CURTAIL IT.  I JUST THINK TO THE END OF

02:45PM  18    THIS PERIOD WHEN HE'S IN ACTIVE COMMUNICATION WITH ALL OF THESE

02:45PM  19    CLIENTS, ONE OF WHOM IS MS. WALTON WHO IS PART OF THE FAMILY,

02:45PM  20    THE FIRST FAMILY HE STARTED TO COMMUNICATE WITH.

02:45PM  21         THE COURT:  SO I LOOK AT THIS AND I THINK, OKAY, THE

02:45PM  22    REAL VALUE OF THIS IS TO GET IN FRONT OF THE JURY THIS AUTHOR'S

02:45PM  23    WRITING SAYING, I KNOW YOU HAVE ALWAYS LOOKED FOR OPPORTUNITIES

02:45PM  24    TO SUPPORT WOMEN, I CAN'T THINK OF A BETTER EXAMPLE THAN

02:45PM  25    ELIZABETH.

MOSLEY CROSS BY MR. WADE (RES.)                                    5369

02:45PM  1     IT SEEMS TO ME -- AND ALL OF THESE EMAILS HAVE FLATTERING

02:45PM  2   LANGUAGE FOR YOUR CLIENT, AND IT SEEMS LIKE THAT'S THE REAL

02:45PM  3   PURPOSE.  MAYBE YOU DON'T HAVE TO ANSWER THAT QUESTION.

02:45PM  4         MR. WADE:  NO, YOUR HONOR.  THAT PURPOSE SHOWS THE

02:45PM  5   RELEVANCE OF THE DOCUMENTS BECAUSE THEY REFLECT, THEY REFLECT

02:45PM  6   THIS WITNESS'S BELIEF AND FOCUS ON INFORMATION AROUND THE TIME

02:45PM  7   PERIOD THAT HE MADE THE INVESTMENT.

02:45PM  8     HE'S NOT FOCUSSING ON, FOR EXAMPLE, WHO PUT THE LOGO ON

02:45PM  9   THE PFIZER REPORT.

02:45PM  10    HE'S FOCUSSED ON THE BROAD VISION OF THE CLIENT AND HER

02:45PM  11  CHARACTERISTICS, YOU KNOW, AS A PROMINENT FEMALE LEADER.

02:45PM  12    I THINK THAT THAT IS RELEVANT TO SHOW WHAT WAS MATERIAL TO

02:45PM  13  HIM IN CONNECTION WITH HIS INVESTMENT DECISION RIGHT IN THE

02:45PM  14  SAME WINDOW.

02:45PM  15        THE COURT:  BUT THE WINDOW IS CLOSED HERE.  THIS IS

02:45PM  16  WELL AFTER HIS INVESTMENT.

02:45PM  17        MR. WADE:  NO.  BUT AGAIN, YOUR HONOR, THIS RELATES

02:45PM  18  TO A POINT THAT I RAISED WITH THE COURT YESTERDAY, AND ALL I'M

02:45PM  19  LOOKING TO GET IN IS THE INTRODUCTION SO WE HAVE THE ABILITY TO

02:45PM  20  SHOW THAT THIS INVESTOR HAD SUCH BELIEF IN THE, IN THE COMPANY

02:45PM  21  THAT HE CONTINUED TO PUT PEOPLE INTO IT.

02:45PM  22    AND I THINK THERE IS SOME OTHER EVIDENCE THAT MAY COME OUT

02:45PM  23  IN THIS WINDOW, THAT THE FACT THAT HE CONTINUED TO BELIEVE THAT

02:45PM  24  I THINK IS RELEVANT AND IS APPROPRIATE FOR US TO ARGUE.

02:45PM  25        THE COURT:  ONE OF THE OTHER THINGS THAT HAS COME UP

02:45PM 1    THROUGH THE FIVE AND A HALF HOURS OF YOUR EXAMINATION OF THIS

02:45PM 2    WITNESS IS IT ALMOST SOUNDS LIKE YOU'RE GOING TO BLAME THE

02:45PM 3    VICTIMS, THESE INVESTORS AND THINGS, AND I JUST -- I HAVEN'T

02:45PM 4    HEARD ANY OBJECTIONS ABOUT THAT, BUT -- AND OF COURSE NOW IS

02:45PM 5    NOT THE TIME TO OBJECT TO THAT AS IT WOULD BE IN CLOSING

02:45PM 6    ARGUMENTS.

02:45PM 7         BUT I JUST WANTED TO REMIND EVERYONE ABOUT THAT CAVEAT.

02:45PM 8    WE CAN'T DO THAT IN ARGUMENT, OF COURSE.

02:45PM 9              MR. WADE:  OF COURSE NOT, YOUR HONOR.

02:45PM 10        AND IT IS NOT OUR INTENT IN ANY WAY TO BLAME THE VICTIM.

02:45PM 11        BUT THE INFORMATION THAT THEY HAD AND THAT THEY CONSIDERED

02:45PM 12   DURING THIS TIME PERIOD IS RELEVANT.  THE GOVERNMENT PRESENTED

02:45PM 13   SUBSTANTIALLY ALL EVIDENCE THAT RELATES TO SEPTEMBER 2ND, 2014,

02:45PM 14   AND BY AND LARGE IT STOPPED.

02:45PM 15        AND THE REALITY IS THAT THIS WITNESS HAD A LOT OF ONGOING

02:45PM 16   INTERACTIONS THEREAFTER, SOME OF WHICH WE CAN'T EXPLORE BECAUSE

02:45PM 17   OF PRIVILEGE ISSUES.

02:45PM 18        BUT I THINK IT'S FAIR TO PUT INTO THE CASE ALL OF THE

02:45PM 19   INFORMATION THAT WAS AVAILABLE TO THE INVESTOR IN CONNECTION

02:45PM 20   WITH WHAT COULD HAVE BEEN MATERIAL TO THE INVESTOR IN MAKING

02:45PM 21   THE INVESTMENT DECISION.

02:45PM 22              THE COURT:  YOU MEAN THESE OTHER INVESTORS, NOT THIS

02:45PM 23   INVESTOR?

02:45PM 24              MR. WADE:  WELL, THIS INVESTOR.

02:45PM 25              THE COURT:  HE'S MADE HIS INVESTMENT, THOUGH, AT THE

MOSLEY CROSS BY MR. WADE (RES.)                                    5371

```
02:45PM   1    TIME OF THESE EMAILS, HASN'T HE?

02:45PM   2              MR. WADE:  HE HAS MADE HIS INVESTMENT AT THE TIME OF

02:45PM   3    THESE EMAILS, BUT SUBSEQUENT ACTS, AS THE GOVERNMENT USUALLY

02:45PM   4    STATES AGAINST CLIENTS OF MINE, SUBSEQUENT ACTS CAN BE RELEVANT

02:45PM   5    AS TO THE PRIOR INTENT, AND I THINK THAT -- I THINK THAT HIS

02:45PM   6    COMMUNICATION AND FOCUS IS RELEVANT.

02:45PM   7              THE COURT:  MR. SCHENK?

02:45PM   8              MR. SCHENK:  I CAN IMAGINE WHERE THE PERIOD GOES

02:45PM   9    BEYOND THE DATE OF THE INVESTMENT, ACTIONS OF INVESTORS AFTER

02:45PM  10    THEIR INVESTMENT WOULD BE RELEVANT.

02:45PM  11        MY ARGUMENT IS NOT THAT AN INVESTOR'S ACTIONS BEYOND THE

02:45PM  12    DATE OF INVESTMENT COULD NEVER BE RELEVANT.  THESE THREE EMAILS

02:45PM  13    ARE NOT RELEVANT.

02:45PM  14        THESE THREE EMAILS DO NOT SUGGEST WHAT THE DEFENSE

02:45PM  15    BELIEVES THAT THEY DO.  THE CONCEPT CAN BE INQUIRED INTO

02:45PM  16    THROUGH A QUESTION.

02:45PM  17        IN FACT, I THINK THE QUESTION FOR SOME HAS ALREADY BEEN

02:45PM  18    ASKED WHETHER INTRODUCTIONS WERE MADE BETWEEN MS. HOLMES AND

02:45PM  19    MS. WALTON.  I MAY BE WRONG ABOUT THAT.

02:45PM  20        THE FACT HAS ALREADY BEEN ESTABLISHED.  AS THE COURT

02:45PM  21    NOTED, MR. WADE CAN CERTAINLY ASK QUESTIONS ABOUT THAT.

02:45PM  22        I DO NOT SEE THE RELEVANCE OF THE DOCUMENTS.

02:45PM  23              THE COURT:  ANYTHING FURTHER?

02:45PM  24              MR. WADE:  I DON'T.

02:45PM  25              THE COURT:  I'M GOING TO ALLOW YOU TO INQUIRE AND
```

MOSLEY CROSS BY MR. WADE (RES.)                                      5372

02:45PM  1    YOU CAN ASK, DID YOU SAY FLATTERING THINGS IN REGARDS TO YOUR

02:45PM  2    INTRODUCTION, AND THAT TYPE OF THING.

02:45PM  3        BUT I THINK THE EMAILS, THE DATES AND THINGS, I THINK IT

02:45PM  4    GOES TOO FAR.

02:45PM  5        I THINK YOU CAN ACCOMPLISH WHAT YOU SEEK TO ACCOMPLISH

02:45PM  6    WITHOUT THE ACTUAL DOCUMENT GOING IN, AND I JUST DON'T SEE THE

02:45PM  7    RELEVANCE FOR THAT.

02:45PM  8        SO I'LL SUSTAIN THE OBJECTION, PARDON ME, AS TO 168, 138,

02:45PM  9    AND 139.

02:45PM  10        I WILL PERMIT YOU, THOUGH, TO MAKE INQUIRY ON THAT.

02:45PM  11        NOW, TIMING IS PROBLEM.  YOU KNOW, WE SAID YESTERDAY WE

02:45PM  12    WERE GOING TO FINISH THIS WITNESS.  YOU'VE HAD HIM ALL DAY AND

02:45PM  13    NOW THE GOVERNMENT HAS 12 MINUTES TO DO A REDIRECT.

02:45PM  14        YOU KNOW, I DON'T KNOW IF THAT WAS STRATEGIC OR WHAT THAT

02:45PM  15    WAS.  BUT, YOU KNOW, IT'S JUST NOT FAIR.

02:45PM  16            MR. WADE:  YOUR HONOR, I APOLOGIZE.  THERE WERE A

02:45PM  17    COUPLE OF THINGS THAT BLED INTO OUR TIME TODAY THAT CUT US A

02:45PM  18    LITTLE BIT WHERE WE GOT STARTED A LITTLE BIT SHORT AND THERE

02:45PM  19    WERE A COUPLE OF CONTINUANCES.

02:45PM  20        AND I'LL REQUEST, TOO -- I BELIEVE AT THE TIME I MADE THAT

02:45PM  21    STATEMENT, I THOUGHT WE WERE GOING UNTIL 4:00 O'CLOCK TODAY,

02:45PM  22    AND SO I TAKE RESPONSIBILITY FOR THAT.

02:45PM  23        AT THE BREAK, I'LL TELL THE COURT, I CUT ABOUT EIGHT

02:45PM  24    DOCUMENTS THAT I WAS PLANNING TO PUT IN TO TRY AND GET IT

02:45PM  25    FORWARD.

MOSLEY CROSS BY MR. WADE (RES.)                                    5373

02:45PM  1        I WAS SURPRISED THAT THESE DOCUMENTS GOT OBJECTIONS, BUT

02:45PM  2   I'LL ASK THREE QUICK QUESTIONS AND PASS HIM TO THE GOVERNMENT.

02:45PM  3             THE COURT:  OKAY.  THAT WILL FULFILL YOUR NEEDS FOR

02:45PM  4   YOUR CROSS-EXAMINATION?

02:45PM  5             MR. WADE:  IT WILL.

02:45PM  6             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

02:45PM  7             MR. SCHENK:  THANK YOU.

02:45PM  8        (END OF DISCUSSION AT SIDE-BAR.)

02:45PM  9             THE COURT:  ALL RIGHT.  THANK YOU.

02:45PM 10        WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

02:45PM 11   ARE PRESENT AGAIN.

02:45PM 12        MR. MOSLEY IS ON THE STAND.

02:45PM 13        I'M GOING TO SUSTAIN THE OBJECTIONS AS TO THE ADMISSION OF

02:45PM 14   THE DOCUMENTS.

02:45PM 15             MR. WADE:  MAY I PROCEED, YOUR HONOR?

02:45PM 16             THE COURT:  YES.

02:45PM 17   BY MR. WADE:

02:45PM 18   Q.   MR. MOSLEY, JUST A COUPLE OF QUICK QUESTIONS.

02:45PM 19        DO YOU RECALL THAT YOU PROVIDED AN INTRODUCTION TO

02:45PM 20   MS. HOLMES -- THAT YOU PROVIDED MR. SLACK WITH AN INTRODUCTION

02:45PM 21   TO MS. HOLMES IN LATE FALL OF 2014?

02:45PM 22   A.   I THINK I DID PROVIDE AN INTRODUCTION AT THE REQUEST OF

02:45PM 23   DR. KISSINGER.

02:45PM 24   Q.   OKAY.  AND DO YOU ALSO RECALL THAT YOU --

02:45PM 25   A.   I DON'T THINK I EVER MET HANK SLACK AT THE TIME.

MOSLEY REDIRECT BY MR. SCHENK                                    5374

02:45PM  1     Q.   FAIR ENOUGH.

02:45PM  2          AND DO YOU ALSO RECALL IN THAT TIME PERIOD THAT YOU

02:46PM  3     PROVIDED AN INTRODUCTION TO MR. OHANA?

02:46PM  4     A.   I BELIEVE I DID, ONCE AGAIN, AT THE REQUEST OF

02:46PM  5     DR. KISSINGER, I THINK WHO CONTACTED JOHN ELKANN.

02:46PM  6     Q.   AND, AGAIN, THOSE WEREN'T YOUR CLIENTS?

02:46PM  7     A.   NO.

02:46PM  8     Q.   AND THERE WAS, ALSO IN THAT TIME PERIOD, MS. ALICE WALTON?

02:46PM  9     A.   YES.

02:46PM  10    Q.   AND SHE WAS A CLIENT OF YOURS?

02:46PM  11    A.   YES, SHE WAS.

02:46PM  12    Q.   AND DO YOU RECALL PROVIDING AN INTRODUCTION TO

02:46PM  13    FACILITATING A CONNECTION BETWEEN MS. HOLMES AND MS. WALTON?

02:46PM  14    A.   YEAH, I THINK I SENT AN EMAIL SUGGESTING THAT THEY OUGHT

02:46PM  15    TO FIND A TIME TO GET TOGETHER AND TALK.

02:46PM  16    Q.   AND SAYING SOME NICE THINGS ABOUT MS. HOLMES.

02:46PM  17         DO YOU RECALL THAT?

02:46PM  18    A.   ABSOLUTELY.

02:46PM  19         MR. WADE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

02:46PM  20         THE COURT:  ALL RIGHT.

02:46PM  21    REDIRECT?

02:46PM  22         MR. SCHENK:  YES.  THANK YOU.

02:46PM  23                    **REDIRECT EXAMINATION**

02:46PM  24    BY MR. SCHENK:

02:47PM  25    Q.   GOOD AFTERNOON, MR. MOSLEY.

MOSLEY REDIRECT BY MR. SCHENK                                    5375

02:47PM   1      A.   GOOD AFTERNOON.

02:47PM   2      Q.   I JUST HAVE A COUPLE OF QUESTIONS.  I WANT TO FOLLOW UP ON

02:47PM   3      SOME TOPICS THAT YOU DISCUSSED WITH MR. WADE, IF THAT WOULD BE

02:47PM   4      OKAY.

02:47PM   5      A.   ABSOLUTELY.

02:47PM   6      Q.   THERE WERE MANY QUESTIONS WHERE MR. WADE ASKED YOU IF YOU

02:47PM   7      UNDERSTOOD THAT A STATEMENT THAT MS. HOLMES WAS MAKING, OR THE

02:47PM   8      PURPOSE OF A MEETING WAS FOR MS. HOLMES TO COMMUNICATE HER

02:47PM   9      VISION.

02:47PM   10          MR. WADE USED THE WORD "VISION" QUITE OFTEN IN CERTAIN

02:47PM   11     INSTANCES WHERE MS. HOLMES WOULD COMMUNICATE HER VISION.

02:47PM   12          DO YOU RECALL THOSE QUESTIONS, AT LEAST GENERALLY?

02:47PM   13     A.   I DO YES, GENERALLY.

02:48PM   14     Q.   AND I WANT TO BE SPECIFIC WITH YOU RIGHT NOW.

02:48PM   15     A.   RIGHT.

02:48PM   16     Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT CERTAIN TOPICS,

02:48PM   17     WHEN THEY WERE COMMUNICATED TO YOU BY MS. HOLMES EITHER IN A

02:48PM   18     MEETING, ON THE PHONE, OR IN WRITTEN MATERIAL, WERE VISION AS

02:48PM   19     OPPOSED TO A CURRENT CAPABILITY OF THE TECHNOLOGY.

02:48PM   20          DO YOU UNDERSTAND THAT DISTINCTION?

02:48PM   21     A.   I DO.

02:48PM   22     Q.   WHEN MS. HOLMES COMMUNICATED TO YOU, OR WHEN YOU REACHED

02:48PM   23     THE CONCLUSION THAT THERANOS COULD PERFORM A VAST ARRAY OF

02:48PM   24     TESTS ON FINGERSTICK, DID YOU THINK THAT THAT WAS MS. HOLMES'S

02:48PM   25     VISION OR DID YOU THINK THAT THAT WAS A CURRENT CAPABILITY?

MOSLEY REDIRECT BY MR. SCHENK                                      5376

02:48PM  1              MR. WADE:  YOUR HONOR, JUST OBJECTION TO THE FORM AS

02:48PM  2      TO WHETHER IT WAS SOMETHING THAT HE LEARNED OR WHETHER IT WAS

02:48PM  3      SOMETHING THAT SHE SAID.

02:48PM  4          I THINK HE HAD A COMPOUND QUESTION.

02:48PM  5              THE COURT:  DO YOU WANT TO -- MAYBE YOU SHOULD

02:48PM  6      CLARIFY JUST SO MR. MOSLEY CAPTURES A COMPLETE UNDERSTANDING OF

02:48PM  7      THE QUESTION.

02:48PM  8              MR. SCHENK:  SURE.

02:48PM  9      Q.  DO YOU RECALL UNDERSTANDING AND WRITING IN YOUR OUTLINE AT

02:48PM 10      ONE POINT THAT THERANOS COULD PERFORM A VAST ARRAY OF TESTS?

02:48PM 11          DO YOU RECALL THAT?

02:48PM 12      A.  I DO.

02:48PM 13      Q.  DID YOU UNDERSTAND THAT THAT WAS A CURRENT CAPABILITY?

02:49PM 14      A.  I DID.

02:49PM 15      Q.  DID YOU GAIN THAT UNDERSTANDING FROM MS. HOLMES?

02:49PM 16      A.  I THINK I MAINLY GAINED THAT UNDERSTANDING FROM THE

02:49PM 17      MATERIALS --

02:49PM 18      Q.  OKAY.

02:49PM 19      A.  -- THAT I RECEIVED.

02:49PM 20      Q.  FROM THE WRITTEN MATERIALS, THE BINDERS THAT WE TALKED

02:49PM 21      ABOUT?

02:49PM 22      A.  THAT IS CORRECT.

02:49PM 23      Q.  DID YOU HAVE AN UNDERSTANDING, BEFORE YOU INVESTED

02:49PM 24      $6 MILLION, THAT THERANOS HAD THE ABILITY TO PROVIDE ACCURATE

02:49PM 25      BLOOD TESTS?

MOSLEY REDIRECT BY MR. SCHENK                                    5377

02:49PM   1    A.   YES, I BELIEVED THAT.

02:49PM   2    Q.   DID YOU THINK THAT WAS A CURRENT CAPABILITY OR THAT WAS

02:49PM   3    MS. HOLMES'S VISION?

02:49PM   4    A.   I BELIEVED THAT WAS A CURRENT CAPABILITY.

02:49PM   5    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

02:49PM   6    A.   I WOULD SAY PRIMARILY FROM THE MATERIALS.

02:49PM   7    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING, BEFORE YOU INVESTED,

02:49PM   8    THAT THERANOS HAD A RELATIONSHIP -- AND I'LL USE THE WORD

02:49PM   9    "HEALTHY" -- A HEALTHY RELATIONSHIP WITH WALGREENS?

02:49PM  10         DID YOU HAVE THAT UNDERSTANDING?

02:49PM  11    A.   I BELIEVE I THOUGHT THAT THEY HAD A HEALTHY RELATIONSHIP.

02:50PM  12    Q.   AND DID YOU BELIEVE THAT THAT WAS A CURRENT STATEMENT

02:50PM  13    REGARDING THE RELATIONSHIP, OR WAS THAT MS. HOLMES'S VISION?

02:50PM  14    A.   I THOUGHT THAT WAS CURRENT.

02:50PM  15    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:50PM  16    A.   PRINCIPALLY FROM THE MATERIALS.  MAYBE THERE WAS ALSO A

02:50PM  17    REFERENCE IN THAT "FORBES" ARTICLE.

02:50PM  18    Q.   DID YOU MEAN "FORTUNE"?

02:50PM  19    A.   THE "FORTUNE" ARTICLE THAT WAS A QUOTE FROM -- AND I'M

02:50PM  20    SURE I READ THAT.

02:50PM  21    Q.   OKAY.

02:50PM  22    A.   SO IT COULD HAVE COME FROM SOME NUMBER OF SOURCES.

02:50PM  23    Q.   WHEN -- BEFORE YOU MADE THE DECISION TO INVEST, DID YOU

02:50PM  24    THINK THAT CURRENTLY THERANOS HAD MEANINGFUL REVENUE?

02:50PM  25    A.   I DID.

MOSLEY REDIRECT BY MR. SCHENK                                    5378

02:50PM  1    Q.   AND WAS THAT DIFFERENT THAN MS. HOLMES HAD A VISION TO

02:50PM  2    HAVE REVENUE?

02:50PM  3    A.   YES, I DID.

02:50PM  4    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:50PM  5    A.   AND I THINK THAT, ONCE AGAIN, CAME PRIMARILY FROM THE

02:50PM  6    MATERIALS THAT HAD A 2014 INCOME STATEMENT.

02:50PM  7    Q.   WHO SENT YOU THESE MATERIALS WE'VE BEEN REFERRING TO?

02:50PM  8    A.   ELIZABETH DID.

02:51PM  9    Q.   BEFORE YOU MADE THE DECISION TO INVEST, DID YOU HAVE THE

02:51PM  10   UNDERSTANDING THAT THERANOS ELIMINATED THE NEED FOR VIALS OF

02:51PM  11   BLOOD?

02:51PM  12   A.   I BELIEVE THEY WERE USING THE FINGERSTICK, WHICH DID NOT

02:51PM  13   REQUIRE VIALS OF BLOOD.  IT REQUIRED A VERY SMALL SAMPLE.

02:51PM  14   Q.   WAS THAT YOUR UNDERSTANDING OF ITS CURRENT CAPABILITY OR

02:51PM  15   WAS THAT MS. HOLMES'S VISION?

02:51PM  16   A.   THAT WAS MY UNDERSTANDING OF THE CURRENT CAPABILITY.

02:51PM  17   Q.   AND WHERE DID YOU GET THAT UNDERSTANDING FROM?

02:51PM  18   A.   THAT WAS PROBABLY A COMBINATION FROM TALKING TO ELIZABETH

02:51PM  19   AND THE MATERIALS.

02:51PM  20   Q.   BEFORE YOU DECIDED TO INVEST IN THERANOS, DID YOU HAVE AN

02:51PM  21   UNDERSTANDING ABOUT WHETHER THERANOS USED ITS OWN TECHNOLOGY,

02:51PM  22   ITS OWN DEVICES TO TEST THE BLOOD?

02:51PM  23   A.   I BELIEVE THAT IT WAS USING ITS OWN DEVICES.

02:51PM  24   Q.   WAS THAT A CURRENT CAPABILITY OR WAS THAT MS. HOLMES'S

02:51PM  25   VISION?

                                                                    5379
MOSLEY REDIRECT BY MR. SCHENK

02:51PM   1    A.   I BELIEVED IT WAS A CURRENT CAPABILITY.

02:51PM   2    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

02:52PM   3    A.   I THINK FROM A COMBINATION OF TALKING WITH ELIZABETH AND

02:52PM   4    FROM THE MATERIALS.

02:52PM   5    Q.   BEFORE YOU DECIDED TO INVEST, DID YOU THINK THAT PFIZER

02:52PM   6    HAD AUTHORED A GLOWING REPORT REGARDING THE THERANOS

02:52PM   7    TECHNOLOGY?

02:52PM   8    A.   I DID.

02:52PM   9    Q.   AND DID YOU THINK THAT MS. HOLMES'S HAD A VISION THAT ONE

02:52PM  10    DAY PFIZER WOULD WRITE SOMETHING GOOD ABOUT THERANOS, OR THAT

02:52PM  11    WAS CURRENT, THAT THAT HAD HAPPENED?

02:52PM  12    A.   I READ THAT REPORT AS A STUDY, A REPORT AND A STUDY THAT

02:52PM  13    HAD ALREADY OCCURRED.

02:52PM  14    Q.   MR. WADE ASKED YOU SOME QUESTIONS ABOUT A GROUP OF

02:52PM  15    INDIVIDUALS.  I'M NOT GOING TO GO THROUGH ALL OF THE NAMES, BUT

02:52PM  16    SOME WERE YOUR CLIENTS AND SOME WERE INDIVIDUALS THAT

02:52PM  17    DR. KISSINGER ASKED YOU TO MAKE INTRODUCTIONS?

02:52PM  18    A.   THAT'S CORRECT.

02:52PM  19    Q.   AND DO YOU RECALL THIS GROUP OF INDIVIDUALS?

02:52PM  20    A.   I DO.

02:52PM  21    Q.   DID YOU ENCOURAGE ANY OF THEM TO INVEST IN THERANOS?

02:52PM  22    A.   NO, I DIDN'T.

02:52PM  23    Q.   A MOMENT AGO WE SAW A DOCUMENT, AND IN THE DOCUMENT I

02:53PM  24    THINK IT HAD THE PHRASE "RECOMMENDATION" OR THAT YOU

02:53PM  25    RECOMMENDED CLIENTS.

MOSLEY REDIRECT BY MR. SCHENK                                    5380

02:53PM  1            DO YOU RECALL THAT DOCUMENT?  IT WAS --

02:53PM  2       A.   I DO.

02:53PM  3       Q.   -- AN EMAIL BETWEEN YOU AND MR. BOIES?

02:53PM  4       A.   YES, I BELIEVE IT WAS AN EMAIL BETWEEN DAVID BOIES, OR

02:53PM  5       CHRIS BOIES OR WHOEVER, AND MYSELF, AND IT DID HAVE THAT

02:53PM  6       REFERENCE TO IT IN IT.

02:53PM  7       Q.   EXPLAIN THAT TO ME.  YOU TOLD ME THAT YOU DIDN'T ENCOURAGE

02:53PM  8       ANYONE IN THIS GROUP TO INVEST IN LIGHT OF THAT SENTENCE.

02:53PM  9       A.   I THINK IT WAS JUST LOOSE LANGUAGE.  I MEAN, I THINK IT

02:53PM  10      WAS REFERRING TO THE CLIENTS I HAD INTRODUCED TO ELIZABETH OR

02:53PM  11      WHO HAD BEEN, YOU KNOW, REALLY THE CLIENTS THAT I HAD

02:53PM  12      INTRODUCED TO ELIZABETH.

02:53PM  13      Q.   OKAY.  SO THEN TO BE CLEAR ONE LAST TIME, DID YOU

02:53PM  14      ENCOURAGE ANY OF THE INDIVIDUALS THAT YOU -- THAT WE ARE

02:53PM  15      TALKING ABOUT RIGHT NOW, YOUR CLIENTS AND THE PEOPLE THAT

02:53PM  16      DR. KISSINGER ASKED YOU TO MAKE INTRODUCTIONS TO MS. HOLMES,

02:53PM  17      DID YOU ENCOURAGE ANY OF THEM TO INVEST IN THERANOS?

02:53PM  18      A.   NO, I DIDN'T.  THESE ARE HIGHLY SOPHISTICATED PARTIES WITH

02:54PM  19      LARGE INVESTMENT STAFFS IN ALMOST EVERY CASE -- I'M SORRY.

02:54PM  20           THESE WERE SOPHISTICATED CLIENTS THAT HAD SIGNIFICANT

02:54PM  21      INVESTMENT STAFFS THAT THEY USED TO VET INVESTMENTS.

02:54PM  22      Q.   THANK YOU.

02:54PM  23           THANK YOU, YOUR HONOR.  NO FURTHER QUESTIONS.

02:54PM  24            THE COURT:  MR. WADE?

02:54PM  25            MR. WADE:  NO FURTHER QUESTIONS.

5381

| | | |
|---|---|---|
| 02:54PM | 1 | THE COURT:  THANK YOU.  MAY THIS WITNESS BE EXCUSED? |
| 02:54PM | 2 | MR. WADE:  HE MAY. |
| 02:54PM | 3 | THE COURT:  THANK YOU.  YOU MAY BE EXCUSED. |
| 02:54PM | 4 | THE WITNESS:  THANK YOU.  I APPRECIATE IT. |
| 02:54PM | 5 | THE COURT:  I THINK THAT CONCLUDES OUR DAY AND |
| 02:54PM | 6 | EVENING, LADIES AND GENTLEMEN.  WE'LL TAKE OUR EVENING BREAK |
| 02:54PM | 7 | NOW. |
| 02:54PM | 8 | PLEASE REMEMBER TOMORROW WE'LL BEGIN AT 9:30, 9:30. |
| 02:54PM | 9 | REMIND ME, MS. KRATZMANN, TOMORROW ARE WE GOING UNTIL |
| 02:54PM | 10 | 4:00? |
| 02:54PM | 11 | THE CLERK:  YES. |
| 02:54PM | 12 | THE COURT:  SO TOMORROW IS A 4:00 O'CLOCK DAY. |
| 02:54PM | 13 | SO BEFORE YOU LEAVE, PLEASE REMEMBER THE ADMONITION. |
| 02:54PM | 14 | PLEASE AVOID READING, COMING INTO CONTACT, SPEAKING WITH |
| 02:55PM | 15 | ANYONE, DOING ANY RESEARCH OR FORMING ANY OPINION ABOUT |
| 02:55PM | 16 | ANYTHING THAT YOU'VE HEARD SO FAR IN THIS CASE. |
| 02:55PM | 17 | I'LL ASK YOU TOMORROW MORNING FIRST IF YOU'VE HAD A |
| 02:55PM | 18 | PLEASANT EVENING, AND THEN I'LL ASK YOU IF YOU HAD CAUSE TO |
| 02:55PM | 19 | COME ACROSS ANY INFORMATION. |
| 02:55PM | 20 | SO WE'LL BE IN RECESS.  HAVE A GOOD EVENING.  THANK YOU. |
| 02:55PM | 21 | (JURY OUT AT 2:55 P.M.) |
| 02:55PM | 22 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 02:55PM | 23 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 02:55PM | 24 | DAY.  MR. MOSLEY HAS LEFT THE COURTROOM. |
| 02:55PM | 25 | BEFORE WE ADJOURN, ANYTHING FURTHER BEFORE WE ADJOURN? |

5382

| | | |
|---|---|---|
| 02:55PM | 1 | MR. SCHENK? |
| 02:55PM | 2 | MR. SCHENK: |
| 02:55PM | 3 | MR. WADE:  NO, YOUR HONOR. |
| 02:55PM | 4 | THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD |
| 02:56PM | 5 | EVENING. |
| 02:56PM | 6 | MR. SCHENK, MAY I SEE YOU AND MR. WADE FOR JUST A |
| 02:56PM | 7 | MOMENT -- I'M SORRY.  MR. DOWNEY. |
| 02:56PM | 8 | (DISCUSSION OFF THE RECORD.) |
| 02:56PM | 9 | THE COURT:  MR. DOWNEY, MR. SCHENK, CAN I SEE YOU |
| 02:56PM | 10 | FOR A SECOND? |
| 02:56PM | 11 | WE'RE OTHERWISE IN RECESS FOR THE DAY.  THANK YOU VERY |
| 02:56PM | 12 | MUCH. |
| 02:56PM | 13 | (COURT ADJOURNED AT 2:56 P.M.) |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  NOVEMBER 3, 2021

22

23

24

25

1

2                      UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                      )
                       PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                      )
            VS.                        )  VOLUME 28
8                                      )
      ELIZABETH A. HOLMES,             )  NOVEMBER 4, 2021
9                                      )
                       DEFENDANT.      )  PAGES 5383 - 5597
10    _____ )

11                   TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14
      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

      OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  PATRICK LOOBY
                                    SEEMA ROPER
 6                                  RICHARD CLEARY
                                    PATRICK LEMENS
 7                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 8

 9    ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
10
                               OFFICE OF THE U.S. ATTORNEY
11                             BY:  LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
12
                               WILLIAMS & CONNOLLY
13                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

14                             TBC
                               BY:  BRIAN BENNETT, TECHNICIAN
15

16

17

18

19

20

21

22

23

24

25
```

5385

1                          INDEX OF PROCEEDINGS

2          GOVERNMENT'S:

3

4          **CHRISTOPHER LUCAS**
           DIRECT EXAM BY MR. BOSTIC                    P. 5389
5          CROSS-EXAM BY MR. DOWNEY                     P. 5446
           REDIRECT EXAM BY MR. BOSTIC                  P. 5544
6          RECROSS-EXAM BY MR. DOWNEY                   P. 5554

7          **LYNETTE SAWYER**
           DIRECT EXAM BY MR. LEACH                     P. 5557
8          CROSS-EXAM BY MR. WADE                       P. 5572

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-9006**

```
 1                          INDEX OF EXHIBITS

 2
                                       IDENT.      EVIDENCE
 3        GOVERNMENT'S:

 4        5016                                     5395
          5095                                     5402
 5        1102                                     5405
          5143                                     5411
 6        5144                                     5415
          5444                                     5421
 7        5446                                     5426
          5447                                     5427
 8        1770, PAGES 1 AND 2                      5444
          5548                                     5537
 9

10

11
          DEFENDANT'S:
12
          7366, PAGES 2 - END                      5434
13        12022                                    5454
          14213                                    5479
14        12003A                                   5484
          12051                                    5496
15        12052                                    5500
          12054                                    5503
16        12323, 12TH AND 13TH PAGES              5530
          10586                                    5579
17

18

19

20

21

22

23

24

25
```

5387

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
|          | 1  | SAN JOSE, CALIFORNIA                     NOVEMBER 4, 2021        |
| 09:20AM  | 2  | P R O C E E D I N G S                                           |
| 09:38AM  | 3  | (COURT CONVENED AT 9:38 A.M.)                                   |
| 09:38AM  | 4  | (JURY IN AT 9:38 A.M.)                                          |
| 09:38AM  | 5  | THE COURT:  WE'RE BACK ON THE RECORD IN THE HOLMES              |
| 09:38AM  | 6  | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.       |
| 09:38AM  | 7  | THE JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.       |
| 09:38AM  | 8  | BEFORE WE START, LET ME ASK THAT QUESTION AGAIN.  THANKS        |
| 09:39AM  | 9  | FOR YOUR ENDURANCE.                                             |
| 09:39AM  | 10 | DURING THE RECESS, DID YOU, ANY MEMBERS OF THE JURY, HAVE       |
| 09:39AM  | 11 | CAUSE TO COME ACROSS ANY INFORMATION, COMMUNICATION -- AND      |
| 09:39AM  | 12 | SPEAK INTO THE MIKE -- WITH ANYONE OR ANYTHING TO DO WITH THIS  |
| 09:39AM  | 13 | CASE?  IF SO, PLEASE LET ME SEE YOUR HANDS, PLEASE.             |
| 09:39AM  | 14 | I SEE NO HANDS.                                                 |
| 09:39AM  | 15 | THANK YOU VERY MUCH.                                            |
| 09:39AM  | 16 | BEFORE I ASK ABOUT THE NEXT WITNESS, MR. LEACH, LET ME          |
| 09:39AM  | 17 | JUST INQUIRE OF THE PARTIES.  DID EVERYTHING GO WELL THIS       |
| 09:39AM  | 18 | MORNING, WHATEVER THAT TRANSACTION WAS?  IS THERE ANYTHING THAT |
| 09:39AM  | 19 | EITHER SIDE NEEDS TO DISCUSS ON THAT?                           |
| 09:39AM  | 20 | MR. DOWNEY:  I THINK THERE IS ONE ITEM, YOUR HONOR.            |
| 09:39AM  | 21 | MAYBE WE CAN JUST TAKE THAT UP --                               |
| 09:39AM  | 22 | THE COURT:  AT A BREAK?                                         |
| 09:39AM  | 23 | MR. DOWNEY:  YEAH.                                              |
| 09:39AM  | 24 | THE COURT:  SURE.                                               |
| 09:39AM  | 25 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL?                     |

LUCAS DIRECT BY MR. BOSTIC                                    5388

| | | |
|---|---|---|
| 09:39AM | 1 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:39AM | 2 | THE UNITED STATES CALLS CHRIS LUCAS. |
| 09:39AM | 3 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD PLEASE |
| 09:40AM | 4 | WALK OVER HERE AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE |
| 09:40AM | 5 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 09:40AM | 6 | THE WITNESS:  SURE. |
| 09:40AM | 7 | THE CLERK:  GOOD MORNING. |
| 09:40AM | 8 | THE WITNESS:  GOOD MORNING. |
| 09:40AM | 9 | **(GOVERNMENT'S WITNESS, CHRISTOPHER LUCAS, WAS SWORN.)** |
| 09:40AM | 10 | THE WITNESS:  YES. |
| 09:40AM | 11 | THE CLERK:  THANK YOU. |
| 09:40AM | 12 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  LET ME |
| 09:40AM | 13 | INVITE YOU TO MAKE YOURSELF COMFORTABLE. |
| 09:40AM | 14 | THE WITNESS:  THANK YOU. |
| 09:40AM | 15 | THE COURT:  YOU'RE WELCOME. |
| 09:40AM | 16 | FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED, |
| 09:40AM | 17 | AND I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 09:40AM | 18 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR |
| 09:40AM | 19 | NAME, AND THEN SPELL IT, PLEASE. |
| 09:40AM | 20 | THE WITNESS:  SURE.  MY NAME IS CHRISTOPHER LUCAS. |
| 09:40AM | 21 | C-H-R-I-S-T-O-P-H-E-R, LUCAS, L-U-C-A-S. |
| 09:40AM | 22 | THE COURT:  THANK YOU. |
| 09:40AM | 23 | COUNSEL. |
| 09:40AM | 24 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 09:40AM | 25 | **DIRECT EXAMINATION** |

LUCAS DIRECT BY MR. BOSTIC                                         5389

09:41AM    1        BY MR. BOSTIC:

09:41AM    2        Q.   MR. LUCAS, IF YOU ARE FULLY VACCINATED AND COMFORTABLE

09:41AM    3        DOING SO, I UNDERSTAND THE COURT WILL ALLOW YOU TO TESTIFY

09:41AM    4        WITHOUT A MASK.

09:41AM    5        A.   OKAY.  THANK YOU.

09:41AM    6        Q.   I'LL REMOVE MY MASK AS WELL.

09:41AM    7             MR. LUCAS, WERE YOU AN INVESTOR IN A COMPANY CALLED

09:41AM    8        THERANOS?

09:41AM    9        A.   YES, I WAS.

09:41AM   10        Q.   I'LL ASK YOU SOME QUESTIONS ABOUT THAT, BUT FIRST LET ME

09:41AM   11        ASK YOU SOME QUESTIONS ABOUT YOUR BACKGROUND.

09:41AM   12             CAN YOU SUMMARIZE FOR US YOUR EDUCATION, PLEASE?

09:41AM   13        A.   SURE.  I HAVE A BACHELOR'S IN ENGINEERING FROM UCLA AND AN

09:41AM   14        MBA FROM U.S.C.

09:41AM   15        Q.   AND AFTER YOU OBTAINED THOSE DEGREES, CAN YOU SUMMARIZE

09:41AM   16        YOUR WORK HISTORY, YOUR CAREER FOR US, PLEASE?

09:41AM   17        A.   SURE.  AFTER MY MBA, I WORKED IN STARTUPS FOR QUITE SOME

09:41AM   18        TIME, BOTH AS CFO, AS WELL AS SOME SALES POSITIONS.

09:41AM   19             AND THEN IN 1998 -- AND I'VE BEEN AROUND VENTURE

09:41AM   20        INVESTMENTS ALL OF MY LIFE.  I STARTED OUR FIRM,

09:42AM   21        BLACK DIAMOND VENTURES, IN 1998.

09:42AM   22        Q.   AND WHAT IS BLACK DIAMOND VENTURES?

09:42AM   23        A.   SO WE'RE A VENTURE CAPITAL FIRM.  WE INVEST IN TECHNOLOGY

09:42AM   24        COMPANIES, PRIMARILY SEMICONDUCTOR SOFTWARE, MEDICAL, AND

09:42AM   25        MEDICAL DEVICE.

LUCAS DIRECT BY MR. BOSTIC                                            5390

| | | |
|---|---|---|
| 09:42AM | 1 | Q.   AND HAVE YOU BEEN AFFILIATED WITH BLACK DIAMOND VENTURES |
| 09:42AM | 2 | SINCE 1998? |
| 09:42AM | 3 | A.   YES. |
| 09:42AM | 4 | Q.   WHAT IS YOUR TITLE AT BLACK DIAMOND VENTURES? |
| 09:42AM | 5 | A.   MANAGING DIRECTOR. |
| 09:42AM | 6 | Q.   AND IN PLAIN TERMS, WHAT DOES THAT MEAN ABOUT YOUR ROLE AT |
| 09:42AM | 7 | BLACK DIAMOND? |
| 09:42AM | 8 | A.   SO I FOUNDED THE FIRM IN '98, AND OBVIOUSLY BACK -- WELL, |
| 09:42AM | 9 | NOT OBVIOUSLY, BUT BACK THEN I DID MOST OF THE RESEARCH, |
| 09:42AM | 10 | ANALYSIS, AND SO FORTH. |
| 09:42AM | 11 | AND THEN AS WE HAD OTHER FOLKS COME INTO THE FIRM, THEY |
| 09:42AM | 12 | DID MORE OF THAT, AND I WAS MORE IN A MANAGING ROLE. |
| 09:42AM | 13 | Q.   AS MANAGING DIRECTOR, ARE YOU THE SENIOR MOST PERSON AT |
| 09:42AM | 14 | BLACK DIAMOND VENTURES? |
| 09:43AM | 15 | A.   YES. |
| 09:43AM | 16 | Q.   AND IN THAT CAPACITY, HAVE YOU WORKED ON A NUMBER OF |
| 09:43AM | 17 | VENTURE INVESTMENTS AT BLACK DIAMOND VENTURES? |
| 09:43AM | 18 | A.   YES. |
| 09:43AM | 19 | Q.   I'D LIKE TO TALK ABOUT HOW YOU APPROACH A POTENTIAL |
| 09:43AM | 20 | INVESTMENT. |
| 09:43AM | 21 | FIRST OF ALL, CAN YOU GIVE US AN OVERVIEW OF THE PROCESS, |
| 09:43AM | 22 | IF THERE IS ONE, THAT BLACK DIAMOND VENTURES USES IN EVALUATING |
| 09:43AM | 23 | A POSSIBLE INVESTMENT? |
| 09:43AM | 24 | A.   SURE.  SO GENERALLY MOST OF OUR INVESTMENTS COME FROM |
| 09:43AM | 25 | REFERRALS, EITHER FROM EITHER VC FIRMS OR FOLKS THAT WE KNOW. |

LUCAS DIRECT BY MR. BOSTIC                                            5391

09:43AM  1        AND THEN WE START OUR PROCESS OF -- OBVIOUSLY WE MEET THE
09:43AM  2   CEO AND ANY OF THE FOUNDING MANAGEMENT TEAM.  AND GENERALLY
09:43AM  3   THEY PUT TOGETHER MATERIALS THAT WE THEN REVIEW.
09:43AM  4        TO THE EXTENT SOMETIMES THEY PUT TOGETHER WHAT IS CALLED A
09:44AM  5   DATA ROOM WHERE THEY PUT ALL OF THE RELEVANT DOCUMENTS INTO
09:44AM  6   THAT PLACE ON A HARD DRIVE.
09:44AM  7   Q.   AND WHEN BDV IS DECIDING WHETHER TO INVEST IN A COMPANY --
09:44AM  8   WELL, LET ME ASK, WHERE IS THE -- WHERE ARE THE FUNDS COMING
09:44AM  9   FROM THAT ACTUALLY MAKE UP THE INVESTMENT IN A TYPICAL CASE?
09:44AM  10  A.   SO UNIQUELY, OUR FIRM IS COMPRISED OF ALL INDIVIDUALS, SO
09:44AM  11  IT'S FOLKS WHO HAVE THE CAPACITY AND ARE ACCREDITED INVESTORS
09:44AM  12  SO THAT THEY CAN INVEST IN DEALS LIKE THIS.
09:44AM  13  Q.   AND --
09:44AM  14  A.   AND I MAKE THE DISTINCTION THAT WE DO NOT HAVE ANY
09:44AM  15  INSTITUTIONAL INVESTORS.
09:44AM  16  Q.   UNDERSTOOD.  SO THE FIRM IS MANAGING AND IMPLEMENTING THE
09:44AM  17  INVESTMENT ON BEHALF OF THOSE INDIVIDUALS?
09:44AM  18  A.   THAT'S CORRECT.
09:44AM  19  Q.   WHEN -- CAN I CALL BLACK DIAMOND VENTURES BDV FOR SHORT?
09:45AM  20  DO YOU EVER USE THAT ABBREVIATION?
09:45AM  21  A.   YES.
09:45AM  22  Q.   WHEN BDV IS EVALUATING A POTENTIAL INVESTMENT, DO YOU
09:45AM  23  CATEGORIZE COMPANIES BASED ON HOW LONG THEY'VE BEEN AROUND AND
09:45AM  24  HOW FAR ALONG THEY ARE?
09:45AM  25  A.   WE DO.  AND IT GOES FROM SOMEONE MAY HAVE AN IDEA FOR A

LUCAS DIRECT BY MR. BOSTIC                                              5392

09:45AM  1    COMPANY VERY EARLY STAGE, KIND OF THE DREAM STAGE, AND THEN UP

09:45AM  2    FROM THERE EARLY STAGE, MEDIUM STAGE, LATE STAGE WHERE LATE

09:45AM  3    STAGE IS YOU'RE ROLLING WHATEVER IT IS YOU'RE DOING OUT TO THE

09:45AM  4    MARKETPLACE AND YOU'RE NOW RAISING CAPITAL JUST TO CONTINUE

09:45AM  5    THAT PROCESS.

09:45AM  6    Q.   AND HOW DOES THAT FACTOR, THE STAGE OF GROWTH THAT A

09:45AM  7    COMPANY IS IN, HOW DOES THAT FACTOR AFFECT YOUR EVALUATION OF A

09:45AM  8    POTENTIAL INVESTMENT?

09:45AM  9    A.   SO CLEARLY EARLIER STAGE COMPANIES, IT'S MORE RISKY AND

09:46AM  10   IT'S MORE UNCERTAIN, SO WHEN YOU EVALUATE IT, YOU HOPE TO BE --

09:46AM  11   YOU HOPE TO GET A LARGER RETURN FOR THAT.

09:46AM  12       AS YOU'RE FARTHER UP THE CHAIN, MAYBE IT'S MORE CERTAIN

09:46AM  13   THAT YOU'RE GOING TO MAKE A RETURN, AND YOU AREN'T SURE HOW

09:46AM  14   MUCH, BUT YOU ARE GOING TO MAKE A RETURN AND UNLIKELY THAT

09:46AM  15   YOU'RE GOING TO LOSE MONEY.

09:46AM  16       AND SO SUBSEQUENTLY THE RETURNS ARE GENERALLY NOT AS GREAT

09:46AM  17   THAN IF YOU HAD INVESTED IN AN EARLY STAGE.

09:46AM  18   Q.   SO IN DETERMINING WHETHER TO INVEST IN EVALUATING A

09:46AM  19   POTENTIAL COMPANY, WHAT ARE YOUR PRIMARY SOURCES OF

09:46AM  20   INFORMATION?

09:46AM  21   A.   CERTAINLY INITIALLY MEETING WITH THE MANAGEMENT TEAM AND

09:46AM  22   UNDERSTANDING THE CAPABILITY OF THEM, ANALYZING THE POTENTIAL

09:46AM  23   OF WHATEVER IT IS THAT THEY'RE GOING TO DO, AND THE SIZE OF THE

09:47AM  24   MARKET, AND IS THIS WORTHWHILE AND SO FORTH.

09:47AM  25       AND THEN HOW MUCH MONEY IS IT GOING TO TAKE TO GET THE

LUCAS DIRECT BY MR. BOSTIC                                             5393

```
09:47AM   1    COMPANY TO FRUITION.

09:47AM   2    Q.   I'D LIKE TO TALK ABOUT YOUR EXPERIENCE WITH THERANOS

09:47AM   3    SPECIFICALLY.

09:47AM   4        HOW WERE YOU FIRST INTRODUCED TO THE COMPANY, OR HOW DID

09:47AM   5    YOU BECOME AWARE OF THERANOS?

09:47AM   6    A.   MY UNCLE, DON LUCAS, HAS BEEN A VENTURE CAPITALIST A LONG

09:47AM   7    TIME IN THE VALLEY, AND HE HAD MET ELIZABETH EARLY ON THROUGH

09:47AM   8    ONE OF HIS FRIENDS, AND SO HE INTRODUCED HER TO ME

09:47AM   9    SUBSEQUENTLY.

09:47AM  10    Q.   DO YOU RECALL APPROXIMATELY WHEN YOU FIRST BECAME AWARE OF

09:47AM  11    THE COMPANY?

09:47AM  12    A.   APPROXIMATELY 2005, I BELIEVE, 2005, 2006.

09:47AM  13    Q.   AND AROUND THAT TIME PERIOD, DO YOU RECALL WHAT

09:48AM  14    DON LUCAS'S CONNECTION TO THERANOS WAS?

09:48AM  15    A.   WELL, AS I SAY, HE WAS INTRODUCED TO ELIZABETH, AND HE

09:48AM  16    STARTED SPENDING CONSIDERABLE TIME WITH HER, AND HE WAS VERY

09:48AM  17    EXCITED ABOUT THE OPPORTUNITY, AND THAT WAS PRETTY MUCH THE

09:48AM  18    INVOLVEMENT.

09:48AM  19        AND THEN HE TOOK IT FROM THERE.

09:48AM  20    Q.   DID DON LUCAS INVEST IN THERANOS TO YOUR KNOWLEDGE?

09:48AM  21    A.   HE DID.

09:48AM  22    Q.   AND WAS THERE A TIME WHEN DON LUCAS WAS ON THE BOARD OF

09:48AM  23    DIRECTORS FOR THERANOS?

09:48AM  24    A.   HE WAS ON THE BOARD CERTAINLY IN THE BEGINNING, AND FOR

09:48AM  25    SOME TIME HE WAS CHAIRMAN OF THE BOARD.
```

LUCAS DIRECT BY MR. BOSTIC                                      5394

09:48AM    1              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

09:48AM    2              THE COURT:  YES.

09:48AM    3         BY MR. BOSTIC:

09:48AM    4         Q.  (HANDING.)

09:48AM    5              MR. LUCAS, I'VE HANDED YOU A BINDER OF DOCUMENTS.  I'VE

09:48AM    6         PROVIDED THE COURT AND DEFENSE COUNSEL WITH COPIES AS WELL.

09:48AM    7              I'LL ASK YOU TO TURN TO TAB 5016 IN THAT BINDER IF YOU

09:49AM    8         COULD.

09:49AM    9              DO YOU HAVE 5016 IN FRONT OF YOU?

09:49AM   10         A.  I DO.

09:49AM   11         Q.  DO YOU RECOGNIZE THAT DOCUMENT?

09:49AM   12         A.  I DO.

09:49AM   13         Q.  IS THIS AN EMAIL FROM JANUARY 2006 TO YOU ABOUT AN

09:49AM   14         INVESTMENT IN THERANOS?

09:49AM   15         A.  DID YOU SAY JANUARY 6TH?

09:49AM   16         Q.  JANUARY 2006.

09:49AM   17         A.  MAYBE I'M IN THE WRONG ONE.  THIS IS --

09:49AM   18         Q.  ARE YOU AT TAB 50 --

09:49AM   19         A.  OH, JANUARY 2006.  I'M SORRY.

09:50AM   20              YES, YES.  JANUARY 30TH.  YEP.

09:50AM   21              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5016.

09:50AM   22              MR. DOWNEY:  NO OBJECTION.

09:50AM   23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:50AM   24         (GOVERNMENT'S EXHIBIT 5016 WAS RECEIVED IN EVIDENCE.)

09:50AM   25         BY MR. BOSTIC:

LUCAS DIRECT BY MR. BOSTIC                                      5395

```
09:50AM    1    Q.   AND, MR. LUCAS, WE SEE HERE AN EMAIL HERE FROM SOMEONE

09:50AM    2    NAMED NICOLE HARPER AT FENWICK & WEST.

09:50AM    3         DO YOU SEE THAT?

09:50AM    4    A.   YES.

09:50AM    5    Q.   AND IS THAT YOUR EMAIL AT THE TOP, CHRIS@BDVENTURES AT THE

09:50AM    6    TOP?

09:50AM    7    A.   IT IS.

09:50AM    8    Q.   CAN YOU DESCRIBE FOR US WHAT WAS HAPPENING AS REFERENCED

09:50AM    9    IN THIS EMAIL IN JANUARY 2006?

09:50AM   10    A.   THIS IS REFERRING TO A SERIES B FINANCING, WHICH WE

09:50AM   11    INVESTED SOME MONEY BACK THERE AT THAT TIME.

09:50AM   12    Q.   SO THIS IS IN CONNECTION WITH AN INVESTMENT BY BDV IN

09:50AM   13    THERANOS?

09:50AM   14    A.   CORRECT.

09:50AM   15    Q.   DO YOU RECALL THE APPROXIMATE AMOUNT OF THAT INVESTMENT IN

09:50AM   16    EARLY 2006?

09:51AM   17    A.   I DO.  I BELIEVE IT WAS ABOUT 400,000.

09:51AM   18    Q.   APPROXIMATELY?

09:51AM   19    A.   APPROXIMATELY.

09:51AM   20    Q.   AND THOSE FUNDS, GENERALLY SPEAKING, WHAT WAS THE SOURCE

09:51AM   21    OF THOSE FUNDS?  DID THEY COME FROM THE INDIVIDUAL CLIENTS OF

09:51AM   22    BDV, OR WERE YOUR PERSONAL FUNDS INCLUDED IN THAT?

09:51AM   23    A.   THERE MAY HAVE BEEN SOME OF MY PERSONAL FUNDS, BUT THE

09:51AM   24    MAJORITY FROM OUR INVESTORS.

09:51AM   25    Q.   AROUND THIS TIME IN JANUARY 2006, DID YOU HAVE OCCASION TO
```

LUCAS DIRECT BY MR. BOSTIC                                        5396

09:51AM   1    HAVE CONVERSATIONS WITH MS. HOLMES?

09:51AM   2    A.   YES.

09:51AM   3    Q.   WOULD THIS HAVE BEEN AROUND THE TIME WHEN YOU FIRST MET

09:51AM   4    MS. HOLMES?

09:51AM   5    A.   YES.  IF I'M RECOLLECTING PROPERLY, IT MAY HAVE BEEN A

09:51AM   6    LITTLE BIT BEFORE.  I'M JUST NOT RECALLING.

09:51AM   7    Q.   WE TALKED A LITTLE BIT BEFORE ABOUT BDV'S PROCESS FOR

09:52AM   8    EVALUATING INVESTMENTS.  FOR THIS INVESTMENT IN JANUARY OF

09:52AM   9    2006, WHAT WERE YOUR SOURCES OF INFORMATION ABOUT THERANOS

09:52AM   10   GENERALLY SPEAKING?

09:52AM   11   A.   GENERALLY IT WOULD HAVE BEEN EARLY ON THAT I MET ELIZABETH

09:52AM   12   AND -- BUT THE MAJORITY OF THE INFORMATION AT THAT TIME WAS

09:52AM   13   COMING FROM MY UNCLE, AND I THINK AT THAT TIME THERE WAS

09:52AM   14   ANOTHER INVESTOR AS WELL THAT WAS PROVIDING INFORMATION.

09:52AM   15        BUT BACK THEN IT WAS, AGAIN, WOULD HAVE BEEN ON A REFERRAL

09:52AM   16   BASIS, AND YOU WANT TO CLEARLY INVEST IN WONDERFUL

09:52AM   17   OPPORTUNITIES, AND SOMETIMES YOU DO GET THE SENSE THAT THIS IS

09:52AM   18   A GREAT OPPORTUNITY.  AND SO, YEAH, YOU'RE BEING INVITED TO

09:52AM   19   COME INTO A DEAL AND INVEST.

09:52AM   20   Q.   AND IN YOUR MIND, WHAT MADE THERANOS A WONDERFUL

09:52AM   21   OPPORTUNITY IN 2006?

09:52AM   22   A.   CERTAINLY WITH ELIZABETH, AND AGAIN, IF I HAD MET HER

09:53AM   23   AROUND THAT TIME AND SO FORTH, SHE WAS VERY PASSIONATE ABOUT

09:53AM   24   THE PROJECT, VERY SINCERE WHAT SHE WAS TRYING TO DO, WORKED ALL

09:53AM   25   OF THE TIME.  IT WAS ALL THERANOS ALL THE TIME FOR ELIZABETH.

LUCAS DIRECT BY MR. BOSTIC                                    5397

09:53AM   1    Q.   AND IN CONNECTION WITH THAT INVESTMENT, DID YOU HAVE THE

09:53AM   2    OPPORTUNITY TO REVIEW ANY DOCUMENTATION PROVIDED BY THE

09:53AM   3    GOVERNMENT?

09:53AM   4    A.   I MAY HAVE, AND IT WAS -- AGAIN, IF IT WAS AT THIS TIME --

09:53AM   5    A RUDIMENTARY DISCUSSION OF WHAT THE COMPANY WAS TRYING TO

09:53AM   6    ACHIEVE WITH A DROP OF BLOOD AND ALL OF THE TESTS AND SO FORTH.

09:53AM   7    Q.   TELL US MORE ABOUT THAT.  BASED ON THE INFORMATION THAT

09:53AM   8    YOU HAD AT THAT TIME, WHAT WAS YOUR UNDERSTANDING OF WHERE THE

09:53AM   9    COMPANY WAS, WHAT ITS PRODUCT WAS, THINGS LIKE THAT?

09:53AM   10   A.   YEAH.  SO, SO THIS WAS AT THE TIME VERY EARLY STAGE.

09:54AM   11   ELIZABETH WAS SPENDING ALL THE TIME WITH SOME OF THE FOLKS.

09:54AM   12       SO IT IS TRULY AT THAT STAGE, YOU DON'T KNOW IF THE

09:54AM   13   COMPANY IS GOING TO BE ABLE TO COME UP WITH IT OR NOT.  YOU

09:54AM   14   TAKE A SHOT, IT SOUNDS VERY INTERESTING AND EXCITING, AND IF IT

09:54AM   15   ALL WORKED OUT, WONDERFUL.

09:54AM   16       AND IF THEY WERE NOT ABLE TO DEVELOP THE TECHNOLOGY, GIVEN

09:54AM   17   THAT THIS WAS SO EARLY STAGE, YOU KNOW, YOU TOOK YOUR CHANCE,

09:54AM   18   AND IF IT DIDN'T WORK OUT, YOU MOVE ON.

09:54AM   19   Q.   AND AS YOU UNDERSTOOD IT AT THE TIME, WHAT WAS THE

09:54AM   20   TECHNOLOGY THAT THE COMPANY WAS TRYING TO DEVELOP?

09:54AM   21   A.   SO FROM A SMALL AMOUNT OF BLOOD, A VERY SMALL AMOUNT OF

09:54AM   22   BLOOD, FINGERSTICK, THAT THE COMPANY'S TECHNOLOGY WOULD

09:54AM   23   ULTIMATELY BE ABLE TO EVALUATE AND TEST THE BLOOD CERTAINLY

09:55AM   24   WITH THE MOST OF THE GENERAL TESTS THAT WOULD BE ADMINISTRATED

09:55AM   25   BY A QUEST OR A LABCORP.

LUCAS DIRECT BY MR. BOSTIC                                            5398

```
09:55AM    1          BUT THE ULTIMATE VISION WAS TO HAVE ALL TESTS BE ABLE TO

09:55AM    2    TEST WITH A SMALL AMOUNT OF BLOOD.

09:55AM    3    Q.   AND BASED ON THE INFORMATION THAT YOU WERE GETTING FROM

09:55AM    4    MS. HOLMES AND THERANOS AT THIS TIME, WHAT WAS YOUR

09:55AM    5    UNDERSTANDING OF HOW FAR ALONG THAT TECHNOLOGY WAS?  WAS IT A

09:55AM    6    VERY ROUGH CONCEPT?  A DRAWING ON A NAPKIN?  WAS IT A FULLY

09:55AM    7    FINISHED PRODUCT?  OR SOMEWHERE IN BETWEEN?

09:55AM    8    A.   IT WAS CERTAINLY BEYOND A DRAWING ON A NAPKIN, BUT WE

09:55AM    9    CERTAINLY DIDN'T BELIEVE AT THAT TIME THAT IT WAS FULLY

09:55AM   10    FUNCTIONAL AND DEVELOPED.

09:55AM   11    Q.   AND FINALLY, HOW DID THAT UNDERSTANDING RELATE TO YOUR

09:55AM   12    ASSESSMENT OF THE AMOUNT OF RISK INVOLVED IN THE INVESTMENT?

09:56AM   13    A.   AT THAT POINT IT WOULD HAVE BEEN VERY HIGH RISK.

09:56AM   14    Q.   WAS THE 2006 INVESTMENT THE ONLY TIME THAT BDV INVESTED IN

09:56AM   15    THERANOS?

09:56AM   16    A.   WE INVESTED LATER THAT YEAR AS WELL, AND AGAIN IN 2013.

09:56AM   17    Q.   AND DO YOU RECALL THE AMOUNT OF THE SECOND INVESTMENT IN

09:56AM   18    2006?

09:56AM   19    A.   I BELIEVE IT WAS AROUND A MILLION AND A HALF.

09:56AM   20    Q.   AND THEN YOU SAID THERE WAS AN INVESTMENT AFTER THAT AS

09:56AM   21    WELL?

09:56AM   22    A.   YES.

09:56AM   23    Q.   AND WHEN DID THAT OCCUR?

09:56AM   24    A.   THAT OCCURRED IN DECEMBER OF 2013.

09:56AM   25    Q.   OKAY.  LET'S TALK ABOUT THE TIME PERIOD LEADING UP TO THAT
```

LUCAS DIRECT BY MR. BOSTIC                                          5399

| | | |
|---|---|---|
| 09:56AM | 1 | 2013 INVESTMENT, IF WE COULD. |
| 09:56AM | 2 | FIRST, DO YOU RECALL THE APPROXIMATE AMOUNT OF THAT 2013 |
| 09:56AM | 3 | INVESTMENT? |
| 09:56AM | 4 | A.   YES.   ABOUT 5.4 MILLION. |
| 09:56AM | 5 | Q.   SO APPROXIMATELY FIVE TO TEN TIMES THE AMOUNT OF THE |
| 09:57AM | 6 | INVESTMENT IN 2006? |
| 09:57AM | 7 | A.   ABOUT FOUR TIMES. |
| 09:57AM | 8 | Q.   THREE TO FOUR TIMES? |
| 09:57AM | 9 | A.   YEP. |
| 09:57AM | 10 | Q.   FOLLOWING YOUR INITIAL CONVERSATIONS WITH MS. HOLMES IN |
| 09:57AM | 11 | 2006, DID YOU REMAIN IN CONTACT WITH HER? |
| 09:57AM | 12 | A.   YES. |
| 09:57AM | 13 | Q.   AND DURING THOSE FURTHER CONTACTS, DID YOU RECEIVE |
| 09:57AM | 14 | ADDITIONAL INFORMATION FROM HER ABOUT THERANOS? |
| 09:57AM | 15 | A.   YES. |
| 09:57AM | 16 | Q.   CAN YOU GIVE US A SENSE OF HOW FREQUENTLY YOU WERE IN |
| 09:57AM | 17 | TOUCH WITH MS. HOLMES DURING THAT TIME PERIOD?  AND AGAIN, |
| 09:57AM | 18 | WE'RE TALKING GENERALLY FROM 2006 TO 2013. |
| 09:57AM | 19 | A.   CERTAINLY BY, BY PHONE QUITE OFTEN, AND WHEN I WOULD BE UP |
| 09:57AM | 20 | HERE IN THE BAY AREA WE WOULD GET TOGETHER, AND THAT COULD HAVE |
| 09:57AM | 21 | BEEN FOUR OR FIVE TIMES A YEAR. |
| 09:57AM | 22 | Q.   IN-PERSON MEETINGS APPROXIMATELY FOUR TO FIVE TIMES A |
| 09:57AM | 23 | YEAR? |
| 09:57AM | 24 | A.   I WOULD SAY SO, AND, YES, IN PERSON. |
| 09:58AM | 25 | Q.   AND AS FAR AS THE PHONE CONTACT, HOW FREQUENT WAS THAT? |

LUCAS DIRECT BY MR. BOSTIC                                    5400

```
09:58AM    1    A.    I'M REALLY NOT REMEMBERING, BUT I COULD IMAGINE ONCE A
09:58AM    2    MONTH, SOMETHING LIKE THAT.
09:58AM    3    Q.    AND DURING THAT TIME PERIOD, THOSE YEARS LEADING UP TO THE
09:58AM    4    2013 INVESTMENT, WERE THERE OTHER INDIVIDUALS AT THERANOS WITH
09:58AM    5    WHOM YOU WERE ALSO IN CONTACT?
09:58AM    6    A.    GENERALLY ELIZABETH, CERTAINLY SOME OF HER ASSISTANTS, AND
09:58AM    7    THEN I'M JUST FORGETTING THE TIMEFRAME WHEN I THEN GOT TO KNOW
09:58AM    8    HER BROTHER, CHRISTIAN, AND SOME OF THE OTHER FOLKS.
09:58AM    9          BUT PRIMARILY IT WAS DIRECTLY WITH ELIZABETH.
09:58AM   10    Q.    DOES THAT MEAN THAT MS. HOLMES WAS THE PRIMARY SOURCE OF
09:58AM   11    INFORMATION ABOUT THERANOS IN THE TIME LEADING UP TO THAT 2013
09:58AM   12    INVESTMENT?
09:58AM   13    A.    YES.  YES.
09:58AM   14    Q.    YOU MENTIONED THAT YOUR UNCLE, DON LUCAS, HAD BEEN ON THE
09:59AM   15    BOARD OF DIRECTORS AT THERANOS; IS THAT CORRECT?
09:59AM   16    A.    CORRECT.
09:59AM   17    Q.    AND DID YOU ALSO HAVE CONVERSATIONS WITH HIM ABOUT THE
09:59AM   18    COMPANY DURING THAT TIME PERIOD?
09:59AM   19    A.    YES.
09:59AM   20    Q.    WAS HE THEN A SECONDARY SOURCE OF INFORMATION FOR YOU
09:59AM   21    ABOUT THE COMPANY?
09:59AM   22    A.    ABSOLUTELY.
09:59AM   23    Q.    WHEN YOU WERE IN TOUCH WITH MS. HOLMES DURING THIS TIME
09:59AM   24    PERIOD, WAS IT ONLY IN BUSINESS SETTINGS OR DID YOU ALSO HAVE
09:59AM   25    SOCIAL CONTACT WITH MS. HOLMES?
```

LUCAS DIRECT BY MR. BOSTIC                                                5401

09:59AM   1    A.   WELL, WE WOULD A NUMBER OF TIMES GO HAVE DINNER OR HAVE

09:59AM   2    LUNCH, AND IF THAT'S CONSIDERED A SOCIAL SETTING, THEN

09:59AM   3    ABSOLUTELY.  I FELT THAT SHE AND I GOT TO KNOW EACH OTHER QUITE

09:59AM   4    WELL.

09:59AM   5    Q.   DURING THOSE CONVERSATIONS WITH MS. HOLMES -- AND I'LL ASK

09:59AM   6    YOU FOR SOME MORE DETAILS IN A MOMENT -- WAS THE NEWS THAT YOU

09:59AM   7    GOT ABOUT THERANOS GENERALLY POSITIVE, OR DID YOU EVER RECEIVE

09:59AM   8    NEGATIVE NEWS ABOUT THE COMPANY?

10:00AM   9    A.   GENERALLY POSITIVE, AND I DON'T RECOLLECT, IF ANY,

10:00AM  10    NEGATIVE NEWS.

10:00AM  11    Q.   AS FAR AS THE AMOUNT OF INFORMATION THAT YOU RECEIVED

10:00AM  12    ABOUT THE COMPANY, DID YOU FEEL THAT THERE WAS A HIGH DEGREE OF

10:00AM  13    TRANSPARENCY AT THERANOS?  DID YOU GET A LOT OF INSIGHT INTO

10:00AM  14    WHAT WAS HAPPENING AT THE COMPANY DURING THAT TIME PERIOD?

10:00AM  15    A.   THERE WAS NOT A LOT OF TRANSPARENCY.

10:00AM  16         HOWEVER, WE FELT, AND I FELT WITH MY RELATIONSHIP WITH

10:00AM  17    ELIZABETH, THAT I WAS CERTAINLY BEING TOLD THE INFORMATION THAT

10:00AM  18    I NEEDED IN MAKING ANY DECISIONS.

10:00AM  19    Q.   WHEN YOU SAY THERE WAS NOT A HIGH DEGREE OF TRANSPARENCY,

10:00AM  20    WHAT MAKES YOU SAY THAT?

10:00AM  21    A.   WELL, TYPICALLY WE WOULD RECEIVE FINANCIAL STATEMENTS AND

10:00AM  22    ACTUALLY SEE EVERYTHING WORKING IN THE LABORATORY AND SO FORTH,

10:01AM  23    AND A LOT OF THAT WAS -- WE WERE NOT PROVIDED THE OPPORTUNITY.

10:01AM  24    Q.   DID THERE COME A TIME DURING THAT TIME PERIOD WHEN YOUR

10:01AM  25    UNCLE, DON LUCAS, STEPPED AWAY FROM INVOLVEMENT WITH THERANOS?

LUCAS DIRECT BY MR. BOSTIC                                              5402

10:01AM   1    A.   YES.  OFFICIALLY IN 2012 HE RESIGNED FROM THE BOARD.

10:01AM   2    Q.   AND WHAT EFFECT, IF ANY, DID THAT HAVE ON HOW YOU RECEIVED

10:01AM   3    INFORMATION ABOUT THE COMPANY?

10:01AM   4    A.   CERTAINLY AFTER THAT TIME HE HAD NO -- NOTHING MORE TO BE

10:01AM   5    ABLE TO CONTRIBUTE BECAUSE HE WAS NOT WITH THE COMPANY.

10:01AM   6         BUT AT THAT TIME I HAD A GREAT RELATIONSHIP WITH

10:01AM   7    ELIZABETH, AND WE TALKED, AND I RECEIVED THE INFORMATION MAINLY

10:01AM   8    FROM HER.

10:01AM   9    Q.   I'LL ASK YOU TO TURN TO TAB 5095 IN THE BINDER.  IT SHOULD

10:02AM   10   BE THE NEXT ONE.

10:02AM   11        DO YOU HAVE THAT EMAIL IN FRONT OF YOU?

10:02AM   12   A.   I DO.

10:02AM   13   Q.   ARE YOU LOOKING AT AN EMAIL FROM JULY OF 2013 FROM

10:02AM   14   THERANOS TO A NUMBER OF INDIVIDUALS, INCLUDING YOURSELF?

10:02AM   15   A.   YES.

10:02AM   16   Q.   AND IS THIS MESSAGE ADDRESSED "DEAR SHAREHOLDER" AT THE

10:02AM   17   TOP?

10:02AM   18   A.   IT IS.

10:02AM   19        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:02AM   20   EXHIBIT 5095.

10:02AM   21        MR. DOWNEY:  NO OBJECTION.

10:02AM   22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:02AM   23        (GOVERNMENT'S EXHIBIT 5095 WAS RECEIVED IN EVIDENCE.)

10:02AM   24   BY MR. BOSTIC:

10:02AM   25   Q.   AND, MR. LUCAS, WE'VE REDACTED A MAJORITY OF THE EMAIL

LUCAS DIRECT BY MR. BOSTIC                                    5403

10:02AM  1    ADDRESSES HERE.

10:02AM  2         DO YOU SEE AT THE TOP THAT YOU WERE INCLUDED ON THIS

10:02AM  3    EMAIL?

10:02AM  4    A.   YES, I WAS.

10:02AM  5    Q.   AND DO YOU SEE MS. HOLMES WAS BCC'ED AS WELL?

10:02AM  6    A.   YES.

10:02AM  7    Q.   LET'S ZOOM IN ON THE TEXT OF THE MESSAGE ITSELF.

10:03AM  8         AND THIS EMAIL SAYS, "DEAR SHAREHOLDER.

10:03AM  9         "IT IS WITH GREAT PLEASURE THAT I WRITE YOU TO INFORM YOU

10:03AM  10   OF OUR UPCOMING CONSUMER LAUNCH."

10:03AM  11        DO YOU SEE THAT?

10:03AM  12   A.   YES.

10:03AM  13   Q.   AND THE LINE BELOW SAYS, AS YOU ALL KNOW, WE HAVE BEEN

10:03AM  14   WORKING IN STEALTH MODE TO PREPARE FOR THIS.

10:03AM  15        DO YOU RECALL AT THIS TIME IN 2013 WHEN YOU WERE INFORMED

10:03AM  16   BY THERANOS ABOUT THEIR UPCOMING CONSUMER LAUNCH?

10:03AM  17   A.   YES.

10:03AM  18   Q.   AND WHAT WAS YOUR REACTION TO THIS AS AN INVESTOR?

10:03AM  19   A.   VERY EXCITING.

10:03AM  20   Q.   WHY?

10:03AM  21   A.   IT'S EXCITING BECAUSE THIS IS WHAT ELIZABETH AND HER

10:03AM  22   DEDICATED TEAM HAD BEEN WORKING ON FOR SO LONG, AND THEY FELT

10:03AM  23   IT WAS NOW READY FOR PRIMETIME, TO BE TAKEN OUT TO THE MARKET.

10:03AM  24   Q.   AND -- APOLOGIES.

10:03AM  25   A.   NO, I'M SORRY.  THAT'S IT.

LUCAS DIRECT BY MR. BOSTIC                                    5404

| | | |
|---|---|---|
| 10:03AM | 1 | Q.   AND FROM THE PERSPECTIVE OF SOMEONE WHO HAS INVESTED IN |
| 10:04AM | 2 | THE COMPANY, WHY WOULD THIS BE EXCITING OR GOOD NEWS? |
| 10:04AM | 3 | A.   WELL, IT WOULD INDICATE THAT ALL OF THEIR EFFORTS HAD NOW |
| 10:04AM | 4 | STARTED TO COME TO FRUITION.  THAT ALLOWED THEM, AS I SAID, TO |
| 10:04AM | 5 | TAKE IT TO MARKET. |
| 10:04AM | 6 | AND, OF COURSE, IN DOING SO, THE VALUE OF THE COMPANY AND |
| 10:04AM | 7 | OUR INVESTMENT WAS CERTAINLY INCREASING. |
| 10:04AM | 8 | Q.   DO YOU SEE TWO PARAGRAPHS DOWN FROM WHERE WE WERE JUST |
| 10:04AM | 9 | LOOKING IN THAT EMAIL, THERE'S A LINE THAT SAYS, "WE HAVE BEEN |
| 10:04AM | 10 | PREPARING A NEW WEBSITE IN ANTICIPATION OF THE LAUNCH"? |
| 10:04AM | 11 | A.   YES. |
| 10:04AM | 12 | Q.   DO YOU REMEMBER EVENTUALLY REVIEWING THE THERANOS WEBSITE |
| 10:04AM | 13 | WHEN IT BECAME PUBLIC? |
| 10:04AM | 14 | A.   YES. |
| 10:04AM | 15 | Q.   TURN NOW, PLEASE, TO TAB 1102, PLEASE, IN YOUR BINDER. |
| 10:05AM | 16 | A.   I'M SORRY.  SAY THE NUMBER AGAIN. |
| 10:05AM | 17 | Q.   1102. |
| 10:05AM | 18 | A.   1102. |
| 10:05AM | 19 | Q.   IT SHOULD BE THE -- |
| 10:05AM | 20 | A.   OH, IT'S BACK.  SORRY. |
| 10:05AM | 21 | Q.   AND DO YOU HAVE THAT ONE IN FRONT OF YOU? |
| 10:05AM | 22 | A.   I DO. |
| 10:05AM | 23 | Q.   AND DO YOU SEE AN EMAIL DATED SEPTEMBER 7TH, 2013? |
| 10:05AM | 24 | A.   YES. |
| 10:05AM | 25 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS |

LUCAS DIRECT BY MR. BOSTIC                                         5405

```
10:05AM   1      EXHIBIT 1102.

10:05AM   2                MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:05AM   3                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:05AM   4           (GOVERNMENT'S EXHIBIT 1102 WAS RECEIVED IN EVIDENCE.)

10:05AM   5      BY MR. BOSTIC:

10:05AM   6      Q.   AND, MR. LUCAS, WERE YOU INCLUDED ON THIS EMAIL TO

10:05AM   7      THERANOS SHAREHOLDERS?

10:05AM   8           I'LL DIRECT YOUR ATTENTION TO THE TOP QUARTER OF THE PAGE

10:05AM   9      ON THE LEFT-HAND SIDE THERE IS AN EMAIL IS

10:06AM  10      CHRIS@BDVENTURES.COM?

10:06AM  11           I PUT A MARK NEXT TO IT IF THAT HELPS.

10:06AM  12      A.   YES.

10:06AM  13      Q.   ALL RIGHT.  LET'S ZOOM OUT AND THEN ZOOM IN ON THE CONTENT

10:06AM  14      OF THIS EMAIL.

10:06AM  15           SO ON SEPTEMBER 7TH, 2013, THERANOS SENT THIS MESSAGE.

10:06AM  16           IT SAYS, "TO OUR SHAREHOLDERS.

10:06AM  17           "I AM DELIGHTED TO SHARE THAT WE HAVE NOW BEGUN THE

10:06AM  18      COMMERCIAL LAUNCH OF THE NEW PRODUCTS AND SERVICES WE HAVE BEEN

10:06AM  19      WORKING ON FOR THE PAST YEARS."

10:06AM  20           DO YOU SEE THAT?

10:06AM  21      A.   I DO.

10:06AM  22      Q.   AND DO YOU RECALL RECEIVING THIS ANNOUNCEMENT, THAT THE

10:06AM  23      COMMERCIAL LAUNCH OF THERANOS'S SERVICES HAD BEGUN?

10:06AM  24      A.   YES.

10:07AM  25      Q.   AND WHAT WAS YOUR REACTION TO THIS?
```

LUCAS DIRECT BY MR. BOSTIC                                              5406

```
10:07AM   1    A.   I'M SORRY.  AGAIN, VERY EXCITING.  THIS IS WHAT YOU WOULD

10:07AM   2    HOPE FOR AND EXPECT FOR IN INVESTING IN A COMPANY THAT HAD

10:07AM   3    WORKED SO HARD TO GET TO THIS POINT.

10:07AM   4    Q.   AND SPECIFICALLY FROM THE PERSPECTIVE OF AN INVESTOR, WAS

10:07AM   5    THIS GOOD NEWS ABOUT THE STATUS OF AN INVESTMENT?

10:07AM   6    A.   IT IS INDEED GOOD NEWS.

10:07AM   7    Q.   DO YOU SEE THAT BELOW THE HIGHLIGHTED LANGUAGE THERE, THIS

10:07AM   8    EMAIL ANNOUNCES THE NEW WEBSITE AT WWW.THERANOS.COM?

10:07AM   9    A.   YES.

10:07AM  10    Q.   AND IS THAT THE WEBSITE THAT YOU REVIEWED AS AN INVESTOR

10:07AM  11    IN THE COMPANY?

10:07AM  12    A.   YES.

10:07AM  13    Q.   BELOW THAT THIS EMAIL PROVIDES A LINK TO A STORY IN "THE

10:07AM  14    WALL STREET JOURNAL."

10:07AM  15         DO YOU SEE THAT?

10:07AM  16    A.   I DO.

10:07AM  17    Q.   IF YOU CAN TURN THE TAB TO 1106.

10:07AM  18         DO YOU SEE THERE "THE WALL STREET JOURNAL" STORY THAT IS

10:08AM  19    REFERENCED IN THE EMAIL THAT WE WERE JUST LOOKING AT?

10:08AM  20    A.   I DO.

10:08AM  21              MR. BOSTIC:  YOUR HONOR, I BELIEVE THIS IS IN

10:08AM  22    EVIDENCE ALREADY.  PERMISSION TO PUBLISH?

10:08AM  23              MR. DOWNEY:  IT IS IN EVIDENCE.

10:08AM  24              THE COURT:  YES, IT MAY BE PUBLISHED.  THANK YOU.

10:08AM  25    BY MR. BOSTIC:
```

LUCAS DIRECT BY MR. BOSTIC                                          5407

10:08AM   1    Q.   MR. LUCAS, DID YOU READ THIS "WALL STREET JOURNAL" ARTICLE

10:08AM   2    IN SEPTEMBER OF 2013?

10:08AM   3    A.   YES.

10:08AM   4    Q.   AND THE TITLE IS "ELIZABETH HOLMES:  THE BREAKTHROUGH OF

10:08AM   5    INSTANT DIAGNOSIS."

10:08AM   6         AND I'D LIKE TO DRAW YOUR ATTENTION TO FURTHER DOWN THAT

10:08AM   7    PAGE, THE FIRST INDENTED PARAGRAPH.

10:08AM   8    A.   OKAY.

10:08AM   9    Q.   THANK YOU, MS. HOLLIMAN.

10:08AM  10         AND DO YOU SEE LANGUAGE IN THE PARAGRAPH THAT BEGINS "THE

10:08AM  11    SECRET"?

10:08AM  12         IT SAYS, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW

10:08AM  13    REFINING INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE

10:08AM  14    THAN 1,000 LABORATORY TESTS FROM ROUTINE BLOOD WORK AND

10:09AM  15    ADVANCED GENETIC ANALYSES."

10:09AM  16         DO YOU SEE THAT?

10:09AM  17    A.   I DO.

10:09AM  18    Q.   AND IT SAYS, "THERANOS'S PROCESSES ARE FASTER, CHEATER AND

10:09AM  19    MORE ACCURATE THAN CONVENTIONAL METHODS AND REQUIRE ONLY

10:09AM  20    MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

10:09AM  21         DO YOU REMEMBER READING THAT LANGUAGE IN 2013?

10:09AM  22    A.   I'M SURE I READ THE ARTICLE.  I DON'T SPECIFICALLY

10:09AM  23    REMEMBER THAT LANGUAGE, BUT CERTAINLY THERE IT IS.

10:09AM  24    Q.   THAT CLAIM, THAT THE THERANOS PROCESSES WERE FASTER,

10:09AM  25    CHEAPER, AND MORE ACCURATE THAN CONVENTIONAL METHODS, WAS THAT

LUCAS DIRECT BY MR. BOSTIC                                              5408

10:09AM   1      IMPORTANT TO YOU AS AN INVESTOR IN THE COMPANY?

10:09AM   2      A.   YES, AND IT WAS VERY IMPORTANT TO THE COMPANY.  THAT WAS

10:09AM   3      THE WHOLE ESSENCE OF THE COMPANY.

10:09AM   4      Q.   AND YOUR UNDERSTANDING THAT THAT WAS THE ESSENCE OF THE

10:09AM   5      COMPANY, WHERE DID THAT UNDERSTANDING COME FROM?

10:09AM   6      A.   WELL, CERTAINLY NOW AT THIS POINT, BEING AROUND THE

10:09AM   7      COMPANY FOR ABOUT SEVEN YEARS AND AROUND ELIZABETH, I MEAN,

10:09AM   8      THAT'S ITS MISSION CLEARLY.

10:09AM   9      Q.   AND WHY WAS THAT IMPORTANT TO YOU AS AN INVESTOR, THE

10:10AM  10      CLAIM THAT THE COMPANY'S PROCESSES WERE FASTER, CHEAPER AND

10:10AM  11      MORE ACCURATE THAN CONVENTIONAL METHODS?

10:10AM  12      A.   BECAUSE IT WOULD ALLOW THE COMPANY TO EFFECTIVELY COMPETE

10:10AM  13      IN THE LAB SPACE, THE LAB TESTING SPACE.

10:10AM  14      Q.   AND HOW ABOUT THE FACT THAT THOSE METHODS OR THE PROCESSES

10:10AM  15      OF THERANOS REQUIRED ONLY MICROSCOPIC BLOOD VOLUMES, NOT VIAL

10:10AM  16      AFTER VIAL OF THE STUFF?  WAS THAT IMPORTANT TO YOU AS WELL?

10:10AM  17      A.   WELL, IT WAS IMPORTANT IN THE SENSE THAT SINCE ELIZABETH

10:10AM  18      STARTED THE COMPANY, HER -- AS SHE HAS SAID AND SAID TO ME

10:10AM  19      OFTEN, SHE HERSELF IS AFRAID OF NEEDLES AND OTHER PEOPLE ARE

10:10AM  20      AFRAID OF NEEDLES AND THE AMOUNT OF BLOOD, AND THIS WAS GOING

10:10AM  21      TO ALLOW MANY FOLKS TO JUST HAVE A PIN PRICK AND BE ABLE TO --

10:10AM  22      ALL OF THE TESTS COULD BE RUN JUST ON, ON THAT.

10:10AM  23      Q.   AND IN YOUR VIEW, WAS THAT ABILITY OF THERANOS IMPORTANT

10:11AM  24      TO THE LIKELIHOOD OF SUCCESS OF THE COMPANY?

10:11AM  25      A.   YES.

LUCAS DIRECT BY MR. BOSTIC                                        5409

10:11AM   1    Q.   LET'S GO TO PAGE 2 OF THIS ARTICLE.  ABOUT HALFWAY DOWN

10:11AM   2    THE PAGE, THERE'S A PARAGRAPH THAT SAYS, "THERANOS'S TECHNOLOGY

10:11AM   3    ELIMINATES."

10:11AM   4        DO YOU SEE THAT?

10:11AM   5    A.   YES.

10:11AM   6    Q.   AND IT READS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE

10:11AM   7    LAB TRIPS BECAUSE IT CAN 'RUN ANY COMBINATION OF TESTS,

10:11AM   8    INCLUDING SETS OF FOLLOW-ON TESTS' AT ONCE VERY QUICKLY, ALL

10:11AM   9    FROM A SINGLE MICRO-SAMPLE."

10:11AM   10       DO YOU SEE THAT LANGUAGE?

10:11AM   11   A.   I DO.

10:11AM   12   Q.   WAS THE ABILITY OF THE THERANOS TECHNOLOGY TO RUN MULTIPLE

10:11AM   13   TESTS AN IMPORTANT FACT FOR YOU AS AN INVESTOR?

10:11AM   14   A.   YES.

10:11AM   15   Q.   LET'S GO DOWN TO THE PARAGRAPH THAT BEGINS "ANOTHER

10:12AM   16   THERANOS ADVANCE" AT THE BOTTOM OF THE PAGE THERE.

10:12AM   17       AND, MS. HOLLIMAN, IF WE CAN ZOOM BACK IN ON THAT?

10:12AM   18       IT SAYS, "ANOTHER THERANOS ADVANCE IS ITS TESTING

10:12AM   19   ACCURACY."

10:12AM   20       AND THEN THERE'S SOME LANGUAGE ABOUT CONVENTIONAL

10:12AM   21   LABORATORY CHAIN OF CUSTODY INTRODUCING OPPORTUNITIES FOR

10:12AM   22   ERROR.

10:12AM   23       DO YOU SEE THAT?

10:12AM   24   A.   I DO.

10:12AM   25   Q.   AT THE BOTTOM OF THIS PAGE, IT SAYS, "THERANOS'S

LUCAS DIRECT BY MR. BOSTIC                                      5410

10:12AM  1    TECHNOLOGY IS AUTOMATED, STANDARDIZED, AND ATTEMPTS TO SUBTRACT

10:12AM  2    HUMAN ERROR," LET'S GO TO PAGE 3 AND ZOOM IN ON THE TOP,

10:12AM  3    "ATTEMPTS TO SUBTRACT HUMAN ERROR FROM THE PROCESS.  IT CAN

10:12AM  4    THUS ACHIEVE MUCH LOWER VARIANCE RANGES FOR A GIVEN TEST."

10:13AM  5         DO YOU SEE THAT?

10:13AM  6    A.   I DO.

10:13AM  7    Q.   AS AN INVESTOR IN THE COMPANY, WAS THE ACCURACY OF

10:13AM  8    THERANOS'S TESTING AN IMPORTANT FACTOR FOR YOU?

10:13AM  9    A.   ABSOLUTELY.

10:13AM  10   Q.   WHY IS THAT?

10:13AM  11   A.   WELL, WHAT THEY ARE SHOWING IS THAT THEY CAN DO SOMETHING

10:13AM  12   AT A HIGHER -- IN ADDITION TO THE FAST TURN AROUND OF THE BLOOD

10:13AM  13   TEST, THAT THEY ARE MORE ACCURATE THAN THE CONVENTIONAL TESTING

10:13AM  14   THAT THE VIAL AND VIAL OF BLOODS TYPICALLY COULD DO.

10:13AM  15   Q.   AND WHY DOES THAT MATTER FOR AN INVESTOR?

10:13AM  16   A.   AGAIN, YOU HAVE SOMETHING THAT IS UNIQUE AND THAT GIVEN

10:13AM  17   HOW THE PROCESS WAS, THAT THEY WERE GOING TO BE ABLE TO BRING

10:13AM  18   THAT TO MARKET AND BEAT THE COMPETITION.

10:13AM  19   Q.   AROUND THE TIME OF THE COMMERCIAL LAUNCH IN SEPTEMBER OF

10:13AM  20   2013, WERE YOU STILL IN CONTACT WITH MS. HOLMES AT THERANOS?

10:13AM  21   A.   IN WHAT PART OF 2013?

10:13AM  22   Q.   SO THIS IS AROUND THE TIME OF THE COMMERCIAL LAUNCH IN

10:14AM  23   SEPTEMBER OF 2013.

10:14AM  24   A.   YES.

10:14AM  25   Q.   AND WAS THE INFORMATION THAT YOU WERE RECEIVING FROM

LUCAS DIRECT BY MR. BOSTIC                                    5411

10:14AM  1     MS. HOLMES GENERALLY CONSISTENT WITH WHAT YOU WERE READING IN

10:14AM  2     ARTICLES LIKE THIS ONE?

10:14AM  3     A.   YES.

10:14AM  4     Q.   IF I COULD ASK YOU TO LOOK AT TAB 5143 IN YOUR BINDER.

10:14AM  5     AND IS EXHIBIT 5143 AN EMAIL FROM YOU TO A COWORKER OF YOURS AT

10:14AM  6     BDV RELATING TO THE THERANOS INVESTMENT?

10:14AM  7     A.   YES.

10:14AM  8          MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5143.

10:14AM  9          MR. DOWNEY:  NO OBJECTION.

10:14AM  10         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:14AM  11    (GOVERNMENT'S EXHIBIT 5143 WAS RECEIVED IN EVIDENCE.)

10:14AM  12    BY MR. BOSTIC:

10:14AM  13    Q.   AND FIRST LET'S GO DOWN TO THE HEADER AT THE BOTTOM OF

10:15AM  14    PAGE 1.

10:15AM  15         MR. LUCAS, DO YOU SEE WE'RE ABOUT TO LOOK AT AN EMAIL FROM

10:15AM  16    THERANOS, THE ADDRESS SHAREHOLDERINFO@THERANOS.COM TO YOU IN

10:15AM  17    MID-DECEMBER 2013?

10:15AM  18    A.   YES.

10:15AM  19    Q.   AND LET'S TURN THE PAGE AND GO TO PAGE 2, AND ZOOM IN ON

10:15AM  20    THE TOP THIRD, PLEASE.

10:15AM  21         AND THIS EMAIL FROM THERANOS SAYS, "DEAR CHRIS.

10:15AM  22         "WE HOPE THIS EMAIL FINDS YOU WELL.  PLEASE FIND A MEMO TO

10:15AM  23    STOCKHOLDERS REGARDING CERTAIN DEALS AND TRANSACTIONS WE'RE

10:15AM  24    WORKING TO CLOSE BY YEAR END."

10:15AM  25         DO YOU SEE THAT?

LUCAS DIRECT BY MR. BOSTIC                                          5412

10:15AM   1    A.   YES.

10:15AM   2    Q.   AND THEN THE MEMO TO STOCKHOLDERS SAYS, "DEAR THERANOS

10:15AM   3    STOCKHOLDER.

10:15AM   4         "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

10:15AM   5    RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

10:15AM   6    THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED,

10:16AM   7    NATIONAL LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY

10:16AM   8    TESTS FROM A FEW TINY DROPLETS OF BLOOD."

10:16AM   9         DO YOU SEE THAT?

10:16AM  10    A.   I DO.

10:16AM  11    Q.   AND WAS IT YOUR UNDERSTANDING THAT THIS WAS A MESSAGE THAT

10:16AM  12    THERANOS SENT TO ALL OF ITS SHAREHOLDERS AT THE TIME?

10:16AM  13    A.   YES.

10:16AM  14    Q.   AT THE BOTTOM OF THAT SAME PARAGRAPH IT SAYS, "AS WE

10:16AM  15    PREPARE FOR 2014 AND CLOSING YEAR END, WE ARE ACTIVELY

10:16AM  16    INVESTING IN INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE

10:16AM  17    CREATED."

10:16AM  18         DO YOU SEE THAT?

10:16AM  19    A.   I DO.

10:16AM  20    Q.   THAT LANGUAGE IN THE FIRST SENTENCE OF THAT MEMO, "WITH

10:16AM  21    OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE RAPIDLY

10:16AM  22    SCALING," CAN YOU EXPLAIN THE SIGNIFICANCE OF SCALING TO AN

10:16AM  23    INVESTOR?

10:16AM  24    A.   WELL, WITH THE PARTNERSHIPS THAT THEY HAD OR WERE

10:16AM  25    ESTABLISHING, IT'S NOW TIME, AS IT SAYS, TO ROLL IT OUT IN A

LUCAS DIRECT BY MR. BOSTIC                                        5413

10:16AM   1     STAGED WAY.

10:16AM   2         AND THIS, AGAIN, WAS THE WHOLE REASON THAT THE COMPANY WAS

10:17AM   3     CREATED AND THE TECHNOLOGY, TO COME OUT AND HELP FOLKS AND BE

10:17AM   4     OUT THERE INTO THE DRUG STORES AND SO FORTH.

10:17AM   5     Q.   IS THERE A DIFFERENCE BETWEEN SCALING ACTIVITY THAT A

10:17AM   6     COMPANY DOES AND DEVELOPMENT ACTIVITY THAT A COMPANY DOES?

10:17AM   7     A.   DEVELOPMENT IN MY MIND REFERS TO ALL OF THE THINGS THAT GO

10:17AM   8     BEFORE YOU CAN SCALE, ALL OF THE DEVELOPMENT, ALL OF THE R&D.

10:17AM   9         AND WHEN YOU'RE SCALING, IT REFERS TO YOU'RE RAMPING UP

10:17AM   10    PRODUCTION AND STARTING TO GO OUT TO THE WORLD AND SELL YOUR

10:17AM   11    PRODUCT.

10:17AM   12    Q.   LET'S ZOOM IN ON THE BOTTOM HALF OF THIS PAGE, PAGE 2.

10:17AM   13        AND WAS THIS EMAIL FROM THERANOS GENERALLY ANNOUNCING AN

10:18AM   14    ADDITIONAL RAISING OF FUNDS OR INVESTMENT CAPITAL BY THE

10:18AM   15    COMPANY?

10:18AM   16    A.   YES.

10:18AM   17    Q.   AND DO YOU SEE THAT THE COMPANY AT THE BOTTOM THERE WAS

10:18AM   18    ALSO SEEKING SHAREHOLDER CONSENT FOR A NUMBER OF TRANSACTIONS,

10:18AM   19    ISSUING STOCK AND SIMILAR THINGS?

10:18AM   20    A.   YES.

10:18AM   21    Q.   LET'S TURN TO PAGE 1 OF THE EXHIBIT, AND LET'S ZOOM IN ON

10:18AM   22    THE BOTTOM HALF OF THE PAGE.  THERE'S AN EMAIL THERE FROM

10:18AM   23    SOMEONE NAMED ANA QUINTANA.

10:18AM   24        DO YOU SEE THAT?

10:18AM   25    A.   YES.

LUCAS DIRECT BY MR. BOSTIC                                           5414

10:18AM    1      Q.   AND WHO IS SHE?

10:18AM    2      A.   ANA IS WITH BLACK DIAMOND VENTURES.

10:18AM    3      Q.   AND WHAT IS HER --

10:18AM    4      A.   RIGHT NOW SHE'S A PARTNER, BUT BACK THEN SHE WAS A

10:18AM    5      PRINCIPAL.

10:18AM    6      Q.   DID SHE WORK WITH YOU ON EVALUATING AND IMPLEMENTING

10:19AM    7      INVESTMENTS FOR BDV?

10:19AM    8      A.   YES.

10:19AM    9      Q.   IN HER EMAIL RESPONDING TO THERANOS ON DECEMBER 16TH, SHE

10:19AM   10      SAYS, "DEAR SHAREHOLDER INFORMATION REPRESENTATIVE.

10:19AM   11          "BLACK DIAMOND VENTURES IS INTERESTED IN INCREASING ITS

10:19AM   12      EQUITY POSITION IN THERANOS."

10:19AM   13          DO YOU SEE THAT?

10:19AM   14      A.   I DO.

10:19AM   15      Q.   AT THIS TIME IN MID-DECEMBER 2013, HAD BDV ALREADY MADE

10:19AM   16      THE FINAL DECISION TO INVEST MORE MONEY IN THERANOS?

10:19AM   17      A.   WELL, WE CERTAINLY WERE VERY INTERESTED AND WE -- YOU

10:19AM   18      KNOW, WE'LL ULTIMATELY PRESENT IT TO OUR INVESTORS, AND IF

10:19AM   19      FOLKS WANT TO INVEST, THEN WE'RE GOING TO INVEST.

10:19AM   20          BUT IT CERTAINLY WOULD HAVE BEEN OUR RECOMMENDATION TO OUR

10:19AM   21      GROUP TO INVEST.

10:19AM   22      Q.   I'LL ASK YOU TO LOOK AT THE NEXT TAB IN THE BINDER, WHICH

10:20AM   23      IS 5144.

10:20AM   24          DO YOU SEE THERE AN EMAIL CHAIN INCLUDING YOU, MS. HOLMES,

10:20AM   25      AND OTHERS RELATING TO THIS THERANOS FUND RAISE IN DECEMBER OF

LUCAS DIRECT BY MR. BOSTIC                                    5415

10:20AM  1    2013?

10:20AM  2    A.   YES.

10:20AM  3              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5144.

10:20AM  4              MR. DOWNEY:  NO OBJECTION.

10:20AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:20AM  6         (GOVERNMENT'S EXHIBIT 5144 WAS RECEIVED IN EVIDENCE.)

10:20AM  7    BY MR. BOSTIC:

10:20AM  8    Q.   AND LET'S START ON PAGE 3 OF THIS EXHIBIT.

10:20AM  9         AND, MR. LUCAS, DO YOU SEE ON PAGE 3 THIS IS THE SAME

10:20AM  10   MESSAGE FROM THERANOS TO ALL STOCKHOLDERS THAT WE WERE JUST

10:20AM  11   LOOKING AT?

10:20AM  12   A.   YES.

10:21AM  13   Q.   OKAY.  LET'S FOLLOW THAT EMAIL CHAIN UP AND LOOK AT

10:21AM  14   PAGE 2, AND IF WE CAN ZOOM IN ON THE MIDDLE OF THAT PAGE.

10:21AM  15        AND WE SEE HERE AN EMAIL FROM YOU TO THERANOS, CC'ING

10:21AM  16   MS. QUINTANA ON DECEMBER 18TH, 2013; IS THAT RIGHT?

10:21AM  17   A.   YES.

10:21AM  18   Q.   AND YOU SAY, "I HAVE THE FOLLOWING QUESTIONS," AND YOU

10:21AM  19   LIST THE QUESTIONS THERE; IS THAT RIGHT?

10:21AM  20   A.   CORRECT.

10:21AM  21   Q.   AND WHAT WAS THE PURPOSE OF POSING THOSE QUESTIONS TO

10:21AM  22   THERANOS AT THIS TIME?

10:21AM  23   A.   TO FIND OUT ADDITIONAL INFORMATION AS I'M READING THIS AS

10:21AM  24   IT RELATED PRIMARILY TO THIS FINANCING.

10:21AM  25   Q.   AND WAS THIS AN EFFORT TO GATHER INFORMATION AND FACTS TO

LUCAS DIRECT BY MR. BOSTIC                                          5416

10:21AM  1    INCORPORATE INTO YOUR DECISION OF WHETHER TO INVEST OR

10:21AM  2    RECOMMEND AN INVESTMENT IN THERANOS?

10:22AM  3    A.   YES.

10:22AM  4    Q.   I WANT TO ASK YOU ABOUT A FEW OF THESE QUESTIONS.

10:22AM  5         FIRST, QUESTION NUMBER 1 SAYS, "WHEN AND HOW CAN WE EXPECT

10:22AM  6    A PARTIAL OR FULL LIQUIDITY EVENT?"

10:22AM  7         DO YOU SEE THAT?

10:22AM  8    A.   I DO.

10:22AM  9    Q.   WHAT WAS THE SIGNIFICANCE OF THAT QUESTION AT THE TIME?

10:22AM 10    A.   WELL, WHEN YOU INVEST IN A COMPANY, YOU ARE GENERALLY

10:22AM 11    CONCERNED, FIRST, DOES THE PRODUCT -- DOES EVERYTHING WORK?

10:22AM 12         AND THEN, WHEN ARE WE GOING TO HAVE THE COMPANY MATURE

10:22AM 13    ENOUGH THAT POTENTIALLY THE COMPANY WOULD GO PUBLIC OR IT WOULD

10:22AM 14    BE SOLD?

10:22AM 15         AND SO PERIODICALLY YOU WOULD CHECK ON TIMING AND SEE

10:22AM 16    WHERE WE ARE.

10:22AM 17    Q.   HOW ABOUT QUESTION NUMBER 2?  YOU ASK, "WHAT AMOUNT OF

10:22AM 18    MONEY IS EXPECTED TO BE RAISED IN THIS FINANCING?"

10:22AM 19         WHY WOULD THAT HAVE BEEN AN IMPORTANT FACT FOR YOU TO KNOW

10:22AM 20    AS AN INVESTOR?

10:22AM 21    A.   SO IF YOU'RE SCALING UP, RAMPING UP PRODUCTION AND

10:22AM 22    DISTRIBUTION, YOU WANT TO UNDERSTAND HOW MUCH MONEY IS BEING

10:22AM 23    RAISED THAT CAN THEN FULFILL THAT MISSION, THAT PART OF THE --

10:23AM 24    WHERE THE COMPANY IS AT, IF THEY'RE RAISING TOO LITTLE MONEY,

10:23AM 25    IT'S NOT GOING TO HAPPEN.

LUCAS DIRECT BY MR. BOSTIC                                      5417

10:23AM  1    Q.   MOVING TO QUESTION NUMBER 4, YOU SAY, "WE HAVE EXPRESSED

10:23AM  2    INTEREST IN THIS ROUND, HOWEVER, OUR CONCERN IS THAT THE

10:23AM  3    EXPECTED CLOSING DATE OF 12/31/13 MAY PRECLUDE US FROM

10:23AM  4    PARTICIPATING.  DUE TO THIS SHORT PERIOD OF TIME, IS AN

10:23AM  5    EXTENSION CONTEMPLATED?"

10:23AM  6         CAN YOU EXPLAIN WHAT YOU WERE GETTING AT THERE?

10:23AM  7    A.   WELL, AS YOU CAN SEE, THE TIMING WAS QUITE COMPRESSED AND

10:23AM  8    I WANTED TO UNDERSTAND IF IT TRULY HAD TO CLOSE BY

10:23AM  9    DECEMBER 31ST OR NOT, AND INDEED, IT DID HAVE TO CLOSE BY

10:23AM  10   DECEMBER 31ST.

10:23AM  11   Q.   YOU TESTIFIED EARLIER THAT DURING YOUR TIME WITH BDV

10:23AM  12   YOU'VE WORKED ON A NUMBER OF INVESTMENTS; IS THAT RIGHT?

10:23AM  13   A.   YES.

10:23AM  14   Q.   THIS TIME SCALE, APPROXIMATELY TWO WEEKS BETWEEN THE

10:23AM  15   ANNOUNCEMENT OF A FUND RAISE AND THE CLOSING OF THE ROUND,

10:24AM  16   WHERE DOES THAT FALL ON THE SPECTRUM AS FAR AS PACE OF

10:24AM  17   INVESTMENT?

10:24AM  18   A.   VERY SHORT.

10:24AM  19   Q.   AND WHAT EFFECT DOES THAT HAVE ON BDV'S PROCESS IN

10:24AM  20   EVALUATING THE INVESTMENT?

10:24AM  21   A.   THIS WAS HOLIDAY TIME, AND WE ENDED UP WORKING AROUND THE

10:24AM  22   CLOCK TO -- I FELT THIS WAS IMPORTANT TO INVEST AND FOR OUR

10:24AM  23   GROUP TO INVEST, AND SO WE WORKED TO GET IT DONE, AND IT TOOK A

10:24AM  24   LOT OF EXTRA HOURS.

10:24AM  25   Q.   LET'S LOOK AT THE TOP OF THAT PAGE, PAGE 2.

LUCAS DIRECT BY MR. BOSTIC                                          5418

10:24AM   1            AND YOU SEE PART OF AN EMAIL FROM SHAREHOLDER INFORMATION

10:24AM   2     AT THERANOS?

10:24AM   3            DO YOU SEE THAT?

10:24AM   4     A.   YES.

10:24AM   5     Q.   AND IT READS, "ELIZABETH'S OFFICE MENTIONED THAT SHE SPOKE

10:25AM   6     WITH YOU DIRECTLY.  PLEASE LET US KNOW IF THERE IS ANY FURTHER

10:25AM   7     INFORMATION YOU NEED TO TURN THE CONSENT BACK TO US."

10:25AM   8            DO YOU SEE THAT?

10:25AM   9     A.   I DO.

10:25AM   10    Q.   AND SO AROUND THIS TIME, IN ADDITION TO YOUR EMAILS WITH

10:25AM   11    THERANOS, WERE YOU ALSO HAVE ONE-ON-ONE PHONE CONVERSATIONS

10:25AM   12    WITH MS. HOLMES?

10:25AM   13    A.   CLEARLY IF THAT'S WHAT THE EMAIL SAYS, YES, I'M SURE I

10:25AM   14    DID.

10:25AM   15    Q.   AND LET ME JUST ASK ABOUT YOUR MEMORY.

10:25AM   16           DO YOU RECALL THAT DURING THIS TIME PERIOD YOU WERE STILL

10:25AM   17    IN PERIODIC CONTACT WITH MS. HOLMES AT THERANOS?

10:25AM   18    A.   ABSOLUTELY, YEAH.

10:25AM   19    Q.   LET'S GO TO PAGE 1, PLEASE, OF THIS EXHIBIT, AND ZOOM IN

10:25AM   20    ON THE BOTTOM HALF.  ACTUALLY, IF WE CAN ZOOM IN ON THE MIDDLE,

10:25AM   21    CAPTURE THE MIDDLE TWO MESSAGES.

10:25AM   22           THANK YOU, MS. HOLLIMAN.

10:26AM   23           DO YOU SEE AT THE BOTTOM THERE, THERE'S A MESSAGE FROM

10:26AM   24    MS. QUINTANA TO THERANOS SAYING, "WE VERY MUCH APPRECIATE THE

10:26AM   25    TIME ELIZABETH SPENT DISCUSSING THIS MATTER WITH CHRIS"?

LUCAS DIRECT BY MR. BOSTIC                                      5419

10:26AM  1    A.   YES.

10:26AM  2    Q.   AND WOULD YOU BE THE CHRIS REFERENCED IN THIS EMAIL?  ARE

10:26AM  3    YOU THE CHRIS REFERENCED IN THIS EMAIL?

10:26AM  4    A.   YES.

10:26AM  5    Q.   AND THE EMAIL ABOVE THAT IS AGAIN FROM MS. QUINTANA, AND

10:26AM  6    IN THAT EMAIL, SHE SAYS, "PLEASE LET ME KNOW IF YOU'D LIKE TO

10:26AM  7    DISCUSS THE DETAILS REGARDING FRIDAY'S CALL WITH ELIZABETH."

10:26AM  8         DO YOU SEE THAT?

10:26AM  9    A.   I DO.

10:26AM 10    Q.   THIS WAS ON WEDNESDAY, DECEMBER 18TH.  DO YOU RECALL THERE

10:26AM 11    WAS A FRIDAY CALL WITH MS. HOLMES ON DECEMBER 20TH, 2013?

10:26AM 12    A.   YES.

10:26AM 13    Q.   AND DO YOU REMEMBER, GENERALLY SPEAKING, HOW THAT CALL

10:26AM 14    HAPPENED AND WHO WAS ON THAT CALL?

10:27AM 15    A.   IF THIS IS -- I JUST WANT TO MAKE SURE THAT WE'RE TALKING

10:27AM 16    ABOUT THE RIGHT CALL.  IS THIS THE INVESTOR CALL THAT I HAD

10:27AM 17    WITH OUR GROUP?

10:27AM 18    Q.   LET ME ASK, FIRST OF ALL, HAVE YOU -- LET ME ASK IT A

10:27AM 19    DIFFERENT WAY.

10:27AM 20         DO YOU HAVE A RECOLLECTION OF AN INVESTOR CALL THAT BDV

10:27AM 21    HAD WHERE MS. HOLMES PARTICIPATED AND ANSWERED QUESTIONS?

10:27AM 22    A.   YES.

10:27AM 23    Q.   AND WAS THAT CALL AROUND DECEMBER 20TH, 2013?

10:27AM 24    A.   YES.

10:27AM 25    Q.   A RECORDING OF THAT CALL HAS BEEN REFERENCED IN THIS TRIAL

LUCAS DIRECT BY MR. BOSTIC                                          5420

10:27AM   1    AS EXHIBIT 1348 AND 1349.

10:27AM   2         AT THE TIME, WERE YOU AWARE THAT THAT CALL WAS BEING

10:27AM   3    RECORDED?

10:27AM   4    A.   NO.

10:27AM   5    Q.   SINCE THEN, HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE

10:28AM   6    RECORDING OF THAT DECEMBER 20TH, 2013 CALL?

10:28AM   7    A.   YES.

10:28AM   8    Q.   AND DID THAT RECORDING REFRESH YOUR RECOLLECTION GENERALLY

10:28AM   9    ABOUT THE TOPICS DISCUSSED ON THE CALL?

10:28AM  10    A.   YES.

10:28AM  11    Q.   SO GOING BACK TO KIND OF HOW THAT CALL HAPPENED AND WHO

10:28AM  12    WAS ON IT.

10:28AM  13         WHAT IS YOUR MEMORY?  AND LET ME BREAK THAT OUT.

10:28AM  14         FIRST OF ALL, HOW DID THAT CALL HAPPEN?  WHAT WAS ITS

10:28AM  15    PURPOSE?

10:28AM  16    A.   SO, AS I'VE SAID, I WAS IN QUITE FREQUENT CONTACT WITH

10:28AM  17    ELIZABETH, AND IF THIS FINANCING WAS COMING UP, TYPICALLY THE

10:28AM  18    WAY WE OPERATE IS THAT WE HAVE THE CEO OR THE MANAGEMENT TEAM

10:28AM  19    THEN PRESENT TO OUR GROUP.

10:28AM  20         SO THE PURPOSE WAS TO HAVE THIS CALL AND HAVE ELIZABETH

10:28AM  21    PRESENT, AND THEN LET ANY OF OUR PEOPLE ASK ANY QUESTIONS.

10:28AM  22    Q.   AND WAS THE PURPOSE OF THIS CALL TO HELP INFORM THE GROUP

10:28AM  23    SO THAT YOU AND OTHER INDIVIDUALS COULD DECIDE WHETHER TO

10:29AM  24    INVEST IN THE COMPANY?

10:29AM  25    A.   YES.

LUCAS DIRECT BY MR. BOSTIC                                      5421

10:29AM   1    Q.   DO YOU RECALL A PORTION OF THAT CALL AFTER MS. HOLMES

10:29AM   2    DROPPED OFF THE CALL WHEN YOU REMAINED ON THE LINE?

10:29AM   3    A.   YES.

10:29AM   4    Q.   AND DID YOU CONTINUE TO ANSWER SOME QUESTIONS POSED BY

10:29AM   5    POTENTIAL INVESTORS DURING THAT PERIOD OF THE CALL?

10:29AM   6    A.   THAT'S CORRECT.

10:29AM   7    Q.   IN ANSWERING THOSE QUESTIONS, WHERE DID YOUR INFORMATION

10:29AM   8    COME FROM?

10:29AM   9    A.   WELL, PRIMARILY FROM ELIZABETH, FROM THE CALL THAT -- OR

10:29AM   10   FROM THE CONVERSATION THAT WE JUST HAD WITH HER, AND THROUGH

10:29AM   11   WHAT I KNEW FROM MY CONVERSATIONS WITH HER.

10:29AM   12   Q.   LET'S TURN NEXT TO TAB 5444.

10:30AM   13        DO YOU HAVE EXHIBIT 5444 IN FRONT OF YOU?

10:30AM   14   A.   I DO.

10:30AM   15   Q.   AND IS THAT AN EMAIL CHAIN BETWEEN YOU AND MS. HOLMES

10:30AM   16   RELATING TO THE BDV INVESTMENT?

10:30AM   17   A.   YES.

10:30AM   18            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5444.

10:30AM   19            MR. DOWNEY:  NO OBJECTION.

10:30AM   20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:30AM   21        (GOVERNMENT'S EXHIBIT 5444 WAS RECEIVED IN EVIDENCE.)

10:30AM   22            MR. BOSTIC:  AND IF WE CAN START WITH PAGE 2 OF THIS

10:30AM   23   EXHIBIT.  AND IF WE ZOOM DOWN AT THE BOTTOM, WE'LL SEE A

10:30AM   24   HEADER.

10:30AM   25   Q.   SHOWING THAT, WE'RE ABOUT TO LOOK AT AN EMAIL FROM YOU TO

LUCAS DIRECT BY MR. BOSTIC                                              5422

| | | |
|---|---|---|
| 10:30AM | 1 | MS. HOLMES ON DECEMBER 24TH, 2013. |
| 10:31AM | 2 | AT THE VERY BOTTOM OF THE PAGE. |
| 10:31AM | 3 | DO YOU SEE THAT, MR. LUCAS? |
| 10:31AM | 4 | A.   YES. |
| 10:31AM | 5 | Q.   AND LET'S TURN TO PAGE 3 AND SEE THAT EMAIL.  LET'S ZOOM |
| 10:31AM | 6 | IN ON THE CONTENT AT THE TOP. |
| 10:31AM | 7 | MR. LUCAS, YOU WRITE TO MS. HOLMES, YOU SAY THAT YOU'VE |
| 10:31AM | 8 | CONTINUED TO HAVE CALLS WITH BDV'S INVESTORS AND YOU'VE |
| 10:31AM | 9 | DETERMINED THAT THERE IS SIGNIFICANT INTEREST IN PARTICIPATING |
| 10:31AM | 10 | IN THIS ROUND. |
| 10:31AM | 11 | DO YOU SEE THAT? |
| 10:31AM | 12 | A.   I DO. |
| 10:31AM | 13 | Q.   AND YOU THEN PASS ALONG SOME QUESTIONS THAT YOU HAD |
| 10:31AM | 14 | RECEIVED FROM BDV INVESTORS; IS THAT RIGHT? |
| 10:31AM | 15 | A.   YES. |
| 10:31AM | 16 | Q.   AND WE SEE HERE, FOR EXAMPLE, THERE'S THE QUESTION, IN |
| 10:31AM | 17 | ADDITION TO THE CONVERSIONS, HOW MUCH NEW CAPITAL IS COMING IN? |
| 10:31AM | 18 | DO YOU SEE THAT QUESTION? |
| 10:31AM | 19 | A.   YES. |
| 10:31AM | 20 | Q.   AND THEN ABOVE THAT THERE'S A QUESTION ABOUT STRATEGIC |
| 10:31AM | 21 | PARTNERS CONVERTING THE ENTIRE AMOUNT OF THEIR NOTES IN THIS |
| 10:32AM | 22 | OFFERING? |
| 10:32AM | 23 | A.   YES. |
| 10:32AM | 24 | Q.   CAN YOU GIVE US, AT A HIGH LEVEL, AN EXPLANATION FOR WHY |
| 10:32AM | 25 | THESE QUESTIONS WERE IMPORTANT TO YOU AT THE TIME? |

LUCAS DIRECT BY MR. BOSTIC                                          5423

10:32AM  1    A.   SO ONE OF THE PARTNERS, WALGREENS, AND THIS I THINK WAS

10:32AM  2    THE PRIMARILY REASON WHY IT HAD TO CLOSE BY THE END OF 2013, IS

10:32AM  3    THAT THEY HAD INVESTED -- I'M SORRY, THEY HAD LENT THE COMPANY

10:32AM  4    MONEY IN THE FORM OF A NOTE, AND THEY HAD THE OPTION TO CONVERT

10:32AM  5    THAT NOTE INTO STOCK, BUT THEY HAD TO EXERCISE THAT OPTION

10:32AM  6    PRIOR TO THE END OF 2013.

10:32AM  7    Q.   AND WHY DID YOU WANT TO KNOW WHAT THE STATUS WAS IN THAT

10:32AM  8    AREA?

10:32AM  9    A.   WELL, YOU WANT MORE PEOPLE IN THE WAGON HELPING FUND THE

10:33AM  10   COMPANY, AND IF THEY WERE MAKING THE DECISION AND THEY WERE

10:33AM  11   CONFIDENT IN THEIR DECISION AND THE SCALEUP THEMSELVES, THEY

10:33AM  12   WOULD CONVERT AND WANT TO PARTICIPATE IN THE UP SIDE OF THE

10:33AM  13   COMPANY FOR SURE.

10:33AM  14   Q.   IN YOUR EMAIL THERE'S ALSO A REFERENCE THERE NEAR THE TOP

10:33AM  15   WHERE YOU SAY, "THE CHALLENGE WILL BE GETTING ALL OF THE FUNDS

10:33AM  16   PRIOR TO YEAR END.  IF THERE IS ANY TIME FLEXIBILITY, PLEASE

10:33AM  17   LET ME KNOW."

10:33AM  18        DO YOU SEE THAT?

10:33AM  19   A.   YES.

10:33AM  20   Q.   AND IS THIS ANOTHER REFERENCE TO WHAT YOU MENTIONED BEFORE

10:33AM  21   ABOUT THE FAST PACE OF THIS INVESTMENT?

10:33AM  22   A.   YES.

10:33AM  23   Q.   LET'S GO TO PAGE 2.  AND IF WE CAN ZOOM IN ON THE MIDDLE

10:33AM  24   THIRD OF THE PAGE.

10:33AM  25        DO YOU SEE THERE, THERE'S A RESPONSE FROM MS. HOLMES TO

LUCAS DIRECT BY MR. BOSTIC                                   5424

10:33AM  1   YOU ON DECEMBER 24TH, 2013?

10:34AM  2   A.   YES.

10:34AM  3   Q.   AND SHE WRITES IN RESPONSE TO YOUR QUESTION ABOUT TIMING,

10:34AM  4   "OUR CURRENT DOCUMENTS ARE STRUCTURED TO ALLOW FOR INVESTMENT

10:34AM  5   AT $15 A SHARE UP TO 12/31, AFTER WHICH TIME THE NEW

10:34AM  6   PRICE/SHARE TAKES EFFECT."

10:34AM  7       DO YOU SEE THAT?

10:34AM  8   A.   YES.

10:34AM  9   Q.   AND WHAT WAS THE ULTIMATE OUTCOME HERE?  WAS BDV REQUIRED

10:34AM  10  TO COMPLETE ITS INVESTMENT BY THE 31ST, OR WAS AN EXTENSION

10:34AM  11  GIVEN?

10:34AM  12  A.   NO.  WE HAD TO COMPLETE BY DECEMBER 31ST.

10:34AM  13  Q.   BELOW THAT MS. HOLMES MENTIONS THAT, "ALL CAPITAL COMING

10:34AM  14  IN NOW IS ASSOCIATED WITH STRATEGIC PARTNERS/ENTITIES WITH

10:34AM  15  EXISTING EQUITY POSITIONS AND ABILITY TO MAKE FURTHER

10:34AM  16  INVESTMENTS."

10:34AM  17      DO YOU SEE THAT?

10:34AM  18  A.   YES.

10:34AM  19  Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT.  AND IF WE COULD ZOOM

10:34AM  20  IN ON THE BOTTOM HALF.

10:35AM  21      AND IN THIS EMAIL ON DECEMBER 26TH YOU SAY, "ON A

10:35AM  22  DIFFERENT TOPIC, ONE OF OUR INVESTORS ASKED WHAT INFORMATION

10:35AM  23  WAS PROVIDED TO THE STRATEGIC PARTNERS SO THAT THEY COULD MAKE

10:35AM  24  THEIR DECISION WHETHER TO CONVERT OR NOT."

10:35AM  25      DO YOU SEE THAT?

LUCAS DIRECT BY MR. BOSTIC                                          5425

10:35AM  1    A.   I DO.

10:35AM  2    Q.   AND ABOVE THAT THERE'S A RESPONSE FROM MS. HOLMES THAT

10:35AM  3    SAYS -- WELL, FIRST LET ME ASK, WHY WAS THAT INFORMATION

10:35AM  4    IMPORTANT FOR AN INVESTOR AT THAT TIME?

10:35AM  5    A.   WELL, SO THEY WOULD BE INFORMED, WELL INFORMED AND MAKE AN

10:35AM  6    EDUCATED DECISION WHETHER THEY SHOULD CONVERT.

10:35AM  7    Q.   ABOVE THAT MS. HOLMES RESPONDS, "OUR RECENT MILESTONES IN

10:35AM  8    ENTERING THIS $180 BILLION-PLUS INDUSTRY, AND THE POTENTIAL OUR

10:35AM  9    PARTNERS THINK WE HAVE TO REVOLUTIONIZE HEALTH CARE, OBVIOUSLY

10:36AM  10   ALSO SPEAK FOR THEMSELVES IN THIS CONTEXT BASED ON EVERYTHING

10:36AM  11   IN THE PUBLIC DOMAIN."

10:36AM  12        DO YOU SEE THAT?

10:36AM  13   A.   YES.

10:36AM  14   Q.   AND WHAT WAS YOUR RESPONSE TO THAT QUESTION?

10:36AM  15   A.   GREAT.  IT MEANS EVERYONE IS SET TO GO.

10:36AM  16   Q.   DID YOU FIND THAT TO BE A SATISFYING RESPONSE THAT

10:36AM  17   ENCOURAGED YOU TO INVEST?

10:36AM  18   A.   YES.

10:36AM  19   Q.   LET'S LOOK AT THE TOP PART OF PAGE 1 AND CAPTURE THOSE TWO

10:36AM  20   TOP MESSAGES.

10:36AM  21        YOU RESPOND, "YES, ABSOLUTELY."

10:36AM  22        YOU SAY, "AS WE PULL TOGETHER OUR FINANCING, I WOULD LIKE

10:36AM  23   TO HAVE A CONVERSATION WITH YOU."

10:36AM  24        MS. HOLMES RESPONDS THE FOLLOWING DAY, OR ACTUALLY IT

10:36AM  25   MIGHT HAVE BEEN THE SAME DAY GIVEN THE TIME STAMP, BUT SHE

LUCAS DIRECT BY MR. BOSTIC                                       5426

10:36AM   1    RESPONDS SHORTLY TO SAY, "I'M IN THE OFFICE NOW AND COULD

10:36AM   2    CONNECT," AND SHE PROVIDES THE NUMBER.

10:36AM   3        DO YOU SEE?

10:36AM   4    A.   YES.

10:36AM   5    Q.   AND IS THIS CONSISTENT WITH YOUR MEMORY THAT IN THE DAYS

10:36AM   6    LEADING UP TO BDV'S INVESTMENT IN THERANOS, YOU HAD ACCESS TO

10:37AM   7    MS. HOLMES AND ADDITIONAL CONVERSATIONS WITH HER?

10:37AM   8    A.   YES.

10:37AM   9    Q.   LET'S LOOK AT TAB 5446.

10:37AM  10        IS THIS ANOTHER EMAIL CHAIN BETWEEN YOU AND MS. HOLMES

10:37AM  11    REGARDING THAT DECEMBER 2013 INVESTMENT?

10:37AM  12    A.   YES.

10:37AM  13            MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 5446.

10:37AM  14            MR. DOWNEY:  NO OBJECTION.

10:37AM  15            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:37AM  16        (GOVERNMENT'S EXHIBIT 5446 WAS RECEIVED IN EVIDENCE.)

10:37AM  17    BY MR. BOSTIC:

10:37AM  18    Q.   MR. LUCAS -- IF WE CAN JUST ZOOM IN ON THE TOP HALF OF

10:37AM  19    PAGE 1 HERE -- AND DO YOU SEE HERE THAT ON DECEMBER 29TH, 2013,

10:38AM  20    THERE'S SOME ADDITIONAL DISCUSSION ABOUT ANOTHER CALL WITH

10:38AM  21    MS. HOLMES RELATING TO THE INVESTMENT?

10:38AM  22    A.   YES.

10:38AM  23    Q.   LET'S LOOK NEXT AT THE FOLLOWING TAB, WHICH IS TAB 5447.

10:38AM  24        AND, MR. LUCAS, IS THIS EMAIL CHAIN SIMILARLY RELATED TO

10:38AM  25    THE BDV INVESTMENT IN DECEMBER OF 2013 AND INCLUDING YOU AND

LUCAS DIRECT BY MR. BOSTIC                                          5427

10:38AM  1    OTHERS?

10:38AM  2    A.   YES.

10:38AM  3         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5447.

10:38AM  4         MR. DOWNEY:  NO OBJECTION.

10:38AM  5         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38AM  6         (GOVERNMENT'S EXHIBIT 5447 WAS RECEIVED IN EVIDENCE.)

10:38AM  7         MR. BOSTIC:  AND IF WE CAN ZOOM IN ON THE TOP HALF

10:38AM  8    OF THIS PAGE, PLEASE.

10:38AM  9    Q.   AND IN THE BOTTOM MESSAGE HERE, THERE'S AN EMAIL FROM

10:39AM  10   MS. QUINTANA TO THERANOS, CC'ING YOU, AND IT SAYS, "ATTACHED

10:39AM  11   PLEASE FIND BLACK DIAMOND VENTURE'S EXECUTED MASTER SIGNATURE

10:39AM  12   PAGE," AND IT SAYS "OUR WIRE IN THE AMOUNT OF $5,349,900 WAS

10:39AM  13   INITIATED THIS MORNING."

10:39AM  14        COULD YOU EXPLAIN WHAT WAS HAPPENING AS REFERENCED IN THIS

10:39AM  15   EMAIL?

10:39AM  16   A.   THIS WAS THE LAST IN THE PROCESS.  WE MADE THE DECISION

10:39AM  17   WITH OUR GROUP TO INVEST, WE'RE ACKNOWLEDGING THE WIRE AND

10:39AM  18   SIGNING THIS SIGNATURE PAGE OF THE SHAREHOLDER, OF THE STOCK

10:39AM  19   PURCHASE AGREEMENT.

10:39AM  20   Q.   SO THIS IS HAPPENING ON DECEMBER 31ST.  THAT'S THE

10:39AM  21   DEADLINE FOR THE INVESTMENT; CORRECT?

10:39AM  22   A.   YES.

10:39AM  23   Q.   CAN YOU EXPLAIN WHEN THE ACTUAL DECISION WAS MADE TO

10:39AM  24   INVEST?  DID IT HAPPEN EXACTLY ON THE 31ST OR THE DAYS LEADING

10:39AM  25   UP TO IT?  WHAT IS YOUR RECOLLECTION THERE?

LUCAS DIRECT BY MR. BOSTIC                                    5428

| | | |
|---|---|---|
| 10:40AM | 1 | A.   CERTAINLY AFTER WE -- WELL, INITIALLY WE WERE VERY |
| 10:40AM | 2 | INTERESTED IN INVESTING, WE HAD THE CALL WITH ELIZABETH, WE |
| 10:40AM | 3 | THEN FOLLOW UP WITH OUR INVESTORS, AND SO WHETHER WE WERE |
| 10:40AM | 4 | EXCITED -- "WE" BLACK DIAMOND -- WERE EXCITED TO INVEST OR NOT, |
| 10:40AM | 5 | IF NO ONE ELSE WAS INTERESTED IN INVESTING, WE WOULDN'T HAVE |
| 10:40AM | 6 | THE CAPITAL TO INVEST, SO THAT WOULD HAVE ENDED THE PROCESS. |
| 10:40AM | 7 | HOWEVER, WE DID HAVE SIGNIFICANT INTEREST, AND THIS WAS |
| 10:40AM | 8 | THE LEVEL, $5.3 MILLION, AND WE COLLECT THE FUNDS, WIRE, AND |
| 10:40AM | 9 | THEN WE MANAGE THE FUNDS ON BEHALF OF OUR INVESTORS. |
| 10:41AM | 10 | Q.   AND DO YOU RECALL WHETHER THIS $5.3 MILLION AMOUNT |
| 10:41AM | 11 | INCLUDED ANY OF YOUR PERSONAL FUNDS? |
| 10:41AM | 12 | A.   I EXPECT IT DID, BUT I JUST DON'T RECALL. |
| 10:41AM | 13 | Q.   LET'S GO TO EXHIBIT 4845. |
| 10:41AM | 14 | YOUR HONOR, THAT IS IN EVIDENCE.  PERMISSION TO PUBLISH? |
| 10:41AM | 15 | THE COURT:  YES. |
| 10:41AM | 16 | BY MR. BOSTIC: |
| 10:41AM | 17 | Q.   LET'S LOOK AT PAGE 19 OF THIS EXHIBIT. |
| 10:41AM | 18 | A.   PLEASE SAY AGAIN WHICH EXHIBIT. |
| 10:41AM | 19 | Q.   THIS WILL BE ON THE SCREEN BECAUSE IT'S ALREADY IN |
| 10:41AM | 20 | EVIDENCE. |
| 10:41AM | 21 | A.   OH, OKAY. |
| 10:41AM | 22 | Q.   DO YOU SEE IN FRONT OF YOU THE DETAILS OF A WIRE |
| 10:41AM | 23 | TRANSACTION INVOLVING BLACK DIAMOND VENTURES? |
| 10:41AM | 24 | A.   YES. |
| 10:41AM | 25 | Q.   AND DO YOU SEE AT THE TOP THERE IN A LINE THAT READS OMAD, |

LUCAS DIRECT BY MR. BOSTIC                                        5429

10:41AM  1    THERE'S A DATE INDICATED 2013-12-31?

10:42AM  2    A.   YES.

10:42AM  3    Q.   AND IN THE NEXT SECTION UNDER AMOUNT, THERE'S THE AMOUNT

10:42AM  4    THAT WE JUST SAW, APPROXIMATELY $5.35 MILLION?

10:42AM  5    A.   YES.

10:42AM  6    Q.   AND UNDER ORIGINATOR, IT SHOWS THAT THIS IS COMING FROM

10:42AM  7    BLACK DIAMOND VENTURES.

10:42AM  8         AND UNDER BENEFICIARY, IT SHOWS THAT THIS IS GOING TO

10:42AM  9    THERANOS.

10:42AM 10         DO YOU SEE THAT?

10:42AM 11    A.   YES.

10:42AM 12    Q.   IS THIS THE WIRE THROUGH WHICH BDV INVESTED IN THERANOS?

10:42AM 13    A.   YES.

10:42AM 14    Q.   LET'S GO BACK TO EXHIBIT 5143 JUST BRIEFLY.  THIS IS IN

10:42AM 15    EVIDENCE.

10:42AM 16         AND IF WE COULD LOOK AT PAGE 1 FIRST.

10:42AM 17         WE SEE THAT THIS EMAIL ATTACHES SOME TRANSACTION DOCUMENTS

10:42AM 18    AT THE TOP.

10:42AM 19         DO YOU SEE THAT?

10:42AM 20    A.   YES.

10:42AM 21    Q.   LET'S GO TO PAGE 55 OF THE EXHIBIT.  I WOULD JUST LIKE TO

10:43AM 22    SHOW YOU A FEW PORTIONS OF ONE OF THESE AGREEMENTS.

10:43AM 23         DO YOU SEE THAT ONE OF THE DOCUMENTS ATTACHED WAS NAMED

10:43AM 24    PREFERRED STOCK PURCHASE AGREEMENT?

10:43AM 25    A.   YES.

LUCAS DIRECT BY MR. BOSTIC                                          5430

10:43AM   1    Q.   AND LET'S LOOK AT THE FOLLOWING PAGE IN THIS DOCUMENT.

10:43AM   2         LET'S GO TO PAGE 65 OF THE EXHIBIT.  AND LET'S ZOOM IN ON

10:43AM   3    SECTIONS 4.3 AND 4.4.

10:43AM   4         MR. LUCAS, DO YOU SEE THAT THIS AGREEMENT REPRESENTS THAT

10:43AM   5    THE INVESTOR INVESTING IN THERANOS, IT SAYS, HAS SUBSTANTIAL

10:43AM   6    EXPERIENCE IN EVALUATING AND INVESTING IN PRIVATE PLACEMENT

10:43AM   7    TRANSACTIONS OF SECURITIES AND COMPANIES SIMILAR TO THE

10:43AM   8    COMPANY?

10:43AM   9    A.   YES.

10:43AM  10    Q.   AND IT ALSO SAYS THAT THE INVESTOR CAN PROTECT ITS OWN

10:43AM  11    INTERESTS AND HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND

10:44AM  12    BUSINESS MATTERS SO THAT THE INVESTOR IS CAPABLE OF EVALUATING

10:44AM  13    THE MERITS AND RISKS OF THE INVESTMENT.

10:44AM  14         DO YOU SEE THAT?

10:44AM  15    A.   YES.

10:44AM  16    Q.   AND WAS THAT TRUE AS TO YOU AND BDV AT THE TIME OF THE

10:44AM  17    INVESTMENT?

10:44AM  18    A.   YES.  AND GENERALLY FOR ANY KIND OF INVESTMENT LIKE THIS,

10:44AM  19    THIS LANGUAGE IS IN THE DOCUMENTATION.

10:44AM  20    Q.   YOU WERE FAMILIAR WITH LANGUAGE LIKE THIS FROM YOUR

10:44AM  21    PREVIOUS INVESTMENTS?

10:44AM  22    A.   YES.

10:44AM  23    Q.   UNDER SECTION 4.4, THE NEXT ONE, IT'S LABELLED

10:44AM  24    "SPECULATIVE NATURE OF INVESTMENT."

10:44AM  25         DO YOU SEE THAT?

LUCAS DIRECT BY MR. BOSTIC                                          5431

10:44AM  1    A.    YES.

10:44AM  2    Q.    THAT SECTION TALKS ABOUT THE COMPANY HAVING LIMITED

10:44AM  3    FINANCIAL AND OPERATING HISTORY.

10:44AM  4          AND THEN IF WE GO TO PAGE 66 OF THE EXHIBIT, AT THE TOP

10:44AM  5    THERE, THERE'S A CONFIRMATION THAT THE INVESTOR UNDERSTANDS

10:44AM  6    THAT THIS IS A HIGHLY SPECULATIVE INVESTMENT AND IT INVOLVES

10:44AM  7    SUBSTANTIAL RISKS.

10:44AM  8          DO YOU SEE THAT?

10:44AM  9    A.    YES.

10:44AM 10    Q.    AND DID YOU UNDERSTAND THAT AT THE TIME AS TO THERANOS?

10:45AM 11    A.    YES.

10:45AM 12    Q.    SECTION 4.5 TALKS ABOUT THE INVESTOR'S ACCESS TO

10:45AM 13    INFORMATION ABOUT THE COMPANY.

10:45AM 14          DO YOU SEE THAT?

10:45AM 15    A.    YES.

10:45AM 16    Q.    AND WERE THOSE STATEMENTS TRUE AS TO YOU AND BDV AT THE

10:45AM 17    TIME?

10:45AM 18    A.    WELL, CERTAINLY WE RECEIVED ENOUGH INFORMATION THAT

10:45AM 19    ALLOWED US TO MAKE A DECISION.

10:45AM 20          THERE COULD HAVE BEEN ADDITIONAL INFORMATION, AS I SAID

10:45AM 21    EARLIER, LIKE FINANCIAL STATEMENTS AND SO FORTH THAT WOULD HAVE

10:45AM 22    BEEN HELPFUL.

10:45AM 23          BUT, AGAIN, I HAD A VERY COMFORTABLE RELATIONSHIP WITH

10:45AM 24    ELIZABETH AND EVERYTHING SEEMED TO BE GOING GREAT.

10:45AM 25    Q.    DID THE FACT THAT YOU FELT THAT YOU HAD A GOOD

LUCAS DIRECT BY MR. BOSTIC                                    5432

| | | |
|---|---|---|
| 10:45AM | 1 | RELATIONSHIP WITH MS. HOLMES INCREASE YOUR COMFORT LEVEL WITH |
| 10:45AM | 2 | THE INVESTMENT? |
| 10:45AM | 3 | A.   YES. |
| 10:45AM | 4 | Q.   DID IT INCREASE YOUR COMFORT LEVEL WITH THE INVESTMENT |
| 10:45AM | 5 | DESPITE THE FACT THAT YOU DIDN'T HAVE INFORMATION LIKE |
| 10:45AM | 6 | FINANCIAL INFORMATION FROM THE COMPANY? |
| 10:45AM | 7 | A.   YES. |
| 10:45AM | 8 | AND IF I MAY ADD?  THE FACT THAT SHE HAD BEEN ABLE TO |
| 10:46AM | 9 | ATTRACT PARTNERS LIKE WALGREENS AND OTHERS, THAT'S A HUGE |
| 10:46AM | 10 | FACTOR. |
| 10:46AM | 11 | Q.   YOU MENTIONED WALGREENS. |
| 10:46AM | 12 | IN DECEMBER OF 2013, WAS IT YOUR UNDERSTANDING THAT THE |
| 10:46AM | 13 | PARTNERSHIP WITH WALGREENS HAD BEEN IN OPERATION FOR A FEW |
| 10:46AM | 14 | MONTHS? |
| 10:46AM | 15 | A.   I DON'T REMEMBER THE AMOUNT OF TIME, BUT SOMETHING LIKE |
| 10:46AM | 16 | THAT. |
| 10:46AM | 17 | Q.   BASED ON YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU |
| 10:46AM | 18 | UNDERSTAND THAT THAT PARTNERSHIP WAS GOING WELL? |
| 10:46AM | 19 | A.   YES. |
| 10:46AM | 20 | Q.   FINALLY, IF WE COULD JUST MOVE DOWN TO SECTION 4.6. |
| 10:46AM | 21 | THIS SECTION IN THE AGREEMENT HAS THE INVESTOR CONFIRMING |
| 10:46AM | 22 | THAT IT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF A |
| 10:46AM | 23 | CERTAIN REGULATION. |
| 10:46AM | 24 | WAS THAT TRUE AS TO BDV AND YOU AT THE TIME? |
| 10:47AM | 25 | A.   YES. |

LUCAS DIRECT BY MR. BOSTIC                                                5433

10:47AM  1      Q.   I'LL ASK YOU TO LOOK AT TAB 7366 IN YOUR BINDER.  IT

10:47AM  2      SHOULD BE AT THE VERY BACK.

10:47AM  3           AND DO YOU HAVE 7366 IN FRONT OF YOU?

10:47AM  4      A.   I DO.

10:47AM  5      Q.   I'LL ASK YOU TO GO TO PAGE 2 OF THE EXHIBIT.

10:47AM  6           DO YOU SEE THERE AN EMAIL FROM MS. QUINTANA AT BDV TO YOU

10:47AM  7      REGARDING THE THERANOS INVESTMENT?

10:47AM  8      A.   YES.

10:47AM  9                MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS PAGES

10:47AM 10      2 THROUGH THE END OF EXHIBIT 7366.

10:48AM 11                MR. DOWNEY:  YOUR HONOR, CAN I HAVE JUST ONE SECOND

10:48AM 12      TO TALK TO MR. BOSTIC?

10:48AM 13                THE COURT:  SURE.

10:48AM 14           (DISCUSSION OFF THE RECORD.)

10:48AM 15                THE COURT:  FOLKS, WHY DON'T YOU STAND UP RIGHT NOW

10:48AM 16      AND STRETCH A LITTLE BIT.  WE'LL BE TAKING OUR BREAK IN ABOUT

10:48AM 17      45 MINUTES OR SO, BUT FEEL FREE TO STAND AND STRETCH.

10:48AM 18           (STRETCHING.)

10:48AM 19                THE COURT:  YOU AS WELL, SIR, IF YOU WOULD LIKE,

10:48AM 20      YES.

10:48AM 21                THE WITNESS:  THANK YOU.

10:49AM 22           (STRETCHING.)

10:49AM 23                THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

10:49AM 24           MR. BOSTIC?

10:49AM 25                MR. BOSTIC:  THANK YOU, YOUR HONOR.

LUCAS DIRECT BY MR. BOSTIC                                              5434

10:49AM   1          THE GOVERNMENT JUST HAD MOVED TO ADMIT EXHIBIT 7366, PAGES

10:49AM   2     2 THROUGH THE END.

10:49AM   3               MR. DOWNEY:  TO WHICH WE HAVE NO OBJECTION.

10:49AM   4               THE COURT:  THANK YOU.  IT'S ADMITTED.  IT MAY BE

10:49AM   5     PUBLISHED.

10:49AM   6          (DEFENDANT'S EXHIBIT 7366, PAGES 2 - END, WAS RECEIVED IN

10:49AM   7     EVIDENCE.)

10:49AM   8     BY MR. BOSTIC:

10:49AM   9     Q.   MR. LUCAS, DO YOU SEE HERE AN EMAIL BETWEEN INDIVIDUALS AT

10:49AM  10     BDV RELATING TO THE THERANOS INVESTMENT IN DECEMBER 2013?

10:49AM  11     A.   YES.

10:49AM  12     Q.   AND THE EMAIL READS, "DEAR BDV INVESTOR.

10:49AM  13          "THANK YOU FOR YOUR INTEREST AND PARTICIPATION IN THIS

10:49AM  14     SERIES C-1 STOCK FINANCING.  PER OUR COUNSEL'S RECOMMENDATION,

10:50AM  15     WE WOULD LIKE TO SHARE ADDITIONAL INFORMATION AND DISCLOSURES

10:50AM  16     IN THE ATTACHED ACKNOWLEDGEMENT LETTER AND ACCOMPANYING

10:50AM  17     EXHIBIT A."

10:50AM  18          DO YOU SEE THAT?

10:50AM  19     A.   YES.

10:50AM  20     Q.   NOW, I DON'T WANT YOU TO DISCLOSE ANY PRIVILEGED

10:50AM  21     COMMUNICATIONS THAT YOU HAD WITH COUNSEL, BUT CAN YOU EXPLAIN

10:50AM  22     WHAT THIS COMMUNICATION WAS AND WHAT WAS BEING DISCLOSED TO BDV

10:50AM  23     INVESTORS ABOUT THERANOS AT THIS TIME?

10:50AM  24     A.   JUST GENERALLY, AS I DON'T HAVE THAT PART OF IT IN FRONT

10:50AM  25     OF ME, BUT GENERALLY WE WERE SAYING TO OUR GROUP THAT THERE WAS

LUCAS DIRECT BY MR. BOSTIC                                            5435

10:50AM  1    A CERTAIN AMOUNT OF INFORMATION THAT WE DID NOT HAVE ACCESS TO,

10:50AM  2    AND WE WANTED THEM TO KNOW THAT AND ACKNOWLEDGE THAT, AND IF

10:50AM  3    THEY STILL WANTED TO INVEST, THEY WOULD ACKNOWLEDGE AND SIGN

10:50AM  4    THAT, AND OBVIOUSLY GET US THE FUNDS.

10:50AM  5         IF THAT MEMO SWAYED THEM OR CAUSED THEM TO CHANGE THEIR

10:50AM  6    MIND, THEN AT THAT POINT THEY WOULDN'T SIGN IT, THEY WOULDN'T

10:51AM  7    INVEST, AND THAT WOULD BE THE END OF THEIR PARTICIPATION.

10:51AM  8    Q.   YOU SPOKE EARLIER ABOUT SOME KINDS OF INFORMATION THAT YOU

10:51AM  9    DIDN'T HAVE FROM THERANOS AT THE TIME, INCLUDING SOME FINANCIAL

10:51AM  10   INFORMATION; IS THAT RIGHT?

10:51AM  11   A.   YES.

10:51AM  12   Q.   WHEN IT CAME TO THE AMOUNT OF INFORMATION THAT YOU HAD

10:51AM  13   FROM THERANOS AND THE LEVEL OF TRANSPARENCY, HOW WOULD YOU

10:51AM  14   COMPARE IT TO PREVIOUS INVESTMENTS THAT YOU HAD PARTICIPATED

10:51AM  15   IN?

10:51AM  16   A.   CERTAINLY IRREGULAR IN THAT GENERALLY WE WOULD HAVE

10:51AM  17   FINANCIAL STATEMENTS, AS I'VE SAID BEFORE, AND OTHER

10:51AM  18   DOCUMENTATION AND SO FORTH COMING FROM THE COMPANY.

10:51AM  19        I FELT COMFORTABLE WITH ELIZABETH AND A FEW OTHERS THAT I

10:51AM  20   MET THAT SHE WAS VERY CONCERNED, AND POTENTIALLY RIGHTLY SO,

10:51AM  21   THAT WHAT SHE WAS WORKING ON AND THE COMPANY WAS WORKING ON WAS

10:52AM  22   VERY TRANSFORMATIVE, AND THEY DID NOT WANT TO HAVE ANY

10:52AM  23   INFORMATION GET OUT INTO THE PUBLIC DOMAIN SO AS TO GIVE ONE OF

10:52AM  24   HER COMPETITORS A CHANCE TO CRUSH THE COMPANY BEFORE THE

10:52AM  25   COMPANY GOT TO FRUITION.

LUCAS DIRECT BY MR. BOSTIC                                      5436

10:52AM   1        BUT THERE IS CERTAIN INFORMATION, AS I SAID BEFORE, LIKE

10:52AM   2    FINANCIALS, THAT TYPICALLY WOULD HAVE BEEN PROVIDED.

10:52AM   3    Q.   AND AT THE TIME THAT YOU WERE MOVING FORWARD WITH THIS

10:52AM   4    INVESTMENT AND LACKED THAT INFORMATION, WERE YOU SATISFIED WITH

10:52AM   5    THAT EXPLANATION FROM MS. HOLMES ABOUT THE REASON WHY YOU

10:52AM   6    DIDN'T HAVE THAT INFORMATION?

10:52AM   7    A.   YES.

10:52AM   8    Q.   THIS STEP OF SENDING THIS KIND OF DISCLOSURE TO BDV

10:52AM   9    INVESTORS, HAD BDV EVER TAKEN THIS ACTION BEFORE WITH RESPECT

10:52AM   10   TO A PREVIOUS INVESTMENT?

10:52AM   11   A.   NO, NOT SOMETHING LIKE THIS.  OUR DOCUMENTATION WOULD

10:52AM   12   INCLUDE SOMETHING SIMILAR AS WAS BEFORE, YOU ARE AN ACCREDITED

10:53AM   13   INVESTOR, YOU REALIZE THIS IS SPECULATIVE, AND SO FORTH.  BUT

10:53AM   14   WE FELT THAT IT WAS IMPORTANT TO PROVIDE THIS ADDITIONAL

10:53AM   15   DISCLOSURE.

10:53AM   16   Q.   IN DECIDING TO INVEST IN THERANOS, I JUST WANT TO MAKE

10:53AM   17   SURE THAT I UNDERSTAND THE SOURCES OF INFORMATION THAT YOU

10:53AM   18   RELIED UPON.

10:53AM   19        IN ADDITION TO THE CALLS WITH MS. HOLMES THAT WE'VE BEEN

10:53AM   20   TALKING ABOUT, DID YOU EVER RECEIVE WRITTEN MATERIALS FROM THE

10:53AM   21   COMPANY IN THE TIME PERIOD LEADING UP TO THE 2013 INVESTMENT?

10:53AM   22   A.   I DON'T RECALL OTHER THAN WHAT WAS MADE GENERALLY PUBLICLY

10:53AM   23   AVAILABLE.  I DON'T THINK I RECEIVED ANYTHING PROPRIETARY.

10:53AM   24   Q.   DID YOU VIEW ANY PRESENTATIONS FROM MS. HOLMES DURING ANY

10:53AM   25   IN-PERSON MEETINGS LEADING UP TO THAT 2013 INVESTMENT?

LUCAS DIRECT BY MR. BOSTIC                                    5437

10:53AM   1    A.   IF, IF YOU LITERALLY MEAN RIGHT BEFORE THE INVESTMENT OR

10:54AM   2    WITHIN A FEW MONTHS, I DON'T THINK SO.  BUT I WOULD ALSO HAVE

10:54AM   3    TO SAY THAT I DON'T REMEMBER FOR SURE.

10:54AM   4    Q.   TO THE EXTENT THAT YOU WERE PRESENTED WITH ANY SLIDE

10:54AM   5    PRESENTATIONS BY MS. HOLMES OR THERANOS AROUND THE 2013 TIME

10:54AM   6    PERIOD, WERE YOU ALLOWED TO RETAIN COPIES OF THOSE

10:54AM   7    PRESENTATIONS?

10:54AM   8    A.   I JUST DON'T, DON'T REMEMBER.  YEAH, I JUST DON'T

10:54AM   9    REMEMBER.

10:54AM  10    Q.   WE SPOKE ABOUT NEWS ARTICLES REGARDING THERANOS.  DID YOU

10:54AM  11    GENERALLY LOOK FOR AND REVIEW NEWS ARTICLES ABOUT THE COMPANY

10:54AM  12    LEADING UP TO THE INVESTMENT?

10:54AM  13    A.   YES.

10:54AM  14    Q.   YOU ALSO TALKED ABOUT THE WEBSITE.  DID YOU REVIEW THE

10:54AM  15    THERANOS WEBSITE BEFORE DECIDING TO INVEST IN THE COMPANY IN

10:54AM  16    DECEMBER OF 2013?

10:54AM  17    A.   YES.

10:54AM  18    Q.   WHEN IT CAME TO YOUR UNDERSTANDING OF THE COMPANY STATUS

10:55AM  19    AT THAT TIME, I'D LIKE TO ASK YOU ABOUT A FEW SPECIFICS, AND

10:55AM  20    THIS IS BASED ON THE SOURCES OF INFORMATION THAT WE JUST TALKED

10:55AM  21    ABOUT.

10:55AM  22         FIRST, WHEN IT CAME TO THE COMPANY'S TECHNOLOGY, WHAT WAS

10:55AM  23    YOUR UNDERSTANDING OF THE DEVICES, THE DEVICE OR DEVICES THAT

10:55AM  24    THERANOS WAS USING TO CONDUCT ITS BLOOD TESTS?

10:55AM  25    A.   SO THE BRAIN OF THE DEVICE WAS, AND I THINK IT HAD

LUCAS DIRECT BY MR. BOSTIC                                      5438

10:55AM  1    DIFFERENT NAMES, BUT THE ANALYZER WAS A BOX THE SIZE OF A PC,

10:55AM  2    YOU KNOW, A COUPLE FEET LONG, FOOT WIDE, AND LIKE OTHER

10:55AM  3    TECHNOLOGIES -- AND ABOUT A FOOT AND A HALF TALL.

10:55AM  4         AND LIKE OTHER TECHNOLOGIES, THEY WERE CONSTANTLY WORKING

10:55AM  5    TO MINIMIZE THAT, SO THERE WERE LARGER VERSIONS BEFORE, AND

10:55AM  6    WITH EACH ITERATION IT GOT SMALLER.

10:56AM  7         SO THAT WAS THE GUTS.

10:56AM  8    Q.   DID YOU EVER HAVE AN OPPORTUNITY TO SEE THE THERANOS

10:56AM  9    ANALYZER ITSELF?

10:56AM  10   A.   YES.

10:56AM  11   Q.   AND WHEN DID THAT HAPPEN?

10:56AM  12   A.   I'M SURE OVER THE YEARS A NUMBER OF TIMES.

10:56AM  13   Q.   MULTIPLE TIMES?

10:56AM  14   A.   YES.

10:56AM  15   Q.   AND WOULD THAT HAVE BEEN AT THERANOS'S HEADQUARTERS?

10:56AM  16   A.   YES.  AND PRIOR TO THAT, MY UNCLE WOULD HAVE AN ANNUAL

10:56AM  17   CONFERENCE FOR HIS INVESTORS, FOLKS WHO HAD COME IN ON OCCASION

10:56AM  18   AS THE TECHNOLOGY WAS DEVELOPED, AND ELIZABETH HAD BROUGHT A

10:56AM  19   BOX OR TWO, AN ANALYZER TO LET PEOPLE SEE IT.

10:56AM  20   Q.   BASED ON YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU HAVE

10:56AM  21   AN UNDERSTANDING THAT THERE WAS ONE THERANOS ANALYZER THAT WAS

10:56AM  22   KIND OF GOING THROUGH VERSIONS, OR WAS THERE EVER A DISCUSSION

10:56AM  23   OF THE NEED FOR MULTIPLE DEVICES TO DO DIFFERENT KINDS OF

10:57AM  24   TESTS?

10:57AM  25   A.   MY GENERAL RECOLLECTION IS THAT IT WAS ONE DEVICE THAT WAS

LUCAS DIRECT BY MR. BOSTIC                                               5439

10:57AM  1    BEING DEVELOPED TO HANDLE ALL OF THE TESTS.

10:57AM  2    Q.   AND AS FAR AS WHAT IT COULD DO, DID YOU UNDERSTAND THAT

10:57AM  3    THAT DEVICE WOULD RUN BLOOD TESTS USING A FINGERSTICK SAMPLE?

10:57AM  4    A.   YES.

10:57AM  5    Q.   HOW ABOUT AS TO THE AMOUNT OF TESTS THAT THAT DEVICE COULD

10:57AM  6    RUN?  DID YOU UNDERSTAND THAT IT COULD DO MULTIPLE KINDS OF

10:57AM  7    BLOOD TESTS?

10:57AM  8    A.   YES.

10:57AM  9    Q.   DID YOU HAVE AN UNDERSTANDING AROUND THE TIME THAT YOU

10:57AM  10   INVESTED ABOUT HOW MANY BLOOD TESTS THERANOS WAS OFFERING TO

10:57AM  11   THE PUBLIC?

10:57AM  12   A.   MY ESTIMATE WAS THAT IT COULD DO THE MAJORITY OF THE MOST

10:57AM  13   COMMON TESTS OUT THERE, SO THAT WOULD HAVE BEEN AT LEAST DOZENS

10:57AM  14   OF TESTS.

10:57AM  15   Q.   AND WAS THAT YOUR UNDERSTANDING BASED ON CONVERSATIONS

10:58AM  16   WITH MS. HOLMES?

10:58AM  17   A.   YES.  I WOULD JUST ADD, WITH THE INTENT OF CONTINUING TO

10:58AM  18   DEVELOP OTHER TESTS AS THEY'RE ABLE TO EXPAND THEIR EXPERTISE.

10:58AM  19   Q.   YOU UNDERSTOOD THAT THE NUMBER OF TESTS THAT THE ANALYZER

10:58AM  20   COULD PERFORM WAS GROWING?

10:58AM  21   A.   CORRECT.

10:58AM  22   Q.   BUT AT THE TIME WHEN YOU INVESTED IN DECEMBER OF 2013,

10:58AM  23   WHAT WAS YOUR UNDERSTANDING AS TO THE PROPORTION OF THERANOS'S

10:58AM  24   TESTS THAT COULD BE DONE USING THE THERANOS ANALYZER?

10:58AM  25   A.   YEAH.  AS I SAY, YOU KNOW, DOZENS, BUT CERTAINLY SOME HIGH

LUCAS DIRECT BY MR. BOSTIC                                    5440

10:58AM  1    PERCENTAGE OF THE MOST COMMON BLOOD TESTS OUT THERE.

10:58AM  2    Q.   WOULD YOU HAVE BEEN SURPRISED AT THE TIME TO HEAR THAT THE

10:58AM  3    THERANOS ANALYZER WAS NEVER USED TO RUN MORE THAN 12 DIFFERENT

10:58AM  4    KINDS OF BLOOD TESTS IN THE THERANOS LAB?

10:58AM  5    A.   YES.

10:58AM  6    Q.   WOULD YOU HAVE BEEN VERY SURPRISED TO HEAR THAT?

10:58AM  7    A.   VERY SURPRISED.

10:59AM  8    Q.   WOULD THAT HAVE BEEN IMPORTANT INFORMATION FOR YOU TO KNOW

10:59AM  9    AT THE TIME THAT YOU INVESTED?

10:59AM  10   A.   YES.

10:59AM  11   Q.   WHY?

10:59AM  12   A.   WELL, IF WE HAD SPENT ALL OF THIS TIME AND NOW WE CAN ONLY

10:59AM  13   DO 12, THAT WOULD BE A PROBLEM.

10:59AM  14        HOWEVER, IF ONE WAS TOLD, GEE, WE CAN ONLY DO 12, BUT

10:59AM  15   WE'RE ADDING DOZENS EVERY MONTH, OR SOME NUMBER LIKE THAT, THEN

10:59AM  16   THAT'S JUST THE PROCESS THAT YOU GO THROUGH AS THE TECHNOLOGY

10:59AM  17   IS GETTING PREPARED FOR PRIMETIME AND DISTRIBUTION.

10:59AM  18   Q.   SO IT SOUNDS LIKE YOU WOULD HAVE BEEN UNDERSTANDING IF THE

10:59AM  19   ANSWER HAD BEEN, HERE'S WHERE WE ARE AND THERE'S MORE TO COME?

10:59AM  20   A.   YES.  IF TRULY THAT WAS THE CASE, YES.

10:59AM  21   Q.   BUT JUST TO BE CLEAR, WERE YOU TOLD IN 2013 THAT THE

10:59AM  22   THERANOS ANALYZER COULD RUN NO MORE THAN 12 TESTS?

10:59AM  23   A.   NO.

10:59AM  24   Q.   SPEAKING MORE ABOUT THE CAPABILITIES OF THE THERANOS

11:00AM  25   ANALYZER, DID MS. HOLMES TELL YOU ANYTHING ABOUT THE LEVEL OF

LUCAS DIRECT BY MR. BOSTIC                                          5441

11:00AM   1   AUTOMATION AND ACCURACY THAT THE DEVICE WAS CAPABLE OF?

11:00AM   2   A.   I DON'T REMEMBER IF WE GOT INTO SPECIFICS, BUT CERTAINLY

11:00AM   3   THAT WAS THE WHOLE PURPOSE OF DEVELOPING THE TECHNOLOGY.

11:00AM   4   Q.   IF THE DEVICE HAD HAD THE SAME LEVEL OF AUTOMATION AS

11:00AM   5   CONVENTIONAL DEVICES AND IT HAD ACCURACY PROBLEMS, WOULD THOSE

11:00AM   6   FACTS HAVE BEEN IMPORTANT TO YOU AS A POTENTIAL INVESTOR IN THE

11:00AM   7   COMPANY?

11:00AM   8   A.   YES.

11:00AM   9   Q.   DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID SHE EVER

11:00AM  10   TELL YOU ABOUT ANY ACCURACY OR RELIABILITY PROBLEMS EXPERIENCED

11:00AM  11   BY THE THERANOS ANALYZER?

11:00AM  12   A.   I DON'T RECALL THAT HAPPENING.

11:00AM  13   Q.   IN YOUR CONVERSATIONS WITH MS. HOLMES, DID SHE EVER

11:00AM  14   DISCUSS THERANOS'S WORK WITH THE UNITED STATES MILITARY?

11:01AM  15   A.   YES.

11:01AM  16   Q.   AT THE TIME THAT YOU INVESTED, WHAT WAS YOUR UNDERSTANDING

11:01AM  17   FROM THOSE CONVERSATIONS ABOUT THE MILITARY'S USE OF THERANOS'S

11:01AM  18   TECHNOLOGY?

11:01AM  19   A.   WELL, THAT IT WAS BEING USED IN THE FIELD AND THAT IT WAS

11:01AM  20   VERY EXCITING BECAUSE OF THE THINGS THAT THE TECHNOLOGY COULD

11:01AM  21   DO THAT OTHER TECHNOLOGIES COULD NOT DO IN THE FIELD, AND IT

11:01AM  22   WAS IMPORTANT FOR THE SURVIVOR RATE FOR FOLKS WHO HAD BEEN

11:01AM  23   WOUNDED IN THE FIELD.

11:01AM  24   Q.   JUST TO BE CLEAR, FROM WHAT MS. HOLMES TOLD YOU, DID YOU

11:01AM  25   UNDERSTAND THAT THE THERANOS ANALYZER WAS ACTIVELY BEING USED

LUCAS DIRECT BY MR. BOSTIC                                             5442

11:01AM   1     BY THE MILITARY TO TREAT SOLDIERS IN THE FIELD?

11:01AM   2     A.   YES.

11:01AM   3     Q.   WOULD YOU HAVE BEEN SURPRISED AT THAT TIME TO HEAR THAT

11:01AM   4     THE MILITARY HAD NEVER USED ANY THERANOS TECHNOLOGY IN THE

11:01AM   5     TREATMENT OF SOLDIERS?

11:01AM   6     A.   YES, I WOULD HAVE BEEN SURPRISED.

11:01AM   7     Q.   WOULD IT HAVE SURPRISED YOU AT THAT TIME TO HEAR THAT

11:02AM   8     THERANOS OR THE MILITARY HAD NEVER SENT EVEN A SINGLE ANALYZER

11:02AM   9     TO THE MIDDLE EAST?

11:02AM   10    A.   YES, I WOULD HAVE BEEN SURPRISED.

11:02AM   11    Q.   COMPARING BDV'S INVESTMENT IN 2013 TO ITS INVESTMENT IN

11:02AM   12    2006, CAN YOU TELL ME ABOUT WHETHER YOU VIEWED THOSE TWO

11:02AM   13    INVESTMENTS AS CARRYING THE SAME AMOUNT OF RISK?

11:02AM   14    A.   NO.   THE ONE IN 2006, AS I SAID EARLIER, WE HOPED THAT

11:02AM   15    ELIZABETH AND HER TEAM, WHO SEEMED VERY DEDICATED AND VERY

11:02AM   16    PURPOSEFUL AND PASSIONATE, COULD DEVELOP IT, BUT THERE WAS NO

11:02AM   17    GUARANTEE.   HOPEFULLY IT HAPPENED, AND HOPEFULLY NOT.   THAT'S

11:02AM   18    WHAT VENTURE INVESTING IS.

11:02AM   19         HOWEVER, ALSO, AS I SAID EARLIER, AS YOU GO UP TO LATER

11:02AM   20    STAGE INVESTMENTS, THE RISK PROFILE GOES DOWN AND YOU WOULD

11:02AM   21    EXPECT TO HAVE A HIGHER CERTAINTY OF A RETURN.

11:03AM   22         SO THE DIFFERENCE BETWEEN THE TWO TIME PERIODS WAS HUGE.

11:03AM   23    Q.   AND IN DRAWING THAT COMPARISON AND REACHING THAT

11:03AM   24    UNDERSTANDING ABOUT THE LEVEL OF RISK IN 2013, WERE YOU RELYING

11:03AM   25    ON YOUR CONVERSATIONS WITH MS. HOLMES?

LUCAS DIRECT BY MR. BOSTIC                                    5443

11:03AM   1    A.   YES.

11:03AM   2    Q.   FOLLOWING BDV'S INVESTMENT IN THERANOS IN 2013, DID YOU

11:03AM   3    CONTINUE TO STAY IN CONTACT WITH MS. HOLMES?

11:03AM   4    A.   YES.

11:03AM   5    Q.   DID SHE CONTINUE TO PROVIDE YOU WITH INFORMATION ABOUT THE

11:03AM   6    COMPANY?

11:03AM   7    A.   YES, WE WOULD SPEAK REGULARLY.

11:03AM   8    Q.   I'LL ASK YOU TO LOOK, JUST BRIEFLY, AT EXHIBIT 1770.  IT'S

11:03AM   9    TAB 1770 IN YOUR BINDER.

11:04AM   10        AND DO YOU HAVE THAT IN FRONT OF YOU?

11:04AM   11   A.   YES.

11:04AM   12   Q.   IS THIS ANOTHER EMAIL FROM THERANOS TO A GROUP OF

11:04AM   13   INVESTORS, INCLUDING YOU, IN JUNE OF 2014?

11:04AM   14   A.   YES.

11:04AM   15        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT --

11:04AM   16        THE WITNESS:  I CAN'T FIND MY ADDRESS, BUT I'M SURE

11:04AM   17   I'M IN HERE.

11:04AM   18        MR. BOSTIC:  I THINK WE CAN HIGHLIGHT IT FOR YOU.

11:04AM   19     YOUR HONOR, THE GOVERNMENT MOVES TO ADMIT EXHIBIT 1770.

11:04AM   20        MR. DOWNEY:  YOUR HONOR, I ACTUALLY THINK THE

11:04AM   21   ATTACHMENT TO THIS IS A LITTLE DIFFERENT THAN WHAT WAS

11:04AM   22   CONTEMPORANEOUSLY SENT.

11:04AM   23     THIS SAME EXHIBIT ATTACHMENT HAS BEEN ADMITTED ELSEWHERE.

11:04AM   24     I DON'T OBJECT TO THE EMAIL, BUT I OBJECT TO THE CONTENT

11:04AM   25   FROM AFTER THE EMAIL WAS SENT.

LUCAS DIRECT BY MR. BOSTIC                                5444

| | | |
|---|---|---|
| 11:04AM | 1 | MR. BOSTIC:  YOUR HONOR, I'M HAPPY TO ADMIT JUST |
| 11:04AM | 2 | PAGES 1 AND 2 OF THE EXHIBIT IF THAT WOULD ADDRESS THE CONCERN. |
| 11:05AM | 3 | MR. DOWNEY:  IT WOULD, YOUR HONOR. |
| 11:05AM | 4 | THE COURT:  PAGES 1 AND 2 OF 1770 ARE ADMITTED, AND |
| 11:05AM | 5 | THEY MAY BE PUBLISHED. |
| 11:05AM | 6 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 11:05AM | 7 | (GOVERNMENT'S EXHIBIT 1770, PAGES 1 AND 2, WAS RECEIVED IN |
| 11:05AM | 8 | EVIDENCE.) |
| 11:05AM | 9 | BY MR. BOSTIC: |
| 11:05AM | 10 | Q.   AND, MR. LUCAS, DO YOU SEE THAT WE'VE REDACTED A NUMBER OF |
| 11:05AM | 11 | EMAIL ADDRESSES HERE, BUT APPEARING ON THE PAGE SHOULD BE YOUR |
| 11:05AM | 12 | ADDRESS AND MS. HOLMES IN THAT BCC FIELD. |
| 11:05AM | 13 | DO YOU SEE THAT? |
| 11:05AM | 14 | A.   YES. |
| 11:05AM | 15 | Q.   AND THIS IS A JUNE 12TH, 2014 EMAIL. |
| 11:05AM | 16 | LET'S LOOK AT PAGE 2 AND ZOOM IN ON THE TEXT THERE. |
| 11:05AM | 17 | IT SAYS, "TO OUR SHAREHOLDERS: |
| 11:05AM | 18 | "LAST SEPTEMBER, WE INTRODUCED OUR PRODUCTS TO THE |
| 11:05AM | 19 | CONSUMER AND CLINICAL MARKETS AFTER TEN YEARS OF INCREDIBLE |
| 11:05AM | 20 | WORK AND DEDICATION OF SO MANY PEOPLE." |
| 11:05AM | 21 | DO YOU SEE THAT? |
| 11:05AM | 22 | A.   YES. |
| 11:05AM | 23 | Q.   AND THE SECOND PARAGRAPH SAYS, "WITH THIS EMAIL, WE'RE |
| 11:05AM | 24 | VERY PLEASED TO SHARE WITH YOU THIS MONTH'S 'FORTUNE' MAGAZINE |
| 11:05AM | 25 | COVER STORY.  FORTUNE DID IN-DEPTH RESEARCH TO UNDERSTAND THE |

LUCAS DIRECT BY MR. BOSTIC                                           5445

| | | |
|---|---|---|
| 11:06AM | 1 | IMPACT OUR WORK WILL HAVE ON THE WORLD AND WE SELECTIVELY |
| 11:06AM | 2 | SHARED MORE OF OUR WORK FOR THIS PIECE." |
| 11:06AM | 3 | DO YOU SEE THAT? |
| 11:06AM | 4 | A.   YES. |
| 11:06AM | 5 | Q.   AND THERE'S A LINK TO THE JUNE 2014 "FORTUNE" ARTICLE; IS |
| 11:06AM | 6 | THAT CORRECT? |
| 11:06AM | 7 | A.   YES. |
| 11:06AM | 8 | Q.   AND DO YOU REMEMBER REVIEWING THAT 2014 "FORTUNE" ARTICLE |
| 11:06AM | 9 | WHEN THEY SENT IT TO YOU? |
| 11:06AM | 10 | A.   YES.  IT WAS VERY EXCITING. |
| 11:06AM | 11 | Q.   LET'S LOOK AT THAT ARTICLE.  IT'S EXHIBIT 1776, AND IT'S |
| 11:06AM | 12 | ALREADY IN EVIDENCE. |
| 11:06AM | 13 | MR. LUCAS, THIS IS AN ARTICLE TITLED "THIS CEO IS OUT FOR |
| 11:06AM | 14 | BLOOD" WRITTEN BY SOMEONE NAMED ROGER PARLOFF, PUBLISHED ON |
| 11:06AM | 15 | JUNE 12TH, 2014; IS THAT CORRECT? |
| 11:06AM | 16 | A.   YES. |
| 11:06AM | 17 | Q.   AND DO YOU RECALL READING THIS ARTICLE? |
| 11:06AM | 18 | A.   GREAT ARTICLE AND GREAT PICTURES, THE WHOLE THING. |
| 11:06AM | 19 | Q.   AND DID THIS ARTICLE CAUSE YOU TO FEEL MORE POSITIVE ABOUT |
| 11:07AM | 20 | THE INVESTMENT THAT YOU HAD MADE IN THERANOS? |
| 11:07AM | 21 | A.   YES.  I WAS VERY PROUD OF THE SITUATION, PROUD WE WERE |
| 11:07AM | 22 | INVOLVED, PROUD OF ELIZABETH, THE WHOLE THING, YES. |
| 11:07AM | 23 | MR. BOSTIC:  A MOMENT, YOUR HONOR? |
| 11:07AM | 24 | THE COURT:  YES. |
| 11:07AM | 25 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |

LUCAS CROSS BY MR. DOWNEY                                        5446

| | | |
|---|---|---|
| 11:07AM | 1 | MR. BOSTIC:  NO FURTHER QUESTIONS AT THIS TIME. |
| 11:07AM | 2 | THANK YOU, MR. LUCAS. |
| 11:07AM | 3 | THE COURT:  CROSS-EXAMINATION? |
| 11:07AM | 4 | MR. DOWNEY:  YES, YOUR HONOR. |
| 11:07AM | 5 | THE COURT:  FOLKS, IF YOU WOULD LIKE TO STAND AND |
| 11:07AM | 6 | STRETCH AGAIN WHILE WE MAKE THIS CHANGE, FEEL FREE. |
| 11:07AM | 7 | (STRETCHING.) |
| 11:08AM | 8 | MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS? |
| 11:08AM | 9 | THE COURT:  YES. |
| 11:08AM | 10 | MR. DOWNEY:  (HANDING.) |
| 11:08AM | 11 | THE WITNESS:  GOOD MORNING. |
| 11:08AM | 12 | MR. DOWNEY:  GOOD MORNING. |
| 11:08AM | 13 | THE WITNESS:  THANK YOU. |
| 11:08AM | 14 | THE COURT:  MR. DOWNEY. |
| 11:08AM | 15 | **CROSS-EXAMINATION** |
| 11:08AM | 16 | BY MR. DOWNEY: |
| 11:08AM | 17 | Q.   MR. LUCAS, I'M GOING TO REMOVE MY MASK AS WELL. |
| 11:08AM | 18 | A.   SURE. |
| 11:08AM | 19 | Q.   GOOD MORNING TO YOU. |
| 11:08AM | 20 | MY NAME IS KEVIN DOWNEY, AND I REPRESENT MS. HOLMES.  I'M |
| 11:08AM | 21 | GOING TO ASK YOU A FEW QUESTIONS TODAY. |
| 11:08AM | 22 | I WANT TO TALK ABOUT THE PERIOD WHEN YOU WERE INTRODUCED |
| 11:08AM | 23 | TO THERANOS.  THAT WAS IN -- I BELIEVE YOU TESTIFIED THAT WAS |
| 11:08AM | 24 | EITHER 2005 OR 2006; CORRECT? |
| 11:09AM | 25 | A.   YES. |

LUCAS CROSS BY MR. DOWNEY                                                    5447

11:09AM  1    Q.   AND YOU WERE INTRODUCED TO THE INVESTMENT OPPORTUNITY BY

11:09AM  2    YOUR UNCLE, DON LUCAS; IS THAT RIGHT?

11:09AM  3    A.   YES.

11:09AM  4    Q.   AND HE WAS -- HE HAD BEEN A LEGENDARY VENTURE CAPITAL

11:09AM  5    INVESTOR FOR YEARS IN THE VALLEY; CORRECT?

11:09AM  6    A.   HE HAD BEEN VERY SUCCESSFUL, YES.

11:09AM  7    Q.   AND HE WAS SOMEWHAT OF A MENTOR TO YOU; CORRECT?

11:09AM  8    A.   YES.

11:09AM  9    Q.   AND HE RECOMMENDED THAT YOU LOOK AT THERANOS AS A

11:09AM  10   POTENTIAL INVESTMENT; IS THAT RIGHT?

11:09AM  11   A.   YES.

11:09AM  12   Q.   IN CONNECTION WITH YOUR DECISION TO INVEST IN THERANOS,

11:09AM  13   DID YOU ENGAGE IN THE NORMAL PROCESS THAT YOU ENGAGE IN OF

11:09AM  14   ASSESSING A COMPANY ALONG THE LINES OF WHAT YOU DESCRIBED TO

11:09AM  15   MR. BOSTIC ON DIRECT EXAMINATION?

11:09AM  16   A.   IN THE VERY BEGINNING I DON'T REMEMBER HOW MUCH DILIGENCE

11:09AM  17   WE DID.  THIS WAS A SITUATION WHERE DON HAD ALREADY BEEN ON THE

11:09AM  18   BOARD, OR ABOUT TO BE ON THE BOARD, AND SO OBVIOUSLY WE FELT

11:10AM  19   VERY COMFORTABLE WITH HIS EXPERIENCE AND KNOWLEDGE.

11:10AM  20   Q.   IN THE ORDINARY COURSE, I THINK YOU TESTIFIED THAT YOU

11:10AM  21   WOULD MEET THE CEO OR THE MANAGEMENT TEAM; CORRECT?

11:10AM  22   A.   CORRECT.

11:10AM  23   Q.   AND YOU DID THAT WITH MS. HOLMES PRIOR TO THE INVESTMENT;

11:10AM  24   CORRECT?

11:10AM  25   A.   I, I BELIEVE SO.  I DON'T, I DON'T ABSOLUTELY RECALL --

LUCAS CROSS BY MR. DOWNEY                                        5448

11:10AM  1      Q.   OKAY.

11:10AM  2      A.   -- IF IT WAS BEFORE.

11:10AM  3      Q.   OKAY.  AT WHATEVER POINT YOU MET HER, YOUR IMPRESSIONS OF

11:10AM  4      HER WERE VERY POSITIVE; CORRECT?

11:10AM  5      A.   VERY POSITIVE.

11:10AM  6      Q.   AND THAT'S AN IMPORTANT FACTOR IN MAKING A DECISION TO

11:10AM  7      INVEST IN A COMPANY; CORRECT?

11:10AM  8      A.   YES.

11:10AM  9      Q.   AND COULD YOU TELL US WHAT CHARACTERISTICS OF MS. HOLMES

11:10AM  10     GAVE YOU A POSITIVE IMPRESSION AS YOU WERE EVALUATING THE

11:10AM  11     INVESTMENT?

11:10AM  12     A.   SURE.  SHE WAS VERY ARTICULATE, VERY PASSIONATE, SHE IS

11:10AM  13     VERY SMART, AND SHE WAS ON A MISSION.  THIS WAS NOT JUST FOR

11:11AM  14     HER, "WE'RE GOING TO MAKE A BUNCH OF MONEY."  SHE WAS ON A

11:11AM  15     MISSION TO PROVIDE TECHNOLOGY TO THE WORLD THAT WOULD BE VERY

11:11AM  16     HELPFUL.

11:11AM  17     Q.   AND WAS THAT IMPRESSION OF HER IMPORTANT TO YOUR DECISION

11:11AM  18     TO INVEST IN 2006?

11:11AM  19     A.   YES.

11:11AM  20     Q.   WAS IT IMPORTANT TO YOUR DECISION TO INVEST IN 2013?

11:11AM  21     A.   YES.

11:11AM  22     Q.   YOU TALKED ABOUT HER VISION.  TELL US HER VISION AS YOU

11:11AM  23     UNDERSTOOD IT IN 2006.

11:11AM  24     A.   IT WAS -- JUST BROADLY, WITH A SMALL AMOUNT OF BLOOD,

11:11AM  25     WE'RE GOING TO DEVELOP THE TECHNOLOGY TO BE ABLE TO RUN TESTS

LUCAS CROSS BY MR. DOWNEY                                            5449

| | | |
|---|---|---|
| 11:11AM | 1 | ON THAT BLOOD SO THAT VIALS DID NOT HAVE TO BE DRAWN FROM THE |
| 11:11AM | 2 | ARM. |
| 11:11AM | 3 | Q.   OKAY.  AND DO YOU RECALL THE CONTEXT IN WHICH SHE WANTED |
| 11:11AM | 4 | TO BRING THAT PRODUCT TO MARKET AT THAT TIME IN 2006? |
| 11:11AM | 5 | A.   THERE MAY HAVE BEEN SOME THOUGHTS, BUT THIS WOULD HAVE |
| 11:12AM | 6 | BEEN VERY PREMATURE GIVEN THAT THE TECHNOLOGY WASN'T AVAILABLE |
| 11:12AM | 7 | YET. |
| 11:12AM | 8 | Q.   WAS IT YOUR UNDERSTANDING THAT THE SITUATION WAS THAT THEY |
| 11:12AM | 9 | HAD A PROTOTYPE AND THEY WERE WORKING TO DEVELOP THAT INTO A |
| 11:12AM | 10 | MORE DEVELOPED FORM OF TECHNOLOGY? |
| 11:12AM | 11 | A.   I DON'T FULLY RECALL, BUT CERTAINLY THEY HAD SOME |
| 11:12AM | 12 | TECHNOLOGY THAT HAD BEEN DEVELOPED THAT THEY WERE WORKING ON. |
| 11:12AM | 13 | Q.   OKAY.  YOU DESCRIBED FOR MR. BOSTIC THE TYPICAL PROCESS IN |
| 11:12AM | 14 | VENTURE CAPITAL OF ASSESSING AN INVESTMENT, AND I REALIZE IT'S |
| 11:12AM | 15 | A LONG TIME AGO AND YOU DON'T RECALL PRECISELY WHAT PROCESS YOU |
| 11:12AM | 16 | WENT THROUGH. |
| 11:12AM | 17 | I WANT TO ASK YOU ABOUT YOUR UNCLE AND HIS PROCESSES IN |
| 11:12AM | 18 | ASSESSING INVESTMENTS. |
| 11:12AM | 19 | DO YOU KNOW IF HE WENT THROUGH THE TYPE OF PROCESS IN |
| 11:12AM | 20 | ASSESSING AN INVESTMENT THAT YOU DESCRIBED ON DIRECT TO |
| 11:13AM | 21 | MR. BOSTIC? |
| 11:13AM | 22 | A.   TYPICALLY HE, HE WOULD. |
| 11:13AM | 23 | HAVING SAID THAT, HE WAS VERY MUCH ONE THAT PUT A LOT OF |
| 11:13AM | 24 | FAITH IN THE FOUNDER OR FOUNDERS OF THE COMPANY. |
| 11:13AM | 25 | HE WOULD SAY IT'S ALWAYS ABOUT THE PEOPLE.  IT'S ALL ABOUT |

LUCAS CROSS BY MR. DOWNEY                                          5450

11:13AM  1    THE PEOPLE.

11:13AM  2    Q.   AND THAT, THAT WAS A THOUGHT THAT HE COMMUNICATED TO YOU

11:13AM  3    AS A GENERAL INVESTING PHILOSOPHY?

11:13AM  4    A.   YES.

11:13AM  5    Q.   AND HE COMMUNICATED HIS VIEWS -- DID HE COMMUNICATE HIS

11:13AM  6    VIEWS OF MS. HOLMES TO YOU AROUND THE TIME THAT YOU MADE YOUR

11:13AM  7    ORIGINAL INVESTMENT?

11:13AM  8    A.   YES.

11:13AM  9    Q.   AND WHAT DID HE CONVEY TO YOU AT THE TIME ABOUT

11:13AM  10   MS. HOLMES?

11:13AM  11   A.   THAT, AS I SAID EARLIER, SHE WAS VERY PASSIONATE, AND THAT

11:13AM  12   IT SEEMED LIKE SHE WAS GOING TO BE ABLE TO DEVELOP THE

11:13AM  13   TECHNOLOGY, AND THIS LOOKED LIKE A WONDERFUL INVESTMENT

11:14AM  14   OPPORTUNITY.

11:14AM  15   Q.   I THINK YOU MENTIONED ON DIRECT THAT IN ADDITION TO YOUR

11:14AM  16   UNCLE, THERE WAS ANOTHER VENTURE INVESTOR WHO WAS INVOLVED IN

11:14AM  17   INVESTING IN THE COMPANY AT THE SAME TIME.

11:14AM  18       DO YOU RECALL TELLING THAT TO US ON DIRECT?

11:14AM  19   A.   YES.

11:14AM  20   Q.   LET ME -- IF I MIGHT, I WILL FINISH THE QUESTION AND THEN

11:14AM  21   YOU CAN RESPOND SO IT'S EASIER FOR OUR COURT REPORTER TO TAKE

11:14AM  22   DOWN WHAT WE'RE SAYING.

11:14AM  23       WAS THE OTHER INVESTOR PETE THOMAS?

11:14AM  24   A.   YES.

11:14AM  25   Q.   AND HE WAS AFFILIATED WITH A FIRM CALLED ATA VENTURES;

LUCAS CROSS BY MR. DOWNEY                                                5451

| | | |
|---|---|---|
| 11:14AM | 1 | CORRECT? |
| 11:14AM | 2 | A.   CORRECT. |
| 11:14AM | 3 | Q.   AND DID YOU BECOME FAMILIAR WITH THE PROCESS THAT |
| 11:14AM | 4 | MR. THOMAS WENT THROUGH IN INVESTING PRIOR TO THE TIME THAT YOU |
| 11:14AM | 5 | MADE YOUR FIRST INVESTMENT IN THERANOS? |
| 11:14AM | 6 | A.   I MAY HAVE HAD A CONVERSATION WITH HIM, BUT I DON'T KNOW |
| 11:14AM | 7 | FULLY THE PROCESS THAT HE DID. |
| 11:14AM | 8 | Q.   OKAY.  IS IT CUSTOMARY IN CONNECTION WITH THE DILIGENCE |
| 11:15AM | 9 | PROCESS FOR THE VENTURE CAPITAL FIRM TO IN SOME INSTANCES |
| 11:15AM | 10 | RETAIN A LAW FIRM TO ASSIST IT IN CONDUCTING DUE DILIGENCE? |
| 11:15AM | 11 | A.   SOMETIMES. |
| 11:15AM | 12 | Q.   WAS THAT DONE IN CONNECTION -- BY EITHER YOUR UNCLE OR BY |
| 11:15AM | 13 | MR. THOMAS IN CONNECTION WITH ASSESSING THE INVESTMENT IN 2006? |
| 11:15AM | 14 | A.   I DON'T KNOW.  YEAH, I DON'T KNOW. |
| 11:15AM | 15 | Q.   LET ME SEE IF I CAN SHOW YOU A DOCUMENT, AND JUST TAKE A |
| 11:15AM | 16 | LOOK AT IT, AND WE'LL SEE IF IT REFRESHES YOUR RECOLLECTION IN |
| 11:15AM | 17 | ANY REGARD.  I DON'T WANT YOU TO COMMENT ON THE DOCUMENT.  I |
| 11:15AM | 18 | JUST WANT YOU TO LOOK AT IT IN THE FIRST INSTANCE. |
| 11:15AM | 19 | THE DOCUMENT WILL BE IN THE NOTEBOOK THAT I GAVE YOU, AND |
| 11:15AM | 20 | IT'S LABELLED 14219. |
| 11:16AM | 21 | (PAUSE IN PROCEEDINGS.) |
| 11:16AM | 22 | BY MR. DOWNEY: |
| 11:16AM | 23 | Q.   HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THAT? |
| 11:16AM | 24 | A.   OH, I'M SORRY.  I'VE JUST SEEN -- I DON'T KNOW WHAT YOU |
| 11:16AM | 25 | WANT ME TO LOOK AT. |

LUCAS CROSS BY MR. DOWNEY                                    5452

11:16AM 1   Q.  WELL, IF YOU LOOK AT THE EMAIL, AND YOU CAN SKIM THE

11:17AM 2   ATTACHMENT.

11:17AM 3   A.  YOU WANT ME TO LOOK AT THE WHOLE?

11:17AM 4   Q.  YEAH.  YOU DON'T HAVE TO LOOK AT IT IN DETAIL.  I JUST

11:17AM 5   WANT YOU TO LOOK AT THE NATURE OF THE ATTACHMENT.

11:17AM 6   A.  YES.

11:17AM 7   Q.  DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE TOLD IN

11:17AM 8   2005 OR 2006 THAT MR. THOMAS HAD ENGAGED IN A DUE DILIGENCE

11:17AM 9   PROCESS IN CONNECTION WITH MAKING A DECISION TO INVEST IN

11:17AM 10  THERANOS?

11:17AM 11  A.  NO.  I DID NOT KNOW PETE THOMAS VERY WELL, AND CERTAINLY

11:17AM 12  AT THIS TIME I DIDN'T KNOW ANYTHING ABOUT THIS.

11:17AM 13  Q.  OKAY.  DO YOU HAVE ANY RECOLLECTION WHETHER YOU ENGAGED IN

11:17AM 14  THE REVIEW OF ANY OF THE TYPES OF MATERIALS THAT ARE IDENTIFIED

11:17AM 15  IN EXHIBIT 14219?

11:17AM 16  A.  THERE MAY HAVE BEEN SOME MATERIAL.  THERE WAS -- IF I AM

11:17AM 17  REMEMBERING CORRECTLY -- A DESCRIPTION OF THE TECHNOLOGY AND

11:18AM 18  WHAT THE INTENT WAS SUPPOSED TO BE AND SO FORTH.

11:18AM 19      BUT IN TERMS OF GOING THROUGH THE CORPORATE RECORDS AND IP

11:18AM 20  LIST AND MATERIAL AGREEMENTS AND SO FORTH, I MEAN, THIS IS A

11:18AM 21  STANDARD DUE DILIGENCE LIST THAT ONE WOULD CERTAINLY DO.

11:18AM 22  Q.  OKAY.  AND AM I UNDERSTANDING YOU THAT YOU JUST DON'T

11:18AM 23  RECALL ONE WAY OR ANOTHER WHETHER YOU DID THAT PRIOR TO THE

11:18AM 24  TIME THAT YOU UNDERTOOK YOUR INVESTMENT?

11:18AM 25  A.  OTHER THAN, AS I SAY, MAYBE SEEING SOME MATERIAL.  NO, WE

LUCAS CROSS BY MR. DOWNEY                                          5453

11:18AM  1    DID NOT CONDUCT ALL OF THIS --

11:18AM  2    Q.   OKAY.

11:18AM  3    A.   -- AS I WOULD BELIEVE THAT MAYBE IT WAS DONE.

11:18AM  4         AND, AGAIN, WITH MY UNCLE'S INVOLVEMENT, IT CERTAINLY

11:18AM  5    WOULD -- YOU KNOW, WE'RE GOING ON HIS EXPERIENCE AS WELL.

11:18AM  6    Q.   OKAY.  AND IT'S CUSTOMARY IN THESE SITUATIONS TO LOOK AT

11:18AM  7    THE PATENT PORTFOLIO OF THE COMPANY; CORRECT?

11:19AM  8    A.   YES, MANY TIMES, YES.

11:19AM  9    Q.   AND IT IS CUSTOMARY TO LOOK AT THE MATERIAL AGREEMENTS

11:19AM  10   THAT THE COMPANY HAS, THE CONTRACTS THAT IT HAS IN PLACE THAT

11:19AM  11   WILL AFFECT ITS BUSINESS?

11:19AM  12   A.   YES.

11:19AM  13   Q.   AND IT'S CUSTOMARY TO LOOK AT OTHER CORPORATE DOCUMENTS TO

11:19AM  14   SEE HOW THE COMPANY IS SET UP; CORRECT?

11:19AM  15   A.   YES.

11:19AM  16   Q.   OKAY.  LET ME SHOW YOU AN EXHIBIT THAT IS ALSO IN THE

11:19AM  17   BLACK BINDER THAT IS NUMBERED 12022.

11:19AM  18        AND THERE'S AN ATTACHMENT TO THIS.  I DON'T WANT TO OR

11:19AM  19   REALLY NEED YOU TO TAKE THE TIME TO REVIEW THE ENTIRE

11:20AM  20   ATTACHMENT.

11:20AM  21        I GUESS MY FIRST QUESTION IS, DO YOU JUST RECOGNIZE THIS

11:20AM  22   AS AN EMAIL BETWEEN YOU AND MS. HOLMES AT YOUR BDVENTURES EMAIL

11:20AM  23   ADDRESS IN LATE 2005?

11:20AM  24   A.   YES, AND THIS IS -- AND AGAIN, I'VE NOT LOOKED AT IT, BUT

11:20AM  25   THIS IS -- WHEN I WAS REFERRING TO SOME MATERIAL, I WOULD HAVE

LUCAS CROSS BY MR. DOWNEY                                        5454

11:20AM  1     SEEN THIS.  IT LOOKS LIKE WHAT I MAY HAVE SEEN.

11:20AM  2     Q.   THIS APPEARS TO BE MATERIAL THAT SHE SENT TO YOU IN

11:20AM  3     CONNECTION WITH YOUR 2006 INVESTMENT?

11:20AM  4     A.   YEAH, YEAH.

11:20AM  5     Q.   AGAIN, MR. LUCAS, I KNOW IT'S NOT CUSTOMARY, IF YOU COULD

11:20AM  6     WAIT UNTIL THE QUESTION HAS ENDED, IT WILL MAKE OUR TRANSCRIPT

11:20AM  7     A LITTLE BETTER.

11:20AM  8         THIS IS MATERIAL THAT MS. HOLMES SENT YOU IN CONNECTION

11:20AM  9     WITH YOUR CONSIDERATION OF AN INVESTMENT IN 2006?

11:20AM  10    A.   YES.

11:20AM  11             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

11:20AM  12    12022.

11:21AM  13             MR. BOSTIC:  NO OBJECTION.

11:21AM  14             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:21AM  15        (DEFENDANT'S EXHIBIT 12022 WAS RECEIVED IN EVIDENCE.)

11:21AM  16    BY MR. DOWNEY:

11:21AM  17    Q.   YOU CAN REVIEW AS MUCH OF THE ATTACHMENT AS YOU NEED TO,

11:21AM  18    BUT I'M GOING TO POINT YOU TO SOME PARTICULAR PLACES THAT ARE

11:21AM  19    OF INTEREST TO ME.

11:21AM  20        FIRST OF ALL, IF YOU SEE THE EMAIL ON THE FIRST PAGE

11:21AM  21    BETWEEN -- THE EMAIL ON THE TOP INDICATES THAT THIS IS THE

11:21AM  22    COMMUNICATION BETWEEN YOU AND MS. HOLMES; CORRECT?

11:21AM  23    A.   YES.

11:21AM  24    Q.   AND SHE WAS SENDING YOU A POWERPOINT ABOUT THE THERANOS

11:21AM  25    INDUSTRY; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                              5455

11:21AM   1      A.    YES.

11:21AM   2      Q.    AND AN OFFERING MEMORANDUM; CORRECT?

11:21AM   3      A.    YES.

11:21AM   4      Q.    AND VARIOUS FINANCIAL INFORMATION RELATED TO THE COMPANY;

11:21AM   5      CORRECT?

11:21AM   6      A.    YES.

11:21AM   7      Q.    AND IF YOU GO DOWN TO THE BOTTOM EMAIL ON THAT PAGE, YOU

11:22AM   8      SEE THAT THERE'S AN EMAIL FROM YOU, AND IT SAYS, "I REALLY

11:22AM   9      ENJOYED MEETING YOU AND LEARNING ABOUT YOUR COMPANY"?

11:22AM  10            CORRECT?

11:22AM  11      A.    YES.

11:22AM  12      Q.    AND SO THIS LOOKS LIKE TO BE A FOLLOWUP AFTER YOUR FIRST

11:22AM  13      MEETING WITH MS. HOLMES; CORRECT?

11:22AM  14      A.    YES.

11:22AM  15      Q.    AND THEN IN THE NEXT PARAGRAPH IT SAYS, "I KNOW THAT DON

11:22AM  16      IS VERY EXCITED ABOUT YOUR FUTURE AND SEES HOW WE CAN HELP MAKE

11:22AM  17      YOUR COMPANY A HUGE SUCCESS."

11:22AM  18            DO YOU SEE THAT?

11:22AM  19      A.    YES.

11:22AM  20      Q.    AND THAT'S A REFERENCE TO YOUR UNCLE; CORRECT?

11:22AM  21      A.    CORRECT.

11:22AM  22      Q.    AND THAT'S CONSISTENT WITH YOUR RECOLLECTION THAT HE WAS

11:22AM  23      EXCITED ABOUT THE COMPANY; CORRECT?

11:22AM  24      A.    YES.   SORRY.

11:22AM  25      Q.    IN THE CONTEXT OF MAKING AN INVESTMENT, OF COURSE YOUR

LUCAS CROSS BY MR. DOWNEY                                            5456

| | | |
|---|---|---|
| 11:22AM | 1 | UNCLE'S VIEW OF HOW THE -- A VIEW OF THE INVESTMENT AND YOUR |
| 11:22AM | 2 | LIKELY SUCCESS IN CONNECTION WITH THE INVESTMENT WAS AN |
| 11:22AM | 3 | IMPORTANT FACTOR TO YOU? |
| 11:23AM | 4 | A.   CORRECT. |
| 11:23AM | 5 | Q.   I WANT YOU TO -- I WANT TO JUST DIRECT YOUR ATTENTION TO |
| 11:23AM | 6 | THE ATTACHMENTS.  I THINK THERE'S AN ATTACHMENT SET OF SLIDES, |
| 11:23AM | 7 | AND THAT STARTS IMMEDIATELY THEREAFTER AND CONTINUES FOR |
| 11:23AM | 8 | SEVERAL PAGES. |
| 11:23AM | 9 | BUT IF YOU GO TO THE SECOND SLIDE OF THAT GROUP OF SLIDES, |
| 11:23AM | 10 | WHICH I'LL PUT UP ON THE SCREEN, THIS IS JUST -- IS THIS AN |
| 11:23AM | 11 | INDEX OF THE MATERIALS THAT SHE COVERS IN THE ATTACHED SLIDE |
| 11:23AM | 12 | DECK? |
| 11:23AM | 13 | A.   YES. |
| 11:23AM | 14 | Q.   AND, AND THIS TYPE OF INFORMATION IS CUSTOMARY INFORMATION |
| 11:23AM | 15 | TO GIVE TO AN INVESTOR THAT IS CONSIDERING AN INVESTMENT; |
| 11:23AM | 16 | CORRECT? |
| 11:23AM | 17 | A.   YES. |
| 11:23AM | 18 | Q.   AND SHE PROFILED THE MANAGEMENT TEAM; CORRECT? |
| 11:23AM | 19 | A.   YES. |
| 11:23AM | 20 | Q.   AND SHE TALKED ABOUT THE INTELLECTUAL PROPERTY OF THE |
| 11:23AM | 21 | COMPANY; CORRECT? |
| 11:23AM | 22 | A.   YES. |
| 11:23AM | 23 | Q.   AND SHE TALKED ABOUT THE TECHNOLOGY OF THE COMPANY; |
| 11:23AM | 24 | CORRECT? |
| 11:23AM | 25 | A.   YES. |

LUCAS CROSS BY MR. DOWNEY                                            5457

11:23AM   1    Q.   AND SHE ALSO TALKED ABOUT REGULATORY ISSUES; CORRECT?

11:24AM   2    A.   YES, IT CERTAINLY IS SHOWN HERE, YES.

11:24AM   3    Q.   AND REGULATORY ISSUES IN THE MEDICAL DEVICE BUSINESS CAN

11:24AM   4    BE IMPORTANT; CORRECT?

11:24AM   5    A.   VERY IMPORTANT.

11:24AM   6    Q.   OKAY.  AND YOU KNOW THAT FROM YOUR INVESTMENTS IN OTHER

11:24AM   7    ENTITIES IN THAT INDUSTRY; CORRECT?

11:24AM   8    A.   CORRECT.

11:24AM   9    Q.   AND YOU KNEW THAT IN 2006; CORRECT?

11:24AM  10    A.   YES.

11:24AM  11    Q.   LET ME ASK YOU TO GO FORWARD IN THIS COMPANY -- IN THIS

11:24AM  12    SLIDE TO WHAT IS SLIDE NUMBER 22.  IT'S ON PAGE 26 OF THE

11:24AM  13    EXHIBIT.

11:24AM  14         AND THIS SLIDE SEEMS TO SET FORTH WHAT IS CALLED A

11:24AM  15    THERANOS PRODUCT PIPELINE.

11:24AM  16         DO YOU SEE THAT?

11:24AM  17    A.   YES.

11:24AM  18    Q.   AND DO YOU SEE THAT ON THE LEFT-HAND SIDE OF THE SLIDE,

11:25AM  19    THERE SEEMS TO BE A LIST OF DIFFERENT SERIES OF THE THERANOS

11:25AM  20    ANALYZER; CORRECT?

11:25AM  21    A.   CORRECT.

11:25AM  22    Q.   AND THEN ON THE RIGHT-HAND SIDE, THERE SEEMS TO ASSOCIATE,

11:25AM  23    WITH WHATEVER SERIES IS ACROSS FROM IT, THE NUMBER OF ASSAYS

11:25AM  24    THAT THAT SERIES OF THERANOS ANALYZER WOULD BE CAPABLE OF

11:25AM  25    PERFORMING.

LUCAS CROSS BY MR. DOWNEY                                              5458

11:25AM  1          DO YOU SEE THAT?

11:25AM  2     A.   YES.

11:25AM  3     Q.   AND THIS PROJECTS GOING THROUGH A THERANOS 5.0 SERIES.

11:25AM  4          DO YOU SEE THAT?

11:25AM  5     A.   YES.

11:25AM  6     Q.   AND THIS IS BECAUSE THE TECHNOLOGY WAS EXPECTED TO CHANGE

11:25AM  7     AND DEVELOP AND GROW BETTER OVER TIME; CORRECT?

11:25AM  8     A.   CORRECT.

11:25AM  9     Q.   AND ON THE RIGHT-HAND SIDE WITH THE NUMBER OF ASSAYS

11:25AM  10    LISTED, IT APPEARS TO REFLECT THAT MS. HOLMES THOUGHT THAT AS

11:25AM  11    THE DEVICE DEVELOPED, THE NUMBER OF ASSAYS THAT IT COULD

11:25AM  12    PERFORM WOULD GROW OVER TIME; CORRECT?

11:25AM  13    A.   CORRECT.

11:25AM  14    Q.   AND THAT WAS A CONCEPT THAT SHE COMMUNICATED TO YOU EVEN

11:26AM  15    BEFORE YOU INVESTED; CORRECT?

11:26AM  16    A.   YES.

11:26AM  17    Q.   AND THAT'S A CONCEPT THAT YOU UNDERSTOOD THROUGHOUT THE

11:26AM  18    TIME THAT YOU WERE AN INVESTOR IN THERANOS; CORRECT?

11:26AM  19    A.   YES.

11:26AM  20    Q.   YOU, I THINK, TESTIFIED ON YOUR DIRECT EXAMINATION WITH

11:26AM  21    MR. BOSTIC ABOUT SEEING VERSIONS OF THE ANALYZER; CORRECT?

11:26AM  22    A.   CORRECT.

11:26AM  23    Q.   DO YOU KNOW WHICH SERIES OF DEVICE YOU ACTUALLY SAW WHEN

11:26AM  24    MS. HOLMES SHOWED IT TO YOU EITHER AT THERANOS OR TO YOUR

11:26AM  25    UNCLE'S ANNUAL MEETING?

LUCAS CROSS BY MR. DOWNEY                                    5459

11:26AM  1    A.   I, I DON'T KNOW AS YOU'RE -- AS HIGHLIGHTED HERE 1.0, 2.0.

11:26AM  2         I KNOW I SAW A FEW VERSIONS.  I MAY HAVE SEEN 1.0 AND 2.0.

11:26AM  3    I JUST DON'T RECALL.

11:26AM  4    Q.   OKAY.  DO YOU SEE ON THE RIGHT-HAND SIDE NEXT TO THE

11:27AM  5    SERIES THERE ALSO IS A PROJECTION OF -- NEXT TO THE 2.0, THAT

11:27AM  6    THERE WOULD BE OVER-THE-COUNTER SALES.

11:27AM  7         DO YOU SEE THAT?

11:27AM  8    A.   I DO.

11:27AM  9    Q.   DO YOU KNOW WHAT THAT MEANS?

11:27AM  10   A.   WELL, CERTAINLY OVER THE COUNTER WOULD MEAN TO ME THAT YOU

11:27AM  11   ARE SELLING SOMETHING THAT WHOEVER PURCHASES IT CAN DO IT FOR

11:27AM  12   THEMSELVES.

11:27AM  13   Q.   OKAY.  DO YOU KNOW HOW THAT ASSOCIATED WITH ANY BUSINESS

11:27AM  14   PLAN FOR THERANOS AS OF 2006?

11:27AM  15   A.   I, I DON'T.

11:27AM  16   Q.   OKAY.

11:27AM  17   A.   IT NEVER HAPPENED, BUT I DON'T.

11:27AM  18   Q.   OKAY.  LET ME ASK YOU NOW TO LOOK AT THE SECOND DOCUMENT

11:27AM  19   WHICH IS ATTACHED TO EXHIBIT 12022.

11:28AM  20        AND DO YOU SEE THAT THIS IS -- THIS APPEARS TO BE SOME

11:28AM  21   TYPE OF A DOCUMENT.  IT'S MARKED THERANOS AND CONFIDENTIAL ON

11:28AM  22   THE FIRST PAGE.

11:28AM  23        DO YOU SEE THAT?

11:28AM  24   A.   AM I LOOKING ON THE SCREEN OR BACK IN THE BOOK?

11:28AM  25   Q.   I THINK IT MIGHT BE EASIER TO LOOK AT THE SCREEN, BUT --

LUCAS CROSS BY MR. DOWNEY                                                5460

11:28AM   1     A.   OH, THIS IS THE DOCUMENT.  YES, I SEE IT.

11:28AM   2     Q.   OKAY.  AND DO YOU SEE IN THE BOTTOM CAPTION THE FIRST

11:28AM   3     SENTENCE READS, "THIS CONFIDENTIAL SUMMARY HAS BEEN PREPARED

11:28AM   4     FOR PARTIES WISHING TO ESTABLISH A BUSINESS RELATIONSHIP WITH

11:28AM   5     THERANOS"?

11:28AM   6          DO YOU SEE THAT?

11:28AM   7     A.   YES.

11:28AM   8     Q.   AND THIS DOCUMENT IS THE KIND OF DOCUMENT THAT YOUNG

11:28AM   9     COMPANIES OFTEN PRESENT TO POTENTIAL INVESTORS TO EXPLAIN HOW

11:29AM  10     THEY THINK THEIR COMPANY WILL DEVELOP OVER TIME; CORRECT?

11:29AM  11     A.   YES.

11:29AM  12     Q.   AND IF YOU GO FORWARD -- JUST FLIP THROUGH THE PAGES OF

11:29AM  13     THAT DOCUMENT.  DO YOU SEE THAT THERE'S A SUMMARY AND

11:29AM  14     DISCUSSION OF THE MARKETS THAT THERANOS WILL BE IN AND A

11:29AM  15     DISCUSSION OF OTHER ASPECTS OF HOW THERANOS THOUGHT ABOUT ITS

11:29AM  16     BUSINESS; CORRECT?

11:29AM  17     A.   YES.

11:29AM  18     Q.   ALL RIGHT.  I WANT TO GO TO WHAT IS PAGE 36 OF THE

11:29AM  19     EXHIBIT, ALTHOUGH IT'S PAGE 9 OF THIS ATTACHMENT.

11:29AM  20          AND DO YOU SEE THAT THERE'S A DISCUSSION THERE OF THE

11:29AM  21     THERANOS 1.0?

11:29AM  22     A.   YES.

11:29AM  23     Q.   AND DO YOU SEE THAT THE INDICATION WAS THAT IT WAS BEING

11:29AM  24     INTRODUCED TO THE COMPANY FOR IMPROVING RISK PROFILES AND

11:30AM  25     SAFETY PROFILES IN CONNECTION WITH THE DEVELOPMENT OF DRUGS?

LUCAS CROSS BY MR. DOWNEY                                        5461

11:30AM   1      A.   YES.

11:30AM   2      Q.   AND WAS THAT THE ORIGINAL BUSINESS PLAN FOR THERANOS AS

11:30AM   3      YOU UNDERSTOOD IT?

11:30AM   4      A.   YES.

11:30AM   5      Q.   IN OTHER WORDS --

11:30AM   6      A.   I UNDERSTOOD THAT THEY WERE WORKING WITH SOME

11:30AM   7      PHARMACEUTICAL COMPANIES.

11:30AM   8      Q.   OKAY.  WELL, LET ME ACTUALLY DIRECT YOU IN THAT SAME

11:30AM   9      LITTLE BOX TO THE LAST TWO PARAGRAPHS.

11:30AM  10           AND DO YOU SEE THE SECOND TO THE LAST PARAGRAPH READS,

11:30AM  11      "THE COMPANY IS WORKING WITH LEADING PHARMACEUTICAL COMPANIES

11:30AM  12      TO INTRODUCE THE SYSTEMS ALONGSIDE THERAPEUTICS IN DRUG-DEVICE

11:30AM  13      COMBINATIONS WHICH DRAMATICALLY IMPROVE THE SAFETY PROFILES OF

11:30AM  14      WHAT WILL NOW BE THE NEXT GENERATION OF BLOCKBUSTERS"?

11:30AM  15           DO YOU SEE THAT?

11:30AM  16      A.   YES.

11:30AM  17      Q.   AND WAS THAT A STATEMENT OF THEIR DESIRE TO INTRODUCE THE

11:31AM  18      PRODUCT INTO PHARMACEUTICAL TRIALS?

11:31AM  19      A.   THAT'S WHAT I UNDERSTOOD WAS GOING ON, THAT BY USING THE

11:31AM  20      THERANOS TECHNOLOGY, THEY COULD REDUCE THE TIME OF ANALYSIS AND

11:31AM  21      THE COST WHICH, AGAIN, WHAT I UNDERSTOOD AT THE TIME, WAS THE

11:31AM  22      LARGE COST OF CLINICAL TRIALS IS THE BLOOD TESTING.

11:31AM  23      Q.   AND I THINK YOU MENTIONED SEVERAL TIMES NOW THAT THIS WAS

11:31AM  24      AN EARLY STAGE COMPANY; CORRECT?

11:31AM  25      A.   ESPECIALLY AT THAT TIME, YES.

LUCAS CROSS BY MR. DOWNEY                                          5462

| | | |
|---|---|---|
| 11:31AM | 1 | Q.   OKAY.  DID YOU KNOW THAT AS OF THIS TIME, NOVARTIS HAD |
| 11:31AM | 2 | ALREADY AGREED TO EVALUATE THE TECHNOLOGY THAT THERANOS WAS |
| 11:31AM | 3 | DEVELOPING TO ANALYZE -- TO ASSESS WHETHER IT COULD BE USED IN |
| 11:31AM | 4 | CONNECTION WITH ITS CLINICAL TRIALS? |
| 11:32AM | 5 | A.   EITHER I DON'T RECALL OR I DIDN'T KNOW. |
| 11:32AM | 6 | Q.   YOU RECALL MS. HOLMES TELLING YOU AT VARIOUS POINTS ABOUT |
| 11:32AM | 7 | CERTAIN PHARMACEUTICAL COMPANIES ASSESSING THERANOS'S |
| 11:32AM | 8 | TECHNOLOGY; IS THAT RIGHT? |
| 11:32AM | 9 | A.   YES, AS THEY WERE WORKING WITH THERANOS IN THEIR CLINICAL |
| 11:32AM | 10 | TRIALS. |
| 11:32AM | 11 | Q.   OKAY.  BUT AM I RIGHT THAT IT'S BEEN SUCH A LONG TIME THAT |
| 11:32AM | 12 | YOU ACTUALLY DON'T REMEMBER WHICH PHARMACEUTICAL COMPANIES YOU |
| 11:32AM | 13 | HEARD ABOUT? |
| 11:32AM | 14 | A.   I KNEW IT WAS SOME OF THE LEADING COMPANIES, AND I MAY |
| 11:32AM | 15 | VERY WELL REMEMBER NOVARTIS, BUT I CAN'T TELL YOU FOR CERTAIN. |
| 11:32AM | 16 | Q.   OKAY.  WE'LL LOOK AT SOME MATERIALS IN A LITTLE BIT TO SEE |
| 11:32AM | 17 | IF THAT WILL REFRESH YOUR RECOLLECTION IN ANY SENSE. |
| 11:32AM | 18 | BUT LET ME LOOK NOW AT THE BALANCE OF THIS DOCUMENT. |
| 11:32AM | 19 | LET ME GO FORWARD IN THIS DOCUMENT TO PAGE 64 OF THE |
| 11:32AM | 20 | EXHIBIT, AND I WANT TO DIRECT YOUR ATTENTION TO THE BOTTOM |
| 11:33AM | 21 | THREE-QUARTERS OF THE DOCUMENT, THE SECTION THAT BEGINS |
| 11:33AM | 22 | "ASSAY." |
| 11:33AM | 23 | DO YOU SEE THAT? |
| 11:33AM | 24 | A.   YES. |
| 11:33AM | 25 | Q.   AND I THINK ON DIRECT YOU TALKED ABOUT THE ANALYZER BEING |

LUCAS CROSS BY MR. DOWNEY                                    5463

11:33AM   1    THE BRAIN OF THE TECHNOLOGY THAT MS. HOLMES WAS DEVELOPING;

11:33AM   2    CORRECT?

11:33AM   3    A.   YES.

11:33AM   4    Q.   BUT YOU ALSO UNDERSTOOD THAT ANOTHER COMPONENT OF

11:33AM   5    TECHNOLOGY THAT SHE WAS DEVELOPING WERE SMALL SAMPLE ASSAYS;

11:33AM   6    CORRECT?

11:33AM   7    A.   I'M NOT SURE WHAT YOU'RE REFERRING TO OTHER THAN THERE WAS

11:33AM   8    SOMETHING AT ONE TIME CALLED A NANOTAINER THAT -- THAT WAS THE

11:33AM   9    COLLECTION DEVICE THAT THE PIN PRICK WAS THEN USED TO COLLECT

11:33AM   10   THE BLOOD.

11:33AM   11   Q.   OKAY.  DO YOU RECALL IN THE EARLY DISCUSSIONS THE

11:34AM   12   DISCUSSION OF CARTRIDGES FOR USE IN CONNECTION WITH THE

11:34AM   13   TECHNOLOGY?

11:34AM   14   A.   YES.

11:34AM   15   Q.   OKAY.  AND DO YOU RECALL THAT THOSE CARTRIDGES CONTAIN THE

11:34AM   16   CHEMISTRY THAT WOULD ACTUALLY PERFORM THE BLOOD TESTS ON THE

11:34AM   17   ANALYZER?

11:34AM   18   A.   YES.

11:34AM   19   Q.   AND DID YOU UNDERSTAND THAT THOSE ASSAYS ASSOCIATED WITH

11:34AM   20   BLOOD TESTS, THAT EACH ASSAY WAS A SEPARATE BLOOD TEST?

11:34AM   21   A.   CORRECT.

11:34AM   22   Q.   AND DID YOU UNDERSTAND THAT THERANOS OVER TIME WAS

11:34AM   23   DEVELOPING AN INCREASING NUMBER OF SMALL SAMPLE ASSAYS?

11:34AM   24   A.   CORRECT.

11:34AM   25   Q.   LET ME DIRECT YOUR ATTENTION TO SOME OF THE LANGUAGE THAT

LUCAS CROSS BY MR. DOWNEY                                          5464

```
11:34AM   1    WAS CONTAINED IN THIS BUSINESS PLAN.  I'LL JUST DIRECT YOUR

11:34AM   2    ATTENTION TO THE -- UNDER THE SECOND HEADER, IT READS, "DETAILS

11:34AM   3    OF THE ASSAY/CHEMILUMINESCENCE."

11:35AM   4         DO YOU SEE THAT?

11:35AM   5    A.   YES.

11:35AM   6    Q.   AND DO YOU SEE THAT UNDER THIS DOCUMENT IT DESCRIBES WHAT

11:35AM   7    THE METHOD IS FOR DEVELOPING EACH OF THESE BLOOD TESTS.

11:35AM   8         DO YOU SEE THAT?

11:35AM   9    A.   YES.

11:35AM  10    Q.   IF YOU GO BELOW, YOU WILL SEE THAT THERE'S A TIMELINE WITH

11:35AM  11    THE DEVELOPMENT OF EACH ASSAY.

11:35AM  12         YOU HAVE TO ACTUALLY TURN TO PAGE 65, I THINK, OF THE

11:35AM  13    EXHIBIT.

11:35AM  14         AND DO YOU SEE THAT THIS DOCUMENT FROM LATE 2005 DESCRIBED

11:35AM  15    THE PROCESS BY WHICH ASSAYS WOULD BE DEVELOPED?

11:36AM  16         DO YOU SEE THAT?

11:36AM  17    A.   YES.

11:36AM  18    Q.   AND DO YOU SEE IN THE LAST SENTENCE IT GIVES THE TIMELINE

11:36AM  19    THAT IT WOULD TAKE TO DEVELOP EACH ASSAY?

11:36AM  20    A.   YES.

11:36AM  21    Q.   AND IT INDICATED THAT EACH ASSAY WOULD TAKE ABOUT THREE

11:36AM  22    MONTHS TO DEVELOP; CORRECT?

11:36AM  23    A.   YES.

11:36AM  24    Q.   AND THEN THAT THEY COULD BE FULLY DEVELOPED AT SOMETHING

11:36AM  25    CALLED ISO 9000 STANDARDS WITHIN ABOUT SIX MONTHS.
```

LUCAS CROSS BY MR. DOWNEY                                      5465

11:36AM   1          DO YOU SEE THAT?

11:36AM   2     A.   YES.

11:36AM   3     Q.   AND DO YOU KNOW WHAT ISO 9000 STANDARDS ARE?

11:36AM   4     A.   I'M NOT FAMILIAR WITH THE SPECIFICS, BUT IT'S A STANDARD

11:36AM   5     WHICH IS RECOGNIZED WORLDWIDE AS A CERTAIN LEVEL OF COMPETENCE

11:36AM   6     AND -- OF THE TECHNOLOGY AND ITS DURABILITY AND RELIABILITY AND

11:36AM   7     ACCURACY.

11:36AM   8     Q.   IT'S A QUALITY MANAGEMENT METRIC; RIGHT?

11:36AM   9     A.   SURE.

11:36AM   10    Q.   SO YOU KNEW EVEN BEFORE YOU INVESTED THAT THERE WAS A

11:36AM   11    PROCESS FOR DEVELOPING ASSAYS; CORRECT?

11:36AM   12    A.   YES.

11:36AM   13    Q.   AND YOU KNEW THAT THOSE ASSAYS WOULD DEVELOP AND CHANGE

11:37AM   14    AND HOPEFULLY GET BETTER OVER TIME; CORRECT?

11:37AM   15    A.   CORRECT.

11:37AM   16    Q.   AND GENERALLY THE TIME TO DEVELOP EACH ONE WAS ABOUT SIX

11:37AM   17    MONTHS; CORRECT?

11:37AM   18    A.   YES, AS STATED HERE.

11:37AM   19    Q.   NOW, AS YOU WERE LEARNING INFORMATION GOING FORWARD ABOUT

11:37AM   20    THE COMPANY, DID YOU ALSO LOOK AT SOME OF THE INFORMATION THAT

11:37AM   21    IS DISCUSSED IN HERE?  DID YOU ACTUALLY LOOK AT ANY MATERIALS

11:37AM   22    IN THE COMPANY ABOUT QUALITY MANAGEMENT, OR ABOUT THE

11:37AM   23    DEVELOPMENT OF ASSAYS, OR ANY KIND OF DATA WITHIN THE COMPANY?

11:37AM   24    DID YOU GO AND HAVE THE OPPORTUNITY TO DO THAT?

11:37AM   25    A.   CERTAINLY I BELIEVE I WAS AT THEIR OLD OFFICE OR THIS

LUCAS CROSS BY MR. DOWNEY                                5466

11:37AM  1    ORIGINAL OFFICE, AND WHAT I WOULD HAVE SEEN WOULD HAVE BEEN

11:38AM  2    QUITE RUDIMENTARY I BELIEVE.

11:38AM  3        BUT I DON'T HAVE A VIVID RECOLLECTION.

11:38AM  4    Q.   OKAY.  DO YOU KNOW IF YOU AT SOME POINT LOOKED AT THE

11:38AM  5    PATENTS THAT THE COMPANY HAD APPLIED FOR AND OBTAINED IN

11:38AM  6    CONNECTION WITH ITS TECHNOLOGY?

11:38AM  7    A.   YES, AND NOT IN GREAT DETAIL.

11:38AM  8        MY UNDERSTANDING WAS THAT THE PATENT, OR THE PRINCIPAL

11:38AM  9    PATENT WAS, YOU KNOW, A FUNDAMENTAL PATENT OF WHICH IT WAS

11:38AM  10   OUTSTANDING TO HAVE BEEN GRANTED BECAUSE IT MAY, ALONG WITH

11:38AM  11   OTHER PATENTS, BLOCK OTHERS FROM USING THAT TECHNOLOGY.

11:38AM  12   Q.   OKAY.  AND AM I RIGHT THAT THE STRENGTH OF A COMPANY'S

11:38AM  13   PATENTS IS AN IMPORTANT FACTOR IN DECIDING WHETHER TO INVEST IN

11:38AM  14   THE COMPANY; CORRECT?

11:38AM  15   A.   IT IS, BUT NOT ALL -- THE DEVELOPMENT OF THE TECHNOLOGY IS

11:39AM  16   AT TIMES MORE IMPORTANT THAN THE PATENT PORTFOLIO.

11:39AM  17   Q.   HAVING THE PATENT MIGHT JUST BE THE FIRST STEP; CORRECT?

11:39AM  18   A.   YEAH, AND HAVING THE PATENT IS CERTAINLY A PLUS,

11:39AM  19   ABSOLUTELY.

11:39AM  20   Q.   AND EVEN AS OF THIS TIME, 2005/2006, YOU UNDERSTOOD THAT

11:39AM  21   THERANOS WAS DEVELOPING THE TECHNOLOGY THAT IT EITHER OBTAINED

11:39AM  22   OR SOUGHT INTELLECTUAL PROPERTY PROTECTION FOR?

11:39AM  23   A.   YES.

11:39AM  24   Q.   I WANT TO GO FORWARD IN THIS DOCUMENT A LITTLE BIT TO LOOK

11:39AM  25   AT ITS DISCUSSION OF THE RISKS THAT THE BUSINESS WOULD FACE

LUCAS CROSS BY MR. DOWNEY                                                5467

| | | |
|---|---|---|
| 11:39AM | 1 | OVER ITS LIFE, AND I'LL DIRECT YOUR ATTENTION TO PAGE 45 OF THE |
| 11:39AM | 2 | EXHIBIT. |
| 11:39AM | 3 | AND ON THE BOTTOM HALF OF THE DOCUMENT, DO YOU SEE THAT |
| 11:39AM | 4 | THERE'S A DISCUSSION OF REGULATORY? |
| 11:39AM | 5 | DO YOU SEE THAT? |
| 11:40AM | 6 | A.   IF IT'S LITERALLY THE LAST PARAGRAPH, IT'S NOT |
| 11:40AM | 7 | HIGHLIGHTED, SO I -- |
| 11:40AM | 8 | Q.   WELL, LET ME SEE IF I CAN CALL OUT THAT LAST PARAGRAPH TO |
| 11:40AM | 9 | MAKE IT A LITTLE EASIER FOR YOU TO READ. |
| 11:40AM | 10 | THE COURT:  MR. DOWNEY, SHOULD WE TAKE A BREAK NOW |
| 11:40AM | 11 | BEFORE WE LAUNCH INTO THIS? |
| 11:40AM | 12 | MR. DOWNEY:  YEAH, THAT'S FINE. |
| 11:40AM | 13 | THE COURT:  LET'S DO THAT.  LET'S TAKE OUR MORNING |
| 11:40AM | 14 | BREAK, LADIES AND GENTLEMEN, 30 MINUTES, 30 MINUTES. |
| 11:40AM | 15 | WE'LL SEE YOU -- YOU CAN STAND DOWN, SIR.  WE'LL TAKE A |
| 11:40AM | 16 | BREAK FOR 30 MINUTES AND THEN YOU CAN RETURN. |
| 11:40AM | 17 | THE WITNESS:  OKAY.  THANK YOU. |
| 11:40AM | 18 | THE COURT:  YOU'RE WELCOME. |
| 11:40AM | 19 | (JURY OUT AT 11:40 A.M.) |
| 11:41AM | 20 | THE COURT:  YOU CAN STAND DOWN, SIR. |
| 11:41AM | 21 | THE WITNESS:  OH.  THANK YOU. |
| 11:41AM | 22 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 11:41AM | 23 | THE WITNESS:  JUST WALK OUT? |
| 11:41AM | 24 | THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT |
| 11:41AM | 25 | THAT THE JURY HAS LEFT THE COURTROOM. |

LUCAS CROSS BY MR. DOWNEY                                      5468

11:41AM   1          MR. LUCAS IS LEAVING THE COURTROOM.

11:41AM   2          DO YOU WANT A BREAK NOW AND TALK ABOUT THAT MORNING MATTER

11:41AM   3   LATER BEFORE WE COME BACK?

11:41AM   4               MR. DOWNEY:  MAYBE BEFORE WE COME BACK.

11:41AM   5               THE COURT:  SURE:  YES, THAT'S FINE.  ALL RIGHT.

11:41AM   6   THANK YOU.

11:41AM   7               THE CLERK:  COURT IS IN RECESS.

11:41AM   8          (LUNCH RECESS TAKEN AT 11:41 A.M.)

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

LUCAS CROSS BY MR. DOWNEY                                          5469

| | | |
|---|---|---|
| 11:41AM | 1 | **AFTERNOON SESSION** |
| 12:31PM | 2 | (JURY IN AT 12:31 P.M.) |
| 12:31PM | 3 | THE COURT:  THANK YOU FOR YOUR PATIENCE.  WE'RE BACK |
| 12:31PM | 4 | ON THE RECORD. |
| 12:31PM | 5 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 12:31PM | 6 | MR. LUCAS IS ON THE STAND AGAIN. |
| 12:31PM | 7 | YOU CAN REMOVE YOUR MASK AGAIN IF YOU WOULD LIKE AS YOU |
| 12:31PM | 8 | HAD BEFORE. |
| 12:31PM | 9 | THE WITNESS:  YES? |
| 12:31PM | 10 | THE COURT:  YES.  AND OUR JURY IS PRESENT. |
| 12:31PM | 11 | MR. DOWNEY. |
| 12:31PM | 12 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 12:31PM | 13 | Q.  MR. LUCAS, DO YOU RECALL BEFORE THE BREAK WE WERE TALKING |
| 12:31PM | 14 | ABOUT SOME REGULATORY ISSUES RELATED TO THERANOS; CORRECT? |
| 12:31PM | 15 | A.  YES. |
| 12:31PM | 16 | Q.  AND WE WERE LOOKING AT EXHIBIT 12022 AT PAGE 45, WHICH IS |
| 12:31PM | 17 | DISPLAYED ON THE SCREEN. |
| 12:32PM | 18 | AND I WANT TO DRAW YOUR ATTENTION TO THE LAST PARAGRAPH |
| 12:32PM | 19 | THERE, AND THE FIRST SENTENCE OF THAT PARAGRAPH SAYS, "AS |
| 12:32PM | 20 | THERANOS PREPARES TO INTRODUCE ITS SYSTEMS TO MARKET, THE |
| 12:32PM | 21 | COMPANY WILL ENTER A TWO-PART 510(K) PROCESS FOR USE OF THE |
| 12:32PM | 22 | DEVICE IN THERAPEUTIC DRUG MONITORING ACROSS A RANGE OF |
| 12:32PM | 23 | THERAPEUTIC COMPOUNDS." |
| 12:32PM | 24 | DO YOU SEE THAT? |
| 12:32PM | 25 | A.  YES. |

LUCAS CROSS BY MR. DOWNEY                                    5470

12:32PM   1    Q.   AND DO YOU KNOW WHAT THE 510(K) PROCESS IS?

12:32PM   2    A.   THAT'S ONE OF THE REGULATORY PROCESSES THAT ARE USED FOR

12:32PM   3    APPROVING A MEDICAL DEVICE.

12:32PM   4    Q.   OKAY.  THERANOS WAS INDICATING TO YOU, AS A POTENTIAL

12:32PM   5    INVESTOR, THAT IT INTENDED TO APPLY FOR THAT APPROVAL?

12:32PM   6    A.   YES.

12:32PM   7    Q.   IF YOU LOOK AT THE SECOND SENTENCE, IT SAYS, "THE 510(K)

12:32PM   8    PROCESS WILL CONSIST FIRST OF APPROVAL OF THE ASSAYS, AND

12:32PM   9    SECOND TO APPROVE THE NON-DISPOSABLE READER."

12:33PM  10         DO YOU SEE THAT?

12:33PM  11    A.   YES.

12:33PM  12    Q.   AND THERANOS HAD INDICATED THAT IT INTENDED TO APPLY FOR

12:33PM  13    FDA APPROVAL OF BOTH OF ITS ASSAYS; CORRECT?

12:33PM  14    A.   YES.

12:33PM  15    Q.   AND OF ITS ANALYZER; CORRECT?

12:33PM  16    A.   YES.

12:33PM  17    Q.   NOW, HAVING BEEN AROUND THE REGULATORY PROCESS FOR

12:33PM  18    COMPANIES THAT YOU'VE INVESTED IN, YOU REALIZE THAT'S AN

12:33PM  19    UNCERTAIN PROCESS; CORRECT?

12:33PM  20    A.   CORRECT.

12:33PM  21    Q.   AND DEPENDING ON HOW LONG THAT PROCESS TAKES, IT CAN

12:33PM  22    AFFECT THE VALUE OF A COMPANY; CORRECT?

12:33PM  23    A.   THAT'S RIGHT.

12:33PM  24    Q.   AND DEPENDING ON WHETHER THE COMPANY -- THE DEVICES ARE

12:33PM  25    APPROVED, THAT CAN AFFECT THE VALUE OF THE COMPANY, CAN'T IT?

LUCAS CROSS BY MR. DOWNEY                                    5471

12:33PM   1     A.   YES.

12:33PM   2     Q.   ALL RIGHT.  I WANT TO DRAW YOUR ATTENTION NOW TO PAGE 42

12:33PM   3     OF THE ATTACHMENT, WHICH IS PAGE 69 OF THE EXHIBIT.

12:34PM   4          DO YOU SEE THAT THIS IS LABELED RISKS RELATED TO OUR

12:34PM   5     BUSINESS?

12:34PM   6     A.   YES.

12:34PM   7     Q.   IS THIS A RISK DISCLOSURE THAT THERANOS MADE TO YOU BEFORE

12:34PM   8     YOU MADE YOUR FIRST INVESTMENT IN THE COMPANY?

12:34PM   9     A.   I'M JUST FORGETTING THE DATE OF THIS DOCUMENT, IF IT'S

12:34PM  10     2005.

12:34PM  11     Q.   WELL, LET ME ASK YOU TO LOOK BACK AT THE FIRST PAGE OF THE

12:34PM  12     EXHIBIT, WHICH IS 12022.  WE CAN PUT THAT ON THE SCREEN.

12:34PM  13          AND IF WE FOCUS ON THE ADDRESS LINE ON THE TOP, DO YOU SEE

12:34PM  14     THAT THESE MATERIALS WERE SENT TO YOU IN LATE 2005?

12:34PM  15     A.   YES.

12:34PM  16     Q.   AND THAT PREDATES THE TIME OF YOUR FIRST INVESTMENT IN

12:35PM  17     THERANOS; CORRECT?

12:35PM  18     A.   CORRECT.

12:35PM  19     Q.   OKAY.  SO LET'S RETURN TO PAGE 69 OF THE EXHIBIT.  AND

12:35PM  20     ARE, ARE -- IS THIS A RISK DISCLOSURE THAT THERANOS MADE TO YOU

12:35PM  21     PRIOR TO THE TIME OF YOUR FIRST INVESTMENT IN THERANOS?

12:35PM  22     A.   IF THIS IS A CONTINUATION OF THE DOCUMENT THAT WE'VE BEEN

12:35PM  23     LOOKING AT, YES.

12:35PM  24     Q.   AND YOU SEE THAT THE FIRST DISCUSSION UNDER RISKS RELATED

12:35PM  25     TO OUR BUSINESS RELATES TO CAPITAL RESOURCES?

LUCAS CROSS BY MR. DOWNEY                                          5472

12:35PM  1        DO YOU SEE THAT SECTION?

12:35PM  2    A.   YES.

12:35PM  3    Q.   AND IT SAYS, "BASED ON CURRENT PROJECTIONS, THERANOS

12:35PM  4    BELIEVES THAT THE PROCEEDS OF THIS OFFERING WILL ENABLE THE

12:35PM  5    COMPANY TO BUILD THE PRODUCTION INFRASTRUCTURE NECESSARY TO

12:35PM  6    SERVICE ITS PHARMACEUTICAL CUSTOMERS AND REACH CASH FLOW

12:35PM  7    POSITIVE.  HOWEVER, WE CANNOT BE ASSURED THAT CHANGED

12:35PM  8    CIRCUMSTANCES WILL NOT RESULT IN THE DEPLETION OF OUR CAPITAL

12:36PM  9    RESOURCES MORE RAPIDLY THAN WE CURRENTLY ANTICIPATE."

12:36PM  10        DO YOU SEE THAT?

12:36PM  11   A.   YES.

12:36PM  12   Q.   AND THAT WAS A RISK THAT YOU UNDERSTOOD IN CONNECTION WITH

12:36PM  13   MAKING THIS INVESTMENT IN THERANOS?

12:36PM  14   A.   YES.

12:36PM  15   Q.   AND, INDEED, IN CONNECTION WITH ALL SUBSEQUENT INVESTMENTS

12:36PM  16   IN THERANOS?

12:36PM  17   A.   I WOULDN'T NECESSARILY AGREE WITH THAT COMMENT AS IN 2013

12:36PM  18   IT WAS INFRASTRUCTURE CAPITAL AND INVESTMENTS BY OTHERS OF

12:36PM  19   HUNDREDS OF MILLIONS OF DOLLARS, SO ONE COULD, ONE COULD HAVE

12:36PM  20   BELIEVED AT THAT TIME THAT THE COMPANY COULD GET THE CASH FLOW

12:36PM  21   POSITIVE.

12:36PM  22   Q.   IN 2013 THERE WERE CERTAIN STRATEGIC PARTNERS THAT HAD

12:36PM  23   ENTERED INTO RELATIONSHIPS WITH THERANOS; CORRECT?

12:36PM  24   A.   YES.  YES.

12:36PM  25   Q.   AND SO THE NATURE OF THERANOS'S BUSINESS AT THAT TIME WAS

LUCAS CROSS BY MR. DOWNEY                                    5473

| 12:36PM | 1 | DIFFERENT; CORRECT? |
| 12:36PM | 2 | A.   CORRECT. |
| 12:36PM | 3 | Q.   AND IT WAS OFFERING SERVICES FOR BLOOD TESTING TO THE |
| 12:37PM | 4 | PUBLIC; CORRECT? |
| 12:37PM | 5 | A.   CORRECT. |
| 12:37PM | 6 | Q.   AND IT WAS DOING THAT THROUGH WALGREENS; CORRECT? |
| 12:37PM | 7 | A.   CORRECT. |
| 12:37PM | 8 | Q.   OKAY.  AND AT THIS TIME THE COMPANY WAS FOCUSSED ON USING |
| 12:37PM | 9 | ITS TECHNOLOGY IN CONNECTION WITH PHARMACEUTICAL COMPANIES; |
| 12:37PM | 10 | CORRECT? |
| 12:37PM | 11 | A.   CORRECT. |
| 12:37PM | 12 | Q.   OKAY.  SO LET'S LOOK AT THE BALANCE OF THE OTHER RISK |
| 12:37PM | 13 | FACTORS ON THIS PAGE.  HIGHLIGHT THAT MIDDLE SECTION. |
| 12:37PM | 14 | DO YOU SEE THAT THE FIRST RISK THAT WAS DISCLOSED WAS THAT |
| 12:37PM | 15 | "THE RATE OF PROGRESS AND COSTS OF OUR RESEARCH AND DEVELOPMENT |
| 12:37PM | 16 | ACTIVITIES, LEADING TO THE PRODUCTION OF OUR FIRST GENERATION |
| 12:37PM | 17 | DEVICE." |
| 12:37PM | 18 | DO YOU SEE THAT? |
| 12:37PM | 19 | A.   YES. |
| 12:37PM | 20 | Q.   AND IT'S TRUE THAT IT'S SOMETIMES DIFFICULT, WITH |
| 12:37PM | 21 | TECHNOLOGY DEVELOPMENT, TO ASSESS HOW QUICKLY THE TECHNOLOGY |
| 12:37PM | 22 | WILL BE DEVELOPED; CORRECT? |
| 12:37PM | 23 | A.   CORRECT. |
| 12:37PM | 24 | Q.   AND ALSO HOW MUCH IT WILL COST TO DEVELOP THAT TECHNOLOGY; |
| 12:37PM | 25 | CORRECT? |

LUCAS CROSS BY MR. DOWNEY                                    5474

12:37PM    1     A.   CORRECT.

12:37PM    2     Q.   AND COMPANIES OFTEN ASSESS THAT THE PROCESS WILL TAKE A

12:38PM    3     SHORTER PERIOD OF TIME THAN IT DOES; CORRECT?

12:38PM    4     A.   THAT THEY PROJECT IT WOULD BE A SHORTER LENGTH OF TIME,

12:38PM    5     YES.  IT'S GENERALLY LONGER.

12:38PM    6     Q.   AND IT'S A LITTLE BIT LIKE RENOVATING YOUR KITCHEN, RIGHT?

12:38PM    7     IT TAKES LONGER AND COSTS MORE THAN YOU THINK?

12:38PM    8     A.   THAT'S PARTICULARLY RELEVANT TO ME RIGHT NOW ACTUALLY.

12:38PM    9          (LAUGHTER.)

12:38PM   10     BY MR. DOWNEY:

12:38PM   11     Q.   OKAY.  WE TALKED ABOUT THE REGULATORY APPROVAL ISSUES.

12:38PM   12          AND THEN YOU SEE THE THIRD RISK, "OUR SUCCESS IN

12:38PM   13     ESTABLISHING STRATEGIC BUSINESS COLLABORATIONS."

12:38PM   14          DO YOU SEE THAT?

12:38PM   15     A.   YES.

12:38PM   16     Q.   AND THAT'S JUST SAYING WE EXPECT WE'LL BE ABLE TO HAVE

12:38PM   17     ENTITIES INTERESTED IN US, BUT WE MAY OR MAY NOT BE RIGHT ABOUT

12:38PM   18     THAT; CORRECT?

12:38PM   19     A.   CORRECT.

12:38PM   20     Q.   NOW, IN 2013 YOU LEARNED THAT THERANOS HAD ESTABLISHED A

12:38PM   21     VERY IMPORTANT STRATEGIC BUSINESS COLLABORATION; CORRECT?

12:39PM   22     A.   YES.

12:39PM   23     Q.   IT HAD DONE SO WITH WALGREENS; CORRECT?

12:39PM   24     A.   YES.

12:39PM   25     Q.   AND THAT WAS A VERY IMPORTANT FACTOR IN YOUR CONSIDERATION

LUCAS CROSS BY MR. DOWNEY                                          5475

12:39PM  1    OF THE VALUE OF THERANOS; CORRECT?

12:39PM  2    A.   YES.

12:39PM  3    Q.   AND LET ME HIGHLIGHT NEXT, "THE TIMING AND AMOUNT OF FEES

12:39PM  4    FROM POTENTIAL CUSTOMERS."

12:39PM  5         DO YOU SEE THAT?

12:39PM  6    A.   YES.

12:39PM  7    Q.   AND MS. HOLMES WAS GIVING YOU IN THIS TIME PERIOD HER

12:39PM  8    PROJECTION OF HOW MUCH THE COMPANY MIGHT BE ABLE TO EARN IN THE

12:39PM  9    FUTURE; CORRECT?

12:39PM  10   A.   YES.

12:39PM  11   Q.   BUT SHE WAS INDICATING HERE THAT, YOU KNOW, HER ASSESSMENT

12:39PM  12   OF THAT COULD BE WRONG; CORRECT?

12:39PM  13   A.   YES.

12:39PM  14   Q.   OKAY.  AND THEN THE NEXT ENTRY SAYS, "OUR SUCCESS IN

12:39PM  15   COMMERCIALIZING OUR PRODUCT CANDIDATES"?

12:39PM  16        CORRECT?

12:39PM  17   A.   YES.

12:39PM  18   Q.   AND YOU KNEW THAT WAS A RISK?

12:39PM  19   A.   CORRECT.

12:39PM  20   Q.   AND IT MIGHT BE, AS THERANOS DEVELOPED THIS PRODUCT, THAT

12:40PM  21   PHARMACEUTICAL COMPANIES JUST MIGHT NOT BE INTERESTED IN IT;

12:40PM  22   CORRECT?

12:40PM  23   A.   THAT'S RIGHT.

12:40PM  24   Q.   OR THEY MIGHT NOT BE INTERESTED IN USING IT IN THE WAY

12:40PM  25   THAT SHE THOUGHT THEY WOULD; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                                5476

12:40PM  1    A.   YES.

12:40PM  2    Q.   AND THE NEXT RISK THAT CAN IT IDENTIFIES IS "THE EMERGENCE

12:40PM  3    OF COMPETING TECHNOLOGIES AND PRODUCTS."

12:40PM  4         THAT'S ALWAYS A RISK FOR ANY COMPETING COMPANY; RIGHT?

12:40PM  5    A.   GENERALLY, YES.

12:40PM  6    Q.   AND THE NEXT RISK TO BE AWARE OF WAS THE COST OF

12:40PM  7    ESSENTIALLY PROTECTING THE COMPANY'S INTELLECTUAL PROPERTY;

12:40PM  8    CORRECT?

12:40PM  9    A.   YES.

12:40PM 10    Q.   AND THEN SOME ADDITIONAL RISK FACTORS ARE IDENTIFIED

12:40PM 11    UNDERNEATH THAT.

12:40PM 12         THERE'S A RISK IN CONNECTION WITH FUTURE FINANCING.

12:40PM 13         DO YOU SEE THAT?

12:40PM 14    A.   YES.

12:40PM 15    Q.   AND THE INDICATION THERE WAS THAT THEY MIGHT HAVE

12:40PM 16    FUTURE -- THERE MIGHT BE FUTURE INSTANCES WHERE THEY WANTED TO

12:40PM 17    RAISE ADDITIONAL MONEY; CORRECT?

12:40PM 18    A.   CORRECT.

12:40PM 19    Q.   AND THAT COULD AFFECT YOUR RIGHTS AS A SHAREHOLDER;

12:41PM 20    CORRECT?

12:41PM 21    A.   YES.

12:41PM 22    Q.   AND, IN FACT, THERE WERE IN THE FUTURE SUBSEQUENT

12:41PM 23    INSTANCES WHERE THERANOS WENT OUT AND RAISED ADDITIONAL MONEY;

12:41PM 24    CORRECT?

12:41PM 25    A.   YES.

LUCAS CROSS BY MR. DOWNEY                                              5477

12:41PM   1     Q.   BUT FROM THE POINT OF TIME IN 2006, THAT YOU MADE YOUR

12:41PM   2     LAST INVESTMENT IN 2006 UNTIL 2010, THERANOS DIDN'T RAISE ANY

12:41PM   3     MONEY, DID IT?

12:41PM   4     A.   I DON'T KNOW THAT THAT'S ACCURATE ACTUALLY.

12:41PM   5     Q.   DO YOU KNOW WHEN THE NEXT RAISE OF MONEY WAS AFTER 2006?

12:41PM   6     A.   I WOULDN'T REMEMBER.

12:41PM   7     Q.   OKAY.  DID YOU PARTICIPATE IN THE NEXT RAISE OF MONEY

12:41PM   8     AFTER 2006?

12:41PM   9     A.   NO.

12:41PM   10    Q.   OKAY.  THE NEXT ENTRY IS MANAGING GROWTH.

12:41PM   11         AND THIS IS AN IMPORTANT RISK FOR A TECHNOLOGY COMPANY;

12:41PM   12    RIGHT?  THERANOS IS TELLING YOU HERE THAT THEY MAY NOT BE ABLE

12:41PM   13    TO MANAGE THEIR GROWTH IN CONNECTION WITH TRANSITIONING FROM A

12:41PM   14    DEVELOPMENT COMPANY TO A COMPANY THAT CAN SUCCESSFULLY

12:41PM   15    COMMERCIALIZE ITS PRODUCT.

12:42PM   16         DO YOU SEE THAT?

12:42PM   17    A.   YES.

12:42PM   18    Q.   AND THAT'S A RISK FOR COMPANIES THAT MAY BE VERY GOOD AT

12:42PM   19    DEVELOPING TECHNOLOGY, BUT AREN'T VERY GOOD AT INTRODUCING IT

12:42PM   20    INTO THE MARKETS WHERE IT'S GOING TO BE USED; CORRECT?

12:42PM   21    A.   CORRECT.

12:42PM   22    Q.   AND THEN THE LAST ENTRY RELATES TO MARKET ACCEPTANCE;

12:42PM   23    CORRECT?

12:42PM   24    A.   YES.

12:42PM   25    Q.   AND THAT INDICATES THAT THE MARKET MAY OR MAY NOT BE

LUCAS CROSS BY MR. DOWNEY                                              5478

12:42PM  1    INTERESTED IN OUR PRODUCT IN THE WAY THAT WE EXPECT THEY WILL;

12:42PM  2    CORRECT?

12:42PM  3         AND THEN UNDER THAT -- CORRECT?  IS THAT CORRECT?

12:42PM  4    A.   YES.

12:42PM  5    Q.   AND THEN IT IDENTIFIES SOME PARTICULAR RISKS THAT

12:42PM  6    ACCOMPANIED THERANOS'S ATTEMPT TO USE THIS IN CONNECTION WITH

12:42PM  7    TAKING BLOOD TESTS FROM PATIENTS; CORRECT?

12:42PM  8    A.   YES.

12:42PM  9    Q.   OKAY.  AND THEN PRODUCT LIABILITIES AND KEY EMPLOYEES ARE

12:42PM 10    ALSO IDENTIFIED; CORRECT?

12:42PM 11    A.   YES.

12:43PM 12    Q.   AND DO YOU SEE UNDER KEY EMPLOYEES THERE'S A REFERENCE

12:43PM 13    THAT MS. HOLMES WAS A KEY EMPLOYEE?

12:43PM 14    A.   YES.

12:43PM 15    Q.   I HAD ASKED YOU BEFORE ABOUT YOUR PERCEPTIONS OF

12:43PM 16    MS. HOLMES.

12:43PM 17         DO YOU KNOW HOW OLD MS. HOLMES WAS WHEN YOU MET HER AT

12:43PM 18    THIS TIME IN 2005?

12:43PM 19    A.   I BELIEVE 19.

12:43PM 20    Q.   LET ME -- I WANT TO JUST MAKE SURE WE INTRODUCE THE RIGHT

12:43PM 21    DOCUMENTS TO DOCUMENT YOUR EARLY INVESTMENTS IN 2006, SO I'D

12:43PM 22    LIKE TO START BY SHOWING YOU EXHIBIT 14213.

12:44PM 23    A.   DO YOU WANT ME TO OPEN IT IN THIS?

12:44PM 24    Q.   IT SHOULD BE IN YOUR BLACK BINDER, YES.

12:44PM 25    A.   SAY THE NUMBER AGAIN, PLEASE.

LUCAS CROSS BY MR. DOWNEY                                          5479

12:44PM   1      Q.   14213.

12:44PM   2      A.   OKAY.

12:44PM   3      Q.   AND IF YOU -- IF YOU LOOK AT THE COVER PAGE OF THIS, DO

12:44PM   4      YOU SEE THAT THIS IS THE SERIES B PREFERRED STOCK PURCHASE

12:44PM   5      AGREEMENT FROM FEBRUARY 2006?

12:44PM   6      A.   YES.

12:44PM   7      Q.   AND THEN I'D LIKE TO ASK YOU TO JUST TAKE A MOMENT AND

12:44PM   8      FLIP THROUGH ALL THE WAY TO PAGE 32 OF THE EXHIBIT, AND I WILL

12:45PM   9      TELL YOU THAT THE WAY PERHAPS TO DO THAT IS THAT THE BOTTOM

12:45PM   10     RIGHT-HAND CORNER HAS SOME NUMBERS, AND THE LAST FOUR DIGITS

12:45PM   11     WILL BE 6326.

12:45PM   12     A.   YES.

12:45PM   13     Q.   DO YOU SEE A SIGNATURE ON THAT PAGE?

12:45PM   14     A.   YES.

12:45PM   15     Q.   IS THAT YOUR SIGNATURE?

12:45PM   16     A.   IT SURE LOOKS LIKE IT, YES.

12:45PM   17     Q.   OKAY.

12:45PM   18          YOUR HONOR, I MOVE THE ADMISSION OF 14213.

12:45PM   19              MR. BOSTIC:   NO OBJECTION.

12:45PM   20              THE COURT:   IT'S ADMITTED AND MAY BE PUBLISHED.

12:45PM   21          (DEFENDANT'S EXHIBIT 14213 WAS RECEIVED IN EVIDENCE.)

12:45PM   22     BY MR. DOWNEY:

12:45PM   23     Q.   AND THEN IF YOU LOOK AT THE FIRST PAGE, THIS IS THE

12:45PM   24     AGREEMENT WHICH SETS FORTH THE TERMS UNDER WHICH YOU PURCHASED

12:45PM   25     STOCK FROM THERANOS IN FEBRUARY OF 2006; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                                5480

12:46PM   1      A.   YES.

12:46PM   2      Q.   AND I THINK YOU'VE TESTIFIED ON DIRECT THAT YOU HAVE

12:46PM   3      EXPERIENCE WITH THESE KINDS OF DOCUMENTS; CORRECT?

12:46PM   4      A.   CORRECT.

12:46PM   5      Q.   AND ARE THESE DOCUMENTS THAT YOU TYPICALLY SIGN IN

12:46PM   6      CONNECTION WITH MAKING AN INVESTMENT IN A PRIVATE COMPANY?

12:46PM   7      A.   YES.

12:46PM   8      Q.   AND YOU UNDERSTAND THAT THIS IS INTENDED TO BE THE

12:46PM   9      AGREEMENT THAT DOCUMENTS THE TERMS ON WHICH YOU'RE BUYING THE

12:46PM  10      STOCK; CORRECT?

12:46PM  11      A.   YES.  THERE ARE OTHER AGREEMENTS THAT COME ALONG WITH

12:46PM  12      THIS, BUT THIS IS, AS IT SAYS, IT'S A STOCK PURCHASE AGREEMENT.

12:46PM  13      Q.   OKAY.  AND LET ME ASK YOU TO LOOK, AND WE'LL JUST DISPLAY

12:46PM  14      IT ON THE SCREEN FOR SIMPLICITY'S SAKE, I'M GOING TO DIRECT

12:46PM  15      YOUR ATTENTION TO PAGES 70 AND 71 OF THE DOCUMENT.

12:46PM  16          DO YOU SEE THAT THIS IS A SCHEDULE THAT IS ATTACHED TO THE

12:47PM  17      STOCK PURCHASE AGREEMENT THAT LISTS THE INVESTORS IN THIS

12:47PM  18      SERIES B INVESTMENT IN THERANOS?

12:47PM  19      A.   YES.

12:47PM  20      Q.   AND DO YOU SEE THAT BLACK DIAMOND VENTURES XII IS LISTED

12:47PM  21      AT THE TOP?

12:47PM  22      A.   YES.

12:47PM  23      Q.   AND YOU BOUGHT 433,304 SHARES OF STOCK IN THIS OFFERING?

12:47PM  24      A.   YES.

12:47PM  25      Q.   AND YOU PAID JUST A LITTLE BIT OVER $400,000; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                              5481

12:47PM   1    A.   CORRECT.

12:47PM   2    Q.   AND FOR SOME REASON THERE'S AN EXTRA $0.25 THERE.  WHY IS

12:47PM   3    THAT?

12:47PM   4    A.   DO YOU WANT ME TO ANSWER?

12:47PM   5    Q.   YEAH.  DO YOU KNOW?

12:47PM   6    A.   DEPENDING ON THE PRICE PER SHARE OF THE STOCK, THAT WOULD

12:47PM   7    HAVE TO BE THE NUMBER TO MAKE AN EVEN NUMBER OF SHARES.

12:47PM   8    Q.   SO IT LOOKS LIKE, JUST DOING THE MATH BASED LOOKING AT

12:48PM   9    THESE TWO NUMBERS, IT LOOKS LIKE YOU PAID A LITTLE UNDER A

12:48PM   10   DOLLAR A SHARE FOR THE SERIES B SHARES IN 2006.  CORRECT?

12:48PM   11   A.   CORRECT.

12:48PM   12   Q.   AND I THINK YOU TESTIFIED THAT YOU'RE NOT SURE IF THIS WAS

12:48PM   13   MONEY FROM PEOPLE WHO INVEST IN YOUR FIRM OR YOUR OWN MONEY OR

12:48PM   14   BOTH?

12:48PM   15   A.   YES.  IT WAS THE MAJORITY OF OUR INVESTORS, AND IT COULD

12:48PM   16   HAVE BEEN AND LIKELY SOME OF MY OWN.

12:48PM   17   Q.   I WANT TO ASK YOU TO JUST LOOK AT ONE OTHER SCHEDULE WHICH

12:48PM   18   IS ATTACHED TO THIS, WHICH IS AT PAGE 76 OF THE EXHIBIT.  I'LL

12:48PM   19   JUST DRAW YOUR ATTENTION TO THE SCHEDULE 3.8(A), WHICH IS ON

12:49PM   20   THE BOTTOM.

12:49PM   21       AND IS THIS A LISTING OF THE PATENT APPLICATIONS THAT

12:49PM   22   THERANOS HAD PENDING AT THE TIME?

12:49PM   23   A.   YES, IF THAT'S AN ACCURATE STATEMENT, YES.

12:49PM   24   Q.   AND IS THIS TYPICALLY THE KIND OF INFORMATION THAT WOULD

12:49PM   25   BE AVAILABLE IN WHAT YOU CALLED A DATA ROOM PRIOR TO AN

LUCAS CROSS BY MR. DOWNEY                                    5482

12:49PM  1    INVESTMENT?

12:49PM  2    A.   YES.

12:49PM  3    Q.   OKAY.  I TAKE IT THAT REVIEWING ALL OF THIS MATERIAL, DOES

12:49PM  4    IT REFRESH YOUR RECOLLECTION ONE WAY OR ANOTHER WHETHER YOU

12:49PM  5    ACTUALLY ACCESSED THAT DATA ROOM PRIOR TO THIS INVESTMENT?

12:49PM  6    A.   I AM NOT CERTAIN.  HOWEVER, I DON'T BELIEVE THAT THERE WAS

12:49PM  7    AT THAT TIME A DATA ROOM AND ALL OF THE INFORMATION WAS

12:49PM  8    PROVIDED BY EMAILS AND/OR PRINTED MATERIAL.

12:50PM  9    Q.   OKAY.  NOW, I THINK YOU TESTIFIED THAT AT SOME POINT YOUR

12:50PM  10   UNCLE BECAME THE CHAIRMAN OF THE BOARD OF THERANOS; IS THAT

12:50PM  11   RIGHT?

12:50PM  12   A.   CORRECT.

12:50PM  13   Q.   AND THAT WAS AROUND THE TIME OF THIS INVESTMENT; CORRECT?

12:50PM  14   A.   YES, I WOULD SAY SO.  BUT HE -- I DON'T ABSOLUTELY RECALL

12:50PM  15   WHEN.

12:50PM  16   Q.   OKAY.  BUT DO YOU REMEMBER THAT GENERALLY WHEN YOU

12:50PM  17   INVESTED, THAT HE INVESTED IN THE COMPANY AT THE SAME TIME?

12:50PM  18   A.   CORRECT.  IF NOT, MAYBE HE DID SOMETHING SOONER.  BUT

12:50PM  19   CERTAINLY ONCE WE INVESTED, HE WAS AN INVESTOR.

12:50PM  20   Q.   OKAY.  NOW, DID I UNDERSTAND YOU ON DIRECT TO SAY THAT YOU

12:50PM  21   MADE ANOTHER INVESTMENT IN THERANOS PRIOR TO THE END OF THAT

12:50PM  22   CALENDAR YEAR?

12:50PM  23   A.   CORRECT.

12:50PM  24   Q.   WAS THAT IN CONNECTION WITH ANOTHER RAISE OF STOCK?

12:51PM  25   A.   YES.

                        UNITED STATES COURT REPORTERS
                                 **ER-9103**

LUCAS CROSS BY MR. DOWNEY                                         5483

| | | |
|---|---|---|
| 12:51PM | 1 | Q.   DO YOU KNOW WHY THERE WAS THAT ADDITIONAL RAISE OF STOCK |
| 12:51PM | 2 | IN THE LATTER PART OF 2006? |
| 12:51PM | 3 | A.   I WOULD EXPECT IT'S BECAUSE THE COMPANY NEEDED ADDITIONAL |
| 12:51PM | 4 | FUNDS AND SO THEY WENT AND RAISED IT AND PROGRESS WAS BEING |
| 12:51PM | 5 | MADE. |
| 12:51PM | 6 | Q.   OKAY.   LET ME ASK YOU TO LOOK IN YOUR BLACK NOTEBOOK AT |
| 12:51PM | 7 | THE EXHIBIT THAT IS MARKED AS 12003A. |
| 12:52PM | 8 | A.   OKAY. |
| 12:52PM | 9 | Q.   AND DO YOU HAVE THAT DOCUMENT? |
| 12:52PM | 10 | A.   YES. |
| 12:52PM | 11 | Q.   OKAY.   AND I'M GOING TO ASK YOU TO GO TO THE PAGE THAT IS |
| 12:52PM | 12 | BATES LABELLED IN THE LOWER RIGHT-HAND CORNER AS 8412.   THAT'S |
| 12:52PM | 13 | A GOOD DISTANCE AHEAD OF THE DOCUMENT OF WHERE IT STARTS, |
| 12:52PM | 14 | ALMOST AT THE END OF THE DOCUMENTS. |
| 12:52PM | 15 | A.   YES. |
| 12:52PM | 16 | Q.   AND DO YOU SEE REFERENCE TO -- DO YOU SEE A REFERENCE TO |
| 12:53PM | 17 | YOUR FIRM ON THAT PAGE? |
| 12:53PM | 18 | A.   8412? |
| 12:53PM | 19 | Q.   YEAH.   I'M SORRY.   I THINK IT'S ACTUALLY -- LET ME GIVE |
| 12:53PM | 20 | YOU THE RIGHT PAGE.   THERE IS THAT REFERENCE, BUT LET ME ASK |
| 12:53PM | 21 | YOU TO DEAL WITH FIRST 8316. |
| 12:53PM | 22 | A.   YES. |
| 12:53PM | 23 | Q.   AND IS THAT YOUR SIGNATURE UNDER BLACK DIAMOND VENTURES |
| 12:53PM | 24 | THERE? |
| 12:53PM | 25 | A.   YES, IT CERTAINLY APPEARS THAT WAY. |

LUCAS CROSS BY MR. DOWNEY                                          5484

12:53PM   1              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:53PM   2     12003A.

12:53PM   3              MR. BOSTIC:  YOUR HONOR, IS THIS COMING IN AS A

12:53PM   4     BUSINESS RECORD?

12:54PM   5              MR. DOWNEY:  YES, THIS IS THE DOCUMENTATION OF HIS

12:54PM   6     INVESTMENT WHICH WAS DISCUSSED ON DIRECT.

12:54PM   7              THE COURT:  DOES THIS MEMORIALIZE THAT?  HAVE YOU

12:54PM   8     ESTABLISHED THAT?

12:54PM   9              MR. DOWNEY:  WELL, HE SIGNED IT AND HE LOOKED AT THE

12:54PM  10     FIRST PAGE.

12:54PM  11              THE COURT:  RIGHT.  CAN YOU JUST ASK A COUPLE OF

12:54PM  12     QUESTIONS, DOES THIS MEMORIALIZE --

12:54PM  13              MR. DOWNEY:  SURE, SURE.

12:54PM  14     Q.  IS THIS THE CONTRACT THAT WAS ENTERED INTO IN CONNECTION

12:54PM  15     WITH THE INVESTMENT THAT YOU MADE IN THERANOS IN THE LATTER

12:54PM  16     PART OF 2006?

12:54PM  17     A.  IT LOOKS THAT WAY, YES.

12:54PM  18              MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE

12:54PM  19     ADMISSION.

12:54PM  20              MR. BOSTIC:  NO OBJECTION.

12:54PM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:54PM  22         (DEFENDANT'S EXHIBIT 12003A WAS RECEIVED IN EVIDENCE.)

12:54PM  23     BY MR. DOWNEY:

12:54PM  24     Q.  I WANT TO ASK YOU TO LOOK AT PAGE 91 OF THE EXHIBIT, WHICH

12:55PM  25     WE'LL DISPLAY ON THE SCREEN TO MAKE IT EASY FOR YOU TO SEE.

LUCAS CROSS BY MR. DOWNEY                                          5485

| | | |
|---|---|---|
| 12:55PM | 1 | IF YOU GO ABOUT HALF -- A LITTLE OVER HALFWAY DOWN THE |
| 12:55PM | 2 | PAGE, DO YOU SEE A REFERENCE TO BLACK DIAMOND VENTURES XII? |
| 12:55PM | 3 | A.   YES. |
| 12:55PM | 4 | Q.   AND DOES THAT INDICATE THAT YOU INVESTED ABOUT $925,000 IN |
| 12:55PM | 5 | CONNECTION WITH THIS INVESTMENT? |
| 12:55PM | 6 | A.   YES. |
| 12:55PM | 7 | Q.   AND I WANT TO SHOW YOU THE COVER PAGE JUST TO ORIENT YOU |
| 12:55PM | 8 | AS TO -- BECAUSE I THINK THERE ARE A FEW MORE ENTRIES ON HERE |
| 12:55PM | 9 | I'M GOING TO SHOW YOU. |
| 12:55PM | 10 | LET ME JUST SHOW YOU THE COVER PAGE OF THIS DOCUMENT. |
| 12:55PM | 11 | BRING IT UP ON THE SCREEN. |
| 12:55PM | 12 | DO YOU SEE THAT THIS IS, THIS IS THE STOCK PURCHASE |
| 12:55PM | 13 | AGREEMENT FROM THE SECOND HALF OF 2006; CORRECT? |
| 12:55PM | 14 | A.   CORRECT. |
| 12:55PM | 15 | Q.   AND THEN THERE'S A SERIES OF CLOSING DATES, DIFFERENT |
| 12:56PM | 16 | CLOSING DATES, FOR DIFFERENT CLOSING DATES THAT ARE ASSOCIATED |
| 12:56PM | 17 | WITH THIS STOCK PURCHASE? |
| 12:56PM | 18 | A.   YES. |
| 12:56PM | 19 | Q.   AND WHY IS THIS -- CAN YOU EXPLAIN WHY THERE ARE DIFFERENT |
| 12:56PM | 20 | CLOSING DATES? |
| 12:56PM | 21 | A.   GENERALLY IT'S BECAUSE A CERTAIN AMOUNT OF FUNDS HAVE COME |
| 12:56PM | 22 | IN DURING A PERIOD OF TIME AND THEY CLOSE ON THAT AMOUNT.   THEY |
| 12:56PM | 23 | WAIT FOR ANOTHER AMOUNT TO COME IN. |
| 12:56PM | 24 | AND IN THIS CASE USUALLY DOCUMENTS ALLOW FOR A 60-DAY |
| 12:56PM | 25 | CLOSING PERIOD, AND IT LOOKS LIKE THAT'S THE CASE HERE. |

LUCAS CROSS BY MR. DOWNEY                                    5486

12:56PM   1   Q.   OKAY.  SO LET'S GO BACK TO PAGE 91, WHERE WE WERE, THE

12:56PM   2   $925,000 INVESTMENT.

12:56PM   3        AND THAT'S IN CONNECTION WITH THE FIRST CLOSE ON

12:57PM   4   OCTOBER 13TH.

12:57PM   5        DO YOU SEE THAT?

12:57PM   6   A.   YES.

12:57PM   7   Q.   OKAY.  NOW I WANT YOU TO LOOK AT -- AND BY THE WAY,

12:57PM   8   BLACK DIAMOND VENTURES XII, DOES THAT CONSIST OF MONEY OF

12:57PM   9   INVESTORS WHO INVEST THROUGH BLACK DIAMOND VENTURES?

12:57PM  10   A.   CORRECT.

12:57PM  11   Q.   I WANT TO SHOW YOU PAGE 102 OF THE EXHIBIT AND BLOW THAT

12:57PM  12   UP.

12:57PM  13        AND DO YOU SEE THAT THERE'S ANOTHER REFERENCE -- WELL, DO

12:57PM  14   YOU SEE, FIRST OF ALL, IN THE TOP THAT THIS INDICATES THE THIRD

12:57PM  15   CLOSE IN NOVEMBER OF 2006?

12:57PM  16   A.   YES.

12:57PM  17   Q.   OKAY.  AND THAT UNDERNEATH THERE IT APPEARS THAT

12:57PM  18   BLACK DIAMOND VENTURES XII BOUGHT ANOTHER $425,000 SHARES IN

12:57PM  19   THIS OFFERING; CORRECT?

12:57PM  20   A.   CORRECT.

12:57PM  21   Q.   AND THE PURCHASE PRICE FOR THAT WAS A LITTLE UNDER

12:58PM  22   $1.2 MILLION; CORRECT?

12:58PM  23   A.   CORRECT.

12:58PM  24   Q.   AND THERE'S ANOTHER REFERENCE THERE TO

12:58PM  25   BLACK DIAMOND VENTURES 55, LLC.

5487

LUCAS CROSS BY MR. DOWNEY

12:58PM  1          DO YOU SEE THAT?

12:58PM  2     A.   YES.

12:58PM  3     Q.   IS THAT AN ENTITY THAT HAS SOME ASSOCIATION WITH YOUR

12:58PM  4     FIRM?

12:58PM  5     A.   YES.

12:58PM  6     Q.   AND CAN YOU EXPLAIN WHAT THAT IS?

12:58PM  7     A.   SO WE HAVE HAD AN INVESTOR, CRAIG HALL AND HIS GROUP, AND

12:58PM  8     WE ESTABLISHED A SEPARATE ENTITY FOR HIS AMOUNT.

12:58PM  9     Q.   I SEE.  WAS THAT OF HIS REQUEST?

12:58PM  10    A.   YES.

12:58PM  11    Q.   OKAY.  AND IT APPEARS THAT BLACK DIAMOND 55 INVESTED A

12:58PM  12    LITTLE UNDER $1,930,000.

12:58PM  13         DO YOU SEE THAT?

12:58PM  14    A.   YES.

12:58PM  15    Q.   AND THE INVESTOR, CRAIG HALL, WHO HAD THIS SEPARATE ENTITY

12:59PM  16    SET UP, HE IS SOMEONE WHO HAD BEEN INTRODUCED TO YOU BY YOUR

12:59PM  17    UNCLE; IS THAT RIGHT?

12:59PM  18    A.   NO.  INTRODUCED BY A MUTUAL FRIEND.

12:59PM  19    Q.   I SEE.  OKAY.

12:59PM  20         BUT THE INTRODUCTION WAS MADE AROUND THE POTENTIAL

12:59PM  21    INVESTMENT IN THERANOS?

12:59PM  22    A.   AROUND THAT TIME, YES.

12:59PM  23    Q.   OKAY.  SO YOU REALLY MET HIM IN CONNECTION WITH THERANOS?

12:59PM  24    A.   I DON'T RECALL IF IT WAS SPECIFICALLY BECAUSE OF THERANOS,

12:59PM  25    BUT IT CERTAINLY WAS AROUND THAT TIME.

LUCAS CROSS BY MR. DOWNEY                                          5488

12:59PM   1    Q.   OKAY.  BUT YOU CAME TO LEARN THAT HE WAS A VERY SUCCESSFUL

12:59PM   2    REAL ESTATE INVESTOR IN TEXAS; CORRECT?

12:59PM   3    A.   CORRECT.

12:59PM   4    Q.   AND THAT HE HAD A LOT OF EXPERIENCE IN INVESTMENT;

12:59PM   5    CORRECT?

12:59PM   6    A.   YES.

12:59PM   7    Q.   AND HE HAD BEEN, FOR EXAMPLE, AT ONE POINT THE LARGEST

12:59PM   8    SHAREHOLDER IN AMERICAN AIRLINES?

12:59PM   9    A.   AS I UNDERSTAND IT, YES.

12:59PM   10   Q.   BUT HE ALSO INVESTED IN A LOT OF REAL ESTATE ENTITIES,

12:59PM   11   HOTELS AND WINERIES, ET CETERA; CORRECT?

01:00PM   12   A.   CORRECT.

01:00PM   13   Q.   ALL RIGHT.  NOW, WERE THE INVESTORS IN BLACK DIAMOND XII,

01:00PM   14   THEY WERE INVESTORS WHO HAD BEEN LONG TIME INVESTORS IN OTHER

01:00PM   15   PROJECTS WITH BLACK DIAMOND?

01:00PM   16   A.   NOT NECESSARILY.  LARGELY TRUE, BUT BECAUSE WE HAVE

01:00PM   17   SEPARATE ENTITIES, THERE COULD HAVE BEEN SOME NEW INVESTORS IN

01:00PM   18   THAT ENTITY INVESTING WITH BLACK DIAMOND FOR THE FIRST TIME.

01:00PM   19   Q.   NOW, I SHOWED YOU A MOMENT AGO, AND WE WENT THROUGH IN

01:00PM   20   SOME DETAIL, THE -- A BUSINESS PLAN THAT MS. HOLMES HAD GIVEN

01:00PM   21   YOU IN CONNECTION WITH THERANOS.

01:00PM   22        DO YOU RECALL THAT?

01:00PM   23   A.   YES.

01:00PM   24   Q.   DID YOU TRANSMIT THAT BUSINESS PLAN TO BLACK DIAMOND XII

01:00PM   25   INVESTORS FOR PURPOSES OF THEIR EVALUATION OF AN INVESTMENT IN

LUCAS CROSS BY MR. DOWNEY                                          5489

01:00PM    1      THERANOS?

01:00PM    2      A.   I DON'T RECALL.

01:00PM    3      Q.   WHETHER YOU TRANSMITTED IT, THE ACTUAL DOCUMENT OR NOT,

01:01PM    4      DID YOU COMMUNICATE THE SUBSTANCE OF WHAT WAS IN THE DOCUMENT

01:01PM    5      TO BLACK DIAMOND XII INVESTORS?

01:01PM    6      A.   I WOULD THINK I WOULD HAVE SHARED SOME OF THE INFORMATION.

01:01PM    7      Q.   OKAY.  AND WHAT ABOUT WITH MR. HALL?  DID YOU SHARE THE

01:01PM    8      INFORMATION THAT WAS CONTAINED IN THE BUSINESS PLAN WITH

01:01PM    9      MR. HALL OR HIS REPRESENTATIVES?

01:01PM   10      A.   I CERTAINLY WOULD HAVE SPOKEN ABOUT WHAT WAS GOING ON AT

01:01PM   11      THERANOS.  I DON'T KNOW IF I SHARED THE DOCUMENT.

01:01PM   12      Q.   OKAY.  YOU DON'T RECALL ONE WAY OR THE OTHER?

01:01PM   13      A.   NOT RIGHT NOW, NO.

01:01PM   14      Q.   OKAY.  LET ME JUST TRY TO GET A SENSE OF THE MAGNITUDE OF

01:01PM   15      THE INVESTMENT AND REALLY SEPARATE THOSE INVESTMENTS OUT.

01:01PM   16           IT LOOKS LIKE BETWEEN THE CLOSE THAT YOU HAD INVESTED IN

01:01PM   17      OCTOBER FOR THE BLACK DIAMOND XII GROUP AND THE NOVEMBER CLOSE,

01:02PM   18      THAT THE INVESTMENT TOTALLED ABOUT A LITTLE BIT OVER

01:02PM   19      $2 MILLION.

01:02PM   20           IS THAT RIGHT?

01:02PM   21      A.   YES.  IF I'M REMEMBERING CORRECTLY, THE FIRST IS AROUND

01:02PM   22      900,000, AND THEN THIS, AND THAT WOULD TOTAL OVER 2 MILLION.

01:02PM   23      Q.   AND THE CLOSE THAT IS ASSOCIATED WITH BLACK DIAMOND LLC,

01:02PM   24      THAT'S THE ONLY CLOSE THAT THE HALL GROUP INVESTOR PARTICIPATED

01:02PM   25      IN; CORRECT?

                            UNITED STATES COURT REPORTERS
                                    **ER-9110**

LUCAS CROSS BY MR. DOWNEY                                    5490

| | | |
|---|---|---|
| 01:02PM | 1 | A.   YES. |
| 01:02PM | 2 | Q.   OKAY.  I WOULD LIKE YOU TO JUST GO BACK TO THE TEXT OF |
| 01:02PM | 3 | THIS DOCUMENT AND LOOK AT PAGES 14 AND 15. |
| 01:02PM | 4 |      I'LL DRAW YOUR ATTENTION TO SECTION 4. |
| 01:03PM | 5 |      AND DO YOU SEE THAT THESE ARE REPRESENTATIONS AND |
| 01:03PM | 6 | WARRANTIES THAT YOU WERE MAKING IN CONNECTION WITH |
| 01:03PM | 7 | PARTICIPATING IN THE INVESTMENT IN 2006? |
| 01:03PM | 8 | A.   YES. |
| 01:03PM | 9 | Q.   OKAY.  AND IF YOU TAKE A MOMENT TO JUST REVIEW THIS |
| 01:03PM | 10 | SECTION, YOU'LL RECOGNIZE IT AS SIMILAR TO A SECTION THAT |
| 01:03PM | 11 | MR. BOSTIC COVERED WITH YOU WHEN YOU WERE ON DIRECT |
| 01:03PM | 12 | EXAMINATION; IS THAT RIGHT? |
| 01:03PM | 13 | A.   YES. |
| 01:03PM | 14 | Q.   LET ME JUST DRAW YOUR ATTENTION FIRST TO SECTION 4.3. |
| 01:03PM | 15 |      AND THAT RELATES TO A REPRESENTATION THAT YOU MAKE ABOUT |
| 01:03PM | 16 | YOURSELF, CORRECT, IN TERMS OF YOUR QUALIFICATION TO EVALUATE |
| 01:03PM | 17 | AN INVESTMENT? |
| 01:03PM | 18 | A.   YES. |
| 01:03PM | 19 | Q.   AND YOU REPRESENTED THAT YOU HAD SUBSTANTIAL EXPERIENCE IN |
| 01:04PM | 20 | EVALUATING AND INVESTING IN PRIVATE PLACEMENT TRANSACTIONS OF |
| 01:04PM | 21 | SECURITIES AND COMPANIES SIMILAR TO THE COMPANY; CORRECT? |
| 01:04PM | 22 | A.   YES. |
| 01:04PM | 23 | Q.   AND THAT WAS CERTAINLY TRUE; CORRECT? |
| 01:04PM | 24 | A.   YES. |
| 01:04PM | 25 | Q.   OKAY.  BECAUSE THIS WAS -- YOU NOT ONLY HAD INVESTED, BUT |

LUCAS CROSS BY MR. DOWNEY                                              5491

| | | |
|---|---|---|
| 01:04PM | 1 | REALLY YOU WERE -- THIS WAS YOUR LIFE'S WORK?  YOU'RE A VENTURE |
| 01:04PM | 2 | CAPITALIST BY TRADE? |
| 01:04PM | 3 | A.   CORRECT. |
| 01:04PM | 4 | Q.   AND IN THE NEXT SECTION, WHICH IS SECTION 4.4, YOU |
| 01:04PM | 5 | REPRESENT YOUR -- THAT YOU UNDERSTAND THE SPECULATIVE NATURE OF |
| 01:04PM | 6 | THE INVESTMENT; CORRECT? |
| 01:04PM | 7 | A.   CORRECT. |
| 01:04PM | 8 | Q.   AND ALSO THAT IF THE INVESTMENT IS COMPLETELY LOST, THAT |
| 01:04PM | 9 | THAT'S SOMETHING THAT YOU CAN SUSTAIN; CORRECT? |
| 01:04PM | 10 | A.   CORRECT. |
| 01:04PM | 11 | Q.   AND THAT WOULD BE TRUE NOT ONLY FOR YOU, BUT FOR THOSE WHO |
| 01:04PM | 12 | INVESTED THROUGH YOU; CORRECT? |
| 01:04PM | 13 | A.   THAT'S RIGHT. |
| 01:04PM | 14 | Q.   AND LET ME DIRECT YOUR ATTENTION TO SECTION 4.5.  AND THIS |
| 01:05PM | 15 | IS ABOUT YOUR ACCESS TO DATA. |
| 01:05PM | 16 | AND YOU REPRESENT THAT YOU'VE HAD THE OPPORTUNITY TO ASK |
| 01:05PM | 17 | QUESTIONS OF AND RECEIVE ANSWERS FROM THE OFFICERS OF THE |
| 01:05PM | 18 | COMPANY CONCERNING THE AGREEMENTS, AND THEN IT LISTS THE |
| 01:05PM | 19 | VARIOUS SCHEDULES AND EXHIBITS AND SO FORTH, AND AS WELL AS THE |
| 01:05PM | 20 | COMPANY'S BUSINESS MANAGEMENT AND FINANCIAL AFFAIRS, WHICH |
| 01:05PM | 21 | QUESTIONS WERE ANSWERED TO ITS SATISFACTION. |
| 01:05PM | 22 | DO YOU SEE THAT? |
| 01:05PM | 23 | A.   YES. |
| 01:05PM | 24 | Q.   AND THAT WAS ALSO TRUE; CORRECT? |
| 01:05PM | 25 | A.   AS I STATED EARLIER, THERE CERTAINLY WOULD HAVE BEEN MORE |

                                                                              5492
LUCAS CROSS BY MR. DOWNEY

01:05PM   1    INFORMATION WE WOULD HAVE POTENTIALLY HAD LIKED, BUT WE DIDN'T

01:05PM   2    HAVE ACCESS TO IT, AND WE MADE THE DECISION TO INVEST.

01:05PM   3    Q.   OKAY.  BECAUSE AFTER ALL, YOU HAD THE OPPORTUNITY TO

01:06PM   4    REVIEW THAT LARGE DOCUMENT THAT WE WENT THROUGH AT SOME LENGTH

01:06PM   5    ABOUT WHAT THE COMPANY'S BUSINESS PLAN WAS; CORRECT?

01:06PM   6    A.   WELL, WE CERTAINLY REVIEWED IT.  THAT WOULDN'T NECESSARILY

01:06PM   7    BE SUFFICIENT, BUT CERTAINLY WE RELIED ON THE DOCUMENT AND THE

01:06PM   8    OTHER INFORMATION THAT WE RECEIVED FROM ELIZABETH.

01:06PM   9    Q.   EXCUSE ME.  I'M SORRY.

01:06PM   10        AND YOUR ASSESSMENT OF MANAGEMENT; CORRECT?

01:06PM   11   A.   YES.

01:06PM   12   Q.   AND SOME OF THE OTHER FACTORS WE DISCUSSED EARLIER?

01:06PM   13   A.   SURE.

01:06PM   14   Q.   OKAY.  NOW, I WANT TO ASK YOU TO GO FORWARD IN THE EXHIBIT

01:06PM   15   TO PAGE 116, AND WE'LL PUT IT UP ON THE SCREEN FOR EASE.

01:07PM   16        I THINK IT'S THE PAGE BEFORE THIS.  OH, NO, SORRY, IT IS

01:07PM   17   THIS PAGE.

01:07PM   18        COULD YOU BLOW UP THE SECTION ENTITLED SCHEDULE 3.8(B).

01:07PM   19        I'M SHOWING YOU A LATER PAGE IN 12 -- IN THIS STOCK

01:07PM   20   PURCHASE AGREEMENT FROM OCTOBER 2006.

01:07PM   21        AND DO YOU SEE THERE'S A REFERENCE HERE TO AN EVALUATION

01:07PM   22   AGREEMENT BETWEEN THERANOS AND SMITHKLINE BEECHAM?

01:07PM   23   A.   YES.

01:07PM   24   Q.   AND YOU RECOGNIZE SMITHKLINE BEECHAM AS A LEADING

01:07PM   25   PHARMACEUTICAL COMPANY; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                          5493

01:08PM   1     A.   YES.

01:08PM   2     Q.   AT THAT TIME ANY WAY; CORRECT?

01:08PM   3     A.   YES.

01:08PM   4     Q.   AND DID YOU REVIEW THE AGREEMENT THAT IS REFERENCED IN

01:08PM   5     SCHEDULE 3.8(B) PRIOR TO THE TIME THAT YOU HAD MADE AN

01:08PM   6     INVESTMENT?

01:08PM   7     A.   I WOULD THINK SO.  I JUST DON'T ABSOLUTELY RECALL.

01:08PM   8     Q.   OKAY.  WELL, DO YOU RECALL THAT THE ADDITIONAL RAISE PRIOR

01:08PM   9     TO THE END OF 2006 WAS BECAUSE THE COMPANY HAD HAD SUCCESS IN

01:08PM  10     CONNECTION WITH TRYING TO ESTABLISH RELATIONSHIPS WITH

01:08PM  11     PHARMACEUTICAL COMPANIES AND THAT IT WAS SEEKING FUNDS TO BUILD

01:08PM  12     FURTHER INFRASTRUCTURE TO PERFORM THOSE CONTRACTS?

01:08PM  13     A.   THAT WOULD MAKE SENSE.

01:08PM  14     Q.   LET ME ASK YOU TO JUST LOOK AT, IN YOUR BINDER, BUT DON'T

01:08PM  15     COMMENT ON IT AND I'M NOT GOING TO PUT IT ON THE SCREEN, AT

01:09PM  16     EXHIBIT 14111.

01:09PM  17          AND REALLY MY ONLY QUESTION ABOUT THIS DOCUMENT FOR YOU,

01:09PM  18     MR. LUCAS, IS WHETHER YOU RECALL EVER SEEING THIS DOCUMENT.

01:09PM  19     A.   I DON'T RECALL.

01:09PM  20     Q.   OKAY.  YOU CAN PUT THAT ASIDE.

01:09PM  21          LET ME JUST GO BACK FOR ONE MOMENT TO EXHIBIT A ON

01:10PM  22     PAGE 91, AND JUST -- I WANT TO PUT IT BACK UP FOR A MOMENT AND

01:10PM  23     HIGHLIGHT THE BLACK DIAMOND VENTURES XII INVESTMENT AMOUNT.

01:10PM  24          THIS IS THE DOCUMENT THAT WE LOOKED AT A MOMENT AGO WITH

01:10PM  25     THE $925,000 INVESTMENT.

LUCAS CROSS BY MR. DOWNEY                                              5494

| | | |
|---|---|---|
| 01:10PM | 1 | DO YOU SEE THAT? |
| 01:10PM | 2 | A.   YES. |
| 01:10PM | 3 | Q.   AND FOR $925,000 AT THIS STAGE, YOU ONLY GOT -- WELL, YOU |
| 01:10PM | 4 | GOT 328,000 SHARES. |
| 01:10PM | 5 | DO YOU SEE THAT? |
| 01:10PM | 6 | A.   YES. |
| 01:10PM | 7 | Q.   OKAY.  AND DO YOU RECALL THAT IN FEBRUARY, THE FEBRUARY |
| 01:10PM | 8 | RAISE WHEN YOU BOUGHT STOCK, YOU HAD PAID A LITTLE BIT LESS |
| 01:10PM | 9 | THAN A DOLLAR PER SHARE; RIGHT? |
| 01:10PM | 10 | A.   CORRECT. |
| 01:10PM | 11 | Q.   AND IN CONNECTION WITH THIS OCTOBER RAISE, YOU WERE PAYING |
| 01:10PM | 12 | A LITTLE BIT UNDER $3 A SHARE; CORRECT? |
| 01:10PM | 13 | A.   YES. |
| 01:10PM | 14 | Q.   AND DID THAT REFLECT THAT THERE WAS INCREASING VALUE IN |
| 01:11PM | 15 | THE COMPANY? |
| 01:11PM | 16 | A.   CORRECT. |
| 01:11PM | 17 | Q.   DO YOU KNOW IF THAT RELATED AT ALL TO WHAT THERANOS WAS |
| 01:11PM | 18 | DOING IN CONNECTION WITH THE PHARMACEUTICAL BUSINESS? |
| 01:11PM | 19 | A.   AFTER YOU SHOW ME -- YOU'VE SHOWN THE AGREEMENT HERE, I |
| 01:11PM | 20 | WOULD EXPECT -- |
| 01:11PM | 21 | Q.   MR. LUCAS, IF YOU DON'T RECOGNIZE THE DOCUMENT, DON'T, |
| 01:11PM | 22 | DON'T -- I DON'T WANT YOU TO TESTIFY ABOUT THINGS YOU DIDN'T |
| 01:11PM | 23 | KNOW AT THE TIME.  SO IF YOU DON'T RECOGNIZE IT, I DON'T WANT |
| 01:11PM | 24 | YOU TO DESCRIBE IT TO THE JURY BECAUSE IT WILL BE EVIDENCE IN |
| 01:11PM | 25 | THE CASE. |

LUCAS CROSS BY MR. DOWNEY                                        5495

01:11PM  1     A.   OH.  OKAY.

01:11PM  2     Q.   BUT IS IT TYPICALLY THE CASE THAT IF PHARMACEUTICAL

01:11PM  3     CONTRACTS ARE OBTAINED, IT CAN CONTRIBUTE TO INCREASING THE

01:11PM  4     VALUE OF THE COMPANY?

01:11PM  5     A.   YES.

01:11PM  6     Q.   DO YOU RECALL LEARNING THAT, SHORTLY AFTER YOU INVESTED IN

01:12PM  7     THE COMPANY, THAT THERANOS FINALIZED ANOTHER CONTRACT WITH A

01:12PM  8     PHARMACEUTICAL COMPANY?

01:12PM  9     A.   THIS IS THE 2006?

01:12PM  10    Q.   YES, YES.  AND I'M REFERRING TO THE SECOND INVESTMENT IN

01:12PM  11    2006.

01:12PM  12    A.   GOT IT.

01:12PM  13    Q.   OCTOBER, NOVEMBER CLOSE.

01:12PM  14    A.   GOT IT.

01:12PM  15    Q.   OKAY.  DO YOU RECALL LEARNING THAT THEY HAD OBTAINED

01:12PM  16    ANOTHER PHARMACEUTICAL CONTRACT?

01:12PM  17    A.   I BELIEVE THAT THERE WERE MULTIPLE COMPANIES THAT THERANOS

01:12PM  18    WAS WORKING FOR, BUT I DON'T RECALL THE NAMES.

01:12PM  19    Q.   OKAY.  AND YOU DON'T RECALL THE DRUGS THAT THERANOS WAS

01:12PM  20    INVOLVED IN, IN EVALUATING IN THOSE PROJECTS, DO YOU?

01:12PM  21    A.   NOT NOW, NO.

01:12PM  22    Q.   OKAY.  YOU THINK YOU MAY HAVE BEEN TOLD AT THE TIME, BUT

01:12PM  23    YOU DON'T RECALL NOW?

01:12PM  24    A.   CORRECT.

01:12PM  25    Q.   OKAY.  ALL RIGHT.  SO AFTER THE INVESTMENT IN THE LATTER

LUCAS CROSS BY MR. DOWNEY                                              5496

01:13PM  1    HALF OF 2006, I THINK YOU DESCRIBED THAT YOU WOULD STAY IN

01:13PM  2    TOUCH WITH MS. HOLMES ABOUT THE COMPANY PERIODICALLY AND GET

01:13PM  3    UPDATES ON THE COMPANY; CORRECT?

01:13PM  4    A.   CORRECT.

01:13PM  5    Q.   DO YOU RECALL THAT YOU WERE ACTUALLY ASKED TO REVIEW THE

01:13PM  6    FINANCIAL INFORMATION OF THE COMPANY AND PREPARE REVENUE MODELS

01:13PM  7    GOING FORWARD FOR THE COMPANY SHORTLY AFTER THIS 2006

01:14PM  8    INVESTMENT?

01:14PM  9    A.   I DON'T RECALL.

01:14PM  10   Q.   OKAY.  LET ME ASK YOU TO LOOK AT AN EXHIBIT, AND THE

01:14PM  11   NUMBER IN YOUR NOTEBOOK WILL BE, THE BLACK NOTEBOOK AGAIN,

01:14PM  12   12051.

01:14PM  13   A.   OKAY.

01:14PM  14   Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES

01:14PM  15   RELATED TO THERANOS IN 2007?

01:14PM  16   A.   YES.

01:14PM  17   Q.   OKAY.

01:14PM  18        YOUR HONOR, I MOVE THE ADMISSION OF 12051.

01:14PM  19             MR. BOSTIC:  NO OBJECTION.

01:14PM  20             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:14PM  21        (DEFENDANT'S EXHIBIT 12051 WAS RECEIVED IN EVIDENCE.)

01:14PM  22   BY MR. DOWNEY:

01:14PM  23   Q.   I'M SHOWING YOU AT THE TOP THAT THIS IS AN EMAIL IN JUNE

01:15PM  24   OF 2007 BETWEEN -- WHICH WAS SENT FROM YOU TO MS. HOLMES;

01:15PM  25   CORRECT?

LUCAS CROSS BY MR. DOWNEY                                                5497

01:15PM   1      A.    YES.

01:15PM   2      Q.    AND IN THE BODY OF THE EMAIL YOU SAY, "ELIZABETH.

01:15PM   3            "ATTACHED IS THE LATEST SPREADSHEET WHICH SHOWS THREE

01:15PM   4      SCENARIOS OF CASH PAYMENTS.  SPECIFICALLY, THEY ARE AN ADVANCE

01:15PM   5      OF ONE MONTH'S PAYMENT, TWO MONTH'S PAYMENT, THREE MONTH'S

01:15PM   6      PAYMENT.  THE RESULTS ARE SHOWN AT THE BOTTOM OF THE

01:15PM   7      SPREADSHEET.  USING A THREE MONTH ADVANCE PAYMENT TERM, WE DO

01:15PM   8      ACHIEVE CASH BREAKEVEN BY THE END OF THIS YEAR."

01:15PM   9            DO YOU SEE THAT?

01:15PM  10      A.    YES.

01:15PM  11      Q.    AND IS THIS IN CONNECTION WITH YOUR PREPARATION OF A

01:15PM  12      SPREADSHEET THAT WILL REFLECT A MODEL ANTICIPATING WHAT

01:15PM  13      THERANOS'S REVENUE WOULD BE GOING FORWARD?

01:15PM  14      A.    YES.  IT CERTAINLY APPEARS THAT I WAS TRYING TO HELP OUT

01:15PM  15      AND I PUT SOMETHING TOGETHER THAT WE COULD ALL REVIEW.

01:16PM  16      Q.    AND LET ME JUST ASK YOU TO LOOK AT THE ATTACHMENT.  AND I

01:16PM  17      DON'T NECESSARILY WANT TO SHOW YOU THIS IN -- ON A

01:16PM  18      MONTH-BY-MONTH BASIS, BUT I WANT TO GET A SENSE OF HOW THIS WAS

01:16PM  19      ANALYZING THERANOS'S BUSINESS.

01:16PM  20            DO YOU SEE ON THE LEFT-HAND COLUMN THE -- I'VE EXCERPTED

01:16PM  21      THE TOP HALF OF THE PAGE, WHICH IS REVENUE.

01:16PM  22            DO YOU SEE THAT?

01:16PM  23      A.    YES.

01:16PM  24      Q.    AND DO YOU SEE THAT THERE APPEAR TO BE DIFFERENT ITEMS

01:16PM  25      THAT IT'S ANTICIPATED WILL GENERATE REVENUE.

LUCAS CROSS BY MR. DOWNEY                                          5498

```
01:16PM   1            DO YOU SEE THAT?

01:16PM   2       A.   YES.

01:16PM   3       Q.   ONE OF THOSE IS READERS, ONE OF THEM IS CARTRIDGES, AND

01:16PM   4       ONE OF THEM IS DATABASE.

01:16PM   5            DO YOU SEE THAT?

01:16PM   6       A.   YES.

01:16PM   7       Q.   AND THAT'S A REFERENCE TO THE FACT THAT THERANOS HAD

01:17PM   8       DIFFERENT COMPONENTS TO ITS TECHNOLOGY; CORRECT?

01:17PM   9       A.   CORRECT.

01:17PM  10       Q.   AND THE READERS ARE THE ANALYZERS THAT YOU'VE BEEN TALKING

01:17PM  11       ABOUT; CORRECT?

01:17PM  12       A.   YES.

01:17PM  13       Q.   AND THE CARTRIDGES WERE THE TECHNOLOGY THAT CONTAIN THE

01:17PM  14       ASSAYS; CORRECT?

01:17PM  15       A.   CORRECT.

01:17PM  16       Q.   AND THEN WE DIDN'T TALK ABOUT THIS BEFORE, BUT ANOTHER

01:17PM  17       ELEMENT OF ITS TECHNOLOGY WAS ITS DATABASE; CORRECT?

01:17PM  18       A.   YES, YOU WERE ANNOUNCING THAT.  I HADN'T RECOLLECTED IT.

01:17PM  19       Q.   I AGREE.  BUT THAT IS CORRECT, ISN'T IT?  LET ME ASK --

01:17PM  20       A.   IT'S CORRECT THAT THAT IS HERE.

01:17PM  21       Q.   YEAH, YEAH.  A DATABASE WAS A TECHNOLOGY THAT THERANOS WAS

01:17PM  22       WORKING ON IN THE PERIOD BETWEEN 2006 AND 2013.

01:17PM  23            DO YOU RECALL -- DO YOU KNOW THAT ONE WAY OR ANOTHER?

01:17PM  24       A.   IN THINKING IT WAS AS -- YES, AS THEY WOULD AMASS THE DATA

01:18PM  25       INFORMATION, THEY COULD PUT IT IN A DATABASE SO THEY COULD
```

LUCAS CROSS BY MR. DOWNEY                                        5499

01:18PM   1      CROSS REFERENCE AND SO FORTH.

01:18PM   2      Q.   OKAY.  THEY WANTED TO BE ABLE TO PERFORM CERTAIN WHAT THEY

01:18PM   3      CALLED ANALYTICS IN CONNECTION WITH PEOPLE'S HEALTH; RIGHT?

01:18PM   4      A.   YES.

01:18PM   5      Q.   SO THE MORE DATA THEY COMPILED ABOUT A PERSON, THE MORE

01:18PM   6      THEY THOUGHT THEY COULD ANALYZE WHAT MIGHT OR MIGHT NOT BE

01:18PM   7      HELPFUL IN TREATMENT OF THAT PERSON; CORRECT?

01:18PM   8      A.   CORRECT.

01:18PM   9      Q.   IN PROJECTING THE REVENUE THAT IS CONTAINED HERE, WHICH

01:18PM  10      LOOKS TO BE FOR CERTAIN MONTHS OF 2008, DO YOU KNOW WHAT YOU

01:18PM  11      WERE REVIEWING TO COMPLETE THIS MODEL?

01:18PM  12      A.   I MEAN WHAT I USED TO HELP OUT?

01:18PM  13      Q.   YES.  LET ME ASK IT DIFFERENT.  LET ME ASK IT IN A CLEARER

01:18PM  14      WAY FOR YOU.

01:18PM  15          WHAT DOCUMENT DID YOU USE TO PREPARE THE MODEL THAT IS

01:19PM  16      PART OF EXHIBIT 12051?

01:19PM  17      A.   I DON'T REMEMBER.

01:19PM  18      Q.   OKAY.  LET ME ASK YOU TO JUST LOOK AT 12052, WHICH SHOULD

01:19PM  19      BE THE NEXT DOCUMENT IN YOUR NOTEBOOK.

01:19PM  20      A.   OKAY.

01:19PM  21      Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES

01:19PM  22      FROM JULY OF 2007 RELATED TO THERANOS'S BUSINESS?

01:19PM  23      A.   YES.

01:19PM  24      Q.   OKAY.

01:19PM  25          YOUR HONOR, I MOVE THE ADMISSION OF 12052.

LUCAS CROSS BY MR. DOWNEY                                              5500

01:19PM  1                  MR. BOSTIC:  NO OBJECTION.

01:19PM  2                  THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

01:20PM  3                  MR. DOWNEY:  12052.

01:20PM  4            (DEFENDANT'S EXHIBIT 12052 WAS RECEIVED IN EVIDENCE.)

01:20PM  5       BY MR. DOWNEY:

01:20PM  6       Q.   AND THIS IS A DOCUMENT CONSISTING OF REALLY ONLY ONE EMAIL

01:20PM  7       AND ATTACHMENT.

01:20PM  8            DO YOU SEE THIS IS AN EMAIL THAT YOU SENT TO MS. HOLMES IN

01:20PM  9       JULY OF 2007 WITH THE SUBJECT THERANOS MODELS?

01:20PM  10      A.   YES.

01:20PM  11      Q.   AND DO YOU SEE IN THE BODY OF THE EMAIL YOU TOLD HER THAT

01:20PM  12      YOU WERE ATTACHING TWO CURRENT MODELS; CORRECT?

01:20PM  13      A.   YES.

01:20PM  14      Q.   AND ONE OF THE MODELS WAS LABELLED REV. 9 (EXPECTED).

01:20PM  15           DO YOU SEE THAT?

01:20PM  16      A.   YES.

01:20PM  17      Q.   AND ONE WAS LABELLED REV. 10 (CAPACITY).

01:20PM  18           DO YOU SEE THAT?

01:20PM  19      A.   YES.

01:20PM  20      Q.   AND DO YOU KNOW WHAT -- CAN YOU EXPLAIN WHAT THAT MEANS TO

01:20PM  21      US?

01:20PM  22      A.   AT THIS POINT I CAN'T.

01:20PM  23      Q.   OKAY.

01:20PM  24      A.   I JUST CAN'T RECOLLECT.

01:20PM  25      Q.   OKAY.  LET ME ASK YOU TO LOOK AT THE ATTACHMENT, AND

                                                                              5501
LUCAS CROSS BY MR. DOWNEY

01:21PM   1      THERE'S A LONG SERIES OF PAGES THAT SEEM TO CONTAIN SOME

01:21PM   2      FINANCIAL DATA.

01:21PM   3          DO YOU SEE THAT?

01:21PM   4          ON THE SCREEN I'M ACTUALLY PUTTING IT UP IN NATIVE FORMAT.

01:21PM   5          DO YOU SEE THAT, MR. LUCAS?

01:21PM   6      A.   WHAT DO YOU MEAN BY "NATIVE"?

01:21PM   7      Q.   I'M DISPLAYING IT AS A SPREADSHEET AS IT WOULD LOOK

01:21PM   8      ONLINE, WHEREAS IN YOUR NOTEBOOK I HAVE ACTUALLY PRINTED THE

01:21PM   9      PAGES OUT.

01:21PM   10     A.   YEAH.

01:21PM   11     Q.   AND THIS SPREADSHEET IS A SPREADSHEET THAT IS -- LOOKS

01:21PM   12     LIKE OTHER MODELS THAT YOU HAVE CREATED TO PROJECT THE REVENUE

01:21PM   13     OF BUSINESSES; CORRECT?

01:21PM   14     A.   YES.  I'M -- I DON'T KNOW THAT WE, BLACK DIAMOND,

01:22PM   15     DEVELOPED THIS MODEL.

01:22PM   16     Q.   OKAY.

01:22PM   17     A.   IT ACTUALLY IS QUITE A GOOD MODEL IT SEEMS, SO I'M --

01:22PM   18     Q.   YOU'RE ESPECIALLY MODEST.  MAYBE YOU DID DEVELOP IT.

01:22PM   19     A.   NO.  I'M LOOKING AT THE TABS DOWN BELOW AND I DON'T THINK

01:22PM   20     THAT WE PREPARED THIS.

01:22PM   21     Q.   OKAY.  WELL, DID YOU FORM AN IMPRESSION AT SOME POINT THAT

01:22PM   22     THE FINANCIAL EXPERTISE WITHIN THERANOS NEEDED SOME HELP?

01:22PM   23     A.   CERTAINLY INITIALLY WITH THE OTHER.

01:22PM   24         I DON'T KNOW IF THIS -- I'M TRYING TO REMEMBER IF THIS IS

01:22PM   25     A YEAR PAST THE OTHER MODEL.  I'M JUST FORGETTING AS -- YOU

LUCAS CROSS BY MR. DOWNEY                                                    5502

01:22PM   1     SHOWED IT.

01:22PM   2     Q.   YEAH.

01:22PM   3     A.   BUT THIS LOOKS LIKE THIS COULD HAVE BEEN AN INTERNALLY

01:22PM   4     PREPARED MODEL.

01:22PM   5     Q.   OKAY.  IF YOU LOOK BACK AT EXHIBIT 12051, THAT LOOKS LIKE

01:22PM   6     IT'S FROM -- IF YOU LOOK AT THE -- JUST THE EMAIL.

01:23PM   7     A.   YES.

01:23PM   8     Q.   YEAH.  THIS APPEARS TO BE FROM JUNE OF 2007.

01:23PM   9          DO YOU SEE THAT?

01:23PM   10    A.   YES.

01:23PM   11    Q.   AND THEN IF YOU LOOK AT 12052 AND WE LOOK AT THAT, THAT

01:23PM   12    APPEARS TO BE FROM JULY OF 2007?

01:23PM   13    A.   YES.

01:23PM   14    Q.   AND REVIEWING THIS TODAY WITHOUT RECALLING IT, DOES IT

01:23PM   15    APPEAR TO BE SOMETHING THAT IS TRYING TO PROJECT THE EXPECTED

01:23PM   16    REVENUE OF THERANOS AND THE CAPACITY TO GENERATE REVENUE THAT

01:23PM   17    THERANOS HAD?

01:23PM   18    A.   YES, WHOEVER PREPARED THEM, YES.

01:23PM   19    Q.   I UNDERSTAND.

01:23PM   20         LET ME ASK YOU TO LOOK AT EXHIBIT 12054.

01:24PM   21    A.   YES, I HAVE IT.

01:24PM   22    Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES

01:24PM   23    CONCERNING THERANOS'S BUSINESS IN AUGUST OF 2007?

01:24PM   24    A.   YES.

01:24PM   25    Q.   OKAY.

LUCAS CROSS BY MR. DOWNEY                                              5503

01:24PM   1           YOUR HONOR, I MOVE THE ADMISSION OF EXHIBIT 12054.

01:24PM   2                MR. BOSTIC:  NO OBJECTION.

01:24PM   3                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:24PM   4           (DEFENDANT'S EXHIBIT 12054 WAS RECEIVED IN EVIDENCE.)

01:24PM   5    BY MR. DOWNEY:

01:24PM   6    Q.   LET ME ASK YOU TO LOOK AT THE BOTTOM EMAIL, WHICH MAYBE WE

01:24PM   7    CAN BREAK THAT OUT AND MOVE IT UP A LITTLE SO THAT EVERYONE CAN

01:25PM   8    SEE FROM THEIR LOCATIONS.

01:25PM   9           DO YOU SEE THERE'S AN EMAIL FROM MS. HOLMES IN JULY SAYING

01:25PM  10    "RUCHITA MENTIONS SHE HAS BEEN FOLLOWING UP WITH YOU.  I HAVE

01:25PM  11    NOT YET FOLLOWED UP WITH DON BUT WILL DO SO FRIDAY"?

01:25PM  12           AND THEN SHE TALKED ABOUT FOLLOWING UP ON A GO FORWARD

01:25PM  13    PLAN AND THAT SHE'S CONTINUING HARD CORE ON IMPLEMENTING OUR

01:25PM  14    PLAN.

01:25PM  15           I ASSUME DON IN THAT EMAIL IS A REFERENCE TO YOUR UNCLE?

01:25PM  16    A.   YES.

01:25PM  17    Q.   WAS RUCHITA THE INTERNAL FINANCE PERSON AT THERANOS?

01:25PM  18    A.   YOU'RE CERTAINLY TAKING ME DOWN MEMORY LANE WITH SOME OF

01:25PM  19    THE NAMES.  AND WE'RE GOING THROUGH HERE, AND I'M SEEING THEM

01:25PM  20    AND I'M GOING, OH, MY GOSH, I FORGOT THAT PERSON.

01:25PM  21           YES, SHE WAS INTERNAL TO THE COMPANY IN THE FINANCE

01:25PM  22    DEPARTMENT.

01:26PM  23    Q.   AND SHE WAS SOMEBODY WHO YOU DEALT WITH IN CONNECTION WITH

01:26PM  24    FINANCIAL INFORMATION FROM THERANOS?

01:26PM  25    A.   YES.

LUCAS CROSS BY MR. DOWNEY                                                    5504

01:26PM   1      Q.   AND RUCHITA SINGAL, WAS THAT HER FULL NAME?

01:26PM   2      A.   SURE.  I'M SORRY.

01:26PM   3      Q.   LET'S LOOK AT THE TOP EMAIL.

01:26PM   4           THIS IS A RESPONSE FROM YOU TO MS. HOLMES, CORRECT, IN

01:26PM   5      AUGUST?

01:26PM   6      A.   YES.

01:26PM   7      Q.   AND YOU INDICATE, "YESTERDAY, I SPOKE WITH RUCHITA AND

01:26PM   8      SEPARATELY I SPOKE WITH DON ABOUT THE PROJECTIONS.  WITH THE

01:26PM   9      LATEST REVISIONS, WE ARE IN AGREEMENT THAT THEY PROPERLY

01:26PM  10      REPRESENT THERANOS'S FINANCIAL FORECAST BASED UPON OUR

01:26PM  11      DISCUSSIONS AND ASSUMPTIONS.  I'VE REALLY ENJOYED WORKING

01:26PM  12      THROUGH THE PROCESS WITH RUCHITA."

01:26PM  13           DO YOU KNOW WHAT THE PROCESS IS THAT YOU'RE DESCRIBING

01:27PM  14      HERE AFTER HAVING HAD THE BENEFIT OF REVIEWING THESE DOCUMENTS?

01:27PM  15      A.   JUST -- I WOULD THINK REFINING THE MODEL.

01:27PM  16      Q.   AND WHEN YOU SAY "THE MODEL," DO YOU MEAN THE MODEL THAT

01:27PM  17      WOULD BE USED TO PROJECT FUTURE REVENUES OF THE COMPANY?

01:27PM  18      A.   YES.  TAKING WHAT THE COMPANY WOULD HAVE THOUGHT AND

01:27PM  19      PUTTING IT INTO A PROJECTION IN READABLE FORMAT.

01:27PM  20      Q.   YOU WOULD LOOK, FOR EXAMPLE, AT THE CONTRACTS THAT THE

01:27PM  21      COMPANY HAD?

01:27PM  22      A.   NO, I DON'T BELIEVE SO.  IT WAS, IT WAS -- WE WOULD TALK

01:27PM  23      ABOUT THE NUMBERS AND THEN MAKE SURE THAT THE MODEL ACCURATELY

01:28PM  24      REPRESENTED WHAT WAS -- WHAT THEY EXPECTED.

01:28PM  25      Q.   OKAY.  AND YOU WORKED ON THAT PROCESS WITH MS. HOLMES I

LUCAS CROSS BY MR. DOWNEY                                          5505

01:28PM  1     PRESUME?

01:28PM  2     A.   I JUST DON'T REMEMBER WHO.  I KNOW THERE WAS CERTAINLY A

01:28PM  3     BACK AND FORTH EXCHANGE.

01:28PM  4     Q.   OKAY.

01:28PM  5     A.   BUT AS IT SAYS HERE IT WAS WITH RUCHITA THAT I SPENT TIME

01:28PM  6     WITH.

01:28PM  7     Q.   NOW, THERE'S A REFERENCE TO YOUR UNCLE AND TALKING TO HIM

01:28PM  8     ABOUT THE PROJECTIONS.

01:28PM  9         AT THE TIME OF YOUR 2006 INVESTMENT AND UNTIL THE TIME

01:28PM  10    THAT HE STEPPED BACK FROM THE COMPANY, WERE YOU IN REGULAR

01:28PM  11    TOUCH WITH HIM ABOUT THE COMPANY?

01:28PM  12    A.   YES.

01:28PM  13    Q.   AND DO YOU RECALL HEARING FROM HIM THAT THE COMPANY WAS

01:29PM  14    DOING WELL?

01:29PM  15    A.   YES.

01:29PM  16    Q.   AND DO YOU RECALL HEARING FROM HIM AT A CERTAIN POINT THAT

01:29PM  17    THE COMPANY WAS EXPLORING TRYING TO TAKE ITS TECHNOLOGY INTO

01:29PM  18    RETAIL STORES?

01:29PM  19         DO YOU RECALL TALKING TO HIM ABOUT THAT?

01:29PM  20            MR. BOSTIC:  HEARSAY, YOUR HONOR.

01:29PM  21            MR. DOWNEY:  WELL, I --

01:29PM  22            THE COURT:  YOU'RE JUST ASKING HIM IF HE RECALLS?

01:29PM  23            MR. DOWNEY:  YEAH, I'M JUST ASKING IF HE RECALLS.

01:29PM  24    I'M TRYING TO ORIENT HIM.

01:29PM  25            THE COURT:  YOU CAN ANSWER THE QUESTION, SIR, IF YOU

LUCAS CROSS BY MR. DOWNEY                                              5506

01:29PM  1    RECALL SPEAKING WITH YOUR UNCLE ABOUT THAT?

01:29PM  2            THE WITNESS:  CERTAINLY AS IT BECAME CLOSER WE WOULD

01:29PM  3    HAVE HAD CONVERSATIONS.

01:29PM  4        I DON'T REMEMBER AT THIS TIME.  EXCUSE ME.  I DON'T

01:29PM  5    REMEMBER AT THIS TIME THE CONVERSATIONS.

01:29PM  6    BY MR. DOWNEY:

01:29PM  7    Q.   OKAY.  LET ME ASK YOU, YOU LOOKED ON YOUR DIRECT

01:30PM  8    EXAMINATION AT DOCUMENTS FROM LATE 2013 AND THE INVESTMENT THAT

01:30PM  9    YOU MADE THEN.

01:30PM  10       DO YOU RECALL THAT?

01:30PM  11   A.   YES.

01:30PM  12   Q.   AND YOU KNOW THAT BY LATE 2013 YOU KNEW THAT THERANOS WAS

01:30PM  13   IN A PARTNERSHIP WITH WALGREENS; CORRECT?

01:30PM  14   A.   CORRECT.

01:30PM  15   Q.   WHAT I'M TRYING TO ORIENT US TOWARDS IS WHEN DID YOU FIRST

01:30PM  16   LEARN THERE WAS A PARTNERSHIP BETWEEN WALGREENS AND THERANOS?

01:30PM  17   A.   I DON'T REMEMBER.

01:30PM  18   Q.   DO YOU RECALL IF IT WAS YEARS BEFORE THE DECEMBER '13

01:30PM  19   INVESTMENT OR JUST A MATTER OF MONTHS?

01:30PM  20   A.   I DON'T RECALL.  IF I HAD TO THINK ABOUT IT, IT WOULD HAVE

01:30PM  21   BEEN SHORTLY BEFORE THAT THEY HAD AN AGREEMENT.

01:30PM  22   Q.   OKAY.  DID YOU LEARN AT SOME POINT THAT WALGREENS HAD ALSO

01:30PM  23   ENTERED INTO AN AGREEMENT WITH SAFEWAY?

01:30PM  24   A.   I'M SORRY, ASK AGAIN.

01:30PM  25   Q.   DID YOU LEARN AT SOME POINT THAT THERANOS HAD ALSO ENTERED

LUCAS CROSS BY MR. DOWNEY                                           5507

01:30PM  1      INTO AN AGREEMENT WITH SAFEWAY?

01:31PM  2      A.   OH, YES.

01:31PM  3      Q.   OKAY.  AND DO YOU REMEMBER WHEN YOU LEARNED THAT?

01:31PM  4      A.   I DON'T.

01:31PM  5      Q.   DO YOU RECALL HOW YOU LEARNED THAT?

01:31PM  6      A.   I DON'T.

01:31PM  7      Q.   DO YOU RECALL THAT YOUR UNCLE HAD INTRODUCED THERANOS TO

01:31PM  8      SAFEWAY?

01:31PM  9      A.   I DON'T KNOW WHO MADE THE INTRODUCTION.  I KNOW AT SOME

01:31PM 10      POINT THAT DON KNEW SOMEBODY AT SAFEWAY, ONE OF THE EXECUTIVES.

01:31PM 11      Q.   ALL RIGHT.  NOW, I THINK YOU TESTIFIED THAT AT A CERTAIN

01:31PM 12      POINT YOUR UNCLE STEPPED DOWN AS CHAIRMAN OF THE BOARD OF

01:31PM 13      THERANOS; CORRECT?

01:31PM 14      A.   YES.

01:31PM 15      Q.   AND HE WAS SUCCEEDED IN THAT POSITION BY GEORGE SHULTZ;

01:31PM 16      CORRECT?

01:31PM 17      A.   I DON'T REMEMBER.

01:31PM 18      Q.   OKAY.  YOU ARE AWARE AT SOME POINT THAT MR. SHULTZ BECAME

01:31PM 19      THE CHAIRMAN OF THERANOS'S BOARD?

01:32PM 20      A.   YES.

01:32PM 21      Q.   AND WAS PART OF THE REASON THAT YOUR UNCLE STEPPED BACK

01:32PM 22      WAS A HEALTH REASON?

01:32PM 23      A.   CORRECT.

01:32PM 24      Q.   AND AFTER HE STEPPED BACK, YOU WOULD STILL INTERACT WITH

01:32PM 25      MS. HOLMES OCCASIONALLY ABOUT THE COMPANY; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                              5508

01:32PM  1    A.   CORRECT.

01:32PM  2    Q.   BUT YOU LEARNED AT LEAST AT SOME POINT IN 2013 THAT

01:32PM  3    THERANOS HAD ENTERED INTO A RETAIL AGREEMENT WITH WALGREENS; IS

01:32PM  4    THAT RIGHT?

01:32PM  5    A.   YES.

01:32PM  6    Q.   AND THAT WAS GOOD NEWS; RIGHT?

01:32PM  7    A.   GREAT NEWS.

01:32PM  8    Q.   AND THAT WAS BECAUSE -- TELL US WHY IT WAS GREAT NEWS?

01:32PM  9    A.   WELL, AS I SAID EARLIER, IT MEANS THAT THE TECHNOLOGY WAS

01:32PM 10    NOW READY TO BE ROLLED OUT IN A COMMERCIAL ENDEAVOR, AND

01:32PM 11    OBVIOUSLY THAT MEANS MORE REVENUE FOR THE COMPANY, MORE VALUE

01:32PM 12    FOR THE COMPANY, AND THAT WE WERE IN A REAL BUSINESS.

01:33PM 13    Q.   SO YOU HAD INVESTED IN THE COMPANY SEVEN YEARS BEFORE;

01:33PM 14    CORRECT?

01:33PM 15    A.   CORRECT.

01:33PM 16    Q.   AND YOU HAD INVESTED WHEN STOCK WAS, INITIALLY WHEN IT WAS

01:33PM 17    LESS THAN A DOLLAR A SHARE; CORRECT?

01:33PM 18    A.   YES.

01:33PM 19    Q.   AND THEN YOU MADE AN ADDITIONAL INVESTMENT WHEN IT WAS A

01:33PM 20    LITTLE UNDER $3 A SHARE; CORRECT?

01:33PM 21    A.   CORRECT.

01:33PM 22    Q.   AND IN LATE 2013 YOU WERE INFORMED THAT THERE WOULD BE

01:33PM 23    ANOTHER OPPORTUNITY TO INVEST IN THE COMPANY; CORRECT?

01:33PM 24    A.   CORRECT.

01:33PM 25    Q.   LET ME TAKE YOU BACK TO EXHIBIT 5143, WHICH WAS ADMITTED

LUCAS CROSS BY MR. DOWNEY                                          5509

01:33PM   1      BY -- ON YOUR DIRECT EXAMINATION.

01:33PM   2           SO THIS WOULD BE IN YOUR WHITE NOTEBOOK, BUT WE'LL ALSO

01:33PM   3      DISPLAY IT ON THE SCREEN.

01:34PM   4           YOU CAN GO TO THE BOTTOM OF PAGE 1.  AND I'M JUST SHOWING

01:34PM   5      YOU THAT THIS APPEARS TO BE AN EMAIL THAT WAS SENT FROM

01:34PM   6      THERANOS TO YOU.

01:34PM   7           DO YOU SEE THAT?

01:34PM   8      A.   YES.

01:34PM   9      Q.   AND THAT WAS ON DECEMBER 15TH, 2013; CORRECT?

01:34PM  10      A.   YES.

01:34PM  11      Q.   AND THEN IF WE LOOK AT THE SECOND PAGE OF THE DOCUMENT, DO

01:34PM  12      YOU SEE THAT THIS IS TELLING YOU THAT THERE'S A MEMO ABOUT

01:34PM  13      CERTAIN DEALS AND TRANSACTIONS THAT THE COMPANY IS GOING TO

01:34PM  14      CLOSE BY YEAREND.

01:34PM  15           DO YOU SEE THAT?

01:34PM  16      A.   YES.

01:34PM  17      Q.   AND IF YOU GO BENEATH THAT, YOU ACTUALLY SEE THE MEMO;

01:34PM  18      CORRECT?

01:34PM  19      A.   YES.

01:35PM  20      Q.   OKAY.  AND DO YOU SEE THE FIRST PARAGRAPH DESCRIBES NEWS

01:35PM  21      ABOUT THE LAUNCH AND OTHER PUBLIC NEWS ABOUT THE COMPANY.

01:35PM  22           DO YOU SEE THAT?

01:35PM  23      A.   YES.

01:35PM  24      Q.   AND THEN IN THE SECOND PARAGRAPH IT SAYS IN THE FIRST

01:35PM  25      SENTENCE OF THE SECOND PARAGRAPH IT SAYS, "AS PART OF THIS

LUCAS CROSS BY MR. DOWNEY                                          5510

01:35PM   1   INITIATIVE, WE ARE COMPLETING A SERIES OF FINANCIAL

01:35PM   2   TRANSACTIONS WITH STRATEGIC PARTNERS THAT PROVIDE ACCESS TO

01:35PM   3   ADDITIONAL CAPITAL IN ORDER TO ACCELERATE OUR GROWTH."

01:35PM   4        DO YOU SEE THAT?

01:35PM   5   A.   YES.

01:35PM   6   Q.   AND IN REFERRING TO STRATEGIC PARTNERS, DID YOU UNDERSTAND

01:35PM   7   THAT THAT WAS LIKELY A REFERENCE TO, AMONG OTHERS, WALGREENS?

01:35PM   8   A.   WHAT WAS THE DATE OF THIS, THIS COMMUNICATION?

01:35PM   9   Q.   WELL, IF YOU RECALL AT THE TOP OF EXHIBIT 5143, DO YOU

01:36PM  10   RECALL THAT IT WAS DECEMBER 15TH OF 2013?

01:36PM  11   A.   SO THEN THE ANSWER WOULD BE YES.

01:36PM  12   Q.   OKAY.  AND THIS MEMO IS TELLING YOU AND ALL OTHER

01:36PM  13   SHAREHOLDERS THAT THERE'S GOING TO BE A SERIES OF FINANCIAL

01:36PM  14   TRANSACTIONS THAT ARE GOING TO TAKE PLACE WITH WALGREENS AND

01:36PM  15   PERHAPS OTHERS BY THE END OF THE YEAR; CORRECT?

01:36PM  16   A.   YES.

01:36PM  17   Q.   AND IT ALSO SAYS -- IT GOES ON TO TELL SHAREHOLDERS THAT

01:36PM  18   THERANOS WAS COMPLETING EQUITY TRANSACTIONS WITH STRATEGIC

01:36PM  19   ENTITIES WHO HAD PREVIOUSLY INVESTED IN THERANOS AND THAT

01:36PM  20   THOSE -- THEY WERE PEOPLE WHO HAD THE OPTION TO INVEST

01:36PM  21   ADDITIONAL EQUITY.

01:36PM  22        DO YOU SEE THAT?

01:36PM  23   A.   YES.

01:36PM  24   Q.   AND YOU KNEW THAT IN ADDITION TO WALGREENS AND SAFEWAY,

01:36PM  25   THAT THERANOS ALSO HAD PARTNERSHIPS, FOR EXAMPLE, WITH HOSPITAL

LUCAS CROSS BY MR. DOWNEY

01:37PM  1     GROUPS; CORRECT?

01:37PM  2     A.   I DON'T RECALL THAT.

01:37PM  3     Q.   OKAY.   DO YOU KNOW WHO THE STRATEGIC ENTITIES ARE WHO ARE

01:37PM  4     REFERENCED IN THE SECOND SENTENCE?

01:37PM  5     A.   IF I DID, I DON'T REMEMBER.

01:37PM  6     Q.   OKAY.   NOW, IN THE SECOND PARAGRAPH THIS SETS FORTH THE

01:37PM  7     PRICE THAT WAS BEING ATTACHED TO THERANOS STOCK IN CONNECTION

01:37PM  8     WITH THOSE TRANSACTIONS.

01:37PM  9     DO YOU SEE THAT?

01:37PM 10     A.   YEAH.

01:37PM 11     Q.   SO, IN OTHER WORDS, THIS IS THE AMOUNT THAT STRATEGIC

01:37PM 12     PARTNERS WERE WILLING TO PAY FOR STOCK IN THERANOS AT THE END

01:37PM 13     OF 2013; CORRECT?

01:37PM 14     A.   CORRECT.

01:37PM 15     Q.   AND THAT PRICE WAS $75 A SHARE; CORRECT?

01:37PM 16     A.   YES.

01:37PM 17     Q.   AND THOSE WERE THE SAME SHARES THAT IN 2006 YOU, FOR

01:37PM 18     EXAMPLE, HAD PAID ON ONE OCCASION LESS THAN A DOLLAR; CORRECT?

01:38PM 19     A.   CORRECT.

01:38PM 20     Q.   AND ON ANOTHER OCCASION YOU HAD PAID A LITTLE BIT LESS

01:38PM 21     THAN $3; CORRECT?

01:38PM 22     A.   CORRECT.

01:38PM 23     Q.   SO UPON RECEIVING THIS NEWS YOU IMMEDIATELY REALIZED THAT

01:38PM 24     THE INVESTMENT THAT YOU HAD MADE SEVEN YEARS BEFORE HAD BECOME

01:38PM 25     INCREDIBLY VALUABLE; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                              5512

01:38PM 1      A.   CORRECT.

01:38PM 2      Q.   AND THE QUESTION THAT WAS BEING POSED TO YOU IN THIS

01:38PM 3      MEMORANDUM IS YOU COULD -- YOU CAN INVEST NOW AGAIN, BUT YOU'RE

01:38PM 4      GOING TO HAVE TO PAY THE $75 A SHARE THAT OTHER ENTITIES ARE

01:38PM 5      PAYING AT THE END OF THE YEAR; CORRECT?

01:38PM 6      A.   YES.

01:38PM 7      Q.   AND SO THAT WAS REALLY WHAT THIS DISCUSSION WAS ABOUT IN

01:38PM 8      THE TIME PERIOD BETWEEN DECEMBER 15TH AND DECEMBER 31ST, 2013;

01:38PM 9      CORRECT?

01:38PM 10     A.   YES.

01:38PM 11     Q.   AND YOU KNEW AS YOU TOOK THIS INFORMATION IN THAT FOR

01:38PM 12     WHATEVER THIS PRECISE LENGTH OF IT WAS, THAT WALGREENS HAD BEEN

01:39PM 13     IN A PARTNERSHIP WITH THERANOS FOR A SUBSTANTIAL NUMBER OF

01:39PM 14     YEARS; CORRECT?

01:39PM 15     A.   I DON'T KNOW THAT.

01:39PM 16     Q.   OKAY.  YOU KNEW, HOWEVER, THAT AS OF THE TIME OF THIS

01:39PM 17     ANNOUNCEMENT, THERANOS HAD ACTUALLY BEEN LAUNCHED IN WALGREENS

01:39PM 18     STORES; CORRECT?

01:39PM 19     A.   I FORGET IF IT HAD BEEN LAUNCHED OR IT CERTAINLY WAS GOING

01:39PM 20     TO BE SHORTLY LAUNCHED.

01:39PM 21     Q.   OKAY.  DO YOU RECALL THAT THERE WAS INITIALLY THE LAUNCH

01:39PM 22     OF A FEW STORES AND THEN OVER TIME ADDITIONAL STORES WERE

01:39PM 23     LAUNCHED THROUGHOUT 2014?

01:39PM 24     A.   YES.

01:39PM 25     Q.   AND YOU WERE AT LEAST AWARE THAT THERE WAS GOING TO BE A

LUCAS CROSS BY MR. DOWNEY                                            5513

01:39PM   1    RETAIL LAUNCH AS OF THIS TIME; CORRECT?

01:39PM   2    A.   CORRECT.

01:39PM   3    Q.   AND YOU ASSUMED THAT WALGREENS, IN MAKING A DECISION TO

01:39PM   4    PARTNER WITH THERANOS, HAD EVALUATED THAT -- THERANOS VERY

01:39PM   5    CLOSELY; CORRECT?

01:39PM   6    A.   I CERTAINLY WOULD HAVE BELIEVED THAT, YES.

01:40PM   7    Q.   OKAY.  AND, IN FACT, AT THIS TIME THEY WERE STARTING TO

01:40PM   8    SEE THERANOS EVERY DAY, ITS OPERATIONS EVERY DAY IN THEIR

01:40PM   9    STORES; CORRECT?

01:40PM  10    A.   THAT THEY WERE STARTING TO?

01:40PM  11    Q.   WELL, THAT THERANOS WAS BEGINNING TO OPERATE OUT OF THEIR

01:40PM  12    STORES; CORRECT?

01:40PM  13    A.   WELL, AS YOU SAID, STARTING TO -- SORRY TO STOP YOU.  BUT

01:40PM  14    UP HERE IN PALO ALTO THERE WAS ONE, OR MAYBE THERE WERE TWO UP

01:40PM  15    HERE, AND THEN THE ROLLOUT WAS SUPPOSED TO CONTINUE IN SOUTHERN

01:40PM  16    CALIFORNIA.  I DON'T KNOW IF THERE WAS ANYTHING EVER DONE DOWN

01:40PM  17    THERE, BUT THEN INDEED THE PHOENIX AREA.

01:40PM  18    Q.   RIGHT.  AND MY QUESTION IS ONLY AS YOU SAT HERE

01:40PM  19    CONSIDERING THIS INVESTMENT BY WALGREENS, YOU KNEW THAT THEY

01:40PM  20    WERE HAVING THE OPPORTUNITY TO WATCH THAT ROLLOUT AND THE

01:40PM  21    PLANNING FOR IT; CORRECT?

01:40PM  22    A.   ABSOLUTELY.

01:40PM  23    Q.   AND THAT WAS INCREDIBLY IMPORTANT TO YOU IN CONNECTION

01:40PM  24    WITH MAKING THE INVESTMENT DECISION THAT WAS THE SUBJECT OF

01:40PM  25    THIS MEMORANDUM; CORRECT?

LUCAS CROSS BY MR. DOWNEY                                          5514

01:41PM  1    A.   CORRECT.

01:41PM  2    Q.   AND BECAUSE YOU UNDERSTOOD THAT THEY -- WHETHER YOU WERE

01:41PM  3    WILLING TO PAY $75 WAS ONE QUESTION; RIGHT?

01:41PM  4    A.   YES.

01:41PM  5    Q.   BUT THEY WERE WILLING TO PAY $75 A SHARE FOR THERANOS;

01:41PM  6    CORRECT?

01:41PM  7    A.   YES.

01:41PM  8    Q.   AND THEY HAD A LOT MORE INFORMATION ABOUT THERANOS AND ITS

01:41PM  9    TECHNOLOGY AND ITS OPERATIONS THAN YOU DID; RIGHT?

01:41PM  10          MR. BOSTIC:  CALLS FOR SPECULATION.

01:41PM  11          THE COURT:  SUSTAINED.  YOU CAN ASK ANOTHER

01:41PM  12   QUESTION.

01:41PM  13   BY MR. DOWNEY:

01:41PM  14   Q.   WELL, MY QUESTION IS JUST DID YOU MAKE AN ASSUMPTION ABOUT

01:41PM  15   THE RELATIVE DEGREE OF YOUR EVALUATION OF THERANOS AND

01:41PM  16   WALGREENS'S EVALUATION OF THERANOS?

01:41PM  17          THE COURT:  YOU CAN ANSWER THAT?

01:41PM  18          THE WITNESS:  I CAN?

01:41PM  19          THE COURT:  YES.

01:41PM  20          THE WITNESS:  YEAH, I WOULD BELIEVE THAT THEY DID AN

01:41PM  21   EXTENSIVE ANALYSIS PRIOR TO WANTING TO ROLL IT OUT AND INVEST.

01:42PM  22   BY MR. DOWNEY:

01:42PM  23   Q.   OKAY.  AND THAT WAS MEANINGFUL TO YOU; CORRECT?

01:42PM  24   A.   CORRECT.

01:42PM  25   Q.   NOW, THE SECOND PARAGRAPH OF THIS -- ACTUALLY, I BELIEVE

LUCAS CROSS BY MR. DOWNEY                                                    5515

01:42PM    1    IT'S ACTUALLY REALLY THE SECOND PARAGRAPH, BUT IT'S THE THIRD

01:42PM    2    PARAGRAPH ON THE SCREEN, GOES ON TO DESCRIBE THAT THERE'S GOING

01:42PM    3    TO BE A STOCK SPLIT; CORRECT?

01:42PM    4    A.   YES.

01:42PM    5    Q.   AND A STOCK SPLIT IS JUST WHEN YOU HAVE A SHARE IN A

01:42PM    6    COMPANY AND IT'S JUST DIVIDED IN HALF OR IN THREE OR FOUR OR

01:42PM    7    FIVE, WHATEVER THE SPLIT IS; CORRECT?

01:42PM    8    A.   CORRECT.

01:42PM    9    Q.   AND SO THE NEW PRICE OF SHARES WAS GOING TO BE $15 A

01:42PM   10    SHARE; CORRECT?

01:42PM   11    A.   CORRECT.

01:42PM   12    Q.   BUT YOU, WITH YOUR OLD SHARES, WOULD OWN FIVE TIMES AS

01:42PM   13    MANY SHARES; CORRECT?

01:42PM   14    A.   CORRECT.

01:42PM   15    Q.   AND SO EFFECTIVELY YOU WOULD BE REALIZING A GAIN TO THE

01:42PM   16    POINT WHERE THE SHARES THAT YOU HAD BOUGHT IN 2006 WERE NOW

01:42PM   17    WORTH $75; RIGHT?

01:42PM   18    A.   YES.

01:42PM   19    Q.   NOW, MR. BOSTIC WAS ASKING YOU ON DIRECT ABOUT KIND OF THE

01:43PM   20    COMPRESSED PERIOD AND YOUR EXPERIENCE OF THE COMPRESSED PERIOD

01:43PM   21    AT THE END OF 2013.

01:43PM   22       WHAT WAS YOUR UNDERSTANDING OF WHY THERE WAS A

01:43PM   23    DECEMBER 31ST, 2013 DEADLINE FOR YOU TO MAKE A DECISION IN

01:43PM   24    CONNECTION WITH THIS INVESTMENT?

01:43PM   25    A.   AS I THINK I SAID DURING THE DIRECT, MY UNDERSTANDING WAS

LUCAS CROSS BY MR. DOWNEY

01:43PM  1   THAT WALGREENS HAD AN AGREEMENT TO CONVERT THEIR STOCK AT A

01:43PM  2   PRE-DETERMINED PRICE PRIOR TO THE END OF 2013, AND THIS WAS THE

01:43PM  3   PRICE, AND THAT WAS THE TIMING, AND IF OTHERS WANTED TO INVEST,

01:43PM  4   THEY COULD INVEST AT THAT PRICE ALSO.

01:43PM  5   Q.   LET ME ASK YOU TO LOOK AT AN EXHIBIT THAT IS ALREADY IN

01:43PM  6   EVIDENCE, 1387.

01:44PM  7        IF YOU SEE THE FIRST PAGE, YOU SEE THAT THIS IS SOME FORM

01:44PM  8   OF A LETTER TO MS. HOLMES FROM DECEMBER 31ST, 2013.  THE

01:44PM  9   SUBJECT IS AN AMENDED AND RESTATED THERANOS MASTER SERVICES

01:44PM  10  AGREEMENT.

01:44PM  11       DO YOU SEE THAT?

01:44PM  12  A.   YES.

01:44PM  13  Q.   AND THEN IF I CAN DIRECT YOUR ATTENTION TO THE BACK OF THE

01:44PM  14  DOCUMENT, THE SIGNATURE PAGE.

01:44PM  15       DO YOU SEE THIS IS SIGNED BETWEEN THERANOS AND WALGREENS

01:44PM  16  ON THE 31ST OF DECEMBER 2013?

01:44PM  17  A.   YES.

01:44PM  18  Q.   AND IF I COULD DIRECT YOUR ATTENTION IN CONNECTION WITH

01:44PM  19  THIS TO PARAGRAPH 7, DO YOU SEE THAT THERE ARE EQUITY RIGHTS

01:45PM  20  GRANTED TO THERANOS, OR TO WALGREENS, PURSUANT TO THIS

01:45PM  21  AGREEMENT?

01:45PM  22  A.   YES.

01:45PM  23  Q.   AND DO YOU KNOW WHAT THE PRICE WAS THAT WAS CHARGED TO

01:45PM  24  WALGREENS IN CONNECTION WITH THIS EQUITY RIGHT THAT THEY WERE

01:45PM  25  OBTAINING UNDER THIS AGREEMENT?

LUCAS CROSS BY MR. DOWNEY                                              5517

01:46PM  1          (PAUSE IN PROCEEDINGS.)

01:46PM  2             THE WITNESS:  SORRY TO TAKE THE TIME.

01:46PM  3          DO YOU WANT ME TO UNDERSTAND THIS, OR ARE YOU JUST ASKING,

01:46PM  4     DO I SEE IT?

01:46PM  5     BY MR. DOWNEY:

01:46PM  6     Q.   YEAH.  CAN YOU SEE THE PRICE THAT IS BEING CHARGED TO

01:46PM  7     WALGREENS -- THE SHARE PRICE IN CONNECTION WITH THE DIVISION

01:46PM  8     EQUITY RIGHTS THAT ARE PART OF THIS AGREEMENT, SPECIFICALLY

01:46PM  9     WHETHER IT'S $15 A SHARE --

01:46PM 10     A.   YEAH, IT APPEARS TO BE $15 PER SHARE.

01:46PM 11     Q.   OKAY.  AND THAT IS THE POST-SPLIT PRICING THAT IS -- THAT

01:46PM 12     WAS USED FOR PURPOSES OF YOUR INVESTMENT IN LATE 2013; CORRECT?

01:46PM 13     A.   THAT'S HOW I WOULD -- THAT'S HOW I UNDERSTOOD IT BACK

01:46PM 14     THEN, THAT WE'RE ALL INVESTING AT THE SAME PRICE.

01:46PM 15     Q.   OKAY.  AND MS. HOLMES WAS DESCRIBING TO YOU THAT THERE WAS

01:46PM 16     A TRANSACTION LIKE THIS GOING ON; CORRECT?

01:47PM 17          LET ME ASK THAT A LITTLE MORE CLEARLY.

01:47PM 18          IN TELLING YOU THAT YOU HAD THE OPPORTUNITY TO BUY NEW

01:47PM 19     SHARES, SHE TOLD YOU, WE HAVE TO DO THIS BY THE END OF THE YEAR

01:47PM 20     BECAUSE WE HAVE TO SIGN A NEW DEAL WITH OUR STRATEGIC PARTNER

01:47PM 21     BY THE END OF THE YEAR; CORRECT?

01:47PM 22     A.   I UNDERSTOOD IT TO BE DIFFERENTLY, THAT THEY HAD THE

01:47PM 23     OPTION TO DO THIS CONVERSION AT THE END OF THE YEAR.

01:47PM 24          YOU MAY BE CORRECT ON THE OTHER OF WHAT YOU SAID, BUT I

01:47PM 25     CERTAINLY DON'T RECALL THAT.

LUCAS CROSS BY MR. DOWNEY                                           5518

01:47PM   1    Q.   OKAY.  AND DO YOU RECALL, IF YOU LOOK AT THE FIRST

01:47PM   2    PARAGRAPH, THAT MS. HOLMES WAS DESCRIBING A -- SORRY, THE

01:47PM   3    PARAGRAPH LABELLED NUMBER 1 ON PAGE 2.

01:47PM   4        DO YOU SEE THAT THIS RELATES TO THE ROLLOUT OF THERANOS

01:47PM   5    STORES IN SEVERAL DIFFERENT MARKETS AND SETTING UP A PLAN TO DO

01:48PM   6    THAT?

01:48PM   7    A.   YES.

01:48PM   8    Q.   AND DO YOU -- AND THAT WAS SOMETHING THAT YOU WERE

01:48PM   9    GENERALLY AWARE WAS GOING ON; CORRECT?

01:48PM   10   A.   THIS IS WHAT IT WAS ALL ABOUT, YEP.

01:48PM   11   Q.   OKAY.  THAT'S WHAT YOUR INVESTMENT WAS ALL ABOUT YOU MEAN?

01:48PM   12   A.   WELL, I MEAN, TO GET TO THE POINT OF HAVING SOMEONE OF

01:48PM   13   NATIONAL PRESENCE START TO ROLL OUT THE COMPANY'S TECHNOLOGY.

01:48PM   14   Q.   OKAY.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 5143, WHICH

01:48PM   15   IS THE EXHIBIT THAT WAS INTRODUCED BY THE GOVERNMENT.

01:48PM   16       DO YOU SEE IN THE MIDDLE THERE THAT MS. QUINTANA

01:49PM   17   INDICATED, IN RESPONSE TO THE DECEMBER 15TH EMAIL, THAT ON THE

01:49PM   18   16TH SHE SAID, "BLACK DIAMOND VENTURES IS INTERESTED IN

01:49PM   19   INCREASING ITS EQUITY POSITION IN THERANOS"?

01:49PM   20       DO YOU SEE THAT?

01:49PM   21   A.   YES.

01:49PM   22   Q.   AND THAT WAS SOMETHING THAT YOU AND SHE COMMUNICATED ABOUT

01:49PM   23   AND AGREED TO SEND THIS MESSAGE; CORRECT?

01:49PM   24   A.   YES.

01:49PM   25   Q.   OKAY.  ALL RIGHT.  NOW, I WANT TO LOOK -- GO BACK TO

LUCAS CROSS BY MR. DOWNEY                                    5519

01:49PM   1      PAGE 2 OF THIS EXHIBIT.  SORRY.

01:49PM   2          LET ME -- I'LL SHOW YOU A DIFFERENT EXHIBIT, AND I WILL

01:49PM   3      MAKE IT A LITTLE EASIER TO SHOW YOU THIS.

01:49PM   4          LOOK AT -- IF WE CAN PULL UP EXHIBIT 5144, WHICH WAS ALSO

01:49PM   5      ADMITTED, I BELIEVE, DURING THE GOVERNMENT'S EXAMINATION.

01:50PM   6          AND JUST TO REORIENT YOU, DO YOU SEE THAT THIS IS THE --

01:50PM   7      MS. QUINTANA'S TRANSMISSION AT THE VERY END OF THE EMAIL STRING

01:50PM   8      OF VARIOUS SHAREHOLDER CONSENTS THAT HAD BEEN ASKED FOR IN THE

01:50PM   9      MEMO?

01:50PM  10      A.   YES.

01:50PM  11      Q.   OKAY.  AND IF YOU GO DOWN EARLIER IN THE MEMO, I WANT TO

01:50PM  12      HIGHLIGHT THE PART THAT MR. BOSTIC DISCUSSED WITH YOU.

01:50PM  13          AND THIS IS THE SERIES OF QUESTIONS THAT YOU ASKED OF

01:50PM  14      THERANOS IN CONNECTION WITH THE ANNOUNCEMENT THAT THERE WOULD

01:50PM  15      BE THIS INVESTMENT; CORRECT?

01:50PM  16      A.   CORRECT.

01:50PM  17      Q.   AND DO YOU RECALL THAT YOU WERE -- I WANT TO SEE WHAT YOU

01:51PM  18      RECALL ABOUT THE ANSWERS THAT YOU GOT TO THESE QUESTIONS OVER

01:51PM  19      THE PERIOD THAT FOLLOWED AND PRIOR TO YOUR INVESTMENT.

01:51PM  20          DO YOU RECALL IF THERE WAS ANY DISCUSSION OF A PARTIAL OR

01:51PM  21      FULL LIQUIDITY EVENT?

01:51PM  22      A.   YES, AND I'M NOT SURE WHAT TIMEFRAME THAT WAS GOING TO BE.

01:51PM  23      Q.   OKAY.  AND IF YOU GO TO THE FIFTH ITEM THAT YOU RAISED,

01:51PM  24      YOU RAISED THE QUESTION, "IS THERE A PRO-RATA AMOUNT?"

01:51PM  25          DO YOU SEE THAT?

LUCAS CROSS BY MR. DOWNEY                                                      5520

01:51PM  1     A.   YES.

01:51PM  2     Q.   AND THIS IS JUST ASKING, IS THIS GOING TO BE APPORTIONED

01:51PM  3     BASED ON HOW WE PREVIOUSLY INVESTED; IS THAT RIGHT?

01:51PM  4     A.   YES, TYPICALLY IN DOCUMENTS AND PRIOR FINANCINGS, YOU'RE

01:51PM  5     GIVEN THE RIGHT FOR ANY FUTURE FINANCING TO PURCHASE AT A PRO

01:52PM  6     RATA AMOUNT.

01:52PM  7     Q.   AND IF YOU LOOK AT NUMBER 3, YOU SAY, "DO THE NEW

01:52PM  8     INVESTORS IN THIS SERIES INCLUDE BOTH FINANCIAL AND STRATEGIC

01:52PM  9     PARTNERS?"

01:52PM  10         DO YOU SEE THAT?

01:52PM  11    A.   YES.

01:52PM  12    Q.   AND STRATEGIC PARTNERS I THINK WE DISCUSSED INCLUDED

01:52PM  13    WALGREENS, FOR EXAMPLE?

01:52PM  14    A.   YES.

01:52PM  15    Q.   AND WHAT DID FINANCIAL PARTNERS MEAN?

01:52PM  16    A.   ANY OTHER INSTITUTION OR INVESTOR THAT WAS JUST PROVIDING

01:52PM  17    MONEY AND THAT WAS IT.

01:52PM  18    Q.   WELL, WHY DID YOU WANT TO KNOW THAT INFORMATION?

01:52PM  19    A.   WELL, JUST TO HAVE A FULL PICTURE OF THE FINANCING.

01:52PM  20    Q.   OKAY.  AND DO YOU RECALL THAT YOU WERE TOLD, PRIOR TO

01:52PM  21    MAKING YOUR DECEMBER 2013 INVESTMENT, THAT THERANOS ANTICIPATED

01:52PM  22    THAT AFTER THE NEW YEAR IT WOULD DO AN ADDITIONAL FUND RAISE?

01:52PM  23         DO YOU REMEMBER THAT?

01:52PM  24    A.   YES.

01:52PM  25    Q.   AND DO YOU REMEMBER THAT THERANOS TOLD YOU THAT IT

LUCAS CROSS BY MR. DOWNEY                                                5521

01:53PM  1    EXPECTED THAT AFTER THE NEW YEAR WHEN IT DID AN ADDITIONAL FUND

01:53PM  2    RAISE, THAT THE COMPANY WOULD BE VALUED A BIT HIGHER THAN IT

01:53PM  3    WAS FOR PURPOSES OF THIS OFFERING?

01:53PM  4    A.   YES.

01:53PM  5    Q.   AND DO YOU RECALL THAT THE REASON THAT THIS OFFERING WAS

01:53PM  6    BEING MADE AVAILABLE WAS THAT YOU AND OTHER SERIES C

01:53PM  7    SHAREHOLDERS HAD ACTUALLY A CONTRACTUAL RIGHT TO HAVE THIS

01:53PM  8    OFFERING MADE TO THEM?

01:53PM  9    A.   YES.  AS I SAID EARLIER, THAT'S THE PRO RATA RIGHT THAT

01:53PM  10   EVERYONE IS GIVEN.

01:53PM  11   Q.   OKAY.

01:53PM  12        SO THE QUESTION REALLY FOR YOU WAS, DO I WANT TO MAKE THIS

01:53PM  13   INVESTMENT AT THE $15 A SHARE PRICE OR DO I WANT TO TAKE A

01:53PM  14   LONGER TIME AND CONSIDER IT AND INVEST AT A SLIGHTLY HIGHER

01:53PM  15   PRICE IN 2017 -- 2014; CORRECT?

01:53PM  16   A.   SURE.

01:53PM  17   Q.   OKAY.  AND, AND AM I RIGHT THAT NOTHING WOULD HAVE

01:54PM  18   PRECLUDED YOU FROM INVESTING AGAIN IN 2014?  CORRECT?

01:54PM  19   A.   I WOULD EXPECT NOT.  I JUST DON'T REMEMBER.

01:54PM  20   Q.   OKAY.  I WANT TO SHOW YOU NEXT EXHIBIT 5444.

01:54PM  21   A.   IS THIS ONE I GO TO THE BOOK AGAIN?

01:54PM  22   Q.   NO.  YOU'LL BE ABLE TO SEE IT I BELIEVE BECAUSE IT WAS

01:54PM  23   ADMITTED BY THE GOVERNMENT DURING YOUR DIRECT EXAMINATION.

01:54PM  24   A.   OKAY.

01:54PM  25   Q.   YEAH.  ALL RIGHT.

LUCAS CROSS BY MR. DOWNEY                                    5522

01:54PM   1        AND JUST TO REORIENT YOU, DO YOU REMEMBER THAT THIS IS

01:55PM   2    REALLY THE PART OF A SERIES OF EMAILS BETWEEN YOU AND

01:55PM   3    MS. HOLMES ABOUT TWO WEEKS LATER WHERE YOU'RE TRYING TO FIND A

01:55PM   4    TIME TO TALK; CORRECT?

01:55PM   5    A.   YES.

01:55PM   6    Q.   AND I WANT TO ASK YOU TO GO BACK IN THIS EMAIL STRING TO

01:55PM   7    THE EMAIL THAT YOU SENT HER ON DECEMBER THE 24TH.

01:55PM   8        DO YOU SEE THAT?  IT'S AT THE -- IT SHOULD BE ON THE

01:55PM   9    SCREEN IN A MOMENT.  IT'S THE BOTTOM OF PAGE 2.

01:55PM   10       AND THEN DO YOU SEE THERE'S AN EMAIL EXCHANGE HERE ON

01:55PM   11   CHRISTMAS EVE; CORRECT?

01:55PM   12   A.   YES.

01:55PM   13   Q.   AND THEN LET ME JUST SHOW YOU THAT.

01:55PM   14       AND YOU INFORM MS. HOLMES HERE, "I HAVE CONTINUED TO HAVE

01:55PM   15   CALLS WITH OUR INVESTORS AND HAVE DETERMINED THAT THERE IS

01:55PM   16   SIGNIFICANT INTEREST IN PARTICIPATING IN THIS ROUND.  THE

01:56PM   17   CHALLENGE WILL BE GETTING ALL OF THE FUNDS PRIOR TO YEAR END.

01:56PM   18   IF THERE IS ANY FLEXIBILITY, PLEASE LET ME KNOW."

01:56PM   19       AND THEN YOU GO ON TO SAY THAT YOU'VE BEEN ASKED A SERIES

01:56PM   20   OF ADDITIONAL QUESTIONS.

01:56PM   21       AND ARE THESE QUESTIONS THAT THE INVESTORS IN BDV WERE

01:56PM   22   ASKING ABOUT THE INVESTMENT?

01:56PM   23   A.   QUITE LIKELY.  I JUST DON'T REMEMBER.

01:56PM   24   Q.   OKAY.  THE FIRST QUESTION IS, "ARE THE STRATEGIC PARTNERS

01:56PM   25   CONVERTING THE ENTIRE AMOUNT OF THEIR NOTES IN THIS OFFERING?"

LUCAS CROSS BY MR. DOWNEY                                                5523

01:56PM    1        DO YOU SEE THAT?

01:56PM    2   A.   YES.

01:56PM    3   Q.   AND WHY WAS THAT IMPORTANT?

01:56PM    4   A.   WELL, IF AN INVESTING ENTITY, OR ANY ENTITY, IS CONVERTING

01:56PM    5   THEIR NOTES, THEIR NOTES ARE AT A HIGHER SECURITY THAN STOCK,

01:56PM    6   AND SO IF THEY'RE WILLING TO CONVERT IT INTO EQUITY, IT MEANS

01:57PM    7   THEY FEEL GOOD ABOUT THE INVESTMENT AND THAT THEY CAN THEN

01:57PM    8   APPRECIATE.

01:57PM    9   Q.   I SEE.  AND THEN YOU WERE ASKED, "WAS THIS CONVERSION

01:57PM   10   PRICE AND EXPIRATION DATE SET AT THE TIME WHEN THEY MADE THE

01:57PM   11   LOANS?"

01:57PM   12        DO YOU SEE THAT?

01:57PM   13   A.   YES.

01:57PM   14   Q.   AND TELL US WHY THAT WAS IMPORTANT.

01:57PM   15   A.   BECAUSE THAT WOULD VALIDATE THAT THIS FINANCING HAD TO

01:57PM   16   CLOSE PRIOR TO DECEMBER OF 2013.

01:57PM   17   Q.   I SEE.  PEOPLE WOULD HAVE TO UNDERSTAND WHAT IS THE

01:57PM   18   TRANSACTION HAPPENING BEFORE THE END OF 2013; CORRECT?

01:57PM   19   A.   YES.

01:57PM   20   Q.   I SEE.

01:57PM   21   A.   AND WHY THE URGENCY.

01:57PM   22   Q.   AND WHY IT IS BEING OFFERED WITH THIS 12/31 DEADLINE?

01:57PM   23   A.   CORRECT.

01:57PM   24   Q.   NOW, YOU WERE NOT GIVEN THE OPPORTUNITY, I THINK, AM I

01:57PM   25   RIGHT, IN 2013 TO LOOK AT ANY OF THE EITHER DRAFT OR FINAL

LUCAS CROSS BY MR. DOWNEY                                              5524

01:57PM  1    DOCUMENTS RELATED TO NEGOTIATIONS BETWEEN THERANOS AND

01:57PM  2    WALGREENS IN THAT PERIOD?

01:58PM  3    A.   NO.

01:58PM  4    Q.   IN FACT, WHEN I SHOWED YOU THAT AGREEMENT, THAT'S THE

01:58PM  5    FIRST TIME YOU'VE SEEN IT; CORRECT?

01:58PM  6    A.   YES, AND THAT WAS PRETTY EXCITING TO SEE ACTUALLY.

01:58PM  7         (LAUGHTER.)

01:58PM  8    BY MR. DOWNEY:

01:58PM  9    Q.   AND YOU HAD CONVERSATIONS WITH MS. HOLMES AND SHE CONVEYED

01:58PM  10   SOME OF THIS INFORMATION TO YOU, BUT NOT ALL OF IT; CORRECT?

01:58PM  11   A.   JUST THE, THE OVERALL, WE'RE GOING TO START ROLLING IT

01:58PM  12   OUT.

01:58PM  13   Q.   RIGHT.  SHE TOLD YOU THERE WAS SOME INFORMATION SHE COULD

01:58PM  14   SHARE WITH YOU, BUT SOME INFORMATION SHE COULDN'T; CORRECT?

01:58PM  15   A.   I DON'T KNOW IF IT WAS PUT THAT WAY.

01:58PM  16        BUT IT WAS CERTAINLY WE HAVE A DEAL WITH WALGREENS, WE'RE

01:58PM  17   GOING TO START ROLLING OUT, CHRIS, ISN'T THIS EXCITING?

01:58PM  18        YES, ABSOLUTELY.

01:58PM  19   Q.   OKAY.  LET ME ASK YOU ALSO, I ASSUME YOU KNEW LESS ABOUT

01:59PM  20   THE BOARD OF DIRECTORS AND ITS OPERATIONS AFTER YOUR UNCLE

01:59PM  21   STEPPED BACK FROM THE COMPANY; IS THAT RIGHT?

01:59PM  22   A.   YES.

01:59PM  23   Q.   OKAY.  BUT DID YOU KNOW THAT THE PRICE THAT WAS SET FOR

01:59PM  24   THIS OFFERING AT THE END OF 2013 HAD ACTUALLY BEEN APPROVED BY

01:59PM  25   THE BOARD OF DIRECTORS OF THE COMPANY?

LUCAS CROSS BY MR. DOWNEY                                                5525

01:59PM   1    A.   ANY FINANCING WOULD HAVE TO BE APPROVED BY THE BOARD,

01:59PM   2    SO -- JUST AS THE AGREEMENT PRIOR TO GIVE WALGREENS THE

01:59PM   3    OPPORTUNITY TO CONVERT, THAT WOULD HAVE HAD TO HAVE BEEN

01:59PM   4    APPROVED.

01:59PM   5    Q.   AND THE COMPOSITION OF THE BOARD GAVE YOU CONFIDENCE THAT

01:59PM   6    THIS WAS A REASONABLE INVESTMENT TO MAKE; CORRECT?

02:00PM   7    A.   YES.

02:00PM   8    Q.   WE TALKED A LITTLE BIT A FEW MOMENTS AGO ABOUT SAFEWAY.

02:00PM   9         I WANT TO ASK YOU WHETHER YOU TRIED TO FOLLOW EVENTS IN

02:00PM  10    THE THERANOS/SAFEWAY RELATIONSHIP, AS WELL AS IN THE

02:00PM  11    THERANOS/WALGREENS RELATIONSHIP.

02:00PM  12    A.   TO THE EXTENT I COULD.

02:00PM  13    Q.   OKAY.

02:00PM  14    A.   BUT I DID NOT HAVE SPECIFIC, YOU KNOW, UPDATES FOR EITHER

02:00PM  15    OF THEM.

02:00PM  16         AND THEN IT BECAME CLEAR, AS WALGREENS STARTED TO ROLL

02:00PM  17    OUT, I WAS AWARE THAT IT WAS GOING TO -- THEY WERE GOING TO

02:00PM  18    CONCENTRATE THEIR EFFORT IN THE PHOENIX AREA.

02:00PM  19    Q.   OKAY.  LET ME ASK YOU TO LOOK AT -- THIS YOU WILL HAVE TO

02:00PM  20    GO TO YOUR BLACK BINDER FOR THIS -- TO 12323.

02:01PM  21    A.   YES.

02:01PM  22    Q.   DO YOU SEE THAT THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND

02:01PM  23    MS. QUINTANA FROM FEBRUARY OF 2013?

02:01PM  24    A.   YES.

02:01PM  25    Q.   AND WAS THIS AN EMAIL EXCHANGE THAT WAS MADE IN CONNECTION

LUCAS CROSS BY MR. DOWNEY                                                5526

02:02PM 1    WITH BDV'S EFFORTS TO KEEP UP WITH THERANOS INVESTMENT?

02:02PM 2    A.   YES.

02:02PM 3              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:02PM 4    12323.

02:02PM 5              MR. BOSTIC:  YOUR HONOR, HEARSAY AND RELEVANCE.

02:02PM 6              THE COURT:  IT'S THE ENTIRETY OF THE DOCUMENT YOU

02:02PM 7    WANT IN, MR. DOWNEY?

02:02PM 8              MR. DOWNEY:  WELL, THERE'S AN INDICATION IN THE

02:02PM 9    COVER MEMO THAT CERTAIN PORTIONS WERE HIGHLIGHTED FOR REVIEW BY

02:02PM 10   THE INDIVIDUAL RECEIVING THE EMAIL.  THAT'S REALLY -- THOSE ARE

02:02PM 11   REALLY THE ONLY SECTIONS I'M INTERESTED IN, ALTHOUGH I WILL SAY

02:02PM 12   THAT I DON'T THINK THE BALANCE OF IT IS OF REALLY GREAT

02:02PM 13   CONCERN.  IT'S ABOUT OTHER MATTERS.

02:02PM 14             THE COURT:  ARE YOU REFERRING TO THE TRANSCRIPT CALL

02:03PM 15   DATA?

02:03PM 16             MR. DOWNEY:  YES.

02:03PM 17             THE COURT:  IS IT POSSIBLE FOR YOU TO LOOK AT THESE

02:03PM 18   AND PARSE OUT EXACTLY WHAT IT IS YOU WOULD LIKE?

02:03PM 19             MR. DOWNEY:  I THINK THAT WOULD BE, YOUR HONOR.

02:03PM 20             THE COURT:  AND SHOULD WE DO THAT AFTER OUR

02:03PM 21   2:00 O'CLOCK BREAK?  WE'LL GIVE YOU TIME TO DO THAT.

02:03PM 22             MR. DOWNEY:  I CERTAINLY COULD, OR I CAN EVEN

02:03PM 23   IDENTIFY -- THAT WOULD BE FINE.  I CAN GIVE YOU THE SECTIONS

02:03PM 24   NOW IF YOU WANT TO --

02:03PM 25             THE COURT:  WELL, I THINK A BREAK IS PROBABLY

LUCAS CROSS BY MR. DOWNEY                                                 5527

| | | |
|---|---|---|
| 02:03PM | 1 | APPROPRIATE AT THIS TIME. |
| 02:03PM | 2 | MR. DOWNEY:  OKAY. |
| 02:03PM | 3 | THE COURT:  SO LET'S TAKE OUR AFTERNOON BREAK, |
| 02:03PM | 4 | LADIES AND GENTLEMEN.  WE'LL TAKE 30 MINUTES, 30 MINUTES. |
| 02:03PM | 5 | THE WITNESS:  OKAY. |
| 02:03PM | 6 | THE COURT:  AND THEN WE'LL COME BACK AND WE'LL |
| 02:03PM | 7 | CONTINUE THE TESTIMONY.  THANK YOU. |
| 02:04PM | 8 | (JURY OUT AT 2:04 P.M.) |
| 02:04PM | 9 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 02:04PM | 10 | ANYTHING BEFORE WE BREAK? |
| 02:04PM | 11 | MR. DOWNEY:  NO, YOUR HONOR. |
| 02:04PM | 12 | MR. BOSTIC:  NO, YOUR HONOR. |
| 02:04PM | 13 | THE COURT:  OKAY.  THANK YOU.  BUT CAN I SEE YOU |
| 02:04PM | 14 | BEFORE WE BREAK? |
| 02:04PM | 15 | MR. DOWNEY:  SURE. |
| 02:04PM | 16 | (RECESS FROM 2:04 P.M. UNTIL 2:37 P.M.) |
| 02:37PM | 17 | (JURY IN AT 2:37 P.M.) |
| 02:37PM | 18 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 02:37PM | 19 | ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 02:37PM | 20 | THE JURY IS PRESENT.  PLEASE BE SEATED. |
| 02:37PM | 21 | MR. LUCAS IS STILL ON THE STAND. |
| 02:37PM | 22 | COUNSEL? |
| 02:37PM | 23 | MR. DOWNEY:  YOUR HONOR, I THINK BEFORE WE BROKE I |
| 02:37PM | 24 | WAS SEEKING TO ADMIT EXHIBIT 12323. |
| 02:37PM | 25 | THE COURT:  YES. |

LUCAS CROSS BY MR. DOWNEY                                                          5528

| | | |
|---|---|---|
| 02:37PM | 1 | MR. DOWNEY:  THEN THERE HAD BEEN AN OBJECTION AND |
| 02:37PM | 2 | THEN A COLLOQUY. |
| 02:37PM | 3 | I JUST WANTED TO IDENTIFY FOR THE COURT THE PORTIONS OF |
| 02:37PM | 4 | THE DOCUMENT THAT WERE OF INTEREST.  I THINK THAT THEY WERE AT |
| 02:38PM | 5 | THE, BY MY READ, THE 12TH AND 13TH PAGE OF THE EXHIBIT, AND I |
| 02:38PM | 6 | THINK THAT THEY ARE TWO QUESTIONS AND ANSWERS AND THEY ARE |
| 02:38PM | 7 | ELECTRONICALLY HIGHLIGHTED IN THE DOCUMENT. |
| 02:38PM | 8 | THE COURT:  OKAY.  LET ME -- THESE ARE NOT |
| 02:38PM | 9 | PAGINATED, ARE THEY?  NO. |
| 02:38PM | 10 | MR. DOWNEY:  NO. |
| 02:38PM | 11 | THE COURT:  OKAY.  I THINK I'VE GOT IT. |
| 02:38PM | 12 | MR. DOWNEY:  IF IT HELPS, ONE QUESTION IS FROM A |
| 02:38PM | 13 | KELLY BANIA, B-A-N-I-A, AND THEN THERE'S ANOTHER ONE ON THE |
| 02:38PM | 14 | OPPOSITE PAGE. |
| 02:38PM | 15 | MR. BOSTIC:  YOUR HONOR, AS TO THOSE PORTIONS, NO |
| 02:38PM | 16 | RELEVANCE OBJECTION AS TO THOSE PORTIONS. |
| 02:38PM | 17 | I WOULD STILL HAVE HEARSAY CONCERNS IF THE DEFENSE IS |
| 02:38PM | 18 | SEEKING TO ADMIT THEM FOR THE TRUTH. |
| 02:38PM | 19 | MR. DOWNEY:  NO.  I'M ONLY SEEKING TO ADMIT THEM FOR |
| 02:38PM | 20 | WHAT WAS IMPORTANT FOR THIS INVESTOR AND NOT FOR ANY OF THE |
| 02:39PM | 21 | TRUTH OF THE STATEMENTS CONTAINED HEREIN. |
| 02:39PM | 22 | THE COURT:  I HAVE A HIGHLIGHTED PORTION THAT BEGINS |
| 02:39PM | 23 | WITH "MORE RECENTLY." |
| 02:39PM | 24 | IS THAT SOMETHING -- THAT'S EARLIER ON. |
| 02:39PM | 25 | MR. DOWNEY:  I ACTUALLY -- THAT IS HIGHLIGHTED, BUT |

LUCAS CROSS BY MR. DOWNEY                                            5529

02:39PM   1    I'M NOT -- I'D BE HAPPY TO --

02:39PM   2              THE COURT:  YOU'RE NOT SEEKING AN INTRODUCTION OF

02:39PM   3    THAT?

02:39PM   4              MR. DOWNEY:  I'M NOT SEEKING TO INTRODUCE THAT, NO.

02:39PM   5              THE COURT:  OKAY.

02:39PM   6              MR. DOWNEY:  I MEAN, IN ALL CANDOR, YOUR HONOR, I

02:39PM   7    WOULD SAY 98 PERCENT OF THIS DOCUMENT IS, IS NOT RELEVANT TO

02:39PM   8    OUR PROCEEDINGS.  IT'S JUST THAT THERE ARE TWO QUESTIONS THAT

02:39PM   9    ARE.

02:39PM   10             THE COURT:  SO YOU'RE SEEKING TO INTRODUCE THESE NOT

02:39PM   11   FOR THE TRUTH OF THE MATTER ASSERTED IN EACH OF THESE

02:39PM   12   STATEMENTS, BUT RATHER, HOW AND IF AND WHETHER THESE STATEMENTS

02:39PM   13   INFORMED ANY CONDUCT OF THIS WITNESS?

02:39PM   14             MR. DOWNEY:  THAT'S CORRECT.

02:39PM   15             THE COURT:  OKAY.  ALL RIGHT.  WITH THAT RESERVATION

02:40PM   16   THEN, I'LL ADMIT THEM.

02:40PM   17        LADIES AND GENTLEMEN, YOU'RE GOING TO SEE CERTAIN PAGES OF

02:40PM   18   DOCUMENT 12323.  THEY'RE NOT PAGINATED, SO I DON'T KNOW HOW

02:40PM   19   WE'LL MARK THOSE.

02:40PM   20        BUT THE HIGHLIGHTED STATEMENTS HERE ARE NOT, LADIES AND

02:40PM   21   GENTLEMEN, OFFERED FOR THE TRUTH OF THE MATTER ASSERTED IN EACH

02:40PM   22   OF THOSE STATEMENTS THAT YOU WILL SEE, THE HIGHLIGHTED

02:40PM   23   PORTIONS.

02:40PM   24        THEIR ONLY EFFECT AND RELEVANCE HERE IS AS TO WHETHER OR

02:40PM   25   NOT THEY HAD AN EFFECT ON THE CONDUCT OF THIS WITNESS, AND

LUCAS CROSS BY MR. DOWNEY                                        5530

02:40PM  1    WE'LL FIND THAT OUT WHEN MR. DOWNEY ASKS HIS QUESTIONS.

02:40PM  2        SO YOU CAN -- THOSE PORTIONS ARE ADMITTED, AND YOU CAN

02:40PM  3    DISPLAY THOSE TO THE JURY.

02:40PM  4        (DEFENDANT'S EXHIBIT 12323, 12TH AND 13TH PAGES, WAS

02:40PM  5    RECEIVED IN EVIDENCE.)

02:40PM  6            MR. DOWNEY:  THANK YOU, YOUR HONOR.  AND WE'LL, JUST

02:40PM  7    IN AN ABUNDANCE OF CAUTION, WE'LL REDACT THE BALANCE OF THE

02:40PM  8    DOCUMENT TO THE EXTENT THAT IT RAISES ANY CONCERNS AND WE CAN

02:40PM  9    BE CONFIDENT THAT WE'VE ONLY ADMITTED WHAT WE NEED.

02:40PM  10            THE COURT:  OKAY.  THANK YOU.

02:40PM  11   BY MR. DOWNEY:

02:40PM  12   Q.  IF YOU LOOK AT THE COVER PAGE OF THIS DOCUMENT, FIRST AT

02:41PM  13   PAGE 1, THERE'S AN EMAIL FROM MS. QUINTANA TO YOU AND SHE SAYS

02:41PM  14   SHE'S ATTACHING AND FORWARDING A CONFERENCE CALL TRANSCRIPT AND

02:41PM  15   A Q&A PORTION OF THAT.

02:41PM  16        DO YOU SEE THAT?

02:41PM  17   A.  YES.

02:41PM  18   Q.  AND IF YOU GO TO A FURTHER PAGE OF THIS EXHIBIT, THERE'S

02:41PM  19   FURTHER COLOR ON WHAT SHE'S TALKING ABOUT.

02:41PM  20        THE NEXT PAGE FROM THAT.  SORRY, THE PRIOR PAGE.  I BEG

02:41PM  21   YOUR PARDON.

02:41PM  22        SORRY, IT'S THE THIRD PAGE OF THE EXHIBIT.

02:42PM  23        YES.  OKAY.

02:42PM  24        ALL RIGHT.  THIS IS AN EMAIL FROM MELISSA FINDLEY TO YOU

02:42PM  25   WITH THE SUBJECT BEING KURT.

LUCAS CROSS BY MR. DOWNEY                                              5531

02:42PM   1          DO YOU SEE THAT?

02:42PM   2     A.   YES.

02:42PM   3     Q.   AND IS MELISSA FINDLEY SOMEBODY WHO WORKED FOR YOU?

02:42PM   4     A.   NO.  SHE WAS ONE OF THE ASSISTANTS TO MY UNCLE.

02:42PM   5     Q.   I SEE.  OKAY.

02:42PM   6          AND IN THE EMAIL SHE SAYS THAT "KURT WILL GIVE YOU A CALL

02:42PM   7     LATER TODAY.  HE DID ASK ME TO HAVE YOU HIT THE HIGHLIGHTS OF

02:42PM   8     THE SAFEWAY CALL FOR ME WITH REGARD TO THE WELLNESS PROGRAM SO

02:42PM   9     THAT I AM PREPARED IF PEOPLE ASK ME.  CAN YOU EMAIL ME THE KEY

02:42PM  10     POINTS?"

02:42PM  11          SO IS THIS A COMMUNICATION REALLY FROM YOUR UNCLE?

02:43PM  12          (PAUSE IN PROCEEDINGS.)

02:43PM  13          THE WITNESS:  SURE.  BETWEEN THE TWO OF THEM, YES.

02:43PM  14     BY MR. DOWNEY:

02:43PM  15     Q.   OKAY.  AND THIS IS JUST A REQUEST THAT YOU SUMMARIZE A

02:43PM  16     TRANSCRIPT OF A SAFEWAY CALL, WHICH IS ATTACHED; CORRECT?

02:43PM  17     A.   YES.

02:43PM  18     Q.   AND I WANT TO DRAW YOUR ATTENTION TO A FEW EXCERPTS THAT

02:43PM  19     WE'VE BEEN EXCHANGING ABOUT HERE.  FIRST TO THE QUESTION THAT

02:43PM  20     IS ASKED BY AN ANALYST.

02:43PM  21          IN SEEING THIS DOCUMENT, IF WE CAN GO TO THAT 12TH PAGE,

02:43PM  22     BUT IN SEEING THIS DOCUMENT, BEFORE WE TALK ABOUT THE SUBSTANCE

02:43PM  23     OF IT, DO YOU RECOGNIZE THIS AS AN EXCHANGE THAT TOOK PLACE IN

02:43PM  24     AN ANALYST CALL WITH SAFEWAY?

02:44PM  25     A.   YES.

5532

LUCAS CROSS BY MR. DOWNEY

| | | |
|---|---|---|
| 02:44PM | 1 | Q.   AND ANALYST CALLS ARE CALLS THAT ARE CONDUCTED BY WALL |
| 02:44PM | 2 | STREET ANALYSTS WHO FOLLOW THE STOCK OF PARTICULAR COMPANIES; |
| 02:44PM | 3 | IS THAT CORRECT? |
| 02:44PM | 4 | A.   CORRECT. |
| 02:44PM | 5 | Q.   AND THEY PRESENT OPPORTUNITIES FOR THOSE ANALYSTS TO ASK |
| 02:44PM | 6 | QUESTIONS OF THE SENIOR MANAGEMENT OF THE COMPANY THAT THEY'RE |
| 02:44PM | 7 | FOLLOWING; CORRECT? |
| 02:44PM | 8 | A.   RIGHT. |
| 02:44PM | 9 | Q.   AND THIS PORTION OF A TRANSCRIPT IS JUST ONE EXCHANGE IN |
| 02:44PM | 10 | SUCH A CALL BETWEEN ANALYSTS FOR MERRILL LYNCH AND STEVEN BURD, |
| 02:44PM | 11 | THE CHAIRMAN AND CEO OF SAFEWAY. |
| 02:44PM | 12 | DO YOU SEE THAT? |
| 02:44PM | 13 | A.   YES. |
| 02:44PM | 14 | Q.   AND WE DON'T HAVE TO GO THROUGH THE ANSWER, BUT TO LOOK AT |
| 02:44PM | 15 | THE ANSWER. |
| 02:44PM | 16 | HE'S PROVIDING AN UPDATE AT THIS POINT TO THE ANALYSTS AS |
| 02:44PM | 17 | TO HIS EXPECTATIONS FOR THE LAUNCH; CORRECT? |
| 02:45PM | 18 | A.   THERANOS IS CERTAINLY NOT MENTIONED, BUT I AM BELIEVING |
| 02:45PM | 19 | THAT'S WHAT THEY'RE TALKING ABOUT. |
| 02:45PM | 20 | Q.   OKAY.  AND DOES THE FACT THAT YOU RECEIVED THIS EXCHANGE |
| 02:45PM | 21 | REFLECT THAT MONITORING THE ACTIVITIES OF SAFEWAY WAS -- THE |
| 02:45PM | 22 | SAFEWAY/THERANOS PARTNERSHIP WAS IMPORTANT TO YOU IN |
| 02:45PM | 23 | CONSIDERING YOUR INVESTMENT DECISION IN 2013? |
| 02:45PM | 24 | A.   YES. |
| 02:45PM | 25 | Q.   LET ME SHOW YOU JUST THE OTHER QUESTION, WHICH COMES FROM |

LUCAS CROSS BY MR. DOWNEY

| | | |
|---|---|---|
| 02:45PM | 1 | A DIFFERENT ANALYST, AGAIN, ADDRESSED TO MR. BURD.  AND, AGAIN, |
| 02:45PM | 2 | THIS IS JUST FURTHER COLOR ON THE STATUS OF THE |
| 02:46PM | 3 | THERANOS/SAFEWAY PARTNERSHIP IN EARLY 2013; CORRECT? |
| 02:46PM | 4 | A.   YES. |
| 02:46PM | 5 | Q.   AND BY THE WAY, DID YOU KNOW BY EARLY 2013 THAT MR. BURD, |
| 02:46PM | 6 | WHO WAS THE CHAIRMAN OF SAFEWAY, HAD ACTUALLY ANNOUNCED THAT HE |
| 02:46PM | 7 | WAS LEAVING THE COMPANY? |
| 02:46PM | 8 | A.   I JUST DON'T REMEMBER. |
| 02:46PM | 9 | Q.   OKAY.  DO YOU RECALL LEARNING FROM ELIZABETH, |
| 02:46PM | 10 | ELIZABETH HOLMES THAT SHE HAD BEEN IN SUBSTANTIAL COMMUNICATION |
| 02:46PM | 11 | WITH MR. BURD OVER A PERIOD OF YEARS ABOUT THAT PARTNERSHIP? |
| 02:46PM | 12 | A.   I WAS NOT SURE WHO IT WAS, BUT CERTAINLY ONE OF THE |
| 02:46PM | 13 | EXECUTIVES AT SAFEWAY. |
| 02:46PM | 14 | Q.   FAIR ENOUGH.  WE CAN TAKE THAT DOWN. |
| 02:47PM | 15 | NOW, I THINK YOU WERE TALKING DURING YOUR DIRECT |
| 02:47PM | 16 | EXAMINATION ABOUT A PERIOD OF WHEN THERANOS WAS A DEVELOPMENT |
| 02:47PM | 17 | COMPANY; CORRECT? |
| 02:47PM | 18 | A.   YES. |
| 02:47PM | 19 | Q.   AND YOU UNDERSTOOD THAT THERANOS HAD SPENT A LOT OF MONEY |
| 02:47PM | 20 | ON THE RESEARCH AND DEVELOPMENT OF ITS INVESTMENTS; CORRECT? |
| 02:47PM | 21 | A.   OVER THE YEARS, YES. |
| 02:47PM | 22 | Q.   AND YOU UNDERSTOOD THAT ONE ELEMENT OF WHAT THEY WERE |
| 02:47PM | 23 | DEVELOPING WAS THESE SMALL SAMPLES, ASSAYS, SO THAT THEY COULD |
| 02:47PM | 24 | TEST FINGERSTICK SAMPLES; CORRECT? |
| 02:47PM | 25 | A.   YES. |

LUCAS CROSS BY MR. DOWNEY                                              5534

02:47PM  1    Q.   AND YOU WOULD PERIODICALLY GET UPDATES FROM MS. HOLMES AS

02:47PM  2    TO HOW THE DEVELOPMENT OF THAT WAS GOING; CORRECT?

02:47PM  3    A.   YES.

02:47PM  4    Q.   AND WOULD IT BE CONSISTENT WITH YOUR RECOLLECTION THAT YOU

02:47PM  5    UNDERSTOOD THAT THERANOS HAD DEVELOPED FOR USE IN A CLINICAL

02:47PM  6    LAB ABOUT 70 FINGERSTICK SAMPLE ASSAYS?

02:48PM  7    A.   I DON'T KNOW -- I DON'T REMEMBER EXACTLY THE NUMBER, BUT

02:48PM  8    AS I SAID EARLIER, IT CERTAINLY WAS DOZENS.

02:48PM  9    Q.   OKAY.  AND YOU JUST DON'T RECALL HER ASSIGNING A

02:48PM  10   PARTICULAR NUMBER, OR DO YOU BELIEVE THAT SHE SAID DOZENS?

02:48PM  11   A.   I DON'T REMEMBER EITHER.

02:48PM  12   Q.   OKAY.  BUT IT WOULD BE CONSISTENT IN YOUR VIEW WITH YOUR

02:48PM  13   RECOLLECTION IF THERANOS HAD, IN FACT, DEVELOPED AND VALIDATED

02:48PM  14   70 FINGERSTICK SMALL SAMPLE ASSAYS?

02:48PM  15   A.   YES.

02:48PM  16   Q.   AND YOU UNDERSTOOD THAT THEY WERE WORKING ALL OF THE TIME

02:48PM  17   TO DEVELOP MORE ASSAYS; CORRECT?

02:48PM  18   A.   CORRECT.

02:48PM  19   Q.   AND IT WOULD BE CONSISTENT WITH YOUR CONVERSATIONS WITH

02:48PM  20   MS. HOLMES IF, AS OF THE TIME OF YOUR 2013 INVESTMENT, THERANOS

02:48PM  21   HAD ACTUALLY DEVELOPED, TO THE POINT OF BEGINNING CLINICAL

02:49PM  22   VALIDATION, ABOUT 300 SMALL SAMPLE ASSAYS; CORRECT?

02:49PM  23   A.   I JUST DON'T RECOLLECT WHAT NUMBER.  I MORE FOCUSSED ON

02:49PM  24   THAT THEY WERE ROLLING OUT THE PLATFORM WITH WALGREENS, AND

02:49PM  25   WHATEVER IT IS THAT THEY HAD AT THAT TIME CERTAINLY WAS

LUCAS CROSS BY MR. DOWNEY                                                    5535

02:49PM    1    RELEVANT, OTHERWISE THEY WOULDN'T BE ROLLING IT OUT

02:49PM    2    COMMERCIALLY AND WALGREENS WOULDN'T BE DOING IT.

02:49PM    3    Q.   OKAY.  DID YOU UNDERSTAND THAT SOME OF THE SAMPLES THAT

02:49PM    4    WERE BEING DRAWN AT THE THERANOS SITES IN WALGREENS, AT LEAST

02:49PM    5    IN THE FIRST INSTANCE, WOULD BE DRAWN FROM VENOUS SAMPLES?

02:49PM    6         DO YOU REMEMBER KNOWING THAT?

02:49PM    7    A.   I THINK I REMEMBER THAT THERE WERE SOME TESTS THAT

02:49PM    8    THERANOS SAID THEY COULDN'T DO, AND SO IF YOU'RE HERE FOR THE

02:49PM    9    OTHERS, THEN WE HAVE TO DRAW THE BLOOD.

02:49PM   10    Q.   OKAY.  I THINK I NEGLECTED, WHEN WE WERE TALKING ABOUT

02:50PM   11    YOUR 2013 INVESTMENT, JUST TO ADMIT THE DOCUMENTS WHICH

02:50PM   12    DOCUMENTED IT.

02:50PM   13         SO I WANT TO MAKE SURE THAT WE HAVE ALL OF THAT IN

02:50PM   14    EVIDENCE, SO PARDON ME FOR ONE MOMENT.

02:50PM   15    A.   SURE.

02:50PM   16    Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 3530, WHICH I

02:50PM   17    THINK IS ALREADY IN EVIDENCE THROUGH ANOTHER WITNESS.

02:51PM   18         ALL RIGHT.  AND DO YOU SEE THAT THIS IS AN AMENDED

02:51PM   19    PREFERRED STOCK PURCHASE AGREEMENT FROM AN INITIAL CLOSING DATE

02:51PM   20    IN 2010?

02:51PM   21         DO YOU SEE THAT?

02:51PM   22    A.   YES.

02:51PM   23    Q.   AND DO YOU RECALL THAT AT SOME POINT IN 2010 YOU HAD BEEN

02:51PM   24    ASKED FOR CERTAIN APPROVALS IN CONNECTION WITH THE STOCK THAT

02:51PM   25    YOU ALREADY HELD AND THAT THAT RESULTED IN THE ISSUANCE OF A

LUCAS CROSS BY MR. DOWNEY                                              5536

| | | |
|---|---|---|
| 02:51PM | 1 | NEW STOCK PURCHASE AGREEMENT? |
| 02:51PM | 2 | A.   I'M NOT SURE WHAT TIMEFRAME IT WAS, BUT I DO REMEMBER THAT |
| 02:51PM | 3 | THERE WAS -- THERE WERE SOME DOCUMENTS THAT WE HAD TO APPROVE. |
| 02:51PM | 4 | Q.   OKAY.  LET ME ASK YOU JUST TO LOOK AT PAGE 25 OF THIS |
| 02:51PM | 5 | AGREEMENT. |
| 02:51PM | 6 | AND THIS, I THINK -- IS THIS THE MASTER SIGNATURE PAGE IN |
| 02:51PM | 7 | CONNECTION WITH THE DECEMBER 31ST, 2013 AGREEMENT THAT YOU |
| 02:51PM | 8 | SIGNED? |
| 02:52PM | 9 | A.   IT CERTAINLY LOOKS LIKE MY SIGNATURE.  I'M NOT SURE WHAT |
| 02:52PM | 10 | IS MEANT BY THE MASTER SIGNATURE PAGE. |
| 02:52PM | 11 | Q.   WELL, I THINK, I THINK YOU HAD TESTIFIED THAT THERE WERE |
| 02:52PM | 12 | SEVERAL DOCUMENTS IN CONNECTION -- |
| 02:52PM | 13 | A.   YES. |
| 02:52PM | 14 | Q.   -- WITH THIS.  AND A MASTER SIGNATURE PAGE IS SOMETIMES |
| 02:52PM | 15 | USED TO SIGN ONCE AND INDICATE YOUR AGREEMENT TO MULTIPLE |
| 02:52PM | 16 | AGREEMENTS? |
| 02:52PM | 17 | A.   YES, THAT LOOKS LIKE THE CASE. |
| 02:52PM | 18 | Q.   OKAY.  IF YOU WOULD JUST GO FORWARD TO SECTION 4.  THIS, |
| 02:52PM | 19 | AGAIN, IS THE REPRESENTATIONS AND WARRANTIES THAT YOU MADE IN |
| 02:52PM | 20 | CONNECTION WITH THE TRANSACTION. |
| 02:52PM | 21 | AND I DON'T WANT TO GO THROUGH THESE, BUT I JUST WANT TO |
| 02:52PM | 22 | GIVE YOU AN OPPORTUNITY TO REVIEW THEM AND CONFIRM THAT YOU |
| 02:52PM | 23 | MADE THESE REPRESENTATIONS IN CONNECTION WITH THE 2013 |
| 02:52PM | 24 | AGREEMENT. |
| 02:53PM | 25 | A.   YES.  IF THIS IS PART OF THAT DOCUMENT, YES. |

LUCAS CROSS BY MR. DOWNEY                                        5537

| | | |
|---|---|---|
| 02:53PM | 1 | Q.   OKAY.  AND LET ME GO FORWARD TO PAGE 41. |
| 02:53PM | 2 | AND JUST SO WE HAVE THE PRECISE DETAILS, YOU, I THINK IN |
| 02:53PM | 3 | CONNECTION WITH THIS TRANSACTION, PURCHASED -- IF WE LOOK AT |
| 02:53PM | 4 | THE CLOSING INFORMATION, IT INDICATES THAT YOU PURCHASED ABOUT |
| 02:53PM | 5 | 357,000 SHARES AND THAT YOU PAID ABOUT $5.35 MILLION FOR THEM; |
| 02:53PM | 6 | CORRECT? |
| 02:53PM | 7 | A.   YES. |
| 02:53PM | 8 | Q.   AND SO THAT REFLECTS THE $15 PRICE; CORRECT? |
| 02:53PM | 9 | A.   YES. |
| 02:53PM | 10 | Q.   OKAY.  NOW, SHORTLY AFTER THIS INVESTMENT CLOSED, I THINK |
| 02:54PM | 11 | YOU WERE -- AM I RIGHT THAT YOU WERE OFFERED IN WRITING THE |
| 02:54PM | 12 | OPPORTUNITY TO INVEST AGAIN AT THE HIGHER $17 PRICE? |
| 02:54PM | 13 | A.   YES. |
| 02:54PM | 14 | Q.   OKAY.  LET ME SHOW YOU EXHIBIT 5448 IN THE GOVERNMENT'S |
| 02:54PM | 15 | BINDER, WHICH IS THE WHITE BINDER. |
| 02:55PM | 16 | A.   OKAY. |
| 02:55PM | 17 | Q.   IS THIS DOCUMENT AN EMAIL EXCHANGE BETWEEN THERANOS AND |
| 02:55PM | 18 | BLACK DIAMOND VENTURES ABOUT A POTENTIAL INVESTMENT IN 2014 |
| 02:55PM | 19 | WITH THERANOS? |
| 02:55PM | 20 | A.   YES. |
| 02:55PM | 21 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 02:55PM | 22 | EXHIBIT 5448. |
| 02:55PM | 23 | MR. BOSTIC:  NO OBJECTION. |
| 02:55PM | 24 | THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 02:55PM | 25 | (GOVERNMENT'S EXHIBIT 5448 WAS RECEIVED IN EVIDENCE.) |

LUCAS CROSS BY MR. DOWNEY                                           5538

| | | |
|---|---|---|
| 02:55PM | 1 | BY MR. DOWNEY: |
| 02:55PM | 2 | Q.   SO IF YOU LOOK AT THE SORT OF BLAST EMAIL TO SHAREHOLDERS |
| 02:55PM | 3 | THAT YOU'RE ADDRESSED ON AS BLACK DIAMOND VENTURES, DO YOU SEE |
| 02:55PM | 4 | THAT THERE'S AN OFFERING HERE AND THE OFFERING IS AT ABOUT $17 |
| 02:56PM | 5 | PER SHARE; CORRECT? |
| 02:56PM | 6 | A.   CORRECT. |
| 02:56PM | 7 | Q.   AND IF YOU LOOK AT THE DATE IN THE ADDRESS BLOCK AT THE |
| 02:56PM | 8 | TOP, IT'S FROM JANUARY 21ST, 2014; CORRECT? |
| 02:56PM | 9 | A.   YES. |
| 02:56PM | 10 | Q.   AND SO THIS IS ABOUT THREE WEEKS AFTER THE CLOSING ON THE |
| 02:56PM | 11 | INVESTMENT YOU MADE IN 2013 AT $15 A SHARE; CORRECT? |
| 02:56PM | 12 | A.   YES. |
| 02:56PM | 13 | Q.   DID, DID YOU INVEST AT -- ADDITIONAL MONEY IN THERANOS IN |
| 02:56PM | 14 | CONNECTION WITH THIS 2014 OFFERING? |
| 02:56PM | 15 | A.   NO. |
| 02:56PM | 16 | Q.   OKAY.  WE SPOKE BRIEFLY BEFORE ABOUT THE BLACK DIAMOND 55 |
| 02:57PM | 17 | THAT REFLECTED MR. HALL'S INVESTMENT. |
| 02:57PM | 18 | DO YOU RECALL THAT? |
| 02:57PM | 19 | A.   YES. |
| 02:57PM | 20 | Q.   AND MR. HALL INVESTED IN BOTH 2006 AND 2013 IN THERANOS; |
| 02:57PM | 21 | CORRECT? |
| 02:57PM | 22 | A.   CORRECT. |
| 02:57PM | 23 | Q.   AND IN 2006 WHEN HE MADE HIS INVESTMENT, HE AGREED TO PAY |
| 02:57PM | 24 | A FORM OF COMPENSATION TO YOU FOR BEING ESSENTIALLY HIS |
| 02:57PM | 25 | INVESTMENT MANAGER WITH REGARD TO THE COMPANY; CORRECT? |

LUCAS CROSS BY MR. DOWNEY                                                 5539

02:57PM  1     A.   YES.

02:57PM  2     Q.   DO YOU RECALL THE TERMS OF THAT?

02:57PM  3     A.   I DON'T.

02:57PM  4     Q.   OKAY.  LET ME ASK YOU JUST TO LOOK AT AN EXHIBIT THAT IS

02:57PM  5     IN EVIDENCE AND SEE IF THESE ARE TERMS THAT WERE ULTIMATELY

02:57PM  6     AGREED TO.

02:57PM  7          IF YOU'LL LOOK AT EXHIBIT 3790.

02:57PM  8          DO YOU SEE AT THE TOP THAT THIS IS AN EXCHANGE BETWEEN

02:58PM  9     BRYAN TOLBERT OF HALL GROUP AND SEEMINGLY WITH MR. HALL.

02:58PM 10          DO YOU SEE THAT?

02:58PM 11     A.   YES.

02:58PM 12     Q.   OKAY.  AND THEN ATTACHED TO THIS DOCUMENT THERE ARE SOME

02:58PM 13     NOTES, AND I JUST WANT TO FOCUS ON SOME NOTES AT THE BOTTOM OF

02:58PM 14     PAGE 3.  IT'S THE SECOND TO THE LAST PARAGRAPH REALLY.  OKAY.

02:58PM 15          THIS DESCRIBES THAT THE 2006 INVESTMENT WOULD TAKE PLACE

02:58PM 16     THROUGH BLACK DIAMOND VENTURES, YOUR FUND; CORRECT?

02:58PM 17     A.   YES.

02:58PM 18     Q.   AND THAT MR. HALL WOULD PAY A 2.5 PERCENT ANNUAL

02:58PM 19     MANAGEMENT FEE ON THE FUNDS THAT WERE COMMITTED; CORRECT?

02:58PM 20     A.   YES.

02:58PM 21     Q.   AND 16 PERCENT OF THE UP SIDE; CORRECT?

02:58PM 22     A.   CORRECT.

02:58PM 23     Q.   AND IS THE MANAGEMENT FEE JUST A FEE THAT IS PAID ANNUALLY

02:59PM 24     BASED ON A PERCENTAGE OF THE MONEY THAT HAS BEEN INVESTED?

02:59PM 25     A.   CORRECT.

LUCAS CROSS BY MR. DOWNEY                                                5540

02:59PM  1     Q.   AND DOES THE UP SIDE REFER TO WHATEVER MONEY IS EVER

02:59PM  2     REALIZED ON THE INVESTMENT?

02:59PM  3     A.   YES, THAT WOULD BE THE PROFIT PARTICIPATION.

02:59PM  4     Q.   OKAY.  AND WERE THESE TERMS ULTIMATELY AGREED TO BETWEEN

02:59PM  5     BDV AND THE HALL GROUP?

02:59PM  6     A.   IT SEEMS THAT THEY WERE, BUT I JUST DON'T RECALL --

02:59PM  7     Q.   OKAY.

02:59PM  8     A.   -- THE EXACT.  IT CERTAINLY SEEMS WHAT WE DID, BUT I DON'T

02:59PM  9     RECALL THAT THEY WERE THE FINAL NUMBERS.

02:59PM  10    Q.   OKAY.  AND DO YOU RECALL IN 2013 THAT MR. HALL DID NOT

02:59PM  11    WANT TO CONTINUE TO INVEST IN THERANOS THROUGH

02:59PM  12    BLACK DIAMOND VENTURES?

02:59PM  13    A.   YES.

02:59PM  14    Q.   AND DO YOU RECALL THAT HE ASKED TO BECOME A DIRECT

02:59PM  15    INVESTOR WITHOUT HAVING A MANAGEMENT ARRANGEMENT WITH

02:59PM  16    BLACK DIAMOND VENTURES?

03:00PM  17    A.   I FORGET WHAT THE TERMS ENDED UP BEING, BUT, YES, HE

03:00PM  18    WANTED TO INVEST DIRECTLY.

03:00PM  19    Q.   OKAY.  AND THAT WAS A SUBSTANTIAL SUBJECT OF DISCUSSION

03:00PM  20    BETWEEN YOU AND -- ON THE ONE HAND AND MR. HALL AND MR. TOLBERT

03:00PM  21    ON THE OTHER HAND IN THIS 15-DAY WINDOW IN LATE DECEMBER 2013?

03:00PM  22    A.   YEAH.  I DON'T KNOW HOW SUBSTANTIAL, BUT IT CERTAINLY WAS

03:00PM  23    A DISCUSSION, YES.

03:00PM  24    Q.   AND MS. HOLMES WAS ALSO DRAWN INTO THAT CONVERSATION;

03:00PM  25    CORRECT?

LUCAS CROSS BY MR. DOWNEY                                              5541

03:00PM  1    A.   I DON'T, I DON'T RECALL.

03:00PM  2    Q.   OKAY.  I WANT YOU, FOR THE TIME BEING, JUST TO LOOK AT A

03:00PM  3    PAGE THAT IS IN YOUR NOTEBOOK.  IT'S THE FIRST PAGE OF

03:01PM  4    EXHIBIT 14217.

03:01PM  5    A.   THIS IS YOUR BOOK NOW?

03:01PM  6    Q.   YES, AND IN THE -- THAT'S RIGHT, YES.

03:01PM  7    A.   PLEASE SAY AGAIN THE NUMBER.

03:01PM  8    Q.   IT'S 14217.

03:01PM  9    A.   YES.

03:01PM  10   Q.   IS THIS A LIST OF THE INDIVIDUALS WHO INVESTED IN THERANOS

03:01PM  11   THROUGH BLACK DIAMOND VENTURES IN LATE 2013?

03:02PM  12   A.   YES, IT APPEARS TO BE.

03:02PM  13   Q.   OKAY.  AND THERE'S, THERE'S, I DON'T KNOW, 30 OR SO

03:02PM  14   INDIVIDUALS ON THAT LIST?

03:02PM  15   A.   YES.

03:02PM  16   Q.   AND WHAT -- UNDER WHAT TERMS DID THEY INVEST WITH

03:02PM  17   BLACK DIAMOND VENTURES IN CONNECTION WITH THEIR THERANOS

03:02PM  18   INVESTMENT?

03:02PM  19   A.   IT WOULD HAVE BEEN A 2 AND A HALF PERCENT ANNUAL

03:02PM  20   MANAGEMENT FEE, AND THEN I'M JUST NOT REMEMBERING WHAT THE

03:02PM  21   PROFIT PARTICIPATION WAS AS OUR NUMBERS HAVE INCREASED OVER THE

03:02PM  22   YEARS, AND SO IT MAY VERY WELL BE THE 16 PERCENT THAT WAS SHOWN

03:02PM  23   PRIOR.  I JUST FORGET.

03:02PM  24   Q.   OKAY.  AND IN EXCHANGE FOR, FOR THESE MANAGEMENT FEES AND

03:02PM  25   POTENTIAL UP SIDE, YOU KEEP THE INVESTORS INFORMED OF WHAT YOU

LUCAS CROSS BY MR. DOWNEY                                                   5542

03:03PM   1      KNOW ABOUT THE COMPANY; CORRECT?

03:03PM   2      A.   THAT'S CERTAINLY ONE OF THE ACTIVITIES, YES.

03:03PM   3      Q.   OKAY.  AND WHAT ELSE IS ASSOCIATED WITH THAT MANAGEMENT

03:03PM   4      FEE AND POTENTIAL UP SIDE?  WHAT DO YOU DO FOR THE INVESTORS?

03:03PM   5      A.   WELL, CERTAINLY IN MONITORING THE INVESTMENT AND TALKING

03:03PM   6      WITH MANAGEMENT AND SO FORTH, AND I'M SAYING THIS IN GENERAL,

03:03PM   7      WE HELP ALSO AS MUCH AS WE CAN WITH THE COMPANY TO HELP THEM

03:03PM   8      SUCCEED.

03:03PM   9      Q.   OKAY.  AND DO YOU RECALL, FOR EXAMPLE, WITH REGARD TO THE

03:03PM   10     THERANOS INVESTMENT, THAT YOU WOULD DO THINGS AFTER THESE

03:03PM   11     INVESTORS INVESTED, LIKE KEEP THEM UP TO DATE WITH THE OPENING

03:03PM   12     OF NEW WALGREENS, OPENING OF NEW THERANOS CENTERS IN WALGREENS

03:03PM   13     STORES?

03:03PM   14     A.   I WOULD EXPECT WE DID BECAUSE THAT'S VERY EXCITING AND I

03:03PM   15     WANT EVERYONE TO KNOW.

03:03PM   16     Q.   OKAY.  LET ME JUST SHOW YOU A DOCUMENT, WHICH WILL BE

03:04PM   17     EXHIBIT 12604.

03:04PM   18          YOUR HONOR, MAY I JUST HAVE A MOMENT?

03:04PM   19               THE COURT:  YES.  YES.

03:04PM   20          (PAUSE IN PROCEEDINGS.)

03:04PM   21               MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

03:04PM   22               THE COURT:  YES, OF COURSE.

03:04PM   23     BY MR. DOWNEY:

03:04PM   24     Q.   (HANDING.)

03:04PM   25     A.   OKAY.

LUCAS CROSS BY MR. DOWNEY

03:04PM  1    Q.   THIS EXHIBIT 12604, IS THIS AN EMAIL COMMUNICATION BETWEEN

03:05PM  2    YOU AND AN INVESTOR IN BDV ABOUT THERANOS?

03:05PM  3    A.   IT CERTAINLY LOOKS LIKE THAT.  I'M JUST GOING DOWN THE

03:05PM  4    LIST TO SEE IF HE WAS AN INVESTOR.

03:05PM  5         HE CERTAINLY IS ONE OF OUR INVESTORS.  I'M NOT SEEING

03:06PM  6    HIS -- UNLESS I'M MISSING IT, I'M NOT SEEING HIS NAME ON OUR

03:06PM  7    INVESTOR LIST.

03:06PM  8    Q.   OKAY.  YOU CAN PUT THAT DOCUMENT ASIDE.

03:06PM  9         DO YOU ALSO REMEMBER KEEPING INVESTORS UP TO SPEED ON

03:06PM  10   PUBLIC DEVELOPMENTS WITH THE COMPANY IN TERMS OF BOARD

03:06PM  11   APPOINTMENTS AND SO FORTH?

03:06PM  12   A.   YES.  IF THERE WAS SOMETHING RELEVANT, WE GENERALLY GOT IT

03:06PM  13   OUT TO OUR GROUP.

03:07PM  14            MR. DOWNEY:  YOUR HONOR, MAY I HAVE ONE MOMENT?

03:07PM  15            THE COURT:  YES.

03:07PM  16        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:07PM  17   BY MR. DOWNEY:

03:07PM  18   Q.   MR. LUCAS, I'M JUST GOING TO ASK YOU A QUESTION, AND I'M

03:07PM  19   NOT GOING TO HAVE YOU GO BACK AND LOOK AT IT, BUT DO YOU RECALL

03:07PM  20   WE WERE LOOKING AT A SLIDE WHICH WAS PART OF A BUSINESS PLAN

03:08PM  21   WHICH INDICATED VARIOUS SERIES OF ANALYZERS THAT THERANOS

03:08PM  22   INTENDED TO DEVELOP?

03:08PM  23        DO YOU RECALL THAT?

03:08PM  24   A.   YES.

03:08PM  25   Q.   AND THERE WAS TO BE 1.0, 2.0, ET CETERA?

LUCAS REDIRECT BY MR. BOSTIC                                    5544

03:08PM   1      A.   YES.

03:08PM   2      Q.   AND DID YOU EXPECT THAT EVEN AFTER THERANOS BEGAN TO OFFER

03:08PM   3      BLOOD TESTING SERVICES TO THE PUBLIC, IT WOULD CONTINUE TO

03:08PM   4      DEVELOP THE SERIES OF TECHNOLOGIES THAT IT OFFERED?

03:08PM   5      A.   YES.

03:08PM   6      Q.   AND DID YOU EXPECT THAT IT WOULD CONTINUE TO DEVELOP AND

03:08PM   7      VALIDATE SMALL SAMPLE ASSAYS TO USE IN CONNECTION WITH THOSE

03:08PM   8      ANALYZERS?

03:08PM   9      A.   YES.

03:08PM   10     Q.   OKAY.  SO A COMPANY CAN BOTH SCALE AND BE A DEVELOPMENT

03:08PM   11     COMPANY AT THE SAME TIME; CORRECT?

03:08PM   12     A.   YES, IT WOULD HAVE TO BE.

03:08PM   13     Q.   OKAY.

03:09PM   14          ALL RIGHT.  YOUR HONOR, I HAVE NO FURTHER QUESTIONS FOR

03:09PM   15     THIS WITNESS AT THIS TIME.

03:09PM   16              THE COURT:  ALL RIGHT.  MR. BOSTIC?

03:09PM   17              MR. BOSTIC:  YES, YOUR HONOR.

03:09PM   18              THE COURT:  FEEL FREE TO STRETCH AT THIS TIME.

03:09PM   19     WE'RE GOING TO END OUR DAY TODAY AT 4:00 O'CLOCK, 4:00 O'CLOCK.

03:09PM   20              MR. BOSTIC:  MAY I PROCEED, YOUR HONOR?

03:09PM   21              THE COURT:  PLEASE.

03:09PM   22                         **REDIRECT EXAMINATION**

03:09PM   23     BY MR. BOSTIC:

03:09PM   24     Q.   GOOD AFTERNOON, MR. LUCAS.  I'D JUST LIKE TO FOLLOW UP ON

03:09PM   25     A FEW THINGS YOU DISCUSSED WITH MR. DOWNEY.

LUCAS REDIRECT BY MR. BOSTIC                                    5545

03:09PM   1        FIRST OF ALL, IN THE BLACK BINDER, CAN I ASK YOU TO TURN

03:09PM   2   BACK TO TAB 14217.

03:10PM   3        DO YOU HAVE THAT IN FRONT OF YOU?

03:10PM   4   A.   YES.

03:10PM   5   Q.   YOU DISCUSSED THIS DOCUMENT WITH MR. DOWNEY.  DID YOU

03:10PM   6   IDENTIFY IT AS A LIST OF INDIVIDUALS WHO INVESTED IN THERANOS

03:10PM   7   IN DECEMBER 2013?

03:10PM   8   A.   YES.

03:10PM   9   Q.   I'LL ASK YOU TO REVIEW THE LIST, AND LET ME KNOW IF IT

03:10PM  10   REFRESHES YOUR RECOLLECTION AS TO WHETHER YOUR PERSONAL FUNDS

03:10PM  11   WERE ALSO INCLUDED IN THIS INVESTMENT BATCH.

03:10PM  12   A.   YES.

03:10PM  13   Q.   IT DOES REFRESH YOUR RECOLLECTION?

03:10PM  14   A.   WELL, MY NAME IS THERE.

03:10PM  15   Q.   LET ME ASK YOU, MR. LUCAS, BASED ON YOUR CURRENT MEMORY,

03:11PM  16   ARE YOU AWARE OF WHETHER OR NOT YOUR PERSONAL FUNDS WERE

03:11PM  17   ACTUALLY INCLUDED IN THIS 2013 THERANOS INVESTMENT?

03:11PM  18   A.   YES.

03:11PM  19   Q.   AND --

03:11PM  20   A.   I MEAN, AGAIN, THIS IS OUR INVESTOR SCHEDULE, AND IT LISTS

03:11PM  21   ALL OF OUR INVESTORS, AND I'M ONE OF THEM.

03:11PM  22   Q.   THANK YOU.

03:11PM  23        DO YOU REMEMBER SOME DISCUSSION WITH MR. DOWNEY ABOUT

03:11PM  24   MS. HOLMES'S AGE IN 2005?

03:11PM  25   A.   I DO.

LUCAS REDIRECT BY MR. BOSTIC                                            5546

03:11PM   1    Q.   AND LET'S LOOK JUST BRIEFLY AT EXHIBIT 1776 ONE MORE TIME,

03:11PM   2    AND THAT'S ADMITTED.

03:11PM   3         MAY WE PUBLISH, YOUR HONOR?

03:11PM   4              THE COURT:   YES.

03:11PM   5    BY MR. BOSTIC:

03:11PM   6    Q.   AND, MR. LUCAS, I BELIEVE YOU SAID THAT YOU RECALL THAT

03:11PM   7    MS. HOLMES MIGHT HAVE BEEN APPROXIMATELY 19 IN 2005?

03:11PM   8    A.   YES.

03:11PM   9    Q.   I'LL INVITE YOU TO JUST LOOK AT THE FIRST LINE OF THIS

03:11PM  10    "FORTUNE" ARTICLE THAT WE LOOKED AT BEFORE, AND WE'LL ZOOM IN

03:12PM  11    ON THE SCREEN.

03:12PM  12         DO YOU SEE WHERE IT SAYS, "IN THE FALL OF 2013" -- EXCUSE

03:12PM  13    ME.  "IN THE FALL OF 2003, ELIZABETH HOLMES, A 19-YEAR OLD

03:12PM  14    SOPHOMORE AT STANFORD."

03:12PM  15         DO YOU SEE THAT LANGUAGE?

03:12PM  16    A.   I DO.

03:12PM  17    Q.   SO JUST TO CLARIFY, IF THIS IS CORRECT, WOULD THAT MAKE

03:12PM  18    MS. HOLMES 21 IN 2005?

03:12PM  19    A.   YES.

03:12PM  20    Q.   OKAY.  AND WOULD THAT MEAN THAT SHE WAS THEN 29 YEARS OLD

03:12PM  21    IN 2013 AT THE TIME OF THE FOLLOW-ON INVESTMENT?

03:12PM  22    A.   YES.

03:12PM  23    Q.   AT THAT POINT IN 2013, WOULD THAT MEAN THAT MS. HOLMES HAD

03:12PM  24    BEEN CEO OF THERANOS FOR APPROXIMATELY TEN YEARS?

03:12PM  25    A.   YES.

LUCAS REDIRECT BY MR. BOSTIC                                          5547

03:12PM  1    Q.   AS AN INVESTOR LOOKING AT AN INVESTMENT OPPORTUNITY IN

03:12PM  2    2006 VERSUS 2013, DID YOU HAVE MORE CONFIDENCE IN MS. HOLMES

03:12PM  3    AND THERANOS IN 2013 GIVEN THAT SHE WAS A MORE SEASONED CEO?

03:13PM  4    A.   YES.

03:13PM  5    Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.

03:13PM  6         DO YOU RECALL DISCUSSING WITH MR. DOWNEY SOME FINANCIAL

03:13PM  7    PROJECTIONS THAT YOU APPEARED TO HAVE BEEN INVOLVED WITH IN

03:13PM  8    COLLABORATION WITH THERANOS?

03:13PM  9    A.   YES.

03:13PM  10   Q.   AND JUST TO BE CLEAR, DO YOU RECALL WHAT INFORMATION YOU

03:13PM  11   RELIED UPON IN ASSISTING WITH THOSE PROJECTIONS?

03:13PM  12   A.   I DON'T FULLY RECALL THE PROCESS, BUT I WOULD HAVE

03:13PM  13   RECEIVED NUMBERS FROM THE COMPANY, AND THEN I WOULD HAVE PUT

03:13PM  14   THEM IN A NICE FORMAT.

03:13PM  15   Q.   AND THAT'S MY QUESTION.  AT THAT TIME, DID YOU HAVE ANY

03:13PM  16   INDEPENDENT SOURCE OF INFORMATION OR KNOWLEDGE ABOUT THE

03:13PM  17   COMPANY'S FINANCIALS OTHER THAN MS. HOLMES AND THE COMPANY

03:13PM  18   ITSELF?

03:13PM  19   A.   NO.

03:13PM  20   Q.   DURING THAT PERIOD OF TIME, WAS MS. HOLMES STILL YOUR

03:14PM  21   PRIMARY SOURCE OF INFORMATION ABOUT THERANOS?

03:14PM  22   A.   YES.  AND IN THAT PROCESS, AS WAS MENTIONED EARLIER, THE

03:14PM  23   PEOPLE THAT I WORKED WITH IN PUTTING THE NUMBERS TOGETHER.

03:14PM  24   Q.   THE DOCUMENTS THAT YOU REVIEWED WITH MR. DOWNEY WERE FROM

03:14PM  25   2007 PROJECTING FINANCIALS FOR 2008.

LUCAS REDIRECT BY MR. BOSTIC                                    5548

03:14PM   1        DO YOU RECALL THAT?

03:14PM   2   A.   YES.

03:14PM   3   Q.   IN THE YEARS AFTER 2007 LEADING UP TO 2013, DO YOU RECALL

03:14PM   4   DOING ANY ADDITIONAL WORK ON THERANOS FINANCIAL INFORMATION?

03:14PM   5   A.   I DON'T.

03:14PM   6   Q.   IN THE TIME AROUND THE 2013 INVESTMENT, DID YOU HAVE

03:14PM   7   ACCESS TO THERANOS FINANCIAL INFORMATION?

03:14PM   8   A.   NO.

03:14PM   9   Q.   AT THE TIME THAT YOU DECIDED TO INVEST IN LATE 2013, DID

03:14PM  10   YOU HAVE ANY KNOWLEDGE AS TO WHETHER THERANOS WAS SHORT ON

03:14PM  11   MONEY AND NEEDED INVESTMENT TO CONTINUE OPERATIONS?

03:14PM  12   A.   I WAS NOT -- EXCUSE ME -- I WAS NOT AWARE OF THE CASH

03:15PM  13   POSITION.

03:15PM  14        BUT CERTAINLY WHEN YOU'RE RAISING MONEY, IT'S -- YOU NEED

03:15PM  15   THE MONEY, SO YOU'RE RAISING IT FOR EITHER -- YOU'RE RAISING

03:15PM  16   MONEY FOR THE EXPANSION, AND YOU MAY NOT BE OUT OF MONEY, BUT

03:15PM  17   YOU CERTAINLY NEED ADDITIONAL MONEY FOR THAT SORT OF ROLLOUT.

03:15PM  18   Q.   AND TO BE CLEAR, YOUR TESTIMONY IS THAT YOU DIDN'T KNOW

03:15PM  19   ONE WAY OR ANOTHER WHAT THERANOS'S FINANCIAL SITUATION WAS IN

03:15PM  20   LATE 2013; IS THAT RIGHT?

03:15PM  21   A.   CORRECT.

03:15PM  22   Q.   EXHIBIT 10 -- EXCUSE ME, 12022 WAS PREVIOUSLY ADMITTED.

03:15PM  23        MS. HOLLIMAN, DO WE HAVE THE ABILITY TO PROJECT THAT?

03:16PM  24        AND IF WE CAN GO TO, LET'S SEE, SLIDE 22 IN THE

03:16PM  25   PRESENTATION.  SO FOUR MORE PAGES FORWARD, PLEASE,

LUCAS REDIRECT BY MR. BOSTIC                                        5549

03:16PM  1      MS. HOLLIMAN.

03:16PM  2          MR. LUCAS, DO YOU REMEMBER REVIEWING THIS SLIDE THAT YOU

03:16PM  3      RECEIVED IN LATE 2005?

03:16PM  4      A.   YES.

03:16PM  5      Q.   THIS SLIDE HAS PROJECTIONS FOR A SERIES OF THE THERANOS

03:16PM  6      ANALYZER; IS THAT CORRECT?

03:16PM  7      A.   CORRECT.

03:16PM  8      Q.   AND DOWN AT THE BOTTOM, DO YOU SEE THAT THERE ARE YEARS

03:16PM  9      LISTED SO THAT THE VERSIONS OF THE ANALYZER APPEAR ON A

03:16PM 10      TIMELINE?

03:16PM 11      A.   YES.

03:16PM 12      Q.   AND THIS TIMELINE GOES TO 2010; CORRECT?

03:16PM 13      A.   YES.

03:16PM 14      Q.   INDICATING THAT AT THIS TIME THE COMPANY WAS PROJECTING

03:16PM 15      THAT ITS ANALYZER WOULD BE ABLE TO DO MORE THAN 1,000 ASSAYS BY

03:17PM 16      APPROXIMATELY 2010?  IS THAT HOW YOU READ THIS CHART?

03:17PM 17      A.   YES.

03:17PM 18      Q.   AT THE TIME THAT YOU INVESTED IN 2013, I THINK YOU

03:17PM 19      TESTIFIED BEFORE YOU UNDERSTOOD FROM MS. HOLMES THAT THE

03:17PM 20      ANALYZER COULD PERFORM DOZENS OF TESTS; IS THAT CORRECT?

03:17PM 21      A.   CORRECT.

03:17PM 22      Q.   SO THEN BASED ON THIS CHART, WOULD THAT MEAN THAT YOU

03:17PM 23      UNDERSTOOD THAT THERANOS WAS PAST WHAT WOULD BE VERSION 3.0 ON

03:17PM 24      THIS CHART WHICH COULD ONLY DO TEN ASSAYS?

03:17PM 25      A.   I DON'T REMEMBER WHAT I WOULD HAVE ASSUMED AT THAT TIME.

LUCAS REDIRECT BY MR. BOSTIC                                        5550

03:17PM   1    THIS HAD BEEN DONE BACK IN 2006.  YOU KNOW, THAT'S A GOOD PIECE

03:17PM   2    OF TIME, AND I PROBABLY DID NOT EVEN GO BACK AND REFER TO THIS

03:18PM   3    DOCUMENT.

03:18PM   4    Q.   SORRY TO TALK OVER YOU.

03:18PM   5         IN 2013 THEN, TO UNDERSTAND WHERE THERANOS WAS WITH ITS

03:18PM   6    TECHNOLOGY, YOU WERE NOT REFERRING BACK TO THIS DOCUMENT;

03:18PM   7    CORRECT?

03:18PM   8    A.   NO.

03:18PM   9    Q.   WHAT WERE YOU RELYING ON FOR YOUR UNDERSTANDING OF HOW FAR

03:18PM  10    ALONG THERANOS'S ANALYZER WAS IN 2013?

03:18PM  11    A.   AS I SAID EARLIER, IT WAS MY UNDERSTANDING THAT THERANOS

03:18PM  12    WAS ABLE TO DO DOZENS OF TESTS, AND WHICH VERSION THE COMPANY

03:18PM  13    WAS ON I DIDN'T KNOW.

03:18PM  14    Q.   AND YOUR UNDERSTANDING THAT THE COMPANY COULD DO DOZENS OF

03:18PM  15    TESTS, FIRST OF ALL, DID YOU UNDERSTAND THAT THAT MEANT THAT

03:18PM  16    THE COMPANY'S HOME GROWN ANALYZER COULD PERFORM DOZENS OF

03:18PM  17    TESTS?

03:18PM  18    A.   YES.

03:18PM  19    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?  WHAT SOURCE?

03:18PM  20    A.   LIKELY JUST FROM ELIZABETH.

03:18PM  21    Q.   AND THERE WAS SOME TALK DURING YOUR CROSS-EXAMINATION

03:18PM  22    ABOUT THE IMPORTANCE THAT YOU ASCRIBED TO THERANOS'S

03:19PM  23    PARTNERSHIPS WITH WALGREENS AND SAFEWAY.

03:19PM  24         DO YOU REMEMBER THAT TESTIMONY?

03:19PM  25    A.   YES.

LUCAS REDIRECT BY MR. BOSTIC                                          5551

03:19PM   1    Q.   WERE THOSE PARTNERSHIPS ALL THAT MATTERED TO YOU IN MAKING

03:19PM   2    YOUR DECISION TO INVEST IN 2013, OR DID THE STATE OF THE

03:19PM   3    COMPANY'S TECHNOLOGY AND HOW FAR ALONG IT WAS ALSO MATTER TO

03:19PM   4    YOU AT THAT TIME?

03:19PM   5    A.   ABSOLUTELY.  IT WAS THE WHOLE THING AND THE FACT THAT

03:19PM   6    THERE WERE OTHER RELATIONSHIPS WITH THE PHARMAS AND GOVERNMENT.

03:19PM   7         MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN ACTUALLY KEEP

03:19PM   8    12022 UP AND GO TO THE PAGE WITH THE BATES NUMBER 18849.

03:19PM   9         I'M SORRY.  I COULD TRY TO FIGURE OUT WHAT PAGE NUMBER

03:19PM   10   THAT IS IN THE DOCUMENT, BUT I'M NOT GOING TO TRY TO DO MATH IN

03:19PM   11   FRONT OF A CROWD.

03:19PM   12        SO ABOUT 50 PAGES MORE.

03:20PM   13        HERE WE ARE.  THANK YOU.

03:20PM   14   Q.   MR. LUCAS, DO YOU REMEMBER REVIEWING THIS PORTION OF A

03:20PM   15   MEMO WITH MR. DOWNEY WHERE IN 2005 THERE WERE RISKS DISCLOSED

03:20PM   16   RELATING TO THE THERANOS INVESTMENT?

03:20PM   17   A.   YES.

03:20PM   18   Q.   AND ONE OF THOSE RISKS, IN FACT, THE FIRST ONE, "THE RATE

03:20PM   19   OF PROGRESS AND COSTS OF OUR RESEARCH AND DEVELOPMENT

03:20PM   20   ACTIVITIES, LEADING TO THE PRODUCTION OF OUR FIRST GENERATION

03:20PM   21   DEVICE."

03:20PM   22        DO YOU SEE THAT?

03:20PM   23   A.   YES.

03:20PM   24   Q.   AND FIRST, WHEN YOU MADE YOUR 2013 INVESTMENT, DID YOU

03:21PM   25   RECEIVE A SIMILAR DISCLOSURE ABOUT RISKS FROM THERANOS OR

LUCAS REDIRECT BY MR. BOSTIC                                        5552

03:21PM  1    MS. HOLMES?

03:21PM  2    A.   THIS PERTAINS TO THE SECOND 2006 INVESTMENT?  I'M SORRY.

03:21PM  3    Q.   UM, SO I -- I DON'T WANT YOU TO RELY ON ME FOR THAT, BUT

03:21PM  4    YOU UNDERSTAND THAT THIS WAS RELATING TO YOUR INVESTMENT IN THE

03:21PM  5    2006 TIME PERIOD?

03:21PM  6    A.   YES.

03:21PM  7    Q.   AND MY QUESTION IS FOR 2013.

03:21PM  8    A.   OH.

03:21PM  9    Q.   SEVEN YEARS LATER, DID YOU RECEIVE A SIMILAR LIST OR

03:21PM  10   DISCLOSURE FROM THERANOS ABOUT RISKS INVOLVED IN THAT

03:21PM  11   INVESTMENT?

03:21PM  12   A.   I DON'T REMEMBER.  I'D HAVE TO LOOK AT THE DOCUMENTS.

03:21PM  13   Q.   SITTING HERE TODAY, DO YOU HAVE A MEMORY OF RECEIVING SUCH

03:21PM  14   A LIST?

03:21PM  15   A.   I JUST DON'T RECALL.

03:21PM  16   Q.   THAT FIRST RISK THAT IS LISTED HERE IN 2006 RELATES TO

03:21PM  17   PROGRESS AND COST OF R&D.

03:22PM  18        DO YOU SEE THAT?

03:22PM  19   A.   YES.

03:22PM  20   Q.   AND WHAT WAS YOUR UNDERSTANDING IN 2013 OF THE AMOUNT OF

03:22PM  21   R&D RISK ASSOCIATED WITH THERANOS.

03:22PM  22        WAS IT THE SAME AS IT WAS IN 2006?

03:22PM  23   A.   NO.  IF THEY'RE STARTING TO ROLL OUT THE TECHNOLOGY TO

03:22PM  24   COMMERCIAL PARTNERS, THEN CERTAINLY WE'RE BEYOND -- ONE WOULD

03:22PM  25   THINK WE'RE BEYOND THE R&D RISK FOR THE INITIAL ROLLOUT.

LUCAS REDIRECT BY MR. BOSTIC                                          5553

```
03:22PM   1         BUT AS WE DISCUSSED EARLIER, R&D IS REALLY IMPORTANT IN

03:22PM   2    TECHNOLOGY COMPANIES TO KEEP GOING, ALSO MAKING IT BETTER,

03:22PM   3    FASTER, SMALLER, AND SO FORTH.

03:22PM   4         BUT CERTAINLY IF YOU'RE ROLLING IT OUT, YOU WOULD BELIEVE

03:22PM   5    THE R&D FOR THAT PORTION OF IT WAS DONE.

03:22PM   6    Q.   AND TO BE CLEAR, WHEN WE'RE TALKING ABOUT YOUR

03:22PM   7    UNDERSTANDING OF HOW FAR ALONG THE THERANOS TECHNOLOGY WAS, WAS

03:22PM   8    THAT UNDERSTANDING JUST BASED ON YOUR ASSUMPTIONS BECAUSE THE

03:22PM   9    ROLLOUT WAS HAPPENING, OR WAS IT ALSO INFORMED BY CONVERSATIONS

03:23PM  10    WITH MS. HOLMES ABOUT THE TECHNOLOGY?

03:23PM  11    A.   I WOULD CERTAINLY THINK BOTH.

03:23PM  12    Q.   SO BOTH OF THOSE SOURCES OF INFORMATION WOULD HAVE BEEN

03:23PM  13    IMPORTANT TO YOU AS AN INVESTOR?

03:23PM  14    A.   YES.

03:23PM  15    Q.   DO YOU RECALL REVIEWING THE STOCK PURCHASE AGREEMENT WITH

03:23PM  16    MR. DOWNEY THAT CONTAINED A SECTION FOR REPRESENTATIONS AND

03:23PM  17    WARRANTIES THAT THE INVESTOR HAD TO MAKE?

03:23PM  18    A.   YES.

03:23PM  19    Q.   AND DO YOU RECALL THAT ONE OF THOSE PORTIONS TALKED ABOUT

03:23PM  20    ACCESS TO INFORMATION AND WHETHER YOU AS THE INVESTOR HAD HAD A

03:23PM  21    CHANCE TO ASK QUESTIONS OF COMPANY MANAGEMENT AND RECEIVE

03:23PM  22    INFORMATION BACK?

03:23PM  23    A.   YES.

03:23PM  24    Q.   WHEN YOU MADE THE 2013 INVESTMENT, WERE YOU SATISFIED WITH

03:23PM  25    YOUR ABILITY TO ASK MS. HOLMES QUESTIONS AND THE ANSWERS THAT
```

LUCAS RECROSS BY MR. DOWNEY                                           5554

03:23PM  1    SHE HAD PROVIDED TO YOU AT THE TIME?

03:23PM  2    A.   WITH THE QUESTIONS WE ASKED AND THE RESPONSES, YES.

03:24PM  3    Q.   AND WAS THAT SATISFACTION BASED ON AN ASSUMPTION THAT THE

03:24PM  4    INFORMATION THAT YOU HAD GOTTEN FROM MS. HOLMES WAS TRUTHFUL

03:24PM  5    AND ACCURATE?

03:24PM  6    A.   YES.

03:24PM  7         MR. BOSTIC:  NO FURTHER QUESTIONS.

03:24PM  8         THANK YOU.

03:24PM  9                      **RECROSS-EXAMINATION**

03:24PM  10   BY MR. DOWNEY:

03:24PM  11   Q.   I REALLY JUST HAVE A COUPLE OF QUESTIONS FOR YOU.

03:24PM  12        COULD YOU LOOK BACK AT EXHIBIT 1776 IN THE WHITE NOTEBOOK.

03:25PM  13   A.   OKAY.

03:25PM  14   Q.   AND I'M GOING TO DIRECT YOUR ATTENTION TO THE BOTTOM OF

03:25PM  15   PAGE 8 OF THAT EXHIBIT.

03:25PM  16        ON YOUR REDIRECT EXAMINATION, DO YOU RECALL THAT --

03:25PM  17        MR. WADE:  I THINK WE NEED A TECH SWITCH HERE.

03:25PM  18   SORRY FOR THE INTERRUPTION.

03:25PM  19        THE CLERK:  APOLOGIES.

03:25PM  20        THE COURT:  IT'S ON THE SCREEN NOW I BELIEVE.

03:25PM  21        JUROR:  UH-HUH.

03:25PM  22        MR. DOWNEY:  I CAN SEE IT.  CAN OTHERS?  OKAY.

03:25PM  23   Q.   FIRST OF ALL, I THINK WE ESTABLISHED THAT MS. HOLMES WAS

03:25PM  24   ACTUALLY 21?

03:25PM  25   A.   YES.

LUCAS RECROSS BY MR. DOWNEY                                        5555

03:25PM  1    Q.   YES.  OKAY.

03:25PM  2         AND THEN CAN I ASK YOU TO LOOK AT THE BOTTOM OF PAGE 8 IN

03:25PM  3    THIS EXHIBIT, AND I'M REALLY JUST INTERESTED IN THE LAST

03:25PM  4    PARAGRAPH THERE.

03:26PM  5         AND BEFORE I DO THAT, DO YOU RECALL THAT MR. BOSTIC WAS

03:26PM  6    JUST ASKING YOU QUESTIONS ABOUT THE FACT THAT YOU WERE RELYING

03:26PM  7    ON DATA THAT THERANOS PROVIDED TO YOU IN CONSIDERATION CERTAIN

03:26PM  8    ASPECTS OF YOUR INVESTMENT?

03:26PM  9    A.   YES.  BACK AT THIS 2006 OR 2013 TIMEFRAME?

03:26PM 10    Q.   YES, RIGHT.  DO YOU RECALL HE WAS ASKING YOU THAT?

03:26PM 11    A.   YEAH.

03:26PM 12    Q.   OKAY.  I WANT TO DIRECT YOUR ATTENTION TO A QUOTE

03:26PM 13    CONTAINED IN THE ARTICLE THAT MR. BOSTIC FIRST REFERRED YOU TO,

03:26PM 14    WHICH READS AS FOLLOWS:

03:26PM 15         "THE FIRST TIME I HEARD ABOUT THIS, I THOUGHT IT WAS SNAKE

03:26PM 16    OIL AND MIRRORS SAYS DAVID HELFET, THE CHIEF OF ORTHOPEDIC

03:26PM 17    TRAUMA AT THE HOSPITAL FOR SPECIAL SURGERY IN MANHATTAN.  BUT

03:26PM 18    AFTER REVIEWING VOLUMINOUS VALIDATION STUDIES SUPPLIED TO HIM

03:26PM 19    BY THE COMPANY, HE HAS BECOME A BELIEVER AND IS URGING HIS

03:26PM 20    HOSPITAL TO CONSIDER ADOPTION."

03:27PM 21         DO YOU SEE THAT?

03:27PM 22    A.   YES.

03:27PM 23    Q.   AND IF YOU SEE, IT CARRIES OVER TO THE NEXT PAGE AND IT

03:27PM 24    SAYS -- THE FIRST PARAGRAPH SAYS, "'IT'S REAL DATA,' HE SAYS.

03:27PM 25    IT'S NOT THEIR INTERPRETATION."

5556
LUCAS RECROSS BY MR. DOWNEY

03:27PM    1          AND THEN HE NOTES THAT "THERANOS INVITED DR. HELFET TO

03:27PM    2     JOIN A MEDICAL ADVISORY BOARD."

03:27PM    3          DID YOU READ THIS AS PART OF YOUR REVIEW OF THIS ARTICLE

03:27PM    4     IN 2014?

03:27PM    5     A.   I DON'T REMEMBER, BUT I CERTAINLY REMEMBER THE ARTICLE AND

03:27PM    6     I READ THE ARTICLE.

03:27PM    7     Q.   WAS IT IMPORTANT TO YOU, IN THINKING ABOUT YOUR

03:27PM    8     INVESTMENT, THAT MEDICAL EXPERTS HAD REVIEWED DATA IN

03:27PM    9     CONNECTION WITH THERANOS'S TECHNOLOGY?

03:27PM   10     A.   GREAT.

03:27PM   11               MR. DOWNEY:  I HAVE NOTHING FURTHER, YOUR HONOR.

03:27PM   12               MR. BOSTIC:  I HAVE NOTHING FURTHER.  THANK YOU.

03:27PM   13               THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:27PM   14               MR. BOSTIC:  YES, YOUR HONOR.

03:27PM   15               MR. DOWNEY:  YES, YOUR HONOR.

03:27PM   16               THE COURT:  SIR, YOU'RE EXCUSED.  THANK YOU.

03:27PM   17               THE WITNESS:  THANK YOU.

03:28PM   18               THE COURT:  YOU'RE WELCOME.  YOU CAN LEAVE THOSE

03:28PM   19     BINDERS THERE.

03:28PM   20          AND THE GOVERNMENT HAS ANOTHER WITNESS?

03:28PM   21               MR. LEACH:  WE DO, YOUR HONOR.

03:28PM   22          THE UNITED STATES CALLS LYNETTE SAWYER.

03:28PM   23               THE COURT:  GOOD AFTERNOON.  IF YOU'LL PLEASE COME

03:29PM   24     FORWARD, AND I'LL INVITE YOU OVER HERE TO STAND AND FACE OUR

03:29PM   25     COURTROOM DEPUTY.

SAWYER DIRECT BY MR. LEACH                                    5557

03:29PM   1        IF YOU WOULD RAISE YOUR RIGHT HAND, WHILE YOU DO SO, SHE

03:29PM   2   HAS A QUESTION FOR YOU.

03:29PM   3        **(GOVERNMENT'S WITNESS, LYNETTE SAWYER, WAS SWORN.)**

03:29PM   4        THE WITNESS:  YES.

03:29PM   5        THE COURT:  THANK YOU.  PLEASE HAVE A SEAT HERE.

03:29PM   6   LET ME INVITE YOU TO TAKE A SEAT.  MAKE YOURSELF COMFORTABLE.

03:29PM   7        FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

03:29PM   8   NEED.

03:29PM   9        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

03:29PM  10        WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

03:29PM  11   AND THEN SPELL IT, PLEASE.

03:29PM  12        THE WITNESS:  MY NAME IS LYNETTE SAWYER.

03:29PM  13   L-Y-N-E-T-T-E, S-A-W-Y-E-R.

03:29PM  14        THE COURT:  THANK YOU.

03:29PM  15   MR. LEACH.

03:29PM  16        MR. LEACH:  THANK YOU, YOUR HONOR.

03:29PM  17                      **DIRECT EXAMINATION**

03:29PM  18   BY MR. LEACH:

03:29PM  19   Q.   DR. SAWYER, IF YOU ARE FULLY VACCINATED, I UNDERSTAND YOU

03:29PM  20   HAVE THE PERMISSION OF THE COURT TO REMOVE YOUR MASK DURING

03:29PM  21   TESTIMONY IF YOU'RE COMFORTABLE.

03:29PM  22   A.   THANK YOU.

03:30PM  23   Q.   AND I'LL REMOVE MINE.

03:30PM  24        GOOD AFTERNOON.

03:30PM  25        IN THE FOURTH QUARTER OF 2014, WERE YOU ASKED TO SERVE AS

SAWYER DIRECT BY MR. LEACH                                    5558

03:30PM   1     A CO-DIRECTOR OF THERANOS'S CALIFORNIA CLINICAL LABORATORY?

03:30PM   2     A.   YES.

03:30PM   3     Q.   AND DID YOU ULTIMATELY AGREE?

03:30PM   4     A.   YES.

03:30PM   5     Q.   AND WERE YOU A CO-DIRECTOR OF THERANOS'S CALIFORNIA

03:30PM   6     CLINICAL LABORATORY FROM LATE 2014 THROUGH APPROXIMATELY THE

03:30PM   7     END OF JUNE 2015?

03:30PM   8     A.   YES.

03:30PM   9     Q.   WHY DID YOU STOP BEING THE CO-DIRECTOR OF THERANOS'S

03:30PM  10     CALIFORNIA CLINICAL LABORATORY IN JUNE OF 2015?

03:30PM  11     A.   I HAD ORIGINALLY TAKEN THE JOB, AS DESCRIBED TO ME, IT WAS

03:30PM  12     A TWO TO THREE MONTH FILLER UNTIL THEY HAD ANOTHER DIRECTOR WAS

03:30PM  13     THAT GOING TO BE COMING ON, AND AS THAT TIME WORE ON AND ON, I

03:30PM  14     GREW INCREASINGLY UNCOMFORTABLE WITH THE WAY THINGS WERE DONE

03:30PM  15     IN TERMS OF HOW I WAS DEALT WITH AS A DIRECTOR.

03:30PM  16     Q.   I HAVE SOME MORE QUESTIONS ABOUT THAT, BUT LET ME FIRST

03:31PM  17     ASK YOU TO PLEASE DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US.

03:31PM  18     A.   I HAVE A DOCTORATE IN PUBLIC HEALTH FROM U.C. BERKELEY.  I

03:31PM  19     ALSO AM A LICENSED CLINICAL LABORATORY SCIENTIST, LICENSED

03:31PM  20     PUBLIC HEALTH MICROBIOLOGIST, AND I HAVE A BIOANALYST LICENSE,

03:31PM  21     WHICH IS WHAT ALLOWS ME TO DIRECT LABORATORIES UNDER BOTH CLIA

03:31PM  22     AND CALIFORNIA LAW.

03:31PM  23     Q.   LET ME BACK UP A LITTLE BIT FURTHER.  DO YOU HAVE A

03:31PM  24     COLLEGE DEGREE?

03:31PM  25     A.   OH, YEAH, SORRY.

SAWYER DIRECT BY MR. LEACH                                        5559

03:31PM  1    Q.   WONDERFUL.  AND WHERE IS THAT FROM?

03:31PM  2    A.   SAN DIEGO STATE.

03:31PM  3    Q.   AND WHEN DID YOU OBTAIN YOUR COLLEGE DEGREE FROM SAN DIEGO

03:31PM  4    STATE?

03:31PM  5    A.   1977.

03:31PM  6    Q.   AND I THINK I HEARD YOU HAVE A MASTER'S DEGREE ALSO.

03:31PM  7    A.   YES, I DO.

03:31PM  8    Q.   AND WHERE IS YOUR MASTER'S DEGREE FROM?

03:31PM  9    A.   U.C. BERKELEY.

03:31PM  10   Q.   AND WHEN DID YOU GET THAT?

03:31PM  11   A.   1987.

03:32PM  12   Q.   AND DID YOU ALSO OBTAINED A PH.D. IN PUBLIC HEALTH FROM

03:32PM  13   U.C. BERKELEY?

03:32PM  14   A.   YES.

03:32PM  15   Q.   AND WHEN WAS THAT?

03:32PM  16   A.   1996.

03:32PM  17   Q.   AND LET'S START WITH THE TIME PERIOD OF 1996 GOING

03:32PM  18   FORWARD.  AT A HIGH LEVEL, BRIEFLY DESCRIBE YOUR PROFESSIONAL

03:32PM  19   EXPERIENCE.

03:32PM  20   A.   I WAS DIRECTING SEVERAL SMALL LABORATORIES FOR A LARGE

03:32PM  21   LABORATORY SYSTEM IN SAN JOSE.

03:32PM  22        I WORKED AT THE VIRUS LAB OF THE CALIFORNIA DEPARTMENT OF

03:32PM  23   PUBLIC HEALTH FOR YEARS DOING HIV RESEARCH.

03:32PM  24        I ALSO DIRECTED A CLINICAL LAB FOR WHAT WAS CHIRON WHAT I

03:32PM  25   STARTED, BAYER BY THE TIME I LEFT, A SMALL CLINICAL LAB THAT

SAWYER DIRECT BY MR. LEACH                                          5560

03:32PM  1    THAT BIOTECH COMPANY HAD.  SORRY.

03:32PM  2         AND I HAVE DIRECTED SIMILAR LABORATORIES, SMALL CLINICAL

03:33PM  3    LABORATORIES FOR SEVERAL BIOTECH COMPANIES SINCE.

03:33PM  4         I'VE ALSO WORKED AT A LARGE BIOTECH COMPANY DIRECTING

03:33PM  5    RESEARCH AND DEVELOPMENT.

03:33PM  6    Q.   HOW DID YOU LEARN ABOUT THERANOS?

03:33PM  7    A.   I WAS ASKED BY JERRY HURST OF LABORATORY CONSULTING

03:33PM  8    SERVICES, I WAS TOLD THAT THEY NEEDED A DIRECTOR.  HE ACTUALLY

03:33PM  9    WAS TALKING TO TWO OF US AT THE TIME.  THEY NEEDED A TEMPORARY

03:33PM 10    DIRECTOR AND ASKED IF EITHER ONE OF US WAS INTERESTED IN DOING

03:33PM 11    THAT.

03:33PM 12    Q.   AND AT SOME POINT DID YOU SPEAK TO SOMEBODY FROM THERANOS?

03:33PM 13    A.   I DID BEFORE I ACTUALLY STARTED.

03:33PM 14    Q.   WHO DID YOU SPEAK WITH?

03:33PM 15    A.   I SPOKE WITH SUNNY.

03:33PM 16    Q.   SUNNY BALWANI?

03:33PM 17    A.   YES.

03:33PM 18    Q.   AND WHAT DID MR. BALWANI TELL YOU?

03:33PM 19    A.   IT WAS A LONG TIME AGO AND I DO NOT REMEMBER DETAILS OF

03:33PM 20    THE CONVERSATION REALLY, BUT I BELIEVE HE CONFIRMED THAT THEY

03:33PM 21    JUST NEEDED SOMEBODY VERY TEMPORARILY.

03:33PM 22    Q.   DID HE TELL YOU ANYTHING ABOUT WHETHER IT WAS FULL-TIME OR

03:34PM 23    PART-TIME?

03:34PM 24    A.   NO.  I KNEW IT WAS PART-TIME GOING IN.

03:34PM 25    Q.   OKAY.  AND DID HE TELL YOU ANYTHING ABOUT COMPENSATION?

SAWYER DIRECT BY MR. LEACH                                    5561

03:34PM   1    A.   NO.  HE AND JERRY HAD ARRANGED THAT.  I ACTUALLY AM A

03:34PM   2    SUBCONTRACT FOR LABORATORY CONSULTING SERVICES, SO THAT IS

03:34PM   3    ARRANGED THROUGH THEM.

03:34PM   4    Q.   DID MR. BALWANI MENTION ANYONE NAMED ADAM ROSENDORFF?

03:34PM   5    A.   NO.

03:34PM   6    Q.   DID HE EXPLAIN ANYTHING ABOUT THE CIRCUMSTANCES OF

03:34PM   7    DR. ROSENDORFF'S DEPARTURE FROM THERANOS?

03:34PM   8    A.   NO.

03:34PM   9    Q.   DID HE SUGGEST IN ANY WAY THAT DR. ROSENDORFF HAD CONCERNS

03:34PM  10    ABOUT THERANOS'S LABORATORY TESTING OR PERFORMANCE OF ITS BLOOD

03:34PM  11    ANALYZER?

03:34PM  12    A.   NO.

03:34PM  13    Q.   AFTER SPEAKING WITH MR. BALWANI, DID YOU AGREE TO SERVE AS

03:34PM  14    A CO-DIRECTOR OF THERANOS'S CLINICAL LABORATORY IN CALIFORNIA?

03:34PM  15    A.   YES.

03:34PM  16         MR. LEACH:  YOUR HONOR, I ASK PERMISSION TO PUBLISH

03:34PM  17    EXHIBIT 10562, WHICH I BELIEVE IS IN EVIDENCE.

03:35PM  18         THE COURT:  YES.  THERE IT IS.

03:35PM  19         MR. LEACH:  THANK YOU, YOUR HONOR.

03:35PM  20    Q.   AND, DR. SAWYER, DO YOU SEE IN THE LETTER HERE THERE'S A

03:35PM  21    DATE OF DECEMBER 17TH, 2014?

03:35PM  22    A.   YES.

03:35PM  23    Q.   AND THIS SAYS, "PLEASE FIND ENCLOSED LFS FORM 193 AND A

03:35PM  24    DIRECTOR'S ATTESTATION ADDING LYNETTE SAWYER, DR. PH, AS A

03:35PM  25    CO-DIRECTOR OF THE THERANOS, INC. CLINICAL LABORATORY."

SAWYER DIRECT BY MR. LEACH                                              5562

03:35PM   1            DO YOU SEE THAT LANGUAGE?

03:35PM   2       A.   YES.

03:35PM   3       Q.   AND IS THAT CONSISTENT WITH THE TIME PERIOD WHEN YOU TOOK

03:35PM   4       ON THIS ASSIGNMENT?

03:35PM   5       A.   YES.

03:35PM   6       Q.   OKAY.  WERE YOU EVER ASKED TO -- WERE YOU EVER ASKED TO

03:35PM   7       VISIT THERANOS'S LABORATORY?

03:35PM   8       A.   NO.

03:35PM   9       Q.   AT ANY POINT WERE YOU INVITED INTO THERANOS'S CALIFORNIA

03:35PM   10      LABORATORY?

03:35PM   11      A.   NO.

03:35PM   12      Q.   DID YOU EVER SET FOOT IN THE LABORATORY?

03:36PM   13      A.   NO.

03:36PM   14      Q.   DID YOU EVER SEE SOMETHING CALLED AN EDISON DEVICE?

03:36PM   15      A.   I DID NOT.

03:36PM   16      Q.   HOW ABOUT SOMETHING CALLED THE MINILAB?

03:36PM   17      A.   NO.

03:36PM   18      Q.   HOW ABOUT SOMETHING CALLED THE THERANOS SAMPLE PROCESSING

03:36PM   19      UNIT?

03:36PM   20      A.   NO.

03:36PM   21      Q.   AND DID YOU EVER SEE ANY OTHER THERANOS MANUFACTURED

03:36PM   22      ANALYZER?

03:36PM   23      A.   NO.

03:36PM   24      Q.   DID YOU EVER REVIEW ANY DATA THAT WAS GENERATED FROM AN

03:36PM   25      EDISON DEVICE?

SAWYER DIRECT BY MR. LEACH                                          5563

03:36PM   1      A.   NO.

03:36PM   2      Q.   HOW ABOUT A MINILAB?

03:36PM   3      A.   NOT TO MY KNOWLEDGE.

03:36PM   4      Q.   HOW ABOUT TSPU?

03:36PM   5      A.   I'M NOT FAMILIAR WITH THAT TERM.

03:36PM   6      Q.   OKAY.  DID YOU EVER REVIEW DATA GENERATED FROM WHAT YOU

03:36PM   7      UNDERSTOOD TO BE A THERANOS MANUFACTURED ANALYZER?

03:36PM   8      A.   NO.

03:36PM   9      Q.   IN YOUR CALL WITH MR. BALWANI, DID HE TELL YOU THAT

03:36PM   10     THERANOS WAS USING AN EDISON 3.5 DEVICE IN THE CLIA LAB?

03:36PM   11     A.   NO.

03:36PM   12     Q.   WHAT DID HE TELL YOU ABOUT TECHNOLOGIES THAT THERANOS WAS

03:37PM   13     DEVELOPING?

03:37PM   14     A.   NOTHING.

03:37PM   15     Q.   DID HE TELL YOU THAT THEY WERE USING ANY OTHER THERANOS

03:37PM   16     MANUFACTURED ANALYZER IN THE CLIA LAB?

03:37PM   17     A.   NO.

03:37PM   18     Q.   I WANT TO FOCUS ON THE TIME PERIOD LATE 2014 WHEN YOU COME

03:37PM   19     ON AS THE CO-DIRECTOR AND THE END OF JUNE 2015 WHEN YOU RESIGN.

03:37PM   20          SUMMARIZE FOR US WHAT YOU WERE CALLED UPON TO DO.

03:37PM   21     A.   IN LARGE PART I WAS REVIEWING AND APPROVING SOP'S AND

03:37PM   22     ASSAY VALIDATIONS OR VERIFICATIONS.

03:37PM   23     Q.   DID YOU REVIEW ANY SOP'S OR VALIDATION DOCUMENTS RELATED

03:37PM   24     TO SOMETHING CALLED EDISON?

03:37PM   25     A.   NO.

SAWYER DIRECT BY MR. LEACH                                              5564

03:37PM   1     Q.   SOMETHING CALLED THE MINILAB?

03:37PM   2     A.   NO.

03:37PM   3     Q.   SOMETHING CALLED THE TSPU?

03:37PM   4     A.   NOPE.

03:37PM   5     Q.   HOW ABOUT ANY OTHER THERANOS MANUFACTURED ANALYZER?

03:37PM   6     A.   NO.

03:37PM   7     Q.   BASED ON THE SOP'S THAT YOU WERE GIVEN, IS IT YOUR

03:38PM   8     IMPRESSION THAT THERANOS WAS DOING SOMETHING OTHER THAN RUNNING

03:38PM   9     BLOOD TESTS ON ORDINARY FDA APPROVED MACHINES AND ORDINARY FDA

03:38PM  10     APPROVED TESTS?

03:38PM  11     A.   NO.  ALL OF THE SOP'S I SAW PERTAINED TO ORDINARY FDA

03:38PM  12     APPROVED ASSAYS.

03:38PM  13     Q.   HOW DID YOU RECEIVE THE SOP'S?

03:38PM  14     A.   UM, ELECTRONICALLY.  THEY WERE DOCUSIGNED DOCUMENTS.

03:38PM  15     Q.   DID YOU HAVE THE CAPABILITY TO EDIT THEM?

03:38PM  16     A.   I DID NOT.

03:38PM  17     Q.   OKAY.  IT WAS ESSENTIALLY, HERE'S THE DOCUMENT, SIGN HERE?

03:38PM  18     A.   YES.  WHEN I HAD ISSUES WITH THEM, I ATTEMPTED TO BRING

03:38PM  19     THOSE UP WITH THE PERSON WHO WAS SENDING THE DOCUMENTS TO ME.

03:38PM  20     Q.   DID YOU EXERCISE ANY DECISION MAKING IN TERMS OF WHAT WAS

03:38PM  21     SENT TO YOU?

03:38PM  22     A.   NO.

03:38PM  23     Q.   IN THIS TIME PERIOD, LATE 2014 UNTIL JUNE OF 2015, WHO AT

03:38PM  24     THERANOS DID YOU HAVE CONTACT WITH?

03:38PM  25     A.   REALLY I ONLY HAD CONTACT WITH THE WOMAN WHO WAS SENDING

SAWYER DIRECT BY MR. LEACH                                          5565

03:39PM   1      THE SOP'S TO ME.

03:39PM   2      Q.    AND DO YOU REMEMBER HER NAME?

03:39PM   3      A.    NOT RIGHT NOW.

03:39PM   4      Q.    IF I TOLD YOU IT WAS MICHELLE LEE, WOULD THAT HELP YOU?

03:39PM   5      A.    YES, IT WOULD.

03:39PM   6      Q.    THAT'S YOUR MEMORY?

03:39PM   7      A.    YEAH.

03:39PM   8      Q.    I DON'T WANT TO TESTIFY HERE FOR YOU, BUT DOES IT REFRESH

03:39PM   9      YOUR RECOLLECTION?

03:39PM  10      A.    NO.   THAT IS WHAT I RECALL.

03:39PM  11      Q.    DID YOU HAVE -- OTHER THAN THE ONE -- THE INITIAL PHONE

03:39PM  12      CALL WITH MR. BALWANI, DID YOU HAVE ANY OTHER CONTACT WITH HIM?

03:39PM  13      A.    NOT DURING THAT TIME PERIOD.  I BELIEVE I HAD ANOTHER

03:39PM  14      PHONE CALL WITH HIM WHEN I QUIT.

03:39PM  15      Q.    SO THE EXTENT OF YOUR CONTACT WITH SUNNY BALWANI WAS THE

03:39PM  16      INITIAL CALL WHERE YOU WERE ASKED TO TAKE ON THIS SHORT-TERM

03:39PM  17      ASSIGNMENT AND YOUR RESIGNATION?

03:39PM  18      A.    AS I RECALL, YES.

03:39PM  19      Q.    AND OTHER THAN MR. BALWANI AND MS. LEE, DID YOU HAVE

03:39PM  20      CONTACT WITH ANYBODY ELSE AT THERANOS?

03:39PM  21      A.    THERE WERE A COUPLE OF EMAIL CONTACTS WITH BRAD ARINGTON

03:40PM  22      REGARDING HIS INABILITY TO FIND PAPERWORK THAT I HAD ORIGINALLY

03:40PM  23      SENT, AND A LATER CONTACT ASKING FOR COPIES OF MY CV.

03:40PM  24      Q.    OTHER THAN THOSE BRIEF CONTACTS WITH MR. ARINGTON, ANY

03:40PM  25      OTHER CONTACTS WITH ANYONE FROM THERANOS?

SAWYER DIRECT BY MR. LEACH                                              5566

03:40PM   1    A.    NO.

03:40PM   2    Q.    PRIOR TO RESIGNING IN JUNE OF 2015, DID YOU HAVE ANY

03:40PM   3    CONTACT WITH SOMEONE NAMED SUNIL DHAWAN?

03:40PM   4    A.    NO, I DID NOT.

03:40PM   5    Q.    DO YOU KNOW WHO SUNIL DHAWAN IS?

03:40PM   6    A.    I DO.

03:40PM   7    Q.    HOW DO YOU KNOW THAT?

03:40PM   8    A.    FROM HEARING ABOUT THIS TRIAL.

03:40PM   9    Q.    PRIOR TO RESIGNING IN JUNE OF 2015, DID YOU HAVE ANY

03:40PM  10    CONTACT WITH YOUR CO-LABORATORY DIRECTOR?

03:40PM  11    A.    NO.

03:40PM  12    Q.    AND DID YOU HAVE ANY DISCUSSIONS ABOUT HOW TO DIVIDE

03:40PM  13    RESPONSIBILITIES WITH YOUR CO-LAB DIRECTOR?

03:40PM  14    A.    NO.

03:40PM  15    Q.    DID YOU HAVE ANY CONTACT WITH ELIZABETH HOLMES?

03:40PM  16    A.    NO.

03:40PM  17    Q.    HAVE YOU EVER MET ELIZABETH HOLMES?

03:40PM  18    A.    NO.

03:40PM  19    Q.    AS FAR AS YOU KNOW, IS TODAY THE FIRST TIME THAT YOU HAVE

03:41PM  20    EVER BEEN IN THE SAME ROOM WITH ELIZABETH HOLMES?

03:41PM  21    A.    YES.

03:41PM  22    Q.    DID YOU HAVE ANY CONTACT WITH THE TECHNICAL SUPERVISOR?

03:41PM  23    A.    NO.

03:41PM  24    Q.    WHAT IS THE TECHNICAL SUPERVISOR?

03:41PM  25    A.    IT'S THE PERSON WHO IS RESPONSIBLE FOR THE OPERATIONS

                                                                    5567
SAWYER DIRECT BY MR. LEACH

03:41PM   1    WITHIN THE LABORATORY, BASICALLY THE TECHNICAL EXPERT ON WHAT

03:41PM   2    GOES ON IN THE LAB.

03:41PM   3    Q.   AND YOU DIDN'T HAVE ANY CONTACT WITH THE TECHNICAL

03:41PM   4    SUPERVISOR AT THERANOS?

03:41PM   5    A.   NO.

03:41PM   6    Q.   AND DID YOU KNOW WHO THE TECHNICAL SUPERVISOR WAS?

03:41PM   7    A.   NO.

03:41PM   8    Q.   DID YOU HAVE ANY CONTACT WITH THE GENERAL SUPERVISOR?

03:41PM   9    A.   NO.

03:41PM  10    Q.   DID YOU KNOW WHO THE GENERAL SUPERVISOR WAS?

03:41PM  11    A.   NO.

03:41PM  12    Q.   DID YOU DELEGATE RESPONSIBILITIES TO ANYBODY?

03:41PM  13    A.   I BELIEVE THAT THERE WAS ONE RESPONSIBILITY DELEGATION,

03:41PM  14    YES.

03:41PM  15    Q.   AND WHAT IS YOUR RECOLLECTION?

03:41PM  16    A.   MY RECOLLECTION IS THAT IT WAS A RESPONSIBILITY DELEGATION

03:41PM  17    TO THE TECHNICAL SUPERVISOR, BUT RIGHT THIS MINUTE I DON'T

03:41PM  18    REMEMBER FOR WHAT.

03:41PM  19    Q.   IN YOUR TIME AS CO-DIRECTOR FROM THE END OF 2014 UNTIL THE

03:42PM  20    END OF JUNE OF 2015, DID YOU SPEAK TO ANY DOCTORS?

03:42PM  21    A.   NO.

03:42PM  22    Q.   DID YOU SPEAK TO ANY PATIENTS?

03:42PM  23    A.   NO.

03:42PM  24    Q.   WERE YOU ALERTED TO ANY CRITICAL VALUES?

03:42PM  25    A.   NO.

                        UNITED STATES COURT REPORTERS

SAWYER DIRECT BY MR. LEACH                                            5568

03:42PM  1     Q.   DID YOU REVIEW ANY QUALITY CONTROL DATA?

03:42PM  2     A.   NO.

03:42PM  3     Q.   DID YOU RECEIVE ANY REPORTS ABOUT THE ACTIVITIES OF THE

03:42PM  4     LAB?

03:42PM  5     A.   NO.

03:42PM  6     Q.   AT ANY POINT DID YOU ORDER TESTING BE TAKEN DOWN ON ANY

03:42PM  7     THERANOS DEVICE?

03:42PM  8     A.   NO.

03:42PM  9     Q.   DID YOU EVER ORDER THAT THERANOS -- OR THAT TESTING BE

03:42PM 10     TAKEN UP ON A THERANOS DEVICE?

03:42PM 11     A.   NO.

03:42PM 12          MR. LEACH:  YOUR HONOR, I ASK PERMISSION TO DISPLAY

03:42PM 13     WHAT IS IN EVIDENCE AS EXHIBIT 4553.

03:42PM 14          THE COURT:  YES.

03:42PM 15          MR. LEACH:  I'M SORRY.  CAN YOU TAKE THIS DOWN,

03:42PM 16     MS. HOLLIMAN.

03:43PM 17          I THINK IT'S 4533.  THERE WE GO.

03:43PM 18          MS. HOLLIMAN, IF WE COULD PLEASE HIGHLIGHT THE TOP HALF OF

03:43PM 19     THIS DOCUMENT.

03:43PM 20     Q.   HAVE YOU SEEN THIS BEFORE, DR. SAWYER?

03:43PM 21     A.   NOT THAT I RECALL.

03:43PM 22     Q.   OKAY.  DO YOU SEE THE DATE SEPTEMBER 23RD, 2015?

03:43PM 23     A.   I DO.

03:43PM 24     Q.   AND DO YOU KNOW WHETHER THERANOS PROVIDED THIS DOCUMENT TO

03:43PM 25     INSPECTORS FROM CMS ON OR ABOUT THAT DATE?

SAWYER DIRECT BY MR. LEACH                                          5569

03:43PM   1    A.   I DO NOT.  I WAS NO LONGER THERE.

03:43PM   2    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE LINE THAT SAYS,

03:43PM   3    THIRD LINE THAT SAYS, "ADDITIONALLY, THE FOLLOWING IS THE LIST

03:43PM   4    OF THE LABORATORY DEVELOPED TESTS THAT THERANOS TESTED ON

03:44PM   5    THERANOS DEVICE, ALSO CALLED THERANOS SAMPLE PROCESSING UNITS

03:44PM   6    (TSPU'S), ALONG WITH THE TIME PERIODS WHEN THOSE TESTS WERE

03:44PM   7    RUN."

03:44PM   8        DO YOU SEE THAT LANGUAGE?

03:44PM   9    A.   I DO.

03:44PM  10    Q.   AND NOW IF WE CAN PLEASE GO TO THE BOTTOM OF THE PAGE,

03:44PM  11    MS. HOLLIMAN, AND HIGHLIGHT JUST THE BOX, PLEASE.

03:44PM  12        DO YOU SEE A LIST OF 12 ASSAYS LISTED HERE --

03:44PM  13    A.   YES.

03:44PM  14    Q.   -- DR. SAWYER?

03:44PM  15    A.   I DO.

03:44PM  16    Q.   AND AT THE TIME YOU WERE THE LAB DIRECTOR, YOU HAD NO IDEA

03:44PM  17    THAT THERANOS WAS USING ITS DEVICE TO TEST FOR THESE 12 ASSAYS?

03:44PM  18    A.   CORRECT.

03:44PM  19    Q.   AND THE FIRST LINE SAID VIT D.

03:44PM  20        DO YOU SEE THAT?

03:44PM  21    A.   YES.

03:44PM  22    Q.   AND THE DATES ARE 11/6 -- OR AN INITIAL 11/6/2013, AND AN

03:44PM  23    END OF MARCH 10TH, 2015.

03:44PM  24        DO YOU KNOW WHY THERANOS STOPPED TESTING VITAMIN D ON ITS

03:45PM  25    TSPU IN MARCH 2015?

SAWYER DIRECT BY MR. LEACH                                          5570

03:45PM   1      A.   I DO NOT.

03:45PM   2      Q.   DID ANYONE CONSULT WITH YOU ABOUT THAT?

03:45PM   3      A.   NO.

03:45PM   4      Q.   THE NEXT ASSAY IS TSH.

03:45PM   5           DO YOU SEE THAT?

03:45PM   6      A.   I DO.

03:45PM   7      Q.   AND DO YOU SEE THAT THE END DATE IS FEBRUARY 4TH, 2015?

03:45PM   8      A.   I DO.

03:45PM   9      Q.   AND THAT'S YOUR TIME PERIOD AS THE LAB DIRECTOR?

03:45PM  10      A.   RIGHT.

03:45PM  11      Q.   DID ANYONE CONSULT WITH YOU ABOUT THAT?

03:45PM  12      A.   NO.

03:45PM  13      Q.   AND DO YOU HAVE ANY IDEA WHY THERANOS STOPPED USING THE

03:45PM  14      TSPU FOR TSH IN THE CLINICAL LAB?

03:45PM  15      A.   NO.

03:45PM  16      Q.   AND THERE ARE SOME ADDITIONAL DATES AS WE GO DOWN ON THIS

03:45PM  17      EXHIBIT FROM FEBRUARY 4TH, 2015, DOWN TO MARCH 6TH, 2015, FT4

03:45PM  18      TO V B12.

03:45PM  19           DO YOU SEE THAT?

03:45PM  20      A.   UH-HUH.

03:45PM  21      Q.   AND YOU HAVE NO IDEA WHY THERANOS STOPPED TESTING THESE

03:45PM  22      ASSAYS ON THE TSPU ON THESE DATES?

03:45PM  23      A.   NO.

03:45PM  24      Q.   NO ONE CONSULTED YOU ABOUT THAT?

03:45PM  25      A.   CORRECT.

SAWYER DIRECT BY MR. LEACH                                              5571

03:45PM  1      Q.   AT SOME POINT IN TIME, DID YOU ASK FOR A LIST OF PERSONNEL

03:46PM  2      IN THE THERANOS LAB?

03:46PM  3      A.   I DID.

03:46PM  4      Q.   AND WHO DID YOU MAKE THAT REQUEST OF?

03:46PM  5      A.   SUNNY.

03:46PM  6      Q.   AND DID YOU EVER GET ONE?

03:46PM  7      A.   NO.

03:46PM  8      Q.   AND WAS THAT A MATTER OF FRUSTRATION TO YOU?

03:46PM  9      A.   YES.

03:46PM  10     Q.   LET ME FOCUS TO JUNE OF 2015.  YOU RESIGNED AT THE END OF

03:46PM  11     JUNE OF 2015?

03:46PM  12     A.   YES.

03:46PM  13     Q.   AND EXPLAIN TO US WHY YOU ELECTED TO RESIGN.

03:46PM  14     A.   I ELECTED TO RESIGN BECAUSE I WAS VERY UNCOMFORTABLE WITH

03:46PM  15     THE LACK OF CLARITY THAT I WAS GETTING ABOUT THE LAB, ABOUT

03:46PM  16     PERSONNEL, THE INABILITY TO GET THAT -- IT'S ACTUALLY A FORM

03:46PM  17     THAT LISTS EVERYBODY AND THEIR POSITIONS, AND THE FACT THAT I

03:46PM  18     COULDN'T REALLY TALK -- DIDN'T HAVE A PERSON THAT I COULD

03:46PM  19     ACTUALLY TALK TO ABOUT ISSUES THAT I HAD WITH SOME OF THE

03:46PM  20     SOP'S.

03:46PM  21     Q.   DID YOU EXPRESS THAT TO MR. BALWANI?

03:46PM  22     A.   YES, I BELIEVE SO.

03:46PM  23     Q.   AND DID HE TRY TO ENCOURAGE YOU TO STAY?

03:47PM  24     A.   YES.

03:47PM  25     Q.   AND TELL US ABOUT THAT.

SAWYER CROSS BY MR. WADE                                          5572

03:47PM   1    A.   JUST THAT IT WAS A LITTLE UNCOMFORTABLE BECAUSE HE WAS A

03:47PM   2    BIT PUSHY ABOUT IT.

03:47PM   3    Q.   AND DID YOU FEEL LIKE YOU WERE BEING GIVEN THE INFORMATION

03:47PM   4    THAT YOU NEEDED TO DO YOUR ASSIGNMENT?

03:47PM   5    A.   NO.

03:47PM   6          MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

03:47PM   7      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:47PM   8          MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

03:47PM   9      THANK YOU.

03:47PM   10     THANK YOU, DR. SAWYER.

03:47PM   11         THE COURT:  CROSS-EXAMINATION?

03:47PM   12                  **CROSS-EXAMINATION**

03:47PM   13   BY MR. WADE:

03:48PM   14   Q.   GOOD AFTERNOON, DR. SAWYER.

03:48PM   15   A.   GOOD AFTERNOON.

03:48PM   16   Q.   MY NAME IS LANCE WADE, AND I REPRESENT MS. HOLMES.  I'LL

03:48PM   17   BE ASKING YOU A FEW QUESTIONS HERE.

03:48PM   18   A.   UH-HUH.

03:48PM   19         MR. WADE:  YOUR HONOR, MAY I APPROACH?

03:48PM   20         THE COURT:  YES.

03:49PM   21   BY MR. WADE:

03:49PM   22   Q.   (HANDING.)

03:49PM   23     I HANDED YOU A BOOK OF DOCUMENTS, AND AT SOME POINT DURING

03:49PM   24   THE EXAMINATION I MAY ASK YOU ABOUT SOME DOCUMENTS, AND IF I

03:49PM   25   DO, YOU'LL SEE THERE ARE SOME NUMERICAL TABS AND I'LL CALL YOUR

SAWYER CROSS BY MR. WADE                                          5573

03:49PM  1    ATTENTION TO THOSE TABS AND ASK YOU SOME QUESTIONS ABOUT THE

03:49PM  2    DOCUMENT.

03:49PM  3         OKAY?

03:49PM  4    A.   OKAY.

03:49PM  5    Q.   I'D LIKE TO BACK UP AND START AND ASK YOU A COUPLE OF

03:49PM  6    QUESTIONS ABOUT HOW YOU GOT TO THERANOS AND YOUR EXPERIENCE AS

03:49PM  7    A LAB DIRECTOR.

03:49PM  8         BUT BEFORE I DO THAT -- WELL, LET ME START THERE.  YOU

03:49PM  9    WORKED WITH A GENTLEMAN NAMED JERRY HURST; IS THAT CORRECT?

03:49PM  10   A.   YES.

03:49PM  11   Q.   AND MR. HURST IS -- HAS A LAB CONSULTING COMPANY; IS THAT

03:49PM  12   RIGHT?

03:49PM  13   A.   YES.

03:49PM  14   Q.   AND ARE YOU FAMILIAR WITH MR. HURST'S BACKGROUND?

03:49PM  15   A.   YES.

03:49PM  16   Q.   AND YOU'RE AWARE THAT HE WAS A LONG-TIME CALIFORNIA

03:50PM  17   DEPARTMENT OF HEALTH INSPECTOR?

03:50PM  18   A.   YES.

03:50PM  19   Q.   AND AFTER HE STOPPED HIS SERVICE WITH THE GOVERNMENT, HE

03:50PM  20   OPENED A CONSULTING SHINGLE.

03:50PM  21        DO YOU RECALL THAT?

03:50PM  22   A.   YES.

03:50PM  23   Q.   AND HE HAD BEEN DOING CONSULTING FOR, I DON'T KNOW, A

03:50PM  24   COUPLE OF DECADES MAYBE?

03:50PM  25   A.   POTENTIALLY QUITE A WHILE, YES.

SAWYER CROSS BY MR. WADE                                          5574

03:50PM  1    Q.  A LONG TIME.

03:50PM  2        AND HOW LONG DID YOU WORK WITH MR. HURST?

03:50PM  3    A.  I STILL WORK WITH HIM.

03:50PM  4    Q.  YOU STILL WORK WITH HIM?

03:50PM  5    A.  YES.

03:50PM  6    Q.  OKAY.  AND WHEN DID YOU START WORKING WITH MR. HURST?

03:50PM  7    A.  IN A LAB DIRECTOR CAPACITY?  I PROBABLY STARTED WORKING

03:50PM  8    WITH HIM IN ABOUT 2013.

03:50PM  9    Q.  2013?

03:50PM 10    A.  2012 OR 2013.  I'M NOT SURE.

03:50PM 11    Q.  2012 OR 2013 IN A LAB DIRECTOR CAPACITY?

03:50PM 12    A.  CORRECT.

03:50PM 13    Q.  DID YOU WORK IN SOME OTHER CAPACITY FOR HIM PRIOR TO THAT?

03:50PM 14    A.  NOT FOR HIM, NO.

03:51PM 15    Q.  IN CONNECTION WITH HIS CLIENTS, OR DID YOU WORK --

03:51PM 16    A.  NO.

03:51PM 17    Q.  -- WITH HIM?

03:51PM 18    A.  NO.  WE WORKED TOGETHER AT THE STATE HEALTH DEPARTMENT.

03:51PM 19    Q.  OH.  SO YOU WERE COLLEAGUES THERE AND SO THAT'S HOW YOU

03:51PM 20    GOT TO MEET HIM THERE IN THE FIRST PLACE?

03:51PM 21    A.  UH-HUH.

03:51PM 22    Q.  OKAY.  AND ARE YOU AWARE THAT MR. HURST STARTED DOING

03:51PM 23    CONSULTING WORK FOR THERANOS IN 2011?

03:51PM 24    A.  NO.

03:51PM 25    Q.  OKAY.  YOU'RE AWARE THAT THE WAY THAT YOU ENDED UP GETTING

SAWYER CROSS BY MR. WADE                                          5575

03:51PM   1    THIS POSITION WAS BECAUSE MR. BALWANI CALLED MR. HURST;

03:51PM   2    CORRECT?

03:51PM   3    A.   CORRECT.

03:51PM   4    Q.   AND HE WAS CALLING MR. HURST BECAUSE THE COMPANY HAD

03:51PM   5    WORKED WITH MR. HURST PREVIOUSLY; CORRECT?

03:51PM   6    A.   CORRECT.  I KNEW THEY WORKED TOGETHER PREVIOUSLY.  I

03:51PM   7    DIDN'T KNOW WHEN.

03:51PM   8    Q.   OKAY.  YOU DIDN'T KNOW WHEN THAT RELATIONSHIP STARTED?

03:51PM   9    A.   CORRECT.

03:51PM   10   Q.   AND MR. HURST CONSULTS WITH A LOT OF DIFFERENT LAB

03:51PM   11   COMPANIES, DOES HE NOT?

03:51PM   12   A.   YES, HE DOES.

03:51PM   13   Q.   AND HE'S SOMEWHAT OF AN EXPERT IN THE FIELD; IS THAT FAIR?

03:52PM   14   A.   YES.

03:52PM   15   Q.   OKAY.  AND A LOT OF TIMES COMPANIES WILL HIRE HIM TO HELP

03:52PM   16   SET UP THEIR LABORATORIES IN THE FIRST INSTANCE; IS THAT RIGHT?

03:52PM   17   A.   I HAVE KNOWN THAT HAPPEN, YES.

03:52PM   18   Q.   OKAY.  AND HAVE YOU EVER WORKED WITH HIM IN CONNECTION

03:52PM   19   WITH A PROJECT LIKE THAT?

03:52PM   20   A.   YES.

03:52PM   21   Q.   OKAY.  AND SO SOMETIMES HE'S, MR. HURST AND THE COMPANY

03:52PM   22   WILL COME IN ANEW AND THEY'LL WORK TO GET THE WHOLE LAB SET UP,

03:52PM   23   RIGHT, AND ALL OF THE PROCEDURES AND EVERYTHING THAT GO WITH

03:52PM   24   IT?

03:52PM   25   A.   YES.

SAWYER CROSS BY MR. WADE                                                    5576

| | | |
|---|---|---|
| 03:52PM | 1 | Q.   AND IN CONNECTION WITH THAT, THERE'S A CERTIFICATION |
| 03:52PM | 2 | PROCESS? |
| 03:52PM | 3 | A.   THE LABORATORY LICENSING PROCESS, YES. |
| 03:52PM | 4 | Q.   YOU NEED TO GET IT CERTIFIED BY DIFFERENT STATE REGULATORS |
| 03:52PM | 5 | AND THE LIKE? |
| 03:52PM | 6 | A.   YES. |
| 03:52PM | 7 | Q.   AND AS YOU SIT HERE TODAY, ARE YOU AWARE WHETHER MR. HURST |
| 03:52PM | 8 | SERVED IN THAT CAPACITY FOR THERANOS WHEN IT FIRST STARTED |
| 03:52PM | 9 | OFFERING LAB SERVICES? |
| 03:53PM | 10 | A.   I DO NOT KNOW. |
| 03:53PM | 11 | Q.   OKAY.  AND MR. HURST DOES OTHER THINGS AS WELL; CORRECT? |
| 03:53PM | 12 | A.   YES. |
| 03:53PM | 13 | Q.   IN ADDITION TO HELPING SET UP LABS, HE'LL ALSO COME IN AND |
| 03:53PM | 14 | LOOK AT LAB PROCEDURES AND HE'LL PROVIDE ADVICE TO LABS ON HOW |
| 03:53PM | 15 | TO IMPROVE THEIR PROCEDURES; RIGHT? |
| 03:53PM | 16 | A.   I CAN'T REALLY SPEAK TO EXACTLY WHAT HE DOES. |
| 03:53PM | 17 | Q.   OKAY.  WELL, YOU WORK WITH HIS COMPANY?  IT'S CALLED |
| 03:53PM | 18 | LABORATORY CONSULTING SERVICES? |
| 03:53PM | 19 | A.   UH-HUH. |
| 03:53PM | 20 | Q.   IS THAT RIGHT? |
| 03:53PM | 21 | A.   YES. |
| 03:53PM | 22 | Q.   AND YOU'RE AWARE THAT THEY HAVE A WEBSITE; RIGHT? |
| 03:53PM | 23 | A.   YES. |
| 03:53PM | 24 | Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 10585. |
| 03:53PM | 25 | A.   OKAY. |

5577
SAWYER CROSS BY MR. WADE

| 03:53PM | 1 | Q.   AND LABORATORY CONSULTING SERVICES WAS ACTUALLY THE ENTITY |

03:53PM   1   Q.   AND LABORATORY CONSULTING SERVICES WAS ACTUALLY THE ENTITY

03:54PM   2   THAT WAS RETAINED BY THERANOS TO GET LAB DIRECTOR SERVICES WHEN

03:54PM   3   YOU CAME IN TO WORK WITH THERANOS; RIGHT?

03:54PM   4   A.   CORRECT.

03:54PM   5   Q.   AND DO YOU RECOGNIZE THIS TO BE A PRINTOUT OF THE HOME

03:54PM   6   PAGE OF LABORATORY CONSULTING SERVICES?

03:54PM   7   A.   PROBABLY, YEAH.  I HAVEN'T LOOKED AT IT IN A VERY LONG

03:54PM   8   TIME.

03:54PM   9        MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10585.

03:54PM   10        MR. LEACH:  RELEVANCE.  HEARSAY.

03:54PM   11        THE COURT:  THE ENTIRETY OF THE DOCUMENT?  ALL OF

03:54PM   12   THE PAGES?

03:54PM   13        MR. WADE:  THIS IS THE COMPANY THAT WAS RETAINED TO

03:54PM   14   PROVIDE LABORATORY SERVICES.

03:54PM   15        THE COURT:  I'M AWARE OF THAT.

03:54PM   16        MR. WADE:  YES, YES.

03:54PM   17        THE COURT:  I'M CURIOUS IF YOU WANT ALL OF THIS, AND

03:54PM   18   WHAT IS THE RELEVANCE OF ALL OF THIS?

03:54PM   19        MR. WADE:  WELL, WHY DON'T I COME BACK TO THIS,

03:54PM   20   YOUR HONOR, AND I THINK MAYBE THE RELEVANCE WILL BECOME CLEAR.

03:54PM   21        THE COURT:  OKAY.  SURE.

03:54PM   22   Q.   DO YOU RECALL -- LET ME -- YOU TALKED ABOUT WHEN YOU CAME

03:54PM   23   IN -- I THINK YOU TESTIFIED THAT YOU HAD TWO CONVERSATIONS WITH

03:54PM   24   MR. BALWANI, ONE AT THE BEGINNING OF THE ENGAGEMENT; RIGHT?

03:55PM   25   A.   I DEFINITELY HAD THAT CONVERSATION, YES.

SAWYER CROSS BY MR. WADE                                        5578

03:55PM   1     Q.   AND ONE AT THE END OF THE ENGAGEMENT?

03:55PM   2     A.   YEAH.

03:55PM   3     Q.   OKAY.  AND -- BUT YOU WERE AWARE THAT MR. BALWANI HAD HAD

03:55PM   4     CONVERSATIONS WITH MR. HURST TO OBTAIN YOUR SERVICES PRIOR TO

03:55PM   5     WHEN YOU COMMUNICATED WITH HIM?

03:55PM   6     A.   YES.

03:55PM   7     Q.   AND YOU WEREN'T A PARTY TO ANY OF THOSE CONVERSATIONS,

03:55PM   8     WERE YOU?

03:55PM   9     A.   NO.

03:55PM   10    Q.   OKAY.  YOU'RE AWARE ULTIMATELY THAT THERE WAS AN AGREEMENT

03:55PM   11    BY WHICH YOU PROVIDED SERVICES TO THE COMPANY; RIGHT?

03:55PM   12    A.   YES.

03:55PM   13    Q.   OKAY.  LET'S TAKE A LOOK AT 10586.

03:56PM   14         THE COURT'S INDULGENCE FOR ONE MOMENT?

03:56PM   15              THE COURT:  SURE.

03:56PM   16    BY MR. WADE:

03:56PM   17    Q.   DO YOU HAVE THAT IN FRONT OF YOU, MA'AM?  DOCTOR?

03:56PM   18    A.   UH-HUH, YEAH.

03:56PM   19    Q.   AND DO YOU SEE THAT THIS IS A CONSULTING AGREEMENT?

03:56PM   20    A.   I DO.

03:56PM   21    Q.   AND IF YOU GO TO EXHIBIT A1, WHICH IS A FEW PAGES BACK,

03:56PM   22    THERE'S A LITTLE NUMBER IN THE CORNER IN THE BOTTOM RIGHT THAT

03:56PM   23    SAYS 808.  IT ENDS IN 808.

03:56PM   24         DO YOU SEE THAT?

03:56PM   25    A.   YES.

SAWYER CROSS BY MR. WADE                                              5579

03:56PM  1     Q.   AND THIS SETS FORTH THE SERVICES AND COMPENSATION FOR

03:56PM  2     LYNETTE SAWYER?

03:56PM  3     A.   YES, IT SAYS THAT.

03:56PM  4              MR. WADE:  OKAY.  I MOVE THE ADMISSION OF 10586.

03:57PM  5              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:57PM  6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:57PM  7          (DEFENDANT'S EXHIBIT 10586 WAS RECEIVED IN EVIDENCE.)

03:57PM  8     BY MR. WADE:

03:57PM  9     Q.   AND DO YOU SEE HERE IN THAT FIRST PARAGRAPH THAT THIS IS

03:57PM  10    AN AGREEMENT DATED NOVEMBER 19TH, 2014 BETWEEN LABORATORY

03:57PM  11    CONSULTING SERVICES AND THERANOS?

03:57PM  12    A.   YES, IT SAYS THAT.

03:57PM  13    Q.   OKAY.  AND IF YOU LOOK, IT SETS FORTH THE SERVICES AND

03:57PM  14    COMPENSATION AND REFERS TO EXHIBIT A.

03:57PM  15         DO YOU SEE THAT?

03:57PM  16    A.   YES.

03:57PM  17    Q.   OKAY.  LET'S TAKE A LOOK AT -- WELL, BEFORE WE JUMP RIGHT

03:57PM  18    TO EXHIBIT A, LET'S JUST GO TO WHERE THIS IS SIGNED ON BATES

03:57PM  19    RANGE ENDING 807, WHICH I THINK IS ABOUT FIVE PAGES BACK.

03:58PM  20         DO YOU SEE THIS IS SIGNED BY MR. BALWANI AND MR. HURST?

03:58PM  21         DO YOU SEE THAT?

03:58PM  22    A.   YES.

03:58PM  23    Q.   OKAY.  AND IF YOU GO TO THE NEXT PAGE, YOU SEE THAT THIS

03:58PM  24    SETS FORTH THE SERVICES THAT YOU WERE GOING TO PROVIDE FOR THE

03:58PM  25    COMPANY; RIGHT?

SAWYER CROSS BY MR. WADE                                              5580

03:58PM  1    A.   CORRECT.

03:58PM  2    Q.   OKAY.  AND LET'S LOOK AT A COUPLE OF THINGS HERE.

03:58PM  3         THIS, THIS SAYS THAT YOUR PRINCIPAL COMPANY CONTACT IS

03:58PM  4    SUNNY BALWANI, THE PRESIDENT AND CHIEF OPERATING OFFICER;

03:58PM  5    RIGHT?

03:58PM  6    A.   THAT SAYS THAT, YES.

03:58PM  7    Q.   AND DID YOU EITHER LEARN FROM MR. HURST OR DURING YOUR

03:58PM  8    CONVERSATION WITH MR. BALWANI THAT HE ACTUALLY, FROM A

03:58PM  9    MANAGEMENT STANDPOINT, WAS IN CHARGE OF THE LAB?

03:58PM  10   A.   NO.

03:58PM  11   Q.   OKAY.  YOU DIDN'T UNDERSTAND THAT AT THE TIME?

03:59PM  12   A.   NO, NOT SPECIFICALLY.

03:59PM  13   Q.   OKAY.  BUT I TAKE IT BASED ON HIS TITLE, YOU UNDERSTOOD

03:59PM  14   THAT HE WAS A SENIOR LEADER IN THE COMPANY?

03:59PM  15   A.   YES.

03:59PM  16   Q.   OKAY.  AND THIS AGREEMENT THEN SETS FORWARD VARIOUS

03:59PM  17   SERVICES THAT YOU'RE TO PROVIDE.

03:59PM  18        AND IF WE GO TO THE PARAGRAPH, THE FIRST PARAGRAPH THAT

03:59PM  19   SAYS, "LYNETTE," DO YOU SEE THAT?

03:59PM  20        LET'S HIGHLIGHT THAT AND BLOW THAT UP.

03:59PM  21        THIS SAYS THAT YOU'RE GOING TO SERVE AS THE CO-DIRECTOR OF

03:59PM  22   THERANOS'S CLIA LABORATORY; CORRECT?

03:59PM  23   A.   CORRECT.

03:59PM  24   Q.   AND THERE'S GOING TO BE ANOTHER CO-DIRECTOR AS WELL;

03:59PM  25   RIGHT?

SAWYER CROSS BY MR. WADE                                        5581

03:59PM   1    A.   YES.

03:59PM   2    Q.   AND YOU UNDERSTOOD -- I KNOW MR. LEACH ASKED YOU A LOT OF

03:59PM   3    QUESTIONS, DID YOU EVER DO THIS AND DID YOU EVER DO THAT?

03:59PM   4         DO YOU RECALL SOME OF THOSE QUESTIONS?

03:59PM   5    A.   UH-HUH.

03:59PM   6    Q.   YOU UNDERSTOOD THIS WAS A TEMPORARY AND LIMITED

04:00PM   7    ENGAGEMENT; RIGHT?

04:00PM   8    A.   CORRECT.

04:00PM   9    Q.   AND YOU UNDERSTOOD AT THE TIME YOU WENT INTO THE

04:00PM  10    ENGAGEMENT THAT THIS WAS GOING TO BE MAYBE AS MANY AS FIVE

04:00PM  11    HOURS A WEEK OR SOMETHING; RIGHT?

04:00PM  12    A.   POTENTIALLY.

04:00PM  13    Q.   AND THAT YOU WERE NOT GOING TO BE REQUIRED TO BE ON SITE?

04:00PM  14    THAT WAS A SPECIFIC --

04:00PM  15    A.   CORRECT.

04:00PM  16    Q.   RIGHT.  AND YOU NEVER ASKED TO GO ON SITE; RIGHT?

04:00PM  17    A.   I DID NOT.

04:00PM  18    Q.   OKAY.  BUT -- AND SOMETIMES LABS HAVE KIND OF PINCH HITTER

04:00PM  19    LAB DIRECTORS; RIGHT?

04:00PM  20    A.   I SUPPOSE YOU COULD CALL CO-DIRECTORS THAT SOMETIMES.

04:00PM  21    Q.   OKAY.  WELL, YOU UNDERSTAND THAT ONE OF THE SERVICES THAT

04:00PM  22    MR. HURST PROVIDES IS THAT IF A LAB DIRECTOR IS NEEDED BY A LAB

04:00PM  23    COMPANY ON A SHORT-TERM BASIS, THAT HE'LL HELP, HE'LL HELP

04:00PM  24    FACILITATE A LAB DIRECTOR WHO CAN PROVIDE SERVICES ON A

04:00PM  25    TEMPORARY BASIS; RIGHT?

SAWYER CROSS BY MR. WADE                                                5582

04:00PM   1    A.   YEAH, THAT WAS MY UNDERSTANDING OF THIS, THAT IT WAS TO BE

04:00PM   2    VERY TEMPORARY, TWO TO THREE MONTHS.

04:01PM   3    Q.   YEAH.  AND YOU UNDERSTOOD THAT MR. HURST DID THAT WITH

04:01PM   4    OTHER COMPANIES AS WELL; RIGHT?

04:01PM   5    A.   I -- IT WOULD NOT SURPRISE ME, BUT I DO NOT KNOW THAT.

04:01PM   6    Q.   OKAY.  HAVE YOU SERVED AS A LAB DIRECTOR THROUGH MR. HURST

04:01PM   7    FOR OTHER COMPANIES AS WELL?

04:01PM   8    A.   YES.

04:01PM   9    Q.   AND SOMETIMES HAVE YOU SERVED FOR LAB DIRECTORS FOR

04:01PM   10   MULTIPLE COMPANIES AT ONE TIME?

04:01PM   11   A.   YES.

04:01PM   12   Q.   AND THOSE JOBS ARE PART-TIME TEMPORARY ASSIGNMENTS; RIGHT?

04:01PM   13   A.   NOT NECESSARILY TEMPORARY, NO.  PART-TIME, YES.

04:01PM   14   Q.   OKAY.  MAYBE THEY'RE FOR A SPECIFIED DURATION?

04:01PM   15   A.   THEY COULD BE.  MOST OF THE OTHER ONES I HAVE DONE ARE

04:01PM   16   NOT.  THEY'RE INDEFINITE AS LONG AS WE WANT TO RENEW THE

04:01PM   17   CONTRACT, AS LONG AS BOTH PARTIES WANT TO RENEW THE ACCOUNT.

04:01PM   18   Q.   OKAY.  FAIR ENOUGH.

04:01PM   19        AND UNDER AT LEAST CLIA REGULATIONS, YOU CAN SERVE AS A

04:01PM   20   LAB DIRECTOR FOR AS MANY AS FIVE LABS?

04:01PM   21   A.   CORRECT.

04:01PM   22   Q.   OKAY.  AND YOU KNEW, YOU KNEW WHEN YOU WERE DOING THIS

04:02PM   23   THAT THIS WAS GOING TO BE A TEMPORARY LIMITED ASSIGNMENT;

04:02PM   24   RIGHT?

04:02PM   25   A.   CORRECT.

```
04:02PM   1    Q.   AND DID YOU KNOW THAT WAS IN PART BECAUSE THERANOS HAD AN
04:02PM   2    INTERNAL CANDIDATE WHO THEY THOUGHT COULD PROVIDE THE SERVICES
04:02PM   3    WHO JUST NEEDED TO COMPLETE SOME CERTIFICATION PAPERWORK?
04:02PM   4             MR. LEACH:   OBJECTION.   FOUNDATION.
04:02PM   5             MR. WADE:   IF YOU KNOW.
04:02PM   6             THE COURT:   SUSTAINED.   SUSTAINED.
04:02PM   7         YOU CAN ASK ANOTHER QUESTION, BUT WHY DON'T YOU DO THAT
04:02PM   8    TUESDAY?
04:02PM   9             MR. WADE:   THAT'S A GREAT IDEA, YOUR HONOR.
04:02PM  10         THE LAST THING I WANT TO DO IS STAND BETWEEN THE END OF
04:02PM  11    THIS WEEK AND THIS JURY, SO --
04:02PM  12             THE COURT:   LET'S DO THAT.   SO WE'LL RESUME AGAIN
04:02PM  13    TUESDAY, PLEASE RECALL, TUESDAY, TUESDAY NEXT, WHICH IS
04:02PM  14    NOVEMBER 9TH, AND WE'LL DO THAT AT 9:00 A.M., LADIES AND
04:02PM  15    GENTLEMEN, 9:00 A.M.
04:02PM  16         I CAN'T RECALL IF I ASKED YOU IF IT WAS A 3:00 O'CLOCK DAY
04:02PM  17    OR A 4:00 O'CLOCK DAY.   CAN WE GO UNTIL 4:00 O'CLOCK ON
04:02PM  18    TUESDAY, THE 9TH, WITHOUT ANY OBJECTION?
04:02PM  19         I DON'T SEE ANY HANDS.
04:02PM  20         LET'S TRY TO DO THAT.   THANK YOU VERY MUCH.
04:03PM  21         BEFORE WE BREAK, LADIES AND GENTLEMEN, I REMIND YOU AGAIN
04:03PM  22    OF THE ADMONITION.   PLEASE AVOID ANYTHING TO DO WITH THIS CASE
04:03PM  23    OUTSIDE OF THIS COURTROOM.   PLEASE DO NOT WATCH, LISTEN TO,
04:03PM  24    READ, OR TALK ABOUT THIS CASE IN ANY WAY, AND PLEASE DO NOT
04:03PM  25    FORM ANY OPINION ABOUT THIS CASE OR ANYTHING TO DO WITH IT.
```

04:03PM  1        ON TUESDAY NEXT I'LL ASK YOU IF THOSE THINGS HAVE OCCURRED

04:03PM  2    AND YOU'LL LET ME KNOW.

04:03PM  3        OTHER THAN THAT, PLEASE ENJOY YOUR WEEKEND AND WE'LL SEE

04:03PM  4    YOU TUESDAY.  THANK YOU.

04:03PM  5           AND, DR. SAWYER, WE'LL SEE YOU TUESDAY NEXT.  THANK YOU.

04:03PM  6              THE WITNESS:  OKAY.

04:03PM  7           (JURY OUT AT 4:03 P.M.)

04:03PM  8              THE COURT:  YOU CAN STAND DOWN.  THANKS.

04:04PM  9        PLEASE BE SEATED.  THE RECORD SHOULD REFLECT THE JURY HAS

04:04PM  10   LEFT FOR THE WEEKEND.  ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:04PM  11       GIVE ME JUST A SECOND.

04:04PM  12       ALL RIGHT.  DR. SAWYER HAS LEFT.

04:04PM  13       ANYTHING FURTHER BEFORE WE BREAK FROM EITHER SIDE?

04:04PM  14              MR. LEACH:  ONE MATTER, YOUR HONOR.

04:04PM  15              THE COURT:  YES, PLEASE.

04:04PM  16              MR. LEACH:  YOUR HONOR, AFTER DR. SAWYER'S

04:04PM  17   TESTIMONY, THE GOVERNMENT ANTICIPATES CALLING

04:04PM  18   DR. KINGSHUK DAS, WHO WAS THE LAB DIRECTOR AFTER SUNIL DHAWAN

04:04PM  19   WHO WAS AT THERANOS AT THE TIME THAT THERANOS RECEIVED THE CMS

04:04PM  20   INSPECTION REPORT, THE 2567 THAT HAS BEEN THE SUBJECT OF A

04:04PM  21   NUMBER OF MOTION PRACTICE.

04:04PM  22       HE'S ALSO THE LAB DIRECTOR WHO VOIDED ALL OF THE TESTS ON

04:04PM  23   THERANOS'S EDISON DEVICE, WHICH WAS ALSO THE SUBJECT OF SOME

04:05PM  24   MOTION IN LIMINE PRACTICE.

04:05PM  25       IN ONE OF THE ORDERS THE GOVERNMENT DIRECTED -- IF THE

5585

04:05PM 1   COURT MAY RECALL IN THE ORIGINAL MOTION IN LIMINE ORDER, I

04:05PM 2   THINK IT'S 798, THE COURT ADMITTED THE CMS REPORT.

04:05PM 3      AFTER THAT THE DEFENSE FILED A MOTION FOR CERTAIN

04:05PM 4   REDACTIONS.

04:05PM 5      THE COURT NOTED THE FACT THAT IT APPEARED TO BE A MOTION

04:05PM 6   FOR RECONSIDERATION, BUT DEFERRED RULING ON IT AND ORDERED THE

04:05PM 7   GOVERNMENT TO PROVIDE NOTICE OF WHEN IT INTENDED TO ADMIT THE

04:05PM 8   REPORT.

04:05PM 9      WE DO INTEND TO ADMIT THE REPORT AT SOME POINT NEXT WEEK.

04:05PM 10  AND OUR POSITION NOW IS THAT THE FULL REPORT IS ADMISSIBLE FOR

04:05PM 11  A NUMBER OF REASONS, AND I'M HAPPY TO EXPLAIN AT THE

04:05PM 12  APPROPRIATE TIME.

04:05PM 13     IN ADDITION, IN THE MIL ORDER, THE COURT, WITH RESPECT TO

04:05PM 14  THE VOIDING OF THE TESTS, DEFERRED RULING UNTIL THE GOVERNMENT

04:05PM 15  PROFFERED A CONNECTION BETWEEN THE VOIDING AND THE CHARGED

04:06PM 16  CONDUCT, AND A FACTUAL BASIS THAT IT WAS DONE INVOLUNTARY.

04:06PM 17     THE GOVERNMENT IS PREPARED TO MAKE THAT PROFFER AT ANY

04:06PM 18  TIME THE COURT DEEMS APPROPRIATE.  WE THINK IT CLEARLY CONNECTS

04:06PM 19  TO THE CHARGED CONDUCT FOR A NUMBER OF REASONS.

04:06PM 20     AND DR. DAS HAS SAID ON MULTIPLE OCCASIONS, AND I

04:06PM 21  ANTICIPATE HE WILL SAY AGAIN IN THE NEXT FEW DAYS, THAT HE WAS

04:06PM 22  LEGALLY REQUIRED TO VOID THE TESTS AND HAD COMMUNICATIONS WITH

04:06PM 23  MS. HOLMES ABOUT THE NEED TO DO THAT, AS WELL AS THE TESTING

04:06PM 24  CAPABILITIES OF THE EDISON DEVICE.

04:06PM 25     SO THERE'S A NUMBER OF ISSUES RELATING TO THE MOTION IN

5586

| | | |
|---|---|---|
| 04:06PM | 1 | LIMINE ORDER THAT I THINK WARRANT SOME DISCUSSION.  I WAS |
| 04:06PM | 2 | HOPEFUL WE MIGHT BE ABLE TO DO THAT ON MONDAY, BUT I NOW |
| 04:06PM | 3 | UNDERSTAND MEMBERS OF THE DEFENSE TEAM HAVE IMPORTANT |
| 04:06PM | 4 | COMMITMENTS THAT DAY THAT WE DON'T NECESSARILY WANT TO |
| 04:06PM | 5 | INTERFERE WITH.  BUT WE WOULD LIKE TO FIND SOME TIME TO VET |
| 04:06PM | 6 | THESE ISSUES IN ADVANCE OF HIS TESTIMONY. |
| 04:06PM | 7 | THE COURT:  THANK YOU. |
| 04:07PM | 8 | MR. WADE, YOU'RE HANDLING THIS, I TAKE IT? |
| 04:07PM | 9 | MR. WADE:  I AM, YOUR HONOR. |
| 04:07PM | 10 | THE COURT:  SO I KNOW WE WON'T BE ABLE TO DISCUSS |
| 04:07PM | 11 | THIS MONDAY, AND THE WITNESS -- WE'LL HAVE DR. SAWYER -- IS IT |
| 04:07PM | 12 | LIKELY WE'LL FINISH DR. SAWYER TUESDAY? |
| 04:07PM | 13 | MR. WADE:  WE WILL.  I, I -- AND I APOLOGIZE FOR THE |
| 04:07PM | 14 | CONFLICT.  I DON'T KNOW IF THERE IS -- |
| 04:07PM | 15 | THE COURT:  OH, NO, NOT AT ALL.  GOSH.  NO. |
| 04:07PM | 16 | MR. WADE:  -- IF THERE'S ANY WAY TO SWITCH DR. DAS |
| 04:07PM | 17 | TO TUESDAY OR TO WEDNESDAY, AND THEN WE'LL HAVE A LITTLE MORE |
| 04:07PM | 18 | TIME TO DEAL WITH IT. |
| 04:07PM | 19 | THE COURT:  I WANTED TO ASK ABOUT SCHEDULING.  I |
| 04:07PM | 20 | DON'T KNOW IF DR. DAS IS LOCAL OR NOT. |
| 04:07PM | 21 | MR. LEACH:  HE IS IN MINNESOTA UNFORTUNATELY, YOUR |
| 04:07PM | 22 | HONOR, AS ARE A NUMBER OF UPCOMING WITNESSES, INCLUDING |
| 04:07PM | 23 | ALAN EISENMAN WHO WAS HERE EARLIER.  I KNOW HE'S COMING BACK IN |
| 04:07PM | 24 | FROM OUT OF THE COUNTRY. |
| 04:07PM | 25 | SO DR. DAS WAS REALLY, HE WAS THE NEXT LOGICAL PERSON UP, |

5587

| | | |
|---|---|---|
| 04:07PM | 1 | AND IT'S A SHORT WEEK NEXT WEEK, SO WE HAVE A BIT OF A |
| 04:08PM | 2 | CHALLENGE IN COORDINATING SOME OF THE OUT-OF-TOWN WITNESSES. |
| 04:08PM | 3 | THE COURT:  RIGHT. |
| 04:08PM | 4 | MR. WADE:  I DO ANTICIPATE WITH THIS -- AS |
| 04:08PM | 5 | YOUR HONOR MAY RECALL, THERE WERE SOME MOTIONS RELATING TO |
| 04:08PM | 6 | DR. DAS JUST BEFORE THE TRIAL BEGAN. |
| 04:08PM | 7 | I THINK SOME OF THOSE MOTIONS -- I HAVEN'T GONE BACK TO |
| 04:08PM | 8 | LOOK AT THE BRIEFING AND THE ORDER ON THAT, BUT I THINK THERE |
| 04:08PM | 9 | ARE SOME ISSUES THAT REMAIN WITH RESPECT TO DR. DAS AND WHETHER |
| 04:08PM | 10 | IT'S EXPERT TESTIMONY OR FACT TESTIMONY. |
| 04:08PM | 11 | THE TRIAL IN THAT RESPECT HAS PROCEEDED SOMEWHAT |
| 04:08PM | 12 | UNEXPECTEDLY.  FROM THE DEFENSE PERSPECTIVE, WE WOULD HAVE |
| 04:08PM | 13 | THOUGHT, WE WOULD HAVE THOUGHT THAT THE GOVERNMENT WOULD HAVE |
| 04:08PM | 14 | OFFERED THE CMS REPORT THROUGH A CMS WITNESS, AND I WANT TO |
| 04:08PM | 15 | THINK ABOUT WHETHER THEIR FAILURE TO DO SO CREATES ANY |
| 04:08PM | 16 | ADDITIONAL CONCERNS. |
| 04:08PM | 17 | IT WOULD APPEAR -- I INFER THEY'RE INTENDING TO OFFER IT |
| 04:08PM | 18 | THROUGH DR. DAS IF THEY'RE RAISING THESE ISSUES NOW. |
| 04:08PM | 19 | SO I THINK THERE ARE A LOT OF THORNY LEGAL ISSUES.  WE CAN |
| 04:09PM | 20 | OBVIOUSLY -- OUR TEAM CAN DO SOME WORK ON THEM OVER THE |
| 04:09PM | 21 | WEEKEND. |
| 04:09PM | 22 | WE CAN TRY TO TAKE THEM UP, YOU KNOW, TUESDAY MORNING.  I |
| 04:09PM | 23 | JUST WORRY ABOUT -- I DON'T WANT TO HAVE A SITUATION WHERE |
| 04:09PM | 24 | WE'RE BLENDING INTO THE TRIAL TIME. |
| 04:09PM | 25 | THE COURT:  RIGHT.  THANK YOU FOR THAT.  I JUST |

5588

| | | |
|---|---|---|
| 04:09PM | 1 | DON'T WANT TO INCONVENIENCE THE TRIAL PROCESS, AND PARTICULARLY |
| 04:09PM | 2 | WITNESSES THAT ARE FLYING IN FROM THE GREAT STATE OF MINNESOTA |
| 04:09PM | 3 | AND ELSEWHERE.  THAT'S REALLY AN INCONVENIENCE. |
| 04:09PM | 4 | MR. WADE:  YES. |
| 04:09PM | 5 | THE COURT:  AND THAT'S WHY I'M CURIOUS ABOUT -- |
| 04:09PM | 6 | DR. SAWYER IS LOCAL? |
| 04:09PM | 7 | MR. LEACH:  YES. |
| 04:09PM | 8 | THE COURT:  SO I HOPE WE DON'T HAVE TO INTERRUPT HER |
| 04:09PM | 9 | TESTIMONY IN FAVOR OF ANOTHER TESTIMONY, BUT IT SOUNDS LIKE |
| 04:09PM | 10 | DR. DAS IS PROBABLY GOING TO BE A LENGTHY EXAMINATION. |
| 04:09PM | 11 | MR. LEACH:  THE GOVERNMENT'S ESTIMATE OF ITS DIRECT |
| 04:09PM | 12 | AT THIS POINT, YOUR HONOR, IS ONE TO TWO HOURS. |
| 04:09PM | 13 | I DON'T KNOW WHAT THE DEFENSE INTENDS. |
| 04:10PM | 14 | MR. WADE:  IT SOUNDS LIKE IT COULD BE ONE LONG DAY. |
| 04:10PM | 15 | WE OBVIOUSLY DON'T KNOW THE SCOPE OF THE ISSUES THAT THEY |
| 04:10PM | 16 | INTEND TO GO INTO. |
| 04:10PM | 17 | AND PART OF THAT, TOO, WILL RAISE SOME ISSUES, YOUR HONOR. |
| 04:10PM | 18 | I KNOW A LOT OF ISSUES HAVE COME UP WITH RESPECT TO CONDUCT |
| 04:10PM | 19 | THAT HAPPENED REALLY AFTER THE RELEVANT TIME PERIOD AND IS |
| 04:10PM | 20 | RETROSPECTIVE IN NATURE. |
| 04:10PM | 21 | AND I THINK THERE HAVE BEEN SOME LIMITATIONS THAT HAVE |
| 04:10PM | 22 | BEEN IMPOSED ON THAT. |
| 04:10PM | 23 | A LOT OF DR. DAS'S KNOWLEDGE RELATES TO THAT. |
| 04:10PM | 24 | YOU KNOW, HE DIDN'T START WORK -- HE STARTED WORKING |
| 04:10PM | 25 | TEMPORARILY WITH THE COMPANY IN LATE 2015 AND THEN IN 2016, AND |

04:10PM 1    HE'S NOT REALLY A PERCIPIENT FACT WITNESS WITH RESPECT TO MOST

04:10PM 2    OF THE PERTINENT CONDUCT.  HE'S EFFECTIVELY GOING TO OPINE UPON

04:10PM 3    HIS REVIEW OF THE HISTORICAL CONDUCT.

04:10PM 4        SO I DO THINK IT CREATES SOME POTENTIAL RELEVANCE ISSUES

04:11PM 5    AND, YOU KNOW IT MAYBE RIPENS UP SOME OF THOSE EXPERT ISSUES.

04:11PM 6            THE COURT:  WELL, AND THEN, MR. LEACH, IT SOUNDS

04:11PM 7    LIKE YOU'VE SAID THAT YOU WILL AT LEAST MAKE AN OFFER OF PROOF

04:11PM 8    AS TO THAT CONNECTION ISSUE WITH MS. HOLMES.  YOU ARE

04:11PM 9    INDICATING THAT YOU CAN ESTABLISH THAT THROUGH THIS WITNESS.

04:11PM 10           MR. LEACH:  THERE IS, YOUR HONOR.

04:11PM 11           THE COURT:  OKAY.

04:11PM 12           MR. LEACH:  THE DEFENDANT STATED IN HER OPENING THAT

04:11PM 13   IN 2016 THEY FORMED A SCIENTIFIC ADVISORY BOARD.  SHE STATED

04:11PM 14   THAT SHE BROUGHT ON EXPERTS.  SHE'S ELICITED TESTIMONY ABOUT

04:11PM 15   THE AAC CONFERENCE IN 2016 THROUGH GENERAL MATTIS, THEY OFFERED

04:11PM 16   DOCUMENTS FROM MARCH OF 2016 ABOUT SCIENTIFIC OPINIONS THAT

04:11PM 17   SHE'S RECEIVING, ALL OF WHICH TO SUGGEST THAT, YOU KNOW, A

04:11PM 18   GUILTY -- A PERSON WHO IS CONFIDENT IN HER TECHNOLOGY WOULD NOT

04:11PM 19   DO THESE THINGS AND THAT SHE, THEREFORE, DID NOT HAVE THE

04:12PM 20   INTENT TO DEFRAUD.

04:12PM 21       IF THEY'RE GOING TO HOLD OUT THESE 2016 EVENTS AS

04:12PM 22   INDICATIVE OF HER GOOD FAITH AND INTENT, THE GOVERNMENT SHOULD

04:12PM 23   BE ABLE TO COMPLETE THE PICTURE OF WHAT WAS REALLY MOTIVATING

04:12PM 24   HER AT THOSE PERIODS OF TIME.

04:12PM 25           IN ADDITION, I ANTICIPATE DR. DAS WILL SAY THAT WHEN HE

04:12PM 1    TOLD MS. HOLMES WE NEED TO VOID THE TESTS, HE GOT PUSH BACK.

04:12PM 2    SHE DID NOT WANT TO DO THAT.  SHE CAME UP WITH ALTERNATIVE

04:12PM 3    REASONS FOR IT.

04:12PM 4         AND THAT PUSH BACK IS CONSCIOUSNESS OF GUILT.  IT GOES TO

04:12PM 5    HER STATE OF MIND ABOUT THERANOS'S TECHNOLOGY.

04:12PM 6         AND FOR THAT REASON IT VERY CLEARLY CONNECTS.

04:12PM 7         I WOULD ALSO ADD THAT ONE OF THE POINTS THAT THE

04:12PM 8    GOVERNMENT IS TRYING TO PROVE IS THAT, YOU KNOW, AT THE END OF

04:12PM 9    THE DAY, THE TESTS WERE INACCURATE AND THE VOIDING OF THE TESTS

04:12PM 10   SPEAKS TO WHETHER THE TESTS WERE ACCURATE OR NOT.

04:12PM 11        SO WE THINK, ALTHOUGH THE VOIDING IS IN 2016, IT CLEARLY

04:12PM 12   CONNECTS TO HER INTENT AT THE TIME.

04:12PM 13        THE DEFENSE HAS INJECTED THINGS THAT SHE'S DOING IN 2016

04:12PM 14   TO TRY TO SUGGEST A GUILTY PERSON WOULD NOT DO THOSE THINGS,

04:13PM 15   AND I THINK THE WHOLE TRUTH HERE, YOUR HONOR, IS THEY CAME UP

04:13PM 16   WITH AN EXPLANATION FOR WHY THEY WERE VOIDING THE TESTS, THEY

04:13PM 17   MINIMIZED THOSE ISSUES TO THEIR INVESTORS, AND WHEN SHE'S GOING

04:13PM 18   TO ACC AND THESE OTHER THINGS, IT'S A PR SPIN, NOT GENUINE

04:13PM 19   INDICATION OF CONFIDENCE IN HER TECHNOLOGY.

04:13PM 20        IT GOES RIGHT TO HER STATE OF MIND, AND DR. DAS LAYS THAT

04:13PM 21   FOUNDATION.

04:13PM 22             MR. WADE:  YOUR HONOR, WE'VE HAD -- WE'VE DISCUSSED

04:13PM 23   THESE ISSUES AT LENGTH BEFORE.

04:13PM 24        THE ARGUMENT THAT WAS JUST MADE -- YOU KNOW, WE WANTED TO

04:13PM 25   OFFER EVIDENCE RELATED TO THESE VERY ISSUES RECENTLY THROUGH

04:13PM 1    MANY WITNESSES ACTUALLY AND THE GOVERNMENT HAS OBJECTED TO OUR

04:13PM 2    OFFERING THE EVIDENCE.

04:13PM 3         AND SO IN THIS CASE THEY WANT TO OFFER THE EVIDENCE THAT

04:13PM 4    GOES, GOES DEEP INTO THIS.  THERE WERE SEVERE LIMITATIONS IN

04:13PM 5    TERMS OF -- AND WE WERE VERY CAUTIOUS TO TRY TO -- WE DIDN'T

04:13PM 6    PLAY THE AACC PRESENTATION.

04:13PM 7         DR. DAS IS ANOTHER WITNESS WHO OBSERVED THE AACC

04:14PM 8    PRESENTATION, I BELIEVE, AND SO HE CAN TESTIFY TO IT.

04:14PM 9         THERE ARE INCONSISTENT LINES BEING DRAWN ON THE GOVERNMENT

04:14PM 10   AS TO WHAT IS FAIR GAME AND WHAT IS NOT, AND MY CONCERN IS THAT

04:14PM 11   THESE WITNESSES' PATHS, THEIR APPROACH DIFFERS, AND THEN WE

04:14PM 12   MISS THE OPPORTUNITY TO CROSS-EXAMINE THE WITNESSES ON THESE

04:14PM 13   POINTS.

04:14PM 14        A LOT OF WHAT HE'S TALKING ABOUT IS DEALING WITH

04:14PM 15   HISTORICAL PROBLEMS, AND THAT'S WHY WE THINK, YOU KNOW, THERE

04:14PM 16   MAY BE 701, 702 ISSUES.

04:14PM 17        BUT I THINK FOR PURPOSES OF TODAY, YOUR HONOR, I THINK

04:14PM 18   WHAT I'M RAISING FOR THE COURT IS THAT THIS IS A COMPLICATED --

04:14PM 19   THIS IS ABOUT AS COMPLICATED A SET OF KIND OF LEGAL ISSUES IN

04:14PM 20   TERMS OF ADMISSIBILITY AS I THINK WE'VE HAD WITH A WITNESS, AND

04:14PM 21   I WORRY A LITTLE BIT JUST FROM A SCHEDULING STANDPOINT HERE.

04:14PM 22        SO I'M NOT SURE WHAT THE PATH FORWARD FROM THAT STANDPOINT

04:14PM 23   IS.

04:14PM 24             THE COURT:  THANK YOU.  I THINK WE SHOULD MEET

04:14PM 25   PROBABLY TUESDAY AT 8:00 O'CLOCK TO DISCUSS AND AT LEAST TRY TO

| | | |
|---|---|---|
| 04:14PM | 1 | GET A PATH TO THIS, AND IT MAY BE THAT THAT MAY DEFER |
| 04:15PM | 2 | DR. SAWYER.  I KNOW IT'S AN INCONVENIENCE, BUT I'D LIKE TO GET |
| 04:15PM | 3 | HER FINISHED. |
| 04:15PM | 4 | WHAT DID YOU TELL ME? |
| 04:15PM | 5 | MR. WADE:  I DON'T THINK DR. SAWYER WILL BE A LONG |
| 04:15PM | 6 | WITNESS.  I WOULD EXPECT THE REMAINING CROSS WOULD BE AN HOUR |
| 04:15PM | 7 | OR LESS. |
| 04:15PM | 8 | THE COURT:  OKAY.  AND THEN DR. DAS WILL BE HERE |
| 04:15PM | 9 | TUESDAY? |
| 04:15PM | 10 | MR. LEACH:  HE'S CURRENTLY SCHEDULED TO BE HERE ON |
| 04:15PM | 11 | TUESDAY, YOUR HONOR. |
| 04:15PM | 12 | THE COURT:  I SEE.  WELL, IF WE'RE GOING TO HAVE |
| 04:15PM | 13 | DISCUSSION OF THIS ON TUESDAY MORNING -- AND THEN THE OTHER |
| 04:15PM | 14 | WITNESS IS COMING IN SOMETIME LATER IN THE WEEK?  IS THAT THE |
| 04:15PM | 15 | ANTICIPATION. |
| 04:15PM | 16 | MR. LEACH:  I THINK WE ANTICIPATE MR. EISENMAN ON |
| 04:15PM | 17 | WEDNESDAY, BUT I HAVE NOT FULLY CONNECTED WITH MY TEAM. |
| 04:15PM | 18 | THE COURT:  JUST IN LIGHT OF WHAT I'M HEARING, THAT |
| 04:15PM | 19 | SOUNDS OPTIMISTIC AT BEST. |
| 04:15PM | 20 | MR. LEACH:  I'M SORRY? |
| 04:15PM | 21 | THE COURT:  IT SOUNDS OPTIMISTIC AT BEST. |
| 04:15PM | 22 | IF DR. DAS TESTIFIES, IF WE GO THROUGH THIS CONVERSATION |
| 04:16PM | 23 | THAT WE'LL HAVE TO HAVE ON TUESDAY SOMETIME, AND IT'S A SHORT |
| 04:16PM | 24 | WEEK, ISN'T IT?  YEAH. |
| 04:16PM | 25 | MR. LEACH:  IT IS. |

5593

04:16PM 1          THE COURT:  WE JUST HAVE TWO DAYS.  RIGHT.

04:16PM 2          LET ME JUST ASK, IS IT LIKELY WE'LL GET TO THE SECOND

04:16PM 3    WITNESS?  I'M LOOKING AT YOU, MR. WADE.

04:16PM 4          MR. WADE:  THE SECOND WITNESS BEING?

04:16PM 5          THE COURT:  OTHER THAN DR. DAS?

04:16PM 6          MR. WADE:  IF DR. DAS IS THE WITNESS?

04:16PM 7          THE COURT:  YES.

04:16PM 8          MR. WADE:  A LOT IS GOING TO DEPEND ON THE SCOPE AND

04:16PM 9    WHETHER THERE IS A LINK.

04:16PM 10         BUT I WOULD EXPECT THAT WE COULD GET DR. DAS IN IN THE

04:16PM 11   EQUIVALENT OF A TRIAL DAY.

04:16PM 12         THE COURT:  SO I'M LOOKING --

04:16PM 13         MR. WADE:  IF HE TESTIFIES ON DIRECT FOR AN HOUR TO

04:16PM 14   TWO HOURS.

04:16PM 15         THE COURT:  SO I'M JUST TRYING TO BE REALISTIC.

04:16PM 16   WE'RE GOING TO HAVE A CONVERSATION ABOUT THE LEGAL LIMITS, IF

04:16PM 17   THERE ARE ANY, AS TO DR. DAS.  THAT'S GOING TO TAKE US A COUPLE

04:16PM 18   OF HOURS, I THINK.  I'M JUST -- JUST BASED ON THE WAY THINGS

04:16PM 19   ARE GOING.

04:16PM 20         AND THEN IF HE TESTIFIES, ASSUMING THAT DR. SAWYER DOESN'T

04:17PM 21   FINISH ON TUESDAY.

04:17PM 22         MR. WADE:  DR. SAWYER WILL CERTAINLY FINISH ON

04:17PM 23   TUESDAY.  SHE'LL FINISH EARLY ON TUESDAY.

04:17PM 24         THE COURT:  SO IF WE FACTOR IN ANOTHER HOUR, THAT'S

04:17PM 25   THE MORNING, ISN'T IT?

5594

04:17PM 1          MR. WADE:  YEAH.

04:17PM 2          THE COURT:  AND THEN DR. DAS STARTS THE AFTERNOON OF

04:17PM 3    TUESDAY -- OR EXCUSE ME.

04:17PM 4      CAN YOU GET DR. DAS DONE ON WEDNESDAY?  I'M JUST SAYING, I

04:17PM 5    DON'T THINK WE'RE GOING TO GET THAT OTHER WITNESS IN.  I JUST

04:17PM 6    DON'T SEE IT REALISTICALLY, BUT --

04:17PM 7          MR. LEACH:  WE'LL BE PREPARED IN ANY EVENT,

04:17PM 8    YOUR HONOR, AND, YOU KNOW, THE GOVERNMENT IS TRYING TO MOVE AS

04:17PM 9    EFFICIENTLY AS POSSIBLE.

04:17PM 10         THE COURT:  RIGHT.

04:17PM 11         MR. LEACH:  AND MY INTEREST IS NOT TO HAVE DR. DAS

04:17PM 12   ON THERE FOR MORE THAN ONE TO TWO HOURS.

04:17PM 13     COMING INTO THIS CONVERSATION, MY EXPECTATION WAS THAT WE

04:17PM 14   COULD DO IT AT A NORMAL TRIAL DAY.  IF WE START ON TUESDAY, I'M

04:17PM 15   CONVINCED THAT WE CAN FINISH ON WEDNESDAY.

04:17PM 16     AND IF WE'RE STARTING ANOTHER WITNESS, THE GOVERNMENT WILL

04:18PM 17   GIVE THOUGHT TO, IS THERE A LOCAL WITNESS THAT WE CAN

04:18PM 18   SUBSTITUTE IN?  OR ANOTHER OUT-OF-TOWN WITNESS WITH FEWER

04:18PM 19   SCHEDULING CONFLICTS?

04:18PM 20     BUT I -- FROM MY PERSPECTIVE, HE COULD BE DONE IN A DAY.

04:18PM 21     AND I JUST NEED TO ADD, MANY OF THESE LEGAL ISSUES HAVE

04:18PM 22   BEEN FULLY VETTED THROUGH EXTENSIVE MOTION PRACTICE.

04:18PM 23         THE COURT:  SURE.  YOU'RE CUTTING ME OFF AND YOU'RE

04:18PM 24   SAYING, JUDGE, DON'T ASK ME -- DON'T ASK US TO PROVIDE YOU WITH

04:18PM 25   UP TO FIVE PAGES OF ADDITIONAL BRIEFING ON THIS.

5595

04:18PM  1          MR. LEACH:  WE'RE HAPPY TO PROVIDE BRIEFING,

04:18PM  2    YOUR HONOR.

04:18PM  3          BUT I'M THINKING BACK TO OUR THREE DAY MOTION IN LIMINE

04:18PM  4    HEARING, AND I WOULD LIKE TO AVOID BLEEDING INTO THE TRIAL DAY

04:18PM  5    AS MUCH AS WE CAN.

04:18PM  6          THE COURT:  NO.  I AGREE.  I'M NOT GOING TO ASK YOU

04:18PM  7    TO DO THAT.

04:18PM  8          BUT I DO THINK, JUST BASED ON SOME OF THE THINGS THAT

04:18PM  9    YOU'VE TALKED ABOUT HERE, WE ARE IN TRIAL NOW, AND I THINK,

04:18PM 10    MR. LEACH, WHAT YOU'VE TOLD ME IS YOU BELIEVE SOME OF THE

04:18PM 11    TESTIMONY AND THE EVIDENCE THAT HAS BEEN RECEIVED HERE ALLOWS A

04:19PM 12    PATH FORWARD TO THE TESTIMONY THAT YOU WOULD LIKE TO INTRODUCE.

04:19PM 13          DID I --

04:19PM 14          MR. LEACH:  YES.

04:19PM 15          THE COURT:  AND I THINK WHAT I WOULD LIKE TO ASK YOU

04:19PM 16    TO DO IS TO PUT THAT IN WRITING FOR ME, SO YOU CREATE YOUR PATH

04:19PM 17    IN WRITING THAT SUGGESTS AND SO COUNSEL CAN BE AWARE OF THE

04:19PM 18    PATH FORWARD WITH DR. DAS FOR THE ISSUES THAT YOU'D LIKE TO

04:19PM 19    INTRODUCE, AND THAT WOULD BE HELPFUL TO ME.

04:19PM 20          WE SHOULD PROBABLY GET THAT SOMETIME -- I'M NOT GOING TO

04:19PM 21    ASK YOU FOR TOMORROW.  TOMORROW IS FRIDAY, AND WE'RE GOING TO

04:19PM 22    TALK ABOUT THIS TUESDAY.

04:19PM 23          SO IF I COULD HAVE IT ON MONDAY, THAT WOULD BE HELPFUL, NO

04:19PM 24    LATER THAN MIDDAY MONDAY WOULD BE HELPFUL.

04:19PM 25          MR. LEACH:  WILL DO, YOUR HONOR.

5596

04:19PM 1          MR. WADE:  AND JUST SO OUR THINKING IS CLEAR ON

04:19PM 2     THAT, AND FOR THE BENEFIT OF THE PARTIES TO TRY AND TEE THIS

04:19PM 3     UP, I THINK WHAT I HEAR FROM MR. LEACH IS A COUPLE OF ISSUES.

04:19PM 4          I HEAR THE ADMISSIBILITY OF THE CMS REPORT AND WHAT

04:19PM 5     PORTIONS OF THE CMS REPORT IS ONE ISSUE.

04:19PM 6          THERE'S THE VOIDING ISSUE, WHICH IS ANOTHER ISSUE WHICH IS

04:19PM 7     PART OF PRIOR MOTIONS PRACTICE.

04:20PM 8          AND THEN THE THIRD ISSUE IS THE 701, 702 ISSUE.

04:20PM 9          I DON'T KNOW IF WE HAVE OTHER ISSUES OR NOT, BUT THOSE ARE

04:20PM 10    THE THREE ISSUES THAT I THINK MR. LEACH IS REFERRING TO.

04:20PM 11         THE COURT:  ALL OF US HAVE ISSUES, MR. WADE.

04:20PM 12        (LAUGHTER.)

04:20PM 13         MR. WADE:  SO WE'LL WORK TO RIPEN THOSE UP FOR

04:20PM 14    DISCUSSION WITH THE COURT.

04:20PM 15         THE COURT:  SURE.  AND IF YOU WANT TO -- IT WOULD BE

04:20PM 16    HELPFUL TO ME TO GET THAT BEFORE NOON ON MONDAY.

04:20PM 17         WELL, YOU'VE GOT ALL DAY TOMORROW, AND THEN, OF COURSE,

04:20PM 18    THAT'S WHAT THE WEEKENDS ARE FOR, SO -- BUT THAT WOULD BE

04:20PM 19    HELPFUL FOR ME TO DIGEST, AND THEN I'LL LOOK AT IT.

04:20PM 20         AND I THINK YOU ALSO SUPPLIED SOME SUPPLEMENTAL

04:20PM 21    INFORMATION EARLIER AS WELL.  SO I'LL LOOK AT THAT, AS WELL AS

04:20PM 22    OUR MOTIONS, OUR MOTIONS IN LIMINE.

04:20PM 23         OKAY?

04:20PM 24         MR. LEACH:  WILL DO, YOUR HONOR.

04:20PM 25         THE COURT:  OKAY.

5597

04:20PM   1                    MR. WADE:  THANK YOU, YOUR HONOR.

04:20PM   2                    THE CLERK:  THANK YOU.  COURT IS ADJOURNED.

04:20PM   3              (COURT ADJOURNED AT 4:20 P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2
3                       CERTIFICATE OF REPORTERS
4
5
6
7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10   HEREBY CERTIFY:
11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13   ABOVE-ENTITLED MATTER.
14
15
16          _____
             IRENE RODRIGUEZ, CSR, CRR
17           CERTIFICATE NUMBER 8076
18          _____
19           LEE-ANNE SHORTRIDGE, CSR, CRR
             CERTIFICATE NUMBER 9595
20
21          DATED:  NOVEMBER 4, 2021
22
23
24
25
```

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
6                                  )
                     PLAINTIFF,    )  SAN JOSE, CALIFORNIA
7                                  )
          VS.                      )  VOLUME 29
8                                  )
   ELIZABETH A. HOLMES,            )  NOVEMBER 8, 2021
9                                  )
                     DEFENDANT.    )  PAGES 5598 - 5670
10  _____  )

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
                UNITED STATES DISTRICT JUDGE
13
   A P P E A R A N C E S:
14

15  FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:  ROBERT S. LEACH
18                        1301 CLAY STREET, SUITE 340S
                          OAKLAND, CALIFORNIA 94612
19
        (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20

21  OFFICIAL COURT REPORTERS:
                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                        CERTIFICATE NUMBER 8074
                          LEE-ANNE SHORTRIDGE, CSR, CRR
23                        CERTIFICATE NUMBER 9595

24      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
25

```
1        A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
4                                 KATHERINE TREFZ
                                  RICHARD CLEARY
5                            725 TWELFTH STREET, N.W.
                             WASHINGTON, D.C. 20005
6
                             LAW OFFICE OF JOHN D. CLINE
7                            BY:  JOHN D. CLINE
                             ONE EMBARCADERO CENTER, SUITE 500
8                            SAN FRANCISCO, CALIFORNIA 94111

9
     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
10                           BY:  ADELAIDA HERNANDEZ

11

12   TELEPHONICALLY:         JOSHUA KOLTUN
                             DAVID KORZENIK
13

14

15

16

17

18

19

20

21

22

23

24

25
```

|          | 1  | SAN JOSE, CALIFORNIA                          NOVEMBER 8, 2021 |
| 10:04AM  | 2  | P R O C E E D I N G S |
| 10:04AM  | 3  | (COURT CONVENED AT 10:04 A.M.) |
| 10:04AM  | 4  | (JURY OUT AT 10:04 A.M.) |
| 10:04AM  | 5  | THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES |
| 10:04AM  | 6  | MATTER, 18-258. |
| 10:05AM  | 7  | THIS IS A SESSION OUTSIDE OF THE PRESENCE OF THE JURY TO |
| 10:05AM  | 8  | DISCUSS CERTAIN MOTIONS. |
| 10:05AM  | 9  | LET'S SEE, THE GOVERNMENT IS PRESENT, MR. SCHENK, |
| 10:05AM  | 10 | MR. BOSTIC, MR. LEACH. |
| 10:05AM  | 11 | THE DEFENSE IS PRESENT. |
| 10:05AM  | 12 | MR. CLINE, ARE YOU GOING TO ARGUE THIS? |
| 10:05AM  | 13 | MR. CLINE:  I AM.  AND MS. HOLMES IS NOT HERE, BUT |
| 10:05AM  | 14 | SHE FILED A WAIVER OF HER APPEARANCE. |
| 10:05AM  | 15 | THE COURT:  YES, I DID RECEIVE THAT. |
| 10:05AM  | 16 | SO DO YOU FORMALLY THEN WAIVE HER APPEARANCE AND AGREE TO |
| 10:05AM  | 17 | PROCEED IN THIS MATTER WITHOUT HER BEING PERSONALLY PRESENT, |
| 10:05AM  | 18 | MR. CLINE? |
| 10:05AM  | 19 | MR. CLINE:  WE DO. |
| 10:05AM  | 20 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:05AM  | 21 | ALSO, I THINK WE HAVE SOMEONE PARTICIPATING ON THE |
| 10:05AM  | 22 | TELEPHONE? |
| 10:05AM  | 23 | MR. KORZENIK:  YES, YOUR HONOR. |
| 10:05AM  | 24 | DAVID KORZENIK READY TO ADDRESS THE PENDING MOTION. |
| 10:05AM  | 25 | AND ALSO WITH ME LISTENING IS JOSH COLTON. |

5601

| | | |
|---|---|---|
| 10:05AM | 1 | THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING. |
| 10:05AM | 2 | COUNSEL, IF YOU COULD COME FORWARD, PLEASE.  THANK YOU. |
| 10:05AM | 3 | THIS MORNING WE'RE DISCUSSING DOCKET 1103, WHICH IS |
| 10:06AM | 4 | MS. HOLMES'S MOTION TO EXCLUDE CERTAIN TESTIMONY OF |
| 10:06AM | 5 | ROGER PARLOFF AND TO EXCLUDE IT LOOKS LIKE EXHIBIT 3733. |
| 10:06AM | 6 | I'VE READ THAT, AS WELL AS 1115, WHICH IS THE GOVERNMENT'S |
| 10:06AM | 7 | OPPOSITION. |
| 10:06AM | 8 | AND I'VE ALSO READ 1114, WHICH IS THE KORZENIK OPPOSITION |
| 10:06AM | 9 | AND RESPONSE. |
| 10:06AM | 10 | AND I THINK 1117 WAS ALSO THE GOVERNMENT'S -- EXCUSE ME, |
| 10:06AM | 11 | MR. CLINE.  THAT WAS YOUR REPLY I THINK? |
| 10:06AM | 12 | MR. CLINE:  YES, YOUR HONOR. |
| 10:06AM | 13 | THE COURT:  RIGHT.  SO HAVING READ ALL OF THOSE |
| 10:06AM | 14 | THINGS, INCLUDING MR. BOSTIC'S STATEMENT -- AND LAST TIME, LAST |
| 10:06AM | 15 | TIME WE WERE HERE, WE WERE DISCUSSING A LITTLE BIT IN |
| 10:06AM | 16 | ANTICIPATION WHAT CONTEXT MEANS AND THOSE ADDITIONAL QUESTIONS |
| 10:06AM | 17 | THAT YOU WANT TO ASK. |
| 10:06AM | 18 | MY SENSE IS THAT WE SHOULD ASK MR. BOSTIC TO GO FORWARD. |
| 10:07AM | 19 | BUT, MR. CLINE, ANYTHING YOU WOULD LIKE TO STATE BEFORE WE |
| 10:07AM | 20 | TURN TO MR. BOSTIC? |
| 10:07AM | 21 | MR. CLINE:  I THINK IT WOULD BE HELPFUL TO HAVE |
| 10:07AM | 22 | MR. BOSTIC GO FORWARD. |
| 10:07AM | 23 | I WILL SAY THIS, THAT MR. BOSTIC AND I SPOKE ON FRIDAY. |
| 10:07AM | 24 | IT WAS A GOOD CONVERSATION. |
| 10:07AM | 25 | I'M NOT SURE THAT WE NARROWED OUR DIFFERENCES, BUT I THINK |

10:07AM   1    EACH OF US UNDERSTANDS EACH OTHER'S POSITIONS MORE CLEARLY.  SO

10:07AM   2    I THINK THIS SHOULD PROCEED PRETTY EFFICIENTLY.

10:07AM   3              THE COURT:  ALL RIGHT.  THANK YOU.

10:07AM   4         MR. BOSTIC?

10:07AM   5              MR. BOSTIC:  YES.  THANK YOU.

10:07AM   6         LET ME START BY BRIEFLY HIGHLIGHTING WHAT IS NOT IN

10:07AM   7    CONTENTION BETWEEN THE PARTIES, AND MR. CLINE CAN CORRECT ME IF

10:07AM   8    I GET ANYTHING WRONG.

10:07AM   9         BUT MY UNDERSTANDING IS THAT A LOT OF WHAT IS OBJECTED TO

10:07AM   10   IN THE DEFENSE'S FILING IS ACTUALLY NOT AN INTENDED PART OF

10:07AM   11   MR. PARLOFF'S TESTIMONY.

10:07AM   12        FOR EXAMPLE, AT NO TIME WILL THE GOVERNMENT ASK

10:07AM   13   MR. PARLOFF TO PASS JUDGMENT ON THE TRUTH OR FALSITY OF

10:07AM   14   MS. HOLMES'S STATEMENT TO HIM OR THE MATERIALS THAT HE RECEIVED

10:07AM   15   FROM THERANOS.

10:07AM   16        SIMILARLY, I DO NOT INTEND TO ASK HIM QUESTIONS ABOUT

10:07AM   17   MS. HOLMES'S CREDIBILITY OR VERACITY OR HONESTY, THINGS LIKE

10:08AM   18   THAT THAT I THINK THIS WITNESS IS NOT IN A POSITION TO TESTIFY,

10:08AM   19   AND I WOULD UNDERSTAND 403 OBJECTIONS TO THAT.

10:08AM   20        SO THE GOVERNMENT UNDERSTANDS WHERE THAT LINE IS.

10:08AM   21        SIMILARLY, WE'RE NOT GOING TO ASK THIS WITNESS TO COMMENT

10:08AM   22   ON COMPARISONS BETWEEN WHAT MS. HOLMES TOLD HIM AND WHAT HE

10:08AM   23   LATER LEARNED THROUGH OTHER REPORTING.  THAT WOULD BE A HEARSAY

10:08AM   24   BASIS FOR HIM TO COMMENT ON THAT COMPARISON, SO WE'RE NOT GOING

10:08AM   25   TO GO INTO THAT EITHER.

| | | |
|---|---|---|
| 10:08AM | 1 | LET ME TRY TO BREAK DOWN THE CATEGORIES OF WHAT THIS |
| 10:08AM | 2 | WITNESS WILL TESTIFY ON. |
| 10:08AM | 3 | FIRST OF ALL, HE WILL AUTHENTICATE THE RECORDINGS OF |
| 10:08AM | 4 | CONVERSATIONS THAT HE HAD WITH MS. HOLMES, AS WELL AS EMAILS |
| 10:08AM | 5 | THAT HE RECEIVED FROM THE COMPANY, WRITTEN MATERIALS. |
| 10:08AM | 6 | HE WILL TALK ABOUT TOURS THAT HE HAD OF FACILITIES AT |
| 10:08AM | 7 | THERANOS.  I DON'T BELIEVE THERE'S A DISPUTE AS TO THE |
| 10:08AM | 8 | ADMISSIBILITY OF THAT TESTIMONY. |
| 10:08AM | 9 | HE'LL EXPLAIN COMMENTS THAT MS. HOLMES MADE IN THE CONTEXT |
| 10:09AM | 10 | OF THEIR LARGER CONVERSATIONS. |
| 10:09AM | 11 | AND HERE'S WHERE I THINK I CAN HELP THE COURT'S |
| 10:09AM | 12 | UNDERSTANDING OF WHAT THE GOVERNMENT MEANS BY CONTEXT. |
| 10:09AM | 13 | I BELIEVE THERE ARE APPROXIMATELY TEN HOURS OF RECORDED |
| 10:09AM | 14 | CONVERSATIONS BETWEEN MS. HOLMES AND MR. PARLOFF.  THE |
| 10:09AM | 15 | GOVERNMENT, FOR A NUMBER OF REASONS, DOESN'T INTEND TO |
| 10:09AM | 16 | INTRODUCE THAT ENTIRE TEN HOUR RECORDING. |
| 10:09AM | 17 | THAT SAID, MR. PARLOFF HAS MEMORIES OF THOSE CONVERSATIONS |
| 10:09AM | 18 | AND HE'S REVIEWED THOSE RECORDINGS TO REFRESH HIS RECOLLECTION, |
| 10:09AM | 19 | SO HE SHOULD BE ABLE TO TESTIFY NOT JUST ABOUT SPECIFIC |
| 10:09AM | 20 | STATEMENTS THAT MS. HOLMES MADE IN PORTIONS THAT THE GOVERNMENT |
| 10:09AM | 21 | WILL PLAY FOR THE JURY, BUT ALSO HOW THOSE PORTIONS AND |
| 10:09AM | 22 | STATEMENTS FIT INTO THEIR OVERALL CONVERSATIONS. |
| 10:09AM | 23 | SO THAT COULD BE QUESTIONS LIKE, FOR EXAMPLE, WHETHER A |
| 10:09AM | 24 | TOPIC HAD COME UP BEFORE, WHETHER THAT HAD BEEN THE ONLY TIME |
| 10:09AM | 25 | THAT THEY HAD DISCUSSED THAT TOPIC OR WHETHER IT WAS A REPEATED |

10:09AM 1   TOPIC IN THEIR CONVERSATIONS; WHETHER WHAT MS. HOLMES SAID IN A

10:10AM 2   CERTAIN STATEMENT WAS EITHER THE SAME AS OR DIFFERENT FROM WHAT

10:10AM 3   SHE HAD SAID IN OTHER CONVERSATIONS WHEN THAT SAME TOPIC HAD

10:10AM 4   COME UP.

10:10AM 5      THIS IS JUST FACTUAL TESTIMONY.  THIS IS A WITNESS

10:10AM 6   TESTIFYING ABOUT THE CONTENT OF A COMMUNICATION OR A

10:10AM 7   CONVERSATION THAT HE PARTICIPATED IN, SO THAT SHOULDN'T BE

10:10AM 8   CONTROVERSIAL.

10:10AM 9      THE COURT:  I'M SORRY, MR. BOSTIC.

10:10AM 10     SO THAT WOULD BE, ON TUESDAY SHE SAID THIS, AND ON

10:10AM 11   THURSDAY SHE SAID, TO THE SAME QUESTION, THIS, SOMETHING LIKE

10:10AM 12   THAT?

10:10AM 13      MR. BOSTIC:  IT MIGHT BE AS SIMPLE AS, ON

10:10AM 14   APRIL 17TH, SHE TOLD YOU X.  IS THAT CONSISTENT WITH WHAT SHE

10:10AM 15   TOLD YOU ON OTHER OCCASIONS?  SO HE SHOULD BE ABLE TO COMMENT

10:10AM 16   ON SOMETHING LIKE THAT.

10:10AM 17     THERE WILL ALSO BE SITUATIONS WHERE STATEMENTS IN THE

10:10AM 18   RECORDED CONVERSATIONS REQUIRE SOME CONTEXT TO UNDERSTAND WHAT

10:10AM 19   THE PARTIES ARE TALKING ABOUT.

10:10AM 20     SO, FOR EXAMPLE, THERE'S AT LEAST ONE CASE WHERE

10:10AM 21   MS. HOLMES MAKES A STATEMENT REFERENCING A TOUR OF A FACILITY

10:11AM 22   THAT MR. PARLOFF HAD HAD AND WHAT HE HAD SEEN ON THAT TOUR.

10:11AM 23     SO AT THAT POINT HE'LL NEED TO EXPLAIN, SO THAT THE JURY

10:11AM 24   CAN UNDERSTAND THAT STATEMENT AND WHAT THAT IS REFERRING TO,

10:11AM 25   HE'LL NEED TO EXPLAIN WHAT HE SAW IN THAT TOUR AND THE

10:11AM  1    INFORMATION THAT HE RECEIVED IN THAT SEPARATE CONTEXT TO PUT

10:11AM  2    THE NECESSARY BACKGROUND ON MS. HOLMES'S STATEMENTS THERE.

10:11AM  3        SIMILARLY, I MIGHT ASK QUESTIONS ABOUT THINGS THAT

10:11AM  4    MS. HOLMES DID NOT TELL HIM.  SO BECAUSE HE PARTICIPATED IN

10:11AM  5    THOSE MANY CONVERSATIONS, HE CAN SAY, MS. HOLMES NEVER TOLD ME

10:11AM  6    X, Y, OR Z.  HE'LL BE ABLE TO SAY THAT SHE DID NOT TELL HIM,

10:11AM  7    FOR EXAMPLE, ABOUT THE COMPANY'S RELIANCE ON THIRD PARTY

10:11AM  8    MACHINES.  THAT'S A RELEVANT FACT.

10:11AM  9        BESIDES ASKING HIM THAT SIMPLE QUESTION, THE ONLY OTHER

10:11AM  10   WAY TO PROVE IT WOULD BE TO PLAY THE ENTIRE TEN HOUR PORTION OF

10:12AM  11   THE RECORDING, WHICH I DON'T THINK THE DEFENSE IS ADVOCATING

10:12AM  12   FOR EITHER.

10:12AM  13        THE COURT:  SO WOULD YOU -- AS TO THAT POINT, WOULD

10:12AM  14   YOU, MR. BOSTIC, THEN ASK HIM, DID SHE EVER MENTION ANYTHING

10:12AM  15   ABOUT THIRD PARTY MACHINES BEING USED AT THE COMPANY?

10:12AM  16        MR. BOSTIC:  THAT WOULD BE ONE EXAMPLE OF THAT KIND

10:12AM  17   OF A QUESTION, YES, YOUR HONOR.

10:12AM  18        THE COURT:  AND I GUESS THE FOLLOWUP IS, DID HE EVER

10:12AM  19   ASK THAT QUESTION?

10:12AM  20        MR. BOSTIC:  I THINK THAT WOULD ALSO BE AN

10:12AM  21   ADMISSIBLE OR A PROPER QUESTION FOR EITHER THE GOVERNMENT TO

10:12AM  22   ASK OR FOR THE DEFENSE TO ASK ON CROSS.

10:12AM  23        I DON'T WANT TO GET -- I KNOW THE DEFENSE HAS CONCERNS

10:12AM  24   ABOUT MR. PARLOFF TESTIFYING ABOUT WHY HE DID OR DID NOT ASK A

10:12AM  25   CERTAIN QUESTION, AND SO I WOULD INTEND NOT TO GO TOO FAR INTO

5606

10:12AM 1    THAT ON DIRECT.

10:12AM 2         BUT BASED ON THE CONTEXT OF THE CROSS, I MAY NEED TO COME

10:12AM 3    BACK AND LET HIM HAVE THE OPPORTUNITY TO EXPLAIN WHY HE DID OR

10:12AM 4    DID NOT ASK A CERTAIN QUESTION.

10:12AM 5             THE COURT:  SURE.  OKAY.

10:12AM 6             MR. BOSTIC:  SO THAT'S WHAT THE GOVERNMENT MEANS BY

10:12AM 7    CONTEXT.

10:13AM 8         SIMILARLY, I THINK THAT IT'S APPROPRIATE AND USEFUL FOR

10:13AM 9    THE WITNESS TO CONNECT CERTAIN STATEMENTS THAT MS. HOLMES MADE

10:13AM 10   TO THE CONTENT OF THE ARTICLE THAT HE PUBLISHED.  SO THIS MIGHT

10:13AM 11   BE, FOR EXAMPLE, PLAYING A CLIP OR HAVING THE WITNESS TESTIFY

10:13AM 12   ABOUT INFORMATION HE RECEIVED FROM MS. HOLMES, THEN POINTING TO

10:13AM 13   A STATEMENT OR A PARAGRAPH IN THE ARTICLE AND ASKING WHETHER

10:13AM 14   THAT'S CONSISTENT WITH WHAT MS. HOLMES TOLD HIM.

10:13AM 15        AND THIS IS THE -- THE POINT OF THE TESTIMONY IS TO SHOW

10:13AM 16   HOW MS. HOLMES'S STATEMENTS TO THIS JOURNALIST ENDED UP BEING

10:13AM 17   DISTILLED DOWN INTO A PACKAGE, THAT IS, THE ARTICLE ITSELF THAT

10:13AM 18   WAS PUBLISHED, AND THEN GIVEN BY HOLMES TO INVESTORS IN THE

10:13AM 19   COMPANY.

10:13AM 20        SO THE CONTENT OF THE ARTICLE IS IMPORTANT, AND THIS IS

10:13AM 21   MERELY TO CONNECT THE CONTENT OF THE ARTICLE TO THE STATEMENTS

10:13AM 22   THAT MS. HOLMES MADE.

10:13AM 23        THERE MAY ALSO BE QUESTIONS UNDER THAT CATEGORY TO THE

10:13AM 24   EFFECT OF, IF MS. HOLMES HAD TOLD YOU X, WOULD YOU HAVE

10:14AM 25   INCLUDED THAT DETAIL IN THE ARTICLE OR WOULD THAT HAVE CHANGED

| | | |
|---|---|---|
| 10:14AM | 1 | THIS STATEMENT IN THE ARTICLE, FOR EXAMPLE? |
| 10:14AM | 2 | I THINK THAT'S AN APPROPRIATE QUESTION TO SHOW, AGAIN, HOW |
| 10:14AM | 3 | MS. HOLMES'S INFORMATION GIVEN TO MR. PARLOFF AFFECTED WHAT |
| 10:14AM | 4 | THAT ARTICLE ACTUALLY SAID IN THE ARTICLE THAT WENT TO THE |
| 10:14AM | 5 | INVESTORS. |
| 10:14AM | 6 | AND I THINK THE FINAL CATEGORY OF QUESTIONS THAT WE SHOULD |
| 10:14AM | 7 | TALK ABOUT ARE QUESTIONS THAT GO TO THE WITNESS'S UNDERSTANDING |
| 10:14AM | 8 | OF STATEMENTS MADE BY MS. HOLMES.  AND I UNDERSTAND THE DEFENSE |
| 10:14AM | 9 | HAS OBJECTIONS HERE. |
| 10:14AM | 10 | THE POINT OF THESE QUESTIONS -- AND THESE WOULD BE |
| 10:14AM | 11 | QUESTIONS LIKE, WHAT WAS YOUR UNDERSTANDING ABOUT THE NUMBER OF |
| 10:14AM | 12 | TESTS THAT THERANOS'S DEVICE COULD RUN BASED ON THAT STATEMENT |
| 10:14AM | 13 | FROM MS. HOLMES? |
| 10:14AM | 14 | AND I THINK THE DEFENSE, AND I'LL LET MR. CLINE SPEAK FOR |
| 10:14AM | 15 | HIMSELF, BUT THE DEFENSE OBJECTS THAT MR. PARLOFF'S SUBJECTIVE |
| 10:15AM | 16 | UNDERSTANDING IS NOT RELEVANT HERE. |
| 10:15AM | 17 | THE GOVERNMENT DISAGREES WITH THAT. |
| 10:15AM | 18 | THE INDICTMENT SPECIFICALLY ALLEGES IN PARAGRAPH 12(I) |
| 10:15AM | 19 | THAT IT WAS PART OF THE SCHEME TO DEFRAUD THAT THE DEFENDANT |
| 10:15AM | 20 | MADE FALSE AND MISLEADING STATEMENTS TO JOURNALISTS AND THEN |
| 10:15AM | 21 | PASSED ALONG THE ARTICLES TO INVESTORS AND VICTIMS. |
| 10:15AM | 22 | SHOWING THAT THIS WITNESS WAS DECEIVED BY THE DEFENDANT IS |
| 10:15AM | 23 | NOT THE SAME THING AS ALLEGING THAT THIS VICTIM -- OR THAT THIS |
| 10:15AM | 24 | WITNESS IS A VICTIM OF THE SCHEME TO DEFRAUD.  THOSE ARE TWO |
| 10:15AM | 25 | DIFFERENT THINGS. |

10:15AM 1        AND ACTUALLY PREPARING FOR THIS HEARING, I CAME ACROSS THE

10:15AM 2   COURT'S ORDER ON THE DEFENDANT'S MOTION TO DISMISS THE

10:15AM 3   SUPERSEDING INDICTMENTS, AND THE COURT WILL RECALL THAT SEVERAL

10:15AM 4   MONTHS AGO THE DEFENSE WAS OBJECTING TO LANGUAGE IN THE

10:15AM 5   INDICTMENTS THAT RELATED TO THE DECEPTION OF DOCTORS.

10:15AM 6        AND THE DEFENSE WAS ADVANCING THE ARGUMENT THAT THE

10:15AM 7   DECEPTION OF SOMEONE OTHER THAN A VICTIM COULD NOT BE PROBATIVE

10:16AM 8   AS TO THE DEFENDANT'S INTENT TO DECEIVE ACTUAL VICTIMS.

10:16AM 9        THE COURT DISAGREED WITH THAT, AND THAT'S AT ECF 552 AT

10:16AM 10  PAGES 26 TO 27.  AND THE COURT SAID THAT TO THE EXTENT THAT THE

10:16AM 11  DEFENDANTS BELIEVE ALLEGATIONS THAT A DEFENDANT DECEIVED ONE

10:16AM 12  PARTY CANNOT BE PROBATIVE OF AN INTENT TO DEFRAUD ANOTHER, THE

10:16AM 13  COURT CANNOT AGREE.  THERE'S NO QUESTION THAT DOCTORS MAY SERVE

10:16AM 14  AS CONDUITS OF INFORMATION TO THEIR PATIENTS.

10:16AM 15       THAT'S THE SAME THING THAT HAPPENED HERE.  THIS WITNESS

10:16AM 16  WAS A CONDUIT OF MISLEADING INFORMATION TO VICTIMS IN THIS

10:16AM 17  CASE, AND FOR THAT REASON HIS UNDERSTANDING AND THE FACT THAT

10:16AM 18  HE WAS HIMSELF DECEIVED IS A NECESSARY PART OF EXPLAINING THE

10:16AM 19  MECHANISM OF HOW THOSE ARTICLES WERE USED TO DECEIVE THE

10:16AM 20  VICTIMS.

10:16AM 21            THE COURT:  THANK YOU.

10:16AM 22       TELL ME A LITTLE BIT ABOUT HOW THAT WOULD, TO THE EXTENT

10:16AM 23  THAT YOU CAN, JUST AN EXAMPLE OF A QUESTION, HIS UNDERSTANDING

10:17AM 24  OF HER STATEMENTS.  IT'S KIND OF BROAD.  THAT STATEMENT IS

10:17AM 25  BROAD, PARDON ME.

10:17AM 1      BUT WHAT DOES THAT MEAN?  AND YOU JUST SAID, WELL, THE

10:17AM 2   NUMBER OF MACHINES OR THE NUMBER OF ASSAYS AND THOSE TYPES OF

10:17AM 3   THINGS.  IS THAT DIFFERENT THAN ASKING THE QUESTION, HOW MANY

10:17AM 4   ASSAYS DID SHE SAY THE MACHINES COULD RUN?  AND SHE SAID 50,

10:17AM 5   100, 5, WHATEVER THE ANSWER IS, AND ISN'T THAT ENOUGH OR

10:17AM 6   DOES -- DO YOU NEED HIS UNDERSTANDING OF THAT ANSWER?

10:17AM 7      MR. BOSTIC:  SO, FOR EXAMPLE, YOUR HONOR, THERE IS,

10:17AM 8   THERE IS ONE CONVERSATION WHERE MS. HOLMES TELLS MR. PARLOFF

10:17AM 9   THAT SHE CAN'T TALK ABOUT THE ACTUAL USE IN AFGHANISTAN OF THE

10:17AM 10  COMPANY'S TECHNOLOGY.

10:17AM 11     I WOULD CONSIDER ASKING MR. PARLOFF A QUESTION ABOUT THAT

10:17AM 12  STATEMENT TO THE EFFECT OF, DID YOU UNDERSTAND FROM

10:18AM 13  MS. HOLMES'S STATEMENT THAT THERE WAS SOME ACTUAL USE OCCURRING

10:18AM 14  IN AFGHANISTAN AT THAT TIME?

10:18AM 15     SO IT'S AS SIMPLE AS JUST TO GIVE HIM A CHANCE TO EXPLAIN

10:18AM 16  THE EFFECT THAT THOSE STATEMENTS WERE HAVING ON HIM AND HOW THE

10:18AM 17  INFORMATION FROM MS. HOLMES WAS SHAPING HIS UNDERSTANDING ABOUT

10:18AM 18  WHAT THE TECHNOLOGY CAN DO AND HOW IT WAS BEING USED, BECAUSE

10:18AM 19  THAT UNDERSTANDING IS WHAT ENDED UP SHAPING THE CONTENT OF THE

10:18AM 20  ARTICLE.

10:18AM 21     THE COURT:  ALL RIGHT.  AND I THINK I UNDERSTAND

10:18AM 22  YOUR ARGUMENT THAT TO THE EXTENT THAT WHATEVER INFORMATION HE

10:18AM 23  RECEIVED FROM HER, EITHER STATEMENTS, WHATEVER, AND I THINK YOU

10:18AM 24  TOUCH ON THIS IN THE PLEADINGS AS WELL, WITNESSES CAN TESTIFY

10:18AM 25  ABOUT OBSERVATIONS OF THE PARTY THAT THEY'RE TALKING TO.  WERE

5610

10:18AM 1    THEY NERVOUS?  WHATEVER THAT IS.  I DON'T KNOW IF THAT'S

10:18AM 2    RELEVANT HERE.

10:18AM 3        BUT A WITNESS COULD CERTAINLY TALK ABOUT THOSE TYPES OF

10:18AM 4    THINGS AS WELL IN ADDITION TO.

10:18AM 5        ONE CONCERN I HAVE IS THE ISSUE ABOUT -- THAT RELATES TO

10:19AM 6    THE SUBPOENA ISSUE AND WHETHER OR NOT INFORMATION IS GOING TO

10:19AM 7    BE ADDRESSED THAT MIGHT CALL UPON OTHER INDIVIDUALS THAT

10:19AM 8    MR. PARLOFF TALKED TO SUCH THAT WE NEED TO WORRY ABOUT WHETHER

10:19AM 9    OR NOT OTHER INFORMATION IS AT ISSUE IN THE CASE.

10:19AM 10       IT SOUNDS LIKE, FROM WHAT YOU'VE TOLD ME, THAT HE IS GOING

10:19AM 11   TO TESTIFY ABOUT HIS INTERVIEW AND THE ANSWERS THAT SHE GAVE,

10:19AM 12   PERHAPS HIS UNDERSTANDING OF THOSE ANSWERS CONTEXTUAL WITH

10:19AM 13   HIS -- WHY HE WROTE THE ARTICLE, WHY HE PUT CERTAIN STATEMENTS

10:19AM 14   IN HIS ARTICLE, BUT NOT AS TO ANYTHING ELSE HE LEARNED IN OTHER

10:19AM 15   RESEARCH FROM OTHER INDIVIDUALS THAT MIGHT IMPACT THAT

10:19AM 16   SUBPOENA.

10:19AM 17          MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

10:19AM 18       THE GOVERNMENT DOES NOT INTEND TO ASK MR. PARLOFF ABOUT

10:20AM 19   STATEMENTS MADE BY INDIVIDUALS OTHER THAN MS. HOLMES OR ABOUT

10:20AM 20   HIS OWN INDEPENDENT RESEARCH OR INFORMATION HE MIGHT HAVE

10:20AM 21   GLEANED FROM OTHER SOURCES.

10:20AM 22       THE FOCUS HERE, PROPERLY, SHOULD BE ON WHAT THE DEFENDANT

10:20AM 23   TOLD HIM, INFORMATION THAT SHE SUPPLIED, AND WHAT INFERENCES

10:20AM 24   CAN BE DRAWN ABOUT HER INTENT FROM THAT.

10:20AM 25          THE COURT:  ALL RIGHT.  THERE'S SOME -- I READ

5611

10:20AM   1    SOMEWHERE WHERE SHE APPARENTLY TOLD HIM TO CONTACT THESE OTHER

10:20AM   2    PEOPLE FOR HIS STORY, AND HE TOLD HER TO CONTACT, I THINK,

10:20AM   3    SCIENTISTS OR OTHER INDIVIDUALS.

10:20AM   4         IS THAT GOING TO COME UP AT ALL IN YOUR EXAMINATION?

10:20AM   5              MR. BOSTIC:  NOT IN THE GOVERNMENT'S DIRECT,

10:20AM   6    YOUR HONOR.

10:20AM   7              THE COURT:  OKAY.  THANK YOU.

10:20AM   8         MR. CLINE?

10:20AM   9              MR. CLINE:  YES, YOUR HONOR.  LET ME TAKE THOSE IN

10:20AM  10    REVERSE ORDER IF I COULD.

10:20AM  11         LET ME START WITH MR. PARLOFF'S UNDERSTANDING, AND MAYBE

10:20AM  12    ACTUALLY STEP BACK FOR A SECOND AND SAY WHAT WE ARE TRYING TO

10:20AM  13    DO HERE, AS A WAY OF -- BOTH AS A MATTER OF RELEVANCE AND 403,

10:21AM  14    AND ALSO AS A MATTER OF AVOIDING THE SUBPOENA AND PRIVILEGE

10:21AM  15    ISSUES THAT LURK ON THE PERIPHERY HERE, IS KEEP MR. PARLOFF TO

10:21AM  16    THE OBJECTIVE FACTS.

10:21AM  17         SO, FOR EXAMPLE, HE CAN TESTIFY ABOUT HE, HE HAD AN IDEA

10:21AM  18    ABOUT WRITING AN ARTICLE FOR "FORTUNE," HE PITCHED IT TO

10:21AM  19    "FORTUNE."  AS PART OF THAT PROCESS HE INTERVIEWED MS. HOLMES.

10:21AM  20         AND THEN, OF COURSE, HE HAS TAPES OF THOSE INTERVIEWS.  SO

10:21AM  21    THERE WON'T BE ANY QUESTIONS ABOUT WHAT MS. HOLMES SAID.

10:21AM  22         NOW, THERE MAY VERY WELL BE COMPLETENESS ISSUES THAT WE'LL

10:21AM  23    HAVE TO WRESTLE WITH A LITTLE BIT FURTHER DOWN THE ROAD.  I'M

10:21AM  24    SURE THERE WILL BE ACTUALLY.

10:21AM  25         BUT APART FROM THAT, IT WILL BE AN OBJECTIVE FACT WHAT MS.

5612

10:21AM  1    HOLMES SAID TO MR. PARLOFF, WHAT HE ASKED HER, WHAT SHE SAID TO

10:21AM  2    HIM, THE WHOLE EXCHANGE.

10:21AM  3         THE NEXT OBJECTIVE FACT IS THAT HE WROTE AN ARTICLE, AND

10:22AM  4    THAT ARTICLE IS ALREADY IN EVIDENCE.  HE'LL AUTHENTICATE IT

10:22AM  5    AGAIN.

10:22AM  6         AND THEN THE THIRD OBJECTIVE FACT, AND THIS IS SOMETHING

10:22AM  7    THAT MR. PARLOFF CAN'T TESTIFY ABOUT, BUT IT'S -- IT IS

10:22AM  8    INTEGRAL TO THIS CONDUIT THEORY, IS, WHAT DID MS. HOLMES DO

10:22AM  9    WITH THAT ARTICLE?  DID SHE USE IT TO IN SOME WAY DECEIVE

10:22AM  10   INVESTORS?

10:22AM  11        SO THOSE ARE KIND OF THE THREE OBJECTIVE PILLARS OF WHAT

10:22AM  12   THE GOVERNMENT IS TRYING TO PROVE HERE.

10:22AM  13        WHAT DID MS. HOLMES -- WHAT WAS MR. PARLOFF DOING?  HE WAS

10:22AM  14   WRITING AN ARTICLE FOR FORTUNE.

10:22AM  15        WHAT DID MS. HOLMES SAY TO HIM?  WHAT DID HE END UP

10:22AM  16   WRITING?  AND THEN WHAT DID MS. HOLMES DO WITH THE ARTICLE?

10:22AM  17             THE COURT:  BUT HE CAN'T TESTIFY AS TO THE LATTER?

10:22AM  18             MR. CLINE:  HE CANNOT.  HE CANNOT.

10:22AM  19        BUT JUST IN TERMS OF THE GOVERNMENT'S THEORY, THAT'S THE

10:22AM  20   FINAL PIECE OF IT.

10:22AM  21        IF THE ARTICLE HAD NEVER BEEN PUBLISHED, THIS WOULD JUST

10:22AM  22   HAVE BEEN AN IDEA, YOU KNOW, HER STATEMENTS MIGHT HAVE

10:22AM  23   INDEPENDENT EVIDENTIARY SIGNIFICANCE, LIKE A STATEMENT TO A

10:23AM  24   HAIR DRESSER WOULD, BUT THE CONDUIT THEORY WOULDN'T EXIST.

10:23AM  25        THE POINT OF THIS IS THAT THIS ARTICLE GETS PUBLISHED AND

UNITED STATES COURT REPORTERS

**ER-9234**

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023