No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXXIV of LVII | ER-9536 to ER-9835

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
600 Stewart Street
Suite 400
Seattle, WA 98101
(360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
680 Maine Ave. S.W.
Washington, D.C. 200024
(202) 434-5000
asaharia@wc.com

DAS CROSS BY MR. WADE (RES.)                                    5909

09:28AM   1    Q.   OKAY.  YOU DID HOWEVER RECOMMEND SOME NAMES OF YOUR OWN;

09:28AM   2    CORRECT?

09:28AM   3    A.   YES.

09:28AM   4    Q.   OKAY.  LET'S GO UP THE EMAIL CHAIN.  I'M SORRY.  IF WE CAN

09:28AM   5    GET THE EMAIL DOWN BELOW.  IN FACT, I DON'T NEED TO DISPLAY THE

09:28AM   6    EMAIL.

09:28AM   7         BUT DO YOU RECALL TELLING MS. HOLMES THAT YOU WERE A

09:28AM   8    LITTLE DELAYED IN GETTING TO THE EMAIL, BUT IF YOUR THOUGHTS

09:28AM   9    WERE STILL NEEDED, YOU WOULD HAVE SOME ADDITIONS THAT COULD BE

09:29AM   10   PROVIDED?

09:29AM   11   A.   YES.

09:29AM   12   Q.   AND MS. HOLMES SAYS PLEASE DO, ADD ANY THOUGHTS THAT YOU

09:29AM   13   HAVE.

09:29AM   14        DO YOU SEE THAT?

09:29AM   15   A.   YES.

09:29AM   16   Q.   AND THEN YOU, YOU PROPOSED A NUMBER OF PEOPLE WHO COULD BE

09:29AM   17   ADDED TO THIS SCIENTIFIC ADVISORY BOARD; RIGHT?

09:29AM   18   A.   YES.

09:29AM   19   Q.   AND THESE WERE PEOPLE WHO YOU KNEW AND WERE FAMILIAR WITH

09:29AM   20   BASED UPON YOUR WORK; RIGHT?

09:29AM   21   A.   YES, BASED UPON MY TRAINING.

09:29AM   22   Q.   AND SOME OF THESE PEOPLE YOU HAD ACTUALLY TRAINED UNDER;

09:29AM   23   CORRECT?

09:29AM   24   A.   YES.

09:29AM   25   Q.   AND YOU THOUGHT THEM TO BE HIGHLY QUALIFIED AND THOUGHTFUL

DAS CROSS BY MR. WADE (RES.)                                    5910

09:29AM  1    PEOPLE; IS THAT FAIR?

09:29AM  2    A.   YES.

09:29AM  3    Q.   OKAY.  AND IN PARTICULAR, DR., IS IT, GRONOWSKI?

09:29AM  4    A.   GRONOWSKI.

09:29AM  5    Q.   OKAY.  GRONOWSKI.  IS SHE SOMEONE YOU TRAINED UNDER?

09:29AM  6    A.   YES.

09:29AM  7    Q.   AND YOU RECOMMEND THAT SHE -- SHE WAS A FORMER AACC

09:29AM  8    PRESIDENT.

09:29AM  9         DO YOU SEE THAT?

09:29AM  10   A.   YES.

09:29AM  11   Q.   AND THE AACC, THAT'S A -- SORT OF A TRADE GROUP OF

09:29AM  12   CLINICAL CHEMISTS; IS THAT RIGHT?

09:29AM  13   A.   YES.

09:29AM  14   Q.   AND YOU RECOMMENDED THAT SHE BE CONSIDERED; IS THAT RIGHT?

09:30AM  15   A.   YES.

09:30AM  16   Q.   AND SHE ACTUALLY JOINED THE SCIENTIFIC REVIEW COMMITTEE,

09:30AM  17   DID SHE NOT?

09:30AM  18   A.   YES.

09:30AM  19   Q.   AND YOU UNDERSTOOD AT THE TIME THAT THIS WAS PART OF THOSE

09:30AM  20   REFORM EFFORTS THAT THE COMPANY WAS INVOLVED IN TO TRY TO GET

09:30AM  21   MORE DIALOGUE AND INPUT FROM THE SCIENTIFIC COMMUNITY?

09:30AM  22   A.   YES.

09:30AM  23   Q.   I NEXT WANT TO ASK YOU BRIEFLY ABOUT YOUR TRANSITION UP

09:30AM  24   AND THE WORK THAT YOU HAD BEEN DOING IN BETWEEN.

09:30AM  25        THIS MUST HAVE BEEN SOMEWHAT DIFFICULT.  YOUR FAMILY WAS

DAS CROSS BY MR. WADE (RES.)                                              5911

09:30AM  1    STILL IN LOS ANGELES; RIGHT?

09:30AM  2    A.  YES.

09:30AM  3    Q.  AND YOU WERE WEARING MULTIPLE HATS AND TRYING TO MEET ALL

09:30AM  4    OF YOUR RESPONSIBILITIES; RIGHT?

09:30AM  5    A.  YES.

09:30AM  6    Q.  AND SO IT WAS PROBABLY A PRETTY TAXING TIME FOR YOU; IS

09:31AM  7    THAT FAIR?

09:31AM  8    A.  YES.

09:31AM  9    Q.  OKAY.  BUT THERE WAS A TEAM OF PEOPLE THAT WERE WORKING ON

09:31AM  10   SOME OF THE ISSUES THAT CAME UP; RIGHT?

09:31AM  11   A.  YES.

09:31AM  12   Q.  AND DR. TSCHIRHART WAS ALSO GOING TO BE COMING UP AT

09:31AM  13   EXACTLY THE SAME TIME.

09:31AM  14       DO YOU RECALL?

09:31AM  15   A.  YES.

09:31AM  16   Q.  AND DO YOU RECALL THAT AS PART OF -- IN ADVANCE OF YOUR

09:31AM  17   COMING UP, YOU WERE COMMUNICATING WITH DR. TSCHIRHART TO KIND

09:31AM  18   OF FORMULATE A PLAN AS TO HOW YOU WOULD WORK TO IMPROVE THE LAB

09:31AM  19   AT THERANOS.

09:31AM  20       DO YOU RECALL THAT?

09:31AM  21   A.  YES.

09:31AM  22   Q.  LET ME HAVE YOU TAKE A LOOK AT 10666.

09:31AM  23   A.  OKAY.

09:31AM  24   Q.  DO YOU RECOGNIZE THIS TO BE AN EMAIL CHAIN BETWEEN YOU AND

09:31AM  25   DR. TSCHIRHART WITH RESPECT TO THE PLANS THAT YOU WERE PUTTING

DAS CROSS BY MR. WADE (RES.)                                    5912

09:31AM   1    IN PLACE FOR HOW YOU WOULD IMPROVE THE LAB AT THERANOS?

09:32AM   2         (PAUSE IN PROCEEDINGS.)

09:32AM   3              THE WITNESS:  YES.

09:32AM   4              MR. WADE:  MOVE THE ADMISSION OF 10666.

09:32AM   5              MR. LEACH:  NO OBJECTION.

09:32AM   6              THE COURT:  IT IS ADMITTED.  IT MAY BE PUBLISHED.

09:32AM   7         (DEFENDANT'S EXHIBIT 10666 WAS RECEIVED IN EVIDENCE.)

09:32AM   8              MR. WADE:  AND IF WE CAN START AT THE LAST EMAIL AND

09:32AM   9    FOCUS.  GOOD.  THANK YOU.

09:32AM  10    Q.   AND IN THIS EMAIL, DR. TSCHIRHART IS REACHING OUT AND

09:32AM  11    NOTES THAT HE WAS -- YOU AND HE WERE GOING TO JOIN ABOUT THE

09:32AM  12    SAME TIME ON MARCH 14TH.

09:32AM  13         DO YOU RECALL THAT?

09:32AM  14    A.   YES.

09:32AM  15    Q.   AND BY "FULL," THAT MEANS YOU WERE GOING TO BE PHYSICALLY

09:32AM  16    ON SITE FROM THAT POINT GOING FORWARD; IS THAT RIGHT?

09:33AM  17    A.   YES.

09:33AM  18    Q.   OKAY.  AND HE SAYS HE NOTES HOW THERE WOULD BE SOME

09:33AM  19    BENEFITS IN TALKING ABOUT SOME OF THE PRELIMINARY ISSUES.

09:33AM  20         DO YOU SEE THAT?

09:33AM  21    A.   YES.

09:33AM  22    Q.   OKAY.  AND THEN IT SAYS, "OF COURSE WE WILL NEED TO REVIEW

09:33AM  23    THE INSPECTION DEFICIENCY RESPONSE, AS IT WILL BE OUR BURDEN TO

09:33AM  24    MAKE SURE THAT THE SPECIFIED CORRECTIVE ACTION ACTUALLY TAKES

09:33AM  25    PLACE."

DAS CROSS BY MR. WADE (RES.)                                    5913

09:33AM  1        DO YOU SEE THAT?

09:33AM  2     A.   YES.

09:33AM  3     Q.   AND HE NOTES HE WOULD LIKE TO DO THAT TOGETHER IF YOU'RE

09:33AM  4     COMFORTABLE WITH THAT SO YOU COULD WORK AS A TEAM?

09:33AM  5     A.   YES.

09:33AM  6     Q.   AND I TAKE IT YOU WERE COMFORTABLE WORKING AS A TEAM WITH

09:33AM  7     DR. TSCHIRHART?

09:33AM  8     A.   YES.

09:33AM  9     Q.   YOU CONSIDERED HIM TO BE A HIGHLY COMPETENT AND QUALIFIED

09:33AM 10     PATHOLOGIST?

09:33AM 11     A.   YES.

09:33AM 12     Q.   OKAY.  HE THEN NOTES IN THE FINAL PARAGRAPH, "THE LAST

09:33AM 13     STICKY PART IS THAT BOTH OF US ANSWER DIRECTLY TO ELIZABETH;

09:33AM 14     BUT AS THESE ARE ALL OPERATIONAL ISSUES, IT SEEMS TO ME THAT

09:34AM 15     SUNNY SHOULD SIGN OFF ON THE CHANGES BEFORE WE GO THERE.  DO

09:34AM 16     YOU HAVE A FEEL FOR THIS YET?"

09:34AM 17        DO YOU SEE THAT?

09:34AM 18     A.   YES.

09:34AM 19     Q.   AND DO YOU RECALL IN THIS TIME PERIOD LEARNING THAT

09:34AM 20     HISTORICALLY IT HAD BEEN MR. BALWANI WHO HAD HAD THE

09:34AM 21     RESPONSIBILITY OVER THE LABORATORY FROM A MANAGEMENT

09:34AM 22     STANDPOINT?

09:34AM 23     A.   YES.

09:34AM 24     Q.   AND THAT THE LABORATORY DIRECTORS PREVIOUSLY HAD REPORTED

09:34AM 25     UP TO MR. BALWANI?

DAS CROSS BY MR. WADE (RES.)                                      5914

09:34AM  1    A.   YES.

09:34AM  2    Q.   BUT AS A RESULT OF THE DESIRE TO MAKE IMPROVEMENTS AND

09:34AM  3    ADDRESS SOME OF THESE REFORM EFFORTS, THAT FOR THE FIRST TIME

09:34AM  4    MS. HOLMES WAS GOING TO COME IN AND HAVE THE LABORATORY

09:34AM  5    DIRECTORS REPORT DIRECTLY TO HER; CORRECT?

09:34AM  6         MR. LEACH:  OBJECTION.  FOUNDATION.  ARGUMENT.

09:34AM  7         THE COURT:  IF YOU CAN LAY A FOUNDATION FOR THAT

09:34AM  8    QUESTION.

09:34AM  9         MR. WADE:  SURE.

09:34AM  10   Q.   WE TALKED ABOUT THE REFORM EFFORTS THAT THE LAB WAS MAKING

09:34AM  11   YESTERDAY A BIT.

09:34AM  12        DO YOU RECALL THAT?

09:35AM  13   A.   YES.

09:35AM  14   Q.   AND YOU RECALL THAT THAT INCLUDED HIRING NEW PEOPLE;

09:35AM  15   CORRECT?

09:35AM  16   A.   YES.

09:35AM  17   Q.   AND DO YOU RECALL THAT AS PART OF THAT THERE WAS A DESIRE

09:35AM  18   WITHIN THE COMPANY TO HAVE THE LABORATORY DIRECTORS REPORT

09:35AM  19   DIRECTLY TO THE CEO?

09:35AM  20        MR. LEACH:  OBJECTION.  VAGUE, FOUNDATION.

09:35AM  21        THE COURT:  I THINK YOU CAN ASK THAT QUESTION IN A

09:35AM  22   DIFFERENT WAY.  YOU'RE STATING IT AS IF IT IS A FACT AND IF HE

09:35AM  23   KNOWS THAT AS A FACT.

09:35AM  24        MR. WADE:  FAIR ENOUGH, YOUR HONOR.

09:35AM  25   Q.   DO YOU RECALL WHETHER PART OF THOSE EFFORTS WAS A DESIRE

DAS CROSS BY MR. WADE (RES.)                                    5915

09:35AM  1    TO HAVE THE LABORATORY DIRECTORS REPORT DIRECTLY TO THE CEO AS

09:35AM  2    A GOVERNANCE MATTER?

09:35AM  3    A.   NO, I WAS NOT PRIVY TO THE REASONING OF THE SWITCH IN THE

09:35AM  4    CHAIN OF COMMAND.

09:35AM  5    Q.   OKAY.  FAIR ENOUGH.

09:35AM  6         BUT YOU DO RECALL THAT WHEN YOU WERE COMING IN AS

09:35AM  7    LABORATORY DIRECTOR, YOU WERE NOT GOING TO BE REPORTING TO

09:35AM  8    MR. BALWANI; CORRECT?

09:35AM  9    A.   YES.

09:35AM  10   Q.   AND YOU RECALL THAT YOU WERE GOING TO BE REPORTING

09:36AM  11   DIRECTLY TO MS. HOLMES?

09:36AM  12   A.   YES.

09:36AM  13   Q.   AND WAS IT YOUR UNDERSTANDING AT THE TIME THAT THIS WAS

09:36AM  14   THE FIRST TIME THAT A LABORATORY DIRECTOR HAD EVER REPORTED

09:36AM  15   DIRECTLY TO MS. HOLMES?

09:36AM  16   A.   YES.

09:36AM  17   Q.   I'D LIKE TO GO UP THE EMAIL AND JUST LOOK AT YOUR

09:36AM  18   RESPONSE, THE EMAIL UP THE CHAIN.

09:36AM  19        YOU RESPOND TO HIM WITHIN A COUPLE OF DAYS HERE, AND I

09:36AM  20   JUST WANT TO FOCUS ON THAT FIRST SUBSTANTIVE PARAGRAPH.

09:36AM  21        IT SAYS, THE SECOND SENTENCE, "I CAN TELL YOU THAT THE CMS

09:36AM  22   DEFICIENCY RESPONSE IS QUITE COMPREHENSIVE, AND ADDRESSES ALL

09:36AM  23   OF THE BASIC INFRASTRUCTURE THAT WAS MISSING (A LARGE

09:36AM  24   UNDERTAKING) QUITE NICELY -- THE CLINICAL CONSULTANTS AND LEGAL

09:36AM  25   TEAM DID AN OUTSTANDING JOB PUTTING IT TOGETHER - I'M MOST

DAS CROSS BY MR. WADE (RES.)                                    5916

09:37AM   1    FAMILIAR WITH THE PATIENT IMPACT ASSESSMENTS, SINCE THAT WAS MY

09:37AM   2    FOCUS."

09:37AM   3        DO YOU SEE THAT?

09:37AM   4    A.   YES.

09:37AM   5    Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT -- AS TO THE

09:37AM   6    TEAM EFFORT THAT WAS UNDERWAY IN THIS PERIOD TO TRY TO RESPOND

09:37AM   7    TO THE CMS ISSUES?

09:37AM   8    A.   YES.

09:37AM   9    Q.   AND SO IT WASN'T JUST YOU, IT WAS ALSO SOME MEMBERS OF THE

09:37AM  10    LEGAL TEAM THAT WERE INVOLVED IN GOING THROUGH THE LEGAL

09:37AM  11    ASPECTS OF THAT RESPONSE?

09:37AM  12    A.   COULD YOU CLARIFY "THE LEGAL ASPECTS OF THE RESPONSE"?

09:37AM  13    Q.   WELL, THERE ARE A LOT OF REGULATIONS; CORRECT?

09:37AM  14    A.   YES.

09:37AM  15    Q.   AND THERE IS SORT OF AN ADMINISTRATIVE PROCESS THAT A

09:37AM  16    COMPANY CAN GO THROUGH IN THESE MATTERS?

09:37AM  17    A.   YES.

09:37AM  18    Q.   AND THE LAWYERS WERE INVOLVED IN THAT; RIGHT?

09:37AM  19    A.   YES.

09:37AM  20    Q.   OKAY.  BUT ALSO WE TALKED ABOUT YESTERDAY THEY HAD THIS

09:37AM  21    BIG TEAM OF PEOPLE THAT WAS BROUGHT IN TO DIG IN ON SOME OF THE

09:38AM  22    FACTS; RIGHT?

09:38AM  23    A.   YES.

09:38AM  24    Q.   AND THOSE ARE THE CLINICAL CONSULTANTS THAT YOU REFER TO

09:38AM  25    IN THAT EMAIL?

DAS CROSS BY MR. WADE (RES.)                                    5917

09:38AM   1      A.   YES.

09:38AM   2      Q.   AND IT WAS YOUR BELIEF THAT ALL OF THESE PEOPLE WERE

09:38AM   3   WORKING HARD AND IN GOOD FAITH AS THEY WERE UNDERTAKING THESE

09:38AM   4   EFFORTS; IS THAT FAIR?

09:38AM   5      A.   YES.

09:38AM   6      Q.   OKAY.  AND YOU NOTE THERE THAT IT WAS A LARGE UNDERTAKING.

09:38AM   7           DO YOU SEE THAT?

09:38AM   8      A.   YES.

09:38AM   9      Q.   AND WE'LL TALK ABOUT THIS A BIT MORE LATER.

09:38AM   10          BUT AS YOU CAME INTO THE COMPANY, YOU RECOGNIZED THERE

09:38AM   11   WERE A LOT OF IMPROVEMENTS THAT WERE NEEDED AS A RESULT OF

09:38AM   12   PRIORS ISSUES THAT HADN'T BEEN ADEQUATELY ADDRESSED BY PRIOR

09:38AM   13   LAB DIRECTORS; IS THAT RIGHT?

09:38AM   14     A.   YES.

09:38AM   15     Q.   YOU THEN NOTE ALL OF THE SOP'S, COMPETENCIES, TRAINING

09:39AM   16   HAVE BEEN ADDRESSED, HOWEVER, AS YOU KNOW, THEY WILL NEED TO BE

09:39AM   17   REDUCED TO PRACTICE AND MONITORED, WHICH WILL BE JUST AS

09:39AM   18   DIFFICULT EVIDENCED BY THE PROCEEDINGS IN THE RECENT MONTHLY

09:39AM   19   QA/QC MEETINGS.

09:39AM   20          DO YOU SEE THAT?

09:39AM   21     A.   YES.

09:39AM   22     Q.   AND SO THE PROCEDURES HAD BEEN IN PLACE, BUT YOU

09:39AM   23   UNDERSTOOD AS YOU WENT IN, THERE WAS GOING TO BE A LOT OF WORK

09:39AM   24   REQUIRED TO TRY TO MAKE SURE THAT THE TEAM WAS REALLY LIVING

09:39AM   25   THE POLICIES?

DAS CROSS BY MR. WADE (RES.)                                          5918

09:39AM   1        A.   YES.

09:39AM   2        Q.   AND THAT'S IMPORTANT; CORRECT?

09:39AM   3        A.   YES.

09:39AM   4        Q.   AND BECAUSE ULTIMATELY A POLICY IS ONLY AS GOOD AS WHETHER

09:39AM   5   OR NOT IT'S FOLLOWED; IS THAT RIGHT?

09:39AM   6        A.   YES.

09:39AM   7        Q.   AND AS LABORATORY DIRECTOR, YOU UNDERSTOOD THAT YOU ARE

09:39AM   8   THE PERSON RESPONSIBLE TO ENSURE THAT THOSE WERE FOLLOWED;

09:39AM   9   RIGHT?

09:39AM  10        A.   YES.

09:39AM  11        Q.   AND IT WAS YOUR INTENTION AT THIS POINT TO GO AND DO JUST

09:40AM  12   THAT; IS THAT RIGHT?

09:40AM  13        A.   YES.

09:40AM  14        Q.   OKAY.  AND YOU THEN NOTE IF THERE'S, IN THAT SECOND

09:40AM  15   SENTENCE, YOU HAVE SOME TWEAKS ON QC/QA,

09:40AM  16   VERIFICATION/VALIDATION THAT YOU WANT TO PUT IN PLACE, BUT THE

09:40AM  17   BONES HAVE BEEN PUT IN PLACE NICELY ALREADY.

09:40AM  18        DO YOU SEE THAT?

09:40AM  19        A.   YES.

09:40AM  20        Q.   SO THERE WAS PROGRESS MADE, BUT YOU STILL HAD WORK THAT

09:40AM  21   YOU WANTED TO DO; IS THAT FAIR?

09:40AM  22        A.   YES.

09:40AM  23        Q.   AND THEN IF WE CAN -- YOU OFFERED TO PROVIDE

09:40AM  24   DR. TSCHIRHART ANY OF THE MATERIALS OR GET HIM ANY OF THE

09:40AM  25   SPECIFIC MATERIALS ON THIS IF IT WOULD BE HELPFUL TO HIM?

DAS CROSS BY MR. WADE (RES.)                                    5919

09:40AM  1    A.   YES.

09:40AM  2    Q.   AND YOU ALSO THEN ADDRESSED THE ISSUE WITH RESPECT TO

09:41AM  3    MS. HOLMES AND MR. BALWANI A COUPLE OF PARAGRAPHS DOWN; RIGHT?

09:41AM  4         LET'S PUT THAT UP.

09:41AM  5         DO YOU SEE THERE ON THE PARAGRAPH IN THE SCREEN,

09:41AM  6    "REGARDING SIGN-OFF BY SUNNY, THAT MAKES SENSE - I'M NOT SURE

09:41AM  7    EXACTLY HOW THAT IS PLANNED.  I KNOW FOR SURE THAT I REPORT

09:41AM  8    DIRECTLY TO ELIZABETH, AND SOUNDS LIKE YOU DO AS WELL - BUT I'M

09:41AM  9    SURE SUNNY IS INVOLVED.  THAT'S PROBABLY A QUESTION BEST LEFT

09:41AM  10   FOR ELIZABETH."

09:41AM  11        DO YOU SEE THAT?

09:41AM  12   A.   YES.

09:41AM  13   Q.   AND, IN FACT, A SHORT TIME LATER YOU UNDERSTOOD THAT

09:41AM  14   MR. BALWANI LEFT THE COMPANY; IS THAT RIGHT?

09:41AM  15   A.   YES.

09:41AM  16   Q.   AND YOU REPORTED DIRECTLY TO ELIZABETH; RIGHT?

09:41AM  17   A.   YES.

09:41AM  18   Q.   AND YOUR INTERACTIONS, AS YOU TALKED ABOUT WITH MR. LEACH,

09:41AM  19   ON IMPROVEMENTS TO THE LAB WERE WITH MS. HOLMES AT THAT POINT?

09:41AM  20   A.   YES.

09:41AM  21   Q.   AND JUST SO WE'RE CLEAR ABOUT THAT, YOU WERE IN CHARGE OF

09:41AM  22   THE LABORATORY; CORRECT?

09:41AM  23   A.   YES.

09:41AM  24   Q.   ARE YOU FAMILIAR WITH MS. HOLMES'S BACKGROUND AND TRAINING

09:42AM  25   A BIT?

DAS CROSS BY MR. WADE (RES.)                                    5920

09:42AM   1    A.   YES.

09:42AM   2    Q.   AND AS YOU UNDERSTAND IT, SHE WOULDN'T BE QUALIFIED TO

09:42AM   3    SERVE AS A LABORATORY DIRECTOR IN A HIGH COMPLEXITY LAB, WOULD

09:42AM   4    SHE?

09:42AM   5    A.   CORRECT.

09:42AM   6    Q.   AND THAT WAS GOING TO BE -- YOU WERE THE PERSON WHO HAD

09:42AM   7    THE NECESSARY TRAINING AND EXPERTISE TO FILL THAT JOB?

09:42AM   8    A.   YES.

09:42AM   9    Q.   AND YOU WOULD BRIEF MS. HOLMES ON WHAT WAS HAPPENING AND

09:42AM  10    EDUCATE HER ON DIFFERENT REQUIREMENTS AND PROCEDURES AND THE

09:42AM  11    LIKE?

09:42AM  12    A.   YES.

09:42AM  13    Q.   BUT ULTIMATELY THE JUDGMENTS WERE YOURS; RIGHT?

09:42AM  14    A.   YES.

09:42AM  15    Q.   AND MS. HOLMES SUPPORTED YOU IN THAT; RIGHT?

09:42AM  16    A.   YES.

09:42AM  17    Q.   IF WE THEN GO UP THE CHAIN AND LOOK AT DR. TSCHIRHART'S

09:42AM  18    RESPONSE BRIEFLY, FOCUSSING ON THE SECOND PARAGRAPH.  HE TALKS

09:42AM  19    ABOUT HOW HE WANTS TO GET INVOLVED AND FOCUS ON THE STRUCTURE

09:43AM  20    WITHIN THE LAB AND THE REORGANIZATION AND FIGURE OUT WHAT

09:43AM  21    PERSONNEL WERE RIGHT TO PUT IN PLACE; RIGHT?

09:43AM  22    A.   YES.

09:43AM  23    Q.   AND THAT'S IMPORTANT; RIGHT?

09:43AM  24    A.   YES.

09:43AM  25    Q.   YOU WERE GOING TO ULTIMATELY BE RESPONSIBLE TO A DEGREE

DAS CROSS BY MR. WADE (RES.)                                    5921

09:43AM   1    FOR THE REACTIONS OF THE PEOPLE WHO WERE WORKING UNDER YOU;

09:43AM   2    RIGHT?

09:43AM   3    A.   YES.

09:43AM   4    Q.   AND YOU WANTED, YOU WANTED COMFORT THAT THEY WERE GOOD

09:43AM   5    PEOPLE WHO WERE DOING A GOOD JOB; RIGHT?

09:43AM   6    A.   YES.

09:43AM   7    Q.   OKAY.  AND MS. HOLMES SUPPORTED YOU IN THAT; IS THAT

09:43AM   8    RIGHT?

09:43AM   9    A.   YES.

09:43AM   10   Q.   OKAY.  LET'S GO JUST TO THE CONTINUATION OF THAT, WHICH IS

09:43AM   11   BACK ON THE SECOND PAGE.

09:43AM   12        HE ACTUALLY -- DR. TSCHIRHART DESCRIBED THIS AS LOOKING

09:43AM   13   FOR A BULLDOG.

09:43AM   14        DO YOU SEE THAT?

09:43AM   15   A.   YES.

09:43AM   16   Q.   AND SOMEONE WHO WOULD REALLY DIG IN; RIGHT?

09:43AM   17   A.   YES.

09:43AM   18   Q.   AND LET'S LOOK AT YOUR RESPONSE.

09:44AM   19        YOU AGREED, YOU WANTED A BULLDOG; RIGHT?

09:44AM   20   A.   YES.

09:44AM   21   Q.   AND YOU WANTED SOMEONE WHO WOULD DIG IN AND START TURNING

09:44AM   22   OVER ROCKS; RIGHT?

09:44AM   23   A.   YES.

09:44AM   24   Q.   AND WHO YOU COULD TRUST TO BE THOROUGH IN EVERYTHING THEY

09:44AM   25   WERE DOING; IS THAT FAIR?

DAS CROSS BY MR. WADE (RES.)                                      5922

09:44AM  1      A.   YES.

09:44AM  2      Q.   AND YOU IDENTIFIED THAT THERE WAS ACTUALLY A PERSON THERE

09:44AM  3      ALREADY, SONIA, WHO MAY BE IN A POSITION TO SERVE THAT

09:44AM  4      FUNCTION; RIGHT?

09:44AM  5      A.   YES.

09:44AM  6      Q.   AND DO YOU RECALL SONIA'S LAST NAME?

09:44AM  7      A.   CENDEJAS, I BELIEVE.

09:44AM  8      Q.   SONIA CENDEJAS.  BUT YOU NOTED IT WOULD TAKE SOME TIME

09:44AM  9      WHEN YOU WERE ON THE GROUND TO SORT OF ASSESS THE STRENGTHS AND

09:44AM  10     WEAKNESSES AND FIGURE OUT THE BEST PLAN; IS THAT FAIR?

09:44AM  11     A.   YES.

09:44AM  12     Q.   AND THEN IF YOU FOCUS ON THAT BOTTOM PARAGRAPH, DO YOU SEE

09:44AM  13     IT SAYS, "ELIZABETH AND SUNNY HAVE BEEN FULLY SUPPORTIVE, SO

09:44AM  14     THERE'S ABSOLUTELY NO ISSUES THERE."

09:45AM  15          DO YOU SEE THAT?

09:45AM  16     A.   YES.

09:45AM  17     Q.   AND YOU BELIEVED THAT AT THE TIME; RIGHT?

09:45AM  18     A.   YES.

09:45AM  19     Q.   AND WITH RESPECT TO MS. HOLMES, WHO STAYED THERE, YOU

09:45AM  20     BELIEVED THAT THROUGHOUT YOUR TENURE THERE; IS THAT RIGHT?

09:45AM  21     A.   YES.

09:45AM  22     Q.   AND YOU NOTICED THAT IN THIS PERIOD THEY SHARED OVERSIGHT

09:45AM  23     AND THERE WERE NO ISSUES; RIGHT?

09:45AM  24     A.   YES.

09:45AM  25     Q.   BUT THEN AGAIN, OF COURSE, MR. BALWANI LEFT JUST A SHORT

DAS CROSS BY MR. WADE (RES.)                                    5923

09:45AM   1    TIME AFTER THIS?

09:45AM   2    A.   YES.

09:45AM   3    Q.   OKAY.  I'D LIKE TO SWITCH TO ASK YOU SOME QUESTIONS ABOUT

09:45AM   4    THE CMS REPORT.  AND YOU RECALL THAT MR. LEACH ASKED YOU SOME

09:45AM   5    QUESTIONS ABOUT THAT YESTERDAY.

09:46AM   6         AND A LOT OF THE CMS REPORT RELATED TO -- WELL, ALL OF THE

09:46AM   7    CMS REPORT RELATED TO HISTORICAL ISSUES AT THE COMPANY UNDER

09:46AM   8    PRIOR LABORATORY DIRECTORS; IS THAT RIGHT?

09:46AM   9    A.   YES.

09:46AM   10   Q.   AND A LOT OF THE QUESTIONS THAT YOU WERE ASKED ABOUT

09:46AM   11   RELATED TO THE LAB DEVELOPED TESTS THAT WERE RUN ON THE EDISON

09:46AM   12   3.5 DEVICE.

09:46AM   13        DO YOU RECALL THAT?

09:46AM   14   A.   YES.

09:46AM   15   Q.   OKAY.  AND THAT WAS -- I THINK YOU SAID THERE WERE MAYBE

09:46AM   16   12 TESTS THAT WERE RUN ON THE EDISON DEVICE.

09:46AM   17        DO YOU RECALL THAT?

09:46AM   18   A.   YES.

09:46AM   19   Q.   AND DO YOU RECALL LEARNING THROUGH YOUR WORK THAT THOSE

09:46AM   20   WERE BROUGHT ONLINE OR VALIDATED AND PUT INTO THE LABORATORY

09:46AM   21   DURING THE TENURE OF DR. ADAM ROSENDORFF?

09:47AM   22   A.   I DON'T RECALL WHOSE TENURE.

09:47AM   23   Q.   WELL, DO YOU RECALL THE TENURE OF DR. ADAM ROSENDORFF?

09:47AM   24   A.   I WAS AWARE OF HIS NAME.

09:47AM   25   Q.   OKAY.  AND THAT HE STARTED SERVING THE LAB WHEN IT WENT

DAS CROSS BY MR. WADE (RES.)                                    5924

09:47AM   1    LIVE FROM A COMMERCIAL STANDPOINT.

09:47AM   2        DO YOU RECALL THAT?

09:47AM   3    A.   I WASN'T SURE OF THE TIMELINE.

09:47AM   4    Q.   OKAY.  AND LET ME JUST -- DO YOU RECALL -- LET ME STRIKE

09:47AM   5    THAT.

09:47AM   6        YOU RECALL COMING TO THE VIEW IN THIS TIME PERIOD THAT THE

09:47AM   7    LABORATORY WAS NOT WELL RUN; IS THAT FAIR, HISTORICALLY?

09:47AM   8    A.   YES.

09:47AM   9    Q.   AND, IN FACT, THAT WAS THE REASON WHY YOU WERE WORKING TO

09:47AM  10    IMPROVE IT; CORRECT?

09:47AM  11    A.   YES.

09:47AM  12    Q.   I WANT TO FOCUS A LITTLE BIT -- DO YOU RECALL THAT

09:48AM  13    MR. LEACH SHOWED YOU THAT LETTER THAT TALKED ABOUT IMMEDIATE

09:48AM  14    JEOPARDY?

09:48AM  15        DO YOU RECALL THAT?

09:48AM  16    A.   YES.

09:48AM  17    Q.   AND THAT WAS ONE OF THE REASONS THAT PROMPTED SUCH A QUICK

09:48AM  18    AND URGENT RESPONSE FROM THE COMPANY.

09:48AM  19        DO YOU RECALL THAT?

09:48AM  20    A.   YES.

09:48AM  21    Q.   AND YOU TOOK THAT SERIOUSLY I TAKE IT?

09:48AM  22    A.   YES.

09:48AM  23    Q.   AND -- BUT AS YOU SIT HERE TODAY, THERE'S NO CLEAR

09:48AM  24    UNDERSTANDING -- WHEN A COMPANY RECEIVES INFORMATION LIKE THAT,

09:48AM  25    THERE WAS NO CLEAR UNDERSTANDING AS TO EXACTLY WHAT THAT MEANT

DAS CROSS BY MR. WADE (RES.)                                      5925

09:48AM   1    OR EXACTLY WHAT WAS NEEDED TO RESPOND TO THAT?

09:48AM   2              MR. LEACH:  OBJECTION.  AMBIGUOUS.  VAGUE.

09:48AM   3              THE COURT:  DID YOU UNDERSTAND THE QUESTION?

09:48AM   4              THE WITNESS:  I COULD USE SOME CLARIFICATION,

09:48AM   5    PLEASE.

09:48AM   6              MR. WADE:  FAIR ENOUGH.

09:48AM   7    Q.   THE WORDS "IMMEDIATE JEOPARDY" AS APPLIED TO THE FACTS OF

09:49AM   8    A LAB ARE NOT SPELLED OUT SPECIFICALLY WITHIN THAT LETTER;

09:49AM   9    RIGHT?

09:49AM  10    A.   I BELIEVE THEY WERE.

09:49AM  11    Q.   THE APPLICATION OF THAT DETERMINATION WAS.

09:49AM  12         DO YOU RECALL THAT?

09:49AM  13    A.   I DO NOT.

09:49AM  14    Q.   LET ME DO THIS, LET ME SHOW YOU A COPY OF THE REPORT.

09:49AM  15    A.   YES.

09:49AM  16    Q.   WHAT I'D LIKE TO DO IS SHOW YOU -- DO YOU RECALL YESTERDAY

09:49AM  17    COUNSEL WAS DOING SOME REDACTIONS AND WAS PRESENTING YOU

09:49AM  18    EXCERPTS OF THE REPORT.

09:49AM  19         DO YOU RECALL THAT?

09:49AM  20    A.   YES.

09:49AM  21    Q.   OKAY.  I HAVE COPIES OF THOSE, JUST THE EXCERPTS SO WE CAN

09:49AM  22    ALL AVOID CONFUSION.

09:49AM  23         AND I'M GOING TO HAND UP TO YOU, WITH THE COURT'S

09:49AM  24    PERMISSION, A COPY OF THE LETTER THAT WAS ADMITTED AND A COPY

09:50AM  25    OF THE EXCERPTS.

DAS CROSS BY MR. WADE (RES.)                                      5926

09:50AM   1        AND I'LL PROVIDE A COPY TO COUNSEL AS WELL AND THE COURT.

09:50AM   2        MAY I APPROACH, YOUR HONOR?

09:50AM   3             THE COURT:  YES.

09:50AM   4             MR. WADE:  (HANDING.)

09:50AM   5        AND JUST FOR THE RECORD, I BELIEVE THESE EXCERPTS ARE

09:50AM   6   ALREADY IN EVIDENCE AND HAVE BEEN MADE AVAILABLE PUBLICLY.

09:50AM   7        I THINK THE LETTER WE HAVE BEEN REFERRING TO IS PART A,

09:50AM   8   4621A, AND I'LL REFER TO THE EXCERPTS FROM THE REPORT AS 4621B,

09:51AM   9   WITH THE COURT'S PERMISSION.

09:51AM  10             THE COURT:  YES.  THANK YOU.

09:51AM  11   BY MR. WADE:

09:51AM  12   Q.   NOW, BEFORE I ASK YOU QUESTIONS ABOUT THIS, DO YOU RECALL

09:51AM  13   THE GUIDELINES AND REGULATIONS THAT SET FORTH HOW A CLIA LAB

09:51AM  14   OPERATES ARE SET FORTH IN THOSE -- IN THAT EXHIBIT THAT

09:51AM  15   MR. LEACH WAS SHOWING YOU YESTERDAY, EXHIBIT 7603; RIGHT?

09:51AM  16   A.   YES.

09:51AM  17   Q.   AND MR. LEACH SHOWED YOU SOME SPECIFIC PORTIONS OF THAT.

09:51AM  18        DO YOU RECALL?

09:51AM  19   A.   YES.

09:51AM  20   Q.   AND SOME OF THOSE RELATED TO OWNERS OF A LAB.

09:52AM  21        DO YOU RECALL THAT?

09:52AM  22   A.   YES.

09:52AM  23   Q.   AND ULTIMATELY AN OWNER WHO IS NOT QUALIFIED TO SERVE AS A

09:52AM  24   LABORATORY DIRECTOR CANNOT COME IN AND PERFORM THE FUNCTIONS OF

09:52AM  25   A LABORATORY DIRECTOR; CORRECT?

DAS CROSS BY MR. WADE (RES.)                                      5927

09:52AM  1    A.   YES.

09:52AM  2    Q.   OKAY.  SO THERE'S A DEGREE TO WHICH THE OWNER IS DEPENDENT

09:52AM  3    UPON THE LABORATORY DIRECTOR TO TRY TO MAKE SURE THAT

09:52AM  4    EVERYTHING IS DONE CONSISTENT WITH THE REGULATORY STRUCTURE; IS

09:52AM  5    THAT RIGHT?

09:52AM  6    A.   YES.

09:52AM  7    Q.   AND THAT POSITION IS AN IMPORTANT JOB; RIGHT?

09:52AM  8    A.   YES.

09:52AM  9    Q.   BECAUSE THE LABORATORY DIRECTOR IN A HIGH COMPLEXITY

09:52AM 10    LABORATORY IS A PERSON WHO IS HIGHLY TRAINED AND QUALIFIED;

09:52AM 11    RIGHT?

09:52AM 12    A.   YES.

09:52AM 13    Q.   AND THOSE REGULATIONS PUT A LOT OF RESPONSIBILITY ON THAT

09:52AM 14    PERSON TO TRY TO ENSURE THAT EVERYTHING IS DONE RIGHT; CORRECT?

09:52AM 15    A.   YES.

09:52AM 16    Q.   AND THAT'S, THAT'S MORE RESPONSIBILITY THAN ANY ONE PERSON

09:53AM 17    COULD THEMSELVES ACTUALLY PERFORM; RIGHT?

09:53AM 18              MR. LEACH:  OBJECTION.  ARGUMENT.

09:53AM 19              THE COURT:  SUSTAINED.

09:53AM 20    BY MR. WADE:

09:53AM 21    Q.   IN ORDER TO MEET ALL OF THOSE RESPONSIBILITIES, THE

09:53AM 22    LABORATORY DIRECTOR NEEDS TO RELY ON OTHER PEOPLE TO PERFORM

09:53AM 23    CERTAIN FUNCTIONS; RIGHT?

09:53AM 24    A.   USUALLY, YES.

09:53AM 25    Q.   AND THAT'S WHY OFTENTIMES THERE ARE PEOPLE WHO ARE

DAS CROSS BY MR. WADE (RES.)                                    5928

09:53AM   1    INVOLVED IN QUALITY ASSURANCE AND QUALITY CONTROL; RIGHT?

09:53AM   2    A.   YES.

09:53AM   3    Q.   AND THERE ARE SOMETIMES SEPARATE TECHNICAL SUPERVISORS;

09:53AM   4    RIGHT?

09:53AM   5    A.   YES.

09:53AM   6    Q.   AND THERE ARE GENERAL SUPERVISORS?

09:53AM   7    A.   YES.

09:53AM   8    Q.   AND ALL OF THOSE PEOPLE HAVE TO MEET REQUIREMENTS THAT ARE

09:53AM   9    SET FORTH IN THOSE REGULATIONS; RIGHT?

09:53AM   10   A.   YES.

09:53AM   11   Q.   AND WHEN WE TALKED ABOUT HIRING QUALIFIED PERSONNEL, ONE

09:53AM   12   OF THE REASONS WHY YOU NEED TO DO THAT IS BECAUSE AS THE

09:53AM   13   LABORATORY DIRECTOR, YOU'RE DEPENDENT UPON THOSE PEOPLE IN

09:53AM   14   ORDER TO DISPATCH YOUR OBLIGATIONS; RIGHT?

09:53AM   15   A.   YES.

09:53AM   16   Q.   AND IF THEY DON'T PERFORM THEIR JOB, THERE'S A DEGREE TO

09:54AM   17   WHICH YOU COULD BE HELD RESPONSIBLE FOR IT; RIGHT?

09:54AM   18   A.   YES.

09:54AM   19   Q.   OKAY.  AND IN CONNECTION WITH -- AND WERE YOU AWARE WHEN

09:54AM   20   YOU CAME IN THAT THE COMPANY -- YOU WERE AWARE THAT THE COMPANY

09:54AM   21   HAD PRIOR LABORATORY DIRECTORS; RIGHT?

09:54AM   22   A.   YES.

09:54AM   23   Q.   AND YOU WERE AWARE THAT THEY ALSO RETAINED CONSULTING

09:54AM   24   SERVICES TO ADVISE THEM ON POLICIES AND PROCEDURES AND THE

09:54AM   25   LIKE?

DAS CROSS BY MR. WADE (RES.)                                    5929

09:54AM   1      A.   NOT UNTIL I JOINED.

09:54AM   2      Q.   OKAY.  WHEN YOU JOINED YOU LEARNED THAT THEY HAD GOTTEN

09:54AM   3      SOME ADVICE ON THAT PREVIOUSLY?

09:54AM   4      A.   YES.

09:54AM   5      Q.   AND THAT ADVICE HAD COME FROM A GENTLEMAN NAMED

09:54AM   6      JERRY HURST.

09:54AM   7           DO YOU RECALL THAT?

09:54AM   8      A.   I DON'T RECALL THAT NAME.

09:54AM   9      Q.   DO YOU RECALL LEARNING THAT IN ADVANCE OF THE INSPECTION

09:54AM  10      THAT CMS HAD DONE, THAT THEY HAD DONE SOME MOCK AUDITS?

09:54AM  11      A.   YES, I WAS AWARE OF THAT.

09:54AM  12      Q.   YES.  AND THAT THEY ACTUALLY FELT THAT THE MOCK AUDITS

09:54AM  13      WENT PRETTY WELL?

09:55AM  14              MR. LEACH:  OBJECTION.  FOUNDATION.

09:55AM  15              THE COURT:  YOU'RE ASKING HIS UNDERSTANDING OF THAT?

09:55AM  16      BY MR. WADE:

09:55AM  17      Q.   DID YOU --

09:55AM  18              THE COURT:  WERE YOU AWARE OF THAT, SIR?

09:55AM  19              THE WITNESS:  HUH?

09:55AM  20              THE COURT:  WERE YOU AWARE OF THAT?

09:55AM  21              THE WITNESS:  YES, YOUR HONOR.

09:55AM  22      BY MR. WADE:

09:55AM  23      Q.   OKAY.  YOU WERE AWARE THAT THE MOCK AUDITS WERE THOUGHT TO

09:55AM  24      HAVE GONE WELL?

09:55AM  25      A.   YES, I WAS MADE AWARE OF THOSE.

DAS CROSS BY MR. WADE (RES.)                                    5930

09:55AM  1      Q.   BUT NEVERTHELESS, THERE WERE THESE DEFICIENCIES IDENTIFIED

09:55AM  2      DURING THE INSPECTION?

09:55AM  3      A.   YES.

09:55AM  4      Q.   OKAY.   AND WITHIN THE DOCUMENT THAT I'VE HANDED YOU MARKED

09:55AM  5      4621B THERE ARE, THERE ARE ISSUES THAT ARE IDENTIFIED THAT

09:55AM  6      MR. LEACH WENT THROUGH.

09:56AM  7           DO YOU RECALL THAT?

09:56AM  8      A.   YES.

09:56AM  9      Q.   AND I THINK THE VAST MAJORITY OF THEM RELATED TO QUALITY

09:56AM  10     CONTROL.

09:56AM  11          DO YOU RECALL THAT?

09:56AM  12     A.   I DON'T REMEMBER THE PROPORTION, BUT THERE WERE A NUMBER.

09:56AM  13     Q.   FAIR ENOUGH.   YOU RECALL A SIGNIFICANT NUMBER OF THEM

09:56AM  14     RELATED TO QUALITY CONTROL?

09:56AM  15     A.   YES.

09:56AM  16     Q.   AND A QUALITY CONTROL PROCEDURE IS SOMETHING THAT A LAB

09:56AM  17     DIRECTOR IS RESPONSIBLE FOR IMPLEMENTING; RIGHT?

09:56AM  18     A.   YES.

09:56AM  19     Q.   AND EITHER THE LAB DIRECTOR OR SOMEONE TO WHOM THE LAB

09:56AM  20     DIRECTOR HAS DELEGATED RESPONSIBILITY IS RESPONSIBLE FOR

09:56AM  21     ENSURING THAT THAT IS ENFORCED?

09:56AM  22     A.   YES.

09:56AM  23     Q.   AND TO -- AND THE PEOPLE -- AND THOSE ARE PEOPLE WHO HAVE

09:56AM  24     SOME EXPERTISE; RIGHT?

09:56AM  25     A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    5931

09:56AM   1    Q.   AND THEY'RE RESPONSIBLE FOR LOOKING AT THE DATA AND MAKING

09:56AM   2    SURE THAT THE POLICY IS ADHERED TO; IS THAT RIGHT?

09:56AM   3    A.   YES.

09:56AM   4    Q.   OKAY.  AND WHEN YOU LOOKED AT THAT DATA, YOU, YOU

09:57AM   5    ULTIMATELY HAD, YOU ULTIMATELY CAME TO THE VIEW THAT SOME

09:57AM   6    REMEDIATION WAS NECESSARY; IS THAT RIGHT?

09:57AM   7    A.   YES.

09:57AM   8    Q.   AND I WANT TO TALK A LITTLE BIT ABOUT -- I THINK WITH

09:57AM   9    MR. LEACH YOU WERE ASKED SOME QUESTIONS ABOUT SOME OF THE

09:57AM   10   INFORMATION THAT YOU LOOKED AT.

09:57AM   11        DO YOU RECALL THAT?

09:57AM   12   A.   YES.

09:57AM   13   Q.   AND YOU, YOU -- WE WERE TALKING ABOUT BUCKETS, I THINK.

09:57AM   14        DO YOU RECALL THAT?

09:57AM   15   A.   YES.

09:57AM   16   Q.   AND THERE WERE, THERE WERE THREE BUCKETS IN PARTICULAR.

09:57AM   17        DO YOU RECALL?

09:57AM   18   A.   YES.

09:57AM   19   Q.   AND ONE RELATED TO THE VALIDATION OF THOSE EDISON ASSAYS;

09:57AM   20   RIGHT?

09:57AM   21   A.   YES.

09:58AM   22   Q.   AND THE SECOND BUCKET RELATED TO QUALITY CONTROL RESULTS;

09:58AM   23   CORRECT?

09:58AM   24   A.   YES.

09:58AM   25   Q.   AND THEN THE THIRD BUCKET RELATED TO WHAT I THINK YOU

DAS CROSS BY MR. WADE (RES.)                                5932

09:58AM  1    DESCRIBED AS SORT OF A PATIENT TEST RESULT DISTRIBUTION

09:58AM  2    ANALYSIS; RIGHT?

09:58AM  3    A.  YES.

09:58AM  4    Q.  AND I JUST WANT TO MAKE SURE THAT WE ALL UNDERSTAND KIND

09:58AM  5    OF A LITTLE BIT MORE ABOUT WHAT YOU DID AND WHAT YOU CONSIDERED

09:58AM  6    THERE.  OKAY?

09:58AM  7    A.  YES.

09:58AM  8    Q.  WITHIN 4621, THERE WAS SOME SPECIFIC DATA AND ITEMS THAT

09:58AM  9    WERE IDENTIFIED RELATING TO QUALITY CONTROL; RIGHT?

09:58AM  10   A.  YES.

09:58AM  11   Q.  BUT YOU -- IN PERFORMING YOUR FUNCTION, YOU DIDN'T LIMIT

09:58AM  12   YOURSELF TO JUST LOOKING AT THAT QUALITY CONTROL INFORMATION;

09:58AM  13   RIGHT?

09:58AM  14   A.  YES.

09:58AM  15   Q.  YOU ACTUALLY ASKED FOR ALL OF THE QUALITY CONTROL

09:58AM  16   INFORMATION WITH RESPECT TO EDISON ASSAYS TO BE EXTRACTED AND

09:59AM  17   REVIEWED; RIGHT?

09:59AM  18   A.  YES.

09:59AM  19   Q.  AND YOU STARTED TO TURN OVER ROCKS, IF YOU WILL?

09:59AM  20   A.  YES.

09:59AM  21   Q.  AND YOU DID A RETROSPECTIVE ANALYSIS OF THE QUALITY

09:59AM  22   CONTROL DATA APPLYING CERTAIN WESTGARD RULES AND PRINCIPLES TO

09:59AM  23   ASSESS THE HISTORICAL QUALITY CONTROL PERFORMANCE OF THOSE

09:59AM  24   EDISON ASSAYS; RIGHT?

09:59AM  25   A.  YES.

DAS CROSS BY MR. WADE (RES.)                                    5933

| | | |
|---|---|---|
| 09:59AM | 1 | Q.   AND IN DOING THAT, YOU ASKED SOMEONE TO EXTRACT ALL OF |
| 09:59AM | 2 | THAT INFORMATION OUT OF THE LIS, OR LABORATORY INFORMATION |
| 09:59AM | 3 | SYSTEMS DATABASE; RIGHT? |
| 09:59AM | 4 | A.   I'M NOT SURE WHERE THEY WOULD HAVE EXTRACTED THEM FROM BUT |
| 09:59AM | 5 | YES, THOSE WERE BROUGHT TO OUR -- |
| 09:59AM | 6 | Q.   ALL OF THOSE ASSAYS? |
| 09:59AM | 7 | A.   YES. |
| 09:59AM | 8 | Q.   AND JUST SO WE'RE CLEAR, THERE WERE A COUPLE OF SPECIFIC |
| 09:59AM | 9 | EDISON DEVICES OR 3.5 DEVICES OF THERANOS THAT WERE IDENTIFIED |
| 10:00AM | 10 | WITHIN THIS EXCERPT OF 4621B; CORRECT? |
| 10:00AM | 11 | A.   YES. |
| 10:00AM | 12 | Q.   BUT THERE WERE A COUPLE HUNDRED EDISON DEVICES THAT THE |
| 10:00AM | 13 | COMPANY HAD AT THE TIME? |
| 10:00AM | 14 | A.   YES. |
| 10:00AM | 15 | Q.   AND YOU LOOKED AT ALL OF THE DATA FOR ALL OF THEM; |
| 10:00AM | 16 | CORRECT? |
| 10:00AM | 17 | A.   YES. |
| 10:00AM | 18 | Q.   AND MS. HOLMES ENCOURAGED YOU TO TURN OVER THOSE ROCKS; |
| 10:00AM | 19 | RIGHT? |
| 10:00AM | 20 | A.   YES. |
| 10:00AM | 21 | Q.   OKAY.  AND WHEN YOU APPLIED THOSE WESTGARD PRINCIPLES AND |
| 10:00AM | 22 | LOOKED AT THE COMPANY'S HISTORIC POLICY, YOU FELT LIKE THERE |
| 10:00AM | 23 | WERE DEFICIENCIES? |
| 10:00AM | 24 | A.   YES. |
| 10:00AM | 25 | Q.   AND YOU FELT LIKE THE QUALIFIED PROFESSIONALS WHO ARE |

DAS CROSS BY MR. WADE (RES.)                                    5934

| | | |
|---|---|---|
| 10:00AM | 1 | TASKED WITH MONITORING THAT BEFORE SHOULD HAVE IDENTIFIED THOSE |
| 10:00AM | 2 | ISSUES; IS THAT FAIR? |
| 10:00AM | 3 | A.   YES. |
| 10:00AM | 4 | Q.   AND PERHAPS, AS A RESULT OF THAT, SHOULD HAVE STOPPED |
| 10:00AM | 5 | OFFERING THOSE EDISON TESTS WHEN THEY SAW THAT DATA; IS THAT |
| 10:01AM | 6 | FAIR? |
| 10:01AM | 7 | A.   YES. |
| 10:01AM | 8 | Q.   OKAY.  AND IN ADDITION TO THAT, YOU LOOKED AT, YOU LOOKED |
| 10:01AM | 9 | AT VALIDATION DATA FOR -- OR VALIDATION INFORMATION WITH |
| 10:01AM | 10 | RESPECT TO THE EDISON ASSAYS; RIGHT? |
| 10:01AM | 11 | A.   YES. |
| 10:01AM | 12 | Q.   AND IN CONNECTION WITH THAT VALIDATION DATA, YOU CAME TO |
| 10:01AM | 13 | THE VIEW THAT THE PROFESSIONALS WHO IMPLEMENTED THOSE REPORTS |
| 10:01AM | 14 | DIDN'T USE THE APPROPRIATE STANDARDS IN SETTING BENCHMARKS FOR |
| 10:01AM | 15 | THE PERFORMANCE OF THE ASSAYS; RIGHT? |
| 10:01AM | 16 | A.   I DON'T REMEMBER SPECIFYING THE PROFESSIONALS, BUT IN |
| 10:01AM | 17 | GENERAL, YES. |
| 10:01AM | 18 | Q.   OKAY.  FAIR ENOUGH. |
| 10:01AM | 19 | YOU RECALL COMING TO THE VIEW THAT THE STANDARDS THAT WERE |
| 10:01AM | 20 | SET FORTH FOR VALIDATION WEREN'T APPROPRIATE IN YOUR VIEW? |
| 10:02AM | 21 | A.   CAN YOU CLARIFY THAT? |
| 10:02AM | 22 | Q.   SURE.  YOU'RE AWARE THAT WHEN AN LDT IS OFFERED WITHIN A |
| 10:02AM | 23 | LAB, THAT TYPICALLY A VALIDATION REPORT IS PREPARED BEFORE THE |
| 10:02AM | 24 | LDT IS OFFERED IN THE LAB; RIGHT? |
| 10:02AM | 25 | A.   YES. |

DAS CROSS BY MR. WADE (RES.)

| 10:02AM | 1 | Q.   AND IN CONNECTION WITH THAT VALIDATION REPORT, THERE ARE |
| 10:02AM | 2 | DIFFERENT STANDARDS THAT ARE SET UNDER WHICH THE ASSAY NEEDS TO |
| 10:02AM | 3 | PERFORM BEFORE IT CAN BE OFFERED IN THE LAB; RIGHT? |
| 10:02AM | 4 | A.   CORRECT. |
| 10:02AM | 5 | Q.   AND THOSE -- THERE'S NO MAGIC LIST SOMEWHERE THAT SAYS |
| 10:02AM | 6 | THESE ARE THE STANDARDS FOR LDT'S THAT NEED TO BE MET; RIGHT? |
| 10:02AM | 7 | A.   THERE ARE A SET OF EXPERIMENTS THAT NEED TO BE MET. |
| 10:02AM | 8 | Q.   THERE ARE EXPERIMENTS THAT NEED TO BE MET, BUT IN TERMS |
| 10:02AM | 9 | OF, FOR EXAMPLE, TOTAL ALLOWABLE ERROR, THERE ISN'T A SET LIST |
| 10:02AM | 10 | IN CLIA REGULATIONS THAT SAYS FOR AN LDT, THIS IS THE BENCHMARK |
| 10:03AM | 11 | THAT YOU NEED FOR VALIDATION? |
| 10:03AM | 12 | A.   CORRECT. |
| 10:03AM | 13 | Q.   THERE'S A DEGREE TO WHICH SETTING THOSE, THE TOTAL |
| 10:03AM | 14 | ALLOWABLE ERROR, IS SOMETHING THAT IS WITHIN THE PROFESSIONAL |
| 10:03AM | 15 | JUDGMENT OF THE LABORATORY DIRECTOR? |
| 10:03AM | 16 | A.   YES. |
| 10:03AM | 17 | Q.   OKAY.  AND, AND THAT IS USUALLY INCLUDED WITHIN THE |
| 10:03AM | 18 | VALIDATION REPORT, THE TOTAL ALLOWABLE ERROR? |
| 10:03AM | 19 | A.   YES. |
| 10:03AM | 20 | Q.   AND THAT SORT OF SETS THE FRAMEWORK FOR THE PRECISION OF |
| 10:03AM | 21 | THE ASSAY; IS THAT RIGHT? |
| 10:03AM | 22 | A.   IT SETS A FRAMEWORK FOR ASSESSING THE ASSAY. |
| 10:03AM | 23 | Q.   RIGHT.  AND IF -- AND IN COMING TO AND LOOKING AT THIS |
| 10:03AM | 24 | DATA BACK THEN, YOU LOOKED AT THE TOTAL ALLOWABLE ERROR METRICS |
| 10:03AM | 25 | THAT HAD BEEN SET BY THE COMPANY. |

DAS CROSS BY MR. WADE (RES.)                          5936

10:03AM  1        DO YOU RECALL THAT?

10:03AM  2   A.   YES.

10:03AM  3   Q.   AND I'M GOING TO GO INTO THOSE IN A SECOND.  BEFORE I DO,

10:03AM  4   I JUST WANT TO GO INTO THE THIRD BUCKET, WHICH WAS THE PATIENT

10:04AM  5   TEST DISTRIBUTION RESULTS.  OKAY?

10:04AM  6   A.   YES.

10:04AM  7   Q.   AND THERE WHAT YOU DID IS FOR EACH OF THE ASSAYS YOU

10:04AM  8   ESSENTIALLY PULLED OUT OF THE LIS ALL OF THE PATIENT RESULTS

10:04AM  9   FOR EACH ASSAY; RIGHT?

10:04AM 10   A.   I'M NOT SURE WHERE THE DATA WAS PULLED FROM.  IT WAS

10:04AM 11   PULLED FOR OUR TEAM.

10:04AM 12   Q.   OKAY.  WHEREVER THE DATA WAS -- FOR PATIENT RESULTS WAS

10:04AM 13   MAINTAINED, ALL OF THAT DATA WAS EXTRACTED; CORRECT?

10:04AM 14   A.   YES, THAT WAS TRUE TO THE BEST OF MY UNDERSTANDING.

10:04AM 15   Q.   OKAY.  AND YOU LOOKED AT ALL OF THE RESULTS AND LOOKED AT

10:04AM 16   SORT OF WHETHER THEY -- HOW THEY PERFORMED WITHIN THE REFERENCE

10:04AM 17   RANGE.

10:04AM 18        IS THAT --

10:04AM 19   A.   TO SOME EXTENT.

10:04AM 20   Q.   CAN YOU GIVE US A SENSE OF WHAT THE PATIENT DISTRIBUTION

10:04AM 21   ANALYSIS CONSISTS OF?

10:04AM 22   A.   I'LL TRY TO AVOID JARGON AS MUCH AS POSSIBLE.

10:04AM 23        IN GENERAL, WE WERE TRYING TO ASSESS HOW THE AVERAGE

10:05AM 24   VALUES WERE CHANGING OR NOT CHANGING OVER TIME, WHICH IS A

10:05AM 25   REFLECTION OF INACCURACY WITH THE TEST.

DAS CROSS BY MR. WADE (RES.)                    5937

10:05AM  1         ALSO, YOU CAN LOOK AT WHAT YOU WERE DESCRIBING, THE

10:05AM  2     DISTRIBUTIONS OF ABNORMALS VERSUS NORMALS, AND GET A SENSE OF

10:05AM  3     ANY SORT OF IMPRECISION IN THE ASSAY.

10:05AM  4         THERE'S VARIOUS WAYS TO LOOK AT THESE METRICS.  BUT, YES

10:05AM  5     IN GENERAL.

10:05AM  6     Q.  SO YOU ESSENTIALLY PLOT ALL OF THE RESULTS FOR THE

10:05AM  7     PATIENTS AND SORT OF LOOK AT AND ANALYZE THE DATA AND CONSIDER

10:05AM  8     WHETHER YOU CAN INFER ANYTHING FROM ALL OF THE RESULTS FOR THAT

10:05AM  9     PARTICULAR ASSAY?

10:05AM  10    A.  TO SOME EXTENT, YES.  WE MAKE CALCULATIONS BASED ON THE

10:05AM  11    ENTIRE DATA SET AND LOOK AT IT IN CHUNKS.  BUT, BUT OVERALL,

10:05AM  12    YES.

10:05AM  13    Q.  OKAY.  AND THESE, THESE THREE BUCKETS THAT YOU'RE TALKING

10:05AM  14    ABOUT, THIS IS A PRETTY SOPHISTICATED ANALYSIS; IS THAT FAIR?

10:05AM  15    A.  YES.

10:05AM  16    Q.  AND IT REQUIRED THE EXTRACTION OF A LOT OF DATA; RIGHT?

10:06AM  17    A.  YES.

10:06AM  18    Q.  AND IT REQUIRED THE CONSIDERATION AND ANALYSIS OF A LOT OF

10:06AM  19    THAT DATA IN ORDER TO INFORM YOUR VIEWS; RIGHT?

10:06AM  20    A.  YES.

10:06AM  21    Q.  THIS IS NOT SOMETHING THAT IN YOUR VIEW SOMEONE WITHOUT

10:06AM  22    KNOWLEDGE AND TRAINING WOULD BE IN A POSITION TO DO; IS THAT

10:06AM  23    FAIR?

10:06AM  24    A.  CORRECT.

10:06AM  25    Q.  OKAY.  AND AS A RESULT OF THAT COMBINATION OF INFORMATION,

DAS CROSS BY MR. WADE (RES.)                                    5938

10:06AM  1    THAT INFORMED YOUR ANALYSIS AS TO HOW TO RESPOND AND WHAT

10:06AM  2    ACTIONS TO TAKE WITH RESPECT TO THE EDISON 3.5; IS THAT RIGHT?

10:06AM  3    A.   YES.

10:06AM  4    Q.   OKAY.  AND I'D LIKE TO FOCUS YOU ON EXHIBIT 10678, WHICH I

10:06AM  5    THINK IS THE RED WELD.

10:07AM  6         MAY I APPROACH, YOUR HONOR?

10:07AM  7              THE COURT:  YES.

10:07AM  8    BY MR. WADE:

10:07AM  9    Q.   (HANDING.)

10:07AM 10         DR. DAS, DO YOU HAVE EXHIBIT 10678 IN FRONT OF YOU?

10:07AM 11    A.   I DO.

10:07AM 12    Q.   AND DO YOU RECOGNIZE THIS TO BE INFORMATION THAT YOU WERE

10:07AM 13    PROVIDED IN CONNECTION WITH YOUR ANALYSIS OF THAT FIRST BUCKET,

10:07AM 14    THE VALIDATION BUCKET?

10:08AM 15    A.   YES, IT LOOKS FAMILIAR.

10:08AM 16              MR. WADE:  I MOVE THE ADMISSION OF 10678.

10:08AM 17              MR. LEACH:  NO OBJECTION.

10:08AM 18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:08AM 19         (DEFENDANT'S EXHIBIT 10678 WAS RECEIVED IN EVIDENCE.)

10:08AM 20              MR. WADE:  IF WE CAN, LET'S JUST BLOW UP QUICKLY THE

10:08AM 21    BOTTOM EMAIL.

10:08AM 22    Q.   DO YOU RECALL YESTERDAY THAT WE WERE TALKING ABOUT AS YOU

10:08AM 23    WERE BECOMING MORE FAMILIAR, OR AS YOU WERE FAMILIARIZING

10:08AM 24    YOURSELF WITH THE COMPANY, YOU WERE TALKING WITH A VARIETY OF

10:08AM 25    PEOPLE AT THE COMPANY AND ASKING THEM TO PROVIDE YOU WITH A

DAS CROSS BY MR. WADE (RES.)                                    5939

10:08AM  1    VARIETY OF INFORMATION.

10:08AM  2         DO YOU RECALL THAT?

10:08AM  3    A.   YES.

10:08AM  4    Q.   AND THAT PROCESS BECAME A LITTLE MORE EXPEDITED AS YOU

10:08AM  5    WERE DEALING WITH THE CMS RESPONSE; RIGHT?

10:08AM  6    A.   YES.

10:08AM  7    Q.   AND SOME OF THE PEOPLE -- AND THIS EMAIL, MARCH 23RD, THIS

10:09AM  8    IS A LITTLE OVER A WEEK AFTER YOU JOINED THE COMPANY?

10:09AM  9    A.   YES.

10:09AM  10   Q.   AND IS IT FAIR TO SAY THAT THE PEOPLE WHO ARE IDENTIFIED

10:09AM  11   IN THE EMAIL ARE AMONG THE INTERNAL FOLKS AT THERANOS WHO ARE

10:09AM  12   PROVIDING YOU WITH INFORMATION TO HELP GET YOU UP TO SPEED?

10:09AM  13   A.   YES.

10:09AM  14   Q.   OKAY.  AND YOU WERE SENT THIS SPREADSHEET THAT INCLUDED

10:09AM  15   SOME INFORMATION WITH RESPECT TO THE EDISON ASSAYS; CORRECT?

10:09AM  16   A.   YES.

10:09AM  17   Q.   AND JUST FOR CONTEXT, YOU'RE GETTING THIS INFORMATION

10:09AM  18   AROUND THE TIME OF WHETHER -- OF WHEN DECISIONS ARE BEING MADE

10:09AM  19   ABOUT WHETHER TO VOID THE RESULTS ON THE -- RELATING TO THE

10:09AM  20   EDISON; CORRECT?

10:09AM  21   A.   YES.

10:09AM  22   Q.   OKAY.  AND LET'S LOOK AT THE SPREADSHEET.  AND LET'S JUST

10:10AM  23   HIGHLIGHT, OR IF WE CAN ZOOM IN SO WE CAN JUST FOCUS ON THOSE

10:10AM  24   FIRST FOUR COLUMNS.

10:10AM  25        DO YOU SEE THAT?

DAS CROSS BY MR. WADE (RES.)                                    5940

10:10AM   1      A.   YES.

10:10AM   2      Q.   OKAY.  AND IT IDENTIFIES THE DIFFERENT ASSAYS.

10:10AM   3           DO YOU SEE THAT IN COLUMN B?

10:10AM   4      A.   YES.

10:10AM   5      Q.   AND THESE ARE ALL -- THIS IS EXCLUSIVELY THE 12 EDISON

10:10AM   6      ASSAYS; RIGHT?

10:10AM   7      A.   YES.

10:10AM   8      Q.   AND THEN WE WERE JUST TALKING A LITTLE BIT ABOUT TOTAL

10:10AM   9      ALLOWABLE ERROR.  AND THE TOTAL ALLOWABLE ERROR, IS THAT

10:10AM  10      SOMETIMES REFERRED TO AS TAE?

10:10AM  11      A.   YES.

10:10AM  12      Q.   AND DO YOU SEE THE TAE IDENTIFIED IN COLUMN E THERE?

10:10AM  13      A.   YES.

10:10AM  14      Q.   AND DID YOU UNDERSTAND AT THE TIME THAT TAE HERE REFERRED

10:10AM  15      TO THE STANDARDS THAT WERE SET FOR THE VALIDATION OF THESE

10:11AM  16      ASSAYS ON THE EDISON 3.5 DEVICE?

10:11AM  17      A.   I'M NOT SURE I WAS AWARE OF THAT AT THE TIME.

10:11AM  18      Q.   OKAY.  BUT YOU RECALL LEARNING ABOUT THE TOTAL ALLOWABLE

10:11AM  19      ERROR STANDARDS THAT THE COMPANY WAS USING?

10:11AM  20      A.   YES.

10:11AM  21      Q.   AND DO YOU RECALL COMING TO THE VIEW THAT THE COMPANY, IN

10:11AM  22      YOUR JUDGMENT, HAD USED THE WRONG STANDARDS FOR TOTAL ALLOWABLE

10:11AM  23      ERROR IN CONNECTION WITH THE VALIDATION OF THE EDISON ASSAYS?

10:11AM  24      A.   THAT WAS NOT MY DISAGREEMENT WITH THOSE NUMBERS.

10:11AM  25      Q.   WHAT WAS YOUR DISAGREEMENT?

DAS CROSS BY MR. WADE (RES.)                              5941

10:11AM   1      A.   IT WAS THE WAY THAT THOSE, THOSE STANDARDS WERE USED.

10:11AM   2      Q.   OKAY.  EXPLAIN.

10:11AM   3      A.   SO THE TOTAL ALLOWABLE ERROR WAS PRESUMABLY SET BY THE

10:11AM   4  LABORATORY DIRECTOR OR THEIR STAFF.  I DIDN'T SCRUTINIZE THOSE

10:11AM   5  AS MUCH AS HOW THEY WERE USED IN THE CALCULATIONS.

10:11AM   6      Q.   AND HOW DID YOU SCRUTINIZE THOSE AND HOW THEY WERE USED IN

10:12AM   7  THE CALCULATIONS?

10:12AM   8      A.   SO I CALCULATED WHAT ARE CALLED SIGMA METRICS.  SO I'LL

10:12AM   9  SPARE THE JARGON, BUT BASICALLY I SET A BASELINE TO WHICH THEY

10:12AM  10  SHOULD SET THEMSELVES, OR A BENCHMARK SO TO SPEAK, WHICH WAS

10:12AM  11  NOT DONE PROPERLY IN THE VALIDATION REPORTS.

10:12AM  12      SO I WAS NOT SCRUTINIZING THE TAE COLUMN SO TO SPEAK, BUT

10:12AM  13  MORE THE USE OF IT.

10:12AM  14      Q.   RIGHT.  AND I WANT TO STAY OUT OF THE COMPLEXITY.

10:12AM  15      BUT ESSENTIALLY, DO YOU RECALL COMING TO THE VIEW THAT THE

10:12AM  16  STANDARDS THAT WERE USED WITHIN THE VALIDATION OF THE ASSAYS

10:12AM  17  WERE ESSENTIALLY TOO WIDE AND SHOULD HAVE BEEN TIGHTER?

10:12AM  18      A.   NO, THAT WAS, THAT WAS NOT MY DESCRIPTION.

10:12AM  19      Q.   AND IS THERE A SIMPLIFIED DESCRIPTION OF THE CONCLUSION

10:12AM  20  THAT YOU CAME TO?

10:12AM  21      A.   LET ME TRY.

10:13AM  22      Q.   YEAH.

10:13AM  23      A.   IT WAS AN ANALYSIS OF THE ERROR RATES THAT ENDED UP BEING

10:13AM  24  TOO HIGH --

10:13AM  25      Q.   OKAY.

DAS CROSS BY MR. WADE (RES.)                                5942

10:13AM  1    A.   -- TO BE MOST CORRECT.

10:13AM  2    Q.   AND THAT WAS IN CONNECTION WITH THE VALIDATION OF THE

10:13AM  3    ASSAYS?

10:13AM  4    A.   YES.

10:13AM  5    Q.   AND SO YOUR, YOUR VIEW ESSENTIALLY BECAME THAT THESE,

10:13AM  6    THESE ASSAYS NEVER SHOULD HAVE BEEN OFFERED WITHIN THE CLIA

10:13AM  7    LAB?

10:13AM  8    A.   YES.

10:13AM  9    Q.   BASED UPON THE STANDARDS THAT WERE USED IN THE VALIDATION?

10:13AM  10   A.   YES.

10:13AM  11   Q.   AND THAT THE VALIDATION REPORTS SHOULD NEVER HAVE BEEN

10:13AM  12   SIGNED BY THE LAB DIRECTOR?

10:13AM  13   A.   YES.

10:13AM  14   Q.   OKAY.  AND THAT WAS -- WITH RESPECT TO THAT BUCKET, THAT

10:13AM  15   SORT OF INFORMED YOUR VIEW AS TO WHY -- THE USE OF THE WRONG

10:13AM  16   STANDARDS INVALIDATING THE ASSAYS INFORMED YOUR VIEW AS TO WHY

10:14AM  17   THE RESULTS NEEDED TO BE VOIDED; RIGHT?

10:14AM  18   A.   IF I MAY CORRECT YOU, IT'S THE INAPPROPRIATE USE OF THOSE

10:14AM  19   STANDARDS.

10:14AM  20   Q.   SURE.

10:14AM  21   A.   BUT YES.

10:14AM  22   Q.   AND AGAIN, WITHOUT GOING INTO THE SPECIFICS, THERE WERE

10:14AM  23   SORT OF CALCULATIONS THAT WERE PERFORMED WHICH CAUSED YOU TO BE

10:14AM  24   OF THE VIEW THAT THE ASSAYS SHOULD NEVER HAVE BEEN VALIDATED;

10:14AM  25   CORRECT?

DAS CROSS BY MR. WADE (RES.)                                         5943

10:14AM   1    A.   YES.

10:14AM   2    Q.   AND IT NEVER SHOULD HAVE BEEN USED WITHIN THE LAB?

10:14AM   3    A.   CORRECT.

10:14AM   4    Q.   OKAY.  AND SO THE VALIDATION OF AN ASSAY IS GENERALLY DONE

10:14AM   5    WITHIN THE SET OF STANDARDS AND FRAMEWORK THAT ARE SET BY THE

10:14AM   6    LAB DIRECTOR TO ASSESS WHETHER IT'S APPROPRIATE TO OFFER IT

10:14AM   7    WITHIN THE CLIA LAB; RIGHT?

10:14AM   8    A.   YES.  WE CALL THOSE ACCEPTANCE CRITERIA.

10:15AM   9    Q.   ACCEPTANCE CRITERIA AS SET FORTH IN THE CLIA REGULATIONS I

10:15AM   10   BELIEVE; RIGHT?

10:15AM   11   A.   YES, THERE ARE DIFFERENT CRITERIA, YES.

10:15AM   12   Q.   AND THEN AS A COMPANY WORKS ON THE PERFORMANCE OF THE

10:15AM   13   ASSAY, THEY WORK ON IT TO TRY TO MEET THAT CRITERIA; CORRECT?

10:15AM   14   A.   YES.

10:15AM   15   Q.   AND ONCE THEY MEET THE CRITERIA THAT IS SET BY THE

10:15AM   16   LABORATORY DIRECTOR, THE ASSAY WILL BE VALIDATED AND THEN

10:15AM   17   PERMITTED INTO THE LAB; RIGHT?

10:15AM   18   A.   YES.

10:15AM   19   Q.   AND YOUR VIEW IS ESSENTIALLY THE GATES THAT WERE SET WERE

10:15AM   20   WRONG?

10:15AM   21   A.   YES.

10:15AM   22   Q.   OKAY.  AND I THINK YOU TALKED ABOUT HOW YOU WENT INTO A

10:15AM   23   MEETING AND THIS WAS DISCUSSED.

10:15AM   24        DO YOU RECALL THAT?

10:15AM   25   A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    5944

10:15AM  1    Q.   AND I WANT TO ASK YOU A LITTLE BIT ABOUT THAT MEETING.

10:16AM  2         DO YOU RECALL THAT IN -- BEFORE I DO, LET ME JUST ASK YOU

10:16AM  3    A LITTLE BIT ABOUT SOME EVENTS AROUND THAT TIME PERIOD.

10:16AM  4         YOU WERE WORKING -- YOU WERE TURNING OVER ROCKS AND

10:16AM  5    DIGGING INTO DATA; RIGHT?

10:16AM  6    A.   YES.

10:16AM  7    Q.   AND YOU WERE LEARNING ABOUT HOW THE COMPANY HAD VALIDATED

10:16AM  8    THE ASSAYS?

10:16AM  9    A.   YES.

10:16AM 10    Q.   AND YOU WERE ALSO INTERACTING WITH FOLKS AT CMS A BIT

10:16AM 11    DIRECTLY.

10:16AM 12         DO YOU RECALL THAT?

10:16AM 13    A.   YES, FROM TIME TO TIME.

10:16AM 14    Q.   AND LET ME -- AND THAT WAS GARY YAMAMOTO; RIGHT?

10:16AM 15    A.   YES.

10:16AM 16    Q.   AND HE WAS ONE OF THE SENIOR PEOPLE IN THE CALIFORNIA

10:16AM 17    REGION?

10:16AM 18    A.   I'M NOT AWARE OF THE HIERARCHY, BUT --

10:16AM 19    Q.   OKAY.  AND HE WAS ONE OF THE PERSONS -- HE WAS ONE OF THE

10:17AM 20    CMS EMPLOYEES WHO WAS INVOLVED IN THE INSPECTION OF THERANOS?

10:17AM 21    A.   YES.

10:17AM 22    Q.   AND THE OTHER PERSON WAS SARAH BENNETT?

10:17AM 23    A.   YES.

10:17AM 24    Q.   AND YOU INTERACTED WITH MS. BENNETT AND MR. YAMAMOTO --

10:17AM 25    A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    5945

| | | |
|---|---|---|
| 10:17AM | 1 | Q.   -- WHEN YOU CAME IN? |
| 10:17AM | 2 | LET'S -- AND PART OF YOUR INTERACTIONS WITH THEM, WAS THAT |
| 10:17AM | 3 | HELPING KIND OF INFORM HOW BEST TO RESPOND TO CMS? |
| 10:17AM | 4 | A.   YES. |
| 10:17AM | 5 | Q.   AND DO YOU RECALL COMING TO THE VIEW THAT THE COMPANY |
| 10:17AM | 6 | SHOULD TAKE A CONSERVATIVE RESPONSE -- A CONSERVATIVE POSITION |
| 10:17AM | 7 | IN TERMS OF HOW IT DEALS WITH PATIENTS IN A SAFE -- LET ME |
| 10:17AM | 8 | STRIKE THAT. |
| 10:17AM | 9 | YOU WANTED TO BE CONSERVATIVE, DO YOU RECALL, IN TERMS OF |
| 10:17AM | 10 | THE APPROACH THAT YOU WERE TAKING ON THIS? |
| 10:17AM | 11 | A.   WOULD YOU MIND PROVIDING THE SPECIFICS THERE, PLEASE. |
| 10:17AM | 12 | Q.   SURE.  LET ME SHOW YOU A DOCUMENT. |
| 10:17AM | 13 | A.   SURE. |
| 10:17AM | 14 | MR. WADE:  THE COURT'S INDULGENCE FOR ONE SECOND? |
| 10:18AM | 15 | MAY I APPROACH, YOUR HONOR? |
| 10:18AM | 16 | THE COURT:  YES. |
| 10:18AM | 17 | BY MR. WADE: |
| 10:18AM | 18 | Q.   (HANDING.) |
| 10:18AM | 19 | AND I PUT IN FRONT OF YOU EXHIBIT 14162.  AND DO YOU |
| 10:18AM | 20 | RECOGNIZE THIS TO BE EMAIL COMMUNICATIONS BETWEEN YOU AND |
| 10:18AM | 21 | MEMBERS OF THE TEAM THAT WAS WORKING ON THE CMS RESPONSE? |
| 10:18AM | 22 | A.   YES. |
| 10:18AM | 23 | Q.   OKAY. |
| 10:18AM | 24 | MOVE THE ADMISSION OF 14162. |
| 10:18AM | 25 | MR. LEACH:  NO OBJECTION. |

DAS CROSS BY MR. WADE (RES.)

10:18AM   1              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:19AM   2          (DEFENDANT'S EXHIBIT 14162 WAS RECEIVED IN EVIDENCE.)

10:19AM   3      BY MR. WADE:

10:19AM   4      Q.   AND I DRAW YOUR ATTENTION TO THE SECOND PAGE.  AND DO YOU

10:19AM   5      SEE THERE'S AN EMAIL FROM YOU TO OTHERS MARCH 11TH?

10:19AM   6      A.   YES.

10:19AM   7      Q.   AND DO YOU SEE THAT YOU'RE GIVING A LITTLE BIT, I GUESS,

10:19AM   8      OF AN UPDATE ON SOME THINGS?

10:19AM   9          DO YOU SEE THAT?

10:19AM  10          OR YOUR PERSPECTIVE ON THINGS?

10:19AM  11      A.   YES.

10:19AM  12      Q.   AND YOU SEE IT SAYS, "I HAD A CHANCE TO TOUCH BASE WITH

10:19AM  13      TINA AND DANIEL THE OTHER DAY TO GET DETAILS ON THE UPDATED

10:19AM  14      PATIENT IMPACT ASSESSMENTS, AND I'VE DECIDED TO TAKE A MORE

10:19AM  15      CONSERVATIVE APPROACH."

10:19AM  16          DO YOU SEE THAT?

10:19AM  17      A.   YES.

10:19AM  18      Q.   AND IS IT FAIR -- AND WHAT DID YOU MEAN BY "CONSERVATIVE"

10:20AM  19      IN THAT CONTEXT?

10:20AM  20      A.   YOU KNOW, TO THE BEST OF MY RECOLLECTION, I BELIEVE I

10:20AM  21      DISAGREED WITH THE APPROACH THAT THEY WERE USING AT THE TIME.

10:20AM  22      Q.   OKAY.  YOU WANTED TO BE MORE CAUTIOUS; IS THAT FAIR?

10:20AM  23      A.   NO, I WOULD DISAGREE WITH THAT DESCRIPTION.

10:20AM  24          I BELIEVE THEY WERE APPROACHING THE PATIENT, HOW TO USE

10:20AM  25      THE SPECIAL ANALYTES TOGETHER AS OPPOSED TO SEPARATELY AS WE --

DAS CROSS BY MR. WADE (RES.)

| 10:20AM | 1 | I THINK YOU CAN READ IT LATER IN THE PARAGRAPH.  THAT WAS MY |

10:20AM  1   I THINK YOU CAN READ IT LATER IN THE PARAGRAPH.  THAT WAS MY

10:20AM  2   DISAGREEMENT.

10:20AM  3   Q.   OKAY.  AND YOU WERE WEIGHING IN HERE SUGGESTING THAT A

10:20AM  4   DIFFERENT APPROACH SHOULD BE TAKEN; RIGHT?

10:20AM  5   A.   THAT'S CORRECT.

10:20AM  6   Q.   AND SO THERE'S A -- TO THE EXTENT THAT THERE WAS A LITTLE

10:20AM  7   BIT OF A DISAGREEMENT BETWEEN YOU AND SOME OF THE HISTORICAL

10:20AM  8   PEOPLE WHO HAD WORKED IN THE LAB?

10:20AM  9   A.   YES.

10:20AM  10  Q.   AND YOUR APPROACH WAS FOLLOWED; CORRECT?

10:20AM  11  A.   YES.

10:20AM  12  Q.   OKAY.  AND THEN YOU -- WE TALKED ABOUT YOUR THREE BUCKETS.

10:21AM  13  THIS EMAIL MARCH 11TH I THINK IS JUST BEFORE YOU JOINED FULL

10:21AM  14  TIME, MAYBE THE FRIDAY BEFORE?

10:21AM  15  A.   YES.

10:21AM  16  Q.   AND A SHORT TIME LATER, YOU HAD A MEETING WITH MS. HOLMES.

10:21AM  17       DO YOU RECALL THAT?

10:21AM  18  A.   I DON'T RECALL THAT MEETING.

10:21AM  19  Q.   WELL, YOU RECALL A MEETING WHERE THE MAIN TOPIC OF THE

10:21AM  20  DISCUSSION WAS WHETHER OR NOT THE EDISON 3.5 ASSAY SHOULD BE

10:21AM  21  VOIDED?

10:21AM  22  A.   YES, I RECALL THAT MEETING.

10:21AM  23  Q.   OKAY.  WHO DO YOU RECALL BEING PRESENT FOR THAT MEETING?

10:21AM  24  A.   THERE WERE QUITE A FEW PEOPLE IN THE ROOM.  I DO REMEMBER

10:21AM  25  ELIZABETH, DANIEL YOUNG, I BELIEVE THE BOIES SCHILLER LAWYERS

DAS CROSS BY MR. WADE (RES.)                                    5948

10:21AM   1    WERE THERE AS WELL, WHICH WOULD BE DAVID ZIFKIN AND TWO OTHER

10:21AM   2    LAWYERS, DR. TSCHIRHART, AND DR. HELFEND I BELIEVE.  AND MAYBE

10:22AM   3    OTHERS.

10:22AM   4    Q.   THERE MAY HAVE BEEN OTHERS?

10:22AM   5    A.   THERE MAY HAVE BEEN OTHERS.  THOSE ARE THE PRINCIPAL FOLKS

10:22AM   6    THAT I REMEMBER.

10:22AM   7    Q.   OKAY.  IS IT FAIR TO SAY THAT THE MAIN TOPIC OF THAT

10:22AM   8    MEETING WAS WHETHER THE -- ALL OF THE EDISON 3.5 RESULTS SHOULD

10:22AM   9    BE VOIDED?

10:22AM   10   A.   THAT WAS THE TOPIC.

10:22AM   11   Q.   OKAY.  AND YOU CAME INTO THAT MEETING WITH THE VIEW THAT

10:22AM   12   THEY SHOULD BE VOIDED; RIGHT?

10:22AM   13   A.   YES.

10:22AM   14   Q.   AND THERE WERE OTHER PEOPLE WHO CAME INTO THAT MEETING

10:22AM   15   WITH THE VIEW THAT THEY SHOULD NOT ALL BE VOIDED; CORRECT?

10:22AM   16   A.   I DON'T KNOW THE VIEWS OF THE OTHER PEOPLE IN THE ROOM.

10:22AM   17   Q.   WELL, DO YOU RECALL THAT THERE WAS DISCUSSION AND SOME

10:22AM   18   DISAGREEMENT AS TO APPROACH WITHIN THE MEETING?

10:22AM   19   A.   THERE WAS NO DISAGREEMENT ABOUT VOIDING.

10:22AM   20   Q.   OKAY.  DO YOU RECALL THAT MS. HOLMES FULLY SUPPORTED YOUR

10:22AM   21   DECISION TO VOID ALL OF THE EDISON 3.5 RESULTS?

10:22AM   22   A.   YES.

10:22AM   23   Q.   AND THIS WAS A BIG DECISION AT THE TIME; RIGHT?

10:23AM   24   A.   YES.

10:23AM   25   Q.   AT THE TIME THAT THIS WAS HAPPENING, THERE HAD BEEN A FAIR

DAS CROSS BY MR. WADE (RES.)                                    5949

10:23AM  1      AMOUNT OF MEDIA SCRUTINY ON THE COMPANY; RIGHT?

10:23AM  2      A.   YES.

10:23AM  3      Q.   AND A FAIR AMOUNT OF CRITICISM; CORRECT?

10:23AM  4      A.   YES.

10:23AM  5      Q.   AND THIS WAS GOING TO HAVE SOME POTENTIALLY SERIOUS

10:23AM  6      RAMIFICATIONS FOR THE COMPANY GOING FORWARD; RIGHT?

10:23AM  7      A.   COULD YOU CLARIFY THAT LAST POINT, PLEASE.

10:23AM  8      Q.   WELL, IT WAS A BIG DECISION TO MAKE TO VOID ALL OF THE

10:23AM  9      ASSAYS FOR THEIR ANALYZER; RIGHT?

10:23AM 10      A.   YES.

10:23AM 11      Q.   AND THAT WASN'T NECESSARILY SOMETHING THAT ANYONE WANTED

10:23AM 12      TO DO; CORRECT?

10:23AM 13      A.   I'M NOT AWARE OF THEIR INTENTIONS OR WISHES.

10:23AM 14      Q.   WELL, THE PREFERENCE WOULD BE NOT TO HAVE TO DO THAT; IS

10:23AM 15      THAT FAIR?

10:23AM 16      A.   I APOLOGIZE, I CAN'T SPEAK TO WHAT THEY WOULD HAVE WANTED.

10:23AM 17      Q.   FAIR ENOUGH, DOCTOR.

10:23AM 18          BUT WITHIN THAT MEETING YOU WENT IN, YOU EXPRESSED YOUR

10:24AM 19      VIEWS ABOUT THE EDISON 3.5, AND YOU RECOMMENDED THAT THE

10:24AM 20      RESULTS SHOULD BE VOIDED; CORRECT?

10:24AM 21      A.   YES.

10:24AM 22      Q.   AND YOU RECOMMENDED THAT THE -- AND MS. HOLMES AGREED WITH

10:24AM 23      THAT DECISION; RIGHT?

10:24AM 24      A.   YES.

10:24AM 25      Q.   AND THAT DECISION WAS THEN ACTED UPON VERY SHORTLY

DAS CROSS BY MR. WADE (RES.)                                         5950

10:24AM   1      THEREAFTER; RIGHT?

10:24AM   2      A.   YES.

10:24AM   3      Q.   AND THE VOIDING WAS COMMUNICATED TO CMS; RIGHT?

10:24AM   4      A.   YES.

10:24AM   5      Q.   AND THE VOIDED RESULTS WENT OUT TO ALL OF THE PATIENTS;

10:24AM   6      RIGHT?

10:24AM   7      A.   YES.

10:24AM   8      Q.   OKAY.  AND YOU UNDERSTOOD THAT THAT EDISON 3.5 DEVICE AT

10:24AM   9      THAT POINT HAD NOT BEEN USED FOR SOME TIME; RIGHT?

10:24AM   10     A.   YES.

10:24AM   11     Q.   THAT WAS THE, THAT WAS THE VERSION OF THE ANALYZER THAT

10:24AM   12     THE COMPANY HAD STOPPED USING BEFORE YOU JOINED, YOU EVEN

10:24AM   13     JOINED THE COMPANY; RIGHT?

10:24AM   14     A.   YES.

10:24AM   15     Q.   AND THERE WAS NEVER -- MR. LEACH ASKED YOU ABOUT WHETHER

10:25AM   16     IT EVER CAME BACK ONLINE.

10:25AM   17          DO YOU RECALL THAT?

10:25AM   18     A.   I DO RECALL THAT.

10:25AM   19     Q.   AND THERE WAS ACTUALLY NEVER INTENTION TO EVER BRING THAT

10:25AM   20     DEVICE BACK ONLINE AT THE TIME THAT YOU JOINED THE COMPANY;

10:25AM   21     RIGHT?

10:25AM   22     A.   NOT TO MY KNOWLEDGE.

10:25AM   23     Q.   AND THE COMPANY WAS ACTUALLY WORKING ON THE NEXT

10:25AM   24     GENERATION DEVICE AT THE TIME THAT YOU JOINED THE COMPANY;

10:25AM   25     RIGHT?

DAS CROSS BY MR. WADE (RES.)                                    5951

10:25AM   1    A.   I DON'T REMEMBER THE TIMELINE ON THAT, BUT I BELIEVE

10:25AM   2    YOU'RE CORRECT.

10:25AM   3    Q.   WELL, YOU RECALL IN THE TIME PERIOD THAT YOU WERE AT THE

10:25AM   4    COMPANY THAT THERE WAS WORK BEING DONE ON THE NEXT GENERATION

10:25AM   5    DEVICE?

10:25AM   6    A.   YES.

10:25AM   7    Q.   OKAY.  AND YOU, YOU PLAYED SOME ROLE IN THAT DURING YOUR

10:25AM   8    TENURE; RIGHT?

10:25AM   9    A.   YES.

10:25AM   10   Q.   OKAY.  I BELIEVE ON DIRECT YOU TALKED A LITTLE BIT ABOUT

10:25AM   11   THE PSA ASSAY AND A DISCUSSION THAT YOU HAD ABOUT THE PSA

10:25AM   12   ASSAY.

10:25AM   13        DO YOU RECALL THAT?

10:25AM   14   A.   YES.

10:25AM   15   Q.   OKAY.  WAS THAT IN THIS MEETING OR IN A SEPARATE MEETING?

10:26AM   16   A.   IT WAS IN AN INFORMAL MEETING.

10:26AM   17   Q.   IT WAS IN AN INFORMAL MEETING?

10:26AM   18   A.   YES.

10:26AM   19   Q.   AND LET ME STAY WITH THIS MEETING FOR A BIT.  YOU TALKED

10:26AM   20   ABOUT -- SOMETHING ABOUT MS. HOLMES REFERRING TO ONE OF HER

10:26AM   21   DEPUTIES, OR SOMETHING, IN THIS MEETING AND A DIFFERENT VIEW

10:26AM   22   THAT THEY EXPRESSED?

10:26AM   23   A.   YES.

10:26AM   24   Q.   WHAT DO YOU RECALL ABOUT THAT?

10:26AM   25   A.   I BELIEVE THERE WAS DISAGREEMENT ON WHY THE VOIDING WAS

DAS CROSS BY MR. WADE (RES.)                                                  5952

10:26AM   1    BEING DONE.

10:26AM   2    Q.   OKAY.  AND WHAT WAS MOSTLY -- AND IT WAS YOUR VIEW THAT

10:26AM   3    OTHER PEOPLE WERE EXPRESSING OTHER VIEWS ON THE VOIDING AND WHY

10:26AM   4    IT SHOULD BE DONE?

10:26AM   5    A.   I WAS ONLY AWARE OF THAT ONE ALTERNATE VIEW.

10:26AM   6    Q.   OKAY.  AND WAS THAT DR. YOUNG?

10:26AM   7    A.   I BELIEVE SO, YES.

10:26AM   8    Q.   OKAY.  AND HE WAS EXPRESSING A DIFFERENT REASON FOR WHY

10:27AM   9    THESE RESULTS SHOULD BE VOIDED; RIGHT?

10:27AM  10    A.   I DON'T RECALL DR. YOUNG ACTUALLY VERBALIZING HIS VIEW.

10:27AM  11    Q.   OKAY.  AND I'M TRYING TO UNDERSTAND YOUR TESTIMONY.  YOU

10:27AM  12    UNDERSTOOD THAT MS. HOLMES WAS RECEIVING DIFFERENT VIEWS FROM

10:27AM  13    OTHER ADVISORS?

10:27AM  14    A.   YES.

10:27AM  15    Q.   OKAY.  AND THE MOST IMPORTANT THING FOR YOU COMING OUT OF

10:27AM  16    THAT MEETING WAS THE VOIDING OF THE RESULTS; CORRECT?

10:27AM  17    A.   YES.

10:27AM  18    Q.   AND THAT WAS WHAT HAPPENED AND WHAT WAS AGREED TO IN THAT

10:27AM  19    MEETING; RIGHT?

10:27AM  20    A.   YES.

10:27AM  21    Q.   AND THE PSA MEETING, OR PSA CONVERSATION THAT YOU HAD, I

10:27AM  22    THINK YOU TALKED ABOUT HOW YOU WERE USING THAT SORT OF AS A

10:27AM  23    DEVICE TO TRY TO EXPLAIN ISSUES RELATING TO THE EDISON TO

10:27AM  24    MS. HOLMES.

10:27AM  25        DO YOU RECALL THAT?

DAS CROSS BY MR. WADE (RES.)                                        5953

10:27AM   1    A.   YES, I WAS USING THAT AS AN EXAMPLE.

10:27AM   2    Q.   AND MANY OF THE ANALYSES THAT YOU WERE DOING WERE PRETTY

10:28AM   3    TECHNICAL IN NATURE; RIGHT?

10:28AM   4    A.   YES.

10:28AM   5    Q.   AND MS. HOLMES'S DIDN'T HAVE THAT SORT OF TECHNICAL

10:28AM   6    BACKGROUND; RIGHT?

10:28AM   7    A.   YES.

10:28AM   8    Q.   AND SO YOU WERE TRYING -- AND SHE HAD NOT SUPERVISED THE

10:28AM   9    LAB PREVIOUSLY TO YOUR KNOWLEDGE; RIGHT?

10:28AM   10   A.   CORRECT.

10:28AM   11   Q.   AND SO YOU WERE TRYING TO KIND OF BRIEF HER IN ON SOME OF

10:28AM   12   THESE CONCEPTS AND EXPLAIN TO HER WHY YOU CAME TO THE VIEWS

10:28AM   13   THAT YOU CAME TO; IS THAT FAIR?

10:28AM   14   A.   YES.

10:28AM   15   Q.   AND SO WHILE DOING THAT, IS IT FAIR TO SAY THAT IN SOME

10:28AM   16   WAY YOU WERE DESCRIBING, OR TRYING TO DESCRIBE, THESE THREE

10:28AM   17   BUCKETS AND HOW YOUR VIEWS WERE INFORMED?

10:28AM   18   A.   YES.

10:28AM   19   Q.   AND YOU USED, AS AN EXAMPLE OF THAT, THE PSA ASSAY TO NOTE

10:28AM   20   THAT PSA WAS DETECTED IN SOME FEMALE PATIENTS, WHICH WAS

10:28AM   21   UNUSUAL; RIGHT?

10:28AM   22   A.   YES.

10:28AM   23   Q.   AND DID YOU COME TO UNDERSTAND THAT MS. HOLMES HAD

10:29AM   24   PROVIDED SOME KIND OF A STUDY BY ANOTHER ADVISOR THAT SUGGESTED

10:29AM   25   THAT PSA COULD SOMETIMES BE DETECTED IN FEMALES?

DAS CROSS BY MR. WADE (RES.)                                    5954

10:29AM  1    A.   SHE BROUGHT THAT INFORMATION AT A LATER TIME POINT.

10:29AM  2    Q.   OKAY.  SOME SORT OF ACADEMIC RESEARCH OR THE LIKE.

10:29AM  3         DO YOU RECALL?

10:29AM  4    A.   I BELIEVE IT WAS EITHER AN ARTICLE OR AN ABSTRACT THAT SHE

10:29AM  5    HAD FOUND.

10:29AM  6    Q.   OKAY.  AND ARE YOU AWARE THAT THERE ARE ENDOCRINOLOGISTS

10:29AM  7    WHO HAVE DETECTED PSA IN FEMALES ON OCCASION?

10:29AM  8    A.   YES, ON OCCASION.

10:29AM  9    Q.   AND YOU CAME TO THE VIEW THAT THAT WASN'T A PLAUSIBLE

10:29AM 10    EXPLANATION FOR THE DATA ANALYSIS THAT YOU WERE DOING; CORRECT?

10:29AM 11    A.   CORRECT.

10:29AM 12    Q.   AND THAT DISCUSSION THAT YOU HAD ABOUT THAT INFORMATION,

10:29AM 13    THAT DIDN'T ALTER THE COURSE OF ACTION THAT THE COMPANY WAS

10:29AM 14    TAKING WITH RESPECT TO THE ASSAYS IN ANY WAY; RIGHT?

10:29AM 15    A.   CORRECT.

10:30AM 16    Q.   AND YOU STILL VOIDED ALL OF THE PSA ASSAYS; RIGHT?

10:30AM 17    A.   CORRECT.

10:30AM 18    Q.   AND THIS WAS PART OF THE DISCUSSION WHERE YOU, AS THE

10:30AM 19    EXPERT IN THE FIELD, WERE TRYING TO --

10:30AM 20         MR. LEACH:  YOUR HONOR, I'M SORRY TO INTERRUPT, BUT

10:30AM 21    THE JUROR IS RAISING HER HAND.

10:30AM 22         JUROR:  COULD WE TAKE A BREAK?  I NEED TO USE THE

10:30AM 23    RESTROOM.

10:30AM 24         THE COURT:  SURE.  SURE.  LET'S TAKE A BREAK NOW.

10:30AM 25         COULD WE TAKE A BREAK NOW?  WOULD THIS BE A GOOD TIME FOR

DAS CROSS BY MR. WADE (RES.)                                        5955

| | | |
|---|---|---|
| 10:30AM | 1 | OUR 30 MINUTE RECESS? |
| 10:30AM | 2 | MS. TREFZ:  YES. |
| 10:30AM | 3 | THE COURT:  LET'S TAKE A BREAK, AND WE'LL RESUME IN |
| 10:30AM | 4 | 30 MINUTES.  THANK YOU. |
| 10:30AM | 5 | THE WITNESS:  THANK YOU. |
| 10:30AM | 6 | (JURY OUT AT 10:30 A.M.) |
| 10:30AM | 7 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 10:31AM | 8 | YOU CAN STAND DOWN, DOCTOR.  THANK YOU. |
| 10:31AM | 9 | ANYTHING FURTHER BEFORE WE BREAK? |
| 10:31AM | 10 | MR. LEACH:  NO, YOUR HONOR. |
| 10:31AM | 11 | THE COURT:  ALL RIGHT. |
| 10:31AM | 12 | MR. WADE:  NO, YOUR HONOR. |
| 10:31AM | 13 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:31AM | 14 | (RECESS FROM 10:31 A.M. UNTIL 11:03 A.M.) |
| 11:03AM | 15 | THE COURT:  LET'S GO BACK ON THE RECORD.  ALL |
| 11:03AM | 16 | COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 11:03AM | 17 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:03AM | 18 | MR. BOSTIC, YOU WANTED TO TALK ABOUT THE NEXT WITNESS? |
| 11:03AM | 19 | MR. BOSTIC:  YES.  THANK YOU, YOUR HONOR. |
| 11:03AM | 20 | THE GOVERNMENT'S NEXT WITNESS IS ALAN EISENMAN. |
| 11:03AM | 21 | I BELIEVE THE DEFENSE MIGHT HAVE SOME QUESTIONS FROM THE |
| 11:03AM | 22 | COURT OR MIGHT BE SEEKING SOME GUIDANCE ON SOME ISSUES WE |
| 11:03AM | 23 | PREVIOUSLY TALKED ABOUT, BUT I'LL LET MR. DOWNEY ADDRESS THAT. |
| 11:03AM | 24 | THE GOVERNMENT WANTED TO RAISE WITH THE COURT THE ISSUE OF |
| 11:03AM | 25 | AN OUT OF COURT COMMENT BY THIS WITNESS.  I UNDERSTAND THE |

DAS CROSS BY MR. WADE (RES.)                                    5956

11:03AM 1    COURT IS AWARE.

11:03AM 2        I HAVE DISCUSSED THE MATTER WITH DEFENSE COUNSEL.  MY

11:03AM 3    UNDERSTANDING IS THAT THE DEFENSE COUNSEL MAY DECIDE TO RAISE

11:03AM 4    THAT TOPIC IN THE CROSS OF THIS WITNESS.

11:04AM 5        MY CONCERN, IF SO, WOULD BE MAKING SURE THAT THE COURT'S

11:04AM 6    ORDER REGARDING MENTIONING PUNISHMENT IN FRONT OF THE JURY IS

11:04AM 7    COMPLIED WITH.  SO I WANTED TO MAKE SURE THAT WE HAD AN

11:04AM 8    OPPORTUNITY TO UNDERSTAND THE BOUNDARIES OF THAT EXAMINATION,

11:04AM 9    IF NECESSARY.

11:04AM 10           THE COURT:  SURE.  OKAY.  THANK YOU.

11:04AM 11           MR. DOWNEY:  WELL, YOUR HONOR, I THINK I WAS REALLY

11:04AM 12   INTENDING, IN TERMS OF THE CONTENT OF THE WITNESS'S COMMENT

11:04AM 13   OUTSIDE OF COURT, JUST TO ASK HIM WHETHER HE MADE THE COMMENT

11:04AM 14   OR NOT, AND NOT BEYOND THAT.

11:04AM 15       I DON'T THINK -- I THINK IT'S AN IMPORTANT ELEMENT OF

11:04AM 16   CONFRONTING THIS WITNESS POTENTIALLY DEPENDING ON HIS TESTIMONY

11:04AM 17   ON DIRECT.  THERE'S NOT A REFERENCE TO A PARTICULAR TERM OR A

11:04AM 18   PARTICULAR PUNISHMENT.  I THINK IN GENERAL TERMS IT WON'T

11:04AM 19   INTRUDE ON THAT -- ON THE COURT'S INSTRUCTION ON PUNISHMENT,

11:04AM 20   WHICH I ANTICIPATE IT WILL GIVE, AS IT ALWAYS DOES.

11:04AM 21       SO I DON'T THINK THERE'S ANY ISSUE PRESENTED.  I DON'T

11:04AM 22   MEAN TO GO BEYOND WHAT THE WITNESS SAID.

11:05AM 23           THE COURT:  SO IS IT YOUR INTENT -- OR AS YOU LOOK

11:05AM 24   AT IT TODAY, YOUR INTENT WOULD BE TO ASK HIM, DID YOU SAY X?

11:05AM 25           MR. DOWNEY:  EXACTLY.

DAS CROSS BY MR. WADE (RES.)

| | | |
|---|---|---|
| 11:05AM | 1 | THE COURT:  AND HE'LL RESPOND.  AND WHAT WILL YOU DO |
| 11:05AM | 2 | WITH THAT? |
| 11:05AM | 3 | MR. DOWNEY:  WELL, I -- WHATEVER I DO WITH IT, IT'S |
| 11:05AM | 4 | NOT GOING TO BE TALKING ABOUT THE SENTENCING GUIDELINES WITH |
| 11:05AM | 5 | HIM GETTING INTO PARTICULAR PUNISHMENT. |
| 11:05AM | 6 | SO I DON'T THINK MR. BOSTIC'S CONCERN IS REALLY GOING TO |
| 11:05AM | 7 | BE MADE RIPE I THINK AT THIS POINT. |
| 11:05AM | 8 | THE COURT:  THANK YOU FOR THAT.  I SUPPOSE THAT |
| 11:05AM | 9 | COULD BLEED INTO -- IT MIGHT BE A BIAS ISSUE OR SOMETHING LIKE |
| 11:05AM | 10 | THAT. |
| 11:05AM | 11 | MR. DOWNEY:  SURE. |
| 11:05AM | 12 | THE COURT:  BUT IT COULD BLEED INTO SOMETHING ELSE |
| 11:05AM | 13 | THAT I'LL JUST SAY I'LL HAVE TO SCRUTINIZE AT THE TIME. |
| 11:05AM | 14 | MR. DOWNEY:  WELL, YOUR HONOR, I DON'T WANT THE |
| 11:05AM | 15 | WITNESS'S, YOU KNOW, OUT OF COURT BEHAVIOR, WHICH IS |
| 11:05AM | 16 | INAPPROPRIATE IN MY VIEW, I DON'T WANT TO ALLOW THAT TO BECOME |
| 11:06AM | 17 | AN INVITATION TO HIM TO SORT OF NARRATE HIS GRIEVANCES ON |
| 11:06AM | 18 | REDIRECT, FOR EXAMPLE. |
| 11:06AM | 19 | THE COURT:  SURE. |
| 11:06AM | 20 | MR. DOWNEY:  SO, YOU KNOW, MY CONCERN IS ONLY TO |
| 11:06AM | 21 | DEMONSTRATE THAT HE'S ARTICULATED THAT PARTICULAR AGENDA BEFORE |
| 11:06AM | 22 | TESTIFYING AND NOT REALLY BEYOND THAT. |
| 11:06AM | 23 | BUT I DON'T WANT HIM TO BE PERMITTED ON REDIRECT TO SAY |
| 11:06AM | 24 | THINGS HE OTHERWISE WOULD NOT BE PERMITTED TO SAY IN TERMS OF |
| 11:06AM | 25 | MAKING CLAIMS ABOUT MS. HOLMES. |

DAS CROSS BY MR. WADE (RES.)                                    5958

| | | |
|---|---|---|
| 11:06AM | 1 | SO I, I -- IF THE COURT WERE TO INDICATE IT'S GOING TO |
| 11:06AM | 2 | ALLOW THAT, I PROBABLY WOULD REFRAIN FROM THAT QUESTIONING, BUT |
| 11:06AM | 3 | I THINK THAT WOULD BE HIGHLY INAPPROPRIATE. |
| 11:06AM | 4 | THE COURT:  WELL, I DON'T.  HIS -- A WITNESS'S BIAS, |
| 11:06AM | 5 | IF ANY, IS ALWAYS RELEVANT AS WE KNOW. |
| 11:06AM | 6 | AND WE KNOW THERE WAS THIS STATEMENT THAT WAS OBSERVED BY |
| 11:06AM | 7 | INDIVIDUALS. |
| 11:06AM | 8 | HAVE YOU SATISFIED REVIEWING THAT WITH MR. SCHENK? |
| 11:06AM | 9 | MR. DOWNEY:  WELL, I HAVE NOT YET HAD THE |
| 11:06AM | 10 | OPPORTUNITY TO REVIEW WHAT MR. SCHENK AND I WERE INTENDING TO |
| 11:06AM | 11 | REVIEW. |
| 11:06AM | 12 | THE COURT:  OKAY. |
| 11:06AM | 13 | MR. DOWNEY:  AS OF THIS MORNING, I THINK MR. SCHENK |
| 11:06AM | 14 | HAS STILL NOT BEEN APPRISED OF WHEN THAT MIGHT BE POSSIBLE. |
| 11:07AM | 15 | THE COURT:  OKAY.  WELL, WE -- |
| 11:07AM | 16 | MR. BOSTIC? |
| 11:07AM | 17 | MR. BOSTIC:  I'M SORRY.  TWO POINTS IN RESPONSE TO |
| 11:07AM | 18 | THE ARGUMENTS BY MR. DOWNEY. |
| 11:07AM | 19 | FIRST, AS TO THE CONTENT OF THE STATEMENT, I DON'T THINK |
| 11:07AM | 20 | THAT -- EVEN PUTTING THE CONTENT OF THE STATEMENT IN FRONT OF |
| 11:07AM | 21 | THE JURY I THINK IS IN CONFLICT WITH OR IN SEVERE TENSION WITH |
| 11:07AM | 22 | THE COURT'S ORDER ABOUT MENTIONING PUNISHMENT IN FRONT OF THE |
| 11:07AM | 23 | JURY. |
| 11:07AM | 24 | THAT RULE AND THE COURT'S ORDER DOESN'T SAY ANYTHING |
| 11:07AM | 25 | ABOUT, WELL, YOU CAN MENTION PUNISHMENT OR THE NATURE OF THE |

DAS CROSS BY MR. WADE (RES.)                                    5959

11:07AM   1    PUNISHMENT, JUST NOT THE LENGTH OF THE TERM OR ANYTHING

11:07AM   2    SPECIFIC.  IT'S MORE GENERAL THAN THAT, AND FOR GOOD REASON.

11:07AM   3        I THINK THE PARTIES HAVE BEEN CAREFUL THUS FAR NOT TO MAKE

11:07AM   4    COMMENTS, ANY OF WHICH WOULD BE SPECULATIVE, BY THE WAY, ABOUT

11:07AM   5    WHAT ANY SENTENCE MIGHT BE OR THE FORM IT MIGHT TAKE.

11:07AM   6        SO I THINK TO PUT THAT CONCEPT IN FRONT OF THE JURY FOR

11:07AM   7    THE FIRST TIME I THINK WOULD BE CROSSING A LINE THAT WE HAVE

11:07AM   8    NOT YET CROSSED AND SHOULDN'T BE CROSSED.

11:07AM   9        I THINK THERE'S A WAY TO EXPLORE THAT SAME ISSUE BY SIMPLY

11:08AM  10    REMOVING THAT CONCEPT FROM THE COMMENT AND DESCRIBING IT IN

11:08AM  11    TERMS OF A DESIRE ABOUT THE OUTCOME OF THE CASE OR ABOUT THE

11:08AM  12    JURY'S VERDICT.  I THINK THERE'S A WAY TO DO THAT WITHOUT

11:08AM  13    MENTIONING THE NATURE OF ANY POTENTIAL PUNISHMENT THAT IS IN

11:08AM  14    GREATER COMPLIANCE WITH THE COURT'S ORDER.

11:08AM  15            THE COURT:  WELL, THANK YOU.  AGAIN, IT'S ONE OF THE

11:08AM  16    MANY THORNY ISSUES THAT HAVE COME UP IN THIS CASE.  IT'S -- AND

11:08AM  17    WE HAVE NO CONTROL OVER WHAT THIS WITNESS'S RESPONSE IS.  I'M

11:08AM  18    NOT GOING TO ASK THE GOVERNMENT TO TELL ITS WITNESS WHAT TO SAY

11:08AM  19    AND WHAT NOT TO SAY, NOR AM I GOING TO TELL YOU, MR. DOWNEY,

11:08AM  20    THAT.

11:08AM  21        WE HAVE TO BE VERY CAREFUL ABOUT -- YOU KNOW WHAT THE RULE

11:08AM  22    IS.  YOU KNOW I'VE SAID WE'RE NOT GOING TO MENTION PUNISHMENT

11:08AM  23    AND WE'RE NOT GOING TO GET THAT OUT OF ANY WITNESS.

11:08AM  24        THIS STATEMENT WAS NOT A STATEMENT THAT WAS ELICITED BY A

11:08AM  25    COUNSEL AT ALL.  IT WAS A STATEMENT THAT APPARENTLY THIS

DAS CROSS BY MR. WADE (RES.)                                        5960

11:09AM  1    WITNESS MADE UPON ENTERING THE COURT.  IT PERHAPS TOUCHES ON

11:09AM  2    HIS BIAS, HIS PERSONAL FEELINGS.

11:09AM  3        I DON'T KNOW, MR. DOWNEY, IF YOU CAN ASK A QUESTION THAT

11:09AM  4    AVOIDS THAT.  I DON'T KNOW WHAT THE VALUE IS OF GETTING THE

11:09AM  5    ACTUAL PUNISHMENT TYPE IN AS OPPOSED TO GETTING IN, YOU KNOW,

11:09AM  6    YOU HAVE CERTAIN FEELINGS ABOUT WHAT SHOULD HAPPEN IN THIS

11:09AM  7    CASE.

11:09AM  8            MR. DOWNEY:  WELL, I DON'T KNOW THAT I CAN DO THAT,

11:09AM  9    YOUR HONOR.  I MEAN, I THINK THE STATEMENT REVEALS THE SEVERITY

11:09AM  10   OF THE AGENDA THAT HE'S BRINGING IN TO TESTIFY.

11:09AM  11       I'M NOT SURE THAT REALLY A RESTRICTION ON SORT OF A

11:09AM  12   GENERAL CONCEPT OF SENDING A WITNESS -- SENDING A DEFENDANT TO

11:09AM  13   PRISON OR JAIL WOULD ACTUALLY BE CONSISTENT WITH THE

11:09AM  14   CONFRONTATION CLAUSE.

11:09AM  15       I THINK AS YOU GET INTO MORE DETAIL ABOUT THAT, YOU KNOW,

11:09AM  16   THE CASES TEND TO RESTRICT IT.

11:09AM  17       BUT I DON'T WANT TO -- AT THIS POINT, I DON'T WANT TO BE

11:10AM  18   UNDER ANY RESTRICTION, YOU KNOW, AND WE'LL SEE HOW IT GOES.  I

11:10AM  19   MEAN, I HAVE TO ASSESS THE WITNESS OBVIOUSLY.

11:10AM  20           THE COURT:  NO.  SURE.  AND YOU HAVEN'T SEEN --

11:10AM  21           MR. DOWNEY:  I HAVEN'T SEEN HIM AND SEEN THE TAPE.

11:10AM  22           THE COURT:  AND I DON'T KNOW IF THERE'S VIDEO OR

11:10AM  23   AUDIO ON THAT TAPE OR WHATEVER.

11:10AM  24       ALL RIGHT.  WELL, THANK YOU FOR RAISING IT.  I DO HAVE

11:10AM  25   SOME CONCERNS ABOUT THAT.

DAS CROSS BY MR. WADE (RES.)                                    5961

11:10AM  1        ON THE OTHER HAND, THE WITNESS SAID WHAT HE ALLEGEDLY

11:10AM  2   SAID, AND I DO THINK IT'S APPROPRIATE TO INQUIRE ON THAT.

11:10AM  3        BUT YOU CAN'T GO INTO ANY DETAIL ON THAT.  YOU REALLY

11:10AM  4   CAN'T.

11:10AM  5        AND IT WILL MOST LIKELY BE, IF SOMETHING COMES UP ABOUT

11:10AM  6   THAT, I WILL, ONCE AGAIN, TELL THIS JURY THAT THEY'RE NOT TO

11:10AM  7   CONSIDER PUNISHMENT IN ANY WAY, IN ANY FASHION AT ALL.  AND I

11:10AM  8   MIGHT DO THAT WHILE THIS WITNESS IS ON THE STAND.

11:10AM  9        BUT, YOU KNOW, TO PROBE IT ANY FURTHER THAN THAT, OF

11:10AM 10   COURSE --

11:10AM 11            MR. DOWNEY:  WELL, AS I'VE SAID, I DON'T INTEND TO

11:10AM 12   PROBE IT ANY FURTHER THAN THAT, BUT I THINK THAT'S SORT OF

11:10AM 13   PRECISELY WHERE THE LINE HAS BEEN WHERE I'M BALANCING THE

11:11AM 14   PRINCIPLE YOUR HONOR IS ARTICULATING WITH THE RIGHT TO

11:11AM 15   DEMONSTRATE A WITNESS'S BIAS.

11:11AM 16            MR. BOSTIC:  YOUR HONOR, JUST ON THAT, I WOULD ASK,

11:11AM 17   IF THE DEFENSE IS ALLOWED TO GO INTO THE CONTENT OF THAT

11:11AM 18   QUESTION, THE GOVERNMENT BE ALLOWED A REASONABLE AMOUNT OF

11:11AM 19   LATITUDE TO FOLLOW UP, AGAIN, NOT GOING DEEPER INTO THE

11:11AM 20   PROBLEMATIC AREAS, BUT TO ASK THIS WITNESS, YOU KNOW, FOR

11:11AM 21   EXAMPLE, WHETHER THAT FEELING AFFECTED HIS TESTIMONY OR THE --

11:11AM 22   YOU KNOW, INTERFERED WITH HIS ABILITY TO ANSWER QUESTIONS

11:11AM 23   DURING DIRECT.

11:11AM 24            THE COURT:  I THINK THIS WITNESS HAS BEEN IDENTIFIED

11:11AM 25   BY THE GOVERNMENT AS A VICTIM.

DAS CROSS BY MR. WADE (RES.)                                    5962

11:11AM  1                 MR. DOWNEY:  HE HAS.

11:11AM  2                 THE COURT:  AND AS A VICTIM, HE MAY HAVE SOME

11:11AM  3      STATEMENTS ABOUT WHAT HAPPENED TO HIM AND HOW HE FEELS, AND

11:11AM  4      THAT'S, THAT'S -- WITHIN CERTAIN REASON, THAT'S PERMISSIBLE.

11:11AM  5           BUT THIS WHOLE OTHER ISSUE IS SOMETHING THAT YOU BOTH HAVE

11:12AM  6      TO TREAD VERY LIGHTLY ON.

11:12AM  7                 MR. DOWNEY:  WELL, YOUR HONOR, I DON'T WANT TO LET

11:12AM  8      YOUR COMMENT GO, BECAUSE TO MY MIND, I DON'T THINK THE WITNESS

11:12AM  9      SHOULD GET A GOLD STAR FOR THIS BEHAVIOR AND BE ALLOWED TO SAY,

11:12AM 10      BOY, BECAUSE I'VE BEEN DEFRAUDED, I WANT HER TO GO TO PRISON.

11:12AM 11      THAT SEEMS TO ME LIKE IT WOULD BE WILDLY INAPPROPRIATE.

11:12AM 12                 THE COURT:  WELL, IF HE SAYS THAT, IF HE SAYS, I

11:12AM 13      SAID WHAT I SAID BECAUSE SHE, YOU KNOW -- PARDON ME -- STOLE

11:12AM 14      MONEY FROM ME AND I BELIEVE PEOPLE WHO STEAL SHOULD GO TO

11:12AM 15      PRISON, I DON'T KNOW, HE MIGHT SAY SOMETHING LIKE THAT.

11:12AM 16                 MR. BOSTIC:  YOUR HONOR, THAT'S THE KIND OF

11:12AM 17      TESTIMONY, OF COURSE, THE GOVERNMENT WOULD NEVER SEEK TO ELICIT

11:12AM 18      ON DIRECT OR ON REDIRECT.

11:12AM 19           BUT THAT'S PART OF MY CONCERN HERE IS THAT IF WE GO INTO

11:12AM 20      THAT TOPIC, WE'RE NOT SURE WHAT THE WITNESS WILL SAY ON CROSS.

11:12AM 21           AND ON DIRECT I FEEL LIKE IT WILL OPEN THE DOOR TO SOME

11:12AM 22      APPROPRIATE LEVEL OF QUESTIONING ABOUT THE MOTIVE FOR THAT

11:13AM 23      STATEMENT, WITHIN REASON.

11:13AM 24                 THE COURT:  WELL, AND THAT'S THE THING, TOO, IS THAT

11:13AM 25      A WITNESS, A VICTIM MIGHT SAY, WELL, YEAH, I'M UPSET BECAUSE I

DAS CROSS BY MR. WADE (RES.)                                    5963

11:13AM   1    LOST MONEY, OR WHATEVER THE WITNESS MIGHT SAY.

11:13AM   2        I THINK THAT'S SOMETHING THAT WE COULD EXPECT IN THE HUMAN

11:13AM   3    EXPERIENCE.  SOMEONE -- PARTICULARLY BASED ON WHAT WE KNOW

11:13AM   4    ABOUT WHAT WAS SAID HERE, WE MIGHT ANTICIPATE THAT.

11:13AM   5        SO WE'RE ALL GOING TO BE -- HAVE TO BE ON GUARD TO SHUT

11:13AM   6    THAT DOWN AS BEST WE CAN FOR BOTH SIDES' REASONS.

11:13AM   7        SOME OF THIS IS -- THE BIAS, THAT'S ALWAYS RELEVANT FOR A

11:13AM   8    WITNESS.  THE WITNESS, HIS STATEMENT, THE REASONS WHY HE SAYS

11:13AM   9    WHAT HE DOES, BECAUSE HE FEELS HE'S A VICTIM, THAT HAPPENS IN

11:13AM  10    CRIMINAL TRIALS FREQUENTLY.

11:13AM  11        BUT THERE'S LIMITS TO THAT, OF COURSE.

11:13AM  12        OKAY.

11:13AM  13            MR. DOWNEY:  YOUR HONOR, JUST A MORE MEAT AND

11:13AM  14    POTATOES ISSUE.

11:14AM  15            THE COURT:  SURE.

11:14AM  16            MR. DOWNEY:  WE HAD DISCUSSED MANY MOONS AGO WHEN

11:14AM  17    THIS WITNESS WAS ANTICIPATED THAT I HAD ASKED FOR SOME

11:14AM  18    RESTRICTIONS ON PORTIONS OF DOCUMENTS, AND I THINK YOUR HONOR

11:14AM  19    HAD DISAGREED WITH ME ON ONE FRONT AND AGREED ON ANOTHER FRONT.

11:14AM  20        AND THERE ARE FOUR EXHIBITS THAT ARE AFFECTED BY THAT, AND

11:14AM  21    I THOUGHT, SINCE I'LL BE MENTIONING THAT WHEN THE WITNESS IS ON

11:14AM  22    DIRECT, I MIGHT JUST GIVE THE COURT THOSE EXHIBITS.

11:14AM  23            THE COURT:  SURE.

11:14AM  24            MR. DOWNEY:  BUT I WILL HIGHLIGHT TO MR. BOSTIC AS

11:14AM  25    WELL.

DAS CROSS BY MR. WADE (RES.)                                    5964

11:14AM  1        THEY ARE 2216.  THE COURT HAD REJECTED ONE OF MY

11:14AM  2   SUGGESTIONS, BUT ACCEPTED ANOTHER ONE, AND THAT IS ON THE FIRST

11:14AM  3   PAGE AND IT'S HIGHLIGHTED HERE.

11:14AM  4        THE COURT:  DO YOU WANT ME TO LOOK AT THIS?

11:14AM  5        MR. DOWNEY:  JUST -- I THINK THAT, I THINK THAT IS

11:14AM  6   CONSISTENT WITH THE DIRECTION, BUT YOU MIGHT WANT TO CONFIRM IT

11:14AM  7   AND HAVE IT SO IF THE ISSUE COMES UP.

11:15AM  8        AND THEN --

11:15AM  9        MR. BOSTIC:  COUNSEL, I'M SORRY.  IF WE COULD JUST

11:15AM  10  TAKE THESE ONE BY ONE VERY BRIEFLY?

11:15AM  11        MR. DOWNEY:  SURE.

11:15AM  12        MR. BOSTIC:  AS TO 2216, YOUR HONOR, MY

11:15AM  13  UNDERSTANDING FROM OUR PREVIOUS DISCUSSION IS THAT THERE'S A

11:15AM  14  LINE IN MR. EISENMAN'S EMAIL THAT SAYS -- SORRY.  THERE'S A

11:15AM  15  LINE ON PAGE 1 OF 2216, AN EMAIL FROM MR. EISENMAN SAYS, "I

11:15AM  16  HAVE MOST OF MY NET WORTH IN YOUR COMPANY."

11:15AM  17       I REMEMBER THE COURT HAD CONCERNS ABOUT THAT LINE.  THE

11:15AM  18  GOVERNMENT'S INTENTION IS TO REDACT THAT FROM THE --

11:15AM  19        MR. DOWNEY:  OKAY.  THAT'S FINE.  THAT'S GOOD WITH

11:15AM  20  ME.

11:15AM  21       AND THEN ON 2648, I THINK THE COURT --

11:15AM  22        MR. BOSTIC:  2468?

11:15AM  23        MR. DOWNEY:  2468, WE HAD A SIMILAR CONCERN, AND I

11:15AM  24  THINK YOU HAD PERMITTED THE GOVERNMENT TO INCLUDE THE DIFFERENT

11:16AM  25  STAGE OF LIFE LANGUAGE ON THE FIRST PAGE, SO I WAS UNSUCCESSFUL

DAS CROSS BY MR. WADE (RES.)                              5965

11:16AM  1      THERE.

11:16AM  2           BUT THEN THERE'S A REFERENCE ON THE SECOND PAGE TO THE

11:16AM  3      GRANDDAUGHTER BEING BORN AND HIS RETIREMENT AND SO FORTH.

11:16AM  4                THE COURT:  RIGHT.

11:16AM  5                MR. DOWNEY:  I DON'T KNOW WHAT THE COURT'S INTENTION

11:16AM  6      IS WITH RESPECT TO THAT, BUT I HAVE HIGHLIGHTED WHAT BOTHERS ME

11:16AM  7      THERE.

11:16AM  8                MR. BOSTIC:  I INTEND TO INTRODUCE THAT EXHIBIT AS

11:16AM  9      IS, YOUR HONOR.  I DON'T THINK THAT HAS ANYTHING TO DO WITH THE

11:16AM 10      KINDS OF ISSUES THAT THE COURT WOULD SEEK TO LIMIT IN TERMS OF

11:16AM 11      DOWNSTREAM HARM.

11:16AM 12           THIS IS SIMPLY AN EXPLANATION FROM THIS WITNESS ABOUT WHY

11:16AM 13      HE WAS SEEKING ADDITIONAL INFORMATION FROM THE COMPANY.

11:16AM 14                THE COURT:  DO YOU HAVE A COPY?  I DIDN'T BRING IT

11:16AM 15      UP WITH ME HERE.  I'M SORRY.

11:16AM 16                MR. DOWNEY:  YES, I DO, YOUR HONOR.

11:16AM 17                THE COURT:  THANK YOU.

11:17AM 18                MR. DOWNEY:  LET ME JUST ELIMINATE ONE OF THESE.

11:17AM 19                MR. BOSTIC:  YOUR HONOR, MY UNDERSTANDING FOLLOWING

11:17AM 20      OUR LAST CONVERSATION WAS THAT THE LINE THAT I MENTIONED

11:17AM 21      REDACTING WAS THE ONLY LINE THAT THE COURT WAS INCLINED TO

11:17AM 22      REDACT.  BUT WE'RE, OF COURSE, INTERESTED IN ANY FURTHER

11:17AM 23      GUIDANCE THE COURT HAS.

11:17AM 24                THE COURT:  THAT WAS IN 2216?

11:17AM 25                MR. BOSTIC:  YES, YOUR HONOR.

DAS CROSS BY MR. WADE (RES.)                                    5966

11:17AM  1          THE COURT:  YES.

11:17AM  2          MR. DOWNEY:  AND 2468, IT'S REALLY THE TOP OF THE

11:17AM  3   SECOND PAGE WHICH IS HIGHLIGHTED WHICH IS THE REFERENCE TO A

11:17AM  4   BABY AND SO FORTH.

11:17AM  5          (HANDING.)

11:17AM  6          (PAUSE IN PROCEEDINGS.)

11:17AM  7          THE COURT:  THE FIRST LINE ON PAGE 2?

11:17AM  8          MR. DOWNEY:  THAT'S RIGHT.

11:17AM  9          THE COURT:  YES.

11:18AM  10         (PAUSE IN PROCEEDINGS.)

11:18AM  11         THE COURT:  SO IF THAT LINE IS REDACTED, THEN WHAT

11:18AM  12  REMAINS IS, "WE ARE BOTH CONSIDERING."

11:18AM  13       THIS CONVERSATION SEEMS TO INCLUDE THE DAUGHTER.

11:18AM  14         MR. DOWNEY:  RIGHT.

11:18AM  15         MR. BOSTIC:  YOUR HONOR, I JUST DON'T THINK THAT'S

11:18AM  16  ANYWHERE NEAR THE STANDARD OF WHAT NEEDS TO BE EXCLUDED UNDER

11:18AM  17  403.

11:18AM  18         MR. DOWNEY:  WELL, I THINK WE'RE AGREED, MAYBE WE'RE

11:19AM  19  NOT, BUT I THINK WE'RE AGREED THAT WHAT A PURPORTED VICTIM DOES

11:19AM  20  WITH THE PROPERTY THAT IS THE SUBJECT OF THE WIRE FRAUD CHARGE

11:19AM  21  IS POTENTIAL 403 MATERIAL AND NOT RELEVANT.

11:19AM  22       I WOULD SAY THIS IS HIGHLY INFLAMMATORY IN THE SENSE THAT

11:19AM  23  WHATEVER THE TRUTH OF THE ASSERTION IS, YOU KNOW, THE SENSE OF

11:19AM  24  IT IS THAT THE IMPACT IS BEING VISITED ON HIS GRANDDAUGHTER.

11:19AM  25         THE COURT:  HIS DAUGHTER.

DAS CROSS BY MR. WADE (RES.)

11:19AM  1    AND IF IT READ, IN ADDITION TO THE FACT I'M RETIRING, AND

11:19AM  2    THEN ALL OF THAT BALANCE IS REDACTED, PERHAPS THAT SOLVES IT.

11:19AM  3        BUT I STILL HAVE A PROBLEM WITH THE CONTEXT, BECAUSE THEN

11:19AM  4    IT REFERS TO "WE."

11:19AM  5        MR. BOSTIC:  YOUR HONOR, I'LL JUST POINT OUT THIS IS

11:19AM  6    ALL BEFORE ANY MONEY WAS ACTUALLY LOST.  SO IT WOULD BE ONE

11:19AM  7    THING IF THE WITNESS HAD LOST THE MONEY, WAS AT THIS TIME A

11:19AM  8    VICTIM OF A COMPLETED FRAUD, AND WAS SAYING, HERE'S HOW THIS

11:20AM  9    HURT ME, HERE'S HOW THIS HURT MY FAMILY.

11:20AM 10        THAT'S NOT AT ALL WHAT IS HAPPENING HERE.  INSTEAD, THIS

11:20AM 11    WITNESS IS SAYING, AS THE COURT NOTED BEFORE, MY LIFE

11:20AM 12    CIRCUMSTANCES HAVE CHANGED AND HERE'S WHY I'M EVALUATING WHAT

11:20AM 13    TO DO WITH THIS INVESTMENT, THIS IS WHY I WOULD LIKE MORE

11:20AM 14    INFORMATION ABOUT THE COMPANY.

11:20AM 15        MR. DOWNEY:  ON THAT POINT, YOUR HONOR, HE'S

11:20AM 16    OBVIOUSLY TYING THESE ISSUES TO THE INVESTMENT, WHICH THE

11:20AM 17    BALANCE OF HIS TESTIMONY IS GOING TO SUGGEST, YOU KNOW, HE LOST

11:20AM 18    SO MUCH.  I DON'T THINK THE DISTINCTION IS AS SIGNIFICANT AS

11:20AM 19    MR. BOSTIC SUGGESTS, BUT --

11:20AM 20        THE COURT:  THANK YOU.  I THINK AT LEAST I'M TRYING

11:20AM 21    TO PUT MYSELF IN YOUR SHOES, MR. DOWNEY, AND I THINK THE MOST

11:20AM 22    TROUBLING PART OF THIS IS "RECENTLY HAD A BABY."

11:20AM 23        MR. DOWNEY:  FOR SURE.

11:20AM 24        THE COURT:  "AND NEEDS LIQUIDITY."

11:20AM 25        AND I THINK IF IT READ, IN ADDITION TO THE FACT THAT I'M

DAS CROSS BY MR. WADE (RES.)

| | | |
|---|---|---|
| 11:20AM | 1 | RETIRING, MY DAUGHTER KELLY EITHER NEEDS -- AND STRIKE THE |
| 11:21AM | 2 | "RECENTLY HAD A BABY" PART -- NEEDS LIQUIDITY TO BUY A HOUSE |
| 11:21AM | 3 | AND WE'RE BOTH CONSIDERING -- |
| 11:21AM | 4 | MR. DOWNEY:  THAT'S FINE, YOUR HONOR.  THAT SOUNDS |
| 11:21AM | 5 | LIKE A SENSIBLE LINE. |
| 11:21AM | 6 | THE COURT:  SO WE'LL STRIKE THE "RECENTLY HAD A |
| 11:21AM | 7 | BABY" -- |
| 11:21AM | 8 | MR. DOWNEY:  THAT'S FINE. |
| 11:21AM | 9 | THE COURT:  -- UNDER 403. |
| 11:21AM | 10 | AND THEN THE CONTEXT, OR AT LEAST THE GRAMMAR, THE |
| 11:21AM | 11 | REMAINING WOULD BE CONSISTENT. |
| 11:21AM | 12 | MR. BOSTIC:  UNDERSTOOD, YOUR HONOR. |
| 11:21AM | 13 | THE COURT:  AND YOU'LL DO THE BEST THAT YOU CAN TO |
| 11:21AM | 14 | NOT HAVE HIM TALK ABOUT HIS GRANDDAUGHTER. |
| 11:21AM | 15 | MR. BOSTIC:  I WON'T INTENTIONALLY ELICIT THAT, |
| 11:21AM | 16 | YOUR HONOR. |
| 11:21AM | 17 | THE COURT:  LET ME RETURN THESE TO YOU BOTH |
| 11:21AM | 18 | (HANDING). |
| 11:21AM | 19 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 11:21AM | 20 | AND THE LAST ISSUE RELATES TO ANOTHER ISSUE ON WHICH THE |
| 11:21AM | 21 | COURT HAS ALREADY RULED, BUT I JUST WANTED TO IDENTIFY TWO OF |
| 11:21AM | 22 | THE DOCUMENTS, AND THERE'S ALSO A BIT OF A DISCUSSION ABOUT THE |
| 11:21AM | 23 | GRANDDAUGHTER IN THESE AS WELL, 1371 AND 1663.  I'LL HAND THOSE |
| 11:22AM | 24 | UP. |
| 11:22AM | 25 | I HAD REQUESTED THAT MR. BOSTIC BE PRECLUDED FROM |

DAS CROSS BY MR. WADE (RES.)

| | | |
|---|---|---|
| 11:22AM | 1 | ELICITING FROM THE WITNESS DETAILS ABOUT DISCUSSIONS OF AN IPO |
| 11:22AM | 2 | IN THE 2006 TO 2010 TIMEFRAME. |
| 11:22AM | 3 | I THINK THE COURT SUGGESTED IT WAS MORE INCLINED TO GIVE |
| 11:22AM | 4 | AN INSTRUCTION IN CONNECTION WITH THAT.  I THINK -- OUR |
| 11:22AM | 5 | POSITION IS I THINK THAT IT IS WELL BEYOND THE SCOPE OF A |
| 11:22AM | 6 | WIDELY CHARGED CASE, BOTH IN TIME AND SUBSTANCE, AND SO WE |
| 11:22AM | 7 | WOULD LIKE TO HAVE IT EXCLUDED. |
| 11:22AM | 8 | BUT IN ANY EVENT, IF THE COURT WERE TO AGREE WITH US, THAT |
| 11:22AM | 9 | REFLECTS WHERE THE REDACTIONS WOULD BE. |
| 11:22AM | 10 | THE COURT:  ALL RIGHT.  THIS IS ON -- SHOULD WE LOOK |
| 11:22AM | 11 | AT 1371 FIRST? |
| 11:22AM | 12 | MR. DOWNEY:  OKAY. |
| 11:23AM | 13 | THE COURT:  AND IS THE FIRST REDACTION ON PAGE 12? |
| 11:23AM | 14 | NO.  IT LOOKS LIKE -- |
| 11:23AM | 15 | MR. DOWNEY:  YEAH, THERE ARE SOME TELEPHONIC |
| 11:23AM | 16 | REDACTIONS BEFORE THEN, BUT -- |
| 11:23AM | 17 | THE COURT:  IT LOOKS LIKE IT'S PAGE 9. |
| 11:23AM | 18 | MR. DOWNEY:  YEAH, I THINK ON PAGE 9 THE COURT HAS |
| 11:23AM | 19 | EFFECTIVELY NOT ACCEPTED THAT REDACTION BY ITS RULING ON THE |
| 11:23AM | 20 | OTHER DOCUMENTS. |
| 11:23AM | 21 | I THINK ON PAGE 10 THERE ARE TWO REDACTIONS, ONE OF WHICH |
| 11:23AM | 22 | TOUCHES ON THE BABY. |
| 11:23AM | 23 | THE COURT:  WE JUST COVERED THAT, DIDN'T WE? |
| 11:23AM | 24 | MR. DOWNEY:  YEAH, I THINK THAT'S THE SAME EMAIL. |
| 11:23AM | 25 | THE COURT:  RIGHT. |

DAS CROSS BY MR. WADE (RES.)                                5970

11:23AM   1            MR. DOWNEY:  BUT IT WOULD BE REDACTED HERE.

11:23AM   2            MR. BOSTIC:  SORRY TO INTERRUPT, COUNSEL.  I ONLY

11:23AM   3    INTEND TO INTRODUCE PAGES 1 THROUGH 8.

11:23AM   4            MR. DOWNEY:  ALL RIGHT.  WELL, THAT SOLVES THE

11:23AM   5    PROBLEM.

11:23AM   6            MR. BOSTIC:  JUST TO SAVE US SOME TIME.

11:23AM   7            THE COURT:  THANK YOU, MR. BOSTIC.

11:23AM   8        LET'S MOVE TO 663.

11:23AM   9            MR. DOWNEY:  AND THIS IS A DISCUSSION I THINK,

11:23AM  10    YOUR HONOR, EXCLUSIVELY UNDER THE COURT'S RULING THAT TOUCHES

11:24AM  11    ON THAT IPO ISSUE AND REFERS TO IT LARGELY I THINK REFERRING

11:24AM  12    BACK TO EVENTS BETWEEN 2006 AND 2010, ALTHOUGH THIS IS A, YOU

11:24AM  13    KNOW, AN EXCHANGE THAT BEGINS IN 2010 AND THEN GOES FORWARD.

11:25AM  14        (PAUSE IN PROCEEDINGS.)

11:25AM  15            THE COURT:  MR. BOSTIC?

11:25AM  16            MR. BOSTIC:  I UNDERSTAND THE DEFENSE TO BE

11:25AM  17    REQUESTING THAT ANY MENTION OF AN IPO BE REDACTED FROM THIS

11:25AM  18    EMAIL CONVERSATION BETWEEN MR. EISENMAN AND MS. HOLMES.

11:25AM  19        I DON'T THINK THAT'S NECESSARY.  I REALLY DON'T INTEND TO

11:25AM  20    FEATURE THE IPO OR REPRESENTATIONS ABOUT THE IPO IN THIS

11:25AM  21    WITNESS'S EXAMINATION.

11:25AM  22        AS I REPRESENTED TO THE COURT BEFORE, THE GOVERNMENT IS

11:25AM  23    NOT GOING TO ARGUE THAT THE DEFENDANT DEFRAUDED VICTIMS BY

11:25AM  24    MAKING MISREPRESENTATIONS ABOUT AN IPO.

11:25AM  25            INSTEAD, IT'S PART OF A CONVERSATION THREAD BETWEEN

                          DAS CROSS BY MR. WADE (RES.)                    5971

11:25AM    1    MS. HOLMES AND AN INVESTOR IN THERANOS WHERE THE INVESTOR IS

11:25AM    2    ASKING FOR INFORMATION ABOUT WHERE THINGS STAND WITH THE

11:25AM    3    COMPANY.

11:25AM    4         QUESTIONS ABOUT PLANS FOR AN IPO OR TIMING OF THE IPO ARE

11:25AM    5    JUST RELEVANT GENERALLY TO THAT CONVERSATION.  HE'S SIMPLY

11:25AM    6    ASKING FOR SOME UPDATED INFORMATION RELATING TO STATEMENTS THAT

11:26AM    7    MS. HOLMES PREVIOUSLY MADE.

11:26AM    8              MR. DOWNEY:  WELL, I'LL ACCEPT THAT LINE.  THAT'S

11:26AM    9    MORE PROGRESS THAN WHERE WE WERE, SO I'LL ACCEPT THAT, AND WE

11:26AM   10    SHOULD GO FROM THERE.

11:26AM   11         I APOLOGIZE FOR TAKING THIS TIME.

11:26AM   12              THE COURT:  NO, NOT AT ALL.  THEY'RE IMPORTANT

11:26AM   13    ISSUES.

11:26AM   14         THANK YOU, MR. BOSTIC.

11:26AM   15         SO I'M NOT GOING TO ORDER ANY REDACTIONS.  THAT'S NOT

11:26AM   16    GOING TO BE ARGUED IN YOUR CASE THEN AT ALL?

11:26AM   17              MR. BOSTIC:  NO, YOUR HONOR.

11:26AM   18              MR. DOWNEY:  THANK YOU, YOUR HONOR.

11:26AM   19              MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:26AM   20              MR. SCHENK:  YOUR HONOR, MAY WE COME TO SIDE-BAR

11:26AM   21    VERY BRIEFLY ABOUT A SCHEDULING ISSUE?

11:26AM   22              THE COURT:  YES.  THANK YOU.

11:26AM   23         (SIDE-BAR CONFERENCE OFF THE RECORD.)

11:30AM   24         (PAUSE IN PROCEEDINGS.)

11:30AM   25         (JURY IN AT 11:30 A.M.)

DAS CROSS BY MR. WADE (RES.)                                    5972

11:30AM   1          THE COURT:  THANK YOU.  PLEASE BE SEATED.

11:30AM   2          WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:30AM   3    ARE PRESENT ONCE AGAIN.

11:30AM   4          OUR JURY IS PRESENT.

11:30AM   5          DR. DAS IS ON THE STAND.

11:30AM   6          YOU'D LIKE TO RESUME YOUR EXAMINATION, MR. WADE?

11:30AM   7              MR. WADE:  I WOULD, YOUR HONOR.  THANK YOU.

11:30AM   8    Q.   GOOD MORNING AGAIN.

11:30AM   9    A.   GOOD MORNING.

11:30AM   10   Q.   BEFORE WE BROKE, I WAS ASKING YOU SOME QUESTIONS RELATING

11:31AM   11   TO THE COMPANY'S RESPONSE RELATING TO ITS ANALYZER.

11:31AM   12        DO YOU RECALL THAT?

11:31AM   13   A.   YES.

11:31AM   14   Q.   AND I'D LIKE TO ASK YOU ABOUT A FEW OTHER MATTERS THAT

11:31AM   15   RELATE TO THE WORK THAT YOU WERE DOING WHEN YOU CAME INTO THE

11:31AM   16   COMPANY FULL TIME.  OKAY?

11:31AM   17   A.   OKAY.

11:31AM   18   Q.   COULD I DRAW YOUR ATTENTION TO EXHIBIT 10674, WHICH SHOULD

11:31AM   19   BE IN YOUR BINDER.

11:31AM   20   A.   YES.

11:31AM   21   Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

11:31AM   22   A.   YES.

11:31AM   23   Q.   AND IS THIS AN EMAIL IN WHICH YOU WERE GIVING AN UPDATE TO

11:31AM   24   MS. HOLMES ON THE WORK YOU WERE DOING AFTER YOU STARTED AT THE

11:31AM   25   COMPANY FULL TIME?

11:31AM  1    A.   YES.

11:31AM  2              MR. WADE:  MOVE THE ADMISSION OF 10674.

11:31AM  3              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:31AM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:32AM  5         (DEFENDANT'S EXHIBIT 10674 WAS RECEIVED IN EVIDENCE.)

11:32AM  6    BY MR. WADE:

11:32AM  7    Q.   HERE YOU NOTE -- LET'S LOOK AT THE SUBJECT MATTER.  IT

11:32AM  8    SAYS "SOME GOOD NEWS, FOR ONCE."

11:32AM  9         DO YOU SEE THAT?

11:32AM  10   A.   YES.

11:32AM  11   Q.   AND WE TALKED ABOUT THE MEETING THAT OCCURRED AND SOME

11:32AM  12   OTHER COMMUNICATIONS WHERE YOU WERE AT TIMES DELIVERING WHAT

11:32AM  13   COULD BE CONSIDERED BAD NEWS.

11:32AM  14        DO YOU RECALL THAT?

11:32AM  15   A.   YES.

11:32AM  16   Q.   AND YOU WERE, ON THIS PARTICULAR OCCASION, ON THIS WORK,

11:32AM  17   YOU ACTUALLY HAD SOME GOOD NEWS TO REPORT; RIGHT?

11:32AM  18   A.   YES.

11:32AM  19   Q.   OKAY.  LET'S TAKE A LOOK.

11:32AM  20        IT NOTES HERE THAT YOU HAD DONE CALCULATIONS FOR TWO OF

11:32AM  21   THE FIVE CAPILLARY 1800 ANALYTES, GLUCOSE AND SODIUM, FOR THOSE

11:33AM  22   VALIDATIONS.

11:33AM  23        DO YOU SEE THAT?

11:33AM  24   A.   YES.

11:33AM  25   Q.   AND THEY LOOK EXCELLENT.

DAS CROSS BY MR. WADE (RES.)                                              5974

| | | |
|---|---|---|
| 11:33AM | 1 | DO YOU SEE THAT? |
| 11:33AM | 2 | A.   YES. |
| 11:33AM | 3 | Q.   AND YOU THEN NOTE DOWN BELOW THAT YOU WERE NOT A BIG FAN |
| 11:33AM | 4 | OF CERTAIN ASPECTS OF THE STUDIES AS THEY WERE DOCUMENTED; IS |
| 11:33AM | 5 | THAT FAIR? |
| 11:33AM | 6 | A.   YES.  I DON'T HAVE A SPECIFIC RECOLLECTION. |
| 11:33AM | 7 | Q.   OKAY.  BUT YOU THOUGHT THE DATA WAS GOOD ON THESE? |
| 11:33AM | 8 | A.   IT APPEARS SO. |
| 11:33AM | 9 | Q.   AND THE 1800 ANALYTES, THOSE WERE ADVIA 1800? |
| 11:33AM | 10 | A.   YES. |
| 11:33AM | 11 | Q.   AND THOSE WERE THE CIRCUMSTANCES IN WHICH THE COMPANY WAS |
| 11:33AM | 12 | RUNNING A SMALL SAMPLE ASSAY ON A MODIFIED ADVIA 1800. |
| 11:33AM | 13 | DO YOU RECALL THAT? |
| 11:33AM | 14 | A.   YES. |
| 11:33AM | 15 | Q.   AND DO YOU RECALL LEARNING WHEN YOU WERE THERE THAT THE |
| 11:33AM | 16 | ADVIA 1800, THE COMPANY HAD ADAPTED SOME TECHNOLOGY TO MODIFY |
| 11:34AM | 17 | THE ADVIA 1800 SO IT COULD RUN SMALL SAMPLES OF THE ASSAYS IN A |
| 11:34AM | 18 | HIGH THROUGHPUT MANNER? |
| 11:34AM | 19 | A.   YES. |
| 11:34AM | 20 | Q.   AND THAT'S WHAT YOU'RE REFERRING TO IN THIS EMAIL? |
| 11:34AM | 21 | A.   YES. |
| 11:34AM | 22 | Q.   OKAY.  AND IN YOUR PRIOR EXPERIENCE AS A LAB DIRECTOR, |
| 11:34AM | 23 | HAVE YOU EVER SEEN SOMEONE DO THESE ASSAYS ON A SMALL SAMPLE IN |
| 11:34AM | 24 | A HIGH THROUGHPUT MANNER? |
| 11:34AM | 25 | A.   YES. |

DAS CROSS BY MR. WADE (RES.)                                    5975

11:34AM   1    Q.   YOU HAVE?   ON A FINGERSTICK?

11:34AM   2    A.   I DON'T RECALL IF IT WAS A FINGERSTICK.

11:34AM   3    Q.   OKAY.

11:34AM   4    A.   I BELIEVE HEELSTICK.

11:34AM   5    Q.   HEELSTICK.   OKAY.

11:34AM   6         AND THE -- IN LOOKING AT THESE VALIDATIONS, THIS WAS PART

11:34AM   7    OF ONE OF THOSE ASPECTS WHERE YOU WERE JUST TURNING OVER THE

11:34AM   8    DIFFERENT ROCKS AND LOOKING AT THE DIFFERENT ITEMS WITHIN THE

11:34AM   9    LAB TO GET YOURSELF COMFORTABLE WITH IT; IS THAT RIGHT?

11:34AM   10   A.   YES.

11:34AM   11   Q.   AND, IN FACT, IN THE NEXT EMAIL BELOW, YOU NOTE THAT

11:34AM   12   YOU'RE GOING TO LOOK AT THE THREE OTHER ANALYTES; CORRECT?

11:34AM   13   A.   YES.

11:35AM   14   Q.   AND DO YOU RECALL WHETHER YOU DID THAT?

11:35AM   15   A.   I DO NOT.

11:35AM   16   Q.   OKAY.   I'D LIKE TO NEXT TURN YOUR ATTENTION TO

11:35AM   17   EXHIBIT 10651, WHICH SHOULD BE A COUPLE DOCUMENTS BACK?

11:35AM   18   A.   YES.

11:35AM   19   Q.   AND IS THIS AN EMAIL COMMUNICATION BETWEEN YOU AND

11:35AM   20   MS. HOLMES IN WHICH YOU'RE INFORMING HER OF PLANS THAT YOU HAD

11:35AM   21   UNDERWAY TO DIG IN ON THE CMS RESPONSE?

11:35AM   22   A.   YES.

11:35AM   23               MR. WADE:   MOVE THE ADMISSION OF 10651.

11:35AM   24               MR. LEACH:   NO OBJECTION, YOUR HONOR.

11:35AM   25               THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

DAS CROSS BY MR. WADE (RES.)                                    5976

| | | |
|---|---|---|
| 11:36AM | 1 | (DEFENDANT'S EXHIBIT 10651 WAS RECEIVED IN EVIDENCE.) |
| 11:36AM | 2 | BY MR. WADE: |
| 11:36AM | 3 | Q.   OKAY.  IN THIS EMAIL IN EARLY APRIL YOU SAY, "AFTER WE GOT |
| 11:36AM | 4 | BACK FROM NWK." |
| 11:36AM | 5 | IS NWK THE NEWARK LAB? |
| 11:36AM | 6 | A.   YES. |
| 11:36AM | 7 | Q.   YOU GOT IN TOUCH WITH MICHELE, FRAN, AND LISA. |
| 11:36AM | 8 | DO YOU KNOW WHO MICHELE, FRAN, AND LISA ARE THERE? |
| 11:36AM | 9 | A.   YES. |
| 11:36AM | 10 | Q.   AND WHO ARE THEY? |
| 11:36AM | 11 | A.   MICHELE REFERS TO MICHELE CARBONE, FRAN REFERS TO |
| 11:36AM | 12 | FRANCIS YOUNG, AND LISA REFERS TO LISA HELFEND, DR. HELFEND. |
| 11:36AM | 13 | Q.   OKAY.  AND THOSE WERE SOME OF THE OUTSIDE CONSULTANTS THAT |
| 11:36AM | 14 | THE COMPANY BROUGHT IN TO WORK ON CMS ISSUES AND IMPROVING THE |
| 11:36AM | 15 | LAB? |
| 11:36AM | 16 | A.   YES. |
| 11:36AM | 17 | Q.   AND IT NOTES HERE IN THIS EMAIL, "WE'RE FULL STEAM AHEAD |
| 11:36AM | 18 | ON 2120 AND REVIEW OF THE CMS RESPONSE, AS YOU OUTLINED EARLIER |
| 11:37AM | 19 | TODAY." |
| 11:37AM | 20 | DO YOU SEE THAT? |
| 11:37AM | 21 | A.   YES. |
| 11:37AM | 22 | Q.   AND DOES THIS INDICATE THAT YOU PUT THIS TEAM TO WORK ON |
| 11:37AM | 23 | DIGGING IN AND ADDRESSING ISSUES THAT WERE COMING UP IN CMS? |
| 11:37AM | 24 | A.   YES. |
| 11:37AM | 25 | Q.   OKAY.  AND YOU NOTE A CHANGE THERE IN THE SECOND |

5977
DAS CROSS BY MR. WADE (RES.)

11:37AM  1    PARAGRAPH, AND IT SAYS -- CAN YOU TELL ME WHAT YOU'RE REFERRING

11:37AM  2    TO IN THIS PARAGRAPH?

11:37AM  3    A.   YES.  TO THE BEST OF MY RECOLLECTION, I WAS RECOMMENDING

11:37AM  4    THAT A STAFF MEMBER NAMED JUN RUN THE 2120 ASSAY INSTEAD OF

11:37AM  5    ANOTHER STAFF MEMBER NAMED HODA.

11:37AM  6    Q.   OKAY.  AND THAT WAS BECAUSE YOU THOUGHT THAT WOULD BE A

11:37AM  7    BETTER FIT?

11:37AM  8    A.   YES.  HE HAD MORE EXPERIENCE.

11:37AM  9    Q.   OKAY.  AND YOU WANTED SOMEONE WITH THE MOST EXPERIENCE ON

11:37AM  10   THAT?

11:37AM  11   A.   YES.

11:37AM  12   Q.   THEN IN THE NEXT LINE YOU SAY YOU'LL BE CONTACTING A. BACA

11:38AM  13   IN A FEW MINUTES TO SECURE HIS SERVICES, IF POSSIBLE.

11:38AM  14       DO YOU SEE THAT?

11:38AM  15   A.   YES.

11:38AM  16   Q.   AND IS THAT DR. BACA, THE LABORATORY CONSULTANT THAT WE

11:38AM  17   REFERRED TO PREVIOUSLY?

11:38AM  18   A.   YES, DR. AUTHOR BACA.

11:38AM  19   Q.   AND YOU WERE BRINGING IN EVEN MORE RESEARCHERS TO WORK ON

11:38AM  20   THIS; RIGHT?

11:38AM  21   A.   YES.

11:38AM  22   Q.   AND THAT WAS BECAUSE YOU WANTED TO GO QUICKLY AND ADDRESS

11:38AM  23   IT THOROUGHLY.

11:38AM  24       IS THAT FAIR?

11:38AM  25   A.   I DON'T RECALL MY EXACT INTENTIONS WITH DR. BACA.

DAS CROSS BY MR. WADE (RES.)                                    5978

11:38AM   1    Q.   OKAY.  BUT GENERALLY WITH RESPECT TO WHAT YOU WERE DOING

11:38AM   2    HERE, IS IT FAIR TO SAY THAT YOU WANTED TO BE THOROUGH?

11:38AM   3    A.   YES.

11:38AM   4    Q.   AND TRY TO DEAL WITH IT AS QUICKLY AS YOU COULD

11:38AM   5    CONSIDERING YOUR PROFESSIONAL OBLIGATIONS?

11:38AM   6    A.   YES.

11:38AM   7    Q.   AND YOU NOTE WE'RE GOING TO GET ALL OF THIS DONE, AND THIS

11:38AM   8    IS JUST AN UPDATE; RIGHT?

11:38AM   9    A.   YES.

11:38AM   10   Q.   AND MS. HOLMES IS NOT DIRECTLY INVOLVED IN THE WORK THAT

11:38AM   11   YOU WERE DOING; RIGHT?

11:38AM   12   A.   NOT TO MY RECOLLECTION.

11:38AM   13   Q.   BUT YOU WERE REPORTING TO HER AT THIS TIME?

11:39AM   14   A.   YES.

11:39AM   15   Q.   AND YOU WERE GIVING HER AN UPDATE ON YOUR PLAN; RIGHT?

11:39AM   16   A.   YES.

11:39AM   17   Q.   OKAY.  LET'S LOOK AT HER RESPONSE.

11:39AM   18        SHE THANKS YOU FOR THE UPDATE AND FOR DRIVING THIS FORWARD

11:39AM   19   AND NOTES THIS IS HOW WE MAKE SURE WE GET ACCEPTED BY CMS.

11:39AM   20        DO YOU SEE THAT?

11:39AM   21   A.   YES.

11:39AM   22   Q.   AND DID YOU FEEL LIKE IN THIS TIME PERIOD MS. HOLMES WAS

11:39AM   23   DEDICATED TO GIVING YOU WHATEVER RESOURCES YOU ASKED FOR TO TRY

11:39AM   24   TO ADDRESS THESE LAB ISSUES?

11:39AM   25   A.   YES.

DAS CROSS BY MR. WADE (RES.)                                          5979

11:39AM  1    Q.   AND DID YOU FEEL LIKE SHE WAS GIVING YOU UNFETTERED ACCESS

11:39AM  2    TO THE INFORMATION THAT YOU NEEDED WITHIN THE COMPANY TO DO A

11:39AM  3    THOROUGH ANALYSIS?

11:39AM  4    A.   COULD YOU SPECIFY, PLEASE?

11:39AM  5    Q.   WELL, WHEN YOU WERE TURNING OVER THOSE ROCKS, DO YOU

11:39AM  6    RECALL TALKING ABOUT THAT?

11:39AM  7    A.   YES.

11:39AM  8    Q.   DID YOU FEEL LIKE YOU COULD LOOK AT ANY INFORMATION OR

11:39AM  9    DATA THAT YOU NEEDED?

11:39AM  10   A.   AS OF THE DATE OF THIS EMAIL, I DON'T RECALL.  AS TIME

11:40AM  11   WENT ON, YES.

11:40AM  12   Q.   AND SO AS TIME WENT ON, YOU WOULD GET MORE AND MORE

11:40AM  13   INFORMATION; RIGHT?

11:40AM  14   A.   YES.

11:40AM  15   Q.   OKAY.  LET'S LOOK NEXT AT 10641.

11:40AM  16   A.   OKAY.

11:40AM  17   Q.   AND THIS -- DO YOU RECOGNIZE THIS TO BE AN EMAIL

11:40AM  18   COMMUNICATION BETWEEN YOU AND MS. HOLMES IN EARLY MARCH OF 2016

11:40AM  19   RELATING TO SOME OF THERANOS'S TECHNOLOGY?

11:40AM  20   A.   YES.

11:40AM  21          MR. WADE:  MOVE THE ADMISSION OF 10641.

11:40AM  22          MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:40AM  23          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:40AM  24     (DEFENDANT'S EXHIBIT 10641 WAS RECEIVED IN EVIDENCE.)

11:41AM  25   BY MR. WADE:

DAS CROSS BY MR. WADE (RES.)                                      5980

11:41AM   1    Q.   AND I JUST WANT TO FOCUS ON A COUPLE OF THINGS.

11:41AM   2         YOU RECALL THAT A LOT OF THE QUESTIONING RELATED TO THE

11:41AM   3    OLDER 3.0 DEVICE.

11:41AM   4         DO YOU RECALL THAT QUESTIONING?

11:41AM   5    A.   YES.

11:41AM   6    Q.   BUT WE TALKED ABOUT THE NEWER DEVICE THAT THE COMPANY WAS

11:41AM   7    BRINGER FORWARD?

11:41AM   8    A.   YES.

11:41AM   9    Q.   AND DO YOU RECALL HAVING A MEETING IN MARCH WHERE YOU WERE

11:41AM   10   SHOWN THAT DEVICE AND GIVEN A SENSE FOR HOW IT WAS DEVELOPED,

11:41AM   11   BEING DEVELOPED?

11:41AM   12   A.   I DON'T RECALL THAT SPECIFIC MEETING.

11:41AM   13   Q.   DOES THIS EMAIL REFRESH YOUR RECOLLECTION OF A MEETING

11:41AM   14   THAT YOU HAD, A SCIENTIFIC MEETING?

11:41AM   15   A.   IT DOES NOT, BUT I DON'T DOUBT IT.

11:41AM   16   Q.   OKAY.  YOU SEE THERE IN THE SECOND PARAGRAPH IT SAYS, "NOW

11:41AM   17   THAT I'VE SEEN 'UNDER THE HOOD' OF YOUR INSTRUMENT, SOMETHING

11:42AM   18   ALONG THESE LINES WOULD BE PERFECT AS FAR AS SPACE, PLUS ONLY

11:42AM   19   NEEDS A LAPTOP PROCESSOR."

11:42AM   20        DO YOU SEE THAT?

11:42AM   21   A.   YES.

11:42AM   22   Q.   AND DO YOU RECALL THAT THERE WAS -- MAYBE YOU DON'T

11:42AM   23   REMEMBER THIS MEETING, BUT DO YOU RECALL SOME POINT IN TIME

11:42AM   24   WHERE YOU GOT A LOOK UNDER THE HOOD OF THE THERANOS INSTRUMENT?

11:42AM   25   A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    5981

| | | |
|---|---|---|
| 11:42AM | 1 | Q.   AND THAT WAS THE NEXT GENERATION INSTRUMENT AFTER THE 3.5? |
| 11:42AM | 2 | A.   YES.  I DON'T REMEMBER WHICH GENERATION EXACTLY, BUT YES. |
| 11:42AM | 3 | Q.   OKAY.  AND YOU HAD A PARTICULAR -- YOU HAD SOME PARTICULAR |
| 11:42AM | 4 | BACKGROUNDS ON SOME RNA, RRNA SEQUENCING BASED UPON SOME WORK |
| 11:42AM | 5 | THAT YOU HAD DONE AT UCLA; IS THAT RIGHT? |
| 11:42AM | 6 | A.   YES. |
| 11:42AM | 7 | Q.   AND YOU WERE SUGGESTING SOME WAYS IN WHICH THE DEVICE |
| 11:42AM | 8 | MIGHT BE ABLE TO ADAPT TO INCLUDE SOME OF THAT TECHNOLOGY? |
| 11:42AM | 9 | A.   YES. |
| 11:42AM | 10 | Q.   AND YOU UNDERSTOOD THAT THE PRODUCT THAT WAS BEING |
| 11:43AM | 11 | DEVELOPED WAS BEING DEVELOPED SO IT COULD RUN MULTIPLE |
| 11:43AM | 12 | DIFFERENT TYPES OF ASSAYS ON A SINGLE DEVICE? |
| 11:43AM | 13 | A.   YES. |
| 11:43AM | 14 | Q.   AND WERE YOU AWARE OF THAT EVER BEING DONE BEFORE? |
| 11:43AM | 15 | A.   NOT TO MY RECOLLECTION. |
| 11:43AM | 16 | Q.   OKAY.  AND SO YOU WERE MAKING SOME RECOMMENDATIONS BASED |
| 11:43AM | 17 | UPON YOUR EXPERIENCE FOR WAYS IN WHICH THAT MIGHT BE MODIFIED |
| 11:43AM | 18 | TO ACCOUNT FOR SOME ADDITIONAL AREAS OF TESTING? |
| 11:43AM | 19 | A.   YES. |
| 11:43AM | 20 | Q.   OKAY.  AND LET ME ASK YOU -- YOU DON'T RECALL THE SPECIFIC |
| 11:43AM | 21 | DEVICE, BUT LET ME ASK YOU AND SHOW YOU A PICTURE AND SEE IF |
| 11:43AM | 22 | THIS IS THE DEVICE.  I'LL HAND UP TWO PICTURES. |
| 11:44AM | 23 | MAY I APPROACH, YOUR HONOR? |
| 11:44AM | 24 | THE COURT:  YES. |
| 11:44AM | 25 | BY MR. WADE: |

DAS CROSS BY MR. WADE (RES.)                                        5982

11:44AM   1       Q.   (HANDING.)

11:44AM   2            DR. DAS, I'VE HANDED YOU TWO DOCUMENTS, ONE MARKED

11:44AM   3    EXHIBIT 7747 AND ANOTHER MARKED 7746.

11:44AM   4            DO YOU RECOGNIZE THIS TO BE THE DEVICE THAT YOU WERE

11:44AM   5    SHOWN -- A DEVICE OF THIS TYPE BEING THE ONE THAT YOU WERE

11:44AM   6    SHOWN WHEN YOU JOINED THE COMPANY?

11:44AM   7       A.   I RECOGNIZE THIS DEVICE.  I DON'T KNOW IF THIS IS THE

11:44AM   8    DEVICE WE'RE REFERRING TO IN THE EMAIL.

11:44AM   9       Q.   OKAY.  YOU DON'T KNOW IF IT'S THE DEVICE THAT YOU ARE

11:44AM  10    REFERRING TO IN EXHIBIT 10641?

11:45AM  11       A.   THAT'S CORRECT.

11:45AM  12       Q.   OKAY.  BUT YOU WERE SHOWN THIS DEVICE AT SOME POINT?

11:45AM  13       A.   YES.

11:45AM  14       Q.   AND THIS IS WHAT -- THIS DEVICE IS SOMETIMES WHAT IS

11:45AM  15    REFERRED TO AS THE MINILAB?

11:45AM  16       A.   YES.

11:45AM  17            MR. WADE:  OKAY.  MOVE TO ADMIT EXHIBIT 7747 AND

11:45AM  18    7746.

11:45AM  19            MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:45AM  20            THE COURT:  THEY'RE ADMITTED AND MAY BE PUBLISHED.

11:45AM  21       (DEFENDANT'S EXHIBITS 7746 AND 7747 WERE RECEIVED IN

11:45AM  22    EVIDENCE.)

11:45AM  23    BY MR. WADE:

11:45AM  24       Q.   AND THIS IS A COPY OF THAT DEVICE WHICH IS SHOWING UP IN

11:45AM  25    BLACK AND WHITE ON THE SCREEN.

5983

DAS CROSS BY MR. WADE (RES.)

| | | |
|---|---|---|
| 11:45AM | 1 | AND YOU SAW THIS DEVICE WHEN YOU WERE WORKING WITH THE |
| 11:45AM | 2 | COMPANY? |
| 11:45AM | 3 | A.   YES. |
| 11:45AM | 4 | Q.   AND YOU UNDERSTOOD THAT IN THE SLOT THERE ON THE FRONT |
| 11:45AM | 5 | BELOW THE LABEL THERANOS IS WHERE A CARTRIDGE WOULD GO IN? |
| 11:46AM | 6 | A.   YES. |
| 11:46AM | 7 | Q.   OKAY.  AND COULD WE PUBLISH 7746, PLEASE. |
| 11:46AM | 8 | AND IS THIS SORT OF UNDER THE HOOD, IF YOU WILL, OF THAT |
| 11:46AM | 9 | DEVICE? |
| 11:46AM | 10 | A.   YES. |
| 11:46AM | 11 | Q.   AND THE IDEA WAS THAT DIFFERENT FORMS OF SENSORS AND THE |
| 11:46AM | 12 | LIKE COULD BE ADAPTED ONTO THIS PLATFORM SO THAT DIFFERENT |
| 11:46AM | 13 | TYPES OF ASSAYS COULD BE RUN; IS THAT RIGHT? |
| 11:46AM | 14 | A.   YES. |
| 11:46AM | 15 | Q.   OKAY.  AND IN THIS EMAIL IN MARCH, YOU'RE PROVIDE SOME |
| 11:46AM | 16 | THOUGHTS AND INPUT TO MS. HOLMES IN THAT REGARD; IS THAT RIGHT? |
| 11:46AM | 17 | A.   YES. |
| 11:46AM | 18 | Q.   I BELIEVE YOU TESTIFIED ON DIRECT ABOUT PARTICIPATING IN A |
| 11:47AM | 19 | MEETING WITH DR. GOODRICH FROM CMS. |
| 11:47AM | 20 | DO YOU RECALL THAT? |
| 11:47AM | 21 | A.   YES. |
| 11:47AM | 22 | Q.   AND THAT WAS A MEETING -- AND DO YOU RECALL WHO |
| 11:47AM | 23 | DR. GOODRICH IS? |
| 11:47AM | 24 | A.   YES. |
| 11:47AM | 25 | Q.   AND WHO WAS DR. GOODRICH? |

DAS CROSS BY MR. WADE (RES.)                                        5984

11:47AM  1    A.   I BELIEVE HER TITLE WAS MEDICAL DIRECTOR AT CMS FOR

11:47AM  2    LABORATORIES.

11:47AM  3    Q.   UM --

11:47AM  4    A.   BUT I DON'T KNOW THE EXACT WORDING.

11:47AM  5    Q.   SHE WAS A SENIOR POSITION OR SENIOR PERSON WITHIN CMS; IS

11:47AM  6    THAT RIGHT?

11:47AM  7    A.   YES.

11:47AM  8    Q.   AND THERE WAS -- DO YOU RECALL THAT THERANOS PROVIDED A

11:47AM  9    WRITTEN BRIEFING ON THE STEPS THAT THEY WERE TAKING UNDER YOUR

11:47AM  10   LEADERSHIP TO IMPROVE THE QUALITY OF THE LAB?

11:48AM  11   A.   YES.

11:48AM  12   Q.   AND THERE WAS A MEETING OUT IN BALTIMORE, MARYLAND TO

11:48AM  13   DISCUSS THAT.

11:48AM  14        DO YOU RECALL THAT?

11:48AM  15   A.   YES.

11:48AM  16   Q.   AND YOU PARTICIPATED IN THAT, ALONG WITH OTHER PEOPLE AT

11:48AM  17   THERANOS WHO PROVIDED INFORMATION TO DR. GOODRICH; IS THAT

11:48AM  18   RIGHT?

11:48AM  19   A.   YES.

11:48AM  20   Q.   AND I TAKE IT YOU FELT AT THE TIME THAT THE COMPANY HAD

11:48AM  21   MADE A LOT OF PROGRESS IN IMPROVING THE LAB AND WAS COMMITTED

11:48AM  22   TO EVEN MAKING MORE.

11:48AM  23        IS THAT FAIR?

11:48AM  24   A.   YES.

11:48AM  25   Q.   OKAY.  A SIGNIFICANT FOCUS OF THAT WAS ACTUALLY BRINGING

DAS CROSS BY MR. WADE (RES.)                                    5985

11:48AM   1    YOU IN AS LABORATORY DIRECTOR; RIGHT?

11:48AM   2    A.   YES.

11:48AM   3    Q.   YOU WERE CONSIDERED BY THE COMPANY TO BE HIGHLY QUALIFIED

11:48AM   4    AND CREDENTIALED AND CAPABLE OF DOING THIS VERY IMPORTANT JOB;

11:48AM   5    RIGHT?

11:48AM   6    A.   I CAN'T SPEAK TO THEIR THOUGHTS EXACTLY.

11:48AM   7    Q.   WELL, DO YOU RECALL THEM ARTICULATING THAT TO CMS?

11:48AM   8    A.   YES.

11:48AM   9    Q.   AND THERE WAS ALSO A SUBSTANTIAL REWORKING OF THE

11:49AM  10    PERSONNEL WITHIN THE LAB AT THERANOS; RIGHT?

11:49AM  11    A.   YES.

11:49AM  12    Q.   AND THAT WAS FEATURED AS PART OF THAT RESPONSE AS WELL;

11:49AM  13    RIGHT?

11:49AM  14    A.   YES, I BELIEVE SO.

11:49AM  15    Q.   AND THERE WAS ALSO ENHANCED POLICIES AND PROCEDURES THAT

11:49AM  16    WERE PUT IN PLACE?

11:49AM  17    A.   YES.

11:49AM  18    Q.   AND THERE WAS NEW COMPREHENSIVE TRAINING THAT WAS

11:49AM  19    IMPLEMENTED TO ENSURE THAT PEOPLE UNDERSTOOD WHAT THEY WERE

11:49AM  20    DOING?

11:49AM  21    A.   YES.

11:49AM  22    Q.   AND UNDERSTOOD THEIR JOBS AND HOW THE LAB TECHNOLOGY

11:49AM  23    WORKED; RIGHT?

11:49AM  24    A.   YES.

11:49AM  25    Q.   THERE WAS -- WE TALKED ABOUT THERE WAS A NEW OPERATIONAL

DAS CROSS BY MR. WADE (RES.)                                        5986

11:49AM   1      STRUCTURE WHERE YOU REPORTED DIRECTLY TO THE CEO; CORRECT?

11:49AM   2      A.   YES.

11:49AM   3      Q.   AND THE COMPANY ALSO IMPLEMENTED SOME ENHANCED AUDIT

11:49AM   4      PROCEDURES.

11:49AM   5           DO YOU RECALL THAT?

11:50AM   6      A.   YES.

11:50AM   7      Q.   AND THEY ALSO IMPLEMENTED A NEW QUALITY MONITORING AND

11:50AM   8      PROCESSING PROGRAM.

11:50AM   9           DO YOU RECALL THAT?

11:50AM  10      A.   YES.

11:50AM  11      Q.   AND ALL OF THESE THINGS ARE UNDER YOUR LEADERSHIP; IS THAT

11:50AM  12      RIGHT?

11:50AM  13      A.   YES.

11:50AM  14      Q.   AND THEY WERE WITH THE SUPPORT OF MS. HOLMES; CORRECT?

11:50AM  15      A.   YES.

11:50AM  16      Q.   DO YOU RECALL THERE WAS ALSO SOME EFFORTS MADE TO DO WHAT

11:50AM  17      ARE CALLED TRACER AUDITS?

11:50AM  18      A.   YES.

11:50AM  19      Q.   AND WHAT IS A TRACER AUDIT?

11:50AM  20      A.   BASICALLY IT IS A PERIODIC AUDITING BACK OF A SAMPLE ALL

11:50AM  21      OF THE WAY THROUGH THE LABORATORY PROCESS TO MAKE SURE ALL OF

11:50AM  22      THE PROCEDURES WERE FOLLOWED.

11:50AM  23      Q.   OKAY.  SO YOU FOLLOW IT THROUGH FROM CRADLE TO GRAVE, IF

11:50AM  24      YOU WILL?

11:50AM  25      A.   YES, AND VICE VERSA.

DAS CROSS BY MR. WADE (RES.)                                    5987

11:50AM   1    Q.   AND MAKE SURE THAT ALL OF THE DIFFERENT STEPS IN THE

11:50AM   2    PROCESS ARE WORKING?

11:50AM   3    A.   CORRECT.

11:50AM   4    Q.   OKAY.  AND WAS THAT SOMETHING THAT YOU IMPLEMENTED AT

11:50AM   5    THERANOS?

11:50AM   6    A.   YES.

11:50AM   7    Q.   OKAY.  AND, OF COURSE, YOU ALSO WORKED TO TRY TO GET THOSE

11:51AM   8    CORRECTED LABORATORY REPORTS OUT AS WELL.

11:51AM   9         DO YOU RECALL THAT?

11:51AM   10   A.   YES.

11:51AM   11   Q.   AND THAT WAS PART OF WHAT YOU WORKED ON AT THERANOS;

11:51AM   12   RIGHT?

11:51AM   13   A.   YES.

11:51AM   14   Q.   OKAY.  AND DO YOU -- ONE OF THE THINGS, WE TALKED A LITTLE

11:51AM   15   BIT ABOUT HOW YOU WERE LOOKING AT SOME OF THE ADVIA 1800

11:51AM   16   ASSAYS.

11:51AM   17        DO YOU RECALL THAT?

11:51AM   18   A.   YES.

11:51AM   19   Q.   AND DO YOU RECALL COMING TO THE CONCLUSION WITH RESPECT TO

11:51AM   20   GETTING YOURSELF COMFORTABLE WITH RESPECT TO SOME OF THOSE

11:51AM   21   ASSAYS AND THEIR VALIDATION AND COMMUNICATING THAT TO CMS?

11:51AM   22   A.   YES.

11:51AM   23   Q.   AND SPECIFICALLY RELATING TO AN ASSAY ALT?

11:52AM   24   A.   YES.

11:52AM   25   Q.   AND WHAT IS THAT?

DAS CROSS BY MR. WADE (RES.)                                    5988

11:52AM  1      A.   THAT STANDS FOR ALANINE AMINOTRANSFERASE.

11:52AM  2      Q.   I'M GLAD YOU SAID THAT AND NOT ME.

11:52AM  3           AND HOW ABOUT BUN?

11:52AM  4      A.   YES.

11:52AM  5      Q.   AND WHAT IS THAT?

11:52AM  6      A.   THAT STANDS FOR BLOOD UREA NITROGEN.

11:52AM  7      Q.   OKAY.  AND IN ADDITION TO THAT, ALSO CALCIUM, GLUCOSE, AND

11:52AM  8      SODIUM; IS THAT RIGHT?

11:52AM  9      A.   YES.

11:52AM 10      Q.   AND YOUR ANALYSIS GAVE YOU COMFORT IN CONNECTION WITH

11:52AM 11      THOSE ASSAYS; CORRECT?

11:52AM 12      A.   YES, AT THAT POINT IN TIME.

11:52AM 13      Q.   LET ME DRAW YOUR ATTENTION TO 10629.

11:53AM 14           AND DO YOU RECALL -- I THINK YOU TALKED ABOUT THE COMPANY

11:53AM 15      WAS RECEIVING IN THIS TIME PERIOD A FAIR AMOUNT OF MEDIA

11:53AM 16      SCRUTINY.

11:53AM 17           DO YOU RECALL THAT?

11:53AM 18      A.   YES.

11:53AM 19      Q.   AND FROM TIME TO TIME, THE COMPANY WOULD BE ASKED TO MAKE

11:53AM 20      STATEMENTS TO MEDIA OUTLETS.

11:53AM 21           DO YOU RECALL THAT?

11:53AM 22      A.   YES.

11:53AM 23      Q.   AND IN CONNECTION WITH THAT, YOU WOULD SOMETIMES BE ASKED

11:53AM 24      TO REVIEW A COMMENT.

11:54AM 25           DO YOU RECALL THAT?

DAS CROSS BY MR. WADE (RES.)                                        5989

| | | |
|---|---|---|
| 11:54AM | 1 | A.   YES. |
| 11:54AM | 2 | Q.   AND IS 10629 ONE OF THOSE OCCASIONS WHERE YOU WERE ASKED |
| 11:54AM | 3 | TO REVIEW A COMMENT? |
| 11:54AM | 4 | A.   YES. |
| 11:54AM | 5 | MR. WADE:  OKAY.  MOVE TO ADMIT 10629. |
| 11:54AM | 6 | MR. LEACH:  HEARSAY, YOUR HONOR. |
| 11:54AM | 7 | THE COURT:  ARE YOU OFFERING IT FOR THE TRUTH OF |
| 11:54AM | 8 | WHAT WAS SAID IN THE STATEMENT? |
| 11:54AM | 9 | MR. WADE:  NO, I AM NOT. |
| 11:54AM | 10 | THE COURT:  WHAT IS THE RELEVANCE? |
| 11:54AM | 11 | MR. WADE:  THE RELEVANCE IS THAT THERE WAS A |
| 11:54AM | 12 | STATEMENT THAT THE COMPANY WAS INTENDING TO MAKE AND THE |
| 11:54AM | 13 | WITNESS WAS ASKED TO REVIEW IT, AND SO IT INFORMED MS. HOLMES'S |
| 11:54AM | 14 | STATE OF MIND AS TO THE ACCURACY OF THE STATEMENT. |
| 11:54AM | 15 | THE COURT:  CAN YOU LAY A FOUNDATION FOR THAT? |
| 11:54AM | 16 | MR. WADE:  SURE.  WHY DON'T I GO A DIFFERENT |
| 11:54AM | 17 | DIRECTION HERE? |
| 11:54AM | 18 | THE COURT:  SURE. |
| 11:54AM | 19 | MR. WADE:  I TAKE IT THE OBJECTION IS IN CONNECTION |
| 11:54AM | 20 | WITH THE TOP EMAIL? |
| 11:54AM | 21 | THE COURT:  WELL, I THINK IT'S THE ENTIRETY OF THE |
| 11:54AM | 22 | DOCUMENT, IS IT, MR. LEACH? |
| 11:55AM | 23 | MR. LEACH:  YES, YOUR HONOR. |
| 11:55AM | 24 | MR. WADE:  OKAY.  LET'S TAKE A LOOK AT 10628. |
| 11:55AM | 25 | Q.   WE TALKED ABOUT HOW THE COMPANY IN THIS PERIOD WAS BEING |

DAS CROSS BY MR. WADE (RES.)                                    5990

11:55AM   1    ASKED TO PROVIDE MEDIA COMMENTS ON, MEDIA STATEMENTS IN

11:55AM   2    CONNECTION WITH ISSUES THAT WERE ARISING.

11:55AM   3        DO YOU RECALL THAT?

11:55AM   4    A.   YES.

11:55AM   5    Q.   AND THERE WAS A TEAM OF PEOPLE WHO WORKED ON INTERACTING

11:55AM   6    WITH THE MEDIA IN THAT PERIOD; CORRECT?

11:55AM   7    A.   YES.

11:55AM   8    Q.   AND BEFORE THE COMPANY WOULD ISSUE STATEMENTS RELATING TO

11:55AM   9    YOUR AREA, THEY WOULD OFTENTIMES GO THROUGH A PROCESS WHERE

11:55AM   10   THEY WOULD RUN IT BY YOU TO MAKE SURE THAT YOU WERE COMFORTABLE

11:55AM   11   WITH THE LANGUAGE THAT WAS BEING OFFERED; RIGHT?

11:55AM   12   A.   YES.  THAT WAS NOT ALWAYS DONE, BUT FROM TIME TO TIME.

11:56AM   13   Q.   RIGHT.  AND THAT WAS, IN PART, TO ENSURE THAT, BASED UPON

11:56AM   14   YOUR AREA OF EXPERTISE, THAT YOU WERE COMFORTABLE THAT THE

11:56AM   15   STATEMENT WAS AN ACCURATE REPRESENTATION; CORRECT?

11:56AM   16   A.   I DON'T KNOW IF I COULD SPEAK TO THEIR INTENTIONS.

11:56AM   17   Q.   OKAY.  BUT YOU -- DID YOU UNDERSTAND THAT THEY WERE ASKING

11:56AM   18   FOR YOU TO CHECK THE ACCURACY OF THE STATEMENT WHEN IT WAS SENT

11:56AM   19   TO YOU?

11:56AM   20   A.   YES.

11:56AM   21   Q.   AND THE WAY IN WHICH THEY WOULD COMMUNICATE THAT TO YOU

11:56AM   22   WAS VIA EMAIL SOMETIMES?

11:56AM   23   A.   YES.

11:56AM   24   Q.   AND THAT WAS OFTENTIMES THE WAY IN WHICH THE COMPANY WOULD

11:56AM   25   GO ABOUT DOING BUSINESS ON VARIOUS MATTERS; IS THAT RIGHT?

5991
DAS CROSS BY MR. WADE (RES.)

11:56AM  1    A.   YES.

11:56AM  2    Q.   AND INCLUDING ON THESE TYPES OF ISSUES; RIGHT?

11:56AM  3    A.   YES.

11:56AM  4    Q.   AND YOU UNDERSTOOD THAT IT WAS IMPORTANT WHEN YOU WERE

11:56AM  5    DOING THIS TO TRY AND PROVIDE ACCURATE INFORMATION IN RESPONSE

11:56AM  6    TO ANY INQUIRIES THAT WERE MADE OF YOU; RIGHT?

11:56AM  7    A.   YES.

11:56AM  8    Q.   AND YOU UNDERSTOOD THAT THE COMPANY HAD A PROCESS WHEREBY

11:56AM  9    THEY WERE PRESERVING ITS ELECTRONIC INFORMATION; RIGHT?

11:57AM  10   A.   I DON'T KNOW IF I KNEW THAT AT THE TIME.

11:57AM  11   Q.   OKAY.  BUT YOU UNDERSTOOD THAT THE EMAILS WERE PART OF THE

11:57AM  12   BOOKS AND RECORDS OF THE COMPANY?

11:57AM  13   A.   YES.

11:57AM  14   Q.   AND THAT THEY WERE PART OF THE WAY IN WHICH THE COMPANY

11:57AM  15   OPERATED FROM A BUSINESS ON A VARIETY OF DIFFERENT ISSUES?

11:57AM  16   A.   YES.

11:57AM  17          MR. WADE:  OFFER 10628.

11:57AM  18          MR. LEACH:  NO OBJECTION TO 10628, YOUR HONOR.

11:57AM  19          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:57AM  20       (DEFENDANT'S EXHIBIT 10628 WAS RECEIVED IN EVIDENCE.)

11:57AM  21   BY MR. WADE:

11:57AM  22   Q.   OKAY.  AND IF YOU LOOK ON THE BOTTOM, DO YOU SEE

11:57AM  23   MR. BALWANI WAS SENDING YOU A STATEMENT THAT WAS MADE AND

11:57AM  24   ASKING YOU TO REVIEW IT AND MAKE SURE THAT IT WAS REASONABLE.

11:57AM  25          DO YOU SEE THAT?

5992
DAS CROSS BY MR. WADE (RES.)

11:57AM  1    A.   YES.

11:57AM  2    Q.   AND ON OTHER OCCASIONS MS. HOLMES ASKED YOU TO PERFORM

11:58AM  3    EXACTLY THE SAME KIND OF REVIEW; IS THAT RIGHT?

11:58AM  4    A.   YES.

11:58AM  5    Q.   AND YOU UNDERSTOOD THAT WHEN SHE DID THAT, IT WAS TO GET

11:58AM  6    YOUR VIEW AS TO WHETHER OR NOT THE STATEMENT WAS ACCURATE;

11:58AM  7    RIGHT?

11:58AM  8    A.   YES.

11:58AM  9    Q.   OKAY.  AND LET'S JUST LOOK AT THE STATEMENT THAT IS

11:58AM  10   PROVIDED HERE.

11:58AM  11       THIS SAYS, "CMS SURVEYS EVALUATE LAB PRACTICES.  THE

11:58AM  12   DEFICIENCIES CITED REFER TO HOW CERTAIN THERANOS TECHNOLOGIES

11:58AM  13   WERE USED AND NOT TO THE FUNDAMENTAL INTEGRITY OF THE

11:58AM  14   TECHNOLOGIES THEMSELVES.  THE COMPANY'S PROPRIETARY

11:58AM  15   TECHNOLOGIES HAVE ALWAYS BEEN CLEARED FOR TESTING HSV-1 BY THE

11:58AM  16   FDA.  SEPARATELY, THE MAJORITY OF THE CMS DEFICIENCIES WERE NOT

11:58AM  17   RELATED TO THERANOS PROPRIETARY TECHNOLOGIES."

11:58AM  18       DO YOU SEE THAT?

11:58AM  19   A.   I DO.

11:59AM  20   Q.   IF WE JUST LOOK AT YOUR RESPONSE.  YOU BELIEVED AT THE

11:59AM  21   TIME THAT IT WAS A TRUE AND ACCURATE STATEMENT; IS THAT

11:59AM  22   CORRECT?

11:59AM  23   A.   THAT'S CORRECT.

11:59AM  24   Q.   AND AGAIN, ON OTHER OCCASIONS MS. HOLMES ASKED YOU TO

11:59AM  25   PERFORM EXACTLY THAT KIND OF REVIEW; RIGHT?

DAS CROSS BY MR. WADE (RES.)                                    5993

| | | |
|---|---|---|
| 11:59AM | 1 | A.  I DON'T RECALL THE SPECIFIC OCCASIONS. |
| 11:59AM | 2 | Q.  OKAY.  WELL, LET'S LOOK AT 10629. |
| 11:59AM | 3 | A.  OKAY. |
| 11:59AM | 4 | Q.  DOES THIS REFRESH YOUR RECOLLECTION OF MS. HOLMES ASKING |
| 11:59AM | 5 | YOU TO PERFORM A REVIEW OF A STATEMENT THAT WAS GOING TO BE |
| 11:59AM | 6 | PROVIDED TO MAKE SURE THAT IT WAS ACCURATE? |
| 11:59AM | 7 | A.  YES. |
| 11:59AM | 8 | Q.  AND THIS IS IN THE -- YOU RECALL HER DOING THAT IN LATE |
| 11:59AM | 9 | MARCH OF 2016? |
| 11:59AM | 10 | A.  YES, IT APPEARS SO. |
| 12:00PM | 11 | Q.  OKAY.  I'D LIKE TO TALK A LITTLE MORE ABOUT SOME OTHER |
| 12:00PM | 12 | REFORMS THAT YOU WERE WORKING ON WITHIN THE LAB DURING YOUR |
| 12:00PM | 13 | TENURE AT THERANOS. |
| 12:00PM | 14 | IF WE CAN GO TO 13333.  THAT'S ONE 1, FOUR 3'S. |
| 12:00PM | 15 | A.  YES. |
| 12:00PM | 16 | Q.  DO YOU RECALL THAT THERE WERE SOME ISSUES THAT AROSE IN |
| 12:01PM | 17 | CONNECTION WITH -- OR ISSUES THAT YOU DISCOVERED IN CONNECTION |
| 12:01PM | 18 | WITH REVIEWING THE WORK OF THE BUGS LAB? |
| 12:01PM | 19 | A.  YES. |
| 12:01PM | 20 | Q.  AND FOR THE BENEFIT OF THE JURY, WHAT IS THE BUGS LAB? |
| 12:01PM | 21 | A.  IT WAS OUR CODE NAME FOR THE MICROBIOLOGY LAB IN NEWARK. |
| 12:01PM | 22 | Q.  OKAY.  AND JUST GIVE US A SENSE OF WHAT THE MICROBIOLOGY |
| 12:01PM | 23 | LAB WAS AND HOW IT DIFFERED FROM OTHER LABS. |
| 12:01PM | 24 | A.  IT DIFFERED BY THE TYPE OF TESTING.  SO THIS TYPE OF |
| 12:01PM | 25 | LABORATORY IS INVOLVED IN IDENTIFYING INFECTIOUS ORGANISMS. |

DAS CROSS BY MR. WADE (RES.)                                    5994

12:01PM   1      Q.   OKAY.  AND DOES THIS EMAIL RELATE TO, DOES THIS EMAIL

12:01PM   2    RELATE TO CONCERNS THAT YOU DISCOVERED OR ISSUES YOU DISCOVERED

12:01PM   3    IN CONNECTION WITH YOUR WORK AS LAB DIRECTOR?

12:02PM   4      A.   YES.

12:02PM   5              MR. WADE:  MOVE THE ADMISSION OF 13333.

12:02PM   6              MR. LEACH:  YOUR HONOR, I DON'T OBJECT TO THE BOTTOM

12:02PM   7    PORTION OF THE EMAIL.

12:02PM   8          THE TOP PORTION IS HEARSAY.

12:02PM   9          (PAUSE IN PROCEEDINGS.)

12:02PM   10             MR. WADE:  I OFFER IT FOR THE STATE OF MIND OF

12:02PM   11   MS. HOLMES, NOT FOR THE TRUTH.

12:02PM   12             THE COURT:  AS TO WHAT ISSUE?  AS TO WHAT ISSUE?

12:02PM   13             MR. WADE:  AS TO THE REMEDIAL EFFORTS THAT WERE

12:02PM   14   BEING MADE WITHIN THE LAB.

12:02PM   15             MR. LEACH:  IT'S AN OUT-OF-COURT STATEMENT BY A

12:02PM   16   NONTESTIFYING WITNESS, YOUR HONOR.  IT WAS THE SUBJECT OF A

12:02PM   17   MOTION IN LIMINE.

12:02PM   18             THE COURT:  DO YOU HAVE ANY OBJECTION TO IT COMING

12:02PM   19   IN SOLELY FOR THE STATE OF MIND FOR REMEDIAL ISSUES AT THIS

12:03PM   20   TIME?

12:03PM   21             MR. LEACH:  YES.

12:03PM   22             THE COURT:  ALL RIGHT.  I'M GOING TO SUSTAIN THE

12:03PM   23   OBJECTION.

12:03PM   24             MR. WADE:  OKAY.  I'M GOING TO OFFER -- I CAN REDACT

12:03PM   25   THAT EMAIL.

DAS CROSS BY MR. WADE (RES.)                              5995

12:03PM   1                        THE COURT:  SURE.

12:03PM   2                        MR. WADE:  COULD I OFFER THE BOTTOM PORTION OF THE

12:03PM   3        DOCUMENT?

12:03PM   4                        THE COURT:  I THINK YOU CAN DO THAT, YES.

12:03PM   5                   (DISCUSSION OFF THE RECORD WITH THE COURT AND CLERK.)

12:03PM   6                        THE COURT:  COUNSEL?

12:03PM   7                        MR. WADE:  MAY I PUBLISH?

12:03PM   8                        THE COURT:  YES.

12:03PM   9                   (DEFENDANT'S EXHIBIT 13333, REDACTED, WAS RECEIVED IN

12:03PM   10       EVIDENCE.)

12:03PM   11       BY MR. WADE:

12:03PM   12       Q.   THIS EMAIL RELATES TO THE ISSUE WE WERE JUST DISCUSSING;

12:03PM   13       IS THAT CORRECT?

12:03PM   14       A.   YES.

12:03PM   15       Q.   AND IN THIS YOU NOTE SOME GOOD NEWS LAST NIGHT REGARDING

12:04PM   16       THE CAPILLARY DATA.

12:04PM   17            DO YOU SEE THAT?

12:04PM   18       A.   YES.

12:04PM   19       Q.   AND LET'S FOCUS ON THE BOTTOM EMAIL.  DO YOU SEE THAT THIS

12:04PM   20       IS WHAT REFERS TO THE BUGS LAB?

12:04PM   21       A.   YES.

12:04PM   22       Q.   IT SAYS -- YOU IDENTIFIED SOME CONCERNS WITHIN THAT LAB

12:04PM   23       THAT MAY JEOPARDIZE PATIENT CARE, "SO I'M BRINGING THAT ASSAY

12:04PM   24       DOWN."  AND IS THAT ASSAY REFERRING TO HIV?

12:04PM   25       A.   THAT IS.

DAS CROSS BY MR. WADE (RES.)                                              5996

| | | |
|---|---|---|
| 12:04PM | 1 | Q.   OKAY.  AND THEN YOU NOTED, "AS WELL AS ALL OTHERS IN THE |
| 12:04PM | 2 | BUGS LAB." |
| 12:04PM | 3 | CORRECT? |
| 12:04PM | 4 | A.   YES. |
| 12:04PM | 5 | Q.   "AS THERE'S NO REASON TO GO ASSAY BY ASSAY IN OUR LOOK |
| 12:04PM | 6 | BACK AFTER UNCOVERING SUCH ISSUES." |
| 12:04PM | 7 | RIGHT? |
| 12:04PM | 8 | A.   YES. |
| 12:04PM | 9 | Q.   AND IS THAT FAIR TO SAY, THAT YOU WERE EFFECTIVELY |
| 12:04PM | 10 | SHUTTING DOWN THE BUGS LAB? |
| 12:04PM | 11 | A.   YES. |
| 12:04PM | 12 | Q.   AND THAT'S BECAUSE, AS YOU WERE TURNING OVER THOSE ROCKS, |
| 12:04PM | 13 | YOU CAME TO THE VIEW THAT THAT'S WHAT NEEDED TO BE DONE HERE; |
| 12:05PM | 14 | RIGHT? |
| 12:05PM | 15 | A.   YES. |
| 12:05PM | 16 | Q.   AND WAS MS. HOLMES FULLY SUPPORTIVE OF YOUR DECISION TO DO |
| 12:05PM | 17 | THAT? |
| 12:05PM | 18 | A.   YES. |
| 12:05PM | 19 | Q.   WAS TURNING OVER THOSE ROCKS AND FINDING THOSE ISSUES |
| 12:05PM | 20 | EXACTLY WHAT SHE WANTED YOU TO DO WHEN SHE HIRED YOU? |
| 12:05PM | 21 | MR. LEACH:  OBJECTION.  FOUNDATION. |
| 12:05PM | 22 | BY MR. WADE: |
| 12:05PM | 23 | Q.   DID YOU UNDERSTAND -- |
| 12:05PM | 24 | THE COURT:  THIS IS A NEW QUESTION? |
| 12:05PM | 25 | MR. WADE:  YEAH.  I'LL WITHDRAW THE QUESTION. |

DAS CROSS BY MR. WADE (RES.)                                    5997

12:05PM   1    Q.   DID YOU UNDERSTAND THAT THIS WAS EXACTLY THE KIND OF WORK

12:05PM   2    AND DISCOVERY THAT MS. HOLMES WAS ASKING YOU TO DO?

12:05PM   3    A.   YES.

12:05PM   4    Q.   OKAY.  LET'S GO TO 10668.

12:06PM   5    A.   OKAY.

12:06PM   6    Q.   AND DO YOU RECALL EARLIER WE TALKED ABOUT EFFORTS THAT YOU

12:06PM   7    WERE MAKING TO ENSURE THAT LABORATORY PERSONNEL WERE QUALIFIED

12:06PM   8    AND UP TO THE JOB?

12:06PM   9    A.   YES.

12:06PM   10   Q.   AND THAT WAS SOMETHING THAT WAS IMPORTANT TO YOU?

12:06PM   11   A.   YES.

12:06PM   12   Q.   AND IS THIS EMAIL CHAIN AN EMAIL IN WHICH YOU WERE

12:06PM   13   COMMUNICATING WITH A TEAM AT THERANOS ABOUT MAKING THOSE

12:06PM   14   ASSESSMENTS AND TAKING NECESSARY ACTIONS?

12:06PM   15   A.   YES.

12:06PM   16              MR. WADE:  OFFER 10668.

12:07PM   17              MR. LEACH:  HEARSAY, YOUR HONOR, TO THE BOTTOM

12:07PM   18   PORTION OF PAGE 1.

12:07PM   19              THE COURT:  SHOULD THAT BE REDACTED?

12:07PM   20              MR. WADE:  SURE.

12:07PM   21              THE COURT:  THE OBJECTION IS SUSTAINED.  THAT CAN BE

12:07PM   22   REDACTED.

12:07PM   23       WHILE THAT BEING DONE, JUST GIVE ME JUST A SECOND.  THE

12:07PM   24   CSO HAS TO SPEAK SOMEONE IN THE AUDIENCE, THE GENTLEMAN WITH

12:07PM   25   THE PLAID SHIRT.  THE CSO IS GOING TO SPEAK WITH THIS GENTLEMAN

DAS CROSS BY MR. WADE (RES.)                                    5998

12:07PM   1    FOR JUST A MOMENT.

12:07PM   2              MR. WADE:  I'LL GET SOME WATER, YOUR HONOR.

12:07PM   3         (PAUSE IN PROCEEDINGS.)

12:08PM   4              THE COURT:  ALL RIGHT.  THANK YOU.

12:08PM   5              MR. WADE:  YOUR HONOR, JUST FOR THE RECORD, I

12:08PM   6    BELIEVE THE PRIOR EXHIBIT, I JUST WANT TO MAKE SURE THE RECORD

12:08PM   7    IS CLEAR, I WAS MOVING ITS ADMISSION CONTINGENT UPON THE

12:08PM   8    REDACTION.

12:08PM   9              THE COURT:  CORRECT.

12:08PM   10             MR. WADE:  I UNDERSTOOD IT WAS ADMITTED.

12:08PM   11             THE COURT:  AND WE PAUSED FOR A MINUTE TO ALLOW FOR

12:08PM   12   THE REDACTIONS, AND IF IT'S ACCOMPLISHED IT CAN NOW BE

12:08PM   13   PUBLISHED.

12:08PM   14             MR. WADE:  AND SIMILARLY FOR THE PRIOR DOCUMENT.

12:08PM   15             THE COURT:  CORRECT.

12:08PM   16             MR. WADE:  AND SIMILARLY FOR 10668, I WILL OFFER IT

12:08PM   17   WITH THE BOTTOM PORTION TO WHICH MR. LEACH OBJECTED REDACTED.

12:08PM   18   FOR THE TIME BEING I WON'T PUBLISH IT TO THE JURY.

12:08PM   19             THE COURT:  OKAY.  THAT'S FINE.  THANK YOU.

12:08PM   20        (DEFENDANT'S EXHIBIT 10668, REDACTED, WAS RECEIVED IN

12:08PM   21   EVIDENCE.)

12:08PM   22   BY MR. WADE:

12:08PM   23   Q.   BEFORE I PUBLISH THAT DOCUMENT, I MEANT TO ASK YOU ONE

12:08PM   24   MORE QUESTION ABOUT THE HIV TEST IN THE BUGS LAB.

12:08PM   25   A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    5999

| | | |
|---|---|---|
| 12:08PM | 1 | Q.   THAT WAS AN FDA APPROVED TEST THAT YOU WERE LOOKING AT; |
| 12:09PM | 2 | CORRECT? |
| 12:09PM | 3 | A.   CORRECT. |
| 12:09PM | 4 | Q.   AND THAT WASN'T A THERANOS TECHNOLOGY ISSUE; RIGHT? |
| 12:09PM | 5 | A.   CORRECT. |
| 12:09PM | 6 | Q.   AND SIMILARLY, YOU'VE BEEN ASKED SOME QUESTIONS IN DIRECT |
| 12:09PM | 7 | EXAMINATION ABOUT PT INR. |
| 12:09PM | 8 | DO YOU RECALL THAT? |
| 12:09PM | 9 | A.   YES. |
| 12:09PM | 10 | Q.   AND THAT WAS AN ISSUE THAT CAME UP WITH CMS; CORRECT? |
| 12:09PM | 11 | A.   YES. |
| 12:09PM | 12 | Q.   AND THAT WAS AN FDA APPROVED DEVICE; CORRECT? |
| 12:09PM | 13 | A.   YES. |
| 12:09PM | 14 | Q.   AND THAT -- BY THAT I MEAN THE ASSAY THAT HAD ISSUES THAT |
| 12:09PM | 15 | AROSE WAS BEING RUN ON AN FDA APPROVED DEVICE? |
| 12:09PM | 16 | A.   YES. |
| 12:09PM | 17 | Q.   OKAY.  THAT WAS NOT THERANOS TECHNOLOGY; CORRECT? |
| 12:09PM | 18 | A.   CORRECT. |
| 12:09PM | 19 | Q.   OKAY.  TURNING BACK TO 10668, WHICH WE WILL PUBLISH IN |
| 12:09PM | 20 | REDACTED FORM, IF WE CAN GO TO THE LAST EMAIL. |
| 12:10PM | 21 | AND THIS IS AN EMAIL FROM TRACY MASSON IN APRIL OF 2016. |
| 12:10PM | 22 | DO YOU SEE THAT? |
| 12:10PM | 23 | A.   YES. |
| 12:10PM | 24 | Q.   DO YOU RECALL THAT TRACY MASSON WAS SORT OF A MANAGEMENT |
| 12:10PM | 25 | PERSON WHO WAS BROUGHT IN TO HELP IMPROVE OPERATIONS WITHIN THE |

DAS CROSS BY MR. WADE (RES.)                                      6000

12:10PM   1    LAB?

12:10PM   2    A.   YES.

12:10PM   3    Q.   SHE WASN'T A SPECIFIC TECHNICAL LAB PERSON; CORRECT?

12:10PM   4    A.   THAT'S CORRECT.

12:10PM   5    Q.   SHE WAS MORE OF AN OPERATIONS OR MANAGEMENT PERSON WHO WAS

12:10PM   6    HELPING OUT?

12:10PM   7    A.   YES.

12:10PM   8    Q.   AND DID YOU CONSIDER HER TO BE A GOOD EMPLOYEE AND

12:10PM   9    COMPETENT?

12:10PM  10    A.   YES.

12:10PM  11    Q.   AND AS PART OF THAT EFFORT, SHE WAS WORKING WITH YOU AND

12:10PM  12    OTHERS TO TRY TO MAKE SURE THAT THE RIGHT TEAM WAS IN PLACE; IS

12:11PM  13    THAT RIGHT?

12:11PM  14    A.   YES.

12:11PM  15    Q.   AND THIS EMAIL TALKS ABOUT, THIS EMAIL TALKS ABOUT HOW

12:11PM  16    THERE HAVE BEEN SOME ASSESSMENTS OF EMPLOYEES AND SOME

12:11PM  17    RECOMMENDATIONS AS TO WHO SHOULD BE KEPT AND WHO SHOULDN'T BE

12:11PM  18    KEPT; RIGHT?

12:11PM  19    A.   YES.

12:11PM  20    Q.   AND WHETHER THEY WERE A BENEFIT TO THE DEPARTMENT OR NOT A

12:11PM  21    BENEFIT TO THE DEPARTMENT?

12:11PM  22    A.   YES.

12:11PM  23    Q.   OKAY.  I'M NOT GOING TO PUBLISH THAT PART OF THE EXHIBIT

12:11PM  24    FOR CONFIDENTIALITY REASONS, BUT I WANT TO FOCUS ON YOUR

12:11PM  25    RESPONSE UP THE CHAIN.

DAS CROSS BY MR. WADE (RES.)

12:11PM   1          YOU THANK HER FOR THIS WORK AND YOU NOTE THAT YOU TRUST

12:12PM   2     THE INPUT OF JEN.

12:12PM   3          AND JEN THERE IS JEN TRICK?

12:12PM   4     A.   YES.

12:12PM   5     Q.   AND WHO IS JEN TRICK?

12:12PM   6     A.   JEN TRICK WAS ONE OF THE LABORATORY MANAGERS.

12:12PM   7     Q.   OKAY.  AND WAS SHE SOMEONE NEW WHO WAS BROUGHT IN AS WELL?

12:12PM   8     A.   AS OF APRIL 2016?  I DON'T RECALL THE EXACT TIMELINES.

12:12PM   9     Q.   OKAY.  BUT WAS SHE SOMEONE WHO WAS BROUGHT IN AS PART OF

12:12PM  10     THE EFFORT TO BRING NEW PERSONNEL IN AND IMPROVE THE LAB?

12:12PM  11     A.   YES.

12:12PM  12     Q.   OKAY.  AND YOU THOUGHT HER TO BE A -- YOU RESPECTED HER

12:12PM  13     OPINION?

12:12PM  14     A.   YES.

12:12PM  15     Q.   OKAY.  AND I WANT TO FOCUS ON THE NEXT EMAIL UP THE CHAIN.

12:12PM  16          I WANT TO ASK, BEFORE WE PUBLISH THAT, IF THE COURT OR

12:12PM  17     COUNSEL HAS A PREFERENCE AS TO WHETHER I REDACT -- MAY I CONFER

12:12PM  18     WITH MR. LEACH?

12:12PM  19               THE COURT:  YES.  GO RIGHT AHEAD.  PLEASE.

12:12PM  20          (DISCUSSION AMONGST GOVERNMENT AND DEFENSE COUNSEL OFF THE

12:13PM  21     RECORD.)

12:13PM  22               MR. WADE:  THANK YOU, YOUR HONOR.

12:13PM  23          WE'RE JUST GOING TO TAKE A MOMENT AND REDACT, HAVING

12:13PM  24     CONFERRED WITH COUNSEL, THE NAME OF AN INDIVIDUAL FOR

12:13PM  25     CONFIDENTIALITY PURPOSES.

DAS CROSS BY MR. WADE (RES.)                                    6002

12:14PM   1          OKAY.  WE HAVE THE REDACTED DOCUMENT UP, WHICH I MOVE THE

12:14PM   2     ADMISSION OF THIS REDACTED VERSION.

12:14PM   3               THE CLERK:  WHAT IS THE EXHIBIT NUMBER?

12:14PM   4               THE COURT:  THE OBJECTION, MR. LEACH?  THERE'S NO

12:14PM   5     OBJECTION TO THIS.

12:14PM   6               MR. LEACH:  NO OBJECTION.

12:14PM   7               MR. WADE:  MOVE THE ADMISSION OF 10668 AS REDACTED.

12:14PM   8               THE COURT:  AS REDACTED, IT'S ADMITTED, AND IT MAY

12:14PM   9     BE PUBLISHED, YES.

12:14PM  10          (DEFENDANT'S EXHIBIT 10668, REDACTED, WAS RECEIVED IN

12:14PM  11     EVIDENCE.)

12:14PM  12     BY MR. WADE:

12:14PM  13     Q.   AND DO YOU SEE HERE YOU'RE PROVIDING AN UPDATE ON SOME OF

12:14PM  14     THESE EFFORTS THAT YOU'RE DOING WITH MS. MASSON ON -- BOTH IN

12:14PM  15     THE BUGS LAB AND WITH RESPECT TO PERSONNEL?

12:14PM  16     A.   YES.

12:14PM  17     Q.   YOU NOTE FIRST THAT, WITH RESPECT TO THE BUGS LAB, THAT

12:14PM  18     THERE'S A CULTURE OVER THERE THAT NEEDS CHANGING.

12:14PM  19          DO YOU SEE THAT?

12:14PM  20     A.   YES.

12:14PM  21     Q.   AND YOU TALK ABOUT SOME WAYS IN WHICH YOU'RE GOING TO GO

12:14PM  22     ABOUT TRYING TO DO THAT; RIGHT?

12:15PM  23     A.   YES.

12:15PM  24     Q.   AND THEN LET'S FOCUS ON THE NEXT PARAGRAPH.  AND THERE IT

12:15PM  25     SAYS WITH RESPECT TO A CERTAIN INDIVIDUAL, YOU HAD MORE

DAS CROSS BY MR. WADE (RES.)                                6003

12:15PM   1    SIGNIFICANT CONCERNS, DIDN'T YOU?

12:15PM   2    A.   YES.

12:15PM   3    Q.   YOU HAD CONCERNS ABOUT INCOMPETENCE AND DISHONESTY; RIGHT?

12:15PM   4    A.   YES.

12:15PM   5    Q.   AND YOU WERE UNWILLING TO TOLERATE THAT; IS THAT RIGHT?

12:15PM   6    A.   YES.

12:15PM   7    Q.   AND SO YOU --

12:15PM   8    A.   THE DISHONESTY PART.

12:15PM   9    Q.   RIGHT.  THE DISHONESTY WAS -- INCOMPETENCE MAYBE YOU COULD

12:15PM   10   WORK AND TRAIN TO IMPROVE THE PERSON; IS THAT FAIR?

12:15PM   11   A.   YES.

12:15PM   12   Q.   BUT SOMEONE WHO WAS DISHONEST YOU HAD NO PATIENCE FOR; IS

12:15PM   13   THAT RIGHT?

12:15PM   14   A.   YES.

12:15PM   15   Q.   AND AS A RESULT OF THAT, YOU ASKED TO HAVE THAT PERSON

12:15PM   16   REMOVED; IS THAT CORRECT?

12:15PM   17   A.   YES.

12:15PM   18   Q.   AND THAT PERSON WAS REMOVED; CORRECT?

12:15PM   19   A.   YES.

12:15PM   20   Q.   AND MS. HOLMES WAS FULLY SUPPORTIVE OF THOSE EFFORTS;

12:16PM   21   RIGHT?

12:16PM   22   A.   YES.

12:16PM   23   Q.   AND SHE KNEW IT WAS IMPORTANT THAT YOU HAD THE TEAM THAT

12:16PM   24   YOU FELT LIKE YOU NEEDED?

12:16PM   25   A.   YES.

                                                                              6004
                          DAS CROSS BY MR. WADE (RES.)

12:16PM   1    Q.    AND YOU UNDERSTOOD THAT SHE WASN'T GOING TO TOLERATE ANY

12:16PM   2    INTEGRITY ISSUES EITHER; CORRECT?

12:16PM   3    A.    YES.

12:16PM   4    Q.    AND LET'S GO TO THE TOP EMAIL ON PAGE 1.

12:16PM   5          AND YOU THANKED HER FOR THE SUPPORT ON THAT; RIGHT?

12:16PM   6    A.    YES.

12:16PM   7    Q.    BUT IN REALITY, THIS WASN'T A TOUGH CALL, WAS IT?

12:16PM   8    A.    NO.

12:16PM   9    Q.    AND YOU HAD TO TAKE ACTIONS ONCE YOU HAD THOSE KINDS OF

12:16PM   10   CONCERNS; RIGHT?

12:16PM   11   A.    YES.

12:16PM   12   Q.    LET'S GO TO 10639.

12:17PM   13         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

12:17PM   14   A.    I DO.

12:17PM   15   Q.    AND THIS IS, THIS IS A DOCUMENT WHERE YOU JUST ARE

12:17PM   16   PROVIDING AN UPDATE TO MS. HOLMES ON REPORTING STRUCTURES AND

12:17PM   17   SOME WORK YOU WERE DOING WITHIN THE LAB; CORRECT?

12:17PM   18   A.    YES.

12:17PM   19              MR. WADE:  MOVE THE ADMISSION OF 10639.

12:17PM   20              MR. LEACH:  NO OBJECTION.

12:17PM   21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:17PM   22        (DEFENDANT'S EXHIBIT 10639 WAS RECEIVED IN EVIDENCE.)

12:17PM   23   BY MR. WADE:

12:17PM   24   Q.    AND I DON'T NEED TO SPEND A LOT OF TIME ON THIS, BUT YOU

12:17PM   25   WERE WORKING ON REVAMPING THE REPORTING STRUCTURE AND THE

DAS CROSS BY MR. WADE (RES.)                                        6005

| 12:17PM | 1 | ORGANIZATIONAL STRUCTURE IN THE LAB; RIGHT? |

12:17PM  1    ORGANIZATIONAL STRUCTURE IN THE LAB; RIGHT?

12:17PM  2    A.   YES.

12:17PM  3    Q.   AND YOU WERE GIVING MS. HOLMES AN UPDATE ON THAT; RIGHT?

12:17PM  4    A.   YES.

12:17PM  5    Q.   AND SHE WAS FULLY SUPPORTIVE OF THE EFFORTS THAT YOU WERE

12:17PM  6    UNDERTAKING IN THAT REGARD; IS THAT FAIR?

12:17PM  7    A.   YES.

12:17PM  8    Q.   LET'S LOOK AT 10675.

12:18PM  9    A.   YES.

12:18PM  10   Q.   DO YOU RECALL THAT, AS PART OF THE WORK THAT YOU WERE

12:18PM  11   DOING TO IMPROVE THE LAB, THAT YOU WERE WORKING TO FIND A THIRD

12:18PM  12   PARTY WHO COULD COME IN AND DO SOME TESTING ON LABORATORY

12:19PM  13   QUALITY?

12:19PM  14   A.   IF I MAY, MR. WADE?  IF I MAY MAKE A SLIGHT CLARIFICATION

12:19PM  15   OF THAT?

12:19PM  16   Q.   SURE.

12:19PM  17   A.   WE WERE LOOKING FOR A QUALITY MANAGER --

12:19PM  18   Q.   OKAY.

12:19PM  19   A.   -- TO HIRE.

12:19PM  20   Q.   TO HIRE?

12:19PM  21   A.   YES.

12:19PM  22   Q.   AND DOES THIS EMAIL RELATE TO THAT?

12:19PM  23   A.   I BELIEVE SO.

12:19PM  24          MR. WADE:  MOVE THE ADMISSION OF 10675.

12:19PM  25          MR. LEACH:  NO OBJECTION.

DAS CROSS BY MR. WADE (RES.)                                    6006

12:19PM   1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:19PM   2              (DEFENDANT'S EXHIBIT 10675 WAS RECEIVED IN EVIDENCE.)

12:19PM   3      BY MR. WADE:

12:19PM   4      Q.  AND IF I COULD FOCUS -- DR. TSCHIRHART DRAFTED AN EMAIL

12:19PM   5      THERE.

12:19PM   6          DO YOU SEE THAT?

12:19PM   7      A.  YES.

12:19PM   8      Q.  AND IT NOTES -- DO YOU KNOW WHO MS. ABBOTT WAS?

12:20PM   9      A.  I DON'T RECALL.

12:20PM  10      Q.  AND IT WAS A CANDIDATE POTENTIALLY FOR THAT POSITION, OR

12:20PM  11      SOMEONE WHO MIGHT REFER SOMEONE?

12:20PM  12      A.  PERHAPS.

12:20PM  13      Q.  AND DO YOU RECALL BEING REFERRED BY DR. KRICKA?

12:20PM  14      A.  I DON'T RECALL THAT SPECIFICALLY.

12:20PM  15      Q.  OKAY.  BUT IN ANY EVENT, DOES THIS FAIRLY DESCRIBE THE

12:20PM  16      TYPE OF PERSON WHO YOU WERE LOOKING FOR TO COME IN AND DIG IN

12:20PM  17      ON QUALITY ISSUES?

12:20PM  18      A.  YES.

12:20PM  19      Q.  OKAY.  MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE

12:20PM  20      ARIZONA LAB.

12:20PM  21          DO YOU RECALL THAT?

12:20PM  22      A.  YES.

12:20PM  23      Q.  AND THAT WAS -- AND YOU BECAME GENERALLY FAMILIAR WITH

12:20PM  24      WHAT WAS -- THAT THERE WAS AN ARIZONA LAB; RIGHT?

12:20PM  25      A.  YES.

DAS CROSS BY MR. WADE (RES.)                                    6007

12:20PM  1      Q.   BUT YOU WEREN'T THE LABORATORY DIRECTOR OF THAT LAB?

12:21PM  2      A.   CORRECT.

12:21PM  3      Q.   AND YOU UNDERSTOOD THAT THAT LAB WAS LOCATED IN CLOSE

12:21PM  4      PROXIMITY TO THE WALGREENS LOCATIONS AT WHICH THERANOS WAS

12:21PM  5      COLLECTING SAMPLES?

12:21PM  6      A.   I DON'T RECALL THE LOCATION OF THE LAB WITH RESPECT TO

12:21PM  7      WALGREENS.  IT WAS LOCATED IN SCOTTSDALE, I BELIEVE.

12:21PM  8      Q.   IT WAS LOCATED IN SCOTTSDALE.

12:21PM  9           AND DO YOU RECALL THAT THERANOS HAD SOME WALGREENS PATIENT

12:21PM 10      SERVICE CENTERS IN THE GREATER PHOENIX AREA?

12:21PM 11      A.   YES.

12:21PM 12      Q.   OKAY.  AND THERE WERE SOME QUESTIONS ABOUT THE PROPORTION

12:21PM 13      OF TESTS THAT WERE DONE THERE.

12:21PM 14           DO YOU RECALL THAT?

12:21PM 15      A.   YES.

12:21PM 16      Q.   AND YOU DIDN'T RECALL THAT, DID YOU?

12:21PM 17      A.   NO, I DON'T BELIEVE I DID.

12:21PM 18      Q.   GENERALLY DO YOU RECALL THAT YOU WERE LOOKING -- LET ME

12:21PM 19      STRIKE THAT AND START OVER.

12:21PM 20           AS PART OF YOUR WORK, YOU WERE LOOKING BACK OVER A RANGE

12:21PM 21      OF TESTS AT THERANOS; CORRECT?

12:22PM 22      A.   YES.

12:22PM 23      Q.   AND DO YOU RECALL THAT IN THE TIME PERIOD IT WAS OPERATING

12:22PM 24      AS A CLINICAL LABORATORY, THAT IT PERFORMED A LITTLE MORE THAN

12:22PM 25      8 MILLION TESTS?

DAS CROSS BY MR. WADE (RES.)                                    6008

12:22PM   1    A.   I DON'T RECALL THAT NUMBER SPECIFICALLY.

12:22PM   2              MR. LEACH:  I OBJECT TO THE QUESTION.  CAN WE BE

12:22PM   3    CLEAR ABOUT WHICH LAB WE'RE TALKING ABOUT?

12:22PM   4              THE COURT:  DID YOU UNDERSTAND THE QUESTION, SIR?

12:22PM   5              THE WITNESS:  I COULD USE SOME CLARIFICATION,

12:22PM   6    YOUR HONOR.

12:22PM   7              THE COURT:  OKAY.  WHY DON'T WE -- WHY DON'T YOU ASK

12:22PM   8    THE QUESTION AGAIN.

12:22PM   9              MR. WADE:  FAIR ENOUGH.

12:22PM  10    Q.   JUST TO BE CLEAR, I'M ASKING GENERALLY.  YOU DIDN'T RECALL

12:22PM  11    THE PROPORTIONS FROM ONE LAB TO THE NEXT?

12:22PM  12    A.   NO.

12:22PM  13    Q.   AND MY QUESTION WAS WHETHER YOU RECALLED THAT, IN TOTAL,

12:22PM  14    THE ENTITY PERFORMED ABOUT 8 MILLION TESTS?

12:22PM  15    A.   I DON'T RECALL THAT NUMBER SPECIFICALLY.

12:22PM  16    Q.   OKAY.  DO YOU HAVE A GENERAL RECOLLECTION?

12:22PM  17    A.   I WAS MORE FAMILIAR WITH A NUMBER IN THE RANGE OF 800-,

12:22PM  18    900,000.

12:22PM  19    Q.   THAT WAS IN THE NEWARK LAB?

12:23PM  20    A.   YES, BUT THAT'S THE NUMBER WITH WHICH I'M FAMILIAR.

12:23PM  21    Q.   UNDERSTOOD.  I JUST WANT TO MAKE SURE THAT THE RECORD IS

12:23PM  22    CLEAR.

12:23PM  23         YOU UNDERSTOOD THAT THE NEWARK LAB HAD PERFORMED ABOUT

12:23PM  24    THAT NUMBER OF TESTS ON AN ANNUAL BASIS; CORRECT?

12:23PM  25    A.   YES.

DAS CROSS BY MR. WADE (RES.)                                    6009

12:23PM  1    Q.   OKAY.  AND AS YOU SIT HERE TODAY, YOU DON'T KNOW THE TOTAL

12:23PM  2    NUMBER OF TESTS THAT THE COMPANY AS A WHOLE WAS PERFORMING AT

12:23PM  3    DIFFERENT LOCATIONS?

12:23PM  4    A.   CORRECT.

12:23PM  5    Q.   OKAY.  DO YOU RECALL THERE WAS A TIME PERIOD WHEN YOU

12:23PM  6    BEGAN DOING A LITTLE MORE WORK ON SOME R&D ISSUES AS WELL?

12:23PM  7    A.   I NEED A LITTLE BIT OF SPECIFICITY THERE AS WELL,

12:24PM  8    MR. WADE.

12:24PM  9    Q.   SURE.  THERE WERE TIMES WHERE YOUR INPUT WAS SOUGHT ON

12:24PM  10   DIFFERENT R&D MATTERS THAT THE COMPANY WAS WORKING ON; IS THAT

12:24PM  11   CORRECT?

12:24PM  12   A.   YES.

12:24PM  13   Q.   IN FACT, THERE CAME A TIME WHERE, IN ADDITION TO YOUR

12:24PM  14   OFFICE OVER AT THE NEWARK FACILITY, YOU WERE SPENDING SOME TIME

12:24PM  15   OVER AT THE PALO ALTO FACILITY AS WELL?

12:24PM  16   A.   YES.

12:24PM  17   Q.   AND THAT WAS WHERE THE R&D WORK WAS HAPPENING?

12:24PM  18   A.   PREDOMINANTLY, YES.

12:24PM  19   Q.   AND THAT WAS AN AREA THAT INTERESTED YOU; IS THAT RIGHT?

12:24PM  20   A.   YES.

12:24PM  21   Q.   AND YOU WERE ASKED TO PARTICIPATE IN DIFFERENT ASPECTS OF

12:24PM  22   THAT IN YOUR TENURE AT THE COMPANY; CORRECT?

12:24PM  23   A.   YES.

12:24PM  24   Q.   LET'S TAKE A LOOK AT 10638.

12:25PM  25   A.   OKAY.

DAS CROSS BY MR. WADE (RES.)                                    6010

12:25PM    1     Q.   AND DOES THIS EMAIL RELATE -- THIS IS AN EMAIL FROM

12:25PM    2     MAY 16TH, 2016; CORRECT?

12:25PM    3     A.   YES.

12:25PM    4     Q.   AND IT'S AN EMAIL THAT YOU SENT TO MS. HOLMES?

12:25PM    5     A.   YES.

12:25PM    6     Q.   AND IT RELATES TO SOME FEEDBACK THAT YOU WERE PROVIDING ON

12:25PM    7     SOME R&D ISSUES; IS THAT FAIR?

12:25PM    8     A.   I DON'T RECALL THE CONTEXT FOR THIS EMAIL.

12:25PM    9     Q.   DO YOU RECALL PARTICIPATING IN AN R&D CALL WHERE SOME

12:25PM   10     ISSUES WERE DISCUSSED AND YOU THOUGHT THAT YOU SHOULD PROVIDE

12:25PM   11     SOME PERSPECTIVE TO MS. HOLMES?

12:25PM   12     A.   I DON'T RECALL THAT.

12:25PM   13     Q.   OKAY.  DO YOU RECALL, IN CONNECTION WITH R&D WORK, BEING

12:26PM   14     ASKED TO PROVIDE SOME THOUGHTS IN CONNECTION WITH THE TYPES OF

12:26PM   15     STANDARDS THAT THE COMPANY SHOULD USE IN CONNECTION WITH THE

12:26PM   16     VALIDATION OF ASSAYS?

12:26PM   17     A.   YES.  VAGUELY THOUGH.

12:26PM   18     Q.   OKAY.  AND WE TALKED ABOUT THAT BEFORE IN CONNECTION WITH

12:26PM   19     SOME OF THE EDISON 3.5 ASSAYS.

12:26PM   20          DO YOU RECALL THAT?

12:26PM   21     A.   YES.

12:26PM   22     Q.   AND DO YOU RECALL THAT AS THE COMPANY WAS WORKING TO

12:26PM   23     DEVELOP ITS NEXT GENERATION DEVICE, THAT IT WANTED YOUR INPUT

12:26PM   24     ON THE RIGHT STANDARDS TO USE AS IT WAS IMPLEMENTING ITS NEXT

12:26PM   25     TECHNOLOGY?

DAS CROSS BY MR. WADE (RES.)                                    6011

| | | |
|---|---|---|
| 12:26PM | 1 | A.   I RECALL BEING CONSULTED FROM TIME TO TIME. |
| 12:26PM | 2 | Q.   OKAY. |
| 12:26PM | 3 |      MOVE THE ADMISSION OF 10638. |
| 12:26PM | 4 |           MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:26PM | 5 |           THE COURT:  IT'S ADMITTED. |
| 12:26PM | 6 |      (DEFENDANT'S EXHIBIT 10638 WAS RECEIVED IN EVIDENCE.) |
| 12:27PM | 7 | BY MR. WADE: |
| 12:27PM | 8 | Q.   AND DO YOU SEE HERE THAT THIS REFERS TO AN R&D CALL IN THE |
| 12:27PM | 9 | SUBJECT LINE? |
| 12:27PM | 10 | A.   YES. |
| 12:27PM | 11 | Q.   AND YOU REFERENCE A DISCUSSION AND YOU TALK ABOUT |
| 12:27PM | 12 | ALLOWABLE BIAS AND TOTAL ALLOWABLE ERROR FOR POTASSIUM THERE. |
| 12:27PM | 13 |      DO YOU SEE THAT? |
| 12:27PM | 14 | A.   YES. |
| 12:27PM | 15 | Q.   AND YOU SET FORTH SOME THOUGHTS AS TO WHAT APPROPRIATE |
| 12:27PM | 16 | STANDARDS MIGHT BE FOR THAT; RIGHT? |
| 12:27PM | 17 | A.   YES. |
| 12:27PM | 18 | Q.   AND YOU NOTE THERE IN THE SECOND PARAGRAPH, SECOND |
| 12:27PM | 19 | SENTENCE, THAT YOU USE CLIA AS A LAST RESORT SINCE IT'S AKIN TO |
| 12:27PM | 20 | HITTING THE BROAD SIDE OF A BARN? |
| 12:27PM | 21 | A.   YES. |
| 12:27PM | 22 | Q.   AND SO BASED ON YOUR EXPERTISE HERE, YOU WERE OF THE VIEW |
| 12:28PM | 23 | THAT YOU SHOULDN'T USE THE CLIA STANDARD AS THE BENCHMARK FOR |
| 12:28PM | 24 | TOTAL ALLOWABLE ERROR; RIGHT? |
| 12:28PM | 25 | A.   YES.  THAT WOULD BE INAPPROPRIATE. |

DAS CROSS BY MR. WADE (RES.)                                    6012

12:28PM   1    Q.   OKAY.  AND WERE YOU RELAYING THIS TO MS. HOLMES SO THAT

12:28PM   2    SHE HAD THE BENEFIT OF YOUR EXPERTISE ON THIS ISSUE?

12:28PM   3    A.   YES.

12:28PM   4    Q.   AND YOU ACTUALLY REFER TO A DIFFERENT SET OF STANDARDS

12:28PM   5    THAT COULD BE USED THERE BASED ON CALLUM FRASER'S WORK?

12:28PM   6         DO YOU SEE THAT?

12:28PM   7    A.   YES.

12:28PM   8    Q.   AND THAT WAS REFERENCED IN THE RICOS HANDBOOK, WHICH I

12:28PM   9    THINK IS AVAILABLE ON THE INTERNET AS WELL; CORRECT?

12:28PM  10    A.   YES.

12:28PM  11    Q.   AND THIS WAS AN INSTANCE WHERE YOU WERE TRYING TO GET

12:28PM  12    INVOLVED IN THE R&D THAT THE COMPANY WAS WORKING ON AND GIVE

12:28PM  13    THEM AN APPROPRIATE CLIA LENS AND STANDARD TO DEVELOP THEIR

12:29PM  14    TECHNOLOGY BASED UPON; IS THAT RIGHT?

12:29PM  15    A.   YES.

12:29PM  16    Q.   AND IN CONNECTION WITH THE DEVELOPMENT OF THAT TECHNOLOGY,

12:29PM  17    YOU'RE AWARE THAT A PRESENTATION WAS GIVEN OF THE NEXT

12:29PM  18    GENERATION DEVICE AT THE AACC CONFERENCE IN AUGUST OF 2016?

12:29PM  19    A.   YES.

12:29PM  20    Q.   AND YOU DID NOT, YOU DID NOT ATTEND THAT CONFERENCE;

12:29PM  21    CORRECT?

12:29PM  22    A.   CORRECT.

12:29PM  23    Q.   BUT YOU WATCHED THAT PRESENTATION OVER A VIDEO LINK;

12:29PM  24    RIGHT?

12:29PM  25    A.   I DID NOT VIEW THE PRESENTATION.

DAS CROSS BY MR. WADE (RES.) 6013

12:30PM 1    Q.   LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

12:30PM 2        COULD YOU LOOK AT 14160?

12:30PM 3    A.   YES.

12:30PM 4    Q.   AND IF I COULD JUST CALL YOUR ATTENTION TO THE ITEM

12:30PM 5    RELATING TO AUGUST 2ND, 2016.

12:30PM 6        DO YOU SEE THAT?  AND JUST READ THAT TO YOURSELF.

12:30PM 7    A.   YES.

12:31PM 8        (PAUSE IN PROCEEDINGS.)

12:31PM 9            THE WITNESS:  I'VE READ IT.

12:31PM 10   BY MR. WADE:

12:31PM 11   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WATCHED AT

12:31PM 12   LEAST PORTIONS OF THE AACC CONFERENCE IN YOUR OFFICE?

12:31PM 13   A.   YES.  I DON'T RECALL DOING SO, BUT IT APPEARS THAT I DID.

12:31PM 14   Q.   AND MAYBE YOU RECALL THAT IT WAS ACTUALLY RECORDED AND

12:31PM 15   AVAILABLE ONLINE?

12:31PM 16   A.   RIGHT, YES, I'M AWARE OF THAT.

12:31PM 17   Q.   AND YOU'VE SEEN PART OF THAT?

12:31PM 18   A.   YES.

12:31PM 19   Q.   AND DO YOU RECALL BEING OF THE VIEW THAT MS. HOLMES DID A

12:31PM 20   GOOD JOB IN THAT PRESENTATION?

12:31PM 21   A.   YES.

12:31PM 22   Q.   AND THAT YOU THOUGHT THAT SOME OF THE FOCUS ON THAT

12:31PM 23   PRESENTATION WAS, WAS NARROW MINDED?

12:31PM 24   A.   IT APPEARS SO.  I DON'T RECALL THAT.

12:32PM 25   Q.   OKAY.  BUT YOU WERE COMPLIMENTARY OF THE WORK THAT SHE HAD

DAS CROSS BY MR. WADE (RES.)                                    6014

12:32PM    1     DONE THERE; IS THAT RIGHT?

12:32PM    2     A.   YES.

12:32PM    3     Q.   AND DO YOU RECALL DURING THAT PRESENTATION SOME SLIDES

12:32PM    4     WERE PROJECTED?

12:32PM    5     A.   YES.

12:32PM    6     Q.   OKAY.

12:32PM    7          MAY I APPROACH, YOUR HONOR?

12:32PM    8              THE COURT:  YES.

12:33PM    9     BY MR. WADE:

12:33PM   10     Q.   (HANDING.)

12:33PM   11          HAVE YOU HAD A CHANCE TO JUST GENERALLY PERUSE THE SLIDE

12:33PM   12     PRESENTATION?

12:33PM   13     A.   IT DOES LOOK FAMILIAR.

12:33PM   14     Q.   DO YOU RECOGNIZE THIS TO BE THE SLIDES THAT WERE PRESENTED

12:33PM   15     DURING THAT PRESENTATION?

12:33PM   16     A.   THEY'RE CONSISTENT WITH MY RECOLLECTION.

12:33PM   17              MR. WADE:  MOVE THE ADMISSION OF 7673A.

12:33PM   18              MR. LEACH:  OBJECTION, YOUR HONOR.  RELEVANCE,

12:34PM   19     HEARSAY.

12:34PM   20              THE COURT:  SUSTAINED.

12:34PM   21     BY MR. WADE:

12:34PM   22     Q.   YOUR UNDERSTANDING WAS PART OF THAT PRESENTATION WAS AN

12:34PM   23     EFFORT THAT THE COMPANY WAS MAKING TO ENGAGE IN SOME SCIENTIFIC

12:34PM   24     DIALOGUE WITH THE BROADER CLINICAL LABORATORY COMMUNITY?

12:34PM   25     A.   YES.

DAS CROSS BY MR. WADE (RES.)                                6015

| | | |
|---|---|---|
| 12:34PM | 1 | Q.   AND AN EFFORT TO TRY TO BE MORE TRANSPARENT ABOUT THE |
| 12:34PM | 2 | PRODUCT THAT IT WAS DEVELOPING? |
| 12:34PM | 3 | A.   YES. |
| 12:34PM | 4 | Q.   ABOUT ITS TECHNOLOGY? |
| 12:34PM | 5 | A.   YES. |
| 12:34PM | 6 | Q.   AND WHAT IT THOUGHT ITS TECHNOLOGY COULD DO? |
| 12:34PM | 7 | DO YOU RECALL THAT? |
| 12:34PM | 8 | MR. LEACH:  OBJECTION.  FOUNDATION. |
| 12:34PM | 9 | THE COURT:  WELL, I'LL ALLOW HIM TO ANSWER THIS LAST |
| 12:34PM | 10 | QUESTION. |
| 12:34PM | 11 | DO YOU RECALL THAT, SIR? |
| 12:34PM | 12 | THE WITNESS:  I DO, YOUR HONOR. |
| 12:34PM | 13 | BY MR. WADE: |
| 12:34PM | 14 | Q.   OKAY.  AND IN ADDITION TO THAT PRESENTATION, THE COMPANY |
| 12:34PM | 15 | WAS WORKING ON PUBLICATIONS AND ENGAGING WITH OTHER MEDICAL |
| 12:35PM | 16 | INSTITUTIONS TO TRY TO INCREASE TRANSPARENCY; IS THAT RIGHT? |
| 12:35PM | 17 | A.   YES.  JUST AS A MATTER OF CLARIFICATION, I BELIEVE IT WAS |
| 12:35PM | 18 | ONE INSTITUTION THAT I WAS AWARE OF.  BUT, YES. |
| 12:35PM | 19 | Q.   AND WHAT INSTITUTION WAS THAT? |
| 12:35PM | 20 | A.   I BELIEVE IT WAS UCSF. |
| 12:35PM | 21 | Q.   IT WAS UCSF THAT THEY WERE WORKING WITH ON A STUDY? |
| 12:35PM | 22 | A.   YES. |
| 12:35PM | 23 | MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT? |
| 12:35PM | 24 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 12:35PM | 25 | BY MR. WADE: |

DAS CROSS BY MR. WADE (RES.)                              6016

| | | |
|---|---|---|
| 12:35PM | 1 | Q.   JUST A COUPLE MORE QUESTIONS FOR YOU, SIR. |
| 12:36PM | 2 | AT THE -- DO YOU RECALL ABOUT WHEN YOU LEFT, YOU STOPPED |
| 12:36PM | 3 | WORKING AT THERANOS? |
| 12:36PM | 4 | A.   THAT WOULD HAVE BEEN JUNE OF 2018, I BELIEVE. |
| 12:36PM | 5 | Q.   OKAY.  AND AT THE TIME THAT YOU LEFT THE COMPANY -- YOU |
| 12:36PM | 6 | STARTED AT THE COMPANY WITH MS. HOLMES COMMUNICATING TO HER |
| 12:36PM | 7 | ABOUT HOW IMPRESSED YOU WERE WITH THE VISION SHE HAD AND WHAT |
| 12:36PM | 8 | SHE WAS TRYING TO ACCOMPLISH; CORRECT? |
| 12:36PM | 9 | A.   YES. |
| 12:36PM | 10 | Q.   AND AT THE TIME THAT YOU LEFT THE COMPANY, DID YOU STILL |
| 12:36PM | 11 | BELIEVE IN THE MISSION AND WHAT IT HAD HOPED TO ACCOMPLISH? |
| 12:37PM | 12 | A.   YES. |
| 12:37PM | 13 | MR. WADE:  NO FURTHER QUESTIONS, YOUR HONOR. |
| 12:37PM | 14 | THE COURT:  REDIRECT? |
| 12:37PM | 15 | MR. LEACH:  YES, YOUR HONOR.  BRIEFLY. |
| 12:37PM | 16 | (PAUSE IN PROCEEDINGS.) |
| 12:37PM | 17 | THE COURT:  FOLKS, GO AHEAD AND STAND UP AND STRETCH |
| 12:37PM | 18 | IF YOU WOULD LIKE WHILE WE MAKE THE TRANSITION HERE. |
| 12:37PM | 19 | YOU, TOO, DOCTOR.  GO AHEAD AND STAND UP AND STRETCH IF |
| 12:37PM | 20 | YOU WOULD LIKE. |
| 12:37PM | 21 | THE WITNESS:  THANK YOU, YOUR HONOR. |
| 12:37PM | 22 | THE COURT:  YOU'RE WELCOME. |
| 12:37PM | 23 | (STRETCHING.) |
| 12:38PM | 24 | MR. WADE:  LET ME GET MY WATER HERE. |
| 12:38PM | 25 | MR. LEACH:  THANK YOU. |

DAS REDIRECT BY MR. LEACH                                                6017

| | | |
|---|---|---|
| 12:38PM | 1 | MAY I INQUIRE, YOUR HONOR? |
| 12:38PM | 2 | THE COURT: YES. |
| 12:38PM | 3 | MR. WADE: THANK YOU. |
| 12:38PM | 4 | **REDIRECT EXAMINATION** |
| 12:38PM | 5 | BY MR. LEACH: |
| 12:38PM | 6 | Q. GOOD AFTERNOON, DR. DAS. I JUST HAVE A FEW QUESTIONS. |
| 12:38PM | 7 | YOU WERE ASKED A NUMBER OF QUESTIONS ON CROSS-EXAMINATION |
| 12:38PM | 8 | ABOUT THERANOS'S NEXT GENERATION DEVICE. |
| 12:38PM | 9 | DO YOU RECALL QUESTIONS ALONG THOSE LINES? |
| 12:38PM | 10 | A. YES. |
| 12:38PM | 11 | Q. AND DO YOU RECALL REVIEWING A PHOTO OF THE INSIDE OF ONE |
| 12:38PM | 12 | OF THE NEXT GENERATION DEVICES? |
| 12:38PM | 13 | A. YES. |
| 12:38PM | 14 | Q. AND YOU WERE ASKED SOME QUESTIONS ABOUT A PRESENTATION AT |
| 12:38PM | 15 | AACC WHERE THERE WAS DISCUSSION ABOUT THE NEXT GENERATION |
| 12:38PM | 16 | DEVICE. |
| 12:38PM | 17 | DO YOU RECALL THAT? |
| 12:38PM | 18 | A. YES. |
| 12:38PM | 19 | Q. AND THAT NEXT GENERATION DEVICE WAS NEVER USED IN THE |
| 12:38PM | 20 | CLINICAL LAB; CORRECT? |
| 12:39PM | 21 | A. YES. |
| 12:39PM | 22 | Q. IT WAS NEVER USED TO TEST PATIENT SAMPLES IN THE LAB THAT |
| 12:39PM | 23 | YOU WERE OPERATING; RIGHT? |
| 12:39PM | 24 | A. CORRECT. |
| 12:39PM | 25 | Q. AND TO YOUR KNOWLEDGE, IT WAS NEVER USED IN THE ARIZONA |

DAS REDIRECT BY MR. LEACH                                    6018

| | | |
|---|---|---|
| 12:39PM | 1 | MODERATE COMPLEXITY LAB; IS THAT CORRECT? |
| 12:39PM | 2 | A.   CORRECT. |
| 12:39PM | 3 | Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT ACTIONS |
| 12:39PM | 4 | THAT YOU WERE TAKING AND STEPS THAT THE COMPANY WAS TAKING IN |
| 12:39PM | 5 | 2016.  AND I WANT TO MAKE SURE -- I WANT TO GO THROUGH THAT |
| 12:39PM | 6 | TIMELINE WITH YOU IF WE COULD. |
| 12:39PM | 7 | A.   SURE. |
| 12:39PM | 8 | Q.   WAS IT YOUR UNDERSTANDING THAT THERANOS FIRST OBTAINED ITS |
| 12:39PM | 9 | CLIA LICENSE IN 2011? |
| 12:39PM | 10 | A.   I DON'T HAVE RECOLLECTION OF THAT DATE. |
| 12:39PM | 11 | Q.   WELL, YOU STARTED IN 2015; IS THAT RIGHT? |
| 12:39PM | 12 | A.   YES. |
| 12:39PM | 13 | Q.   AND WHEN YOU STARTED THE LAB WASN'T NEW?  IT HAD BEEN |
| 12:39PM | 14 | OPERATING FOR YEARS BASED ON YOUR UNDERSTANDING? |
| 12:39PM | 15 | A.   YES, THAT WAS MY UNDERSTANDING. |
| 12:39PM | 16 | Q.   AND IF I COULD PLEASE DISPLAY, WITH THE COURT'S |
| 12:39PM | 17 | PERMISSION, WHAT IS IN EVIDENCE AS EXHIBIT 4528. |
| 12:40PM | 18 | THE COURT:  YES. |
| 12:40PM | 19 | MR. LEACH:  I THINK THIS IS A NATIVE DOCUMENT, |
| 12:40PM | 20 | MS. HOLLIMAN. |
| 12:40PM | 21 | IF WE CAN ZOOM IN ON THE FIRST PAGE OF THE POWERPOINT. |
| 12:40PM | 22 | Q.   DR. DAS, DO YOU SEE WHERE IT SAYS THERANOS CLIA LABORATORY |
| 12:40PM | 23 | OVERVIEW 9-22-15? |
| 12:40PM | 24 | A.   YES. |
| 12:40PM | 25 | Q.   AND I WANT TO FOCUS ON THAT DATE, SEPTEMBER 22ND, 2015. |

DAS REDIRECT BY MR. LEACH                                    6019

12:40PM   1         DID YOU HAVE AN UNDERSTANDING THAT THAT WAS THE DATE WHEN

12:40PM   2    CMS'S SURVEY BEGAN?

12:40PM   3    A.   I WASN'T AWARE OF THAT EXACT DATE.

12:40PM   4    Q.   BUT YOU KNEW IT HAD STARTED AT SOME POINT BEFORE YOU

12:40PM   5    JOINED?

12:40PM   6    A.   YES.

12:40PM   7    Q.   MS. HOLLIMAN, IF WE COULD PLEASE GO TO PAGE 8.

12:40PM   8         DO YOU SEE THE CLIA LABORATORIES ORG CHART ON THIS SLIDE,

12:40PM   9    DR. DAS?

12:40PM   10   A.   YES.

12:40PM   11   Q.   AND DO YOU SEE MS. HOLMES'S NAME AT THE TOP?

12:41PM   12   A.   YES.

12:41PM   13   Q.   OKAY.  YOU TALKED ABOUT A NUMBER OF PEOPLE ON YOUR DIRECT

12:41PM   14   EXAMINATION, ARTHUR BACA, FRANCIS YOUNG, MICHELE CARBONE,

12:41PM   15   DR. HELFEND.

12:41PM   16        ARE THOSE ALL INDIVIDUALS WHO JOINED THE COMPANY AFTER

12:41PM   17   SEPTEMBER OF 2015?

12:41PM   18   A.   YES.

12:41PM   19   Q.   AND AT SOME POINT DID YOU BECOME AWARE THAT IN OCTOBER OF

12:41PM   20   2015, THERE WAS AN ARTICLE IN "THE WALL STREET JOURNAL"

12:41PM   21   GENERALLY CRITICAL OF THERANOS?

12:41PM   22   A.   YES.

12:41PM   23   Q.   AND YOU WERE COMING ON BOARD AFTER THAT ARTICLE HAD BEEN

12:41PM   24   PUBLISHED?

12:41PM   25   A.   YES.

DAS REDIRECT BY MR. LEACH                                          6020

12:41PM   1    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 4621, WHICH

12:41PM   2    IS IN EVIDENCE.  LET'S GO TO PAGE 1.

12:41PM   3        AND IF WE COULD GO DOWN TO THE START OF THE SECOND

12:42PM   4    PARAGRAPH, MS. HOLLIMAN.

12:42PM   5        DO YOU SEE, DR. DAS, WHERE IT SAYS, "THE ON-SITE SURVEY

12:42PM   6    WAS COMPLETED ON NOVEMBER 20TH, 2015"?

12:42PM   7        DO YOU SEE THAT LANGUAGE?

12:42PM   8    A.   YES.

12:42PM   9    Q.   AND IS THAT YOUR UNDERSTANDING OF THE DATE WHEN CMS

12:42PM  10    LARGELY COMPLETED ITS SURVEY?

12:42PM  11    A.   YES.

12:42PM  12    Q.   OKAY.  DO YOU KNOW WHETHER CMS PROVIDED AN EXIT INTERVIEW

12:42PM  13    TO MS. HOLMES ON NOVEMBER 20TH, 2015?

12:42PM  14    A.   I'M NOT AWARE OF THAT.

12:42PM  15    Q.   DO YOU KNOW WHETHER CMS DESCRIBED ANY OF THE POTENTIAL

12:42PM  16    FINDINGS TO MS. HOLMES AT THE COMPLETION OF THE SURVEY IN

12:42PM  17    NOVEMBER OF 2015?

12:42PM  18    A.   NO.

12:42PM  19    Q.   YOU INTERVIEWED WITH MS. HOLMES AT SOME POINT IN DECEMBER

12:42PM  20    OF 2015?

12:42PM  21    A.   YES.

12:42PM  22    Q.   AND DID SHE BRING UP THE CMS INSPECTION AT THAT POINT?

12:42PM  23    A.   NO.

12:42PM  24    Q.   DID SHE MENTION ANYTHING ABOUT THE POSSIBILITY OF SOME

12:42PM  25    FORM OF STATEMENT OF DEFICIENCIES?

DAS REDIRECT BY MR. LEACH                                                6021

| | | |
|---|---|---|
| 12:42PM | 1 | A.   NO. |
| 12:42PM | 2 | Q.   AND YOU DON'T LEARN ABOUT THAT UNTIL YOU COME ON BOARD AT |
| 12:43PM | 3 | SOME POINT IN JANUARY OR FEBRUARY; IS THAT FAIR? |
| 12:43PM | 4 | A.   I CAN'T REMEMBER THE EXACT DATE. |
| 12:43PM | 5 | Q.   OKAY.  THAT'S SOMETHING THAT YOU LEARNED OF AFTER YOU |
| 12:43PM | 6 | JOINED THE COMPANY? |
| 12:43PM | 7 | A.   YES. |
| 12:43PM | 8 | Q.   THANK YOU, MS. HOLLIMAN.  WE CAN TAKE THAT DOWN. |
| 12:43PM | 9 | YOU WERE ASKED A COUPLE OF QUESTIONS ON CROSS-EXAMINATION |
| 12:43PM | 10 | ABOUT OWNERS AND OPERATORS OF CLIA LABS. |
| 12:43PM | 11 | I WANT TO UNDERSTAND YOUR POSITION WITHIN THE THERANOS |
| 12:43PM | 12 | HIERARCHY. |
| 12:43PM | 13 | YOU REPORTED TO MS. HOLMES? |
| 12:43PM | 14 | A.   YES. |
| 12:43PM | 15 | Q.   AND SO SHE'S THE ONE WHO HIRED YOU? |
| 12:43PM | 16 | A.   YES. |
| 12:43PM | 17 | Q.   AND SHE IN THEORY COULD FIRE YOU AT ANY POINT?  WAS THAT |
| 12:43PM | 18 | YOUR UNDERSTANDING? |
| 12:43PM | 19 | A.   YES. |
| 12:43PM | 20 | Q.   IF SHE DIDN'T LIKE THE JOB YOU WERE DOING, SHE COULD FIRE |
| 12:43PM | 21 | YOU, JUST LIKE ANY EMPLOYEE AT ANY OTHER COMPANY? |
| 12:43PM | 22 | A.   YES. |
| 12:43PM | 23 | Q.   AND IF YOU NEEDED RESOURCES FOR YOUR CLIA LAB, WHO WOULD |
| 12:43PM | 24 | YOU GO TO? |
| 12:43PM | 25 | A.   I WOULD GO TO MS. HOLMES. |

DAS REDIRECT BY MR. LEACH                                    6022

12:44PM  1     Q.  WHY WOULD YOU GO TO HER?

12:44PM  2     A.  SHE WOULD HAVE CONTROL OVER THE RESOURCES.

12:44PM  3     Q.  RESOURCES YOU WOULD NEED TO GET YOUR JOB DONE?

12:44PM  4     A.  YES.

12:44PM  5     Q.  YOU WERE ALSO ASKED SOME QUESTIONS ABOUT A MOCK AUDIT AT

12:44PM  6     SOME POINT IN ADVANCE OF SEPTEMBER 2015.

12:44PM  7         DO YOU RECALL THOSE QUESTIONS?

12:44PM  8     A.  YES, I DO.

12:44PM  9     Q.  AND DO YOU RECALL THE NAME JERRY HURST BEING MENTIONED?

12:44PM  10    A.  YES.

12:44PM  11    Q.  HAVE YOU EVER MET MR. HURST?

12:44PM  12    A.  NO.

12:44PM  13    Q.  DO YOU HAVE ANY IDEA WHAT WAS DONE IN THAT AUDIT?

12:44PM  14    A.  NO.

12:44PM  15    Q.  DO YOU KNOW WHETHER MR. HURST LOOKED AT AN EDISON DEVICE?

12:44PM  16    A.  NO.

12:44PM  17    Q.  DO YOU KNOW WHETHER HE WAS SHOWN ANY DATA FROM AN EDISON

12:44PM  18    DEVICE?

12:44PM  19    A.  NO.

12:44PM  20    Q.  DO YOU KNOW WHETHER HE WAS SHOWN ANY DATA FROM TESTING ON

12:44PM  21    MODIFIED THIRD PARTY DEVICES?

12:44PM  22    A.  NO.

12:44PM  23    Q.  DO YOU KNOW WHETHER HE SAW A MODIFIED SIEMENS MACHINE?

12:44PM  24    A.  NO.

12:44PM  25             MR. WADE:  YOUR HONOR, FOUNDATION.  I THINK WE'VE --

DAS REDIRECT BY MR. LEACH                                              6023

12:44PM    1    HE SAID HE DOESN'T KNOW WHAT HAPPENED AND --

12:45PM    2                    THE COURT:  WELL, I'LL ALLOW IT.  I THINK YOU'RE

12:45PM    3    ABOUT DONE WITH THIS.

12:45PM    4                    MR. LEACH:  I'M ABOUT DONE, YOUR HONOR.  THANK YOU.

12:45PM    5    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT SOME OF THE

12:45PM    6    QUALITY CONTROL DATA THAT WAS REPORTED IN THE CMS REPORT.

12:45PM    7         DO YOU RECALL SOME QUESTIONS ABOUT THAT?

12:45PM    8    A.   YES.

12:45PM    9    Q.   AND IN RESPONSE TO THE 2567, YOU REVIEWED NOT JUST THE

12:45PM   10    QUALITY CONTROL DATA THAT WAS LISTED IN THE CMS REPORT, BUT A

12:45PM   11    BROADER UNIVERSE OF DATA.

12:45PM   12         IS THAT FAIR?

12:45PM   13    A.   YES.

12:45PM   14    Q.   AND WHAT WAS THE REASON FOR DOING THAT?

12:45PM   15    A.   THAT WAS TO IDENTIFY THE EXTENT OF THE DEFICIENCY.

12:45PM   16    Q.   OKAY.  AND AFTER THAT BROADER REVIEW, DID YOU VIEW THE

12:45PM   17    INSTANCES THAT WERE LISTED BY CMS AS REPRESENTATIVE SAMPLES?

12:45PM   18    A.   YES.

12:45PM   19    Q.   THOSE DIDN'T SEEM OUT OF -- UNUSUAL IN THE SENSE OF BEING

12:45PM   20    ONE OFFS OR OUT OF THE ORDINARY?

12:45PM   21    A.   OUTLIERS?  IS THAT CORRECT?

12:46PM   22    Q.   WE'VE USED THAT TERM IN SOME OTHER CONTEXTS.  I JUST WANT

12:46PM   23    TO MAKE SURE IF WHAT WAS REPORTED IN CMS WAS REPRESENTATIVE OF

12:46PM   24    WHAT YOU SAW IN YOUR BROADER REVIEW.

12:46PM   25    A.   YES.

DAS REDIRECT BY MR. LEACH                                               6024

| | | |
|---|---|---|
| 12:46PM | 1 | Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE VALIDATION |
| 12:46PM | 2 | REPORTS FOR ASSAYS RUN ON THE EDISON 3.5. |
| 12:46PM | 3 | DO YOU RECALL THAT TESTIMONY? |
| 12:46PM | 4 | A.   YES. |
| 12:46PM | 5 | Q.   AND A VALIDATION REPORT IS THE DOCUMENT AT THE OUTSET OF |
| 12:46PM | 6 | TESTING WHEN YOU START USING A PARTICULAR ASSAY IN A PARTICULAR |
| 12:46PM | 7 | DEVICE IN THE LAB; IS THAT RIGHT? |
| 12:46PM | 8 | A.   CORRECT. |
| 12:46PM | 9 | Q.   IS THAT THE END OF THE MATTER WHEN IT COMES TO THE LAB |
| 12:46PM | 10 | DIRECTOR ASSESSING WHETHER THE ASSAY IS WORKING OR NOT WORKING? |
| 12:46PM | 11 | A.   NO. |
| 12:46PM | 12 | Q.   HOW IS THAT NOT THE END OF THE MATTER? |
| 12:46PM | 13 | A.   MAY I GET A LITTLE BIT OF SPECIFICITY THERE? |
| 12:46PM | 14 | Q.   WELL, ARE THERE OTHER PROCEDURES IN A LAB TO MAKE SURE |
| 12:46PM | 15 | THAT, AFTER VALIDATION, THE ASSAY IS WORKING OR NOT WORKING AS |
| 12:46PM | 16 | IT'S SUPPOSED TO? |
| 12:47PM | 17 | A.   YES. |
| 12:47PM | 18 | Q.   AND IS QUALITY CONTROL ONE OF THOSE? |
| 12:47PM | 19 | A.   THAT IS THE CHIEF COMPONENT, YES. |
| 12:47PM | 20 | Q.   AND IS QUALITY CONTROL, LIKE, THE ALARM BELL TO ASSESS |
| 12:47PM | 21 | WHETHER A PARTICULAR ASSAY IS WORKING OR NOT WORKING AS IT'S |
| 12:47PM | 22 | SUPPOSED TO? |
| 12:47PM | 23 | A.   YES. |
| 12:47PM | 24 | Q.   OKAY.  AND BASED ON YOUR REVIEW OF THE BROADER UNIVERSE OF |
| 12:47PM | 25 | QC DATA, WERE ALARM BELLS GOING OFF? |

DAS REDIRECT BY MR. LEACH                                          6025

```
12:47PM   1      A.   YES.

12:47PM   2      Q.   AT ANY TIME IN YOUR INITIAL INTERVIEW WITH MR. HOLMES, OR

12:47PM   3      EVEN IN THE PERIOD UP THROUGH MARCH, DID ANYBODY EVER RAISE

12:47PM   4      INSTANCES TO YOU WHERE FOLKS WITHIN THE CLIA LAB WERE RAISING

12:47PM   5      ISSUES WITH RESPECT TO QUALITY CONTROL?

12:47PM   6      A.   COULD YOU ELABORATE A LITTLE BIT, PLEASE.

12:47PM   7      Q.   FOR EXAMPLE, IN YOUR INTERVIEW WITH MS. HOLMES OR IN YOUR

12:47PM   8      FIRST FEW WEEKS AS YOU'RE COMING UP TO THE LAB, DID ANYBODY

12:47PM   9      REPORT TO YOU ISSUES THAT HAD BEEN RAISED PREVIOUSLY WITHIN THE

12:47PM  10      CLIA LAB BY INSIDERS WITHIN THE COMPANY?

12:47PM  11      A.   NO.

12:47PM  12      Q.   DID ANYONE MENTION THE NAME ERIKA CHEUNG TO YOU?

12:48PM  13      A.   NO.

12:48PM  14      Q.   DID ANYBODY MENTION THE NAME TYLER SHULTZ TO YOU?

12:48PM  15      A.   NO.

12:48PM  16      Q.   AND DID ANYBODY DESCRIBE FOR YOU THE CIRCUMSTANCES UNDER

12:48PM  17      WHICH DR. ROSENDORFF LEFT?

12:48PM  18      A.   NO.

12:48PM  19      Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT EXHIBIT 14162.

12:48PM  20           AND IF WE COULD PLEASE DISPLAY THAT, MS. HOLLIMAN.

12:48PM  21           DO YOU RECALL BEING EXAMINED ABOUT YOUR APPROACH WITH

12:48PM  22      RESPECT TO SOME PARTICULAR ASSAYS IN EXHIBIT 14162, DR. DAS?

12:48PM  23      A.   YES.

12:48PM  24      Q.   I WANT TO WALK THROUGH SOME OF THE DETAILS OF THIS EMAIL

12:48PM  25      AND MAKE SURE I UNDERSTAND THE CONTEXT OF YOUR COMMENT.
```

DAS REDIRECT BY MR. LEACH                                          6026

12:48PM   1          IF WE CAN GO, PLEASE, TO I BELIEVE IT'S PAGE 5 OF THE

12:49PM   2     DOCUMENT, MS. HOLLIMAN.  AND IF WE CAN ZOOM IN ON THE PORTION

12:49PM   3     BEGINNING, "THANKS FOR YOUR TIME YESTERDAY."

12:49PM   4          DR. DAS, WHAT PARTICULAR ASSAYS AND DEVICES ARE BEING

12:49PM   5     REFERENCED IN THIS EMAIL?

12:49PM   6     A.   I BELIEVE THESE WOULD BE THE MODIFIED ADVIA 18 ASSAYS.

12:49PM   7     Q.   AND THERE'S A REFERENCE TO SODIUM AND CALCIUM.

12:49PM   8          DO YOU SEE THAT?

12:49PM   9     A.   YES.

12:49PM  10     Q.   AND IF WE COULD NOW PLEASE GO TO YOUR COMMENT ON PAGE 2

12:49PM  11     AND ZOOM IN ON THE TOP EMAIL FROM DR. DAS ALL OF THE WAY DOWN

12:49PM  12     TO THE --

12:50PM  13          ONE MORE PARAGRAPH IF WE COULD, MS. HOLLIMAN.  IF WE COULD

12:50PM  14     ZOOM DOWN A LITTLE BIT MORE TO THE SECOND PARAGRAPH,

12:50PM  15     MS. HOLLIMAN.

12:50PM  16          DO YOU HAVE THAT IN FRONT OF YOU, DR. DAS?

12:50PM  17     A.   YES, I DO.

12:50PM  18     Q.   OKAY.  YOU WROTE, "I HAD A CHANCE TO TOUCH BASE WITH TINA

12:50PM  19     AND DANIEL THE OTHER DAY TO GET DETAILS ON THE UPDATED PATIENT

12:50PM  20     IMPACT ASSESSMENTS, AND I'VE DECIDED TO TAKE A MORE

12:50PM  21     CONSERVATIVE APPROACH."

12:50PM  22          IS THAT IN THE CONTEXT OF THESE ASSAYS RUN ON THE

12:50PM  23     SIEMENS ADVIA?

12:50PM  24     A.   YES.

12:50PM  25     Q.   AND JUST EXPLAIN FOR US WHAT YOU MEANT BY THAT.

DAS REDIRECT BY MR. LEACH                                      6027

| | | |
|---|---|---|
| 12:50PM | 1 | A.   REGARDING THE PRIOR EMAIL, THERE WAS AN APPROACH OUTLINED |
| 12:50PM | 2 | THAT I DISAGREED WITH. |
| 12:50PM | 3 | Q.   AND WHAT WAS THE APPROACH THAT YOU DISAGREED WITH? |
| 12:50PM | 4 | A.   IF I REMEMBER CORRECTLY, THEY WERE PROPOSING A MORE |
| 12:50PM | 5 | LIBERAL APPROACH THAT WOULD REQUIRE MULTIPLE ANALYTES TO BE, |
| 12:51PM | 6 | QUOTE-UNQUOTE, ABNORMAL IN ORDER TO TRIGGER VOIDING OR |
| 12:51PM | 7 | CORRECTIONS, AND I DISAGREED WITH THAT ASSERTION. |
| 12:51PM | 8 | Q.   AND YOU WANTED TO LOOK AT IT ANALYTE BY ANALYTE; IS THAT |
| 12:51PM | 9 | FAIR? |
| 12:51PM | 10 | A.   YES, THAT WOULD BE THE CORRECT WAY TO DO IT. |
| 12:51PM | 11 | Q.   AND WHEN YOU VOIDED TESTS ON THE EDISON 3.5 DEVICE, WERE |
| 12:51PM | 12 | YOU BEING CONSERVATIVE? |
| 12:51PM | 13 | A.   CAN YOU CLARIFY, PLEASE. |
| 12:51PM | 14 | Q.   DID YOU FEEL LIKE YOU WERE BEING CONSERVATIVE? |
| 12:51PM | 15 | A.   I WAS JUST FOLLOWING THE DATA. |
| 12:51PM | 16 | Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT |
| 12:51PM | 17 | MS. HOLMES'S BACKGROUND AND EXPERIENCE. |
| 12:51PM | 18 | DO YOU RECALL THAT TESTIMONY? |
| 12:51PM | 19 | A.   YES. |
| 12:51PM | 20 | Q.   OKAY.  YOU WERE HIRED IN 2015? |
| 12:51PM | 21 | A.   YES. |
| 12:51PM | 22 | Q.   OKAY.  AT THAT POINT THERANOS HAD BEEN IN EXISTENCE FOR |
| 12:51PM | 23 | OVER 12 YEARS. |
| 12:51PM | 24 | WAS THAT YOUR UNDERSTANDING? |
| 12:51PM | 25 | A.   YES. |

DAS REDIRECT BY MR. LEACH                                      6028

| | | |
|---|---|---|
| 12:51PM | 1 | Q. OKAY. AND SHE WAS THE CEO OF THE COMPANY; CORRECT? |
| 12:52PM | 2 | A. YES. |
| 12:52PM | 3 | Q. AND WERE YOU AWARE THAT SHE HELD HERSELF OUT AS THE AUTHOR |
| 12:52PM | 4 | OF A NUMBER OF PATENTS? |
| 12:52PM | 5 | A. NO. |
| 12:52PM | 6 | Q. WERE YOU AWARE THAT SHE HAD HELD HERSELF OUT TO MEDIA |
| 12:52PM | 7 | OUTLETS AS BEING THE LEADER OF THE COMPANY? |
| 12:52PM | 8 | A. YES. |
| 12:52PM | 9 | Q. I'D ALSO LIKE TO ASK SOME QUESTIONS ABOUT EXHIBIT 10674. |
| 12:52PM | 10 | YOU WERE ASKED SOME QUESTIONS ABOUT GLUCOSE AND SODIUM |
| 12:52PM | 11 | VALIDATION DATA THAT YOU LOOKED AT IN APRIL OF 2016? |
| 12:52PM | 12 | A. YES. |
| 12:52PM | 13 | Q. AND I THINK YOU WERE THEN SHOWN SOME QUESTIONS OR ASKED |
| 12:52PM | 14 | SOME QUESTIONS ABOUT SOME ADDITIONAL ASSAYS THAT HAD BEEN RUN |
| 12:52PM | 15 | ON THE MODIFIED SIEMENS MACHINE, AND YOU WERE ASKED WERE YOU |
| 12:52PM | 16 | COMFORTABLE WITH THE DATA, AND YOUR ANSWER WAS AT THAT POINT IN |
| 12:52PM | 17 | TIME. |
| 12:52PM | 18 | DO YOU RECALL THAT TESTIMONY? |
| 12:52PM | 19 | A. YES. |
| 12:52PM | 20 | Q. AND WHAT DID YOU MEAN BY "AT THAT POINT IN TIME"? |
| 12:52PM | 21 | A. WE SUBSEQUENTLY TURNED OVER MORE ROCKS AND STONES. |
| 12:53PM | 22 | Q. YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT A MEETING THAT |
| 12:53PM | 23 | YOU HAD WITH MS. HOLMES AND OTHERS ABOUT THE VOIDING OF THE |
| 12:53PM | 24 | TESTS. |
| 12:53PM | 25 | DO YOU RECALL THAT TESTIMONY? |

DAS REDIRECT BY MR. LEACH                                          6029

| | | |
|---|---|---|
| 12:53PM | 1 | A.   YES. |
| 12:53PM | 2 | Q.   AND I THINK YOU TESTIFIED THAT THERE WAS AGREEMENT TO VOID |
| 12:53PM | 3 | THE TESTS? |
| 12:53PM | 4 | A.   YES. |
| 12:53PM | 5 | Q.   OKAY.  DID YOU GET PUSHBACK FROM MS. HOLMES ABOUT HOW TO |
| 12:53PM | 6 | CHARACTERIZE THE VOIDING OF THE TESTS? |
| 12:53PM | 7 | A.   YES. |
| 12:53PM | 8 | Q.   DESCRIBE THAT PUSHBACK FOR US, PLEASE? |
| 12:53PM | 9 | A.   THERE WAS A CHARACTERIZATION FOR WHY THE VOIDING WAS DONE, |
| 12:53PM | 10 | TO WHICH I DISAGREED. |
| 12:53PM | 11 | Q.   AND THAT CHARACTERIZATION WAS WHAT? |
| 12:53PM | 12 | A.   THAT CHARACTERIZATION WAS THAT THE PROBLEMS WERE DUE TO |
| 12:53PM | 13 | ISSUES WITH QUALITY CONTROL AND QUALITY ASSURANCE RATHER THAN |
| 12:53PM | 14 | THE INSTRUMENT ITSELF. |
| 12:53PM | 15 | Q.   AND THAT WAS COMMUNICATED -- THE IDEA THAT THIS WAS JUST A |
| 12:54PM | 16 | QUALITY SYSTEMS ISSUE WAS COMMUNICATED TO CMS; IS THAT CORRECT? |
| 12:54PM | 17 | A.   YES. |
| 12:54PM | 18 | Q.   AND YOU DISAGREED WITH THAT? |
| 12:54PM | 19 | A.   YES. |
| 12:54PM | 20 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |
| 12:54PM | 21 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 12:54PM | 22 | MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR. |
| 12:54PM | 23 | THANK YOU. |
| 12:54PM | 24 | THANK YOU, DR. DAS. |
| 12:54PM | 25 | THE WITNESS:  THANK YOU. |

DAS RECROSS BY MR. WADE                                        6030

| | | |
|---|---|---|
| 12:54PM | 1 | THE COURT:  MR. WADE? |
| 12:54PM | 2 | **RECROSS-EXAMINATION** |
| 12:54PM | 3 | BY MR. WADE: |
| 12:54PM | 4 | Q.   JUST A COUPLE MORE QUESTIONS, DR. DAS. |
| 12:54PM | 5 | A.   SURE. |
| 12:54PM | 6 | Q.   YOU WERE JUST ASKED ABOUT THAT MEETING AND WHAT WAS |
| 12:54PM | 7 | COMMUNICATED TO CMS ABOUT THE REASONS FOR VOIDING. |
| 12:54PM | 8 | DO YOU RECALL THAT? |
| 12:54PM | 9 | A.   YES. |
| 12:54PM | 10 | Q.   AND THERE WERE A LOT OF -- I THINK WHEN YOU DESCRIBED THAT |
| 12:55PM | 11 | MEETING, YOU DESCRIBED THAT THERE WERE A LOT OF COOKS IN THE |
| 12:55PM | 12 | KITCHEN, IF YOU WILL? |
| 12:55PM | 13 | A.   I DON'T RECALL THAT STATEMENT BUT -- |
| 12:55PM | 14 | Q.   OKAY.  YOU RECALL THAT THERE WERE SOME LAWYERS PRESENT AND |
| 12:55PM | 15 | SOME OTHER ADVISORS AND MS. HOLMES AND YOURSELF? |
| 12:55PM | 16 | A.   YES. |
| 12:55PM | 17 | Q.   AND THEN THE OUTGROWTH OF THAT MEETING WAS THE PREPARATION |
| 12:55PM | 18 | OF SOME COMMUNICATIONS TO CMS PROVIDING INFORMATION ABOUT THE |
| 12:55PM | 19 | VOIDING. |
| 12:55PM | 20 | DO YOU RECALL THAT? |
| 12:55PM | 21 | A.   YES. |
| 12:55PM | 22 | Q.   AND WE LOOKED AT THAT PATIENT IMPACT ASSESSMENT YESTERDAY. |
| 12:55PM | 23 | DO YOU RECALL THAT? |
| 12:55PM | 24 | A.   YES. |
| 12:55PM | 25 | Q.   AND THAT RELATED TO THE EDISON 3.5 DEVICE; RIGHT? |

DAS RECROSS BY MR. WADE                                      6031

12:55PM   1    A.   YES.

12:55PM   2    Q.   AND THAT SET FORTH THE QUALITY CONTROL AND QUALITY

12:55PM   3    ASSURANCE CONCERNS AS A BASIS TO VOID THE TESTS; CORRECT?

12:55PM   4    A.   IN PART, YES.

12:55PM   5    Q.   AND YOU BELIEVED THAT WAS A BASIS TO VOID THE TESTS;

12:55PM   6    CORRECT?

12:55PM   7    A.   THE QUALITY CONTROL RESULTS?  YES.

12:55PM   8    Q.   YEAH.  AND THE -- WHAT THAT BUCKET ON QUALITY CONTROL AND

12:56PM   9    QUALITY ASSURANCE THAT YOU HAD IDENTIFIED AS YOU WERE TURNING

12:56PM  10    OVER THOSE ROCKS, YOU FELT AS A RESULT OF THAT YOU SHOULD VOID

12:56PM  11    THE EDISON RESULTS; CORRECT?

12:56PM  12    A.   YES, IN PART.

12:56PM  13    Q.   AND THAT STATEMENT WAS PUT INTO A LETTER THAT WAS DRAFTED

12:56PM  14    AND SENT TO CMS; RIGHT?

12:56PM  15    A.   YES, I BELIEVE SOME OF VERBIAGE WAS THERE.

12:56PM  16    Q.   AND YOU SIGNED THE LETTER, RIGHT, SIR?

12:56PM  17    A.   I DID.

12:56PM  18    Q.   AND YOU WERE COMFORTABLE WITH IT AT THAT TIME?

12:56PM  19    A.   I BELIEVE I DISAGREED WITH THAT PARTICULAR

12:56PM  20    CHARACTERIZATION, BUT THE LETTER AS A WHOLE WAS ACCEPTABLE.

12:56PM  21    Q.   AND YOU -- IN FACT, YOU RECALL THAT THERE WERE TWO

12:56PM  22    LETTERS.  THERE WAS ONE SENT MARCH 28TH.

12:56PM  23         DO YOU RECALL THAT?

12:56PM  24    A.   I COULD USE A REFRESHER, PLEASE.

12:56PM  25    Q.   SURE.  LET'S SEE IF WE CAN FIND THIS.

DAS RECROSS BY MR. WADE                                    6032

12:57PM   1              THE COURT'S INDULGENCE FOR A MOMENT?

12:57PM   2                   THE COURT:  SURE.

12:57PM   3       BY MR. WADE:

12:57PM   4       Q.   IT WILL BE IN THE WHITE BINDER.  AND LOOK AT 5260.

12:57PM   5       A.   YES.

12:57PM   6       Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERE WAS A

12:57PM   7       LETTER SENT TO CMS ON MARCH 28TH, 2016?

12:57PM   8       A.   YES.

12:57PM   9       Q.   AND YOU SIGNED THIS LETTER; CORRECT?

12:57PM   10      A.   I BELIEVE SO, YES.

12:57PM   11      Q.   AND WAS IT YOUR RECOLLECTION, WAS THIS LETTER PREPARED BY

12:58PM   12      THE LAWYERS WHO WERE ADVISING THE COMPANY?

12:58PM   13      A.   YES.

12:58PM   14      Q.   OKAY.  AND THEN AFTER THEY PREPARED IT, YOU REVIEWED AND

12:58PM   15      SENT IT TO THE COMPANY, OR SENT IT TO CMS; CORRECT?

12:58PM   16      A.   YES.

12:58PM   17      Q.   AND THEN THERE WAS ANOTHER SIMILAR LETTER THAT WAS SENT

12:58PM   18      APRIL 1ST; IS THAT CORRECT?

12:58PM   19      A.   I DON'T RECALL THE EXACT DATE, BUT --

12:58PM   20      Q.   I'LL CALL YOUR ATTENTION TO 5471.

12:58PM   21      A.   YES, APRIL 1ST.

12:58PM   22      Q.   AND AGAIN, THIS WAS A LETTER THAT WAS PREPARED BY COUNSEL;

12:58PM   23      CORRECT?

12:58PM   24      A.   YES.

12:58PM   25      Q.   AND YOU SIGNED THAT LETTER; CORRECT?

DAS RECROSS BY MR. WADE                                              6033

12:58PM   1    A.   YES.

12:58PM   2    Q.   AND DO YOU KNOW, WAS THE COUNSEL WHO PREPARED IT THE

12:58PM   3    LAWYER WHO WAS IN THE ROOM MEETING WITH YOU AND MS. HOLMES?

12:58PM   4    A.   YES.

12:58PM   5    Q.   THE, THE -- MR. LEACH TALKED TO YOU ABOUT HOW MS. HOLMES

12:59PM   6    HAD SOME EXPERIENCE.

12:59PM   7         DO YOU RECALL THAT?

12:59PM   8    A.   YES.

12:59PM   9    Q.   AND TO BE SURE, THE COMPANY HAD BEEN AROUND FOR A WHILE AT

12:59PM   10   THAT TIME; IS THAT CORRECT?

12:59PM   11   A.   YES.

12:59PM   12   Q.   BUT BASED UPON YOUR INTERACTIONS WITH HER, DID YOU FEEL

12:59PM   13   THAT SHE WAS -- SHE HAD EXPERIENCE IN CLIA LABORATORY

12:59PM   14   OPERATIONS?

12:59PM   15   A.   NO.

12:59PM   16   Q.   OR CLIA LABORATORY REGULATIONS?

12:59PM   17   A.   NO.

12:59PM   18   Q.   OR EXPERTISE IN VALIDATION?

12:59PM   19   A.   NO.

12:59PM   20   Q.   OR EXPERTISE IN PATHOLOGY?

12:59PM   21   A.   NO.

12:59PM   22   Q.   OR THE APPROPRIATE BENCHMARKS FOR VALIDATION?

12:59PM   23   A.   NO.

12:59PM   24   Q.   OR THE WAY IN WHICH TO RUN A QUALITY CONTROL PROGRAM?

12:59PM   25   A.   NO.

                        DAS RECROSS BY MR. WADE                          6034

12:59PM    1    Q.   AND UNTIL SHE WAS REPORTING TO YOU, SHE HAD NEVER HAD A

12:59PM    2    LABORATORY DIRECTOR REPORT DIRECTLY TO HER TO YOUR KNOWLEDGE;

12:59PM    3    CORRECT?

12:59PM    4    A.   I'M NOT AWARE OF THAT.  I DON'T KNOW.

01:00PM    5    Q.   MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THAT BROADER

01:00PM    6    REVIEW THAT WAS DONE AND SOME OF THE CONCLUSIONS THAT YOU CAME

01:00PM    7    TO BASED UPON THAT REVIEW?

01:00PM    8    A.   YES.

01:00PM    9    Q.   DO YOU RECALL THAT?

01:00PM   10         AND THAT WAS SOMETHING THAT THIS WHOLE TEAM OF PEOPLE THAT

01:00PM   11    HAD BEEN BROUGHT TOGETHER ENGAGED IN; CORRECT?

01:00PM   12    A.   YES.

01:00PM   13    Q.   AND THOSE PEOPLE WERE OUTSIDE PEOPLE WHO DID COME IN AFTER

01:00PM   14    THAT SEPTEMBER 2015 INSPECTION; RIGHT?

01:00PM   15    A.   YES.

01:00PM   16    Q.   THERE WAS A DESIRE TO HAVE THE OUTSIDE, OUTSIDER'S

01:00PM   17    PERSPECTIVE ON THESE ISSUES; CORRECT?

01:00PM   18    A.   I'M NOT AWARE OF THE DESIRE OR THE INTENT.

01:00PM   19    Q.   BUT IN ANY EVENT, THE PEOPLE CAME IN ANEW TO LOOK AT THESE

01:00PM   20    ISSUES; RIGHT?

01:00PM   21    A.   YES.

01:00PM   22    Q.   AND TO TURN OVER THOSE ROCKS?

01:01PM   23    A.   YES.

01:01PM   24    Q.   AND THAT WAS A HARD AND DIFFICULT PROCESS FOR THE TEAM

01:01PM   25    THAT WAS INVOLVED; RIGHT?

DAS RECROSS BY MR. WADE                                                    6035

01:01PM   1     A.   YES.

01:01PM   2     Q.   AND DO YOU RECALL DESCRIBING, AS YOU TALKED ABOUT, AS YOU

01:01PM   3     WERE WORKING THROUGH THAT PROCESS, LIKENING IT TO A FAVORITE

01:01PM   4     MOVIE QUOTE THAT YOU HAVE?

01:01PM   5     A.   I RECALL WRITING A MOVIE QUOTE AT SOME POINT.  I DON'T

01:01PM   6     RECALL THE EXACT QUOTE.

01:01PM   7     Q.   AND WHAT IS THAT MOVIE QUOTE?

01:01PM   8     A.   I DON'T REMEMBER THAT OFF THE TOP OF MY HEAD.

01:01PM   9     Q.   OKAY.  DO YOU RECALL IT BEING ABOUT "EVERYTHING WILL BE

01:01PM  10     RIGHT IN THE END, AND IF IT'S" --

01:01PM  11     A.   CORRECT, YES.  I'M SORRY TO SPEAK OVER YOU, BUT I BELIEVE

01:01PM  12     THAT WAS A QUOTE FROM "THE BEST EXOTIC MARIGOLD HOTEL."

01:01PM  13     Q.   AND WHAT DO YOU RECALL THE QUOTE?

01:01PM  14     A.   DO WE HAVE IT HERE?  I DON'T THINK I'LL DO IT JUSTICE.

01:01PM  15     Q.   IS IT SOMETHING TO THE EFFECT OF "EVERYTHING WILL BE ALL

01:01PM  16     RIGHT IN THE END AND IF IT'S NOT ALL RIGHT, IT'S NOT YET THE

01:02PM  17     END"?

01:02PM  18     A.   YES.

01:02PM  19     Q.   NO FURTHER QUESTIONS.

01:02PM  20              MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

01:02PM  21              THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:02PM  22              MR. WADE:  YES, YOUR HONOR.

01:02PM  23              MR. LEACH:  YES.

01:02PM  24              THE COURT:  THANK YOU, SIR.  YOU'RE EXCUSED.

01:02PM  25         YOU CAN LEAVE THOSE BINDERS THERE.

DAS RECROSS BY MR. WADE                                    6036

01:02PM  1              THE WITNESS:  OKAY.  THANK YOU.

01:02PM  2              THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

01:02PM  3     WITNESS?

01:02PM  4              MR. BOSTIC:  YES, YOUR HONOR.

01:02PM  5          THE UNITED STATES CALLS ALAN EISENMAN.

01:02PM  6              THE COURT:  FOLKS, WE'LL BE BREAKING AT 1:30.  IF

01:03PM  7     YOU WANT TO TAKE STRETCH, FEEL FREE.

01:03PM  8          (STRETCHING.)

01:03PM  9              THE COURT:  SIR, IF YOU'LL COME FORWARD, PLEASE.

01:03PM  10    I'LL INVITE YOU TO FACE OUR COURTROOM DEPUTY HERE.  RAISE YOUR

01:03PM  11    RIGHT HAND WHILE YOU DO SO, SHE HAS A QUESTION FOR YOU.

01:03PM  12              THE WITNESS:  OKAY.

01:03PM  13              THE CLERK:  GOOD AFTERNOON.

01:03PM  14              THE WITNESS:  GOOD AFTERNOON.

01:03PM  15          **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS SWORN.)**

01:03PM  16              THE WITNESS:  YES.

01:03PM  17              THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  LET ME

01:03PM  18    INVITE YOU TO MAKE YOURSELF COMFORTABLE.

01:03PM  19          FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

01:04PM  20    NEED.

01:04PM  21          I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

01:04PM  22          WHEN YOU ARE COMFORTABLE --

01:04PM  23              THE WITNESS:  IS IT OKAY TO TAKE THIS OFF?

01:04PM  24              THE COURT:  HAVE YOU BEEN VACCINATED, SIR?

01:04PM  25              THE WITNESS:  YES, I HAVE.

EISENMAN DIRECT BY MR. BOSTIC                                      6037

01:04PM  1                THE COURT:  YES, THAT'S FINE.

01:04PM  2                THE WITNESS:  THANK YOU.

01:04PM  3                THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

01:04PM  4     PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

01:04PM  5                THE WITNESS:  MY NAME IS ALAN EISENMAN.  A-L-A-N,

01:04PM  6     E-I-S-E-N-M-A-N.

01:04PM  7                THE COURT:  THANK YOU.  I'LL ENCOURAGE YOU TO SPEAK

01:04PM  8     DIRECTLY INTO THE MICROPHONE AS YOU CAN.

01:04PM  9          MR. BOSTIC?

01:04PM  10               MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:04PM  11                         **DIRECT EXAMINATION**

01:04PM  12    BY MR. BOSTIC:

01:04PM  13    Q.   GOOD AFTERNOON, MR. EISENMAN.

01:04PM  14    A.   GOOD AFTERNOON.

01:04PM  15    Q.   LET ME START BY ASKING WAS THERE A TIME WHEN YOU WERE AN

01:04PM  16    INVESTOR IN A COMPANY CALLED THERANOS?

01:04PM  17    A.   YES, THERE WAS.

01:04PM  18    Q.   I'D LIKE TO TALK TO YOU ABOUT THAT, BUT FIRST LET ME ASK

01:04PM  19    YOU SOME QUESTIONS ABOUT YOUR BACKGROUND.

01:04PM  20         FIRST, WHERE DO YOU LIVE?

01:04PM  21    A.   HOUSTON, TEXAS.

01:04PM  22    Q.   ARE YOU CURRENTLY EMPLOYED?

01:04PM  23    A.   I AM RETIRED.

01:04PM  24    Q.   BEFORE YOU RETIRED, WHAT WAS YOUR PROFESSION?

01:04PM  25    A.   I WOULD SAY FINANCIAL PLANNER AND A MONEY MANAGER.

EISENMAN DIRECT BY MR. BOSTIC                                    6038

01:05PM  1    Q.   AND FOR HOW LONG WERE YOU A FINANCIAL PLANNER AND MONEY

01:05PM  2    MANAGER?

01:05PM  3    A.   THIRTY-FIVE YEARS.

01:05PM  4    Q.   AND WHEN DID YOU RETIRE?

01:05PM  5    A.   FOUR YEARS AGO.

01:05PM  6    Q.   CAN YOU GIVE US AN OVERVIEW OF YOUR EDUCATIONAL

01:05PM  7    BACKGROUND, PLEASE?

01:05PM  8    A.   I WENT TO UNDERGRAD AT UNIVERSITY OF TEXAS AT AUSTIN; WENT

01:05PM  9    TO LAW SCHOOL AT UNIVERSITY OF HOUSTON; AND A YEAR AFTER LAW

01:05PM 10    SCHOOL I PICKED UP MY CPA CERTIFICATE.

01:05PM 11    Q.   AND CAN YOU GIVE US, JUST AT A HIGH LEVEL, AN OVERVIEW OF

01:05PM 12    YOUR CAREER FOLLOWING YOUR EDUCATION?

01:05PM 13    A.   FOLLOWING MY EDUCATION, I DID SOME ESTATE PLANNING AND TAX

01:05PM 14    WORK FOR A COUPLE OF YEARS, AND THEN I WENT TO WORK FOR A

01:05PM 15    COUPLE OF REAL ESTATE DEVELOPERS IN HOUSTON WHO WERE GENERATING

01:05PM 16    SIGNIFICANT CASH FLOW, AND I WAS RESPONSIBLE FOR PUTTING THEIR

01:05PM 17    CASH FLOW TO WORK AND LOOKING AT A VARIETY OF INVESTMENTS, ALSO

01:05PM 18    DOING A LITTLE BIT OF TAX WORK FOR THEM.

01:05PM 19         AFTER THAT I GOT MY SERIES 7 AND STARTED ACQUIRING CLIENTS

01:06PM 20    AND DOING INVESTING IN PUBLIC MARKETS.

01:06PM 21    Q.   YOU MENTIONED YOUR WORK AS A MONEY MANAGER.  IN YOUR

01:06PM 22    PERSONAL CAPACITY, DID YOU ALSO DO SOME INVESTING IN COMPANIES?

01:06PM 23    A.   FREQUENTLY.

01:06PM 24    Q.   AS OF AROUND 2005, CAN YOU TELL ME ABOUT THAT ACTIVITY AT

01:06PM 25    A HIGH LEVEL?  WHAT WERE YOUR PRACTICES THERE?

EISENMAN DIRECT BY MR. BOSTIC                                    6039

```
01:06PM   1    A.   IN 2005 I HAD CLIENTS THAT I WAS INVESTING IN PUBLIC

01:06PM   2    MARKETS, BUT I ALSO HAD A NETWORK OF FRIENDS AND FAMILY THAT WE

01:06PM   3    WERE LOOKING AT PRIVATE EQUITY.

01:06PM   4    Q.   AND DID THAT INCLUDE INVESTING YOUR PERSONAL ASSETS IN

01:06PM   5    COMPANIES?

01:06PM   6    A.   YES, IT DID.

01:06PM   7    Q.   APPROXIMATELY WHEN DID YOU FIRST INVEST IN THERANOS?

01:06PM   8    A.   I BELIEVE IT WAS 2006.

01:06PM   9    Q.   AND UP TILL THAT POINT HAD YOU HAD ANY PREVIOUS EXPERIENCE

01:07PM  10    INVESTING IN A BIOTECH COMPANY?

01:07PM  11    A.   NO.

01:07PM  12    Q.   LET'S TALK ABOUT HOW YOU CAME TO BE ACQUAINTED WITH

01:07PM  13    THERANOS, THE COMPANY.

01:07PM  14         DO YOU REMEMBER HOW YOU FIRST HEARD ABOUT IT?

01:07PM  15    A.   YES, I DO.

01:07PM  16    Q.   HOW WAS THAT?

01:07PM  17    A.   ONE OF MY CLOSE PERSONAL FRIENDS IN HOUSTON, DAVID HARRIS,

01:07PM  18    WAS THE FINANCIAL ADVISOR TO THE HOLMES FAMILY, AND HE TOLD ME

01:07PM  19    AND ANOTHER GROUP OF FRIENDS ABOUT THIS OPPORTUNITY.

01:07PM  20    Q.   AND WHAT DID HE TELL YOU ABOUT THE COMPANY AT THAT TIME?

01:07PM  21    A.   HE TOLD ME THAT ELIZABETH WAS BRILLIANT; THAT SHE WAS

01:07PM  22    DROPPING OUT OF SCHOOL TO START A COMPANY; AND SHE WAS

01:07PM  23    PARTIALLY ON HER WAY.

01:07PM  24         HE HAD INVESTED IN THE FIRST SEED ROUND, AND THEY WERE

01:07PM  25    RAISING MONEY IN A SECOND SEED ROUND, AND GOT ME INVOLVED TO DO
```

EISENMAN DIRECT BY MR. BOSTIC                                    6040

01:07PM  1    A LITTLE DUE DILIGENCE AND MAKE A DECISION WHETHER I WANTED TO

01:07PM  2    CO-INVEST WITH HIS OTHER GROUP OF HOUSTON INVESTORS IN THE

01:08PM  3    SECOND SEED ROUND.

01:08PM  4    Q.    AND YOU'RE USING THAT TERM "SEED ROUND."  WHAT DOES THAT

01:08PM  5    MEAN IN THE CONTEXT OF AN INVESTMENT IN A COMPANY LIKE THIS?

01:08PM  6    A.    JUST LIKE IN A TREE, IT'S A VERY EARLY STAGE.

01:08PM  7    Q.    AND YOUR UNDERSTANDING WHEN YOU FIRST FOUND OUT ABOUT THE

01:08PM  8    COMPANY WAS THAT THERE HAD BEEN ONE ROUND OF INVESTMENT THAT

01:08PM  9    HAD ALREADY OCCURRED?

01:08PM 10    A.    CORRECT.

01:08PM 11    Q.    AND THE SECOND ROUND OF SEED FUNDING WAS PENDING?

01:08PM 12    A.    THAT IS CORRECT.

01:08PM 13    Q.    WAS MR. HARRIS ABLE TO PUT YOU IN CONTACT WITH MS. HOLMES

01:08PM 14    AT THERANOS?

01:08PM 15    A.    YES, HE WAS.

01:08PM 16    Q.    AND WERE YOU IN TOUCH WITH MS. HOLMES PRIOR TO YOUR FIRST

01:08PM 17    INVESTMENT IN THE COMPANY?

01:08PM 18    A.    YES, I WAS.

01:08PM 19    Q.    WHAT FORM DID THAT CONTACT TAKE?  DID YOU HAVE AN

01:08PM 20    IN-PERSON MEETING?  DID YOU SPEAK ON THE PHONE?

01:08PM 21    A.    WE HAD SEVERAL CONVERSATIONS ON THE PHONE.

01:08PM 22    Q.    WHAT DO YOU RECALL ABOUT THOSE CONVERSATIONS AND

01:08PM 23    INFORMATION THAT YOU GAINED?

01:08PM 24    A.    I RECALL THAT LARRY ELLISON WAS INVOLVED IN THE COMPANY,

01:09PM 25    WAS ON HER BOARD.  IT WAS THE ONLY BOARD THAT HE SERVED ON

EISENMAN DIRECT BY MR. BOSTIC                                          6041

01:09PM  1    OTHER THAN ORACLE.

01:09PM  2        THE SEED ROUND WAS APPROXIMATELY $30 MILLION.  HE WAS

01:09PM  3    TAKING $20 MILLION OF THE SEED ROUND.  I WAS TOLD THAT HE WAS A

01:09PM  4    PERSONAL ADVISOR AND SPOKE TO ELIZABETH ON A WEEKLY BASIS.

01:09PM  5    Q.   DID YOU HAVE -- BEFORE YOU INVESTED IN THE COMPANY IN

01:09PM  6    2006, DID YOU HAVE A SINGLE CONVERSATION WITH MS. HOLMES OR

01:09PM  7    MULTIPLE CONVERSATIONS?

01:09PM  8    A.   MULTIPLE CONVERSATIONS.

01:09PM  9    Q.   AROUND THE TIME THAT YOU INVESTED, WHAT WAS YOUR

01:09PM 10    UNDERSTANDING FROM THOSE CONVERSATIONS AS TO WHAT THE COMPANY

01:09PM 11    WAS DOING?

01:09PM 12    A.   MY UNDERSTANDING IS THEY HAD A TECHNOLOGY THAT WOULD TAKE

01:09PM 13    A RELATIVELY SMALL AMOUNT OF BLOOD AND WOULD PERFORM A LOT OF

01:09PM 14    TESTS THAT WERE CURRENTLY REQUIRED BY A MUCH LARGER BLOOD DRAW,

01:10PM 15    AND IT WOULD PROVIDE THOSE TESTS IN A MUCH MORE RAPID FASHION.

01:10PM 16    Q.   AROUND THIS TIME PERIOD, THE TIMING OF YOUR FIRST

01:10PM 17    INVESTMENT, HOW ACCESSIBLE WAS MS. HOLMES TO YOU?

01:10PM 18    A.   EXTREMELY ACCESSIBLE.

01:10PM 19        WE WOULD HAVE UPDATED QUARTERLY MEETINGS BY TELEPHONE, AND

01:10PM 20    THAT OCCURRED FOR THE FIRST COUPLE YEARS OF OUR INVESTMENT.

01:10PM 21    Q.   DID YOU HAVE, FOR EXAMPLE, MS. HOLMES'S DIRECT CONTACT

01:10PM 22    INFORMATION, INCLUDING HER CELL NUMBER?

01:10PM 23    A.   I DID.

01:10PM 24    Q.   AND DID YOUR CONVERSATIONS WITH MS. HOLMES CONTINUE AFTER

01:10PM 25    YOU MADE YOUR INITIAL INVESTMENT IN THE COMPANY?

EISENMAN DIRECT BY MR. BOSTIC                                    6042

01:10PM  1    A.   THEY DID.

01:10PM  2    Q.   BASED ON YOUR CONVERSATIONS WITH MS. HOLMES AROUND THE

01:10PM  3    TIME OF THAT FIRST INVESTMENT, SO AROUND 2006, HOW FAR ALONG

01:10PM  4    DID YOU UNDERSTAND THE THERANOS TECHNOLOGY TO BE?

01:11PM  5    A.   I UNDERSTOOD THE TECHNOLOGY TO BE SIGNIFICANTLY FAR ALONG

01:11PM  6    FOR AN EARLY STAGE COMPANY.

01:11PM  7         ONE OF THE THINGS THAT IMPRESSED ME, IN ADDITION TO HAVING

01:11PM  8    LARRY ELLISON INVOLVED WITH CAPITAL AND WITH TIME, IS BEFORE I

01:11PM  9    MADE MY FIRST INVESTMENT I WAS ALSO TOLD THAT THEY CURRENTLY

01:11PM  10   HAD CONTRACTS WITH FIVE OR SIX MAJOR INTERNATIONAL

01:11PM  11   PHARMACEUTICAL COMPANIES.

01:11PM  12        AND I TOOK NOTES AND CONTEMPORANEOUS NOTES.  AND IT WAS AN

01:11PM  13   IMPRESSIVE LIST OF COMPANIES.  IT WAS COMPANIES LIKE PFIZER,

01:11PM  14   BRISTOL MYERS, NOVARTIS, SMITHKLINE BEECHAM.  SO TO ME, THAT

01:11PM  15   PUT AN ADDITIONAL STAMP OF APPROVAL ON THIS INVESTMENT.

01:11PM  16   Q.   AND YOU SAID THAT YOU UNDERSTOOD FROM THOSE CONVERSATIONS

01:11PM  17   THAT THE TECHNOLOGY WAS, I'LL PARAPHRASE IT, FAIRLY FAR ALONG

01:11PM  18   FOR AN EARLY STAGE COMPANY; IS THAT CORRECT?

01:11PM  19   A.   MY UNDERSTANDING IS THAT THESE INTERNATIONAL

01:12PM  20   PHARMACEUTICAL COMPANIES HAD ADOPTED THIS TECHNOLOGY IN SOME OF

01:12PM  21   THEIR CLINICAL TRIALS.  SO I WAS UNDER THE IMPRESSION THAT NOT

01:12PM  22   ONE COMPANY, AND NOT ONE MINOR COMPANY, BUT SEVERAL MAJOR

01:12PM  23   COMPANIES WERE USING THIS TECHNOLOGY FOR SOME OF THEIR CLINICAL

01:12PM  24   STUDIES AND DRUGS.

01:12PM  25        SO MY UNDERSTANDING WAS THAT IT WAS SIGNIFICANTLY FAR

EISENMAN DIRECT BY MR. BOSTIC                                    6043

01:12PM   1   ALONG FOR AN EARLY STAGE COMPANY.

01:12PM   2   Q.   YOU STILL UNDERSTOOD, THOUGH, THAT THIS WAS AN EARLY STAGE

01:12PM   3   COMPANY?

01:12PM   4   A.   ABSOLUTELY, YES.

01:12PM   5   Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO WHETHER R&D WORK

01:12PM   6   AT THERANOS WAS COMPLETE OR WHETHER THERE WAS STILL RESEARCH

01:12PM   7   AND DEVELOPMENT TO BE DONE?

01:12PM   8   A.   MY UNDERSTANDING IS THAT THE TECHNOLOGY WAS TO A POINT

01:12PM   9   WHERE IT WAS SOLVING PROBLEMS AND IT WAS BEING USED, BUT IT WAS

01:12PM  10   A WORK-IN-PROCESS AND THAT THERE WERE GOING TO BE FUTURE

01:12PM  11   ITERATIONS AND FUTURE IMPROVEMENTS.

01:12PM  12   Q.   AND THAT UNDERSTANDING THAT THERE WAS STILL SOME

01:12PM  13   DEVELOPMENT WORK TO BE DONE, DID THAT COME THROUGH IN

01:13PM  14   MS. HOLMES'S DESCRIPTIONS TO YOU?

01:13PM  15   A.   THAT'S A HARD QUESTION TO ANSWER BECAUSE MY UNDERSTANDING

01:13PM  16   IS THE TECHNOLOGY WAS WORKING BUT WAS WORKING AT A LEVEL THAT

01:13PM  17   COULD BE IMPROVED UPON OVER TIME.

01:13PM  18   Q.   AROUND THAT TIME WHAT WERE YOUR SOURCES OF INFORMATION

01:13PM  19   ABOUT WHAT THERANOS WAS DOING?  AGAIN, WE'RE STILL IN THE 2006

01:13PM  20   TIMEFRAME.

01:13PM  21   A.   MY SOURCE OF INFORMATION WERE PRIMARILY CALLS WITH

01:13PM  22   ELIZABETH.

01:13PM  23   Q.   WAS THERE ANYONE ELSE THAT YOU WERE GETTING INFORMATION

01:13PM  24   ABOUT THE COMPANY FROM?

01:13PM  25   A.   THERE WAS A TIME, AND I THINK IT WAS A LITTLE BIT LATER IN

EISENMAN DIRECT BY MR. BOSTIC                                    6044

01:13PM  1    THE TIMEFRAME, THAT I REACHED OUT TO DON LUCAS, WHO WAS THEIR

01:13PM  2    CHAIRMAN OF THE BOARD AND ALSO THE CHAIRMAN OF THE BOARD OF

01:13PM  3    ORACLE, AND THERE WERE SOME CONVERSATIONS AMONG THE HOUSTON

01:13PM  4    INVESTORS, BUT THE INFORMATION REALLY WASN'T FRESH INFORMATION,

01:13PM  5    IT WAS JUST PASSING ALONG.

01:14PM  6        SOMETIMES DAVID HARRIS WOULD HAVE CALLS, AND HE WOULD PASS

01:14PM  7    ALONG INFORMATION TO ME.  AND OCCASIONALLY I WOULD HAVE AN

01:14PM  8    INDEPENDENT CALL, AND I WOULD PASS ALONG INFORMATION TO DAVID

01:14PM  9    AND A COUPLE OF THE OTHER HOUSTON INVESTORS.

01:14PM  10   Q.   WHAT WAS YOUR PRIMARY SOURCE OF INFORMATION ABOUT THE

01:14PM  11   COMPANY DURING AT THAT TIME?

01:14PM  12   A.   ELIZABETH.

01:14PM  13   Q.   AND AGAIN, WE'RE TALKING ABOUT ONE-ON-ONE CALLS BETWEEN

01:14PM  14   YOU AND MS. HOLMES?

01:14PM  15   A.   MOSTLY ONE-ON-ONE CALLS.  THERE WERE A COUPLE OF QUARTERLY

01:14PM  16   CALLS WHERE SOME OF THE OTHER HOUSTON INVESTORS WERE INVOLVED,

01:14PM  17   BUT MOSTLY ONE-ON-ONE CALLS.

01:14PM  18   Q.   YOU MENTIONED THAT YOU TOOK CONTEMPORANEOUS NOTES OF THESE

01:14PM  19   CALLS; IS THAT CORRECT?

01:14PM  20   A.   YES, I DID FROM EVERY CALL.

01:14PM  21   Q.   TELL ME ABOUT THAT.  TELL ME ABOUT YOUR NOTE TAKING

01:14PM  22   PRACTICE FOR THESE CALLS?

01:14PM  23   A.   I'VE BEEN INVOLVED IN INVESTMENTS FOR DECADES, AND IT'S

01:14PM  24   JUST MY PRACTICE ANY TIME I TALK TO SOMEONE I TAKE

01:14PM  25   CONTEMPORANEOUS NOTES BECAUSE PEOPLE HAVE A TENDENCY TO

EISENMAN DIRECT BY MR. BOSTIC                              6045

01:14PM   1   EXAGGERATE, AND I LIKE TO TAKE A SNAPSHOT OF THAT POINT IN TIME

01:14PM   2   AND WHAT THEIR THINKING IS, AND USE THAT AS A BASELINE TO

01:15PM   3   COMPARE AND SEE WHY WE'RE ON SCHEDULE AND WHY WE'RE NOT ON

01:15PM   4   SCHEDULE.

01:15PM   5   Q.   AND DO YOU TAKE THOSE NOTES DURING THE CONVERSATIONS?

01:15PM   6   IMMEDIATELY AFTERWARDS?  WHAT IS YOUR PRACTICE THERE?

01:15PM   7   A.   CONTEMPORANEOUS, DURING THE CONVERSATIONS.

01:15PM   8   Q.   AND JUST TO BE CLEAR, WAS THAT YOUR PRACTICE, GENERALLY

01:15PM   9   SPEAKING, AS TO THE CALLS WITH MS. HOLMES?

01:15PM   10  A.   YES.

01:15PM   11  Q.   AROUND THE 2006 TIME PERIOD, DO YOU RECALL MS. HOLMES

01:15PM   12  TELLING YOU ANYTHING ABOUT THE FINANCIAL HEALTH OR THE

01:15PM   13  FINANCIAL STATUS OF THE COMPANY?

01:15PM   14  A.   YES, I DO.

01:15PM   15  Q.   WHAT DO YOU REMEMBER ABOUT THAT?

01:15PM   16  A.   THEY'RE IN MY NOTES, BUT SHE TOLD ME CERTAIN REVENUE

01:15PM   17  LEVELS THAT THEY WERE ACHIEVING, CERTAIN REVENUE LEVELS THAT

01:15PM   18  THEY WERE GOING TO ACHIEVE IN THE NEXT YEAR OR TWO, SAID THAT

01:15PM   19  AT THE TIME OF MY INVESTMENT THEY WERE ALREADY TALKING TO

01:15PM   20  INVESTMENT BANKERS, SPECIFICALLY MORGAN STANLEY, ABOUT AN IPO

01:16PM   21  IN THE 12 TO 18 MONTH TIME PERIOD, WHICH WAS ANOTHER REASON

01:16PM   22  THAT COMPELLED ME TO MAKE MY INVESTMENT KNOWING THAT ALREADY

01:16PM   23  INVESTMENT BANKERS ARE LOOKING AT THIS OR THEY'RE HAVING

01:16PM   24  CONVERSATIONS AND THERE'S A POSSIBILITY FOR LIQUIDITY EVENT IN

01:16PM   25  THE NEXT YEAR OR SO.

EISENMAN DIRECT BY MR. BOSTIC                                         6046

01:16PM   1    Q.   AND I WANT TO FOLLOW UP MORE ON THE REVENUE NUMBERS THAT

01:16PM   2    YOU HEARD FROM MS. HOLMES.

01:16PM   3        SITTING HERE TODAY, DO YOU HAVE A MEMORY OF WHAT REVENUE

01:16PM   4    NUMBERS MS. HOLMES WAS REPRESENTING TO YOU AROUND THE 2006 TIME

01:16PM   5    PERIOD?

01:16PM   6    A.   YES, I DO.   THEY WERE SUPPOSED TO GENERATE ABOUT $50 OR

01:16PM   7    $60 MILLION IN REVENUES IN THE COMING YEAR AND POTENTIALLY

01:16PM   8    $200 MILLION IN REVENUES IN 2008.

01:16PM   9    Q.   AND AS AN INVESTOR IN THE COMPANY, WAS THAT IMPORTANT

01:16PM  10    INFORMATION FOR YOU?

01:16PM  11    A.   EXTREMELY IMPORTANT.

01:16PM  12    Q.   WHY SO?

01:16PM  13    A.   A START-UP COMPANY WHO IS GENERATING HUNDREDS OR HUNDREDS

01:16PM  14    OF THOUSANDS OR A FEW MILLION DOLLARS OF REVENUE, A COMPANY

01:16PM  15    THAT HAS THE POTENTIAL A YEAR OR SO DOWN THE ROAD TO GENERATE

01:17PM  16    $200 MILLION IN REVENUE IS PRETTY FAR ALONG AND POTENTIALLY

01:17PM  17    VERY SUCCESSFUL AND VERY VALUABLE.

01:17PM  18    Q.   AND THAT $200 MILLION NUMBER, IS THAT REFLECTED IN THE

01:17PM  19    NOTES THAT YOU TOOK DURING YOUR CALLS WITH MS. HOLMES?

01:17PM  20        MR. DOWNEY:   YOUR HONOR, OBJECTION TO THE

01:17PM  21    DESCRIPTION TO THESE DOCUMENTS.   EITHER THE DOCUMENTS COME IN

01:17PM  22    OR THEY DON'T.   I DON'T THINK WE SHOULD BE TALKING ABOUT

01:17PM  23    UNADMITTED DOCUMENTS.

01:17PM  24        THE COURT:   ARE YOU ASKING WHETHER HE MEMORIALIZED

01:17PM  25    THESE THINGS?

EISENMAN DIRECT BY MR. BOSTIC                                    6047

01:17PM   1          MR. BOSTIC:  YES, YOUR HONOR.  I CAN REFRAME THE

01:17PM   2    QUESTION.

01:17PM   3          THE COURT:  SURE, WHY DON'T YOU.

01:17PM   4    BY MR. BOSTIC:

01:17PM   5    Q.   MR. EISENMAN, HAVE YOU REVIEWED THE NOTES OF YOUR

01:17PM   6    CONVERSATIONS WITH MS. HOLMES SINCE THOSE CONVERSATIONS?

01:17PM   7    A.   YES, I HAVE.

01:17PM   8    Q.   AND WHEN WAS THE LAST TIME THAT YOU REVIEWED THOSE NOTES?

01:17PM   9    A.   LAST NIGHT.

01:17PM  10    Q.   AND DID THEY GENERALLY REFRESH YOUR RECOLLECTION ABOUT THE

01:17PM  11    CONTENT OF YOUR CONVERSATIONS WITH MS. HOLMES?

01:17PM  12    A.   YES, THEY DO.  I HAVE A CLEAR RECOLLECTION OF THAT.

01:17PM  13    Q.   APOLOGIES FOR TALKING OVER YOU.

01:18PM  14          SITTING HERE TODAY, DO YOU HAVE A RECOLLECTION OF

01:18PM  15    MS. HOLMES CONVEYING TO YOU THAT REVENUE PROJECTION OF

01:18PM  16    $200 MILLION?

01:18PM  17    A.   YES, I DO.  AND I KNOW YOU'RE SUPPOSED TO ASK THE

01:18PM  18    QUESTIONS, BUT HOW THAT RELATES IS THE ROUND THAT WE WERE IN

01:18PM  19    WAS A $20 MILLION ROUND.

01:18PM  20          MR. DOWNEY:  OBJECTION.

01:18PM  21          THE COURT:  EXCUSE ME.  EXCUSE ME.  LET'S WAIT FOR

01:18PM  22    THE NEXT QUESTION.

01:18PM  23          THE WITNESS:  OKAY.

01:18PM  24    BY MR. BOSTIC:

01:18PM  25    Q.   THANK YOU, MR. EISENMAN.

EISENMAN DIRECT BY MR. BOSTIC                                    6048

01:18PM   1     A.   SORRY.

01:18PM   2     Q.   SO BASED ON THE INFORMATION THAT YOU WERE RECEIVING FROM

01:18PM   3     MS. HOLMES IN THAT 2006 TIME PERIOD, YOU MADE THE DECISION TO

01:18PM   4     INVEST IN THE COMPANY; CORRECT?

01:18PM   5     A.   THAT IS CORRECT.

01:18PM   6     Q.   AND HOW MUCH DID YOU INVEST IN THAT FIRST ROUND IN THE

01:18PM   7     COMPANY?

01:18PM   8     A.   PERSONALLY OR FAMILY WIDE?

01:18PM   9     Q.   GIVE US A BREAKDOWN IF YOU CAN?

01:18PM   10    A.   OKAY.  MY WIFE AND I SHARED A $900,000 INVESTMENT, AND

01:18PM   11    EACH OF MY THREE KIDS HAD A $90,000 INVESTMENT.

01:19PM   12    Q.   DOES THAT MEAN APPROXIMATELY $1.1 MILLION?

01:19PM   13    A.   APPROXIMATELY.  A LITTLE CLOSER TO 1.2 BUT --

01:19PM   14    Q.   FOLLOWING THAT INVESTMENT, HOW FREQUENTLY WERE YOU IN

01:19PM   15    CONTACT WITH MS. HOLMES?

01:19PM   16    A.   AT LEAST QUARTERLY.

01:19PM   17    Q.   AND GENERALLY SPEAKING, WERE THOSE PHONE CALLS?

01:19PM   18    A.   THOSE WERE PHONE CALLS.  ONE PERSONAL VISIT.

01:19PM   19    Q.   OKAY.  I'LL CIRCLE BACK TO THAT.

01:19PM   20         FOR THOSE PHONE CALLS, WERE THEY PRESCHEDULED AT A CERTAIN

01:19PM   21    TIME?  HOW DID THEY COME TO TAKE PLACE?

01:19PM   22    A.   WE HAD AN UNDERSTANDING THAT THERE WOULD BE A QUARTERLY

01:19PM   23    UPDATE, AND EVERY QUARTER TYPICALLY I WOULD REACH OUT AND SAY,

01:19PM   24    YOU KNOW, WE'RE COMING UP TO THE QUARTER, CAN WE SCHEDULE

01:19PM   25    SOMETHING?  AND WE WOULD PUT SOMETHING ON THE CALENDAR.

EISENMAN DIRECT BY MR. BOSTIC                                    6049

01:19PM   1    Q.   AND FROM YOUR PERSPECTIVE, WHAT WAS THE PURPOSE OF THOSE

01:19PM   2    CALLS WITH MS. HOLMES?

01:19PM   3    A.   TO DETERMINE THE PROGRESS OF THE COMPANY.

01:19PM   4    Q.   AND WHY WAS THAT INFORMATION THAT YOU NEEDED TO HAVE?

01:20PM   5    A.   BECAUSE I'M ALWAYS INTERESTED IN FOLLOWING THE COMPANIES

01:20PM   6    THAT I'M INVESTED IN.  THERE'S ALWAYS AN OPPORTUNITY TO INVEST

01:20PM   7    MORE IN LATER ROUNDS.  THERE'S POTENTIALLY AN OPPORTUNITY FOR

01:20PM   8    AN EXIT, WHICH IN THE EARLY YEARS THERE WAS COMMUNICATED THAT

01:20PM   9    THERE WOULD BE AN EXIT ONE YEAR AWAY, TWO YEARS AWAY, AND THAT

01:20PM   10   KEPT GETTING PUSHED FURTHER AWAY.  AND I WANT TO BE SENSITIVE

01:20PM   11   TO THE VALUE PROPOSITION IF I'M GOING TO CONSIDER A POTENTIAL

01:20PM   12   EXIT.

01:20PM   13   Q.   DO YOU RECALL WHETHER YOUR DISCUSSIONS DURING THOSE CALLS

01:20PM   14   INCLUDED MS. HOLMES PROVIDING INFORMATION ABOUT PRODUCT

01:20PM   15   DEVELOPMENT AND THE STATE OF THE TECHNOLOGY?

01:20PM   16   A.   YES, I DO RECALL, AND THAT WAS THE SUBSTANCE OF THE CALLS.

01:20PM   17   Q.   DURING THAT TIME PERIOD, SO NOW WE'RE TALKING ABOUT

01:20PM   18   FOLLOWING YOUR INVESTMENT, 2006, 2007, DID YOU HAVE AN

01:20PM   19   UNDERSTANDING OF WHAT TECHNOLOGY OR WHAT KIND OF DEVICE

01:21PM   20   THERANOS WAS DEVELOPING?

01:21PM   21   A.   YES.

01:21PM   22   Q.   AND WHAT WAS YOUR UNDERSTANDING?

01:21PM   23   A.   MY UNDERSTANDING WAS IT WAS A DEVICE TO ANALYZE BLOOD THAT

01:21PM   24   WAS MORE ACCURATE, AND PROVIDED MORE RAPID RESULTS, AND

01:21PM   25   INVOLVED A SMALLER BLOOD DRAW THAN CONVENTIONAL BLOOD TESTING

EISENMAN DIRECT BY MR. BOSTIC                                    6050

01:21PM   1    EQUIPMENT AND BLOOD TESTING THERAPIES.

01:21PM   2    Q.   DID MS. HOLMES TELL YOU ANYTHING ABOUT THE SCALEABILITY OF

01:21PM   3    THE THERANOS TECHNOLOGY?

01:21PM   4    A.   IT DEPENDS ON WHICH YEAR, BUT, YES, THERE WERE

01:21PM   5    CONVERSATIONS ALONG THE WAY ABOUT THE SCALEABILITY, ABOUT THE

01:21PM   6    APPLICATION.

01:21PM   7         AND THERE WERE ALSO CONVERSATIONS A COUPLE OF YEARS AFTER

01:21PM   8    WE INVESTED ABOUT THE DATA THAT THEY WERE GATHERING FROM THESE

01:21PM   9    PHARMACEUTICAL COMPANIES THAT WOULD BE A SECOND SOURCE OF

01:21PM  10    REVENUE POSSIBLY EQUALLING THE FIRST SOURCE OF REVENUE.

01:21PM  11    Q.   AND WHEN WE'RE TALKING ABOUT SCALEABILITY, WHAT DOES THAT

01:22PM  12    MEAN IN THE CONTEXT OF A COMPANY LIKE THIS?

01:22PM  13    A.   SCALEABILITY MEANS ACCEPTANCE INTO THE MARKETPLACE, MORE

01:22PM  14    APPLICATIONS, MORE PHARMACEUTICAL COMPANIES USING IT IN

01:22PM  15    CLINICAL TRIALS, DRUG DEVELOPMENT.

01:22PM  16         AND THIS IS A FEW YEARS FURTHER DOWN THE ROAD, BUT THERE

01:22PM  17    WAS ALSO TALK ABOUT APPLICATIONS IN THE MILITARY, APPLICATIONS

01:22PM  18    IN FOREIGN COUNTRIES FOR DIFFERENT TYPES OF DISEASES THAT WERE

01:22PM  19    MORE RAMPANT IN CERTAIN AREAS OF THE WORLD.

01:22PM  20    Q.   AND THIS WAS -- WHAT YOU'RE DESCRIBING NOW IS CONTENT OF

01:22PM  21    YOUR CONVERSATIONS WITH MS. HOLMES?

01:22PM  22    A.   YES.

01:22PM  23    Q.   YOU MENTIONED ONE IN-PERSON MEETING AS WELL DURING THESE

01:22PM  24    EARLY YEARS; IS THAT CORRECT?

01:22PM  25    A.   THAT'S CORRECT.

EISENMAN DIRECT BY MR. BOSTIC                                    6051

01:22PM   1      Q.   AND WHEN DID THAT HAPPEN?

01:22PM   2      A.   IT HAPPENED APPROXIMATELY 2008 OR '09.  IT WAS MY HIGH

01:22PM   3      SCHOOL SON'S SPRING BREAK TRIP TO CALIFORNIA, AND OUR FIRST

01:23PM   4      STOP WAS VISITING ELIZABETH AND GETTING A TOUR OF THE LAB.

01:23PM   5      Q.   WAS THAT AT THE THERANOS HEADQUARTERS?

01:23PM   6      A.   THAT WAS AT THE EARLY THERANOS HEADQUARTERS.

01:23PM   7      Q.   AND WHAT DO YOU REMEMBER ABOUT THAT VISIT?

01:23PM   8      A.   I REMEMBER BEING TAKEN INTO THE LAB AND SHOWN AN EARLY

01:23PM   9      VERSION OF THE READERS.  I RECALL THAT IT HAD MULTIPLE TESTS ON

01:23PM  10      EACH READER.  I THINK IT WAS MAYBE FIVE TESTS.

01:23PM  11           SO THEY HAD A PROTOTYPE THAT THEY APPARENTLY WERE USING,

01:23PM  12      AND YOU HAD THE CARTRIDGES, AND THEN YOU HAD THE READER.  YOU

01:23PM  13      PUT -- IT WAS EXPLAINED THAT YOU PUT THE BLOOD IN THE

01:23PM  14      CARTRIDGES, YOU PUT THE CARTRIDGE IN THE READER, AND THE READER

01:23PM  15      GAVE YOU THE TEST RESULTS.

01:23PM  16      Q.   YOU DESCRIBED WHAT YOU SAW AS AN "EARLY VERSION" OF THE

01:23PM  17      READER; IS THAT CORRECT?

01:23PM  18      A.   YES.

01:23PM  19      Q.   AND WHAT MAKES YOU CALL WHAT YOU SAW AS AN EARLY VERSION?

01:23PM  20      A.   BECAUSE WE LEARNED EITHER FROM RESOURCES IN THE COMPANY OR

01:23PM  21      THE WEBSITE OR PUBLICITY THAT IT WAS DIFFERENT VERSIONS THAT

01:24PM  22      CAME OUT.  I THINK THEY CALLED ONE OF THE EARLY VERSIONS THE

01:24PM  23      EDISON, AND THEN THERE WAS THE EDISON 2.  I DON'T REMEMBER THE

01:24PM  24      EXACT LABELLING, BUT THERE WERE BETTER AND BETTER VERSIONS OF

01:24PM  25      THE EARLIER TECHNOLOGY THAT APPARENTLY THE FINANCIAL PRESS

EISENMAN DIRECT BY MR. BOSTIC                                    6052

01:24PM  1    BROUGHT TO LIGHT.

01:24PM  2    Q.   CAN YOU DESCRIBE WHAT YOU SAW PHYSICALLY?  WHAT DID THE

01:24PM  3    DEVICE OR DEVICES LOOK LIKE?

01:24PM  4    A.   I DON'T HAVE A STRONG RECOLLECTION, BUT I DO REMEMBER THAT

01:24PM  5    THE THING THAT YOU PUT THE SAMPLES IN WAS FAIRLY SMALL, AND

01:24PM  6    THERE WAS SOME KIND OF A BOX THAT LOOKED LIKE A COMPUTER THAT

01:24PM  7    THOSE SAMPLES WENT INTO FOR READING PURPOSES.

01:24PM  8        BUT AGAIN, I DON'T HAVE A STRONG RECOLLECTION.  JUST A

01:24PM  9    LITTLE BIT FUZZY.

01:24PM  10   Q.   AND DO YOU REMEMBER ANYTHING ABOUT THE OVERALL SIZE OF THE

01:24PM  11   DEVICE, JUST ROUGHLY SPEAKING?

01:24PM  12   A.   I REMEMBER THE READER BEING FAIRLY SMALL, AND I THINK IT

01:24PM  13   WAS SORT OF RECTANGULAR.

01:25PM  14   Q.   WHEN YOU SAY "SMALL," CAN YOU ATTEMPT TO QUANTIFY IT TO

01:25PM  15   SOMETHING?

01:25PM  16   A.   MAYBE A HALF AN INCH BY FOUR INCHES.

01:25PM  17   Q.   SOMETHING THAT YOU CAN HOLD IN YOUR HANDS?

01:25PM  18   A.   YES.

01:25PM  19   Q.   AND DID YOU LATER COME TO UNDERSTAND THAT THERANOS WAS

01:25PM  20   WORKING ON A LARGER ANALYZER THAT WOULD SIT ON A DESKTOP?

01:25PM  21   A.   THERE WERE TWO OR THREE ADVANCED ITERATIONS, AND I

01:25PM  22   REMEMBER THERE WAS SOME CONVERSATIONS A FEW YEARS AFTER WE

01:25PM  23   INVESTED THAT THERE WERE -- THERE WAS SOME KIND OF A DESKTOP

01:25PM  24   THAT WAS FIRST PUT IN PHARMACEUTICAL COMPANIES FOR CLINICAL

01:25PM  25   TESTS, BUT THEN THERE WAS SOME CONVERSATION ABOUT THESE THINGS

EISENMAN DIRECT BY MR. BOSTIC                                    6053

01:25PM   1    WERE PORTABLE, AND THESE COULD BE IN EVERY DOCTOR'S OFFICES AND

01:25PM   2    POTENTIALLY IN PEOPLE'S HOMES.

01:25PM   3    Q.   THE LARGER ANALYZER THAT WE'RE REFERENCING, DID YOU EVER

01:26PM   4    SEE A PHYSICAL EXAMPLE OF THAT?

01:26PM   5    A.   YOU KNOW, I THINK I DID, BUT I'M NOT POSITIVE.

01:26PM   6    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING FROM YOUR

01:26PM   7    CONVERSATIONS WITH MS. HOLMES ABOUT CARTRIDGES THAT WOULD BE

01:26PM   8    USED IN CONNECTION WITH THE THERANOS ANALYZERS?

01:26PM   9    A.   YES.

01:26PM  10    Q.   AND WHAT DID YOU UNDERSTAND CARTRIDGES TO BE REFERRING TO?

01:26PM  11    A.   ARE WE TALKING ABOUT IN THE EARLY STAGE OR THE MIDDLE

01:26PM  12    STAGE BECAUSE THERE WAS A LITTLE BIT OF A DIFFERENCE?

01:26PM  13    Q.   I THINK WE'RE INTO THE MIDDLE STAGE NOW.

01:26PM  14         SO FIRST CAN YOU DEFINE WHAT YEARS WE'RE TALKING ABOUT IN

01:26PM  15    THE MIDDLE STAGE?

01:26PM  16    A.   OKAY.  THIS WAS, YOU KNOW, THREE OR FOUR YEARS INTO OUR

01:26PM  17    INVESTMENT.  THERE WERE CONVERSATIONS, AND THERE WAS AN EMAIL

01:26PM  18    EXCHANGE THAT THERE WAS, THERE WAS WIDE ACCEPTANCE IN THE

01:26PM  19    MARKETPLACE WITH THESE CARTRIDGES THAT COULD DO BETWEEN ONE AND

01:26PM  20    EITHER FIVE OR SIX TESTS, AND THEY WERE GOING TO CHARGE $30 PER

01:26PM  21    TEST FOR THESE CARTRIDGES.

01:27PM  22         AND THERE WAS CURRENT DEMAND FOR A MILLION OF THESE

01:27PM  23    CARTRIDGES A MONTH.  THAT THEY WERE SCALING UP.  THAT THEY WERE

01:27PM  24    DOING 200,000 IN FEBRUARY; THEY WERE GOING TO DO 300,000 IN

01:27PM  25    MARCH, BUT WITHIN A PERIOD OF 6 MONTHS THEY WERE GOING TO SCALE

EISENMAN DIRECT BY MR. BOSTIC                                    6054

01:27PM   1    UP TO MEET THE MARKET DEMAND OF 1 MILLION CARTRIDGES PER MONTH,

01:27PM   2    AND THEY THOUGHT THAT DEMAND IN THE NEXT YEAR WOULD GO TO 2

01:27PM   3    MILLION CARTRIDGES PER MONTH.

01:27PM   4         SO JUST DOING SIMPLE MATH, IF THE AVERAGE CARTRIDGE DOES

01:27PM   5    UP TO 5 TESTS AT $30 A TEST AND IT'S $100 FOR 3 TESTS, AND

01:27PM   6    YOU'RE DOING A MILLION OF THESE A MONTH, GOING TO 2 MILLION A

01:27PM   7    MONTH, AND THERE'S CURRENT DEMAND FOR A MILLION A MONTH, THESE

01:27PM   8    ARE NUMBERS THAT ARE PRETTY ASTOUNDING AND WOULD CREATE A VERY

01:27PM   9    SIGNIFICANT VALUE FOR THIS COMPANY.

01:27PM  10    Q.   YOU UNDERSTOOD THAT THIS WOULD BE REVENUE GENERATING

01:27PM  11    ACTIVITY BY THE COMPANY?

01:27PM  12    A.   YES.

01:27PM  13    Q.   THESE REPRESENTATIONS ABOUT THE DEMAND AND MANUFACTURING

01:28PM  14    OF THESE CARTRIDGES, WHEN DID THOSE CONVERSATIONS TAKE PLACE,

01:28PM  15    IF YOU RECALL?

01:28PM  16    A.   I WOULD HAVE TO LOOK AT MY NOTES, BUT MY RECOLLECTION IS

01:28PM  17    IT WAS ABOUT THREE OR FOUR YEARS AFTER MY INVESTMENT.  SO 2008,

01:28PM  18    2009.

01:28PM  19    Q.   LET ME DIRECT YOU TO YOUR NOTES.  IF YOU COULD TURN IN THE

01:28PM  20    BINDER IN FRONT OF YOU TO TAB 14.

01:28PM  21    A.   OKAY.

01:28PM  22    Q.   FIRST OF ALL, DOES THE DOCUMENT AT TAB 14 INCLUDE YOUR

01:28PM  23    HANDWRITTEN NOTES?

01:28PM  24    A.   YES, IT DOES.

01:28PM  25    Q.   I'LL DIRECT YOUR ATTENTION TO PAGE 14 OF TAB 14.

EISENMAN DIRECT BY MR. BOSTIC                                         6055

01:28PM   1    A.   OKAY.

01:28PM   2    Q.   AND I WANT YOU TO, JUST WHEN YOU GET THERE, ON PAGE 14 --

01:28PM   3    A.   GOT IT.

01:28PM   4    Q.   PAGE 14, TAKE A MOMENT AND REVIEW THAT PAGE TO YOURSELF

01:28PM   5    AND DON'T READ IT OUT LOUD, AND THEN LET ME KNOW WHEN YOU'RE

01:28PM   6    DONE.

01:28PM   7         (PAUSE IN PROCEEDINGS.)

01:28PM   8              THE WITNESS:  OKAY.

01:29PM   9    BY MR. BOSTIC:

01:29PM   10   Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN THESE

01:29PM   11   CONVERSATIONS ABOUT THE NUMBER OF CARTRIDGES TOOK PLACE?

01:29PM   12   A.   YES.  EARLIER THAN I RECALLED.  THIS WAS DATED 10-1-09.

01:29PM   13   Q.   DURING THESE CONVERSATIONS WITH MS. HOLMES IN THIS TIME

01:29PM   14   PERIOD DID SHE TELL YOU ANYTHING ABOUT WHETHER THE COMPANY WAS

01:29PM   15   CASH FLOW POSITIVE OR WHEN THAT WOULD HAPPEN?

01:29PM   16   A.   YES.  THERE WAS ONE ANNUAL MEETING IN THE WHOLE HISTORY OF

01:29PM   17   THE COMPANY, AND THEY WERE TALKING ABOUT THE REVENUES THAT WERE

01:29PM   18   CURRENTLY GENERATED AND THE CONTRACTS THAT THEY WERE CAPTURING.

01:29PM   19        THEY SAID AT THAT TIME THEY HAD ENOUGH CASH IN THE

01:29PM   20   TREASURY FOR A ONE AND A HALF YEAR RUNWAY, BUT WITHIN THAT ONE

01:30PM   21   AND A HALF YEAR RUNWAY, THE OTHER CONTRACTS WOULD START

01:30PM   22   CATCHING UP AND THEY WOULD NOT HAVE TO GO TO THE MARKETS TO

01:30PM   23   RAISE ADDITIONAL CAPITAL.

01:30PM   24   Q.   AND WHAT DID YOU HEAR ABOUT THE TIMING OF WHEN THE COMPANY

01:30PM   25   WOULD BE CASH FLOW POSITIVE, IF YOU RECALL?

EISENMAN DIRECT BY MR. BOSTIC                    6056

01:30PM  1    A.   THE TIMING WAS -- I'D HAVE TO REFER TO MY NOTES, BUT THE

01:30PM  2    TIMING WAS WITHIN A YEAR OR SO OF THIS POINT IN TIME.

01:30PM  3         SO AROUND 2010.

01:30PM  4    Q.   LET ME INVITE YOU TO LOOK AT PAGE 10 OF TAB 14.

01:30PM  5         WHEN YOU GET THERE, SAME THING AS BEFORE, JUST TAKE A

01:30PM  6    MOMENT TO REVIEW THOSE NOTES ON YOUR OWN.  LET ME KNOW WHEN

01:30PM  7    YOU'RE DONE.

01:30PM  8         (PAUSE IN PROCEEDINGS.)

01:30PM  9              THE WITNESS:  OKAY.

01:31PM  10   BY MR. BOSTIC:

01:31PM  11   Q.   AND, MR. EISENMAN, DOES THAT REFRESH YOUR RECOLLECTION AS

01:31PM  12   TO INFORMATION THAT MS. HOLMES GAVE YOU ABOUT THE COMPANY

01:31PM  13   BECOMING CASH FLOW POSITIVE?

01:31PM  14   A.   YES.

01:31PM  15   Q.   DID MS. HOLMES -- WELL, FIRST LET ME ASK, WHAT DOES "CASH

01:31PM  16   FLOW POSITIVE" MEAN IN THE CONTEXT OF A COMPANY LIKE THIS?

01:31PM  17   A.   CASH FLOW POSITIVE MEANS THAT YOU'RE GENERATING MORE CASH

01:31PM  18   THAN YOU'RE EXPENDING, AND ONE OF THE REASONS THAT THAT'S

01:31PM  19   IMPORTANT IS THAT YOU DON'T HAVE TO GO OUT TO THE MARKETS AND

01:31PM  20   RAISE MORE CASH, MORE CAPITAL.

01:31PM  21   Q.   IS THAT AN IMPORTANT MILESTONE FROM AN INVESTOR'S

01:31PM  22   PERSPECTIVE?

01:31PM  23   A.   IT'S A HUGE MILESTONE BECAUSE YOUR COMPANY IS NO LONGER A

01:31PM  24   SEED COMPANY, IT'S A GROWING COMPANY.  IT'S A MUCH LATER STAGE

01:32PM  25   AND MUCH LESS RISKY AND MUCH MORE VALUABLE.

EISENMAN DIRECT BY MR. BOSTIC                                    6057

01:32PM  1    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THE TIMING OF

01:32PM  2    THERANOS BECOMING CASH FLOW POSITIVE?

01:32PM  3    A.   CASH FLOW POSITIVE BY THE END OF '08.

01:32PM  4    Q.   AND WAS THAT GOOD NEWS TO YOU AS AN INVESTOR?

01:32PM  5    A.   THAT WAS TREMENDOUS NEWS, VERY GOOD NEWS.

01:32PM  6              MR. BOSTIC:  YOUR HONOR, DID THE COURT SAY IT

01:32PM  7    INTENDED TO TAKE A BREAK AT 1:30?

01:32PM  8              THE COURT:  YES.

01:32PM  9              MR. BOSTIC:  THIS MAY BE A GOOD STOPPING POINT.

01:32PM 10              THE COURT:  LET'S DO THAT.  LET'S TAKE A BREAK FOR

01:32PM 11    30 MINUTES, LADIES AND GENTLEMEN, 30 MINUTES.

01:32PM 12         YOU CAN STEP DOWN, SIR.  WE WILL RESUME IN 30 MINUTES.

01:32PM 13              THE WITNESS:  OKAY.  THANK YOU.

01:32PM 14              THE COURT:  YOU'RE WELCOME.

01:51PM 15         (LUNCH RECESS TAKEN AT 1:32 P.M.)

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

                         UNITED STATES COURT REPORTERS
                                  **ER-9685**

EISENMAN DIRECT BY MR. BOSTIC                                   6058

| | | |
|---|---|---|
| 01:51PM | 1 | **AFTERNOON SESSION** |
| 02:07PM | 2 | (JURY IN AT 2:07 P.M.) |
| 02:07PM | 3 | THE COURT:  THANK YOU.  LADIES AND GENTLEMEN, PLEASE |
| 02:07PM | 4 | BE SEATED.  WE'RE BACK ON THE RECORD.  THE JURY IS PRESENT. |
| 02:07PM | 5 | ALL COUNSEL IS PRESENT.  MS. HOLMES IS PRESENT.  THE |
| 02:07PM | 6 | WITNESS IS ON THE STAND. |
| 02:07PM | 7 | MR. BOSTIC, YOU'D LIKE TO CONTINUE? |
| 02:07PM | 8 | MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU. |
| 02:07PM | 9 | Q.  WELCOME BACK, MR. EISENMAN. |
| 02:07PM | 10 | A.  THANK YOU. |
| 02:07PM | 11 | Q.  IN THE BINDER IN FRONT OF YOU CAN I ASK YOU TO TURN TO THE |
| 02:07PM | 12 | TAB MARKED 663, PLEASE. |
| 02:08PM | 13 | A.  OKAY. |
| 02:08PM | 14 | Q.  AND AT TAB 663 ARE YOU LOOKING AT AN EMAIL CHAIN INCLUDING |
| 02:08PM | 15 | MESSAGES BETWEEN YOU, SOMEONE NAMED NANCY MINNIG, AND |
| 02:08PM | 16 | ELIZABETH HOLMES? |
| 02:08PM | 17 | A.  YES. |
| 02:08PM | 18 | Q.  AND IS THIS EMAIL CORRESPONDENCE RELATING TO INFORMATION |
| 02:08PM | 19 | THAT YOU WERE SEEKING TO OBTAIN FROM MS. HOLMES ABOUT THERANOS? |
| 02:08PM | 20 | A.  YES. |
| 02:08PM | 21 | MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 663. |
| 02:08PM | 22 | MR. DOWNEY:  NO OBJECTION. |
| 02:08PM | 23 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:08PM | 24 | (GOVERNMENT'S EXHIBIT 663 WAS RECEIVED IN EVIDENCE.) |
| 02:08PM | 25 | MR. BOSTIC:  MS. HOLLIMAN, IF WE CAN START WITH PAGE |

EISENMAN DIRECT BY MR. BOSTIC                              6059

02:08PM   1    4 OF EXHIBIT 663.

02:08PM   2              THE WITNESS:  OKAY.

02:08PM   3    BY MR. BOSTIC:

02:08PM   4    Q.   MR. EISENMAN, THIS WILL BE ON THE SCREEN IN FRONT OF YOU,

02:08PM   5    AND YOU CAN ALSO REFERENCE THE COPY IN THE BINDER.

02:09PM   6         LET'S ZOOM IN ON THE BOTTOM OF PAGE 4 AND LOOK AT THE

02:09PM   7    HEADER THERE.

02:09PM   8         AND, MR. EISENMAN, DO YOU SEE WE'RE ABOUT TO LOOK AT AN

02:09PM   9    EMAIL FROM YOU TO ELIZABETH HOLMES?

02:09PM  10    A.   YES.

02:09PM  11    Q.   LET'S GO TO THE NEXT PAGE, PAGE 5.  LET'S ZOOM IN ON THE

02:09PM  12    TEXT OF THE EMAIL.

02:09PM  13         FIRST OF ALL, DO YOU SEE THE DATE OF THE EMAIL IS MAY 3RD,

02:09PM  14    2010?

02:09PM  15    A.   YES, I DO.

02:09PM  16    Q.   IN THE EMAIL YOU WRITE, "ELIZABETH,

02:09PM  17         "CAN WE SCHEDULE OUR QUARTERLY UPDATE THE WEEK OF JUNE

02:09PM  18    FIRST TO JUNE 4TH."

02:09PM  19         DO YOU SEE THAT?

02:09PM  20    A.   YES, I DO.

02:09PM  21    Q.   DURING THAT PERIOD OF MID 2010 HAD YOU STILL BEEN HAVING

02:09PM  22    THOSE QUARTERLY UPDATE CALLS WITH MS. HOLMES?

02:09PM  23    A.   YES.

02:09PM  24    Q.   YOU ALSO HAVE SOME QUESTIONS FOR HER IN THIS EMAIL; IS

02:09PM  25    THAT RIGHT?

EISENMAN DIRECT BY MR. BOSTIC                                    6060

02:09PM   1     A.   YES.

02:09PM   2     Q.   YOU'RE ASKING FOR A RESPONSE TO A COUPLE OF QUESTIONS.

02:10PM   3          ITEM NUMBER 1 YOU WRITE, "YOU SAID IN MARCH YOU WERE

02:10PM   4     MANUFACTURING ABOUT 500,000 CARTRIDGES AND SELLING ABOUT

02:10PM   5     400,000 AT ABOUT $80 PER CARTRIDGE.  CAN YOU SHARE THE SAME

02:10PM   6     STATISTICS FOR APRIL, AND AN ESTIMATE FOR MAY?"

02:10PM   7          DO YOU SEE THAT?

02:10PM   8     A.   YES, I DO.

02:10PM   9     Q.   DO YOU RECALL MS. HOLMES TELLING YOU ABOUT MANUFACTURING

02:10PM   10    HUNDREDS OF THOUSANDS OF CARTRIDGES ON A MONTHLY BASIS?

02:10PM   11    A.   YES, I DO.

02:10PM   12    Q.   AND AGAIN, WHAT WAS YOUR UNDERSTANDING OF WHAT THESE

02:10PM   13    CARTRIDGES WERE AND HOW THEY WERE BEING USED?

02:10PM   14    A.   THE CARTRIDGES HAD BETWEEN ONE AND EITHER FIVE OR SIX

02:10PM   15    TESTS, AND THEY WERE SELLING THEM FOR $30 PER TEST, AND THEY

02:10PM   16    WERE GEARING UP TO MEET THE DEMAND, WHICH THEY SAID WAS OR SHE

02:10PM   17    SAID WAS CURRENTLY A MILLION A MONTH, POSSIBLY GOING TO

02:10PM   18    2 MILLION A MONTH IN THE NEXT YEAR.

02:10PM   19    Q.   AND IN YOUR EMAIL YOU ASK FOR CARTRIDGE MANUFACTURE

02:11PM   20    NUMBERS FOR APRIL AND AN ESTIMATE FOR MAY; IS THAT RIGHT?

02:11PM   21    A.   CORRECT.

02:11PM   22    Q.   AND WHY WERE YOU ASKING FOR THAT INFORMATION?

02:11PM   23    A.   TO SEE THE TREND IF INDEED THEY WERE MANUFACTURING AND

02:11PM   24    DELIVERING INCREASING NUMBERS APPROACHING THE MILLION -- A

02:11PM   25    MILLION CARTRIDGES PER MONTH.

EISENMAN DIRECT BY MR. BOSTIC                                    6061

| | | |
|---|---|---|
| 02:11PM | 1 | Q.   AND WHY WERE YOU INTERESTED IN THAT AS AN INVESTOR? |
| 02:11PM | 2 | A.   ONE OF THE MAIN INDICATIONS OF VALUE IS REVENUE AND EARLY |
| 02:11PM | 3 | STAGE COMPANIES SELL AT A MULTITUDE OF REVENUE, SO IF THEY WERE |
| 02:11PM | 4 | POTENTIALLY GENERATING $200- OR $300,000 MILLION IN REVENUE, |
| 02:11PM | 5 | THE COMPANY WAS POTENTIALLY WORTH $1, $2, OR $3 BILLION AT THAT |
| 02:11PM | 6 | TIME.  AND AT THE POINT OF OUR INVESTMENT, THE ENTIRE COMPANY |
| 02:11PM | 7 | WAS ONLY WORTH $150 MILLION. |
| 02:11PM | 8 | Q.   SO THIS WAS AN EFFORT BY YOU TO TRY TO BETTER UNDERSTAND |
| 02:11PM | 9 | WHAT YOUR INVESTMENT WAS WORTH? |
| 02:11PM | 10 | A.   EXACTLY. |
| 02:11PM | 11 | Q.   AND IN THAT SAME EMAIL YOU ASK ABOUT WHETHER MS. HOLMES |
| 02:12PM | 12 | HAS ANY THOUGHTS OF A SHAREHOLDER MEETING IN ITEM NUMBER 2. |
| 02:12PM | 13 | DO YOU SEE THAT? |
| 02:12PM | 14 | A.   YES. |
| 02:12PM | 15 | Q.   AND WAS THAT ALSO FOR THE PURPOSE OF POTENTIALLY GETTING |
| 02:12PM | 16 | MORE INFORMATION ABOUT THE COMPANY? |
| 02:12PM | 17 | A.   YES. |
| 02:12PM | 18 | Q.   AND IN ITEM NUMBER 4 YOU SAY, "ARE THERE ANY OTHER |
| 02:12PM | 19 | SIGNIFICANT ITEMS THAT YOU CAN SHARE BEFORE WE HAVE OUR |
| 02:12PM | 20 | QUARTERLY UPDATE CALL?" |
| 02:12PM | 21 | WERE YOU ASKING THAT QUESTION FOR THE SAME REASON? |
| 02:12PM | 22 | A.   YES. |
| 02:12PM | 23 | Q.   LET'S LOOK AT PAGE 4 OF THIS EXHIBIT.  ZOOM IN ON THE |
| 02:12PM | 24 | MIDDLE OF THE PAGE.  THERE'S AN EMAIL FROM YOU ON MAY 10TH, |
| 02:12PM | 25 | 2010. |

EISENMAN DIRECT BY MR. BOSTIC                                    6062

02:12PM  1        SO ONE WEEK AFTER THE EMAIL THAT WE JUST LOOKED AT;

02:12PM  2   CORRECT?

02:12PM  3   A.   YES.

02:12PM  4   Q.   IN THAT MESSAGE YOU WRITE AGAIN TO MS. HOLMES, "WOULD IT

02:12PM  5   BE POSSIBLE TO GET A RESPONSE TODAY?  I HAVE BEEN TRYING SINCE

02:12PM  6   LAST MONDAY."

02:12PM  7        WAS THIS A CONTINUING EFFORT TO TRY TO OBTAIN INFORMATION

02:12PM  8   ABOUT THE COMPANY?

02:12PM  9   A.   YES, IT WAS.

02:12PM 10   Q.   LET'S GO TO PAGE 3 OF THIS EXHIBIT NOW, SO WE'RE MOVING

02:13PM 11   FORWARD IN TIME.

02:13PM 12        LET'S ZOOM IN ON THE BOTTOM TWO-THIRDS OF THE PAGE.

02:13PM 13   STARTING WHERE IT SAYS, "ALAN."

02:13PM 14   A.   OKAY.

02:13PM 15   Q.   WE SEE HERE A RESPONSE FROM MS. HOLMES; IS THAT RIGHT?

02:13PM 16   A.   YES.

02:13PM 17   Q.   SHE SAYS THAT SHE RECEIVED YOUR EMAILS.  SHE SAYS, "JUNE

02:13PM 18   IS A TOUGH MONTH FOR US, AND I DON'T KNOW WHEN WE CAN DO OUR

02:13PM 19   NEXT CALL.  AS YOU KNOW, WE DON'T DO QUARTERLY CALLS WITH OUR

02:13PM 20   OTHER INVESTORS, MANY OF WHOM INVESTED MUCH GREATER AMOUNTS

02:13PM 21   THAN YOU DID."

02:13PM 22        DO YOU SEE THAT?

02:13PM 23   A.   YES, I DO.

02:13PM 24   Q.   SHE THEN SAYS IN THE FOLLOWING PARAGRAPH, "AS DISCUSSED IN

02:13PM 25   OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION

EISENMAN DIRECT BY MR. BOSTIC                                    6063

02:13PM   1    YOU KEEP REQUESTING."

02:13PM   2        DO YOU RECALL AROUND THIS TIME PERIOD CONVERSATIONS WITH

02:13PM   3    MS. HOLMES ABOUT HER NOT BEING ABLE OR WILLING TO PROVIDE THE

02:13PM   4    LEVEL OF COMMUNICATION THAT YOU WANTED?

02:13PM   5    A.   YES, I DO.

02:13PM   6    Q.   AND DID SHE GIVE YOU AN EXPLANATION AS TO WHY THAT WAS THE

02:14PM   7    CASE?

02:14PM   8    A.   THERE WAS NO EXPLANATION.

02:14PM   9    Q.   BELOW THAT HER EMAIL GOES ON TO SAY, "WITH THE DEALS WE

02:14PM   10   ARE FORMALIZING WITH RETAILERS, WE ARE NOW OBLIGATED NOT TO

02:14PM   11   DISCLOSE OUR PRODUCTION VOLUMES AND CARTRIDGE SALE PRICES."

02:14PM   12       DO YOU SEE THAT?

02:14PM   13   A.   YES.

02:14PM   14   Q.   AND WHAT WAS YOUR UNDERSTANDING OF THAT STATEMENT?

02:14PM   15   A.   THERE WAS SOME INFORMATION THAT THEY WERE TRYING TO HAVE

02:14PM   16   THEIR DEVICES AND CHANGE THE PHARMACIES.  THERE WAS THE NAME

02:14PM   17   WAL-MART THAT WAS MENTIONED, CVS, WALGREENS.

02:14PM   18       SO WE DIDN'T HAVE ANY DIRECT KNOWLEDGE, BUT THERE WAS SOME

02:14PM   19   INFORMATION THAT THEY WERE TRYING TO MOVE ALL OF THE READERS

02:14PM   20   INTO ONE CHAIN OF PHARMACIES.

02:14PM   21   Q.   AND WHAT DID THAT HAVE TO DO WITH YOUR REQUEST FOR

02:14PM   22   INFORMATION ABOUT PRODUCTION VOLUME INFORMATION?

02:14PM   23   A.   I THINK IT WAS IRRELEVANT.

02:15PM   24       AS A SHAREHOLDER, I'VE HAD LOTS OF CONVERSATIONS WITH

02:15PM   25   SIMILAR SITUATIONS WHERE THERE IS A CERTAIN LEVEL OF

EISENMAN DIRECT BY MR. BOSTIC                            6064

02:15PM  1    COMMUNICATION AND IF IT IS SENSITIVE INFORMATION, THERE'S A

02:15PM  2    SIMPLE SOLUTION, YOU JUST SIGN AN NDA, NONDISCLOSURE AGREEMENT,

02:15PM  3    SO ANY CONVERSATION THAT YOU HAVE --

02:15PM  4            MR. DOWNEY:  YOUR HONOR, EXCUSE ME.  I MOVE TO

02:15PM  5    STRIKE EVERYTHING AFTER "IRRELEVANT" IN THE ANSWER GIVEN.

02:15PM  6            (PAUSE IN PROCEEDINGS.)

02:15PM  7            THE COURT:  ALL RIGHT.  I'LL STRIKE EVERYTHING AFTER

02:15PM  8    THE WORD "IRRELEVANT."

02:15PM  9        THE ANSWER WAS "I THINK IT WAS IRRELEVANT."  AND THEN

02:15PM  10   EVERYTHING AFTER THAT, LADIES AND GENTLEMEN, IS STRICKEN AS

02:15PM  11   NONRESPONSIVE.

02:15PM  12       YOU CAN ASK ANOTHER QUESTION, MR. BOSTIC.

02:15PM  13   BY MR. BOSTIC:

02:15PM  14   Q.   MR. EISENMAN, DID MS. HOLMES EVER EXPLAIN TO YOU THAT SHE

02:16PM  15   WAS UNABLE TO PROVIDE THE INFORMATION THAT YOU WERE REQUESTING

02:16PM  16   BECAUSE IT WAS CONFIDENTIAL?

02:16PM  17   A.   NO.

02:16PM  18   Q.   IF SHE HAD EXPLAINED THAT TO YOU AND ASKED YOU TO SIGN AN

02:16PM  19   NDA, WOULD YOU HAVE BEEN WILLING TO SIGN ONE?

02:16PM  20   A.   YES.  I'VE DONE IT MANY TIMES.

02:16PM  21   Q.   LET'S MOVE ON IN THIS EMAIL.  AT THE BOTTOM OF PAGE 3

02:16PM  22   MS. HOLMES WRITES -- IF WE COULD ZOOM BACK IN ON THE VERY

02:16PM  23   BOTTOM PARAGRAPH.  MS. HOLMES WRITES, "GIVEN YOUR FRUSTRATION

02:16PM  24   LEVEL AND OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I

02:16PM  25   STRONGLY ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I

EISENMAN DIRECT BY MR. BOSTIC                                    6065

02:16PM 1    PRESENTED ON OUR LAST CALL TO REALIZE THE RETURN ON YOUR

02:16PM 2    INVESTMENT."

02:16PM 3        LET'S GO TO PAGE 4.  AT THE TOP OF THE PAGE MS. HOLMES

02:16PM 4    SAYS, "WE RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME,

02:16PM 5    AND IF WE PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN

02:17PM 6    PROVIDE YOU WITH A GREATER THAN 5X RETURN ON YOUR INVESTMENT IN

02:17PM 7    THERANOS."

02:17PM 8        DO YOU SEE THAT?

02:17PM 9    A.   YES.

02:17PM 10   Q.   AROUND THIS TIME PERIOD, DO YOU RECALL CONVERSATIONS WITH

02:17PM 11   MS. HOLMES ABOUT POTENTIALLY EXITING FROM YOUR INVESTMENT IN

02:17PM 12   THE COMPANY?

02:17PM 13   A.   YES, I HAVE A CLEAR RECOLLECTION.

02:17PM 14   Q.   AND TELL US ABOUT THOSE COMMUNICATIONS?

02:17PM 15   A.   AS ELIZABETH MENTIONED, THERE WAS FRUSTRATION WITH ME

02:17PM 16   TRYING TO GET INFORMATION ON THE COMPANY.  AND THERE WAS NOT

02:17PM 17   JUST A LIMITED AMOUNT OF INFORMATION, THERE WAS NO INFORMATION

02:17PM 18   COMING FROM THE COMPANY.  AND TO ME THAT'S, THAT'S A SIGN OF

02:17PM 19   TROUBLE.

02:17PM 20       I'VE BEEN INVESTORS IN OTHER COMPANIES, AND WHEN

02:17PM 21   INFORMATION DOESN'T FLOW --

02:17PM 22             MR. DOWNEY:  YOUR HONOR, YOUR HONOR, I MOVE TO

02:17PM 23   STRIKE THIS ANSWER AS NONRESPONSIVE.  AND MAYBE THE QUESTION

02:17PM 24   CAN BE ASKED AGAIN.

02:17PM 25             THE COURT:  WELL, I THINK THE LAST TWO WORDS ARE

EISENMAN DIRECT BY MR. BOSTIC                              6066

02:18PM   1    NONRESPONSIVE, BUT THE BALANCE OF THE ANSWER WILL REMAIN.

02:18PM   2         BUT WHY DON'T YOU ASK ANOTHER QUESTION TO FOLLOW UP.

02:18PM   3              MR. BOSTIC:  SURE.

02:18PM   4    Q.   MR. EISENMAN, TELL US WHAT YOU RECALL ABOUT THE CONTENT OF

02:18PM   5    YOUR COMMUNICATIONS WITH MS. HOLMES AROUND THIS TIME ABOUT

02:18PM   6    POSSIBLY EXITING FROM YOUR INVESTMENT?  WHAT WAS SAID BETWEEN

02:18PM   7    THE TWO OF YOU?

02:18PM   8    A.   UM, THERE WAS A SERIES OF CONVERSATIONS ABOUT A LIQUIDITY

02:18PM   9    EVENT THAT WE WERE EXPECTING.  IT WAS FIRST 12 TO 18 MONTHS

02:18PM  10    AFTER WE INVESTED, AND THEN IT WAS 2 YEARS AFTER, THEN 3 YEARS

02:18PM  11    AFTER, THEN 4 YEARS AFTER, AND THAT WAS ONE OF THE DATA POINTS

02:18PM  12    THAT I WAS TRYING TO GET BECAUSE ALL INVESTORS WOULD LIKE TO

02:18PM  13    EXIT AT SOME POINT.

02:18PM  14         AND THAT POINT -- IF A COMPANY SAYS SOMETHING AND IT

02:18PM  15    CHANGES, THAT'S OKAY, BUT IF IT KEEPS CHANGING YEAR AFTER YEAR

02:18PM  16    AFTER YEAR, IT RAISES SUSPICION.

02:19PM  17         AND I WAS, I WAS MORE PROACTIVE AS A STAKEHOLDER THAN

02:19PM  18    OTHER STAKEHOLDERS.  AND MANAGEMENT, PARTICULARLY ELIZABETH,

02:19PM  19    DID NOT LIKE THE FACT THAT I WAS TRYING TO COMMUNICATE AND

02:19PM  20    TRYING TO GET INFORMATION.

02:19PM  21         SO THIS WAS A WAY THAT WAS PROPOSED FROM ELIZABETH TO ME

02:19PM  22    TO TAKE ME OUT OF MY POSITION.

02:19PM  23    Q.   AND WHAT WAS THAT PROPOSAL FROM MS. HOLMES?

02:19PM  24    A.   THE PROPOSAL IS STATED HERE.  SHE WAS GOING TO PROVIDE A

02:19PM  25    LIQUIDITY EVENT FOR MY INVESTMENT OF GREATER THAN 5 TIMES MY

EISENMAN DIRECT BY MR. BOSTIC                                    6067

02:19PM   1      COST.

02:19PM   2      Q.   AT THAT TIME DID YOU FEEL LIKE YOU HAD THE INFORMATION

02:19PM   3      FROM THE COMPANY THAT YOU NEEDED TO DECIDE WHETHER TO TAKE PART

02:19PM   4      IN THAT TRANSACTION?

02:19PM   5              MR. DOWNEY:   YOUR HONOR, I OBJECT TO THIS AS 401 AND

02:19PM   6      403.   WE'RE WELL OUTSIDE ANY ISSUES IN THE CASE HERE IN TERMS

02:19PM   7      OF HAVING HIM NARRATE HIS MINDSET ON THESE ISSUES.

02:20PM   8              THE COURT:   MR. BOSTIC, WHAT IS THE RELEVANCE OF

02:20PM   9      THIS?

02:20PM   10             MR. BOSTIC:   SO, YOUR HONOR, PART OF THE SCOPE OF

02:20PM   11     THE TESTIMONY HERE WILL RELATE TO MR. EISENMAN'S CONTINUING

02:20PM   12     EFFORTS TO GET INFORMATION FROM THE COMPANY.   I BELIEVE HE

02:20PM   13     SHOULD BE ALLOWED TO EXPLAIN WHY HE WAS SEEKING THAT

02:20PM   14     INFORMATION.

02:20PM   15             THE COURT:   WELL, I'LL ALLOW HIM TO CONTINUE WITH

02:20PM   16     THIS BY QUESTION AND ANSWER.

02:20PM   17     BY MR. BOSTIC:

02:20PM   18     Q.   AND LET ME ASK, MR. EISENMAN, AROUND THIS TIME PERIOD WHEN

02:20PM   19     MS. HOLMES HAD MADE THIS PROPOSAL, WERE YOU SEEKING MORE

02:20PM   20     INFORMATION FROM THE COMPANY TO HELP YOU DECIDE WHETHER TO

02:20PM   21     ACCEPT THAT OFFER OR NOT?

02:20PM   22     A.   YES.

02:20PM   23     Q.   LET'S LOOK AT PAGE 2 OF EXHIBIT 663.   LET'S ZOOM IN ON THE

02:20PM   24     TOP HALF.

02:21PM   25             MR. EISENMAN, IS THIS YOUR RESPONSE TO THE EMAIL FROM

EISENMAN DIRECT BY MR. BOSTIC                                        6068

02:21PM  1    MS. HOLMES THAT WE JUST SAW?

02:21PM  2    A.   YES, IT IS.

02:21PM  3    Q.   YOU THANK HER FOR HER RESPONSE AND YOU SAY, "MY QUESTIONS

02:21PM  4    WERE MERELY A FOLLOW UP FROM OUR DECEMBER CALL WHEN YOU SAID

02:21PM  5    THAT:" AND THEN YOU INCLUDE A LIST BELOW.

02:21PM  6         DO YOU SEE THAT?

02:21PM  7    A.   YES, I DO.

02:21PM  8    Q.   IS THIS LIST RECOUNTING THINGS THAT MS. HOLMES TOLD YOU ON

02:21PM  9    A PHONE CALL IN DECEMBER?

02:21PM  10   A.   YES, IT WAS.

02:21PM  11   Q.   ITEM NUMBER 1 ON THIS LIST TALKS ABOUT A STATEMENT FROM

02:21PM  12   MS. HOLMES THAT "THE COMPANY WAS CLOSE TO ACHIEVING $200

02:21PM  13   MILLION IN SALES FOR 2009."

02:21PM  14        DO YOU SEE THAT?

02:21PM  15   A.   YES.

02:21PM  16   Q.   AND DO YOU RECALL MS. HOLMES TELLING YOU THAT THERANOS WAS

02:21PM  17   GOING TO ACHIEVE $200 MILLION IN SALES FOR THE YEAR 2009?

02:21PM  18   A.   YES, I DO.

02:21PM  19   Q.   AND YOU'RE WRITING THIS EMAIL IN MAY OF 2010?

02:21PM  20   A.   YES.

02:21PM  21   Q.   AND SO WERE YOU SEEKING TO FIND OUT IF THE COMPANY HAD HIT

02:22PM  22   THAT TARGET?

02:22PM  23   A.   YES.

02:22PM  24   Q.   YOU ASK FOR THE FINAL FIGURE?  DID MS. HOLMES EVER PROVIDE

02:22PM  25   THAT INFORMATION?  DID SHE EVER TELL YOU WHETHER THE COMPANY

EISENMAN DIRECT BY MR. BOSTIC                                    6069

02:22PM   1    HIT THAT $200 MILLION MARK?

02:22PM   2    A.   THERE WAS AN EMAIL THAT SAID THAT THAT GOAL WAS STRETCHED

02:22PM   3    ANOTHER YEAR.

02:22PM   4    Q.   UNDER ITEM 2 YOU TALK ABOUT THE QUARTERLY UPDATE SCHEDULE

02:22PM   5    THAT YOU HAD UNTIL THEN AND YOU SAY, "SINCE THIS IS MY ONLY

02:22PM   6    AVENUE FOR INFORMATION, I HOPE YOU THAT YOU CAN FIND 20 TO

02:22PM   7    30 MINUTES FOR AN UPDATE IN JUNE AND I AM HAPPY TO CONTACT

02:22PM   8    AFTER HOURS OR ON A WEEKEND."

02:22PM   9         DO YOU SEE THAT?

02:22PM  10    A.   YES.

02:22PM  11    Q.   AND ABOUT HOW LONG HAD EACH OF THESE QUARTERLY CALLS BEEN?

02:22PM  12    A.   TWENTY TO THIRTY MINUTES.

02:22PM  13    Q.   SO APPROXIMATELY ONE TO TWO HOURS PER YEAR OF PHONE

02:22PM  14    COMMUNICATIONS WITH MS. HOLMES DURING THESE QUARTERLY CALLS?

02:23PM  15    A.   YES, AND OCCASIONAL CALLS IN BETWEEN.

02:23PM  16    Q.   UNDER ITEM 3 THERE'S SOME ADDITIONAL DISCUSSION ABOUT

02:23PM  17    DEMAND PER CARTRIDGES PER MONTH AND PRODUCTION NUMBERS.

02:23PM  18         DO YOU SEE THAT?

02:23PM  19    A.   YES.

02:23PM  20    Q.   DID MS. HOLMES EVER RESPOND TO PROVIDE YOU WITH UPDATED

02:23PM  21    INFORMATION ABOUT THE VOLUME OF THERANOS'S CARTRIDGE

02:23PM  22    PRODUCTION?

02:23PM  23    A.   NO.

02:23PM  24    Q.   LOOKING AT PAGE 1 OF THE EXHIBIT, THERE ARE SOME EMAILS

02:23PM  25    BETWEEN YOU AND SOMEONE NAMED NANCY MINNIG.

EISENMAN DIRECT BY MR. BOSTIC                                6070

02:23PM  1         DO YOU SEE THAT?

02:23PM  2    A.   YES.

02:23PM  3    Q.   AND WHO WAS NANCY MINNIG?

02:23PM  4    A.   NANCY MINNIG WAS DON LUCAS'S EXECUTIVE ASSISTANT.

02:23PM  5    Q.   AND WHY DID YOU REACH OUT TO HER AT THIS TIME?

02:23PM  6    A.   BECAUSE I WAS A FRUSTRATED STAKEHOLDER TRYING TO SEEK

02:23PM  7    INFORMATION ON MY INVESTMENT, AND I WASN'T GETTING IT FROM THE

02:23PM  8    COMPANY.

02:24PM  9    Q.   FOLLOWING THIS APPROXIMATE TIME PERIOD, WHAT HAPPENS WITH

02:24PM 10    THE FREQUENCY OF YOUR CONTACT WITH MS. HOLMES?

02:24PM 11    A.   IT DROPPED TO ZERO.

02:24PM 12    Q.   DID THE QUARTERLY CALLS CEASE?

02:24PM 13    A.   THEY CEASED.

02:24PM 14    Q.   WERE THERE ANY IN-PERSON MEETINGS FOLLOW THIS MID 2010

02:24PM 15    TIME PERIOD FOR THE NEXT YEAR OR TWO?

02:24PM 16    A.   NO.

02:24PM 17    Q.   DID YOU CONTINUE TO MAKE ATTEMPTS TO GET MORE INFORMATION

02:24PM 18    FROM MS. HOLMES ABOUT THERANOS?

02:24PM 19    A.   I MADE AN ATTEMPT TO GET INFORMATION WHEREVER I COULD,

02:24PM 20    FROM DIRECTORS, FROM WHATEVER SOURCES WERE AVAILABLE, AND THEY

02:24PM 21    WERE VERY LIMITED.

02:24PM 22    Q.   I'LL ASK YOU TO LOOK AT TAB 713 IN YOUR BINDER, PLEASE.

02:24PM 23    IS EXHIBIT 713 ANOTHER EMAIL CHAIN BETWEEN YOU, AND MS. HOLMES,

02:25PM 24    AND MS. MINNIG RELATING TO REQUESTS FOR INFORMATION ABOUT

02:25PM 25    THERANOS?

EISENMAN DIRECT BY MR. BOSTIC                                6071

02:25PM  1      A.   YES.

02:25PM  2                MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 713.

02:25PM  3                MR. DOWNEY:  YOUR HONOR, I HAVE NO OBJECTION TO THE

02:25PM  4      DOCUMENT.  THERE ARE SOME LAYERS OF DOUBLE HEARSAY IN HERE AT

02:25PM  5      THE BOTTOM OF PAGE 4, THE FIRST SENTENCE OF THE NOVEMBER 13TH

02:25PM  6      EMAIL AT 9:39 A.M., AND THERE ARE TWO OTHER INSTANCES.

02:25PM  7                THE COURT:  MR. BOSTIC?

02:25PM  8                MR. BOSTIC:  YOUR HONOR, I DON'T NEED THIS ADMITTED

02:25PM  9      FOR THE TRUTH.  THIS IS SIMPLY TO SHOW THE CORRESPONDENCE

02:25PM  10     BETWEEN THIS WITNESS AND THE DEFENDANT.

02:26PM  11               THE COURT:  SO IT GOES TO THIS WITNESS'S STATE OF

02:26PM  12     MIND AS TO CORRESPONDENCE.

02:26PM  13               MR. BOSTIC:  CORRECT, THIS WITNESS'S STATE OF MIND

02:26PM  14     AS WELL AS HIS DECISION MAKING AND THE DEFENDANT'S STATE OF

02:26PM  15     MIND AND KNOWLEDGE.

02:26PM  16               MR. DOWNEY:  WELL, YOUR HONOR, IF I MIGHT?  IF YOU

02:26PM  17     LOOK AS WELL AT THE LAST SENTENCE ON PAGE 3 AND ON PAGE 2,

02:26PM  18     REALLY JUST THE SECOND HALF OF THE FIRST SENTENCE IN THE BOTTOM

02:26PM  19     EMAIL, THIS EMAIL IS COMPLETELY DIVORCED IN TIME FROM ANY

02:26PM  20     INVESTMENT DECISION MADE BY THIS WITNESS, IT DOESN'T DISCUSS

02:26PM  21     THAT OR SAY ANYTHING ABOUT IT.

02:26PM  22          SO I DON'T KNOW THAT THIS WITNESS'S STATE OF MIND AT THIS

02:26PM  23     POINT IN TIME IS REALLY RELEVANT TO THE CASE.

02:27PM  24               THE COURT:  WELL, I WOULD -- I THINK THE PAGE 4 THAT

02:27PM  25     YOU MENTIONED, I THINK WE CAN STRIKE THAT.

EISENMAN DIRECT BY MR. BOSTIC                                    6072

02:27PM   1            MR. BOSTIC, I DON'T THINK YOU NEED THAT.

02:27PM   2                 MR. BOSTIC:  IS THAT THE EMAIL MESSAGE AT THE BOTTOM

02:27PM   3     OF PAGE 4?

02:27PM   4                 THE COURT:  YES.

02:27PM   5                 MR. BOSTIC:  IF I COULD HAVE A MOMENT TO MAKE SURE

02:27PM   6     THAT REDACTION GETS IMPLEMENTED.

02:27PM   7                 THE COURT:  OTHERWISE I'LL ALLOW THIS TO COME IN.

02:27PM   8                 MR. DOWNEY:  YOUR HONOR, IF I MIGHT?

02:27PM   9            WELL, THE INFORMATION AT THE BOTTOM OF PAGE 2 IS ACTUALLY

02:27PM  10     THE SAME AS THE COMMUNICATION AT THE BOTTOM OF PAGE 4 AND THE

02:27PM  11     FIRST SENTENCE OF THE NOVEMBER 20TH, 8:36 A.M. EMAIL.  IT'S

02:27PM  12     ESSENTIALLY THE SAME STATEMENT.

02:28PM  13                 THE COURT:  YES, IT'S THE SAME CONTEXT.

02:28PM  14                 MR. DOWNEY:  YES.

02:28PM  15                 MR. BOSTIC:  YOUR HONOR, I THINK I SEE THAT ISSUE AS

02:28PM  16     TO SOME OF THE CONTENT IN THAT MESSAGE, BUT I THINK TO THE

02:28PM  17     EXTENT -- AND THIS IS BEING COMMUNICATED TO THE DEFENDANT --

02:28PM  18                 THE COURT:  I'M LOOKING AT THIS AGAIN.  AND PARDON

02:28PM  19     ME FOR INTERRUPTING YOU, MR. BOSTIC.

02:28PM  20            I THINK I SEE YOUR CONCERN, BUT I DON'T THINK IT IS

02:28PM  21     PRESENT AS IT WAS IN 4.  SO I WILL ALLOW THIS TO COME IN,

02:28PM  22     NOTING YOUR OBJECTION.

02:28PM  23            SO YOU CAN REDACT THAT LAST PORTION.

02:28PM  24                 MR. BOSTIC:  UNDERSTOOD.

02:28PM  25            WITH THE EXCEPTION OF THE BOTTOM MESSAGE ON PAGE 4, IS

EISENMAN DIRECT BY MR. BOSTIC                                    6073

02:28PM   1      THAT DOCUMENT ADMITTED, YOUR HONOR?

02:28PM   2                   THE COURT:  YES.

02:28PM   3                   MR. BOSTIC:  MAY I PUBLISH?

02:28PM   4                   THE COURT:  YES, YOU MAY PUBLISH.

02:28PM   5           (GOVERNMENT'S EXHIBIT 713, REDACTED, WAS RECEIVED IN

02:28PM   6      EVIDENCE.)

02:28PM   7      BY MR. BOSTIC:

02:29PM   8      Q.   WHILE WE'RE WAITING FOR THAT TO COME UP ON THE SCREEN,

02:29PM   9      MR. EISENMAN, CAN YOU EXPLAIN IN NOVEMBER OF 2012, WHAT

02:29PM  10      ADDITIONAL EFFORTS WERE YOU MAKING TO TRY TO LEARN ABOUT THE

02:29PM  11      STATUS OF THERANOS?

02:29PM  12      A.   I WAS REACHING OUT TO DON LUCAS, WHO WAS CHAIRMAN OF THE

02:29PM  13      BOARD.

02:29PM  14      Q.   AND WHAT WAS YOUR PURPOSE IN REACHING OUT TO MR. LUCAS?

02:29PM  15      A.   TO GET UPDATED INFORMATION ON MY INVESTMENT.

02:29PM  16      Q.   LET'S LOOK AT PAGE 3 OF THIS EXHIBIT.  LET'S ZOOM IN ON

02:29PM  17      THE BOTTOM EMAIL MESSAGE.

02:29PM  18           ARE WE LOOKING AT AN EMAIL FROM SOMEONE IN DON LUCAS'S

02:29PM  19      OFFICE TO MS. HOLMES CC'ING YOU?

02:29PM  20      A.   YES.

02:29PM  21      Q.   AND SHE SAYS TO ELIZABETH HOLMES, "PLEASE SEE THE NOTE

02:29PM  22      FROM ALAN EISENMAN.  WOULD YOU PLEASE HAVE THE APPROPRIATE

02:29PM  23      PERSON GET IN TOUCH WITH HIM TO PROVIDE A STATUS REPORT?"

02:29PM  24           DO YOU SEE THAT?

02:29PM  25      A.   YES.

EISENMAN DIRECT BY MR. BOSTIC                           6074

02:29PM  1    Q.   AND LET'S JUST ABOVE THAT MESSAGE.  AND THERE'S A MESSAGE

02:30PM  2    FROM MS. HOLMES DIRECTLY TO YOU.

02:30PM  3         DO YOU SEE THAT?

02:30PM  4    A.   YES.

02:30PM  5    Q.   AND SHE SAYS, "ALAN,

02:30PM  6         "WE HAVE COMMUNICATED ABOUT THIS MULTIPLE TIMES BEFORE YET

02:30PM  7    YOU CHOOSE TO CONTINUE GOING DOWN THIS PATH."

02:30PM  8         WHAT WAS YOUR UNDERSTANDING OF WHAT MS. HOLMES WAS

02:30PM  9    REFERENCING THERE?

02:30PM  10   A.   I FIRST TRIED TO CORRESPOND WITH ELIZABETH ABOUT A

02:30PM  11   BUSINESS UPDATE, WOULD NOT GET A RESPONSE, SO I WAS THEN TRYING

02:30PM  12   TO COMMUNICATE WITH THE CHAIRMAN OF THE BOARD, DON LUCAS, AND

02:30PM  13   THAT WAS NOT TAKEN VERY KINDLY BY ELIZABETH THAT I APPARENTLY

02:30PM  14   WAS GOING AROUND HER.

02:30PM  15   Q.   LET'S LOOK AT YOUR RESPONSE ON PAGE 2, AND LET'S ZOOM IN

02:30PM  16   ON THE BOTTOM OF PAGE 2.

02:30PM  17        MR. EISENMAN, IS THIS A MESSAGE FROM YOU TO MS. HOLMES ON

02:30PM  18   NOVEMBER 20TH, 2012?

02:30PM  19   A.   YES, IT IS.

02:30PM  20   Q.   YOU WRITE, "ELIZABETH.

02:31PM  21        "IT HAS BEEN OVER 2 YEARS SINCE YOU COMMUNICATED WITH YOUR

02:31PM  22   INVESTORS.  I EMAILED YOU ONE WEEK AGO, FOLLOWING YOUR

02:31PM  23   INSTRUCTIONS THAT INVESTORS SHOULD COMMUNICATE DIRECTLY WITH

02:31PM  24   THE COMPANY."

02:31PM  25        YOU THEN ASK WHETHER MS. HOLMES CAN'T OR WON'T COMMUNICATE

EISENMAN DIRECT BY MR. BOSTIC                                          6075

02:31PM   1    WITH YOU OR OTHER INVESTORS?

02:31PM   2         IS THIS ALL PART OF YOUR CONTINUING EFFORTS TO TRY TO

02:31PM   3    REESTABLISH COMMUNICATION SO THAT YOU COULD GET INFORMATION

02:31PM   4    ABOUT THE COMPANY?

02:31PM   5    A.   YES.

02:31PM   6    Q.   IN NOVEMBER OF 2012, WERE YOUR EFFORTS SUCCESSFUL?  WERE

02:31PM   7    YOU ABLE TO OBTAIN ANY UPDATED INFORMATION ABOUT THE STATUS OF

02:31PM   8    THERANOS?

02:31PM   9    A.   NO.

02:31PM  10    Q.   DID THERE COME A TIME WHEN YOU CONSIDERED INVESTING MORE

02:31PM  11    MONEY IN THERANOS?

02:31PM  12    A.   YES.

02:31PM  13    Q.   AND WHEN DID THAT HAPPEN?

02:31PM  14    A.   IN 2013 WHEN THEY APPARENTLY WERE SUCCESSFUL IN PERFECTING

02:32PM  15    THEIR READER AND THEY WERE TRYING TO RAISE GROWTH CAPITAL TO

02:32PM  16    MOVE THE COMPANY FORWARD IN A FASTER FASHION.

02:32PM  17    Q.   BEFORE THAT INVESTMENT, DID YOU HAVE A CALL WITH

02:32PM  18    SUNNY BALWANI IN MID 2014?

02:32PM  19    A.   YES.

02:32PM  20    Q.   AND WHAT DO YOU RECALL ABOUT THAT TELEPHONE CALL?

02:32PM  21    A.   THE CALL WAS UNUSUALLY FRIENDLY AFTER A PERIOD OF VERY

02:32PM  22    STRONG HOSTILITY.

02:32PM  23         IN RETROSPECT, THEY WERE RAISING MONEY, AND WHEN YOU ARE

02:32PM  24    RAISING MONEY SOMETIMES YOU PUT ON A DIFFERENT FACE.

02:32PM  25         I WOULD BE HESITANT TO COMMIT MORE CAPITAL TO A COMPANY

EISENMAN DIRECT BY MR. BOSTIC                                          6076

02:33PM 1    THAT WAS NOT COMMUNICATING WITH A SHAREHOLDER, BUT WITH THE

02:33PM 2    PUBLICITY SURROUNDING THEIR LAUNCH OF THIS ROUND AND WITH THE

02:33PM 3    INFORMATION THAT I GOT FROM DIRECT CONVERSATIONS WITH SUNNY AND

02:33PM 4    ELIZABETH, I WAS OF THE UNDERSTANDING THAT NOT ONLY WAS THE

02:33PM 5    TECHNOLOGY WORKING, THERE WAS A HUGE AND GROWING MARKET THAT

02:33PM 6    WAS ALSO COMMUNICATED TO ME THAT BECAUSE I WAS AN EARLIER

02:33PM 7    INVESTOR, THEY WERE DOING A SPECIAL FAVOR FOR EXISTING

02:33PM 8    INVESTORS, THEY WERE PRICING THIS ROUND AT $15 A SHARE, AND IT

02:33PM 9    WAS A SMALL ROUND, AND AFTER THEY FINISHED RAISING THE MONEY IN

02:33PM 10   THIS ROUND, THEY WERE GOING TO DO A MUCH LARGER INSTITUTIONAL

02:33PM 11   ROUND AT $17 A SHARE.

02:33PM 12   Q.   THE INFORMATION THAT YOU JUST DESCRIBED GETTING FROM

02:33PM 13   MS. HOLMES AND MR. BALWANI, DID YOU OBTAIN THAT INFORMATION IN

02:33PM 14   2013 BEFORE YOU MADE THE DECISION TO INVEST MORE MONEY?

02:34PM 15   A.   YES.

02:34PM 16   Q.   LET'S LOOK AT SOME OF THE PUBLICITY THAT YOU WERE TALKING

02:34PM 17   ABOUT.

02:34PM 18        LET'S START WITH EXHIBIT 1106, WHICH IS IN EVIDENCE.

02:34PM 19        PERMISSION TO PUBLISH, YOUR HONOR?

02:34PM 20             THE COURT:  YES.

02:34PM 21   BY MR. BOSTIC:

02:34PM 22   Q.   THIS IS IN YOUR BINDER BUT ALSO ON THE SCREEN IN FRONT OF

02:34PM 23   YOU OR WILL BE.

02:34PM 24   A.   OKAY.

02:34PM 25   Q.   DO YOU SEE IN FRONT OF YOU A "WALL STREET JOURNAL" ARTICLE

EISENMAN DIRECT BY MR. BOSTIC                                          6077

02:34PM   1    DATED SEPTEMBER 8TH, 2013?

02:34PM   2    A.   YES, I DO.

02:34PM   3    Q.   AND THE TITLE IS "ELIZABETH HOLMES:  THE BREAKTHROUGH OF

02:34PM   4    INSTANT DIAGNOSIS"?

02:34PM   5    A.   YES.

02:34PM   6    Q.   AND DO YOU RECALL READING THIS ARTICLE?

02:34PM   7    A.   YES.

02:34PM   8    Q.   AND GENERALLY SPEAKING, WHAT WAS YOUR REACTION UPON

02:34PM   9    READING THIS PIECE ABOUT THERANOS?

02:34PM   10   A.   TREMENDOUS AMOUNT OF EXCITEMENT AND ENTHUSIASM.

02:34PM   11   Q.   FIRST LOOK AT SOME OF THE CONTENT.

02:34PM   12        FIRST LET'S GO DOWN AND LOOK AT THE FIRST INDENTED

02:34PM   13   PARAGRAPH ON PAGE 1.

02:35PM   14        MR. EISENMAN, DO YOU SEE IN THIS ARTICLE LANGUAGE THAT

02:35PM   15   SAYS, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING

02:35PM   16   INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

02:35PM   17   LABORATORY TESTS"?

02:35PM   18   A.   YES.

02:35PM   19   Q.   AND DO YOU SEE BELOW THAT A CLAIM THAT "THERANOS'S

02:35PM   20   PROCESSES ARE FASTER, CHEAPER, AND MORE ACCURATE THAN THE

02:35PM   21   CONVENTIONAL METHODS AND REQUIRE ONLY MICROSCOPIC BLOOD

02:35PM   22   VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF"?

02:35PM   23   A.   YES.

02:35PM   24   Q.   I WANT TO ASK YOU ABOUT THOSE CLAIMS.

02:35PM   25        FIRST, "AUTOMATING AND MINIATURIZING MORE THAN 1,000

EISENMAN DIRECT BY MR. BOSTIC                                        6078

02:35PM   1    LABORATORY TESTS," THE ABILITY OF THE DEVICE TO DO THAT, WAS

02:35PM   2    THAT AN IMPORTANT FACT TO YOU AS A POTENTIAL INVESTOR?

02:35PM   3    A.   YES.

02:35PM   4    Q.   WHY?

02:35PM   5    A.   BECAUSE THIS IS WHAT LABCORP AND QUEST DO WITH MUCH LARGER

02:35PM   6    BLOOD DRAWS AND THEY CAN ONLY ANALYZE A LIMITED NUMBER OF

02:36PM   7    TESTS.

02:36PM   8        SO THIS IS A BREAKTHROUGH IN TERMS OF THE VOLUME OF BLOOD,

02:36PM   9    AND THE QUANTITY OF TESTS, AND THE SPEED OF RESULTS BACK TO THE

02:36PM  10    PATIENT.

02:36PM  11    Q.   SO THE SPEED OF THE TECHNOLOGY WAS ALSO A MATERIAL FACT TO

02:36PM  12    YOU?

02:36PM  13    A.   YES.

02:36PM  14    Q.   HOW ABOUT ACCURACY, THAT PARAGRAPH SAYS THAT THERANOS'S

02:36PM  15    PROCESSES WERE MORE ACCURATE THAN THE CONVENTIONAL METHODS.

02:36PM  16        DO YOU SEE THAT LANGUAGE?

02:36PM  17    A.   YES.

02:36PM  18    Q.   WAS THE ACCURACY OF THE THERANOS DEVICE IMPORTANT TO YOU

02:36PM  19    WHEN YOU WERE DECIDING WHETHER TO INVEST MORE MONEY IN THE

02:36PM  20    COMPANY?

02:36PM  21    A.   YES, BECAUSE IT'S IMPORTANT TO PATIENTS AND IT'S IMPORTANT

02:36PM  22    TO THE MEDICAL COMMUNITY.  IT'S A VALUE PROPOSITION.

02:36PM  23    Q.   BEFORE YOU INVESTED, DID YOU EVER HAVE CONVERSATIONS WITH

02:36PM  24    MS. HOLMES ABOUT THE CAPABILITIES OF THE THERANOS TECHNOLOGY?

02:36PM  25    A.   YES.

EISENMAN DIRECT BY MR. BOSTIC                                    6079

02:36PM   1    Q.   AND DID SHE EVER MAKE ANY COMPARISONS HOLDING UP

02:36PM   2    THERANOS'S ANALYZERS TO THE CONVENTIONAL ANALYZERS THAT WERE

02:37PM   3    USED BY OTHER LABS?

02:37PM   4    A.   YES.

02:37PM   5    Q.   AND WHAT DID SHE SAY ABOUT HOW THERANOS'S STACKED UP?

02:37PM   6    A.   SHE COMPARED HER TECHNOLOGY TO THE TWO BIG PLAYERS IN THE

02:37PM   7    MARKET, LABCORP AND QUEST, AND SAID THAT HERS WERE CHEAPER,

02:37PM   8    FASTER, MORE ACCURATE, SMALLER BLOOD DRAW.

02:37PM   9    Q.   THE SAME REPRESENTATIONS THAT YOU SEE IN THE ARTICLE IN

02:37PM  10    FRONT OF YOU?

02:37PM  11    A.   YES.

02:37PM  12    Q.   LET'S LOOK AT PAGE 2 OF THIS ARTICLE.  AND LET'S ZOOM IN

02:37PM  13    ON THE BOTTOM HALF OF THE PAGE.  THERE'S A PARAGRAPH BEGINNING

02:37PM  14    "THERANOS'S TECHNOLOGY."

02:37PM  15         MS. HOLLIMAN, LET'S SEE IF WE CAN -- THAT'S PERFECT.

02:37PM  16         DO YOU SEE AT THE TOP, MR. EISENMAN, IT SAYS, "THERANOS'S

02:37PM  17    TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS BECAUSE IT CAN 'RUN

02:38PM  18    ANY COMBINATION OF TESTS, INCLUDING SETS OF FOLLOW-ON TESTS,'

02:38PM  19    AT ONCE VERY QUICKLY ALL FROM A SINGLE MICRO SAMPLE."

02:38PM  20    A.   YES.

02:38PM  21    Q.   WAS THE ABILITY OF THE TECHNOLOGY TO RUN ANY COMBINATION

02:38PM  22    OF TESTS ALL FROM A SINGLE MICRO SAMPLE AN IMPORTANT FACT FOR

02:38PM  23    YOU?

02:38PM  24    A.   YES.

02:38PM  25    Q.   AND WHY IS THAT?

EISENMAN DIRECT BY MR. BOSTIC                                    6080

02:38PM  1    A.   IT'S ONE OF MANY FACTORS THAT SHOW THAT THIS TECHNOLOGY IS

02:38PM  2    SUPERIOR TO CONVENTIONAL TECHNOLOGIES IN THE COMPANIES THAT

02:38PM  3    THERANOS WAS GOING TO COMPETE AGAINST, LABCORP AND QUEST, ARE

02:38PM  4    MULTI BILLION DOLLAR COMPANIES.

02:38PM  5    Q.   AT THE BOTTOM OF THIS PAGE IN THE SECOND TO LAST PARAGRAPH

02:38PM  6    THERE'S A PARAGRAPH THAT BEGINS, "THAT'S BECAUSE THE PRECISION

02:38PM  7    OF LAB INSTRUMENTS, AND THEIR REFERENCE RANGES, VARY FROM

02:38PM  8    MANUFACTURE TO MANUFACTURER.  LABS BUY FROM DIFFERENT VENDORS

02:38PM  9    AND OFTEN DON'T CALIBRATE THE MACHINES TO EACH OTHER."

02:38PM  10        DO YOU SEE THAT?

02:38PM  11   A.   YES.

02:38PM  12   Q.   DID MS. HOLMES EVER TELL YOU ABOUT THERANOS PURCHASING

02:39PM  13   ANALYZERS FROM OTHER MANUFACTURERS?

02:39PM  14   A.   NEVER.

02:39PM  15   Q.   WAS THE COMPANY'S ABILITY TO RUN ALL OF ITS TESTS ON ITS

02:39PM  16   OWN TECHNOLOGY AN IMPORTANT FACT FOR YOU AS A POTENTIAL

02:39PM  17   INVESTOR?

02:39PM  18   A.   YES.

02:39PM  19   Q.   I'LL ASK YOU TO TURN NOW TO TAB 1334 IN THE BINDER.  THAT

02:39PM  20   SHOULD BE THE NEXT ONE.

02:39PM  21        AND DO YOU RECOGNIZE 1334?

02:39PM  22   A.   YES.

02:39PM  23   Q.   IS THIS A DECEMBER EMAIL CHAIN -- I'M SORRY, DECEMBER 2013

02:39PM  24   EMAIL CHAIN BETWEEN YOU AND THERANOS RELATING TO A POTENTIAL

02:39PM  25   INVESTMENT?

EISENMAN DIRECT BY MR. BOSTIC                    6081

02:39PM   1      A.   YES.

02:39PM   2               MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 1334.

02:39PM   3               MR. DOWNEY:  NO OBJECTION.

02:39PM   4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:40PM   5           (GOVERNMENT'S EXHIBIT 1334 WAS RECEIVED IN EVIDENCE.)

02:40PM   6      BY MR. BOSTIC:

02:40PM   7      Q.   LET'S START WITH THE BOTTOM OF PAGE 1.

02:40PM   8           MR. EISENMAN, DO YOU SEE AN EMAIL SENT FROM THERANOS AT

02:40PM   9      THE EMAIL ADDRESS SHAREHOLDERINFO@THERANOS.COM TO YOU?

02:40PM   10     A.   YES.

02:40PM   11     Q.   AND THIS IS ON DECEMBER 16TH, 2013; IS THAT RIGHT?

02:40PM   12     A.   YES.

02:40PM   13     Q.   SO A FEW MONTHS AFTER THE ARTICLE THAT WE JUST LOOKED AT?

02:40PM   14     A.   YES.

02:40PM   15     Q.   THE EMAIL SAYS, "DEAR ALAN.

02:40PM   16          "WE HOPE THIS EMAIL FINDS YOU WELL."

02:40PM   17          AND THEN IT SAYS BELOW, "PLEASE FIND A MEMO TO

02:40PM   18     STOCKHOLDERS REGARDING CERTAIN DEALS AND TRANSACTIONS."

02:40PM   19          DO YOU SEE THAT?

02:40PM   20     A.   YES.

02:40PM   21     Q.   AND LET'S LOOK AT THAT MEMO ON PAGE 2 OF THAT EXHIBIT, AND

02:40PM   22     LET'S ZOOM IN ON THE TOP THIRD.

02:41PM   23          AND DO YOU SEE THAT THIS MEMO TO THERANOS INVESTORS SAYS,

02:41PM   24     "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

02:41PM   25     RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

EISENMAN DIRECT BY MR. BOSTIC                                   6082

02:41PM  1    THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED,

02:41PM  2    NATIONAL LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY

02:41PM  3    TESTS FROM A FEW TINY DROPLETS OF BLOOD."

02:41PM  4        DO YOU SEE THAT?

02:41PM  5    A.   YES.

02:41PM  6    Q.   AND WHEN IT REFERENCES THE LAUNCH TO CONSUMER HEALTH CARE

02:41PM  7    THAT YEAR, WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:41PM  8    A.   MY UNDERSTANDING WAS THE TECHNOLOGY WAS PROVEN, AND THEY

02:41PM  9    WERE OFFERING THE SHAREHOLDERS A DISCOUNTED VALUE BEFORE THEY

02:41PM  10   RAISED THE PRICE AND RAISED A SIGNIFICANT AMOUNT OF ADDITIONAL

02:41PM  11   CAPITAL TO GROW THE COMPANY, AND THIS IS WHAT I THOUGHT WAS

02:41PM  12   GROWTH CAPITAL.

02:41PM  13       THE COMPANY HAD PROVEN ITSELF, AND NOW THEY WERE TRYING TO

02:41PM  14   SCALE UP AS FAST AS POSSIBLE AND TAKING IN CAPITAL TO SCALE UP.

02:41PM  15   Q.   AT THE BOTTOM OF THAT PARAGRAPH THERE'S LANGUAGE THAT

02:42PM  16   SAYS, "WE ARE ACTIVELY INVESTING IN INFRASTRUCTURE TO BUILD

02:42PM  17   THIS NEW INDUSTRY WE HAVE CREATED."

02:42PM  18       DID THAT CONTRIBUTE TO THAT IMPRESSION IN YOUR MIND?

02:42PM  19   A.   YES.

02:42PM  20   Q.   THE LANGUAGE IN THAT MEMO THAT SAYS, "WE ARE RAPIDLY

02:42PM  21   SCALING," DID THAT LANGUAGE HAVE ANY EFFECT ON YOUR PERCEPTION

02:42PM  22   OF THE AMOUNT OF RISK INVOLVED IN THIS INVESTMENT?

02:42PM  23   A.   YES.

02:42PM  24   Q.   HOW SO?

02:42PM  25   A.   THE INVESTMENT WAS SUBSTANTIALLY DE-RISKED.

EISENMAN DIRECT BY MR. BOSTIC                                    6083

02:42PM   1      Q.   IN WHAT WAY?

02:42PM   2      A.   THEY HAD PROVEN THEMSELVES, THEY HAD A TECHNOLOGY THAT

02:42PM   3      THEY CLAIMED WORKED, THERE WAS A HUGE MARKET, AND THIS WAS AN

02:42PM   4      OPPORTUNITY TO RAISE CAPITAL TO GROW THAT MARKET AS RAPIDLY AS

02:43PM   5      POSSIBLE.

02:43PM   6      Q.   LET'S LOOK AT TAB 1371 NEXT.

02:43PM   7           AND I WANT TO HAVE YOU TAKE A LOOK AT THE FIRST EIGHT

02:43PM   8      PAGES OF 1371.

02:43PM   9           AND IS THAT AN EMAIL CHAIN BETWEEN YOU AND MR. BALWANI

02:43PM  10      RELATING TO THIS POTENTIAL INVESTMENT IN DECEMBER OF 2013?

02:43PM  11      A.   YES.

02:43PM  12           MR. BOSTIC:   YOUR HONOR, I OFFER PAGES 1 THROUGH 8

02:43PM  13      OF EXHIBIT 1371.

02:43PM  14           MR. DOWNEY:   1 THROUGH 8 IS FINE, YOUR HONOR.   NO

02:43PM  15      OBJECTION.

02:43PM  16           THE COURT:   THOSE PAGES ARE ADMITTED.   THEY MAY BE

02:43PM  17      PUBLISHED.

02:43PM  18           (GOVERNMENT'S EXHIBIT 1371, PAGES 1 THROUGH 8, WAS

02:43PM  19      RECEIVED IN EVIDENCE.)

02:43PM  20      BY MR. BOSTIC:

02:44PM  21      Q.   AND LET'S START WITH PAGE 6 OF THAT EXHIBIT.

02:44PM  22           AND AT THE BOTTOM OF PAGE 6, MR. EISENMAN, DO YOU SEE THE

02:44PM  23      MESSAGE TO ALL STOCKHOLDERS THAT WE WERE JUST LOOKING AT?

02:44PM  24      A.   YES.

02:44PM  25      Q.   LET'S GO TO PAGE 3, AND AT THE BOTTOM OF PAGE 3 THERE'S AN

EISENMAN DIRECT BY MR. BOSTIC                                    6084

02:44PM   1    EMAIL FROM YOU BACK TO THERANOS.

02:44PM   2         DO YOU SEE THAT?

02:44PM   3    A.   YES.

02:44PM   4    Q.   AND YOU ASK FOR A PHONE CALL.  AND YOU SAY, "I WOULD LIKE

02:44PM   5    TO KNOW HOW MUCH ADDITIONAL INVESTMENT IS AVAILABLE, AND WHAT

02:44PM   6    THE TIMING IS FOR PAPERWORK IN, AND FUNDING."

02:44PM   7         DO YOU SEE THAT?

02:44PM   8    A.   YES.

02:44PM   9    Q.   AND YOU SAY, "WE MAY BE INTERESTED IN $1 MILLION."

02:44PM  10         IS THAT CORRECT?

02:44PM  11    A.   YES.

02:44PM  12    Q.   AND THIS EMAIL WAS SENT TO THERANOS AT THAT SHAREHOLDER

02:44PM  13    INFO ADDRESS; IS THAT RIGHT?

02:44PM  14    A.   CORRECT.

02:44PM  15    Q.   AND LET'S LOOK AT THE EMAIL MESSAGE ABOVE THIS ONE.

02:45PM  16         AND SEE WE THAT SUNNY BALWANI WRITES DIRECTLY BACK TO YOU;

02:45PM  17    IS THAT CORRECT?

02:45PM  18    A.   YES.

02:45PM  19    Q.   AND HE SAYS, "ALAN.

02:45PM  20         LET ME KNOW WHAT TIME WOULD BE GOOD TO TALK AND I CAN CALL

02:45PM  21    AND DISCUSS THIS."

02:45PM  22         DO YOU SEE THAT?

02:45PM  23    A.   YES.

02:45PM  24    Q.   AND LET'S LOOK AT THE NEXT EMAIL IN THE CHAIN ABOVE THAT.

02:45PM  25    JUST ZOOM IN ON THE TOP PORTION OF THE PAGE.

EISENMAN DIRECT BY MR. BOSTIC                                    6085

02:45PM   1     A.   OKAY.

02:45PM   2     Q.   DID WE LOSE ALL OF THE SCREENS OR JUST MINE?  IS YOUR

02:45PM   3     SCREEN STILL DISPLAYING THE DOCUMENT?

02:45PM   4     A.   YES.

02:45PM   5     Q.   AT THE TOP OF THE PAGE DO YOU SEE A MESSAGE FROM YOU THAT

02:45PM   6     SAYS, "I AM AVAILABLE ANY TIME TODAY UNTIL MIDNIGHT CENTRAL

02:45PM   7     TIME"?

02:45PM   8     A.   YES.

02:45PM   9     Q.   AND ABOVE THAT MR. BALWANI WRITES, "OK.  I WILL CALL YOU

02:45PM  10     IN 5-10 MINUTES"?

02:45PM  11     A.   YES.

02:45PM  12     Q.   HOW DID THIS LEVEL OF RESPONSIVENESS COMPARE TO WHAT YOU

02:45PM  13     HAD BEEN EXPERIENCING FROM THE COMPANY IN THE MONTHS AND YEARS

02:46PM  14     LEADING UP TO IT?

02:46PM  15     A.   SHOCKING AND SURPRISING.

02:46PM  16     Q.   IN WHAT WAY?

02:46PM  17     A.   HE WAS -- TO SAY IT MINIMALLY, HE WAS HOSTILE FOR AN

02:46PM  18     EXTENDED PERIOD OF TIME AND NOT ONLY NONRESPONSIVE BUT ACTUALLY

02:46PM  19     AGGRESSIVE IN HIS COMMUNICATIONS WITH ME IN THE PAST COUPLE OF

02:46PM  20     YEARS.

02:46PM  21     Q.   SO THIS WAS A CHANGE IN TUNE TO THAT?

02:46PM  22     A.   180 DEGREES.

02:46PM  23     Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT AND THE TOP HALF.

02:46PM  24          DO YOU SEE AN EMAIL FROM MR. BALWANI TO YOU ON CHRISTMAS,

02:46PM  25     2013?

EISENMAN DIRECT BY MR. BOSTIC                                    6086

02:46PM  1     A.   YES.

02:46PM  2     Q.   AND HE THANKS YOU FOR YOUR EMAIL, AND HE SENDS YOU A

02:46PM  3     SIGNATURE PAGE AND WIRING INSTRUCTIONS.

02:46PM  4          WAS THAT TO FACILITATE YOUR INVESTMENT IN THERANOS?

02:46PM  5     A.   YES.

02:46PM  6     Q.   FINALLY, LET'S GO TO PAGE 1 OF THIS EXHIBIT.

02:47PM  7          LET'S ZOOM IN ON FIRST THE BOTTOM HALF.

02:47PM  8          MR. EISENMAN, DO YOU SEE THAT YOU'RE ASKING SOME QUESTIONS

02:47PM  9     HERE IN CONNECTION WITH THIS POTENTIAL INVESTMENT?

02:47PM  10    A.   YES.

02:47PM  11    Q.   GENERALLY SPEAKING, WHY DID YOU WANT TO OBTAIN THIS

02:47PM  12    INFORMATION FROM THE COMPANY?

02:47PM  13    A.   TO FIND OUT MORE ABOUT THE SIZE OF THE ROUND VERSUS THE

02:47PM  14    SIZE OF THE NEXT ROUND.  AND IF ANY DIRECTORS ARE PARTICIPATING

02:47PM  15    IN THE ROUND, THAT'S A VERY POSITIVE SIGN IF DIRECTORS OF THE

02:47PM  16    COMPANY ARE ALSO PUTTING MONEY IN AT THIS ROUND.

02:47PM  17    Q.   LET'S LOOK AT THE TOP MESSAGE ON THIS PAGE.

02:48PM  18         DO YOU SEE THAT MESSAGE WHICH IS A RESPONSE FROM

02:48PM  19    MR. BALWANI TO YOU?

02:48PM  20    A.   YES.

02:48PM  21    Q.   IN SHORT, HE DECLINES TO PROVIDE THE REQUESTED

02:48PM  22    INFORMATION; IS THAT RIGHT?

02:48PM  23    A.   THAT'S CORRECT.

02:48PM  24    Q.   AROUND THIS TIME PERIOD DID YOU ALSO LOOK AT THE THERANOS

02:48PM  25    PUBLIC WEBSITE?

EISENMAN DIRECT BY MR. BOSTIC                                      6087

02:48PM   1     A.   YES.

02:48PM   2     Q.   DID YOU LOOK AT IT IN ORDER TO GAIN MORE INFORMATION TO

02:48PM   3     HELP YOU DECIDE WHETHER TO INVEST IN THE COMPANY?

02:48PM   4     A.   YES.

02:48PM   5     Q.   AND DID THE INFORMATION ON THE WEBSITE ALSO MAKE YOU FEEL

02:48PM   6     POSITIVE OR INCLINED TO INVEST IN THE COMPANY?

02:48PM   7     A.   YES.

02:48PM   8     Q.   LET'S LOOK AT EXHIBIT 4845.

02:48PM   9          YOUR HONOR, THIS IS IN EVIDENCE.  PERMISSION TO PUBLISH?

02:48PM   10            THE COURT:  YES.

02:48PM   11    BY MR. BOSTIC:

02:48PM   12    Q.   LET'S GO TO PAGE 18 OF 4845.

02:48PM   13         MR. EISENMAN, DO YOU SEE ON THE SCREEN IN FRONT OF YOU A

02:48PM   14    WIRE TRANSFER RECORD?  IT MAY NOT BE IN YOUR BINDER.

02:49PM   15    A.   OKAY.  I DON'T SEE IT IN MY BINDER.  BUT, YES, I DO SEE A

02:49PM   16    WIRE TRANSFER.

02:49PM   17    Q.   AND IF YOU LOOK AT THE LINE NEAR THE TOP LABELLED OMAD

02:49PM   18    THERE'S A DATE INDICATED DECEMBER 30TH, 2013.

02:49PM   19         DO YOU SEE THAT?

02:49PM   20    A.   YES.

02:49PM   21    Q.   AND THIS WIRE TRANSFER IS IN THE AMOUNT OF $99,990.

02:49PM   22         DO YOU SEE THAT?

02:49PM   23    A.   YES.

02:49PM   24    Q.   WAS THIS THE WIRE TRANSFER FOR WHICH YOU INVESTED MORE

02:49PM   25    MONEY IN THERANOS IN DECEMBER?

EISENMAN DIRECT BY MR. BOSTIC                                        6088

02:49PM   1    A.   YES, IT IS.

02:49PM   2    Q.   AND WE SEE THAT YOUR NAME IS INDICATED UNDER ORIGINATOR.

02:49PM   3         DO YOU SEE THAT?

02:49PM   4    A.   YES.

02:49PM   5    Q.   AND THERANOS IS LISTED UNDER BENEFICIARY.

02:49PM   6         DO YOU SEE THAT?

02:49PM   7    A.   YES.

02:49PM   8    Q.   TOWARDS THE BOTTOM OF THE PAGE?

02:49PM   9    A.   YES.

02:49PM   10   Q.   SO AT THE POINT THAT YOU DECIDED TO INVEST, YOU JUST

02:49PM   11   TESTIFIED THAT YOU HAD HAD A CONTENTIOUS, LET'S CALL IT,

02:50PM   12   RELATIONSHIP WITH MR. BALWANI; IS THAT RIGHT?

02:50PM   13   A.   THAT'S PUTTING IT MILDLY.

02:50PM   14   Q.   YOU HAD HAD SOME DIFFICULTY GETTING INFORMATION FROM

02:50PM   15   MS. HOLMES?

02:50PM   16   A.   YES.

02:50PM   17   Q.   WHY DID YOU DECIDE TO INVEST MORE IN THERANOS FOLLOWING

02:50PM   18   THAT EXPERIENCE?

02:50PM   19   A.   THIS IS WHAT WE CALL A SEAT AT THE TABLE.  IF YOU PUT

02:50PM   20   MONEY IN AT AN EARLY STAGE AND THEY ARE SUCCESSFUL, YOU'RE THE

02:50PM   21   FIRST ONE THAT IS ALLOWED TO PUT MONEY IN AS THEY RAISE MORE

02:50PM   22   MONEY AND THE VALUATION INCREASES.

02:50PM   23        AND THIS WAS RATIFIED BY THE PRESS AND BY THIRD PARTIES,

02:50PM   24   AND BY SUNNY AND BY ELIZABETH, THAT THEY WERE SUCCESSFUL, THAT

02:50PM   25   THEY HAD CROSSED THE FINISH LINE, AND THIS WAS TO GROW THE

EISENMAN DIRECT BY MR. BOSTIC                                    6089

02:50PM   1    COMPANY.

02:50PM   2         THEY ALSO TOLD ME THAT THIS WAS A SPECIAL VALUATION FOR

02:50PM   3    EXISTING SHAREHOLDERS; THAT THEY WERE GOING TO ALLOW US IN A

02:50PM   4    SMALL ROUND TO BUY STOCK AT $15 A SHARE, AND THEY WERE GOING TO

02:51PM   5    CLOSE THIS ROUND, AND SHORTLY THEREAFTER THEY WERE GOING TO DO

02:51PM   6    A MUCH MORE INSTITUTIONAL ROUND AT $17 A SHARE.

02:51PM   7    Q.   AND IN YOUR MIND THOSE FACTS WERE ENOUGH TO OVERCOME THE

02:51PM   8    EXPERIENCE THAT YOU HAD HAD IN TRYING TO GET INFORMATION IN THE

02:51PM   9    PAST?

02:51PM   10   A.   YES.

02:51PM   11   Q.   LET'S MOVE FORWARD IN TIME TO 2014.

02:51PM   12        I'LL ASK YOU TO LOOK AT TAB 2223 IN THE BINDER.

02:51PM   13        AND IS THIS AN EMAIL CHAIN BETWEEN YOU, ELIZABETH HOLMES,

02:51PM   14   AND SUNNY BALWANI RELATING TO SOME INFORMATION ABOUT THERANOS?

02:51PM   15   A.   YES.

02:51PM   16             MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 2223.

02:51PM   17             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:51PM   18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:51PM   19        (GOVERNMENT'S EXHIBIT 2223 WAS RECEIVED IN EVIDENCE.)

02:52PM   20   BY MR. BOSTIC:

02:52PM   21   Q.   LET'S START AT THE BOTTOM OF PAGE 1 OF 2223.

02:52PM   22        MR. EISENMAN, DO YOU SEE AN EMAIL THAT YOU SENT ON

02:52PM   23   OCTOBER 8TH, 2014, TO MS. HOLMES AND MR. BALWANI?

02:52PM   24   A.   YES.

02:52PM   25   Q.   AND THE SUBJECT IS "NEGATIVE REPORT ON THERANOS FROM UBS"?

EISENMAN DIRECT BY MR. BOSTIC                                    6090

02:52PM  1    A.   YES.

02:52PM  2    Q.   AND FIRST OF ALL, LET ME ASK, BETWEEN THE TIME OF YOUR

02:52PM  3    INVESTMENT AT THE END OF 2013, AND AT THIS POINT IN LATE 2014,

02:52PM  4    HAD YOU REESTABLISHED COMMUNICATION WITH MS. HOLMES AT

02:52PM  5    THERANOS?

02:52PM  6    A.   NO.

02:52PM  7    Q.   HAD YOU HAD ANY ADDITIONAL LUCK IN OBTAINING MORE DETAILS

02:52PM  8    ABOUT HOW THE COMPANY WAS DOING?

02:52PM  9    A.   NO.

02:52PM  10   Q.   DURING THIS TIME PERIOD WERE YOU MONITORING PUBLIC MEDIA

02:52PM  11   TO TRY TO GET INFORMATION ABOUT THE COMPANY?

02:52PM  12   A.   YES.

02:52PM  13   Q.   IN THIS EMAIL YOU WRITE TO MS. HOLMES AND MR. BALWANI

02:52PM  14   PROVIDING INFORMATION ABOUT A UBS REPORT ON THERANOS; IS THAT

02:53PM  15   CORRECT?

02:53PM  16   A.   YES.

02:53PM  17   Q.   YOUR EMAIL SAYS THAT UBS CLAIMS THAT THE BLOOD SAMPLES

02:53PM  18   HAVE TO BE SENT TO PALO ALTO, THEY ARE LESS RELIABLE THAN

02:53PM  19   TRADITIONAL TESTS, AND THE TURNAROUND TIME IS OVER 24 HOURS.

02:53PM  20       DO YOU SEE THAT?

02:53PM  21   A.   YES.

02:53PM  22   Q.   AND WAS READING THESE CLAIMS ABOUT THE COMPANY CONCERNING

02:53PM  23   TO YOU AT THIS TIME?

02:53PM  24   A.   DEEPLY CONCERNING.

02:53PM  25   Q.   WHY WAS THAT?

EISENMAN DIRECT BY MR. BOSTIC                                    6091

02:53PM  1   A.   BECAUSE I WAS UNDER THE IMPRESSION THAT THE TECHNOLOGY

02:53PM  2   WORKED, THAT THE SAMPLES WERE DONE ON SITE, OR AS ONE OF THEIR

02:53PM  3   DIRECTORS SAID, IT WAS SENT TO THE CLOUD, AND THE CLOUD WOULD

02:53PM  4   ANALYZE IT AND YOU WOULD HAVE RESULTS BACK IN 20 TO 30 MINUTES.

02:53PM  5        SO IF THE TECHNOLOGY WAS WORKING, WHY WASN'T IT BEING USED

02:53PM  6   IN THESE PHARMACIES?  WHY WAS IT -- WERE THEY PHYSICALLY

02:53PM  7   TRANSPORTED BACK TO PALO ALTO USING WHATEVER TECHNOLOGY THEY

02:53PM  8   HAD IN PALO ALTO WITH THE SAME TWO-DAY TURNAROUND THAT THE

02:53PM  9   COMPETITORS HAD?

02:53PM 10   Q.   WAS THAT NEGATIVE INFORMATION THAT YOU READ DIFFERENT FROM

02:54PM 11   THE INFORMATION THAT YOU HAD RECEIVED FROM MS. HOLMES AND

02:54PM 12   MR. BALWANI?

02:54PM 13   A.   TOTALLY CONTRADICTORY.

02:54PM 14   Q.   LET'S LOOK AT THE UBS REPORT ON PAGE 2 OF THIS EXHIBIT.

02:54PM 15   LET'S ZOOM IN ON THE TEXT ON THE TOP HALF OF THE PAGE.

02:54PM 16        DO YOU SEE TOWARDS THE BOTTOM OF THAT SELECTION THERE'S A

02:54PM 17   SUBHEADING, "THERANOS REMAINS A FOCUS FOR INVESTORS"?

02:54PM 18   A.   YES.

02:54PM 19   Q.   AND IT READS THERE, "OUR INDUSTRY CONSULTANT WAS INITIALLY

02:54PM 20   OPTIMISTIC ABOUT THE PROMISE OF THERANOS."

02:54PM 21        DO YOU SEE THAT?

02:54PM 22   A.   YES.

02:54PM 23   Q.   AND IT SAYS IN THE NEXT SENTENCE, "HOWEVER, THE MODEL AS

02:54PM 24   SEEN IN A HANDFUL OF WALGREENS'S LOCATIONS, HAS EVOLVED INTO A

02:54PM 25   TRADITIONAL REFERENCE LAB," EXCUSE ME, "A TRADITIONAL REFERENCE

EISENMAN DIRECT BY MR. BOSTIC                                    6092

02:54PM  1    LAB OFFERING WHERE BLOOD IS DRAWN MOSTLY THROUGH VENIPUNCTURE

02:55PM  2    AND SENT THROUGH A REGIONAL LAB LOCATION WITH A 24 PLUS HOUR

02:55PM  3    TURN AROUND."

02:55PM  4        DO YOU SEE THAT?

02:55PM  5    A.   YES.

02:55PM  6    Q.   AND THIS TALKS ABOUT THE ORIGINAL CONCEPT BEING THAT THE

02:55PM  7    ORIGINAL TEST MENU COULD BE PERFORMED ON ONE MACHINE IN THE

02:55PM  8    WALGREENS.

02:55PM  9        WAS THAT YOUR UNDERSTANDING UNTIL YOU READ THIS?

02:55PM  10   A.   THAT WAS MY UNDERSTANDING.

02:55PM  11   Q.   THAT REPORT GOES ON TO SAY, "HOWEVER, THE TEST MENU AT THE

02:55PM  12   RELEVANT WALGREENS'S LOCATIONS HAS EVOLVED TO OVER 215 TODAY

02:55PM  13   (INCLUDING MANY ESOTERIC TESTS), WHICH BASED ON EXISTING

02:55PM  14   TECHNOLOGY WOULD TEND TO REQUIRE 10-20 DIFFERENT TESTING

02:55PM  15   PLATFORMS.  OUR CONSULTANT BELIEVES IT IS HIGHLY UNLIKELY THAT

02:55PM  16   ALL OF THESE TESTS ARE BEING DONE ON ONE MACHINE."

02:55PM  17       DO YOU SEE THAT?

02:55PM  18   A.   I DO.

02:55PM  19   Q.   AND UP UNTIL THIS POINT, BASED ON THE INFORMATION THAT YOU

02:55PM  20   HAD OBTAINED FROM MS. HOLMES AND MR. BALWANI, DID YOU

02:55PM  21   UNDERSTAND THAT ALL OF THERANOS'S TESTS WERE BEING DONE ON ONE

02:55PM  22   MACHINE?

02:55PM  23   A.   YES.

02:55PM  24   Q.   IN ANY OF YOUR COMMUNICATIONS WITH MS. HOLMES OR

02:56PM  25   MR. BALWANI, DID THEY EXPLAIN TO YOU THE COMPANY'S USE OF THIRD

EISENMAN DIRECT BY MR. BOSTIC                                    6093

02:56PM   1    PARTY ANALYZERS?

02:56PM   2    A.   NO.

02:56PM   3    Q.   LET'S LOOK AT THE RESPONSE OF MR. BALWANI TO YOUR EMAIL.

02:56PM   4    IF WE GO BACK TO PAGE 1 AND ZOOM IN ON THE BOTTOM HALF OF THE

02:56PM   5    PAGE.

02:56PM   6         DO YOU SEE A RESPONSE FROM MR. BALWANI TO YOU IN OCTOBER

02:56PM   7    OF 2014?

02:56PM   8    A.   YES.

02:56PM   9    Q.   AND HIS REACTION TO THAT UBS REPORT IS, "DOESN'T SURPRISE

02:56PM  10    US.   SOUNDS LIKE AN UNINFORMED CONSULTANT."

02:56PM  11         DO YOU SEE THAT?

02:56PM  12    A.   YES.

02:56PM  13    Q.   AND WHAT CONCLUSION DID YOU DRAW FROM THAT ABOUT THE TRUTH

02:56PM  14    OF THE STATEMENTS IN THE UBS REPORT?

02:56PM  15    A.   IT RAISED SUSPICION, AND THE SUSPICION IN MY COMMUNICATION

02:56PM  16    WITH SUNNY ACTUALLY INCREASED MY SUSPICION.

02:57PM  17    Q.   DID YOU TAKE THIS AS A DENIAL OF THE INFORMATION IN THE

02:57PM  18    UBS REPORT?

02:57PM  19    A.   IT WAS AN OPPORTUNITY TO DENY IT, BUT IT WAS KIND OF A

02:57PM  20    KICK THE CAN DOWN THE ROAD, NOT REALLY ADDRESSING THE

02:57PM  21    SITUATION.

02:57PM  22    Q.   LET'S LOOK AT THE TOP HALF OF PAGE 1.

02:57PM  23         IN RESPONSE YOU ASK FOR SOME MORE INFORMATION; IS THAT

02:57PM  24    CORRECT?

02:57PM  25    A.   YES.

EISENMAN DIRECT BY MR. BOSTIC                                        6094

02:57PM   1     Q.   AND MR. BALWANI WRITES BACK IN THE MIDDLE OF THAT

02:57PM   2     SELECTION, "ALAN.

02:57PM   3          "I HAVE NO INTENTION OF RESPONDING TO THIS EMAIL AND

02:57PM   4     EXPLAINING THE TECH AND PROCESSES.  PLEASE STOP SENDING ME WITH

02:57PM   5     EMAILS EVERYDAY."

02:57PM   6          DO YOU SEE THAT?

02:57PM   7     A.   YES.

02:57PM   8     Q.   AND AROUND THIS TIME PERIOD IN NOVEMBER OF 2014 WERE YOU

02:57PM   9     EMAILING THERANOS EVERY DAY?

02:57PM  10     A.   PROBABLY NOT EVERY DAY BUT PROBABLY ON A REGULAR COURSE

02:57PM  11     WHEN THERE WAS INFORMATION THAT WAS CONTRADICTORY TO WHAT I HAD

02:58PM  12     BEEN LED TO BELIEVE.

02:58PM  13     Q.   IF YOU HAD KNOWN BEFORE YOU INVESTED IN 2013 THAT THE

02:58PM  14     COMPANY WAS RELYING ON THIRD PARTY DEVICES FOR MANY OF THE

02:58PM  15     TESTS THAT IT WAS OFFERING, WOULD THAT HAVE BEEN AN IMPORTANT

02:58PM  16     FACT TO YOUR DECISION MAKING?

02:58PM  17     A.   YES.

02:58PM  18     Q.   LET'S LOOK IN YOUR BINDER, PLEASE, AT EXHIBIT 2216 NEXT.

02:58PM  19          DO YOU SEE THAT THIS IS A CONTINUATION OF THAT SAME EMAIL

02:58PM  20     CHAIN?

02:58PM  21     A.   YES.

02:59PM  22              MR. BOSTIC:  YOUR HONOR, I OFFER EXHIBIT 2216.

02:59PM  23              MR. DOWNEY:  YOUR HONOR, OTHER THAN THE REDACTION

02:59PM  24     THAT WE'VE REQUESTED ON THE FIRST PAGE OF THIS, NO OBJECTION.

02:59PM  25              THE COURT:  ALL RIGHT.  WITH THAT REDACTION IT CAN

EISENMAN DIRECT BY MR. BOSTIC                                    6095

02:59PM   1    BE PUBLISHED.  IT'S ADMITTED, AND IT CAN BE PUBLISHED.  THANK

02:59PM   2    YOU.

02:59PM   3         (GOVERNMENT'S EXHIBIT 2216, REDACTED, WAS RECEIVED IN

02:59PM   4    EVIDENCE.)

02:59PM   5              MR. BOSTIC:  MS. HOLLIMAN, LET'S DISPLAY PAGE 1, THE

02:59PM   6    TOP HALF.

02:59PM   7              MR. DOWNEY:  YOUR HONOR, IF I MIGHT?

02:59PM   8         HAVE YOU REDACTED IT?

02:59PM   9              MR. BOSTIC:  YES.

02:59PM  10    Q.   MR. EISENMAN, IN THE MIDDLE OF THAT SELECTION DO YOU SEE A

02:59PM  11    RESPONSE EMAIL THAT YOU WROTE BACK TO MR. BALWANI?

02:59PM  12    A.   YES.

02:59PM  13    Q.   YOU WRITE, "I DON'T MEAN TO BROTHER YOU."

03:00PM  14         THEN THERE'S SOME CONTENT THAT WE'VE REDACTED.

03:00PM  15         YOU SAY, "I AM CLOSE TO RETIREMENT AND I AM TRYING TO

03:00PM  16    DECIDE WHETHER TO LIGHTEN UP IF THERE IS A LIQUIDITY EVENT IN

03:00PM  17    2015.  HOPEFULLY THERE WILL BE ADDITIONAL INFORMATION AVAILABLE

03:00PM  18    IN THE NOT TOO DISTANT FUTURE, OR THERANOS WILL CONSIDER AN

03:00PM  19    INFORMATION EVENT FOR EXISTING SHAREHOLDERS."

03:00PM  20         WHY WERE YOU TRYING TO OBTAIN ADDITIONAL INFORMATION ABOUT

03:00PM  21    THE COMPANY AT THIS TIME AFTER YOUR INVESTMENT?

03:00PM  22    A.   BECAUSE I HAD SUSPICIONS THAT THINGS WERE NOT AS THEY WERE

03:00PM  23    COMMUNICATED.  I HAD A SIGNIFICANT AMOUNT OF NET WORTH INVOLVED

03:00PM  24    IN THIS COMPANY, AND I HAD BEEN LOOKING FOR FURTHER

03:00PM  25    OPPORTUNITIES FOR A LIQUIDITY EVENT TO REDUCE MY POSITION.

EISENMAN DIRECT BY MR. BOSTIC                                6096

03:00PM  1    Q.   I'LL ASK YOU TO TURN TO -- WELL, BEFORE WE GO TO THE NEXT

03:00PM  2    EXHIBIT, WERE YOUR EFFORTS TO GET MORE INFORMATION IN 2014

03:01PM  3    SUCCESSFUL?

03:01PM  4    A.   NO.

03:01PM  5    Q.   PLEASE TURN TO TAP 2468.

03:01PM  6         AT 2468, DO YOU SEE AN EMAIL CHAIN BETWEEN YOU,

03:01PM  7    MS. HOLMES, AND MR. BALWANI IN APRIL 2015?

03:01PM  8    A.   YES.

03:01PM  9         MR. BOSTIC:   YOUR HONOR, I OFFER EXHIBIT 2468 WITH

03:01PM 10    THE REDACTION THAT WE DISCUSSED.

03:01PM 11         MR. DOWNEY:   WITH THAT REDACTION, YOUR HONOR, NO

03:01PM 12    OBJECTION.

03:01PM 13         THE COURT:   THE REDACTED VERSION IS ADMITTED.   IT

03:01PM 14    MAY BE PUBLISHED.

03:01PM 15         (GOVERNMENT'S EXHIBIT 2468, REDACTED, WAS RECEIVED IN

03:02PM 16    EVIDENCE.)

03:02PM 17    BY MR. BOSTIC:

03:02PM 18    Q.   IF WE CAN START ON PAGE 2 AT THE BOTTOM.

03:02PM 19         MR. EISENMAN, DO YOU SEE AN EMAIL THAT YOU SENT

03:02PM 20    MR. BALWANI IN MARCH OF 2015?

03:02PM 21    A.   YES.

03:02PM 22    Q.   YOU SAY "SUNNY,

03:02PM 23         "WE HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS

03:02PM 24    STOCK.   BEFORE WE DO, WE WANTED TO GET SOME NARRATIVE FROM YOU,

03:02PM 25    TO GET A SENSE OF WHETHER OUR VALUE HAS GROWN IN THE YEAR AND

EISENMAN DIRECT BY MR. BOSTIC                                    6097

03:02PM  1    3 MONTHS SINCE THE ROUND VALUING THE COMPANY AT 9 BILLION WAS

03:02PM  2    PRICED."

03:02PM  3         DO YOU SEE THAT?

03:02PM  4    A.   YES.

03:02PM  5    Q.   IN THE PARAGRAPH BELOW THAT YOU SAY, "WOULD IT BE POSSIBLE

03:02PM  6    TO SCHEDULE A SHORT CATCH UP CALL?"

03:02PM  7         DO YOU SEE THAT?

03:02PM  8    A.   YES.

03:02PM  9    Q.   LET'S LOOK AT MR. BALWANI'S RESPONSE.

03:02PM  10        IN HIS EMAIL BACK TO YOU HE TELLS YOU ABOUT THE PRICE OF

03:02PM  11   THE LAST TRANSACTION.  HE SAYS, "I DID NOT SAY WE WILL HAVE, OR

03:03PM  12   CONSIDER A LIQUIDITY EVENT IN 2015."

03:03PM  13        DO YOU SEE THAT?

03:03PM  14   A.   YES.

03:03PM  15   Q.   AND HE SAYS, "WE DON'T KNOW ANYTHING OF THIS TRANSACTION

03:03PM  16   BELOW."

03:03PM  17        DO YOU SEE THAT?

03:03PM  18   A.   YES.

03:03PM  19   Q.   AND LET'S LOOK AT YOUR EMAIL BACK.

03:03PM  20        AND YOU EXPLAIN THAT IN ADDITION TO THE FACT THAT YOU ARE

03:03PM  21   RETIRING, YOUR DAUGHTER NEEDS LIQUIDITY TO BUY A HOUSE.

03:03PM  22        DO YOU SEE THAT?

03:03PM  23   A.   YES.

03:03PM  24   Q.   AND YOU'RE TRYING HERE TO DECIDE, AGAIN, WHETHER TO UNLOAD

03:03PM  25   YOUR THERANOS STOCK; IS THAT CORRECT?

EISENMAN DIRECT BY MR. BOSTIC                                    6098

03:03PM 1      A.   THAT'S CORRECT.

03:03PM 2      Q.   YOU MENTION AT THE BOTTOM OF YOUR EMAIL THAT YOU ALSO

03:03PM 3      DIDN'T GET A RESPONSE TO YOUR REQUEST FOR A COMPANY VISIT?

03:03PM 4      A.   YES.

03:03PM 5      Q.   WERE YOU ASKING FOR A VISIT TO THE COMPANY AT THIS TIME?

03:03PM 6      A.   YES.

03:03PM 7      Q.   AND WAS THAT FOR THE SAME PURPOSE, TO TRY TO LEARN ABOUT

03:03PM 8      WHAT WAS HAPPENING WITH YOUR INVESTMENT?

03:03PM 9      A.   YES, IT WAS.

03:03PM 10     Q.   LET'S GO TO PAGE 1.  LET'S ZOOM IN ON THE BOTTOM HALF OF

03:04PM 11     THE PAGE.

03:04PM 12          WE SEE THERE AN EMAIL ON APRIL 12TH, 2015.  SO -- I'M

03:04PM 13     SORRY, APRIL 11TH, 2015, THE FOLLOWING MONTH.

03:04PM 14          AND YOU'VE CHANGED THE SUBJECT LINE TO "PLEASE RESPOND" IN

03:04PM 15     ALL CAPS; IS THAT RIGHT?

03:04PM 16     A.   THAT'S CORRECT.

03:04PM 17     Q.   AND YOU SAY, "I WOULD APPRECIATE A RESPONSE OR CALL THIS

03:04PM 18     WEEKEND."

03:04PM 19          MR. BALWANI WRITES BACK THAT HE ALREADY RESPONDED TO YOUR

03:04PM 20     QUESTION ABOUT WANTING TO SELL YOUR SHARES.

03:04PM 21          DO YOU SEE THAT?

03:04PM 22     A.   YES.

03:04PM 23     Q.   AT THIS POINT DID YOU HAVE THE INFORMATION THAT YOU NEEDED

03:04PM 24     TO WEIGH THAT OPTION?

03:04PM 25     A.   NO, I HAD NO INFORMATION.

EISENMAN DIRECT BY MR. BOSTIC                                    6099

03:04PM   1      Q.   LET'S LOOK AT THE TOP HALF OF PAGE 1.

03:05PM   2           AND, MR. EISENMAN, IN THIS EMAIL YOU INCLUDE MS. HOLMES ON

03:05PM   3      APRIL 12TH, 2015; IS THAT CORRECT?

03:05PM   4      A.   YES.

03:05PM   5      Q.   AND YOU SAY, "THE RESPONSE I AM LOOKING FOR FROM YOU OR

03:05PM   6      ELIZABETH IS A BUSINESS UPDATE LIKE YOU PROVIDED LAST YEAR WHEN

03:05PM   7      WE DISCUSSED THE COMPANY'S TIMETABLE FOR A PRIVATE OR PUBLIC

03:05PM   8      LIQUIDITY EVENT."

03:05PM   9           AT THE BOTTOM OF THAT PARAGRAPH YOU SAY, "IT IS REALLY

03:05PM   10     UNFAIR FOR YOU TO PLAY THIS CAT AND MOUSE GAME WITH ME.  I HAVE

03:05PM   11     BEEN A SHAREHOLDER FOR OVER 9 YEARS AND I, AS WELL AS MY

03:05PM   12     DAUGHTER, ALSO A SHAREHOLDER, ARE IN A DIFFERENT STAGE OF LIFE.

03:05PM   13     I CAN'T MAKE A RATIONAL DECISION TO SELL OR HOLD MY STOCK WITH

03:05PM   14     THE LACK OF INFORMATION THAT YOU HAVE PROVIDED."

03:05PM   15          DO YOU SEE THAT?

03:05PM   16     A.   YES.

03:05PM   17     Q.   WAS THIS EMAIL MESSAGE SUCCESSFUL IN BREAKING LOOSE THE

03:05PM   18     LOG JAM AND REESTABLISHING THE FLOW OF INFORMATION?

03:05PM   19     A.   NO.

03:05PM   20     Q.   AT THE TOP OF THIS PAGE THERE'S A RESPONSE FROM

03:05PM   21     MR. BALWANI.

03:05PM   22          DO YOU SEE THAT?

03:05PM   23     A.   YES.

03:05PM   24     Q.   HE SAYS TO YOU, "YOUR EMAILS ARE INSULTING, FULL OF

03:06PM   25     INACCURATE STATEMENTS AND WASTEFUL OF OUR TIME.

EISENMAN DIRECT BY MR. BOSTIC                                    6100

03:06PM  1           "OUR NEXT RESPONSE TO THIS EMAIL AND ALL YOUR FUTURE

03:06PM  2      EMAILS WILL COME FROM OUR COUNSEL."

03:06PM  3           DO YOU SEE THAT?

03:06PM  4      A.   YES.

03:06PM  5      Q.   AND FOLLOWING THIS POINT IN APRIL OF 2015 WERE YOU EVER

03:06PM  6      ABLE TO GET A SATISFACTORY LEVEL OF INFORMATION FROM THE

03:06PM  7      COMPANY ABOUT WHAT WAS HAPPENING THERE?

03:06PM  8      A.   NONE WHATSOEVER.

03:06PM  9      Q.   DID YOU END UP ULTIMATELY SELLING ANY OF YOUR SHARES?

03:06PM 10      A.   NO.

03:06PM 11      Q.   TO YOUR KNOWLEDGE DID THE COMPANY ULTIMATELY CEASE

03:06PM 12      OPERATIONS?

03:06PM 13      A.   YES.

03:06PM 14              MR. BOSTIC:  ONE MOMENT, YOUR HONOR.

03:06PM 15              THE COURT:  YES.

03:06PM 16          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:06PM 17              MR. BOSTIC:  NO FURTHER QUESTIONS AT THIS TIME.

03:06PM 18      THANK YOU.

03:06PM 19              THE COURT:  CROSS-EXAMINATION?

03:06PM 20              MR. DOWNEY:  YES, YOUR HONOR.  IT MIGHT TAKE US A

03:06PM 21      MOMENT.

03:07PM 22              THE COURT:  YES.  SO, FOLKS, I'LL REMIND YOU THAT

03:07PM 23      WE'RE GOING UNTIL 4:00 O'CLOCK TODAY.

03:07PM 24          PLEASE FEEL FREE TO STAND AND STRETCH IF YOU WOULD LIKE.

03:07PM 25          YOU MAY AS WELL, SIR, IF YOU WOULD LIKE TO STRETCH FOR A

EISENMAN CROSS BY MR. DOWNEY                                    6101

03:07PM   1    MOMENT, YOU'RE FREE TO STAND.

03:07PM   2         WHILE WE'RE DOING THIS, SCHEDULING WISE, LADIES AND

03:07PM   3    GENTLEMEN, PLEASE RECALL THAT WE WILL BE IN SESSION THE 15TH IN

03:07PM   4    THE MORNING, MONDAY IN THE MORNING.  I WANT TO REMIND YOU OF

03:07PM   5    THAT.  WE'RE SCHEDULED TO GO UNTIL NOON, I THINK.

03:07PM   6         THERE'S A POSSIBILITY THAT I COULD FREE UP THE AFTERNOON,

03:07PM   7    JUST A POSSIBILITY, AND I JUST WANT TO SHARE THAT WITH YOU.  IF

03:07PM   8    THAT'S TOO MUCH -- I KNOW NEXT WEEK IS A HEAVY LIFT FOR US.

03:07PM   9    WE'RE MEETING EVERY DAY NEXT WEEK.

03:07PM  10         BUT THAT REMAINS A POSSIBILITY.

03:07PM  11         SO I JUST WANT TO SHARE THAT WITH YOU FOR NOW.  THANK YOU.

03:07PM  12         (PAUSE IN PROCEEDINGS.)

03:08PM  13                        **CROSS-EXAMINATION**

03:08PM  14    BY MR. DOWNEY:

03:08PM  15    Q.   GOOD AFTERNOON, MR. EISENMAN.

03:08PM  16    A.   GOOD AFTERNOON.

03:08PM  17    Q.   MY NAME IS KEVIN DOWNEY, AND I REPRESENT MS. HOLMES.  I'M

03:08PM  18    GOING TO ASK YOU SOME QUESTIONS TODAY AND POSSIBLY CONTINUING

03:08PM  19    INTO MONDAY.

03:08PM  20         LET ME FIRST TRY TO PIN DOWN THE DATE OF THE FIRST

03:08PM  21    INVESTMENT THAT YOU MADE IN THERANOS.

03:08PM  22         DO YOU RECALL DISCUSSING THAT INVESTMENT WITH MR. BOSTIC?

03:08PM  23    A.   YES.

03:08PM  24    Q.   I'M GOING TO SHOW YOU A DOCUMENT THAT RELATES TO THAT TO

03:08PM  25    SEE IF THAT HELPS US IN IDENTIFYING THAT DATE.

EISENMAN CROSS BY MR. DOWNEY                                    6102

03:08PM   1         YOUR HONOR, MAY I APPROACH THE WITNESS?

03:08PM   2              THE COURT:  YES.

03:09PM   3    BY MR. DOWNEY:

03:09PM   4    Q.  IF YOU CAN LOOK AT THE NOTEBOOK THAT I'VE HANDED YOU,

03:09PM   5    MR. EISENMAN, AT THE TAB THAT IS MARKED 12003A.

03:09PM   6    A.  OKAY.

03:09PM   7    Q.  AND IF YOU LOOK AT THE FIRST PAGE OF THAT --

03:09PM   8         YOUR HONOR, THIS DOCUMENT IS ALREADY IN EVIDENCE, AND I'M

03:09PM   9    GOING TO DISPLAY IT.

03:09PM  10         IF YOU LOOK AT THE FIRST PAGE HERE, THIS IS A SERIES C

03:09PM  11    PREFERRED STOCK PURCHASE AGREEMENT.

03:09PM  12         DO YOU SEE THAT?

03:09PM  13    A.  YES.

03:09PM  14    Q.  AND DO YOU SEE UNDERNEATH THAT IT LISTS A SERIES OF

03:09PM  15    CLOSINGS?

03:09PM  16    A.  YES.

03:09PM  17    Q.  AND THAT THE FIRST CLOSING IS BOLDED, AND IT'S DATED

03:09PM  18    OCTOBER 13TH, 2006.

03:09PM  19         DO YOU SEE THAT?

03:09PM  20    A.  YES.

03:09PM  21    Q.  AND THEN IF YOU TURN TO THE FIFTH PAGE OF THE EXHIBIT

03:10PM  22    WHERE THE TEXT ACTUALLY BEGINS AND YOU ZERO IN ON THE FIRST

03:10PM  23    PARAGRAPH.  WE'LL DO THAT ON THE SCREEN FOR YOU.  IT MIGHT MAKE

03:10PM  24    IT A LITTLE EASIER FOR YOU TO FOLLOW.

03:10PM  25         IT INDICATES THAT THE STOCK PURCHASE AGREEMENT WAS MADE AS

EISENMAN CROSS BY MR. DOWNEY                                    6103

03:10PM   1    OF OCTOBER 13TH, 2006.

03:10PM   2        DO YOU SEE THAT?

03:10PM   3    A.   YES.

03:10PM   4    Q.   AND THEN IF WE LOOK AT THE BACK OF THE DOCUMENT, AND WE'LL

03:10PM   5    PUT THIS ON THE SCREEN SO YOU DON'T HAVE TO GO FENDING THROUGH

03:10PM   6    ALL OF THE PAGES.

03:10PM   7    A.   OKAY.

03:10PM   8    Q.   BUT IF YOU LOOK AT WHAT IS PAGE 45 OF THE EXHIBIT, IS THAT

03:10PM   9    YOUR SIGNATURE THERE ON PAGE 45?

03:10PM   10   A.   YES.

03:10PM   11   Q.   AND LET ME GO FORWARD.  AND I JUST WANT TO SEE IF WE CAN

03:10PM   12   SEE THE AMOUNT THAT YOU INVESTED AS OF THE OCTOBER 13TH

03:11PM   13   INVESTMENT.

03:11PM   14       I'M DRAWING YOUR ATTENTION TO PAGE 94, WHICH IS

03:11PM   15   EXHIBIT 8380.

03:11PM   16       DO YOU SEE THERE EXHIBIT A?

03:11PM   17   A.   YES.

03:11PM   18   Q.   AND THAT'S A SCHEDULE OF PURCHASERS; CORRECT?

03:11PM   19   A.   CORRECT.

03:11PM   20   Q.   AND THAT'S A LISTING OF ALL OF THE PEOPLE WHO HAVE BOUGHT

03:11PM   21   STOCK AS PART OF THE OFFERING THAT YOU WERE PURCHASING STOCK AS

03:11PM   22   PART OF; CORRECT?

03:11PM   23   A.   YES.

03:11PM   24   Q.   AND IT INDICATES HERE THAT YOU BOUGHT ABOUT A LITTLE OVER

03:11PM   25   402 SHARES IN THIS OFFERING; IS THAT RIGHT?

EISENMAN CROSS BY MR. DOWNEY                                    6104

03:11PM  1    A.   YES.

03:11PM  2    Q.   AND YOU PAID A PRICE OF -- YOU AND MR. BOSTIC WERE TRYING

03:11PM  3    TO FIGURE OUT WHETHER IT WAS CLOSER TO 1.1 OR 1.2 BUT --

03:11PM  4    A.   SOMEWHERE IN THE MIDDLE.

03:11PM  5    Q.   TO BE PRECISE IT WAS $1,134,243; RIGHT?

03:11PM  6    A.   YES.

03:11PM  7    Q.   AND IT LOOKS LIKE YOU PAID SOMEWHERE UNDER $3 A SHARE FOR

03:12PM  8    THIS?

03:12PM  9    A.   $2.82.

03:12PM  10   Q.   $2.82.  FAIR ENOUGH.

03:12PM  11        ALL RIGHT.  I WANT TO TAKE YOU BACK TO THE PERIOD BEFORE

03:12PM  12   YOU DECIDED TO MAKE THIS INVESTMENT.

03:12PM  13        YOU COME FROM HOUSTON, TEXAS; RIGHT?

03:12PM  14   A.   YES.

03:12PM  15   Q.   AND AS OF 2006 YOU HAD BEEN WORKING IN HOUSTON

03:12PM  16   PROFESSIONALLY FOR A NUMBER OF DECADES; RIGHT?

03:12PM  17   A.   CORRECT.

03:12PM  18   Q.   AND YOU HAD WORKED AS AN ADVISOR TO INDIVIDUALS AS TO HOW

03:12PM  19   TO MANAGE THEIR MONEY; CORRECT?

03:12PM  20   A.   CORRECT.

03:12PM  21   Q.   AND AS A RESULT OF THAT WORK YOU MADE SOME CONTACTS WHO

03:12PM  22   HAD SOME EXPERTISE IN INVESTMENT AND ADVISED PEOPLE ON HOW BEST

03:12PM  23   TO INVEST THEIR MONEY FOR WHATEVER THEIR PURPOSE WAS?

03:12PM  24   A.   CORRECT.

03:12PM  25   Q.   AND THAT WAS -- I THINK YOU CALLED THAT A NETWORK.  YOU

EISENMAN CROSS BY MR. DOWNEY                                    6105

03:12PM   1    HAD A NETWORK; IS THAT RIGHT?

03:12PM   2    A.   NO.   THERE WERE THINGS.   THERE WERE CLIENTS THAT I

03:13PM   3    INVESTED CONSERVATIVELY IN SECURITIES, AND I HAD A NETWORK OF

03:13PM   4    FRIENDS AND FAMILY THAT WE LOOKED AT PRIVATE SECURITIES LIKE

03:13PM   5    THIS THERANOS --

03:13PM   6    Q.   I SEE.   AND WAS DAVID HARRIS ONE OF THOSE FRIENDS?

03:13PM   7    A.   YES.

03:13PM   8    Q.   AND I ASSUME YOU INVESTED ON YOUR OWN BEHALF?

03:13PM   9    A.   CORRECT.

03:13PM   10   Q.   AND THAT INCLUDED IN PRIVATE COMPANIES; CORRECT?

03:13PM   11   A.   CORRECT.

03:13PM   12   Q.   AND SO YOU HAD YOUR EARS OPEN ON AN ONGOING BASIS TO MAKE

03:13PM   13   AN EFFORT TO TRY TO HEAR ABOUT PRIVATE INVESTING OPPORTUNITIES

03:13PM   14   THAT MIGHT BE OF INTEREST TO YOU; CORRECT?

03:13PM   15   A.   CORRECT.

03:13PM   16   Q.   AND DAVID HARRIS MENTIONED TO YOU THAT HE HAD INVESTED IN

03:13PM   17   A COMPANY A COUPLE OF YEARS BEFORE IN CALIFORNIA CALLED

03:13PM   18   THERANOS; CORRECT?

03:13PM   19   A.   CORRECT.

03:13PM   20   Q.   AND HE TOLD YOU A LITTLE BIT ABOUT THE FOUNDER OF THE

03:13PM   21   COMPANY; CORRECT?

03:13PM   22   A.   CORRECT.

03:13PM   23   Q.   MS. HOLMES; CORRECT?

03:13PM   24   A.   YES.

03:13PM   25   Q.   AND HE TOLD YOU THAT MS. HOLMES WAS SOMEONE WHO HE HAD A

UNITED STATES COURT REPORTERS

**ER-9733**

EISENMAN CROSS BY MR. DOWNEY                                    6106

03:14PM  1    LOT OF CONFIDENCE IN; CORRECT?

03:14PM  2    A.   THAT'S CORRECT.

03:14PM  3    Q.   AND HE TOLD YOU THAT SHE HAD INVENTED A TECHNOLOGY THAT

03:14PM  4    HAD TO DO WITH MEASURING BLOOD AND MEASURING THE DISTRIBUTION

03:14PM  5    OF DRUGS; CORRECT?

03:14PM  6    A.   NOT EXACTLY IN THOSE WORDS BUT SIMILAR.

03:14PM  7    Q.   OKAY.  THE GIST OF IT WAS ALONG THOSE LINES?

03:14PM  8    A.   YES.

03:14PM  9    Q.   OKAY.  HE TOLD YOU HE KNEW HER FAMILY A LITTLE BIT?

03:14PM  10   A.   HE WAS THEIR FINANCIAL ADVISOR.

03:14PM  11   Q.   OKAY.  AND HE TOLD YOU THAT, IN FACT, MS. HOLMES HAD ROOTS

03:14PM  12   IN HOUSTON; CORRECT?

03:14PM  13   A.   CORRECT.

03:14PM  14   Q.   AND SHE HAD ATTENDED HIGH SCHOOL IN HOUSTON; CORRECT?

03:14PM  15   A.   YES.

03:14PM  16   Q.   AND A FEW YEARS BEFORE THE CONVERSATION THAT YOU WERE

03:14PM  17   HAVING WITH MR. HARRIS, SHE HAD GRADUATED FROM HIGH SCHOOL AND

03:14PM  18   GONE ON TO STANFORD UNIVERSITY; CORRECT?

03:14PM  19   A.   CORRECT.

03:14PM  20   Q.   AND HE TOLD YOU THAT WHILE AT STANFORD UNIVERSITY, SHE HAD

03:14PM  21   COME UP WITH THE IDEA FOR THIS INVENTION AND APPLIED FOR A

03:14PM  22   PATENT; CORRECT?

03:14PM  23   A.   CORRECT.

03:14PM  24   Q.   AND THAT HE HAD BEEN ASKED A COUPLE YEARS BEFORE THIS

03:14PM  25   CONVERSATION, HE HAD BEEN ASKED TO INVEST IN A COMPANY THAT SHE

EISENMAN CROSS BY MR. DOWNEY                                    6107

03:14PM   1    HAD JUST FOUNDED; CORRECT?

03:15PM   2    A.   I WAS NOT AWARE OF THE TIMING OR THE EXTENT OF HIS EARLIER

03:15PM   3    INVESTMENT.

03:15PM   4         WE ONLY TALKED ABOUT THIS SECOND ROUND.

03:15PM   5    Q.   I SEE.  OKAY.

03:15PM   6         BUT YOU KNEW THAT HE WAS ALREADY AN INVESTOR?

03:15PM   7    A.   I'M NOT SURE IF I KNEW THAT HE WAS AN INVESTOR IN THE

03:15PM   8    FIRST ROUND.

03:15PM   9    Q.   OKAY.  DID HE TELL YOU THE NAMES OF OTHER INDIVIDUALS IN

03:15PM   10   HOUSTON WHO WERE CONSIDERING BECOMING INVESTORS AT THE SAME

03:15PM   11   TIME YOU WERE CONSIDERING THE INVESTMENT?

03:15PM   12   A.   NO.

03:15PM   13   Q.   BUT HE TOLD YOU, DID HE NOT, THAT THERE WERE SOME

03:15PM   14   INDIVIDUALS IN SILICON VALLEY WHO MIGHT ALSO BE INVESTING IN

03:15PM   15   THE COMPANY; CORRECT?

03:15PM   16   A.   NO.

03:15PM   17   Q.   MR. HARRIS DID NOT TELL YOU THAT?

03:15PM   18   A.   NO.  HE MENTIONED LARRY ELLISON WAS INVOLVED WITH THE

03:15PM   19   COMPANY, BUT AS FAR AS OTHER INDIVIDUALS, NOT TO MY

03:15PM   20   RECOLLECTION.

03:15PM   21   Q.   OKAY.  HE MENTIONED MR. ELLISON'S INVOLVEMENT; CORRECT?

03:15PM   22   A.   YES.

03:15PM   23   Q.   AND DID HE MENTION MR. LUCAS'S INVOLVEMENT AT THAT TIME?

03:15PM   24   A.   I DON'T RECALL IF I GOT THAT INFORMATION FROM DAVID OR

03:16PM   25   FROM ELIZABETH.

EISENMAN CROSS BY MR. DOWNEY                                      6108

03:16PM   1    Q.   OKAY.  NOW, YOU SAY -- AND HE, I PRESUME IT IS HE WHO PUT

03:16PM   2    YOU IN TOUCH WITH MS. HOLMES FOR PURPOSES OF HAVING A PHONE

03:16PM   3    CALL?

03:16PM   4    A.   THAT'S CORRECT.

03:16PM   5    Q.   AND YOU KNEW WHO MR. ELLISON WAS OF COURSE; CORRECT?

03:16PM   6    A.   OF COURSE.

03:16PM   7    Q.   AND YOU KNOW THAT HE WAS VERY SUCCESSFUL AND HAD BEEN VERY

03:16PM   8    SUCCESSFUL IN BUILDING ORACLE; CORRECT?

03:16PM   9    A.   CORRECT.

03:16PM  10    Q.   AND DID YOU KNOW WHO MR. LUCAS WAS?

03:16PM  11    A.   I DIDN'T AT THE TIME, BUT I FOUND OUT THAT HE WAS THE

03:16PM  12    CHAIRMAN OF THE BOARD OF ORACLE AND THAT'S A LEVEL OF

03:16PM  13    RESPECTABILITY.

03:16PM  14    Q.   NOW, PRIOR TO THIS OCTOBER 13TH INVESTMENT, YOU SAY YOU

03:16PM  15    CALLED MS. HOLMES; CORRECT?

03:16PM  16    A.   CORRECT.

03:16PM  17    Q.   AND YOU HAD A SERIES OF TELEPHONE CONVERSATIONS WITH HER;

03:16PM  18    RIGHT?

03:16PM  19    A.   THAT'S CORRECT.

03:16PM  20    Q.   AND DURING THOSE TELEPHONE CONVERSATIONS SHE WENT THROUGH

03:16PM  21    ALL SORTS OF FINANCIAL INFORMATION ABOUT THE COMPANY; CORRECT?

03:16PM  22    A.   PROJECTIONS OVER THE NEXT FEW YEARS, PHARMACEUTICAL

03:16PM  23    COMPANIES SHE WAS DOING BUSINESS WITH, INVESTMENT BANKERS THAT

03:16PM  24    SHE WAS ALREADY IN CONTACT WITH, YES.

03:17PM  25    Q.   SO HOW MANY PHONE CONVERSATIONS WAS THAT PRIOR TO THE DATE

EISENMAN CROSS BY MR. DOWNEY                                    6109

03:17PM  1    OF YOUR OCTOBER 13TH INVESTMENT?

03:17PM  2    A.   I'M GUESSING THREE OR FOUR.

03:17PM  3    Q.   OKAY.  HOW LONG DID THOSE CONVERSATIONS TAKE?

03:17PM  4    A.   IT'S JUST A GUESS BUT, YOU KNOW, 5 TO 15 MINUTES.

03:17PM  5    Q.   ISN'T IT TRUE, MR. EISENMAN, THAT YOU ONLY HAD ONE

03:17PM  6    CONVERSATION WITH MS. HOLMES PRIOR TO THE TIME THAT YOU

03:17PM  7    INVESTED AND IT WAS A VERY BRIEF CONVERSATION?

03:17PM  8    A.   NO.

03:17PM  9    Q.   LET ME ASK YOU TO LOOK AT A DOCUMENT IN YOUR BINDER THAT

03:17PM  10   IS MARKED AS EXHIBIT 10626.

03:18PM  11   A.   OKAY.

03:18PM  12   Q.   AND IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. HARRIS

03:18PM  13   DISCUSSING YOUR POTENTIAL INVESTMENT IN THERANOS AT THAT TIME?

03:18PM  14   A.   YES.

03:18PM  15        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:18PM  16   EXHIBIT 10626.

03:18PM  17        MR. BOSTIC:  NO OBJECTION.

03:18PM  18        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:18PM  19   (DEFENDANT'S EXHIBIT 10626 WAS RECEIVED IN EVIDENCE.)

03:18PM  20   BY MR. DOWNEY:

03:18PM  21   Q.   IF WE JUST BLOW UP -- THERE'S REALLY JUST ONE EMAIL HERE.

03:18PM  22   THIS IS YOU EMAILING MR. HARRIS.  IT LOOKS LIKE IN THE EVENING

03:18PM  23   OF OCTOBER 12TH.

03:18PM  24        DO YOU SEE THAT?

03:18PM  25   A.   YES.

EISENMAN CROSS BY MR. DOWNEY                                    6110

03:18PM  1    Q.  AND YOU SAY TO MR. HARRIS, "THANK YOU FOR ALLOWING ME TO

03:18PM  2    CO-INVEST IN THERANOS."

03:18PM  3        DO YOU SEE THAT?

03:18PM  4    A.  YES.

03:18PM  5    Q.  AND WHAT DID YOU MEAN WHEN YOU USED THE TERM "CO-INVEST"?

03:19PM  6    A.  DAVID WAS INVESTING IN THIS ROUND.

03:19PM  7    Q.  OKAY.  WERE YOU INVESTING ALONGSIDE HIM, OR WHAT DID YOU

03:19PM  8    MEAN WITH THE TERM "CO-INVEST"?

03:19PM  9    A.  NO.  I WAS JUST ANOTHER INVESTOR IN THIS ROUND.

03:19PM 10    Q.  I SEE.  AND THEN YOU GO ON TO SAY, "I CALLED ELIZABETH

03:19PM 11    YESTERDAY AND CHATTED FOR ABOUT 5 MINUTES."

03:19PM 12        AND THAT WAS TRUE, WASN'T IT?

03:19PM 13    A.  APPARENTLY SO.

03:19PM 14    Q.  AND YOU GO ON TO SAY, "SHE SEEMS LIKE A TERRIFIC PERSON."

03:19PM 15        CORRECT?

03:19PM 16    A.  CORRECT.

03:19PM 17    Q.  AND THEN YOU SAY YOU LOOK FORWARD TO MEETING HER AND YOU

03:19PM 18    TALK A LITTLE INSIDE SHOP ABOUT THE MARKET WITH MR. HARRIS;

03:19PM 19    CORRECT?

03:19PM 20    A.  CORRECT.

03:19PM 21    Q.  AND THIS WAS THE EVENING OF OCTOBER 12TH; CORRECT?

03:19PM 22    A.  CORRECT.

03:19PM 23    Q.  AND YOUR INVESTMENT TOOK PLACE ON OCTOBER 13TH; CORRECT?

03:19PM 24    A.  I'D HAVE TO LOOK AT THE INVESTMENT AGAIN.

03:19PM 25    Q.  WELL, LOOK AT -- LET'S PUT BACK UP EXHIBIT 12003A.

EISENMAN CROSS BY MR. DOWNEY                                      6111

03:19PM   1        AND YOU CAN LOOK AT PAGE 1 AND 5 OF THAT.  LET ME DRAW

03:20PM   2    THAT BACK UP FOR YOUR -- JUST LOOK AT THE FIRST PAGE.

03:20PM   3        DO YOU SEE THAT REFERENCE TO THE OCTOBER 13TH AS THE FIRST

03:20PM   4    CLOSING BOLDED?

03:20PM   5    A.   YES.

03:20PM   6    Q.   AND DO YOU SEE THAT REFERENCE THERE?

03:20PM   7    A.   YES.

03:20PM   8    Q.   AND IF WE GO TO THE FIRST PAGE IT INDICATES THE DATE OF

03:20PM   9    THE AGREEMENT WHICH I THINK YOU SIGNED, WHICH IS OCTOBER 13TH,

03:20PM  10    2006; CORRECT?

03:20PM  11    A.   YES.  ALSO, MY RECOLLECTION IS THE FIRST INVESTMENT I

03:20PM  12    INVESTED A SMALLER AMOUNT, AND IT WAS A BACK AND FORTH BETWEEN

03:20PM  13    ME AND THE CHIEF COUNSEL AT THE TIME, I THINK HIS NAME WAS

03:20PM  14    DAVID ESQUIVEL, AND THERE WAS AN OPPORTUNITY THAT SOME

03:20PM  15    INVESTORS DID NOT GET THEIR MONEY IN, AND THERE WAS AN

03:20PM  16    OPPORTUNITY TO ADD TO MY INVESTMENT.

03:20PM  17        AND MY RECOLLECTION IS THAT MY INVESTMENTS WERE STAGED

03:21PM  18    OVER A PERIOD OF TIME.

03:21PM  19    Q.   ARE YOU SAYING THAT YOU INVESTED MORE THAN THE MILLION

03:21PM  20    DOLLARS THAT IS REFLECTED IN THE DOCUMENT THAT IS --

03:21PM  21    A.   NO, NO.

03:21PM  22        MY FIRST INVESTMENT --

03:21PM  23            THE COURT:  LET HIM FINISH HIS QUESTION.

03:21PM  24    BY MR. DOWNEY:

03:21PM  25    Q.   LET ME JUST ASK THE QUESTION AGAIN SO WE HAVE A CLEAR

EISENMAN CROSS BY MR. DOWNEY                                    6112

03:21PM  1    RECORD.

03:21PM  2    A.   OKAY.

03:21PM  3    Q.   ARE YOU SAYING THAT YOU INVESTED MORE THAN THE MILLION

03:21PM  4    1.34 THAT IS INDICATED IN THE OCTOBER 13TH DOCUMENT?

03:21PM  5    A.   NO.   WHAT I'M SAYING IS THAT I INVESTED MUCH LESS, AND IN

03:21PM  6    CONVERSATIONS WITH THEIR GENERAL COUNSEL HE SAID THAT SOME OF

03:21PM  7    OUR INVESTORS DID NOT GET THEIR WIRES IN TIME, THERE'S MORE

03:21PM  8    ROOM IN THIS ROUND IF YOU'RE INTERESTED.   SO I MADE A SERIES OF

03:21PM  9    INVESTMENTS OVER A PERIOD OF TIME THAT TOTALLED THE AMOUNT THAT

03:21PM  10   YOU REFERENCED.

03:21PM  11   Q.   I SEE.   BUT YOUR DECISION TO MAKE THE FIRST INVESTMENT WAS

03:21PM  12   AS OF THIS OCTOBER 13TH DATE; CORRECT?

03:21PM  13   A.   APPARENTLY SO, YES.

03:21PM  14   Q.   ALL RIGHT.   NOW, I WANT TO ASK YOU ABOUT THE PERIOD THAT

03:22PM  15   FOLLOWED THE DECISION TO MAKE YOUR ORIGINAL INVESTMENT AND SOME

03:22PM  16   OF THE COMMENTS OR THE TESTIMONY THAT YOU GAVE DURING YOUR

03:22PM  17   DIRECT EXAMINATION.

03:22PM  18       I GATHERED THAT PERIOD IS A LITTLE HARD TO SEPARATE

03:22PM  19   EXACTLY THE DATE ON WHICH YOU WERE TOLD PARTICULAR INFORMATION

03:22PM  20   THAT YOU RECALL RECEIVING?

03:22PM  21   A.   SURE.   YES.   OKAY.

03:22PM  22       THERE'S ALSO A CONTRADICTION ON NUMBER OF CALLS AND TIMING

03:22PM  23   OF CALLS, BUT I CAN SEE ON MY NOTES THAT WAS MORE THAN ONE

03:22PM  24   5 MINUTE CALL.

03:22PM  25       IF IT WAS ONE CALL, WHICH I DON'T RECALL, IT WAS A MUCH

EISENMAN CROSS BY MR. DOWNEY                                    6113

03:22PM  1    LONGER CALL TO TAKE THIS SERIES OF NOTES THAT WERE IMPORTANT TO

03:22PM  2    ME BEFORE I MADE THAT INVESTMENT.

03:22PM  3              MR. DOWNEY:  I MOVE TO STRIKE EVERYTHING AFTER

03:22PM  4    "SURE."

03:22PM  5              THE COURT:  ALL RIGHT.  EVERYTHING AFTER "SURE" IS

03:22PM  6    STRICKEN AS NONRESPONSIVE.

03:23PM  7         EXCUSE ME.  THE ANSWER "YES" WILL REMAIN.  EVERYTHING

03:23PM  8    AFTER THAT IS STRICKEN.

03:23PM  9              MR. DOWNEY:  THANK YOU.

03:23PM  10   Q.  I THINK YOU MENTIONED THAT YOU RECALL LEARNING AT SOME

03:23PM  11   POINT FROM MS. HOLMES THAT THERANOS HAD DEVELOPED RELATIONSHIPS

03:23PM  12   WITH CERTAIN PHARMACEUTICAL COMPANIES.

03:23PM  13        DO YOU REMEMBER THAT?

03:23PM  14   A.  I REMEMBER THAT BEFORE I MADE MY INVESTMENT THAT SHE WAS

03:23PM  15   CURRENTLY DOING BUSINESS WITH FIVE INTERNATIONAL PHARMACEUTICAL

03:23PM  16   COMPANIES.

03:23PM  17   Q.  AND I THINK YOU IDENTIFIED THEM; CORRECT?

03:23PM  18   A.  CORRECT.

03:23PM  19   Q.  AND YOU ARE READING THE NOTES THAT YOU BROUGHT WITH YOU

03:23PM  20   HERE?

03:23PM  21   A.  YES.

03:23PM  22   Q.  WAS ONE OF THEM GLAXOSMITHKLINE?

03:23PM  23   A.  YES, IT WAS.

03:23PM  24   Q.  AND IT IS TRUE THAT AS OF THE TIME OF THIS 2006 AGREEMENT

03:23PM  25   THAT THERANOS HAD, IN FACT, DEVELOPED A RELATIONSHIP WITH

EISENMAN CROSS BY MR. DOWNEY                                    6114

03:23PM   1    GLAXOSMITHKLINE, WASN'T IT?

03:23PM   2              MR. BOSTIC:  OBJECTION.  FOUNDATION.

03:23PM   3              THE WITNESS:  FIRST OF ALL --

03:23PM   4              THE COURT:  EXCUSE ME.  EXCUSE ME.

03:24PM   5              THE WITNESS:  OH, OKAY.

03:24PM   6              THE COURT:  THERE'S AN OBJECTION.  I HAVE TO RULE ON

03:24PM   7    THE OBJECTION.

03:24PM   8              THE WITNESS:  OH, OKAY.

03:24PM   9              THE COURT:  DO YOU WANT TO ASK A LITTLE MORE

03:24PM  10    FOUNDATIONAL QUESTION ABOUT THAT?

03:24PM  11    BY MR. DOWNEY:

03:24PM  12    Q.  WELL, YOU, AS PART OF THE PURCHASE AGREEMENT THAT YOU

03:24PM  13    SIGNED, CERTAIN DISCLOSURES WERE MADE TO YOU ABOUT IMPORTANT

03:24PM  14    AGREEMENTS THAT THE COMPANY HAD ENTERED INTO, WEREN'T THEY?

03:24PM  15    A.  I DON'T RECALL.

03:24PM  16    Q.  OKAY.  BUT DO YOU HAVE A GENERAL KNOWLEDGE THAT SOMETIMES

03:24PM  17    IN CONNECTION WITH MAKING INVESTMENTS IN A PRIVATE COMPANY,

03:24PM  18    THEY MAKE DISCLOSURES OF CERTAIN IMPORTANT FACTS ABOUT THE

03:24PM  19    COMPANY LIKE PATENTS THAT THE COMPANY HOLDS OR MATERIAL

03:24PM  20    CONTRACTS THAT THE COMPANY HAS?

03:24PM  21    A.  IT'S POSSIBLE.  I DON'T KNOW.

03:24PM  22    Q.  LET ME ASK YOU TO LOOK BACK AT EXHIBIT 12003 AGAIN,

03:24PM  23    12003A.  THIS IS THE EXHIBIT THAT WE WERE LOOKING FOR --

03:24PM  24    LOOKING AT A MOMENT AGO.

03:25PM  25    A.  DO I NEED TO LOOK OR ARE YOU GOING TO PUT IT ON THE

EISENMAN CROSS BY MR. DOWNEY                                        6115

03:25PM 1    SCREEN?

03:25PM 2    Q.   I'LL PUT IT ON THE SCREEN.  THAT MIGHT BE EASIER FOR YOU

03:25PM 3    TO OPERATE WITH.

03:25PM 4         SO JUST TO RE-ORIENT YOU, THIS IS THE DOCUMENT THAT

03:25PM 5    REFLECTS THE STOCK PURCHASE AGREEMENT THAT WE WERE TALKING

03:25PM 6    ABOUT A MOMENT AGO.

03:25PM 7         DO YOU SEE THAT?

03:25PM 8    A.   OKAY.  AND THEN I HAVE A QUESTION.  THAT SAYS FIRST,

03:25PM 9    SECOND, THIRD, AND FOURTH CLOSING.

03:25PM 10   Q.   WELL, LET ME ASK THE QUESTIONS FOR PURPOSES OF THIS

03:25PM 11   EXERCISE.

03:25PM 12        LET ME ASK YOU TO GO TO THE PAGE THAT IS BATES LABELLED

03:25PM 13   8041, AND WE'LL FIND THAT FOR YOU AND PUT IT UP.

03:25PM 14        ACTUALLY, IF YOU GO A FEW PAGES BEFORE THAT, MAYBE TO THE

03:25PM 15   BEGINNING OF THIS APPENDIX TO PAGE 1 HERE OF THIS APPENDIX.

03:25PM 16        OKAY.  DO YOU SEE THERE'S A SCHEDULE OF EXCEPTIONS HERE?

03:26PM 17   A.   YES.

03:26PM 18   Q.   AND DO YOU SEE HERE IT INDICATES -- IF YOU READ THE FIRST

03:26PM 19   PARAGRAPH AND BLOW THAT UP, ABOUT HALFWAY THROUGH THAT

03:26PM 20   PARAGRAPH IT SAYS, "THE SECTION NUMBERS BELOW CORRESPOND TO THE

03:26PM 21   SECTION NUMBERS OF THE REPRESENTATIONS AND WARRANTIES IN THIS

03:26PM 22   AGREEMENT; PROVIDED, HOWEVER, THAT ANY INFORMATION DISCLOSED

03:26PM 23   HEREIN UNDER ANY SECTION NUMBER SHALL BE DEEMED TO BE DISCLOSED

03:26PM 24   AND INCORPORATED," ET CETERA, ET CETERA.

03:26PM 25        DO YOU SEE THAT LANGUAGE?

EISENMAN CROSS BY MR. DOWNEY                                    6116

03:26PM  1    A.   UH-HUH.

03:26PM  2    Q.   AND IF YOU FOLLOW THROUGH TO THE NEXT PAGE, THIS CONTAINS

03:26PM  3    INFORMATION ABOUT THE DIFFERENT ASPECTS OF THE COMPANY.

03:26PM  4         SO, FOR EXAMPLE, AT 3.3(C) AT THE TOP OF PAGE 2 THERE'S AN

03:26PM  5    INDICATION THAT THERE WAS AN ERROR IN SHAREHOLDER GRANTS AND

03:26PM  6    IT'S ATTEMPTING TO CORRECT THOSE ERRORS.

03:27PM  7         DO YOU SEE THAT?

03:27PM  8    A.   YES.

03:27PM  9    Q.   AND IF YOU GO TO THE BOTTOM OF PAGE 2 THERE'S AN

03:27PM  10   INDICATION THAT THEY'VE ENTERED INTO CHANGE OF CONTROL

03:27PM  11   AGREEMENTS WITH THE FOLLOWING PEOPLE.

03:27PM  12        DO YOU SEE THAT?

03:27PM  13   A.   YES.

03:27PM  14   Q.   AND DO YOU KNOW WHAT A CHANGE OF CONTROL AGREEMENT IS?

03:27PM  15   A.   NOT EXACTLY.

03:27PM  16   Q.   AND LET'S GO TO THE PAGE THAT WE WERE LOOKING AT A MOMENT

03:27PM  17   AGO WHICH IS THE BATES LABELLED 8401.  IF YOU LOOK AT THE

03:27PM  18   SECTION LABELLED 3.8(B) AND BLOW THAT UP.

03:27PM  19        DO YOU SEE THERE -- I LOST MY MONITOR.

03:27PM  20             THE CLERK:  CAN WE DO A QUICK RESET?

03:27PM  21   BY MR. DOWNEY:

03:27PM  22   Q.   IF YOU LOOK IN THE MIDDLE OF THE PAGE SCHEDULE 3.8(B) IT

03:28PM  23   SAYS AN EVALUATION --

03:28PM  24             THE COURT:  NOW WE JUST LOST EVERYBODY.

03:28PM  25             THE CLERK:  I'M DOING A RESET.

EISENMAN CROSS BY MR. DOWNEY                                    6117

03:28PM   1            THE WITNESS:  YES, I SAW IT.

03:28PM   2            THE COURT:  GIVE US A MOMENT HERE.  THERE WE ARE.

03:28PM   3       IS THAT UP NOW FOR YOU, MR. DOWNEY?

03:28PM   4            MR. DOWNEY:  IT IS, YOUR HONOR.

03:28PM   5   Q.   AND DO YOU SEE THERE'S A REFERENCE TO AN AGREEMENT BETWEEN

03:28PM   6   THERANOS AND SMITHKLINE BEECHAM CORPORATION?

03:28PM   7       DO YOU SEE THAT?

03:28PM   8   A.   YES.

03:28PM   9   Q.   AND SMITHKLINE DOES BUSINESS AS GLAXOSMITHKLINE; CORRECT?

03:28PM  10   A.   CORRECT.

03:28PM  11   Q.   AND SO IN THIS WRITTEN DISCLOSURE THAT WAS TOLD TO YOU, IF

03:28PM  12   NOT ELSEWHERE, THEY TOLD YOU THAT WE HAVE THIS AGREEMENT;

03:28PM  13   CORRECT?

03:28PM  14   A.   CAN YOU SHOW ME ON THIS AGREEMENT WHERE SHE'S DOING

03:28PM  15   BUSINESS WITH PFIZER, BRISTOL MYERS, AND NOVARTIS BECAUSE

03:28PM  16   THAT'S ALSO WHAT SHE TOLD ME AT THE TIME.

03:29PM  17            MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE THAT.

03:29PM  18   Q.   I WANT TO ASK YOU --

03:29PM  19            THE COURT:  HE'S GOING TO ASK YOU QUESTIONS.

03:29PM  20   BY MR. DOWNEY:

03:29PM  21   Q.   I'M GOING TO SHOW YOU A DOCUMENT, WHICH I DON'T KNOW IF

03:29PM  22   YOU SAW THE DOCUMENT IN REAL TIME OR NOT, BUT I'M GOING TO DO

03:29PM  23   IT FOR PURPOSES OF SEEING IF I CAN -- IF YOU'RE FAMILIAR WITH

03:29PM  24   THE DOCUMENT.

03:29PM  25            SO DON'T DESCRIBE THE DOCUMENT.  DON'T COMMENT ON THE

EISENMAN CROSS BY MR. DOWNEY                                        6118

03:29PM   1    DOCUMENT FOR PURPOSES OF THE JURY.

03:29PM   2         JUST TAKE A LOOK AT THE DOCUMENT, AND TELL ME IF IT'S A

03:29PM   3    DOCUMENT THAT YOU HAVE EVER SEEN BEFORE.  OKAY?

03:29PM   4         AND THIS WILL BE EXHIBIT 14111.

03:29PM   5    A.   ARE YOU PUTTING IT ON THE SCREEN, OR DO I NEED TO LOOK AT

03:29PM   6    IT IN MY BOOK.

03:29PM   7    Q.   NO.  YOU JUST NEED TO LOOK AT IT PRIVATELY.  BECAUSE IF

03:29PM   8    IT'S NOT A DOCUMENT THAT YOU SAW IN REAL TIME, THEN I'M --

03:29PM   9    A.   14110?

03:29PM  10    Q.   14111.  DO YOU HAVE THAT?

03:29PM  11    A.   NO, I DON'T HAVE THAT.

03:30PM  12    Q.   OKAY.  LET ME SEE IF I CAN GET YOU A COPY OF THAT.

03:30PM  13         YOUR HONOR, MAY I APPROACH THE WITNESS?

03:30PM  14              THE COURT:  YES.

03:30PM  15    BY MR. DOWNEY:

03:30PM  16    Q.   AND I'LL GIVE YOU MY QUESTION IN ADVANCE SO YOU DON'T

03:30PM  17    LABOR NEEDLESSLY OVER IT.

03:30PM  18         THE ONLY QUESTION I HAVE IS HAVE YOU SEEN THAT DOCUMENT

03:30PM  19    BEFORE?

03:30PM  20    A.   I DON'T RECALL.

03:30PM  21    Q.   OKAY.  NOW, YOU MENTIONED IN ADDITION TO GLAXO, THAT

03:30PM  22    MS. HOLMES HAD MENTIONED TO YOU THAT AROUND THE TIME OF YOUR

03:31PM  23    INVESTMENT, SO THE 2006 TIMEFRAME, THAT THERANOS WAS ALSO DOING

03:31PM  24    BUSINESS WITH PFIZER; CORRECT?

03:31PM  25    A.   CORRECT.

EISENMAN CROSS BY MR. DOWNEY                                           6119

03:31PM   1    Q.  LET ME ASK YOU TO LOOK AT ANOTHER DOCUMENT -- BY THE WAY,

03:31PM   2    WITH THE COMMENTARY, YOU DON'T MEAN TO IMPLY TO THIS JURY THAT

03:31PM   3    MS. HOLMES DID NOT HAVE AGREEMENTS OR DISCUSSIONS WITH THESE

03:31PM   4    COMPANIES.

03:31PM   5         I THINK YOU'RE SAYING THAT YOU DON'T KNOW; CORRECT?

03:31PM   6    A.  UM, SKEPTICAL.

03:31PM   7    Q.  WELL, DO YOU HAVE ANY FOUNDATION TO KNOW THAT?

03:31PM   8    A.  I HAVE A HISTORY OF INFORMATION THAT WAS TOLD TO ME OVER

03:31PM   9    THE COURSE OF YEARS THAT WAS NOT ACCURATE.

03:31PM   10   Q.  EXCUSE ME?

03:31PM   11        THE COURT:  YOU ASKED THE QUESTION.

03:31PM   12        MR. DOWNEY:  EXCUSE ME.

03:31PM   13   Q.  YOU DON'T KNOW WHAT WAS GOING ON INTERNALLY AT THERANOS IN

03:31PM   14   TERMS OF THEIR WORKING WITH PHARMACEUTICAL COMPANIES, DO YOU?

03:31PM   15   A.  I HAD SOME PRETTY STRONG EVIDENCE FROM A LOT OF SOURCES

03:32PM   16   THAT A LOT OF THINGS THAT WERE TOLD TO ME WERE NOT ACCURATE.

03:32PM   17   Q.  OKAY.  WELL, WHAT ABOUT THE EVIDENCE THAT I JUST SHOWED

03:32PM   18   YOU, DOES THAT REFRESH YOUR RECOLLECTION, FOR EXAMPLE, THAT

03:32PM   19   THEY WERE WORKING WITH GLAXO?

03:32PM   20   A.  I DON'T RECALL SEEING THIS AT THIS TIME.  THAT WAS 2006.

03:32PM   21   Q.  OKAY.

03:32PM   22   A.  AND THERE'S A LOT OF INFORMATION AND A LOT OF DOCUMENTS.

03:32PM   23   Q.  OKAY.  LET ME SHOW YOU ANOTHER DOCUMENT, WHICH I REGRET TO

03:32PM   24   SAY IS ALSO FROM 2006, BUT LET'S SEE IF YOU SAW IT IN REAL

03:32PM   25   TIME.

EISENMAN CROSS BY MR. DOWNEY                                    6120

03:33PM  1              THE CLERK:  WHAT EXHIBIT NUMBER IS THAT, COUNSEL?

03:33PM  2              MR. DOWNEY:  YES.  I DON'T THINK I IDENTIFIED THE

03:33PM  3     EXHIBIT NUMBER, WHICH IS EXHIBIT 14112.

03:33PM  4              THE WITNESS:  CAN YOU TELL ME IF I WAS PROVIDED

03:33PM  5     THESE DOCUMENTS AT THE TIME OF MY INVESTMENT, BECAUSE I DON'T

03:33PM  6     RECALL SEEING THESE?

03:33PM  7     BY MR. DOWNEY:

03:33PM  8     Q.  WELL, I DON'T KNOW.  THAT'S WHY YOU'RE HERE TO ANSWER OUR

03:33PM  9     QUESTIONS ABOUT THAT.  MY QUESTION --

03:33PM  10    A.  I DON'T RECALL.

03:33PM  11    Q.  YOU DON'T RECALL?

03:33PM  12    A.  SO WE HAVE TWO LEFT, BRISTOL MYERS AND NOVARTIS.

03:33PM  13    Q.  WE DON'T WANT YOU TO IMPLY WHAT THE CONTENT OF THE

03:33PM  14    DOCUMENT IS TO THE JURY IF IT'S NOT YET ADMITTED INTO EVIDENCE.

03:33PM  15    SO THAT'S FINE.

03:33PM  16         SO GLAXOSMITHKLINE.

03:33PM  17         BY THE WAY, DO YOU REMEMBER A DESCRIPTION OF THE

03:33PM  18    PARTICULARS OF THE WORK THAT WAS DONE WITH EITHER GLAXO OR

03:34PM  19    SMITHKLINE AS OF 2006?

03:34PM  20    A.  THE DETAILS WEREN'T DISCUSSED.  JUST THE NAMES WERE

03:34PM  21    DISCUSSED THAT PFIZER WAS CURRENTLY DOING BUSINESS WITH THESE

03:34PM  22    FIVE COMPANIES, OR THESE FOUR COMPANIES.

03:34PM  23    Q.  OKAY.  SO WE'VE TALKED ABOUT PFIZER AND WE'VE TALKED ABOUT

03:34PM  24    SMITHKLINE.

03:34PM  25         WHO WERE THE OTHERS?

EISENMAN CROSS BY MR. DOWNEY                                      6121

03:34PM   1     A.   BRISTOL MYERS AND NOVARTIS.

03:34PM   2     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 14113, WHICH I THINK

03:34PM   3     ALSO IS NOT IN YOUR NOTEBOOK.

03:34PM   4     A.   CAN I ASK YOU WHAT A SERVICE FRAME AGREEMENT IS?  I DON'T

03:34PM   5     KNOW WHAT THAT MEANS.

03:34PM   6     Q.   YOU CANNOT.

03:34PM   7              THE COURT:  HE'LL, HE'LL ASK YOU THE QUESTIONS.

03:34PM   8              THE WITNESS:  OKAY.

03:34PM   9              THE COURT:  AND THEN YOU CAN DO YOUR BEST TO ANSWER

03:34PM   10    THE QUESTIONS.

03:34PM   11             MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

03:35PM   12             THE COURT:  YES.

03:35PM   13    BY MR. DOWNEY:

03:35PM   14    Q.   SO I THINK THE THIRD COMPANY THAT YOU MENTIONED WAS

03:35PM   15    NOVARTIS?

03:35PM   16    A.   CORRECT.

03:35PM   17    Q.   AND I'VE SHOWN YOU EXHIBIT 14113.

03:35PM   18         DO YOU SEE THAT?

03:35PM   19    A.   I DO.

03:35PM   20    Q.   AND DID YOU SEE THIS DOCUMENT IN OR AROUND THE TIME OF

03:35PM   21    YOUR 2006 INVESTMENT?

03:35PM   22    A.   NO.

03:35PM   23    Q.   OKAY.  AND I THINK THE LAST COMPANY THAT YOU MENTIONED WAS

03:35PM   24    BRISTOL MYERS; CORRECT?

03:35PM   25    A.   YES.

EISENMAN CROSS BY MR. DOWNEY                                          6122

03:35PM   1     Q.   AND DO YOU KNOW THAT THERANOS MET WITH BRISTOL MYERS?

03:36PM   2     A.   I DON'T KNOW.

03:36PM   3     Q.   OKAY.  YOU DIDN'T KNOW ANY OF THE DETAILS AT THAT TIME,

03:36PM   4     YOU JUST KNEW THE NAMES OF THESE COMPANIES?

03:36PM   5     A.   YES.

03:36PM   6     Q.   NOW, IN CONNECTION WITH THE AGREEMENT, YOU SIGNED THE

03:36PM   7     EXHIBIT THAT WE SAW BEFORE THAT WAS THE STOCK PURCHASE

03:36PM   8     AGREEMENT; CORRECT?

03:36PM   9     A.   WELL, YOU PRESENTED THE THREE COMPANIES.  YOU DIDN'T

03:36PM   10    PRESENT BRISTOL MYERS.  IS THERE EVIDENCE THAT THEY'RE DOING

03:36PM   11    BUSINESS WITH BRISTOL MYERS?

03:36PM   12             THE COURT:  I'M SORRY, SIR.  LISTEN TO HIS QUESTION

03:36PM   13    AND TRY TO ANSWER HIS QUESTION AS BEST YOU CAN.

03:36PM   14    BY MR. DOWNEY:

03:36PM   15    Q.   DO YOU RECALL LOOKING AT THE STOCK PURCHASE AGREEMENT IN

03:36PM   16    CONNECTION WITH YOUR OCTOBER 2006 INVESTMENT?

03:36PM   17    A.   I DON'T RECALL.

03:36PM   18    Q.   WELL, DO YOU RECALL THAT WE JUST LOOKED AT IT A MOMENT

03:36PM   19    AGO?

03:36PM   20    A.   YES.

03:36PM   21    Q.   AND LET ME JUST DRAW THAT BACK UP.  THAT'S EXHIBIT 12003A.

03:37PM   22             AND WHEN YOU ENTERED INTO THE AGREEMENT WITH THERANOS,

03:37PM   23    THIS IS NOT THE FIRST TIME THAT YOU HAD ENTERED INTO A STOCK

03:37PM   24    PURCHASE AGREEMENT; CORRECT?

03:37PM   25    A.   CORRECT.

EISENMAN CROSS BY MR. DOWNEY                                    6123

03:37PM  1    Q.   AND YOU HAD INVESTED IN A NUMBER OF PRIVATE COMPANIES;

03:37PM  2    CORRECT?

03:37PM  3    A.   CORRECT.

03:37PM  4    Q.   AND TYPICALLY THERE'S SOME AGREEMENT BETWEEN THE COMPANY

03:37PM  5    AND THE SHAREHOLDER AS TO THE TERMS ON WHICH THE SHAREHOLDER

03:37PM  6    WILL INVEST; CORRECT?

03:37PM  7    A.   CORRECT.

03:37PM  8    Q.   AND YOU HAD, PRIOR TO 2006, YOU HAD EXPERIENCE REVIEWING

03:37PM  9    AND EDITING AND SIGNING STOCK PURCHASE AGREEMENTS; CORRECT?

03:37PM  10   A.   TYPICALLY NOT EDITING.  REVIEWING AND SIGNING.

03:37PM  11   Q.   OKAY.  WELL, YOU'RE TRAINED AS A LAWYER; CORRECT?

03:37PM  12   A.   NOT EXACTLY.  I WENT TO LAW SCHOOL.  I DID TAX WORK.  IT

03:37PM  13   WAS -- I DIDN'T PRACTICE IN THESE AREAS OF LAW.

03:37PM  14   Q.   WELL, I, I THINK A TAX LAWYER COUNTS AS A LAWYER, BUT IF

03:37PM  15   YOU DON'T ACCEPT IT, THAT'S OKAY.

03:38PM  16        BUT YOU HAD LEGAL TRAINING; CORRECT?

03:38PM  17   A.   CORRECT.

03:38PM  18   Q.   AND YOU TOOK THE COURSES IN CONTRACT AND THE BASIC COURSES

03:38PM  19   IN LAW SCHOOL; CORRECT?

03:38PM  20   A.   CORRECT.

03:38PM  21   Q.   AND WHEN YOU GOT THIS AGREEMENT, DO YOU RECALL MAKING

03:38PM  22   REQUESTS FOR ANY CHANGES TO THE AGREEMENT?

03:38PM  23   A.   NO.  COMPANIES DO NOT CHANGE AGREEMENTS, ESPECIALLY A

03:38PM  24   SMALL SHAREHOLDER.  IT WOULD HAVE BEEN A WASTE OF TIME.

03:38PM  25   Q.   SO YOU DID NOT ASK FOR CHANGES IN THE AGREEMENT?

EISENMAN CROSS BY MR. DOWNEY                                  6124

03:38PM   1    A.   NO.

03:38PM   2    Q.   I WANT TO TAKE A LOOK AT SOME OF THE TERMS UNDER WHICH YOU

03:38PM   3    AGREED.

03:38PM   4         AND I'M GOING TO BEGIN BY -- BY THE WAY, THIS IS IN YOUR

03:38PM   5    BINDER, AND YOU MAY WANT TO REVIEW SOME OF THE SURROUNDING

03:38PM   6    LANGUAGE, BUT SINCE IT'S IN EVIDENCE, I'M GOING TO DISPLAY IT

03:38PM   7    JUST SO THE JURY CAN SEE IT.

03:38PM   8         I'M GOING TO GO TO SECTION 4.9 OF THE AGREEMENT.  OKAY?

03:38PM   9    A.   IT'S GOING TO BE ON THE SCREEN?

03:38PM  10    Q.   IT WILL BE ON THE SCREEN, YEAH.  IT'S AT BATES LABELLED

03:39PM  11    8302.

03:39PM  12         AND I WANT TO JUST HIGHLIGHT THAT PARAGRAPH.  NOW, YOU

03:39PM  13    WERE TALKING DURING OF COURSE OF YOUR DIRECT ABOUT AN

03:39PM  14    OPPORTUNITY TO, YOU KNOW, FOR I THINK WHAT YOU CALL A LIQUIDITY

03:39PM  15    EVENT?

03:39PM  16    A.   YES.

03:39PM  17    Q.   AND ONE OF THOSE LIQUIDITY EVENTS MIGHT BE THAT THERE

03:39PM  18    MIGHT BE SOME KIND OF A PUBLIC MARKET THAT MIGHT BE CREATED FOR

03:39PM  19    SHARES IN A COMPANY; CORRECT?

03:39PM  20    A.   IN OUR EARLY CONVERSATIONS THERE WAS A CONVERSATION THAT

03:39PM  21    ELIZABETH TOLD ME THAT SHE HOPED TO IPO IN 12 TO 18 MONTHS.

03:39PM  22    Q.   FAIR ENOUGH.

03:39PM  23    A.   THEY WERE ALREADY TALKING TO AN INVESTMENT BANKER

03:39PM  24    MORGAN STANLEY.

03:39PM  25    Q.   OKAY.  AND WHEN YOU SIGNED THIS AGREEMENT, YOU

EISENMAN CROSS BY MR. DOWNEY                                      6125

03:39PM    1    ACKNOWLEDGED THAT YOU KNEW THAT THERE WAS -- THESE STOCKS WERE

03:39PM    2    PRIVATE STOCKS; CORRECT?

03:39PM    3    A.    CORRECT.

03:39PM    4    Q.    AND THERE WAS NO PUBLIC MARKET ON WHICH TO TRADE THESE

03:39PM    5    STOCKS; CORRECT?

03:39PM    6    A.    CORRECT.

03:39PM    7    Q.    AND THE COMPANY HAD GIVEN YOU NO ASSURANCES THAT THERE

03:39PM    8    WOULD EVER BE A PUBLIC MARKET?

03:39PM    9    A.    SHE -- WELL, THERE'S NEVER ANY GUARANTEE, BUT SHE THOUGHT

03:40PM   10    THE COMPANY WOULD IPO IN 12 TO 18 MONTHS, AND AFTER THAT 12 TO

03:40PM   11    18 MONTHS IT WAS GOING TO BE WITHIN THE NEXT YEAR OR 2.  AND

03:40PM   12    AFTER THAT, WITHIN THE NEXT YEAR OR 2, THERE WAS JUST A WHOLE

03:40PM   13    SERIES OF DELAYS.

03:40PM   14    Q.    AND, WELL, I WANT TO FOCUS YOU ON THE AGREEMENT THAT YOU

03:40PM   15    SIGNED.

03:40PM   16          IN THE AGREEMENT THAT YOU SIGNED, DID YOU AGREE THAT THE

03:40PM   17    COMPANY HAD NOT MADE ANY ASSURANCES THAT A PUBLIC MARKET WOULD

03:40PM   18    EVER EXIST FOR THE COMPANY'S SECURITIES?

03:40PM   19    A.    THERE WAS NO GUARANTEE, BUT IT WAS STATED TO ME THAT THAT

03:40PM   20    WAS THEIR INTENT, AND IT WOULD HAPPEN WITHIN THE NEXT YEAR OR

03:40PM   21    TWO.

03:40PM   22    Q.    WELL, MR. EISENMAN, I'M JUST ASKING YOU A QUESTION ABOUT

03:40PM   23    THE TERMS OF THE AGREEMENT THAT YOU SIGNED.

03:40PM   24          DO YOU AGREE WITH ME THAT IN THE STOCK PURCHASE AGREEMENT,

03:40PM   25    YOU AGREED THAT THE COMPANY HAD MADE NO ASSURANCES THAT A

EISENMAN CROSS BY MR. DOWNEY                              6126

03:40PM  1    PUBLIC MARKET WILL EVER EXIST FOR THE COMPANY'S SECURITIES?

03:40PM  2    A.   THIS IS WHAT WE CALL BOILERPLATE, AS YOU KNOW AS AN

03:40PM  3    ATTORNEY.  THIS IS IN EVERY AGREEMENT AND EVERY PRIVATE

03:40PM  4    INVESTMENT, AND THIS IS WHAT ANY INVESTOR HAS TO SIGN IF THEY

03:40PM  5    WANT TO INVEST IN A PRIVATE COMPANY.

03:41PM  6         BUT WHAT IS MORE IMPORTANT ARE CONVERSATIONS THAT YOU HAVE

03:41PM  7    WITH THE PRINCIPALS, AND THEY WILL TELL YOU WHAT THEIR THOUGHTS

03:41PM  8    ARE, WHAT THEY THINK WILL HAPPEN.

03:41PM  9         AND THAT'S MORE IMPORTANT THAN THIS STATEMENT.

03:41PM  10             THE COURT:  MR. EISENMAN, MR. EISENMAN, I'M SORRY,

03:41PM  11   SIR.  I APPRECIATE YOUR ASSISTANCE HERE, BUT YOU JUST NEED TO

03:41PM  12   LISTEN TO HIS QUESTION AND THEN ANSWER THE QUESTION AS BEST YOU

03:41PM  13   CAN, AND THEN HE'LL ASK YOU ANOTHER QUESTION.

03:41PM  14             THE WITNESS:  OKAY.

03:41PM  15             MR. DOWNEY:  IN CONNECTION WITH THAT, YOUR HONOR, I

03:41PM  16   MOVE TO STRIKE THE ANSWER.

03:41PM  17             THE COURT:  YES.  THE COLLOQUY WOULD BE STRICKEN

03:41PM  18   THEN.  YOU CAN ASK ANOTHER QUESTION.

03:41PM  19   BY MR. DOWNEY:

03:41PM  20   Q.   DID YOU, IN THE STOCK PURCHASE AGREEMENT THAT YOU SIGNED

03:41PM  21   WITH THERANOS, ACKNOWLEDGE THAT NO ASSURANCES HAD BEEN GIVEN TO

03:41PM  22   YOU THAT A PUBLIC MARKET WOULD EVER EXIST FOR THE COMPANY'S

03:41PM  23   SECURITIES?

03:41PM  24   A.   I DON'T UNDERSTAND YOUR LANGUAGE.

03:41PM  25             WHEN YOU SAY "ACKNOWLEDGE," I SIGNED A DOCUMENT THAT EVERY

EISENMAN CROSS BY MR. DOWNEY                                      6127

```
03:41PM   1    INVESTOR SIGNS AND HAS TO SIGN BEFORE MAKING AN INVESTMENT, BUT

03:41PM   2    THIS IS PART OF LANGUAGE THAT IS IN EVERY PRIVATE INVESTMENT

03:41PM   3    THAT THERE'S NO ASSURANCES BUT THAT'S NOT WHY WE INVEST.

03:42PM   4         AN INVESTOR DOES NOT INVEST IN SOMETHING WHEN THERE'S

03:42PM   5    NO --

03:42PM   6              THE COURT:  MR. EISENMAN, MR. EISENMAN, I HAVE TO

03:42PM   7    STOP YOU AGAIN, SIR.

03:42PM   8         SO I'M GOING TO ASK YOU TO FOCUS ON THE LAWYERS, NOT JUST

03:42PM   9    THIS LAWYER, BUT ANY LAWYER WHO ASKS YOU A QUESTION.  JUST

03:42PM  10    FOCUS ON THE QUESTION THAT THEY ASK.

03:42PM  11              THE WITNESS:  OKAY.

03:42PM  12              THE COURT:  AND THEN ANSWER THAT QUESTION.

03:42PM  13              THE WITNESS:  I'M TRYING.

03:42PM  14              THE COURT:  OKAY.  SO THE QUESTION THAT IS BEFORE

03:42PM  15    YOU NOW I BELIEVE IS WHETHER OR NOT YOU SIGNED THIS DOCUMENT.

03:42PM  16         I'M GOING TO ASK MR. WADE TO ASK THAT QUESTION -- EXCUSE

03:42PM  17    ME, MR. DOWNEY TO ASK THAT QUESTION AGAIN.

03:42PM  18              MR. DOWNEY:  THAT IS CORRECT, YOUR HONOR.

03:42PM  19              THE WITNESS:  DID I SIGN THIS?

03:42PM  20              MR. DOWNEY:  YES.

03:42PM  21              THE COURT:  SO LET ME -- HERE'S THE WAY IT WORKS.

03:42PM  22    THEY GET TO ASK THE QUESTIONS.  THEY ALSO GET TO OBJECT TO

03:42PM  23    QUESTIONS.

03:42PM  24              THE WITNESS:  OKAY.

03:42PM  25              THE COURT:  IF THEY OBJECT, THE WITNESS CAN'T ANSWER
```

EISENMAN CROSS BY MR. DOWNEY                                        6128

03:42PM   1    UNTIL THE JUDGE, THAT'S WHO I AM, MAKES A DECISION AS TO

03:42PM   2    WHETHER A QUESTION CAN BE ANSWERED OR NOT.

03:42PM   3              THE WITNESS:  OKAY.

03:42PM   4              THE COURT:  AND THEN THE WITNESS CAN EITHER ANSWER

03:42PM   5    OR WHAT HAPPENS.

03:42PM   6         BUT THEY GET TO ASK THE QUESTIONS.

03:43PM   7              THE WITNESS:  OKAY.

03:43PM   8              THE COURT:  AND YOU GET TO ANSWER THOSE QUESTIONS AS

03:43PM   9    BEST YOU CAN.

03:43PM  10              THE WITNESS:  OKAY.

03:43PM  11              THE COURT:  OKAY.  GREAT.

03:43PM  12         MR. DOWNEY.

03:43PM  13              MR. DOWNEY:  JUST IN THE INTEREST OF PERFECT

03:43PM  14    CLARITY.

03:43PM  15    Q.   YOU SIGNED THE DOCUMENT WHICH CONTAINS THE LANGUAGE

03:43PM  16    REFLECTED IN SECTION 4.9 OF EXHIBIT 12003A; CORRECT?

03:43PM  17    A.   I SIGNED THIS DOCUMENT, CORRECT.

03:43PM  18    Q.   OKAY.  AND YOU ALSO AGREED IN SIGNING THAT DOCUMENT THAT

03:43PM  19    YOU DIDN'T HAVE ANY PRESENT INTENTION TO TRY TO SELL THE

03:43PM  20    SHARES; CORRECT?

03:43PM  21    A.   NO.

03:43PM  22    Q.   LET ME ASK YOU TO LOOK AT WITHIN EXHIBIT 12003A, SECTION

03:43PM  23    4.2.

03:43PM  24    A.   ARE YOU GOING TO PUT IT ON THE SCREEN?

03:43PM  25    Q.   I'M GOING TO PUT IT ON THE SCREEN, YEAH.

EISENMAN CROSS BY MR. DOWNEY                                    6129

03:43PM 1        DO YOU SEE THAT THAT PARAGRAPH READS, "SUCH INVESTOR IS

03:43PM 2   ACQUIRING THE SHARES AND THE CONVERSION SHARES, FOR INVESTMENT

03:44PM 3   FOR ITS OWN ACCOUNT, NOT AS A NOMINEE OR AGENT, AND NOT WITH

03:44PM 4   THE VIEW TO, OR FOR RESALE IN CONNECTION WITH ANY DISTRIBUTION

03:44PM 5   THEREOF, AND THAT SUCH INVESTOR HAS NO PRESENT INTENTION OF

03:44PM 6   SELLING, GRANTING ANY PARTICIPATION IN OR OTHERWISE

03:44PM 7   DISTRIBUTING THE SAME."

03:44PM 8        DO YOU SEE THAT?

03:44PM 9   A.   YES.

03:44PM 10  Q.   AND THAT'S PART OF THE AGREEMENT THAT YOU SIGNED AS WELL;

03:44PM 11  CORRECT?

03:44PM 12  A.   CORRECT.

03:44PM 13  Q.   AND THEN DO YOU RECALL TALKING DURING YOUR DIRECT

03:44PM 14  EXAMINATION ABOUT CERTAIN PREDICTIONS MS. HOLMES MADE OR

03:44PM 15  PROJECTIONS SHE GAVE TO YOU AS TO WHAT THE PERFORMANCE OF THE

03:44PM 16  COMPANY WOULD BE.

03:44PM 17       DO YOU REMEMBER THAT?

03:44PM 18  A.   YES.

03:44PM 19  Q.   AND YOU WENT OVER THAT IN SOME DETAIL WITH MR. BOSTIC;

03:44PM 20  CORRECT?

03:44PM 21  A.   CORRECT.

03:44PM 22  Q.   LET ME ASK YOU TO LOOK AT SECTION 4.5, AND I WANT TO DRAW

03:44PM 23  YOUR ATTENTION ACTUALLY DOWN TO THE NEXT PARAGRAPH OF THE NEXT

03:45PM 24  BOTTOM HALF OF THIS.

03:45PM 25       ALL RIGHT.  DO YOU SEE THE PART THAT WE'VE HIGHLIGHTED

EISENMAN CROSS BY MR. DOWNEY                                    6130

03:45PM   1    WHERE IT SAYS THAT YOU'VE RECEIVED ALL OF THE INFORMATION THAT

03:45PM   2    THE INVESTOR CONSIDERS NECESSARY OR APPROPRIATE FOR DECIDING

03:45PM   3    WHETHER TO PURCHASE THE SHARES AND CONVERSION SHARES.

03:45PM   4        AND THAT WAS TRUE; CORRECT?

03:45PM   5    A.   YES.

03:45PM   6    Q.   AND THEN YOU -- IT GOES ON TO SAY THAT YOU UNDERSTOOD THAT

03:45PM   7    SUCH DISCUSSIONS AS WELL AS ANY INFORMATION ISSUED BY THE

03:45PM   8    COMPANY WERE INTENDED TO DESCRIBE CERTAIN ASPECTS OF THE

03:45PM   9    COMPANY'S BUSINESS AND PROSPECTS BUT WERE NOT NECESSARILY A

03:45PM  10    THOROUGH OR EXHAUSTIVE DESCRIPTION.

03:45PM  11        DO YOU SEE THAT?

03:45PM  12    A.   YES.

03:45PM  13    Q.   SO, FOR EXAMPLE, THEY DIDN'T MAKE AVAILABLE TO YOU

03:45PM  14    INFORMATION ABOUT THE TECHNOLOGY OR TESTS IN ANY, IN ANY -- YOU

03:45PM  15    DIDN'T GO AND INSPECT THE TECHNOLOGY OR ANYTHING?

03:45PM  16    A.   NO.

03:45PM  17    Q.   AND YOU DIDN'T LOOK AT ANY CONTRACTS THAT THE COMPANY HAD

03:46PM  18    IN PLACE, DID YOU?

03:46PM  19    A.   NO.

03:46PM  20    Q.   OKAY.  AND THEN IF YOU GO ON TO THE NEXT SENTENCE IT SAYS,

03:46PM  21    "SUCH INVESTOR ACKNOWLEDGES THAT ANY BUSINESS PLANS PREPARED BY

03:46PM  22    THE COMPANY HAVE BEEN, AND CONTINUE TO BE, SUBJECT TO CHANGE

03:46PM  23    AND THAT ANY PROJECTIONS INCLUDED IN SUCH BUSINESS PLANS, OR

03:46PM  24    OTHERWISE, ARE NECESSARILY SPECULATIVE IN NATURE, AND IT CAN BE

03:46PM  25    EXPECTED THAT SOME OR ALL OF THE ASSUMPTIONS UNDERLYING THE

EISENMAN CROSS BY MR. DOWNEY                                6131

03:46PM   1    PROJECTIONS WILL NOT MATERIALIZE OR WILL VARY SIGNIFICANTLY

03:46PM   2    FROM ACTUAL RESULTS."

03:46PM   3        DO YOU SEE THAT?

03:46PM   4    A.   YES.

03:46PM   5    Q.   AND YOU SIGNED THAT ACKNOWLEDGEMENT AS PART OF THIS

03:46PM   6    AGREEMENT AS WELL; CORRECT?

03:46PM   7    A.   CORRECT.

03:46PM   8    Q.   AND AM I RIGHT THAT IN ORDER TO ENTER INTO -- BE ELIGIBLE

03:46PM   9    TO BUY STOCK FROM THERANOS, YOU HAD TO BE AN ACCREDITED

03:46PM  10    INVESTOR; CORRECT?

03:46PM  11    A.   CORRECT.

03:46PM  12    Q.   AND YOU WERE AN ACCREDITED INVESTOR IN 2006?

03:46PM  13    A.   CORRECT.

03:46PM  14    Q.   AND CAN YOU TELL US WHAT THAT MEANS?

03:46PM  15    A.   IT MEANS THAT YOU HAVE A CERTAIN LEVEL OF NET WORTH OR

03:47PM  16    INCOME.

03:47PM  17    Q.   OKAY.  AND DO YOU KNOW WHAT THAT LEVEL OF INCOME IS?

03:47PM  18    A.   THERE'S DIFFERENT LEVELS AND I DON'T RECALL.

03:47PM  19    Q.   OKAY.  BUT, IN OTHER WORDS, YOU EITHER HAVE TO MAKE A

03:47PM  20    CERTAIN AMOUNT PER YEAR OR YOU HAVE TO BE WORTH A CERTAIN

03:47PM  21    AMOUNT IN TERMS OF YOUR NET WORTH I GUESS?

03:47PM  22    A.   YES.

03:47PM  23    Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT WHEN YOU WERE

03:47PM  24    DISCUSSING MATTERS WITH MR. BOSTIC, YOU SAID THAT FOR THE

03:47PM  25    CLIENTS WHO YOU ADVISED ON WEALTH MANAGEMENT AND -- MAYBE YOU

EISENMAN CROSS BY MR. DOWNEY                                        6132

03:47PM   1      DIDN'T USE THE TERM WEALTH MANAGEMENT.

03:47PM   2          WHAT TERM DID YOU USE TO DESCRIBE YOUR PROFESSION?

03:47PM   3      A.   I DON'T RECALL.

03:47PM   4      Q.   OKAY.  BUT WHAT WAS YOUR PROFESSION BEFORE YOU WERE

03:47PM   5      RETIRED?

03:47PM   6      A.   FINANCIAL PLANNER, INVESTMENT MANAGER, INVESTMENT

03:47PM   7      COUNSELLOR.

03:47PM   8      Q.   RIGHT.  AND YOU SAID THAT YOU ADVISED THOSE CLIENTS

03:47PM   9      TYPICALLY TO INVEST IN WHAT YOU CALLED PUBLIC EQUITIES?

03:47PM   10     A.   YES.

03:47PM   11     Q.   AND THAT MEANS STOCK IN A PUBLICLY TRADED COMPANY;

03:47PM   12     CORRECT?

03:47PM   13     A.   CORRECT.

03:48PM   14     Q.   AND SO STOCK THAT WOULD BE TRADED ON THE NASDAQ OR THE

03:48PM   15     NEW YORK STOCK EXCHANGE OR SOMETHING; CORRECT?

03:48PM   16     A.   CORRECT.

03:48PM   17     Q.   AND THOSE INFORMATION -- THOSE COMPANIES DISCLOSE

03:48PM   18     INFORMATION EVERY QUARTER ABOUT THEIR OPERATIONS; CORRECT?

03:48PM   19     A.   CORRECT.

03:48PM   20     Q.   AND THEY'RE REQUIRED BY LAW TO DO THAT; CORRECT?

03:48PM   21     A.   CORRECT.

03:48PM   22     Q.   BUT YOU SAID THAT FOR PURPOSES OF YOUR OWN INVESTMENTS

03:48PM   23     THAT YOU AT LEAST HAD AN ASPECT OF THEM THAT WAS FOCUSSED ON

03:48PM   24     INVESTING IN PRIVATE COMPANIES; CORRECT?

03:48PM   25     A.   CORRECT.

EISENMAN CROSS BY MR. DOWNEY                               6133

03:48PM  1    Q.   NOW, YOU DIDN'T INVEST OR YOU DIDN'T ADVISE YOUR CLIENTS

03:48PM  2    IN YOUR WORK TO INVEST IN PRIVATE COMPANIES; IS THAT RIGHT?

03:48PM  3    A.   THAT'S CORRECT.

03:48PM  4    Q.   AND WHY IS THAT?

03:48PM  5    A.   BECAUSE PRIVATE COMPANIES HAVE A HIGHER LEVEL OF RISK BUT

03:48PM  6    A HIGHER LEVEL OF RETURN.  AND TO BE SUCCESSFUL, WHAT MOST

03:48PM  7    PEOPLE DO IS THAT THEY INVEST IN A LOT OF COMPANIES, BECAUSE

03:48PM  8    SOME OF THEM ARE GOING TO GO OUT OF BUSINESS AND SOME OF THEM

03:48PM  9    ARE GOING TO DO REALLY WELL.

03:48PM  10       IT'S A HIGH RISK, HIGHER POTENTIAL REWARD SITUATION.

03:49PM  11   Q.   BUT YOUR CLIENTS GENERALLY WERE NOT PEOPLE WHO YOU WANTED

03:49PM  12   TO SEE LOSE THE ENTIRE AMOUNT OF AN INVESTMENT, FOR EXAMPLE?

03:49PM  13   A.   THEIR RISK TOLERANCE WAS AT A DIFFERENT LEVEL WHERE THEY

03:49PM  14   WERE SUITED TO INVEST IN PUBLIC SECURITIES, NOT PRIVATE

03:49PM  15   EQUITIES.

03:49PM  16   Q.   FAIR ENOUGH.

03:49PM  17       AND WHEN YOU WERE SIGNING THE DOCUMENT THAT IS 12003A, THE

03:49PM  18   STOCK PURCHASE AGREEMENT FOR THERANOS, YOU ACKNOWLEDGED THAT

03:49PM  19   THIS WAS A LITTLE BIT OF A SPECULATIVE INVESTMENT; CORRECT?

03:49PM  20   A.   YES.

03:49PM  21   Q.   AND LET'S PUT THAT LANGUAGE UP.  THAT'S SECTION 4.4 OF

03:49PM  22   EXHIBIT 12003A, AND IF WE BLOW THAT UP -- FIRST OF ALL, IT

03:49PM  23   INDICATED THAT THE COMPANY HAD A LIMITED FINANCIAL AND

03:49PM  24   OPERATING HISTORY; RIGHT?

03:49PM  25   A.   RIGHT.

EISENMAN CROSS BY MR. DOWNEY                                    6134

03:49PM   1    Q.   AND YOU KNEW THAT WAS TRUE; CORRECT?

03:50PM   2    A.   CORRECT.

03:50PM   3    Q.   IN FACT, IT WAS ONLY, WHAT, A COUPLE YEARS OLD WHEN YOU

03:50PM   4    MADE YOUR INVESTMENT?

03:50PM   5    A.   I BELIEVE SO.

03:50PM   6    Q.   OKAY.  AND YOU REPRESENTED THAT YOU COULD BE BEAR THE

03:50PM   7    ECONOMIC RISK OF YOUR INVESTMENT; CORRECT?

03:50PM   8    A.   CORRECT.

03:50PM   9    Q.   AND THAT IT WOULDN'T IMPAIR YOUR FINANCIAL CONDITION IF

03:50PM  10    THERE WERE A LOSS; CORRECT?

03:50PM  11    A.   CORRECT.

03:50PM  12    Q.   AND THAT YOU COULD SUFFER A COMPLETE LOSS OF YOUR

03:50PM  13    INVESTMENT; CORRECT?

03:50PM  14    A.   CORRECT.

03:50PM  15    Q.   I WANT TO SHOW YOU JUST ON THE ATTACHMENT OF SCHEDULES

03:50PM  16    THAT WE LOOKED AT A MOMENT AGO, SOME ADDITIONAL INFORMATION

03:50PM  17    THAT WAS PROVIDED WITH THIS STOCK PURCHASE AGREEMENT.

03:50PM  18         SO IF WE CAN GO BACK TO THE SCHEDULE OF PURCHASERS ON

03:50PM  19    8377.

03:51PM  20         YOU MAY RECALL WE WERE LOOKING AT THIS EARLIER, AND THIS

03:51PM  21    REFLECTED THE LIST OF INDIVIDUALS WHO HAD INVESTED IN THERANOS

03:51PM  22    AS PART OF THE SAME ROUND WHERE YOU INVESTED; CORRECT?

03:51PM  23    A.   OKAY.

03:51PM  24    Q.   AND I WANT TO JUST DRAW YOUR ATTENTION TO A FEW OF THEM.

03:51PM  25         THE ENTITY HIGHLIGHTED RIGHT NOW IS ATA VENTURES.

EISENMAN CROSS BY MR. DOWNEY                                    6135

03:51PM  1        DID YOU RECOGNIZE THAT NAME WHEN YOU WERE INVESTING IN

03:51PM  2   2006?

03:51PM  3   A.   I DON'T RECALL.

03:51PM  4   Q.   OKAY.  LET ME ASK YOU -- LET ME GO DOWN A LITTLE BIT TO

03:51PM  5   THE E SECTION.  LET ME GO FORWARD A FEW PAGES.

03:51PM  6        YEAH, HERE.  IF WE COULD GO UP SORT OF THE FIRST THREE

03:51PM  7   ENTRIES HERE.  THIS WAS THE SECTION THAT WE WERE LOOKING AT

03:51PM  8   BEFORE.

03:51PM  9        DO YOU SEE YOUR OWN INVESTMENT AGAIN?

03:51PM 10   A.   YES.

03:51PM 11   Q.   AND THEN YOU SEE UNDER THAT AN INVESTMENT BY MR. LUCAS OF

03:52PM 12   ABOUT A MILLION DOLLARS.

03:52PM 13        DO YOU SEE THAT?

03:52PM 14   A.   YES.

03:52PM 15   Q.   AND YOU SEE THAT MR. ELLISON INVESTED AS WELL AT THE SAME

03:52PM 16   TIME; CORRECT?

03:52PM 17   A.   CORRECT.

03:52PM 18   Q.   OR I SHOULD SAY EACH OF THEM I THINK PERHAPS INVESTED

03:52PM 19   THROUGH TRUSTS, BUT EFFECTIVELY INVESTED?

03:52PM 20   A.   YES.

03:52PM 21   Q.   OKAY.  NOW, LET'S MOVE FORWARD FROM THE TIME OF -- THAT

03:52PM 22   YOU MAKE THE DECISION TO INVEST AND GO AHEAD AND INVEST, AND

03:52PM 23   LET'S TALK ABOUT THE PERIOD BETWEEN LET'S SAY 2006 AND 2010.

03:52PM 24   OKAY?

03:52PM 25   A.   OKAY.

EISENMAN CROSS BY MR. DOWNEY                                    6136

03:52PM   1    Q.   NOW, I THINK YOU SAID THAT IN SOME RANGE, AND I DON'T WANT

03:52PM   2    TO PUT WORDS IN YOUR MOUTH AS TO WHAT THE RANGE WAS, BUT THAT

03:52PM   3    YOU WERE ABLE TO HAVE QUARTERLY MEETINGS WITH THE COMPANY;

03:52PM   4    CORRECT?

03:52PM   5    A.   WITH ELIZABETH.

03:52PM   6    Q.   OKAY.  AND THEY WOULD TYPICALLY TAKE PLACE TELEPHONICALLY;

03:53PM   7    CORRECT?

03:53PM   8    A.   CORRECT.

03:53PM   9    Q.   AND WAS THAT SOMETHING THAT EVERY SHAREHOLDER OF THE

03:53PM   10   COMPANY WAS DOING?

03:53PM   11   A.   NOT TO MY KNOWLEDGE.

03:53PM   12   Q.   OKAY.  IN FACT, YOU AND YOUR GROUP FROM HOUSTON WERE THE

03:53PM   13   ONLY GROUP OF SHAREHOLDERS WHO WERE HAVING THAT QUARTERLY

03:53PM   14   MEETING WITH MS. HOLMES; ISN'T THAT RIGHT?

03:53PM   15           MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.

03:53PM   16           THE COURT:  IF YOU COULD LAY A FOUNDATION.  I'LL

03:53PM   17   SUSTAIN THE OBJECTION.

03:53PM   18           MR. DOWNEY:  SURE.

03:53PM   19   Q.   WELL, DID MS. HOLMES TELL YOU OVER TIME THAT YOUR GROUP

03:53PM   20   WAS THE ONLY GROUP THAT SHE WAS MEETING WITH ON A QUARTERLY

03:53PM   21   BASIS?

03:53PM   22           MR. BOSTIC:  HEARSAY, YOUR HONOR.

03:53PM   23           THE COURT:  SUSTAINED.

03:53PM   24           MR. DOWNEY:  OKAY.  FAIR ENOUGH.

03:53PM   25   Q.   BUT YOU RECOGNIZE GENERALLY THAT NOT EVERY INVESTOR HAD A

EISENMAN CROSS BY MR. DOWNEY                                        6137

03:53PM   1    QUARTERLY MEETING WITH THE CEO OF THE COMPANY; CORRECT?

03:53PM   2              MR. BOSTIC:  SAME OBJECTION, YOUR HONOR.

03:53PM   3              THE WITNESS:  I DON'T KNOW.

03:53PM   4              THE COURT:  THE ANSWER IS STRICKEN.  YOU CAN ASK

03:53PM   5    ANOTHER QUESTION.  THE OBJECTION IS SUSTAINED.

03:53PM   6              MR. DOWNEY:  SURE.

03:53PM   7    Q.   NOW, UNDER -- YOU WERE PROVIDED INFORMATION ABOUT THE

03:54PM   8    COMPANY, CORRECT, AND ITS OPERATIONS BY MS. HOLMES DURING THOSE

03:54PM   9    MEETINGS; CORRECT?

03:54PM  10    A.   CORRECT.

03:54PM  11    Q.   BUT YOU UNDERSTOOD ACTUALLY THAT YOU DIDN'T HAVE ANY RIGHT

03:54PM  12    TO INFORMATION UNDER THE AGREEMENTS THAT YOU HAD SIGNED;

03:54PM  13    CORRECT?

03:54PM  14    A.   CORRECT.

03:54PM  15    Q.   AND THAT'S BECAUSE UNLIKE IN A PUBLIC COMPANY WHERE

03:54PM  16    THERE'S A LOT OF INFORMATION PROVIDED SO THAT EVERYBODY CAN

03:54PM  17    HAVE IT AT THE SAME TIME, PRIVATE COMPANIES DON'T TYPICALLY

03:54PM  18    PROVIDE THAT SAME LEVEL OF DISCLOSURE; CORRECT?

03:54PM  19    A.   INCORRECT.

03:54PM  20    Q.   WELL, LET ME ASK YOU TO LOOK AT THE EXHIBIT THAT IS IN

03:54PM  21    YOUR -- LET ME GIVE YOU A DIFFERENT NOTEBOOK, OKAY?

03:54PM  22         YOUR HONOR, MAY I JUST HAVE A MOMENT TO GRAB ANOTHER

03:54PM  23    NOTEBOOK?

03:54PM  24              THE COURT:  YES, OF COURSE.

03:55PM  25              MR. DOWNEY:  ACTUALLY, I THINK THIS WILL BE IN THE

EISENMAN CROSS BY MR. DOWNEY                                    6138

03:55PM   1    COURT'S BINDER, AND IT'S IN A DIFFERENT BINDER FOR ME.

03:55PM   2    Q.   IT SHOULD BE IN YOUR BINDER, MR. EISENMAN.

03:55PM   3         I'M GOING TO DRAW YOUR ATTENTION TO EXHIBIT 11021.

03:55PM   4    A.   WILL THAT BE ON THE SCREEN?

03:55PM   5    Q.   IT WILL NOT BE ON THE SCREEN, NO.  SO I'M GOING TO ASK

03:55PM   6    YOU, FIRST OF ALL, JUST TO LOOK AT IT.

03:55PM   7         BUT BEFORE WE GET INTO IT, AM I RIGHT THAT AT SOME POINT

03:55PM   8    DURING THE COURSE OF YOUR DEALINGS WITH THERANOS, I THINK IT'S

03:55PM   9    FAIR TO SAY FROM YOUR DIRECT TESTIMONY THAT YOU HAD A LEVEL OF

03:55PM   10   FRUSTRATION WITH THE AMOUNT OF COMMUNICATION THAT YOU WERE

03:55PM   11   RECEIVING; CORRECT?

03:55PM   12   A.   CORRECT.

03:55PM   13   Q.   AND YOU WENT BACK AND YOU TRIED TO FIGURE OUT WHETHER YOU

03:55PM   14   HAD A RIGHT UNDER YOUR AGREEMENTS TO GET INFORMATION FROM

03:56PM   15   THERANOS; CORRECT?

03:56PM   16   A.   INCORRECT.

03:56PM   17   Q.   OKAY.  AND DID YOU ALSO HAVE AN ATTORNEY LOOK AT THE

03:56PM   18   AGREEMENTS FOR PURPOSES OF DETERMINING WHETHER OR NOT YOU HAD A

03:56PM   19   RIGHT TO INFORMATION?

03:56PM   20   A.   NO.  IT WAS IRRELEVANT.

03:56PM   21   Q.   OKAY.  LET ME ASK YOU IN EXHIBIT 11021 TO LOOK AT

03:56PM   22   PAGE 129, LINE 7.  AND DON'T SAY ANYTHING OUT LOUD.

03:56PM   23   A.   I'M SORRY, WHAT PAGE?  I'VE GOT 11021.  WHAT PAGE?

03:56PM   24   Q.   11021.

03:56PM   25   A.   OKAY.

EISENMAN CROSS BY MR. DOWNEY                                        6139

03:56PM   1    Q.   PAGE 129.

03:56PM   2    A.   I DON'T SEE WHERE THE PAGE -- OH, OKAY.  OKAY.

03:57PM   3    Q.   CAN YOU SEE IT IN THE BOTTOM --

03:57PM   4    A.   YEAH.

03:57PM   5    Q.   UNFORTUNATELY, I CAN'T BRING THIS UP ON THE SCREEN.

03:57PM   6    A.   OKAY.

03:57PM   7    Q.   ALL RIGHT.  NOW, YOU RECALL THAT IN CONNECTION WITH

03:57PM   8    ANOTHER PROCEEDING RELATED TO THERANOS YOU GAVE A DEPOSITION.

03:57PM   9         DO YOU RECALL THAT?

03:57PM   10   A.   YES.

03:57PM   11   Q.   AND YOU WENT TO AN OFFICE AND WERE QUESTIONED BY SOME

03:57PM   12   LAWYERS ABOUT YOUR EXPERIENCES INVESTING IN THERANOS; CORRECT?

03:57PM   13   A.   CORRECT.

03:57PM   14   Q.   AND YOU, AS YOU DID HERE TODAY, YOU TOOK AN OATH TO TELL

03:57PM   15   THE TRUTH; CORRECT?

03:57PM   16   A.   CORRECT.

03:57PM   17   Q.   AND DURING THE COURSE OF THAT DEPOSITION, I WANT TO ASK

03:57PM   18   YOU IF YOU WERE ASKED THE FOLLOWING QUESTION AND GAVE THE

03:57PM   19   FOLLOWING ANSWER:

03:57PM   20        "AND IS THAT A TRUE STATEMENT OF YOUR UNDERSTANDING OF

03:57PM   21   YOUR RIGHTS, THAT YOU HAD NO INFORMATION RIGHTS?"

03:58PM   22        "ANSWER:  YES."  I'M SORRY.

03:58PM   23        THE QUESTION IS, THEN YOU WROTE, QUOTE, "IT IS MY

03:58PM   24   UNDERSTANDING" -- I'M SORRY.

03:58PM   25        "QUESTION:  AND IS THAT A TRUE STATEMENT OF YOUR

EISENMAN CROSS BY MR. DOWNEY                                    6140

03:58PM   1    UNDERSTANDING OF YOUR RIGHTS, THAT YOU HAD NO INFORMATION

03:58PM   2    RIGHTS?

03:58PM   3         "ANSWER:  YES."

03:58PM   4         AND THEN MY QUESTION TO THE WITNESS IS, WERE YOU ASKED

03:58PM   5    THAT QUESTION AND DID YOU GIVE THAT ANSWER IN THE DEPOSITION

03:58PM   6    ABOUT THERANOS?

03:58PM   7    A.   APPARENTLY SO.

03:58PM   8              MR. DOWNEY:  YOUR HONOR, I'M GOING TO MOVE TO A

03:58PM   9    DIFFERENT TOPIC AT THIS POINT.

03:58PM  10              THE COURT:  WELL, LET'S MOVE TO OUR WEEKEND THEN,

03:58PM  11    SHALL WE?

03:58PM  12         (LAUGHTER.)

03:58PM  13              THE COURT:  THANK YOU, MR. DOWNEY.  I APPRECIATE

03:58PM  14    THAT.

03:58PM  15         LADIES AND GENTLEMEN, WE'RE GOING TO TAKE OUR RECESS NOW,

03:58PM  16    AND THIS WILL BE A LONG RECESS.  AS YOU KNOW TOMORROW IS A

03:59PM  17    HOLIDAY.  WE RECOGNIZE VETERAN'S DAY TOMORROW.

03:59PM  18         THEN WE WILL NOT BE IN SESSION ON FRIDAY, WE WILL NOT BE

03:59PM  19    IN SESSION ON FRIDAY.  WE'LL NEXT BE IN SESSION MONDAY NEXT,

03:59PM  20    WHICH IS THE 15TH, NOVEMBER 15TH.  AND WE'VE SCHEDULED THAT FOR

03:59PM  21    THE MORNING, 9:00 O'CLOCK.  I'D LIKE TO START AT 9:00 O'CLOCK

03:59PM  22    IF WE CAN.

03:59PM  23         I'LL DEFER WHETHER OR NOT WE CAN GO IN THE AFTERNOON OR

03:59PM  24    NOT.  I'M JUST SAYING THAT THAT'S AVAILABLE FOR US.  IT MIGHT

03:59PM  25    BE AVAILABLE.

6141

03:59PM   1        IF IT CAUSES PROBLEMS FOR ANY JUROR, THAT'S FINE.  AS I

03:59PM   2   SAID, OUR SCHEDULE NEXT WEEK, WE'RE SCHEDULED TO SEE EACH OTHER

03:59PM   3   EVERY DAY OF THE WEEK, 16TH, 17TH, 18TH, 19TH.

03:59PM   4        THERE'S AN ABBREVIATED BREAK ON THE 17TH, BUT OTHERWISE

03:59PM   5   NEXT WEEK WILL BE A FULL WEEK.  WE'LL TRY TO ACCOMMODATE YOU AS

03:59PM   6   BEST WE CAN WITH OTHER TREATS TO HELP MAKE YOUR STAY MORE

04:00PM   7   ENJOYABLE.

04:00PM   8        BUT UNTIL THEN, PLEASE, DURING THIS LONG BREAK, AGAIN, I

04:00PM   9   REMIND YOU OF THE ADMONITION, DO NOT, DO NOT DO ANY

04:00PM  10   INVESTIGATION, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY, DO

04:00PM  11   NOT READ, DISCUSS, GO ON SOCIAL MEDIA, OR IN ANY WAY ATTEMPT TO

04:00PM  12   FIND OUT ANYTHING ABOUT THIS CASE OR LEARN ANYTHING ABOUT THIS

04:00PM  13   CASE.

04:00PM  14        IF SUCH A THING HAPPENS, PLEASE TURN AWAY, TURN OFF THE

04:00PM  15   DEVICE, CLOSE THE PAPER, WHATEVER IT IS, AND I'LL ASK YOU

04:00PM  16   WHETHER OR NOT ANY OF THESE THINGS HAPPENED WHEN WE SEE EACH

04:00PM  17   OTHER NEXT ON THE 15TH.

04:00PM  18        SO DO HAVE A GOOD LONG WEEKEND.  ENJOY.

04:00PM  19        WE'LL SEE YOU NEXT WEEK.  THANK YOU VERY MUCH.

04:00PM  20        (JURY OUT AT 4:00 P.M.)

04:01PM  21          THE COURT:  AND WE'LL SEE YOU BACK NEXT WEEK AS

04:01PM  22   WELL, SIR.  THANK YOU VERY MUCH.  YOU'RE FREE TO GO.

04:01PM  23        ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.  THANK YOU.

04:01PM  24        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:01PM  25   LONG WEEKEND.  THE WITNESS HAS LEFT THE COURTROOM.

6142

04:01PM   1          ALL COUNSEL AND MS. HOLMES ARE PRESENT.

04:01PM   2          ANYTHING THAT EITHER COUNSEL WOULD LIKE TO PUT ON THE

04:01PM   3   RECORD BEFORE WE BREAK?

04:01PM   4          MR. SCHENK:  YES, YOUR HONOR, JUST TWO QUICK THINGS.

04:01PM   5          FIRST, MR. EISENMAN JUST ASKED US A QUESTION ABOUT TRAVEL.

04:01PM   6   SO I WOULD SEEK PERMISSION FROM THE COURT AND NOTIFY COUNSEL

04:01PM   7   THAT ORDINARILY WE WOULD NOT TALK TO A WITNESS ONCE WE PASS THE

04:01PM   8   WITNESS.  WE WILL STILL COMMUNICATE WITH MR. EISENMAN IF THAT'S

04:01PM   9   OKAY, BUT JUST ABOUT SCHEDULING, FLIGHTS, THINGS LIKE THAT.

04:01PM   10          THE COURT:  RIGHT.  THAT'S FINE.

04:01PM   11      MR. DOWNEY?

04:01PM   12          MR. DOWNEY:  YEAH, I THINK IF IT'S CONFINED TO THAT

04:01PM   13   IT'S FINE.

04:01PM   14          THE COURT:  SURE.  OKAY.

04:01PM   15          MR. SCHENK:  THANK YOU, YOUR HONOR.

04:02PM   16      THE SECOND TOPIC IS SCHEDULING FOR NEXT WEEK.

04:02PM   17      I THINK IT IS LIKELY THAT THE GOVERNMENT WILL REST NEXT

04:02PM   18   WEEK.  I THINK IT IS LIKELY THAT WE DO NOT HAVE ENOUGH

04:02PM   19   WITNESSES TO FILL THE WEEK.

04:02PM   20      I DON'T KNOW EXACTLY WHICH DAY NEXT WEEK WE WOULD REST.

04:02PM   21   IT'S GOING TO DEPEND ON HOW QUICKLY WE MOVE THROUGH THE

04:02PM   22   REMAINING WITNESSES.

04:02PM   23      WHAT WE WOULD ASK IS A COUPLE OF THINGS.  THURSDAY AT

04:02PM   24   7:00 P.M. HAS BEEN THE ROLLING DISCLOSURE DEADLINE.  WE WILL

04:02PM   25   MAKE OUR DISCLOSURE BY 7:00 P.M. TOMORROW OF THE WITNESSES WE

04:02PM 1    ANTICIPATE CALLING NEXT WEEK.

04:02PM 2         WE WOULD ASK THAT THAT DISCLOSURE OBLIGATION KICK IN FOR

04:02PM 3    THE DEFENSE TOMORROW AT 7:00, THAT THEY GIVE US A FIRST HALF,

04:02PM 4    THAT THEY GIVE US NEXT WEEK WITNESSES, AND ALSO JENCKS.  I

04:02PM 5    DON'T BELIEVE WE'VE RECEIVED A JENCKS PRODUCTION SINCE THE

04:02PM 6    THIRD DAY OF OUR MOTION IN LIMINE HEARING.

04:02PM 7         SO I THINK IT'S APPROPRIATE FOR THOSE OBLIGATIONS TO NOW

04:03PM 8    KICK IN.

04:03PM 9              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:03PM 10             MR. DOWNEY:  ALL OF THAT IS FINE WITH US,

04:03PM 11   YOUR HONOR.

04:03PM 12        ONE THING THAT WOULD HELP TO GET SOME SENSE OF IS WHAT DAY

04:03PM 13   DURING THE WEEK THEY WOULD BE IN THE BEST POSITION TO REST.

04:03PM 14             THE COURT:  WELL, WHILE YOU PONDER THAT, I KNOW

04:03PM 15   YOU'RE GOING TO GIVE SOME INFORMATION TO THE GOVERNMENT ABOUT

04:03PM 16   THIS LIS BUSINESS AND WHETHER OR NOT THAT POTENTIALLY COULD

04:03PM 17   EXTEND THIS CASE.

04:03PM 18        SO YOU'LL BE INFORMED, MR. SCHENK, BY THAT -- I THINK YOU

04:03PM 19   SAID TOMORROW AT 4:00 P.M.?

04:03PM 20             MR. DOWNEY:  WE'LL DO THAT TOMORROW BY 4:00 SO AS

04:03PM 21   NOT TO DISTURB THE NORMAL PROCEDURE.

04:03PM 22             THE COURT:  RIGHT.

04:03PM 23             MR. DOWNEY:  AND THEN WE WILL COMPLY WITH

04:03PM 24   MR. SCHENK'S REQUEST IN TERMS OF IDENTIFYING FIRST HALF

04:03PM 25   WITNESSES.

6144

```
04:03PM    1              THE COURT:  THAT WOULD BE HELPFUL.

04:03PM    2              MR. DOWNEY:  AT 7:00 P.M. I SHOULD SAY.

04:03PM    3              THE COURT:  RIGHT.

04:03PM    4         AND THEN MAYBE WHAT WE SHOULD DO IS WHY DON'T WE PLAN

04:03PM    5    ON -- CAN WE GET TOGETHER THE MORNING OF THE 15TH JUST TO GET

04:04PM    6    ANOTHER PLOT ABOUT SCHEDULING BEFORE WE START?

04:04PM    7              MR. DOWNEY:  IS THAT MONDAY, YOUR HONOR?

04:04PM    8              THE COURT:  YES.

04:04PM    9              MR. DOWNEY:  YES, THAT WOULD BE GOOD.

04:04PM   10              MR. SCHENK:  YES.

04:04PM   11              THE COURT:  WERE YOU SUGGESTING THE WEEKEND,

04:04PM   12    MR. DOWNEY?

04:04PM   13              MR. DOWNEY:  NO.  I'M SO DISORIENTED AT THIS POINT

04:04PM   14    AS TO DATES, I DIDN'T KNOW WHAT DAY IT WAS.

04:04PM   15              THE COURT:  THEY ALL BLEND TOGETHER.  THE GOOD THING

04:04PM   16    IS THAT OUR COMPUTERS SEEM TO WORK TOGETHER.

04:04PM   17              MR. DOWNEY:  QUITE WELL, ACTUALLY.

04:04PM   18              THE COURT:  THERE WAS A LITTLE GLITCH, BUT WE'RE

04:04PM   19    GRATEFUL FOR ALL OF THE EFFORTS OUR I.T. PEOPLE GAVE TO THAT.

04:04PM   20         ALL RIGHT.  THANK YOU THEN.

04:04PM   21         THERE'S AGREEMENT ON THIS SCHEDULE THEN I THINK FROM THE

04:04PM   22    DEFENSE; IS THAT RIGHT?

04:04PM   23              MR. DOWNEY:  THERE IS AGREEMENT ON OUR FULFILLING

04:04PM   24    JENCKS OBLIGATIONS, MAKING THE DISCLOSURE, AND WE'LL RECEIVE

04:04PM   25    THE DISCLOSURE.
```

04:04PM   1            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  HAVE A

04:04PM   2   GOOD WEEKEND.

04:05PM   3           THE CLERK:  COURT IS ADJOURNED.

04:05PM   4        (COURT ADJOURNED AT 4:05 P.M.)

      5

      6

      7

      8

      9

     10

     11

     12

     13

     14

     15

     16

     17

     18

     19

     20

     21

     22

     23

     24

     25

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                    )
                      PLAINTIFF,     )  SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )  VOLUME 32
8                                    )
   ELIZABETH A. HOLMES,              )  NOVEMBER 15, 2021
9                                    )
                      DEFENDANT.     )  PAGES 6146 - 6301
10   _____)

11                  TRANSCRIPT OF TRIAL PROCEEDINGS

12            BEFORE THE HONORABLE EDWARD J. DAVILA
                 UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14

   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

   OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S:  (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
 4                                LANCE A. WADE
                                  KATHERINE TREFZ
 5                                PATRICK LOOBY
                                  ANDREW LEMENS
 6                                J.R. FLEURMONT
                                  RICHARD CLEARY
 7                                SEEMA ROPER
                             725 TWELFTH STREET, N.W.
 8                           WASHINGTON, D.C. 20005

 9                           LAW OFFICE OF JOHN D. CLINE
                             BY:  JOHN D. CLINE
10                           ONE EMBARCADERO CENTER, SUITE 500
                             SAN FRANCISCO, CALIFORNIA 94111
11

12    ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
                             BY:  ADELAIDA HERNANDEZ
13
                             OFFICE OF THE U.S. ATTORNEY
14                           BY:  LAKISHA HOLLIMAN, PARALEGAL
                                  MADDI WACHS, PARALEGAL
15
                             WILLIAMS & CONNOLLY
16                           BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                           TBC
                             BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25
```

6148

1

2                          INDEX OF PROCEEDINGS

3          GOVERNMENT'S:

4          **ALAN EISENMAN**
           CROSS-EXAM BY MR. DOWNEY (RES.)          P. 6157
5          REDIRECT EXAM BY MR. BOSTIC              P. 6277
           RECROSS-EXAM BY MR. DOWNEY               P. 6290

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-9776**

INDEX OF EXHIBITS

|  |  | IDENT. | EVIDENCE |
|---|---|---|---|
| GOVERNMENT'S: | | | |
| 1370 | | | 6240 |
| 1362 | | | 6291 |
| | | | |
| DEFENDANT'S: | | | |
| 14103 | | | 6158 |
| 14225 | | | 6168 |
| 14224 | | | 6172 |
| 14226 | | | 6174 |
| 12185 | | | 6178 |
| 11253 | | | 6183 |
| 12999 | | | 6212 |
| 13150 | | | 6260 |
| 13191 | | | 6266 |
| 14109 | | | 6275 |

```
 1   SAN JOSE, CALIFORNIA                    NOVEMBER 15, 2021

 2                        P R O C E E D I N G S

 3         (COURT CONVENED AT 8:37 A.M.)

 4         (JURY OUT AT 8:37 A.M.)

 5              THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

 6   THE RECORD IN THE HOLMES MATTER.

 7         ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  WE'RE

 8   OUTSIDE OF THE PRESENCE OF THE JURY.

 9         GOOD MORNING.  I HOPE EVERYONE HAD A GOOD WEEKEND.

10         I JUST WANTED TO TOUCH BASE, AS I SAID LAST WEEK, JUST TO

11   DO A SCHEDULING CHECK AND SEE.

12         LET'S SEE, WE HAVE MR. EISENMAN ON.  I THINK, MR. DOWNEY,

13   YOU'RE CONTINUING WITH YOUR CROSS OF HIM TODAY, THIS MORNING.

14              MR. DOWNEY:  YES, SIR.

15              THE COURT:  AND WE'LL BE IN SESSION JUST IN THE

16   MORNING.  AND I WONDER IF WE COULD MAYBE GO UNTIL 1:00 O'CLOCK.

17   I HAVE A 1:30 CALENDAR.  I WAS THINKING IF WE COULD GO UNTIL

18   1:00 O'CLOCK, WE CAN CAPTURE AS MUCH EVIDENCE AS WE CAN, AND

19   THEN TOMORROW AT 9:00.

20         SO LET ME TURN TO YOU AND ASK YOU SCHEDULING.  WHAT -- DO

21   YOU THINK WE'LL FINISH WITH THIS WITNESS THIS MORNING?

22              MR. DOWNEY:  I WOULD EXPECT SO, YOUR HONOR.

23              THE COURT:  OKAY.

24              MR. DOWNEY:  I THINK BETWEEN THE PARTIES, THAT

25   SHOULD BE ENOUGH TIME TO FINISH HIM.  IF NOT, IT WOULD BE AN
```

08:38AM 1    HOUR TO HOUR SOMETHING.  BUT I WOULD THINK THAT WE WILL.

08:38AM 2             THE COURT:  OKAY.  GREAT.

08:38AM 3         MR. LEACH?  MR. BOSTIC?  ANYTHING TO ADD?

08:38AM 4             MR. BOSTIC:  YOUR HONOR, ONLY TO AGREE ON

08:38AM 5    MR. EISENMAN.

08:38AM 6         I DON'T EXPECT LENGTHY REDIRECT, SO I THINK WE SHOULD BE

08:38AM 7    ABLE TO FINISH HIM AS WELL.

08:38AM 8             THE COURT:  OKAY.  AND THEN MAYBE WE'LL GET ANOTHER

08:38AM 9    WITNESS STARTED, OR AT LEAST INTRODUCED THIS MORNING?  THERE'S

08:38AM 10   A POSSIBILITY OF THAT?

08:38AM 11            MR. LEACH:  YES, YOUR HONOR, WE HAVE ANOTHER WITNESS

08:38AM 12   READY TO GO.

08:38AM 13            THE COURT:  OKAY.  ALL RIGHT.  GREAT.

08:39AM 14        ANYTHING ELSE THEN THAT YOU THINK WE SHOULD TALK ABOUT?

08:39AM 15            MR. BOSTIC:  JUST ONE MATTER BRIEFLY, YOUR HONOR.

08:39AM 16            THE COURT:  SURE.

08:39AM 17            MR. BOSTIC:  THANK YOU, YOUR HONOR.

08:39AM 18        AS TO THE WITNESS CURRENTLY ON THE STAND, HE HAD AN

08:39AM 19   INTERACTION WITH THE NATIONAL ASSOCIATION OF SECURITIES DEALERS

08:39AM 20   IN 2000, AND IT RELATED TO, I BELIEVE, TWO ORDERS THAT THIS

08:39AM 21   WITNESS HAD PLACED.  I'M NOT PRIVY TO ALL OF THE MATERIALS FROM

08:39AM 22   THAT INVESTIGATION, OR ANY OF THEM THAT AREN'T PUBLICLY

08:39AM 23   AVAILABLE, BUT I UNDERSTAND THAT THE MATTER RESULTED IN A FINE

08:39AM 24   TO THE WITNESS AND A SEVEN DAY SUSPENSION.

08:39AM 25        I ASKED THE DEFENSE WHETHER MR. DOWNEY INTENDED TO GET

08:39AM  1     INTO THIS ON CROSS-EXAMINATION, AND HE SAID POSSIBLY.

08:39AM  2          SO I WANTED TO RAISE IT WITH THE COURT.

08:39AM  3          WE DON'T SEE IT AS PROPER IMPEACHMENT IN THIS CASE.  THIS

08:39AM  4     WAS MORE THAN 20 YEARS AGO.  THIS OBVIOUSLY WAS NOT A CRIMINAL

08:39AM  5     CONVICTION, AND WE DON'T THINK IT'S SUFFICIENTLY PROBATIVE OF

08:40AM  6     HIS CREDIBILITY AND CERTAINLY HAS NO RELATION TO THE FACTS OF

08:40AM  7     THIS CASE.

08:40AM  8               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

08:40AM  9          MR. DOWNEY, GOOD MORNING.

08:40AM  10              MR. DOWNEY:  HOW ARE YOU?

08:40AM  11              THE COURT:  WELL, THANKS.

08:40AM  12              MR. DOWNEY:  THANK YOU.

08:40AM  13         I TOLD MR. BOSTIC, I DON'T INTEND TO INTRODUCE THE

08:40AM  14    DOCUMENTS WHICH REFLECT, YOU KNOW, THE PAST ISSUES THAT

08:40AM  15    MR. EISENMAN HAS HAD, AND I DON'T INTEND TO INTRODUCE THE

08:40AM  16    DOCUMENTS FOR PURPOSES OF IMPEACHING HIM OR SUGGESTING THAT HE

08:40AM  17    ENGAGES IN A PATTERN OF THIS BEHAVIOR.

08:40AM  18         IT'S POSSIBLE, DEPENDING ON WHAT HE CONCEDES ABOUT HIS

08:40AM  19    KNOWLEDGE OF RESTRICTIONS ON THE ABILITY OF A SHAREHOLDER OR A

08:40AM  20    POTENTIAL INVESTOR TO OBTAIN INSIDE INFORMATION, THAT AN

08:40AM  21    EXCHANGE ABOUT THE KNOWLEDGE HE RECEIVED AS A RESULT OF HIS

08:40AM  22    PAST ISSUES COULD COME UP IN THE EXCHANGE.  BUT THAT WAS THE

08:41AM  23    ONLY PURPOSE FOR WHICH IT WAS INTRODUCED.

08:41AM  24              THE COURT:  AND HOW WOULD THAT -- WOULD YOU ASK HIM

08:41AM  25    THE STANDARD IMPEACHMENT QUESTIONS, "ISN'T IT A FACT THAT," OR

08:41AM   1    SOMETHING LIKE --

08:41AM   2              MR. DOWNEY:  YES, YES.

08:41AM   3              THE COURT:  I SEE.  WELL, IF IT WERE A CRIMINAL

08:41AM   4    CONVICTION, IT'S 20 YEARS OLD.  I WOULD DOUBT IT WOULD BE A

08:41AM   5    CRIMINAL CONVICTION IT SOUNDS LIKE.

08:41AM   6              MR. DOWNEY:  IT WOULDN'T.  AND I DON'T THINK, IN A

08:41AM   7    SQUARE WAY, THE FACT OF THE SUSPENSION THAT WAS VISITED ON HIM

08:41AM   8    OR THE FINE THAT WAS VISITED ON HIM IS ADMISSIBLE.

08:41AM   9         I THINK ALL THAT IS REALLY ADMISSIBLE IS SOMETHING WHICH

08:41AM   10   EITHER REFRESHES HIM AS TO THE FACT THAT HE HAD KNOWLEDGE OF

08:41AM   11   THESE RESTRICTIONS, WHICH WE WOULD NEED TO EXPRESS IN FRONT OF

08:41AM   12   THE JURY, OR A QUESTION WHICH ASKS HIM IF HE'S EVER BEEN MADE

08:41AM   13   AWARE, YOU KNOW, THROUGH A COMMUNICATION OF SOME KIND THAT

08:41AM   14   THERE ARE SOME RESTRICTIONS.  THAT'S THE ONLY WAY.

08:41AM   15        IT REALLY IS NOT DESIGNED TO SHOW THAT PATTERN.

08:42AM   16             MR. BOSTIC:  YOUR HONOR, I'M STILL NOT SEEING THE

08:42AM   17   CONNECTION BETWEEN THAT CONTEXT AND THIS ONE.  IN THAT CONTEXT

08:42AM   18   HE WAS, AS I UNDERSTAND IT, WORKING AS A TRADER TRADING IN

08:42AM   19   PUBLIC SECURITIES.

08:42AM   20        HERE HE'S AN INVESTOR IN A PRIVATE COMPANY.

08:42AM   21        SO I'M NOT SEEING THE CONNECTION BETWEEN THE INFORMATION

08:42AM   22   RESTRICTION RULES THAT WOULD APPLY IN BOTH OF THOSE CASES.

08:42AM   23        EVEN IF THERE WAS SOME OVERLAP, THOUGH, IT SOUNDS LIKE

08:42AM   24   MR. DOWNEY'S PURPOSE COULD BE ACCOMPLISHED WITHOUT ANY

08:42AM   25   REFERENCE TO THE PENALTIES THAT WERE IMPOSED 20 YEARS AGO.

08:42AM  1          MR. DOWNEY:  I THINK THAT'S FAIR, YOUR HONOR.

08:42AM  2          THE COURT:  I DON'T THINK YOU -- WHAT I THOUGHT I

08:42AM  3  HEARD YOU SAY, MR. DOWNEY, IS THAT YOU DON'T WANT TO GO INTO

08:42AM  4  THAT.

08:42AM  5          MR. DOWNEY:  I DON'T, THAT'S CORRECT.

08:42AM  6          THE COURT:  YOU'RE GOING TO ASK HIM IF HE HAS

08:42AM  7  KNOWLEDGE OF RESTRICTIONS, REGULATIONS IN TRADING, AND WHAT

08:42AM  8  THOSE REGULATIONS MEAN TO A TRADER, ET CETERA.

08:42AM  9          MR. DOWNEY:  THAT'S RIGHT.  OR TO, YOU KNOW,

08:42AM  10  INVESTORS OR PEOPLE WHO HAVE ACCESS TO INFORMATION THAT OTHER

08:43AM  11  INVESTORS OR POTENTIAL INVESTORS DON'T HAVE.

08:43AM  12          THE COURT:  AND YOU'RE NOT TRYING TO -- AND PARDON

08:43AM  13  ME FOR PUTTING IT THIS WAY, YOU'RE NOT TRYING TO SET HIM UP TO

08:43AM  14  ALLOW THE ANSWER TO COME IN, "ISN'T IT A FACT THAT"?  YOU'RE

08:43AM  15  NOT TRYING TO SET THAT UP?

08:43AM  16          MR. DOWNEY:  NO.  I EXPECT, BASED ON SOME OF WHAT WE

08:43AM  17  SAW FRIDAY, THAT HE COULD DENY KNOWLEDGE, WHICH I THINK HE

08:43AM  18  CLEARLY HAS.

08:43AM  19          THE COURT:  LET ME JUST SAY THEN IT WOULD BE A

08:43AM  20  LITTLE TOUCHY ABOUT HOW TO IMPEACH HIM ON THAT, AND SO I WOULD

08:43AM  21  ASK YOU TO BEAR CAUTION.

08:43AM  22     I THINK MR. BOSTIC'S POINT IS CORRECT, AND I THINK YOU

08:43AM  23  AGREE, IT'S IMPROPER FOR THE JURY TO HEAR THAT HE HAD THIS,

08:43AM  24  WHATEVER IT IS, A VIOLATION OF ANY KIND.

08:43AM  25          MR. DOWNEY:  I DON'T THINK -- I'M AWARE OF THAT.

08:43AM   1              THE COURT:  RIGHT.

08:43AM   2              MR. DOWNEY:  AND I THINK I'M JUST CONCERNED ABOUT

08:43AM   3    THE SCOPE OF WHAT THE WITNESS WILL ACKNOWLEDGE.

08:43AM   4         SO THIS STRIKES ME AS AN ISSUE THAT SHOULDN'T COME UP IF

08:43AM   5    THIS WITNESS HAS HAD SEVERAL MEETINGS WITH THE GOVERNMENT AND

08:44AM   6    DISCUSSED THIS ISSUE, BUT IT IS ALWAYS POSSIBLE.

08:44AM   7              THE COURT:  OKAY.

08:44AM   8              MR. BOSTIC:  THAT WOULD BE FINE, YOUR HONOR.  THANK

08:44AM   9    YOU.

08:44AM  10              THE COURT:  THANK YOU.

08:44AM  11              MR. DOWNEY:  THANK YOU.

08:44AM  12              THE COURT:  ALL RIGHT.  WELL, WE'LL TAKE OUR BREAK

08:44AM  13    NOW UNLESS THERE'S ANYTHING ELSE FROM EITHER SIDE?

08:44AM  14         GREAT.  ALL RIGHT.

08:44AM  15         AND WE HAVE -- A MOTION WAS FILED I THINK OVER THE

08:44AM  16    WEEKEND, MAYBE IT WAS FRIDAY, BY THE DEFENSE TO CONSIDER SOME

08:44AM  17    EVIDENCE.  I THINK WE'RE TO DISCUSS THAT TOMORROW MORNING I

08:44AM  18    THINK IS WHAT MS. SAHARIA SAID IN HER PAPERS.

08:44AM  19         THERE'S A YOUNG MAN RISING BEHIND YOU.

08:44AM  20              MR. DOWNEY:  I THINK THAT'S RIGHT, YOUR HONOR.

08:44AM  21              THE COURT:  ALL RIGHT.  IS THAT RIGHT?

08:44AM  22              MR. BOSTIC:  THAT'S FINE, YOUR HONOR.  THANK YOU.

08:44AM  23              THE COURT:  YEAH, LET'S DO THAT.  I WAS THINKING

08:44AM  24    ABOUT MAYBE WE COULD DO THIS AFTERNOON, BUT LET'S, LET'S TALK

08:44AM  25    ABOUT IT TOMORROW MORNING.

| | | |
|---|---|---|
| 08:44AM | 1 | OKAY.  THANK YOU. |
| 08:44AM | 2 | (RECESS FROM 8:44 A.M. UNTIL 9:07 A.M.) |
| 09:07AM | 3 | (JURY IN AT 9:07 A.M.) |
| 09:07AM | 4 | THE COURT:  ALL RIGHT.  GOOD MORNING.  WE'RE ON THE |
| 09:07AM | 5 | RECORD IN THE HOLMES MATTER.  OUR JURY IS PRESENT AND COUNSEL |
| 09:07AM | 6 | ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 09:07AM | 7 | GOOD MORNING, LADIES AND GENTLEMEN.  I HOPE YOU ALL HAD A |
| 09:07AM | 8 | GOOD LONG WEEKEND.  JUST TO REMIND YOU, WE'RE ONLY GOING HALF |
| 09:07AM | 9 | DAY TODAY.  I HOPE WE CAN GO UNTIL 1:00 O'CLOCK TODAY, AND THE |
| 09:07AM | 10 | REST OF THE WEEK WILL BE FULL DAYS AS NECESSARY.  WE MIGHT HAVE |
| 09:07AM | 11 | A LATE START ON ONE OF THE DAYS. |
| 09:07AM | 12 | BUT BEFORE WE BEGIN OUR EVIDENCE, LET ME ASK THE JURY THE |
| 09:07AM | 13 | QUESTION AGAIN WHETHER OR NOT DURING THE BREAK ANY OF YOU HAD |
| 09:07AM | 14 | OCCASION TO COME ACROSS, READ, DISCUSS ANY INFORMATION THAT HAD |
| 09:07AM | 15 | ANYTHING TO DO WITH THIS CASE. |
| 09:07AM | 16 | IF SO, PLEASE RAISE YOUR HAND.  IF YOU WOULD LIKE TO SPEAK |
| 09:07AM | 17 | PRIVATELY ABOUT THAT, WE CAN DO THAT. |
| 09:07AM | 18 | I SEE NO HANDS. |
| 09:07AM | 19 | THANK AGAIN FOR YOUR CONTINUED VIGILANCE AND ADHERENCE TO |
| 09:07AM | 20 | THE COURT'S ADMONITION. |
| 09:07AM | 21 | WE HAVE A WITNESS, I THINK, MR. EISENMAN.  LET'S BRING HIM |
| 09:07AM | 22 | IN. |
| 09:07AM | 23 | MR. DOWNEY, YOU WOULD LIKE TO CONTINUE WITH YOUR |
| 09:07AM | 24 | EXAMINATION? |
| 09:07AM | 25 | MR. DOWNEY:  YES, SIR. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6157

| 09:07AM | 1 | THE COURT:  GOOD MORNING, SIR. |
| 09:07AM | 2 | THE WITNESS:  GOOD MORNING. |
| 09:07AM | 3 | THE COURT:  IF YOU COULD JUST RESUME YOUR SEAT |
| 09:07AM | 4 | AGAIN. |
| 09:07AM | 5 | THE WITNESS:  OKAY. |
| 09:08AM | 6 | THE COURT:  AGAIN, MAKE YOURSELF COMFORTABLE AND |
| 09:08AM | 7 | ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. |
| 09:08AM | 8 | THE WITNESS:  THANK YOU. |
| 09:08AM | 9 | THE COURT:  YOU'RE WELCOME. |
| 09:08AM | 10 | YOU CAN REFRESH YOURSELF WITH WATER THERE.  THERE'S FRESH |
| 09:08AM | 11 | WATER IF YOU WOULD LIKE TO. |
| 09:08AM | 12 | THE WITNESS:  THANK YOU. |
| 09:08AM | 13 | THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU |
| 09:08AM | 14 | STATE YOUR NAME AGAIN, PLEASE. |
| 09:08AM | 15 | THE WITNESS:  YES, SIR.  MY NAME IS ALAN EISENMAN. |
| 09:08AM | 16 | THE COURT:  THANK YOU, SIR.  I'LL REMIND YOU, SIR, |
| 09:08AM | 17 | YOU'RE STILL UNDER OATH. |
| 09:08AM | 18 | THE WITNESS:  OKAY. |
| 09:08AM | 19 | **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS PREVIOUSLY** |
| 09:08AM | 20 | **SWORN.)** |
| 09:08AM | 21 | THE COURT:  MR. DOWNEY. |
| 09:08AM | 22 | **CROSS-EXAMINATION** |
| 09:08AM | 23 | BY MR. DOWNEY: |
| 09:08AM | 24 | Q.  GOOD MORNING, MR. EISENMAN. |
| 09:08AM | 25 | A.  GOOD MORNING. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6158

09:08AM  1    Q.   I WANT TO RESUME TODAY BY TALKING ABOUT THE EVENTS IN 2010

09:08AM  2    THAT YOU TALKED ABOUT WITH MR. BOSTIC ON YOUR DIRECT

09:08AM  3    EXAMINATION.

09:08AM  4         DO YOU RECALL THAT?

09:08AM  5    A.   YOU'LL HAVE TO REFRESH MY MEMORY.

09:08AM  6    Q.   OKAY.  LET ME ASK YOU TO PULL UP, IN THE BLACK NOTEBOOK

09:08AM  7    THAT YOU HAVE, EXHIBIT 14103.

09:09AM  8    A.   14103?

09:09AM  9    Q.   YES, SIR.

09:09AM  10   A.   OKAY.

09:09AM  11   Q.   DO YOU SEE, FROM THE ADDRESS AT THE TOP OF THESE EMAILS,

09:09AM  12   THAT THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

09:09AM  13   MAY OF 2010 DISCUSSING YOUR THERANOS INVESTMENT?

09:09AM  14   A.   IT SAYS MAY 11TH.  IS THAT THE ONE YOU'RE TALKING ABOUT?

09:09AM  15   Q.   YES, SIR.  MAY 11TH, 2010?

09:09AM  16   A.   YES.

09:09AM  17            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:10AM  18   14103.

09:10AM  19            MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

09:10AM  20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:10AM  21       (DEFENDANT'S EXHIBIT 14103 WAS RECEIVED IN EVIDENCE.)

09:10AM  22   BY MR. DOWNEY:

09:10AM  23   Q.   DO YOU RECALL THAT IN MARCH OF 2010 THAT YOU HAD ONE OF

09:10AM  24   YOUR QUARTERLY MEETING CALLS WITH MS. HOLMES?

09:10AM  25   A.   I DON'T RECALL.

EISENMAN CROSS BY MR. DOWNEY (RES.)                           6159

09:10AM    1    Q.   OKAY.  LET ME ASK YOU TO LOOK AT THE SECOND PARAGRAPH OF

09:10AM    2    THE TOP EMAIL ON -- IT'S AT THE BOTTOM OF PAGE 1.  IF WE CAN

09:10AM    3    BRING THAT UP.

09:10AM    4    A.   I SEE IT NOW.

09:10AM    5    Q.   OKAY.  AND DO YOU RECALL THAT IN THE FIRST HALF OF 2010

09:10AM    6    MS. HOLMES TOLD YOU THAT TWO VERY IMPORTANT EVENTS WERE

09:10AM    7    HAPPENING AT THERANOS IN 2010?

09:10AM    8    A.   I DON'T RECALL.

09:10AM    9    Q.   WELL, DO YOU RECALL THAT SHE TOLD YOU THAT THERANOS WAS IN

09:10AM   10    NEGOTIATIONS WITH RETAILERS ABOUT POTENTIAL AGREEMENTS --

09:11AM   11              JUROR:  YOUR HONOR, OUR SCREENS ARE NOT ON.

09:11AM   12              THE COURT:  YOU HAVE A MONITOR ISSUE?

09:11AM   13              JUROR:  I'M SORRY.

09:11AM   14              THE COURT:  ARE THE MONITORS FUNCTIONING IN THE JURY

09:11AM   15    BOX?

09:11AM   16              JUROR:  JUST THAT ONE.

09:11AM   17              THE COURT:  OKAY.  GIVE US JUST -- I'M SORRY,

09:11AM   18    MR. DOWNEY.

09:11AM   19              MR. DOWNEY:  NOT AT ALL.

09:11AM   20         (PAUSE IN PROCEEDINGS.)

09:12AM   21              THE COURT:  YOU KNOW, KASSIE, SHE SOMETIMES REBOOTS

09:12AM   22    THE WHOLE SYSTEM.

09:12AM   23              THE CLERK:  YEAH, I'LL DO THAT NOW.

09:12AM   24              THE COURT:  OKAY.

09:12AM   25         (PAUSE IN PROCEEDINGS.)

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6160

09:12AM  1          MR. DOWNEY:  YOU KNOW, YOUR HONOR, I CAN CHECK.  I

09:12AM  2   CAN SEE IF WE HAVE CLEAN COPIES OF THE DOCUMENTS, AND WE CAN DO

09:13AM  3   IT OLD STYLE FOR THE TWO JURORS WHO DON'T HAVE ACCESS.

09:13AM  4          THE COURT:  SURE.  LET'S SEE.  IF YOU WANT TO CHECK,

09:13AM  5   THAT WOULD BE HELPFUL.  THANK YOU.

09:13AM  6          MR. DOWNEY:  WELL, I'VE CHECKED AND I DON'T HAVE TWO

09:13AM  7   CLEAN COPIES.

09:13AM  8      (LAUGHTER.)

09:13AM  9          THE COURT:  WELL, THERE'S SOME EFFICIENCY IN OLD

09:13AM 10   SCHOOL.

09:13AM 11          MR. DOWNEY:  YES.  SURE.  I'M SURE YOU THINK ABOUT

09:13AM 12   IT THESE DAYS.

09:13AM 13          THE COURT:  WE'LL SEE IF WE CAN GET COPIES.

09:13AM 14      IT LOOKS LIKE THE JURORS ARE SAYING THEY'RE GOING TO SHARE

09:13AM 15   A MONITOR.

09:13AM 16          JUROR:  THAT'S WHAT IT LOOKS LIKE.

09:14AM 17          THE COURT:  SO WE MAY HAVE TO WORK AROUND.

09:15AM 18      (PAUSE IN PROCEEDINGS.)

09:15AM 19          THE COURT:  LET ME ASK COUNSEL, WE HAVE COPIES.  IS

09:15AM 20   THERE ANY OBJECTION TO THE COURT PROVIDING COPIES TO THE

09:15AM 21   AFFECTED JURORS THERE?

09:15AM 22          MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

09:15AM 23          THE COURT:  MR. DOWNEY, ANY OBJECTION TO THAT?

09:15AM 24          MR. DOWNEY:  I DON'T, YOUR HONOR.  WE'LL SEE HOW WE

09:15AM 25   CAN GET THROUGH THIS EXHIBIT, AND WE'LL SEE HOW THE NEXT ONE

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6161

09:15AM   1    GOES.

09:15AM   2              THE COURT:  SURE.  AND FOR THE RECORD, IT LOOKS LIKE

09:15AM   3    THE CLERK HAS PROVIDED TWO COPIES TO SOME OF THE JURORS IN THE

09:15AM   4    COURTROOM.  THE MONITORS HAVE BEEN TURNED TO ALLOW ACCESS TO

09:15AM   5    THOSE AFFECTED JURORS.

09:15AM   6         ONLY ONE MONITOR IS OUT.  I THINK YOU CAN CONTINUE NOW.

09:15AM   7    THANK YOU.

09:15AM   8              MR. DOWNEY:  THANK YOU.

09:15AM   9    Q.   DO YOU RECALL THAT MS. HOLMES TOLD YOU THAT THERANOS WAS

09:15AM   10   IN THE PROCESS OF NEGOTIATING AGREEMENTS WITH RETAILERS?

09:15AM   11   A.   YES.

09:15AM   12   Q.   AND DO YOU RECALL THAT SHE ALSO TOLD YOU IN THAT

09:15AM   13   MARCH 2010 MEETING THAT THERANOS WAS CONSIDERING AN EQUITY

09:16AM   14   OFFERING IN THERANOS STOCK?

09:16AM   15   A.   I'M A LITTLE CONFUSED.  ARE YOU TALKING ABOUT AN EQUITY

09:16AM   16   OFFERING TO ME?

09:16AM   17   Q.   NO.  I'M TALKING ABOUT AN EQUITY OFFERING GENERALLY TO

09:16AM   18   INVESTORS.

09:16AM   19   A.   I HAVE NOTES WHERE SHE WAS TALKING ABOUT AN IPO YEAR AFTER

09:16AM   20   YEAR AFTER YEAR.  IT'S COMING NEXT YEAR, IT'S COMING IN TWO

09:16AM   21   YEARS, IT'S COMING NEXT YEAR.

09:16AM   22        SO I HAVE A WHOLE TRAIL OF NOTES OVER A PERIOD OF YEARS

09:16AM   23   THAT SHE WAS HINTING THERE WAS AN IPO AROUND THE CORNER.

09:16AM   24   Q.   I DIDN'T ASK YOU ABOUT AN IPO, MR. EISENMAN.  I ASKED YOU

09:16AM   25   ABOUT AN EQUITY OFFERING IN ANY FORM.

UNITED STATES COURT REPORTERS
**ER-9789**

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6162

09:16AM  1      DID SHE TELL YOU THERE WAS AN EQUITY OFFERING, PRIVATE,

09:16AM  2   PUBLIC, INDIVIDUAL, GROUP, TO WHOMEVER?  DID SHE TELL YOU IN

09:16AM  3   MARCH OF 2010 THAT THERANOS WAS CONSIDERING AN EQUITY OFFERING

09:16AM  4   IN 2010?

09:16AM  5   A.   MY RECOLLECTION WAS THAT THERE WAS DISCUSSION ABOUT AN

09:16AM  6   EQUITY OFFERING TO ME, BUT I DON'T RECALL AN EQUITY OFFERING TO

09:17AM  7   OTHERS OR TO THE PUBLIC.

09:17AM  8   Q.   OKAY.  LET ME ASK YOU TO LOOK AT 2000 -- I'M SORRY, 14103,

09:17AM  9   AND LOOK AT THE BOTTOM EMAIL ON PAGE 1, WHICH APPEARS TO BE AN

09:17AM  10  EMAIL FROM YOU TO MS. HOLMES.

09:17AM  11      DO YOU SEE THAT?

09:17AM  12  A.   YES.

09:17AM  13  Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH YOU SAY, "SINCE IT

09:17AM  14  HAS BEEN 2 MONTHS SINCE WE TALKED, AND WILL PROBABLY BE ANOTHER

09:17AM  15  MONTH UNTIL WE TALK AGAIN, I WAS WONDERING IF YOU COULD EMAIL

09:17AM  16  ME A RESPONSE TO THE FOLLOWING ITEMS?"

09:17AM  17      DO YOU SEE THAT?

09:17AM  18  A.   YES.

09:17AM  19  Q.   AND THEN YOU GO ON TO ASK HER A SERIES OF ITEMS FOLLOWING

09:17AM  20  FROM THERE.

09:17AM  21      IS THAT REFERRING BACK TO THE CONVERSATION THAT YOU HAD IN

09:17AM  22  MARCH WITH MS. HOLMES?

09:17AM  23  A.   YES.

09:17AM  24  Q.   OKAY.  AND THEN YOU ASK HER FOR -- TO SCHEDULE A MEETING

09:18AM  25  AND, IN THE INTERIM, TO GET THE INFORMATION THAT YOU'RE

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6163

09:18AM  1    REQUESTING IN THE EMAIL; CORRECT?

09:18AM  2    A.   CORRECT.

09:18AM  3    Q.   AND THEN ABOUT A WEEK LATER, IF YOU GO TO THE EMAIL ABOVE,

09:18AM  4    DO YOU SEE THAT THERE'S ANOTHER EMAIL FROM YOU ASKING FOR A

09:18AM  5    RESPONSE?

09:18AM  6    A.   YES.

09:18AM  7    Q.   AND THEN IF YOU GO TO THE TOP EMAIL, DO YOU SEE THERE'S A

09:18AM  8    RESPONSE FROM MS. HOLMES TO YOU?

09:18AM  9    A.   YES.

09:18AM  10   Q.   AND IF YOU LOOK AT THE SECOND SENTENCE OF THE FIRST

09:18AM  11   PARAGRAPH, SHE SAYS, "AS YOU KNOW, WE DON'T DO QUARTERLY CALLS

09:18AM  12   WITH OUR OTHER INVESTORS, MANY OF WHOM INVESTED MUCH GREATER

09:18AM  13   AMOUNTS THAN YOU DID, AND I CANNOT COMMIT TO AN EXACT QUARTERLY

09:18AM  14   SCHEDULE GOING FORWARD."

09:18AM  15        DO YOU SEE THAT?

09:18AM  16   A.   YES.

09:18AM  17   Q.   AND THEN DO YOU SEE IN THE SECOND PARAGRAPH SHE SAID, "AS

09:18AM  18   DISCUSSED IN OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF

09:19AM  19   COMMUNICATION YOU KEEP REQUESTING."

09:19AM  20        DO YOU SEE THAT?

09:19AM  21   A.   YES.

09:19AM  22   Q.   AND IT WAS IN THE MARCH MEETING THAT SHE TOLD YOU THAT

09:19AM  23   THERE WOULD BE AN EQUITY OFFERING IN 2010 AND THAT THERANOS WAS

09:19AM  24   IN THE PROCESS OF NEGOTIATIONS WITH RETAILERS; CORRECT?

09:19AM  25   A.   I DON'T RECALL THE EQUITY OFFERING DISCUSSION.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6164

09:19AM 1    Q.   OKAY.  AND IF YOU LOOK AT THE THIRD PARAGRAPH, SHE SAYS,

09:19AM 2    "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS WE ARE NOW

09:19AM 3    OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND CARTRIDGE

09:19AM 4    SALE PRICES.  I CANNOT PROVIDE YOU THE METRICS YOU ARE

09:19AM 5    REQUESTING IN YOUR EMAIL."

09:19AM 6        DO YOU SEE THAT?

09:19AM 7    A.   YES.

09:19AM 8    Q.   NOW, I THINK YOU TESTIFIED ON DIRECT THAT YOU WEREN'T EVEN

09:19AM 9    CERTAIN WHAT RETAILERS THERANOS WAS NEGOTIATING WITH; IS THAT

09:19AM 10   RIGHT?

09:19AM 11   A.   SHE HAD MENTIONED THE NAME WAL-MART, SHE HAD MENTIONED

09:19AM 12   CVS.  THERE WERE SOME NAMES THAT SHE HAD MENTIONED IN PRIOR

09:20AM 13   CONVERSATIONS THAT I'M NOT -- I'M NOT CERTAIN WHICH RETAILER

09:20AM 14   SHE WAS TALKING ABOUT IN THIS EMAIL.

09:20AM 15   Q.   OKAY.  SO I TAKE IT THAT YOU DID NOT SEE ANY DOCUMENTS

09:20AM 16   RELATED TO THAT NEGOTIATION?

09:20AM 17   A.   NO, I DIDN'T.

09:20AM 18   Q.   AND YOU DON'T KNOW WHETHER THERE WAS A RESTRICTION IMPOSED

09:20AM 19   ON EITHER THE RETAILER OR ON THERANOS AS TO INFORMATION THAT IT

09:20AM 20   COULD SHARE DURING THE PERIOD OF THOSE NEGOTIATIONS?

09:20AM 21   A.   I WASN'T AWARE.

09:20AM 22   Q.   AND YOU DON'T KNOW WHETHER, IN THE FINAL AGREEMENT THAT

09:20AM 23   WAS SUBSEQUENTLY NEGOTIATED, WHETHER THERE WAS A RESTRICTION ON

09:20AM 24   THE INFORMATION THAT THERANOS COULD SHARE?

09:20AM 25   A.   NO, I DON'T KNOW.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6165

```
09:20AM   1    Q.   BECAUSE YOU'VE NEVER SEEN THAT AGREEMENT; RIGHT?

09:20AM   2    A.   NO.

09:20AM   3    Q.   NOW, YOU UNDERSTAND ALSO, DO YOU NOT, THAT DURING THE

09:20AM   4    PERIOD WHEN A COMPANY IS SELLING STOCK TO A GROUP OF INVESTORS,

09:20AM   5    BE IT THE PUBLIC OR TO A SMALLER GROUP OF INVESTORS, THERE

09:21AM   6    COULD BE RESTRICTIONS ON THE INFORMATION THAT IT'S IN A

09:21AM   7    POSITION TO SHARE.

09:21AM   8         YOU UNDERSTAND THAT, DON'T YOU?

09:21AM   9    A.   WELL, I'LL GO BACK TO MY EARLIER COMMUNICATION.  I WAS NOT

09:21AM  10    AWARE THAT THERE WAS ANY ATTEMPTS TO DO ANY KIND OF OFFERING.

09:21AM  11    IT WAS NOT MENTIONED TO ME.

09:21AM  12    Q.   I DIDN'T ASK YOU ABOUT THIS OFFERING.  I'M JUST ASKING YOU

09:21AM  13    ABOUT YOUR GENERAL LEVEL OF KNOWLEDGE AS A SOPHISTICATED

09:21AM  14    INVESTOR AND BROKER AND SO FORTH.

09:21AM  15         YOU'RE AWARE THAT THERE ARE RESTRICTIONS ON THE

09:21AM  16    INFORMATION THAT A COMPANY COULD SHARE WHEN IT'S DOING AN

09:21AM  17    EQUITY OFFERING, AREN'T YOU?

09:21AM  18    A.   I AM AWARE OF THAT.

09:21AM  19    Q.   AND YOU'RE AWARE THAT IF A POTENTIAL INVESTOR RECEIVES

09:21AM  20    INFORMATION THAT OTHER INVESTORS DON'T HAVE, THAT THAT INVESTOR

09:21AM  21    MIGHT BE UNDER RESTRICTIONS AS TO WHETHER HE OR SHE CAN SHARE

09:21AM  22    THAT INFORMATION; CORRECT?

09:21AM  23    A.   WELL, I WAS NOT MADE AWARE OF THE FACT THAT THEY WERE

09:21AM  24    DOING ANY KIND OF EQUITY OFFERING, SO IT SEEMS LIKE THIS IS

09:22AM  25    MOOT.
```

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6166

09:22AM  1    Q.   I'M NOT ASKING YOU ABOUT YOUR AWARENESS WITH RESPECT TO

09:22AM  2    THERANOS.  I'M ASKING YOU ABOUT WHAT YOU KNOW AS A

09:22AM  3    SOPHISTICATED INVESTOR, SHAREHOLDER, INVESTMENT ADVISOR,

09:22AM  4    PRIVATE INVESTOR, PUBLIC INVESTOR FOR 35 YEARS.

09:22AM  5    A.   SINCE I WAS NOT AWARE THAT THEY WERE ATTEMPTING TO DO ANY

09:22AM  6    KIND OF OFFERING, I CAN'T REALLY RESPOND TO THE QUESTION.

09:22AM  7         I WILL ALSO SAY THAT AS AN INVESTOR IN OTHER PRIVATE

09:22AM  8    COMPANIES, I HAVE SIGNED A NONDISCLOSURE AGREEMENT SO I COULD

09:22AM  9    BE PRIVY TO THOSE KINDS OF CONVERSATIONS AND PROMISE NOT TO

09:22AM 10    DISCLOSE TO ANYBODY.

09:22AM 11    Q.   I UNDERSTAND THAT.

09:22AM 12         I MOVE TO STRIKE THAT ANSWER.

09:22AM 13         AND I'LL ASK YOU THE SAME QUESTION FOR A THIRD TIME.

09:22AM 14              THE COURT:  I'LL STRIKE THAT.  THE LAST RESPONSE WAS

09:22AM 15    STRICKEN.

09:22AM 16         MR. DOWNEY, IF YOU COULD ASK YOUR ORIGINAL QUESTION AGAIN,

09:22AM 17    PLEASE.

09:22AM 18         JUST LISTEN TO HIS ORIGINAL QUESTION.

09:22AM 19              THE WITNESS:  I'M TRYING.  THANK YOU.

09:22AM 20    BY MR. DOWNEY:

09:22AM 21    Q.   THE QUESTION IS, YOU ARE AWARE THAT THERE ARE RESTRICTIONS

09:22AM 22    ON THE INFORMATION THAT A COMPANY CAN SHARE DURING THE PERIOD

09:23AM 23    WHERE IT IS MAKING AN EQUITY OFFERING, AREN'T YOU?

09:23AM 24    A.   AS A GENERAL RULE, YES.

09:23AM 25    Q.   OKAY.  AND YOU'RE ALSO AWARE, ARE YOU NOT, THAT IF A

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6167

09:23AM   1    POTENTIAL INVESTOR, OR INVESTOR, DISCOVERS INFORMATION ABOUT

09:23AM   2    THAT COMPANY THAT OTHER POTENTIAL INVESTORS DON'T HAVE, THAT

09:23AM   3    THAT INVESTOR MIGHT BE UNDER RESTRICTION AS TO WHETHER IT CAN

09:23AM   4    SHARE THAT INFORMATION; CORRECT?

09:23AM   5    A.   I'M SORRY.  I'M STILL NOT FOLLOWING THIS, BECAUSE I WAS

09:23AM   6    NOT GIVEN ANY INFORMATION THAT THEY WERE ATTEMPTING TO DO ANY

09:23AM   7    KIND OF OFFERING, SO THAT WOULD NOT RESTRICT ME FROM GAINING

09:23AM   8    INFORMATION.  IT'S NOT, YOU KNOW, PRIVY TO OTHER PEOPLE.

09:23AM   9           THE COURT:  MR. EISENMAN, I THINK HE'S JUST ASKING

09:23AM  10    YOU, DISASSOCIATED FROM YOUR INVESTMENT, JUST YOUR KNOWLEDGE

09:23AM  11    ABOUT GENERAL CONCEPTS.

09:23AM  12           THE WITNESS:  OKAY.  DISASSOCIATED WITH THIS

09:23AM  13    INVESTMENT WITH THERANOS, AS A GENERAL STATEMENT, YES, THAT IS

09:23AM  14    CORRECT.

09:23AM  15           MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE THE PRIOR

09:23AM  16    ANSWER TO MY QUESTION.

09:24AM  17           THE COURT:  WELL, THE PRIOR ANSWER IS STRICKEN.

09:24AM  18       LADIES AND GENTLEMEN, THE LAST RESPONSE AFTER MY

09:24AM  19    INTERJECTION -- AND LET ME ASK YOU, WAS MY INTERJECTION

09:24AM  20    APPROPRIATE FOR YOUR QUESTION?

09:24AM  21           MR. DOWNEY:  IT WAS, YOUR HONOR, AND I THINK THAT

09:24AM  22    THE QUESTION AND ANSWER CAN REMAIN --

09:24AM  23           THE COURT:  ALL RIGHT.  THANK YOU.

09:24AM  24           MR. DOWNEY:  -- IN THE TRANSCRIPT.

09:24AM  25           THE COURT:  THANK YOU.  AND YOU CAN ASK ANOTHER

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6168

09:24AM   1    QUESTION.  THANK YOU.

09:24AM   2              MR. DOWNEY:  ALL RIGHT.

09:24AM   3    Q.   NOW, FOLLOWING ON THIS EMAIL IN WHICH MS. HOLMES TOLD YOU

09:24AM   4    SHE COULD NOT PROVIDE THE LEVEL OF INFORMATION THAT YOU WERE

09:24AM   5    REQUESTING, YOU CONTINUED TO REQUEST INFORMATION FROM THERANOS,

09:24AM   6    DID YOU NOT?

09:24AM   7    A.   YES.

09:24AM   8    Q.   LET ME ASK YOU TO LOOK IN THE BLACK NOTEBOOK THAT YOU HAVE

09:24AM   9    AT EXHIBIT 12285.

09:25AM   10        YOU KNOW, MR. EISENMAN, I APOLOGIZE.  I'M GOING TO HAVE

09:25AM   11   YOU LOOK AT A DIFFERENT EXHIBIT.

09:25AM   12   A.   OKAY.

09:25AM   13   Q.   LET ME ASK YOU TO LOOK FIRST AT THE EXHIBIT THAT IS MARKED

09:25AM   14   AS 14225.

09:25AM   15   A.   OKAY.

09:25AM   16   Q.   AND DO YOU SEE THAT THIS IS ALSO A SERIES OF EMAIL

09:25AM   17   EXCHANGES BETWEEN YOURSELF AND MS. HOLMES RELATED TO YOUR

09:25AM   18   INVESTMENT IN THERANOS?

09:25AM   19   A.   YES.

09:25AM   20              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14225.

09:25AM   21              MR. BOSTIC:  NO OBJECTION.

09:25AM   22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:26AM   23        (DEFENDANT'S EXHIBIT 14225 WAS RECEIVED IN EVIDENCE.)

09:26AM   24   BY MR. DOWNEY:

09:26AM   25   Q.   IF YOU GO TO THE BOTTOM OF PAGE 2, THERE'S AN EMAIL

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6169

09:26AM   1     EXCHANGE FROM YOU TO MS. HOLMES AND OTHERS ARE COPIED; CORRECT?

09:26AM   2     A.   YES.

09:26AM   3     Q.   AND THAT'S DATED JULY 13TH, 2010.

09:26AM   4          DO YOU SEE THAT?

09:26AM   5     A.   YES.

09:26AM   6     Q.   AND THE EMAIL SAYS, "ELIZABETH,

09:26AM   7          "I HEARD YESTERDAY THAT YOU COMPLETED AN EQUITY OFFERING."

09:26AM   8          DO YOU SEE THAT?

09:26AM   9     A.   YES.

09:26AM  10     Q.   AND MS. HOLMES RESPONDS TO YOUR EMAIL IN THE EMAIL ABOVE

09:26AM  11     BY SAYING, "PER MY PREVIOUS EMAIL, I WILL CALL YOU AS SOON AS

09:26AM  12     WE HAVE SOMETHING CONCRETE."

09:26AM  13          YOU THEN MOVE UP ABOVE THAT EMAIL AND THERE'S ANOTHER

09:27AM  14     SERIES OF EMAIL EXCHANGES.  YOU SAY IN THE EMAIL ABOVE THAT,

09:27AM  15     "ELIZABETH,

09:27AM  16          "I AM REALLY TRYING TO KEEP MY EMAILS TO A MINIMUM.  CAN

09:27AM  17     YOU RESPOND TO MY INQUIRY BELOW ABOUT THE PRICING OF THE EQUITY

09:27AM  18     ROUND, AND IF THE OFFER TO BUY OUR STOCK IS DELAYED UNTIL YEAR

09:27AM  19     END?"

09:27AM  20          AND THEN YOU SENT ANOTHER EMAIL THAT I THINK IS GENERALLY

09:27AM  21     JUST A REMINDER ABOVE THAT, OR A FURTHER REQUEST, IF YOU WILL.

09:27AM  22          DO YOU SEE THAT?

09:27AM  23     A.   YES.

09:27AM  24     Q.   AND THEN THERE'S A FEW MORE EMAILS ALONG THOSE LINES.

09:27AM  25          AND THEN AT THE TOP OF THE PAGE 1, DO YOU SEE THAT

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6170

09:27AM   1    MS. HOLMES RESPONDS TO THE EMAILS THAT YOU HAD SENT TO HER?

09:27AM   2    A.   YES.

09:27AM   3    Q.   LET'S TAKE A LOOK AT THAT EMAIL.

09:27AM   4         SHE SAYS, "ALAN,

09:27AM   5         "YOUR CONTINUED DAILY CALLS AND EMAILS --"

09:28AM   6         NOW, IS IT TRUE THAT YOU WERE CALLING AND EMAILING THE

09:28AM   7    COMPANY DAILY?

09:28AM   8    A.   THAT'S AN EXAGGERATION.

09:28AM   9    Q.   BUT YOU ACKNOWLEDGE THAT YOU WERE EMAILING AND CALLING THE

09:28AM  10    COMPANY AND ASKING FOR INFORMATION FREQUENTLY?

09:28AM  11         IS THAT FAIR?

09:28AM  12    A.   SEMI FAIR.  IT WAS FREQUENTLY BECAUSE I WASN'T GETTING

09:28AM  13    RESPONSES, SO I WOULD FOLLOW UP.

09:28AM  14    Q.   AND MS. HOLMES GOES ON TO SAY, "WE'VE ALREADY TOLD YOU WE

09:28AM  15    DO NOT HAVE ADDITIONAL INFORMATION WE CAN DISCLOSE BEYOND WHAT

09:28AM  16    WE'VE ALREADY SHARED WITH DAVID ARE UPSETTING TO US."

09:28AM  17         DO YOU SEE THAT?

09:28AM  18    A.   YES.

09:28AM  19    Q.   AND DAVID IS A REFERENCE TO MR. HARRIS; CORRECT?

09:28AM  20    A.   CORRECT.

09:28AM  21    Q.   AND MR. HARRIS WAS AN INDIVIDUAL WHO HAD FIRST INTRODUCED

09:28AM  22    YOU TO THERANOS; IS THAT RIGHT?

09:28AM  23    A.   THAT'S CORRECT.

09:28AM  24    Q.   AND MS. HOLMES WOULD FREQUENTLY TALK TO MR. HARRIS ABOUT

09:28AM  25    THERANOS; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6171

09:28AM  1    A.   I DON'T KNOW IF IT WAS FREQUENT.  MY UNDERSTANDING IS THAT

09:28AM  2    IT WAS INFREQUENT.

09:28AM  3    Q.   BUT YOU WOULD SOMETIMES FIND OUT INFORMATION FROM

09:29AM  4    MS. HOLMES ABOUT MR. HARRIS?

09:29AM  5    A.   THAT'S FAIR.

09:29AM  6    Q.   AND SHE GOES ON TO SAY, "ONCE WE HAVE ADDITIONAL

09:29AM  7    INFORMATION WE CAN SHARE WITH YOU WE WILL CONTACT YOU AS

09:29AM  8    MENTIONED MULTIPLE TIMES BEFORE -- YOU'RE NOT GETTING A

09:29AM  9    RESPONSE BECAUSE IT IS NOT AN EFFECTIVE USE OF OUR TIME TO KEEP

09:29AM 10    REPEATING THIS."

09:29AM 11         DO YOU SEE THAT?

09:29AM 12    A.   YES.

09:29AM 13    Q.   AND DO YOU UNDERSTAND THAT SHE WAS FRUSTRATED WITH THE

09:29AM 14    FACT THAT SHE TOLD YOU SHE WAS NOT IN A POSITION TO DISCLOSE

09:29AM 15    THIS INTERNAL INFORMATION ABOUT THERANOS?

09:29AM 16              MR. BOSTIC:  CALLS FOR SPECULATION.  FOUNDATION.

09:29AM 17              MR. DOWNEY:  IF YOU KNOW ONE WAY OR ANOTHER.

09:29AM 18              THE COURT:  I'LL ALLOW HIM TO ANSWER THAT QUESTION.

09:29AM 19              THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

09:29AM 20    BY MR. DOWNEY:

09:29AM 21    Q.   DID YOU UNDERSTAND THAT SHE WAS FRUSTRATED THAT YOU KEPT

09:29AM 22    ASKING HER FOR INFORMATION THAT SHE HAD ALREADY TOLD YOU THAT

09:29AM 23    SHE WASN'T IN A POSITION TO DISCLOSE?

09:29AM 24    A.   NO.  I UNDERSTOOD THAT SHE WAS HIDING INFORMATION THAT I

09:29AM 25    SHOULD KNOW AS A SHAREHOLDER.

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6172

09:30AM   1     Q.   I SEE.

09:30AM   2          I MOVE TO STRIKE THAT.

09:30AM   3             THE COURT:  WELL, I THINK THAT'S HIS ANSWER,

09:30AM   4     MR. DOWNEY.

09:30AM   5             MR. DOWNEY:  WELL, HE DOESN'T HAVE ANY BASIS TO KNOW

09:30AM   6     THAT SHE WAS HIDING INFORMATION.

09:30AM   7             THE WITNESS:  I CAN ELABORATE IF YOU WANT ME TO.

09:30AM   8             THE COURT:  EXCUSE ME, SIR.  THAT WAS HIS OPINION OF

09:30AM   9     HIS UNDERSTANDING.

09:30AM  10             MR. DOWNEY:  FAIR ENOUGH.

09:30AM  11     Q.   LET ME ASK YOU TO GO FORWARD FROM THERE AND TO TAKE A LOOK

09:30AM  12     AT 14224, WHICH SHOULD BE JUST BEFORE WE WERE IN YOUR EMAIL.

09:30AM  13          AND IF YOU LOOK AT EXHIBIT 14224, THIS IS AN EMAIL BETWEEN

09:30AM  14     YOU AND MS. HOLMES ALSO FROM JULY OF 2010.

09:30AM  15          DO YOU SEE THAT?

09:30AM  16     A.   YES.

09:30AM  17     Q.   AND THIS CONCERNS YOUR INVESTMENT IN THERANOS; CORRECT?

09:31AM  18     A.   CORRECT.

09:31AM  19             MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14224.

09:31AM  20             MR. BOSTIC:  NO OBJECTION.

09:31AM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:31AM  22          (DEFENDANT'S EXHIBIT 14224 WAS RECEIVED IN EVIDENCE.)

09:31AM  23     BY MR. DOWNEY:

09:31AM  24     Q.   AND IF YOU LOOK AT EXHIBIT 14224, IT'S AN EMAIL FROM YOU

09:31AM  25     TO MS. HOLMES; RIGHT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6173

09:31AM   1    A.   YES.

09:31AM   2    Q.   AND YOU SAY IN THE FIRST SENTENCE OF 14224, "I HAVEN'T

09:31AM   3    MADE A DECISION WHETHER TO SELL STOCK."

09:31AM   4         DO YOU SEE THAT?

09:31AM   5    A.   YES.

09:31AM   6    Q.   AND THAT WAS A COMMENT ON THE FACT THAT MS. HOLMES HAD

09:31AM   7    TOLD YOU THAT THERANOS WAS WILLING TO BUY YOUR STOCK BACK

09:31AM   8    BECAUSE OF YOUR FRUSTRATION WITH THE COMPANY; CORRECT?

09:31AM   9    A.   IT'S A LITTLE MORE COMPLICATED THAN THAT.

09:31AM  10    Q.   OKAY.  WELL, WE'LL TALK ABOUT THAT.

09:31AM  11    A.   I'LL BE HAPPY TO ELABORATE IF I'M ALLOWED TO.

09:32AM  12    Q.   WELL, WE'LL TALK ABOUT THE OFFER TO BUY YOUR STOCK IN A

09:32AM  13    LITTLE BIT.

09:32AM  14         AND YOU TRIED TO SCHEDULE ANOTHER CALL.  DO YOU SEE THAT?

09:32AM  15    A.   YES.

09:32AM  16    Q.   AND, NOW, DO YOU KNOW IF OTHERS WERE BUYING STOCK AT

09:32AM  17    THERANOS AT THE SAME TIME?

09:32AM  18    A.   I WASN'T AWARE.

09:32AM  19    Q.   OKAY.  ALL RIGHT.  LET ME ASK YOU NEXT TO LOOK AT

09:32AM  20    EXHIBIT 14226.

09:32AM  21         DO YOU HAVE THAT?

09:32AM  22    A.   YES.

09:32AM  23    Q.   AND DO YOU SEE THAT THIS IS ALSO AN EMAIL BETWEEN YOU AND

09:32AM  24    MS. HOLMES CONCERNING YOUR INVESTMENT IN THERANOS?

09:32AM  25    A.   YES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6174

09:32AM  1        MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14226.

09:32AM  2        MR. BOSTIC:  NO OBJECTION.

09:33AM  3        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM  4        (DEFENDANT'S EXHIBIT 14226 WAS RECEIVED IN EVIDENCE.)

09:33AM  5   BY MR. DOWNEY:

09:33AM  6   Q.   IS EXHIBIT 14226 ANOTHER EMAIL FROM YOU TO MS. HOLMES --

09:33AM  7   A.   YES.

09:33AM  8   Q.   -- DISCUSSING YOUR INVESTMENT IN THERANOS?

09:33AM  9   A.   YES.

09:33AM  10  Q.   AND DO YOU SEE IN THE TOP OF THE EMAIL -- I'M SORRY, IN

09:33AM  11  THE BOTTOM EMAIL YOU SAY, "ELIZABETH,

09:33AM  12       "I NOTICED THAT LARRY IS NOT CURRENTLY LISTED AS A

09:33AM  13  DIRECTOR."

09:33AM  14       DO YOU SEE THAT?

09:33AM  15  A.   YES.

09:33AM  16  Q.   AND THAT WAS A REFERENCE TO LARRY ELLISON, RIGHT, WHO IS

09:33AM  17  THE SUBJECT OF THE EMAIL?

09:33AM  18  A.   YES.

09:33AM  19  Q.   AND YOU HAD RECEIVED A COMMUNICATION WHICH INDICATED THAT

09:33AM  20  MR. ELLISON WAS NO LONGER A BOARD MEMBER; CORRECT?

09:33AM  21  A.   CORRECT.

09:33AM  22  Q.   AND YOU GO ON TO SAY, "DID HE GO OFF THE BOARD?  IF SO,

09:33AM  23  WHY?  ALSO, DO YOU HAVE ANY VISIBILITY WHEN WE WILL RECEIVE

09:33AM  24  INFORMATION," ET CETERA.

09:33AM  25       DO YOU SEE THAT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6175

09:33AM   1    A.   YES.

09:33AM   2    Q.   AND THEN DO YOU SEE ABOVE THAT MS. HOLMES TELLS YOU "I

09:33AM   3    RECEIVED THIS EMAIL FROM SATURDAY AS WELL -- AT THIS POINT, PER

09:34AM   4    OUR CALL, THERE IS NO NEW INFORMATION TO BE SHARED WITH OUR

09:34AM   5    INVESTOR BASE.  AS DISCUSSED, WHEN WE COMMUNICATE ANYTHING WITH

09:34AM   6    OUR INVESTOR BASE, YOU WILL BE INCLUDED ON THOSE COMMUNICATIONS

09:34AM   7    AS WELL."

09:34AM   8         DO YOU SEE THAT?

09:34AM   9    A.   YES.

09:34AM   10   Q.   AND THERE HAD BEEN A COMMUNICATION WITH THE INVESTOR BASE

09:34AM   11   THAT WAS ALSO COMMUNICATED TO YOU ABOUT WHO THE BOARD MEMBERS

09:34AM   12   WERE; RIGHT?

09:34AM   13   A.   PRESUMABLY SO.  I DON'T RECALL.

09:34AM   14   Q.   OKAY.  AND YOU HAD BEEN INCLUDED ON THAT COMMUNICATION?

09:34AM   15   A.   I'M SAYING PRESUMABLY SO.  I DON'T RECALL.

09:34AM   16   Q.   OKAY.  NOW, IS IT FAIR TO SAY FROM THE TESTIMONY THAT YOU

09:34AM   17   GAVE ON WEDNESDAY OF LAST WEEK THAT YOU FELT FRUSTRATED BY THE

09:34AM   18   FACT THAT YOU COULDN'T GET INFORMATION FROM THERANOS

09:34AM   19   INDIVIDUALLY?  IS THAT FAIR TO SAY?

09:34AM   20   A.   INDIVIDUALLY AND COLLECTIVELY.  MY GROUP WAS ALSO TRYING

09:34AM   21   TO GET INFORMATION AND THEY WERE SIMILARLY FRUSTRATED.

09:35AM   22   Q.   OKAY.  BUT YOU, YOU -- IF THERANOS COMMUNICATED WITH

09:35AM   23   INVESTORS GENERALLY, YOU WERE INCLUDED ON THOSE COMMUNICATIONS;

09:35AM   24   CORRECT?

09:35AM   25   A.   WELL, THE ISSUE WAS THE LACK OF COMMUNICATION.  IT WAS A

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6176

```
09:35AM   1   LONG PERIOD OF TIME WHERE THERE WAS NO COMMUNICATION.
09:35AM   2   Q.   I'M SORRY.  I HAD ASKED YOU IF THERANOS HAD COMMUNICATED
09:35AM   3   GENERALLY WITH ITS INVESTORS.  YOU WERE INCLUDED IN THOSE
09:35AM   4   COMMUNICATIONS?
09:35AM   5   A.   THERE WAS NO COMMUNICATIONS TO INVESTORS GENERALLY EITHER.
09:35AM   6   Q.   WELL, DIDN'T WE JUST LOOK AT AN EMAIL IN WHICH YOU
09:35AM   7   ACKNOWLEDGED THAT THE CHANGE IN BOARD MEMBERS HAD BEEN
09:35AM   8   COMMUNICATED TO YOU?
09:35AM   9   A.   AS I SAID EARLIER, I DON'T RECALL WHERE I GOT THAT
09:35AM  10   INFORMATION.  THAT MIGHT HAVE BEEN FROM A CONVERSATION WITH
09:35AM  11   ELIZABETH AND DAVID HARRIS.  I DON'T RECALL WHERE THAT
09:35AM  12   INFORMATION CAME FROM.
09:35AM  13   Q.   OKAY.
09:35AM  14   A.   I DON'T THINK THEY COMMUNICATED THAT TO THEIR INVESTOR
09:35AM  15   BASE.
09:35AM  16   Q.   OKAY.  NOW, WE WERE TALKING FRIDAY ABOUT THE ISSUE OF YOUR
09:35AM  17   RIGHTS TO OBTAIN THE KIND OF INFORMATION THAT YOU WERE SEEKING
09:36AM  18   TO OBTAIN FROM THE COMPANY.
09:36AM  19        DO YOU REMEMBER THAT?
09:36AM  20   A.   YES.
09:36AM  21   Q.   AND YOU UNDERSTOOD THAT THE COMPANY DIDN'T HAVE ANY
09:36AM  22   OBLIGATION TO UPDATE YOU WITH THE KIND OF FREQUENT AND SPECIFIC
09:36AM  23   INFORMATION THAT YOU WERE REPEATEDLY REQUESTING?
09:36AM  24        YOU UNDERSTOOD THAT, DIDN'T YOU?
09:36AM  25   A.   I THINK, AS I RECALL, I DON'T HAVE A LEGAL RIGHT, BUT AS A
```

EISENMAN CROSS BY MR. DOWNEY (RES.)                            6177

09:36AM  1    PRACTICAL MATTER, EVERY OTHER PRIVATE COMPANY I INVEST IN ARE

09:36AM  2    HAPPY TO TALK TO YOU, AND THIS WAS AN UNUSUAL FENCE BETWEEN

09:36AM  3    MANAGEMENT AND SHAREHOLDERS FOR AN EXTENDED PERIOD OF TIME.

09:36AM  4           MR. DOWNEY:  I MOVE TO STRIKE EVERYTHING AFTER

09:36AM  5    "LEGAL RIGHT."

09:36AM  6         ALL RIGHT.  LADIES AND GENTLEMEN, I'LL STRIKE THE RESPONSE

09:36AM  7    AFTER "I THINK, AS I RECALL, I DON'T HAVE A LEGAL RIGHT."

09:36AM  8         EVERYTHING AFTER THAT IS STRICKEN.

09:37AM  9    BY MR. DOWNEY:

09:37AM  10   Q.   ALL RIGHT.  LET'S LOOK AT ONE LAST DOCUMENT IN THIS 2010,

09:37AM  11   2011 TIMEFRAME, WHICH IS EXHIBIT 12185.

09:37AM  12        DO YOU HAVE THAT ONE?

09:37AM  13   A.   YES.

09:37AM  14   Q.   AND IS THIS A SERIES OF EXCHANGES BETWEEN YOU AND

09:37AM  15   MR. BALWANI RELATED TO YOUR INVESTMENT IN THERANOS?

09:37AM  16   A.   YES.

09:37AM  17   Q.   AND YOU UNDERSTOOD THAT MR. BALWANI HAD JOINED THE COMPANY

09:38AM  18   AS AN EXECUTIVE AT SOME POINT PRIOR TO 2011; CORRECT?

09:38AM  19   A.   I'M NOT SURE WHEN HE JOINED THE COMPANY.

09:38AM  20   Q.   OKAY.

09:38AM  21   A.   MY UNDERSTANDING IS THAT HE JOINED IT MUCH EARLIER, BUT WE

09:38AM  22   WERE NOT MADE AWARE OF THAT.

09:38AM  23   Q.   OKAY.  BUT AT THE TIME THAT YOU WERE COMMUNICATING WITH

09:38AM  24   HIM IN 2011, YOU UNDERSTOOD THAT HE WAS A THERANOS EXECUTIVE;

09:38AM  25   CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6178

09:38AM   1     A.   CORRECT.

09:38AM   2     Q.   NOW, YOU GO ON TO -- YOU ASK IN THE VERY BOTTOM EMAIL, AND

09:38AM   3     YOU ASK AGAIN FOR ANOTHER CALL.

09:38AM   4          DO YOU SEE THAT ON THE JANUARY 31ST EMAIL AND THE LAST

09:38AM   5     EMAIL ON PAGE 2?

09:38AM   6     A.   I SEE A FEBRUARY 1ST -- OH, JANUARY 31ST.  OKAY.

09:38AM   7     Q.   DO YOU SEE THAT?

09:38AM   8     A.   YES, I DO.

09:38AM   9               MR. DOWNEY:  YOUR HONOR, I SHOULD HAVE ADMITTED THIS

09:39AM  10     DOCUMENT IF I CAN.

09:39AM  11     Q.   THIS IS ANOTHER EMAIL RELATED TO YOUR INVESTMENT; CORRECT?

09:39AM  12     A.   CORRECT.

09:39AM  13               MR. DOWNEY:  YOUR HONOR, I MOVE EXHIBIT 12185.

09:39AM  14               MR. BOSTIC:  NO OBJECTION.

09:39AM  15               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM  16          (DEFENDANT'S EXHIBIT 12185 WAS RECEIVED IN EVIDENCE.)

09:39AM  17     BY MR. DOWNEY:

09:39AM  18     Q.   AND I WAS JUST, FOR THE BENEFIT, I WAS JUST SHOWING YOU

09:39AM  19     THE FIRST EMAIL IN THE SERIES OF EMAILS.

09:39AM  20          AND IT'S JUST ANOTHER EMAIL FROM YOU ASKING FOR UPDATES

09:39AM  21     AND INFORMATION ABOUT THE COMPANY; CORRECT?

09:39AM  22     A.   CORRECT.

09:39AM  23     Q.   AND THEN MR. BALWANI RESPONDED TO THAT ABOVE THAT.

09:39AM  24          DO YOU SEE THAT?

09:39AM  25     A.   YES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6179

09:39AM   1    Q.   AND MR. BALWANI SAID, "THERE IS NO QUARTERLY UPDATE WE

09:39AM   2    PROVIDE.  AS MENTIONED TO YOU BEFORE, WE WILL SEND UPDATES TO

09:39AM   3    ALL INVESTORS AT THE SAME TIME."

09:39AM   4         DO YOU SEE THAT?

09:39AM   5    A.   YES.

09:39AM   6    Q.   AND THEN YOU, YOU DON'T RESPOND TO -- YOU DON'T ADDRESS

09:39AM   7    MR. BALWANI WHEN YOU RESPOND.  INSTEAD, YOU ADDRESSED

09:40AM   8    MS. HOLMES IN THE LAST FULL EMAIL ON PAGE 1.

09:40AM   9         AND YOU SAY THERE -- YOU ACKNOWLEDGE IN THE LAST SENTENCE,

09:40AM  10    "I UNDERSTAND YOU DON'T HAVE AN OBLIGATION TO UPDATE US, BUT IT

09:40AM  11    WOULD BE APPRECIATED IF YOU WOULD ARRANGE A CALL."

09:40AM  12         DO YOU SEE THAT?

09:40AM  13    A.   YES.

09:40AM  14    Q.   AND THEN YOU EMAILED AGAIN, RIGHT, IN THE EMAIL ABOVE

09:40AM  15    THAT?

09:40AM  16    A.   YES.

09:40AM  17    Q.   AND THEN ABOVE THAT MR. BALWANI HAD ALREADY TOLD YOU HE

09:40AM  18    RESPONDED; CORRECT?

09:40AM  19    A.   HE DIDN'T REALLY RESPOND, BUT OKAY.

09:40AM  20    Q.   WELL, HE TOLD YOU HE RESPONDED; CORRECT?

09:40AM  21    A.   HE SAID HE RESPONDED, BUT HE DIDN'T RESPOND.

09:40AM  22    Q.   OKAY.  YOU WEREN'T SATISFIED WITH HIS RESPONSE, BUT HE

09:40AM  23    TOLD YOU THAT YOU HAD GOTTEN THE RESPONSE THAT YOU WERE GOING

09:40AM  24    TO GET; CORRECT?

09:40AM  25    A.   THAT'S RIGHT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6180

09:40AM  1    Q.   NOW, BECAUSE YOU WANTED TO GET INFORMATION EITHER

09:41AM  2    PERSONALLY OR AS A GROUP WITH THE OTHER -- LET ME USE -- AGREE

09:41AM  3    ON A TERM WITH YOU IS I'M GOING TO CALL YOU AND MR. HARRIS AND

09:41AM  4    THE OTHER INDIVIDUALS FROM HOUSTON WHO INVESTED, THE HOUSTON

09:41AM  5    INVESTORS JUST.  OKAY?  JUST SO I DON'T HAVE A --

09:41AM  6    A.   OKAY.

09:41AM  7    Q.   SO YOU WANTED TO GET AN UPDATE EITHER FOR YOURSELF OR FOR

09:41AM  8    THE HOUSTON INVESTORS; IS THAT FAIR?

09:41AM  9    A.   THAT'S FAIR.

09:41AM  10   Q.   AND WHEN THERANOS TOLD YOU THAT IT WOULDN'T COMMUNICATE

09:41AM  11   WITH THAT GROUP WITHOUT COMMUNICATING WITH THE WHOLE INVESTOR

09:41AM  12   BASE, YOU WENT DIRECTLY TO THERANOS'S BOARD; CORRECT?

09:41AM  13   A.   I DON'T RECALL.

09:41AM  14   Q.   WELL, DIDN'T YOU TELL US ON WEDNESDAY THAT YOU MADE

09:41AM  15   EFFORTS TO TRY TO CONTACT THE CHAIRMAN OF THE BOARD, DON LUCAS?

09:41AM  16   A.   I DON'T HAVE THE TIMEFRAME, BUT THERE WERE SOME

09:41AM  17   CONVERSATIONS THAT I HAD WITH DON, AND DON WAS VERY WILLING TO

09:42AM  18   SHARE INFORMATION.

09:42AM  19   Q.   OKAY.  LET ME SHOW YOU AN EMAIL THAT IS MARKED

09:42AM  20   EXHIBIT 12252.

09:42AM  21       DO YOU KNOW WHO -- DO YOU SEE THE NAME THERE NANCY MINNIG,

09:42AM  22   M-I-N-N-I-G?

09:42AM  23   A.   I DO.

09:42AM  24   Q.   AND DO YOU KNOW WHO MS. MINNIG WAS?

09:42AM  25   A.   I THINK SHE WAS THE EXECUTIVE ASSISTANT FOR DON LUCAS; IS

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6181

09:42AM   1    THAT CORRECT?

09:42AM   2    Q.    AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MS. MINNIG

09:42AM   3    RELATED TO THE ISSUES THAT WE'VE BEEN TALKING ABOUT AT

09:43AM   4    THERANOS; CORRECT?

09:43AM   5    A.    WHICH EMAIL ARE YOU REFERRING TO?

09:43AM   6    Q.    THE EMAIL EXCHANGE FROM -- THERE ARE TWO EMAILS ON THE

09:43AM   7    DOCUMENT THAT IS 12252, AND BOTH OF THEM ARE EMAIL EXCHANGES

09:43AM   8    BETWEEN YOU AND MS. MINNIG; CORRECT?

09:43AM   9    A.    I'M SORRY, I'M ON THE WRONG TAB.  12252?

09:43AM  10    Q.    YES, SIR.

09:43AM  11    A.    YES.

09:43AM  12    Q.    DO YOU HAVE THAT NOW?

09:43AM  13    A.    YES.

09:43AM  14    Q.    AND DO YOU RECOGNIZE THOSE AS EMAIL EXCHANGES BETWEEN YOU

09:43AM  15    AND MS. MINNIG RELATED TO YOUR INVESTMENT IN THERANOS?

09:43AM  16    A.    YES.

09:43AM  17    Q.    OKAY.  AND IF YOU LOOK AT THE BOTTOM EMAIL, IT BEGINS, "HI

09:43AM  18    ALAN, MY APOLOGIES FOR NOT GETTING BACK TO YOU."

09:43AM  19          DO YOU SEE THAT?

09:43AM  20    A.    YES.

09:43AM  21    Q.    AND THAT APPEARS TO BE THAT YOU HAD TRIED TO CONTACT

09:44AM  22    MS. MINNIG AND SHE HAD NOT, AT LEAST FOR SOME PERIOD OF TIME,

09:44AM  23    RESPONDED TO YOU.

09:44AM  24          DO YOU SEE THAT?

09:44AM  25    A.    COULD YOU ASK THE QUESTION AGAIN.

EISENMAN CROSS BY MR. DOWNEY (RES.)                        6182

09:44AM  1   Q.   I'M JUST ASKING YOU TO TELL US WHEN SHE SAID, "MY

09:44AM  2   APOLOGIES FOR NOT GETTING BACK TO YOU," DO YOU KNOW WHAT THAT

09:44AM  3   REFERRED TO?

09:44AM  4   A.   NOT EXACTLY.

09:44AM  5   Q.   BUT YOU AGREE WITH ME THAT IT APPEARS THAT YOU HAD EITHER

09:44AM  6   CALLED OR EMAILED AND SHE HADN'T RESPONDED FOR A WHILE AND SHE

09:44AM  7   WAS APOLOGIZING.

09:44AM  8       DO YOU SEE THAT?

09:44AM  9   A.   I DO SEE THAT.

09:44AM  10  Q.   OKAY.  AND THEN SHE CONVEYS TO YOU THAT SHE SPOKE TO

09:44AM  11  MR. LUCAS; CORRECT?

09:44AM  12  A.   YES.

09:44AM  13  Q.   AND HE DOESN'T HAVE ANY FURTHER INFORMATION; RIGHT?

09:44AM  14  A.   YES.

09:44AM  15  Q.   AND HE TOLD YOU, HE CONVEYED THAT THERE WERE ARTICLES IN

09:44AM  16  THE NEWS, AS YOU HAD MENTIONED; CORRECT?

09:44AM  17  A.   YOU KNOW, I DON'T RECALL THIS.  THERE WAS SOME ARTICLES IN

09:45AM  18  THE NEWS ABOUT MOVING TO A NEW HEADQUARTERS.  I'M NOT SURE IF

09:45AM  19  THAT IS WHAT THIS IS REFERRING TO.

09:45AM  20      IF YOU'RE ALLOWED TO REFRESH MY MEMORY.  IS THIS THE POINT

09:45AM  21  IN TIME WHEN THEY MOVED TO THEIR NEW HEADQUARTERS?

09:45AM  22  Q.   WELL, I COME NOT ALLOWED TO REFRESH YOU AND IN ANY EVENT

09:45AM  23  I'M NOT SURE I COULD.

09:45AM  24  A.   OKAY.

09:45AM  25           MR. DOWNEY:  BUT LET ME DO THIS, LET ME ADMIT 12252.

UNITED STATES COURT REPORTERS

**ER-9810**

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6183

09:45AM  1              MR. BOSTIC:  NO OBJECTION.

09:45AM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:45AM  3         (DEFENDANT'S EXHIBIT 11253 WAS RECEIVED IN EVIDENCE.)

09:45AM  4     BY MR. DOWNEY:

09:45AM  5     Q.   LET ME HIGHLIGHT THE BOTTOM EMAIL.

09:45AM  6          DO YOU SEE THAT SHE SAYS, "MY APOLOGIES FOR NOT GETTING

09:45AM  7     BACK TO YOU"?

09:45AM  8     A.   YES.

09:45AM  9     Q.   AND SHE GOES ON TO SAY THAT SHE SPOKE TO DON?

09:45AM 10     A.   CORRECT.

09:45AM 11     Q.   AND THAT'S A REFERENCE TO DON LUCAS; CORRECT?

09:45AM 12     A.   CORRECT.

09:45AM 13     Q.   AND SHE SAID HE DOESN'T HAVE ANY FURTHER INFORMATION;

09:45AM 14     CORRECT?

09:45AM 15     A.   CORRECT.

09:45AM 16     Q.   AND THEN SHE SAID WHATEVER THE SUBJECT MATTER WAS, THERE

09:45AM 17     WAS ARTICLES IN THE NEWS; CORRECT?

09:45AM 18     A.   CORRECT.

09:45AM 19     Q.   AND SHE HAD MENTIONED THAT YOU HAD TOLD HER THAT YOU WERE

09:45AM 20     AWARE OF THOSE ARTICLES; CORRECT?

09:45AM 21     A.   CORRECT.

09:45AM 22     Q.   AND MR. LUCAS SUGGESTED THAT YOU FOLLOW THE COMPANY IN

09:46AM 23     THAT MANNER; CORRECT?

09:46AM 24     A.   CORRECT.

09:46AM 25     Q.   AND HE SAID IF THERE WAS INFORMATION HE COULD SHARE WITH

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6184

09:46AM   1      YOU, THEY WILL; CORRECT?

09:46AM   2      A.   CORRECT.

09:46AM   3      Q.   ALL RIGHT.  NOW, AT SOME POINT YOU LEARNED THAT MR. LUCAS

09:46AM   4      HAD CONVEYED TO MS. HOLMES, AND OTHERS AT THERANOS, THAT YOU

09:46AM   5      WERE CALLING AND EMAILING HIM SEEKING INFORMATION.

09:46AM   6           YOU CAME TO UNDERSTAND THAT, DIDN'T YOU?

09:46AM   7      A.   YES.

09:46AM   8      Q.   AND YOU GOT A RESPONSE FROM MS. HOLMES RELATED TO THAT;

09:46AM   9      CORRECT?

09:46AM  10      A.   I'LL HAVE TO SEE THE RESPONSE.  I DON'T RECALL.

09:46AM  11      Q.   OKAY.  WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 713.

09:47AM  12           DO YOU HAVE THAT?  IF NOT, I COULD GIVE YOU A COPY.

09:47AM  13      A.   713?

09:47AM  14      Q.   YES, SIR.

09:47AM  15      A.   I DON'T HAVE IT.

09:47AM  16      Q.   OKAY.

09:47AM  17           MAY I APPROACH THE WITNESS, YOUR HONOR?

09:47AM  18                THE COURT:  YES.  DO YOU HAVE COPIES FOR COUNSEL AND

09:47AM  19      THE COURT?

09:47AM  20                MR. DOWNEY:  I THINK THEY INTRODUCED THIS EXHIBIT.

09:47AM  21                THE COURT:  IT'S A GOVERNMENT EXHIBIT?

09:47AM  22                MR. DOWNEY:  YES.

09:47AM  23      Q.   (HANDING.)  HERE YOU GO.

09:48AM  24           DO YOU SEE THAT?

09:48AM  25      A.   YES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6185

09:48AM   1    Q.   OKAY.

09:48AM   2         YOUR HONOR, THIS DOCUMENT IS ALREADY IN EVIDENCE, BUT I'M

09:48AM   3    NOT SURE THAT THE VERSION THAT HE HAS, HAS THE REDACTIONS THAT

09:48AM   4    WE AGREED TO.

09:48AM   5         BUT I WILL JUST SHOW UNREDACTED PORTIONS FOR PURPOSES OF

09:48AM   6    THE JURY.

09:48AM   7              THE COURT:   I'M SORRY, UNREDACTED?

09:48AM   8              MR. DOWNEY:   THE PORTION THAT THE COURT HAS DIRECTED

09:48AM   9    SHOULD BE PUBLISHED AND NOT THE PORTIONS THAT SHOULD BE

09:48AM  10    REDACTED.

09:48AM  11              THE COURT:   ALL RIGHT.   THAT'S WHAT THE JURY HAS

09:48AM  12    NOW?

09:48AM  13              MR. DOWNEY:   THAT'S WHAT THE JURY IS LOOKING AT NOW.

09:48AM  14              THE COURT:   ALL RIGHT.

09:48AM  15    BY MR. DOWNEY:

09:48AM  16    Q.   WOULD YOU LOOK AT THE EMAIL THAT IS AT NOVEMBER 26TH,

09:48AM  17    2012, AT 2:10 P.M. AT THE BOTTOM OF PAGE 1?

09:48AM  18    A.   YES.

09:48AM  19    Q.   OKAY.   AND THIS WAS YOU CONTACTING MS. MINNIG AGAIN;

09:48AM  20    CORRECT?

09:48AM  21    A.   YES.

09:48AM  22    Q.   AND YOU WERE REACTING TO AN EMAIL THAT MS. HOLMES HAD SENT

09:48AM  23    YOU IN CONNECTION WITH THE FACT THAT YOU WERE COMMUNICATING

09:49AM  24    WITH MR. LUCAS AND SENDING EMAILS TO HIM AND CALLING AND SO

09:49AM  25    FORTH; RIGHT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6186

09:49AM  1    A.   I'M SORRY, WHAT'S THE QUESTION?

09:49AM  2    Q.   THE QUESTION IS WHETHER YOUR EMAIL TO MS. MINNIG IS YOUR

09:49AM  3    REACTION TO MS. HOLMES SENDING YOU AN EMAIL ABOUT YOUR EFFORTS

09:49AM  4    TO COMMUNICATE WITH MR. LUCAS?

09:49AM  5    A.   YES.

09:49AM  6    Q.   OKAY.  AND IF YOU GO BELOW THAT TO THE TOP OF PAGE 2, BUT

09:49AM  7    BELOW IN THE CHAIN.

09:49AM  8         ACTUALLY, GO TO THE EMAIL BELOW THAT.  AND IF YOU LOOK AT

09:49AM  9    THE FIRST LINE OF YOUR EMAIL IT SAYS, "IT HAS BEEN OVER 2 YEARS

09:49AM  10   SINCE YOU HAVE COMMUNICATED WITH YOUR INVESTORS."

09:49AM  11        DO YOU SEE THAT?

09:49AM  12   A.   YES.

09:49AM  13   Q.   AND IF YOU GO TO HER EMAIL ABOVE SHE RESPONDS AND SAYS TO

09:49AM  14   YOU, "NO, ALAN, IT HAS BEEN ABOUT THAT LONG SINCE YOU DECIDED

09:50AM  15   TO START HARASSING OUR CHAIRMAN, DESPITE THE FACT WE

09:50AM  16   COMMUNICATED MULTIPLE TIMES THAT IF WE DID SO, WE WOULD NO

09:50AM  17   LONGER RESPOND TO YOUR REQUESTS TO TALK WITH YOU IN LIGHT OF

09:50AM  18   ALL OF OUR PAST INTERACTIONS."

09:50AM  19        DO YOU SEE THAT?

09:50AM  20   A.   THAT'S A TOTAL MISCHARACTERIZATION.  I NEVER HARASSED

09:50AM  21   DON LUCAS.  WE HAD A VERY NICE RELATIONSHIP UNTIL COMMUNICATION

09:50AM  22   WAS CUT OFF PRESUMABLY FROM ELIZABETH.

09:50AM  23   Q.   OKAY.  BUT YOU SAY THIS IS WHAT SHE WAS CONVEYING, HER

09:50AM  24   UNDERSTANDING OF THE SITUATION?

09:50AM  25   A.   TOTAL MISCHARACTERIZATION.  I DO SEE THAT.  I'M NOT

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6187

09:50AM   1    AGREEING THAT THAT'S ACCURATE.

09:50AM   2    Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH SHE SAYS THAT

09:50AM   3    SHE'LL BE TALKING TO DAVID AGAIN.

09:50AM   4         DO YOU SEE THAT?

09:50AM   5         (CELL PHONE RINGING.)

09:50AM   6              THE COURT:   JUST A SECOND.   SOMEONE'S DEVICE JUST

09:50AM   7    WENT OFF.   IF YOU COULD DISABLE IT OR LEAVE THE COURTROOM,

09:50AM   8    PLEASE.

09:50AM   9         I'M SORRY FOR THE INTERRUPTION, MR. DOWNEY.

09:50AM  10              MR. DOWNEY:   I APOLOGIZE, MR. EISENMAN.

09:50AM  11    Q.   I WAS JUST DIRECTING YOUR ATTENTION TO THE SECOND

09:50AM  12    PARAGRAPH WHERE MS. HOLMES SAYS SHE WILL BE TALKING TO DAVID

09:51AM  13    AGAIN.

09:51AM  14         DO YOU SEE THAT?

09:51AM  15    A.   YES.

09:51AM  16    Q.   AND THAT'S A REFERENCE TO MR. HARRIS AGAIN?

09:51AM  17    A.   THAT IS.

09:51AM  18    Q.   SO SHE WAS COMMUNICATING WITH HIM; CORRECT?

09:51AM  19    A.   YES.

09:51AM  20    Q.   OKAY.   NOW, AFTER MR. LUCAS DECLINED TO COMMUNICATE WITH

09:51AM  21    YOU, YOU WENT TO OTHER MEMBERS OF THE THERANOS BOARD ASKING FOR

09:51AM  22    INFORMATION; CORRECT?

09:51AM  23    A.   CORRECT.

09:51AM  24    Q.   YOU APPROACHED MR. FRIST; CORRECT?

09:51AM  25    A.   THAT IS CORRECT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6188

09:51AM   1   Q.   AND MR. FRIST WAS THE FORMER SENATOR, BILL FRIST; IS THAT

09:51AM   2   CORRECT?

09:51AM   3   A.   CORRECT.

09:51AM   4   Q.   AND HE WAS THE FORMER MAJORITY LEADER IN THE SENATE; IS

09:51AM   5   THAT CORRECT?

09:51AM   6   A.   THAT IS CORRECT.

09:51AM   7   Q.   AND ALSO A VERY RESPECTED SURGEON AND PHYSICIAN; CORRECT?

09:51AM   8   A.   THAT IS CORRECT.

09:51AM   9   Q.   AND YOU KNEW MR. FRIST -- WELL, YOU DIDN'T KNOW MR. FRIST

09:51AM  10   PERSONALLY YOURSELF, RIGHT, AT THE TIME HE CONTACTED YOU?

09:51AM  11   A.   HE'S A FAMILY FRIEND.  I DIDN'T KNOW HIM PERSONALLY.

09:52AM  12   Q.   HE'S A FRIEND OF YOUR FATHER-IN-LAW; CORRECT?

09:52AM  13   A.   THAT IS CORRECT.

09:52AM  14   Q.   AND BECAUSE SENATOR FRIST IS FROM TENNESSEE; CORRECT?

09:52AM  15   A.   CORRECT.

09:52AM  16   Q.   AND YOUR FATHER-IN-LAW LIVED IN TENNESSEE; CORRECT?

09:52AM  17   A.   CORRECT.

09:52AM  18   Q.   AND YOUR FATHER-IN-LAW IS A SUBSTANTIAL FIGURE IN

09:52AM  19   TENNESSEE; CORRECT?

09:52AM  20   A.   I'D RATHER NOT COMMENT.

09:52AM  21   Q.   WELL, HE'S A, HE'S A -- HE'S AN EXTREMELY WEALTHY

09:52AM  22   INDIVIDUAL IN TENNESSEE; CORRECT?

09:52AM  23   A.   I'M NOT GOING TO COMMENT.

09:52AM  24   Q.   WELL, YOU RECOGNIZE HIM TO BE ACTIVE IN MAKING POLITICAL

09:52AM  25   CONTRIBUTIONS AND ACTIVE AROUND POLITICS; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                      6189

09:52AM  1    A.   I RECOGNIZE HIM BEING VERY PHILANTHROPIC.  AS FAR AS

09:52AM  2    POLITICAL CONTRIBUTIONS, I'M NOT AWARE.

09:52AM  3    Q.   AND YOU WERE REACHING OUT TO MR. FRIST REFERENCING YOUR

09:52AM  4    RELATIONSHIP WITH YOUR FATHER-IN-LAW; CORRECT?

09:52AM  5    A.   THIS IS INTERESTING BECAUSE I REACHED OUT TO HIM AS A

09:52AM  6    FAMILY FRIEND, AND IT WAS A CONFIDENTIAL COMMUNICATION, AND HOW

09:53AM  7    IT MADE IT INTO THE DOMAIN OF THERANOS IS A LITTLE BIT

09:53AM  8    IRREGULAR.

09:53AM  9    Q.   WELL, THAT'S RIGHT.

09:53AM 10         YOU REACHED OUT TO HIM ON A CONFIDENTIAL BASIS LETTING HIM

09:53AM 11    KNOW THAT YOU WERE THE SON-IN-LAW OF JOEL GORDON, YOUR

09:53AM 12    FATHER-IN-LAW; CORRECT?

09:53AM 13    A.   THAT IS CORRECT.

09:53AM 14    Q.   BUT YOU TOLD HIM YOU DIDN'T WANT MR. GORDON TO KNOW THAT

09:53AM 15    YOU WERE REACHING OUT TO HIM; CORRECT?

09:53AM 16    A.   MISLEADING.

09:53AM 17    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 2470.

09:53AM 18         THIS MAY BE ANOTHER ONE I HAVE TO HAND TO YOU.  I DON'T

09:54AM 19    THINK IT'S IN YOUR BLACK -- IS IT IN YOUR BLACK NOTEBOOK?

09:54AM 20    A.   I'M SORRY, WHAT IS THE NUMBER?

09:54AM 21    Q.   2470.

09:55AM 22         (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

09:55AM 23              MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

09:55AM 24              THE COURT:  YES.

09:55AM 25              MR. DOWNEY:  (HANDING.)

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6190

09:55AM   1        YOUR HONOR, LET ME SAY BEFORE I HAVE A DISCUSSION WITH

09:55AM   2   THIS WITNESS ABOUT THIS DOCUMENT, THAT THERE WAS A PORTION OF

09:55AM   3   THIS DOCUMENT THAT WAS DIRECTED TO BE REDACTED.  I BELIEVE IN

09:55AM   4   ONE VERSION OF THIS, ONE PHRASE OR TWO PHRASES WERE REDACTED

09:55AM   5   THAT WERE BEYOND THE SCOPE OF THE COURT'S DIRECTION, AND WE'LL

09:55AM   6   FIX THAT IN THE PUBLIC EXHIBIT.

09:55AM   7        THE COURT:  THANK YOU.

09:55AM   8     DO YOU HAVE THIS, MR. BOSTIC?

09:55AM   9        MR. BOSTIC:  I DO, YOUR HONOR.

09:56AM  10     MY REQUEST WOULD BE THAT THE REDACTION SCOPE ISSUE BE

09:56AM  11   FIXED IN THE VERSIONS PUBLISHED TO THE JURY.

09:56AM  12        THE COURT:  I THINK THAT'S YOUR INTENT, ISN'T IT?

09:56AM  13        MR. DOWNEY:  YEAH, I THINK THAT CAN BE ACCOMPLISHED.

09:56AM  14     CAN IT?

09:56AM  15        THE COURT:  YES, LET ME GIVE YOU A MINUTE TO SPEAK

09:56AM  16   WITH YOUR PERSON.

09:56AM  17     (PAUSE IN PROCEEDINGS.)

09:56AM  18     (DISCUSSION AMONGST DEFENSE COUNSEL AND I.T. OFF THE

09:57AM  19   RECORD.)

09:57AM  20        MR. DOWNEY:  OKAY.  YOUR HONOR, TO AVOID DELAY, WHY

09:57AM  21   DON'T WE COME BACK TO THIS SO I DON'T TIE UP --

09:57AM  22        THE COURT:  WE'LL PASS THIS FOR A MOMENT?

09:57AM  23        MR. DOWNEY:  YES, WE'LL PASS THIS, AND WE'LL GET A

09:57AM  24   REDACTED VERSION THAT THE JURY IS IN A POSITION TO SEE

09:57AM  25   CONSISTENT WITH THE COURT'S ORDER.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6191

09:57AM   1    Q.   LET ME SHOW YOU ANOTHER EMAIL ON THIS SAME SUBJECT, WHICH

09:57AM   2    I BELIEVE SHOULD BE IN YOUR NOTEBOOK.

09:57AM   3        WELL, WITHOUT SHOWING YOU THE EXHIBIT, LET ME JUST ASK

09:57AM   4    YOU, YOU REMEMBER REACHING OUT TO SENATOR FRIST, DO YOU?

09:57AM   5    A.   YES, I DO.

09:57AM   6    Q.   AND YOU ASKED HIM QUESTIONS ABOUT THERANOS; CORRECT?

09:57AM   7    A.   YES.

09:57AM   8    Q.   AND ULTIMATELY HE STOPPED COMMUNICATING WITH YOU ABOUT

09:57AM   9    THERANOS AS WELL; CORRECT?

09:58AM  10    A.   CAN I SAY THAT MY TALKING TO SENATOR FRIST WAS TOTALLY

09:58AM  11    APPROPRIATE.

09:58AM  12    Q.   WELL, LET ME ASK YOU ABOUT MY QUESTION FIRST.

09:58AM  13        YOU REACHED OUT TO SENATOR FRIST AND COMMUNICATED ABOUT

09:58AM  14    THERANOS; CORRECT?

09:58AM  15    A.   I REACHED OUT TO A DIRECTOR OF A COMPANY THAT I HAVE A

09:58AM  16    SUBSTANTIAL INVESTMENT IN, THAT I WAS SHUT OUT OF INFORMATION

09:58AM  17    FOR AN EXTENDED PERIOD OF TIME.

09:58AM  18    Q.   SO IS IT YES THAT YOU DID REACH OUT?

09:58AM  19    A.   AND IT WAS A POINT WHERE I MIGHT HAVE HAD AN OPPORTUNITY

09:58AM  20    TO SELL SOME OF MY INVESTMENT.

09:58AM  21        THE COURT:  MR. EISENMAN, MR. EISENMAN, FOR THE

09:58AM  22    EFFICIENCY OF THIS, TRY TO LISTEN TO HIS QUESTION AND ANSWER

09:58AM  23    HIS QUESTION, PLEASE.

09:58AM  24        THE WITNESS:  OKAY.

09:58AM  25        THE COURT:  WHY DON'T YOU ASK YOUR QUESTION AGAIN.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6192

09:58AM  1     BY MR. DOWNEY:

09:58AM  2     Q.   YOU REACHED OUT TO DISCUSS THERANOS WITH SENATOR FRIST;

09:58AM  3     CORRECT?

09:58AM  4     A.   CORRECT.

09:58AM  5     Q.   AND YOU TOLD HIM THAT YOU WERE DOING THIS, BUT YOU DID NOT

09:58AM  6     WANT YOUR FATHER-IN-LAW TO KNOW THAT YOU WERE DOING IT;

09:58AM  7     CORRECT?

09:58AM  8     A.   THAT'S CORRECT, BUT THERE ARE REASONS THAT YOU'RE IMPLYING

09:59AM  9     THAT I DON'T THINK ARE CORRECT.

09:59AM  10    Q.   I HAVEN'T IMPLIED ANYTHING.  I JUST ASKED YOU ABOUT --

09:59AM  11    A.   OKAY.  I'M PUTTING THAT OUT.

09:59AM  12    Q.   AND AT THE TIME YOUR FATHER-IN-LAW, YOUR FATHER-IN-LAW WAS

09:59AM  13    ALSO, THROUGH HIS FAMILY OFFICE, AN INVESTOR IN THERANOS;

09:59AM  14    CORRECT?

09:59AM  15    A.   CORRECT.

09:59AM  16    Q.   NOW, THIS PATTERN OF SENDING EMAILS AFTER YOU'VE BEEN

09:59AM  17    INFORMED THAT YOU'RE NOT GOING TO GET THE INFORMATION OR IT'S

09:59AM  18    NOT APPROPRIATE FOR YOU TO GET THE INFORMATION, THAT'S

09:59AM  19    SOMETHING THAT YOU ENGAGE IN FREQUENTLY; IS THAT CORRECT?

09:59AM  20    A.   I TAKE EXCEPTION.  IT WAS TOTALLY APPROPRIATE FOR ME TO

09:59AM  21    GET THE INFORMATION AT THE TIME.  I WAS CONTEMPLATING SELLING

09:59AM  22    SOME OF MY INVESTMENT.

09:59AM  23    Q.   WELL, LET'S TALK ABOUT SOME OF THE EVENTS THAT HAVE

09:59AM  24    HAPPENED SINCE YOU LEFT THE STAND ON WEDNESDAY.

09:59AM  25         ON WEDNESDAY YOU LEFT THE STAND AFTER TESTIFYING ON DIRECT

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6193

09:59AM   1      EXAMINATION; CORRECT?

09:59AM   2      A.   CORRECT.

09:59AM   3      Q.   AND THEN YOU APPROACHED THE GOVERNMENT AND YOU ASKED THEM

09:59AM   4      ABOUT WHETHER YOU COULD RETURN TRAVEL TO HOUSTON THAT NIGHT;

10:00AM   5      RIGHT?

10:00AM   6      A.   I DON'T RECALL.

10:00AM   7      Q.   OKAY.  WOULD YOU RECALL SPEAKING TO THEM AFTER YOU LEFT

10:00AM   8      THE STAND?

10:00AM   9      A.   I DON'T RECALL.  MY HEAD WAS -- I WAS PRETTY TIRED.

10:00AM  10      Q.   OKAY.  DO YOU RECALL THAT THEY TOLD YOU THAT THEY COULD

10:00AM  11      TELL YOU, YOU WERE PERMITTED TO RETURN TO HOUSTON, BUT THAT

10:00AM  12      THEY COULD NOT DISCUSS ANY SUBSTANCE ABOUT THE TESTIMONY WITH

10:00AM  13      YOU?

10:00AM  14           DO YOU RECALL THAT THEY TOLD YOU THAT?

10:00AM  15      A.   YES.

10:00AM  16      Q.   THEY TOLD YOU NOT TO COMMUNICATE WITH ANY OF THE LAWYERS;

10:00AM  17      CORRECT?

10:00AM  18      A.   I DIDN'T RECALL AT THE TIME.  AS I MENTIONED, I WAS PRETTY

10:00AM  19      TIRED WHEN I LEFT THE STAND.

10:00AM  20      Q.   OKAY.  SO YOU'RE SAYING THAT YOU DON'T RECALL MR. SCHENK

10:00AM  21      OR MR. BOSTIC OR MR. LEACH TELLING YOU DO NOT COMMUNICATE WITH

10:00AM  22      US ABOUT THE SUBSTANCE OF YOUR TESTIMONY?

10:00AM  23      A.   I DO RECALL NOW.

10:00AM  24      Q.   OKAY.  AND YOU UNDERSTOOD WHEN THEY COMMUNICATED THAT TO

10:00AM  25      YOU THAT THAT'S IMPORTANT; RIGHT?  THAT RELATES TO THE

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6194

10:00AM   1     INTEGRITY OF THIS TRIAL; CORRECT?

10:00AM   2     A.   CORRECT.

10:00AM   3     Q.   AND YOU THEN RETURNED TO HOUSTON; CORRECT?

10:01AM   4     A.   YES.

10:01AM   5     Q.   AND HOW LONG DID IT TAKE YOU TO VIOLATE THE DIRECTION THAT

10:01AM   6     HAD BEEN GIVEN TO YOU BY MR. SCHENK, AND MR. BOSTIC, AND

10:01AM   7     MR. LEACH?  HOW LONG?

10:01AM   8     A.   I DON'T RECALL.  NOT, NOT --

10:01AM   9     Q.   WAS IT LESS THAN ABOUT 15 HOURS?

10:01AM   10    A.   I DON'T RECALL.

10:01AM   11    Q.   WELL, DIDN'T YOU EMAIL REPRESENTATIVES OF THE PROSECUTION

10:01AM   12    TEAM THE NEXT MORNING AFTER YOU RETURNED TO HOUSTON TO DISCUSS

10:01AM   13    THE SUBSTANCE OF YOUR TESTIMONY?

10:01AM   14    A.   I RECALL AN EMAIL, BUT I DON'T RECALL THE TIMELINE.

10:01AM   15    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 14223.

10:01AM   16    I'M SORRY, 14233.

10:01AM   17    A.   I DON'T HAVE THAT EXHIBIT.

10:02AM   18         THE COURT:  IT MIGHT NOT BE IN THE BINDER.

10:02AM   19         MR. DOWNEY:  IT PROBABLY IS NOT.  THANK YOU,

10:02AM   20    YOUR HONOR.

10:02AM   21    (PAUSE IN PROCEEDINGS.)

10:02AM   22         MR. DOWNEY:  YOUR HONOR, I'VE PASS THE UP

10:02AM   23    EXHIBIT 14233.  THERE ARE -- I'VE PASSED UP BOTH AN UNREDACTED

10:02AM   24    AND A REDACTED VERSION.  IT'S MY INTENTION TO INTRODUCE ONLY

10:03AM   25    THE REDACTED PORTION OF THE EMAIL.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6195

10:03AM   1          THE COURT:  ALL RIGHT.  DOES THE GOVERNMENT HAVE

10:03AM   2    THIS?  YOU HAVE THIS, MR. BOSTIC?

10:03AM   3          MR. BOSTIC:  I DO, YOUR HONOR.

10:03AM   4          MR. DOWNEY:  MAY I APPROACH THE WITNESS?

10:03AM   5          THE COURT:  YES.

10:03AM   6    BY MR. DOWNEY:

10:03AM   7    Q.   (HANDING.)

10:03AM   8         AND EXHIBIT 14233 IS AN EMAIL THAT YOU SENT TO

10:03AM   9    AGENT HERNANDEZ, IS IT NOT?

10:03AM  10    A.   YES.

10:03AM  11    Q.   AND THAT'S AGENT HERNANDEZ WHO IS SITTING RIGHT HERE AT

10:03AM  12    COUNSEL TABLE; CORRECT?

10:03AM  13    A.   CORRECT.

10:03AM  14    Q.   AND DESPITE THE FACT THAT YOU HAD BEEN TOLD NOT TO

10:03AM  15    COMMUNICATE WITH THE PROSECUTION TEAM ABOUT SUBSTANCE, YOU SENT

10:03AM  16    HER AN EMAIL WHICH DID JUST THAT; CORRECT?

10:03AM  17    A.   CORRECT.

10:03AM  18          MR. DOWNEY:  AND THAT EMAIL, WHICH I'LL INTRODUCE

10:03AM  19    THE REDACTED VERSION OF, WHICH IS 14233, I MOVE TO ADMIT.

10:04AM  20          MR. BOSTIC:  YOUR HONOR, I'D OBJECT TO THE

10:04AM  21    REDACTIONS.  I'M NOT SURE WHAT THE PURPOSE IS OF ADMITTING THE

10:04AM  22    EXHIBIT WITH 90 PERCENT REDACTED.

10:04AM  23          MR. DOWNEY:  FAIR ENOUGH.  YOU KNOW, YOUR HONOR,

10:04AM  24    I'LL WITHDRAW THE REQUEST TO ADMIT IT.

10:04AM  25    Q.   YOU ACKNOWLEDGE THAT YOU SENT AN EMAIL THE NEXT DAY AFTER

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6196

10:04AM  1    YOUR TESTIMONY; CORRECT?

10:04AM  2    A.   CORRECT.

10:04AM  3    Q.   AND YOU SENT IT TO AGENT HERNANDEZ; CORRECT?

10:04AM  4    A.   CORRECT.

10:04AM  5    Q.   AND YOU OFFERED SOME REFLECTIONS ON THE TESTIMONY THAT YOU

10:04AM  6    HAD GIVEN THE DAY BEFORE?

10:04AM  7    A.   CORRECT.

10:04AM  8    Q.   AND YOU DID THAT BECAUSE YOU WANTED TO GET SOME FEEDBACK

10:04AM  9    AND GUIDANCE AS TO HOW PEOPLE THOUGHT YOUR TESTIMONY WAS GOING;

10:04AM  10   RIGHT?

10:04AM  11   A.   INCORRECT.

10:04AM  12   Q.   OKAY.  NOW, THE GOVERNMENT REACTED TO THE FACT THAT YOU

10:04AM  13   HAD SENT THIS, THIS COMMUNICATION TO THEM, FORWARDING

10:04AM  14   INFORMATION AND DISCUSSING YOUR TESTIMONY, THEY CALLED YOU;

10:05AM  15   CORRECT?

10:05AM  16   A.   I DON'T RECALL.

10:05AM  17   Q.   AGENT HERNANDEZ CALLED YOU ON THE TELEPHONE.  YOU DON'T

10:05AM  18   RECALL?

10:05AM  19   A.   YES.

10:05AM  20   Q.   THIS WAS JUST LAST THURSDAY; RIGHT?

10:05AM  21   A.   CORRECT.

10:05AM  22   Q.   AND AGENT HERNANDEZ TOLD YOU DO NOT COMMUNICATE WITH THE

10:05AM  23   GOVERNMENT; CORRECT?

10:05AM  24   A.   CORRECT.

10:05AM  25   Q.   SHE SAID DO NOT CALL US; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6197

| | | |
|---|---|---|
| 10:05AM | 1 | A.   I DON'T RECALL WHAT SHE SAID, BUT THE GIST WAS WE CAN'T |
| 10:05AM | 2 | COMMUNICATE. |
| 10:05AM | 3 | Q.   RIGHT.  AND SHE SAID THAT SPECIFICALLY MEANS DO NOT CALL |
| 10:05AM | 4 | US; RIGHT? |
| 10:05AM | 5 | A.   COMMUNICATE, YES, IS A CALL, YES. |
| 10:05AM | 6 | Q.   AND DO NOT TEXT US; RIGHT? |
| 10:05AM | 7 | A.   YES. |
| 10:05AM | 8 | Q.   AND DO NOT EMAIL US; CORRECT? |
| 10:05AM | 9 | A.   I DON'T RECALL HER EXACT WORDS, BUT THE COMMUNICATION, AS |
| 10:05AM | 10 | I SAID, WAS WE CANNOT TALK. |
| 10:05AM | 11 | Q.   RIGHT. |
| 10:05AM | 12 | A.   AND WE CANNOT COMMUNICATE. |
| 10:05AM | 13 | Q.   AND YOU LEFT THAT -- WELL, IT WASN'T JUST TALK; RIGHT?  IT |
| 10:05AM | 14 | WAS DON'T SEND US AN EMAIL, DON'T TEXT US, DON'T SEND A CARRIER |
| 10:05AM | 15 | PIGEON.  YOU CANNOT COMMUNICATE WITH US; RIGHT? |
| 10:05AM | 16 | A.   CORRECT. |
| 10:05AM | 17 | Q.   AND SO YOU LEFT THAT CALL UNDERSTANDING THAT; CORRECT? |
| 10:06AM | 18 | A.   CORRECT. |
| 10:06AM | 19 | Q.   HOW LONG DID IT TAKE FROM THAT CALL UNTIL THE NEXT TIME |
| 10:06AM | 20 | THAT YOU EMAILED THE GOVERNMENT? |
| 10:06AM | 21 | A.   THERE WERE NO FURTHER EMAILS WITH ANYTHING SUBSTANTIVE. |
| 10:06AM | 22 | Q.   HOW LONG DID IT TAKE UNTIL YOU EMAILED THE GOVERNMENT |
| 10:06AM | 23 | AFTER THAT CALL? |
| 10:06AM | 24 | A.   MY RECOLLECTION IS THAT THERE'S AN EMAIL ABOUT TRAVEL |
| 10:06AM | 25 | ARRANGEMENTS. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6198

10:06AM  1    Q.   OKAY.  HOW LONG WAS THE EMAIL THAT YOU RECALL SENT TO THE

10:06AM  2    GOVERNMENT AFTER THE, THE COMMUNICATION FROM AGENT HERNANDEZ

10:06AM  3    NOT TO TALK TO THE GOVERNMENT?

10:06AM  4    A.   ARE YOU REFERRING TO MY ATTEMPTED COMMUNICATION ABOUT

10:06AM  5    TRAVEL ARRANGEMENTS?

10:06AM  6    Q.   I'M ASKING YOU HOW LONG IT WAS.

10:06AM  7    A.   I DON'T KNOW.  YOU'LL HAVE TO SHOW ME THE EXHIBIT.

10:06AM  8              THE COURT:  EXCUSE ME, EXCUSE ME.  ONE AT A TIME,

10:06AM  9    PLEASE.

10:06AM  10             THE WITNESS:  I DON'T KNOW.

10:06AM  11             MR. DOWNEY:  I'M JUST --

10:06AM  12             THE COURT:  THAT WAS HIS ANSWER, "I DON'T KNOW."

10:06AM  13   BY MR. DOWNEY:

10:06AM  14   Q.   YOU DON'T KNOW HOW LONG IT WAS AFTER YOU SENT AN EMAIL

10:06AM  15   AFTER THAT COMMUNICATION; RIGHT?

10:06AM  16   A.   I DON'T KNOW.

10:06AM  17   Q.   WAS IT YOUR UNDERSTANDING THAT THE NEXT MORNING YOU SENT

10:07AM  18   THE GOVERNMENT AN EMAIL AGAIN?

10:07AM  19   A.   YOU'RE GOING TO HAVE TO SHOW ME THE EXHIBIT.  I DON'T

10:07AM  20   KNOW.

10:07AM  21   Q.   OKAY.

10:07AM  22        MAY I APPROACH THE WITNESS, YOUR HONOR?

10:07AM  23             THE COURT:  YES.

10:07AM  24   BY MR. DOWNEY:

10:07AM  25   Q.   (HANDING.)

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6199

| | | |
|---|---|---|
| 10:07AM | 1 | DOES WHAT I'VE SHOWN YOU, WHICH IS EXHIBIT 14234, DOES |
| 10:08AM | 2 | THAT REFRESH YOUR RECOLLECTION AS TO HOW LONG IT TOOK YOU TO |
| 10:08AM | 3 | EMAIL THE GOVERNMENT AFTER AGENT HERNANDEZ HAD TOLD YOU NOT TO |
| 10:08AM | 4 | EMAIL THE GOVERNMENT? |
| 10:08AM | 5 | A.   AS I MENTIONED EARLIER, THIS EMAIL HAS NOTHING TO DO WITH |
| 10:08AM | 6 | THE CASE. |
| 10:08AM | 7 | Q.   WELL, DID THE GOVERNMENT VIEW IT THAT WAY? |
| 10:08AM | 8 | A.   I DON'T KNOW. |
| 10:08AM | 9 | Q.   WELL, THE GOVERNMENT CALLED YOU AFTER GETTING THIS |
| 10:08AM | 10 | COMMUNICATION; CORRECT? |
| 10:08AM | 11 | A.   CORRECT. |
| 10:08AM | 12 | Q.   AND THIS TIME IT WASN'T JUST AGENT HERNANDEZ; CORRECT? |
| 10:08AM | 13 | A.   CORRECT. |
| 10:08AM | 14 | Q.   MR. BOSTIC, THE LAWYER FOR THE GOVERNMENT, CALLED YOU AS |
| 10:08AM | 15 | WELL; RIGHT? |
| 10:08AM | 16 | A.   CORRECT. |
| 10:08AM | 17 | Q.   AND THEY TOLD YOU DO NOT COMMUNICATE WITH US AGAIN; RIGHT? |
| 10:08AM | 18 | A.   CORRECT. |
| 10:08AM | 19 | Q.   AND THAT WAS THE THIRD TIME THAT THE GOVERNMENT HAD TOLD |
| 10:08AM | 20 | YOU DO NOT COMMUNICATE WITH US ABOUT THE TESTIMONY THAT IS |
| 10:08AM | 21 | ONGOING IN JUDGE DAVILA'S COURT; RIGHT? |
| 10:08AM | 22 | A.   THIS COMMUNICATION HAS NOTHING TO DO WITH THE TESTIMONY OR |
| 10:08AM | 23 | THE CASE. |
| 10:08AM | 24 | Q.   IS IT UP TO YOU WHAT STUFF HAS TO DO WITH WHAT? |
| 10:08AM | 25 | A.   I'M A SMART GUY.  THIS HAS NOTHING TO DO WITH THE CASE. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6200

10:09AM   1    Q.   DID THEY AGREE WITH YOUR SMART JUDGMENT?

10:09AM   2              MR. BOSTIC:  OBJECTION.

10:09AM   3              THE WITNESS:  I DID THIS ON MY OWN VOLITION.

10:09AM   4              THE COURT:  EXCUSE ME, SIR.  THERE'S AN OBJECTION.

10:09AM   5              MR. BOSTIC:  CALLS FOR SPECULATION.  LACKS

10:09AM   6    FOUNDATION.

10:09AM   7              THE COURT:  OVERRULED.  OVERRULED.

10:09AM   8         BUT I WANT YOU TO ASK ANOTHER QUESTION, PLEASE.

10:09AM   9              MR. DOWNEY:  SURE.  SURE.  ALL RIGHT.

10:09AM   10   Q.   NOW, SIMILARLY, OVER THE WEEKEND YOU GOT A SUBPOENA FROM

10:09AM   11   THE DEFENSE, FROM OUR TEAM; RIGHT?

10:09AM   12   A.   I DID.

10:09AM   13   Q.   AND WE ASKED YOU TO BRING TO COURT TODAY THE ORIGINALS OF

10:09AM   14   EXHIBIT 14, WHICH ARE THE NOTES THAT MR. BOSTIC HAD USED TO

10:09AM   15   REFRESH YOUR TESTIMONY, REFRESH YOUR RECOLLECTION WHEN YOU WERE

10:09AM   16   TESTIFYING ON YOUR DIRECT TESTIMONY.

10:09AM   17        DO YOU RECALL THAT?

10:09AM   18   A.   I DO.

10:09AM   19   Q.   DID YOU BRING THE ORIGINALS OF THOSE NOTES?

10:09AM   20   A.   I DID.

10:09AM   21   Q.   OKAY.  WILL YOU AT THE BREAK PASS THOSE NOTES TO THE

10:09AM   22   COURTROOM DEPUTY SO THAT WE MIGHT HAVE A CHANCE TO INSPECT

10:09AM   23   THEM?

10:09AM   24   A.    IT IS MY ONLY COPY OF MY HANDWRITTEN NOTES.  I WOULD

10:09AM   25   PREFER NOT TO RELEASE THEM.  I HAVE NOT HAD AN OPPORTUNITY TO

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6201

10:09AM   1    TALK TO EITHER THE PROSECUTION OR THE JUDGE, WHETHER THAT'S

10:10AM   2    APPROPRIATE, WHAT I'M REQUIRED OR REQUESTED TO DO.

10:10AM   3    Q.   WELL, I GUARANTEE YOU SHE'S A RELIABLE PERSON TO PASS THE

10:10AM   4    DOCUMENT TO.

10:10AM   5         ARE YOU GOING TO COMPLY WITH THAT SUBPOENA?

10:10AM   6    A.   I DON'T UNDERSTAND THE PROCESS.  IF I PASS THEM TO HER, DO

10:10AM   7    I GET THESE NOTES BACK?  DO THEY MAKE COPIES?  I'D LIKE TO KNOW

10:10AM   8    THE PROCESS.

10:10AM   9    Q.   ALL RIGHT.  LET'S GO BACK TO TALKING ABOUT THE

10:10AM  10    COMMUNICATIONS THAT YOU HAD WITH THERANOS AND TO THE SECOND

10:10AM  11    INVESTMENT THAT YOU MADE IN THERANOS IN 2013, OKAY?

10:10AM  12    A.   OKAY.

10:10AM  13    Q.   NOW, IT'S, IT'S FAIR TO SAY THAT YOU HAD A HIGH DEGREE OF

10:10AM  14    FRUSTRATION WITH THERANOS'S LEVEL OF COMMUNICATION WITH YOU IN

10:10AM  15    THE PERIOD BETWEEN 2010 AND 2013; CORRECT?

10:10AM  16    A.   CORRECT.

10:10AM  17    Q.   YOU HAD COMMUNICATED WITH -- YOU HAD SENT EMAILS

10:11AM  18    COMPLAINING ABOUT IT TO TWO MEMBERS OF MANAGEMENT; CORRECT?

10:11AM  19    A.   I'M SORRY, WHO WERE THE TWO MEMBERS OF MANAGEMENT?

10:11AM  20    Q.   WELL, I WAS THINKING OF MS. HOLMES AND MR. BALWANI.

10:11AM  21    CORRECT?

10:11AM  22    A.   I DON'T KNOW IF THEY WERE CRITICISMS, BUT THEY WERE

10:11AM  23    REQUESTS FOR INFORMATION.

10:11AM  24    Q.   IN FACT, NOW THAT I THINK ABOUT IT, YOU SENT IT TO SEVERAL

10:11AM  25    OTHER PEOPLE AT THERANOS AS WELL; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6202

10:11AM  1   A.   NOT TO MY RECOLLECTION.

10:11AM  2   Q.   OKAY.  AND YOU HAD TRIED TO COMMUNICATE WITH -- SENT

10:11AM  3   COMMUNICATIONS TO MR. LUCAS; CORRECT?

10:11AM  4   A.   CORRECT.

10:11AM  5   Q.   AND YOU SENT COMMUNICATIONS TO SENATOR FRIST; CORRECT?

10:11AM  6   A.   I DO RECALL ONE OTHER PERSON AT THERANOS THAT I HAD

10:11AM  7   CONSTANT COMMUNICATION WITH, DANISE YAM, BECAUSE I WAS TRYING

10:11AM  8   TO CONVERT A STOCK CERTIFICATE INTO A DIFFERENT FAMILY NAME,

10:11AM  9   AND IT TOOK WELL OVER A YEAR AND MULTIPLE COMMUNICATIONS JUST

10:11AM 10   TO DO A SIMPLE TRANSACTION, WHICH ALSO RAISED A RED FLAG, WHY

10:11AM 11   CAN'T THEY TRANSFER A STOCK CERTIFICATE?  WHY DOES IT TAKE

10:11AM 12   MULTIPLE EMAILS AND A PERIOD OF WELL OVER A YEAR TO TRANSFER A

10:12AM 13   STOCK CERTIFICATE?

10:12AM 14   Q.   AND DID YOU GET THAT STOCK CERTIFICATE FROM MS. YAM AND

10:12AM 15   COMPLETE THAT TRANSACTION?

10:12AM 16   A.   EVENTUALLY.  I DON'T KNOW IF IT WAS DANISE OR SOMEONE ELSE

10:12AM 17   BECAUSE IT WAS KIND OF A REVOLVING DOOR OF PERSONNEL AT

10:12AM 18   THERANOS, BUT MY RECOLLECTION IS THAT I DID GET IT AND IT WAS

10:12AM 19   WELL OVER A YEAR AFTER I MADE THE REQUEST.

10:12AM 20   Q.   WELL, DANISE YAM WORKED AT THERANOS FOR ABOUT 13 YEARS,

10:12AM 21   DIDN'T SHE?

10:12AM 22   A.   I DON'T KNOW.

10:12AM 23   Q.   AND YOU COMMUNICATED WITH HER THROUGHOUT THAT PERIOD,

10:12AM 24   DIDN'T YOU?

10:12AM 25   A.   MY ONLY COMMUNICATION WAS ABOUT THE STOCK CERTIFICATES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6203

10:12AM  1    SO THERE WERE MULTIPLE COMMUNICATIONS WHERE THERE SHOULD HAVE

10:12AM  2    BEEN ONE.

10:12AM  3    Q.   OKAY.  BUT WHATEVER THE NUMBER OF COMMUNICATIONS WAS, YOU

10:12AM  4    WERE VERY FRUSTRATED WITH DEALING WITH THERANOS; IS THAT FAIR

10:12AM  5    TO SAY?

10:12AM  6    A.   THAT'S FAIR TO SAY.

10:12AM  7    Q.   OKAY.  AND THEN IN DECEMBER OF 2013, LO AND BEHOLD,

10:12AM  8    ANOTHER OPPORTUNITY AROSE FOR YOU TO INVEST IN THERANOS;

10:12AM  9    CORRECT?

10:12AM  10   A.   CORRECT.

10:12AM  11   Q.   NOW, DO YOU ACKNOWLEDGE THAT IN CONNECTION WITH THAT 2013

10:12AM  12   INVESTMENT, YOU NEVER SPOKE TO MS. HOLMES?  IS THAT FAIR?

10:12AM  13   A.   THERE WERE SOME CONVERSATIONS BEFORE WE MADE THE 2013

10:12AM  14   INVESTMENT RATIFYING THAT THE TECHNOLOGY WORKED AND THIS WAS

10:13AM  15   GROWTH CAPITAL.  THE RISK HAD BEEN TAKEN OUT OF THE COMPANY.

10:13AM  16   Q.   YOU DID NOT SPEAK TO MS. HOLMES BEFORE YOU MADE YOUR 2013

10:13AM  17   INVESTMENT IN THERANOS.

10:13AM  18        IS THAT TRUE OR FALSE?

10:13AM  19   A.   MY RECOLLECTION IS I TALKED TO SUNNY BALWANI.  I'D HAVE TO

10:13AM  20   REVIEW MY NOTES.  I DON'T RECALL IF I TALKED TO ELIZABETH.

10:13AM  21   Q.   OKAY.  YOU DON'T RECALL, AS YOU SIT HERE TODAY, SPEAKING

10:13AM  22   TO MS. HOLMES ABOUT YOUR 2013 INVESTMENT; RIGHT?

10:13AM  23   A.   THAT'S CORRECT.

10:13AM  24   Q.   OKAY.  YOU DO RECALL SPEAKING TO MR. BALWANI; CORRECT?

10:13AM  25   A.   YES, I DO.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6204

10:13AM  1   Q.   AND YOU KNOW THAT AT SOME POINT AFTER THE SERIES OF 2010

10:13AM  2   EXCHANGES WITH MS. HOLMES THAT SHE ACTUALLY HAD CEASED

10:13AM  3   COMMUNICATING WITH YOU DIRECTLY; CORRECT?

10:13AM  4   A.   I DON'T RECALL WHEN THE COMMUNICATIONS CEASED.

10:13AM  5   Q.   OKAY.  BUT YOU RECALL THAT THEY CEASED AT SOME POINT?

10:13AM  6   A.   IT'S A LITTLE CONFUSING BECAUSE THERE WERE SOME

10:14AM  7   COMMUNICATIONS AFTER 2013.  THERE WERE SOME CALLS AND SOME

10:14AM  8   COMMUNICATIONS.

10:14AM  9   Q.   YOU CAN'T PRECISELY DATE WHEN SHE --

10:14AM  10  A.   NO, I CANNOT.

10:14AM  11  Q.   OKAY.  NOW, I THINK YOU TESTIFIED DURING YOUR DIRECT

10:14AM  12  EXAMINATION THAT MR. BALWANI PROVIDED YOU SOME COMMUNICATIONS

10:14AM  13  WHEN HE SPOKE TO YOU THAT ENCOURAGED YOU TO INVEST IN THERANOS

10:14AM  14  IN 2013.

10:14AM  15       IS THAT FAIR TO SAY, OR IS --

10:14AM  16  A.   YES.

10:14AM  17  Q.   OKAY.  BUT IS IT ALSO FAIR TO SAY THAT DURING -- WELL, LET

10:14AM  18  ME ASK YOU, WAS -- THE COMMUNICATION WITH MR. BALWANI WAS ON

10:14AM  19  THE TELEPHONE; CORRECT?

10:14AM  20  A.   CORRECT.

10:14AM  21  Q.   DID YOU HAVE ANY PERSON-TO-PERSON MEETING WITH MR. BALWANI

10:14AM  22  IN THAT WINDOW?

10:14AM  23  A.   NO.

10:14AM  24  Q.   OKAY.  AND IS IT FAIR TO SAY THAT YOU HAD A COUPLE CALLS

10:14AM  25  WITH HIM?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6205

| | | |
|---|---|---|
| 10:14AM | 1 | A.   I DON'T RECALL THE NUMBER OF CALLS. |
| 10:14AM | 2 | Q.   OKAY.  BUT IN ANY EVENT, WHATEVER THE NUMBER OF CALLS WAS, |
| 10:14AM | 3 | HE DID NOT DURING THOSE CALLS DESCRIBE THERANOS'S ACTIVITIES AT |
| 10:15AM | 4 | ALL, DID HE? |
| 10:15AM | 5 | A.   HE CONFIRMED THAT THE TECHNOLOGY WORKED BECAUSE THAT'S THE |
| 10:15AM | 6 | QUESTION THAT I ASKED. |
| 10:15AM | 7 | Q.   HE DID NOT DESCRIBE THERANOS'S ACTIVITIES AT ALL DURING |
| 10:15AM | 8 | THAT CALL IN 2013 -- THOSE CALLS IN 2013? |
| 10:15AM | 9 | A.   I DON'T UNDERSTAND WHAT YOU MEAN "DESCRIBE THERANOS'S |
| 10:15AM | 10 | ACTIVITIES AT ALL." |
| 10:15AM | 11 | Q.   OKAY.  WELL, DO YOU RECALL TELLING THAT TO AGENTS OF THE |
| 10:15AM | 12 | FBI IN 2018? |
| 10:15AM | 13 | A.   DO YOU HAVE AN EXHIBIT THAT YOU CAN SHOW ME TO REFRESH MY |
| 10:15AM | 14 | RECOLLECTION? |
| 10:15AM | 15 | Q.   I DO.  WELL, I CAN TRY TO REFRESH YOUR RECOLLECTION. |
| 10:16AM | 16 | (HANDING.) |
| 10:16AM | 17 | I THINK THIS IS, YOUR HONOR, IN OUR NOTEBOOKS. |
| 10:16AM | 18 | THE COURT:  GREAT.  OKAY. |
| 10:16AM | 19 | MR. BOSTIC:  I'M SORRY, YOUR HONOR. |
| 10:16AM | 20 | CAN I KNOW WHAT EXHIBIT NUMBER? |
| 10:16AM | 21 | MR. DOWNEY:  YES.  IT'S 11014.  IT SHOULD BE 11014. |
| 10:16AM | 22 | DO YOU HAVE THAT? |
| 10:16AM | 23 | THE COURT:  IT'S IN THE BINDER. |
| 10:17AM | 24 | MR. DOWNEY:  DO YOU HAVE THAT? |
| 10:17AM | 25 | MR. BOSTIC:  YES. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6206

10:17AM   1      BY MR. DOWNEY:

10:17AM   2      Q.   I DON'T WANT YOU TO DESCRIBE WHAT IT IS THAT YOU'RE

10:17AM   3      LOOKING AT AT ALL.

10:17AM   4      A.   OKAY.

10:17AM   5      Q.   I'M JUST ASKING YOU -- I'D LIKE TO DIRECT YOUR ATTENTION

10:17AM   6      TO PAGE 4 OF THE EXHIBIT AND TO REVIEW THE PARAGRAPH THAT

10:17AM   7      BEGINS "BALWANI DID NOT."

10:17AM   8           DO YOU SEE THAT?

10:17AM   9      A.   YES.

10:17AM  10      Q.   PAGE 4.

10:17AM  11           DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID

10:17AM  12      NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS CALLS WITH YOU IN

10:17AM  13      2013?

10:18AM  14           (PAUSE IN PROCEEDINGS.)

10:18AM  15                THE WITNESS:   OKAY.   WHAT IS THE QUESTION?

10:18AM  16      BY MR. DOWNEY:

10:18AM  17      Q.   DOES YOUR REVIEW OF EXHIBIT 11014 REFRESH YOUR

10:18AM  18      RECOLLECTION THAT MR. BALWANI DID NOT DESCRIBE THERANOS'S

10:18AM  19      ACTIVITIES DURING YOUR CALLS WITH HIM IN 2013?

10:18AM  20      A.   THE PLAIN READING OF THIS --

10:18AM  21      Q.   I DON'T WANT YOU TO DESCRIBE THE DOCUMENT.   I -- THAT'S

10:18AM  22      IMPORTANT THAT YOU NOT DO THAT.

10:18AM  23      A.   I'M NOT GOING TO DESCRIBE THE DOCUMENT.

10:18AM  24           THE PLAIN READING OF THIS IMPLIES THAT I DID NOT DISCUSS

10:18AM  25      THE MOST SUBSTANTIVE QUESTION WITH SUNNY AT THE TIME, AND I

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023