No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXXV of LVII | ER-9836 to ER-10133

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6207

10:19AM    1    DON'T HAVE A CRYSTAL CLEAR RECOLLECTION, BUT KNOWING THE KIND

10:19AM    2    OF INVESTOR I AM AND THE QUESTIONS I ASK, I MOST LIKELY ASKED

10:19AM    3    HIM IF THE TECHNOLOGY WORKED.

10:19AM    4    Q.   WELL, I DON'T WANT TO YOU SPECULATE, MR. EISENMAN.

10:19AM    5    A.   I'M NOT GOING TO SPECULATE.  BUT IT SAYS HERE THAT HE

10:19AM    6    REFERRED ME TO, HE REFERRED ME --

10:19AM    7              THE COURT:  EXCUSE ME.  YOU'RE NOT TO READ THE

10:19AM    8    DOCUMENT.

10:19AM    9              THE WITNESS:  OH, OKAY.

10:19AM   10              THE COURT:  THIS IS JUST FOR YOUR RECOLLECTION.

10:19AM   11              MR. DOWNEY:  OKAY.

10:19AM   12    Q.   LET ME TRY TO ASK A QUESTION AND GET REORIENTED HERE.

10:19AM   13              THE COURT:  LET'S RESET.

10:19AM   14              THE WITNESS:  ALL RIGHT.

10:19AM   15              THE COURT:  AND IT GOES BY QUESTION AND ANSWER.

10:19AM   16              THE WITNESS:  OKAY.

10:19AM   17              THE COURT:  AND THE LAWYERS GET TO ASK THE QUESTIONS

10:19AM   18    AND IT'S YOUR PRIVILEGE TO ANSWER THEM.

10:19AM   19              THE WITNESS:  OKAY.

10:19AM   20              THE COURT:  SO, MR. DOWNEY, WHY DON'T YOU ASK YOUR

10:19AM   21    QUESTION.

10:19AM   22    BY MR. DOWNEY:

10:19AM   23    Q.   OKAY.  YOU UNDERSTAND I'VE PUT AN EXHIBIT IN FRONT OF YOU;

10:19AM   24    CORRECT?

10:19AM   25    A.   CORRECT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6208

| | | |
|---|---|---|
| 10:19AM | 1 | Q.   AND ALL I WANT TO KNOW IN CONNECTION WITH THE EXHIBIT THAT |
| 10:19AM | 2 | I'M SHOWING YOU IS WHETHER IT REFRESHES YOUR RECOLLECTION OF A |
| 10:19AM | 3 | FACT THAT I AM STATING.  OKAY? |
| 10:20AM | 4 | DO YOU UNDERSTAND THAT? |
| 10:20AM | 5 | A.   WHAT'S THE FACT THAT YOU'RE STATING? |
| 10:20AM | 6 | Q.   I HAVEN'T STATED IT YET. |
| 10:20AM | 7 | A.   OH, OKAY. |
| 10:20AM | 8 | Q.   I'M JUST DESCRIBING THE PROCESS SO THAT WE ENGAGE SENSIBLY |
| 10:20AM | 9 | IN A QUESTION AND ANSWER.  OKAY? |
| 10:20AM | 10 | A.   OKAY. |
| 10:20AM | 11 | Q.   DON'T -- I'M NOT GOING TO ASK YOU WHAT THE DOCUMENT SAYS |
| 10:20AM | 12 | OR WHAT OTHER THINGS IT MAKES YOU REFLECT ON.  OKAY? |
| 10:20AM | 13 | DOES EXHIBIT 11014 REFRESH YOUR RECOLLECTION THAT |
| 10:20AM | 14 | MR. BALWANI DID NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS |
| 10:20AM | 15 | CALLS WITH YOU REGARDING THE INVESTMENT IN 2013? |
| 10:20AM | 16 | A.   NOT EXACTLY. |
| 10:20AM | 17 | Q.   OKAY.  IS IT TRUE THAT YOU DID NOT TRY TO ASK MR. BALWANI |
| 10:20AM | 18 | QUESTIONS ABOUT THERANOS DURING THAT CALL? |
| 10:20AM | 19 | A.   PROBABLY NOT TRUE, BUT I DON'T HAVE A CRYSTAL |
| 10:20AM | 20 | RECOLLECTION. |
| 10:20AM | 21 | Q.   OKAY.  YOU DON'T HAVE A -- YOU DON'T RECALL RIGHT NOW |
| 10:20AM | 22 | ASKING HIM QUESTIONS -- |
| 10:20AM | 23 | A.   I JUST KNOW -- |
| 10:20AM | 24 | Q.   -- IN THAT CALL? |
| 10:20AM | 25 | A.   I JUST KNOW FROM THE WAY THAT I CONDUCT MY BUSINESS, THAT |

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6209

10:21AM   1    BEFORE I MAKE AN INVESTMENT, I ASK THE PERTINENT QUESTIONS, AND

10:21AM   2    THE PERTINENT QUESTION IS, DOES THE TECHNOLOGY WORK?

10:21AM   3              MR. DOWNEY:  WELL, YOUR HONOR, I'M SORRY TO DO THIS,

10:21AM   4    BUT I HAVE TO CONTINUE TO MOVE TO STRIKE ON THESE ANSWERS.  I'M

10:21AM   5    ASKING HIM IF HE RECALLS ASKING QUESTIONS.

10:21AM   6    Q.   DO YOU ACTUALLY RECALL THAT, OR DO YOU NOT KNOW ONE WAY OR

10:21AM   7    THE OTHER?

10:21AM   8    A.   I DON'T RECALL.

10:21AM   9    Q.   OKAY.  NOW, IS IT TRUE THAT AT THE TIME THAT YOU HAD THIS

10:21AM  10    CONVERSATION WITH MR. BALWANI, YOUR RELATIONSHIP WITH HIM HAD

10:21AM  11    BEEN VERY HOSTILE FOR A NUMBER OF YEARS?

10:21AM  12         IS THAT FAIR?

10:21AM  13    A.   THAT'S FAIR.

10:21AM  14    Q.   YOU HAD FREQUENTLY SENT EMAILS OR CALLED THE COMPANY;

10:21AM  15    CORRECT?

10:21AM  16    A.   CORRECT.

10:21AM  17    Q.   AND HE HAD RESPONDED TO THOSE EMAILS, OR IN RESPONSE TO

10:21AM  18    YOUR CALLS, SENT YOU EMAILS; CORRECT?

10:21AM  19    A.   HE HAD RESPONDED FICTITIOUSLY, SO HIS CREDIBILITY WAS LOW.

10:21AM  20    Q.   WELL, I'M JUST ASKING YOU IF HE RESPONDED.  THAT'S ALL THE

10:21AM  21    QUESTION THAT'S ON THE TABLE RIGHT NOW.  HE RESPONDED --

10:22AM  22    A.   THE ONE ISSUE THAT HE RESPONDED TO WAS FICTITIOUS.

10:22AM  23    Q.   WELL, DID HE RESPOND OR DID HE NOT RESPOND?

10:22AM  24    A.   TO WHAT?

10:22AM  25    Q.   TO THE EMAILS THAT YOU WERE SENDING TO THE COMPANY.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6210

10:22AM  1    A.   UM --

10:22AM  2    Q.   DID YOU SEND HIM AN EMAIL AND THEN HE HIT A REPLY AND SENT

10:22AM  3    AN EMAIL BACK TO YOU?

10:22AM  4    A.   FOR THE MOST PART THEY WERE IGNORED OR HE THREATENED THAT

10:22AM  5    THE NEXT EMAIL WOULD COME FROM COUNSEL.

10:22AM  6    Q.   EXACTLY.  SO HE HAD EITHER IGNORED YOU; CORRECT?

10:22AM  7    A.   IGNORED OR INTIMIDATED ME.

10:22AM  8    Q.   OR HE WAS HOSTILE TOWARD YOU; CORRECT?

10:22AM  9    A.   CORRECT.

10:22AM  10   Q.   NOW, YOU HAD GOTTEN THIS ANNOUNCEMENT FROM THERANOS THAT

10:22AM  11   YOU COULD INVEST AGAIN WITH THIS COMPANY WHERE THE CHIEF

10:22AM  12   OPERATING OFFICER WAS THREATENING YOU AND HOSTILE TO YOU.

10:22AM  13       IS THAT FAIR TO SAY?

10:22AM  14   A.   I'M NOT INVESTING BASED ON A PERSON.  I'M INVESTING BASED

10:22AM  15   ON THE PROGRESS OF A COMPANY.

10:22AM  16   Q.   WELL, YOU WERE -- YOU WERE NEVERTHELESS -- WOULD YOU AGREE

10:22AM  17   WITH ME THAT YOU HAD GOTTEN THIS COMMUNICATION OFFERING YOU THE

10:22AM  18   OPPORTUNITY TO INVEST AGAIN?

10:22AM  19       IS THAT FAIR?  I THINK THAT'S A YES OR NO QUESTION.

10:23AM  20   A.   I WAS GIVEN THE OPPORTUNITY TO INVEST AGAIN, THAT'S

10:23AM  21   CORRECT.

10:23AM  22   Q.   OKAY.  AND YOU ENDED UP, IN CONNECTION WITH THAT

10:23AM  23   INVESTMENT, SPEAKING WITH MR. BALWANI; CORRECT?

10:23AM  24   A.   CORRECT.

10:23AM  25   Q.   AND DURING THAT CONVERSATION, WHAT MR. BALWANI DID TELL

UNITED STATES COURT REPORTERS

**ER-9840**

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6211

10:23AM   1     YOU IS, YOU KNOW, YOU CAN LOOK AT THE INFORMATION THAT IS

10:23AM   2     AVAILABLE TO EVERYBODY ELSE; CORRECT?

10:23AM   3     A.   HE SAID LOOK AT THE -- YES, THE PUBLIC INFORMATION.

10:23AM   4     Q.   RIGHT.  AND ALSO IN CONNECTION WITH OFFERING YOU THE

10:23AM   5     OPPORTUNITY TO INVEST IN THERANOS, THEY ACTUALLY SENT A LONG

10:23AM   6     COMMUNICATION TO YOU AND TO ALL OTHER SHAREHOLDERS WHO WERE

10:23AM   7     BEING OFFERED THE SAME OPPORTUNITY TO INVEST; CORRECT?

10:23AM   8     A.   CORRECT.

10:23AM   9     Q.   AND YOU READ THAT COMMUNICATION PRESUMABLY; RIGHT?

10:23AM  10     A.   CORRECT.

10:23AM  11     Q.   NOW, DO YOU, DO YOU DENY THAT MR. BALWANI DISCOURAGED YOU

10:23AM  12     FROM INVESTING AT THAT TIME?

10:23AM  13     A.   NO.  HE WAS ENCOURAGING.

10:24AM  14     Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 12999.

10:24AM  15     A.   OKAY.

10:24AM  16     Q.   AND I, I WOULD JUST ASK YOU, IS THIS A SERIES OF

10:24AM  17     COMMUNICATIONS BETWEEN YOU AND MS. HOLMES WITH ONE OF THEM

10:24AM  18     INVOLVING -- SORRY.  A SERIES OF COMMUNICATIONS BETWEEN YOU AND

10:24AM  19     MR. BALWANI THAT ARE THEN SEEMINGLY FORWARDED TO MS. HOLMES?

10:25AM  20     IF YOU WOULD JUST LOOK AT THE TOP EMAIL AT THE BOTTOM -- THE

10:25AM  21     TOP EMAIL ON THE TOP OF PAGE 1.

10:25AM  22     A.   OKAY.

10:25AM  23     Q.   DO YOU RECOGNIZE THESE AS DISCUSSING YOUR INVESTMENT IN

10:25AM  24     THERANOS?

10:25AM  25     A.   YES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6212

10:25AM   1              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

10:25AM   2     EXHIBIT 12999.

10:25AM   3              MR. BOSTIC:  NO OBJECTION.

10:25AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:25AM   5         (DEFENDANT'S EXHIBIT 12999 WAS RECEIVED IN EVIDENCE.)

10:25AM   6     BY MR. DOWNEY:

10:25AM   7     Q.  IF YOU GO TO THE BOTTOM EMAIL ON PAGE 2, THERE'S AN EMAIL

10:25AM   8     FROM YOU TO MS. HOLMES AND TO MR. BALWANI, AND YOU SAY TO THEM

10:26AM   9     THAT "THIS IS THE SECOND GOOGLE ALERT I HAVE RECEIVED RECENTLY

10:26AM   10    THAT CLAIMS THAT THERANOS COULD BECOME OBSOLETE.  CAN WE HAVE A

10:26AM   11    BRIEF CATCH UP CALL THIS WEEK?  PLEASE DON'T IGNORE THIS

10:26AM   12    REQUEST."

10:26AM   13         DO YOU SEE THAT?

10:26AM   14    A.  YES.

10:26AM   15    Q.  AND THEN ABOVE THAT MR. BALWANI RESPONDED; RIGHT?

10:26AM   16         DO YOU SEE THAT, MR. BALWANI'S RESPONSE?

10:26AM   17    A.  YES.

10:26AM   18    Q.  AND HE TOLD YOU THAT HE THOUGHT THE EMAILS WERE BEYOND

10:26AM   19    RIDICULOUS; RIGHT?

10:26AM   20    A.  RIGHT.

10:26AM   21    Q.  AND THAT THERANOS COULD BECOME OBSOLETE; CORRECT?

10:26AM   22    A.  JUST A POINT OF INFORMATION.  THIS IS 2015 AND THE SECOND

10:26AM   23    ROUND WAS 2013; CORRECT?

10:26AM   24    Q.  NO, NO.  I UNDERSTAND THAT.  WE'RE GOING TO GET TO THAT IN

10:26AM   25    A MOMENT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                  6213

10:26AM   1        BUT HE TOLD YOU IN THIS EMAIL THAT THERANOS COULD BECOME

10:26AM   2    OBSOLETE; CORRECT?

10:26AM   3    A.   I JUST WANT TO MAKE SURE THAT I'VE GOT THE TIMELINE,

10:27AM   4    BECAUSE THIS IS TWO YEARS AFTER WE MADE THE SECOND INVESTMENT

10:27AM   5    AND THERE WAS ALL KINDS OF PUBLIC INFORMATION AND AN

10:27AM   6    ACKNOWLEDGEMENT FROM THE COMPANY THAT THE TECHNOLOGY WORKED.

10:27AM   7    Q.   WELL, DO YOU RECALL THAT YOUR SECOND INVESTMENT, YOUR 2013

10:27AM   8    INVESTMENT WAS AT THE END OF 2013, IN DECEMBER OF 2013?  DO YOU

10:27AM   9    RECALL THAT FROM YOUR TESTIMONY?

10:27AM  10    A.   YES.

10:27AM  11    Q.   AND YOU SEE THAT THIS EMAIL IS FROM JANUARY OF 2015;

10:27AM  12    CORRECT?

10:27AM  13    A.   CORRECT.

10:27AM  14    Q.   SO THIS IS ABOUT, YOU KNOW, A LITTLE OVER 12 MONTHS AFTER

10:27AM  15    YOU'VE MADE THAT INVESTMENT; CORRECT?

10:27AM  16    A.   CORRECT.

10:27AM  17    Q.   AND IF YOU LOOK AT THE SECOND PARAGRAPH HERE, DO YOU SEE

10:27AM  18    MR. BALWANI REFERRED BACK TO THE CONVERSATIONS THAT YOU HAD HAD

10:27AM  19    IN CONNECTION WITH THAT INVESTMENT?

10:27AM  20        DO YOU SEE THAT?

10:27AM  21    A.   YES.

10:27AM  22    Q.   AND HE SAYS, "YOU CONTINUE TO BOMBARD US WITH EMAILS AND

10:27AM  23    PHONE CALLS EVEN THOUGH JUST 12 SHORT MONTHS AGO I SPOKE WITH

10:27AM  24    YOU IN DETAIL THAT YOU WILL NOT GET ANY UPDATES."

10:28AM  25        DO YOU SEE THAT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6214

10:28AM   1      A.   YES.

10:28AM   2      Q.   AND DO YOU RECALL HIM, AT THE END OF 2013, TELLING YOU YOU

10:28AM   3      WOULD NOT GET ANY UPDATES BEFORE YOU MADE THE DECISION TO

10:28AM   4      INVEST IN THERANOS?

10:28AM   5      A.   I DON'T RECALL HIM SAYING THAT I WOULD NOT GET ANY

10:28AM   6      PROSPECTIVE UPDATES AFTER MY SECOND INVESTMENT.

10:28AM   7      Q.   OKAY.  AND THEN HE GOES ON TO SAY THAT YOU SHOULDN'T

10:28AM   8      INVEST.

10:28AM   9           DO YOU SEE THAT?

10:28AM  10      A.   I THINK IT'S TOO LATE.  WE ALREADY INVESTED.  WE'RE NOT

10:28AM  11      GOING TO INVEST AGAIN.

10:28AM  12      Q.   WELL, HE'S REFERRING BACK TO A CONVERSATION THAT HE HAD

10:28AM  13      WITH YOU IN DECEMBER OF 2013.

10:28AM  14           I'M ASKING IF YOU RECALL HIM TELLING YOU IN THAT

10:28AM  15      DECEMBER 2013 CONVERSATION THAT YOU SHOULDN'T INVEST?

10:28AM  16      A.   CAN YOU SHOW ME AN EXHIBIT TO REFRESH MY MEMORY?

10:28AM  17      Q.   I AM SHOWING YOU AN EXHIBIT.  I AM ASKING YOU IF WHAT HE

10:28AM  18      TOLD YOU IN THIS EXHIBIT IS SOMETHING THAT YOU RECALL HAPPENING

10:28AM  19      OR THAT YOU DON'T RECALL HAPPENING?

10:28AM  20      A.   WELL, THIS IS REFERRING TO SOMETHING IN 2013, AND UNLESS

10:29AM  21      YOU SHOW ME AN EXHIBIT FROM 2013, I DON'T RECALL.

10:29AM  22      Q.   OKAY.  AND THAT HE ALSO GOES ON TO SAY THAT HE TOLD YOU 12

10:29AM  23      SHORT MONTHS AGO THAT MANAGEMENT WOULD NOT BE SPENDING ANY TIME

10:29AM  24      WITH YOU OR PROVIDING UPDATES OR RESPONDING TO EMAILS ABOUT

10:29AM  25      OPERATION STRATEGY AND DETAILS.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6215

10:29AM   1          DO YOU SEE THAT?

10:29AM   2      A.   YEAH.  THAT'S A LIE.

10:29AM   3      Q.   YOU DON'T RECALL HIM TELLING YOU THAT?

10:29AM   4      A.   NO, HE DID NOT TELL ME THAT.

10:29AM   5      Q.   OKAY.

10:29AM   6      A.   AND HE WOULDN'T TELL ME THAT.  THAT'S RIDICULOUS.  SORRY.

10:29AM   7      Q.   AND YOU SEE ABOVE AT THE VERY TOP OF 12999 THAT HE

10:29AM   8  FORWARDED THIS EMAIL ON TO MS. HOLMES.

10:29AM   9          DO YOU SEE THAT?

10:29AM  10      A.   I DO.

10:29AM  11      Q.   OKAY.  AND JUST BELOW WHERE HE FORWARDED IT, HE SAID,

10:29AM  12  "SUNNY,

10:29AM  13          "IT WASN'T A FIRM COMMITMENT, ONLY A COURTESY."

10:29AM  14          AND THEN YOU CONTINUE TO ASK FOR UPDATES AND SAY THAT

10:30AM  15  YOU'VE BEEN PATIENT.

10:30AM  16          DO YOU SEE THAT?

10:30AM  17      A.   YES.

10:30AM  18      Q.   DID YOU DISPUTE ANY OF THE OTHER THINGS THAT HE SAID IN

10:30AM  19  THE EMAIL?  DID YOU DISPUTE THAT HE TOLD YOU THAT YOU SHOULDN'T

10:30AM  20  INVEST?

10:30AM  21      A.   AGAIN, YOU'RE GOING TO HAVE TO SHOW ME AN EXHIBIT THAT HE

10:30AM  22  INDICATED THAT I SHOULDN'T INVEST.  I DON'T RECALL.

10:30AM  23      Q.   WELL, LET'S FOCUS ON EXHIBIT 12999.  THAT'S THE EXHIBIT

10:30AM  24  THAT WE'RE LOOKING AT.

10:30AM  25      A.   THIS IS FROM 2015, AND YOU'RE ASKING ME ABOUT SOMETHING

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6216

10:30AM   1    THAT HAPPENED IN 2013.

10:30AM   2    Q.   I'M ASKING YOU, MR. EISENMAN, IF IN THIS EMAIL YOU

10:30AM   3    DISPUTED THE PRIOR EMAIL WHERE MR. BALWANI TOLD YOU THAT HE HAD

10:30AM   4    DISCOURAGED YOU FROM INVESTING IN 2013?

10:30AM   5    A.   WELL, AGAIN, I DON'T RECALL HIM DISCOURAGING ME.  IF YOU

10:30AM   6    SHOW ME AN EXHIBIT, IT MIGHT REFRESH MY MEMORY.

10:30AM   7    Q.   IS THERE ANY RESPONSE IN THE EMAIL CHAIN WHERE HE MADE

10:30AM   8    THAT STATEMENT TO YOU WHERE YOU SAY, THAT'S NOT TRUE, YOU

10:30AM   9    DIDN'T DISCOURAGE ME FROM INVESTING, IN SUBSTANCE?

10:30AM  10    A.   I CAN'T ANSWER THE QUESTION BECAUSE YOU'RE ASKING ME

10:31AM  11    SOMETHING THAT I DON'T RECALL UNLESS YOU SHOW ME AN EXHIBIT.

10:31AM  12    Q.   WELL, LOOK AT EXHIBIT 12999 AND SEE IF YOU SEE ANYTHING IN

10:31AM  13    THERE WHERE YOU DISPUTE THAT MR. BALWANI --

10:31AM  14    A.   DO YOU WANT ME TO JUST LOOK AT THE MONITOR OR LOOK AT THE

10:31AM  15    WHOLE CHAIN?

10:31AM  16    Q.   YOU CAN LOOK AT THE WHOLE CHAIN.  WHATEVER YOU FEEL MORE

10:31AM  17    COMFORTABLE WITH.

10:31AM  18    A.   OKAY.  PLEASE REPEAT THE QUESTION.

10:31AM  19    Q.   DID YOU SEE ANYTHING IN EXHIBIT 12999 IN WHICH YOU

10:31AM  20    DISPUTED MR. BALWANI'S STATEMENT THAT HE HAD DISCOURAGED YOU

10:31AM  21    FROM INVESTING IN 2013?

10:31AM  22    A.   I DON'T SEE ANYTHING IN THIS EXHIBIT WHERE HE DISCOURAGES

10:31AM  23    ME FROM INVESTING.  CAN YOU POINT TO THE LANGUAGE?

10:32AM  24    Q.   AND IS IT FAIR TO SAY, MR. EISENMAN, THAT YOU DID NOT

10:32AM  25    RESPOND TO OR DISPUTE AT ALL -- WHEN MR. BALWANI MADE THAT

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6217

10:32AM  1    STATEMENT TO YOU, YOU DID NOT DISPUTE HIS STATEMENT THAT HE HAD

10:32AM  2    DISCOURAGED YOU FROM INVESTING --

10:32AM  3    A.   CAN YOU SHOW ME THE STATEMENT WHERE HE DISCOURAGED ME FROM

10:32AM  4    INVESTING?  MAYBE I'M NOT SEEING IT.  IS IT ON THIS EXHIBIT?

10:32AM  5    Q.   I THINK, MR. EISENMAN, I THINK YOU'RE HAVING TROUBLE

10:32AM  6    FOLLOWING ME.

10:32AM  7         LET ME SHOW YOU AGAIN THE EMAIL AT THE MIDDLE OF PAGE 2,

10:32AM  8    WHICH IS AN EMAIL FROM MR. BALWANI TO YOU AT -- ON JANUARY 21ST

10:32AM  9    AT 9:18 A.M.

10:32AM 10         DO YOU SEE THAT?

10:32AM 11    A.   YES.

10:32AM 12    Q.   LET'S LOOK AT THE SECOND PARAGRAPH, WHICH WE LOOKED AT

10:32AM 13    BEFORE, AND IN THE SECOND PARAGRAPH DO YOU SEE THAT MR. BALWANI

10:32AM 14    BEGINS BY SAYING, "YOU CONTINUE TO BOMBARD US WITH EMAILS AND

10:32AM 15    PHONE CALLS"?

10:33AM 16         DO YOU SEE THAT?

10:33AM 17    A.   YES.

10:33AM 18    Q.   AND THEN HE GOES ON TO SAY, "EVEN THOUGH JUST 12 SHORT

10:33AM 19    MONTHS AGO."

10:33AM 20         DO YOU SEE THAT?

10:33AM 21    A.   YES, I DO.  YEAH, THIS IS A DISCONNECT BECAUSE HE NEVER

10:33AM 22    DISCOURAGED ME FROM INVESTING.  THIS IMPLIES THAT HE

10:33AM 23    DISCOURAGED ME, AND UNLESS YOU CAN SHOW ME SOMETHING FROM 2013

10:33AM 24    TO REFRESH MY RECOLLECTION, I DON'T HAVE ANY RECOLLECTION.

10:33AM 25         I THINK HE WAS MOST ENCOURAGING AT THE TIME, NOT

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6218

10:33AM  1    DISCOURAGING.

10:33AM  2              MR. DOWNEY:  YOUR HONOR, I MOVE TO STRIKE EVERYTHING

10:33AM  3    AFTER THE FIRST PHRASE, IF I MIGHT?

10:33AM  4              THE COURT:  GIVE ME JUST A MOMENT, PLEASE.

10:33AM  5         (PAUSE IN PROCEEDINGS.)

10:33AM  6              THE COURT:  THE QUESTION WAS, "AND THEN HE GOES ON

10:33AM  7    TO SAY 'EVEN THOUGH JUST 12 MONTHS AGO.'  DO YOU SEE THAT?

10:33AM  8         "YES, I DO."

10:33AM  9         EVERYTHING AFTER "YES, I DO" IS STRICKEN.

10:34AM 10    BY MR. DOWNEY:

10:34AM 11    Q.   LET ME TRY TO SET THE TABLE SO THAT YOU'RE NOT DEPRIVED OF

10:34AM 12    SAYING SOMETHING THAT YOU WANT TO SAY.

10:34AM 13         I UNDERSTAND THAT YOUR TESTIMONY TODAY IS THAT MR. BALWANI

10:34AM 14    DID NOT DISCOURAGE YOU FROM INVESTING.  RIGHT?

10:34AM 15    A.   IN 2013, NO, HE DID NOT DISCOURAGE ME.

10:34AM 16    Q.   OKAY.  I'M ASKING YOU ABOUT WHAT HAPPENED DURING THE

10:34AM 17    PERIOD WHEN YOU WERE AN INVESTOR IN THERANOS.  OKAY?

10:34AM 18    A.   2015?

10:34AM 19    Q.   YEAH.

10:34AM 20    A.   OKAY.

10:34AM 21    Q.   AND IN 2015, MR. BALWANI SENT YOU THIS EMAIL; CORRECT?

10:34AM 22    A.   CORRECT.

10:34AM 23    Q.   AND MY QUESTION TO YOU IS THAT, DID YOU RESPOND TO THIS

10:34AM 24    EMAIL BY SAYING, THAT'S NOT TRUE, YOU DIDN'T DISCOURAGE ME FROM

10:34AM 25    INVESTING?

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6219

10:34AM   1    A.   ARE YOU ASKING ME TO READ THE EXHIBIT AND THAT'S WHAT I

10:34AM   2    RESPONDED?

10:34AM   3    Q.   I'M ASKING YOU IF YOU SEE ANY DISPUTE WITH MR. BALWANI'S

10:34AM   4    CHARACTERIZATION OF WHAT HAPPENED.

10:34AM   5    A.   OH, YEAH, THIS IS A MISCHARACTERIZATION.  THAT'S WHAT

10:34AM   6    YOU'RE ASKING ME.

10:34AM   7    Q.   OKAY.  AND YOU DID NOT DISPUTE IT AT THE TIME.  IS THAT

10:34AM   8    WHAT YOU'RE TRYING TO AVOID SAYING?

10:34AM   9    A.   I DID NOT DISPUTE WHAT?

10:35AM  10    Q.   YOU DID NOT DISPUTE IN THIS EMAIL IN 2015 THAT MR. BALWANI

10:35AM  11    HAD DISCOURAGED YOU FROM INVESTING PRIOR TO THE TIME THAT YOU

10:35AM  12    MADE YOUR INVESTMENT IN 2013?

10:35AM  13    A.   YEAH.  TO REPEAT, HE DID NOT DISCOURAGE ME AT THE TIME OF

10:35AM  14    THE INVESTMENT IN 2013.  HE WAS MOST ENCOURAGING.

10:35AM  15    Q.   OKAY.  OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 1371.

10:35AM  16         THE COURT:  MR. DOWNEY, I WONDER IF WE SHOULD TAKE

10:35AM  17    OUR MORNING BREAK NOW BEFORE WE MOVE INTO ANOTHER EXHIBIT?

10:35AM  18         MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

10:35AM  19         THE COURT:  LET'S DO THAT.

10:35AM  20    LADIES AND GENTLEMEN, LET'S TAKE OUR MORNING BREAK.  IT

10:35AM  21    WILL BE ABOUT 30 MINUTES.  IT WILL BE ABOUT 30 MINUTES.

10:35AM  22         THE WITNESS:  WILL THERE BE A LATER BREAK FOR LUNCH,

10:35AM  23    OR IS THIS AN OPPORTUNITY --

10:35AM  24         THE COURT:  WE'RE GOING TO END AT 1:00 O'CLOCK

10:35AM  25    TODAY.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6220

10:35AM    1                    THE WITNESS:  OH, OKAY.

10:35AM    2                    THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.

10:35AM    3            COUNSEL, PLEASE REMAIN FOR JUST A MOMENT.

10:36AM    4            (JURY OUT AT 10:36 A.M.)

10:36AM    5                    THE COURT:  THANK YOU.  PLEASE BE SEATED.  THE

10:36AM    6    RECORD SHOULD REFLECT THAT THE JURY HAS LEFT.

10:36AM    7            MR. EISENMAN, YOU CAN LEAVE AS WELL.

10:36AM    8                    MR. DOWNEY:  YOUR HONOR, BEFORE MR. EISENMAN LEAVES,

10:36AM    9    DO YOU WANT TO GIVE HIM ANY DIRECTION?

10:36AM   10                    THE COURT:  I WANT TO TALK TO COUNSEL FIRST.

10:36AM   11                    MR. DOWNEY:  OKAY.  THANK YOU.

10:36AM   12                    THE COURT:  MR. EISENMAN, IF YOU WOULD LEAVE THE

10:36AM   13    COURTROOM FOR JUST A MOMENT.  IF YOU WOULD STAY OUTSIDE FOR

10:36AM   14    JUST A MOMENT, I MAY WANT TO TALK TO YOU A LITTLE BIT.

10:36AM   15                    THE WITNESS:  OKAY.

10:36AM   16                    THE COURT:  AND WE'LL CALL YOU BACK IN.

10:36AM   17                    THE WITNESS:  THANK YOU.

10:36AM   18                    THE COURT:  YOU'RE WELCOME.

10:37AM   19            ALL RIGHT.  ALL COUNSEL ARE PRESENT.  OUR JURY HAS LEFT.

10:37AM   20    THE WITNESS HAS LEFT THE COURTROOM.

10:37AM   21            DO YOU WANT TO EXCUSE YOUR CLIENT FOR THIS DISCUSSION, OR

10:37AM   22    DO YOU WANT TO TALK FOR JUST A MOMENT?  WHATEVER YOU WOULD LIKE

10:37AM   23    TO DO.

10:37AM   24                    MR. DOWNEY:  LET ME JUST -- MAY WE JUST SPEAK FOR

10:37AM   25    ONE MOMENT, YOUR HONOR?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                        6221

10:37AM  1              THE COURT:  YES.  OF COURSE.

10:37AM  2              MR. DOWNEY:  YOUR HONOR, WE'VE HAD THE OPPORTUNITY

10:37AM  3      TO CONSULT AND THAT'S FINE.

10:37AM  4              THE COURT:  ALL RIGHT.  THANK YOU.

10:37AM  5          WITH COUNSEL'S CONSENT, MS. HOLMES HAS STEPPED OUT.  ALL

10:37AM  6      OTHER PARTIES ARE PRESENT.

10:37AM  7          THIS IS REGARDING THE SUBPOENA ISSUE.

10:37AM  8              MR. DOWNEY:  YES.

10:37AM  9              THE COURT:  AND IT SOUNDS LIKE YOU ISSUED A

10:37AM 10      SUBPOENA, MR. DOWNEY.  THE NOTES OF MR. EISENMAN APPARENTLY ARE

10:38AM 11      HERE, HE HAS THEM, AND YOU WOULD LIKE THEM SUBMITTED TO THE

10:38AM 12      COURT.

10:38AM 13          TELL ME WHAT YOU WOULD LIKE TO HAVE.

10:38AM 14              MR. DOWNEY:  YES, YOUR HONOR.  THANK YOU.

10:38AM 15          WHAT HE WAS SUBPOENAED FOR WAS AN ORIGINAL COPY OF THE

10:38AM 16      NOTES THAT HE PROVIDED.  THOSE EXHIBITS ARE -- A COPY OF THOSE

10:38AM 17      NOTES IS ACTUALLY MARKED AS EXHIBIT 14, AND WE WOULD LIKE JUST

10:38AM 18      THE OPPORTUNITY TO INSPECT THE ORIGINAL OF THE NOTES.

10:38AM 19              THE COURT:  OKAY.  THANK YOU.

10:38AM 20          MR. BOSTIC?

10:38AM 21              MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

10:38AM 22          THE GOVERNMENT WOULD LIKE AN OPPORTUNITY TO INSPECT

10:38AM 23      WHATEVER IS PROVIDED TO THE DEFENSE.

10:38AM 24              THE COURT:  HOW SHOULD WE -- LET'S TALK ABOUT THE

10:38AM 25      PROTOCOL OF THAT THEN.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6222

10:38AM  1          I'M HAPPY TO LET YOU DO THAT.  IS THIS THE TIME THAT YOU

10:38AM  2    SHOULD DO THAT THEN DURING THIS BREAK?

10:38AM  3          MR. DOWNEY:  I THINK IT WOULD PROBABLY BE BEST IN

10:38AM  4    CASE WE FINISH WITH THIS WITNESS TODAY.

10:38AM  5          THE COURT:  RIGHT.  OKAY.  SO LET'S CALL HIM BACK.

10:38AM  6    I'LL TELL HIM THAT, MR. EISENMAN, PARDON ME, THAT I'LL --

10:38AM  7    PURSUANT TO THE SUBPOENA, THAT IF HE COULD LODGE HIS NOTES WITH

10:38AM  8    OUR COURTROOM DEPUTY -- AND THIS IS NOT FOR PHOTOCOPYING.  THIS

10:39AM  9    IS JUST FOR COUNSEL TO REVIEW; IS THAT CORRECT?

10:39AM 10          MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.  I THINK WE

10:39AM 11    HAVE -- I THINK, UNLESS MR. BOSTIC AND I ARE BOTH MISTAKEN, I

10:39AM 12    THINK WE HAVE A PHOTOCOPY.

10:39AM 13          MR. BOSTIC:  THAT'S MY UNDERSTANDING.

10:39AM 14          THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO DO THAT

10:39AM 15    HERE IN THE COURTROOM?  WOULD YOU LIKE ME TO PROVIDE YOU A

10:39AM 16    SPACE TO DO THAT WHERE THE TWO OF YOU CAN DO THAT PRIVATELY?

10:39AM 17          MAYBE I CAN OFFER YOU OUR SMALL ANTE ROOM BEHIND HERE FOR

10:39AM 18    THAT PURPOSE.

10:39AM 19          MR. DOWNEY:  EITHER IS FINE, YOUR HONOR.

10:39AM 20          MR. BOSTIC:  WHATEVER WORKS BEST.

10:39AM 21          THE COURT:  LET'S HAVE YOU DO IT THE BACK.  I THINK

10:39AM 22    THAT MIGHT BE MORE ADVANTAGEOUS.

10:39AM 23          LET'S CALL MR. EISENMAN IN, PLEASE.

10:39AM 24          ANYTHING FURTHER BEFORE HE COMES BACK IN?

10:39AM 25          MR. DOWNEY:  NO, YOUR HONOR.

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6223

10:39AM   1              MR. BOSTIC:  NO, YOUR HONOR.

10:39AM   2              THE COURT:  AND THEN THEY'LL BE RETURNED BACK TO HIM

10:39AM   3      AFTER THE REVIEW.

10:39AM   4              MR. DOWNEY:  IT DEPENDS ON WHAT WE SEE IN THE

10:39AM   5      REVIEW.  IF WE WANT TO RETAIN THEM OR HAVE FURTHER REVIEW BY AN

10:39AM   6      EXPERT, WE'LL CERTAINLY APPRISE THE COURT.

10:39AM   7              THE COURT:  ALL RIGHT.

10:39AM   8         THANK YOU FOR COMING BACK, MR. EISENMAN.

10:40AM   9         I JUST WANT TO LET YOU KNOW, YOU DID BRING YOUR NOTES

10:40AM  10      PURSUANT TO THE SUBPOENA.  YOU HAVE A FOLDER IN YOUR HAND.

10:40AM  11      THANK YOU FOR THAT.

10:40AM  12         WHAT I'M GOING TO ASK YOU TO DO IS TO LODGE THEM WITH OUR

10:40AM  13      COURTROOM DEPUTY NOW.

10:40AM  14         LET ME TELL YOU WHAT IS GOING TO HAPPEN, SIR, WITH YOUR

10:40AM  15      NOTES.

10:40AM  16         I HAVE AGREED TO HAVE THE LAWYERS, BOTH SIDES, REVIEW THE

10:40AM  17      NOTES, AND THEY'RE GOING TO STEP INTO AN ANTE ROOM BEHIND ME

10:40AM  18      DURING OUR BREAK, AND THEY'RE JUST GOING TO REVIEW THOSE NOTES

10:40AM  19      WITH WHAT THEY HAVE.

10:40AM  20         MY ANTICIPATION IS THAT THE NOTES WILL BE RETURNED TO YOU.

10:40AM  21         HOWEVER, I WILL HAVE FURTHER DISCUSSION WITH THE LAWYERS

10:40AM  22      PRIOR TO THAT HAPPENING, AND I WILL INFORM YOU AS TO WHAT NEXT

10:40AM  23      IS GOING TO HAPPEN WITH THE NOTES.

10:40AM  24         ALL RIGHT, SIR?  YOU HAVE THOSE WITH YOU?

10:40AM  25              THE WITNESS:  YES.

                              EISENMAN CROSS BY MR. DOWNEY (RES.)                    6224

10:40AM   1              THE COURT:  GREAT.  WHY DON'T YOU BRING THOSE

10:40AM   2     FORWARD.  YOU CAN HAND THEM TO OUR COURTROOM DEPUTY HERE.  I

10:40AM   3     APPRECIATE THAT.  AND THERE'S A FOLDER.

10:40AM   4              THE WITNESS:  (HANDING.)

10:40AM   5              THE COURT:  THANK YOU, AND WE'LL BE ON A BREAK NOW.

10:40AM   6              THE WITNESS:  OKAY.

10:40AM   7              THE COURT:  AND WE'LL LET YOU KNOW -- THIS MAY

10:40AM   8     EXTEND LONGER THAN 30 MINUTES.  I DON'T KNOW.  BUT WE'LL

10:41AM   9     CERTAINLY LET YOU KNOW WHEN YOU CAN COME BACK.

10:41AM  10          THANK YOU, SIR.

10:41AM  11              THE WITNESS:  OKAY.  THANK YOU.

10:41AM  12              THE COURT:  YOU'RE WELCOME.

10:41AM  13          THE RECORD SHOULD REFLECT THAT THE WITNESS HAS LEFT THE

10:41AM  14     COURTROOM.

10:41AM  15          ANYTHING ELSE BEFORE WE BREAK, COUNSEL?

10:41AM  16              MR. BOSTIC:  NO, YOUR HONOR.

10:41AM  17              MR. DOWNEY:  NO, YOUR HONOR.

10:41AM  18              THE COURT:  ALL RIGHT.  THANK YOU.

10:41AM  19          THE NOTES ARE HERE.  OUR COURTROOM DEPUTY, MS. DIBBLE,

10:41AM  20     WILL ESCORT YOU TO THE ROOM BEHIND ME WHERE COUNSEL CAN REVIEW

10:41AM  21     THOSE NOTES, AND THEN YOU CAN LET ME KNOW IF THERE'S ANYTHING

10:41AM  22     ELSE WE NEED TO DO.

10:41AM  23              MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:41AM  24              MR. DOWNEY:  THANK YOU, YOUR HONOR.

10:41AM  25          (RECESS FROM 10:41 A.M. UNTIL 11:21 A.M.)

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6225

11:21AM  1              THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

11:21AM  2      ARE PRESENT.  MS. HOLMES IS PRESENT.

11:21AM  3          WE'RE OUTSIDE OF THE PRESENCE OF THE JURY AND THE WITNESS.

11:21AM  4          COUNSEL, YOU'VE HAD AN OPPORTUNITY TO REVIEW THE NOTES?

11:21AM  5              MR. DOWNEY:  WE DID, YOUR HONOR.

11:21AM  6              MR. BOSTIC:  YES, YOUR HONOR.

11:21AM  7              THE COURT:  ANYTHING YOU WANT TO TALK ABOUT?

11:21AM  8              MR. DOWNEY:  YES, THERE IS, YOUR HONOR.

11:21AM  9          I WANTED TO ASK IF THE COURT WOULD DO ONE OF TWO THINGS.

11:21AM 10      I GUESS I WOULD PREFER THE FIRST OPTION, BUT WE'LL TAKE THE

11:21AM 11      SECOND OPTION.

11:21AM 12          AS I SUSPECTED, THERE ARE SOME INDICATIONS IN THE NOTES

11:21AM 13      THAT THE NOTES ARE NOT WHAT MR. EISENMAN DESCRIBED ON HIS

11:21AM 14      DIRECT EXAMINATION AS BEING, YOU KNOW, CONTEMPORANEOUS NOTES OF

11:22AM 15      CONVERSATIONS THAT HE HAD WITH MS. HOLMES.  AT CERTAIN

11:22AM 16      IMPORTANT PLACES IN THE NOTES, ADDITIONAL INFORMATION HAS BEEN

11:22AM 17      INSERTED IN A DIFFERENT COLORED INK.

11:22AM 18          FOR EXAMPLE, THERE'S ONE EXAMPLE, I THINK IT'S ON PAGE 7

11:22AM 19      OF THE EXHIBIT, WHERE THERE'S A LIST OF PHARMACEUTICAL

11:22AM 20      COMPANIES THAT HAVE BEEN INSERTED IN BLUE INK WHEN THE

11:22AM 21      REMAINDER OF THE DOCUMENT IS IN BLACK INK.

11:22AM 22          NOW, ON DIRECT EXAMINATION, YOUR HONOR WILL RECALL THAT

11:22AM 23      MR. EISENMAN TESTIFIED ABOUT HOW IMPORTANT INFORMATION WAS THAT

11:22AM 24      MS. HOLMES WAS PROVIDING HIM ABOUT THE INVESTMENT, THE

11:22AM 25      PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES, ET CETERA.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6226

11:22AM  1        AND IT DOES NOT APPEAR THAT IT WAS PART OF THE SAME -- DID

11:22AM  2   NOT HAPPEN AT THE SAME TIME I WILL SAY AT LEAST, THAT A LISTING

11:23AM  3   OF THOSE PHARMACEUTICAL COMPANIES IN THE NOTES WAS PUT IN

11:23AM  4   THERE.

11:23AM  5        I DON'T KNOW THE SIGNIFICANCE OF ANY OF THAT.  I WOULD

11:23AM  6   JUST LIKE AN OPPORTUNITY TO -- I'D ASK THE COURT, IN THE FIRST

11:23AM  7   INSTANCE, TO JUST RETAIN THE NOTES SO THAT WE MIGHT HAVE AN

11:23AM  8   OPPORTUNITY TO REVIEW THEM IN MORE DETAIL.  OVER THE COURSE OF

11:23AM  9   THE LAST 30 MINUTES OR SO, MR. BOSTIC AND I, I THINK, GOT

11:23AM  10  THROUGH THE NOTES ONCE.  SO I DON'T WANT TO SAY MORE THAN THAT

11:23AM  11  AT THIS POINT.

11:23AM  12       BUT I THINK SOME OF THE CONCERNS THAT I HAVE ABOUT THE

11:23AM  13  INTEGRITY OF THE NOTES ARE CONFIRMED.

11:23AM  14       THERE ALSO WAS LESS OF A FORENSIC ANALYSIS CONCERN, BUT

11:23AM  15  THERE WAS JUST A PRESENTATIONAL CONCERN.

11:23AM  16       THE NOTES WERE REORDERED IN THE PRODUCTION GIVEN TO THE

11:23AM  17  GOVERNMENT SO THAT THE SECOND PAGE WAS MADE TO APPEAR TO BE THE

11:23AM  18  FIRST PAGE.

11:23AM  19       THAT WAS IMPORTANT, I THINK, TO MR. EISENMAN'S

11:23AM  20  PRESENTATION BECAUSE IT'S EVIDENT IN THE MIDDLE OF THE PAGE

11:23AM  21  THAT HAD BEEN MOVED TO PAGE 1 THAT HE GETS MS. HOLMES'S

11:24AM  22  TELEPHONE NUMBER.  BUT ON THE ORIGINAL OF PAGE 1, WHICH I

11:24AM  23  BELIEVE REFLECTS CONVERSATIONS WITH MANY OTHER INDIVIDUALS

11:24AM  24  BEFORE HE EVER MET MS. HOLMES, THERE'S A GOOD DEAL OF

11:24AM  25  INFORMATION.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6227

11:24AM  1        BY REORDERING THE NOTES, IT CONVEYED THAT THE INFORMATION

11:24AM  2   WAS OBTAINED FROM MS. HOLMES RATHER THAN FROM OTHERS.

11:24AM  3        SO IT -- THE NOTES CONCERN ME.  WE HAVE THE JURY HERE FOR

11:24AM  4   HALF A DAY TODAY, AND I'M VERY RELUCTANT TO, YOU KNOW, DELAY

11:24AM  5   THIS FURTHER OR DISTURB IT.

11:24AM  6        BUT I HAVE CONCERNS.  I'D LIKE THE OPPORTUNITY TO REVIEW

11:24AM  7   THE ORIGINAL FURTHER.

11:24AM  8        I'M HAPPY TO STAY OUT OF THIS ISSUE FOR THE BALANCE OF

11:24AM  9   TODAY, AND IF THERE IS ANY ISSUE THAT WE WANT TO ADDRESS AFTER

11:24AM 10   WE REVIEW THE NOTES, TO RECALL MR. EISENMAN.  BUT I WOULD LIKE

11:24AM 11   THE OPPORTUNITY TO FORENSICALLY REVIEW THEM.

11:24AM 12        ALTERNATIVELY, I'D LIKE TO -- THE OPPORTUNITY TO EXAMINE

11:25AM 13   MR. EISENMAN OUTSIDE OF THE PRESENCE OF THE JURY TO UNDERSTAND

11:25AM 14   WHAT THE EXPLANATION IS FOR SOME OF THE DISCREPANCIES, THE

11:25AM 15   ORDERING, ET CETERA.

11:25AM 16            THE COURT:  AND WHAT WOULD YOUR -- THANK YOU.  WHAT

11:25AM 17   WOULD YOUR INTENT BE AFTER YOU VOIR DIRE THE WITNESS ON THE

11:25AM 18   NOTES?

11:25AM 19            MR. DOWNEY:  WELL, IT MAY BE -- LET ME SAY BEFORE I

11:25AM 20   SAY ANY OF THIS, I BELIEVE THAT MR. BOSTIC RECEIVED THE SAME

11:25AM 21   COPY OF THE NOTES THAT I RECEIVED.  I DON'T HAVE ANY

11:25AM 22   INFORMATION OR INDICATION THAT THE GOVERNMENT WAS PROVIDED WITH

11:25AM 23   AN ORIGINAL SET OF THE NOTES.  SO I JUST WANT TO BE CLEAR ABOUT

11:25AM 24   THAT IN ADVANCE.

11:25AM 25            NEVERTHELESS, THE NOTES WERE USED ON DIRECT EXAMINATION

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6228

11:25AM  1   FOR PURPOSES OF REFRESHING THE WITNESS'S RECOLLECTION.

11:25AM  2        AS YOUR HONOR KNOWS, HE WAS QUITE AGGRESSIVE, AND THE

11:25AM  3   WITNESS WAS AGGRESSIVE IN TRYING TO READ HIS NOTES AND TO

11:25AM  4   SUGGEST THAT REVIEWING THE NOTES WOULD REFLECT THE ACTUAL

11:25AM  5   CONTENT OF CONVERSATIONS WITH MS. HOLMES.

11:25AM  6        I DO NOT BELIEVE THAT IS TRUE.  I THINK THAT TESTIMONY

11:25AM  7   SHOULD -- LIKELY THE REMEDY IS TO STRIKE THAT TESTIMONY.

11:26AM  8             THE COURT:  ALL RIGHT.

11:26AM  9        MR. BOSTIC?

11:26AM 10             MR. BOSTIC:  SO, YOUR HONOR, I HAVE TO DISAGREE WITH

11:26AM 11   COUNSEL'S CHARACTERIZATION OF WHAT THE ORIGINALS SHOW.

11:26AM 12        I THINK THERE ARE A LOT OF ASSUMPTIONS AND JUMPING TO

11:26AM 13   CONCLUSIONS BAKED INTO WHAT DEFENSE COUNSEL IS ALLEGING HERE,

11:26AM 14   AND I JUST DON'T THINK THAT IT'S SUPPORTED BY THE EVIDENCE.

11:26AM 15        THE ORIGINALS OF MR. EISENMAN'S NOTES DO SHOW IN A COUPLE

11:26AM 16   OF LOCATIONS WHERE A SINGLE PAGE WILL CONTAIN TWO COLORS OF

11:26AM 17   INK.

11:26AM 18        COUNSEL REFERRED TO PAGE 7 OF THE EXHIBIT.  I THINK HE

11:26AM 19   MEANT TO REFER TO PAGE 13 OF THE EXHIBIT, WHICH IS A PAGE WHERE

11:26AM 20   TWO COLORS OF INK APPEAR.  MOST OF THE TEXT IS IN BLACK.  A

11:26AM 21   LIST OF PHARMACEUTICAL COMPANIES AND OTHER INFORMATION APPEAR

11:26AM 22   IN BLUE.

11:26AM 23        I UNDERSTAND COUNSEL IS READING INTO THAT SOME KIND OF

11:26AM 24   NEFARIOUS INTENT TO DOCTOR THESE MATERIALS AFTER THEY WERE

11:27AM 25   CREATED.  I DON'T THINK THERE'S ANY REAL SHOWING THAT THAT'S

EISENMAN CROSS BY MR. DOWNEY (RES.)                           6229

11:27AM   1    WHAT HAS HAPPENED HERE.

11:27AM   2        I WASN'T HERE WHEN THESE NOTES WERE CREATED, SO I DON'T

11:27AM   3    KNOW WHY THERE ARE TWO COLORS OF INK THERE, BUT I THINK IT'S

11:27AM   4    NOT FAIR TO ASSUME THAT THERE IS SOMETHING DISHONEST HAPPENING

11:27AM   5    AS A RESULT.

11:27AM   6        THESE NOTES ARE NOT IN EVIDENCE.  THEY WERE NOT ADMITTED.

11:27AM   7    THE JURY IS NOT RELYING ON THE SUBSTANCE OR THE AUTHENTICITY OF

11:27AM   8    THE NOTES IN THEIR REVIEW OF THE EVIDENCE IN THIS CASE.

11:27AM   9        THE POINTS THAT COUNSEL HAS RAISED ALSO DID NOT FEATURE

11:27AM  10    PROMINENTLY IN THE WITNESS'S TESTIMONY.

11:27AM  11        FOR EXAMPLE, THE ORDERING OF PAGE 1 VERSUS PAGE 2 OF THE

11:27AM  12    NOTES, WHETHER THE EXHIBIT HAS PAGE 1 AND 2 IN A DIFFERENT

11:27AM  13    ORDER FROM HOW THE NOTES WERE ORIGINALLY PREPARED HAS NO

11:27AM  14    RELEVANCE TO THE SUBSTANCE OF MR. EISENMAN'S TESTIMONY ON

11:27AM  15    DIRECT OR ON CROSS.

11:27AM  16        THE TESTIMONY REGARDING MS. HOLMES'S CELL PHONE NUMBER,

11:28AM  17    WHICH APPEARS IN THE NOTES, AS I RECALL, IT WAS SIMPLY

11:28AM  18    MR. EISENMAN TESTIFIED THAT IN THE EARLY DAYS OF THEIR

11:28AM  19    CONVERSATIONS, HE HAD ACCESS TO MS. HOLMES AND THAT HE HAD BEEN

11:28AM  20    PROVIDED HER CELL PHONE NUMBER.

11:28AM  21        THERE'S NO TESTIMONY ABOUT EXACTLY WHEN THAT OCCURRED, AND

11:28AM  22    I DON'T THINK THE JURY HAS BEEN ASKED TO MAKE ANY FINDINGS ON

11:28AM  23    THAT, ESPECIALLY NOT AS A RESULT OF THE ORDERING OF PAGES AND

11:28AM  24    NOTES.

11:28AM  25        SO I DON'T HAVE ANY OBJECTION, OF COURSE, TO THE COURT

EISENMAN CROSS BY MR. DOWNEY (RES.)                           6230

```
11:28AM   1    RETAINING A COPY.

11:28AM   2        I WOULD OBJECT TO CROSS-EXAMINING THE WITNESS IN FRONT OF

11:28AM   3    THE JURY WITHOUT A MORE SUBSTANTIAL SHOWING THAT THERE'S A

11:28AM   4    BASIS FOR THAT, AND I ALSO HAVE CONCERNS ABOUT COUNSEL'S

11:28AM   5    SUGGESTION OF DELAYING THE PROGRESS OF THE TRIAL.

11:28AM   6            THE COURT:  WHAT ARE YOUR THOUGHTS ABOUT, MR. DOWNEY

11:28AM   7    SAID THAT HE WOULD LIKE TO VOIR DIRE THE WITNESS ON HIS NOTES

11:28AM   8    OUTSIDE OF THE PRESENCE OF THE JURY?

11:28AM   9            MR. BOSTIC:  I DEFER TO THE COURT ON WHETHER THE

11:28AM  10    COURT BELIEVES THAT THAT IS NECESSARY.  I'M DOUBTFUL AS TO

11:29AM  11    WHETHER A SUFFICIENT FOUNDATION HAS BEEN LAID EVEN TO WARRANT

11:29AM  12    THAT STEP, BUT I'LL LEAVE THAT TO THE COURT.

11:29AM  13            THE COURT:  OKAY.

11:29AM  14        MR. DOWNEY?

11:29AM  15            MR. DOWNEY:  YOUR HONOR, LET ME BE CLEAR.  I'M NOT

11:29AM  16    ALLEGING ANYTHING.  I'M JUST SEEING A SITUATION WHERE SOMETHING

11:29AM  17    HAS BEEN IMPORTANT TO A WITNESS'S TESTIMONY, AND I THINK IT'S

11:29AM  18    IMPORTANT TO UNDERSTAND SOME DISCREPANCIES.

11:29AM  19        WHAT MAKES THAT IMPORTANT IS NOT THAT THE EXHIBIT HAS BEEN

11:29AM  20    ADMITTED.  IT HASN'T.  MR. BOSTIC IS CORRECT IN THAT REGARD.

11:29AM  21        WHAT MAKES IT IMPORTANT IS THAT FOR A SUBSTANTIAL PORTION

11:29AM  22    OF HIS DIRECT, HE WAS LOOKING AT THE DOCUMENT IN QUESTION AND

11:29AM  23    ESSENTIALLY TESTIFYING OUT OF A RECOLLECTION OF WHAT HE WAS

11:29AM  24    SEEING WITHIN THAT DOCUMENT.  THAT'S, THAT'S THE SIGNIFICANCE

11:29AM  25    OF IT.
```

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6231

11:29AM  1        I DON'T MIND THE OPTION OF VOIR DIRING HIM OUTSIDE OF THE

11:29AM  2   JURY, BUT IT DOES SEEM TO ME THAT IF SOMEBODY WITH SOME

11:29AM  3   EXPERTISE BEYOND WHAT EXPERTISE I HAVE WERE TO REVIEW THE

11:29AM  4   NOTES, IT MIGHT ALLAY ANY CONCERNS THAT I HAVE AND IT MIGHT

11:30AM  5   MAKE SUCH A PROCEEDING UNNECESSARY.  AND BY THE SAME TOKEN, I

11:30AM  6   MIGHT PROCEED INTO SUCH A HEARING WITHOUT A FULL UNDERSTANDING

11:30AM  7   OF WHAT HAS OCCURRED WITH RESPECT TO THE NOTES.

11:30AM  8        SO I'M NOT ASKING TO HAVE THIS EXAMINATION IN FRONT OF THE

11:30AM  9   JURY.  I AGREE WITH MR. BOSTIC AT THIS POINT AS TO THAT.

11:30AM 10        BUT I DON'T WANT TO NOT ADDRESS THIS ISSUE AND DETERMINE

11:30AM 11   WHAT THE APPROPRIATE REMEDY IS IN LIGHT OF THE GOVERNMENT'S

11:30AM 12   SUBSTANTIAL RELIANCE ON GOVERNMENT'S 14 ON THE DIRECT.

11:30AM 13             THE COURT:  HOW WAS THAT RELIANCE?  WHAT WAS

11:30AM 14   RELIANCE?

11:30AM 15             MR. DOWNEY:  YOUR HONOR, IF YOU LOOK AT -- I'M NOT

11:30AM 16   SURE I CAN ARTICULATE IT TO A FULL EXTENT, BUT MR. EISENMAN WAS

11:30AM 17   UNABLE TO RECALL OF HIS OWN MEMORY CERTAIN CONVERSATIONS THAT

11:30AM 18   HE HAD HAD WITH MS. HOLMES.

11:30AM 19        AND IF YOU LOOK IN THE EARLY PART OF HIS DIRECT ON TRYING

11:31AM 20   TO IDENTIFY THE FIRST AMOUNT, THE FIRST PLACE THAT IT HAPPENS,

11:31AM 21   IT -- HE'S SHOWN THIS DOCUMENT FOR PURPOSES OF REFRESHING HIS

11:31AM 22   RECOLLECTION.  HE'S REFERRED BOTH ON HIS DIRECT AND HE REFERRED

11:31AM 23   TODAY TO, YOU KNOW, THE NOTES AS, YOU KNOW, A SUBJECT THAT, YOU

11:31AM 24   KNOW, WHERE HE BELIEVES IF HE HAD THE NOTES, HE WOULD BE ABLE

11:31AM 25   TO TESTIFY ACCURATELY.

EISENMAN CROSS BY MR. DOWNEY (RES.)                            6232

11:31AM   1        THE QUESTION IS, IS THAT AN ACCURATE SUPPOSITION ON HIS

11:31AM   2    PART?  ARE THESE NOTES ACCURATE?

11:31AM   3        SO I THINK IF I -- I DON'T HAVE -- I'VE NOT GONE THROUGH,

11:31AM   4    IN THE BRIEF TIME THAT WE'VE HAD, ALL OF THE INSTANCES IN WHICH

11:31AM   5    HE WAS SHOWN EXHIBIT 14 IN HIS DIRECT, BUT IT WAS QUITE A FEW.

11:31AM   6        THE COURT:  SO -- ALL RIGHT.  THANK YOU.

11:31AM   7        SO IT SOUNDS LIKE WHAT YOU'RE SAYING IS THAT YOU THINK HE

11:31AM   8    MAY HAVE ALTERED THE NOTES, THE INTEGRITY OF THE NOTES MAY HAVE

11:31AM   9    BEEN DISTURBED FROM WHAT THE GOVERNMENT RECEIVED AND WHAT YOU

11:31AM  10    RECEIVED?

11:31AM  11        MR. DOWNEY:  I'M NOT AT THAT POINT YET, YOUR HONOR.

11:32AM  12        THE COURT:  SO WHAT IS THE -- I GUESS I'M TRYING TO

11:32AM  13    CAPTURE, IF HE CHANGED HIS NOTES, WHAT DOES THAT SAY TO US?

11:32AM  14        MR. DOWNEY:  WELL, HE'S TESTIFIED THAT THESE NOTES

11:32AM  15    ARE NOTES OF CONTEMPORANEOUS CONVERSATION WITH THE DEFENDANT.

11:32AM  16        THE COURT:  SO WHEN HE COMES BACK, WE HAVE THE

11:32AM  17    NOTES, HAVE YOU CHANGED THE NOTES AT ALL?  AND HE SAYS YES OR

11:32AM  18    NO, AND THEN YOU CAN FOLLOW UP WITH THAT.

11:32AM  19        BUT IS THE REAL ISSUE HERE, HAS HE CHANGED, OR DOES HIS

11:32AM  20    TESTIMONY -- WILL HIS TESTIMONY CHANGE BASED ON AN ALTERATION

11:32AM  21    OF NOTES IF, IN FACT, THAT HAPPENED?

11:32AM  22        MR. DOWNEY:  WELL, YOUR HONOR, I THINK THERE'S A

11:32AM  23    WHOLE RANGE OF POSSIBILITIES.  IF THE NOTES HAVE BEEN ALTERED,

11:32AM  24    IT'S CORRECT, ONE POSSIBILITY IS THAT IF HE WERE TO SEE THAT,

11:32AM  25    HE MIGHT SAY, OH, I'M SORRY, I DIDN'T MEAN TO SUGGEST THIS WAS

EISENMAN CROSS BY MR. DOWNEY (RES.)                           6233

11:32AM  1    A CONTEMPORANEOUS NOTE OF A CONVERSATION.  IT'S ACTUALLY AN

11:32AM  2    ANALYSIS THAT I ENTERED AFTER THE CONVERSATION OR AFTER LOOKING

11:32AM  3    BACK AT THE NOTES, AND THAT MIGHT CLARIFY IT.

11:33AM  4         BUT, YOU KNOW, SO IT MIGHT BE AT THAT LEVEL.

11:33AM  5         HE MAY NOT RECALL WHY THE NOTES ARE DIFFERENT.  I THINK

11:33AM  6    THAT'S MOST LIKELY TO BE WHAT THE WITNESS HIMSELF IS GOING TO

11:33AM  7    SAY.

11:33AM  8         THE QUESTION IS, YOU KNOW, DO WE KNOW WHEN THAT WAS DONE

11:33AM  9    RELATIVE TO THE VALUE IN CONTROVERSY?

11:33AM  10            THE COURT:  SO THE VALUE, THE VALUE, I THINK WHAT IS

11:33AM  11   IMPORTANT TO YOU IS HE TESTIFIED THAT HE MADE, FOR EXAMPLE, IN

11:33AM  12   HIS CONVERSATION, CONTEMPORANEOUS NOTES.

11:33AM  13            MR. DOWNEY:  RIGHT.

11:33AM  14            THE COURT:  AND MAYBE HE HASN'T.

11:33AM  15            MR. DOWNEY:  RIGHT.

11:33AM  16            THE COURT:  AND MAYBE HE ADDED THAT LATER AND,

11:33AM  17   THEREFORE, THAT CALLS INTO QUESTION HIS TESTIMONY THAT, I MADE

11:33AM  18   CONTEMPORANEOUS NOTES AT THE TIME I TALKED.

11:33AM  19            MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.

11:33AM  20        AND AGAIN, JUST TO REFER TO THE EXAMPLE THAT I REFERRED TO

11:33AM  21   BEFORE AND THAT MR. BOSTIC REFERRED TO, THE ENTRY OF THE

11:33AM  22   PHARMACEUTICAL COMPANIES IN A DIFFERENT -- I THINK MR. BOSTIC

11:33AM  23   IS CORRECT IT'S ON PAGE 13, YOU KNOW, I THINK YOUR HONOR

11:34AM  24   RECALLS THAT ON WEDNESDAY THAT WAS A SUBJECT OF TESTIMONY FROM

11:34AM  25   HIM, IT WAS IMPORTANT TO HIM, IT WAS A VERIFICATION AS TO WHY

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6234

11:34AM   1    HE SHOULD INVEST.  I ASKED HIM SOME QUESTIONS ON CROSS.

11:34AM   2              THE COURT:  WHY DOES IT MATTER IF IT'S ON PAGE 7 OR

11:34AM   3    PAGE 13 OF HIS NOTES?

11:34AM   4              MR. DOWNEY:  IT DOESN'T MATTER.  I WAS IN ERROR

11:34AM   5    SAYING --

11:34AM   6              THE COURT:  WHY ARE THE PAGES -- IF IT'S NOT

11:34AM   7    PAGINATED CORRECTLY, WHY DOES THAT MATTER?

11:34AM   8              MR. DOWNEY:  THE ISSUE IS THAT IT'S IN A DIFFERENT

11:34AM   9    COLORED INK, AND IT WAS APPEARS TO HAVE BEEN ENTERED AT A

11:34AM  10    DIFFERENT TIME WHEN IT WAS PRESENTED AS CONTEMPORANEOUSLY

11:34AM  11    RECORDED NOTES FOR PURPOSES OF REFRESHING HIS RECOLLECTION OF A

11:34AM  12    CONVERSATION WITH MS. HOLMES AND HIM THEN SAYING, I HAD THIS

11:34AM  13    CONVERSATION, AND THAT'S THE REASON THAT I INVESTED.

11:34AM  14              THE COURT:  OKAY.  WELL, IT'S, IT'S NOW 11:35 OR SO.

11:34AM  15        WHERE ARE YOU WITH YOUR CROSS-EXAMINATION OF THE WITNESS?

11:35AM  16              MR. DOWNEY:  I'M STILL HOPEFUL THAT, OTHER THAN THIS

11:35AM  17    ISSUE, THE CROSS-EXAMINATION COULD PROBABLY FINISH BY 1:00,

11:35AM  18    WHICH WOULD BE OUR PLANNED ENDING TIME.

11:35AM  19        BUT I'M NOT SURE -- IT'S POSSIBLE THAT THE REDIRECT COULD

11:35AM  20    BE CONDUCTED AS WELL, BUT I'M NOT 100 PERCENT SURE OF THAT.

11:35AM  21              THE COURT:  IS THIS IN LIGHT OF THE NOTE ISSUE OR IS

11:35AM  22    THIS WHAT YOU HAD PLANNED ALL ALONG?

11:35AM  23              MR. DOWNEY:  NO, WITHOUT REGARD TO THE NOTE ISSUE.

11:35AM  24              THE COURT:  BECAUSE I THOUGHT OUR ORIGINAL PLAN WAS

11:35AM  25    THAT THEY WOULD FINISH THIS WITNESS TODAY AND WE WOULD HAVE

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6235

11:35AM  1     TIME FOR ANOTHER WITNESS.

11:35AM  2              MR. DOWNEY:  YEAH, BUT I THINK WE'VE BEEN MORE

11:35AM  3     THAN -- HALF AN HOUR BEYOND OUR PROJECTED BREAK TIME.

11:35AM  4              THE COURT:  RIGHT.

11:35AM  5              MR. DOWNEY:  I THINK THAT'S THE ISSUE.

11:35AM  6              THE COURT:  RIGHT.  SO -- YOU KNOW, THE TIME

11:35AM  7     ESTIMATES ARE A LITTLE FUZZY HERE.

11:35AM  8              MR. DOWNEY:  I THINK IT'S --

11:35AM  9              THE COURT:  NOT JUST NOW, BUT WHENEVER WE HAVE

11:35AM  10    PROJECTED THROUGH THE TRIAL, I'VE ASKED FOR THAT QUESTION.  I

11:36AM  11    KNOW IT'S A MOVEABLE FEAST.  YOU CAN'T ALWAYS BE ACCURATE ON

11:36AM  12    TIMING.  BUT FOR ALL OF THE REASONS WE HAVE TALKED ABOUT, IT'S

11:36AM  13    IMPORTANT, AT LEAST FOR MY MANAGEMENT OF THE TRIAL, THAT I TRY

11:36AM  14    TO KEEP THINGS GOING.

11:36AM  15              MR. DOWNEY:  OF COURSE.

11:36AM  16              THE COURT:  WELL, WHY DON'T WE -- IT SOUNDS LIKE

11:36AM  17    THIS IS AN ISSUE FOR YOU, AND I'D LIKE TO TAKE CARE OF THIS AS

11:36AM  18    SOON AS WE CAN.

11:36AM  19         IF WE'RE GOING TO DISCUSS THESE NOTES, THERE'S TWO WAYS TO

11:36AM  20    DO IT.  WE CAN BRING HIM IN RIGHT NOW AND YOU CAN VOIR DIRE ON

11:36AM  21    A LIMITED BASIS ABOUT THE COLOR CHANGE OF THE INK, THE

11:36AM  22    PAGINATION, WHAT THEY WERE, THOSE TYPES OF THINGS, WHETHER OR

11:36AM  23    NOT THEY WERE CONTEMPORANEOUS WITH HIS CONVERSATION.

11:36AM  24         ARE THOSE THE THREE ISSUES THAT YOU WANT?

11:36AM  25              MR. DOWNEY:  WELL, YOUR HONOR, IN FAIRNESS, I HAVE

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6236

11:36AM  1    TO SAY THESE ARE ALMOST 40 PAGES OF NOTES.  I'VE ONLY HAD

11:36AM  2    30 MINUTES TO EXAMINE THEM.

11:36AM  3         SO MY PREFERENCE WOULD BE TO HAVE AN OPPORTUNITY -- I'M

11:36AM  4    NOT CERTAIN THERE WILL BE AN ISSUE HERE.

11:36AM  5         MY PREFERENCE WOULD BE TO HAVE AN OPPORTUNITY TO REVIEW

11:36AM  6    THEM MORE CAREFULLY COMPARED TO THE COPY THAT WAS INTRODUCED AS

11:37AM  7    EXHIBIT 14.  BUT IF THE REMEDY YOUR HONOR DECIDES ON IS THAT, I

11:37AM  8    CAN DO IT.

11:37AM  9         THE HESITATION I HAVE WITH THAT REMEDY IS THAT WE HAVE,

11:37AM  10   YOU KNOW -- YOU KNOW, WE'RE IMPINGING MORE ON, I KNOW, THE

11:37AM  11   ISSUE YOUR HONOR.

11:37AM  12        THE COURT:  WELL, IT'S JUST WHERE DO WE PUT THAT

11:37AM  13   DELAY, RIGHT, IN THE FRONT OR THE BACK?

11:37AM  14        MR. DOWNEY:  YEAH.

11:37AM  15        THE COURT:  BECAUSE IT SOUNDS LIKE IF WE DON'T DEAL

11:37AM  16   WITH IT TODAY -- AND PARDON ME, I DON'T WANT YOU TO FILL TIME

11:37AM  17   JUST TO FILL THE DAY KNOWING WE ARE GOING TO HAVE TO DEAL WITH

11:37AM  18   THIS.

11:37AM  19        MR. DOWNEY:  NO, YOUR HONOR.  WE HAVE SEVERAL OTHER

11:37AM  20   SUBJECTS RELATED TO HIS -- OFFERS TO THIS WITNESS TO BUY

11:37AM  21   THERANOS STOCK, YOU KNOW, FOUR OR FIVE DIFFERENT TIMES AND

11:37AM  22   TURNING IT DOWN AND SO FORTH.

11:37AM  23        I THINK THAT'S IN THE NEIGHBORHOOD OF AN HOUR, HOUR AND

11:37AM  24   15 MINUTES.  THAT'S WHAT I THINK WOULD -- THAT'S WHY

11:37AM  25   I'M HESITANT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6237

11:37AM  1        THE COURT:  THANK YOU FOR THAT.

11:37AM  2        I WONDER IF YOU JUST BROACH THESE QUESTIONS WITH HIM ABOUT

11:38AM  3   THE COLOR CHANGE, WHETHER THEY WERE CONTEMPORANEOUS OR NOT,

11:38AM  4   MAYBE YOU'LL GET THE ANSWER TO YOUR QUESTION TODAY, RIGHT NOW,

11:38AM  5   IF WE BRING HIM IN AND ASK HIM.

11:38AM  6        MR. DOWNEY:  WELL, YOUR HONOR, I'M HAPPY TO DO THAT.

11:38AM  7   I WOULD JUST ASK THAT IF WE APPROACH THE PROBLEM THAT WAY, THAT

11:38AM  8   WE BE ALLOWED TO -- THAT THE DEPUTY RETAIN THE NOTES AND WE BE

11:38AM  9   ALLOWED TO HAVE ACCESS TO THE NOTES FOR PURPOSES OF MAKING SURE

11:38AM  10  WE'RE COMFORTABLE WITH ANY TESTIMONY ALONG THOSE LINES.

11:38AM  11       THE COURT:  SO HOW ARE YOU GOING TO REVIEW THESE?

11:38AM  12  YOU DON'T HAVE COPIES OF THESE?

11:38AM  13       MR. DOWNEY:  I DON'T HAVE A COLOR COPY.  IT'S A

11:38AM  14  LITTLE BIT OF A DIFFICULT EXAMINATION TO CONDUCT FOR THAT

11:38AM  15  REASON, AND I DON'T THINK WE HAVE THE ABILITY IMMEDIATELY TO

11:38AM  16  MAKE A COLOR COPY THAT I KNOW OF.

11:38AM  17       LET ME CHECK ON THAT.

11:38AM  18       OH, WE COULD MAKE A COLOR COPY, SO MAYBE THAT WOULD BE

11:38AM  19  HELPFUL.

11:38AM  20       THE COURT:  ALL RIGHT.  WELL, LET'S BRING THE

11:38AM  21  WITNESS AND THE JURY IN.  LET'S CONTINUE YOUR EXAMINATION, AND

11:38AM  22  I'LL ASK YOU TO PROCEED WITH YOUR EXAMINATION.

11:38AM  23       WE'LL KEEP THE NOTES FOR NOW AND I'LL TELL HIM OUTSIDE OF

11:39AM  24  THE PRESENCE OF THE JURY THAT WE'RE GOING TO KEEP THEM, MAKE

11:39AM  25  PHOTOCOPIES.

11:39AM  1        IT SOUNDS LIKE HE'S NOT GOING TO BE DONE TODAY.  HE'S NOT

11:39AM  2   GOING TO BE FINISHED TODAY.

11:39AM  3             MR. DOWNEY:  LET'S TRY.

11:39AM  4             THE COURT:  I APPRECIATE THAT.

11:39AM  5             MR. DOWNEY:  YEAH.

11:39AM  6             MR. BOSTIC:  YOUR HONOR, I JUST WANT TO MAKE SURE

11:39AM  7   THAT WE'RE CLEAR.  MY UNDERSTANDING IS THAT THE PARTIES AGREE

11:39AM  8   THAT THIS TOPIC WON'T BE BROACHED WITH THE WITNESS IN FRONT OF

11:39AM  9   THE JURY, AT LEAST PENDING FURTHER DISCUSSION.

11:39AM  10            THE COURT:  THAT'S MY UNDERSTANDING.

11:39AM  11            MR. DOWNEY:  CERTAINLY.

11:39AM  12            MR. BOSTIC:  JUST TO CLARIFY, COUNSEL MADE REFERENCE

11:39AM  13  TO EXHIBIT 14 BEING INTRODUCED OR ENTERED, AND I WANT THE

11:39AM  14  RECORD CLEAR, IT'S NOT IN EVIDENCE AND IT HAS NOT BEEN OFFERED.

11:39AM  15            THE COURT:  THE NOTES ARE NOT EVIDENCE.

11:39AM  16            MR. DOWNEY:  I COMPLETELY RECOGNIZE THAT.

11:39AM  17            THE COURT:  THE NOTES WERE REFERENCED.  I SAW HIM

11:39AM  18  LOOK AT HIS NOTES WHILE HE WAS TESTIFYING, BOTH YOUR QUESTIONS,

11:39AM  19  MR. DOWNEY, AND THE GOVERNMENT'S, AND THERE WAS NO COMMENT.  I

11:39AM  20  THINK YOU ASKED HIM AT ONE TIME, ARE YOU READING YOUR NOTES

11:39AM  21  THERE?

11:39AM  22            MR. DOWNEY:  YES.

11:39AM  23            THE COURT:  AND YOU DIDN'T ASK ANYTHING FURTHER.

11:39AM  24            MR. DOWNEY:  NO.  THAT'S CORRECT.

11:39AM  25            THE COURT:  OKAY.  ALL RIGHT.  WE'LL BRING THE JURY

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6239

| | | |
|---|---|---|
| 11:39AM | 1 | IN. |
| 11:39AM | 2 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 11:39AM | 3 | (JURY IN AT 11:39 A.M.) |
| 11:42AM | 4 | THE COURT:  PLEASE BE SEATED.  COUNSEL ARE PRESENT. |
| 11:42AM | 5 | MS. HOLMES IS PRESENT AND THE JURY IS PRESENT. |
| 11:42AM | 6 | MR. EISENMAN HAS RETURNED TO THE STAND. |
| 11:42AM | 7 | MR. DOWNEY, YOU HAVE ADDITIONAL QUESTIONS? |
| 11:42AM | 8 | MR. DOWNEY:  I DO, YOUR HONOR. |
| 11:42AM | 9 | Q.  MR. EISENMAN, YOU RECALL BEFORE WE BREAK WE WERE TALKING |
| 11:42AM | 10 | ABOUT YOUR CONVERSATION WITH MR. BALWANI PRIOR TO YOUR |
| 11:42AM | 11 | INVESTMENT IN 2013? |
| 11:42AM | 12 | A.  YES. |
| 11:42AM | 13 | Q.  I'D LIKE TO ASK YOU TO LOOK AT THE EXHIBIT THAT IS MARKED |
| 11:42AM | 14 | AS 1370 IN YOUR NOTEBOOK. |
| 11:43AM | 15 | DO YOU HAVE THAT? |
| 11:43AM | 16 | A.  YES. |
| 11:43AM | 17 | Q.  AND DO YOU SEE THAT THIS IS A LONG SERIES OF EMAIL |
| 11:43AM | 18 | EXCHANGES IN CONNECTION WITH THE OFFER OF AN ADDITIONAL |
| 11:43AM | 19 | INVESTMENT BY THERANOS AT THE END OF 2013? |
| 11:43AM | 20 | A.  YES. |
| 11:43AM | 21 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 1370. |
| 11:43AM | 22 | MR. BOSTIC:  I BELIEVE THAT IS ALREADY IN EVIDENCE, |
| 11:43AM | 23 | YOUR HONOR.  OR IT MAY BE A DIFFERENT VERSION. |
| 11:43AM | 24 | AT ANY RATE, THERE'S NO OBJECTION. |
| 11:43AM | 25 | MR. DOWNEY:  I THINK IT'S A DIFFERENT VERSION. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6240

11:43AM   1                   THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:43AM   2            (GOVERNMENT'S EXHIBIT 1370 WAS RECEIVED IN EVIDENCE.)

11:43AM   3       BY MR. DOWNEY:

11:43AM   4       Q.   AT THIS TIME, AT THE END OF THE YEAR IN 2013, YOU WERE

11:43AM   5       EXCHANGING MESSAGES AND PERHAPS EVEN PHONE CALLS WITH

11:43AM   6       MR. BALWANI ABOUT THE POTENTIAL INVESTMENT; CORRECT?

11:43AM   7       A.   CORRECT.

11:44AM   8       Q.   AND IF WE LOOK ON THE FIRST PAGE OF THE SECOND EMAIL, THE

11:44AM   9       ONE THAT IS FROM YOU TO MR. BALWANI --

11:44AM   10      A.   YES.

11:44AM   11      Q.   -- YOU ASKED MR. BALWANI BY EMAIL FOR INFORMATION ABOUT

11:44AM   12      THE THERANOS INVESTMENT; CORRECT?

11:44AM   13      A.   CORRECT.

11:44AM   14      Q.   YOU ASKED HIM HOW BIG THE ROUND WOULD BE; CORRECT?

11:44AM   15      A.   CORRECT.

11:44AM   16      Q.   AND WHETHER DIRECTORS WERE PARTICIPATING IN THE ROUND;

11:44AM   17      CORRECT?

11:44AM   18      A.   CORRECT.

11:44AM   19      Q.   AND WHETHER THERE WOULD BE ANOTHER EQUITY OFFERING AFTER

11:44AM   20      JANUARY 1ST; CORRECT?

11:44AM   21      A.   CORRECT.

11:44AM   22      Q.   AND HE RESPONDED TO YOU AT THE TOP OF PAGE 1 OF

11:44AM   23      EXHIBIT 1370, AND HE SAID, "WE CAN'T ANSWER YOUR QUESTIONS

11:44AM   24      ABOUT DIRECTORS, OTHER INVESTORS AND CERTAINLY NOT ABOUT ANY

11:44AM   25      FUTURE INVESTMENT ROUNDS AND SPECULATE ON WHAT THOSE VALUATIONS

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6241

11:45AM  1    MAY BE.  THOSE MAY OR MAY NOT HAPPEN."

11:45AM  2         DO YOU SEE THAT?

11:45AM  3    A.   THAT CONTRADICTED HIS EARLIER WORDS.

11:45AM  4    Q.   OKAY.  AND DO YOU SEE IN THE SECOND PARAGRAPH OF THE EMAIL

11:45AM  5    HE TOLD YOU THAT HIS PERSONAL ASSISTANTS WERE NOT PRIVY TO

11:45AM  6    CONFIDENTIAL FINANCIAL INFORMATION.

11:45AM  7         DO YOU SEE THAT?

11:45AM  8    A.   YES.

11:45AM  9    Q.   AND DO YOU KNOW WHY HE WAS TELLING YOU THAT?

11:45AM  10   A.   NO.

11:45AM  11   Q.   HAD YOU BEEN LEAVING MESSAGES WITH THEM ASKING FOR

11:45AM  12   FINANCIAL DETAILS ABOUT THE COMPANY?

11:45AM  13   A.   NOT TO MY RECOLLECTION.

11:45AM  14   Q.   HAD YOU BEEN ASKING THEM QUESTIONS ABOUT THE ACTIVITIES OF

11:45AM  15   THE COMPANY?

11:45AM  16   A.   NO.

11:45AM  17   Q.   NOW, I WANT TO SHOW YOU -- I JUST WANT TO SHOW YOU THIS

11:45AM  18   EXHIBIT FOR PURPOSES TO SEE IF IT REFRESHES YOUR RECOLLECTION,

11:45AM  19   SO I DON'T WANT YOU TO DESCRIBE THE EXHIBIT BECAUSE IT'S NOT IN

11:46AM  20   EVIDENCE.

11:46AM  21        TAKE A LOOK AT EXHIBIT -- WELL, LET ME PASS THAT EXHIBIT

11:46AM  22   BECAUSE IT WILL REQUIRE A BIT MORE TIME TO GO INTO THAT.

11:46AM  23        LET ME TURN TO THE QUESTIONS RELATED TO WHAT YOUR

11:46AM  24   UNDERSTANDING WAS OF THE RISK LEVEL OF THE INVESTMENT.  OKAY?

11:46AM  25   A.   OKAY.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6242

11:46AM   1   Q.   YOU RECALL THAT BACK IN 2010 MS. HOLMES HAD TOLD YOU THAT

11:46AM   2   AN INVESTMENT IN THERANOS CARRIED IMMENSE RISKS.

11:46AM   3        DO YOU RECALL THAT?

11:46AM   4   A.   I DON'T.

11:46AM   5   Q.   LET ME ASK YOU TO PULL BACK UP EXHIBIT 12285.

11:47AM   6   A.   OKAY.

11:47AM   7   Q.   DO YOU HAVE THAT?

11:47AM   8   A.   UH-HUH.

11:47AM   9   Q.   OKAY.  IF YOU LOOK AT THIS EXHIBIT, YOU'LL SEE THAT THE

11:47AM  10   SECOND PART OF THIS EMAIL IS THE EMAIL THAT WE LOOKED AT BEFORE

11:47AM  11   FROM JUNE OF 2010.

11:47AM  12        DO YOU SEE THAT?

11:47AM  13   A.   YES.

11:47AM  14   Q.   AND IF YOU LOOK AT THE THIRD PARAGRAPH OF THE EMAIL THAT

11:48AM  15   BEGINS, "AS YOU'VE ACKNOWLEDGED."

11:48AM  16   A.   YES.

11:48AM  17   Q.   AND IT GOES ON TO SAY, AS YOU'VE ACKNOWLEDGED, THERANOS IS

11:48AM  18   AN EARLY LIFE STAGE SCIENCE, I THINK SHE MEANT TO SAY COMPANY.

11:48AM  19        I'M SORRY.  LET ME JUST REREAD IT.

11:48AM  20        "AS YOU HAVE ACKNOWLEDGED, THERANOS IS AN EARLY STAGE LIFE

11:48AM  21   SCIENCES STARTUP AND BY ITS VERY NATURE CARRIES IMMENSE RISK

11:48AM  22   AND UNPREDICTABILITY AS YOU ALREADY KNOW AS A SAVVY INVESTOR.

11:48AM  23   THIS MAY NOT CHANGE FOR YEARS TO COME."

11:48AM  24        DID MS. HOLMES TELL YOU THAT IN 2010 ABOUT INVESTING IN

11:48AM  25   THERANOS?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6243

11:48AM   1     A.   THIS IS A SURPRISE AND A DIRECT CONTRADICTION TO MANY

11:48AM   2     OTHER EARLIER EMAILS AND CONVERSATIONS I HAD.  SIX YEARS AFTER

11:48AM   3     WE INVESTED, I HAD A WHOLE STREAM OF INFORMATION THAT THE

11:48AM   4     COMPANY WAS ON THEIR WAY TO DOING HUNDREDS OF MILLIONS OF

11:48AM   5     DOLLARS OF REVENUE, DOING CONTRACTS WITH MAJOR PHARMACEUTICAL

11:49AM   6     COMPANIES.  THEY HAD SEVEN, SEVEN CLINICAL TRIALS WITH

11:49AM   7     BRISTOL MYERS THAT WENT FLAWLESS.  I'VE GOT EMAIL AFTER EMAIL.

11:49AM   8        THIS IS A TOTAL CONTRADICTION TO EVERYTHING UP TO THIS

11:49AM   9     POINT.

11:49AM   10             MR. DOWNEY:  I MOVE TO STRIKE THAT, YOUR HONOR.  AND

11:49AM   11    I'M GOING TO TRY TO RE-ASK THE QUESTION.

11:49AM   12             THE COURT:  ALL RIGHT.  THAT LAST ANSWER IS STRICKEN

11:49AM   13    AS NONRESPONSIVE, AND YOU CAN ASK ANOTHER QUESTION.

11:49AM   14    BY MR. DOWNEY:

11:49AM   15    Q.   LET ME ASK YOU TO LOOK AT THE FOURTH BULLET POINT.

11:49AM   16        DO YOU SEE WHERE THERE'S A SERIES OF BULLET POINTS?

11:49AM   17    A.   I DO.

11:49AM   18    Q.   AND DO YOU SEE THERE IN THE FIRST BULLET POINT THE FIRST

11:49AM   19    SENTENCE READS, "WE DO NOT CURRENTLY HAVE PLANS TO GO IPO BY

11:49AM   20    THE END OF 2011."

11:49AM   21        DO YOU SEE THAT?

11:49AM   22    A.   I DO.

11:49AM   23    Q.   AND YOU ACKNOWLEDGE THAT YOU RECEIVED THIS EMAIL IN 2010?

11:50AM   24    A.   AGAIN, THIS IS A DIRECT CONTRADICTION TO MANY EARLIER

11:50AM   25    COMMUNICATIONS.

6244

EISENMAN CROSS BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 11:50AM | 1 | THE COURT:  SIR, SIR, EXCUSE ME, SIR.  DID YOU HEAR |
| 11:50AM | 2 | THE QUESTION? |
| 11:50AM | 3 | THE WITNESS:  I DID.  BUT IT'S MISLEADING.  I'M |
| 11:50AM | 4 | SORRY. |
| 11:50AM | 5 | THE COURT:  THE WAY THIS WORKS, SIR, IS THAT A |
| 11:50AM | 6 | QUESTION IS ASKED AND YOU'LL HAVE TO WAIT FOR THE QUESTION. |
| 11:50AM | 7 | THE WITNESS:  OKAY.  ASK THE QUESTION AGAIN AND I'LL |
| 11:50AM | 8 | RESPOND. |
| 11:50AM | 9 | THE COURT:  WELL, HE'S NOT GOING TO DO THAT BECAUSE |
| 11:50AM | 10 | I'M NOT FINISHED. |
| 11:50AM | 11 | THE WITNESS:  OKAY. |
| 11:50AM | 12 | THE COURT:  YOU SEE, THAT'S HOW IT WORKS. |
| 11:50AM | 13 | THE WITNESS:  OKAY.  SORRY. |
| 11:50AM | 14 | THE COURT:  NO, THAT'S QUITE ALL RIGHT.  YOU HAVE TO |
| 11:50AM | 15 | WAIT UNTIL THE QUESTION IS COMPLETED, AND THEN TAKE WHATEVER |
| 11:50AM | 16 | TIME YOU NEED TO GIVE A THOUGHTFUL ANSWER TO THE QUESTION, TO |
| 11:50AM | 17 | THE QUESTION ITSELF. |
| 11:50AM | 18 | THE WITNESS:  OKAY. |
| 11:50AM | 19 | THE COURT:  ALL RIGHT.  IF YOU NEED CLARIFICATION OF |
| 11:50AM | 20 | THE QUESTION, YOU CAN ASK A LAWYER IF THEY NEED TO CLARIFY |
| 11:50AM | 21 | BECAUSE YOU DON'T UNDERSTAND, AND THAT'S FAIR. |
| 11:50AM | 22 | THE WITNESS:  OKAY. |
| 11:50AM | 23 | THE COURT:  WE WANT TO MAKE SURE EVERY WITNESS |
| 11:50AM | 24 | UNDERSTANDS THE QUESTION SO THEY CAN GIVE A FULL ANSWER. |
| 11:50AM | 25 | THE WITNESS:  OKAY. |

UNITED STATES COURT REPORTERS

**ER-9874**

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6245

11:50AM   1              THE COURT:  THAT'S WHAT THIS IS.

11:50AM   2         SO I'LL ASK MR. DOWNEY TO ASK ANOTHER QUESTION, PLEASE.

11:50AM   3    BY MR. DOWNEY:

11:51AM   4    Q.  DO YOU ACKNOWLEDGE THAT MS. HOLMES TOLD YOU IN 2010 THAT

11:51AM   5    THERANOS WAS AN EARLY STAGE LIFE SCIENCES STARTUP THAT CARRIED

11:51AM   6    RISK.

11:51AM   7         DO YOU ACKNOWLEDGE THAT?

11:51AM   8    A.  I ACKNOWLEDGE THAT THIS IS WHAT WAS COMMUNICATED IN 2010,

11:51AM   9    BUT IT CONTRADICTS MANY OTHER THINGS THAT I WAS LED TO BELIEVE

11:51AM   10   PRIOR TO THIS.

11:51AM   11   Q.  OKAY.  AND YOU ACKNOWLEDGE THAT SHE TOLD YOU IN 2010 THAT

11:51AM   12   THERANOS'S STATUS AS AN EARLY STAGE LIFE SCIENCES STARTUP THAT

11:51AM   13   CARRIED IMMENSE RISK MIGHT NOT CHANGE FOR YEARS TO COME?  YOU

11:51AM   14   ACKNOWLEDGE THAT BASED ON THE --

11:51AM   15   A.  I ACKNOWLEDGE THAT BASED ON THIS EMAIL.

11:51AM   16        BUT IT CONTRADICTS EARLIER COMMUNICATIONS.

11:51AM   17   Q.  OKAY.  BUT YOU ACKNOWLEDGE THAT YOU RECEIVED THE EMAIL?

11:51AM   18   A.  I DO ACKNOWLEDGE THAT I RECEIVED THIS EMAIL, YES, SIR.

11:51AM   19   Q.  LET'S GO BACK TO THE INVESTMENT DECISION SORT OF IN THE

11:51AM   20   LATE YEAR OF 2013 AND LOOK AT THE COMMUNICATIONS THAT YOU

11:52AM   21   RECEIVED AROUND THAT OFFER.

11:52AM   22        AND TO DO THAT, IF YOU WOULD LOOK BACK AT EXHIBIT 1370.

11:52AM   23        AND WE HAVE LOOKED AT THIS EXHIBIT BEFORE, BUT NOW I'M

11:52AM   24   INTERESTED IN PAGE 4 OF THE EXHIBIT.

11:52AM   25   A.  OKAY.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                6246

11:52AM   1    Q.   DO YOU SEE THE EMAIL THAT IS SORT OF THE SECOND HALF, THE

11:52AM   2    BOTTOM EMAIL ON THE PAGE 4 OF 1370 THAT BEGINS, "DEAR

11:52AM   3    STOCKHOLDER"?

11:52AM   4    A.   YES.

11:52AM   5    Q.   AND THIS WAS A COMMUNICATION THAT WAS SENT OUT TO ALL OF

11:53AM   6    THE SHAREHOLDERS IN THE COMPANY, INCLUDING YOU; CORRECT?

11:53AM   7    A.   CORRECT.

11:53AM   8    Q.   AND THIS INFORMED YOU AS TO A NUMBER OF THINGS, THAT THERE

11:53AM   9    WAS AN INVESTMENT OFFER IN THERANOS; CORRECT?

11:53AM  10    A.   CORRECT.

11:53AM  11    Q.   I'D ASK YOU TO LOOK DOWN TO THE FOURTH LINE OF THE NEXT

11:53AM  12    PAGE, WHICH IS PAGE 5, AND I'LL ASK YOU TO BLOW THAT UP, WHICH

11:53AM  13    BEGINS "AS PART OF THIS INITIATIVE."

11:53AM  14    A.   OKAY.

11:53AM  15    Q.   AND THERE'S A REFERENCE IN THIS SENTENCE TO FINANCIAL

11:53AM  16    TRANSACTIONS WITH STRATEGIC PARTNERS THAT THERANOS WAS

11:53AM  17    CONCLUDING.

11:53AM  18         DO YOU SEE THAT?

11:54AM  19    A.   YES.

11:54AM  20    Q.   AND THEN IN THE NEXT SENTENCE, IT GOES ON TO SAY THAT

11:54AM  21    THERANOS WAS COMPLETING EQUITY TRANSACTIONS WITH STRATEGIC

11:54AM  22    ENTITIES WHO HAD PREVIOUSLY INVESTED IN THERANOS AND HAD THE

11:54AM  23    OPTION TO INVEST ADDITIONAL EQUITY THROUGH THE END OF 2013.

11:54AM  24         DO YOU SEE THAT?

11:54AM  25    A.   YES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6247

11:54AM   1    Q.   NOW, YOU KNEW THAT ABOUT THREE MONTHS BEFORE THIS EMAIL,

11:54AM   2    THERANOS HAD ANNOUNCED ITS PARTNERSHIP WITH WALGREENS; RIGHT?

11:54AM   3    A.   I DON'T RECALL THE TIMELINE.

11:54AM   4    Q.   OKAY.   BUT YOU RECALL IT WAS SOME POINT BEFORE YOUR

11:54AM   5    DECISION TO INVEST IN DECEMBER OF 2013 THAT YOU KNEW THAT THERE

11:54AM   6    WAS A PARTNERSHIP BETWEEN THERANOS AND WALGREENS; CORRECT?

11:54AM   7    A.   AGAIN, I DON'T RECALL THE TIMELINE.

11:54AM   8    Q.   OKAY.   DO YOU THINK THAT YOU DID NOT KNOW AT THE TIME OF

11:54AM   9    THIS INVESTMENT THAT THERANOS HAD A PARTNERSHIP WITH WALGREENS?

11:54AM   10   A.   I WOULD HAVE TO REVIEW MY NOTES OR REVIEW INFORMATION.   I

11:54AM   11   DON'T RECALL THE TIMELINE.

11:54AM   12   Q.   OKAY.   LET'S GO ON TO THE NEXT SENTENCE OF THIS EMAIL

11:55AM   13   WHICH GOES ON TO SAY, "THE PRICE PER SHARE OF THERANOS SERIES

11:55AM   14   C-1 PREFERRED STOCK IN THE TRANSACTIONS CLOSING BETWEEN NOW AND

11:55AM   15   DECEMBER 31ST, 2013 IS $75 A SHARE."

11:55AM   16        DO YOU SEE THAT?

11:55AM   17   A.   YES.

11:55AM   18   Q.   NOW, REMIND US WHAT YOU HAD PAID IN 2006 FOR SHARES IN

11:55AM   19   THERANOS IN SERIES C.

11:55AM   20   A.   I BELIEVE IT WAS $2.82.

11:55AM   21   Q.   $2.82.

11:55AM   22        SO WHEN YOU RECEIVED THIS COMMUNICATION, YOU REALIZED THAT

11:55AM   23   THE VALUE OF THOSE SHARES HAD GONE UP FROM $2.82 UP TO $75 PER

11:55AM   24   SHARE; CORRECT?

11:55AM   25   A.   CORRECT.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6248

11:55AM   1    Q.   AND I THINK WE TALKED ON WEDNESDAY ABOUT THE FACT THAT

11:55AM   2    WHEN YOU INVESTED IN 2006 THAT YOU HAD PURCHASED A LITTLE OVER

11:55AM   3    2,000 SHARES; RIGHT?

11:56AM   4    A.   I DON'T RECALL THE NUMBER.

11:56AM   5    Q.   OKAY.  BUT YOU REMEMBER IN DOLLAR FIGURES YOUR INVESTMENT

11:56AM   6    WAS A LITTLE BIT OVER A MILLION ONE?

11:56AM   7    A.   YES.

11:56AM   8    Q.   NOW, IF YOU WERE TO MULTIPLY THE INVESTMENT THAT YOU MADE

11:56AM   9    IN 2006 BY THIS INCREASE IN THE VALUE OF SHARES, YOU REALIZED

11:56AM   10   WHEN YOU RECEIVED THIS COMMUNICATION THAT YOU WERE HOLDING

11:56AM   11   SHARES OF THERANOS THAT WERE NOW WORTH ABOUT $30 MILLION;

11:56AM   12   RIGHT?

11:56AM   13   A.   CORRECT.

11:56AM   14   Q.   AND THAT'S MORE THAN 2000 PERCENT RETURN; CORRECT?

11:56AM   15   A.   I'D HAVE TO USE A CALCULATOR.

11:56AM   16   Q.   BUT A BIG RETURN WE CAN AGREE; RIGHT?

11:56AM   17   A.   YES.

11:56AM   18   Q.   AND YOU HAD HEARD SOMETHING THAT YOU REFERENCED IN THE

11:56AM   19   EMAIL TO MR. BALWANI THAT THERE MIGHT BE ANOTHER EQUITY

11:56AM   20   OFFERING SHORTLY AFTER JANUARY 1, 2014; CORRECT?

11:56AM   21   A.   THAT WAS COMMUNICATION FROM SUNNY TO ME.

11:56AM   22   Q.   OKAY.  HE TOLD YOU THAT --

11:57AM   23   A.   HE TOLD ME THERE WAS GOING TO BE ANOTHER INSTITUTIONAL

11:57AM   24   ROUND SHORTLY AFTER THIS ONE CLOSED AT $17, THAT THIS IS WHAT

11:57AM   25   IS CALLED A FRIENDS AND FAMILY ROUND, AND IT WAS BASICALLY

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6249

11:57AM  1    DOING US A FAVOR SINCE WE HAD BEEN LONG-TIME SHAREHOLDERS.

11:57AM  2    Q.   RIGHT.  SINCE YOU HAD ALREADY INVESTED YEARS AGO, YOU

11:57AM  3    COULD BUY BEFORE THE END OF THE YEAR AT $15 A SHARE; CORRECT?

11:57AM  4    A.   CORRECT.

11:57AM  5    Q.   AND PRESUMABLY, IF YOU WANTED, YOU COULD BUY AFTER THE NEW

11:57AM  6    YEAR, BUT YOU WOULD GET A SLIGHTLY REDUCED PRICE?

11:57AM  7    A.   NO.  WE WEREN'T OFFERED -- WHAT WAS TOLD TO ME WAS IT WAS

11:57AM  8    AN INSTITUTIONAL ROUND AND THEY WERE SELLING IT TO

11:57AM  9    INSTITUTIONS, NOT TO INDIVIDUALS.

11:57AM  10   Q.   I SEE.  AND YOU WERE CURIOUS, IN YOUR COMMUNICATIONS, TO

11:57AM  11   VERIFY WITH MR. BALWANI WHETHER THAT WAS TRUE; RIGHT?  WE

11:57AM  12   LOOKED AT THAT A MOMENT AGO?

11:57AM  13   A.   YES.

11:57AM  14   Q.   DO YOU KNOW WHETHER THERANOS MADE AN OFFERING IN 2013 TO

11:57AM  15   INSTITUTIONAL INVESTORS OF $17 A SHARE?

11:57AM  16   A.   I TRIED TO FIND OUT, AND I WAS SHUT OUT OF THAT

11:57AM  17   COMMUNICATION.

11:58AM  18   Q.   OKAY.  BUT NOW IN 2021, YOU KNOW THAT THERANOS DID MAKE AN

11:58AM  19   EQUITY OFFERING OF SHARES AT $17 A SHARE TO INSTITUTIONAL

11:58AM  20   INVESTORS; CORRECT?

11:58AM  21   A.   I DON'T HAVE ANY INFORMATION TO CONFIRM THAT.

11:58AM  22   Q.   NOW, I WANT YOU TO JUST -- IN THE INTEREST OF TIME I'M

11:58AM  23   GOING TO SHOW YOU EXHIBIT 3530, AND I'M NOT GOING TO ASK YOU TO

11:58AM  24   REVIEW IT INDIVIDUALLY, BUT I WANT TO GIVE YOU A MOMENT TO LOOK

11:58AM  25   AT EXHIBIT 3530 AND TO CONFIRM FOR US THAT THIS IS THE STOCK

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6250

| | | |
|---|---|---|
| 11:58AM | 1 | PURCHASE AGREEMENT THAT YOU'VE SIGNED IN CONNECTION WITH YOUR |
| 11:58AM | 2 | 2013 INVESTMENT. |
| 11:58AM | 3 | AND IN THAT REGARD, I WOULD ASK YOU TO LOOK PARTICULARLY |
| 11:58AM | 4 | AT PAGE 29, WHICH IS THE SIGNATURE PAGE. |
| 11:59AM | 5 | A.   OKAY. |
| 11:59AM | 6 | Q.   IS THAT RIGHT, THIS IS THE STOCK PURCHASE AGREEMENT THAT |
| 11:59AM | 7 | YOU SIGNED IN CONNECTION WITH YOUR 2013 INVESTMENT? |
| 11:59AM | 8 | A.   I DON'T KNOW BECAUSE THE FRONT PAGE SAYS INITIAL CLOSING |
| 11:59AM | 9 | DATE JULY 1ST, 2010. |
| 11:59AM | 10 | Q.   WELL, THAT'S AN AMENDMENT OF A STOCK PURCHASE AGREEMENT |
| 11:59AM | 11 | THAT HAD BEEN MADE IN 2010, AND THIS WAS AN AMENDMENT THAT WAS |
| 11:59AM | 12 | BEING ENACTED AT THE END OF 2013; CORRECT? |
| 11:59AM | 13 | A.   I DON'T KNOW. |
| 11:59AM | 14 | Q.   WELL, LET ME ASK YOU TO LOOK AT THE FIFTH PAGE OF THE |
| 11:59AM | 15 | EXHIBIT. |
| 11:59AM | 16 | JUST TAKE A MOMENT TO REVIEW THE FIRST PARAGRAPH AND THEN |
| 11:59AM | 17 | THE PARAGRAPHS A THROUGH D. |
| 12:00PM | 18 | A.   OKAY. |
| 12:00PM | 19 | Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERE HAD BEEN |
| 12:00PM | 20 | A -- THAT THIS DOCUMENT WAS AN AMENDMENT OF AN EARLY STOCK |
| 12:00PM | 21 | PURCHASE AGREEMENT AND THAT IT WAS IN CONNECTION WITH THE |
| 12:00PM | 22 | CLOSINGS WHICH WERE HELD ON DECEMBER 31ST, 2013? |
| 12:00PM | 23 | A.   IT DOESN'T REFLECT MY RECOLLECTION.  I'M READING IT NOW, |
| 12:00PM | 24 | AND IT APPEARS THAT THIS WAS A 2010 AGREEMENT THAT WAS AMENDED, |
| 12:00PM | 25 | BUT I DON'T RECALL. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6251

```
12:00PM   1    Q.   OKAY.  LET ME ASK YOU TO LOOK BRIEFLY AT PAGE 11,

12:00PM   2    SECTION 4.  THAT'S PAGE 11 OF THE EXHIBIT.

12:00PM   3         AND MY QUESTION TO YOU IS ONLY, WITHOUT GOING THROUGH THEM

12:00PM   4    INDIVIDUALLY, YOU ACKNOWLEDGED THAT YOU MADE THE SAME

12:01PM   5    REPRESENTATIONS AND WARRANTIES ABOUT YOUR INVESTMENT IN 2013

12:01PM   6    THAT YOU HAD MADE IN 2006; IS THAT RIGHT?

12:01PM   7    A.   WELL, AGAIN, I'D HAVE TO LOOK AT THE 2006 AGREEMENT AND

12:01PM   8    THE 2010 AMENDED TO 2013.  I PRESUME IF YOU SAY SO, THAT THE

12:01PM   9    LANGUAGE IS THE SAME.  BUT I WOULDN'T KNOW WITHOUT COMPARING.

12:01PM  10    Q.   WELL, LET'S JUST LOOK THROUGH IT VERY QUICKLY.

12:01PM  11         IF YOU LOOK AT PARAGRAPH 4.4.  DO YOU SEE THAT?

12:01PM  12    A.   YES, I DO.

12:01PM  13    Q.   DO YOU AGREE WITH ME, DO YOU NOT, THAT THIS AGREEMENT

12:01PM  14    ACKNOWLEDGES THAT THE COMPANY HAD A LIMITED FINANCIAL AND

12:01PM  15    OPERATING HISTORY?

12:01PM  16    A.   I WOULDN'T AGREE WITH THAT AT ALL.

12:01PM  17    Q.   OKAY.  BUT YOU AGREE THAT YOU ACKNOWLEDGED IT WHEN YOU

12:01PM  18    SIGNED THIS AGREEMENT?

12:01PM  19    A.   I WOULD AGREE THAT THIS IS BOILERPLATE.  IT'S IN EVERY

12:01PM  20    AGREEMENT LIKE THIS, AND EVERYONE SIGNS IT.

12:02PM  21         BUT THERE'S ALSO AN UNDERSTANDING WHAT YOU'RE INVESTING

12:02PM  22    IN, AND THIS CONTRADICTS THE UNDERSTANDING WHAT I WAS INVESTING

12:02PM  23    IN AT THE TIME.

12:02PM  24    Q.   OKAY.  SO WHEN YOU SIGNED THIS LEGAL DOCUMENT SAYING THAT

12:02PM  25    YOU ACKNOWLEDGED THAT THE COMPANY HAD A LIMITED FINANCIAL AND
```

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6252

| | | |
|---|---|---|
| 12:02PM | 1 | OPERATING HISTORY, YOU DID NOT MEAN FOR THERANOS TO RELY ON THE |
| 12:02PM | 2 | DOCUMENT THAT YOU WERE SENDING BACK TO THEM SIGNED? |
| 12:02PM | 3 | A.   AGAIN, THIS, THIS CONTRADICTS EVERYTHING THAT I'D |
| 12:02PM | 4 | UNDERSTOOD UP TO THIS POINT IN TIME, AND THIS IS SOMETHING THAT |
| 12:02PM | 5 | IS IN EVERY DOCUMENT THAT YOU'RE INVESTING IN A NON-PUBLIC |
| 12:02PM | 6 | COMPANY, AND THIS IS WHAT WE CALL BOILERPLATE. |
| 12:02PM | 7 | Q.   I'M ASKING YOU A LITTLE BIT OF A DIFFERENT QUESTION. |
| 12:02PM | 8 | WHEN YOU SIGNED THIS LEGAL DOCUMENT AT THE COMPANY'S |
| 12:02PM | 9 | REQUEST AND SENT IT BACK TO THEM, FIRST OF ALL, YOU |
| 12:02PM | 10 | ACKNOWLEDGED THAT THE DOCUMENT ACKNOWLEDGED THAT YOU KNEW THE |
| 12:02PM | 11 | COMPANY HAD A LIMITED FINANCIAL AND OPERATING HISTORY AND THAT |
| 12:02PM | 12 | THE INVESTMENT WAS HIGHLY SPECULATIVE? |
| 12:03PM | 13 | A.   NO. |
| 12:03PM | 14 | Q.   YOU ACKNOWLEDGED THAT? |
| 12:03PM | 15 | A.   NO, I'M NOT ACKNOWLEDGING THAT THAT'S MY UNDERSTANDING. |
| 12:03PM | 16 | I'M ACKNOWLEDGING THAT THIS IS BOILERPLATE.  THAT IF YOU |
| 12:03PM | 17 | WANT TO INVEST, YOU MUST SIGN THIS.  AND I HAD NO POWER TO |
| 12:03PM | 18 | CHANGE THIS.  BUT THAT'S NOT MY UNDERSTANDING OF WHERE THE |
| 12:03PM | 19 | COMPANY WAS. |
| 12:03PM | 20 | Q.   WELL, THE COMPANY DIDN'T PUT A GUN TO YOUR HEAD AND MAKE |
| 12:03PM | 21 | YOU INVEST, DID THEY? |
| 12:03PM | 22 | A.   EXCUSE ME.  I DON'T UNDERSTAND YOUR QUESTION. |
| 12:03PM | 23 | Q.   YOU WERE PERFECTLY FREE NOT TO SIGN THIS DOCUMENT, WEREN'T |
| 12:03PM | 24 | YOU? |
| 12:03PM | 25 | A.   SIGNING THE DOCUMENT WAS A PRECONDITION TO INVESTING IN |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                      6253

| | | |
|---|---|---|
| 12:03PM | 1 | SOMETHING THAT I WAS MADE OF THE UNDERSTANDING THAT THIS WAS A |
| 12:03PM | 2 | COMPANY THAT HAD PROVEN ITSELF, WAS SUCCESSFUL, AND THIS WAS A |
| 12:03PM | 3 | FAVOR TO BE ABLE TO INVEST AT $15 BECAUSE THEY WERE SUCCESSFUL |
| 12:03PM | 4 | AND ON THEIR WAY.  AND AROUND THE CORNER THEY WERE GOING TO |
| 12:03PM | 5 | SELL A LOT OF STOCK TO INVESTORS AT $17 TO FURTHER HELP THE |
| 12:03PM | 6 | COMPANY GROW. |
| 12:03PM | 7 | Q.   I SEE.  SO YOU SAY THAT THE DOCUMENT WHICH CONSTITUTED THE |
| 12:03PM | 8 | DOCUMENT REFLECTING YOUR AGREEMENT, THAT HAD NO MEANING; |
| 12:04PM | 9 | CORRECT?  THAT'S WHAT YOU'RE SAYING? |
| 12:04PM | 10 | A.   I'M NOT SAYING THAT IT HAD NO MEANING, BUT THIS IS LEGAL |
| 12:04PM | 11 | BOILERPLATE THAT IS IN EVERY -- |
| 12:04PM | 12 | Q.   WHAT MEANING WOULD YOU ACKNOWLEDGE THAT IT HAD? |
| 12:04PM | 13 | A.   CAN YOU REPHRASE YOUR QUESTION.  I DON'T UNDERSTAND IT. |
| 12:04PM | 14 | Q.   WELL, YOU ACKNOWLEDGED THAT THIS LEGAL DOCUMENT, WHICH YOU |
| 12:04PM | 15 | SIGNED, AND WHICH THERANOS RELIED ON, HAS SOME MEANING; RIGHT? |
| 12:04PM | 16 | A.   NO, I DON'T ACKNOWLEDGE THAT. |
| 12:04PM | 17 | Q.   YOU BELIEVE IT HAS NO MEANING.  OKAY. |
| 12:04PM | 18 | LET'S MOVE NEXT TO THE ISSUE OF OPPORTUNITIES THAT YOU HAD |
| 12:04PM | 19 | AT VARIOUS POINTS IN TIME TO SELL YOUR SHARES IN THERANOS. |
| 12:04PM | 20 | DO YOU RECALL WHEN WE LOOKED AT SOME DOCUMENTS FROM MAY OF |
| 12:04PM | 21 | 2010 THAT THERE WAS A REFERENCE TO AN OFFER MADE TO YOU TO SELL |
| 12:04PM | 22 | YOUR STOCK AT FIVE TIMES WHAT YOU PAID FOR THEM? |
| 12:04PM | 23 | A.   NOT A GENUINE OFFER, BUT I DO RECALL. |
| 12:04PM | 24 | Q.   LET'S LOOK BACK AT EXHIBIT 14103. |
| 12:05PM | 25 | AND I'M LOOKING AT THE EMAIL AT THE TOP OF THAT EXHIBIT, |

EISENMAN CROSS BY MR. DOWNEY (RES.)                        6254

12:05PM   1    THE VERY TOP EMAIL EXCHANGE, WHICH IS AN EMAIL FROM MS. HOLMES

12:05PM   2    TO YOU.

12:05PM   3        DO YOU HAVE THAT?

12:05PM   4    A.   YES.

12:05PM   5    Q.   OKAY.  AND I'M JUST DIRECTING YOUR ATTENTION TO THE LAST

12:05PM   6    PARAGRAPH.

12:05PM   7        DO YOU SEE THAT?

12:05PM   8    A.   YES.

12:05PM   9    Q.   AND MS. HOLMES SAYS TO YOU, "GIVEN YOUR FRUSTRATION LEVEL

12:05PM   10   AND OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I STRONGLY

12:05PM   11   ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I PRESENTED ON OUR

12:05PM   12   LAST CALL TO REALIZE THE RETURN ON YOUR INVESTMENT.  WE

12:06PM   13   RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME, AND IF WE

12:06PM   14   PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN PROVIDE

12:06PM   15   YOU WITH A GREATER THAN 5X RETURN ON YOUR INVESTMENT IN

12:06PM   16   THERANOS."

12:06PM   17        CORRECT?

12:06PM   18   A.   CORRECT.

12:06PM   19   Q.   NOW, HAD YOU SOLD YOUR SHARES IN 2013 IN THERANOS AT A 5X

12:06PM   20   VALUATION, THAT WOULD HAVE BEEN A LITTLE BIT UNDER $6 MILLION

12:06PM   21   FOR YOU; IS THAT RIGHT?

12:06PM   22   A.   THERE'S NO WAY I COULD HAVE SOLD MY SHARES AT 5X BECAUSE I

12:06PM   23   WAS SERIOUSLY CONSIDERING THIS OFFER, AND THE COMPANY NEVER

12:06PM   24   CAME THROUGH WITH THE OFFER.  THEY JUST MENTIONED IT, AND THEY

12:06PM   25   DROPPED THE BALL.

EISENMAN CROSS BY MR. DOWNEY (RES.)                               6255

| | | |
|---|---|---|
| 12:06PM | 1 | Q.   YOU DIDN'T RESPOND TO THIS EMAIL BY SAYING, BOY, I'LL TAKE |
| 12:06PM | 2 | THAT OFFER, DID YOU? |
| 12:06PM | 3 | A.   I DON'T RECALL HOW I RESPONDED. |
| 12:06PM | 4 | Q.   WELL, IN FACT, YOU SENT A SERIES OF EMAILS OVER THE NEXT |
| 12:06PM | 5 | SEVERAL MONTHS SAYING THAT YOU WANTED THIS PIECE OF |
| 12:06PM | 6 | INFORMATION, AND THAT PIECE OF INFORMATION, AND ANOTHER PIECE |
| 12:07PM | 7 | OF INFORMATION; CORRECT? |
| 12:07PM | 8 | A.   WHICH IS A LOGICAL RESPONSE IF YOU'RE GOING TO SELL STOCK. |
| 12:07PM | 9 | YOU WOULD LIKE TO BE AN INFORMED INVESTOR, NOT TO BE TOTALLY |
| 12:07PM | 10 | HIDDEN AND ALL OF THE INFORMATION FROM THE COMPANY BEFORE YOU |
| 12:07PM | 11 | MAKE AN INVESTMENT DECISION.  IT HAPPENS WITH EVERY OTHER |
| 12:07PM | 12 | INVESTMENT I'VE EVER BEEN IN.  NOBODY HAS EVER TREATED ME THIS |
| 12:07PM | 13 | WAY. |
| 12:07PM | 14 | Q.   IN OTHER WORDS, WHAT YOU'RE SAYING IS THAT YOU KNEW AT THE |
| 12:07PM | 15 | TIME THAT THE COMPANY WAS SIX YEARS OLD, THAT A RETURN WHICH |
| 12:07PM | 16 | MADE YOU $5 AND A HALF MILLION WAS NOT SUFFICIENT FROM YOUR |
| 12:07PM | 17 | PERSPECTIVE.  YOU NEEDED MORE INFORMATION TO MAKE THAT |
| 12:07PM | 18 | DECISION; IS THAT RIGHT? |
| 12:07PM | 19 | A.   IT IS CORRECT THAT TO MAKE ANY INVESTMENT DECISION YOU |
| 12:07PM | 20 | HAVE TO HAVE KNOWLEDGE ABOUT WHAT IS GOING ON WITH THE COMPANY. |
| 12:07PM | 21 | I DID NOT HAVE ANY KNOWLEDGE FOR AN EXTENDED PERIOD OF |
| 12:07PM | 22 | TIME, BUT I DID HAVE PRIOR KNOWLEDGE THAT THEY PROMISED THEY |
| 12:07PM | 23 | WERE GOING TO DO HUNDREDS OF MILLIONS OF DOLLARS OF REVENUE, |
| 12:07PM | 24 | THEY HAD ALL OF THESE CONTRACTS WITH MAJOR INTERNATIONAL |
| 12:07PM | 25 | PHARMACEUTICAL COMPANIES, THEY WERE, THEY WERE GOING INTO A |

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6256

12:08PM    1    SECOND LINE OF BUSINESS BY SELLING DATA.  THERE WAS POTENTIAL

12:08PM    2    VALUE IN THIS COMPANY AT A MUCH EARLIER STAGE, AND I WAS

12:08PM    3    TOTALLY IN THE DARK FOR AN EXTENDED PERIOD OF TIME BEFORE THIS

12:08PM    4    OFFER WAS MADE.

12:08PM    5         AND AGAIN, I'LL EMPHASIZE, I CONSIDERED THIS OFFER, BUT IT

12:08PM    6    NEVER CAME THROUGH.  THEY NEVER FOLLOWED UP.

12:08PM    7    Q.  OKAY.  THEN AFTER YOU INVESTED AGAIN IN DECEMBER OF 2013,

12:08PM    8    YOU HAD OTHER OPPORTUNITIES TO SELL YOUR SHARES IN THERANOS; IS

12:08PM    9    THAT RIGHT?

12:08PM   10    A.  COULD YOU REFRESH MY MEMORY.

12:08PM   11    Q.  SURE.  LOOK AT --

12:09PM   12         YOUR HONOR, I'M SHOWING THE WITNESS EXHIBIT 2468, WHICH IS

12:09PM   13    IN THE GOVERNMENT'S NOTEBOOK FROM FRIDAY.

12:09PM   14         MAY I APPROACH THE WITNESS?

12:09PM   15              THE COURT:  YES, YES.

12:09PM   16    BY MR. DOWNEY:

12:09PM   17    Q.  (HANDING.)

12:09PM   18              THE COURT:  THIS IS THE REDACTED VERSION?

12:09PM   19              MR. DOWNEY:  CORRECT.  I BELIEVE SO.

12:10PM   20    Q.  AND ALL I'M REALLY INTERESTED IN HERE IS THE EMAIL AT THE

12:10PM   21    BOTTOM OF PAGE 2 AT 8:26 A.M. ON MARCH 30, 2015.

12:10PM   22         DO YOU SEE THAT?

12:10PM   23    A.  YES.

12:10PM   24    Q.  AND IN THIS EMAIL YOU TELL MR. BALWANI THAT YOU HAD BEEN

12:10PM   25    INFORMED OF AN OPPORTUNITY TO SELL THERANOS STOCK; IS THAT

EISENMAN CROSS BY MR. DOWNEY (RES.)                            6257

12:10PM   1      RIGHT?

12:10PM   2      A.   YES.

12:10PM   3      Q.   AND I WANT TO GO UP ABOVE THAT.

12:10PM   4           AND MR. BALWANI TELLS YOU THAT "THE LAST TRANSACTION WAS

12:10PM   5      AT $17 PER SHARE AS YOU ALREADY KNOW."

12:10PM   6           HE DIDN'T SAY THAT THERANOS WOULD EVER CONSIDER A

12:10PM   7      LIQUIDITY EVENT IN 2015, AND HE DIDN'T KNOW ANYTHING ABOUT THE

12:10PM   8      TRANSACTION BELOW.

12:10PM   9           DO YOU SEE THAT?

12:10PM   10     A.   YES.

12:10PM   11     Q.   WHAT OPPORTUNITY HAD MR. BALWANI -- HAD COME TO YOUR

12:10PM   12     ATTENTION THAT YOU WERE EMAILING MR. BALWANI ABOUT?

12:11PM   13     A.   YOU KNOW, I'M NOT SURE OF THE TIMELINE, AND I'M NOT SURE

12:11PM   14     IF THIS WAS THE TRANSACTION.

12:11PM   15          BUT I WAS APPROACHED BY CHRIS BOIES, WHO IS THE SON OF

12:11PM   16     DAVID BOIES, WHO IS THE THERANOS COUNSEL, THAT IF I WAS WILLING

12:11PM   17     TO SELL ALL OF MY STOCK AND THERE WAS ANOTHER COINVESTOR WHO

12:11PM   18     WAS ALSO ASKING QUESTIONS, IF HE JOINED ME IN SELLING

12:11PM   19     100 PERCENT OF HIS STOCK, THAT THEY WERE WILLING TO BUY US OUT

12:11PM   20     OF ALL OF OUR STOCK.

12:11PM   21     Q.   OKAY.  LET ME -- WE'LL GET TO THAT IN A MOMENT.  LET ME

12:11PM   22     ASK YOU TO LOOK BRIEFLY AT THE TOP OF PAGE 3 OF THIS EMAIL TO

12:11PM   23     SEE IF THIS IS A DIFFERENT EVENT.

12:11PM   24          YOU CAN JUST HIGHLIGHT THE FIRST PARAGRAPH THERE.

12:11PM   25          AND DO YOU SEE THERE THAT THERE IS A REFERENCE TO AN

EISENMAN CROSS BY MR. DOWNEY (RES.)                        6258

12:11PM   1      ENTITY CALLED BROADMARK?

12:11PM   2      A.   I DO.

12:11PM   3      Q.   AND WHAT IS BROADMARK?

12:11PM   4      A.   I DON'T RECALL.

12:11PM   5      Q.   IS THAT FORM OF SOME ENTITY THAT WAS CREATED SPECIALLY TO

12:12PM   6      INVEST IN THERANOS SHARES?

12:12PM   7      A.   CAN YOU TELL ME?  I DON'T RECALL WHO BROADMARK IS.

12:12PM   8      Q.   WELL, I'M ASKING YOU.  I DON'T KNOW.  I WASN'T PART OF

12:12PM   9      THESE EMAIL COMMUNICATIONS.

12:12PM  10      A.   YEAH, I DON'T RECALL WHO THEY ARE.

12:12PM  11      Q.   OKAY.  AND DO YOU SEE THAT THE EMAIL GOES ON TO SAY THAT

12:12PM  12      "THE SHARES ARE BEING SOLD BY EXISTING THERANOS SHAREHOLDERS"?

12:12PM  13      A.   YES.

12:12PM  14      Q.   AND THEN IT GOES ON TO DESCRIBE SOME FINANCIAL ISSUES,

12:12PM  15      VALUATION, AND PROVIDING AN OPPORTUNITY, ET CETERA; CORRECT?

12:12PM  16      A.   YEAH.  I ALSO SEE IT SAYS THAT THEY'RE SUBJECT TO A RIGHT

12:12PM  17      OF FIRST REFUSAL, SO YOU HAVE TO OFFER THEM TO THE COMPANY

12:12PM  18      FIRST AND GET THEIR PERMISSION PRESUMABLY.

12:12PM  19      Q.   RIGHT.  THIS WOULD NOT BE THE OFFER FROM THE COMPANY THAT

12:12PM  20      YOU MENTIONED A MOMENT AGO; RIGHT?

12:12PM  21      A.   I STAND CORRECTED.

12:12PM  22      Q.   THIS WOULD BE AN OFFER BY A THIRD PARTY, WE WILL BUY YOUR

12:12PM  23      SHARES; CORRECT?

12:12PM  24      A.   CORRECT.

12:12PM  25      Q.   AND THEN YOU WERE COMMUNICATING WITH MR. BALWANI ABOUT

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6259

12:13PM   1    THAT; CORRECT?

12:13PM   2    A.   CORRECT.

12:13PM   3    Q.   NOW, IN THIS OFFER IT CONVEYS THAT THERE WAS A $9 BILLION

12:13PM   4    VALUATION IN MAY OF 2014.

12:13PM   5         DO YOU SEE THAT?

12:13PM   6    A.   YES.

12:13PM   7    Q.   AND WHAT WOULD YOUR SHARES IN THERANOS BE WORTH, THE

12:13PM   8    SHARES THAT YOU PAID A MILLION DOLLARS FOR, WHAT WOULD THEY BE

12:13PM   9    WORTH AT A $9 BILLION VALUATION FOR THE COMPANY?

12:13PM   10   A.   I WOULD HAVE TO HAVE A CALCULATOR.  YOU COULD PROBABLY

12:13PM   11   TELL ME.

12:13PM   12   Q.   WELL, AM I RIGHT THAT IT WOULD BE SOMEWHERE BETWEEN $30

12:13PM   13   AND $35 MILLION?

12:13PM   14   A.   I DON'T KNOW.

12:13PM   15   Q.   OKAY.  NOW, DID YOU PROCEED WITH THIS OFFER FROM BROADMARK

12:13PM   16   TO SELL YOUR SHARES IN THERANOS?

12:13PM   17   A.   I, I DON'T HAVE A STRONG RECOLLECTION.  I'M SURE THAT I

12:13PM   18   PURSUED IT TO SEE IF IT WAS LEGITIMATE, AND I DON'T RECALL IF

12:13PM   19   THIS OFFER WAS LEGITIMATE OR NOT, IF IT WAS REALLY AN

12:14PM   20   OPPORTUNITY, BECAUSE THERE WERE A LOT OF OPPORTUNITIES FLOATING

12:14PM   21   AROUND IN THE MARKET, AND MOST OF THEM WERE NOT LEGITIMATE.

12:14PM   22   Q.   AND IS IT FAIR TO SAY, JUST BASED ON YOUR RECOLLECTION,

12:14PM   23   YOU DON'T HAVE A VERY STRONG RECOLLECTION OF THE BROADMARK

12:14PM   24   OFFER TO YOU ONE WAY OR THE OTHER?

12:14PM   25   A.   NO, I DON'T.

EISENMAN CROSS BY MR. DOWNEY (RES.)                    6260

| | | |
|---|---|---|
| 12:14PM | 1 | Q.  LET ME ASK YOU TO LOOK AT 13150.  AND I MAY HAVE TO GIVE |
| 12:14PM | 2 | YOU -- OH, NO.  IT SHOULD BE IN YOUR NOTEBOOK. |
| 12:14PM | 3 | A.  OKAY. |
| 12:14PM | 4 | Q.  AND WITH RESPECT TO THE EMAIL, EXCHANGES IN THIS EMAIL, |
| 12:14PM | 5 | ARE THEY EMAIL EXCHANGES BETWEEN -- ONE EMAIL IS BETWEEN YOU |
| 12:15PM | 6 | AND CHRIS BOIES; CORRECT? |
| 12:15PM | 7 | A.  CORRECT. |
| 12:15PM | 8 | Q.  AND ONE EMAIL IS BETWEEN YOU AND MR. HARRIS, ANOTHER |
| 12:15PM | 9 | INVESTOR FROM HOUSTON; IS THAT RIGHT? |
| 12:15PM | 10 | A.  YES. |
| 12:15PM | 11 | Q.  OKAY.  AND THESE ALL RELATE TO YOUR INVESTMENT IN |
| 12:15PM | 12 | THERANOS; CORRECT? |
| 12:15PM | 13 | A.  CORRECT. |
| 12:15PM | 14 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13150. |
| 12:15PM | 15 | MR. BOSTIC:  YOUR HONOR, JUST 401 AND BEYOND THE |
| 12:15PM | 16 | SCOPE OF THE DIRECT IN LIGHT OF THE TIMING. |
| 12:15PM | 17 | (PAUSE IN PROCEEDINGS.) |
| 12:15PM | 18 | THE COURT:  ALL RIGHT.  THANK YOU.  I'LL ALLOW IT. |
| 12:15PM | 19 | IT'S ADMITTED OVER OBJECTION.  IT CAN BE PUBLISHED. |
| 12:16PM | 20 | (DEFENDANT'S EXHIBIT 13150 WAS RECEIVED IN EVIDENCE.) |
| 12:16PM | 21 | BY MR. DOWNEY: |
| 12:16PM | 22 | Q.  I'LL ASK YOU TO LOOK AT THE BOTTOM EMAIL FIRST. |
| 12:16PM | 23 | A.  OKAY. |
| 12:16PM | 24 | Q.  AND THIS IS AN EMAIL FROM YOU TO CHRIS BOIES; CORRECT? |
| 12:16PM | 25 | A.  CORRECT. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6261

12:16PM   1     Q.   AND YOU'RE REPORTING ON A CALL THAT YOU HAD HAD WITH SOME

12:16PM   2     OF THE OTHER HOUSTON INVESTORS; CORRECT?

12:16PM   3     A.   CORRECT.

12:16PM   4     Q.   YOU'RE ASKING ABOUT A $15 OFFER TO BUY YOUR SHARES IN

12:16PM   5     THERANOS; CORRECT?

12:16PM   6     A.   CORRECT.

12:16PM   7     Q.   AND $15 IS THE VALUATION THAT HAD BEEN GIVEN TO SHARES

12:16PM   8     ABOUT A LITTLE OVER 18 MONTHS BEFORE THIS; CORRECT?

12:16PM   9     A.   CORRECT.

12:16PM   10    Q.   AND THE COMPANY HAD TOLD YOU, FOLLOWING UP ON SOME

12:16PM   11    COMMUNICATIONS THAT YOU HAD WITH THEM, THAT IT WAS WILLING TO

12:16PM   12    REPURCHASE YOUR SHARES IN THERANOS AT $15 A SHARE; CORRECT?

12:16PM   13    A.   INCORRECT.

12:17PM   14    Q.   OKAY.  WELL, YOU REFERENCED $15 OFFERED BY THE COMPANY AT

12:17PM   15    THE END OF THE FIRST PARAGRAPH OF YOUR EMAIL WITH CHRIS BOIES.

12:17PM   16         DO YOU SEE THAT?

12:17PM   17    A.   THEY MADE AN OFFER AT $15 AND THEY NEVER FOLLOWED THROUGH.

12:17PM   18    I TRIED TO CONTACT CHRIS BOIES FOR A PERIOD OF MONTHS, AND HE

12:17PM   19    DID NOT RESPOND TO EMAILS OR CALLS, SO IT WAS A FALSE OFFER.

12:17PM   20    Q.   OKAY.  WELL, LET'S START WITH WHAT THIS EMAIL REFLECTS.

12:17PM   21    YOU'RE REFERRING TO A $15 OFFER FROM THE COMPANY THAT YOU HAD

12:17PM   22    RECEIVED; CORRECT?

12:17PM   23    A.   CORRECT.

12:17PM   24    Q.   AND THEN YOU SAY, WELL, THE CURRENT VALUATION IS PROBABLY

12:17PM   25    WELL IN EXCESS OF $15; CORRECT?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6262

12:17PM   1     A.   CORRECT.

12:17PM   2     Q.   AND YOU WANT TO FIND OUT MORE INFORMATION ABOUT THE

12:17PM   3     COMPANY THAT WOULD ALLOW YOU TO MAKE A JUDGMENT AS TO WHETHER

12:17PM   4     YOU SHOULD, IN FACT, BE INVESTING AT MORE THAN -- IN FACT, YOUR

12:17PM   5     INVESTMENT WAS WORTH MORE THAN $15 PER SHARE; CORRECT?

12:18PM   6     A.   A LOGICAL QUESTION BEFORE YOU MAKE AN INVESTMENT DECISION

12:18PM   7     IS TO BE ARMED WITH FINANCIAL INFORMATION, AND WE HAD --

12:18PM   8     Q.   AND THAT'S WHAT YOU WERE TRYING TO DO?

12:18PM   9     A.   WE HAD NO FINANCIAL INFORMATION TO MAKE A RATIONAL

12:18PM   10    DECISION.

12:18PM   11    Q.   OKAY.  AND JUST TO SORT OF REORIENT US TO THIS VALUATION,

12:18PM   12    IT'S THE SAME VALUATION AT WHICH YOU BOUGHT SHARES 18 MONTHS

12:18PM   13    BEFORE.  THIS OFFER, HOWEVER YOU CHARACTERIZE IT, THIS OFFER

12:18PM   14    WAS AN OFFER TO BUY YOUR SHARES IN THERANOS AT SOMEWHERE

12:18PM   15    BETWEEN $25 AND $30 MILLION IN THERANOS; RIGHT?

12:18PM   16    A.   RIGHT.

12:18PM   17    Q.   AND YOU THOUGHT THAT THE SHARES WERE PROBABLY WORTH ABOUT

12:18PM   18    ANOTHER $4 A SHARE, CORRECT, POTENTIALLY?

12:18PM   19    A.   I DIDN'T KNOW WHAT THEY WERE WORTH.  I DIDN'T HAVE ANY

12:18PM   20    INFORMATION TO BASE A RATIONAL DECISION.

12:19PM   21    Q.   OKAY.  BUT YOU TOLD THERANOS THAT YOU HAD HEARD THERE WAS

12:19PM   22    A, QUOTE-UNQUOTE, "POST-MONEY ROUND AT $19;" CORRECT?

12:19PM   23    A.   I DON'T RECALL.

12:19PM   24    Q.   WHAT DOES THAT MEAN "A POST-MONEY ROUND AT $19"?

12:19PM   25    A.   THAT MEANS THEY'VE RAISED MONEY FROM OTHER INSTITUTIONS AT

EISENMAN CROSS BY MR. DOWNEY (RES.)                           6263

12:19PM   1      $19 PER SHARE.

12:19PM   2      Q.   OKAY.  SO YOU WERE SAYING I MIGHT WANT $19 A SHARE, TOO;

12:19PM   3      RIGHT?

12:19PM   4      A.   I DON'T RECALL WHAT I WAS SAYING.

12:19PM   5      Q.   OKAY.  BUT IF YOU WERE TO GET $19 A SHARE, YOU WOULD BE

12:19PM   6      PAID -- INSTEAD OF BETWEEN $25 AND $30 MILLION FOR YOUR

12:19PM   7      $1 MILLION INVESTMENT, YOU WOULD BE PAID SOMEWHERE BETWEEN $30

12:19PM   8      AND $35 MILLION; CORRECT?

12:19PM   9      A.   NO, THAT'S NOT A FAIR QUESTION BECAUSE IT DOESN'T MATTER

12:19PM  10      WHAT YOU GET PAID, YOU MAKE A DECISION BASED ON FINANCIAL

12:19PM  11      INFORMATION, AND THERE WAS NO FINANCIAL INFORMATION COMING FOR

12:19PM  12      AN EXTENDED PERIOD OF TIME.

12:19PM  13      Q.   AND YOU WERE CONTACTING MR. BOIES ABOUT THIS BECAUSE HE

12:20PM  14      WAS A LAWYER FOR THE COMPANY; CORRECT?

12:20PM  15      A.   HE CONTACTED ME FIRST, AND I WAS TRYING TO RESPOND.

12:20PM  16      Q.   FAIR ENOUGH.

12:20PM  17          THE DIALOGUE THAT YOU WERE HAVING WITH MR. BOIES WAS IN

12:20PM  18      HIS ROLE AS A LAWYER FOR THERANOS?

12:20PM  19      A.   WELL, HIS DAD WAS CHIEF COUNSEL.  I DON'T KNOW WHAT

12:20PM  20      CHRIS'S ROLE WAS.  HE'S SON OF DAVID, BUT I DON'T KNOW IF HE

12:20PM  21      HAD A ROLE WITH THE COMPANY OR IF THIS WAS JUST A ONE-OFF LEGAL

12:20PM  22      MATTER FOR HIM TO HANDLE.

12:20PM  23      Q.   RIGHT.  BUT YOUR UNDERSTANDING WAS THAT HE WAS

12:20PM  24      REPRESENTING THERANOS IN SOME CAPACITY --

12:20PM  25      A.   YES, THAT'S FAIR.

EISENMAN CROSS BY MR. DOWNEY (RES.)                            6264

12:20PM   1    Q.   -- IN YOUR DEALINGS WITH HIM?

12:20PM   2         AND SO THAT TRANSACTION AT $15 A SHARE NEVER HAPPENED;

12:20PM   3    CORRECT?

12:20PM   4    A.   AS I MENTIONED, THEY DROPPED THE BALL.  THEY STOPPED

12:20PM   5    COMMUNICATING.

12:20PM   6    Q.   OKAY.  AND THEN ABOUT A MONTH AFTER THIS IN AUGUST, THIS

12:20PM   7    IS FROM AUGUST OF 2015; CORRECT?

12:20PM   8    A.   YES.

12:20PM   9    Q.   AND THEN ABOUT A MONTH LATER YOU WENT OUT TO SEE IF YOU

12:20PM  10    COULD EVEN GET A BETTER OFFER FROM SOMEBODY ELSE, YOU WENT TO

12:20PM  11    AN ENTITY CALLED SHARESPOST; RIGHT?

12:20PM  12    A.   YES.

12:21PM  13    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 13191.

12:21PM  14    A.   OKAY.

12:21PM  15    Q.   AND GO DOWN TO THE BOTTOM OF -- WELL, LET ME ASK YOU, THIS

12:21PM  16    IS AN EMAIL EXCHANGE ABOUT YOUR THERANOS INVESTMENT WITH AN

12:21PM  17    INDIVIDUAL FROM AN ENTITY CALLED SHARESPOST; RIGHT?

12:21PM  18    A.   YES.

12:21PM  19    Q.   AND WHAT IS SHARESPOST?

12:21PM  20    A.   MY UNDERSTANDING IS THAT IT'S A MARKET MAKER TO MATCH

12:21PM  21    BUYERS AND SELLERS AND PRIVATE SECURITIES.

12:21PM  22    Q.   AND CAN YOU GIVE US MORE EXPLANATION ABOUT WHAT A MARKET

12:22PM  23    MAKER IS?

12:22PM  24    A.   IF THERE'S AN ILLIQUID INVESTMENT, IT TRIES TO PUT

12:22PM  25    TOGETHER BUYERS AND SELLERS, AND THEY TAKE A COMMISSION, AND

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6265

12:22PM  1    THEY TRY TO MATCH BUYERS AND SELLERS.

12:22PM  2    Q.   SO AN INVESTMENT THAT IS IN A PRIVATE COMPANY LIKE

12:22PM  3    THERANOS, THAT'S NOT TRADED ON THE NEW YORK STOCK EXCHANGE OR

12:22PM  4    ANY STOCK EXCHANGE; CORRECT?

12:22PM  5    A.   NO.

12:22PM  6    Q.   SO IF PEOPLE WHO HOLD SHARES IN THERANOS WANT TO SELL

12:22PM  7    THEIR SHARES IN THERANOS, THEY HAVE TO FIND ON THEIR OWN

12:22PM  8    SOMEONE TO SELL THOSE SHARES TO; CORRECT?

12:22PM  9    A.   CORRECT.

12:22PM  10   Q.   BUT SHARESPOST IS AN ENTITY THAT SAYS, WELL, WE'LL DO THAT

12:22PM  11   WORK FOR YOU, WE'LL FIND SOMEBODY WHO IS WILLING TO BUY YOUR

12:22PM  12   SHARES AT A CERTAIN PRICE, AND THEN YOU CAN DECIDE WHETHER YOU

12:22PM  13   WANT TO SELL THE SHARES OR NOT; RIGHT?

12:22PM  14   A.   I DON'T RECALL IF IT'S A SOLID COMMITMENT OR A LESS SOLID

12:22PM  15   COMMITMENT.

12:22PM  16   Q.   OKAY.  BUT THE GIST OF IT IS THAT THEY LOOK FOR POTENTIAL

12:22PM  17   BUYERS; CORRECT?

12:22PM  18   A.   THEY MATCH BUYERS AND SELLERS AND THEY TAKE A COMMISSION.

12:22PM  19   Q.   RIGHT.  AND IN THIS INSTANCE YOU WERE A SELLER; CORRECT?

12:23PM  20   A.   CORRECT.

12:23PM  21   Q.   AND YOU WERE COMMUNICATING TO -- WITH THE REPRESENTATIVE

12:23PM  22   OF SHARESPOST IN EXHIBIT 13191 TO DETERMINE HOW MUCH YOUR

12:23PM  23   INVESTMENT IN THERANOS MIGHT BE WORTH; RIGHT?

12:23PM  24   A.   I WAS DETERMINING WHAT THE MARKET WAS WORTH AND WHAT

12:23PM  25   SOMEONE MIGHT PAY FOR MY SHARES.

12:23PM   1          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:23PM   2   13191.

12:23PM   3          MR. BOSTIC:  401.  BEYOND THE SCOPE.

12:23PM   4          THE COURT:  I'LL ALLOW IT.  IT'S ADMITTED OVER

12:23PM   5   OBJECTION.

12:23PM   6      (DEFENDANT'S EXHIBIT 13191 WAS RECEIVED IN EVIDENCE.)

12:23PM   7   BY MR. DOWNEY:

12:23PM   8   Q.   I WANT TO DIRECT YOUR ATTENTION TO AN EMAIL ON THE BOTTOM

12:23PM   9   OF THE PAGE, AND THIS IS AN EMAIL TO YOU FROM SOMEONE AT

12:23PM   10  SHARESPOST; CORRECT?

12:23PM   11  A.   I'M SORRY, WHAT IS THE QUESTION?

12:23PM   12  Q.   THE EMAIL THAT WE'RE LOOKING AT ON THE SCREEN, WHICH IS

12:24PM   13  THE BOTTOM EMAIL ON PAGE 1 OF THE EMAIL, IS AN EMAIL FROM

12:24PM   14  SHARESPOST TO YOU; CORRECT?

12:24PM   15  A.   CORRECT.

12:24PM   16  Q.   AND IN THIS EMAIL HE'S PROVIDING THE INFORMATION ABOUT THE

12:24PM   17  PRICE AT WHICH SHARESPOST HAS BEEN ABLE TO SET UP TRANSACTIONS

12:24PM   18  IN THERANOS STOCK; CORRECT?

12:24PM   19  A.   CORRECT.

12:24PM   20  Q.   AND HE TELLS YOU THAT THEY WERE ABLE TO DO A TRANSACTION

12:24PM   21  AT SOME POINT IN 2015 WHERE INVESTORS IN THERANOS SOLD THEIR

12:24PM   22  STOCK AT $14.75 A SHARE; CORRECT?

12:24PM   23  A.   CORRECT.

12:24PM   24  Q.   AND THAT BUYERS BOUGHT AT THAT PRICE; CORRECT?

12:24PM   25  A.   AGAIN, THERE'S A COMMISSION.  SO I DON'T KNOW WHAT THE

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6267

12:24PM   1    PRICE WAS ON EITHER SIDE, BUT THERE WAS A DIFFERENCE.

12:24PM   2    Q.   FAIR ENOUGH.

12:24PM   3         THERE MIGHT BE A MARGINAL DIFFERENCE FROM THE 14.75 PRICE;

12:24PM   4    RIGHT?

12:24PM   5    A.   RIGHT.

12:24PM   6    Q.   AND THAT'S THE KIND OF INFORMATION THAT YOU WERE SEEKING

12:25PM   7    FROM HIM.  SO IF I WENT OUT TO GO AND TRY TO SELL MY SHARES ON

12:25PM   8    THESE MARKETS, WHAT COULD I GET FROM THEM; RIGHT?

12:25PM   9    A.   RIGHT.

12:25PM  10    Q.   AND YOU WOULD AGREE WITH ME THAT IF YOU SOLD YOUR SHARES

12:25PM  11    AT $14.75 A SHARE, THAT YOUR MILLION DOLLAR INVESTMENT IN

12:25PM  12    THERANOS WOULD HAVE TURNED INTO -- YOU'RE PROBABLY BETTER AT

12:25PM  13    THE MATH THAN I AM -- BUT SOMEWHERE BETWEEN $20 AND

12:25PM  14    $25 MILLION?

12:25PM  15    A.   HOW IS THAT RELEVANT?

12:25PM  16    Q.   WELL, DO YOU AGREE WITH ME?

12:25PM  17    A.   YES.

12:25PM  18    Q.   THE MATH IS GENERALLY RIGHT; RIGHT?  WE CAN AGREE ON THE

12:25PM  19    MATH?

12:25PM  20    A.   OKAY.

12:25PM  21         THE COURT:  YOU CAN ASK ANOTHER QUESTION.

12:25PM  22    BY MR. DOWNEY:

12:25PM  23    Q.   LET ME ASK YOU TO GO TO THE EMAIL ABOVE THAT.

12:25PM  24         YOU RESPOND AND YOU SAY YOU GOT INFORMATION FROM ANOTHER

12:25PM  25    INDIVIDUAL AT SHARESPOST; CORRECT?  THAT'S GENO?

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6268

12:25PM   1        A.   CORRECT.

12:25PM   2        Q.   AND THAT HE TOLD YOU THAT CURRENT TRANSACTIONS WERE

12:25PM   3        SELLING IN THE $17 TO $19 PRICE RANGE; CORRECT?

12:26PM   4        A.   CORRECT.

12:26PM   5        Q.   AND THEN IF YOU GO TO THE EMAIL ABOVE THAT HE SAID TO YOU

12:26PM   6        THAT HE HAD RETURNED FROM A LONG VACATION AND THAT HE WOULD BE

12:26PM   7        ABLE TO DISCUSS WITH YOU; CORRECT?

12:26PM   8        A.   CORRECT.

12:26PM   9        Q.   AND THEN YOU EMAILED HIM BACK AND TOLD HIM THAT YOU NEED

12:26PM  10        ACCURATE INFORMATION; RIGHT?

12:26PM  11        A.   YES.

12:26PM  12        Q.   AND THEN IN THE LAST SENTENCE OF THAT YOU ASKED IS THE

12:26PM  13        MARKET LIQUID ENOUGH TO ABSORB $10 MILLION WITHOUT LOWERING MY

12:26PM  14        PRICE.

12:26PM  15             DO YOU SEE THAT?

12:26PM  16        A.   YES.

12:26PM  17        Q.   AND IS THAT, IS THAT QUESTION BY YOU AS TO WHETHER YOU

12:26PM  18        COULD SELL THE FIRST $10 MILLION OF YOUR SHARES WITHOUT IT

12:26PM  19        RESULTING IN THAT $14.75 PRICE BEING REDUCED?

12:26PM  20        A.   I DON'T HAVE ENOUGH INFORMATION TO ANSWER THAT QUESTION.

12:26PM  21        Q.   OKAY.  WELL, I'M JUST ASKING IN THIS EMAIL YOU PREPARED

12:27PM  22        HERE, WHAT IS -- WHAT DO YOU MEAN BY IS THE MARKET LIQUID

12:27PM  23        ENOUGH TO ABSORB $10 MILLION WITHOUT LOWERING MY PRICE?

12:27PM  24        A.   IT WAS JUST AN EXPLORATORY QUESTION TO SEE HOW LIQUID THE

12:27PM  25        MARKET WAS.

EISENMAN CROSS BY MR. DOWNEY (RES.)                          6269

12:27PM 1   Q.   OKAY.  AND DID YOU GET INFORMATION AS TO WHAT WOULD HAPPEN

12:27PM 2   TO THE PRICE IF YOU SOLD $10 MILLION OR TRIED TO SELL

12:27PM 3   $10 MILLION AT $14.75 A SHARE?

12:27PM 4   A.   I DON'T RECALL.

12:27PM 5   Q.   OKAY.  NOW, DURING THIS WINDOW BOTH PRIOR TO YOUR 2013

12:27PM 6   INVESTMENT AND AFTER YOUR 2013 INVESTMENT, AM I RIGHT THAT YOU

12:27PM 7   WERE HUNGRY FOR INFORMATION ABOUT THERANOS; IS THAT RIGHT?

12:27PM 8   A.   I WAS SEEKING INFORMATION.

12:27PM 9   Q.   RIGHT.  AND YOU WANTED TO KNOW ANY INFORMATION YOU COULD

12:27PM 10  ABOUT THERANOS; IS THAT RIGHT?

12:27PM 11  A.   I WAS SEEKING INFORMATION.

12:27PM 12  Q.   OKAY.  SO AM I RIGHT THAT IF THERE WERE NEWSPAPER ARTICLES

12:27PM 13  OR ONLINE MAGAZINE ARTICLES OR SO FORTH, YOU READ THOSE?

12:27PM 14  A.   I READ SOME OF THEM.

12:27PM 15  Q.   OKAY.  WHY DID YOU ONLY READ SOME OF THEM WHEN YOU WERE

12:28PM 16  EAGER FOR INFORMATION ABOUT THERANOS?

12:28PM 17  A.   BECAUSE THERE WAS A TREMENDOUS VOLUME OF INFORMATION ABOUT

12:28PM 18  THERANOS.

12:28PM 19  Q.   OKAY.

12:28PM 20  A.   AND IT WOULD HAVE BEEN DIFFICULT TO READ EVERY PIECE OF

12:28PM 21  INFORMATION THAT WAS PUBLISHED.

12:28PM 22  Q.   OKAY.  WELL, YOU KNEW THAT THERANOS HAD ALSO PUT UP A

12:28PM 23  WEBSITE; CORRECT?

12:28PM 24  A.   CORRECT.

12:28PM 25  Q.   AND AM I RIGHT THAT AS AN INVESTOR IN THE COMPANY THAT WAS

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6270

12:28PM   1    EAGER TO UNDERSTAND THE COMPANY, YOU REVIEWED THAT WEBSITE?

12:28PM   2    A.   YES.

12:28PM   3    Q.   FROM TOP TO BOTTOM?

12:28PM   4    A.   I CAN'T SAY FROM TOP TO BOTTOM, BUT I REVIEWED THE

12:28PM   5    WEBSITE.

12:28PM   6    Q.   OKAY.  AND YOU KNEW THAT WALGREENS -- YOU KNEW AT SOME

12:28PM   7    POINT THAT WALGREENS WAS THE PARTNER WITH WHOM WALGREENS --

12:28PM   8    WELL, THERANOS WAS LAUNCHING TESTING SERVICES; RIGHT?

12:28PM   9    A.   RIGHT.

12:28PM   10   Q.   AND DID YOU REVIEW WALGREENS'S ANNOUNCEMENT ABOUT THEIR

12:28PM   11   PARTNERSHIP WITH THERANOS?

12:28PM   12   A.   I DON'T RECALL.

12:28PM   13   Q.   OKAY.  DID YOU REVIEW THE WALGREENS WEBSITE WITH RESPECT

12:29PM   14   TO THE PORTIONS OF THE WALGREENS WEBSITE THAT TALKED ABOUT THE

12:29PM   15   THERANOS SERVICES OFFERED IN THEIR STORES?

12:29PM   16   A.   I DON'T RECALL.

12:29PM   17   Q.   OKAY.  WHEN THERANOS AND WALGREENS MADE AN ANNOUNCEMENT OF

12:29PM   18   THEIR JOINT PROJECT OF OFFERING BLOOD TESTING SERVICES, DID YOU

12:29PM   19   SEE IF THEY HAD ISSUED TOGETHER A PRESS RELEASE?

12:29PM   20   A.   I READ THE PUBLICITY AT THE TIME, BUT I DON'T RECALL IF IT

12:29PM   21   WAS JOINED OR IF IT WAS FROM THERANOS.

12:29PM   22   Q.   OKAY.  WHATEVER THE ANNOUNCEMENTS WERE OF IT, YOU'RE

12:29PM   23   CONFIDENT THAT YOU READ IT; CORRECT?

12:29PM   24   A.   YES.

12:29PM   25   Q.   OKAY.  NOW, I WANT TO ASK YOU, AS A FINAL SUBJECT, ABOUT

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6271

12:29PM  1    SOME COMMUNICATIONS THAT YOU HAD WITH THE PROSECUTION TEAM IN

12:30PM  2    THIS MATTER BEYOND THE ONES THAT WE TALKED ABOUT EARLIER.

12:30PM  3        FIRST OF ALL, WILL YOU TELL US, HOW MANY TIMES HAVE YOU

12:30PM  4    MET WITH REPRESENTATIVES OF THE GOVERNMENT IN CONNECTION WITH

12:30PM  5    YOUR TESTIMONY HERE TODAY?

12:30PM  6    A.   I'M SORRY, I -- HOW MANY TIMES HAVE I MET SINCE?

12:30PM  7    Q.   WELL, HOW MANY TIMES -- AT SOME POINT YOU BEGAN MEETING

12:30PM  8    WITH LAWYERS AND AGENTS FROM THE GOVERNMENT; CORRECT?

12:30PM  9    A.   THE FIRST PERSONAL MEETING WAS BEFORE I CAME TO SAN JOSE

12:30PM  10   FOR MY FIRST TESTIMONY.

12:30PM  11   Q.   OKAY.  AND SINCE THAT MEETING, HOW MANY OTHER MEETINGS

12:30PM  12   HAVE YOU HAD WITH THE GOVERNMENT IN CONNECTION WITH THE

12:30PM  13   THERANOS MATTERS?

12:30PM  14   A.   REALLY NONE WHERE THERE'S BEEN ANYTHING SUBSTANTIVE

12:30PM  15   DISCUSSED.

12:30PM  16   Q.   OKAY.  WELL, LET ME ASK YOU TO LOOK AT -- DO YOU

12:30PM  17   ACKNOWLEDGE THAT YOU'VE HAD SOME MEETINGS WITH THE GOVERNMENT?

12:30PM  18   A.   I ACKNOWLEDGE THAT WE HAVE -- I DON'T KNOW IF YOU WOULD

12:31PM  19   CALL THEM MEETINGS, BUT WE HAVE SEEN EACH OTHER AND BEEN

12:31PM  20   DIRECTED TO THE CONFERENCE ROOM AND -- YEAH.

12:31PM  21   Q.   WELL, WHEN YOU'VE SEEN EACH OTHER AND DIRECTED TO THE

12:31PM  22   CONFERENCE ROOM, DID YOU GO INTO THE CONFERENCE ROOM AND

12:31PM  23   DISCUSS MATTERS RELATED TO YOUR INVESTMENTS IN THERANOS?

12:31PM  24   A.   MY RECOLLECTION IS NO.

12:31PM  25   Q.   SO YOU'VE NEVER HAD A MEETING WITH THE GOVERNMENT WHERE

EISENMAN CROSS BY MR. DOWNEY (RES.)                               6272

12:31PM   1    YOU DISCUSSED YOUR INVESTMENT WITH THERANOS?

12:31PM   2    A.   AS I MENTIONED EARLIER, I HAD A MEETING WITH THEM BEFORE

12:31PM   3    MY FIRST PROPOSED TESTIMONY.

12:31PM   4    Q.   OKAY.  AND WHERE WAS YOUR FIRST PROPOSED TESTIMONY?  YOU

12:31PM   5    MEAN DURING THE COURSE OF THIS TRIAL?

12:31PM   6    A.   WELL, IT WAS SUPPOSED TO BE HERE, THE FIRST TIME THAT I

12:31PM   7    WAS CALLED, BECAUSE WITNESSES RAN OVER.  I NEVER TESTIFIED THE

12:31PM   8    FIRST TIM THAT I WAS ASKED TO COME TO SAN JOSE.

12:32PM   9    Q.   I SEE.  YOU'RE TALKING ABOUT YOUR TESTIMONY IN THIS MATTER

12:32PM   10   IN THIS TRIAL?

12:32PM   11   A.   YES, YES.

12:32PM   12   Q.   OKAY, OKAY.

12:32PM   13        BUT OTHER THAN THAT, YOU DON'T RECALL ANY SUCH MEETINGS?

12:32PM   14   A.   NOT IN-PERSON MEETINGS.  IS THAT WHAT YOU'RE REFERRING TO?

12:32PM   15   Q.   WELL, HAD YOU HAD TELEPHONIC MEETINGS?  I THOUGHT YOU SAID

12:32PM   16   HE SAW THEM AND THEY DIRECTED YOU INTO A CONFERENCE ROOM?

12:32PM   17   A.   YEAH, THERE WERE TELEPHONIC MEETINGS.

12:32PM   18   Q.   OKAY.  HOW MANY TELEPHONIC MEETINGS DID YOU HAVE WITH THE

12:32PM   19   GOVERNMENT ABOUT YOUR INVESTMENT IN THERANOS?

12:32PM   20   A.   I DON'T RECALL.  I WOULD GUESS MAYBE TWO OR THREE.

12:32PM   21   Q.   WELL, DIDN'T YOU TESTIFY WAY BACK IN 2019 THAT YOU HAD

12:32PM   22   ALREADY MET WITH THE GOVERNMENT SIX TO TEN TIMES?

12:32PM   23   A.   I'M SORRY, I DON'T FOLLOW YOUR QUESTION.

12:32PM   24   Q.   WELL, YOU JUST TOLD ME THAT YOU MET WITH THE GOVERNMENT IN

12:32PM   25   CONNECTION WITH YOUR INVESTMENT IN THERANOS TWO OR THREE TIMES.

EISENMAN CROSS BY MR. DOWNEY (RES.)                              6273

12:32PM    1           DO YOU REMEMBER SAYING THAT A MOMENT AGO?

12:32PM    2      A.   LET ME GO BACK.  I'M A LITTLE BIT UNCLEAR ON WHAT YOU'RE

12:33PM    3      ASKING ME.

12:33PM    4           I CAME HERE TO TESTIFY AND HAVE A MEETING.

12:33PM    5      Q.   I THINK WE'RE NOT UNDERSTANDING EACH OTHER.  I AM ASKING

12:33PM    6      YOU HOW MANY MEETINGS YOU HAVE HAD WITH THE GOVERNMENT ABOUT

12:33PM    7      YOUR INVESTMENT IN THERANOS?

12:33PM    8      A.   OKAY.  IS YOUR QUESTION ABOUT MEETINGS OVER THE TELEPHONE?

12:33PM    9      Q.   TELEPHONIC MEETINGS, IN-PERSON MEETINGS, MEETINGS WHERE

12:33PM   10      THEY DIRECTED YOU TO THE CONFERENCE ROOM?

12:33PM   11      A.   OKAY.  I DON'T RECALL THE NUMBER.

12:33PM   12      Q.   IT'S MORE THAN TEN, ISN'T IT?

12:33PM   13      A.   I CAN'T RECALL THE NUMBER.

12:33PM   14      Q.   OKAY.  YOU CAN'T SAY WHETHER IT'S MORE THAN TEN?

12:33PM   15      A.   I DON'T RECALL.

12:33PM   16      Q.   OKAY.  IS IT MORE THAN TWO?

12:33PM   17      A.   MOST LIKELY.

12:33PM   18      Q.   OKAY.  BUT YOU DON'T HAVE AN ESTIMATE OF SOMEWHERE BETWEEN

12:33PM   19      TWO AND TEN?

12:33PM   20      A.   I DON'T.

12:33PM   21      Q.   OKAY.  AND DO YOU ACKNOWLEDGE THAT YOU'VE BEEN IN REGULAR

12:33PM   22      TOUCH WITH MEMBERS OF THE PROSECUTION TEAM AND FBI AGENTS ABOUT

12:34PM   23      THERANOS?

12:34PM   24      A.   MY RECOLLECTION IS THAT IT'S NOT -- IT HAS NOT BEEN

12:34PM   25      REGULAR COMMUNICATION.  THERE HAS BEEN SOME IRREGULAR, AND AS I

6274

EISENMAN CROSS BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 12:34PM | 1 | MENTIONED EARLIER, I CAN'T, I CAN'T TELL YOU HOW MANY TIMES |
| 12:34PM | 2 | THAT HAS BEEN. |
| 12:34PM | 3 | Q.  AND WHAT DO YOU MEAN WHEN YOU SAY "IRREGULAR"? |
| 12:34PM | 4 | A.  THERE HAVE BEEN SOME COMMUNICATIONS OVER A PERIOD AND, |
| 12:34PM | 5 | AGAIN, EVERYTHING SORT OF RUNS TOGETHER.  IT COULD BE OVER THE |
| 12:34PM | 6 | LAST ONE YEAR OR TWO YEARS.  I DON'T RECALL. |
| 12:34PM | 7 | BUT THERE HAVE BEEN COMMUNICATIONS THAT HAVE BEEN OVER THE |
| 12:34PM | 8 | LAST YEAR OR TWO, GIVE OR TAKE, AND I CANNOT TELL YOU HOW MANY |
| 12:34PM | 9 | COMMUNICATIONS THERE HAVE BEEN. |
| 12:34PM | 10 | Q.  OKAY.  AND IS IT FAIR TO SAY THAT AS A RESULT OF THOSE |
| 12:34PM | 11 | COMMUNICATIONS, YOU'VE DEVELOPED A RELATIONSHIP WITH SOME OF |
| 12:34PM | 12 | THE AGENTS IN THE CASE? |
| 12:34PM | 13 | A.  NO, THAT'S NOT FAIR TO SAY.  I HAD NO RELATIONSHIP WITH |
| 12:34PM | 14 | THE AGENTS IN THE CASE. |
| 12:34PM | 15 | Q.  OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 14109. |
| 12:35PM | 16 | (PAUSE IN PROCEEDINGS.) |
| 12:35PM | 17 | BY MR. DOWNEY: |
| 12:35PM | 18 | Q.  DO YOU RECOGNIZE EXHIBIT 14109 AS AN EMAIL EXCHANGE |
| 12:35PM | 19 | BETWEEN YOURSELF AND AGENT HERNANDEZ? |
| 12:35PM | 20 | A.  YES. |
| 12:35PM | 21 | Q.  AND THE SUBJECT OF THE COMMUNICATIONS RELATES TO MATTERS |
| 12:35PM | 22 | RELATED TO YOUR TESTIMONY TODAY; CORRECT? |
| 12:36PM | 23 | A.  YES. |
| 12:36PM | 24 | Q.  AND YOU WERE SENDING HER, AS PART OF THESE COMMUNICATIONS, |
| 12:36PM | 25 | YOU SENT AGENT HERNANDEZ A PERSONAL COMPUTER OF YOURS; CORRECT? |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6275

| | | |
|---|---|---|
| 12:36PM | 1 | A.   I SENT A HARD DRIVE THAT WAS CORRUPTED THAT HAD |
| 12:36PM | 2 | POTENTIALLY EMAILS REGARDING THERANOS THAT ALSO HAD FAMILY |
| 12:36PM | 3 | PICTURES. |
| 12:36PM | 4 |         MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT |
| 12:36PM | 5 | EXHIBIT 14109. |
| 12:36PM | 6 |         MR. BOSTIC:  NO OBJECTION. |
| 12:36PM | 7 |         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:36PM | 8 |     (DEFENDANT'S EXHIBIT 14109 WAS RECEIVED IN EVIDENCE.) |
| 12:36PM | 9 | BY MR. DOWNEY: |
| 12:36PM | 10 | Q.   AND I'D DIRECT YOU TO THE LAST SENTENCE AND ASK YOU IF |
| 12:36PM | 11 | THAT'S AN ACCURATE STATEMENT OF YOUR FEELING IN CONNECTION WITH |
| 12:36PM | 12 | THE PROSECUTION TEAM IN THIS MATTER? |
| 12:36PM | 13 | A.   IT'S A LITTLE MISLEADING.  WHAT THAT IS, IS THAT WE ARE ON |
| 12:37PM | 14 | THE SAME PAGE, AND I FEEL LIKE I WAS LIED TO AND CHEATED FROM |
| 12:37PM | 15 | THE COMPANY. |
| 12:37PM | 16 | Q.   WELL, IS IT AN ACCURATE STATEMENT OF YOUR FEELING TOWARDS |
| 12:37PM | 17 | THE PROSECUTION TEAM THAT YOU ARE A FAITHFUL PART OF THEIR |
| 12:37PM | 18 | TEAM? |
| 12:37PM | 19 | A.   AGAIN, THAT'S A LITTLE MISLEADING.  IF YOU'LL ALLOW ME TO |
| 12:37PM | 20 | ELABORATE. |
| 12:37PM | 21 | Q.   WELL, I JUST WANT TO KNOW WHETHER IT'S AN ACCURATE |
| 12:37PM | 22 | STATEMENT OR NOT AN ACCURATE STATEMENT.  I'M NOT REALLY LOOKING |
| 12:37PM | 23 | FOR YOU TO ELABORATE.  IF IT'S NOT AN ACCURATE STATEMENT, |
| 12:37PM | 24 | THAT'S FINE. |
| 12:37PM | 25 | A.   IT'S SUBJECTIVE, AND I WAS TRYING TO CLARIFY. |

EISENMAN CROSS BY MR. DOWNEY (RES.)                                    6276

12:37PM  1    Q.   SO IT'S NOT AN ACCURATE STATEMENT, IS THAT WHAT YOU'RE

12:37PM  2    SAYING, OR THE WAY I'VE ASKED THE QUESTION IS NOT ACCURATE?

12:37PM  3              MR. BOSTIC:  YOUR HONOR, I'D ASK THAT THE WITNESS BE

12:37PM  4    ALLOWED TO ANSWER THE QUESTION.

12:37PM  5              THE COURT:  HE HADN'T FINISHED HIS ANSWER.

12:38PM  6              MR. DOWNEY:  I BEG YOUR PARDON.

12:38PM  7              THE WITNESS:  OKAY.  FAITHFUL IS A SUBJECTIVE

12:38PM  8    CLAUSE.  I'LL BE MORE OBJECTIVE.  I THINK THERE WAS BUSINESS

12:38PM  9    FRAUD.  I THINK THAT I WAS LIED TO AND TAKEN ADVANTAGE OF.  I

12:38PM  10   THINK THAT THERE WAS A LOT OF ABUSE THROUGH THE YEARS, AND I

12:38PM  11   WOULD DO WHAT I CAN TO TELL MY STORY, AND I KNOW THAT WE, WE

12:38PM  12   HAVE THE SAME OUTCOME, THAT JUSTICE BE SERVED.

12:38PM  13   BY MR. DOWNEY:

12:38PM  14   Q.   IN FACT, IT'S NOT JUST YOUR INVESTMENT IN THERANOS THAT

12:38PM  15   YOU'RE A FAITHFUL MEMBER OF THE TEAM WITH RESPECT TO THE

12:38PM  16   LAWYERS AND AGENTS IN THIS CASE; IS THAT RIGHT?

12:38PM  17   A.   I'M SORRY?

12:38PM  18   Q.   WELL, YOU HAVE ASKED THE AGENTS AND LAWYERS IN THIS CASE

12:38PM  19   TO INVESTIGATE OTHER INVESTMENTS YOU MADE WHERE YOU LOST MONEY

12:38PM  20   ON THE INVESTMENTS; ISN'T THAT RIGHT?

12:38PM  21             MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT UNDER 401

12:38PM  22   AND 403.

12:38PM  23             THE COURT:  I WILL SUSTAIN THE OBJECTION.

12:39PM  24             MR. DOWNEY:  ALL RIGHT.  I'M HAPPY TO MAKE A

12:39PM  25   SHOWING.  I WOULD OFFER IT AS ONLY GOING TO HIS BIAS.  HE HAS

UNITED STATES COURT REPORTERS

**ER-9906**

EISENMAN REDIRECT BY MR. BOSTIC                              6277

| | | |
|---|---|---|
| 12:39PM | 1 | THAT TO CONDUCT -- |
| 12:39PM | 2 | THE WITNESS:  I HAVE NO BIAS IN THIS CASE. |
| 12:39PM | 3 | THE COURT:  SIR, SIR, THERE'S NO QUESTION PENDING. |
| 12:39PM | 4 | THAT'S STRICKEN.  THAT'S STRICKEN. |
| 12:39PM | 5 | THE WITNESS:  OKAY. |
| 12:39PM | 6 | (PAUSE IN PROCEEDINGS.) |
| 12:39PM | 7 | MR. DOWNEY:  I THINK WITH THAT, YOUR HONOR, I MIGHT |
| 12:39PM | 8 | BE DONE. |
| 12:39PM | 9 | MAY I HAVE JUST ONE MOMENT? |
| 12:39PM | 10 | THE COURT:  SURE.  OF COURSE. |
| 12:39PM | 11 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 12:40PM | 12 | MR. DOWNEY:  YOUR HONOR, SUBJECT TO THE OTHER |
| 12:40PM | 13 | DISCUSSION THAT WE HAD, THAT CONCLUDES ANY FURTHER QUESTIONS ON |
| 12:40PM | 14 | THE CROSS-EXAMINATION. |
| 12:40PM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:40PM | 16 | MR. BOSTIC, ANY REDIRECT? |
| 12:40PM | 17 | MR. BOSTIC:  YES, YOUR HONOR. |
| 12:40PM | 18 | **REDIRECT EXAMINATION** |
| 12:40PM | 19 | BY MR. BOSTIC: |
| 12:40PM | 20 | Q.  GOOD AFTERNOON, MR. EISENMAN. |
| 12:40PM | 21 | A.  GOOD AFTERNOON. |
| 12:40PM | 22 | Q.  I JUST WANT TO ASK YOU A FEW QUESTIONS FOLLOWING UP ON |
| 12:40PM | 23 | YOUR CONVERSATION WITH MR. DOWNEY. |
| 12:40PM | 24 | A.  I'M SORRY, MR. WHO? |
| 12:40PM | 25 | Q.  MR. DOWNEY, DEFENSE COUNSEL. |

EISENMAN REDIRECT BY MR. BOSTIC                                    6278

```
12:40PM   1    A.   OH, I AM SORRY.  I APOLOGIZE.

12:40PM   2    Q.   FIRST, DO YOU RECALL A CONVERSATION WITH MR. DOWNEY ABOUT

12:40PM   3    SOME OF THE PROVISIONS IN THE CONTRACT THAT YOU SIGNED WHEN YOU

12:41PM   4    INVESTED IN THERANOS?

12:41PM   5    A.   I'M SORRY, I'M -- COULD YOU ASK THE QUESTION AGAIN?

12:41PM   6    Q.   YES.  DO YOU RECALL DISCUSSING WITH MR. DOWNEY SOME OF THE

12:41PM   7    LANGUAGE IN THE CONTRACTS THAT YOU SIGNED WHEN YOU INVESTED IN

12:41PM   8    THERANOS?

12:41PM   9    A.   YES, I DO.

12:41PM  10    Q.   AND DO YOU RECALL THAT THOSE CONTRACTS HAD LANGUAGE ABOUT

12:41PM  11    PROJECTIONS BEING SPECULATIVE IN NATURE?

12:41PM  12    A.   YES.

12:41PM  13    Q.   AS AN INVESTOR IN THERANOS AND IN OTHER COMPANIES, ARE YOU

12:41PM  14    FAMILIAR WITH THE IDEA OF A COMPANY PROVIDING PROJECTIONS TO

12:41PM  15    POTENTIAL INVESTORS?

12:41PM  16    A.   YES, I AM.

12:41PM  17    Q.   DO YOU KNOW THE DIFFERENCE BETWEEN PROJECTIONS THAT ARE

12:41PM  18    FORWARD LOOKING AND PRESENT TENSE REPRESENTATIONS ABOUT WHAT

12:41PM  19    THE COMPANY CAN DO?

12:41PM  20    A.   YES.

12:41PM  21    Q.   IN YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU GET BOTH OF

12:41PM  22    THOSE?  DID YOU GET BOTH FORWARD LOOKING PROJECTIONS BUT ALSO

12:41PM  23    PRESENT TENSE STATEMENTS ABOUT WHAT THE COMPANY HAD DONE AND

12:41PM  24    WAS DOING?

12:41PM  25    A.   YES, I DID.
```

EISENMAN REDIRECT BY MR. BOSTIC                                6279

12:41PM  1    Q.   YOU TESTIFIED ON DIRECT ABOUT INFORMATION THAT MS. HOLMES

12:42PM  2    HAD GIVEN YOU RELATING TO HOW WELL THE THERANOS TECHNOLOGY

12:42PM  3    WORKED; IS THAT CORRECT?

12:42PM  4    A.   THAT'S CORRECT.

12:42PM  5    Q.   IN THOSE CONVERSATIONS DID SHE COMPARE THE THERANOS

12:42PM  6    TECHNOLOGY TO TECHNOLOGY USED BY QUEST AND LABCORP?

12:42PM  7    A.   SHE DID.

12:42PM  8    Q.   AND WHAT DID SHE SAY IN THAT REGARD?

12:42PM  9    A.   BASICALLY THAT, THAT THOSE COMPANIES WOULD BECOME

12:42PM 10    OBSOLETE, THAT THERANOS'S TECHNOLOGY WAS A SMALLER DRAW OF

12:42PM 11    BLOOD, COULD DO MORE TESTS, AND COULD HAVE RESULTS BACK IN A

12:42PM 12    MUCH QUICKER PERIOD OF TIME.

12:42PM 13         AND ONE YEAR AFTER WE INVESTED, IN THE ANNUAL MEETING SHE

12:42PM 14    SAID THAT THE TECHNOLOGY NOT ONLY TOOK A SNAPSHOT, BUT IT

12:42PM 15    BASICALLY TOOK A MOVIE OF WHAT WAS HAPPENING IN YOUR BLOOD,

12:42PM 16    WHICH WOULD BE GOOD FOR ADVERSE DRUG REACTIONS, FOR DRUG

12:42PM 17    DOSING, AND THAT AT THAT SAME MEETING THERE WAS ALSO SOME

12:43PM 18    MENTION THAT BRISTOL MYERS HAD DONE SIX CLINICAL TRIALS WITH

12:43PM 19    THE LATEST ITERATION OF THEIR TECHNOLOGY AND THEY WERE LIKE A

12:43PM 20    747, FLAWLESS.

12:43PM 21    Q.   WHEN MS. HOLMES COMPARED THE PERFORMANCE OF THERANOS

12:43PM 22    TECHNOLOGY TO CONVENTIONAL TECHNOLOGY, WAS SHE MAKING

12:43PM 23    PROJECTIONS ABOUT WHAT WOULD BE POSSIBLE IN THE FUTURE, OR WAS

12:43PM 24    SHE TELLING YOU WHAT THE TECHNOLOGY COULD DO IN THAT MOMENT?

12:43PM 25    A.   WHAT THE TECHNOLOGY COULD DO IN THAT MOMENT.

EISENMAN REDIRECT BY MR. BOSTIC                                    6280

12:43PM   1    Q.   AND DID YOU RELY ON THOSE PRESENT TENSE REPRESENTATIONS IN

12:43PM   2    DECIDING TO INVEST IN THE COMPANY IN 2013?

12:43PM   3    A.   YES, I DID.

12:43PM   4    Q.   DO YOU RECALL THAT DURING YOUR TESTIMONY WE'VE LOOKED AT

12:43PM   5    SOME TEXT FROM A NEWS ARTICLE DISCUSSING WHAT THERANOS COULD DO

12:43PM   6    AND THE CAPABILITIES OF ITS TECHNOLOGY?

12:43PM   7    A.   CAN YOU REFRESH MY MEMORY?  WHAT YEAR WAS THE ARTICLE AND

12:43PM   8    WHAT WAS THE SOURCE?

12:43PM   9    Q.   COULD I DIRECT YOU TO THE WHITE BINDER --

12:44PM  10    A.   I DON'T HAVE A WHITE ONE.  I HAVE A BLACK ONE.

12:44PM  11    Q.   I'M SORRY.  THIS IS IN EVIDENCE.  MAYBE WE CAN JUST

12:44PM  12    PUBLISH IT.  IT'S 1106 IN EVIDENCE ALREADY.

12:44PM  13            MR. DOWNEY:  YOUR HONOR, I DON'T THINK I ASKED ABOUT

12:44PM  14    THIS ON THE CROSS-EXAMINATION.

12:44PM  15            MR. BOSTIC:  YOUR HONOR, THIS IS STILL IN THE

12:44PM  16    SUBJECT OF PROJECTIONS VERSUS PRESENT TERMS STATEMENTS.

12:44PM  17            THE COURT:  I'LL ALLOW EXAMINATION ON THIS.

12:44PM  18    BY MR. BOSTIC:

12:44PM  19    Q.   IF WE CAN ZOOM IN ON THE FIRST INDENTED PARAGRAPH.

12:44PM  20            MR. EISENMAN, DO YOU RECALL READING THIS PUBLICATION OR

12:44PM  21    THIS ARTICLE BEFORE YOU DECIDED TO INVEST IN 2013?

12:44PM  22    A.   YES.

12:44PM  23    Q.   WERE YOU AWARE AT THE TIME THAT MS. HOLMES HAD REVIEWED OR

12:44PM  24    HAD THE OPPORTUNITY TO REVIEW A DRAFT OF THIS ARTICLE BEFORE IT

12:44PM  25    WAS PUBLISHED?

EISENMAN REDIRECT BY MR. BOSTIC                                    6281

12:44PM   1    A.   I WAS NOT AWARE THAT SHE REVIEWED A DRAFT OF THIS ARTICLE

12:44PM   2    BEFORE IT WAS PUBLISHED.

12:44PM   3    Q.   IN THE TEXT HIGHLIGHTED ON THE SCREEN THERE, THERE'S A

12:45PM   4    LINE THAT SAYS, "THERANOS'S PROCESSES ARE FASTER, CHEAPER, AND

12:45PM   5    MORE ACCURATE THAN THE CONVENTIONAL METHODS AND REQUIRE ONLY

12:45PM   6    MICROSCOPIC BLOOD VOLUMES, NOT VIAL AFTER VIAL OF THE STUFF."

12:45PM   7         DO YOU SEE THAT LANGUAGE?

12:45PM   8    A.   I DO.

12:45PM   9    Q.   AS AN INVESTOR, DO YOU INTERPRET THAT LANGUAGE TO BE A

12:45PM   10   PROJECTION THAT MIGHT BE SPECULATIVE, OR DOES IT REFER TO THE

12:45PM   11   PRESENT TENSE CAPABILITIES OF THE TECHNOLOGY?

12:45PM   12   A.   THAT REFERS TO THE PRESENT TENSE.

12:45PM   13   Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU, MS. HOLLIMAN.

12:45PM   14        THERE WAS SOME DISCUSSION DURING CROSS-EXAMINATION ABOUT

12:45PM   15   YOUR REPEATED ATTEMPTS TO GET INFORMATION FROM THE COMPANY.

12:45PM   16        DO YOU REMEMBER THAT?

12:45PM   17   A.   YES.

12:45PM   18   Q.   AND THERE WAS A DISCUSSION DURING THAT CONVERSATION AS TO

12:45PM   19   WHETHER YOU UNDERSTOOD THAT THERANOS COULDN'T GIVE YOU SPECIAL

12:45PM   20   INFORMATION NOT GIVEN TO OTHER INVESTORS.

12:45PM   21        DID YOU UNDERSTAND THAT AT THE TIME?

12:45PM   22   A.   YES.

12:45PM   23   Q.   AND IS THAT WHAT YOU WERE ASKING FOR?  WERE YOU ASKING FOR

12:45PM   24   INFORMATION TO BE EXCLUSIVELY SHARED WITH YOU AND NOT PROVIDED

12:46PM   25   TO OTHER INVESTORS?

EISENMAN REDIRECT BY MR. BOSTIC                                6282

12:46PM   1      A.   NO.

12:46PM   2      Q.   HOW ABOUT YOUR GROUP?  THERE WAS SOME REFERENCE TO OTHER

12:46PM   3      INVESTORS THAT YOU WERE ASSOCIATED WITH.

12:46PM   4           DO YOU RECALL THAT DISCUSSION?

12:46PM   5      A.   YES.

12:46PM   6      Q.   AND WERE YOU ASKING FOR INFORMATION TO BE SHARED ONLY WITH

12:46PM   7      THAT GROUP TO THE EXCLUSION OF OTHER INVESTORS?

12:46PM   8      A.   YES.

12:46PM   9      Q.   LET ME ASK THAT AGAIN.  IS WHAT YOU WANTED FOR YOUR GROUP

12:46PM   10     ONLY TO GET INFORMATION AND THAT THAT INFORMATION WOULD NOT BE

12:46PM   11     SHARED WITH OTHER INVESTORS?

12:46PM   12     A.   WHEN I REQUESTED INFORMATION MOST OF THE TIME IT WAS FOR

12:46PM   13     ME PERSONALLY.  THERE WERE A FEW INSTANCES WHEN INFORMATION WAS

12:46PM   14     REQUESTED AND IT WAS SHARED AMONG THE SMALL GROUP THAT INVESTED

12:46PM   15     TOGETHER IN 2006.

12:46PM   16     Q.   IN ASKING FOR INFORMATION FROM THE COMPANY, WERE YOU

12:46PM   17     TRYING TO PUT YOURSELF OR YOUR GROUP AT AN ADVANTAGE COMPARED

12:46PM   18     TO OTHER INVESTORS IN THE COMPANY?

12:46PM   19     A.   NO.

12:46PM   20     Q.   IF THE COMPANY HAD PROVIDED THE INFORMATION THAT YOU WERE

12:46PM   21     ASKING FOR TO ALL OF THE INVESTORS, WOULD THAT HAVE SATISFIED

12:46PM   22     YOU?

12:46PM   23     A.   YES.

12:47PM   24     Q.   MR. DOWNEY ALSO ASKED YOU ABOUT OTHER INVESTORS WHO

12:47PM   25     INVESTED IN THERANOS BETWEEN 2010 AND 2013.

EISENMAN REDIRECT BY MR. BOSTIC                                          6283

12:47PM   1        DO YOU RECALL THAT DISCUSSION?

12:47PM   2    A.   YES.

12:47PM   3    Q.   DO YOU KNOW WHETHER THOSE INVESTORS WERE PROVIDED ANY

12:47PM   4    INFORMATION BY THE COMPANY IN CONNECTION WITH THEIR

12:47PM   5    INVESTMENTS?

12:47PM   6    A.   WE HEARD THAT THERE WAS MONEY -- I'M SORRY, THAT THERE WAS

12:47PM   7    INFORMATION PROVIDED TO OTHER LARGER INSTITUTIONAL INVESTORS,

12:47PM   8    AND WE CONTACTED THE COMPANY TO CONFIRM IF FINANCIAL

12:47PM   9    INFORMATION WAS SHARED, AND IF SO, IF THEY COULD SHARE IT WITH

12:47PM  10    US.

12:47PM  11        AND WE NEVER GOT AN ADEQUATE RESPONSE FROM THE COMPANY.

12:47PM  12    Q.   WERE YOU EVER GIVEN INFORMATION BY MS. HOLMES OR THE

12:47PM  13    COMPANY THAT YOU WERE TOLD HAD BEEN PROVIDED TO THOSE OTHER

12:47PM  14    INVESTORS DURING THAT 2010, 2013 TIMEFRAME?

12:48PM  15    A.   NO, WE WEREN'T.

12:48PM  16    Q.   YOU UNDERSTOOD AT THE TIME THAT YOU WERE HAVING THESE

12:48PM  17    COMMUNICATIONS WITH MS. HOLMES THAT YOU HAD NO LEGAL RIGHT TO

12:48PM  18    ADDITIONAL INFORMATION; IS THAT RIGHT?

12:48PM  19    A.   I UNDERSTOOD THAT, YES.

12:48PM  20    Q.   IF YOU UNDERSTOOD THAT AT THE TIME, WHY DID YOU KEEP

12:48PM  21    ASKING?  IF YOU WEREN'T INVOKING CONTRACTUAL OR LEGAL RIGHT,

12:48PM  22    WHY DID YOU KEEP ASKING FOR MORE INFORMATION?

12:48PM  23    A.   BECAUSE AS A PRACTICAL MATTER WE MAKE INVESTMENTS IN A LOT

12:48PM  24    OF PRIVATE COMPANIES, AND THIS WAS THE EXCEPTION, THE COMPANY

12:48PM  25    THAT WOULD NOT SPEAK TO US.

EISENMAN REDIRECT BY MR. BOSTIC                                    6284

12:48PM   1        AND BECAUSE WE HAD A SIGNIFICANT INVESTMENT, IT'S LOGICAL

12:48PM   2   THAT THERE WOULD BE AT LEAST A MINIMAL AMOUNT OF COMMUNICATION,

12:48PM   3   SOME INDICATION ON HOW THE COMPANY IS DOING, OR HOW OUR

12:48PM   4   INVESTMENT IS DOING WITHOUT VIOLATING ANYTHING THAT IS

12:48PM   5   CONFIDENTIAL.

12:48PM   6        AND IF THERE IS CONFIDENTIAL INFORMATION, I HAVE SIGNED A

12:49PM   7   NONDISCLOSURE AGREEMENT ON SEVERAL OCCASIONS WHERE COMPANIES

12:49PM   8   ARE FREE TO GIVE ME THE INFORMATION THAT I REQUEST, AND I HAVE

12:49PM   9   SWORN NOT TO SHARE THAT INFORMATION WITH ANYONE.

12:49PM  10   Q.   AND LET'S SEE.  I'D LIKE TO TALK TO YOU NOW ABOUT A

12:49PM  11   CONVERSATION THAT YOU HAD WITH MR. BALWANI BEFORE YOUR 2013

12:49PM  12   INVESTMENT.

12:49PM  13        DO YOU RECALL THAT?

12:49PM  14   A.   YES, I DO.

12:49PM  15   Q.   FIRST OF ALL, YOU TOLD MR. DOWNEY THAT RIGHT AROUND THE

12:49PM  16   TIME PERIOD OF THE 2013 INVESTMENT YOU WERE NOT IN DIRECT

12:49PM  17   COMMUNICATION WITH MS. HOLMES; IS THAT RIGHT?

12:49PM  18   A.   THAT'S CORRECT.

12:49PM  19   Q.   HAD YOU HAD PREVIOUS CONVERSATIONS WITH MS. HOLMES ABOUT

12:49PM  20   THE STATE OF THE TECHNOLOGY AND THE THINGS THAT THE COMPANY HAD

12:49PM  21   PURPORTEDLY DONE?

12:49PM  22   A.   TO MY RECOLLECTION WE HAD QUARTERLY UPDATE CALLS FOR THE

12:49PM  23   FIRST THREE OR FOUR YEARS AND MAYBE A SHORT CALL OR TWO IN THE

12:49PM  24   INTERIM.

12:49PM  25        BUT, YOU KNOW, AGAIN, MY ONLY STRONG RECOLLECTION WERE

EISENMAN REDIRECT BY MR. BOSTIC                                    6285

12:50PM    1    THOSE EARLY QUARTERLY CALLS THAT ENDED.

12:50PM    2    Q.   AND WERE THE FACTS OR THE CLAIMS THAT MS. HOLMES RELAYED

12:50PM    3    TO YOU DURING THOSE EARLIER CALLS STILL IN YOUR MIND WHEN YOU

12:50PM    4    MADE THE DECISION TO INVEST IN 2013?

12:50PM    5    A.   YES.

12:50PM    6    Q.   WERE YOU STILL RELYING ON THE CLAIMS THAT MS. HOLMES HAD

12:50PM    7    MADE IN THE PAST WHEN YOU MADE THAT DECISION?

12:50PM    8    A.   NO.   I WAS RELYING ON CURRENT INFORMATION.

12:50PM    9    Q.   AND WHAT WAS THE SOURCE OF THAT CURRENT INFORMATION?

12:50PM   10    A.   CURRENT INFORMATION WAS THE FINANCIAL PRESS, "THE

12:50PM   11    WALL STREET JOURNAL" ARTICLE THAT YOU JUST PUT UP, THERE WERE

12:50PM   12    ARTICLES IN SEVERAL CREDIBLE FINANCIAL PUBLICATIONS THAT THE

12:50PM   13    TECHNOLOGY HAD WORKED.   THERE WAS ALSO CONVERSATIONS THAT I,

12:50PM   14    THAT I HAD DURING THE LEAD UP.   FOR EXAMPLE, THERE WAS A

12:50PM   15    CONFERENCE THAT BILL FRIST GAVE THE KEYNOTE SPEECH TO IN

12:50PM   16    NASHVILLE, AND HE CLAIMED -- AND HE WAS A DIRECTOR OF THE

12:51PM   17    COMPANY, SO I'M SURE HE GOT HIS INFORMATION FROM EXECUTIVES OF

12:51PM   18    THE COMPANY.

12:51PM   19        BUT AT THE TIME HE CLAIMED THAT THE TECHNOLOGY WORKED.

12:51PM   20    YOU WOULD PUT THE BLOOD SAMPLE IN A READER, IT SENDS THE SIGNAL

12:51PM   21    UP TO THE CLOUD, AND YOU GET QUICK RESULTS IN 30 MINUTES TO

12:51PM   22    2 HOURS, AND YOU HAVE QUICK ACCURATE RESULTS.

12:51PM   23        HE ALSO SAID THAT IT HAD MILITARY APPLICATIONS.   IT WAS

12:51PM   24    BEING TESTED AND USED IN THE FIELD.   SO THERE WAS A LOT OF

12:51PM   25    INFORMATION THAT KIND OF RATIFIED A LOT OF THE POSITIVE

EISENMAN REDIRECT BY MR. BOSTIC

12:51PM 1    INVESTMENT INFORMATION THAT I HAD IN THE PAST FROM A DIRECTOR

12:51PM 2    OF THE COMPANY.

12:51PM 3        SO I TOOK, BETWEEN THE FINANCIAL PUBLICATIONS, THE SHORT

12:51PM 4    CONVERSATION I HAD WITH SUNNY BEFORE WE INVESTED, THE

12:51PM 5    INVESTMENT CONFERENCE FROM SENATOR FRIST AND OTHER SOURCES,

12:51PM 6    THAT IT WAS JUST A BARRAGE OF CREDIBLE INFORMATION THAT THEY

12:51PM 7    HAD WHAT THEY CLAIMED THAT THEY HAD AND IT WAS WORKING AND IT

12:51PM 8    WAS A HUGE MARKET.

12:51PM 9    Q.   AND WAS THAT INFORMATION THAT YOU WERE RECEIVING AT THE

12:51PM 10   TIME CONSISTENT WITH THINGS THAT MS. HOLMES HAD TOLD YOU IN THE

12:52PM 11   PAST?

12:52PM 12   A.   BECAUSE WE DIDN'T HAVE QUALITY CONVERSATIONS FOR A PERIOD

12:52PM 13   OF YEARS, I CAN ONLY SAY THAT SHE SAID THINGS IN THE DISTANT

12:52PM 14   PAST THAT BASICALLY THE TECHNOLOGY WAS WORKING, AND IT WAS

12:52PM 15   WORKING IN THE MARKETPLACE, AND THERE WERE PHARMACEUTICAL

12:52PM 16   COMPANIES THAT WERE USING IT IN TRIALS, AND IT HAD APPLICATIONS

12:52PM 17   FOR BLOOD TESTING AND BLOOD DOSING, AND IT CONNECTED THE DOTS

12:52PM 18   THAT MAYBE THE THINGS THAT SHE SAID EARLIER HERE, THERE WAS A

12:52PM 19   PERIOD OF TIME WHERE THE COMPANY WAS MAYBE KIND OF STRUGGLING

12:52PM 20   BUT IT LOOKS LIKE THEY KIND OF FOUND THEIR GAME AGAIN AND GAME

12:52PM 21   WAS BACK ON.

12:52PM 22   Q.   AND THE THINGS THAT MS. HOLMES HAD TOLD YOU EARLIER ABOUT

12:52PM 23   THE STATE OF THE TECHNOLOGY AND WHAT IT COULD DO, DID YOU

12:52PM 24   ASSUME THAT THAT INFORMATION WAS ACCURATE AT THE TIME THAT YOU

12:52PM 25   MADE YOUR 2013 INVESTMENT?

EISENMAN REDIRECT BY MR. BOSTIC                                    6287

12:52PM  1    A.   YES, I DID.

12:52PM  2    Q.   THERE WAS SOME DISCUSSION WITH MR. DOWNEY ABOUT A

12:53PM  3    CONVERSATION WITH MR. BALWANI AND WHETHER HE DISCOURAGED YOUR

12:53PM  4    INVESTMENT IN 2013.

12:53PM  5         DO YOU RECALL THAT DISCUSSION?

12:53PM  6    A.   YES.

12:53PM  7    Q.   AND JUST SO THE RECORD IS CLEAR, WHAT WAS MR. BALWANI'S

12:53PM  8    ATTITUDE TOWARDS THE IDEA OF YOU INVESTING IN THERANOS IN 2013?

12:53PM  9    A.   IT WAS SURPRISINGLY POSITIVE.

12:53PM  10   Q.   AT ANY TIME DID HE ENCOURAGE YOU NOT TO INVEST OR NOT TO

12:53PM  11   INVEST IN THE COMPANY?

12:53PM  12   A.   NO, HE DIDN'T.

12:53PM  13   Q.   THERE WAS A DISCUSSION OF AN EMAIL FROM JUNE OF 2010 WHERE

12:53PM  14   MS. HOLMES TOLD YOU THAT THERANOS WAS AN EARLY STAGE LIFE

12:53PM  15   SCIENCES COMPANY THAT CARRIED IMMENSE RISK.

12:53PM  16        DO YOU RECALL SEEING THAT EMAIL?

12:53PM  17   A.   I DO.

12:53PM  18   Q.   SHE SAID IN THAT EMAIL THAT THE STATUS THERE MIGHT NOT

12:53PM  19   CHANGE FOR YEARS TO COME.

12:53PM  20        WHEN YOU MADE THE INVESTMENT IN 2013, DID YOU UNDERSTAND

12:53PM  21   THAT THAT STATUS HAD CHANGED?

12:54PM  22   A.   YES.

12:54PM  23   Q.   HOW SO?

12:54PM  24   A.   WELL, AS I MENTIONED EARLIER, WHEN I GOT THAT EMAIL, THAT

12:54PM  25   WAS NOT LOGICAL WITH ALL OF THE OTHER INFORMATION THAT HAD BEEN

EISENMAN REDIRECT BY MR. BOSTIC                              6288

12:54PM  1    PASSED BEFORE; THAT THE COMPANY WAS SUCCESSFUL, THEY WERE

12:54PM  2    GETTING CONTRACTS, THEY HAD DEMAND FOR A MILLION READERS GOING

12:54PM  3    TO 2 MILLION -- I'M SORRY, GOING TO 2 MILLION CARTRIDGES A

12:54PM  4    MONTH, THAT REVENUES WOULD BE IN THE HUNDREDS OF MILLIONS OF

12:54PM  5    DOLLARS.

12:54PM  6        SO THAT EMAIL CONTRADICTED ALL OF THE EARLIER INFORMATION

12:54PM  7    THINKING THAT THEY WERE HITTING MILESTONES AND THEY WERE MAKING

12:54PM  8    SUCCESS IN THE MARKET.

12:54PM  9        BY THE 2013 INVESTMENT, BETWEEN CONVERSATIONS AND PRESS,

12:54PM 10    IT, IT APPEARED THAT THE COMPANY HAD A PROVEN TECHNOLOGY WITH

12:54PM 11    AN EXTREMELY LARGE MARKET.

12:54PM 12        AND WHAT WAS, WHAT WAS PUT IN THE OFFERING MEMO, AND WHAT

12:54PM 13    WAS COMMUNICATED TO ME, IS THE COMPANY HAD PROVEN ITSELF.  THEY

12:55PM 14    WERE RAISING MONEY TO GROW FASTER.  THIS WAS GROWTH CAPITAL.

12:55PM 15    Q.   AND THE EARLIER CONVERSATIONS THAT YOU HAD HAD WITH

12:55PM 16    MS. HOLMES, WAS THAT INFORMATION THAT YOU GAINED FROM HER STILL

12:55PM 17    A FACTOR IN YOUR DECISION TO INVEST IN 2013?

12:55PM 18    A.   IT WAS A MINOR FACTOR.  I THOUGHT THAT THE COMPANY HAD

12:55PM 19    MADE SIGNIFICANT PROGRESS AND IN THE 2006 TO 2010 TIMEFRAME.

12:55PM 20        AND THERE WAS ALSO INFORMATION THAT AS TIME GOES ON,

12:55PM 21    TECHNOLOGY GETS BETTER.  SO THEIR READER, I THINK THEY CALLED

12:55PM 22    IT THE EDISON, THERE WERE LATER VERSIONS JUST LIKE THE IPHONE.

12:55PM 23    THERE IS THE IPHONE 6, AND THEN THE 7, AND THEN THE 8.

12:55PM 24        SO MY UNDERSTANDING IS THAT THE TECHNOLOGY WAS PROVEN,

12:55PM 25    THEY WERE JUST PERFECTING IT.  THEY WERE MAKING IT AN EVEN

EISENMAN REDIRECT BY MR. BOSTIC                                    6289

12:55PM   1    BETTER TECHNOLOGY.

12:55PM   2    Q.   YOU ALSO DISCUSSED WITH MR. DOWNEY OPPORTUNITIES THAT YOU

12:55PM   3    HAD TO SELL YOUR THERANOS STOCK.

12:55PM   4        DO YOU RECALL THAT?

12:55PM   5    A.   YES.

12:55PM   6    Q.   WHEN YOU WERE EVALUATING THOSE OPPORTUNITIES, DID YOU HAVE

12:56PM   7    THE INFORMATION THAT YOU NEEDED TO MAKE THOSE DECISIONS?

12:56PM   8    A.   NO, I DID NOT.

12:56PM   9    Q.   OKAY.

12:56PM   10       ULTIMATELY YOU DECIDED NOT TO SELL YOUR THERANOS STOCK AT

12:56PM   11   ANY POINT PRIOR TO 2016 OR 2017; CORRECT?

12:56PM   12   A.   NO.   I SERIOUSLY CONSIDERED SELLING MY STOCK WHEN

12:56PM   13   CHRIS BOIES MADE THE OFFER, BUT THEN THERE WAS A PERIOD OF TWO

12:56PM   14   OR THREE MONTHS WHERE HE WOULD NOT FOLLOW THROUGH, HE DID NOT

12:56PM   15   RESPOND TO CALLS, HE WOULD NOT RESPOND TO EMAILS, AND THEN A

12:56PM   16   FEW MONTHS AFTER THAT ALL OF THE NEGATIVE PUBLICITY HIT, AND

12:56PM   17   OBVIOUSLY THEY WERE NOT GOING TO BUY MY STOCK ONCE THE CASCADE

12:56PM   18   OF NEGATIVE PUBLICITY WAS UNLEASHED.

12:56PM   19   Q.   YOU DISCUSSED WITH MR. DOWNEY AT A COUPLE POINTS -- WHAT

12:56PM   20   YOUR STOCK MIGHT HAVE BEEN WORTH AT A COUPLE OF POINTS IF YOU

12:56PM   21   HAD SOLD IT.

12:56PM   22       DO YOU REMEMBER THAT?

12:56PM   23   A.   I DO.

12:56PM   24   Q.   AND WHAT IS YOUR UNDERSTANDING OF WHAT YOUR STOCK IN

12:56PM   25   THERANOS IS WORTH TODAY?

EISENMAN RECROSS BY MR. DOWNEY                                    6290

```
12:56PM   1    A.   IT'S NOT AN UNDERSTANDING, IT'S A CONCLUSION.  IT'S WORTH

12:57PM   2    ZERO.

12:57PM   3              MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

12:57PM   4              THE COURT:  YES.

12:57PM   5         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:57PM   6              MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

12:57PM   7              MR. DOWNEY:  YOUR HONOR, I JUST HAVE ABOUT THREE

12:57PM   8    QUESTIONS FOLLOWING UP ON THAT.

12:57PM   9                      RECROSS-EXAMINATION

12:57PM  10    BY MR. DOWNEY:

12:57PM  11    Q.   MR. EISENMAN, JUST NOW ON THE REDIRECT EXAMINATION YOU

12:57PM  12    TALKED WITH MR. BOSTIC ABOUT SHARING INFORMATION AMONGST A

12:57PM  13    GROUP ABOUT THE THERANOS INVESTMENT.

12:57PM  14         DO YOU RECALL THAT?

12:57PM  15    A.   YES.

12:57PM  16    Q.   AND I JUST WANT TO SHOW YOU AN EXHIBIT TO SEE IF IT

12:57PM  17    IDENTIFIES SOME MEMBERS OF THAT GROUP.  OKAY?

12:57PM  18    A.   OKAY.

12:57PM  19              MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

12:57PM  20              THE COURT:  YES.

12:58PM  21    BY MR. DOWNEY:

12:58PM  22    Q.   AND LOOKING AT EXHIBIT 1362, IS THIS THE EMAIL IN WHICH

12:58PM  23    YOU COMMUNICATE TO MR. BALWANI THAT YOU DO INTEND TO MAKE AN

12:58PM  24    INVESTMENT IN THERANOS IN LATE 2013?

12:58PM  25    A.   YES.
```

EISENMAN RECROSS BY MR. DOWNEY                                    6291

12:58PM   1            MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 1362.

12:58PM   2            MR. BOSTIC:  NO OBJECTION.

12:58PM   3            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:58PM   4        (GOVERNMENT'S EXHIBIT 1362 WAS RECEIVED IN EVIDENCE.)

12:58PM   5    BY MR. DOWNEY:

12:58PM   6    Q.   AND I JUST WANT TO BLOW UP THE LIST OF INDIVIDUALS

12:58PM   7    UNDERNEATH THERE.

12:58PM   8        AND ALAN EISENMAN IS OF COURSE YOURSELF?

12:59PM   9    A.   CORRECT.

12:59PM  10    Q.   AND IS SHERRIE EISENMAN YOUR DAUGHTER OR YOUR WIFE?

12:59PM  11    A.   MY WIFE.

12:59PM  12    Q.   AND THEN THERE ARE TWO OTHER ENTITIES LISTED,

12:59PM  13    GORDON FAMILY TRUST AND CROFTON CAPITAL GP.  WHAT ARE THOSE?

12:59PM  14    A.   GORDON FAMILY TRUST IS A TRUST WITH MY THREE KIDS AND

12:59PM  15    THEIR NINE COUSINS.

12:59PM  16    Q.   AND WAS THAT ESTABLISHED BY THEIR GRANDFATHER?

12:59PM  17    A.   YES, IT WAS.

12:59PM  18    Q.   AND IS THAT MR. GORDON WHO WE HAD DISCUSSED A FEW MOMENTS

12:59PM  19    AGO?

12:59PM  20    A.   YES.

12:59PM  21    Q.   AND HAD YOU RECOMMENDED TO MR. GORDON THAT HE MAKE THIS

12:59PM  22    INVESTMENT?

12:59PM  23    A.   I WOULDN'T SAY I RECOMMENDED, BUT WE HAVE FAMILY MEETINGS

12:59PM  24    WHERE WE TALK ABOUT OPPORTUNITIES WE'RE LOOKING AT, AND WE

12:59PM  25    DECIDE, THE DIFFERENT ENTITIES DECIDE.

EISENMAN RECROSS BY MR. DOWNEY                              6292

12:59PM   1    Q.   AND WHAT IS CROFTON CAPITAL GP?

12:59PM   2    A.   CROFTON CAPITAL IS A PARTNERSHIP WITH MY WIFE'S THREE

12:59PM   3    SIBLINGS.

12:59PM   4    Q.   AND IS THAT ACTUALLY THE FAMILY OFFICE OF YOUR WIFE'S

12:59PM   5    FAMILY?

12:59PM   6    A.   NO.  IT'S -- WELL, THE FAMILY OFFICE, YES.  IT'S TITLED

12:59PM   7    CROFTON CAPITAL, THAT'S CORRECT.

01:00PM   8    Q.   OKAY.  AND WHEN I SAY, "FAMILY OFFICE," I MEAN JUST THE

01:00PM   9    ENTITY FOR YOUR IN-LAW'S FAMILY THAT, AMONG OTHER THINGS, MAKES

01:00PM  10    DECISIONS AS TO HOW TO INVEST THEIR MONEY; IS THAT RIGHT?

01:00PM  11    A.   YES.

01:00PM  12    Q.   AND WHEN YOU GOT INFORMATION ABOUT THERANOS OVER TIME

01:00PM  13    BETWEEN 2016 AND 2013, WOULD YOU ALWAYS BE CAREFUL TO SHARE

01:00PM  14    THAT INFORMATION WITH PEOPLE IN THIS GROUP?

01:00PM  15    A.   I CAN'T SAY THAT WE ALWAYS SHARED, AND THEY WERE PRIVY TO

01:00PM  16    SOME OF THE SAME INFORMATION IF IT WAS COMING FROM THE COMPANY.

01:00PM  17    Q.   OKAY.  WELL, DID THEY, TO YOUR KNOWLEDGE, HAVE DIRECT

01:00PM  18    COMMUNICATIONS WITH THE COMPANY?

01:00PM  19    A.   I'M SORRY, DID THEY?

01:00PM  20    Q.   DID THEY, TO YOUR KNOWLEDGE, HAVE DIRECT COMMUNICATIONS

01:00PM  21    WITH THE COMPANY?

01:00PM  22    A.   NOT TO MY KNOWLEDGE, BUT IT'S POSSIBLE.

01:00PM  23    Q.   BUT IF YOU LEARN SOMETHING TO THE COMPANY, YOU CONVEYED IT

01:00PM  24    ON TO THEM; CORRECT?

01:00PM  25    A.   THAT'S A POSSIBILITY.

EISENMAN RECROSS BY MR. DOWNEY                              6293

| | | |
|---|---|---|
| 01:00PM | 1 | Q.   AND ANY VIEWS THAT YOU HAD OF THE COMPANY AS YOU WENT |
| 01:00PM | 2 | THROUGH THE EXPERIENCE OF BEING AN INVESTOR, YOU WOULD, YOU |
| 01:00PM | 3 | WOULD CONVEY TO THEM; CORRECT? |
| 01:01PM | 4 | A.   SOMETIMES YES, SOMETIMES NO. |
| 01:01PM | 5 | Q.   FAIR ENOUGH. |
| 01:01PM | 6 |     NOTHING FURTHER, MR. EISENMAN. |
| 01:01PM | 7 |         MR. BOSTIC:  NOTHING FURTHER. |
| 01:01PM | 8 |         THE COURT:  ALL RIGHT.  THANK YOU.  IT'S 1:00 P.M. |
| 01:01PM | 9 | IS THIS WITNESS EXCUSED? |
| 01:01PM | 10 |         MR. DOWNEY:  WELL, YOUR HONOR, NOTHING FURTHER |
| 01:01PM | 11 | SUBJECT TO THE DISCUSSION WE HAD EARLIER. |
| 01:01PM | 12 |         THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:01PM | 13 |     IT SOUNDS LIKE, MR. EISENMAN, YOU MIGHT BE CALLED BACK TO |
| 01:01PM | 14 | TESTIFY TOMORROW.  SO I'M NOT GOING TO EXCUSE YOU AT THIS |
| 01:01PM | 15 | POINT. |
| 01:01PM | 16 |     YOU'LL BE NOTIFIED BY THE GOVERNMENT, I THINK A |
| 01:01PM | 17 | REPRESENTATIVE, AS TO WHETHER OR NOT YOU NEED TO COME BACK AND |
| 01:01PM | 18 | WHEN THAT IS. |
| 01:01PM | 19 |         THE WITNESS:  CAN I ASK YOU A QUESTION?  IS THAT |
| 01:01PM | 20 | FAIR? |
| 01:01PM | 21 |         THE COURT:  YES. |
| 01:01PM | 22 |         THE WITNESS:  IS IT POSSIBLE TO MAKE A DETERMINATION |
| 01:01PM | 23 | SO I COULD POSSIBLY CATCH A FLIGHT HOME IF I'M NOT GOING TO BE |
| 01:01PM | 24 | CALLED BACK? |
| 01:01PM | 25 |         THE COURT:  WELL, I'M NOT CERTAIN I'LL KNOW THAT, |

| | | |
|---|---|---|
| 01:01PM | 1 | WHEN I'LL HAVE THAT INFORMATION.  IT MIGHT NOT BE UNTIL |
| 01:01PM | 2 | TOMORROW MORNING WHEN WE'LL HAVE THAT INFORMATION. |
| 01:02PM | 3 | THE WITNESS:  OKAY.  THERE'S A LATE FLIGHT FROM 6:45 |
| 01:02PM | 4 | FROM SAN FRANCISCO, AND IT WOULD BE VERY HELPFUL IF I KNEW. |
| 01:02PM | 5 | THE COURT:  YES, I APOLOGIZE.  I DON'T THINK THAT |
| 01:02PM | 6 | WILL BE POSSIBLE, THAT FLIGHT WILL BE POSSIBLE. |
| 01:02PM | 7 | SO WE WILL, WE WILL RESUME, LADIES AND GENTLEMEN, WE'LL |
| 01:02PM | 8 | RESUME -- I THINK TOMORROW IS OUR 9:00 O'CLOCK START.  WE'LL BE |
| 01:02PM | 9 | STARTING AT 9:00 A.M. TOMORROW. |
| 01:02PM | 10 | SIR, I DON'T KNOW WHO YOUR CONTACT IS WITH THE GOVERNMENT |
| 01:02PM | 11 | AND THE WITNESS PERSON, BUT THAT PERSON WILL LET YOU KNOW. |
| 01:02PM | 12 | THE WITNESS:  OKAY.  BUT I WON'T KNOW UNTIL TONIGHT |
| 01:02PM | 13 | OR TOMORROW, IS THAT WHAT YOU'RE SAYING? |
| 01:02PM | 14 | THE COURT:  PROBABLY NOT TONIGHT.  I JUST DON'T |
| 01:02PM | 15 | KNOW.  I NEED TO TALK TO THE LAWYERS A LITTLE BIT ABOUT SOME OF |
| 01:02PM | 16 | OUR PROTOCOLS AND THINGS SO. |
| 01:02PM | 17 | THE WITNESS:  OKAY.  CAN I HOLD A GLIMMER OF HOPE OR |
| 01:02PM | 18 | POSSIBILITY THAT AFTER YOUR DISCUSSION? |
| 01:02PM | 19 | THE COURT:  WELL, ALL THINGS ARE POSSIBLE, SIR. |
| 01:02PM | 20 | THE WITNESS:  OKAY.  I'LL ACCEPT THAT. |
| 01:02PM | 21 | THE COURT:  AS I SAID BEFORE, THE CHICAGO CUBS WIN |
| 01:03PM | 22 | THE WORLD SERIES EVERY NOW AND THEN.  SO ALL THINGS ARE |
| 01:03PM | 23 | POSSIBLE. |
| 01:03PM | 24 | THE WITNESS:  OKAY. |
| 01:03PM | 25 | THE COURT:  YOU CAN STAND DOWN, NOW, SIR.  THANK |

6295

01:03PM  1    YOU.

01:03PM  2         AND, LADIES AND GENTLEMEN, WE'LL TAKE OUR RECESS NOW.

01:03PM  3    THANK YOU FOR YOUR PATIENCE.  WE'LL RESUME TOMORROW AT

01:03PM  4    9:00 A.M., 9:00 A.M.

01:03PM  5         PLEASE REMEMBER THE ADMONITION.  DO NOT IN ANY WAY DO ANY

01:03PM  6    INVESTIGATION, DO NOT LISTEN, READ, OR TALK ABOUT ANYTHING TO

01:03PM  7    DO WITH THIS CASE.  I'LL CHECK IN WITH YOU TOMORROW MORNING TO

01:03PM  8    SEE IF ANY OF THAT HAS OCCURRED.

01:03PM  9         HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.  THANK YOU.

01:03PM 10         (JURY OUT AT 1:03 P.M.)

01:04PM 11         THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

01:04PM 12    THAT THE JURY HAS LEFT FOR THE DAY.

01:04PM 13         THE WITNESS HAS LEFT THE COURTROOM.

01:04PM 14         COUNSEL, WHAT WOULD YOU LIKE TO DO ABOUT THE NOTES AND

01:04PM 15    WHAT ARE YOUR THOUGHTS ABOUT THAT?

01:04PM 16         MR. BOSTIC AND MR. DOWNEY, IF YOU COULD COME FORWARD.

01:04PM 17         I GUESS THE FIRST QUESTION IS WILL HE MAKE HIS 6:45 FLIGHT

01:04PM 18    TONIGHT?

01:04PM 19         (LAUGHTER.)

01:04PM 20         MR. DOWNEY:  I DON'T KNOW.

01:04PM 21         MR. BOSTIC:  YOUR HONOR, IT MIGHT BE HELPFUL IF WE

01:04PM 22    JUST KNEW WHAT THE NEXT STEPS WERE SO WE KNEW WHAT WE WERE

01:04PM 23    WAITING FOR.

01:04PM 24         THE COURT:  YES.

01:04PM 25         MR. BOSTIC:  AS THE COURT KNOWS, THE GOVERNMENT'S

6296

01:04PM 1    INTEREST IS IN HAVING THE TRIAL MOVE FORWARD EXPEDITIOUSLY, AND

01:04PM 2    WE ALSO DON'T WANT TO SEE WITNESSES INCONVENIENCED

01:04PM 3    UNNECESSARILY, BUT I ALSO WANT ISSUES TO GET THE ATTENTION THEY

01:04PM 4    DESERVE SO.

01:04PM 5          THE COURT:  OF COURSE.  I THINK WE'RE ALL OF COMMON

01:04PM 6    PURPOSE IN THAT.

01:04PM 7       I KNOW YOU WANTED TO LOOK AT THESE NOTES AND WANTED SOME

01:04PM 8    TIME.  WE SHARED OUR THOUGHTS ABOUT THESE, WHETHER OR NOT THEY

01:05PM 9    HAVE IMPORTANCE BASED ON THE TESTIMONY.

01:05PM 10         MR. DOWNEY:  YES.

01:05PM 11         THE COURT:  BUT YOU NEED TIME TO LOOK THEM OVER.

01:05PM 12   YOU'VE LOOKED AT ABOUT HALF OF THEM I THINK YOU'VE SAID.

01:05PM 13         MR. DOWNEY:  WELL, I HAD ABOUT A HALF AN HOUR.  I

01:05PM 14   WENT THROUGH EACH OF THEM ONCE, BUT I WASN'T ABLE TO GO THROUGH

01:05PM 15   AND FIGURE OUT WHY ALL OF THE VARIATIONS EXIST, OR RESPECTFULLY

01:05PM 16   AS TO WHEN ALL OF THE VARIATIONS EXISTED.  SO I REALLY HAVEN'T

01:05PM 17   HAD A CHANCE TO REVIEW THEM.

01:05PM 18         THE COURT:  SO WHAT DO YOU THINK ABOUT TIMING ABOUT

01:05PM 19   THIS?

01:05PM 20      LET ME JUST POSE SOMETHING.

01:05PM 21         MR. DOWNEY:  YES.

01:05PM 22         THE COURT:  YOU KNOW, WE HAVE A HALF A DAY THAT YOU

01:05PM 23   HAVE AVAILABLE, AND I'LL ENCOURAGE YOU TO LOOK THROUGH THOSE

01:05PM 24   NOTES.

01:05PM 25      THIS IS REALLY YOUR TEAM'S DECISION, MR. DOWNEY --

6297

```
01:05PM   1              MR. DOWNEY:  YES.

01:05PM   2              THE COURT:  -- AS TO WHETHER OR NOT YOU FEEL YOU

01:05PM   3    NEED TO CALL HIM BACK FOR ANY POTENTIAL DISCREPANCIES OR

01:05PM   4    ANYTHING THAT WE'VE TALKED ABOUT THIS MORNING, WHAT IS THE

01:05PM   5    VALUE OF THAT.

01:05PM   6              MR. DOWNEY:  THAT'S WHAT I -- WHAT I WOULD LIKE TO

01:05PM   7    DO, YOUR HONOR, IS TO HAVE THE OPPORTUNITY TO EXAMINE THEM,

01:05PM   8    PARTICULARLY IN LIGHT OF THE TESTIMONY THAT THE WITNESS GAVE ON

01:06PM   9    DIRECT.

01:06PM  10        IF IT SEEMS TO BE MEANINGFUL, THEN I THINK, YOU KNOW, WE

01:06PM  11    CAN LET THE COURT KNOW THAT TONIGHT.

01:06PM  12        IF IT IS NOT, THEN I'M NOT GOING TO HAUL HIM BACK

01:06PM  13    NEEDLESSLY.

01:06PM  14              THE COURT:  RIGHT.

01:06PM  15              MR. DOWNEY:  AND OBVIOUSLY WE WERE SUCCESSFUL IN

01:06PM  16    OTHERWISE FINISHING HIS EXAM SO.

01:06PM  17              THE COURT:  WELL, I APPRECIATE THAT.

01:06PM  18        AGAIN, I'M NOT MEDDLING, BUT YOU'LL LOOK AT THESE, AND YOU

01:06PM  19    WILL ASSESS THE TESTIMONY THAT HAS BEEN RECEIVED, AND YOU WILL

01:06PM  20    MAKE A VALUE JUDGMENT AS TO WHETHER OR NOT YOU NEED ANYTHING

01:06PM  21    FURTHER FROM THIS WITNESS.

01:06PM  22              MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.

01:06PM  23              MR. BOSTIC:  AND, YOUR HONOR, IF THE COURT IS

01:06PM  24    WILLING TO IMPOSE A DEADLINE OR THINKS A DEADLINE MIGHT BE

01:06PM  25    HELPFUL IN THAT REGARD, THE GOVERNMENT WOULD ENCOURAGE IT.
```

| | | |
|---|---|---|
| 01:06PM | 1 | THE COURT:  RIGHT.  I THINK -- THAT WAS MY NEXT |
| 01:06PM | 2 | STEP, MR. DOWNEY. |
| 01:06PM | 3 | MR. DOWNEY:  I THINK THAT'S FINE, YOUR HONOR. |
| 01:06PM | 4 | COULD I JUST HAVE UNTIL 5:00 P.M. TO GO THROUGH THEM, AND |
| 01:06PM | 5 | I'LL LET MR. BOSTIC KNOW? |
| 01:06PM | 6 | THE COURT:  WELL, THAT MAKES HIS FLIGHT -- I DON'T |
| 01:06PM | 7 | KNOW WHERE HE'S STAYING BUT -- |
| 01:06PM | 8 | MR. DOWNEY:  WELL, YOU GENTLEMEN KNOW BETTER THAN I |
| 01:06PM | 9 | ABOUT WHAT TIME HE WOULD NEED TO KNOW ABOUT HIS FLIGHT. |
| 01:07PM | 10 | THE COURT:  WELL, YOU HAVE NOT EXPERIENCED THE |
| 01:07PM | 11 | FREEWAYS HERE I KNOW.  YOU'RE FROM A DIFFERENT PART OF THE |
| 01:07PM | 12 | COUNTRY. |
| 01:07PM | 13 | YOU DID EXPERIENCE HERE AT 12:10 P.M., I THINK SOMEWHERE |
| 01:07PM | 14 | AROUND THERE, YOU EXPERIENCED A CALIFORNIA EARTHQUAKE.  I DON'T |
| 01:07PM | 15 | KNOW IF YOU FELT IT OR NOT. |
| 01:07PM | 16 | MR. DOWNEY:  ACTUALLY I DIDN'T.  BUT I'LL INVITE YOU |
| 01:07PM | 17 | TO WASHINGTON IF YOU WOULD LIKE TO SEE TRAFFIC. |
| 01:07PM | 18 | THE COURT:  YOU THOUGHT, NO DOUBT, THAT WAS JUST |
| 01:07PM | 19 | YOUR CROSS-EXAMINATION.  IT WAS EARTH SHAKING. |
| 01:07PM | 20 | MR. DOWNEY:  NO DOUBT. |
| 01:07PM | 21 | (LAUGHTER.) |
| 01:07PM | 22 | MR. DOWNEY:  I THINK -- WHY DON'T YOU TELL ME WHAT |
| 01:07PM | 23 | TIME IT WOULD BE? |
| 01:07PM | 24 | THE COURT:  WELL, I KNOW YOU NEED TO LOOK AT THIS, |
| 01:07PM | 25 | MR. DOWNEY. |

6299

| | | |
|---|---|---|
| 01:07PM | 1 | MR. DOWNEY: RIGHT. |
| 01:07PM | 2 | THE COURT: AND I APPRECIATE -- MR. BOSTIC AGREES, |
| 01:07PM | 3 | YOU NEED TO GIVE IT A REVIEW TO SEE WHAT PURPOSE IT HOLDS. |
| 01:07PM | 4 | MR. DOWNEY: IF ANY. |
| 01:07PM | 5 | THE COURT: RIGHT, IF ANY. |
| 01:07PM | 6 | AND THE WITNESS HAS EXPRESSED A DESIRE TO MAKE A 6:45 |
| 01:07PM | 7 | FLIGHT I THINK HE SAID. IF HE'S IN SAN JOSE, IT'S GOING TO |
| 01:07PM | 8 | TAKE HIM AT LEAST AN HOUR TO GET TO SAN FRANCISCO, DEPENDING ON |
| 01:07PM | 9 | WHEN HE LEAVES. |
| 01:07PM | 10 | MR. DOWNEY: WELL, YOUR HONOR, I UNDERSTAND HIS |
| 01:08PM | 11 | TRAVEL SITUATION, AND I REGRET IT. I DON'T WANT TO HAVE THIS |
| 01:08PM | 12 | TURN ON THE WITNESS'S TRAVEL SITUATION. THERE'S A LOT GOING ON |
| 01:08PM | 13 | IN THE PROCEEDING. AND THE JURY AND THE COURT OBVIOUSLY HAVE |
| 01:08PM | 14 | DEDICATED A LOT OF TIME TO IT. |
| 01:08PM | 15 | I APPRECIATE, YOU KNOW, AND WOULD LIKE TO ACCOMMODATE HIM. |
| 01:08PM | 16 | AND IT SEEMS LIKE THERE'S A SCENARIO UNDER WHICH HE DOESN'T |
| 01:08PM | 17 | HAVE TO COME BACK, BUT I WOULD SAY WITH AN ISSUE SUCH AS |
| 01:08PM | 18 | STUDYING THE ORIGINAL OF THE DOCUMENT, I'M JUST RELUCTANT TO |
| 01:08PM | 19 | COMMIT DOING SO, SO HE CAN MAKE A PLANE. |
| 01:08PM | 20 | THE COURT: I UNDERSTAND THE BALANCE THERE. DO YOU |
| 01:08PM | 21 | THINK YOU COULD GET IT DONE BY 4:00 O'CLOCK, OR CAN YOU CHECK |
| 01:08PM | 22 | IN WITH MR. BOSTIC? |
| 01:08PM | 23 | MR. DOWNEY: WHY DON'T WE CHECK IN SORT OF AROUND |
| 01:08PM | 24 | THAT TIME AND THEN WE CAN FIGURE OUT WHAT NEEDS TO BE, WHAT |
| 01:08PM | 25 | NEEDS TO BE DONE, IF ANYTHING, AND MAKE A PROPOSAL. |

6300

| | | |
|---|---|---|
| 01:08PM | 1 | THE COURT:  OKAY.  MR. BOSTIC, WILL THAT WORK? |
| 01:08PM | 2 | MR. BOSTIC:  THAT'S FINE.  THANK YOU. |
| 01:08PM | 3 | THE COURT:  AND ASSUMING THE WITNESS IS EXCUSED, AND |
| 01:08PM | 4 | I'LL DO THAT TOMORROW ON THE RECORD. |
| 01:09PM | 5 | AND YOU HAVE ANOTHER WITNESS LINED UP? |
| 01:09PM | 6 | MR. BOSTIC:  YES. |
| 01:09PM | 7 | MR. DOWNEY:  AND I THINK AFTER MR. BOSTIC AND I |
| 01:09PM | 8 | CHAT, MAYBE I CAN REPORT BACK TO THE DEPUTY ON WHERE WE ARE SO |
| 01:09PM | 9 | THE COURT WILL BE APPRISED IN ADVANCE?  OR DO YOU WANT US TO |
| 01:09PM | 10 | REPORT IN THE MORNING? |
| 01:09PM | 11 | THE COURT:  NO, NO.  I'D LIKE TO KNOW TONIGHT, AND |
| 01:09PM | 12 | YOU CAN LET MS. DIBBLE KNOW.  SHE'LL GIVE HER EMAIL, AND SHE'LL |
| 01:09PM | 13 | BE WITH US TOMORROW AS WELL, AND SHE'LL GIVE YOU THAT, AND I |
| 01:09PM | 14 | CAN BE APPRISED OF THAT. |
| 01:09PM | 15 | AND IF YOU DON'T NEED THE WITNESS, WE CAN TELL HIM HE'S |
| 01:09PM | 16 | EXCUSED. |
| 01:09PM | 17 | MR. DOWNEY:  I THINK THAT'S THE PLAN. |
| 01:09PM | 18 | THE COURT:  AND WHAT ABOUT HIS NOTES, HOW DO WE GET |
| 01:09PM | 19 | HIS NOTES BACK TO HIM? |
| 01:09PM | 20 | MR. DOWNEY:  WELL -- |
| 01:09PM | 21 | THE COURT:  THAT'S GOING TO BE PART OF YOUR |
| 01:09PM | 22 | DISCUSSION. |
| 01:09PM | 23 | MR. DOWNEY:  WELL, PERHAPS COULD HE PICK THEM UP AT |
| 01:09PM | 24 | THE COURTHOUSE SINCE THEY'VE BEEN PRODUCED TO THE COURT? |
| 01:09PM | 25 | THE COURT:  YES.  BUT IT'S KIND OF THE OPPOSITE WAY |

6301

| | | |
|---|---|---|
| 01:09PM | 1 | FROM THE AIRPORT THOUGH. |
| 01:10PM | 2 | MR. BOSTIC:  WHY DON'T THE PARTIES MEET AND CONFER |
| 01:10PM | 3 | ON THAT, YOUR HONOR. |
| 01:10PM | 4 | THE COURT:  EXACTLY.  EXACTLY. |
| 01:10PM | 5 | THERE'S ALSO A MONDAY NIGHT FOOTBALL GAME THAT YOU'RE |
| 01:10PM | 6 | GOING TO PROBABLY TAKE YOUR TEAM TO SINCE YOU'RE IN CALIFORNIA. |
| 01:10PM | 7 | MR. DOWNEY:  WELL, THEY WERE OUT LATE IN LAS VEGAS. |
| 01:10PM | 8 | THE COURT:  OF COURSE.  WELL, THANK YOU FOR THE |
| 01:10PM | 9 | FOLLOW UP.  AND I'LL WAIT TO HEAR ABOUT THE NOTES, AND WE'LL |
| 01:10PM | 10 | SEE WHERE WE GO. |
| 01:10PM | 11 | IF NOT, AT 9:00 O'CLOCK WE'LL HAVE A NEW WITNESS. |
| 01:10PM | 12 | MR. BOSTIC:  UNDERSTOOD. |
| 01:10PM | 13 | THE COURT:  OKAY.  GREAT.  HAVE A GOOD EVENING. |
| 01:10PM | 14 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 01:10PM | 15 | MR. BOSTIC:  THANK YOU. |
| 01:10PM | 16 | (COURT ADJOURNED AT 1:10 P.M.) |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076
17

18    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
19    CERTIFICATE NUMBER 9595

20

21         DATED:  NOVEMBER 15, 2021

22

23

24

25

6302

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
6                                   )
                      PLAINTIFF,    )  SAN JOSE, CALIFORNIA
7                                   )
             VS.                    )  VOLUME 33
8                                   )
     ELIZABETH A. HOLMES,           )  NOVEMBER 16, 2021
9                                   )
                      DEFENDANT.    )  PAGES 6302 – 6573
10   _____ )  **SEALED PAGES 6566 – 6573**

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE EDWARD J. DAVILA
13              UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21

22   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
24                         CERTIFICATE NUMBER 9595

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER

6303

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  PATRICK LOOBY
                                    SEEMA ROPER
 6                                  RICHARD CLEARY
                                    J.R. FLEURMONT
 7                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 8
                               LAW OFFICE OF JOHN D. CLINE
 9                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
10                             SAN FRANCISCO, CALIFORNIA 94111

11
      ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
12                             BY:  ADELAIDA HERNANDEZ

13                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                  MADDI WACHS, PARALEGAL

15                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                               TBC
17                             BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

1

2                          INDEX OF PROCEEDINGS

3       GOVERNMENT'S:

4       **SO-HAN (DANISE) SPIVEY**
        DIRECT EXAM BY MR. LEACH                    P. 6355
5       CROSS-EXAM BY MR. WADE                      P. 6364

6

7       **BRIAN GROSSMAN**
        DIRECT EXAM BY MR. LEACH                    P. 6374
8       CROSS-EXAM BY MR. WADE                      P. 6462

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

|  |  | IDENT. | EVIDENCE |
|---|---|---|---|
| GOVERNMENT'S: |  |  |  |
|  |  |  |  |
| 5454 |  |  | 6358 |
| 1396 |  |  | 6371 |
| 1404 |  |  | 6387 |
| 4077 |  |  | 6410 |
| 1443 |  |  | 6430 |
| 5441 |  |  | 6444 |
| 1482 |  |  | 6453 |
| 1505 |  |  | 6458 |
| 1506 |  |  | 6459 |
| 4052 |  |  | 6500 |
| 1434 |  |  | 6509 |
| 1422 |  |  | 6511 |
| 1360 |  |  | 6521 |
| 4036 |  |  | 6536 |
|  |  |  |  |
|  |  |  |  |
| DEFENDANT'S: |  |  |  |
|  |  |  |  |
| 7353 |  |  | 6484 |
| 7354 |  |  | 6486 |
| 7358 |  |  | 6490 |
| 7376 |  |  | 6514 |
| 14025 |  |  | 6523 |
| 7378 |  |  | 6529 |
| 14021 |  |  | 6541 |
| 7390 |  |  | 6544 |

|  |  | SAN JOSE, CALIFORNIA                          NOVEMBER 16, 2021 |
|--|--|--|
| 08:17AM | 1 | SAN JOSE, CALIFORNIA                          NOVEMBER 16, 2021 |

SAN JOSE, CALIFORNIA                          NOVEMBER 16, 2021

08:17AM   2              P R O C E E D I N G S

08:17AM   3        (COURT CONVENED AT 8:17 A.M.)

08:17AM   4        (JURY OUT AT 8:17 A.M.)

08:17AM   5             THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:17AM   6    MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

08:17AM   7        WE'RE OUTSIDE OF THE PRESENCE OF THE JURY THIS MORNING.

08:17AM   8    WE WERE GOING TO TAKE UP -- I THINK THERE WAS A MATTER, THE

08:17AM   9    MOTION FILED BY THE DEFENSE.

08:17AM   10       I JUST WANTED TO TOUCH BASE.  LAST WEEK WE -- WHEN WE LEFT

08:17AM   11   COUNSEL, I THINK YOU WERE GOING TO HAVE SOME DISCUSSION ABOUT

08:17AM   12   SOME IDENTIFICATION OF DECISIONS MADE BY 4:00 P.M. LAST WEEK.

08:17AM   13       IS THAT SOMETHING THAT I SHOULD KNOW ABOUT, OR CAN I JUST

08:17AM   14   KNOW, HAVE YOU HAD THAT DISCUSSION?  I THINK THIS --

08:17AM   15             MR. DOWNEY:  YOUR HONOR, ARE YOU REFERRING TO

08:17AM   16   YESTERDAY?

08:17AM   17             THE COURT:  NO.  I THINK IT WAS LAST WEEK THERE WAS

08:18AM   18   A DISCUSSION ABOUT THE LIS, AND IS THAT SOMETHING THAT WE

08:18AM   19   SHOULD TALK ABOUT THIS MORNING?

08:18AM   20             MR. SCHENK:  I'M NOT SURE THERE'S AN ISSUE THAT

08:18AM   21   NEEDS THE COURT'S ATTENTION.  THE DEFENSE DID SEND US A LETTER

08:18AM   22   BY 4:00 P.M.  THE LETTER INDICATED THAT THEY DID NOT BELIEVE

08:18AM   23   THAT THE DOOR WAS OPEN FOR THE GOVERNMENT TO INTRODUCE FACTS

08:18AM   24   REGARDING THE LIS DATABASE, AND THEY ALSO MAINTAIN THEIR

08:18AM   25   ABILITY TO MAKE ANY ARGUMENTS, IF I'M SUMMARIZING THEIR

08:18AM  1    POSITION CORRECTLY.

08:18AM  2         THE COURT:  OKAY.

08:18AM  3         MR. SCHENK:  I DON'T KNOW -- THE POINT THE

08:18AM  4    GOVERNMENT WAS MAKING WAS THAT WE DON'T KNOW WHETHER THE

08:18AM  5    DEFENSE IS GOING TO PUT A CASE ON OR NOT, AND WHEN WE ARE IN

08:18AM  6    THAT POSITION, WHAT WE ARE FACED WITH IS ASKING THE COURT, HAS

08:18AM  7    THE DOOR BEEN OPENED SO THAT WE CAN PUT IN THE FACTS AS WE SEE

08:18AM  8    THEM WITH REGARD TO LIS?

08:18AM  9         BECAUSE THE CURRENT STATE OF THE RECORD IS A LITTLE BIT

08:18AM  10   UNCLEAR ON WHAT ARGUMENTS THE DEFENSE CAN MAKE BASED UPON THE

08:19AM  11   FACTS THAT HAVE BEEN INTRODUCED.  FOR INSTANCE, THE

08:19AM  12   CAPABILITIES OF LIS IS IN THE RECORD.

08:19AM  13        SO FROM THAT THE DEFENSE MIGHT ARGUE, IF THEY PUT ON NO

08:19AM  14   CASE, THEY MIGHT ARGUE IN CLOSING THAT THE GOVERNMENT FAILED TO

08:19AM  15   GET VERY IMPORTANT EVIDENCE.

08:19AM  16        FROM THE GOVERNMENT'S PERSPECTIVE, IT WOULD BE UNFAIR TO

08:19AM  17   HAVE THAT ARGUMENT BASED UPON THIS RECORD WITHOUT THE

08:19AM  18   GOVERNMENT IN ITS CASE-IN-CHIEF GETTING TO INTRODUCE ADDITIONAL

08:19AM  19   EVIDENCE REGARDING LIS TO CONFRONT THAT TYPE OF ARGUMENT.

08:19AM  20        THAT'S WHAT THE GOVERNMENT WAS GETTING AT BY RAISING THIS

08:19AM  21   TO THE COURT'S ATTENTION LAST WEEK BY ASKING FOR SOME NOTICE

08:19AM  22   REGARDING HOW THE DEFENSE VIEWS THE STATE OF THE EVIDENCE.

08:19AM  23        AND WHAT WE DETERMINED IS THAT THE DEFENSE DOESN'T BELIEVE

08:19AM  24   THAT THE DOOR IS OPEN, WHICH WE TAKE TO MEAN THAT THEY WILL NOT

08:19AM  25   MAKE THAT ARGUMENT BECAUSE IT CAN'T BE -- BOTH CAN'T EXIST.

| | | |
|---|---|---|
| 08:19AM | 1 | THE DOOR CAN'T BE CLOSED AND ALSO THE DEFENSE GETS TO ARGUE |
| 08:20AM | 2 | MISSING EVIDENCE HERE.  THAT WOULD BE UNFAIR. |
| 08:20AM | 3 | AND WE'RE FINE WITH THE RECORD AS IT IS ON THAT ISSUE, |
| 08:20AM | 4 | UNLESS SORT OF HEARING THAT THE COURT HAS FURTHER GUIDANCE FOR |
| 08:20AM | 5 | THE PARTIES. |
| 08:20AM | 6 | THE COURT:  AND THIS IS WHAT I WANTED TO TOUCH ON. |
| 08:20AM | 7 | I THINK THERE WAS SOME DISCUSSION ABOUT THIS, AND I |
| 08:20AM | 8 | THOUGHT, MR. WADE, YOUR TEAM HAD SAID WE'RE GOING TO LOOK AT |
| 08:20AM | 9 | THIS AND MAKE A DECISION OR GIVE SOME INFORMATION. |
| 08:20AM | 10 | SO -- |
| 08:20AM | 11 | MR. WADE:  YOUR HONOR, IF I MIGHT, WE DID SEND A |
| 08:20AM | 12 | LETTER TO THE COUNSEL. |
| 08:20AM | 13 | IF I MIGHT PASS THAT UP, ALONG WITH -- |
| 08:20AM | 14 | THE COURT:  SURE. |
| 08:20AM | 15 | MR. WADE:  -- THERE'S AN EXCERPT OF THE PORTION OF |
| 08:20AM | 16 | DOCKET 798 WHICH, OF COURSE, IS THE COURT'S MOTION IN LIMINE |
| 08:20AM | 17 | RULING THAT RELATES TO THE LIS ISSUE. |
| 08:20AM | 18 | I'M SURE THE COURT HAS A DOG-EARED COPY OF 798 THAT IT |
| 08:20AM | 19 | KEEPS UP ON THE BENCH, BUT I HAVE JUST COPIED THE RELEVANT |
| 08:20AM | 20 | PORTIONS THERE. |
| 08:20AM | 21 | YOU'LL SEE, YOUR HONOR, WHAT WE DID IN THE LETTER IS WE |
| 08:20AM | 22 | TOOK MR. SCHENK'S INQUIRY TO BE AN INQUIRY AS TO WHETHER WE |
| 08:21AM | 23 | WISHED TO TELL HIM WHAT DEFENSES WE WANT TO PRESENT BEFORE HIS |
| 08:21AM | 24 | CASE CLOSES.  WE DECLINED THE INVITATION. |
| 08:21AM | 25 | WE RESERVE OUR RIGHT TO OFFER ANY DEFENSE. |

08:21AM  1      WE DID NOTE IN THE COURT'S ORDER, AS MR. SCHENK SUGGESTED,

08:21AM  2   WE DID NOTE THAT WE DON'T BELIEVE THAT WE HAVE OPENED THE DOOR.

08:21AM  3   THE COURT'S ORDER SPECIFICALLY DISCUSSED ISSUES THAT WE COULD

08:21AM  4   ADDRESS WITH RESPECT TO LIS, AND IT ADDRESSED -- IT NOTED THE

08:21AM  5   CONCEPT THAT IF WE, THAT IF WE ARGUE THAT THE LIS DATABASE IS

08:21AM  6   UNAVAILABLE BECAUSE OF THE GOVERNMENT'S FAILURE TO OBTAIN IT,

08:21AM  7   THAT THAT COULD OPEN THE DOOR.

08:21AM  8      I THINK THE COURT ALSO NOTED IN THE ORDER THAT IF WE

08:21AM  9   SOUGHT A JURY INSTRUCTION THAT RELATED TO SPOLIATION -- I

08:22AM 10   ALWAYS HAVE TROUBLE WITH THAT WORD, YOUR HONOR -- AND WE

08:22AM 11   PRESENTLY DON'T INTEND TO OFFER THAT, BUT, OF COURSE, WE'LL SEE

08:22AM 12   WHERE WE ARE AFTER THE GOVERNMENT RESTS AND WHAT DEFENSE WE

08:22AM 13   NEED TO PROVE.

08:22AM 14      THE GOVERNMENT HAS A REBUTTAL CASE IF WE END UP OPENING

08:22AM 15   THAT DOOR IN THE DEFENSE CASE, AND AS ALWAYS, IT HAS THE

08:22AM 16   ABILITY TO ADDRESS WHATEVER DEFENSES WE MIGHT RAISE IN ITS

08:22AM 17   REBUTTAL.

08:22AM 18         THE COURT:  OKAY.  WELL, ONE OF THE OBSERVATIONS,

08:22AM 19   LET ME JUST SAY, IS THERE'S BEEN MENTION OF THE LIS THROUGH

08:22AM 20   CROSS-EXAMINATION, AND TWO OR THREE WITNESSES WERE ASKED ABOUT

08:22AM 21   IT, THE LAB DIRECTORS AND THE EXISTENCE OF IT, AND IT WAS, I'LL

08:22AM 22   USE THE WORD INTERESTING, TO LISTEN TO THOSE QUESTIONS AS TO

08:22AM 23   THE RELEVANCY OF THE TOPICS AND RAISING THE LIS, WHICH CAUSED

08:23AM 24   ME, PARDON ME, SOME QUESTION ABOUT WHETHER OR NOT THAT IS GOING

08:23AM 25   TO BE AN ISSUE IN THE CASE.

08:23AM  1        AND I UNDERSTAND WE'RE TREADING LIGHTLY BECAUSE I'M NOT

08:23AM  2    ASKING THE DEFENSE TO REVEAL WHAT THEIR DEFENSE IS IN ADVANCE.

08:23AM  3    I'M NOT DOING THAT.  NEITHER IS THE GOVERNMENT.

08:23AM  4        BUT THERE IS THIS ISSUE.  IT'S BEEN PROBED BY YOU, WHICH,

08:23AM  5    TO THE GOVERNMENT, PERHAPS SUGGESTS THAT, WELL, WHAT DO WE NEED

08:23AM  6    TO DO ABOUT IT?  IF WE SIT ON OUR HANDS ABOUT IT AND THEN THIS

08:23AM  7    BECOMES AN ISSUE, THEN IT'S PART OF THE REBUTTAL CASE.  I

08:23AM  8    UNDERSTAND THAT'S HOW THE SYSTEM WORKS AND THEY CAN PUT THAT

08:23AM  9    ON.

08:23AM  10        THE OTHER REASON FOR ME TO MAKE INQUIRY ON THIS IS THE

08:23AM  11    TIMING OF THINGS.  IF THE LIS COMES IN, IT COULD OPEN THE DOOR

08:23AM  12    TO -- IF YOUR TEAM IS GOING TO ARGUE THAT THE GOVERNMENT

08:23AM  13    DESTROYED IT AND IT'S THEIR FAULT, OR SOMEHOW THE JURY SHOULD

08:23AM  14    LOOK AT THAT, THEN THAT OPENS THE DOOR TO SIGNIFICANT OTHER

08:24AM  15    ISSUES ABOUT RESPONSIBILITY FOR THAT.

08:24AM  16        AND YOU KNOW WHAT THE HISTORY IS.  YOU KNOW WHAT THE

08:24AM  17    EVIDENCE IS AND THAT, AND WHAT TESTIMONY IS LIKELY TO COME IN

08:24AM  18    FRONT OF ALL OF THAT.

08:24AM  19        SO MY THOUGHT IN DOCKET 798 WAS THE LIS IS NOT GOING TO BE

08:24AM  20    RELEVANT IN THE CASE, BUT THAT'S WHAT THE COURT'S THOUGHT WAS

08:24AM  21    AFTER LOOKING AT YOUR MOTIONS.

08:24AM  22        BUT IT COULD COME IN.  AND, OF COURSE, IF THE DOOR IS

08:24AM  23    OPENED, THEN IT IS PART OF THE CASE AND THE JURY IS ENTITLED TO

08:24AM  24    HEAR BOTH SIDES OF IT.

08:24AM  25        SO YOU'RE KIND OF DRIVING THIS, MR. WADE.  YOU'RE KIND OF

| | | |
|---|---|---|
| 08:24AM | 1 | DRIVING THIS.  BUT, YOU KNOW, YOU'RE IN THE DRIVER'S SEAT ON |
| 08:24AM | 2 | THIS, BUT QUERY AS TO, YOU KNOW, ARE YOU ON THE FREEWAY YET? |
| 08:24AM | 3 | MR. WADE:  I'M NOT EVEN SURE WE'VE TURNED ONTO THE |
| 08:25AM | 4 | ENTRY RAMP, YOUR HONOR. |
| 08:25AM | 5 | OF COURSE THE LIS IS IN THE CASE.  AS WE NOTED AT THE |
| 08:25AM | 6 | OUTSET IN THE MOTIONS PRACTICE, THE LIS IS THE CENTRAL HUB OF |
| 08:25AM | 7 | INFORMATION WITHIN THE CASE. |
| 08:25AM | 8 | THE GOVERNMENT CALLED WITNESS AND THEY ASKED A LOT OF |
| 08:25AM | 9 | QUESTIONS RELATING TO RESULTS.  THEY ASKED DR. DAS, FOR |
| 08:25AM | 10 | EXAMPLE, ABOUT DIFFERENT THINGS HE DID WHEN HE CAME INTO THE |
| 08:25AM | 11 | COMPANY.  ALL OF THAT RELATED TO DATA WITHIN THE LIS. |
| 08:25AM | 12 | AND OF COURSE THE COURT IN ITS ORDER IN 798 DIDN'T |
| 08:25AM | 13 | PRECLUDE US FROM QUESTIONING ON LIS.  THE LINE THAT WE TOOK THE |
| 08:25AM | 14 | COURT TO BE DRAWING THERE, AND WHICH WE'VE SOUGHT TO BE MINDFUL |
| 08:25AM | 15 | OF AS WE'VE ASKED QUESTIONS, IS WHETHER WE ARGUE OR WHETHER WE |
| 08:25AM | 16 | SEEK EVIDENCE RELATING TO THE LIS BEING UNAVAILABLE BECAUSE OF |
| 08:25AM | 17 | THE GOVERNMENT'S FAILURE TO OBTAIN IT. |
| 08:25AM | 18 | AND I DON'T BELIEVE THAT WE'VE ASKED ANY QUESTIONS WITH |
| 08:25AM | 19 | RESPECT TO THE GOVERNMENT'S FAILURE TO OBTAIN IT.  I DON'T |
| 08:26AM | 20 | BELIEVE AT THIS POINT THAT WE'VE ASKED ANY QUESTIONS -- YOU |
| 08:26AM | 21 | KNOW, AN AGENT HASN'T TESTIFIED, FOR EXAMPLE, THERE'S BEEN NO |
| 08:26AM | 22 | INQUIRY ABOUT THE GOVERNMENT'S FAILURE TO OBTAIN IT. |
| 08:26AM | 23 | BUT WE DID RAISE THIS VERY ISSUE IN 798 ABOUT PRESERVING |
| 08:26AM | 24 | OUR ABILITY TO MAKE ARGUMENTS ABOUT THE GOVERNMENT'S FAILURE TO |
| 08:26AM | 25 | MEET ITS BURDEN. |

6312

| | | |
|---|---|---|
| 08:26AM | 1 | THE COURT:  WELL, HOW IS THAT DIFFERENT FROM THE |
| 08:26AM | 2 | GOVERNMENT'S FAILURE TO MAINTAIN IT, TO MAINTAIN THE EVIDENCE |
| 08:26AM | 3 | AND MAINTAIN IT? |
| 08:26AM | 4 | THIS IS THE -- YOU KNOW, THIS IS THE ISSUE HERE, AND IF |
| 08:26AM | 5 | THERE'S -- IF THERE'S SOME OPAQUENESS ABOUT THIS, THEN THE |
| 08:26AM | 6 | GOVERNMENT IS JUST GOING TO HAVE TO DO WHAT THEY NEED TO DO IN |
| 08:26AM | 7 | THEIR CASE-IN-CHIEF I SUPPOSE. |
| 08:26AM | 8 | MR. WADE:  WELL, YOUR HONOR, OF COURSE, CONSIDERED |
| 08:26AM | 9 | THIS AT LENGTH WITH LENGTHY BRIEFING AND ARGUMENT IN THE MOTION |
| 08:26AM | 10 | IN LIMINE STAGE. |
| 08:26AM | 11 | AND YOU'LL RECALL AT 58 OF THE COURT'S ORDER, IT DECLINED |
| 08:27AM | 12 | TO PRECLUDE MS. HOLMES FROM RAISING THE LACK OF STATISTICAL OR |
| 08:27AM | 13 | SCIENTIFIC EVIDENCE AS A DEFENSE, FROM CHARACTERIZING THAT |
| 08:27AM | 14 | MISSING EVIDENCE AS CRITICAL TO THE GOVERNMENT'S CASE, OR FROM |
| 08:27AM | 15 | ARGUING ABOUT THE STATISTICAL INSIGNIFICANCE OF INDIVIDUAL |
| 08:27AM | 16 | PATIENT OR PHYSICIAN TESTIMONY. |
| 08:27AM | 17 | SO TO THE EXTENT THAT THE GOVERNMENT WAS SEEKING TO |
| 08:27AM | 18 | EXCLUDE THAT, THE COURT SAID NO. |
| 08:27AM | 19 | THE COURT ALSO SAID IN THAT ORDER THAT THERE IS NO |
| 08:27AM | 20 | EVIDENCE TYING ANY OF THE UNAVAILABILITY OF LIS TO MS. HOLMES, |
| 08:27AM | 21 | AND SO THE GOVERNMENT COULDN'T GO INTO THAT UNLESS WE OPENED |
| 08:27AM | 22 | THE DOOR TO THE -- BY BLAMING THE GOVERNMENT FOR THE FAILURE TO |
| 08:27AM | 23 | OBTAIN OR PRESERVE THE EVIDENCE. |
| 08:27AM | 24 | AND I DON'T BELIEVE YET WE'VE DONE THAT, SO I DON'T THINK |
| 08:27AM | 25 | THE DOOR HAS BEEN OPENED IN THE GOVERNMENT'S CASE. |

08:27AM  1      THIS IS SOMETHING THAT WE CAN DISCUSS AS THE DEFENSE CASE,

08:28AM  2  IF THERE IS ONE, MOVES FORWARD.  BUT I DON'T SEE ANYTHING THAT

08:28AM  3  WE'VE DONE TO DATE AS CHANGING THE STATUS QUO.

08:28AM  4      THE LIS IS THE CENTRAL HUB OF ALL OF THE DATA AND ALL OF

08:28AM  5  THE PATIENT INFORMATION, AND THAT'S JUST A FACT OF THE CASE.

08:28AM  6  BUT WE HAVEN'T ARGUED ABOUT THE GOVERNMENT'S FAILURE TO

08:28AM  7  PRESERVE IT IN ANY WAY TO MY KNOWLEDGE.

08:28AM  8      IF WE HAVE, I WELCOME, YOU KNOW, THE REFERENCES IN THE

08:28AM  9  TRANSCRIPT.  WE CAN CONSIDER IT AND COME BACK AND, YOU KNOW,

08:28AM 10  ADDRESS THE SIGNIFICANCE OF IT WITH THE COURT IN LIGHT OF THE

08:28AM 11  ORDER.

08:28AM 12      OF COURSE, YOU KNOW, IF THE COURT WANTS TO REVISIT ITS

08:28AM 13  ORDER AND THE GOVERNMENT WANTS TO GO INTO THAT, WE CAN

08:28AM 14  ENTERTAIN THAT, TOO.  IT WAS MY UNDERSTANDING THEY DIDN'T

08:28AM 15  INTEND TO CALL WITNESSES ON THAT IN THEIR CASE-IN-CHIEF.

08:28AM 16      THE COURT:  WELL, IT SOUNDS TO ME LIKE -- AND YOU

08:28AM 17  DON'T HAVE TO CORRECT ME -- BUT IT SOUNDS TO ME LIKE THE LIS IS

08:28AM 18  IMPORTANT TO THE DEFENSE AND IT SOUNDS LIKE IF THERE WAS

08:29AM 19  NOTHING ELSE, IF THE CASE ENDED NOW AND WE ARGUED TOMORROW, YOU

08:29AM 20  WOULD BE PREPARED TO ARGUE THAT THE GOVERNMENT HASN'T PROVEN

08:29AM 21  THE CASE BECAUSE THE LIS THAT YOU EXAMINED ON IS THE REPOSITORY

08:29AM 22  OF ALL THE INFORMATION, AND YOU HAVE NO INFORMATION FROM THE

08:29AM 23  GOVERNMENT AS TO THAT INFORMATION.

08:29AM 24      IT SOUNDS LIKE THAT'S THE ARGUMENT THAT YOU'RE GOING TO

08:29AM 25  MAKE.  I'M NOT ASKING YOU TO REVEAL OR NOT, BUT I'M JUST

6314

08:29AM  1    TELLING YOU, GENERALLY IT SOUNDS LIKE YOU'RE PREPARED TO MAKE

08:29AM  2    THAT ARGUMENT.

08:29AM  3              MR. WADE:  WE, OF COURSE, ARE PREPARED TO ARGUE THE

08:29AM  4    EVIDENCE IN THE CASE.

08:29AM  5         WE HAVEN'T MADE ANY SPECIFIC -- WE'VE GOT SOME ROAD TO

08:29AM  6    COVER HERE --

08:29AM  7              THE COURT:  SURE.

08:29AM  8              MR. WADE:  -- USING THE FREEWAY METAPHOR.

08:29AM  9              THE COURT:  SURE.

08:29AM  10              MR. WADE:  AND WE DON'T KNOW IF THERE'S A DEFENSE

08:29AM  11    CASE AND, IF THERE IS, WHAT THE CONTOURS OF THAT MIGHT BE.

08:29AM  12         SO WE'RE STILL IN THE GOVERNMENT'S CASE.

08:29AM  13         I UNDERSTOOD THE LITIGATION OF THIS ISSUE.  I THINK WE

08:29AM  14    STILL UNDERSTAND THE LITIGATION OF THIS ISSUE AS RELATING TO

08:29AM  15    WHAT IS FAIR GAME WITHIN THE GOVERNMENT'S CASE-IN-CHIEF.

08:30AM  16         I DON'T THINK -- WHO WAS RESPONSIBLE FOR NOT GETTING THE

08:30AM  17    LIS OR NOT PRESERVING THE LIS, THE COURT KNOWS THERE COULD BE

08:30AM  18    A 10 DAY TRIAL, PROBABLY, ON THAT ISSUE, AND 10 OR 15

08:30AM  19    WITNESSES.

08:30AM  20         WE HAVEN'T SOUGHT TO BURDEN THE COURT WITH THOSE ISSUES,

08:30AM  21    BUT WE HAVE PRESENTED ISSUES WITH RESPECT TO THE SIGNIFICANCE

08:30AM  22    OF THE ROLE THAT THE LIS PLAYED WITHIN THE LAB, THE ROLE -- THE

08:30AM  23    GOVERNMENT'S WITNESSES, DR. DAS IN PARTICULAR, BROUGHT THAT

08:30AM  24    ISSUE INTO THE CASE BASED UPON THE -- THEIR EXAMINATION OF THE

08:30AM  25    WITNESS.

6315

08:30AM  1          MR. SCHENK:  ON THAT LAST POINT, I DISAGREE.

08:30AM  2     DR. DAS, HIS TESTIMONY, MY RECOLLECTION IS, WAS THAT HE DIDN'T

08:30AM  3     GATHER THE INFORMATION THAT HE ENDED UP REVIEWING TO REACH HIS

08:30AM  4     CONCLUSIONS.

08:30AM  5          OTHER PEOPLE AT THERANOS GATHERED INFORMATION, AND HE

08:30AM  6     WASN'T SURE WHERE THAT INFORMATION CAME FROM.

08:31AM  7          SO FOR THE DEFENSE TO SUGGEST THAT THE GOVERNMENT'S DIRECT

08:31AM  8     OR THE GOVERNMENT'S CHOICE OF WITNESSES IN THIS CASE HAS

08:31AM  9     INJECTED OR CAUSED LIS TO BE AN ISSUE IS DISINGENUOUS.  IT'S

08:31AM 10     NOT TRUE.

08:31AM 11          AND ALL THE GOVERNMENT IS CONCERNED ABOUT IS BEING PUT IN

08:31AM 12     A POSITION WHERE THE DEFENSE DOES NOT PUT ON A CASE.  OF COURSE

08:31AM 13     IF THEY PUT ON A CASE, WE HAVE REBUTTAL AND WE HAVE AN

08:31AM 14     OPPORTUNITY TO COME BACK TO THE COURT AND SAY, CAN WE HAVE

08:31AM 15     DIRECTION NOW, YOUR HONOR, ON WHETHER THE DOOR IS OPEN?

08:31AM 16          THERE IS NO ISSUE AT THAT POINT.  THEN WE ALL KNOW, AND

08:31AM 17     THE GOVERNMENT IS IN A POSITION WHERE IT COULD CALL NEW

08:31AM 18     WITNESSES ON LIS.

08:31AM 19          THE GOVERNMENT'S CONCERN IS THAT AT THIS STAGE, ONE, WE

08:31AM 20     DON'T KNOW IF THE DEFENSE IS GOING TO PUT ON A CASE, AND TWO,

08:31AM 21     WE DON'T KNOW IF, BASED UPON THE RECORD THAT THE DEFENSE HAS

08:31AM 22     ELICITED THROUGH CROSS, THEY INTEND TO MAKE ARGUMENTS

08:31AM 23     SUGGESTING LIS IS MISSING.

08:31AM 24          AND WHEN THE GOVERNMENT BEARS THE BURDEN OF PROOF, IT'S

08:31AM 25     IMPLICIT IN THAT ARGUMENT THAT THE MISSING EVIDENCE SHOULD BE

08:32AM 1   HELD AGAINST THE GOVERNMENT.  IT IS IMPLICIT IN THAT ARGUMENT

08:32AM 2   THAT THE JURY SHOULD FAULT THE GOVERNMENT FOR THIS EVIDENCE TO

08:32AM 3   BE LACKING.

08:32AM 4       AND ALL WE'RE ASKING FOR IS, BASED UPON THE CURRENT STATE

08:32AM 5   OF THE RECORD, IS THE DOOR OPEN AND SHOULD WE TELL THE COMPLETE

08:32AM 6   STORY ABOUT LIS?

08:32AM 7       IF THE ANSWER IS NO, THAT'S FINE.  I'M NOT ASKING FOR THE

08:32AM 8   COURT TO FIND THAT THE DOOR HAS BEEN OPENED.

08:32AM 9       BUT I GUESS WHAT I'M ASKING IS THAT IF THE DOOR ISN'T

08:32AM 10  OPEN, WHEN WE OBJECT TO THIS ARGUMENT IN CLOSING, THAT

08:32AM 11  OBJECTION SHOULD BE SUSTAINED.

08:32AM 12      THE DEFENSE SHOULDN'T BE ABLE TO HAVE IT BOTH WAYS.  THAT

08:32AM 13  REALLY IS THE SUM OF IT.

08:32AM 14          THE COURT:  I THINK THAT'S WHAT I UNDERSTAND FROM

08:32AM 15  LAST WEEK'S CONVERSATION.

08:32AM 16      AND I WAS APPRECIATIVE OF, MR. WADE, YOUR TEAM SAYING

08:32AM 17  WE'LL LET THEM KNOW BY 4:00 O'CLOCK, WE'LL MAKE THAT DECISION

08:32AM 18  AT 4:00 O'CLOCK.

08:32AM 19      I THINK THE GOVERNMENT ASKED, WELL, YOU KNOW, WE'RE

08:32AM 20  PROBABLY GOING TO FINISH OUR CASE MID NEXT WEEK AND SO WE'VE

08:32AM 21  HAD THIS ENGAGEMENT OF RECIPROCITY ABOUT WITNESSES, AND MAYBE

08:33AM 22  THEY CAN LET US KNOW SO WE CAN PREPARE, AND I THINK YOU SAID

08:33AM 23  WE'LL BE IN COMMUNICATION BY 4:00 P.M., WHICH WOULD INCLUDE

08:33AM 24  THIS LIS ISSUE.

08:33AM 25          MR. WADE:  WE DID, YOUR HONOR.  WE DID EXCHANGE

6317

08:33AM 1     WITNESSES EVEN AS WE AGREED TO BEFORE THE CASE BEGAN.

08:33AM 2              THE COURT:  SURE.

08:33AM 3              MR. WADE:  OF COURSE WE'RE NOT SAYING WE'RE

08:33AM 4     PRESENTING A DEFENSE CASE BY --

08:33AM 5              THE COURT:  RIGHT.

08:33AM 6              MR. WADE:  -- GIVING THEM A SENSE OF THE WITNESSES.

08:33AM 7        I DON'T THINK IT WAS ANYONE'S UNDERSTANDING THAT WE WERE,

08:33AM 8     YOU KNOW, COMMITTING TO THAT BEFORE THE GOVERNMENT RESTS ITS

08:33AM 9     CASE, BUT WE DID PROVIDE WITNESSES.

08:33AM 10             AND, YOUR HONOR, I DON'T THINK I'VE EVER BEEN ASKED TO

08:33AM 11    RULE IN OR OUT A DEFENSE BEFORE THE GOVERNMENT CASE CLOSED, AND

08:33AM 12    I KNOW --

08:33AM 13             THE COURT:  I'M NOT ASKING.

08:33AM 14             MR. WADE:  -- THE COURT IS NOT ASKING THAT.

08:33AM 15        I'M JUST VERY MINDFUL OF THE COURT'S ORDER ON THIS ISSUE,

08:33AM 16    WHICH WAS AFTER CONSIDERED BRIEFING, WHICH WAS THE COURT

08:33AM 17    DECLINES TO PRECLUDE HOLMES FROM RAISING THE LACK OF

08:34AM 18    STATISTICAL OR SCIENTIFIC EVIDENCE AS A DEFENSE, FROM

08:34AM 19    CHARACTERIZING THAT MISSING EVIDENCE AS CRITICAL TO THE

08:34AM 20    GOVERNMENT'S CASE, OR FROM ARGUING ABOUT THE STATISTICAL

08:34AM 21    INSIGNIFICANCE OF INDIVIDUAL PATIENT OR PHYSICIAN TESTIMONY.

08:34AM 22        THAT'S WHAT THE COURT CONTEMPLATED IN ITS ORDER.  I DON'T

08:34AM 23    THINK -- WE TAKE THAT ORDER SERIOUSLY, AS I KNOW THE COURT

08:34AM 24    DOES, AND I KNOW THE GOVERNMENT DOES.

08:34AM 25        AS TO BLAMING THE GOVERNMENT FOR THE LIS OR SEEKING A

```
08:34AM   1    DESTRUCTION OF EVIDENCE INSTRUCTION OF SOME SORT, THAT'S A
08:34AM   2    TOTALLY DIFFERENT ISSUE, AND IT MAY BE THAT -- I WOULD IMAGINE
08:34AM   3    IF WE WERE TO SEEK SUCH AN INSTRUCTION BASED UPON THE EVIDENCE
08:34AM   4    WE HAVE ELICITED DURING THE GOVERNMENT'S CASE, THAT THE COURT
08:34AM   5    PROBABLY WOULDN'T PERMIT US TO OFFER THAT INSTRUCTION, BECAUSE
08:34AM   6    I DON'T THINK THERE HAS YET BEEN EVIDENCE OF THE GOVERNMENT'S
08:34AM   7    DESTRUCTION OF THE EVIDENCE OR NEGLIGENT FAILURE TO GET THE
08:35AM   8    EVIDENCE.  I KNOW THERE ARE A COUPLE OF NINTH CIRCUIT
08:35AM   9    INSTRUCTIONS ON THAT.
08:35AM  10         AND SO --
08:35AM  11           THE COURT:  WELL, NOT IN THE EVIDENCE, BUT CERTAINLY
08:35AM  12    IN THE MOTIONS THAT HAVE PRECLUDED -- OR EXCUSE ME, THAT HAVE
08:35AM  13    COME UP EARLIER IN THE TRIAL.  YOUR TEAM HAS MADE THAT
08:35AM  14    ALLEGATION, AND WE HAD SOME, WE HAD SOME MOTION PRACTICE ON
08:35AM  15    THAT.
08:35AM  16         AND I THINK THAT'S THE GOVERNMENT'S CONCERN, AND THAT'S --
08:35AM  17    FROM A TRIAL MANAGEMENT POSITION, THAT'S MY CONCERN, TOO.
08:35AM  18         IF WE NEED TO DO THAT LITIGATION, WE'LL DO IT.  WE'LL DO
08:35AM  19    IT.
08:35AM  20         BUT WHETHER OR NOT IT BECOMES AN ISSUE IN THIS CASE IS
08:35AM  21    SOMETHING THAT I'M JUST TRYING TO PROBE RIGHT NOW.
08:35AM  22         AND YOU KNOW WHAT THE EVIDENCE IS.  YOU KNOW WHAT THAT
08:35AM  23    EVIDENCE IS GOING TO LOOK LIKE, WE ALL DO, ABOUT THE LIS.  WE
08:35AM  24    HAD MOTIONS ON THAT, AND YOU HAD THE COURT'S OPINION ON THAT,
08:35AM  25    AND THE COURT HAD EXPRESSED ITS OPINION.  SO I THINK YOU KNOW
```

08:35AM  1    WHAT IS COMING.

08:35AM  2              MR. WADE:  WE DO, YOUR HONOR.

08:35AM  3         AND AGAIN, LIKE I SAID, I DON'T WANT TO -- I DON'T KNOW

08:36AM  4    THAT WE WOULD OFFER, I DON'T KNOW THAT WE WOULD OFFER ANY KIND

08:36AM  5    OF INSTRUCTION OF THAT NATURE AT THIS POINT.

08:36AM  6         AND AS I SAID, BASED ON THE PRIOR LITIGATION, BASED ON THE

08:36AM  7    RECORD EVIDENCE TO DATE, MY GUESS IS -- AND I HATE TO GUESS HOW

08:36AM  8    THE COURT IS GOING TO RULE -- BUT IF WE SOUGHT SUCH AN

08:36AM  9    INSTRUCTION BASED ON THE EVIDENCE THAT HAS BEEN ELICITED SO

08:36AM  10   FAR, YOU WOULDN'T LET US OFFER IT BECAUSE I DON'T THINK THERE

08:36AM  11   IS ANY EVIDENCE THAT GOES TO THAT AT THIS POINT.

08:36AM  12        THAT'S KIND OF MY POINT.  AND SO -- NOW, OF COURSE IF WE

08:36AM  13   CHOOSE TO GO INTO THAT IN OUR DEFENSE CASE, THEN THE GOVERNMENT

08:36AM  14   HAS THAT REBUTTAL CASE THAT THEY'RE FOCUSSED ON AND THEY COULD

08:36AM  15   GO INTO THAT.

08:36AM  16        BUT I THINK IT'S A LITTLE PREMATURE.  MAYBE WE CAN HAVE

08:36AM  17   THIS DISCUSSION, YOU KNOW, A LITTLE BIT LATER IN THE WEEK OR

08:36AM  18   EARLY NEXT WEEK --

08:36AM  19              THE COURT:  SURE.

08:36AM  20              MR. WADE:  -- YOU KNOW, AS IT RELATES TO HOW WE'RE

08:36AM  21   GOING TO PROCEED IN THIS.

08:36AM  22        WE'RE MINDFUL OF THE SCHEDULE, YOUR HONOR, AND, YOU KNOW,

08:36AM  23   ARE WORKING TO TRY TO CONTINUE TO MOVE FORWARD.

08:37AM  24              THE COURT:  WELL, THANK YOU.

08:37AM  25        I JUST WANTED TO RAISE THIS BECAUSE I THINK FROM THE

08:37AM 1    GOVERNMENT'S SIDE THEIR CONCERN IS IF WE, IF WE DO NOTHING ON

08:37AM 2    THIS, BUT YET THE ARGUMENT IS THAT THEY HAVEN'T PROVEN THEIR

08:37AM 3    CASE BECAUSE THE LIS IS THERE AND THEY DIDN'T PUT IT ON, THEY

08:37AM 4    HAD ACCESS TO THE LIS, OR SOMETHING LIKE THAT.

08:37AM 5          AND MR. SCHENK SAYS, WELL, AT A MINIMUM, YOU NEED TO STOP

08:37AM 6    THAT ARGUMENT BECAUSE.  I THINK THAT'S WHAT I HEARD HIM SAY.

08:37AM 7          YOU KNOW, THAT MAY BE AN ISSUE.  IT MIGHT BE AN ISSUE AS

08:37AM 8    TO HOW DOES THE LIS COME INTO THE CASE AND WHAT IS IT?

08:37AM 9          THERE'S BEEN EVIDENCE IN ABOUT THE EXISTENCE OF A LIS.

08:37AM 10         AND I'M CONCERNED THAT IF THE DOOR IS NOT OPENED, THE

08:37AM 11   LIGHT IS CERTAINLY COMING THROUGH THE CRACK IN THE DOOR.  SO WE

08:37AM 12   NEED TO BE MINDFUL OF THAT.

08:37AM 13             MR. WADE:  WELL, IF THAT'S THE CONCERN -- I WANT TO

08:37AM 14   BE VERY CLEAR, YOUR HONOR.  THE DEFENSE BELIEVES THAT IT CAN

08:37AM 15   ARGUE THE EVIDENCE IN THE CASE, OKAY?

08:37AM 16             THE COURT:  SURE.

08:37AM 17             MR. WADE:  SO IF THE GOVERNMENT FEELS THAT IT NEEDS

08:37AM 18   TO CALL WITNESSES TO MEET THAT EVIDENCE, IT SHOULD CALL THE

08:38AM 19   WITNESSES.  THAT'S OUR POSITION, BECAUSE WE'RE NOT GOING TO

08:38AM 20   LIMIT OUR ABILITY TO ARGUE THE EVIDENCE THAT HAS BEEN ELICITED

08:38AM 21   AT THIS POINT.

08:38AM 22         YOU KNOW, WITH RESPECT TO THE COURT, WE'RE MINDFUL OF THE

08:38AM 23   TIME, AND WITH RESPECT TO THE GOVERNMENT, WE'RE JUST NOT GOING

08:38AM 24   TO DO THAT.

08:38AM 25             SO I THINK THERE HAS BEEN SOME EVIDENCE WITH RESPECT TO

6321

08:38AM 1    LIS.  I THINK WE'VE BEEN MINDFUL OF THE LINE THAT THE COURT

08:38AM 2    DREW IN ITS ORDER, BUT I THINK WE HAVE THE RIGHT TO ARGUE THE

08:38AM 3    EVIDENCE THAT HAS BEEN ELICITED.

08:38AM 4        AND IF THE GOVERNMENT WANTS TO CALL WITNESSES AND THINKS

08:38AM 5    THAT IT NEEDS TO -- THAT SOME LINE HAS BEEN CROSSED, IT SHOULD

08:38AM 6    SAY WHO IT WANTS TO CALL AND WE SHOULD ADDRESS WHETHER THAT IS

08:38AM 7    ADMISSIBLE UNDER 401 OR 403.

08:38AM 8        THE COURT:  OKAY.  I THINK THOSE LAST COMMENTS ARE

08:38AM 9    VERY INFORMATIVE.

08:38AM 10       ALL RIGHT.  WELL, LET'S MOVE ON TO THE MOTION THAT WE HAVE

08:38AM 11   THIS MORNING.  THANK YOU.

08:38AM 12       ANYTHING ELSE, MR. SCHENK?

08:38AM 13       MR. SCHENK:  NO.  THANK YOU.

08:38AM 14       THE COURT:  ALL RIGHT.  LET'S SEE.  THIS IS

08:39AM 15   DOCUMENT 1140, I THINK, MS. HOLMES'S RENEWED MOTION TO ADMIT.

08:39AM 16       MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:39AM 17   I HAVE ASKED ONE OF OUR YOUNG COLLEAGUES, MR. CLEARY, TO

08:39AM 18   ADDRESS THIS MOTION WITH YOU.

08:39AM 19       THE COURT:  YES.

08:39AM 20       MR. DOWNEY:  AND HE HASN'T BEEN HERE BEFORE AND SO I

08:39AM 21   JUST WANTED TO INTRODUCE THE COURT TO RICHARD CLEARY.  HE'S

08:39AM 22   BEEN ADMITTED PRO HAC FOR SOME TIME AND HAS BEEN WORKING ON THE

08:39AM 23   MATTER.

08:39AM 24       THE COURT:  GREAT, THANK YOU.  WE'RE ALWAYS HAPPY TO

08:39AM 25   HAVE NEW COUNSEL APPEAR.

6322

08:39AM  1          GOOD MORNING, MR. CLEARY.

08:39AM  2               MR. CLEARY:  GOOD MORNING, YOUR HONOR.

08:39AM  3               THE COURT:  I THINK YOU ROSE TO YOUR FEET YESTERDAY

08:39AM  4     JUST AS THE MENTION OF THIS MOTION.

08:39AM  5          (LAUGHTER.)

08:39AM  6               MR. CLEARY:  YES.  I'M ALMOST AS ENTHUSIASTIC AS THE

08:39AM  7     CUSTOMERS APPEAR TO BE IN THESE REPORTS.

08:39AM  8               THE COURT:  ALL RIGHT.  WELL, WE WON'T NEED A

08:39AM  9     PHLEBOTOMIST TO TELL US ABOUT YOUR ENTHUSIASM.

08:39AM 10               MR. CLEARY:  THAT'S RIGHT, YOUR HONOR.

08:39AM 11          TO BEGIN, WE VIEW THESE REPORTS AS VERY IMPORTANT EVIDENCE

08:39AM 12     IN THIS CASE.  THEY'RE POWERFUL EVIDENCE OF MS. HOLMES'S INTENT

08:40AM 13     AND HER KNOWLEDGE.

08:40AM 14          MR. EDLIN LAID A FOUNDATION FOR THEIR ADMISSION SUBJECT TO

08:40AM 15     THE GOVERNMENT'S OBJECTION, WHICH WAS SUSTAINED BY THE COURT.

08:40AM 16          WE UNDERSTOOD THAT THE COURT HAD EXPRESSED AN OPENNESS TO

08:40AM 17     REVISITING THIS ISSUE.  THAT WOULD BE AT TRANSCRIPT PAGE 4263.

08:40AM 18          FOR FOUR REASONS, WE BELIEVE THAT THIS EVIDENCE IS

08:40AM 19     RELEVANT TO CORE ISSUES IN THIS CASE, INCLUDING THREE SEPARATE

08:40AM 20     ISSUES IDENTIFIED IN THE INDICTMENT.

08:40AM 21          SO THE FIRST IS WALGREENS, THE WALGREENS ALLEGATIONS IN

08:40AM 22     PARAGRAPH 12(D).

08:40AM 23          THE SECOND IS THE ACCURACY AND RELIABILITY ALLEGATIONS IN

08:40AM 24     PARAGRAPH 16.

08:40AM 25          THE THIRD ARE ALLEGATIONS CONCERNING PRICE AND THE ROLE OF

08:40AM 1    PRICE AND THE REPRESENTATIONS THAT WERE ALLEGEDLY MADE BY

08:40AM 2    MS. HOLMES TO CUSTOMERS.

08:40AM 3        AND THEN THE FOURTH, THIS IS CRITICAL CONTEXT FOR

08:41AM 4    MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:41AM 5    BUSINESS WAS WORKING.

08:41AM 6        SO I'M HAPPY TO TAKE THOSE IN TURN.

08:41AM 7            THE COURT:  ALL RIGHT.  THAT'S FINE.

08:41AM 8            MR. CLEARY:  FIRST WITH WALGREENS, THE ALLEGATION IN

08:41AM 9    THE INDICTMENT GOES TO THE STATUS AND PROSPECTS OF THE

08:41AM 10   RELATIONSHIP DURING THE CONSPIRACY PERIOD; SPECIFICALLY,

08:41AM 11   WHETHER REPRESENTATIONS WERE MADE THAT THE RELATIONSHIP WITH

08:41AM 12   WALGREENS WAS EXPANDING OR WHETHER -- WHEN ALLEGEDLY THE

08:41AM 13   RELATIONSHIP WAS STALLING.

08:41AM 14       SO THESE ARE STATEMENTS ABOUT THE BUSINESS PERFORMANCE.

08:41AM 15   THEY ARE NOT STATEMENTS ABOUT THE TECHNOLOGY ITSELF.

08:41AM 16       AND THESE REPORTS GIVE INSIGHT INTO THE MARKETPLACE

08:41AM 17   RESPONSE TO THIS INNOVATIVE PARTNERSHIP.  THESE ARE

08:41AM 18   ENTHUSIASTIC RESPONSES.  THEY GIVE A SENSE OF THE MARKET

08:41AM 19   POSITION.  THEY EXPLAIN THE COMPETITIVE ADVANTAGES THAT MIGHT

08:41AM 20   EXIST.

08:42AM 21       AND TO BE CLEAR, WE ARE OFFERING THIS EVIDENCE FOR THE

08:42AM 22   NONHEARSAY PURPOSE OF ITS INTENT -- OF MS. HOLMES'S INTENT, ITS

08:42AM 23   EFFECT ON HER STATE OF MIND.

08:42AM 24       WE ARE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:42AM 25   ASSERTED.

08:42AM  1          THE COURT:  AND JUST SO I'M CLEAR -- PARDON ME,

08:42AM  2     MR. CLEARY.

08:42AM  3          MR. CLEARY:  SURE.

08:42AM  4          THE COURT:  YOU'RE ASKING THAT ALL OF THE CUSTOMER,

08:42AM  5     ALL OF THE CUSTOMER SURVEYS BE ADMITTED AS IS, WITHOUT ANY

08:42AM  6     REDACTIONS, WITHOUT ANY CHANGES, ANYTHING LIKE THAT; IS THAT

08:42AM  7     CORRECT?

08:42AM  8          MR. CLEARY:  THAT'S CORRECT, YOUR HONOR.  AND I'M

08:42AM  9     HAPPY TO DISCUSS THE REDACTION ISSUE.

08:42AM  10          WE BELIEVE THAT REDACTIONS WOULD BE INAPPROPRIATE BECAUSE

08:42AM  11     ALL OF THE SURVEY RESPONSES ARE RELEVANT TO DIFFERENT

08:42AM  12     ALLEGATIONS IN THE CASE.

08:42AM  13          MR. JHAVERI TALKED ABOUT PATIENT EXPERIENCE AND TALKED

08:42AM  14     ABOUT HOW IT WAS ESSENTIAL TO THE WALGREENS/THERANOS

08:42AM  15     PARTNERSHIP, AND ALL OF THESE GO TO THAT PATIENT EXPERIENCE IN

08:42AM  16     ONE WAY OR ANOTHER.

08:42AM  17          SO --

08:42AM  18          THE COURT:  HE DID.  HE TALKED ABOUT -- HE WAS

08:43AM  19     ASKED, I THINK BY ONE OF YOUR COLLEAGUES, WHETHER OR NOT THERE

08:43AM  20     WAS POSITIVE CUSTOMER INFORMATION, AND I THINK HIS TESTIMONY

08:43AM  21     WAS THAT THERE WAS GENERALLY POSITIVE CUSTOMER REACTION TO

08:43AM  22     THERANOS IN WALGREENS AND THEIR EXPERIENCE.

08:43AM  23          MR. CLEARY:  SO, YES, YOUR HONOR.

08:43AM  24          BUT THIS IS NOT CUMULATIVE WITH THAT TESTIMONY FOR A

08:43AM  25     COUPLE OF REASONS.

6325

08:43AM 1        FIRST, THESE ARE REPORTS THAT WENT DIRECTLY TO MS. HOLMES.

08:43AM 2   THEY SPAN -- THEY BEGIN IN THE FALL OF 2014.  THEY CONTINUE IN

08:43AM 3   REALLY THE -- THE FIRST ONE IS REALLY FROM FALL OF 2014, AND

08:43AM 4   THE REMAINING NINE ARE FROM SUMMER OF 2015.

08:43AM 5        AND BECAUSE THEY GO TO MS. HOLMES, THEY'RE DIRECTLY

08:43AM 6   RELEVANT TO HER INTENT, AND THEREFORE, NOT CUMULATIVE WITH

08:43AM 7   OTHER POSITIVE FEEDBACK THAT WALGREENS MAY HAVE OBTAINED.  THEY

08:44AM 8   GO TO MS. HOLMES, NOT TO WALGREENS.

08:44AM 9        AND MR. JHAVERI, ON PAGE 3587 OF THE TRANSCRIPT, SPEAKS

08:44AM 10  ABOUT THE ENTIRE SERVICE WAS TO CREATE A NEW PATIENT

08:44AM 11  EXPERIENCE, ONE THAT IS EFFICIENT, ONE THAT IS LESS PAINFUL,

08:44AM 12  ONE THAT IS LESS COST.

08:44AM 13       AND WHEN MS. HOLMES RECEIVES THESE REPORTS, THESE REPORTS

08:44AM 14  SUPPORT A REASONABLE BELIEF THAT NOT ONLY IS THE RELATIONSHIP

08:44AM 15  WITH WALGREENS, LIKE, WORKING, IT IS THRIVING, AND IT'S

08:44AM 16  POWERFUL EVIDENCE FOR THAT REASON.

08:44AM 17       SO THAT'S PARAGRAPH 12(D).

08:44AM 18       NOW, LET'S MOVE TO PARAGRAPH 16, WHICH IS THE ACCURACY AND

08:44AM 19  RELIABILITY ALLEGATIONS.  I THINK THERE ARE FOUR DIFFERENT

08:44AM 20  CATEGORIES OF TESTIMONIALS IN THESE REPORTS THAT ARE RELEVANT

08:44AM 21  TO THOSE ALLEGATIONS.

08:44AM 22       THE FIRST ARE THE COMPARISONS BETWEEN LABS.  SO YOUR HONOR

08:45AM 23  WILL RECALL THE TESTIMONIAL BY THE DOCTOR WHO COMPARED HIS LAB

08:45AM 24  RESULT WITH LAB RESULTS -- HIS LAB RESULT FROM THERANOS WITH

08:45AM 25  LAB RESULTS FROM STANFORD.

6326

08:45AM 1    THE SECOND ARE REPEAT CUSTOMERS WHO GENERALLY GIVE THESE

08:45AM 2    GLOWING REVIEWS.  YOU WOULD EXPECT REPEAT CUSTOMERS NOT TO GIVE

08:45AM 3    GLOWING REVIEWS IF THEY HAD SOME REASON TO DOUBT THE SOUNDNESS

08:45AM 4    OF THE RESULTS THAT THEY RECEIVED.

08:45AM 5    AND I WILL SAY THAT, AS YOUR HONOR KNOWS, THE DEFENSE DOES

08:45AM 6    NOT CONCEDE THAT INDIVIDUAL ANECDOTES ARE, IN FACT, PROBATIVE

08:45AM 7    OF ACCURACY AND RELIABILITY.

08:45AM 8    BUT ONCE THE GOVERNMENT HAS PUT ANECDOTES INTO THE CASE,

08:45AM 9    WE BELIEVE THAT WE CAN PRESENT ANECDOTES OF OUR OWN AS THEY

08:45AM 10   RELATE TO MS. HOLMES'S UNDERSTANDING OF THE PERFORMANCE OF THE

08:45AM 11   TECHNOLOGY.

08:45AM 12   YOU ALSO HAVE CUSTOMERS WHO ARE REFERRED BY OTHER

08:46AM 13   CUSTOMERS.  SO I THINK THAT'S A FAIR INFERENCE THAT A CUSTOMER

08:46AM 14   WOULD NOT REFER, IN ONE CASE, A PATIENT.  THERE'S AN M.P., FOR

08:46AM 15   EXAMPLE, WHO WAS A REGULAR PATIENT -- A REGULAR CUSTOMER OF

08:46AM 16   THERANOS WHO REFERRED ANOTHER CUSTOMER TO THERANOS.  THAT

08:46AM 17   CUSTOMER HAD A GOOD EXPERIENCE AND EXPLAINED THE SOURCE OF THE

08:46AM 18   REFERRAL.

08:46AM 19   YOU ALSO HAD FAMILY MEMBERS, LIKE, YOU KNOW, PARENTS

08:46AM 20   BRINGING THEIR CHILDREN BACK, FOR EXAMPLE.

08:46AM 21   AND THEN LAST YOU HAVE SOME -- AN INTERESTING COMMENT

08:46AM 22   ABOUT THE POTENTIAL FOR PRE-ANALYTIC ERROR.  YOUR HONOR WILL

08:46AM 23   CALL THAT DR. ROSENDORFF DISCUSSED THIS ISSUE.

08:46AM 24   SO IN THIS CASE, FOR EXAMPLE, THERE IS AN ANECDOTE BY A

08:46AM 25   PHLEBOTOMIST ABOUT HOW SHE MESSED UP THE LABELS ON THE TUBES OF

08:46AM   1    THE -- CONTAINING BLOOD THAT WOULD NEED TO BE SENT FOR

08:47AM   2    PROCESSING AT THE THERANOS FACILITY.

08:47AM   3        WELL, THAT'S AN EXAMPLE OF HUMAN ERROR AT THE PRE-ANALYTIC

08:47AM   4    PHASE THAT WOULD NOT RELATE TO THERANOS TECHNOLOGY AND ITS

08:47AM   5    PERFORMANCE, AND, THEREFORE, GIVES REASON TO BELIEVE THAT

08:47AM   6    THERE'S A POTENTIAL FOR THIS ERROR THAT HAS NOTHING TO DO WITH

08:47AM   7    THERANOS TECHNOLOGY.

08:47AM   8        SO THE THIRD IS THE PRICE.  AND I APPRECIATE THE

08:47AM   9    GOVERNMENT'S REPRESENTATION, AT LEAST AS I UNDERSTAND IT, IN

08:47AM   10   THEIR PLEADING THAT THEY'RE NOT ALLEGING FALSITY OF PRICE.

08:47AM   11       BUT THE INDICTMENT DOES ALLEGE IN PARAGRAPHS 15, 16, AND

08:47AM   12   17 THAT PRICE -- REPRESENTATIONS AS TO PRICE WERE PART OF THE

08:47AM   13   ALLEGED SCHEME TO DEFRAUD.

08:47AM   14       PARAGRAPH 17 IN PARTICULAR SAYS THE PRICE WAS USED TO

08:47AM   15   INDUCE CUSTOMERS TO PURCHASE THERANOS BLOOD TESTS.  PRICE IS IN

08:47AM   16   THE CASE.

08:48AM   17       YOUR HONOR WILL REMEMBER THE TESTIMONY OF B.G. AND THE

08:48AM   18   TESTIMONY OF MR. JHAVERI.

08:48AM   19       WE BELIEVE THAT WE ARE ENTITLED TO PUT ON EVIDENCE SHOWING

08:48AM   20   THAT THERE WAS A BASIC GOOD FAITH BELIEF AND GOOD FAITH REASON

08:48AM   21   FOR THESE PRICES.

08:48AM   22       AND THEN FINALLY, WE BELIEVE THAT THIS IS CRITICAL CONTEXT

08:48AM   23   FOR MS. HOLMES'S VISION AND HER UNDERSTANDING THAT THE THERANOS

08:48AM   24   BUSINESS WAS WORKING, HER UNDERSTANDING OF WHAT PATIENTS,

08:48AM   25   CUSTOMERS WANTED IN THE MARKET, AND WHAT THEY VALUED.

08:48AM 1          YOUR HONOR WILL RECALL THAT MR. MOSLEY DISCUSSED THE

08:48AM 2     IMPORTANCE OF VISION, INCLUDING THE VISION WITH RESPECT TO

08:48AM 3     WALGREENS'S DECISION IN MAKING THE DECISION TO INVEST, AND WE

08:48AM 4     BELIEVE THIS EVIDENCE IS CONSISTENT WITH THAT.

08:48AM 5          AND THEN I'LL GIVE MR. BOSTIC AN OPPORTUNITY TO SPEAK, BUT

08:48AM 6     I JUST WANTED TO ADDRESS BRIEFLY THE 403 ARGUMENT THAT THE

08:48AM 7     GOVERNMENT MADE.

08:49AM 8          WE BELIEVE THAT THE REPORTS THAT WE SEEK TO ADMIT AND THE

08:49AM 9     CUSTOMER SERVICE SPREADSHEETS THAT THE GOVERNMENT PREVIOUSLY

08:49AM 10    SOUGHT TO ADMIT AND THAT WERE EXCLUDED ARE FUNDAMENTALLY

08:49AM 11    DIFFERENT.

08:49AM 12         THESE REPORTS WERE SENT TO MS. HOLMES.  THE CUSTOMER

08:49AM 13    SERVICE SPREADSHEETS WERE NOT SENT TO MS. HOLMES.  THESE

08:49AM 14    REPORTS ARE RELEVANT TO MS. HOLMES'S INTENT AND HER KNOWLEDGE

08:49AM 15    AND HER STATE OF MIND.  THE SPREADSHEETS ARE NOT RELEVANT TO

08:49AM 16    THOSE ISSUES.

08:49AM 17         FURTHERMORE, AS THE COURT WILL RECALL, IN ITS RULING AT

08:49AM 18    ECF 798 THAT WE'VE BEEN DISCUSSING THIS MORNING, THE COURT

08:49AM 19    RULED THAT THE CONTENTS OF THE SPREADSHEETS THEMSELVES COULD

08:49AM 20    NOT BE ADMITTED, AND THE GOVERNMENT HAS NEVER PROFFERED A BASIS

08:49AM 21    CONNECTING THOSE DOCUMENTS TO MS. HOLMES.

08:49AM 22              THE COURT:  THANK YOU.  SO LET ME ASK YOU, IT SEEMS

08:49AM 23    LIKE, MR. CLEARY, THAT THE VALUE OR THE REASON THAT YOU WOULD

08:49AM 24    LIKE, YOUR TEAM WOULD LIKE THESE IN, ALL OF THESE SURVEYS IN,

08:50AM 25    IS BECAUSE THEY SHOW MS. HOLMES'S STATE OF MIND.

08:50AM 1      YOU'RE NOT OFFERING THEM FOR THE TRUTH OF THE MATTER

08:50AM 2  ASSERTED, WHETHER OR NOT SOMEBODY ENJOYED THEIR VISIT OR NOT,

08:50AM 3  BUT YOU'RE SAYING THAT THESE THEN WOULD ALLOW YOU TO ARGUE THAT

08:50AM 4  MS. HOLMES'S STATE OF MIND AT THE TIME IN QUESTION INFORMED HER

08:50AM 5  THAT, OR THESE DOCUMENTS INFORMED HER THAT THINGS WERE GOING

08:50AM 6  WELL AT WALGREENS, AND THAT'S HER STATE OF MIND SUCH THAT THE

08:50AM 7  JURY CAN CONSIDER THAT AS SHE ENGAGED WITH INVESTORS DURING

08:50AM 8  THIS TIME PERIOD.

08:50AM 9      IS THAT, IS THAT THE PURPOSE FOR THESE?

08:50AM 10         MR. CLEARY:  YOUR HONOR IS ABSOLUTELY RIGHT THAT WE

08:50AM 11  SEEK TO ADMIT THESE ONLY FOR THE NONHEARSAY PURPOSE, NONHEARSAY

08:50AM 12  PURPOSE OF THEIR EFFECT ON MS. HOLMES'S STATE OF MIND.

08:50AM 13      WE BELIEVE THAT THESE REPORTS ARE RELEVANT FOR HER STATE

08:50AM 14  OF MIND IN THE PARAGRAPH 12 ALLEGATIONS AS SHE ALLEGEDLY MADE

08:51AM 15  CERTAIN REPRESENTATIONS ABOUT THE WALGREENS RELATIONSHIP TO

08:51AM 16  INVESTORS.

08:51AM 17      WE BELIEVE THAT THEY'RE RELEVANT TO THE OTHER PARAGRAPHS

08:51AM 18  IDENTIFIED IN THE INDICTMENT AS WELL.

08:51AM 19         THE COURT:  OKAY.  ALL RIGHT.

08:51AM 20      IN LOOKING AT THESE, I HAD ASKED PREVIOUSLY WHEN WE WERE

08:51AM 21  DISCUSSING THESE IF THE DEFENSE WISHED TO PARSE OUT -- I THINK

08:51AM 22  I USED THE PHRASE PARSE -- TO PARSE OUT ANY OF THESE SURVEYS

08:51AM 23  THAT WOULD SPEAK TO TEST RESULTS.

08:51AM 24      AND THAT'S WHY MY THRESHOLD QUESTION THIS MORNING WAS, YOU

08:51AM 25  WANT ALL OF THESE IN, NOT ANY PARSE OF THEM?

6330

08:51AM   1      WHEN I LOOK AT THESE, I WAS TRYING TO FIND WHETHER ANY OF

08:51AM   2   THESE HAD RESULTS JUST TO SEE, AND MY REVIEW OF THE RECORDS

08:51AM   3   DIDN'T COME UP WITH ANY.

08:51AM   4      I DID SEE AN INDIVIDUAL WHO SAID THAT THEY CAN'T -- THIS

08:52AM   5   WAS IN THE TWO PATIENTS ON JULY 4TH AND JULY 6TH OF 2015, AND

08:52AM   6   THEIR RESPONSES WERE "I CAN'T WAIT TO GET THE RESULTS."

08:52AM   7      MR. BOSTIC:  UH-HUH.

08:52AM   8      THE COURT:  THOSE WERE THE ONLY -- AND, AGAIN, I

08:52AM   9   DIDN'T DO AS THOROUGH A JOB AS YOU DID WITH YOUR ENTHUSIASM,

08:52AM  10   BUT THOSE WERE THE ONLY RESULTS THAT I COULD FIND THAT TALK

08:52AM  11   ABOUT RESULTS, AND THEY SEEM TO TALK ABOUT A FUTURE EVENT.

08:52AM  12   "CAN'T WAIT TO GET THE APP."  APPARENTLY THERE WAS AN APP THAT

08:52AM  13   WAS CREATED AND THE PATIENTS, FOR EASE OF CUSTOMER SERVICE --

08:52AM  14   THERE'S AN APP FOR EVERYTHING.  THERE WAS AN APP.  THEY PUT IN

08:52AM  15   WHATEVER THEIR INFORMATION WAS, AND IT SOUNDS LIKE THEY WOULD

08:52AM  16   GET THEIR TEST RESULTS BACK THROUGH THIS APP ON THEIR MOBILE

08:52AM  17   DEVICE OR WHATEVER, AND THEY WERE VERY EXCITED ABOUT THAT.

08:52AM  18      BUT THOSE WERE THE ONLY REFERENCES THAT I COULD FIND THAT

08:52AM  19   ACTUALLY SPEAK TO RESULTS.

08:52AM  20      AND, OF COURSE, THEY'RE NOT TEST RESULTS.  IT'S

08:53AM  21   ANTICIPATION OF RECEIVING.

08:53AM  22      SO THAT'S SOMETHING THAT I WAS -- AGAIN, THIS GETS TO --

08:53AM  23   THE ISSUE, AS I TALKED ABOUT PREVIOUSLY, WAS THE TECHNOLOGY,

08:53AM  24   THE TECHNOLOGY BEING THE RESULTS AND HOW THAT IS AN ISSUE IN

08:53AM  25   THE CASE.

6331

08:53AM 1        THE MAJORITY OF THE COMMENTS, A SIGNIFICANT MAJORITY OF

08:53AM 2   THE COMMENTS, AS YOU KNOW, TALK ABOUT PRICING.  THEY ALL TALK

08:53AM 3   ABOUT PRICING.  AND THEY SEEM TO SAY THAT ONE OF THE DRAWS OF

08:53AM 4   THE TECHNOLOGY OF THE WALGREENS RELATIONSHIP WAS MANY OF THE

08:53AM 5   PATIENTS, THE CUSTOMERS, HAD NO INSURANCE, AND THEY WERE, THEY

08:53AM 6   WERE VERY HAPPY THAT THEY COULD FIND AFFORDABLE TESTING, AND

08:53AM 7   THEY EXPRESSED THAT IN THEIR COMMENTS.

08:53AM 8        THAT WAS A CONCURRENT THEME THROUGHOUT.  THEY WERE -- WHAT

08:54AM 9   WE LEARNED FROM READING THE -- AND I THINK THESE ALL HAVE SOME

08:54AM 10  QUESTIONS ABOUT YOU -- IT SEEMS LIKE THESE WERE ALL THE

08:54AM 11  PHLEBOTOMIST COMMENTS.  I COULDN'T DISCERN WHICH WERE APPS AND

08:54AM 12  WHICH WERE PHLEBOTOMISTS, OTHER THAN THE PRELIMINARY PAGES THAT

08:54AM 13  HAVE THE GRAPHS AND THINGS THAT TALK ABOUT CUSTOMER SERVICE.

08:54AM 14  MY SENSE IS THAT THOSE ARE CUSTOMERS WHO RESPONDED THROUGH AN

08:54AM 15  APP.

08:54AM 16       THE WRITINGS, THE LITTLE COMMENTS, THOSE ARE ALL, MY SENSE

08:54AM 17  IS, COMMENTS FROM THE PHLEBOTOMISTS WHO WERE EMPLOYEES OF THE

08:54AM 18  COMPANY, NOT OF WALGREENS, BUT OF YOUR CLIENT'S COMPANY, AND SO

08:54AM 19  THEY WERE MAKING THOSE NOTES.  MANY OF THE NOTES HAVE SIMILAR

08:54AM 20  COMMENTS AND OBSERVATIONS.

08:54AM 21       BUT IT APPEARS, IT APPEARS THAT THE MAJORITY OF THOSE

08:54AM 22  COMMENTS RELATE TO PRICING AND THE RELIEF OF FINDING AFFORDABLE

08:54AM 23  TESTING THROUGH WALGREENS, THROUGH YOUR CLIENT'S COMPANY.

08:54AM 24       WHAT WE ALSO LEARNED IN LOOKING AT THAT IS THAT THERE WAS

08:54AM 25  A MENTION OF GIFT CARDS.  AND IT SEEMS LIKE DOCTORS GAVE $100

6332

08:55AM   1    GIFT CARDS TO INDIVIDUALS TO USE AT WALGREENS TO OBTAIN TESTING

08:55AM   2    THROUGH YOUR CLIENT'S COMPANY.  MAYBE THAT WAS PART OF THE

08:55AM   3    BUSINESS PLAN.  I DON'T KNOW.  BUT IT SEEMS LIKE THAT APPEARED

08:55AM   4    THROUGHOUT.

08:55AM   5        THERE WERE MANY REFERENCES TO "THE DOCTOR GAVE ME A GIFT

08:55AM   6    CARD SO I COULD GET THE TESTING DONE."  I DON'T KNOW WHAT THAT

08:55AM   7    IS RELEVANT TO OTHER THAN THAT'S A FAVORABLE COMMENT, I

08:55AM   8    SUPPOSE, OF THE EXPERIENCE.

08:55AM   9        AND THAT WOULD -- THAT WAS A CONCERN THAT I HAD PREVIOUSLY

08:55AM   10   ALSO.

08:55AM   11       THE OTHER THING THAT WAS -- I THINK WAS THE GENESIS OF THE

08:55AM   12   ARGUMENT HERE WAS MR. EDLIN TESTIFIED THAT THESE SURVEYS WERE

08:55AM   13   SHARED, AND HE USED THE WORD "SHARED," THEY WERE SHARED WITH

08:55AM   14   HIM, HE RECEIVED THEM.

08:55AM   15       AND I THINK YOUR CLIENT, THEY WERE SHARED WITH YOUR

08:56AM   16   CLIENT.

08:56AM   17       HE DID NOT TESTIFY, AND I HAVEN'T HEARD ANY WITNESS

08:56AM   18   TESTIFY, THAT THESE WERE ACTUALLY READ BY YOUR CLIENT.

08:56AM   19       WE KNOW AT LEAST FROM THE TESTIMONY THAT THEY WERE SENT TO

08:56AM   20   HER, BUT I'M CURIOUS WHETHER OR NOT THERE NEEDS TO BE SOME

08:56AM   21   FOUNDATIONAL EVIDENCE THAT SHE READ THEM, YOU KNOW?  JUST

08:56AM   22   BECAUSE IT WAS SENT DOESN'T MEAN IT WAS READ AND DOESN'T MEAN

08:56AM   23   THAT IT HAD THAT EFFECT.

08:56AM   24       SO I'M JUST CURIOUS WHETHER OR NOT THERE'S A FOUNDATIONAL

08:56AM   25   GAP HERE THAT NEEDS TO -- BUT LET ME TURN TO MR. BOSTIC.

08:56AM   1        MR. BOSTIC?

08:56AM   2             MR. BOSTIC:  THANK YOU, YOUR HONOR.  WOULD THE COURT

08:56AM   3   MIND IF I REMOVED MY MASK?

08:56AM   4             THE COURT:  THANK YOU.

08:56AM   5             MR. BOSTIC:  MOSTLY FOR THE COURT REPORTER'S SAKE.

08:56AM   6        SO, FIRST OF ALL, JUST TO BE CLEAR ABOUT WHAT WE'RE

08:56AM   7   TALKING ABOUT HERE, I THINK FOCUS NEEDS TO BE KEPT ON THE SCOPE

08:56AM   8   OF THE DEFENSE'S REQUEST AND HOW MUCH EVIDENCE THEY'RE SEEKING

08:56AM   9   TO ADMIT IN THIS CASE.

08:56AM  10        THESE PATIENT STATEMENTS CONSTITUTE A MOUNTAIN OF HEARSAY

08:57AM  11   STATEMENTS.  THEY'RE ALL OUT OF COURT STATEMENTS BY

08:57AM  12   NONTESTIFYING WITNESSES.  THEY ARE GENERALLY FAVORABLE TO

08:57AM  13   THERANOS.  THEY'RE POSITIVE ABOUT THE EXPERIENCE THAT THE

08:57AM  14   PATIENTS AND CUSTOMERS HAD WITH THERANOS, BUT OTHERWISE THEY'RE

08:57AM  15   REALLY NOT RELEVANT TO THE ISSUES IN THE CASE, AND THAT'S WHY

08:57AM  16   THEY SHOULD BE EXCLUDED.

08:57AM  17        I THINK THE, YOU KNOW, THE POTENTIAL IMPACT OF THIS KIND

08:57AM  18   OF EVIDENCE ON THE JURY OR THE WAY THE DEFENSE MIGHT USE IT IS

08:57AM  19   TO BALANCE OUT THE SCALES AS IT WERE BETWEEN, YOU KNOW, THE

08:57AM  20   NEGATIVE EVIDENCE THAT THE JURY HAS HEARD ABOUT PROBLEMS WITH

08:57AM  21   THE THERANOS ASSAYS, INCORRECT AND QUESTIONABLE PATIENT

08:57AM  22   RESULTS, INFORMATION WITHHELD WITH PATIENTS AND DOCTORS.

08:57AM  23        I THINK THIS EVIDENCE, YOU KNOW, COULD BE PLACED ON THE

08:57AM  24   OTHER SIDE OF A SCALE AND THE DEFENSE COULD SEEK TO SHOW, WELL,

08:57AM  25   THERE WERE ALSO POSITIVE REPORTS COMING IN ABOUT THERANOS.

08:58AM  1        BUT THAT EVIDENCE DOESN'T REALLY BELONG ON THE OTHER SIDE

08:58AM  2   OF THE SCALE WEIGHED AGAINST THE EVIDENCE THAT ACTUALLY GOES TO

08:58AM  3   THE ISSUES HERE, AND THOSE ISSUES ARE THE ACCURACY AND

08:58AM  4   RELIABILITY OF THE TESTS AND MS. HOLMES'S KNOWLEDGE OF THE

08:58AM  5   ACCURACY AND RELIABILITY.

08:58AM  6        THE COURT PREVIOUSLY RULED, CORRECTLY IN THE GOVERNMENT'S

08:58AM  7   VIEW, THAT THIS EVIDENCE WAS NOT ADMISSIBLE.

08:58AM  8        TO THE EXTENT THAT THE COURT WAS OPEN TO THE ISSUE BEING

08:58AM  9   RAISED AGAIN, WE UNDERSTOOD THAT TO MEAN TO THE EXTENT THE

08:58AM 10   RECORD WAS DEVELOPED FURTHER IN A WAY THAT SUPPORTED THE

08:58AM 11   ADMISSION OF THIS EVIDENCE, OR TO THE EXTENT THAT THE DEFENSE

08:58AM 12   TOOK THE COURT'S SUGGESTION TO TRY TO IDENTIFY INDIVIDUAL

08:58AM 13   STATEMENTS AMONG THIS MOUNTAIN OF HEARSAY THAT WERE ACTUALLY

08:58AM 14   RELEVANT SOMEHOW TO AN ISSUE IN DISPUTE IN THE CASE, AND

08:58AM 15   NEITHER OF THOSE THINGS HAVE HAPPENED.

08:58AM 16        SO WE THINK THE SAME RULING SHOULD APPLY TO THE MOTION FOR

08:58AM 17   RECONSIDERATION.

08:58AM 18        THE COURT HIT ON SOME TIMING ISSUES WITH RESPECT TO THESE

08:59AM 19   PATIENT STATEMENTS, AND I THINK THAT'S IMPORTANT TO FOCUS ON

08:59AM 20   ALSO.  THESE STATEMENTS ARE INADMISSIBLE FOR TIMING REASONS,

08:59AM 21   TWO DIFFERENT KINDS OF TIMING PROBLEMS.

08:59AM 22        ONE IS THE STAGE IN THE PROCESS AT WHICH THESE CUSTOMER

08:59AM 23   REPORTS WERE COLLECTED, AND THE COURT NOTED THAT MANY OF THEM

08:59AM 24   WERE COLLECTED BY PHLEBOTOMISTS AT THE TIME OF THE SAMPLE DRAW.

08:59AM 25   THAT WOULD HAVE BEEN BEFORE THE PATIENTS RECEIVED THEIR

6335

08:59AM   1   RESULTS.

08:59AM   2        BY DEFINITION THEN, THOSE PATIENT STATEMENTS CAN'T HAVE

08:59AM   3   ANYTHING TO DO WITH THE ACCURACY OR INACCURACY OF THE RESULTS

08:59AM   4   THAT HAVEN'T EVEN BEEN CREATED YET, MUCH LESS PROVIDED TO THE

08:59AM   5   PATIENTS.

08:59AM   6        I SHOULD ALSO SAY, THOUGH, THAT EVEN AFTER A PATIENT

08:59AM   7   RECEIVES A RESULT, I THINK THE EVIDENCE IN THE CASE HAS SHOWN

08:59AM   8   THAT IT'S NOT ALWAYS CLEAR WHETHER A RESULT IS ACCURATE OR NOT.

08:59AM   9        DR. ROSENDORFF TESTIFIED ABOUT HOW TO IDENTIFY INACCURATE

09:00AM  10   RESULTS, AND I THINK THAT'S MADE CLEAR THAT A PATIENT LOOKING

09:00AM  11   AT A SHEET OF RESULTS CANNOT BE COUNTED ON TO SAY, HERE'S AN

09:00AM  12   INACCURATE ONE, I'M THEREFORE NOT GOING TO GIVE THERANOS A

09:00AM  13   POSITIVE REVIEW WHEN I FILL OUT THIS SURVEY.

09:00AM  14        SO THE SURVEY COMMENTS EXPRESSING FAVORABLE EXPERIENCES BY

09:00AM  15   PATIENTS, AGAIN, REALLY JUST DON'T GO TO THE ACCURACY OF THE

09:00AM  16   RESULTS, AND THAT MAKES THEM UNLIKE THE INDIVIDUAL ACCOUNTS

09:00AM  17   THAT THE GOVERNMENT HAS SUBMITTED, WHICH ACTUALLY DO CONSTITUTE

09:00AM  18   PROOF OF INACCURATE OR UNRELIABLE PATIENT RESULTS SENT OUT BY

09:00AM  19   THERANOS.

09:00AM  20        SO THAT'S ONE TIMING ISSUE.

09:00AM  21        THE OTHER TIMING ISSUE RELATES TO WHEN THESE BATCHES OF

09:00AM  22   PATIENT STATEMENTS WERE ACTUALLY SENT TO MS. HOLMES.  IF I'M

09:00AM  23   READING THEM CORRECTLY, THE MANY BATCHES OF REPORTS THAT THE

09:00AM  24   DEFENSE SEEKS TO ADMIT WERE SENT TO THE DEFENDANT MOSTLY IN

09:01AM  25   2015.  I THINK THERE WAS ONE THAT WAS SENT TO HER IN EARLY

6336

09:01AM  1    OCTOBER 2014, ONE INITIAL BATCH.

09:01AM  2        TO THE EXTENT THAT THE DEFENSE IS TRYING TO USE THIS AS

09:01AM  3    EVIDENCE OF MS. HOLMES'S MENTAL STATE ON THE INVESTOR SIDE OF

09:01AM  4    THE CASE, THAT REALLY MATTERS BECAUSE THE MAJORITY OF THE

09:01AM  5    INVESTMENTS CHARGED IN THE INDICTMENT OCCURRED BEFORE

09:01AM  6    OCTOBER 2014.  SO THERE ARE NO PATIENT REPORTS THAT THE DEFENSE

09:01AM  7    IS TRYING TO ADMIT DURING THE TIME PERIOD WHEN THE MAJORITY OF

09:01AM  8    THE INVESTMENTS WERE TAKING PLACE.

09:01AM  9        THERE ARE TWO INVESTMENTS THAT TOOK PLACE THAT ARE CHARGED

09:01AM  10   IN THE INDICTMENT IN LATE OCTOBER 2014.

09:01AM  11       SO ARGUABLY, YOU KNOW, IF THE SUBSTANCE WERE DIFFERENT,

09:01AM  12   THE CONTENT OF THAT FIRST BATCH MIGHT BE RELEVANT TO HER MENTAL

09:01AM  13   STATE AS TO THOSE INVESTMENTS.

09:01AM  14       BUT THE 2015 REPORTS CAN'T HAVE ANYTHING TO DO WITH WHAT

09:01AM  15   SHE WAS THINKING WHEN SHE ENCOURAGED AND ACCEPTED THOSE

09:02AM  16   INVESTMENTS THAT ARE CHARGED IN THE INDICTMENT.

09:02AM  17       I'D LIKE TO BRIEFLY JUST GO THROUGH THE CATEGORIES FOR

09:02AM  18   WHICH THE DEFENSE SAID THAT THIS EVIDENCE WOULD BE ADMISSIBLE.

09:02AM  19       FIRST, ON THE TOPIC OF WALGREENS, THIS EVIDENCE MISSES THE

09:02AM  20   POINT, AND I THINK THAT'S THE THEME HERE.

09:02AM  21       I THINK IT WAS CLEAR FROM MR. JHAVERI'S TESTIMONY THAT

09:02AM  22   WALGREENS EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE,

09:02AM  23   SPECIFICALLY WHEN IT CAME TO THE COMPANY'S RELIANCE ON

09:02AM  24   VENIPUNCTURE AND THE COMPANY'S FAILURE TO DELIVER ON ITS

09:02AM  25   PROMISE TO CONDUCT ITS TESTS USING THIS REVOLUTIONARY

| | | |
|---|---|---|
| 09:02AM | 1 | FINGERSTICK TECHNOLOGY. |
| 09:02AM | 2 | THE INDICTMENT, BY THE WAY, DOES NOT SAY ANYTHING ABOUT |
| 09:02AM | 3 | CUSTOMER DISSATISFACTION.  IT SPECIFICALLY SAYS WALGREENS |
| 09:02AM | 4 | EXECUTIVES HAD CONCERNS ABOUT THERANOS'S PERFORMANCE, AND |
| 09:02AM | 5 | THAT'S WHAT THE EVIDENCE AT TRIAL HAS SHOWN. |
| 09:02AM | 6 | THIS EVIDENCE DOESN'T COUNTER THAT OR RELATE TO IT IN ANY |
| 09:02AM | 7 | WAY. |
| 09:03AM | 8 | THE COURT NOTED THAT MR. JHAVERI WAS AWARE, OR THAT |
| 09:03AM | 9 | WALGREENS GENERALLY WAS AWARE OF POSITIVE CUSTOMER FEEDBACK |
| 09:03AM | 10 | FROM THERANOS. |
| 09:03AM | 11 | SO THIS EVIDENCE HAS NOTHING TO DO WITH WALGREENS'S |
| 09:03AM | 12 | DISSATISFACTION.  THAT MEANS IT WOULD HAVE GIVEN MS. HOLMES NO |
| 09:03AM | 13 | REASON TO SUSPECT THAT ONCE WALGREENS FOUND OUT ABOUT THESE |
| 09:03AM | 14 | POSITIVE CUSTOMER STATEMENTS, THE RELATIONSHIP WOULD HAVE |
| 09:03AM | 15 | TURNED AROUND. |
| 09:03AM | 16 | SHE UNDERSTOOD AT THE TIME THAT THIS DID NOT ADDRESS |
| 09:03AM | 17 | WALGREENS'S CONCERNS, WHICH AGAIN RELATED TO THE COMPANY'S |
| 09:03AM | 18 | RELIANCE ON VENIPUNCTURE AND THE ABILITY TO DO ALL OF ITS |
| 09:03AM | 19 | TESTING BY FINGERSTICK. |
| 09:03AM | 20 | SO IN THAT SENSE IT'S NOT ABOUT WHETHER THESE POSITIVE |
| 09:03AM | 21 | RESULTS ARE CUMULATIVE OR NOT.  IT'S ABOUT THE FACT THAT |
| 09:03AM | 22 | THEY'RE SIMPLY NOT RELEVANT TO WALGREENS'S CONCERNS AS SHOWN IN |
| 09:03AM | 23 | THE RECORD. |
| 09:03AM | 24 | WHEN IT COMES TO THE ACCURACY OF THE TESTS, FIRST OF ALL, |
| 09:03AM | 25 | IF THE DEFENSE IS SEEKING TO USE THIS AS ACTUAL EVIDENCE OF |

6338

09:04AM  1    WHETHER THE TESTS WERE ACCURATE OR NOT, THAT'S A HEARSAY USE.

09:04AM  2         AND I DON'T THINK THE DEFENSE IS SEEKING TO USE THEM THAT

09:04AM  3    WAY, BUT THERE'S STILL DANGER THAT THEY COULD CREATE CONFUSION

09:04AM  4    ON THE PART OF THE JURY AND THAT THE JURY MIGHT VIEW THEM AS

09:04AM  5    EVIDENCE OF THE ACCURACY OR INACCURACY OF THE TESTS.

09:04AM  6         THESE REPORTS AREN'T CAPABLE OF SPEAKING TO THAT FACT.

09:04AM  7         AND THAT GOES FOR THE SUBCATEGORIES THAT THE DEFENSE

09:04AM  8    MENTIONED ALSO.

09:04AM  9         THE FACT THAT THERE WERE REPEAT CUSTOMERS, CUSTOMERS CAME

09:04AM  10   BACK OR REFERRED OTHERS, CAN'T SPEAK TO THE ACCURACY OF THE

09:04AM  11   TESTS BECAUSE PATIENTS DIDN'T ALWAYS KNOW WHETHER THEY WERE

09:04AM  12   GETTING ACCURATE TEST RESULTS OR NOT.

09:04AM  13        SO THE FACT THAT THEY MIGHT HAVE COME BACK MIGHT SUGGEST

09:04AM  14   THAT THEY DIDN'T HAVE ANY SUBJECTIVE CONCERNS ABOUT ACCURACY,

09:04AM  15   BUT IT HAS NOTHING TO DO WITH THE ACTUAL ACCURACY OF THE TESTS.

09:04AM  16        AND MS. HOLMES HAD BETTER SOURCES OF INFORMATION BECAUSE

09:04AM  17   SHE HAD LAB PERSONNEL WHO WERE TELLING HER, WE HAVE PROBLEMS

09:04AM  18   WITH THE TESTS.  ACCURACY PROBLEMS WERE BEING RAISED TO HER AND

09:05AM  19   SHE WAS BEING KEPT IN THE LOOP ON THOSE.

09:05AM  20        THAT'S HOW SHE KNEW ABOUT THE ACCURACY PROBLEMS WITH

09:05AM  21   THERANOS'S TESTS, NOT FROM READING EXPERIENCE RATINGS FROM

09:05AM  22   SURVEYS OF WALGREENS'S PATIENTS.

09:05AM  23        SO AGAIN, IT'S JUST --

09:05AM  24            THE COURT:  MS. VOLKAR TELLS US IN THE PLEADING THAT

09:05AM  25   WAS SUBMITTED FOR YOUR TEAM THAT THERE WAS A CONCURRENT EMAIL

09:05AM  1    EXCHANGE WITH MR. BALWANI ABOUT ACCURACY, ABOUT PROBLEMS AT THE

09:05AM  2    LAB AT THIS TIME PERIOD.

09:05AM  3              MR. BOSTIC:  YES, YOUR HONOR, THAT'S EXACTLY THE

09:05AM  4    POINT.

09:05AM  5         THE CONVERSATION -- THE CONVERSATIONS ABOUT THE ACCURACY

09:05AM  6    OF THE THERANOS'S TESTS THAT MS. HOLMES WAS INVOLVED IN WERE

09:05AM  7    SEPARATE FROM THIS INFORMATION.  THIS WAS NOT PART OF THAT

09:05AM  8    ANALYSIS.

09:05AM  9         AND THERE HASN'T BEEN ANY SUGGESTION IN THE RECORD THAT

09:05AM  10   CUSTOMER EXPERIENCE SCORES SOMEHOW RELATE TO THE ACCURACY OF

09:05AM  11   TESTS.  NONE OF THE LAB DIRECTORS HAVE SAID, FOR EXAMPLE, THAT

09:05AM  12   THEY RELY ON SURVEY RESULTS TO DETERMINE WHETHER THEIR LAB IS

09:05AM  13   FUNCTIONING CORRECTLY OR NOT, OR WHETHER A GIVEN ASSAY IS

09:06AM  14   RELIABLE, NOR WOULD WE EXPECT THEM TO.  THIS IS JUST NOT THAT

09:06AM  15   KIND OF EVIDENCE, AND THAT'S THE POINT.

09:06AM  16        THE DEFENSE POINTS TO A COUPLE EXAMPLES.  APPARENTLY THERE

09:06AM  17   MAY BE AN EXAMPLE OR TWO WHERE A PATIENT COMPARES THERANOS LAB

09:06AM  18   RESULTS TO A THIRD PARTY LAB.

09:06AM  19        BUT, AGAIN, THERE'S BEEN NO EFFORT TO PARSE OUT THOSE

09:06AM  20   POTENTIALLY RELEVANT STATEMENTS FROM THE WHOLE.  AND THE

09:06AM  21   EXISTENCE OF THOSE, YOU KNOW, REALLY MINORITY OF EXAMPLES THAT

09:06AM  22   MIGHT RELATE TO SOME KIND OF OBJECTIVE COMPARISON DON'T MAKE

09:06AM  23   THE ENTIRE BATCH ADMISSIBLE.

09:06AM  24        I'LL ALSO POINT OUT JUST ON THE TOPIC OF REPEAT CUSTOMERS,

09:06AM  25   ON THE FACE OF THE DOCUMENTS, THE MAJORITY OF THE COMMENTS DO

09:06AM 1    COME FROM FIRST-TIME USERS.  THE COMMENTS ARE EXPLICIT IN THAT

09:06AM 2    RESPECT, SO I THINK EVE THAT WOULD BE A MINORITY HERE.

09:06AM 3        FINALLY, WHEN IT COMES TO PRICE, PRICE IS MENTIONED IN THE

09:06AM 4    INDICTMENT, BUT IT'S NOT A DISPUTED ISSUE IN THE CASE.  THERE'S

09:07AM 5    EVIDENCE IN THE CASE ALREADY THAT THE THERANOS PRICES WERE LOW.

09:07AM 6    PEOPLE LIKED LOW PRICES.  THAT'S NOT A CONTROVERSIAL POINT

09:07AM 7    EITHER.

09:07AM 8        SO THE FACT THAT INDIVIDUAL PATIENTS SENT IN COMMENTS

09:07AM 9    PRAISING THE PRICES IS NOT RELEVANT TO ANY QUESTION BEFORE THE

09:07AM 10   JURY.

09:07AM 11       AND ALTHOUGH THE INDICTMENT MENTIONS PRICE, THE GOVERNMENT

09:07AM 12   HAS NOT INTRODUCED EVIDENCE AND DOESN'T INTEND TO ARGUE THAT

09:07AM 13   ANY REPRESENTATIONS ABOUT PRICES WERE DISHONEST TO PATIENTS; IN

09:07AM 14   OTHER WORDS, THAT THERANOS WASN'T CHARGING THE LOW PRICES THAT

09:07AM 15   IT WAS ADVERTISING OR SOMETHING IN THAT RESPECT.

09:07AM 16       SO THERE'S NO NEED TO INTRODUCE EVIDENCE THAT PATIENTS

09:07AM 17   APPRECIATED LO9W PRICES.  THAT'S BESIDE THE POINT OF THE

09:07AM 18   PATIENT SCHEME AND THE INVESTOR SCHEME.

09:07AM 19       AND REALLY FINALLY, ON MS. HOLMES'S VISION AND HER OVERALL

09:07AM 20   UNDERSTANDING OF HOW WELL THE BUSINESS WAS GOING, I THINK,

09:07AM 21   AGAIN, IT'S -- MS. HOLMES HAD BETTER INFORMATION AND ACTUAL

09:08AM 22   RELEVANT INFORMATION WHEN IT CAME TO THE PERFORMANCE OF THE

09:08AM 23   TECHNOLOGY AND THE STATE OF THE BUSINESS WITH WALGREENS.

09:08AM 24       SHE WAS IN CONVERSATIONS WITH LAB STAFF.  SHE WAS IN

09:08AM 25   CONVERSATIONS WITH WALGREENS EXECUTIVES.

09:08AM 1      THIS IS NOT THE EVIDENCE THAT WOULD HAVE INFORMED HER

09:08AM 2   UNDERSTANDING THERE.

09:08AM 3      THE REAL POTENTIAL IMPACT OF THIS EVIDENCE ON THE JURY IS

09:08AM 4   TO SHOW THERE WERE FAVORABLE REPORTS ABOUT THERANOS, BUT THAT'S

09:08AM 5   A HEARSAY PURPOSE AND AN IRRELEVANT ONE.

09:08AM 6      IF THE TEST FOR ADMISSIBILITY HERE IS -- ESPECIALLY IN THE

09:08AM 7   2015 TIME PERIOD, IS THAT ANYTHING THAT WENT TO MS. HOLMES OR

09:08AM 8   ANYTHING THAT SHE WAS AWARE OF IS ADMISSIBLE FOR HER MENTAL

09:08AM 9   STATE, THAT WOULD ALSO INCLUDE THINGS THAT THE DEFENSE HAS

09:08AM 10  SOUGHT TO EXCLUDE, LIKE "THE WALL STREET JOURNAL" ARTICLE IN

09:08AM 11  OCTOBER OF 2015.

09:08AM 12     IF THIS POSITIVE INFORMATION ABOUT THERANOS IS ADMISSIBLE

09:08AM 13  JUST BECAUSE MS. HOLMES SAW IT, THEN IS NEGATIVE INFORMATION,

09:08AM 14  LIKE "THE WALL STREET JOURNAL" ARTICLE, ALSO ADMISSIBLE,

09:09AM 15  BECAUSE THAT WOULD HAVE INFORMED HER UNDERSTANDING OF HOW

09:09AM 16  THINGS WERE GOING?

09:09AM 17     I'M NOT RAISING THAT TO SAY THAT IT ALL SHOULD COME IN.

09:09AM 18  I'M SAYING THAT I THINK THE COURT KNOWS HOW TO DRAW THE PROPER

09:09AM 19  LINE THERE.

09:09AM 20          THE COURT:  ALL RIGHT.  THANK YOU.

09:09AM 21     MR. CLEARY?

09:09AM 22          MR. CLEARY:  YOUR HONOR, IF I MAY, THERE ARE A

09:09AM 23  NUMBER OF THINGS TO RESPOND TO HERE.

09:09AM 24     SO FIRST, IN THE PLEADING AND AGAIN HERE THE GOVERNMENT

09:09AM 25  HAS SUGGESTED THAT WE MAY SEEK TO ADMIT THIS, OR ASK THAT THIS

09:09AM 1    BE ADMITTED FOR A HEARSAY PURPOSE.

09:09AM 2         THAT'S NOT TRUE.  THIS IS SOLELY NONHEARSAY AS THE

09:09AM 3    COURT -- A NONHEARSAY PURPOSE AS THE COURT EXPRESSED EARLIER.

09:09AM 4         THE POINT THAT THERE MAY BE AN ISSUE UNDER 403 WITH

09:09AM 5    RESPECT TO A BALANCING OF THE SCALES, WE BELIEVE THAT IT WOULD

09:09AM 6    BE VERY MISLEADING TO THE JURY AND UNFAIRLY PREJUDICIAL TO OUR

09:09AM 7    CASE TO EXCLUDE THIS EVIDENCE BECAUSE -- THIS EVIDENCE WHICH

09:09AM 8    WENT TO MS. HOLMES BECAUSE THERE IS OTHER EVIDENCE IN THE CASE

09:10AM 9    THAT DID NOT GO TO MS. HOLMES.

09:10AM 10        IN FACT, AS THE COURT KNOWS, ONE OF THE STARTING POINTS

09:10AM 11   FOR ANY FULL AND FAIR ASSESSMENT OF MS. HOLMES'S STATE OF MIND

09:10AM 12   IS THE INFORMATION THAT WAS SENT TO HER, THE INFORMATION THAT

09:10AM 13   WAS TRANSMITTED TO HER, THE INFORMATION THAT SHE HAD AVAILABLE.

09:10AM 14        AND FOR THAT REASON, THE FACT THAT CERTAIN CUSTOMER

09:10AM 15   SERVICE SPREADSHEETS WERE NOT SHARED WITH HER, BUT THESE

09:10AM 16   REPORTS WERE, JUST MAKES THE REPORTS THAT MUCH MORE PROBATIVE.

09:10AM 17        AND TO THE COURT'S EARLIER QUESTION, MY UNDERSTANDING --

09:10AM 18   CONCERNING WHETHER THERE WOULD NEED TO BE A SPONSORING WITNESS

09:10AM 19   FOR THESE DOCUMENTS, WE BELIEVE, CONSISTENT WITH THE COURT'S

09:10AM 20   RULING, THAT MR. EDLIN AUTHENTICATED THESE, HE LAID A

09:10AM 21   FOUNDATION FOR THEM.  AND WE WOULD COMMIT TO ADMITTING THESE

09:10AM 22   THROUGH A WITNESS, BUT WE DON'T BELIEVE THAT SOMEONE WITH

09:11AM 23   KNOWLEDGE OF THE REPORTS WOULD BE NEEDED TO TESTIFY.

09:11AM 24        IN THIS CASE A NUMBER OF EMAILS HAVE BEEN ADMITTED THAT

09:11AM 25   WENT TO MS. HOLMES WITHOUT ANY TESTIMONY AS TO WHETHER

6343

09:11AM 1    MS. HOLMES ACTUALLY READ THE EMAILS.

09:11AM 2        THE COURT:  WELL, MANY OF THOSE HAD RESPONSES FROM

09:11AM 3    HER.

09:11AM 4        MR. CLEARY:  SO IN THE CASE --

09:11AM 5        THE COURT:  SO THEY WERE SELF-AUTHENTICATING IN THAT

09:11AM 6    REGARD.

09:11AM 7        MR. CLEARY:  IN THE CASE OF EMAILS WITH THE

09:11AM 8    RESPONSES IN WHICH MS. HOLMES RESPONDED, THAT IS THE INFERENCE.

09:11AM 9    FOR OTHER EMAILS WHERE SHE WAS CC'D OR WHERE SHE WAS THE

09:11AM 10   RECIPIENT, THE INFERENCE IS THAT THIS IS RELEVANT BECAUSE IT

09:11AM 11   WAS SHARED WITH HER AND IS THEREFORE RELEVANT TO HER STATE OF

09:11AM 12   MIND.

09:11AM 13       THERE ARE A COUPLE OF POINTS ABOUT TIMING.

09:11AM 14       THE -- I'LL TAKE THEM IN REVERSE ORDER.

09:11AM 15       THE INDICTMENT CHARGES A CONSPIRACY UNDER COUNT ONE AND A

09:11AM 16   SCHEME TO DEFRAUD UNDER COUNTS THREE THROUGH EIGHT THROUGH

09:12AM 17   2015.

09:12AM 18       THE GOVERNMENT HAS NOT DISCLAIMED THAT TIME PERIOD.  WE'RE

09:12AM 19   ENTITLED TO PUT ON EVIDENCE RELATING TO MS. HOLMES'S INTENT

09:12AM 20   DURING THAT TIME PERIOD.

09:12AM 21       SEPARATELY, THE GOVERNMENT HAS HAD SUCCESSFULLY ADMITTED

09:12AM 22   CERTAIN EVIDENCE THAT ACTUALLY POST-DATES THESE REPORTS AND IS

09:12AM 23   PRESUMABLY RELEVANT TO THE INVESTOR COUNTS.  THAT WOULD BE,

09:12AM 24   JUST TO TAKE A COUPLE OF EXAMPLES, THE "MAD MONEY" CLIP THAT

09:12AM 25   THE COURT WILL RECALL FROM OCTOBER OF 2015, AND THEN "THE TODAY

6344

09:12AM 1    SHOW" CLIP FROM 2016.

09:12AM 2        WITH RESPECT TO TIMING, I THINK THAT THE TIMING OF THE

09:12AM 3    RETURN OF THE REPORTS, THE CUSTOMER TESTIMONIALS AND FEEDBACK,

09:12AM 4    IT IS CERTAINLY TRUE THAT FOR MANY THEY WERE FILLED OUT BEFORE

09:12AM 5    ANY THERANOS RESULT WAS TRANSMITTED TO THE INDIVIDUAL CUSTOMER

09:13AM 6    OR -- IN THE CASE WHERE THE PHLEBOTOMIST WAS MAKING AN ENTRY

09:13AM 7    BEFORE THE CUSTOMER HAD HAD A CHANCE TO REVIEW THE RESULT.

09:13AM 8        BUT I DO THINK THAT IT IS A FAIR INFERENCE THAT, FOR

09:13AM 9    REPEAT VISITORS, FOR VISITORS WHO WERE REFERRED BY FAMILY AND

09:13AM 10   FRIENDS WHO WERE PRIOR CUSTOMERS, FOR VISITORS WHO MADE EXPRESS

09:13AM 11   COMPARISONS BETWEEN THEIR EXPERIENCES AT THESE DIFFERENT LABS,

09:13AM 12   ALL OF THAT SUPPORTS THE INFERENCE THAT THEY BELIEVED THAT THE

09:13AM 13   RESULTS THAT THEY HAD RECEIVED WERE SOUND.

09:13AM 14       AND IN THIS CASE WE HAVE HEARD LAY OPINION TESTIMONY ABOUT

09:13AM 15   THE ACCURACY OR INACCURACY OF THE RESULTS.

09:13AM 16       MS. B.G. EXPLICITLY TESTIFIED TO THAT.  AND -- SO WE

09:13AM 17   BELIEVE THAT --

09:13AM 18            THE COURT:  BUT NONE OF THESE DO -- NONE OF THESE

09:13AM 19   SPEAK TO THE RESULTS.

09:13AM 20       THEY SPEAK TO -- THE REFERRALS, THE MAJORITY, IF NOT ALL,

09:14AM 21   OF THE REFERRALS ARE BASED ON EITHER CONVENIENCE, BUT THE

09:14AM 22   MAJORITY OF THOSE ARE BASED ON PRICING, AT LEAST FROM MY REVIEW

09:14AM 23   OF THIS.  THEY'RE GOING TO TELL THEIR FAMILY, THEY'RE GOING TO

09:14AM 24   TELL THEIR FRIENDS, FINALLY THERE'S A LOW COST AVAILABILITY FOR

09:14AM 25   TESTING FOR THEIR MEDICAL NEEDS.  THAT SEEMS TO BE THE

6345

09:14AM 1    CONCURRENT THEME THROUGHOUT ALL OF THAT.

09:14AM 2        AS I SAID EARLIER, I DID NOT SEE, AND I INVITE YOU TO

09:14AM 3    POINT ME, PLEASE, TO ANYONE SAYING "MY TEST RESULTS WERE GREAT"

09:14AM 4    OR ANYTHING ABOUT THE RESULTS.  IT'S ABOUT THE EXPERIENCE.

09:14AM 5        AND, YOU KNOW, A LOT OF IT IS, WHICH I SUPPOSE GOES TO

09:14AM 6    RELIABILITY, I SUPPOSE, YOU KNOW, IT'S THE PHLEBOTOMIST GIVING

09:14AM 7    THEIR COMMENTS, THEIR INTERPRETATION OF THE COMMENTS OF THEIR

09:14AM 8    PATIENTS AND THEY'RE POSITIVE AND, YOU KNOW, THEY ENJOYED THE

09:14AM 9    EXPERIENCE, ALL OF THAT.

09:14AM 10       BUT I DON'T SEE ANY REALLY RESULTS, AS I SAID.  I DIDN'T

09:15AM 11   SEE ANY OF THOSE.  TWO PEOPLE I POINT OUT WHO ARE EAGER TO GET

09:15AM 12   THEIR RESULTS, THOSE ARE -- THAT'S WHAT I FOUND.  IF YOU HAVE

09:15AM 13   OTHERS, I'M HAPPY TO HEAR ABOUT THEM.

09:15AM 14       ONE PERSON, I THINK THIS IS JUNE 9, 2015, SAID, "I CAME IN

09:15AM 15   BECAUSE I SAW" -- I'M QUOTING HERE -- "ELIZABETH ON T.V.,"

09:15AM 16   THAT'S WHAT THE PATIENT SAID, "SO I CAME IN AFTER HAVING SEEN

09:15AM 17   HER ON T.V.  THAT'S WHY I'M HERE."

09:15AM 18       AND ON JUNE 26TH, I THINK I POINT OUT ANOTHER PATIENT SAID

09:15AM 19   "I CAME IN FOR A PREGNANCY TEST," AND THAT'S VERY CLOSE IN TIME

09:15AM 20   TO B.G.'S TEST.  I THINK SHE WAS IN MAY, WAS IT?  OR PERHAPS

09:15AM 21   JULY.  I CAN'T RECALL.

09:15AM 22       SO THE RESULTS IS SOMETHING THAT I'M LOOKING AT HERE.  IT

09:15AM 23   SEEMS LIKE THESE ARE CUSTOMER REVIEWS THAT ARE POSITIVE ABOUT

09:15AM 24   THE EXPERIENCE, AND THEY ALL ARE.  THERE'S A FEW CRITICISMS

09:16AM 25   ABOUT WAITING IN LINES AND BATHROOMS BEING UNCLEAN AND THOSE

6346

09:16AM 1    KINDS OF THINGS, BUT THE MAJORITY OF THEM ARE POSITIVE.

09:16AM 2        AND YOU WANT THEM TO COME IN TO SHOW, NOT FOR THE TRUTH OF

09:16AM 3    THE MATTER ASSERTED THAT THEY HAD A POSITIVE EXPERIENCE, BUT

09:16AM 4    RATHER TO SHOW THAT YOUR CLIENT SOMEHOW READ ALL OF THESE

09:16AM 5    DOCUMENTS, CONSUMED THE INFORMATION IN THEM, AND THAT THAT

09:16AM 6    INFORMED HER AS TO HER STATE OF MIND THAT THINGS WERE GOING

09:16AM 7    WELL AT WALGREENS AND DURING THE RELATIONSHIP.

09:16AM 8        MR. CLEARY:  YOUR HONOR, A COUPLE OF THINGS.

09:16AM 9        SO WE ARE SEEKING TO ADMIT THESE BECAUSE THEY WERE SHARED

09:16AM 10   WITH MS. HOLMES.  THEY WERE TRANSMITTED TO HER.

09:16AM 11       I DON'T WANT TO LOSE SIGHT OF PARAGRAPH 12(D) WITH RESPECT

09:16AM 12   TO WALGREENS.  YOUR HONOR IS CERTAINLY RIGHT THAT THE VAST

09:16AM 13   MAJORITY OF THE EXPLICIT TESTIMONIALS HAVE TO DO WITH FACETS OF

09:16AM 14   THE EXPERIENCE AND DO NOT EXPRESSLY MENTION THE BLOOD TEST

09:17AM 15   RESULTS.

09:17AM 16       THERE ARE EXAMPLES OF COMMENTARY ON THE BLOOD TEST RESULT

09:17AM 17   ITSELF.  JUST TO READ ONE, THIS IS DOCKET NUMBER 1142-4.  "I'VE

09:17AM 18   HAD SOME OTHER ROUTINE BLOOD TESTS DONE AT YOUR LAB AND

09:17AM 19   CROSS-CHECKED THEM WITH STANFORD, THEY WERE ALL CONGRUENT."

09:17AM 20       BUT TO YOUR HONOR -- YOUR HONOR IS ABSOLUTELY CORRECT THAT

09:17AM 21   MANY OF THESE RELATE TO PRICE.  MANY RELATE TO OTHER FEATURES

09:17AM 22   OF THE CUSTOMER EXPERIENCE, ACCESSIBILITY, THE ABILITY TO TRACK

09:17AM 23   AND MONITOR TESTS OVER TIME, WHICH IS SOMETHING THAT WE'VE

09:17AM 24   HEARD ABOUT.  THAT WAS ONE OF THE REAL VISIONS OF MS. HOLMES

09:17AM 25   AND OF THE COMPANY.

09:17AM 1      AND ALL OF THESE DIFFERENT FEATURES -- ANOTHER ASPECT

09:17AM 2  ACTUALLY WOULD BE THE ENTHUSIASM ASSOCIATED WITH RECEIVING A

09:17AM 3  FINGERSTICK TEST, BUT ALSO THE WILLINGNESS OF CUSTOMERS TO SAY

09:18AM 4  VERY POSITIVE THINGS AFTER RECEIVING A VENOUS BLOOD DRAW.

09:18AM 5      THERE ARE A NUMBER OF ACCOUNTS IN HERE THAT SAY THAT THE

09:18AM 6  CUSTOMER RECEIVED A VENOUS BLOOD DRAW AND, FOR A VARIETY OF

09:18AM 7  REASONS, EXPECTS TO COME BACK TO THERANOS.

09:18AM 8      THIS BRINGS ME TO THE WALGREENS ALLEGATION, AND I THINK

09:18AM 9  THAT THE GOVERNMENT HAS NARROWED THAT ALLEGATION SUBSTANTIALLY.

09:18AM 10 IT DOES NOT JUST RELATE TO THE SUBJECTIVE OPINIONS OF WALGREENS

09:18AM 11 EXECUTIVES.  IN THE CASE OF ONE EXECUTIVE, MR. JHAVERI, HE HAD

09:18AM 12 VERY LIMITED CONTACT WITH MS. HOLMES.

09:18AM 13     THE ALLEGATION ITSELF, AND JUST READING FROM PARAGRAPH

09:18AM 14 12(D) OF THE INDICTMENT, IS THAT MS. HOLMES ALLEGEDLY

09:18AM 15 REPRESENTED TO INVESTORS THAT THERANOS PRESENTLY HAD AN

09:18AM 16 EXPANDING PARTNERSHIP WITH WALGREENS, THAT IS, THAT THERANOS

09:19AM 17 WOULD SOON DRAMATICALLY INCREASE THE NUMBER OF WELLNESS CENTERS

09:19AM 18 WITHIN WALGREENS STORES, WHEN, IN TRUTH, HOLMES AND BALWANI

09:19AM 19 KNEW BY LATE 2014 THAT THERANOS'S RETAIL WALGREENS ROLLOUT HAD

09:19AM 20 STALLED BECAUSE OF SEVERAL ISSUES, INCLUDING THAT WALGREENS

09:19AM 21 EXECUTIVES HAD CONCERNS WITH THERANOS'S PERFORMANCE.

09:19AM 22     SO I JUST WANT THE RECORD TO BE CLEAR ABOUT THE NATURE OF

09:19AM 23 THAT ALLEGATION AND OUR ABILITY TO MEET THAT ALLEGATION.

09:19AM 24     JUST A FEW OTHER THINGS.  AS THE COURT KNOWS, WE WOULD BE

09:19AM 25 HAPPY TO CONSENT TO A LIMITING INSTRUCTION INFORMING THE JURY

09:19AM 1    OF THE PURPOSE FOR WHICH THESE DOCUMENTS ARE ADMITTED.

09:19AM 2        THERE WERE A NUMBER OF ARGUMENTS THAT MR. BOSTIC MADE

09:19AM 3    CONCERNING HIS VIEW THAT MS. HOLMES HAD BETTER SOURCES OF

09:19AM 4    INFORMATION.

09:19AM 5        THAT'S A FACT ARGUMENT THAT THE GOVERNMENT CAN CERTAINLY

09:19AM 6    MAKE IN CLOSING.  IT GOES TO WEIGHT.  IN MY VIEW IT DOES NOT GO

09:20AM 7    TO ADMISSIBILITY.

09:20AM 8        AGAIN, I APPRECIATE THE GOVERNMENT'S COMMENTS CONCERNING

09:20AM 9    PRICE, BUT I RESPECTFULLY DISAGREE.  PRICE IS VERY MUCH AT

09:20AM 10   ISSUE IN THIS CASE BECAUSE THE GOVERNMENT HAS ALLEGED THAT

09:20AM 11   THERE WAS A SCHEME TO DEFRAUD COMMITTED BY WAY OF

09:20AM 12   REPRESENTATIONS AS TO PRICE AMONG OTHER THINGS.

09:20AM 13       THAT'S PART OF THE CASE.  THERE'S BEEN TESTIMONY ABOUT

09:20AM 14   PRICE, AND THE GOVERNMENT CAN CHARACTERIZE THE NATURE OF THOSE

09:20AM 15   REPRESENTATIONS, BUT WE'RE ABLE TO PUT ON EVIDENCE OF OUR OWN

09:20AM 16   AS TO THE GOOD FAITH REASONS FOR THE THERANOS PRICE AND THE WAY

09:20AM 17   IT FIT INTO THE THERANOS BUSINESS MODEL.

09:20AM 18       I DON'T WANT TO TAKE UP ANY MORE OF THE COURT'S TIME.  I

09:20AM 19   THINK THE COURT IS AWARE OF OUR POSITIONS, AND I'M HAPPY TO

09:20AM 20   RESPOND TO ANY MORE SPECIFIC QUESTIONS THAT YOU MIGHT HAVE.

09:20AM 21           THE COURT:  WELL, THANK YOU.

09:20AM 22       MR. BOSTIC, MR. CLEARLY GETS THE LAST WORD, BUT ANYTHING

09:21AM 23   YOU WANT TO SAY?

09:21AM 24           MR. BOSTIC:  A FINAL POINT.

09:21AM 25       IMAGINE THAT THE GOVERNMENT WAS SEEKING TO ADMIT HUNDREDS

09:21AM 1     OF PAGES OF CUSTOMER REPORTS THAT WERE GENERALLY NEGATIVE ABOUT

09:21AM 2     THERANOS, RELATING TO THINGS LIKE DISTANCE BETWEEN A CUSTOMER'S

09:21AM 3     HOME AND A STORE, THE AMOUNT OF TIME THAT THEY HAD TO WAIT IN

09:21AM 4     LINE, HOW CLEAN THE FACILITIES WERE, HOW FRIENDLY PEOPLE WERE,

09:21AM 5     A LOT OF NEGATIVE INFORMATION ON THOSE ANCILLARY UNRELATED

09:21AM 6     POINTS.

09:21AM 7         THE DEFENSE WOULD BE MAKING THE SAME ARGUMENTS THAT I AM

09:21AM 8     MAKING HERE TODAY, AND THEY WOULD BE RIGHT TO DO SO.

09:21AM 9         CUSTOMER FEEDBACK ON THESE ISSUES IS NOT RELEVANT TO THE

09:21AM 10     CASE, REGARDLESS OF WHETHER IT'S FAVORABLE OR NOT.  THE FACT

09:21AM 11     THAT IT'S FAVORABLE RAISES 403 CONCERNS WITH THE GOVERNMENT,

09:21AM 12     AND IT'S INADMISSIBLE FOR THE REASONS THAT I'VE DESCRIBED.

09:21AM 13         THE COURT:  THANK YOU.

09:21AM 14       MR. CLEARY, THE LAST WORD.

09:21AM 15         MR. CLEARY:  THIS IS POWERFUL EVIDENCE OF

09:21AM 16     MS. HOLMES'S STATE OF MIND.  WE BELIEVE THAT IT SHOULD BE

09:21AM 17     ADMITTED, AND WE BELIEVE THAT EXCLUDING IT FOR THE REASONS THAT

09:21AM 18     THE GOVERNMENT INVITES THE COURT TO DO SO WOULD SERIOUSLY

09:22AM 19     MISLEAD THE JURY AS TO THE INFORMATION SENT AND SHARED TO

09:22AM 20     MS. HOLMES ABOUT CRITICAL ALLEGATIONS IN THE CASE AND WOULD

09:22AM 21     UNFAIRLY PREJUDICE OUR DEFENSE.

09:22AM 22         THE COURT:  THANK YOU VERY MUCH.  THANK YOU.

09:22AM 23       AND THANK YOU FOR YOUR PLEADINGS AND THE ARGUMENT THIS

09:22AM 24     MORNING.

09:22AM 25       MR. CLEARY, I DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB

09:22AM  1      THE COURT'S PREVIOUS RULING IN THIS MATTER.  I UNDERSTAND YOUR

09:22AM  2   VIEW AND YOUR TEAM'S VIEW THAT THIS IS CRITICALLY IMPORTANT TO

09:22AM  3   SHOW YOUR CLIENT'S STATE OF MIND AS TO THE NEGOTIATION THAT SHE

09:22AM  4   HAD, AND THIS WOULD BETTER INFORM HER OF THE INFORMATION RATHER

09:22AM  5   THAN THE INFORMATION THAT SHE RECEIVED FROM WALGREENS, ET

09:22AM  6   CETERA.  I KNOW YOU COMMENTED ON THAT'S A FACT ISSUE AND THAT'S

09:22AM  7   AN ISSUE THAT THE JURY COULD WRESTLE WITH IF THIS INFORMATION

09:22AM  8   IS ADMITTED.

09:22AM  9      BUT AS A THRESHOLD ISSUE, I JUST DON'T SEE THAT IT'S

09:22AM  10  RELEVANT TO THE ISSUES IN THE INDICTMENT, NOTWITHSTANDING THE

09:22AM  11  FACT THAT PRICE IS MENTIONED.  THIS IS NOT A PRICING CASE,

09:22AM  12  QUOTE-UNQUOTE.

09:22AM  13     IT'S NOT A -- THE ALLEGATIONS ARE NOT SPECIFIC THAT ONE

09:23AM  14  PRICE WAS PROMISED AND A DIFFERENT PRICE WAS OBTAINED.  IT'S

09:23AM  15  NOT BAIT AND SWITCH.

09:23AM  16     PRICE IS PERHAPS AN ANCILLARY PART OF THE CASE, AND I

09:23AM  17  APPRECIATE THAT.

09:23AM  18     BUT THE REAL ISSUES IN THE CASE I THINK ARE CONTAINED IN

09:23AM  19  12(D), WHICH TALK ABOUT THE ACCURACY OF THE TEST RESULTS.

09:23AM  20  THAT'S REALLY WHAT THE FOCUS OF THE PROSECUTION IS.

09:23AM  21     I DON'T HEAR THE GOVERNMENT SAYING THAT THEY'RE GOING TO

09:23AM  22  ARGUE THAT PRICING IN ANY WAY, THE FALSITY OF PRICING WAS AN

09:23AM  23  ISSUE.

09:23AM  24     I JUST DON'T SEE ANYTHING THAT CAUSES ME TO DISTURB THE

09:23AM  25  COURT'S PREVIOUS RULING ON THIS MATTER, AND I'M GOING TO

6351

09:23AM 1    RESPECTFULLY DECLINE YOUR INVITATION TO CHANGE THAT POSITION.

09:23AM 2        I AM INFORMED WHEN I LOOK AT THE TIMING AND THE RANGES OF

09:23AM 3    THIS INFORMATION, I THINK THAT'S IMPORTANT ALSO.  THAT WAS

09:23AM 4    POINTED OUT DURING OUR DISCUSSION.  I JUST DON'T SEE THE

09:23AM 5    RELEVANCE OF THIS.

09:23AM 6        AND EVEN UNDER A 403 ANALYSIS, I DO THINK THAT THIS

09:24AM 7    INFORMATION, THE PROBATIVE VALUE IS OUTWEIGHED BY ANY

09:24AM 8    PREJUDICIAL VALUE, AS WELL AS ANY TIME CONSUMPTION THAT IS

09:24AM 9    GOING TO BE REQUIRED TO LOOK THROUGH THESE DOCUMENTS FOR THAT

09:24AM 10   PROBATIVE, MINIMAL, MINIMAL PROBATIVE VALUE.

09:24AM 11       SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

09:24AM 12   DISTURB THE COURT'S PREVIOUS RULING ON THESE MATTERS.  THESE

09:24AM 13   WILL CONTINUE TO BE EXCLUDED.

09:24AM 14       SO THANK YOU VERY MUCH.

09:24AM 15       THANK YOU, MR. CLEARY.

09:24AM 16       THANK YOU, MR. BOSTIC.

09:24AM 17           MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:24AM 18           THE COURT:  I APPRECIATE IT.

09:24AM 19       ANYTHING ELSE BEFORE WE BRING IN THE JURY?

09:24AM 20           MR. BOSTIC:  YOUR HONOR, I'M NOT SURE WHETHER THE

09:24AM 21   COURT WANTED TO DO THIS IN THE JURY'S PRESENCE OR NOT, BUT I

09:24AM 22   UNDERSTAND FROM THE DEFENSE THAT THEY HAD NO OBJECTION TO

09:24AM 23   EXCUSING MR. EISENMAN.

09:24AM 24       WE SO INFORMED HIM, AND I BELIEVE HE HAS TRAVELLED OUT OF

09:24AM 25   TOWN.  WE JUST WANTED TO PUT THAT ON THE RECORD.

6352

09:24AM  1          THE COURT:  YES.  THANK YOU.

09:24AM  2      IS THAT CORRECT, MR. DOWNEY?

09:24AM  3          MR. DOWNEY:  YOUR HONOR, I THINK THE SIMPLEST, MOST

09:25AM  4  SUCCINCT STATEMENT IS THAT WE DON'T OBJECT TO HIS EXCUSAL.  I

09:25AM  5  WOULDN'T WANT THE COURT TO TAKE THAT AS AN INDICATION THAT WE

09:25AM  6  DIDN'T CONTINUE TO HAVE SOME OF THE CONCERNS AFTER WE'VE HAD

09:25AM  7  THE OPPORTUNITY TO REVIEW.

09:25AM  8      BUT FOR PURPOSES OF WHERE WE ARE, WE DON'T OBJECT TO HIS

09:25AM  9  EXCUSAL.

09:25AM  10          THE COURT:  ALL RIGHT.  THANK YOU THEN.  HE IS

09:25AM  11  EXCUSED.  I WILL MENTION THAT IN FRONT OF THE PRESENCE OF THE

09:25AM  12  JURY.  I THINK THAT'S APPROPRIATE.

09:25AM  13      AND YOU OTHERWISE HAVE A WITNESS, THE GOVERNMENT HAS

09:25AM  14  ANOTHER WITNESS?

09:25AM  15          MR. BOSTIC:  YES, YOUR HONOR, WE DO.

09:25AM  16          THE COURT:  OKAY.

09:25AM  17          MR. BOSTIC:  AND THE LAST ISSUE RELATED TO

09:25AM  18  MR. EISENMAN.  THE GOVERNMENT HAS POSSESSION CURRENTLY OF THE

09:25AM  19  ORIGINAL NOTES THAT WERE SUBPOENAED BY THE DEFENSE.

09:25AM  20      I UNDERSTAND FROM CONVERSATIONS WITH MR. DOWNEY THAT HE'S

09:25AM  21  FINE WITH THE GOVERNMENT SENDING THOSE BACK TO MR. EISENMAN.  I

09:25AM  22  WANTED TO MAKE SURE THAT WAS OKAY WITH THE COURT.

09:25AM  23          THE COURT:  THAT'S FINE.  YOU'LL DO THAT.  AND YOU

09:25AM  24  HAVE THE MECHANISMS AND THE KNOWLEDGE AND THE ABILITY TO GET

09:25AM  25  THOSE BACK TO HIM UNDISTURBED?

6353

09:25AM 1               MR. BOSTIC:  I THINK WE CAN HANDLE THAT, YES, YOUR

09:25AM 2  HONOR.

09:25AM 3               THE COURT:  OKAY.

09:25AM 4           THAT'S OKAY WITH YOU, MR. DOWNEY?

09:25AM 5               MR. DOWNEY:  THAT'S FINE.

09:25AM 6               THE COURT:  ALL RIGHT.  WE'LL TAKE OUR BREAK NOW.

09:25AM 7           YOU CAN -- MR. DOWNEY, IF YOU WOULD NOTIFY MS. DIBBLE AS

09:26AM 8  TO YOUR SUGGESTED BREAKS, THAT WOULD BE HELPFUL.

09:26AM 9               MR. DOWNEY:  WE'LL DO THAT, YOUR HONOR.  THANK YOU.

09:26AM 10               THE COURT:  YOU'RE WELCOME.

09:26AM 11         (RECESS FROM 9:26 A.M. UNTIL 9:39 A.M.)

09:39AM 12         (JURY IN AT 9:39 A.M.)

09:42AM 13               THE COURT:  ALL RIGHT.  WE'RE ON THE RECORD IN THE

09:42AM 14  HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS

09:42AM 15  PRESENT.

09:42AM 16          OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN.

09:42AM 17  I APOLOGIZE FOR THE DELAY.  I NEEDED TO GET SOME ASSISTANCE AND

09:42AM 18  DISCUSS SOME THINGS WITH THE LAWYERS.

09:42AM 19         SO WE'RE GETTING STARTED NOW.  LET ME ASK THAT QUESTION

09:42AM 20  AGAIN.  DURING OUR BREAK, DID ANY MEMBER OF THE JURY HAVE CAUSE

09:42AM 21  OR COME ACROSS ANY INFORMATION, CONVERSATION, READ, OR LISTEN

09:42AM 22  TO ANYTHING THAT HAD ANYTHING TO DO WITH THIS CASE?

09:42AM 23         I SEE NO HANDS.

09:42AM 24         THANK YOU AGAIN.  THANK YOU VERY MUCH, LADIES AND

09:42AM 25  GENTLEMEN.

09:42AM   1        SCHEDULING, I THINK WE'RE GOING TO END AT 4:00 TODAY.  I

09:42AM   2   THINK TODAY IS A 4:00 O'CLOCK DAY.

09:42AM   3        TOMORROW WE'LL END AT 3:30.  WE'LL START AT 9:00.  THAT'S

09:42AM   4   OUR SCHEDULE SO FAR.

09:42AM   5        SO LET ME ASK A QUESTION REGARDING THE LAST WITNESS,

09:43AM   6   MR. EISENMAN, IS HE EXCUSED?  MAY THAT WITNESS BE EXCUSED?

09:43AM   7             MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:43AM   8             MR. DOWNEY:  HE MAY, YOUR HONOR.

09:43AM   9             THE COURT:  ALL RIGHT.  THANK YOU.

09:43AM  10        DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

09:43AM  11             MR. LEACH:  THE UNITED STATES RECALLS SO-HAN SPIVEY.

09:43AM  12             THE COURT:  GOOD MORNING, MS. SPIVEY.  IF YOU WOULD

09:43AM  13   COME AND FACE OUR COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT

09:43AM  14   HAND, SHE HAS A QUESTION FOR YOU.

09:43AM  15             THE CLERK:  GOOD MORNING.

09:43AM  16        **(GOVERNMENT'S WITNESS, SO-HAN SPIVEY, WAS SWORN.)**

09:43AM  17             THE WITNESS:  YES.

09:43AM  18             THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT.

09:43AM  19             THE COURT:  PLEASE HAVE A SEAT.  I'LL INVITE YOU TO

09:43AM  20   MAKE YOURSELF COMFORTABLE AGAIN.  FEEL FREE TO ADJUST THE CHAIR

09:43AM  21   AND THE MICROPHONE.

09:43AM  22        I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

09:43AM  23        IF YOU HAVE BEEN VACCINATED, I THINK -- IF YOU HAVE BEEN,

09:44AM  24   YOU MAY REMOVE YOUR MASK IF YOU WISH.

09:44AM  25        BUT WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT,

SPIVEY DIRECT BY MR. LEACH                                          6355

| | | |
|---|---|---|
| 09:44AM | 1 | PLEASE. |
| 09:44AM | 2 | THE WITNESS:  SO-HAN SPIVEY.  S-O-H-A-N, |
| 09:44AM | 3 | S-P-I-V-E-Y. |
| 09:44AM | 4 | THE COURT:  THANK YOU. |
| 09:44AM | 5 | COUNSEL. |
| 09:44AM | 6 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 09:44AM | 7 | **DIRECT EXAMINATION** |
| 09:44AM | 8 | BY MR. LEACH: |
| 09:44AM | 9 | Q.  WELCOME BACK, MS. SPIVEY.  YOU PREVIOUSLY TESTIFIED IN |
| 09:44AM | 10 | THIS CASE, DO YOU RECALL THAT? |
| 09:44AM | 11 | A.  YES. |
| 09:44AM | 12 | Q.  AND YOU SERVED AS THE CONTROLLER FOR THERANOS FOR A NUMBER |
| 09:44AM | 13 | OF YEARS, 2010 UP THROUGH 2016 OR '17? |
| 09:44AM | 14 | A.  FROM 2006. |
| 09:44AM | 15 | Q.  OKAY.  I HAVE ONE BRIEF TOPIC I WANTED TO COVER WITH YOU, |
| 09:44AM | 16 | MS. SPIVEY. |
| 09:44AM | 17 | MAY I APPROACH THE WITNESS, YOUR HONOR? |
| 09:44AM | 18 | THE COURT:  YES. |
| 09:45AM | 19 | BY MR. LEACH: |
| 09:45AM | 20 | Q.  (HANDING.) |
| 09:45AM | 21 | MS. SPIVEY, I'VE PLACED BEFORE YOU WHAT HAS BEEN MARKED AS |
| 09:45AM | 22 | EXHIBIT 5454. |
| 09:45AM | 23 | DO YOU HAVE THAT IN FRONT OF YOU? |
| 09:45AM | 24 | A.  YES. |
| 09:45AM | 25 | Q.  DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO |

SPIVEY DIRECT BY MR. LEACH                                    6356

09:45AM  1    ELIZABETH HOLMES AND SUNNY BALWANI DATED JULY 25TH, 2015?

09:45AM  2    A.   YES.

09:45AM  3    Q.   AND DOES THIS RELATE TO A COMPANY CALLED HORIZON MEDIA?

09:45AM  4    A.   YES.

09:45AM  5    Q.   AND DOES IT RELATE TO POTENTIAL ADVERTISING IN MEDIA THAT

09:45AM  6    THERANOS WAS CONTEMPLATING PURCHASING?

09:45AM  7    A.   YES.

09:45AM  8    Q.   AND WERE YOU SENDING THIS TO MS. HOLMES AND MR. BALWANI TO

09:45AM  9    OBTAIN THEIR APPROVAL FOR CERTAIN PAYMENTS SUGGESTED IN THIS

09:45AM  10   EMAIL?

09:45AM  11   A.   YES.

09:45AM  12          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454 INTO

09:45AM  13   EVIDENCE.

09:45AM  14          MR. WADE:  802, YOUR HONOR.

09:45AM  15          THE COURT:  IS THIS A FOUR-PAGE, A FOUR-PAGE

09:46AM  16   DOCUMENT?

09:46AM  17          MR. LEACH:  IT'S A FIVE-PAGE DOCUMENT, YOUR HONOR.

09:46AM  18          THE COURT:  THIS IS OFFERED, MR. LEACH, FOR?

09:46AM  19          MR. LEACH:  A BUSINESS RECORD.

09:46AM  20          THE COURT:  OKAY.  DO YOU WANT TO LAY A FOUNDATION?

09:46AM  21          MR. LEACH:  SURE.

09:46AM  22   Q.   MS. SPIVEY, DID YOU, IN THE ORDINARY COURSE OF BUSINESS,

09:46AM  23   DID YOU OBTAIN APPROVALS FROM MS. HOLMES AND MR. BALWANI FOR

09:46AM  24   EXPENSES OVER A CERTAIN THRESHOLD?

09:46AM  25   A.   YES.

SPIVEY DIRECT BY MR. LEACH                                              6357

09:46AM  1    Q.   AND WHAT WAS THAT THRESHOLD?

09:46AM  2    A.   SO FOR SUNNY -- SO ALL OF THE EXPENSES WOULD GO THROUGH

09:46AM  3    THE APPROVAL OF EITHER SUNNY BALWANI OR ELIZABETH HOLMES.

09:46AM  4    Q.   OKAY.  SO WHATEVER THE DOLLAR VALUE?

09:47AM  5    A.   YES.

09:47AM  6    Q.   AND DO THE EXPENSES IN HERE RELATE TO THE DOLLAR VALUE IN

09:47AM  7    THE MANY MILLIONS OF DOLLARS?

09:47AM  8    A.   YES.

09:47AM  9    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

09:47AM  10   BUSINESS?

09:47AM  11   A.   YES.

09:47AM  12   Q.   AND IS THE INFORMATION IN EXHIBIT 5454 PREPARED AT OR

09:47AM  13   AROUND THE TIME BASED ON INFORMATION FROM PEOPLE WITH

09:47AM  14   KNOWLEDGE?

09:47AM  15   A.   YES.

09:47AM  16   Q.   AND WAS IT YOUR PRACTICE TO KEEP AND RETAIN THE EMAILS

09:47AM  17   THAT YOU WOULD SEND TO MS. HOLMES AND MR. BALWANI RESPECTING

09:47AM  18   CERTAIN APPROVALS FOR CERTAIN EXPENSES?

09:47AM  19   A.   WHAT DO YOU MEAN?

09:47AM  20   Q.   WOULD YOU RETAIN EMAILS IN THE COURSE OF YOUR BUSINESS TO

09:47AM  21   MAKE SURE THAT YOU HAD A RECORD OF WHAT MS. HOLMES OR

09:47AM  22   MR. BALWANI WERE APPROVING FOR EXPENSES?

09:47AM  23   A.   YES.

09:47AM  24   Q.   AND WOULD -- AFTER OBTAINING THE APPROVAL, WOULD THOSE

09:47AM  25   EXPENSES BE ENTERED INTO THE GENERAL LEDGER?

SPIVEY DIRECT BY MR. LEACH                                    6358

09:47AM   1      A.   YES.

09:47AM   2      Q.   AND IN THE EMAIL THERE'S TWO ATTACHMENTS.  WERE YOU

09:48AM   3      SENDING THESE ATTACHMENTS SO THAT MR. BALWANI AND MS. HOLMES

09:48AM   4      WOULD KNOW WHAT YOU WERE SEEKING APPROVAL OF?

09:48AM   5      A.   YES.

09:48AM   6              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5454.

09:48AM   7              MR. WADE:  SAME OBJECTION.

09:48AM   8              THE COURT:  ALL RIGHT.  THANK YOU.  THIS IS

09:48AM   9      ADMITTED, 803(6), IT IS ADMITTED AS A BUSINESS RECORD, AND IT

09:48AM  10      MAY BE PUBLISHED.

09:48AM  11          (GOVERNMENT'S EXHIBIT 5454 WAS RECEIVED IN EVIDENCE.)

09:48AM  12              MR. LEACH:  THANK YOU, YOUR HONOR.

09:48AM  13      Q.   MS. SPIVEY, I'D LIKE TO DRAW YOUR ATTENTION TO THE EMAIL

09:48AM  14      AT THE BOTTOM OF THE CHAIN.  THIS APPEARS -- THE BOTTOM EMAIL

09:48AM  15      APPEARS TO BE FROM CARISA BIANCHI.

09:48AM  16          ARE YOU FAMILIAR WITH HER?

09:48AM  17      A.   YES.

09:48AM  18      Q.   AND WHO IS SHE?

09:48AM  19      A.   SHE IS THE HEAD OF THE MARKETING DEPARTMENT.

09:48AM  20      Q.   AND THE SUBJECT IS HORIZON MEDIA.  WHAT IS HORIZON MEDIA?

09:49AM  21      A.   THAT'S THE COMPANY THAT HANDLES A MAJORITY OF THE

09:49AM  22      MARKETING AND ADVERTISING ACTIVITIES FOR THE COMPANY.

09:49AM  23      Q.   AND WHEN YOU SAY MARKETING AND ADVERTISING ACTIVITIES,

09:49AM  24      DOES THAT INCLUDE TELEVISION ADVERTISEMENTS?

09:49AM  25      A.   YES.

SPIVEY DIRECT BY MR. LEACH                                        6359

09:49AM  1    Q.   AND DOES IT INCLUDE PRINTED MEDIA ADVERTISEMENTS?

09:49AM  2    A.   YES.

09:49AM  3    Q.   AND IN THIS EMAIL, AT THE BOTTOM MS. BIANCHI IS WRITING

09:49AM  4    "HI SUNNY,

09:49AM  5         "HERE IS THE DETAILED LIST OF WHAT IS INCLUDED IN THE

09:49AM  6    PHOENIX MEDIA PLAN FOR 3TH," I THINK SHE MEANT 3RD, "AND 4TH

09:49AM  7    QUARTER.  ALL INVOICES REFLECT DATES THROUGH END OF YEAR."

09:49AM  8         DO YOU SEE THAT LANGUAGE?

09:49AM  9    A.   YES.

09:49AM  10   Q.   AND THE 3RD AND 4TH QUARTER, THAT WOULD BE OF 2015?

09:49AM  11   A.   YES.

09:49AM  12   Q.   IN NUMBER 2 -- WELL, IN NUMBER 1, DO YOU SEE WHERE THERE

09:49AM  13   ARE SOME EXPENSES RELATING TO OOH/CINEMA, PEOPLE MAGAZINE

09:49AM  14   COVER, AZ REPUBLIC, DIGITAL/MOBILE ACTIVITY?

09:50AM  15        DO YOU SEE THAT LAID OUT IN NUMBER 1?

09:50AM  16   A.   YES.

09:50AM  17   Q.   AND AZ REPUBLIC, IS THAT THE ARIZONA REPUBLIC?

09:50AM  18   A.   I BELIEVE SO.

09:50AM  19   Q.   THAT'S THE NEWSPAPER IN ARIZONA?

09:50AM  20   A.   I THINK SO.

09:50AM  21   Q.   IN NUMBER 2 IT SAYS, "WIRE FUNDS DUE 7/31 -- $1,126,661."

09:50AM  22        DO YOU SEE THAT?

09:50AM  23   A.   YES.

09:50AM  24   Q.   AND BENEATH THAT IS THERE THE WORDS 3Q AND 4Q, T.V. AND

09:50AM  25   ANOTHER NUMBER IN THE 800,000?

SPIVEY DIRECT BY MR. LEACH                                    6360

09:50AM  1    A.   YES.

09:50AM  2    Q.   AND BENEATH THAT DO YOU SEE WHERE IT SAYS, "I WILL HAVE

09:50AM  3    THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW NEXT

09:50AM  4    TUESDAY"?

09:50AM  5    A.   YES.

09:50AM  6    Q.   AND DOES THAT RELATE TO POTENTIAL MEDIA EXPENSES FOR THE

09:50AM  7    3RD AND 4TH QUARTER OF 2015?

09:50AM  8    A.   YES.

09:50AM  9         MR. WADE:   YOUR HONOR, 602.   602.

09:50AM  10        THE COURT:   CAN YOU LAY A FOUNDATION FOR HER

09:51AM  11   KNOWLEDGE?

09:51AM  12   BY MR. LEACH:

09:51AM  13   Q.   YOU ULTIMATELY REVIEWED AND FORWARD THIS EMAIL TO

09:51AM  14   MS. HOLMES AND MR. BALWANI; IS THAT CORRECT?

09:51AM  15   A.   YES.

09:51AM  16   Q.   SO WHEN YOU'RE SENDING THIS TO MS. HOLMES AND MR. BALWANI,

09:51AM  17   WAS IT IMPORTANT FOR YOU TO HAVE A GENERAL UNDERSTANDING OF

09:51AM  18   WHAT YOU WERE SEEKING APPROVAL FOR?

09:51AM  19   A.   YES.

09:51AM  20        THE COURT:   AND DID SHE --

09:51AM  21   BY MR. LEACH:

09:51AM  22   Q.   WHEN YOU'RE EMAILING MS. HOLMES AND MR. BALWANI, "I WILL

09:51AM  23   HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND ELIZABETH'S REVIEW

09:51AM  24   NEXT TUESDAY," WHAT DID YOU UNDERSTAND MS. BIANCHI TO MEAN BY

09:51AM  25   THAT?

SPIVEY DIRECT BY MR. LEACH                                    6361

09:51AM   1    A.    SHE IS SEEKING APPROVAL FROM ELIZABETH HOLMES AND

09:51AM   2    SUNNY BALWANI FOR THE T.V. SPEND FOR 3Q AND 4Q.

09:52AM   3    Q.    THANK YOU.  LET'S LOOK AT PAGE 2, PLEASE.

09:52AM   4              THE COURT:  I'LL ALLOW THAT.

09:52AM   5              MR. LEACH:  THANK YOU, YOUR HONOR.

09:52AM   6    Q.    DO YOU SEE WHERE IT SAYS "3Q AND 4Q RADIO ($282,570).

09:52AM   7          "I WILL HAVE THE 3Q AND 4Q BUYS READY FOR YOUR AND

09:52AM   8    ELIZABETH'S REVIEW NEXT TUESDAY."

09:52AM   9          DO YOU SEE THAT LANGUAGE?

09:52AM   10   A.    YES.

09:52AM   11   Q.    AND DID YOU UNDERSTAND THIS TO BE MS. BIANCHI SEEKING

09:52AM   12   APPROVAL FOR RADIO ADVERTISEMENTS IN THE SECOND HALF OF 2015?

09:52AM   13   A.    YES.

09:52AM   14   Q.    THE LAST ENTRY UNDER 2 IS "SEPTEMBER DJ AND T.V. HOST

09:52AM   15   ON-AIR SEGMENTS $24,920.

09:52AM   16         "FINALIZING TIMING AND DETAILS, TARGETING FOR SEPTEMBER.

09:52AM   17         "ATTACHING PROPOSED DJ COPY POINTS."

09:52AM   18         DO YOU SEE THAT?

09:52AM   19   A.    YES.

09:53AM   20   Q.    AND ARE THOSE COPY POINTS ONE OF THE ATTACHMENTS TO THE

09:53AM   21   EMAIL THAT YOU FORWARDED TO MS. HOLMES AND MR. BALWANI?

09:53AM   22   A.    I AM NOT SURE.

09:53AM   23   Q.    LET ME DRAW YOUR ATTENTION TO THE --

09:53AM   24         IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN, AND GO BACK TO

09:53AM   25   PAGE 1, PLEASE.

SPIVEY DIRECT BY MR. LEACH                                        6362

09:53AM   1         IF WE CAN ZOOM IN ON THE TOP HALF OF THIS PARAGRAPH, DO

09:53AM   2    YOU SEE THE MIDDLE EMAIL, MS. SPIVEY, WHERE CARISA EMAILS YOU,

09:53AM   3    "HI DANISE,

09:53AM   4         "PER MY EARLIER EMAIL, HERE IS THE RECAP I SENT TO

09:53AM   5    ELIZABETH AND SUNNY EARLIER TODAY WHICH RECAPS ALL MEDIA

09:54AM   6    ACTIVITY, WIRE DATES AND AMOUNTS."

09:54AM   7         DO YOU SEE THAT LANGUAGE?

09:54AM   8    A.   YES.

09:54AM   9    Q.   AND THEN ABOVE YOU WRITE TO MS. HOLMES AND MR. BALWANI,

09:54AM  10    "HI SUNNY/ELIZABETH,

09:54AM  11         "CARISA GAVE MORE DETAILS ABOUT THE WIRE REQUEST.  DO YOU

09:54AM  12    WANT ME TO SUBMIT A WIRE FOR MONDAY DELIVERY?"

09:54AM  13         DO YOU SEE THAT?

09:54AM  14    A.   YES.

09:54AM  15    Q.   AND DO YOU SEE THERE ARE TWO ATTACHMENTS IN THE SUBJECT

09:54AM  16    MATTER EMAIL PX OOH AND DJ COPY POINTS?

09:54AM  17    A.   YES.

09:54AM  18    Q.   AND WERE THOSE MATERIALS THAT YOU WERE SEEKING TO HAVE

09:54AM  19    MS. HOLMES AND MR. BALWANI APPROVE?

09:54AM  20    A.   YES.

09:54AM  21    Q.   AND YOU BELIEVED THOSE TO BE THE ATTACHMENTS TO THE EMAIL?

09:54AM  22    A.   YES.

09:54AM  23    Q.   IF WE CAN ZOOM OUT AGAIN, MS. HOLLIMAN.

09:54AM  24         I WANT TO DRAW YOUR ATTENTION BACK TO THE BOTTOM OF THE

09:54AM  25    EMAIL, MS. SPIVEY, THERE'S A NUMBER "WIRE FUNDS DUE 7/31 --

SPIVEY DIRECT BY MR. LEACH                                                6363

09:54AM   1      $1,126,661."

09:55AM   2           DO YOU SEE THAT NUMBER?

09:55AM   3      A.   YES.

09:55AM   4      Q.   KEEP THAT NUMBER IN MIND.  AND I'D LIKE TO DRAW YOUR

09:55AM   5      ATTENTION TO WHAT IS EXHIBIT 5248.

09:55AM   6           AND PERMISSION TO DISPLAY, YOUR HONOR?

09:55AM   7               THE COURT:  YES.

09:55AM   8      BY MR. LEACH:

09:55AM   9      Q.   MS. SPIVEY, DO YOU SEE THE NAME -- DOES THIS APPEAR TO BE

09:55AM   10     A RECORD OF A WIRE TRANSFER?

09:55AM   11     A.   YES.

09:55AM   12     Q.   AND DO YOU SEE THE NAME HORIZON MEDIA, INC. DOWN AT THE

09:55AM   13     BOTTOM?

09:55AM   14     A.   YES.

09:55AM   15     Q.   AND DO THEY APPEAR TO BE THE BENEFICIARY OF THIS

09:55AM   16     PARTICULAR WIRE?

09:55AM   17     A.   YES.

09:55AM   18     Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE MIDDLE PORTION

09:55AM   19     OF THE PAGE THERE'S AN AMOUNT OF $1,126,661.

09:55AM   20          DO YOU SEE THAT?

09:55AM   21     A.   YES.

09:55AM   22     Q.   AND WAS THAT THE SAME DOLLAR AMOUNT THAT YOU WERE SEEKING

09:55AM   23     APPROVAL OF FROM MS. HOLMES AND MR. BALWANI?

09:55AM   24     A.   YES.

09:55AM   25     Q.   AND BASED ON THESE TWO DOCUMENTS, ARE YOU SATISFIED THAT

SPIVEY CROSS BY MR. WADE                                        6364

09:56AM  1    YOU ULTIMATELY OBTAINED AN APPROVAL IN ONE FORM OR ANOTHER?

09:56AM  2    A.   YES.

09:56AM  3    Q.   I ALSO DRAW YOUR ATTENTION TO THE DATE TO THE RIGHT OF THE

09:56AM  4    LINE OMAD.

09:56AM  5         DO YOU SEE 20150803?

09:56AM  6    A.   YES.

09:56AM  7    Q.   AND THAT'S A WEEK OR SO AFTER THE JULY 25TH EMAIL THAT WE

09:56AM  8    LOOKED AT IN EXHIBIT 5454?

09:56AM  9    A.   CORRECT.

09:56AM  10             MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:56AM  11             THE COURT:  YES.

09:56AM  12        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:56AM  13             MR. LEACH:  I HAVE NO FURTHER QUESTIONS.

09:56AM  14        THANK YOU, MS. SPIVEY.

09:56AM  15             THE COURT:  CROSS?

09:56AM  16                        **CROSS-EXAMINATION**

09:56AM  17   BY MR. WADE:

09:57AM  18   Q.   GOOD MORNING, MS. SPIVEY.

09:57AM  19        MY NAME IS LANCE WADE, AND I REPRESENT MS. HOLMES.

09:57AM  20        I'M GOING TO ASK YOU A FEW QUESTIONS THIS MORNING, OKAY?

09:57AM  21   A.   SURE.

09:57AM  22   Q.   IT'S NICE TO SEE YOU AGAIN.

09:57AM  23        IF I COULD PULL UP EXHIBIT 5454, AND JUST BLOW UP THE

09:57AM  24   BOTTOM EMAIL.

09:57AM  25        YOU'VE TESTIFIED THAT THIS EMAIL RELATES TO SOME MEDIA

SPIVEY CROSS BY MR. WADE                                6365

09:57AM  1    ACTIVITY OF HORIZON MEDIA; CORRECT?

09:57AM  2    A.   YES.

09:57AM  3    Q.   DID YOU HAVE ANY ROLE WITH RESPECT TO MEDIA CONTENT OR THE

09:57AM  4    PREPARATION OF ANY ADVERTISING FOR THE COMPANY?

09:57AM  5    A.   NO.

09:57AM  6    Q.   OKAY.  AND WAS THAT MS. BIANCHI AND OTHERS WHO WERE

09:58AM  7    INVOLVED IN THOSE EFFORTS?

09:58AM  8    A.   YES.

09:58AM  9    Q.   AND WHEN THERE IS APPROVAL OF THIS SOUGHT, DO YOU FOCUS ON

09:58AM  10   THE CONTENT OF THE APPROVAL, OR DO YOU JUST MAKE SURE THERE'S

09:58AM  11   ENOUGH INFORMATION NECESSARY FOR THE EXPENSE TO BE APPROVED?

09:58AM  12   A.   YEAH, I FOCUS ON WHAT'S -- WELL, INFORMATION THAT

09:58AM  13   SUNNY BALWANI AND ELIZABETH HOLMES NEEDS IN ORDER TO APPROVE

09:58AM  14   THE PAYMENT.

09:58AM  15   Q.   RIGHT.  SO IN THIS CASE FOR ADVERTISING, FOR EXAMPLE, YOU

09:58AM  16   WEREN'T FOCUSSED ON WHAT THE ADVERTISING WOULD SAY, FOR

09:58AM  17   EXAMPLE?

09:58AM  18   A.   CORRECT.

09:58AM  19   Q.   OKAY.  AND YOU DIDN'T PLAY ANY ROLE IN THAT ADVERTISING;

09:58AM  20   CORRECT?

09:58AM  21   A.   CORRECT.

09:58AM  22   Q.   AND IF WE LOOK AT THE BOTTOM -- IF WE LOOK AT ITEM 2, AND

09:59AM  23   CAN WE BRING UP THE TOP OF THE NEXT PAGE AS WELL SO WE CAN SEE

09:59AM  24   THE FULL ITEM.

09:59AM  25        AND I'D LIKE TO JUST ASK YOU A COUPLE OF QUESTIONS ABOUT

SPIVEY CROSS BY MR. WADE                                              6366

| | | |
|---|---|---|
| 09:59AM | 1 | ITEM 2.  DO YOU SEE IN THE FIRST HEADING UNDER ITEM 2 IT SAYS, |
| 09:59AM | 2 | "3Q AND 4Q T.V. ($819,171)." |
| 09:59AM | 3 | DO YOU SEE THAT? |
| 09:59AM | 4 | A.  YES. |
| 09:59AM | 5 | Q.  AND IT NOTES THAT THE BUYS WOULD BE READY FOR REVIEW IN |
| 09:59AM | 6 | THE FUTURE; CORRECT? |
| 09:59AM | 7 | A.  YES. |
| 09:59AM | 8 | Q.  SO AS YOU UNDERSTOOD IT AT THIS TIME THERE HAD BEEN |
| 10:00AM | 9 | NOTHING CONCRETE FINALIZED IN TERMS OF WHAT WOULD BE BOUGHT; |
| 10:00AM | 10 | RIGHT? |
| 10:00AM | 11 | A.  BASED ON THIS EMAIL, YES. |
| 10:00AM | 12 | Q.  YES, THIS WAS SOME KIND OF FUTURE ACTIVITY? |
| 10:00AM | 13 | A.  YES. |
| 10:00AM | 14 | Q.  AND DID YOU PLAY ANY ROLE IN THAT FUTURE ACTIVITY AT ALL? |
| 10:00AM | 15 | A.  NO. |
| 10:00AM | 16 | Q.  OKAY.  AND WITH RESPECT TO THE SECOND ITEM, ARE THE |
| 10:00AM | 17 | ANSWERS THE SAME FOR THAT, FUTURE ACTIVITY THAT YOU DIDN'T PLAY |
| 10:00AM | 18 | A ROLE IN? |
| 10:00AM | 19 | A.  YES. |
| 10:00AM | 20 | Q.  OKAY.  AND IF WE LOOK AT THE THIRD ITEM THERE IT SAYS, |
| 10:00AM | 21 | "FINALIZING TIMING AND DETAILS." |
| 10:00AM | 22 | DO YOU SEE THAT? |
| 10:00AM | 23 | A.  YES. |
| 10:00AM | 24 | Q.  AND SO YOU UNDERSTOOD THAT THE DETAILS WEREN'T YET |
| 10:00AM | 25 | FINALIZED; CORRECT? |

SPIVEY CROSS BY MR. WADE                                    6367

10:00AM  1    A.   CORRECT.

10:00AM  2    Q.   AND YOU DIDN'T PLAY ANY ROLES IN THE DETAILS AFTER THIS

10:00AM  3    EMAIL, DID YOU?

10:00AM  4    A.   NO.

10:00AM  5    Q.   OKAY.  AND IT NOTES TARGETING FOR SEPTEMBER.  THAT'S A

10:00AM  6    COUPLE OF MONTHS IN THE FUTURE AFTER JULY; CORRECT?

10:00AM  7    A.   CORRECT.

10:00AM  8    Q.   AND YOU DON'T KNOW WHAT ULTIMATELY HAPPENED WITH RESPECT

10:01AM  9    TO ANY OF THIS, DO YOU?

10:01AM  10   A.   NO.

10:01AM  11   Q.   DO YOU KNOW WHETHER THESE ADS EVER -- THAT ARE IDENTIFIED

10:01AM  12   IN ITEM 2 WERE EVER RAN?

10:01AM  13   A.   I DON'T KNOW.

10:01AM  14   Q.   OKAY.  IT SAYS, "ATTACHING PROPOSED DJ COPY POINTS."

10:01AM  15        DO YOU SEE THAT THERE?

10:01AM  16   A.   YES.

10:01AM  17   Q.   AND THERE WAS AN ATTACHMENT TO THE EMAIL.  MR. LEACH NOTED

10:01AM  18   THAT; CORRECT?

10:01AM  19   A.   YES.

10:01AM  20   Q.   BUT YOU DIDN'T PLAY ANY ROLE IN FINALIZING THE PROPOSED

10:01AM  21   TALKING POINTS, DID YOU?

10:01AM  22   A.   NO.

10:01AM  23   Q.   OKAY.  LET'S TURN TO PAGE 4 OF THE EXHIBIT, AND LET'S BLOW

10:01AM  24   UP THE FIRST SECTION THERE.

10:01AM  25        AND THIS HERE TALKS ABOUT "SMALLER SAMPLES.  SMALLER

UNITED STATES COURT REPORTERS

**ER-9998**

SPIVEY CROSS BY MR. WADE                                                6368

10:02AM  1    NEEDLES.  A BETTER EXPERIENCE."

10:02AM  2         DO YOU SEE THAT?

10:02AM  3    A.   YES.

10:02AM  4    Q.   AND YOU HAD SEEN PROMOTIONS FROM THE COMPANY ALONG THOSE

10:02AM  5    LINES PREVIOUSLY I TAKE IT?

10:02AM  6    A.   SOMETHING LIKE THAT.

10:02AM  7    Q.   DO YOU SEE THE NEXT LINE IT SAYS, "MANY OF THERANOS TESTS

10:02AM  8    REQUIRE ONLY A FEW DROPS OF BLOOD."

10:02AM  9         DO YOU SEE THAT?

10:02AM  10   A.   YES.

10:02AM  11   Q.   AND YOU UNDERSTOOD THAT TO BE THE MICRO-SAMPLE THAT THE

10:02AM  12   COMPANY WOULD USE FOR SMALL SAMPLE TESTING?

10:02AM  13   A.   YES.

10:02AM  14   Q.   OKAY.  SOMETIMES REFERRED TO AS THE NANOTAINER; IS THAT

10:02AM  15   RIGHT?

10:02AM  16   A.   CORRECT.

10:02AM  17   Q.   OKAY.  AND THEN IT SAYS, "ALL OF OUR TESTS, INCLUDING

10:02AM  18   VENOUS DRAWS, REQUIRE SMALLER SAMPLES THAN TRADITIONAL LABS."

10:02AM  19        RIGHT?

10:02AM  20   A.   YES.

10:02AM  21   Q.   AND SO -- AND YOU UNDERSTOOD THAT AT THIS TIME THAT THE

10:02AM  22   VENOUS DRAWS WOULD SOMETIMES BE USED IN THERANOS LABS?

10:02AM  23   A.   YOU MEAN BASED ON THIS DOCUMENT?

10:03AM  24   Q.   YEAH.

10:03AM  25   A.   YES.

SPIVEY CROSS BY MR. WADE                                    6369

10:03AM  1    Q.   AND THAT THEY TRIED TO USE A SMALLER SAMPLE VENOUS DRAW

10:03AM  2    WHEN THEY DID THAT?

10:03AM  3    A.   YES.

10:03AM  4    Q.   OKAY.  AND, IN FACT, IN THE NEXT LINE THERE IT ACTUALLY

10:03AM  5    TALKS ABOUT THE SMALLEST VENOUS DRAW SAMPLE POSSIBLE.

10:03AM  6         DO YOU SEE THAT?

10:03AM  7    A.   YES.

10:03AM  8    Q.   AND HOW THERANOS TESTS MEAN LESS BLOOD.

10:03AM  9         DO YOU SEE THAT?

10:03AM  10   A.   YES.

10:03AM  11   Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

10:03AM  12   A.   YES.

10:03AM  13   Q.   OKAY.  LET'S GO TO -- IF WE CAN BOLD BACK OUT AND LOOK AT

10:03AM  14   THE SECOND SENTENCE.

10:03AM  15        YOU UNDERSTOOD THAT THESE PROPOSED TALKING POINTS ALSO --

10:03AM  16   AND AGAIN, THESE WERE -- THIS WAS SOMETHING THAT MS. HOLMES

10:03AM  17   APPROVED; CORRECT?  I BELIEVE THAT WAS YOUR TESTIMONY,

10:03AM  18   MS. HOLMES APPROVED THIS OR MR. BALWANI?

10:03AM  19   A.   THEY APPROVED THE WIRE.

10:04AM  20   Q.   THEY APPROVED THE WIRE.

10:04AM  21        AND YOU HAD SENT THEM THIS INFORMATION; RIGHT?

10:04AM  22   A.   YES.

10:04AM  23   Q.   AND INCLUDING THIS INFORMATION ABOUT THE VENOUS TESTING;

10:04AM  24   RIGHT?

10:04AM  25   A.   RIGHT.

SPIVEY CROSS BY MR. WADE                                          6370

10:04AM   1     Q.   OKAY.  AND THERE'S ALSO AN EMPHASIS HERE ON AFFORDABLE

10:04AM   2     PRICING.

10:04AM   3          DO YOU SEE THAT?

10:04AM   4     A.   YES.

10:04AM   5     Q.   AND YOU UNDERSTOOD THAT THAT WAS THE FOCUS OF THE

10:04AM   6     COMPANY'S ADVERTISING AT THE TIME; RIGHT?

10:04AM   7     A.   WHAT DOES THAT MEAN?

10:04AM   8     Q.   YOU REMEMBER THE COMPANY WAS FOCUSSED ON TRYING TO PROVIDE

10:04AM   9     ITS SERVICES AT LOW PRICES?

10:04AM   10    A.   YES.

10:04AM   11    Q.   AND IF WE GO TO THE NEXT HEADING YOU SEE THE THERANOS

10:04AM   12    EXPERIENCE.

10:04AM   13         AND THE COMPANY WAS VERY FOCUSSED OF TRYING TO PROVIDE A

10:04AM   14    VERY GOOD EXPERIENCE TO ITS CUSTOMERS, WAS IT NOT?

10:04AM   15    A.   YES.

10:04AM   16    Q.   OKAY.  AND THERE'S ALSO DISCUSSION WITHIN THIS DOCUMENT

10:05AM   17    ABOUT CONVENIENT LOCATION AND HOURS; RIGHT?

10:05AM   18    A.   YES.

10:05AM   19    Q.   AND HOW TO GO -- THERE'S SOME DISCUSSION AT THE BOTTOM OF

10:05AM   20    HOW TO GET SERVICES WORKING WITH THE PHYSICIAN.

10:05AM   21         DO YOU SEE THAT?

10:05AM   22    A.   YES.

10:05AM   23    Q.   OKAY.  I'D LIKE TO SHOW YOU ONE OTHER DOCUMENT FROM THE

10:05AM   24    GOVERNMENT THAT I CAN HAND UP.

10:05AM   25         MAY I APPROACH, YOUR HONOR?

SPIVEY CROSS BY MR. WADE                                              6371

10:05AM   1                    THE COURT:  YES.

10:05AM   2        BY MR. WADE:

10:05AM   3        Q.   (HANDING.)

10:05AM   4             AND DO YOU RECALL WHEN YOU TESTIFIED PREVIOUSLY THAT YOU

10:06AM   5        TALKED ABOUT HOW SOMETIMES AT MR. BALWANI'S REQUEST YOU WOULD

10:06AM   6        PREPARE BALANCE SHEETS FOR HIM?

10:06AM   7        A.   YES.

10:06AM   8        Q.   AND YOU WOULD FREQUENTLY EMAIL THOSE TO HIM WHEN HE WOULD

10:06AM   9        MAKE REQUESTS?

10:06AM  10        A.   YES.

10:06AM  11        Q.   AND IS THIS ONE OF THOSE OCCASIONS WHERE YOU DID THAT?

10:06AM  12        A.   YES.

10:06AM  13        Q.   AND WHEN I SAY "THIS," THIS IS EXHIBIT 1396; CORRECT?

10:06AM  14        A.   YES.

10:06AM  15                    MR. WADE:  I MOVE THE ADMISSION OF 1396.

10:06AM  16                    MR. LEACH:  NO OBJECTION.

10:06AM  17                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:06AM  18             (GOVERNMENT'S EXHIBIT 1396 WAS RECEIVED IN EVIDENCE.)

10:06AM  19        BY MR. WADE:

10:06AM  20        Q.   AND THE TIME PERIOD FOR THIS PARTICULAR BALANCE SHEET IS

10:06AM  21        JANUARY 8TH, 2014; CORRECT?

10:06AM  22        A.   CORRECT.

10:06AM  23        Q.   AND IF WE GO TO THE NEXT PAGE, YOU UNDERSTOOD THIS TO BE A

10:07AM  24        TRUE AND CORRECT BALANCE SHEET AS OF THAT DATE?

10:07AM  25        A.   FROM THIS EMAIL IT SEEMS LIKE WE'RE MAKING SOME

SPIVEY CROSS BY MR. WADE                                                 6372

10:07AM  1    ASSUMPTIONS, SO I'M NOT SURE IF THAT WAS AN ACCURATE NUMBER AT

10:07AM  2    THAT TIME.

10:07AM  3    Q.   OKAY.  WELL, LET'S LOOK BACK AT THAT EMAIL.

10:07AM  4         IN THE REQUEST MR. BALWANI ASKED FOR A BALANCE SHEET,

10:07AM  5    ASSUMING THE EQUITY TRANSACTION DOLLARS IS IN AND THE

10:07AM  6    $75 MILLION FROM WAG BY THEN.

10:07AM  7         DO YOU SEE THAT?

10:08AM  8    A.   YES.

10:08AM  9    Q.   AND DO YOU RECALL THAT THOSE WERE PAYMENTS THAT CAME IN

10:08AM  10   LATE IN THE PRIOR YEAR AND HE WAS ASKING HERE WHETHER THEY HAD

10:08AM  11   BEEN ENTERED INTO THE BOOKS?

10:08AM  12   A.   I AM NOT SURE.

10:08AM  13   Q.   YOU DON'T RECALL AS YOU SIT HERE?

10:08AM  14   A.   I DON'T RECALL WHEN THE MONEY WAS IN AND WHAT THIS

10:08AM  15   ASSUMPTION WAS MADE BY, WHAT THAT MEANS.

10:08AM  16   Q.   OKAY.  WHATEVER IT WAS DURING THIS TIME PERIOD, WHEN HE

10:08AM  17   ASKED YOU FOR THE BALANCE SHEET, YOU DID YOUR BEST TO PROVIDE

10:08AM  18   THE MOST ACCURATE BALANCE SHEET THAT YOU COULD AT THE TIME

10:08AM  19   BASED UPON THE STATE OF THE BOOKS AND SENT IT BACK TO

10:08AM  20   MR. BALWANI?

10:08AM  21   A.   YES.

10:08AM  22   Q.   OKAY.

10:08AM  23        NO FURTHER QUESTIONS, YOUR HONOR.

10:08AM  24             THE COURT:  MR. LEACH?

10:08AM  25             MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

SPIVEY CROSS BY MR. WADE                                        6373

| 10:08AM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 10:08AM | 2 | MR. LEACH:  YES, YOUR HONOR. |
| 10:08AM | 3 | MR. WADE:  SHE MAY. |
| 10:08AM | 4 | THE COURT:  THANK YOU, MS. SPIVEY.  YOU MAY GO. |
| 10:08AM | 5 | YOU'RE EXCUSED. |
| 10:09AM | 6 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL? |
| 10:09AM | 7 | MR. LEACH:  YES, YOUR HONOR. |
| 10:09AM | 8 | THE GOVERNMENT CALLS BRIAN GROSSMAN. |
| 10:09AM | 9 | THE COURT:  SIR, IF YOU COULD JUST STAND THERE FOR |
| 10:09AM | 10 | JUST A MOMENT. |
| 10:09AM | 11 | THE CLERK:  EXCUSE ME. |
| 10:09AM | 12 | THE COURT:  AND IF YOU WOULD RAISE YOUR RIGHT HAND |
| 10:09AM | 13 | IN A MOMENT WHILE YOU FACE OUR COURTROOM DEPUTY, SHE WILL HAVE |
| 10:09AM | 14 | A QUESTION FOR YOU. |
| 10:09AM | 15 | THE CLERK:  GOOD MORNING. |
| 10:09AM | 16 | **(GOVERNMENT'S WITNESS, BRIAN GROSSMAN, WAS SWORN.)** |
| 10:09AM | 17 | THE WITNESS:  I DO. |
| 10:09AM | 18 | THE CLERK:  THANK YOU.  PLEASE HAVE A SEAT. |
| 10:09AM | 19 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  I'LL |
| 10:09AM | 20 | INVITE YOU TO MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST |
| 10:09AM | 21 | THE CHAIR AND MICROPHONE AS YOU NEED. |
| 10:09AM | 22 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 10:09AM | 23 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 10:10AM | 24 | AND THEN SPELL IT, PLEASE. |
| 10:10AM | 25 | THE WITNESS:  BRIAN GROSSMAN, B-R-I-A-N, |

GROSSMAN DIRECT BY MR. LEACH                                    6374

10:10AM  1      G-R-O-S-S-M-A-N.

10:10AM  2                  THE COURT:  THANK YOU.

10:10AM  3          COUNSEL.

10:10AM  4                  MR. LEACH:  THANK YOU, YOUR HONOR.

10:10AM  5                        **DIRECT EXAMINATION**

10:10AM  6      BY MR. LEACH:

10:10AM  7      Q.   MR. GROSSMAN, I UNDERSTAND YOU'RE FULLY VACCINATED AND ARE

10:10AM  8      COMFORTABLE TESTIFYING WITHOUT A MASK.

10:10AM  9      A.   YES, I AM.

10:10AM  10     Q.   OKAY.  WHERE DO YOU WORK, SIR?

10:10AM  11     A.   I WORK AT A FIRM CALLED PFM HEALTH SCIENCES.

10:10AM  12     Q.   WHAT IS PFM HEALTH SCIENCES?

10:10AM  13     A.   WE ARE AN S.E.C. REGISTERED INVESTMENT ADVISOR.  WE HAVE

10:10AM  14     TWO PRINCIPAL STRATEGIES.  WE HAVE A HEDGE FUND STRATEGY AND A

10:10AM  15     GROWTH EQUITY STRATEGY THAT WE MANAGE.

10:10AM  16     Q.   WHEN YOU SAY AN S.E.C. REGISTERED INVESTMENT ADVISOR, WHAT

10:10AM  17     DO YOU MEAN?

10:10AM  18     A.   WE ARE AN INVESTMENT FIRM THAT REGISTERS WITH THE S.E.C.,

10:10AM  19     FILES REGULATORY UPDATES, HOLDINGS.  WE'RE A REGULATED ENTITY.

10:11AM  20     Q.   IF YOU'RE COMFORTABLE AND WOULD LIKE SOME WATER, LET ME

10:11AM  21     GIVE YOU THE OPPORTUNITY TO POUR THAT.

10:11AM  22          ARE YOU COMFORTABLE NOW?

10:11AM  23     A.   YES.

10:11AM  24     Q.   AND WHAT DO YOU DO FOR PFM?

10:11AM  25     A.   I AM THE MANAGING PARTNER FOR THE FIRM.  I AM THE

GROSSMAN DIRECT BY MR. LEACH                                          6375

10:11AM  1    PORTFOLIO MANAGER FOR BOTH STRATEGIES AND THE CHIEF INVESTMENT

10:11AM  2    OFFICER.

10:11AM  3    Q.   WHEN YOU SAY THE CHIEF INVESTMENT OFFICER, WHAT ARE SOME

10:11AM  4    OF YOUR RESPONSIBILITIES?

10:11AM  5    A.   PORTFOLIO MANAGEMENT, RISK MANAGEMENT ARE THE TWO MAIN

10:11AM  6    ONES.

10:11AM  7    Q.   OKAY.   IN OR ABOUT FEBRUARY OF 2014, DID PFM INVEST IN A

10:11AM  8    COMPANY CALLED THERANOS?

10:11AM  9    A.   WE DID.

10:11AM  10   Q.   AND WERE YOU INVOLVED IN MAKING THAT INVESTMENT DECISION?

10:11AM  11   A.   I WAS.

10:11AM  12   Q.   WE'LL COME BACK TO THAT.   BUT FOR NOW COULD YOU BRIEFLY

10:12AM  13   DESCRIBE YOUR EDUCATIONAL BACKGROUND?

10:12AM  14   A.   YES.   I GRADUATED FROM THE UNIVERSITY OF PENNSYLVANIA IN

10:12AM  15   1996.

10:12AM  16        I JOINED JP MORGAN ASSET MANAGEMENT IN SUMMER OF 1996 AND

10:12AM  17   WORKED THERE FOR FIVE YEARS.   THE FIRST TWO I WAS A -- I WORKED

10:12AM  18   IN THE EQUITY PORTFOLIO MANAGEMENT GROUP, AND THE LAST THREE I

10:12AM  19   WAS PROMOTED TO BE A RESEARCH ANALYST COVERING THE HEALTH CARE

10:12AM  20   SECTOR.

10:12AM  21        IN THE MIDDLE OF 2001 I LEFT JP MORGAN TO JOIN A FIRM

10:12AM  22   CALLED PEQUOT CAPITAL, THEY WERE A HEDGE FUND BASED IN

10:12AM  23   CONNECTICUT, NEW YORK, AND MY ROLE AT THAT POINT WAS TO COVER

10:12AM  24   THE BIOTECHNOLOGY SECTOR.   I DID THAT AT PEQUOT FOR A FEW

10:12AM  25   MONTHS.

GROSSMAN DIRECT BY MR. LEACH                                    6376

```
10:12AM   1          PEQUOT THEN SPLIT INTO TWO FIRMS.  THE FIRM THAT LEFT AND
10:12AM   2    SPLIT OUT AND SPUN OUT OF PEQUOT WAS A FIRM CALLED ANDOR
10:13AM   3    CAPITAL.  I JOINED -- I WAS PART OF THE GROUP THAT LEFT PEQUOT
10:13AM   4    AND JOINED ANDOR.  THAT WAS IN 2001.
10:13AM   5          FROM NOVEMBER OF 2001 UNTIL THE MIDDLE OF 2004 I WAS THE
10:13AM   6    BIOTECH ANALYST AT ANDOR CAPITAL MANAGEMENT.
10:13AM   7          AND THEN ANDOR HAD A SIMILAR SPLIT IN THE MIDDLE OF 2004,
10:13AM   8    AND AT THAT POINT MYSELF AND A FEW OF THE OTHER -- MY
10:13AM   9    COLLEAGUES STARTED OUR CURRENT FIRM, PFM.
10:13AM  10    Q.   SO YOU'VE HAD OVER 20 YEARS EXPERIENCE COVERING THE
10:13AM  11    BIOTECH SECTOR EITHER AS ANALYST OR AN INVESTOR?
10:13AM  12    A.   THAT IS CORRECT.
10:13AM  13    Q.   OKAY.  AND PFM IS AN INVESTMENT PARTNERSHIP?
10:13AM  14    A.   WE ARE -- YES, WE ARE A, WE ARE A PARTNERSHIP.  WE ARE NOT
10:13AM  15    A C CORP, AND SO WE HAVE, WE HAVE PARTNERS AND THEN WE HAVE
10:14AM  16    NON-PARTNERED EMPLOYEES.
10:14AM  17    Q.   OKAY.  DO YOU INVEST JUST FOR YOURSELF OR DO YOU INVEST
10:14AM  18    FOR CLIENTS?  WHAT DO YOU DO?
10:14AM  19    A.   THE PRINCIPAL CAPITAL BASE, THE VAST MAJORITY OF THAT IS
10:14AM  20    NON-EMPLOYEE CAPITAL.
10:14AM  21    Q.   SO INDIVIDUALS WHO INVEST IN YOUR FUND?
10:14AM  22    A.   THAT'S CORRECT.
10:14AM  23    Q.   OKAY.  DO YOU ALSO MAKE INVESTMENTS ON BEHALF OF PENSION
10:14AM  24    FUNDS?
10:14AM  25    A.   YES, WE DO.  WE HAVE A BROAD RANGE OF DIFFERENT INVESTORS
```

GROSSMAN DIRECT BY MR. LEACH                                        6377

10:14AM   1     IN OUR FUNDS.

10:14AM   2     Q.   AND ARE THOSE PENSION FUNDS PRIVATE COMPANIES?  PUBLIC

10:14AM   3     COMPANIES?  STATES?  WHAT ARE THEY?

10:14AM   4     A.   THEY REPRESENT BOTH.

10:14AM   5     Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO THE TIME

10:14AM   6     PERIOD DECEMBER OF 2013.  IN OR AROUND THAT TIME, DID YOU MEET

10:14AM   7     WITH INDIVIDUALS FROM THERANOS ABOUT A POSSIBLE INVESTMENT IN

10:15AM   8     THE COMPANY?

10:15AM   9     A.   YES.

10:15AM   10    Q.   OKAY.  WHO DID YOU MEET WITH?

10:15AM   11    A.   WE MET WITH MS. HOLMES AND MR. BALWANI.

10:15AM   12    Q.   AND WAS IT JUST YOU ON BEHALF OF PFM OR WAS THERE SOMEBODY

10:15AM   13    ELSE?

10:15AM   14    A.   IN THAT FIRST MEETING IT WAS MYSELF AND MY PARTNER,

10:15AM   15    CHRIS JAMES.

10:15AM   16    Q.   WHERE DID YOU MEET WITH MS. HOLMES AND MR. BALWANI?

10:15AM   17    A.   WE MET AT THEIR OFFICES ON CALIFORNIA AVENUE IN PALO ALTO.

10:15AM   18    Q.   APPROXIMATELY HOW LONG DID YOU MEET WITH THEM FOR?

10:15AM   19    A.   I BELIEVE IT WAS ROUGHLY AN HOUR MEETING.

10:15AM   20    Q.   OKAY.  WERE YOU SHOWN ANY DOCUMENTS IN THIS HOUR LONG

10:15AM   21    MEETING?

10:15AM   22    A.   I BELIEVE THERE WAS A LAPTOP WITH A PRESENTATION IN THAT

10:15AM   23    MEETING.

10:15AM   24    Q.   OKAY.  DESCRIBE FOR US WHAT HAPPENED, YOUR EXPERIENCE IN

10:15AM   25    GOING TO THERANOS AND RECEIVING INFORMATION FROM MS. HOLMES AND

GROSSMAN DIRECT BY MR. LEACH                                    6378

10:15AM   1    MR. BALWANI.

10:15AM   2    A.   WELL, WE SCHEDULED THE MEETING FOR MID-DECEMBER.  I

10:16AM   3    REMEMBER DRIVING DOWN FROM SAN FRANCISCO WHERE OUR OFFICES ARE

10:16AM   4    WITH MY PARTNER.

10:16AM   5        I REMEMBER ARRIVING AT THE COMPANY'S HEADQUARTERS AND

10:16AM   6    GOING THROUGH THE LOBBY WHERE THEY HAD SECURITY, AND WE HAD TO

10:16AM   7    SIGN SOME DOCUMENTS THAT I WAS A LITTLE SURPRISED THAT WE HAD

10:16AM   8    TO SIGN DOCUMENTS TO GET INTO THE BUILDING.

10:16AM   9        THEN WE WERE USHERED THROUGH AN AREA THAT WAS A LOBBY AREA

10:16AM  10    WITH SOME EQUIPMENT, KIND OF A DEMONSTRATION AREA, BACK THROUGH

10:16AM  11    A KITCHEN, PASSED A WHOLE BUNCH OF PEOPLE WORKING, AND INTO A

10:16AM  12    CONFERENCE ROOM IN THE BACK OF THE BUILDING, AND THAT'S WHERE

10:16AM  13    WE MET WITH MS. HOLMES AND MR. BALWANI.

10:16AM  14    Q.   YOU MENTIONED THE LEVEL OF SECURITY GETTING IN THERANOS.

10:16AM  15    WAS IT UNUSUALLY HIGH IN YOUR EXPERIENCE?

10:16AM  16    A.   IT WAS A LITTLE UNUSUAL.  WE HAD -- I DON'T REMEMBER -- I

10:17AM  17    DON'T RECALL THAT FOR EITHER A PUBLIC OR PRIVATE COMPANY,

10:17AM  18    BUT -- SO I DO REMEMBER THAT ASPECT OF IT.

10:17AM  19    Q.   OKAY.  AND YOU MET WITH MS. HOLMES AND MR. BALWANI IN THIS

10:17AM  20    DECEMBER 2013 MEETING?

10:17AM  21    A.   YES.

10:17AM  22    Q.   OKAY.  TAKE A MOMENT AND DESCRIBE FOR US THE SUBSTANCE OF

10:17AM  23    WHAT WAS SAID.

10:17AM  24    A.   OKAY.  WELL, THE MEETING STARTED OUT, AND THE FIRST THING

10:17AM  25    WE TALKED ABOUT WAS THE TECHNOLOGY.  WE KNEW WHAT WAS PUBLICLY

GROSSMAN   DIRECT BY MR. LEACH                                           6379

10:17AM   1    AVAILABLE, WHAT HAD BEEN PUBLICLY DISCLOSED ABOUT THE COMPANY

10:17AM   2    AT THAT POINT.  WE KNEW THAT THEY HAD A PARTNERSHIP WITH

10:17AM   3    WALGREENS THAT HAD BEEN ANNOUNCED I THINK IN SEPTEMBER OF 2013.

10:17AM   4    BUT BEYOND THAT WE REALLY KNEW NOTHING ABOUT THERANOS.

10:17AM   5         SO THIS WAS OUR FIRST OPPORTUNITY TO REALLY HEAR THEIR

10:17AM   6    STORY AND UNDERSTAND WHAT THEIR, WHAT THEIR BUSINESS, THEIR

10:18AM   7    BUSINESS WAS.

10:18AM   8         THE FIRST THING WE TALKED ABOUT WAS THE TECHNOLOGY, AND

10:18AM   9    THEY TOLD US THAT THEY COULD DO ALL -- OVER A THOUSAND CPT

10:18AM   10   CODES WITH THEIR TECHNOLOGY.  THAT WAS A PRETTY PROFOUND

10:18AM   11   STATEMENT.

10:18AM   12        SO THEY THEN EXPLAINED HOW IT HAD TAKEN THEM TEN YEARS TO

10:18AM   13   GET TO THAT POINT, AND OVER THAT TEN YEAR PERIOD OF TIME THEY

10:18AM   14   DESCRIBED HOW THEY HAD WORKED WITH BOTH THE MILITARY, THE

10:18AM   15   DEPARTMENT OF DEFENSE, AND PHARMACEUTICAL COMPANIES DOING

10:18AM   16   CLINICAL TRIAL RESEARCH.

10:18AM   17        ON THE DEPARTMENT OF DEFENSE, THEY TOLD US THAT THE

10:18AM   18   TECHNOLOGY HAD BEEN USED IN THE BATTLEFIELD ON MEDEVACS, FOR

10:18AM   19   EXAMPLE, AND THAT GETTING DIAGNOSTIC INFORMATION TO MEDICAL

10:19AM   20   PERSONNEL IN THE -- IN THAT SETTING WAS A MATTER OF LIFE AND

10:19AM   21   DEATH.  AND THEY EMPHASIZED HOW THEIR TECHNOLOGY HAD BEEN ABLE

10:19AM   22   TO DO THAT IN THOSE DIFFICULT CONDITIONS.

10:19AM   23        ON THE PHARMACEUTICAL SIDE, THEY TALKED ABOUT THE

10:19AM   24   PARTNERSHIPS THAT THEY HAD WITH A VARIETY OF DIFFERENT

10:19AM   25   PHARMACEUTICAL COMPANIES, AND THEY SAID OVER THE YEARS THEY HAD

GROSSMAN DIRECT BY MR. LEACH                                    6380

10:19AM   1    BEEN ASKED TO DO A VARIETY OF DIFFERENT TESTS.  THE IDEA WAS

10:19AM   2    THAT YOU COULD GIVE SOMEONE A REAL -- A TEST IN THEIR HOUSE

10:19AM   3    WITHIN 20, 30 MINUTES FOR AN EXPERIMENTAL DRUG, AND IT WAS

10:19AM   4    THE -- IT WAS THOSE RELATIONSHIPS WHICH OPENED THEIR EYES TO

10:19AM   5    THE FACT THAT THERE WERE REALLY WERE NO LIMITATIONS TO THE

10:19AM   6    TECHNOLOGY.

10:19AM   7         SO THAT'S WHAT KIND OF STARTED THEIR THINKING ABOUT A

10:19AM   8    RETAIL-LIKE STRATEGY WITH SOMEONE LIKE WALGREENS.

10:20AM   9         THEY THEN DESCRIBED HOW THE TECHNOLOGY WAS ACTUALLY BETTER

10:20AM   10   THAN CONVENTIONAL LABORATORY EQUIPMENT, WHICH SUFFERED FROM A

10:20AM   11   HUGE AMOUNT OF VARIABILITY.

10:20AM   12        AND VARIABILITY WAS DUE TO HUMANS, INTERACTING WITH BIG

10:20AM   13   VENOUS DRAWS, SAMPLES THAT WERE TAKEN CONVENTIONALLY, AND THEN

10:20AM   14   MANIPULATING THOSE SAMPLES IN A LABORATORY ENVIRONMENT.  IT

10:20AM   15   CREATED -- IT INTRODUCED A SIGNIFICANT AMOUNT OF VARIABILITY.

10:20AM   16        AND THEY EXPLAINED THAT THEIR TECHNOLOGY ELIMINATED THE

10:20AM   17   HUMAN ASPECT OF THAT, AND AS A RESULT IT HAD DRAMATICALLY LESS

10:20AM   18   VARIABILITY FROM TEST TO TEST, FROM MACHINE TO MACHINE.

10:20AM   19        I THINK IN THAT MEETING THEY TALKED ABOUT A NUMBER THAT

10:20AM   20   WAS LESS THAN 5 PERCENT, AND THEY COMPARED THAT TO SOMETHING

10:20AM   21   LIKE HIGH DENSITY -- HDL, WHICH IS THE GOOD CHOLESTEROL, SO

10:20AM   22   HIGH DENSITY LIPID PROTEIN, AND THEY EXPLAINED THAT THAT TEST,

10:21AM   23   WHICH IS PROBABLY A TEST THAT EVERYONE IN THIS COURTROOM HAS

10:21AM   24   HAD, YOU CAN SEE VARIABILITY OF UPWARDS OF 30 PERCENT OR MORE

10:21AM   25   FROM THE SAME MACHINE IN THE SAME LAB.

GROSSMAN DIRECT BY MR. LEACH                                          6381

10:21AM  1      SO THEY REALLY EMPHASIZED HOW NOT ONLY WAS THIS A MORE

10:21AM  2   CONVENIENT TECHNOLOGY, BUT, YOU KNOW, IT HAD VERY, VERY

10:21AM  3   SIGNIFICANT ADVANTAGES IN TERMS OF THE RELIABILITY AND

10:21AM  4   REPRODUCIBILITY.

10:21AM  5      WE CIRCLED BACK TO THE TECHNOLOGY AT THAT POINT AND SAID

10:21AM  6   THAT WE WANTED TO COME BACK TO UNDERSTAND AND -- COME BACK TO

10:21AM  7   THE OPENING STATEMENTS IN THAT MEETING AND UNDERSTAND IF THERE

10:21AM  8   WERE ANY LIMITATIONS.

10:21AM  9      AND, AGAIN, THEY WERE VERY CLEAR.  MS. HOLMES WAS ACTUALLY

10:21AM 10   VERY CLEAR THAT THEY COULD MATCH EVERY TEST ON THE LABCORP AND

10:21AM 11   QUEST MENU OF TESTS.

10:21AM 12      THOSE WERE THE TWO LABORATORIES THAT ARE PROBABLY MOST

10:21AM 13   WELL-KNOWN IN THE CLINICAL DIAGNOSTIC SPACE AS BEING

10:22AM 14   INDEPENDENT, WHAT WE REFER TO AS REFERENCE LABORATORIES.

10:22AM 15      BUT SHE DID HIGHLIGHT THAT THERE WAS ONE LIMITATION THAT

10:22AM 16   THEY HAD WITH THE TECHNOLOGY AT FIRST, WHICH WAS AROUND

10:22AM 17   CULTURES, AND CULTURES, BY THAT SHE WAS REFERRING TO THE IDEA

10:22AM 18   OF HOW YOU GROW A LITTLE MICROORGANISMS AND IDENTIFY THOSE, AND

10:22AM 19   IT'S SOMETHING THAT HAPPENS ALL THE TIME IN HOSPITALS.

10:22AM 20      SHE DESCRIBED A TECHNOLOGY THAT THEY HAD DEVELOPED

10:22AM 21   INTERNALLY TO DO THAT TYPE OF TESTING ON THEIR PROPRIETARY

10:22AM 22   EQUIPMENT.  IT INVOLVED A DIFFERENT TYPE OF NUCLEIC ACID

10:22AM 23   AMPLIFICATION THAT WAS MUCH FASTER, MEANINGFULLY FASTER THAN

10:22AM 24   ANYTHING THAT WAS AVAILABLE AT THAT POINT IN TIME.

10:22AM 25      SO WE TALKED ABOUT THIS NUCLEIC ACID AMPLIFICATION

GROSSMAN DIRECT BY MR. LEACH                                      6382

```
10:22AM   1    TECHNOLOGY.

10:22AM   2         FROM THERE --

10:22AM   3    Q.   MR. GROSSMAN, LET ME PAUSE YOU BRIEFLY BECAUSE --

10:23AM   4    A.   YEAH.

10:23AM   5    Q.   -- BECAUSE I WANT TO BREAK DOWN SOME OF THE ELEMENTS OF

10:23AM   6    YOUR ANSWER AND I DON'T MEAN TO INTERRUPT YOU.

10:23AM   7         YOU STARTED WITH THE REFERENCE TO THE NUMBER OF CPT CODES

10:23AM   8    THAT THERANOS COULD PERFORM.

10:23AM   9         DO YOU RECALL THAT?

10:23AM  10    A.   YES.

10:23AM  11    Q.   AND WHAT WAS THE NUMBER THAT YOU RECALL MS. HOLMES AND

10:23AM  12    MR. BALWANI PROVIDING YOU?

10:23AM  13    A.   IT WAS OVER A THOUSAND.

10:23AM  14    Q.   OKAY.  AND WAS THAT IMPRESSIVE TO YOU?

10:23AM  15    A.   VERY.

10:23AM  16    Q.   OKAY.  WHY WAS THAT IMPRESSIVE TO YOU?

10:23AM  17    A.   WELL, THIS WAS A COMPANY THAT WE REALLY HAD NEVER HEARD

10:23AM  18    OF, AND TO BE ABLE TO MATCH THE ENTIRE MENU OF TESTS, A

10:23AM  19    THOUSAND CPT CODES, WAS A REALLY BIG STATEMENT ABOUT HOW MUCH

10:23AM  20    THEY HAD ACCOMPLISHED, WHERE THE TECHNOLOGY WAS AT THAT POINT

10:23AM  21    IN TIME.

10:23AM  22         AND THEN IT WAS KIND OF ALSO SUPPORTED BY HOW IT HAD BEEN

10:23AM  23    USED IN BOTH THE MILITARY AND IN THE PHARMACEUTICAL CLINICAL

10:24AM  24    TRIAL SETTING.

10:24AM  25    Q.   OKAY.  YOU TALKED A LITTLE BIT ABOUT THE MILITARY
```

GROSSMAN DIRECT BY MR. LEACH                                    6383

10:24AM  1    APPLICATIONS THAT WERE DESCRIBED TO YOU IN THIS MEETING, AND I

10:24AM  2    THINK I HEARD YOU SAY YOU WERE TOLD IT WAS BEING USED IN THE

10:24AM  3    BATTLEFIELD.

10:24AM  4    A.   CORRECT.

10:24AM  5    Q.   AND IT WAS BEING USED ON MEDEVAC HELICOPTERS?

10:24AM  6    A.   CORRECT.

10:24AM  7    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:24AM  8    A.   I MEAN, WHAT, WHAT -- YES.  WHAT BETTER APPLICATION FOR A

10:24AM  9    TECHNOLOGY LIKE THIS THAN IN A MILITARY SETTING UNDER HARSH

10:24AM 10    CONDITIONS LIKE ONE WOULD EXPECT IN A PLACE LIKE AFGHANISTAN OR

10:24AM 11    IRAQ.

10:24AM 12    Q.   YOU ALSO DESCRIBED WORK THAT THE COMPANY HAD BEEN DOING

10:24AM 13    WITH PHARMACEUTICAL COMPANIES.

10:24AM 14         DO YOU RECALL THAT?

10:24AM 15    A.   I DO, YES.

10:24AM 16    Q.   AND DID MS. HOLMES OR MR. BALWANI GIVE YOU A SENSE OF HOW

10:24AM 17    LARGE AND ROBUST THAT BUSINESS WAS?

10:24AM 18    A.   I DON'T RECALL SPECIFICALLY, ONLY THAT THAT HAD BEEN A BIG

10:24AM 19    PART OF WHAT HAD SUSTAINED, ALONG WITH THE MILITARY, THE

10:24AM 20    COMPANY OVER THE TEN YEARS THAT THEY WERE, THEY WERE IN STEALTH

10:25AM 21    MODE.

10:25AM 22    Q.   DID EITHER OF THEM MAKE REFERENCE TO HISTORICAL REVENUE

10:25AM 23    NUMBERS ABOUT THE WORK WITH PHARMA AND THE MILITARY?

10:25AM 24    A.   TOWARDS THE END OF THE MEETING THEY TALKED ABOUT HOW THEY

10:25AM 25    HAD -- I WANT TO SAY SOMETHING, A LITTLE OVER 200 MILLION OF

GROSSMAN DIRECT BY MR. LEACH                                    6384

10:25AM  1    REVENUES FROM THE DEPARTMENT OF DEFENSE, MOSTLY FROM THE

10:25AM  2    DEPARTMENT OF DEFENSE, THAT HAD SUSTAINED THE COMPANY THROUGH

10:25AM  3    THIS PERIOD, THIS PERIOD THAT THEY WERE BUILDING THEIR MENU OF

10:25AM  4    TESTS FOR THE RETAIL SETTING.

10:25AM  5    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM  6    A.   YEAH, IT WAS VERY IMPRESSIVE, YES.

10:25AM  7    Q.   I THINK I ALSO HEARD YOU SAY THAT THEY TALKED ABOUT THE

10:25AM  8    LACK OF VARIABILITY FROM MACHINE TO MACHINE AND HOW THAT

10:25AM  9    ELIMINATED ERROR IN TRADITIONAL LABS.

10:25AM 10    A.   CORRECT.

10:25AM 11    Q.   AND WAS THAT IMPRESSIVE TO YOU?

10:25AM 12    A.   VERY.

10:25AM 13    Q.   AND WHY WAS THAT?

10:25AM 14    A.   WELL, WE KNEW THAT IN THE CONVENTIONAL LABORATORY

10:26AM 15    ENVIRONMENT THERE WERE MANY DIFFERENT TYPES OF EQUIPMENT, AND

10:26AM 16    HUMANS HAD -- HUMAN LAB TECHNICIANS HAD A BIG ROLE AND OFTEN

10:26AM 17    ONLY HAD A NARROW JOB WITHIN THE LABORATORY TO WORK ONE PIECE

10:26AM 18    OF EQUIPMENT.

10:26AM 19        AND SO, YOU KNOW, THAT IS THE WAY THAT THE INDUSTRY HAD

10:26AM 20    BEEN FOR THE LAST 30, 40 YEARS.  SO THE IDEA THAT YOU COULD

10:26AM 21    ELIMINATE THE HUMAN PART OF THE LABORATORY INDUSTRY HAD

10:26AM 22    PROFOUND IMPLICATIONS FOR THE ECONOMICS OF THAT INDUSTRY, THE

10:26AM 23    PROFITABILITY, THE COSTS.

10:26AM 24        SO THAT WAS, THAT WAS A VERY KIND OF IMPORTANT PART OF

10:26AM 25    THAT MEETING.

GROSSMAN DIRECT BY MR. LEACH                                        6385

10:26AM  1    Q.    WHO DID MOST OF THE TALKING IN THIS DECEMBER 2013 MEETING?

10:26AM  2    A.    MS. HOLMES.

10:26AM  3    Q.    AT ANY POINT DID MS. HOLMES OR MR. BALWANI DISAGREE WITH

10:27AM  4    EACH OTHER ABOUT INFORMATION THAT WAS BEING PROVIDED TO YOU?

10:27AM  5    A.    NO.

10:27AM  6    Q.    WAS THERE ANY DISCUSSION OF THE WALGREENS RELATIONSHIP IN

10:27AM  7    THIS DECEMBER 2013 MEETING?

10:27AM  8    A.    YES, THERE WAS.

10:27AM  9          WE -- THEY TALKED -- THEY TOLD US THAT WALGREENS HAD 8100

10:27AM  10   STORES.  THEY WOULD BE COMMERCIALLY ROLLING THIS TECHNOLOGY OUT

10:27AM  11   IN ALL OF THE WALGREENS STORES, AND THAT AT THAT POINT IN TIME

10:27AM  12   THEY WERE ACTUALLY USING THE PROPRIETARY TECHNOLOGY, TESTING

10:27AM  13   HUMAN SAMPLES, AND BILLING FOR THOSE TESTS, BEING REIMBURSED,

10:27AM  14   TO USE A TERM WE USE A LOT, AN INVESTMENT TERM THAT WE USE.

10:27AM  15         SO THAT WAS -- THEY WERE USING THE TECHNOLOGY ON ACTUAL

10:27AM  16   HUMANS AT THAT POINT IN TIME, OR NOT HUMANS, BUT HUMAN SAMPLES.

10:27AM  17   Q.    AND WAS THAT IMPRESSIVE TO YOU?

10:28AM  18   A.    VERY.

10:28AM  19   Q.    AT THE CONCLUSION OF THIS DECEMBER 2013 MEETING WITH

10:28AM  20   MS. HOLMES AND MR. BALWANI, WERE YOU INTERESTED IN PURSUING A

10:28AM  21   POSSIBLE INVESTMENT IN THERANOS?

10:28AM  22   A.    WE WERE INTERESTED IN LEARNING MORE ABOUT THE COMPANY,

10:28AM  23   YES.

10:28AM  24   Q.    OKAY.

10:28AM  25         MAY I APPROACH THE WITNESS, YOUR HONOR?

10:28AM   1                    THE COURT:  YES.

10:28AM   2        BY MR. LEACH:

10:28AM   3        Q.   (HANDING.)

10:28AM   4             MR. GROSSMAN, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS

10:28AM   5        AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

10:28AM   6        TRIAL EXHIBIT 1404.

10:28AM   7                    THE COURT:  DOES THE DEFENSE HAVE A COPY OF YOUR

10:28AM   8        BINDER?

10:28AM   9                    MR. LEACH:  YOUR HONOR, I BELIEVE THE DEFENSE DOES,

10:28AM  10        BUT I NEGLECTED TO TENDER THE BINDER TO THE COURT.

10:29AM  11                    THE COURT:  THANK YOU.

10:29AM  12                    MR. LEACH:  (HANDING.)

10:29AM  13             THANK YOU, YOUR HONOR.

10:29AM  14        Q.   DO YOU HAVE 1404 IN FRONT OF YOU, SIR?

10:29AM  15        A.   I DO.

10:29AM  16        Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL EXCHANGE AMONG

10:29AM  17        YOU, SUNNY BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES?

10:29AM  18        A.   IF I COULD JUST TAKE A MINUTE TO REVIEW IT?

10:29AM  19        Q.   PLEASE.

10:29AM  20        A.   THANK YOU.

10:29AM  21             (PAUSE IN PROCEEDINGS.)

10:29AM  22                    THE WITNESS:  OKAY.

10:29AM  23        BY MR. LEACH:

10:29AM  24        Q.   IS THIS A TRUE AND CORRECT COPY OF AN EMAIL INVOLVING YOU,

10:29AM  25        MR. BALWANI, CHRIS JAMES, AND ELIZABETH HOLMES IN OR ABOUT

GROSSMAN DIRECT BY MR. LEACH                                       6387

10:30AM  1      JANUARY 7TH, 2014?

10:30AM  2      A.   YES.

10:30AM  3      Q.   AND DO YOU SEE THE SUBJECT LINE "DUE DILIGENCE QUESTIONS"?

10:30AM  4      A.   YES.

10:30AM  5      Q.   OKAY.  AND IS THIS EMAIL -- DOES THIS EMAIL EXCHANGE

10:30AM  6      INCLUDE DUE DILIGENCE QUESTIONS THAT YOU SENT TO MS. HOLMES AND

10:30AM  7      MR. BALWANI TO BETTER UNDERSTAND THE THERANOS OPPORTUNITY?

10:30AM  8      A.   YES.

10:30AM  9           MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1404 INTO

10:30AM 10      EVIDENCE.

10:30AM 11           MR. WADE:  NO OBJECTION.

10:30AM 12           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:30AM 13      (GOVERNMENT'S EXHIBIT 1404 WAS RECEIVED IN EVIDENCE.)

10:30AM 14      BY MR. LEACH:

10:30AM 15      Q.   MR. GROSSMAN, I'D LIKE TO DRAW YOUR ATTENTION TO THE

10:30AM 16      BOTTOM EMAIL ON PAGE 1.

10:30AM 17           DO YOU SEE YOUR NAME ON THE FROM LINE?

10:30AM 18      A.   YES.

10:30AM 19      Q.   AND YOU MENTIONED CHRIS JAMES.  HE WAS YOUR PARTNER AT THE

10:30AM 20      TIME?

10:30AM 21      A.   YES.

10:30AM 22      Q.   AND THE SUBJECT OF THIS IS DUE DILIGENCE QUESTIONS.

10:30AM 23           DO YOU SEE THAT?

10:31AM 24      A.   YES.

10:31AM 25      Q.   AND IN THE PARAGRAPH YOU WROTE, "ELIZABETH AND SUNNY.

GROSSMAN DIRECT BY MR. LEACH                                    6388

10:31AM  1        "I HOPE YOU BOTH HAD AN ENJOYABLE FINISH TO WHAT WAS

10:31AM  2    OBVIOUSLY A TREMENDOUSLY SUCCESSFUL YEAR FOR THE COMPANY."

10:31AM  3        FURTHER ON YOU SAY, "BELOW IS OUR LIST OF DUE DILIGENCE

10:31AM  4    QUESTIONS.  WE WERE HOPING TO START THE PROCESS AS SOON AS

10:31AM  5    POSSIBLE."

10:31AM  6        WHY WERE YOU SENDING THESE QUESTIONS TO MS. HOLMES AND

10:31AM  7    MR. BALWANI?

10:31AM  8    A.   WELL, AFTER OUR FIRST MEETING, WE DIGESTED THAT THE -- THE

10:31AM  9    MATERIAL THAT THE, THE INFORMATION THE COMPANY PROVIDED US, AND

10:31AM 10    WE AS A GROUP CAME UP WITH QUESTIONS THAT WE WANTED TO

10:31AM 11    UNDERSTAND, OR WE WANTED ANSWERS TO THAT WE WANTED TO BETTER

10:31AM 12    UNDERSTAND THE BUSINESS.

10:31AM 13        SO THIS IS -- THIS IS THE RESULT OF THAT EFFORT TO PUT

10:31AM 14    TOGETHER A MORE COMPREHENSIVE LIST OF QUESTIONS SO THAT THE

10:31AM 15    NEXT TIME WE MET WITH THEM IT WOULD BE A PRODUCTIVE MEETING AND

10:31AM 16    THEY WOULD KNOW WHAT ISSUES WE WANTED TO ADDRESS BEFORE WE GOT

10:32AM 17    TO THE -- BEFORE THE MEETING STARTED.

10:32AM 18    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2.  AND UP AT

10:32AM 19    THE TOP --

10:32AM 20        IF YOU CAN ZOOM IN ON THE TOP HALF, MS. HOLLIMAN?

10:32AM 21        YOU WROTE, "DEAL TEAM, BRIAN GROSSMAN, PORTFOLIO

10:32AM 22    MANAGER/HEAD OF HEALTH CARE TEAM."

10:32AM 23        DO YOU SEE THAT?

10:32AM 24    A.   YES.

10:32AM 25    Q.   AND THERE ARE SOME OTHERS LISTED BELOW YOU?

GROSSMAN DIRECT BY MR. LEACH                                    6389

10:32AM   1    A.   YES.

10:32AM   2    Q.   AND CAN YOU EXPLAIN WHO THESE OTHER FOLKS ARE?

10:32AM   3    A.   ALEX RABODZEY WAS ONE OF OUR BIOTECH ANALYSTS AT THAT

10:32AM   4    POINT AND HE HAD DONE SOME WORK FOR US IN THE DIAGNOSTIC SPACE

10:32AM   5    AND SO HE WAS GOING TO, HE WAS GOING TO BE PART OF THE

10:32AM   6    ANALYSIS, PART OF THE DUE DILIGENCE TEAM.

10:32AM   7         VIVEK KHANNA WAS OUR HEALTH CARE SERVICES.  HEALTH CARE IS

10:32AM   8    A BROAD TERM THAT REFERS TO BUSINESSES THAT ARE INVOLVED IN THE

10:32AM   9    DELIVERY OF HEALTH CARE, SO HOSPITALS, INSURANCE COMPANIES,

10:32AM   10   LABORATORIES, DIALYSIS COMPANIES.  SO THERE'S QUITE AN ECLECTIC

10:33AM   11   GROUP OF BUSINESSES THAT FALL UNDER THAT HEADING.

10:33AM   12        BUT HE'S BEEN COVERING THE HEALTH CARE SPACE, INCLUDING

10:33AM   13   THE REFERENCE LABORATORIES, FOR AT THAT POINT I THINK MORE THAN

10:33AM   14   25 YEARS.

10:33AM   15        AND THEN SRI BALASURYAN WAS OUR JUNIOR ANALYST WHO WORKED

10:33AM   16   WITH VIVEK.  HIS JOB WAS MORE ANALYTIC SUPPORT.  HE DID A LOT

10:33AM   17   OF THE MODELING AND WAS AVAILABLE TO HELP VIVEK, AND ACTUALLY

10:33AM   18   HE WORKED WITH ANOTHER ANALYST AS WELL.

10:33AM   19        SO THOSE WERE THE INDIVIDUALS LISTED THERE AT THE TOP OF

10:33AM   20   THIS EMAIL.

10:33AM   21   Q.   OKAY.  YOU MENTIONED MODELING.  WHAT DID YOU MEAN BY THAT?

10:33AM   22   A.   WHEN WE INVEST IN COMPANIES, WE LIKE TO UNDERSTAND

10:33AM   23   QUALITATIVELY WHAT THEY DO, WHAT IS INTERESTING ABOUT THE

10:33AM   24   BUSINESS.

10:33AM   25        BUT WE ALWAYS MAKE AN EFFORT TO TRANSLATE THAT INTO AN

GROSSMAN DIRECT BY MR. LEACH                                    6390

10:33AM    1    ACTUAL FORECAST FOR THE BUSINESS.  WE DO THAT FOR EVERYTHING --

10:33AM    2    EVERY INVESTMENT THAT WE MAKE.

10:34AM    3        SO AS ANALYST AT OUR FIRM, THERE'S A LOT OF ANALYTIC LABOR

10:34AM    4    THAT GOES INTO BUILDING THOSE MODELS, SO FOR OUR SENIOR PEOPLE

10:34AM    5    OVER THE YEARS WE'VE USED -- WE'VE HIRED JUNIOR ANALYSTS TO

10:34AM    6    HELP WITH THE MODEL BUILDING AND UPDATING MODELS EVERY TIME WE

10:34AM    7    REPORT.  SO IT'S SOMETHING NOW THAT WE'VE BEEN DOING FOR OVER A

10:34AM    8    DECADE.

10:34AM    9    Q.   BENEATH THE DEAL TEAM THAT YOU'VE LISTED HERE, THERE'S AN

10:34AM   10    OUTLINE:  TECHNOLOGY, INTELLECTUAL PROPERTY AND BARRIERS TO

10:34AM   11    ENTRY, WALGREENS'S PARTNERSHIP AND COMMERCIAL STRATEGY, AND SO

10:34AM   12    ON.

10:34AM   13        DO YOU SEE THAT?

10:34AM   14    A.   YES.

10:34AM   15    Q.   AND IS THIS AN OUTLINE OF THE QUESTIONS THAT YOU WERE

10:34AM   16    PROPOSING TO MS. HOLMES AND MR. BALWANI TO BETTER UNDERSTAND

10:34AM   17    THE THERANOS OPPORTUNITY?

10:34AM   18    A.   YES.

10:34AM   19    Q.   I'D LIKE TO BETTER LOOK AT SOME OF YOUR QUESTIONS THAT YOU

10:34AM   20    PUT TO MS. HOLMES AND MR. BALWANI.

10:34AM   21        LET'S START WITH NUMBER 1, TECHNOLOGY.

10:34AM   22        DO YOU SEE THAT ON THE SCREEN?

10:34AM   23    A.   YES.

10:34AM   24    Q.   AND THE VERY FIRST QUESTION, "HOW DOES YOUR ACCURACY AND

10:34AM   25    SPEED STACK UP AGAINST TRADITIONAL TESTS."

GROSSMAN DIRECT BY MR. LEACH                                    6391

10:35AM  1          DO YOU SEE THAT?

10:35AM  2     A.   YES.

10:35AM  3     Q.   AND WHY WERE YOU ASKING THAT?

10:35AM  4     A.   WELL, IT WAS, IT WAS A FUNDAMENTAL PART OF UNDERSTANDING

10:35AM  5     WHAT THEIR TECHNOLOGY WAS CAPABLE OF DOING, AND WHAT THEIR

10:35AM  6     COMPETITIVE ADVANTAGE -- WHAT COMPETITIVE ADVANTAGE THAT THEY

10:35AM  7     HAD AGAINST THE CONVENTIONAL LABORATORY EQUIPMENT.

10:35AM  8     Q.   AND OVER THE COURSE OF YOUR DECISION MAKING PROCESS, DID

10:35AM  9     MS. HOLMES AND MR. BALWANI MAKE STATEMENTS TO YOU RESPONSIVE TO

10:35AM 10     THIS QUESTION?

10:35AM 11     A.   YES.

10:35AM 12     Q.   AND WHAT DID THEY TELL YOU?

10:35AM 13     A.   THEY TOLD US MULTIPLE TIMES OVER --

10:35AM 14          MR. WADE:  YOUR HONOR, OBJECTION, JUST TO THE

10:35AM 15     COMPOUND QUESTION.

10:35AM 16          THE COURT:  COMPOUND QUESTION?  DO YOU WANT TO BREAK

10:35AM 17     IT --

10:35AM 18          MR. WADE:  TWO PEOPLE ARE REFERENCED IN THE QUESTION

10:35AM 19     AND THE ANSWER.

10:35AM 20          THE COURT:  OKAY.  SURE.

10:35AM 21     BY MR. LEACH:

10:35AM 22     Q.   SITTING HERE TODAY, MR. GROSSMAN, HOW MANY MEETINGS DID

10:35AM 23     YOU HAVE WITH MS. HOLMES?

10:35AM 24     A.   I BELIEVE WE HAD TWO MEETINGS WITH MS. HOLMES.

10:35AM 25     Q.   SO THE FIRST ONE IN DECEMBER OF 2013?

GROSSMAN DIRECT BY MR. LEACH                                    6392

| | | |
|---|---|---|
| 10:35AM | 1 | A.   YES. |
| 10:35AM | 2 | Q.   AND A SECOND ONE AT SOME POINT SUBSEQUENT TO PROPOSING |
| 10:36AM | 3 | THESE QUESTIONS? |
| 10:36AM | 4 | A.   YES. |
| 10:36AM | 5 | Q.   AND DID YOU ALSO HAVE ADDITIONAL -- AND WAS MR. BALWANI |
| 10:36AM | 6 | THERE FOR THE SECOND MEETING? |
| 10:36AM | 7 | A.   YES. |
| 10:36AM | 8 | Q.   WITH MS. HOLMES? |
| 10:36AM | 9 | A.   YES. |
| 10:36AM | 10 | Q.   AND DID YOU ALSO HAVE FOLLOW-UP CONVERSATIONS WITH |
| 10:36AM | 11 | MR. BALWANI? |
| 10:36AM | 12 | A.   YES. |
| 10:36AM | 13 | Q.   OKAY.  SITING HERE TODAY, ARE YOU ABLE TO DISSECT EVERY |
| 10:36AM | 14 | SINGLE CONVERSATION AS TO WHO SAID WHAT IN EACH ONE? |
| 10:36AM | 15 | A.   NO. |
| 10:36AM | 16 | Q.   DO YOU RECALL -- WHAT DO YOU RECALL MS. HOLMES TELLING YOU |
| 10:36AM | 17 | ABOUT "HOW DOES YOUR ACCURACY AND SPEED STACK UP AGAINST |
| 10:36AM | 18 | TRADITIONAL TESTS"? |
| 10:36AM | 19 | A.   I RECALL FROM OUR FIRST MEETING THAT THEY TOLD US FROM AN |
| 10:36AM | 20 | ACCURACY STANDPOINT THEIR MACHINES WERE MORE ACCURATE, HAD LESS |
| 10:36AM | 21 | VARIABILITY THAN CONVENTIONAL LAB EQUIPMENT BOTH INSIDE OF A |
| 10:36AM | 22 | LAB, TWO DIFFERENT MACHINES SIDE BY SIDE, DIFFERENT RESULTS, |
| 10:36AM | 23 | AND THEN INTRA LAB VARIABILITY, OR THE RESULTS BETWEEN |
| 10:36AM | 24 | DIFFERENT LABS USING THE SAME TYPE OF EQUIPMENT. |
| 10:37AM | 25 | AND AGAIN, THAT GOES BACK TO THE FACT THAT THEY DIDN'T |

GROSSMAN DIRECT BY MR. LEACH                                    6393

10:37AM 1    HAVE THE HUMAN INTERACTION AND EVERYTHING WAS MINIATURIZED

10:37AM 2    INSIDE OF THE SAMPLE PROCESSING UNIT.

10:37AM 3        IN TERMS OF SPEED, THEY TOLD US THAT THEY COULD HAVE

10:37AM 4    RESULTS FOR THE RETAIL SETTING WITHIN FOUR HOURS.  THEY COULD

10:37AM 5    GUARANTEE TEST RESULTS WITHIN FOUR HOURS.  THAT HAD IMPORTANT

10:37AM 6    IMPLICATIONS FOR HOW PHYSICIANS INTERACT -- AND THEY EXPLAINED

10:37AM 7    HOW THAT HAD IMPORTANT IMPLICATIONS FOR HOW PHYSICIANS INTERACT

10:37AM 8    WITH THEIR PATIENTS.

10:37AM 9        YOU COULD ACTUALLY HAVE YOUR LAB WORK DONE THE SAME DAY

10:37AM 10   YOU VISIT YOUR PHYSICIAN, WHICH WAS A PARADIGM SHIFT IN TERMS

10:37AM 11   OF PRODUCTIVITY FOR PHYSICIAN PRACTICES.

10:37AM 12       AND SO -- AND THEN WHEN THE TECHNOLOGY WAS USING THE

10:37AM 13   NUCLEIC ACID AMPLIFICATION TECHNOLOGY ON THEIR PROPRIETARY

10:37AM 14   SYSTEMS IN A HOSPITAL SETTING, THEY COULD IDENTIFY A VIRAL OR A

10:37AM 15   BACTERIAL PATHOGEN IN I BELIEVE IT WAS LESS THAN AN HOUR, AND

10:38AM 16   THAT COMPARED TO A DAY OR TWO USING CONVENTIONAL CULTURED

10:38AM 17   TECHNOLOGIES THAT WERE PROCESSES.

10:38AM 18       SO, SO, YOU KNOW, THOSE WERE STATEMENTS THAT I RECALL FROM

10:38AM 19   BOTH OF THOSE FIRST TWO MEETINGS.

10:38AM 20   Q.   THANK YOU.  THE NEXT BULLET IS, "WHAT ARE THE KEY TESTS

10:38AM 21   FROM A COMMERCIAL STANDPOINT AND HOW DOES ACCURACY AND SPEED

10:38AM 22   COMPARE SPECIFICALLY ON THOSE."

10:38AM 23       DO YOU SEE THAT QUESTION?

10:38AM 24   A.   YES.

10:38AM 25   Q.   AND WHY WERE YOU ASKING ABOUT THAT?

GROSSMAN DIRECT BY MR. LEACH                                    6394

10:38AM  1    A.   WELL, WE, WE WERE VERY FOCUSSED ON UNDERSTANDING HOW THIS

10:38AM  2    TECHNOLOGY WAS, WAS BEING USED IN THE COMMERCIAL SETTING, IN

10:38AM  3    THE RETAIL COMMERCIAL SETTING, AND SO WE WANTED TO BE VERY

10:38AM  4    CLEAR, WE WANTED TO BE CRYSTAL CLEAR ABOUT WHAT THE TECHNOLOGY

10:38AM  5    CAPABILITIES WERE AT THAT POINT IN TIME IN A REAL WORLD RETAIL

10:39AM  6    SETTING.

10:39AM  7    Q.   AND WHY WAS IT IMPORTANT FOR YOU TO KNOW AT THE TIME IN

10:39AM  8    THE REAL WORLD RETAIL SETTING?  WHY WAS THAT IMPORTANT TO YOU?

10:39AM  9    A.   BECAUSE OUR INVESTMENT WAS BASED ON -- I MEAN, I THINK AT

10:39AM  10   A -- SO, NUMBER ONE, WE, WE -- THAT WAS A CRITICAL PART OF OUR

10:39AM  11   INVESTMENT, UNDERSTANDING HOW THIS TECHNOLOGY WAS ACTUALLY

10:39AM  12   BEING USED AT THAT POINT IN TIME IN A RETAIL ENVIRONMENT AND

10:39AM  13   WHAT, IF ANY, LIMITATIONS THERE WERE.

10:39AM  14       BUT FROM A BIGGER PICTURE PERSPECTIVE, WE WANTED TO

10:39AM  15   UNDERSTAND WHETHER THERE WAS DEVELOPMENT, TECHNOLOGICAL RISKS

10:39AM  16   OR WHETHER WE WERE INVESTING IN A COMPANY THAT ALREADY PASSED

10:39AM  17   THAT REALLY PROOF OF IMPORTANT CONCEPTS, AND THE RISKS WERE

10:39AM  18   REALLY COMMERCIAL ROLLOUT AND BUSINESS STRATEGY.

10:39AM  19   Q.   AND LET ME DRAW YOUR ATTENTION TO THE FOURTH BULLET.

10:39AM  20       DO YOU SEE WHERE IT SAYS, "WHAT ARE THE LIMITATIONS TO THE

10:40AM  21   TECHNOLOGY?  WHAT TESTS ARE NOT FEASIBLE?  ARE THERE

10:40AM  22   TRADITIONAL ANALYTIC APPROACHES THAT ARE NOT WELL SUITED TO

10:40AM  23   THERANOS'S PLATFORM?"

10:40AM  24       WHY WERE YOU ASKING ABOUT THAT?

10:40AM  25   A.   WE JUST WANTED TO ASK THE SAME QUESTIONS AS MANY WAYS AS

GROSSMAN DIRECT BY MR. LEACH                                      6395

```
10:40AM   1    WE COULD SO THERE WAS NO AMBIGUITY, THERE WAS ABSOLUTELY NO,

10:40AM   2    THERE WAS NO CONFUSION ABOUT WHAT THE TECHNOLOGY WAS CAPABLE OF

10:40AM   3    DOING.

10:40AM   4         AND SO THIS IS ANOTHER WAY OF ASKING THE SAME QUESTION

10:40AM   5    AGAIN.

10:40AM   6         THE ANSWER WAS THAT THERE WERE NO LIMITATIONS.  THERE WAS

10:40AM   7    NO METHODOLOGY THAT EXISTED IN THE ANALYTIC, THERE WAS NO

10:40AM   8    ANALYTIC TECHNIQUE THAT WAS USED IN A REFERENCE LAB THAT THEY

10:40AM   9    COULD NOT AND WERE NOT DOING ON THEIR PROPRIETARY TECHNOLOGY.

10:40AM   10        AND AGAIN, THE COMMENTS, THE CONVERSATION AROUND NUCLEIC

10:40AM   11   ACID AMPLIFICATION ALSO KIND OF CAME UP AGAIN.

10:41AM   12   Q.   AND THAT'S SOMETHING THAT MS. HOLMES TOLD YOU?

10:41AM   13   A.   YES.

10:41AM   14   Q.   LET ME LOOK FURTHER DOWN, IF WE COULD, MS. HOLMES -- OR

10:41AM   15   MS. HOLLIMAN, DOWN TO NUMBER 3, WALGREENS'S RELATIONSHIP AND

10:41AM   16   COMMERCIAL STRATEGY.

10:41AM   17        DO YOU SEE THAT HEADING?

10:41AM   18   A.   YES.

10:41AM   19   Q.   AND YOUR FIRST QUESTION, "IS THE WALGREENS'S RELATIONSHIP

10:41AM   20   EXCLUSIVE?  CAN YOU SELL ANALYZERS TO PHYSICIANS?  DOES IT MAKE

10:41AM   21   ECONOMIC SENSE TO DO THIS IN THE LONG RUN?"

10:41AM   22        WHAT DID YOU MEAN BY "ANALYZERS"?

10:41AM   23   A.   WHAT I MEANT WAS THE MINILAB, THE SAMPLE PROCESSING UNIT.

10:41AM   24   Q.   AND AT ANY POINT DID YOU SEE A MINILAB OR A SAMPLE

10:41AM   25   PROCESSING UNIT?
```

GROSSMAN DIRECT BY MR. LEACH                                6396

10:41AM   1        A.   YES.

10:41AM   2        Q.   DESCRIBE IT FOR US.

10:41AM   3        A.   I SAW A FEW DIFFERENT, I SAW A FEW DIFFERENT VERSIONS.

10:41AM   4             THE VERSION THAT WAS BEING MANUFACTURED FOR THE RETAIL

10:41AM   5        SETTING WAS THE SIZE OF A PC, LIKE, FIVE YEARS AGO, A BIG PC.

10:42AM   6        THEY'RE OBVIOUSLY -- THEY KEEP GETTING SMALLER, BUT, YOU KNOW,

10:42AM   7        MAYBE, MAYBE 2 FEET TALL BY 10 INCHES WIDE, KIND OF LIKE THAT

10:42AM   8        DIMENSION.

10:42AM   9             WE SAW THEM MAKING THOSE MACHINES AT THEIR MANUFACTURING

10:42AM  10        FACILITY IN NEWARK.

10:42AM  11             WE ALSO SAW THOSE MACHINES IN THEIR CLIA LABORATORY IN

10:42AM  12        PALO ALTO.

10:42AM  13             WE ALSO SAW A DIFFERENT VERSION OF THE MINILAB IN THE

10:42AM  14        LOBBY OF THEIR CALIFORNIA AVENUE OFFICES THAT THEY TOLD US WERE

10:42AM  15        USED IN THE CLINICAL SETTING.  THEY WERE SMALLER, AND I THINK

10:42AM  16        THE POINT OF BEING SMALLER WAS TO MAKE THEM EASIER TO PUT IN

10:42AM  17        SOMEONE'S HOME.

10:42AM  18             SO WE SAW A DIFFERENT DEVICE THAT THEY TOLD US AT THE TIME

10:43AM  19        WAS WHAT THEY USED IN THE CLINICAL TRIAL BUSINESS.

10:43AM  20        Q.   AND DID MS. HOLMES HOLD OUT THIS MINILAB DEVICE THAT YOU

10:43AM  21        WERE SHOWN ON A NUMBER OF OCCASIONS AS THE DEVICE BEING USED TO

10:43AM  22        TEST PATIENT SAMPLES?

10:43AM  23        A.   YES.

10:43AM  24        Q.   AND WAS IT RELEVANT TO YOU THAT IT WAS A SMALL DEVICE THAT

10:43AM  25        THERANOS WAS MANUFACTURING?

GROSSMAN DIRECT BY MR. LEACH                                              6397

10:43AM   1    A.   YES.

10:43AM   2    Q.   WHY?

10:43AM   3    A.   IT HAD A FUNDAMENTAL, PROFOUND IMPACT ON THE ECONOMICS OF

10:43AM   4    THE LABORATORY INDUSTRY.  THIS ISSUE CAME UP IN OUR SECOND

10:43AM   5    MEETING WITH THE COMPANY.

10:43AM   6         WHEN THEY WERE DESCRIBING THE SAMPLE PROCESSING UNIT, THEY

10:43AM   7    WERE EMPHATIC WITH US THAT THIS WAS NOT ANOTHER POINT OF CARE

10:43AM   8    TESTING TECHNOLOGY.  THIS WAS THE ENTIRE LABORATORY SHRUNK DOWN

10:43AM   9    INTO A BOX.

10:43AM  10         THE IMPLICATION OF THAT IS A RADICAL CHANGE IN THE COST

10:43AM  11    AND THE REAL ESTATE YOU NEED TO SUPPORT A LAB OPERATION IN A,

10:44AM  12    IN ANY GIVEN AREA.

10:44AM  13         AND THE EXAMPLE THEY USED WAS THE PHOENIX MARKET.  THEY

10:44AM  14    SAID, WE CAN -- WITH OUR MINILABS, WE CAN SUPPORT THE ENTIRE

10:44AM  15    COMMERCIAL ROLLOUT OF THE PHOENIX MARKET IN 200 SQUARE FEET,

10:44AM  16    20 FEET BY 10, BECAUSE OUR SYSTEMS ARE SO MUCH SMALLER.

10:44AM  17         AND THAT HAS PROFOUND IMPLICATIONS FOR THE COST STRUCTURE

10:44AM  18    OF THIS BUSINESS.

10:44AM  19         AND YOU THINK ABOUT WHAT THAT MEANS ON A GLOBAL BASIS AS

10:44AM  20    YOU TAKE A TECHNOLOGY LIKE THIS AND YOU APPLY IT NOT JUST TO

10:44AM  21    THE U.S., BUT TO OTHER MARKETS.  YOU COMPARE THAT TO A

10:44AM  22    CONVENTIONAL REFERENCE LABORATORY -- AND I'VE TOURED

10:44AM  23    CONVENTIONAL REFERENCE LABORATORIES.  QUEST HAS A BIG FACILITY

10:44AM  24    IN NEW JERSEY JUST ACROSS FROM THE GEORGE WASHINGTON BRIDGE.

10:44AM  25    IT'S HUNDREDS OF THOUSANDS OF SQUARE FEET.  SO THAT'S BIGGER

GROSSMAN DIRECT BY MR. LEACH                                    6398

10:44AM  1    THAN MOST REFERENCE LABORATORIES, BUT YOU NEED DRAMATICALLY

10:45AM  2    MORE SPACE BECAUSE EACH TESTING METHODOLOGY HAS BIG PIECES OF

10:45AM  3    EQUIPMENT THAT NEED LAB TECHNICIANS TO RUN THOSE, YOU NEED

10:45AM  4    CHEMICALS, REAGENTS TO RUN THOSE EXPERIMENTS.

10:45AM  5         SO IT WAS A -- IT HAD IMPORTANT, PROFOUND IMPLICATIONS FOR

10:45AM  6    THE ECONOMICS OF THE TESTING BUSINESS AND REPRESENTED TO US A

10:45AM  7    TREMENDOUS DISRUPTION TO AN INDUSTRY THAT HADN'T CHANGED IN 30,

10:45AM  8    40 YEARS.

10:45AM  9         SO, YES.

10:45AM 10    Q.   THANK YOU.  LET ME DRAW YOUR ATTENTION TO PAGE 3 OF YOUR

10:45AM 11    DUE DILIGENCE QUESTIONS.  AND THESE ARE UNDER THE HEADING

10:45AM 12    "WALGREENS RELATIONSHIP AND CUSTOMER STRATEGY."

10:45AM 13         DO YOU SEE THE QUESTIONS UP AT THE TOP, "WHAT DOES THE

10:46AM 14    WALGREENS SYSTEM COST TO PRODUCE, HOW WILL THAT CHANGE OVER

10:46AM 15    TIME, AND WHAT IS THE TRANSFER PRICING YOU HAVE AGREED TO?

10:46AM 16         "DO ANALYZERS NEED TO BE VALIDATED IN THE FIELD.  WHAT IS

10:46AM 17    THE ROLLOUT SCHEDULE FOR WALGREENS.

10:46AM 18         "WHAT IS THE CAP X FROM THE WALGREENS ROLLOUT."

10:46AM 19         WHY WERE YOU ASKING THESE TYPES OF QUESTIONS,

10:46AM 20    MR. GROSSMAN?

10:46AM 21    A.   WELL, IT WAS NOT JUST TO BETTER UNDERSTAND HOW THEY WERE

10:46AM 22    GOING TO WORK WITH WALGREENS, BUT THE STRATEGY.  YOU KNOW, DID

10:46AM 23    THEY WANT TO BE A MEDICAL DEVICE COMPANY?  DID THEY WANT TO

10:46AM 24    SELL THESE DEVICES?  THAT'S TYPICALLY WHAT COMPANIES WE SEE IN

10:46AM 25    THIS SECTOR DO.

GROSSMAN DIRECT BY MR. LEACH                                      6399

10:46AM  1        OR DID THEY WANT TO BE A VERTICALLY INTEGRATED SERVICE

10:46AM  2    PROVIDER?  DID THEY WANT TO USE THEIR OWN EQUIPMENT JUST FOR

10:46AM  3    THEMSELVES AND THEIR OWN, AND IN THEIR OWN LABORATORY.

10:46AM  4        SO WE WERE REALLY TRYING TO UNDERSTAND THE BUSINESS

10:46AM  5    STRATEGY HERE AND HOW THEY THOUGHT ABOUT THE LONG-TERM

10:46AM  6    OPPORTUNITY WITH THIS DISRUPTIVE TECHNOLOGY.

10:47AM  7    Q.   LET ME NEXT DRAW YOUR ATTENTION TO PAGE 4.  AND AT

10:47AM  8    PARAGRAPH 7, ARE THERE A NUMBER OF QUESTIONS RELATED TO

10:47AM  9    FINANCIAL MODEL/PROJECTIONS?

10:47AM  10   A.   YES.

10:47AM  11   Q.   ROUGHLY SIX BULLETS DOWN YOU WROTE, "WHAT ARE GM ON THE

10:47AM  12   ANALYZERS, THE TESTS?"

10:47AM  13       DO YOU SEE THAT?

10:47AM  14   A.   YES.

10:47AM  15   Q.   AND WHAT DOES GM STAND FOR?

10:47AM  16   A.   THAT'S A SHORTHAND FOR GROSS MARGIN.  THAT'S JUST THE

10:47AM  17   SELLING PRICE OF THE DEVICE, AND THEN YOU SUBTRACT THE COST OF

10:47AM  18   MANUFACTURING THE DEVICE, AND THAT'S YOUR GROSS PROFIT.

10:47AM  19       THAT DOESN'T INCLUDE SALES, MARKETING, ADMINISTRATIVE,

10:47AM  20   OTHER EXPENSES.

10:47AM  21   Q.   WHY DID YOU WANT TO UNDERSTAND WHAT THE COST OF

10:47AM  22   MANUFACTURING THE DEVICE WAS?

10:48AM  23   A.   WELL, WE WANTED TO UNDERSTAND WHETHER THIS WAS A

10:48AM  24   SCALEABLE, VIABLE BUSINESS.

10:48AM  25       AND THE POINT THERE IS THAT THE TECHNOLOGY COULD BE

GROSSMAN DIRECT BY MR. LEACH                                    6400

10:48AM   1    INCREDIBLE, BUT IF YOU CAN'T MANUFACTURE IT AT A COST THAT IS

10:48AM   2    AFFORDABLE, THAT IS SIMILAR TO OTHER EQUIPMENT, THEN THEY WERE

10:48AM   3    GOING TO NEED DRAMATICALLY MORE CAPITAL TO COMMERCIALIZE THE

10:48AM   4    TECHNOLOGY OR THEY MAY NEVER BE PROFITABLE, IN WHICH CASE THIS

10:48AM   5    WOULDN'T HAVE BEEN A VERY -- THAT WOULD HAVE HAD AN IMPACT

10:48AM   6    ON -- THAT WOULD HAVE IMPACTED OUR INVESTMENT DECISION.

10:48AM   7         SO, YOU KNOW, IN THIS CASE THEY WERE -- THE GOOD NEWS WAS

10:48AM   8    THAT CONVENTIONAL EQUIPMENT FROM COMPANIES LIKE CEPHEID WAS

10:48AM   9    ALREADY KIND OF -- THEY REPRESENTED TO US THAT THE COST OF

10:48AM   10   MAKING THE MINILAB WAS ALREADY ABOUT 20 PERCENT BELOW WHAT

10:48AM   11   EQUIVALENT EQUIPMENT COSTS, AND THAT THEY HAD A PLAN TO, OVER

10:49AM   12   TIME, AS THEY MADE MORE OF THE MINILABS, THEY THOUGHT THEY

10:49AM   13   COULD GET THAT COST DOWN TO 20 PERCENT.

10:49AM   14        SO AN 80 PERCENT DECLINE VERSUS WHAT EXISTING EQUIPMENT

10:49AM   15   MOLECULAR DIAGNOSTIC EQUIPMENT COSTS.

10:49AM   16        IN ADDITION TO THAT, WE WANTED TO MAKE SURE THAT THE

10:49AM   17   CAPITAL THAT THEY RAISED WOULD -- THEY WOULD HAVE ENOUGH CASH

10:49AM   18   TO BUILD AND MANUFACTURE THESE DEVICES.

10:49AM   19        AND SO, YOU KNOW, UNDERSTANDING WHAT THEY COST WAS

10:49AM   20   FUNDAMENTAL TO UNDERSTANDING WHETHER THE SALES PROJECTIONS FOR

10:49AM   21   2014 AND '15 WERE REALISTIC BASED ON THEIR ABILITY TO

10:49AM   22   MANUFACTURE MINILABS.

10:49AM   23   Q.   AND IN YOUR MEETING WITH MS. HOLMES IN DECEMBER OF 2013

10:50AM   24   AND THE MEETING WITH MS. HOLMES THAT YOU LATER HAD WITH HER

10:50AM   25   AFTER SENDING THESE QUESTIONS, DID YOU HAVE DISCUSSIONS WITH

GROSSMAN DIRECT BY MR. LEACH                                    6401

10:50AM  1    HER AROUND THE COSTS OF THE ANALYZER?

10:50AM  2    A.   WE, WE -- THESE QUESTIONS WERE ADDRESSED OVER THE COURSE

10:50AM  3    OF OUR DUE DILIGENCE MEETINGS, YES.

10:50AM  4    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT

10:50AM  5    THE THERANOS ANALYZER WAS CURRENTLY BEING USED FOR ONLY A

10:50AM  6    HANDFUL OF TESTS IN THE CLIA LAB?

10:50AM  7          MR. WADE:  OBJECT TO THE FORM OF THE QUESTION.

10:50AM  8          THE COURT:  CAN YOU JUST PARSE THAT OUT AS TO WHICH

10:50AM  9    INDIVIDUAL?

10:50AM 10          MR. LEACH:  YES.

10:50AM 11    Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS ANALYZER

10:50AM 12    WAS CURRENTLY BEING USED FOR ONLY A HANDFUL OF TESTS IN THE

10:50AM 13    CLIA LAB?

10:50AM 14    A.   NO.

10:50AM 15    Q.   DID MR. BALWANI EVER TELL YOU THAT?

10:50AM 16    A.   NO.

10:50AM 17    Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS WAS USING

10:50AM 18    MODIFIED COMMERCIALLY AVAILABLE MACHINES TO PERFORM SOME OF ITS

10:50AM 19    TESTING IN THE CLIA LAB?

10:50AM 20    A.   NO.

10:50AM 21    Q.   DID MR. BALWANI EVER TELL THAT TO YOU?

10:50AM 22    A.   NO.

10:50AM 23    Q.   DID THEY EVER -- IN THE DISCUSSIONS THAT YOU HAD WITH

10:50AM 24    MS. HOLMES, DID SHE EVER DESCRIBE FOR YOU THE COSTS OF

10:51AM 25    ACQUIRING SIEMENS MACHINES TO DO TESTING?

GROSSMAN DIRECT BY MR. LEACH                                            6402

10:51AM  1      A.   ABSOLUTELY NOT.

10:51AM  2      Q.   WOULD THAT HAVE BEEN RESPONSIVE TO QUESTIONS THAT YOU PUT

10:51AM  3      TO MS. HOLMES?

10:51AM  4      A.   YES.

10:51AM  5      Q.   AND WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM  6      A.   YES.

10:51AM  7      Q.   OKAY.  DID MR. BALWANI EVER TALK TO YOU ABOUT THE COST OF

10:51AM  8      ACQUIRING SIEMENS MACHINES AND HOW THAT MIGHT AFFECT GROSS

10:51AM  9      MARGIN?

10:51AM  10     A.   NO.

10:51AM  11     Q.   AND WOULD THAT HAVE BEEN RELEVANT AS YOU'RE ASSESSING THE

10:51AM  12     POTENTIAL COSTS AND PROFITABILITY OF THIS OPERATION?

10:51AM  13     A.   YES.

10:51AM  14     Q.   DID MS. HOLMES EVER TELL YOU THAT THE GM ON ANALYZERS

10:51AM  15     INCLUDED THE COST OF THIRD PARTY MACHINES?

10:51AM  16     A.   NO.

10:51AM  17     Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:51AM  18     A.   YES.

10:51AM  19     Q.   AND DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGINS

10:51AM  20     ON ANALYZERS INCLUDED THE COSTS OF THIRD PARTY MACHINES?

10:52AM  21     A.   DID HE EVER TELL ME THAT?

10:52AM  22     Q.   YES.

10:52AM  23     A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:52AM  24     Q.   DID MR. BALWANI EVER TELL YOU THAT THE GROSS MARGIN ON THE

10:52AM  25     ANALYZERS INCLUDED COSTS OF THIRD PARTY MACHINES?

GROSSMAN DIRECT BY MR. LEACH                                    6403

10:52AM   1    A.   NO.

10:52AM   2    Q.   LET'S GO BACK TO PAGE 1 OF EXHIBIT 1404.

10:52AM   3         AND IF WE CAN ZOOM IN ON THE TOP, MS. HOLLIMAN.

10:52AM   4         IN THE TOP EMAIL MR. BALWANI IS WRITING TO YOU,

10:52AM   5    MR. GROSSMAN, "WE ARE CONFIRMED FOR FRIDAY AT 9:00 A.M.  SEE

10:52AM   6    YOU THEN."

10:52AM   7         DO YOU SEE THAT LANGUAGE?

10:52AM   8    A.   YES.

10:52AM   9    Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO A MEETING

10:52AM  10    THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI LATER THAT WEEK IN

10:52AM  11    JANUARY OF 2014?

10:52AM  12    A.   YES.

10:52AM  13    Q.   WHERE WAS THAT MEETING HELD?

10:53AM  14    A.   THAT MEETING WAS ALSO HELD AT THEIR CORPORATE HEADQUARTERS

10:53AM  15    ON CALIFORNIA AVENUE IN PALO ALTO.

10:53AM  16    Q.   AND DID YOU GO THROUGH THE SAME LEVEL OF SECURITY FOR THAT

10:53AM  17    MEETING?

10:53AM  18    A.   YES, WE HAD, WE HAD -- WE BROUGHT OUR FULL INVESTMENT TEAM

10:53AM  19    WITH US, AND SO THE NEW MEMBERS WHO HAD NOT BEEN AT THE FIRST

10:53AM  20    MEETING WERE REQUIRED TO SIGN SIMILAR DOCUMENTATION BEFORE WE

10:53AM  21    WERE ADMITTED TO THE LOBBY OF THE BUILDING.

10:53AM  22    Q.   OKAY.  WHO WAS THERE FROM THE THERANOS SIDE?

10:53AM  23    A.   IT WAS -- FROM THE THERANOS SIDE IT WAS MS. HOLMES AND

10:53AM  24    MR. BALWANI.

10:53AM  25    Q.   AND WHO WAS THERE FROM THE PFM SIDE?

GROSSMAN DIRECT BY MR. LEACH                                    6404

10:53AM   1    A.    THE PFM SIDE HAD MYSELF, BRIAN GROSSMAN; VIVEK KHANNA;

10:53AM   2    ALEX RABODZEY; SRI BALASURYAN; AND I BELIEVE MY PARTNER,

10:54AM   3    CHRIS JAMES.

10:54AM   4    Q.    AND WERE YOU SHOWN ANY DOCUMENTS IN THIS MEETING?

10:54AM   5    A.    YES.

10:54AM   6    Q.    WHAT WERE YOU SHOWN?

10:54AM   7    A.    THE COMPANY HAD A PRESENTATION ON A LAPTOP.  THEY ALSO HAD

10:54AM   8    A FINANCIAL MODEL WHICH WAS ALSO ON A LAPTOP.

10:54AM   9    Q.    WAS MS. HOLMES THERE FOR THE ENTIRETY OF THE MEETING?

10:54AM  10    A.    I DO NOT -- I DON'T BELIEVE SHE WAS.

10:54AM  11    Q.    OKAY.  TELL US WHAT HAPPENED.

10:54AM  12    A.    THE MEETING -- COULD YOU BE A LITTLE MORE SPECIFIC?

10:54AM  13    Q.    WHY DO YOU SAY SHE WASN'T THERE FOR THE WHOLE MEETING?

10:54AM  14    A.    I REMEMBER AT SOME POINT IN THE MEETING SHE STEPPED OUT OF

10:54AM  15    THAT, OF THAT MEETING.

10:54AM  16    Q.    OKAY.  AND SITTING HERE TODAY, ARE YOU ABLE TO TELL US

10:54AM  17    WHICH PARTS SHE WAS THERE FOR OR NOT THERE FOR?

10:54AM  18    A.    I BELIEVE IT WAS ROUGHLY HALFWAY THROUGH.

10:54AM  19    Q.    OKAY.  DESCRIBE -- DID MS. HOLMES TALK TO YOU IN THIS

10:55AM  20    MEETING ABOUT THE IDEA OF MINIATURIZING THE LAB?

10:55AM  21    A.    YES.

10:55AM  22    Q.    AND WHAT DID SHE SAY ON THAT POINT?

10:55AM  23    A.    THAT, THAT THIS WAS -- WE DISCUSSED THE DIFFERENCE BETWEEN

10:55AM  24    A POINT OF CARE TESTING TECHNOLOGY, LIKE A HOME PREGNANCY TEST

10:55AM  25    OR A HOME COVID TEST, AND THE MINIATURIZATION OF THE ENTIRE

GROSSMAN DIRECT BY MR. LEACH                                    6405

10:55AM    1    REFERENCE LAB INTO ONE SMALL DEVICE, AND THEY WERE VERY CLEAR

10:55AM    2    THAT THIS TECHNOLOGY WAS NOT A POINT OF CARE TEST, WAS NOT A

10:55AM    3    POINT OF CARE TESTING PLATFORM.  IT WAS A MINIATURIZED LAB.

10:55AM    4        AGAIN, THAT LED TO THE IMPLICATION ON THE COST OF

10:55AM    5    PROVIDING LABORATORY SERVICES IN A RETAIL OR IN A HOSPITAL

10:55AM    6    SETTING.

10:56AM    7    Q.    DID MS. HOLMES TALK TO YOU ABOUT WHY THEY WERE LAUNCHING

10:56AM    8    NOW AS OPPOSED TO EARLIER?

10:56AM    9    A.    YES.

10:56AM   10    Q.    WHAT DID SHE SAY?

10:56AM   11    A.    THAT WAS AT THE BEGINNING OF THIS MEETING, AND THEY TOLD

10:56AM   12    US THAT THE REASON THAT THEY HAD WAITED THIS LONG TO LAUNCH A

10:56AM   13    RETAIL PRODUCT WAS THAT THEY WANTED TO MAKE SURE THAT THEY HAD

10:56AM   14    COMPLETE COVERAGE, 100 PERCENT COVERAGE OF WHAT QUEST AND

10:56AM   15    LABCORP COULD OFFER.

10:56AM   16    Q.    AND DID SHE SAY THAT THEY HAD ACCOMPLISHED THAT AT THIS

10:56AM   17    POINT?

10:56AM   18    A.    YES.

10:56AM   19    Q.    AND DID MS. HOLMES TALK ABOUT THE VARIANCE BETWEEN

10:56AM   20    TRADITIONAL ANALYZERS?

10:56AM   21    A.    IN THIS MEETING WE ALSO DISCUSSED, AS WE DID IN THE FIRST

10:56AM   22    MEETING, THE ADVANTAGES OF THE MINILAB AND THEIR PROPRIETARY

10:56AM   23    TECHNOLOGY, THE FACT THAT BY ELIMINATING HUMAN ELEMENTS OF A

10:56AM   24    REFERENCE LABORATORY OPERATING ENVIRONMENT YOU COULD

10:56AM   25    DRAMATICALLY REDUCE THE VARIABILITY SYSTEM TO SYSTEM.

GROSSMAN DIRECT BY MR. LEACH                                    6406

10:57AM   1        SO, YES, WE HIGHLIGHTED THAT AND WE DISCUSSED SOME OF THE

10:57AM   2    TESTS THAT WERE KNOWN TO BE PROBLEMATIC IN THE REFERENCE

10:57AM   3    LABORATORY ENVIRONMENT, AND I BELIEVE THAT THEY, THEY -- WE

10:57AM   4    DISCUSSED HOW THEIR PROPRIETARY TECHNOLOGY HAD A VARIANCE OF

10:57AM   5    LESS THAN 3 PERCENT.

10:57AM   6    Q.   DID MS. HOLMES MAKE STATEMENTS ABOUT THE COST OF THE

10:57AM   7    DEVICE?

10:57AM   8    A.   I BELIEVE IN THIS MEETING WE ALSO DISCUSSED THE COST OF

10:57AM   9    THE DEVICE SAMPLE PROCESSING UNIT BEING ALREADY LESS THAN WHAT

10:57AM   10   A SYSTEM FROM CEPHEID OR ILLUMINA, WHICH WERE TWO OTHER

10:57AM   11   COMPANIES THAT MAKE DIAGNOSTIC EQUIPMENT, WHAT THOSE SYSTEMS

10:57AM   12   COST, AND I BELIEVE THEY SAID THEY ALREADY WERE 15 OR

10:57AM   13   20 PERCENT LESS THAN -- THE COST WAS ALREADY 15 OR 20 PERCENT

10:57AM   14   LESS THAN WHAT THOSE SYSTEMS WERE SELLING FOR.

10:58AM   15        MR. WADE:  YOUR HONOR, MOVE TO STRIKE THE ANSWER AS

10:58AM   16   NONRESPONSIVE TO THE QUESTION.

10:58AM   17        THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

10:58AM   18   BY MR. LEACH:

10:58AM   19   Q.   DID MS. HOLMES ALSO MAKE STATEMENTS ABOUT THE SPEED WITH

10:58AM   20   WHICH THERANOS COULD TEST BLOOD?

10:58AM   21   A.   YES.  THAT THIS IS -- THEY DESCRIBED HOW IN THE RETAIL

10:58AM   22   SETTING THEY COULD GUARANTEE A TEST RESULT WITHIN FOUR HOURS,

10:58AM   23   AND IN THE HOSPITAL SETTING HOW THEY COULD GET AN ANSWER IN

10:58AM   24   LESS THAN AN HOUR.

10:58AM   25        MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO

GROSSMAN DIRECT BY MR. LEACH                                         6407

```
10:58AM   1    ANOTHER DOCUMENT.  I'M NOT SURE WHAT TIME WE HAD PLANNED ON OUR
10:58AM   2    BREAK, BUT WE'RE GETTING CLOSE TO 11:00.
10:58AM   3             THE COURT:  WE WERE PLANNING ON 11:00 O'CLOCK.
10:58AM   4    SHOULD WE DO THAT NOW?
10:59AM   5         LET'S TAKE OUR MORNING BREAK.  30 MINUTES, LADIES AND
10:59AM   6    GENTLEMEN.
10:59AM   7         THIRTY MINUTES, SIR, AND THEN YOU'LL RETURN TO THE STAND.
10:59AM   8             THE WITNESS:  OKAY.
10:59AM   9             THE COURT:  AND WE'LL HAVE OUR BREAK.
10:59AM  10             MR. LEACH:  THANK YOU.
10:59AM  11         (JURY OUT AT 10:59 A.M.)
11:35AM  12         (RECESS FROM 10:59 A.M. UNTIL 11:35 A.M.)
11:35AM  13             THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE
11:35AM  14    RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.
11:35AM  15         MR. LEACH, DO YOU WANT TO CONTINUE WITH YOUR EXAMINATION?
11:36AM  16             MR. LEACH:  YES, YOUR HONOR.  THANK YOU.
11:36AM  17    Q.  MR. GROSSMAN, WHEN WE BROKE WE WERE TALKING ABOUT A
11:36AM  18    MEETING THAT YOU HAD WITH MS. HOLMES AND MR. BALWANI IN EARLY
11:36AM  19    JANUARY 2014.
11:36AM  20         DO YOU RECALL THAT TOPIC?
11:36AM  21    A.  YES.
11:36AM  22    Q.  IN YOUR MEETING WITH MS. HOLMES AND MR. BALWANI, DID
11:36AM  23    MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE SIZE OF THE
11:36AM  24    THERANOS EQUIPMENT COMPARED TO OTHER LABORATORIES?
11:36AM  25    A.  YES.
```

GROSSMAN DIRECT BY MR. LEACH                                    6408

11:36AM  1      Q.   WHAT DID SHE TELL YOU?

11:36AM  2      A.   I'M SORRY, CAN YOU RESTATE THE QUESTION AGAIN.

11:36AM  3      Q.   DID MS. HOLMES MAKE STATEMENTS TO YOU ABOUT THE

11:36AM  4      COMPARATIVE SIZE OF THE THERANOS LAB OR ANALYZER COMPARED TO

11:36AM  5      TRADITIONAL LABORATORY EQUIPMENT?

11:36AM  6      A.   YES.

11:36AM  7      Q.   WHAT DID SHE SAY TO YOU ABOUT THAT?

11:36AM  8      A.   THEY WERE -- THEIR PROPRIETARY EQUIPMENT WAS MUCH SMALLER

11:36AM  9      THAN CONVENTIONAL LABORATORY ANALYTIC INSTRUMENTS.

11:37AM  10     Q.   AND WAS THAT ATTRACTIVE TO YOU?

11:37AM  11     A.   YES.

11:37AM  12     Q.   HOW SO?

11:37AM  13     A.   IT, ON ONE LEVEL, SPOKE TO THE TECHNOLOGICAL

11:37AM  14     ACCOMPLISHMENTS THE COMPANY HAD ACHIEVED AT THAT POINT.

11:37AM  15          BUT FROM A BUSINESS PERSPECTIVE, IT HAD PROFOUND

11:37AM  16     IMPLICATIONS FOR THE COSTS, THE PRODUCTIVITY, THE ECONOMICS OF

11:37AM  17     PROVIDING LABORATORY SERVICES, WHETHER IT WAS A RETAIL LAB

11:37AM  18     SETTING OR A HOSPITAL LABORATORY SETTING.

11:37AM  19     Q.   LET ME MOVE FORWARD IN TIME, PLEASE, AND DRAW YOUR

11:37AM  20     ATTENTION TO WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 4077.

11:37AM  21          IT SHOULD BE IN YOUR BINDER.

11:38AM  22          LET ME DRAW YOUR ATTENTION TO THE FIRST TWO PAGES OF

11:38AM  23     EXHIBIT 4077.

11:38AM  24          DO YOU RECOGNIZE THIS?

11:38AM  25     A.   I'M JUST REVIEWING THIS.

GROSSMAN DIRECT BY MR. LEACH                                    6409

11:38AM   1              (PAUSE IN PROCEEDINGS.)

11:38AM   2                  THE WITNESS:  YEAH.  YES.

11:38AM   3       BY MR. LEACH:

11:38AM   4       Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND SUNNY BALWANI

11:38AM   5       FOLLOWING THE EARLY JANUARY 2014 MEETING WITH MS. HOLMES AND

11:38AM   6       MR. BALWANI AT THERANOS?

11:38AM   7       A.   I BELIEVE IT IS.

11:38AM   8       Q.   OKAY.

11:38AM   9       A.   YES.

11:38AM  10       Q.   AND THERE'S ATTACHMENTS TO THIS EMAIL.  ARE YOU FAMILIAR

11:38AM  11       WITH THE -- AND IT'S QUITE LENGTHY, BUT IF YOU COULD JUST

11:39AM  12       PERUSE IT AND LET ME KNOW IF YOU'RE GENERALLY FAMILIAR WITH IT.

11:39AM  13       A.   YES.

11:39AM  14       Q.   WHAT IS THE ATTACHMENT?

11:39AM  15       A.   THIS WAS THE PRESENTATION, CORPORATE PRESENTATION THAT

11:39AM  16       THEY SENT US.

11:39AM  17            IT ALSO INCLUDED ANALYTIC MEASUREMENT, DATA TABLES FROM

11:39AM  18       DIFFERENT TESTS THAT WE HAD ASKED THEM FOR ON THEIR PROPRIETARY

11:39AM  19       TECHNOLOGY.

11:39AM  20       Q.   AND IS THIS POWERPOINT CONSISTENT WITH SLIDES THAT YOU SAW

11:39AM  21       AT THERANOS IN DECEMBER AND JANUARY?

11:39AM  22       A.   I BELIEVE IT IS, YES.

11:39AM  23       Q.   OKAY.  AND IS THIS PART OF THE INFORMATION THAT YOU RELIED

11:39AM  24       ON IN DECIDING WHETHER OR NOT TO INVEST IN THERANOS?

11:39AM  25       A.   YES.

GROSSMAN DIRECT BY MR. LEACH                                6410

11:39AM   1              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 4077 INTO

11:39AM   2     EVIDENCE.

11:39AM   3              MR. WADE:  NO OBJECTION, YOUR HONOR.

11:40AM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:40AM   5         (GOVERNMENT'S EXHIBIT 4077 WAS RECEIVED IN EVIDENCE.)

11:40AM   6              MR. LEACH:  LET ME START WITH PAGE 2, IF WE COULD,

11:40AM   7     MS. HOLLIMAN.

11:40AM   8     Q.   AND I'LL DRAW YOUR ATTENTION TO THE BOTTOM HALF,

11:40AM   9     MR. GROSSMAN.

11:40AM  10          DO YOU SEE THE DATE OF JANUARY 10TH, 2014?

11:40AM  11     A.   YES.

11:40AM  12     Q.   AND THIS IS AN EMAIL FROM YOU TO SUNNY BALWANI?

11:40AM  13     A.   YES.

11:40AM  14     Q.   YOU WROTE, "THANKS AGAIN FOR THE TIME YOU SPENT WITH OUR

11:40AM  15     TEAM WALKING US THROUGH THE THERANOS STORY."

11:40AM  16          IS THAT A REFERENCE TO YOUR SECOND MEETING AT THERANOS

11:40AM  17     WITH MEMBERS OF YOUR TEAM?

11:40AM  18     A.   YES.

11:40AM  19     Q.   OKAY.  YOU SAID, "WE WILL LIKELY NEED A FEW DAYS TO

11:40AM  20     PROCESS EVERYTHING WE LEARNED TODAY.  ONE THING THAT WOULD BE

11:40AM  21     ESPECIALLY HELPFUL TO OUR DUE DILIGENCE PROCESS IS HAVING

11:41AM  22     ACCESS TO THE FINANCIAL MODEL WE VIEWED WITH YOU TODAY."

11:41AM  23          DO YOU SEE THAT LANGUAGE?

11:41AM  24     A.   YES.

11:41AM  25     Q.   AND WHAT WERE YOU REFERRING TO?

GROSSMAN DIRECT BY MR. LEACH                                    6411

11:41AM  1     A.    IN OUR MEETING THEY SHARED A FINANCIAL FORECAST, A

11:41AM  2     FINANCIAL MODEL WITH US, A DETAILED FINANCIAL MODEL WITH US,

11:41AM  3     AND I'M ASKING FOR AN ELECTRONIC COPY OF THE MODEL THAT THEY

11:41AM  4     REVIEWED AT THAT MEETING ON JANUARY 10TH.

11:41AM  5     Q.    OKAY.  AT SOME POINT DID YOU GET A COPY OF THAT FINANCIAL

11:41AM  6     MODEL?

11:41AM  7     A.    YES.

11:41AM  8     Q.    AND DID YOU USE THAT AS PART OF THE BASIS TO PREPARE YOUR

11:41AM  9     OWN FINANCIAL MODEL WITH PROJECTIONS ABOUT WHAT THERANOS WOULD

11:41AM  10    ACHIEVE IN THE YEARS TO COME?

11:41AM  11    A.    YES.

11:41AM  12    Q.    WAS THAT AN IMPORTANT BUILDING BLOCK FOR YOUR MODEL?

11:41AM  13    A.    YES.

11:41AM  14    Q.    OKAY.  LET'S GO TO PAGE 1, PLEASE.

11:41AM  15          AND I DRAW YOUR ATTENTION TO THE TOP PORTION OF THE EMAIL

11:41AM  16    ALL OF THE WAY DOWN TO P.S.

11:42AM  17          DO YOU SEE MR. BALWANI'S NAME AT THE TOP, MR. GROSSMAN, IN

11:42AM  18    THE FROM LINE?

11:42AM  19    A.    YES.

11:42AM  20    Q.    AND DO YOU SEE WHERE HE WROTE, "BRIAN.

11:42AM  21          "ATTACHED PLEASE FIND A PDF WHICH IS A VERY CONFIDENTIAL

11:42AM  22    SLIDE DECK OF DISCUSSIONS WE HAD.  IT ALSO INCLUDES A VERY

11:42AM  23    DETAILED SECTION ON DATA WHICH ALEX HAD REQUESTED, INCLUDING

11:42AM  24    THE NUCLEIC ACID APPLICATION ASSAYS.  THIS SLIDE DECK DOES NOT

11:42AM  25    INCLUDE ANY REFERENCE TO SAFEWAY."

GROSSMAN DIRECT BY MR. LEACH                                      6412

11:42AM   1        DO YOU SEE THAT?

11:42AM   2    A.   YES.

11:42AM   3    Q.   AND ALEX, HE WAS A MEMBER OF YOUR TEAM?

11:42AM   4    A.   YES.   THAT'S ALEX RABODZEY.

11:42AM   5    Q.   OKAY.   AND HAD YOU REQUESTED THAT MR. BALWANI PROVIDE IN

11:42AM   6    WRITTEN FORMAT SOME OF THE INFORMATION THAT YOU HAD GONE OVER

11:42AM   7    WITH HE AND MS. HOLMES IN THE PRIOR MEETINGS?

11:42AM   8    A.   YES.

11:42AM   9    Q.   LET'S LOOK AT THE SLIDE DECK, PLEASE.

11:42AM  10        JUST TO ORIENT US, PLEASE GO TO PAGE 3, PLEASE,

11:43AM  11    MS. HOLLIMAN.

11:43AM  12        IS THIS THE COVER PAGE OF THE SLIDE DECK THAT YOU

11:43AM  13    RECEIVED, MR. GROSSMAN?

11:43AM  14    A.   YES.

11:43AM  15    Q.   LET'S NOW GO TO PAGE 67 IF WE COULD.

11:43AM  16        DO YOU SEE THE SLIDE ENTITLED "OVERVIEW:   THERANOS

11:43AM  17    SYSTEMS," MR. GROSSMAN?

11:43AM  18    A.   YES.

11:43AM  19    Q.   AND IS THIS A FAIR DEPICTION OF WHAT YOU UNDERSTOOD THE

11:43AM  20    THERANOS SYSTEMS TO BE?

11:43AM  21    A.   YES.

11:43AM  22    Q.   TO THE LEFT SIDE OF THE SCREEN THERE'S THE WORDS "THERANOS

11:43AM  23    ANALYZERS," AND THERE ARE IMAGES OF TWO DEVICES.

11:43AM  24        DO YOU SEE THOSE?

11:43AM  25    A.   YES.

GROSSMAN DIRECT BY MR. LEACH                                          6413

11:43AM  1    Q.   HOW DO THOSE COMPARE TO THE DEVICES YOU SAW IN YOUR TRIPS

11:43AM  2    TO THERANOS?

11:44AM  3    A.   THEY LOOK -- THOSE DEVICES LOOK VERY SIMILAR TO THE

11:44AM  4    DEVICES WE SAW WHEN WE VISITED THEIR CORPORATE HEADQUARTERS.

11:44AM  5    Q.   OKAY.  AT ANY POINT IN TIME DID MS. HOLMES TELL YOU THAT

11:44AM  6    THEY WERE USING THIRD PARTY MACHINES TO DO ITS TESTING?

11:44AM  7    A.   NO.

11:44AM  8    Q.   DID THEY EVER SHOW YOU AN IMAGE OF A SIEMENS DEVICE?

11:44AM  9    A.   NO.

11:44AM  10   Q.   TO THE RIGHT THERE'S THE WORDS "CARTRIDGES."

11:44AM  11        WHAT DID YOU UNDERSTAND CARTRIDGES TO BE?

11:44AM  12   A.   CARTRIDGES WERE THE CONSUMABLE, WERE THE ACTUAL TESTS.

11:44AM  13   THEY COULD PUT, I BELIEVE, UP TO 70 TESTS ON ONE CARTRIDGE, AND

11:44AM  14   THOSE CARTRIDGES WERE THEN LOADED INTO THE ANALYZER, THE SAMPLE

11:44AM  15   PROCESSING UNIT, AND THE SAMPLE PROCESSING UNIT WOULD THEN RUN

11:44AM  16   THE EXPERIMENTS ON THOSE SAMPLES.

11:44AM  17   Q.   WHERE DID YOU GET THE INFORMATION THAT THERANOS COULD PUT

11:45AM  18   70 TESTS ON A CARTRIDGE?

11:45AM  19   A.   THAT WAS PART OF OUR DUE DILIGENCE PROCESS.  I BELIEVE THE

11:45AM  20   SECOND MEETING WITH THE COMPANY, WE DISCUSSED THAT TOWARDS THE

11:45AM  21   BEGINNING OF THE MEETING.

11:45AM  22        AND THEN THAT ISSUE OF WHAT WE REFER TO AS MULTIPLEXING,

11:45AM  23   THE ABILITY TO TEST FOR MULTIPLE THINGS AT THE SAME TIME CAME

11:45AM  24   UP OVER THE COURSE OF OUR DUE DILIGENCE AS IT WAS A DRAMATIC

11:45AM  25   IMPROVEMENT ON WHAT COMPANIES THAT WERE OFFERING EQUIPMENT IN

GROSSMAN DIRECT BY MR. LEACH                                        6414

11:45AM   1      THIS SPACE WERE CAPABLE OF DOING.

11:45AM   2      Q.   AND THE 70 TESTS ON ONE CARTRIDGE, YOU BELIEVED THAT WAS

11:45AM   3      SOMETHING THAT THERANOS WAS CURRENTLY DOING?

11:45AM   4      A.   YES.

11:45AM   5      Q.   WITH ITS SAMPLE PROCESSING UNIT?

11:45AM   6      A.   YES.

11:45AM   7      Q.   LET'S LOOK AT PAGE 66.

11:46AM   8           DO YOU SEE THE HEADING "PRODUCTS," MR. GROSSMAN?

11:46AM   9      A.   YES.

11:46AM  10      Q.   AND DOES THIS SUMMARIZE WHAT YOU UNDERSTOOD THERANOS'S

11:46AM  11      PRODUCTS TO BE?

11:46AM  12      A.   YES.

11:46AM  13      Q.   THE FIRST LINE SAYS, "DEVICE.  MINILAB AND 4S FOR

11:46AM  14      AUTOMATED PROCESSING."

11:46AM  15           DO YOU SEE THAT?

11:46AM  16      A.   YES.

11:46AM  17      Q.   AND WHAT DID YOU UNDERSTAND THE 4S TO BE?

11:46AM  18      A.   I DON'T REMEMBER.

11:46AM  19      Q.   AND WHAT DID YOU UNDERSTAND MINILAB TO BE?

11:46AM  20      A.   MINILAB REFERRED TO THE SAMPLE PROCESSING UNIT, THE

11:46AM  21      LABORATORY DOWN INTO A SINGLE DEVICE.

11:47AM  22      Q.   IN ANY OF THE WRITTEN MATERIALS THAT YOU'VE REVIEWED, DID

11:47AM  23      YOU SEE ANYTHING SUGGESTING THE DEVICE INCLUDED THIRD PARTY

11:47AM  24      MACHINES FROM SIEMENS OR SOME OTHER MANUFACTURER?

11:47AM  25      A.   NO.

GROSSMAN DIRECT BY MR. LEACH                                    6415

11:47AM  1    Q.   WOULD THAT HAVE BEEN A RED FLAG FOR YOU?

11:47AM  2    A.   YES.

11:47AM  3    Q.   WHY IS THAT?

11:47AM  4    A.   IT WOULD HAVE RAISED A WHOLE SERIES OF QUESTIONS ABOUT

11:47AM  5    WHAT THE TECHNOLOGY WAS CAPABLE OF DOING.  IT WOULD HAVE LED TO

11:47AM  6    A SERIES OF QUESTIONS ON THE BUSINESS, HOW -- WHAT MACHINES ARE

11:47AM  7    YOU USING, WHAT SETTINGS, WHAT TYPES OF ANALYTIC EXPERIMENTS DO

11:47AM  8    YOU NEED THIRD PARTY MACHINES TO PERFORM AND WHY?

11:47AM  9         THAT WOULD HAVE LED TO A WHOLE SERIES OF QUESTIONS AROUND

11:47AM  10   THE TECHNICAL LIMITATIONS AROUND THE PLATFORM.

11:47AM  11        IT ALSO WOULD HAVE HAD IMPLICATIONS FOR THE COST STRUCTURE

11:47AM  12   OF THE BUSINESS, THE SIZE OF THE LABORATORIES THAT THEY WOULD

11:47AM  13   NEED AS THEY ROLLED THIS OUT GEOGRAPHICALLY TO DIFFERENT URBAN

11:47AM  14   AREAS.

11:47AM  15        IT WOULD HAVE IMPACTED THEIR ABILITY TO REPLACE HOSPITALS,

11:48AM  16   THE LABORATORIES WITHIN HOSPITALS, AND IT WOULD HAVE -- IT

11:48AM  17   WOULD HAVE OBVIOUSLY HAD AN IMPACT ON THE CASH BURN OF THE

11:48AM  18   BUSINESS, WHERE CASH FLOW, THE CASH THAT WAS SITTING ON THE

11:48AM  19   BALANCE SHEET WOULD GO, WHERE IT WOULD BE SPENT.

11:48AM  20        OUR, OUR UNDERSTANDING FROM THE FINANCIAL MODEL THEY SENT

11:48AM  21   US, ALL OF THE CAPITAL SPENDING WAS FOCUSSED ON MANUFACTURING

11:48AM  22   MINILABS AND MAKING ADDITIONAL INVESTMENTS IN PRODUCTION LINES

11:48AM  23   FOR EXPANDED MINILAB PRODUCTION.

11:48AM  24   Q.   BENEATH THAT FIRST LINE DEVICE IT SAYS, "CARTRIDGE.

11:48AM  25        "AUTOMATED CONSUMABLES FOR 75 PLUS ASSAYS SIMULTANEOUSLY

GROSSMAN DIRECT BY MR. LEACH                                      6416

11:48AM  1    ACROSS ALL SAMPLE TYPES (BLOOD, URINE, TISSUE, ET CETERA)."

11:49AM  2        DO YOU SEE THAT?

11:49AM  3    A.   YES.

11:49AM  4    Q.   IS THAT CONSISTENT WITH STATEMENTS MS. HOLMES MADE TO YOU

11:49AM  5    IN YOUR MEETINGS WITH HER IN DECEMBER OR JANUARY?

11:49AM  6    A.   YES.

11:49AM  7    Q.   AND BENEATH THAT IT SAYS, "BLOOD COLLECTION DEVICES.

11:49AM  8        "AUTOMATED SAMPLE COLLECTION FOR MICRO-SAMPLE VOLUMES

11:49AM  9    CUSTOMIZED FOR PEDIATRICS, PHLEBOTOMY, AND FULL RANGE OF

11:49AM  10   COLLECTION PROCEDURES."

11:49AM  11       DO YOU SEE THAT?

11:49AM  12   A.   YES.

11:49AM  13   Q.   AND ARE YOU FAMILIAR WITH THE TERM "NANOTAINER"?

11:49AM  14   A.   YES.

11:49AM  15   Q.   AND WHAT IS THE NANOTAINER?

11:49AM  16   A.   THE NANOTAINER WAS THE COLLECTION DEVICE THEY USED TO

11:49AM  17   CAPTURE DROPLETS OF BLOOD AFTER YOUR FINGER HAD BEEN PRICKED,

11:49AM  18   AND THEN THOSE NANOTAINERS COULD THEN TRANSPORT THE SAMPLE TO A

11:49AM  19   LOCATION WHERE IT COULD BE ANALYZED.

11:49AM  20   Q.   BENEATH THAT IT SAYS, "ASSAYS.

11:49AM  21       "CHEMISTRIES, 800 PLUS TEST MENU AND TPS LIBRARY."

11:50AM  22       DO YOU SEE THAT LANGUAGE?

11:50AM  23   A.   YES.

11:50AM  24   Q.   AND IS THAT CONSISTENT WITH THE STATEMENTS THAT MS. HOLMES

11:50AM  25   MADE TO YOU IN YOUR DECEMBER AND JANUARY MEETINGS?

GROSSMAN DIRECT BY MR. LEACH                                    6417

11:50AM   1    A.   YES.

11:50AM   2    Q.   LET'S GO BACK IN THIS DOCUMENT TO PAGE 8.

11:50AM   3         IF WE CAN ZOOM IN ON THE SUBSTANCE, MS. HOLLIMAN.

11:50AM   4         MR. GROSSMAN, DO YOU SEE THE HEADING "PRESS" ON THIS?

11:50AM   5    A.   YES.

11:50AM   6    Q.   AND DO YOU SEE A REFERENCE IN "THE WALL STREET JOURNAL,"

11:50AM   7    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:50AM   8    A.   YES.

11:50AM   9    Q.   IS THIS MATERIAL THAT YOU REVIEWED PRIOR TO PFM'S

11:50AM  10    INVESTMENT?

11:50AM  11    A.   YES.

11:50AM  12    Q.   AND WAS THIS RELEVANT INFORMATION TO YOUR INVESTMENT

11:50AM  13    DECISION?

11:50AM  14    A.   YES.

11:50AM  15    Q.   OKAY.  LET'S, PLEASE, LOOK AT PAGE 9, MS. HOLLIMAN.

11:51AM  16         DO YOU SEE WHAT APPEARS TO BE A PRESS RELEASE TITLED

11:51AM  17    "THERANOS SELECTS WALGREENS AS A LONG-TERM PARTNER THROUGH

11:51AM  18    WHICH TO OFFER ITS NEW CLINICAL LABORATORY SERVICE.

11:51AM  19         "WITH FIRST LOCATION LAUNCHING THIS MONTH IN

11:51AM  20    SILICON VALLEY, CONSUMERS CAN NOW COMPLETE ANY

11:51AM  21    CLINICIAN-DIRECTED LAB TEST WITH AS LITTLE AS A FEW DROPS OF

11:51AM  22    BLOOD AND RESULTS AVAILABLE IN A MATTER OF HOURS."

11:51AM  23         WITH YOU FAMILIAR WITH THIS LANGUAGE?

11:51AM  24    A.   YES.

11:51AM  25    Q.   AND WERE YOU FAMILIAR WITH THIS AT THE TIME OF PFM'S

GROSSMAN DIRECT BY MR. LEACH                                    6418

11:51AM   1      INVESTMENT?

11:51AM   2      A.   YES.

11:51AM   3      Q.   AND WAS THIS IMPORTANT INFORMATION TO YOU?

11:51AM   4      A.   YES.

11:51AM   5      Q.   AND WHY WAS THAT?

11:51AM   6      A.   THIS WAS CRITICAL.  IT REPRESENTED A TRANSITION FOR THIS

11:51AM   7      BUSINESS FROM BEING A RISKY EARLY STAGE COMPANY TO BEING A

11:52AM   8      COMMERCIAL BUSINESS, AND IT CHANGED THE NATURE OF THE

11:52AM   9      INVESTMENT AND THE RISKS OF THE INVESTMENT.

11:52AM  10           IT ALSO REPRESENTED A POWERFUL EXTERNAL VALIDATION TO THE

11:52AM  11      TECHNOLOGY, A COMPANY LIKE WALGREENS, ONE OF THE LARGEST

11:52AM  12      NATIONAL PHARMACY CHAINS, PARTNERING WITH THEM.

11:52AM  13           IT ALSO HIGHLIGHTED THAT THIS TECHNOLOGY WAS, WAS

11:52AM  14      AVAILABLE OR SOON TO BE AVAILABLE.  I DIDN'T READ THE WHOLE

11:52AM  15      ARTICLE, BUT, YOU KNOW, IT REPRESENTED, YOU KNOW, THE BEGINNING

11:52AM  16      OF THE COMMERCIAL ERA FOR THIS COMPANY.

11:52AM  17      Q.   OKAY.  YOU SAY YOU DIDN'T REVIEW THE WHOLE ARTICLE, AND I

11:52AM  18      SAW YOU LOOKING AT THE SCREEN, AND I UNDERSTAND YOU TO BE

11:52AM  19      SAYING THAT YOU DIDN'T READ THE WHOLE THING RIGHT NOW.

11:52AM  20      A.   THAT'S RIGHT.

11:53AM  21      Q.   BUT BACK AT THE TIME, YOU'RE CONFIDENT THAT YOU REVIEWED

11:53AM  22      IT IN FULL?

11:53AM  23      A.   YES.

11:53AM  24      Q.   OKAY.  LET'S GO TO PAGE 17, PLEASE.

11:53AM  25           DO YOU SEE A SLIDE TITLED, "SAME TESTS, A WHOLE NEW

GROSSMAN DIRECT BY MR. LEACH                                    6419

11:53AM  1    APPROACH"?

11:53AM  2    A.   YES.

11:53AM  3    Q.   AND DO YOU SEE AN IMAGE OF THE NANOTAINER ON KIND OF THE

11:53AM  4    RIGHT SIDE IN THE MIDDLE THERE?

11:53AM  5    A.   YES, I DO.

11:53AM  6    Q.   OKAY.  AND THIS READS, "THERANOS RUNS ANY TEST AVAILABLE

11:53AM  7    IN CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

11:53AM  8        IS THAT CONSISTENT WITH INFORMATION THAT MS. HOLMES

11:53AM  9    PROVIDED YOU IN YOUR JANUARY AND DECEMBER MEETINGS?

11:53AM  10   A.   YES.

11:53AM  11   Q.   AND WAS THAT IMPORTANT TO YOU?

11:53AM  12   A.   YES.

11:53AM  13   Q.   IN THE THIRD LINE IT SAYS, "THERANOS PROVIDES THE HIGHEST

11:53AM  14   LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

11:53AM  15   AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

11:53AM  16   ACCURACY AND PRECISION."

11:54AM  17       WAS THAT RELEVANT INFORMATION TO YOU?

11:54AM  18   A.   YES, IT WAS.

11:54AM  19   Q.   AND WAS IT CONSISTENT WITH ORAL STATEMENTS THAT MS. HOLMES

11:54AM  20   MADE TO YOU?

11:54AM  21   A.   YES, IT WAS.

11:54AM  22   Q.   LET ME DRAW YOUR ATTENTION TO PAGE 19.

11:54AM  23       DO YOU SEE THE HEADING, "FASTER RESULTS.  FASTER ANSWERS"?

11:54AM  24   A.   YES.

11:54AM  25   Q.   AND WAS THE SPEED WITH WHICH THERANOS COULD PRODUCE

GROSSMAN DIRECT BY MR. LEACH                                      6420

11:54AM  1    RESULTS IMPORTANT TO YOU?

11:54AM  2    A.   YES.

11:54AM  3    Q.   AND WHY WAS THAT?

11:54AM  4    A.   IT WAS PART OF WHY THIS COMPANY WAS CAPABLE OF

11:54AM  5    SIGNIFICANTLY IMPACTING THE LABORATORY RETAIL INDUSTRY.  THE

11:54AM  6    ABILITY TO GET YOUR TEST BACK THAT QUICKLY ON THE SAME DAY WAS

11:54AM  7    A SIGNIFICANT IMPROVEMENT FOR THE TYPICAL CONSUMER.

11:54AM  8         IT ALSO HAD IMPLICATIONS FOR HOW PHYSICIAN OFFICES WERE

11:55AM  9    ORIENTED.  THE ABILITY TO SEE THE PATIENT AND HAVE THE LAB WORK

11:55AM  10   DONE IN THE SAME DAY AVOIDED A SECOND OFFICE VISIT.

11:55AM  11        SO FOR ALL OF THOSE REASONS THIS WAS, YOU KNOW, THIS WAS

11:55AM  12   AN IMPORTANT ASPECT OF THE COMMERCIAL OFFERING.

11:55AM  13   Q.   LET'S GO FORWARD TO PAGE 21, PLEASE.

11:55AM  14        DO YOU SEE THE HEADING "A NEW STANDARD IN QUALITY.

11:55AM  15        "THE HIGHEST LEVELS OF ACCURACY"?

11:55AM  16   A.   YES.

11:55AM  17   Q.   AND DO YOU SEE IN THE MIDDLE THERE'S A LESS THAN

11:55AM  18   10 PERCENT COEFFICIENT OF VARIATION FOR VITAMIN D?

11:55AM  19   A.   YES.

11:55AM  20   Q.   AND DID YOU ASK QUESTIONS OF MS. HOLMES ABOUT THE ACCURACY

11:55AM  21   OF THERANOS'S TESTS?

11:55AM  22   A.   YES.

11:55AM  23   Q.   AND WHAT WAS THE SUBSTANCE OF WHAT SHE SAID TO YOU?

11:55AM  24   A.   IN THE FIRST MEETING WE HAD WITH THE COMPANY, THEY

11:56AM  25   DESCRIBED THAT THEIR TECHNOLOGY, BECAUSE IT DID NOT HAVE THE

GROSSMAN DIRECT BY MR. LEACH                                              6421

11:56AM  1    HUMAN ELEMENTS, THE POTENTIAL FOR HUMANS TO INTRODUCE

11:56AM  2    VARIABILITY IN ERRORS INTO THE ANALYTIC PROCESSES IN

11:56AM  3    LABORATORIES, BY LIMITING IT, IT HAD DRAMATICALLY LESS

11:56AM  4    VARIABILITY.

11:56AM  5         WE TALKED ABOUT SOME OF THE TYPICAL TESTS THAT ARE

11:56AM  6    DIFFICULT FOR TRADITIONAL LABORATORIES TO RUN.

11:56AM  7         ONE OF THEM WAS VITAMIN D.  ANOTHER ONE WE DISCUSSED WAS

11:56AM  8    HDL.

11:56AM  9         AND IN BOTH CASES I THINK WE, WE -- IN BOTH CASES THE

11:56AM  10   PERCENTAGE OF THE COEFFICIENT OF VARIATION WAS SIGNIFICANTLY

11:56AM  11   HIGHER.  I WANT TO -- I BELIEVE SOMETHING ON THE ORDER OF 25 TO

11:56AM  12   30 PERCENT, OR HIGHER, FOR THOSE TESTS USING CONVENTIONAL

11:56AM  13   EQUIPMENT.

11:56AM  14   Q.   LET'S PLEASE NOW LOOK AT PAGE 33.

11:57AM  15        DO YOU SEE THE HEADING "COMMERCIAL"?

11:57AM  16   A.   YES.

11:57AM  17   Q.   AND THERE'S A NUMBER OF KEY DEPLOYMENTS LISTED HERE.

11:57AM  18        DO YOU SEE THAT?

11:57AM  19   A.   YES.

11:57AM  20   Q.   AND THERE'S REFERENCES DOWN AT THE BOTTOM TO DOD AND

11:57AM  21   PHARMA?

11:57AM  22   A.   YES.

11:57AM  23   Q.   AND I THINK YOU TESTIFIED EARLIER MS. HOLMES MADE

11:57AM  24   REPRESENTATIONS TO YOU ABOUT THE DOD RELATIONSHIP IN THAT FIRST

11:57AM  25   MEETING IN DECEMBER OF 2013.

GROSSMAN DIRECT BY MR. LEACH                                    6422

| | | |
|---|---|---|
| 11:57AM | 1 | A.   YES. |
| 11:57AM | 2 | Q.   AND SHE ALSO MADE REPRESENTATIONS TO YOU ABOUT THE DOLLAR |
| 11:57AM | 3 | AMOUNT OF THE PHARMA BUSINESS? |
| 11:57AM | 4 | A.   YES. |
| 11:57AM | 5 | Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 51. |
| 11:58AM | 6 | DO YOU SEE THE HEADING, "NEW POSSIBILITY IS IN LAB"? |
| 11:58AM | 7 | A.   YES. |
| 11:58AM | 8 | Q.   AND TO THE LEFT THERE'S A BOX WITH THE TITLE, "ROUTINE, |
| 11:58AM | 9 | SPECIALTY, AND ESOTERIC TESTING." |
| 11:58AM | 10 | DO YOU SEE THAT? |
| 11:58AM | 11 | A.   YES. |
| 11:58AM | 12 | Q.   AND DO YOU SEE THE REFERENCE, "ALL 1,000 PLUS CURRENTLY |
| 11:58AM | 13 | RUN TESTS/CPT CODES ARE AVAILABLE THROUGH THERANOS." |
| 11:58AM | 14 | DO YOU SEE THAT? |
| 11:58AM | 15 | A.   YES, I DO. |
| 11:58AM | 16 | Q.   AND IS THAT CONSISTENT WITH INFORMATION THAT YOU RECEIVED |
| 11:58AM | 17 | FROM MS. HOLMES IN THE MEETING IN DECEMBER OF 2013? |
| 11:58AM | 18 | A.   YES. |
| 11:58AM | 19 | Q.   DOWN AT THE BOTTOM IT SAYS, "WITH CLIA CERTIFICATION, |
| 11:58AM | 20 | THERANOS IS A NATIONALLY ACCREDITED PROVIDER." |
| 11:58AM | 21 | DO YOU SEE THAT LANGUAGE? |
| 11:58AM | 22 | A.   I DO. |
| 11:58AM | 23 | Q.   OKAY.  IF YOU COULD NOW TURN TO PAGE 62 AND 63. |
| 11:58AM | 24 | MAYBE WE CAN SPLIT THE SCREEN, MS. HOLLIMAN. |
| 11:59AM | 25 | MR. GROSSMAN, ON THE -- ON PAGE 62, WHICH IS DISPLAYED ON |

GROSSMAN DIRECT BY MR. LEACH                                    6423

11:59AM  1     THE LEFT SIDE OF THE SCREEN, IT SAYS, "THERANOS'S CLIA QUALITY

11:59AM  2     STANDARDS."

11:59AM  3          DO YOU SEE THAT?

11:59AM  4     A.   I DO.

11:59AM  5     Q.   AND THERE'S A LIST OF PERSONNEL QUALIFICATIONS AND

11:59AM  6     RESPONSIBILITIES, QUALITY CONTROL, SPECIMEN INTEGRITY AND

11:59AM  7     RECORDKEEPING, PROFICIENCY TESTING, QUALITY ASSESSMENT.

11:59AM  8          DO YOU SEE THAT LANGUAGE?

11:59AM  9     A.   I DO.

11:59AM  10    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THERANOS'S

11:59AM  11    PROFICIENCY TESTING?

11:59AM  12    A.   THEY TOLD US THAT, THEY TOLD US THAT THEIR, THEIR -- THE

11:59AM  13    REGULATORY AUTHORITY, OR THE REGULATORY RULES FOR THEIR

12:00PM  14    LABORATORY FELL UNDER THE CLIA LAWS, AND UNDER CLIA THEY HAD A

12:00PM  15    PROCESS THEY HAD TO, THEY HAD TO RUN IN ORDER FOR THEIR

12:00PM  16    PROPRIETARY TECHNOLOGY TO BE COMMERCIALLY AVAILABLE.

12:00PM  17         THEY WERE SENT SAMPLES THAT THEY HAD TO MEASURE, AND THEY

12:00PM  18    HAD TO REPORT THOSE MEASUREMENTS BACK TO AN INDEPENDENT

12:00PM  19    ORGANIZATION.

12:00PM  20         AND THEY TOLD US THAT THEY HAD BEEN -- THEY TOLD US THAT

12:00PM  21    THEY COULD REPEATEDLY AND RELIABLY MEET THOSE STANDARDS FOR ALL

12:00PM  22    OF THEIR COMMERCIALLY AVAILABLE TESTS ON THEIR PROPRIETARY

12:00PM  23    TECHNOLOGY.

12:00PM  24    Q.   DID MS. HOLMES TELL YOU ANYTHING ABOUT SOMETHING CALLED

12:00PM  25    ALTERNATIVE ASSESSMENT OF PROFICIENCY?

GROSSMAN DIRECT BY MR. LEACH                                6424

12:00PM  1    A.   WE DID, I BELIEVE, DISCUSS ALTERNATIVE -- CAN YOU PLEASE

12:01PM  2    RESTATE THE QUESTION?

12:01PM  3    Q.   ALTERNATIVE ASSESSMENT OF PROFICIENCY, OR AAP?

12:01PM  4    A.   YES, I BELIEVE WE DID DISCUSS AAP AND HOW THAT APPLIED TO

12:01PM  5    PROFICIENCY TESTING.

12:01PM  6    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THAT?

12:01PM  7    A.   I DON'T HAVE -- I BELIEVE THEY, I BELIEVE THEY -- I

12:01PM  8    BELIEVE WE DISCUSSED HOW THAT WAS APPLIED AS THEY DEVELOPED NEW

12:01PM  9    ASSAYS FOR THEIR PLATFORM.

12:01PM  10        FOR EXAMPLE, A NEW FLU TEST IF THERE WAS A FLU STRAIN THAT

12:01PM  11   WAS CIRCULATING THAT WAS NEW TO THE WORLD, THEY WOULD DEVELOP

12:01PM  12   THE TEST, VALIDATE THE TEST, AND THEN BRING IT UP IN THE CLIA

12:01PM  13   LAB.

12:01PM  14        AND AS PART OF THAT DISCUSSION, I BELIEVE WE TALKED ABOUT

12:01PM  15   THOSE ALTERNATIVE PROTOCOLS.

12:01PM  16   Q.   THE DISCUSSION YOU HAD ABOUT BLINDED SAMPLES AND THERANOS

12:01PM  17   GOING THROUGH TRADITIONAL PROFICIENCY TESTING, DID YOU BELIEVE

12:02PM  18   THAT APPLIED TO THERANOS'S MINILAB?

12:02PM  19   A.   YES.

12:02PM  20   Q.   LET ME DRAW YOUR ATTENTION TO PAGE 64.

12:02PM  21        FORGIVE ME, MR. GROSSMAN.  BEFORE WE GO TO 64, I HAVE ONE

12:02PM  22   MORE QUESTION ON 63.

12:02PM  23        THERE'S A STATEMENT IN 63 THAT SAYS, "THERANOS MAINTAINS

12:02PM  24   CLIA ACCREDITATION AS A HIGH COMPLEXITY LAB AND HAS PASSED ALL

12:02PM  25   AUDITS WITHOUT A SINGLE DEFICIENCY TO MAINTAIN THIS STATUS."

GROSSMAN DIRECT BY MR. LEACH                                    6425

```
12:02PM   1              DO YOU SEE THAT LANGUAGE?

12:02PM   2      A.    YES.

12:02PM   3      Q.    AND WAS THAT IMPORTANT TO YOU?

12:02PM   4      A.    YES, VERY IMPORTANT.

12:02PM   5      Q.    AND WHY WAS THAT?

12:02PM   6      A.    IT JUST SPOKE TO THE FACT THAT THEY WERE ABLE TO MEET THIS

12:03PM   7      STANDARD OF ACCREDITATION UNDER THE CLIA LAWS FOR ALL OF THEIR

12:03PM   8      TESTS, AND IT ALSO MEANT THAT THEY WERE ABLE TO BILL MEDICARE

12:03PM   9      AND MEDICAID FOR LAB SERVICES FOR SAMPLES THAT THEY WERE

12:03PM   10     PROCESSING.

12:03PM   11     Q.    AND DID YOU BELIEVE THIS ACCREDITATION TO SPEAK TO USE OF

12:03PM   12     THE MINILAB IN THE CLIA LAB?

12:03PM   13     A.    YES.

12:03PM   14     Q.    NOW LET'S PLEASE GO TO PAGE 64.

12:03PM   15              DO YOU SEE THE HEADING "VALIDATION OF THERANOS"?

12:03PM   16     A.    YES.

12:03PM   17     Q.    AND DO YOU SEE THE FIRST LINE, "THERANOS HAS BEEN

12:03PM   18     COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

12:03PM   19     YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

12:03PM   20     WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

12:03PM   21              WAS THAT RELEVANT TO YOU?

12:03PM   22     A.    YES, IT WAS.

12:03PM   23     Q.    HOW SO?

12:04PM   24     A.    IT WAS A VALIDATION OF THE TECHNOLOGY.  THOSE

12:04PM   25     ORGANIZATIONS, MANY OF WHOM WE KNEW WELL AS INVESTORS IN THIS
```

GROSSMAN DIRECT BY MR. LEACH                                    6426

12:04PM   1    SPACE, ARE HIGHLY DEMANDING ORGANIZATIONS AND USING A

12:04PM   2    TECHNOLOGY LIKE THIS ON SOMETHING AS IMPORTANT AS A CLINICAL

12:04PM   3    TRIAL PROGRAM WOULD ONLY -- YOU COULD ONLY DO THAT IF YOU HAD

12:04PM   4    ENORMOUS CONFIDENCE IN THE ANALYTIC ACCURACY OF THE TECHNOLOGY

12:04PM   5    THAT WAS BEING USED.

12:04PM   6        FOR THOSE COMPANIES, CLINICAL TRIALS ON NEW EXPERIMENTAL

12:04PM   7    MEDICINES ARE THE LIFEBLOOD OF THOSE BUSINESSES.  WITHOUT

12:04PM   8    APPROVAL, WITHOUT SUCCESSFUL CLINICAL RESULTS, PHASE THREE

12:04PM   9    TRIAL RESULTS, THOSE ORGANIZATIONS CAN'T GROW.

12:04PM  10        SO THIS IS THE MOST IMPORTANT PART OF THEIR BUSINESS.

12:04PM  11        SO USING A TECHNOLOGY LIKE THIS IN THEIR SETTING IS A HUGE

12:04PM  12    VALIDATION ON THE CAPABILITIES AND ANALYTIC ACCURACY OF THIS

12:05PM  13    TECHNOLOGY.

12:05PM  14    Q.   DID MS. HOLMES EVER TELL YOU THAT THERANOS HAD ZERO

12:05PM  15    REVENUE FROM PHARMACEUTICAL COMPANIES IN 2013?

12:05PM  16    A.   NO.

12:05PM  17    Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

12:05PM  18    A.   YES.

12:05PM  19    Q.   WHY?

12:05PM  20    A.   IT WOULD HAVE LED TO A SERIES OF QUESTIONS AROUND WHY

12:05PM  21    THERE WAS NO REVENUE.  SO, YES, IT WOULD HAVE BEEN, IT WOULD

12:05PM  22    HAVE BEEN RELEVANT TO US.

12:05PM  23    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO PAGE 69.

12:05PM  24        DO YOU SEE THE HEADING "EXCERPTS FROM THERANOS'S TEST

12:05PM  25    MENU"?

GROSSMAN DIRECT BY MR. LEACH                                          6427

```
12:05PM    1      A.   YES.

12:05PM    2      Q.   AND THERE'S AN ASTERISK, "105 TESTS SHOWN, ANOTHER 20 PLUS

12:05PM    3      PAGES SHOW ALL AVAILABLE TESTS WITH THERANOS."

12:06PM    4           DO YOU SEE THAT LANGUAGE?

12:06PM    5      A.   YES.

12:06PM    6      Q.   AND DID YOU BELIEVE THIS TO BE A LISTING OF THE TESTS THAT

12:06PM    7      THERANOS WAS CURRENTLY ABLE TO PERFORM WITH ITS MINILAB?

12:06PM    8      A.   YES.

12:06PM    9      Q.   AND WAS THAT SIGNIFICANT TO YOU?

12:06PM   10      A.   YES, IT WAS.

12:06PM   11      Q.   LAST, LET ME DRAW YOUR ATTENTION TO PAGE 95.

12:06PM   12           DO YOU SEE THE HEADING "THERANOS:  COST SAVINGS"?

12:06PM   13      A.   YES.

12:06PM   14      Q.   AND DO YOU SEE THE FIRST BULLET, "THERANOS'S INITIAL PRICE

12:06PM   15      POINTS ARE 50 PERCENT BELOW MEDICARE REIMBURSEMENT AMOUNTS FOR

12:06PM   16      ALL CURRENTLY RUN TESTS/CPT CODES."

12:06PM   17           WAS THAT RELEVANT INFORMATION TO YOU?

12:06PM   18      A.   YES.

12:06PM   19      Q.   EXPLAIN WHY, PLEASE.

12:06PM   20      A.   IT SPOKE TO THE UNIT ECONOMICS, THE COST ADVANTAGE THAT

12:06PM   21      THEY HAD AGAINST TRADITIONAL LABORATORY EQUIPMENT AND

12:06PM   22      TRADITIONAL LABORATORY OPERATIONS, THE FACT THAT THEY COULD,

12:06PM   23      THEY COULD BILL AT 50 PERCENT OF THE MEDICARE REIMBURSEMENT AND

12:07PM   24      THEY WERE PROFITABLE DOING THAT WAS AN IMPORTANT PART, NOT THE

12:07PM   25      ONLY, BUT AN IMPORTANT PART OF THE COMPETITIVE ADVANTAGE THAT
```

GROSSMAN DIRECT BY MR. LEACH                                    6428

12:07PM   1    THIS COMPANY HAD AS A RESULT OF THEIR PROPRIETARY TECHNOLOGY.

12:07PM   2    Q.   AND IS THIS BULLET HERE CONSISTENT WITH STATEMENTS

12:07PM   3    MS. HOLMES MADE TO YOU IN THE DECEMBER 2013 AND JANUARY 2014

12:07PM   4    MEETING?

12:07PM   5    A.   YES.

12:07PM   6    Q.   OKAY.   AND AT ANY POINT IN TIME DID YOU THINK THERANOS WAS

12:07PM   7    USING LOW COST TESTS AS SOME FORM OF LOSS LEADER?

12:07PM   8    A.   I DON'T RECALL IF THEY WERE USING THIS AS A LOSS LEADER.

12:07PM   9    Q.   FURTHER DOWN THERE'S A BULLET, "THE UNPRECEDENTED LACK OF

12:07PM   10   VARIATION FROM SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA."

12:07PM   11       DO YOU SEE THAT LANGUAGE?

12:07PM   12   A.   YES.

12:07PM   13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:07PM   14   A.   THIS WAS CONSISTENT WITH THE COMMENTS THAT THEY MADE, THAT

12:08PM   15   MS. HOLMES MADE TO US IN THE FIRST MEETING ABOUT THE LACK OF

12:08PM   16   HUMAN INVOLVEMENT IN THE ANALYTIC OPERATIONS OF THE LABORATORY.

12:08PM   17       ELIMINATING THAT REDUCED MANY OF THE ERRORS THAT HAPPENED

12:08PM   18   IN TRADITIONAL LABORATORIES, AND STANDARDIZING -- AND ALLOWED

12:08PM   19   YOU TO STANDARDIZE THE ANALYTIC PROCESSES WITHIN THE MINILAB SO

12:08PM   20   THAT MUCH OF THE VARIATION THAT EXISTED IN THE TRADITIONAL

12:08PM   21   LABORATORY ENVIRONMENT WAS ELIMINATED, AND THAT'S WHY THEIR

12:08PM   22   TECHNOLOGY HAD SUCH LOW LEVELS OF VARIABILITY COMPARED TO

12:08PM   23   CONVENTIONAL EQUIPMENT.

12:08PM   24   Q.   IS THAT LACK OF VARIABILITY LOST SOMEHOW IF YOU'RE USING

12:08PM   25   CONVENTIONAL EQUIPMENT?

GROSSMAN DIRECT BY MR. LEACH                                    6429

12:08PM  1    A.    IF YOU USED CONVENTIONAL EQUIPMENT, YOU WOULD HAVE ALL OF

12:08PM  2    THE SAME ISSUES THAT TRADITIONAL THIRD PARTY REFERENCE LABS

12:09PM  3    HAVE, BIG MACHINES, LAB TECHS FOR EACH MACHINE, AND THROUGHOUT

12:09PM  4    THAT PROCESS MISTAKES AND VARIATION CAN BE CREATED AT MULTIPLE

12:09PM  5    POINTS IN TIME.

12:09PM  6    Q.    AFTER RECEIVING THIS POWERPOINT FROM MR. BALWANI AROUND

12:09PM  7    JANUARY 17TH, DID YOU CONTINUE TO HAVE EMAIL AND PHONE

12:09PM  8    CONVERSATIONS WITH MR. BALWANI ABOUT A POTENTIAL INVESTMENT?

12:09PM  9    A.    YES.

12:09PM  10   Q.    OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

12:09PM  11   AS EXHIBIT 1443.

12:09PM  12       DO YOU RECOGNIZE THIS DOCUMENT?

12:09PM  13   A.    I DON'T HAVE A DOCUMENT ON MY SCREEN.

12:09PM  14   Q.    LET'S USE THE BINDER.

12:09PM  15   A.    OKAY.

12:09PM  16   Q.    WE CAN'T DISPLAY IT UNTIL IT'S IN EVIDENCE.

12:09PM  17   A.    OH, SORRY.

12:09PM  18   Q.    SO IF WE CAN LOOK AT THE HARD COPY AT 1443.

12:10PM  19   A.    CAN YOU JUST GIVE ME A MOMENT TO REVIEW THIS?

12:10PM  20   Q.    PLEASE, TAKE YOUR TIME.

12:10PM  21       (PAUSE IN PROCEEDINGS.)

12:10PM  22          THE WITNESS:  YES, I AM FAMILIAR WITH THIS.

12:10PM  23   BY MR. LEACH:

12:10PM  24   Q.    OKAY.  AND IS THIS AN EMAIL WITH ADDITIONAL QUESTIONS AND

12:10PM  25   REQUESTS FOR INFORMATION THAT YOU SENT TO MR. BALWANI IN OR

GROSSMAN DIRECT BY MR. LEACH                                    6430

12:10PM   1    AROUND THE JANUARY 20TH, 2014 TIME PERIOD?

12:10PM   2    A.   YES.

12:10PM   3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1443 INTO

12:10PM   4    EVIDENCE.

12:10PM   5              MR. WADE:  NO OBJECTION, YOUR HONOR.

12:10PM   6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:11PM   7         (GOVERNMENT'S EXHIBIT 1443 WAS RECEIVED IN EVIDENCE.)

12:11PM   8    BY MR. LEACH:

12:11PM   9    Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO THE EMAIL ON

12:11PM  10    THE BOTTOM PART OF PAGE 1.

12:11PM  11         DO YOU SEE WHERE YOU WROTE, "HERE ARE A FEW OF THE TOPICS

12:11PM  12    FOR TOMORROW"?

12:11PM  13    A.   YES.

12:11PM  14    Q.   AND IS THAT A REFERENCE TO A PHONE CONVERSATION THAT YOU

12:11PM  15    WERE SCHEDULED TO HAVE WITH MR. BALWANI?

12:11PM  16    A.   YES, I BELIEVE IT WAS.

12:11PM  17    Q.   OKAY.  THE FIRST PARAGRAPH RELATES TO COMPETITION.

12:11PM  18         I WANT TO FOCUS ON THE SECOND PARAGRAPH WHERE YOU WROTE,

12:11PM  19    "WE WANT TO REVISIT THE FDA APPROVAL PROCESS FOR ASSAYS AND

12:11PM  20    ANALYZER."

12:11PM  21         WHAT DID YOU MEAN BY "ANALYZER"?

12:11PM  22    A.   ANALYZER WAS REFERRING TO THE MINILAB, THE SAMPLE

12:11PM  23    PROCESSING UNIT.

12:11PM  24    Q.   "MORE DETAIL ON HOW YOU INTEND TO PROCEED.  WHAT THE FDA

12:12PM  25    HAS SAID.  THE NATURE OF THE FDA COMMUNICATIONS.  WILL THE

GROSSMAN DIRECT BY MR. LEACH                              6431

12:12PM   1    ANALYZER BE AN FDA APPROVED DEVICE?"

12:12PM   2         WHY WERE YOU ASKING THAT?

12:12PM   3    A.   WE WANTED TO UNDERSTAND THEIR BUSINESS STRATEGY, WHETHER

12:12PM   4    THEY INTEND TO -- WHETHER THEY INTENDED TO SELL ANALYZERS TO

12:12PM   5    THIRD PARTIES OR WHETHER THEY WERE GOING TO USE ANALYZERS IN A

12:12PM   6    CLIA ENVIRONMENT AND OPERATE AS A LAB AND A MEDICAL DEVICE

12:12PM   7    COMPANY, SO WE REALLY WANTED TO UNDERSTAND THE BUSINESS

12:12PM   8    STRATEGY.

12:12PM   9         BUT BEYOND THAT, THEY HAD TOLD US THAT AN IMPORTANT PART

12:12PM  10    OF THEIR EXTERNAL VALIDATION WAS SEEKING FDA APPROVAL FOR ALL

12:12PM  11    OF THEIR TESTS, THE MINILAB AND THE NANOTAINERS, AND THAT WOULD

12:12PM  12    BE THE ULTIMATE PROOF TO THE MARKET, CONSUMERS, EXPERTS IN THE

12:12PM  13    LAB INDUSTRY, OTHER HEALTH CARE WORKERS THAT THIS TECHNOLOGY

12:12PM  14    WAS AS GOOD -- ACTUALLY BETTER THAN WHAT TRADITIONAL

12:13PM  15    LABORATORIES USE.

12:13PM  16         THE REASON IT WAS BETTER IS THAT TRADITIONAL LABORATORIES

12:13PM  17    DON'T OFTEN RECEIVE FDA APPROVAL FOR TESTS THAT THEY RUN.  THEY

12:13PM  18    OPERATE IN A BIT OF A GREY AREA, AND A REGULATORY GREY AREA.

12:13PM  19         BUT IN A CLIA ENVIRONMENT THEY'RE ALLOWED TO DO THAT.

12:13PM  20         SO THIS WAS -- THE COMPANY HAD EXPLAINED TO US THAT IN

12:13PM  21    ADDITION TO HAVING A HIGH PERFORMANCE, HIGHLY PERFORMING CLIA

12:13PM  22    LAB ENVIRONMENT WHERE THEY WERE RUNNING THEIR OWN PROPRIETARY

12:13PM  23    TECHNOLOGY, THEY, IN ADDITION TO THAT, WERE GOING TO SEEK FDA

12:13PM  24    APPROVAL FOR ALL OF THEIR TESTS.

12:13PM  25         SO WE WANTED TO UNDERSTAND WHERE THAT PROCESS WAS BECAUSE

GROSSMAN DIRECT BY MR. LEACH                                      6432

12:13PM   1    AS AN INVESTOR, FDA APPROVAL WOULD BE A REALLY SIGNIFICANT

12:13PM   2    VALUE DRIVER FOR THE INVESTMENT OVER TIME.

12:13PM   3    Q.   FURTHER DOWN IN THIS EMAIL YOU WROTE TO MR. BALWANI, "WE

12:14PM   4    WANT TO BETTER UNDERSTAND THE MANUFACTURING RAMP OF ANALYZERS.

12:14PM   5    CAN THEY MAKE THEM AT HIGHER VOLUME WITHOUT SACRIFICING PRODUCT

12:14PM   6    QUALITY?  WHERE DO THEY MAKE THEM?  WE'D LIKE TO SEE THAT PART

12:14PM   7    OF THE OPERATION IF POSSIBLE.  WHY DID THEY DECIDE TO MAKE THE

12:14PM   8    ANALYZERS VERSUS OUTSOURCE THEM?"

12:14PM   9        WHAT WERE YOU GETTING AT THERE?

12:14PM  10    A.   THERE WERE A FEW DIFFERENT THINGS THAT WE WERE FOCUSSED ON

12:14PM  11    HERE.

12:14PM  12        FIRST OF ALL, MOST PEOPLE IN THE MEDICAL DEVICE INDUSTRY,

12:14PM  13    CLINICAL DIAGNOSTICS INDUSTRY, THEY OUTSOURCE MANUFACTURING.

12:14PM  14    THEY'RE JUST LIKE YOUR IPHONE.  IF YOU HAVE AN APPLE IPHONE,

12:14PM  15    IT'S NOT MADE BY APPLE, IT'S MADE BY THIRD PARTIES.

12:14PM  16        THE SAME IS TRUE IN THE MEDICAL DEVICE INDUSTRY.

12:14PM  17        SO OUR FIRST MEETING WITH THE COMPANY, ELIZABETH TOLD US

12:14PM  18    THAT THEY WERE VERTICALLY INTEGRATING FROM A MANUFACTURER

12:14PM  19    STANDPOINT, MEANING THAT THEY MADE THEIR OWN ANALYZERS AS

12:14PM  20    OPPOSED TO USING THIRD PARTIES.

12:15PM  21        SO WE WANTED TO UNDERSTAND WHY THEY WERE DOING THAT AND

12:15PM  22    MAKE SURE THAT THEY WEREN'T, AS A RESULT OF NOT USING THIRD

12:15PM  23    PARTIES, THEY WOULD BE UNABLE TO MEET DEMAND FOR THEIR SERVICE

12:15PM  24    IN THE MARKETPLACE, AND NOT HAVE ENOUGH MINILABS TO PROCESS THE

12:15PM  25    TESTS.

GROSSMAN DIRECT BY MR. LEACH                                6433

12:15PM  1        SO WE WANTED TO MAKE SURE THAT, NUMBER ONE, THEY HAD THEIR

12:15PM  2   ARMS AROUND THE MANUFACTURING OF THESE DEVICES SINCE THEY WERE

12:15PM  3   DOING IT THEMSELVES, WHICH WAS UNUSUAL FOR COMPANIES IN THE

12:15PM  4   DIAGNOSTIC SPACE.

12:15PM  5        NUMBER TWO, AS PART OF OUR DUE DILIGENCE PROCESS, WE

12:15PM  6   WANTED TO SEE THE FACILITY.  WE, WE, WE -- THAT IS -- IT WAS AN

12:15PM  7   IMPORTANT -- MEETING THE DEMAND ON THE HOSPITAL SIDE, ON THE

12:15PM  8   RETAIL SIDE, WE HAD TO FEEL COMFORTABLE THAT THEY HAD THE

12:15PM  9   ABILITY TO ACTUALLY MAKE THESE DEVICES.

12:15PM  10       AND THEN OBVIOUSLY YOU CAN'T, IN THE PROCESS OF SCALING

12:15PM  11  THE MANUFACTURING PROCESS, YOU CAN'T COMPROMISE QUALITY.  SO

12:16PM  12  THE DEVICE -- THEY, THEY -- IT'S ONE THING TO MAKE A DEVICE,

12:16PM  13  YOU KNOW, 10 DEVICES, BUT CAN YOU MAKE 200 DEVICES?  AND ARE

12:16PM  14  THOSE 200 DEVICES GOING TO WORK THE WAY THAT 1 OR 2 DEVICE

12:16PM  15  PROTOTYPE WOULD HAVE PERFORMED?

12:16PM  16       SO WE REALLY WANTED TO MAKE SURE THAT THIS COMPANY COULD

12:16PM  17  ACTUALLY MAKE THESE THINGS, THESE MINILABS.

12:16PM  18       AND IT WAS ALSO PART OF THE FINANCIAL FORECAST IN THE

12:16PM  19  FINANCIAL MODEL, THE CASH THAT WAS GOING TOWARDS PRODUCING

12:16PM  20  MINILABS.  WE WANTED TO MAKE SURE THAT THEY REALLY COULD MAKE

12:16PM  21  THE REQUIRED NUMBER OF MINILABS THAT WAS IN THE FORECAST.

12:16PM  22       SO FOR ALL OF THOSE REASONS WE WANTED TO, WE REALLY WANTED

12:16PM  23  TO, WE WANTED TO CIRCLE BACK TO THIS ISSUE, AND WE DIDN'T WANT

12:16PM  24  ANY MISUNDERSTANDING OR AMBIGUITY AROUND THEIR ABILITY TO

12:16PM  25  PRODUCE THEIR OWN SAMPLE PROCESSING UNITS.

GROSSMAN DIRECT BY MR. LEACH                                6434

12:16PM  1   Q.   SO IN YOUR INITIAL MEETING IN DECEMBER, MS. HOLMES TOLD

12:17PM  2   YOU THEY WERE VERTICALLY INTEGRATED?

12:17PM  3   A.   YES.

12:17PM  4   Q.   MEANING WE MAKE ALL OF OUR DEVICES?

12:17PM  5   A.   YES.

12:17PM  6   Q.   AND THIS IS YOU FOLLOWING UP ON STATEMENTS LIKE THAT AND

12:17PM  7   OTHER STATEMENTS THAT YOU HAD RECEIVED?

12:17PM  8   A.   YES.

12:17PM  9   Q.   OKAY.  AFTER THIS EMAIL TO MR. BALWANI, DID HE DESCRIBE

12:17PM  10  FOR YOU ANYTHING ABOUT THE MANUFACTURING RAMP UP OR ANALYZERS

12:17PM  11  VERSUS OUTSOURCING THEM?  DID HE RESPOND TO THESE QUESTIONS

12:17PM  12  HERE?

12:17PM  13  A.   YES, HE DID.

12:17PM  14  Q.   WHAT DID HE TELL YOU?

12:17PM  15  A.   HE WAS, HE WAS VERY CONFIDENT THAT THEY WOULD HAVE NO

12:17PM  16  ISSUES MANUFACTURING MINILABS TO MEET THE SALES FORECAST FOR

12:17PM  17  BOTH 2014 AND 2015.

12:17PM  18      IN FACT, HE SAID THAT THEY WOULDN'T EVEN NEED TO REACH

12:17PM  19  PEAK CAPACITY, PRODUCTION CAPACITY TO MEET THEIR FORECAST.  SO

12:17PM  20  THEY HAD SLACK.  THEY HAD EXCESS CAPACITY IN THEIR

12:17PM  21  MANUFACTURING PROCESS IN ORDER TO DELIVER ON THE FINANCIAL

12:17PM  22  FORECAST THAT THEY SENT US.

12:18PM  23      AND IT WASN'T JUST THE RETAIL SETTING.  THEY ALSO HAD TO

12:18PM  24  MAKE THESE DEVICES FOR THE HOSPITAL VISITS.  SO IT WAS BOTH OF

12:18PM  25  THOSE BUSINESSES AND UNDERSTANDING THE PRODUCTIVITY AND

GROSSMAN DIRECT BY MR. LEACH                                6435

12:18PM  1    THROUGHPUT OF THE SYSTEMS WAS PARTS OF THAT ANALYSIS.

12:18PM  2    Q.   DID HE SAY ANYTHING TO THE EFFECT OF, WE'RE USING MACHINES

12:18PM  3    MANUFACTURED BY OTHERS TO DO MOST OF THE TESTING IN OUR LAB?

12:18PM  4    A.   NO, NO, HE DID NOT.

12:18PM  5    Q.   DID MR. BALWANI MAKE STATEMENTS TO YOU ABOUT THERANOS'S --

12:18PM  6    WHAT IT TOOK TO MAINTAIN A PARTICULAR MINILAB?

12:18PM  7    A.   YES, HE DID.

12:18PM  8    Q.   WHAT DID HE TELL YOU?

12:18PM  9    A.   WE TALKED ABOUT HOW THEY HAD ENGINEERED THESE DEVICES SO

12:18PM  10   THAT THEY HAD INTELLIGENCE EXISTING CONVENTIONAL ANALYTICS

12:18PM  11   INSTRUMENTS THINGS DON'T HAVE, THINGS LIKE WIRELESS SENSORS

12:18PM  12   THAT WOULD PROVIDE REALTIME FEEDBACK TO THERANOS IF A MACHINE

12:19PM  13   WAS NOT PROPERLY CALIBRATED, IF IT WAS PERFORMING POORLY, IF IT

12:19PM  14   WAS CLOGGED, AND THOSE -- AND SO THAT CAPABILITY WOULD ENABLE

12:19PM  15   THEM TO SERVICE THESE MACHINES FOR EFFICIENTLY AT LOWER COST

12:19PM  16   THAN EXISTING LAB INFRASTRUCTURE, AGAIN, SPEAKING TO THE

12:19PM  17   COMPETITIVE ADVANTAGE THIS COMPANY HAD AS RESULT OF THEIR CORE

12:19PM  18   TECHNOLOGY.

12:19PM  19       HE ALSO EXPLAINED THAT BASED ON USING THESE DEVICES IN

12:19PM  20   AFGHANISTAN, THEY KNEW THAT THE SYSTEM DIDN'T FUNCTION AT

12:19PM  21   TEMPERATURES OVER 120 DEGREES FAHRENHEIT, AND THAT WAS AN

12:19PM  22   EXAMPLE OF HOW, IF A SYSTEM IS EXPOSED TO AN EXTREME

12:19PM  23   TEMPERATURE LIKE THAT, THEY WOULD HAVE -- THEY WOULD BE ALERTED

12:19PM  24   TO THAT EXPOSURE AND THEY WOULD BE ABLE TO TAKE THAT MACHINE

12:19PM  25   OFFLINE OR PUT IT IN A DIFFERENT ENVIRONMENT.

GROSSMAN DIRECT BY MR. LEACH                                6436

12:19PM   1      Q.   AT SOME POINT DURING YOUR ANALYSIS OF THE THERANOS

12:20PM   2      INVESTMENT, DID YOU ASK MR. BALWANI IF YOU COULD SPEAK TO

12:20PM   3      REPRESENTATIVES OF WALGREENS?

12:20PM   4      A.   YES.

12:20PM   5      Q.   WHAT DID HE TELL YOU?

12:20PM   6      A.   HE SAID HE WAS VERY UNCOMFORTABLE WITH THAT AND HE SAID

12:20PM   7      THEY WEREN'T WILLING TO DO THAT.

12:20PM   8           HE, HE, HE REFERENCED SOMETHING TO THE EFFECT THAT IT

12:20PM   9      WOULD BE A STRANGE CONVERSATION.  THEY HAVE A GREAT

12:20PM   10     RELATIONSHIP.  THEY DIDN'T -- THAT COULD SEEM -- IT WOULDN'T

12:20PM   11     LOOK GOOD.  HE HAD A SERIES OF RESPONSES ALONG THOSE LINES.

12:20PM   12     Q.   DID YOU ALSO ASK MR. BALWANI IF YOU COULD SPEAK WITH

12:20PM   13     UNITED HEALTH CARE?

12:20PM   14     A.   YES, WE DID.

12:20PM   15     Q.   AND WHY WERE YOU INTERESTED IN SPEAKING WITH UNITED HEALTH

12:20PM   16     CARE?

12:20PM   17     A.   SO IN -- TOWARDS THE BEGINNING OF OUR SECOND MEETING WITH

12:20PM   18     THE COMPANY, THEY DETAILED THE COMMERCIAL CONTRACTS THEY HAD

12:21PM   19     WITH IMPORTANT INSURANCE COMPANIES.

12:21PM   20          THE FIRST WAS THE BLUE CROSS AND BLUE SHIELD ORGANIZATION,

12:21PM   21     WHICH EVERY STATE HAS A NOT FOR PROFIT HEALTH INSURANCE

12:21PM   22     COMPANY, AND IN CALIFORNIA WE HAVE TWO, BUT THAT'S THE ONLY

12:21PM   23     STATE THAT HAS TWO.

12:21PM   24          THEY'RE TYPICALLY THE LARGEST INSURER IN EACH STATE.  THEY

12:21PM   25     ARE THE LARGEST INSURER IN EACH STATE, AND THEY HAVE A NATIONAL

GROSSMAN DIRECT BY MR. LEACH                                6437

12:21PM   1    ORGANIZATION THAT CAN EVALUATE TECHNOLOGY.

12:21PM   2         SO THEY TOLD US THEY HAD A CONTRACT WITH THE PARENT BLUE

12:21PM   3    CROSS AND BLUE CROSS -- I'M SORRY.  AND THEY HAD ACCESS TO THE

12:21PM   4    MEMBER STATE BLUE'S PLANS.

12:21PM   5         THEY ALSO TOLD US IN THAT MEETING THAT THEY HAD A NATIONAL

12:21PM   6    CONTRACT WITH UNITED HEALTH CARE.  THAT WAS VERY SIGNIFICANT TO

12:21PM   7    US BECAUSE UNITED HEALTH CARE IS, IN OUR VIEW, THE SMARTEST,

12:22PM   8    MOST SOPHISTICATED NATIONAL HEALTH INSURANCE COMPANY.

12:22PM   9         UNLIKE THE BLUES PLANS, THEY'RE A FOR PROFIT HEALTH

12:22PM  10    COMPANY.  SO WE KNOW THESE COMPANIES VERY WELL IN THE HEALTH

12:22PM  11    CARE SPACE AND WE HIGHLY VALUE THEIR ABILITY TO VET TECHNOLOGY

12:22PM  12    AND NEW COMPANIES.

12:22PM  13         THE FACT THAT -- SO IN THAT MEETING THE COMPANY TOLD US

12:22PM  14    THAT THEY HAD A CONTRACT WITH UNITED HEALTH CARE.  THAT WAS

12:22PM  15    SIGNIFICANT NOT JUST BECAUSE UNITED WAS A VERY SMART, WELL

12:22PM  16    RESPECTED ORGANIZATION, UNITED HAD A CONTRACT WITH I BELIEVE

12:22PM  17    LABCORP AT THE TIME.

12:22PM  18         SO THEY EXPLAINED THAT -- SO IT WAS VERY UNUSUAL THAT THEY

12:22PM  19    HAD A CONTRACT IF THEY ALREADY HAD ANOTHER CONTRACT WITH

12:22PM  20    ANOTHER THIRD PARTY.

12:22PM  21         THEY EXPLAINED TO US, BECAUSE THE TECHNOLOGY WAS SO

12:22PM  22    DIFFERENT AND SO TRANSFORMATIVE AND SUCH A HUGE ADVANCEMENT FOR

12:22PM  23    PATIENTS, THAT THEY WERE ABLE TO CONTRACT DIRECTLY WITH UNITED

12:22PM  24    HEALTH CARE AND THEY HAD ACCESS TO UNITED'S, I THINK AT THE

12:23PM  25    TIME THEY HAD ROUGHLY 30 MILLION COVERED LIVES.

GROSSMAN DIRECT BY MR. LEACH                                    6438

12:23PM   1        SO AS A RESULT OF THAT, WE WANTED TO SPEAK TO SOMEONE AT

12:23PM   2   UNITED THAT DID THE TECHNICAL DUE DILIGENCE.  WE WANTED TO

12:23PM   3   UNDERSTAND THEIR VIEW OF THE COMPANY AND THE TECHNOLOGY AND,

12:23PM   4   JUST AS IMPORTANT, HOW THEY SAW THIS, THIS TESTING METHODOLOGY

12:23PM   5   BEING USED BY THEIR BENEFICIARIES IN THE DIFFERENT MARKETS THAT

12:23PM   6   THEY OPERATED.

12:23PM   7   Q.   OKAY.  AND WHEN YOU MADE THIS REQUEST OF MR. BALWANI, WHAT

12:23PM   8   DID HE TELL YOU?

12:23PM   9   A.   HE SAID -- SIMILAR TO WALGREENS.  HE SAID NO, WE WILL NOT

12:23PM  10   ALLOW YOU TO SPEAK TO UNITED HEALTH CARE.  WE'RE UNCOMFORTABLE

12:23PM  11   WITH THAT.  IT WOULD, AGAIN, LOOK BADLY ON US, THERANOS, IF

12:23PM  12   INVESTORS ARE ASKING TO SPEAK TO SOMEONE AT THE COMPANY.

12:23PM  13        SO SIMILAR, A VERY SIMILAR ANSWER TO WHAT -- HOW HE

12:23PM  14   RESPONDED TO THE WALGREENS, THE WALGREENS REQUEST.

12:24PM  15   Q.   AT SOME POINT IN JANUARY OF 2014 DID YOU SPEAK WITH

12:24PM  16   SOMEBODY NAMED CHANNING ROBERTSON?

12:24PM  17   A.   YES.

12:24PM  18   Q.   WHO IS CHANNING ROBERTSON?

12:24PM  19   A.   HE'S A STANFORD PROFESSOR WHO, WHO HELPED MS. HOLMES START

12:24PM  20   THE COMPANY TEN YEARS BEFORE OUR DUE DILIGENCE PROCESS.

12:24PM  21   Q.   WHY DID YOU WANT TO SPEAK WITH MR. ROBERTSON?

12:24PM  22   A.   HE WAS AN IMPORTANT FOUNDING MEMBER OF THE COMPANY.  HE

12:24PM  23   WAS ON THE BOARD, THE ORIGINAL BOARD.  I BELIEVE HE WAS ON THE

12:24PM  24   ORIGINAL BOARD WITH MS. HOLMES, AND HE WAS A WELL RESPECTED

12:24PM  25   SCIENTIST IN THE LOCAL COMMUNITY THAT HAD BEEN INVOLVED WITH

GROSSMAN DIRECT BY MR. LEACH                                    6439

12:24PM  1    OTHER SUCCESSFUL HEALTH CARE STARTUPS THAT, AS INVESTORS IN THE

12:25PM  2    HEALTH CARE INDUSTRY, WE KNEW.  WE KNEW THOSE STARTUPS.

12:25PM  3        SO WE -- HE WAS SOMEONE THAT WE WANTED TO SPEAK TO.

12:25PM  4    Q.   AND DID YOU RELY IN PART ON THE INFORMATION THAT

12:25PM  5    MR. ROBERTSON PROVIDED YOU?

12:25PM  6    A.   YES.

12:25PM  7    Q.   OKAY.  DID MR. ROBERTSON MAKE STATEMENTS TO YOU ABOUT THE

12:25PM  8    RISKS THAT HE SAW RELATING TO THERANOS?

12:25PM  9    A.   YES.

12:25PM  10   Q.   AND WHAT DID HE TELL YOU?

12:25PM  11   A.   HE TOLD ME THAT THE RISK THAT -- THE TWO PRINCIPAL RISKS

12:25PM  12   THAT HE SAW FOR THE BUSINESS, OR THE PRINCIPAL RISK HE SAW FOR

12:25PM  13   THE BUSINESS WAS THE CONSUMER EXPERIENCE, AND THAT THIS

12:25PM  14   COMPANY, THIS TECHNOLOGY HAD LONG PASSED THE POINT OF TECHNICAL

12:25PM  15   RISK OR REGULATORY RISK.

12:25PM  16       HE DID NOT SEE ANY TECHNICAL RISK AT ALL IN, IN THEIR CORE

12:25PM  17   TECHNOLOGY AND WHAT THEY COULD DO USING THEIR PROPRIETARY

12:25PM  18   FINGERSTICK TECHNOLOGY AND THEIR SAMPLE PROCESSING UNITS.  THAT

12:25PM  19   WAS HIS PERSPECTIVE ON THE RISKS OF THE BUSINESS.

12:26PM  20   Q.   AND DID HE MAKE STATEMENTS TO YOU ABOUT THERANOS'S USE OF

12:26PM  21   ITS DEVICE COMPARED TO OTHER COMPANIES OR OTHER COMPETITORS?

12:26PM  22   A.   HE DID.  WE HAD, I BELIEVE, TWO CONVERSATIONS.  IN THE

12:26PM  23   FIRST CONVERSATION HE DESCRIBED THE PHILOSOPHICAL DIFFERENCE

12:26PM  24   THAT THERANOS HAD ABOUT TESTING COMPARED TO THE CONVENTIONAL

12:26PM  25   LABORATORY INDUSTRY.

GROSSMAN DIRECT BY MR. LEACH                                    6440

12:26PM  1      THE CONVENTIONAL LAB INDUSTRY HAD A DECENTRALIZED NETWORK

12:26PM  2   OF SUPPLIERS.  THEY BOUGHT THIRD PARTY EQUIPMENT, THEY HAD TO

12:26PM  3   HIRE TECHNICIANS TO RUN THAT EQUIPMENT, THEY WERE INEFFICIENT,

12:26PM  4   THEY REALLY DIDN'T FOCUS ON THE PATIENT, THEY DIDN'T KEEP TRACK

12:26PM  5   OF THEIR DATA.  IT WAS AN OUTDATED, INEFFICIENT, ANTIQUATED

12:26PM  6   BUSINESS MODEL.

12:26PM  7      HE COMPARED THAT TO THERANOS WHERE EVERYTHING WAS

12:26PM  8   CENTRALIZED, AND IT WAS A PATIENT SPECIFIC, PATIENT FOCUSSED

12:27PM  9   BUSINESS WHERE YOU AS A CONSUMER NOT ONLY HAD A RADICALLY

12:27PM 10   DIFFERENT EXPERIENCE, IT WAS CHEAPER, EASY TO ACCESS, OPEN UP

12:27PM 11   TESTING TO POPULATIONS THAT STRUGGLED WITH FEAR OF NEEDLES,

12:27PM 12   VENOUS ACCESS, A WHOLE SERIES OF ISSUES.

12:27PM 13      BUT IT ALSO ENABLED THE CONSUMER TO KEEP THEIR DATA OVER

12:27PM 14   TIME, AND SO HE WAS -- AND THEN BEYOND THAT, HE JUST TALKED

12:27PM 15   ABOUT THE TECHNICAL CAPABILITIES, THE TECHNOLOGY WITHIN THE

12:27PM 16   MINILAB.

12:27PM 17      HE DESCRIBED THE PROCESS OF LOOKING IT OVER AND THE

12:27PM 18   TECHNOLOGY THAT WAS IN IT, THE OPTICS, THE CHEMISTRIES, THE

12:27PM 19   TINY PLASTIC CHANNELS WHERE FLUIDS ARE EXCHANGED, WHICH IS

12:27PM 20   CALLED MICROFLUIDICS.

12:27PM 21      HIS VIEW WAS THAT EVEN IF A COMPETITOR OPENED THE BOX, IT

12:28PM 22   WOULD TAKE THEM YEARS, IF THEY COULD AT ALL, TO CREATE A

12:28PM 23   SIMILAR TYPE OF TECHNOLOGY, REINFORCING THE COMPETITIVE

12:28PM 24   ADVANTAGE THAT THE COMPANY HAD DESCRIBED TO US OVER THE COURSE

12:28PM 25   OF OUR DUE DILIGENCE.

GROSSMAN DIRECT BY MR. LEACH                                6441

12:28PM   1    Q.   AND DID THE NUMBER OF ASSAYS OR PARTICULAR ASSAYS COME UP

12:28PM   2    IN YOUR CONVERSATIONS WITH MR. ROBERTSON?

12:28PM   3    A.   YEAH.   WE TALKED ABOUT THE UNDERLYING TECHNOLOGY, AND HE

12:28PM   4    DESCRIBED HOW THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS

12:28PM   5    THAT ONE HAD TO MEASURE IN ORDER TO MATCH THE FULL MENU THAT A

12:28PM   6    REFERENCE LABORATORY LIKE A QUEST OR A LABCORP, WHAT THEY

12:28PM   7    OFFER.

12:28PM   8        AND HE DESCRIBED THE PROCESS OVER THE PRECEDING TEN YEARS

12:28PM   9    OF GOING TEST BY TEST AND TRYING TO FIGURE OUT HOW TO MEASURE

12:28PM  10    THAT THING AT DRAMATICALLY LESS VOLUMES, MICROLITERS AS OPPOSED

12:29PM  11    TO MILLILITERS, AND THERE WAS NOTHING THAT THEY COULDN'T DO.

12:29PM  12    THERE WAS NOTHING THE TECHNOLOGY COULDN'T DO.

12:29PM  13        THERE WERE THINGS THAT WERE EASIER, BUT THEY HADN'T FOUND

12:29PM  14    A SINGLE ANALYTIC TECHNIQUE THAT THEY WERE NOT ABLE TO MEASURE.

12:29PM  15    Q.   CURRENTLY MEASURE?

12:29PM  16    A.   CURRENTLY MEASURE, CORRECT.

12:29PM  17    Q.   I THINK YOU TESTIFIED EARLIER THAT AT SOME POINT YOU

12:29PM  18    VISITED THE THERANOS MANUFACTURING FACILITY.

12:29PM  19    A.   YES.

12:29PM  20    Q.   AND WHO WAS THERE FOR THAT?

12:29PM  21    A.   FROM THE PFM SIDE IT WAS MYSELF AND MR. KHANNA, I BELIEVE

12:29PM  22    MR. KHANNA.

12:29PM  23        FROM -- MR. KHANNA -- WE MAY HAVE HAD ONE OTHER PERSON

12:29PM  24    FROM THE PFM SIDE.

12:29PM  25        FROM THE THERANOS SIDE, MR. BALWANI MET US AT THE

GROSSMAN DIRECT BY MR. LEACH                                    6442

12:29PM   1    FACILITY, THE MANUFACTURING FACILITY IN NEWARK, CALIFORNIA,

12:30PM   2    WHICH IS IN THE EAST BAY.

12:30PM   3    Q.   OKAY.  AND WHAT DID YOU OBSERVE ON THIS TOUR OF THE

12:30PM   4    MANUFACTURING FACILITY?

12:30PM   5    A.   WE SAW, WE SAW THEM MAKING MINILABS FROM THE MICRO

12:30PM   6    MACHINING OF SPECIFIC PARTS, BOTH PLASTIC AND METAL, AND THEY

12:30PM   7    DESCRIBED FOR US HOW THAT PROCESS WAS EVOLVING FROM THOUSANDS

12:30PM   8    OF DIFFERENT LITTLE PARTS.  AND THEN WITH THEIR PROPRIETARY

12:30PM   9    MANUFACTURING TECHNIQUES THEY WERE SIMPLIFYING THE PROCESS.

12:30PM   10   THEY WERE MAKING THEIR OWN PARTS SO THAT THEY COULD REDUCE THE

12:30PM   11   NUMBER OF PIECES THAT GO INTO A MINILAB.

12:30PM   12        WE -- SO WE SAW THOSE -- THE BIG EQUIPMENT THAT MACHINED

12:30PM   13   THOSE PARTS.

12:30PM   14        WE THEN TRANSFERRED -- WE THEN MOVED TO THE PART OF THE

12:30PM   15   FACTORY FLOOR WHERE THEY WERE ASSEMBLING MINILABS, AND THEN WE

12:30PM   16   FINISHED OUR TOUR IN THE DISTRIBUTION PART OF THE MANUFACTURING

12:31PM   17   FACILITY WHERE THEY WERE PACKAGING AND SHIPPING MATERIALS.

12:31PM   18   Q.   AT ANY POINT DURING THIS TOUR OF THE MANUFACTURING

12:31PM   19   FACILITY, DID YOU SEE ANY THIRD PARTY BLOOD TESTING MACHINES?

12:31PM   20   A.   NO.

12:31PM   21   Q.   DID MR. BALWANI HIGHLIGHT ANY THIRD PARTY BLOOD TESTING

12:31PM   22   MACHINES TO YOU?

12:31PM   23   A.   NO.

12:31PM   24   Q.   DID YOU ALSO CONDUCT A TOUR OF THE THERANOS CALIFORNIA

12:31PM   25   CLIA LAB?

GROSSMAN DIRECT BY MR. LEACH                                6443

| 12:31PM | 1 | A.   YES. |
| 12:31PM | 2 | Q.   WHAT DID -- WHO WAS THERE FOR THAT? |
| 12:31PM | 3 | A.   I BELIEVE IT WAS MR. BALWANI, ALTHOUGH I DON'T |
| 12:31PM | 4 | SPECIFICALLY REMEMBER. |
| 12:31PM | 5 | IT WAS MYSELF, AND I BELIEVE IT WAS MR. KHANNA, ALTHOUGH |
| 12:31PM | 6 | I'M NOT -- I DON'T, I DON'T -- I BELIEVE HE WAS WITH ME AS |
| 12:31PM | 7 | WELL. |
| 12:31PM | 8 | Q.   WHAT DID YOU OBSERVE ON THIS TOUR OF THE THERANOS CLIA |
| 12:31PM | 9 | LAB? |
| 12:31PM | 10 | A.   WE OBSERVED A LABORATORY SETTING WITH METAL RACKS THAT |
| 12:32PM | 11 | CONTAINED MINILABS THAT WERE ACTIVELY PROCESSING SAMPLES. |
| 12:32PM | 12 | Q.   DID YOU SEE ANY SIEMENS MACHINES? |
| 12:32PM | 13 | A.   NO. |
| 12:32PM | 14 | Q.   DID YOU SEE ANY OTHER THIRD PARTY BLOOD TESTING MACHINES? |
| 12:32PM | 15 | A.   NO. |
| 12:32PM | 16 | Q.   LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED |
| 12:32PM | 17 | AS EXHIBIT 5441. |
| 12:32PM | 18 | DO YOU HAVE THAT IN FRONT OF YOU, SIR? |
| 12:32PM | 19 | A.   YES. |
| 12:32PM | 20 | Q.   IS THE FIRST PAGE OF EXHIBIT 5441 AN EMAIL FROM YOU TO |
| 12:32PM | 21 | SOMEONE NAMED ADAM CLAMMER? |
| 12:32PM | 22 | A.   YES. |
| 12:33PM | 23 | Q.   AND WHO IS MR. CLAMMER? |
| 12:33PM | 24 | A.   HE IS A PERSONAL FRIEND OF MY PARTNER AT THE TIME, |
| 12:33PM | 25 | CHRIS JAMES, AND HE'S ALSO AN INVESTOR.  HE WAS AN INVESTOR BY |

GROSSMAN DIRECT BY MR. LEACH                                    6444

12:33PM   1    PROFESSION IN THE PRIVATE EQUITY SPACE AND HAD INVESTED IN

12:33PM   2    HEALTH CARE COMPANIES DURING HIS CAREER.

12:33PM   3    Q.   THERE IS AN ATTACHMENT TO THIS EMAIL ENTITLED

12:33PM   4    THERANOS_V12.XLSX.

12:33PM   5         DO YOU KNOW WHAT THE ATTACHMENT IS?

12:33PM   6    A.   YES.

12:33PM   7    Q.   AND WHAT IS IT?

12:33PM   8    A.   IT IS A FINANCIAL MODEL.

12:33PM   9    Q.   AND DID YOU -- DID PFM PREPARE THIS IN THE ORDINARY COURSE

12:33PM  10    OF ITS BUSINESS?

12:33PM  11    A.   YES.

12:33PM  12    Q.   AND WAS THIS PART OF YOUR EFFORT TO UNDERSTAND SOME OF THE

12:33PM  13    FINANCIAL METRICS AROUND A POSSIBLE INVESTMENT?

12:33PM  14    A.   YES.

12:33PM  15            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5441.  5441.

12:34PM  16            MR. WADE:  NO OBJECTION.

12:34PM  17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:34PM  18         (GOVERNMENT'S EXHIBIT 5441 WAS RECEIVED IN EVIDENCE.)

12:34PM  19            MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE

12:34PM  20    TOP.

12:34PM  21    Q.   DO YOU SEE YOUR NAME IN THE FROM LINE, MR. GROSSMAN?

12:34PM  22    A.   YES.

12:34PM  23    Q.   AND DO YOU SEE IT SAYS, "CELL D113 ON PFM, REV MODEL IS

12:34PM  24    SCENARIO.  1, 2, 3 FOR THE BEAR, BASE, BULL."

12:34PM  25         WHAT DOES THAT MEAN?

GROSSMAN DIRECT BY MR. LEACH                                      6445

12:34PM   1    A.   SO, FIRST OF ALL, THIS IS AN EXCEL MODEL AND IN EXCEL

12:34PM   2    MODELS YOU CAN CREATE SCENARIOS WHERE, IF YOU JUST CHANGE ONE

12:34PM   3    CELL, THERE ARE A WHOLE SERIES OF ASSUMPTIONS THAT WILL CHANGE.

12:34PM   4    SO IT'S A GREAT WAY OF PRESENTING DIFFERENT IMAGES OF A

12:34PM   5    BUSINESS.

12:35PM   6        IN THIS CASE WE HAD BUILT THREE SCENARIOS TO CAPTURE WHAT

12:35PM   7    WE THOUGHT THE FINANCIAL OUTLOOK FOR THERANOS WAS, BEAR BEING

12:35PM   8    THE LOWEST, BASE BEING THE -- USING BEAR REFERS TO KIND OF BEAR

12:35PM   9    MARKET OR A BAD OUTCOME; BASE BEING KIND OF OUR CENTRAL CASE,

12:35PM   10   AND THEN BULL BEING THE UP SIDE, POSITIVE CASE, BULL STANDING

12:35PM   11   FOR BULL MARKET.

12:35PM   12   Q.   AND THE MODEL THAT PFM PREPARED, WAS THAT BASED IN PART ON

12:35PM   13   FINANCIAL INFORMATION THAT YOU RECEIVED FROM THERANOS?

12:35PM   14   A.   YES.

12:35PM   15   Q.   AND IS THAT INFORMATION INCLUDED ON SOME OF THE SLIDES OF

12:35PM   16   THE EXCEL SPREADSHEET THAT IS ATTACHED TO THIS EXHIBIT?

12:36PM   17   A.   I'D HAVE TO REVIEW THE SPREADSHEET.  I DON'T KNOW.

12:36PM   18   Q.   LET ME --

12:36PM   19   A.   THE MODEL HAD DIFFERENT TABS IN IT, SO I DON'T KNOW WHAT

12:36PM   20   IS IN THIS BINDER.

12:36PM   21   Q.   WELL, LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 44.

12:36PM   22   A.   I'VE GOT YOU.

12:36PM   23   Q.   DO YOU SEE THE LOGO FOR THERANOS IN THE TOP UPPER

12:36PM   24   LEFT-HAND CORNER?

12:36PM   25   A.   YES.

GROSSMAN DIRECT BY MR. LEACH                                6446

12:36PM   1    Q.   AND DO YOU REMEMBER THIS TO BE A MODEL THAT YOU RECEIVED

12:36PM   2    FROM THERANOS?

12:36PM   3    A.   YES.

12:36PM   4    Q.   AND IF YOU CONTINUE LOOKING IN THE HARD COPY TO PAGE 52,

12:36PM   5    CAN YOU TELL US IF THESE ARE ALSO INPUTS IN DATA THAT YOU

12:37PM   6    RECEIVED FROM THERANOS?

12:37PM   7    A.   IT'S KIND OF SMALL.

12:37PM   8    Q.   WE CAN DO IT ONE BY ONE THEN.  I DON'T WANT TO TEST

12:37PM   9    YOUR --

12:37PM   10   A.   I MEAN, MY EYESIGHT ISN'T WHAT IT USED TO BE.

12:37PM   11        (LAUGHTER.)

12:37PM   12            THE WITNESS:  BUT I BELIEVE THIS IS THE FINANCIAL

12:37PM   13   MODEL THAT THE COMPANY PROVIDED US.

12:37PM   14   BY MR. LEACH:

12:37PM   15   Q.   WELL, THIS SHOULDN'T BE AN EYESIGHT TEST, AND WE CAN GO

12:37PM   16   THROUGH THIS ONE BY ONE, MR. GROSSMAN.

12:37PM   17        WE'RE ON PAGE 4, WHICH IS ON THE SCREEN.

12:37PM   18   A.   YEP.

12:37PM   19   Q.   ARE YOU SATISFIED THAT THIS IS INFORMATION FROM THERANOS?

12:37PM   20   A.   YES.

12:37PM   21   Q.   OKAY.  THERE'S A ROW AT THE TOP, 2014 DEVICE COST PLUS

12:37PM   22   INSTALLATION/CONFIG PLUS TRAINING.

12:37PM   23        WHAT DID YOU UNDERSTAND THAT TO BE?

12:37PM   24   A.   THAT WAS THEIR COST OF PRODUCING MINILABS IN 2014.

12:37PM   25   Q.   AND THE COST THAT THEY WERE GIVING YOU WAS WHAT?

GROSSMAN DIRECT BY MR. LEACH                                    6447

12:38PM   1    A.   $70,000.

12:38PM   2    Q.   AND THEN BENEATH THAT IT SAYS 2015 PLUS DEVICE COST, PLUS

12:38PM   3    INSTALLATION/CONFIG.

12:38PM   4         IS THAT A REFERENCE TO THE MINILAB DEVICE COST FOR 2015?

12:38PM   5    A.   YES.

12:38PM   6    Q.   AND WAS THIS THERANOS TELLING YOU THAT THE COST WAS GOING

12:38PM   7    TO GO DOWN FROM $70,000 TO $50,000?

12:38PM   8    A.   YES.

12:38PM   9    Q.   BENEATH THAT THERE ARE SOME LINES FOR DEPRECIATIONS, PP&E,

12:38PM  10    DEVICE INSTALLATIONS.

12:38PM  11         WHAT DID YOU UNDERSTAND THOSE TO REFER TO?

12:38PM  12    A.   THIS WAS THE ASSUMPTION THE COMPANY WAS USING TO

12:38PM  13    DEPRECIATE THEIR CAPITAL SPENDING.

12:38PM  14         SO STANDARD ACCOUNTING PRACTICES FOR BUSINESSES LIKE THIS

12:38PM  15    WHEN THEY PURCHASE CAPITAL EQUIPMENT, WHETHER IT'S -- OR

12:38PM  16    MANUFACTURE CAPITAL EQUIPMENT, EITHER ONE, YOU WILL -- IT WILL

12:39PM  17    GO AS AN ASSET ON THE BALANCE SHEET, AND THEN OVER TIME THE

12:39PM  18    ACCOUNTING STANDARDS ALLOW YOU TO DEPRECIATE THAT ASSET UNDER

12:39PM  19    DIFFERENT SCHEDULES.

12:39PM  20         IN THIS CASE THEY -- THEY'RE USING WHAT IS REFERRED TO AS

12:39PM  21    STRAIGHT LINE DEPRECIATION, THAT'S THE SL, AND THAT'S JUST A

12:39PM  22    LINEAR DEPRECIATION.

12:39PM  23         THERE ARE OTHER ACCELERATED DEPRECIATION SCHEDULES WHICH

12:39PM  24    COMPANIES OFTEN USE, BUT IN THIS CASE THE ASSUMPTION WAS A

12:39PM  25    STRAIGHT LINE DEPRECIATION.

GROSSMAN DIRECT BY MR. LEACH                                    6448

12:39PM  1    Q.   AT ANY POINT IN TIME DID THERANOS PROVIDE YOU WITH DEVICE

12:39PM  2    COSTS OR DEPRECIATION INFORMATION FOR THIRD PARTY MACHINES MADE

12:39PM  3    BY OTHERS?

12:39PM  4    A.   NO.

12:39PM  5    Q.   DID THEY, FOR EXAMPLE, SPELL OUT FOR YOU IN THEIR MODEL

12:39PM  6    WHAT THE DEPRECIATION FOR A SIEMENS MACHINE WOULD BE?

12:39PM  7    A.   NO.

12:39PM  8    Q.   WAS THAT INFORMATION THAT WOULD HAVE BEEN RELEVANT TO YOU

12:40PM  9    IN ASSESSING THE ECONOMICS FOR THIS TRANSACTION?

12:40PM  10   A.   YES.

12:40PM  11   Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 45.

12:40PM  12        AND IF WE CAN ZOOM IN ON THE LEFT HALF OF THIS,

12:40PM  13   MS. HOLLIMAN.

12:40PM  14            THE COURT:  BEFORE YOU ASK A QUESTION, LET'S LET OUR

12:40PM  15   JURY STAND UP AND STRETCH FOR JUST A MOMENT.

12:40PM  16            MR. LEACH:  THANK YOU, YOUR HONOR.

12:40PM  17            THE COURT:  THE NUMBERS LOOK INTIMIDATING HERE.  SO

12:40PM  18   PLEASE STAND UP AND STRETCH, FOLKS.

12:41PM  19        (STRETCHING.)

12:41PM  20            MR. LEACH:  MAY I CONTINUE, YOUR HONOR?

12:41PM  21            THE COURT:  YES.  THANK YOU VERY MUCH.

12:41PM  22   BY MR. LEACH:

12:41PM  23   Q.   MR. GROSSMAN, THE NUMBERS ON THIS PAGE ARE A LITTLE HARD

12:41PM  24   TO SEE.  MY ONLY QUESTION IS, IS THIS INFORMATION THAT YOU

12:41PM  25   BELIEVE CAME FROM THERANOS?

GROSSMAN DIRECT BY MR. LEACH                                      6449

| | | |
|---|---|---|
| 12:41PM | 1 | A.   YES, I DO. |
| 12:41PM | 2 | Q.   AND IF WE CAN NOW TURN TO PAGE 47, AND IF WE CAN ZOOM IN |
| 12:41PM | 3 | ON THE SUBSTANCE OF THE SLIDE, MS. HOLLIMAN. |
| 12:41PM | 4 | DO YOU SEE THE HEADING "THERANOS PROJECTED STATEMENT OF |
| 12:41PM | 5 | INCOME" IN THE TOP LEFT CORNER, MR. GROSSMAN? |
| 12:42PM | 6 | A.   YES. |
| 12:42PM | 7 | Q.   AND DO YOU BELIEVE THIS TO BE INFORMATION THAT THERANOS |
| 12:42PM | 8 | PROVIDED TO YOU IN CONNECTION WITH A POSSIBLE INVESTMENT? |
| 12:42PM | 9 | A.   YES. |
| 12:42PM | 10 | Q.   AND DID YOU USE THE INFORMATION ON THIS SLIDE AS A BASIS |
| 12:42PM | 11 | FOR HOW TO BUILD YOUR OWN REVENUE MODEL? |
| 12:42PM | 12 | A.   YES. |
| 12:42PM | 13 | Q.   IF WE CAN NOW GO TO PAGE 48, MS. HOLLIMAN. |
| 12:42PM | 14 | ZOOM IN ON THE SUBSTANCE. |
| 12:42PM | 15 | IS THIS A CONTINUATION OF THE PROJECTED STATEMENT OF |
| 12:42PM | 16 | INCOME THAT THERANOS PROVIDED TO YOU, MR. GROSSMAN? |
| 12:42PM | 17 | A.   YES, IT IS. |
| 12:42PM | 18 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE COLUMN TO THE FAR |
| 12:42PM | 19 | RIGHT FOR THE PERIOD ENDING 12/30/2014. |
| 12:43PM | 20 | DO YOU SEE THAT? |
| 12:43PM | 21 | A.   YES. |
| 12:43PM | 22 | Q.   AND WHAT WAS THE REVENUE THAT THERANOS WAS PROJECTING FROM |
| 12:43PM | 23 | LAB SERVICES FROM U.S. RETAIL PARTNERS? |
| 12:43PM | 24 | A.   $109 MILLION. |
| 12:43PM | 25 | Q.   AND WHAT WAS THE REVENUE THERANOS WAS PROJECTING TO YOU |

GROSSMAN DIRECT BY MR. LEACH                                              6450

12:43PM   1    FOR LAB SERVICES REVENUE FROM PHYSICIAN OFFICES?

12:43PM   2    A.   $72 MILLION.

12:43PM   3    Q.   AND WHAT WAS THE REVENUE THAT WAS BEING PROJECTED FOR

12:43PM   4    PHARMACEUTICAL SERVICES?

12:43PM   5    A.   $30 MILLION.

12:43PM   6    Q.   AND DO YOU SEE THE TOTAL OF 261 MILLION IN REVENUES BY THE

12:43PM   7    END OF 2014?

12:43PM   8    A.   YES.

12:43PM   9    Q.   WAS THAT ATTRACTIVE TO YOU?

12:43PM   10   A.   YES.

12:43PM   11   Q.   HOW SO?

12:43PM   12   A.   IT WAS A, IT WAS A STRONG, IMPRESSIVE GROWTH IN REVENUES

12:43PM   13   AS THE COMPANY COMMERCIALIZED THEIR TECHNOLOGY BOTH WITH

12:44PM   14   WALGREENS BUT ALSO THE NON-WALGREENS PART OF THE BUSINESS AS

12:44PM   15   WELL.

12:44PM   16   Q.   AND THEN TO THE RIGHT, ARE THERE PROJECTED REVENUE FOR THE

12:44PM   17   PERIOD ENDING 12/30/2015?

12:44PM   18   A.   YES.

12:44PM   19   Q.   AND WAS THERANOS PROJECTING 750 MILLION IN LAB SERVICES

12:44PM   20   FROM U.S. RETAIL PHARMACIES?

12:44PM   21   A.   YES.

12:44PM   22   Q.   AND WAS THERANOS TELLING YOU THAT IT EXPECTED 120 MILLION

12:44PM   23   FROM PHARMACEUTICAL COMPANIES BY THE END OF 2015?

12:44PM   24   A.   YES.

12:44PM   25   Q.   AND WHAT WAS THE TOTAL REVENUE THAT THERANOS WAS TELLING

GROSSMAN DIRECT BY MR. LEACH                                          6451

12:44PM  1    YOU IT EXPECTED TO ACHIEVE BY THE END OF 2015?

12:44PM  2    A.   $1,608,000,000.

12:45PM  3    Q.   AND WAS THAT ATTRACTIVE TO YOU?

12:45PM  4    A.   YES.

12:45PM  5    Q.   AND IS IT FAIR, MR. GROSSMAN, THAT FOR PAGES WITH THE

12:45PM  6    THERANOS LOGO, LIKE WE SEE IN THE TOP LEFT HAND OF THE SCREEN,

12:45PM  7    THAT THAT IS INFORMATION COMING FROM THERANOS?

12:45PM  8    A.   YES.

12:45PM  9    Q.   AT SOME POINT IN TIME DID YOU GO TO A WALGREENS TO GET

12:45PM  10   YOUR BLOOD TESTED?

12:45PM  11   A.   YES, I DID.

12:45PM  12   Q.   TELL US ABOUT THAT EXPERIENCE.

12:45PM  13   A.   I WENT TO THE PALO ALTO STORE THAT WAS OFFERING THERANOS

12:45PM  14   SERVICES -- I DID NOT TELL THE COMPANY I WAS GOING -- AND I HAD

12:45PM  15   MY BLOOD DRAWN WITH A VENOUS DRAW, NOT A FINGERSTICK, AND MY

12:45PM  16   LAB RESULTS WERE, WERE -- AND I LEFT WITHIN A FEW MINUTES AND

12:45PM  17   THAT WAS MY EXPERIENCE.

12:45PM  18   Q.   OKAY.  AND DID YOU HAVE QUESTIONS FOR MR. BALWANI ABOUT

12:45PM  19   YOUR EXPERIENCE?

12:45PM  20   A.   YES.

12:45PM  21   Q.   AND TELL US ABOUT THAT, PLEASE.

12:45PM  22   A.   WELL, I ASKED HIM WHY I DIDN'T RECEIVE A FINGERSTICK AND

12:46PM  23   WHY IT WAS A VENOUS DRAW, AND I ALSO ASKED HIM WHY IT TOOK

12:46PM  24   LONGER THAN FOUR HOURS TO GET MY TEST RESULTS BACK.

12:46PM  25   Q.   AND WHAT DID HE TELL YOU?

GROSSMAN DIRECT BY MR. LEACH                                    6452

12:46PM   1    A.   HE TOLD ME THAT THE TEST -- ONE OF THE TESTS THAT MY

12:46PM   2    PHYSICIAN HAD ORDERED WAS A HIGHLY UNUSUAL TEST, THAT THEY WERE

12:46PM   3    NOT AT THAT POINT IN TIME OFFERING ON FINGERSTICK.

12:46PM   4         BUT -- AND THEN IN ADDITION TO THAT, HE SAID THAT THERE

12:46PM   5    WAS SOME TYPE OF LAB FAILURE THAT SHOULD HAVE BEEN RELEASED TO

12:46PM   6    MY PHYSICIAN, THAT THEY INVESTIGATED.

12:46PM   7         IN OTHER WORDS, THERE WAS ONE TEST THAT WAS -- THAT HELD

12:46PM   8    THE PROCESS UP.  THEY SHOULD HAVE REPORTED OUT THE RESULTS

12:47PM   9    WITHIN FOUR HOURS.

12:47PM  10         I BELIEVE HE THANKED ME FOR HIGHLIGHTING THIS PROCESS

12:47PM  11    ISSUE, AND THEY HAVE ADDRESSED IT, AND FIXED IT GOING FORWARD.

12:47PM  12         SOMETHING TO THAT EFFECT.

12:47PM  13    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

12:47PM  14    EXHIBIT 1482.

12:47PM  15    A.   OKAY.

12:47PM  16    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI

12:47PM  17    RELATING IN PART TO THE TESTS THAT YOU WERE ORDERING THROUGH

12:47PM  18    WALGREENS?

12:47PM  19    A.   IF YOU COULD JUST GIVE ME A MINUTE TO REVIEW THIS?

12:47PM  20    Q.   PLEASE.

12:47PM  21         (PAUSE IN PROCEEDINGS.)

12:47PM  22              THE WITNESS:  YES, OKAY.

12:48PM  23    BY MR. LEACH:

12:48PM  24    Q.   YES, IT IS AN EXCHANGE BETWEEN YOU AND MR. BALWANI

12:48PM  25    RELATING TO YOUR TESTS AT WALGREENS?

GROSSMAN DIRECT BY MR. LEACH                                    6453

| | | |
|---|---|---|
| 12:48PM | 1 | A.   YES. |
| 12:48PM | 2 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1482. |
| 12:48PM | 3 | MR. WADE:  NO OBJECTION, YOUR HONOR. |
| 12:48PM | 4 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:48PM | 5 | (GOVERNMENT'S EXHIBIT 1482 WAS RECEIVED IN EVIDENCE.) |
| 12:48PM | 6 | BY MR. LEACH: |
| 12:48PM | 7 | Q.   LET ME DRAW YOUR ATTENTION, MR. GROSSMAN, TO PAGE 2. |
| 12:48PM | 8 | LET'S WORK OUR WAY UP FROM THE SECOND EMAIL FROM THE BOTTOM. |
| 12:48PM | 9 | DO YOU SEE WHERE YOU QUOTE, "SUNNY, JUST TO CONFIRM WE |
| 12:48PM | 10 | WOULD STILL LIKE TO SEE THE NEWARK AND THE THERANOS CLIA LAB." |
| 12:49PM | 11 | DO YOU SEE THAT? |
| 12:49PM | 12 | A.   YES, I DO. |
| 12:49PM | 13 | Q.   IS THAT A REFERENCE TO THE TOUR THAT YOU ENDED UP TAKING? |
| 12:49PM | 14 | A.   YES. |
| 12:49PM | 15 | Q.   MR. BALWANI RESPONDS IN THE NEXT EMAIL, "I AM WORKING ON |
| 12:49PM | 16 | BOTH.  NEWARK HAS A LOT OF OPEN DEVICES AND EQUIPMENT SO WE ARE |
| 12:49PM | 17 | MOVING THEM ASIDE BUT WE CAN VISIT NEWARK FRIDAY MORNING." |
| 12:49PM | 18 | DO YOU SEE THAT LANGUAGE? |
| 12:49PM | 19 | A.   YES. |
| 12:49PM | 20 | Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 12:49PM | 21 | A.   I DON'T, I DON'T KNOW WHAT -- I MEAN, I THINK WHAT I |
| 12:49PM | 22 | UNDERSTOOD IS THAT WE HAD AN APPOINTMENT FOR 11:00 O'CLOCK ON |
| 12:49PM | 23 | FRIDAY MORNING TO TOUR THE NEWARK LAB.  I'M NOT SURE ABOUT THE |
| 12:49PM | 24 | BEGINNING OF THAT. |
| 12:49PM | 25 | Q.   OKAY.  YOU WROTE BACK IN THE NEXT EMAIL, "OK THANKS.  IS |

GROSSMAN DIRECT BY MR. LEACH                                    6454

| | | |
|---|---|---|
| 12:49PM | 1 | THERE A WAY WE CAN SEE A PART OF THE LAB WITHOUT COMPROMISING |
| 12:49PM | 2 | THE PATENT PENDING OR UNFILLED PARTS OF IT?  THIS IS MORE OF A |
| 12:49PM | 3 | PERFUNCTORY EXERCISE TO MAKE SURE THERE IS ACTUALLY A LAB |
| 12:49PM | 4 | THERE." |
| 12:49PM | 5 | WHAT WERE YOU GETTING AT THERE? |
| 12:50PM | 6 | A.  WELL, HE WAS RESISTING OUR VISIT TO THE LAB ON THE GROUNDS |
| 12:50PM | 7 | THAT THEY HAD IMPORTANT UNPATENTED INFORMATION, ROBOTICS THAT |
| 12:50PM | 8 | THEY WERE USING, AND BY SHOWING US THE LAB, THEY WOULD |
| 12:50PM | 9 | COMPROMISE THEIR INTELLECTUAL PROPERTY, THEIR ABILITY TO GET |
| 12:50PM | 10 | PATENTS ISSUED ON THOSE, ON THOSE PROPRIETARY AUTOMATION |
| 12:50PM | 11 | TECHNIQUES USING THEIR OWN PROPRIETARY TECHNOLOGY. |
| 12:50PM | 12 | SO HE WAS RESISTING OUR LAB TOUR ON THOSE GROUNDS, OR HE |
| 12:50PM | 13 | WAS RESISTING OUR VIEW OF THE CLIA LAB ON THOSE GROUNDS, AND I |
| 12:50PM | 14 | BELIEVE HE WAS REFERRING SPECIFICALLY TO THE WHOLE BOTTOM FLOOR |
| 12:50PM | 15 | OF THEIR CORPORATE HEADQUARTERS WHERE THIS AUTOMATION WAS |
| 12:50PM | 16 | DEPLOYED, AND SO HE WAS NOT WILLING TO LET US SEE THAT PART OF |
| 12:51PM | 17 | THE CLIA LAB. |
| 12:51PM | 18 | SO THEN I'M ASKING, IS THERE A WAY THAT WE CAN SEE A PART |
| 12:51PM | 19 | OF THE LAB THAT DOESN'T HAVE THIS PROPRIETARY PATENT PENDING |
| 12:51PM | 20 | AUTOMATION SO THAT WE CAN MAKE SURE THAT YOU ACTUALLY ARE USING |
| 12:51PM | 21 | YOUR OWN PROPRIETARY TECHNOLOGY IN A CLIA LAB ENVIRONMENT? |
| 12:51PM | 22 | Q.  AT THIS POINT IN TIME, HAD YOU SIGNED A CONFIDENTIALITY |
| 12:51PM | 23 | AGREEMENT? |
| 12:51PM | 24 | A.  YES. |
| 12:51PM | 25 | Q.  AND WERE YOU PREPARED TO GIVE THERANOS WHATEVER ASSURANCES |

GROSSMAN DIRECT BY MR. LEACH                                    6455

12:51PM   1    OF CONFIDENTIALITY THEY NEEDED IN THE COURSE OF MAKING YOUR

12:51PM   2    INVESTMENT DECISION?

12:51PM   3    A.   YES.

12:51PM   4    Q.   LET'S GO TO PAGE 1.   IF I COULD DRAW YOUR ATTENTION TO THE

12:51PM   5    BOTTOM PORTION.

12:51PM   6         MR. BALWANI IS WRITING, "ON YOUR TESTS.   THERE WAS A

12:52PM   7    CONTROL THAT FAILED ON ONE OF THE ASSAYS AND THE LAB RERAN THE

12:52PM   8    SAMPLE AND THEY WERE HOLDING BACK RESULTS FOR ALL OF THE OTHER

12:52PM   9    TESTS UNTIL THE ENTIRE ORDER WAS COMPLETE."

12:52PM   10        DO YOU SEE THAT LANGUAGE?

12:52PM   11   A.   YES, I DO.

12:52PM   12   Q.   AND DO YOU BELIEVE THIS TO BE A REFERENCE TO THE TESTS

12:52PM   13   THAT YOU ORDERED THROUGH A WALGREENS?

12:52PM   14   A.   YES.

12:52PM   15   Q.   AT ANY POINT DID MR. BALWANI TELL YOU THAT SOME OF YOUR

12:52PM   16   TESTS WERE RUN ON A THIRD PARTY MACHINE?

12:52PM   17   A.   NO, HE DID NOT.

12:52PM   18   Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

12:52PM   19   A.   YES.

12:52PM   20   Q.   I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS EXHIBIT 1491.

12:52PM   21        PERMISSION TO DISPLAY, YOUR HONOR?

12:52PM   22            THE COURT:   YES.

12:52PM   23   BY MR. LEACH:

12:52PM   24   Q.   LET ME DRAW YOUR ATTENTION TO -- DO YOU HAVE 1491 IN FRONT

12:52PM   25   OF YOU, MR. GROSSMAN?

GROSSMAN DIRECT BY MR. LEACH                                    6456

| | | |
|---|---|---|
| 12:52PM | 1 | A.   I DO. |
| 12:52PM | 2 | Q.   AND THIS IS AN EMAIL THAT YOU'RE NOT ON; IS THAT CORRECT? |
| 12:52PM | 3 | A.   CAN YOU ASK THE QUESTION AGAIN? |
| 12:53PM | 4 | Q.   THIS IS AN EMAIL THAT YOU WERE NOT ON A NOT A PARTY TO? |
| 12:53PM | 5 | A.   YES, CORRECT. |
| 12:53PM | 6 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2. |
| 12:53PM | 7 | DO YOU SEE AT THE BOTTOM WHERE SOMEONE NAMED MAX FOSQUE IS |
| 12:53PM | 8 | WRITING, "PLEASE FOLLOW UP ON WHY BRIAN GROSSMAN HAS NOT BEEN |
| 12:53PM | 9 | RELEASED YET, HE WAS PENDING AN LDAQ AS OF LAST NIGHT.  THIS IS |
| 12:53PM | 10 | CRITICAL TO GET OUT ASAP." |
| 12:53PM | 11 | DO YOU SEE THAT LANGUAGE? |
| 12:53PM | 12 | A.   YES. |
| 12:53PM | 13 | Q.   OKAY.  AND THEN IF WE LOOK -- AND THIS IS AROUND THE TIME |
| 12:54PM | 14 | WHERE YOU WERE CONSIDERING AN INVESTMENT IN THERANOS, |
| 12:54PM | 15 | JANUARY 28TH? |
| 12:54PM | 16 | A.   YES. |
| 12:54PM | 17 | Q.   OKAY.  UP AT THE TOP, MR. FOSQUE WRITES AGAIN, "HI |
| 12:54PM | 18 | ADAM/MARK, |
| 12:54PM | 19 | THIS PATIENT (BRIAN GROSSMAN) IS A VIP, WOULD YOU MIND |
| 12:54PM | 20 | LOOKING INTO THE SLOW DOWN HERE?" |
| 12:54PM | 21 | DO YOU SEE THAT LANGUAGE? |
| 12:54PM | 22 | A.   YES, I DO. |
| 12:54PM | 23 | Q.   AND IF WE GO DOWN TO PAGE 1 UP AT THE TOP, THIS IS ON THE |
| 12:54PM | 24 | IMMULITE; CORRECT? |
| 12:54PM | 25 | DO YOU SEE WHERE MR. FOSQUE IS WRITING, "GREAT, THANKS FOR |

GROSSMAN DIRECT BY MR. LEACH                                    6457

12:54PM  1    THE UPDATE.  PLEASE LET US KNOW THE OUTCOME.

12:54PM  2         "THIS IS ON THE IMMULITE; CORRECT?"

12:54PM  3         DO YOU SEE THAT LANGUAGE?

12:54PM  4    A.   YES.

12:54PM  5    Q.   AND SOMEONE NAMED MARK PANDORI RESPONDS YES?

12:54PM  6    A.   YES.

12:54PM  7    Q.   AND DO YOU KNOW WHETHER THE IMMULITE IS A THIRD PARTY

12:55PM  8    MACHINE MADE BY SOMEONE OTHER THAN THERANOS?

12:55PM  9    A.   I DON'T KNOW WHAT THAT'S REFERRING TO.

12:55PM  10   Q.   OKAY.  BUT AT NO POINT DID MR. BALWANI TELL YOU THAT A

12:55PM  11   PORTION OF YOUR TEST WAS RUN ON A THIRD PARTY MACHINE?

12:55PM  12   A.   NO, HE DID NOT.

12:55PM  13   Q.   WOULD THAT HAVE BEEN A RED FLAG TO YOU?

12:55PM  14   A.   YES.

12:55PM  15   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 1505.

12:55PM  16        ARE YOU FAMILIAR WITH THIS DOCUMENT?

12:55PM  17   A.   YES.

12:55PM  18   Q.   WHAT IS IT?

12:55PM  19   A.   CAN I MAYBE JUST TAKE A MINUTE TO LOOK THROUGH IT?

12:55PM  20   Q.   SURE.

12:55PM  21        (PAUSE IN PROCEEDINGS.)

12:55PM  22             THE WITNESS:  OKAY.  THIS IS -- UM, I AM FAMILIAR

12:56PM  23   WITH THIS.

12:56PM  24   BY MR. LEACH:

12:56PM  25   Q.   OKAY.  WHAT IS IT?

GROSSMAN DIRECT BY MR. LEACH                                         6458

12:56PM  1    A.    THIS IS THE SERIES C-2 STOCK PURCHASE AGREEMENT.

12:56PM  2    Q.    AND IS THIS THE AGREEMENT BY WHICH PFM MADE AN INVESTMENT

12:56PM  3    INTO THERANOS?

12:56PM  4    A.    YES.

12:56PM  5            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1505.

12:56PM  6            MR. WADE:  NO OBJECTION.

12:56PM  7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:57PM  8         (GOVERNMENT'S EXHIBIT 1505 WAS RECEIVED IN EVIDENCE.)

12:57PM  9    BY MR. LEACH:

12:57PM  10   Q.    MR. GROSSMAN, DO YOU SEE THE TITLE, THERANOS, INC. SERIES

12:57PM  11   C-2 PREFERRED STOCK PURCHASE AGREEMENT AT THE TOP?

12:57PM  12   A.    YES.

12:57PM  13   Q.    AND IS THIS A DOCUMENT THAT YOU AND YOUR TEAM REVIEWED IN

12:57PM  14   CONNECTION WITH THE THERANOS INVESTMENT?

12:57PM  15   A.    YES.

12:57PM  16   Q.    AND IF I COULD PLEASE DRAW YOUR ATTENTION TO PAGE 6.

12:57PM  17        DO YOU SEE IN SECTION 4 THERE ARE A NUMBER OF

12:57PM  18   REPRESENTATIONS AND WARRANTIES OF THE INVESTORS?

12:57PM  19   A.    YES.

12:57PM  20   Q.    AND THE INVESTORS IS A REFERENCE TO YOUR FUNDS?

12:57PM  21   A.    YES.

12:57PM  22   Q.    AND IS IF WE LOOK AT PAGE 7, THERE'S A NUMBER OF

12:57PM  23   REPRESENTATIONS RELATING TO THE INVESTORS EXPERIENCE, THE

12:57PM  24   NATURE OF THE INVESTMENT, ACCESS TO DATA, AND THE ACCREDITED

12:58PM  25   NATURE OF THE INVESTOR.

GROSSMAN DIRECT BY MR. LEACH                                    6459

| | | |
|---|---|---|
| 12:58PM | 1 | DO YOU SEE THOSE PARAGRAPHS? |
| 12:58PM | 2 | A.   I'M NOT A LEGAL EXPERT BUT, YES, I DO SEE THOSE. |
| 12:58PM | 3 | Q.   WELL, YOU ENDED UP SIGNING THE STOCK PURCHASE AGREEMENT; |
| 12:58PM | 4 | IS THAT FAIR? |
| 12:58PM | 5 | A.   YES. |
| 12:58PM | 6 | Q.   AND WERE YOU SATISFIED THAT THE REPRESENTATIONS MADE BY |
| 12:58PM | 7 | PFM AT THE TIME OF THE STOCK PURCHASE AGREEMENT WERE TRUE AND |
| 12:58PM | 8 | CORRECT? |
| 12:58PM | 9 | A.   I MEAN, TO THE BEST OF MY MEMORY, YES. |
| 12:58PM | 10 | Q.   OKAY.  PLEASE LOOK AT EXHIBIT 1506. |
| 12:58PM | 11 | ARE YOU FAMILIAR WITH THIS DOCUMENT? |
| 12:58PM | 12 | A.   YES. |
| 12:58PM | 13 | Q.   WHAT IS THIS? |
| 12:58PM | 14 | A.   THIS IS THE MASTER SIGNATURE PAGE. |
| 12:58PM | 15 | Q.   OKAY.  FOR THE INVESTMENT THAT YOU AND YOUR FUNDS |
| 12:58PM | 16 | ULTIMATELY MAKE? |
| 12:58PM | 17 | A.   YES. |
| 12:59PM | 18 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 1506. |
| 12:59PM | 19 | MR. WADE:  NO OBJECTION. |
| 12:59PM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:59PM | 21 | (GOVERNMENT'S EXHIBIT 1506 WAS RECEIVED IN EVIDENCE.) |
| 12:59PM | 22 | MR. LEACH:  IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE |
| 12:59PM | 23 | PORTION WHERE THERE IS FIRST SOME HANDWRITING, IT SAYS, "I |
| 12:59PM | 24 | ACKNOWLEDGE AND AGREE," AND ZOOM IN ON THE NEXT THREE -- THERE |
| 12:59PM | 25 | YOU GO. |

GROSSMAN DIRECT BY MR. LEACH                                    6460

12:59PM  1    Q.   MR. GROSSMAN, THERE ARE THREE DIFFERENT ENTITIES ON THIS,

12:59PM  2    PARTNER INVESTMENT, LP; PFM HEALTHCARE MASTER FUND, LP; AND

12:59PM  3    PFM HEALTHCARE PRINCIPALS FUND, LP.

12:59PM  4         CAN YOU JUST EXPLAIN WHAT THOSE ARE?

12:59PM  5    A.   YES.  I'M GOING TO START WITH PFM HEALTHCARE MASTER FUND

12:59PM  6    LP.  THAT IS THE ENTITY THAT REPRESENTS OUR HEDGE FUND THAT IS

12:59PM  7    AVAILABLE TO INSTITUTIONAL CLIENTS, PENSION PLANS, FOUNDATIONS,

01:00PM  8    ENDOWMENTS, HIGH NET WORTH INDIVIDUALS.

01:00PM  9         PFM HEALTHCARE PRINCIPAL FUNDS IS WHAT WE CALLED OUR

01:00PM  10   FRIENDS AND FAMILY FUND.  IT'S A DIFFERENT LEGAL STRUCTURE, AND

01:00PM  11   AS A RESULT PEOPLE, INDIVIDUALS WITH LOWER INCOME AND WEALTH

01:00PM  12   LEVELS WERE ABLE TO INVEST IN THE PRINCIPALS FUND WHO WERE

01:00PM  13   NOT -- WHO WOULDN'T BE ABLE TO INVEST IN OUR PFM HEALTHCARE

01:00PM  14   MASTER FUND.

01:00PM  15        SO THAT'S WHAT WE REFERRED TO AS OUR FRIENDS AND FAMILY

01:00PM  16   FUND.

01:00PM  17        PARTNER INVESTMENTS IS AN ENTITY THAT WE FORMED, THAT WE

01:00PM  18   USED TO COINVEST IN DEALS, IN PRIVATE DEALS.  AND WHAT I MEAN

01:00PM  19   BY COINVEST IS WE AGGREGATE INVESTMENT INTEREST FROM OUR

01:01PM  20   EXISTING INVESTORS AND POTENTIALLY NON -- OTHER INDIVIDUALS OR

01:01PM  21   ENTITIES THAT AREN'T INVESTED WITH PFM, WE AGGREGATE THAT TO

01:01PM  22   PARTNER INVESTMENTS AND WE MAKE ONE INVESTMENT INTO A COMPANY

01:01PM  23   ALONGSIDE OUR HEDGE FUND, OUR TWO HEDGE FUNDS.

01:01PM  24        SO IT IS AS OPPOSED TO HAVING 10 OR 15 INDIVIDUALS INVEST

01:01PM  25   SEPARATELY.

GROSSMAN DIRECT BY MR. LEACH                                    6461

01:01PM   1    Q.   AND SO DOES THIS REFLECT THAT PARTNER INVESTMENTS, LP, THE

01:01PM   2    COINVESTMENT VEHICLE, INVESTED APPROXIMATELY $55.5 MILLION IN

01:01PM   3    THERANOS?

01:01PM   4    A.   YES, IT DOES.

01:01PM   5    Q.   AND DOES THIS REFLECT THAT THE -- YOUR INVESTMENT FUND,

01:01PM   6    THE HEDGE FUND, INVESTED APPROXIMATELY 38.3 MILLION IN

01:01PM   7    THERANOS?

01:01PM   8    A.   OUR INSTITUTIONAL HEDGE FUND, YES.

01:01PM   9    Q.   AND DOES THIS REFLECT THAT THE FRIENDS AND FAMILY VEHICLE,

01:02PM   10   PFM HEALTHCARE PRINCIPALS FUND, LP, INVESTED ABOUT $2.3 MILLION

01:02PM   11   IN THERANOS?

01:02PM   12   A.   YES.

01:02PM   13   Q.   LET ME NEXT PLEASE DRAW YOUR ATTENTION TO WHAT IS IN

01:02PM   14   EVIDENCE AS EXHIBIT 4345.

01:02PM   15        PERMISSION TO DISPLAY, YOUR HONOR?

01:02PM   16             THE COURT:  YES.

01:02PM   17             MR. LEACH:  GO TO PAGE 1.  IT'S 4845.  EXCUSE ME.

01:02PM   18   Q.   DOES THIS APPEAR TO BE A, A WIRE INFORMATION RELATING TO

01:02PM   19   PFM, MR. GROSSMAN?

01:02PM   20   A.   YES.

01:02PM   21   Q.   AND UNDER BASIC INFORMATION, THERE'S AN AMOUNT

01:03PM   22   $38,336,632, THAT'S THE INVESTMENT OF THE INSTITUTIONAL HEDGE

01:03PM   23   FUND THAT YOU MANAGE?

01:03PM   24   A.   YES.

01:03PM   25             MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

GROSSMAN CROSS BY MR. WADE                                              6462

01:03PM  1              THE COURT:  YES.

01:03PM  2              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:03PM  3              MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

01:03PM  4         THANK YOU.  THANK YOU, MR. GROSSMAN.

01:03PM  5              THE COURT:  CROSS-EXAMINATION?

01:03PM  6              MR. WADE:  I DO, YOUR HONOR.  MAYBE A STRETCH BREAK?

01:03PM  7              THE COURT:  SURE.  FOLKS, IF YOU FEEL LIKE STANDING

01:03PM  8         AND STRETCHING, YOU CAN DO THAT DURING THIS EXCHANGE.

01:03PM  9         (STRETCHING.)

01:05PM  10              THE COURT:  MR. WADE.

01:05PM  11              MR. WADE:  THANK YOU, YOUR HONOR.

01:06PM  12                         **CROSS-EXAMINATION**

01:06PM  13         BY MR. WADE:

01:06PM  14         Q.  GOOD AFTERNOON, MR. GROSSMAN.

01:06PM  15         A.  GOOD AFTERNOON.

01:06PM  16         Q.  MY NAME IS LANCE WADE.  I REPRESENT ELIZABETH HOLMES.

01:06PM  17             I'M GOING TO ASK YOU A FEW QUESTIONS HERE THIS AFTERNOON.

01:06PM  18         A.  OKAY.

01:06PM  19         Q.  OKAY.  I'D LIKE TO START JUST BY PROVIDING A LITTLE

01:06PM  20         FRAMEWORK DURING THE PERIOD IN WHICH PFM WAS CONSIDERING THE

01:06PM  21         INVESTMENT IN THERANOS.

01:06PM  22             ACTUALLY, YOUR HONOR, MAY I APPROACH?

01:06PM  23              THE COURT:  YES.

01:06PM  24         BY MR. WADE:

01:06PM  25         Q.  (HANDING.)

GROSSMAN CROSS BY MR. WADE                                        6463

01:06PM   1          BUT BEFORE I DO THAT, I'M GOING TO HAND YOU A COUPLE OF

01:06PM   2     BINDERS, AND THEY WILL HAVE NUMERICAL TABS.  AS I CALL YOUR

01:06PM   3     ATTENTION TO PARTICULAR DOCUMENTS, YOU CAN REFERENCE THEM IN

01:06PM   4     THESE BINDERS.  OKAY?

01:07PM   5          NOW, SIR, DO YOU RECALL THAT YOU FIRST LEARNED ABOUT

01:07PM   6     THERANOS AND THE FACT THAT IT MIGHT BE A POSSIBLE INVESTMENT ON

01:07PM   7     NOVEMBER 1ST OF 2013?

01:07PM   8     A.   I DO.

01:07PM   9     Q.   OKAY.  AND I'M GOING TO PUT UP, WITH THE COURT'S

01:07PM  10     PERMISSION, A CALENDAR DEMONSTRATIVE JUST SO THAT WE CAN MARK

01:07PM  11     THESE DATES.  OKAY?

01:07PM  12          AND I BELIEVE YOU JUST TESTIFIED ON DIRECT TESTIMONY THAT

01:08PM  13     THE INVESTMENT DECISION THAT YOU MADE WAS MADE IN, WAS IT

01:08PM  14     FEBRUARY 5TH, 4TH OR 5TH OF 2014?

01:08PM  15     A.   I BELIEVE THAT'S RIGHT.

01:08PM  16     Q.   OKAY.  LET ME MARK THAT HERE ON THE DEMONSTRATIVE.

01:08PM  17          AND ON DECEMBER 12TH OF 2013, YOU HAD YOUR INITIAL MEETING

01:08PM  18     WITH MS. HOLMES AND MR. BALWANI; CORRECT?

01:08PM  19     A.   YES.

01:08PM  20     Q.   AND THAT LASTED ABOUT AN HOUR?

01:08PM  21     A.   I BELIEVE THAT'S RIGHT.

01:08PM  22     Q.   OKAY.  AND THEN I BELIEVE YOU TESTIFIED THAT THERE WAS A

01:09PM  23     SECOND MEETING ON JANUARY 10TH OF 2013; CORRECT?

01:09PM  24     A.   I BELIEVE THAT'S RIGHT.

01:09PM  25     Q.   AND I THINK YOU, YOU TESTIFIED MS. HOLMES WAS THERE FOR

GROSSMAN CROSS BY MR. WADE                                          6464

01:09PM   1    ABOUT HALF OF THE MEETING; IS THAT RIGHT?

01:09PM   2    A.   YES.

01:09PM   3    Q.   AND WAS THAT ABOUT AN HOUR?

01:09PM   4    A.   I BELIEVE IT WAS LONGER THAN THAT.

01:09PM   5    Q.   MAYBE AN HOUR AND A HALF?

01:09PM   6    A.   YES.

01:09PM   7    Q.   OKAY.  NOW, YOU ALSO TESTIFIED ABOUT A SLIDE DECK THAT THE

01:09PM   8    COMPANY SENT YOU AT SOME POINT; RIGHT?

01:09PM   9    A.   YES.

01:09PM   10   Q.   AND THAT WAS SENT AT YOUR REQUEST; RIGHT?

01:09PM   11   A.   YES.

01:09PM   12   Q.   THERE HAD BEEN SOME SLIDES THAT WERE SHOWN IN A MEETING

01:09PM   13   AND YOU ASKED TO RECEIVE THOSE MATERIALS; CORRECT?

01:09PM   14   A.   YES.

01:09PM   15   Q.   OKAY.  AND IT WAS NOT JUST THE SLIDE -- AND THERE WERE

01:10PM   16   SOME OTHER PHONE CALLS WITH MR. BALWANI; CORRECT?

01:10PM   17   A.   YES.

01:10PM   18   Q.   OKAY.  BUT YOU -- YOU AS AN INSTITUTION, PFM -- DID MORE

01:10PM   19   THAN JUST HAVE THOSE MEETINGS AND LOOK AT THOSE MATERIALS;

01:10PM   20   RIGHT?

01:10PM   21   A.   YES.

01:10PM   22   Q.   YOU WENT THROUGH A PRETTY EXTENSIVE PROCESS BY WHICH YOU

01:10PM   23   CONSIDERED THE INVESTMENT; CORRECT?

01:10PM   24   A.   YES.

01:10PM   25   Q.   WOULD YOU SAY THAT YOU SPENT HUNDREDS OF HOURS

GROSSMAN CROSS BY MR. WADE                                           6465

01:10PM  1     COLLECTIVELY AS A GROUP?

01:10PM  2     A.   I DON'T KNOW.

01:10PM  3     Q.   OKAY.  DO YOU HAVE ANY ESTIMATE ON THE NUMBER OF HOURS?

01:10PM  4     A.   I DON'T.

01:10PM  5     Q.   OKAY.  BUT THERE WERE, THERE WERE FOUR MEMBERS OF THE

01:10PM  6     TEAM, SOMETIMES FIVE WHO WERE INVOLVED IN THIS?

01:10PM  7     A.   YES.

01:10PM  8     Q.   THAT WAS YOU AND MR. JAMES, RIGHT, WERE IN THE INITIAL

01:10PM  9     MEETING?

01:10PM  10    A.   YES.

01:10PM  11    Q.   AND THEN THERE WERE THREE ANALYSTS; RIGHT?

01:10PM  12    A.   YES.

01:10PM  13    Q.   AND THEN IN ADDITION TO THAT, YOU ALSO CALLED IN, OR

01:10PM  14    CALLED UPON A VARIETY OF OUTSIDE EXPERTS FOR THEIR VIEWS ON THE

01:11PM  15    COMPANY; CORRECT?

01:11PM  16    A.   YES.

01:11PM  17    Q.   REGULATORY ADVISORS; RIGHT?

01:11PM  18    A.   I BELIEVE SO, YES.

01:11PM  19    Q.   SOMEONE WITH SOME LAB BACKGROUND IN THE FINANCE SECTOR,

01:11PM  20    MR. CLAMMER; RIGHT?

01:11PM  21    A.   YES.

01:11PM  22    Q.   AND A REGULATORY LAWYER, I BELIEVE, AT SOME POINT; RIGHT?

01:11PM  23    A.   I DON'T REMEMBER SPECIFICALLY.

01:11PM  24    Q.   OKAY.  BUT YOU'RE A PRETTY SOPHISTICATED OPERATION.  IS

01:11PM  25    THAT A FAIR CHARACTERIZATION?

GROSSMAN CROSS BY MR. WADE                                    6466

01:11PM   1    A.   I DON'T -- I'M NOT SURE HOW TO ANSWER YOUR QUESTION.

01:11PM   2         IF YOU'RE ASSUMING -- IF THE QUESTION IS, ARE WE AN

01:11PM   3    ACCREDITED S.E.C. REGISTERED ADVISOR WITH INSTITUTIONAL FUNDS,

01:11PM   4    YES, WE ARE.

01:11PM   5    Q.   AND I DIDN'T MEAN FOR IT TO BE A TRICK QUESTION.

01:12PM   6         YOU'VE MADE A LOT OF INVESTMENTS IN YOUR CAREER; CORRECT?

01:12PM   7    A.   YES.

01:12PM   8    Q.   AND YOU GO THROUGH A PROCESS BY WHICH YOU CONSIDER WHETHER

01:12PM   9    TO MAKE AN INVESTMENT OR WHETHER TO PASS ON IT; RIGHT?

01:12PM  10    A.   YES.

01:12PM  11    Q.   AND THIS IS AN INVESTMENT THAT YOU CONSIDERED AND YOU

01:12PM  12    EITHER COULD HAVE MOVED FORWARD OR YOU COULD HAVE PASSED AT ANY

01:12PM  13    POINT; RIGHT?

01:12PM  14    A.   YES.

01:12PM  15    Q.   OKAY.  AFTER THAT MEETING HERE IN JANUARY OF 2010, YOUR

01:12PM  16    WORK WAS NOT COMPLETE; RIGHT?

01:12PM  17    A.   YES, THAT'S CORRECT.

01:12PM  18    Q.   OKAY.  BUT AFTER THAT POINT, IT WAS MORE THAN A YEAR UNTIL

01:12PM  19    YOU EVER SPOKE WITH MS. HOLMES AGAIN; CORRECT?

01:12PM  20    A.   I DON'T RECALL.

01:12PM  21    Q.   OKAY.  DO YOU RECALL SPEAKING WITH HER AGAIN PRIOR TO

01:13PM  22    FEBRUARY 4TH OR 5TH?

01:13PM  23    A.   I DON'T RECALL.

01:13PM  24    Q.   OKAY.  BUT AS YOU SIT HERE TODAY, YOU DON'T HAVE ANY

01:13PM  25    INDICATIONS THAT THERE WERE ANY INTERACTIONS WITH MS. HOLMES

GROSSMAN CROSS BY MR. WADE                                      6467

01:13PM   1    AFTER YOU LEFT THAT MEETING ON JANUARY 10TH, 2014; CORRECT?

01:13PM   2    A.   IF THE QUESTION -- I'M -- I DON'T RECALL WHETHER I

01:13PM   3    INTERACTED WITH HER AFTER THE JANUARY 10TH MEETING.

01:13PM   4    Q.   OKAY.  DO YOU RECALL PREVIOUSLY MAKING STATEMENTS THAT YOU

01:13PM   5    DIDN'T INTERACT WITH HER AGAIN UNTIL LATE 2015?

01:13PM   6    A.   I DON'T.

01:13PM   7    Q.   OKAY.  AND AT THE TIME THAT YOU LEFT THAT MEETING IN

01:13PM   8    JANUARY, THERE WAS A LOT OF WORK THAT YOU WANTED TO DO AS AN

01:13PM   9    INSTITUTION BEFORE YOU WERE GOING TO MAKE AN INVESTMENT

01:13PM  10    DECISION; IS THAT FAIR?

01:13PM  11    A.   THERE WAS WORK THAT WE NEEDED TO DO, YES.

01:13PM  12    Q.   YOU WANTED TO DO ADDITIONAL RESEARCH AND DUE DILIGENCE SO

01:14PM  13    THAT YOU COULD BE FULLY INFORMED BEFORE YOU COULD MAKE YOUR

01:14PM  14    ASSESSMENT ON WHETHER TO INVEST IN THERANOS; RIGHT?

01:14PM  15    A.   YES.

01:14PM  16    Q.   OKAY.  AND THIS WAS IN SOME WAYS JUST THE START OF THE

01:14PM  17    PROCESS; CORRECT?

01:14PM  18    A.   I DON'T QUITE UNDERSTAND THE QUESTION.

01:14PM  19    Q.   WELL, YOUR INITIAL MEETINGS WITH THE BUSINESS IN WHICH YOU

01:14PM  20    MIGHT INVEST ARE SORT OF THE BEGINNING OF THE PROCESS, AND THEN

01:14PM  21    YOUR FUND GOES THROUGH ITS OWN SORT OF BOTTOM UP PROCESS BEFORE

01:14PM  22    IT MAKES AN INVESTMENT DECISION; RIGHT?

01:14PM  23    A.   NOT ALWAYS.

01:14PM  24    Q.   WELL, DO YOU RECALL TESTIFYING IN THIS CASE THAT THIS --

01:14PM  25    DO YOU RECALL TESTIFYING PREVIOUSLY WITH RESPECT TO THESE FACTS

GROSSMAN CROSS BY MR. WADE                                6468

01:14PM   1   THAT THAT JANUARY 10TH MEETING WAS JUST REALLY THE START OF THE

01:14PM   2   INVESTMENT ANALYSIS PROCESS FOR PFM?

01:14PM   3   A.   I DON'T RECALL SPECIFICALLY, BUT WE -- BUT IF THE

01:14PM   4   QUESTION -- IF THE QUESTION IS, DID WE DO SUBSEQUENT ANALYSIS,

01:15PM   5   THE ANSWER IS YES.

01:15PM   6   Q.   OKAY.  AND THAT WASN'T THE QUESTION, BUT I'LL TAKE THE

01:15PM   7   ANSWER.  OKAY?

01:15PM   8   A.   ALL RIGHT.

01:15PM   9   Q.   AND WE'LL GO INTO SOME DETAIL ON WHAT YOU CONSIDERED AS

01:15PM  10   YOU WENT THROUGH THAT INVESTMENT DECISION.

01:15PM  11       AT THE TIME THAT YOU FIRST LEARNED OF THERANOS IN

01:15PM  12   NOVEMBER 1ST OF 2013, DO YOU RECALL HOW MANY WALGREENS

01:15PM  13   LOCATIONS THERANOS WAS OPERATING OUT OF?

01:15PM  14   A.   I BELIEVE IT WAS AT THAT POINT ZERO.

01:15PM  15   Q.   OKAY.  AND, AND WITHIN ABOUT A WEEK OR SO, THEY HAD

01:15PM  16   ACTUALLY OPENED UP TO ONE LOCATION IN PALO ALTO; CORRECT?

01:15PM  17   A.   I BELIEVE THAT'S RIGHT.

01:15PM  18   Q.   OKAY.  AND THEN BY THE TIME YOU COMPLETED YOUR INVESTMENT

01:16PM  19   DECISION, DO YOU KNOW HOW MANY LOCATIONS THERANOS WAS OPERATING

01:16PM  20   OUT OF?

01:16PM  21   A.   I DON'T REMEMBER SPECIFICALLY.

01:16PM  22   Q.   DO YOU RECALL IT BEING THREE?

01:16PM  23   A.   I THINK IT WAS -- I DON'T, I DON'T REMEMBER.

01:16PM  24   Q.   FEWER THAN FIVE?

01:16PM  25   A.   I -- AS OF FEBRUARY 5TH, WHAT WAS THE NUMBER?

GROSSMAN CROSS BY MR. WADE                                    6469

01:16PM  1    Q.   YEAH.

01:16PM  2    A.   YEAH, I DON'T REMEMBER.

01:16PM  3    Q.   OKAY.  WE'LL SEE IF WE CAN REFRESH YOU AS WE GO THROUGH

01:16PM  4    YOUR TESTIMONY TODAY.

01:16PM  5         YOU RECALLED LEARNING DURING THE PROCESS THAT -- WELL, IN

01:16PM  6    ANY EVENT, YOU RECALL IT WAS VERY EARLY IN THE ROLLOUT OF THE

01:16PM  7    WALGREENS RELATIONSHIP; IS THAT FAIR?

01:16PM  8    A.   YES.

01:16PM  9    Q.   OKAY.  AND THERE HAD BEEN SOME TALK OF THE 8200 LOCATIONS

01:16PM  10   NATIONWIDE; RIGHT?

01:16PM  11   A.   I BELIEVE IT WAS 8100, BUT, YES.

01:16PM  12   Q.   OKAY.  8100?

01:16PM  13   A.   YES.

01:16PM  14   Q.   BUT THEY WERE IN, A HANDFUL IN THE PERIOD THAT YOU WERE

01:17PM  15   CONSIDERING THE INVESTMENT; CORRECT?

01:17PM  16   A.   YES.

01:17PM  17   Q.   OKAY.  AND YOU RECALL THAT LEARNING DURING THIS PROCESS

01:17PM  18   THERE WAS A TWO PHASE ROLLOUT THAT WAS GOING TO HAPPEN AT

01:17PM  19   THERANOS?

01:17PM  20   A.   YES.

01:17PM  21   Q.   AND PHASE I WAS GOING TO BE THE PERIOD WHERE THEY WERE

01:17PM  22   GOING TO OPERATE WITHIN A -- I THINK YOU REFERRED TO IT IN YOUR

01:17PM  23   DOCUMENTS AS A HUB AND SPOKE MODEL; IS THAT RIGHT?

01:17PM  24   A.   YES.

01:17PM  25   Q.   WHERE THEY WOULD BASICALLY RUN A CENTRAL LABORATORY;

GROSSMAN CROSS BY MR. WADE                                    6470

01:17PM   1    RIGHT?

01:17PM   2    A.   YES.

01:17PM   3    Q.   AND PHASE II WAS GOING TO BE THE POINT WHERE THE DEVICES

01:17PM   4    WERE DEPLOYED OUT INTO THE PHYSICAL LOCATIONS AT WALGREENS

01:17PM   5    LOCATIONS; CORRECT?

01:17PM   6    A.   YES.

01:17PM   7    Q.   AND AS YOU WERE LEARNING ABOUT THIS PROCESS FROM THE

01:17PM   8    COMPANY, YOU DISCUSSED AT DIFFERENT TIMES PHASE I AND PHASE II

01:18PM   9    OF THEIR BUSINESS PLAN; RIGHT?

01:18PM   10   A.   YES.

01:18PM   11   Q.   NOW, I WANT TO -- YOU MENTIONED THAT YOU'RE AN S.E.C.

01:18PM   12   REGISTERED INVESTMENT ADVISOR, AND I THINK YOU ALSO USED THE

01:18PM   13   WORD HEDGE FUND.

01:18PM   14        IS IT -- MR. LEACH SHOWED YOU THE THREE ENTITIES THAT

01:18PM   15   INVESTED IN THERANOS.  DO YOU RECALL THAT JUST A MINUTE AGO?

01:18PM   16   A.   YES, I DO.

01:18PM   17   Q.   OKAY.  WHY DON'T WE --

01:18PM   18        WITH THE COURT'S PERMISSION, I'LL PULL UP 1506, WHICH I

01:18PM   19   THINK IS IN EVIDENCE.

01:18PM   20             THE COURT:  YES.

01:18PM   21   BY MR. WADE:

01:18PM   22   Q.   AND JUST SO WE UNDERSTAND, WHICH ONE OF THESE, OR ARE

01:18PM   23   MULTIPLE OF THESE ENTITIES CONSIDERED HEDGE FUNDS?

01:19PM   24   A.   THE MIDDLE ENTITY AND THE BOTTOM ENTITY ARE CONSIDERED

01:19PM   25   HEDGE FUNDS.

GROSSMAN CROSS BY MR. WADE                                        6471

01:19PM  1    Q.   OKAY.  AND WHY -- WHAT MAKES THEM A HEDGE FUND VERSUS

01:19PM  2    THE -- BY COMPARISON TO THE TOP ENTITIES, FOR EXAMPLE?

01:19PM  3    A.   WHAT MAKES THEM A HEDGE FUND?

01:19PM  4    Q.   WHY IS IT CONSIDERED A HEDGE FUND IN THE INVESTMENT WORLD?

01:19PM  5    A.   THEY'RE GOVERNED BY DIFFERENT REGULATORY REGIMES.  I'M NOT

01:19PM  6    A HEDGE FUND LEGAL EXPERT, BUT AS A HEDGE FUND YOU ARE LIMITED

01:19PM  7    IN WHAT YOU CAN SELL THE WAY YOU MARKET THE FUND, AND AS A

01:19PM  8    RESULT YOU DON'T -- YOU'RE NOT ALLOWED TO MARKET THE, THE

01:19PM  9    INVESTMENT PRODUCT TO THE GENERAL PUBLIC.

01:19PM  10        THERE ARE OTHER DIFFERENCES BETWEEN MUTUAL FUNDS AND HEDGE

01:19PM  11   FUNDS, ONE OBVIOUS ONE BEING IS THAT HEDGE FUNDS CAN HEDGE.

01:20PM  12   Q.   OKAY.  THE, THE -- AND THE -- IS IT FAIR TO SAY THE

01:20PM  13   PRINCIPAL HEALTH CARE FUND WITHIN PFM IS SOMETHING THAT YOU

01:20PM  14   WERE IN CHARGE OF DURING THIS PERIOD?

01:20PM  15   A.   CAN YOU BE A LITTLE MORE SPECIFIC WHAT YOU'RE REFERRING

01:20PM  16   TO?

01:20PM  17   Q.   WHAT WAS THE LARGEST HEALTH CARE FUND AT PFM IN THIS TIME

01:20PM  18   PERIOD?

01:20PM  19   A.   THE LARGEST HEALTH CARE FUND WAS THE HEALTH CARE MASTER

01:20PM  20   FUND.

01:20PM  21   Q.   OKAY.  AND WERE YOU THE PORTFOLIO MANAGER OF THE HEALTH

01:20PM  22   CARE MASTER FUND?

01:20PM  23   A.   YES.

01:20PM  24   Q.   OKAY.  AND THAT'S THE, THAT'S THE MIDDLE ENTITY HERE ON

01:20PM  25   THIS EXHIBIT 1506; CORRECT?

GROSSMAN CROSS BY MR. WADE                                      6472

01:20PM   1    A.   YES.

01:20PM   2    Q.   OKAY.  AND THAT'S, THAT'S -- AND ARE YOU THE PERSON,

01:20PM   3    THEREFORE, THAT HAS THE ULTIMATE AUTHORITY TO MAKE THE

01:20PM   4    INVESTMENT DECISIONS WITH RESPECT TO THAT FUND?

01:20PM   5    A.   YES.

01:20PM   6    Q.   OKAY.  AND JUST SO WE ALL UNDERSTAND SORT OF HOW THIS

01:21PM   7    WORKS, YOU MENTIONED THAT THERE WERE VARIOUS, I THINK YOU SAID,

01:21PM   8    FAMILY OFFICES AND INSTITUTIONAL INVESTORS AND HIGH NET WORTH

01:21PM   9    INDIVIDUALS WHO CHOOSE TO PLACE MONEY INTO THAT FUND; IS THAT

01:21PM   10   RIGHT?

01:21PM   11   A.   THAT IS RIGHT.

01:21PM   12   Q.   AND AT THAT POINT, ALL OF THE INVESTMENT DECISIONS ARE

01:21PM   13   MADE BY YOU; IS THAT CORRECT?

01:21PM   14   A.   I HAVE -- YEAH, YES.

01:21PM   15   Q.   IN OTHER WORDS --

01:21PM   16   A.   WELL, LET ME JUST -- I JUST WANT TO MAKE SURE THAT I AGREE

01:21PM   17   WITH THE ASSUMPTION IN YOUR QUESTION.

01:21PM   18        I DON'T MAKE EVERY INVESTMENT DECISION, BUT I HAVE THE

01:21PM   19   FINAL INVESTMENT DECISION FOR THE PORTFOLIO.

01:21PM   20   Q.   FAIR ENOUGH.

01:21PM   21        AND I GUESS THE POINT I'M TRYING TO MAKE IS THAT WHEN

01:21PM   22   SOMEONE GIVES MONEY TO YOU AS A HEDGE FUND, THEY NO LONGER HAVE

01:21PM   23   CONTROL OVER HOW YOU INVEST THE MONEY.  THE DECISION IS YOURS,

01:22PM   24   NOT THE FAMILY OFFICE THAT GAVE YOU THE MONEY; CORRECT?

01:22PM   25   A.   UNTIL THEY REQUEST IT BACK, YES.

GROSSMAN CROSS BY MR. WADE                                                6473

01:22PM  1      Q.   FAIR ENOUGH.

01:22PM  2           AND WITH RESPECT TO THE FUND ON THE BOTTOM, THE PRINCIPAL

01:22PM  3      HEALTH CARE, OR THE PFM HEALTHCARE PRINCIPALS FUND, LP, WHO

01:22PM  4      MAKES DECISIONS FOR THAT FUND?

01:22PM  5      A.   THE GOVERNANCE FOR THAT FUND IS THE SAME AS THE GOVERNANCE

01:22PM  6      FOR THE PFM HEALTHCARE MASTER FUND.

01:22PM  7      Q.   OKAY.  SO YOU HAVE THE ULTIMATE DECISION MAKING AUTHORITY

01:22PM  8      FOR THAT FUND AS WELL?

01:22PM  9      A.   YES.

01:22PM  10     Q.   SO WHEN PEOPLE PUT MONEY INTO THAT FUND, THEY'RE

01:22PM  11     ENTRUSTING YOU TO MAKE THE INVESTMENT DECISION; IS THAT FAIR?

01:22PM  12     A.   YES.

01:22PM  13     Q.   OKAY.  AND THEN THE FIRST FUND IS PARTNER INVESTMENT

01:23PM  14     FUNDS -- I'M SORRY, PARTNER INVESTMENTS, LP.

01:23PM  15          DO YOU SEE THAT?

01:23PM  16     A.   YES.

01:23PM  17     Q.   AND IN THAT FUND, DO THE INDIVIDUALS RETAIN CONTROL TO

01:23PM  18     MAKE INVESTMENT DECISIONS?

01:23PM  19     A.   COULD YOU BE A LITTLE MORE SPECIFIC?

01:23PM  20     Q.   WELL, LET'S USE THERANOS, FOR EXAMPLE.

01:23PM  21          SO THE PEOPLE WHO INVESTED -- I ASSUME THE 55.5 MILLION IS

01:23PM  22     MADE UP OF A NUMBER OF DIFFERENT INVESTORS; IS THAT FAIR?

01:23PM  23     A.   YES.

01:23PM  24     Q.   AND DID THOSE INDIVIDUAL INVESTORS HAVE THE ABILITY TO

01:23PM  25     MAKE THE DECISION TO INVEST IN THERANOS?

GROSSMAN CROSS BY MR. WADE                                    6474

```
01:23PM   1    A.   YES.

01:23PM   2    Q.   OKAY.  AND DID THEY DO THAT BASED UPON ANALYSIS AND

01:23PM   3    INFORMATION THAT WAS PROVIDED BY YOU AND YOUR TEAM?

01:23PM   4    A.   I, I CAN'T REALLY ANSWER THAT QUESTION.  I'M NOT SURE WHAT

01:23PM   5    THE BASIS FOR THOSE INDIVIDUALS MAKING DECISIONS WERE.  I

01:23PM   6    DON'T, I DON'T KNOW.

01:23PM   7    Q.   FAIR ENOUGH.

01:23PM   8         WE'LL GO THROUGH SOME OF THE MATERIALS THAT THEY WERE

01:23PM   9    GIVEN.

01:23PM   10        DO YOU RECALL THAT YOU PREPARED AN ANALYSIS THAT WAS GIVEN

01:23PM   11   TO SOME OF THE PEOPLE WHO INVESTED IN THAT FUND?

01:24PM   12   A.   YES.

01:24PM   13   Q.   OKAY.  AND DO YOU HAVE REASON TO BELIEVE THAT SOME OF THE

01:24PM   14   PEOPLE WHO INVESTED IN THAT FUND MADE THE DECISIONS BASED UPON

01:24PM   15   THAT ANALYSIS?

01:24PM   16   A.   IT'S POSSIBLE.

01:24PM   17   Q.   OKAY.  NOW, AS SOMEONE WHO MAKES THESE INVESTMENT

01:24PM   18   DECISIONS, I'M SURE YOU UNDERSTAND, YOU KNOW, RISKS ARE COMMON

01:24PM   19   IN INVESTMENTS; IS THAT FAIR?

01:24PM   20   A.   YES.

01:24PM   21   Q.   OKAY.  AND ONE OF THE THINGS THAT YOU DO IS ASSESS THE

01:24PM   22   RISKS AND THE REWARDS AND DECIDE WHETHER OR NOT IT'S WORTH

01:24PM   23   PROCEEDING WITH AN INVESTMENT; IS THAT FAIR?

01:24PM   24   A.   YES.

01:24PM   25   Q.   OKAY.  AND I -- AND WOULD YOU SAY YOU'VE MADE TENS OF
```

GROSSMAN CROSS BY MR. WADE                                        6475

01:24PM   1   THOUSANDS OF INVESTMENTS DECISIONS IN YOUR CAREER?

01:24PM   2   A.   I DON'T KNOW.

01:24PM   3   Q.   A LOT?

01:24PM   4   A.   YEAH, I DON'T -- WHAT'S "A LOT"?

01:25PM   5   Q.   HAVE YOU MADE MORE THAN A HUNDRED INVESTMENT DECISIONS IN

01:25PM   6   YOUR CAREER?

01:25PM   7   A.   YES.

01:25PM   8   Q.   OKAY.  AND SOMETIMES YOU WIN AND SOMETIMES YOU LOSE;

01:25PM   9   RIGHT?

01:25PM  10   A.   YES.

01:25PM  11   Q.   OKAY.  AND IS IT FAIR TO SAY THAT GENERALLY THE MORE RISK

01:25PM  12   THAT YOU TAKE, THE GREATER THE REWARD?  IS THAT SORT OF A

01:25PM  13   COMMON THOUGHT WITH AN INVESTMENT PHILOSOPHY?

01:25PM  14   A.   YES.

01:25PM  15   Q.   AND WHEN, WHEN -- JUST SO WE'RE CLEAR, WHEN YOU'RE MAKING

01:25PM  16   THESE INVESTMENT DECISIONS, YOU'RE NOT DOING THIS BASED UPON

01:25PM  17   JUST GUT FEEL; RIGHT?

01:25PM  18   A.   UM, NO.

01:25PM  19   Q.   YOU GO THROUGH A PRETTY EXTENSIVE PROCESS OF ANALYSIS

01:25PM  20   BEFORE YOU MAKE A DECISION TO INVEST OTHER PEOPLE'S MONEY;

01:26PM  21   RIGHT?

01:26PM  22   A.   YES.

01:26PM  23   Q.   AND YOU WANT TO DO YOUR RESEARCH AND BE CAUTIOUS TO MAKE

01:26PM  24   SURE YOU'RE MAKING A SOUND AND PRUDENT INVESTMENT DECISION;

01:26PM  25   CORRECT?

GROSSMAN CROSS BY MR. WADE                                      6476

01:26PM   1    A.   YES.

01:26PM   2    Q.   OKAY.  AND IN THE HEALTH CARE SPACE IN PARTICULAR, YOU

01:26PM   3    HAVE A FAIR AMOUNT OF EXPERTISE; RIGHT?

01:26PM   4    A.   I MEAN, IF, IF YOU'RE ASKING DO I HAVE EXPERIENCE AS A

01:26PM   5    HEALTH CARE INVESTOR, YES.

01:26PM   6    Q.   HOW MUCH EXPERIENCE DO YOU HAVE AS A HEALTH CARE INVESTOR?

01:26PM   7    A.   I'VE BEEN INVESTING IN THE SPACE SINCE THE LATE '90S.

01:26PM   8    Q.   OKAY.  SO MORE THAN 20 YEARS OF EXPERIENCE IN INVESTING IN

01:26PM   9    HEALTH CARE COMPANIES; IS THAT FAIR?

01:26PM   10   A.   YES.

01:26PM   11   Q.   AND DOES THAT INCLUDE A WIDE VARIETY OF HEALTH CARE

01:26PM   12   COMPANIES?

01:26PM   13   A.   YES.

01:26PM   14   Q.   GIVE US JUST A SENSE OF THE RANGE OF DIFFERENT COMPANIES

01:26PM   15   THAT YOU HAVE EXPERIENCE INVESTING IN IN THE HEALTH CARE SPACE.

01:27PM   16   A.   FROM THE LARGEST COMPANIES LIKE UNITED HEALTH CARE, LIKE

01:27PM   17   PFIZER, TO, YOU KNOW, SMALL SERIES A SEED INVESTMENTS, THE

01:27PM   18   WHOLE CONTINUUM.

01:27PM   19   Q.   OKAY.  AND PFM IN PARTICULAR IN THE HEALTH CARE SPACE

01:27PM   20   INVESTS PREDOMINANTLY IN PUBLIC MARKET SECURITIES; IS THAT

01:27PM   21   RIGHT?

01:27PM   22   A.   MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.  WHAT DO YOU

01:27PM   23   MEAN BY "PREDOMINANTLY"?

01:27PM   24   Q.   WHAT PERCENTAGE OF PFM -- IN THIS TIME PERIOD ROUGHLY,

01:27PM   25   WHAT PERCENTAGE OF PFM'S INVESTMENTS WERE IN PUBLICLY TRADED

GROSSMAN CROSS BY MR. WADE                                      6477

01:27PM   1    SECURITIES?

01:27PM   2    A.   I DON'T, I DON'T KNOW OFF THE TOP OF MY HEAD.

01:27PM   3    Q.   DO YOU HAVE AN ESTIMATE?

01:27PM   4    A.   I DON'T.

01:27PM   5    Q.   OKAY.  YOU WERE THE PORTFOLIO MANAGER AT THE TIME; RIGHT?

01:27PM   6    A.   YES.

01:27PM   7    Q.   OKAY.

01:27PM   8    A.   I WAS ONE OF -- THERE WAS ANOTHER PORTFOLIO MANAGER AT PFM

01:28PM   9    AS WELL.

01:28PM  10    Q.   IS THAT MR. JAMES?

01:28PM  11    A.   YES.

01:28PM  12    Q.   BUT YOU WERE THE PORTFOLIO MANAGER OF THE HEALTH CARE

01:28PM  13    INVESTMENT FUND; CORRECT?

01:28PM  14    A.   YEP.

01:28PM  15    Q.   AND HE GENERALLY DEFERRED TO YOU ON THE HEALTH CARE

01:28PM  16    INVESTMENTS; IS THAT FAIR?

01:28PM  17    A.   YES.

01:28PM  18    Q.   OKAY.  AND JUST SO WE UNDERSTAND HOW YOUR MODEL WORKS, IF

01:28PM  19    SOMEONE ENTRUSTS YOU WITH THEIR MONEY, YOU'RE COMPENSATED BASED

01:28PM  20    UPON A PERCENTAGE OF THE ASSETS UNDER MANAGEMENT; RIGHT?

01:28PM  21    A.   NO.

01:28PM  22    Q.   OKAY.  WHY DON'T YOU TELL US HOW YOU'RE COMPENSATED.

01:28PM  23    A.   IT IS A FUNCTION OF -- IT'S THE NET PROFITABILITY OF THE

01:28PM  24    BUSINESS AFTER EXPENSES.

01:28PM  25    Q.   OKAY.  AND SO YOU HAVE TO MAKE PROFIT TO -- IN ORDER TO BE

GROSSMAN CROSS BY MR. WADE                                                    6478

01:28PM  1      PAID?

01:28PM  2      A.   THE BUSINESS HAS TO HAVE PROFITS IN ORDER FOR PARTNERS TO

01:28PM  3      BE COMPENSATED, YES.

01:28PM  4      Q.   RIGHT.  BUT MY QUESTION IS HOW THE BUSINESS MAKES MONEY,

01:29PM  5      NOT NECESSARILY HOW YOU PERSONALLY MAKE MONEY.

01:29PM  6      A.   OH, SORRY.

01:29PM  7      Q.   I WASN'T CLEAR.

01:29PM  8      A.   SORRY.

01:29PM  9      Q.   I APOLOGIZE.

01:29PM  10          THE BUSINESS MAKES MONEY BASED UPON A PERCENTAGE OF THE

01:29PM  11     MONEY THAT THEY'RE MANAGING FOR A PARTICULAR INVESTOR; CORRECT?

01:29PM  12     A.   NO.

01:29PM  13     Q.   OKAY.  WHY DON'T YOU EXPLAIN IT TO US?

01:29PM  14     A.   THE BUSINESS MAKES MONEY WHEN THE REVENUES -- THE

01:29PM  15     CUMULATIVE REVENUES IN ANY GIVEN YEAR ARE IN EXCESS OF OUR

01:29PM  16     CUMULATIVE EXPENSES.

01:29PM  17     Q.   OKAY.

01:29PM  18     A.   LIKE ANY BUSINESS.

01:29PM  19     Q.   ARE YOU -- LET ME TRY A THIRD TIME.  MAYBE WE'LL GET IT

01:29PM  20     THIS TIME.

01:29PM  21          YOU'RE COMPENSATED BY YOUR INVESTORS; CORRECT?

01:29PM  22     A.   IF THE QUESTION IS, DO OUR INVESTORS PAY FEES, YES, THEY

01:29PM  23     DO PAY FEES.

01:29PM  24     Q.   OKAY.  WHY DON'T YOU EXPLAIN THE FEES THAT THEY PAID TO

01:29PM  25     PFM?

GROSSMAN CROSS BY MR. WADE                                              6479

01:29PM   1    A.   INVESTORS PAY A MANAGEMENT FEE, WHICH IS A PERCENTAGE OF

01:29PM   2    THEIR ASSETS.  IT CAN BE ANYWHERE FROM 0 TO 2 PERCENT.

01:30PM   3         AND THEN IN ADDITION TO THAT, THEY PAY PERFORMANCE FEES,

01:30PM   4    WHICH ARE A FUNCTION OF HOW THE FUND PERFORMS IN ANY GIVEN

01:30PM   5    YEAR.

01:30PM   6    Q.   OKAY.  SO THERE'S A, THERE'S A SMALL AMOUNT THAT YOU MAKE

01:30PM   7    REGARDLESS OF WHETHER THE INVESTMENT GOES UP OR DOWN; IS THAT

01:30PM   8    FAIR?

01:30PM   9    A.   CAN YOU BE A LITTLE MORE CLEAR ABOUT WHAT "MAKE" MEANS?

01:30PM   10   Q.   IN FEES?

01:30PM   11   A.   YEAH, WE HAVE REVENUES, YES.

01:30PM   12   Q.   OKAY.  AND THEN THERE'S SOME WHERE YOU ONLY GENERATE

01:30PM   13   ADDITIONAL FEES IF YOU PERFORM WELL ON THE INVESTMENT; IS THAT

01:30PM   14   FAIR?

01:30PM   15   A.   NO.

01:30PM   16   Q.   OKAY.  WHY DON'T YOU EXPLAIN WHAT I GOT WRONG THEN.

01:30PM   17   A.   IT'S NOT AT THE INVESTMENT, IT'S AT THE FUND LEVEL.

01:30PM   18   Q.   OKAY.  AT THE FUND LEVEL?

01:30PM   19   A.   CORRECT.

01:30PM   20   Q.   OKAY.  SO IF THEY HAVE AN INVESTMENT IN A FUND, IT'S BASED

01:30PM   21   UPON THE PERFORMANCE IN THAT FUND; IS THAT RIGHT?

01:30PM   22   A.   CORRECT.

01:30PM   23   Q.   AND IF YOU DO WELL WITH THEIR INVESTMENT WITHIN THAT FUND,

01:30PM   24   THEN YOU RECEIVE MORE MONEY; RIGHT?

01:30PM   25   A.   THE FIRM EARNS MORE REVENUES.

GROSSMAN CROSS BY MR. WADE                                      6480

01:30PM   1    Q.   OKAY.  THE -- WHEN YOU'RE OUT MARKETING YOUR SERVICES, THE

01:31PM   2    PERFORMANCE IN TERMS OF RETURN ON INVESTMENTS IS A SIGNIFICANT

01:31PM   3    THING THAT YOU MARKET TO PEOPLE WHO ARE CONSIDERING INVESTMENT

01:31PM   4    IN A PFM FUND; IS THAT FAIR?

01:31PM   5    A.   UM, IT'S HARD FOR ME TO ANSWER WHAT OTHER PEOPLE THINK ARE

01:31PM   6    SIGNIFICANT, SO I -- I'M NOT SURE HOW TO ANSWER THAT QUESTION.

01:31PM   7    Q.   OKAY.  IS YOUR HISTORICAL INVESTMENT PERFORMANCE SOMETHING

01:31PM   8    THAT YOU FREQUENTLY INCLUDE WITHIN YOUR PROMOTIONAL MATERIALS

01:31PM   9    THAT YOU GIVE TO PEOPLE --

01:31PM   10   A.   YES.

01:31PM   11   Q.   -- WHO ARE CONSIDERING INVESTMENTS IN YOUR FUNDS?

01:31PM   12   A.   YES.

01:31PM   13           MR. WADE:  OKAY.  YOUR HONOR, MAYBE NOW WOULD BE A

01:31PM   14   GOOD TIME FOR OUR 1:30 BREAK AND SEE IF WE CAN RESET WHEN WE

01:31PM   15   COME BACK.

01:31PM   16           THE COURT:  I THINK THAT'S A GOOD IDEA.

01:31PM   17       LET'S TAKE OUR BREAK, LADIES AND GENTLEMEN, 30 MINUTES,

01:31PM   18   PLEASE, 30 MINUTES.

01:32PM   19       (RECESS FROM 1:32 P.M. UNTIL 2:04 P.M.)

02:04PM   20           THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

02:04PM   21   THE RECORD.  PLEASE BE SEATED.

02:04PM   22       ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY

02:04PM   23   IS PRESENT.

02:04PM   24       MR. WADE.

02:04PM   25           MR. WADE:  THANK YOU, YOUR HONOR.

UNITED STATES COURT REPORTERS

GROSSMAN CROSS BY MR. WADE                                    6481

02:04PM   1    Q.   MR. GROSSMAN, I'D LIKE TO ASK JUST A COUPLE OF QUESTIONS

02:04PM   2    ABOUT THE DUE DILIGENCE TEAM THAT, OR ANALYST TEAM THAT WORKED

02:04PM   3    ON THE INVESTMENT.  OKAY?

02:04PM   4    A.   OKAY.

02:04PM   5    Q.   AND YOU MENTIONED MR. KHANNA.  HAD HE -- AT THE TIME HE

02:04PM   6    WAS WORKING ON THIS INVESTMENT, HAD HE BEEN AT PFM FOR A

02:04PM   7    SIGNIFICANT PERIOD OF TIME?

02:04PM   8    A.   I BELIEVE HE JOINED IN 2013.

02:05PM   9    Q.   OKAY.  SO HAD HE BEEN THERE FOR A REASONABLY SHORT PERIOD

02:05PM   10   OF TIME?

02:05PM   11   A.   YES.

02:05PM   12   Q.   BUT HE HAD SIGNIFICANT EXPERIENCE IN THE HEALTH CARE FIELD

02:05PM   13   PRIOR TO JOINING PFM?

02:05PM   14   A.   YES.

02:05PM   15   Q.   ABOUT 20 YEARS OF EXPERIENCE WITH RESPECT TO HEALTH CARE

02:05PM   16   COMPANIES; IS THAT RIGHT?

02:05PM   17   A.   OR MORE, YEAH.

02:05PM   18   Q.   OKAY.  AND I THINK YOU MENTIONED ALEX RABODZEY.  AM I

02:05PM   19   PRONOUNCING THAT CORRECTLY?

02:05PM   20   A.   YEP.

02:05PM   21   Q.   AND DR. RABODZEY HAD SOME TECHNICAL TRAINING; IS THAT

02:05PM   22   RIGHT?

02:05PM   23   A.   HE DID.

02:05PM   24   Q.   AND HE, HE, HE GOT A BACHELOR'S DEGREE FROM THE MOSCOW

02:05PM   25   INSTITUTE OF PHYSICS AND TECHNOLOGY; IS THAT RIGHT?

GROSSMAN CROSS BY MR. WADE                                    6482

02:05PM   1    A.   YES.

02:05PM   2    Q.   AND THEN HE WENT ON TO GET A PH.D. IN BIOENGINEERING FROM

02:05PM   3    MASSACHUSETTS INSTITUTE OF TECHNOLOGY?

02:06PM   4    A.   YES.

02:06PM   5    Q.   AND IS IT FAIR TO SAY THAT HE SERVED ON SOME OF THE

02:06PM   6    TECHNICAL ISSUES AS SORT OF A SUBJECT MATTER EXPERT FOR YOU ON

02:06PM   7    THIS INVESTMENT?

02:06PM   8    A.   YES.

02:06PM   9    Q.   A SMART FELLOW.  IS THAT FAIR?

02:06PM  10    A.   MORE OF A SCIENCE BACKGROUND THAN MR. KHANNA.

02:06PM  11    Q.   UH-HUH.  AND THEN YOU MENTIONED IS IT SRI BALASURYAN?

02:06PM  12    A.   YES.

02:06PM  13    Q.   AND HE WAS, AND HE WAS THE GUY, HE WAS THE JUNIOR ANALYST

02:06PM  14    YOU REFERRED TO?

02:06PM  15    A.   YES.

02:06PM  16    Q.   AND WAS HE THE PERSON WHO DID SORT OF THE TECHNICAL

02:06PM  17    SPREADSHEET WORK AROUND BUILDING THE MODEL AND THE LIKE?

02:06PM  18    A.   HE CERTAINLY DID SOME OF IT, AND ALSO -- YOU KNOW, OLD

02:06PM  19    GUYS LIKE ME CAN'T DO POWERPOINT, AND SO HE DID ALL OF THE

02:06PM  20    CHARTS AND PRESENTATIONS.  SO HE DID THAT TYPE OF WORK FOR US.

02:07PM  21    Q.   GREAT.  AND THE -- I NOW WANT TO SHIFT AND FOCUS JUST

02:07PM  22    BRIEFLY, IF I CAN, ON THIS PERIOD IN HERE BETWEEN NOVEMBER 1ST

02:07PM  23    AND THAT FIRST MEETING THAT YOU HAD AT THERANOS, AND I HAVE

02:07PM  24    SOME QUESTIONS ON THAT PERIOD.  OKAY?

02:07PM  25    A.   OKAY.

GROSSMAN CROSS BY MR. WADE                                6483

02:07PM  1    Q.  DO YOU RECALL THAT IN THE FIRST INSTANCE, ACTUALLY

02:07PM  2    THERANOS DID NOT SOLICIT PFM FOR AN INVESTMENT, DID IT?

02:07PM  3    A.  NO.

02:07PM  4    Q.  PFM WAS ACTUALLY INTRODUCED BY ANOTHER HEDGE FUND; IS THAT

02:07PM  5    RIGHT?

02:07PM  6    A.  I, I DON'T, I DON'T RECALL EXACTLY HOW THE INTRODUCTION

02:07PM  7    WAS MADE.

02:07PM  8    Q.  OKAY.  DO YOU KNOW MR. LAFFONT?

02:07PM  9    A.  I KNOW WHO HE IS.

02:07PM  10   Q.  AND WHO IS HE?

02:07PM  11   A.  HE'S A -- HE RUNS -- HE'S ANOTHER -- HE'S AN INVESTOR WHO

02:07PM  12   WORKS AT A -- WHO RUNS -- HE WORKS AT ANOTHER HEDGE FUND.

02:08PM  13   Q.  AND IS THAT COATUE?

02:08PM  14   A.  IT'S COATUE.

02:08PM  15   Q.  COATUE.

02:08PM  16       AND DO YOU RECALL THAT HE WAS A PERSON WHO INTRODUCED YOUR

02:08PM  17   PARTNER, MR. JAMES, TO THE THERANOS INVESTMENT?

02:08PM  18   A.  THAT IS MY MEMORY, YES.

02:08PM  19   Q.  OKAY.  AND THEN ONCE MR. JAMES LEARNED ABOUT THIS

02:08PM  20   POTENTIAL OPPORTUNITY, DO YOU RECALL THAT HE KIND OF PASSED IT

02:08PM  21   ON TO YOUR GROUP TO SEE IF YOU KNEW ANYTHING ABOUT THE COMPANY?

02:08PM  22   A.  YES.

02:08PM  23   Q.  LET'S TAKE A LOOK IN YOUR BOOK AT EXHIBIT 7353.

02:08PM  24           THE COURT:  WHICH VOLUME WILL THAT BE?

02:08PM  25           MR. WADE:  THAT WILL BE IN VOLUME 1.

GROSSMAN CROSS BY MR. WADE                                    6484

02:09PM  1    Q.   DO YOU HAVE THAT IN FRONT OF YOU, MR. GROSSMAN?

02:09PM  2    A.   I DO.

02:09PM  3    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL ON NOVEMBER 1ST

02:09PM  4    THAT INVOLVES YOU AND SOME OTHER EMPLOYEES OF PFM RELATING TO

02:09PM  5    THERANOS?

02:09PM  6    A.   YES, I DO.

02:09PM  7              MR. WADE:  MOVE THE ADMISSION OF 7353.

02:09PM  8              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:09PM  9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:09PM  10    (DEFENDANT'S EXHIBIT 7353 WAS RECEIVED IN EVIDENCE.)

02:09PM  11              MR. WADE:  AND IF WE CAN BLOW UP THE BOTTOM.

02:09PM  12    Q.   THIS IS AN EMAIL FROM MR. LAFFONT TO MR. JAMES ON

02:09PM  13    NOVEMBER 1ST.

02:09PM  14         DO YOU SEE THAT?

02:09PM  15    A.   YEP.

02:09PM  16    Q.   AND WE TALKED ABOUT HOW NOVEMBER 1ST WAS THE DATE WHEN YOU

02:09PM  17    FIRST LEARNED ABOUT THERANOS BEFORE THE BREAK.

02:09PM  18         DO YOU RECALL THAT?

02:09PM  19    A.   YES.

02:09PM  20    Q.   AND WAS THIS THE EMAIL BY WHICH YOU FIRST LEARNED ABOUT

02:09PM  21    IT?

02:09PM  22    A.   I BELIEVE SO, YES.

02:09PM  23    Q.   OKAY.  YOU DON'T RECALL KNOWING ANYTHING ABOUT THE COMPANY

02:10PM  24    PRIOR TO THAT?

02:10PM  25    A.   I DON'T REMEMBER ACTUALLY BEFORE THAT, NO.

GROSSMAN CROSS BY MR. WADE                                    6485

02:10PM  1    Q.   HAD YOU MET MS. HOLMES PRIOR TO THAT?

02:10PM  2    A.   NO.

02:10PM  3    Q.   OKAY.  IT ASKS -- MR. LAFFONT, YOU SEE, ASKS MR. JAMES TO

02:10PM  4    LET HIM KNOW IF HE'S INTERESTED IN THE INVESTMENT AND POINTS

02:10PM  5    OUT THE WEBSITE.

02:10PM  6        DO YOU SEE THAT?

02:10PM  7    A.   WELL, I'M NOT SURE IF HE SAYS ANYTHING ABOUT THE

02:10PM  8    INVESTMENT, BUT IT SAYS "LET ME KNOW ASAP IF THIS PRIVATE

02:10PM  9    COMPANY IS OF INTEREST TO YOU."

02:10PM  10   Q.   FAIR ENOUGH.

02:10PM  11   A.   SO, YEAH.

02:10PM  12   Q.   AND WHEN IT WAS FORWARDED TO YOU, DID YOU INFER THAT THIS

02:10PM  13   WAS A POSSIBLE INVESTMENT OPPORTUNITY?

02:10PM  14   A.   I MEAN, SORT OF.  I MEAN, PRIVATE COMPANIES ARE ALWAYS

02:10PM  15   RAISING MONEY, BUT I WOULD SAY THERE WAS MORE -- I'M SORRY, I

02:10PM  16   DIDN'T ANSWER YOUR QUESTION.

02:11PM  17       THE QUESTION IS -- COULD YOU REPEAT THE QUESTION?

02:11PM  18   Q.   DID YOU -- WHEN THIS WAS SENT TO YOU, DID YOU UNDERSTAND

02:11PM  19   THAT THIS WAS BEING SENT TO YOU AS A POSSIBLE INVESTMENT

02:11PM  20   OPPORTUNITY?

02:11PM  21   A.   ACTUALLY, AT THE TIME, NO.  NO.

02:11PM  22   Q.   OKAY.  AND -- BUT DO YOU RECALL THAT YOU FORWARDED IT TO

02:11PM  23   SOME MEMBERS OF YOUR TEAM TO ASK IF THEY KNEW ANYTHING ABOUT

02:11PM  24   THE COMPANY?

02:11PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE                                                      6486

02:11PM  1    Q.   AND THESE ARE SOME OF THE FOLKS WHOSE NAMES WE'VE BEEN

02:11PM  2    TALKING ABOUT HERE, MR. KHANNA AND MR. RABODZEY.

02:11PM  3        DO YOU SEE THAT?

02:11PM  4    A.   YEP.  I DO, YES.

02:11PM  5    Q.   AND YOU WERE JUST SEEING IF ANYONE HAD ANY INTEL ON THIS

02:11PM  6    COMPANY; IS THAT FAIR?

02:11PM  7    A.   YES.

02:11PM  8    Q.   DO YOU RECALL WHETHER AT THIS TIME YOU TOOK A LOOK AT THE

02:11PM  9    WEBSITE AND DID A LITTLE INTERNET RESEARCH OR ANYTHING ABOUT

02:11PM 10    THE COMPANY?

02:11PM 11    A.   I BELIEVE I DID, YES.

02:11PM 12    Q.   OKAY.  AND, IN FACT, IF WE LOOK AT -- IF YOU LOOK AT THE

02:11PM 13    NEXT DOCUMENT IN YOUR BOOK AT 7354, DO YOU SEE YOU RESPOND TO

02:12PM 14    MR. JAMES?

02:12PM 15    A.   OKAY.  YES.

02:12PM 16    Q.   YOU RECOGNIZE THIS EMAIL TO BE A RESPONSE TO MR. JAMES'S

02:12PM 17    INITIAL EMAIL, JUST A DIFFERENT EMAIL CHAIN?

02:12PM 18    A.   YES, I DO.

02:12PM 19            MR. WADE:  MOVE THE ADMISSION OF 7354.

02:12PM 20            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:12PM 21            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:12PM 22        (DEFENDANT'S EXHIBIT 7354 WAS RECEIVED IN EVIDENCE.)

02:12PM 23    BY MR. WADE:

02:12PM 24    Q.   AND DO YOU SEE THERE, I THINK WE SAW THE RESPONSE FROM

02:12PM 25    MR. JAMES BEFORE, WOWSY.

GROSSMAN CROSS BY MR. WADE                                      6487

| | | |
|---|---|---|
| 02:12PM | 1 | DO YOU SEE THAT? |
| 02:12PM | 2 | A.   YES, I DO. |
| 02:12PM | 3 | Q.   AND IF WE LOOK UP BELOW, YOU NOTE ACTUALLY THAT IT WAS |
| 02:12PM | 4 | PRETTY COOL, BUT YOU HAD NEVER HEARD OF IT BEFORE; RIGHT? |
| 02:12PM | 5 | A.   YES. |
| 02:12PM | 6 | Q.   AND WHEN YOU SAID IT WAS PRETTY COOL, WAS THAT BECAUSE YOU |
| 02:12PM | 7 | HAD DONE A LITTLE POKING AROUND? |
| 02:12PM | 8 | A.   I DON'T REMEMBER, BUT YES, LIKELY. |
| 02:13PM | 9 | Q.   AND DO YOU RECALL HAVING ANY CONVERSATIONS WITH MR. JAMES |
| 02:13PM | 10 | ABOUT THE COMPANY AND WHETHER THIS WAS AN OPPORTUNITY THAT |
| 02:13PM | 11 | SHOULD BE CONSIDERED? |
| 02:13PM | 12 | A.   I DON'T RECALL HAVING -- I DON'T RECALL DISCUSSING WITH |
| 02:13PM | 13 | HIM ABOUT AN INVESTMENT IN THE COMPANY AT THIS POINT.  IT WAS |
| 02:13PM | 14 | MORE, DO YOU KNOW ANYTHING ABOUT THIS COMPANY? |
| 02:13PM | 15 | Q.   OKAY. |
| 02:13PM | 16 | A.   SO -- |
| 02:13PM | 17 | Q.   AND WHEN YOU SAY "PRETTY COOL," DO YOU REMEMBER WHAT |
| 02:13PM | 18 | MATERIALS YOU REVIEWED OR INFORMATION YOU REVIEWED DURING THIS |
| 02:13PM | 19 | TIME PERIOD THAT CAUSED YOU TO FORM THE INITIAL IMPRESSION? |
| 02:13PM | 20 | A.   I DON'T REMEMBER SPECIFICALLY, BUT MOST LIKELY IT WAS |
| 02:13PM | 21 | WHATEVER WAS ON THE WEB PAGE, YOU KNOW, AT THAT TIME, THE |
| 02:13PM | 22 | FINGERSTICK, THE MAIN WEB TEMPLATE THEY HAD AND, YOU KNOW, THE |
| 02:13PM | 23 | FINGERSTICK, ALL OF THE -- MUCH OF THE SAME STUFF THAT WAS IN |
| 02:13PM | 24 | SOME OF THE MATERIALS THAT THEY SENT US. |
| 02:13PM | 25 | Q.   OKAY.  SOME SIMILAR GRAPHICS AND THINGS? |

GROSSMAN CROSS BY MR. WADE                                      6488

02:13PM    1    A.   YEAH.

02:13PM    2    Q.   AND DID YOU -- DO YOU RECALL TAKING A LOOK AT THEIR

02:14PM    3    LOCATIONS OR ANYWHERE YOU MIGHT GO TO GET A TEST --

02:14PM    4    A.   I DON'T, NO.

02:14PM    5    Q.   DO YOU RECALL THAT YOU TOOK A LOOK AT THE TESTING MENU

02:14PM    6    DURING THIS TIME PERIOD?

02:14PM    7    A.   I DON'T.

02:14PM    8    Q.   OKAY.  HAD YOU INVESTED IN LAB COMPANIES BEFORE THERANOS?

02:14PM    9    A.   YES.

02:14PM   10    Q.   OKAY.  SO YOU HAD SOME FAMILIARITY WITH TESTING MENUS AND

02:14PM   11    THE LIKE?

02:14PM   12    A.   UM, YES.

02:14PM   13    Q.   WHICH COMPANIES HAD YOU INVESTED IN?

02:14PM   14    A.   QUEST, LABCORP.  THERE WERE A FEW OTHER COMPANIES IN THE

02:14PM   15    LABORATORY INDUSTRY THAT HAVE BEEN ACQUIRED OVER THE YEARS.

02:14PM   16         THEN ALSO COMPANIES THAT MAKE DIAGNOSTIC ANALYTIC

02:14PM   17    INSTRUMENTS, MOLECULAR TESTING PLATFORMS.

02:14PM   18         SO ALL OF THOSE TYPES OF BUSINESSES WE'VE SEEN AS PART OF

02:15PM   19    OUR NORMAL INVESTMENT ACTIVITIES.

02:15PM   20    Q.   OKAY.  AND YOU RECALL AT SOME POINT THAT THERE WAS A

02:15PM   21    DECISION MADE TO PURSUE THIS FURTHER?

02:15PM   22    A.   YES.

02:15PM   23    Q.   AND DO YOU RECALL THAT THAT WAS DONE BY MR. JAMES

02:15PM   24    EXPRESSING AN INTEREST IN BEING CONNECTED WITH AN INVESTMENT

02:15PM   25    OPPORTUNITY?  WERE YOU AWARE OF THAT?

GROSSMAN CROSS BY MR. WADE                                      6489

02:15PM  1    A.   I ACTUALLY DON'T REMEMBER THAT, BUT -- SO I DON'T REMEMBER

02:15PM  2    THE SPECIFICS OF HOW WE ENDED UP CONNECTED TO THEM.

02:15PM  3    Q.   OKAY.  DO YOU KNOW A GENTLEMAN BY THE NAME OF BOB COHEN?

02:15PM  4    A.   NEVER HEARD OF HIM.

02:15PM  5    Q.   OKAY.  BUT IN ANY EVENT, AT SOME POINT YOU OBVIOUSLY WENT

02:15PM  6    TO THE MEETING THAT YOU'VE TESTIFIED ABOUT PREVIOUSLY.

02:15PM  7    A.   YEP.

02:15PM  8    Q.   AND DO YOU RECALL IN THE MEANTIME SOME MEMBERS OF YOUR

02:15PM  9    TEAM MADE A FEW INQUIRIES ABOUT THERANOS?

02:16PM  10   A.   YES.

02:16PM  11   Q.   IN THAT TIME PERIOD THAT I POINTED TO BEFORE THAT MEETING?

02:16PM  12   DO YOU RECALL THAT?

02:16PM  13   A.   YES.

02:16PM  14   Q.   AND LET'S TAKE A LOOK AT 7358.

02:16PM  15        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:16PM  16   A.   YEAH, I DO.  COULD I JUST TAKE A MINUTE TO READ THROUGH

02:16PM  17   IT?

02:16PM  18   Q.   SURE.  LET ME KNOW WHEN YOU'RE READY.

02:16PM  19        (PAUSE IN PROCEEDINGS.)

02:16PM  20           THE WITNESS:  OKAY.  YEP.

02:16PM  21   BY MR. WADE:

02:16PM  22   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL CHAIN WITH YOUR

02:17PM  23   ANALYST TEAM ABOUT SOME RESEARCH THAT THEY HAD GATHERED ON

02:17PM  24   THERANOS?

02:17PM  25   A.   I DO.

GROSSMAN CROSS BY MR. WADE                                    6490

02:17PM    1            MR. WADE:  MOVE THE ADMISSION OF 7358.

02:17PM    2            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:17PM    3            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM    4        (DEFENDANT'S EXHIBIT 7358 WAS RECEIVED IN EVIDENCE.)

02:17PM    5   BY MR. WADE:

02:17PM    6   Q.   AND IF WE LOOK AT THE BOTTOM ON NOVEMBER 18TH, DO YOU SEE

02:17PM    7   IN THE SUBJECT MATTER THERE YOU POSED THE QUESTION TO YOUR

02:17PM    8   ANALYST, "IS THIS SOMETHING WE SHOULD WORK UP ON THE PRIVATE

02:17PM    9   SIDE?"

02:17PM   10        DO YOU SEE THAT?

02:17PM   11   A.   I DO, YES.

02:17PM   12   Q.   AND WHAT DID YOU MEAN BY THAT?

02:17PM   13   A.   I MEAN IS IT SOMETHING THAT WE SHOULD DEDICATE RESOURCES

02:17PM   14   TO AND LEARN MORE ABOUT THE BUSINESS.

02:17PM   15   Q.   OKAY.  SO WORK UP, YOU MEAN SORT OF START THAT RESEARCH

02:17PM   16   PROCESS WHERE YOU INFORM YOURSELVES AS TO WHETHER OR NOT TO

02:17PM   17   MAKE THE INVESTMENT DECISION?

02:17PM   18   A.   I THINK THAT'S WHAT -- I MEAN, THAT'S GENERALLY WHAT I

02:17PM   19   MEAN BY THAT.

02:17PM   20   Q.   OKAY.  AND DO YOU RECALL WHAT HAPPENED BETWEEN

02:18PM   21   NOVEMBER 1ST AND NOVEMBER 18TH THAT PROMPTED YOU TO START THAT

02:18PM   22   PROCESS OR EXPLORE THAT PROCESS?

02:18PM   23   A.   I DON'T, NO.

02:18PM   24   Q.   OKAY.  LET'S TAKE A LOOK UP THE CHAIN.

02:18PM   25        DO YOU SEE THAT MR. KHANNA NOTES THAT HE GOT VERY GOOD

GROSSMAN CROSS BY MR. WADE                                              6491

02:18PM   1      FEEDBACK FROM WAG?

02:18PM   2           DO YOU SEE THAT?

02:18PM   3      A.   I DO, YES.

02:18PM   4      Q.   AND YOU UNDERSTAND WAG THERE TO BE WALGREENS?

02:18PM   5      A.   YES.

02:18PM   6      Q.   AND WAS IT YOUR UNDERSTANDING THAT MR. KHANNA HAD REACHED

02:18PM   7      OUT TO SOMEONE AT WALGREENS TO SEE WHAT THEY COULD TELL HIM

02:18PM   8      ABOUT THERANOS?

02:18PM   9      A.   I, I DON'T KNOW WHAT HE WAS REFERRING TO HERE.

02:18PM   10     Q.   OKAY.  BUT IN ANY EVENT, YOU RECEIVED THE EMAIL; RIGHT?

02:18PM   11     A.   YES.

02:18PM   12     Q.   AND YOU UNDERSTOOD THAT HE HAD HEARD SOME POSITIVE NEWS

02:18PM   13     ABOUT THE COMPANY IN CONNECTION WITH THE WORK THAT THEY WERE

02:18PM   14     DOING WITH THERANOS; IS THAT FAIR?

02:18PM   15     A.   WELL, YES, AND THERE HAD BEEN PUBLIC PRESS RELEASES FROM

02:18PM   16     BOTH WALGREENS AND THERANOS, SO ONE DIDN'T HAVE TO LOOK VERY

02:19PM   17     FAR TO FIND POSITIVE INFORMATION.

02:19PM   18          SO I DON'T -- SO THERE WAS, THERE WAS A LOT OF -- YOU

02:19PM   19     KNOW, THERE WERE THINGS THAT ONE COULD EASILY FIND AT THAT

02:19PM   20     POINT ON BOTH COMPANIES.

02:19PM   21     Q.   AND JUST SO WE'RE CLEAR, WALGREENS WAS A COMPANY THAT YOU

02:19PM   22     WERE VERY FAMILIAR WITH AT THIS TIME; IS THAT RIGHT?

02:19PM   23     A.   YES.

02:19PM   24     Q.   YOU HAD INVESTED IN WALGREENS AT DIFFERENT POINTS IN TIME;

02:19PM   25     IS THAT RIGHT?

GROSSMAN CROSS BY MR. WADE                                    6492

02:19PM   1      A.   YES.

02:19PM   2      Q.   AND WHEN A FUND LIKE YOURS INVESTS IN WALGREENS, IT

02:19PM   3      GENERALLY GETS ANALYST REPORTS AND PERFORMS RESEARCH; IS THAT

02:19PM   4      FAIR?

02:19PM   5      A.   YES.

02:19PM   6      Q.   AND SO YOU HAD SORT OF A BASE LEVEL UNDERSTANDING ABOUT

02:19PM   7      WALGREENS AND HOW IT OPERATED?

02:19PM   8      A.   YES.

02:19PM   9      Q.   AND WERE YOU GENERALLY IMPRESSED BY THE COMPANY?

02:19PM  10      A.   OUR VIEWS OF COMPANIES CHANGE ALL THE TIME, SO IT'S HARD

02:19PM  11      FOR ME TO KNOW EXACTLY WHAT WE WERE THINKING AT THAT POINT IN

02:19PM  12      TIME.

02:19PM  13           BUT THE RETAIL PHARMACY BUSINESS IS A TOUGH BUSINESS AND

02:20PM  14      HAS BEEN FOR YEARS, AND SO I THINK WE, WE'VE GENERALLY BEEN

02:20PM  15      SKEPTICAL OVER THE YEARS ABOUT THEIR ABILITY TO SURVIVE IN A

02:20PM  16      WORLD WITH AMAZON AND OTHER COMPETITIVE PRESSURES.

02:20PM  17           BUT WALGREENS IS A GREAT FRANCHISE, A GREAT BUSINESS, AND

02:20PM  18      SO, YOU KNOW, FROM TIME TO TIME WE COULD BE POSITIVE, WE COULD

02:20PM  19      BE NEGATIVE.  IT JUST SORT OF DEPENDED.

02:20PM  20           I DON'T BELIEVE WE HAD ANY PARTICULAR POINT OF VIEW ON

02:20PM  21      WALGREENS AT THIS POINT, BUT THAT'S JUST SORT OF A GENERAL

02:20PM  22      MEMORY OF THAT POINT IN TIME.

02:20PM  23      Q.   AND YOU RECOGNIZED THEM AT THE TIME TO BE A WELL

02:20PM  24      EXPERIENCED RETAILER; CORRECT?

02:20PM  25      A.   YES.

GROSSMAN CROSS BY MR. WADE                                              6493

02:20PM   1     Q.   AND A VERY WELL ESTABLISHED BRAND?

02:20PM   2     A.   YES.

02:20PM   3     Q.   AND THEY HAD A SIGNIFICANT NATIONAL FOOTPRINT; RIGHT?

02:20PM   4     A.   YES.

02:20PM   5     Q.   AND SIGNIFICANT EXPERIENCE IN RETAIL OPERATIONS?

02:20PM   6     A.   YES.

02:20PM   7     Q.   AND SO WHEN YOU STARTED EXPLORING THIS CONNECTION BETWEEN

02:21PM   8     THERANOS AND WALGREENS, YOU SORT OF -- DID YOU SEE THAT AS A

02:21PM   9     POSITIVE?

02:21PM   10    A.   A POTENTIAL POSITIVE, YES.

02:21PM   11    Q.   TELL US WHY YOU THOUGHT IT WAS POSITIVE.

02:21PM   12    A.   WELL, IT WAS, IT WAS A NEW REVENUE SOURCE FOR A BUSINESS

02:21PM   13    THAT, AS I SAID BEFORE, WAS -- YOU KNOW, HAD SOME STRUCTURAL

02:21PM   14    PRESSURES, AND SO GETTING INTO THE REFERENCE LABORATORY SPACE

02:21PM   15    WAS, WAS INTERESTING.

02:21PM   16         AND I MEAN, I DON'T WANT TO -- THIS IS A LONG TIME AGO,

02:21PM   17    BUT WE WEREN'T -- I DON'T THINK WE REALLY WERE INVOLVED MUCH.

02:21PM   18    WE DIDN'T THINK ANYTHING AT THAT TIME.  I DON'T BELIEVE WE HAD

02:21PM   19    A POSITION IN WALGREENS.  SO, YOU KNOW, IT WAS SOMETHING THAT

02:21PM   20    JUST WASN'T THAT INTERESTING TO US.

02:22PM   21         AND THIS WAS SOMETHING THAT WAS INTERESTING.  ALL OF A

02:22PM   22    SUDDEN WALGREENS WAS -- MAYBE THERE WAS SOMETHING INTERESTING

02:22PM   23    ABOUT THE BUSINESS.

02:22PM   24         SO I THINK THAT WAS KIND OF THE GENESIS OF THIS EMAIL,

02:22PM   25    SHOULD WE TRY TO UNDERSTAND THIS?

GROSSMAN CROSS BY MR. WADE                                    6494

02:22PM  1        AND IT ALSO HAD IMPLICATIONS FOR OTHER COMPANIES IN THE

02:22PM  2   SPACE, SO WE WANTED TO KIND OF UNDERSTAND WHAT THIS COULD MEAN

02:22PM  3   FOR THE REFERENCE LAB INDUSTRY, DIAGNOSTIC EQUIPMENT.

02:22PM  4        SO I THINK WE WERE CURIOUS ABOUT THIS PARTNERSHIP.

02:22PM  5   Q.   AND YOU WERE CURIOUS BECAUSE IT PRESENTED SOME

02:22PM  6   INTERESTING -- AN INTERESTING DEVELOPMENT FOR WALGREENS; RIGHT?

02:22PM  7   A.   POTENTIALLY.

02:22PM  8   Q.   BUT IT WAS ALSO A SIGNIFICANT FACTOR RELATING TO A

02:22PM  9   POTENTIAL INVESTMENT IN THERANOS, WAS IT NOT?

02:22PM  10  A.   YES, I GUESS.  I SUPPOSE.

02:22PM  11  Q.   I MEAN, ULTIMATELY THE ABILITY TO STAND UP A RETAIL

02:22PM  12  OPERATION, IT'S GOOD TO HAVE A VERY WELL ESTABLISHED RETAIL

02:22PM  13  PARTNER WORKING WITH YOU; CORRECT?

02:22PM  14  A.   CAN YOU REPHRASE THE QUESTION OR ASK THE QUESTION AGAIN?

02:23PM  15  I'M SORRY.

02:23PM  16  Q.   WELL, YOU CAME TO LEARN THAT THERANOS WAS GOING TO OPERATE

02:23PM  17  COMMERCIALLY THROUGH A RETAIL ESTABLISHMENT; RIGHT?

02:23PM  18  A.   YES.

02:23PM  19  Q.   AND, AND FOR A YOUNG COMPANY LIKE THERANOS TO DO THAT, DID

02:23PM  20  YOU VIEWS IT AS A POSITIVE FACTOR THAT THEY WERE PARTNERED WITH

02:23PM  21  A COMPANY LIKE WALGREENS?

02:23PM  22  A.   UH, I DID.

02:23PM  23  Q.   IN FACT, DO YOU RECALL COMING TO THE VIEW OF IF IT WERE

02:23PM  24  NOT FOR WALGREENS, YOU PROBABLY WOULDN'T HAVE EVEN CONSIDERED

02:23PM  25  THIS INVESTMENT OPPORTUNITY; IS THAT FAIR?

GROSSMAN CROSS BY MR. WADE                                            6495

| | | |
|---|---|---|
| 02:23PM | 1 | A.   UH, I DON'T REMEMBER SPECIFICALLY THINKING THAT OR |
| 02:23PM | 2 | DISCUSSING THAT.  SO IT'S HARD FOR ME TO ANSWER THAT. |
| 02:23PM | 3 | BUT WALGREENS WAS CERTAINLY IMPORTANT. |
| 02:23PM | 4 | Q.   THE -- IF WE CAN WORK OUR WAY UP THE CHAIN TO THE NEXT |
| 02:23PM | 5 | EMAIL. |
| 02:23PM | 6 | DO YOU SEE -- YOU ASK WHAT, YOU ASK WHAT THE GOOD FEEDBACK |
| 02:24PM | 7 | MEANT; RIGHT? |
| 02:24PM | 8 | AND THEN YOU ALSO NOTE, "WHAT DOES IT MEAN FOR LH/DGX |
| 02:24PM | 9 | LONGER TERM?" |
| 02:24PM | 10 | DO YOU SEE THAT? |
| 02:24PM | 11 | A.   YES, I DO. |
| 02:24PM | 12 | Q.   AND WHAT DOES THAT REFER TO? |
| 02:24PM | 13 | A.   WELL, I THINK I'M RESPONDING TO MY COLLEAGUE, VIVEK'S |
| 02:24PM | 14 | EMAIL, HE SAYS, "GOOD FEEDBACK FROM WAG," SO I'M ASKING HIM TO |
| 02:24PM | 15 | SORT OF ELABORATE ON THAT.  HE'S NOT ALWAYS THE MOST -- HE |
| 02:24PM | 16 | DOESN'T ALWAYS OFFER UP A LOT OF INFORMATION.  HE TENDS TO BE |
| 02:24PM | 17 | VERY KIND OF DIRECT IN EMAIL. |
| 02:24PM | 18 | SO I'M ASKING FOR MORE INFORMATION.  AND THE ANSWER TO |
| 02:24PM | 19 | YOUR SECOND QUESTION IS LH AND DGX ARE THE STOCK SYMBOLS FOR |
| 02:24PM | 20 | QUEST -- WELL, LABCORP OF AMERICA, WHICH IS LH, AND THEN |
| 02:24PM | 21 | QUEST DIAGNOSTICS.  BOTH OF THOSE ARE THE PUBLICLY TRADED |
| 02:25PM | 22 | REFERENCE LABORATORY COMPANIES. |
| 02:25PM | 23 | Q.   WHICH YOU HAD INVESTED IN PREVIOUSLY? |
| 02:25PM | 24 | A.   WE HAD AT DIFFERENT POINTS, YES. |
| 02:25PM | 25 | Q.   OKAY.  AND SO YOU'RE JUST KIND OF GETTING INTO HOW THIS |

GROSSMAN CROSS BY MR. WADE                                    6496

02:25PM   1    FITS WITHIN THE LAB SPACE; IS THAT FAIR?

02:25PM   2    A.   YES.

02:25PM   3    Q.   AND YOU'RE TRYING TO PULL INFORMATION OUT OF MAYBE A

02:25PM   4    RELUCTANT MR. KHANNA, AND HE ACTUALLY COMPLIES.  LET'S TAKE A

02:25PM   5    LOOK AT HIS RESPONSE.

02:25PM   6         AND THIS IS -- DO YOU KNOW WHAT HE'S INCLUDING WITHIN THIS

02:25PM   7    EMAIL?  DO YOU RECOGNIZE THIS FORM OF INFORMATION?

02:25PM   8    A.   I DO.

02:25PM   9    Q.   AND WHAT IS THE FORM OF INFORMATION?

02:25PM   10   A.   WELL, YOU MEAN -- THIS IS AN EMAIL THAT HE'S --

02:25PM   11   Q.   RIGHT.  I MEANT -- I'M SORRY, MR. GROSSMAN.  I WAS

02:25PM   12   REFERRING TO THE PORTION THAT IS EXCERPTED THERE.

02:25PM   13        DO YOU UNDERSTAND THAT TO BE HIS TEXT, OR IS HE CUTTING

02:25PM   14   AND PASTING SOMETHING FROM SOMEWHERE ELSE, IF YOU KNOW?

02:25PM   15   A.   I DO KNOW.  HE'S CUTTING AND PASTING IT FROM SOMEWHERE

02:26PM   16   ELSE.

02:26PM   17   Q.   AND WHAT IS HE CUTTING AND PASTING FROM THERE?

02:26PM   18   A.   THIS IS ANOTHER EMAIL THAT WE RECEIVED, I DON'T KNOW IF IT

02:26PM   19   WAS THAT DAY, BUT LIKELY THAT DAY OR CONTEMPORANEOUS WITH THIS

02:26PM   20   EMAIL CHAIN FROM SOMEONE ELSE.

02:26PM   21   Q.   AND WHO IS THAT OTHER PERSON?

02:26PM   22   A.   FROM WHAT I REMEMBER, THIS IS AN INDIVIDUAL NAMED

02:26PM   23   JAY SCHNEIDER.

02:26PM   24   Q.   OKAY.  AND WHO IS HE?

02:26PM   25   A.   JAY SCHNEIDER IS WHAT YOU WOULD CALL AN INSTITUTIONAL

GROSSMAN CROSS BY MR. WADE                                    6497

02:26PM   1      EQUITY SALESPERSON.

02:26PM   2      Q.   OKAY.

02:26PM   3      A.   HE WORKS FOR A COMPANY CALLED COWEN, C-O-W-E-N.

02:26PM   4      Q.   OKAY.

02:26PM   5      A.   THEY'RE A BROKER DEALER.  THEY'RE WHAT MOST PEOPLE WOULD

02:26PM   6      CALL A BOUTIQUE INVESTMENT BANK.  THEY HAVE -- THEY SERVICE AND

02:26PM   7      FOCUS ON THE HEALTH CARE AND TECHNOLOGY SECTORS.  THEY HAVE

02:26PM   8      INVESTMENT BANKING OPERATIONS IN THOSE AREAS.  THEY HAVE SALES

02:26PM   9      AND TRADING OPERATIONS.

02:26PM  10          THEY DON'T HAVE A RETAIL -- THEY DON'T OFFER RETAIL

02:27PM  11      BROKERAGE ACCOUNTS, SO THEIR BUSINESS IS FOCUSSED ON

02:27PM  12      INSTITUTIONAL CLIENTS LIKE OUR FIRM AND COMPANIES IN THIS

02:27PM  13      SECTOR THAT ARE LOOKING TO -- OR THAT NEED BANKING ADVICE OR

02:27PM  14      BANKING SERVICES.

02:27PM  15      Q.   OKAY.  AND DID YOU CONSIDER THIS TO BE VALUABLE

02:27PM  16      INFORMATION AT THE TIME?

02:27PM  17      A.   YES.

02:27PM  18      Q.   OKAY.  AND BECAUSE HE WAS A RESPECTED SOURCE?

02:27PM  19      A.   THAT'S DEBATABLE.  BUT MR. RHYEE WAS AN ANALYST AT COWEN.

02:27PM  20      HE'S A VERY NICE GUY.  WE DIDN'T ALWAYS AGREE WITH HIS VIEWS.

02:27PM  21          BUT IN THIS CASE HE HAD JUST BEEN MARKETING WITH THE

02:27PM  22      COMPANY, SO HE HAD JUST SPENT -- WHAT THE FIRST LINE IS

02:27PM  23      REFERRING TO IS HE REMAINS BULLISH POST MARKETING WITH THE IR

02:27PM  24      TEAM.

02:27PM  25          I'M SORRY, THIS IS ALL THE VERNACULAR OF OUR BUSINESS.

GROSSMAN CROSS BY MR. WADE                                        6498

02:27PM  1      SO IR REFERS TO INVESTOR RELATIONS.  SO CHARLES, THE

02:28PM  2   ANALYST, WAS TAKING THE INVESTOR RELATIONS TEAM FROM WALGREENS

02:28PM  3   AROUND TO MEET WITH INVESTORS.

02:28PM  4      SO INVESTOR RELATIONS IS ACTUALLY A PRETTY IMPORTANT ROLE.

02:28PM  5   IT TENDS TO BE KIND OF A VICE PRESIDENT TYPE ROLE WITHIN

02:28PM  6   COMPANIES LIKE WALGREENS.  THEY'RE THE INTERFACE BETWEEN

02:28PM  7   INVESTORS LIKE US, MUTUAL FUNDS LIKE FIDELITY OR OTHER LARGE

02:28PM  8   INSTITUTIONAL ASSET MANAGERS AND THE COMPANY.

02:28PM  9      SO THEY OFTEN ARE THE -- IT'S HARD, ESPECIALLY FOR LARGER

02:28PM  10  COMPANIES, TO GET ACCESS TO THE CEO, THE CFO.  AND SO THE

02:28PM  11  INVESTOR RELATIONS TEAM, THEY'RE KIND OF A LIAISON AND THEY ARE

02:28PM  12  ABLE TO ANSWER QUESTIONS AND THEY KNOW WHAT THEY CAN DISCLOSE

02:28PM  13  AND CAN'T DISCLOSE PUBLICLY AND WHAT IS IN THE PUBLIC DOMAIN

02:28PM  14  AND WHAT ISN'T IN THE PUBLIC DOMAIN.

02:28PM  15      AND IN THIS CASE CHARLES RHYEE, HE HAD BEEN TRAVELLING

02:28PM  16  WITH THE IR TEAM, AND SO THEY HAD MADE STATEMENTS TO INVESTORS

02:29PM  17  OVER THE COURSE OF, I DON'T KNOW IF IT WAS A DAY OR A COUPLE OF

02:29PM  18  DAYS, ABOUT THERANOS.

02:29PM  19      AND SO JAY SCHNEIDER, WHO IS THE INSTITUTIONAL PERSON AT

02:29PM  20  COWEN, IS PARAPHRASING FROM CHARLES RHYEE THE COMMENTS THAT

02:29PM  21  WALGREENS WAS MAKING TO OTHER INVESTORS ABOUT THIS PARTNERSHIP

02:29PM  22  AND THIS TECHNOLOGY, AND SO THAT'S WHAT THIS IS REFERRING TO.

02:29PM  23  Q.   AND THAT -- BECAUSE OF THAT, BECAUSE IT WAS ACTUALLY

02:29PM  24  COMING FROM WALGREENS, THAT WAS SIGNIFICANT INTEL FOR YOU?

02:29PM  25  A.   WELL, IT'S -- I MEAN, IT'S ALSO -- THEY WERE POSITIVE, AND

GROSSMAN CROSS BY MR. WADE                                          6499

| | | |
|---|---|---|
| 02:29PM | 1 | CHARLES HIMSELF IS POSITIVE, TOO.  SO THEY BOTH SEEM TO BE |
| 02:29PM | 2 | EXCITED ABOUT THIS PARTNERSHIP. |
| 02:29PM | 3 | AND THEN THERE ARE SPECIFIC COMMENTS HERE ABOUT, YOU KNOW, |
| 02:29PM | 4 | SOME OF THE TECHNOLOGICAL CAPABILITIES THAT, YOU KNOW, OF |
| 02:29PM | 5 | THERANOS. |
| 02:29PM | 6 | Q.   AND IF WE JUST LOOK QUICKLY AT YOUR RESPONSE, YOU NOTED |
| 02:30PM | 7 | THAT IT WAS QUITE AN ENDORSEMENT AT THE TIME; CORRECT? |
| 02:30PM | 8 | A.   YES. |
| 02:30PM | 9 | Q.   AND THE -- IN ADDITION TO THAT, DO YOU RECALL THAT THERE |
| 02:30PM | 10 | WAS SOME OUTREACH DONE TO LABCORP ITSELF? |
| 02:30PM | 11 | A.   I DON'T RECALL SPECIFICALLY. |
| 02:30PM | 12 | Q.   LET'S TAKE A LOOK AT, TAKE A LOOK AT 7359 AND JUST READ IT |
| 02:30PM | 13 | TO YOURSELF FOR A SECOND.  LET ME KNOW ONCE YOU'VE HAD A CHANCE |
| 02:30PM | 14 | TO DO THAT. |
| 02:30PM | 15 | A.   OKAY.  YEP. |
| 02:30PM | 16 | Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. KHANNA WAS |
| 02:30PM | 17 | REACHING OUT TO LABCORP TO GET SOME INTEL AS WELL? |
| 02:31PM | 18 | A.   YES. |
| 02:31PM | 19 | Q.   OKAY.  AND IF I CAN BRING YOU NEXT TO EXHIBIT 4052. |
| 02:31PM | 20 | A.   BINDER 1? |
| 02:31PM | 21 | Q.   IT SHOULD BE, YES. |
| 02:31PM | 22 | A.   51? |
| 02:31PM | 23 | Q.   4052. |
| 02:31PM | 24 | A.   OKAY. |
| 02:31PM | 25 | Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA |

GROSSMAN CROSS BY MR. WADE                                        6500

02:31PM  1    IS RELAYING SOME INTELLIGENCE THAT HE HAD GATHERED RELATING TO

02:31PM  2    THERANOS?

02:32PM  3    A.   I'M SORRY, COULD YOU ASK THE QUESTION AGAIN?

02:32PM  4    Q.   SURE.

02:32PM  5         DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE MR. KHANNA WAS

02:32PM  6    RELAYING TO YOU SOME MARKET INTELLIGENCE THAT HE HAD GATHERED

02:32PM  7    AS A RESULT OF HIS RESEARCH?

02:32PM  8    A.   YES.

02:32PM  9    Q.   OKAY.

02:32PM  10        MOVE THE ADMISSION OF 4052.

02:32PM  11            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:32PM  12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:32PM  13        (GOVERNMENT'S EXHIBIT 4052 WAS RECEIVED IN EVIDENCE.)

02:32PM  14   BY MR. WADE:

02:32PM  15   Q.   AND ON THE BOTTOM OF THIS EMAIL, IF WE CAN START THERE, DO

02:32PM  16   YOU SEE THAT IT'S DECEMBER 9TH, 2013?  AND YOU NOTE THAT YOU

02:32PM  17   WERE ACTUALLY GOING TO GO HAVE THAT MEETING THAT YOU TESTIFIED

02:32PM  18   ABOUT.

02:32PM  19        DO YOU SEE THAT?

02:32PM  20   A.   I DO, YES.

02:32PM  21   Q.   AND YOU WERE ASKING MR. KHANNA IF HE PICKED UP ANY

02:32PM  22   INFORMATION THAT WOULD BE HELPFUL TO YOU IN ADVANCE OF THAT

02:32PM  23   MEETING; RIGHT?

02:32PM  24   A.   YES.

02:32PM  25   Q.   AND LET'S LOOK AT HIS RESPONSE.

GROSSMAN CROSS BY MR. WADE                                    6501

02:33PM   1        HE GIVES YOU LABCORP'S VIEW; RIGHT?

02:33PM   2   A.   YES.

02:33PM   3   Q.   AND THAT WAS NEGATIVE?  IS THAT A FAIR CHARACTERIZATION?

02:33PM   4   A.   YES.

02:33PM   5   Q.   THEY TOLD YOU -- THEY TOLD HIM THE TECHNOLOGY DIDN'T WORK;

02:33PM   6   RIGHT?

02:33PM   7   A.   YES.

02:33PM   8   Q.   AND THEY TOLD HIM THAT THERE WAS A LIMITED MENU BY

02:33PM   9   COMPARISON TO THEIR ROBUST OFFERING; CORRECT?

02:33PM   10  A.   YES.

02:33PM   11  Q.   AND ESSENTIALLY ASPECTS OF THEIR MODEL WOULDN'T WORK.

02:33PM   12       DO YOU SEE THAT?

02:33PM   13  A.   YES.

02:33PM   14  Q.   WALGREENS HAD A LITTLE BIT DIFFERENT REACTION; IS THAT

02:33PM   15  FAIR?

02:33PM   16  A.   ACCORDING TO THIS EMAIL, THEY THINK IT IS VERY EXCITING

02:33PM   17  AND WILL LIKELY BUNDLE WITH THEIR EXISTING PAYOR CONTRACTS.

02:33PM   18  Q.   YEAH.  AND WHAT DO YOU UNDERSTAND THAT TO MEAN?

02:33PM   19  A.   I'M NOT SURE WHO "THEY" IS REFERRING TO.  WAG IS

02:34PM   20  DEFINITELY REFERRING TO WALGREENS.

02:34PM   21       "THEY THINK IT IS VERY EXCITING."  I'M ASSUMING HE'S

02:34PM   22  REFERRING TO THERANOS AND THEIR TECHNOLOGY.

02:34PM   23       "BUNDLE WITH EXISTING PAYOR CONTRACTS," WHAT HE'S

02:34PM   24  REFERRING TO THERE IS THE ABILITY TO OFFER THIS LAB SERVICE AS

02:34PM   25  PART OF EXISTING CONTRACTS THEY HAVE WITH COMPANIES LIKE UNITED

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023