No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXXVI of LVII | ER-10134 to ER-10433

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

GROSSMAN CROSS BY MR. WADE                                          6502

02:34PM   1    HEALTH CARE, ANTHEM, CIGNA, BLUE SHIELD OF CALIFORNIA WHERE

02:34PM   2    THEY ALREADY HAVE A PHARMACY CONTRACT FOR DISPENSING BRAND

02:34PM   3    PHARMACEUTICALS, GENERIC PHARMACEUTICALS, AND SO THEY CAN FOLD

02:34PM   4    THIS -- HE'S SUGGESTING THAT THEY MAY BE ABLE TO FOLD LAB

02:34PM   5    SERVICES INTO THOSE EXISTING CONTRACTS.

02:34PM   6    Q.   AND THAT WOULD BE A SIGNIFICANT BENEFIT FOR BOTH WALGREENS

02:34PM   7    AND THERANOS; CORRECT?

02:34PM   8    A.   IT COULD BE.

02:34PM   9    Q.   OKAY.  AND SO THIS WAS INFORMATION THAT YOU HAD IN ADVANCE

02:34PM   10   OF THAT MEETING THAT YOU ATTENDED WITH MS. HOLMES AND

02:35PM   11   MR. BALWANI?

02:35PM   12   A.   YES.

02:35PM   13   Q.   CORRECT?

02:35PM   14        AND I THINK YOU ALSO TESTIFIED YOU HAD READ SOME OF THE

02:35PM   15   PRESS RELEASES THAT WALGREENS HAD PUT OUT; RIGHT?

02:35PM   16   A.   YES.

02:35PM   17   Q.   AND THOSE WERE SIGNIFICANT TO YOU IN TERMS OF GATHERING

02:35PM   18   INTELLIGENCE AND YOUR INVESTMENT DECISION; IS THAT FAIR?

02:35PM   19   A.   YES.

02:35PM   20   Q.   AND YOU KNOW THAT A COMPANY LIKE WALGREENS -- OR YOU

02:35PM   21   ASSUME A COMPANY LIKE WALGREENS IS NOT GOING TO ENTER INTO A

02:35PM   22   BUSINESS RELATIONSHIP WITHOUT DOING DUE DILIGENCE AND THE LIKE;

02:35PM   23   CORRECT?

02:35PM   24   A.   YES.

02:35PM   25   Q.   AND, AND THAT THEY'RE NOT GOING TO DO IT WITHOUT DOING

GROSSMAN CROSS BY MR. WADE                                        6503

02:35PM    1    THEIR OWN VETTING OF THE TECHNOLOGY AND THE PEOPLE AT THERANOS;

02:35PM    2    IS THAT RIGHT?

02:35PM    3    A.   YES.

02:35PM    4    Q.   AND WAS THAT SIGNIFICANT FOR YOU IN TERMS OF YOUR

02:35PM    5    INVESTMENT DECISION IN THERANOS?

02:35PM    6    A.   YES.

02:35PM    7    Q.   THE -- IF WE GO TO -- I WANT TO SHIFT TO THE -- ASK YOU

02:35PM    8    SOME QUESTIONS ABOUT THE NOVEMBER 13TH MEETING -- I'M SORRY,

02:36PM    9    THE DECEMBER 13TH, 2013, MEETING.

02:36PM   10        BUT BEFORE I DO THAT, I WANT TO ASK YOU A COUPLE QUESTIONS

02:36PM   11    ABOUT SORT OF CONFIDENTIALITY AT THERANOS IF I COULD.

02:36PM   12    A.   YEAH, OKAY.

02:36PM   13    Q.   DO YOU RECALL ON YOUR DIRECT TESTIMONY YOU TALKED ABOUT

02:36PM   14    THAT THERANOS TOOK CONFIDENTIALITY VERY SERIOUSLY; IS THAT

02:36PM   15    RIGHT?

02:36PM   16    A.   WELL, AND ALSO SECURITY.

02:36PM   17    Q.   AND PHYSICAL SECURITY?

02:36PM   18    A.   PHYSICAL SECURITY.

02:36PM   19    Q.   AND I BELIEVE -- DO YOU RECALL THAT THERANOS WAS NOT

02:36PM   20    COMFORTABLE SHARING INFORMATION OR HAVING THEIR INFORMATION

02:36PM   21    SHARED WITH OTHERS WITHOUT A CONFIDENTIAL DISCLOSURE AGREEMENT

02:36PM   22    BEING SIGNED PRIOR TO THE DISCLOSURE?

02:36PM   23    A.   YES.

02:36PM   24    Q.   AND DO YOU RECALL THAT BEING IMPORTANT TO THERANOS AT THE

02:36PM   25    TIME THAT THEY WERE -- YOU WERE INTERACTING WITH THEM IN YOUR

GROSSMAN CROSS BY MR. WADE                                    6504

02:37PM  1      INVESTMENT DECISION?

02:37PM  2      A.   YES.

02:37PM  3      Q.   AND SO, FOR EXAMPLE, WHEN YOU BROUGHT CERTAIN CONSULTANTS

02:37PM  4      IN TO PROVIDE SERVICES, THEY INSISTED THAT YOU HAVE THEM SIGN A

02:37PM  5      CONFIDENTIAL DISCLOSURE AGREEMENT BEFORE THEY COULD REVIEW

02:37PM  6      THERANOS INFORMATION; CORRECT?

02:37PM  7      A.   YES.

02:37PM  8      Q.   AND THAT EVEN INCLUDED MEMBERS OF YOUR TEAM?

02:37PM  9      CONFIDENTIAL, HIGHLY CONFIDENTIAL INFORMATION WOULDN'T BE

02:37PM  10     SHARED WITH YOUR TEAM UNTIL A CONFIDENTIAL DISCLOSURE AGREEMENT

02:37PM  11     WAS SIGNED; RIGHT?

02:37PM  12     A.   I MEAN, I'M NOT A LEGAL EXPERT SO I DON'T KNOW EXACTLY

02:37PM  13     WHAT WAS IN THOSE DOCUMENTS THAT WE SIGNED, BUT IN GENERAL THEY

02:37PM  14     WERE VERY PROTECTIVE OF THEIR, THEIR INFORMATION.

02:37PM  15     Q.   AND THAT'S WHY THEY -- YOU UNDERSTOOD THAT'S WHY THEY

02:37PM  16     WANTED THOSE AGREEMENTS SIGNED; IS THAT RIGHT?

02:37PM  17     A.   I'M, I'M NOT SURE WHY THEY WERE SO SPECIFIC ON EVERYONE

02:37PM  18     SIGNING THOSE, BUT -- SO I DON'T KNOW.  IT'S HARD FOR ME TO

02:38PM  19     KNOW EXACTLY WHY THEY WANTED -- WHY THAT WAS SO IMPORTANT TO

02:38PM  20     THEM.

02:38PM  21     Q.   FAIR ENOUGH.

02:38PM  22          YOU DON'T KNOW WHY THEY WERE SPECIFIC, BUT YOU DO KNOW

02:38PM  23     THAT BEFORE THEY WERE SHARING CONFIDENTIAL INFORMATION, THEY

02:38PM  24     ASKED THAT THE DOCUMENT BE SIGNED FIRST; CORRECT?

02:38PM  25     A.   YES.

GROSSMAN CROSS BY MR. WADE                                              6505

02:38PM  1      Q.   OKAY.  AND IN CONNECTION WITH THAT MEETING ON

02:38PM  2      DECEMBER 13TH, 2013, I BELIEVE YOU SAID THAT WAS IN PALO ALTO

02:38PM  3      AT THE THERANOS HEADQUARTERS; IS THAT RIGHT?

02:38PM  4      A.   YES.

02:38PM  5      Q.   AND THIS WAS THE INTRODUCTORY MEETING BETWEEN PFM AND

02:38PM  6      THERANOS; CORRECT?

02:38PM  7      A.   YEP.

02:38PM  8      Q.   YOU DIDN'T DO -- YOU DID A LITTLE INITIAL RESEARCH THAT

02:38PM  9      WE'VE SEEN HERE BEFORE THE MEETING; CORRECT?

02:38PM  10     A.   YES.

02:38PM  11     Q.   BUT YOU DIDN'T DO ANY SORT OF, YOU KNOW, ROBUST VETTING OR

02:39PM  12     RESEARCH IN ADVANCE OF THAT?

02:39PM  13     A.   THAT'S CORRECT.

02:39PM  14     Q.   IT WAS SORT OF A LITTLE BIT OF A GETTING TO KNOW YOU

02:39PM  15     MEETING; IS THAT FAIR?

02:39PM  16     A.   YEAH.

02:39PM  17     Q.   AND DO YOU RECALL THAT IN ADDITION TO THERANOS TALKING A

02:39PM  18     LITTLE BIT ABOUT ITSELF, THEY ASKED QUESTIONS ABOUT PFM AND

02:39PM  19     YOUR INVESTMENT PHILOSOPHY.

02:39PM  20          DO YOU RECALL THAT?

02:39PM  21     A.   I DON'T SPECIFICALLY REMEMBER THAT, BUT, YES, THAT'S

02:39PM  22     NORM -- THAT WOULD BE TYPICAL IN A FIRST MEETING LIKE THAT.

02:39PM  23     Q.   AND WITHOUT INTENDING ANY OFFENSE, YOU UNDERSTAND THAT

02:39PM  24     THERE ARE SOME COMPANIES WHO HAVE SOME HESITANCE ABOUT HEDGE

02:39PM  25     FUND INVESTORS FOR REASONS WITHOUT GETTING TO KNOW THEM; IS

GROSSMAN CROSS BY MR. WADE                                          6506

02:39PM  1    THAT FAIR?

02:39PM  2    A.    I DON'T KNOW.  I DON'T KNOW WHY THERE'S A BIG DIFFERENCE

02:39PM  3    BETWEEN A HEDGE FUND AND A MUTUAL FUND IF YOU'RE A PRIVATE

02:39PM  4    COMPANY.

02:39PM  5    Q.    OKAY.  BUT YOU UNDERSTOOD IN THIS CASE THAT THERANOS WAS

02:39PM  6    LOOKING FOR LONGER TERM INVESTORS; RIGHT?

02:40PM  7    A.    I GUESS, YEAH.  THEY WANTED FIRMS THAT COULD PARTNER WITH

02:40PM  8    THEM FOR -- YEAH, FOR THE JOURNEY FROM BEING, YOU KNOW, AS THEY

02:40PM  9    GROW OR GREW AND COMMERCIALIZED.

02:40PM  10   Q.    AND SO DO YOU RECALL THEM ASKING QUESTIONS THAT WENT TO,

02:40PM  11   YOU KNOW, WHETHER PFM AS A HEDGE FUND WAS INTERESTED IN MORE OF

02:40PM  12   A LONGER TERM RELATIONSHIP WITH THE COMPANY?

02:40PM  13   A.    I DO REMEMBER THAT.

02:40PM  14   Q.    AND, IN FACT, PFM SPECIFICALLY HAS STRUCTURES WITHIN ITS

02:40PM  15   ORGANIZATION TO PERMIT LONGER TERM INVESTMENT IN COMPANIES BY

02:40PM  16   INVESTING IN SIDE POCKETS; RIGHT?

02:40PM  17   A.    THAT'S CORRECT.

02:40PM  18   Q.    AND THAT IS WHERE PFM PUTS MORE ILLIQUID INVESTMENTS SO

02:40PM  19   THAT -- AND IT KEEPS THE MORE LIQUID INVESTMENTS IN THE MAIN

02:40PM  20   FUNDS.

02:40PM  21       IS THAT FAIR?

02:40PM  22   A.    YEAH, WE SEPARATE THE PRIVATE INVESTMENTS FROM THE PUBLIC

02:41PM  23   INVESTMENTS.  SO WE HAVE A LIQUID SECURITIES PORTFOLIO, AND WE

02:41PM  24   HAVE AN ILLIQUID SECURITIES PORTFOLIO.

02:41PM  25       SO, YES, WE DO SEPARATE THOSE.

GROSSMAN CROSS BY MR. WADE                                             6507

02:41PM   1    Q.   OKAY.  AND DO YOU RECALL PFM COMMUNICATING TO THERANOS IN

02:41PM   2    THIS MEETING THAT IT WAS INTERESTED IN A, OR MAYBE AFTER THE

02:41PM   3    MEETING, THAT IT WAS INTERESTED IN EXPLORING THE POTENTIAL

02:41PM   4    LONGER TERM INVESTMENT RELATIONSHIP WITH THE COMPANY?

02:41PM   5    A.   I'M NOT EXACTLY SURE HOW WE PHRASED IT, BUT, YEAH, WE

02:41PM   6    WERE -- BASED ON THE REPRESENTATIONS FROM THAT FIRST MEETING,

02:41PM   7    WHAT THEY TOLD US THEY WERE CAPABLE OF DOING, WE WERE VERY

02:41PM   8    INTERESTED IN LEARNING MORE ABOUT THE COMPANY.

02:41PM   9    Q.   AND THIS MEETING, WHICH I THINK YOU SAID WAS ABOUT AN HOUR

02:41PM  10    LONG; IS THAT RIGHT?

02:41PM  11    A.   I DON'T I DON'T REMEMBER EXACTLY, BUT --

02:41PM  12    Q.   IT DIDN'T DELVE INTO A LOT OF SPECIFICS; CORRECT?

02:41PM  13    A.   IF THE QUESTION IS RELATIVE TO SUBSEQUENT MEETINGS THAT WE

02:42PM  14    HAD WITH THE COMPANY, IT WAS MORE HIGH LEVEL THAN THE

02:42PM  15    SUBSEQUENT MEETINGS.

02:42PM  16         BUT WE WENT THROUGH THE WHOLE BUSINESS.

02:42PM  17    Q.   AT A HIGH LEVEL.  BUT YOU RECALL THAT YOU HADN'T YET

02:42PM  18    SIGNED THE CONFIDENTIAL DISCLOSURE AGREEMENT AT THAT MEETING,

02:42PM  19    AND SO THEY WERE A LITTLE HESITANT TO SHARE WITH YOU THE MORE

02:42PM  20    SENSITIVE INFORMATION.

02:42PM  21         DO YOU RECALL THAT?

02:42PM  22    A.   I DON'T RECALL THAT ACTUALLY.  SORRY.

02:42PM  23    Q.   LET ME SEE, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

02:42PM  24         IF YOU TAKE A LOOK IN YOUR BOOK AT EXHIBIT 1422.

02:42PM  25              THE COURT:  IS THIS IN VOLUME 2?

GROSSMAN CROSS BY MR. WADE                                    6508

02:42PM   1                   MR. WADE:  1422 SHOULD BE IN VOLUME 1, YOUR HONOR.

02:42PM   2                   THE WITNESS:  1422?

02:42PM   3                   MR. WADE:  CORRECT.

02:43PM   4             DO YOU HAVE A COPY OF THAT?

02:43PM   5                   THE WITNESS:  I DON'T THINK I HAVE THAT.

02:43PM   6                   THE COURT:  IT'S NOT IN MY 1.

02:43PM   7                   THE WITNESS:  I MEAN, IT'S GETTING LATE IN THE DAY,

02:43PM   8       BUT I THINK MY EYES ARE STILL WORKING.

02:43PM   9       BY MR. WADE:

02:43PM  10       Q.   WELL, GIVE ME A SECOND HERE AND I'LL SEE IF I CAN HELP THE

02:43PM  11       COURT AND THE WITNESS.

02:43PM  12             WHILE WE'RE DOING THAT, WHY DON'T WE START BY LOOKING AT

02:43PM  13       EXHIBIT 14 -- WHILE I'M LOOKING FOR THE RIGHT EXHIBIT THAT I

02:43PM  14       WAS POINTING TO YOU FIRST -- MY APOLOGIES -- WHY DON'T YOU TAKE

02:43PM  15       A MINUTE TO LOOK AT EXHIBIT 1434.

02:43PM  16             DO YOU HAVE THAT ONE?

02:43PM  17       A.   YES.

02:43PM  18       Q.   OKAY.  TAKE A MINUTE TO FAMILIARIZE YOURSELF WITH THAT,

02:43PM  19       AND I'M PARTICULARLY FOCUSSED ON THE ATTACHMENTS TO THAT JUST

02:43PM  20       SO --

02:43PM  21                   MR. DOWNEY:  YOUR HONOR, WILL YOU JUST EXCUSE ME FOR

02:43PM  22       ONE SECOND?

02:43PM  23                   THE COURT:  SURE.

02:43PM  24             (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM  25                   MR. WADE:  THE COURT'S INDULGENCE FOR JUST ONE

GROSSMAN CROSS BY MR. WADE                                              6509

02:44PM    1    MOMENT?

02:44PM    2            THE COURT:  SURE.

02:44PM    3        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:44PM    4    BY MR. WADE:

02:44PM    5    Q.   DO YOU HAVE 1434 IN FRONT OF YOU?

02:44PM    6    A.   YES.

02:44PM    7    Q.   AND DO YOU RECALL THE COVER EMAIL WAS AN EMAIL THAT, OR A

02:44PM    8    COPY OF AN EMAIL THAT MR. LEACH HAD ASKED YOU SOME QUESTIONS

02:44PM    9    ABOUT?

02:44PM   10        DO YOU RECALL THAT?

02:44PM   11    A.   I DON'T, BUT -- NO, I'M SORRY.

02:44PM   12    Q.   OKAY.  YOU SEE THAT ATTACHED TO THIS -- YOU SEE THIS IS AN

02:44PM   13    EMAIL FROM MR. BALWANI TO YOU?

02:44PM   14    A.   YES.

02:44PM   15    Q.   AND YOU SEE ATTACHED TO THIS EMAIL ARE CONFIDENTIAL

02:44PM   16    DISCLOSURE AGREEMENTS THAT ARE SIGNED BY VARIOUS PFM EMPLOYEES?

02:45PM   17    A.   YES.

02:45PM   18            MR. WADE:  MOVE THE ADMISSION OF 1434.

02:45PM   19            MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:45PM   20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:45PM   21        (GOVERNMENT'S EXHIBIT 1434 WAS RECEIVED IN EVIDENCE.)

02:45PM   22    BY MR. WADE:

02:45PM   23    Q.   AND LET'S JUST FOCUS ON THE DATE.  WE'LL COME BACK TO THE

02:45PM   24    SUBSTANCE OF THE EMAIL LATER.  BUT YOU SEE THIS IS AN EMAIL

02:45PM   25    FROM MR. BALWANI TO YOU ON JANUARY 7TH, 2014?

GROSSMAN CROSS BY MR. WADE                                         6510

| | | |
|---|---|---|
| 02:45PM | 1 | DO YOU SEE THAT? |
| 02:45PM | 2 | A.   IT'S NOT JANUARY 7TH. |
| 02:45PM | 3 | Q.   JANUARY 17TH, 2014? |
| 02:45PM | 4 | A.   YES. |
| 02:45PM | 5 | Q.   IS THAT CORRECT? |
| 02:45PM | 6 | A.   YES. |
| 02:45PM | 7 | Q.   AND THIS WAS FOLLOWING UP ON THE MEETING, THE SECOND |
| 02:45PM | 8 | MEETING THAT YOU HAD AT THERANOS; CORRECT? |
| 02:45PM | 9 | A.   I BELIEVE THAT IS CORRECT, YES. |
| 02:45PM | 10 | Q.   OKAY.  AND IF YOU JUST TURN YOUR ATTENTION TO THE |
| 02:46PM | 11 | ATTACHMENT WHICH IS AT PAGE 5 OF THE EXHIBIT. |
| 02:46PM | 12 | A.   OKAY. |
| 02:46PM | 13 | Q.   DO YOU RECOGNIZE THAT TO BE A CONFIDENTIAL DISCLOSURE |
| 02:46PM | 14 | AGREEMENT THAT YOU SIGNED ON 1-10-2014? |
| 02:46PM | 15 | A.   YES. |
| 02:46PM | 16 | Q.   AND THAT'S YOUR SIGNATURE DOWN THERE ON THE BOTTOM? |
| 02:46PM | 17 | A.   YES. |
| 02:46PM | 18 | Q.   OKAY.  AND LET ME, LET ME NOW TRY TO BRING YOU TO 1422, |
| 02:46PM | 19 | WHICH I THINK MIGHT BE, JUST TO REALLY MAKE LIFE DIFFICULT FOR |
| 02:46PM | 20 | YOU, IS GOING TO BE IN THE GOVERNMENT'S BINDER. |
| 02:46PM | 21 | A.   OKAY. |
| 02:46PM | 22 | Q.   IF YOU COULD? |
| 02:46PM | 23 | A.   SAME NUMBER? |
| 02:46PM | 24 | Q.   YES, 1422. |
| 02:46PM | 25 | A.   OKAY. |

GROSSMAN CROSS BY MR. WADE                                    6511

| | | |
|---|---|---|
| 02:46PM | 1 | Q.   AND DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU? |
| 02:46PM | 2 | A.   I DO. |
| 02:46PM | 3 | Q.   AND DO YOU RECOGNIZE THAT TO BE AN EMAIL BETWEEN YOU AND |
| 02:46PM | 4 | MR. BALWANI ALSO ON JANUARY 13TH, 2014? |
| 02:47PM | 5 | A.   WOULD YOU JUST GIVE ME A MINUTE TO REVIEW IT? |
| 02:47PM | 6 |      (PAUSE IN PROCEEDINGS.) |
| 02:47PM | 7 |           THE WITNESS:  OKAY.  YES. |
| 02:47PM | 8 |           MR. WADE:  MOVE THE ADMISSION OF 1422. |
| 02:47PM | 9 |           MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 02:47PM | 10 |           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:47PM | 11 |      (GOVERNMENT'S EXHIBIT 1422 WAS RECEIVED IN EVIDENCE.) |
| 02:47PM | 12 | BY MR. WADE: |
| 02:47PM | 13 | Q.   AND LET ME FOCUS ON THE BOTTOM EMAIL, THE FIRST COUPLE OF |
| 02:47PM | 14 | PARAGRAPHS THERE. |
| 02:47PM | 15 |      DO YOU SEE THAT'S AN EMAIL FROM YOU TO MR. BALWANI? |
| 02:47PM | 16 |      DO YOU SEE THAT? |
| 02:47PM | 17 | A.   YES, I DO. |
| 02:47PM | 18 | Q.   AND IF I JUST LOOK AT THAT VERY FIRST PARAGRAPH, I'M |
| 02:47PM | 19 | SORRY, THE PARAGRAPH THAT STARTS WITH THE WORD "FIRST." |
| 02:47PM | 20 |      DO YOU SEE THERE IT SAYS, "FIRST, WE TAKE COMPLIANCE |
| 02:48PM | 21 | EXTREMELY SERIOUSLY.  AS SUCH WE'D LIKE TO UNDERSTAND WHAT WE |
| 02:48PM | 22 | ACTUALLY SIGNED WHEN WE REGISTERED FOR OUR ON SITE MEETING.  IS |
| 02:48PM | 23 | IT POSSIBLE FOR OUR GENERAL COUNCIL, KIMBERLY SUMME, TO REVIEW |
| 02:48PM | 24 | THAT DOCUMENT?" |
| 02:48PM | 25 |      DO YOU SEE THAT? |

GROSSMAN CROSS BY MR. WADE                                                      6512

02:48PM   1     A.   YES.

02:48PM   2     Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT IT WAS IN

02:48PM   3     THAT SECOND MEETING THAT YOU SIGNED THE CONFIDENTIAL DISCLOSURE

02:48PM   4     AGREEMENT WITH THERANOS?

02:48PM   5     A.   YES.

02:48PM   6     Q.   OKAY.  YOU CAN SET THAT BOOK ASIDE.

02:48PM   7          DO YOU -- LET ME ASK YOU A COUPLE OF THINGS ABOUT THE

02:48PM   8     GENERAL TOPICS THAT CAME UP IN THAT FIRST MEETING ON

02:49PM   9     DECEMBER 13TH, 2013.

02:49PM   10         SO I'M BACK TO THE DECEMBER 13TH, 2013 MEETING.

02:49PM   11    A.   OKAY.

02:49PM   12    Q.   OKAY.  DO YOU RECALL THAT THERE WAS DISCUSSION ABOUT --

02:49PM   13    WELL, LET ME STRIKE THAT.

02:49PM   14         THE WALGREENS LAUNCH WAS PUBLIC AT THAT POINT; CORRECT?

02:49PM   15    A.   YES.

02:49PM   16    Q.   AND YOU RECALL THAT THERE WAS SOME DISCUSSION ABOUT THE

02:49PM   17    WALGREENS RELATIONSHIP AND THAT LAUNCH?

02:49PM   18    A.   YES.

02:49PM   19    Q.   AND THE TWO PHASES TO THAT LAUNCH, DO YOU RECALL THAT

02:49PM   20    COMING UP IN THAT MEETING?

02:49PM   21    A.   YES.

02:49PM   22    Q.   AND DO YOU RECALL THE COMPANY TELLING YOU THAT GIVEN THE

02:49PM   23    PRESSURE OF THAT INITIAL COMMERCIAL LAUNCH, THAT THEY WERE

02:49PM   24    GOING TO BE PAUSING THEIR WORK ON MILITARY AND PHARMA PROJECTS

02:49PM   25    AND PUT THOSE ON HOLD?

GROSSMAN CROSS BY MR. WADE                                        6513

02:50PM  1          DO YOU RECALL THAT?

02:50PM  2     A.   YES.

02:50PM  3     Q.   OKAY.  BECAUSE THE COMMERCIAL ROLLOUT WAS A BIG

02:50PM  4     UNDERTAKING; CORRECT?

02:50PM  5     A.   YES.

02:50PM  6     Q.   AND THEY WANTED TO FOCUS THEIR BEST ASSETS ON THAT

02:50PM  7     PROJECT.

02:50PM  8          IS THAT YOUR UNDERSTANDING?

02:50PM  9     A.   THAT AND THE HOSPITAL BUSINESS.

02:50PM  10    Q.   OKAY.

02:50PM  11    A.   AND THE PHYSICIAN BUSINESS.

02:50PM  12    Q.   AND, IN FACT, NOT LONG LATER THEY ANNOUNCED A DEAL WITH

02:50PM  13    INTERMOUNTAIN; IS THAT RIGHT?

02:50PM  14    A.   I DON'T REMEMBER SPECIFICALLY WHEN THEY ANNOUNCED THAT

02:50PM  15    DEAL, BUT --

02:50PM  16    Q.   OKAY.  AND I THINK YOU TESTIFIED ON DIRECT THAT THERE MAY

02:50PM  17    HAVE BEEN A FEW SLIDES THAT WERE SHOWN IN THAT MEETING; IS THAT

02:50PM  18    RIGHT?

02:50PM  19    A.   I BELIEVE SO.  YEAH.

02:50PM  20    Q.   BUT AS YOU SIT HERE TODAY, CAN YOU REMEMBER WHICH SLIDES

02:50PM  21    WERE SHOWN IN THAT MEETING?

02:50PM  22    A.   I DON'T, I DON'T REMEMBER SPECIFICALLY WHICH SLIDES WERE

02:50PM  23    SHOWN.

02:50PM  24    Q.   OKAY.  AND IS IT FAIR TO SAY THAT THIS WAS GENERALLY --

02:51PM  25    THIS WAS A RAPPORT BUILDING EXERCISE IN PART AS WELL?

GROSSMAN CROSS BY MR. WADE                                              6514

02:51PM   1    A.   THAT WAS A PART OF THE MEETING, YES.

02:51PM   2    Q.   AND IT WAS A -- DO YOU RECALL IT BEING A POSITIVE MEETING?

02:51PM   3    A.   YES.

02:51PM   4    Q.   OKAY.  AND THE -- AND DO YOU RECALL COMING OUT OF THE

02:51PM   5    MEETING AND BEING INTERESTED IN EXPLORING THE INVESTMENT MORE?

02:51PM   6    A.   YES.

02:51PM   7    Q.   OKAY.  LET'S FOCUS ON SOME OF THE EVENTS AFTER THAT

02:51PM   8    MEETING, SO BETWEEN DECEMBER 12TH AND THE SECOND MEETING, AND

02:51PM   9    SOME OF THE WORK THAT YOU ALL AT PFM WERE DOING.  OKAY?

02:51PM  10    A.   OKAY.

02:51PM  11    Q.   LET'S GO TO 7376.

02:52PM  12         DO YOU HAVE, DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:52PM  13    A.   I DO.

02:52PM  14    Q.   AND DO YOU RECOGNIZE THAT TO BE ANOTHER REPORT FROM

02:52PM  15    MR. KHANNA ON MATTERS RELATING TO THERANOS AND WALGREENS?

02:52PM  16    A.   I DO.

02:52PM  17              MR. WADE:  MOVE THE ADMISSION OF 7376.

02:52PM  18              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:52PM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:52PM  20         (DEFENDANT'S EXHIBIT 7376 WAS RECEIVED IN EVIDENCE.)

02:52PM  21    BY MR. WADE:

02:52PM  22    Q.   AND DO YOU SEE THERE IT SAYS "THERANOS - COMMENTS ON THE

02:52PM  23    WAG CALL"?

02:52PM  24    A.   I DO.

02:52PM  25    Q.   DO YOU KNOW WHAT WAG CALL REFERS TO THERE?

GROSSMAN CROSS BY MR. WADE                                      6515

02:52PM  1    A.    I BELIEVE IT REFERS TO THE WALGREENS EARNINGS CALL.

02:53PM  2    Q.    AND THE WALGREENS EARNINGS CALL IS A CALL WHERE THE SENIOR

02:53PM  3    MANAGEMENT OF THE COMPANY GOES ON A TELEPHONE CALL; IS THAT

02:53PM  4    RIGHT?

02:53PM  5    A.    YEAH, FOUR TIMES A YEAR IN THE U.S.

02:53PM  6    Q.    WHY DON'T YOU DESCRIBE FOR US WHAT HAPPENS IN THAT CALL.

02:53PM  7    A.    YEAH.  FOUR TIMES A YEAR, QUARTERLY, THE S.E.C. REQUIRES

02:53PM  8    COMPANIES IN THE U.S. THAT ARE PUBLICLY LISTED, SO ON A STOCK

02:53PM  9    EXCHANGE, THEY'VE GONE THROUGH THE IPO PROCESS, TO HAVE -- TO

02:53PM 10    REPORT QUARTERLY RESULTS, FILE THAT WITH THE S.E.C.

02:53PM 11         AND ABOVE AND BEYOND THAT, MANY, MOST LARGE COMPANIES HOST

02:53PM 12    AN EARNINGS CALL.  THEY'LL ISSUE A PRESS RELEASE.  THEY DON'T

02:53PM 13    HAVE TO DO THAT, BUT THEY HAVE TO FILE WHAT IS CALLED FORM 10Q

02:53PM 14    WITH THE S.E.C., WHICH IS AN UPDATE OF THEIR BUSINESS.

02:53PM 15         BUT IN ADDITION TO THAT, ALMOST EVERY COMPANY, LARGE

02:53PM 16    COMPANY, MAJOR COMPANY, THEY HOLD A QUARTERLY CONFERENCE CALL.

02:54PM 17    THEY'LL ISSUE A PRESS RELEASE THAT INFORMS INVESTORS ON HOW THE

02:54PM 18    BUSINESS PERFORMED OVER THAT THREE MONTH PERIOD.

02:54PM 19         AND THEN FOR THE CONFERENCE CALLS, THEY'LL OFTEN GIVE

02:54PM 20    INVESTORS AN OPPORTUNITY TO ASK QUESTIONS.  ALMOST ALWAYS IT'S

02:54PM 21    SELL-SIDE ANALYSTS, NOT PEOPLE LIKE US.  SO THAT'S THE TYPICAL

02:54PM 22    PROCESS.

02:54PM 23         SO THIS IS THE WALGREENS HOLDS AND EARNINGS CALL.

02:54PM 24         THEIR QUARTERLY CALENDAR IS DIFFERENT FROM THE VAST

02:54PM 25    MAJORITY OF COMPANIES.  I BELIEVE THEY'RE ON AN AUGUST FISCAL

GROSSMAN CROSS BY MR. WADE                                          6516

02:54PM   1    YEAR, OR THEY WERE AT THIS POINT.  SO THIS WAS THEIR -- WHAT --

02:54PM   2    IT WOULD HAVE BEEN THEIR FISCAL Q1, I THINK, THEIR FISCAL FIRST

02:54PM   3    QUARTER CALL IN LATE DECEMBER.

02:54PM   4    Q.   AND DO YOU RECALL THAT THIS WOULD BE, THIS WOULD PROBABLY

02:54PM   5    BE THE FIRST CALL AFTER THE LAUNCH WITH THERANOS?

02:55PM   6    A.   YES.

02:55PM   7    Q.   OKAY.  AND MR. KHANNA -- AND IN MORE LAYMAN'S TERMS, IT'S

02:55PM   8    A CALL IN WHICH INFORMATION IS PROVIDED, QUESTIONS ARE ASKED,

02:55PM   9    AND YOU GET, YOU GET TO LEARN WHAT IS GOING ON AT THE COMPANY.

02:55PM  10        IS THAT FAIR?

02:55PM  11    A.   YES.

02:55PM  12    Q.   AND SOMETIMES IT'S GENERAL, BUT OFTENTIMES IT GETS VERY

02:55PM  13    SPECIFIC ON FINANCIAL PERFORMANCE AND BUSINESS METRICS AND THE

02:55PM  14    LIKE.

02:55PM  15        IS THAT FAIR?

02:55PM  16    A.   YES.

02:55PM  17    Q.   OKAY.  AND MR. KHANNA WATCHED OUT OR LISTENED IN ON THE

02:55PM  18    WALGREENS CALL, IT WOULD APPEAR?

02:55PM  19    A.   YES.

02:55PM  20    Q.   AND IS THAT SOMETHING -- DID HE USUALLY LISTEN IN ON

02:55PM  21    WALGREENS CALLS GIVEN THE SIGNIFICANCE OF THE COMPANY IN THE

02:55PM  22    HEALTH CARE SPACE?

02:55PM  23    A.   YEAH, HE LISTENS TO A LOT -- YES, ALL OF THE MAJOR

02:55PM  24    COMPANIES HE'S RESPONSIBLE FOR COVERING, HE LISTENS TO THOSE

02:55PM  25    CONFERENCE CALLS.

GROSSMAN CROSS BY MR. WADE                                    6517

```
02:55PM    1      Q.   AND WALGREENS WAS ONE OF THEM?

02:56PM    2      A.   YES.

02:56PM    3      Q.   AND BECAUSE YOU ALL WERE EXPLORING A POSSIBLE INVESTMENT

02:56PM    4      WITH THERANOS, HE PROVIDED THIS REPORT?

02:56PM    5      A.   YES.

02:56PM    6      Q.   AND THAT REPORT IS GENERALLY THAT WALGREENS WAS VERY

02:56PM    7      POSITIVE ON THERANOS; CORRECT?

02:56PM    8      A.   I MEAN, I'M JUST READING FROM WHAT HE WROTE.  SO "WE ARE

02:56PM    9      VERY POSITIVE ON THERANOS."

02:56PM   10           YEAH, I THINK HE'S ATTEMPTING TO PARAPHRASE FROM THE

02:56PM   11      WALGREENS CONFERENCE CALL.

02:56PM   12      Q.   FAIR ENOUGH.  BUT IS IT, IS IT FAIR TO SAY THAT THIS IS

02:56PM   13      A -- THIS IS A POSITIVE REPORT THAT IS COMING OUT OF THE

02:56PM   14      THERANOS -- OR THE WALGREENS ANALYST CALL WITH RESPECT TO

02:56PM   15      THERANOS?

02:56PM   16      A.   YES.

02:56PM   17      Q.   AND WAS THAT MEANINGFUL INFORMATION TO YOU WHEN YOU WERE

02:56PM   18      MAKING THE INVESTMENT DECISION?

02:56PM   19      A.   YES, YES.

02:56PM   20      Q.   AND IF WE CAN LOOK, AND I APOLOGIZE TO THE COURT AND

02:56PM   21      COUNSEL, I'M GOING TO PUT UP AN EXHIBIT THAT IS ALREADY IN

02:56PM   22      EVIDENCE.

02:56PM   23           I FAILED TO BRING A COPY OF THIS.  IF WE CAN LOOK QUICKLY

02:57PM   24      AT 12510.

02:57PM   25      A.   BINDER 2?
```

GROSSMAN CROSS BY MR. WADE                                    6518

02:57PM   1    Q.   WE'LL BRING IT UP ON THE SCREEN.  IT'S IN EVIDENCE.

02:57PM   2         AND I TAKE IT YOU'VE SEEN A FEW TRANSCRIPTS OF ANALYST

02:57PM   3    CALLS IN YOUR DAY.

02:57PM   4    A.   YES.

02:57PM   5    Q.   AND DO YOU RECOGNIZE THIS TO BE A TRANSCRIPT OF THAT CALL

02:57PM   6    IN DECEMBER OF 2013?

02:57PM   7    A.   YES.

02:57PM   8    Q.   AND I JUST WANT TO NOTE A COUPLE OF QUICK THINGS HERE.

02:57PM   9         DO YOU SEE ON THE SECOND PAGE IN THE MIDDLE WALGREENS AND

02:57PM  10    THERANOS?

02:57PM  11         DO YOU SEE THAT?

02:57PM  12         THIS WAS SOMETHING THAT WAS RAISED BY THE CEO IN HIS

02:58PM  13    OPENING COMMENTS ON THE COMPANY; IS THAT RIGHT?

02:58PM  14    A.   IT APPEARS TO BE, YES.

02:58PM  15    Q.   AND GENERALLY -- IS IT FAIR TO SAY THAT GENERALLY THE CEO,

02:58PM  16    YOU KNOW, INCLUDES SOMETHING IN KIND OF THE OPENING COMMENT

02:58PM  17    THAT THE COMPANY CONSIDERS IT TO BE, YOU KNOW, AN IMPORTANT

02:58PM  18    INITIATIVE FOR THE COMPANY?

02:58PM  19    A.   YES.

02:58PM  20    Q.   AND DO YOU KNOW -- LET'S TAKE A LOOK AT EXHIBIT 12, OR

02:58PM  21    PAGE 12.  IF WE CAN BLOW UP THE Q AND A STARTING WITH THE NEXT

02:58PM  22    ONE DOWN, RIGHT THERE (INDICATING).

02:58PM  23         DO YOU KNOW WHO RICKY GOLDWASSER IS?

02:58PM  24    A.   I DO.

02:58PM  25    Q.   AND IS RICKY A RESPECTED ANALYST WHO COVERS STOCKS?

GROSSMAN CROSS BY MR. WADE                                       6519

02:59PM   1    A.   YES.

02:59PM   2    Q.   OKAY.  AND DO YOU KNOW WHO WADE MIQUELON IS?

02:59PM   3    A.   YES.

02:59PM   4    Q.   HE'S THE CFO OF WALGREENS AT THIS POINT IN TIME?

02:59PM   5    A.   YES.

02:59PM   6    Q.   AND DO YOU SEE HERE THAT HE GIVES A REPORT ON THE THERANOS

02:59PM   7    RELATIONSHIP?

02:59PM   8         DO YOU SEE THAT?

02:59PM   9    A.   DO YOU MIND IF I JUST READ THIS?

02:59PM   10   Q.   SURE.  YEAH.  TAKE A MOMENT.

02:59PM   11        (PAUSE IN PROCEEDINGS.)

02:59PM   12             THE WITNESS:  OKAY.

03:00PM   13   BY MR. WADE:

03:00PM   14   Q.   OKAY.  AND IS IT FAIR TO SAY THAT MR. MIQUELON IS GIVING A

03:00PM   15   PRETTY POSITIVE REVIEW OF THERANOS ON THIS CALL?

03:00PM   16   A.   YES.

03:00PM   17   Q.   AND DO YOU RECALL LEARNING THAT AT THE TIME THAT YOU WERE

03:00PM   18   CONSIDERING THE THERANOS INVESTMENT, THAT SENIOR LEADERSHIP OF

03:00PM   19   WALGREENS WAS POSITIVE ON THE THERANOS RELATIONSHIP?

03:00PM   20   A.   YES.

03:00PM   21   Q.   AND DO YOU SEE IN THE BOTTOM OF THE FIRST PARAGRAPH UNDER

03:00PM   22   MR. MIQUELON'S COMMENTS, HE SAYS, "WE'LL KEEP LEARNING AND

03:00PM   23   PERFECTING THE PATIENT EXPERIENCE WHICH IS REALLY THE" CASE --

03:00PM   24   "THE KEY THING."

03:00PM   25        DO YOU SEE THAT?

GROSSMAN CROSS BY MR. WADE                                          6520

```
03:00PM    1      A.   I DO.

03:00PM    2      Q.   AND DID YOU RECOGNIZE, GIVEN YOUR EXPERIENCE WITH

03:00PM    3    RETAILERS, THAT BEFORE YOU'RE GOING TO ROLL OUT A CONCEPT LIKE

03:00PM    4    THE THERANOS CONCEPT, THAT YOU WANTED TO MAKE SURE THAT YOU

03:00PM    5    NAILED THE PATIENT EXPERIENCE BEFORE YOU TOOK IT NATIONWIDE?

03:01PM    6      A.   I MEAN, I'M NOT -- CAN YOU REPHRASE -- CAN YOU ASK THE

03:01PM    7    QUESTION AGAIN?  I'M SORRY.

03:01PM    8      Q.   SURE.  YOU RECOGNIZED THAT, WHEN YOU WERE CONSIDERING THE

03:01PM    9    THERANOS RETAIL SERVICES, THAT PATIENT EXPERIENCE WAS

03:01PM   10    IMPORTANT; CORRECT?

03:01PM   11      A.   YES, I AGREE WITH THAT.

03:01PM   12      Q.   AND DID YOU RECOGNIZE ALSO THAT IT WAS IMPORTANT TO

03:01PM   13    PERFECT THAT PATIENT EXPERIENCE BEFORE YOU EXPAND WIDELY?

03:01PM   14      A.   THAT SEEMS LIKE A REASONABLE BUSINESS PRINCIPLE.

03:01PM   15      Q.   OKAY.  LET'S LOOK NEXT AT 125 -- OH, I'M SORRY.  LET'S

03:01PM   16    LOOK NEXT AT 1360.

03:02PM   17           AND THAT MAY BE IN THE GOVERNMENT BINDER IF IT'S NOT IN

03:02PM   18    YOUR BINDER.

03:02PM   19      A.   OKAY.  I'VE GOT THE EXHIBIT.

03:02PM   20      Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON

03:02PM   21    THAT FIRST MEETING THAT YOU HAD AT THERANOS?

03:02PM   22      A.   LET ME JUST READ IT.

03:02PM   23      Q.   SURE.  I APOLOGIZE.  IT'S SMALL FONT.

03:02PM   24      A.   IT'S TINY.  JEEZ.

03:02PM   25      Q.   DO YOU NEED SOME GLASSES?
```

GROSSMAN CROSS BY MR. WADE                                          6521

03:02PM   1    A.   NO, NOT YET.

03:03PM   2         (PAUSE IN PROCEEDINGS.)

03:03PM   3            THE WITNESS:  OKAY.

03:03PM   4    BY MR. WADE:

03:03PM   5    Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL FOLLOWING UP ON THAT

03:03PM   6    INITIAL MEETING THAT YOU HAD AT THERANOS?

03:03PM   7    A.   YES.

03:03PM   8            MR. WADE:  I WOULD MOVE THE ADMISSION OF 1360.

03:03PM   9            MR. LEACH:  NO OBJECTION.

03:03PM   10           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:03PM   11        (GOVERNMENT'S EXHIBIT 1360 WAS RECEIVED IN EVIDENCE.)

03:03PM   12   BY MR. WADE:

03:03PM   13   Q.   FORTUNATELY, WE CAN NOW ZOOM THIS DOCUMENT.  IF WE CAN

03:03PM   14   BLOW IT UP?

03:03PM   15   A.   I'M GOING TO BE BLIND BY THE END OF THIS.

03:04PM   16   Q.   DO YOU SEE AT THE BOTTOM MR. JAMES FOLLOWS UP ON THAT

03:04PM   17   MEETING AND HE SAYS HE IS JUST CHECKING TO SEE IF WE CAN MOVE

03:04PM   18   THE PROCESS FORWARD.

03:04PM   19        DO YOU SEE THAT?

03:04PM   20   A.   YES, YES.

03:04PM   21   Q.   AND COMING OUT OF THAT MEETING, THERANOS WASN'T, YOU KNOW,

03:04PM   22   BANGING ON YOUR DOOR TRYING TO DEMAND AN INVESTMENT.  YOU JUST

03:04PM   23   HAD THE MEETING AND YOU MOVED ON; RIGHT?

03:04PM   24   A.   THEY WERE NOT BANGING DOWN OUR DOOR, I AGREE WITH THAT.

03:04PM   25   Q.   RIGHT.  AND MR. JAMES WAS THE ONE WHO ACTUALLY CIRCLED

GROSSMAN CROSS BY MR. WADE                                          6522

03:04PM   1    BACK TO THE INVESTMENT; CORRECT?

03:04PM   2    A.   YES, THAT APPEARS TO BE TRUE.

03:04PM   3    Q.   AND HE NOTES THERE, DO YOU SEE AT THE END, "WE HAVE SHOWN

03:04PM   4    TO BE GREAT LONG-TERM," AND THEN HE CUTS OFF PARTNERS, I THINK.

03:04PM   5         DO YOU RECALL THAT BEING AN ISSUE OF CONCERN TO THERANOS

03:04PM   6    AT THE TIME?

03:04PM   7    A.   I DON'T.

03:04PM   8    Q.   OKAY.  DO YOU HAVE ANY RECOLLECTION AS TO WHY MR. JAMES

03:04PM   9    WAS PROVIDING THOSE ASSURANCES?

03:04PM   10   A.   I HAVE NO IDEA.

03:05PM   11   Q.   OKAY.  AND THEN DO YOU SEE THAT MS. HOLMES RESPONDS AND

03:05PM   12   SHE THANKS, SHE THANKS MR. JAMES FOR THE NOTE AND SAYS THAT

03:05PM   13   THEY WILL BE IN TOUCH TO FOLLOW UP; RIGHT?

03:05PM   14   A.   I'M SORRY.  THE QUESTION IS WHAT?

03:05PM   15   Q.   THERE WAS AN AGREEMENT -- MS. HOLMES EXPRESSED AN INTEREST

03:05PM   16   IN RESPONSE TO MR. JAMES'S EMAIL --

03:05PM   17   A.   YES.

03:05PM   18   Q.   -- AND SAID LET'S CONTINUE OUR DISCUSSIONS; CORRECT?

03:05PM   19   A.   YES.

03:05PM   20   Q.   AND INTERNALLY IN RESPONSE TO THIS, DO YOU RECALL YOU KIND

03:05PM   21   OF ACTIVATED YOUR ANALYST TEAM TO START TO DIG IN IN A LITTLE

03:05PM   22   MORE DEPTH COMING OUT OF THAT DECEMBER MEETING?

03:05PM   23   A.   I BELIEVE THAT IS, THAT IS RIGHT.

03:05PM   24   Q.   AND DO YOU RECALL DR. RABODZEY IN PARTICULAR STARTED

03:05PM   25   DIGGING IN?

GROSSMAN CROSS BY MR. WADE                                    6523

```
03:06PM   1    A.   YES.

03:06PM   2    Q.   DO YOU RECALL ON I THINK IT WAS CHRISTMAS EVE HE DROVE UP

03:06PM   3    TO THE WALGREENS IN PALO ALTO?

03:06PM   4         DO YOU RECALL THAT?

03:06PM   5    A.   I DON'T RECALL THAT.

03:06PM   6    Q.   ALL RIGHT.  WELL, LET'S TAKE A LOOK.  LET'S TAKE A LOOK AT

03:06PM   7    14025, WHICH I THINK IS IN YOUR SECOND BINDER.

03:06PM   8         AS YOU'RE GATHERING IT, THIS ISN'T AN EMAIL -- PLEASE DO

03:06PM   9    GATHER IT, BUT THIS ISN'T AN EMAIL ON THE CHRISTMAS VISIT TO

03:07PM  10    WALGREENS.  THIS EMAIL ACTUALLY REFERS -- THIS IS A DISCUSSION

03:07PM  11    WHERE YOU AND MR. JAMES TALK ABOUT CONTINUING TO EXPLORE THE

03:07PM  12    WALGREENS INVESTMENT; IS THAT RIGHT?

03:07PM  13    A.   YES.

03:07PM  14    Q.   AND DO YOU SEE --

03:07PM  15         MOVE THE ADMISSION OF 14025.

03:07PM  16              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:07PM  17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:07PM  18         (DEFENDANT'S EXHIBIT 14025 WAS RECEIVED IN EVIDENCE.)

03:07PM  19    BY MR. WADE:

03:07PM  20    Q.   DO YOU SEE IN THE MIDDLE -- THIS IS A RESPONSE TO THE

03:07PM  21    EMAIL THAT CAME FROM MS. HOLMES WHERE YOU AND MR. JAMES TALK

03:07PM  22    ABOUT PULLING TOGETHER A DUE DILIGENCE TEAM AND PULLING

03:07PM  23    TOGETHER A LIST OF QUESTIONS AND STARTING TO THINK ABOUT THE

03:07PM  24    SIZE OF THE INVESTMENT; CORRECT?

03:07PM  25    A.   YES.
```

GROSSMAN CROSS BY MR. WADE                                              6524

03:07PM  1    Q.   AND THERE'S SOME DISCUSSION ABOUT THE POTENTIAL SIZE OF

03:08PM  2    THE INVESTMENT.

03:08PM  3         DO YOU SEE THAT THERE?

03:08PM  4    A.   YES.

03:08PM  5    Q.   AND YOU SAY "20 AT LEAST."

03:08PM  6         I TAKE IT THAT'S 20 MILLION?

03:08PM  7    A.   YES.

03:08PM  8    Q.   BUT YOU HAD NOT MADE ANY INVESTMENT DECISIONS AT THIS

03:08PM  9    POINT; CORRECT?

03:08PM  10   A.   THAT'S CORRECT.

03:08PM  11   Q.   YOU WERE JUST STARTING THIS DILIGENCE PROCESS; RIGHT?

03:08PM  12   A.   YES.

03:08PM  13   Q.   AND UP AT THE TOP, IF WE LOOK AT THE TOP TWO EMAILS, YOU

03:08PM  14   TALK ABOUT WANTING TO GET SOME ADDITIONAL INFORMATION FROM THE

03:08PM  15   COMPANY SO THAT YOU CAN DIG IN MORE; RIGHT?

03:08PM  16   A.   YES.

03:08PM  17   Q.   AND ULTIMATELY -- AND YOU TALK ABOUT PREPARING A LIST OF

03:08PM  18   QUESTIONS SO THAT YOU CAN HAVE ADDITIONAL DISCUSSIONS WITH THE

03:08PM  19   COMPANY; RIGHT?

03:08PM  20   A.   I'M SORRY, WHICH -- THE QUESTION TO ME IS WHAT?

03:08PM  21   Q.   YOU TALK ABOUT ADDITIONAL -- YOU TALK ABOUT PREPARING A

03:08PM  22   LIST OF QUESTIONS TO HELP FACILITATE A DISCUSSION WITH THE

03:09PM  23   COMPANY.

03:09PM  24   A.   I THINK THAT'S ACTUALLY CHRIS EMAILING ME.

03:09PM  25   Q.   OKAY.  BUT YOU AND MR. JAMES ARE HAVING THE DIALOGUE ABOUT

GROSSMAN CROSS BY MR. WADE                                          6525

| | | |
|---|---|---|
| 03:09PM | 1 | TRYING TO GET INFORMATION AND PREPARE A LIST OF QUESTIONS; |
| 03:09PM | 2 | RIGHT? |
| 03:09PM | 3 | A.   YES. |
| 03:09PM | 4 | Q.   AND TO PULL TOGETHER A DUE DILIGENCE TEAM; CORRECT? |
| 03:09PM | 5 | A.   YES. |
| 03:09PM | 6 | Q.   AND THAT'S A STANDARD APPROACH THAT YOU WOULD, YOU WOULD |
| 03:09PM | 7 | TAKE AT PFM BEFORE MAKING A MAJOR INVESTMENT; IS THAT FAIR? |
| 03:09PM | 8 | A.   YES. |
| 03:09PM | 9 | Q.   OKAY.  AND THE DUE DILIGENCE TEAM IS THE TEAM OF ANALYSTS |
| 03:09PM | 10 | WE'VE TALKED ABOUT BEFORE; RIGHT? |
| 03:09PM | 11 | A.   YES. |
| 03:09PM | 12 | Q.   AND, AND PART OF THE STANDARD DUE DILIGENCE PROCESS IS |
| 03:09PM | 13 | PREPARING THOSE LISTS OF QUESTIONS ALONG THE LINES THAT |
| 03:09PM | 14 | MR. LEACH WAS READING TO YOU EARLIER; CORRECT? |
| 03:09PM | 15 | A.   YES. |
| 03:09PM | 16 | Q.   THERE WASN'T ANYTHING SPECIAL ABOUT THE THERANOS |
| 03:09PM | 17 | INVESTMENT WITH RESPECT TO THOSE QUESTIONS; CORRECT? |
| 03:09PM | 18 | A.   WELL, THE QUESTIONS WERE SPECIFIC TO THE THERANOS |
| 03:09PM | 19 | INVESTMENT. |
| 03:09PM | 20 | Q.   FAIR ENOUGH. |
| 03:09PM | 21 | BUT IS IT FAIR TO SAY THAT WHENEVER YOU CONSIDER A MAJOR |
| 03:10PM | 22 | INVESTMENT, YOU PREPARE A LIST OF DUE DILIGENCE QUESTIONS; |
| 03:10PM | 23 | CORRECT? |
| 03:10PM | 24 | A.   YES. |
| 03:10PM | 25 | Q.   AND YOU SEND IT OVER TO THE OTHER SIDE, AND YOU WAIT TO |

GROSSMAN CROSS BY MR. WADE                                        6526

03:10PM 1    GET A RESPONSE; RIGHT?

03:10PM 2    A.   IT DOESN'T ALWAYS WORK LIKE THAT, BUT THAT'S CERTAINLY A

03:10PM 3    REASONABLE APPROACH.

03:10PM 4    Q.   RIGHT.  AND THAT'S, THAT'S WHAT YOU WERE EXPECTING IN THIS

03:10PM 5    CASE; RIGHT?

03:10PM 6    A.   WELL, WE HAD A LOT OF QUESTIONS TO GO THROUGH, SO WE

03:10PM 7    WANTED TO MAKE SURE THAT IT WAS A PRODUCTIVE MEETING.

03:10PM 8         WITHOUT FRAMING THE ISSUES THAT WE HAD, THAT WE WANTED TO

03:10PM 9    DISCUSS, SOMETIMES A MEETING, EVEN IF IT'S AN HOUR AND A HALF

03:10PM 10   OR TWO HOURS, CAN BE UNPRODUCTIVE.

03:10PM 11   Q.   SO YOU FELT IT WAS USEFUL TO PROVIDE THAT LIST IN

03:10PM 12   ADVANCE --

03:10PM 13   A.   YES.

03:10PM 14   Q.   -- SO GOING INTO THAT MEETING YOU WOULD HAVE A SENSE FOR

03:10PM 15   WHAT EXACTLY IT WAS THAT WOULD BE FOCUSSED ON?

03:10PM 16   A.   SO THEY WOULD HAVE A SENSE OF WHAT WE WANTED TO FOCUS ON.

03:10PM 17   Q.   SO THEY COULD PREPARE TO ANSWER YOUR QUESTIONS; RIGHT?

03:10PM 18   A.   YES.

03:10PM 19   Q.   AND THERE WERE A COUPLE OF INSTANCES WHERE YOU ASKED TO

03:10PM 20   GET ACCESS TO INFORMATION, THE CONTRACTS.

03:10PM 21        DO YOU RECALL THAT?

03:11PM 22   A.   YES.

03:11PM 23   Q.   AND THEY TOLD -- OR THEY ASKED -- LET ME STRIKE THAT.

03:11PM 24        YOU ASKED TO TALK TO SOME OF THE PEOPLE WITH WHOM THEY HAD

03:11PM 25   BUSINESS RELATIONSHIPS?

GROSSMAN CROSS BY MR. WADE                                          6527

03:11PM  1    A.   SORT OF, YES.

03:11PM  2    Q.   YOU ASKED TO SPEAK TO UNITED HEALTH ABOUT THERANOS;

03:11PM  3    CORRECT?

03:11PM  4    A.   WE WANTED TO SPEAK TO THE PEOPLE WHO DID THE TECHNICAL DUE

03:11PM  5    DILIGENCE ON THERANOS'S TECHNOLOGY.

03:11PM  6         WE WANTED TO SPEAK TO PEOPLE WHO WERE INVOLVED IN THE

03:11PM  7    BUSINESS DEVELOPMENT DECISION TO PARTNER, CONTRACT WITH THOSE

03:11PM  8    TYPES OF ACTIVITIES.

03:11PM  9    Q.   I UNDERSTAND.

03:11PM  10        BUT MY QUESTION WAS THAT YOU ASKED TO SPEAK SPECIFICALLY

03:11PM  11   TO UNITED HEALTH; RIGHT?

03:11PM  12   A.   YES.

03:11PM  13   Q.   AND YOU ASKED SPECIFICALLY TO SPEAK WITH WALGREENS;

03:11PM  14   CORRECT?

03:11PM  15   A.   YES.

03:11PM  16   Q.   AND THEY TOLD YOU THAT THEY WERE NOT COMFORTABLE WITH YOU

03:11PM  17   DOING THAT; RIGHT?

03:11PM  18   A.   THAT IS CORRECT.

03:11PM  19   Q.   AND YOU AT THAT POINT COULD WALK AWAY FROM THE INVESTMENT

03:11PM  20   IF THAT WAS NOT SATISFACTORY TO YOU; CORRECT?

03:11PM  21   A.   CORRECT.

03:11PM  22   Q.   AND YOU CHOSE NOT TO; CORRECT?

03:11PM  23   A.   THAT'S CORRECT.

03:11PM  24   Q.   THE -- BUT YOU DID GATHER A LOT OF INFORMATION FROM OTHER

03:12PM  25   SOURCES, INCLUDING THE COMPANY; RIGHT?

GROSSMAN CROSS BY MR. WADE                                        6528

03:12PM   1    A.   YES.

03:12PM   2    Q.   AND IN THE DAYS TO FOLLOW, YOU GATHERED INFORMATION ABOUT

03:12PM   3    THE REGULATORY ENVIRONMENT; RIGHT?

03:12PM   4    A.   WELL, WE JUST -- IT FORCED US TO RELY ON THE

03:12PM   5    REPRESENTATIONS THAT THEY MADE TO US.  SO IT JUST -- BY NOT

03:12PM   6    LETTING US TO TALK TO THOSE PEOPLE, WE HAD TO RELY ON WHAT THEY

03:12PM   7    TOLD US IN THE DUE DILIGENCE MEETINGS.

03:12PM   8    Q.   RIGHT.  BUT MY QUESTION WAS WHETHER YOU GATHERED OTHER

03:12PM   9    INFORMATION IN RESPONSE; RIGHT?

03:12PM   10   A.   YES, WE DID.

03:12PM   11   Q.   AND YOU WENT ABOUT A PROCESS TO GATHER THAT INFORMATION

03:12PM   12   WITH THIS TEAM; RIGHT?

03:12PM   13   A.   YES.

03:12PM   14   Q.   AND SOME OF THAT WORK HAPPENED IN ADVANCE OF THE NEXT

03:12PM   15   MEETING; CORRECT?

03:12PM   16   A.   WHAT SPECIFICALLY ARE YOU REFERRING TO?  WHICH MEETING?

03:12PM   17   Q.   FAIR POINT.

03:12PM   18        SOME OF THE DUE DILIGENCE WORK YOU DID HAPPENED BETWEEN

03:12PM   19   THESE TWO MEETINGS THAT WE WERE TALKING ABOUT; RIGHT?

03:13PM   20   A.   THE DECEMBER 13TH AND THE JANUARY 10TH?

03:13PM   21   Q.   YEAH.

03:13PM   22   A.   I, I, I DON'T RECALL SPECIFICALLY WHAT HAPPENED IN BETWEEN

03:13PM   23   THE FIRST AND SECOND VERSUS THE SECOND AND THE THIRD.  SO

03:13PM   24   THAT'S -- BUT WE WERE WORKING THROUGH THAT PERIOD, ESPECIALLY

03:13PM   25   ONCE THE NEW YEAR STARTED.

GROSSMAN CROSS BY MR. WADE                                          6529

03:13PM   1        THINGS GET SLOW AT THE END OF THE YEAR, RIGHT?  IT'S THE

03:13PM   2   HOLIDAYS.  PEOPLE NEED A BREAK.

03:13PM   3        SO I THINK WE KIND OF GAVE EVERYONE A LITTLE VACATION AT

03:13PM   4   THE END OF THE YEAR.

03:13PM   5   Q.   FAIR ENOUGH.

03:13PM   6        LET'S TAKE A LOOK AT EXHIBIT 7378, AND WE'LL SEE IF YOU

03:14PM   7   CAN GIVE DR. RABODZEY AS MUCH OF A BREAK AS SOME OF THE OTHER

03:14PM   8   FOLKS.

03:14PM   9   A.   OKAY.

03:14PM  10   Q.   AND THIS IS AN EMAIL ON CHRISTMAS EVE OF 2013 THAT -- IN

03:14PM  11   WHICH DR. RABODZEY EMAILS WITH YOU AND MR. KHANNA ABOUT GOING

03:14PM  12   UP TO THE PALO ALTO WALGREENS; CORRECT?

03:14PM  13   A.   YES.

03:14PM  14           MR. WADE:  MOVE THE ADMISSION OF 7378.

03:14PM  15           MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:14PM  16           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:14PM  17        (DEFENDANT'S EXHIBIT 7378 WAS RECEIVED IN EVIDENCE.)

03:14PM  18   BY MR. WADE:

03:14PM  19   Q.   IF YOU LOOK AT THAT EMAIL -- WELL, LET'S START IN THE

03:14PM  20   EMAIL BELOW THIS ON THE BOTTOM.

03:14PM  21        THIS GIVES YOU THE GREEN LIGHT TO MOVE FORWARD ON THE DUE

03:14PM  22   DILIGENCE; CORRECT?  THIS GIVES YOUR TEAM THE GREEN LIGHT?

03:15PM  23   A.   YES.

03:15PM  24   Q.   AND THIS IS SORT OF THE FORMAL KICK OFF OF A MORE FORMAL

03:15PM  25   DUE DILIGENCE PROCESS?

GROSSMAN CROSS BY MR. WADE                                          6530

03:15PM   1    A.   IT APPEARS TO BE, YES.

03:15PM   2    Q.   AND IT LOOKS LIKE, IF YOU GO UP THE CHAIN, DR. RABODZEY

03:15PM   3    WITHIN A COUPLE OF HOURS IS ON HIS WAY TO THE WALGREENS IN

03:15PM   4    PALO ALTO; RIGHT?

03:15PM   5    A.   YES.

03:15PM   6    Q.   AND HE'S GOING UP THERE --

03:15PM   7    A.   HE LIVES IN PALO ALTO.

03:15PM   8    Q.   HE LIVES IN PALO ALTO?

03:15PM   9    A.   YEAH, IT'S NOT THAT FAR FROM --

03:15PM   10   Q.   THE RECORD WILL NOTE THAT HE WAS DOING IT ON HIS WAY HOME

03:15PM   11   ON CHRISTMAS EVE?

03:15PM   12   A.   HE WAS -- I BELIEVE HE WAS AT HOME AND JUST WENT --

03:15PM   13   PROBABLY HAD TO GO TO THE DRUG STORE.

03:15PM   14   Q.   OKAY.  BUT HE WAS ACTUALLY -- HE SAID HE'S GOING TO SEE IF

03:15PM   15   HE CAN GET A LITTLE INTEL; RIGHT?

03:15PM   16   A.   YEAH, HE'S LOOKING FOR INFORMATION ON THE SYSTEM, AND IT

03:16PM   17   LOOKS LIKE HE HAD SOME QUESTIONS, OR A LIST OF QUESTIONS.

03:16PM   18   Q.   AND ULTIMATELY -- AND HE ACTUALLY NOTES IN THIS EMAIL THAT

03:16PM   19   HE WAS GOING TO GET THE TEST, BUT HE COULDN'T GET THE TEST

03:16PM   20   BECAUSE I GUESS THEY WEREN'T DOING THEM ON CHRISTMAS EVE;

03:16PM   21   RIGHT?

03:16PM   22   A.   I GUESS NOT.

03:16PM   23   Q.   BUT HE HAD A CHANCE TO TALK TO SOMEONE THERE AND GOT SOME

03:16PM   24   FEEDBACK FROM HOW THE SYSTEM WORKED WHEN HE WENT TO THE

03:16PM   25   WALGREENS; RIGHT?

GROSSMAN CROSS BY MR. WADE                                          6531

03:16PM   1    A.    YES.

03:16PM   2    Q.    AND AGAIN, THIS IS YOUR EFFORT TO TRY TO GATHER INTEL THAT

03:16PM   3    IS INDEPENDENT OF YOUR INTERACTIONS WITH THE COMPANY; RIGHT?

03:16PM   4    A.    YES.

03:16PM   5    Q.    AND MR. RABODZEY DIDN'T NOTIFY ANYBODY AT THE COMPANY THAT

03:16PM   6    HE WAS GOING, RIGHT, TO YOUR KNOWLEDGE?

03:16PM   7    A.    NO.

03:16PM   8    Q.    AND ALTHOUGH HE DIDN'T GET A TEST ON THIS OCCASION, DO YOU

03:16PM   9    RECALL THAT HE DID GET A TEST SUBSEQUENTLY?

03:16PM  10    A.    I DO RECALL THAT HE GOT A TEST SUBSEQUENTLY.

03:16PM  11    Q.    AND HE GOT A FINGERSTICK TEST; RIGHT?

03:16PM  12    A.    I BELIEVE THAT HE DID.

03:17PM  13    Q.    AND WE'LL LOOK AT SOME DOCUMENTS LATER.

03:17PM  14          BUT DO YOU RECALL THAT WERE THERE SOME DELAYS IN GETTING

03:17PM  15    THAT TEST; IS THAT RIGHT?

03:17PM  16    A.    I DON'T RECALL SPECIFICALLY.

03:17PM  17    Q.    OKAY.  AND YOU GOT A TEST AS WELL; CORRECT?

03:17PM  18    A.    YES.

03:17PM  19    Q.    AND YOUR TEST WAS A VENOUS DRAW; RIGHT?

03:17PM  20    A.    YES.

03:17PM  21    Q.    AND YOU UNDERSTOOD THAT THERANOS WAS PERFORMING VENOUS

03:17PM  22    DRAWS IN THIS TIME PERIOD; RIGHT?

03:17PM  23    A.    YES.

03:17PM  24    Q.    AND WHAT WAS YOUR UNDERSTANDING OF THE MACHINERY ON WHICH

03:17PM  25    THEY WERE PERFORMING VENOUS DRAWS?

GROSSMAN CROSS BY MR. WADE                                              6532

03:17PM 1    A.   MY UNDERSTANDING IS THAT THEY WERE PERFORMING VENOUS DRAWS

03:17PM 2    ON THEIR PROPRIETARY TECHNOLOGY.

03:17PM 3    Q.   WELL, YOU UNDERSTOOD THAT THE BASIS -- THE FRAME OF THEIR

03:17PM 4    PROPRIETARY TECHNOLOGY WAS FINGERSTICK BASED TECHNOLOGY; RIGHT?

03:17PM 5    A.   THAT WAS ONE WAY TO ACQUIRE THE SAMPLE, BUT NOT THE ONLY

03:17PM 6    WAY TO ACQUIRE THE SAMPLE.

03:17PM 7    Q.   OKAY.  DID YOU EVER SPECIFICALLY ASK THE QUESTION OF

03:17PM 8    WHETHER THE VENOUS DRAWS WERE PERFORMED ON COMMERCIAL

03:17PM 9    ANALYZERS?

03:17PM 10   A.   I DON'T RECALL.

03:17PM 11   Q.   OKAY.  AND SO WE'RE CLEAR, THE FACT THAT THEY WERE

03:18PM 12   PERFORMING VENOUS DRAWS WAS NOT A SECRET IN THIS PROCESS;

03:18PM 13   RIGHT?

03:18PM 14   A.   NO.

03:18PM 15   Q.   AND, IN FACT, IT WAS IN THE WALGREENS PRESS RELEASES;

03:18PM 16   RIGHT?

03:18PM 17   A.   WE COULD REVIEW THAT IF YOU WOULD LIKE.  I DON'T HAVE

03:18PM 18   THAT.  I DON'T REMEMBER.  I DON'T HAVE THAT DOCUMENT.

03:18PM 19   Q.   WELL, WHY DON'T YOU TAKE A LOOK AT 1113.

03:18PM 20        ACTUALLY, I THINK THIS ONE IS IN EVIDENCE.  WE CAN PUT IT

03:18PM 21   RIGHT UP ON THE SCREEN.

03:18PM 22        AND DO YOU SEE ON THE BOTTOM THERE IT SAYS, "THE SAMPLES

03:18PM 23   ARE EITHER TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE

03:18PM 24   TAKEN FROM TRADITIONAL METHODS, ELIMINATING THE NEED FOR LARGER

03:19PM 25   NEEDLES AND NUMEROUS VIALS OF BLOOD."

GROSSMAN CROSS BY MR. WADE                                      6533

03:19PM   1          DO YOU SEE THAT?

03:19PM   2     A.   YES, I DO.

03:19PM   3     Q.   AND YOU UNDERSTOOD THE TRADITIONAL METHOD WAS VENOUS;

03:19PM   4     CORRECT?

03:19PM   5     A.   NO, I DON'T THINK THAT'S CORRECT.

03:19PM   6     Q.   YOU DIDN'T UNDERSTAND WHAT TRADITIONAL METHOD TO BE VENOUS

03:19PM   7     METHOD THERE?

03:19PM   8     A.   MY UNDERSTANDING OF THAT IS MICRO-SAMPLE TAKEN FROM

03:19PM   9     TRADITIONAL METHODS MEANS THAT YOU'RE TAKING MUCH LESS BLOOD

03:19PM   10    THAN IS TRADITIONALLY TAKEN USING VENOUS DRAW.  AND IF YOU TAKE

03:19PM   11    MUCH LESS BLOOD USING VENOUS DRAW, YOU CAN'T USE IT ON

03:19PM   12    CONVENTIONAL EQUIPMENT.

03:19PM   13    Q.   WELL, DID YOU ACTUALLY UNDERSTAND THAT THERANOS COULD TAKE

03:19PM   14    MUCH LESS BLOOD BY VENOUS DRAW AND USE IT ON COMMERCIAL

03:19PM   15    EQUIPMENT?

03:19PM   16    A.   I WOULD FIND THAT VERY TROUBLESOME BECAUSE THAT EQUIPMENT

03:19PM   17    IS FDA APPROVED TO BE USED WITH THE COLLECTION DEVICES THAT ARE

03:19PM   18    IN THE MARKET, THE LARGER VENOUS DRAWS.

03:19PM   19          SO I WOULD BE CONCERNED THAT IF SOMEONE WAS USING A

03:19PM   20    MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS AND USING THAT ON

03:19PM   21    CONVENTIONAL LAB EQUIPMENT, THAT WOULD BE CONCERNING TO ME.

03:20PM   22          THAT'S NOT HOW IT WAS APPROVED.

03:20PM   23    Q.   WELL, DID YOU HAVE -- I BELIEVE YOU TESTIFIED THAT YOU

03:20PM   24    READ THIS PRESS RELEASE; CORRECT?

03:20PM   25    A.   YES.

GROSSMAN CROSS BY MR. WADE                                            6534

03:20PM  1   Q.   AND DID YOU ASK ANYONE ABOUT ANY OF THIS LANGUAGE WHEN YOU

03:20PM  2   WERE DOING YOUR DUE DILIGENCE?

03:20PM  3   A.   I DON'T RECALL SPECIFICALLY.

03:20PM  4   Q.   OKAY.  AND DO YOU RECALL HAVING DISCUSSIONS WITH THEM

03:20PM  5   ABOUT HOW THEY PERFORM THEIR VENOUS TESTING AT ALL?

03:20PM  6   A.   I, I DON'T RECALL SPECIFICALLY.  I DON'T RECALL.

03:20PM  7   Q.   BUT YOU KNEW THAT THEY WERE DOING VENOUS TESTING; RIGHT?

03:20PM  8   A.   YES.

03:20PM  9   Q.   OKAY.  AND THE -- DO YOU RECALL WHETHER YOUR VENOUS TEST

03:20PM  10  USED THE BUTTERFLY NEEDLE?

03:20PM  11  A.   I DON'T.

03:20PM  12  Q.   YOU DON'T RECALL?

03:20PM  13  A.   I DON'T.

03:20PM  14  Q.   DO YOU KNOW WHAT A BUTTERFLY NEEDLE IS?

03:21PM  15  A.   I BELIEVE IT'S A SMALLER NEEDLE.

03:21PM  16  Q.   UH-HUH.  AND YOU KNOW IT'S SOMETIMES USED IN PEDIATRIC

03:21PM  17  APPLICATIONS AND THE LIKE?

03:21PM  18  A.   YES.

03:21PM  19  Q.   AND YOU KNOW THAT OFTENTIMES THE AMOUNT OF BLOOD THAT

03:21PM  20  COMES OUT OF A BUTTERFLY NEEDLE IS SMALLER THAN THE MULTIPLE

03:21PM  21  VIALS OF BLOOD THAT COME OUT OF A TRADITIONAL NEEDLE?

03:21PM  22  A.   YES.

03:21PM  23  Q.   OKAY.  AND DO YOU UNDERSTAND THAT THE AMOUNT OF BLOOD THAT

03:21PM  24  COMES OUT OF A BUTTERFLY NEEDLE IS FREQUENTLY RUN ON COMMERCIAL

03:21PM  25  DEVICES?

GROSSMAN CROSS BY MR. WADE                                    6535

03:21PM  1    A.   I DON'T KNOW THAT.

03:21PM  2    Q.   OKAY.  YOU DON'T KNOW THAT ONE WAY OR THE OTHER?

03:21PM  3    A.   I DON'T KNOW IF THOSE ARE APPROVED, IF THOSE DEVICES ARE

03:21PM  4    APPROVED TO BE RUN SPECIFICALLY ON A BUTTERFLY, A BUTTERFLY

03:21PM  5    COLLECTION DEVICE.

03:21PM  6    Q.   RIGHT.

03:21PM  7    A.   I WOULD HOPE -- IF I WERE THE LAB OPERATING THAT, I WOULD

03:21PM  8    HOPE THAT THEY WERE.

03:21PM  9    Q.   AND YOU UNDERSTAND THAT THIS IS A CLIA LAB; RIGHT?

03:21PM  10   A.   WHICH LAB ARE YOU REFERRING TO?

03:21PM  11   Q.   THE THERANOS LAB.

03:21PM  12   A.   YES.

03:21PM  13   Q.   AND THEY HAD TO MEET ALL OF THE REGULATORY REQUIREMENTS;

03:21PM  14   RIGHT?

03:21PM  15   A.   CORRECT.

03:21PM  16   Q.   OKAY.  LET'S TAKE A LOOK -- AND DO YOU UNDERSTAND THAT

03:22PM  17   SAME LANGUAGE IS IN THE NOVEMBER WALGREENS PRESS RELEASE AS

03:22PM  18   WELL?

03:22PM  19   A.   I DON'T, I DON'T RECALL THAT DOCUMENT, SO I DON'T HAVE --

03:22PM  20   I DON'T REMEMBER THAT DOCUMENT.

03:22PM  21   Q.   OKAY.  WELL, LET'S TAKE A LOOK AT 4036.

03:22PM  22   A.   OKAY.  I'VE GOT IT.

03:23PM  23   Q.   AND DO YOU RECOGNIZE THAT TO BE A PRESS RELEASE RELATING

03:23PM  24   TO THE WALGREENS EXPANSION INTO THE PHOENIX MARKET?

03:23PM  25   A.   I DO.

GROSSMAN CROSS BY MR. WADE                                           6536

03:23PM   1              MR. WADE:  MOVE THE ADMISSION OF 4036.

03:23PM   2              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:23PM   3              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM   4         (GOVERNMENT'S EXHIBIT 4036 WAS RECEIVED IN EVIDENCE.)

03:23PM   5    BY MR. WADE:

03:23PM   6    Q.   AND, AGAIN, THE DATE HERE IS NOVEMBER 13TH, 2013.

03:23PM   7         DO YOU SEE THAT?

03:23PM   8         AND THIS IS THERANOS AND WALGREENS JOINT RELEASE; CORRECT?

03:23PM   9    A.   YES.

03:23PM  10    Q.   AND LET'S LOOK AT THE SECOND PARAGRAPH.

03:23PM  11         DO YOU SEE THERE IN THE SECOND LINE IT SAYS, "LAB TESTING

03:24PM  12    FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS"?

03:24PM  13    A.   YES.

03:24PM  14    Q.   IT DOESN'T SAY, ONLY A FEW DROPS, OR EVERY TEST IS ON A

03:24PM  15    FEW DROPS; RIGHT?

03:24PM  16    A.   YES.

03:24PM  17    Q.   AND IT THEN TALKS ABOUT THE MICRO-SAMPLES COLLECTED BY

03:24PM  18    CERTIFIED PHLEBOTOMISTS; CORRECT?

03:24PM  19    A.   IT SAYS THAT, YES.

03:24PM  20    Q.   AND THEN IT TALKS ABOUT IT CAN BE TAKEN FROM A FINGERSTICK

03:24PM  21    OR TRADITIONAL METHODS; RIGHT?

03:24PM  22    A.   YES.

03:24PM  23    Q.   AND THEN IT SAYS, "ELIMINATING THE NEED FOR LARGER

03:24PM  24    NEEDLES;" RIGHT?

03:24PM  25    A.   YES.

GROSSMAN CROSS BY MR. WADE                                          6537

```
03:24PM   1    Q.  AND THAT'S BECAUSE THEY WERE USING BUTTERFLY NEEDLES;

03:24PM   2    CORRECT?

03:24PM   3              MR. LEACH:  OBJECTION.  FOUNDATION.

03:24PM   4              THE COURT:  SUSTAINED.

03:24PM   5    BY MR. WADE:

03:24PM   6    Q.  DO YOU RECALL SEEING A PICTURE IN THE SLIDE DECK THAT

03:24PM   7    MR. LEACH SHOWED YOU OF THE USE OF A BUTTERFLY NEEDLE AS A

03:24PM   8    THERANOS METHOD?

03:24PM   9    A.  I DON'T.

03:24PM  10    Q.  OKAY.  WE'LL GO THROUGH IT IN A BIT.

03:25PM  11        LET'S LOOK AT EXHIBIT 1400, WHICH I BELIEVE IS IN THE

03:25PM  12    GOVERNMENT'S BINDER.

03:25PM  13    A.  OKAY.

03:25PM  14    Q.  AND THIS WAS -- THIS IS THAT LIST OF QUESTIONS THAT

03:25PM  15    MR. LEACH -- THIS IS IN EVIDENCE, I BELIEVE.

03:25PM  16              MR. LEACH:  I THINK IT'S 1404.

03:25PM  17              MR. WADE:  LET'S PUT UP 1404.  IT INCLUDES THE CHAIN

03:26PM  18    IN 1400.

03:26PM  19    Q.  THIS IS THE LIST THAT MR. LEACH WAS ASKING YOU ABOUT;

03:26PM  20    CORRECT?

03:26PM  21    A.  I BELIEVE THAT'S CORRECT, YES.

03:26PM  22    Q.  AND IT HAS DIFFERENT CATEGORIES OF ITEMS THAT YOU WANT TO

03:26PM  23    EXPLORE?

03:26PM  24    A.  YES.

03:26PM  25    Q.  AND IS IT FAIR THAT THE CATEGORIES RELATE TO RISKS THAT
```

GROSSMAN CROSS BY MR. WADE                                    6538

03:26PM  1    YOU WANT TO ASSESS IN CONSIDERING YOUR INVESTMENT?

03:26PM  2    A.   SOME OF THEM RELATE TO RISKS.

03:26PM  3    Q.   YOU WANTED TO ASSESS THE TECHNOLOGY RISK; IS THAT FAIR?

03:26PM  4    A.   YEAH.

03:26PM  5    Q.   AND YOU WANTED TO INVESTIGATE THE INTELLECTUAL PROPERTY

03:26PM  6    RISK; RIGHT?

03:26PM  7    A.   WELL, IT'S -- I SUPPOSE.  BUT IT'S ALSO A STRENGTH, RIGHT?

03:26PM  8    Q.   IT'S A STRENGTH IF THE INTELLECTUAL PROPERTY IS STRONG;

03:26PM  9    RIGHT?

03:26PM  10   A.   SO IT'S NOT ALL RISKS.  SOME OF THESE ARE RISKS AND SOME

03:26PM  11   OF THESE ARE JUST UNDERSTANDING THE NATURE OF THE BUSINESS SO

03:26PM  12   THAT WE CAN MAKE A MORE INFORMED INVESTMENT DECISION.

03:26PM  13   Q.   RIGHT.  AND, AND YOU SAID ABOUT EXPLORING ALL OF THOSE

03:27PM  14   THINGS, AND THAT'S WHY YOU LISTED THESE SEVEN CATEGORIES OF

03:27PM  15   QUESTIONS THAT YOU SENT TO THE TEAM; CORRECT?

03:27PM  16   A.   WELL, WE LISTED THESE JUST TO MAKE IT EASIER FOR THEM TO

03:27PM  17   PROCESS.  I THINK WE HAD OVER 60 QUESTIONS.  SO TRYING TO

03:27PM  18   ORGANIZE THEM SO THEY COULD PROCESS THEM.

03:27PM  19   Q.   RIGHT.  AND THESE QUESTIONS WERE COMING IN FROM -- YOU

03:27PM  20   ASKED ALL OF THE MEMBERS OF YOUR TEAM TO PROVIDE INPUT INTO ALL

03:27PM  21   OF THESE QUESTIONS; CORRECT?

03:27PM  22   A.   THAT'S CORRECT.

03:27PM  23   Q.   AND THIS WAS THE AMALGAMATION OF ALL OF THOSE DIFFERENT

03:27PM  24   INPUTS; RIGHT?

03:27PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE                                            6539

```
03:27PM   1     Q.   AND JUST SO WE'RE CLEAR, THERE'S NO -- THE PHARMACEUTICAL

03:27PM   2     PARTNERSHIPS ARE NOT MENTIONED THERE; CORRECT?

03:27PM   3     A.   THAT'S CORRECT.

03:27PM   4     Q.   AND THE, THE DEPARTMENT OF DEFENSE PROJECTS ARE NOT

03:27PM   5     MENTIONED THERE; CORRECT?

03:27PM   6     A.   THAT'S CORRECT.

03:28PM   7     Q.   AND THIS IS WHAT YOU WERE FOCUSSED ON HEADING INTO THAT

03:28PM   8     MEETING; RIGHT?

03:28PM   9     A.   YES.

03:28PM  10     Q.   AND IT WAS, HOW MANY WOULD YOU SAY, 60 QUESTIONS OR SO?

03:28PM  11     A.   I -- THAT'S MY GENERAL MEMORY.

03:28PM  12     Q.   A LOT OF QUESTIONS THOUGH; RIGHT?

03:28PM  13          AND SOME OF THESE YOU COULD DISCUSS FOR SOME TIME; RIGHT?

03:28PM  14     A.   YES.

03:28PM  15     Q.   AND YOU DISCUSSED THESE -- IN TERMS OF MS. HOLMES, YOU

03:28PM  16     DISCUSSED THOSE FOR ABOUT AN HOUR AT THAT MEETING WITH HER IN

03:28PM  17     JANUARY AT THE THERANOS FACILITY; RIGHT?

03:28PM  18     A.   I DON'T REMEMBER THE ORDER OF QUESTIONS, BUT, YES, SOME OF

03:28PM  19     THOSE.

03:28PM  20     Q.   BUT SHE WAS PRESENT I THINK YOU SAID FOR ABOUT AN HOUR,

03:28PM  21     HOUR AND A HALF AT THAT MEETING?

03:28PM  22     A.   YES.

03:28PM  23     Q.   OKAY.  AND AS YOU WERE PREPARING FOR THIS, YOU ALSO

03:28PM  24     CONTINUED TO DO OTHER WORK OUTSIDE OF YOUR COMMUNICATIONS WITH

03:29PM  25     THE COMPANY; RIGHT?
```

GROSSMAN CROSS BY MR. WADE                                      6540

03:29PM   1    A.   YES.

03:29PM   2    Q.   AND YOU WERE CONTINUING TO GATHER INTELLIGENCE

03:29PM   3    INDEPENDENTLY?

03:29PM   4    A.   YES.

03:29PM   5    Q.   RIGHT?

03:29PM   6         AND DO YOU RECALL THAT IN THIS PERIOD YOU ALSO STARTED TO

03:29PM   7    GATHER MARKET INTELLIGENCE SO THAT YOU COULD CONSTRUCT A MODEL?

03:29PM   8    A.   YES.

03:29PM   9    Q.   AND IF YOU LOOK AT 14021.

03:30PM  10    A.   OKAY.

03:30PM  11    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

03:30PM  12    A.   I DO.

03:30PM  13    Q.   AND WHAT DO YOU RECOGNIZE THAT DOCUMENT TO BE?

03:30PM  14    A.   COULD I HAVE A MINUTE JUST TO READ THROUGH IT?

03:30PM  15    Q.   SURE.

03:30PM  16         (PAUSE IN PROCEEDINGS.)

03:30PM  17              THE WITNESS:  OKAY.

03:30PM  18    BY MR. WADE:

03:30PM  19    Q.   AS YOU'RE READING, MAYBE I CAN HELP YOU, DO YOU RECOGNIZE

03:30PM  20    THIS TO BE EARLY DISCUSSIONS ABOUT MARKET DATA THAT WOULD FEED

03:30PM  21    INTO A MODEL?

03:30PM  22    A.   YES.

03:30PM  23              MR. WADE:  MOVE THE ADMISSION OF 14021.

03:30PM  24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:30PM  25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

GROSSMAN CROSS BY MR. WADE                                          6541

03:30PM   1            (DEFENDANT'S EXHIBIT 14021 WAS RECEIVED IN EVIDENCE.)

03:31PM   2       BY MR. WADE:

03:31PM   3       Q.   AND THIS IS AN EMAIL CHAIN WITH YOU AND MR. KHANNA IN

03:31PM   4       JANUARY OF 2014; CORRECT?

03:31PM   5       A.   YES.

03:31PM   6       Q.   AND YOU ALL WERE WORKING TOWARDS BUILDING A MODEL EVEN

03:31PM   7       BEFORE THAT SECOND MEETING WITH THERANOS; CORRECT?

03:31PM   8       A.   I DON'T KNOW WHETHER WE WERE BUILDING A MODEL.  I, I

03:31PM   9       ACTUALLY DON'T THINK THAT WE WERE, BUT I THINK THIS IS MORE

03:31PM  10       TRYING TO UNDERSTAND THE SIZE OF THE MARKET.

03:31PM  11       Q.   AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE THERANOS

03:31PM  12       MODEL.

03:31PM  13            DO YOU RECALL THAT?

03:31PM  14       A.   I DO.

03:31PM  15       Q.   AND DO YOU RECALL YOUR MODEL ACTUALLY HAS A DIFFERENT

03:31PM  16       PHILOSOPHY IN TERMS OF HOW IT APPROACHED THE VALUATION FROM

03:31PM  17       THERANOS'S; CORRECT?

03:31PM  18       A.   UM, I JUST WANT TO MAKE SURE I ANSWER YOUR QUESTION.

03:31PM  19            WHAT -- I DON'T -- I DON'T -- I'M HAVING A HARD TIME

03:31PM  20       ANSWERING BECAUSE I'M NOT EXACTLY CLEAR WHAT I'M COMPARING IT

03:32PM  21       TO.

03:32PM  22       Q.   OKAY.  WELL, DO YOU UNDERSTAND THAT, SEPARATE AND APART

03:32PM  23       FROM THE THERANOS MODEL THAT MR. BALWANI SENT YOU, YOU ACTUALLY

03:32PM  24       DEVELOPED YOUR OWN PROPRIETARY MODEL; RIGHT?

03:32PM  25       A.   NO, NOT REALLY.

GROSSMAN CROSS BY MR. WADE                                        6542

| | | |
|---|---|---|
| 03:32PM | 1 | I MEAN, CAN I EXPLAIN? |
| 03:32PM | 2 | Q.   WELL, LET ME ASK THIS, DO YOU RECALL GIVING TESTIMONY |
| 03:32PM | 3 | BEFORE IN A DEPOSITION THAT YOU BUILT YOUR OWN PROPRIETARY |
| 03:32PM | 4 | MODEL? |
| 03:32PM | 5 | MR. LEACH:  OBJECTION, YOUR HONOR.  HEARSAY. |
| 03:32PM | 6 | THE COURT:  SUSTAINED. |
| 03:32PM | 7 | MR. WADE:  OKAY. |
| 03:32PM | 8 | THE COURT:  SO YOU CAN ASK ANOTHER QUESTION. |
| 03:32PM | 9 | MR. WADE:  YEAH, I'LL ASK ANOTHER QUESTION.  SURE. |
| 03:32PM | 10 | THE COURT:  THAT'S HOW IT GOES. |
| 03:32PM | 11 | BY MR. WADE: |
| 03:32PM | 12 | Q.   DO YOU RECALL BUILDING YOUR OWN PROPRIETARY MODEL WITHIN |
| 03:32PM | 13 | PFM TO PLACE A VALUATION ON THERANOS? |
| 03:32PM | 14 | A.   YES. |
| 03:32PM | 15 | Q.   OKAY.  AND IS THAT SOMETHING THAT YOU DO FREQUENTLY FOR |
| 03:33PM | 16 | MAJOR INVESTMENTS? |
| 03:33PM | 17 | A.   YES. |
| 03:33PM | 18 | Q.   OKAY.  THE -- IN ADVANCE OF THIS MEETING IN JANUARY, DO |
| 03:33PM | 19 | YOU RECALL ENCOURAGING DR. RABODZEY TO GO INTO THE MEETING AND |
| 03:33PM | 20 | REALLY DRILL FOR INFORMATION TO MAKE SURE THAT HE UNDERSTOOD |
| 03:33PM | 21 | EVERYTHING? |
| 03:33PM | 22 | A.   I DON'T SPECIFICALLY REMEMBER. |
| 03:33PM | 23 | Q.   BUT YOU RECALL HE WAS KIND OF YOUR TECHNICAL GUY ON THE |
| 03:33PM | 24 | TEAM; RIGHT? |
| 03:33PM | 25 | A.   HE WAS -- I WANTED -- HIS DOMAIN EXPERTISE, HIS SUBJECT |

GROSSMAN CROSS BY MR. WADE                                    6543

03:33PM  1    MATTER EXPERTISE WAS IN DATA ANALYSIS, BIO STATISTICS, THE

03:33PM  2    STATISTICAL CALCULATIONS WITHIN THE FIELD OF BIO -- BIOLOGY.

03:34PM  3        AND SO HIS -- HE WAS -- HIS SKILL SET WAS WELL MATCHED TO

03:34PM  4    ANALYZING THE DATA THAT THEY HAD, THEIR PROPRIETARY, THEIR

03:34PM  5    PROPRIETARY DATA ON THEIR PROPRIETARY TECHNOLOGY.

03:34PM  6    Q.   SO YOU WANTED HIM TO FOCUS ON THE DATA?

03:34PM  7    A.   YES.

03:34PM  8    Q.   RIGHT?

03:34PM  9        AND THE TESTING MENU?

03:34PM  10   A.   YES.

03:34PM  11   Q.   DID YOU WANT HIM TO FOCUS ON THAT?

03:34PM  12   A.   I BELIEVE THOSE WERE THE AREAS THAT WE WANTED HIM TO FOCUS

03:34PM  13   ON, YES.

03:34PM  14   Q.   AND ALSO THE SCIENCE AND REGULATORY ISSUES AS WELL?

03:34PM  15   A.   YES.

03:34PM  16   Q.   AND LET'S, LET'S --

03:34PM  17   A.   HE WASN'T THE ONLY ONE FOCUSSED ON REGULATORY, BUT THAT

03:34PM  18   WAS CERTAINLY WITHIN THE REALM OF THE TYPES OF THINGS THAT HE

03:34PM  19   WAS LOOKING AT.

03:34PM  20   Q.   AND CAN YOU LOOK AT EXHIBIT 7390, PLEASE.

03:35PM  21   A.   OKAY.

03:35PM  22   Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL WHERE YOU WERE

03:35PM  23   GIVING SOME DIRECTION TO MR. -- DR. RABODZEY IN ADVANCE OF THAT

03:35PM  24   THERANOS MEETING?

03:35PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE                                          6544

03:35PM   1            MR. WADE:  MOVE THE ADMISSION OF 7390.

03:35PM   2            MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:35PM   3            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM   4       (DEFENDANT'S EXHIBIT 7390 WAS RECEIVED IN EVIDENCE.)

03:35PM   5            MR. WADE:  AND IF WE CAN JUST FOCUS ON THE TOP TWO

03:35PM   6   EMAILS.

03:35PM   7   Q.   THERE'S A LOGISTICAL COMPONENT WHERE YOU WERE JUST NOTING

03:35PM   8   THAT YOU WERE GOING TO MEET AT THE FACILITY; RIGHT?

03:35PM   9   A.   YES.

03:35PM  10   Q.   AND I TAKE IT THAT -- WE'VE LEARNED THAT HE LIVED IN

03:35PM  11   PALO ALTO AT THE TIME; RIGHT?

03:35PM  12   A.   YES.

03:35PM  13   Q.   AND THEN YOU ENCOURAGE HIM TO BRING YOUR A GAME.  YOU SAY,

03:35PM  14   "U ARE THE TECHNICAL EXPERT, NEED U TO BE REALLY BE SKEPTICAL

03:36PM  15   (BUT NOT AN A HOLE)"?  RIGHT?

03:36PM  16   A.   YES.

03:36PM  17   Q.   AND THAT WAS SORT OF THE MISSION THAT YOU SENT HIM DURING

03:36PM  18   THE DUE DILIGENCE PROCESS; IS THAT FAIR?

03:36PM  19   A.   YES.

03:36PM  20   Q.   AND DID HE FULFILL THE MISSION IN YOUR MIND?

03:36PM  21   A.   YES.

03:36PM  22   Q.   AND WHEN HE WENT INTO THAT MEETING AT THERANOS, DO YOU

03:36PM  23   RECOGNIZE THAT ABOUT HALF OF THE MEETING WAS ACTUALLY SPENT

03:36PM  24   WITH HIM AND MR. BALWANI GOING OVER DETAILED DATA?

03:36PM  25   A.   I DON'T RECALL THAT.

GROSSMAN CROSS BY MR. WADE                                        6545

03:36PM   1    Q.   DO YOU RECALL A SIGNIFICANT PART WAS SPENT ON THAT?

03:36PM   2    A.   I DON'T RECALL IT WAS A SIGNIFICANT PART OF THE MEETING.

03:36PM   3    Q.   AND DO YOU RECALL YOU LEARNED -- WE TALKED ABOUT THE CPT

03:36PM   4    CODES.

03:36PM   5         DO YOU RECALL YOUR TESTIMONY ON THAT?

03:36PM   6    A.   YES.

03:36PM   7    Q.   AND THERE'S A DIFFERENCE BETWEEN A CPT CODE AND AN ASSAY;

03:37PM   8    RIGHT?

03:37PM   9    A.   YES.

03:37PM   10   Q.   AND SOMETIMES ONE ASSAY CAN BE A PART OF MANY DIFFERENT

03:37PM   11   CPT CODES; CORRECT?

03:37PM   12   A.   I BELIEVE THAT IS TRUE.

03:37PM   13   Q.   BECAUSE A CPT CODE RELATES TO BILLING; RIGHT?

03:37PM   14   A.   CORRECT.

03:37PM   15   Q.   AND IT'S USED IN THE HEALTH CARE INDUSTRY USUALLY RELATING

03:37PM   16   TO REIMBURSEMENT FROM HEALTH INSURANCE COMPANIES OR MEDICARE

03:37PM   17   AND MEDICAID; CORRECT?

03:37PM   18   A.   YEAH, IT RELATES TO -- THERE ARE CODES THAT ARE USED FOR

03:37PM   19   MEDICAL INVENTION, SURGICAL INTERVENTION, AND DIAGNOSTIC

03:37PM   20   INVENTIONS, AND THEY'RE GOVERNED BY THE AMERICAN MEDICAL

03:37PM   21   ASSOCIATION AND, YES, THEY'RE USED AS BILLING CODES FOR THE

03:37PM   22   GOVERNMENT.

03:37PM   23   Q.   RIGHT.  AND SO WHEN YOU MENTIONED, FOR EXAMPLE, A THOUSAND

03:37PM   24   CPT CODES, THAT'S NOT A THOUSAND ASSAYS, THAT'S A THOUSAND

03:37PM   25   DIFFERENT BILLING NUMBERS; RIGHT?

GROSSMAN CROSS BY MR. WADE                                              6546

03:37PM   1    A.   WELL, I DIDN'T MENTION THAT.  MS. HOLMES MENTIONED THAT.

03:37PM   2    Q.   NO.  WHEN YOU TALKED ABOUT IT, I MEANT IN YOUR DIRECT

03:38PM   3    TESTIMONY; RIGHT?  YOU RECALL TALKING ABOUT CPT CODES WITH

03:38PM   4    MR. LEACH?

03:38PM   5    A.   I DO.  I DON'T REMEMBER SPECIFICALLY WHAT HE WAS ASKING,

03:38PM   6    BUT, YES.

03:38PM   7    Q.   OKAY.  AND IN THIS MEETING, DO YOU RECALL THAT -- BEING

03:38PM   8    INFORMED THAT THERANOS'S ANALYSIS WAS THAT 96 PERCENT OF THE

03:38PM   9    TESTING VOLUME WAS COVERED BY 70 ASSAYS?

03:38PM   10   A.   I DON'T RECALL THAT.

03:38PM   11   Q.   UM, DO YOU RECALL THAT THERANOS DISCUSSED THAT THEY HAD 70

03:38PM   12   SMALL SAMPLE ASSAYS THAT THEY WERE USING IN THEIR ROLLOUT AT

03:38PM   13   THAT POINT?

03:38PM   14   A.   I DON'T SPECIFICALLY RECALL THAT.

03:39PM   15   Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION WITHIN THIS

03:39PM   16   MEETING ABOUT HOW THEY HAD JUST OVER 200 ASSAYS THAT THEY WERE

03:39PM   17   OFFERING IN THE CLIA LAB?

03:39PM   18   A.   I, I DON'T REMEMBER SPECIFICALLY.

03:39PM   19        BUT I DO REMEMBER THAT THEY SAID THAT THEY COULD COVER

03:39PM   20   99.9 PERCENT OF THE TESTS THAT WERE DONE IN A REFERENCE LAB

03:39PM   21   SETTING.

03:39PM   22   Q.   WELL, WE'LL COME BACK TO THE PERCENTAGES.

03:39PM   23        BUT YOU RECALL THAT -- DO YOU RECALL A DISCUSSION ABOUT

03:39PM   24   THE FACT THAT TO GET FROM 96 PERCENT TO 99 PERCENT REQUIRED A

03:39PM   25   LOT OF ADDITIONAL ASSAYS AND THAT THE CORE ASSAYS, THE CORE 70

GROSSMAN CROSS BY MR. WADE                                                          6547

03:39PM  1    ASSAYS WOULD COVER 96 PERCENT OF THE TEST ACQUISITIONS BASED

03:39PM  2    UPON THERANOS'S DATA ANALYSIS?

03:39PM  3    A.   I DON'T RECALL THAT.

03:39PM  4    Q.   DO YOU RECALL WHEN YOU CAME OUT OF THAT MEETING, DO YOU

03:40PM  5    RECALL BEING IN A DEBRIEF MEETING WITH YOUR ANALYST TEAM ABOUT

03:40PM  6    THE THERANOS MEETING?

03:40PM  7    A.   I DON'T REMEMBER.

03:40PM  8    Q.   OKAY.  DO YOU RECALL -- BUT YOU INTERACTED WITH THE

03:40PM  9    MEMBERS OF THE ANALYST TEAM AFTER THE MEETING; RIGHT?

03:40PM  10   A.   YES.

03:40PM  11   Q.   AND DO YOU RECALL WHETHER DR. RABODZEY INFORMED YOU OF HIS

03:40PM  12   UNDERSTANDING THAT THERE WERE 70 SMALL SAMPLE ASSAYS THAT

03:40PM  13   THERANOS WAS USING AT THAT TIME?

03:40PM  14   A.   I DON'T, I DON'T RECALL.

03:40PM  15   Q.   DO YOU RECALL LEARNING AT SOME POINT THAT HE WAS OF THE

03:40PM  16   UNDERSTANDING THAT THERANOS WAS USING 70 SMALL SAMPLE ASSAYS AT

03:40PM  17   THAT TIME?

03:40PM  18   A.   I DON'T REMEMBER.

03:40PM  19   Q.   OKAY.  DO YOU RECALL WHETHER -- I THINK YOU TALKED ABOUT

03:41PM  20   YOUR WEBSITE REVIEW WHEN YOU FIRST LEARNED OF THE THERANOS

03:41PM  21   INVESTMENT.

03:41PM  22        DO YOU RECALL THAT?

03:41PM  23   A.   I MEAN, VAGUELY.

03:41PM  24   Q.   OKAY.  DO YOU KNOW WHETHER AFTER, WHEN YOU WERE MORE

03:41PM  25   SERIOUSLY CONSIDERING THE INVESTMENT, WHETHER YOU WENT BACK TO

GROSSMAN CROSS BY MR. WADE                                    6548

03:41PM   1    THAT THERANOS WEBSITE AT ALL?

03:41PM   2    A.   I DON'T REMEMBER.

03:41PM   3    Q.   OKAY.  DO YOU RECALL WHETHER YOU EVER LEARNED THAT THERE

03:41PM   4    WERE 213 ASSAYS LISTED ON THE THERANOS WEBSITE AT THAT TIME?

03:41PM   5    A.   NO.

03:41PM   6    Q.   OKAY.  DO YOU RECALL EVER SEEKING A CURRENT TEST MENU

03:41PM   7    DURING THIS POINT IN TIME?

03:41PM   8    A.   YES, I DO RECALL THAT.

03:41PM   9    Q.   AND DO YOU RECALL GETTING THE TEST MENU THAT IDENTIFIED

03:41PM  10    213 ASSAYS?

03:41PM  11    A.   NO.

03:41PM  12    Q.   DO YOU REMEMBER DURING THIS MEETING THERE WAS DISCUSSION

03:42PM  13    OF THAT 8100 GOAL, THAT THEY WERE GOING TO ROLL OUT TO 8100

03:42PM  14    WALGREENS LOCATIONS; RIGHT?

03:42PM  15    A.   I DO REMEMBER.  THAT WAS ONE OF THE FIRST THINGS THAT THEY

03:42PM  16    TALKED ABOUT, THE SPEED OF THE ROLLOUT.

03:42PM  17    Q.   RIGHT.  AND THAT THAT WAS -- EXECUTION ON THAT WAS A

03:42PM  18    SIGNIFICANT ISSUE FOR THE BUSINESS AT THAT TIME; RIGHT?

03:42PM  19    A.   JUST TO BE CLEAR, THOUGH, WHAT MEETING ARE YOU REFERRING

03:42PM  20    TO AT THIS POINT?

03:42PM  21    Q.   I'M REFERRING TO THE JANUARY MEETING WITH DR. RABODZEY AND

03:42PM  22    THE -- AND YOUR OTHER ANALYSTS.

03:42PM  23    A.   SO THIS WAS THE -- YEAH, OKAY, THE JANUARY 10TH.

03:42PM  24    Q.   THE JANUARY 10TH MEETING.

03:42PM  25    A.   YEAH, YES.

GROSSMAN CROSS BY MR. WADE                                      6549

03:42PM   1    Q.   AND DO YOU RECALL THAT THERE WAS DISCUSSION OF THE 8100

03:42PM   2    LOCATIONS?

03:42PM   3    A.   I DO.

03:42PM   4    Q.   AND AT THAT TIME YOU KNEW THAT THEY WERE ONLY IN A FEW;

03:42PM   5    RIGHT?

03:42PM   6    A.   YES.

03:42PM   7    Q.   DID YOU KNOW WHAT RETAIL EXPERIENCE THERANOS MANAGEMENT

03:43PM   8    HAD AT THAT TIME?

03:43PM   9    A.   I DID NOT.

03:43PM  10    Q.   DID YOU KNOW WHETHER ANY OF THE SENIOR MANAGEMENT HAD ANY

03:43PM  11    RETAIL MANAGEMENT?

03:43PM  12    A.   I DON'T RECALL.

03:43PM  13    Q.   OKAY.  YOU TALKED ABOUT -- I THINK YOU TALKED ABOUT THE --

03:43PM  14    HOW THE ANALYZERS -- THE VARIATION WITHIN ANALYZERS BEING THE

03:43PM  15    TOPIC THAT CAME UP.

03:43PM  16        DO YOU RECALL THAT?

03:43PM  17    A.   YES.

03:43PM  18    Q.   AND DO YOU RECALL THAT COMING UP SPECIFICALLY IN

03:43PM  19    CONNECTION WITH THE DISTRIBUTED ANALYZERS WILL NOT HAVE

03:43PM  20    VARIATION?

03:43PM  21    A.   I -- IT CAME UP AT MULTIPLE POINTS.  I DON'T -- I'M TRYING

03:43PM  22    TO THINK OF THE CONTEXT YOU'RE PUTTING THIS QUESTION IN.

03:43PM  23        MAYBE YOU CAN BE A LITTLE MORE SPECIFIC.

03:43PM  24    Q.   WELL, LET ME ASK IT THIS WAY, I BELIEVE YOU'VE TESTIFIED

03:44PM  25    THAT THERE WAS A PHASE I AND A PHASE II THAT WAS UNDER

GROSSMAN CROSS BY MR. WADE                                              6550

03:44PM    1    DISCUSSION IN YOUR MEETINGS WITH THERANOS; CORRECT?

03:44PM    2    A.   YES.

03:44PM    3    Q.   AND YOU UNDERSTOOD THAT PHASE II WAS WHEN THERE WOULD BE

03:44PM    4    DISTRIBUTED ANALYZERS; RIGHT?

03:44PM    5    A.   WELL, THIS IS REFERRING TO THE RETAIL ROLLOUT.

03:44PM    6    Q.   RIGHT.

03:44PM    7    A.   THIS HAS NOTHING TO DO WITH THE HOSPITAL, THE PHYSICIAN

03:44PM    8    OFFICE BUSINESS, THE CLINICAL TRIAL BUSINESS.  THIS IS THE

03:44PM    9    RETAIL ROLLOUT, YEAH.

03:44PM   10    Q.   THIS IS THE PHASE II OF THE RETAIL ROLLOUT WHERE THEY WERE

03:44PM   11    GOING TO DISTRIBUTE ANALYZERS; RIGHT?

03:44PM   12    A.   YEAH.

03:44PM   13    Q.   AND YOU RECALL HAVING DISCUSSIONS WITH THERANOS IN THESE

03:44PM   14    MEETINGS; RIGHT?

03:44PM   15    A.   WE -- I DEFINITELY REMEMBER DISCUSSING THE PHASES OF THE

03:44PM   16    RETAIL ROLLOUT, YES.

03:44PM   17    Q.   RIGHT.  AND YOU UNDERSTOOD THAT IN THOSE MEETINGS THERE

03:44PM   18    WAS SOME DISCUSSION ABOUT REGULATORY ISSUES RELATING TO THAT;

03:44PM   19    RIGHT?

03:44PM   20    A.   I, I DON'T REMEMBER SPECIFICALLY WHAT REGULATORY ISSUES

03:44PM   21    YOU'RE HIGHLIGHTING, BUT REGULATORY IS OFTEN A TOPIC IN

03:45PM   22    MEETINGS LIKE THIS.

03:45PM   23    Q.   OKAY.  DO YOU RECALL IT BEING A TOPIC IN THIS MEETING AS

03:45PM   24    OPPOSED TO MEETINGS LIKE THIS?

03:45PM   25    A.   I DON'T.

GROSSMAN CROSS BY MR. WADE                                              6551

03:45PM  1    Q.   OKAY.  BUT YOU DO RECALL LEARNING --

03:45PM  2    A.   WELL, ACTUALLY, I'M SORRY.

03:45PM  3         SO YOU'RE ASKING SPECIFICALLY ABOUT THE REGULATORY RISK

03:45PM  4    AROUND PHASE II?

03:45PM  5    Q.   YEAH.

03:45PM  6    A.   IS THAT THE QUESTION?

03:45PM  7    Q.   YEAH.

03:45PM  8    A.   YEAH, I DON'T REMEMBER SPECIFICALLY WHAT WE DISCUSSED

03:45PM  9    AROUND THE REGULATORY RISK OF PHASE II.

03:45PM  10   Q.   DO YOU RECALL AT THAT TIME PERIOD THAT THERANOS WAS TAKING

03:45PM  11   THE POSITION THAT THEY WERE NOT GOING TO ROLL OUT TO PHASE II

03:45PM  12   UNTIL THEY GOT FDA APPROVAL?

03:45PM  13        DO YOU RECALL THAT?

03:45PM  14   A.   THAT WAS NOT MY RECOLLECTION.

03:45PM  15   Q.   OKAY.  DO YOU RECALL LEARNING THAT SOMETIME AFTER THE

03:45PM  16   MEETING?

03:45PM  17   A.   I DON'T REMEMBER SPECIFICALLY WHEN THAT ISSUE CAME UP, BUT

03:45PM  18   I DO RECALL THAT IN 2014 THEY HAD NO PLANS TO DISTRIBUTE THE

03:45PM  19   MINILABS IN THE WALGREENS RETAIL SETTING, THAT IT WAS A HUB AND

03:46PM  20   SPOKE MODEL.  THAT WAS MY MEMORY OF THAT CONVERSATION.

03:46PM  21   Q.   ALSO KNOWN AS MORE OF A CENTRAL LAB MODEL; RIGHT?

03:46PM  22   A.   THOSE ARE YOUR WORDS.  I THINK OF IT AS A HUB AND SPOKE.

03:46PM  23   Q.   OKAY.  BUT THE IDEA IS THAT THE LAB EQUIPMENT IS IN ONE

03:46PM  24   LOCATION, AND THE SAMPLES COME TO THAT ONE LOCATION; CORRECT?

03:46PM  25   A.   CORRECT.

GROSSMAN CROSS BY MR. WADE                                          6552

03:46PM   1     Q.   OKAY.  AND WHEN YOU WERE DOING YOUR ANALYSIS AND BUILDING

03:46PM   2     YOUR MODEL, YOU WERE DOING IT UNDER THE ASSUMPTION THAT IT

03:46PM   3     WOULD ONLY BE IN THAT PHASE I; CORRECT?

03:46PM   4     A.   OUR MODEL WAS BASED ON PHASE I, YES.

03:46PM   5     Q.   OKAY.  AND PHASE II, IF IT HAPPENED IN THE FUTURE, WOULD

03:46PM   6     BE UP SIDE; CORRECT?

03:46PM   7     A.   YES.

03:46PM   8     Q.   AND IN PHASE I, YOU UNDERSTOOD THAT AT THIS POINT IN

03:46PM   9     PHASE I THERANOS WAS JUST GETTING UP AND GOING IN THOSE HANDFUL

03:46PM  10     OF LOCATIONS; RIGHT?

03:46PM  11     A.   YES.

03:47PM  12     Q.   THEY WERE JUST STARTING THEIR OPERATIONS?

03:47PM  13     A.   YES.

03:47PM  14     Q.   OKAY.  AND THAT THERE WAS STILL A LEARNING PROCESS THAT

03:47PM  15     THEY WERE GOING THROUGH.

03:47PM  16          DO YOU RECALL?

03:47PM  17     A.   I DO.

03:47PM  18     Q.   OKAY.  AND THAT YOU'RE AWARE THAT AS COMPANIES GO THROUGH

03:47PM  19     A LEARNING PROCESS, SOMETIMES THEY CHANGE THEIR APPROACH TO

03:47PM  20     THINGS; RIGHT?

03:47PM  21     A.   YES.

03:47PM  22     Q.   OKAY.  AND, UM, THAT'S A NATURAL PART OF BUSINESS

03:47PM  23     SOMETIMES; ISN'T IT?

03:47PM  24     A.   YES, IT IS.

03:47PM  25     Q.   OKAY.  AND AS AN INVESTOR WHO INVESTS IN THE COMPANY, YOU

GROSSMAN CROSS BY MR. WADE                                      6553

03:47PM  1   UNDERSTAND THAT SOMETIMES A COMPANY MAY CHANGE ITS APPROACH TO

03:47PM  2   SOMETHING, AND YOU MAY AGREE WITH IT OR DISAGREE WITH IT, BUT

03:47PM  3   ULTIMATELY THAT'S NOT YOUR CALL; RIGHT?

03:47PM  4   A.   YES.

03:47PM  5   Q.   AND YOU'VE SAID THAT THE FOCUS WAS ON PHASE I AND YOUR

03:47PM  6   MODEL WAS FOCUSSED ON PHASE I.

03:47PM  7        DO YOU RECALL LEARNING AT SOME POINT THAT ONE OF THE

03:48PM  8   ISSUES RELATING TO PHASE II WAS A REGULATORY ISSUE, AND THAT A

03:48PM  9   REGULATORY ISSUE NEEDED TO BE ADDRESSED BEFORE PHASE II COULD

03:48PM 10   COMMENCE?

03:48PM 11   A.   I DON'T REMEMBER SPECIFICALLY.

03:48PM 12   Q.   OKAY.  DO YOU RECALL IN THIS MEETING THERE WAS SOME

03:48PM 13   DISCUSSION ABOUT THE PRIOR ROUND OF FUNDRAISING THE COMPANY HAD

03:48PM 14   DONE?

03:48PM 15   A.   I DO.

03:48PM 16   Q.   AND DO YOU RECALL THAT THE VALUATION THAT THE COMPANY HAD

03:48PM 17   AT THAT TIME WAS $15 A SHARE?

03:48PM 18        DO YOU RECALL THAT?

03:48PM 19   A.   THAT WAS NOT MY RECOLLECTION.

03:48PM 20        THEY TOLD US THE VALUE WAS $17 A SHARE.

03:48PM 21   Q.   $17 A SHARE FOR -- IS WHAT THEY WERE OFFERING YOU IN YOUR

03:48PM 22   ROUND; RIGHT?

03:48PM 23   A.   C-2, YES.  THE C-2 ROUND.

03:48PM 24        THEY TOLD US THAT THE C-1 ROUND, WHICH HAD CLOSED I

03:49PM 25   THINK -- WELL, THEY TOLD US IT HAD CLOSED A WEEK OR SO, A

GROSSMAN CROSS BY MR. WADE                                    6554

03:49PM   1    MONTH -- WITHIN A MONTH OF OUR FIRST MEETING.

03:49PM   2        THEY TOLD US THE C-1 ROUND HAD CLOSED AT 15 AND THEY WERE

03:49PM   3    RAISING THE PRICE OF THE C-2 BASED ON HOW WELL THE C-1 ROLLOUT

03:49PM   4    WAS GOING, AND THEY RAISED IT TWICE SINCE THE WALGREENS

03:49PM   5    PARTNERSHIP WAS ANNOUNCED IN SEPTEMBER.

03:49PM   6    Q.   I THINK WE'RE TALKING ABOUT THE SAME THING.  YOU

03:49PM   7    UNDERSTOOD THAT C-1 WAS BEING OFFERED, THE MOST RECENT C-1

03:49PM   8    OFFERING WAS AT $15 A SHARE?

03:49PM   9    A.   YES.

03:49PM   10   Q.   OKAY.  AND DID YOU ALSO UNDERSTAND THAT ONE OF THERANOS'S

03:49PM   11   COMMERCIAL PARTNERS CONVERTED EQUITY AT THAT POINT AT THAT

03:49PM   12   PRICE?

03:49PM   13   A.   I, I DID NOT.

03:49PM   14   Q.   OKAY.

03:49PM   15   A.   WELL, I SHOULD SAY I DON'T REMEMBER.

03:49PM   16   Q.   OKAY.  DO YOU RECALL WALGREENS MAKING AN EQUITY CONVERSION

03:49PM   17   AT THAT PRICE IN THAT TIMEFRAME?

03:49PM   18            MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

03:49PM   19   ANSWERED.

03:49PM   20            THE COURT:  WELL, IT WAS, BUT I'LL ALLOW HIM TO

03:49PM   21   ANSWER.

03:49PM   22        YOU CAN ASK YOUR QUESTION AGAIN.

03:50PM   23   BY MR. WADE:

03:50PM   24   Q.   DO YOU RECALL -- I BELIEVE YOU SAID YOU DIDN'T RECALL

03:50PM   25   LEARNING THAT, AND I WAS WONDERING IF THE FACT THAT IT WAS

GROSSMAN CROSS BY MR. WADE                                                      6555

| | | |
|---|---|---|
| 03:50PM | 1 | WALGREENS, WHETHER THAT WOULD REFRESH YOUR RECOLLECTION. |
| 03:50PM | 2 | A.   NO. |
| 03:50PM | 3 | Q.   OKAY.  AND WHEN YOU CAME OUT OF THIS, THIS MEETING, YOU |
| 03:50PM | 4 | HAD NOT YET MADE AN INVESTMENT DECISION; RIGHT? |
| 03:50PM | 5 | A.   THAT'S CORRECT. |
| 03:50PM | 6 | Q.   AND YOU CONTINUED IN YOUR DUE DILIGENCE PROCESS |
| 03:50PM | 7 | THEREAFTER; CORRECT? |
| 03:50PM | 8 | A.   YES. |
| 03:50PM | 9 | Q.   AND ONE OF THE THINGS THAT YOU WANTED TO DO COMING OUT OF |
| 03:50PM | 10 | THAT WAS GET ADDITIONAL INFORMATION FROM THE COMPANY THAT WOULD |
| 03:50PM | 11 | HELP AID YOUR DUE DILIGENCE PROCESS; IS THAT RIGHT? |
| 03:50PM | 12 | A.   YES. |
| 03:50PM | 13 | Q.   AND SPECIFICALLY THERE WAS THE FINANCIAL MODEL THAT |
| 03:50PM | 14 | MR. LEACH REFERRED TO.  HAD THAT BEEN DISPLAYED IN THE MEETING? |
| 03:51PM | 15 | A.   YES. |
| 03:51PM | 16 | Q.   AND THAT WAS AN EXCEL SPREADSHEET; RIGHT? |
| 03:51PM | 17 | A.   I ACTUALLY DON'T KNOW WHAT IT WAS.  IT WAS ON THE LAPTOP. |
| 03:51PM | 18 | Q.   OKAY. |
| 03:51PM | 19 | A.   IT WAS A PRESENTATION ON A LAPTOP. |
| 03:51PM | 20 | Q.   BUT IN ANY EVENT, YOU ASKED -- YOU CAME OUT OF THE MEETING |
| 03:51PM | 21 | AND YOU ASKED THEM FOR A COPY OF THAT SPREADSHEET; RIGHT? |
| 03:51PM | 22 | A.   YES. |
| 03:51PM | 23 | Q.   AND THEY GAVE IT TO YOU; RIGHT? |
| 03:51PM | 24 | A.   THEY DID GIVE IT TO US, YES. |
| 03:51PM | 25 | Q.   AND YOU UNDERSTAND THAT A MODEL IS A PROJECTION OF FUTURE |

GROSSMAN CROSS BY MR. WADE                                              6556

03:51PM  1    POTENTIAL GROWTH OF A COMPANY; RIGHT?

03:51PM  2    A.   YES.

03:51PM  3    Q.   AND THAT SOMETIMES MODELS ARE ACCURATE AND SOMETIMES

03:51PM  4    THEY'RE INACCURATE; RIGHT?

03:51PM  5    A.   YES.

03:51PM  6    Q.   BUT YOU ALSO UNDERSTOOD THAT TO DO A MODEL, THERE ARE A

03:51PM  7    LOT OF FACTUAL ASSUMPTIONS THAT YOU NEED TO BUILD INTO THE

03:51PM  8    MODEL THAT GET TO THE ULTIMATE VALUATION OR ULTIMATE

03:51PM  9    PROJECTIONS; RIGHT?

03:51PM  10   A.   IF IT'S A COMPLICATED COMPANY, THERE ARE OFTEN MANY

03:52PM  11   ASSUMPTIONS.

03:52PM  12        IF IT'S A SIMPLE SINGLE PRODUCT COMPANY, THERE ARE OFTEN

03:52PM  13   VERY FEW ASSUMPTIONS.

03:52PM  14        SO IT JUST DEPENDS ON THE NATURE OF THE BUSINESS THAT

03:52PM  15   WE'RE LOOKING AT.

03:52PM  16   Q.   AND YOU ASKED TO SEE FROM THERANOS THEIR PROJECTIONS WITH

03:52PM  17   THE DATA THAT INCLUDED ALL OF THE UNDERLYING ASSUMPTIONS;

03:52PM  18   RIGHT?

03:52PM  19   A.   WE WANTED TO UNDERSTAND THE MODEL THAT THEY SHOWED US, THE

03:52PM  20   FINANCIAL FORECAST THAT THEY SHARED WITH US AND, MORE

03:52PM  21   IMPORTANTLY, HOW THEY GOT THERE.

03:52PM  22        WHAT WERE THE ASSUMPTIONS UNDERPINNING THOSE FINANCIAL

03:52PM  23   FORECASTS THAT THEY SHARED WITH US?

03:52PM  24   Q.   RIGHT.  AND DO YOU RECALL THAT ALL OF THOSE ASSUMPTIONS

03:52PM  25   WERE INCLUDED IN THE MATERIALS THAT THEY SHARED WITH YOU AFTER

GROSSMAN CROSS BY MR. WADE                                    6557

03:52PM   1    THE MEETING?

03:52PM   2    A.   YES, I THINK THEY PROVIDED THAT MATERIAL TO US AFTER THAT

03:52PM   3    MEETING.

03:52PM   4    Q.   FAIR ENOUGH.

03:52PM   5         AND THEN ONE OF THE THINGS THAT DR. RABODZEY WANTED AS

03:52PM   6    WELL IS HE WANTED TO LOOK AT THE TESTING DATA; RIGHT?

03:52PM   7    A.   YES.

03:53PM   8    Q.   AND HE -- THERE HAD BEEN SOME TESTING DATA, MAYBE WE CAN

03:53PM   9    AGREE, THAT WAS SHOWN IN THE MEETING; RIGHT?

03:53PM  10    A.   YES.

03:53PM  11    Q.   AND THERE WERE SOME SLIDES THAT DEPICTED THE PERFORMANCE

03:53PM  12    OF CERTAIN ASSAYS ON CHARTS; RIGHT?

03:53PM  13    A.   YES.

03:53PM  14    Q.   AND DID YOU HAVE ENOUGH FAMILIARITY WITH THE CHARTS TO

03:53PM  15    UNDERSTAND THAT DATA?

03:53PM  16    A.   I DON'T -- MY MEMORY OF THAT MEETING IS THAT WE SPENT VERY

03:53PM  17    LITTLE TIME ON THAT DATA, AND THAT'S WHY WE ASKED FOR IT IN

03:53PM  18    FOLLOWUP SO THAT WE COULD REVIEW THAT MORE CAREFULLY WITH MORE

03:53PM  19    TIME.

03:53PM  20         SO THE ANSWER TO YOUR QUESTION IS -- I THINK THE ANSWER TO

03:53PM  21    YOUR QUESTION IS -- ACTUALLY, I DON'T KNOW WHAT THE ANSWER TO

03:53PM  22    YOUR QUESTION IS.  IS IT YES OR NO?  I DON'T KNOW.

03:53PM  23    Q.   I THINK THE ANSWER TO THE QUESTION IS THAT YOU DON'T

03:53PM  24    REMEMBER HOW MUCH TIME YOU SPENT GOING OVER THE DATA IN THE

03:53PM  25    MEETING.  IS THAT RIGHT?

GROSSMAN CROSS BY MR. WADE                                          6558

03:53PM   1    A.   YES.

03:53PM   2    Q.   OKAY.  BUT YOU DO RECALL THAT A LOT OF DATA WAS PROVIDED

03:53PM   3    AFTER THE MEETING; RIGHT?

03:53PM   4    A.   YES.

03:53PM   5    Q.   AND IN THAT SLIDE DECK THAT MR. LEACH SHOWED YOU AND YOU

03:54PM   6    WENT THROUGH SOME OF THE SLIDES, DO YOU RECALL THAT THERE WAS

03:54PM   7    MAYBE ABOUT 150 PAGES OF DATA WITHIN, WITHIN THE MATERIALS THAT

03:54PM   8    WERE PROVIDED TO YOU?

03:54PM   9    A.   THAT, THAT SOUNDS REASONABLE.  I DON'T KNOW EXACTLY.

03:54PM  10    Q.   AND, AND WE'LL GO OVER IT.  I'M NOT GOING TO START IT AT

03:54PM  11    3:54 WHEN THIS JURY LEAVES.  WE CAN PICK UP ON THAT TOMORROW.

03:54PM  12         BUT ONE OF THE REASONS THAT DR. RABODZEY WANTED IT IS THAT

03:54PM  13    HE WANTED TO ASSESS, HE WANTED TO ASSESS THE ACCURACY AND

03:54PM  14    PERFORMANCE OF THERANOS'S ASSAYS; CORRECT?

03:54PM  15    A.   WELL, WE WANTED HIM TO ASSESS, TO ANALYZE THAT, YES.

03:54PM  16    Q.   MAYBE HE DIDN'T WANT TO DO IT, BUT YOU MADE MR. RABODZEY

03:54PM  17    DO IT; IS THAT FAIR?

03:54PM  18    A.   WELL, AT FIRST HE DIDN'T, YEAH.

03:54PM  19    Q.   OKAY.  AND YOU WANTED HIM TO TAKE ALL OF THAT TECHNICAL

03:54PM  20    DATA AND LOOK AT IT AND GET A READ ON THE PERFORMANCE OF THE

03:54PM  21    THERANOS TESTS; RIGHT?

03:54PM  22    A.   YES.

03:54PM  23    Q.   AND ONE OF THE THINGS THAT YOU, YOU TASKED HIM WITH OR

03:55PM  24    THAT HE VOLUNTEERED FOR WAS TO DO THAT AND TO LOOK AT OTHER

03:55PM  25    ASSAYS AND SEE HOW THERANOS PERFORMED VIS-A-VIS OTHER ASSAYS?

GROSSMAN CROSS BY MR. WADE                                        6559

03:55PM   1    A.   I DON'T RECALL GIVING SPECIFIC INSTRUCTIONS ON OTHER

03:55PM   2    NON-THERANOS ASSAYS.

03:55PM   3    Q.   OKAY.  BUT YOU DO RECALL ASKING HIM TO REVIEW AND DRILL

03:55PM   4    DOWN THE DATA?

03:55PM   5    A.   YES.

03:55PM   6    Q.   AND DO YOU RECALL SENDING YOUR ANALYSTS OFF TO LOOK AT THE

03:55PM   7    REGULATORY ISSUES IN GREATER DETAIL?

03:55PM   8    A.   YES.

03:55PM   9    Q.   AND DO YOU RECALL THAT, IN CONNECTION WITH THAT, THEY

03:55PM  10    RETAINED EXPERTS FROM A CONSULTING FIRM TO CONSULT WITH ON

03:55PM  11    THAT?

03:56PM  12    A.   YES.

03:56PM  13    Q.   OKAY.  AND YOU ULTIMATELY GOT THE FEEDBACK ON THOSE

03:56PM  14    ISSUES, AND WE CAN TALK ABOUT THAT TOMORROW AS WELL.

03:56PM  15         DO YOU RECALL THAT WHEN YOU CAME OUT OF THAT SECOND

03:56PM  16    MEETING AND YOU STARTED TO DRILL IN ON THESE ISSUES -- IF I

03:56PM  17    COULD HAVE THE ELMO.  THANK YOU.

03:56PM  18         IN THIS PERIOD BETWEEN JANUARY 10TH AND YOUR INVESTMENT

03:56PM  19    DECISION, DO YOU RECALL THAT THERE WERE, THERE WERE ACTUALLY A

03:56PM  20    LOT OF ISSUES THAT AROSE THAT GAVE YOU CONCERN WITH RESPECT TO

03:56PM  21    WHETHER OR NOT YOU SHOULD INVEST IN THERANOS?

03:56PM  22    A.   I DON'T REMEMBER SPECIFICALLY, BUT -- SO I SUPPOSE -- I

03:57PM  23    GUESS THE ANSWER TO YOUR QUESTION IS THAT THERE WERE, THERE

03:57PM  24    WERE OPEN ITEMS ON THE DUE DILIGENCE LIST THAT WE NEEDED TO

03:57PM  25    COMPLETE.

| | | |
|---|---|---|
| 03:57PM | 1 | SO, YES, WE HAD NOT FINISHED OUR WORK. |
| 03:57PM | 2 | Q.   OKAY.  AND YOU CONTINUED TO DRILL IN ON THE MATERIALS AS |
| 03:57PM | 3 | YOU WENT THROUGH IN THAT PERIOD FOLLOWING THAT; RIGHT? |
| 03:57PM | 4 | A.   YES. |
| 03:57PM | 5 | MR. WADE:  YOUR HONOR, THAT IS SORT OF EMBARKING |
| 03:57PM | 6 | UPON A NEW SECTION THAT PROBABLY DOESN'T MAKE SENSE WITH THREE |
| 03:57PM | 7 | MINUTES LEFT. |
| 03:57PM | 8 | THE COURT:  LET'S TAKE OUR EVENING RECESS NOW, |
| 03:57PM | 9 | LADIES AND GENTLEMEN. |
| 03:57PM | 10 | LET ME REMIND YOU OF THE ADMONITION AGAIN, PLEASE.  DO NOT |
| 03:57PM | 11 | DO ANY RESEARCH, DO NOT FORM ANY OPINION, DO NOT READ, LISTEN, |
| 03:57PM | 12 | OR DISCUSS ANYTHING TO DO WITH THIS CASE. |
| 03:57PM | 13 | I'LL ASK YOU IF THAT HAPPENED TOMORROW MORNING AGAIN. |
| 03:57PM | 14 | LET ME REMIND YOU OF OUR SCHEDULE.  TOMORROW WE'LL START |
| 03:57PM | 15 | AT 9:00 O'CLOCK. |
| 03:57PM | 16 | SO I'LL ASK YOU TO RETURN, SIR, SUCH THAT YOU CAN CONTINUE |
| 03:58PM | 17 | YOUR EXAMINATION AT 9:00 A.M. |
| 03:58PM | 18 | LADIES AND GENTLEMEN, WE WILL BE TAKING A BREAK TOMORROW. |
| 03:58PM | 19 | PLEASE RECALL -- I THINK IT'S FOR AN HOUR AND IT WILL PROBABLY |
| 03:58PM | 20 | BE SOME TIME BETWEEN 10:30 AND 11:50, SOMETHING LIKE THAT, BUT |
| 03:58PM | 21 | WE WILL NEED TO TAKE THAT BREAK. |
| 03:58PM | 22 | AND THEN TOMORROW WE END AT 3:30.  3:30 IS THE END OF OUR |
| 03:58PM | 23 | DAY TOMORROW. |
| 03:58PM | 24 | AND I'LL KEEP YOU APPRISED OF ANY OTHER CHANGES IN |
| 03:58PM | 25 | SCHEDULES. |

| | | |
|---|---|---|
| 03:58PM | 1 | I THINK THE OTHER ONE I HAVE A NOTE OF IS ON THE 29TH OF |
| 03:58PM | 2 | NOVEMBER WE START AT 10:00 A.M., I BELIEVE.  I THINK I HAVE A |
| 03:58PM | 3 | NOTE TO THAT EFFECT, BUT WE CAN UPDATE THAT AS WE MOVE ALONG. |
| 03:58PM | 4 | SO THANK YOU VERY MUCH.  HAVE A GOOD EVENING. |
| 03:58PM | 5 | THANK YOU, SIR.  YOU CAN STAND DOWN.  AND WE'LL SEE YOU |
| 03:58PM | 6 | TOMORROW MORNING. |
| 03:59PM | 7 | (JURY OUT AT 3:59 P.M.) |
| 03:59PM | 8 | MR. WADE:  YOU CAN LEAVE ALL OF THE MATERIALS RIGHT |
| 03:59PM | 9 | THERE, SIR. |
| 03:59PM | 10 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 03:59PM | 11 | SIR, YOU CAN LEAVE.  THANK YOU. |
| 03:59PM | 12 | ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR |
| 03:59PM | 13 | JURY HAS LEFT FOR THE DAY.  OUR WITNESS HAS LEFT FOR THE DAY. |
| 03:59PM | 14 | ALL COUNSEL REMAIN AND MS. HOLMES REMAINS. |
| 03:59PM | 15 | MR. DOWNEY, DID YOU WANT TO TALK ABOUT SOMETHING? |
| 03:59PM | 16 | MR. DOWNEY:  I DID IN PART WANT TO TOUCH ON A SEALED |
| 03:59PM | 17 | PROCEEDING WE HAD EARLIER IN THE CASE.  I DON'T KNOW IF YOU |
| 03:59PM | 18 | WANT TO DO THAT NOW OR IN SOME OTHER FORUM. |
| 04:00PM | 19 | THE COURT:  OKAY.  WELL, LET'S DO THAT IN -- IS THIS |
| 04:00PM | 20 | REGARDING A SEALED MATTER THAT WE -- |
| 04:00PM | 21 | MR. DOWNEY:  A SEALED MATTER THAT WE DEALT WITH IN |
| 04:00PM | 22 | CAMERA EARLIER IN THE TRIAL. |
| 04:00PM | 23 | THE COURT:  MAYBE WE CAN DO THAT.  WE'LL GO IN |
| 04:00PM | 24 | CAMERA AGAIN IF IT TOUCHES ON THAT. |
| 04:00PM | 25 | WOULD THIS INVOLVE MR. SCHENK THEN? |

6562

04:00PM 1             MR. DOWNEY:  I THINK IT WILL INVOLVE MR. SCHENK.  I

04:00PM 2     ALSO THINK IT WILL BE QUITE BRIEF.

04:00PM 3             THE COURT:  ALL RIGHT.  DO YOU HAVE TIME,

04:00PM 4     MR. SCHENK?

04:00PM 5             MR. SCHENK:  YES, YOUR HONOR.

04:00PM 6             MR. DOWNEY:  AND I'VE ALERTED MR. SCHENK OF THE

04:00PM 7     ISSUE.

04:00PM 8             THE COURT:  ANYTHING ELSE?

04:00PM 9             MR. DOWNEY:  NOTHING FROM THE DEFENSE, YOUR HONOR.

04:00PM 10            THE COURT:  OKAY.  ANYTHING FROM THE GOVERNMENT

04:00PM 11    BEFORE WE BREAK?

04:00PM 12            MR. LEACH:  ONLY, YOUR HONOR, IF WE CAN PLEASE GET

04:00PM 13    AN ESTIMATE OF THE REMAINDER OF THE CROSS FOR MR. GROSSMAN.

04:00PM 14        I THINK THE GOVERNMENT'S DIRECT WAS APPROXIMATELY 2 HOURS

04:00PM 15    AND 15 MINUTES, AND I THINK WE HAVE ALREADY EXCEEDED THAT IN

04:00PM 16    THE CROSS-EXAMINATION, AND IN THE INTEREST OF BEING ABLE TO

04:00PM 17    MANAGE THE REMAINING WITNESSES, I WAS JUST HOPING IF WE COULD

04:00PM 18    GET A TIME ESTIMATE.

04:00PM 19            THE COURT:  ALL RIGHT.

04:00PM 20            MR. WADE:  I'LL GO THROUGH MY MATERIALS.  I'LL GIVE

04:01PM 21    MR. LEACH AN EMAIL UPDATE ON THAT.

04:01PM 22            THE COURT:  WHAT CAN YOU TELL ME RIGHT NOW?

04:01PM 23            MR. WADE:  VERY LITTLE, YOUR HONOR.

04:01PM 24        I, OF COURSE, WANT TO BE ACCURATE.

04:01PM 25            THE COURT:  AND I WANT TO KNOW A LOT.  THAT'S A

6563

04:01PM   1    PITY.

04:01PM   2         (LAUGHTER.)

04:01PM   3              THE COURT:  I DO WANT TO -- I NOTE THAT THERE HAVE

04:01PM   4    BEEN MANY QUESTIONS -- AND I'M NOT INTERFERING WITH YOUR

04:01PM   5    DEFENSE -- BUT THERE ARE MANY QUESTIONS THAT HAVE BEEN ASKED

04:01PM   6    AND ANSWERED ON DIRECT, AND I RECOGNIZE MUCH OF THAT IS

04:01PM   7    FOUNDATIONAL FROM YOUR PERSPECTIVE, AND I RESPECT THAT.

04:01PM   8         BUT SOME OF THE MATERIAL HERE, I JUST DON'T -- I'M NOT

04:01PM   9    ASKING YOU TO REVEAL WHAT YOUR DEFENSE IS, BUT YOU NEED TO DO

04:01PM   10   WHAT YOU HAVE TO DO.  THERE ARE TWO BINDERS HERE THAT ARE ABOUT

04:01PM   11   THREE INCHES THICK WITH MATERIALS.

04:01PM   12        SO WILL YOU FINISH WITH THIS WITNESS THIS WEEK?  LET'S

04:01PM   13   START THERE.

04:01PM   14              MR. WADE:  I BELIEVE I WILL FINISH WITH THIS WITNESS

04:02PM   15   TOMORROW, AND IT MAY WELL BE ANOTHER WITNESS IS NECESSARY.

04:02PM   16        I'LL ADVISE MR. LEACH MORE PRECISELY TO THAT.

04:02PM   17              THE COURT:  OKAY.

04:02PM   18              MR. WADE:  BUT OFTENTIMES THE INQUIRY OF COUNSEL IS

04:02PM   19   WHETHER THEY SHOULD HAVE A WITNESS READY.  MY GUESS, AS WE SIT

04:02PM   20   HERE TODAY, IS THAT THEY SHOULD HAVE ANOTHER WITNESS READY.

04:02PM   21   THEY MAY GET TO ANOTHER WITNESS TOMORROW.

04:02PM   22              THE COURT:  OKAY.  WHAT WE'VE EXPERIENCED IN THE

04:02PM   23   TRIAL IS CROSS-EXAMINATION FINISHING ABOUT A QUARTER TILL OR

04:02PM   24   ABOUT THE TIME WE'RE GOING TO CLOSE WITH 30 MINUTES LEFT TO

04:02PM   25   CLOSE FOR THE DAY.

6564

```
04:02PM   1          I DON'T KNOW, CAN YOU TELL ME, IS THAT THE SITUATION WE'LL

04:02PM   2    BE IN TOMORROW?

04:02PM   3          MR. WADE:  IT'S CERTAINLY NOT BY DESIGN THAT WE

04:02PM   4    WOULD DO THAT, YOUR HONOR.

04:02PM   5          I DON'T KNOW IF MR. LEACH ANTICIPATES A REDIRECT THAT IS

04:02PM   6    LENGTHY OR NOT, BUT IT'S HARD FOR ME TO BE MORE PRECISE THAN I

04:02PM   7    HAVE BEEN APART FROM, YOU KNOW, WE'LL TRY TO FINISH WITH THE

04:02PM   8    WITNESS TOMORROW.

04:02PM   9          THE COURT:  WELL, WE KNOW WE FINISH TOMORROW AT

04:02PM  10    3:30, AND WE'VE GOT THIS HOUR BREAK.

04:02PM  11          MR. WADE:  I WAS TRYING TO THINK THROUGH -- AS THE

04:03PM  12    COURT WAS RAISING THE BREAK AND THE EARLY START, I WAS TRYING

04:03PM  13    TO THINK THROUGH EXACTLY HOW LONG IT WILL BE.

04:03PM  14          SO I TAKE IT WE HAVE ABOUT AN HOUR AND A HALF IN THE

04:03PM  15    MORNING, AND THEN WE'LL HAVE THREE AND A HALF HOURS IN THE

04:03PM  16    AFTERNOON.

04:03PM  17          WE SHOULD, WE SHOULD EASILY BE ABLE TO FINISH THE WITNESS

04:03PM  18    BY THEN.

04:03PM  19          THE COURT:  AND WHEN YOU SAY THAT, WHEN YOU SAY

04:03PM  20    "WE," IS THAT THE ROYAL WE OR IS THAT YOU?

04:03PM  21          MR. WADE:  THE ROYAL WE IN THIS CASE, AND I'LL REFER

04:03PM  22    TO MYSELF AND MR. LEACH.

04:03PM  23          SO I THINK THERE SHOULD BE MORE THAN ENOUGH TIME.

04:03PM  24          THE COURT:  OKAY.

04:03PM  25          MR. LEACH:  WE'LL HAVE ADDITIONAL WITNESSES READY
```

6565

04:03PM   1        FOR TOMORROW, YOUR HONOR.

04:03PM   2                THE COURT:  OKAY.  GREAT.

04:03PM   3          ALL RIGHT.  WHY DON'T I SEE, MR. DOWNEY, YOU AND

04:03PM   4     MR. SCHENK, AND WE'LL HAVE OUR REPORTER MEET YOU IN CHAMBERS.

04:03PM   5          MS. DIBBLE WILL ESCORT YOU BACK IN JUST A MOMENT.  THANK

04:03PM   6     YOU.

04:03PM   7            (SEALED PROCEEDINGS HELD IN CAMERA.)

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
17        CERTIFICATE NUMBER 8076

18

19        _____
          LEE-ANNE SHORTRIDGE, CSR, CRR
20        CERTIFICATE NUMBER 9595

21        DATED:  NOVEMBER 16, 2021

22

23

24

25

6574

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                   PLAINTIFF,        )   SAN JOSE, CALIFORNIA
7                                    )
         VS.                         )   VOLUME 34
8                                    )
    ELIZABETH A. HOLMES,             )   NOVEMBER 17, 2021
9                                    )
                   DEFENDANT.        )   PAGES 6574 - 6779
10   _____)

11                  TRANSCRIPT OF TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)
 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   SEEMA ROPER
                                     J.R. FLEURMONT
 6                                   RICHARD CLEARY
                                     PATRICK LOOBY
 7                              725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
 8
                                LAW OFFICE OF JOHN D. CLINE
 9                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
10                              SAN FRANCISCO, CALIFORNIA 94111

11
       ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
12                              BY:  ADELAIDA HERNANDEZ

13                              OFFICE OF THE U.S. ATTORNEY
                                BY:  LAKISHA HOLLIMAN, PARALEGAL
14                                   MADDI WACHS, PARALEGAL

15                              WILLIAMS & CONNOLLY
                                BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
16
                                TBC
17                              BY:  BRIAN BENNETT, TECHNICIAN

18

19

20

21

22

23

24

25
```

<u>INDEX OF PROCEEDINGS</u>

GOVERNMENT'S:


**BRIAN GROSSMAN**
CROSS-EXAM BY MR. WADE (RES.)              P. 6583
REDIRECT EXAM BY MR. LEACH                 P. 6735


**ERIN TOMPKINS**
DIRECT EXAM BY MR. BOSTIC                  P. 6747
CROSS-EXAM BY MS. TREFZ                    P. 6762

```
 1                         INDEX OF EXHIBITS

 2
                                      IDENT.    EVIDENCE
 3        GOVERNMENT'S:

 4        1454                                    6622
          1477                                    6650
 5        4093                                    6669
          4088                                    6688
 6        4089                                    6690
          4090                                    6697
 7        5483                                    6752
          5484                                    6760
 8

 9

10        DEFENDANT'S:

11        7391                                    6600
          14002                                   6608
12        7399                                    6627
          7400                                    6632
13        7403                                    6638
          14001                                   6644
14        14073                                   6653
          14073 (WITHDRAWN)                       6654
15        7398                                    6658
          14072                                   6660
16        13720A                                  6664
          14057                                   6699
17        14054                                   6701
          14055                                   6703
18        14029                                   6705
          7411                                    6708
19        13822                                   6719

20

21

22

23

24

25
```

```
         1   SAN JOSE, CALIFORNIA                    NOVEMBER 17, 2021

08:35AM  2                    P R O C E E D I N G S

08:35AM  3        (COURT CONVENED AT 8:35 A.M.)

08:35AM  4        (JURY OUT AT 8:35 A.M.)

08:35AM  5            THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:35AM  6   MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

08:35AM  7        WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

08:36AM  8        GOOD MORNING.

08:36AM  9        COUNSEL, I THINK 1146 WAS FILED, DOCKET 1146, AND I THINK,

08:36AM 10   COUNSEL, YOU WANT TO SPEAK TO THAT FOR JUST A MOMENT.

08:36AM 11            MR. CLINE:  YES, FOR JUST A MOMENT.  AND I'M GOING

08:36AM 12   TO HAND COURTESY COPIES TO MS. KRATZMANN.

08:36AM 13            THE COURT:  OH, THANK YOU.

08:36AM 14            MR. CLINE:  (HANDING.)

08:36AM 15        THIS HAS TO DO WITH MR. PARLOFF'S TESTIMONY.  HE WON'T BE

08:36AM 16   TESTIFYING UNTIL TOMORROW, AND SO I THINK MR. BOSTIC AND I

08:36AM 17   AGREE THAT WE CAN DEFER DISCUSSION OF THIS MOTION UNTIL

08:36AM 18   TOMORROW MORNING, BUT I WANTED TO TELL THE COURT -- UPDATE YOU

08:36AM 19   ON WHERE WE ARE.

08:36AM 20            THE COURT:  WELL, THERE WAS SOME PROMISING LANGUAGE

08:36AM 21   IN THIS THAT SUGGESTED THAT YOU WERE MEETING AND CONFERRING AND

08:36AM 22   WORKING ON AGREEMENT.

08:36AM 23            MR. CLINE:  WE HAVE HAD THE MOST PRODUCTIVE

08:36AM 24   DISCUSSION HERE THAT YOU CAN IMAGINE.  IT'S BEEN GREAT.

08:36AM 25            THE COURT:  WELL, WHY DON'T I JUST GO BACK THEN.
```

| | | |
|---|---|---|
| 08:36AM | 1 | (LAUGHTER.) |
| 08:36AM | 2 | MR. CLINE:  WE'RE NOT QUITE AT THAT POINT, BUT WE'RE |
| 08:36AM | 3 | CLOSE.  WE'RE CLOSE. |
| 08:36AM | 4 | THERE WERE FOUR DESIGNATED CLIPS THAT OUR MOTION ADDRESS. |
| 08:37AM | 5 | NUMBER ONE WE'RE GOING TO BE ABLE TO AGREE ON.  WE'RE STILL |
| 08:37AM | 6 | TALKING ABOUT IT, BUT YOU DON'T NEED TO WORRY ABOUT THAT. |
| 08:37AM | 7 | NUMBER TWO IS STILL AT ISSUE. |
| 08:37AM | 8 | THE COURT:  OKAY. |
| 08:37AM | 9 | MR. CLINE:  AND WE'LL WANT TO DISCUSS THAT TOMORROW |
| 08:37AM | 10 | MORNING. |
| 08:37AM | 11 | NUMBER THREE THE GOVERNMENT HAS NO OBJECTION, SO THAT ONE |
| 08:37AM | 12 | IS RESOLVED. |
| 08:37AM | 13 | AND NUMBER FOUR IS STILL AT ISSUE. |
| 08:37AM | 14 | THE COURT:  OKAY. |
| 08:37AM | 15 | MR. CLINE:  NUMBER FOUR THERE'S A TRANSCRIPT FOR IT. |
| 08:37AM | 16 | IT'S EXHIBIT 3 TO MY DECLARATION. |
| 08:37AM | 17 | FOR NUMBER TWO THERE IS NOT A TRANSCRIPT.  WE'VE HANDED UP |
| 08:37AM | 18 | A -- |
| 08:37AM | 19 | THE COURT:  THAT'S THE -- |
| 08:37AM | 20 | MR. CLINE:  IT'S ON THE MEMORY STICK. |
| 08:37AM | 21 | THE COURT:  I SEE.  OKAY. |
| 08:37AM | 22 | SO I CAN LOOK AT THAT.  ALL RIGHT. |
| 08:37AM | 23 | AND THESE ARE -- THESE DESIGNATIONS APPEAR ON PAGE 2 OF |
| 08:37AM | 24 | YOUR MOTION, I BELIEVE, UP AT THE TOP. |
| 08:37AM | 25 | MR. CLINE:  YES. |

08:37AM 1              THE COURT:  RIGHT.  GOT IT.  OKAY.  THANK YOU.

08:37AM 2              MR. CLINE:  SO THAT'S WHERE WE ARE, AND THAT'S ALL

08:37AM 3      WE NEEDED FROM THE COURT AND WE JUST WANTED TO UPDATE YOU.

08:38AM 4              THE COURT:  OKAY.  WELL, THANK YOU VERY MUCH.

08:38AM 5           AND YOU'RE GOING TO CONTINUE TO TALK, OR DO YOU THINK YOUR

08:38AM 6      CONVERSATION IS EXHAUSTED SUCH THAT WE WILL HAVE TO RESOLVE

08:38AM 7      THIS TOMORROW MORNING?

08:38AM 8              MR. CLINE:  I THINK FOR DESIGNATIONS TWO AND FOUR

08:38AM 9      WE'RE GOING TO HAVE TO TALK IN THE MORNING.

08:38AM 10             THE COURT:  OKAY.

08:38AM 11             MR. CLINE:  ONE WE WILL AGREE ON, SO WE WON'T NEED

08:38AM 12     TO WORRY ABOUT THAT.

08:38AM 13             MR. BOSTIC:  AGREED, YOUR HONOR.

08:38AM 14          THE PARTIES WILL KEEP IN TOUCH ON THESE ISSUES, BUT I

08:38AM 15     THINK WE JUST SEE THE DESIGNATED CLIPS THAT MR. CLINE MENTIONED

08:38AM 16     DIFFERENTLY, SO WE WILL NEED THE COURT'S INPUT ON THAT.

08:38AM 17             THE COURT:  GREAT.

08:38AM 18             MR. BOSTIC:  I'M HAPPY TO DISCUSS THAT TOMORROW

08:38AM 19     MORNING.

08:38AM 20          I THINK THIS WITNESS WILL LIKELY TESTIFY TOMORROW MORNING

08:38AM 21     OR MIDDAY TOMORROW.

08:38AM 22             THE COURT:  OKAY.  THAT SOUNDS GOOD.

08:38AM 23          OKAY.  THANK YOU.  THANK YOU FOR THAT.  I'LL LOOK AT

08:38AM 24     THESE.

08:38AM 25          YOU KNOW, TODAY WE HAVE -- I THINK WE END AT 3:30 TODAY.

6581

```
08:38AM   1         I KNOW I'M PRESSING IT, BUT MAYBE WE COULD USE THE
08:38AM   2    AFTERNOON TO DISCUSS, PERHAPS NOT THIS, I'LL NEED TO LOOK AT
08:38AM   3    THINGS, BUT IF THERE'S ANYTHING ELSE THAT WE NEED TO DISCUSS,
08:39AM   4    YOU KNOW, I'M -- I WOULD JUST AS SOON USE AS MUCH COURT TIME
08:39AM   5    THAT WE HAVE AVAILABLE TO KEEP THINGS GOING FORWARD.
08:39AM   6         SO WE'LL LOOK AT THE END OF THE DAY AND SEE HOW THAT
08:39AM   7    LOOKS.
08:39AM   8         AND WE HAVE A BREAK TODAY, I THINK IT'S FROM ABOUT 10:40
08:39AM   9    TO ABOUT 11:50 THAT WE'LL NEED TO --
08:39AM  10              MR. CLINE:  RIGHT.
08:39AM  11              THE COURT:  RIGHT.  AND THEN WE GO UNTIL 3:30.  SO
08:39AM  12    IT'S KIND OF AN ABBREVIATED DAY.
08:39AM  13              MR. CLINE:  OKAY.  THANK YOU.
08:39AM  14              THE COURT:  MR. CLEARY IS NOT HERE TODAY, IS HE?
08:39AM  15         I DON'T SEE HIM IN THE AUDIENCE.  I WANTED TO -- YOU KNOW,
08:39AM  16    I NEGLECTED YESTERDAY TO THANK HIM FOR HIS THOROUGH
08:39AM  17    PRESENTATION.  I THOUGHT HE DID A FINE JOB, MORE THAN FINE, I
08:39AM  18    THOUGHT HE DID AN EXCELLENT JOB ADVOCATING HIS INTEREST.  HE
08:39AM  19    RESPONDED TO MY QUESTIONS AND TO MR. BOSTIC'S COMMENTS, AND I
08:40AM  20    DIDN'T GET A CHANCE TO THANK HIM AND RECOGNIZE HIM FOR HIS
08:40AM  21    PRESENTATION.  I WAS HOPING I COULD DO THAT TODAY.  BUT IN HIS
08:40AM  22    ABSENCE, COULD I ASK COUNSEL TO SHARE WITH HIM MY THOUGHTS?
08:40AM  23              MR. CLINE:  CERTAINLY, YOUR HONOR.
08:40AM  24         AND MORE THAN THAT, I'M GOING TO GET THIS PORTION OF THE
08:40AM  25    TRANSCRIPT AND MAKE SURE HE PUTS IT ON HIS WEBSITE.
```

6582

| | | |
|---|---|---|
| 08:40AM | 1 | (LAUGHTER.) |
| 08:40AM | 2 | THE COURT:  SOUNDS GOOD.  OKAY. |
| 08:40AM | 3 | (LAUGHTER.) |
| 08:40AM | 4 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 08:40AM | 5 | YOU. |
| 08:40AM | 6 | MR. CLINE:  THANK YOU. |
| 08:40AM | 7 | THE CLERK:  COURT IS IN RECESS. |
| 08:40AM | 8 | (RECESS FROM 8:40 A.M. UNTIL 9:06 A.M.) |
| 09:06AM | 9 | (JURY IN AT 9:06 A.M.) |
| 09:06AM | 10 | THE COURT:  GOOD MORNING.  WE'RE BACK ON THE RECORD |
| 09:06AM | 11 | IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS |
| 09:06AM | 12 | PRESENT. |
| 09:06AM | 13 | OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:06AM | 14 | WE'LL RESUME EVIDENCE IN JUST A MOMENT. |
| 09:06AM | 15 | LET ME ASK YOU THE QUESTION AGAIN.  DURING THE BREAK, DID |
| 09:06AM | 16 | ANY OF YOU COME ACROSS, DISCUSS, READ, OR LISTEN TO ANYTHING TO |
| 09:06AM | 17 | DO WITH THIS CASE DURING THE BREAK?  IF SO, PLEASE SHOW ME YOUR |
| 09:06AM | 18 | HAND. |
| 09:06AM | 19 | I SEE NO HANDS. |
| 09:06AM | 20 | GREAT.  THANK YOU VERY MUCH. |
| 09:06AM | 21 | LET'S CONTINUE WITH THE WITNESS THEN.  IF WE CAN BRING THE |
| 09:06AM | 22 | WITNESS IN. |
| 09:06AM | 23 | GOOD MORNING, MR. WADE. |
| 09:06AM | 24 | MR. WADE:  GOOD MORNING, YOUR HONOR. |
| 09:06AM | 25 | THE COURT:  AND MR. GROSSMAN, GOOD MORNING. |

| | | |
|---|---|---|
| 09:06AM | 1 | THE WITNESS: GOOD MORNING. |
| 09:07AM | 2 | THE COURT: PLEASE GO AHEAD AND HAVE A SEAT AGAIN |
| 09:07AM | 3 | AND MAKE YOURSELF COMFORTABLE. |
| 09:07AM | 4 | WHEN YOU ARE COMFORTABLE, AGAIN, WOULD YOU PLEASE STATE |
| 09:07AM | 5 | YOUR NAME. |
| 09:07AM | 6 | THE WITNESS: BRIAN GROSSMAN. |
| 09:07AM | 7 | **(GOVERNMENT'S WITNESS, BRIAN GROSSMAN, WAS PREVIOUSLY** |
| 09:07AM | 8 | **SWORN.)** |
| 09:07AM | 9 | THE COURT: MR. WADE. |
| 09:07AM | 10 | MR. WADE: THANK YOU, YOUR HONOR. |
| 09:07AM | 11 | **CROSS-EXAMINATION** |
| 09:07AM | 12 | Q. GOOD MORNING. |
| 09:07AM | 13 | A. GOOD MORNING. |
| 09:07AM | 14 | Q. YOU RECALL YESTERDAY WE HAD SOME DISCUSSION ABOUT THE |
| 09:07AM | 15 | JANUARY 10TH, 2014 MEETING THAT YOU HAD AT THERANOS? |
| 09:07AM | 16 | A. YES. |
| 09:07AM | 17 | Q. AND I JUST WANT TO ASK A COUPLE OF QUICK QUESTIONS ABOUT |
| 09:07AM | 18 | THAT AND THEN MOVE ON ON SOME OF THE ITEMS THAT FOLLOWED OUT OF |
| 09:07AM | 19 | THAT MEETING. |
| 09:07AM | 20 | DO YOU RECALL THAT IT WAS -- ON BEHALF OF THERANOS, THAT |
| 09:07AM | 21 | IT WAS MR. BALWANI WHO SORT OF DROVE THAT MEETING? |
| 09:07AM | 22 | A. I RECALL THAT BOTH MS. HOLMES AND MR. BALWANI SPOKE IN |
| 09:07AM | 23 | THAT MEETING, AND THAT MS. HOLMES EXITED THE MEETING AT SOME |
| 09:08AM | 24 | POINT ROUGHLY HALFWAY THROUGH. |
| 09:08AM | 25 | Q. RIGHT. AND DO YOU RECALL THAT DURING PART OF THE |

GROSSMAN CROSS BY MR. WADE (RES.)                                    6584

09:08AM   1    DISCUSSION THAT YOU WERE THERE THAT MR. BALWANI WAS SORT OF

09:08AM   2    DRIVING THE DISCUSSION ON SOME OF THE DETAILS THAT YOU WERE

09:08AM   3    FOCUSSED ON?

09:08AM   4    A.   I DON'T RECALL.

09:08AM   5    Q.   IF YOU LOOK TO YOUR LEFT, THERE'S A BINDER IN FRONT OF YOU

09:08AM   6    THAT SHOULD BE OPEN TO EXHIBIT 11049.

09:08AM   7         DO YOU SEE THAT?

09:08AM   8    A.   I DO.

09:08AM   9    Q.   AND IF YOU COULD DO ME A FAVOR AND JUST READ THE LAST LINE

09:08AM   10   ON THE LAST PARAGRAPH, OR THE LAST SENTENCE IN THE LAST

09:08AM   11   PARAGRAPH -- SECOND TO THE LAST SENTENCE IN THAT PARAGRAPH ON

09:08AM   12   THE FIRST PAGE.

09:08AM   13            THE COURT:   TO HIMSELF?   OUT LOUD?

09:08AM   14   BY MR. WADE:

09:08AM   15   Q.   TO YOURSELF, AND LET ME KNOW WHEN YOU'RE FINISHED.

09:09AM   16   A.   OKAY.

09:09AM   17   Q.   DOES THAT, READING THAT PORTION, THE PORTION OF THAT

09:09AM   18   DOCUMENT REFRESH YOUR RECOLLECTION THAT IT WAS MR. BALWANI WHO

09:09AM   19   DROVE THAT MEETING ON BEHALF OF THERANOS?

09:09AM   20   A.   WELL, THESE ARE NOT MY NOTES, SO I DON'T --

09:09AM   21   Q.   AND WE DON'T WANT YOU TO READ THE NOTES.

09:09AM   22        AND YOU RECALL THAT AT DIFFERENT POINTS DURING THIS

09:09AM   23   INVESTIGATION THAT YOU HAD MEETINGS WITH THE GOVERNMENT;

09:09AM   24   CORRECT?

09:09AM   25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6585

09:09AM  1    Q.   AND THEY ASKED YOU QUESTIONS, AND YOU GAVE THEM ANSWERS.

09:09AM  2         DO YOU RECALL THAT?

09:09AM  3    A.   I DO, YES.

09:09AM  4    Q.   AND YOU RECALL THAT THERE WERE DIFFERENT LAWYERS FROM THE

09:09AM  5    GOVERNMENT WHO WERE THERE WHO WERE TAKING NOTES?

09:09AM  6    A.   YES.

09:09AM  7    Q.   OKAY.  MY QUESTION IS WHETHER SIMPLY READING THE NOTE IN

09:09AM  8    FRONT OF YOU REFRESHES YOUR RECOLLECTION AS TO WHETHER IT WAS

09:09AM  9    MR. BALWANI WHO DROVE THAT MEETING ON BEHALF OF THERANOS?

09:10AM 10    A.   WELL, MR. WADE, AS I SAID BEFORE, IN THE SECOND HALF OF

09:10AM 11    THE MEETING, HE DEFINITELY DROVE THE MEETING BECAUSE HE WAS THE

09:10AM 12    ONLY ONE IN THE MEETING.

09:10AM 13    Q.   OKAY.

09:10AM 14    A.   IN THE FIRST PART OF THE MEETING, I WOULD SAY -- I DON'T

09:10AM 15    HAVE A SPECIFIC MEMORY OF WHO DROVE WHAT, WHO SAID WHAT, BUT

09:10AM 16    BOTH MS. HOLMES AND MR. BALWANI WERE SPEAKING IN THE FIRST PART

09:10AM 17    OF THE MEETING.

09:10AM 18    Q.   FAIR ENOUGH.

09:10AM 19         DO YOU RECALL YESTERDAY THAT I ASKED YOU SOME QUESTIONS

09:10AM 20    ABOUT WHETHER THE BULK OF THE MEETING WAS ACTUALLY TAKEN UP BY

09:10AM 21    AN INTERACTION WITH MR. BALWANI AND DR. RABODZEY?

09:10AM 22         DO YOU RECALL THAT?

09:10AM 23    A.   YES.

09:10AM 24    Q.   AND THAT WAS NOT -- YOU DIDN'T HAVE THAT RECOLLECTION.  IS

09:10AM 25    THAT FAIR?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6586

09:10AM   1      A.   THAT'S FAIR.

09:10AM   2      Q.   OKAY.  I'D LIKE TO SEE IF I COULD REFRESH YOUR

09:10AM   3      RECOLLECTION.

09:10AM   4           MAY I APPROACH, YOUR HONOR?

09:10AM   5                THE COURT:  YES.

09:11AM   6      BY MR. WADE:

09:11AM   7      Q.   AND I'M SHOWING YOU EXHIBIT 11483, WHICH IS A TRANSCRIPT

09:11AM   8      EXCERPT.  IF YOU COULD JUST LOOK AT THE HIGHLIGHTED PORTION

09:11AM   9      WHICH STARTS AT PAGE 256.

09:11AM  10           AND I BELIEVE I'VE TENDERED THIS TO THE COURT AND TO

09:11AM  11      COUNSEL FOR THE RECORD.

09:11AM  12           IF YOU COULD READ 256, STARTING AT LINE 13, AND READING TO

09:11AM  13      257 THROUGH LINE 4 TO YOURSELF, AND LET ME KNOW WHEN YOU'RE

09:11AM  14      DONE.

09:11AM  15      A.   MAYBE IF I COULD JUST TAKE A MINUTE TO SORT OF REFRESH

09:11AM  16      MYSELF OR REVIEW THIS A LITTLE, IF YOU DON'T MIND.  THANK YOU.

09:11AM  17      Q.   SURE.  LET ME KNOW WHEN YOU'VE HAD A CHANCE.  I'M FOCUSSED

09:12AM  18      ON THOSE PORTIONS THAT I'VE IDENTIFIED.

09:12AM  19      A.   SO MAYBE YOU CAN JUST EXPLAIN WHAT THIS DOCUMENT IS.

09:12AM  20                THE COURT:  IF YOU COULD JUST, SIR, JUST DRAW YOUR

09:12AM  21      ATTENTION TO THE AREAS THAT MR. WADE SUGGESTED YOU READ.

09:12AM  22                THE WITNESS:  OKAY.

09:12AM  23                THE COURT:  AND THEN HE'LL ASK YOU --

09:12AM  24                MR. LEACH:  MAY I ASK THAT THE WITNESS ALSO BE

09:12AM  25      DIRECTED TO THE FIRST PAGE SO HE HAS AN UNDERSTANDING,

GROSSMAN CROSS BY MR. WADE (RES.)                        6587

```
09:12AM   1      YOUR HONOR?

09:12AM   2             MR. WADE:  THAT'S FAIR ENOUGH, I THINK.

09:12AM   3      Q.   MR. GROSSMAN, IF YOU COULD JUST LOOK AT 11483 AT THE FIRST

09:12AM   4      PAGE.

09:12AM   5         DO YOU SEE THAT?

09:12AM   6      A.   YES.

09:12AM   7      Q.   AND DO YOU SEE LINE 16?

09:12AM   8      A.   YES.

09:12AM   9      Q.   AND I WANT YOU TO JUST READ THAT TO YOURSELF.  OKAY?

09:12AM   10     A.   OKAY.

09:12AM   11     Q.   AND THEN IF YOU COULD GO TO 256, LINE 13, TO 257, LINE 4,

09:12AM   12     AND READ THAT TO YOURSELF?

09:13AM   13     A.   OKAY.

09:13AM   14     Q.   AND MY QUESTION TO YOU IS WHETHER READING THAT EXCERPT

09:13AM   15     REFRESHES YOUR RECOLLECTION THAT THE MAJORITY OF THE TIME IN

09:13AM   16     THE MEETING WAS SPENT WITH MR. BALWANI AND DR. RABODZEY

09:13AM   17     REVIEWING THE TECHNICAL DATA?

09:13AM   18     A.   NO, IT DOES NOT.

09:13AM   19     Q.   OKAY.  AND WITH RESPECT TO THAT MEETING, DO YOU RECALL

09:13AM   20     YESTERDAY I ALSO ASKED YOU ABOUT WHETHER YOU ADVISED THAT

09:14AM   21     96 PERCENT OF TEST REQUISITIONS WERE COVERED BY 70 ASSAYS.

09:14AM   22         DO YOU RECALL THAT?

09:14AM   23     A.   YES.

09:14AM   24     Q.   AND I THINK YOU SAID YOU DIDN'T RECALL WHETHER THAT CAME

09:14AM   25     UP OR NOT.
```

GROSSMAN CROSS BY MR. WADE (RES.)                                 6588

| | | |
|---|---|---|
| 09:14AM | 1 | IS THAT FAIR? |
| 09:14AM | 2 | A.   I'M NOT SURE THAT THAT -- I DON'T REMEMBER SPECIFICALLY |
| 09:14AM | 3 | WHAT I SAID. |
| 09:14AM | 4 | Q.   OKAY.  DO YOU RECALL WHETHER IN THAT MEETING YOU WERE |
| 09:14AM | 5 | ADVISED BY SOMEONE AT THERANOS THAT 96 PERCENT OF TEST |
| 09:14AM | 6 | REQUISITIONS FELL INTO 70 ASSAYS BASED UPON THEIR ESTIMATES OF |
| 09:14AM | 7 | DATA? |
| 09:14AM | 8 | A.   I DO REMEMBER THAT THE NUMBER 96 PERCENT CAME UP, BUT IT |
| 09:14AM | 9 | WAS NOT IN THE CONTEXT THAT YOU WERE DESCRIBING. |
| 09:14AM | 10 | Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION. |
| 09:14AM | 11 | A.   OKAY. |
| 09:14AM | 12 | MR. WADE:  MAY I APPROACH, YOUR HONOR? |
| 09:14AM | 13 | THE COURT:  YES. |
| 09:14AM | 14 | MR. WADE:  (HANDING.) |
| 09:14AM | 15 | Q.   AND I'M GOING TO HAND YOU WHAT IS MARKED AS 3162.  AND I'D |
| 09:15AM | 16 | JUST LIKE TO -- I'LL CALL YOUR ATTENTION TO PAGE 2 OF THE |
| 09:15AM | 17 | NOTES.  I'VE HIGHLIGHTED AN EXCERPT FOR YOU THERE JUST TO MAKE |
| 09:15AM | 18 | IT EASY. |
| 09:15AM | 19 | DO YOU SEE THAT? |
| 09:15AM | 20 | A.   YES, I DO. |
| 09:15AM | 21 | Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE |
| 09:15AM | 22 | ADVISED THAT 96 PERCENT OF ALL TEST REQUISITIONS FALL WITHIN 70 |
| 09:15AM | 23 | ASSAYS? |
| 09:15AM | 24 | A.   WELL, AGAIN, MR. WADE, I KNOW THAT -- I KNOW WHAT YOU'RE |
| 09:15AM | 25 | ASSUMING IN YOUR QUESTION, BUT I THINK YOU HAVE A |

GROSSMAN CROSS BY MR. WADE (RES.)                                    6589

09:15AM    1    MISUNDERSTANDING OF WHAT THIS SECTION IS REFERRING TO.

09:15AM    2    Q.   I'M JUST ASKING IF IT REFRESHES YOUR RECOLLECTION AS TO

09:15AM    3    WHETHER 96 PERCENT -- WE WANT TO BE CAREFUL NOT TO READ THE

09:15AM    4    DOCUMENT.  I'M JUST ASKING YOU TO READ IT TO YOURSELF.  OKAY?

09:15AM    5    A.   YEAH.

09:15AM    6    Q.   AND I'M ASKING IF LOOKING AT THE HIGHLIGHTED PORTION OF

09:15AM    7    THE NOTES REFRESH YOUR RECOLLECTION THAT YOU WERE ADVISED THAT

09:15AM    8    96 PERCENT OF ALL TEST REQUISITIONS FALL WITHIN 90 -- WITHIN 70

09:16AM    9    ASSAYS?

09:16AM   10    A.   THIS SECTION OF THE NOTES IS REFERRING TO SOMETHING

09:16AM   11    COMPLETELY DIFFERENT.

09:16AM   12    Q.   I'M NOT ASKING YOU TO GO THROUGH THE NOTES.

09:16AM   13    A.   WELL, I'D LIKE TO ANSWER YOUR QUESTION, BUT I WOULD NEED

09:16AM   14    TO EXPLAIN MY ANSWER.

09:16AM   15    Q.   BUT I HOPE YOU UNDERSTAND, I'M TRYING TO, TO BE RESPECTFUL

09:16AM   16    OF THE RULES OF THE COURT WHEN I ASK THIS QUESTION.  I'M NOT

09:16AM   17    MEANING TO BE RUDE.

09:16AM   18    A.   THIS WAS A CONVERSATION ABOUT THE HOSPITAL ACQUIRED

09:16AM   19    INFECTION.  SO HOSPITALS ARE REQUIRED UNDER THE LAW TO TEST FOR

09:16AM   20    ANY POTENTIAL INFECTION, AND AS PART OF THAT, THEY, THEY

09:16AM   21    TYPICALLY SEND THOSE SAMPLES OUT TO OTHER HOSPITALS, AND THAT

09:16AM   22    PROCESS CAN BE TWO TO THREE DAYS BEFORE THEY GET THOSE ANSWERS

09:16AM   23    BACK.

09:16AM   24       NOW, THIS WAS 10 PERCENT OF ALL OF WHAT MEDICARE SPENT ON

09:16AM   25    TESTING, HOSPITAL ACQUIRED INFECTIONS ON THE LAW.

GROSSMAN CROSS BY MR. WADE (RES.)                                      6590

```
09:16AM    1          SO THE POINT WAS THERANOS'S NEW PROPRIETARY TECHNOLOGY
09:17AM    2    USING NUCLEIC ACID -- THIS GOES BACK TO OUR FIRST MEETING WHEN
09:17AM    3    THE COMPANY --
09:17AM    4    Q.   IF I COULD JUST INTERRUPT YOU FOR A SECOND.
09:17AM    5          IF I COULD MOVE TO STRIKE THE ANSWER AND THEN I'LL REASK
09:17AM    6    MY QUESTION.
09:17AM    7              THE COURT:  WELL, I'LL ALLOW THIS TO REMAIN AND STOP
09:17AM    8    THE ANSWER THERE, AND THEN HE'S GOING TO ASK THE QUESTION.
09:17AM    9              THE WITNESS:  OKAY.  THANK YOU.
09:17AM   10    BY MR. WADE:
09:17AM   11    Q.   I DON'T MEAN TO BE RUDE.  I'M JUST ASKING IF READING THAT
09:17AM   12    HIGHLIGHTED PORTION REFRESHES YOUR RECOLLECTION THAT YOU WERE
09:17AM   13    ADVISED THAT 96 PERCENT OF TEST REQUISITIONS FALL WITHIN 70
09:17AM   14    ASSAYS?
09:17AM   15    A.   NO, IT DOES NOT.
09:17AM   16    Q.   OKAY.
09:17AM   17          YOUR HONOR, MAY I APPROACH?
09:17AM   18              THE COURT:  YES.
09:17AM   19    BY MR. WADE:
09:17AM   20    Q.   I'M GOING TO SHOW YOU A DOCUMENT THAT IS MARKED AS
09:17AM   21    EXHIBIT 1415.
09:18AM   22          AND, AGAIN, I'D JUST ASK THAT YOU READ THESE NOTES TO
09:18AM   23    YOURSELF.
09:18AM   24          DO YOU SEE THAT THERE ARE TWO EXCERPTS THAT ARE
09:18AM   25    HIGHLIGHTED, ONE IN GREEN AND ONE IN ORANGE?
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6591

```
09:18AM   1    A.   YES, I DO.

09:18AM   2    Q.   OKAY.  AND IF YOU COULD JUST READ THE PART IN GREEN, AND

09:18AM   3    THEN I HAVE A QUESTION FOR YOU.

09:18AM   4    A.   SINCE THESE ARE NOT MY NOTES, IF YOU DON'T MIND, I'D LIKE

09:18AM   5    TO REVIEW THEM.

09:18AM   6    Q.   YOU'RE WELCOME TO REVIEW THEM TO YOURSELF, AND THEN I WANT

09:18AM   7    TO ASK YOU A QUESTION IF YOU'VE READ THE GREEN PORTION INTO

09:18AM   8    THEM.

09:18AM   9         (PAUSE IN PROCEEDINGS.)

09:18AM  10              THE WITNESS:  OKAY.

09:19AM  11    BY MR. WADE:

09:19AM  12    Q.   OKAY.  HAVE YOU HAD A CHANCE TO READ THE GREEN PORTION,

09:19AM  13    SIR?

09:19AM  14    A.   YOU MEAN THE YELLOW PART?

09:19AM  15    Q.   SURE.  FLUORESCENT GREEN, MAYBE YELLOW?

09:19AM  16    A.   I'M A LITTLE COLOR BLIND.

09:19AM  17    Q.   IT'S NOT ORANGE?

09:19AM  18    A.   YES.

09:19AM  19    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT DURING THIS

09:19AM  20    MEETING, YOU AND OTHERS AT PFM WERE ADVISED THAT 96 PERCENT OF

09:19AM  21    TESTS FALL INTO 70 ASSAYS?

09:19AM  22    A.   MR. WADE, THIS IS CONSISTENT WITH EXACTLY WHAT I JUST

09:19AM  23    DESCRIBED.

09:19AM  24    Q.   SIR, I'M SORRY.

09:19AM  25    A.   THE LINE ABOVE THAT, HOSPITAL ACQUIRED INFECTIONS ASSAYS
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6592

09:19AM  1    PANEL 2014 WERE DESCRIBING --

09:19AM  2    Q.   IF I COULD --

09:19AM  3              THE COURT:  MR. GROSSMAN, WE HAVE TO SPEAK ONE AT A

09:19AM  4    TIME.

09:19AM  5         WE HAVE THE BEST COURT REPORTER IN THE BUILDING.

09:19AM  6              THE WITNESS:  I'M SORRY.

09:19AM  7              THE COURT:  BUT EVEN WITH ALL OF HER SKILLS AND

09:19AM  8    ABILITY, IT'S DIFFICULT FOR HER TO CAPTURE THREE PEOPLE TALKING

09:19AM  9    AT THE SAME TIME.

09:20AM  10             THE WITNESS:  I UNDERSTAND.

09:20AM  11             THE COURT:  SO THAT'S HOW WE PROCESS HERE.

09:20AM  12        SO THE QUESTION IS, JUST READING THAT, IF YOU CAN ANSWER

09:20AM  13   THE QUESTION, JUST READING THOSE SIX WORDS, IF THAT REFRESHES

09:20AM  14   YOUR RECOLLECTION?

09:20AM  15        IS THAT YOUR QUESTION?

09:20AM  16             MR. WADE:  THAT IS MY QUESTION.

09:20AM  17   Q.   DOES IT REFRESH YOUR RECOLLECTION THAT PFM WAS ADVISED IN

09:20AM  18   THIS MEETING THAT 96 PERCENT OF TESTS FALL IN 70 ASSAYS?

09:20AM  19   A.   I WOULD LIKE -- I CAN'T ANSWER THAT QUESTION WITHOUT

09:20AM  20   EXPLAINING THAT ANSWER.

09:20AM  21        THE LINE DIRECTLY ABOVE THAT, HOSPITAL ACQUIRED INFECTIONS

09:20AM  22   2014, THOSE 70 ASSAYS ARE THE HOSPITAL ACQUIRED INFECTION PANEL

09:20AM  23   THAT THEY'RE TALKING ABOUT.

09:20AM  24             THE COURT:  SIR, SIR, IF IT REFRESHES YOUR

09:20AM  25   RECOLLECTION, IT DOES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6593

09:20AM   1            IF IT DOESN'T, IT DOESN'T.

09:20AM   2                 THE WITNESS:  IT DOES, YES.

09:20AM   3      BY MR. WADE:

09:20AM   4      Q.   IT REFRESHED YOUR RECOLLECTION?  YES?

09:20AM   5      A.   YES.

09:20AM   6      Q.   OKAY.

09:20AM   7      A.   IT REFRESHED MY RECOLLECTION ABOUT WHAT THAT SPECIFIC 70

09:21AM   8      ASSAYS ARE REFERRING TO.

09:21AM   9      Q.   OKAY.

09:21AM   10     A.   WHICH WAS THE HOSPITAL ACQUIRED INFECTION ASSAY PANEL THAT

09:21AM   11     THEY WERE ROLLING OUT IN 2014.

09:21AM   12     Q.   OKAY.

09:21AM   13     A.   NOT THE RETAIL TEST MENU.

09:21AM   14     Q.   OKAY.  AND DO YOU RECALL BEING ADVISED DURING THIS MEETING

09:21AM   15     THAT THERANOS ACTUALLY TOLD YOU THAT THEY HAD 70 SMALL SAMPLE

09:21AM   16     ASSAYS THAT THEY WERE PREPARED TO ROLL OUT IN THEIR COMMERCIAL

09:21AM   17     ENVIRONMENT?

09:21AM   18          DO YOU RECALL THAT?

09:21AM   19     A.   MR. WADE, WE TALKED AGAIN ABOUT 70 ASSAYS IN THE HOSPITAL

09:21AM   20     ACQUIRED INFECTION MARKET.  THAT'S MY MEMORY OF THAT

09:21AM   21     CONVERSATION.

09:21AM   22     Q.   I UNDERSTAND.  I'M JUST WANTING -- AND MY QUESTION, MY

09:21AM   23     QUESTION IS WHETHER YOU ALSO RECALL IN THAT MEETING THAT YOU

09:21AM   24     WERE ADVISED THAT -- BY THERANOS THAT THEY HAD 70 SMALL SAMPLE

09:21AM   25     ASSAYS THAT WERE READY TO ROLL OUT IN THE COMMERCIAL SETTING?

GROSSMAN CROSS BY MR. WADE (RES.)                          6594

09:21AM   1    A.   I THINK THEIR CARTRIDGES HAD 70 ASSAYS, SO ALL OF THEIR

09:22AM   2    CARTRIDGES HAD 70 ASSAYS.

09:22AM   3    Q.   OKAY.  LET ME TRY IT ONE MORE TIME.

09:22AM   4    A.   SO, YES, THE ANSWER IS ALL OF THEIR CARTRIDGES HAD 70

09:22AM   5    ASSAYS.

09:22AM   6         SO IF THE QUESTION IS, DID THEY TELL US THAT THEY WERE

09:22AM   7    ROLLING OUT CARTRIDGES THAT HAD 70 ASSAYS, THE ANSWER IS, YES,

09:22AM   8    THEY DID.

09:22AM   9    Q.   OKAY.  MY QUESTION -- AND IF YOU CAN CAN'T ANSWER IT, YOU

09:22AM  10    CAN'T ANSWER IT.  I'LL TRY ONE MORE TIME.

09:22AM  11    A.   OKAY.

09:22AM  12    Q.   -- IS WHETHER THERANOS SPECIFICALLY TOLD YOU IN THAT

09:22AM  13    MEETING THAT THEY HAD 70 SMALL SAMPLE ASSAYS THAT IT WAS

09:22AM  14    WORKING TO ROLL OUT IN THE COMMERCIAL SETTING.

09:22AM  15         DO YOU RECALL THAT, SIR?

09:22AM  16    A.   I DON'T RECALL THAT SPECIFIC STATEMENT.

09:22AM  17    Q.   OKAY.  AND REVIEWING THAT ORANGE EXCERPT ON THESE NOTES

09:22AM  18    DOES NOT REFRESH YOUR RECOLLECTION AS TO THAT POINT; CORRECT?

09:22AM  19              MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:22AM  20    ANSWERED.

09:22AM  21              MR. WADE:  I DIDN'T GET TO THE ORANGE EXCERPT I

09:22AM  22    DON'T THINK.

09:22AM  23              THE COURT:  I THINK IT'S TIME TO MOVE ON.  YOU CAN

09:22AM  24    ASK ANOTHER QUESTION.

09:22AM  25              MR. WADE:  OKAY.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6595

09:22AM   1    Q.   THE -- COMING OUT OF THAT MEETING, I BELIEVE YOU TESTIFIED

09:23AM   2    YESTERDAY THAT YOU HAD INTERACTIONS WITH MEMBERS OF YOUR TEAM;

09:23AM   3    CORRECT?

09:23AM   4    A.   YES.

09:23AM   5    Q.   OKAY.  AND DURING THOSE INTERACTIONS, DO YOU RECALL

09:23AM   6    INITIALLY YOU EXCHANGED EMAIL THOUGHTS IN ADVANCE OF A HEALTH

09:23AM   7    CARE CONFERENCE THAT YOU WERE GOING TO BE GOING TO?

09:23AM   8    A.   YES, THAT WOULD BE VERY TYPICAL AT THAT TIME OF THE YEAR.

09:23AM   9    Q.   OKAY.  IF YOU COULD TAKE A LOOK AT EXHIBIT 7391.

09:24AM  10    A.   OKAY.

09:24AM  11    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:24AM  12    A.   I DO.

09:24AM  13    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL EXCHANGE BETWEEN

09:24AM  14    YOU AND THE PFM TEAM DEBRIEFING ON THAT MEETING THAT YOU HAD AT

09:24AM  15    THERANOS?

09:24AM  16    A.   YES, I DO.

09:24AM  17    Q.   OKAY.

09:24AM  18         MOVE THE ADMISSION OF 7391.

09:24AM  19              MR. LEACH:  802, YOUR HONOR.

09:24AM  20              THE COURT:  MR. WADE?

09:24AM  21              MR. WADE:  I WAS HOPING TO SPEED THINGS ALONG, BUT I

09:24AM  22    CAN LAY SOME FOUNDATION.

09:24AM  23    Q.   DO YOU -- OFTENTIMES WHEN YOU INTERACT WITH, WHEN YOU

09:24AM  24    INTERACT WITH MEMBERS OF YOUR TEAM TO EXCHANGE INFORMATION IN

09:25AM  25    CONNECTION WITH INVESTMENT DECISIONS, DO YOU DO THAT VIA

GROSSMAN CROSS BY MR. WADE (RES.)                                    6596

```
09:25AM   1      ELECTRONIC MAIL?

09:25AM   2      A.   IT JUST DEPENDS.  SOMETIMES, YES.

09:25AM   3      Q.   YEAH.  BECAUSE SOMETIMES YOU TRAVEL; CORRECT?

09:25AM   4      A.   YES.

09:25AM   5      Q.   AND SOMETIMES YOUR COLLEAGUES TRAVEL; RIGHT?

09:25AM   6      A.   OR PEOPLE HAVE MEETINGS.  THEY'RE BUSY.  THERE'S JUST --

09:25AM   7      YOU KNOW, SO, YES, FOR ALL OF THOSE REASONS.

09:25AM   8      Q.   AND SOMETIMES THERE'S A NEED TO SHARE INFORMATION AMONG

09:25AM   9      THE GROUP ELECTRONICALLY; RIGHT?

09:25AM  10      A.   SURE.

09:25AM  11      Q.   AND, IN FACT, SOMETIMES THE EMAILS THAT YOU HAVE, YOU

09:25AM  12      ACTUALLY SAVE IN A FOLDER FOR PARTICULAR INVESTMENTS THAT

09:25AM  13      YOU'RE WORKING ON; RIGHT?

09:25AM  14      A.   I'M NOT SURE ABOUT -- I DON'T -- MAYBE YOU COULD BE A

09:25AM  15      LITTLE MORE SPECIFIC.

09:25AM  16      Q.   I CAN BE MORE SPECIFIC WITH OTHER DOCUMENTS WHERE I'VE

09:25AM  17      SEEN THAT.

09:25AM  18      A.   OKAY.

09:25AM  19      Q.   BUT WHEN YOU'RE EMAILING ON THIS WITH YOUR TEAM, DO YOU

09:25AM  20      ALWAYS WORK TO PROVIDE THE BEST INFORMATION POSSIBLE?

09:26AM  21      A.   DO I ALWAYS PROVIDE?

09:26AM  22      Q.   YEAH.  YOU TRY TO BE TRUTHFUL AND PROVIDE WHATEVER

09:26AM  23      INFORMATION YOU'VE RECEIVED IN AN ACCURATE MANNER; IS THAT

09:26AM  24      FAIR?

09:26AM  25      A.   YES.
```

GROSSMAN CROSS BY MR. WADE (RES.)                                6597

09:26AM   1    Q.   AND DO YOU TRY TO MAKE SURE THAT EVERYONE ON YOUR TEAM IS

09:26AM   2    FULLY INFORMED ABOUT THE INFORMATION THAT YOU GATHER?

09:26AM   3    A.   I MEAN, YOU CAN'T MAKE THEM READ THE EMAILS, BUT YOU HOPE

09:26AM   4    THAT THEY DO.

09:26AM   5    Q.   BUT THAT'S THE PURPOSE IN SENDING THE EMAIL IS TO SHARE

09:26AM   6    INFORMATION SO THAT THAT INFORMATION CAN BE CONSIDERED IN

09:26AM   7    CONNECTION WITH INVESTMENT DECISIONS; IS THAT RIGHT?

09:26AM   8    A.   I MEAN, I -- IT'S A LITTLE -- THAT'S A LITTLE TOO SPECIFIC

09:26AM   9    FOR YES, NO.  IT MAY OR MAY NOT BE RELATED TO AN INVESTMENT

09:26AM   10   DECISION.  IT MAY BE RELATED TO OTHER ISSUES THAT ARE RELEVANT

09:26AM   11   TO WHAT WE'RE TRYING TO ACCOMPLISH ON A GIVEN DAY-TO-DAY BASIS.

09:26AM   12   Q.   OKAY.  IS 7391 AN EMAIL IN WHICH YOU'RE SHARING

09:26AM   13   INFORMATION RELATING TO AN INVESTMENT DECISION?

09:26AM   14   A.   IF YOU DON'T MIND, I CAN MAYBE READ IT.

09:26AM   15   Q.   SURE.

09:26AM   16   A.   OKAY.

09:26AM   17        (PAUSE IN PROCEEDINGS.)

09:27AM   18            MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT?

09:27AM   19            THE COURT:  SURE.

09:27AM   20        (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

09:28AM   21            THE WITNESS:  OKAY.

09:28AM   22   BY MR. WADE:

09:28AM   23   Q.   AND DO YOU RECALL THAT THIS WAS AN EMAIL THAT WAS SENT

09:28AM   24   WITH THE TEAM OF PEOPLE AT PFM THAT WAS INVOLVED IN THE

09:28AM   25   THERANOS INVESTMENT DECISION?

GROSSMAN CROSS BY MR. WADE (RES.)                              6598

09:28AM  1    A.   YES.

09:28AM  2    Q.   AND DO YOU RECALL THAT THIS IS INFORMATION THAT WAS BEING

09:28AM  3    PROVIDED AND ITEMS THAT WERE BEING DISCUSSED TO HELP THE TEAM

09:28AM  4    FIGURE OUT A WORKFLOW ON HOW IT WAS GOING TO GO ABOUT GETTING

09:28AM  5    ADDITIONAL INFORMATION ON THE INVESTMENT DECISION?

09:28AM  6    A.   YOU'RE SORT OF PUTTING WORDS IN MY MOUTH.

09:28AM  7         I THINK THIS EMAIL IS SORT OF LAYING OUT SOME OF OUR VIEWS

09:28AM  8    THAT AT THAT POINT, HAVING MET WITH THE COMPANY TWICE AND WE

09:28AM  9    HAD -- AND THIS WAS A BIG INDUSTRY CONFERENCE IN THE SECOND

09:28AM  10   WEEK OF JANUARY, SO MANY OF THE COMPANIES THAT WOULD BE

09:29AM  11   COMPETING WITH, WITH THERANOS ON THE LABORATORY SIDE WOULD BE

09:29AM  12   THERE, AND MANY OF THE COMPANIES THAT MAKE DIAGNOSTIC

09:29AM  13   EQUIPMENT, ANALYTIC INSTRUMENTS, MOLECULAR DIAGNOSTIC EQUIPMENT

09:29AM  14   WOULD ALSO BE AT THIS MEETING, COMPANIES LIKE CEPHEID WHO

09:29AM  15   COMPETES IN THE HOSPITAL ACQUIRED INFECTION SPACE.

09:29AM  16        SO FOR ALL OF THOSE REASONS, WE -- AND THERE WAS ACTUALLY

09:29AM  17   ALSO NOT FOR PROFIT HOSPITAL PANEL, SO WE WOULD HAVE A CHANCE

09:29AM  18   TO TALK TO SOME OF THE BLUES, FOR EXAMPLE, THE BLUES INSURANCE

09:29AM  19   PLANS.

09:29AM  20        SO I THINK THIS IS -- AND FOR ALL OF THOSE REASONS, IT WAS

09:29AM  21   A GOOD OPPORTUNITY TO JUST LEARN ABOUT THIS SPACE AND THIS

09:29AM  22   BUSINESS AND HOW IT WOULD AFFECT ALL OF THOSE DIFFERENT

09:29AM  23   COMPANIES.

09:29AM  24   Q.   AND TO SHARE INFORMATION IN CONNECTION WITH THAT WITH YOUR

09:29AM  25   TEAM SO EVERYONE WOULD GO IN THINKING ABOUT SOME ISSUES THAT

GROSSMAN CROSS BY MR. WADE (RES.)                                6599

09:29AM   1    YOU SHOULD DISCUSS AT THAT CONFERENCE?

09:29AM   2    A.   WELL, WE HAD PROBABLY 100 MEETINGS THAT WEEK, SO IT WAS A

09:29AM   3    VERY BUSY WEEK AND YOU DON'T WANT THOSE OPPORTUNITIES -- WHEN

09:30AM   4    YOU MEET WITH COMPANIES, YOU DON'T WANT TO FORGET TO ASK

09:30AM   5    QUESTIONS.

09:30AM   6         SO A LOT OF PREPARING FOR THIS WEEK WAS JUST MAKING SURE

09:30AM   7    THAT EVERYONE, YOU KNOW, HAD A LIST OF QUESTIONS TO ASK THE

09:30AM   8    DIFFERENT COMPANIES THAT WE WOULD INTERACT WITH OVER THOSE FOUR

09:30AM   9    OR FIVE DAYS.

09:30AM  10    Q.   OKAY.  AND THAT WAS THE PURPOSE OF THIS EMAIL?

09:30AM  11    A.   YES.

09:30AM  12    Q.   AND IT WAS SPECIFIC BECAUSE YOU WERE IN THE PROCESS OF

09:30AM  13    CONSIDERING AN INVESTMENT IN THERANOS; CORRECT?

09:30AM  14    A.   WE WERE DOING DUE DILIGENCE, YES.  WE WERE DOING DUE

09:30AM  15    DILIGENCE ON THE COMPANY AT THAT POINT.

09:30AM  16    Q.   AND I TAKE IT PFM TAKES STEP TO PRESERVE ITS ELECTRONIC

09:30AM  17    EMAIL IN A SAFE AND SECURE MANNER?

09:30AM  18    A.   I'M NOT IN CHARGE OF THE COMPLIANCE OR THE REGULATORY PART

09:30AM  19    OF OUR BUSINESS, BUT WE CERTAINLY DO EVERYTHING THAT WE'RE

09:30AM  20    REQUIRED UNDER THE LAW BY THE S.E.C. AS FAR AS RECORDKEEPING

09:30AM  21    AND DOCUMENT RETENTION.

09:31AM  22         MR. WADE:  OKAY.  I OFFER EXHIBIT 7391.

09:31AM  23         MR. LEACH:  YOUR HONOR, THERE'S 802 WITH RESPECT TO

09:31AM  24    THE LAST PAGE, BUT I HAVE NO OBJECTION TO THIS COMING IN FOR

09:31AM  25    STATE OF MIND OR FOR SOME OTHER PURPOSE.

GROSSMAN CROSS BY MR. WADE (RES.)                                6600

09:31AM  1              THE COURT:  THE LAST PAGE, THE LAST EMAIL?

09:31AM  2              MR. LEACH:  YES, YOUR HONOR.

09:31AM  3              THE WITNESS:  SO WOULD YOU LIKE ME TO READ THE LAST

09:31AM  4      PAGE?

09:31AM  5              THE COURT:  NO.  JUST A SECOND.  THANK YOU.

09:31AM  6              MR. WADE:  NO.

09:31AM  7          (PAUSE IN PROCEEDINGS.)

09:32AM  8              THE COURT:  MR. WADE, ANY OBJECTION TO THIS LAST

09:32AM  9      PORTION, THE LAST EMAIL, THE JANUARY 10TH EMAIL BEING ADMITTED

09:32AM 10      NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT RATHER AS TO THE

09:32AM 11      STATE OF MIND OF THIS WITNESS?

09:32AM 12              MR. WADE:  I HAVE NO OBJECTION TO THAT.

09:32AM 13              THE COURT:  ALL RIGHT.  THANK YOU.  THIS WILL BE

09:32AM 14      ADMITTED.  7391 IS ADMITTED.

09:32AM 15          LADIES AND GENTLEMEN, THIS WILL BE PUBLISHED IN JUST A

09:32AM 16      MOMENT.  THE LAST EMAIL, FRIDAY, JANUARY 10, 2014, 4:37 P.M.,

09:32AM 17      THE CONTENTS OF THAT IS ADMITTED NOT FOR THE TRUTH OF THE

09:32AM 18      MATTERS ASSERTED IN THAT EMAIL, BUT ONLY AS TO THE ISSUE OF THE

09:32AM 19      STATE OF MIND OF THIS WITNESS.

09:32AM 20          SO IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:32AM 21          (DEFENDANT'S EXHIBIT 7391 WAS RECEIVED IN EVIDENCE.)

09:32AM 22              MR. WADE:  THANK YOU, YOUR HONOR.

09:32AM 23          IF WE CAN START WITH THAT LAST EMAIL THAT THE COURT JUST

09:32AM 24      REFERRED TO FOR A LIMITED PURPOSE.

09:32AM 25      Q.  DO YOU SEE THAT IN THIS EMAIL MR. RABODZEY -- DR. RABODZEY

GROSSMAN CROSS BY MR. WADE (RES.)                              6601

09:33AM  1    IS PROVIDING HIS TAKE COMING OUT OF THAT MEETING AT THERANOS?

09:33AM  2    A.   YES.

09:33AM  3    Q.   AND YOU SEE THAT HE NOTES THERE FOR YOU AND OTHERS ON THE

09:33AM  4    TEAM THAT HE THINKS THE TECHNOLOGY SOUNDS VERY GOOD, BUT HE

09:33AM  5    WANTS TO BOUNCE SOME OF THIS OFF OTHERS IN THE INDUSTRY.

09:33AM  6         DO YOU SEE THAT?

09:33AM  7    A.   I SEE THAT LINE THAT IS HIGHLIGHTED IN YELLOW.

09:33AM  8    Q.   AND HE -- BUT HE ALSO, OF COURSE, NOTES THAT HE'S NOT

09:33AM  9    GOING TO VIOLATE THE CBA THERE; CORRECT?

09:33AM 10    A.   THAT'S CORRECT.

09:33AM 11    Q.   I JUST WANT TO BE FAIR TO DR. RABODZEY.

09:33AM 12         AND PART OF THIS WAS SO THAT AS YOU WENT INTO THIS

09:33AM 13    CONFERENCE, YOU COULD TRY TO VET SOME OF THE ISSUES WITH

09:33AM 14    THERANOS IN AN APPROPRIATE WAY WITH OTHERS IN THE INDUSTRY:

09:33AM 15    RIGHT?

09:33AM 16    A.   THAT'S CORRECT.

09:33AM 17    Q.   AND IS THAT A NORMAL TYPE OF PROCESS THAT YOU WOULD GO

09:33AM 18    THROUGH AS PART OF YOUR DUE DILIGENCE IF A CONFERENCE HAPPENS

09:34AM 19    TO BE OCCURRING?

09:34AM 20    A.   YES.

09:34AM 21    Q.   AND DO YOU SEE THERE THAT HE'S NOT CONVINCED ON THE IP AND

09:34AM 22    COMPETITION?

09:34AM 23         AND DO YOU RECALL DR. RABODZEY EXPRESSING SOME CONCERNS IN

09:34AM 24    THAT REGARD AT THIS TIME?

09:34AM 25    A.   I DON'T RECALL SPECIFICALLY, BUT I DO SEE THAT HE WROTE "I

GROSSMAN CROSS BY MR. WADE (RES.)                              6602

09:34AM  1    AM NOT CONVINCED ON IP AND COMPETITION" AFTER HIS FIRST MEETING

09:34AM  2    WITH THE COMPANY.

09:34AM  3    Q.   AND DO YOU RECALL THAT YOU ASKED HIM SUBSEQUENTLY WHETHER

09:34AM  4    IP LAWYERS SHOULD BE RETAINED TO REVIEW THE INTELLECTUAL

09:34AM  5    PROPERTY OF THE COMPANY?

09:34AM  6    A.   I DON'T REMEMBER SPECIFICALLY.

09:34AM  7    Q.   OKAY.  DO YOU RECALL WHETHER YOU RETAINED IP LAWYERS TO DO

09:34AM  8    THAT?

09:34AM  9    A.   I DON'T RECALL.

09:34AM  10       I KNOW THAT WE ASKED -- WE HAD FOLLOW-UP CONVERSATIONS

09:34AM  11   WITH THE COMPANY ON THEIR IP, THEIR IP STRATEGY, THE

09:34AM  12   COMPETITIVE BARRIERS, WHAT PREVENTED OTHER COMPANIES FROM

09:34AM  13   PURSUING A BUSINESS LIKE THIS, COPYING THE MINILAB.  WE HAD ALL

09:35AM  14   OF THOSE TYPES OF CONVERSATIONS.

09:35AM  15       I DON'T RECALL SPECIFICALLY WHETHER WE RETAINED AN IP

09:35AM  16   FIRM.

09:35AM  17   Q.   AND THE COMPETITIVE BARRIERS WAS AN ISSUE, OR THE RESPONSE

09:35AM  18   FROM COMPETITION IS AN ISSUE THAT YOU WERE DISCUSSING ACTIVELY

09:35AM  19   WITHIN THE COMPANY; RIGHT?

09:35AM  20   A.   ANY INVESTMENT THAT WE MAKE, WE WOULD WANT TO UNDERSTAND

09:35AM  21   BARRIERS TO ENTRY AND COMPETITION.

09:35AM  22   Q.   RIGHT.

09:35AM  23   A.   IT'S A STANDARD PART OF A DUE DILIGENCE PROCESS FOR ANY

09:35AM  24   INVESTMENT WE WOULD MAKE.

09:35AM  25   Q.   AND IF YOU LOOK A COUPLE OF LINES DOWN, YOU SEE IT NOTES

GROSSMAN CROSS BY MR. WADE (RES.)                              6603

09:35AM   1    THAT "THEIR PROJECTIONS ARE A BIT AGGRESSIVE FOR SPEED OF RAMP

09:35AM   2    IN 2015 AND BEYOND BUT WITH EXCELLENT EXECUTION ARE DOABLE AND

09:35AM   3    CAN BE EXCEEDED."

09:35AM   4         DO YOU SEE THAT?

09:35AM   5    A.   MR. WADE, MAYBE I CAN READ THE FULL DOCUMENT IF WE'RE

09:35AM   6    GOING TO GO THROUGH IT.  IS THAT OKAY?

09:35AM   7    Q.   I THOUGHT YOU DID.

09:35AM   8    A.   NO.  I WAS WAITING FOR THE JUDGE TO RULE.

09:35AM   9    Q.   I'M SORRY.

09:36AM  10         (PAUSE IN PROCEEDINGS.)

09:36AM  11              THE WITNESS:  OKAY.

09:36AM  12    BY MR. WADE:

09:36AM  13    Q.   AND MY QUESTION WAS JUST WITH THAT HIGHLIGHTED SENTENCE

09:36AM  14    ABOUT THE PROJECTIONS.  DO YOU RECALL RECOGNIZING THAT THE

09:36AM  15    GROWTH OF THE COMPANY AND THE PROJECTIONS WAS A STEEP RAMP AND

09:36AM  16    THAT EXECUTION WAS A RISK GOING INTO THIS INVESTMENT?

09:36AM  17    A.   AFTER OUR FIRST MEETING, THAT WAS -- APPEARS TO BE

09:36AM  18    MR. RABODZEY'S POINT OF VIEW, YES.

09:36AM  19    Q.   AND DID YOU SHARE THAT VIEW?

09:36AM  20    A.   DID HE SHARE THAT VIEW?

09:36AM  21    Q.   DID YOU SHARE THAT VIEW?

09:36AM  22    A.   I DON'T RECALL SPECIFICALLY WHAT I WAS THINKING ON

09:36AM  23    WHATEVER DAY THIS IS, JANUARY 12TH.

09:37AM  24         I, I -- SO I DON'T -- I'M NOT SURE.

09:37AM  25    Q.   WELL, DURING THE DUE DILIGENCE PROCESS, DO YOU RECALL

GROSSMAN CROSS BY MR. WADE (RES.)

09:37AM  1    COMING TO THE RECOGNITION THAT EXECUTION BY THE COMPANY WAS ONE

09:37AM  2    OF THE RISKS THAT WOULD BE FACED?

09:37AM  3    A.   EXECUTION WAS A RISK FOR SURE.  JUST LIKE ANY COMMERCIAL

09:37AM  4    COMPANY THAT WAS ROLLING OUT A TECHNOLOGY OR A DRUG OR A

09:37AM  5    MEDICAL DEVICE OR A NEW HEALTH CARE SERVICE, EXECUTION WOULD

09:37AM  6    ALWAYS BE AN ISSUE WE WOULD FOCUS ON.

09:37AM  7         IN THIS CASE THEY HAD DETAILED PROJECTIONS FROM WALGREENS

09:37AM  8    THAT -- AND ACTUALLY IN THIS MEETING THEY HAD TOLD US THAT THEY

09:37AM  9    HAD UPPED THOSE NUMBERS TWICE BASED ON HOW WELL THINGS WERE

09:37AM  10   GOING.

09:37AM  11        SO I THINK WE WALKED AWAY FROM THAT MEETING FEELING LIKE

09:37AM  12   THEY HAD A REALLY GOOD, THEY HAD A REALLY GOOD SENSE OF HOW THE

09:37AM  13   ROLLOUT WAS GOING AND WHAT THE 2014 PROJECTIONS IN PARTICULAR

09:37AM  14   WOULD LOOK LIKE.

09:37AM  15   Q.   WELL, YOU SAID WE WALKED AWAY FROM THAT MEETING, BUT

09:37AM  16   DR. RABODZEY WALKED AWAY FROM THIS MEETING ADVISED THAT

09:38AM  17   EXECUTION IS A POTENTIAL RISK; RIGHT?

09:38AM  18   A.   HE APPEARS TO HAVE HAD QUESTIONS ON EXECUTION.

09:38AM  19   Q.   OKAY.

09:38AM  20   A.   WHICH I THINK IS A VERY REASONABLE THING TO FOCUS ON IN

09:38AM  21   THE DUE DILIGENCE PROCESS.

09:38AM  22   Q.   AND HE ALSO NOTES ON THE BOTTOM THAT HE ALSO WANTS TO LOOK

09:38AM  23   AT THE TECHNICAL DATA IN MORE DETAIL; RIGHT?

09:38AM  24   A.   YES.

09:38AM  25   Q.   OKAY.  LET'S GO TO THE FIRST PAGE OF THE DOCUMENT.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6605

```
09:38AM   1         ON THE BOTTOM, AGAIN, YOU JUST NOTE -- YOU ASK FOR

09:38AM   2    PEOPLE'S INPUTS AND SUGGEST YOU SHOULD HAVE A MEETING LATER ON;

09:38AM   3    RIGHT?

09:38AM   4    A.   YES.

09:38AM   5    Q.   AND DO YOU RECALL YOU HAD MEETINGS AT PFM TO DISCUSS THE

09:38AM   6    INVESTMENT?

09:38AM   7    A.   I DON'T SPECIFICALLY RECALL THAT WEEK.

09:38AM   8    Q.   OKAY.

09:38AM   9    A.   A MEETING THAT WEEK.

09:38AM   10   Q.   OKAY.

09:38AM   11   A.   WE HAD A LOT OF MEETINGS THAT WEEK.

09:38AM   12   Q.   OKAY.  AND WHEN -- DO YOU SEE THE REFERENCE TO JPM?  WAS

09:38AM   13   THIS A JP MORGAN CONFERENCE?

09:38AM   14   A.   YES.  THERE'S THE -- EVERY JANUARY IN SAN FRANCISCO, I

09:39AM   15   THINK IT'S THE THIRD BIGGEST TRADE SHOW OF THE YEAR FOR THE

09:39AM   16   CITY, IT'S A HEALTH CARE FOCUSSED INVESTMENT CONFERENCE.  IT

09:39AM   17   TAKES PLACE AT THE WESTIN ST. FRANCIS, AND IT'S BEEN GOING ON I

09:39AM   18   THINK FOR 30-PLUS YEARS.

09:39AM   19        AND SO JP MORGAN JUST REFERS TO THAT.  THAT'S WHAT JPM IS

09:39AM   20   REFERRING TO, THIS INDUSTRY TRADE SHOW OR INDUSTRY INVESTMENT

09:39AM   21   CONFERENCE.

09:39AM   22   Q.   AND WHEN YOU TESTIFIED BEFORE ABOUT HOW THIS WOULD BE A

09:39AM   23   PROCESS YOU WOULD GO ABOUT VETTING THIS INVESTMENT IN A

09:39AM   24   CONFIDENTIALITY APPROPRIATE WAY, THAT'S WHAT YOU WERE REFERRING

09:39AM   25   TO WAS THE JP MORGAN CONFERENCE IN SAN FRANCISCO?
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6606

09:39AM   1    A.   ARE YOU REFERRING TO THE PREVIOUS EMAIL?

09:39AM   2    Q.   I THINK IT WAS STILL THIS EMAIL, BUT IT FEELS LIKE IT WAS

09:39AM   3    A WHILE AGO.

09:39AM   4    A.   WE WOULD CERTAINLY WANT TO BE RESPECTFUL OF THE

09:39AM   5    CONFIDENTIALITY OF THE COMPANY AND THE TECHNOLOGY, THE

09:39AM   6    BUSINESS, ALL OF THE ASPECTS OF THE BUSINESS THAT THEY DID NOT

09:39AM   7    WANT US TO SHARE WITH OTHER PEOPLE.

09:40AM   8    Q.   OKAY.  AND IF WE JUST GO UP THE CHAIN QUICKLY, DO YOU SEE

09:40AM   9    THAT'S AN EMAIL WHERE MR. KHANNA PROVIDES SOME OF HIS THOUGHTS?

09:40AM   10        DO YOU SEE THAT?

09:40AM   11   A.   YES, I DO.

09:40AM   12   Q.   AND IF YOU JUST LOOK UNDER RISKS, YOU NOTE IN THAT FIRST

09:40AM   13   BULLET THAT HE TALKS ABOUT EXECUTION BEING A RISK AS WELL;

09:40AM   14   CORRECT?

09:40AM   15   A.   YES.

09:40AM   16   Q.   AND AGAIN, ACTUALLY IF YOU LOOK AT THE LAST PORTION OF HIS

09:40AM   17   EMAIL, THE LAST LINE THERE, HE SAYS, THIS IS ONE OF THE MOST

09:40AM   18   INTERESTING COMPANIES HE'S MET, BUT IT ALL COMES DOWN TO

09:40AM   19   EXECUTION; RIGHT?

09:40AM   20   A.   YES.

09:40AM   21   Q.   AND AS THE DUE DILIGENCE PROCESS WENT FORWARD, I THINK YOU

09:40AM   22   RECALL THERE WAS SOME VETTING THAT WAS DONE BY PFM ON

09:40AM   23   REGULATORY ISSUES.

09:41AM   24        DO YOU RECALL THAT?

09:41AM   25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                      6607

09:41AM   1    Q.   CAN YOU LOOK AT EXHIBIT 14002?

09:41AM   2    A.   14002?

09:41AM   3              THE COURT:  THIS IS IN VOLUME 2?

09:41AM   4              MR. WADE:  THIS IS IN VOLUME 2, CORRECT.

09:41AM   5              THE WITNESS:  OKAY.  SORRY.  YEP.

09:41AM   6              MR. WADE:  IN FACT, IF I MAY APPROACH, YOUR HONOR, I

09:41AM   7    HAVE MY TRUSTY STICKY NOTE.

09:41AM   8              THE COURT:  SURE.

09:41AM   9    BY MR. WADE:

09:41AM  10    Q.   (HANDING.)

09:41AM  11         THIS SHOULD TELL YOU WHAT EXHIBIT.

09:41AM  12    A.   OKAY.  THANK YOU.

09:41AM  13    Q.   AND IS THIS AN EMAIL -- IS 14002 AN EMAIL IN WHICH

09:41AM  14    DR. RABODZEY IS REPORTING TO YOU ON SOME OF THE RESEARCH HE WAS

09:41AM  15    DOING ON THE REGULATORY ISSUES?

09:42AM  16    A.   YES.

09:42AM  17    Q.   AND HE ALSO ADVISED MR. KHANNA AS WELL?

09:42AM  18    A.   YES, HE'S ALSO ON THIS EMAIL, YES.

09:42AM  19    Q.   AND WAS THIS EMAIL FOR THE PURPOSE OF KEEPING, KEEPING THE

09:42AM  20    TEAM INFORMED ABOUT WHAT HE WAS LEARNING ABOUT ISSUES RELATED

09:42AM  21    TO THE THERANOS INVESTMENT?

09:42AM  22    A.   I BELIEVE THAT THAT'S -- I BELIEVE THAT'S RIGHT.

09:42AM  23              MR. WADE:  OFFER 14002, YOUR HONOR.

09:42AM  24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:42AM  25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

GROSSMAN CROSS BY MR. WADE (RES.)                                6608

```
09:42AM   1              (DEFENDANT'S EXHIBIT 14002 WAS RECEIVED IN EVIDENCE.)

09:42AM   2        BY MR. WADE:

09:42AM   3        Q.   AND THIS EMAIL NOTES THAT HE CHECKED WITH NSTG.

09:42AM   4             DO YOU SEE THAT?

09:42AM   5        A.   I DO, YES.

09:42AM   6        Q.   AND DO YOU KNOW WHAT NSTG IS?

09:43AM   7        A.   IT'S A COMPANY IN THE MOLECULAR DIAGNOSTICS SPACE.

09:43AM   8        Q.   AND --

09:43AM   9        A.   A MEDICAL DEVICE COMPANY.

09:43AM  10        Q.   IT'S A MEDICAL DEVICE COMPANY?

09:43AM  11        A.   YES.

09:43AM  12        Q.   AND IS IT A COMPANY IN WHICH YOU HAD AN INVESTMENT OR

09:43AM  13        SOMETHING?

09:43AM  14        A.   NO, I DON'T BELIEVE WE DID, NO.

09:43AM  15        Q.   BUT IN ANY EVENT, IT LOOKS LIKE TO GATHER SOME

09:43AM  16        INTELLIGENCE, DR. RABODZEY REACHED OUT TO THAT COMPANY TO VET

09:43AM  17        SOME OF THE REGULATORY ISSUES.

09:43AM  18             DO YOU SEE THAT?

09:43AM  19        A.   YEAH.  WE MAY HAVE HAD A MEETING WITH NSTG THAT HAD

09:43AM  20        NOTHING TO DO WITH THERANOS, SO I'M NOT SURE THAT HE REACHED

09:43AM  21        OUT SPECIFICALLY BECAUSE OF THERANOS.

09:43AM  22             BUT WE TYPICALLY HAVE MANY, MANY MEETINGS THAT WEEK, SO IT

09:43AM  23        WOULD BE A COMPANY THAT HE WOULD POTENTIALLY MEET WITH.

09:43AM  24        Q.   AND, AND DO YOU SEE IN THE SECOND PORTION OF THAT EMAIL HE

09:43AM  25        SAYS, "THEY DID CONFIRM THAT A DEVICE USED FOR TESTING OUTSIDE
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6609

09:43AM   1    OF A CLIA LAB HAS TO BE FDA CLEARED.  THIS WOULD APPLY TO

09:44AM   2    THERANOS IF AND WHEN THEY DECIDE TO MOVE THE DEVICE OUT OF THE

09:44AM   3    CLIA LAB."

09:44AM   4        DO YOU SEE THAT?

09:44AM   5    A.   YES, I DO.

09:44AM   6    Q.   AND DO YOU RECALL THAT YOU RECOGNIZED AT THE TIME THAT

09:44AM   7    THERE WAS AT LEAST A VIEW, I THINK -- LET ME STRIKE THAT.

09:44AM   8        DO YOU RECALL THAT THERE WAS SOME GREY AREA ON SOME OF THE

09:44AM   9    REGULATORY ISSUES THAT YOU TALKED ABOUT WITH MR. LEACH

09:44AM  10    YESTERDAY?

09:44AM  11    A.   I'M SORRY, MR. WADE, I DON'T SPECIFICALLY REMEMBER WHAT

09:44AM  12    YOU'RE REFERRING TO.

09:44AM  13    Q.   OKAY.  I THINK MR. LEACH WAS ASKING YOU SOME QUESTIONS

09:44AM  14    ABOUT REGULATORY ISSUES THAT PFM WAS CONSIDERING RELATING TO

09:44AM  15    THE THERANOS INVESTMENT, AND THERE WAS SOME GREY AREAS TO HOW

09:44AM  16    THE CLIA REGULATIONS APPLIED VERSUS FDA REGULATIONS.

09:44AM  17        DO YOU RECALL THAT?

09:44AM  18    A.   THE REGULATORY -- WHO HAS REGULATORY OVERSIGHT FOR THE

09:44AM  19    LABORATORIES, YES.

09:44AM  20    Q.   AND I THINK THAT WAS A LITTLE BIT OF AN UNCERTAIN AREA.

09:44AM  21        DO YOU RECALL THAT?

09:44AM  22    A.   YES.

09:44AM  23    Q.   OKAY.  AND DO YOU RECALL LEARNING IN THIS PERIOD THAT

09:44AM  24    THERE WAS AT LEAST A VIEW EXPRESSED BY, BY THIS COMPANY THAT TO

09:45AM  25    DISTRIBUTE THE DEVICE, THERE WOULD HAVE TO BE FDA APPROVAL.

GROSSMAN CROSS BY MR. WADE (RES.)                              6610

09:45AM   1          DO YOU SEE THAT?

09:45AM   2     A.   WELL, THEY TOLD US THAT THEY HAD NO PLANS TO DISTRIBUTE

09:45AM   3     THE DEVICE THE WAY A TYPICAL MEDICAL DEVICE COMPANY WORKS.

09:45AM   4          THEY HAD NO PLANS TO SELL ANY OF THEIR DEVICES TO THIRD

09:45AM   5     PARTIES.

09:45AM   6          SO I GUESS I WANT TO ANSWER YOUR QUESTION, BUT IF YOU'RE

09:45AM   7     ASKING ME DID THEY PLAN ON SELLING, DISTRIBUTING THESE DEVICES

09:45AM   8     OUTSIDE OF THEIR OWN CLIA LABS, OUR UNDERSTANDING FROM OUR DUE

09:45AM   9     DILIGENCE WAS THAT THEY HAD NO INTENTION OF DOING THAT.

09:45AM  10     Q.   OKAY.  LET ME BE SLIGHTLY MORE PRECISE.

09:45AM  11          DO YOU SEE WHERE IT SAYS "THE DEVICE USED FOR TESTING

09:45AM  12     OUTSIDE OF THE CLIA LAB HAS TO BE FDA CLEARED"?

09:45AM  13          DO YOU SEE THAT?

09:45AM  14     A.   A DEVICE.

09:45AM  15     Q.   YEAH.  AND DO YOU RECALL THAT PHASE II OF THERANOS WAS TO

09:46AM  16     DISTRIBUTE THE DEVICES OUT TO AREAS OUTSIDE OF THE CLIA LAB?

09:46AM  17     A.   YES, PHASE II, I BELIEVE, WAS DEPLOYING SAMPLE PROCESSING

09:46AM  18     UNITS IN RETAIL SETTINGS, YES.

09:46AM  19     Q.   RIGHT.  AND DO YOU RECALL LEARNING THAT THERE WAS A VIEW

09:46AM  20     THAT FDA CLEARANCE WOULD BE REQUIRED BEFORE THAT COULD HAPPEN?

09:46AM  21     A.   MY MEMORY OF THAT WAS WE WERE NOT SURE WHETHER FDA

09:46AM  22     CLEARANCE WOULD BE REQUIRED.

09:46AM  23          THE COMPANY TOLD US THAT IF THE ANALYSIS WAS DONE

09:46AM  24     CENTRALLY IN A CLIA LABORATORY, THAT IT WAS NOT CLEAR THAT THEY

09:46AM  25     NEEDED FDA APPROVAL TO DISTRIBUTE THE DEVICES IN A RETAIL

GROSSMAN CROSS BY MR. WADE (RES.)                              6611

09:46AM  1    SETTING, UNLIKE A CONVENTIONAL PIECE OF ANALYTIC

09:46AM  2    INSTRUMENTATION OR A CONVENTIONAL LABORATORY MEDICAL DEVICE

09:46AM  3    WHERE YOU RUN THE SAMPLE AND ANALYZE THE SAMPLE IN THE SAME

09:47AM  4    PLACE, THAT WOULD MOST LIKELY REQUIRE FDA APPROVAL.

09:47AM  5         BUT IF YOU WERE JUST PROCESSING -- IF YOU WERE RUNNING THE

09:47AM  6    SAMPLE AND THEN PROCESSING THAT INFORMATION IN ANOTHER

09:47AM  7    LOCATION, THAT DID NOT, IN THERANOS'S VIEW, RUN AFOUL OF ANY

09:47AM  8    FDA APPROVAL REQUIREMENTS FOR THAT SETTING.

09:47AM  9    Q.   RIGHT.  THIS, I BELIEVE, WAS THE GREY AREA THAT YOU WERE

09:47AM  10   DISCUSSING WITH MR. LEACH; CORRECT?

09:47AM  11   A.   THE GREY AREA WAS MORE JUST GENERAL OVERSIGHT OF THE

09:47AM  12   LABORATORY INDUSTRY, IS IT AN FDA OR IS IT SOME OTHER

09:47AM  13   ORGANIZATION?

09:47AM  14        AND THE FDA ACTUALLY HAS JURISDICTION, BUT THEY, THEY

09:47AM  15   DEFER TO ANOTHER, ANOTHER ORGANIZATION TO MAINTAIN THE

09:47AM  16   STANDARDS, THE CLIA STANDARDS.

09:47AM  17        SO THAT'S THE REGULATORY GREY AREA THAT WE WERE, I BELIEVE

09:47AM  18   WE WERE REFERRING TO YESTERDAY.

09:47AM  19   Q.   OKAY.  AND DO YOU RECALL THAT WHEN YOU WERE VETTING THE

09:48AM  20   INVESTMENT, THAT YOU WERE DOING SOME ADDITIONAL RESEARCH TO

09:48AM  21   UNDERSTAND HOW THE REGULATIONS MIGHT BE APPLIED?

09:48AM  22        DO YOU RECALL THAT?

09:48AM  23   A.   I DO, YES.

09:48AM  24   Q.   OKAY.  AND DO YOU RECALL THAT AS PART OF THAT, THERE WAS

09:48AM  25   AN EFFORT TO REACH OUT AND GET OTHERS' VIEWPOINTS ON THAT?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6612

09:48AM   1          DO YOU RECALL THAT?

09:48AM   2     A.   THAT WOULD CERTAINLY BE SOMETHING THAT WE WOULD WANT.

09:48AM   3     Q.   OKAY.  AND DO YOU RECALL THAT THERANOS TOLD YOU THAT THEY

09:48AM   4     WERE GOING TO SEEK FDA APPROVAL OF THEIR DEVICES AND THEIR

09:48AM   5     ASSAYS?

09:48AM   6          DO YOU RECALL THAT?

09:48AM   7     A.   YES.

09:48AM   8     Q.   AND DO YOU RECALL LEARNING THAT THERE WERE VIEWS OF PEOPLE

09:48AM   9     IN THE INDUSTRY THAT THAT MAY ACTUALLY BE REQUIRED BEFORE THE

09:48AM  10     DEVICE COULD BE USED IN A DEPLOYED SETTING?

09:48AM  11          DO YOU RECALL LEARNING THAT?

09:48AM  12     A.   WELL, WHAT WE LEARNED WAS THAT IF YOU PLANNED TO SELL A

09:48AM  13     MEDICAL DEVICE, IF YOU PLANNED TO SELL A PIECE OF DIAGNOSTIC

09:48AM  14     EQUIPMENT, YOU NEEDED FDA APPROVAL TO SELL THAT IN A SETTING

09:48AM  15     THAT WASN'T A CLIA LAB.

09:48AM  16          THAT'S I THINK WHAT THIS EMAIL IS SPEAKING TO.

09:48AM  17     Q.   WELL, DOESN'T THE SECOND SENTENCE -- THE SECOND SENTENCE

09:49AM  18     OF THE FIRST PARAGRAPH SAY, "THIS WOULD APPLY TO THERANOS IF

09:49AM  19     AND WHEN THEY DECIDE TO MOVE THE DEVICE OUT OF THE CLIA LAB."

09:49AM  20          THAT'S WHAT THAT SAYS; RIGHT?

09:49AM  21     A.   IT POTENTIALLY COULD.  BUT WE REALLY WEREN'T -- BASED ON

09:49AM  22     WHAT THE COMPANY TOLD US ABOUT THE REGULATORY STRATEGY THAT

09:49AM  23     THEY HAD WITH PHASE II, IT WASN'T CLEAR WHETHER THEY NEEDED FDA

09:49AM  24     APPROVAL OR NOT.

09:49AM  25          BUT IN THIS PARTICULAR CASE, NANOSTRING, THEIR PRODUCTS

GROSSMAN CROSS BY MR. WADE (RES.)                          6613

09:49AM  1    RECEIVE FDA APPROVAL AND AS A RESULT THEY DO SELL THEIR

09:49AM  2    DEVICES, AND THAT'S A PART OF WHAT ALLOWS THEM TO OPERATE IN

09:49AM  3    THE MARKETPLACE.

09:49AM  4         SO I THINK THAT SENTENCE, THE FIRST SENTENCE IS REFERRING

09:49AM  5    TO NANOSTRING AND THEIR BUSINESS, WHICH WAS A VERY DIFFERENT

09:49AM  6    BUSINESS THAN THERANOS, A VERY DIFFERENT BUSINESS MODEL.

09:49AM  7         AND MR. RABODZEY IS DOING HIS JOB, HE'S HIGHLIGHTING

09:49AM  8    SOMETHING THAT WE NEED TO EXPLORE, AND WE ASKED QUESTIONS

09:49AM  9    AROUND THIS IN FOLLOW-UP DUE DILIGENCE MEETINGS.

09:49AM  10        SO THIS WAS, I THINK, A GOOD EXAMPLE OF THE KIND OF WORK

09:50AM  11   WE TRY TO DO WHEN WE'RE IN THE EARLY PART OF A DUE DILIGENCE

09:50AM  12   PROCESS WITH A NEW INVESTMENT IDEA.

09:50AM  13   Q.   FAIR ENOUGH.

09:50AM  14        AND YOU WERE STILL IN THE EARLY PART OF THIS AT THIS

09:50AM  15   POINT; CORRECT?

09:50AM  16   A.   YEAH.  I THINK THIS IS A WEEK AFTER, LESS THAN A WEEK

09:50AM  17   AFTER THE SECOND MEETING WE HAD WITH THE COMPANY.

09:50AM  18   Q.   OKAY.  IF I COULD GO BRIEFLY TO 1422, WHICH I BELIEVE IS

09:50AM  19   IN EVIDENCE.

09:50AM  20        AND IF WE CAN BLOW UP THE BOTTOM.

09:50AM  21        DO YOU SEE HERE -- WE TALKED ABOUT THIS EMAIL IN

09:50AM  22   CONNECTION WITH THE CDA YESTERDAY.

09:51AM  23        DO YOU RECALL THAT?

09:51AM  24   A.   YES.

09:51AM  25   Q.   AND YOU JUST NOTE THAT THAT SENTENCE IN THE FOLLOWING

GROSSMAN CROSS BY MR. WADE (RES.)                                    6614

09:51AM  1    PARAGRAPH, WHICH I DON'T THINK WE TALKED ABOUT YESTERDAY, THAT

09:51AM  2    TALKS ABOUT "THE WAG ENDORSEMENT SPEAKS TO THE STRENGTH AND

09:51AM  3    ROBUSTNESS OF THE TECHNOLOGY PLATFORM."

09:51AM  4        DO YOU SEE THAT?

09:51AM  5    A.   I DO, YES.

09:51AM  6    Q.   AND THAT WAS YOUR BELIEF AT THE TIME; CORRECT?

09:51AM  7    A.   THAT WAS OUR IMPRESSION, YES.

09:51AM  8    Q.   AND YOU TALKED ABOUT HOW YOU MIGHT WANT TO HAVE A CALL OR

09:51AM  9    AN ADDITIONAL MEETING TO DISCUSS FURTHER ISSUES AS YOU WERE

09:51AM  10   CONSIDERING THE INVESTMENT; CORRECT?

09:51AM  11   A.   YES.

09:51AM  12   Q.   AND YOU DID HAVE OTHER INTERACTIONS WITH MR. BALWANI;

09:51AM  13   CORRECT?

09:51AM  14   A.   YES, THAT'S CORRECT.

09:51AM  15   Q.   AND I THINK THIS IS -- IF WE CAN GO UP TO HIS RESPONSE.

09:51AM  16       THIS IS A RECOGNITION THAT HE'S GOING TO PROVIDE YOU ALL

09:52AM  17   OF THE DOCUMENTS THAT YOU REQUESTED; CORRECT?

09:52AM  18   A.   THAT IS CORRECT.

09:52AM  19   Q.   OKAY.  IF WE CAN GO TO 4077, WHICH I BELIEVE IS ALSO IN

09:52AM  20   EVIDENCE, THAT'S THE SLIDE DECK.  I'M NOT GOING TO GO THROUGH

09:52AM  21   THE SLIDE DECK AT THIS -- I'LL COME BACK TO THE SLIDE DECK, BUT

09:52AM  22   I JUST HAVE A COUPLE OF QUESTIONS ABOUT THE EMAIL.

09:52AM  23       FEEL FREE TO PULL IT UP IF YOU WANT TO READ THE DOCUMENT.

09:52AM  24       BUT THE -- IF WE CAN LOOK AT THE EMAIL, DO YOU RECALL --

09:52AM  25   IF WE FOCUS ON THE BULLET POINTS DOWN BELOW.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6615

09:52AM   1        AND JUST SO WE'RE CLEAR, WE'LL COME BACK TO IT, BUT THE

09:52AM   2    TOP EMAIL IS AN EMAIL IN WHICH HE'S TELLING YOU THAT HE'S

09:53AM   3    GIVING YOU THE DATA THAT YOU REQUESTED, THE SLIDE DECK;

09:53AM   4    CORRECT?

09:53AM   5    A.   I BELIEVE THAT'S RIGHT, YES.

09:53AM   6    Q.   OKAY.  AND IN THE BOTTOM EMAIL HE GIVES YOU SOME UPDATE ON

09:53AM   7    SOME OTHER INVESTMENTS; RIGHT?

09:53AM   8    A.   THAT APPEARS TO BE THE CASE, YEAH.

09:53AM   9        I HAVEN'T READ ALL OF THE BULLET POINTS, BUT, YES.

09:53AM  10    Q.   OKAY.  AND THE FIRST ONE NOTES THAT, "AT THE CONFERENCE,

09:53AM  11    THE INTERMOUNTAIN HEALTH SYSTEMS ANNOUNCED A STRATEGIC

09:53AM  12    PARTNERSHIP WITH THERANOS."

09:53AM  13        DO YOU SEE THAT?

09:53AM  14    A.   I DO, YES.

09:53AM  15    Q.   AND WHAT IS INTERMOUNTAIN HEALTH SYSTEMS?

09:53AM  16    A.   THEY'RE WHAT IS KNOWN AS AN INTEGRATED DELIVERY NETWORK,

09:53AM  17    AND A WELL RESPECTED ONE.  THEY OPERATE IN UTAH.  THEY OWN

09:53AM  18    HOSPITALS, AND PHYSICIANS -- THEY EMPLOY PHYSICIANS AND THEY

09:53AM  19    OWN HOSPITALS, AND THEY OWN SOME OF THE OTHER FACILITIES AROUND

09:53AM  20    OTHER ALTERNATIVE SITE FACILITIES, EMERGENCY CARE CLINICS AND

09:53AM  21    DIALYSIS CENTERS AND THOSE TYPES OF THINGS.  SO THAT'S WHY

09:54AM  22    THEY'RE CALLED AN INTEGRATED DELIVERY NETWORK.

09:54AM  23        THEY ALSO OFTEN TAKE RISKS.  SO UNLIKE A HOSPITAL, THEY --

09:54AM  24    SOMETIMES THEY ACTUALLY ACT AS AN INSURANCE COMPANY FOR THEIR

09:54AM  25    OWN -- USING THEIR OWN ASSETS, HOSPITAL ASSETS TO TAKE CARE OF

GROSSMAN CROSS BY MR. WADE (RES.)                            6616

09:54AM  1    THOSE PATIENTS.

09:54AM  2         SO THEY'RE ONE OF THE MORE, THEY'RE ONE OF THE MORE

09:54AM  3    RESPECTED, FORWARD LOOKING ORGANIZATIONS, HOSPITAL

09:54AM  4    ORGANIZATIONS.

09:54AM  5    Q.   AND AT THE TIME THAT YOU -- YOU WERE AT THE CONFERENCE

09:54AM  6    THAT IS BEING REFERRED TO HERE; CORRECT?

09:54AM  7    A.   THIS IS, AGAIN, REFERRING TO THE JP MORGAN CONFERENCE.

09:54AM  8    Q.   AND DO YOU RECALL LEARNING, INDEPENDENT FROM MR. BALWANI'S

09:54AM  9    UPDATE, ABOUT THE ANNOUNCEMENT OF THE STRATEGIC PARTNERSHIP?

09:54AM  10   A.   I DON'T REMEMBER SPECIFICALLY WHEN I LEARNED OF IT, BUT I

09:54AM  11   WOULD HAVE LIKELY SEEN SOME PRESS RELEASE THAT WEEK.

09:54AM  12   Q.   AND WAS THIS A POSITIVE FACTOR IN TERMS OF YOUR INVESTMENT

09:54AM  13   DECISION?

09:54AM  14   A.   IT WAS A POSITIVE FACTOR, YES.

09:54AM  15   Q.   OKAY.  AND THEN BELOW HE ALSO NOTES SOME ADDITIONAL

09:55AM  16   INFORMATION THAT CAME OUT AT THAT CONFERENCE FROM WALGREENS.

09:55AM  17        DO YOU SEE THAT?

09:55AM  18   A.   I DO.

09:55AM  19   Q.   AND IN PARTICULAR -- AND DO YOU RECALL WALGREENS, WOULD

09:55AM  20   THEY GENERALLY ATTEND THIS LARGE HEALTH CARE CONFERENCE AS

09:55AM  21   WELL?

09:55AM  22   A.   USUALLY THEY DO, YES.

09:55AM  23   Q.   AND YOU NOTE THAT THERE ARE SOME COMMENTS ATTRIBUTED TO,

09:55AM  24   IS THAT GREG WASSON?  DO YOU UNDERSTAND THAT TO BE GREG WASSON?

09:55AM  25   A.   IT SAYS CEO, SO THAT WOULD BE MY ASSUMPTION, YEAH, IN

GROSSMAN CROSS BY MR. WADE (RES.)                                6617

09:55AM   1    BRACKETS.

09:55AM   2    Q.   OKAY.  AND IT TALKS ABOUT AT THE TIME HOW THEY HAD

09:55AM   3    LAUNCHED THE PALO ALTO LOCATION AND ARE BEGINNING THE ROLLOUT

09:55AM   4    IN PHOENIX.

09:55AM   5        DO YOU SEE THAT?

09:55AM   6    A.   I DO, YES.

09:55AM   7    Q.   AND THEN IT SAYS, "ONCE WE'VE DONE THAT SUCCESSFULLY YOU

09:55AM   8    WILL SEE A MORE RAPID NATIONAL ROLL OUT."

09:55AM   9        DO YOU SEE THAT?

09:55AM   10   A.   I DO.

09:55AM   11   Q.   AND HE SAYS THAT "THEY HAVE INCREDIBLE, INCREDIBLE

09:55AM   12   TECHNOLOGY."

09:56AM   13       RIGHT?

09:56AM   14       AND THEN IT READS, "WE ARE NOT GOING TO COMMENT ON

09:56AM   15   GUIDANCE IN TERMS OF REVENUE.  ONCE WE HAVE ROLLED OUT IN OTHER

09:56AM   16   STATES WE WILL BE ABLE TO TALK MORE ABOUT IT."

09:56AM   17       DO YOU SEE THAT?

09:56AM   18   A.   I DO.

09:56AM   19   Q.   AND DID YOU VIEW THAT EXPRESSION OR ENDORSEMENT OF THE

09:56AM   20   TECHNOLOGY BY MR. WASSON TO BE A POSITIVE FACTOR IN TERMS OF

09:56AM   21   YOUR INVESTMENT DECISION?

09:56AM   22   A.   I DID.

09:56AM   23   Q.   AND THEN IF YOU GO TO THE SECOND PAGE THERE ARE NOTES THAT

09:56AM   24   REFER TO WADE, THE CFO.

09:56AM   25       DO YOU SEE THAT?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6618

09:56AM   1    A.   I DO.

09:56AM   2    Q.   AND DID YOU UNDERSTAND THAT TO BE WADE MIQUELON?

09:56AM   3    A.   YES.

09:56AM   4    Q.   AND DO YOU SEE THE INFORMATION, HE TALKS THERE A LITTLE

09:56AM   5    BIT ABOUT HOW THIS WORKS?

09:56AM   6         DO YOU SEE THAT?

09:57AM   7    A.   I DO.

09:57AM   8    Q.   AND HOW THE RELATIONSHIP WAS GOING TO WORK?

09:57AM   9    A.   YES, I DO.

09:57AM  10    Q.   OKAY.  AND, AGAIN, THIS WAS ANOTHER SORT OF FACTOR IN

09:57AM  11    FAVOR OF YOUR INVESTMENT DECISION; IS THAT FAIR?

09:57AM  12    A.   IT WAS CONSISTENT WITH WHAT WALGREENS HAD ALREADY PUBLICLY

09:57AM  13    SAID.

09:57AM  14    Q.   OKAY.

09:57AM  15    A.   SO, YES, IN THAT SENSE.  IT DID NOT CHANGE FROM WHAT THEY

09:57AM  16    HAD ALREADY SAID.

09:57AM  17    Q.   IF WE CAN GO BRIEFLY TO 1443, WHICH I BELIEVE IS IN

09:57AM  18    EVIDENCE.

09:58AM  19         AND THIS IS AN EMAIL THAT YOU DISCUSSED WITH MR. LEACH ON

09:58AM  20    DIRECT.

09:58AM  21         DO YOU SEE THAT?

09:58AM  22    A.   YES.

09:58AM  23    Q.   AND I THINK A MINUTE AGO YOU TALKED ABOUT THESE REGULATORY

09:58AM  24    ISSUES AND HOW YOU WANTED TO GET SOME ADDITIONAL INFORMATION ON

09:58AM  25    THAT AND HAD ADDITIONAL QUESTIONS; CORRECT?

GROSSMAN CROSS BY MR. WADE (RES.)                              6619

```
09:58AM    1      A.   YES.

09:58AM    2      Q.   AND IS THIS THE EMAIL THAT REFLECTS THOSE QUESTIONS, OR

09:58AM    3      SOME OF THOSE QUESTIONS?

09:58AM    4      A.   IT WAS AN EMAIL THAT REFLECTED SOME OF THOSE QUESTIONS.  I

09:58AM    5      BELIEVE WE HAD OTHER -- THERE WERE OTHER POINTS IN THE DUE

09:58AM    6      DILIGENCE PROCESS WHERE WE DISCUSSED ISSUES AROUND IP AND

09:58AM    7      COMPETITION AND BARRIERS TO ENTRY.

09:58AM    8           BUT, YES, THAT'S CERTAINLY PART OF THIS EMAIL.

09:58AM    9      Q.   AND HE NOTES, "HERE ARE A FEW TOPICS FOR TOMORROW."

09:58AM   10           DO YOU SEE THAT?

09:58AM   11      A.   I DO.

09:58AM   12      Q.   AND DO YOU RECALL THAT YOU WERE GOING TO HAVE ANOTHER

09:59AM   13      MEETING WITH MR. BALWANI?

09:59AM   14      A.   YES.

09:59AM   15      Q.   AND IF WE LOOK UP AT THE TOP EMAIL, HE ACTUALLY NOTES HE

09:59AM   16      WOULD BE HAPPY TO TALK ABOUT THE ISSUES THAT YOU RAISED IN THE

09:59AM   17      MEETING AND HE WOULD GIVE YOU THE USB KEY WITH THE MODEL THAT

09:59AM   18      YOU'VE REQUESTED; RIGHT?

09:59AM   19      A.   YES.

09:59AM   20      Q.   AND DO YOU RECALL THAT?

09:59AM   21      A.   WELL, YEAH, I CAN -- YES.

09:59AM   22      Q.   AND DO YOU RECALL THAT IN THAT MEETING THERE WAS

09:59AM   23      ADDITIONAL DISCUSSION ABOUT, THERE WAS ADDITIONAL DISCUSSION

09:59AM   24      ABOUT THE REGULATORY PROCESS?

09:59AM   25      A.   ARE YOU REFERRING TO THE MEETING THAT HAPPENED SUBSEQUENT
```

GROSSMAN CROSS BY MR. WADE (RES.)                      6620

09:59AM  1    TO THIS EMAIL?

09:59AM  2    Q.   FAIR ENOUGH.

09:59AM  3         DO YOU RECALL THAT THERE ACTUALLY WAS A MEETING WITH

09:59AM  4    MR. BALWANI THE NEXT DAY, JANUARY 21ST?

09:59AM  5    A.   I -- I'M NOT SURE WHAT -- I KNOW WE HAD ADDITIONAL

10:00AM  6    MEETINGS, CONVERSATIONS WITH MR. BALWANI AFTER MONDAY,

10:00AM  7    JANUARY 20TH.  I'M NOT SURE SPECIFICALLY WHAT MEETING YOU'RE

10:00AM  8    REFERRING TO.

10:00AM  9    Q.   DO YOU RECALL HAVING A MEETING WITH HIM ON THE 21ST?

10:00AM  10   A.   I'M SORRY, I DON'T RECALL THE SPECIFIC DATES.  BUT I KNOW

10:00AM  11   WE HAD A THIRD MEETING WITH MR. BALWANI, WHICH I BELIEVE WAS A

10:00AM  12   TELEPHONE CALL.

10:00AM  13   Q.   OH, YOU BELIEVE IT WAS A TELEPHONE CALL?

10:00AM  14   A.   I THINK IT WAS.  ACTUALLY, I DON'T KNOW -- I'M PRETTY

10:00AM  15   SURE.

10:00AM  16   Q.   OKAY.

10:00AM  17   A.   THAT'S MY MEMORY.

10:00AM  18   Q.   AND DO YOU RECALL THAT YOU WERE GIVEN AN OPPORTUNITY TO

10:00AM  19   ASK ADDITIONAL QUESTIONS?

10:00AM  20   A.   YES.

10:00AM  21   Q.   AND MS. HOLMES DID NOT PARTICIPATE IN THAT MEETING;

10:00AM  22   CORRECT?

10:00AM  23   A.   THAT IS CORRECT.

10:00AM  24   Q.   AND THE -- DO YOU RECALL THAT ONE OF THE TOPICS THAT YOU

10:00AM  25   ASKED ADDITIONAL QUESTIONS ABOUT WAS, OR ONE OF THE SUBJECT

GROSSMAN CROSS BY MR. WADE (RES.)                                    6621

10:00AM  1    MATTER AREAS WERE REGULATORY ISSUES?

10:01AM  2        DO YOU RECALL DISCUSSING THAT?

10:01AM  3    A.   I RECALL DISCUSSING COMPETITION AND INTELLECTUAL PROPERTY

10:01AM  4    AT, IF NOT THAT MEETING, AT SOME FUTURE MEETING.

10:01AM  5    Q.   AND DO YOU RECALL THAT THE PHASE I, PHASE II PROCESS WAS

10:01AM  6    ALSO A PART OF THAT DISCUSSION?

10:01AM  7    A.   YES.

10:01AM  8    Q.   BECAUSE THE REGULATORY ISSUES WOULD APPLY DIFFERENTLY IN

10:01AM  9    THE DIFFERENT PHASES; RIGHT?

10:01AM 10    A.   WELL, OUR INVESTMENT CASE WAS REALLY NOT BASED ON PHASE I

10:01AM 11    OR PHASE II.  IT WAS BASED ON THE TECHNOLOGICAL COMPETITIVE

10:01AM 12    ADVANTAGES THAT THEY HAD BECAUSE OF THE MINILAB, BECAUSE OF THE

10:01AM 13    CONSUMER ADVANTAGE, BECAUSE OF ALL OF THE THINGS THAT THEY TOLD

10:01AM 14    US IN OUR FIRST FEW MEETINGS.

10:01AM 15        BUT WE DID WANT TO UNDERSTAND THE REGULATORY RISK AND

10:01AM 16    STRATEGY AS IT RELATED TO BOTH THE FDA AND CLIA LABS.

10:02AM 17        SO THOSE WERE QUESTIONS THAT CAME UP OVER THE COURSE OF

10:02AM 18    OUR DUE DILIGENCE.

10:02AM 19    Q.   AND DO YOU RECALL DURING THAT, DURING THAT MEETING THAT

10:02AM 20    YOU WERE ALSO ADVISED THAT THERANOS OFFERED A TOTAL OF 250

10:02AM 21    TESTS IN ITS CLIA LAB AND THAT THEY REPRESENTED 99 PERCENT OF

10:02AM 22    THE VOLUME?

10:02AM 23    A.   I DO REMEMBER THAT, YES.

10:02AM 24    Q.   OKAY.  AND DO YOU RECALL THAT THE ADDITIONAL TESTS BEYOND

10:02AM 25    THOSE 250 THAT WEREN'T YET CERTIFIED FOR THEIR LAB, THAT THEY

GROSSMAN CROSS BY MR. WADE (RES.)                                    6622

10:02AM   1    HAD RELATIONSHIPS WHERE THEY COULD SEND THOSE OUT TO A

10:02AM   2    REFERENCE LAB IF NEEDED?

10:02AM   3    A.   MR. WADE, WE NEVER DISCUSSED ANYTHING ABOUT A REFERENCE

10:02AM   4    LAB IN THAT MEETING.

10:02AM   5    Q.   OKAY.  DO YOU RECALL LEARNING THAT AT SOME POINT DURING

10:02AM   6    THE DUE DILIGENCE PROCESS?

10:02AM   7    A.   NO.

10:02AM   8    Q.   OKAY.  THE -- IF WE CAN GO TO 1454.

10:03AM   9         AND I UNDERSTAND THE GOVERNMENT STIPULATES TO THE

10:03AM   10   ADMISSION OF THAT DOCUMENT.  WE CAN JUST PUT IT ON THE SCREEN

10:03AM   11   IF IT'S EASIER THAN GOING THROUGH THE BINDER.

10:03AM   12           MR. LEACH:  JUST ONE MOMENT, YOUR HONOR.

10:03AM   13           THE COURT:  SURE.

10:03AM   14       (PAUSE IN PROCEEDINGS.)

10:03AM   15           MR. LEACH:  NO OBJECTION, YOUR HONOR.  THAT'S FINE.

10:03AM   16           MR. WADE:  MAY WE PUBLISH?

10:03AM   17           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:03AM   18       (GOVERNMENT'S EXHIBIT 1454 WAS RECEIVED IN EVIDENCE.)

10:03AM   19   BY MR. WADE:

10:03AM   20   Q.   AND THIS IS, THIS IS AN EMAIL SHORTLY AFTER THAT CALL THAT

10:03AM   21   YOU HAD WITH MR. BALWANI; RIGHT?

10:03AM   22   A.   LET ME JUST TAKE A MINUTE TO READ IT.

10:03AM   23   Q.   SURE.

10:03AM   24   A.   THANK YOU.

10:03AM   25       (PAUSE IN PROCEEDINGS.)

GROSSMAN CROSS BY MR. WADE (RES.)                              6623

| | | |
|---|---|---|
| 10:03AM | 1 | THE WITNESS:  OKAY. |
| 10:04AM | 2 | BY MR. WADE: |
| 10:04AM | 3 | Q.   OKAY.  AND DO YOU RECALL THAT THIS WAS AN EMAIL THAT CAME |
| 10:04AM | 4 | OUT OF THAT -- OR THAT YOU SENT SHORTLY AFTER THAT CALL WITH |
| 10:04AM | 5 | MR. BALWANI? |
| 10:04AM | 6 | A.   WELL, THIS IS AN EMAIL THAT HE SENT TO ME. |
| 10:04AM | 7 | Q.   RIGHT, IN RESPONSE TO AN EMAIL THAT YOU SENT FOLLOWING UP |
| 10:04AM | 8 | ON THAT MEETING? |
| 10:04AM | 9 | A.   YES. |
| 10:04AM | 10 | Q.   IS THAT FAIR? |
| 10:04AM | 11 | A.   YES. |
| 10:04AM | 12 | Q.   AND THE PURPOSE OF THIS WAS JUST TO GET PERMISSION FROM |
| 10:04AM | 13 | THERANOS SO THAT YOU COULD RETAIN SOME REGULATORY CONSULTANTS |
| 10:04AM | 14 | TO LOOK INTO SOME OF THESE REGULATORY ISSUES; RIGHT? |
| 10:05AM | 15 | A.   THE CONSULTANTS THAT WE WANTED TO USE WERE MUCH BROADER |
| 10:05AM | 16 | THAN REGULATORY CONSULTANTS ACTUALLY.  THEY WERE BUSINESS |
| 10:05AM | 17 | CONSULTANTS WHO WERE EXPERTS IN THE LAB INDUSTRY AND WHO HAD |
| 10:05AM | 18 | EXPERIENCE OPERATING AND INVESTING IN THE LABORATORY SPACE. |
| 10:05AM | 19 | Q.   OKAY.  FAIR ENOUGH. |
| 10:05AM | 20 | LET'S ACTUALLY LOOK AT HIS RESPONSE.  YOU WANTED TO GET |
| 10:05AM | 21 | SOMEONE -- WAS THAT CLAMMER, ADAM CLAMMER WHO YOU WANTED TO GET |
| 10:05AM | 22 | INPUT FROM? |
| 10:05AM | 23 | A.   HE WAS ONE OF THOSE INDIVIDUALS. |
| 10:05AM | 24 | Q.   OKAY.  AND THERE WERE OTHER PEOPLE WHO YOU WANTED TO GET |
| 10:05AM | 25 | INPUT FROM? |

GROSSMAN CROSS BY MR. WADE (RES.)                                    6624

```
10:05AM    1      A.   YES.

10:05AM    2      Q.   AND WHO DID YOU WANT TO GET INPUT FROM?

10:05AM    3      A.   THERE WAS ANOTHER INDIVIDUAL, I DON'T REMEMBER HIS NAME,

10:05AM    4      BUT HE WAS AN OPERATE -- HE HAD OPERATED LABORATORIES OVER HIS

10:05AM    5      CAREER.  HE WAS A -- HE WAS AT THE TIME, I BELIEVE, AN EMPLOYEE

10:05AM    6      OF A PRIVATE EQUITY FIRM THAT HAD MADE LABORATORY INVESTMENTS,

10:05AM    7      SO HE HAD DIRECT OPERATING EXPERIENCE IN THE INDUSTRY.  SO HE

10:05AM    8      WAS SOMEONE WHO WE THOUGHT WOULD BE AN EXCELLENT REFERENCE AS

10:06AM    9      WE, AS WE FINISHED OUR DUE DILIGENCE PROCESS.

10:06AM   10      Q.   AND DID YOU RETAIN HIM AND GET HIS GUIDANCE?

10:06AM   11      A.    MR. BALWANI WAS UNWILLING TO GRANT HIM ACCESS BECAUSE WE

10:06AM   12      WEREN'T ABLE TO DISCUSS ANY -- AS YOU CAN SEE IN THIS EMAIL, WE

10:06AM   13      COULDN'T TALK TO HIM ABOUT ANY OF THE ISSUES WE WANTED HIS

10:06AM   14      INPUT ON.

10:06AM   15          SO WE, WE -- WE WEREN'T -- WE ENDED UP NOT, WE ENDED UP

10:06AM   16      NOT WORKING WITH THAT INDIVIDUAL SINCE -- AND SO, WHICH WAS --

10:06AM   17      JUST MEANT THAT WE HAD TO, AGAIN, KIND OF RELY ON THE

10:06AM   18      REPRESENTATIONS THAT THE COMPANY HAD MADE TO US ABOUT THE

10:06AM   19      TECHNOLOGY, THE WALGREENS RELATIONSHIPS, THE HOSPITAL ACQUIRED

10:06AM   20      INFECTION BUSINESS, THE PHYSICIAN OFFICE BUSINESS, ALL OF THE

10:06AM   21      DIFFERENT ASPECTS OF THE FORECAST.

10:07AM   22      Q.   OKAY.  BUT YOU DO RECALL THAT THERE WERE QUESTIONS THAT

10:07AM   23      YOU HAD WITH MR. BALWANI ABOUT -- OVER A PERIOD OF TIME ABOUT

10:07AM   24      WHICH CONSULTANTS YOU COULD RETAIN?

10:07AM   25          DO YOU RECALL THAT?
```

GROSSMAN CROSS BY MR. WADE (RES.)                          6625

10:07AM  1    A.   YES.

10:07AM  2    Q.   AND THERE WERE QUESTIONS ABOUT WHAT KIND OF INFORMATION

10:07AM  3    YOU COULD SHARE WITH THEM; RIGHT?

10:07AM  4    A.   YES.

10:07AM  5    Q.   BECAUSE THERE WAS SOME CONFIDENTIAL INFORMATION THAT

10:07AM  6    MR. BALWANI DIDN'T WANT SHARED WITH CERTAIN PEOPLE IN THE

10:07AM  7    INDUSTRY; RIGHT?

10:07AM  8    A.   HE DIDN'T WANT TO SHARE IT WITH -- I'M NOT SURE IT WAS

10:07AM  9    SPECIFIC TO JUST THE INDUSTRY.  BUT, YES, THERE WAS A WHOLE

10:07AM 10    BUNCH OF -- MUCH OF THE IMPORTANT PART OF THE STORY WE WERE NOT

10:07AM 11    ABLE TO SHARE WITH INDIVIDUALS THAT WEREN'T -- THAT THE COMPANY

10:07AM 12    HADN'T AGREED TO, HADN'T ALLOWED -- THAT DIDN'T APPROVE OUR

10:07AM 13    SPEAKING TO THEM ABOUT THE BUSINESS AND ALL OF THE OTHER ISSUES

10:07AM 14    THAT WE WERE FOCUSSED ON.

10:07AM 15    Q.   WELL, YOU ULTIMATELY RETAINED A NUMBER OF DIFFERENT

10:07AM 16    EXPERTS TO ADVISE YOU ON THESE ISSUES; RIGHT?

10:07AM 17    A.   WE SPOKE TO SUBJECT MATTER EXPERTS, BUT MORE AT A HIGH

10:08AM 18    LEVEL, NOT REFERENCING THERANOS SPECIFICALLY.

10:08AM 19         SO KIND OF -- THE CONCEPT IS KIND OF SORT OF BACKGROUND

10:08AM 20    INFORMATION, ALL RIGHT, EXPLAIN TO US HOW THE REGULATION OF A

10:08AM 21    LAB WORKS, EXPLAIN TO US HOW A PHYSICIAN ORDERS LAB TESTS.

10:08AM 22         WHAT WE WEREN'T ABLE TO DO IS TO GIVE THEM THE THERANOS

10:08AM 23    BUSINESS SPECIFICALLY AND HAVE THEM COMMENT ON WHETHER THAT

10:08AM 24    WAS -- OFFER THEIR PERSPECTIVE AND THEIR COMMENTS ON THE

10:08AM 25    SPECIFICS OF THERANOS'S BUSINESS.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6626

10:08AM   1    Q.   OKAY.  I THINK MY INITIAL QUESTION RELATED TO REGULATORY

10:08AM   2    CONSULTANTS.

10:08AM   3    A.   YES.

10:08AM   4    Q.   AND YOU ASKED TO RETAIN THOSE REGULATORY CONSULTANTS;

10:08AM   5    RIGHT?

10:08AM   6    A.   WELL, MR. WADE, I THINK YOU ASKED ME ABOUT THE TWO

10:08AM   7    INDIVIDUALS AND WHETHER THEY WERE REGULATORY CONSULTANTS, AND

10:08AM   8    MY ANSWER IS THEY ARE NOT REGULATORY CONSULTANTS, THEY'RE BROAD

10:09AM   9    INDUSTRY EXPERTS IN THE LAB SPACE.

10:09AM  10         SO I'M HAPPY TO ANSWER YOUR QUESTION, BUT MAYBE YOU CAN

10:09AM  11    REPHRASE IT SO I CAN GIVE YOU THE ANSWER YOU'RE LOOKING FOR.

10:09AM  12    Q.   WELL, WHY DON'T WE GO TO 7399.

10:09AM  13         DO YOU HAVE THAT EMAIL IN FRONT OF YOU?

10:09AM  14    A.   YES, I DO NOW.  SORRY.

10:09AM  15    Q.   AND IS THIS AN EMAIL FROM DR. RABODZEY TO YOU AND OTHER

10:09AM  16    ANALYSTS WORKING ON THE TEAM WITH RESPECT TO THE THERANOS

10:09AM  17    INVESTMENT?

10:10AM  18    A.   MAYBE I COULD JUST REVIEW IT FOR A SEC.  THANK YOU.

10:10AM  19         (PAUSE IN PROCEEDINGS.)

10:10AM  20              THE WITNESS:  OKAY.

10:11AM  21    BY MR. WADE:

10:11AM  22    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL IN WHICH

10:11AM  23    DR. RABODZEY IS CONVEYING INFORMATION THAT HE GATHERED AS HE

10:11AM  24    WAS DOING RESEARCH RELATED TO THE THERANOS INVESTMENT?

10:11AM  25    A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6627

10:11AM   1            MR. WADE:  MOVE THE ADMISSION OF 7399.

10:11AM   2            MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:11AM   3            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM   4        (DEFENDANT'S EXHIBIT 7399 WAS RECEIVED IN EVIDENCE.)

10:11AM   5    BY MR. WADE:

10:11AM   6    Q.   AND THIS IS JANUARY 21ST, 2014.

10:11AM   7         DO YOU SEE THAT?

10:11AM   8    A.   I DO.

10:11AM   9    Q.   AND DR. RABODZEY NOTES THAT HE READ THE CLIA LAB

10:11AM  10    REQUIREMENTS.

10:11AM  11         DO YOU SEE THAT?

10:11AM  12    A.   I DO.

10:11AM  13    Q.   AND THAT THERANOS SEEMS TO BE CORRECT THAT CLIA

10:11AM  14    CERTIFICATION DOES MEAN THAT THEIR TESTS MEET A CERTAIN LEVEL

10:11AM  15    OF ACCURACY.

10:12AM  16         DO YOU SEE THAT?

10:12AM  17    A.   I DO.

10:12AM  18    Q.   AND DID YOU UNDERSTAND THAT TO BE THAT BECAUSE THERANOS

10:12AM  19    HAD TO VALIDATE ITS TESTS BEFORE IT COULD OFFER THOSE TESTS IN

10:12AM  20    THE CLIA LAB?

10:12AM  21    A.   THAT IS THE PROCESS OF GETTING -- OF QUALIFYING FOR A CLIA

10:12AM  22    CERTIFICATION, YES.

10:12AM  23    Q.   OKAY.  AND DO YOU KNOW IF THAT'S WHAT DR. RABODZEY IS

10:12AM  24    REFERRING TO THERE?

10:12AM  25    A.   I BELIEVE THAT IS WHAT HE IS REFERRING TO, YES.

GROSSMAN CROSS BY MR. WADE (RES.)                          6628

10:12AM  1    Q.   OKAY.  AND THEN HE NOTES IN THE SECOND LINE, "THIS MAY OR

10:12AM  2    MAY NOT BE SUFFICIENT TO MEET THE FDA CRITERIA, BUT I HAVE NO

10:12AM  3    REASON TO BELIEVE IT WON'T."

10:12AM  4         DO YOU SEE THAT?

10:12AM  5    A.   I DO SEE THAT.

10:12AM  6    Q.   AND HE NOTES THAT HE'S GOING TO RETAIN TWO CONSULTANTS

10:12AM  7    FROM GPG.

10:12AM  8         DO YOU SEE THAT?

10:12AM  9    A.   I DO.

10:12AM  10   Q.   AND DO YOU KNOW WHAT THAT REFERS TO?

10:12AM  11   A.   I BELIEVE HE MADE A TYPO.  I BELIEVE HE'S REFERRING TO

10:12AM  12   GLG, NOT GPG.

10:12AM  13   Q.   OKAY.

10:12AM  14   A.   GLG IS A -- THEY'RE AN ORGANIZATION THAT PROVIDES

10:13AM  15   INVESTMENT FIRMS LIKE OURS EXPERTS IN DIFFERENT SUBJECT MATTER

10:13AM  16   AREAS.  SO YOU COULD FIND SOMEONE WHO IS THE WORLD LEADER IN,

10:13AM  17   YOU KNOW, THE REPRODUCTIVE SYSTEM OF MICE, AND THEY WOULD FIND

10:13AM  18   THAT FOR YOU, AND THAT MAY BE SOMETHING THAT IS INTERESTING IN

10:13AM  19   THE CONTEXT OF A NEW DRUG.

10:13AM  20        AND SO WE USE THEM TO FIND, WE USE THEM TO FIND VERY

10:13AM  21   SPECIFIC CONSULTANTS.

10:13AM  22   Q.   AND HERE HE NOTES THAT HE'S WORKING TO GET TWO

10:13AM  23   CONSULTANTS, ONE WHO DEVELOPED LAB TESTS IN THE PAST AND CAN

10:13AM  24   HELP EVALUATE THE TECHNOLOGY, AND ANOTHER PERSON WHO

10:13AM  25   UNDERSTANDS THE CLIA AND FDA REGULATIONS TO EVALUATE THE

GROSSMAN CROSS BY MR. WADE (RES.)                                6629

10:13AM   1    REQUIREMENTS THAT THERANOS HAD TO MEET TO GET CLIA

10:13AM   2    CERTIFICATION; CORRECT?

10:13AM   3    A.   YES.

10:13AM   4    Q.   OKAY.  AND LET'S GO TO THE NEXT PARAGRAPH.

10:14AM   5         HE ALSO CONVEYS HIS VIEW ON THE PHASE II STRATEGY.

10:14AM   6         DO YOU SEE THAT?

10:14AM   7    A.   YES.

10:14AM   8    Q.   AND HE NOTES THAT, "I WOULD STICK TO THE VIEW SHARED BY

10:14AM   9    THE LAWYERS WE SPOKE WITH THAT THE FDA WILL WANT TO REGULATE

10:14AM  10    TESTING AND WILL NOT BUY INTO THIS IDEA OF CLOUD DATA, SO THEY

10:14AM  11    WILL HAVE TO GET THE DEVICE APPROVED BY THE FDA AND/OR THEY MAY

10:14AM  12    NEED TO GET SOME FORM OF CLIA CLEARANCE FOR THOSE WAG LOCATIONS

10:14AM  13    WHERE SYSTEMS ARE DEPLOYED."

10:14AM  14         DO YOU SEE THAT?

10:14AM  15    A.   I DO.

10:14AM  16    Q.   AND DO YOU RECALL LEARNING THAT DURING THE DUE DILIGENCE

10:14AM  17    PROCESS, THAT THAT WAS THE VIEW THAT DR. RABODZEY HAD COME TO?

10:14AM  18    A.   THAT'S ACTUALLY NOT HIS VIEW.  THAT'S THE VIEW OF THE

10:14AM  19    LAWYERS HE SPOKE TO.

10:14AM  20    Q.   OKAY.  DO YOU RECALL -- DID YOU RETAIN COUNSEL TO GET

10:14AM  21    THEIR TAKE ON THE REGULATORY ISSUES?

10:14AM  22    A.   I DON'T SPECIFICALLY REMEMBER WHICH LAWYERS HE'S REFERRING

10:14AM  23    TO, BUT, YOU KNOW, LAWYERS ARE OFTEN VERY CONSERVATIVE WHEN IT

10:15AM  24    COMES TO REGULATORY POLICY.

10:15AM  25         SO WE WOULD -- IN MANY INVESTMENTS, WE WOULD WANT

GROSSMAN CROSS BY MR. WADE (RES.)                          6630

10:15AM   1     PERSPECTIVE OR ADVICE IN TERMS OF HOW TO THINK ABOUT REGULATORY

10:15AM   2     ISSUES AT A HIGH LEVEL, AND I THINK THAT'S -- I DON'T REMEMBER

10:15AM   3     WHICH FIRM WE USED IN THIS PARTICULAR CASE, BUT, YOU KNOW, THAT

10:15AM   4     WOULD BE FAIRLY NORMAL IN THE COURSE OF OUR INVESTMENT RESEARCH

10:15AM   5     ACTIVITIES.

10:15AM   6     Q.   OKAY.  AND IF YOU GO DOWN A COUPLE MORE SENTENCES, HE

10:15AM   7     NOTES THERE, "I WOULD THINK THIS IS NOT A BIG DEAL, BUT MAY BE

10:15AM   8     A BIT OF DELAY FOR THAT PHASE ONLY, STILL, THEY CAN WORK AROUND

10:15AM   9     THESE OBSTACLES QUICKLY AND CAPTURE VOLUME THROUGH THEIR HUB

10:15AM   10    AND SPOKE MODEL."

10:15AM   11         DO YOU SEE THAT?

10:15AM   12    A.   I DO.

10:15AM   13    Q.   AND SO THIS IS ESSENTIALLY A RISK THAT IT MAY BE AWHILE

10:15AM   14    BEFORE THERANOS WOULD BE ABLE TO DEPLOY ITS DEVICE; CORRECT?

10:16AM   15    A.   IF YOU'RE REFERRING TO DEPLOYING DEVICES IN WALGREENS

10:16AM   16    LOCATIONS, THAT IS I BELIEVE WHAT HE'S REFERRING TO HERE, YES.

10:16AM   17    Q.   OKAY.

10:16AM   18    A.   BUT THAT WASN'T WHAT OUR MODEL OR OUR INVESTMENT CASE WAS

10:16AM   19    BASED OFF OF.  IT WAS AN UP SIDE SCENARIO IF SOMETHING LIKE

10:16AM   20    THAT PLAYED OUT.

10:16AM   21    Q.   FAIR ENOUGH.

10:16AM   22    A.   SO, YES.

10:16AM   23    Q.   BUT YOU RECALL THE DISCUSSION OF THE PHASE I AND PHASE II,

10:16AM   24    AND THIS IS SAYING THAT THE PHASE II MIGHT TAKE SOME TIME;

10:16AM   25    RIGHT?

GROSSMAN CROSS BY MR. WADE (RES.)                              6631

```
10:16AM   1    A.   WELL, I THINK IT'S SAYING THAT THERE IS -- THERE MAY BE A

10:16AM   2    BIT OF A DELAY BASED ON -- THAT APPEARS TO BE MR. RABODZEY'S

10:16AM   3    POINT OF VIEW -- BEFORE WE RAISE THESE ISSUES WITH THE COMPANY

10:16AM   4    AND GOT THEIR PERSPECTIVE ON THESE, ON THESE HIGHER LEVEL

10:16AM   5    REGULATORY QUESTIONS AROUND NOT THE INITIAL ROLLOUT, BUT THE

10:16AM   6    LONGER TERM ABILITY TO PUT THESE DEVICES IN STORES LIKE A

10:17AM   7    WALGREENS.

10:17AM   8    Q.   WELL, DO YOU RECALL THIS WAS ACTUALLY, I BELIEVE, JUST

10:17AM   9    AFTER THAT MEETING THAT YOU HAD WITH MR. BALWANI TO DISCUSS

10:17AM  10    THOSE ISSUES?

10:17AM  11    A.   I CAN'T SEE THE DATE.  THE 21ST OF JANUARY.  SO THAT WOULD

10:17AM  12    HAVE BEEN AFTER, I BELIEVE, OUR SECOND OR THIRD MEETING WITH

10:17AM  13    THE COMPANY.

10:17AM  14    Q.   AND, IN FACT, IF YOU NOTE DOWN IN THE LAST LINE IN THE

10:17AM  15    EMAIL, IF WE CAN ZOOM BACK OUT AND JUST GET THE LAST PIECE, IT

10:17AM  16    SAYS, "OVERALL, I THINK EVERYTHING THEY SAID MAKES SENSE AND I

10:17AM  17    HAD NO PROBLEMS WITH THAT, AND I AM VERY MUCH IMPRESSED WITH

10:17AM  18    THEIR LEVEL OF PREPAREDNESS AND PLANNING."

10:17AM  19         DO YOU SEE THAT?

10:17AM  20    A.   I DO.

10:17AM  21    Q.   OKAY.  AND DO YOU RECALL, DID YOU SHARE THAT VIEW COMING

10:17AM  22    OUT OF THAT CALL WITH MR. BALWANI?

10:17AM  23    A.   I DON'T SPECIFICALLY REMEMBER ON THAT ONE ISSUE AFTER THAT

10:17AM  24    CALL WHAT MY PERSPECTIVE WAS.  BUT, I MEAN THEY HAD VERY GOOD

10:18AM  25    ANSWERS FOR ALL OF THE ISSUES THAT WE RAISED ON THE REGULATORY
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6632

10:18AM   1      STRATEGY.

10:18AM   2          AND THEY TALKED ABOUT THE INTERACTIONS THAT THEY WOULD

10:18AM   3      HAVE WITH PEOPLE LIKE KATHLEEN SEBELIUS AND OTHER IMPORTANT

10:18AM   4      PEOPLE ON THE REGULATORY SIDE, IN ADDITION TO THE BOARD MEMBERS

10:18AM   5      THEY HAD THAT HAD EXTENSIVE GOVERNMENT EXPERIENCE.

10:18AM   6          SO THEY WERE VERY CONFIDENT THAT THEY HAD A SOUND

10:18AM   7      REGULATORY STRATEGY GOING FORWARD.

10:18AM   8          BUT, AGAIN, FROM OUR PURPOSES, WE WERE FOCUSSED ON PHASE I

10:18AM   9      OF THE ROLLOUT, THE HUB AND SPOKE ROLLOUT OF THE TECHNOLOGY

10:18AM  10      INITIALLY IN THE PHOENIX MARKET.

10:18AM  11      Q.  BUT YOU NEVERTHELESS CONTINUED TO DO YOUR DUE DILIGENCE

10:18AM  12      PROCESS; CORRECT?

10:18AM  13      A.  YES.

10:18AM  14      Q.  AND LET'S LOOK AT EXHIBIT 7400, WHICH I BELIEVE THE

10:19AM  15      GOVERNMENT HAS STIPULATED TO.

10:19AM  16              MR. LEACH:  CORRECT, YOUR HONOR.

10:19AM  17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:19AM  18          (DEFENDANT'S EXHIBIT 7400 WAS RECEIVED IN EVIDENCE.)

10:19AM  19              MR. WADE:  IF WE CAN BRING THAT UP.

10:19AM  20      Q.  DOES THIS DOCUMENT RELATE TO THE RETENTION OF THAT

10:19AM  21      CONSULTANT WHO IS SPECIALIZED IN LAB DEVELOPED TESTS?

10:19AM  22      A.  I WANT TO BE -- THIS IS -- THIS APPEARS TO BE AN

10:19AM  23      INDIVIDUAL WHO IS AN INDUSTRY EXPERT, BUT I'M NOT SURE IT'S THE

10:19AM  24      SAME CONSULTANT -- ARE YOU REFERRING TO THE PREVIOUS EMAIL?

10:19AM  25      Q.  WELL, LET'S BLOW UP THE EMAIL AND SEE IF YOU RECALL THE

GROSSMAN CROSS BY MR. WADE (RES.)                              6633

10:19AM   1    RETENTION OF THIS PERSON TO DISCUSS THESE ISSUES.

10:20AM   2         IN PARTICULAR, IF YOU LOOK AT THE SCREENING QUESTIONS

10:20AM   3    RELATING TO HIS RETENTION, IT SAYS, "ARE YOU FAMILIAR WITH AND

10:20AM   4    ABLE TO DISCUSS THE REQUIREMENTS THAT ARE NEEDED FOR

10:20AM   5    LABORATORY-DEVELOPED TESTS TO BE CLIA CERTIFIED?  PLEASE

10:20AM   6    BRIEFLY ELABORATE."

10:20AM   7         HE WRITES, "I WROTE THE CLIA MANUAL FOR USERS OF IVD TESTS

10:20AM   8    AND QUITE FAMILIAR WITH ITS REGULATIONS."

10:20AM   9         DO YOU SEE THAT?

10:20AM   10   A.   YES, I DO.

10:20AM   11   Q.   AND HE INDICATES HIS EXPERIENCE IN GUIDING CLIENTS THROUGH

10:20AM   12   THE PROCESS?

10:20AM   13   A.   YES.

10:20AM   14   Q.   OKAY.  AND DO YOU RECALL GETTING REPORTS FROM YOUR TEAM ON

10:20AM   15   THIS?

10:20AM   16   A.   WELL, I BELIEVE I ACTUALLY SPOKE TO THE INDIVIDUAL.

10:20AM   17   Q.   SO YOU HAD A CALL IN WHICH YOU WERE ABLE TO ASK QUESTIONS

10:20AM   18   AND GET ADDITIONAL INFORMATION?

10:20AM   19   A.   YES.

10:20AM   20   Q.   ON THE REGULATORY ENVIRONMENT?

10:20AM   21   A.   THE STANDARD TYPE OF THINGS WE WOULD DO FOR AN INVESTMENT,

10:20AM   22   YES.

10:20AM   23   Q.   FAIR ENOUGH.

10:20AM   24        IN THE -- DO YOU RECALL THAT YOU ACTUALLY ALSO SOUGHT OUT

10:21AM   25   A DOCTOR WHO HAD REFERRED PATIENTS TO A THERANOS WELLNESS

GROSSMAN CROSS BY MR. WADE (RES.)                                    6634

10:21AM   1    CENTER TO GET INFORMATION FROM THE DOCTOR ON THE EXPERIENCE

10:21AM   2    THAT THE DOCTOR HAD?

10:21AM   3    A.   AS PART OF OUR DUE DILIGENCE, I BELIEVE WE TRIED TO FIND

10:21AM   4    PHYSICIANS THAT WERE INTERESTED IN USING THE SERVICE OR HAD

10:21AM   5    USED IT.  SO, YES, THAT WOULD BE VERY CONSISTENT WITH HOW WE

10:21AM   6    APPROACHED OUR DUE DILIGENCE PROCESS.

10:21AM   7    Q.   AND IF YOU CAN JUST TAKE A LOOK -- DO YOU RECALL ACTUALLY

10:21AM   8    DOING THAT IN THIS PROCESS?

10:21AM   9    A.   I DO RECALL THAT, YES.

10:21AM  10    Q.   OKAY.  THAT, THAT THROUGH A FIRM YOU WERE ABLE TO LOCATE A

10:21AM  11    DOCTOR WHO YOU COULD TALK TO ABOUT THE EXPERIENCE HE HAD WITH

10:21AM  12    THERANOS?

10:21AM  13    A.   I BELIEVE, YEAH, I BELIEVE THAT -- MY MEMORY IS THAT THERE

10:21AM  14    WERE -- I WASN'T THE ONLY ONE THAT DID THAT.  THAT WE HAD --

10:21AM  15    SO, YES.  AGAIN, THAT'S KIND OF STANDARD OPERATING PROCEDURE

10:21AM  16    FOR WHAT WE WOULD DO IN AN INVESTMENT LIKE THIS.

10:22AM  17         WE WOULD WANT TO SPEAK TO REGULATORY CONSULTANTS, WE WOULD

10:22AM  18    WANT TO SPEAK TO PHYSICIANS, WE WOULD WANT TO UNDERSTAND THE

10:22AM  19    BUSINESS STRATEGY.

10:22AM  20         AND SO, YES, WE DID SPEAK TO PHYSICIANS.

10:22AM  21    Q.   AND DO YOU RECALL SPECIFIC CONVERSATIONS THAT YOU HAD WITH

10:22AM  22    PHYSICIANS ABOUT THERANOS?

10:22AM  23    A.   GENERAL MEMORY.

10:22AM  24    Q.   AND WHAT DO YOU RECALL LEARNING FROM THAT PROCESS?

10:22AM  25    A.   IF THE TECHNOLOGY --

GROSSMAN CROSS BY MR. WADE (RES.)                        6635

10:22AM   1            MR. LEACH:  YOUR HONOR --

10:22AM   2            THE WITNESS:  -- WAS --

10:22AM   3            THE COURT:  EXCUSE ME, MR. GROSSMAN.  PARDON ME.

10:22AM   4            MR. LEACH:  I WANT TO RAISE A HEARSAY ISSUE.  I

10:22AM   5    DON'T MIND THIS COMING IN FOR STATE OF MIND OF THE WITNESS, BUT

10:22AM   6    I DON'T THINK IT SHOULD BE OFFERED FOR THE TRUTH.

10:22AM   7            MR. WADE:  STATE OF MIND IS FINE, YOUR HONOR.

10:22AM   8    THAT'S WHAT IT'S BEING SOUGHT FOR.

10:22AM   9            THE COURT:  LADIES AND GENTLEMEN, I'LL LET

10:22AM  10    MR. GROSSMAN FINISH HIS ANSWER, AND WHAT HE SPEAKS TO IS NOT

10:22AM  11    OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

10:22AM  12        AGAIN, IT'S OFFERED FOR THE STATE OF MIND OF THIS WITNESS?

10:22AM  13            MR. WADE:  YES.

10:22AM  14            THE COURT:  ALL RIGHT.  IT RELATES TO THE STATE OF

10:22AM  15    MIND OF THIS WITNESS ONLY.  NOT FOR THE TRUTH.

10:23AM  16        SO I'M SORRY TO INTERRUPT YOU, MR. GROSSMAN.

10:23AM  17        YOU CAN FINISH.

10:23AM  18            THE WITNESS:  I'M SORRY, I INTERRUPTED YOU.

10:23AM  19        SO MY GENERAL MEMORY OF THOSE PHYSICIAN INTERACTIONS, IF

10:23AM  20    THE TECHNOLOGY WAS ABLE TO DO WHAT THE COMPANY TOLD US IT COULD

10:23AM  21    DO, IF IT COULD MATCH THE FULL MENU OF LABCORP AND QUEST TESTS,

10:23AM  22    YOU KNOW, IF THEY COULD, WITH A VENOUS PUNCTURE, TAKE

10:23AM  23    DRAMATICALLY LESS VOLUME, IF THEY COULD GET THE ANSWERS BACK IN

10:23AM  24    FOUR HOURS, IF A PATIENT COULD KEEP TRACK OF THEIR DATA OVER

10:23AM  25    TIME ON AN APP, IF THEY COULD SEE THE PHYSICIAN THE SAME DAY

GROSSMAN CROSS BY MR. WADE (RES.)                                6636

10:23AM   1    THAT THEY GOT THEIR LAB WORK, ALL OF THOSE WERE VERY ATTRACTIVE

10:23AM   2    FEATURES TO THE PHYSICIANS THAT WE SPOKE TO AND THEY WOULD BE

10:23AM   3    INTERESTED IN USING A SERVICE LIKE THIS.

10:23AM   4        THAT WAS THE GENERAL MEMORY OF THOSE CONVERSATIONS.

10:24AM   5    BY MR. WADE:

10:24AM   6    Q.   AND DO YOU RECALL ACTUALLY SPEAKING WITH PHYSICIANS WHO

10:24AM   7    HAD ACTUALLY USED THE SERVICE OR HAD PATIENTS WHO USED THE

10:24AM   8    SERVICE?

10:24AM   9    A.   I BELIEVE WE DID SPEAK TO PHYSICIANS WHO HAD EITHER USED

10:24AM  10    IT OR HAD REFERRED PATIENTS TO IT.

10:24AM  11    Q.   AND WHAT DID, DID YOU LEARN AS A RESULT OF THOSE SPECIFIC

10:24AM  12    CONVERSATIONS WITH RESPECT TO THE PHYSICIANS WHO HAD USED THE

10:24AM  13    SERVICE?

10:24AM  14    A.   I, I DON'T RECALL SPECIFICALLY WHAT THOSE PHYSICIANS SAID.

10:24AM  15        AGAIN, I WASN'T THE ONLY ONE HAVING THOSE CONVERSATIONS,

10:24AM  16    DOING THAT TYPE OF DUE DILIGENCE.

10:24AM  17    Q.   OKAY.  I UNDERSTAND YOU DON'T RECALL SPECIFICALLY.

10:24AM  18        DO YOU RECALL GENERALLY WHETHER IT WAS POSITIVE OR

10:24AM  19    NEGATIVE?

10:24AM  20    A.   THE CONCEPTS, THE REACTION TO THE CONCEPT WAS WHAT WAS

10:24AM  21    POSITIVE.

10:24AM  22    Q.   RIGHT.  I WAS TRYING TO ASK A SLIGHTLY MORE SPECIFIC

10:24AM  23    QUESTION.

10:24AM  24        DO YOU RECALL WHETHER YOU LEARNED FROM THE PHYSICIANS WHO

10:24AM  25    HAD ACTUALLY USED THE SERVICE THAT THEY HAD A POSITIVE

GROSSMAN CROSS BY MR. WADE (RES.)                                    6637

10:24AM   1     EXPERIENCE?

10:24AM   2     A.   I DON'T, I DON'T RECALL SPECIFICALLY.

10:24AM   3     Q.   OKAY.  AND IF I CAN DRAW YOUR ATTENTION TO 14 -- I'M

10:25AM   4     SORRY, 7403, WHICH I BELIEVE IS IN VOLUME 1.

10:25AM   5     A.   OKAY.

10:25AM   6     Q.   OKAY.  AND DO YOU RECALL YESTERDAY WE TALKED ABOUT THE

10:25AM   7     SLIDE DECK OF DATA AND OTHER ITEMS THAT YOU WERE SENT BY

10:25AM   8     THERANOS; RIGHT?

10:25AM   9     A.   YES.

10:25AM   10    Q.   AND ONE OF THE REASONS THAT WAS SENT WAS BECAUSE

10:25AM   11    DR. RABODZEY WANTED TO REVIEW THE TECHNICAL DATA MORE CLOSELY;

10:25AM   12    CORRECT?

10:25AM   13    A.   WELL, WE WANTED HIM TO REVIEW THE TECHNICAL DATA.

10:25AM   14    Q.   FAIR ENOUGH.  I FORGOT THAT.

10:25AM   15         AND DOES THIS EMAIL RELATE TO HIS REVIEW OF THAT DATA?

10:25AM   16    A.   IF I COULD JUST HAVE A MINUTE TO REVIEW IT?

10:26AM   17    Q.   SURE.

10:26AM   18         (PAUSE IN PROCEEDINGS.)

10:26AM   19             THE WITNESS:  OKAY.

10:26AM   20    BY MR. WADE:

10:26AM   21    Q.   AND DO YOU RECALL THAT THIS EMAIL IS A REPORT FROM HIM ON

10:26AM   22    HIS REVIEW OF THAT DATA AND RELATED ANALYSIS?

10:26AM   23    A.   YES.

10:26AM   24             MR. WADE:  I MOVE THE ADMISSION OF 7403.

10:26AM   25             MR. LEACH:  NO OBJECTION, YOUR HONOR.

GROSSMAN CROSS BY MR. WADE (RES.)                    6638

| | | |
|---|---|---|
| 10:26AM | 1 | THE COURT:  THIS IS THE MULTIPAGE -- IS THE EMAIL |
| 10:26AM | 2 | WITH THE ATTACHMENT? |
| 10:26AM | 3 | MR. WADE:  CORRECT. |
| 10:26AM | 4 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:26AM | 5 | (DEFENDANT'S EXHIBIT 7403 WAS RECEIVED IN EVIDENCE.) |
| 10:26AM | 6 | MR. WADE:  AND IF WE CAN JUST BLOW THIS UP. |
| 10:27AM | 7 | Q.   DR. RABODZEY HERE IS PROVIDING A REPORT. |
| 10:27AM | 8 | HE NOTES -- THIS IS JANUARY 24TH, 2014; CORRECT? |
| 10:27AM | 9 | A.   JANUARY 24TH, YES. |
| 10:27AM | 10 | Q.   AND HE NOTES, "HERE ARE THE REFERENCE DOCUMENTS FOR OUR |
| 10:27AM | 11 | DISCUSSION TODAY." |
| 10:27AM | 12 | AND IT WAS A LONG TIME AGO.  DO YOU RECALL A DISCUSSION ON |
| 10:27AM | 13 | THE TOPICS IN THIS EMAIL? |
| 10:27AM | 14 | A.   I DON'T SPECIFICALLY RECALL THE DISCUSSION, NO. |
| 10:27AM | 15 | Q.   OKAY.  BUT DO YOU RECALL LEARNING -- DR. RABODZEY -- DO |
| 10:27AM | 16 | YOU RECALL LEARNING THAT HE DID SOME ANALYSIS WHERE HE WAS |
| 10:27AM | 17 | COMPARING SOME OF THE THERANOS DATA TO OTHER DATA FOR SIMILAR |
| 10:27AM | 18 | TESTS? |
| 10:27AM | 19 | A.   I, I'M NOT -- I DON'T REMEMBER SPECIFICALLY WHAT HE -- |
| 10:27AM | 20 | WHAT ANALYSES HE DID. |
| 10:27AM | 21 | Q.   OKAY.  WE'LL JUST WALK THROUGH IT AND TAKE A LOOK. |
| 10:27AM | 22 | HE -- IF YOU LOOK AT LINE 2, YOU SEE THAT HE MENTIONS A |
| 10:28AM | 23 | PARVOVIRUS IG ASSAY WITH 4 PERCENT CV. |
| 10:28AM | 24 | DO YOU SEE THAT? |
| 10:28AM | 25 | A.   I DO SEE THAT, YES. |

GROSSMAN CROSS BY MR. WADE (RES.)                                      6639

10:28AM  1    Q.   AND, IN FACT, I THINK HE ATTACHED THE VALIDATION REPORT

10:28AM  2    FOR THAT ASSAY.

10:28AM  3         DO YOU RECALL THAT?

10:28AM  4    A.   I DON'T RECALL THAT, BUT IT SAYS SEE PAGE 143.

10:28AM  5    Q.   OKAY.  AND HE COMPARES THE CV TO THE THERANOS ASSAY AT 15

10:28AM  6    TO 20 PERCENT.

10:28AM  7         DO YOU SEE THAT?

10:28AM  8    A.   I DO.

10:28AM  9    Q.   AND HE SAYS THAT'S PAGE 143 OF THEIR PRESENTATION?

10:28AM  10   A.   YES, I SEE THAT.

10:28AM  11   Q.   AND YOU UNDERSTOOD THAT WAS THAT SLIDE DECK THAT

10:28AM  12   MR. LEACH, PART OF THE SLIDE DECK THAT MR. LEACH SHOWED YOU

10:29AM  13   YESTERDAY?

10:29AM  14   A.   YES.

10:29AM  15   Q.   AND HE THEN ALSO COMPARES, IN ITEM 3, THE R SQUARED FOR

10:29AM  16   SOME COMMONLY USED TESTS.

10:29AM  17        AND HE NOTES THAT MOST OF THEM ARE GREATER THAN

10:29AM  18   95 PERCENT, BUT THERANOS IS SOMETIMES UNDER 95 PERCENT.

10:29AM  19        DO YOU SEE THAT?

10:29AM  20   A.   YES.

10:29AM  21   Q.   AND, AGAIN, THAT WAS JUST BASED UPON HIS ABILITY TO REVIEW

10:29AM  22   THE DATA PROVIDED BY THERANOS; RIGHT?

10:29AM  23   A.   YES.

10:29AM  24   Q.   AND HE SAYS THERE, "BASICALLY, MY CONCERN IS THAT THEIR

10:29AM  25   METHODOLOGY IS STILL RAW."

GROSSMAN CROSS BY MR. WADE (RES.)                                    6640

10:29AM   1          DO YOU SEE THAT?

10:29AM   2     A.   YES.

10:29AM   3     Q.   AND THAT, "THEY MAY BE PUSHING THE LIMITS HERE."

10:29AM   4          DO YOU SEE THAT?

10:29AM   5     A.   I DO.

10:29AM   6     Q.   AND HE SAYS, "I DO NOT THINK IT'S A DEAL BREAKER AS LONG

10:29AM   7     AS THEY CAN GET CLIA AND FDA APPROVAL ON THEIR TESTS AND CAN

10:29AM   8     MAINTAIN CERTIFICATION IN THE FUTURE."

10:30AM   9          DO YOU SEE THAT?

10:30AM  10     A.   I DO SEE THAT.

10:30AM  11     Q.   AND SO IF YOU LOOK DOWN BELOW, HE ALSO NOTES THERE IS A

10:30AM  12     GOOD EXAMPLE OF WHAT HE IS REFERRING TO ON PAGE 137 OF THEIR

10:30AM  13     ASSAY.

10:30AM  14          DO YOU SEE THAT?

10:30AM  15          AND HE COMPARES THE R SQUARED AT .91 TO OTHER R SQUARES

10:30AM  16     THAT ARE AT .992.

10:30AM  17          DO YOU SEE THAT?

10:30AM  18     A.   YES.

10:30AM  19     Q.   AND YOU UNDERSTAND THAT CLOSER TO 1, THE HIGHER NUMBER WAS

10:30AM  20     BETTER THAN THE LOWER NUMBER; IS THAT RIGHT?  THE .992 IS THE

10:30AM  21     BETTER NUMBER; RIGHT?

10:30AM  22     A.   I'M NOT EXACTLY SURE WHAT TEST THAT IS REFERRING TO, BUT

10:30AM  23     THERE ARE NO HARD AND FAST RULES WHEN IT COMES TO THESE TYPES

10:30AM  24     OF TESTS AND GETTING CLIA CERTIFICATION.

10:30AM  25          SO IN GENERAL, A HIGHER NUMBER IS BETTER, BUT EACH TEST IS

GROSSMAN CROSS BY MR. WADE (RES.)                                    6641

10:30AM   1    DIFFERENT.

10:30AM   2    Q.   RIGHT.  AND YOU UNDERSTOOD AT THE TIME THAT DR. RABODZEY

10:31AM   3    IS SORT OF DOING HIS JOB TO USE --

10:31AM   4    A.   YEP.

10:31AM   5    Q.   -- YOUR TERMS; RIGHT?

10:31AM   6         AND HE WENT INTO THAT DATA; CORRECT?

10:31AM   7    A.   YES.

10:31AM   8    Q.   AND HE COMPARED IT TO OTHER DATA AND EXPRESSED SOME

10:31AM   9    CONCERN THAT THE METHODOLOGY MAY STILL BE RAW AND THEY MAY BE

10:31AM  10    TESTING THEIR LIMITS A LITTLE BIT.

10:31AM  11         DO YOU SEE THAT?

10:31AM  12    A.   I DO SEE THAT, YES.

10:31AM  13    Q.   AND YOU KNEW THAT IN ADVANCE OF MAKING THE INVESTMENT

10:31AM  14    DECISION; CORRECT?

10:31AM  15    A.   AT THIS POINT IN TIME ON JANUARY 24TH, THAT WAS HIS -- HE

10:31AM  16    WAS DOING EXACTLY WHAT WE ASKED HIM TO DO, WHICH WAS ANALYZE

10:31AM  17    THE DATA WITH A SKEPTICAL POINT OF VIEW AND REPORT BACK HIS

10:31AM  18    CONCLUSIONS.

10:31AM  19         AND AS HE SAID, IT'S NOT A DEAL BREAKER.

10:31AM  20         THE COMPANY HAD ALREADY TOLD US THAT THEY HAD CLIA

10:31AM  21    CERTIFICATION FOR ALL OF THEIR TESTS AND THEY HAD BEEN ABLE TO

10:31AM  22    REPEATEDLY MEET THOSE FOR PROFICIENCY TESTING IN THEIR CLIA

10:32AM  23    LAB.

10:32AM  24         AND SO THEY WERE VERY COMFORTABLE THAT IF THERE WERE ONE

10:32AM  25    OR TWO TESTS THAT LOOKED LIKE THEY HAD A LOW R SQUARED, THAT

GROSSMAN CROSS BY MR. WADE (RES.)                              6642

10:32AM 1    WAS PERFECTLY ACCEPTABLE WITHIN THE RULES FOR HOW THESE TYPES

10:32AM 2    OF TESTS WORK.

10:32AM 3        THERE WAS NO HARD RULE THAT YOU HAD TO BE A CERTAIN

10:32AM 4    NUMBER.

10:32AM 5        AND IT'S ACTUALLY JUST MATH.  YOU'RE DIVIDING THE VARIANCE

10:32AM 6    OF THE STANDARD DEVIATION OF THESE TESTS BY THE MEAN.

10:32AM 7        SO IF YOU HAVE A SMALL REFERENCE RANGE, LET'S SAY A NORMAL

10:32AM 8    RANGE IS 10 TO 15, THAT'S GOING TO HAVE A LOW COEFFICIENT OF

10:32AM 9    VARIATION.

10:32AM 10       BUT IF THE RANGE IS 10 TO 10,000 AND PEOPLE HAVE VERY

10:32AM 11   DIFFERENT READINGS, YOU'RE GOING TO HAVE A MUCH HIGHER

10:32AM 12   COEFFICIENT OF VARIATION, AND THAT'S PERFECTLY ACCEPTABLE UNDER

10:32AM 13   THE RULES FOR PROFICIENCY TESTING.

10:32AM 14       SO THIS IS, THIS IS A GOOD EXAMPLE OF MR. RABODZEY DOING

10:32AM 15   HIS JOB.

10:32AM 16   Q.   RIGHT.  AND GATHERING THE INFORMATION SO THAT YOU COULD

10:32AM 17   MAKE A FULLY INFORMED DECISION; CORRECT?

10:32AM 18   A.   CORRECT.

10:32AM 19   Q.   AND ONE OF THE OTHER THINGS THAT YOU VETTED IN CONNECTION

10:33AM 20   WITH THIS PROCESS WAS THE PATIENT EXPERIENCE; CORRECT?

10:33AM 21   A.   THAT IS CORRECT.

10:33AM 22   Q.   AND AT DIFFERENT TIMES, DIFFERENT PEOPLE WENT AND HAD

10:33AM 23   THEIR TEST TAKEN AT WALGREENS; RIGHT?

10:33AM 24   A.   THAT'S CORRECT.

10:33AM 25   Q.   UNANNOUNCED; RIGHT?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6643

10:33AM  1    A.   I BELIEVE THEY WERE ALL UNANNOUNCED, YEAH.

10:33AM  2    Q.   YEAH.  LET'S LOOK AT 14001, WHICH WOULD BE IN VOLUME 2.

10:33AM  3    A.   OKAY.  I HAVE IT.

10:33AM  4    Q.   OKAY.  AND DO YOU RECOGNIZE THIS DOCUMENT TO BE A REPORT

10:33AM  5    ON DR. RABODZEY'S VISIT TO THE WALGREENS, THE THERANOS TESTING

10:34AM  6    CENTER AT THE WALGREENS LOCATION IN PALO ALTO?

10:34AM  7    A.   MR. WADE, IF I COULD HAVE A MINUTE TO REVIEW IT?

10:34AM  8    Q.   SURE.

10:34AM  9    A.   THANKS.

10:34AM  10        (PAUSE IN PROCEEDINGS.)

10:34AM  11            THE WITNESS:  OKAY.

10:35AM  12   BY MR. WADE:

10:35AM  13   Q.   DO YOU RECOGNIZE THIS TO BE AN EMAIL REPORT FROM

10:35AM  14   DR. RABODZEY ON HIS VISIT TO THE WALGREENS LOCATION?

10:35AM  15   A.   I DO.

10:35AM  16            MR. WADE:  I MOVE THE ADMISSION OF 14001.

10:35AM  17            MR. LEACH:  YOUR HONOR, 802, BUT I DON'T OBJECT TO

10:35AM  18   THIS COMING IN FOR STATE OF MIND CONSISTENT WITH THE OTHER

10:35AM  19   DOCUMENTS.

10:35AM  20            MR. WADE:  NO PROBLEM WITH THAT, YOUR HONOR.

10:35AM  21            THE COURT:  SO THIS SHOULD BE ENTERED THEN,

10:35AM  22   MR. WADE, NOT FOR THE TRUTH OF ANYTHING ASSERTED IN THIS EMAIL,

10:35AM  23   BUT ONLY AS TO THE STATE OF MIND OF THIS WITNESS?

10:35AM  24            MR. WADE:  YES.

10:35AM  25            THE COURT:  ALL RIGHT.  IT'S ADMITTED WITH THAT

GROSSMAN CROSS BY MR. WADE (RES.)                                    6644

10:35AM   1    LIMITATION.

10:35AM   2         LADIES AND GENTLEMEN, THIS IS NOT ADMITTED FOR THE TRUTH

10:35AM   3    OF THE MATTER OF ANYTHING ASSERTED IN THE EMAIL.  IT ONLY GOES

10:35AM   4    TO THE STATE OF MIND OF MR. GROSSMAN AS TO THIS ISSUE.

10:35AM   5         (DEFENDANT'S EXHIBIT 14001 WAS RECEIVED IN EVIDENCE.)

10:35AM   6         THE COURT:  AND BEFORE YOU BEGIN YOUR EXAMINATION,

10:35AM   7    WE'RE GOING TO HAVE TO BREAK.  I THINK I TOLD YOU WE'RE

10:35AM   8    BREAKING AT ABOUT 10:35, 10:40 THIS MORNING.  AND THIS WILL BE

10:36AM   9    ABOUT AN HOUR BREAK.

10:36AM  10         MR. WADE:  SHOULD WE DO THAT RIGHT NOW, YOUR HONOR?

10:36AM  11         THE COURT:  I THINK SO.  IF YOU'RE GOING TO GO

10:36AM  12    THROUGH THIS, I DON'T WANT TO BREAK UP YOUR QUESTIONS, NOR

10:36AM  13    MR. GROSSMAN'S ANSWERS IN THE NEXT THREE OR FOUR MINUTES.

10:36AM  14         MR. WADE:  NO PROBLEM, YOUR HONOR.  LET'S BREAK.

10:36AM  15         THE COURT:  SO LET'S BREAK NOW.

10:36AM  16         THE WITNESS:  OKAY.

10:36AM  17         THE COURT:  SO, LADIES AND GENTLEMEN, IT WILL

10:36AM  18    PROBABLY BE ABOUT AN HOUR.  THAT'S THE LENGTH OF THIS BREAK.

10:36AM  19         SO WE'LL SEE YOU ALL BACK IN ABOUT AN HOUR.

10:36AM  20         THANK YOU.

10:36AM  21         (JURY OUT AT 10:36 A.M.)

10:36AM  22         MR. WADE:  YOU CAN GO.

10:37AM  23         (RECESS FROM 10:37 A.M. UNTIL 11:53 A.M.)

11:54AM  24         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11:54AM  25         PLEASE BE SEATED.  WE'RE BACK ON THE RECORD.  ALL PARTIES

GROSSMAN CROSS BY MR. WADE (RES.)                                         6645

11:54AM   1      PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:54AM   2           OUR JURY IS PRESENT.  THANK YOU, LADIES AND GENTLEMEN, FOR

11:54AM   3      THE BREAK.

11:54AM   4           MR. WADE, IF YOU WOULD LIKE TO CONTINUE.

11:54AM   5              MR. WADE:  PLEASE, YOUR HONOR.

11:54AM   6      Q.   GOOD AFTERNOON, MR. GROSSMAN.

11:54AM   7      A.   GOOD AFTERNOON.

11:54AM   8      Q.   I'D LIKE TO TURN BACK TO EXHIBIT 14001, WHICH IS IN

11:54AM   9      EVIDENCE.  AND I BELIEVE YOU MAY RECALL BEFORE THE BREAK WE

11:54AM   10     WERE TALKING ABOUT DR. RABODZEY GIVING A REPORT ON THE PATIENT

11:54AM   11     EXPERIENCE HE HAD AT WALGREENS.

11:54AM   12          DO YOU RECALL THAT?

11:54AM   13     A.   YES, I DO.

11:54AM   14     Q.   OKAY.  AND I JUST WANT TO -- IF I CAN FOCUS INITIALLY JUST

11:54AM   15     ON THE TOP.

11:54AM   16          DO YOU RECALL THAT HE NOTED THAT IT TOOK ABOUT 31 MINUTES

11:54AM   17     FOR HIM TO DO THE TEST?

11:55AM   18          AND HE THEN GAVE A PRETTY DETAILED REPORT OF HIS

11:55AM   19     EXPERIENCE; RIGHT?

11:55AM   20     A.   THAT IS -- YES.

11:55AM   21     Q.   AND PART OF THE REASON THAT HE WAS GIVING A DETAILED

11:55AM   22     REPORT IS THAT YOU WANTED TO CONSIDER THIS INFORMATION IN

11:55AM   23     CONNECTION WITH YOUR INVESTMENT DECISION.

11:55AM   24          IS THAT FAIR?

11:55AM   25     A.   I THINK HE WAS GIVING US A DETAILED REPORT ON HIS

GROSSMAN CROSS BY MR. WADE (RES.)                          6646

11:55AM   1    EXPERIENCE.  IT WAS -- SO, YES.

11:55AM   2    Q.   OKAY.  AND IF YOU GO ABOUT HALFWAY DOWN, YOU SEE THAT HE

11:55AM   3    REPORTS ON THE MOST FREQUENT TEST THAT REQUIRES VENOUS DRAW IS

11:55AM   4    SODIUM, WHICH IS DONE PRE-SURGERY.

11:55AM   5         DO YOU SEE THAT?

11:55AM   6    A.   I DO.

11:55AM   7    Q.   AND DO YOU RECALL THAT ONE OF THE THINGS THAT DR. RABODZEY

11:55AM   8    TRIED TO DO IS JUST GET AS MUCH INFORMATION AS HE COULD ABOUT

11:55AM   9    THIS PROCESS AND CONVEY THAT TO THE TEAM?

11:55AM  10    A.   I'M SORRY.  COULD YOU ASK THE QUESTION AGAIN?

11:55AM  11    Q.   YEAH.

11:55AM  12         DO YOU RECALL THAT DR. RABODZEY AS HE WAS EMAILING --

11:56AM  13    INTERACTING WITH PEOPLE AT WALGREENS, WAS TRYING TO GET

11:56AM  14    WHATEVER INFORMATION ABOUT THE PROCESS HE COULD SO THAT HE

11:56AM  15    COULD RELAY THAT TO THE TEAM?

11:56AM  16    A.   I DON'T KNOW SPECIFICALLY WHAT HE DID WHILE HE WAS AT

11:56AM  17    WALGREENS OR WHO HE SPOKE TO, SO I --

11:56AM  18    Q.   YOU RECALL THIS REPORT ON THE VENOUS DRAWS COMING UP?

11:56AM  19    A.   I, I RECALL THIS.  NOW THAT I'M LOOKING AT THIS EMAIL, I

11:56AM  20    DO REMEMBER THAT HE WENT TO WALGREENS AND SENT AN EMAIL.

11:56AM  21    Q.   OKAY.

11:56AM  22    A.   YES.

11:56AM  23    Q.   AND I THINK WE TALKED YESTERDAY ABOUT VENOUS DRAWS.

11:56AM  24         DO YOU RECALL THAT?

11:56AM  25    A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                          6647

11:56AM  1   Q.   AND YOU WERE AWARE THAT THERANOS WAS DOING VENOUS DRAWS IN

11:56AM  2   THIS PERIOD; CORRECT?

11:56AM  3   A.   THEY WERE DOING VENOUS DRAWS, BUT THEY WERE STILL USING

11:56AM  4   THE PROPRIETARY TECHNOLOGY ON THOSE VENOUS DRAWS, YES, THAT'S

11:56AM  5   CORRECT.

11:56AM  6   Q.   THE -- AND HOW IS IT, SIR, THAT YOU KNOW THAT THEY WERE

11:57AM  7   DOING THE -- USING THE PROPRIETARY TECHNOLOGY?  I BELIEVE

11:57AM  8   YESTERDAY YOU TESTIFIED THAT YOU DIDN'T REMEMBER DISCUSSING

11:57AM  9   THAT WITH THERANOS.

11:57AM  10  A.   THAT IS NOT MY MEMORY OF WHAT QUESTION YOU ASKED ME, BUT

11:57AM  11  MS. HOLMES ACTUALLY TOLD ME THAT.

11:57AM  12  Q.   THAT'S WHAT SHE TOLD YOU?

11:57AM  13  A.   YES.

11:57AM  14  Q.   AND IN WHICH MEETING WAS THAT?

11:57AM  15  A.   IT WAS A MEETING IN I BELIEVE IT WAS 2000 -- IT MAY HAVE

11:57AM  16  BEEN 2015, 2016 WHEN SHE --

11:57AM  17  Q.   OKAY.  SO WE'RE LIMITING OUR DISCUSSION HERE TO THE

11:57AM  18  INVESTMENT PERIOD.  OKAY?

11:57AM  19  A.   OKAY.

11:57AM  20  Q.   AND YESTERDAY WE ASKED QUESTIONS ABOUT THE PERIOD DURING

11:57AM  21  THE INVESTMENT.

11:57AM  22       AND I BELIEVE YOUR TESTIMONY WAS THAT YOU DIDN'T RECALL

11:57AM  23  HAVING ANY DISCUSSIONS ABOUT WHAT TECHNOLOGY WAS USED FOR

11:57AM  24  VENOUS DRAWS.

11:57AM  25  A.   WELL, I THINK WHAT I, WHAT I, WHAT I TESTIFIED TO WAS THAT

GROSSMAN CROSS BY MR. WADE (RES.)                                6648

11:58AM  1    WHEN THEY DID A VENOUS DRAW, IT WAS ON THE WORLD'S SMALLEST

11:58AM  2    VENOUS DRAW, DRAMATICALLY LESS BLOOD, AND YOU WOULDN'T USE THAT

11:58AM  3    ON CONVENTIONAL LAB EQUIPMENT.

11:58AM  4         SO OUR ASSUMPTION ALL THROUGH THE DUE DILIGENCE PROCESS

11:58AM  5    WAS THAT EVEN WHEN THERE WAS A VENOUS DRAW, IT WAS STILL RUN ON

11:58AM  6    THERANOS PROPRIETARY ANALYZERS.

11:58AM  7    Q.   OKAY.  AND I JUST WANT TO MAKE CLEAR, THAT WAS AN

11:58AM  8    ASSUMPTION THAT YOU HAD IN THIS PROCESS, AND I BELIEVE YOUR

11:58AM  9    TESTIMONY YESTERDAY WAS THAT YOU DON'T RECALL HAVING A

11:58AM  10   DISCUSSION WITH THAT -- ABOUT THAT WITH THERANOS; IS THAT

11:58AM  11   CORRECT?

11:58AM  12   A.   I DON'T SPECIFICALLY RECALL THAT.  I DON'T SPECIFICALLY

11:58AM  13   RECALL THAT.  SO, YES, I DON'T SPECIFICALLY RECALL IN WHICH

11:58AM  14   MEETING OVER THE COURSE OF THIS DUE DILIGENCE PROCESS WE

11:58AM  15   ADDRESSED THAT SPECIFIC QUESTION.

11:58AM  16        BUT WE CERTAINLY ASKED MANY TIMES WHAT THE TECHNOLOGY

11:59AM  17   COULD DO, AND WHAT THE LIMITATIONS WERE.

11:59AM  18   Q.   RIGHT.  AND YOU UNDERSTOOD THE TECHNOLOGY PROCESSED

11:59AM  19   MICRO-SAMPLES; RIGHT?

11:59AM  20   A.   I UNDERSTOOD THE TECHNOLOGY SAMPLE TO BE WHAT?

11:59AM  21   Q.   THE TECHNOLOGY USED WAS A NANOTAINER; CORRECT?

11:59AM  22   A.   THAT WAS THE COLLECTION DEVICE THEY USED FOR DROPS OF

11:59AM  23   BLOOD, YES.

11:59AM  24   Q.   YEAH.  AND I BELIEVE YOUR TESTIMONY, BUT I WANT TO MAKE

11:59AM  25   SURE THAT I UNDERSTAND IT, YESTERDAY WAS YOU DON'T RECALL THE

GROSSMAN CROSS BY MR. WADE (RES.)                                    6649

| | | |
|---|---|---|
| 11:59AM | 1 | TYPE OF VENOUS DRAW YOU PERSONALLY RECEIVED WHEN YOU WENT TO |
| 11:59AM | 2 | WALGREENS IN PALO ALTO; IS THAT CORRECT? |
| 11:59AM | 3 | A.   THAT'S CORRECT, I DO NOT. |
| 11:59AM | 4 | Q.   I TAKE IT YOU DON'T RECALL IT BEING A VENOUS DRAW INTO A |
| 11:59AM | 5 | SMALL NANOTAINER; CORRECT? |
| 11:59AM | 6 | A.   I DON'T RECALL. |
| 11:59AM | 7 | Q.   DO YOU THINK THAT IS SOMETHING THAT YOU WOULD HAVE |
| 11:59AM | 8 | REMEMBERED? |
| 11:59AM | 9 | A.   I DON'T REMEMBER. |
| 11:59AM | 10 | Q.   OKAY. |
| 11:59AM | 11 | A.   I DON'T REMEMBER. |
| 11:59AM | 12 | Q.   IF YOU GO DOWN TO "OVERALL, I THINK THERE ARE QUITE A FEW |
| 12:00PM | 13 | THINGS THEY CAN IMPROVE AND THE PROCESS WAS NOT COMPLICATED." |
| 12:00PM | 14 | DO YOU SEE THAT? |
| 12:00PM | 15 | A.   I DO. |
| 12:00PM | 16 | Q.   AND DO YOU RECALL GENERALLY DR. RABODZEY'S REPORT THAT AT |
| 12:00PM | 17 | THIS POINT THE PATIENT EXPERIENCE WAS FAR FROM PERFECT? |
| 12:00PM | 18 | A.   AT -- I MEAN, I BELIEVE THIS WAS THE FIRST, THE FIRST PART |
| 12:00PM | 19 | OF THE DAY ON A WEEKEND.  YES, THAT'S -- THAT WAS -- IT TOOK |
| 12:00PM | 20 | 30-SOMETHING MINUTES. |
| 12:00PM | 21 | SO, YES, THAT WAS -- THERE WAS ROOM TO IMPROVE THE |
| 12:00PM | 22 | PROCESS. |
| 12:00PM | 23 | Q.   OKAY.  AND DO YOU RECALL THEN TAKING SOME OF THE QUESTIONS |
| 12:00PM | 24 | THAT YOU HAD ABOUT VENOUS DRAWS AND RELAYING THEM TO |
| 12:01PM | 25 | MR. BALWANI? |

GROSSMAN CROSS BY MR. WADE (RES.)                              6650

12:01PM   1    A.   MAYBE YOU COULD BE A LITTLE MORE SPECIFIC.

12:01PM   2    Q.   WHY DON'T WE TAKE A LOOK AT 1477, WHICH I BELIEVE IS IN

12:01PM   3    THE GOVERNMENT BINDER.

12:01PM   4    A.   OKAY.

12:01PM   5    Q.   AND DO YOU UNDERSTAND THIS TO BE AN INTERACTION THAT YOU

12:01PM   6    HAD WITH -- AN EMAIL THAT YOU HAD WITH MR. BALWANI IN LATE

12:01PM   7    JANUARY OF 2014 ON SOME OPEN DUE DILIGENCE ITEMS?

12:01PM   8    A.   I'M JUST GOING TO REVIEW IT FOR A SECOND.

12:02PM   9         OH, OKAY.

12:02PM  10    Q.   AND DO YOU RECALL THAT THIS WAS AN EMAIL WITH MR. BALWANI

12:02PM  11    IN LATE JANUARY 2014 WITH RESPECT TO SOME OPEN DUE DILIGENCE

12:02PM  12    ITEMS?

12:02PM  13    A.   I DO.

12:02PM  14              MR. WADE:  I MOVE THE ADMISSION OF 1477.

12:02PM  15              MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:02PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM  17         (GOVERNMENT'S EXHIBIT 1477 WAS RECEIVED IN EVIDENCE.)

12:02PM  18    BY MR. WADE:

12:02PM  19    Q.   AND I'D LIKE TO JUST CALL YOUR ATTENTION DOWN TO THE

12:02PM  20    BOTTOM PARAGRAPH THERE STARTING WITH "HOW DO THEY DEAL."

12:02PM  21         DO YOU SEE THAT?

12:02PM  22    A.   I DO.

12:02PM  23    Q.   AND IT NOTES -- YOU'RE POSING TO THE QUESTION TO HIM, "HOW

12:02PM  24    DO THEY DEAL WITH THE VENOUS DRAW ISSUE.  I HAD TESTS DONE

12:02PM  25    TODAY IN THE" -- IS THAT PALO ALTO WALGREENS?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6651

12:02PM   1      A.   YES.

12:02PM   2      Q.   OKAY.

12:03PM   3           -- "AND HAD TO GET A VENOUS DRAW."

12:03PM   4           YOU WEREN'T OFFERED A FINGERSTICK.  AND THEN YOU HAD SOME

12:03PM   5      QUESTIONS RELATING TO HOW THAT WOULD IMPACT WHETHER OR NOT A

12:03PM   6      PHLEBOTOMIST WAS NEEDED; CORRECT?

12:03PM   7      A.   YES.

12:03PM   8      Q.   AND DO YOU RECALL THAT YOU THEN HAD A CONVERSATION WITH

12:03PM   9      MR. BALWANI ABOUT THAT?

12:03PM  10      A.   YES.

12:03PM  11      Q.   AND DO YOU RECALL THAT MR. BALWANI TOLD YOU THAT FOR SOME

12:03PM  12      TESTS THEY WERE STILL USING VENOUS DRAWS; CORRECT?

12:03PM  13      A.   HE SAID THAT 1 PERCENT OF PATIENTS WOULD REQUIRE A VENOUS

12:03PM  14      DRAW, YES, AND IT WOULD BE SIX MONTHS BEFORE THEY WOULD ADDRESS

12:03PM  15      THAT.

12:03PM  16      Q.   WELL, ACTUALLY, YOU RECALL THE CONVERSATION SPECIFICALLY?

12:03PM  17      A.   YES.

12:03PM  18      Q.   OKAY.  LET ME TAKE THIS ONE STEP AT A TIME.

12:03PM  19           DO YOU RECALL, FIRST OF ALL, THAT HE SAID THAT THEY WERE

12:03PM  20      STILL DOING VENOUS DRAWS, OR THEY WERE USING VENOUS DRAWS AT

12:03PM  21      THE WALGREENS LOCATIONS; RIGHT?

12:03PM  22      A.   YES.

12:03PM  23      Q.   AND THERE WAS A QUESTION ABOUT HOW THAT WAS GOING TO WORK

12:03PM  24      GOING FORWARD; CORRECT?

12:04PM  25      A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                6652

12:04PM   1    Q.   AND HE TOLD YOU THAT IN -- HE TOLD YOU THAT THE GOAL WAS

12:04PM   2    WITHIN SIX MONTHS TO DRAMATICALLY REDUCE THE PERCENTAGE;

12:04PM   3    CORRECT?

12:04PM   4    A.   THAT'S CORRECT.

12:04PM   5    Q.   AND THAT THE GOAL WAS TO REDUCE IT TO 2 PERCENT VENOUS

12:04PM   6    DRAWS WITHIN SIX MONTHS; CORRECT?

12:04PM   7    A.   I BELIEVE HE SAID THAT THEY WERE AT 99 OR 98 PERCENT, AND

12:04PM   8    THEY HAD A PLAN WITHIN A FEW MONTHS TO GET TO 100 PERCENT.

12:04PM   9    Q.   WELL, ISN'T IT TRUE, SIR, THAT HE ACTUALLY SAID THAT

12:04PM   10   WITHIN SIX MONTHS THE GOAL WAS TO GET THE BLOOD DRAW UNDER

12:04PM   11   2 PERCENT?

12:04PM   12   A.   I MEAN, I DON'T REMEMBER SPECIFICALLY WHAT HE SAID.  MY

12:04PM   13   GENERAL MEMORY IS THAT THE NUMBER WAS 98 OR 99 PERCENT, AND HE

12:05PM   14   HAD A PLAN WITHIN A FEW MONTHS TO GET THAT NUMBER DOWN TO WHERE

12:05PM   15   1 OUT OF EVERY 100, OR LESS, OF PEOPLE THAT WOULD WALK INTO A

12:05PM   16   WALGREENS WOULD REQUIRE A VENOUS DRAW.

12:05PM   17   Q.   RIGHT.  BUT MY QUESTION IS A SPECIFIC ONE, AND IF YOU

12:05PM   18   DON'T RECALL, YOU DON'T RECALL.

12:05PM   19        BUT DO YOU REMEMBER HIM SAYING THAT IT WAS GOING TO TAKE

12:05PM   20   SIX MONTHS TO TRY TO GET THAT DOWN TO 2 PERCENT?

12:05PM   21   A.   WELL, I -- WE HAD MULTIPLE MEETINGS OVER THIS COURSE OF

12:05PM   22   THE DUE DILIGENCE.

12:05PM   23        SO I DON'T REMEMBER SPECIFICALLY WHAT MEETING YOU'RE

12:05PM   24   REFERRING TO, BUT I DO REMEMBER THAT THOSE NUMBERS I JUST --

12:05PM   25   THE ANSWER I JUST GAVE IS MY MEMORY OF HIS RESPONSE TO THIS

GROSSMAN CROSS BY MR. WADE (RES.)                6653

| | | |
|---|---|---|
| 12:05PM | 1 | PARTICULAR QUESTION. |
| 12:05PM | 2 | Q.   AND IF WE CAN GO NEXT TO 14073, WHICH I BELIEVE -- |
| 12:06PM | 3 | A.   THE GOVERNMENT ONE? |
| 12:06PM | 4 | Q.   I BELIEVE THE GOVERNMENT HAS STIPULATED TO THIS. |
| 12:06PM | 5 | MR. LEACH:  ONE MOMENT, YOUR HONOR. |
| 12:06PM | 6 | (PAUSE IN PROCEEDINGS.) |
| 12:06PM | 7 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:06PM | 8 | THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED. |
| 12:06PM | 9 | (DEFENDANT'S EXHIBIT 14073 WAS RECEIVED IN EVIDENCE.) |
| 12:06PM | 10 | MR. WADE:  ACTUALLY, IF WE CAN NOT PUBLISH IT FOR |
| 12:06PM | 11 | JUST A MOMENT.  LET ME ASK SOME QUESTIONS. |
| 12:06PM | 12 | Q.   DO YOU RECALL THAT IN CONNECTION WITH YOUR DUE DILIGENCE |
| 12:06PM | 13 | PROCESS THAT YOU ACTUALLY -- ONE OF THE THINGS YOU DID WAS THAT |
| 12:06PM | 14 | YOU INTERACTED WITH YOUR OWN PERSONAL DOCTOR ABOUT THE |
| 12:06PM | 15 | EXPERIENCE AND WHAT YOUR DOCTOR THOUGHT ABOUT THE EXPERIENCE? |
| 12:06PM | 16 | A.   I DID HAVE A, A FRIEND OF MINE WHO WAS A PHYSICIAN ORDER |
| 12:07PM | 17 | SOME TESTS FOR ME, YES. |
| 12:07PM | 18 | Q.   OKAY.  ARE YOU COMFORTABLE WITH US PUBLISHING THIS EMAIL, |
| 12:07PM | 19 | OR WOULD YOU PREFER THAT WE NOT? |
| 12:07PM | 20 | A.   I WOULD PREFER NOT. |
| 12:07PM | 21 | Q.   OKAY.  OKAY.  LET ME JUST ASK YOU SOME QUESTIONS ABOUT IT |
| 12:07PM | 22 | IN THAT CASE. |
| 12:07PM | 23 | DO YOU RECALL THAT -- YOU TALKED WITH THIS FRIEND WHO WAS |
| 12:07PM | 24 | A PHYSICIAN AFTER YOU GOT THE BLOOD TEST RESULTS BACK; IS THAT |
| 12:07PM | 25 | RIGHT? |

GROSSMAN CROSS BY MR. WADE (RES.)                          6654

12:07PM  1    A.   I DON'T REMEMBER SPECIFICALLY.

12:07PM  2    Q.   OKAY.  DO YOU RECALL YOUR BLOOD TESTS BEING GENERALLY

12:07PM  3    CONSISTENT WITH OTHER BLOOD TESTS YOU HAD PREVIOUSLY RECEIVED?

12:07PM  4    A.   I DON'T REMEMBER.

12:07PM  5    Q.   AND DO YOU RECALL WHETHER THE DOCTOR WHO YOU INTERACTED

12:07PM  6    WITH WAS GENERALLY FAVORABLE ABOUT THE THERANOS CONCEPT?

12:07PM  7    A.   I DON'T REMEMBER.

12:07PM  8    Q.   OKAY.  I WANT TO SWITCH TOPICS FOR A SECOND.

12:08PM  9         THE COURT:  LET ME JUST -- JUST BASED ON

12:08PM  10   MR. GROSSMAN'S WISHES, THIS HAS BEEN INTRODUCED BY STIPULATION,

12:08PM  11   BUT YOU'LL NEED TO REDACT THIS INFORMATION IN THE MIDDLE.

12:08PM  12        MR. WADE:  IT'S ACTUALLY ALL REDACTED, YOUR HONOR.

12:08PM  13     AND IF THE GOVERNMENT CONSENTS, GIVEN THE WITNESS'S

12:08PM  14   PREFERENCE, I'LL WITHDRAW IT FROM EVIDENCE AND -- JUST GIVEN

12:08PM  15   THE WITNESS'S PREFERENCE.

12:08PM  16        THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT?

12:08PM  17        MR. LEACH:  I DON'T OBJECT TO IT BEING WITHDRAWN,

12:08PM  18   YOUR HONOR.

12:08PM  19     I MAY HAVE QUESTIONS ON REDIRECT ABOUT SOME OF THE

12:08PM  20   SUBSTANCE, BUT I THINK WE CAN DO THAT WITHOUT PUBLISHING IT.

12:08PM  21        THE COURT:  ALL RIGHT.  THANK YOU.  THEN THIS

12:08PM  22   EXHIBIT 14073 IS WITHDRAWN WITH CONSENT OF THE PARTIES.

12:08PM  23     (DEFENDANT'S EXHIBIT 14073 WAS WITHDRAWN.)

12:08PM  24        MR. WADE:  THANK YOU, YOUR HONOR.

12:08PM  25   Q.   DO YOU RECALL YESTERDAY YOU TALKED A LITTLE BIT ABOUT

GROSSMAN CROSS BY MR. WADE (RES.)                           6655

12:08PM   1        DR. ROBERTSON?

12:08PM   2        A.   YES.

12:08PM   3        Q.   OR MAYBE PROFESSOR CHANNING ROBERTSON, JUST SO WE'RE ALL

12:09PM   4    ON THE SAME PAGE.

12:09PM   5             DO YOU RECALL THAT?

12:09PM   6        A.   YES, I DO.

12:09PM   7        Q.   AND DR. ROBERTSON, YOU UNDERSTOOD HE WAS ON THE FACULTY AT

12:09PM   8    STANFORD FOR MANY DECADES?

12:09PM   9        A.   I DID.

12:09PM  10        Q.   AND A PROFESSOR OF CHEMICAL ENGINEERING OVER THERE?

12:09PM  11        A.   YES.

12:09PM  12        Q.   AND THAT HE WAS GENERALLY, I THINK YOU SAID, A VERY

12:09PM  13    WELL-THOUGHT OF GUY WITHIN THE LOCAL SCIENTIFIC COMMUNITY?

12:09PM  14        A.   YES.

12:09PM  15        Q.   AND I DON'T WANT TO GO THROUGH -- YOU TESTIFIED YESTERDAY,

12:09PM  16    AND I DON'T WANT TO RE-PLOW THE SAME GROUND.  I JUST HAVE A

12:09PM  17    COUPLE OF SPECIFIC QUESTIONS.

12:09PM  18             DO YOU RECALL THAT WHEN YOU TALKED WITH HIM ABOUT

12:09PM  19    THERANOS, YOU ALSO ASKED HIM SOME QUESTIONS ABOUT MS. HOLMES

12:10PM  20    PERSONALLY?

12:10PM  21        A.   YES.

12:10PM  22        Q.   AND DO YOU RECALL HIM TELLING YOU THAT IN HIS OVER

12:10PM  23    50 YEARS AT STANFORD, HE NEVER ENCOUNTERED ANYTHING LIKE HER?

12:10PM  24        A.   I VAGUELY REMEMBER SOMETHING TO THAT EFFECT, YES.

12:10PM  25        Q.   AND THAT HE HAD A HIGH DEGREE OF CONFIDENCE IN HER AND THE

GROSSMAN CROSS BY MR. WADE (RES.)                            6656

| | | |
|---|---|---|
| 12:10PM | 1 | MANAGEMENT TEAM AT THERANOS? |
| 12:10PM | 2 | A.   YES. |
| 12:10PM | 3 | Q.   AND I THINK YOU TALKED ABOUT HIM IDENTIFYING PATIENT |
| 12:10PM | 4 | EXPERIENCE AS ONE OF THE RISKS THAT HE IDENTIFIED; RIGHT? |
| 12:10PM | 5 | A.   YES. |
| 12:10PM | 6 | Q.   AND HE ALSO SAW A POTENTIAL RISK WITH RESPECT TO SCALING; |
| 12:10PM | 7 | IS THAT RIGHT? |
| 12:10PM | 8 | A.   I BELIEVE THAT'S RIGHT, YES. |
| 12:10PM | 9 | Q.   AND THE PROFESSOR -- ONE OF THE WAYS YOU GOT TO KNOW |
| 12:10PM | 10 | PROFESSOR ROBERTSON WAS BECAUSE HE WAS ACTUALLY FRIENDLY WITH |
| 12:11PM | 11 | YOUR FATHER-IN-LAW; IS THAT RIGHT? |
| 12:11PM | 12 | A.   THEY WERE NEIGHBORS. |
| 12:11PM | 13 | Q.   NEIGHBORS IN HOUSE OR IN OFFICES AT STANFORD? |
| 12:11PM | 14 | A.   IN -- ON THEIR STREET. |
| 12:11PM | 15 | Q.   ON THEIR STREET.  OKAY. |
| 12:11PM | 16 | A.   YEAH. |
| 12:11PM | 17 | Q.   AND YOUR FATHER IS A -- YOUR FATHER-IN-LAW IS A VERY |
| 12:11PM | 18 | DISTINGUISHED PROFESSOR OF POLITICAL SCIENCE AND A FELLOW AT |
| 12:11PM | 19 | THE HOOVER INSTITUTE AT STANFORD; CORRECT? |
| 12:11PM | 20 | A.   HE USED TO BE. |
| 12:11PM | 21 | Q.   HE USED TO BE.  HE'S RETIRED? |
| 12:11PM | 22 | A.   UH-HUH. |
| 12:11PM | 23 | Q.   OKAY.  AND IF WE CAN GO TO EXHIBIT 7398. |
| 12:12PM | 24 | DO YOU RECALL THAT IT WAS -- IS THIS AN EMAIL WHERE YOUR |
| 12:12PM | 25 | FATHER-IN-LAW WAS PROVIDING INFORMATION AND HELPING FACILITATE |

GROSSMAN CROSS BY MR. WADE (RES.)                          6657

12:12PM    1      AN INTRODUCTION TO PROFESSOR ROBERTSON?

12:12PM    2      A.   YES, IT IS.

12:12PM    3      Q.   OKAY.

12:12PM    4           MOVE TO ADMIT 7398.

12:12PM    5               MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:12PM    6               THE COURT:  WHAT'S THE RELEVANCE OF THIS?

12:12PM    7               MR. WADE:  THE RELEVANCE IS THAT --

12:12PM    8               THE COURT:  HE JUST ANSWERED THE QUESTION THAT THERE

12:12PM    9      WAS THE INTRODUCTION.

12:12PM   10           AND WHY IS THIS NECESSARY?

12:12PM   11               MR. WADE:  I HAVE SOME SPECIFIC QUESTIONS ABOUT

12:12PM   12      INFORMATION THAT IS REFERRED TO IN THE EMAIL.

12:12PM   13           (PAUSE IN PROCEEDINGS.)

12:13PM   14               MR. WADE:  I CAN TRY TO ASK QUESTIONS WITHOUT

12:13PM   15      ADMITTING THE EMAIL IF THERE'S SOME CONCERN THE COURT

12:13PM   16      IDENTIFIES.

12:13PM   17      Q.   JUST SO WE'RE -- YOUR FATHER-IN-LAW ENDED UP INVESTING IN

12:13PM   18      THERANOS AS WELL; IS THAT CORRECT?

12:13PM   19      A.   YES, HE DID.

12:13PM   20      Q.   THROUGH PFM; RIGHT?

12:13PM   21      A.   THROUGH PFM, YES.

12:13PM   22               THE COURT:  IS THAT IT?

12:13PM   23               MR. WADE:  I MEAN, I THINK I'VE LAID THE --

12:13PM   24               THE COURT:  THERE'S A PHONE NUMBER HERE.  I ASSUME

12:13PM   25      YOU'RE GOING TO REDACT THAT.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6658

12:13PM  1              MR. WADE:  YES.

12:13PM  2              THE COURT:  ALL RIGHT.  WITH THAT REDACTION, IT'S

12:13PM  3      ADMITTED, AND IT MAY BE PUBLISHED.

12:13PM  4              MR. WADE:  THANK YOU, YOUR HONOR.

12:13PM  5         (DEFENDANT'S EXHIBIT 7398 WAS RECEIVED IN EVIDENCE.)

12:13PM  6      BY MR. WADE:

12:13PM  7      Q.   AND IN THIS EMAIL, YOU SEE WHERE YOUR FATHER-IN-LAW

12:13PM  8      MENTIONS THAT PROFESSOR ROBERTSON HEADED BIO X AT STANFORD?

12:14PM  9      A.   I DO SEE THAT, YES.

12:14PM 10      Q.   AND DO YOU KNOW WHAT BIO X WAS?

12:14PM 11      A.   I DON'T RECALL.

12:14PM 12      Q.   OKAY.  DID YOU RECALL WHETHER YOU DID ANY RESEARCH INTO

12:14PM 13      WHAT IT WAS?

12:14PM 14      A.   NO.

12:14PM 15      Q.   AND I THINK YOU HAD TESTIFIED THAT YOU HAD ACTUALLY

12:14PM 16      ENCOUNTERED PROFESSOR ROBERTSON WITH RESPECT TO SOME COMPANIES

12:14PM 17      SORT OF INDEPENDENTLY AS WELL, SOME COMPANIES THAT YOU HAD

12:14PM 18      WORKED WITH?

12:14PM 19      A.   WELL, I THINK WHAT I TESTIFIED WAS THAT HE HAD BEEN

12:14PM 20      INVOLVED IN HELPING TO START AND ADVISE COMPANIES IN THE HEALTH

12:14PM 21      CARE SECTOR, BIOTECHNOLOGY SECTOR FOR MANY YEARS.

12:14PM 22      Q.   OKAY.  AND THIS CONVERSATION -- DO YOU RECALL THAT THIS

12:14PM 23      CONVERSATION OCCURRED ABOUT A WEEK AFTER YOUR FATHER-IN-LAW

12:14PM 24      INTRODUCED YOU TO PROFESSOR ROBERTSON?

12:14PM 25      A.   I DON'T RECALL THE SPECIFIC DATE.

GROSSMAN CROSS BY MR. WADE (RES.)                                6659

| | | |
|---|---|---|
| 12:14PM | 1 | Q.   JUST TO REFRESH YOUR RECOLLECTION, IF YOU COULD TAKE A |
| 12:14PM | 2 | LOOK AT EXHIBIT 783, WHICH I THINK IS IN YOUR BINDER.  IT MIGHT |
| 12:15PM | 3 | BE IN THE GOVERNMENT BINDERS ACTUALLY. |
| 12:15PM | 4 | THE CLERK:  COUNSEL, EXHIBIT 783? |
| 12:15PM | 5 | MR. WADE:  783, WHICH IS NOT IN EVIDENCE. |
| 12:15PM | 6 | Q.   AND I REALLY JUST WANT YOU TO LOOK AT THE TOP HEADING OF |
| 12:15PM | 7 | THE PAGE. |
| 12:15PM | 8 | A.   OKAY.  I SEE 783, YES. |
| 12:15PM | 9 | Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOUR FIRST |
| 12:15PM | 10 | CONVERSATION WITH PROFESSOR ROBERTSON WAS ON JANUARY 25TH, |
| 12:15PM | 11 | 2013? |
| 12:15PM | 12 | A.   YES, IT DOES. |
| 12:15PM | 13 | Q.   OKAY.  AND YOU THINK IT WAS ON THAT DATE? |
| 12:15PM | 14 | A.   I MEAN, I -- I'M NOT ALWAYS GREAT AT REMEMBERING EXACTLY |
| 12:15PM | 15 | WHAT DATE IT IS, BUT IT PROBABLY IS PRETTY CLOSE. |
| 12:15PM | 16 | Q.   OKAY.  FAIR ENOUGH. |
| 12:15PM | 17 | AND YOU REPORTED OUT ON THIS CONVERSATION TO SOME OF THE |
| 12:16PM | 18 | MEMBERS OF YOUR TEAM. |
| 12:16PM | 19 | DO YOU RECALL THAT? |
| 12:16PM | 20 | A.   I DON'T RECALL, NO. |
| 12:16PM | 21 | Q.   OKAY.  I'D LIKE TO TURN YOUR ATTENTION TO 14072, WHICH I |
| 12:16PM | 22 | BELIEVE THE GOVERNMENT HAS STIPULATED TO. |
| 12:16PM | 23 | MR. LEACH:  THAT'S CORRECT, YOUR HONOR. |
| 12:16PM | 24 | (PAUSE IN PROCEEDINGS.) |
| 12:16PM | 25 | THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED. |

GROSSMAN CROSS BY MR. WADE (RES.)                          6660

12:16PM   1        (DEFENDANT'S EXHIBIT 14072 WAS RECEIVED IN EVIDENCE.)

12:16PM   2             THE WITNESS:  OKAY.

12:16PM   3    BY MR. WADE:

12:16PM   4    Q.   OKAY.  AND THIS IS AN EMAIL FROM YOU TO MR. JAMES ON THE

12:17PM   5    26TH OF JANUARY, 2014; CORRECT?

12:17PM   6    A.   YES.

12:17PM   7    Q.   AND THAT'S ABOUT TEN DAYS BEFORE THE INVESTMENT DECISION;

12:17PM   8    CORRECT?

12:17PM   9    A.   YES.

12:17PM  10    Q.   AND IN HERE YOU TALK ABOUT SOME SCHEDULING MATTERS

12:17PM  11    RELATING TO A PRESENTATION THAT WAS GOING TO BE GIVEN AT PFM

12:17PM  12    RELATING TO THERANOS; RIGHT?

12:17PM  13    A.   YES, THAT APPEARS TO BE THE CASE.

12:17PM  14    Q.   AND THEN I WANT TO JUST FOCUS ON THAT SECOND PARAGRAPH.

12:17PM  15    YOU NOTE, "VALUATION AND TERMS ASIDE, WHICH ARE OBVIOUSLY TOUGH

12:17PM  16    TO SWALLOW."

12:17PM  17        AND LET ME JUST PAUSE THERE FOR A SECOND.  YOU RECALL YOU

12:18PM  18    WERE HAVING SOME UNCERTAINTY AS TO WHETHER YOU WERE COMFORTABLE

12:18PM  19    PAYING THE AMOUNT THAT THERANOS WAS ASKING, THAT $17 A SHARE?

12:18PM  20    A.   UM, YES.

12:18PM  21    Q.   AND YOU WERE GOING THROUGH THE ANALYTICS TO SEE WHETHER IT

12:18PM  22    WAS WORTH THE INVESTMENT; IS THAT FAIR?

12:18PM  23    A.   YES.

12:18PM  24    Q.   OKAY.  AND THEN YOU SAY WHILE THAT'S TOUGH TO SWALLOW,

12:18PM  25    YOU'RE FEELING EVEN BETTER ABOUT THAT NOW.  "I HAD A MIND

GROSSMAN CROSS BY MR. WADE (RES.)                                    6661

12:18PM  1    BLOWING CALL YESTERDAY WITH ELIZABETH'S PROFESSOR WHO HELPED

12:18PM  2    HER START THIS.  WAS THE ORIGINAL BOARD MEMBER."

12:18PM  3        RIGHT?

12:18PM  4    A.   YES.

12:18PM  5    Q.   AND IS THAT A FAIR DESCRIPTION OF HOW YOU FELT ABOUT THE

12:18PM  6    CONVERSATION, IT WAS A MIND BLOWING CONVERSATION?

12:18PM  7    A.   IT WAS A POSITIVE CALL.

12:18PM  8    Q.   AND YOU THEN GO ON IN THIS EMAIL TO TALK ABOUT THE

12:18PM  9    RELEVANT COMP GROUP TO USE.

12:19PM  10       DO YOU SEE THAT?

12:19PM  11   A.   I DO SEE THAT.

12:19PM  12   Q.   AND WHAT DO YOU MEAN BY "THE RELEVANT COMP GROUP" IN THAT

12:19PM  13   EMAIL?

12:19PM  14   A.   WE'RE TRYING TO FIND OPEN ENDED, BEST OF BREED, DISRUPTIVE

12:19PM  15   COMPANIES AS A WAY TO THINK ABOUT HOW THE PUBLIC MARKET WILL

12:19PM  16   VALUE A COMPANY THAT HAS THIS TYPE OF TECHNOLOGY THAT IS THIS

12:19PM  17   OPEN ENDED THAT HAS REALLY A GLOBAL OPPORTUNITY.

12:19PM  18       AND SO THAT WAS THE, THAT WAS THE IDEA BEHIND THAT

12:19PM  19   STATEMENT.

12:19PM  20   Q.   OKAY.  AND YOU'RE INTERACTING WITH MR. JAMES, WHO WAS

12:19PM  21   ANOTHER SENIOR PRINCIPAL WITHIN PFM; CORRECT?

12:19PM  22   A.   YES.

12:19PM  23   Q.   AND IS IT FAIR TO SAY THAT YOU TWO WERE KIND OF THE SENIOR

12:19PM  24   PEOPLE AT PFM AT THIS TIME?

12:19PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                              6662

| | | |
|---|---|---|
| 12:19PM | 1 | Q.   AND YOU'RE TALKING ABOUT WHICH GROUP OF COMPARATOR |
| 12:19PM | 2 | COMPANIES TO USE HERE. |
| 12:20PM | 3 |     AND, AND THE -- THERE ARE THREE COMPANIES IDENTIFIED |
| 12:20PM | 4 | THERE. |
| 12:20PM | 5 |     AND ARE THOSE TICKER SYMBOLS? |
| 12:20PM | 6 | A.   THOSE ARE TICKER SYMBOLS, THAT'S RIGHT. |
| 12:20PM | 7 | Q.   AND COULD YOU TELL US WHICH COMPANIES THOSE ARE? |
| 12:20PM | 8 | A.   THE FIRST ONE IS GOOGLE; THE SECOND ONE IS FACEBOOK; AND |
| 12:20PM | 9 | THEN THE THIRD ONE, ILMN, IS A COMPANY CALLED ILLUMINA. |
| 12:20PM | 10 | Q.   OKAY.  AND THOSE WERE VERY SUCCESSFUL COMPANIES WITHIN |
| 12:20PM | 11 | SILICON VALLEY; IS THAT CORRECT? |
| 12:20PM | 12 | A.   THEY WERE OPEN ENDED, DISRUPTIVE, BEST OF BREED |
| 12:20PM | 13 | BUSINESSES. |
| 12:20PM | 14 | Q.   AND YOU HEARD THEM REFERRED TO AS UNICORNS? |
| 12:20PM | 15 | A.   I DON'T KNOW IF THEY WERE ALL REFERRED TO AS UNICORNS.  I |
| 12:20PM | 16 | DON'T THINK THEY WERE. |
| 12:20PM | 17 | Q.   AND PART OF THE REASON THAT YOU WERE LOOKING AT THIS IS IN |
| 12:20PM | 18 | CONNECTION WITH TRYING TO FIND THE APPROPRIATE VALUATION FOR |
| 12:20PM | 19 | THE COMPANY; IS THAT RIGHT? |
| 12:20PM | 20 | A.   NO. |
| 12:20PM | 21 | Q.   OKAY.  YOU'RE USING IT TO TRY TO MODEL OUT HOW THERANOS |
| 12:21PM | 22 | MIGHT COMPARE IN VALUE TO THESE SIMILAR COMPANIES? |
| 12:21PM | 23 | A.   WE'RE TRYING TO UNDERSTAND HOW PUBLIC MARKET INVESTORS, |
| 12:21PM | 24 | WHEN THEY HEAR THIS INCREDIBLE OPEN ENDED STORY, WHAT THE |
| 12:21PM | 25 | TECHNOLOGY COULD DO, THE GLOBAL NATURE OF IT, HOW MUCH BETTER |

GROSSMAN CROSS BY MR. WADE (RES.)                              6663

12:21PM  1    IT IS FROM A CONSUMER EXPERIENCE, WE WERE TRYING TO GET A SENSE

12:21PM  2    OF HOW OTHER INVESTORS WOULD REACT TO A REAL OPEN ENDED,

12:21PM  3    DISRUPTIVE BUSINESS LIKE THIS.

12:21PM  4    Q.   OKAY.  AND YOU -- AND AS PART OF THAT, YOU DID A FINANCIAL

12:21PM  5    ANALYSIS RELATING TO THE PERFORMANCE OF THOSE COMPANIES AND THE

12:21PM  6    VALUATION OF THOSE COMPANIES OVER TIME?

12:21PM  7    A.   I BELIEVE WE LOOKED AT THE REVENUES FROM THOSE BUSINESSES.

12:21PM  8    Q.   AND THAT WAS IN CONNECTION WITH SOME OF THE FINANCIAL

12:22PM  9    MODELING THAT YOU DID THAT YOU TALKED ABOUT YESTERDAY; IS THAT

12:22PM 10    RIGHT?

12:22PM 11    A.   THAT IS CORRECT.

12:22PM 12    Q.   AND THERE WAS -- YOU ALSO LOOKED AT THE INFORMATION THAT

12:22PM 13    THERANOS PROVIDED YOU WITH RESPECT TO ITS MODEL; RIGHT?

12:22PM 14    A.   YES.

12:22PM 15    Q.   AND THEY GAVE YOU THE ELECTRONIC FILE SO THAT YOU COULD

12:22PM 16    HAVE ALL OF THE DATA THAT WENT INTO THEIR MODEL; IS THAT RIGHT?

12:22PM 17    A.   THAT IS RIGHT.

12:22PM 18    Q.   AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THAT

12:22PM 19    YESTERDAY, BUT I'LL CONFESS THAT THE FONT WAS SO SMALL, I

12:22PM 20    COULDN'T, I COULDN'T SEE IT.

12:22PM 21        SO I'VE GOTTEN, WITH THE GOVERNMENT'S STIPULATION, THE

12:22PM 22    ELECTRONIC FILE AND I'LL PUT THE SPREADSHEET UP.  IT MIGHT BE A

12:22PM 23    LITTLE EASIER TO READ.

12:22PM 24        YOUR HONOR, WITH STIPULATION FROM THE GOVERNMENT, I WOULD

12:22PM 25    MOVE THE ADMISSION OF EXHIBIT 13720A.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6664

12:23PM   1                 MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:23PM   2                 THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:23PM   3            (DEFENDANT'S EXHIBIT 13720A WAS RECEIVED IN EVIDENCE.)

12:23PM   4      BY MR. WADE:

12:23PM   5      Q.   DO YOU RECOGNIZE THIS TO BE THE MODEL THAT WAS PROVIDED TO

12:23PM   6      YOU BY THERANOS?

12:23PM   7      A.   YES.

12:23PM   8      Q.   OKAY.  AND JUST SO WE'RE CLEAR, IN TERMS OF THE ITEMS THAT

12:23PM   9      I'VE JUST MENTIONED, THERE ARE -- YOU UNDERSTAND THAT THE MODEL

12:23PM  10      IS BASED UPON DIFFERENT ASSUMPTIONS; CORRECT?

12:23PM  11      A.   THE PROJECTIONS WERE BASED ON DIFFERENT ASSUMPTIONS.

12:23PM  12      Q.   RIGHT.  WHEN YOU'RE MODELING FUTURE PERFORMANCE, YOU'RE

12:23PM  13      DOING IT BASED UPON CERTAIN ASSUMPTIONS; RIGHT?

12:23PM  14      A.   YES.

12:23PM  15      Q.   AND THERANOS INCLUDED IN THE MODEL THAT THEY SENT YOU ALL

12:23PM  16      OF THE ASSUMPTIONS HERE WITH RESPECT TO WHAT WENT INTO THEIR

12:23PM  17      MODEL; CORRECT?

12:23PM  18      A.   THAT IS CORRECT.

12:24PM  19      Q.   AND SO THAT GAVE YOU THE ABILITY TO ASK QUESTIONS ABOUT

12:24PM  20      ANY OF THE ASSUMPTIONS IF YOU WEREN'T CLEAR ON WHY THEY WERE

12:24PM  21      USING PARTICULAR ASSUMPTIONS; RIGHT?

12:24PM  22      A.   THAT WOULD GIVE US THE ABILITY TO DO THAT, YES.

12:24PM  23      Q.   AND, IN FACT, YOU DID ASK THEM SOME QUESTIONS ABOUT THEIR

12:24PM  24      ASSUMPTIONS; RIGHT?

12:24PM  25      A.   WE DID ASK THE QUESTIONS, YES.

GROSSMAN CROSS BY MR. WADE (RES.)                        6665

12:24PM    1    Q.   AND THEY ALSO -- SOME OF THIS DATA YOU CONSIDERED IN

12:24PM    2    CONNECTION WITH PREPARATION OF YOUR OWN MODEL; IS THAT RIGHT?

12:24PM    3    A.   YES.

12:24PM    4    Q.   BUT YOU ALSO WENT OUT AND GOT SIGNIFICANT ADDITIONAL DATA

12:24PM    5    THAT YOU FACTORED INTO YOUR PROPRIETARY ANALYSIS; RIGHT?

12:24PM    6    A.   YES.

12:24PM    7    Q.   OKAY.  AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT, I

12:24PM    8    THINK IT WAS ON THIS SHEET HERE, RELATING TO THE MINILAB COSTS

12:24PM    9    OR THE MINILAB PRODUCTION COSTS.

12:25PM   10        MAYBE IT WAS -- DO YOU RECALL THAT?

12:25PM   11    A.   YES, I DO.

12:25PM   12    Q.   AND I JUST WANT TO ASK SOME OTHER -- SOME QUESTIONS

12:25PM   13    RELATED TO THAT.

12:25PM   14        DO YOU SEE I HAVE UP THE SUMMARY CASH FLOW STATEMENT TAB

12:25PM   15    OF THE SPREADSHEET?

12:25PM   16    A.   I DO, YES.

12:25PM   17    Q.   AND DO YOU SEE IT TALKS ABOUT DIFFERENT CAPITAL

12:25PM   18    EXPENDITURES?

12:25PM   19    A.   I DO.

12:25PM   20    Q.   AND DID YOU HAVE ANY DISCUSSION WITH MR. BALWANI ABOUT THE

12:25PM   21    LINES OF PRODUCTION CAPITAL EXPENDITURES?

12:25PM   22    A.   I BELIEVE WE TALKED ABOUT THAT, YES.

12:25PM   23    Q.   AND YOU HAD ACTUALLY -- I THINK YESTERDAY YOU SAID YOU

12:25PM   24    WENT AND LOOKED AT THEIR PRODUCTION FACILITY.

12:25PM   25        DO YOU RECALL THAT?

GROSSMAN CROSS BY MR. WADE (RES.)                            6666

12:25PM   1    A.   I DO RECALL SAYING THAT YESTERDAY.

12:25PM   2    Q.   AND THAT, AND THAT MR. BALWANI SAID THAT THEY ALREADY HAD

12:25PM   3    THE CAPABILITY TO PRODUCE A PRETTY HIGH VOLUME OF MINILABS

12:26PM   4    WITHIN THAT FACILITY?

12:26PM   5    A.   WELL, HE -- I BELIEVE WHAT HE TOLD US WAS THAT THERE WOULD

12:26PM   6    BE NO PROBLEM PRODUCING MINILABS TO MEET THE NEEDS OF BOTH THE

12:26PM   7    RETAIL ROLLOUT --

12:26PM   8    Q.   OKAY.

12:26PM   9    A.   -- AND THE HOSPITAL ROLLOUT.

12:26PM  10    Q.   OKAY.  AND DID YOU ASK HIM WHETHER THE LINES OF PRODUCTION

12:26PM  11    AND CAPITAL EXPENDITURE INCLUDED ANYTHING RELATING TO ANY

12:26PM  12    COMMERCIAL DEVICES?

12:26PM  13    A.   WE DID NOT.

12:26PM  14    Q.   AND SOMEWHAT RELATED TO THIS, IN ALL OF THAT DATA THAT

12:26PM  15    DR. RABODZEY WAS REVIEWING --

12:26PM  16    A.   THAT WOULD BE A SEPARATE ITEM ON A CAPITAL EXPENDITURE.

12:26PM  17    YOU WOULD NOT PUT OTHER PRODUCTION LINES.  YOU WOULD NOT PUT

12:26PM  18    THIRD PARTY EQUIPMENT IN THE LINES OF PRODUCTION.  THAT WOULD

12:26PM  19    BE -- UNDER ACCOUNTING PRINCIPLES, THAT WOULD BE A SEPARATE

12:26PM  20    LINE ITEM.

12:26PM  21        LINES OF PRODUCTION RELATE TO INCREASING THE MANUFACTURING

12:27PM  22    FACILITY THAT IS MAKING THE MINILABS.

12:27PM  23             THE COURT:  DOES THIS ASSIST YOUR PREVIOUS QUESTION?

12:27PM  24             MR. WADE:  THERE WAS NOT A PREVIOUS QUESTION FOR

12:27PM  25    THAT ANSWER, SO JUST MOVE TO STRIKE THAT ANSWER.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6667

12:27PM  1            THE COURT:  MY QUESTION WAS, DOES THIS ASSIST YOUR

12:27PM  2     PREVIOUS QUESTION?

12:27PM  3            MR. WADE:  IT DOESN'T.

12:27PM  4            THE COURT:  ALL RIGHT.  THANK YOU.

12:27PM  5            MR. LEACH:  I THINK IT'S RESPONSIVE, YOUR HONOR.  HE

12:27PM  6     SHOULD BE ALLOWED TO ANSWER.

12:27PM  7            THE COURT:  WELL, HE DID RESPOND TO THE PREVIOUS

12:27PM  8     QUESTION IN THE MIDDLE OF YOUR CURRENT QUESTION, AND I'LL ALLOW

12:27PM  9     IT TO REMAIN FOR EXPLANATION OF THE BOX.  YOU CAN RETURN TO IT

12:27PM 10     IF YOU WISH.

12:27PM 11         BUT LET'S FINISH WITH YOUR PREVIOUS QUESTION.

12:27PM 12            MR. WADE:  BEFORE I FORGET IT.

12:27PM 13     Q.   THAT DATA COMPARED THERANOS'S ASSAYS ON FINGERSTICK TO A

12:27PM 14     PREDICATE ASSAY.

12:27PM 15         DO YOU RECALL THAT?

12:27PM 16     A.   CAN YOU BE A LITTLE MORE SPECIFIC?

12:27PM 17     Q.   YEAH.  SORT OF THE CORE OF THE PURPOSE OF THE DATA THAT

12:27PM 18     THERANOS WAS PROVIDING YOU WAS TO SHOW HOW THE PERFORMANCE OF

12:28PM 19     ITS FINGERSTICK ASSAYS COMPARED TO THE PERFORMANCE OF

12:28PM 20     TRADITIONAL VENOUS ASSAYS?

12:28PM 21     A.   ARE WE TALKING ABOUT THE PRESENTATION THAT MR. -- THAT

12:28PM 22     DR. RABODZEY REVIEWED?

12:28PM 23     Q.   YEAH.

12:28PM 24     A.   OKAY.  YES, THAT'S MY GENERAL UNDERSTANDING.

12:28PM 25     Q.   YOU UNDERSTAND THAT THE BASIC PREMISE WAS ON AN

GROSSMAN CROSS BY MR. WADE (RES.)                                    6668

12:28PM   1    ASSAY-BY-ASSAY BASIS THAT WAS SHOWING YOU HOW THERANOS'S ASSAYS

12:28PM   2    PERFORM TO PREDICATE FDA APPROVED ASSAYS; RIGHT?

12:28PM   3    A.   I DON'T REMEMBER.  I DON'T REMEMBER SPECIFICALLY WHAT THAT

12:28PM   4    WAS MEASURING.

12:28PM   5    Q.   OKAY.  DID YOU KNOW IT WAS COMPARING FINGERSTICK ASSAYS TO

12:28PM   6    TRADITIONAL ASSAYS?

12:28PM   7    A.   WELL, I JUST -- DR. RABODZEY WAS THE ONE THAT REVIEWED

12:28PM   8    THAT DATA FOR US, SO I DON'T WANT TO SPEAK FOR HIM IN TERMS OF

12:28PM   9    WHAT HE WAS REVIEWING.

12:28PM   10       WE ASKED FOR DATA ON THE ACCURACY OF THEIR PROPRIETARY

12:28PM   11   TECHNOLOGY, AND THAT'S WHAT WE ASSUMED THEY GAVE US.

12:28PM   12   Q.   OKAY.  FAIR ENOUGH.

12:28PM   13       DO YOU SEE ON THE SUMMARY CASH FLOW STATEMENT TAB OF

12:29PM   14   EXHIBIT 13720A THIS BREAKS OUT DIFFERENT CASH FLOW FOR

12:29PM   15   DIFFERENT PERIODS.

12:29PM   16       DO YOU SEE THAT?

12:29PM   17   A.   I DO SEE THAT.

12:29PM   18   Q.   AND YOU SEE THERE'S NO CASH FLOW IDENTIFIED IN 2014 AND

12:29PM   19   '15 RELATING TO WALGREENS; CORRECT?

12:29PM   20   A.   THAT IS CORRECT.

12:29PM   21   Q.   AND I JUST WANT TO GO TO THE BALANCE SHEET TAB OF THE SAME

12:29PM   22   EXHIBIT.

12:29PM   23       DO YOU SEE THAT?

12:29PM   24   A.   I DO SEE THE BALANCE SHEET TAB, YES.

12:29PM   25   Q.   OKAY.  AND YOU'LL FORGIVE ME FOR ASKING SOME OF THESE

GROSSMAN CROSS BY MR. WADE (RES.)                                6669

12:29PM   1    QUESTIONS, BUT I JUST NEED TO MAKE SURE THE RECORD IS CLEAR.

12:29PM   2    A.   YEP, I SEE THAT.

12:29PM   3    Q.   OKAY.  AND DO YOU SEE THAT THERE'S DEFERRED REVENUE THERE

12:29PM   4    IN THE AMOUNT OF ABOUT $184 MILLION?

12:29PM   5    A.   I DO SEE THAT.

12:29PM   6    Q.   OKAY.  THE -- IF I CAN, I'D LIKE TO FLIP TO YOUR MODEL IN

12:30PM   7    A SECOND, BUT DO YOU SEE THAT THIS HAS MACRO -- THIS MODEL,

12:30PM   8    WHICH IS 13720A, HAS A MACRO ASSUMPTIONS TAB, A THERANOS MARKET

12:30PM   9    ASSUMPTIONS TAB, PRO FORMA INCOME STATEMENT TAB, SUMMARY CASH

12:30PM   10   FLOW STATEMENT TAB, AND A BALANCE SHEET TAB?

12:30PM   11   A.   I DO SEE THAT, YES.

12:30PM   12   Q.   OKAY.

12:30PM   13        YOUR HONOR, I'D LIKE TO MOVE THE ADMISSION OF 4093 WITH

12:30PM   14   STIPULATION FROM THE GOVERNMENT.

12:30PM   15            MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

12:30PM   16            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM   17        (GOVERNMENT'S EXHIBIT 4093 WAS RECEIVED IN EVIDENCE.)

12:31PM   18   BY MR. WADE:

12:31PM   19   Q.   AND DO YOU RECOGNIZE THIS SPREADSHEET TO BE THE PFM MODEL?

12:31PM   20   A.   IT LOOK LIKE A MODEL THAT WE WOULD -- A FORMAT OF A PFM

12:31PM   21   MODEL, YES.

12:31PM   22   Q.   OKAY.  AND YOU UNDERSTAND, THOUGH, JUST CALLING YOUR

12:31PM   23   ATTENTION TO THE TABS DOWN BELOW, YOU HAVE -- IF I SCROLL OVER

12:31PM   24   HERE, DO YOU SEE THOSE BLUE TABS THERE?  THOSE ARE, THOSE ARE

12:31PM   25   IMPORTED FROM THE THERANOS MODEL; CORRECT?

GROSSMAN CROSS BY MR. WADE (RES.)                              6670

12:31PM   1     A.   I BELIEVE THAT'S THE CASE, YES.

12:31PM   2     Q.   AND THEN THE ORANGE TABS HERE, WHICH INCLUDE HIGH GROWTH

12:31PM   3     COMPS, OUTPUTS, CHARTS, CENSUS DATA, AND CENSUS DATA (2), ARE

12:31PM   4     ADDITIONAL INPUTS THAT YOUR TEAM ADDED; IS THAT RIGHT?

12:32PM   5     A.   THAT IS RIGHT.

12:32PM   6     Q.   AND I'M NOT GOING TO GO THROUGH THESE IN DETAIL, BUT YOU

12:32PM   7     SEE THESE HAVE SPECIFIC DATA RELATING TO POPULATION IN

12:32PM   8     DIFFERENT METROPOLITAN MARKETS.

12:32PM   9          DO YOU SEE THAT?

12:32PM  10     A.   YES.

12:32PM  11     Q.   AND SOME INFORMATION RELATING TO MARKET SHARE.

12:32PM  12          DO YOU SEE THAT?

12:32PM  13     A.   YES.

12:32PM  14     Q.   AND SOME OUT -- SOME HIGH GROWTH COMPS.

12:32PM  15          DO YOU SEE THAT TAB COMPARED SOME OF THOSE COMPANIES THAT

12:32PM  16     WE WERE TALKING ABOUT PREVIOUSLY?

12:32PM  17     A.   YES.

12:32PM  18     Q.   AND IN ADDITION TO THOSE COMPANIES, THERE ARE A FEW OTHER

12:32PM  19     COMPARATIVE COMPANIES THAT WERE ADDED INTO THIS ANALYSIS;

12:32PM  20     CORRECT?

12:32PM  21     A.   YES.

12:32PM  22     Q.   AND CAN YOU IDENTIFY THE ADDITIONAL COMPANIES THAT WERE

12:33PM  23     ADDED TO THIS ANALYSIS?

12:33PM  24     A.   THIS INCLUDED INTUITIVE SURGICAL, SALESFORCE.COM, TESLA,

12:33PM  25     FACEBOOK, SPLUNK, TWITTER.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6671

12:33PM   1    Q.   OKAY.  AND THOSE WERE ALL VERY SUCCESSFUL SILICON VALLEY

12:33PM   2    BASED TECHNOLOGY COMPANIES AT THE TIME; IS THAT FAIR?

12:33PM   3    A.   THEY WERE OPEN ENDED, DISRUPTIVE PLATFORM COMPANIES THAT

12:33PM   4    HAD RECENTLY MOVED INTO THE PUBLIC MARKETS.

12:33PM   5    Q.   OKAY.  WHEN I GO OVER TO THE GREEN TABS HERE, THOSE WERE

12:33PM   6    ALSO TABS CREATED BY PFM; CORRECT?

12:33PM   7    A.   I CAN'T SEE THEM, BUT I BELIEVE SO.

12:33PM   8    Q.   OH, I'M SORRY.  CAN YOU SEE THESE DOWN HERE (INDICATING)?

12:33PM   9    A.   MAYBE YOU COULD CLICK.

12:34PM  10         MR. WADE:  MAY I APPROACH, YOUR HONOR?

12:34PM  11         THE COURT:  SURE.

12:34PM  12    BY MR. WADE:

12:34PM  13    Q.   (HANDING.)

12:34PM  14         ARE YOU ABLE TO READ THESE WHEN I HOLD THE MOUSE ON THEM?

12:34PM  15    A.   MAYBE IF YOU CLICK.

12:34PM  16    Q.   OKAY.

12:34PM  17    A.   THERE YOU GO.

12:34PM  18    Q.   THIS IS A PFM REVENUE MODEL-BOTTOMS UP.

12:34PM  19         DO YOU SEE THAT?

12:34PM  20    A.   YES.

12:34PM  21    Q.   AND DO YOU SEE UP AT THE TOP THERE, THERE'S A NOTE THAT

12:34PM  22    SAYS BEAR CASE, BASE CASE, AND BULL CASE?

12:34PM  23    A.   I DO.

12:34PM  24    Q.   AND YOU TALKED A LITTLE BIT ABOUT THIS IN YOUR DIRECT

12:34PM  25    TESTIMONY; CORRECT?

GROSSMAN CROSS BY MR. WADE (RES.)                              6672

12:34PM   1    A.   YES.

12:34PM   2    Q.   AND THESE ARE DIFFERENT SCENARIOS; RIGHT?

12:34PM   3    A.   YES.

12:34PM   4    Q.   AND THE BASE CASE IS CONSIDERED SORT OF THE MEDIAN

12:34PM   5    SCENARIO IN THE MODEL; IS THAT RIGHT?

12:34PM   6    A.   IT'S OUR KIND OF AVERAGE -- WHAT WE THINK IS MOST LIKELY

12:35PM   7    TO HAPPEN.

12:35PM   8    Q.   OKAY.  AND I'D LIKE TO GO TO THE VALUATION TAB.  THIS IS

12:35PM   9    A -- THIS IS AN ANALYSIS THAT YOUR TEAM DID; CORRECT?

12:35PM  10    A.   YES.

12:35PM  11    Q.   AND HERE YOU WERE PROJECTING REVENUES FOR THE COMPANY

12:35PM  12    WITHIN THE MODEL; RIGHT?

12:35PM  13    A.   YES.

12:35PM  14    Q.   AND THE REVENUE THAT YOU PROJECTED FOR 2014 WAS

12:35PM  15    $249 MILLION; RIGHT?

12:35PM  16    A.   YES.

12:35PM  17    Q.   AND THEN YOU PROJECTED $1.558 BILLION FOR 2015; CORRECT?

12:35PM  18    A.   YES.

12:35PM  19    Q.   AND YOU WERE AWARE AT THE TIME THAT IN 2013 THE COMPANY

12:35PM  20    HAD 20 -- ABOUT $25 MILLION IN REVENUE; RIGHT?

12:35PM  21    A.   I BELIEVE THAT'S ROUGHLY RIGHT, YES.

12:36PM  22    Q.   SO YOU WERE PROJECTING FROM -- AND YOU WERE DOING THIS AT

12:36PM  23    THE BEGINNING OF 2014; CORRECT?

12:36PM  24    A.   THAT'S CORRECT.

12:36PM  25    Q.   AND SO YOU WERE PROJECTING GROWTH FROM 25 MILLION TO 250

GROSSMAN CROSS BY MR. WADE (RES.)                                6673

```
12:36PM   1    MILLION; CORRECT?

12:36PM   2    A.   YES.

12:36PM   3    Q.   AND THEN FROM 249 TO 1.56 BILLION; RIGHT?

12:36PM   4    A.   YES.

12:36PM   5    Q.   AND THAT -- EVEN THAT LAST PIECE IS, GOING FROM 2014 TO

12:36PM   6    2015, WAS 525 PERCENT GROWTH; CORRECT?

12:36PM   7    A.   THAT IS CORRECT.

12:36PM   8    Q.   OKAY.  AND WERE YOU AWARE OF ANY OTHER COMPANY THAT HAD

12:36PM   9    THAT SORT OF REVENUE GROWTH WITHIN A TWO YEAR PERIOD?

12:36PM  10    A.   THERE HAVE BEEN EXAMPLES OF COMPANIES WHO HAVE HAD THAT

12:36PM  11    KIND OF REVENUE GROWTH.

12:36PM  12         THEY TEND TO BE OPEN ENDED, IMPORTANT TECHNOLOGIES, NEW

12:36PM  13    PRODUCT.

12:36PM  14         SO, YES, THERE ARE EXAMPLES.

12:37PM  15    Q.   WELL, CAN YOU IDENTIFY ANY?

12:37PM  16    A.   WELL, I CAN GIVE YOU A RECENT EXAMPLE, LIKE A MODERNA,

12:37PM  17    RIGHT.

12:37PM  18    Q.   OKAY.

12:37PM  19    A.   THAT COMES UP WITH A REALLY IMPORTANT NEW VACCINE, AND YOU

12:37PM  20    CAN SEE REVENUES RAMP DRAMATICALLY.

12:37PM  21         SO, YES, THERE ARE EXAMPLES OF COMPANIES.

12:37PM  22         THEY TEND TO BE REALLY IMPORTANT OPEN ENDED TECHNOLOGY,

12:37PM  23    VERY DISRUPTIVE, THAT HAVE A BIG IMPACT ON SOCIETY, BIG IMPACT

12:37PM  24    ON THE HEALTH CARE SPACE.

12:37PM  25    Q.   OKAY.  AND AS PART OF THIS ANALYSIS, THE GOAL WAS TO DO A
```

GROSSMAN CROSS BY MR. WADE (RES.)                              6674

12:37PM  1    NET PRESENT VALUATION OF THE COMPANY; CORRECT?

12:37PM  2    A.   YES.

12:37PM  3    Q.   AND YOU DID THAT; CORRECT?

12:37PM  4    A.   IT WAS ONE WAY.  THERE ARE DIFFERENT WAYS OF VALUING HIGH

12:37PM  5    GROWTH COMPANIES LIKE A THERANOS, AND SO WE WANTED TO MAKE SURE

12:37PM  6    THAT WE LOOKED AT THESE A FEW DIFFERENT WAYS.  ONE OF THEM WAS

12:37PM  7    USING A DISCOUNTED CASH FLOW MODEL.

12:37PM  8    Q.   AND THAT'S WHAT THIS IS; CORRECT?

12:38PM  9    A.   THAT'S WHAT THIS IS, THAT'S CORRECT.

12:38PM 10    Q.   A DISCOUNTED CASH FLOW MODEL IS SORT OF A STANDARD MODEL

12:38PM 11    THAT IS USED TO VALUE COMPANIES; IS THAT FAIR?

12:38PM 12    A.   IT IS A STANDARD MODEL USED TO VALUE COMPANIES, YES.

12:38PM 13    Q.   BUT AS YOU KNOW, THERE ARE A VARIETY OF OTHER MODELS, SOME

12:38PM 14    OF WHICH ARE MORE CONSERVATIVE AND SOME THAT ARE LESS

12:38PM 15    CONSERVATIVE; IS THAT FAIR?

12:38PM 16    A.   I'M SORRY, COULD YOU ASK THAT ONE MORE TIME?

12:38PM 17    Q.   SURE.  THERE ARE A VARIETY OF MODELS THAT COULD BE USED;

12:38PM 18    RIGHT?

12:38PM 19    A.   A VARIETY -- I DON'T QUITE UNDERSTAND THE QUESTION.

12:38PM 20    Q.   WHY DON'T WE JUST GO BACK TO YOUR MODEL.

12:38PM 21         BASED ON THE MODEL, YOU VALUED THERANOS AT $20.3 BILLION;

12:38PM 22    CORRECT?

12:38PM 23    A.   THAT'S THE TOTAL VALUE IN THIS, IN THIS MODEL, AND THAT'S,

12:38PM 24    THAT'S THE U.S., THAT'S JUST THE U.S. -- THAT'S THE U.S.

12:38PM 25    OPPORTUNITY, YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6675

12:38PM   1        IT DOESN'T INCLUDE ANYTHING FROM ANY OTHER PART OF THE

12:38PM   2   WORLD.

12:39PM   3        BUT, YES, THAT IS THE OUTPUT OF THIS PARTICULAR

12:39PM   4   SPREADSHEET.

12:39PM   5   Q.   RIGHT.  AND THERANOS, BASED UPON -- I THINK WE TALKED

12:39PM   6   ABOUT YESTERDAY, BASED UPON THE C-1 VALUATION SOLD AT $15 A

12:39PM   7   SHARE; RIGHT?

12:39PM   8   A.   YES.

12:39PM   9   Q.   AND THE VALUATION BASED UPON THAT WAS ABOUT 7 BILLION; IS

12:39PM  10   THAT CORRECT?

12:39PM  11   A.   YES.

12:39PM  12   Q.   AND THEN THE VALUATION BASED UPON THE C-2 ROUND WAS

12:39PM  13   9 BILLION; CORRECT?

12:39PM  14   A.   CORRECT.

12:39PM  15   Q.   OKAY.  AND IN PREPARING THIS VALUATION, YOU ALSO PROJECTED

12:39PM  16   REVENUE, CORRECT, RELATING TO THE RETAIL EFFORTS?

12:39PM  17        DO YOU RECALL THAT?

12:39PM  18   A.   WE, WE CERTAINLY WOULD HAVE PROJECTED REVENUE FOR THE

12:39PM  19   RETAIL OPERATION, YES.

12:40PM  20   Q.   OKAY.  AND THE -- DO YOU RECALL THAT THE REVENUE NUMBERS

12:40PM  21   THAT PFM PROJECTED FOR 2014, FOR EXAMPLE, WERE SIGNIFICANTLY

12:40PM  22   HIGHER THAN THE NUMBERS THAT THERANOS GAVE YOU?

12:40PM  23   A.   THAT'S NOT MY MEMORY.

12:40PM  24   Q.   OKAY.  LET'S TAKE A LOOK.

12:40PM  25        LET'S FIRST GO TO THE PFM REVENUE MODEL-BOTTOMS UP.

GROSSMAN CROSS BY MR. WADE (RES.)                              6676

12:40PM   1        AND IF WE CAN SCROLL -- DO YOU SEE THE RETAIL REVENUE --

12:41PM   2   I'M IN THE PFM REVENUE MODEL-BOTTOMS UP TAB.

12:41PM   3        DO YOU SEE THAT?

12:41PM   4   A.   I DO SEE THAT.

12:41PM   5   Q.   IN ROW 19 FOR 2014, DO YOU SEE THE NUMBERS LISTED THERE ON

12:41PM   6   A QUARTERLY BASIS?

12:41PM   7   A.   I DO SEE THOSE, YES.

12:41PM   8   Q.   AND THE FIRST ONE IS THIS $887,500.

12:41PM   9        DO YOU SEE THAT?

12:41PM   10  A.   I DO SEE THAT.

12:41PM   11  Q.   AND THEN ABOUT 4.4 MILLION.

12:42PM   12       DO YOU SEE THAT?

12:42PM   13  A.   I DO SEE THAT.

12:42PM   14  Q.   AND THEN ABOUT 21.4 MILLION AND 70 MILLION FOR THE FOURTH

12:42PM   15  QUARTER.

12:42PM   16       DO YOU SEE THAT?

12:42PM   17  A.   I DO SEE THAT.

12:42PM   18  Q.   OKAY.  LET'S, LET'S GO BACK TO THE THERANOS PERIOD.

12:42PM   19       LET'S GO BACK TO THE OTHER SPREADSHEET.

12:42PM   20       AS WE'RE DOING THIS, DO YOU RECALL THAT YOU CAME UP WITH

12:42PM   21  YOUR REVENUE NUMBERS AND YOUR MODELING NUMBERS TOTALLY

12:43PM   22  INDEPENDENT FROM THERANOS; RIGHT?

12:43PM   23  A.   NO.

12:43PM   24  Q.   WELL, YOU ADDED SUBSTANTIAL ADDITIONAL DATA; RIGHT?

12:43PM   25  A.   WE DID ADD ADDITIONAL DATA TO OUR MODEL, YES.

GROSSMAN CROSS BY MR. WADE (RES.)                          6677

12:43PM   1    Q.   AND YOU WERE AWARE AT THE TIME THAT THE MODELS WERE BASED

12:43PM   2    UPON, WERE BASED UPON THE -- AN ASSUMPTION OF A NUMBER OF

12:43PM   3    PATIENTS WITHIN STORES; RIGHT?

12:43PM   4    A.   THERE WERE A BUNCH OF ASSUMPTIONS THAT WENT INTO THE

12:43PM   5    MODEL.

12:43PM   6    Q.   RIGHT?

12:43PM   7    A.   YES.

12:43PM   8    Q.   AND A SIGNIFICANT ONE WAS THE NUMBER OF PATIENTS PER STORE

12:43PM   9    PER DAY; RIGHT?

12:43PM   10   A.   THAT WAS AN ASSUMPTION IN THE MODEL.

12:43PM   11   Q.   AND THERANOS TOLD YOU THAT IN THEIR MODEL THEY PROJECTED

12:43PM   12   25 PATIENTS PER STORE; RIGHT?

12:43PM   13   A.   I DON'T REMEMBER SPECIFICALLY WHAT THEY TOLD US.

12:43PM   14   Q.   OKAY.   WELL, LET'S TAKE A LOOK.

12:44PM   15        DO YOU SEE UP HERE IN EXHIBIT 13720A IT IDENTIFIES 25

12:44PM   16   PATIENTS PER STORE AT WALGREENS THERE?

12:44PM   17   A.   YES.

12:44PM   18   Q.   AND DO YOU ALSO RECALL THAT AT THE TIME MR. BALWANI GAVE

12:44PM   19   THIS, THAT THERE WERE ACTUALLY ONLY 10 TO 15 PATIENTS PER STORE

12:44PM   20   THAT WERE COMING INTO THE FEW LOCATIONS; RIGHT?

12:44PM   21   A.   I DON'T REMEMBER SPECIFICALLY.

12:44PM   22        WHAT DAY ARE YOU REFERRING TO?

12:44PM   23   Q.   WELL, DO YOU RECALL DURING THE DUE DILIGENCE PERIOD

12:44PM   24   LEARNING THAT BREAK EVEN FOR THE STORES WAS 15 PATIENTS A

12:44PM   25   STORE?

GROSSMAN CROSS BY MR. WADE (RES.)                              6678

12:44PM   1    A.    I DO REMEMBER TALKING ABOUT BREAK EVEN.

12:44PM   2          I DON'T REMEMBER THE SPECIFICS OF WHAT THE ACTUAL NUMBERS

12:44PM   3    WERE, BUT, YES, I DO REMEMBER GOING THROUGH THE ECONOMICS FROM

12:44PM   4    THE WALGREENS PERSPECTIVE.

12:44PM   5    Q.    OKAY.  AND YOU RECALL HIM TELLING YOU THAT WHAT THEY WERE

12:44PM   6    MODELING WAS ACTUALLY ABOVE THE 15 PERCENT, OR THE 15 PATIENTS

12:44PM   7    PER STORE; RIGHT?

12:45PM   8    A.    WELL, I DON'T REMEMBER EXACTLY THE 15, BUT, YEAH, I DO

12:45PM   9    REMEMBER -- WHAT I REMEMBER WAS THAT HE FELT LIKE THESE NUMBERS

12:45PM  10    WERE VERY CONSERVATIVE BASED ON THE PATIENT FLOW THAT THEY WERE

12:45PM  11    SEEING IN SOME OF THE FIRST STORES THAT THEY HAD OPENED.

12:45PM  12          BUT I DON'T REMEMBER SPECIFICALLY WHAT CONVERSATION I HAD

12:45PM  13    WITH HIM AT A GIVEN POINT IN TIME ON THIS PARTICULAR VERSION OF

12:45PM  14    THE MODEL.

12:45PM  15    Q.    OKAY.  AND DO YOU REMEMBER THAT IN MANY LOCATIONS WHERE

12:45PM  16    YOU WERE MODELING, THAT YOU WERE PROJECTING 80 OR 90 PATIENTS

12:45PM  17    PER STORE PER DAY?

12:45PM  18    A.    I DON'T BELIEVE THAT'S HOW OUR MODEL WORKS, BUT WE -- SO I

12:45PM  19    DON'T REMEMBER THAT.

12:45PM  20    Q.    OKAY.  WELL, LET'S LOOK -- LET'S LOOK BACK AT YOUR MODEL.

12:45PM  21    LET'S LOOK AT THE STORE BUILD.  AND LET'S GO DOWN HERE.

12:46PM  22          AND DO YOU SEE HERE WHERE THERE ARE PATIENTS PER STORE

12:46PM  23    DATA?

12:46PM  24    A.    I DO SEE THAT, YES.

12:46PM  25    Q.    AND DO YOU SEE THAT MANY OF THEM ARE AS HIGH AS 80 OR 90

GROSSMAN CROSS BY MR. WADE (RES.)                    6679

| | | |
|---|---|---|
| 12:46PM | 1 | PATIENTS PER STORE IN SOME MARKETS? |
| 12:46PM | 2 | A.   YES.  WELL, I ACTUALLY DON'T SEE -- MAYBE YOU COULD SHOW |
| 12:46PM | 3 | ME WHERE. |
| 12:46PM | 4 | I DON'T SEE THAT, SO I'M SORRY.  MAYBE YOU COULD POINT TO |
| 12:46PM | 5 | WHERE THE -- |
| 12:46PM | 6 | Q.   DO YOU SEE HERE IN LOS ANGELES IT'S -- YOU INCLUDE |
| 12:46PM | 7 | PROJECTIONS OF AS HIGH AS 90 TO 92 PATIENTS PER STORE. |
| 12:47PM | 8 | DO YOU SEE THAT? |
| 12:47PM | 9 | A.   THAT'S IN 2017. |
| 12:47PM | 10 | Q.   YES. |
| 12:47PM | 11 | A.   I THINK YOU WERE ASKING ME ABOUT 2014. |
| 12:47PM | 12 | Q.   WELL, I BELIEVE THE THERANOS MODEL WAS AT 25; IS THAT |
| 12:47PM | 13 | RIGHT? |
| 12:47PM | 14 | A.   I'M SORRY, COULD YOU ASK THE QUESTION AGAIN? |
| 12:47PM | 15 | Q.   THE THERANOS MODEL WAS 25 ACROSS THE BOARD, WAS IT NOT? |
| 12:47PM | 16 | A.   IN 2014. |
| 12:47PM | 17 | Q.   AND INTO '15? |
| 12:47PM | 18 | A.   I DON'T RECALL.  MAYBE WE CAN LOOK AT THE MODEL FOR '15. |
| 12:47PM | 19 | I DON'T REMEMBER WHAT THE ASSUMPTION THEY HAD WAS FOR 2015. |
| 12:47PM | 20 | Q.   AND DO YOU RECALL MEMBERS OF YOUR TEAM EXPRESSING CONCERN |
| 12:47PM | 21 | ABOUT THE PROJECTIONS ON PATIENTS PER STORE? |
| 12:47PM | 22 | A.   I REMEMBER THAT WE DID THINK VERY HARD ABOUT THIS |
| 12:47PM | 23 | PARTICULAR ASSUMPTION, ESPECIALLY IN THE CONTEXT OF OUR 2017 |
| 12:47PM | 24 | AND '18 MODEL.  WE WANTED TO MAKE SURE THAT THE MARKETS THEY |
| 12:47PM | 25 | HAD TOLD US THEY WOULD ROLL OUT INTO, THERE WERE ENOUGH STORES |

GROSSMAN CROSS BY MR. WADE (RES.)                                    6680

12:47PM   1    TO SUPPORT THE REVENUES ESTIMATES THAT WE HAD IN 2017 AND '18,

12:48PM   2    ESPECIALLY IN 2018, SO YEAR FIVE OF THE COMMERCIAL LAUNCH.

12:48PM   3        IT KIND OF LED INTO A LARGER DISCUSSION AROUND HOW MANY

12:48PM   4    EXTRA RETAIL PARTNERS DID THEY NEED?

12:48PM   5        SO THIS ANALYSIS WAS REALLY MORE TO SANITY CHECK OUR

12:48PM   6    ESTIMATES OF HOW MUCH SHARE THIS COMPANY WOULD TAKE WITH ALL OF

12:48PM   7    THE ADVANTAGES THAT THEY HAD IN THESE GEOGRAPHIC MARKETS THAT

12:48PM   8    THEY TOLD US THAT THEY WERE GOING TO ROLL OUT INTO.

12:48PM   9        AND THEN BACKING INTO WHETHER OR NOT THEY WOULD NEED

12:48PM  10    ADDITIONAL PARTNERS, LIKE A CVS OR A RITE AID OR OTHER GROCERY

12:48PM  11    STORE CHAINS.  THAT WAS THE POINT OF THIS ANALYSIS.

12:48PM  12        THIS ISN'T ACTUALLY WHAT DROVE OUR ACTUAL, WHAT WE CALL

12:48PM  13    POINT ESTIMATES, THE ESTIMATE WE HAD FOR A PARTICULAR QUARTER

12:48PM  14    IN 2014 OR '15 OR OUR MODEL IN 2016, '17, OR '18.

12:48PM  15    Q.   OKAY.  BUT THIS WAS ALL -- THE ANALYSIS THAT YOU JUST

12:48PM  16    DESCRIBED IS ALL ANALYSIS THAT YOU AT PFM DID ON YOUR OWN;

12:48PM  17    RIGHT?

12:48PM  18    A.   AND IT WAS IN CONJUNCTION WITH OUR ESTIMATES FOR 2017 AND

12:48PM  19    '18, NOT RELATIVE TO WHAT THE COMPANY GAVE US FOR THE 2014 TO

12:48PM  20    2015 PROJECTIONS.

12:48PM  21    Q.   OKAY.

12:48PM  22    A.   AND WHICH OUR NUMBERS WERE LOWER -- OUR OVERALL REVENUE

12:49PM  23    NUMBERS FOR THERANOS FOR BOTH '14 AND '15 ON THE BASE CASE WERE

12:49PM  24    LOWER THAN WHAT THERANOS'S MODEL TOTAL REVENUES HAD FOR BOTH

12:49PM  25    YEARS.

GROSSMAN CROSS BY MR. WADE (RES.)                              6681

| | | |
|---|---|---|
| 12:49PM | 1 | SO, YES, THAT WAS -- THAT MODEL WAS VERY IMPORTANT TO HOW |
| 12:49PM | 2 | WE BUILT THIS MODEL.  IT WAS VERY IMPORTANT TO HOW WE THOUGHT |
| 12:49PM | 3 | ABOUT 2014 AND 2015, AND IT REFLECTED THE INFORMATION THAT THEY |
| 12:49PM | 4 | HAD BECAUSE OF THE WALGREENS RELATIONSHIP. |
| 12:49PM | 5 | Q.   AND ULTIMATELY YOU CAME TO -- WHATEVER ANALYSIS YOU CAME |
| 12:49PM | 6 | TO IN DOING THIS WITH YOUR TEAM, YOU WERE COMFORTABLE WITH THE |
| 12:49PM | 7 | VALUATION THAT YOU, THAT YOU COMMUNICATED TO YOUR INVESTORS; |
| 12:49PM | 8 | CORRECT? |
| 12:49PM | 9 | A.   IN AN ANALYSIS LIKE THIS, YOU WANT TO MAKE SURE THAT ON |
| 12:49PM | 10 | YOUR BASE CASE ASSUMPTIONS, YOU CAN JUSTIFY A SUBSTANTIALLY |
| 12:49PM | 11 | HIGHER PRICE FOR THE ASSET, FOR THE COMPANY, AND THAT WAS THE |
| 12:50PM | 12 | POINT OF THIS EXERCISE. |
| 12:50PM | 13 | AND, YES, WE FELT LIKE WE COULD MORE THAN JUSTIFY |
| 12:50PM | 14 | INVESTING AT $9 BILLION BASED ON THE MODEL THE COMPANY HAD |
| 12:50PM | 15 | GIVEN US FOR 2014 AND 2015, AND THEN THE ASSUMPTIONS THAT WE |
| 12:50PM | 16 | HAD FOR HOW MUCH SHARE OF THE MARKETS THAT THEY WERE GOING TO |
| 12:50PM | 17 | TARGET, NEW YORK CITY, L.A., THE OTHER MAJOR METROPOLITAN |
| 12:50PM | 18 | AREAS, WHAT SHARE OF THOSE MARKETS THAT A COMPANY WITH THIS |
| 12:50PM | 19 | TYPE OF TECHNOLOGY WOULD BE ABLE TO, WOULD BE ABLE TO ACHIEVE. |
| 12:50PM | 20 | Q.   AND PART OF THAT WAS THE NUMBER OF STORES THAT YOU COULD |
| 12:50PM | 21 | GROW TO, CORRECT, THE RATE OF EXPANSION? |
| 12:50PM | 22 | A.   WELL, IT WAS -- THEY HAD A SUBSTANTIAL ADVANTAGE AGAINST |
| 12:50PM | 23 | EXISTING LAB COMPANIES.  LAB -- QUEST HAS 2,000 OR SO STORES |
| 12:50PM | 24 | THAT YOU CAN GET YOUR BLOOD DRAWN.  WALGREENS HAD OVER 8,000 |
| 12:50PM | 25 | LOCATIONS. |

GROSSMAN CROSS BY MR. WADE (RES.)                          6682

12:50PM   1         SO THEY HAD A LOT OF ADVANTAGES WHEN IT CAME TO

12:50PM   2   CONVENIENCE.

12:50PM   3         BUT WE WANTED TO MAKE SURE THAT WE UNDERSTOOD THEIR

12:51PM   4   COMMERCIAL STRATEGY, ESPECIALLY WHEN IT CAME TO PARTNERING WITH

12:51PM   5   ADDITIONAL RETAILERS SO THAT THEY WOULD HAVE ENOUGH

12:51PM   6   DISTRIBUTION, ENOUGH ACCESS POINTS TO DELIVER ON THE FINANCIAL

12:51PM   7   FORECAST THAT WE HAD FOR 2017 AND 2018.

12:51PM   8   Q.   RIGHT.  AND JUST SO WE'RE CLEAR, THEY HAD THREE STORES AT

12:51PM   9   THE TIME THAT YOU WERE DOING THIS ANALYSIS; RIGHT?

12:51PM  10   A.   AT THE FIRST MONTH OF THE LAUNCH, YES.  IN JANUARY OF

12:51PM  11   2014, YES.

12:51PM  12   Q.   AND PART OF YOUR ANALYSIS HERE WAS TO PROJECT THE NUMBER

12:51PM  13   OF STORES THAT THEY WERE GOING TO OPEN DURING PARTICULAR

12:51PM  14   PERIODS OF TIME IN DIFFERENT MARKETS; CORRECT?

12:51PM  15   A.   WELL, THEY GAVE US A VERY SPECIFIC BY-THE-MONTH FORECAST

12:51PM  16   FOR WALGREENS STORES, AND ALSO SAFEWAY STORES.

12:51PM  17   Q.   RIGHT.

12:51PM  18   A.   AND SO THAT WAS -- SO WE USED THEIR FORECAST TO BUILD OUR

12:51PM  19   MODEL IN 2014 AND 2015.  I BELIEVE WE MAY HAVE USED, I BELIEVE

12:51PM  20   WE MAY HAVE USED LOWER -- WELL, ANYWAY, YEAH, WE HAD DIFFERENT

12:52PM  21   ASSUMPTIONS AS WE KIND OF WENT OUT BEYOND -- THEY GAVE US A

12:52PM  22   MODEL THAT WENT TO 2015, A VERY DETAILED MODEL.

12:52PM  23         BUT WHEN IT CAME TO OUR MODEL BEYOND 2015, WHICH BUILT OFF

12:52PM  24   OF ASSUMPTIONS AND THE INFORMATION THAT THEY PROVIDED US, WE

12:52PM  25   USED OUR OWN ASSUMPTIONS THAT WERE DIFFERENT IN SOME CASES

GROSSMAN CROSS BY MR. WADE (RES.)                                   6683

| | | |
|---|---|---|
| 12:52PM | 1 | FROM -- OVER TIME. |
| 12:52PM | 2 | Q.   AND YOU TALKED ABOUT THE ASSUMPTIONS FOR STORES IN 2014. |
| 12:52PM | 3 | ISN'T IT TRUE THAT YOU ACTUALLY -- YOU PROJECTED ABOUT |
| 12:52PM | 4 | 1500 MORE STORES WOULD BE OPEN THAN THERANOS HAD IN ITS MODEL? |
| 12:52PM | 5 | A.   I DON'T BELIEVE THAT'S TRUE, BUT -- SO, NO, I DON'T |
| 12:52PM | 6 | BELIEVE THAT'S TRUE. |
| 12:52PM | 7 | Q.   WELL, LET'S TAKE A LOOK. |
| 12:52PM | 8 | IF YOU LOOK AT THE NUMBER OF STORES IN RETAIL HERE, AND WE |
| 12:53PM | 9 | GO TO COLUMN G FOR '15. |
| 12:53PM | 10 | DO YOU SEE COLUMN G HERE? |
| 12:53PM | 11 | A.   I DO SEE COLUMN G, YES. |
| 12:53PM | 12 | Q.   AND YOU SEE THE NUMBER OF STORES IN RETAIL? |
| 12:53PM | 13 | A.   I DO SEE THAT, YES. |
| 12:53PM | 14 | Q.   DO YOU SEE THAT? |
| 12:53PM | 15 | AND SO THIS IS THE PART WHERE IT GETS QUITE DANGEROUS. |
| 12:53PM | 16 | AND DO YOU SEE THAT THAT EQUALS 4685 STORES? |
| 12:53PM | 17 | A.   THAT -- I DO SEE 4685, YES. |
| 12:53PM | 18 | Q.   AND THAT'S FOR 2015; CORRECT? |
| 12:53PM | 19 | A.   THAT'S FOR 2018, '17, '16, '15, '14.  THEY'RE ALL THE SAME |
| 12:54PM | 20 | NUMBER. |
| 12:54PM | 21 | SO IF THAT'S YOUR QUESTION, YES. |
| 12:54PM | 22 | WE WERE LOOKING AT -- WE WANTED TO -- THIS ISN'T HOW WE |
| 12:54PM | 23 | DROVE THE MODEL.  THE MODEL WAS DRIVEN BASED ON THE PERCENTAGE |
| 12:54PM | 24 | OF THOSE -- WE LOOKED AT THE POPULATION OF EACH MARKET, AND |
| 12:54PM | 25 | THEN WE FORECAST THE PERCENTAGE OF THE TESTS DONE IN THOSE |

GROSSMAN CROSS BY MR. WADE (RES.)                                    6684

12:54PM   1    MARKETS.  THAT'S WHAT DROVE THE REVENUE FORECASTS.

12:54PM   2         THIS WAS JUST A SANITY CHECK.

12:54PM   3         AGAIN, AS I SAID BEFORE, THIS WAS REALLY DONE TO LOOK TO

12:54PM   4    SEE WHETHER THE ESTIMATES THAT WE HAD FOR 2017 AND 2018 WERE

12:54PM   5    REALISTIC AND WHETHER THEY NEEDED MORE RETAIL PARTNERS.

12:54PM   6         THIS DIDN'T ACTUALLY DRIVE ANY REVENUE ASSUMPTIONS IN ANY

12:54PM   7    OF OUR MODELS IN ANY QUARTER IN ANY YEAR.

12:54PM   8         SO, AGAIN, THIS WAS A SECONDARY ANALYSIS THAT WE DID TO

12:54PM   9    MAKE SURE THAT WALGREENS -- TO SEE HOW FAR THEY COULD GO WITH

12:54PM  10    WALGREENS AND WHETHER THEY NEEDED OTHER ADDITIONAL PARTNERS.

12:54PM  11         AND YOU CAN SEE THE NUMBER OF STORES IN 2018 IS THE SAME

12:54PM  12    AS '17, '16, '15, AND WE WANTED TO SEE WHAT THE THROUGHPUT WAS

12:54PM  13    JUST WITH WALGREENS AND SAFEWAYS AS THEY RAMPED OVER THIS

12:54PM  14    PERIOD OF TIME AND JUST MAKE SURE THAT IT WAS A NUMBER THAT

12:55PM  15    WASN'T UNREALISTIC BASED ON OUR UNDERSTANDING OF THROUGHPUT IN

12:55PM  16    THOSE ORGANIZATIONS.

12:55PM  17         AND IF IT WAS, THAT WOULD LEAD TO FOLLOW-ON CONVERSATIONS,

12:55PM  18    WELL, WHAT OTHER RETAIL PARTNERS DO YOU NEED FOR A MARKET LIKE

12:55PM  19    LOS ANGELES?  AND MAYBE THE ANSWER IS RITE AID WOULD BE A GREAT

12:55PM  20    ADDITIONAL PARTNER TO HAVE FOR THAT MARKET.

12:55PM  21         SO THAT'S WHAT THIS ANALYSIS WAS REFERRING TO.

12:55PM  22    Q.   AND THE ANALYSIS, I BELIEVE YOU JUST TESTIFIED ABOUT 90 TO

12:55PM  23    120 SECONDS AGO THAT YOU BUILT THE ANALYSIS OFF OF THE NUMBER

12:55PM  24    OF STORES THAT THERANOS USED IN ITS MODEL FOR 2014 TO 2015.

12:55PM  25         THAT WAS YOUR TESTIMONY, WAS IT NOT?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6685

12:55PM   1      A.   THAT WAS THE MODEL THAT THEY SENT US.

12:55PM   2      Q.   YOUR TESTIMONY WAS THAT YOU BUILT YOUR MODEL OFF OF THAT;

12:55PM   3      CORRECT?

12:55PM   4      A.   WE, WE USED -- WE RELIED HEAVILY ON THE MODEL THAT THEY

12:55PM   5      PROVIDED.

12:55PM   6      Q.   I'M NOT ASKING ABOUT WHAT YOU RELIED ON.  I'M ASKING YOU

12:55PM   7      THAT YOU JUST TESTIFIED THAT YOU USED THE SAME NUMBER OF STORES

12:55PM   8      FROM THE THERANOS MODEL AND YOUR MODEL?

12:56PM   9           DID YOU JUST TESTIFY TO THAT?

12:56PM  10      A.   I, I -- MR. WADE, I'M -- I -- I'M SORRY.  I DIDN'T MEAN TO

12:56PM  11      CONFUSE YOU OR MISLEAD YOU IN MY ANSWER.

12:56PM  12           THE MODEL REALLY HAS TWO STAGES.  IN 2014 AND 2015, WE

12:56PM  13      RELIED HEAVILY ON THE THERANOS ASSUMPTIONS.  WE DIDN'T TAKE

12:56PM  14      THEM WORD FOR WORD, NUMBER FOR NUMBER, BUT WE RELIED ON THOSE.

12:56PM  15           AND THEN IN '16, '17 AND '18, WE HAD NO THERANOS

12:56PM  16      ASSUMPTION, SO WE HAD TO HAVE OUR OWN.

12:56PM  17           THE PERCENTAGE OF EACH MARKET THAT THESE -- I BELIEVE THE

12:56PM  18      MODEL WAS DRIVEN BY THE PERCENTAGE OF EACH ONE OF THESE

12:56PM  19      METROPOLITAN AREAS, THE TESTS THAT WERE DONE IN THOSE AREAS IN

12:56PM  20      EACH OF THOSE YEARS.

12:56PM  21      Q.   WELL, LET ME TAKE THOSE ONE AT A TIME.

12:56PM  22           THE PERCENTAGE OF PATIENTS IN A MARKET IS A TOTALLY

12:56PM  23      DIFFERENT ANALYSIS FROM THE ANALYSIS THERANOS DID; CORRECT?

12:56PM  24      A.   WELL, I'M NOT SURE WHAT ANALYSIS THERANOS DID.  THE

12:57PM  25      THERANOS MODEL WAS DRIVEN BY PATIENTS PER STORE THAT HAD A

GROSSMAN CROSS BY MR. WADE (RES.)                                    6686

12:57PM   1    WHOLE SERIES OF ASSUMPTIONS.

12:57PM   2    Q.   RIGHT.   RIGHT.   THERE WAS NO ANALYSIS BASED UPON THE

12:57PM   3    POPULATION IN THE AREA AND AN ASSUMPTION OF ORDER OR ANYTHING

12:57PM   4    OF THE KIND THAT YOU JUST DISCUSSED; RIGHT?

12:57PM   5    A.   THAT IS CORRECT.

12:57PM   6    Q.   AND THERE WAS NOTHING LIKE THAT IN THE THERANOS MODEL;

12:57PM   7    RIGHT?

12:57PM   8    A.   THAT'S CORRECT.

12:57PM   9    Q.   AND SO WHAT YOU JUST DESCRIBED AS TO YOUR MODELING WAS

12:57PM   10   COMPLETELY DIFFERENT METHODOLOGY THAN THE THERANOS MODEL;

12:57PM   11   RIGHT?

12:57PM   12   A.   IT WAS A DIFFERENT METHODOLOGY, YES.

12:57PM   13   Q.   OKAY.   AND TO THE EXTENT THAT YOU LOOKED AT THE NUMBER OF

12:57PM   14   RETAIL STORES IN 2015 AS SOME SORT OF SANITY CHECK OR THE LIKE,

12:57PM   15   YOU CAME UP WITH 4685 STORES; IS THAT RIGHT?

12:57PM   16   A.   NO.

12:57PM   17   Q.   IT, IT -- I USED THE SPREADSHEET.   ISN'T THAT WHAT THOSE

12:57PM   18   STORES IDENTIFY IN THAT COLUMN?

12:57PM   19   A.   THOSE ARE THE NUMBER OF WALGREENS AND SAFEWAY STORES IN

12:57PM   20   THE 18 METROPOLITAN AREA THAT OUR MODEL USED TO FORECAST

12:58PM   21   REVENUES, THE TOTAL NUMBER OF STORES.

12:58PM   22   Q.   RIGHT.   SO THE ASSUMPTION WOULD BE THAT THEY'RE ACTUALLY

12:58PM   23   OPERATING OUT OF THE STORES; IS THAT RIGHT?

12:58PM   24   A.   THAT WAS NOT OUR ASSUMPTION.

12:58PM   25   Q.   OKAY.   AND YOU'RE AWARE THAT THERANOS, THERANOS'S

GROSSMAN CROSS BY MR. WADE (RES.)                              6687

12:58PM   1    PROJECTION AT THE TIME WAS 3100 STORES?

12:58PM   2    A.   I BELIEVE THAT'S RIGHT.

12:58PM   3    Q.   OKAY.

12:58PM   4    A.   BY THE END OF 2015.

12:58PM   5    Q.   CORRECT.

12:58PM   6         AND I THINK YOU DID TESTIFY THAT THERE WAS SOME CONCERN

12:58PM   7    EXPRESSED BY YOUR TEAM, OR SOME DISCUSSION WITHIN THE TEAM,

12:58PM   8    ABOUT SOME OF THE ASSUMPTIONS IN THE MODEL.

12:58PM   9         DO YOU RECALL THAT?

12:58PM  10    A.   I DON'T RECALL ALL OF THE BACK AND FORTH, BUT WE DID HAVE

12:58PM  11    A COLLABORATIVE EFFORT AROUND THE MODEL AND THE ASSUMPTIONS

12:59PM  12    THAT WENT INTO IT.

12:59PM  13    Q.   OKAY.  AND THERE WAS SOME DISCUSSION AND DEBATE ABOUT

12:59PM  14    THAT; IS THAT FAIR?

12:59PM  15    A.   THAT WOULD BE TYPICAL OF ANY INVESTMENT, YES.

12:59PM  16    Q.   OKAY.  AND DO YOU RECALL THAT THERE WAS ALSO SOME DEBATE

12:59PM  17    INTERNALLY ABOUT THE ACCURACY OF THERANOS'S TESTS?

12:59PM  18    A.   I DO RECALL THAT, YES.

12:59PM  19    Q.   AND IN THE DAYS LEADING UP TO THE INVESTMENT IN JANUARY OF

12:59PM  20    2000 -- IN LATE JANUARY OF 2014, SOME MEMBERS OF THE TEAM

12:59PM  21    EXPRESSED, YOU KNOW, SOME CONCERNS BASED UPON THE DATA ANALYSIS

12:59PM  22    OF THE ACCURACY OF THE TESTS; RIGHT?

12:59PM  23    A.   I BELIEVE THERE WERE QUESTIONS AROUND THE ACCURACY, YES.

12:59PM  24    Q.   AND LET'S LOOK AT 4088.

01:00PM  25    A.   OKAY.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6688

01:00PM  1    Q.   AND 4088 IS AN EMAIL BETWEEN YOU AND MR. CLAMMER; CORRECT?

01:00PM  2    A.   YES.

01:00PM  3    Q.   AND IN THAT EMAIL -- AND MR. CLAMMER ENDED UP INVESTING IN

01:00PM  4    THERANOS THROUGH PFM; CORRECT?

01:00PM  5    A.   I BELIEVE THAT'S CORRECT.

01:00PM  6    Q.   AND IN THAT -- IN THIS EMAIL YOU'RE, YOU'RE IDENTIFYING

01:00PM  7    FOR HIM THAT THERE WAS THAT DEBATE WITH RESPECT TO ACCURACY;

01:00PM  8    CORRECT?

01:00PM  9    A.   YES.

01:01PM  10            MR. WADE:  MOVE THE ADMISSION OF 4088.

01:01PM  11            MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:01PM  12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:01PM  13         (GOVERNMENT'S EXHIBIT 4088 WAS RECEIVED IN EVIDENCE.)

01:01PM  14            MR. WADE:  IF WE CAN JUST FOCUS ON THE TOP EMAIL.

01:01PM  15    Q.   AND AGAIN, MR. CLAMMER WAS AN EXPERIENCED EXECUTIVE AND

01:01PM  16    INVESTOR?

01:01PM  17    A.   NOT AN EXECUTIVE.  AN INVESTOR IN THIS INDUSTRY DURING HIS

01:01PM  18    CAREER AS AN INVESTOR.

01:01PM  19    Q.   AND HE ENDED UP COMING UNDER A CDA SO HE COULD RECEIVE

01:01PM  20    INFORMATION RELATING TO THERANOS?

01:01PM  21    A.   I BELIEVE BY THE END OF THE PROCESS, YEAH, HE WAS.

01:01PM  22    Q.   OKAY.  AND HE WOULD PROVIDE INPUT TO YOU; RIGHT?

01:01PM  23    A.   HE WAS -- YEAH, HE, HE WAS, HE WAS NOT INVOLVED VERY MUCH

01:01PM  24    IN, IN THE ANALYSIS.

01:01PM  25    Q.   OKAY.  BUT HERE YOU'RE IDENTIFYING FOR HIM THE DEBATE

GROSSMAN CROSS BY MR. WADE (RES.)                              6689

01:02PM   1    INTERNALLY ABOUT THE ACCURACY; CORRECT?

01:02PM   2    A.   YES.

01:02PM   3    Q.   AND IF WE GO BACK TO OUR CALENDAR DEMONSTRATIVE HERE ON

01:02PM   4    THE ELMO, THIS IS, THIS IS, RIGHT HERE, ABOUT A WEEK BEFORE YOU

01:02PM   5    MAKE THE INVESTMENT DECISION; CORRECT?

01:02PM   6    A.   YES.

01:02PM   7    Q.   AND DO YOU RECALL IN THAT WEEK THERE WERE SOME OTHER

01:02PM   8    CONCERNS THAT CAME UP AS EXPRESSED BY THE DUE DILIGENCE TEAM?

01:02PM   9    A.   I DON'T RECALL SPECIFICALLY.  I KNOW WE HAD A NUMBER OF

01:02PM  10    ITEMS THAT WE WANTED TO GET THROUGH THAT LAST WEEK.

01:02PM  11    Q.   LET'S TAKE A LOOK AT 4089.

01:03PM  12         DO YOU HAVE THAT IN FRONT OF YOU?

01:03PM  13    A.   I DO, YEAH.

01:03PM  14    Q.   AND IS THIS AN EMAIL IN WHICH DR. RABODZEY IS PROVIDING A

01:03PM  15    THERANOS TECHNICAL AND REGULATORY ASSESSMENT TO THE ANALYST

01:03PM  16    TEAM?

01:03PM  17    A.   MAYBE I COULD HAVE A MINUTE TO REVIEW IT.

01:03PM  18    Q.   SURE.

01:03PM  19    A.   OKAY.

01:03PM  20         (PAUSE IN PROCEEDINGS.)

01:03PM  21          THE WITNESS:  OKAY.  SORRY.  IT'S A LONG EMAIL.

01:05PM  22    BY MR. WADE:

01:05PM  23    Q.   AND MY QUESTION, MR. GROSSMAN, WAS, IS THIS A THERANOS

01:05PM  24    TECHNICAL AND REGULATORY ASSESSMENT THAT WAS PROVIDED TO THE

01:05PM  25    ANALYST TEAM BY DR. RABODZEY?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6690

| | | |
|---|---|---|
| 01:05PM | 1 | A.   IT IS AN ANALYSIS OF SOME OF THE TEST MATERIAL FROM |
| 01:05PM | 2 | THERANOS, YES. |
| 01:05PM | 3 | MR. WADE:  I WOULD MOVE THE ADMISSION OF 4089. |
| 01:05PM | 4 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 01:05PM | 5 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 01:05PM | 6 | (GOVERNMENT'S EXHIBIT 4089 WAS RECEIVED IN EVIDENCE.) |
| 01:06PM | 7 | BY MR. WADE: |
| 01:06PM | 8 | Q.   AND JUST LOOKING AT THE TOP OF THE EMAIL, DR. RABODZEY |
| 01:06PM | 9 | NOTES THAT HE WANTED TO FOLLOW UP ON SOME OF THE DISCUSSIONS |
| 01:06PM | 10 | AND SPEND MORE TIME UNDERSTANDING THE RISKS WE HAVE TO ACCOUNT |
| 01:06PM | 11 | FOR. |
| 01:06PM | 12 | DO YOU SEE THAT? |
| 01:06PM | 13 | A.   I DO, YES. |
| 01:06PM | 14 | Q.   AND HE GOES THROUGH A PRETTY DETAILED DISCUSSION OF SOME |
| 01:06PM | 15 | CALLS HE HAD WITH RESPECT TO CONSULTANTS ON DIFFERENT |
| 01:06PM | 16 | REGULATORY ITEMS; CORRECT? |
| 01:06PM | 17 | A.   THAT IS CORRECT. |
| 01:06PM | 18 | Q.   AND THEN IF YOU LOOK AT THE PARAGRAPH STARTING WITH "IN |
| 01:06PM | 19 | FACT," IN THE MIDDLE OF THAT DISCUSSION.  HE NOTES AT THE END, |
| 01:07PM | 20 | AT THIS POINT MANY OF THERANOS TESTS WOULD NOT QUALIFY UNDER |
| 01:07PM | 21 | ONE OR TWO OR BOTH FDA REQUIREMENTS. |
| 01:07PM | 22 | DO YOU SEE THAT? |
| 01:07PM | 23 | A.   I DO SEE THAT. |
| 01:07PM | 24 | Q.   AND THAT AGAIN RELATES TO THAT R SQUARED DATA; RIGHT? |
| 01:07PM | 25 | A.   YES. |

GROSSMAN CROSS BY MR. WADE (RES.)                                6691

01:07PM  1    Q.   AND THE --

01:07PM  2    A.   WELL, THAT'S MR. RABODZEY'S, MR. RABODZEY'S PERSPECTIVE AT

01:07PM  3    THAT POINT IN TIME, YES.

01:07PM  4    Q.   AND IF YOU GO DOWN TO -- AND THAT WAS THE DATA THAT

01:07PM  5    THERANOS PROVIDED TO PFM; CORRECT?

01:07PM  6    A.   I'M NOT SURE WHAT DATA HE'S ANALYZING HERE.

01:07PM  7    Q.   OKAY.  IF YOU GO TO THE NEXT BULLET POINT, HE TALKS

01:08PM  8    ABOUT -- I'M SORRY.  IF WE CAN JUST GRAB THE LAST SENTENCE OF

01:08PM  9    THAT BULLET STARTING WITH "IN COMPARISON TO."

01:08PM  10        DO YOU SEE THERE IT SAYS, "IN COMPARISON TO THAT, THERANOS

01:08PM  11   USED 32 SAMPLES TO VALIDATE," SOME OF ITS ASSAYS.

01:08PM  12        AND HE'S COMPARING THE RESULTS OF SOME OF THE THERANOS

01:08PM  13   DATA TO OTHER DATA THAT HE REVIEWED.

01:08PM  14        DO YOU SEE THAT?

01:08PM  15   A.   I DO SEE THAT.

01:08PM  16   Q.   AND HE WAS SUGGESTING THAT IT COMPARED UNFAVORABLY;

01:08PM  17   CORRECT?

01:08PM  18   A.   I THINK HE'S SAYING BOTH ARE GOOD NUMBERS.

01:09PM  19        SO I'M NOT SURE I AGREE WITH YOUR CONCLUSION THERE.

01:09PM  20   Q.   OKAY.  WELL, LET'S LOOK AT HIS CONCLUSION DOWN BELOW.  LET

01:09PM  21   ME DIGEST IT IN A SIMPLE WAY.  LET'S LOOK AT -- HE HAS THREE

01:09PM  22   NUMBERED PARAGRAPHS THERE.

01:09PM  23        DO YOU SEE THAT?

01:09PM  24   A.   I DO, YES.

01:09PM  25   Q.   AND HE IDENTIFIES SOME RISKS.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6692

01:09PM   1        IS THAT FAIR?

01:09PM   2   A.   YES.

01:09PM   3   Q.   HE SAYS, "THE FDA COULD CHOOSE TO SEND CEASE AND DESIST

01:09PM   4   ORDER TO THERANOS ANY TIME BECAUSE THEIR TESTS ARE NOT FDA

01:09PM   5   CLEARED."

01:09PM   6        DO YOU SEE THAT?

01:09PM   7   A.   I DO.

01:09PM   8   Q.   HE SAYS, "HISTORICALLY, THE FDA DID NOT DO THIS, SO

01:09PM   9   THERANOS IS CORRECT THAT SUCH AN AGGRESSIVE SCENARIO IS

01:09PM  10   UNLIKELY IN THE NEAR FUTURE."

01:09PM  11        DO YOU SEE THAT?

01:09PM  12   A.   I DO SEE THAT.

01:09PM  13   Q.   HE THEN SAYS, "CLIA DOES NOT GUARANTEE THE COMPANY THAT

01:09PM  14   THE FDA WILL NOT GO AFTER THEM, BUT THERE ARE EXAMPLES OF LARGE

01:09PM  15   CLIA LABS OPERATING WITHOUT FDA APPROVAL."

01:09PM  16        DO YOU SEE THAT?

01:09PM  17   A.   I DO SEE THAT.

01:09PM  18   Q.   AND THEN HE NOTES THAT THERE'S A RISK, IF YOU GO ON TO THE

01:10PM  19   SECOND PAGE AT THE TOP.

01:10PM  20        DO YOU SEE IT SAYS, "BASED ON THE DATA I HAVE SEEN SO FAR

01:10PM  21   I DO NOT BELIEVE THERANOS HAS ADEQUATE DATA FOR FDA APPROVAL

01:10PM  22   FOR MANY OF ITS TESTS TODAY (THEY ARE CLEARLY WORKING ON

01:10PM  23   THAT)."

01:10PM  24        DO YOU SEE THAT?

01:10PM  25   A.   I DO SEE THAT, YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6693

01:10PM  1    Q.   OKAY.  AND YOU RECOGNIZED THAT RISK AT THE TIME THAT YOU

01:10PM  2    WERE MAKING THIS DECISION?

01:10PM  3    A.   MR. RABODZEY IS DOING HIS JOB.  HE'S ANALYZING THE DATA

01:10PM  4    AND HE'S PROVIDING HIS RISK ASSESSMENT BASED ON THE DATA THEY

01:10PM  5    PROVIDED US, WHICH WAS NOT ALL OF THE DATA THAT THEY HAD, AND

01:10PM  6    WAS NOT THE DATA THAT WAS -- WE DIDN'T REVIEW THEIR FDA

01:11PM  7    FILINGS, SO WE DON'T KNOW WHAT ADDITIONAL DATA SETS THEY HAVE.

01:11PM  8    WE JUST ASKED FOR A SAMPLE OF DATA ON THEIR TECHNOLOGY.

01:11PM  9         SO BASED ON THAT, THIS IS HIS RISK ASSESSMENT.

01:11PM  10   Q.   OKAY.  THAT IS WHAT YOU WERE ASKING HIM TO DO IS TO ASSESS

01:11PM  11   THE RISK SO YOU KNEW THE RISK YOU WERE TAKING WHEN YOU MADE THE

01:11PM  12   INVESTMENT; RIGHT?

01:11PM  13   A.   THAT'S CORRECT.

01:11PM  14   Q.   ALL RIGHT.  LET'S LOOK AT THE CONCLUSION.  AND I WANT TO

01:11PM  15   LOOK IN PARTICULAR AT THE LAST SENTENCE OF THAT FIRST

01:11PM  16   PARAGRAPH.

01:11PM  17        HE SAYS, "WE ALSO HAVE TO ASSUME THAT THERE IS A

01:11PM  18   POSSIBILITY THAT THEY WILL NEVER BE ABLE TO GET CERTAIN TESTS

01:11PM  19   APPROVED BY THE FDA AND THEY WILL REMAIN VENOUS BLOOD DRAW

01:11PM  20   TESTS (WHICH THEY MENTIONED)."

01:11PM  21        DO YOU SEE THAT?

01:11PM  22   A.   YES.

01:11PM  23   Q.   AND YOU UNDERSTOOD THAT WAS --

01:11PM  24   A.   I'M SORRY, COULD YOU REPEAT THE LAST PART?

01:11PM  25   Q.   YOU UNDERSTOOD WHAT HE WAS COMMUNICATING TO YOU AT THE

GROSSMAN CROSS BY MR. WADE (RES.)                          6694

01:11PM  1    TIME?

01:11PM  2    A.   WELL, THIS IS HIS RISK ASSESSMENT.  WELL, THIS IS HIS --

01:12PM  3    WELL, MR. RABODZEY IS PROVIDING US HIS PERSPECTIVE ON THE RISKS

01:12PM  4    AROUND FDA APPROVAL.

01:12PM  5    Q.   AND THAT THEY MAY NOT GET APPROVAL AND THAT SOME OF THEIR

01:12PM  6    TESTS MAY REMAIN VENOUS BLOOD DRAW TESTS, WHICH THERANOS TOLD

01:12PM  7    YOU; RIGHT?

01:12PM  8    A.   THEY DID NOT TELL US THEIR TESTS WOULD REMAIN VENOUS BLOOD

01:12PM  9    DRAW TESTS, NO, THAT'S NOT WHAT THEY TOLD US.

01:12PM  10   Q.   ISN'T THAT WHAT DR. RABODZEY WROTE RIGHT THERE?

01:12PM  11   A.   WELL, I THINK WE MAY BE TALKING ABOUT DIFFERENT THINGS.

01:12PM  12        THE COMPANY TOLD US THAT THEY WOULD, IN A SHORT PERIOD OF

01:12PM  13   TIME, BE DOING ALMOST ALL FINGERSTICK USING THE PROPRIETARY

01:12PM  14   TECHNOLOGY.

01:12PM  15        THIS IS REFERRING TO THE RISKS -- ALL COMPANIES THAT ARE

01:12PM  16   GOING THROUGH AN FDA APPROVAL PROCESS HAVE RISKS.  WE CAN PICK

01:12PM  17   UP THE PAPER EVERY WEEK AND READ ABOUT COMPANIES THAT HAVE

01:12PM  18   SETBACKS FROM A REGULATORY STANDPOINT.  IT'S JUST PART OF THIS

01:13PM  19   INDUSTRY.

01:13PM  20        SO HE'S DOING HIS JOB TO IDENTIFY THE POTENTIAL RISKS

01:13PM  21   ASSOCIATED WITH SEEKING FDA APPROVAL.

01:13PM  22        BUT THEY WERE ABLE TO OPERATE THEIR CLIA LABORATORY, THEY

01:13PM  23   WERE ABLE TO PROVIDE A GREAT RETAIL PRODUCT, DIFFERENTIATED

01:13PM  24   RETAIL PRODUCT, WITHOUT GETTING FDA APPROVAL.

01:13PM  25        SO THIS WAS AN IMPORTANT PART OF UNDERSTANDING LONGER TERM

GROSSMAN CROSS BY MR. WADE (RES.)                                    6695

01:13PM   1    HOW THEY WOULD EVENTUALLY SECURE FDA APPROVAL FOR ALL OF THEIR

01:13PM   2    TESTS, WHICH IS SOMETHING THEY TOLD US THAT THEY WERE GOING TO

01:13PM   3    DO.

01:13PM   4         BUT IT REALLY WASN'T FUNDAMENTAL TO THE MODEL, THE

01:13PM   5    BUSINESS THAT WE WERE INVESTING IN AT THAT POINT IN TIME.

01:13PM   6         BUT IT WAS SOMETHING THAT WAS IMPORTANT TO THE COMPANY, SO

01:13PM   7    WE WANTED TO UNDERSTAND WHAT THE PROCESS FOR GETTING FDA

01:13PM   8    APPROVAL WAS.

01:13PM   9    Q.   WELL, DOESN'T IT SAY RIGHT HERE, SIR, THAT THERANOS TOLD

01:13PM  10    YOU CERTAIN OF ITS TESTS MAY RETAIN VENOUS BLOOD DRAW TESTS?

01:13PM  11         ISN'T THAT WHAT THAT SENTENCE SAYS RIGHT THERE?

01:13PM  12    A.   I BELIEVE THIS IS MR. RABODZEY COMMUNICATING TO US.

01:13PM  13    NOT -- I DON'T BELIEVE THIS IS A THERANOS EMAIL TO PFM.

01:14PM  14    Q.   NO.  HE'S SAYING WE HAVE TO ASSUME THAT THERE IS A

01:14PM  15    POSSIBILITY THAT THEY WILL NEVER BE ABLE -- "THEY" MEANING

01:14PM  16    THERANOS; RIGHT?

01:14PM  17    A.   YES, THAT'S WHO HE IS REFERRING TO.

01:14PM  18    Q.   "WILL NEVER BE ABLE TO GET CERTAIN TESTS APPROVED BY THE

01:14PM  19    FDA AND THEY WILL REMAIN VENOUS BLOOD DRAW TESTS (WHICH THEY

01:14PM  20    MENTIONED)."

01:14PM  21    A.   THEY DID MENTION TO US THAT A SMALL PERCENTAGE OF TESTS

01:14PM  22    WERE VENOUS BLOOD DRAW AT THE TIME OF OUR DUE DILIGENCE, THAT

01:14PM  23    IS TRUE.

01:14PM  24    Q.   LET'S GO TO THE NEXT PARAGRAPH AND LOOK AT THE BOTTOM

01:14PM  25    SENTENCE STARTING WITH "BASICALLY."

GROSSMAN CROSS BY MR. WADE (RES.)                                    6696

01:14PM   1         IT SAYS, "BASICALLY, I WOULD ASSUME 10 TO 25 PERCENT

01:14PM   2    CHANCE OF A MAJOR DELAY OR PROBLEMS WITH GETTING ALL TESTS ON

01:14PM   3    THE MARKET THROUGH FDA."

01:14PM   4         DO YOU SEE THAT?

01:14PM   5    A.   I SEE THAT.

01:14PM   6    Q.   AND IT SAYS, "OBVIOUSLY, IF EVERYTHING GOES WELL, THIS

01:14PM   7    WILL BE A HUGE SUCCESS, SO I DON'T WANT US TO BE TOO

01:15PM   8    CONSERVATIVE HERE, BUT WANT TO MAKE SURE WE UNDERSTAND THE

01:15PM   9    RISKS INVOLVED SINCE THIS MAY AFFECT SIZING DECISIONS."

01:15PM   10        DO YOU SEE THAT?

01:15PM   11   A.   I DO SEE THAT.

01:15PM   12   Q.   LET'S NEXT TURN TO 4090.

01:15PM   13   A.   OKAY.

01:15PM   14   Q.   AND DO YOU RECOGNIZE THIS TO BE ANOTHER EMAIL IN WHICH

01:15PM   15   INFORMATION IS BEING CONVEYED AS PART OF THE DUE DILIGENCE

01:15PM   16   PROCESS RELATING TO THERANOS?

01:15PM   17   A.   IF I COULD HAVE A MINUTE TO JUST GO THROUGH THIS EMAIL

01:15PM   18   CHAIN?  THANK YOU.

01:15PM   19   Q.   SURE.  IF IT HELPS, I'M GOING TO START WITH THE SECOND TO

01:15PM   20   LAST EMAIL ON THE SECOND PAGE.

01:16PM   21        (PAUSE IN PROCEEDINGS.)

01:16PM   22           THE WITNESS:  OKAY.  SORRY.  IT'S A LONG CHAIN.

01:16PM   23   BY MR. WADE:

01:16PM   24   Q.   OKAY.  DID I ACCURATELY DESCRIBE THIS AS AN EMAIL THAT

01:17PM   25   CONVEYS ADDITIONAL INFORMATION RELATING TO THE DUE DILIGENCE

GROSSMAN CROSS BY MR. WADE (RES.)                    6697

01:17PM   1    PROCESS WITH RESPECT TO YOUR THERANOS INVESTMENT?

01:17PM   2    A.   YES.

01:17PM   3              MR. WADE:  MOVE THE ADMISSION OF EXHIBIT 4090.

01:17PM   4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:17PM   5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:17PM   6         (GOVERNMENT'S EXHIBIT 4090 WAS RECEIVED IN EVIDENCE.)

01:17PM   7              MR. WADE:   IF WE CAN GO TO THE SECOND PAGE AND LOOK

01:17PM   8    AT THE SECOND TO THE LAST EMAIL.

01:17PM   9    Q.   DO YOU SEE HERE THAT MR. KHANNA IS CONVEYING TO YOU

01:17PM   10   THAT -- SOME INTEL THAT HE GOT WITH RESPECT TO THERANOS?

01:17PM   11   A.   YES, HE IS.

01:17PM   12   Q.   AND WHAT DO YOU RECALL HIM CONVEYING?

01:17PM   13   A.   WELL, BASED ON THIS EMAIL, HE SAID THAT HE CHECKED WITH

01:18PM   14   BLUE CROSS AND BLUE SHIELD OF ILLINOIS, THAT'S WHAT THAT --

01:18PM   15   THOSE SYMBOLS STAND FOR, BCBSIL.

01:18PM   16   Q.   UH-HUH.

01:18PM   17   A.   AGAIN, WE TALKED ABOUT THIS YESTERDAY, EACH STATE HAS A

01:18PM   18   NOT FOR PROFIT HEALTH INSURANCE COMPANY UNDER THE BLUE CROSS OR

01:18PM   19   BLUE SHIELD NAME, AND SO THIS IS THE ILLINOIS BLUE CROSS AND

01:18PM   20   BLUE SHIELD.

01:18PM   21        IT'S NOT A PUBLIC COMPANY SO THIS IS A CONTACT THAT HE HAS

01:18PM   22   FROM THIS NOT FOR PROFIT ORGANIZATION IN ILLINOIS.

01:18PM   23        AND THE FEEDBACK WAS THAT THEY HAD EVALUATED THERANOS'S

01:18PM   24   SERVICES AND THEY CONCLUDED THAT IT DOES NOT WORK -- I'M JUST

01:18PM   25   READING FROM THE EMAIL -- THEY HAVE NO CONTRACT WITH THERANOS

GROSSMAN CROSS BY MR. WADE (RES.)                              6698

01:18PM   1      AND THEY DID EXTENSIVE DILIGENCE ON THE MACHINE AND CAME TO

01:18PM   2      THIS CONCLUSION.

01:18PM   3      Q.   OKAY.  SO YOU LEARNED THROUGH YOUR DUE DILIGENCE PROCESS

01:19PM   4      THAT THIS BLUE CROSS BLUE SHIELD ENTITY HAD LOOKED AT THE

01:19PM   5      TECHNOLOGY AND COME TO THE VIEW THAT IT DIDN'T WORK; RIGHT?

01:19PM   6      A.   WE -- YES.

01:19PM   7      Q.   DO YOU RECALL THAT?

01:19PM   8      A.   THAT WAS THE INFORMATION THAT WE HAD FROM VIVEK KHANNA'S

01:19PM   9      CONTACT AT BLUE CROSS BLUE SHIELD ILLINOIS.

01:19PM  10      Q.   OKAY.  AND AGAIN, THIS IS ABOUT A WEEK BEFORE YOU'RE

01:19PM  11      MAKING THE INVESTMENT DECISION; RIGHT?

01:19PM  12      A.   YES.

01:19PM  13      Q.   AND LET'S GO, LET'S GO NEXT TO 14057.

01:20PM  14      A.   OKAY.

01:20PM  15      Q.   DO YOU HAVE THAT IN FRONT OF YOU?

01:20PM  16      A.   I DO.

01:20PM  17      Q.   AND DO YOU RECOGNIZE THAT EMAIL?

01:20PM  18      A.   I DO, YES.

01:20PM  19      Q.   AND DO YOU RECOGNIZE THIS TO BE A COMMUNICATION RELATING

01:20PM  20      TO YOUR OWN TEST AT THERANOS?

01:20PM  21      A.   YES.

01:20PM  22      Q.   OKAY.  AND --

01:20PM  23      A.   WELL, THE TOP EMAIL IS.  THE REST OF THE EMAIL CHAIN IS

01:20PM  24      NOT RELATED TO THAT.

01:20PM  25      Q.   RIGHT.  THIS -- YOU OBTAINED INFORMATION FROM THE COMPANY

GROSSMAN CROSS BY MR. WADE (RES.)                          6699

01:20PM  1    ABOUT YOUR TEST; CORRECT?

01:20PM  2    A.   YES.

01:20PM  3    Q.   AND THEN YOU CONVEYED IT TO YOUR TEAM; RIGHT?

01:21PM  4    A.   YES.

01:21PM  5              MR. WADE:  MOVE THE ADMISSION OF 14057.

01:21PM  6              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:21PM  7              THE COURT:  IT'S ADMITTED.

01:21PM  8         (DEFENDANT'S EXHIBIT 14057 WAS RECEIVED IN EVIDENCE.)

01:21PM  9    BY MR. WADE:

01:21PM  10   Q.   AND IN THIS EMAIL, DO YOU RECALL THAT THERE WAS ACTUALLY A

01:21PM  11   DELAY THAT RESULTED FROM YOU GETTING YOUR TEST RESULTS BACK

01:21PM  12   FROM THE COMPANY?

01:21PM  13   A.   YES, I DO.

01:21PM  14   Q.   AND THAT THE RESULTS GOT HUNG UP FOR SEVERAL DAYS; IS THAT

01:21PM  15   RIGHT?

01:21PM  16   A.   I DON'T, I DON'T RECALL IF IT WAS SEVERAL DAYS, BUT I DO

01:21PM  17   RECALL THAT IT WAS NOT FOUR HOURS.

01:21PM  18   Q.   YEAH.  IT WAS LONGER THAN EXPECTED.  IS THAT FAIR?

01:21PM  19   A.   YES.

01:21PM  20   Q.   OKAY.  AND DO YOU RECALL LEARNING THAT THAT WAS BECAUSE A

01:21PM  21   CONTROL HAD FAILED ON ONE OF THE ASSAYS THAT YOU HAD TESTED?

01:21PM  22   A.   I BELIEVE THAT, YEAH, WE -- I THINK WE COVERED THAT

01:21PM  23   YESTERDAY, YES.

01:21PM  24   Q.   AND THAT, THAT IS WHAT HELD UP THE RESULT; IS THAT RIGHT?

01:21PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                   6700

01:21PM  1    Q.   AND IF I JUST LOOK AT YOUR EMAIL AT THE TOP, YOU

01:21PM  2    RECOGNIZED, AND YOUR TEAM RECOGNIZED, THAT THIS IS THE REAL

01:22PM  3    WORLD AND THINGS LIKE THIS CAN HAPPEN IN THE PATIENT

01:22PM  4    EXPERIENCE; CORRECT?

01:22PM  5    A.   I -- I'M NOT SURE WHAT I WAS REFERRING TO THERE.  I GUESS

01:22PM  6    IT -- OKAY.  YES.  YES.  YEAH.

01:22PM  7    Q.   AND, AGAIN, THIS IS IN THAT WINDOW JUST ABOUT A WEEK

01:22PM  8    BEFORE YOUR INVESTMENT DECISION; CORRECT?

01:22PM  9    A.   YES.

01:22PM  10   Q.   OKAY.  AND LET'S GO TO 14054.

01:23PM  11        DO YOU HAVE THAT?

01:23PM  12   A.   I DO.

01:23PM  13   Q.   AND IS THAT ANOTHER REPORT ON A DILIGENCE CALL THAT

01:23PM  14   DR. RABODZEY HAD?

01:23PM  15   A.   IT APPEARS TO BE, YES.

01:23PM  16        MR. WADE:  MOVE THE ADMISSION OF 14054.

01:23PM  17        MR. LEACH:  YOUR HONOR, 802.  I DON'T MIND THIS

01:23PM  18   COMING IN FOR STATE OF MIND.

01:23PM  19        MR. WADE:  THAT'S FINE.

01:23PM  20        THE COURT:  STATE OF MIND OF THIS WITNESS?

01:23PM  21        MR. WADE:  YES.

01:23PM  22        THE COURT:  IN REGARDS TO THE INVESTMENT DECISION?

01:23PM  23        MR. WADE:  YES.

01:23PM  24        THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

01:23PM  25   IS ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

GROSSMAN CROSS BY MR. WADE (RES.)                                    6701

01:23PM  1    DOCUMENT, BUT ONLY AS TO THE ISSUE OF THE STATE OF MIND OF

01:23PM  2    MR. GROSSMAN IN REGARDS TO THE INVESTMENT DECISION.

01:23PM  3         AND IT MAY BE PUBLISHED.

01:23PM  4              MR. WADE:  THANK YOU, YOUR HONOR.

01:23PM  5         (DEFENDANT'S EXHIBIT 14054 WAS RECEIVED IN EVIDENCE.)

01:23PM  6    BY MR. WADE:

01:23PM  7    Q.   AND THIS IS ON THE -- THIS IS THE NEXT DAY, THIS IS ON THE

01:23PM  8    29TH OF JANUARY; CORRECT?

01:23PM  9    A.   YES.

01:23PM  10   Q.   AND DR. RABODZEY REPORTS ON A CALL THAT HE HAD WITH A

01:24PM  11   SCIENTIST WHO DEVELOPS LAB DEVELOPED TESTS.

01:24PM  12        DO YOU SEE THAT?

01:24PM  13   A.   I DO.

01:24PM  14   Q.   AND HE SAYS THAT THAT SCIENTIST'S VIEW WAS THAT CLIA

01:24PM  15   APPROVAL IS ENOUGH FOR AS LONG AS YOU HAVE MACHINES INSIDE OF

01:24PM  16   THE CLIA LAB.  THERE IS NO NEED FOR FDA APPROVAL.

01:24PM  17        DO YOU SEE THAT?

01:24PM  18   A.   I DO.

01:24PM  19   Q.   AND THEN HE SAID THAT IF YOU WANT TO PUT A MACHINE IN A

01:24PM  20   WALGREENS LOCATION, IT HAD TO BE FDA CLEARED.

01:24PM  21        DO YOU SEE THAT?

01:24PM  22   A.   I DO SEE THAT.

01:24PM  23   Q.   OKAY.  AND HE -- THIS PERSON ALSO EXPRESSED THE VIEW, IF

01:24PM  24   YOU LOOK AT THE "ADDITIONALLY" SENTENCE THERE.

01:24PM  25        "HE DID BELIEVE THAT WHILE MINIATURIZING" -- LH, IS THAT

GROSSMAN CROSS BY MR. WADE (RES.)                                    6702

01:24PM  1     LABCORP?

01:24PM  2     A.    LH IS REFERRING TO LABCORP.

01:24PM  3     Q.    OKAY.

01:24PM  4           -- "LABCORP TEST MENU IS POSSIBLE, IT WILL BE VERY HARD TO

01:24PM  5     DO ON SOME TESTS AND ACCURACY WILL DETERIORATE (BUT WE ALREADY

01:25PM  6     KNOW THAT)."

01:25PM  7           DO YOU SEE THAT?

01:25PM  8     A.    I SEE THAT.

01:25PM  9     Q.    AND IF YOU LOOK AT THE NEXT, IT SAYS, "OVERALL, I THINK

01:25PM  10    ACROSS THE 3 REGULATORY/SCIENCE CALLS I FEEL THAT THERE IS

01:25PM  11    SMALL RISK TO IMPLEMENTATION IF THE FDA CHOOSES TO EXERCISE

01:25PM  12    THEIR AUTHORITY, BUT THIS WOULD BE UNUSUAL.  SO, I WOULD STICK

01:25PM  13    TO MY LOW 10 TO 20 PERCENT CHANCE THAT THE IMPLEMENTATION GETS

01:25PM  14    DERAILED BY THE FDA DEMANDING MORE REGULATION AND A DECENT

01:25PM  15    CHANCE THAT SOME OF THE TESTS MAY NOT PASS THE FDA 501K

01:25PM  16    REVIEW."

01:25PM  17          DO YOU SEE THAT?

01:25PM  18    A.    I DO SEE THAT.

01:25PM  19    Q.    AND THIS IS, AGAIN, DR. RABODZEY DOING HIS JOB ABOUT A

01:25PM  20    WEEK OUT FROM THE INVESTMENT; IS THAT FAIR?

01:25PM  21    A.    AND I CONTINUE -- AND HE CONTINUES TO BELIEVE THAT THIS IS

01:26PM  22    AN ACCEPTABLE RISK FOR A PRIVATE INVESTMENT AS LONG AS WE

01:26PM  23    BELIEVE UP SIDE OF THE BASE CASE SCENARIO.

01:26PM  24    Q.    I WAS CORRECT IN MY QUESTION; IS THAT RIGHT?

01:26PM  25    A.    YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6703

01:26PM   1    Q.   LET'S GO TO 14055.

01:26PM   2         DO YOU RECOGNIZE THIS TO BE ANOTHER EMAIL RELATING TO THE

01:26PM   3    THERANOS DUE DILIGENCE PROCESS RELATING TO DR. RABODZEY'S

01:27PM   4    PATIENT EXPERIENCE DUE DILIGENCE?

01:27PM   5    A.   YES.

01:27PM   6              MR. WADE:  MOVE THE ADMISSION OF 14055.

01:27PM   7              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:27PM   8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:27PM   9         (DEFENDANT'S EXHIBIT 14055 WAS RECEIVED IN EVIDENCE.)

01:27PM   10   BY MR. WADE:

01:27PM   11   Q.   AND THIS EMAIL -- DO YOU RECALL THAT DR. RABODZEY WENT IN

01:27PM   12   AND GOT HIS BLOOD TESTED AT WALGREENS?

01:27PM   13        I BELIEVE YOU TESTIFIED TO THAT.

01:27PM   14   A.   YES.

01:27PM   15   Q.   AND THERE WAS A DELAY IN GETTING THE TEST RESULTS.

01:27PM   16        DO YOU RECALL THAT?

01:27PM   17   A.   I RECALL THAT NOW, YES.

01:27PM   18   Q.   AND DO YOU RECALL THAT BEING AS A RESULT OF THE EMR SYSTEM

01:27PM   19   NOT FUNCTIONING PROPERLY YET?

01:27PM   20   A.   I WOULD NEED TO READ THIS TO REFRESH MY MEMORY OF THAT.

01:27PM   21   Q.   WELL, DO YOU RECALL THAT IT WAS AN ISSUE RELATING TO THE

01:27PM   22   ELECTRONIC CONNECTIVITY BETWEEN THE PHARMACY AND HIS DOCTOR'S

01:28PM   23   OFFICE?

01:28PM   24   A.   IT, IT -- IN READING THIS, IT SEEMS THAT THEY DIDN'T HAVE

01:28PM   25   THE RIGHT FAX NUMBER, BUT MAYBE I'M MISSING SOMETHING.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6704

```
01:28PM   1    Q.   WELL, THAT THEY DIDN'T HAVE -- THEY WEREN'T YET CONNECTED

01:28PM   2    ON ELECTRONIC MEDICAL RECORDS; IS THAT RIGHT?  IF YOU LOOK AT

01:28PM   3    THE SECOND PARAGRAPH OF THE FIRST EMAIL?

01:28PM   4    A.   WELL, IT SOUNDS LIKE THEY SENT THE RESULTS TO A FAX

01:28PM   5    NUMBER, BUT THERE WAS A SECONDARY FAX NUMBER BASED ON THE

01:28PM   6    EMAIL.

01:28PM   7         BUT I DON'T KNOW EXACTLY WHAT MR. BLICKMAN FROM THERANOS

01:28PM   8    WAS -- I DON'T, I DON'T -- SO I'M NOT SURE.

01:28PM   9    Q.   WELL, LET ME, LET ME JUST FOCUS YOU ON THE SENTENCE ON THE

01:28PM  10    SCREEN.

01:28PM  11         YOU RECOGNIZE AT THE TIME THAT THAT WALGREENS LOCATION WAS

01:28PM  12    NOT CONNECTED VIA ELECTRONIC MEDICAL RECORDS TO DR. RABODZEY'S

01:29PM  13    MEDICAL PRACTICE?

01:29PM  14    A.   IT'S HARD FOR ME TO ANSWER THAT QUESTION.  THEY MAY HAVE

01:29PM  15    BEEN AND THE PHYSICIAN MAY HAVE STILL WANTED THE FAX BECAUSE

01:29PM  16    THAT'S HOW THEY RECEIVED IT.  IT'S HARD FOR ME TO REALLY ANSWER

01:29PM  17    THAT.  I DON'T KNOW.

01:29PM  18    Q.   OKAY.  LET'S TAKE A QUICK LOOK AT 14029.

01:29PM  19    A.   OKAY.

01:29PM  20    Q.   AND IS THIS ANOTHER EMAIL RELATING TO DR. RABODZEY'S TEST

01:29PM  21    RESULTS AS PART OF THAT DUE DILIGENCE PROCESS?

01:29PM  22    A.   YES, IT APPEARS TO BE.

01:29PM  23              MR. WADE:  MOVE THE ADMISSION OF 14029.

01:30PM  24              MR. LEACH:  802, YOUR HONOR.

01:30PM  25              MR. WADE:  I CAN OFFER IT FOR A LIMITED PURPOSE,
```

GROSSMAN CROSS BY MR. WADE (RES.)                                6705

01:30PM  1    YOUR HONOR, TO KEEP THINGS MOVING.

01:30PM  2              THE COURT:  WHAT LIMITED PURPOSE?

01:30PM  3              MR. WADE:  THE STATE OF MIND OF THE INVESTOR.

01:30PM  4              THE COURT:  DOES THIS RELATE TO YOUR LAST QUESTION

01:30PM  5    ABOUT THE FAX MACHINE?

01:30PM  6              MR. WADE:  I BELIEVE THE SECOND EMAIL IN THE CHAIN

01:30PM  7    REFLECTS THE STATE OF MIND WITH RESPECT TO A TIMING ISSUE, AND

01:30PM  8    THEN THE TOP EMAIL WOULD BE RELEVANT TO THE STATE OF MIND WITH

01:30PM  9    RESPECT TO PERFORMANCE OF THE TEST.

01:31PM  10             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

01:31PM  11   WILL BE ADMITTED NOT FOR THE TRUTH OF ANYTHING ASSERTED IN THE

01:31PM  12   EMAILS, BUT ONLY AS TO ANY ISSUE AND THE STATE OF MIND OF

01:31PM  13   MR. GROSSMAN AS TO ANY DECISION AS TO INVESTMENT.

01:31PM  14             AND IT MAY BE PUBLISHED.

01:31PM  15             (DEFENDANT'S EXHIBIT 14029 WAS RECEIVED IN EVIDENCE.)

01:31PM  16   BY MR. WADE:

01:31PM  17   Q.   OKAY.  AND IT'S A SIMILAR EMAIL -- SAME EMAIL FROM

01:31PM  18   MR. BLICKMAN DOWN BELOW.  AND YOU NOTED IT TOOK A LONG TIME?

01:31PM  19   A.   YES.

01:31PM  20   Q.   AND YOU RECOGNIZED THAT AT THE TIME?

01:31PM  21   A.   YES.

01:31PM  22   Q.   BUT YOU ALSO LEARNED THAT, FROM MR. RABODZEY'S POINT OF

01:31PM  23   VIEW, THE RESULTS WERE CONSISTENT WITH PREVIOUS TESTS; RIGHT?

01:31PM  24   A.   THAT IS -- YES, THAT IS WHAT MR. RABODZEY COMMUNICATED TO

01:31PM  25   ALL OF US ON THE DUE DILIGENCE TEAM.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6706

01:31PM   1    Q.   OKAY.  AND DO YOU RECALL THAT, IN PART, AS SOME OF THESE

01:32PM   2    CONCERNS WERE COMING TO LIGHT IN THIS WINDOW, THAT ONE OF THE

01:32PM   3    THINGS THAT YOU DID IS YOU PLACED A SECOND CALL TO

01:32PM   4    DR. ROBERTSON?

01:32PM   5    A.   I DO BELIEVE I SPOKE TO HIM AGAIN BEFORE THE INVESTMENT.

01:32PM   6    Q.   AND DO YOU RECALL THAT YOU WANTED TO MAKE SURE, IN LIGHT

01:32PM   7    OF SOME OF THESE CONCERNS, THAT YOU WERE, YOU WERE COMFORTABLE

01:32PM   8    WITH HIS VIEWS WITH RESPECT TO THE TECHNOLOGY; RIGHT?

01:32PM   9    A.   THAT'S A LONG QUESTION.  MAYBE YOU COULD TRY TO -- COULD

01:32PM  10    YOU ASK THAT ONE MORE TIME?

01:32PM  11    Q.   WELL, LET ME ASK THIS, DO YOU RECALL THAT YOU CALLED HIM

01:32PM  12    AND JUST POINT-BLANK SAID, DOES THE TECHNOLOGY WORK?  AND HE

01:32PM  13    SAID YES?

01:32PM  14    A.   I BELIEVE WE TALKED ABOUT THE TECHNOLOGY IN THAT SECOND

01:32PM  15    CONVERSATION, YES.

01:32PM  16    Q.   AND DO YOU RECALL WHAT HE CONVEYED TO YOU ABOUT THE

01:33PM  17    TECHNOLOGY IN THAT SECOND CONVERSATION?

01:33PM  18    A.   I -- WHAT I REMEMBER WASN'T REALLY ANY DIFFERENT FROM THE

01:33PM  19    FIRST CONVERSATION.

01:33PM  20    Q.   IT WAS CONSISTENT WITH THAT AND THAT HE WAS COMFORTABLE

01:33PM  21    WITH THE TECHNOLOGY --

01:33PM  22    A.   YES.

01:33PM  23    Q.   -- AND THAT GAVE YOU ASSURANCE?

01:33PM  24         BUT YOU, YOU WENT BACK TO HIM LATE IN THE DUE DILIGENCE

01:33PM  25    PROCESS FOR A SECOND CALL AFTER SOME OF THESE ISSUES CAME UP;

GROSSMAN CROSS BY MR. WADE (RES.)                                    6707

01:33PM   1     IS THAT RIGHT?

01:33PM   2     A.   I DON'T -- I MEAN, WE WERE -- OFTEN IN AN INVESTMENT LIKE

01:33PM   3     THIS WHERE THERE'S A DEADLINE, THERE'S A LOT OF WORK THAT GETS

01:33PM   4     DONE IN THE LAST DAY, TWO, THREE DAYS.

01:33PM   5          WE HAD A NUMBER OF ITEMS THAT WE HAD TO GET THROUGH, AND

01:33PM   6     AS PART OF OUR DUE DILIGENCE PROCESS, IT INCLUDED CIRCLING BACK

01:33PM   7     TO MR. ROBERTSON, IN ADDITION TO OTHER ITEMS THAT WE HAD, OPEN

01:33PM   8     ITEMS THAT WE HAD.

01:33PM   9     Q.   OKAY.

01:33PM   10    A.   SORT OF A NORMAL PART OF A PROCESS LIKE THIS.

01:34PM   11    Q.   OKAY.  AND AS YOU PUSHED THIS FORWARD, DO YOU RECALL THAT

01:34PM   12    YOUR TEAM PREPARED, YOUR ANALYST TEAM PREPARED A POWERPOINT FOR

01:34PM   13    THE PEOPLE WITHIN PFM WHO WERE CONSIDERING AN INVESTMENT?

01:34PM   14    A.   YES, I DO REMEMBER THAT.

01:34PM   15    Q.   AND LET'S LOOK AT 7411.

01:34PM   16         DO YOU HAVE THAT IN FRONT OF YOU?

01:34PM   17    A.   I DO.

01:34PM   18    Q.   AND IS THIS THE POWERPOINT THAT YOU GAVE, OR THAT WAS

01:34PM   19    GIVEN TO THE PEOPLE WHO MIGHT BE INTERESTED IN INVESTING IN

01:34PM   20    THERANOS?

01:34PM   21    A.   THIS WAS THE POWERPOINT THAT AT THAT POINT IN TIME WE

01:35PM   22    PRODUCED.

01:35PM   23         I'M NOT SURE HOW IT WAS DISTRIBUTED OR SHARED, BUT THIS IS

01:35PM   24    A DOCUMENT THAT INTERNALLY WE PRODUCED AT OUR FIRM.

01:35PM   25    Q.   AND DO YOU RECALL WHETHER YOU WERE PRESENT FOR THE

GROSSMAN CROSS BY MR. WADE (RES.)                                    6708

01:35PM   1    PRESENTATION TO POTENTIAL -- PEOPLE WHO WERE INTERESTED IN

01:35PM   2    POTENTIALLY INVESTING?

01:35PM   3    A.   I DON'T -- I DO RECALL.  I WAS NOT PRESENT.  I WAS NOT IN

01:35PM   4    SAN FRANCISCO THE DAY OF THIS PRESENTATION.

01:35PM   5    Q.   OKAY.  BUT YOU RECEIVED A COPY OF THE FINAL PRESENTATION?

01:35PM   6    A.   MY MEMORY IS THAT WE HAD MULTIPLE ITERATIONS OF THIS, SO I

01:35PM   7    DO -- I WOULD HAVE EXPECTED IT WOULD BE UNUSUAL IF I DIDN'T GET

01:35PM   8    A COPY OF THIS.

01:35PM   9         BUT I DON'T REMEMBER SPECIFICALLY.

01:35PM   10   Q.   OKAY.

01:35PM   11        I THINK WITH STIPULATION FROM THE GOVERNMENT, I MOVE THE

01:35PM   12   ADMISSION OF 7411.

01:35PM   13             MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

01:35PM   14             THE COURT:  ARE THERE ANY REDACTIONS THAT WILL BE

01:35PM   15   MADE TO THIS?

01:36PM   16             MR. WADE:  IS THE COURT PARTICULARLY FOCUSSED ON --

01:36PM   17             THE COURT:  THERE'S -- THE BATES NUMBERS IN THE

01:36PM   18   RIGHT-HAND CORNER SEEM TO HAVE SOME IDENTIFIERS.

01:36PM   19             MR. WADE:  THE COURT'S INDULGENCE FOR A MOMENT.

01:36PM   20        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:37PM   21             MR. WADE:  WE WILL REDACT THOSE.

01:37PM   22   Q.   AND WHILE WE ARE WORKING TO DO THAT, AND BEFORE WE

01:37PM   23   PUBLISH --

01:37PM   24             THE COURT:  THANK YOU.

01:37PM   25        (DEFENDANT'S EXHIBIT 7411 WAS RECEIVED IN EVIDENCE.)

GROSSMAN CROSS BY MR. WADE (RES.)                              6709

01:37PM  1    BY MR. WADE:

01:37PM  2    Q.   -- LET ME JUST ASK A COUPLE OF QUESTIONS TO REMEMBER WHERE

01:37PM  3    WE STARTED ON CROSS-EXAMINATION.

01:37PM  4         THERE ARE A GROUP OF PEOPLE WITHIN PFM WHO HAVE THE

01:37PM  5    DECISION TO INVEST THROUGH PFM IN SOME OF THESE INVESTMENTS;

01:37PM  6    CORRECT?

01:37PM  7    A.   THERE'S -- I'M SORRY.  COULD YOU REPEAT THE QUESTION?

01:37PM  8    Q.   YEAH.  DO YOU RECALL THAT ONE OF YOUR FUNDS ALLOWS CERTAIN

01:37PM  9    SENIOR MEMBERS OF YOUR FIRM TO INVEST ALONGSIDE THE HEDGE FUND?

01:37PM  10   A.   YES.

01:37PM  11   Q.   AND SOMETIMES WHEN YOU DO THAT, DO YOU GIVE A PRESENTATION

01:37PM  12   OF THE INTERNAL ANALYSIS TO THOSE PEOPLE WHO ARE CONSIDERING

01:37PM  13   THAT SIDECAR INVESTMENT?

01:37PM  14   A.   WE WOULD PREPARE AN ANALYSIS.  WE MAY OR MAY NOT DO A

01:37PM  15   PRESENTATION.

01:37PM  16   Q.   OKAY.  AND IS THE IDEA THAT YOU'LL GIVE THEM AN OVERVIEW

01:38PM  17   OF THE INVESTMENT AND ASSESSMENT OF THE RISKS AND HOW THE FIRM

01:38PM  18   SEES THE INVESTMENT AT THE TIME?

01:38PM  19   A.   YES.

01:38PM  20   Q.   AND THEN ULTIMATELY THE DECISION IN THAT CASE IS UP TO THE

01:38PM  21   INDIVIDUALS AS TO WHETHER OR NOT THEY WISH TO INVEST?

01:38PM  22   A.   YES.

01:38PM  23   Q.   AND I TAKE IT THOSE INDIVIDUALS CAN CONSIDER WHATEVER

01:38PM  24   INFORMATION THEY WANT; RIGHT?

01:38PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6710

01:38PM  1   Q.  BUT DO YOU DO YOUR BEST TO FULLY INFORM THEM OF THE

01:38PM  2   RELEVANT INFORMATION WHEN YOU GIVE PRESENTATIONS?

01:38PM  3   A.  YES.

01:38PM  4   Q.  OKAY.

01:38PM  5       IF WE CAN PUBLISH THAT AND FOCUS ON -- THIS IS DATED

01:38PM  6   JANUARY 30TH, 2014.  DO YOU SEE THAT, THE EMAIL THAT TRANSMITS

01:38PM  7   THIS?

01:38PM  8   A.  I DO.  SORRY.  YES.

01:38PM  9   Q.  AND IF WE JUST GO TO THE FIRST PAGE OF THE POWERPOINT.

01:39PM  10      DO YOU SEE THERE THERE'S A THERANOS LOGO; RIGHT?

01:39PM  11  A.  I DO.

01:39PM  12  Q.  AND DID YOU SEEK PERMISSION FROM THERANOS TO USE THEIR

01:39PM  13  LOGO?

01:39PM  14  A.  I DON'T RECALL.

01:39PM  15  Q.  WERE YOU TRYING TO CREATE THE IMPRESSION WITH THE PEOPLE

01:39PM  16  THAT THIS WAS INFORMATION THAT WAS BEING CONVEYED BY THERANOS?

01:39PM  17  A.  I, I, I DON'T BELIEVE THAT WAS WHAT WE WERE TRYING TO

01:39PM  18  CONVEY, BUT I DID NOT PREPARE THIS SLIDE, SO I DON'T -- I CAN'T

01:39PM  19  SPEAK FOR THE THOUGHT PROCESS BEHIND IT.

01:39PM  20  Q.  LET'S GO TO, LET'S GO TO THE NEXT PAGE, AND THE NEXT PAGE.

01:39PM  21      THIS -- THAT WAS JUST A TRANSITION PAGE.

01:39PM  22      THIS MARKET OVERVIEW, THIS IS THAT ANALYSIS FROM YOUR

01:39PM  23  MODEL THAT WE WERE LOOKING AT EARLIER; IS THAT RIGHT?

01:39PM  24  A.  YES.

01:39PM  25  Q.  AND THIS WAS AN INDEPENDENT ANALYSIS THAT YOUR TEAM HAD

GROSSMAN CROSS BY MR. WADE (RES.)                                        6711

01:40PM  1    DONE AS PART OF YOUR MODELING?

01:40PM  2    A.    THESE FIGURES I BELIEVE WERE LESS THAN THE MARKET FIGURES

01:40PM  3    THE COMPANY HAD SHARED WITH US.

01:40PM  4    Q.    OKAY.

01:40PM  5    A.    SO, YES, I THINK WE, WE BELIEVE WE ARRIVED AT THESE MARKET

01:40PM  6    SIZES INDEPENDENTLY.

01:40PM  7    Q.    AND DO YOU RECALL WHAT YOU WERE PROJECTING THERANOS'S

01:40PM  8    MARKET SHARE TO BE AT?

01:40PM  9    A.    IN WHICH PART OF THE BUSINESS?

01:40PM  10   Q.    WELL, IN THE TOTAL U.S. LAB MARKET?

01:40PM  11   A.    IN THE TOTAL U.S. LAB MARKET.

01:40PM  12         WE DIDN'T, WE DIDN'T MODEL THE COMPANY BASED ON A TOPS

01:40PM  13   DOWN VIEW OF THE WHOLE U.S. LAB MARKET.

01:40PM  14         SO, I'M SORRY, I CAN'T REALLY ANSWER THE QUESTION THE WAY

01:40PM  15   YOU WANT.

01:40PM  16   Q.    WELL, I'M JUST WONDERING IF YOU RECALL.  DO YOU RECALL

01:41PM  17   THAT WHEN YOU DID YOUR MODELING THAT YOU PROJECTED THAT

01:41PM  18   THERANOS WOULD HAVE 19 PERCENT OF THE U.S. LAB MARKET BY 2017?

01:41PM  19   A.    WE HAD DIFFERENT SCENARIOS, SO I THINK IT DEPENDED ON

01:41PM  20   WHICH SCENARIO YOU'RE REFERRING TO.

01:41PM  21   Q.    I'M JUST -- DO YOU RECALL GENERALLY WHAT PERCENTAGE OF THE

01:41PM  22   U.S. MARKET YOU RECALL THEM OBTAINING IN YOUR FINANCIAL

01:41PM  23   MODELING, BASE CASE?

01:41PM  24   A.    I DON'T REMEMBER SPECIFICALLY THE THREE SCENARIOS, BUT I

01:41PM  25   DO KNOW THAT WE LOOKED AT -- THAT'S EXACTLY HOW WE LOOKED AT

GROSSMAN CROSS BY MR. WADE (RES.)                              6712

01:41PM  1    IT.  WE SAID, WITH A TECHNOLOGY LIKE THIS THAT WAS EASIER TO

01:41PM  2    USE, WAS CHEAPER FOR THE CONSUMER, MORE CONVENIENT, ALL OF THE

01:41PM  3    GREAT ASPECTS OF FINGERSTICK TECHNOLOGY, WHAT SHARE OF EACH ONE

01:41PM  4    OF THESE METROPOLITAN AREAS WOULD THIS TECHNOLOGY, WHAT SHARE

01:41PM  5    OF THE MARKET WOULD THEY HAVE OVER THE NEXT COUPLE YEARS.

01:41PM  6    Q.   AND IF WE JUST -- LET'S JUST JUMP QUICKLY, WHILE WE'RE ON

01:41PM  7    THIS POINT, TO PAGE 8.

01:42PM  8        DO YOU SEE HERE A 19 PERCENT MARKET PENETRATION BY 2017?

01:42PM  9    A.   YES.

01:42PM  10   Q.   OKAY.  AND IF WE CAN JUMP BACK TO WHERE WE WERE IN THE

01:42PM  11   LAST SLIDE WITH THE PIE CHARTS.

01:42PM  12   A.   WELL, I'M SORRY, THAT'S OF THOSE 18 MARKETS.

01:42PM  13   Q.   OKAY.  OF THE 18 MARKETS THAT THEY WERE GOING TO BE IN.

01:42PM  14   OKAY.

01:42PM  15       AND IF WE CAN GO TO THE NEXT SLIDE.

01:42PM  16       HERE YOU PROVIDED THE BUSINESS REVIEW.  THIS IS JUST A

01:42PM  17   QUICK OVERVIEW OF THE COMPANY; RIGHT?

01:42PM  18   A.   YES.

01:42PM  19   Q.   AND DO YOU SEE IN THE THIRD BULLET YOU NOTE A MODEST

01:43PM  20   NUMBER OF CURRENT TESTS REQUIRE VENOUS BLOOD DRAW.

01:43PM  21       DO YOU SEE THAT?

01:43PM  22   A.   I DO.

01:43PM  23   Q.   AND THAT THEY WILL BE TRANSITIONED IN THE COMING MONTHS?

01:43PM  24   A.   YES.

01:43PM  25   Q.   OKAY.  AND IF YOU GO TO THE NEXT SLIDE, THIS IDENTIFIES

GROSSMAN CROSS BY MR. WADE (RES.)                           6713

01:43PM   1    ALL OF THE RISKS.  IS THAT FAIR?

01:43PM   2    A.   WELL, I WANT TO ANSWER YOUR QUESTION.  I THINK THIS IS

01:43PM   3    REALLY MORE DESCRIBING THE SCENARIOS, NOT -- IT'S NOT A RISK.

01:43PM   4    IT'S NOT A -- IT'S NOT A PAGE IN THE PRESENTATION THAT JUST

01:43PM   5    ADDRESSES RISK.

01:43PM   6    Q.   OKAY.  WELL, DID YOU WANT INVESTORS TO KNOW ABOUT THE

01:43PM   7    REGULATORY RISKS THAT DR. RABODZEY IDENTIFIED?

01:43PM   8    A.   I MEAN, I -- THE GOAL WAS TO GIVE INVESTORS A PICTURE OF

01:44PM   9    WHAT WE THOUGHT THE BUSINESS WAS -- WHAT WE THOUGHT OF THE

01:44PM  10    BUSINESS AND WHAT THE DIFFERENT SCENARIOS WERE.

01:44PM  11    Q.   RIGHT.  MY QUESTION IS -- WAS SLIGHTLY DIFFERENT.

01:44PM  12         DID YOU WANT THEM TO KNOW ABOUT THE RISKS THAT WERE

01:44PM  13    IDENTIFIED DURING THE DUE DILIGENCE PROCESS?

01:44PM  14    A.   YES, SURE.

01:44PM  15    Q.   OKAY.  DO YOU BELIEVE THAT YOU FULLY INFORMED THEM OF ALL

01:44PM  16    OF THOSE RISKS THAT YOU IDENTIFIED IN THIS PRESENTATION?

01:44PM  17    A.   YES.

01:44PM  18    Q.   OKAY.  DO YOU SEE ANYWHERE HERE WHERE YOU DISCUSS THE

01:44PM  19    ACCURACY CONCERNS THAT WERE EXPRESSED BY DR. RABODZEY?

01:44PM  20    A.   WE -- I DON'T -- WELL, MAYBE I CAN REVIEW THIS.

01:44PM  21         (PAUSE IN PROCEEDINGS.)

01:44PM  22              THE WITNESS:  YEAH, I DON'T THINK THAT WAS -- THAT

01:45PM  23    WAS NOT A RISK THAT WE FELT WAS A MAJOR RISK AT THIS POINT IN

01:45PM  24    THE INVESTMENT GIVEN THAT THEY WERE OPERATING THEIR CLIA LAB

01:45PM  25    AND HAD SUCCESSFULLY PASSED PROFICIENCY TESTING REQUIREMENTS

GROSSMAN CROSS BY MR. WADE (RES.)                                    6714

01:45PM   1    FOR ALL OF THEIR MENU OF TESTS.

01:45PM   2         AS IT RELATES TO ACCURACY, I THINK THAT WAS MUCH MORE OF

01:45PM   3    AN FDA APPROVAL ISSUE, WHICH REALLY WAS ABOUT THE UP SIDE

01:45PM   4    SCENARIO LONGER TERM.  I DO THINK WE TALKED ABOUT THE FDA MAY

01:45PM   5    REGULATE TESTING MORE AGGRESSIVELY.  SO I MEAN, I THINK WE DO

01:45PM   6    HIGHLIGHT THAT.

01:45PM   7         AND THIS WAS A DOCUMENT THAT WAS PART OF A CONVERSATION, A

01:45PM   8    PRESENTATION.

01:45PM   9         SO THOSE TYPES OF QUESTIONS AND ANSWERS WOULD HAVE BEEN

01:45PM  10    VERY TYPICAL WITHIN THE MEETING ITSELF.

01:45PM  11    BY MR. WADE:

01:45PM  12    Q.   OKAY.  DID YOU FEEL IT WAS APPROPRIATE TO COMMUNICATE TO

01:45PM  13    YOUR INVESTORS SORT OF THE LIMITED EXPERIENCE THAT THERANOS HAD

01:45PM  14    OPERATING IN THE RETAIL ENVIRONMENT GIVEN I THINK YOU SAID IT

01:45PM  15    WAS A TOUGH ENVIRONMENT?

01:45PM  16    A.   THE INDUSTRY CAN BE HARD AS A RETAIL PHARMACY.  THAT'S A

01:46PM  17    DIFFICULT BUSINESS TO OPERATE OVER TIME.

01:46PM  18         BUT AS IT RELATES TO THERANOS, I THINK WE, WE TRIED TO --

01:46PM  19    I DON'T -- I GUESS THE ANSWER TO YOUR QUESTION IS I'M NOT SURE

01:46PM  20    EXACTLY WHAT WE DISCUSSED IN THIS MEETING.  I WASN'T AT THIS

01:46PM  21    MEETING, SO --

01:46PM  22    Q.   OKAY.  BUT YOU WORKED -- THE TEAM WORKED ON THIS TOGETHER;

01:46PM  23    RIGHT?

01:46PM  24    A.   YES, THIS WAS A COLLABORATIVE EFFORT.

01:46PM  25    Q.   OKAY.  AND I ASSUME YOU WANTED TO TRY AND INFORM THEM OF

GROSSMAN CROSS BY MR. WADE (RES.)                                    6715

01:46PM   1    ALL OF THE RISKS THAT YOU IDENTIFIED; IS THAT RIGHT?

01:46PM   2    A.   I THINK THERE'S AN EFFORT TO SUMMARIZE THE INVESTMENT,

01:46PM   3    BOTH THE POSITIVES AND THE NEGATIVES.  I DON'T THINK A MEETING

01:46PM   4    LIKE THIS WE HAVE TIME TO GO THROUGH EVERY PIECE OF DUE

01:46PM   5    DILIGENCE, ALL OF THE DIFFERENT PEOPLE WE TALKED TO.

01:46PM   6         SO THE GOAL OF A MEETING LIKE THIS IS TO ACTUALLY GIVE

01:46PM   7    THEM AN OVERVIEW, A HIGH LEVEL SUMMARY OF THE INVESTMENT

01:46PM   8    OPPORTUNITY, THE POSITIVES, THE NEGATIVES.  THAT'S REALLY THE

01:46PM   9    GOAL OF A MEETING AND DOCUMENT LIKE THIS.

01:46PM  10         IT'S NOT, IT'S NOT SUPPOSED TO BE A DETAILED REVIEW OF

01:47PM  11    EVERY SINGLE PIECE OF DUE DILIGENCE THAT WE DID.

01:47PM  12    Q.   FAIR ENOUGH.

01:47PM  13         IN AN HOUR LONG MEETING, YOU CAN'T COVER EVERYTHING;

01:47PM  14    CORRECT?

01:47PM  15    A.   YES.

01:47PM  16    Q.   AND IT'S UP TO THE INVESTORS ON AN INDIVIDUAL BASIS TO

01:47PM  17    FOLLOW UP IF THEY HAVE QUESTIONS; RIGHT?

01:47PM  18    A.   CORRECT.

01:47PM  19    Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.  THE NEXT SLIDE.

01:47PM  20    SORRY.

01:47PM  21         IN THIS YOU WERE CONVEYING TO THEM -- YOU WERE CONVEYING

01:47PM  22    TO THE POTENTIAL INTERNAL INVESTORS THE FINANCIAL MODELING IN

01:47PM  23    THE BASE CASE; CORRECT?

01:47PM  24    A.   THAT'S CORRECT.

01:47PM  25    Q.   AND WERE YOU COMFORTABLE INCLUDING THESE NUMBERS WITHOUT

GROSSMAN CROSS BY MR. WADE (RES.)                          6716

01:47PM   1    INDICATING THAT THEY ONLY HAD $25 MILLION IN REVENUE IN 2013?

01:47PM   2    A.   THIS WAS A FORECAST OF FUTURE REVENUE GROWTH, SO WE

01:47PM   3    WEREN'T -- 2013 WASN'T REALLY RELEVANT TO THE OUTLOOK OVER THE

01:48PM   4    NEXT COUPLE OF YEARS.

01:48PM   5    Q.   RIGHT.  BUT YOU WERE GOING -- THERANOS -- YOU HAD

01:48PM   6    PROJECTED THERANOS GOING FROM 25 MILLION TO 249 MILLION.

01:48PM   7    THAT'S -- YOU ARE THE FINANCE GUY, BUT THAT'S SEVERAL HUNDRED

01:48PM   8    PERCENT RETURN; RIGHT?  APPROACHING A THOUSAND PERCENT RETURN?

01:48PM   9    A.   YES, THAT SEEMS LIKE MAYBE AN ACCURATE CALCULATION.

01:48PM  10    Q.   OKAY.  YOU DIDN'T THINK THAT WAS -- REQUIRED DISCLOSURE IN

01:48PM  11    THIS?

01:48PM  12    A.   WELL, I THINK THE THING THAT I THINK WE IMPRESSED UPON

01:48PM  13    OUR, OUR -- IN THIS PRESENTATION WAS THAT THESE NUMBERS WERE

01:48PM  14    LOWER THAN THE COMPANY'S FORECASTS, AND WE HAD THOROUGHLY

01:48PM  15    VETTED THEIR FORECASTS AND HAD DONE AN EXTENSIVE AMOUNT OF DUE

01:48PM  16    DILIGENCE ON THE COMPANY, THE TECHNOLOGY, AND ALL OF THE

01:48PM  17    DIFFERENT PIECES OF THIS BUSINESS THAT WE FELT WERE IMPORTANT

01:48PM  18    TO UNDERSTAND IN BUILDING A MODEL LIKE THIS.

01:48PM  19    Q.   OKAY.  AND IF WE GO TO THE NEXT PAGE.  I'M SORRY, IF WE

01:49PM  20    CAN GO TO THE NEXT PAGE.

01:49PM  21        THIS IS THE BULL CASE, AND THIS IS THE -- THIS IS THE

01:49PM  22    OPTIMISTIC SCENARIO; CORRECT?

01:49PM  23    A.   YES.

01:49PM  24    Q.   AND SO, AGAIN, YOU GAVE THEM THE THREE CASES, AND THEY CAN

01:49PM  25    SORT OF ASSESS THE RISK HOWEVER THEY WISH TO ASSESS IT.

GROSSMAN CROSS BY MR. WADE (RES.)                                6717

01:49PM   1        FAIR ENOUGH?

01:49PM   2   A.   YES.

01:49PM   3   Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.

01:49PM   4        AND HERE YOU PROVIDE THEM THE COMPARISON TO OTHER HIGH

01:49PM   5   GROWTH COMPANIES SO THAT THEY HAVE THAT INFORMATION IN

01:49PM   6   CONNECTION WITH THEIR ANALYSIS; RIGHT?

01:49PM   7   A.   HOW THE PUBLIC MARKET VALUES OTHER OPEN ENDED DISRUPTIVE

01:49PM   8   COMPANIES, YES.

01:49PM   9   Q.   AND YOU FELT LIKE THIS WAS AN APPROPRIATE PEER GROUP BASED

01:50PM  10   UPON YOUR DISCUSSIONS WITH MR. JAMES AND OTHERS?

01:50PM  11   A.   YES.

01:50PM  12   Q.   OKAY.  LET'S GO TO THE NEXT SLIDE.

01:50PM  13        AND YOU CONVEYED TO THE INTERNAL PFM PEOPLE CONSIDER AN

01:50PM  14   INVESTMENT $20.3 BILLION VALUATION THAT YOU CAME UP WITH;

01:50PM  15   CORRECT?

01:50PM  16   A.   AGAIN, I WASN'T IN THIS MEETING, SO I'M NOT EXACTLY SURE

01:50PM  17   HOW THIS WAS CONVEYED.  BUT IT'S CERTAINLY PART OF THE

01:50PM  18   PRESENTATION.

01:50PM  19   Q.   OKAY.

01:50PM  20   A.   AND THE DOCUMENT.

01:50PM  21   Q.   AND I DON'T SEE ANYWHERE IN THE SLIDE WHERE YOU MENTION

01:50PM  22   THAT THEY WERE ONLY IN THREE STORES AT THE TIME OF THE

01:50PM  23   INVESTMENT.

01:50PM  24        DO YOU KNOW WHETHER THAT WAS CONVEYED IN THE MEETING?

01:50PM  25   A.   I DON'T.

GROSSMAN CROSS BY MR. WADE (RES.)                          6718

01:50PM  1    Q.   OKAY.  IN ADDITION -- SO THIS WAS AN INTERNAL DOCUMENT.

01:50PM  2         WOULD YOU SEND THIS DOCUMENT TO PEOPLE OUTSIDE OF THE FIRM

01:50PM  3    WHO WERE CONSIDERING INVESTMENT AS WELL?

01:51PM  4    A.   I, I, I WASN'T INVOLVED IN THAT, SO I'M NOT SURE.

01:51PM  5    Q.   OKAY.  AND IN ADDITION TO THAT, THERE WERE SOME ONE OFF

01:51PM  6    CALLS THAT YOU MADE TO PEOPLE WHO MIGHT BE INTERESTED IN

01:51PM  7    INVESTING THROUGH THE PARTNERS VEHICLE; IS THAT RIGHT?

01:51PM  8    A.   THAT WOULDN'T BE UNUSUAL IN A SITUATION LIKE THIS.  I

01:51PM  9    DON'T RECALL SPECIFICALLY THE CALLS THAT I MADE.

01:51PM  10   Q.   CAN YOU TAKE A LOOK AT 13822.

01:51PM  11   A.   OKAY.

01:51PM  12   Q.   AND DO YOU RECALL DISCUSSIONS WITH MR. GREER ABOUT AN

01:52PM  13   INVESTMENT?

01:52PM  14   A.   I DON'T RECALL, BUT OBVIOUSLY THIS EMAIL HELPS TO REFRESH

01:52PM  15   MY MEMORY.

01:52PM  16   Q.   AND WAS HE SOMEONE OUTSIDE OF THE FIRM?  OR WHAT WAS HIS

01:52PM  17   RELATIONSHIP?  HOW WAS HE GOING TO INVEST?

01:52PM  18   A.   HE WAS AN INVESTOR IN OUR HEDGE FUND.

01:52PM  19   Q.   OKAY.  SO WAS THIS LIKE A SIDECAR INVESTMENT THAT HE WAS

01:52PM  20   GOING TO DO?

01:52PM  21   A.   THIS WOULD BE A COINVESTMENT OPPORTUNITY, ABOVE AND BEYOND

01:52PM  22   THE INVESTMENT HE WOULD MAKE THROUGH HIS ALLOCATION TO OUR

01:52PM  23   HEDGE FUND.

01:52PM  24   Q.   OKAY.  AND SO YOU WERE CONVEYING SOME OF THE RISKS TO HIM

01:52PM  25   IN CONNECTION WITH THE INVESTMENT?

GROSSMAN CROSS BY MR. WADE (RES.)                    6719

01:52PM  1   A.   I BELIEVE I WAS -- WE WERE EMAILING ABOUT THE BUSINESS,

01:52PM  2   YES.

01:52PM  3              MR. WADE:  OKAY.  MOVE EXHIBIT 13822.

01:52PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:52PM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:52PM  6         (DEFENDANT'S EXHIBIT 13822 WAS RECEIVED IN EVIDENCE.)

01:53PM  7   BY MR. WADE:

01:53PM  8   Q.   AND DO YOU SEE IN THIS EMAIL MR. GREER ASKS ABOUT THE

01:53PM  9   VALUATION IN THE SECOND TO THE TOP EMAIL AND ASKS IF IT'S

01:53PM  10  $20 BILLION?

01:53PM  11       DO YOU SEE THAT?

01:53PM  12       AND WHETHER IT'S OFF THE FINANCING, DO YOU KNOW WHAT HE

01:53PM  13  MEANS THERE?

01:53PM  14  A.   HE'S ASKING IS THE VALUATION -- HE'S ASKING A QUESTION

01:53PM  15  RELATED TO WHETHER THE VALUE IS 20 BILLION BEFORE OR AFTER

01:53PM  16  INVESTING.

01:53PM  17  Q.   THE VALUATION BASED UPON THE OFFERING PRICE WOULD HAVE

01:53PM  18  BEEN ABOUT 9 BILLION; RIGHT?

01:53PM  19  A.   YEAH.  I THINK MR. GREER WAS CONFUSED BETWEEN THE VALUE WE

01:53PM  20  HAD ON THE COMPANY ON THE U.S. OPERATIONS AND THE ACTUAL

01:53PM  21  VALUATION THAT WE WERE INVESTING IN.

01:53PM  22  Q.   OKAY.  AND YOU CLARIFIED THAT IT WAS A DISCOUNTED CASH

01:54PM  23  FLOW VALUATION?

01:54PM  24  A.   CORRECT.

01:54PM  25  Q.   AND THAT IT WAS VALUED OFF GOING PUBLIC OFF THOSE COMPS;

GROSSMAN CROSS BY MR. WADE (RES.)                                    6720

01:54PM  1    RIGHT?

01:54PM  2    A.   WELL, WHAT I SAID WAS THAT THAT'S THE INTRINSIC VALUE,

01:54PM  3    THAT'S THE VALUE OF THIS BUSINESS, THE U.S. PART OF THE

01:54PM  4    BUSINESS THAT WE SEE.

01:54PM  5         BUT IF THIS COMPANY GOES PUBLIC, THE -- IT WILL LIKELY NOT

01:54PM  6    BE VALUED OFF OF A DCF VALUE.  IT WILL LIKELY BE VALUED THE WAY

01:54PM  7    THAT THE PUBLIC MARKET GETS EXCITED ABOUT OTHER OPEN ENDED,

01:54PM  8    DISRUPTED BUSINESSES, AND THOSE ARE SOME EXAMPLES THAT I PUT IN

01:54PM  9    THIS EMAIL THAT HE WOULD LIKELY KNOW AND RELATE TO.

01:54PM 10    Q.   AND THAT WOULD EVEN BE A HIGHER VALUATION THAN 20 BILLION?

01:54PM 11    A.   IT DEPENDS.

01:54PM 12    Q.   OKAY.  DID -- I DIDN'T SEE YOU TELL MR. GREER, OR ANY OF

01:54PM 13    THE PEOPLE IN THE PRESENTATION, THAT THERANOS HAD TOLD YOU THAT

01:55PM 14    THEY INTENDED TO GO PUBLIC IN THE NEAR TERM.

01:55PM 15         DID YOU THINK THAT WAS SIGNIFICANT INFORMATION TO CONVEY

01:55PM 16    TO INVESTORS?

01:55PM 17    A.   THAT'S NOT WHAT THEY TOLD US.

01:55PM 18    Q.   DIDN'T THEY TELL YOU THAT YOU WERE LOOKING FOR LONG-TERM

01:55PM 19    INVESTMENT AND THAT'S WHAT MR. JAMES COMMUNICATED BACK?

01:55PM 20    A.   YES, THEY DID.

01:55PM 21    Q.   AND THE -- LET ME GO TO ANOTHER EMAIL FROM MR. GREER AT

01:55PM 22    14074.

01:55PM 23              THE COURT:  BEFORE WE DO THAT, LET'S TAKE OUR

01:55PM 24    AFTERNOON BREAK NOW, PLEASE.  WE'LL TAKE 30 MINUTES, LADIES AND

01:55PM 25    GENTLEMEN, 30 MINUTES.

GROSSMAN CROSS BY MR. WADE (RES.)                              6721

| | | |
|---|---|---|
| 01:55PM | 1 | SIR, YOU CAN STAND DOWN. |
| 01:55PM | 2 | PERHAPS THAT EMAIL WILL BE THERE WHEN YOU COME BACK. |
| 01:55PM | 3 | WE'LL TAKE A BREAK OF 30 MINUTES, PLEASE. |
| 01:56PM | 4 | (JURY OUT AT 1:56 P.M.) |
| 01:56PM | 5 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 01:56PM | 6 | SIR, YOU CAN STAND DOWN. |
| 01:56PM | 7 | ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY HAS |
| 01:56PM | 8 | LEFT FOR THE AFTERNOON BREAK.  THE WITNESS HAS LEFT THE |
| 01:56PM | 9 | COURTROOM. |
| 01:56PM | 10 | I JUST WANT TO POINT OUT SOME STATISTICS HERE.  THE |
| 01:56PM | 11 | GOVERNMENT'S DIRECT EXAMINATION OF THIS WITNESS WAS 1 HOUR AND |
| 01:56PM | 12 | 30 MINUTES. |
| 01:56PM | 13 | TO DATE THE CROSS-EXAMINATION HAS EXCEEDED 6 HOURS. |
| 01:56PM | 14 | I THINK MY ESTIMATE YESTERDAY WAS WE PROBABLY WON'T FINISH |
| 01:56PM | 15 | THIS WITNESS UNTIL FRIDAY IS COMING TO FRUITION, AND THAT COULD |
| 01:57PM | 16 | PLAY HAVOC WITH OUR TRIAL SCHEDULE, BUT THAT'S ENTIRELY IN YOUR |
| 01:57PM | 17 | HANDS. |
| 01:57PM | 18 | WE'LL TAKE OUR BREAK.  THANK YOU. |
| 01:57PM | 19 | THE CLERK:  COURT IS IN RECESS. |
| 01:57PM | 20 | (RECESS FROM 1:57 P.M. UNTIL 2:32 P.M.) |
| 02:32PM | 21 | (JURY IN AT 2:32 P.M.) |
| 02:32PM | 22 | THE COURT:  PLEASE BE SEATED.  WE ARE BACK ON THE |
| 02:32PM | 23 | RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 02:32PM | 24 | MR. WADE, YOU'D LIKE TO CONTINUE. |
| 02:32PM | 25 | MR. WADE:  THANK YOU, YOUR HONOR. |

GROSSMAN CROSS BY MR. WADE (RES.)                              6722

```
02:32PM   1    Q.   MR. GROSSMAN, JUST A COUPLE MORE QUESTIONS ABOUT THE FOLKS
02:32PM   2    YOU WERE INTERACTING WITH AS PEOPLE WHO WERE POTENTIALLY
02:32PM   3    JOINING THE THERANOS INVESTMENT.
02:32PM   4         THE SLIDE PRESENTATION THAT WE LOOKED AT AT EXHIBIT 7411,
02:32PM   5    WAS THAT SHARED WITH PEOPLE, WITH CLIENTS, IN ADDITION TO
02:32PM   6    PEOPLE INSIDE THE FIRM?
02:32PM   7    A.   I DON'T RECALL.
02:32PM   8    Q.   OKAY.  SO, FOR EXAMPLE, THERE WERE A NUMBER OF OTHER
02:33PM   9    PEOPLE WHO DID INVESTMENTS IN THERANOS THROUGH THE PARTNERS
02:33PM  10    VEHICLE; IS THAT RIGHT?
02:33PM  11    A.   THERE WERE OTHER INDIVIDUALS THAT INVESTED THROUGH PARTNER
02:33PM  12    INVESTMENTS, THAT IS CORRECT.
02:33PM  13    Q.   OKAY.  AND, FOR EXAMPLE, LIKE STANLEY DRUCKENMILLER
02:33PM  14    INVESTED THROUGH THE PARTNERS INTO THERANOS; CORRECT?
02:33PM  15    A.   THROUGH PARTNER INVESTMENTS, THAT IS CORRECT.
02:33PM  16    Q.   AND WOULD HE HAVE RECEIVED THE PRESENTATION, OR WHAT LEVEL
02:33PM  17    OF INFORMATION WOULD HE HAVE BEEN PROVIDED IN CONNECTION WITH
02:33PM  18    HIS INVESTMENT DECISION?
02:33PM  19    A.   I DON'T KNOW.
02:33PM  20    Q.   OKAY.  DID YOU VIEW THERE AS BEING ANY RESTRICTIONS AS A
02:33PM  21    RESULT OF THE CDA ON SHARING INFORMATION WITH THOSE OUTSIDE
02:33PM  22    INVESTORS?
02:33PM  23    A.   WE WOULD -- EVERYONE AT OUR FIRM IS, IS TAUGHT THE
02:34PM  24    IMPORTANCE OF COMPLIANCE, CONFIDENTIALITY, SO I WOULD HOPE THAT
02:34PM  25    ALL OF OUR EMPLOYEES WOULD HONOR ALL OF THE AGREEMENTS THAT WE
```

GROSSMAN CROSS BY MR. WADE (RES.)                                    6723

02:34PM    1    HAVE WITH ALL OF THE DIFFERENT COMPANIES WE INTERACT WITH.

02:34PM    2    Q.   OKAY.  AND DO YOU RECALL THAT IN ADDITION TO SOME OF THE

02:34PM    3    INTERNAL PEOPLE -- LET ME STRIKE THAT.

02:34PM    4        YOU RECALL AS A RESULT OF THAT PRESENTATION MANY INTERNAL

02:34PM    5    PEOPLE AT PFM DECIDED TO INVEST IN THERANOS?

02:34PM    6    A.   I DO RECALL THAT THERE WERE INTERNAL PEOPLE THAT INVESTED

02:34PM    7    IN THERANOS.

02:34PM    8    Q.   OKAY.  AND DO YOU RECALL THAT THERE WERE ALSO SOME OF THE

02:34PM    9    FRIENDS AND FAMILY OF THE FIRM WHO INVESTED AS WELL?

02:34PM   10    A.   YES, I KNOW -- I DO BELIEVE THAT WE HAD FRIENDS AND FAMILY

02:34PM   11    WHO INVESTED AS WELL.

02:34PM   12    Q.   AND DID THOSE PEOPLE DO THAT BASED UPON YOUR GENERAL

02:34PM   13    RECOMMENDATION, OR WERE YOU -- DO YOU RECALL IF YOU PROVIDED

02:34PM   14    THEM SPECIFIC INFORMATION ABOUT THERANOS, IF YOU RECALL?

02:34PM   15    A.   I DON'T RECALL.

02:34PM   16    Q.   OKAY.  AND IF I CAN ASK YOU A COUPLE OF QUESTIONS, IF I

02:35PM   17    COULD TURN YOUR ATTENTION -- I THINK I SET YOUR BINDER TO

02:35PM   18    EXHIBIT 4077.

02:35PM   19    A.   OKAY.

02:35PM   20    Q.   DO YOU SEE THAT?

02:35PM   21        AND THIS IS THE, THIS IS THE SLIDE PRESENTATION THAT

02:35PM   22    MR. LEACH SPENT SOME TIME WITH YOU ON DIRECT TESTIMONY.

02:35PM   23        DO YOU RECALL THAT?

02:35PM   24    A.   YES.

02:35PM   25    Q.   AND YOU NOTE HERE THERE ARE ABOUT 267 SLIDES; RIGHT?

GROSSMAN CROSS BY MR. WADE (RES.)                                6724

02:35PM  1    A.   I DON'T REMEMBER THE NUMBER, BUT I ASSUME THAT'S RIGHT.

02:35PM  2    Q.   IF YOU WOULD JUST LOOK AT THE LAST PAGE, DO YOU SEE THE

02:35PM  3    LAST PAGE NUMBER IS 269?

02:35PM  4    A.   YEP.

02:36PM  5    Q.   AND ABOUT 150 PAGES OF THIS ARE THE DATA.  IS THAT FAIR?

02:36PM  6    IF YOU LOOK AT AROUND PAGE 100, YOU SEE THE CLINICAL DATA

02:36PM  7    STARTS AROUND PAGE 99 OR 100?

02:36PM  8    A.   YES.

02:36PM  9    Q.   AND IS IT FAIR TO SAY THAT THOSE 267 SLIDES WERE NOT GONE

02:36PM  10   THROUGH SORT OF SLIDE BY SLIDE AT ANY OF THE MEETINGS THAT YOU

02:36PM  11   HAD AT THERANOS; CORRECT?

02:36PM  12   A.   I DON'T, I DON'T RECALL GOING THROUGH EVERY SINGLE SLIDE

02:36PM  13   WITH THE COMPANY.

02:36PM  14   Q.   THEY WERE JUST SORT OF BROUGHT UP, YOU KNOW, WITH RESPECT

02:36PM  15   TO DIFFERENT POINTS THAT WERE UNDER DISCUSSION?

02:36PM  16   A.   WELL, I WANT TO ANSWER YOUR QUESTION.

02:37PM  17       SO THE MEETINGS WE HAD WITH THE COMPANY WERE -- AFTER THE

02:37PM  18   FIRST MEETING WE HAD SPECIFIC QUESTIONS THAT WE WANTED TO

02:37PM  19   ADDRESS.

02:37PM  20       THE COMPANY SENT US THIS PRESENTATION SO THAT WE COULD

02:37PM  21   REVIEW ON OUR OWN THE MATERIAL IN HERE.

02:37PM  22   Q.   FAIR ENOUGH.  YOU HAD THIS -- I DIDN'T MEAN TO SUGGEST

02:37PM  23   OTHERWISE.

02:37PM  24       YOU HAD THIS SLIDE DECK AND YOU COULD GO THROUGH THE WHOLE

02:37PM  25   THING; CORRECT?

GROSSMAN CROSS BY MR. WADE (RES.)                                    6725

02:37PM  1     A.   YES.

02:37PM  2     Q.   AND I'M JUST TRYING TO SUGGEST THAT IN THE MEETINGS YOU

02:37PM  3     HAD, YOU DIDN'T GO THROUGH THE WHOLE THING AND TALK ABOUT EACH

02:37PM  4     AND EVERY ITEM IN THE MEETING; CORRECT?

02:37PM  5     A.   WHICH MEETINGS ARE YOU REFERRING TO?

02:37PM  6     Q.   THE TWO MEETINGS IN -- THE ONE IN DECEMBER OF 2013 AND THE

02:37PM  7     FIRST MEETING IN JANUARY OF 2014.

02:37PM  8     A.   OKAY.  YES, WE DID NOT GO THROUGH EVERY SLIDE IN THESE TWO

02:37PM  9     MEETINGS.

02:37PM  10    Q.   OKAY.  AND I TAKE IT, GIVEN THE PASSAGE OF TIME, IT WOULD

02:37PM  11    BE IMPOSSIBLE FOR YOU TO GO THROUGH AND PICK OUT WHICH SLIDES

02:37PM  12    YOU WENT THROUGH DURING THOSE MEETINGS.  IS THAT FAIR?

02:37PM  13    A.   I DON'T REMEMBER WHICH SLIDES WE WENT THROUGH.

02:37PM  14    Q.   OKAY.  AND WITH -- CAN I ASK YOU A COUPLE OF QUESTIONS

02:38PM  15    ABOUT THE SLIDES IN PARTICULAR.

02:38PM  16         IF YOU CAN TAKE A LOOK AT PAGE 4, AND WE'LL TRY TO PULL

02:38PM  17    THESE UP ON THE SCREEN IF THAT'S EASIER FOR YOU.

02:38PM  18         DO YOU SEE THE SLIDE THERE THAT SAYS, "GOODBYE, BIG BAD

02:38PM  19    NEEDLE"?

02:38PM  20    A.   I DO.

02:38PM  21    Q.   AND YOU'VE SEEN SOME VERSION OF THIS SLIDE MAYBE ON OTHER

02:38PM  22    PROMOTIONAL MATERIALS RELATING TO THERANOS?

02:38PM  23    A.   YES.

02:38PM  24    Q.   IT'S HARD NOT TO REMEMBER A CUTE KID LIKE THAT; RIGHT?

02:38PM  25    A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                          6726

02:38PM  1    Q.   IF WE CAN GO FROM THERE TO PAGE 48 WHICH I BELIEVE IS A

02:38PM  2    SLIDE THAT MR. LEACH ASKED YOU ABOUT.

02:38PM  3         DO YOU RECALL THAT?

02:38PM  4    A.   I THINK THAT'S SLIDE 46.

02:38PM  5    Q.   WELL, LET'S ASK ABOUT SLIDE 48.  DO YOU SEE SLIDE 48?

02:39PM  6    MAYBE MR. LEACH DIDN'T ASK YOU ABOUT THAT.

02:39PM  7         DO YOU HAVE THAT ONE IN FRONT OF YOU?

02:39PM  8    A.   YES.

02:39PM  9    Q.   AND I'M FOCUSSED -- THERE'S SOME CONFUSION IN THESE SLIDE

02:39PM  10   DECKS.  I'M FOCUSSING ON THE NUMBERING IN THE BOTTOM IN CASE

02:39PM  11   YOU WANT TO LOOK ON YOUR OWN.

02:39PM  12        AND THIS TALKS ABOUT THE TRANSFORMATION OF THE CLINICAL

02:39PM  13   CARE; CORRECT?

02:39PM  14   A.   YES.

02:39PM  15   Q.   AND IT TALKS ABOUT THE LAB OF TODAY WITH A BIG NEEDLE

02:39PM  16   THERE ON THE LEFT; RIGHT?

02:39PM  17   A.   IT'S A NEEDLE, YES.

02:39PM  18   Q.   YES.  AND THE FINGERSTICK.

02:39PM  19        DO YOU SEE THAT?

02:39PM  20   A.   YES.

02:39PM  21   Q.   AND LET'S GO TO, LET'S GO TO THE NEXT SLIDE.

02:39PM  22        AND DO YOU SEE HERE THEY TALK ABOUT ANOTHER TRANSFORMATION

02:39PM  23   WHERE THEY GO FROM THAT BIG NEEDLE ON THE LEFT TO THAT SMALL

02:39PM  24   BUTTERFLY NEEDLE ON THE RIGHT?

02:39PM  25   A.   YES.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6727

02:39PM   1     Q.   DO YOU SEE THAT?

02:39PM   2     A.   I DO.

02:39PM   3     Q.   OKAY.  AND DO YOU SEE, DO YOU SEE THAT TUBE OF BLOOD

02:40PM   4     THAT'S HOOKED ON TO THAT DEVICE THERE?

02:40PM   5     A.   I DO.

02:40PM   6     Q.   AND THAT'S NOT ONE OF THOSE LITTLE -- THAT'S NOT ONE OF

02:40PM   7     THOSE LITTLE NANOTAINERS, IS IT?

02:40PM   8     A.   NO.

02:40PM   9     Q.   OKAY.  AND IF WE CAN GO -- DO YOU RECALL, WHEN YOU WERE

02:40PM  10     TALKING ABOUT THESE SLIDES IN THE MEETING, WHETHER THERE WAS

02:40PM  11     ANY EFFORT TO DIFFERENTIATE WHICH SLIDES RELATED TO PHASE I OF

02:40PM  12     THERANOS'S BUSINESS MODEL AND WHICH SLIDES RELATED TO PHASE II,

02:40PM  13     OR IF THEY RELATED TO BOTH?

02:40PM  14     A.   I DON'T.

02:40PM  15     Q.   OKAY.  AND DO YOU RECALL RECOGNIZING AT THE TIME THAT YOU

02:40PM  16     REVIEWED THESE MATERIALS -- DID YOU ACTUALLY -- DO YOU THINK

02:40PM  17     YOU REVIEWED THESE SLIDES AT SOME POINT?

02:40PM  18     A.   AT THE TIME, YES.

02:40PM  19     Q.   OKAY.  AND DO YOU RECALL RECOGNIZING THAT MANY OF THEM ARE

02:40PM  20     SORT OF ASPIRATIONAL IN NATURE?

02:40PM  21     A.   NO.

02:40PM  22     Q.   OKAY.  LET'S TAKE A LOOK AT PAGE 11.

02:41PM  23          AND JUST THERE, FOR EXAMPLE, YOU SEE -- DID YOU RECOGNIZE

02:41PM  24     THIS TO BE SORT OF A MOCK-UP OF AN ADVERTISEMENT?

02:41PM  25     A.   I SUPPOSE.

GROSSMAN CROSS BY MR. WADE (RES.)                                6728

02:41PM 1    Q.   AND YOU KNEW AT THE TIME THAT THERANOS WASN'T SOON GOING

02:41PM 2    TO BE NATIONWIDE; RIGHT?  THAT IT WAS GOING TO TAKE A WHILE FOR

02:41PM 3    THEM TO UNROLL?

02:41PM 4    A.   WE HAD A ROLLOUT FORECAST FROM THE COMPANY, SO WE KNEW

02:41PM 5    THAT THEY WOULD BE ROLLING OUT ACROSS DIFFERENT REGIONS OVER

02:41PM 6    2014 AND '15, AND, YES, THEY WOULD ROLL OUT NATIONWIDE.

02:41PM 7    Q.   AND IF YOU GO TO PAGE 16 OF THE EXHIBIT, YOU SEE THIS

02:42PM 8    SLIDE TALKS ABOUT THERANOS'S PROXIMITY TO CONSUMERS.

02:42PM 9        YOU SEE THAT; RIGHT?

02:42PM 10   A.   I DO.

02:42PM 11   Q.   AND THIS WAS PART OF MS. HOLMES'S VISION THAT THEY TALKED

02:42PM 12   ABOUT; RIGHT?

02:42PM 13   A.   I'M NOT SURE IT'S A PART OF HER VISION.  IT SEEMS TO BE A

02:42PM 14   SLIDE THAT'S DESCRIBING THEIR PATIENT SERVICE CENTERS AND

02:42PM 15   ACCESS.

02:42PM 16   Q.   RIGHT.  AND YOU RECOGNIZE THAT THEIR GOAL THERE WAS TO

02:42PM 17   BE -- HAVE GREATER THAN 90 PERCENT WITHIN A FEW MILES OF

02:42PM 18   PEOPLE; RIGHT?

02:42PM 19   A.   I'M SORRY, MAYBE YOU CAN ASK THE QUESTION AGAIN.

02:42PM 20   Q.   WELL, YOU SEE THIS CHART REFLECTS THAT THERANOS'S GOAL IS

02:42PM 21   TO HAVE GREATER THAN 95 PERCENT OF PATIENTS WITHIN A MILE OR

02:42PM 22   ONE TO FIVE MILES OF A TESTING LOCATION.

02:43PM 23       DO YOU SEE THAT?

02:43PM 24   A.   I SEE ON THE SLIDE THAT THERANOS HAS GREATER THAN

02:43PM 25   95 PERCENT, AND IT APPEARS TO RELATE TO WALGREENS AND OTHER

GROSSMAN CROSS BY MR. WADE (RES.)                                6729

```
02:43PM   1    RETAIL PHARMACIES.

02:43PM   2    Q.   RIGHT.  BUT YOU KNEW AT THE TIME THAT YOU WERE LOOKING AND

02:43PM   3    YOU GOT THESE SLIDES THAT THEY DIDN'T HAVE THAT KIND OF

02:43PM   4    FOOTPRINT OUT THERE IN THE FIELD; RIGHT?

02:43PM   5    A.   WE KNEW AS OF JANUARY 2014 THEY WERE NOT -- THIS

02:43PM   6    TECHNOLOGY HAD NOT BEEN ROLLED OUT NATIONALLY TO WALGREENS, ALL

02:43PM   7    WALGREENS AND OTHER RETAIL PHARMACIES, YES.

02:43PM   8    Q.   ALL RIGHT.  AND IF WE CAN GO TO 19 OF THE EXHIBIT.

02:43PM   9         THIS TALKS ABOUT "FASTER RESULTS.  FASTER ANSWERS."

02:43PM  10         DO YOU SEE THAT IN FOUR HOURS OR LESS?

02:43PM  11    A.   I DO.

02:43PM  12    Q.   AND YOU KNEW THAT RESULTS WERE NOT ALWAYS PROVIDED IN FOUR

02:43PM  13    HOURS OR LESS; RIGHT?

02:43PM  14    A.   WELL, FROM MY OWN TEST I KNEW THAT IT WASN'T, BUT THIS IS

02:44PM  15    WHAT THEY TOLD US THE TECHNOLOGY WAS CAPABLE OF DOING IN THE

02:44PM  16    RETAIL SETTING.

02:44PM  17    Q.   RIGHT.  BUT YOU KNEW THAT -- YOU HAD PERSONAL EXPERIENCE

02:44PM  18    BEFORE THE INVESTMENT DECISION THAT IT TOOK MORE THAN FOUR

02:44PM  19    HOURS; CORRECT?

02:44PM  20    A.   YES.

02:44PM  21    Q.   BUT YOU ALSO KNEW THAT THEY WERE PERFORMING TESTS IN

02:44PM  22    ARIZONA; CORRECT?

02:44PM  23    A.   YES.

02:44PM  24    Q.   AND THAT AT THE TIME THAT YOU MADE THE INVESTMENT

02:44PM  25    DECISION, THEY WERE, THEY WERE TRANSPORTING THOSE SPECIMENS TO
```

GROSSMAN CROSS BY MR. WADE (RES.)                               6730

02:44PM  1    CALIFORNIA FOR TESTING; RIGHT?

02:44PM  2    A.   YES.

02:44PM  3    Q.   SO YOU KNEW AT THE TIME THAT THEY WEREN'T DOING TESTS, ALL

02:44PM  4    OF THEIR TESTS IN FOUR HOURS OR LESS?

02:44PM  5    A.   AS OF JANUARY 2014, YES.

02:44PM  6    Q.   OKAY.  AND IF WE CAN GO TO PAGE 26.

02:44PM  7         DO YOU KNOW WHAT THIS IS?

02:44PM  8    A.   I BELIEVE IT IS ONE OF THE COLLECTION DEVICES.

02:45PM  9    Q.   OKAY.  AND YOU DIDN'T USE ONE OF THESE WHEN YOU GOT YOUR

02:45PM  10   TESTING; CORRECT?

02:45PM  11   A.   THAT'S CORRECT.

02:45PM  12   Q.   OKAY.  AND LET'S GO TO PAGE 27.

02:45PM  13        THIS TALKS ABOUT THE SEAMLESS INTEGRATION WITH PHYSICIAN

02:45PM  14   PRACTICES.

02:45PM  15        DO YOU SEE THAT?

02:45PM  16   A.   I DO SEE THAT.

02:45PM  17   Q.   AND THAT WAS AT -- YOU KNEW THIS WAS ASPIRATIONAL AT THE

02:45PM  18   TIME; RIGHT?

02:45PM  19   A.   NO.

02:45PM  20   Q.   WELL, YOU KNEW DR. RABODZEY'S PRACTICE WAS NOT SEAMLESSLY

02:45PM  21   INTEGRATED WITH THERANOS AT THE TIME THAT YOU MADE YOUR

02:45PM  22   INVESTMENT DECISION; RIGHT?

02:45PM  23   A.   DR. RABODZEY'S -- I DON'T KNOW HOW DR. RABODZEY'S

02:45PM  24   PRACTICE, PHYSICIAN PRACTICE WAS INTEGRATED WITH THE LABORATORY

02:45PM  25   OR THE RETAIL PHARMACY THAT PERFORMED HIS TEST.

GROSSMAN CROSS BY MR. WADE (RES.)                                    6731

02:45PM  1   Q.   WELL, YOU RECALL THAT THEY -- THERE WAS THE EMAIL THAT YOU

02:45PM  2   REVIEWED ABOUT HIM RECEIVING FAX RESULTS?

02:45PM  3   A.   I DON'T BELIEVE HE RECEIVED THE FAX RESULTS.

02:45PM  4   Q.   OKAY.

02:46PM  5   A.   I THINK IT WAS HIS PHYSICIAN.

02:46PM  6   Q.   HIS PHYSICIAN RECEIVED?

02:46PM  7   A.   CORRECT.

02:46PM  8   Q.   SO THE PHYSICIAN PRACTICES WAS NOT SEAMLESSLY INTEGRATED

02:46PM  9   AT THE TIME; RIGHT?

02:46PM  10  A.   WELL, I GUESS -- SORRY, I GUESS I'M ANSWERING THE WRONG --

02:46PM  11  A DIFFERENT QUESTION.

02:46PM  12       I DON'T KNOW HOW DR. RABODZEY'S PRACTICE PHYSICIAN OFFICE

02:46PM  13  WAS ELECTRONICALLY CONNECTED TO THAT WALGREENS LOCATION.

02:46PM  14  Q.   ISN'T IT FAIR TO SAY THAT YOU KNEW THAT THIS WAS A

02:46PM  15  WORK-IN-PROCESS AT THE TIME AND THAT YOU MADE THE INVESTMENT

02:46PM  16  DECISION THAT THIS WAS ASPIRATIONAL AS WELL?

02:46PM  17  A.   AT THE TIME OF THE INVESTMENT THEY TOLD US I BELIEVE THEY

02:46PM  18  HAD ELECTRONIC CONNECTIONS TO MANY OF THE LARGEST ELECTRONIC

02:46PM  19  MEDICAL RECORD PROVIDERS, BUT I DON'T REMEMBER SPECIFICALLY

02:46PM  20  WHAT NUMBER THAT WAS, BUT IT WAS A FOCUS OF THEIR SOFTWARE

02:46PM  21  DEVELOPMENT ACTIVITIES.

02:46PM  22       AND THAT'S A MARKET THAT IS VERY CONCENTRATED AT THE TOP

02:47PM  23  IN TERMS OF PHYSICIAN OFFICE SOFTWARE, SO IT SHOULDN'T TAKE

02:47PM  24  LONG TO ELECTRONICALLY CONNECT TO THE MAJORITY OF PHYSICIAN

02:47PM  25  PRACTICES, ESPECIALLY LARGER PHYSICIAN GROUPS.

GROSSMAN CROSS BY MR. WADE (RES.)                                6732

02:47PM   1    Q.   OKAY.  AND IF I CAN CALL YOUR ATTENTION TO PAGE 34 OF THE

02:47PM   2    EXHIBIT.

02:47PM   3         YOU RECOGNIZE THAT THE DESCRIPTION OF THE NATIONAL RETAIL

02:47PM   4    FOOTPRINT THROUGHOUT THE UNITED STATES WAS AT THIS TIME

02:47PM   5    ASPIRATIONAL; CORRECT?

02:47PM   6    A.   THEY HAD NOT YET ROLLED IT OUT NATIONALLY, CORRECT.

02:47PM   7    Q.   AND THE SAME FOR THE NEXT SLIDE?

02:47PM   8    A.   YES, THEY HAD NOT YET, THEY HAD NOT YET -- WELL, IF THE

02:48PM   9    QUESTION IS WAS THIS ASPIRATIONAL, THE ANSWER IS NO.

02:48PM  10    Q.   WELL, YOU UNDERSTOOD THAT THEY WEREN'T IN 8100 WALGREENS

02:48PM  11    LOCATIONS AT THE TIME THAT YOU MADE THE INVESTMENT DECISION;

02:48PM  12    RIGHT?

02:48PM  13    A.   WE DID UNDERSTAND THAT, YES.

02:48PM  14    Q.   AND IF WE GO TO SLIDE 5 -- EXHIBIT PAGE 53.

02:48PM  15         DO YOU RECALL WITH RESPECT TO SOME OF THESE DEPLOYMENTS

02:48PM  16    THAT THOSE WERE DISCLOSED TO YOU AS PHASES III AND IV OF THEIR

02:48PM  17    ROLLOUT PLAN?

02:48PM  18    A.   I DON'T RECALL PHASES III AND IV.

02:48PM  19    Q.   OKAY.  YOU DON'T RECALL BEING TOLD THAT THE ER AND SOME OF

02:48PM  20    THE PEDIATRIC APPLICATIONS WERE PHASES III AND IV IN THAT

02:48PM  21    MEETING?

02:48PM  22    A.   NO.

02:48PM  23    Q.   DO YOU RECALL TAKING ANY NOTES TO THAT EFFECT?

02:48PM  24    A.   I DON'T RECALL SPECIFICALLY THAT PART OF -- WHICH MEETING

02:49PM  25    ARE YOU REFERRING TO?

UNITED STATES COURT REPORTERS

**ER-10358**

GROSSMAN CROSS BY MR. WADE (RES.)                                   6733

02:49PM   1     Q.   I BELIEVE IT WAS THE SECOND MEETING.

02:49PM   2          DO YOU RECALL THAT?

02:49PM   3     A.   I DON'T RECALL THAT.

02:49PM   4     Q.   OKAY.  THE -- IF YOU CAN GO TO SLIDES, SLIDES -- PAGE 66

02:49PM   5     AND THEN 67.

02:49PM   6          MR. LEACH ASKED YOU ABOUT SOME OF THESE SLIDES; RIGHT?

02:49PM   7     A.   YES.

02:49PM   8     Q.   AND YOU WERE AWARE AT THE TIME THAT YOU MADE YOUR

02:49PM   9     INVESTMENT DECISION AS A RESULT OF YOUR TOUR THAT THERE WAS

02:49PM   10    SOME OF THEIR TECHNOLOGY THAT WAS PATENT PENDING OR TRADE

02:49PM   11    SECRET WITHIN THEIR LAB AND THAT THEY TOLD YOU THAT THEY

02:49PM   12    WOULDN'T SHOW IT TO YOU; CORRECT?

02:49PM   13    A.   THAT'S WHAT THEY TOLD US.  I DON'T KNOW WHETHER THERE WAS

02:49PM   14    OR THERE WASN'T.

02:49PM   15    Q.   RIGHT.  BUT THAT'S WHAT THEY TOLD YOU AT THE TIME; RIGHT?

02:49PM   16    A.   YES.

02:49PM   17    Q.   OKAY.  AND SO YOU, YOU RECOGNIZE THAT, YOU KNOW, SOME OF

02:50PM   18    THESE DIFFERENT SLIDES WERE NOT NECESSARILY THE PRESENT

02:50PM   19    STATEMENT OF WHAT THE COMPANY COULD DO BUT WERE RATHER THE GOAL

02:50PM   20    OF WHAT IT HOPED TO DO ONCE IT WAS FULLY OPERATIONAL; RIGHT?

02:50PM   21    A.   NO.

02:50PM   22    Q.   YOU DIDN'T RECOGNIZE THAT WITH RESPECT TO SOME OF THESE

02:50PM   23    SLIDES THAT WE JUST LOOKED AT?

02:50PM   24             MR. LEACH:  OBJECTION.  ASKED AND ANSWERED.

02:50PM   25             THE COURT:  SUSTAINED.

GROSSMAN CROSS BY MR. WADE (RES.)                                      6734

02:50PM   1      BY MR. WADE:

02:50PM   2      Q.   THE -- YOU TALKED ABOUT YOUR CONNECTIONS TO WALGREENS.

02:50PM   3           DO YOU RECALL THAT?

02:50PM   4      A.   YES.

02:50PM   5      Q.   AND THE FACT THAT YOU HAD BEEN AN INVESTOR IN WALGREENS

02:50PM   6      OVER A PERIOD OF TIME?

02:50PM   7      A.   WE HAD -- OVER THE COURSE OF THE LAST 15 OR SO YEARS,

02:50PM   8      THERE HAD BEEN PERIODS OF TIME WHERE WE HAD INVESTED IN

02:51PM   9      WALGREENS, YES.

02:51PM  10      Q.   AND WAS PART OF THE REASON WHY YOU WERE INTERESTED IN

02:51PM  11      INVESTING IN THERANOS, A DESIRE TO GET INFORMATION THAT WOULD

02:51PM  12      HELP INFORM YOUR INVESTMENT DECISIONS IN WALGREENS?

02:51PM  13      A.   NO.

02:51PM  14      Q.   DO YOU RECALL THAT ALMOST IMMEDIATELY AFTER THE CLOSING

02:51PM  15      YOU STARTED TRADING WALGREENS STOCK?

02:51PM  16               MR. LEACH:   OBJECTION.   401, 403.

02:51PM  17               THE COURT:   SUSTAINED.

02:51PM  18               MR. WADE:   THE COURT'S INDULGENCE FOR A SECOND.

02:51PM  19           (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:51PM  20               MR. WADE:   NO FURTHER QUESTIONS, YOUR HONOR.

02:51PM  21               THE COURT:   REDIRECT?

02:51PM  22               MR. LEACH:   YES, YOUR HONOR, BRIEFLY.

02:51PM  23      ///

02:51PM  24      ///

02:52PM  25      ///

GROSSMAN REDIRECT BY MR. LEACH                                    6735

| | | |
|---|---|---|
| 02:52PM | 1 | **REDIRECT EXAMINATION** |
| 02:52PM | 2 | BY MR. LEACH: |
| 02:52PM | 3 | Q.   GOOD AFTERNOON, MR. GROSSMAN. |
| 02:52PM | 4 | A.   GOOD AFTERNOON. |
| 02:52PM | 5 | Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ON CROSS-EXAMINATION |
| 02:52PM | 6 | ABOUT VENOUS DRAWS AT THERANOS? |
| 02:52PM | 7 | A.   YES. |
| 02:52PM | 8 | Q.   AND WHAT DID THERANOS TELL YOU ABOUT THE EXTENT OF VENOUS |
| 02:52PM | 9 | DRAWS? |
| 02:52PM | 10 | A.   THEY TOLD US FROM THE VERY BEGINNING THAT IT WAS A TINY |
| 02:52PM | 11 | FRACTION OF THE TESTS IN THE VERY BEGINNING OF THE ROLLOUT.  IT |
| 02:52PM | 12 | WAS LESS THAN 1 PERCENT, 1 PERCENT, 2 PERCENT, AND THAT THEY |
| 02:52PM | 13 | HAD A PLAN TO VERY QUICKLY BRING THAT NUMBER BACK DOWN TO WHERE |
| 02:52PM | 14 | IT WAS SOMETHING, YOU KNOW, VERY, YOU KNOW, WELL BELOW |
| 02:52PM | 15 | 1 PERCENT OF PEOPLE THAT WOULD WALK IN AND WOULD HAVE TO |
| 02:52PM | 16 | REQUIRE A VENOUS DRAW. |
| 02:53PM | 17 | Q.   WERE YOU EVER TOLD IT WAS IN THE NEIGHBORHOOD OF |
| 02:53PM | 18 | 40 PERCENT? |
| 02:53PM | 19 | A.   NEVER. |
| 02:53PM | 20 | Q.   WAS THE FACT THAT IT WAS LIMITED TO 1 TO 2 PERCENT OR A |
| 02:53PM | 21 | SMALL NUMBER REASSURING TO YOU? |
| 02:53PM | 22 | A.   YES. |
| 02:53PM | 23 | Q.   HOW SO? |
| 02:53PM | 24 | A.   WELL, IT, IT WAS PART OF THE CORE TECHNOLOGICAL ADVANTAGE |
| 02:53PM | 25 | THIS COMPANY HAD COMPARED TO THE EXISTING LABORATORY |

GROSSMAN REDIRECT BY MR. LEACH                                    6736

02:53PM  1    INFRASTRUCTURE AND SERVICE OFFERINGS AND WAS A BIG PART OF WHY

02:53PM  2    WE FELT THIS WOULD TAKE A SIGNIFICANT SHARE OF THE MARKET, EACH

02:53PM  3    OF THE MARKETS THAT THIS PRODUCT WAS INTRODUCED INTO FOR THE

02:53PM  4    OBVIOUS REASONS, CHEAPER, MUCH MORE CONVENIENT, IT COULD --

02:53PM  5    MUCH LESS INVASIVE, OPENED UP TESTING OPPORTUNITIES FOR PEOPLE

02:53PM  6    THAT WERE AFRAID OF NEEDLES, AND THEN POPULATIONS THAT REALLY

02:53PM  7    STRUGGLE WITH, YOU KNOW, HAVING A GOOD VEIN TO ACCESS.

02:53PM  8         SO FOR ALL OF THOSE REASONS, THAT WAS A REALLY IMPORTANT

02:54PM  9    PART OF OUR UNDERSTANDING OF THE BUSINESS AND THE COMPANY AT

02:54PM  10   THE TIME THAT WE INVESTED.

02:54PM  11   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT THE MODEL

02:54PM  12   THAT PFM PUT TOGETHER.

02:54PM  13        DO YOU RECALL THOSE QUESTIONS?

02:54PM  14   A.   YES.

02:54PM  15   Q.   AND BEFORE PUTTING TOGETHER PFM'S MODEL, IT RECEIVED

02:54PM  16   PROJECTED INCOME FORECASTS FROM THERANOS?

02:54PM  17   A.   YES.

02:54PM  18   Q.   AND DID YOU RELY ON THOSE INCOME PROJECTIONS FROM

02:54PM  19   THERANOS?

02:54PM  20   A.   WE, WE USED THOSE AS INPUT TO BUILD OUR MODEL FOR 2014 AND

02:54PM  21   2015.

02:54PM  22        WE DIDN'T USE EXACTLY THEIR FORECAST, BUT IT WAS AN

02:54PM  23   IMPORTANT PART OF UNDERSTANDING THE MARGIN STRUCTURE OF THE

02:54PM  24   BUSINESS, THE CASH FLOW, CHARACTERISTICS OF THE BUSINESS, AND

02:54PM  25   THEIR ABILITY TO OBVIOUSLY MAKE ENOUGH EQUIPMENT, MINILABS, TO

GROSSMAN REDIRECT BY MR. LEACH                            6737

02:54PM  1    MEET THE REVENUE FORECAST THAT THEY PROVIDED US.

02:54PM  2    Q.   AND WHO WAS IN A BETTER POSITION TO UNDERSTAND THERANOS'S

02:54PM  3    PROJECTED REVENUE FOR 2014 AND 2015, YOU OR THE COMPANY?

02:54PM  4    A.   THE COMPANY.

02:55PM  5    Q.   OKAY.  YOU WERE SHOWN EXHIBIT 7411.

02:55PM  6         AND I DON'T KNOW, MS. HOLLIMAN, IF WE CAN BRING THAT UP.

02:55PM  7    7411.

02:55PM  8    A.   OKAY.

02:55PM  9              MR. LEACH:  MS. HOLLIMAN -- OR, MS. KRATZMANN, MAY I

02:55PM 10    USE THE ELMO?

02:55PM 11    Q.   MR. GROSSMAN, DO YOU RECALL BEING ASKED QUESTIONS ABOUT

02:55PM 12    THIS POWERPOINT PRESENTATION THAT WAS PROVIDED TO SOME PFM

02:56PM 13    INVESTORS?

02:56PM 14    A.   ON CROSS-EXAMINATION?

02:56PM 15    Q.   YES.

02:56PM 16    A.   YES.

02:56PM 17    Q.   OKAY.  AND I THINK YOU TESTIFIED THAT YOU DIDN'T ATTEND

02:56PM 18    THIS MEETING?

02:56PM 19    A.   NO.  THAT'S CORRECT, I DID NOT ATTEND THIS MEETING.

02:56PM 20    Q.   OKAY.  AND I WANT TO DISPLAY FOR YOU PAGE 7 OF THE

02:56PM 21    POWERPOINT.

02:56PM 22         YOUR HONOR, I'M SORRY.  I MADE SOME NOTES ON MY COPY.  I

02:56PM 23    DON'T MEAN TO DISPLAY THOSE.

02:56PM 24         IN FACT, I CAN USE PAGE 6.

02:56PM 25         DO YOU SEE WHERE IT SAYS KEY FINANCIALS -- PFM BEAR CASE?

GROSSMAN REDIRECT BY MR. LEACH                                      6738

```
02:56PM   1    A.   YES.

02:56PM   2    Q.   AND WHAT IS THE BEAR CASE?

02:56PM   3    A.   THAT REFLECTED OUR LOW -- THE LOW FORECASTS, THE LOWER

02:57PM   4    FORECASTS OF THE THREE SCENARIOS THAT WE CONSTRUCTED FOR THE

02:57PM   5    BUSINESS OVER THIS FIVE YEAR PERIOD OF TIME.

02:57PM   6    Q.   SO THIS IS THE CASE IF THINGS GO BADLY?

02:57PM   7    A.   THIS WAS THE CASE IF THINGS GO SLOWER THAN WE EXPECTED ON

02:57PM   8    THE COMMERCIAL ROLLOUT.

02:57PM   9    Q.   OKAY.  AND YOUR ESTIMATED INCOME FOR THERANOS'S REVENUE

02:57PM  10    FOR 2014 IS 249 MILLION?

02:57PM  11    A.   MILLION.

02:57PM  12    Q.   AND THAT'S SLIGHTLY LESS THAN THE 261 MILLION THAT

02:57PM  13    THERANOS HAD PROVIDED YOU?

02:57PM  14    A.   YES, THAT'S CORRECT.

02:57PM  15    Q.   OKAY.  AND YOUR BEAR CASE FOR 2015 IS 1.4 MILLION, OR

02:57PM  16    1.4 BILLION?

02:57PM  17    A.   YES.

02:57PM  18    Q.   AND THAT'S SLIGHTLY LESS THAN THE 1.6 BILLION THAT

02:57PM  19    THERANOS WAS FORECASTING TO YOU?

02:57PM  20    A.   I BELIEVE IT WAS AROUND 15 PERCENT OR MORE BELOW THE

02:57PM  21    COMPANY'S FORECAST, YES.

02:57PM  22    Q.   OKAY.  HAVE YOU EVER SEEN A COMPANY MISS ITS REVENUE

02:57PM  23    PROJECTIONS BY OVER A BILLION DOLLARS?

02:57PM  24    A.   IT'S UNUSUAL.

02:57PM  25    Q.   WAS THAT A RISK THAT YOU THOUGHT YOU WERE TAKING WITH THIS
```

GROSSMAN REDIRECT BY MR. LEACH                                    6739

02:58PM   1     INVESTMENT?

02:58PM   2     A.   NOT IN THE, IN THE 2014 AND '15 PERIOD, NO.

02:58PM   3     Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE ASSUMPTIONS

02:58PM   4     THAT THERANOS PROVIDED YOU WITH RESPECT TO ITS REVENUE

02:58PM   5     PROJECTIONS AND ITS, ITS NET INCOME AND COST CONSIDERATIONS.

02:58PM   6         DO YOU RECALL THAT?

02:58PM   7     A.   YES.

02:58PM   8     Q.   AND I THINK YOU DESCRIBED IT AS VERY DETAILED?

02:58PM   9     A.   YES.

02:58PM  10     Q.   THE ASSUMPTIONS THAT THERANOS WAS PROVIDING YOU?

02:58PM  11     A.   YES.

02:58PM  12     Q.   DID YOU SEE ANY ASSUMPTIONS IN THAT VERY DETAILED MODEL

02:58PM  13     RELATING TO THE USE OF THIRD PARTY MACHINES?

02:58PM  14     A.   NO.

02:58PM  15     Q.   DID YOU SEE ANYTHING IN THAT VERY DETAILED MODEL ABOUT THE

02:58PM  16     USE OF SIEMENS MACHINES?

02:58PM  17     A.   NO.

02:58PM  18     Q.   DID YOU GO THROUGH THOSE ASSUMPTIONS WITH A FINE TOOTH

02:58PM  19     COMB TRYING TO UNDERSTAND EVERY INPUT OF COST THAT WAS GOING

02:58PM  20     INTO THIS COMPANY?

02:58PM  21     A.   YES.

02:58PM  22     Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT INTERMOUNTAIN.

02:59PM  23         DO YOU RECALL THOSE QUESTIONS?

02:59PM  24     A.   I DO.

02:59PM  25     Q.   DO YOU KNOW WHETHER THERANOS EVER RECOGNIZED ANY REVENUE

GROSSMAN REDIRECT BY MR. LEACH                          6740

02:59PM   1    FROM INTERMOUNTAIN?

02:59PM   2    A.   I DON'T KNOW.

02:59PM   3    Q.   AND DO YOU KNOW WHETHER THERANOS EVER RECOGNIZED A SINGLE

02:59PM   4    DOLLAR OF REVENUE FROM HOSPITALS?

02:59PM   5    A.   I DON'T KNOW IF THEY DID.

02:59PM   6    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT YOUR INITIAL MEETING

02:59PM   7    IN DECEMBER OF 2013 WITH MS. HOLMES.

02:59PM   8         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THAT ON

02:59PM   9    CROSS-EXAMINATION?

02:59PM  10    A.   I DO.

02:59PM  11    Q.   AND I THINK YOU DESCRIBED THIS AS A POSITIVE RAPPORT BUILD

02:59PM  12    MEETING?

02:59PM  13    A.   WELL, IT WAS AN INTRODUCTORY MEETING.  SO, YES, IT WAS A

02:59PM  14    POSITIVE MEETING.

02:59PM  15    Q.   DID YOU RELY ON THE STATEMENTS FROM MS. HOLMES IN THAT

02:59PM  16    MEETING?

02:59PM  17    A.   WE DID RELY ON STATEMENTS FROM MS. HOLMES IN THAT MEETING.

02:59PM  18    Q.   DID YOU ACCORD THE STATEMENTS IN THAT MEETING ANY LESSER

02:59PM  19    WEIGHT THAN INFORMATION THAT YOU LEARNED LATER ON IN YOUR

02:59PM  20    INVESTMENT PROCESS?

02:59PM  21    A.   NO.

02:59PM  22    Q.   OKAY.  WHEN MS. HOLMES TOLD YOU THAT THE THERANOS DEVICE

02:59PM  23    WAS ON MEDEVAC HELICOPTERS, DID YOU RELY ON THAT INFORMATION?

03:00PM  24    A.   YES.

03:00PM  25    Q.   WAS THAT IMPORTANT TO YOU?

GROSSMAN REDIRECT BY MR. LEACH                                6741

03:00PM   1    A.   YES.

03:00PM   2    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 7391.

03:00PM   3         MS. HOLLIMAN -- OR, MS. KRATZMANN, I'LL DISPLAY THAT.

03:00PM   4              THE CLERK:  OH.

03:00PM   5    BY MR. LEACH:

03:00PM   6    Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT 7391,

03:00PM   7    MR. GROSSMAN?

03:00PM   8    A.   I DO RECALL, YES.

03:00PM   9    Q.   OKAY.  AND THIS IS AN EMAIL FROM MR. KHANNA AFTER THE

03:00PM   10   JANUARY 10TH MEETING LAYING OUT SOME OF HIS THOUGHTS ABOUT

03:00PM   11   THERANOS?

03:00PM   12   A.   YES, THAT'S CORRECT.

03:00PM   13   Q.   IN THE THIRD BULLET UNDER THOUGHTS IT SAYS, "GREAT

03:01PM   14   PARTNERS WAG, SAFEWAY, DOD (STILL TO BE SIZED)."

03:01PM   15   A.   YES.

03:01PM   16   Q.   AND IS THAT A REFLECTION OF A POSITIVE THAT THERANOS IS

03:01PM   17   STILL DOING WORK WITH DOD?

03:01PM   18   A.   YES, IT WAS A BIG VALIDATION OF THE TECHNOLOGY THAT THE

03:01PM   19   DEPARTMENT OF DEFENSE WOULD USE THIS ON ACTUAL SOLDIERS AND OF

03:01PM   20   ALL PLACES AND IN THE TYPE OF AN ENVIRONMENT THAT, HOSTILE

03:01PM   21   ENVIRONMENT THAT YOU WOULD SEE IN BATTLEFIELD CONDITIONS AT

03:01PM   22   THAT POINT IN TIME.

03:01PM   23        AND SO THAT WAS AN IMPORTANT, AN IMPORTANT SUPPORT FOR THE

03:01PM   24   TECHNOLOGY AS IT EXISTED AT THAT POINT IN TIME, THE WORK THAT

03:01PM   25   IT HAD DONE OVER THE TEN YEARS TO DEVELOP IT TO THE POINT THAT

GROSSMAN REDIRECT BY MR. LEACH                                          6742

03:01PM  1    IT WAS CAPABLE OF OFFERING ABROAD RETAIL MENU EVERYTHING THAT

03:01PM  2    QUEST OR LABCORP COULD DO.

03:02PM  3    Q.   IN THE NEXT BULLET IT SAYS, IN THE SECOND SENTENCE, "THEY

03:02PM  4    CITE MOORE'S LAW AS DRIVING DOWN COGS -- WE NEED TO GET

03:02PM  5    COMFORTABLE WITH THIS TRAJECTORY."

03:02PM  6         DO YOU SEE THAT?

03:02PM  7         IN THE THIRD BULLET WHERE IT STARTS, "PRICING AT

03:02PM  8    50 PERCENT."

03:02PM  9    A.   YES.

03:02PM  10   Q.   THEY CITE MOORE'S LAW?

03:02PM  11   A.   YES.

03:02PM  12   Q.   AND IS THAT A REFERENCE TO INTEL AND SEMICONDUCTORS?

03:02PM  13   A.   YEAH.  IT'S THE WELL-KNOWN RELATIONSHIP BETWEEN PRODUCTION

03:02PM  14   VOLUME AND THE COST OF PRODUCING SEMICONDUCTOR CHIPS.

03:02PM  15        AND THIS IS A REFERENCE, SPECIFIC FOR THERANOS, IF YOU'RE

03:02PM  16   GOING TO BE OFFERING DISCOUNTED PRICING, THE ONLY WAY THAT

03:02PM  17   WOULD BE ECONOMICALLY VIABLE, IS IF YOU COULD CONTINUE TO DRIVE

03:02PM  18   DOWN THE COST OF THE MINILAB SO THAT IT COULD BE -- IT COULD

03:02PM  19   REACH THE PROFITABILITY TARGETS THAT THEY HAD PRESENTED IN THAT

03:02PM  20   MEETING THAT PRECEDED THIS EMAIL.

03:02PM  21        SO IT SPOKE TO HOW IMPORTANT IT WAS TO BE ABLE TO DELIVER

03:03PM  22   NOT JUST ENOUGH MINILABS, BUT TO BE ABLE TO MAKE THEM AT A COST

03:03PM  23   THAT WOULD ENABLE THEM TO HAVE THIS REALLY POWERFUL

03:03PM  24   DIFFERENTIATED PRICING MODEL TO THE RETAIL CUSTOMER.

03:03PM  25   Q.   AND IN THIS DISCUSSION OF THE COST OF THE MINILAB AND

GROSSMAN REDIRECT BY MR. LEACH                                    6743

03:03PM   1    BRINGING THEM DOWN CONSISTENT WITH MOORE'S LAW, WAS THERE ANY

03:03PM   2    DISCUSSION OF THIRD PARTY DEVICES OR THE NEED TO ACQUIRE

03:03PM   3    SIEMENS MACHINES?

03:03PM   4    A.   NO, AND THERE WOULD BE NO WAY TO COST DOWN THIRD PARTY

03:03PM   5    MACHINES.

03:03PM   6         SO, NO, THERE WAS NO DISCUSSION OF THAT, AND IT WASN'T --

03:03PM   7    IT WOULDN'T REALLY MAKE ANY SENSE IN THE CONTEXT OF THAT

03:03PM   8    CONCEPT DRIVING DOWN THE COST OF THEIR EQUIPMENT, THEIR

03:03PM   9    PROPRIETARY TECHNOLOGY WITH THAT PRICING STRUCTURE.

03:03PM   10   Q.   FURTHER DOWN THERE'S, IN THE CONCLUSION, A -- THE LAST

03:03PM   11   BULLET, "THIS IS ONE OF THE MOST INTERESTING COMPANIES I HAVE

03:03PM   12   MET AND IT ALL COMES DOWN TO EXECUTION."

03:03PM   13        WHAT DID YOU UNDERSTAND "EXECUTION" TO MEAN?

03:04PM   14   A.   I THINK MY COLLEAGUE IS EXPLAINING, OR HIS POINT OF VIEW

03:04PM   15   IS THAT THE TECHNOLOGY HAS ALREADY PASSED THE POINT OF, OR LONG

03:04PM   16   PAST THE PROOF OF CONCEPT POINT, THAT THIS WAS A COMPANY THAT

03:04PM   17   OVER THE LAST TEN-PLUS YEARS HAS MADE INCREDIBLE STRIDES TO

03:04PM   18   BUILD THE TECHNOLOGY CAPABILITIES THAT THEY HAD AT THAT POINT.

03:04PM   19        AND FROM HERE THE RISKS WERE REALLY FOCUSSED -- THE RISK

03:04PM   20   TO THE BUSINESS, THE RISK TO THE COMPANY GOING FORWARD WAS

03:04PM   21   REALLY AROUND EXECUTION, AND SO I THINK THAT WAS MR. KHANNA'S

03:04PM   22   VIEW AT THAT POINT IN TIME AFTER THAT FIRST MEETING.

03:04PM   23   Q.   DID YOU THINK THERE WAS RISK AROUND THE MINILAB WORKING IN

03:04PM   24   THE CLIA LAB?

03:04PM   25   A.   WE DID NOT THINK THERE WAS -- THAT WAS A RISK TO THE

GROSSMAN REDIRECT BY MR. LEACH                                6744

03:04PM  1    COMPANY, NO.

03:04PM  2    Q.   YOU WERE ALSO SHOWN EXHIBIT 4089, A LENGTHY EMAIL FROM

03:05PM  3    DR. RABODZEY ABOUT FDA APPROVAL.

03:05PM  4         DO YOU RECALL THAT EXHIBIT?

03:05PM  5    A.   WE LOOKED AT A LOT OF MR. RABODZEY EXHIBITS, SO I DON'T

03:05PM  6    REMEMBER SPECIFICALLY WHICH ONE THAT WAS.

03:05PM  7    Q.   OKAY.  WHY WAS RISK RELATING TO FDA APPROVAL NOT A CONCERN

03:05PM  8    TO YOU?

03:05PM  9    A.   THE, THE BUSINESS THAT WE WERE INVESTING IN WAS REALLY A

03:05PM 10    HUB AND SPOKE MODEL USING THESE MINILABS TO BUILD SMALL

03:05PM 11    LABORATORIES.  THE EXAMPLE IN THE PHOENIX MARKET, 200 SQUARE

03:05PM 12    FEET, THEY COULD SUPPORT THAT WHOLE OPERATION WITH THE

03:05PM 13    MINILABS.

03:05PM 14         SO ROLLING THOSE OUT TO DIFFERENT URBAN AREAS IN THE U.S.,

03:05PM 15    LEVERAGING WALGREENS'S RETAIL FOOTPRINT, SAFEWAY'S RETAIL

03:05PM 16    FOOTPRINT WAS THE WAY WE BUILT THE MODEL AND WAS THE BASIS FOR

03:05PM 17    THE INVESTMENTS THAT WE MADE.

03:05PM 18         THE UP SIDE OF BEING ABLE TO DELIVER THESE, DEPLOY THESE

03:05PM 19    INTO A WALGREENS RETAIL SETTING OR ANOTHER RETAILER WAS, WAS AN

03:06PM 20    UP SIDE SCENARIO ABOVE AND BEYOND, YOU KNOW, HOW WE THOUGHT

03:06PM 21    ABOUT OUR, OUR TRANSLATING THESE CONCEPTS, THESE

03:06PM 22    REPRESENTATIONS, THESE STATEMENTS FROM THE COMPANY INTO AN

03:06PM 23    ACTUAL FINANCIAL FORECAST.

03:06PM 24    Q.   SO DID YOU VIEW THE FACT THAT THERANOS HAD CLIA

03:06PM 25    CERTIFICATION FOR ALL OF ITS TESTS AS MITIGATING THAT FDA RISK?

GROSSMAN REDIRECT BY MR. LEACH                                      6745

03:06PM  1   A.   IT WAS A HUGE ENDORSEMENT OF WHERE THE TECHNOLOGY WAS AT

03:06PM  2   THAT POINT IN TIME.

03:06PM  3        THE FACT THAT THEY TOLD US THAT THEY COULD, AND THEY WERE

03:06PM  4   ABLE TO GET -- MEET CLIA STANDARDS FOR ALL OF THE MENU OF TESTS

03:06PM  5   THAT THEY OFFERED WAS A HUGE STATEMENT THAT SPOKE TO THE

03:06PM  6   QUALITY OF THE UNDERLYING TECHNOLOGY.

03:06PM  7        IT WAS ALSO CONSISTENT WITH WHAT THEY TOLD US ABOUT HOW

03:06PM  8   THEIR MINILABS HAD LESS VARIATION COMPARED TO OTHER

03:06PM  9   CONVENTIONAL ANALYTIC INSTRUMENTS THAT WERE SOLD INTO CUSTOMERS

03:06PM 10   OR COMPETITORS LIKE A LABCORP OR A QUEST DIAGNOSTIC.

03:07PM 11        SO YES FOR ALL OF THOSE REASONS.

03:07PM 12   Q.   AND MR. WADE ASKED YOU A NUMBER OF QUESTIONS ABOUT OTHER

03:07PM 13   RISKS ASSOCIATED WITH THE THERANOS INVESTMENT AND INVESTMENTS

03:07PM 14   IN GENERAL.

03:07PM 15        DID YOU THINK ONE OF THE RISKS HERE WAS THAT THE FOUNDER

03:07PM 16   AND CEO OF THE COMPANY WAS NOT BEING TRUTHFUL WITH YOU?

03:07PM 17   A.   WE DID NOT THINK THAT WAS ONE OF THE RISKS, NO.

03:07PM 18            MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

03:07PM 19            THE COURT:  YES.

03:07PM 20        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:07PM 21            MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

03:07PM 22   THANK YOU.

03:07PM 23   THANK YOU, MR. GROSSMAN.

03:07PM 24            MR. WADE:  NOTHING FURTHER, YOUR HONOR.

03:07PM 25        THE WITNESS MAY BE RELEASED.

6746

| | | |
|---|---|---|
| 03:07PM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 03:07PM | 2 | MR. LEACH:  YES, YOUR HONOR. |
| 03:07PM | 3 | THE COURT:  SIR, YOU'RE EXCUSED. |
| 03:07PM | 4 | THE WITNESS:  THANK YOU. |
| 03:07PM | 5 | THE COURT:  THANK YOU.  YOU CAN JUST LEAVE ALL OF |
| 03:07PM | 6 | THAT THERE. |
| 03:08PM | 7 | MR. LEACH, DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO |
| 03:08PM | 8 | CALL THIS AFTERNOON? |
| 03:08PM | 9 | MR. BOSTIC:  WE DO, YOUR HONOR. |
| 03:08PM | 10 | THE COURT:  MR. BOSTIC? |
| 03:08PM | 11 | IS HE HERE? |
| 03:08PM | 12 | MR. BOSTIC:  SHE IS HERE. |
| 03:08PM | 13 | THE COURT:  SHE IS HERE.  THANK YOU. |
| 03:08PM | 14 | MR. BOSTIC:  THE UNITED STATES CALLS ERIN TOMPKINS. |
| 03:08PM | 15 | THE COURT:  GOOD AFTERNOON. |
| 03:08PM | 16 | THE WITNESS:  GOOD AFTERNOON. |
| 03:08PM | 17 | THE COURT:  THERE'S A BIT OF A CONGESTION, BUT AS |
| 03:08PM | 18 | SOON AS THESE BODIES CLEAR OUT, I'LL ASK YOU TO STAND AND FACE |
| 03:08PM | 19 | OUR COURTROOM DEPUTY. |
| 03:09PM | 20 | THANK YOU, ADRIANA. |
| 03:09PM | 21 | IF YOU COULD FACE OUR COURTROOM DEPUTY WHILE YOU RAISE |
| 03:09PM | 22 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 03:09PM | 23 | **(GOVERNMENT'S WITNESS, ERIN TOMPKINS, WAS SWORN.)** |
| 03:09PM | 24 | THE WITNESS:  YES. |
| 03:09PM | 25 | THE COURT:  I'LL INVITE YOU TO HAVE A SEAT HERE. |

TOMPKINS DIRECT BY MR. BOSTIC                                    6747

03:09PM  1    FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU NEED.

03:09PM  2         I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

03:09PM  3         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

03:09PM  4    AND THEN SPELL IT, PLEASE.

03:09PM  5             THE WITNESS:  YES.  MY NAME IS ERIN TOMPKINS.

03:09PM  6    E-R-I-N, T-O-M-P-K-I-N-S.

03:09PM  7             THE COURT:  THANK YOU.  COUNSEL.

03:09PM  8             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:09PM  9                         **DIRECT EXAMINATION**

03:10PM  10   BY MR. BOSTIC:

03:10PM  11   Q.   GOOD AFTERNOON, MS. TOMPKINS.

03:10PM  12   A.   GOOD AFTERNOON, SIR.

03:10PM  13   Q.   MS. TOMPKINS, IF YOU ARE FULLY VACCINATED AND COMFORTABLE

03:10PM  14   TO DO SO, I UNDERSTAND THE COURT WILL ALLOW YOU TO TESTIFY

03:10PM  15   WITHOUT A MASK.

03:10PM  16   A.   THANK YOU.

03:10PM  17   Q.   THANK YOU.  I'LL DO THE SAME.

03:10PM  18        LET ME START BY ASKING, WAS THERE A TIME WHEN YOU RECEIVED

03:10PM  19   BLOOD TEST SERVICES FROM A COMPANY CALLED THERANOS?

03:10PM  20   A.   YES.

03:10PM  21   Q.   AND I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT, BUT FIRST

03:10PM  22   LET ME ASK ABOUT YOUR BACKGROUND.

03:10PM  23        WHERE DO YOU CURRENTLY LIVE?

03:10PM  24   A.   MY PERMANENT ADDRESS IS IN ARIZONA.  I'M CURRENTLY STAYING

03:10PM  25   IN NEW MEXICO.

TOMPKINS DIRECT BY MR. BOSTIC                                        6748

03:10PM  1    Q.   WHERE WERE YOU LIVING IN 2015?

03:10PM  2    A.   CENTRAL PHOENIX.

03:10PM  3    Q.   WERE YOU EMPLOYED AT THAT TIME?

03:10PM  4    A.   YES.

03:10PM  5    Q.   WHAT WAS YOUR JOB AT THAT TIME IN PHOENIX IN 2015?

03:10PM  6    A.   I HAD THREE ESSENTIALLY.  I WAS MUSIC DIRECTOR OF A SMALL

03:10PM  7    METHODIST CONGREGATION; I SPENT ONE SEMESTER AS A PERFORMING

03:10PM  8    ARTIST IN THE CHILDREN'S PROGRAM AT ARIZONA OPERA; AND I ALSO

03:10PM  9    TAUGHT PRIVATE VOICE LESSONS.

03:10PM  10   Q.   DID THERE COME A TIME WHEN YOU HEARD ABOUT A COMPANY

03:11PM  11   CALLED THERANOS FOR THE FIRST TIME?

03:11PM  12   A.   I BELIEVE THE FIRST TIME WAS -- I THINK THE FIRST TIME WAS

03:11PM  13   WHEN I SAW THE ARTICLE IN "FORBES" MAGAZINE IN APPROXIMATELY

03:11PM  14   2013, IF THAT SOUNDS ABOUT RIGHT, AND THEN GREW MORE INTERESTED

03:11PM  15   WHEN I WAS SEEING SOMETHING ON SOCIAL MEDIA PROMOTING IT.

03:11PM  16   Q.   IN ADDITION TO SEEING THAT ARTICLE IN -- YOU BELIEVE IT

03:11PM  17   WAS "FORBES" MAGAZINE?

03:11PM  18   A.   UH-HUH.

03:11PM  19   Q.   DID YOU LOOK AT SOME OF THE CONTENT OF THAT ARTICLE AND

03:11PM  20   LEARN ABOUT SOME OF THE BASIC FACTS AROUND THE COMPANY?

03:11PM  21   A.   I KIND OF SKIMMED IT.  BASICALLY I REMEMBER HAVING A BRIEF

03:11PM  22   CONVERSATION WITH MY FATHER ABOUT IT.

03:11PM  23   Q.   OVER THE FOLLOWING MONTHS, DID YOU LEARN MORE FACTS ABOUT

03:11PM  24   THE COMPANY?

03:11PM  25   A.   WELL, WHAT I GLEANED FROM WHAT I READ ON FACEBOOK, WHICH

TOMPKINS DIRECT BY MR. BOSTIC                                         6749

03:11PM   1    WAS PRIMARILY A RECOMMENDATION FROM A FRIEND OF MINE WHO RUNS A

03:11PM   2    DAY RESOURCE CENTER, THAT -- ONE OF HER BIGGEST PRIORITIES WAS

03:12PM   3    FINDING AFFORDABLE HEALTH CARE OPTIONS FOR PEOPLE WHO ARE

03:12PM   4    WITHOUT COVERAGE AND/OR WHO ARE HOMELESS AND NEED TO GET SOME

03:12PM   5    BLOOD WORK DONE AND THINGS LIKE THAT, AND SHE WAS A BIG, BIG

03:12PM   6    SUPPORTER OF THERANOS, AND SO I THOUGHT I WOULD LOOK INTO IT.

03:12PM   7    Q.   FOCUSSING ON THE TIME PERIOD BEFORE YOU ACTUALLY WENT TO

03:12PM   8    THERANOS, WHAT DID YOU UNDERSTAND ABOUT THE SERVICE THAT THE

03:12PM   9    COMPANY OFFERED, ANYTHING THAT MADE IT DIFFERENT?

03:12PM  10    A.   WHAT DID I UNDERSTAND?

03:12PM  11         MY PERCEPTION WAS THAT THE NATURE OF A BLOOD DRAW REQUIRED

03:12PM  12    NOT EVEN AN ENTIRE VIAL, JUST A TINY LITTLE CAPSULE'S WORTH OF

03:12PM  13    BLOOD, IT COULD BE LIKE A PIN PRICK, AND THAT ANALYSIS WOULD

03:12PM  14    THEN GIVE THE SAME AMOUNT OF INFORMATION AS IF YOU HAD AN

03:12PM  15    ENTIRE VIAL OF BLOOD DRAWN.

03:12PM  16         THAT WAS THE IMPRESSION I HAD OF WHAT MADE THE TECHNOLOGY

03:12PM  17    SO ADVANCED AND DIFFERENT FROM EVERYTHING ELSE THAT WE HAD BEEN

03:12PM  18    EXPERIENCING IN PREVIOUS YEARS.

03:12PM  19         DOES THAT MAKE SENSE?

03:12PM  20    Q.   AND WAS THAT ABILITY TO OBTAIN BLOOD TEST RESULTS FROM A

03:12PM  21    TINY SAMPLE FROM A FINGERSTICK APPEALING TO YOU AS A POTENTIAL

03:13PM  22    CUSTOMER?

03:13PM  23    A.   OH, SURE.

03:13PM  24    Q.   AT SOME POINT IN MID 2015, DID YOU MAKE THE DECISION TO

03:13PM  25    GET SOME BLOOD TEST WORK DONE?

TOMPKINS DIRECT BY MR. BOSTIC                                                6750

03:13PM  1    A.   YES.

03:13PM  2    Q.   AND DID YOU ORDER THAT BLOOD TEST WORK YOURSELF OR THROUGH

03:13PM  3    YOUR PHYSICIAN?

03:13PM  4    A.   THROUGH MY PHYSICIAN, YES.

03:13PM  5    Q.   AND WHAT IS YOUR PHYSICIAN'S NAME, OR WHAT WAS YOUR

03:13PM  6    PHYSICIAN'S NAME AT THAT TIME?

03:13PM  7    A.   DR. GERALD ASIN.

03:13PM  8    Q.   AND IS THAT LAST NAME A-S-I-N?

03:13PM  9    A.   YES.

03:13PM 10    Q.   HOW DID YOU DECIDE WHICH LAB TO GO TO FOR YOUR BLOOD TEST

03:13PM 11    IN MID 2015?

03:13PM 12    A.   I REQUESTED THERANOS BECAUSE I WAS INTERESTED IN THAT

03:13PM 13    PROCESS.

03:13PM 14    Q.   WERE YOU INSURED AT THE TIME?

03:13PM 15    A.   NO.  THIS WAS AN OUT-OF-POCKET VISIT AND THE COST OF THAT

03:13PM 16    BLOOD WORK WAS PART OF THE -- THAT WAS PART OF THE DECISION

03:13PM 17    MAKING.

03:13PM 18    Q.   I SEE.  YOU UNDERSTOOD THERANOS'S PRICES TO BE LOWER THAN

03:14PM 19    COMPETING LABS?

03:14PM 20    A.   UH-HUH.

03:14PM 21         THE COURT:  IS THAT YES?  WAS THAT YES?

03:14PM 22         THE WITNESS:  YES.

03:14PM 23         MR. BOSTIC:  SORRY.

03:14PM 24    Q.   WE JUST NEED AN AUDIBLE YES FOR THE RECORD.

03:14PM 25    A.   YES, I UNDERSTOOD THEM TO BE LOWER PRICING THAN OTHER

TOMPKINS DIRECT BY MR. BOSTIC                                    6751

03:14PM  1    OPTIONS.

03:14PM  2    Q.   WHEN YOU DECIDED TO GO TO THERANOS FOR BLOOD TESTING, WERE

03:14PM  3    YOU COUNTING ON THE LAB'S ABILITY TO RETURN ACCURATE RESULTS

03:14PM  4    FOR YOUR BLOOD TESTS?

03:14PM  5    A.   ABSOLUTELY.

03:14PM  6    Q.   YOU MENTIONED THAT COST WAS A FACTOR IN CHOOSING WHERE TO

03:14PM  7    GO.

03:14PM  8         BETWEEN COST AND ACCURACY, WHICH OF THOSE WAS MORE

03:14PM  9    IMPORTANT TO YOU AT THE TIME THAT YOU WERE GETTING BLOOD

03:14PM  10   TESTING DONE?

03:14PM  11   A.   WELL, I THINK ACCURACY IS THE MOST IMPORTANT ANY TIME

03:14PM  12   YOU'RE HAVING A MEDICAL PROCEDURE, BUT COST WAS A VERY, VERY

03:14PM  13   CLOSE SECOND FOR ME AT THE TIME.

03:14PM  14   Q.   AS A PATIENT, IN YOUR VIEW, IS THERE ANY BENEFIT TO YOU IN

03:14PM  15   BLOOD TEST RESULTS THAT ARE NOT ACCURATE OR RELIABLE?

03:14PM  16   A.   I CAN'T IMAGINE ONE, NO.

03:15PM  17   Q.   AFTER CHOOSING THERANOS AS THE LAB, DO YOU REMEMBER WHERE

03:15PM  18   YOU WENT TO HAVE YOUR BLOOD DRAWN?

03:15PM  19   A.   I BELIEVE IT WAS INSIDE OF A WALGREENS.

03:15PM  20   Q.   AND YOU MENTIONED THAT YOU WERE NOT INSURED.  AT THE TIME,

03:15PM  21   DO YOU RECALL HOW YOU PAID FOR YOUR THERANOS BLOOD TEST?

03:15PM  22   A.   EITHER CASH OR CARD, BANK CARD PROBABLY.

03:15PM  23   Q.   YOUR PERSONAL FUNDS?

03:15PM  24   A.   YES.

03:15PM  25         MR. BOSTIC:  YOUR HONOR, I WOULD MOVE TO ADMIT

TOMPKINS DIRECT BY MR. BOSTIC                                    6752

03:15PM    1    EXHIBIT 5483, WHICH I'M HANDING UP A COPY TO THE COURT NOW.

03:15PM    2         (HANDING.)

03:15PM    3         THESE ARE RELEVANT PAGES TO AN EXHIBIT WHICH I BELIEVE THE

03:15PM    4    DEFENSE HAS STIPULATED.

03:15PM    5              MS. TREFZ:  NO OBJECTION.

03:15PM    6              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

03:15PM    7              THE COURT:  YES.

03:15PM    8    BY MR. BOSTIC:

03:15PM    9    Q.   (HANDING.)

03:15PM   10    A.   THANK YOU.  EXCUSE ME.

03:15PM   11              THE COURT:  ARE THERE ANY REDACTIONS THAT NEED TO BE

03:15PM   12    CONDUCTED ON THIS FORM?

03:15PM   13              MR. BOSTIC:  YOUR HONOR, THE EXHIBIT THAT WE'RE

03:15PM   14    MOVING INTO EVIDENCE MATCHES WHAT THE COURT HAS.  IT'S ALREADY

03:16PM   15    BEEN REDACTED, AND I UNDERSTAND THAT THE WITNESS IS COMFORTABLE

03:16PM   16    WITH THE LEVEL OF REDACTIONS ON THIS DOCUMENT.

03:16PM   17              THE COURT:  ALL RIGHT.  THANK YOU.

03:16PM   18         THERE'S PHONE NUMBERS THERE.

03:16PM   19              MR. BOSTIC:  IS THAT IN THE UPPER RIGHT, YOUR HONOR?

03:16PM   20              THE COURT:  YES.

03:16PM   21              MR. BOSTIC:  THOSE ARE OFFICE PHONE NUMBERS THAT I

03:16PM   22    UNDERSTAND ARE PUBLIC.

03:16PM   23              THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED,

03:16PM   24    AND IT MAY BE PUBLISHED.

03:16PM   25         (GOVERNMENT'S EXHIBIT 5483 WAS RECEIVED IN EVIDENCE.)

6753

TOMPKINS DIRECT BY MR. BOSTIC

03:16PM   1          MR. BOSTIC:  MS. HOLLIMAN, LET'S BRING UP EXHIBIT

03:16PM   2   5483.

03:16PM   3   Q.   MS. TOMPKINS, DO YOU SEE IN FRONT OF YOU EXHIBIT 5483?

03:16PM   4   A.   YES.

03:16PM   5   Q.   AND ARE THESE YOUR TEST RESULTS, OR AN EXCERPT OF YOUR

03:16PM   6   TEST RESULTS FROM THERANOS IN 2015?

03:16PM   7   A.   THEY APPEAR TO BE, YES.

03:16PM   8   Q.   AND DO YOU SEE YOUR NAME AT THE TOP, TOMPKINS, COMMA,

03:16PM   9   ERIN?

03:16PM   10  A.   YES, I DO.

03:16PM   11  Q.   AND IS THAT YOUR PHYSICIAN'S NAME TO THE RIGHT OF THAT,

03:16PM   12  GERALD ASIN?

03:16PM   13  A.   YES, IT IS.

03:16PM   14  Q.   UNDERNEATH THAT IN A BLACK BAR THAT MAKES IT ESPECIALLY

03:16PM   15  DIFFICULT TO READ, THERE'S A LINE THAT SAYS VISIT.

03:17PM   16       DO YOU SEE THAT?

03:17PM   17  A.   YES, JUST BARELY.

03:17PM   18  Q.   AND DO YOU SEE AN ADDRESS THERE, THERANOS SERVICE CENTER

03:17PM   19  ON NORTH 16TH STREET IN PHOENIX, ARIZONA?

03:17PM   20  A.   YES.

03:17PM   21  Q.   AND THE VISIT DATE LOOKS LIKE MAY 8TH, 2015.  IS THAT

03:17PM   22  CONSISTENT WITH YOUR MEMORY?

03:17PM   23  A.   THAT LOOKS LIKE THAT'S WHAT IS ON THERE, BUT IT'S VERY

03:17PM   24  HARD FOR ME TO READ.

03:17PM   25       BUT I KNOW THAT IT WAS IN THE FIRST WEEKISH OF MAY, YEAH.

TOMPKINS DIRECT BY MR. BOSTIC                                        6754

03:17PM   1    THAT'S PRETTY CONSISTENT.

03:17PM   2    Q.   AND AT THE TOP OF THIS PAGE, DO YOU SEE AT THE VERY TOP

03:17PM   3    THERE'S A LINE THAT READS THERANOS FACT SERVER?

03:17PM   4         DO YOU SEE THAT AT THE TOP OF THE PAGE?

03:17PM   5    A.   YES.  NOT AT THE TOP OF THE IMAGE ON THE SCREEN, BUT AT

03:17PM   6    THE TOP OF THE PAGE THAT I'M HOLDING.  THERE IT IS.

03:17PM   7    Q.   MS. HOLLIMAN, LET'S SEE IF WE CAN ZOOM OUT AND SEE IF WE

03:18PM   8    CAN CAPTURE THE INFORMATION AT THE TOP OF THE PAGE.

03:18PM   9         DO YOU SEE IT INDICATES THERE THERANOS FAX SERVER, AND DO

03:18PM  10    YOU SEE A TIME STAMP INDICATING THAT IT WAS SENT MAY 11TH,

03:18PM  11    2015?

03:18PM  12    A.   UH-HUH, I DO.

03:18PM  13    Q.   AND FINALLY, JUST LOOKING AT YOUR PHYSICIAN'S CONTACT

03:18PM  14    INFORMATION, DO YOU SEE THAT HIS FAX NUMBER BEGINS WITH A 480

03:18PM  15    AREA CODE?

03:18PM  16    A.   YES.

03:18PM  17    Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT AREA THAT AREA

03:18PM  18    CODE REFERS TO?

03:18PM  19    A.   YES.  THAT'S IN SCOTTSDALE, AND THE PHONE NUMBER, THE

03:18PM  20    OFFICE PHONE NUMBER HERE IS CORRECT.  I DON'T HAVE THE FAX

03:18PM  21    MEMORIZED BUT, YEAH.

03:18PM  22    Q.   UNDERSTOOD.  WAS YOUR DOCTOR'S OFFICE AT THAT TIME IN

03:18PM  23    SCOTTSDALE, ARIZONA?

03:18PM  24    A.   YES, THAT'S STONECREEK MEDICAL ASSOCIATES.

03:18PM  25    Q.   LOOKING AT THE TOP RIGHT CORNER OF THE PAGE, THERE'S

TOMPKINS DIRECT BY MR. BOSTIC                                6755

03:18PM  1    INFORMATION FOR THERANOS.

03:18PM  2         DO YOU SEE THAT?

03:18PM  3    A.   UH-HUH.

03:18PM  4    Q.   AND THERE'S A FAX NUMBER WITH A 650 AREA CODE.

03:18PM  5         DO YOU SEE THAT?

03:18PM  6    A.   UH-HUH.

03:18PM  7    Q.   DO YOU UNDERSTAND --

03:18PM  8              THE COURT:  I'M SORRY.  IS THAT YES?

03:18PM  9              THE WITNESS:  YES.

03:18PM  10             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:18PM  11   Q.   DO YOU UNDERSTAND THE 650 AREA CODE TO CORRESPOND TO PART

03:19PM  12   OF THE BAY AREA IN CALIFORNIA?

03:19PM  13   A.   YES.

03:19PM  14   Q.   AND LET'S LOOK AT THE RESULTS THEMSELVES.  DO YOU SEE

03:19PM  15   ABOUT A THIRD OF THE WAY DOWN THE PAGE THERE'S A SECTION

03:19PM  16   LABELLED SUMMARY OF ABNORMAL RESULTS?

03:19PM  17   A.   A THIRD OF THE WAY DOWN, YES, THE FIRST LIST.

03:19PM  18   Q.   YES, EXACTLY.

03:19PM  19        AND WE'VE REDACTED THE NONRELEVANT PORTIONS HERE, BUT DO

03:19PM  20   YOU SEE A LINE FOR A TEST FOR HIV 1 PLUS 2 ANTIBODIES?

03:19PM  21   A.   YES.

03:19PM  22   Q.   AND DO YOU SEE THE RESULT THERE IS LISTED THERE AS

03:19PM  23   REACTIVE?

03:19PM  24   A.   YES.

03:19PM  25   Q.   AND IT'S FLAGGED AS REACTIVE.

TOMPKINS DIRECT BY MR. BOSTIC                                    6756

03:19PM  1          DO YOU SEE THAT?

03:19PM  2     A.   I DO, YES.

03:19PM  3     Q.   DO YOU REMEMBER RECEIVING THESE RESULTS IN MAY 2015?

03:19PM  4     A.   I DO.

03:19PM  5     Q.   LET'S LOOK AT THE NEXT PAGE, WHICH IS PAGE 2 OF

03:19PM  6     EXHIBIT 5483.  AND LET'S ZOOM IN ON THE BOX IN THE MIDDLE OF

03:20PM  7     THE PAGE LABELLED HIV 1, 2 ANTIBODY SCREEN.

03:20PM  8          MS. TOMPKINS, DO YOU SEE A BREAKDOWN OF SOME ADDITIONAL

03:20PM  9     HIV RELATED RESULTS FROM YOUR THERANOS TEST?

03:20PM 10     A.   YES.

03:20PM 11     Q.   AND YOU'LL SEE AGAIN THAT THE HIV 1 PLUS 2 ANTIBODY TEST

03:20PM 12     IS MARKED AS REACTIVE.

03:20PM 13          DO YOU SEE THAT?

03:20PM 14     A.   YES.

03:20PM 15     Q.   AND THAT THE OTHERS FOR HIV 1 ANTIBODY, HIV 2 ANTIBODY,

03:20PM 16     AND HIV 1 RNA ARE MARKED AS NON-REACTIVE OR NOT DETECTED.

03:20PM 17          DO YOU SEE THAT?

03:20PM 18     A.   YES.

03:20PM 19     Q.   PRIOR TO 2015, WERE YOU EVER AT ANY TIME DIAGNOSED WITH

03:20PM 20     HIV OR AIDS?

03:20PM 21     A.   NO.

03:20PM 22     Q.   AT ANY TIME SINCE 2015 HAVE YOU BEEN DIAGNOSED WITH HIV OR

03:20PM 23     AIDS?

03:21PM 24     A.   NO.

03:21PM 25     Q.   TO YOUR KNOWLEDGE, HAVE YOU EVER HAD ANY SYMPTOMS OF HIV

TOMPKINS DIRECT BY MR. BOSTIC                                               6757

03:21PM  1      OR AIDS?

03:21PM  2      A.   NO.

03:21PM  3      Q.   HAVE YOU EVER RECEIVED TREATMENT FOR HIV OR AIDS?

03:21PM  4      A.   NO.

03:21PM  5      Q.   I'D LIKE TO DRAW YOUR ATTENTION TO SOME LANGUAGE ON PAGE 3

03:21PM  6      OF THE EXHIBIT.

03:21PM  7      A.   PAGE 3?

03:21PM  8      Q.   PAGE 3 OF THE EXHIBIT, AT THE BOTTOM OF THE PAGE THERE'S A

03:21PM  9      SECTION MARKED LAB NOTES.

03:21PM 10           DO YOU SEE THAT?

03:21PM 11      A.   YES.

03:21PM 12      Q.   AND IT READS THERE, "HIV ANTIBODIES WERE NOT CONFIRMED AND

03:21PM 13      HIV-1 RNA WAS NOT DETECTED.  NO LABORATORY EVIDENCE OF HIV-1

03:21PM 14      INFECTION.  FOLLOW-UP TESTING FOR HIV-2 SHOULD BE PERFORMED IF

03:21PM 15      CLINICALLY INDICATED."

03:21PM 16           DO YOU SEE THAT?

03:21PM 17      A.   YES.

03:21PM 18      Q.   BASED ON YOUR MEDICAL HISTORY, ARE YOU AWARE OF ANY REASON

03:21PM 19      WHY HIV ANTIBODIES WOULD BE PRESENT IN YOUR BLOOD?

03:22PM 20      A.   NO.

03:22PM 21      Q.   FOLLOWING YOUR RECEIPT OF THESE RESULTS, DID YOU TAKE ANY

03:22PM 22      STEPS TO CONFIRM THESE RESULTS OR GET A SECOND OPINION?

03:22PM 23      A.   FOLLOWING MY -- I'M SORRY, CAN YOU SAY THAT AGAIN, PLEASE.

03:22PM 24      Q.   AFTER YOU GOT THESE RESULTS, DID YOU TAKE ANY STEPS TO TRY

03:22PM 25      TO VERIFY WHAT WAS REALLY HAPPENING?

TOMPKINS DIRECT BY MR. BOSTIC                                      6758

03:22PM  1    A.   YES.  I MADE A DIRECT CALL TO THE NUMBER FOR THERANOS AND

03:22PM  2    ASKED IF I COULD SPEAK WITH SOMEONE WORKING IN A LAB WHO COULD

03:22PM  3    EXPLAIN TO ME HOW THIS IS POSSIBLE.

03:22PM  4    Q.   AND HOW SOON AFTER RECEIVING THESE RESULTS DID YOU CALL

03:22PM  5    THE COMPANY?

03:22PM  6    A.   FROM THE DAY -- IT WAS EITHER ON THE DAY THAT I RECEIVED

03:22PM  7    THEM OR THE FOLLOWING DAY.

03:22PM  8    Q.   SO I UNDERSTAND WE'RE TALKING ABOUT MAY 2015?

03:22PM  9    A.   UH-HUH.

03:22PM  10   Q.   WHAT, IF ANYTHING, DO YOU REMEMBER ABOUT THAT CONVERSATION

03:22PM  11   WITH SOMEONE AT THE COMPANY?

03:22PM  12   A.   I REMEMBER ASKING IF I COULD BE TRANSFERRED TO SOMEONE WHO

03:22PM  13   WORKS WITH THE LAB EQUIPMENT WHO MIGHT BE ABLE TO HAVE A MORE

03:22PM  14   IN-DEPTH CONVERSATION WITH ME ABOUT HOW THIS IS POSSIBLE.

03:23PM  15        SHE SAID SHE WAS A CUSTOMER SERVICE REPRESENTATIVE AND SHE

03:23PM  16   COULDN'T TRANSFER ME, AND THAT WAS ABOUT IT.

03:23PM  17        I DON'T RECALL IF I ATTEMPTED TO CALL THEM BACK AGAIN, BUT

03:23PM  18   I WAS QUITE EMOTIONAL AT THE TIME.

03:23PM  19   Q.   AT ANY TIME TO YOUR KNOWLEDGE DID YOU SPEAK TO A SCIENTIST

03:23PM  20   OR A MEDICAL PROFESSIONAL --

03:23PM  21   A.   NO.

03:23PM  22   Q.   -- ASSOCIATED WITH THERANOS?

03:23PM  23   A.   NO.

03:23PM  24   Q.   TO YOUR KNOWLEDGE, DID YOU GET A CALL BACK FROM THE

03:23PM  25   COMPANY TO PROVIDE MORE INFORMATION ABOUT YOUR TEST RESULTS?

TOMPKINS DIRECT BY MR. BOSTIC                                    6759

03:23PM  1    A.   NOT THAT I RECALL, NO.

03:23PM  2    Q.   AT SOME POINT AFTER THESE TEST RESULTS, DID YOU GET

03:23PM  3    ADDITIONAL EXAMINATION OR ANOTHER TEST TO TRY TO CONFIRM

03:23PM  4    WHETHER THESE RESULTS WERE ACCURATE OR NOT?

03:23PM  5    A.   YES.  IT TOOK ME A LITTLE LONGER THAN I LIKED, BUT WITHIN

03:23PM  6    THE NEXT THREE MONTHS I WAS ABLE TO GO INTO THE WOMEN'S CLINIC

03:23PM  7    AND GET SOME SCREENING DONE.  THAT CAME BACK NEGATIVE.  THEY

03:23PM  8    SAID EVERYTHING WAS FINE.

03:23PM  9        THEN I WENT, LIKE, I DON'T KNOW, THREE YEARS LATER AND HAD

03:24PM 10    IT DONE AGAIN.

03:24PM 11    Q.   AND DID YOU HAVE ANOTHER TEST DONE IN AUGUST OF THIS YEAR,

03:24PM 12    WHICH INCLUDED AN HIV SCREEN?

03:24PM 13    A.   YES, THAT IS THE MOST RECENT ONE.

03:24PM 14             MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

03:24PM 15             THE COURT:  YES.

03:24PM 16    BY MR. BOSTIC:

03:24PM 17    Q.   (HANDING.)

03:24PM 18        MS. TOMPKINS, I'VE PUT IN FRONT OF YOU WHAT IS MARKED

03:24PM 19    5484.

03:24PM 20        DO YOU HAVE THAT?

03:24PM 21    A.   YES.

03:24PM 22    Q.   AND IS THIS A REPORT WITH YOUR HIV TEST RESULTS FROM

03:24PM 23    AUGUST OF THIS YEAR?

03:24PM 24    A.   YES.

03:24PM 25             MR. BOSTIC:  YOUR HONOR, I WOULD MOVE TO ADMIT

TOMPKINS DIRECT BY MR. BOSTIC                                      6760

03:24PM   1    EXHIBIT 5484 AT THIS TIME, AND I WILL BE REDACTING THE DATE OF

03:24PM   2    BIRTH AT THE TOP OF THE PAGE.

03:24PM   3              MS. TREFZ:  NO OBJECTION.

03:24PM   4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED WITH

03:25PM   5    THE REDACTION.

03:25PM   6         (GOVERNMENT'S EXHIBIT 5484 WAS RECEIVED IN EVIDENCE.)

03:25PM   7    BY MR. BOSTIC:

03:25PM   8    Q.  MS. TOMPKINS, ARE YOU SEEING YOUR AUGUST HIV RESULTS IN

03:25PM   9    FRONT OF YOU?

03:25PM   10             THE COURT:  EXCUSE ME.  THE MONITORS ARE NOT

03:25PM   11   WORKING.  I DON'T SEE --

03:25PM   12             THE CLERK:  LET ME DO A QUICK RESET, YOUR HONOR.

03:25PM   13             THE COURT:  PARDON ME, MR. BOSTIC.

03:25PM   14             MR. BOSTIC:  OF COURSE, YOUR HONOR.

03:26PM   15        (PAUSE IN PROCEEDINGS.)

03:26PM   16             THE COURT:  ALL RIGHT.  IT LOOKS LIKE IT'S JUST ONE

03:26PM   17   OF OUR MONITORS ON THE EAST SIDE.

03:26PM   18        DOES THE JURY HAVE A VIEW OF THIS?

03:26PM   19             JUROR:  (NODS HEAD UP AND DOWN.)

03:26PM   20             THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL PROCEED.

03:26PM   21        THERE IS ONE MONITOR UP IN THE PUBLIC AREA, AND THAT'S

03:26PM   22   WHAT WE'LL HAVE TO USE FOR NOW.

03:26PM   23        SO YOU CAN CONTINUE, MR. BOSTIC.

03:26PM   24             MS. TREFZ:  I'M SORRY.

03:26PM   25             THE COURT:  MS. TREFZ IS GOING TO SIT AT A TABLE

TOMPKINS DIRECT BY MR. BOSTIC                                        6761

03:26PM   1    HERE THAT HAS THE MONITOR THAT DISPLAYS THE EXHIBIT.

03:26PM   2         YOU HAVE THE EXHIBIT THOUGH?

03:26PM   3              MS. TREFZ:  I DO, BUT I WILL SIT HERE.

03:26PM   4              THE COURT:  THAT'S FINE.

03:26PM   5         MR. BOSTIC.

03:26PM   6              MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:26PM   7    Q.   MS. TOMPKINS, ON THE FORM IN FRONT OF YOU, FIRST AT THE

03:26PM   8    TOP IT IS LABELLED CONTRA COSTA HEALTH SERVICES.

03:26PM   9         IS THAT THE LAB THAT YOU WENT TO FOR YOUR AUGUST 2021 HIV

03:27PM   10   TEST?

03:27PM   11   A.   YES.

03:27PM   12   Q.   AND, MS. HOLLIMAN, LET'S ZOOM IN ON THE RESULTS WHERE THE

03:27PM   13   BOX IS CHECKED NEXT TO NEGATIVE.

03:27PM   14        AND, MS. TOMPKINS, DO YOU SEE THAT YOUR RESULT FOR THIS

03:27PM   15   TEST CAME BACK NEGATIVE AND IT READS, "EVIDENCE OF HIV ANTIGEN

03:27PM   16   OR ANTIBODY WERE NOT DETECTED."

03:27PM   17        DO YOU SEE THAT?

03:27PM   18   A.   I DO, YES.

03:27PM   19              MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

03:27PM   20              THE COURT:  YES.

03:27PM   21        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:27PM   22              MR. BOSTIC:  NO FURTHER QUESTIONS.

03:27PM   23        THANK YOU, MS. TOMPKINS.

03:27PM   24              THE COURT:  MS. TREFZ?

03:27PM   25              MS. TREFZ:  I DO.  I'M ALSO MINDFUL OF THE TIME.  I

TOMPKINS CROSS BY MS. TREFZ                                        6762

03:27PM   1    THINK IT WILL TAKE MORE THAN THREE MINUTES.  I'M HAPPY TO

03:27PM   2    START.

03:27PM   3              THE COURT:  WELL, WHY DON'T YOU START?  WHY DON'T

03:27PM   4    YOU INTRODUCE YOURSELF AND LET'S GET STARTED.

03:27PM   5              MS. TREFZ:  OKAY.  I'M HAPPY TO DO THAT.

03:28PM   6                        **CROSS-EXAMINATION**

03:28PM   7    BY MS. TREFZ:

03:28PM   8    Q.   GOOD AFTERNOON, MS. TOMPKINS.

03:28PM   9    A.   GOOD AFTERNOON.

03:28PM   10   Q.   MY NAME IS KATIE TREFZ, AND I REPRESENT MS. HOLMES.  I'M

03:28PM   11   JUST GOING TO ASK YOU A FEW QUESTIONS.

03:28PM   12        BECAUSE OF THE TIME, I APOLOGIZE, BUT IT PROBABLY WILL

03:28PM   13   TAKE UNTIL TOMORROW, BUT IT WON'T BE SUPER LONG.

03:28PM   14   A.   OKAY.

03:28PM   15   Q.   DO YOU RECALL HOW MUCH YOUR HIV TEST COST FROM THERANOS?

03:28PM   16   A.   OFF THE TOP OF MY HEAD?  NO.

03:28PM   17        I REMEMBER IT BEING OF LOWER COST AND I REMEMBER RECEIVING

03:28PM   18   A REFUND CHECK IN THE MAIL APPROXIMATELY TWO YEARS LATER MAYBE,

03:28PM   19   SOMETHING LIKE THAT.

03:29PM   20   Q.   OKAY.  I THINK YOU MENTIONED ON DIRECT THAT COST WAS AN

03:29PM   21   IMPORTANT DRIVER FOR YOU IN GOING TO THERANOS; IS THAT CORRECT?

03:29PM   22   A.   UH-HUH, ONE OF THEM.

03:29PM   23   Q.   YOU DISCUSSED THE RESULTS THAT YOU GOT WITH YOUR DOCTOR;

03:29PM   24   CORRECT?

03:29PM   25   A.   UH-HUH.

TOMPKINS CROSS BY MS. TREFZ                                    6763

03:29PM  1              THE COURT:  YES?

03:29PM  2              THE WITNESS:  YES.  BAD HABIT.  I APOLOGIZE.

03:29PM  3       BY MS. TREFZ:

03:29PM  4       Q.   I FEEL YOU.

03:29PM  5            LOOKING -- WHEN YOU DISCUSSED YOUR TEST RESULT WITH YOUR

03:29PM  6       DOCTOR, WHAT DID HE TELL YOU ABOUT WHAT IT MEANT?

03:29PM  7       A.   HE SAID HE --

03:29PM  8              MR. BOSTIC:  OBJECTION.  THIS IS HEARSAY.  ALSO TO

03:29PM  9       THE EXTENT THAT IT CALLS FOR DOCTOR-PATIENT CONFIDENTIALITY.

03:29PM  10             THE COURT:  THERE MIGHT BE SOME PRIVILEGE ISSUES

03:29PM  11      INVOLVED IN THAT, AND WE'LL HAVE TO SEE WHETHER OR NOT

03:29PM  12      MS. TOMPKINS WISHES TO DISCLOSE THAT.

03:29PM  13           AND WE'LL DO THAT TOMORROW, LADIES AND GENTLEMEN.

03:29PM  14           MS. TOMPKINS, WE'RE ENDING TODAY AT 3:30.  I WANTED TO GET

03:30PM  15      MS. TREFZ STARTED TO CAPTURE AS EVIDENCE AS WE COULD.

03:30PM  16           SO I'LL HAVE TO ASK YOU TO RETURN TOMORROW AT 9:00 A.M.,

03:30PM  17      PLEASE, OR BE READY FOR TESTIMONY AT 9:00 A.M.

03:30PM  18           LADIES AND GENTLEMEN, WE'LL TAKE A RECESS NOW, EVENING

03:30PM  19      RECESS.  PLEASE AGAIN REMEMBER THE ADMONISHMENT.  DO NOT LISTEN

03:30PM  20      TO, READ, OR COME UPON ANY INFORMATION, DISCUSSION, OR

03:30PM  21      OTHERWISE ON SOCIAL MEDIA.  DO NOT DO ANY INVESTIGATION.

03:30PM  22           AND TOMORROW I WILL -- ABOUT THIS CASE, AND TOMORROW I'LL

03:30PM  23      ASK YOU WHETHER OR NOT ANY OF THOSE THINGS HAVE OCCURRED.

03:30PM  24           HAVE A GOOD EVENING.  THANK YOU.  WE'LL SEE YOU TOMORROW.

03:30PM  25           AND YOU CAN -- MS. TOMPKINS, YOU CAN STAND DOWN, AND WE'LL

6764

| | | |
|---|---|---|
| 03:30PM | 1 | SEE YOU BACK TOMORROW AT 9:00 O'CLOCK. |
| 03:30PM | 2 | THE WITNESS:  OKAY.  THANK YOU, SIR. |
| 03:30PM | 3 | THE COURT:  YOU'RE WELCOME. |
| 03:31PM | 4 | (JURY OUT AT 3:31 P.M.) |
| 03:31PM | 5 | MS. TREFZ:  THOSE ARE THE EXHIBITS THAT YOU'RE |
| 03:31PM | 6 | SUPPOSED TO LEAVE. |
| 03:31PM | 7 | THE COURT:  JUST LEAVE THOSE EXHIBITS UP THERE, |
| 03:31PM | 8 | MS. TOMPKINS.  THANK YOU. |
| 03:31PM | 9 | THE WITNESS:  NO.  I APOLOGIZE. |
| 03:31PM | 10 | THE COURT:  AND PLEASE BE SEATED, LADIES AND |
| 03:31PM | 11 | GENTLEMEN.  THANK YOU. |
| 03:31PM | 12 | OH, AND, MS. TOMPKINS, YOU CAN -- THE RECORD SHOULD |
| 03:31PM | 13 | REFLECT THAT THE JURY HAS LEFT FOR THE RECESS AND THE WITNESS |
| 03:31PM | 14 | HAS LEFT THE COURTROOM.  ALL COUNSEL AND MS. HOLMES ARE |
| 03:31PM | 15 | PRESENT. |
| 03:31PM | 16 | ANYTHING BEFORE WE BREAK, COUNSEL? |
| 03:31PM | 17 | MR. SCHENK:  NO, YOUR HONOR. |
| 03:31PM | 18 | MR. DOWNEY:  I UNDERSTAND THAT YOUR HONOR IS GOING |
| 03:31PM | 19 | TO TAKE THE PARLOFF MATTERS UP TOMORROW MORNING, AND MR. CLINE |
| 03:31PM | 20 | WILL BE HERE AND AVAILABLE TO DO THAT. |
| 03:31PM | 21 | THE COURT:  THAT'S FINE.  THAT'S FINE. |
| 03:31PM | 22 | MS. TREFZ:  YOUR HONOR, I WOULD JUST LIKE, ON THIS |
| 03:31PM | 23 | LAST OBJECTION, I WOULD LIKE -- WE CAN TALK ABOUT IT TOMORROW |
| 03:32PM | 24 | MORNING, I'M HAPPY TO, OR WE CAN TALK ABOUT IT NOW, BUT I WOULD |
| 03:32PM | 25 | LIKE TO KNOW THE BOUNDARIES OF WHAT WE'RE ALLOWED TO ASK ABOUT |

03:32PM  1    IN PARTICULAR, BECAUSE WE WERE -- IT HAS BEEN DISCLOSED TO US

03:32PM  2    WHAT THE DOCTOR TOLD THE PATIENT AND WE BELIEVE IT'S HIGHLY

03:32PM  3    RELEVANT.

03:32PM  4         SO I'M HAPPY TO DISCUSS THAT NOW OR LATER.  I DEFER TO THE

03:32PM  5    COURT.

03:32PM  6              THE COURT:  WHY DON'T YOU WALK UP HERE, AND WE'LL

03:32PM  7    TALK ABOUT IT NOW.  I'D LIKE TO TAKE ADVANTAGE OF AS MUCH TIME

03:32PM  8    AS WE HAVE SO WE DON'T RUN INTO ANY OTHER UNTOWARD DELAYS IN

03:32PM  9    THE CASE.

03:32PM 10              MS. TREFZ:  SO WITH RESPECT TO THIS PARTICULAR

03:32PM 11    ISSUE, THERE IS AN ISSUE THAT GOES TO WHETHER THE TEST ACTUALLY

03:32PM 12    WAS ACCURATE OR NOT.

03:32PM 13              THE COURT:  WHICH TEST?

03:32PM 14              MS. TREFZ:  THE HIV TEST THAT WE'RE TALKING ABOUT.

03:32PM 15              THE COURT:  YOUR CLIENT'S TEST OR THE SUBSEQUENT

03:32PM 16    TEST?

03:33PM 17              MS. TREFZ:  THE TEST --

03:33PM 18              THE COURT:  FROM YOUR CLIENT'S COMPANY?

03:33PM 19              MS. TREFZ:  FROM THERANOS, YES.

03:33PM 20              THE COURT:  YES.

03:33PM 21              MS. TREFZ:  IN PARTICULAR, HIV IS A REFLEX TEST

03:33PM 22    PURSUANT TO A CBC ALGORITHM, AND WE BELIEVE THIS WAS

03:33PM 23    COMMUNICATED TO THE PATIENT, AND WE ALSO BELIEVE THAT IT WAS

03:33PM 24    COMMUNICATED TO THE PATIENT THAT THERE WAS NO INDICATION --

03:33PM 25    THERE WAS NO BELIEF THAT SHE WAS HIV POSITIVE AS A RESULT OF

6766

03:33PM  1      THIS PARTICULAR TEST.

03:33PM  2                  THE COURT:  FROM THIS --

03:33PM  3                  MS. TREFZ:  I'M SORRY.

03:33PM  4                  THE COURT:  THIS INFORMATION COMES FROM HER DOCTOR

03:33PM  5      TO HER?

03:33PM  6                  MS. TREFZ:  FROM HER DOCTOR TO HER.

03:33PM  7         BUT IT'S BEEN DISCLOSED TO US AS PART OF DISCOVERY, AND WE

03:33PM  8      THINK IT'S HIGHLY RELEVANT TO THE MATTERS HERE, IN PART BECAUSE

03:33PM  9      WE BELIEVE THAT THE CONFIDENTIALITY HAS ALREADY BEEN BROKEN AND

03:33PM  10     THAT IT'S BEEN DISCLOSED TO US.

03:33PM  11        AND WE THINK IT'S IMPORTANT THAT THE JURY UNDERSTAND THAT

03:33PM  12     THE PATIENT WAS TOLD AT THE TIME THAT THIS WAS NOT A POSITIVE

03:34PM  13     TEST RESULT.

03:34PM  14                 THE COURT:  TOLD AT THE TIME?

03:34PM  15                 MS. TREFZ:  SHE RECEIVED THE RESULT AROUND MAY OF

03:34PM  16     2015, THAT SHE WAS TOLD AT THE TIME BY HER DOCTOR THAT IT WAS

03:34PM  17     NOT AN INDICATION OF A POSITIVE TEST RESULT.

03:34PM  18                 THE COURT:  OKAY.  SO SHE TOOK THE TEST, SHE GOT THE

03:34PM  19     RESULTS, SHE CALLED HER DOCTOR, AND THEN HER DOCTOR THEN TELLS

03:34PM  20     HER THIS INFORMATION?

03:34PM  21                 MS. TREFZ:  THAT IS WHAT WE WOULD LIKE TO ELICIT.

03:34PM  22     WE BELIEVE THAT THAT IS THE CASE BASED ON THE -- OUR

03:34PM  23     UNDERSTANDING OF THE DISCOVERY THAT HAS BEEN PRODUCED TO US IN

03:34PM  24     THIS CASE, AND SO I DON'T BELIEVE THE OBJECTION IS WELL TAKEN.

03:34PM  25                 THE COURT:  OKAY.  ALL RIGHT.

6767

| | | |
|---|---|---|
| 03:34PM | 1 | MR. BOSTIC? |
| 03:34PM | 2 | MR. BOSTIC:  YOUR HONOR, A FEW POINTS. |
| 03:34PM | 3 | FIRST, WHEN IT COMES TO THE OBJECTION TO THE |
| 03:34PM | 4 | DOCTOR-PATIENT CONFIDENTIALITY, TO THE EXTENT THAT |
| 03:34PM | 5 | CONFIDENTIALITY HAS BEEN WAIVED AS TO THE SPECIFIC STATEMENT |
| 03:34PM | 6 | THAT MS. TREFZ IS REFERENCING, I THINK THE OBJECTION WAS STILL |
| 03:35PM | 7 | NECESSARY BECAUSE THE QUESTION WAS MUCH MORE OPEN ENDED.  THE |
| 03:35PM | 8 | QUESTION WAS, WHAT DID YOUR DOCTOR TELL YOU? |
| 03:35PM | 9 | AND I THINK -- I DON'T KNOW WHAT THAT CALLS FOR.  I DON'T |
| 03:35PM | 10 | KNOW WHAT OTHER CONTENT MIGHT BE THERE. |
| 03:35PM | 11 | BUT I DIDN'T WANT THE WITNESS TO INADVERTENTLY OR TO FEEL |
| 03:35PM | 12 | THAT SHE WAS OBLIGATED TO PROVIDE INFORMATION BEYOND I THINK |
| 03:35PM | 13 | WHAT MS. TREFZ IS ASKING ABOUT. |
| 03:35PM | 14 | EVEN AS TO THE STATEMENT THAT MS. TREFZ IS REFERENCING, |
| 03:35PM | 15 | THOUGH, I DO HAVE HEARSAY CONCERNS STILL, AND I ALSO HAVE |
| 03:35PM | 16 | RELEVANCE CONCERNS BECAUSE I'M NOT SURE OF THE RELEVANCE OF |
| 03:35PM | 17 | WHAT THIS PATIENT'S PHYSICIAN TOLD HER ABOUT THE RESULTS. |
| 03:35PM | 18 | SEPARATELY, JUST FACTUALLY, AND I SHOULD HAVE STARTED |
| 03:35PM | 19 | HERE, MY UNDERSTANDING OF THE FACT IS SLIGHTLY DIFFERENT FROM |
| 03:35PM | 20 | MS. TREFZ'S ALSO, AND MAY BE I SHOULD GO BACK AND WE SHOULD |
| 03:35PM | 21 | BOTH REVIEW THE 302'S. |
| 03:35PM | 22 | BUT MY UNDERSTANDING IS THAT HER DOCTOR EXPRESSED SOME |
| 03:35PM | 23 | DOUBT ABOUT WHETHER THAT TEST RESULT COULD BE ACCURATE.  HE WAS |
| 03:36PM | 24 | IN DISBELIEF, IN OTHER WORDS, THAT MS. TOMPKINS COULD ACTUALLY |
| 03:36PM | 25 | HAVE HIV ANTIBODIES IN HER BLOOD, SO HE EXPRESSED SKEPTICISM OR |

6768

03:36PM 1   DISBELIEF AS TO THE ACCURACY OF THE RESULTS.

03:36PM 2       I DON'T UNDERSTAND THAT TO BE THE SAME AS HIM SAYING,

03:36PM 3   "THESE RESULTS ARE ACCURATE AND THEY DO NOT CONNOTE AN HIV

03:36PM 4   INFECTION," WHICH COULD POTENTIALLY BE RELEVANT.

03:36PM 5       BUT EVEN THERE I WOULD QUESTION THE RELEVANCE BECAUSE,

03:36PM 6   FIRST OF ALL, THAT'S -- THAT WOULD BE A HEARSAY OUT-OF-COURT

03:36PM 7   OPINION ABOUT THE TEST ACCURACY COMING INTO EVIDENCE HERE,

03:36PM 8   WHICH WOULD NOT BE PROPER.

03:36PM 9       AND IF IT'S SOLELY FOR THE WITNESS'S STATE OF MIND, I

03:36PM 10  DON'T THINK THAT'S RELEVANT GIVEN THAT THE COURT HAS EXCLUDED,

03:36PM 11  YOU KNOW, VICTIM IMPACT INFORMATION.

03:36PM 12      IF WE WERE TRYING TO PRESENT EVIDENCE OF PAIN AND

03:36PM 13  SUFFERING OR TRAUMA THAT SHE WENT THROUGH AS A RESULT OF

03:36PM 14  RECEIVING THIS RESULT, THEN IT MIGHT BE RELEVANT THAT HER

03:37PM 15  DOCTOR GAVE HER SOME INFORMATION TO MITIGATE THAT.

03:37PM 16      BUT BECAUSE THAT IS NOT WHAT THE CASE IS ABOUT, I'M NOT

03:37PM 17  SURE WHY IT'S NECESSARY.

03:37PM 18          THE COURT:  THANK YOU.  WELL, SHE DID TESTIFY -- I

03:37PM 19  THINK -- WHAT DID SHE SAY?  SHE WAS UPSET, SHOCKED, SURPRISED.

03:37PM 20          MS. TREFZ:  YES, SHE SAID SHE WAS EMOTIONAL.

03:37PM 21          THE COURT:  YES.  AND MR. BOSTIC DID NOT FOLLOW UP

03:37PM 22  ON THAT.

03:37PM 23          MS. TREFZ:  I AGREE.

03:37PM 24          THE COURT:  AND I THINK THAT THE QUESTION DID NOT

03:37PM 25  CALL FOR THAT TYPE OF A RESPONSE.  IT WAS -- THE QUESTION

6769

03:37PM 1    CALLED FOR A DIFFERENT CALL.

03:37PM 2         SO THAT WAS PURELY VOLUNTARY ON HER PART THAT SHE SAID

03:37PM 3    THAT.  THERE WAS NO FOLLOWUP ON IT AT ALL.

03:37PM 4         I SAY THAT BECAUSE I THINK MR. BOSTIC'S POINT ABOUT IT

03:37PM 5    COULD, IT COULD ALLOW HER, AND I MIGHT ALLOW HER TO THEN TALK A

03:37PM 6    LITTLE BIT MORE ABOUT THAT IF WE GET INTO WHAT THE DOCTOR SAID.

03:37PM 7         BUT IS IT YOUR -- YOU JUST WANT TO GET IN THE FACT THAT --

03:37PM 8    IT SOUNDS LIKE YOU WANT TO GET SOME SCIENTIFIC EVIDENCE IN.

03:37PM 9         MS. TREFZ:  I BELIEVE THAT THIS DOCTOR IS GOING TO

03:37PM 10   TESTIFY AS WELL, THAT IS MY UNDERSTANDING, AND, YOU KNOW, WE

03:38PM 11   WOULD OBVIOUSLY HAVE A PROBLEM IF HE WAS NOT GOING TO TESTIFY

03:38PM 12   AS WELL.

03:38PM 13        SO SOME OF THIS INFORMATION I'M HAPPY TO GET IN THROUGH

03:38PM 14   THE DOCTOR, BUT WHAT I DON'T WANT TO BE THE CASE IS TO BE

03:38PM 15   PRECLUDED FROM CROSS-EXAMINING EITHER HER OR THE DOCTOR ON KIND

03:38PM 16   OF WHAT THEY SAID AT THE TIME IF IT'S INCONSISTENT WITH WHAT

03:38PM 17   WAS SAID NOW.

03:38PM 18        AND THAT'S -- I WAS TRYING TO EXPLORE THAT SO WE DON'T

03:38PM 19   HAVE TO CALL SOMEBODY BACK IN ORDER TO DO THAT.

03:38PM 20        I FULLY TAKE THE POINT THAT THE QUESTION WAS BROADER.  I'M

03:38PM 21   HAPPY TO NARROW IT SPECIFICALLY.

03:38PM 22        I DO THINK I CAN TRY TO COME AT IT ANOTHER WAY, AND MAYBE

03:38PM 23   WE'LL GET THERE IN A WAY THAT DOESN'T CAUSE MR. -- WHATEVER --

03:38PM 24   THE CONCERN THAT MR. BOSTIC HAS TO COME TO FRUITION.

03:38PM 25        BUT I DO BELIEVE THAT WE SHOULD BE ABLE TO EXPLORE THE

03:38PM 1    UNDERSTANDING OF THE DOCTOR AT THE TIME AND WHETHER THAT WAS

03:39PM 2    COMMUNICATED TO THE PATIENT AT THE TIME BECAUSE WE'RE NOW MANY

03:39PM 3    YEARS LATER, OF COURSE, AND WE'RE IN A TRIAL, AND, YOU KNOW,

03:39PM 4    THERE'S A LOT OF ATTENTION ON WHETHER A RESULT IS ACCURATE OR

03:39PM 5    NOT IN A DIFFERENT KIND OF SETTING.

03:39PM 6        BUT WE DO HAVE EVIDENCE FROM THE TIME PERIOD THAT, YOU

03:39PM 7    KNOW, THAT AT LEAST THE DOCTOR DID NOT BELIEVE THAT THIS WAS A

03:39PM 8    POSITIVE, OR DID NOT BELIEVE THAT THIS PATIENT HAD A

03:39PM 9    POSITIVE -- WAS HIV POSITIVE AND THAT THE DOCTOR, YOU KNOW,

03:39PM 10   INDICATED ON THE -- OR INDICATED THAT THE REPORT ITSELF WAS

03:39PM 11   PERHAPS CONFUSING.

03:39PM 12       BUT THE REPORT ITSELF SAYS AT THE END IN THE PART THAT

03:39PM 13   MR. BOSTIC IDENTIFIED ON DIRECT, IT SAYS, YOU KNOW, THERE'S NO

03:39PM 14   EVIDENCE OF HIV, THERE'S NO LABORATORY EVIDENCE OF HIV

03:40PM 15   INFECTION.

03:40PM 16       AND WE BELIEVE THAT THE -- THAT PART OF THE CONFUSION HERE

03:40PM 17   COMES FROM HOW THIS INFORMATION WAS PRESENTED IN THE LAB REPORT

03:40PM 18   AND IS LESS ABOUT KIND OF THE OVERALL ACCURACY OF THE TEST.

03:40PM 19       THIS WAS RUN ON AN FDA APPROVED DEVICE, AND AN FDA

03:40PM 20   APPROVED METHOD.

03:40PM 21       SO I THINK THERE ARE A NUMBER OF DIFFERENT ISSUES THAT

03:40PM 22   POTENTIALLY COME INTO THIS PARTICULAR PATIENT, AND I WOULD --

03:40PM 23   AND THIS PARTICULAR RESULT, AND I WOULD LIKE JUST THE LEEWAY TO

03:40PM 24   EXPLORE THE KIND OF UNDERSTANDING OF WHAT THIS TEST RESULT

03:40PM 25   MEANT AND WHAT WAS COMMUNICATED AT THE TIME.

6771

03:40PM 1      THE COURT:  WELL, SHE TESTIFIED WHAT IT MEANT TO HER

03:40PM 2  WAS THAT SHE HAD HIV.

03:40PM 3      AND IF YOU'RE GOING TO GET INTO SCIENTIFIC EVIDENCE OF

03:40PM 4  THIS AS TO WHAT THE DOCTOR'S OPINION IS, IT MIGHT BE BETTER TO

03:40PM 5  WAIT FOR HIM OR HER TO TESTIFY ABOUT WHAT HE TOLD HER.

03:40PM 6      SHE CAN TESTIFY ABOUT -- WITH THAT LIMITED SCOPE OF, DID

03:41PM 7  YOU TALK TO YOUR DOCTOR ABOUT THIS TEST AND WHAT WAS THE

03:41PM 8  DISCUSSION ABOUT THE TEST?

03:41PM 9      I THINK THAT'S WHAT MR. BOSTIC IS REFERRING TO.

03:41PM 10         MS. TREFZ:  AND I'M HAPPY TO LIMIT MY, MY

03:41PM 11 QUESTIONING WITH HER TO THE TEST ITSELF.

03:41PM 12     BUT I DO THINK IT'S RELEVANT FOR THE JURY TO HEAR, NOW

03:41PM 13 THAT THEY'VE HEARD THAT SHE THOUGHT IT MEANT THAT IT WAS --

03:41PM 14 THAT SHE -- THAT IT MEANT THAT SHE MIGHT HAVE BEEN HIV

03:41PM 15 POSITIVE, TO HEAR THAT SHE WAS TOLD BASICALLY IMMEDIATELY THAT,

03:41PM 16 IN FACT, THAT'S NOT WHAT THE DOCTOR BELIEVED.

03:41PM 17         MR. BOSTIC:  SO, YOUR HONOR, I DON'T THINK SHE

03:41PM 18 TESTIFIED TO THAT.

03:41PM 19     I DON'T REMEMBER HER SAYING THAT SHE BELIEVED THAT SHE WAS

03:41PM 20 HIV POSITIVE.

03:41PM 21     AND WHEN IT COMES TO THE ACCURACY OF THE TEST, THIS IS AN

03:41PM 22 HIV ANTIBODY TEST.  THE THERANOS TEST DOES INCLUDE THE LANGUAGE

03:41PM 23 THAT I HIGHLIGHTED FOR THAT PURPOSE BECAUSE I DIDN'T WANT THERE

03:41PM 24 TO BE ANY CONFUSION ABOUT WHETHER THIS -- WHETHER THERANOS WAS

03:41PM 25 TELLING HER THAT SHE HAD THE VIRUS ITSELF PRESENT IN HER

6772

03:42PM  1    BLOODSTREAM.

03:42PM  2         THE TEST THAT CAME BACK POSITIVE WAS AN HIV ANTIBODY TEST,

03:42PM  3    AND THAT'S WHY IT'S RELEVANT THAT SHE HAD NEVER BEEN DIAGNOSED

03:42PM  4    WITH THE ILLNESS, SHE'D NEVER HAD SYMPTOMS, SHE'D NEVER BEEN

03:42PM  5    TREATED.

03:42PM  6         THOSE FACTS SHOULD PRECLUDE HIV ANTIBODIES FROM BEING

03:42PM  7    PRESENT IN HER BLOODSTREAM, AND THE FACT THAT SHE HAS TESTED

03:42PM  8    SUBSEQUENTLY NEGATIVE FOR THOSE SAME ANTIBODIES, THAT'S THE

03:42PM  9    EVIDENCE THAT THE THERANOS PROVIDED TEST WAS INACCURATE.

03:42PM  10        TO THE EXTENT THAT HER DOCTOR HAD CONCERNS ABOUT THE

03:42PM  11   ACCURACY OF THE TEST AT THE TIME, THAT IS INADMISSIBLE HEARSAY.

03:42PM  12   THAT'S WHY I DIDN'T ASK ABOUT IT.

03:42PM  13        I WOULD NOT TRY TO GET IN THAT DOCTOR'S OPINION OF THE

03:42PM  14   ACCURACY OF THE RESULTS THROUGH THIS WITNESS.

03:42PM  15        I JUST WANT TO BE CLEAR THAT WE ARE NOT CERTAIN AS OF THIS

03:42PM  16   POINT WHETHER THE DOCTOR WILL, IN FACT, TESTIFY.

03:42PM  17        WE'RE, AS THE COURT KNOWS, WE'RE SEEKING TO STREAMLINE THE

03:42PM  18   CASE AS MUCH AS WE CAN.  IN LIGHT OF DELAYS TODAY, WE WERE

03:43PM  19   THANKFUL TO GET MS. TOMPKINS'S DIRECT DONE.

03:43PM  20        DR. ASIN HAS COMMITMENTS LATER IN THE WEEK THAT MIGHT MAKE

03:43PM  21   HIM UNAVAILABLE, AND AS I SAID, WE'RE CONSTANTLY EVALUATING OUR

03:43PM  22   WITNESS LIST TO DETERMINE WHICH WITNESSES ARE TRULY NECESSARY.

03:43PM  23        SO I THINK THE CONVERSATION SHOULD BE CABINED TO WHAT IS

03:43PM  24   ADMISSIBLE THROUGH THIS WITNESS, AND I STILL DON'T SEE A BASIS

03:43PM  25   FOR GETTING IN OUT-OF-COURT STATEMENTS WHICH SOUNDS LIKE THEY

6773

03:43PM   1    WOULD BE COMING IN FOR THEIR TRUTH.

03:43PM   2          THE COURT:  IS IT, IS IT -- WHAT I UNDERSTAND THE

03:43PM   3    DOCTOR -- WHEN SHE CALLED HER PHYSICIAN, HER PHYSICIAN

03:43PM   4    EXPRESSED SURPRISE AT A TEST RESULT, THAT HOW COULD THAT BE?  I

03:43PM   5    DON'T KNOW HOW LONG THEY'VE HAD THEIR RELATIONSHIP,

03:43PM   6    PHYSICIAN-PATIENT RELATIONSHIP.  IT SOUNDS LIKE HE WOULD --

03:43PM   7    BASED ON HIS KNOWLEDGE OF HER HEALTH, THAT'S WHAT HIS

03:43PM   8    EXPRESSION OF SURPRISE WAS.

03:43PM   9       NOW, IT SOUNDS LIKE THAT, THROUGH HER CONVERSATION WITH

03:44PM  10    THE DOCTOR ABOUT THEIR DISCUSSION ABOUT THAT, YOU SHOULD BE

03:44PM  11    ABLE TO FLUSH THAT OUT, IT SOUNDS LIKE.  AND IT SOUNDS LIKE

03:44PM  12    MAYBE -- AND YOU HAVE THE 302'S -- DID THEY HAVE A DISCUSSION

03:44PM  13    ABOUT ANTIBODY VERSUS HIV AND IS THAT -- WELL, IS THAT WHAT

03:44PM  14    YOU'RE GOING TO EXPLORE?

03:44PM  15          MS. TREFZ:  YEAH.  ONE OF THE THINGS I'D LIKE TO

03:44PM  16    EXPLORE IS HOW DETAILED THAT DISCUSSION WAS AND WHETHER THE

03:44PM  17    MULTI-STEP PROCESS WAS EXPLAINED TO HER, ESPECIALLY IF WE'RE

03:44PM  18    NOT GOING TO HAVE, IF WE MAY NOT HAVE THE DOCTOR, WHICH IS,

03:44PM  19    FRANKLY, A SURPRISE TO US, AND WE WOULD WANT TO CONSIDER

03:44PM  20    WHETHER WE NEED TO STRIKE THE TESTIMONY OF THE WITNESS AS

03:44PM  21    PARTICULARLY PREJUDICIAL, BECAUSE JUST A TEST COMING IN, IT IS

03:44PM  22    NOT PROOF OF INACCURACY FOR YOU TO GET A REACTIVE TEST ON AN

03:44PM  23    INITIAL SCREEN AND THEN NOT GET REACTIVE TESTS LATER ON IN YOUR

03:45PM  24    TESTING.  THAT IS NOT PROOF OF INACCURACY, AND THERE WILL BE NO

03:45PM  25    SCIENTIFIC TESTIMONY WITHOUT THIS DOCTOR ABOUT WHETHER IT IS

6774

03:45PM  1    PROOF OF INACCURACY.

03:45PM  2         I MEAN, THE REPRESENTATION THAT MR. BOSTIC JUST MADE ABOUT

03:45PM  3    HOW ALL OF THESE DIFFERENT QUESTIONS ABOUT, YOU KNOW, HAVE YOU

03:45PM  4    EVER TESTED POSITIVE BEFORE AND DO YOU KNOW ANYTHING ABOUT

03:45PM  5    WHETHER YOU WOULD HAVE A CONDITION THAT MIGHT LEAD TO THAT IS

03:45PM  6    KIND OF, IT BECOMES ESPECIALLY PREJUDICIAL BECAUSE IT'S NOT

03:45PM  7    CLEAR THAT SHE HAS THE FOUNDATION TO KNOW THAT WITHOUT THE

03:45PM  8    DOCTOR EXPERT TESTIFYING.

03:45PM  9         YOU KNOW, WITH ALL OF THE PATIENT --

03:45PM  10              THE COURT:  WELL, SHE'S SAID SHE'S NEVER TESTED FOR

03:45PM  11   ANY OF THESE BEFORE, WHICH I SUPPOSE PRESUMES THAT SHE'S BEEN

03:45PM  12   TESTED FOR OTHER THINGS BEFORE, BUT SHE'S NEVER HAD A TEST LIKE

03:45PM  13   THIS.

03:45PM  14         BUT YOU HAVE THE 302, AND THAT SHOULD --

03:45PM  15              MS. TREFZ:  YES.

03:45PM  16              THE COURT:  -- REVEAL WHAT THE DISCUSSION WAS WITH

03:45PM  17   THE DOCTOR.

03:46PM  18              MS. TREFZ:  WELL, IT REVEALS AT LEAST WHAT THE

03:46PM  19   GOVERNMENT ASKED AND WHAT WAS EXPLORED AND WHAT WAS ELICITED IN

03:46PM  20   THE GOVERNMENT'S INTERVIEW FROM THE DOCTOR.

03:46PM  21         I THINK I'M A LITTLE WORRIED THAT WE'RE TALKING PAST EACH

03:46PM  22   OTHER A LITTLE BIT BECAUSE BASED ON THE 302, THAT'S WHY I WANT

03:46PM  23   TO EXPLORE WITH THE WITNESS WHAT WAS DISCUSSED.

03:46PM  24         BUT I WAS JUST HIGHLIGHTING A SEPARATE ISSUE THAT WAS

03:46PM  25   IDENTIFIED IF DR. ASIN DOES NOT COME TO TESTIFY.  THAT'S A

6775

03:46PM 1      PROBLEM FOR US BECAUSE, YOU KNOW, THERE'S A LOT OF -- WE

03:46PM 2      HAVEN'T HAD A LOT OF TESTIMONY AT ALL ABOUT HIV TESTING IN THIS

03:46PM 3      CASE, ASIDE FROM THE TESTIMONY THAT ON THE THERANOS TEST, THAT

03:46PM 4      THERANOS RAN IT ON FDA APPROVED DEVICES, AND AN FDA APPROVED

03:46PM 5      METHOD, AND WITHOUT SCIENTIFIC TESTIMONY ABOUT THE TEST AT ALL,

03:46PM 6      I MEAN, IT WOULD BE HIGHLY PREJUDICIAL TO JUST HAVE A PATIENT

03:46PM 7      SAY, "HERE'S A TEST RESULT, AND I GOT ANOTHER TEST RESULT LATER

03:47PM 8      THAT DIDN'T MATCH THIS" WITHOUT A SCIENTIFIC FOUNDATION TO BE

03:47PM 9      ABLE TO TELL THAT THOSE THINGS ACTUALLY ARE INCONSISTENT WITH

03:47PM 10     EACH OTHER.

03:47PM 11         YOU KNOW, THE TWO TESTS -- JUST TO BE CLEAR, THESE TWO

03:47PM 12     TESTS THAT WERE PRESENTED JUST NOW ARE RUN ON DIFFERENT METHODS

03:47PM 13     BASED ON MY RESEARCH.

03:47PM 14         AND SO --

03:47PM 15             THE COURT:  WELL, MAYBE YOU SHOULD TESTIFY.

03:47PM 16             MS. TREFZ:  YOUR HONOR, IF I COULD.

03:47PM 17         I'M JUST FLAGGING THAT PARTICULAR ISSUE.  I BELIEVE WE

03:47PM 18     SHOULD BE ABLE TO GET INTO THIS QUESTION WITH THIS WITNESS, AND

03:47PM 19     IF DR. ASIN DOESN'T TESTIFY, THEN, YOU KNOW, WE MAY HAVE A

03:47PM 20     MOTION RELATED TO THIS WITNESS'S TESTIMONY.

03:47PM 21             MR. BOSTIC:  SO, YOUR HONOR, CONFLICTING OR

03:47PM 22     INCONSISTENT TEST RESULTS HAS BEEN COMPETENT EVIDENCE AS TO

03:47PM 23     TEST ACCURACY THROUGHOUT THE CASE.  I THINK THAT'S BEEN THE

03:47PM 24     GOVERNMENT'S UNDERSTANDING AND THE COURT'S APPROACH IN MAKING

03:47PM 25     ADMISSIBILITY DECISIONS.

6776

03:47PM  1        I DISAGREE THAT EXPERT TESTIMONY IS NECESSARY FOR THE JURY

03:48PM  2   TO UNDERSTAND THAT A TEST THAT SAYS POSITIVE AT ONE TIME AND

03:48PM  3   ANOTHER TEST THAT SAYS NEGATIVE AT ANOTHER TIME CANNOT BOTH BE

03:48PM  4   CORRECT.  ONE MUST BE INCORRECT.

03:48PM  5        I THINK THAT IS PROBATIVE EVIDENCE OF THE INACCURACY OF

03:48PM  6   THE THERANOS RESULT IN THE CONTEXT OF THE WITNESS'S TESTIMONY.

03:48PM  7           THE COURT:  WELL, IF THAT'S THE EVIDENCE, IT'S A

03:48PM  8   JURY DECISION AS TO WHICH ONE THEY BELIEVE IS ACCURATE THEN,

03:48PM  9   RIGHT?  MAYBE THEY'LL DISBELIEVE THE CONTRA COSTA.  ISN'T THAT

03:48PM  10  WHAT YOU'RE ASKING ULTIMATELY THE JURY TO DO?

03:48PM  11          MS. TREFZ:  I DON'T THINK THAT THAT'S FAIR TO ASK

03:48PM  12  THEM TO DO.

03:48PM  13       I ALSO DISAGREE THAT A TEST THAT -- YOU KNOW, THAT TWO

03:48PM  14  TESTS RUN ON DIFFERENT METHODS CANNOT BOTH BE ACCURATE.  THIS

03:48PM  15  IS THE PROBLEM WITH NOT HAVING A DEEP SCIENTIFIC UNDERSTANDING

03:48PM  16  IN A SCIENTIFIC CASE ABOUT KIND OF ALL OF THE TESTING ISSUES

03:48PM  17  THAT ARE IN THE CASE.  THAT'S WHY WE HAVE BEEN PRESSING FOR THE

03:49PM  18  DOCTORS TO COME WITH THE PATIENTS.

03:49PM  19       I BELIEVE WE LITIGATED ISSUES AROUND THIS PREVIOUSLY.

03:49PM  20          THIS DOCTOR HAS ALWAYS BEEN ON THE LIST, SO THIS WAS NEVER

03:49PM  21  A CONCERN OF OURS.

03:49PM  22          BUT I DON'T THINK THAT TWO TESTS THAT ARE RUN POTENTIALLY

03:49PM  23  ON DIFFERENT METHODS -- I BELIEVE THEY ARE, BUT THAT'S NOT

03:49PM  24  EVIDENCE IN THE CASE -- BUT TWO TESTS THAT ARE RUN ON DIFFERENT

03:49PM  25  METHODS IS INHERENTLY INCONSISTENT.

6777

03:49PM 1      AND I THINK IT WOULD BE HIGHLY MISLEADING TO ALLOW THAT TO

03:49PM 2    BE THE EVIDENCE OF, OF INACCURACY IN THE CASE.

03:49PM 3      SO ALL I'M SAYING, YOUR HONOR, IS THAT, YOU KNOW, WE

03:49PM 4    STRONGLY BELIEVE THAT IF THERE'S GOING TO BE -- THAT IF A

03:49PM 5    PATIENT IS GOING TO COME IN AND TESTIFY ABOUT THEIR INACCURATE,

03:49PM 6    ALLEGEDLY INACCURATE TEST, THEN WE CERTAINLY SHOULD GET TO

03:49PM 7    EXPLORE WITH THAT PATIENT ALL OF THE POTENTIAL SCIENTIFIC -- IF

03:50PM 8    THERE'S NOT GOING TO BE A DOCTOR, WE SHOULD GET TO EXPLORE THE

03:50PM 9    DEPTHS OF THAT PATIENT'S KNOWLEDGE AS TO WHAT THE TEST RESULTS

03:50PM 10   MEAN, INCLUDING WHAT THE DOCTOR TOLD HER.

03:50PM 11     THE COURT:  WELL, I THINK THAT'S FAIR GAME.  I THINK

03:50PM 12   MR. BOSTIC SAID THAT NARROWING DOWN OF WHAT THEIR CONVERSATION

03:50PM 13   WAS.  I DON'T THINK HE HAS --

03:50PM 14     DID YOU SAY YOU DIDN'T HAVE ANY PROBLEM WITH THAT,

03:50PM 15   MR. BOSTIC?

03:50PM 16     MR. BOSTIC:  I'M SORRY TO BE DIFFICULT, YOUR HONOR.

03:50PM 17     I STILL DON'T SEE THE RELEVANCE OF IT BECAUSE IT GOES

03:50PM 18   TO -- THE TWO PURPOSES I CAN THINK OF ARE EITHER THE JURY NEEDS

03:50PM 19   TO KNOW WHAT THIS DOCTOR BELIEVED OR CONCLUDED ABOUT THE TEST

03:50PM 20   RESULTS, THAT'S HEARSAY.  THAT'S AN OUT-OF-COURT STATEMENT

03:50PM 21   COMING IN FOR ITS TRUTH.  THAT'S NUMBER ONE.

03:50PM 22     OR NUMBER TWO, THE JURY NEEDS TO KNOW HOW ALL OF THE

03:50PM 23   INFORMATION AVAILABLE TO THE PATIENT AND HOW THE PATIENT FELT

03:50PM 24   AND WHAT THE PATIENT'S UNDERSTANDING WAS, AND I DON'T THINK

03:50PM 25   THAT'S RELEVANT EITHER IN A CASE WHERE THE COURT HAS RULED THAT

6778

03:51PM  1    PATIENT IMPACT AND EMOTIONAL DISTRESS AND THINGS LIKE THAT ARE

03:51PM  2    NOT AT ISSUE AND WHERE THE GOVERNMENT DIDN'T DELVE INTO THAT ON

03:51PM  3    DIRECT.

03:51PM  4         SO I'M JUST NOT SEEING THE CONNECTION AS TO WHAT MATTER AT

03:51PM  5    ISSUE THIS MAKES MORE OR LESS LIKELY UNDER 401.

03:51PM  6              THE COURT:  WELL, I COULD SEE IF -- AND MS. TREFZ

03:51PM  7    WANTS TO EXPLORE THIS CONVERSATION WITH THE DOCTOR.  YOU TALKED

03:51PM  8    TO YOUR DOCTOR AND YOUR DOCTOR SAID, AND I THINK WHAT THE

03:51PM  9    DOCTOR IS GOING TO SAY IS, HOW IS THAT POSSIBLE OR SOMETHING

03:51PM 10    LIKE THAT, HE'S GOING TO EXPRESS HIS SURPRISE ABOUT THAT.

03:51PM 11         AND HE'LL GET -- THAT'S WHAT YOU WANT TO ASK THIS WITNESS.

03:51PM 12              MS. TREFZ:  AND THEN I WANT TO BE ABLE TO EXPLORE

03:51PM 13    WHETHER SHE WAS TOLD ABOUT A PARTICULAR -- THE PARTICULAR, YOU

03:51PM 14    KNOW, PARAMETERS OF THIS KIND OF TESTING, WHICH IS UNIQUE

03:51PM 15    COMPARED TO OTHER TESTS THAT WE HAVE SEEN SO FAR IN THE CASE IN

03:52PM 16    THAT THEY'RE YOU DO NOT DIAGNOSE SOMEBODY WITH HIV FROM THE,

03:52PM 17    FROM THE -- JUST THE SCREENING TEST.  IT IS, IT IS A WHOLE

03:52PM 18    PROCESS.

03:52PM 19              THE COURT:  SO THAT -- I THINK THAT GOES --

03:52PM 20    CERTAINLY SHE CAN'T TESTIFY ABOUT THAT.  THAT'S BEYOND HER

03:52PM 21    EXPERTISE.

03:52PM 22         YOU WOULD GET THAT THROUGH AS TO WHAT HER DOCTOR TOLD HER

03:52PM 23    I PRESUME.  IS THAT WHAT YOU'RE SAYING?

03:52PM 24              MS. TREFZ:  YES, AND WE BELIEVE IT'S IMPORTANT,

03:52PM 25    ESPECIALLY IF THE DOCTOR IS NOT GOING TO COME, WE NEED TO BE

6779

03:52PM 1    ABLE TO PROBE, WE NEED TO MEET THE ALLEGATIONS OF ACCURACY HERE

03:52PM 2    WITH, YOU KNOW, MEANINGFUL ABILITY TO CROSS-EXAMINE AND -- BUT

03:52PM 3    I BELIEVE THAT THAT'S PART OF IT.

03:52PM 4            THE COURT:  OKAY.

03:52PM 5            MR. BOSTIC:  SO, YOUR HONOR, THE LACK OF A WITNESS

03:52PM 6    WHO CAN TESTIFY COMPETENTLY TO A SUBJECT DOESN'T MAKE IT OKAY

03:52PM 7    TO EXPLORE THAT SUBJECT WITH A WITNESS WHO IS NOT COMPETENT TO

03:52PM 8    TESTIFY ABOUT IT AND WHO LACKS FOUNDATION.

03:52PM 9            THE COURT:  ALL RIGHT.  OKAY.  ALL RIGHT.  THANK

03:52PM 10   YOU.

03:52PM 11           THE CLERK:  COURT IS ADJOURNED.

03:52PM 12        (COURT ADJOURNED AT 3:52 P.M.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

```
 1
 2
 3                    CERTIFICATE OF REPORTERS
 4
 5
 6
 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10   HEREBY CERTIFY:
11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13   ABOVE-ENTITLED MATTER.
14
15
16        _____
          IRENE RODRIGUEZ, CSR, CRR
17        CERTIFICATE NUMBER 8076
18
          _____
19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20
21        DATED:  NOVEMBER 17, 2021
22
23
24
25
```

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                       PLAINTIFF,    )   SAN JOSE, CALIFORNIA
7                                    )
          VS.                        )   VOLUME 35
8                                    )
    ELIZABETH A. HOLMES,             )   NOVEMBER 18, 2021
9                                    )
                       DEFENDANT.    )   PAGES 6780 - 7013
10  _____ )

11                 TRANSCRIPT OF TRIAL PROCEEDINGS

12             BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14

    FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
15                          BY:   JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                          IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
23                          LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

6781

```
1         A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
4                                  LANCE A. WADE
                                   KATHERINE TREFZ
5                                  SEEMA ROPER
                                   AMY SAHARIA
6                                  J.R. FLEURMONT
                                   RICHARD CLEARY
7                                  PATRICK LOOBY
                              725 TWELFTH STREET, N.W.
8                             WASHINGTON, D.C. 20005

9                             LAW OFFICE OF JOHN D. CLINE
                              BY:  JOHN D. CLINE
10                            ONE EMBARCADERO CENTER, SUITE 500
                              SAN FRANCISCO, CALIFORNIA 94111
11

12   ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                             BY:  ADELAIDA HERNANDEZ
13
                             OFFICE OF THE U.S. ATTORNEY
14                           BY:  LAKISHA HOLLIMAN, PARALEGAL
                                  MADDI WACHS, PARALEGAL
15
                             WILLIAMS & CONNOLLY
16                           BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                           TBC
                             BY:  BRIAN BENNETT, TECHNICIAN
18

19   FOR ROGER PARLOFF:      JOSHUA KOLTUN

20

21

22

23

24

25
```

6782

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**ERIN TOMPKINS**
CROSS-EXAM BY MS. TREFZ (RES.)          P. 6819


**MARK BURNES**
DIRECT EXAM BY MR. SCHENK               P. 6832
CROSS-EXAM BY MS. TREFZ                 P. 6859
REDIRECT EXAM BY MR. SCHENK             P. 6880


**MEHRL ELLSWORTH**
DIRECT EXAM BY MR. SCHENK               P. 6886


**ROGER PARLOFF**
DIRECT EXAM BY MR. BOSTIC               P. 6894
CROSS-EXAM BY MR. CLINE                 P. 6970

```
 1                        INDEX OF EXHIBITS

 2
                                    IDENT.    EVIDENCE
 3        GOVERNMENT'S:

 4        4938                                  6837
          4415                                  6845
 5        5485                                  6900
          5487                                  6908
 6        3404                                  6910
          5473A                                 6916
 7        5474AB2                               6919
          5475A                                 6926
 8        5477A                                 6927
          5478A2                                6930
 9        5486                                  6934
          1752                                  6941
10        5480A                                 6943
          5473B2                                6947
11        5473C                                 6950
          5473D2                                6952
12        5488                                  6958
          5481A, 5481B, AND 5481D               6964
13        5481C                                 6967

14

15        DEFENDANT'S:

16        12692, PAGE 7                         6827
          1647A                                 6981
17        1657A                                 6981
          1719A                                 6982
18

19

20

21

22

23

24

25
```

6784

|  | 1 | SAN JOSE, CALIFORNIA                        NOVEMBER 18, 2021 |
|---|---|---|
|  | 2 | P R O C E E D I N G S |
| 07:47AM | 3 | |
| 08:07AM | 4 | (COURT CONVENED AT 8:07 A.M.) |
| 08:07AM | 5 | (JURY OUT AT 8:07 A.M.) |
| 08:07AM | 6 | THE COURT:  WE ARE ON THE RECORD IN THE HOLMES |
| 08:07AM | 7 | MATTER OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:07AM | 8 | ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 08:07AM | 9 | MR. CLINE, GOOD MORNING. |
| 08:07AM | 10 | MR. CLINE:  GOOD MORNING, YOUR HONOR. |
| 08:07AM | 11 | THE COURT:  AND, MR. BOSTIC, GOOD MORNING. |
| 08:07AM | 12 | MR. BOSTIC:  GOOD MORNING, YOUR HONOR. |
| 08:07AM | 13 | THE COURT:  FIRST OF ALL, TELL ME ABOUT YOUR |
| 08:07AM | 14 | CONTINUED COOPERATIVE DISCUSSIONS OVER THE LAST DAY. |
| 08:07AM | 15 | MR. CLINE:  WE MADE FURTHER PROGRESS. |
| 08:07AM | 16 | THE COURT:  GREAT. |
| 08:07AM | 17 | MR. CLINE:  DESIGNATION ONE IS RESOLVED.  WE'VE |
| 08:07AM | 18 | COMPROMISED ON THAT ONE.  SO IT'S DESIGNATIONS TWO AND FOUR |
| 08:07AM | 19 | THAT REMAIN. |
| 08:07AM | 20 | THE COURT:  OKAY. |
| 08:07AM | 21 | MR. CLINE:  FOR DESIGNATION TWO, WITH YOUR HONOR'S |
| 08:07AM | 22 | PERMISSION, I'M GOING TO ASK MR. LOOBY TO ADDRESS IT.  THAT ONE |
| 08:07AM | 23 | IS NOT IN THE TRANSCRIPT AND HE HAS LISTENED TO THE RECORDING |
| 08:07AM | 24 | MORE RECENTLY THAN I HAVE AND IS LESS LIKELY TO GET IT WRONG. |
| 08:07AM | 25 | AND THEN ON FOUR, I'M HAPPY TO TAKE THAT. |

| | | |
|---|---|---|
| 08:08AM | 1 | THE COURT:  THAT'S FINE.  IS THIS THE DESIGNATION |
| 08:08AM | 2 | REGARDING THE -- |
| 08:08AM | 3 | MR. CLINE:  THE BRINGING -- MAY I TAKE THIS OFF? |
| 08:08AM | 4 | THE COURT:  PLEASE.  PLEASE. |
| 08:08AM | 5 | MR. CLINE:  SORRY.  THE BRINGING UP OF THE TESTS. |
| 08:08AM | 6 | AND IT FALLS BETWEEN TWO GOVERNMENT DESIGNATED PORTIONS, |
| 08:08AM | 7 | AND WE'RE JUST ASKING THEM TO PLAY THE WHOLE THING. |
| 08:08AM | 8 | MR. BOSTIC:  THAT'S NUMBER FOUR. |
| 08:08AM | 9 | MR. CLINE:  THAT'S NUMBER FOUR. |
| 08:08AM | 10 | THE COURT:  WHICH EXHIBIT IS THIS, 1648 OR 2580? |
| 08:08AM | 11 | MR. CLINE:  THIS IS 2580, AND IT'S DOCUMENT 1146-4. |
| 08:08AM | 12 | THE COURT:  AND I HAVE IT IN YOUR SUBMISSIONS. |
| 08:08AM | 13 | THANK YOU FOR DOING THE COLOR CODING HERE. |
| 08:08AM | 14 | MR. CLINE:  I WISH I COULD CLAIM CREDIT, YOUR HONOR, |
| 08:09AM | 15 | BUT THAT WAS SOMEONE ELSE. |
| 08:09AM | 16 | THE COURT:  WELL, THEY DID AN EXCELLENT JOB HERE. |
| 08:09AM | 17 | IT TOOK LIKE PAGE 17 OF THE TRANSCRIPT, LINE 22, THROUGH |
| 08:09AM | 18 | PAGE 18 -- 19, PARDON ME, LINE 17 IS WHAT YOU'RE ASKING TO BE |
| 08:09AM | 19 | INCLUDED. |
| 08:09AM | 20 | IS THAT RIGHT? |
| 08:09AM | 21 | MR. CLINE:  YES. |
| 08:09AM | 22 | THE COURT:  MR. BOSTIC, IS THAT YOUR UNDERSTANDING? |
| 08:09AM | 23 | MR. BOSTIC:  WAS THIS FILED AS 1146-4? |
| 08:09AM | 24 | MR. CLINE:  YES. |
| 08:09AM | 25 | MR. BOSTIC:  I THOUGHT THE DEFENSE WAS SEEKING TO |

08:09AM 1    INCLUDE -- APOLOGIES, YES, BEGINNING ON PAGE 17 AS NUMBERED IN

08:09AM 2    THE PDF.

08:09AM 3              THE COURT:  I'M SORRY.  THE DOCUMENT 17.

08:09AM 4              MR. BOSTIC:  MY FAULT.

08:09AM 5         AGREED, YOUR HONOR.

08:09AM 6              MR. CLINE:  WE THINK THIS IS UNDER 106 PRIMARILY.

08:09AM 7    THEY'RE HAVING A DISCUSSION HERE ABOUT TESTING AND WHAT TESTING

08:09AM 8    IS AVAILABLE AND WHERE IT'S AVAILABLE.

08:09AM 9         I THINK TO PUT THAT DISCUSSION IN CONTEXT AND MAKE IT

08:09AM 10   COMPLETE, TO USE THE LANGUAGE OF THE RULE, WE OUGHT TO INCLUDE

08:10AM 11   THAT MIDDLE PORTION.  THIS ON EXACTLY THE SAME TOPIC, AND IN IT

08:10AM 12   MS. HOLMES IS TALKING ABOUT THE PROCESS OF BRINGING UP TESTS,

08:10AM 13   MOVING THEM FROM THE R&D LAB -- I DON'T KNOW IF SHE USES THAT

08:10AM 14   TERM, BUT THAT'S THE PROCESS THAT SHE'S DESCRIBING -- OVER TO

08:10AM 15   THE CLIA LAB AND THEN VALIDATING THEM FOR USE IN THE CLINICAL

08:10AM 16   SETTING.

08:10AM 17             THE COURT:  AND JUST TO BE CLEAR, THESE ARE THE

08:10AM 18   PORTIONS OF THE INTERVIEW FROM MR. PARLOFF WITH MS. HOLMES.

08:10AM 19             MR. CLINE:  THAT'S RIGHT.

08:10AM 20             THE COURT:  AND YOU TELL ME ABOUT IT'S IMPORTANT FOR

08:10AM 21   THE CONTEXT OF THESE THINGS.

08:10AM 22        WE'VE HEARD THAT WORD BEFORE IN REGARDS TO THIS INTERVIEW,

08:10AM 23   HAVEN'T WE?  I THINK THE GOVERNMENT SUGGESTED CONTEXT WAS

08:10AM 24   IMPORTANT.

08:10AM 25             MR. CLINE:  SOMETIMES CONTEXT IS AND SOMETIMES IT'S

08:10AM 1    NOT.  IT DEPENDS A LOT ON THE CONTEXT.

08:10AM 2         (LAUGHTER.)

08:10AM 3              THE COURT:  IT DEPENDS ON THE CONTEXT.

08:10AM 4              MR. CLINE:  IN THIS SETTING WE'RE TALKING ABOUT THE

08:11AM 5    CONTEXT IN THE SENSE OF RULE 106, AND I THINK IT IS IMPORTANT

08:11AM 6    TO INCLUDE THAT.

08:11AM 7              THE COURT:  HOW DOES THE GREEN PORTION, HOW IS THAT

08:11AM 8    IMPORTANT TO CONTINUE THE CONVERSATION IN THE YELLOW PORTION,

08:11AM 9    PARDON ME?

08:11AM 10             MR. CLINE:  WELL, IT'S IMPORTANT BECAUSE MS. HOLMES

08:11AM 11   IS EXPLAINING SORT OF THE PROCESS BY WHICH TESTS ARE MOVED

08:11AM 12   FROM -- UP INTO THE CLIA LAB.  SHE'S TALKING ABOUT THE

08:11AM 13   VALIDATION REPORT PROCESS AND HOW A TEST IS MOVED UP FROM THE

08:11AM 14   R&D PROCESS TO THE CLIA LAB AND PUT ON THE MACHINE.

08:11AM 15        AND THAT'S BASICALLY THE SUBJECT.  IT'S SORT OF LIKE A LOT

08:11AM 16   OF THESE EXCERPTS, IT'S KIND OF A RAMBLING CONVERSATION, BUT

08:11AM 17   IT'S I THINK VERY MUCH GERMANE TO WHAT THEY'RE TALKING ABOUT.

08:11AM 18   THEY'RE TALKING ABOUT HAVING A REFERENCE LAB AND WHAT SORTS OF

08:11AM 19   TESTS ARE AVAILABLE, AND SHE'S CONTINUING TO DESCRIBE THAT

08:11AM 20   PROCESS.

08:11AM 21        AND THEN THEY PICK UP THE CONVERSATION AGAIN OVER ON

08:11AM 22   PAGE 19 OF THE TRANSCRIPT, AND MR. PARLOFF IS ASKING ABOUT

08:12AM 23   VENIPUNCTURE AND USING YOUR SYSTEM AND SO ON.

08:12AM 24        AND MS. HOLMES HAS BEEN JUST EXPLAINING HOW TESTS ARE

08:12AM 25   BROUGHT UP ON THE THERANOS SYSTEM.

08:12AM   1              THE COURT:  SO LET ME -- AND I'LL HEAR FROM

08:12AM   2     MR. BOSTIC HERE.

08:12AM   3          LET ME SAY I'VE LOOKED AT THIS, AND MAYBE I'M BEING TOO

08:12AM   4     CRITICAL OR SOMETHING, BUT I LOOKED AT THIS AND I THOUGHT, IS

08:12AM   5     THIS -- DOES THIS IN ANY WAY RELATE TO THE LIS DISCUSSION?  AND

08:12AM   6     IS THIS, IS THIS AN ENTRE TO LIS IN THIS CASE, THAT IS THE --

08:12AM   7     WE -- ONE OF THE TESTS -- WE HAVE A LOT OF TESTS AND WE

08:12AM   8     VALIDATED ON OUR SYSTEMS A LONG TIME AGO.

08:12AM   9          DOES THIS IMPLICATE THAT AT ALL?

08:12AM  10              MR. CLINE:  TO MY MIND, NO.  AND, IN FACT, YOUR

08:12AM  11     QUESTION IS THE FIRST TIME THAT I'VE EVER ASSOCIATED THIS WITH

08:12AM  12     LIS.

08:12AM  13          I DON'T THINK THAT'S WHAT SHE'D TALKING ABOUT.

08:12AM  14              THE COURT:  MY -- I'M SORRY TO CUT YOU OFF,

08:12AM  15     MR. CLINE, BUT WE'VE HAD -- THE LIS HAS BEEN A TOPIC OF

08:13AM  16     DISCUSSION HERE, AND CONCERN.

08:13AM  17          AND I LOOK AT THIS, AND MAYBE THAT'S WHY I'M LOOKING AT

08:13AM  18     THIS WITH A DISCERNING EYE, IS THIS SOMETHING THAT WOULD ALLOW

08:13AM  19     THEN A DISCUSSION OF LIS?

08:13AM  20              MR. CLINE:  I DON'T THINK SO AT ALL.  I THINK THIS

08:13AM  21     IS BASICALLY THE PROCESS THAT WAS TALKED ABOUT WITH

08:13AM  22     DR. ROSENDORFF, WITH DR. GANGAKHEDKAR, WITH -- ALL OF THE LAB

08:13AM  23     PEOPLE HAVE SORT OF DESCRIBED THIS PROCESS OF BRINGING UP TESTS

08:13AM  24     ON TO THE MACHINE, AND THAT'S WHAT MS. HOLMES IS DOING.

08:13AM  25          THE LIS REALLY DOESN'T TOUCH THIS AT ALL AS FAR AS I'M

08:13AM 1    CONCERNED.

08:13AM 2                THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

08:13AM 3          MR. BOSTIC?

08:13AM 4                MR. BOSTIC:  THANK YOU, YOUR HONOR.

08:13AM 5          FIRST OF ALL, I AGREE WITH MR. CLINE THAT THIS SPECIFIC

08:13AM 6    LANGUAGE DOES NOT IMPLICATE THE LIS.  THAT'S NOT THE SOURCE OF

08:13AM 7    THE GOVERNMENT'S CONCERN HERE.  THIS JUST IS NOT ADMISSIBLE

08:13AM 8    UNDER THE HEARSAY RULES, AND 106 DOESN'T CHANGE THAT.

08:13AM 9          FIRST OF ALL, THE FACT THAT THIS IS A SEGMENT THAT IS IN

08:13AM 10   BETWEEN TWO SEGMENTS THAT THE GOVERNMENT HAS DESIGNATED

08:14AM 11   SHOULDN'T BEAR A LOT OF WEIGHT, OR SHOULDN'T CARRY A LOT OF

08:14AM 12   WEIGHT FOR THE COURT.

08:14AM 13         AS MR. CLINE NOTED, THESE CONVERSATIONS WERE SOMEWHAT

08:14AM 14   RAMBLING AT TIMES.  THEY DID KIND OF HEAD IN DIFFERENT

08:14AM 15   DIRECTIONS ORGANICALLY AND THERE WERE DETOURS AND ASIDES, AND

08:14AM 16   THIS IS NOT A CRITICISM OF THE DEFENDANT.

08:14AM 17         BUT THE PORTION THAT IS NOT INCLUDED IN THE GOVERNMENT'S

08:14AM 18   DESIGNATIONS DOESN'T REALLY BEAR A STRONG RELATIONSHIP TO THE

08:14AM 19   PORTIONS THAT ARE DESIGNATED BY THE GOVERNMENT.  THIS WAS A --

08:14AM 20   THIS WAS AN ASIDE.  THIS WAS SOME INFORMATION PROVIDED BY

08:14AM 21   MS. HOLMES ON A DIFFERENT TOPIC FROM THE ADJOINING PORTIONS OF

08:14AM 22   THE CONVERSATION, AND THOSE TWO PORTIONS OF THE CONVERSATION

08:14AM 23   ARE DIFFERENT FROM EACH OTHER.

08:14AM 24         THE REASON THAT THE GOVERNMENT IS OPPOSING, AND THE REASON

08:14AM 25   THAT THE COURT SHOULD NOT ADMIT THIS, IS THAT THIS IS HEARSAY,

08:14AM 1    AND IT'S ACTUALLY MULTIPLE LAYERS OF HEARSAY.

08:14AM 2         IN THE GREEN PORTION, THE COURT CAN SEE THAT MS. HOLMES IS

08:15AM 3    TALKING ABOUT VALIDATION REPORTS THAT SHE SAID SHE'S GOING TO

08:15AM 4    PROVIDE TO MR. PARLOFF.  SHE'S CHARACTERIZING THE CONTENT AND

08:15AM 5    THE SIGNIFICANCE OF THOSE VALIDATION REPORTS.

08:15AM 6         SO, YOU KNOW, NOT ONLY IS THIS REFERENCING A DOCUMENT AND

08:15AM 7    THE CONTENTS AND MEANING OF THE DOCUMENT, BUT THIS IS GIVING

08:15AM 8    MS. HOLMES'S VIEW OF THAT DOCUMENT, AND THAT'S AN OUT-OF-COURT

08:15AM 9    STATEMENT THAT IT SEEMS THE DEFENSE IS SEEKING TO ADMIT SO THAT

08:15AM 10   THE JURY CAN RELY ON MS. HOLMES'S REPRESENTATIONS ABOUT THE

08:15AM 11   ROBUSTNESS, THE THOROUGHNESS, AND THE IMPRESSIVENESS OF

08:15AM 12   THERANOS'S PREVIOUS VALIDATION ACTIVITY.

08:15AM 13        SO THAT CAN'T COME IN FOR ITS TRUTH OBVIOUSLY.  THIS

08:15AM 14   CANNOT COME IN FOR THE PURPOSE OF THE JURY MAKING CONCLUSIONS

08:15AM 15   ABOUT HOW GOOD A JOB THERANOS DID INVALIDATING ITS TESTS.

08:16AM 16        ALTERNATIVELY, IF THE DEFENSE IS SEEKING TO ADMIT THIS TO

08:16AM 17   SHOW MS. HOLMES'S BELIEF OR HER OPINIONS ABOUT HOW GOOD A JOB

08:16AM 18   THERANOS DID VALIDATING ITS TESTS, IT ALSO CAN'T COME IN FOR

08:16AM 19   THE SAME REASON.

08:16AM 20        IF MS. HOLMES WANTS THE JURY TO KNOW, YOU KNOW, IN HER

08:16AM 21   WORDS HOW SHE FELT ABOUT THE WORK THAT THERANOS HAD DONE, SHE

08:16AM 22   NEEDS TO TAKE THE STAND AND TESTIFY.  THAT NEEDS TO BE TESTED

08:16AM 23   BY CROSS-EXAMINATION.

08:16AM 24        THE FACT THAT THERE HAPPENS TO BE A RECORDING OF HER

08:16AM 25   PROVIDING HER VIEWS ON THESE THINGS YEARS AGO DOESN'T CREATE AN

08:16AM   1    END RUN AROUND THOSE BASIC HEARSAY RULES.

08:16AM   2              THE COURT:  THAT'S AN INTERESTING QUESTION,

08:16AM   3    THRESHOLD QUESTION, ISN'T IT, WHERE -- AND WE KNOW WHAT ORTEGA,

08:16AM   4    THE ORTEGA CASE, THE NINTH CIRCUIT ORTEGA CASE TALKS ABOUT, THE

08:16AM   5    INABILITY OF THE DEFENDANT TO GET EXCULPATORY STATEMENTS IN ON

08:16AM   6    CROSS-EXAMINATION.

08:17AM   7         I LOOK AT THIS AND I WONDER, IS THE SAME THEORY -- DOES

08:17AM   8    THAT THEORY APPLY HERE?

08:17AM   9         I UNDERSTAND YOU'RE NOT OFFERING THESE FOR THE TRUTH OF

08:17AM  10    THE MATTER ASSERTED IN THE STATEMENT, BUT ISN'T THERE SOME

08:17AM  11    INHERENT TRUTHFUL RELIANCE THAT YOU'RE ASKING THE JURY TO, THE

08:17AM  12    JURY TO ASSUME REGARDING THE STATEMENTS AND --

08:17AM  13              MR. CLINE:  NO.

08:17AM  14              THE COURT:  AND DON'T THESE STATEMENTS THEN GO TO A

08:17AM  15    DEFENSE, I THINK YOU TALKED ABOUT, TO MEET THE CHALLENGE OF THE

08:17AM  16    INDICTMENT?

08:17AM  17         ISN'T THAT, ISN'T THAT -- AREN'T THESE A CHALLENGE TO ONE

08:17AM  18    OF THE ELEMENTS OF THE OFFENSE?

08:17AM  19              MR. CLINE:  THE SHORT ANSWER IS NO, BUT LET ME

08:17AM  20    EXPLAIN.

08:17AM  21              THE COURT:  OKAY.

08:17AM  22              MR. CLINE:  THIS SECTION IS BEING OFFERED FOR TWO

08:17AM  23    NONHEARSAY PURPOSES, AND WE'RE FINE IF THE COURT INSTRUCTS THE

08:17AM  24    JURY TO THAT EFFECT.

08:18AM  25         THE NONHEARSAY PURPOSES IS ONE OF COMPLETENESS, AND IN THE

08:18AM  1    LOPEZ CASE, THE NINTH CIRCUIT SAYS THAT WHAT WOULD OTHERWISE BE

08:18AM  2    HEARSAY IF IT IS OFFERED UNDER 106 AND COMES IN UNDER 106 AND

08:18AM  3    IS NECESSARY TO COMPLETE A STATEMENT, IT'S NONHEARSAY.  SO THIS

08:18AM  4    IS NONHEARSAY FOR THAT REASON.

08:18AM  5        IT IS ALSO NONHEARSAY BECAUSE IT SHOWS MS. HOLMES'S STATE

08:18AM  6    OF MIND.

08:18AM  7             THE COURT:  AS TO WHAT?

08:18AM  8             MR. CLINE:  I'M SORRY?

08:18AM  9             THE COURT:  A STATE OF MIND AS TO WHAT?

08:18AM  10            MR. CLINE:  AS TO THE CONDITION -- THE CIRCUMSTANCES

08:18AM  11   UNDER WHICH THESE TESTS ARE BEING BROUGHT UP.

08:18AM  12            THE COURT:  AND WHAT IS THE RELEVANCE OF THAT?  I'M

08:18AM  13   SORRY.

08:18AM  14            MR. CLINE:  THE RELEVANCE OF THAT IS THAT SHE'S NOT

08:18AM  15   TRYING TO DECEIVE MR. PARLOFF.  SHE'S NOT TRYING TO DECEIVE

08:18AM  16   INVESTORS.  SHE'S DESCRIBING THIS PROCESS BY WHICH --

08:18AM  17            THE COURT:  SO ONE OF THE COUNTS -- AND I'M SORRY TO

08:18AM  18   INTERRUPT YOU, BUT I'LL LOSE IT IF I DON'T CONTINUE, MR. CLINE.

08:18AM  19            MR. CLINE:  SURE.

08:18AM  20            THE COURT:  ISN'T THE THRESHOLD -- ONE OF THE

08:18AM  21   THRESHOLD COUNTS IS FRAUD.

08:18AM  22            MR. CLINE:  UH-HUH.

08:18AM  23            THE COURT:  AND YOU JUST TOLD ME THAT THIS WOULD GO

08:18AM  24   AS TO -- THIS WOULD SHOW THAT SHE DOESN'T HAVE THE INTENT TO

08:18AM  25   DEFRAUD.

08:19AM   1              MR. CLINE:  RIGHT.

08:19AM   2              THE COURT:  ISN'T THAT A DIRECT CHALLENGE TO THE

08:19AM   3    ELEMENT OF THE OFFENSE AND DOES THAT REQUIRED TESTIMONY?

08:19AM   4              MR. CLINE:  WELL, IT IS, IT IS RELEVANT EVIDENCE.

08:19AM   5         IT IS RELEVANT, THOUGH, FOR A NONHEARSAY PURPOSE TO SHOW

08:19AM   6    HER STATE OF MIND.

08:19AM   7         AND HERE'S WHAT I MEAN.  WE WOULD, WE WOULD NOT BE ARGUING

08:19AM   8    BASED ON THIS STATEMENT THAT WHAT MS. HOLMES IS SAYING HERE IS

08:19AM   9    CORRECT.  SHE COULD BE TOTALLY MISTAKEN ABOUT EVERYTHING SHE IS

08:19AM  10    SAYING AND THIS WOULD BE JUST AS ADMISSIBLE FOR THE SAME

08:19AM  11    REASON.

08:19AM  12         AND THE REASON IS TO SHOW HER STATE OF MIND, THAT SHE IS

08:19AM  13    INFORMING MR. PARLOFF, SHE'S NOT TRYING TO DECEIVE HIM, SHE'S

08:19AM  14    DESCRIBING TO HIM IN THE CONTEXT OF THIS WHOLE CONVERSATION HOW

08:19AM  15    TESTS ARE BROUGHT UP FROM THIS SORT OF R&D STAGE UP INTO THE

08:19AM  16    CLIA LAB AND THEN MADE AVAILABLE TO PATIENTS.

08:19AM  17         SO IT'S -- SHE COULD BE TOTALLY WRONG ABOUT THAT AND THIS

08:19AM  18    WOULD STILL BE RELEVANT FOR EXACTLY THE SAME REASONS, TO SHOW

08:20AM  19    HER STATE OF MIND, AND ALSO FOR COMPLETENESS.

08:20AM  20              THE COURT:  WELL, WE'LL TALK ABOUT COMPLETENESS IN

08:20AM  21    JUST A MOMENT.

08:20AM  22         I DO SEE THAT THERE'S A BIT OF A TRANSITION BETWEEN THE

08:20AM  23    PRIOR -- BETWEEN THE YELLOW AND THE GREEN, LET ME PUT IT THAT

08:20AM  24    WAY.  IT SEEMS TO BE A DIFFERENT CONTEXT, TO USE THAT WORD

08:20AM  25    AGAIN.

6794

08:20AM  1          BUT ISN'T, ISN'T PART OF THE ALLEGATIONS IN THE SCHEME TO

08:20AM  2   DEFRAUD AN ALLEGATION THAT THE DEFENDANT USED -- I THINK IT'S

08:20AM  3   PARAGRAPH 15, ISN'T IT?  A SCHEME TO DEFRAUD THROUGH

08:20AM  4   ADVERTISEMENTS AND MARKETING MATERIALS?

08:20AM  5          MR. CLINE:  WELL, THERE IS THAT ALLEGATION.

08:20AM  6      I THINK THE ALLEGATION THAT IS PROBABLY MORE RELEVANT

08:20AM  7   HERE, I THINK IT'S IN PARAGRAPH 12, THAT SHE USED THE MEDIA TO

08:20AM  8   DISSEMINATE FALSE INFORMATION AND TO DECEIVE PEOPLE.

08:20AM  9      AND I THINK THE GOVERNMENT'S THEORY IS THAT SHE'S

08:21AM 10   DECEIVING MR. PARLOFF, AND SHE'S DECEIVING MR. PARLOFF FOR THE

08:21AM 11   PURPOSE OF HAVING HIM ACT AS AN UNWITTING CONDUIT FOR THE

08:21AM 12   INFORMATION.  I THINK THAT'S THE THEORY.

08:21AM 13          THE COURT:  RIGHT.

08:21AM 14          MR. CLINE:  WHAT WE WANT TO SHOW IS THAT THAT GOES

08:21AM 15   TO HER STATE OF MIND, HER INTENT TO DEFRAUD, AND THE FACT THAT

08:21AM 16   SHE'S DISCLOSING TO MR. PARLOFF THE PROCESS BY WHICH TESTS ARE

08:21AM 17   BROUGHT UP NEGATES THAT STATE OF MIND, AND IT NEGATES THAT

08:21AM 18   STATE OF MIND WHETHER WHAT SHE'S SAYING IS ACCURATE OR NOT.

08:21AM 19          THE COURT:  MR. BOSTIC?

08:21AM 20          MR. BOSTIC:  I DON'T SEE IT THAT WAY, YOUR HONOR.

08:21AM 21      I THINK THAT THE MAJORITY OF THE PORTION HIGHLIGHTED IN

08:21AM 22   GREEN IS TALKING ABOUT THE COMPANY'S HISTORICAL WORK, AND I

08:21AM 23   THINK IT'S MS. HOLMES PRESENTING, FRANKLY, A FAVORABLE VIEW ON

08:21AM 24   THE COMPANY'S ACHIEVEMENTS TO DATE.  IT'S MS. HOLMES SAYING,

08:21AM 25   WE'RE GOING TO SEND YOU THESE REPORTS, YOU'RE GOING TO BE

6795

08:21AM  1    IMPRESSED BECAUSE THEY'LL SHOW -- AND, FOR EXAMPLE, THE

08:21AM  2    PHARMACEUTICAL STUDIES AS WELL WILL SHOW THAT THE COMPANY HAD

08:22AM  3    THESE CAPABILITIES TO PERFORM REALLY SOPHISTICATED ESOTERIC

08:22AM  4    TESTS ON SYSTEMS THAT WERE RUNNING IN PEOPLE'S HOMES.

08:22AM  5         THERE WERE A LOT OF FACTUAL REPRESENTATIONS ABOUT THE

08:22AM  6    PROGRESS THAT THE COMPANY HAD MADE, ITS VALIDATION WORK.

08:22AM  7         SO IF THAT'S NOT COMING IN FOR ITS TRUTH, AND IF IT'S NOT

08:22AM  8    COMING IN TO SHOW THAT MS. HOLMES BELIEVED THAT, BECAUSE THAT'S

08:22AM  9    NOT -- THAT'S NOT AN ACCEPTABLE NONHEARSAY PURPOSE BY THE WAY.

08:22AM  10   THE DEFENDANT CANNOT INTRODUCE HER OWN STATEMENTS OF HER

08:22AM  11   CONTEMPORANEOUS BELIEF AS I UNDERSTAND THE LAW.  SO THAT'S NOT

08:22AM  12   A PERMISSIBLE PURPOSE.

08:22AM  13        I DON'T SEE WHY THIS IS PERMISSIBLE.  IT DOESN'T TEND TO

08:22AM  14   NEGATE AN ALLEGATION OF A SPECIFIC FALSE STATEMENT IN THIS

08:22AM  15   CASE.

08:22AM  16        I DON'T THINK THERE IS ANY ALLEGATION THAT MS. HOLMES AT

08:22AM  17   SOME OTHER POINT SAID THE OPPOSITE OF WHAT IS IN THE

08:22AM  18   HIGHLIGHTED PORTION IN GREEN.

08:23AM  19             MR. CLINE:  IF YOU'RE CONCENTRATING THERE -- I DON'T

08:23AM  20   MEAN TO INTERRUPT YOU.

08:23AM  21             THE COURT:  NO.  I WAS JUST READING AGAIN.

08:23AM  22             MR. CLINE:  ALL RIGHT.  BUT IF YOU LOOK AT WHERE

08:23AM  23   THIS PICKS UP ON PAGE 17 OF THE TRANSCRIPT, MS. HOLMES IS IN

08:23AM  24   THE MIDDLE OF AN ANSWER.

08:23AM  25        HE'S ASKED HER SOME QUESTIONS, AND SHE'S GIVING A

6796

08:23AM 1    DESCRIPTION OF, OF TESTING AND GETTING MORE TESTS UP.

08:23AM 2         AND THE GREEN PORTION IS JUST A CONTINUATION OF THAT

08:23AM 3    ANSWER.  SHE, SHE SAYS, I MEAN, AS A COMPANY OBVIOUSLY OUR

08:23AM 4    BUSINESS AND WHAT WE DO HERE IN 1701 EVERY DAY IS WORK TO GET

08:23AM 5    MORE AND MORE AND MORE TESTS RUNNING ON CAPILLARY SAMPLES.

08:23AM 6         AND THEN SHE GOES ON.  SO SHE IS CONTINUING HER ANSWER,

08:23AM 7    WHICH IS -- NOW, THIS IS THE COMPLETENESS POINT.  THIS IS ALL

08:23AM 8    ESSENTIALLY ONE ANSWER, ONE DESCRIPTION THAT SHE'S OFFERING IN

08:23AM 9    RESPONSE TO HIS QUESTION.

08:23AM 10        SO I THINK FOR COMPLETENESS PURPOSES, IT'S JUST VERY

08:24AM 11   DIFFICULT TO TAKE THAT OUT AND ALLOW A PARTIAL ANSWER TO STAND

08:24AM 12   AS IF THAT WERE THE WHOLE EVERYTHING THAT SHE HAD SAID IN

08:24AM 13   RESPONSE TO MR. PARLOFF'S QUESTIONS ON THIS POINT.

08:24AM 14        ON THE STATE OF MIND, AGAIN, SHE IS GIVING MR. PARLOFF A

08:24AM 15   DESCRIPTION OF WHAT GOES ON, A FULSOME DESCRIPTION.  SHE IS NOT

08:24AM 16   TRYING TO DECEIVE HIM.  SHE IS DESCRIBING THE PROCESS.

08:24AM 17        IF SHE GETS IT WRONG, IF SHE GETS IT RIGHT, IT DOESN'T

08:24AM 18   MAKE ANY DIFFERENCE FOR THESE PURPOSES.

08:24AM 19        THE POINT IS, AND THIS GOES TO HER STATE OF MIND, SHE IS

08:24AM 20   DESCRIBING TO HIM WHAT -- THE PROCESS.  SHE'S ANSWERING HIS

08:24AM 21   QUESTIONS.  SHE'S GIVING HIM DETAIL IN RESPONSE TO HIS

08:24AM 22   QUESTIONS.

08:24AM 23        SO BOTH FOR COMPLETENESS PURPOSES AND FOR STATE OF MIND,

08:24AM 24   NOT FOR THE TRUTH PURPOSES, WE THINK THIS IS ADMISSIBLE.

08:24AM 25             THE COURT:  SO THE ORIGINAL QUESTION IS ON PAGE 15,

08:24AM  1    ISN'T IT, LINE 24.

08:25AM  2         "OKAY.  NOW, I THOUGHT ALL OF YOUR TESTS WERE SORT OF

08:25AM  3    CONSIDERED LAB DEVELOPED TESTS?"

08:25AM  4         IS THAT THE ORIGINAL QUESTION?

08:25AM  5         AND THEN WHAT WE SEE IN THE FOLLOWING TRANSCRIPT ARE

08:25AM  6    MS. HOLMES'S ANSWERS AND EVERY FEW LINES THERE'S MR. PARLOFF

08:25AM  7    SAYING UH-HUH, AND MS. HOLMES CONTINUES WITH THE ANSWER.

08:25AM  8         AND THEN IT CARRIES OVER.

08:25AM  9         AND THAT WAS HIS ORIGINAL QUESTION ON PAGE 15, AND

08:25AM  10   MS. HOLMES CONTINUED TO PERHAPS ANSWER THE QUESTION AS YOU

08:25AM  11   SUGGEST.

08:25AM  12        HIS NEXT QUESTION WAS FOUND ON PAGE 19 AT LINE 20, I

08:25AM  13   THINK.

08:25AM  14        AND SHE CONTINUES THROUGH PAGE 17.  AND IT -- I SUPPOSE

08:25AM  15   YOU COULD LOOK AT IT AND SAY, WELL, SHE DOES MORE THAN ANSWER

08:25AM  16   THAT QUESTION ON PAGE 15, AND THEN SHE GOES IN TO KEEP TALKING

08:26AM  17   ABOUT OTHER MATTERS.

08:26AM  18        I UNDERSTAND THE 106 ISSUE, BUT SHE ANSWERS THE QUESTION

08:26AM  19   WELL BEFORE PAGE 17 AND 18.

08:26AM  20             MR. CLINE:  BUT WHAT SHE IS DOING IS THEN GIVING

08:26AM  21   HIM -- IT'S NOT AN -- IT'S NOT LIKE SHE GOES OFF IN SOME OTHER

08:26AM  22   DIRECTION AND STARTS TALKING ABOUT WHAT SHE HAD FOR DINNER.

08:26AM  23        SHE'S DESCRIBING THE PROCESS OF GETTING THESE TESTS UP AND

08:26AM  24   RUNNING, WHICH IS WHAT HE ASKED ABOUT.  HE ASKED ABOUT LAB

08:26AM  25   DEVELOPED TESTS, AND SHE'S GIVING HIM A FULSOME ANSWER TO THAT

6798

| | | |
|---|---|---|
| 08:26AM | 1 | QUESTION. |
| 08:26AM | 2 | AND I DON'T THINK IT IS FAIR, TO USE ANOTHER ONE OF 106'S |
| 08:26AM | 3 | TERMS, TO CUT OFF THE ANSWER SORT OF MIDSTREAM AND THEN PICK UP |
| 08:26AM | 4 | AGAIN AFTER SHE'S FINISHED ANSWERING WITH ANOTHER QUESTION FROM |
| 08:26AM | 5 | MR. PARLOFF. |
| 08:27AM | 6 | THE COURT:  WELL, SHE DOES -- SHE TALKS ABOUT LAB |
| 08:27AM | 7 | TESTS, AND THEN SHE TALKS ABOUT COSTS AND PRICE TAG AND |
| 08:27AM | 8 | PRICING, AND SHE TALKS ABOUT HER MISSION AND MISSION ACCESS AND |
| 08:27AM | 9 | PRICING OF DIFFERENT TESTS. |
| 08:27AM | 10 | SO THERE'S A LOT OF TOPICS BEING DISCUSSED HERE THAT WOULD |
| 08:27AM | 11 | SEEM TO BE IN EXCESS OF THE -- I THOUGHT YOUR TESTS WERE SORT |
| 08:27AM | 12 | OF CONSIDERED LAB DEVELOPED TESTS.  I DON'T KNOW WHAT PRICING |
| 08:27AM | 13 | HAS TO DO WITH THAT. |
| 08:27AM | 14 | DO YOU SEE WHAT I'M TALKING ABOUT THERE? |
| 08:27AM | 15 | SO THAT'S EVIDENCE OF, AS I THINK YOU SUGGESTED, IT SOUNDS |
| 08:27AM | 16 | LIKE THESE CONVERSATIONS, SOME OF THEM WERE OVER MEALS.  IT |
| 08:27AM | 17 | SOUNDS LIKE -- I RECALL HEARING SOMETHING ABOUT -- |
| 08:27AM | 18 | MR. CLINE:  YES. |
| 08:27AM | 19 | THE COURT:  -- DINNER OR SOMETHING. |
| 08:27AM | 20 | MR. CLINE:  THIS, I BELIEVE, IS NOT ONE OF THOSE. |
| 08:27AM | 21 | MR. BOSTIC:  I DON'T BELIEVE SO.  AT LEAST THIS ONE |
| 08:27AM | 22 | IS NOT AT A RESTAURANT. |
| 08:27AM | 23 | THE COURT:  RIGHT.  RIGHT.  I SAY THAT BECAUSE THIS |
| 08:27AM | 24 | IS THE NATURE OF -- THIS WAS A MANY DAY CONVERSATION, I THINK, |
| 08:27AM | 25 | WASN'T IT?  IT WAS A CONTINUED CONVERSATION?  NOT JUST THIS, |

6799

08:28AM   1   BUT I MEAN THE ENTIRETY OF THE CONVERSATION.

08:28AM   2           MR. CLINE:  IT DID.  IT COVERED A COUPLE OF MONTHS.

08:28AM   3           MR. BOSTIC:  AND FAR LESS STRUCTURED THAN THE

08:28AM   4   CONVERSATIONS WE'VE BEEN HAVING WITH WITNESSES IN THIS CASE,

08:28AM   5   YOUR HONOR, WHERE THERE'S A CLEAR QUESTION AND ANSWER AND THE

08:28AM   6   ANSWER NEEDS TO BE RESPONSIVE TO THE QUESTION.

08:28AM   7       THIS WAS FAR MORE ORGANIC.  SO I THINK THE COURT IS

08:28AM   8   CORRECT THAT THE CONTENT NEEDS TO CONTROL FOR 106 PURPOSES, AND

08:28AM   9   THE QUESTION FOR 106 IS, WOULD IT BE UNFAIR TO EXCLUDE THIS

08:28AM  10   PORTION OF HEARSAY FROM THE CLIPS THAT THE GOVERNMENT IS

08:28AM  11   PLAYING?  AND I DON'T SEE THE UNFAIRNESS HERE.

08:28AM  12       THE CLIPS THAT THE GOVERNMENT IS PLAYING ALREADY INCLUDE

08:28AM  13   MS. HOLMES'S STATEMENT THAT THE COMPANY IS WORKING EVERY DAY IN

08:28AM  14   1701 TO GET MORE AND MORE AND MORE TESTS RUNNING ON CAPILLARY

08:28AM  15   SAMPLES.

08:28AM  16       SO THERE'S NO FALSE IMPRESSION CREATED HERE THAT

08:28AM  17   MS. HOLMES IS HIDING THE FACT THAT WORK IS ONGOING.

08:28AM  18       THE PORTION IN GREEN IS REALLY, IT'S LIKE A FLASHBACK IN A

08:28AM  19   MOVIE.  IT IS A STEPPING AWAY FROM THE THREAD OF THE

08:29AM  20   CONVERSATION FOR A MOMENT TO TALK ABOUT THE HISTORICAL

08:29AM  21   ACTIVITIES OF THE COMPANY AND MAKES SOME FACTUAL

08:29AM  22   CHARACTERIZATIONS THERE, AND THAT'S WHY IT'S NOT ADMISSIBLE OR

08:29AM  23   NECESSARY UNDER RULE 106.

08:29AM  24           MR. CLINE:  BUT IT'S NOT REALLY A FLASHBACK IN A

08:29AM  25   MOVIE.  SHE SAYS IN THE FIRST PART OF HER ANSWER, WHICH THE

6800

08:29AM  1    GOVERNMENT PLANS TO PLAY ON 17, "I MEAN, AS A COMPANY,

08:29AM  2    OBVIOUSLY OUR BUSINESS AND WHAT WE DO HERE IN 1701 EVERY DAY IS

08:29AM  3    WORK TO GET MORE AND MORE TESTS RUNNING ON CAPILLARY SAMPLES."

08:29AM  4        BUT THEN SHE GOES ON TO EXPLAIN THAT PROCESS TO HIM.

08:29AM  5        AGAIN, WHETHER SHE'S RIGHT OR WRONG IN EXPLAINING THE

08:29AM  6    PROCESS, HER STATE OF MIND IS THAT SHE WANTS HIM TO UNDERSTAND

08:29AM  7    WHAT IS GOING ON HERE.  SHE'S NOT TRYING TO DECEIVE HIM OR PULL

08:29AM  8    THE WOOL OVER HIS EYES.  SHE'S DESCRIBING THE PROCESS, WHICH

08:29AM  9    AGAIN, I THINK GOES BOTH TO COMPLETENESS AND TO THE NONHEARSAY

08:29AM  10   PURPOSE FOR THIS.

08:30AM  11       (PAUSE IN PROCEEDINGS.)

08:30AM  12       THE COURT:  I CAPTURE YOUR POINT, BUT I THINK SOME

08:30AM  13   OF THIS IS NOT NECESSARY FOR THAT, SOME OF THE GREEN.  IT -- I

08:30AM  14   DON'T MEAN TO SIT HERE AS AN EDITOR, BUT I DON'T THINK THIS

08:30AM  15   REALLY ANSWERS THE QUESTION THAT MR. PARLOFF PUT ON.

08:30AM  16       I'M LOOKING AT PAGE 18, AND IN LINE 11 THAT ANSWER THAT

08:30AM  17   CONTINUES.

08:30AM  18       I COULD SEE HOW AN ARGUMENT COULD BE MADE FOR LINE 22,

08:30AM  19   PAGE 17, THROUGH LINE 9 ON PAGE 18.

08:30AM  20       MR. CLINE:  WELL, WHAT I'LL SAY, YOUR HONOR, IS THAT

08:30AM  21   WE WILL TAKE AS MUCH OF THIS AS WE CAN GET, BUT WE BELIEVE THE

08:31AM  22   WHOLE THING OUGHT TO COME IN.

08:31AM  23       THE COURT:  SURE.  I UNDERSTAND.

08:31AM  24       MR. BOSTIC:  AND, YOUR HONOR, AS TO THE PORTION ON

08:31AM  25   18, I THINK THE COURT SAID 18 THROUGH LINE 9?

6801

08:31AM  1           THE COURT:  YES, YES.

08:31AM  2           MR. BOSTIC:  THAT INCLUDES -- SO, AGAIN, I THINK THE

08:31AM  3    PROBLEM THERE IS HISTORICAL REPRESENTATIONS ABOUT THINGS THAT

08:31AM  4    THE COMPANY HAS ACHIEVED, YOU KNOW, "AND WE HAVE A LOT OF TESTS

08:31AM  5    THAT WE HAVE VALIDATED ON OUR SYSTEMS A LONG TIME AGO."  I'M

08:31AM  6    NOT SURE WHY THAT IS RESPONSIVE TO THE CONVERSATION, WHY THAT

08:31AM  7    IS REQUIRED UNDER 106 OR WHETHER THERE WOULD BE -- OR WHAT

08:31AM  8    APPROPRIATE NONHEARSAY PURPOSE THERE WOULD BE FOR SOMETHING

08:31AM  9    LIKE THAT.

08:31AM 10           MR. CLINE:  WHICH I THINK, IN RESPONSE TO

08:31AM 11    MR. BOSTIC'S COMMENT, I THINK IS WHY THE REST OF THAT PAGE IS

08:31AM 12    ALSO NECESSARY, BECAUSE SHE GOES ON TO DESCRIBE WHAT THE

08:31AM 13    PROCESS IS FOR GETTING THESE TESTS UP AND RUNNING.

08:32AM 14        (PAUSE IN PROCEEDINGS.)

08:32AM 15           THE COURT:  ALL RIGHT.  THANK YOU.

08:32AM 16        DO YOU WANT TO HAVE MR. LOOBY SPEAK ON THIS OTHER TOPIC

08:32AM 17    NOW?

08:32AM 18           MR. CLINE:  THAT'S FINE, YOUR HONOR.

08:32AM 19           THE COURT:  OKAY.  LET'S DO THAT.

08:32AM 20        WHAT IS THE SCHEDULE ABOUT -- I HESITATE TO EVEN ASK.

08:32AM 21    WHAT IS OUR SCHEDULE WITH -- WE HAVE A WITNESS ON NOW,

08:32AM 22    MS. TOMPKINS.  SHE'S ON CROSS.

08:32AM 23        AND THEN YOU HAVE ANOTHER, IS IT ANOTHER WITNESS WHO WILL

08:32AM 24    TESTIFY, A BRIEF WITNESS?

08:32AM 25           MR. BOSTIC:  OUR NEXT WITNESS IS A SIMILARLY BRIEF

| | | |
|---|---|---|
| 08:32AM | 1 | WITNESS, YES, YOUR HONOR. |
| 08:32AM | 2 | THE COURT:  OKAY. |
| 08:32AM | 3 | MR. BOSTIC:  WE HAVE WITNESSES PLANNED FOR TODAY, |
| 08:33AM | 4 | YES. |
| 08:33AM | 5 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 08:33AM | 6 | MR. CLINE:  I'M HAPPY TO HAVE MR. LOOBY COME UP. |
| 08:33AM | 7 | THE COURT:  WELL, THAT'S WHY YOU'RE STILL HERE.  LET |
| 08:33AM | 8 | ME JUST TELL YOU MY THOUGHTS AND THEN WE'LL MOVE TO MR. LOOBY. |
| 08:33AM | 9 | MR. CLINE:  SURE. |
| 08:33AM | 10 | THE COURT:  THANK YOU FOR THE COMMENTS THIS MORNING. |
| 08:33AM | 11 | I DO SEE THAT UNDER COMPLETENESS, AND I'M GOING TO -- |
| 08:33AM | 12 | CANDIDLY, I'M GOING TO -- I HAVE SOME DOUBTS ABOUT IT, BUT THIS |
| 08:33AM | 13 | IS A CRIMINAL CASE AND I UNDERSTAND THE IMPORTANCE OF THIS TO |
| 08:33AM | 14 | YOUR ARGUMENT.  I DO THINK IT STRETCHES THINGS A BIT UNDER 106, |
| 08:33AM | 15 | BUT I'LL GIVE YOU THE BENEFIT OF THE DOUBT, YOUR TEAM, |
| 08:33AM | 16 | MR. CLINE, IN THAT REGARD, BUT I DO SEE SOME LIMITATIONS TO |
| 08:33AM | 17 | THIS. |
| 08:33AM | 18 | I'LL ALLOW LINE 22 -- THIS IS PAGE 17 OF THE DOCUMENT, |
| 08:33AM | 19 | LINE 22, DOWN TO PAGE 18, LINE 22 ENDING AT THE WORD "TESTS." |
| 08:34AM | 20 | DO YOU SEE THAT? |
| 08:34AM | 21 | MR. CLINE:  YES, YOUR HONOR. |
| 08:34AM | 22 | THE COURT:  EVERYTHING ELSE, INCLUDING PAGE 19, AND |
| 08:34AM | 23 | EVERYTHING ELSE ON PAGE 18 WILL NOT BE PERMITTED.  I DON'T |
| 08:34AM | 24 | THINK THAT'S CONTEXTUALLY RELEVANT FOR 106. |
| 08:34AM | 25 | I'LL ALLOW THIS UNDER 106. |

08:34AM  1          AND IT IS OFFERED NOT FOR THE TRUTH OF ANYTHING ASSERTED

08:34AM  2    HERE, BUT ONLY TO THE STATE OF MIND OF MS. HOLMES AS TO THE

08:34AM  3    ISSUES OF -- MR. CLINE?

08:34AM  4          MR. CLINE:  AS TO THE ISSUES OF -- WELL, HER STATE

08:34AM  5    OF MIND REALLY GOES TO WHETHER SHE'S INTENDING TO DECEIVE

08:34AM  6    ANYBODY, BUT IT GOES TO HER STATE OF MIND AS TO THE PROCESS OF

08:34AM  7    BRINGING UP TESTS.

08:34AM  8          THE COURT:  IS THAT RELATED TO INTENT?

08:34AM  9          MR. CLINE:  YES.

08:34AM  10          THE COURT:  MAY I TELL THE JURY THAT?

08:34AM  11          MR. CLINE:  YES.

08:34AM  12          THE COURT:  ALL RIGHT.  THANK YOU.

08:35AM  13      I'LL OTHERWISE SUSTAIN THE OBJECTION.

08:35AM  14          MR. CLINE:  ALL RIGHT.  WELL, I THINK WHILE I'M

08:35AM  15    BATTING 500 AT LEAST, I WILL SIT DOWN AND LET MR. LOOBY TALK.

08:35AM  16      BEFORE I FORGET, I THINK MS. TREFZ HAD ONE OTHER ISSUE SHE

08:35AM  17    WANTS TO BRING UP WITH YOU BEFORE YOU --

08:35AM  18          THE COURT:  OKAY.  SURE.  THANK YOU.

08:35AM  19      MR. BOSTIC, YOU'RE STAYING ON THE PITCHER'S MOUND, AND WE

08:35AM  20    HAVE A NEW BATTER.

08:35AM  21          MR. BOSTIC:  I'LL STAY HERE, YOUR HONOR.  I GET THAT

08:35AM  22    REFERENCE.

08:35AM  23      (LAUGHTER.)

08:35AM  24          MR. LOOBY:  GOOD MORNING, YOUR HONOR.

08:35AM  25      SO THIS IS DEFENSE DESIGNATION TWO.

6804

08:35AM   1            THE COURT:  YES.

08:35AM   2            MR. LOOBY:  AND THIS IS THE EXCHANGE BETWEEN

08:35AM   3    MR. PARLOFF AND MS. HOLMES ABOUT THE COMPANY'S -- THE DIFFERENT

08:35AM   4    TYPES OF IP THAT THE COMPANY HOLDS AND WHETHER OR NOT IT'S

08:35AM   5    STRICTLY PATENTS OR WHETHER OR NOT IT INCLUDES TRADE SECRET

08:35AM   6    PROTECTED PRACTICES.

08:35AM   7            AND MS. HOLMES'S ANSWER IS THAT IT'S BOTH, AND THEN

08:35AM   8    THERE'S A LITTLE BIT OF ELABORATION, BUT THERE'S ABOUT A MINUTE

08:36AM   9    AND CHANGE EXCHANGE.

08:36AM  10            THE COURT:  NOW, THIS IS ONE WE DON'T HAVE A

08:36AM  11    TRANSCRIPT; IS THAT RIGHT?

08:36AM  12            MR. LOOBY:  THAT'S RIGHT, THAT'S RIGHT.

08:36AM  13            THE GOVERNMENT HAD TRANSCRIBED CERTAIN PORTIONS THAT WE

08:36AM  14    WERE ABLE TO MARKUP IN TRANSCRIPTS, BUT NOT OTHER PORTIONS.  SO

08:36AM  15    THIS -- WE HAVE THE AUDIOTAPE THAT WE SUBMITTED TO THE COURT.

08:36AM  16            THERE IS NONHEARSAY PURPOSES, AND THEN THERE IS A 106

08:36AM  17    PURPOSE.  I THINK EITHER ONE OF THEM IS SUFFICIENT TO ADMIT

08:36AM  18    THIS PORTION OF THE TAPE.

08:36AM  19            THE NONHEARSAY PURPOSE IS IT'S RELEVANT TO MS. HOLMES'S

08:36AM  20    KNOWLEDGE AND STATE OF MIND AS TO WHAT TYPES OF IP PROTECTION

08:36AM  21    THE COMPANY HELD.

08:36AM  22            THAT'S TRUE WHETHER OR NOT ANY OF THE UNDERLYING PRACTICES

08:36AM  23    ARE, IN FACT, TRADE SECRETS, WHICH WOULD BE THE TRUTH OF THE

08:36AM  24    MATTER ASSERTED IN THE STATEMENT.  WE HAVE TRADE SECRETS.

08:36AM  25            WE'RE NOT ADMITTING IT FOR THAT PURPOSE.  WE'RE PROPOSING

6805

08:36AM   1    TO ADMIT IT TO SHOW THAT MS. HOLMES WAS AWARE OF AND UNDERSTOOD

08:36AM   2    THAT THERE WERE TRADE SECRET PRACTICES, SHE BELIEVED IT TO BE

08:37AM   3    TRUE IN -- OR AT LEAST REPRESENTED THAT TO MR. PARLOFF IN THE

08:37AM   4    SPRING OF 2014.

08:37AM   5         AND THE REASON WHY THAT IS RELEVANT TO THE CASE IS

08:37AM   6    TWO-FOLD, ONE OF WHICH IS THAT MR. PARLOFF'S ARTICLE REPRESENTS

08:37AM   7    THAT THE COMPANY DOES HOLD TRADE SECRETS, AND SO IT'S PART OF,

08:37AM   8    KIND OF PART OF THE EXCHANGE THAT DOES MAKE IT INTO THE

08:37AM   9    ARTICLE.

08:37AM  10         BUT IT ALSO -- WE EXPECT THE GOVERNMENT TO ARGUE THAT THE

08:37AM  11    COMPANY'S INVOCATION OF TRADE SECRETS AT OTHER POINTS IN TIME

08:37AM  12    WERE, WERE PART OF THE SCHEME TO DEFRAUD.

08:37AM  13         AND SO THE IDEA THAT MS. HOLMES IS AWARE OF TRADE SECRETS

08:37AM  14    AND IS TALKING ABOUT TRADE SECRETS PUBLICLY AND WITH

08:37AM  15    MR. PARLOFF WITH THE IDEA THAT IT WOULD BE RELAYED TO OTHER

08:37AM  16    PEOPLE IS EVIDENCE THAT THIS BELIEF EXISTED IN EARLY 2014.

08:37AM  17         THE COURT:  WELL, WHAT SHE'S -- THANK YOU.

08:37AM  18    WHAT SHE SAYS IN THE TAPE, I THINK -- I DON'T HAVE A

08:38AM  19    TRANSCRIPT OF IT, I LISTENED TO IT SEVERAL TIMES -- SHE

08:38AM  20    EXPRESSES HER BELIEF IN THE PATENT SYSTEM AND THE IMPORTANCE OF

08:38AM  21    THE PATENT SYSTEM.

08:38AM  22         AND I THINK SHE SAID SOMETHING ABOUT, YES, WE DO HAVE

08:38AM  23    PATENTS, IT'S IMPORTANT, BUT WE ALSO FEEL THAT WE COULD

08:38AM  24    PROTECT -- OUTSIDE OF THE PATENT SYSTEM, WE CAN PROTECT OUR

08:38AM  25    TRADE SECRETS INTERNALLY, AND SHE EXPRESSES SOME STRONG BELIEF

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*

AMY MASON SAHARIA

April 17, 2023