No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XXXVII of LVII | ER-10434 to ER-10733

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

08:38AM 1    IN THAT.

08:38AM 2        IS THAT WHAT YOU WANT TO GET IN HERE, THAT PIECE?

08:38AM 3        MR. LOOBY:  YES.  AND THEN THE CLIP ENDS WITH "AND

08:38AM 4    THE COMPANY IS ALWAYS CONTINUALLY INNOVATING" BECAUSE IT'S A

08:38AM 5    DISCUSSION ABOUT WHAT TYPES OF IP DO THEY HAVE, AND WHICH WE

08:38AM 6    HAVE PATENTS THAT ARE KIND OF ON THE RECORD, AND WE HAVE TRADE

08:38AM 7    SECRETS THAT ARE AN ADDITIONAL LAYER OF SUPPORT KIND OF AROUND

08:38AM 8    THAT.

08:38AM 9        THE COURT:  SO WHY IS THAT IMPORTANT?  I JUST -- SO

08:38AM 10   WHAT?

08:38AM 11       MR. LOOBY:  THE SO WHAT, YOUR HONOR, IS THAT WHEN

08:38AM 12   THE COMPANY IS TALKING ABOUT TRADE SECRET PROTECTIONS IN 2015,

08:39AM 13   WE EXPECT THE GOVERNMENT TO ARGUE THAT THOSE INVOCATIONS OF

08:39AM 14   THAT IP PROTECTION ARE IN BAD FAITH.  IN FACT, THEY HAVE

08:39AM 15   ALLEGED THAT IN THEIR 404(B) NOTICE.

08:39AM 16     THIS EXCHANGE WITH MR. PARLOFF IS WELL BEFORE ANY WHIFF OF

08:39AM 17   THAT LATER CONTROVERSY ARISES.  IT IS EVIDENCE THAT MS. HOLMES

08:39AM 18   BELIEVED THAT THERE WERE TRADE SECRETS PROTECTIONS GENERALLY AT

08:39AM 19   THAT TIME, AND IT MAKES IT MORE PROBATIVE AND IT UNDERMINES THE

08:39AM 20   GOVERNMENT'S INFERENCE THAT THEY WOULD HAVE THE JURY DRAW THAT

08:39AM 21   THOSE LATER INVOCATION OF TRADE SECRETS IS ESSENTIALLY MADE UP.

08:39AM 22     WELL, THEY'D BEEN TALKING ABOUT TRADE SECRETS FOR A LONG

08:39AM 23   TIME.  IT'S BEEN MS. HOLMES ON THE RECORD WITH A REPORTER IN AN

08:39AM 24   INTERVIEW FOR A PROFILE.  "WE HAVE TRADE SECRET PROTECTIONS AND

08:39AM 25   WE BELIEVE IN PROTECTING OUR IP THROUGH THAT MECHANISM."

6807

08:39AM 1        THE COURT:  OKAY.

08:39AM 2     MR. BOSTIC?

08:39AM 3        MR. BOSTIC:  SO I THINK THE CONCERN HERE,

08:40AM 4  YOUR HONOR, IS AGAIN A HEARSAY ONE.  THE HEARSAY RULE DOES NOT

08:40AM 5  ALLOW A PARTY TO INTRODUCE ITS OWN STATEMENTS AS EVIDENCE OF

08:40AM 6  THAT PARTY'S BELIEF.

08:40AM 7        AND I THINK JUST ON THE FACE OF THIS CLIP, THIS PORTION --

08:40AM 8  AND BASED ON DEFENSE COUNSEL'S DESCRIPTION, IT'S CLEAR THAT

08:40AM 9  THAT'S WHAT THIS IS.  THIS IS A STATEMENT BY MS. HOLMES ABOUT

08:40AM 10 HER BELIEF AT THE TIME, OR AT LEAST HER PURPORTED BELIEF ABOUT

08:40AM 11 THE STATE OF THE COMPANY'S IP PROTECTION, THE -- I SUPPOSE THE

08:40AM 12 VALIDITY OF THE COMPANY'S TRADE SECRECY PRACTICES, AND HER

08:40AM 13 STATEMENT AT THAT TIME CAN'T BE INTRODUCED BY HER TO SHOW THAT

08:40AM 14 THAT'S WHAT SHE BELIEVED.  THAT CONFLICTS WITH THE HEARSAY

08:40AM 15 RULE.

08:40AM 16       IT'S COMPOUNDED IN THIS CASE BY THE FACT THAT THIS DEALS

08:40AM 17 WITH A LEGAL ISSUE AND THE VALIDITY OR NONVALIDITY OF A TRADE

08:40AM 18 SECRET, THE EXISTENCE OR NONEXISTENCE OF A TRADE SECRET IS A

08:41AM 19 LEGAL QUESTION.

08:41AM 20       SO I THINK THAT THAT'S JUST ANOTHER COMPOUNDING FACTOR

08:41AM 21 THAT MAKES THIS MORE PROBLEMATIC TO LET IN AN OUT-OF-COURT

08:41AM 22 HEARSAY STATEMENT FROM THE DEFENDANT ABOUT THE EXISTENCE OF THE

08:41AM 23 COMPANY'S TRADE SECRET IP AT THE TIME.

08:41AM 24       MR. LOOBY:  RIGHT.  AND MS. HOLMES'S OUT-OF-COURT

08:41AM 25 STATEMENTS ARE SUBJECT TO THE SAME HEARSAY RESTRICTIONS AS ANY

6808

08:41AM  1      OTHER OUT-OF-COURT STATEMENT.

08:41AM  2          WE ARE NOT OFFERING IT FOR THE TRUTH ABOUT WHETHER OR NOT

08:41AM  3      THESE TRADE -- THESE PRACTICES WERE TRADE SECRETS OR WHETHER OR

08:41AM  4      NOT THE COMPANY ACTUALLY HAD TRADE SECRET PROTECTIONS OR THAT

08:41AM  5      MS. HOLMES UNDERSTOOD THEM TO BE THAT WAY.

08:41AM  6          IT'S A DISCLOSURE THAT THE COMPANY DOES KEEP THESE TYPES

08:41AM  7      OF IP, OR AT LEAST THAT WAS ITS POSITION AT THE TIME, AND

08:41AM  8      THAT'S RELEVANT TO MS. HOLMES'S KNOWLEDGE ABOUT KIND OF WHAT IP

08:41AM  9      WAS AT ISSUE, WHICH --

08:41AM  10             THE COURT:  ISN'T THAT IN EVIDENCE ALREADY?  DIDN'T

08:41AM  11     CERTAIN WITNESSES TESTIFY THAT THERE WERE TRADE SECRET

08:42AM  12     PROTECTIONS AT THE COMPANY?

08:42AM  13             MR. LOOBY:  OFF THE TOP OF MY HEAD, I CAN'T RECALL

08:42AM  14     EXACTLY.

08:42AM  15         I KNOW THAT IT'S IN MR. PARLOFF'S ARTICLE, WHICH IS IN

08:42AM  16     EVIDENCE, WHICH LEADS ME TO THE 106 REASON, WHICH IF IT WAS

08:42AM  17     ADMITTED UNDER 106, THERE WOULDN'T BE A HEARSAY ISSUES.

08:42AM  18             THE COURT:  SHOULD WE ADMIT IT UNDER THAT SAME

08:42AM  19     THEORY, THE SECOND ARTICLE?

08:42AM  20             MR. LOOBY:  NO, YOUR HONOR.  THIS WOULD BE CONTEXT

08:42AM  21     TO THE CONVERSATIONS THAT THE GOVERNMENT HAS PROPOSED TO PLAY

08:42AM  22     WHICH CENTER AROUND, PRINCIPALLY AROUND THE 2014 REPORTING THAT

08:42AM  23     LEADS TO THE JUNE 2014 ARTICLE, WHICH THE ARTICLE, OF COURSE,

08:42AM  24     IS IN EVIDENCE AND SAYS THAT THERE ARE TRADE SECRET

08:42AM  25     PROTECTIONS.

6809

08:42AM 1      SO THIS IS PROVIDING CONTEXT TO KIND OF HOW THAT, HOW THAT

08:42AM 2  REPRESENTATION WOUND UP IN THE ARTICLE, AND IT ALSO PROVIDES

08:42AM 3  CONTEXT TO OTHER CLIPS THAT THE GOVERNMENT WOULD PLAY AND ABOUT

08:42AM 4  KIND OF WHAT, WHAT WOULD BE ON THE RECORD AND WHAT WOULD BE OFF

08:43AM 5  THE RECORD IN TERMS OF THE PUBLIC DESCRIPTION OF THE COMPANY'S

08:43AM 6  TECHNOLOGIES.

08:43AM 7      SO THE IDEA THAT THERE ARE TRADE SECRET ISSUES IS KIND OF

08:43AM 8  HANGING OVER A LOT OF THE EXCHANGES BETWEEN MR. PARLOFF AND

08:43AM 9  MS. HOLMES THAT THE JURY WILL HEAR TODAY.

08:43AM 10      SO UNDER RULE 106, THIS IS, THIS COMES IN FOR CONTEXT OF

08:43AM 11  TABLE SETTING OF -- THEY HAD DISCUSSED EARLY ON IN THEIR

08:43AM 12  EXCHANGES, YEAH, WE HAVE TRADE SECRETS.

08:43AM 13      SO THEN LATER WHEN THEY'RE TALKING ABOUT, WELL, HOW SHOULD

08:43AM 14  WE DESCRIBE THIS OR THAT IN THE ARTICLE, IT'S AGAINST THE

08:43AM 15  BACKDROP OF WHAT WE DO CONSIDER ASPECTS OF OUR TECHNOLOGY AND

08:43AM 16  PROCESSES TO BE TRADE SECRET PROTECTION PROTECTED, AND WE'RE

08:43AM 17  HAVING THAT CONVERSATION IN THAT CONTEXT.

08:43AM 18      SO WE SUBMIT THAT IT'S KIND OF A 106 CONTEXT RATIONALE.

08:43AM 19          THE COURT:  AND IT'S NOT HEARSAY.

08:43AM 20          MR. LOOBY:  AND THEN THE HEARSAY QUESTION WOULD BE,

08:43AM 21  WOULD BE MOOT AT THAT POINT?

08:43AM 22      BUT WE ALSO WOULD NOT BE OFFERING IT FOR THE TRUTH OF THE

08:44AM 23  MATTER ASSERTED.  AND SO EVEN IF IT CAME IN FOR 106, I MEAN, WE

08:44AM 24  WOULDN'T BE ARGUING THAT, AND WE WOULDN'T BE OFFERING IT THAT

08:44AM 25  WAY ANYWAY.

| | | |
|---|---|---|
| 08:44AM | 1 | SO IF THE COURT WANTED TO INSTRUCT THAT THAT QUESTION AND |
| 08:44AM | 2 | ANSWER, EVEN IF IT CAME IN UNDER RULE 106, WAS TO BE CONSIDERED |
| 08:44AM | 3 | FOR A LIMITED PURPOSE -- |
| 08:44AM | 4 | THE COURT:  AND THAT LIMITED PURPOSE WOULD BE? |
| 08:44AM | 5 | MR. LOOBY:  THAT WOULD BE MS. HOLMES'S KNOWLEDGE |
| 08:44AM | 6 | ABOUT THE COMPANY'S IP PORTFOLIO, WHAT TYPES OF IP THE COMPANY |
| 08:44AM | 7 | HELD IN JUNE OR MAY OF 2014. |
| 08:44AM | 8 | THE COURT:  WHAT TYPES?  I DON'T THINK IT'S THAT |
| 08:44AM | 9 | DESCRIPTIVE, IS IT? |
| 08:44AM | 10 | MR. LOOBY:  WELL, IT'S DIFFERENT CATEGORIES.  IT'S |
| 08:44AM | 11 | PATENT AND TRADE SECRET. |
| 08:44AM | 12 | THE COURT:  SHE SAYS, WE BELIEVE IN THE PATENT |
| 08:44AM | 13 | SYSTEM. |
| 08:44AM | 14 | MR. LOOBY:  RIGHT. |
| 08:44AM | 15 | THE COURT:  AND WE HAVE PATENTS. |
| 08:44AM | 16 | MR. LOOBY:  YES. |
| 08:44AM | 17 | THE COURT:  AND THEN SHE SAYS BUT WE ALSO OUTSIDE OF |
| 08:44AM | 18 | THAT, I DON'T REMEMBER IF SHE USED THE PHRASE INTERNALLY, BUT |
| 08:45AM | 19 | WE HAVE TRADE SECRET PROTECTION. |
| 08:45AM | 20 | MR. LOOBY:  RIGHT. |
| 08:45AM | 21 | THE COURT:  AND THAT'S REALLY THE PORTION YOU WANT, |
| 08:45AM | 22 | THOSE TWO STATEMENTS I WOULD THINK. |
| 08:45AM | 23 | MR. LOOBY:  CORRECT.  AND I THINK THE TAPE ONLY |
| 08:45AM | 24 | CONTINUES FOR A SHORT WHILE AFTER WHERE SHE MAKES THE |
| 08:45AM | 25 | STATEMENT, AND, OF COURSE, WE CONTINUE INNOVATING. |

6811

| | | |
|---|---|---|
| 08:45AM | 1 | BUT IT'S REALLY THE PORTIONS THAT YOUR HONOR RECALLS THAT |
| 08:45AM | 2 | WE'RE TALKING ABOUT. |
| 08:45AM | 3 | MR. BOSTIC:  I'M NOT SURE I SEE THE 106 CONNECTION. |
| 08:45AM | 4 | USUALLY WITH 106 IT'S EASIER, OR THERE'S A MORE CONCRETE |
| 08:45AM | 5 | CONNECTION BETWEEN THE PORTION THAT A PARTY IS SEEKING TO ADD |
| 08:45AM | 6 | AND ANOTHER PORTION THAT WOULD CREATE AN UNFAIR IMPRESSION -- |
| 08:45AM | 7 | THE COURT:  CONTEXT.  CONTEXT, MR. BOSTIC. |
| 08:45AM | 8 | MR. BOSTIC:  CONTEXT. |
| 08:45AM | 9 | I'M TRYING TO GET THROUGH THIS WHOLE ARGUMENT WITHOUT |
| 08:45AM | 10 | USING THAT WORD. |
| 08:45AM | 11 | (LAUGHTER.) |
| 08:45AM | 12 | MR. BOSTIC:  BUT I DON'T SEE, I DON'T SEE OTHER |
| 08:45AM | 13 | CONTENT IN THE GOVERNMENT'S IDENTIFIED CLIPS THAT WOULD CREATE |
| 08:45AM | 14 | AN UNBALANCED OR MISLEADING IMPRESSION WERE IT NOT FOR GIVING |
| 08:46AM | 15 | MS. HOLMES A CHANCE TO JUSTIFY WITHHOLDING INFORMATION, YOU |
| 08:46AM | 16 | KNOW, THROUGH HER STATEMENT AT THE TIME ABOUT HER BELIEF THAT |
| 08:46AM | 17 | THE COMPANY HAD TRADE SECRET PROTECTION. |
| 08:46AM | 18 | I THINK -- AND I THINK TO THE EXTENT IT WOULD HAVE THAT |
| 08:46AM | 19 | FUNCTION, I THINK THEN IT IS IN VIOLATION OF THE HEARSAY RULES |
| 08:46AM | 20 | IF IT'S SERVING THAT PURPOSE TO FILL IN THAT GAP FOR THE JURY |
| 08:46AM | 21 | AND TELL THEM EITHER WHAT THE STATE OF THERANOS'S IP PORTFOLIO |
| 08:46AM | 22 | WAS AT THE TIME OR WHAT MS. HOLMES BELIEVED ABOUT IT.  I THINK |
| 08:46AM | 23 | THOSE ARE BOTH IMPROPER HEARSAY PURPOSES. |
| 08:46AM | 24 | MR. LOOBY:  JUST ONE FINAL WORD. |
| 08:46AM | 25 | THE COURT:  SURE. |

6812

08:46AM 1          MR. LOOBY:  WHICH IS IF WE ZOOM OUT A LITTLE BIT,

08:46AM 2   WHAT THE GOVERNMENT IS GOING TO DO TODAY IS PLAY A CERTAIN

08:46AM 3   SERIES OF CLIPS AND EXCHANGES WITH MR. PARLOFF AND MS. HOLMES,

08:46AM 4   AND THEY'RE GOING TO THEN ARGUE TO THE JURY THAT THESE ARE

08:46AM 5   EITHER MISLEADING OR THEY HAVE OMISSIONS IN THEM.

08:47AM 6          THE CONTEXT THAT THIS IS BEING DISCUSSED ABOUT THE

08:47AM 7   TECHNOLOGY AGAINST THE BACKDROP OF A DISCLOSURE THAT THE

08:47AM 8   COMPANY MAINTAINS TRADE SECRETS AND TAKES THAT SERIOUSLY I

08:47AM 9   THINK IS IMPORTANT AND NECESSARY TO NOT HAVE THE ISOLATED CLIPS

08:47AM 10  BE MISLEADING IN THAT REGARD.

08:47AM 11         THE COURT:  I SEE.  OKAY.  ALL RIGHT.  THANK YOU.

08:47AM 12     I THINK THE 106 CONNECTION HERE, AS I SEE IT, IS A LITTLE

08:47AM 13  TENUOUS, MR. LOOBY.  I'M JUST NOT, I'M NOT -- I UNDERSTAND THE

08:47AM 14  REASON THAT YOU WANT IT IN, TO CAPTURE THE TRADE SECRET IN THE

08:47AM 15  PATENT AND MR. HOLMES BELIEF IN BOTH OF THOSE, AND HER OVERT

08:47AM 16  ASSERTION THAT THE COMPANY DOES OTHER THINGS TO PROTECT ITS

08:47AM 17  TRADE SECRETS AND THE VALUE FOR THAT IN YOUR CASE.

08:47AM 18     I DO NOT THINK IT MEETS THE 106 AND I DO THINK IT'S

08:47AM 19  IMPROPER HEARSAY, AT LEAST AS IT'S PRESENTED TODAY.

08:48AM 20         LET'S SEE WHEN THE TAPE IS PLAYED AND SEE WHAT -- I'M

08:48AM 21  PAUSING BECAUSE I DON'T WANT TO USE THE WORD CONTEXT, BUT LET'S

08:48AM 22  SEE WHAT DEVELOPS IN RELATION TO THAT AND SEE WHERE IT TAKES

08:48AM 23  US.  THEY MAY DECIDE NOT TO PLAY THE TAPE.

08:48AM 24          MR. LOOBY:  THAT WOULD BE A SURPRISE.

08:48AM 25          THE COURT:  ALL RIGHT.

6813

08:48AM  1          MS. TREFZ, YOU WANTED TO SAY SOMETHING?

08:48AM  2               MS. TREFZ:  VERY BRIEFLY, YOUR HONOR.

08:48AM  3          GOOD MORNING, YOUR HONOR.

08:48AM  4               THE COURT:  GOOD MORNING.

08:48AM  5          AND MR. BOSTIC REMAINS ON THE MOUND.

08:48AM  6               MS. TREFZ:  HE IS.  AND I AM A NEW BATTER.

08:48AM  7               MR. BOSTIC:  IS THREE ON ONE ALLOWED IN SPORTS,

08:48AM  8     YOUR HONOR?

08:48AM  9               MS. TREFZ:  IT DEPENDS ON WHAT SPORT.

08:48AM  10         JUST BRIEFLY, YOUR HONOR.

08:48AM  11         THIS IS WITH RESPECT TO DR. ASIN WHO IS THE DOCTOR OF THE

08:48AM  12    WITNESS ON THE STAND.  I THINK THERE IS STILL A QUESTION AS TO

08:48AM  13    WHETHER THE GOVERNMENT WILL CALL HIM.  LAST NIGHT THEY TOLD US

08:48AM  14    THAT THEY WERE NOT SURE.

08:48AM  15         I DID JUST WANT TO FLAG FOR THE COURT THAT WE HAD SOUGHT

08:49AM  16    AND RECEIVED FROM JUDGE COUSINS A SUBPOENA FOR RECORDS RELATED

08:49AM  17    TO THIS PATIENT.

08:49AM  18         I UNDERSTAND FROM THE CORRESPONDENCE WITH THE DOCTOR LAST

08:49AM  19    NIGHT THAT HE IS OR WILL BE HERE AT THE COURTHOUSE TODAY AND

08:49AM  20    WOULD BE ABLE TO PRODUCE THOSE DOCUMENTS, AND BECAUSE THEY'RE

08:49AM  21    PRODUCIBLE TO THE COURT, I JUST WANTED TO FLAG THAT WE WOULD

08:49AM  22    LIKE TO BE ABLE TO TENDER THEM TO THE COURT AND JUST ASK THAT

08:49AM  23    HE BE REQUESTED TO STAY WHILE WE REVIEW THEM AS THEY RELATE TO

08:49AM  24    THIS PARTICULAR WITNESS.

08:49AM  25               THE COURT:  OKAY.

6814

08:49AM  1          MR. BOSTIC:  DR. ASIN IS MR. LEACH'S WITNESS.  IF I

08:49AM  2     MIGHT CALL ON HIM OR CONFER WITH HIM?

08:49AM  3          THE COURT:  SURE.  THIS IS CALLED A PITCHING CHANGE,

08:49AM  4     MR. BOSTIC.

08:49AM  5          (LAUGHTER.)

08:49AM  6          MR. LEACH:  THANK YOU, YOUR HONOR.

08:49AM  7     I'M GOING TO PITCH HIT.  WE'RE HAPPY TO WORK OUT THE

08:49AM  8     DOCUMENTS WITH DR. ASIN.  WE INTERFERED WITH HIS PRACTICE THIS

08:50AM  9     WEEK ON A NUMBER OF DAYS, SO I WOULD HATE TO HAVE HIM STAY

08:50AM  10    LONGER THAN REQUIRED BECAUSE WE'RE HAPPY TO GET THE DOCUMENTS

08:50AM  11    TO THE DEFENSE, AND I DON'T THINK THERE WOULD BE AN ISSUE

08:50AM  12    THERE.

08:50AM  13         THE COURT:  OKAY.  ALL RIGHT.

08:50AM  14         MS. TREFZ:  WE WOULD LIKE TO TENDER THEM TO THE

08:50AM  15    COURT SO THAT WE COULD REVIEW THEM.

08:50AM  16         THE COURT:  SHOULD WE DO THAT WITH GREAT FLOURISH OR

08:50AM  17    CAN WE HAVE HIM COME IN SOME TIME WHEN WE ARE OUTSIDE OF THE

08:50AM  18    PRESENCE OF THE JURY.

08:50AM  19         MS. TREFZ:  THAT'S WHY I WAS RAISING IT NOW.

08:50AM  20         MR. LEACH:  I THINK IT BE MORE APPROPRIATE TO DO IT

08:50AM  21    OUTSIDE OF THE PRESENCE OF THE JURY.

08:50AM  22         THE COURT:  WELL, LET'S DO THAT.  OKAY.  THANK YOU.

08:50AM  23      THEN DO WE NEED TO TALK ABOUT THE DOCTOR ANYMORE,

08:50AM  24    POTENTIAL TESTIMONY OR ANYTHING LIKE THAT?  IS THAT ALL

08:50AM  25    RESOLVED?

6815

08:50AM 1          MS. TREFZ:  I THINK THE COURT IS AWARE OF OUR

08:50AM 2    POSITION THAT WE STATED YESTERDAY.  I DON'T WANT TO REHASH

08:50AM 3    THOSE ARGUMENTS.

08:50AM 4          THE COURT:  SURE.  OKAY.

08:50AM 5          MS. TREFZ:  BUT I UNDERSTAND THE GOVERNMENT IS NOT

08:50AM 6    SURE IF THEY'RE GOING TO CALL HIM.  YOU KNOW, WE HAVE A

08:50AM 7    SUBPOENA THAT WE CAN SERVE ON HIM, AND WE CAN CALL HIM IF OUR

08:50AM 8    CASE BEGINS TODAY --

08:51AM 9          THE COURT:  YEAH.

08:51AM 10         MS. TREFZ:  -- IF THEY CHOOSE NOT TO, AND IF WE

08:51AM 11   CHOOSE TO PUT ON A CASE.

08:51AM 12      SO I JUST, I JUST -- I DON'T THINK IT'S NECESSARY TO

08:51AM 13   RESOLVE.  THE GOVERNMENT SAID IT WASN'T SURE WHETHER IT WAS

08:51AM 14   GOING TO CALL HIM STILL, AND SO WE WILL HAVE WAIT TO SEE.

08:51AM 15         THE COURT:  OKAY.  SO IS IT -- MS. TOMPKINS IS IT?

08:51AM 16         MR. LEACH:  YES.

08:51AM 17         MS. TREFZ:  CORRECT.

08:51AM 18         THE COURT:  SHE IS ON THE STAND NOW.  YOU HAVE HER

08:51AM 19   ON CROSS.  I'LL DRAW YOUR ATTENTION TO 789 FED.2D 1315 IN

08:51AM 20   REGARDS TO QUESTIONS REGARDING THE PHYSICIAN.

08:51AM 21      LET ME JUST SAY, YOU CAN ASK HER ABOUT -- UNDER THE

08:51AM 22   EXCEPTION SHE CAN SAY WHAT SHE TOLD THE PHYSICIAN, BUT SHE

08:51AM 23   CAN'T TELL YOU WHAT THE PHYSICIAN TOLD HER.

08:51AM 24      YOU UNDERSTAND THAT?

08:51AM 25         MS. TREFZ:  I UNDERSTAND THE COURT'S RULING.  I

| | | |
|---|---|---|
| 08:51AM | 1 | BELIEVE THAT I HAVE HAD THE CHANCE TO REFRAME MY QUESTIONS SO |
| 08:51AM | 2 | THAT THEY WILL BE IN COMPLIANCE, BUT WE WILL SEE I SUPPOSE. |
| 08:51AM | 3 | THE COURT:  GREAT.  OKAY. |
| 08:51AM | 4 | ANYTHING FURTHER? |
| 08:51AM | 5 | MS. TREFZ:  THANK YOU, YOUR HONOR. |
| 08:51AM | 6 | MR. LEACH:  NO, YOUR HONOR.  THANK YOU, YOUR HONOR. |
| 08:51AM | 7 | THE COURT:  OKAY.  THANK YOU.  WE MIGHT GET STARTED |
| 08:51AM | 8 | ON TIME TODAY. |
| 08:51AM | 9 | MR. LEACH:  WONDERFUL. |
| 08:51AM | 10 | THE COURT:  GREAT.  THANK YOU. |
| 08:52AM | 11 | (RECESS FROM 8:52 A.M. UNTIL 9:06 A.M.) |
| 09:06AM | 12 | (JURY OUT AT 9:06 A.M.) |
| 09:06AM | 13 | THE COURT:  PLEASE BE SEATED.  THANK YOU FOR YOUR |
| 09:06AM | 14 | COURTESY. |
| 09:06AM | 15 | WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 09:06AM | 16 | ARE PRESENT ONCE AGAIN. |
| 09:06AM | 17 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 09:06AM | 18 | MR. LEACH, DO YOU HAVE A COMMENT ABOUT THE RECORDS, I |
| 09:06AM | 19 | THINK? |
| 09:06AM | 20 | MR. LEACH:  I DO, YOUR HONOR. |
| 09:06AM | 21 | I'M ADVISED BY THE DEFENSE THAT THEY HAVE SUBPOENAED |
| 09:06AM | 22 | CERTAIN RECORDS FROM DR. ASIN AND WANTED THEM RETURNED TO THE |
| 09:06AM | 23 | CLERK. |
| 09:06AM | 24 | HE'S HERE IN THE COURTROOM AND PREPARED TO DO THAT RIGHT |
| 09:06AM | 25 | NOW. |

6817

09:06AM 1                    THE COURT:  ALL RIGHT.  THANK YOU.

09:06AM 2              DR. ASIN, ARE YOU HERE, SIR?

09:06AM 3              YES.  THANK YOU.  COME FORWARD.

09:06AM 4         LET ME ASK YOU TO STATE YOUR NAME AND THEN SPELL IT,

09:06AM 5    PLEASE.

09:06AM 6                    THE WITNESS:  GERALD ASIN, A-S-I-N.

09:06AM 7                    THE COURT:  THANK YOU.  AND YOU'VE BROUGHT SOME --

09:06AM 8    IT LOOKS LIKE YOU HAVE A MANILA FOLDER OF RECORDS.

09:07AM 9                    THE WITNESS:  CORRECT.

09:07AM 10                   THE COURT:  AND THOSE ARE HERE PURSUANT TO A

09:07AM 11   SUBPOENA THAT YOU RECEIVED FROM THE DEFENSE?

09:07AM 12                   THE WITNESS:  YES.

09:07AM 13                   THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO LODGE

09:07AM 14   THOSE WITH THE COURT AT THIS TIME?

09:07AM 15                   THE WITNESS:  SURE.

09:07AM 16                   THE COURT:  YOU CAN HAND THEM AROUND THE GLASS THERE

09:07AM 17   AND OUR COURTROOM DEPUTY WILL RECEIVE THOSE.  WE'LL KEEP THEM

09:07AM 18   HERE UNDER PROTECTION, AND WE'LL RETURN THEM TO YOU WHEN THEY

09:07AM 19   HAVE CONCLUDED THEIR SERVICE TO THIS CASE.

09:07AM 20        IS THAT ALL RIGHT WITH YOU?

09:07AM 21                   THE WITNESS:  YES, SIR.

09:07AM 22        (HANDING.)

09:07AM 23                   THE COURT:  ALL RIGHT.  ANYTHING FURTHER, MR. LEACH?

09:07AM 24                   MR. LEACH:  NO, YOUR HONOR.

09:07AM 25                   THE COURT:  ALL RIGHT.

**ER-10446**

| | | |
|---|---|---|
| 09:07AM | 1 | THANK YOU, SIR.  ALL RIGHT.  THANK YOU. |
| 09:07AM | 2 | THE CLERK:  COURT IS IN RECESS. |
| 09:07AM | 3 | (RECESS FROM 9:07 A.M. UNTIL 9:15 A.M.) |
| 09:15AM | 4 | (JURY IN AT 9:15 A.M.) |
| 09:15AM | 5 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 09:15AM | 6 | WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL |
| 09:15AM | 7 | ARE PRESENT, MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT. |
| 09:15AM | 8 | GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:15AM | 9 | BEFORE WE START, LET ME ASK YOU THAT QUESTION AGAIN, AND I |
| 09:15AM | 10 | APPRECIATE YOUR PATIENCE WITH ME ASKING THIS QUESTION.  DURING |
| 09:15AM | 11 | THE BREAK, DID ANY OF YOU HAVE CAUSE TO COME ACROSS ANY |
| 09:15AM | 12 | INFORMATION, SPEAK TO ANYONE OR DO ANY INVESTIGATION ABOUT |
| 09:15AM | 13 | ANYTHING TO DO WITH THIS CASE?  IF SO, PLEASE RAISE YOUR HAND. |
| 09:15AM | 14 | AGAIN, I SEE NO HANDS. |
| 09:15AM | 15 | THANK YOU VERY MUCH, LADIES AND GENTLEMEN. |
| 09:15AM | 16 | MS. TOMPKINS IS ON THE STAND; IS THAT RIGHT? |
| 09:15AM | 17 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:15AM | 18 | THE COURT:  LET'S ASK HER TO COME IN. |
| 09:15AM | 19 | AND THEN, MS. TREFZ, YOU WANT TO CONTINUE YOUR |
| 09:15AM | 20 | CROSS-EXAMINATION? |
| 09:15AM | 21 | MS. TREFZ:  I DO, YOUR HONOR.  THANK YOU. |
| 09:15AM | 22 | THE COURT:  GOOD MORNING. |
| 09:15AM | 23 | THE WITNESS:  GOOD MORNING. |
| 09:15AM | 24 | THE COURT:  PLEASE TAKE THE SEAT AGAIN IF YOU WOULD, |
| 09:15AM | 25 | AND AGAIN, MAKE YOURSELF COMFORTABLE.  ADJUST THE CHAIR AND |

6819

| | | |
|---|---|---|
| 09:15AM | 1 | MICROPHONE AS YOU NEED.  YOU MAY REMOVE YOUR MASK IF YOU WISH. |
| 09:15AM | 2 | THE WITNESS:  OKAY.  THANK YOU. |
| 09:15AM | 3 | THE COURT:  YOU'RE WELCOME. |
| 09:15AM | 4 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE YOUR |
| 09:15AM | 5 | NAME AGAIN, PLEASE. |
| 09:15AM | 6 | THE WITNESS:  MY NAME IS ERIN TOMPKINS. |
| 09:16AM | 7 | THE COURT:  THANK YOU. |
| 09:16AM | 8 | COUNSEL? |
| 09:16AM | 9 | **(GOVERNMENT'S WITNESS, ERIN TOMPKINS, WAS PREVIOUSLY** |
| 09:16AM | 10 | **SWORN.)** |
| 09:16AM | 11 | BY MS. TREFZ: |
| 09:16AM | 12 | Q.   GOOD MORNING, MS. TOMPKINS. |
| 09:16AM | 13 | A.   GOOD MORNING. |
| 09:16AM | 14 | Q.   I JUST HAVE A FEW MORE QUESTIONS FOR YOU TODAY. |
| 09:16AM | 15 | IF WE CAN BRING UP EXHIBIT 5484, WHICH IS AN EXHIBIT, AND |
| 09:16AM | 16 | PLEASE MAKE SURE THAT THE BIRTH DATE IS REDACTED. |
| 09:16AM | 17 | THANK YOU. |
| 09:16AM | 18 | MS. TOMPKINS, DO YOU REMEMBER DISCUSSING THIS TEST WITH |
| 09:16AM | 19 | THE GOVERNMENT YESTERDAY? |
| 09:16AM | 20 | A.   YES. |
| 09:16AM | 21 | Q.   THIS WAS A TEST FROM THIS SUMMER; CORRECT? |
| 09:16AM | 22 | A.   CORRECT. |
| 09:16AM | 23 | Q.   AND WAS THIS A TEST THAT THE GOVERNMENT ASKED YOU TO GET? |
| 09:16AM | 24 | A.   NO. |
| 09:16AM | 25 | Q.   DID -- |

| | | |
|---|---|---|
| 09:16AM | 1 | A.   I -- |
| 09:16AM | 2 | Q.   GO AHEAD. |
| 09:16AM | 3 | A.   NO.  I WAS LOOKING FOR ANOTHER TEST TO BRING INTO |
| 09:16AM | 4 | EVIDENCE, SO -- |
| 09:16AM | 5 | Q.   ANOTHER TEST TO BRING INTO EVIDENCE? |
| 09:16AM | 6 | A.   UH-HUH. |
| 09:16AM | 7 | Q.   DID THEY GIVE YOU RECOMMENDATIONS AS TO POTENTIAL PLACES |
| 09:16AM | 8 | TO GO GET SUCH A TEST? |
| 09:16AM | 9 | A.   I DID GET HELP FROM ONE OF THE MEMBERS OF THE GROUP IN |
| 09:17AM | 10 | JUST FINDING LOCATIONS IN THE AREA WHERE I WASN'T FAR IN |
| 09:17AM | 11 | NORTHERN CALIFORNIA.  AT THE TIME, I DIDN'T KNOW THE AREA. |
| 09:17AM | 12 | Q.   THAT WAS AGENT HERNANDEZ; IS THAT CORRECT? |
| 09:17AM | 13 | A.   YES. |
| 09:17AM | 14 | Q.   OKAY.  DID THEY GIVE YOU -- DID THE GOVERNMENT GIVE YOU |
| 09:17AM | 15 | RECOMMENDATIONS OF WHAT KIND OF TEST TO GET IN TERMS OF WHETHER |
| 09:17AM | 16 | IT NEEDED TO BE A PARTICULAR -- RUN ON A PARTICULAR TYPE OF |
| 09:17AM | 17 | DEVICE OR DRAWN OR TAKEN IN A PARTICULAR METHOD? |
| 09:17AM | 18 | A.   NO. |
| 09:17AM | 19 | Q.   AND WHAT METHOD WAS THIS TEST TAKEN BY? |
| 09:17AM | 20 | A.   THIS IS A SWAB IN THE INSIDE OF THE CHEEK. |
| 09:17AM | 21 | Q.   YOUR THERANOS TEST IN 2015, WAS THAT TAKEN BY A VEIN DRAW? |
| 09:17AM | 22 | A.   YES. |
| 09:17AM | 23 | Q.   OKAY.  I WANTED TO -- WE CAN TAKE THAT EXHIBIT DOWN. |
| 09:17AM | 24 | IF WE CAN BRING UP 5483.  IF WE CAN GO TO THE PAGE WITH |
| 09:18AM | 25 | THE FOUR HIV RESULTS, WHICH I THINK IS A COUPLE PAGES IN. |

6821

09:18AM 1    THIS -- THANK YOU.  ONE MORE BACK.

09:18AM 2         IF YOU CAN BLOW UP FOR ME, MR. BENNETT, JUST THE HIV

09:18AM 3    PORTION OF THAT.

09:18AM 4         MS. TOMPKINS, DID YOU END UP LEARNING THROUGH ANY

09:18AM 5    CONVERSATIONS WITH EITHER THERANOS OR ANOTHER SOURCE, DID YOU

09:18AM 6    END UP LEARNING ABOUT THE REASON FOR THE FOUR DIFFERENT TESTS?

09:18AM 7    A.   NO.

09:18AM 8    Q.   DID YOU END UP LEARNING ABOUT THE PROCESS OF HIV TESTING?

09:18AM 9    A.   I ATTEMPTED TO GET SOME EDUCATION FROM THERANOS, BUT WAS

09:18AM 10   NOT PROVIDED WITH THAT.

09:18AM 11   Q.   DID YOU HAPPEN TO LEARN ABOUT -- DID THERANOS TELL YOU

09:18AM 12   ABOUT THE CDC ALGORITHM FOR HIV TESTING?

09:19AM 13   A.   NO.

09:19AM 14   Q.   AND LET ME SEE IF I CAN JUST REFRESH YOU A LITTLE BIT.

09:19AM 15        I THINK THAT YOU, I THINK THAT YOU TESTIFIED YESTERDAY

09:19AM 16   THAT YOU HAD A FIRST PHONE CALL WHEN YOU CALLED INTO THERANOS;

09:19AM 17   CORRECT?

09:19AM 18   A.   UH-HUH.

09:19AM 19   Q.   AND I BELIEVE YOU RECALLED THAT THERE WAS -- IT WAS A

09:19AM 20   FEMALE, YOU SAID SHE, A FEMALE CUSTOMER SERVICE REPRESENTATIVE?

09:19AM 21   A.   UH-HUH.

09:19AM 22        THE COURT:  IS THAT YES, MS. TOMPKINS?

09:19AM 23        THE WITNESS:  YES.

09:19AM 24   BY MS. TREFZ:

09:19AM 25   Q.   THANK YOU.  I MAKE THAT MISTAKE AS WELL.

| | | |
|---|---|---|
| 09:19AM | 1 | WOULD IT REFRESH YOUR RECOLLECTION IF I SAID IT WAS -- WAS |
| 09:19AM | 2 | IT LAUREN TSUGAWA? |
| 09:19AM | 3 | A.   I DON'T REMEMBER WITH WHOM I WAS SPEAKING. |
| 09:19AM | 4 | Q.   THAT'S FINE.  DID YOU ASK HER -- DO YOU RECALL WHETHER YOU |
| 09:19AM | 5 | ASKED HER FOR A CALL BACK TO EXPLAIN WHY YOU TESTED NONREACTIVE |
| 09:19AM | 6 | FOR HIV 1 AND 2, NOT DETECTED FOR HIV 1 RNA, BUT NONREACTIVE |
| 09:20AM | 7 | FOR HIV 1 AND 2? |
| 09:20AM | 8 | A.   I BELIEVE I DID ASK FOR A CALL BACK.  I WAS HOPING TO GET |
| 09:20AM | 9 | A FOLLOW-UP CONVERSATION ON WHY THIS WOULD HAPPEN. |
| 09:20AM | 10 | Q.   AND DO YOU RECALL WHETHER YOU HAD ANOTHER CONVERSATION |
| 09:20AM | 11 | WITH THERANOS? |
| 09:20AM | 12 | A.   I DON'T. |
| 09:20AM | 13 | Q.   YOU DON'T RECALL ONE WAY OR THE OTHER? |
| 09:20AM | 14 | A.   HUH-UH. |
| 09:20AM | 15 | THE COURT:  IS THAT NO?  I'M SORRY, MS. TOMPKINS. |
| 09:20AM | 16 | THE WITNESS:  NO, I DO NOT RECALL. |
| 09:20AM | 17 | MS. TREFZ:  THANK YOU, YOUR HONOR. |
| 09:20AM | 18 | Q.   LET ME SEE IF I CAN JUST REFRESH YOUR RECOLLECTION. |
| 09:20AM | 19 | MAY I APPROACH, YOUR HONOR? |
| 09:20AM | 20 | THE COURT:  YES. |
| 09:20AM | 21 | BY MS. TREFZ: |
| 09:20AM | 22 | Q.   (HANDING.) |
| 09:20AM | 23 | MS. TOMPKINS, I'VE HANDED YOU WHAT HAS BEEN MARKED AS |
| 09:20AM | 24 | EXHIBIT 14259.  THIS IS NOT A DOCUMENT THAT YOU ARE ON, BUT I |
| 09:20AM | 25 | WONDERED IF YOU COULD READ THE DOCUMENT.  IT'S AN EMAIL CHAIN, |

6823

| | | |
|---|---|---|
| 09:21AM | 1 | AND IF YOU CAN READ THE DOCUMENT FROM THE BOTTOM UP AND THEN |
| 09:21AM | 2 | SEE IF IT REFRESHES -- AND THEN I WILL ASK YOU WHETHER IT |
| 09:21AM | 3 | REFRESHES YOUR RECOLLECTION. |
| 09:21AM | 4 | PLEASE DON'T READ ANY PART OF IT OUT LOUD TO THE COURT |
| 09:21AM | 5 | BECAUSE WE HAVE TO DO VERY SPECIFIC QUESTIONS ON THIS ISSUE. |
| 09:21AM | 6 | A.   OKAY. |
| 09:21AM | 7 | (PAUSE IN PROCEEDINGS.) |
| 09:22AM | 8 | THE WITNESS:  OKAY. |
| 09:22AM | 9 | BY MS. TREFZ: |
| 09:22AM | 10 | Q.   SO THEN I'M GOING TO ASK YOU SOME VERY SPECIFIC QUESTIONS, |
| 09:22AM | 11 | SO, AGAIN, YOU WON'T READ FROM THE DOCUMENT. |
| 09:22AM | 12 | A.   UH-HUH. |
| 09:22AM | 13 | Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT YOU -- THAT YOU |
| 09:22AM | 14 | SPOKE WITH AN INDIVIDUAL NAMED DAN FLOREY FROM THERANOS? |
| 09:22AM | 15 | A.   THE NAME?  NO.  BUT IT DOES REFRESH THAT THERE WAS A |
| 09:22AM | 16 | SECOND CONVERSATION. |
| 09:22AM | 17 | Q.   AND WHAT DO YOU RECALL ABOUT THAT SECOND CONVERSATION? |
| 09:23AM | 18 | A.   VERY LITTLE. |
| 09:23AM | 19 | Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT MR. FLOREY WALKED |
| 09:23AM | 20 | YOU THROUGH THE CDC RECOMMENDATIONS ON TESTING FOR HIV? |
| 09:23AM | 21 | A.   THE SPECIFICS OF THAT BRIEF CONVERSATION ARE VERY VAGUE TO |
| 09:23AM | 22 | ME.  I'M OBVIOUSLY JUST RECALLING THAT I HAD IT. |
| 09:23AM | 23 | Q.   IT WAS A LONG TIME AGO? |
| 09:23AM | 24 | A.   IT WAS A LONG TIME AGO, YES. |
| 09:23AM | 25 | Q.   I CAN -- I HAVE ANOTHER DOCUMENT THAT MAY HELP WHETHER |

6824

| | | |
|---|---|---|
| 09:23AM | 1 | YOU -- THAT MAY HELP REFRESH OR MAY NOT.  BUT LET ME TRY ONE |
| 09:23AM | 2 | MORE, UNLESS YOU'RE STILL THINKING ABOUT THE PRIOR QUESTION? |
| 09:24AM | 3 | A.   IT'S OKAY.  WE CAN MOVE FORWARD FROM THIS. |
| 09:24AM | 4 | Q.   OKAY. |
| 09:24AM | 5 | MAY I APPROACH, YOUR HONOR? |
| 09:24AM | 6 | THE COURT:  YES. |
| 09:24AM | 7 | BY MS. TREFZ: |
| 09:24AM | 8 | Q.   (HANDING.) |
| 09:24AM | 9 | AND, MS. TOMPKINS, FOR THE RECORD, I'VE HANDED YOU WHAT |
| 09:24AM | 10 | HAS BEEN MARKED EXHIBIT 12692.  AND, AGAIN, THIS IS GOING TO BE |
| 09:24AM | 11 | ANOTHER CIRCUMSTANCE WHERE I'M GOING TO JUST POINT YOU TO A |
| 09:24AM | 12 | PARTICULAR PART.  YOU'RE WELCOME TO LOOK AT WHATEVER YOU NEED |
| 09:24AM | 13 | IN THE DOCUMENT.  YOU'RE JUST GOING TO READ IT TO YOURSELF, AND |
| 09:24AM | 14 | THEN WE'LL ASK QUESTIONS TO SEE IF IT REFRESHES YOU. |
| 09:24AM | 15 | IF I CAN GET YOU TO TURN TO PAGE 7 OF THE DOCUMENT. |
| 09:24AM | 16 | A.   OKAY. |
| 09:24AM | 17 | Q.   AND IF YOU CAN -- DO YOU SEE THERE'S A BOX ON THERE, |
| 09:24AM | 18 | BOX 1, PAGE 7? |
| 09:25AM | 19 | A.   UH-HUH, YES. |
| 09:25AM | 20 | Q.   AND IF YOU COULD TAKE A -- READ THROUGH THAT AND THEN, |
| 09:25AM | 21 | ONCE YOU'RE FINISHED, LET ME KNOW. |
| 09:25AM | 22 | A.   I DON'T KNOW WHAT P24 AG IS. |
| 09:25AM | 23 | Q.   THERE'S NO NEED TO READ THE DOCUMENT.  THE SIMPLE QUESTION |
| 09:25AM | 24 | IS, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT |
| 09:25AM | 25 | YOU WERE TOLD ABOUT THE CDC ALGORITHM FOR HIV TESTING? |

6825

09:25AM 1    A.   I DON'T RECOGNIZE THE CONTENTS OF BOX NUMBER 1.

09:25AM 2    Q.   OKAY.  DO YOU -- DOES IT REFRESH YOUR RECOLLECTION ABOUT

09:25AM 3    ANYTHING, LEARNING ANYTHING ABOUT THE CDC ALGORITHM FOR HIV

09:25AM 4    TESTING?

09:25AM 5    A.   WHAT IT REMINDS ME IS THE SAME -- EXCUSE ME.  IT HAS THE

09:26AM 6    SAME NUMBERS AS MY TEST, BUT I DO NOT --

09:26AM 7         (PAUSE IN PROCEEDINGS.)

09:26AM 8              THE WITNESS:  I BELIEVE IN THE CONVERSATION WE

09:26AM 9    SIMPLY DISCUSSED THE COMPONENTS.

09:26AM 10        I DON'T NECESSARILY UNDERSTAND WHAT THIS ALL REPRESENTS.

09:26AM 11   BY MS. TREFZ:

09:26AM 12   Q.   YOU'RE NOT A DOCTOR; RIGHT?

09:26AM 13   A.   CORRECT.

09:26AM 14   Q.   WHAT DO YOU RECALL ABOUT THE COMPONENTS THAT YOU

09:26AM 15   MENTIONED?

09:26AM 16   A.   1, 2, 1 PLUS 2, ACTIVE RNA.  THOSE WERE THE COMPONENTS

09:26AM 17   THAT APPEARED IN MY RESULT.

09:26AM 18   Q.   DID YOU -- SORRY.  DID YOU HAVE AN UNDERSTANDING AS TO

09:26AM 19   WHETHER THE HIV 1 PLUS 2 AB WAS A SCREENING TEST?  EXCUSE ME.

09:27AM 20   OR -- AND THE ADDITIONAL TESTS WERE CONFIRMATORY TESTS?

09:27AM 21   A.   NO.  THAT WAS PART OF WHAT WAS CONFUSING.  THE MORE I

09:27AM 22   LOOKED AT IT, I COULDN'T SEE WHY ALL OF THE INDIVIDUAL

09:27AM 23   COMPONENTS WOULD BE NEGATIVE, BUT ONE OF THE COMBINATION WOULD

09:27AM 24   BE POSITIVE.

09:27AM 25   Q.   AND DID YOU END UP ASKING DR. ASIN FOR ADVICE ON THAT

| | | |
|---|---|---|
| 09:27AM | 1 | QUESTION? |
| 09:27AM | 2 | A.   I DON'T RECALL. |
| 09:27AM | 3 | Q.   AND I JUST WANTED TO HIGHLIGHT HERE.  SO HERE IT SAYS HIV |
| 09:27AM | 4 | 1 PLUS 2 AB AS REACTIVE. |
| 09:27AM | 5 | AND IF WE CAN BRING BACK UP 5484 FOR A SECOND AND JUST |
| 09:27AM | 6 | HIGHLIGHT THE NEGATIVE THERE. |
| 09:27AM | 7 | A.   UH-HUH. |
| 09:27AM | 8 | Q.   AND JUST TO BE CLEAR, THE, THE -- 5483, YOUR TEST FROM |
| 09:28AM | 9 | THERANOS, THE FIRST LEVEL, OR THE HIV 1 PLUS 2 AB WAS REACTIVE, |
| 09:28AM | 10 | AND THIS TEST SAYS NEGATIVE; CORRECT? |
| 09:28AM | 11 | A.   CORRECT. |
| 09:28AM | 12 | MS. TREFZ:  YOUR HONOR, I WOULD LIKE TO SEEK TO |
| 09:28AM | 13 | ADMIT EXHIBIT 12692, WHICH IS A PUBLIC RECORD. |
| 09:28AM | 14 | AND FOR THE BENEFIT OF COUNSEL AND THE COURT, I WOULD JUST |
| 09:28AM | 15 | NOTE THAT THE ONLY PART THAT I AM INTERESTED IN DISPLAYING IS |
| 09:28AM | 16 | NUMBER 7, PAGE 7. |
| 09:28AM | 17 | MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT UNDER 401, |
| 09:28AM | 18 | 702, AND AUTHENTICATION. |
| 09:29AM | 19 | THE COURT:  ARE YOU ASKING FOR JUST PAGE 7 TO BE |
| 09:29AM | 20 | INTRODUCED? |
| 09:29AM | 21 | MS. TREFZ:  I AM, YOUR HONOR. |
| 09:29AM | 22 | AND I BELIEVE THIS SHOULD BE A SELF-AUTHENTICATING |
| 09:29AM | 23 | DOCUMENT.  IT'S FROM THE CDC'S WEBSITE. |
| 09:29AM | 24 | THE COURT:  AND UNDER 401, THIS WITNESS CAN'T SAY |
| 09:29AM | 25 | ANYTHING ABOUT THIS.  YOU'VE ALREADY EXAMINED HER ON THAT. |

6827

09:29AM 1    MS. TREFZ:  I UNDERSTAND.  BUT IN LIGHT OF POTENTIAL

09:29AM 2    ADDITIONAL EVENTS, I BELIEVE THAT IT IS RELEVANT TO

09:29AM 3    UNDERSTANDING THE ACCURACY AND --

09:29AM 4        THE COURT:  OKAY.  I'LL ADMIT IT.  PAGE 7 IS

09:29AM 5    ADMITTED.

09:29AM 6        MS. TREFZ:  THANK YOU.

09:29AM 7        THE COURT:  AND IT CAN BE PUBLISHED.

09:29AM 8    (DEFENDANT'S EXHIBIT 12692, PAGE 7, WAS RECEIVED IN

09:29AM 9    EVIDENCE.)

09:29AM 10        MS. TREFZ:  IF WE CAN PUBLISH PAGE 7.  THANK YOU.

09:29AM 11   Q.   AND, MS. TOMPKINS, DO YOU SEE HERE -- IS THIS PAGE 7 OF

09:29AM 12   THE DOCUMENT THAT I HAD HANDED YOU THAT WE WERE JUST --

09:30AM 13   A.   BOX 1 AT THE TOP, PAGE 7, YES.

09:30AM 14   Q.   THANK YOU.

09:30AM 15        AND DO YOU SEE AT THE TOP IT SAYS RECOMMENDED LABORATORY

09:30AM 16   HIV TESTING ALGORITHM FOR SERUM OR PLASMA SPECIMENS?

09:30AM 17   A.   OKAY.  YES, I SEE THAT.

09:30AM 18   Q.   THANK YOU.

09:30AM 19        AND DO YOU SEE THAT THE FIRST LEVEL IS HIV 1/2

09:30AM 20   ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY?

09:30AM 21   A.   UH-HUH.

09:30AM 22        THE COURT:  IS THAT YES?

09:30AM 23        THE WITNESS:  YES, I DO.

09:30AM 24   BY MS. TREFZ:

09:30AM 25   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHETHER THAT WAS

| | | |
|---|---|---|
| 09:30AM | 1 | THE HIV 1 PLUS 2 AB THAT YOU SAW IN YOUR THERANOS TEST RESULT? |
| 09:30AM | 2 | MR. BOSTIC:  OBJECTION.  FOUNDATION. |
| 09:30AM | 3 | THE COURT:  SUSTAINED. |
| 09:31AM | 4 | BY MS. TREFZ: |
| 09:31AM | 5 | Q.   AND DO YOU SEE THAT THERE'S AN ARROW POINTING TO A PLUS |
| 09:31AM | 6 | SIGN THERE ON THE PAGE? |
| 09:31AM | 7 | A.   I DO, YES. |
| 09:31AM | 8 | Q.   AND DO YOU SEE THAT IF THE ARROW, THAT IF THERE'S AN ARROW |
| 09:31AM | 9 | POINTING FROM THE PLUS SIDE TO A FURTHER IDENTIFICATION HIV 1, |
| 09:31AM | 10 | HIV 2, ANTIBODY DIFFERENTIATION IMMUNOASSAY? |
| 09:31AM | 11 | A.   I DO SEE THAT, YES. |
| 09:31AM | 12 | Q.   AND WE ALREADY DISCUSSED YOU DON'T KNOW THE MEANING OF |
| 09:31AM | 13 | THESE PARTICULAR STEPS; CORRECT? |
| 09:31AM | 14 | A.   CORRECT. |
| 09:31AM | 15 | Q.   AND DO YOU SEE THAT THERE ARE VARIOUS POTENTIAL OPTIONS, |
| 09:31AM | 16 | ARROWS COMING OUT FROM THAT STEP? |
| 09:31AM | 17 | A.   YES. |
| 09:31AM | 18 | Q.   AND DO YOU SEE ON THE PLUS -- ON THE BOTTOM OF THE BOX ON |
| 09:31AM | 19 | THE LEFT IT INDICATES -- THE PLUS SIGN INDICATES A REACTIVE |
| 09:31AM | 20 | TEST RESULT AND THE NEGATIVE INDICATES A NONREACTIVE TEST |
| 09:32AM | 21 | RESULT? |
| 09:32AM | 22 | A.   I DO SEE THAT, YES. |
| 09:32AM | 23 | Q.   AND THEN IF WE GO OVER TO THE RIGHT-HAND SIDE, DO YOU SEE |
| 09:32AM | 24 | THAT IT SAYS HIV-1 NEGATIVE OR INDETERMINATE, AND HIV-2 |
| 09:32AM | 25 | NEGATIVE? |

6829

09:32AM   1    A.   YES.

09:32AM   2    Q.   AND DO YOU ALSO SEE THAT IF THAT HAPPENS, THEN THERE'S AN

09:32AM   3    ARROW POINTING DOWN TO HIV 1 NAT?

09:32AM   4    A.   I DO SEE THAT, YES.

09:32AM   5    Q.   AND DO YOU SEE THAT ON THE RIGHT-HAND SIDE THERE'S AN

09:32AM   6    ARROW POINTING DOWN THAT SAYS HIV 1 NAT NEGATIVE?  AND --

09:32AM   7         DO YOU SEE THAT?  I'M SORRY.

09:32AM   8    A.   YES, I SEE THAT.

09:32AM   9    Q.   AND DO YOU SEE THAT IT SAYS UNDER THAT, NEGATIVE FOR HIV?

09:32AM   10   A.   YES.

09:32AM   11   Q.   AND IS THAT THE END OF THE BOX?

09:33AM   12   A.   YES.

09:33AM   13   Q.   AND IF WE CAN COME OUT OF THE BOX AND COME DOWN TO -- AND

09:33AM   14   JUST SHOW THERE ARE A BUNCH OF NUMBERS ON THE BOTTOM.

09:33AM   15        DO YOU SEE THAT NUMBER 1 SAYS, "LABORATORIES SHOULD

09:33AM   16   CONDUCT INITIAL TESTING FOR HIV WITH AN FDA-APPROVED

09:33AM   17   ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY THAT DETECTS HIV-1 AND

09:33AM   18   HIV-2 ANTIBODIES AND HIV-1 P24 ANTIGEN TO SCREEN FOR

09:33AM   19   ESTABLISHED INFECTION WITH HIV-1 OR HIV-2 AND FOR ACUTE HIV-1

09:33AM   20   INFECTION."

09:33AM   21        AND DO YOU SEE THAT SECTION?

09:33AM   22   A.   I DO SEE THAT, YES.

09:33AM   23   Q.   AND DO YOU SEE THAT "NO FURTHER TESTING IS REQUIRED FOR

09:33AM   24   SPECIMENS THAT ARE NONREACTIVE TO THE INITIAL IMMUNOASSAY"?

09:34AM   25        DO YOU SEE THAT IT SAYS THAT?

09:34AM  1    A.   YES.

09:34AM  2    Q.   AND THEN DO YOU SEE IN NUMBER 2 IT SAYS, "SPECIMENS WITH A

09:34AM  3    REACTIVE ANTIGEN/ANTIBODY COMBINATION IMMUNOASSAY RESULT (OR

09:34AM  4    REPEATEDLY REACTIVE, IF REPEAT TESTING IS RECOMMENDED BY THE

09:34AM  5    MANUFACTURER OR REQUIRED BY REGULATORY AUTHORITIES) SHOULD BE

09:34AM  6    TESTED," WITH FURTHER STEPS.

09:34AM  7         DO YOU SEE THAT?

09:34AM  8    A.   "SHOULD BE TESTED WITH" -- I'M CONTINUING THE SENTENCE

09:34AM  9    WHERE SHE STOPPED.  IT SAYS, "SHOULD BE TESTED WITH AN

09:34AM  10   FDA-APPROVED ANTIBODY IMMUNOASSAY THAT DIFFERENTIATES HIV-1

09:34AM  11   ANTIBODIES FROM HIV-2 ANTIBODIES."

09:34AM  12   Q.   THANK YOU.

09:34AM  13        AND THAT'S -- THOSE ARE ALL OF THE QUESTIONS THAT I HAVE

09:34AM  14   ON THAT PARTICULAR DOCUMENT.

09:35AM  15        GIVE ME JUST A SECOND AND I MAY BE DONE.

09:35AM  16        DO YOU KNOW, FROM YOUR PHONE CALL WITH THERANOS, WHETHER

09:35AM  17   HIV TESTING AT THERANOS WAS RUN ON FDA CLEARED COMMERCIALLY

09:35AM  18   AVAILABLE TESTS, METHODS?

09:35AM  19   A.   BASED ON THE CONVERSATION, I WOULD SAY I ASSUMED ALL OF

09:35AM  20   THE EQUIPMENT WAS FDA APPROVED.

09:35AM  21   Q.   OKAY.

09:35AM  22        NO FURTHER QUESTIONS, YOUR HONOR.

09:35AM  23             MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

09:35AM  24   THANK YOU.

09:35AM  25             THE COURT:  MAY THIS WITNESS BE EXCUSED?

6831

| | | |
|---|---|---|
| 09:35AM | 1 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:35AM | 2 | MS. TREFZ:  YES, YOUR HONOR. |
| 09:35AM | 3 | THE COURT:  YOU'RE EXCUSED. |
| 09:35AM | 4 | THE WITNESS:  THANK YOU VERY MUCH. |
| 09:35AM | 5 | THE COURT:  YOU CAN LEAVE.  YES.  THANK YOU. |
| 09:36AM | 6 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL? |
| 09:36AM | 7 | MR. SCHENK:  YES, YOUR HONOR. |
| 09:36AM | 8 | THE UNITED STATES CALLS MARK BURNES. |
| 09:36AM | 9 | THE COURT:  I'M SORRY? |
| 09:36AM | 10 | MR. SCHENK:  MARK BURNES. |
| 09:36AM | 11 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD PLEASE |
| 09:36AM | 12 | COME FORWARD.  I'LL INVITE YOU TO STAND IN FRONT OF OUR |
| 09:36AM | 13 | COURTROOM DEPUTY. |
| 09:36AM | 14 | AND WHEN YOU DO, IF YOU WOULD RAISE YOUR RIGHT HAND, SHE |
| 09:36AM | 15 | HAS A QUESTION FOR YOU. |
| 09:36AM | 16 | THE WITNESS:  GOOD MORNING. |
| 09:36AM | 17 | **(GOVERNMENT'S WITNESS, MARK BURNES, WAS SWORN.)** |
| 09:36AM | 18 | THE WITNESS:  I DO, YES. |
| 09:36AM | 19 | THE COURT:  THANK YOU, SIR.  PLEASE HAVE A SEAT |
| 09:36AM | 20 | HERE.  MAKE YOURSELF COMFORTABLE. |
| 09:36AM | 21 | PLEASE ADJUST THAT CHAIR AND MICROPHONE AS YOU NEED. |
| 09:37AM | 22 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 09:37AM | 23 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 09:37AM | 24 | AND THEN SPELL IT, PLEASE. |
| 09:37AM | 25 | THE WITNESS:  DR. MARK BURNES.  M-A-R-K, |

BURNES DIRECT BY MR. SCHENK                                    6832

09:37AM   1        B-U-R-N-E-S.

09:37AM   2             THE COURT:  THANK YOU.  COUNSEL.

09:37AM   3                   **DIRECT EXAMINATION**

09:37AM   4   BY MR. SCHENK:

09:37AM   5   Q.   GOOD MORNING, DR. BURNES.

09:37AM   6        I UNDERSTAND THAT YOU'RE GOING TO TESTIFY TODAY WITH A

09:37AM   7   MASK ON.  NOTICE NEXT TO THE WIPES ON THE WITNESS STAND, THERE

09:37AM   8   IS A BOX WITH CLEAR MASKS.

09:37AM   9        YOUR HONOR, MAY I APPROACH?

09:37AM  10             THE COURT:  YES, THANK YOU.

09:37AM  11        MR. SCHENK IS GOING TO GET THAT FOR YOU.  SO WE'LL ASK

09:37AM  12   YOU, SIR, TO CHANGE YOUR MASK TO THIS CLEAR MASK, IF YOU WOULD,

09:38AM  13   PLEASE.

09:38AM  14        AND FOR THE RECORD, WE HAVE CLEAR MASKS AVAILABLE IN THE

09:38AM  15   COURT HERE, AND DR. BURNES HAS AFFIXED HIS CLEAR MASK WITH

09:38AM  16   THAT.

09:38AM  17        MR. DOWNEY, ANY OBJECTION TO THIS?

09:38AM  18             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:38AM  19             THE COURT:  ALL RIGHT.  THANK YOU.

09:38AM  20             MR. SCHENK:  MAY I, YOUR HONOR?

09:38AM  21             THE COURT:  YES.

09:38AM  22   BY MR. SCHENK:

09:38AM  23   Q.   DR. BURNES, WHAT TYPE OF MEDICINE DO YOU PRACTICE?

09:38AM  24   A.   INTERNAL MEDICINE.

09:38AM  25   Q.   AND DO YOU HAVE A PRACTICE OF YOUR OWN?

BURNES DIRECT BY MR. SCHENK                                        6833

| 09:38AM | 1 | A.   YES. |

09:38AM 1   A.   YES.

09:38AM 2   Q.   AND WHERE IS THAT PRACTICE LOCATED?

09:38AM 3   A.   GOODYEAR, ARIZONA.

09:38AM 4   Q.   AND WOULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND

09:38AM 5   TO THE JURY?

09:38AM 6   A.   UNDERGRADUATE WAS ACTUALLY HERE IN SANTA CLARA.  I

09:38AM 7   GRADUATED IN 1978.

09:38AM 8        THEN I WENT TO POST GRADUATE SCHOOL AT THE UNIVERSITY OF

09:39AM 9   ARIZONA IN ABOUT THE 1984 TIMEFRAME.

09:39AM 10       THEN I WENT TO ST. LOUIS UNIVERSITY IN ST. LOUIS, MISSOURI

09:39AM 11  MEDICAL SCHOOL FROM 1985/'86 UNTIL I GRADUATED IN 1989.

09:39AM 12       THEN RESIDENCY HERE -- NOT HERE -- IN PHOENIX, ARIZONA IN

09:39AM 13  INTERNAL MEDICINE, AND COMPLETED THAT IN 1992.

09:39AM 14  Q.   AND AFTER YOUR RESIDENCY, DID YOU OPEN YOUR PRACTICE?

09:39AM 15  A.   YES.

09:39AM 16  Q.   AND YOU'VE BEEN WORKING AT THAT PRACTICE EVER SINCE?

09:39AM 17  A.   YES.

09:39AM 18  Q.   AS PART OF YOUR PRACTICE, HAVE YOU BECOME FAMILIAR WITH A

09:39AM 19  BLOOD TEST THAT IS KNOWN AS A PSA TEST?

09:39AM 20  A.   YES.

09:39AM 21  Q.   AND WHAT DOES PSA STAND FOR?

09:39AM 22  A.   PROSTATE SPECIFIC ANTIGEN.

09:39AM 23  Q.   AND WHAT DOES THE PSA TEST TEST FOR?

09:39AM 24  A.   IT'S AN INDICATOR TO SUGGEST SUSPICION FOR POSSIBLE

09:39AM 25  PROSTATE CANCER.

BURNES DIRECT BY MR. SCHENK                                              6834

09:39AM   1    Q.   IN THE COURSE OF YOUR PRACTICE, HAVE YOU HAD EXPERIENCE

09:40AM   2    INTERPRETING PSA TEST RESULTS?

09:40AM   3    A.   YES.

09:40AM   4    Q.   AND DO YOU HAVE AN ESTIMATE OF THE NUMBER OF TIMES OR THE

09:40AM   5    NUMBER OF TESTS THAT YOU'VE INTERPRETED?

09:40AM   6    A.   OVER 10,000.

09:40AM   7    Q.   AND YOU SAID THAT IT'S AN INDICATOR FOR THE POSSIBLE

09:40AM   8    PRESENCE OF PROSTATE CANCER; IS THAT RIGHT?

09:40AM   9    A.   YES.

09:40AM   10   Q.   AND DO YOU HAVE AN ESTIMATE OF THE NUMBER OF PATIENTS

09:40AM   11   YOU'VE TREATED FOLLOWING A POSITIVE OR A POSSIBLE INDICATION OF

09:40AM   12   PROSTATE CANCER?

09:40AM   13   A.   ROUGHLY, OVER THE LAST 30 YEARS, ABOUT 200 PATIENTS WITH

09:40AM   14   PROSTATE CANCER.

09:40AM   15   Q.   DID YOU RECEIVE TRAINING IN MEDICAL SCHOOL ON THE PSA

09:40AM   16   TEST?

09:40AM   17   A.   YES.

09:40AM   18   Q.   AND WOULD YOU JUST BRIEFLY DESCRIBE FOR US WHAT THAT

09:40AM   19   INVOLVED?

09:40AM   20   A.   IT'S PART OF THE STANDARD COURSES TO EDUCATE YOU ON THE

09:41AM   21   INTERPRETATION OF TESTS, AS WELL AS THEIR LIMITATIONS.

09:41AM   22        MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS

09:41AM   23   DR. BURNES AS AN EXPERT IN THE AREA OF DIAGNOSING PROSTATE

09:41AM   24   CANCER, THE BLOOD TEST FOR PSA, AND INTERPRETING PSA TEST

09:41AM   25   RESULTS.

BURNES DIRECT BY MR. SCHENK                                          6835

09:41AM   1              MS. TREFZ:  NO OBJECTION, YOUR HONOR.

09:41AM   2              THE COURT:  ALL RIGHT.  THANK YOU.

09:41AM   3          THIS WITNESS MAY TESTIFY, LADIES AND GENTLEMEN, BECAUSE OF

09:41AM   4      HIS BACKGROUND, EXPERIENCE, AND EDUCATION AS AN EXPERT ON THESE

09:41AM   5      AREAS.  YOU'LL BE INFORMED IN THE FINAL INSTRUCTIONS AS TO HOW

09:41AM   6      YOU MAY TREAT THIS TESTIMONY.

09:41AM   7          THANK YOU.

09:41AM   8              MR. SCHENK:  THANK YOU, YOUR HONOR.

09:41AM   9      Q.   DR. BURNES, THROUGHOUT YOUR TIME RUNNING THIS PRACTICE IN

09:41AM  10      ARIZONA, DID YOU BECOME FAMILIAR WITH A BLOOD TESTING COMPANY

09:41AM  11      KNOWN AS THERANOS?

09:41AM  12      A.   YES.

09:41AM  13      Q.   DID YOU HAVE A PATIENT BY THE NAME OF MEHRL ELLSWORTH?

09:41AM  14      A.   YES.

09:41AM  15      Q.   AND IS THAT M-E-R-H-L, AND THE LAST NAME

09:41AM  16      E-L-L-S-W-O-R-T-H?

09:41AM  17      A.   YES, I BELIEVE THAT'S PRETTY CLOSE.  THAT'S HIS NAME.

09:42AM  18      Q.   THANK YOU.

09:42AM  19          WAS THERE A TIME WHEN YOU SUGGESTED TO -- IS IT

09:42AM  20      DR. ELLSWORTH?

09:42AM  21      A.   YES.  HE'S A RETIRED DENTIST.

09:42AM  22      Q.   WAS THERE A TIME WHEN YOU SUGGESTED TO DR. ELLSWORTH THAT

09:42AM  23      HE HAVE A PSA BLOOD TEST?

09:42AM  24      A.   IT WAS NOT MY SUGGESTION AT THAT PARTICULAR TIME.  WE

09:42AM  25      ROUTINELY PERFORM EXAMS SUCH AS THAT ON PHYSICALS ABOUT ONCE

BURNES DIRECT BY MR. SCHENK                                    6836

09:42AM   1    EVERY YEAR OR TWO.

09:42AM   2        I DON'T KNOW IF YOU WANT ME TO GO INTO THE SPECIFICS OF

09:42AM   3    THE LAB TESTING QUESTION, BUT IT WAS NOT -- IT WAS ORIGINATED

09:42AM   4    BY HIS CHURCH ACTUALLY, THEIR REQUEST.

09:42AM   5    Q.   I SEE.  DR. ELLSWORTH'S CHURCH ASKED HIM TO GET A PSA TEST

09:42AM   6    AND YOU ADVISED HIM WHERE TO GO?

09:42AM   7    A.   YES.

09:42AM   8    Q.   AND WHERE DID YOU ADVISE DR. ELLSWORTH TO GO FOR THE TEST?

09:42AM   9    A.   HE WAS GOING TO BE OUT OF THE COUNTRY FOR TWO YEARS AND

09:42AM  10    THEY REQUIRE IT AS PART OF THE SERVICE FOR MISSIONARY WORK TO

09:43AM  11    OBTAIN THE TEST JUST BEFORE HE DEPARTED, AND IT WAS OUT OF THE

09:43AM  12    NORMAL SEQUENCE, SO I SENT HIM TO THERANOS BECAUSE IT WOULD BE

09:43AM  13    LESS EXPENSIVE FOR HIM TO GET THE TEST DONE.

09:43AM  14    Q.   YOU SAID IT WAS OUT OF SEQUENCE.  WHAT DO YOU MEAN BY

09:43AM  15    THAT?

09:43AM  16    A.   NORMALLY WE DO THOSE EVERY YEAR OR TWO WITH PHYSICALS.  IT

09:43AM  17    WAS -- BUT WE WERE DOING A SPECIFIC TEST FOR HIM AS PART OF

09:43AM  18    HIS -- THAT WAS REQUIRED BY HIS MISSIONARY WORK AS I RECALL.

09:43AM  19    Q.   YOU SAID YOU USUALLY DO "THOSE."  WERE YOU REFERRING TO

09:43AM  20    PSA TESTS?

09:43AM  21    A.   YES, ALONG WITH THE OTHER TESTS WE DO ANNUALLY, OR TWICE A

09:43AM  22    YEAR, OR ABOUT ONCE EVERY TWO YEARS.

09:43AM  23    Q.   THANK YOU.

09:43AM  24        YOUR HONOR, MAY I APPROACH?

09:43AM  25            THE COURT:  YES.

BURNES DIRECT BY MR. SCHENK                                    6837

09:43AM  1    BY MR. SCHENK:

09:43AM  2    Q.   (HANDING.)

09:43AM  3         DR. BURNES, I'VE HANDED YOU A BINDER, AND IF YOU'LL OPEN

09:43AM  4    UP THE BINDER TO THE SECOND TAB IN THE BINDER.  IT'S

09:44AM  5    EXHIBIT 4938.

09:44AM  6         YOUR HONOR, THE GOVERNMENT OFFERS 4938 PURSUANT TO

09:44AM  7    STIPULATION.

09:44AM  8              MS. TREFZ:  THAT'S CORRECT, YOUR HONOR.

09:44AM  9              THE COURT:  IT'S RECEIVED, ADMITTED, AND IT MAY BE

09:44AM  10   PUBLISHED.

09:44AM  11        (GOVERNMENT'S EXHIBIT 4938 WAS RECEIVED IN EVIDENCE.)

09:44AM  12              THE WITNESS:  OKAY.  I'M AT THAT SECTION NOW.

09:44AM  13              THE COURT:  IT MAY BE PUBLISHED.

09:44AM  14        THIS IS A MULTIPAGE DOCUMENT?

09:44AM  15              MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

09:44AM  16        IF WE CAN START ON PAGE 7 OF THIS EXHIBIT.

09:44AM  17   Q.   DR. BURNES, THE EXHIBIT WILL ALSO DISPLAY ON THE SCREEN IN

09:44AM  18   FRONT OF YOU.  IF THAT'S EASIER TO --

09:44AM  19   A.   NO.  THE LIGHTING IN HERE IS PRETTY GOOD.

09:44AM  20   Q.   OKAY.  JUST LET ME KNOW IF YOU'RE HAVING DIFFICULTY SEEING

09:44AM  21   ONE OF THE TWO AND WE'LL DO WHAT WE CAN.

09:44AM  22   A.   OKAY.  I'M ON PAGE 7.

09:44AM  23   Q.   ON PAGE 7 -- FIRST OF ALL, DO YOU RECOGNIZE THIS DOCUMENT?

09:44AM  24   A.   YES.

09:44AM  25   Q.   AND WHAT IS THIS?

BURNES DIRECT BY MR. SCHENK                                      6838

09:44AM   1     A.   THIS IS A LAB RESULT FROM THERANOS.

09:44AM   2     Q.   FOR WHICH PATIENT?

09:44AM   3     A.   ELLSWORTH, MEHRL.

09:44AM   4     Q.   OKAY.  AND ON THE VERY TOP THERE'S A FAX HEADER.

09:45AM   5          DO YOU SEE THAT?

09:45AM   6     A.   YES.

09:45AM   7     Q.   IT SAYS MAY 16, 2015.

09:45AM   8          DO YOU SEE THAT?

09:45AM   9     A.   YES.

09:45AM   10    Q.   IS IT YOUR ROUTINE PRACTICE AT YOUR MEDICAL PRACTICE TO

09:45AM   11    RECEIVE LAB RESULTS FROM THE LAB VIA FAX?

09:45AM   12    A.   YES.

09:45AM   13    Q.   AND DO YOU KNOW WHETHER THIS LAB RESULT WAS FAXED TO YOUR

09:45AM   14    OFFICE?

09:45AM   15    A.   YES.

09:45AM   16    Q.   AND YOUR LAB OFFICE WAS LOCATED IN ARIZONA; IS THAT RIGHT?

09:45AM   17    A.   YES.

09:45AM   18    Q.   IF WE COULD NOW GO DOWN.

09:45AM   19         DO YOU SEE VISIT DATE?

09:45AM   20    A.   I APOLOGIZE.

09:45AM   21         YES, UH-HUH.

09:45AM   22    Q.   AND WHAT IS THE VISIT DATE?

09:45AM   23    A.   I'M SORRY, I NEED MY PHONE TO GET MY LIGHT OUT HERE.

09:46AM   24    Q.   YOUR HONOR, I BROUGHT A FLASHLIGHT.  MAY I APPROACH?

09:46AM   25              THE COURT:  YES.

BURNES DIRECT BY MR. SCHENK                                    6839

09:46AM   1   BY MR. SCHENK:

09:46AM   2   Q.   (HANDING.)

09:46AM   3   A.   THE VISIT DATE WAS MAY 14TH, 2015.

09:46AM   4   Q.   OKAY.  AND A LITTLE BIT BELOW THAT WE SEE A TEST SCORE.

09:46AM   5   IT SAYS FOR THE PROSTATE SPECIFIC ANTIGEN TOTAL, AND THEN THE

09:46AM   6   RESULT.

09:46AM   7        DO YOU SEE THE RESULT?

09:46AM   8   A.   YES.

09:46AM   9   Q.   AND WHAT IS THE RESULT?

09:46AM   10  A.   26.1.

09:46AM   11  Q.   AND IN YOUR EXPERIENCE, WHAT DOES THAT MEAN?  WHAT DOES

09:46AM   12  THE SCORE INFORM THE PHYSICIAN WHEN THE PHYSICIAN LOOKS AT A

09:46AM   13  PSA SCORE?

09:46AM   14  A.   PART OF IT IS THE TOTAL VALUE OF IT, HOW IMPORTANT IT

09:46AM   15  MIGHT BE.  BUT MOSTLY WE TRACK DATA POINTS OVER TIME WITH

09:46AM   16  PATIENTS, AND WHAT WE'RE LOOKING FOR IS A SIGNIFICANT RISE FROM

09:47AM   17  ONE YEAR TO THE NEXT.

09:47AM   18  Q.   EXPLAIN --

09:47AM   19  A.   THAT WOULD INVOKE US TO LOOK AT THIS MORE CLOSELY IN THE

09:47AM   20  UPCOMING YEAR.

09:47AM   21  Q.   HELP ME TO UNDERSTAND THAT.  YOU SAID SOME OF IT IS THE

09:47AM   22  TOTAL SCORE AND SOME OF IT IS THE RISE?

09:47AM   23  A.   IT HAS OCCURRED A COUPLE TIMES WHERE A BRAND NEW PATIENT

09:47AM   24  HASN'T SEEN A DOCTOR FOR A NUMBER OF YEARS WOULD COME IN AND WE

09:47AM   25  DRAW A TEST AND IT WOULD BE QUITE HIGH, SO I HAVE NO REFERENCE

BURNES DIRECT BY MR. SCHENK                                          6840

09:47AM   1    VALUE FOR THE RATE OF RISE.

09:47AM   2         SO IF IT WAS IN THE NORMAL RANGE, AS ON THE SLIDE OF

09:47AM   3    LESSON 4, THEN I WOULDN'T BE TOO SUSPICIOUS.  IF IT WAS QUITE

09:47AM   4    HIGH AND HAD NO PREVIOUS TRACKING, THEN I'M NOT SURE -- IT

09:47AM   5    WOULD BE A LITTLE MORE DIFFICULT TO DECIDE WHERE TO GO FROM

09:47AM   6    THERE.

09:47AM   7    Q.   I SEE.  SO YOU MIGHT NOT WANT TO LOOK AT ONE INDIVIDUAL

09:47AM   8    PSA RESULT, YOU WANT TO LOOK AT A COLLECTION OF THEM OR A

09:47AM   9    TREND?

09:47AM   10   A.   THAT IS OUR PREFERENCE.

09:47AM   11   Q.   YOU ALSO SAID SOMETHING ABOUT THE NUMBER 4.  WHAT DID YOU

09:47AM   12   MEAN BY THAT?

09:47AM   13   A.   YOU'LL SEE ON THE LAB DOCUMENTS MOST LAB TESTS, STANDARD

09:48AM   14   RANGE THAT IS IDENTIFIED AS NORMAL FOR A PSA IS LESS 4 AND --

09:48AM   15   OH, THEY'LL HAVE A STANDARD RANGE OF ABOUT 4-NANOGRAMS PER

09:48AM   16   DECILITER.  IF THE TEST IS ABOVE THAT, IF THE RESULT IS ABOVE

09:48AM   17   THAT 4, IT WILL BE FLAGGED AS HIGH, BUT WE DON'T USUALLY PAY

09:48AM   18   ATTENTION TO THAT.

09:48AM   19        WHAT WE USUALLY PAY ATTENTION TO IS THE RATE OF RISE OVER

09:48AM   20   TIME.  SO A PSA WOULD NORMALLY RISE SLOWLY FOR MOST MALE

09:48AM   21   PATIENTS OVER THE YEARS, AND IF WE SEE A DOUBLING AND TRIPLING,

09:48AM   22   THEN THAT MAKES US LOOK INTO IT FURTHER.

09:48AM   23        THAT'S HOW WE USUALLY USE IT.  WE DON'T USUALLY USE AN

09:48AM   24   ISOLATED NUMBER BY ITSELF.

09:48AM   25   Q.   WHEN YOU SAW THAT DR. ELLSWORTH'S SCORE WAS A 26, DO YOU

BURNES DIRECT BY MR. SCHENK                                          6841

| | | |
|---|---|---|
| 09:49AM | 1 | KNOW HOW THAT COMPARED TO PRIOR PSA SCORES FOR DR. ELLSWORTH? |
| 09:49AM | 2 | A.   IT WAS MARKEDLY HIGHER. |
| 09:49AM | 3 | Q.   I'M SORRY, IT WAS WHAT? |
| 09:49AM | 4 | A.   IT WAS MARKEDLY HIGHER. |
| 09:49AM | 5 | Q.   OKAY.  SO USING THAT SORT OF TREND ANALYSIS THAT YOU'VE |
| 09:49AM | 6 | DESCRIBED TO US, WHAT INFORMATION DOES THIS SCORE THEN PROVIDE? |
| 09:49AM | 7 | A.   IT REQUIRED US TO VALIDATE IF THAT WAS A CORRECT VALUE. |
| 09:49AM | 8 | Q.   AND HOW DO YOU DO THAT? |
| 09:49AM | 9 | A.   FIRST IS SIMPLY TO REPEAT THE TEST. |
| 09:49AM | 10 | Q.   OKAY.  COULD WE GO DOWN?  TOWARDS THE BOTTOM OF THIS |
| 09:49AM | 11 | DOCUMENT THERE'S SOME HANDWRITING ON IT. |
| 09:49AM | 12 | DO YOU SEE THAT? |
| 09:49AM | 13 | A.   YES. |
| 09:49AM | 14 | Q.   COULD YOU READ -- FIRST, IS THAT YOUR HANDWRITING? |
| 09:49AM | 15 | A.   THE PART I WILL BE READING, YES. |
| 09:49AM | 16 | Q.   COULD YOU READ THAT? |
| 09:49AM | 17 | A.   "VERY SIGNIFICANT RISE, RECHECK, MAYBE LAB ERROR." |
| 09:50AM | 18 | Q.   AND THEN TO THE RIGHT OF THAT THERE'S A STAMP. |
| 09:50AM | 19 | DO YOU SEE THAT? |
| 09:50AM | 20 | A.   YES. |
| 09:50AM | 21 | Q.   AND COULD YOU EXPLAIN THE STAMP TO THE JURY? |
| 09:50AM | 22 | A.   IT'S A STANDARD STAMP THAT WE USE WHEN WE RECEIVE OUTSIDE |
| 09:50AM | 23 | LAB RESULTS.  THE FIRST PART IS INITIALLED BY THE MEDICAL |
| 09:50AM | 24 | ASSISTANT USUALLY WHO INITIALS IT AND THE DATE THAT WE RECEIVED |
| 09:50AM | 25 | IT. |

09:50AM  1          AND THEN THE NEXT IS MY INITIAL WHEN I SAW IT AND REVIEWED

09:50AM  2     IT, AND THEN IF IT'S A NORMAL VALUE, I MIGHT JUST WRITE NORMAL

09:50AM  3     OR WHATEVER.

09:50AM  4          AND THE LAST PART IS NOTIFICATION.  SO EITHER -- AND

09:50AM  5     WHOEVER INITIALS THAT, EITHER MY MEDICAL ASSISTANT FOR THE

09:50AM  6     NORMAL VALUES, OR MYSELF IF IT'S ABNORMAL, THEN I'LL DIRECTLY

09:50AM  7     CONTACT THE PATIENT AND DISCUSS IT WITH THEM.

09:50AM  8          AND THAT LAST ONE IS THE SIGNIFICANT OR INITIAL SHOWING

09:50AM  9     THE DATE THAT I NOTIFIED THE PATIENT.

09:50AM  10    Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO PAGE 6 IN THIS EXHIBIT,

09:51AM  11    EXHIBIT 4938, PAGE 6.

09:51AM  12         DO YOU RECOGNIZE THIS DOCUMENT?

09:51AM  13    A.   YES.

09:51AM  14    Q.   AND WHAT IS THIS?

09:51AM  15    A.   THIS IS ANOTHER LAB TEST FROM THERANOS.

09:51AM  16    Q.   OKAY.  LET'S LOOK AT THE -- AGAIN, IS THERE A FAX HEADER

09:51AM  17    AT THE TOP?

09:51AM  18    A.   YES.

09:51AM  19    Q.   WAS THIS DOCUMENT FAXED TO YOUR OFFICE JUST LIKE THE LAST

09:51AM  20    ONE?

09:51AM  21    A.   YES.

09:51AM  22    Q.   WHAT IS THE VISIT DATE?

09:51AM  23         DO YOU SEE THAT?

09:51AM  24    A.   VISIT DATE IS MAY 18TH, 2015.

09:51AM  25    Q.   SO IS THAT FOUR DAYS AFTER THE 26, THE SCORE OF 26 THAT WE

BURNES DIRECT BY MR. SCHENK                                          6843

09:51AM    1      JUST SAW?

09:51AM    2      A.   YES.

09:51AM    3      Q.   AND NOW, WHAT IS THE SCORE ON THIS ONE?  DO YOU SEE IN THE

09:51AM    4      SECOND BOX THERE'S SOMETHING CALLED PSA TOTAL?

09:51AM    5      A.   THE SCORE IS 1.71.

09:51AM    6      Q.   IF WE COULD ZOOM OUT AND ZOOM IN ON PSA TOTAL.  THANK YOU.

09:52AM    7           SO THE FIRST TEST THAT WE SAW WAS A 26.

09:52AM    8           IS THAT RIGHT?

09:52AM    9      A.   YES.

09:52AM   10      Q.   AND NOW WE HAVE A SCORE OF 1.71.  HELP ME UNDERSTAND WHAT

09:52AM   11      THAT INFORMATION IS PROVIDING YOU.  WHAT ARE YOU LEARNING?

09:52AM   12      A.   THAT VALUE IS MORE CONSISTENT AS THE TRACKING WE EXPECTED

09:52AM   13      FOR DR. ELLSWORTH BASED ON PREVIOUS TESTS.

09:52AM   14      Q.   OKAY.  BELOW THAT BOX THERE IS SOME HANDWRITING.

09:52AM   15           DO YOU SEE THAT?

09:52AM   16      A.   YES.

09:52AM   17      Q.   IS THIS ALSO YOUR HANDWRITING?

09:52AM   18      A.   YES.

09:52AM   19      Q.   COULD YOU READ THAT TO THE JURY?

09:52AM   20      A.   IT SAYS, "MAY 19, 2015, D/W," WHICH MEANS DISCUSSED WITH,

09:52AM   21      "THERANOS, CLEARLY SOME FORM OF LAB ERROR OCCURRED AND WILL

09:53AM   22      WORK WITH THEM TO MAKE THIS RIGHT FOR PATIENT.  MOST LIKELY

09:53AM   23      TESTING IS IN ERROR FROM MAY 14TH."

09:53AM   24      Q.   AND JUST TO COMPLETE IT, IT LOOKS LIKE ABOUT THE THIRD

09:53AM   25      LINE OF YOUR NOTES WHERE YOU READ, "MAKE THIS RIGHT FOR

BURNES DIRECT BY MR. SCHENK

09:53AM 1    PATIENT," DOES IT THEN CONTINUE "AND CONFIRM ACCURACY"?

09:53AM 2    A.   YES.  I'M SORRY I DIDN'T SEE THAT.

09:53AM 3        "RIGHT FOR PATIENT AND CONFIRM ACCURACY."

09:53AM 4    Q.   OKAY.  SO IN HERE YOU WROTE "DISCUSS WITH THERANOS."

09:53AM 5        WHAT DOES THAT MEAN?

09:53AM 6    A.   WE CALLED -- I CONTACTED THEIR ORGANIZATION AND I ENDED UP

09:53AM 7    TALKING TO I BELIEVE IT WAS A REGIONAL LAB DIRECTOR ABOUT THE

09:54AM 8    ISSUE.

09:54AM 9    Q.   AND WHAT DO YOU RECALL FROM THAT CONVERSATION?

09:54AM 10       FIRST, DO YOU RECALL THE NAME OF THE PERSON YOU SPOKE

09:54AM 11   WITH?

09:54AM 12   A.   NO.

09:54AM 13   Q.   AND WHAT DO YOU RECALL FROM THE CONVERSATION?

09:54AM 14   A.   WE HAD A DISCUSSION ABOUT THE FACT THAT WE HAD TWO WIDELY

09:54AM 15   VARIANT VALUES AND WE WANTED TO GET THIS SQUARED AWAY FOR THE

09:54AM 16   PATIENT BEFORE HE LEFT FOR TWO YEARS.

09:54AM 17       SO I ASKED THAT THEY WOULD REPEAT THE TEST A THIRD TIME,

09:54AM 18   AND I'D FEEL A LITTLE BIT MORE COMFORTABLE IF THE THIRD TEST

09:54AM 19   WAS IN AN EXPECTED RANGE.

09:54AM 20       AND THEN I ASKED -- SINCE IT SEEMED TO BE A LAB ERROR OR A

09:54AM 21   DISCREPANCY WITH THEIR LAB, I ASKED IF THEY WOULD ASSUME THE

09:54AM 22   COST FOR REPEAT TESTING AS OPPOSED TO THE PATIENT PAYING FOR IT

09:54AM 23   AGAIN.

09:54AM 24       AND THEY AGREED TO THAT.

09:54AM 25   Q.   OKAY.  IF WE PAUSE FOR A MOMENT ON THIS EXHIBIT, 4938, AND

BURNES DIRECT BY MR. SCHENK                                          6845

| | | |
|---|---|---|
| 09:54AM | 1 | I'M GOING TO ASK YOU TO TURN TO THE FIRST EXHIBIT IN YOUR |
| 09:54AM | 2 | BINDER, THAT'S 4415? |
| 09:54AM | 3 | A.   SAME SECTION OR THE FIRST SECTION? |
| 09:55AM | 4 | Q.   THE FIRST TAB AT THE VERY BEGINNING OF THE BINDER. |
| 09:55AM | 5 | A.   OKAY. |
| 09:55AM | 6 | Q.   AND YOU'RE NOT ON THIS EMAIL. |
| 09:55AM | 7 |      YOUR HONOR, THE GOVERNMENT OFFERS 4415 AS -- UNDER 803. |
| 09:55AM | 8 | THE COURT HEARD PRIOR 803(6) TESTIMONY FROM DR. ROSENDORFF ON |
| 09:55AM | 9 | SEPTEMBER 24TH, FROM MS. CHEUNG ON SEPTEMBER 14TH AND 15TH, |
| 09:55AM | 10 | DR. DAS LAST WEEK ON NOVEMBER 10TH, AND FROM MR. EDLIN ON |
| 09:55AM | 11 | OCTOBER 19TH, AIL PROVIDING THE FOUNDATION FOR THIS. |
| 09:55AM | 12 |           MS. TREFZ:  OBJECTION.  802.  I BELIEVE, DATE-WISE, |
| 09:55AM | 13 | THIS IS -- I BELIEVE DATE-WISE THIS IS NOT COVERED BY ANY OF |
| 09:55AM | 14 | THOSE PRIOR DISCUSSIONS. |
| 09:56AM | 15 |           THE COURT:  MR. SCHENK, YOU'RE SUGGESTING THAT THE |
| 09:56AM | 16 | PREVIOUS TESTIMONY THAT YOU INDICATED PROVIDES AMPLE FOUNDATION |
| 09:56AM | 17 | FOR THIS DOCUMENT? |
| 09:56AM | 18 |           MR. SCHENK:  YES, YOUR HONOR. |
| 09:56AM | 19 |           THE COURT:  THANK YOU. |
| 09:56AM | 20 |      I'LL OVERRULE THE OBJECTION AND ADMIT THE DOCUMENT.  THE |
| 09:56AM | 21 | TOTALITY OF THE PAGES OF THE DOCUMENT ARE ADMITTED. |
| 09:56AM | 22 |           MR. SCHENK:  THANK YOU, YOUR HONOR. |
| 09:56AM | 23 |           THE COURT:  THEY MAY BE PUBLISHED. |
| 09:56AM | 24 |      (GOVERNMENT'S EXHIBIT 4415 WAS RECEIVED IN EVIDENCE.) |
| 09:56AM | 25 |           MR. SCHENK:  IF NOW WE CAN BRING UP EXHIBIT 4415, |

BURNES DIRECT BY MR. SCHENK                                    6846

09:56AM   1    STARTING ON PAGE 8.

09:56AM   2              THE WITNESS:  IS THAT THE SECOND SECTION?

09:56AM   3    BY MR. SCHENK:

09:56AM   4    Q.   IT'S STILL THE VERY FIRST TAB IN THE BINDER, 4415, AND

09:56AM   5    I'LL BE READING FROM PAGE 8, THE BOTTOM EMAIL FROM MS. AGUIRRE.

09:56AM   6         IF WE CAN BLOW THAT UP.

09:56AM   7         ON MAY 19TH, 2015, MS. AGUIRRE WRITES TO AN EMAIL GROUP

09:57AM   8    CALLED LAB RERUNS AND A COUPLE OTHER EMPLOYEES.

09:57AM   9         "GOOD MORNING,

09:57AM  10         "DR. MARK BURNES CALLED TO SAY THAT THE RESULTS FOR THE

09:57AM  11    PSA, TOTAL WERE VERY HIGH ON 5/14 SO HE HAD HIS PATIENT COME

09:57AM  12    BACK TO TEST AGAIN AND THE RESULTS FOR THE PSA, TOTAL WERE

09:57AM  13    NORMAL ON 5/18."

09:57AM  14         IF WE CAN TURN THE PAGE.

09:57AM  15         LET ME FIRST ASK, DR. BURNES, IS THAT WHAT WE JUST

09:57AM  16    REVIEWED?  YOU SAID THAT YOU CALLED, YOUR PATIENT,

09:57AM  17    DR. ELLSWORTH, HAD VERY HIGH RESULTS ON MAY 14TH AND NORMAL

09:57AM  18    FOUR DAYS LATER ON MAY 18TH?

09:57AM  19    A.   YES.

09:57AM  20    Q.   IF WE COULD NOW TURN TO THE NEXT PAGE, PAGE 9, 4415,

09:57AM  21    PAGE 9.

09:57AM  22         AT THE VERY TOP THIS CONTINUES.  "BECAUSE OF THIS, HE IS

09:58AM  23    NOT CONVINCED THAT THE RESULTS FOR 5/14 BELONG TO HIS PATIENT,"

09:58AM  24    AND ON THE VERSION ON THE SCREEN THE NAME IS REDACTED BUT THE

09:58AM  25    JURY NOW KNOWS IT'S DR. ELLSWORTH, "AND COULD POSSIBLY BELONG

BURNES DIRECT BY MR. SCHENK                                    6847

09:58AM  1    TO ANOTHER PATIENT.

09:58AM  2         "HE WANTS TO BE ASSURED THAT THE RESULTS FROM 5/18 ARE

09:58AM  3    CORRECT FOR HIS PATIENT SO HE IS REQUESTING A RERUN OF THE PSA,

09:58AM  4    TOTAL FOR 5/14 IF POSSIBLE BUT DEFINITELY A RERUN FOR THE PSA,

09:58AM  5    TOTAL FROM 5/18."

09:58AM  6         I'LL PAUSE.  DR. BURNES, IS THAT YOUR RECOLLECTION THAT

09:58AM  7    YOU HAD A CONCERN ABOUT THE ACCURACY AND WANTED TO HAVE THE

09:58AM  8    TEST RUN AGAIN?

09:58AM  9    A.   YES.

09:58AM 10    Q.   THE EMAIL CONTINUES, "HE," THAT'S YOU, DR. BURNES, "ALSO

09:58AM 11    WOULD LIKE THE PATIENT TO BE REIMBURSED FOR THE TEST ON 5/14/15

09:58AM 12    SINCE HE THINKS IT'S INCORRECT.

09:58AM 13         "HE REQUESTED A CALL FROM LAB SUPERVISOR AFTER THE RERUN

09:58AM 14    RESULTS ARE BACK."

09:59AM 15         AND THERE'S A CALL BACK NUMBER PROVIDED.

09:59AM 16         AND IF WE NOW GO FURTHER UP IN THE EMAIL ON PAGE 7.

09:59AM 17    A.   SO TWO PAGES FORWARD?

09:59AM 18    Q.   YES, SIR.  THERE'S AN EMAIL FROM DANIEL YOUNG TO A GROUP

09:59AM 19    OF INDIVIDUALS AND THE LAB RERUN GROUP.

09:59AM 20         AND IT READS, "IT LOOKS LIKE ON 5/15, THE ORIGINAL SAMPLE

09:59AM 21    WAS RERUN CONFIRMING THE HIGH RESULT (29 AND 26)," IS THAT

09:59AM 22    NANOGRAMS PER MILLILITER?

09:59AM 23    A.   YES.

09:59AM 24    Q.   "RESPECTIVELY."

09:59AM 25         "TINA -- I SEE THREE RESULTS FOR 5/19.  TWO LOW, AND 1

BURNES DIRECT BY MR. SCHENK                                        6848

```
09:59AM   1    HIGH.  DO YOU KNOW WHAT IS GOING ON HERE?"

09:59AM   2         DID I READ THIS CORRECTLY?

09:59AM   3    A.   I DON'T UNDERSTAND THIS EMAIL.  I'M UNFAMILIAR WITH IT.

09:59AM   4    Q.   I APPRECIATE THAT.  I'M JUST WONDERING IF I READ IT

10:00AM   5    ACCURATELY.

10:00AM   6    A.   YES, YOU DID.

10:00AM   7    Q.   THANK YOU.  IF YOU'LL NOW TURN TO PAGE 4 OF THIS EMAIL, A

10:00AM   8    FEW PAGES AHEAD.

10:00AM   9         THERE'S ANOTHER EMAIL FROM DANIEL YOUNG, ALSO ON MAY 19TH,

10:00AM  10    2015, AND IT READS, "PLEASE SEND REPORT WITH UPDATED RESULT.

10:00AM  11         "CHRISTIAN DOES NOT DO THOSE CALLS ANYMORE.  DAN FLOREY

10:00AM  12    HELPS WITH THESE NOW.

10:00AM  13         "DAN - WE DON'T KNOW WHY THE FIRST SAMPLE CAME BACK SO

10:00AM  14    HIGH.  IT WAS ACTUALLY RERUN, AND CONFIRMED HIGH ORIGINALLY.  A

10:00AM  15    SAMPLE MIXUP IS POSSIBLE AS THE DOCTOR SUGGESTED, BUT HARD TO

10:00AM  16    CONFIRM AT THIS POINT."

10:00AM  17         DR. BURNES, DID YOU SUGGEST TO THERANOS THAT YOU THOUGHT

10:00AM  18    ONE EXPLANATION FOR THE VERY HIGH RESULT FOR DR. ELLSWORTH WAS

10:00AM  19    THAT THERE WAS A SAMPLE MIXUP, THAT YOU RECEIVED RESULTS THAT

10:00AM  20    BELONGED TO A DIFFERENT PATIENT?

10:01AM  21    A.   I DON'T RECALL THAT WAS THE REASON.  I SIMPLY THOUGHT IT

10:01AM  22    WAS AN INACCURATE TEST.

10:01AM  23    Q.   YOUR MEMORY IS THAT -- YOUR CONCERN WAS THAT IT WAS AN

10:01AM  24    INACCURATE TEST AND NOT A SAMPLE MIXUP?  IS THAT WHAT YOU'RE

10:01AM  25    SAYING?
```

BURNES DIRECT BY MR. SCHENK                                        6849

10:01AM   1      A.   I WAS LEANING TOWARDS THAT.

10:01AM   2      Q.   OKAY.  IF WE COULD NOW GO AHEAD ONE PAGE TO PAGE 3 AND

10:01AM   3      START AT THE BOTTOM.

10:01AM   4           THERE'S AN EMAIL FROM DAN FLOREY AND HE WRITES, "DANIEL

10:01AM   5      AND TEAM.

10:01AM   6           "THIS PATIENT VISITED FOR A THIRD TIME LAST WEEK, AND

10:01AM   7      AGAIN THE PSA CAME BACK ELEVATED.  CAN YOU PLEAD REVIEW THE

10:01AM   8      CASE?  THE DOCTOR WOULD LIKE A CALL ASAP PER THE SALES REP."

10:01AM   9           DR. BURNES, YOU -- WE REVIEWED TWO LAB REPORTS, BOTH FROM

10:01AM   10     MID-MAY 2015.

10:01AM   11          DO YOU RECALL THAT?

10:01AM   12     A.   YES.

10:01AM   13     Q.   AND DID YOU ASK DR. ELLSWORTH TO GO GET A THIRD TEST AFTER

10:01AM   14     THE SECOND?

10:01AM   15     A.   YES.

10:01AM   16     Q.   THE EMAIL CONTINUES BELOW THE PART THAT IS UP FOR THE

10:02AM   17     JURY, THERE ARE TWO LINES HERE AND THEN WE'LL CONTINUE TO THE

10:02AM   18     TOP OF THE NEXT PAGE.  THESE TWO LINES READ 5/14, AND THEN

10:02AM   19     THERE'S AN I.D. NUMBER, 26.1; 5/18, PSA 1.71.

10:02AM   20          DR. BURNES, WERE THOSE THE TWO PSA, TOTAL SCORES THAT WE

10:02AM   21     JUST REVIEWED?

10:02AM   22     A.   YES.

10:02AM   23     Q.   AND NOW IF WE'LL GO TO THE TOP OF PAGE 4 AND CAPTURE THE

10:02AM   24     END OF THIS EMAIL.  THE TOP OF PAGE 4.

10:02AM   25          THE VERY TOP OF THIS EMAIL SHOWS THE THIRD TEST RESULT,

BURNES DIRECT BY MR. SCHENK                                          6850

10:02AM   1    JUNE 11, A PSA SCORE OF 22.8.

10:02AM   2         DR. BURNES, DO YOU RECALL A THIRD THERANOS PSA TEST FOR

10:02AM   3    DR. ELLSWORTH THAT RETURNED A VALUE OF 22.8?

10:03AM   4    A.   YES.

10:03AM   5    Q.   NOW, IF WE GO BACK IN THE EMAIL, LET'S START AT THE VERY

10:03AM   6    BOTTOM OF PAGE 2 AND JUST CAPTURE WHO SENT THE EMAIL, BUT WE'LL

10:03AM   7    READ AT THE TOP OF PAGE 3, THE VERY BOTTOM OF PAGE 2.

10:03AM   8         MR. BALWANI, SUNNY BALWANI, WRITES AN EMAIL JUNE 15, 2015.

10:03AM   9    NOW TURN THE PAGE TO PAGE 3 TO CAPTURE THE TEXT.

10:03AM   10        MR. BALWANI WRITES, "TINA.  CAN YOU INVESTIGATE THIS.

10:03AM   11        "DANIEL.  I DO NOT BELIEVE SAMPLE MIXUP IS POSSIBLE BY A

10:03AM   12   REMOTE SHOT IN OUR SYSTEM BUT SINCE THE MOST RECENT VISIT IS ON

10:03AM   13   6/11 AND SHOULD HAVE THE SAMPLE IN OUR LABS, WE SHOULD BE ABLE

10:03AM   14   TO CHECK THE LABEL ON SAMPLE ACROSS THE ENTIRE SYSTEMS.  WE

10:03AM   15   SHOULD START BY RERUNNING THE SAMPLE TO START AND THE WORK

10:03AM   16   BACKWARDS FROM THERE.

10:04AM   17        "TINA.  CAN YOU PLEASE OWN THIS AND UPDATE ME IN REALTIME.

10:04AM   18        MAX.  CAN U FREE UP YOUR TIME AND START TRACKING THIS

10:04AM   19   SAMPLE AND MAKE SURE EVERYTHING CHECKS OUT THERE.  HAVE SOMEONE

10:04AM   20   PHYSICALLY LOOK AT LABELS TO MAKE SURE LABELS MATCH WITH WHAT

10:04AM   21   WAS DRAWN AT PSC AND THE ONE PRINTED IN LAB, IF PRINTED IN LAB.

10:04AM   22   PLEASE UPDATE IN REAL TIME."

10:04AM   23        NOW, DR. BURNES, IF YOU WILL TURN TO PAGE 2, THERE'S AN

10:04AM   24   EMAIL FROM DANIEL YOUNG.

10:04AM   25        MR. YOUNG WRITES, "THE MOST RECENT SAMPLE WAS FLAGGED FOR

BURNES DIRECT BY MR. SCHENK                                      6851

| | | |
|---|---|---|
| 10:04AM | 1 | HEMOLYSIS AND CLOTTING.  THIS SAMPLE WAS USED FOR THE PSA |
| 10:04AM | 2 | RESULT. |
| 10:04AM | 3 | "PSA FROM VISITS 1 AND 3 WERE RUN ON EDISON.  VISIT 2 WAS |
| 10:04AM | 4 | RUN IN PHOENIX. |
| 10:05AM | 5 | "THIS IS LOOKING LIKE EITHER A SAMPLE INTEGRITY ISSUE, OR |
| 10:05AM | 6 | SOME OTHER INTERFERANT IN THE PATIENT SAMPLE AFFECTED THE PSA |
| 10:05AM | 7 | TEST ON EDISON." |
| 10:05AM | 8 | DR. BURNES, WHEN YOU WERE RECEIVING TEST RESULTS FROM |
| 10:05AM | 9 | THERANOS, DID YOU KNOW ON WHAT DEVICE THERANOS WAS RUNNING THE |
| 10:05AM | 10 | TESTS? |
| 10:05AM | 11 | A.   I WAS TOLD IT WAS A DEVICE IN SCOTTSDALE USUALLY. |
| 10:05AM | 12 | Q.   YOU WERE TOLD BY WHOM? |
| 10:05AM | 13 | A.   THE REPRESENTATIVE FROM THERANOS. |
| 10:05AM | 14 | Q.   AND YOU USED THE WORD "USUALLY."  WHAT DO YOU MEAN BY |
| 10:05AM | 15 | THAT? |
| 10:05AM | 16 | A.   AS FAR AS I KNOW, THEY HAD TESTING SITES IN SCOTTSDALE |
| 10:05AM | 17 | WHERE THEY SENT THE LABS FROM THE WALGREENS. |
| 10:05AM | 18 | Q.   SO IT WAS YOUR UNDERSTANDING THAT THE RESULTS THAT YOU |
| 10:05AM | 19 | WERE REVIEWING FOR DR. ELLSWORTH'S TESTS WERE RUN IN ARIZONA? |
| 10:05AM | 20 | A.   I ASSUMED THAT. |
| 10:05AM | 21 | Q.   AND NOW IF WE CAN TURN TO THE FIRST PAGE OF THIS |
| 10:06AM | 22 | EXHIBIT 4415, PAGE 1. |
| 10:06AM | 23 | WE'LL START AT THE BOTTOM. |
| 10:06AM | 24 | MR. BALWANI WRITES, "IF IT IS THEN WE SHOULD EXPLAIN THIS |
| 10:06AM | 25 | TO THE DOC." |

BURNES DIRECT BY MR. SCHENK                                      6852

10:06AM   1         IF WE MOVE UP ONE EMAIL, MR. FLOREY WRITES, "SUNNY.

10:06AM   2         "DANIEL AND I WERE ABLE TO CONNECT WITH DR. BURNES.  THE

10:06AM   3    CALL WAS POSITIVE AND THE DOCTOR CALLED OUR PLAN TO REDRAW THE

10:06AM   4    GUEST AFTER HE RETURNS FROM VACATION IN TWO WEEKS 'SOLID.'

10:06AM   5    DANIEL DISCUSSED THE SPECIMEN INTEGRITY ISSUES WITH HIM, WHICH

10:06AM   6    SATISFIED HIM.  HE WAS TALKATIVE, SHARED THAT HE LIKES OUR COST

10:06AM   7    AND REALLY APPRECIATES THAT WE SET OUT TO TAKE A SMALLER AMOUNT

10:06AM   8    OF BLOOD THAN LABCORP, WHO HE HAS USED FOR 20 PLUS YEARS.

10:06AM   9    BASED ON THE GOOD THINGS HE SAID ABOUT OUR SALES REP (JESSICA)

10:06AM   10   I EXPECT THAT WHEN WE WRAP THIS CASE UP IN A COUPLE OF WEEKS IT

10:06AM   11   WILL REALLY STRENGTHEN THE RELATIONSHIP."

10:06AM   12        DR. BURNES, DOES THIS PARAGRAPH SUMMARIZE A CONVERSATION

10:07AM   13   THAT YOU RECALL HAVING WITH SOMEONE FROM THERANOS?

10:07AM   14   A.   I DON'T RECALL EXACTLY, BUT THE TONE OF IT WAS LIKE THIS.

10:07AM   15   IT WAS VERY POSITIVE AND THEY WERE PLEASANT.

10:07AM   16   Q.   GREAT.  AND IF WE CAN GO TO THE VERY TOP OF THE EMAIL.

10:07AM   17        DR. BURNES, DO YOU SEE AT THE VERY TOP WHERE SOMEONE NAMED

10:07AM   18   SUNNY BALWANI FORWARDS THIS EMAIL CHAIN TO ELIZABETH HOLMES ON

10:07AM   19   JUNE 15TH, 2015?

10:07AM   20   A.   YES.

10:07AM   21   Q.   IF WE CAN NOW GO BACK TO THE PREVIOUS EXHIBIT, WHICH IS

10:07AM   22   4938, AND WE'LL START ON PAGE 5.

10:07AM   23        DR. BURNES, DO YOU RECOGNIZE THIS DOCUMENT?

10:07AM   24   A.   YES.

10:07AM   25   Q.   AND WHAT IS THIS?

BURNES DIRECT BY MR. SCHENK                                      6853

| | | |
|---|---|---|
| 10:07AM | 1 | A.    IT'S ANOTHER LAB RESULT FROM THERANOS. |
| 10:07AM | 2 | Q.    AND DO YOU SEE THE VISIT DATE? |
| 10:08AM | 3 | A.    THE VISIT DATE IS JUNE 11TH, 2015. |
| 10:08AM | 4 | Q.    DR. BURNES, IS THIS THE THIRD THERANOS TEST RESULT, THE |
| 10:08AM | 5 | THIRD IN TIME? |
| 10:08AM | 6 | A.    YES. |
| 10:08AM | 7 | Q.    AND WHAT WAS THE PSA TOTAL STORE THIS TIME? |
| 10:08AM | 8 | A.    22.8. |
| 10:08AM | 9 | Q.    SO AM I RIGHT THE FIRST WAS 26, AND THEN 1.7, AND NOW |
| 10:08AM | 10 | WE'RE SEEING A SCORE OF 22? |
| 10:08AM | 11 | A.    YES. |
| 10:08AM | 12 | Q.    WHEN YOU RECEIVED THIS RESULT, DID YOU REACH OUT TO |
| 10:08AM | 13 | THERANOS AS WE SAW IN THAT EMAIL CHAIN AND HAVE A CONVERSATION? |
| 10:08AM | 14 | A.    YES. |
| 10:08AM | 15 | Q.    AFTER YOU RECEIVED THIS RESULT, WHAT WAS THE NEXT STEP |
| 10:08AM | 16 | THAT YOU THOUGHT WAS APPROPRIATE TO TAKE? |
| 10:08AM | 17 | A.    WELL, I WAS BECOMING MORE CONCERNED ABOUT THE TEST, SO I |
| 10:09AM | 18 | ACTUALLY ASKED TO TALK TO THEIR NATIONAL LAB DIRECTOR, WHICH |
| 10:09AM | 19 | THEY DIRECTLY AND KINDLY DID. |
| 10:09AM | 20 | Q.    AND WHAT DO YOU RECALL ABOUT THAT CONVERSATION? |
| 10:09AM | 21 | A.    BASICALLY I WAS EXPRESSING SOME LACK OF CONFIDENCE ON THE |
| 10:09AM | 22 | RESULTS WITH THIS -- THE NEW TESTING, THE WAY IT WAS BEING |
| 10:09AM | 23 | DONE, AND I ASKED, TO RESOLVE, FOR THE PATIENT TO DO A FOURTH |
| 10:09AM | 24 | PSA THE TRADITIONAL WAY, AND IF THEY WOULD PAY FOR THE LAB, AND |
| 10:09AM | 25 | THEY AGREED TO THAT. |

BURNES DIRECT BY MR. SCHENK                                          6854

10:09AM  1    Q.   AND WHAT DO YOU MEAN "THE TRADITIONAL WAY"?

10:09AM  2    A.   YOU KNOW, SENDING IT OUT TO A -- IF THEY CAN DO IT IN

10:09AM  3    HOUSE OR SEND IT TO LABCORP, THE TRADITIONAL WAYS PSA'S WERE

10:09AM  4    DONE, NOT THE FINGER POKE.

10:09AM  5    Q.   NOT THE?

10:09AM  6    A.   NOT THE FINGERSTICK.  I WANTED IT TO BE DONE BY WHATEVER

10:09AM  7    TRADITIONAL WAY IT WAS NORMALLY DONE.

10:09AM  8    Q.   I SEE.  AND IF WE CAN GO TO THE BOTTOM OF THIS DOCUMENT.

10:10AM  9         THIS VERSION OF THE LAB TEST HAS A SECTION CALLED

10:10AM  10   PERFORMING SITE.

10:10AM  11        DO YOU SEE THAT?

10:10AM  12        SORT OF IN THE BOTTOM, THE BOTTOM LEFT.

10:10AM  13   A.   OH, YEP, I SEE IT NOW.

10:10AM  14        SO IT SAYS, "NEWARK - 7373 GATEWAY BOULEVARD, NEWARK

10:10AM  15   CALIFORNIA."

10:10AM  16   Q.   NOW, IF WE CAN TURN TO PAGE 4 -- I'M SORRY, PAGE 4, ONE

10:10AM  17   PAGE PRIOR.

10:10AM  18        DO YOU RECOGNIZE THIS DOCUMENT?

10:10AM  19   A.   YES.

10:10AM  20   Q.   WHAT IS THIS?

10:10AM  21   A.   IT'S A LAB RESULT FROM THERANOS.

10:10AM  22   Q.   DO YOU SEE THE VISIT DATE?

10:10AM  23   A.   THE VISIT DATE IS JUNE 30TH, 2015.

10:11AM  24   Q.   DR. BURNES, IS THIS NOW THE FOURTH THERANOS PSA TEST FOR

10:11AM  25   MR. -- FOR DR. ELLSWORTH?

BURNES DIRECT BY MR. SCHENK                                        6855

10:11AM   1      A.   YES.

10:11AM   2      Q.   AND WHAT IS THE PSA TOTAL SCORE THIS TIME?

10:11AM   3      A.   OH, OKAY.  BEAR WITH ME.  I'M STRUGGLING.  I HAVE A VERY

10:11AM   4      NARROW FOCUS OF VISION.

10:11AM   5           I SEE THE PSA TOTAL INTERPRETIVE DATA, PSA ANTIGEN TOTAL.

10:11AM   6      Q.   DR. BURNES, IT'S ON THE SCREEN IN FRONT OF YOU IF IT'S

10:11AM   7      EASIER.  IT'S HIGHLIGHTED.

10:11AM   8      A.   OH.  0.9 I BELIEVE.

10:12AM   9      Q.   DID YOU SAY 0.9?

10:12AM  10      A.   I SHOULD BE ABLE TO SEE IT ON HERE.  LET ME GET THE

10:12AM  11      RIGHT -- I APOLOGIZE FOR STRUGGLING WITH THIS.

10:12AM  12      Q.   NO APOLOGY NEEDED.

10:12AM  13           YOUR HONOR, MAY I APPROACH?

10:12AM  14               THE COURT:  YES.

10:12AM  15               THE WITNESS:  YES, I SEE THE PSA TOTAL THERE.

10:12AM  16           OH, I'M LOOKING DOWN HERE.  OKAY.

10:12AM  17      BY MR. SCHENK:

10:12AM  18      Q.   (INDICATING.)

10:12AM  19      A.   0.95.

10:12AM  20      Q.   THANK YOU.

10:12AM  21           AND THEN AT THE BOTTOM AGAIN WE SEE A KEY WITH A TEST

10:12AM  22      PROCESSED LOCATION.

10:12AM  23           DO YOU SEE THAT?  WAS THE TEST PROCESSED AT THERANOS

10:13AM  24      LABORATORIES IN SCOTTSDALE, ARIZONA?

10:13AM  25      A.   YES.

BURNES DIRECT BY MR. SCHENK

```
10:13AM   1    Q.   SO THE FOURTH DRAW IS ONE THAT YOU DESCRIBED AS WANTING TO

10:13AM   2    BE PERFORMED THROUGH TRADITIONAL METHODS; IS THAT RIGHT?

10:13AM   3    A.   YES.

10:13AM   4    Q.   NOW THAT YOU RECEIVED THIS FOURTH RESULT, HOW DID YOU FEEL

10:13AM   5    ABOUT THE STATE OF DR. ELLSWORTH'S HEALTH?

10:13AM   6    A.   I FELT MORE REASSURED THAT THAT WAS THE CORRECT VALUE.

10:13AM   7    Q.   OKAY.  I WANT TO SHOW YOU JUST A COUPLE OTHER DOCUMENTS.

10:13AM   8         IF YOU'LL NOW TURN TO PAGE 3.  PAGE 3 APPEARS TO BE

10:13AM   9    ANOTHER -- ARE YOU THERE?

10:13AM  10    A.   YES.

10:13AM  11    Q.   -- ANOTHER THERANOS LAB TEST THAT WAS FAXED TO YOUR OFFICE

10:13AM  12    NOW IN MARCH OF 2016.

10:13AM  13         DO YOU SEE THAT?

10:13AM  14    A.   I SEE MARCH 29TH, 2016.

10:14AM  15    Q.   AND IT SAYS IN THE CAPTION THAT "THIS REPORT CONTAINS

10:14AM  16    CORRECTED RESULTS."

10:14AM  17         DO YOU SEE THAT?

10:14AM  18    A.   WHERE WOULD I BE LOOKING AT?

10:14AM  19    Q.   JUST TO THE RIGHT OF THE WORD "THEY."

10:14AM  20    A.   YES, OKAY, I SEE THAT.

10:14AM  21    Q.   AND THEN IF WE GO INTO THE BOX THAT IS LABELLED PROSTATE

10:14AM  22    SPECIFIC ANTIGEN TOTAL, THE SCORE NOW READS "VOID 26.2."

10:14AM  23         DO YOU SEE THAT?

10:14AM  24    A.   YES.

10:14AM  25    Q.   AND BELOW THAT "PROSTATE SPECIFIC ANTIGEN TOTAL AS
```

BURNES DIRECT BY MR. SCHENK                                                    6857

10:14AM  1   PREVIOUSLY REPORTED IS VOIDED AND THIS RESULT SHOULD NOT BE

10:14AM  2   USED OUT OF AN ABUNDANCE OF CAUTION.  REDRAW IS RECOMMENDED AS

10:14AM  3   CLINICALLY INDICATED."

10:15AM  4       WHAT INFORMATION DID YOU UNDERSTAND WAS BEING COMMUNICATED

10:15AM  5   TO YOU THROUGH THIS DOCUMENT?

10:15AM  6   A.   FORMAL DOCUMENTATION THAT THAT LAB TEST ON MAY 14TH, 2015,

10:15AM  7   ABOUT NINE MONTHS BEFORE, WAS INVALID.

10:15AM  8   Q.   AT THE BOTTOM OF THIS DOCUMENT THERE'S A KEY, AND THE

10:15AM  9   FIRST ENTRY INFORMS THAT THE TEST WAS PROCESSED AT THERANOS

10:15AM  10  LABORATORIES IN NEWARK, CALIFORNIA.

10:15AM  11      DO YOU SEE THAT?

10:15AM  12  A.   I SEE INTERPRETIVE -- OH, I SEE IT.

10:15AM  13      SO TEST PROCESSED AT THERANOS LABORATORY, 7373 GATEWAY

10:15AM  14  BOULEVARD, NEWARK, CALIFORNIA.

10:15AM  15  Q.   AND IF YOU'LL TURN TO PAGE 2 IN THE EXHIBIT.

10:16AM  16      DR. BURNES, IS THIS A REPORT VOIDING THE THIRD TEST, THE

10:16AM  17  TEST THAT PRODUCED A 22.8 PSA SCORE?

10:16AM  18  A.   YES.

10:16AM  19  Q.   AND WAS THIS ALSO SENT TO YOU IN MARCH OF 2016?

10:16AM  20  A.   YES, MARCH 29TH, 2016.

10:16AM  21  Q.   THANK YOU.

10:16AM  22      AND THEN ONE FINAL PAGE.  IF YOU'LL TURN TO PAGE 8 OF THIS

10:16AM  23  EXHIBIT.

10:16AM  24      DR. BURNES, DID DR. ELLSWORTH GO TO LABCORP IN 2017 AND

10:16AM  25  GET A PSA TEST?

BURNES DIRECT BY MR. SCHENK                                                    6858

| | | |
|---|---|---|
| 10:16AM | 1 | A.   YES. |
| 10:16AM | 2 | Q.   AND WAS THE PSA SCORE THAT TIME A 2.0? |
| 10:17AM | 3 | A.   YES. |
| 10:17AM | 4 | Q.   IF I CAN ASK YOU TO TURN FINALLY TO PAGE 7, THAT WAS THE |
| 10:17AM | 5 | FIRST THERANOS TEST RESULT, THE 26.1. |
| 10:17AM | 6 | ARE YOU THERE? |
| 10:17AM | 7 | A.   YES. |
| 10:17AM | 8 | Q.   DR. BURNES, DO YOU HAVE AN OPINION ON THE ACCURACY OF THIS |
| 10:17AM | 9 | TEST? |
| 10:17AM | 10 | A.   WHICH TEST? |
| 10:17AM | 11 | Q.   THE ONE THAT WAS SENT TO YOUR OFFICE ON MARCH 16TH, THE |
| 10:17AM | 12 | VISIT DATE WAS -- I'M SORRY, WAS SENT TO YOUR OFFICE ON |
| 10:17AM | 13 | MAY 16TH, 2015, THE VISIT DATE WAS MAY 14TH, 2015, AND THE |
| 10:17AM | 14 | SCORE WAS A 26.1. |
| 10:17AM | 15 | IT'S ON PAGE 7. |
| 10:17AM | 16 | A.   I UNDERSTAND NOW. |
| 10:17AM | 17 | Q.   DO YOU HAVE AN OPINION ON THE ACCURACY OF THIS TEST? |
| 10:17AM | 18 | A.   YES.  I BELIEVE THAT TEST WAS INVALID. |
| 10:17AM | 19 | Q.   AND WHY DO YOU SAY THAT? |
| 10:17AM | 20 | A.   IT WAS NOT CONSISTENT WITH THE PATTERN THAT WE HAVE BEEN |
| 10:17AM | 21 | SEEING OR THE EXPECTED RESULT, AND THE FACT THAT THE REPEAT |
| 10:18AM | 22 | TEST, THE FOURTH TEST IN 2015 WAS CLOSE TO THE EXPECTED RESULT, |
| 10:18AM | 23 | AND THIS FOLLOW-UP TEST WHEN THE PATIENT RETURNED FROM THE |
| 10:18AM | 24 | MISSIONARY WORK WAS WHERE IT SHOULD BE. |
| 10:18AM | 25 | Q.   THANK YOU. |

BURNES CROSS BY MS. TREFZ                                          6859

10:18AM  1          YOUR HONOR, MAY I HAVE A MOMENT?

10:18AM  2              THE COURT:  YES.

10:18AM  3          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:18AM  4              MR. SCHENK:  THANK YOU, YOUR HONOR.

10:18AM  5       NO FURTHER QUESTIONS.

10:18AM  6              THE COURT:  CROSS-EXAMINATION?

10:18AM  7              MS. TREFZ:  YES, YOUR HONOR.

10:18AM  8                      **CROSS-EXAMINATION**

10:18AM  9    BY MS. TREFZ:

10:18AM 10    Q.   GOOD MORNING, DR. BURNES.

10:18AM 11    A.   GOOD MORNING.

10:18AM 12    Q.   MY NAME IS KATIE TREFZ AND I REPRESENT MS. HOLMES, AND I

10:19AM 13    HAVE SOME QUESTIONS FOR YOU.

10:19AM 14       I WANT TO START WITH UNDERSTANDING HOW YOU WERE INTRODUCED

10:19AM 15    TO THERANOS.  IN PARTICULAR, WHEN THERANOS FIRST STARTED

10:19AM 16    OFFERING BLOOD TESTING, IS IT FAIR TO SAY THAT YOU WERE

10:19AM 17    EXCITED?

10:19AM 18    A.   I WAS VERY MUCH INTERESTED IN THIS WAY OF TESTING.

10:19AM 19    Q.   AND IS ONE OF THE REASONS WHY YOU WERE INTERESTED IN THE

10:19AM 20    THERANOS SERVICE THAT THERANOS CHARGED APPROXIMATELY EIGHT

10:19AM 21    TIMES LESS THAN OTHER LABORATORIES?

10:19AM 22    A.   YES.

10:19AM 23    Q.   AND DO YOU RECALL THAT THERANOS PUBLISHED THEIR PRICES ON

10:19AM 24    THE INTERNET?

10:19AM 25    A.   I DON'T RECALL SEEING IT ON THE INTERNET, BUT I DO RECALL

BURNES CROSS BY MS. TREFZ                                              6860

10:19AM  1    SEEING THE PRICES ON THE -- SOMEWHERE ON DOCUMENTATION THAT WAS

10:19AM  2    PROVIDED TO THE OFFICE.

10:20AM  3    Q.   OKAY.  AND DID YOU UNDERSTAND THAT THERANOS CHARGED THE

10:20AM  4    SAME FOR INSURED AND UNINSURED PATIENTS?

10:20AM  5    A.   NO, I DIDN'T KNOW THAT ASPECT.

10:20AM  6    Q.   OKAY.  THERE WAS A THERANOS WALGREENS PATIENT SERVICE

10:20AM  7    CENTER DOWN THE STREET FROM YOUR PRACTICE; RIGHT?

10:20AM  8    A.   YES.

10:20AM  9    Q.   AND DID THIS LOCATION ADD TO THE CONVENIENCE OF THERANOS

10:20AM  10   TESTING FOR YOU?

10:20AM  11   A.   YES.

10:20AM  12   Q.   AND DID YOU ALSO LIKE THE GOAL OF TAKING LESS BLOOD?

10:20AM  13   A.   YES.

10:20AM  14   Q.   AND IS IT FAIR TO SAY THAT YOU HOPED THAT THERANOS WOULD

10:20AM  15   SUCCEED?

10:20AM  16   A.   VERY MUCH SO.

10:20AM  17   Q.   I THINK WE ESTABLISHED ALREADY ON DIRECT THAT YOU'RE IN

10:20AM  18   PRIVATE PRACTICE; CORRECT?

10:20AM  19   A.   YES.

10:20AM  20   Q.   AND YOUR PRACTICE IS INTERNAL MEDICINE?

10:20AM  21   A.   YES.

10:20AM  22   Q.   IS IT FAIR TO SAY THAT AROUND TWO-THIRDS OF THE TIME THAT

10:21AM  23   YOU'RE EXAMINING PATIENTS, YOU'RE DOING WELLNESS EXAMS?

10:21AM  24   A.   YES.

10:21AM  25   Q.   AND DO THOSE OFTEN COME WITH BLOOD TESTS?

BURNES CROSS BY MS. TREFZ                                        6861

10:21AM   1    A.   YES.

10:21AM   2    Q.   AND YOU CURRENTLY HAVE WHAT IS CALLED A CONCIERGE

10:21AM   3    PRACTICE; RIGHT?

10:21AM   4    A.   YES.

10:21AM   5    Q.   AND CAN YOU EXPLAIN WHAT THAT IS?

10:21AM   6    A.   IT'S A --

10:21AM   7              MR. SCHENK:  OBJECTION.  RELEVANCE.

10:21AM   8              THE WITNESS:  OH.

10:21AM   9              THE COURT:  COUNSEL, WHAT IS THE RELEVANCE OF THIS?

10:21AM  10              MS. TREFZ:  I WOULD LIKE TO ESTABLISH THE SCOPE OF

10:21AM  11    THE BLOOD TESTS THAT HE ORDERS.  SO IT'S JUST FOUNDATIONAL TO

10:21AM  12    UNDERSTANDING THE CONTEXT OF HIS PRACTICE.

10:21AM  13              THE COURT:  AT THE TIME OF THE TEST?

10:21AM  14              MS. TREFZ:  THAT WAS GOING TO BE MY NEXT QUESTION,

10:21AM  15    BUT I, I --

10:21AM  16              THE COURT:  MAYBE -- IS IT -- ARE YOU TRYING TO

10:21AM  17    DETERMINE WHETHER OR NOT HIS PRACTICE WAS CONCIERGE AT THE TIME

10:21AM  18    OF THE TEST?

10:21AM  19              MS. TREFZ:  I WAS GOING TO ASK THAT AFTER HE DEFINED

10:21AM  20    IT, BUT YES.

10:21AM  21              THE COURT:  WHY DON'T WE.

10:21AM  22              MS. TREFZ:  I'M HAPPY TO DO IT IN THAT WAY,

10:21AM  23    YOUR HONOR.

10:21AM  24    Q.   WAS YOUR PRACTICE A CONCIERGE PRACTICE IN 2015?

10:22AM  25    A.   THAT WAS A TERM THAT COULD BE APPLIED, YES.

BURNES CROSS BY MS. TREFZ                                              6862

10:22AM   1     Q.   AND COULD YOU EXPLAIN WHAT THAT TERM MEANS?

10:22AM   2     A.   ABOUT 5 PERCENT OF INTERNS PRACTICE THIS WAY CURRENTLY

10:22AM   3     WHERE WE OFFER A FORM OF PRACTICE, WE'RE DOING CARE FOR THE

10:22AM   4     PATIENT ABOVE AND BEYOND WHAT IS NORMALLY COVERED BY THE

10:22AM   5     INSURANCE.  AND THE PRIMARY PIECE OF THIS IS A FEE WE CHARGE

10:22AM   6     FOR AN ANNUAL WELLNESS EXAM.

10:22AM   7     Q.   AND ABOUT HOW MANY PATIENTS WERE IN YOUR CONCIERGE

10:22AM   8     PRACTICE AS OF 2015?

10:22AM   9     A.   ABOUT 180.

10:22AM  10     Q.   OKAY.  DID YOU SEND MANY OF THOSE PATIENTS TO THERANOS FOR

10:22AM  11     TESTING?

10:22AM  12     A.   COULD YOU DEFINE "MANY" THERE?

10:22AM  13     Q.   DID YOU SEND ABOUT A QUARTER TO A THIRD OF THOSE PATIENTS

10:22AM  14     TO THERANOS FOR TESTING?

10:22AM  15     A.   A BETTER WAY OF ANSWERING IT, I MIGHT TRY, WOULD BE THAT

10:22AM  16     THE MAJORITY OF MY LABS WERE SENT TO THE CLEVELAND CLINIC AT

10:23AM  17     THAT TIME -- MOST OF MY LAB WORK WAS DONE AT THE CLEVELAND

10:23AM  18     CLINIC AT THAT TIME, SO MOST OF THE LAB WORK I PERFORMED ON MY

10:23AM  19     PATIENCE ON AN ANNUAL BASIS WAS FOR THE WELLNESS EXAM, AND THAT

10:23AM  20     WAS SENT TO THE CLEVELAND CLINIC IN OHIO.

10:23AM  21          I WOULD ESTIMATE ABOUT 10 PERCENT OF THE LABS AT THAT TIME

10:23AM  22     I WOULD SEND OUT TO THERANOS.

10:23AM  23     Q.   AND JUST SO --

10:23AM  24     A.   AND SO THE TOTAL NUMBER OF LABS I WOULD DO PER YEAR.

10:23AM  25     Q.   OKAY.  SO JUST IN TERMS OF WHAT WE'RE DISTINGUISHING THE

BURNES CROSS BY MS. TREFZ                                      6863

10:23AM  1    DIFFERENCE BETWEEN MY QUESTION AND YOUR ANSWER IS THAT I WAS

10:23AM  2    ASKING ABOUT PATIENTS AND YOU WERE TALKING ABOUT NUMBER OF

10:23AM  3    TESTS, RIGHT, THE NUMBER OF LAB TESTS?

10:23AM  4    A.    OKAY.

10:23AM  5    Q.    WHICH IS FINE.  I JUST WANTED TO MAKE SURE THAT I WAS

10:23AM  6    UNDERSTANDING THE DIFFERENCE.

10:23AM  7          IS IT FAIR THAT --

10:23AM  8    A.    COULD YOU RESTATE THAT?  I'M NOT SURE WHAT THE POINT IS.

10:23AM  9    Q.    SURE.  MY QUESTION WAS, DID YOU SEND ABOUT A QUARTER TO A

10:23AM 10    THIRD OF YOUR PATIENTS TO THERANOS FOR TESTING?

10:23AM 11          AND I UNDERSTOOD YOUR RESPONSE, BUT YOU'LL CORRECT ME IF I

10:24AM 12    MISUNDERSTOOD, I UNDERSTOOD YOUR RESPONSE TO MEAN THAT, THAT

10:24AM 13    REGARDLESS OF THE NUMBER OF PATIENTS, THE MAJORITY OF YOUR LAB

10:24AM 14    TESTING WAS DONE AT CLEVELAND CLINIC.

10:24AM 15    A.    YES.  A BETTER WAY TO PROBABLY STATE IT IS BECAUSE WE

10:24AM 16    AUTOMATICALLY DID THESE TESTS ONCE A YEAR FOR ALL OF THE

10:24AM 17    PATIENTS OVER AGE 50.

10:24AM 18          IF LABS OCCURRED OUTSIDE OF THAT ANNUAL WINDOW, SO THE

10:24AM 19    TOTAL LABS THROUGHOUT THE YEAR WOULD PROBABLY BE 10 PERCENT TO

10:24AM 20    THERANOS, BUT IF ISSUES CAME UP OUTSIDE OF THE ANNUAL PHYSICAL

10:24AM 21    LABS, PROBABLY IT WOULD BE FAIR TO SAY ABOUT A QUARTER TO A

10:24AM 22    THIRD WOULD HAVE BEEN THERANOS.

10:24AM 23    Q.    OKAY.  THANK YOU.

10:24AM 24          ARE YOU ABLE TO QUANTIFY THE NUMBER OF TESTS THAT WOULD

10:24AM 25    BE?

BURNES CROSS BY MS. TREFZ                                          6864

10:24AM   1     A.   I'M SORRY, I DON'T RECALL.

10:24AM   2     Q.   THAT'S OKAY.

10:24AM   3          IS IT TRUE THAT PATIENTS OF YOURS HAD TESTS AT THERANOS

10:25AM   4     FOR APPROXIMATELY A YEAR BEFORE MR. ELLSWORTH'S TEST THAT WAS

10:25AM   5     THE SUBJECT OF YOUR DIRECT EXAMINATION?

10:25AM   6     A.   YES, I BELIEVE THAT IS TRUE.

10:25AM   7     Q.   AND WITH THE EXCEPTION OF DR. ELLSWORTH'S PSA TEST, DID,

10:25AM   8     DID YOU HAVE ANY ISSUE WITH THERANOS'S TESTS UP TO 2015?

10:25AM   9     A.   NO.

10:25AM  10     Q.   YOU TESTIFIED ON DIRECT THAT YOU BROUGHT THE ISSUE THAT

10:25AM  11     YOU IDENTIFIED TO THERANOS'S ATTENTION; CORRECT?

10:25AM  12     A.   YES.

10:25AM  13     Q.   AND BASED ON YOUR INTERACTIONS WITH THERANOS, DID YOU

10:25AM  14     UNDERSTAND THAT THERANOS HAD OR WAS IN THE PROCESS OF

10:25AM  15     INVESTIGATING THE ISSUE?

10:25AM  16     A.   YES.

10:25AM  17     Q.   DID, DID THE THERANOS PERSONNEL THAT YOU SPOKE WITH

10:25AM  18     INDICATE AN INTEREST IN MAKING THE SITUATION RIGHT?

10:26AM  19     A.   YES.

10:26AM  20     Q.   AND DID THEY EXPRESS AN INTEREST IN UNDERSTANDING WHAT HAD

10:26AM  21     HAPPENED WITH THE TESTS?

10:26AM  22     A.   YES.

10:26AM  23     Q.   I'D LIKE TO BRING UP, IF WE CAN, EXHIBIT 4415, WHICH YOU

10:26AM  24     DISCUSSED WITH THE GOVERNMENT.  SO IF YOU CAN -- 4415 I THINK

10:26AM  25     IS THE FIRST TAB IN THE BINDER THAT YOU HAD FROM THE

BURNES CROSS BY MS. TREFZ                                        6865

10:26AM  1        GOVERNMENT.

10:26AM  2        A.   OKAY.

10:26AM  3        Q.   OKAY.  I WANTED TO JUST FOCUS ON THE TOP EMAIL HERE FROM

10:26AM  4        MR. BALWANI TO MS. HOLMES.

10:26AM  5             IS THE DATE OF THE EMAIL JUNE 15TH, 2015?

10:26AM  6        A.   EXCUSE ME, WHICH PAGE ARE WE LOOKING AT?

10:26AM  7        Q.   I'M SORRY.  WE'RE LOOKING AT PAGE 1.

10:26AM  8        A.   OKAY.

10:26AM  9        Q.   AND THE VERY TOP -- THE EMAIL AT THE VERY TOP.

10:26AM  10       A.   OKAY.

10:26AM  11       Q.   IS THE DATE ON THE EMAIL JUNE 15TH, 2015?

10:27AM  12       A.   YES.

10:27AM  13       Q.   AND DO YOU RECALL WHETHER THAT WAS AFTER THE JUNE 11TH,

10:27AM  14       2015 TEST THAT YOU RECEIVED FROM THERANOS?

10:27AM  15       A.   THE SPECIFIC ORDER I DON'T -- I'M NOT SURE HOW TO ANSWER

10:27AM  16       THAT QUESTION TO BE HONEST.

10:27AM  17       Q.   OKAY.  THAT'S FINE.

10:27AM  18            WHY DON'T WE BRING UP, IF WE CAN, 4438, PAGE 5.

10:27AM  19            AND MY QUESTION FIRST, MR. BENNETT, IS DO WE HAVE THE SAME

10:27AM  20       REDACTIONS THAT THE GOVERNMENT HAD?

10:27AM  21                 MR. BENNETT:  A LITTLE MORE REDACTION.

10:27AM  22                 MS. TREFZ:  A LITTLE MORE.  OKAY.  THAT'S FINE.

10:27AM  23            IF WE CAN GO TO 4938.

10:28AM  24                 THE COURT:  4938?

10:28AM  25                 MS. TREFZ:  YES.  THANK YOU.

BURNES CROSS BY MS. TREFZ                                         6866

10:28AM  1              THE WITNESS:  PAGE 5?

10:28AM  2              MS. TREFZ:  PAGE 5, YES.

10:28AM  3         IF WE CAN JUST HIGHLIGHT THE VISIT DATE ON THAT RESULT.

10:28AM  4    Q.   JUST FOR THE SAKE OF CLARITY, IS IT FAIR TO SAY THAT THE

10:28AM  5    EMAIL FROM MR. BALWANI TO MS. HOLMES ON JUNE 15TH, 2015 IS

10:28AM  6    AFTER THE JUNE 11TH VISIT DATE REFLECTED ON 4438?

10:28AM  7    A.   YES.

10:28AM  8    Q.   4938?

10:28AM  9    A.   YES.  SORRY.

10:28AM  10   Q.   AND YOU DON'T HAVE ANY UNDERSTANDING ABOUT WHAT MS. HOLMES

10:28AM  11   KNEW ABOUT DR. ELLSWORTH'S TESTS PRIOR TO THIS DATE; CORRECT?

10:28AM  12   A.   COULD YOU RESTATE THE QUESTION?

10:28AM  13   Q.   YOU DON'T HAVE ANY PERSONAL KNOWLEDGE OF WHAT MS. -- OF

10:29AM  14   WHAT MS. HOLMES MAY OR MAY NOT HAVE KNOWN ABOUT DR. BURNES'S

10:29AM  15   TEST RESULTS?

10:29AM  16   A.   NO.

10:29AM  17   Q.   OKAY.  THANK YOU.

10:29AM  18        IF WE CAN STAY ON 4938 FOR A MOMENT.  I WANT TO GO TO --

10:29AM  19   LET'S START WITH THE PAGE 7 PLEASE, MR. BENNETT.

10:29AM  20        AND I WANT TO JUST HIGHLIGHT AT THE TOP HERE, DO YOU

10:29AM  21   RECALL MR. SCHENK POINTED YOU --

10:29AM  22        EVEN FURTHER UP, PLEASE.  THANK YOU.

10:29AM  23        DO YOU RECALL THAT MR. SCHENK POINTED YOU TO THE FAX

10:29AM  24   HEADER ON THIS PAGE?

10:29AM  25   A.   YES.

BURNES CROSS BY MS. TREFZ

| | | |
|---|---|---|
| 10:29AM | 1 | Q.   AND OVER ON THE RIGHT-HAND SIDE IS THERE A FAX NUMBER |
| 10:29AM | 2 | LISTED FOR THERANOS? |
| 10:30AM | 3 | A.   ON PAGE 3?  WHERE IS IT IN RELATIONSHIP TO THAT? |
| 10:30AM | 4 | Q.   DOWN BELOW. |
| 10:30AM | 5 | A.   AND IS THAT THE NUMBER 866? |
| 10:30AM | 6 | Q.   YES.  AND WHAT IS THE AREA CODE? |
| 10:30AM | 7 | A.   I'M SORRY.  LET ME READ THAT. |
| 10:30AM | 8 | Q.   IN PARTICULAR I'M LOOKING AT THE FAX NUMBER TO THE RIGHT |
| 10:30AM | 9 | OF THE LAB. |
| 10:30AM | 10 | A.   LOOKING AT THE NUMBER THAT SAYS LAB, AND IS IT ABOVE OR |
| 10:30AM | 11 | BELOW IT?  OH, HERE IT IS.  I FOUND IT. |
| 10:30AM | 12 | SO IT SAYS FAX.  IT SAYS (650) 852-9594. |
| 10:30AM | 13 | Q.   AND DO YOU KNOW WHETHER THE 650 AREA CODE, IS THAT AN AREA |
| 10:31AM | 14 | CODE IN ARIZONA? |
| 10:31AM | 15 | A.   I DO NOT KNOW. |
| 10:31AM | 16 | Q.   OKAY.  AND DO YOU SEE LISTED ABOVE 13 -- DO YOU SEE THE |
| 10:31AM | 17 | ADDRESS OF THE THERANOS LAB LISTED ABOVE? |
| 10:31AM | 18 | A.   WHERE IT SAYS 1365 NORTH SCOTTSDALE? |
| 10:31AM | 19 | Q.   YES.  DO YOU SEE THE ADDRESS LISTED THERE? |
| 10:31AM | 20 | AND IS THAT THE ADDRESS LISTED AS SCOTTSDALE, ARIZONA? |
| 10:31AM | 21 | A.   YES. |
| 10:31AM | 22 | Q.   AND IS THERE A FAX SERVER NUMBER ON THE TOP OF THE -- |
| 10:31AM | 23 | LISTED ON THE TOP OF THE FAX HERE, KIND OF AN ORIGINATING |
| 10:31AM | 24 | NUMBER? |
| 10:31AM | 25 | A.   I SEE FAX SERVER AND NUMBER -- I SEE PAGE 2 OF 3.  I'M NOT |

BURNES CROSS BY MS. TREFZ                                          6868

10:31AM  1    SURE WHERE THE NUMBER IS AT.

10:31AM  2    Q.   AND DO YOU KNOW WHETHER THE 650 NUMBER IS A NORTHERN

10:31AM  3    CALIFORNIA NUMBER?

10:31AM  4    A.   I DO NOT KNOW.

10:31AM  5    Q.   OKAY.  I'D JUST LIKE TO GO FORWARD TO PAGE 6.

10:32AM  6         IF YOU CAN GO TO THE TOP AGAIN.

10:32AM  7         I'D JUST LIKE TO NOTE THERE'S NO -- DO YOU SEE WHETHER

10:32AM  8    THERE'S ANY ORIGINATION NUMBER FROM THE FAX SERVER AT THERANOS?

10:32AM  9    A.   I'M AT THE TOP, AND I SEE A THING THAT SAYS THERANOS FAX

10:32AM  10   SERVER, A DASH AND A GREATER SIGN, AND THEN I SEE A THING THAT

10:32AM  11   SAYS IT LOOKS LIKE GE 2/3 -- OR, NO, IT'S PAGE.

10:32AM  12   Q.   DO YOU SEE -- I'M SORRY.

10:32AM  13   A.   MY COPY IS MISSING THE FIRST PART OF THE PAGE, I THINK.

10:32AM  14   Q.   DO YOU SEE AN ORIGINATION NUMBER ON THE TOP OF THIS FAX?

10:32AM  15   A.   WHERE WOULD THAT BE LOCATED IN RELATIONSHIP TO THE WORD

10:33AM  16   FAX SERVER?

10:33AM  17   Q.   I DON'T SEE ONE.  THAT'S WHY I'M ASKING.

10:33AM  18   A.   OKAY.  I DON'T SEE ONE EITHER.

10:33AM  19   Q.   BUT THERE'S A FAX NUMBER ON THE RIGHT-HAND SIDE IN THE

10:33AM  20   SAME PLACE THAT THERE WAS BEFORE; CORRECT?

10:33AM  21   A.   YES.

10:33AM  22   Q.   OKAY.  HAVE YOU -- OVER THE COURSE OF YOUR CAREER, HAVE

10:33AM  23   YOU PRIMARILY USED OTHER LAB COMPANIES OTHER THAN THERANOS?

10:33AM  24   A.   BESIDES CLEVELAND CLINIC, I HAVE USED LABCORP AND

10:33AM  25   OCCASIONALLY SONORA QUEST.

BURNES CROSS BY MS. TREFZ                                                    6869

10:33AM  1    Q.   AND HAVE YOU HAD ANY OTHER TESTING ISSUES WITH THOSE OTHER

10:33AM  2    LABS?

10:33AM  3    A.   YES.

10:33AM  4              MR. SCHENK:   YOUR HONOR, OBJECTION.   RELEVANCE.

10:33AM  5              THE COURT:   SUSTAINED.

10:33AM  6              MS. TREFZ:   MAY I EXPLAIN, OR NO?

10:34AM  7              THE COURT:   CAN YOU ASK ANOTHER QUESTION?

10:34AM  8              MS. TREFZ:   OKAY.

10:34AM  9    Q.   HAVE YOU EVER HAD AN ISSUE WITH ANOTHER LAB WHERE YOUR

10:34AM 10    PATIENT'S LABS WERE SWITCHED WITH ANOTHER PATIENT'S LABS?

10:34AM 11              MR. SCHENK:   OBJECTION.   RELEVANCE.

10:34AM 12              THE COURT:   I'LL ALLOW THAT.

10:34AM 13         YOU CAN ANSWER THAT QUESTION, SIR.

10:34AM 14              THE WITNESS:   YES.

10:34AM 15    BY MS. TREFZ:

10:34AM 16    Q.   AND OVER THE COURSE OF YOUR CAREER -- I THINK YOU

10:34AM 17    TESTIFIED OVER THE COURSE OF YOUR CAREER IN PRIVATE PRACTICE

10:34AM 18    YOU'VE, YOU'VE REVIEWED OVER 10,000 PSA RESULTS; IS THAT

10:34AM 19    CORRECT?

10:34AM 20    A.   YES.

10:34AM 21    Q.   AND DO YOU, DO YOU HAVE A SENSE OF -- OR ARE YOU AWARE OF

10:34AM 22    RESEARCH THAT HAS SHOWN THAT THERE ARE LAB ERRORS THAT

10:34AM 23    OCCASIONALLY OCCUR AT LABORATORIES?

10:34AM 24    A.   I HAVEN'T SEEN THE RESEARCH, BUT COMMON SENSE WOULD

10:35AM 25    DICTATE THAT OCCASIONALLY ERRORS CAN OCCUR.

BURNES CROSS BY MS. TREFZ

10:35AM 1    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE LIKELIHOOD OF OR

10:35AM 2    THE -- WHAT IS YOUR UNDERSTANDING OF THE FREQUENCY OF LAB

10:35AM 3    ORDERS WITH RESPECT TO -- OF LAB ERRORS WITH RESPECT TO PSA

10:35AM 4    TESTS OVERALL IN THE -- IN YOUR EXPERIENCE?

10:35AM 5    A.   THE RESULT ITSELF, RARE.

10:35AM 6    Q.   AND ARE YOU AWARE OF RESEARCH THAT'S SHOWN THAT THE RATE

10:35AM 7    OF LAB ERRORS CAN VARY FROM .1 TO 3 PERCENT?

10:35AM 8    A.   I HAVE NOT SEEN THAT.

10:35AM 9    Q.   OKAY.

10:35AM 10   A.   MY PERSONAL --

10:35AM 11   Q.   GO AHEAD.

10:35AM 12   A.   IF I COULD SPEAK TO THAT?  I'M ALWAYS LOOKING FOR POSSIBLE

10:35AM 13   LAB ERRORS FOR UNEXPECTED RESULTS, AND THEY HAVE OCCURRED, BUT

10:36AM 14   THEY'RE VERY RARE.

10:36AM 15   Q.   OKAY.  ARE YOU AWARE OF THE VARIOUS REASONS THAT AN

10:36AM 16   INACCURATE RESULT CAN BE PRODUCED?

10:36AM 17   A.   YES.

10:36AM 18   Q.   AND CAN YOU -- IS IT FAIR TO SAY THAT PREANALYTICAL

10:36AM 19   PROCESSES, SUCH AS SAMPLE INTEGRITY ISSUES, COULD BE A SOURCE

10:36AM 20   OF LAB ERROR?

10:36AM 21   A.   YES.

10:36AM 22   Q.   AND IS IT FAIR TO SAY THAT ANALYTICAL ISSUES, SUCH AS

10:36AM 23   ERRORS IN THE REAGENT, COULD BE A SOURCE OF LAB ERROR?

10:36AM 24   A.   YES.

10:36AM 25   Q.   AND ARE YOU AWARE THAT SOMETIMES MANUFACTURERS OF

BURNES CROSS BY MS. TREFZ                                              6871

10:36AM  1    COMMERCIALLY AVAILABLE REAGENTS AND EQUIPMENT ISSUE NOTICES

10:36AM  2    INDICATING POTENTIAL ERRORS IN THEIR TESTS?

10:36AM  3    A.   YES.

10:36AM  4    Q.   AND ARE YOU AWARE THAT SOMETIMES THERE ARE ERRORS IN

10:36AM  5    REPORTING?

10:36AM  6    A.   YES.

10:36AM  7    Q.   THE PSA TEST IS -- DO YOU UNDERSTAND THE METHOD BY WHICH

10:36AM  8    IT'S TRADITIONALLY RUN IN TERMS OF THE TYPE OF CHEMISTRY THAT

10:37AM  9    IS APPLIED?

10:37AM  10   A.   NO.  IF I DID ONCE, NO, I DON'T REMEMBER IT.

10:37AM  11   Q.   IF I -- LET ME SEE IF I CAN JUST REFRESH YOU, AND IF NOT,

10:37AM  12   THEN WE'LL MOVE ON.

10:37AM  13        DO YOU RECALL WHETHER PSA IS OFTEN MEASURED BY

10:37AM  14   IMMUNOASSAY?

10:37AM  15   A.   NO, I DON'T RECALL.

10:37AM  16   Q.   OKAY.  AND ARE YOU AWARE -- DO YOU KNOW WHAT IMMUNOASSAY

10:37AM  17   IS?

10:37AM  18   A.   YES.

10:37AM  19   Q.   AND ARE YOU AWARE OF -- THAT THERE CAN BE INHERENT

10:37AM  20   EXPECTED IMPRECISION IN ASSAYS?

10:37AM  21   A.   YES.

10:37AM  22   Q.   AND DOES THAT INCLUDE IN IMMUNOASSAYS?

10:37AM  23   A.   YES.

10:37AM  24   Q.   AND BASED ON YOUR EXPERIENCE REVIEWING TEST RESULTS,

10:37AM  25   INCLUDING PSA TEST RESULTS, DO YOU HAVE AN UNDERSTANDING THAT

6872

BURNES CROSS BY MS. TREFZ

10:38AM  1    DIFFERENT APPROACHES TO MEASUREMENT CAN LEAD TO DIFFERENT

10:38AM  2    RESULTS SOMETIMES?

10:38AM  3    A.   YES.

10:38AM  4    Q.   AND, IN FACT, HARMONIZATION OF RESULTS FROM DIFFERENT

10:38AM  5    CLINICAL LABORATORY MEASUREMENT IS AN IMPORTANT CHALLENGE IN

10:38AM  6    THE FIELD OF LAB SCIENCES, ISN'T IT?

10:38AM  7    A.   COULD YOU RESTATE THE QUESTION?

10:38AM  8    Q.   SURE.  HARMONIZATION OF RESULTS FROM DIFFERENT CLINICAL

10:38AM  9    LABORATORY MEASUREMENT PROCEDURES IS AN IMPORTANT CHALLENGE IN

10:38AM  10   THE FIELD OF LAB TESTING; IS THAT CORRECT?

10:38AM  11   A.   COULD YOU -- I'M HAVING TROUBLE UNDERSTANDING WHAT YOU

10:38AM  12   MEAN BY "HARMONIZATION."  CAN YOU USE A DIFFERENT WORD?

10:38AM  13   Q.   SURE.

10:38AM  14        WE MENTIONED A MINUTE AGO THAT DIFFERENT METHODS CAN

10:38AM  15   SOMETIMES LEAD TO DIFFERENT RESULTS; RIGHT?

10:38AM  16   A.   YES.

10:38AM  17   Q.   AND ARE YOU AWARE OF EFFORTS TO TRY TO MAKE DIFFERENT

10:38AM  18   METHODS -- OR UNDERSTAND THE RELATIONSHIP OF DIFFERENT METHODS

10:38AM  19   SO THAT THEY CAN BE COMPARED?

10:39AM  20   A.   YES.

10:39AM  21   Q.   AND IS THAT AN IMPORTANT, IN YOUR UNDERSTANDING, SUBJECT

10:39AM  22   OF RESEARCH IN THE FIELD OF LAB TESTING?

10:39AM  23   A.   COULD YOU RESTATE THAT QUESTION?

10:39AM  24   Q.   SURE.  IS THIS EFFORT TO UNDERSTAND THE RELATIONSHIP

10:39AM  25   BETWEEN DIFFERENT METHODS, IS THAT AN IMPORTANT AREA OF

BURNES CROSS BY MS. TREFZ                                    6873

10:39AM   1    RESEARCH IN THE FIELD OF LAB TESTING?

10:39AM   2              MR. SCHENK:  OBJECTION.  BEYOND THE AREA IN WHICH HE

10:39AM   3    WAS DESIGNATED AN EXPERT FOR OPINION PURPOSES.

10:39AM   4              THE COURT:  I THINK WE'RE A LITTLE BEYOND THAT.

10:39AM   5    IT'S INTERPRETING THE RESULTS, AND THIS MIGHT GO TO THE

10:39AM   6    SCIENTIFIC ANALYSIS.

10:39AM   7         CAN YOU REPHRASE THAT QUESTION A LITTLE MORE?

10:39AM   8              MS. TREFZ:  OKAY.

10:39AM   9    Q.   YOU ALREADY STATED THAT YOU WERE AWARE THAT DIFFERENT

10:39AM  10    METHODS CAN LEAD TO DIFFERENT RESULTS ON THE SAME ASSAY, OR THE

10:40AM  11    SAME -- EXCUSE ME.  LET ME TRY AGAIN.

10:40AM  12         YOU ALREADY STATED THAT YOU'RE AWARE THAT DIFFERENT

10:40AM  13    METHODS CAN LEAD TO A DIFFERENT RESULT ON THE SAME SAMPLE;

10:40AM  14    CORRECT?

10:40AM  15    A.   YES, BUT THEY SHOULD BE VERY SMALL VARIATIONS.  THEY

10:40AM  16    SHOULD HAVE STANDARDS OF THE NORMAL RANGE ATTACHED TO EACH

10:40AM  17    RESULT.

10:40AM  18    Q.   A REFERENCE RANGE ATTACHED?

10:40AM  19    A.   A REFERENCE RANGE, YES.

10:40AM  20    Q.   AND HAVE YOU TRIED TO COMPARE DIFFERENT -- WE CAN USE THE

10:40AM  21    EXAMPLE OF PSA TESTS.  HAVE YOU TRIED TO COMPARE DIFFERENT PSA

10:40AM  22    TESTS TO EACH OTHER TO UNDERSTAND WHETHER THE RESULTS FROM

10:40AM  23    DIFFERENT LABORATORIES ARE COMPARABLE OR NOT?

10:40AM  24    A.   I HAVE NEVER APPROACHED IT FROM THAT POINT OF VIEW.  I

10:40AM  25    TRUSTED THAT THE LABS ARE VALID AND THE RESULTS, BASED ON THE

BURNES CROSS BY MS. TREFZ                                          6874

10:40AM  1    REFERENCE RANGES STATED BY THE LAB.

10:41AM  2    Q.   OKAY.

10:41AM  3    A.   IF IT WAS WITHIN NORMAL RANGE OR OUTSIDE OF THE NORMAL

10:41AM  4    RANGE.

10:41AM  5         I JUST DON'T UNDERSTAND THE POINT WE'RE TRYING TO MAKE

10:41AM  6    HERE.

10:41AM  7    Q.   WELL, I BELIEVE YOU ANSWERED THE QUESTION, WHICH IS YOU

10:41AM  8    BELIEVE THAT THERE SHOULD BE A SMALL DIFFERENCE AND THAT THERE

10:41AM  9    SHOULD BE A REFERENCE RANGE?

10:41AM 10    A.   A SLIGHT DIFFERENCE, YES.

10:41AM 11    Q.   LET ME -- JUST FOR THE PURPOSES OF POTENTIALLY CLARIFYING

10:41AM 12    FOR ALL OF US WHERE I'M GOING WITH THIS, LET ME HAND UP, IF I

10:41AM 13    CAN, A COUPLE OF EXHIBITS.  THEY'RE JUST GOING TO BE USED TO

10:41AM 14    REFRESH YOUR RECOLLECTION, IF THEY DO.

10:42AM 15         MAY I APPROACH, YOUR HONOR?

10:42AM 16              THE COURT:  YES.

10:42AM 17    BY MS. TREFZ:

10:42AM 18    Q.   (HANDING.)

10:42AM 19         DR. BURNES, I'VE HANDED YOU WHAT I'VE MARKED FOR

10:42AM 20    IDENTIFICATION PURPOSES AS EXHIBITS 13689, 13690, AND 13691.

10:42AM 21         AND WHAT I WOULD LIKE TO ASK IS WHETHER YOU CAN TAKE A

10:42AM 22    LOOK IN PARTICULAR AT 13691.  THE OTHER TWO EXHIBITS ARE

10:43AM 23    PROVIDED FOR CONTEXT.

10:43AM 24    A.   WHAT PAGE IS THAT?

10:43AM 25    Q.   IT'S THE LAST ONE.

BURNES CROSS BY MS. TREFZ                                          6875

10:43AM  1    A.   OH, I SEE.

10:43AM  2    Q.   THE OTHER TWO EXHIBITS ARE PROVIDED FOR CONTEXT JUST SO

10:43AM  3    THAT YOU UNDERSTAND.

10:43AM  4    A.   WHERE IS THE REFERENCE NUMBER I'M LOOKING FOR ON THE PAGE?

10:43AM  5    Q.   13691.  IT'S AT THE TOP RIGHT.

10:43AM  6         AND IT'S A GREY -- THIS PARTICULAR EXHIBIT IS A ONE PAGE

10:43AM  7    EXHIBIT, IT'S PRIMARILY GREY, AND IT HAS A WHITE BOX.

10:43AM  8    A.   OH, YOU'RE TALKING ABOUT THIS ONE (INDICATING)?

10:43AM  9    Q.   YES, THAT IS THE ONE THAT I'M PARTICULARLY INTERESTED IN.

10:43AM 10    HOWEVER, I'VE PROVIDED THE OTHER TWO, WHICH ARE -- THESE ARE

10:43AM 11    ALL FROM THE SAME WEBSITE BASICALLY.

10:43AM 12         AND IF YOU CAN TAKE A READ OF THE 13691, AND I'M GOING TO

10:44AM 13    ASK YOU A QUESTION ABOUT -- RELATED TO WHETHER IT REFRESHES

10:44AM 14    YOUR RECOLLECTION ON A PARTICULAR ISSUE IN JUST A MOMENT.

10:44AM 15    A.   OKAY.  THIS PAGE STATES PROSTHETIC --

10:44AM 16    Q.   I'M SORRY, DON'T -- BECAUSE WE'RE JUST USING IT FOR THIS

10:44AM 17    PURPOSE OF REFRESHING YOUR RECOLLECTION, DON'T READ IT OUT

10:44AM 18    LOUD.  JUST READ IT TO YOURSELF.

10:44AM 19         (PAUSE IN PROCEEDINGS.)

10:45AM 20              THE WITNESS:  I'VE FINISHED.

10:45AM 21    BY MS. TREFZ:

10:45AM 22    Q.   AND MY QUESTION HERE IS, DOES THIS DOCUMENT REFRESH YOUR

10:45AM 23    RECOLLECTION THAT PSA RESULTS ARE DIFFERENT -- FREQUENTLY

10:45AM 24    DIFFERENT AMONG DIFFERENT MEASUREMENT PROCEDURES?

10:46AM 25    A.   THEY CAN BE SLIGHTLY DIFFERENT.

BURNES CROSS BY MS. TREFZ                                        6876

10:46AM   1    Q.   AND DO YOU UNDERSTAND THAT HARMONIZATION OF RESULTS IS

10:46AM   2    CHALLENGING BECAUSE OF HOW THOSE PROCEDURES -- BECAUSE OF HOW

10:46AM   3    PSA IS FREQUENTLY MEASURED?

10:46AM   4    A.   I WOULD APPRECIATE IT IF YOU WOULD USE A DIFFERENT WORD

10:46AM   5    THAN "HARMONIZATION."  I'M NOT SURE WHAT YOU MEAN BY THAT.  IS

10:46AM   6    THAT CONSISTENT?

10:46AM   7    Q.   WHAT I MEAN BY IT IS BRINGING THOSE TWO METHODS IN, YOU

10:46AM   8    KNOW, UNDERSTANDING THE RELATIONSHIP BETWEEN THEM.  I WAS USING

10:46AM   9    THE LANGUAGE OF THE EXHIBIT FOR THAT PURPOSE, BUT --

10:46AM   10   A.   OKAY.  PLEASE RESTATE THE QUESTION.

10:46AM   11   Q.   SURE.  DO YOU UNDERSTAND THAT HARMONIZATION OF PSA RESULTS

10:46AM   12   IS PARTICULARLY CHALLENGING BECAUSE THE WAY THAT IT'S MEASURED

10:46AM   13   IS DIFFERENT IN DIFFERENT METHODS?

10:47AM   14   A.   NO, NOT APPRECIABLY.

10:47AM   15   Q.   OKAY.  I, I --

10:47AM   16   A.   MIGHT I EXPLAIN A LITTLE BIT?  I DON'T WANT TO GO INTO TOO

10:47AM   17   MUCH.

10:47AM   18   Q.   SURE, GO AHEAD.

10:47AM   19   A.   BUT FROM DIFFERENT LABS, THEY EXPECT SLIGHTLY DIFFERENT

10:47AM   20   VALUES FOR THE SAME TESTS, BUT THEY SHOULD BE PRETTY CLOSE TO

10:47AM   21   EACH OTHER.  AND WHEN I'M TALKING ABOUT CLOSE, WITHIN ABOUT 5

10:47AM   22   TO 10 PERCENT OF THE VALUES.

10:47AM   23        SO I WOULD NOT BE SURPRISED TO SEE SLIGHT VARIATION.

10:47AM   24        FOR EXAMPLE, IF I DID A TEST SEPARATE FROM, COMPLETELY

10:47AM   25   SEPARATE FROM THE PSA, SAY LIKE A SODIUM TEST, LIKE IT'S FROM

BURNES CROSS BY MS. TREFZ                                        6877

10:47AM   1    THE SAME SAMPLE, FROM THE SAME PATIENT, TO TWO DIFFERENT LABS,

10:47AM   2    ONE LAB MAY COME BACK AT 135 AND ONE MAY COME BACK AT 137, AND

10:47AM   3    THAT WOULD BE AN EXPECTED VARIATION.

10:47AM   4        BUT I WOULD NOT EXPECT IT TO BE 135 FOR ONE AND 120 WAY

10:48AM   5    OUT OF RANGE ON THE SAME PATIENT.

10:48AM   6        I WOULD EXPECT SOME VARIATION, BUT WITHIN REASON.

10:48AM   7    Q.   OKAY.  AND IS IT FAIR TO SAY THAT THE RANGE OF VARIATION

10:48AM   8    YOU WOULD EXPECT IS DIFFERENT FOR DIFFERENT ANALYTES THAT ARE

10:48AM   9    BEING MEASURED?

10:48AM   10   A.   YES.

10:48AM   11   Q.   AND YOU MENTIONED -- AND DO YOU HAVE AN UNDERSTANDING AS

10:48AM   12   TO WHETHER -- STRIKE THAT.

10:48AM   13       JUST TO UNDERSTAND PSA TESTS GENERALLY FOR ANOTHER MINUTE,

10:48AM   14   ARE -- I THINK YOU TESTIFIED THAT IN THIS PARTICULAR

10:48AM   15   CIRCUMSTANCE THE PATIENT WAS REQUESTED TO, REQUESTED TO HAVE

10:48AM   16   THIS TEST BECAUSE -- BY HIS CHURCH; CORRECT?

10:48AM   17   A.   YES.

10:48AM   18   Q.   IN FACT, WITH PSA TESTS, ISN'T, ISN'T IT THE CASE THAT

10:49AM   19   THERE'S ACTUALLY GUIDANCE THAT SUGGESTS THAT SOMETIMES THE

10:49AM   20   BENEFITS OF DOING A PSA TEST CAN BE -- CAN OUTWEIGH -- OR

10:49AM   21   SORRY.

10:49AM   22       THE RISKS OF DOING THE PSA TESTS CAN OUTWEIGH THE

10:49AM   23   BENEFITS?

10:49AM   24            MR. SCHENK:  OBJECTION.  RELEVANCE.

10:49AM   25            THE COURT:  SUSTAINED.

BURNES CROSS BY MS. TREFZ                                      6878

10:49AM   1            MS. TREFZ:  MAY I --

10:49AM   2            THE COURT:  WELL, THE RISK OF THE TEST AND WHY, THE

10:49AM   3   PURPOSE OF THE TEST BEING IS NOT REALLY AT ISSUE.

10:49AM   4            MS. TREFZ:  WELL, HE'S BEEN OFFERED AS AN EXPERT ON

10:49AM   5   PSA TESTS, AND THERE'S BEEN OTHER TESTIMONY IN THE CASE ABOUT

10:49AM   6   PSA TESTS, SO I THOUGHT THIS WOULD BE AN OPPORTUNITY TO

10:49AM   7   EXPLORE.

10:49AM   8            THE COURT:  HE'S AN EXPERT IN INTERPRETING PSA TEST

10:49AM   9   RESULTS AND BLOOD TESTS FOR PSA AND DIAGNOSING PROSTATE CANCER.

10:49AM  10       DOES YOUR QUESTION RELATE TO EITHER OF THOSE THREE?

10:49AM  11            MS. TREFZ:  IT RELATES TO WHEN YOU RECOMMEND A PSA

10:50AM  12   TEST AND HOW --

10:50AM  13            THE COURT:  WHY DON'T YOU ASK HIM THAT?

10:50AM  14            MS. TREFZ:  OKAY.

10:50AM  15   Q.   DR. BURNES, IS IT FAIR TO SAY THAT YOU DON'T ALWAYS

10:50AM  16   RECOMMEND A PSA TEST FOR EVERY -- FOR EVERYONE ABOVE -- FOR

10:50AM  17   EVERY MALE ABOVE 50?

10:50AM  18   A.   NO.  I DO RECOMMEND IT.

10:50AM  19   Q.   YOU DO?

10:50AM  20   A.   UNLESS THERE'S SPECIAL CIRCUMSTANCES.  THE DEFAULT WOULD

10:50AM  21   BE FOR MALES OVER 50 I WOULD DO IT ABOUT EVERY YEAR, YEAR AND A

10:50AM  22   HALF.

10:50AM  23   Q.   AND ARE YOU AWARE OF THE -- ARE YOU FAMILIAR WITH THE

10:50AM  24   AMERICAN COLLEGE OF PHYSICIANS?

10:50AM  25   A.   YES.

BURNES CROSS BY MS. TREFZ                                          6879

| 10:50AM | 1 | Q.   AND YOU WERE PREVIOUSLY ACP CERTIFIED; IS THAT RIGHT? |
| 10:50AM | 2 | A.   I USED TO BE. |
| 10:50AM | 3 | Q.   AND IN APRIL 2013, ACP RELEASED A NEW PROSTATE CANCER |
| 10:51AM | 4 | SCREENING GUIDANCE. |
| 10:51AM | 5 | ARE YOU AWARE OF THAT? |
| 10:51AM | 6 | A.   YES. |
| 10:51AM | 7 | Q.   AND ISN'T IT THE CASE THAT THE GUIDANCE WAS THAT MEN |
| 10:51AM | 8 | BETWEEN THE AGES OF 50 AND 69 SHOULD DISCUSS THE LIMITED |
| 10:51AM | 9 | BENEFITS AND SUBSTANTIAL HARMS OF THE PROSTATE SPECIFIC ANTIGEN |
| 10:51AM | 10 | TEST WITH THEIR DOCTOR BEFORE UNDERGOING SCREENING FOR PROSTATE |
| 10:51AM | 11 | CANCER? |
| 10:51AM | 12 | MR. SCHENK:  OBJECTION.  RELEVANCE. |
| 10:51AM | 13 | THE COURT:  IT HAS SOME RELEVANCE, SO I'LL ALLOW HIM |
| 10:51AM | 14 | TO ANSWER THE QUESTION. |
| 10:51AM | 15 | DID YOU UNDERSTAND THE QUESTION, DOCTOR? |
| 10:51AM | 16 | THE WITNESS:  NO.  I WAS GOING TO ASK HER TO REPEAT |
| 10:51AM | 17 | IT. |
| 10:51AM | 18 | THE COURT:  SURE.  LET'S DO THAT. |
| 10:51AM | 19 | MS. TREFZ:  SURE. |
| 10:51AM | 20 | Q.   YOU MENTIONED THAT YOU RECALLED THAT ACP RELEASED PROSTATE |
| 10:51AM | 21 | CANCER SCREENING GUIDANCE IN APRIL OF 2013. |
| 10:51AM | 22 | A.   YES. |
| 10:51AM | 23 | Q.   AND ISN'T IT THE CASE THAT THE FIRST LINE OF THAT GUIDANCE |
| 10:51AM | 24 | IS THAT MEN BETWEEN THE AGES OF 50 AND 69 SHOULD DISCUSS THE |
| 10:51AM | 25 | LIMITED BENEFITS AND SUBSTANTIAL HARMS OF THE PROSTATE SPECIFIC |

BURNES REDIRECT BY MR. SCHENK                                    6880

10:52AM   1    ANTIGEN TEST WITH THEIR DOCTOR BEFORE UNDERGOING SCREENING FOR

10:52AM   2    PROSTATE CANCER?

10:52AM   3    A.   I AGREE WITH THE DISCUSSION WITH THE PATIENTS, BUT I

10:52AM   4    DISAGREE WITH THE RECOMMENDATION.

10:52AM   5    Q.   OKAY.  YOU DISAGREE WITH THE RECOMMENDATION, BUT YOU DON'T

10:52AM   6    DISAGREE THAT THAT WAS THE RECOMMENDATION; IS THAT CORRECT?

10:52AM   7    A.   THAT'S CORRECT.

10:52AM   8    Q.   OKAY.  DID YOU -- DID PATIENTS OF YOURS GO TO THERANOS

10:52AM   9    AFTER THE INCIDENT WITH DR. ELLSWORTH?

10:52AM  10    A.   POSSIBLY.  I DON'T RECALL.

10:52AM  11    Q.   OKAY.  YOU DON'T RECALL ONE WAY OR THE OTHER?

10:52AM  12    A.   NO, I DON'T RECALL.

10:52AM  13    Q.   OKAY.  AND DID THE GOVERNMENT ASK YOU AT ANY POINT FOR THE

10:52AM  14    FULL LIST OF PATIENTS OF YOURS THAT, THAT WERE TESTED AT

10:52AM  15    THERANOS?

10:52AM  16    A.   NO.

10:52AM  17            MS. TREFZ:  NO FURTHER QUESTIONS, YOUR HONOR.

10:53AM  18            THE COURT:  MR. SCHENK?

10:53AM  19            MR. SCHENK:  I DO, YOUR HONOR.

10:53AM  20                     **REDIRECT EXAMINATION**

10:53AM  21    BY MR. SCHENK:

10:53AM  22    Q.   DR. BURNES, I JUST WANTED TO FOLLOW UP ON A COUPLE OF

10:53AM  23    QUESTIONS THAT YOU WERE JUST ASKED.

10:53AM  24        THE FIRST AREA IS YOU READ SOME GUIDANCE ABOUT THE RISKS

10:53AM  25    OF THE PSA TEST.

BURNES REDIRECT BY MR. SCHENK                                      6881

| | | |
|---|---|---|
| 10:53AM | 1 | DO YOU RECALL THAT? |
| 10:53AM | 2 | A. YES. |
| 10:53AM | 3 | Q. IS ONE OF THE RISKS THAT SOMEONE GETS A PSA TEST, IT IS |
| 10:53AM | 4 | HIGH, HIGH IS INACCURATE, AND THEN THEY TAKE SOME MEDICAL STEP, |
| 10:53AM | 5 | THEY INTERVENE SURGICALLY OR SOME OTHER WAY? |
| 10:53AM | 6 | A. THAT IS CORRECT. |
| 10:53AM | 7 | Q. SO THE TEST THAT I -- AND IF WE CAN BRING IT UP, ON |
| 10:53AM | 8 | PAGE -- IT'S EXHIBIT 4938, PAGE 7. |
| 10:54AM | 9 | IT'S ALSO ON THE SCREEN IF THAT'S EASIER FOR YOU. |
| 10:54AM | 10 | THIS IS THE MAY 14TH, 2015 TEST THAT DR. ELLSWORTH GOT. |
| 10:54AM | 11 | DO YOU RECALL THIS? |
| 10:54AM | 12 | A. YES. |
| 10:54AM | 13 | Q. SO THERANOS INFORMED YOU THAT DR. ELLSWORTH HAD A PSA |
| 10:54AM | 14 | SCORE OF OVER 26; IS THAT RIGHT? |
| 10:54AM | 15 | A. YES. |
| 10:54AM | 16 | Q. AND IS THE GUIDANCE THAT YOU WERE JUST PROVIDED WARNING |
| 10:54AM | 17 | DOCTORS FROM DOING PSA TESTS BECAUSE SOMETIMES YOU MIGHT GET AN |
| 10:54AM | 18 | ERRONEOUS TEST RESULT LIKE THIS, AND A DOCTOR MIGHT TAKE SOME |
| 10:54AM | 19 | UNNECESSARY MEDICAL INTERVENTION AS A RESULT OF THAT? |
| 10:54AM | 20 | A. YES, IF THEY'RE NOT PAYING ATTENTION. |
| 10:54AM | 21 | Q. PAYING ATTENTION TO WHAT? |
| 10:54AM | 22 | A. REALLY IT'S THE TREND. I WANT TO KEEP MY EXPLANATION |
| 10:54AM | 23 | SHORT, BUT IT'S NOT THE TOTAL RESULT THAT IS SO IMPORTANT |
| 10:55AM | 24 | USUALLY. IT'S THE RATE OF CHANGE. SO YOU REALLY IDEALLY WANT |
| 10:55AM | 25 | TO HAVE TRACKING WITH PATIENTS ABOUT EVERY YEAR, YEAR AND A |

BURNES REDIRECT BY MR. SCHENK                                    6882

10:55AM  1    HALF OVER AGE 50, UNLESS THEY HAVE A HIGHER RISK DUE TO A

10:55AM  2    FAMILY HISTORY, THEN WE START CHECKING IT EARLIER.

10:55AM  3        AND THE PSA SHOULD GENERALLY SLOWLY RISE AS THE PROSTATE

10:55AM  4    SLOWLY ENLARGES OVER THE YEARS, BECAUSE BASICALLY DEBRIS THAT

10:55AM  5    IS EMITTED FROM THE PROSTATE INTO THE BLOOD, WHICH WE MEASURE,

10:55AM  6    AND IT WILL SLOWLY RISE BECAUSE OF THE GROWTH OF THE GLAND.

10:55AM  7        BUT IF YOU HAVE A METABOLICALLY ACTIVE PROCESS, SUCH AS

10:55AM  8    CANCER, IT WILL GENERATE MORE DEBRIS, AND THAT'S THE THEORY

10:55AM  9    ABOUT WHEN IT'S DEPOSITED IN THE BLOOD.

10:55AM 10        AND THAT RISES HOW WE USE THE USEFUL MEASURE THAT ALLOWS

10:55AM 11    US TO PICK UP PROSTATE CANCER YEARS BEFORE WE CAN FEEL IT ON

10:55AM 12    EXAM OR BY DIAGNOSTIC IMAGING.

10:55AM 13        SO THERE'S A VALID RISK THAT IF YOU'RE NOT PAYING CLOSE

10:55AM 14    ATTENTION TO YOUR PATIENTS, THAT IF YOU GET A TEST RESULT AND

10:55AM 15    IT'S HIGH, YOU MIGHT UNNECESSARILY SEND A PATIENT FOR A BIOPSY,

10:56AM 16    A PROCEDURE THAT HAS MORE RISK TO IT THAN SIMPLY DRAWING BLOOD,

10:56AM 17    AND THIS IS TRUE.

10:56AM 18        BUT THAT'S WHY -- BUT PSA'S ARE GENERALLY NEVER URGENT.

10:56AM 19    IF I THINK THE RESULT IS CONCERNING BECAUSE OF A CHANGE, I'LL

10:56AM 20    REPEAT IT IN TWO OR THREE MONTHS.  IF IT'S A VERY SIGNIFICANT

10:56AM 21    CONCERN, THEN I'LL SEND PEOPLE OFF TO A UROLOGIST FIRST.

10:56AM 22        OR IT CAN ALSO BE AN ERROR -- WELL, MAYBE NOT ERROR, BUT

10:56AM 23    INTERPRETED IMPROPERLY BECAUSE IT CAN BE ELEVATED DUE TO

10:56AM 24    INFLAMMATION OF THE PROSTATE GLAND, WHICH IS CALLED

10:56AM 25    PROSTATITIS, AND THAT WILL INCREASE THE VALUE AS WELL.

BURNES REDIRECT BY MR. SCHENK                                        6883

10:56AM   1        SO, AGAIN, COMING BACK TO THE FACT THAT IT IS NOT URGENT,

10:56AM   2    WE JUST LIKE TO PICK IT UP YEARS BEFORE IT'S TOO LATE TO DO

10:56AM   3    SOMETHING ABOUT IT.  WE HAVE TIME, OVER THE COURSE OF THE YEAR

10:56AM   4    OR TWO MONITORING PSA'S, TO DECIDE AT WHAT POINT IN TIME YOU'RE

10:56AM   5    GOING TO SEND PEOPLE FOR MORE INTERVENTION.

10:56AM   6        DR. ELLSWORTH'S SITUATION WAS DIFFERENT BECAUSE HE WAS --

10:57AM   7    IT WAS VERY UNUSUAL BECAUSE HE WAS GOING TO BE LEAVING THE

10:57AM   8    COUNTRY FOR TWO YEARS, SO WE WOULD LIKE -- IF THERE WAS AN

10:57AM   9    ISSUE, WE WOULD LIKE TO HAVE CLARIFIED IT.

10:57AM  10        THAT'S THE ONLY REASON FOR THE -- I WOULD HAVE REPEATED

10:57AM  11    THE TEST ANYWAY, BUT I WOULD HAVE HAD A LITTLE MORE TIME.  I

10:57AM  12    WOULDN'T TAKE ANY ACTION UNTIL I FELT MORE ASSURED THAT WAS A

10:57AM  13    VALID RESULT THAT WOULD WARRANT MORE INTERVENTION.

10:57AM  14    Q.   I SEE.

10:57AM  15    A.   THERE WAS NEVER ANY URGENCY FOR PSA.

10:57AM  16    Q.   FORGIVE ME.

10:57AM  17        I ALSO WANT TO ASK YOU A QUESTION ABOUT THE REFERENCE

10:57AM  18    RANGE.  YOU WERE ASKED SOME QUESTIONS ABOUT HARMONIZATION,

10:57AM  19    ABOUT TESTS AT ONE LAB BEING COMPARED TO TESTS AT ANOTHER LAB.

10:57AM  20        DO YOU REMEMBER THOSE QUESTIONS?

10:57AM  21    A.   YES.

10:57AM  22    Q.   ON THIS DOCUMENT, THERANOS PROVIDES A REFERENCE RANGE.

10:57AM  23        DO YOU SEE THAT?

10:57AM  24    A.   LESS THAN 4.0.

10:57AM  25    Q.   SO WHAT DOES A SCORE OF 26 MEAN IN LIGHT OF THAT REFERENCE

BURNES REDIRECT BY MR. SCHENK                                    6884

10:57AM  1    RANGE?

10:58AM  2    A.   IT WAS, IT WAS ABNORMAL.

10:58AM  3         BUT TO BE A LITTLE BIT MORE PRECISE, IN MY PRACTICE HOW I

10:58AM  4    INTERPRET IT, IT'S THE RATE OF RISE.

10:58AM  5         I'VE HAD PATIENTS WHO HAVE HAD PSA'S OF 18 THAT HAVE

10:58AM  6    SLOWLY RISEN OVER THE YEARS THAT YOU MIGHT -- THAT I BIOPSIED

10:58AM  7    THAT WERE MARKEDLY ELEVATED AND IT TURNED OUT IT WAS NEGATIVE.

10:58AM  8         I'VE HAD PATIENTS THAT I HAVE DIAGNOSED WITH PSA OF 2.5 AS

10:58AM  9    CANCER, BUT HIS VALUE HAD BEEN PRETTY STABLE AT LIKE 0.5, 0.6,

10:58AM  10   0.5, AND THEN THE FOLLOWING YEAR IT HAD A FIVE-FOLD RISE FROM

10:58AM  11   .5 TO 2.5.

10:58AM  12        BUT EVEN THOUGH THAT IS LESS THAN THE -- OR WITHIN THE

10:58AM  13   NORMAL RANGE BY THE LAB STANDARDS, IT'S THE RATE OF RISE IS

10:59AM  14   MORE IMPORTANT, AND THAT'S NEVER BEEN CHANGED ON THE LAB.  THE

10:59AM  15   RATE OF RISE IS WHERE YOU GET SUSPICIOUS.

10:59AM  16   Q.   THANK YOU.

10:59AM  17        NO FURTHER QUESTIONS.

10:59AM  18             MS. TREFZ:  NO FURTHER QUESTIONS.

10:59AM  19             THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:59AM  20             MS. TREFZ:  HE MAY.

10:59AM  21             THE COURT:  THANK YOU.  YOU CAN LEAVE THE DOCUMENTS

10:59AM  22   THERE.  THANK YOU.  AND FEEL FREE TO TAKE THE MASK WITH YOU.

10:59AM  23             THE WITNESS:  OH, THANK YOU.

10:59AM  24             THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER

10:59AM  25   WITNESS?

6885

| | | |
|---|---|---|
| 10:59AM | 1 | MR. SCHENK:  WE DO, YOUR HONOR. |
| 10:59AM | 2 | THE COURT:  IS THIS WITNESS -- WILL THIS BE A BRIEF |
| 10:59AM | 3 | WITNESS AS WELL? |
| 10:59AM | 4 | MR. SCHENK:  YES, YOUR HONOR. |
| 10:59AM | 5 | THE COURT:  ALL RIGHT.  THANK YOU.  I SEE THIS IS |
| 10:59AM | 6 | THE TOP OF THE HOUR.  SHOULD WE TAKE OUR BREAK NOW?  IS THIS A |
| 10:59AM | 7 | GOOD TIME FOR OUR BREAK?  LET'S DO THAT. |
| 10:59AM | 8 | MR. SCHENK:  YES. |
| 10:59AM | 9 | THE COURT:  LET'S TAKE A 30 MINUTE BREAK NOW, LADIES |
| 10:59AM | 10 | AND GENTLEMEN, AND THEN WE'LL TAKE OUR NEXT WITNESS. |
| 11:01AM | 11 | (RECESS FROM 11:01 A.M. UNTIL 11:38 A.M.) |
| 11:38AM | 12 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 11:38AM | 13 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:38AM | 14 | DOES THE GOVERNMENT HAVE A WITNESS? |
| 11:38AM | 15 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:38AM | 16 | THE UNITED STATES CALLS MEHRL ELLSWORTH. |
| 11:38AM | 17 | THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD COME |
| 11:38AM | 18 | FORWARD AND FACE OUR COURTROOM DEPUTY. |
| 11:38AM | 19 | IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR |
| 11:38AM | 20 | YOU. |
| 11:38AM | 21 | THE WITNESS:  GOOD MORNING. |
| 11:38AM | 22 | THE CLERK:  GOOD MORNING. |
| 11:38AM | 23 | **(GOVERNMENT'S WITNESS, MEHRL ELLSWORTH, WAS SWORN.)** |
| 11:38AM | 24 | THE WITNESS:  YES. |
| 11:38AM | 25 | THE COURT:  I'LL INVITE YOU TO HAVE A SEAT UP HERE, |

ELLSWORTH DIRECT BY MR. SCHENK                                    6886

| | | |
|---|---|---|
| 11:38AM | 1 | SIR. |
| 11:38AM | 2 | MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THAT CHAIR |
| 11:38AM | 3 | AND MICROPHONE AS YOU NEED. |
| 11:38AM | 4 | I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 11:38AM | 5 | WHEN YOU ARE COMFORTABLE, I'D LIKE YOU TO STATE YOUR NAME |
| 11:38AM | 6 | AND SPELL IT, PLEASE. |
| 11:38AM | 7 | LET ME ASK YOU, HAVE YOU BEEN VACCINATED, SIR? |
| 11:38AM | 8 | THE WITNESS:  YES, AND INCLUDING THE BOOSTER. |
| 11:39AM | 9 | (LAUGHTER.) |
| 11:39AM | 10 | THE WITNESS:  THREE OF THEM. |
| 11:39AM | 11 | THE COURT:  THREE OF THEM. |
| 11:39AM | 12 | WELL, IF YOU WOULD LIKE TO TAKE YOUR MASK OFF WHILE YOU |
| 11:39AM | 13 | TESTIFY, YOU MAY DO SO. |
| 11:39AM | 14 | THE WITNESS:  I WOULD PREFER THAT. |
| 11:39AM | 15 | THE COURT:  GREAT. |
| 11:39AM | 16 | AND MR. SCHENK WILL DO THAT AS WELL. |
| 11:39AM | 17 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 11:39AM | 18 | AND THEN SPELL IT, PLEAS. |
| 11:39AM | 19 | THE WITNESS:  MEHRL K. ELLSWORTH.  M-E-H-R-L, K, |
| 11:39AM | 20 | ELLSWORTH, E-L-L-S-W-O-R-T-H. |
| 11:39AM | 21 | THE COURT:  THANK YOU.  COUNSEL. |
| 11:39AM | 22 | **DIRECT EXAMINATION** |
| 11:39AM | 23 | BY MR. SCHENK: |
| 11:39AM | 24 | Q.   GOOD MORNING, DR. ELLSWORTH. |
| 11:39AM | 25 | I'D LIKE TO ASK YOU SOME QUESTIONS, AND WE'RE GOING TO |

ELLSWORTH DIRECT BY MR. SCHENK                                    6887

11:39AM   1    FOCUS ON THE MAY, JUNE 2015 TIMEFRAME IF THAT'S OKAY.

11:39AM   2         AT THAT TIME WHERE DID YOU RESIDE?

11:39AM   3    A.   I LIVED IN LITCHFIELD PARK, ARIZONA.

11:39AM   4    Q.   AND WERE YOU EMPLOYED AT THE TIME?

11:39AM   5    A.   IN 2018?

11:39AM   6    Q.   2015.

11:39AM   7    A.   YES.

11:39AM   8    Q.   AND WHAT WERE YOU DOING?

11:39AM   9    A.   I WAS A DENTIST.

11:40AM   10   Q.   AND WERE YOU GETTING READY TO TAKE AN INTERNATIONAL TRIP

11:40AM   11   THAT SUMMER?

11:40AM   12   A.   YES.

11:40AM   13   Q.   BEFORE YOU TOOK THE TRIP, DID YOU GET A BLOOD TEST THROUGH

11:40AM   14   A COMPANY CALLED THERANOS?

11:40AM   15   A.   YES.

11:40AM   16   Q.   DID YOUR PHYSICIAN GIVE YOU INFORMATION ABOUT THE BLOOD

11:40AM   17   TEST AND WHERE TO GO?

11:40AM   18   A.   YES.  HE DIRECTED ME TO GO TO A WALGREENS, WHICH WAS

11:40AM   19   ACTUALLY BETWEEN HIS MEDICAL OFFICE AND MY DENTAL OFFICE.  WE

11:40AM   20   WERE ABOUT A MILE AND THREE-QUARTERS APART.

11:40AM   21   Q.   AND WHAT IS THE NAME OF YOUR PHYSICIAN?

11:40AM   22   A.   DR. MARK BURNES.

11:40AM   23   Q.   WAS THE BLOOD TEST THAT YOU GOT BEFORE THIS INTERNATIONAL

11:40AM   24   TRIP DIFFERENT THAN YOUR ANNUAL PHYSICAL BLOOD TEST?

11:40AM   25   A.   WAS IT DIFFERENT?  HOW IT WAS ADMINISTERED?

ELLSWORTH DIRECT BY MR. SCHENK                                        6888

11:40AM   1    Q.   NO, I'M SORRY.  THAT WAS UNCLEAR.

11:40AM   2         WAS IT NOT AT THE SAME SCHEDULE?

11:40AM   3    A.   CORRECT, CORRECT.  IT WAS STEPPED UP A LITTLE FASTER

11:41AM   4    BECAUSE OF THE REQUIREMENTS OF MY CHURCH.

11:41AM   5    Q.   OKAY.  AND WHAT DO YOU MEAN BY THAT?

11:41AM   6    A.   I HAD VOLUNTEERED AS A HUMANITARIAN DIRECTOR FOR

11:41AM   7    THAILAND-MYANMAR.  ANYWAY, I WAS ASKED TO SERVE WHAT WE TERM A

11:41AM   8    MISSION FOR THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,

11:41AM   9    AND I WAS A VOLUNTEER, AND THEY PUT YOU THROUGH A FINE TOOTH

11:41AM  10    COMB BEFORE YOU GO OUT OF THE COUNTRY BECAUSE THEY TAKE CARE OF

11:41AM  11    ALL MEDICAL EXPENSES WHEN YOU DO THAT.

11:41AM  12    Q.   AND SO YOU HAD TO HAVE A BLOOD TEST BEFORE YOU LEFT?

11:41AM  13    A.   YES.

11:41AM  14    Q.   AND AMONG THE TESTS, WAS PSA ONE OF THE TESTS?

11:41AM  15    A.   NORMALLY IT WAS FROM THE CLEVELAND LABS, YES.

11:41AM  16    Q.   AND HOW ABOUT ON THIS OCCASION BEFORE YOUR INTERNATIONAL

11:41AM  17    TRIP?  WAS A PSA TEST DONE?

11:41AM  18    A.   IT WAS EXCLUDED WITHIN THE 365 DAYTIME PERIOD BECAUSE I

11:41AM  19    PUSHED IT UP A LITTLE EARLIER, AND THEN THE FOREMAN FROM OUR

11:42AM  20    CHURCH REQUIRED THAT I NEEDED TO HAVE THE PSA.

11:42AM  21    Q.   YOU SAID IT WAS EXCLUDED.  I WONDER WHAT YOU MEAN BY THAT.

11:42AM  22    A.   IT WAS EXCLUDED BECAUSE -- IT WASN'T BEING PAID FOR,

11:42AM  23    BECAUSE IF YOU DO IT SOONER THAN 365 DAYS, MEDICARE THAT I WAS

11:42AM  24    UNDER, I GUESS, DIDN'T COVER IT.

11:42AM  25    Q.   I SEE.  SO INSURANCE WOULDN'T PAY FOR THE PSA TEST, SO YOU

11:42AM   1    HAD TO PAY FOR IT?

11:42AM   2    A.   YES.

11:42AM   3    Q.   AND WAS THAT ONE OF THE REASONS THAT YOU CHOSE TO GO TO

11:42AM   4    THERANOS?

11:42AM   5    A.   YES, BUT MAINLY ON THE ADVICE OF MY PHYSICIAN.

11:42AM   6    Q.   WHEN YOU GOT A BLOOD TEST AT THERANOS, DID YOU EXPECT THE

11:42AM   7    RESULTS TO BE ACCURATE?

11:42AM   8    A.   YES.

11:42AM   9    Q.   AND WAS ACCURACY IMPORTANT TO YOU?

11:42AM   10   A.   YES.

11:42AM   11   Q.   IT MIGHT BE OBVIOUS, BUT WHY?

11:42AM   12   A.   I HAVE A DEGREE IN MICROBIOLOGY AND A MINOR IN CHEMISTRY,

11:42AM   13   AND I WORKED IN SCIENCE ALL OF MY LIFE, AND ACCURACY WITH MY

11:42AM   14   LAB RESULTS WAS IMPORTANT.

11:42AM   15   Q.   DO BLOOD TESTS HAVE ANY VALUE OTHER THAN IF THEY ARE

11:42AM   16   ACCURATE?  CAN YOU USE THEM FOR SOMETHING ELSE?

11:42AM   17   A.   ARE BLOOD TESTS --

11:43AM   18          THE COURT:  MAYBE YOU SHOULD ASK THAT QUESTION A

11:43AM   19   DIFFERENT WAY.

11:43AM   20   BY MR. SCHENK:

11:43AM   21   Q.   WHY DON'T WE TURN TO THE DOCUMENTS?

11:43AM   22   A.   OKAY.

11:43AM   23   Q.   IF YOU WOULD LOOK AT -- THERE'S A BINDER IN FRONT OF YOU.

11:43AM   24   4938 IS THE EXHIBIT NUMBER.  IF YOU WOULD TURN TO PAGE 7.

11:43AM   25   A.   SEVEN.

ELLSWORTH DIRECT BY MR. SCHENK                                    6890

```
11:43AM   1              MR. SCHENK:  AND THIS HAS BEEN ADMITTED, YOUR HONOR.

11:43AM   2              THE COURT:  YES.

11:43AM   3              THE WITNESS:  OKAY.

11:43AM   4      BY MR. SCHENK:

11:43AM   5      Q.  AND IT'S ON THE SCREEN IF THAT EASIER.

11:43AM   6          DR. ELLSWORTH, IT LOOKS LIKE WE'RE LOOKING AT A BLOOD TEST

11:43AM   7      THAT HAPPENED FOLLOWING A VISIT ON MAY 14TH, 2015.

11:43AM   8          DO YOU RECALL THAT?

11:43AM   9      A.  YES, I DO.

11:43AM  10      Q.  AND WHERE DID YOU GO TO GET THIS BLOOD TEST?

11:43AM  11      A.  I WENT TO THE WALGREENS ON LITCHFIELD PARK ROAD.

11:43AM  12      Q.  IS THAT IN ARIZONA?

11:43AM  13      A.  YES, ACTUALLY IN LITCHFIELD PARK.  IT SAYS GOODYEAR, BUT

11:43AM  14      IT'S JUST ACROSS THE STREET FROM MY RESIDENCE.

11:44AM  15      Q.  OKAY.  HOW DID YOU PAY FOR THE TEST RESULT?

11:44AM  16      A.  I PAID WITH A CREDIT CARD.

11:44AM  17      Q.  USING YOUR OWN PERSONAL FUNDS?

11:44AM  18      A.  YES.

11:44AM  19      Q.  DO YOU REMEMBER THE METHOD OF BLOOD DRAW FOR THIS

11:44AM  20      PARTICULAR TEST?

11:44AM  21      A.  IT WAS A FINGER PRICK.

11:44AM  22      Q.  AND IT LOOKED LIKE THE BLOOD TEST CAME BACK AS A 26.

11:44AM  23          DO YOU SEE THAT?

11:44AM  24      A.  I SEE, YES, 26.1.

11:44AM  25      Q.  AND WAS 26 DIFFERENT THAN PRIOR PSA TEST RESULTS THAT YOU
```

ELLSWORTH DIRECT BY MR. SCHENK                                    6891

| | | |
|---|---|---|
| 11:44AM | 1 | RECEIVED? |
| 11:44AM | 2 | A.   YES, I HAD NEVER EXCEEDED A 2. |
| 11:44AM | 3 | Q.   IF YOU WILL NOW TURN ONE PAGE FORWARD TO PAGE 6. |
| 11:44AM | 4 | IT LOOKS LIKE ON PAGE 6 WE'RE LOOKING AT A BLOOD TEST |
| 11:44AM | 5 | RESULT FROM MAY 18TH, 2015, AT THERANOS. |
| 11:44AM | 6 | IS THAT RIGHT? |
| 11:44AM | 7 | A.   CORRECT. |
| 11:44AM | 8 | Q.   DID YOU GO TO THE SAME WALGREENS FOR THIS? |
| 11:44AM | 9 | A.   YES. |
| 11:44AM | 10 | Q.   DID YOU ALSO RECEIVE A FINGERSTICK TO DRAW YOUR BLOOD? |
| 11:44AM | 11 | A.   YES. |
| 11:44AM | 12 | Q.   AND HOW ABOUT THE PAYMENT?  HOW DID YOU PAY FOR THIS ONE? |
| 11:45AM | 13 | A.   AGAIN, MY CREDIT CARD.  IT WAS JUST EASIER AND QUICKER. |
| 11:45AM | 14 | Q.   CREDIT CARD DRAWN ON YOUR PERSONAL FUNDS? |
| 11:45AM | 15 | A.   YES, PERSONAL FUNDS. |
| 11:45AM | 16 | Q.   OKAY.  IF I COULD ASK YOU TO TURN TO PAGE 5. |
| 11:45AM | 17 | ON PAGE 5 IT LOOKS LIKE THERE'S A VISIT DATE OF JUNE 11, |
| 11:45AM | 18 | 2015. |
| 11:45AM | 19 | IS THIS A THIRD BLOOD TEST THROUGH THERANOS? |
| 11:45AM | 20 | A.   YES, IT IS. |
| 11:45AM | 21 | Q.   AND WHERE DID YOU GO FOR THIS TEST? |
| 11:45AM | 22 | A.   TO THE SAME LOCATION IN GOODYEAR. |
| 11:45AM | 23 | Q.   WALGREENS? |
| 11:45AM | 24 | A.   WALGREENS, YES. |
| 11:45AM | 25 | Q.   AND WHAT WAS THE FORM OF BLOOD DRAW? |

ELLSWORTH DIRECT BY MR. SCHENK                                    6892

11:45AM   1     A.   FINGER PRICK.

11:45AM   2     Q.   AND HOW ABOUT PAYMENT?  DO YOU REMEMBER HOW YOU PAID?

11:45AM   3     A.   AGAIN, WITH MY PERSONAL CREDIT CARD.

11:45AM   4     Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO PAGE 4, IT LOOKS LIKE

11:46AM   5     THIS ONE IS A BLOOD TEST RESULT ON JUNE 30TH, 2015.

11:46AM   6          IS THIS THE FOURTH THERANOS BLOOD TEST?

11:46AM   7     A.   YES.

11:46AM   8     Q.   DO YOU REMEMBER WHERE THE BLOOD DRAW WAS FOR THIS ONE?

11:46AM   9     A.   A PHLEBOTOMIST WAS DIRECTED BY THERANOS TO COME TO MY

11:46AM   10    OFFICE AND DO A VENOUS BLOOD DRAW.

11:46AM   11    Q.   THIS ONE WAS BY VEIN, COMPARED TO THE OTHERS?

11:46AM   12    A.   CORRECT.

11:46AM   13    Q.   HOW ABOUT PAYMENT?  DID YOU PAY FOR THIS ONE?

11:46AM   14    A.   THERE WAS NO PAYMENT ASKED OR REQUESTED.  IT WAS JUST

11:46AM   15    BEING DONE AS A COURTESY, I SUPPOSE.

11:46AM   16    Q.   SO YOU PAID OUT OF POCKET FOR THE FIRST THREE TESTS, BUT

11:46AM   17    YOU PAID NOTHING FOR THIS FOURTH TEST?

11:46AM   18    A.   CORRECT.

11:46AM   19    Q.   THANK YOU.

11:46AM   20              MR. SCHENK:  YOUR HONOR, MAY I HAVE A MOMENT?

11:46AM   21              THE COURT:  YES.

11:47AM   22       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:47AM   23              MR. SCHENK:  THANK YOU, YOUR HONOR.

11:47AM   24         NO FURTHER QUESTIONS.

11:47AM   25              MS. TREFZ:  WE HAVE NO QUESTIONS, YOUR HONOR.

| | | |
|---|---|---|
| 11:47AM | 1 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 11:47AM | 2 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:47AM | 3 | THE COURT:  YOU'RE EXCUSED. |
| 11:47AM | 4 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS? |
| 11:47AM | 5 | MR. BOSTIC:  YES, YOUR HONOR.  THE UNITED STATES |
| 11:47AM | 6 | CALLS ROGER PARLOFF. |
| 11:48AM | 7 | THE COURT:  SIR, IF YOU WOULD COME FORWARD, PLEASE. |
| 11:48AM | 8 | IF YOU WOULD FACE OUR COURTROOM DEPUTY HERE WHILE YOU RAISE |
| 11:48AM | 9 | YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 11:48AM | 10 | **(GOVERNMENT'S WITNESS, ROGER PARLOFF, WAS SWORN.)** |
| 11:48AM | 11 | THE WITNESS:  YES. |
| 11:48AM | 12 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE |
| 11:48AM | 13 | YOURSELF COMFORTABLE. |
| 11:48AM | 14 | PLEASE FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU |
| 11:48AM | 15 | NEED. |
| 11:48AM | 16 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 11:48AM | 17 | AND THEN SPELL IT, PLEASE. |
| 11:48AM | 18 | THE WITNESS:  ROGER PARLOFF.  P-A-R-L-O-F-F, AS IN |
| 11:48AM | 19 | FRANK. |
| 11:48AM | 20 | THE COURT:  THANK YOU. |
| 11:48AM | 21 | COUNSEL. |
| 11:48AM | 22 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 11:48AM | 23 | /// |
| 11:48AM | 24 | /// |
| 11:48AM | 25 | /// |

PARLOFF DIRECT BY MR. BOSTIC                                    6894

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
| 11:48AM | 1  | **DIRECT EXAMINATION** |
| 11:48AM | 2  | BY MR. BOSTIC: |
| 11:48AM | 3  | Q.   GOOD MORNING, MR. PARLOFF. |
| 11:48AM | 4  | A.   GOOD MORNING. |
| 11:48AM | 5  | Q.   IF YOU ARE VACCINATED AND COMFORTABLE TESTIFYING WITHOUT A |
| 11:48AM | 6  | MASK, THE COURT WILL ALLOW YOU TO DO SO. |
| 11:48AM | 7  | A.   OKAY. |
| 11:48AM | 8  | Q.   MR. PARLOFF, WHAT IS YOUR OCCUPATION? |
| 11:49AM | 9  | A.   I'M A JOURNALIST, REPORTER. |
| 11:49AM | 10 | Q.   AND CAN YOU GIVE US A BRIEF OVERVIEW OF YOUR EDUCATION, |
| 11:49AM | 11 | PLEASE. |
| 11:49AM | 12 | A.   I GRADUATED FROM HARVARD IN '77 AND FROM YALE LAW SCHOOL |
| 11:49AM | 13 | IN '82. |
| 11:49AM | 14 | Q.   AND DID YOU EVER PRACTICE AS A LAWYER DURING YOUR CAREER? |
| 11:49AM | 15 | A.   YEAH, ABOUT FIVE YEARS. |
| 11:49AM | 16 | Q.   GIVE US A BRIEF SUMMARY OF YOUR CAREER AS A JOURNALIST, |
| 11:49AM | 17 | PLEASE. |
| 11:49AM | 18 | A.   IN 1988 I BECAME A FULL-TIME JOURNALIST.  I WORKED WITH |
| 11:49AM | 19 | THE AMERICAN LAWYER PUBLICATION FOR -- OR COMPANY FOR ABOUT |
| 11:49AM | 20 | 12 YEARS.  I WROTE A BOOK WHILE I WAS THERE, WHICH WAS |
| 11:49AM | 21 | PUBLISHED BY LITTLE BROWN, ABOUT A DEATH PENALTY CASE. |
| 11:49AM | 22 | I SWITCHED PUBLICATIONS IN 2000, AND THAT PUBLICATION |
| 11:49AM | 23 | FOLDED, AND THEN I FREELANCED FOR A COUPLE OF YEARS. |
| 11:50AM | 24 | AND IN 2004 I WENT ON STAFF AT "FORTUNE" AS BASICALLY |
| 11:50AM | 25 | THEIR MAIN LEGAL CORRESPONDENT. |

PARLOFF DIRECT BY MR. BOSTIC                                    6895

11:50AM   1          AND THEN I WAS THERE FOR ANOTHER 12 YEARS THROUGH THE END

11:50AM   2     OF 2016.

11:50AM   3          SINCE THEN I'VE BEEN FREELANCING MAINLY FOR A PUBLICATION

11:50AM   4     CALLED "YAHOO FINANCE," BUT ALSO I HAVE PUBLISHED IN OTHER

11:50AM   5     PLACES LIKE "PROPUBLICA" AND "NEW YORK TIMES" AND THE ONLINE

11:50AM   6     VERSIONS OF "THE NEW YORKER" AND "NEW YORK" AND A PUBLICATION

11:50AM   7     CALLED "AIR MAIL."

11:50AM   8          RECENTLY I TOOK A CONTRACT POSITION WITH -- I'M A SENIOR

11:50AM   9     EDITOR AT A PUBLICATION CALLED "LAWFARE," L-A-W-F-A-R-E.

11:50AM  10     Q.   YOU MENTIONED THAT YOU WORKED FOR "FORTUNE" MAGAZINE IN

11:51AM  11     2014; IS THAT CORRECT?

11:51AM  12     A.   THAT'S RIGHT.

11:51AM  13     Q.   AND FOR A NUMBER OF YEARS BEFORE AND AFTER 2014?

11:51AM  14     A.   YEAH.

11:51AM  15     Q.   IN CONNECTION WITH YOUR EMPLOYMENT AT "FORTUNE," DID YOU

11:51AM  16     HAVE OCCASION TO WRITE AN ARTICLE ABOUT DEFENDANT

11:51AM  17     ELIZABETH HOLMES AND HER COMPANY THERANOS?

11:51AM  18     A.   YES.

11:51AM  19     Q.   WHAT KIND OF ARTICLE WAS THAT?  WAS IT A PROFILE?  WAS IT

11:51AM  20     INVESTIGATIVE REPORTING?  HOW WOULD YOU CHARACTERIZE IT?

11:51AM  21     A.    IT WAS A PROFILE OF BOTH HER AND HER COMPANY.

11:51AM  22     Q.   WHEN YOU WOULD WRITE PROFILES IN CONNECTION WITH YOUR JOB

11:51AM  23     AT "FORTUNE," WOULD YOU STRIVE TO MAKE SURE THE ARTICLE THAT

11:51AM  24     YOU CREATED ACCURATELY REFLECTED THE INFORMATION THAT YOU

11:51AM  25     RECEIVED FROM YOUR SUBJECTS?

PARLOFF DIRECT BY MR. BOSTIC                                    6896

11:51AM  1    A.   YES.

11:51AM  2    Q.   HOW DO YOU ACCOMPLISH THAT?  CAN YOU TELL US ABOUT YOUR

11:51AM  3    APPROACH TO THAT KIND OF ARTICLE?

11:51AM  4    A.   WELL, WITH A PROFILE I TRIED TO GET AS MUCH TIME WITH THE

11:52AM  5    SUBJECT AS POSSIBLE.  I LIKE TO TAPE AS MUCH AS POSSIBLE, AND I

11:52AM  6    ALSO LIKE TO SPEAK TO PEOPLE WHO KNOW THE SUBJECT WELL, KNOW

11:52AM  7    THE PERSON WELL, AND GET THE BIG CHUNK OF TIME WITH THE PERSON

11:52AM  8    TO DESCRIBE THEIR BIOGRAPHY AND HOW THEY GOT INTO WHAT THEY'RE

11:52AM  9    DOING AND SO ON.

11:52AM  10   Q.   YOU MENTIONED TAPING.

11:52AM  11        IS IT PART OF YOUR NORMAL PRACTICE TO RECORD SOME

11:52AM  12   INTERVIEWS WITH SUBJECTS THAT YOU'RE PROFILING?

11:52AM  13   A.   YES.

11:52AM  14   Q.   WHEN YOU DO THAT, DO YOU GET THEIR CONSENT TO RECORD?

11:52AM  15   A.   YES.

11:52AM  16   Q.   HOW ABOUT FOR CONVERSATIONS YOU HAVE WITH THEM THAT AREN'T

11:52AM  17   AUDIO RECORDED?  HOW DO YOU KEEP TRACK OF THOSE?

11:52AM  18   A.   I TAKE NOTES.  I USUALLY TAKE THEM IN A SPIRAL NOTEBOOK,

11:52AM  19   AND I USE SOMETHING CALLED SPEED WRITING, WHICH IS A VERY

11:53AM  20   SIMPLE FORM OF SHORTHAND.

11:53AM  21        AND THEN -- WELL --

11:53AM  22   Q.   I DIDN'T MEAN TO INTERRUPT.

11:53AM  23   A.   AND THEN IF IT'S AN ARTICLE FOR THE WEB AND IT'S GOING TO

11:53AM  24   GO UP QUICKLY, THAT MIGHT BE ALL I DO.

11:53AM  25        IF IT'S GOING TO BE A FEATURE ARTICLE OR SOMETHING WHERE

PARLOFF DIRECT BY MR. BOSTIC                                    6897

11:53AM  1    TIME IS GOING TO ELAPSE, I WOULD TRANSCRIBE THE NOTES FROM THE

11:53AM  2    SPIRAL NOTEBOOK INTO A COMPUTER FILE.

11:53AM  3    Q.  IN CONNECTION WITH THE ARTICLE THAT YOU WROTE ABOUT

11:53AM  4    MS. HOLMES AND THERANOS, DID YOU HAVE OCCASION TO INTERVIEW

11:53AM  5    MS. HOLMES?

11:53AM  6    A.  YES.

11:53AM  7    Q.  DID YOU SPEAK TO HER ON A NUMBER OF OCCASIONS?

11:53AM  8    A.  YES.

11:53AM  9    Q.  CAN YOU ESTIMATE FOR US HOW MANY HOURS OF DISCUSSIONS YOU

11:53AM  10   HAD WITH MS. HOLMES IN CONNECTION WITH YOUR WRITING FOR

11:53AM  11   "FORTUNE"?

11:54AM  12   A.  YEAH.  FOR THE -- WELL, FOR THE FIRST ARTICLE, WHICH --

11:54AM  13   AND THE ONLY MAGAZINE ARTICLE, WHICH CAME OUT IN JUNE OF 2014,

11:54AM  14   I HAD ABOUT TEN HOURS OF TAPES.

11:54AM  15        AND SO THEN I WOULD ESTIMATE, MAYBE BALLPARK, ANOTHER TWO,

11:54AM  16   TWO AND A HALF, THREE HOURS OF INTERVIEWS THAT WEREN'T TAPED.

11:54AM  17        AND THEN AFTER THAT ARTICLE, I CONTINUED TO SPEAK TO HER

11:54AM  18   FROM TIME TO TIME.

11:54AM  19   Q.  YOU MENTIONED THAT SOME OF YOUR CONVERSATIONS WITH

11:54AM  20   MS. HOLMES WERE AUDIO RECORDED, OTHERS WERE NOT.

11:54AM  21        FOR THE CONVERSATIONS THAT WERE NOT AUDIO RECORDED, DID

11:54AM  22   YOU TAKE CONTEMPORANEOUS NOTES OF SOME OF THOSE CONVERSATIONS?

11:54AM  23   A.  YES.  MOST.  SOME, NOT ALL.

11:54AM  24   Q.  AND WERE THERE, FINALLY, SOME CONVERSATIONS THAT YOU HAD

11:54AM  25   WITH MS. HOLMES WHERE AUDIO RECORDING AND NOTE-TAKING JUST

PARLOFF DIRECT BY MR. BOSTIC                              6898

| | | |
|---|---|---|
| 11:55AM | 1 | WEREN'T POSSIBLE OR YOU CHOSE NOT TO? |
| 11:55AM | 2 | A.   THAT'S RIGHT. |
| 11:55AM | 3 | Q.   CAN YOU TELL US ABOUT HOW YOU INITIALLY WERE PUT IN |
| 11:55AM | 4 | CONTACT WITH MS. HOLMES? |
| 11:55AM | 5 | A.   WELL, IT WAS THROUGH THE, THE LAW FIRM OF BOIES, |
| 11:55AM | 6 | SCHILLER & FLEXNER, THE LAW OFFICE OF DAVID BOIES. |
| 11:55AM | 7 | INITIALLY THE DIRECTOR OF COMMUNICATIONS OF THAT LAW FIRM |
| 11:55AM | 8 | CALLED ME IN MARCH OF 2014 AND HAD SUGGESTED THAT I MIGHT WANT |
| 11:55AM | 9 | TO WRITE AN ARTICLE ABOUT A LAWSUIT THAT THERANOS HAD JUST WON, |
| 11:55AM | 10 | A PATENT RELATED LAWSUIT. |
| 11:56AM | 11 | AND I HADN'T BEEN FOLLOWING IT IN NEWSLETTERS AND THOUGHT |
| 11:56AM | 12 | IT MIGHT BE INTERESTING, BUT -- AND SO -- EXCUSE ME. |
| 11:56AM | 13 | WE HAD SOME INITIAL BACK AND FORTH, AND THE WORD COMING |
| 11:56AM | 14 | BACK TO ME FROM THE FIRM WAS THAT BOIES WOULD BE -- BOIES HAD |
| 11:56AM | 15 | REPRESENTED THERANOS, DAVID BOIES, A VERY EMINENT LAWYER. |
| 11:56AM | 16 | AND THE WORD COMING BACK TO ME WAS THAT HE WOULD BE HAPPY |
| 11:56AM | 17 | TO COOPERATE WITH SUCH AN ARTICLE, BUT THE REAL STORY WAS THIS |
| 11:56AM | 18 | REMARKABLE COMPANY AND ITS REMARKABLE FOUNDER AND CEO, |
| 11:56AM | 19 | ELIZABETH HOLMES. |
| 11:56AM | 20 | Q.   DID YOU, PARTIALLY IN RESPONSE TO THAT, SWITCH YOUR FOCUS |
| 11:56AM | 21 | AND START MOVING TOWARDS WRITING A PROFILE OF MS. HOLMES AND |
| 11:57AM | 22 | THE COMPANY? |
| 11:57AM | 23 | A.   YES, ALMOST IMMEDIATELY. |
| 11:57AM | 24 | MR. BOSTIC:  MAY I APPROACH, YOUR HONOR? |
| 11:57AM | 25 | THE COURT:  YES. |

| | | |
|---|---|---|
| 11:57AM | 1 | BY MR. BOSTIC: |
| 11:57AM | 2 | Q.   (HANDING.) |
| 11:57AM | 3 | MR. PARLOFF, I'VE HANDED YOU A BINDER, AND FROM TIME TO |
| 11:57AM | 4 | TIME I'LL ASK YOU TO TURN TO TABS. |
| 11:57AM | 5 | LET'S START WITH EXHIBIT 1776. |
| 11:57AM | 6 | YOUR HONOR, THIS IS IN EVIDENCE.  MAY WE PUBLISH? |
| 11:57AM | 7 | THE COURT:  YES. |
| 11:57AM | 8 | BY MR. BOSTIC: |
| 11:57AM | 9 | Q.   MR. PARLOFF, IS EXHIBIT 1776 A COPY OF AN ARTICLE YOU |
| 11:57AM | 10 | WROTE ABOUT MS. HOLMES AND THERANOS? |
| 11:57AM | 11 | A.   YES. |
| 11:57AM | 12 | Q.   AND WAS THIS ARTICLE PUBLISHED ON OR AROUND JUNE 12TH, |
| 11:57AM | 13 | 2014? |
| 11:57AM | 14 | A.   YES. |
| 11:57AM | 15 | Q.   AND THE TITLE AT THE TOP READS, "THIS CEO'S OUT FOR |
| 11:57AM | 16 | BLOOD." |
| 11:57AM | 17 | IS THAT THE TITLE OF THE ARTICLE? |
| 11:57AM | 18 | A.   I REMEMBER THAT -- YEAH, UH-HUH. |
| 11:57AM | 19 | Q.   I'LL ASK YOU TO TURN NOW IN YOUR BINDER TO TAB 5485, |
| 11:58AM | 20 | PLEASE. |
| 11:58AM | 21 | A.   INCIDENTALLY, I THINK THE TITLE WAS DIFFERENT IN THE |
| 11:58AM | 22 | MAGAZINE, BUT I CAN'T REMEMBER WHAT IT WAS. |
| 11:58AM | 23 | Q.   UNDERSTOOD.  OKAY.  THANK YOU. |
| 11:58AM | 24 | A.   5480? |
| 11:58AM | 25 | Q.   5485. |

PARLOFF DIRECT BY MR. BOSTIC                                      6900

11:58AM   1    A.   YEAH, UH-HUH.

11:58AM   2    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

11:58AM   3    A.   YEAH.

11:58AM   4    Q.   AND IS 5485 AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES

11:58AM   5    IN CONNECTION WITH YOU PREPARING THIS ARTICLE?

11:58AM   6    A.   YES.  DO I BEGIN FROM THE BOTTOM?

11:58AM   7    Q.   TAKE A MOMENT TO REVIEW.  IT'S A PAGE AND A LITTLE BIT

11:58AM   8    MORE.

11:58AM   9         I'LL ASK YOU ABOUT THE SUBSTANCE, BUT FOR NOW MY ONLY

11:59AM  10    QUESTION IS, DO YOU RECOGNIZE THIS AS AN EMAIL BETWEEN YOU AND

11:59AM  11    MS. HOLMES?

11:59AM  12    A.   YEAH.  YES.

11:59AM  13              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

11:59AM  14    ADMIT 5485.  I BELIEVE THE DEFENSE HAS STIPULATED.

11:59AM  15              MR. CLINE:  NO OBJECTION.

11:59AM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:59AM  17         (GOVERNMENT'S EXHIBIT 5485 WAS RECEIVED IN EVIDENCE.)

11:59AM  18    BY MR. BOSTIC:

11:59AM  19    Q.   MR. PARLOFF, FEEL FREE TO POUR YOURSELF A CUP OF WATER IF

11:59AM  20    YOU WOULD LIKE.

11:59AM  21    A.   THANK YOU.

11:59AM  22         COULD I EXPLAIN?  I HAVE A SEASONAL ALLERGY AND THE

11:59AM  23    SYMPTOM IS A DRY COUGH.  IT HAPPENS EVERY NOVEMBER.

11:59AM  24         I HAVE THREE VACCINES AND I'M FEELING FINE.

11:59AM  25         (LAUGHTER.)

11:59AM  1           MR. BOSTIC:  I NEVER THOUGHT WE'D NEED TO EXPLAIN A

11:59AM  2    COUGH.

11:59AM  3           THE COURT:  WE APPRECIATE THAT, SIR, AND WELCOME TO

11:59AM  4    CALIFORNIA IN THE FALL.

11:59AM  5    BY MR. BOSTIC:

11:59AM  6    Q.   MR. PARLOFF, ON THE SCREEN IN FRONT OF YOU NOW, YOU SHOULD

11:59AM  7    SEE EXHIBIT 5485, THE EMAIL CHAIN THAT WE WERE JUST TALKING

11:59AM  8    ABOUT.

11:59AM  9         DO YOU SEE THAT?

11:59AM 10    A.   YEAH.

11:59AM 11    Q.   AND LET'S ZOOM IN, MS. HOLLIMAN, ON THE BOTTOM EMAIL

11:59AM 12    MESSAGE IF WE CAN.

11:59AM 13         MR. PARLOFF, DO YOU SEE AN EMAIL FROM YOU TO MS. HOLMES ON

12:00PM 14    APRIL 2ND, 2014?

12:00PM 15    A.   YES.

12:00PM 16    Q.   YOU WRITE, "GREAT SPEAKING WITH YOU JUST NOW, ELIZABETH.

12:00PM 17    HERE'S MY CONTACT INFORMATION."

12:00PM 18         AND YOU TALK ABOUT SOME TRAVEL PLANS THAT ARE COMING UP?

12:00PM 19    A.   YES.

12:00PM 20    Q.   IS THAT RIGHT?

12:00PM 21         WAS THIS AROUND THE TIME WHEN YOU FIRST GOT INTO CONTACT

12:00PM 22    WITH MS. HOLMES?

12:00PM 23    A.   YES.

12:00PM 24    Q.   YOU PROVIDE A LIST BELOW.

12:00PM 25         IS THAT A LIST OF TASKS OR APPROACHES THAT YOU WERE

PARLOFF DIRECT BY MR. BOSTIC                                    6902

12:00PM   1    THINKING OF TAKING TO PREPARE AND RESEARCH YOUR ARTICLE?

12:00PM   2    A.   YES.

12:00PM   3    Q.   NUMBER 1 ON THAT LIST ASKS FOR A GOOD CHUNK OF TIME JUST

12:00PM   4    TO WALK THROUGH THE CHRONOLOGY OF MS. HOLMES'S LIFE, HER

12:00PM   5    DECISION TO FOUND THE COMPANY, AND THE KEY INVENTIONS AND

12:00PM   6    LANDMARKS ALONG THE WAY.

12:00PM   7         DO YOU SEE THAT?

12:00PM   8    A.   YES.

12:00PM   9    Q.   AND NUMBER 2 EXPRESSES YOUR INTEREST IN A CHANCE TO SEE

12:00PM  10    MS. HOLMES IN ACTION AT WORK, MAYBE SHADOWING HER FOR A PORTION

12:00PM  11    OF A DAY.

12:00PM  12         DO YOU SEE THAT?

12:00PM  13    A.   YES.

12:00PM  14    Q.   AND LET'S GO UP IN THIS EMAIL CHAIN AND ZOOM IN ON THE TOP

12:01PM  15    PART, THE TWO TOP MESSAGES.

12:01PM  16         FIRST, IN THE BOTTOM OF THIS SELECTION, DO YOU SEE ANOTHER

12:01PM  17    EMAIL FROM YOU THE FOLLOWING DAY TALKING ABOUT, AGAIN, AN

12:01PM  18    UPCOMING TRAVEL TO MEET WITH MS. HOLMES?

12:01PM  19    A.   YEAH.

12:01PM  20    Q.   AND DID YOU, IN FACT, MEET IN PERSON WITH MS. HOLMES THE

12:01PM  21    WEEK AFTER THIS EMAIL?

12:01PM  22    A.   YES.

12:01PM  23    Q.   IN THAT SAME EMAIL YOU EXPRESS INTEREST IN HAVING THE

12:01PM  24    EXPERIENCE OF GETTING YOUR BLOOD TESTED USING THE THERANOS

12:01PM  25    METHOD.

PARLOFF DIRECT BY MR. BOSTIC                          6903

| | | |
|---|---|---|
| 12:01PM | 1 | IS THAT SOMETHING THAT YOU WANTED AT THAT TIME? |
| 12:01PM | 2 | A.   YES. |
| 12:01PM | 3 | Q.   AND WAS THAT ALL IN CONNECTION WITH YOUR RESEARCH FOR THE |
| 12:01PM | 4 | ARTICLE? |
| 12:01PM | 5 | A.   YES. |
| 12:01PM | 6 | Q.   AND MS. HOLMES IN THE TOP MESSAGE CONFIRMS THAT THE |
| 12:01PM | 7 | COMPANY WILL BE ABLE TO GET YOU A PRESCRIPTION. |
| 12:02PM | 8 | DO YOU SEE THAT? |
| 12:02PM | 9 | A.   YES. |
| 12:02PM | 10 | Q.   AND WHEN YOU WENT TO CALIFORNIA TO MEET WITH MS. HOLMES, |
| 12:02PM | 11 | WHERE DID THE MEETING TAKE PLACE? |
| 12:02PM | 12 | A.   AT THEIR HEADQUARTERS AT THAT TIME WHICH WAS, WHICH I |
| 12:02PM | 13 | THINK IT WAS SOUTH CALIFORNIA AVENUE.  IT WAS NOT THEIR FINAL |
| 12:02PM | 14 | HEADQUARTERS. |
| 12:02PM | 15 | Q.   AND WAS THAT IN PALO ALTO? |
| 12:02PM | 16 | A.   YEAH. |
| 12:02PM | 17 | Q.   DID YOU INTERVIEW MS. HOLMES IN CONNECTION WITH THAT FIRST |
| 12:02PM | 18 | MEETING? |
| 12:02PM | 19 | A.   YES. |
| 12:02PM | 20 | Q.   DID YOU ALSO HAVE A TOUR OF THE THERANOS HEADQUARTERS AT |
| 12:02PM | 21 | THAT TIME? |
| 12:02PM | 22 | A.   YES. |
| 12:02PM | 23 | Q.   AND WHAT DO YOU REMEMBER SEEING ON THAT TOUR? |
| 12:02PM | 24 | A.   AFTER YOU GOT THROUGH THE RECEPTION, THERE WAS A LARGE |
| 12:02PM | 25 | OPEN PLAN ROOM WITH A LOT OF DESKS. |

PARLOFF DIRECT BY MR. BOSTIC                                    6904

12:02PM  1          TOWARDS THE BACK THERE WAS -- EXCUSE ME, THERE WAS A ROW

12:02PM  2   OF OFFICES ALONG THE PERIMETER, AT LEAST ONE PERIMETER.

12:02PM  3          I BELIEVE ELIZABETH'S OFFICE WAS ON THE LEFT.

12:03PM  4          THERE WERE THEN LABS.  YOU WOULD BUZZ THROUGH WITH A BADGE

12:03PM  5   OR A CARD TO GET INTO THE LAB, AND THEN TO GET FROM ONE LAB TO

12:03PM  6   ANOTHER LAB.

12:03PM  7          I THINK THE PLACE HAD AT LEAST TWO LEVELS, POSSIBLY THREE.

12:03PM  8   I REMEMBER A DOWNSTAIRS.  THERE WAS A -- I THINK THERE WAS A

12:03PM  9   CONFERENCE ROOM THAT USED TO BE THE OFFICE OF MARK ZUCKERBERG

12:03PM  10  WHEN FACEBOOK WAS IN THE BUILDING.

12:03PM  11         I DON'T REMEMBER IF THERE WAS A SECOND FLOOR AS WELL.

12:03PM  12  Q.   DO YOU REMEMBER -- WELL, LET ME ASK FIRST, WHILE YOU TOOK

12:03PM  13  THAT TOUR, WAS MS. HOLMES PRESENT WITH YOU?

12:03PM  14  A.   YES.

12:03PM  15  Q.   DURING THE ENTIRE TOUR?

12:03PM  16  A.   I THINK SO.

12:03PM  17  Q.   DO YOU RECALL WHETHER YOU SAW THE CLINICAL LAB WHERE

12:03PM  18  THERANOS ACTUALLY PERFORMED ITS PATIENT TESTING ON THAT TOUR?

12:04PM  19  A.   I DID NOT SEE THE COMMERCIAL LAB.  I SAW AN R&D LAB.

12:04PM  20  Q.   DO YOU REMEMBER SEEING BLOOD ANALYZERS IN THE R&D LAB?

12:04PM  21  A.   YES.

12:04PM  22  Q.   WHAT DID THEY LOOK LIKE?

12:04PM  23  A.   TO ME THEY LOOKED LIKE LARGE -- WELL, THEY LOOKED LIKE IF

12:04PM  24  YOU HAVE A DESKTOP COMPUTER, LIKE A DELL DESKTOP, THE TOWER OF

12:04PM  25  A DESKTOP COMPUTER, MAYBE TWO FEET HIGH, AND MAYBE 8 INCHES TO

PARLOFF DIRECT BY MR. BOSTIC                                    6905

12:04PM  1    A FOOT WIDE, SOMETHING LIKE THAT.

12:04PM  2    Q.   AROUND THE TIME OF THAT FIRST MEETING, WERE YOU HAVING

12:04PM  3    CONVERSATIONS WITH MS. HOLMES, FOR EXAMPLE, DURING THE TOUR

12:04PM  4    ABOUT WHAT THE THERANOS TECHNOLOGY WAS?

12:04PM  5    A.   DURING THE TOUR -- I THINK WE SPOKE MORE ABOUT THAT IN A

12:05PM  6    CONFERENCE ROOM AS I REMEMBER IT.  I CAN'T REMEMBER DURING THE

12:05PM  7    TOUR ITSELF HOW MUCH, YOU KNOW, SHE SHOWED THEM TO ME.  THEY

12:05PM  8    WERE NOT IN OPERATION AT THAT TIME.

12:05PM  9    Q.   OKAY.  SO I WON'T ASK YOU TO PLACE IT IN THE BUILDING.

12:05PM  10        BUT WHAT DO YOU RECALL, AT A HIGH LEVEL, MS. HOLMES

12:05PM  11   TELLING YOU ABOUT WHAT THE COMPANY WAS DOING, WHAT ITS

12:05PM  12   TECHNOLOGY WAS?

12:05PM  13   A.   WELL, THE -- I MEAN, THE KEY ADVANCE WAS THAT THEY COULD

12:05PM  14   DO A TREMENDOUS NUMBER OF BLOOD TESTS WITH A FINGERSTICK

12:05PM  15   INSTEAD OF VENIPUNCTURE, AND THEY HAD MINIATURIZED THE WHOLE

12:05PM  16   LAB PROCESS AND COULD DO -- SO A VERY SMALL QUANTITY OF BLOOD

12:05PM  17   WOULD BE TAKEN, YOU KNOW, IN A NANOTAINER, SOMETHING ABOUT THE

12:05PM  18   SIZE OF A FUSE, AND THEN YOU COULD ANALYZE THAT AND GET VERY

12:06PM  19   QUICK RESULTS.

12:06PM  20   Q.   AND IN THOSE INITIAL CONVERSATIONS WITH MS. HOLMES, WAS

12:06PM  21   THERE A KEY SCIENTIFIC ADVANCE OR PIECE OF TECHNOLOGY THAT SHE

12:06PM  22   WAS HOLDING OUT AS MAKING IT POSSIBLE TO DO THAT KIND OF

12:06PM  23   TESTING?

12:06PM  24   A.   WELL, I MEAN THE, THE SPECIFICS OF HOW THIS WAS DONE WAS

12:06PM  25   ALL A TRADE SECRET, PROBABLY MULTIPLE TRADE SECRETS.

PARLOFF DIRECT BY MR. BOSTIC                                    6906

12:06PM   1        IN GENERAL, SHE WAS SOMEHOW MINIATURIZING THE PROCESS AND

12:06PM   2   ABLE TO RUN ALL OF THESE TESTS IN THIS VERY TINY DEVICE, HIGHLY

12:06PM   3   AUTOMATED AS YOU WOULD PUT THE NANOTAINER INTO A CARTRIDGE.  I

12:06PM   4   DID NOT SEE THIS DONE AT THIS TIME, BUT SHE DESCRIBED IT.

12:07PM   5        AND THEN THE CARTRIDGE WOULD GO INTO THE DEVICE, AND THIS

12:07PM   6   WOULD -- IT WOULD BE AUTOMATED AND THAT WOULD PROTECT AGAINST

12:07PM   7   HUMAN ERROR, AND THAT WOULD IMPROVE THE ACCURACY OF RESULTS.

12:07PM   8   Q.   THAT'S HOW MS. HOLMES EXPLAINED IT TO YOU?

12:07PM   9   A.   YES.

12:07PM  10   Q.   BESIDES THE PALO ALTO HEADQUARTERS, DID YOU ALSO GET A

12:07PM  11   TOUR OF THEIR MANUFACTURING FACILITIES?

12:07PM  12   A.   YEAH.  YES.

12:07PM  13   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

12:07PM  14   A.   IT WAS IN NEWARK, CALIFORNIA ACROSS A BODY OF WATER, I

12:07PM  15   THINK THE SOUTH BAY.

12:07PM  16        AND I THINK IT MIGHT HAVE BEEN A NEW FACILITY.  IT WAS, IT

12:07PM  17   WAS LARGE.  IT HAD A LOT OF OPEN SPACE AT THAT POINT.  IT MIGHT

12:07PM  18   HAVE BEEN -- IT WAS NOT A BUZZING FACTORY, YOU KNOW, NO

12:07PM  19   ASSEMBLY LINES OR ANYTHING, BUT IT MAY HAVE BEEN TOO NEW FOR

12:07PM  20   THAT.  I CAN'T REALLY REMEMBER.

12:07PM  21        THEY WERE GETTING -- THEY SEEMED TO BE GETTING SET UP

12:08PM  22   STILL.

12:08PM  23   Q.   AND ON THAT SAME VISIT, WE SAW IN YOUR EMAIL THAT YOU

12:08PM  24   EXPRESSED SOME INTEREST ABOUT EXPERIENCING THE THERANOS TEST.

12:08PM  25        DID YOU HAVE THAT OPPORTUNITY?

PARLOFF DIRECT BY MR. BOSTIC                                    6907

| | | |
|---|---|---|
| 12:08PM | 1 | A.   YES. |
| 12:08PM | 2 | Q.   AND WHAT DO YOU REMEMBER ABOUT THAT? |
| 12:08PM | 3 | A.   I WENT TO THE WALGREENS AT DOWNTOWN PALO ALTO, AND THIS |
| 12:08PM | 4 | WAS NOT -- THIS WAS ARRANGED BY THEM.  IT WAS NOT A SURPRISE. |
| 12:08PM | 5 | AND THERE WAS A LITTLE WING OF THE WALGREENS THAT WAS SET |
| 12:08PM | 6 | ASIDE AS A THERANOS WELLNESS CENTER, AND YOU WENT IN THERE AND |
| 12:08PM | 7 | IT WAS A -- THERE WAS SORT OF A SOOTHING ENVIRONMENT, THERE WAS |
| 12:08PM | 8 | AN LE -- A HIGH DEFINITION T.V. WITH SOMETHING SOOTHING ON IT, |
| 12:08PM | 9 | I THINK AN AQUARIUM, OR SOMETHING LIKE THAT. |
| 12:09PM | 10 | AND THERE WAS A PHLEBOTOMIST WHO -- SHE HAD SOMETHING TO |
| 12:09PM | 11 | WARM THE FINGER, I THINK, AND THEN SHE MASSAGED IT, AND THEN |
| 12:09PM | 12 | SHE PUT A SMALL LANCET AND PRICKED THE FINGER.  IT WAS VERY |
| 12:09PM | 13 | GOOD.  IT WAS VERY PAINLESS. |
| 12:09PM | 14 | AND THEN THERE WAS A WICKING DEVICE, EITHER -- EXCUSE |
| 12:09PM | 15 | ME -- GLASS OR PLASTIC, THAT YOU PUT AGAINST THE WOUND OR THE |
| 12:09PM | 16 | FINGERSTICK, AND IT WICKED THE BLOOD UP INTO THE NANOTAINER, |
| 12:09PM | 17 | AND THEN SOMEHOW YOU SNAPPED THE NANOTAINER OFF. |
| 12:09PM | 18 | Q.   AND THAT'S WHAT YOU EXPERIENCED DURING THAT VISIT? |
| 12:09PM | 19 | A.   YEAH.  YES. |
| 12:09PM | 20 | Q.   YOU MENTIONED THAT THE COMPANY ARRANGED THAT VISIT.  IN |
| 12:10PM | 21 | OTHER WORDS, YOU JUST DIDN'T DO A COLD WALK IN? |
| 12:10PM | 22 | A.   THAT'S RIGHT. |
| 12:10PM | 23 | Q.   BESIDES THE THINGS THAT YOU WERE ABLE TO SEE, DID |
| 12:10PM | 24 | MS. HOLMES ALSO PROVIDE YOU WITH WRITTEN MATERIALS ABOUT |
| 12:10PM | 25 | THERANOS? |

PARLOFF DIRECT BY MR. BOSTIC                                    6908

12:10PM   1    A.   YES.

12:10PM   2    Q.   CAN YOU TURN TO TAB 5487, PLEASE, IN YOUR BINDER.

12:10PM   3    A.   YEAH.

12:10PM   4         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5487.

12:10PM   5    I BELIEVE THE DEFENSE HAS STIPULATED.

12:10PM   6         MR. CLINE:  NO OBJECTION.

12:10PM   7         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:10PM   8         (GOVERNMENT'S EXHIBIT 5487 WAS RECEIVED IN EVIDENCE.)

12:10PM   9         MR. BOSTIC:  MS. HOLLIMAN, LET'S GO TO PAGE 3 OF

12:10PM  10    THIS EXHIBIT.

12:10PM  11         THE WITNESS:  54?

12:10PM  12    BY MR. BOSTIC:

12:10PM  13    Q.   5487.  AND IT'S ABOUT TO BE ON YOUR SCREEN IF THAT'S

12:10PM  14    EASIER.

12:10PM  15    A.   OKAY.  UH-HUH.

12:10PM  16    Q.   WHILE WE'RE WAITING FOR THE DOCUMENT TO COME UP ON THE

12:11PM  17    SCREEN, MR. PARLOFF, IS THIS AN EMAIL DATED MAY 26TH, 2014, TO

12:11PM  18    YOU FROM CHRISTIAN HOLMES?

12:11PM  19    A.   YES.

12:11PM  20    Q.   OKAY.  AND IF WE GO TO PAGE 3 OF THIS EXHIBIT, AND LET'S

12:11PM  21    ZOOM IN ON THE TEXT OF THAT EMAIL IN THE MIDDLE.

12:11PM  22         AND THE EMAIL FROM CHRISTIAN READS, "ROGER,

12:11PM  23         "I HOPE THIS FINDS YOU WELL.  ATTACHED TO THIS EMAIL IS A

12:11PM  24    PRESENTATION DECK WITH DETAILED CLINICAL BACKGROUND."

12:11PM  25         DO YOU SEE THAT?

PARLOFF DIRECT BY MR. BOSTIC                                        6909

12:11PM  1    A.   YES.

12:11PM  2    Q.   AND THEN AT THE BOTTOM OF THE SELECTION IT READS, "ALL

12:11PM  3    DOCUMENTS CAN BE ACCESSED WITH THE FOLLOWING CREDENTIALS:"

12:11PM  4         WERE THE MATERIALS THAT THERANOS SENT YOU ENCRYPTED?

12:11PM  5    A.   YES.

12:11PM  6    Q.   DO YOU HAVE ACCESS TO THE ELECTRONIC NATIVE VERSIONS OF

12:12PM  7    THOSE DOCUMENTS TODAY?

12:12PM  8    A.   NO.

12:12PM  9    Q.   I'LL ASK YOU TO TURN TO TAB 3404 THEN IN YOUR BINDER.

12:12PM  10   IT'S 3404.

12:12PM  11   A.   YES.

12:12PM  12   Q.   AND ARE YOU LOOKING AT A SLIDE PRESENTATION WHERE THE

12:12PM  13   FRONT PAGE READS THERANOS?

12:12PM  14   A.   YES.

12:12PM  15   Q.   AND I'LL DRAW YOUR ATTENTION TO THE LOWER RIGHT CORNER OF

12:12PM  16   EACH PAGE WHERE THERE'S A BATES NUMBER BEGINNING WITH YOUR LAST

12:12PM  17   NAME.

12:12PM  18        DO YOU SEE THAT?

12:12PM  19   A.   YES.

12:12PM  20   Q.   IS THIS A PRESENTATION THAT YOU RECEIVED FROM THERANOS

12:12PM  21   WHILE YOU WERE PREPARING TO WRITE YOUR JUNE 2014 ARTICLE?

12:12PM  22   A.   YES.

12:12PM  23        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

12:12PM  24   ADMIT 3404.

12:12PM  25        MR. CLINE:  NO OBJECTION.

PARLOFF DIRECT BY MR. BOSTIC                                    6910

| | | |
|---|---|---|
| 12:12PM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:12PM | 2 | (GOVERNMENT'S EXHIBIT 3404 WAS RECEIVED IN EVIDENCE.) |
| 12:12PM | 3 | BY MR. BOSTIC: |
| 12:12PM | 4 | Q.  AND LET'S LOOK FOR A MOMENT AT THE FIRST PAGE. |
| 12:13PM | 5 | MR. PARLOFF, THIS IS THE PRESENTATION THAT THERANOS SENT |
| 12:13PM | 6 | YOU? |
| 12:13PM | 7 | A.  YES.  I RECEIVED IT IN HARD COPY WHILE I WAS THERE, AND |
| 12:13PM | 8 | THEN I GOT A VERSION -- A DIGITAL VERSION AS WELL. |
| 12:13PM | 9 | Q.  AND WAS THIS PRESENTATION JUST EMAILED TO YOU WITHOUT |
| 12:13PM | 10 | EXPLANATION, OR WAS IT ACTUALLY PRESENTED TO YOU AT SOME POINT? |
| 12:13PM | 11 | DO YOU REMEMBER? |
| 12:13PM | 12 | A.  NO.  SHE WENT THROUGH THE HARD COPY. |
| 12:13PM | 13 | I'M A LITTLE -- SHE WENT THROUGH THE HARD COPY I THINK THE |
| 12:13PM | 14 | DAY I GOT THERE, APRIL 7TH. |
| 12:13PM | 15 | I WAS A LITTLE CONFUSED BECAUSE THE EMAIL YOU SENT WAS |
| 12:13PM | 16 | FROM MAY 26TH, AND I THOUGHT I GOT A DIGITAL VERSION OF THIS BY |
| 12:13PM | 17 | APRIL 9TH. |
| 12:13PM | 18 | MAYBE THEY SENT IT AGAIN.  I DON'T KNOW. |
| 12:14PM | 19 | Q.  I SEE.  IN ANY EVENT, AS TO EXHIBIT 3404, DO YOU HAVE A |
| 12:14PM | 20 | RECOLLECTION OF REVIEWING THIS PRESENTATION WITH MS. HOLMES? |
| 12:14PM | 21 | A.  YES.  SHE WALKED ME THROUGH SOME OF THE KEY PAGES OF THIS |
| 12:14PM | 22 | EXHIBIT. |
| 12:14PM | 23 | Q.  OKAY.  I'LL COME BACK TO A COUPLE OF THESE PAGES |
| 12:14PM | 24 | THROUGHOUT OUR CONVERSATION TODAY. |
| 12:14PM | 25 | BUT LET'S LOOK BRIEFLY AT PAGE 13 OF THIS EXHIBIT. |

PARLOFF DIRECT BY MR. BOSTIC                                    6911

12:14PM  1        DO YOU SEE A SLIDE THAT'S TITLED "REINVENTING THE PATIENT

12:14PM  2    EXPERIENCE"?

12:14PM  3    A.   YES.

12:14PM  4    Q.   AND BELOW THAT IT SAYS, "ALL THE SAME TESTS.  ONE TINY

12:14PM  5    SAMPLE."

12:14PM  6    A.   YES.

12:14PM  7    Q.   AND THERE'S SOME IMAGES THERE OF BLOOD BEING COLLECTED

12:14PM  8    FROM A FINGERTIP; IS THAT CORRECT?

12:14PM  9    A.   YES.

12:14PM 10    Q.   AND IS THAT MORE OR LESS HOW YOUR SAMPLE WAS DRAWN AT

12:14PM 11    WALGREENS?

12:14PM 12    A.   YES.

12:14PM 13    Q.   LET'S LOOK AT PAGE 4, PLEASE.

12:14PM 14        AND WAS THIS THE BLOOD CONTAINER THAT YOUR BLOOD WAS

12:15PM 15    COLLECTED INTO, OR DOES THIS RESEMBLE IT?

12:15PM 16    A.   YES.

12:15PM 17    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT THIS CONTAINER OR

12:15PM 18    THIS SAMPLE SIZE?

12:15PM 19    A.   UM, I THINK IT WAS -- WELL, IT WAS ABOUT A THOUSAND -- SHE

12:15PM 20    SAID IT WAS ABOUT A THOUSANDTH THE SIZE OF WHAT A NORMAL BLOOD

12:15PM 21    DRAW MIGHT TAKE.

12:15PM 22        I THINK IT WAS TENS OF MICROLITERS.  I CAN'T REMEMBER HOW

12:15PM 23    TO DESCRIBE THE LARGER TEST TUBES.

12:15PM 24    Q.   LET'S LOOK AT THE NEXT PAGE.  THAT'S PAGE 5.

12:15PM 25        DO YOU RECALL MS. HOLMES GIVING YOU ANY EXPLANATION ABOUT

PARLOFF DIRECT BY MR. BOSTIC                                    6912

12:15PM   1    THIS IMAGE OR A SIMILAR ONE?

12:15PM   2    A.   YES.  APPROXIMATELY WHAT I JUST SAID, THAT IT WAS A TINY

12:16PM   3    PERCENTAGE OF THE NORMAL DRAW.

12:16PM   4    Q.   I'D LIKE TO GO THROUGH SOME OF THE SUBJECTS THAT YOU

12:16PM   5    DISCUSSED WITH MS. HOLMES.

12:16PM   6         LET'S START WITH CONVERSATIONS YOU HAD WITH HER ABOUT THE

12:16PM   7    RANGE OF TESTS THAT THERANOS COULD PERFORM.

12:16PM   8         IS THAT ALL RIGHT?

12:16PM   9    A.   YEAH.

12:16PM   10   Q.   DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID SHE MAKE

12:16PM   11   STATEMENTS ABOUT THE RANGE OF TESTS THAT THE THERANOS ANALYZER

12:16PM   12   COULD PERFORM?

12:16PM   13   A.   YES, SHE DID.

12:16PM   14   Q.   DID THAT TOPIC COME UP MULTIPLE TIMES?

12:16PM   15   A.   YES, THROUGHOUT MY REPORTING, YES.

12:16PM   16   Q.   FIRST LET'S TAKE A LOOK AT -- WHILE WE'RE STILL AT 3404,

12:16PM   17   BACK TO PAGE 13 OF THAT PRESENTATION.

12:16PM   18        AND WE NOTED THAT THERE'S A LINE HERE THAT SAYS, "ALL THE

12:16PM   19   SAME TESTS.  ONE TINY SAMPLE."

12:16PM   20        DO YOU SEE THAT?

12:16PM   21   A.   YES.

12:16PM   22   Q.   LET'S LOOK ALSO AT PAGE 14.

12:17PM   23        AND DO YOU SEE HERE A SLIDE TITLED "1/1,000TH THE SIZE OF

12:17PM   24   A TYPICAL BLOOD DRAW"?

12:17PM   25   A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                    6913

12:17PM   1     Q.   AND THE FIRST LINE UNDERNEATH THAT READS, "THERANOS RUNS

12:17PM   2     ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

12:17PM   3     SAMPLE TYPES."

12:17PM   4          DO YOU SEE THAT?

12:17PM   5     A.   YES.

12:17PM   6     Q.   AND WAS THAT CONSISTENT WITH EXPLANATIONS THAT MS. HOLMES

12:17PM   7     GAVE YOU DURING THIS TIME PERIOD?

12:17PM   8     A.   YES.  I MEAN, IT WAS MORE THAN 1200 TESTS -- WELL, IT WAS

12:17PM   9     MORE THAN 200 TESTS, YEAH.

12:17PM   10    Q.   UM, WERE SOME OF YOUR CONVERSATIONS ON THIS TOPIC WITH

12:17PM   11    MS. HOLMES RECORDED?

12:17PM   12    A.   YES.

12:17PM   13    Q.   DID YOU HAVE ONE SUCH CONVERSATION WITH MS. HOLMES ON OR

12:17PM   14    AROUND MAY 12TH, 2014?

12:17PM   15    A.   YES.

12:17PM   16    Q.   AROUND THAT TIME PERIOD, HAD YOU BEEN LOOKING INTO WHAT

12:17PM   17    TESTS WERE OFFERED BY CONVENTIONAL LABS TO GET AN IDEA --

12:18PM   18    A.   YES.  AFTER I GOT BACK TO NEW YORK -- WHEN I WENT OUT

12:18PM   19    THERE I HAD NEVER SEEN A LAB.

12:18PM   20         WHEN I GOT BACK, I ARRANGED TO VISIT A CONVENTIONAL LAB TO

12:18PM   21    GET A CONTRAST, AND YEAH.

12:18PM   22    Q.   AND WHICH CONVENTIONAL LAB DID YOU VISIT?

12:18PM   23    A.   WELL, I AGREED NOT TO IDENTIFY THE LAB.

12:18PM   24    Q.   THE MAY 12TH CONVERSATION THAT YOU HAD WITH MS. HOLMES,

12:18PM   25    DID YOU CREATE A RECORDING OF THAT CONVERSATION?

PARLOFF DIRECT BY MR. BOSTIC                          6914

12:18PM   1     A.   YES.

12:18PM   2     Q.   CAN YOU TELL US A LITTLE BIT ABOUT YOUR METHOD FOR

12:18PM   3     RECORDING AND PRESERVING THE RECORDINGS.

12:18PM   4     A.   I USED A SMALL HANDHELD DEVICE, IT'S MAYBE FOUR OR FIVE

12:18PM   5     INCHES LONG, AND MAYBE AN INCH WIDE, IF THAT, AND IT'S SOLID

12:18PM   6     STATE.

12:18PM   7          IT HAS BASICALLY A BUILT-IN -- IT'S ALMOST LIKE A BUILT-IN

12:19PM   8     THUMB DRIVE SO THAT AFTER YOU TAPE, YOU PULL THE LEVER AND THE

12:19PM   9     THUMB DRIVE EXTENDS FROM THE TAPE RECORDER AND YOU STICK IT

12:19PM  10     RIGHT INTO THE USB PORT OF YOUR COMPUTER AND THEN DRAG THE FILE

12:19PM  11     FROM THE DIGITAL RECORDING DEVICE INTO THE COMPUTER.

12:19PM  12     Q.   AND WAS THAT YOUR PRACTICE WITH THE RECORDINGS THAT YOU

12:19PM  13     MADE OF YOUR CONVERSATIONS WITH MS. HOLMES?

12:19PM  14     A.   YES.

12:19PM  15     Q.   HOW WERE THE FILES NAMED OR ORGANIZED?

12:19PM  16     A.   THE DEVICE AUTOMATICALLY GAVE IT A FILE NAME, WHICH WAS

12:19PM  17     THE YEAR, THE MONTH AND DATE, AND THEN ANOTHER NUMBER, WHICH

12:19PM  18     WAS THE NUMBER OF TIMES I HAD -- THE NUMBER OF RECORDINGS FOR

12:20PM  19     THAT DATE.

12:20PM  20          AND THEN WHEN I DRAGGED IT INTO MY COMPUTER, I WOULD ADD

12:20PM  21     THE NAME OF THE INDIVIDUAL THAT WAS BEING RECORDED.

12:20PM  22     Q.   AND THEN WAS IT YOUR PRACTICE TO RETAIN THOSE DIGITAL

12:20PM  23     RECORDINGS ON YOUR COMPUTER GOING FORWARD?

12:20PM  24     A.   YES.

12:20PM  25     Q.   AND DID YOU PROVIDE YOUR RECORDINGS OF CONVERSATIONS WITH

PARLOFF DIRECT BY MR. BOSTIC                         6915

12:20PM  1    MS. HOLMES TO THE GOVERNMENT IN RESPONSE TO A SUBPOENA?

12:20PM  2    A.   YES.

12:20PM  3         MR. BOSTIC:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

12:20PM  4    WOULD LIKE TO OFFER EXHIBIT 5473A, WHICH IS A CLIP FROM THE

12:20PM  5    RECORDING THAT WE HAVE BEEN DISCUSSING.

12:20PM  6         I UNDERSTAND THE DEFENSE MAY STIPULATE.

12:20PM  7         MR. CLINE:  NO OBJECTION.  ONE NOTE.  AS I

12:20PM  8    UNDERSTAND IT FROM MR. BOSTIC, THERE'S GOING TO BE A SCROLLING

12:20PM  9    TRANSCRIPT WITH THESE TAPES.

12:20PM  10        WE DON'T OBJECT TO THAT AS LONG AS IT'S NOT PART OF THE

12:21PM  11   ACTUAL EXHIBIT.  I DON'T KNOW IF YOUR HONOR WANTS TO GIVE AN

12:21PM  12   INSTRUCTION ON THAT, BUT IN ANY EVENT, WE DON'T OBJECT TO THE

12:21PM  13   AUDIO AND WE DON'T OBJECT TO THE SCROLLING OF THE TRANSCRIPT,

12:21PM  14   AS LONG AS THE TRANSCRIPT IS REMOVED.

12:21PM  15        THE COURT:  UNDERSTOOD.

12:21PM  16        MR. BOSTIC:  AND TO CLARIFY, YOUR HONOR, THAT WILL

12:21PM  17   ONLY BE THE CASE, ACCOMPANYING SUBTITLES, FOR ONE OF THE

12:21PM  18   EXHIBITS WHERE THERE WAS SOME BACKGROUND NOISE.  THE REST WILL

12:21PM  19   BE AUDIO ONLY.

12:21PM  20        THE COURT:  SO IS THIS AUDIO ONLY?

12:21PM  21        MR. BOSTIC:  THIS IS AUDIO ONLY.

12:21PM  22        MR. CLINE:  FORGIVE ME.  I JUST WANT TO INQUIRE.

12:21PM  23   IT'S JUST ONE THAT HAS THE TRANSCRIPT, NONE OF THE OTHERS?

12:21PM  24        MR. BOSTIC:  CORRECT.

12:21PM  25        MR. CLINE:  UNDERSTOOD.  THANK YOU.

PARLOFF DIRECT BY MR. BOSTIC                    6916

12:21PM  1          THE COURT:  SO THERE'S NO TRANSCRIPT THAT YOU'RE

12:21PM  2    GOING TO SEEK TO PROVIDE FOR THIS?

12:21PM  3          MR. BOSTIC:  NOT FOR THIS EXHIBIT, YOUR HONOR.  I

12:21PM  4    WILL NOTE THAT BEFORE IT IS PRESENTED.

12:21PM  5          THE COURT:  THANK YOU.  AND WHAT IS THE LENGTH OF

12:21PM  6    THIS CLIP?

12:21PM  7          MR. BOSTIC:  THIS CLIP IS APPROXIMATELY TWO MINUTES

12:21PM  8    LONG.

12:21PM  9          THE COURT:  TWO MINUTES LONG, OKAY.

12:21PM  10      LADIES AND GENTLEMEN, YOU'RE ABOUT TO LISTEN TO AN AUDIO

12:21PM  11   RECORDING, AS MR. BOSTIC AND MR. CLINE HAVE INDICATED.  PLEASE

12:21PM  12   LISTEN CLOSELY.  YOU WILL NOT HAVE A TRANSCRIPT OF THIS, SO

12:21PM  13   PLEASE LISTEN CLOSELY.

12:22PM  14      COUNSEL, YOU AGREE THAT THE COURT REPORTER NEED NOT REPORT

12:22PM  15   THE CONTENTS OF THIS RECORDING?

12:22PM  16          MR. BOSTIC:  YES, YOUR HONOR, NO OBJECTION.

12:22PM  17          MR. CLINE:  THAT'S FINE.

12:22PM  18          THE COURT:  ALL RIGHT.  THANK YOU.

12:22PM  19   BY MR. BOSTIC:

12:22PM  20   Q.  SO BEFORE WE PRESS PLAY ON EXHIBIT 5473A, MR. PARLOFF, YOU

12:22PM  21   TESTIFIED JUST NOW THAT YOU HAD CONVERSATIONS WITH MS. HOLMES

12:22PM  22   ABOUT THE RANGE OF TESTS THAT COULD BE PERFORMED ON THE

12:22PM  23   THERANOS DEVICE; CORRECT?

12:22PM  24   A.  YES.

12:22PM  25          MR. BOSTIC:  MS. HOLLIMAN, LET'S PLAY 5473A, PLEASE.

PARLOFF DIRECT BY MR. BOSTIC                                    6917

12:24PM  1          (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:24PM  2     BY MR. BOSTIC:

12:24PM  3     Q.   MR. PARLOFF, WAS THAT AUDIO SOMETHING THAT YOU RECOGNIZE

12:25PM  4     AS YOUR CONVERSATION WITH MS. HOLMES ON MAY 12TH, 2014?

12:25PM  5     A.   YEAH.  I'M NOT POSITIVE OF THE DATE, BUT THEREABOUTS.

12:25PM  6     Q.   IF THE FILE NAME FOR THAT RECORDING HAD THAT DATE IN THE

12:25PM  7     FILE NAME --

12:25PM  8     A.   YES, YES.

12:25PM  9     Q.   -- WOULD IT INDICATE THAT IT WAS FROM THAT DATE?

12:25PM 10     A.   THAT'S RIGHT.

12:25PM 11          THE COURT:  MR. BOSTIC, WE'VE JUST PLAYED THAT.  I'M

12:25PM 12     NOT SURE THAT I FORMALLY ADMITTED THE DOCUMENT PER YOUR

12:25PM 13     AGREEMENT.

12:25PM 14          BUT IT IS ADMITTED, AND IT WAS PLAYED.  THANK YOU.

12:25PM 15          MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:25PM 16          (GOVERNMENT'S EXHIBIT 5473A WAS RECEIVED IN EVIDENCE.)

12:25PM 17     BY MR. BOSTIC:

12:25PM 18     Q.   SO, MR. PARLOFF, YOU'VE HEARD MS. HOLMES'S RESPONSE TO

12:25PM 19     YOUR QUESTION ABOUT WHETHER THERANOS COULD PERFORM ALL OF THE

12:25PM 20     TESTS THAT QUEST COULD.

12:25PM 21          LET ME ASK YOU, BEFORE YOU WROTE YOUR ARTICLE IN JUNE OF

12:25PM 22     2014, DID MS. HOLMES EVER TELL YOU THAT THE RANGE OF TESTS THAT

12:25PM 23     THE THERANOS DEVICE COULD PERFORM WAS ACTUALLY MUCH MORE

12:25PM 24     LIMITED THAN THE HUNDREDS OF TESTS THAT QUEST COULD DO?

12:25PM 25     A.   NO.

PARLOFF DIRECT BY MR. BOSTIC                          6918

12:25PM   1    Q.   DID YOU CONTINUE AFTER THAT DATE TO HAVE DISCUSSIONS WITH

12:26PM   2    MS. HOLMES ABOUT THE NUMBER OF TESTS THAT THE ANALYZER COULD DO

12:26PM   3    IN CONNECTION WITH A NUMBER OF CPT CODES?

12:26PM   4    A.   YES.

12:26PM   5    Q.   AND DID MS. HOLMES PROVIDE AN EXPLANATION TO YOU ABOUT

12:26PM   6    WHAT A CPT CODE WAS?

12:26PM   7    A.   I THINK SHE DID.

12:26PM   8    Q.   WHAT DO YOU RECALL HER SAYING ABOUT THAT, IF YOU REMEMBER?

12:26PM   9    A.   IT'S A CODE THAT I THINK THE AMERICAN MEDICAL ASSOCIATION

12:26PM  10    ASSIGNS TO MEDICAL PROCEDURES, INCLUDING DIAGNOSTIC TESTS, SO

12:26PM  11    THAT WHEN YOU APPLY FOR REIMBURSEMENT FROM AN INSURANCE

12:26PM  12    COMPANY, THEY USE THESE CODES TO INDICATE WHAT THE PROCEDURE

12:27PM  13    WAS.

12:27PM  14    Q.   AND DID YOU RECORD A CONVERSATION WITH MS. HOLMES ON

12:27PM  15    MAY 21ST, 2014 WHERE THIS TOPIC WAS DISCUSSED?

12:27PM  16    A.   YES.

12:27PM  17              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS AT

12:27PM  18    THIS TIME EXHIBIT 5474AB2.  AND I APOLOGIZE FOR THE CRYPTIC

12:27PM  19    EXHIBIT NAMES.

12:27PM  20              THE COURT:  AND THIS IS THE RECORDING?

12:27PM  21              MR. BOSTIC:  IT IS, YOUR HONOR.  THIS IS A CLIP THAT

12:27PM  22    IS APPROXIMATELY SIX MINUTES LONG THAT WE'VE JUST REFERENCED.

12:27PM  23              MR. CLINE:  NO OBJECTION.

12:27PM  24              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

12:27PM  25    IS ADMITTED.

PARLOFF DIRECT BY MR. BOSTIC                                    6919

12:27PM   1          LADIES AND GENTLEMEN, YOU'RE ABOUT TO HEAR ANOTHER TAPE,

12:27PM   2    AS MR. BOSTIC INDICATED.  YOU WILL NOT HAVE A TRANSCRIPT OF THE

12:27PM   3    RECORDING.  PLEASE LISTEN CLOSELY.

12:27PM   4          THE EXHIBIT IS NOW ADMITTED, AND IT MAY NOW BE PLAYED.

12:27PM   5          (GOVERNMENT'S EXHIBIT 5474AB2 WAS RECEIVED IN EVIDENCE.)

12:28PM   6          (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:34PM   7    BY MR. BOSTIC:

12:34PM   8    Q.   DID YOU HEAR MS. HOLMES SAY IN THAT CLIP THAT THERANOS HAD

12:34PM   9    THE ABILITY TO PERFORM MORE THAN THE 200 TESTS THAT WERE THEN

12:34PM  10    LISTED ON THE WEBSITE?

12:34PM  11    A.   YES.

12:34PM  12    Q.   AND DURING THAT TIME PERIOD -- AND THIS WAS BEFORE YOU

12:34PM  13    WROTE THE JUNE 2014 ARTICLE; CORRECT?

12:34PM  14    A.   YES.

12:34PM  15    Q.   DURING THAT TIME PERIOD, DID MS. HOLMES TELL YOU ANYTHING

12:34PM  16    ABOUT THE COMPANY'S RELIANCE ON THIRD PARTY DEVICES, OR WAS ALL

12:34PM  17    OF YOUR DISCUSSION FOCUSSED ON THE THERANOS DEVICE?

12:34PM  18    A.   THE THERANOS DEVICE.

12:34PM  19    Q.   THERE WAS A POINT IN THAT CLIP WHERE YOU ASKED ABOUT

12:34PM  20    VACUTAINER USE.

12:34PM  21          DO YOU REMEMBER THAT?

12:34PM  22    A.   YES.

12:34PM  23    Q.   AND YOU PREFACED THAT QUESTION BY SAYING, NOT TO BELABOR

12:34PM  24    THIS, OR SOMETHING TO THAT EFFECT.

12:34PM  25          HAD YOU HAD PREVIOUS CONVERSATIONS WITH MS. HOLMES ABOUT

PARLOFF DIRECT BY MR. BOSTIC                                    6920

12:34PM  1    USE OF VACUTAINER FOR CERTAIN DRAWS?

12:34PM  2    A.   YES.  WELL, THERE WERE ALREADY REPORTS AT THAT POINT OF

12:35PM  3    PEOPLE WHO WOULD GO TO THE WELLNESS CENTER HOPING -- PATIENTS

12:35PM  4    HOPING TO GET THE FINGERSTICK, AND THEY WOULD BE DISAPPOINTED

12:35PM  5    BECAUSE THEY WOULD HAVE TO BE TOLD THAT THEY WOULD HAVE TO DO

12:35PM  6    VENIPUNCTURE.

12:35PM  7         SO I WAS ASKING HER ABOUT WHY THAT WAS.

12:35PM  8         AND IN THAT CONTEXT SHE HAD SOME ANSWERS TO THAT.

12:35PM  9         BUT THERE WERE CERTAIN SITUATIONS WHERE SHE WOULD DO

12:35PM  10   VENIPUNCTURE.  ONE WAS SHE SAID SOMETIMES DOCTORS WANTED TO DO

12:35PM  11   THE TEST IN THEIR LAB AND JUST SEND IT TO THERANOS BECAUSE THE

12:35PM  12   PRICE WAS LOWER.

12:35PM  13        SO SHE SAID WHEN THEY DID THAT, THEY COULD STILL PROCESS

12:35PM  14   THAT BLOOD, BUT THEY WOULD ASK THE DOCTOR TO SEND IT TO THEM IN

12:36PM  15   THEIR SMALLEST VACUTAINER, WHICH I THINK MEANS A SMALL TEST

12:36PM  16   TUBE, THE TYPE OF TEST TUBE USED FOR THESE BLOOD -- FOR BLOOD

12:36PM  17   DRAWS BECAUSE THEY ONLY NEEDED THESE MICRO SAMPLES GIVEN THEIR

12:36PM  18   SYSTEM, GIVEN THEIR MINIATURIZED SYSTEM.

12:36PM  19   Q.   CAN I ASK YOU A QUESTION ABOUT THE ANSWER THAT MS. HOLMES

12:36PM  20   GAVE IN THE CLIP THAT WE JUST LISTENED TO?  DO YOU REMEMBER THE

12:36PM  21   ANSWER SHE GAVE TALKED ABOUT THE CONFIGURATION OF SOMETHING SHE

12:36PM  22   CALLED CARTRIDGES?

12:36PM  23   A.   YES.

12:36PM  24   Q.   HAD YOU HAD CONVERSATIONS WITH MS. HOLMES WHERE SHE

12:36PM  25   EXPLAINED TO YOU WHAT CARTRIDGE MEANT IN THE CONTEXT OF

PARLOFF DIRECT BY MR. BOSTIC                                    6921

12:36PM   1    TESTING?

12:36PM   2    A.   YEAH.  EXCUSE ME.  THE NANOTAINER WOULD BE PLACED INTO A

12:36PM   3    CARTRIDGE, IF YOU REMEMBER LIKE BETA MAX MACHINES AND THE VCR,

12:37PM   4    YOU WOULD -- THE CARTRIDGE WOULD BE LIKE THE BETA MAX

12:37PM   5    CARTRIDGE, BUT YOU WOULD PUT A NANOTAINER IN THERE AND THEN YOU

12:37PM   6    WOULD FEED IT INTO THE MACHINE.

12:37PM   7         AND THAT I WAS SAYING WAS PART OF THE AUTOMATION THAT

12:37PM   8    WOULD -- THAT WAS SUPPOSED TO MAKE IT MORE RELIABLE, LESS PRONE

12:37PM   9    TO HUMAN ERROR.

12:37PM  10         AND SO SHE SEEMED TO BE SAYING THAT -- WELL, AS I

12:37PM  11    UNDERSTOOD IT, THAT EVEN WITH THE VACUTAINER, THERE WAS A WAY

12:37PM  12    TO SOMEHOW GET IT OR GET A PORTION OF IT INTO THIS CARTRIDGE

12:37PM  13    AND USE IT IN HER DEVICE.

12:37PM  14    Q.   AND BASED ON WHAT MS. HOLMES HAD TOLD YOU, WOULD THAT MEAN

12:37PM  15    ANALYZING THE SAMPLE STILL IN A THERANOS CREATED ANALYZER?

12:37PM  16    A.   YES, UH-HUH.

12:37PM  17              MR. CLINE:  YOUR HONOR, I'M GOING TO OBJECT NOW TO

12:37PM  18    SORT OF INTERPRETING WHAT WAS SAID.  MS. HOLMES'S WORDS ARE

12:37PM  19    CERTAINLY FAIR GAME, NOT THE INTERPRETATION.

12:37PM  20              THE COURT:  UNDERSTOOD.

12:37PM  21         DO YOU WANT TO ASK QUESTIONS AS TO -- IS THIS RELATING TO

12:38PM  22    HOW IT WAS DESCRIBED TO HIM FROM MS. HOLMES?

12:38PM  23              MR. BOSTIC:  CORRECT, YOUR HONOR.

12:38PM  24              THE COURT:  RIGHT.  OKAY.

12:38PM  25    BY MR. BOSTIC:

PARLOFF DIRECT BY MR. BOSTIC                                    6922

| | | |
|---|---|---|
| 12:38PM | 1 | Q.   LET ME SEE IF I CAN CLARIFY THIS, MR. PARLOFF. |
| 12:38PM | 2 | WHEN MS. HOLMES DISCUSSED CARTRIDGES WITH YOU, WERE THOSE |
| 12:38PM | 3 | CARTRIDGES SOMETHING THAT SHE SAID WERE SPECIFIC TO THE |
| 12:38PM | 4 | THERANOS ANALYZER, OR DID SHE SAY THEY WERE ALSO USED WITH |
| 12:38PM | 5 | THIRD PARTY DEVICES? |
| 12:38PM | 6 | A.   NO.  SPECIFIC TO THE THERANOS ANALYZER. |
| 12:38PM | 7 | Q.   LET'S GO BACK TO EXHIBIT 3404.  IF WE COULD DISPLAY THAT, |
| 12:38PM | 8 | MS. HOLLIMAN.  AND IF WE CAN LOOK AT PAGE 16. |
| 12:38PM | 9 | MR. PARLOFF, DO YOU SEE ON PAGE 16 AN EXCERPT FROM THE |
| 12:38PM | 10 | THERANOS TEST MENU? |
| 12:38PM | 11 | A.   YES. |
| 12:38PM | 12 | Q.   AND THIS WAS PART OF THE PRESENTATION THAT YOU WENT |
| 12:38PM | 13 | THROUGH WITH MS. HOLMES? |
| 12:38PM | 14 | A.   YES. |
| 12:39PM | 15 | Q.   LET'S LOOK AT THE FOLLOWING PAGE, PAGE 17. |
| 12:39PM | 16 | IT LOOKS LIKE HERE BEGINS AN ALPHABETICAL LIST OF |
| 12:39PM | 17 | THERANOS'S TEST MENU; IS THAT CORRECT? |
| 12:39PM | 18 | A.   YES. |
| 12:39PM | 19 | Q.   AND LET'S LOOK AT THE FOLLOWING PAGE, PAGE 18. |
| 12:39PM | 20 | WHEN YOU WERE TALKING ABOUT THE TESTS THAT WERE ON THE |
| 12:39PM | 21 | WEBSITE, WERE THESE SOME OF THE TESTS THAT WERE INCLUDED?  WERE |
| 12:39PM | 22 | YOU TALKING ABOUT THE THERANOS TEST MENU AT THE TIME? |
| 12:39PM | 23 | A.   YES. |
| 12:39PM | 24 | Q.   ON THIS PAGE, PAGE 18, LET'S ZOOM IN, IF WE CAN, ON THE |
| 12:39PM | 25 | LEFT SIDE ON THE ENTRY FOR CBC, OR COMPLETE BLOOD COUNT. |

PARLOFF DIRECT BY MR. BOSTIC                                    6923

12:40PM   1          MR. PARLOFF, DO YOU SEE THAT THIS LIST INCLUDES CBC AUTO

12:40PM   2   DIFF WITH REFLEX AND ALSO CBC WITH NO DIFF?

12:40PM   3   A.   YES, YES.

12:40PM   4   Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS BUILT

12:40PM   5   ANALYZER DIDN'T HAVE THE PARTS NECESSARY TO RUN A CBC TEST?

12:40PM   6   A.   NO.

12:40PM   7   Q.   I WANT TO LOOK BRIEFLY AT YOUR ARTICLE, WHICH IS

12:40PM   8   EXHIBIT 1776.

12:40PM   9          MS. HOLLIMAN, LET'S BRING THAT UP.  IF WE CAN GO TO PAGE 5

12:40PM   10  OF THE EXHIBIT.  ZOOM IN ON THE BOTTOM PARAGRAPH, PLEASE.

12:40PM   11         MR. PARLOFF, IS THIS TEXT FROM YOUR JUNE 2014 ARTICLE IN

12:41PM   12  "FORTUNE"?

12:41PM   13  A.   YES.

12:41PM   14  Q.   AND IT READS HERE, "THERANOS RUNS WHAT'S CALLED A

12:41PM   15  HIGH-COMPLEXITY LABORATORY, CERTIFIED BY THE FEDERAL CENTERS

12:41PM   16  FOR MEDICARE AND MEDICAID SERVICES."

12:41PM   17         THE NEXT SENTENCE SAYS, "IT CURRENTLY OFFERS MORE THAN

12:41PM   18  200 -- AND IS RAMPING UP TO OFFER MORE THAN 1,000 -- OF THE

12:41PM   19  MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS ALL WITHOUT THE

12:41PM   20  NEED FOR A SYRINGE."

12:41PM   21         DO YOU SEE THAT?

12:41PM   22  A.   YES.

12:41PM   23  Q.   IS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU DURING

12:41PM   24  YOUR CONVERSATIONS WITH HER?

12:41PM   25  A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                    6924

| | | |
|---|---|---|
| 12:41PM | 1 | Q.   LET'S LOOK AT THE FOLLOWING PAGE CONTINUING ON THAT SAME |
| 12:41PM | 2 | ARTICLE.   THE FOLLOWING TEXT AT THE TOP OF THE PAGE READS, |
| 12:41PM | 3 | "THERANOS'S TESTS CAN BE PERFORMED ON JUST A FEW DROPS OF |
| 12:41PM | 4 | BLOOD, OR ABOUT 1/100TH TO 1/1,000TH OF THE AMOUNT THAT WOULD |
| 12:41PM | 5 | ORDINARILY BE REQUIRED - AN EXTRAORDINARILY POTENTIAL BOON TO |
| 12:41PM | 6 | FREQUENTLY TESTED HOSPITAL PATIENTS OR" PATIENTS IN OTHER |
| 12:42PM | 7 | CATEGORIES. |
| 12:42PM | 8 | DO YOU SEE THAT? |
| 12:42PM | 9 | A.   YES. |
| 12:42PM | 10 | Q.   WAS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU DURING |
| 12:42PM | 11 | YOUR CONVERSATIONS? |
| 12:42PM | 12 | A.   YES. |
| 12:42PM | 13 | Q.   I WANT TO TALK NEXT ABOUT DISCUSSIONS THAT YOU HAD WITH |
| 12:42PM | 14 | MS. HOLMES ABOUT THE ACCURACY OR PRECISION ABOUT THE THERANOS |
| 12:42PM | 15 | TESTS. |
| 12:42PM | 16 | DO YOU RECALL DISCUSSIONS ABOUT THAT TOPIC? |
| 12:42PM | 17 | A.   YES. |
| 12:42PM | 18 | Q.   LET'S GO TO EXHIBIT 3404, BACK TO THE PRESENTATION, AND |
| 12:42PM | 19 | LET'S LOOK AT PAGE 20. |
| 12:42PM | 20 | A.   I'M SORRY, WHICH EXHIBIT? |
| 12:42PM | 21 | Q.   THIS IS 3404, AND IT WILL BE UP ON THE SCREEN. |
| 12:42PM | 22 | DO YOU SEE A SLIDE IN THIS PRESENTATION THAT YOU RECEIVED |
| 12:42PM | 23 | THAT READS, "A NEW STANDARD IN QUALITY"? |
| 12:42PM | 24 | A.   YES. |
| 12:42PM | 25 | Q.   AND UNDERNEATH THAT THERE'S TEXT IN GREEN THAT SAYS, "THE |

PARLOFF DIRECT BY MR. BOSTIC                                    6925

12:42PM   1     HIGHEST LEVELS OF ACCURACY."

12:42PM   2          DO YOU SEE THAT?

12:42PM   3     A.   YES.

12:42PM   4     Q.   AND THE EXPLANATION BELOW THAT GRAPHIC ABOUT A LOW

12:42PM   5     COEFFICIENT OF VARIATION READS, "BY SYSTEMATICALLY CONTROLLING

12:43PM   6     AND STANDARDIZING OUR PROCESSES, THERANOS OFFERS TESTS WITH THE

12:43PM   7     HIGHEST LEVELS OF ACCURACY."

12:43PM   8          DO YOU SEE THAT?

12:43PM   9     A.   YES.

12:43PM  10     Q.   AND WAS THAT CONSISTENT WITH REPRESENTATIONS THAT

12:43PM  11     MS. HOLMES MADE TO YOU DURING YOUR CONVERSATIONS?

12:43PM  12     A.   YES.

12:43PM  13     Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON APRIL 8TH,

12:43PM  14     2014 THAT YOU RECORDED?

12:43PM  15     A.   YES.

12:43PM  16     Q.   AND WAS THIS TOPIC DISCUSSED DURING THAT CONVERSATION?

12:43PM  17     A.   I WOULD ASSUME SO.

12:43PM  18          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:43PM  19     EXHIBIT 5475A, WHICH IS, AS THE DEFENSE NOTES, A CLIP FROM

12:43PM  20     APRIL 8TH, 2014, APPROXIMATELY TWO MINUTES LONG.

12:43PM  21          MR. CLINE:  NO OBJECTION.

12:43PM  22          THE COURT:  IT'S ADMITTED, AND IT MAY BE PLAYED.

12:43PM  23       LADIES AND GENTLEMEN, THIS IS ANOTHER RECORDING.  THERE

12:43PM  24     WILL NOT BE A TRANSCRIPT, SO PLEASE LISTEN CLOSELY TO THIS

12:43PM  25     RECORDING.

PARLOFF DIRECT BY MR. BOSTIC                                    6926

12:44PM   1            IT'S ADMITTED, AND IT MAY BE PLAYED NOW.

12:44PM   2            (GOVERNMENT'S EXHIBIT 5475A WAS RECEIVED IN EVIDENCE.)

12:46PM   3    BY MR. BOSTIC:

12:46PM   4    Q.   I THINK THAT LAST WORD WAS GOING TO BE ANALYSIS IT SOUNDED

12:46PM   5    LIKE; IS THAT CORRECT?

12:46PM   6    A.   YEAH, UH-HUH.

12:46PM   7    Q.   WE JUST HEARD MS. HOLMES MAKE SOME STATEMENTS ABOUT THE

12:46PM   8    RELATIONSHIP BETWEEN AUTOMATION AND ACCURACY.

12:46PM   9            DO YOU RECALL THAT DISCUSSION?

12:46PM   10   A.   YEAH.

12:46PM   11   Q.   DID MS. HOLMES, IN YOUR CONVERSATIONS WITH HER, EVER TELL

12:46PM   12   YOU ABOUT THE MANUAL OR NONAUTOMATIC STEPS THAT HAD TO BE

12:46PM   13   PERFORMED WHEN RUNNING A BLOOD SAMPLE ON THE THERANOS ANALYZER?

12:46PM   14   A.   NO.

12:46PM   15   Q.   FOR EXAMPLE, WERE YOU TOLD THAT SAMPLES FREQUENTLY OR

12:46PM   16   ALWAYS HAD TO BE DILUTED USING A DIFFERENT DEVICE BEFORE THEY

12:46PM   17   WERE PLACED INTO THE THERANOS ANALYZER?

12:47PM   18   A.   NO.

12:47PM   19   Q.   DID MS. HOLMES EVER TELL YOU ABOUT ANY ACCURACY PROBLEMS

12:47PM   20   OR RELIABILITY PROBLEMS EXPERIENCED IN CONNECTION WITH THE

12:47PM   21   THERANOS ANALYZER?

12:47PM   22   A.   NO.

12:47PM   23   Q.   SO FAR WE'VE BEEN LISTENING TO CONVERSATIONS BETWEEN YOU

12:47PM   24   AND MS. HOLMES IN 2014.

12:47PM   25            DID YOU CONTINUE TO HAVE DISCUSSIONS WITH MS. HOLMES IN

PARLOFF DIRECT BY MR. BOSTIC                                    6927

12:47PM   1       2015?

12:47PM   2       A.   YES.

12:47PM   3       Q.   SO THIS WOULD HAVE BEEN AFTER YOUR JUNE 2014 ARTICLE, OF

12:47PM   4       COURSE?

12:47PM   5       A.   YES.

12:47PM   6       Q.   GENERALLY SPEAKING, WHAT WAS THE PURPOSE OF CONTINUED

12:47PM   7       CONVERSATIONS IN 2015?

12:47PM   8       A.   WELL, THERE WERE OTHER THINGS GOING ON WITH HER COMPANY,

12:47PM   9       MULTIPLE OTHER THINGS THAT I WAS INTERESTED IN, AND I WAS

12:47PM  10       CONTINUING TO FOLLOW THE COMPANY.

12:47PM  11       Q.   AND IN 2015, DID YOU CONTINUE TO HAVE CONVERSATIONS WITH

12:47PM  12       MS. HOLMES ABOUT THE QUALITY OR ACCURACY OF THE THERANOS

12:47PM  13       RESULTS?

12:47PM  14       A.   I THINK SO.

12:48PM  15       Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN EARLY

12:48PM  16       FEBRUARY 2015?

12:48PM  17       A.   YES.

12:48PM  18            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:48PM  19       EXHIBIT 5477A, WHICH IS APPROXIMATELY 40 SECONDS LONG.

12:48PM  20            MR. CLINE:  NO OBJECTION.

12:48PM  21            THE COURT:  AND THERE'S NO TRANSCRIPT.

12:48PM  22            MR. BOSTIC:  CORRECT, THERE'S NO TRANSCRIPT.

12:48PM  23            THE COURT:  IT'S ADMITTED.

12:48PM  24       (GOVERNMENT'S EXHIBIT 5477A WAS RECEIVED IN EVIDENCE.)

12:48PM  25            THE COURT:  LADIES AND GENTLEMEN, YOU WILL BE

PARLOFF DIRECT BY MR. BOSTIC                                6928

12:48PM  1    HEARING IN JUST A MOMENT THIS TAPE, THIS VIDEO, PARDON ME, AND

12:48PM  2    PLEASE LISTEN CLOSELY.  THERE'S NO TRANSCRIPT THAT FOLLOWS IT.

12:48PM  3    IT MAY BE PLAYED NOW.

12:48PM  4         (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:49PM  5    BY MR. BOSTIC:

12:49PM  6    Q.   MR. PARLOFF, DO YOU RECOGNIZE THAT AUDIO AS A RECORDING OF

12:49PM  7    A CONVERSATION THAT YOU HAD WITH MS. HOLMES IN FEBRUARY OF

12:49PM  8    2015?

12:49PM  9    A.   YES.

12:49PM  10   Q.   DID THE DEFENDANT TELL YOU THAT, A COUPLE MONTHS BEFORE

12:49PM  11   THAT CONVERSATION, THERANOS'S PATHOLOGIST LAB DIRECTOR HAD LEFT

12:49PM  12   THE COMPANY AFTER REPEATEDLY RAISING CONCERNS ABOUT THE

12:49PM  13   ACCURACY OF THE THERANOS TESTS?

12:49PM  14   A.   NO.

12:49PM  15   Q.   DID YOU ALSO HAVE CONVERSATIONS WITH MS. HOLMES ABOUT THE

12:49PM  16   USE OF THERANOS TECHNOLOGY BY THE U.S. MILITARY?

12:49PM  17   A.   YES.

12:49PM  18   Q.   WAS THAT A TOPIC THAT CAME UP MULTIPLE TIMES?

12:50PM  19   A.   YES.

12:50PM  20   Q.   DO YOU RECALL IN EARLY APRIL 2014 MEETING WITH MS. HOLMES

12:50PM  21   AT A RESTAURANT?

12:50PM  22   A.   YES.

12:50PM  23   Q.   AND DID THE TOPIC OF MILITARY INVOLVEMENT COME UP AT THAT

12:50PM  24   TIME?

12:50PM  25   A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                    6929

12:50PM   1          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

12:50PM   2     EXHIBIT 5478A INTO EVIDENCE, AND PERMISSION TO PUBLISH, OR

12:50PM   3     REQUEST PERMISSION TO PUBLISH A VERSION OF THAT AUDIO CLIP WITH

12:50PM   4     ACCOMPANYING SUBTITLES.

12:50PM   5          MR. CLINE:  NO OBJECTION.  I HAVE IT ON MY LITTLE

12:50PM   6     CHART HERE, BUT IT'S 5478A2.  I'M NOT SURE WHETHER THAT MAKES

12:50PM   7     ANY DIFFERENCE.

12:50PM   8          MR. BOSTIC:  I THINK WE'RE TALKING ABOUT THE SAME

12:50PM   9     CLIP.

12:50PM  10          MR. CLINE:  ALL RIGHT.

12:50PM  11          MR. BOSTIC:  A2 FOR THE RECORD, YOUR HONOR.  THANK

12:50PM  12     YOU.

12:50PM  13          THE COURT:  ALL RIGHT.

12:50PM  14          MR. CLINE:  NO OBJECTION.

12:50PM  15        BUT THE SUBTITLES ARE HERE JUST TO AID THE JURY AND WILL

12:50PM  16     NOT BE OFFERED.

12:50PM  17          MR. BOSTIC:  I'M NOT OFFERING THE SUBTITLES,

12:51PM  18     YOUR HONOR.

12:51PM  19          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, IT IS

12:51PM  20     ADMITTED.

12:51PM  21        I'M SORRY, THE LENGTH OF THIS IS?

12:51PM  22          MR. BOSTIC:  THIS ONE IS APPROXIMATELY THREE MINUTES

12:51PM  23     LONG.

12:51PM  24          THE COURT:  THANK YOU.  IT'S ADMITTED, AND IT MAY BE

12:51PM  25     PLAYED.

PARLOFF DIRECT BY MR. BOSTIC                                    6930

```
12:51PM   1              (GOVERNMENT'S EXHIBIT 5478A2 WAS RECEIVED IN EVIDENCE.)

12:51PM   2                   THE COURT:  LADIES AND GENTLEMEN, YOU'RE ABOUT TO

12:51PM   3      HEAR ANOTHER CLIP, APPROXIMATELY THREE MINUTES LONG.  I'M

12:51PM   4      INFORMED THERE'S A SUBTITLE.

12:51PM   5           WILL THAT BE SHOWN ON OUR MONITORS THEN?

12:51PM   6                   MR. BOSTIC:  IT WILL BE, YOUR HONOR, ON THE BOTTOM

12:51PM   7      OF THE SCREEN.

12:51PM   8                   THE COURT:  ALL RIGHT.  THANK YOU.  THAT WILL HAVE A

12:51PM   9      CONCURRENT TRANSCRIPT.

12:51PM  10           WHAT IS IN EVIDENCE, LADIES AND GENTLEMEN, IS THE

12:51PM  11      RECORDING, NOT THE TRANSCRIPT.

12:51PM  12           SO WHAT YOU HEAR, WHAT YOU HEAR IS WHAT IS IN EVIDENCE.

12:51PM  13           IF YOU WHAT YOU HEAR IS DIFFERENT THAN THE TRANSCRIPT, IF

12:51PM  14      YOU'RE READING THE TRANSCRIPT, WHAT YOU HEAR IS WHAT IS IN

12:51PM  15      EVIDENCE, NOT WHAT IS IN THE TRANSCRIPT.

12:51PM  16           THE TRANSCRIPT IS ONLY PROVIDED AS AN AID TO YOU AS YOU

12:51PM  17      LISTEN.

12:51PM  18           BUT, PLEASE, THE AUDIO PORTION OF THIS RECORDING IS WHAT

12:51PM  19      CONTROLS, NOT THE TRANSCRIPT.

12:51PM  20           WITH THAT, IT'S ADMITTED, AND IT MAY BE PLAYED.

12:52PM  21                   MR. BOSTIC:  THANK YOU, YOUR HONOR.

12:52PM  22           (AUDIO RECORDING PLAYED OFF THE RECORD.)

12:55PM  23      BY MR. BOSTIC:

12:55PM  24      Q.   OKAY.  MR. PARLOFF, WERE YOU ABLE TO HEAR THE AUDIO IN

12:55PM  25      THAT CLIP?
```

PARLOFF DIRECT BY MR. BOSTIC                                    6931

12:55PM   1    A.   YEAH, YES.

12:55PM   2    Q.   AND THAT CLIP BEGAN WITH A CONVERSATION ABOUT WORK FOR

12:55PM   3    PHARMACEUTICAL COMPANIES AND FOREIGN GOVERNMENTS.

12:55PM   4         DO YOU RECALL THAT?

12:55PM   5    A.   YES.

12:55PM   6    Q.   AND AT THE END YOU ASKED A QUESTION ABOUT WHETHER THE

12:55PM   7    DEVICES IN THERANOS'S CENTRAL LAB COULD BE PLACED OUT IN THE

12:55PM   8    FIELD WHEN, I THINK SHE SAID WHEN WE WERE FIGHTING IN IRAQ.

12:55PM   9         DO YOU RECALL THAT?

12:55PM   10   A.   YES.

12:55PM   11   Q.   AND HER ANSWER WAS THAT YES, THAT COULD BE DONE?

12:55PM   12   A.   YEAH.

12:55PM   13   Q.   AND THAT CONVERSATION WAS IN A PUBLIC PLACE; IS THAT

12:55PM   14   CORRECT?

12:55PM   15   A.   YES.

12:55PM   16   Q.   AND AS WITH ALL OF THE RECORDED CONVERSATIONS, DID

12:55PM   17   MS. HOLMES KNOW THAT YOU WERE RECORDING THAT CONVERSATION?

12:55PM   18   A.   YES.

12:55PM   19   Q.   BEFORE YOU PUBLISHED YOUR JUNE 2014 ARTICLE IN "FORTUNE,"

12:55PM   20   DID THAT TOPIC COME UP AGAIN IN A DIFFERENT SETTING?

12:56PM   21   A.   YES.

12:56PM   22   Q.   AND WHAT ELSE DO YOU RECALL THE DEFENDANT SAYING ABOUT

12:56PM   23   WHETHER THE THERANOS TECHNOLOGY WAS BEING USED BY THE MILITARY?

12:56PM   24   A.   AT SOME POINT SHE DID SAY THAT, AND I WAS NOT SUPPOSED TO

12:56PM   25   USE THIS IN THE PIECE, IT WAS VERY SENSITIVE, THAT IT HAD BEEN

PARLOFF DIRECT BY MR. BOSTIC                                     6932

```
12:56PM   1    USED IN THE MILITARY -- BY THE MILITARY IN AFGHANISTAN.

12:56PM   2    Q.    DID SHE GO INTO DETAIL ABOUT THAT OR DID SHE LEAVE IT AT

12:56PM   3    THAT LEVEL?

12:56PM   4    A.    AT THAT LEVEL.

12:56PM   5    Q.    AND BEFORE THE ARTICLE WAS PUBLISHED, SIMILARLY, DID

12:56PM   6    DEFENDANT TELL YOU ANYTHING ABOUT WHETHER YOU COULD BE GIVEN

12:56PM   7    INFORMATION ABOUT SPECIFIC DEPLOYMENTS OF THE THERANOS

12:56PM   8    TECHNOLOGY BY THE MILITARY?

12:56PM   9    A.    SHE SAID, NO, I COULD NOT BE.

12:56PM  10    Q.    IN WHAT CONTEXT DID THAT COME UP, IF YOU RECALL?

12:57PM  11    A.    WELL, I WANTED TO INTERVIEW GENERAL MATTIS AND SHE WAS

12:57PM  12    GOING TO MAKE AN INTRODUCTION AND SHE WAS GOING TO MAKE THAT

12:57PM  13    HAPPEN, BUT SHE TOLD ME THAT GENERAL MATTIS COULD NOT DISCUSS

12:57PM  14    ACTUAL DEPLOYMENTS IN AFGHANISTAN, AND THAT I SHOULD NOT EVEN

12:57PM  15    ASK HIM ABOUT THEM.

12:57PM  16    Q.    I'D LIKE TO LOOK AT SOME LANGUAGE IN YOUR ARTICLE AGAIN,

12:57PM  17    AND THAT'S EXHIBIT 1776.

12:57PM  18         MS. HOLLIMAN, CAN WE BRING THAT UP.  AND LET'S GO TO

12:57PM  19    PAGE 10 IN THE ARTICLE AND ZOOM IN ON THE TOP PARAGRAPH,

12:57PM  20    PLEASE.

12:57PM  21         SO, MR. PARLOFF, HERE IN THE ARTICLE THIS BEGINS WITH A

12:58PM  22    QUOTE FROM SOMEBODY FROM UCSF MEDICAL CENTER; IS THAT CORRECT?

12:58PM  23    A.    YEAH, YES.

12:58PM  24    Q.    AND THE SECOND SENTENCE HAS YOU WRITE, "THIS MAKES IT

12:58PM  25    POSSIBLE TO IMAGINE ONE DAY PLACING HOLMES'S LABS RIGHT BY THE
```

PARLOFF DIRECT BY MR. BOSTIC                                    6933

| | | |
|---|---|---|
| 12:58PM | 1 | OPERATING ROOMS IN HOSPITALS OR IN MILITARY EVACUATION |
| 12:58PM | 2 | HELICOPTERS OR ON SHIPS AND SUBMARINES." |
| 12:58PM | 3 | AND THEN IT GOES ON. |
| 12:58PM | 4 | DO YOU SEE THAT? |
| 12:58PM | 5 | A.   YES. |
| 12:58PM | 6 | Q.   AND IN THE ARTICLE, MILITARY USE OF THE DEVICE IS |
| 12:58PM | 7 | MENTIONED AS SOMETHING THAT CAN BE IMAGINED; IS THAT CORRECT? |
| 12:58PM | 8 | A.   THAT'S RIGHT. |
| 12:58PM | 9 | Q.   IF MS. HOLMES HAD TOLD YOU THAT THE DEVICE WAS ACTUALLY |
| 12:58PM | 10 | BEING USED IN AFGHANISTAN, WHY DID YOU WRITE IT THIS WAY IN THE |
| 12:58PM | 11 | ARTICLE IN TERMS OF WHAT MIGHT HAPPEN IN THE FUTURE? |
| 12:58PM | 12 | A.   SHE -- IT HAD TO BE COMPLETELY OFF THE RECORD.  IT WAS |
| 12:58PM | 13 | SOME SORT OF VERY HIGHLY SENSITIVE SECRET INFORMATION, SO I WAS |
| 12:58PM | 14 | NOT -- SHE DID NOT WANT ME TO PUBLISH THAT.  THIS WAS OBVIOUSLY |
| 12:59PM | 15 | HYPOTHETICAL, AND THERE WAS NOTHING WRONG WITH THAT. |
| 12:59PM | 16 | Q.   AND JUST TO BE CLEAR, DID MS. HOLMES DESCRIBE IT TO YOU AS |
| 12:59PM | 17 | A HYPOTHETICAL, OR DID YOU CHOOSE TO WRITE IT IN A HYPOTHETICAL |
| 12:59PM | 18 | WAY TO COMPLY WITH HER WISHES? |
| 12:59PM | 19 | A.   I CHOSE TO WRITE IT IN A HYPOTHETICAL WAY. |
| 12:59PM | 20 | Q.   LET'S SHIFT GEARS AND TALK ABOUT DISCUSSIONS THAT YOU HAD |
| 12:59PM | 21 | WITH MS. HOLMES ABOUT THE COMPANY'S WORK WITH PHARMACEUTICAL |
| 12:59PM | 22 | COMPANIES. |
| 12:59PM | 23 | DO YOU RECALL THAT COMING UP? |
| 12:59PM | 24 | A.   YES. |
| 12:59PM | 25 | Q.   IN CONNECTION WITH THAT TOPIC, DID MS. HOLMES PROVIDE YOU |

PARLOFF DIRECT BY MR. BOSTIC                              6934

```
12:59PM   1      WITH WRITTEN MATERIALS?

12:59PM   2      A.   YES.

12:59PM   3      Q.   I'D LIKE YOU TO LOOK AT TAB 5486 IN YOUR BINDER.

12:59PM   4           YOUR HONOR, THE GOVERNMENT OFFERS 5486 PURSUANT TO

12:59PM   5      STIPULATION.

12:59PM   6              MR. CLINE:  NO OBJECTION.

12:59PM   7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM   8           (GOVERNMENT'S EXHIBIT 5486 WAS RECEIVED IN EVIDENCE.)

01:00PM   9              MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE

01:00PM  10      TOP PART CAPTURING THE HEADING AND THE MESSAGE FROM MS. HOLMES.

01:00PM  11      Q.   MR. PARLOFF, DO YOU SEE AN EMAIL FROM MS. HOLMES TO YOU ON

01:00PM  12      JUNE 1ST, 2014?

01:00PM  13      A.   YES.

01:00PM  14      Q.   AND SHE REFERENCES IN HER EMAIL, "PLEASE SEE ADDITIONAL

01:00PM  15      FOLLOW UP FROM OUR CALLS BELOW."

01:00PM  16           DO YOU SEE THAT?

01:00PM  17      A.   YES.

01:00PM  18      Q.   AND DURING THIS TIME PERIOD, WERE YOU IN REGULAR CONTACT

01:00PM  19      WITH MS. HOLMES GAINING MORE INFORMATION FROM HER?

01:00PM  20      A.   YES.

01:00PM  21      Q.   LET'S ZOOM IN -- ACTUALLY ZOOM OUT AND THEN BACK IN ON THE

01:00PM  22      MIDDLE OF THE PAGE.

01:00PM  23           THERE'S A TOPIC THAT SAYS, "PHARMACEUTICAL COMPANY WORK."

01:00PM  24           THANK YOU, MS. HOLLIMAN.

01:00PM  25           DO YOU SEE THE SECOND TO THE TOP ENTRY THERE SAYS, "TOPIC:
```

PARLOFF DIRECT BY MR. BOSTIC                          6935

01:01PM  1    PHARMACEUTICAL COMPANY WORK."

01:01PM  2        AND THEN MS. HOLMES WRITES, "I'VE ATTACHED CONFIDENTIAL

01:01PM  3    REPORTS GENERATED IN SOME OF OUR EARLY PHARMACEUTICAL

01:01PM  4    PROGRAMS."

01:01PM  5        DO YOU SEE THAT?

01:01PM  6    A.    YES.

01:01PM  7    Q.    AND DO YOU RECALL RECEIVING DOCUMENTS FROM MS. HOLMES

01:01PM  8    RELATING TO WORK THE COMPANY HAD PURPORTEDLY DONE FOR

01:01PM  9    PHARMACEUTICAL COMPANIES?

01:01PM  10   A.    YES.

01:01PM  11   Q.    AND LET'S ZOOM IN AT THE TOP OF PAGE 1 AND LOOK AT THOSE

01:01PM  12   ATTACHMENT NAMES.

01:01PM  13       FIRST OF ALL, WHAT IS YOUR RECOLLECTION OF HOW IT CAME TO

01:01PM  14   BE THAT MS. HOLMES WAS SENDING YOU THIS INFORMATION?  DO YOU

01:01PM  15   HAVE A MEMORY OF ASKING FOR IT, OR WAS THERE ANOTHER

01:01PM  16   CIRCUMSTANCE?

01:01PM  17   A.    I THINK I DID ASK FOR IT.  SHE HAD MENTIONED -- I BELIEVE

01:01PM  18   SHE MENTIONED THESE, THAT SHE HAD DONE SOME OF -- THAT SHE HAD

01:01PM  19   SOME VALIDATION STUDIES THAT WERE PERFORMED WITH SOME OF THE

01:02PM  20   PHARMACEUTICAL COMPANIES, AND I BELIEVE I ASKED FOR THEM, YOU

01:02PM  21   KNOW, AND YEAH.

01:02PM  22   Q.    THE ATTACHMENTS TO THIS EMAIL, LIKE THE PRESENTATION, WERE

01:02PM  23   ALSO PASSWORD PROTECTED; IS THAT CORRECT?

01:02PM  24   A.    THAT'S RIGHT.

01:02PM  25   Q.    ARE YOU ABLE TO ACCESS THE ELECTRONIC VERSIONS OF THESE

PARLOFF DIRECT BY MR. BOSTIC                                    6936

01:02PM   1    DOCUMENTS TODAY?

01:02PM   2    A.   NOT ANYMORE, NO.

01:02PM   3    Q.   OKAY.  LET'S SEE IF WE CAN FIND COPIES OF THEM ELSEWHERE.

01:02PM   4         FIRST, I WANT TO JUST DRAW YOUR ATTENTION TO TWO OF THESE

01:02PM   5    FILES.  DO YOU SEE THAT THE THIRD ONE DOWN IS TITLED, "PFIZER

01:02PM   6    THERANOS SYSTEM VALIDATION FINAL REPORT - CONFIDENTIAL"?

01:02PM   7    A.   YES.

01:02PM   8    Q.   AND THE LAST ONE, THE FIFTH ONE, IS TITLED, "THERANOS

01:02PM   9    MULTIPLEXED PANEL VALIDATION REPORT SCHERING-PLOUGH -

01:02PM  10    CONFIDENTIAL"?

01:02PM  11    A.   YES.

01:02PM  12    Q.   AND KEEP THAT FINAL DOCUMENT IN MIND, AND LET'S BRING UP

01:03PM  13    1753.

01:03PM  14         AND THIS IS ADMITTED, YOUR HONOR.  MAY WE PUBLISH?

01:03PM  15              THE COURT:  YES.

01:03PM  16    BY MR. BOSTIC:

01:03PM  17    Q.   MR. PARLOFF, DO YOU SEE --

01:03PM  18         LET'S ZOOM IN ON THE TOP PART OF THIS EMAIL.

01:03PM  19         DO YOU SEE AN EMAIL ON YOUR SCREEN FROM MS. HOLMES TO

01:03PM  20    DANIEL EDLIN ON JUNE 1ST, 2014?

01:03PM  21    A.   YES.

01:03PM  22    Q.   AND THE SUBJECT LINE IN THE EMAIL IS "RE: ROGER PARLOFF -

01:03PM  23    AGGREGATED ACTION ITEMS."

01:03PM  24         DO YOU SEE THAT?

01:03PM  25    A.   UH-HUH, YES.

PARLOFF DIRECT BY MR. BOSTIC                                          6937

01:03PM   1    Q.   AND MS. HOLMES ATTACHES A FILE TO THIS EMAIL, PFIZER

01:03PM   2    THERANOS SYSTEM VALIDATION FINAL REPORT.PDF?

01:03PM   3    A.   UH-HUH, YES.

01:03PM   4    Q.   AND LET'S LOOK AT THE ATTACHMENT, AND THAT'S GOING TO BE

01:03PM   5    IN -- I'M SORRY, ON PAGE 7 OF THIS EXHIBIT.

01:04PM   6         MR. PARLOFF, DO YOU RECOGNIZE THE DOCUMENT ON YOUR SCREEN

01:04PM   7    NOW?

01:04PM   8    A.   YES.

01:04PM   9    Q.   AND WAS THIS THE REPORT, OR ONE OF THE REPORTS THAT

01:04PM   10   MS. HOLMES SENT TO YOU WHEN YOU WERE PREPARING YOUR ARTICLE ON

01:04PM   11   THE COMPANY?

01:04PM   12   A.   YES.

01:04PM   13   Q.   I'LL DRAW YOUR ATTENTION TO THE TWO LOGOS AT THE TOP OF

01:04PM   14   THAT PAGE.

01:04PM   15        DO YOU SEE THE PFIZER LOGO ON THE LEFT SIDE?

01:04PM   16   A.   YES.

01:04PM   17   Q.   AND THE THERANOS LOGO ON THE RIGHT?

01:04PM   18   A.   YES.

01:04PM   19   Q.   DID MS. HOLMES TELL YOU THAT THERANOS HAD GENERATED THE

01:04PM   20   CONTENT OF THIS REPORT?

01:04PM   21   A.   NO.

01:04PM   22   Q.   LET'S GO TO PAGE 32 OF THIS EXHIBIT.  LET'S ZOOM IN ON THE

01:04PM   23   TOP THIRD OF THE PAGE.

01:04PM   24        DO YOU SEE ON PAGE 32 THERE ARE SOME CONCLUSIONS MAKING

01:05PM   25   STATEMENTS ABOUT THE PERFORMANCE OF THE THERANOS SYSTEM?

PARLOFF DIRECT BY MR. BOSTIC                                    6938

01:05PM   1    A.   YES.

01:05PM   2    Q.   DID MS. HOLMES EVER TELL YOU THAT THESE CONCLUSIONS WERE

01:05PM   3    NOT THE CONCLUSIONS OF PFIZER?

01:05PM   4    A.   NO.

01:05PM   5    Q.   OKAY.  LET'S GO BACK JUST FOR A MOMENT TO 5486.

01:05PM   6         AND WHEN WE GET THERE LET'S ZOOM IN ON THE TOP HEADER AND

01:05PM   7    THE ATTACHMENTS AGAIN.

01:05PM   8         AND NOW, MR. PARLOFF, WE PREVIOUSLY NOTED THE BOTTOM

01:05PM   9    ATTACHMENT, "THERANOS MULTIPLEXED PANEL VALIDATION REPORT

01:05PM  10    SCHERING-PLOUGH - CONFIDENTIAL"?

01:05PM  11    A.   YES.

01:05PM  12    Q.   AND CAN YOU PLEASE TURN IN YOUR BINDER TO EXHIBIT 1752?

01:06PM  13    A.   YES.

01:06PM  14    Q.   DO YOU SEE AT 1752 ANOTHER EMAIL FROM MS. HOLMES TO

01:06PM  15    DANIEL EDLIN ON JUNE 1ST, 2014?

01:06PM  16    A.   YES.

01:06PM  17    Q.   AND IS THE SUBJECT LINE OF THIS EMAIL THE SAME AS THE LAST

01:06PM  18    ONE WE LOOKED AT, OR THE SAME AS 1753, WHICH IS "ROGER PARLOFF

01:06PM  19    AGGREGATED ACTION ITEMS"?

01:06PM  20    A.   ACTUALLY -- I'M SORRY, WHERE ARE WE?

01:06PM  21    Q.   I'M SORRY.  WE'RE AT 1752, WHICH SHOULD BE THE FIRST

01:06PM  22    EXHIBIT IN YOUR BINDER.

01:06PM  23    A.   UH-HUH.

01:06PM  24    Q.   AND WE'RE JUST ON THE FIRST PAGE.

01:06PM  25         IT'S NOT ON THE SCREEN.

PARLOFF DIRECT BY MR. BOSTIC                           6939

| | | |
|---|---|---|
| 01:06PM | 1 | A.   OH, IT'S NOT.  I SEE. |
| 01:06PM | 2 | Q.   I'M SORRY FOR THE CONFUSION. |
| 01:06PM | 3 | MS. HOLLIMAN, WE CAN -- ACTUALLY, LET'S LEAVE THAT UP. |
| 01:06PM | 4 | I'M SORRY.  LET'S LEAVE THAT UP. |
| 01:07PM | 5 | AND, MR. PARLOFF, I'LL ASK YOU TO JUST LOOK AT THE PAPER |
| 01:07PM | 6 | COPY FOR A MOMENT. |
| 01:07PM | 7 | A.   OH, OKAY. |
| 01:07PM | 8 | Q.   SO YOU'RE LOOKING AT 1752?  WE HAVE -- |
| 01:07PM | 9 | A.   YES, THE TOP, JUNE 1ST. |
| 01:07PM | 10 | Q.   AND WE HAVE 5486 UP ON THE SCREEN. |
| 01:07PM | 11 | MR. PARLOFF, DO YOU SEE THAT WE HAVE THIS EMAIL FROM |
| 01:07PM | 12 | MS. HOLMES TO MR. EDLIN WITH YOUR NAME IN THE SUBJECT LINE AS |
| 01:07PM | 13 | AN ATTACHMENT? |
| 01:07PM | 14 | A.   YES. |
| 01:07PM | 15 | Q.   AND IS THAT ATTACHMENT NAMED SIMILARLY TO THE |
| 01:07PM | 16 | ATTACHMENT -- |
| 01:07PM | 17 | A.   OH, YES, YES. |
| 01:07PM | 18 | Q.   -- IN THE EMAIL THAT IS ON YOUR SCREEN? |
| 01:07PM | 19 | A.   YEAH. |
| 01:07PM | 20 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1752. |
| 01:07PM | 21 | MR. CLINE:  YOUR HONOR, WE OBJECT TO THE EMAIL AS |
| 01:07PM | 22 | HEARSAY.  THERE'S AN ATTACHMENT TO THIS EMAIL, AND IF |
| 01:07PM | 23 | MR. PARLOFF CAN IDENTIFY THAT AS WHAT HE RECEIVED, WE WON'T |
| 01:07PM | 24 | OBJECT TO THE ATTACHMENT. |
| 01:07PM | 25 | MR. BOSTIC:  YOUR HONOR, THIS ISN'T HEARSAY.  THIS |

PARLOFF DIRECT BY MR. BOSTIC                                    6940

01:08PM   1    IS AN EMAIL FROM THE DEFENDANT TO AN EMPLOYEE.

01:08PM   2        IF THE DEFENSE'S CONCERNS ARE WITH THE CONTENT OF THE

01:08PM   3    MESSAGES BELOW, WE CAN REDACT THAT.

01:08PM   4        BUT I'LL NOTE THAT THEY'RE ALREADY IN EVIDENCE FROM 1753.

01:08PM   5        THE ONLY NEW CONTENT HERE IS THE EMAIL FROM MS. HOLMES

01:08PM   6    ATTACHING THE DOCUMENT.

01:08PM   7            THE COURT:  I DO SEE IT'S AN EMAIL FROM YOUR CLIENT,

01:08PM   8    MR. CLINE.

01:08PM   9        DO YOU WISH SOMETHING REDACTED FROM THIS?

01:08PM   10           MR. CLINE:  THERE ARE SEVERAL ITEMS IN THIS, AND YOU

01:08PM   11   CAN SEE THE EMAILS FROM, FROM MS. HOLMES, IT LOOKS LIKE THERE

01:08PM   12   ARE ONE, TWO, THREE, THREE OF THOSE.  I'M JUST LOOKING THROUGH

01:08PM   13   THE DOCUMENT HERE.

01:08PM   14       I THINK THERE ARE THREE THERE ON THE FIRST PAGE.  NO

01:08PM   15   OBJECTION TO THOSE.

01:08PM   16       AND AGAIN, AS TO THE ATTACHMENT, IF MR. PARLOFF CAN

01:09PM   17   IDENTIFY IT AS WHAT HE GOT, NO OBJECTION TO THAT.

01:09PM   18           THE COURT:  ALL RIGHT.  DO YOU WANT TO LAY A

01:09PM   19   FOUNDATION FOR THAT AFTER YOU --

01:09PM   20           MR. BOSTIC:  I CAN IF THE COURT WOULD LIKE,

01:09PM   21   YOUR HONOR.  BUT I WILL JUST NOTE THAT THIS CONTENT, I BELIEVE,

01:09PM   22   IS IDENTICAL TO THE CONTENT THAT IS ALREADY IN THE RECORD IN

01:09PM   23   1753.

01:09PM   24           THE COURT:  ALL RIGHT.  THANK YOU.

01:09PM   25       ALL RIGHT.  THANK YOU, MR. CLINE.

PARLOFF DIRECT BY MR. BOSTIC                                    6941

01:09PM  1          I'LL OVERRULE THE OBJECTION.  THIS IS ADMITTED.

01:09PM  2          AND YOU'LL LAY A FOUNDATION AS TO THE ATTACHMENT AS A

01:09PM  3    PRELIMINARY MATTER.

01:09PM  4              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

01:09PM  5              THE COURT:  THANK YOU.

01:09PM  6          (GOVERNMENT'S EXHIBIT 1752 WAS RECEIVED IN EVIDENCE.)

01:09PM  7              MR. BOSTIC:  MAY WE PUBLISH?

01:09PM  8              THE COURT:  YES.

01:09PM  9    BY MR. BOSTIC:

01:09PM 10    Q.   LET'S BRING UP 1752.

01:09PM 11          MR. PARLOFF, YOU'LL RECALL A MINUTE AGO WE LOOKED AT AN

01:09PM 12    EMAIL FROM MS. HOLMES TO MR. EDLIN SENDING HIM THE PFIZER

01:09PM 13    VALIDATION REPORT.

01:09PM 14          DO YOU RECALL THAT?

01:09PM 15    A.   YES.

01:09PM 16    Q.   AND NOW WE'RE LOOKING AT AN EMAIL FROM MS. HOLMES TO

01:09PM 17    MR. EDLIN AT THAT SAME TIME SENDING THE SCHERING-PLOUGH

01:10PM 18    VALIDATION REPORT; IS THAT CORRECT?

01:10PM 19    A.   YES.

01:10PM 20    Q.   LET'S GO TO PAGE 7 OF THIS EXHIBIT.

01:10PM 21          ON PAGE 7 OF THE EXHIBIT, DO YOU SEE THE SCHERING-PLOUGH

01:10PM 22    REPORT THAT MS. HOLMES PROVIDED YOU ON THIS SAME DATE,

01:10PM 23    JUNE 1ST, 2014?

01:10PM 24    A.   YES.

01:10PM 25    Q.   AND AGAIN, I'LL DRAW YOUR ATTENTION TO THE WORDS AND THE

PARLOFF DIRECT BY MR. BOSTIC                              6942

01:10PM   1    LOGOS AT THE TOP OF THE PAGE.

01:10PM   2        DO YOU SEE THE SCHERING-PLOUGH LOGO ON THE UPPER LEFT?

01:10PM   3    A.   YES.

01:10PM   4    Q.   AND THE THERANOS IN THE UPPER RIGHT?

01:10PM   5    A.   YES.

01:10PM   6    Q.   AND DID MS. HOLMES EVER TELL YOU THAT THERANOS CREATED

01:10PM   7    THIS DOCUMENT?

01:10PM   8    A.   NO.

01:10PM   9    Q.   LET'S TURN TO PAGE 24 OF THE EXHIBIT.  LET'S ZOOM IN ON

01:10PM  10    THE TEXT.

01:10PM  11        MR. PARLOFF, DO YOU SEE UNDER CONCLUSIONS THERE ARE SOME

01:10PM  12    FAVORABLE CONCLUSIONS, IN OTHER WORDS, SOME PRAISE ABOUT

01:11PM  13    THERANOS'S PERFORMANCE?

01:11PM  14    A.   YES.

01:11PM  15    Q.   DID MS. HOLMES EVER TELL YOU THAT THIS PRAISE WAS

01:11PM  16    GENERATED BY THERANOS ITSELF?

01:11PM  17    A.   NO.

01:11PM  18    Q.   BEFORE YOU PUBLISHED YOUR ARTICLE IN JUNE 2014, DID

01:11PM  19    MS. HOLMES TELL YOU WHETHER THERANOS WAS STILL ACTIVELY

01:11PM  20    INVOLVED IN WORK WITH PHARMACEUTICAL COMPANIES?

01:11PM  21    A.   YES.

01:11PM  22    Q.   AND WHAT DID SHE SAY ABOUT THAT?

01:11PM  23    A.   SHE SAID THEY WERE.

01:11PM  24    Q.   AND WAS THAT UP THROUGH THE PRESENT DAY IN 2014?

01:11PM  25    A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                6943

01:11PM  1    Q.   LET'S TALK NEXT ABOUT CONVERSATIONS THAT YOU HAD WITH

01:11PM  2    MS. HOLMES ABOUT THE DEVICE ITSELF AND THE USE OF VENIPUNCTURE

01:11PM  3    BY THE COMPANY.

01:11PM  4         DO YOU HAVE THOSE CONVERSATIONS IN MIND?

01:11PM  5    A.   YES.

01:11PM  6    Q.   WAS THAT A TOPIC THAT CAME UP IN MULTIPLE DISCUSSIONS WITH

01:12PM  7    MS. HOLMES?

01:12PM  8    A.   YES.

01:12PM  9    Q.   AND IN YOUR DISCUSSIONS WITH MS. HOLMES, DID YOU ASK HER

01:12PM  10   QUESTIONS ABOUT WHAT DEVICES THERANOS USED TO RUN TESTS ON

01:12PM  11   PATIENT SAMPLES?

01:12PM  12   A.   YES.

01:12PM  13   Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON APRIL 10TH,

01:12PM  14   2014 WHERE THAT TOPIC MIGHT HAVE COME UP?

01:12PM  15   A.   YES.

01:12PM  16           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:12PM  17   EXHIBIT 5480A AT THIS TIME.  IT'S APPROXIMATELY A MINUTE AND

01:12PM  18   40 SECONDS LONG.

01:12PM  19           MR. CLINE:  NO OBJECTION.

01:12PM  20           THE COURT:  IT'S ADMITTED.  IT WILL BE PLAYED.

01:12PM  21      LADIES AND GENTLEMEN, PLEASE LISTEN CLOSELY.  THERE'S NO

01:12PM  22   TRANSCRIPT FOR THIS AUDIO RECORDING.  IT'S ADMITTED, AND IT NOW

01:12PM  23   MAY BE PLAYED.

01:12PM  24      (GOVERNMENT'S EXHIBIT 5480A WAS RECEIVED IN EVIDENCE.)

01:13PM  25      (AUDIO RECORDING PLAYED OFF THE RECORD.)

PARLOFF DIRECT BY MR. BOSTIC                                    6944

01:14PM   1    BY MR. BOSTIC:

01:14PM   2    Q.    MR. PARLOFF, DID YOU HEAR MS. HOLMES TALK ABOUT LARGE

01:14PM   3    MACHINES AT OTHER LABS, WHICH WERE VERY BIG AND WHICH TAKE UP A

01:14PM   4    HUGE FOOTPRINT?

01:14PM   5    A.    YES.

01:14PM   6    Q.    DID THE DEFENDANT EVER TELL YOU THAT THERANOS ALSO HAD

01:14PM   7    LARGE CONVENTIONAL MACHINES BECAUSE ITS SMALL ANALYZER COULDN'T

01:15PM   8    RUN MOST OF THE TESTS IT WAS OFFERING?

01:15PM   9    A.    NO.

01:15PM  10    Q.    IN THAT CLIP, YOU TALK ABOUT THE USE OF DEVICES AND THEN

01:15PM  11    YOU ASK, "CAN I SAY THAT?"

01:15PM  12          DO YOU RECALL ASKING THAT?

01:15PM  13    A.    YES.

01:15PM  14    Q.    AND WHY DO YOU ASK MS. HOLMES WHAT YOU COULD SAY?

01:15PM  15    A.    SHE WAS VERY CONCERNED ABOUT TRADE SECRETS AND PROTECTING

01:15PM  16    HER INTELLECTUAL PROPERTY, WHICH I THOUGHT WAS A VERY

01:15PM  17    LEGITIMATE CONCERN.

01:15PM  18          AND SO I WAS LETTING HER SPEAK FREELY ABOUT WHAT HER

01:15PM  19    DEVICES COULD DO, AND THEN I WOULD COME BACK TO HER LATER AND

01:15PM  20    TELL HER WHAT PARTS I WANTED TO USE, AND I WOULD SEE IF IT WAS

01:15PM  21    OKAY IN TERMS OF PROTECTING HER INTELLECTUAL PROPERTY.

01:15PM  22    Q.    SO, IN OTHER WORDS, YOU HAD AGREED WITH MS. HOLMES THAT

01:15PM  23    SHE COULD GIVE YOU INFORMATION, BUT THAT YOU WOULD CHECK WITH

01:15PM  24    HER BEFORE DISCLOSING THAT INFORMATION?

01:16PM  25    A.    YEAH.   I WAS GETTING IT ON BACKGROUND OR -- AND WOULD --

PARLOFF DIRECT BY MR. BOSTIC                          6945

01:16PM   1    YEAH, AND WOULD GET HER APPROVAL BEFORE -- SO THAT I DIDN'T

01:16PM   2    COMPROMISE HER INTELLECTUAL PROPERTY RIGHTS.

01:16PM   3    Q.   IS THAT SOMETHING THAT IS A PRACTICE OF YOURS WHEN IT

01:16PM   4    COMES TO DISCUSSING POTENTIALLY SENSITIVE TOPICS WITH SUBJECTS?

01:16PM   5    A.   YES.

01:16PM   6    Q.   WHY DO YOU DO IT THAT WAY INSTEAD OF JUST HAVING THE

01:16PM   7    SUBJECT SENSOR THEMSELVES AND ONLY TELL YOU THINGS THAT THEY

01:16PM   8    WANT IN THE ARTICLE?

01:16PM   9    A.   FIRST, I WOULD RATHER GET THE MOST INFORMATION I CAN SO

01:16PM  10    THAT I GET THE BIG PICTURE.

01:16PM  11         AND IF PEOPLE ARE TOO COWED BY WORRYING ABOUT DOTTING

01:17PM  12    EVERY T AND -- I MEAN DOTTING EVERY I AND CROSSING EVERY T,

01:17PM  13    THEN THEY'RE RELUCTANT TO SPEAK.

01:17PM  14         I SHOULD SAY THIS WAS NOT -- WELL, OKAY.  YEAH.

01:17PM  15    Q.   LET'S GO TO YOUR ARTICLE FOR A MOMENT, HAVING LISTENED TO

01:17PM  16    THAT CLIP.  SO LET'S GO BACK TO 1776, AND PAGE 9 IN THE

01:17PM  17    EXHIBIT.

01:17PM  18    A.   PAGE?

01:17PM  19    Q.   PAGE 9.  IT WILL SHOW UP ON THE SCREEN.  WHATEVER IS

01:17PM  20    EASIER.

01:17PM  21         AND LET'S LOOK TOWARDS THE BOTTOM, THE SECOND TO THE LAST

01:17PM  22    PARAGRAPH THAT STARTS, "IMPORTANTLY."

01:17PM  23         IN THE ARTICLE YOU WRITE, "IMPORTANTLY, IT'S NOT JUST THE

01:17PM  24    BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

01:17PM  25    THERANOS USES TO PERFORM THE TESTS."

PARLOFF DIRECT BY MR. BOSTIC                                    6946

01:18PM   1        DO YOU SEE THAT?

01:18PM   2   A.   YES.

01:18PM   3   Q.   AND YOU WRITE "THEY," THE ANALYTICAL SYSTEMS, "TAKE UP A

01:18PM   4   SMALL FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB

01:18PM   5   TODAY."

01:18PM   6        IS THAT WHAT YOU WROTE?

01:18PM   7   A.   YES.

01:18PM   8   Q.   AND WAS THAT CONSISTENT WITH THE INFORMATION GIVEN TO YOU

01:18PM   9   BY MS. HOLMES?

01:18PM   10  A.   YES.

01:18PM   11  Q.   DID THE DEFENDANT EVER COMPARE THERANOS TO QUEST IN TERMS

01:18PM   12  OF BUYING TESTS FROM THIRD PARTIES?

01:18PM   13  A.   YES.  SO SHE COMPARED IT TO ALL OTHER LABS, YEAH.

01:18PM   14  Q.   AND WHAT DID SHE SAY ABOUT THAT?  WAS THERANOS THE SAME IN

01:18PM   15  THAT WAY OR DIFFERENT?

01:18PM   16  A.   DIFFERENT.  OTHER LABS BUY THEIR TESTS, WE MAKE ALL OF

01:18PM   17  OURS.

01:18PM   18  Q.   YOU SPECIFICALLY REMEMBER MS. HOLMES SAYING THAT?

01:18PM   19  A.   YES.

01:18PM   20  Q.   AND DID SHE SAY THAT TO YOU BEFORE THE JUNE 2014 ARTICLE?

01:18PM   21  A.   YES.

01:19PM   22       SHE SAID OTHER COMPANIES BUY THEIR TESTS FROM THIRD

01:19PM   23  PARTIES, WE MAKE ALL OF OURS.

01:19PM   24  Q.   AND AGAIN, AT THAT POINT, OR AT ANY POINT IN 2014, DID

01:19PM   25  MS. HOLMES DISCLOSE TO YOU THAT THERANOS WAS BUYING AND USING

PARLOFF DIRECT BY MR. BOSTIC                                   6947

01:19PM  1    ANALYZERS FROM THIRD PARTIES?

01:19PM  2    A.   NO.

01:19PM  3    Q.   IN YOUR CONVERSATIONS WITH MS. HOLMES, DID THE TOPIC OF

01:19PM  4    VEIN DRAWS CONTINUE TO COME UP?

01:19PM  5    A.   THE TOPIC OF?

01:19PM  6    Q.   OF VEIN DRAWS CONTINUE TO COME UP?

01:19PM  7    A.   YES.

01:19PM  8    Q.   AND DID YOU ASK MS. HOLMES QUESTIONS ABOUT WHY THERANOS

01:19PM  9    PERFORMED VENIPUNCTURE IN SOME CASES?

01:19PM 10    A.   YES.

01:19PM 11         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

01:19PM 12    EXHIBIT 5473B2, WHICH IS A CLIP LABELLED MAY 12TH, 2014, AND

01:19PM 13    IT'S APPROXIMATELY FIVE MINUTES LONG.

01:19PM 14         MR. CLINE:  NO OBJECTION.

01:20PM 15         THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED,

01:20PM 16    AND IT WILL BE PLAYED.

01:20PM 17    (GOVERNMENT'S EXHIBIT 5473B2 WAS RECEIVED IN EVIDENCE.)

01:20PM 18         THE COURT:  AGAIN, LADIES AND GENTLEMEN, YOU WILL

01:20PM 19    NOT HAVE A TRANSCRIPT OF THIS SO PLEASE LISTEN CLOSELY.  THE

01:20PM 20    RECORDING IS IN EVIDENCE, AND IT MAY NOW BE PLAYED.

01:20PM 21    (AUDIO RECORDING PLAYED OFF THE RECORD.)

01:25PM 22    BY MR. BOSTIC:

01:25PM 23    Q.   OKAY.  MR. PARLOFF, DID YOU HEAR THE DISCUSSION ABOUT THE

01:25PM 24    OCCASIONS WHEN THERANOS WOULD CONDUCT VENIPUNCTURE?

01:25PM 25    A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                    6948

01:25PM   1    Q.   AND MS. HOLMES MENTIONED A FEW REASONS.  SHE MENTIONED

01:25PM   2    SCALING, SHE MENTIONED VEIN DRAWN SAMPLES COLLECTED BY DOCTORS

01:25PM   3    AND SENT IN, SHE MENTIONED THE GOAL OF SHOWING CORRELATION

01:25PM   4    BETWEEN DIFFERENT KINDS OF SAMPLES.

01:25PM   5         DO YOU RECALL THAT DISCUSSION?

01:25PM   6    A.   YEAH.

01:25PM   7    Q.   YOU ASKED MS. HOLMES WHETHER IT WAS A MATTER OF THE

01:25PM   8    PLATFORM NOT BEING ABLE TO RUN A CERTAIN TEST; IS THAT CORRECT?

01:25PM   9    A.   YES.

01:25PM   10   Q.   AND SHE ANSWERED AGAIN IN TERMS OF VOLUME; IS THAT RIGHT?

01:25PM   11   A.   YES.

01:25PM   12   Q.   AT ANY POINT IN 2014, DID MS. HOLMES TELL YOU THAT

01:25PM   13   THERANOS NEEDED TO USE VENIPUNCTURE BECAUSE THERE WERE MANY

01:25PM   14   TESTS THAT ITS OWN TECHNOLOGY SIMPLY COULDN'T DO?

01:25PM   15   A.   NO.

01:26PM   16   Q.   AT SOME POINT BEFORE YOU WROTE YOUR ARTICLE IN JUNE OF

01:26PM   17   2014, DID YOU ASK MS. HOLMES ABOUT VISITING A FUNCTIONING

01:26PM   18   ARIZONA LAB BELONGING TO THERANOS?

01:26PM   19   A.   YES.

01:26PM   20   Q.   WHAT DID MS. HOLMES SAY ABOUT THAT, IF YOU RECALL?

01:26PM   21   A.   WELL, I WAS MISTAKEN.  THE ARIZONA LAB WAS NOT OPERATIONAL

01:26PM   22   YET.

01:26PM   23        AND THEN WE SPOKE ABOUT -- I ASKED IF I COULD SEE THE

01:26PM   24   CALIFORNIA LAB, AND SHE SAID THAT, IN ESSENCE, I ALREADY HAD.

01:26PM   25   I MEAN, THAT IN ESSENCE I THINK SHE SAID, YEAH, YOU'VE SEEN IT.

PARLOFF DIRECT BY MR. BOSTIC                                    6949

01:26PM  1    IT'S JUST A BANK OF THOSE DEVICES I SHOWED YOU, MEANING THE

01:27PM  2    SMALL -- HER DEVICES, THE PROPRIETARY DEVICES ABOUT THE SIZE OF

01:27PM  3    THE COMPUTER TOWER.

01:27PM  4    Q.   SO LET ME ASK YOU, WHEN YOU ASKED TO SEE THE LAB -- YOU

01:27PM  5    PREVIOUSLY TESTIFIED THAT YOU HAD SEEN, IN FACT, THE R&D LAB?

01:27PM  6    A.   I HAD SEEN THE R&D.  I WAS ASKING TO SEE THE COMMERCIAL

01:27PM  7    LAB.

01:27PM  8    Q.   THE LAB WHERE PATIENT SAMPLES ARE ACTUALLY TESTED?

01:27PM  9    A.   THAT'S RIGHT.

01:27PM  10        IN FACT, WHAT SHE SAID WAS --

01:27PM  11            MR. CLINE:  FORGIVE ME, YOUR HONOR.  I APOLOGIZE FOR

01:27PM  12   INTERRUPTING.

01:27PM  13       I THINK WE HAVE A RECORDING OF THIS CONVERSATION WHICH I

01:27PM  14   IMAGINE THAT MR. BOSTIC IS ABOUT TO PLAY.  MAYBE WE CAN HAVE

01:27PM  15   MS. HOLMES'S ACTUAL WORDS INSTEAD OF MR. PARLOFF'S --

01:27PM  16            THE COURT:  WELL, THIS IS HIS WITNESS, AND THE

01:27PM  17   WITNESS CAN SAY WHAT HE RECALLS, AND THEN, OF COURSE, THE AUDIO

01:27PM  18   WILL TELL US WHAT WAS RECORDED.

01:27PM  19       SO YOU CAN CONTINUE.

01:27PM  20            MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:27PM  21   Q.   MR. PARLOFF, LET ME JUST MAKE SURE THAT IT'S CLEAR WHAT

01:28PM  22   YOU HAD PREVIOUSLY SEEN.

01:28PM  23       YOU MENTIONED THAT MS. HOLMES SAID IT'S A BANK OF THE

01:28PM  24   KINDS OF DEVICES YOU HAD PREVIOUSLY SEEN?

01:28PM  25   A.   UH-HUH, YEAH.

PARLOFF DIRECT BY MR. BOSTIC                                   6950

01:28PM   1    Q.   AND DESCRIBE FOR US JUST FOR THE RECORD WHAT YOU HAD SEEN

01:28PM   2    IN THE PAST.

01:28PM   3    A.   SHE HAD SHOWN ME THIS R&D LAB AT HER HEADQUARTERS, AND I

01:28PM   4    MEAN, IT WAS SEVEN YEARS AGO, BUT I WOULD SAY MAYBE TEN OF

01:28PM   5    THESE DEVICES, MAYBE SLIGHTLY LESS, ON SHELVES OR WORK BENCHES.

01:28PM   6    THEY WERE NOT IN OPERATION WHILE I WAS THERE, BUT YEAH, THEY

01:28PM   7    ALL LOOKED PRETTY MUCH IDENTICAL.

01:28PM   8             MR. BOSTIC:   YOUR HONOR, THE GOVERNMENT OFFERS

01:28PM   9    EXHIBIT 5473C.  THIS IS A RECORDING OF WHICH THE DEFENSE IS

01:28PM  10    AWARE FROM MAY 12TH, 2014.

01:28PM  11         IT'S APPROXIMATELY TEN MINUTES LONG -- OR EXCUSE ME, TWO

01:28PM  12    MINUTES LONG.

01:28PM  13             MR. CLINE:   NO OBJECTION.

01:28PM  14             THE COURT:   IT'S ADMITTED, AND IT WILL BE PLAYED.

01:28PM  15         (GOVERNMENT'S EXHIBIT 5473C WAS RECEIVED IN EVIDENCE.)

01:28PM  16             THE COURT:   AGAIN, LADIES AND GENTLEMEN, THERE'S NO

01:29PM  17    TRANSCRIPT, SO PLEASE DO LISTEN CLOSELY.  IT CAN BE PLAYED.

01:29PM  18         (AUDIO RECORDING PLAYED OFF THE RECORD.)

01:31PM  19    BY MR. BOSTIC:

01:31PM  20    Q.   MR. PARLOFF, DID YOU HEAR MS. HOLMES DESCRIBE THE LAB FOR

01:31PM  21    YOU AS A BANK OF THE SMALL THERANOS ANALYZERS THAT YOU HAD SEEN

01:31PM  22    BEFORE?

01:31PM  23    A.   YES.

01:31PM  24    Q.   DURING THAT DESCRIPTION, OR AT ANY POINT BEFORE YOUR

01:31PM  25    JUNE 2014 ARTICLE, DID SHE TELL YOU THAT THE LAB ALSO INCLUDED

PARLOFF DIRECT BY MR. BOSTIC                                6951

01:31PM   1     LARGE COMMERCIALLY AVAILABLE THIRD PARTY DEVICES?

01:31PM   2     A.   NO.

01:31PM   3              MR. BOSTIC:  YOUR HONOR, I HAVE SOME MORE MATERIAL

01:31PM   4     WITH THIS WITNESS, BUT I'M NOT SURE IF THE COURT WANTED TO TAKE

01:31PM   5     A BREAK AT 1:30 OR AT ANOTHER TIME.

01:31PM   6              THE COURT:  LET'S BREAK NOW.  WE'LL TAKE OUR

01:31PM   7     AFTERNOON BREAK.

01:31PM   8         LADIES AND GENTLEMEN, THIS IS 30 MINUTES, 30 MINUTES.

01:31PM   9     WE'LL TAKE A 30 MINUTE BREAK.

01:31PM   10        YOU CAN STAND DOWN, SIR.  AND WE'LL RESUME AGAIN IN

01:31PM   11    30 MINUTES.

01:32PM   12        (RECESS FROM 1:32 P.M. UNTIL 2:13 P.M.)

02:13PM   13             THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

02:13PM   14    RECORD.

02:13PM   15        ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:13PM   16        OUR JURY IS PRESENT.  MR. PARLOFF IS ON THE STAND.

02:13PM   17        MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:13PM   18             MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:13PM   19        FOR THE RECORD, CAN I CONFIRM WITH THE COURT THAT 1752 WAS

02:13PM   20    ADMITTED INTO EVIDENCE?

02:14PM   21             THE COURT:  YES, OVER OBJECTION, YES.

02:14PM   22             MR. BOSTIC:  THANK YOU, YOUR HONOR.

02:14PM   23    Q.   MR. PARLOFF, I'D LIKE TO CONTINUE OUR CONVERSATION ABOUT

02:14PM   24    DISCUSSIONS YOU HAD WITH MS. HOLMES ABOUT WHAT THE THERANOS

02:14PM   25    ANALYZER COULD DO.

PARLOFF DIRECT BY MR. BOSTIC                                    6952

```
02:14PM   1          DO YOU RECALL THOSE DISCUSSIONS GENERALLY?

02:14PM   2      A.   YES.

02:14PM   3      Q.   BEFORE YOU PUBLISHED YOUR ARTICLE IN "FORTUNE" IN JUNE OF

02:14PM   4   2014, DID YOU HAVE DISCUSSIONS WITH THE DEFENDANT ABOUT WHETHER

02:14PM   5   THERANOS WAS USING A SINGLE DEVICE FOR ITS TESTS OR MULTIPLE

02:14PM   6   DEVICES?

02:14PM   7      A.   YES.

02:14PM   8      Q.   OKAY.  AND WAS THAT A TOPIC THAT CAME UP MULTIPLE TIMES?

02:14PM   9      A.   YES.

02:14PM  10      Q.   AND DID YOU HAVE A CONVERSATION WITH MS. HOLMES ON

02:14PM  11   MAY 12TH THAT INCLUDED SOME DISCUSSION ON THAT TOPIC?

02:14PM  12      A.   THAT SOUNDS RIGHT.

02:14PM  13          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

02:14PM  14   EXHIBIT 5473D2.

02:14PM  15      THIS WAS A CLIP THAT THE DEFENSE IS AWARE OF FROM

02:15PM  16   MAY 12TH, 2014.  IT'S APPROXIMATELY TWO MINUTES LONG.

02:15PM  17          MR. CLINE:  NO OBJECTION.

02:15PM  18          THE COURT:  ALL RIGHT.  IT'S ADMITTED, AND IT WILL

02:15PM  19   BE PLAYED.

02:15PM  20      AGAIN, LADIES AND GENTLEMEN, PLEASE PAY ATTENTION.

02:15PM  21   THERE'S NO TRANSCRIPT FOR THIS TAPE.

02:15PM  22      AND IT MAY BE PLAYED NOW.

02:15PM  23      (GOVERNMENT'S EXHIBIT 5473D2 WAS RECEIVED IN EVIDENCE.)

02:15PM  24          MR. BOSTIC:  THANK YOU.  MS. HOLLIMAN -- MY

02:15PM  25   APOLOGIES.  BEFORE WE PRESS PLAY ON THAT.
```

PARLOFF DIRECT BY MR. BOSTIC                                  6953

02:15PM   1    Q.   MR. PARLOFF, DO YOU RECALL MS. HOLMES GIVING YOU DIRECTION

02:15PM   2    OR INPUT ABOUT WHETHER TO DESCRIBE THE THERANOS ANALYZER AS A

02:15PM   3    DEVICE OR MULTIPLE DEVICES?

02:15PM   4    A.   YES.

02:15PM   5    Q.   OKAY.

02:15PM   6    A.   AND GENERALLY, SHE WANTED ME TO USE THE PLURAL.

02:15PM   7    Q.   ALL RIGHT.

02:15PM   8         LET'S LISTEN TO EXHIBIT 5473D2 NOW.

02:15PM   9         (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:18PM  10    BY MR. BOSTIC:

02:18PM  11    Q.   MR. PARLOFF, DID YOU HEAR THE DEFENDANT REFERENCE THE FACT

02:18PM  12    THAT WE HAVE A SINGLE DEVICE THAT CAN PERFORM ANY TEST AND THAT

02:18PM  13    BEING A BIG DEAL?

02:18PM  14    A.   YEAH.

02:18PM  15    Q.   WAS THAT THE ONLY TIME IN YOUR CONVERSATIONS WITH

02:18PM  16    MS. HOLMES THAT SHE MADE THAT CLAIM, OR WAS THAT GENERALLY

02:18PM  17    CONSISTENT WITH WHAT SHE TOLD YOU ABOUT WHAT THE ANALYZER COULD

02:18PM  18    DO?

02:18PM  19    A.   THAT WAS CONSISTENT.

02:18PM  20    Q.   DID YOU EVER ASK MS. HOLMES DIRECTLY WHETHER THERANOS HAD

02:18PM  21    THIRD PARTY ANALYZERS FROM COMPANIES LIKE SIEMENS?

02:18PM  22    A.   YES.

02:18PM  23    Q.   AND WHAT DID YOU ASK HER ABOUT THAT?

02:18PM  24    A.   I ASKED TWO QUESTIONS.  ONE RELATED TO WAS SHE -- DID SHE

02:18PM  25    EVER USE THEM WHEN SHE COULDN'T SIMPLY DO HER OWN TESTS, I

PARLOFF DIRECT BY MR. BOSTIC                              6954

02:19PM  1    MEAN, SHE COULDN'T DO THE TEST ON HER OWN PLATFORM, AND ALSO

02:19PM  2    DID SHE USE THEM -- BECAUSE SHE HAD MENTIONED WHEN SHE DID HAVE

02:19PM  3    TO DO VENIPUNCTURE, IT SOMETIMES HAD SOMETHING TO DO WITH

02:19PM  4    SCALING.  I DIDN'T UNDERSTAND THE WHOLE ANSWER, BUT IT HAD

02:19PM  5    SOMETHING TO DO WITH SCALING.

02:19PM  6         SO IT CROSSED MY MIND, WAS SHE USING THESE LARGE --

02:19PM  7    BECAUSE THESE, THESE LARGE THIRD PARTY ANALYZERS TO SCALE, TO

02:19PM  8    GET UP TO SCALE BECAUSE, BECAUSE THEY ARE LARGE AND HAVE -- CAN

02:19PM  9    DO ENORMOUS VOLUME.

02:19PM  10        SO I ASKED -- AND YOU NEED TO KNOW ONE OTHER THING, YOU

02:19PM  11   MAY KNOW IT ALREADY, BUT THESE THIRD PARTY MACHINES ARE

02:19PM  12   MANUFACTURED BY COMPANIES LIKE SIEMENS, WHICH IS A GERMAN

02:19PM  13   COMPANY, AND BECKMAN COULTER, AND OLYMPUS.

02:20PM  14        SO THE QUESTION I ASKED WAS, JUST TO BE CLEAR, YOU DON'T

02:20PM  15   KEEP A SIEMENS ANALYZER, FOR INSTANCE, ON HAND FOR OVERFLOW, DO

02:20PM  16   YOU?

02:20PM  17        AND SHE SAID, HUH-UH, OR HUM-UM.  IT WAS A NONVERBAL

02:20PM  18   RESPONSE, BUT IT MEANT CORRECT, WE DON'T DO THAT.

02:20PM  19        AND THEN I ASKED A SECOND QUESTION WHICH WAS RELATED, BUT

02:20PM  20   SLIGHTLY DIFFERENT.  AND IT'S NOT A MATTER OF, FOR INSTANCE,

02:20PM  21   WHEN WE CAN'T DO THE TEST ON OUR OWN PLATFORM, WE NEED TO DO IT

02:20PM  22   ON A SIEMENS ANALYZER.

02:20PM  23        AND SHE SAID, HUH-UH, MEANING CORRECT, WE DON'T DO THAT.

02:21PM  24   SO --

02:21PM  25   Q.   FINISH YOUR ANSWER.

PARLOFF DIRECT BY MR. BOSTIC                                    6955

02:21PM   1    A.   SO THOSE WERE DIRECT QUESTIONS AND DIRECT ANSWERS, AND

02:21PM   2    THEY SORT OF REINFORCED THE ANSWERS SHE HAD GIVEN ME BEFORE

02:21PM   3    ABOUT THAT ISSUE AND WHEN SHE SAID --

02:21PM   4              MR. CLINE:  EXCUSE ME, YOUR HONOR.  I OBJECT.  WE'VE

02:21PM   5    HAD THE QUESTION AND THE ANSWER, AND NOW --

02:21PM   6              THE COURT:  YOU CAN ASK ANOTHER QUESTION,

02:21PM   7    MR. BOSTIC.

02:21PM   8              MR. BOSTIC:  THANK YOU.

02:21PM   9    Q.   MR. PARLOFF, LET ME ASK YOU, THE EXCHANGE THAT YOU JUST

02:21PM  10    REFERRED TO, WAS THAT DURING ONE OF THE CONVERSATIONS THAT YOU

02:21PM  11    WERE AUDIO RECORDING, OR WAS THAT DURING ONE OF THE

02:21PM  12    CONVERSATIONS THAT YOU REFERENCED EARLIER WHERE THERE WAS NO

02:21PM  13    AUDIO RECORDING?

02:21PM  14    A.   THERE WAS NO AUDIO RECORDING, BUT I HAD NOTES.

02:21PM  15    Q.   OKAY.  AND WAS THAT CONVERSATION WHERE YOU ASKED

02:21PM  16    MS. HOLMES THOSE DIRECT QUESTIONS AND GOT NEGATIVE ANSWERS IN

02:21PM  17    RESPONSE, WAS THAT EXCHANGE BEFORE YOU WROTE YOUR JUNE 2014

02:21PM  18    ARTICLE IN "FORTUNE"?

02:21PM  19    A.   YES.

02:21PM  20    Q.   LET ME SHOW YOU ONE LINE IN THAT ARTICLE, SO LET ME GO

02:22PM  21    BACK TO 1776.

02:22PM  22         MS. HOLLIMAN, IF YOU COULD PULL THAT UP AND GO TO PAGE 11,

02:22PM  23    PLEASE.

02:22PM  24         ABOUT A THIRD OF THE WAY OR 40 PERCENT OF THE WAY DOWN,

02:22PM  25    THERE'S A PARAGRAPH THAT BEGINS, "THERANOS, WHICH DOES NOT."

PARLOFF DIRECT BY MR. BOSTIC                                    6956

02:22PM   1            MR. PARLOFF, DO YOU SEE IN YOUR ARTICLE YOU WROTE

02:22PM   2     "THERANOS, WHICH DOES NOT BUY ANY ANALYZERS FROM THIRD PARTIES,

02:22PM   3     IS THEREFORE IN A UNIQUE POSITION"?

02:22PM   4            DO YOU RECALL WRITING THAT?

02:22PM   5     A.   YES.

02:22PM   6     Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES TOLD YOU,

02:22PM   7     INCLUDING THE STATEMENT THAT YOU'VE JUST RECOUNTED?

02:22PM   8     A.   YES.

02:22PM   9     Q.   WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

02:22PM  10            IN YOUR CONVERSATIONS WITH MS. HOLMES ABOUT THE THERANOS

02:23PM  11     DEVICES, DID SHE REGULARLY USE THE PHRASE ANALYTICAL SYSTEMS?

02:23PM  12     A.   YES.

02:23PM  13     Q.   AND DID YOU EVER GET AN EXPLANATION FROM HER AS TO WHAT

02:23PM  14     SHE MEANT BY THAT?

02:23PM  15     A.   I NEVER UNDERSTOOD WHY SHE PREFERRED THAT TO DEVICE OR

02:23PM  16     ANALYZER.  I NEVER UNDERSTOOD THE DISTINCTION.

02:23PM  17     Q.   LET'S LISTEN TO A CLIP.  THIS IS EXHIBIT 5474C.

02:23PM  18            YOUR HONOR, I WOULD OFFER THAT EXHIBIT AT THIS TIME.  THIS

02:23PM  19     IS A CLIP DATED MAY 21ST, 2014, AND IT'S APPROXIMATELY

02:23PM  20     30 SECONDS LONG.

02:23PM  21                 MR. CLINE:  MAY I HAVE A MOMENT, YOUR HONOR?

02:23PM  22                 THE COURT:  YES.

02:23PM  23          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:23PM  24                 THE COURT:  IT'S 5474C?

02:23PM  25                 MR. BOSTIC:  5474C.

PARLOFF DIRECT BY MR. BOSTIC                                              6957

02:24PM   1              THE COURT:  THANK YOU.

02:24PM   2              MR. CLINE:  MAY I CONSULT WITH COUNSEL?

02:24PM   3              THE COURT:  YES.

02:24PM   4         (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

02:24PM   5              MR. BOSTIC:  WE'LL MOVE ON FROM THAT ONE AT THIS

02:24PM   6    TIME.

02:24PM   7    Q.   MR. PARLOFF, DO YOU RECALL ASKING MS. HOLMES ABOUT THE

02:24PM   8    TERM "EDISON" AT SOME POINT?

02:24PM   9    A.   YES.

02:24PM  10    Q.   AND DO YOU RECALL WHAT MS. HOLMES TOLD YOU, IF ANYTHING,

02:24PM  11    ABOUT WHAT THAT TERM MEANT AT THERANOS?

02:24PM  12    A.   I'M PRETTY SURE SHE BROUGHT IT UP.  I DON'T THINK I ASKED

02:24PM  13    ABOUT IT.

02:24PM  14         IT WAS A TERM THAT THEY NO LONGER, NO LONGER USED, BUT IT

02:24PM  15    WAS THE TERM FOR THE -- SORT OF THE PROGENITOR OF THE DEVICES I

02:25PM  16    WAS SEEING.  IT WAS THE FIRST ITERATION.  I WAS SEEING LATER

02:25PM  17    ITERATIONS.

02:25PM  18    Q.   MS. HOLMES TOLD YOU THAT THE EDISON DEVICE WAS NO LONGER

02:25PM  19    IN USE AT THERANOS?

02:25PM  20    A.   WELL, THE NAME WAS NO LONGER IN USE.  I MEAN, WHAT WAS IN

02:25PM  21    USE WAS A SUBSEQUENT ITERATION.

02:25PM  22    Q.   I'LL ASK YOU TO TURN TO EXHIBIT 5488 IN YOUR BINDER,

02:25PM  23    PLEASE.

02:25PM  24         YOUR HONOR, I OFFER 5488.  I BELIEVE THE DEFENSE HAS

02:25PM  25    STIPULATED.

PARLOFF DIRECT BY MR. BOSTIC                                6958

| | | |
|---|---|---|
| 02:25PM | 1 | MR. CLINE:  NO OBJECTION. |
| 02:25PM | 2 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 02:25PM | 3 | (GOVERNMENT'S EXHIBIT 5488 WAS RECEIVED IN EVIDENCE.) |
| 02:25PM | 4 | BY MR. BOSTIC: |
| 02:25PM | 5 | Q.   AND LET'S ZOOM IN ON THE MIDDLE OF THE PAGE, PLEASE, THE |
| 02:25PM | 6 | MIDDLE THIRD.  LET'S SEE IF WE CAN CAPTURE -- |
| 02:25PM | 7 | FIRST OF ALL, MR. PARLOFF, DO YOU SEE THAT THIS IS AN |
| 02:26PM | 8 | EMAIL MESSAGE FROM YOU -- I'M SORRY, FROM MS. HOLMES TO YOU ON |
| 02:26PM | 9 | JUNE 6TH, 2014? |
| 02:26PM | 10 | A.   YES. |
| 02:26PM | 11 | Q.   AND LET'S LOOK AT THE FIRST PART OF THE TEXT OF THAT EMAIL |
| 02:26PM | 12 | MESSAGE. |
| 02:26PM | 13 | FIRST OF ALL, CAN YOU TELL ME GENERALLY ABOUT THE PURPOSE |
| 02:26PM | 14 | OF THIS COMMUNICATION?  AT THIS TIME IN EARLY JUNE 2014, WHY |
| 02:26PM | 15 | WERE YOU EMAILING BACK AND FORTH WITH MS. HOLMES WITH THIS |
| 02:26PM | 16 | SUBJECT LINE, ADDITIONAL FOLLOWUP ITEMS? |
| 02:26PM | 17 | A.   WE WERE GETTING PRETTY CLOSE TO PUBLICATION.  I MIGHT HAVE |
| 02:26PM | 18 | HAD A DRAFT.  I PROBABLY HAD A DRAFT.  I KNEW -- SO I WAS |
| 02:26PM | 19 | ASKING ABOUT WHETHER IT WAS OKAY TO INCLUDE CERTAIN THINGS OR |
| 02:26PM | 20 | WERE THEY -- THAT WE HAD DISCUSSED ON BACKGROUND. |
| 02:27PM | 21 | Q.   IN CONNECTION WITH THAT PURPOSE, DID MS. HOLMES PROVIDE |
| 02:27PM | 22 | YOU WITH SOME INFORMATION ABOUT THIS TOPIC, "HOW TO DESCRIBE |
| 02:27PM | 23 | THE ANALYTICAL SYSTEMS"? |
| 02:27PM | 24 | A.   YES. |
| 02:27PM | 25 | Q.   AND THIS EMAIL FROM MS. HOLMES READS, "AS YOU KNOW, WE |

PARLOFF DIRECT BY MR. BOSTIC                                              6959

02:27PM   1    WANT TO GENERALLY KEEP THE FOCUS OFF THE HARDWARE.  A WAY TO DO

02:27PM   2    THIS IF YOU'RE REFERRING TO IT, THE AUTOMATION IN OUR LAB IS TO

02:27PM   3    USE THE WORD ANALYZERS, WHICH IS LIKELY THE BEST WORD TO USE

02:27PM   4    BESIDE ANALYTICAL SYSTEMS (RATHER THAN THE WORD DEVICE)."

02:27PM   5         DO YOU SEE THAT?

02:27PM   6    A.   YES.

02:27PM   7    Q.   AND SHE SAYS, "AS YOU KNOW, ANALYTICAL SYSTEMS IS HOW WE

02:27PM   8    DESCRIBE THEM."

02:27PM   9         DO YOU SEE THAT?

02:27PM  10    A.   YES.

02:27PM  11    Q.   AND THEN IN THE NEXT LINE DOWN SHE TALKS ABOUT REFERENCING

02:27PM  12    THE FDA FILING INITIATIVE AND REGISTRATION OF THE ANALYZER ON

02:27PM  13    THE FDA WEBSITE.

02:27PM  14         DO YOU SEE THAT?

02:27PM  15    A.   YES.

02:27PM  16    Q.   AND THEN SHE SAYS, "IN THAT CONTEXT, IT IS OK TO SAY THE

02:28PM  17    ANALYTICAL SYSTEMS ARE ABOUT THE SIZE OF A DESKTOP COMPUTER

02:28PM  18    (FOR REFERENCE OFF THE RECORD, THIS IS THE SIZE OF THE SYSTEM

02:28PM  19    WE'RE STANDARDIZING AROUND FOR OUR NEXT WAVE OF PRODUCTION) IF

02:28PM  20    CONTRASTING THE SIZE OF OUR LABORATORY FACILITY NEXT TO

02:28PM  21    CONVENTIONAL LABORATORY FACILITIES."

02:28PM  22         DO YOU SEE THAT?

02:28PM  23    A.   YES.

02:28PM  24    Q.   AND SO YOU MENTIONED THIS WAS GETTING PRETTY CLOSE TO THE

02:28PM  25    TIME THAT THE ARTICLE WAS GOING TO BE PUBLISHED?

PARLOFF DIRECT BY MR. BOSTIC                                6960

02:28PM   1    A.   YES.

02:28PM   2    Q.   AS THE CLOCK WAS WINDING DOWN, DID MS. HOLMES DISCLOSE TO

02:28PM   3    YOU AT THIS POINT THAT THERANOS WAS RELYING ON LARGER ANALYZERS

02:28PM   4    FOR MOST OR MANY OF ITS TESTS?

02:28PM   5    A.   NO.

02:28PM   6    Q.   LET'S GO TO PAGE 2 OF THIS EXHIBIT AND ZOOM IN AT THE TOP

02:28PM   7    OF THE PAGE UNDER THE TOPIC VENIPUNCTURE.

02:28PM   8         AND, MR. PARLOFF, DO YOU SEE THAT MS. HOLMES ALSO PROVIDES

02:29PM   9    SOME INFORMATION ON THIS TOPIC?

02:29PM  10    A.   YES.

02:29PM  11    Q.   SHE SAYS HERE, "WE'RE SCALING OUR INFRASTRUCTURE AND

02:29PM  12    WORKING TO MAKE IT POSSIBLE TO ELIMINATE THE NEED TO HAVE BLOOD

02:29PM  13    DRAWN FROM BIG TUBES OR THROUGH VENIPUNCTURE FOR EVERYONE."

02:29PM  14         DO YOU SEE THAT?

02:29PM  15    A.   YES.

02:29PM  16    Q.   SHE TALKS ABOUT CONSTANTLY UPDATING THE INFRASTRUCTURE

02:29PM  17    BASED ON THE TESTS WE ANTICIPATE TO BE RUN IN A GIVEN

02:29PM  18    GEOGRAPHY.

02:29PM  19         DO YOU SEE THAT?

02:29PM  20    A.   YES.

02:29PM  21    Q.   BUT SHE SAYS, "BASED ON THE COMBINATION OF TESTS THAT ARE

02:29PM  22    ORDERED WE'LL OCCASIONALLY RUN THEM THROUGH VENIPUNCTURE, WITH

02:29PM  23    MUCH SMALLER SAMPLE SIZES AS TO WHAT WAS TRADITIONALLY

02:29PM  24    COLLECTED."

02:29PM  25         DO YOU SEE THAT?

PARLOFF DIRECT BY MR. BOSTIC                                    6961

02:29PM   1    A.   YES.

02:29PM   2    Q.   AND WAS THAT CONSISTENT WITH WHAT MS. HOLMES HAD BEEN

02:29PM   3    TELLING YOU ABOUT THE COMPANY'S USE OF VENIPUNCTURE?

02:29PM   4    A.   YES.

02:29PM   5    Q.   AT THE BOTTOM OF THIS PAGE, IF WE CAN JUST ZOOM IN ON THE

02:29PM   6    BOTTOM THIRD OR SO.

02:29PM   7         MS. HOLMES INCLUDES SOME FAVORABLE PATIENT QUOTES; IS THAT

02:30PM   8    CORRECT?

02:30PM   9    A.   YES.

02:30PM   10   Q.   DID MS. HOLMES EVER DISCLOSE TO YOU ANY PATIENT COMPLAINTS

02:30PM   11   OR COMMUNICATIONS FROM DOCTORS ABOUT QUESTIONABLE RESULTS?

02:30PM   12   A.   NO.

02:30PM   13   Q.   OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU, MS. HOLLIMAN.

02:30PM   14        YOU PUBLISHED YOUR ARTICLE, OR "FORTUNE" PUBLISHED YOUR

02:30PM   15   ARTICLE IN JUNE OF 2014?

02:30PM   16   A.   YES.

02:30PM   17   Q.   AND DID YOU CONTINUE TO COMMUNICATE WITH MS. HOLMES AFTER

02:30PM   18   THAT?

02:30PM   19   A.   YES.

02:30PM   20   Q.   AND DID YOU TALK TO HER ABOUT THE ARTICLE THAT YOU HAD

02:30PM   21   WRITTEN?

02:30PM   22   A.   YES.

02:30PM   23   Q.   DID SHE PROVIDE YOU WITH ANY REACTIONS OR FEEDBACK TO THE

02:30PM   24   ARTICLE THAT YOU HAD WRITTEN FOR "FORTUNE"?

02:30PM   25   A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                                    6962

02:30PM   1    Q.   AND WHAT DID SHE SAY?

02:30PM   2    A.   I DON'T KNOW THE WORDS, BUT SHE PHRASED IT EFFUSIVELY, AND

02:30PM   3    I BELIEVE SHE, SHE LINKED TO IT ON HER WEBSITE.

02:30PM   4    Q.   AND AT ANY POINT DID MS. HOLMES COMPLAIN ABOUT ANY OF THE

02:31PM   5    CONTENT IN THE ARTICLE?

02:31PM   6    A.   NO.

02:31PM   7    Q.   AT ANY POINT AFTER THE ARTICLE WAS PUBLISHED, DID

02:31PM   8    MS. HOLMES CONTACT YOU TO ASK FOR A CORRECTION OF ANY OF THE

02:31PM   9    FACTS IN THE ARTICLE?

02:31PM  10    A.   NO.

02:31PM  11    Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN MAY OF 2015

02:31PM  12    ABOUT 11 MONTHS AFTER THE ARTICLE WAS PUBLISHED?

02:31PM  13    A.   YES.

02:31PM  14    Q.   AND WHAT WAS THE IMPETUS FOR THAT CONVERSATION?

02:31PM  15    A.   I WAS WRITING A STORY FOR THE WEB ABOUT SOMETHING SHE WAS

02:31PM  16    DOING IN ARIZONA.  IT HAD TO DO WITH STATE LEGISLATION.

02:31PM  17    Q.   AND WAS THAT CONVERSATION IN MAY OF 2015 ABOUT THE

02:31PM  18    ACTIVITIES OF THE COMPANY AND THE CAPABILITIES OF ITS

02:31PM  19    TECHNOLOGY?

02:31PM  20    A.   WELL, IT WAS, IT WAS REALLY ABOUT THE LEGISLATIVE STUFF.

02:31PM  21         BUT SHE, SHE DID BRING UP AS AN ASIDE THAT THERE WAS

02:32PM  22    SOMETHING NEW THAT THEY HAD STARTED DOING THIS YEAR, MEANING

02:32PM  23    2015, AND THAT WAS THAT THEY HAD BEGUN USING THIRD PARTY

02:32PM  24    MACHINES TO DO ESOTERIC TESTS, SHE CALLED THEM ESOTERIC TESTS.

02:32PM  25         AND SHE DEFINED ESOTERIC TESTS AS TESTS THAT WERE SELDOM

PARLOFF DIRECT BY MR. BOSTIC                                     6963

02:32PM   1    ORDERED OR HIGHLY COMPLEX, AND THEY WOULD DO THOSE WITH A THIRD

02:32PM   2    PARTY MACHINE AND BY VENIPUNCTURE BECAUSE -- IN ESSENCE TO

02:32PM   3    OFFER ONE STOP SHOPPING SO THAT PEOPLE WOULD -- THEY WOULDN'T

02:32PM   4    HAVE TO REFER THOSE OUT TO A SPECIALTY LAB.

02:32PM   5    Q.   SO A COUPLE OF FOLLOW-UP QUESTIONS ABOUT THAT.

02:32PM   6         FIRST OF ALL, WAS THIS CONVERSATION IN MAY OF 2015 THE

02:33PM   7    FIRST TIME THAT MS. HOLMES HAD MENTIONED THE COMPANY'S USE OF

02:33PM   8    THIRD PARTY BLOOD ANALYZERS AS FAR AS YOU RECALL?

02:33PM   9    A.   YES.

02:33PM  10    Q.   IN DESCRIBING THE COMPANY'S USE OF THIRD PARTY ANALYZERS

02:33PM  11    AT THAT TIME, DID SHE LIMIT THE USE TO THOSE ESOTERIC TESTS, IN

02:33PM  12    OTHER WORDS, THE RARELY ORDERED OR ESPECIALLY COMPLEX TESTS?

02:33PM  13    A.   I ONLY REMEMBER HER SAYING THAT THEY USED THEM FOR

02:33PM  14    ESOTERIC TESTS.

02:33PM  15    Q.   AND FINALLY, WHEN MS. HOLMES DESCRIBED THE USE OF THIRD

02:33PM  16    PARTY DEVICES, DID SHE DESCRIBE IT AS SOMETHING THAT HAD

02:33PM  17    STARTED RECENTLY?  WAS THIS A NEW DEVELOPMENT?

02:33PM  18    A.   THIS YEAR, MEANING 2015.

02:33PM  19    Q.   DID MS. HOLMES TELL YOU DURING THAT CONVERSATION THAT

02:33PM  20    THERANOS HAD BEEN USING THIRD PARTY DEVICES FOR MANY OF ITS

02:33PM  21    TESTS SINCE IT FIRST LAUNCHED IN SEPTEMBER OF 2013?

02:33PM  22    A.   NO.

02:33PM  23    Q.   DID YOU HAVE ANOTHER CONVERSATION WITH MS. HOLMES ON

02:34PM  24    SIMILAR TOPICS IN EARLY JULY OF 2015?

02:34PM  25    A.   YES.

PARLOFF DIRECT BY MR. BOSTIC                          6964

02:34PM   1    Q.   AND WAS THAT CONVERSATION RECORDED?

02:34PM   2    A.   YES.

02:34PM   3              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS THREE

02:34PM   4    EXHIBITS AT THIS TIME THAT WE WOULD LIKE TO PLAY IN SEQUENCE.

02:34PM   5    THESE WILL BE EXHIBITS 5481A, 5481B -- EXCUSE ME.  5481A IS

02:34PM   6    FIRST.

02:34PM   7         5481D IS NEXT IN ORDER.

02:34PM   8         THEN 5481B COMES AFTER THAT.

02:34PM   9         THESE ARE ALL A CONTIGUOUS PORTION OF AUDIO FROM A

02:34PM  10    RECORDING DATED JULY 1ST, 2015, AND THE TOTAL IS APPROXIMATELY

02:34PM  11    SIX MINUTES.

02:34PM  12              MR. CLINE:  NO OBJECTION.

02:34PM  13              THE COURT:  ALL RIGHT.  EACH OF THEM ARE ADMITTED.

02:35PM  14    THEY MAY BE PLAYED.

02:35PM  15         AGAIN, LADIES AND GENTLEMEN, THERE IS NO TRANSCRIPT, SO

02:35PM  16    PLEASE DO LISTEN CLOSELY AS THESE ARE PLAYED.

02:35PM  17         AND THEY MAY BE PLAYED NOW.

02:35PM  18         (GOVERNMENT'S EXHIBITS 5481A, 5481B, AND 5481D WERE

02:35PM  19    RECEIVED IN EVIDENCE.)

02:35PM  20              MR. BOSTIC:  THANK YOU.

02:35PM  21         MS. HOLLIMAN, LET'S PLAY 5481A, THEN D, THEN B.

02:35PM  22         (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:40PM  23    BY MR. BOSTIC:

02:40PM  24    Q.   MR. PARLOFF, DID YOU HEAR SOME CONVERSATIONS ABOUT THE

02:40PM  25    REFERENCE LAB THAT YOU MENTIONED EARLIER?

PARLOFF DIRECT BY MR. BOSTIC                                    6965

02:40PM   1    A.   YES.

02:40PM   2    Q.   AND DID YOU ALSO HEAR MS. HOLMES PROVIDE YOU WITH SOME

02:40PM   3    MORE INFORMATION ABOUT THE COMPANY'S USE OF VENIPUNCTURE?

02:40PM   4    A.   YES.

02:40PM   5    Q.   AND IN CONNECTION WITH THAT, MS. HOLMES SAID THAT THE

02:40PM   6    COMPANY DOES SOMETIMES -- OR EXCUSE ME, DOES RUN TRADITIONAL

02:40PM   7    VENIPUNCTURE SOMETIMES ON TRADITIONAL REFERENCE EQUIPMENT.

02:40PM   8         DID YOU HEAR THAT?

02:40PM   9    A.   YES.

02:40PM  10    Q.   AND DID YOU HEAR MS. HOLMES SAY THAT WHEN THAT HAPPENS,

02:40PM  11    IT'S A LOT LESS SAMPLE, TOO, BECAUSE THERE'S ONLY A FEW TESTS

02:41PM  12    THAT WILL ACTUALLY RUN ON THE VENIPUNCTURE.

02:41PM  13         DO YOU RECALL THAT?

02:41PM  14    A.   YEAH.

02:41PM  15    Q.   DID MS. HOLMES EVER TELL YOU THAT APPROXIMATELY 40 PERCENT

02:41PM  16    OF THERANOS PATIENTS AT WALGREENS HAD NEEDED TO HAVE

02:41PM  17    VENIPUNCTURE BECAUSE OF TESTS THAT THE COMPANY COULDN'T RUN ON

02:41PM  18    FINGERSTICK?

02:41PM  19    A.   NO.

02:41PM  20    Q.   AROUND THIS TIME, AND THIS IS EARLY JULY 2015, DID YOU

02:41PM  21    HAVE A SECOND DEMONSTRATION OF THERANOS TECHNOLOGY?

02:41PM  22    A.   YES.

02:41PM  23    Q.   TELL US ABOUT THAT.  WHERE WAS THAT?

02:41PM  24    A.   THAT WAS IN THE OFFICES OF THE LAW FIRM BOIES,

02:41PM  25    SCHILLER & FLEXNER, AND I WAS WRITING A STORY ABOUT AN FDA --

PARLOFF DIRECT BY MR. BOSTIC                                6966

02:41PM   1    TWO FDA APPROVALS RELATING TO A SINGLE TEST.  THAT MIGHT NOT BE

02:42PM   2    THE EXACT PROPER WORD "APPROVAL."

02:42PM   3        I MEAN, ONE WAS A CLEARANCE AND ONE WAS A, YOU KNOW,

02:42PM   4    WAIVER, BUT SUCCESSES RELATING TO ONE TEST.

02:42PM   5        AND SO THEY WERE GOING TO -- AND ONE OF THEM RELATED TO

02:42PM   6    HOW SIMPLE THE MACHINE WAS.  SO I WAS GOING TO HAVE SAMPLES

02:42PM   7    TAKEN OF MY BLOOD, AND I WOULD SEE -- THIS TIME I WOULD SEE THE

02:42PM   8    MACHINE BEING USED.  I HADN'T SEEN IT 13 MONTHS OR 15 MONTHS

02:42PM   9    EARLIER WHEN I -- WHEN MY FIRST STORY WAS DONE.  SO THAT WAS

02:42PM   10   PART OF IT.

02:42PM   11       AND IN ADDITION, ONE OF THE TESTS WAS GOING TO BE FOR THE

02:42PM   12   EBOLA VIRUS, THE VERY LETHAL HEMORRHAGIC FEVER THAT HAD BROKEN

02:43PM   13   OUT IN WEST AFRICA AT THE TIME.  SHE WAS TRYING TO DEVELOP A

02:43PM   14   TEST FOR THAT AND TRYING TO GET AN EMERGENCY USE AUTHORIZATION.

02:43PM   15       SO I WAS EXCITED ABOUT THAT STORY.

02:43PM   16       SO SHE WAS GIVING ME THESE TWO TESTS.

02:43PM   17   Q.   AND YOU HAD THE DRAWS FOR THOSE TESTS PERFORMED IN THE LAW

02:43PM   18   FIRM OFFICE IN NEW YORK?

02:43PM   19   A.   YES.

02:43PM   20   Q.   AND DID YOU SEE A THERANOS DEVICE THERE IN THE ROOM?

02:43PM   21   A.   TWO THERANOS DEVICES.  ONE FOR EACH -- ONE FOR THE

02:43PM   22   POTASSIUM AND ONE FOR THE EBOLA.

02:43PM   23   Q.   DOES ANYTHING STAND OUT IN YOUR MIND ABOUT THAT PROCESS

02:43PM   24   OTHER THAN WHAT WE'VE TALKED ABOUT IN THE NUMBER OF DEVICES?

02:43PM   25   A.   I WAS A LITTLE SURPRISED THAT THEY NEEDED TWO MACHINES

PARLOFF DIRECT BY MR. BOSTIC                              6967

02:43PM  1   BECAUSE I THOUGHT, YOU KNOW, ONE COULD DO EVERYTHING, BUT --

02:43PM  2   AND THEN -- BUT, NO, THE MACHINE TOOK -- WAS TAKING -- BOTH

02:44PM  3   MACHINES WERE TAKING A LONG TIME, AND SO I DIDN'T STAY FOR THE

02:44PM  4   RESULT.  I LEFT AND RECEIVED THE RESULTS, YOU KNOW, LATER THAT

02:44PM  5   EVENING.

02:44PM  6   Q.   AND DID THAT DEMONSTRATION HAPPEN ON THE DAY OF THE CALL

02:44PM  7   ON THIS JULY 1ST, 2015 DAY, IF YOU RECALL?

02:44PM  8   A.   I DON'T RECALL.

02:44PM  9   Q.   LET'S LISTEN TO A CLIP.  THIS WILL BE EXHIBIT 5481C.  THIS

02:44PM 10   IS A CLIP DATED JULY 1ST, 2015.

02:44PM 11       IT'S APPROXIMATELY TWO AND A HALF -- OR TWO MINUTES LONG,

02:44PM 12   SORRY, THREE MINUTES LONG.

02:44PM 13             MR. CLINE:  NO OBJECTION.

02:44PM 14             THE COURT:  IT'S ADMITTED.  IT MAY BE PLAYED.

02:44PM 15       AGAIN, LADIES AND GENTLEMEN, PLEASE PAY ATTENTION TO THE

02:44PM 16   TAPE AS IT'S PLAYED.

02:44PM 17       (GOVERNMENT'S EXHIBIT 5481C WAS RECEIVED IN EVIDENCE.)

02:44PM 18       (AUDIO RECORDING PLAYED OFF THE RECORD.)

02:47PM 19   BY MR. BOSTIC:

02:47PM 20   Q.   MR. PARLOFF, THE TWO DEVICES THAT YOU SAW IN THE ROOM AT

02:47PM 21   THE LAW FIRM IN CONNECTION WITH THAT DEMONSTRATION, DID

02:47PM 22   MS. HOLMES EVER TELL YOU THAT THOSE WERE DIFFERENT FROM THE

02:47PM 23   THERANOS ANALYZERS THAT WERE BEING USED TO TEST PATIENT

02:47PM 24   SAMPLES?

02:47PM 25   A.   NO.

PARLOFF DIRECT BY MR. BOSTIC                                          6968

| | | |
|---|---|---|
| 02:47PM | 1 | Q.   DID MS. HOLMES EVER TELL YOU THAT THE THERANOS ANALYZER |
| 02:48PM | 2 | THAT WAS BEING USED TO TEST PATIENT SAMPLES COULD NOT DO DNA |
| 02:48PM | 3 | ANALYSIS FOR A TEST LIKE EBOLA OR CLINICAL CHEMISTRY? |
| 02:48PM | 4 | A.   NO. |
| 02:48PM | 5 | Q.   IN OCTOBER OF 2015, ARE YOU AWARE THAT A |
| 02:48PM | 6 | "WALL STREET JOURNAL" ARTICLE WAS PUBLISHED WITH CLAIMS |
| 02:48PM | 7 | UNFAVORABLE TO THERANOS? |
| 02:48PM | 8 | A.   YES. |
| 02:48PM | 9 | Q.   I DON'T WANT TO GET INTO THE CONTENT OF THAT ARTICLE, BUT |
| 02:48PM | 10 | I AM WONDERING IF YOU HAD ADDITIONAL COMMUNICATIONS WITH |
| 02:48PM | 11 | MS. HOLMES AFTER THAT ARTICLE CAME OUT? |
| 02:48PM | 12 | A.   YES. |
| 02:48PM | 13 | Q.   AND WHAT WAS THE PURPOSE OF THOSE COMMUNICATIONS? |
| 02:48PM | 14 | A.   I CALLED HER THE DAY THE ARTICLE CAME OUT, WHICH I THINK |
| 02:48PM | 15 | WAS OCTOBER 15TH. |
| 02:48PM | 16 | SHE GOT BACK TO ME A COUPLE DAYS LATER.  I THINK IT WAS |
| 02:49PM | 17 | THE 17TH. |
| 02:49PM | 18 | AND THE THING I WAS MOST -- I ASKED HER ABOUT EVERYTHING |
| 02:49PM | 19 | IN THE ARTICLE I IMAGINE, BUT -- WELL, ACTUALLY BY THEN I ASKED |
| 02:49PM | 20 | HER ABOUT SEVERAL THINGS.  THERE HAD BEEN OTHER DEVELOPMENTS |
| 02:49PM | 21 | EVEN TWO DAYS LATER. |
| 02:49PM | 22 | BUT I WENT BACK TO THE ORIGINAL ARTICLE.  THE THING THAT I |
| 02:49PM | 23 | WAS MOST INTERESTED IN ASKING HER ABOUT WAS THERE WAS A |
| 02:49PM | 24 | STATEMENT IN THE ORIGINAL "WALL STREET JOURNAL" ARTICLE ABOUT |
| 02:49PM | 25 | HOW MANY TESTS THEY COULD REALLY DO AS OF DECEMBER 2014. |

PARLOFF DIRECT BY MR. BOSTIC                          6969

```
02:49PM    1                    THE COURT:  MR. CLINE.

02:49PM    2                    MR. CLINE:  IF WHAT HE'S DESCRIBING IS HIS QUESTION

02:49PM    3     TO MS. HOLMES, THEN NO OBJECTION.

02:49PM    4         I DO OBJECT TO JUST A DESCRIPTION OF "THE

02:50PM    5     WALL STREET JOURNAL" ARTICLE.

02:50PM    6                    THE COURT:  DOES THIS FORM A BASIS -- IF YOU WANT TO

02:50PM    7     LAY A FOUNDATION FOR THAT.

02:50PM    8                    MR. BOSTIC:  YES, YOUR HONOR.  THAT'S WHERE WE'RE

02:50PM    9     HEADING.

02:50PM   10     Q.   SO, MR. PARLOFF, JUST TO BREAK THIS DOWN JUST A LITTLE

02:50PM   11     BIT, AM I CORRECT THAT ONE OF THE REASONS FOR REACHING OUT TO

02:50PM   12     MS. HOLMES ABOUT THE ARTICLE WAS TO GET HER REACTION TO SOME OF

02:50PM   13     THE STATEMENTS THAT WERE IN THAT "WALL STREET JOURNAL" ARTICLE?

02:50PM   14     A.   YES.

02:50PM   15     Q.   AND DID ONE OF THOSE STATEMENTS IN "THE

02:50PM   16     WALL STREET JOURNAL" ARTICLE RELATE TO THE NUMBER OF TESTS THAT

02:50PM   17     THE THERANOS ANALYZER COULD PERFORM?

02:50PM   18     A.   YES.

02:50PM   19     Q.   AND WHAT DID YOU ASK MS. HOLMES ABOUT THAT TOPIC?

02:50PM   20     A.   I ASKED, HOW MANY TESTS COULD YOU DO ON YOUR PROPRIETARY

02:50PM   21     DEVICE AS OF DECEMBER 2014, WHICH WAS THE DATE REFERENCED IN

02:51PM   22     "THE WALL STREET JOURNAL" ARTICLE.  THEY HAD A NUMBER IN THERE.

02:51PM   23         AND SHE RESPONDED 50, 60, MAYBE 70.  WE CAN GET YOU THAT

02:51PM   24     NUMBER.

02:51PM   25     Q.   TWO QUESTIONS ON THAT.
```

PARLOFF CROSS BY MR. CLINE                                    6970

02:51PM  1      FIRST, WAS THIS THE FIRST TIME THAT YOU HAD HEARD FROM

02:51PM  2   MS. HOLMES THAT THE THERANOS ANALYZER COULD ONLY DO 50, 60, OR

02:51PM  3   70 TESTS, AS OPPOSED TO 200 OR A THOUSAND THAT YOU HAD

02:51PM  4   DISCUSSED WITH HER EARLIER?

02:51PM  5   A.   YES.

02:51PM  6   Q.   AND IN CONNECTION WITH THAT CONVERSATION, DID MS. HOLMES

02:51PM  7   EVER TELL YOU THAT, IN FACT, THE THERANOS ANALYZER USED FOR

02:51PM  8   PATIENT TESTING COULD NEVER DO MORE THAN A DOZEN TESTS?

02:51PM  9   A.   NO.

02:51PM 10          MR. BOSTIC:  CAN I HAVE A MOMENT, YOUR HONOR?

02:51PM 11          THE COURT:  YES.

02:51PM 12   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:52PM 13          MR. BOSTIC:  NO FURTHER QUESTIONS.

02:52PM 14      THANK YOU, YOUR HONOR.

02:52PM 15          THE COURT:  MR. CLINE?

02:52PM 16                    **CROSS-EXAMINATION**

02:52PM 17   BY MR. CLINE:

02:52PM 18   Q.   MR. PARLOFF, GOOD AFTERNOON.

02:52PM 19   A.   GOOD AFTERNOON.

02:52PM 20   Q.   I AM GOING TO -- I REPRESENT MS. HOLMES.  MY NAME IS

02:52PM 21   JOHN CLINE.  I HAVE SOME AREAS I WANT TO ASK YOU ABOUT.

02:53PM 22      BUT FIRST I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR

02:53PM 23   BACKGROUND.

02:53PM 24      AND BEFORE I EVEN DO THAT, I'M GOING TO HAND OUT NOTEBOOKS

02:53PM 25   BECAUSE THAT'S SOMETHING THAT WE DO WITH EVERY WITNESS IN THIS

PARLOFF CROSS BY MR. CLINE                                              6971

02:53PM  1    CASE.

02:53PM  2         MAY I APPROACH?

02:53PM  3              THE COURT:  YES.

02:53PM  4    BY MR. CLINE:

02:53PM  5    Q.   (HANDING.)

02:53PM  6         YOU DON'T NEED TO PAY ATTENTION TO THAT FOR NOW.  I MAY

02:53PM  7    CALL ATTENTION TO IT FROM TIME TO TIME, BUT JUST PUT IT ASIDE

02:53PM  8    FOR NOW.

02:53PM  9         YOU PASSED ON DIRECT VERY QUICKLY OVER YOUR EDUCATIONAL

02:53PM  10   BACKGROUND, BUT I WANTED TO TOUCH ON THAT A LITTLE BIT.

02:53PM  11        YOU HAVE YOUR UNDERGRADUATE DEGREE FROM HARVARD; RIGHT?

02:53PM  12   A.   YEAH.

02:53PM  13   Q.   AND THAT'S A COLLEGE UP IN THE NORTHEAST SOMEWHERE; RIGHT?

02:53PM  14   A.   YES.

02:53PM  15   Q.   ALL RIGHT.  AND THEN YOU WENT TO LAW SCHOOL; RIGHT?

02:54PM  16   A.   YES.

02:54PM  17   Q.   AND YOU WENT TO YALE LAW SCHOOL; RIGHT?

02:54PM  18   A.   YES.

02:54PM  19   Q.   AND YOU GOT A JD, A JURIS DOCTORATE DEGREE FROM YALE?

02:54PM  20   A.   YES.

02:54PM  21   Q.   AND AFTER THAT, YOU WERE A LAW CLERK FOR A UNITED STATES

02:54PM  22   DISTRICT JUDGE, SORT OF LIKE JUDGE DAVILA; RIGHT?

02:54PM  23   A.   YES.

02:54PM  24   Q.   AND THAT WAS IN TEXAS?

02:54PM  25   A.   YES.

PARLOFF CROSS BY MR. CLINE                                          6972

02:54PM  1    Q.   AND THAT JUDGE WAS JUDGE JUSTICE; RIGHT?

02:54PM  2    A.   THAT'S RIGHT.

02:54PM  3    Q.   AND THEN YOU PRACTICED LAW FOR A WHILE; RIGHT?

02:54PM  4    A.   YES.

02:54PM  5    Q.   ABOUT FIVE YEARS?

02:54PM  6    A.   YES.

02:54PM  7    Q.   YOU WERE A PROSECUTOR FOR A WHILE?

02:54PM  8    A.   YES.

02:54PM  9    Q.   AND THEN YOU WERE A DEFENSE LAWYER FOR A WHILE?

02:54PM  10   A.   YES.

02:54PM  11   Q.   THEN YOU TAUGHT LAW; RIGHT?

02:54PM  12   A.   YES.

02:54PM  13   Q.   AT HOFSTRA SCHOOL?

02:54PM  14   A.   YEAH.

02:54PM  15   Q.   AND HAVING SEEN ALL SIDES OF THE LAW, YOU QUIT?

02:54PM  16   A.   YES.

02:54PM  17   Q.   AND BECAME A JOURNALIST?

02:54PM  18   A.   YES.

02:54PM  19   Q.   AND YOU WERE A JOURNALIST, I THINK YOU SAID, STARTING IN

02:55PM  20   19 --

02:55PM  21   A.   '88.

02:55PM  22   Q.   -- 88.  SO BY APRIL OF 2014, YOU HAD BEEN A JOURNALIST

02:55PM  23   FOR, WHAT, 26 YEARS?

02:55PM  24   A.   I'LL TAKE YOUR WORD FOR IT.

02:55PM  25   Q.   SOMETHING LIKE THAT?

PARLOFF CROSS BY MR. CLINE                                    6973

02:55PM  1    A.   UH-HUH.

02:55PM  2    Q.   AND IS IT FAIR TO SAY THAT BY APRIL OF 2014, YOU HAD HAD

02:55PM  3    MANY YEARS OF EXPERIENCE ASKING QUESTIONS BOTH AS A LAWYER AND

02:55PM  4    THEN AS A JOURNALIST?

02:55PM  5    A.   I SUPPOSE, YES.

02:55PM  6    Q.   NOW, I WANT TO TOUCH AGAIN ON HOW YOU SORT OF GOT STARTED

02:55PM  7    ON THE THERANOS PROCESS.

02:55PM  8         I'M GOING TO FOCUS FOR A WHILE ON THE JUNE 2014

02:55PM  9    "FORTUNE" ARTICLE --

02:55PM  10   A.   YES.

02:55PM  11   Q.   -- AND THE PROCESS THAT LED TO THAT ARTICLE.

02:55PM  12        SOMETIME IN EARLY 2014, YOU HEARD ABOUT A CASE INVOLVING

02:55PM  13   THERANOS; RIGHT?

02:55PM  14   A.   YES.

02:55PM  15   Q.   AND IF I HEARD YOU RIGHT ON DIRECT, IT'S BECAUSE YOU GOT A

02:56PM  16   CALL FROM A PUBLICITY PERSON AT MR. BOIES'S LAW FIRM?

02:56PM  17   A.   WELL, NO.  I HEARD ABOUT THE CASE FROM READING NEWSLETTERS

02:56PM  18   AND WAS SORT OF FOLLOWING THE CASE JUST OUT OF CURIOSITY.

02:56PM  19        AND THEN I GOT A CALL FROM THE BOIES FIRM AFTER IT

02:56PM  20   SETTLED, YOU KNOW.

02:56PM  21   Q.   ALL RIGHT.  AND THE CALL FROM THE BOIES FIRM WAS SORT OF

02:56PM  22   REACHING OUT TO SEE IF THIS WAS SOMETHING THAT YOU MIGHT HAVE

02:56PM  23   AN INTEREST IN?

02:56PM  24   A.   YEAH.

02:56PM  25   Q.   AND YOU HAD BEEN COVERING LAW AND LAWYERS FOR YEARS AT

PARLOFF CROSS BY MR. CLINE                                                6974

02:56PM   1    THAT POINT?

02:56PM   2    A.   YES.

02:56PM   3    Q.   AND YOU CERTAINLY WERE FAMILIAR WITH MR. BOIES; RIGHT?

02:56PM   4    A.   YES.

02:56PM   5    Q.   ONE OF -- AS OF 2014, APRIL OF 2014, ONE OF THE PREEMINENT

02:56PM   6    LAWYERS IN AMERICA; IS THAT FAIR?

02:57PM   7    A.   YES.

02:57PM   8    Q.   A FAMED TRIAL LAWYER; RIGHT?

02:57PM   9    A.   YES.

02:57PM   10   Q.   ALSO A WELL RESPECTED ADVISOR TO COMPANIES ALL OVER THE

02:57PM   11   COUNTRY; RIGHT?

02:57PM   12   A.   YES.

02:57PM   13   Q.   AND YOU FOUND IT INTERESTING THAT MR. BOIES, WHO WAS SO

02:57PM   14   EMINENT IN THE PROFESSION, WAS REPRESENTING A COMPANY THAT YOU

02:57PM   15   HAD NEVER HEARD OF; RIGHT?

02:57PM   16   A.   EXACTLY, YES.

02:57PM   17   Q.   THAT BEING THERANOS?

02:57PM   18   A.   YES.

02:57PM   19   Q.   AND SO YOU THOUGHT YOU MIGHT WRITE AN ARTICLE ABOUT

02:57PM   20   MR. BOIES AND THIS CASE THAT HE HAD JUST WON FOR THERANOS;

02:57PM   21   RIGHT?

02:57PM   22   A.   YES, I WAS CONSIDERING THAT, YEAH.

02:57PM   23   Q.   AND THEN YOU SORT OF -- DID YOU TALK TO MR. BOIES ABOUT

02:57PM   24   THAT, OR WAS IT JUST WITH PEOPLE AT HIS FIRM?  YOU SAID THE

02:57PM   25   ANSWER CAME BACK.  WHAT WAS THE PROCESS THERE?

PARLOFF CROSS BY MR. CLINE

02:57PM   1    A.   I BELIEVE I DID SPEAK TO HIM BY PHONE WHILE I WAS TRYING

02:58PM   2    TO DECIDE WHETHER TO DO THIS STORY.

02:58PM   3    Q.   ALL RIGHT.  AND WHEN YOU SPOKE WITH MR. BOIES, HE WAS

02:58PM   4    HAPPY TO TALK WITH YOU, BUT HE SAID THE REAL STORY HERE WAS

02:58PM   5    THERANOS AND MS. HOLMES; RIGHT?

02:58PM   6    A.   YES.

02:58PM   7    Q.   AND YOU WERE PERSUADED THAT WAS A REAL STORY; RIGHT?

02:58PM   8    A.   YES.

02:58PM   9    Q.   AND YOU PITCHED IT TO "FORTUNE"; RIGHT?

02:58PM   10   A.   YES.

02:58PM   11   Q.   AND "FORTUNE" SAID, HAVE AT IT?

02:58PM   12   A.   YES.

02:58PM   13   Q.   NOW, YOU MET WITH MR. BOIES AT THE END OF MARCH OF 2014;

02:58PM   14   RIGHT?

02:58PM   15   A.   YES.

02:58PM   16   Q.   MARCH 30TH, 2014.  DOES THAT SOUND ABOUT RIGHT?

02:58PM   17   A.   YES.

02:58PM   18   Q.   AND HE -- YOU TALKED WITH HIM ABOUT THE LAWSUIT THAT HE

02:59PM   19   HAD JUST TRIED FOR THERANOS; RIGHT?

02:59PM   20   A.   WELL, I THINK I'M GOING TO INVOKE REPORTER PRIVILEGE AT

02:59PM   21   ABOUT THIS POINT.

02:59PM   22           MR. COLTON:  YOUR HONOR --

02:59PM   23           THE COURT:  SIR, HAVE A SEAT FOR JUST A MOMENT.  I

02:59PM   24   WANT TO ASK THIS LAWYER SOME QUESTIONS.

02:59PM   25           MR. CLINE, DO YOU WISH TO CONTINUE WITH THIS LINE OR CAN

PARLOFF CROSS BY MR. CLINE                                              6976

02:59PM   1    YOU MOVE TO ANOTHER TOPIC?

02:59PM   2           MR. CLINE:  I'D LIKE TO CONTINUE BRIEFLY WITH THIS.

02:59PM   3    THIS IS INFORMATION THAT WAS PROVIDED TO THE GOVERNMENT IN AN

02:59PM   4    INTERVIEW, SO I DON'T THINK THERE'S ANY REPORTER'S PRIVILEGE

02:59PM   5    THAT CAN BE ASSERTED HERE.

02:59PM   6           THE COURT:  WELL, CAN YOU MOVE TO A DIFFERENT TOPIC?

02:59PM   7    CAN I GET YOU OUT OF YOUR ORDER HERE?  I'M TRYING TO SEE IF YOU

02:59PM   8    CAN KEEP YOUR EXAMINATION GOING.  I DON'T WANT TO INTERRUPT THE

02:59PM   9    FLOW, BUT IT MAY BE THAT WE'LL HAVE TO HAVE A HEARING OUTSIDE

02:59PM  10    OF THE PRESENCE OF THE JURY.

02:59PM  11           MR. CLINE:  ALL RIGHT.  YES.

02:59PM  12           THE COURT:  OKAY.

03:00PM  13           MR. CLINE:  LET'S FLAG THAT.  IT MAY COME UP AGAIN

03:00PM  14    AND WE'LL HAVE TO TALK ABOUT IT.

03:00PM  15           THE COURT:  SURE.

03:00PM  16    BY MR. CLINE:

03:00PM  17    Q.   TELL ME IF YOU CAN ANSWER THIS OR IF IT CAUSES YOU A

03:00PM  18    PRIVILEGE PROBLEM.

03:00PM  19        DID MR. BOIES TELL YOU THAT THERANOS HAD BEEN IN STEALTH

03:00PM  20    MODE, BUT WAS NOW READY TO START TO GO PUBLIC?

03:00PM  21           MR. BOSTIC:  OBJECTION, YOUR HONOR.  HEARSAY AND

03:00PM  22    401.

03:00PM  23           MR. CLINE:  THIS IS GOING TO MR. PARLOFF'S STATE OF

03:00PM  24    MIND HERE AS HE BEGINS THIS PROCESS.

03:00PM  25           THE COURT:  I'LL ALLOW THAT QUESTION.

PARLOFF CROSS BY MR. CLINE                                    6977

03:00PM    1            SO, SIR, DID YOU UNDERSTAND THE QUESTION?

03:00PM    2                 THE WITNESS:  YES, AND I THINK I'VE ANSWERED THIS

03:00PM    3     PUBLICLY ELSEWHERE.  YES, YES.

03:00PM    4     BY MR. CLINE:

03:00PM    5     Q.   ALL RIGHT.  THAT'S FINE.

03:00PM    6          AND IS IT FAIR TO SAY THAT MR. BOIES WAS ENTHUSIASTIC

03:01PM    7     ABOUT BOTH MS. HOLMES AND THERANOS?

03:01PM    8     A.   YES.  I THINK I'VE SAID THAT ELSEWHERE.

03:01PM    9     Q.   ALL RIGHT.  AND MR. BOIES THEN PUT YOU IN TOUCH WITH

03:01PM   10     MS. HOLMES?

03:01PM   11     A.   YES, HIS OFFICE.  HIS OFFICE.

03:01PM   12     Q.   HIS OFFICE PUT YOU IN TOUCH WITH MS. HOLMES?

03:01PM   13     A.   YEAH.

03:01PM   14     Q.   ALL RIGHT.  NOW, YOU FIRST MET WITH MS. HOLMES ON APRIL

03:01PM   15     THE 7TH, 2014?

03:01PM   16     A.   YES.

03:01PM   17     Q.   YOU HAD TALKED WITH HER ON THE PHONE BEFORE THAT AND YOU

03:01PM   18     MADE SOME LOGISTICAL ARRANGEMENTS, BUT THIS WAS THE FIRST

03:01PM   19     MEETING?

03:01PM   20     A.   THAT'S RIGHT.

03:01PM   21     Q.   NOW, I'M GOING TO TALK A LITTLE BIT ABOUT YOUR

03:01PM   22     CONVERSATIONS WITH MS. HOLMES, BUT I WANT TO TALK ABOUT A

03:01PM   23     COUPLE OF SORT OF OTHER BACKGROUND THINGS FIRST.

03:01PM   24          I THINK YOU TESTIFIED ON DIRECT THAT THERE WAS A, A

03:01PM   25     CONCERN ABOUT TRADE SECRETS?

PARLOFF CROSS BY MR. CLINE                                              6978

03:01PM   1       A.   YES.

03:01PM   2       Q.   AND MY QUESTION, AND WE HEARD IT A FEW TIMES ON THE

03:01PM   3       RECORDINGS, IS THAT SOMETHING THAT CAME UP REPEATEDLY IN YOUR

03:02PM   4       DISCUSSIONS WITH --

03:02PM   5       A.   YES.

03:02PM   6       Q.   AND YOU UNDERSTOOD THAT THERE WERE, OR YOU UNDERSTOOD AT

03:02PM   7       THE TIME THAT THERE WERE LIMITS ON WHAT YOU COULD BE TOLD AND

03:02PM   8       WHAT THERANOS WOULD BE COMFORTABLE WITH YOU PUBLISHING BECAUSE

03:02PM   9       OF INTELLECTUAL PROPERTY CONCERNS?

03:02PM  10       A.   THAT'S RIGHT.

03:02PM  11       Q.   AND I ALSO NOTICED THAT DURING THE CLIPS WE PLAYED THAT

03:02PM  12       THINGS WOULD BE ON THE RECORD AND THEN OFF THE RECORD.  DID YOU

03:02PM  13       NOTICE THAT AS WELL?

03:02PM  14       A.   YES.

03:02PM  15       Q.   AND DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU

03:02PM  16       TALK ABOUT GROUND RULES, ON THE RECORD, OFF THE RECORD?

03:02PM  17       A.   I DON'T RECALL.

03:02PM  18       Q.   IS THAT SOMETHING YOU NORMALLY DO WITH PEOPLE YOU TALK

03:02PM  19       WITH?

03:02PM  20       A.   WELL, NORMALLY YOU'RE ON THE RECORD UNLESS YOU SAY OFF THE

03:02PM  21       RECORD.

03:02PM  22       Q.   AND WHEN SOMEONE SAYS -- NOT SOMEONE.  WHEN MS. HOLMES

03:02PM  23       SAYS OFF THE RECORD, WHAT DID YOU UNDERSTAND THAT TO MEAN?

03:02PM  24       A.   WELL, IT ACTUALLY -- IT MEANT DIFFERENT THINGS IN

03:03PM  25       DIFFERENT CONTEXTS.

PARLOFF CROSS BY MR. CLINE                                            6979

03:03PM  1          SOMETIMES IT WAS I WAS NEVER SUPPOSED TO USE IT.

03:03PM  2     SOMETIMES IT WAS SORT OF IN AN EMBARGO, DON'T USE IT NOW, MAYBE

03:03PM  3     AT ONE TIME WE CAN USE IT.

03:03PM  4          SO I GUESS I WOULD HAVE TO LOOK AT THE PARTICULAR CONTEXT.

03:03PM  5     Q.   ALL RIGHT.  TELL ME IF THIS IS A FAIR SUMMARY OF THAT.

03:03PM  6          WHEN -- DURING THESE CONVERSATIONS THAT YOU WERE HAVING

03:03PM  7     WITH HER IN APRIL, MAY, AND EARLY JUNE OF 2014 LEADING UP TO

03:03PM  8     THE "FORTUNE" ARTICLE, DID YOU UNDERSTAND THAT SOMETHING THAT

03:03PM  9     WAS OFF THE RECORD DURING THOSE CONVERSATIONS WAS NOT TO BE

03:03PM 10     USED IN THE ARTICLE?

03:03PM 11     A.   YES.

03:03PM 12     Q.   ALL RIGHT.  NOW, BETWEEN THAT FIRST MEETING WITH

03:03PM 13     MS. HOLMES ON APRIL THE 7TH AND THE PUBLICATION OF YOUR ARTICLE

03:04PM 14     IN JUNE, YOU HAD A NUMBER OF CONVERSATIONS WITH MS. HOLMES.

03:04PM 15          FAIR?

03:04PM 16     A.   YES.

03:04PM 17     Q.   AND SOME OF THOSE WERE RECORDED; RIGHT?

03:04PM 18     A.   YES.

03:04PM 19     Q.   AND I THINK ON DIRECT YOU PUT A NUMBER ON THAT, TEN HOURS

03:04PM 20     OR SOMETHING --

03:04PM 21     A.   IT SEEMED LIKE TEN HOURS.  I TRIED TO COMPUTE IT, BUT IT

03:04PM 22     SEEMED LIKE TEN HOURS.

03:04PM 23     Q.   ALL RIGHT.  AND THERE WERE ALSO DISCUSSIONS THAT WERE NOT

03:04PM 24     RECORDED; RIGHT?

03:04PM 25     A.   THAT'S RIGHT.

PARLOFF CROSS BY MR. CLINE                                    6980

03:04PM  1   Q.   AND I THINK, IF I HEARD YOU RIGHT, YOU ESTIMATED THOSE AT

03:04PM  2   MAYBE ANOTHER THREE HOURS OR SO?

03:04PM  3   A.   YEAH, TWO TO THREE HOURS.

03:04PM  4   Q.   ALL RIGHT.

03:04PM  5   A.   THE BALLPARK, YOU KNOW.

03:04PM  6   Q.   NOW, WE'VE HEARD SOME OF THE RECORDED CONVERSATIONS,

03:04PM  7   PROBABLY, I DON'T KNOW, 20 OR 30 MINUTES WORTH ON DIRECT;

03:04PM  8   RIGHT?

03:04PM  9   A.   YEAH.

03:04PM 10   Q.   OKAY.  AND I'VE GOT A FEW OTHER PORTIONS THAT I'M GOING TO

03:04PM 11   PLAY FOR YOU.

03:05PM 12       AND OTHER THAN ASKING YOU AT THE END IF THAT WAS YOU AND

03:05PM 13   MS. HOLMES TALKING, I'M NOT GOING TO ASK YOU ANY QUESTIONS

03:05PM 14   ABOUT THEM, I'M JUST GOING TO PLAY THEM.

03:05PM 15       SO I THINK WITH COUNSEL'S PERMISSION I'M GOING TO PLAY

03:05PM 16   WHAT I'M GOING TO CALL EXHIBIT 1647A, WHICH IS A PORTION OF THE

03:05PM 17   APRIL 7TH, 2014, CONVERSATION.

03:05PM 18               MR. BOSTIC:  IS THIS ONE THAT WE DISCUSSED?

03:05PM 19               MR. CLINE:  YES.

03:05PM 20               MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

03:05PM 21               THE COURT:  THE DATE AGAIN WAS?  THE DATE AGAIN IS?

03:05PM 22               MR. CLINE:  I'M SORRY?

03:05PM 23               THE COURT:  THE DATE AGAIN?

03:05PM 24               MR. CLINE:  APRIL 7TH, 2014.

03:05PM 25               THE COURT:  ALL RIGHT.  AND THIS IS HOW LONG?

PARLOFF CROSS BY MR. CLINE                                6981

| | | |
|---|---|---|
| 03:05PM | 1 | MR. CLINE:  THIS IS A LITTLE LESS THAN A MINUTE. |
| 03:05PM | 2 | THE COURT:  ALL RIGHT.  ALL RIGHT.  THAT'S ADMITTED, |
| 03:05PM | 3 | AND IT MAY BE PLAYED. |
| 03:05PM | 4 | AGAIN, LADIES AND GENTLEMEN, THERE'S NO TRANSCRIPT. |
| 03:05PM | 5 | MR. CLINE:  THERE'S NO TRANSCRIPT. |
| 03:05PM | 6 | THE COURT:  SO PLEASE DO PAY ATTENTION TO THE AUDIO. |
| 03:05PM | 7 | AND IT MAY BE PLAYED NOW. |
| 03:05PM | 8 | (DEFENDANT'S EXHIBIT 1647A WAS RECEIVED IN EVIDENCE.) |
| 03:05PM | 9 | (AUDIO RECORDING PLAYED OFF THE RECORD.) |
| 03:06PM | 10 | BY MR. CLINE: |
| 03:06PM | 11 | Q.  ALL RIGHT.  THAT WAS YOU AND MS. HOLMES TALKING; RIGHT? |
| 03:06PM | 12 | A.  YES. |
| 03:06PM | 13 | Q.  SO THE NEXT PORTION IS FROM APRIL THE 10TH, 2014, AND THIS |
| 03:06PM | 14 | IS EXHIBIT 1657A. |
| 03:07PM | 15 | MR. BOSTIC:  NO OBJECTION. |
| 03:07PM | 16 | THE COURT:  THIS IS PLAYED -- THIS MAY BE PLAYED. |
| 03:07PM | 17 | IT'S ADMITTED, AND IT MAY BE PLAYED. |
| 03:07PM | 18 | PLEASE LISTEN CAREFULLY TO THE AUDIO.  THERE IS NO |
| 03:07PM | 19 | TRANSCRIPT OF THIS AS WELL. |
| 03:07PM | 20 | (DEFENDANT'S EXHIBIT 1657A WAS RECEIVED IN EVIDENCE.) |
| 03:07PM | 21 | MR. CLINE:  RIGHT.  AND THIS IS ABOUT 45 SECONDS OR |
| 03:07PM | 22 | SO. |
| 03:07PM | 23 | THE COURT:  ALL RIGHT.  THANK YOU.  AND THAT CAN BE |
| 03:07PM | 24 | PLAYED NOW. |
| 03:07PM | 25 | (AUDIO RECORDING PLAYED OFF THE RECORD.) |

PARLOFF CROSS BY MR. CLINE                                          6982

03:08PM   1     BY MR. CLINE:

03:08PM   2     Q.   ALL RIGHT.  AND THAT WAS YOU AND MS. HOLMES; RIGHT?

03:08PM   3     A.   YES.

03:08PM   4     Q.   AND THEN THE THIRD CLIP I'M GOING TO PLAY, AND THE LAST

03:08PM   5     ONE, IS FROM THE MAY 12TH, 2014 CONVERSATION.

03:08PM   6          THIS WILL BE EXHIBIT 1719A.  AND THIS IS ABOUT A LITTLE

03:08PM   7     OVER A MINUTE.

03:08PM   8          YOUR HONOR, IS THAT LAST ONE ADMITTED?

03:08PM   9               THE COURT:  IT WAS, YES.

03:08PM   10              MR. CLINE:  ALL RIGHT.  THANK YOU.

03:08PM   11         I'LL ASK THAT THIS ONE BE ADMITTED AS WELL.

03:08PM   12              MR. BOSTIC:  NO OBJECTION.

03:08PM   13              THE COURT:  1719A WILL BE ADMITTED.

03:08PM   14         PAY ATTENTION TO THIS AUDIO AS IT'S PLAYED.

03:08PM   15         (DEFENDANT'S EXHIBIT 1719A WAS RECEIVED IN EVIDENCE.)

03:08PM   16         (AUDIO RECORDING PLAYED OFF THE RECORD.)

03:10PM   17    BY MR. CLINE:

03:10PM   18    Q.   AGAIN, YOU AND MS. HOLMES?

03:10PM   19    A.   YES.

03:10PM   20    Q.   ALL RIGHT.

03:10PM   21         THAT'S THE END OF OUR CLIPS, YOUR HONOR.

03:10PM   22              THE COURT:  OKAY.

03:10PM   23    BY MR. CLINE:

03:10PM   24    Q.   NOW, I'M GOING TO COME BACK TO YOUR CONVERSATIONS WITH

03:10PM   25    MS. HOLMES, BUT I WANTED TO ASK YOU ABOUT SOME OTHER

PARLOFF CROSS BY MR. CLINE                                    6983

03:10PM   1    INVESTIGATIVE STEPS THAT YOU TOOK FOR THE JUNE 2014 ARTICLE.

03:10PM   2        I'M GOING TO TRY NOT TO GET INTO ANY PRIVILEGE CONCERNS,

03:10PM   3    BUT I'M SURE IF I DO, I'M SURE YOU'LL TELL ME.

03:10PM   4        ONE THING YOU DID WAS READ THE TRANSCRIPT OF THAT TRIAL

03:10PM   5    THAT MR. BOIES HAD JUST HAD; RIGHT?

03:10PM   6    A.   YES.

03:10PM   7    Q.   AND THAT WAS -- IT WAS A PATENT TRIAL; RIGHT?

03:10PM   8    A.   YES.

03:10PM   9    Q.   IT WAS ABOUT THERANOS'S INTELLECTUAL PROPERTY; RIGHT?

03:10PM  10    A.   YES.

03:10PM  11    Q.   AND YOU GLEANED A FAIR AMOUNT OF INFORMATION ABOUT

03:10PM  12    THERANOS'S INTELLECTUAL PROPERTY JUST FROM READING THE

03:10PM  13    TRANSCRIPT OF THE TRIAL; CORRECT?

03:10PM  14    A.   YES, AND I READ -- I READ THAT EVEN BEFORE WHEN I --

03:11PM  15    BEFORE I HAD DECIDED TO FOCUS MORE ON THE COMPANY, I WAS

03:11PM  16    STILL -- I WAS WONDERING, SHOULD I WRITE ABOUT THE LAWSUIT.

03:11PM  17        BUT YOU'RE RIGHT, IT HAD A LOT OF INFORMATION ABOUT THE

03:11PM  18    COMPANY.

03:11PM  19    Q.   ALL RIGHT.  YOU DID SOME INTERNET RESEARCH OF YOUR OWN

03:11PM  20    ABOUT THINGS LIKE REGULATIONS AND THAT SORT OF THING; RIGHT?

03:11PM  21    A.   YES.

03:11PM  22    Q.   YOU HAD RESEARCHERS AT "FORTUNE" WHO WERE HELPING YOU;

03:11PM  23    CORRECT?

03:11PM  24    A.   I DON'T REMEMBER THAT.  I MEAN --

03:11PM  25    Q.   LET ME SEE --

PARLOFF CROSS BY MR. CLINE                                            6984

03:11PM   1    A.   OH, OH.

03:11PM   2    Q.   YOU WERE ABOUT TO SAY SOMETHING AND I INTERRUPTED YOU.

03:11PM   3    WHAT WAS IT?

03:11PM   4    A.   THERE WAS -- WELL, ACTUALLY I THINK MAYBE THIS GETS INTO

03:11PM   5    REPORTER PROCESS AND I DON'T THINK IT'S BEEN PUBLISHED, SO

03:11PM   6    MAYBE I SHOULD INVOKE PRIVILEGE.

03:11PM   7    Q.   OKAY.   YOU INTERVIEWED PEOPLE IN ADDITION TO MS. HOLMES;

03:12PM   8    RIGHT?

03:12PM   9    A.   YES.

03:12PM  10    Q.   MS. HOLMES SUGGESTED SOME OF THE PEOPLE THAT YOU TALK

03:12PM  11    WITH; CORRECT?

03:12PM  12    A.   YES.

03:12PM  13    Q.   AND OTHERS THAT YOU FOUND ON YOUR OWN; RIGHT?

03:12PM  14    A.   YES.

03:12PM  15    Q.   AND I WANT TO GO THROUGH SOME OF THE PEOPLE THAT YOU

03:12PM  16    INTERVIEWED.

03:12PM  17         MR. BOIES WAS ONE; RIGHT?

03:12PM  18    A.   I CAN'T REMEMBER IF HE'S QUOTED IN THE PIECE.   DO YOU

03:12PM  19    KNOW?

03:12PM  20    Q.   I THINK HE'S NAMED IN THE PIECE AS A SOURCE OF

03:12PM  21    INFORMATION.

03:12PM  22         THE COURT:   SIR, DO YOU WANT TO LOOK AT THE PIECE?

03:12PM  23    DO YOU WANT TO REVIEW THIS FOR A MOMENT?

03:12PM  24    BY MR. CLINE:

03:12PM  25    Q.   YOU'RE WELCOME TO IF YOU WANT.   IT IS TAB 1749 IN THAT

PARLOFF CROSS BY MR. CLINE                                       6985

03:12PM   1    BOOK THAT I'VE HANDED YOU.  SO TAKE YOUR TIME AND LOOK THROUGH

03:12PM   2    IT AND MAKE YOURSELF COMFORTABLE.

03:12PM   3            THE COURT:  DO YOU HAVE A DIRECTION TO A PAGE

03:13PM   4    NUMBER?

03:13PM   5    BY MR. CLINE:

03:13PM   6    Q.   TAKE A LOOK, MR. PARLOFF, IF YOU'RE WITH ME, AT PAGE 6.

03:13PM   7    A.   YES.

03:13PM   8    Q.   DOWN AT THE BOTTOM OF THE RIGHT-HAND COLUMN.

03:13PM   9    A.   YEAH, YEAH.  LET ME READ THAT.

03:13PM   10           (PAUSE IN PROCEEDINGS.)

03:14PM   11           THE WITNESS:  YEAH, IT DOES, IT DOES PARAPHRASE HIM

03:14PM   12   SPEAKING.  YEAH, I DID INTERVIEW HIM.

03:14PM   13   BY MR. CLINE:

03:14PM   14   Q.   ALL RIGHT.  SO MR. BOIES WAS ONE OF THE PEOPLE YOU

03:14PM   15   INTERVIEWED; IS THAT RIGHT?

03:14PM   16   A.   YEAH.  YES.

03:14PM   17   Q.   AND YOU INTERVIEWED DR. CHANNING ROBERTSON; RIGHT?

03:14PM   18   A.   YEAH.

03:14PM   19   Q.   AND DR. ROBERTSON, HE TESTIFIED --

03:14PM   20   A.   YES.

03:14PM   21   Q.   -- IN THE TRIAL YOU WERE THINKING ABOUT; RIGHT?

03:14PM   22   A.   YES.

03:14PM   23   Q.   AND YOU READ HIS TESTIMONY; RIGHT?

03:14PM   24   A.   YES.

03:14PM   25   Q.   BUT YOU ALSO SAT DOWN AND INTERVIEWED HIM; RIGHT?

PARLOFF CROSS BY MR. CLINE                                      6986

03:14PM   1    A.   YES.

03:14PM   2    Q.   AND YOU ALSO UNDERSTOOD THAT HE WAS OR HAD BEEN A

03:14PM   3    PROFESSOR AT STANFORD?

03:14PM   4    A.   YES.

03:14PM   5    Q.   AND THAT HE HAD BEEN KIND OF A MENTOR AND ADVISOR TO

03:14PM   6    MS. HOLMES OVER THE YEARS?

03:14PM   7    A.   YES.

03:14PM   8    Q.   YOU TALKED TO RICHARD KOVACEVICH, THE CEO OF WELLS FARGO

03:14PM   9    AND A BOARD MEMBER OF THERANOS; RIGHT?

03:15PM   10   A.   I DON'T KNOW IF HE'S QUOTED.

03:15PM   11   Q.   I DON'T KNOW, EITHER.  BUT I CAN TELL YOU, AND I CAN TELL

03:15PM   12   THE COURT FOR LATER CONSIDERATION IF NECESSARY, THAT HE WAS ON

03:15PM   13   A LIST OF NAMES THAT YOU PROVIDED TO THE GOVERNMENT WHEN YOU

03:15PM   14   FIRST SAT DOWN WITH THEM OF PEOPLE YOU HAD INTERVIEWED.

03:15PM   15   A.   WELL, I'M GOING TO INVOKE THE REPORTER PRIVILEGE.

03:15PM   16   Q.   WOULD IT EASE YOUR MIND IF I WERE TO SHOW YOU THE

03:15PM   17   MEMORANDUM OF THAT INTERVIEW WHERE YOU TOLD THE GOVERNMENT

03:15PM   18   THESE NAMES?

03:15PM   19   A.   NO.

03:15PM   20   Q.   IT WOULDN'T HELP?

03:15PM   21   A.   NO, BECAUSE I DON'T REALLY KNOW -- I'M NOT A MEDIA LAWYER.

03:15PM   22   I DON'T REALLY KNOW THE LIMITATION -- I DON'T WANT TO WAIVE THE

03:15PM   23   PRIVILEGE FOR OTHERS.

03:15PM   24   Q.   DO YOU HAVE A MEDIA LAWYER HERE WITH YOU?

03:15PM   25   A.   YES.

PARLOFF CROSS BY MR. CLINE                                              6987

| | | |
|---|---|---|
| 03:15PM | 1 | THE COURT:  THAT'S MY QUESTION FOR YOU, SIR. |
| 03:15PM | 2 | DO YOU HAVE COUNSEL FOR YOU HERE, MR. PARLOFF? |
| 03:16PM | 3 | THE WITNESS:  YES. |
| 03:16PM | 4 | THE COURT:  AND DO YOU WISH TO TAKE A BREAK AND |
| 03:16PM | 5 | CONSULT WITH YOUR COUNSEL? |
| 03:16PM | 6 | THE WITNESS:  YES. |
| 03:16PM | 7 | THE COURT:  ALL RIGHT.  LET'S DO THAT.  LET'S DO |
| 03:16PM | 8 | THAT. |
| 03:16PM | 9 | MR. CLINE:  THAT'S FINE. |
| 03:16PM | 10 | THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE ABOUT A |
| 03:16PM | 11 | 15 MINUTE BREAK, A 15 TO 20 MINUTE BREAK HERE, AND SO WE'LL BE |
| 03:16PM | 12 | IN RECESS. |
| 03:16PM | 13 | PLEASE, SIR, GO RIGHT AHEAD AND CONSULT WITH YOUR COUNSEL. |
| 03:16PM | 14 | (JURY OUT AT 3:16 P.M.) |
| 03:16PM | 15 | THE COURT:  PLEASE BE SEATED.  THE RECORD SHOULD |
| 03:16PM | 16 | REFLECT THAT THE JURY IS OUT. |
| 03:16PM | 17 | BEFORE YOU LEAVE, MR. CLINE, I'LL INVITE ANY INTERESTED |
| 03:16PM | 18 | PARTY -- IF THERE'S GOING TO BE SOME DISCUSSION ABOUT THIS, |
| 03:16PM | 19 | WE'LL DO THIS OUTSIDE OF THE PRESENCE OF THE JURY, AND IF YOU |
| 03:17PM | 20 | COULD NOTIFY COUNSEL ABOUT THAT. |
| 03:17PM | 21 | MR. CLINE:  I WILL. |
| 03:17PM | 22 | THE COURT:  AND WE CAN JUST GET AN IDEA OF WHEN AND |
| 03:17PM | 23 | IF THAT IS NECESSARY. |
| 03:17PM | 24 | MR. CLINE:  ALL RIGHT.  MOSTLY I'M JUST TRYING TO |
| 03:17PM | 25 | GET THE NAMES, AND I'M HOPEFUL WE CAN DO THAT. |

PARLOFF CROSS BY MR. CLINE                                        6988

03:17PM  1          THE COURT:  SURE.  AND THE GOVERNMENT IS WILLING TO

03:17PM  2   HELP YOU ON THAT, TOO, IF YOU NEED THEIR ASSISTANCE.

03:17PM  3          MR. CLINE:  I'M SURE THEY ARE.

03:17PM  4          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.  THANK

03:17PM  5   YOU.

03:17PM  6          THE CLERK:  COURT.  COURT IS IN RECESS.

03:17PM  7       (RECESS FROM 3:17 P.M. UNTIL 3:32 P.M.)

03:32PM  8       (JURY IN AT 3:32 P.M.)

03:32PM  9          THE COURT:  ALL RIGHT.  THANK YOU.

03:32PM 10       WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

03:32PM 11   ARE PRESENT ONCE AGAIN.

03:32PM 12       PLEASE BE SEATED.  THANK YOU.

03:32PM 13       LET ME INQUIRE OF THE WITNESS.

03:32PM 14       MR. PARLOFF, DID YOU HAVE AN OPPORTUNITY TO CONSULT WITH

03:32PM 15   YOUR COUNSEL?

03:32PM 16          THE WITNESS:  YES.  THANKS.

03:32PM 17          THE COURT:  ALL RIGHT.  YOU'RE WELCOME.

03:32PM 18       ARE YOU READY TO PROCEED AT LEAST WITH THE EXAMINATION?

03:32PM 19          THE WITNESS:  YES.  THANK YOU, YOUR HONOR.

03:32PM 20          THE COURT:  ALL RIGHT.  THANK YOU.

03:32PM 21   BY MR. CLINE:

03:32PM 22   Q.   MR. PARLOFF, I THINK WHEN WE BROKE I HAD ASKED YOU IF YOU

03:33PM 23   SPOKE WITH RICHARD KOVACEVICH, THE CEO OF WELLS FARGO AND A

03:33PM 24   BOARD MEMBER OF THERANOS?

03:33PM 25   A.   YES.

PARLOFF CROSS BY MR. CLINE                                                6989

03:33PM  1       Q.   YOU DID SPEAK WITH HIM?

03:33PM  2       A.   YES.

03:33PM  3       Q.   WILLIAM PERRY, THE FORMER SECRETARY OF DEFENSE --

03:33PM  4       A.   YES.

03:33PM  5       Q.   -- OF THE UNITED STATES AND ANOTHER BOARD MEMBER; RIGHT?

03:33PM  6       A.   YES.

03:33PM  7       Q.   PAUSE ONE SECOND AFTER MY QUESTION BEFORE YOU ANSWER IT.

03:33PM  8       A.   OH, SORRY.

03:33PM  9       Q.   GENERAL JAMES MATTIS, FORMER SITCOM COMMANDER AND BOARD

03:33PM 10       MEMBER; RIGHT?

03:33PM 11       A.   YES.

03:33PM 12       Q.   GEORGE SHULTZ, FORMER SECRETARY OF STATE, AND OTHER THINGS

03:33PM 13       AS WELL, AND ALSO A BOARD MEMBER; RIGHT?

03:33PM 14       A.   YES.

03:33PM 15       Q.   HENRY KISSINGER, FORMER SECRETARY OF STATE, BOARD MEMBER,

03:33PM 16       FORMER NATIONAL SECURITY ADVISOR OF THE UNITED STATES, YOU

03:33PM 17       SPOKE WITH HIM?

03:33PM 18       A.   YES.

03:33PM 19       Q.   AND GREG WASSON, CEO OF WALGREENS?

03:33PM 20       A.   YES.

03:33PM 21       Q.   MARK LARET, THE CEO OF UCSF MEDICAL CENTER; RIGHT?

03:34PM 22       A.   YES.

03:34PM 23       Q.   AND TO GO BACK TO MR. WASSON FOR A SECOND, YOU UNDERSTOOD

03:34PM 24       THAT THERANOS HAD A PARTNERSHIP WITH WALGREENS; RIGHT?

03:34PM 25       A.   YES.

PARLOFF CROSS BY MR. CLINE                                    6990

03:34PM  1   Q.   THAT'S BACK WHERE YOU GOT YOUR FIRST FINGER PRICK; RIGHT?

03:34PM  2   A.   YES.

03:34PM  3   Q.   MARK LARET, CEO OF UCSF MEDICAL CENTER; RIGHT?

03:34PM  4   A.   YES.

03:34PM  5   Q.   AND YOU UNDERSTOOD THAT THERANOS HAD SOME SORT OF A

03:34PM  6   RELATIONSHIP OR POTENTIAL RELATIONSHIP WITH UCSF MEDICAL

03:34PM  7   CENTER; CORRECT?

03:34PM  8   A.   YES, THE ARTICLE SAYS THAT.

03:34PM  9   Q.   LLOYD DEAN FROM DIGNITY HEALTH?

03:34PM 10   A.   YES.

03:34PM 11   Q.   AND AGAIN, YOU UNDERSTOOD THAT THERANOS HAD A RELATIONSHIP

03:34PM 12   WITH DIGNITY HEALTH?

03:34PM 13   A.   YEAH, YES.

03:34PM 14   Q.   SCOTT SEROTA OF BLUE CROSS, BLUE SHIELD?

03:34PM 15   A.   IT WAS WORKING TO CREATE -- IT WAS IN TALKS, YEAH.

03:34PM 16   Q.   YES.  WORKING ON CREATING A RELATIONSHIP?

03:34PM 17   A.   YEAH.

03:34PM 18   Q.   WITH SEVERAL HOSPITALS; RIGHT?

03:34PM 19   A.   YES.

03:35PM 20   Q.   ALL RIGHT.  SCOTT SEROTA OF BLUE CROSS BLUE SHIELD, YOU

03:35PM 21   TALKED WITH HIM?

03:35PM 22   A.   YES.

03:35PM 23   Q.   DR. DAVID HELFET, YOU TALKED WITH HIM; RIGHT?

03:35PM 24   A.   YES.

03:35PM 25   Q.   NOW, DR. HELFET AT THE TIME YOU SPOKE WITH HIM WAS THE

PARLOFF CROSS BY MR. CLINE                                        6991

03:35PM  1      CHIEF OF ORTHOPEDIC SURGERY AT THE HOSPITAL FOR SPECIAL SURGERY

03:35PM  2      IN MANHATTAN; RIGHT?

03:35PM  3      A.   YES.

03:35PM  4      Q.   AND THE COMPANY HAD PROVIDED VALIDATION STUDIES TO

03:35PM  5      DR. HELFET; CORRECT?

03:35PM  6      A.   YES.

03:35PM  7      Q.   AND YOU SPOKE WITH DR. HELFET ABOUT THOSE VALIDATION

03:35PM  8      STUDIES; CORRECT?

03:35PM  9      A.   YES, I REFER TO THAT IN THE ARTICLE.

03:35PM  10     Q.   YOU DO.

03:35PM  11     A.   YEAH.

03:35PM  12     Q.   AND HE GAVE A POSITIVE ASSESSMENT; CORRECT?

03:35PM  13     A.   RIGHT.

03:35PM  14     Q.   YOU SPOKE WITH MS. HOLMES'S PARENTS, CHRIS AND NOEL;

03:35PM  15     RIGHT?

03:35PM  16     A.   YES.

03:35PM  17     Q.   NOW, YOU TESTIFIED ON DIRECT THAT YOU TOURED, I THINK YOU

03:36PM  18     SAID, A COMMERCIAL LABORATORY; RIGHT?

03:36PM  19     A.   YES.

03:36PM  20     Q.   AND THEN WHEN MR. BOSTIC ASKED YOU WHICH ONE, YOU SAID IT

03:36PM  21     WAS CONFIDENTIAL; RIGHT?

03:36PM  22     A.   YES.

03:36PM  23     Q.   AND THEN ABOUT 30 SECONDS LATER ON A CLIP WE HEARD IT WAS

03:36PM  24     QUEST; RIGHT?

03:36PM  25     A.   THE CLIP SAID WHAT IT SAID.

PARLOFF CROSS BY MR. CLINE                                    6992

03:36PM  1    Q.   YES.  TO MS. HOLMES; RIGHT?

03:36PM  2    A.   YEAH.

03:36PM  3    Q.   AND YOU ALSO TOLD THE GOVERNMENT THAT; RIGHT?

03:36PM  4    A.   I CAN'T RECALL, BUT I'LL TAKE YOUR WORD FOR IT.

03:36PM  5    Q.   ALL RIGHT.  SO CAN WE JUST CALL IT QUEST?

03:36PM  6    A.   WELL, IT SLIPPED OUT WHEN I SPOKE TO ELIZABETH, AND I

03:36PM  7    GUESS IT'S OUT NOW.

03:36PM  8         (LAUGHTER.)

03:36PM  9    BY MR. CLINE:

03:36PM  10   Q.   ALL RIGHT.  SO YOU TOURED QUEST?

03:36PM  11   A.   YEAH.

03:36PM  12   Q.   ALL RIGHT.  I KNEW WE WOULD GET THERE.

03:36PM  13        NOW, THIS WAS A QUESTION THAT YOU MAY NOT WANT TO ANSWER,

03:36PM  14   SO LISTEN CAREFULLY.

03:37PM  15        SOME OF THE QUESTIONS THAT YOU ASKED MS. HOLMES ABOUT THE

03:37PM  16   THERANOS TECHNOLOGY CAME FROM THERANOS'S COMPETITORS?

03:37PM  17   A.   YEAH, I DON'T -- I DID RESEARCH AND I HEARD VARIOUS

03:37PM  18   CRITICISMS, AND I, I ASKED HER TO ADDRESS THOSE QUESTIONS AND

03:37PM  19   CRITICISMS.

03:37PM  20   Q.   ALL RIGHT.  AND CAN WE GO SO FAR AS TO SAY THAT SOME OF

03:37PM  21   THOSE CRITICISMS THAT YOU HEARD, YOU HEARD FROM THERANOS'S

03:37PM  22   COMPETITORS?

03:37PM  23   A.   UM, UM, I THINK I'LL SAY NO.

03:38PM  24           THE COURT:  MR. PARLOFF, THE RECORD SHOULD REFLECT

03:38PM  25   THAT YOU PAUSED FOR A MOMENT TO REFLECT ON THAT.

PARLOFF CROSS BY MR. CLINE                                        6993

03:38PM   1        LET ME JUST SAY THAT YOU DO HAVE COUNSEL HERE.  IF AT ANY

03:38PM   2    TIME DURING ANY OF THE QUESTIONS BY MR. CLINE OR MR. BOSTIC OR

03:38PM   3    ANYONE ELSE --

03:38PM   4        THE WITNESS:  YEAH.

03:38PM   5        THE COURT:  -- IF YOU WISH TO CONSULT WITH YOUR

03:38PM   6    COUNSEL BEFORE YOU ANSWER, PLEASE LET ME KNOW AND I'LL, OF

03:38PM   7    COURSE, PROVIDE YOU THAT OPPORTUNITY.

03:38PM   8        AND DON'T BE SHY ABOUT THAT.  THAT'S FINE.

03:38PM   9        THE WITNESS:  I DON'T WANT TO START ANOTHER PAUSE.

03:38PM  10        THE COURT:  NO.  IF IT'S IMPORTANT TO YOU, IT'S

03:38PM  11    IMPORTANT TO US, INCLUDING MR. CLINE.  HE DOESN'T WANT TO

03:38PM  12    INVADE ANY PRIVILEGE UNNECESSARILY.

03:38PM  13        THE WITNESS:  WELL, I'D LIKE TO VERY QUICKLY CONSULT

03:38PM  14    WITH HIM.

03:38PM  15        THE COURT:  SURE.

03:38PM  16        DO YOU HAVE ANY OTHER QUESTIONS FOR EFFICIENCY?

03:38PM  17        MR. CLINE:  IF HE CAN JUST GO TALK QUICKLY TO HIS

03:38PM  18    COUNSEL, WE DON'T EVEN NEED TO TAKE A BREAK.

03:38PM  19        THE COURT:  OKAY.  I SEE A YOUNG MAN STANDING THERE.

03:38PM  20    SIR, MAY I KNOW YOUR NAME?

03:38PM  21        MR. KOLTUN:  YOU SAID YOUNG MAN, BUT I THINK YOU

03:39PM  22    MEANT ME.

03:39PM  23        (LAUGHTER.)

03:39PM  24        THE COURT:  I KNOW I CONFUSED YOU WHEN I SAID YOUNG

03:39PM  25    MAN, BUT NONETHELESS I'M REFERRING TO YOU, SIR.  COULD YOU

PARLOFF CROSS BY MR. CLINE                                              6994

03:39PM   1      STATE YOUR NAME, PLEASE?

03:39PM   2              MR. KOLTUN:  JOSHUA KOLTUN.  MY APPEARANCE HAS BEEN

03:39PM   3      MADE IN PAPERS BEFORE THE COURT.

03:39PM   4          I WONDER IF I COULD TALK BRIEFLY WITH MR. CLINE TO SEE IF

03:39PM   5      I CAN HELP SPEED THINGS UP A LITTLE BIT.

03:39PM   6              THE COURT:  I'M ALWAYS TO OFFER LAWYERS AN

03:39PM   7      OPPORTUNITY TO DISCUSS TO HELP THINGS, YES.

03:39PM   8          WE'LL TAKE A STANDING BREAK HERE.

03:39PM   9          IS THAT ALL RIGHT?

03:39PM   10             MR. CLINE:  A STANDING BREAK WOULD BE PERFECT.

03:39PM   11         (PAUSE IN PROCEEDINGS.)

03:42PM   12             THE COURT:  ALL RIGHT.  THANK YOU.  WE ARE BACK ON

03:42PM   13     THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

03:43PM   14         OUR JURY IS PRESENT.  MS. HOLMES IS PRESENT.

03:43PM   15         MR. PARLOFF HAS RESUMED THE STAND.

03:43PM   16         SIR, YOU'VE HAD AN OPPORTUNITY TO DISCUSS THINGS WITH YOUR

03:43PM   17     ATTORNEY?

03:43PM   18             THE WITNESS:  YES.

03:43PM   19             THE COURT:  ALL RIGHT.  AND AGAIN, IF AT ANY TIME

03:43PM   20     YOU FEEL THAT YOU NEED TO DO THAT, PLEASE LET ME KNOW AND, OF

03:43PM   21     COURSE, YOU'LL HAVE THE OPPORTUNITY.

03:43PM   22             THE WITNESS:  THANK YOU, YOUR HONOR.

03:43PM   23             THE COURT:  YOU'RE WELCOME.

03:43PM   24     BY MR. CLINE:

03:43PM   25     Q.   MR. PARLOFF, YOU HAD HEARD CRITICISMS OF THERANOS;

PARLOFF CROSS BY MR. CLINE                                            6995

03:43PM    1        CORRECT?

03:43PM    2        A.   YES.

03:43PM    3        Q.   AND SOME OF THOSE CRITICISMS CAME FROM THERANOS'S

03:43PM    4        COMPETITORS; CORRECT?

03:43PM    5        A.   YES.

03:43PM    6        Q.   AND YOU THEN PUT SOME OF THOSE CRITICISMS TO MS. HOLMES IN

03:43PM    7        YOUR DISCUSSIONS WITH HER; CORRECT?

03:43PM    8        A.   I ASKED HER TO COMMENT ON THOSE CRITICISMS.

03:43PM    9        Q.   YES.  NOW, I'VE RUN THROUGH A LIST OF PEOPLE THAT YOU

03:43PM   10        SPOKE TO FOR THE ARTICLE; CORRECT?

03:43PM   11        A.   YES.

03:43PM   12        Q.   YOU SPOKE TO OTHER PEOPLE AS WELL; RIGHT?

03:43PM   13        A.   YES.

03:43PM   14        Q.   SOME OF THE PEOPLE THAT YOU SPOKE WITH YOU QUOTED IN THE

03:43PM   15        ARTICLE; CORRECT?

03:43PM   16        A.   YES.

03:43PM   17        Q.   AND THIS GOES WITHOUT SAYING, I SUPPOSE, BUT THE QUOTES IN

03:44PM   18        THE ARTICLE ARE ACCURATE?  THEY'RE WHAT THOSE PEOPLE TOLD YOU;

03:44PM   19        RIGHT?

03:44PM   20        A.   YES.

03:44PM   21        Q.   ALL RIGHT.  NOW, I'M GOING TO TURN BACK TO THE

03:44PM   22        CONVERSATIONS WITH MS. HOLMES.

03:44PM   23             WE'VE, WE'VE NOTED THAT SOME OF THOSE CONVERSATIONS WERE

03:44PM   24        RECORDED AND WE'VE HEARD SOME OF THOSE.

03:44PM   25             SOME OF THE CONVERSATIONS WERE UNRECORDED?

PARLOFF CROSS BY MR. CLINE                                    6996

03:44PM   1    A.    THAT'S RIGHT.

03:44PM   2    Q.    AND FOR SOME OF THOSE CONVERSATIONS, YOU TOOK NOTES;

03:44PM   3    RIGHT?

03:44PM   4    A.    YES.

03:44PM   5    Q.    AND IF I UNDERSTOOD YOU ON DIRECT, YOU HAD A SPIRAL

03:44PM   6    NOTEBOOK; CORRECT?

03:44PM   7    A.    YES.

03:44PM   8    Q.    AND YOU'VE GOT SOME KIND OF A SHORTHAND THAT YOU USE;

03:44PM   9    RIGHT?

03:44PM  10    A.    YES.

03:44PM  11    Q.    AND SO WHEN YOU'RE TALKING WITH SOMEONE ON THE PHONE OR IN

03:44PM  12    PERSON, YOU HAVE YOUR SPIRAL NOTEBOOK THERE AND YOU'RE TAKING

03:44PM  13    NOTES; RIGHT?

03:44PM  14    A.    USUALLY, YES.

03:44PM  15    Q.    ALL RIGHT.  AND DID YOU DO THAT WHEN YOU WERE RECORDING IT

03:45PM  16    AS WELL OR DO YOU NOT BOTHER TO TAKE NOTES?

03:45PM  17    A.    I USUALLY DO AS A BACKUP.

03:45PM  18    Q.    ALL RIGHT.  BUT WE'RE GOING TO FOCUS ON THE UNRECORDED

03:45PM  19    CONVERSATIONS HERE.

03:45PM  20         SO LET'S SAY THAT YOU'RE HAVING A PHONE CALL WITH

03:45PM  21    MS. HOLMES, AND YOU GET OFF THE CALL, AND YOU'VE GOT NOTES IN

03:45PM  22    THIS SHORTHAND; RIGHT?

03:45PM  23    A.    UH-HUH, YES.

03:45PM  24    Q.    AND DO THE NOTES INCLUDE THE QUESTIONS THAT YOU'RE ASKING?

03:45PM  25    IN OTHER WORDS, ARE YOU WRITING WHILE YOU'RE TALKING, OR DO YOU

PARLOFF CROSS BY MR. CLINE                                     6997

03:45PM   1    GO BACK AND FILL THAT IN LATER?

03:45PM   2    A.    TYPICALLY THEY INCLUDE THE QUESTION WHILE I'M, WHILE I'M

03:45PM   3    TALKING.  IT CAN BE ABBREVIATED.  LIKE YOU SAY, IT'S DIFFICULT.

03:45PM   4          BUT IF THERE'S SOME DOUBT ABOUT IT OR IF IT'S PARTICULARLY

03:45PM   5    IMPORTANT, ONE, I WOULD GO BACK AFTER THE FACT AND FILL IT IN

03:46PM   6    AS SOON AS I -- YOU KNOW, TO MAKE IT -- OFTEN THE, OFTEN THE

03:46PM   7    VERBATIM QUALITY OF THE QUESTION IS NOT AS IMPORTANT AS --

03:46PM   8    SINCE YOU'RE NOT GOING TO QUOTE YOURSELF.

03:46PM   9          BUT SOMETIMES IT IS, AND IN THAT CASE I WOULD GO BACK AS

03:46PM   10   SOON AS POSSIBLE AND WRITE IT OUT AS ACCURATELY AS POSSIBLE.

03:46PM   11   Q.    ALL RIGHT.  SO WE'RE TALKING ABOUT A HYPOTHETICAL PHONE

03:46PM   12   CALL WITH MS. HOLMES DURING THIS 2014 INVESTIGATION THAT YOU'RE

03:46PM   13   DOING?

03:46PM   14   A.    YEAH.

03:46PM   15   Q.    OR RESEARCH THAT YOU'RE DOING?

03:46PM   16   A.    YEAH.

03:46PM   17   Q.    AND SO YOU GET OFF THE PHONE.  YOU'VE GOT THESE NOTES,

03:46PM   18   HANDWRITTEN NOTES, AND THEY FIND THEIR WAY THEN INTO A DOCUMENT

03:46PM   19   THAT RESIDES ON YOUR COMPUTER; RIGHT?

03:46PM   20   A.    YES.

03:46PM   21   Q.    AND TELL US ABOUT THAT PROCESS.

03:46PM   22   A.    SO TYPICALLY IF I'M NOT GOING TO WRITE THE ARTICLE

03:46PM   23   IMMEDIATELY, I WOULD TRANSCRIBE THEM AS SOON AS POSSIBLE.  IT

03:47PM   24   COULD BE IMMEDIATELY, BUT IT COULD BE A COUPLE DAYS.

03:47PM   25   Q.    ALL RIGHT.  AND WHEN YOU SAY "TRANSCRIBE THEM," THE NOTES

PARLOFF CROSS BY MR. CLINE                                        6998

| | | |
|---|---|---|
| 03:47PM | 1 | ARE IN THIS SHORTHAND; RIGHT? |
| 03:47PM | 2 | A.   YEAH.  PUT THEM INTO ENGLISH WORDS. |
| 03:47PM | 3 | Q.   ALL RIGHT.  SO WHAT ENDS UP IN YOUR COMPUTER, I TAKE IT, |
| 03:47PM | 4 | IS NOT A VERBATIM RECITATION OF WHAT WAS SAID. |
| 03:47PM | 5 | IS THAT FAIR? |
| 03:47PM | 6 | A.   IT IS SUPPOSED TO BE A VERBATIM RECITATION OF WHAT HOLMES |
| 03:47PM | 7 | SAID. |
| 03:47PM | 8 | Q.   LIKE A TRANSCRIPT, IN OTHER WORDS? |
| 03:47PM | 9 | A.   WELL, AS BEST I CAN DO. |
| 03:47PM | 10 | Q.   ALL RIGHT. |
| 03:47PM | 11 | A.   YEAH, I MEAN, I'M NOT, I'M NOT A, YOU KNOW, A SKILLED |
| 03:47PM | 12 | COURT REPORTER.  I DO THE BEST I CAN WITH MY, YOU KNOW, MY |
| 03:48PM | 13 | SHORTHAND -- MY SPEED WRITING. |
| 03:48PM | 14 | Q.   ALL RIGHT.  SO AT THAT POINT WE HAVE A DOCUMENT ON YOUR |
| 03:48PM | 15 | COMPUTER AND WE ALSO HAVE HANDWRITTEN NOTES; RIGHT? |
| 03:48PM | 16 | A.   YEAH. |
| 03:48PM | 17 | Q.   ALL RIGHT.  SO WHAT DO YOU DO THEN WITH THE HANDWRITTEN |
| 03:48PM | 18 | NOTES? |
| 03:48PM | 19 | A.   AFTER 12 MONTHS, I THROW THEM OUT IN ACCORDANCE WITH |
| 03:48PM | 20 | "FORTUNE"'S POLICY. |
| 03:48PM | 21 | AT SOME POINT -- IT MIGHT BE 14 MONTHS.  AT SOME POINT IT |
| 03:48PM | 22 | CHANGED FROM 12 TO 14 OR 14 TO 12.  I CAN'T REMEMBER NOW. |
| 03:48PM | 23 | BUT YOU WERE SUPPOSED TO THROW THEM OUT, AND YOU SORT OF |
| 03:48PM | 24 | HAD TO BECAUSE THERE WAS JUST NO SPACE TO KEEP ALL OF THESE |
| 03:48PM | 25 | NOTES.  IT WASN'T JUST ONE, ONE ARTICLE.  IT WAS ALL -- |

PARLOFF CROSS BY MR. CLINE                                    6999

03:48PM   1    EVERYTHING YOU WERE WORKING ON.

03:48PM   2    Q.   ALL RIGHT.  SO THE, THE SHORT OF IT IS, THE HANDWRITTEN

03:48PM   3    NOTES THAT YOU TOOK DURING YOUR CONVERSATION WITH MS. HOLMES

03:49PM   4    ARE DESTROYED?

03:49PM   5    A.   THEY'RE THROWN OUT, YEAH.

03:49PM   6    Q.   ALL RIGHT.  AND WHAT WE HAVE LEFT IS THE COMPUTER DOCUMENT

03:49PM   7    THAT YOU HAVE PRODUCED?

03:49PM   8    A.   THAT'S RIGHT.

03:49PM   9    Q.   NOW, THE SET OF -- THE COMPUTER DOCUMENT THAT WE HAVE

03:49PM  10    RECEIVED THAT REFLECTS YOUR CONVERSATIONS WITH MS. HOLMES -- BY

03:49PM  11    THE WAY, IT'S AT TAB 1646 IN YOUR BOOK.  YOU DON'T NEED TO LOOK

03:49PM  12    AT THIS NOW, BUT IF YOU NEED TO, THAT'S WHERE YOU CAN FIND IT.

03:49PM  13    ALL RIGHT?

03:49PM  14        THAT DOCUMENT INCLUDES BOTH RECORDED AND UNRECORDED CALLS;

03:49PM  15    RIGHT?

03:49PM  16    A.   YES.

03:49PM  17    Q.   ALL RIGHT.  AND TELL US HOW YOU CREATED THAT DOCUMENT AS

03:49PM  18    YOU WERE GOING ALONG?  IN OTHER WORDS, DID YOU KEEP IT UP TO

03:50PM  19    DATE?  DID YOU DO IT IN SEQUENCE?

03:50PM  20    A.   UM, YES.  I LIKE TO BE ABLE TO DO A KEY WORD SEARCH OF ALL

03:50PM  21    OF MY CONVERSATIONS WITH ONE PERSON RATHER THAN GOING INTO

03:50PM  22    DIFFERENT FILES.

03:50PM  23        SO I TRIED TO ADD EACH NEW CONVERSATION ON TOP OF -- I

03:50PM  24    MEAN, AFTER THE PREVIOUS ONE.  IT GETS -- YEAH.

03:50PM  25    Q.   WOULD YOU SOMETIMES GO BACK AND FILL THINGS IN THAT YOU

7000

PARLOFF CROSS BY MR. CLINE

03:50PM   1    HAD NOT TRANSCRIBED?

03:50PM   2    A.   WELL, WHAT I WOULD SOMETIMES DO IS THAT I WOULD TRANSCRIBE

03:51PM   3    MY SPEED WRITING NOTES, AND IF I HAD THE TAPE, TOO, THEN LATER

03:51PM   4    I WOULD GO BACK AND FILL IN THE -- AND MAKE IT MORE ACCURATE

03:51PM   5    WITH THE TAPE RECORDER.

03:51PM   6    Q.   ALL RIGHT.  BUT, OF COURSE, IF YOU DIDN'T HAVE A

03:51PM   7    RECORDING, YOU WEREN'T ABLE TO MAKE IT MORE ACCURATE?

03:51PM   8    A.   RIGHT.

03:51PM   9    Q.   ALL RIGHT.  I WANT TO TURN NOW TO A SPECIFIC CONVERSATION

03:51PM  10    THAT YOU TESTIFIED ABOUT ON DIRECT.

03:51PM  11    A.   YES.

03:51PM  12    Q.   YOU TESTIFIED ON DIRECT THAT YOU ASKED MS. HOLMES AT ONE

03:51PM  13    POINT ABOUT THERANOS'S USE OF SIEMENS MACHINES.

03:51PM  14         DO YOU REMEMBER THAT?

03:51PM  15    A.   YES.

03:51PM  16    Q.   AND YOU TESTIFIED, I THINK, THAT THIS HAPPENED IN A

03:51PM  17    TELEPHONE CONVERSATION ON MAY 14TH, 2014?

03:51PM  18    A.   YES.

03:51PM  19    Q.   AND YOU TESTIFIED THAT YOU ASKED MS. HOLMES QUESTIONS TO

03:51PM  20    THE EFFECT OF YOU DON'T KEEP A SPARE SIEMENS ANALYZER FOR

03:52PM  21    OVERFLOW, AND NOT A MATTER OF WE CAN'T DO SUCH AND SUCH A TEST

03:52PM  22    ON OUR PLATFORM, SO WE'LL NEED TO DO THAT ON SIEMENS ANALYZERS;

03:52PM  23    RIGHT?

03:52PM  24    A.   RIGHT.

03:52PM  25    Q.   AND THOSE WERE LEADING QUESTIONS; RIGHT?

PARLOFF CROSS BY MR. CLINE

03:52PM  1          A LEADING QUESTION -- AND I KNOW YOU KNOW THIS, BUT I'M

03:52PM  2     GOING TO EXPLAIN IT FOR THE RECORD -- IS A QUESTION THAT

03:52PM  3     SUGGESTS THE ANSWER THAT YOU'RE LOOKING FOR; RIGHT.

03:52PM  4     A.   YEAH.

03:52PM  5     Q.   LIKE THE QUESTION THAT I JUST ASKED YOU?

03:52PM  6     A.   IT WAS -- YEAH.  YEAH.  IT WAS PHRASED THAT WAY NOT FOR

03:52PM  7     THE REASONS THAT YOU'RE PHRASING YOUR QUESTIONS THAT WAY.

03:52PM  8     Q.   WHY AM I PHRASING MY QUESTIONS THAT WAY?

03:52PM  9     A.   SO I WON'T GO OFF ON A TANGENT.

03:52PM  10         I WOULD HAVE BEEN HAPPY TO HEAR HER GO OFF ON, YOU KNOW,

03:52PM  11    GIVE ME -- SHE WAS, SHE WAS FREE TO -- YOU KNOW, IF THE ANSWER

03:52PM  12    WAS, WAS, OH, YEAH, WE DO, I WOULD HAVE BEEN HAPPY TO HAVE 30

03:53PM  13    MORE QUESTIONS, OH, YOU DO?

03:53PM  14    Q.   MR. PARLOFF, LET ME STOP YOU.

03:53PM  15         I'M GOING TO MOVE TO STRIKE.

03:53PM  16         THE COURT:  WELL, THAT IS WHAT HAPPENS.

03:53PM  17         (LAUGHTER.)

03:53PM  18         MR. CLINE:  YOU KNOW, YOU ALWAYS ASK LEADING

03:53PM  19    QUESTIONS, RIGHT.

03:53PM  20         MR. BOSTIC:  I WAS --

03:53PM  21         THE COURT:  I'LL ALLOW THE ANSWER.  YOU CAN ASK

03:53PM  22    ANOTHER QUESTION.

03:53PM  23         MR. CLINE:  ALL RIGHT.

03:53PM  24    Q.   THE TWO QUESTIONS THAT YOU PUT TO MS. HOLMES WERE LEADING

03:53PM  25    QUESTIONS; RIGHT?

PARLOFF CROSS BY MR. CLINE                                        7002

03:53PM  1    A.   YES, BUT ONLY BECAUSE I, I DIDN'T WANT TO -- I THOUGHT IT

03:53PM  2    WAS ALREADY OBVIOUS AND I DIDN'T WANT TO OFFEND HER.

03:53PM  3         I WOULD SAY, LOOK, YOU'RE NOT SAYING THIS, ARE YOU?  I

03:53PM  4    JUST WANT TO BE CLEAR.

03:53PM  5    Q.   ALL RIGHT.

03:53PM  6    A.   I WAS NOT, YOU KNOW -- I JUST -- I THOUGHT IT WAS ALREADY

03:53PM  7    OBVIOUS, BUT I DIDN'T WANT TO LET SOMETHING LIKE THAT SLIP BY.

03:53PM  8    Q.   OKAY.  AND HER ANSWERS, I THINK YOU TESTIFIED, WERE A

03:53PM  9    VERBAL AGREEMENT, SUCH AS UH-HUH?

03:54PM 10    A.   UH-HUH.

03:54PM 11    Q.   LIKE THAT?

03:54PM 12    A.   UH-HUH, MEANING CORRECT.

03:54PM 13    Q.   SO I'M GOING TO ASK YOU SOME MORE QUESTIONS ABOUT THIS,

03:54PM 14    BUT I THINK FOR SHORTHAND, I WANT TO REFER TO THIS AS THE

03:54PM 15    SIEMENS CONVERSATION.

03:54PM 16    A.   OKAY.

03:54PM 17    Q.   OKAY.  AND AGAIN, THERE'S NO RECORDING OF THIS; RIGHT?

03:54PM 18    A.   RIGHT.

03:54PM 19    Q.   AND NO HANDWRITTEN NOTE OF THIS?

03:54PM 20    A.   NOT ANYMORE.

03:54PM 21    Q.   THE RECORD IS YOUR COMPUTER FILE; RIGHT?

03:54PM 22    A.   YES.

03:54PM 23    Q.   AND DOES THAT STILL EXIST, BY THE WAY?

03:54PM 24    A.   YES.

03:54PM 25    Q.   ALL RIGHT.  SO TAKE A LOOK AT 1646 IN YOUR BOOK, OR TAB

7003
PARLOFF CROSS BY MR. CLINE

03:54PM   1    1646, AND GO TO PAGE 85 DOWN AT THE BOTTOM OF THE PAGE.

03:55PM   2    A.   OH.   SORRY.

03:55PM   3         THERE'S TWO -- THE PAGE NUMBERS OF THE TRIAL EXHIBIT,

03:55PM   4    THERE'S TWO SETS OF PAGE NUMBERS.

03:55PM   5              MR. CLINE:   MAY I APPROACH?

03:55PM   6              THE COURT:   YES.

03:55PM   7              MR. CLINE:   LET ME SHOW YOU WHAT I'M LOOKING AT

03:55PM   8    (INDICATING).

03:55PM   9              THE WITNESS:   OKAY.

03:55PM   10   BY MR. CLINE:

03:55PM   11   Q.   NOW, ARE YOU WITH ME ON PAGE 85?

03:55PM   12   A.   YES.

03:55PM   13   Q.   AND DO YOU SEE THAT THE -- WHAT I'VE CALLED THE SIEMENS

03:56PM   14   CONVERSATION COVERS ABOUT FOUR LINES THERE, MAYBE A THIRD OF

03:56PM   15   THE WAY DOWN THE PAGE?

03:56PM   16   A.   YES.

03:56PM   17   Q.   ALL RIGHT.

03:56PM   18        NOW, THE "FORTUNE" ARTICLE WAS PUBLISHED IN JUNE OF 2014?

03:56PM   19   A.   YES.

03:56PM   20   Q.   ALL RIGHT.   AND I WANT TO FAST FORWARD NOW TO

03:56PM   21   OCTOBER 2015, ABOUT 16 MONTHS OR SO LATER.

03:56PM   22   A.   YES.

03:56PM   23   Q.   I THINK YOU WERE ASKED ON DIRECT ABOUT "THE

03:56PM   24   WALL STREET JOURNAL" ARTICLE THAT CAME OUT.

03:56PM   25   A.   YEAH.

PARLOFF CROSS BY MR. CLINE                                    7004

03:56PM   1    Q.   AND THAT WAS OCTOBER 15TH, 2015; RIGHT?

03:56PM   2    A.   RIGHT.

03:56PM   3    Q.   AND YOU READ IT IMMEDIATELY WHEN IT CAME OUT; RIGHT?

03:56PM   4    A.   YES.

03:56PM   5    Q.   AND ONE OF THE ISSUES THAT "THE WALL STREET JOURNAL"

03:57PM   6    ARTICLE RAISED, I DON'T WANT TO GET INTO THE SUBSTANCE, BUT ONE

03:57PM   7    OF THE ISSUES INVOLVED THE USE OF SIEMENS ANALYZERS; RIGHT?

03:57PM   8    A.   UM, YES.

03:57PM   9    Q.   AND, IN FACT, YOU, YOU WROTE AN ARTICLE YOURSELF THAT

03:57PM   10   AFTERNOON SORT OF HIGHLIGHTING SOME OF THE KEY POINTS IN "THE

03:57PM   11   WALL STREET JOURNAL" ARTICLE; RIGHT?

03:57PM   12   A.   YEAH.

03:57PM   13   Q.   AND THE FIRST KEY POINT THAT YOU NOTED INVOLVED SIEMENS

03:57PM   14   ANALYZERS; RIGHT?

03:57PM   15   A.   YEAH.

03:57PM   16   Q.   OKAY.  AND WHEN YOU READ "THE WALL STREET JOURNAL"

03:57PM   17   ARTICLE, YOU BEGAN RECONSTRUCTING YOUR INTERACTIONS WITH

03:57PM   18   MS. HOLMES LEADING UP TO YOUR JUNE 2014 ARTICLE.

03:57PM   19        IS THAT FAIR?

03:57PM   20   A.   I DID TRY TO FIGURE OUT WHAT HAD HAPPENED.

03:57PM   21   Q.   RIGHT.  AND IN THE COURSE OF THAT RECONSTRUCTION, YOU READ

03:57PM   22   THROUGH YOUR COMPUTER DOCUMENT; RIGHT?

03:57PM   23   A.   I DIDN'T AT THAT TIME.

03:57PM   24   Q.   DIDN'T YOU GO THROUGH YOUR COMPUTER DOCUMENT AND ACTUALLY

03:58PM   25   BOLD CERTAIN THINGS THAT YOU THOUGHT MIGHT BE IMPORTANT?

PARLOFF CROSS BY MR. CLINE                                                    7005

03:58PM   1    A.   I BOLDED CERTAIN THINGS -- WELL, I BOLDED CERTAIN THINGS

03:58PM   2    AS I WAS WRITING BECAUSE I THOUGHT THIS WOULD BE A GOOD QUOTE

03:58PM   3    AND SO ON.

03:58PM   4         WHAT I DID AFTER -- AT SOME POINT EVENTUALLY AFTER "THE

03:58PM   5    WALL STREET JOURNAL" ARTICLES CAME OUT IS THAT I DID KEY WORD

03:58PM   6    SEARCHES.  I LOOKED FOR CERTAIN WORDS AND NUMBERS TO TRY TO

03:58PM   7    FIGURE OUT WHAT HAD HAPPENED.

03:58PM   8         AND I ALSO BOLD FACED AT THAT POINT SOME PASSAGES THAT I

03:58PM   9    FOUND.

03:58PM  10    Q.   ALL RIGHT.  AND I WANT TO NOW FAST FORWARD AGAIN UNTIL

03:59PM  11    YOUR FIRST INTERACTION WITH THE GOVERNMENT.

03:59PM  12         SO NOW THIS IS THE END OF 2015 AND NOW WE'RE FAST

03:59PM  13    FORWARDING TO APRIL OF 2018; RIGHT?

03:59PM  14    A.   YEAH.  YES.

03:59PM  15    Q.   AND IN EARLY APRIL OF 2018 YOU GOT A CALL FROM THE U.S.

03:59PM  16    ATTORNEY'S OFFICE HERE IN SAN FRANCISCO; RIGHT?

03:59PM  17    A.   YES.

03:59PM  18    Q.   AND WAS THAT MR. BOSTIC WHO CALLED YOU?

03:59PM  19    A.   NO.

03:59PM  20    Q.   SOMEONE FROM THE OFFICE CALLED YOU?

03:59PM  21    A.   YES.

03:59PM  22    Q.   AND TOLD YOU THAT THEY WERE INVESTIGATING MS. HOLMES AND

03:59PM  23    THERANOS; RIGHT?

03:59PM  24    A.   YES.

03:59PM  25    Q.   AND YOU AGREED TO MEET WITH THE GOVERNMENT; RIGHT?

PARLOFF CROSS BY MR. CLINE                                              7006

03:59PM   1    A.   YES.

03:59PM   2    Q.   AND AT SOME POINT AROUND THE TIME OF THAT MEETING, YOU GOT

03:59PM   3    A GRAND JURY SUBPOENA FOR DOCUMENTS; RIGHT?

03:59PM   4    A.   OH.  I -- THAT WAS WRITTEN AT THE MEETING AFTER I TURNED

04:00PM   5    OVER THE DOCUMENTS.

04:00PM   6         I, I WAS NOT REPRESENTED BY COUNSEL.  I WAS -- I WAS

04:00PM   7    WILLING TO TURN OVER THE -- MY TAPES AND NOTES OF INTERVIEWS

04:00PM   8    WITH ELIZABETH AND WITH THE CODEFENDANT, BUT NOT OTHER BY AND

04:00PM   9    LARGE -- NOT OTHER ITEMS, NOT OTHER, NOT OTHER FILES.

04:01PM  10         AND I WAS TRYING TO PROTECT THEM.  AND I ASKED --

04:01PM  11    BASICALLY I WAS SAYING IF YOU WILL SUBPOENA THESE DOCUMENTS, I

04:01PM  12    WILL NOT PROTEST THEM.

04:01PM  13    Q.   ALL RIGHT.

04:01PM  14    A.   AND SO THEY WENT AFTER THE FACT AND TRIED TO SUBPOENA THE

04:01PM  15    DOCUMENTS THAT I WAS WILLING TO TURN OVER.

04:01PM  16    Q.   ALL RIGHT.  SO ONE OF THE DOCUMENTS THAT YOU'VE PRODUCED

04:01PM  17    IN THAT PROCESS WAS THE COMPUTER DOCUMENT WITH THE NOTES OF

04:01PM  18    YOUR INTERVIEWS, OR INTERACTIONS WITH MS. HOLMES; RIGHT?

04:01PM  19    A.   YEAH.

04:01PM  20    Q.   NOW, THAT FIRST MEETING WITH THE GOVERNMENT WAS APRIL 12TH

04:01PM  21    OF 2018.

04:01PM  22         DO YOU REMEMBER THAT?

04:01PM  23    A.   THAT COULD BE.

04:01PM  24    Q.   AND THAT WAS IN NEW YORK?

04:01PM  25    A.   YES.

PARLOFF CROSS BY MR. CLINE                                        7007

04:01PM   1    Q.   AND MR. BOSTIC WAS THERE; RIGHT?

04:01PM   2    A.   YES.

04:01PM   3    Q.   AND AN FBI AGENT WAS THERE; RIGHT?

04:01PM   4    A.   YES.

04:01PM   5    Q.   AND THEY, THEY -- YOU GAVE THEM THE COMPUTER DOCUMENT;

04:02PM   6    RIGHT?

04:02PM   7    A.   YES.

04:02PM   8    Q.   AND THEY, THEY ASKED YOU IN THAT MEETING ABOUT THE, THE

04:02PM   9    PORTION, THE FOUR LINES CONTAINING THE SIEMENS CONVERSATION;

04:02PM  10    RIGHT?

04:02PM  11    A.   WELL, I DON'T -- NO, THEY DIDN'T READ ANYTHING.  I, I

04:02PM  12    ALSO, I HIGHLIGHTED CERTAIN THINGS FOR THEM THAT I THOUGHT

04:02PM  13    MIGHT BE RELEVANT.

04:02PM  14              MR. CLINE:  MAY I APPROACH, YOUR HONOR?

04:02PM  15              THE COURT:  YES.

04:02PM  16              THE WITNESS:  SO I THINK I READ THEM THAT -- OR,

04:02PM  17    YEAH, I THINK I READ THEM THAT.

04:02PM  18    BY MR. CLINE:

04:02PM  19    Q.   I'M SORRY.  YOU THINK YOU DID WHAT?

04:02PM  20    A.   I THINK I READ THEM THAT PORTION OF MY NOTES.

04:03PM  21    Q.   ALL RIGHT.  SO YOU READ IT TO THEM AND THEY ASKED YOU

04:03PM  22    ABOUT THEM; RIGHT?

04:03PM  23    A.   YEAH.

04:03PM  24    Q.   AND YOU TOLD THEM THAT BACK IN LATE 2015 YOU HAD FORGOTTEN

04:03PM  25    ABOUT THAT EXCHANGE; RIGHT?

PARLOFF CROSS BY MR. CLINE                                      7008

04:03PM   1    A.   THAT'S RIGHT.

04:03PM   2    Q.   AND YOU SAID THAT YOU HAD ONLY RECALLED THAT EXCHANGE IN

04:03PM   3    FEBRUARY OF 2018; RIGHT?

04:03PM   4    A.   THAT COULD BE.

04:03PM   5    Q.   WOULD IT HELP YOU TO TAKE A LOOK AT THE MEMORANDUM OF THE

04:03PM   6    INTERVIEW?

04:03PM   7    A.   OKAY.

04:03PM   8            MR. CLINE:  MAY I APPROACH?

04:03PM   9            THE COURT:  YES.

04:03PM   10   BY MR. CLINE:

04:03PM   11   Q.   (HANDING.)

04:04PM   12   A.   UM, I, I --

04:04PM   13           THE COURT:  WAIT FOR HIS QUESTION.  HE'LL ASK YOU

04:04PM   14   ANOTHER QUESTION.

04:04PM   15           THE WITNESS:  OKAY.

04:04PM   16   BY MR. CLINE:

04:04PM   17   Q.   SO MY QUESTION IS ONLY THIS:  DID YOU TELL THE GOVERNMENT,

04:04PM   18   MR. BOSTIC AND AGENT SCUSSEL WHO WAS THERE, THAT YOU RECALLED

04:04PM   19   THE INTERACTION WITH MS. HOLMES IN FEBRUARY OF 2018?

04:04PM   20   A.   I'M SURPRISED TO READ THAT, BECAUSE I THOUGHT I LEARNED IT

04:04PM   21   A FEW MONTHS -- A COUPLE MONTHS EARLIER, LIKE IN AROUND -- IT

04:04PM   22   WAS LATE 2017 WHEN I WAS GOING THROUGH THE NOTES AND STUMBLED

04:04PM   23   ACROSS IT.

04:04PM   24   Q.   ALL RIGHT.  BUT YOU DON'T HAVE ANY REASON TO DOUBT THAT

04:04PM   25   THAT'S WHAT YOU TOLD THEM; CORRECT?

PARLOFF CROSS BY MR. CLINE                                              7009

04:04PM   1      A.   NO.

04:04PM   2              THE COURT:  MR. CLINE, DO YOU HAVE ADDITIONAL

04:04PM   3      QUESTIONS?

04:04PM   4              MR. CLINE:  I HAVE A FEW, YES.

04:04PM   5          SHOULD WE CALL IT A DAY?

04:04PM   6              THE COURT:  I'VE TOLD THE JURY THAT WE WOULD END AT

04:05PM   7      4:00 O'CLOCK AND IT'S A LITTLE PAST 4:00 NOW.

04:05PM   8          LADIES AND GENTLEMEN, WE'LL TAKE OUR EVENING RECESS NOW.

04:05PM   9      WE'LL RESUME AT 9:00 O'CLOCK TOMORROW MORNING, PLEASE,

04:05PM   10     9:00 O'CLOCK TOMORROW MORNING.

04:05PM   11         PLEASE REMEMBER THE ADMONISHMENT.  DO NOT READ, DO ANY

04:05PM   12     INVESTIGATION, LISTEN TO OR TALK TO ANYONE ABOUT THIS CASE OR

04:05PM   13     ANYTHING TO DO WITH IT.

04:05PM   14         HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW MORNING.

04:05PM   15             YOU CAN STAND DOWN, SIR.

04:05PM   16             THE WITNESS:  OH.  DO I JUST LEAVE THESE

04:05PM   17     (INDICATING)?

04:05PM   18             THE COURT:  YEAH, JUST LEAVE THEM THERE.

04:05PM   19         (JURY OUT AT 4:05 P.M.)

04:05PM   20             THE COURT:  THANK YOU.  PLEASE BE SEATED.

04:05PM   21         THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE ROOM.

04:05PM   22         YOU CAN STAND DOWN, SIR.

04:05PM   23         BEFORE WE BREAK, MR. CLINE, IN REGARDS TO ANY OTHER ISSUE

04:05PM   24     REGARDING MR. PARLOFF OR ANY PRIVILEGE OR ISSUE, I WOULD

04:06PM   25     ENCOURAGE YOU TO SPEAK WITH HIS ATTORNEY, MR. PARLOFF'S COUNSEL

7010

04:06PM  1    TODAY, NOW, OR ANY TIME PRIOR TO YOUR RESUMPTION OF YOUR

04:06PM  2    EXAMINATION.

04:06PM  3         THAT MIGHT BE HELPFUL.

04:06PM  4              MR. CLINE:  I THINK I'M PROBABLY DONE WITH THAT

04:06PM  5    AREA, THE AREAS THAT WOULD IMPLICATE THAT.  BUT I'LL THINK

04:06PM  6    ABOUT THAT, AND I'VE GOT MR. KOLTUN'S NUMBER AND I'LL GIVE HIM

04:06PM  7    A CALL IF NECESSARY.

04:06PM  8              THE COURT:  ALL RIGHT.  THANK YOU.

04:06PM  9         DO YOU ANTICIPATE THAT WE'LL HAVE NEED TO DISCUSS ANYTHING

04:06PM 10    ON THIS TOPIC WITH THIS WITNESS OUTSIDE OF THE PRESENCE OF THE

04:06PM 11    JURY?

04:06PM 12              MR. CLINE:  I DON'T THINK SO.

04:06PM 13              THE COURT:  YOU THINK ALL OF THAT HAS BEEN RESOLVED

04:06PM 14    YOU BELIEVE?

04:06PM 15              MR. CLINE:  I THINK SO.

04:06PM 16              THE COURT:  ALL RIGHT.  GREAT.

04:06PM 17         ANYTHING ELSE BEFORE WE BREAK?

04:06PM 18              MR. SCHENK:  YOUR HONOR, JUST ONE ISSUE.

04:06PM 19         IF THE DEFENSE DECIDES TO PUT ON A CASE, WE RAISED WITH

04:06PM 20    THE COURT A WEEK OR A WEEK AND A HALF AGO THE QUESTION OF

04:06PM 21    JENCKS.

04:06PM 22         MY RECOLLECTION IS THAT ON THE THIRD DAY OF THE MOTION IN

04:06PM 23    LIMINE HEARING, THE COURT FOUND MOOT, OR FOUND UNNECESSARY TO

04:07PM 24    RULE ON THE GOVERNMENT'S REQUEST BECAUSE THAT MORNING, OR MAYBE

04:07PM 25    THE DAY PRIOR, I DON'T RECALL, THE DEFENSE PROVIDED SOME JENCKS

7011

04:07PM 1    TO THE GOVERNMENT.

04:07PM 2        I WANT TO ASK THE COURT TO ACTUALLY ISSUE AN ORDER TO SAY

04:07PM 3    THAT THE DEFENSE MUST PROVIDE JENCKS TO US.  WE HAVE RECEIVED

04:07PM 4    VERY LITTLE.  IT MIGHT BE EVERYTHING, BUT I WANT TO MAKE SURE

04:07PM 5    THAT THE DEFENSE IS ON NOTICE THAT THEY HAVE THAT JENCKS

04:07PM 6    OBLIGATION.

04:07PM 7            THE COURT:  ALL RIGHT.  THANK YOU.

04:07PM 8        WELL, LET ME, LET ME JUST REAFFIRM THE COURT'S PREVIOUS

04:07PM 9    ORDER REGARDING JENCKS MATERIAL.

04:07PM 10       IT, IT REMAINS IN EFFECT AND IN PLACE, AND I'LL ASK THE

04:07PM 11   DEFENSE TO PLEASE REVIEW YOUR DOCUMENTS, YOUR FILES, EVERYTHING

04:07PM 12   THAT YOU HAVE, AND TO PLEASE DISCLOSE ANY JENCKS MATERIAL THAT

04:07PM 13   YOU THINK IS APPROPRIATE, UNDERSTANDING THE LAW THAT YOU'RE

04:07PM 14   REQUIRED TO PROVIDE.  I WOULD ASK YOU TO DO THAT OVERNIGHT.

04:07PM 15       IF YOU CAN LOOK AT YOUR FILES AND SEE WHERE THAT IS, AND

04:07PM 16   AT LEAST CONTACT THE GOVERNMENT AND LET THEM KNOW WHAT YOU WISH

04:08PM 17   TO PROVIDE AND WHAT YOU'RE GOING TO PROVIDE, OR WHETHER YOU

04:08PM 18   HAVE NOTHING TO PROVIDE.  JUST LET THEM KNOW WHERE YOU ARE AT.

04:08PM 19       MR. DOWNEY.

04:08PM 20           MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO SAY FOR

04:08PM 21   THE COURT'S ASSURANCE, THAT EXERCISE HAS ALREADY BEEN

04:08PM 22   UNDERTAKEN, AND WHAT WE HAVE AFTER REVIEW OF THE ELECTRONIC

04:08PM 23   FILES AND OTHER FILES HAS BEEN PROVIDED TO THE GOVERNMENT.

04:08PM 24           THE COURT:  OKAY.

04:08PM 25           MR. SCHENK:  THANK YOU VERY MUCH.

7012

| | | |
|---|---|---|
| 04:08PM | 1 | THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD |
| 04:08PM | 2 | EVENING.  WE'LL SEE YOU TOMORROW. |
| 04:08PM | 3 | THERE'S NO NEED FOR AN 8:00 O'CLOCK MEETING THEN TOMORROW, |
| 04:08PM | 4 | IS THERE? |
| 04:08PM | 5 | MR. LEACH:  YOUR HONOR, I APOLOGIZE TO DO THIS |
| 04:08PM | 6 | PIECEMEAL.  I DON'T THINK WE NEED TO MEET AT 8:00, BUT I DO |
| 04:08PM | 7 | ANTICIPATE, IF THE DEFENSE BEGINS ITS CASE TOMORROW, THEIR |
| 04:08PM | 8 | FIRST WITNESS, AS I UNDERSTAND IT, IS A PARALEGAL FROM THE |
| 04:08PM | 9 | WILLIAMS & CONNOLLY LAW FIRM WHO IS GOING TO SERVE AS A SUMMARY |
| 04:08PM | 10 | WITNESS. |
| 04:08PM | 11 | LAST NIGHT WE WERE PROVIDED FOR THE FIRST TIME SOME |
| 04:08PM | 12 | SUMMARY EXHIBITS.  WE'RE STILL GOING THROUGH THEM.  BUT I THINK |
| 04:09PM | 13 | THERE ARE AT LEAST ONE OR TWO WHERE WE MIGHT HAVE AN ISSUE THAT |
| 04:09PM | 14 | WE WOULD LIKE TO RAISE WITH THE COURT. |
| 04:09PM | 15 | THE COURT:  SURE. |
| 04:09PM | 16 | MR. LEACH:  I DON'T THINK WE NEED TO MEET AT 8:00 |
| 04:09PM | 17 | FOR THAT, BUT IF WE CAN MEET AT 8:30, THE GOVERNMENT WOULD |
| 04:09PM | 18 | APPRECIATE IT. |
| 04:09PM | 19 | THE COURT:  WELL, THAT'S FINE.  I'M HERE.  LET ME |
| 04:09PM | 20 | KNOW.  JUST GIVE ME AN ALERT AND LET ME KNOW WHAT YOU NEED. |
| 04:09PM | 21 | MR. LEACH:  ALL RIGHT.  THANK YOU. |
| 04:09PM | 22 | THE COURT:  ALL RIGHT.  THANKS.  HAVE A GOOD |
| 04:09PM | 23 | EVENING. |
| 04:09PM | 24 | MR. DOWNEY:  THANK YOU. |
| 04:09PM | 25 | MR. LEACH:  THANK YOU. |

7013

04:09PM  1              THE CLERK:   COURT IS ADJOURNED.

04:09PM  2          (COURT ADJOURNED AT 4:09 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____
19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  NOVEMBER 18, 2021

22

23

24

25

7014

1

2                        UNITED STATES DISTRICT COURT

3                       NORTHERN DISTRICT OF CALIFORNIA

4                             SAN JOSE DIVISION

5

     UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                     )
                        PLAINTIFF,    )   SAN JOSE, CALIFORNIA
7                                     )
              VS.                     )   VOLUME 36
8                                     )
     ELIZABETH A. HOLMES,             )   NOVEMBER 19, 2021
9                                     )
                        DEFENDANT.    )   PAGES 7014 - 7287
10   _____ )

11                    TRANSCRIPT OF TRIAL PROCEEDINGS
12                BEFORE THE HONORABLE EDWARD J. DAVILA
                     UNITED STATES DISTRICT JUDGE
13
     A P P E A R A N C E S:
14

     FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
15                           BY:  JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
16                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17
                             BY:  ROBERT S. LEACH
18                                KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

     OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                TRANSCRIPT PRODUCED WITH COMPUTER

7015

```
 1        A P P E A R A N C E S:  (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  SEEMA ROPER
                                    J.R. FLEURMONT
 6                                  RICHARD CLEARY
                                    ANDREW LEMENS
 7                                  PATRICK LOOBY
                                    AMY SAHARIA
 8                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 9
                               LAW OFFICE OF JOHN D. CLINE
10                             BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
11                             SAN FRANCISCO, CALIFORNIA 94111

12
       ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
13                            BY:  ADELAIDA HERNANDEZ

14                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
15                                 MADDI WACHS, PARALEGAL

16                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                              TBC
18                            BY:  BRIAN BENNETT, TECHNICIAN

19
       FOR ROGER PARLOFF:     JOSHUA KOLTUN
20

21

22

23

24

25
```

7016

1

2                          INDEX OF PROCEEDINGS

3        GOVERNMENT'S:

4

5        **ROGER PARLOFF**
         CROSS-EXAM BY MR. CLINE (RES.)         P. 7052
         REDIRECT EXAM BY MR. BOSTIC            P. 7078
6

7

8        DEFENDANT'S:

9        **TRENT MIDDLETON**
         DIRECT EXAM BY MS. TREFZ               P. 7126
10       CROSS-EXAM BY MR. LEACH                P. 7162

11

12       **FABRIZIO BONANNI**
         DIRECT EXAM BY MS. TREFZ               P. 7181
13       CROSS-EXAM BY MR. SCHENK               P. 7223
         REDIRECT EXAM BY MS. TREFZ             P. 7234
14

15       **ELIZABETH HOLMES**
         DIRECT EXAM BY MR. DOWNEY              P. 7237
16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXHIBITS

 2
                                  IDENT.    EVIDENCE
 3       GOVERNMENT'S:

 4       4859                                7082

 5

 6       DEFENDANT'S:

 7       14271                               7063
         10592                               7070
 8       10691, PAGES 1 - 3                  7129
         10684                               7132
 9       10685                               7135
         10686 AND 10692                     7140
10       10689, PAGE 1                       7144
         10687, PAGE 1                       7150
11       10689, PAGES 2 AND 3                7153
         10688                               7158
12       10312                               7184
         7051                                7244
13       9501                                7251
         15015                               7254
14       15026                               7257, 7258
         12027, PAGES 1 AND 2                7262
15       15016                               7265
         15024                               7268
16       14111 AND 14112                     7271
         15017                               7273
17       13762                               7275
         15013                               7277
18

19

20

21

22

23

24

25
```

```
          1    SAN JOSE, CALIFORNIA                    NOVEMBER 19, 2021

08:31AM   2                      P R O C E E D I N G S

08:31AM   3         (COURT CONVENED AT 8:31 A.M.)

08:31AM   4         (JURY OUT AT 8:31 A.M.)

08:31AM   5              THE COURT:  THANK YOU.  PLEASE BE SEATED.

08:31AM   6         WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL

08:32AM   7    ARE PRESENT.  MS. HOLMES IS PRESENT.

08:32AM   8         WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.

08:32AM   9         I HAVE DOCUMENT 1150 IN FRONT OF ME THAT WAS FILED LAST

08:32AM  10    NIGHT.  SHOULD WE TALK ABOUT THAT?

08:32AM  11              MR. SCHENK:  YES.  THANK YOU.  GOOD MORNING,

08:32AM  12    YOUR HONOR.

08:32AM  13         YOUR HONOR, THE UNITED STATES FILED A MOTION TO EXCLUDE

08:32AM  14    THE TESTIMONY OF A WITNESS THAT THE DEFENSE DISCLOSED TO US

08:32AM  15    RECENTLY.

08:32AM  16         MAY I?

08:32AM  17              THE COURT:  YES, YES.  THANK YOU.

08:32AM  18              MR. SCHENK:  THE WITNESS'S NAME IS DR. BONANNI,

08:32AM  19    B-O-N-A-N-N-I, AND THERE ARE REALLY SORT OF TWO ARGUMENTS THAT

08:32AM  20    I THINK ARE WORTH THE COURT'S ATTENTION.

08:32AM  21         THE FIRST IS A RELEVANCE ARGUMENT.  THIS INDIVIDUAL JOINED

08:32AM  22    THE THERANOS BOARD AROUND MAY OF 2016.  THE COURT HEARD

08:32AM  23    TESTIMONY FROM DR. DAS THAT THE DECISION TO VOID THE TESTS THAT

08:32AM  24    WERE RUN ON THE EDISON OCCURRED EARLIER IN 2016.

08:32AM  25         WE'RE NOT SURE WHAT THE RELEVANCE COULD BE.  THE COURT HAS
```

08:32AM 1    CERTAINLY HEARD PRIOR ARGUMENT THROUGHOUT THIS CASE ABOUT THE

08:32AM 2    RELEVANCE OF 2016 AND BEYOND TESTIMONY, AND WHILE IN CERTAIN

08:33AM 3    INSTANCES IT IS RELEVANT, WE DON'T SEE WHAT POSSIBLE RELEVANCE

08:33AM 4    THERE COULD BE FOR THIS WITNESS.

08:33AM 5         SO THAT'S SORT OF ISSUE ONE.

08:33AM 6         ISSUE TWO INVOLVES THE TIMING OF CERTAIN DISCLOSURES

08:33AM 7    RELATED TO THIS WITNESS.  THE DEFENSE INTENDS TO OFFER SOME

08:33AM 8    VIDEO CLIPS THROUGH THIS WITNESS.  THEY DISCLOSED THOSE CLIPS

08:33AM 9    TO US AT 10:00 O'CLOCK LAST NIGHT.

08:33AM 10        THE DEFENSE INTENDS TO OFFER SOME EXHIBITS THROUGH THIS

08:33AM 11   WITNESS.  AND MY UNDERSTANDING IS THAT ONE OF THE EXHIBITS, AT

08:33AM 12   LEAST, WAS DISCLOSED TO US FOR THE FIRST TIME THIS MORNING.

08:33AM 13   AND THAT WAS NOT THE ONLY ONE.  THERE WERE SOME THAT WE DIDN'T

08:33AM 14   HAVE UNTIL YESTERDAY WHEN THEY PROVIDED THEM TO US.

08:33AM 15        SO I'M NOT SURE HOW WE CAN MEANINGFULLY MAKE 106 ARGUMENTS

08:33AM 16   ABOUT THE VIDEO WHEN WE ACTUALLY RECEIVED THE CLIPS AT

08:33AM 17   10:00 O'CLOCK LAST NIGHT.

08:33AM 18        BUT, AGAIN, THAT'S REALLY SECONDARY.  THE PRIMARY POINT IS

08:33AM 19   THAT I'M NOT SURE WHAT THIS WITNESS COULD PROVIDE OF VALUE TO

08:33AM 20   THE JURY AS IT'S DELIBERATING, AND I THINK THE COURT COULD JUST

08:34AM 21   EXCLUDE IT ON THAT BASIS.

08:34AM 22        THE COURT:  ALL RIGHT.  THANK YOU.

08:34AM 23   WHO IS GOING TO SPEAK TO THIS?

08:34AM 24   GOOD MORNING, MS. SAHARIA.  NICE TO SEE YOU AGAIN.

08:34AM 25        MS. SAHARIA:  IT'S NICE TO BE HERE, YOUR HONOR.

08:34AM 1        BEFORE I ADDRESS THE MOTION ON ITS SUBSTANCE, I JUST DO

08:34AM 2    WANT TO ADDRESS THE FACT THAT IT IS SOMEWHAT AWKWARD FOR US TO

08:34AM 3    BE ARGUING ABOUT THE CONTENT OF THE DEFENSE CASE BEFORE THE

08:34AM 4    GOVERNMENT HAS RESTED.

08:34AM 5        I'M HAPPY TO ADDRESS IT NOW IF THE GOVERNMENT IS WILLING

08:34AM 6    TO COMMIT THAT IT'S NOT GOING TO ALTER THE CONTENT OF ITS

08:34AM 7    CASE-IN-CHIEF BASED ON WHAT I SAY TODAY ABOUT WHAT WE EXPECT

08:34AM 8    WILL COME OUT IN THE DEFENSE CASE.

08:34AM 9            THE COURT:  SO THANK YOU.

08:34AM 10       WELL, LET ME ASK YOU THE THRESHOLD QUESTION.  IS THIS

08:34AM 11   WITNESS -- IS IT ANTICIPATED THAT THIS WITNESS WILL TESTIFY

08:34AM 12   THIS MORNING, BE CALLED BY YOUR TEAM THIS MORNING?

08:34AM 13           MS. SAHARIA:  I EXPECT THAT HE WILL BE OUR SECOND

08:34AM 14   WITNESS.  I DON'T KNOW THE TIMING OF WHETHER IT WILL BE THIS

08:34AM 15   MORNING.  I WOULD EXPECT THAT IT WILL BE AFTER THE MORNING

08:34AM 16   BREAK, SO WE COULD TAKE THIS UP WHEN THE GOVERNMENT RESTS SINCE

08:34AM 17   WE'RE GOING TO HAVE TO EXCUSE THE JURY BRIEFLY ANYWAY AT THAT

08:35AM 18   MOMENT.  I WOULD DEFER TO THE COURT.

08:35AM 19       BUT I WOULD WANT THAT COMMITMENT FROM THE GOVERNMENT

08:35AM 20   BEFORE TALKING ABOUT THE CONTENT OF THE DEFENSE CASE.

08:35AM 21           THE COURT:  ALL RIGHT.  THANK YOU.

08:35AM 22       I'M JUST CURIOUS, THERE WERE A COUPLE OF ISSUES THAT

08:35AM 23   MR. SCHENK RAISED, AND ONE OF THEM WAS THE TIMING OF THESE,

08:35AM 24   WHATEVER IT IS THAT YOUR TEAM GAVE TO THE GOVERNMENT, AND THAT

08:35AM 25   CAUSES ME SOME CONCERN ABOUT THE OPPORTUNITY FOR THE GOVERNMENT

08:35AM 1    TO PREPARE IF THIS WITNESS DOES TESTIFY TODAY.  AND THAT MIGHT

08:35AM 2    SUGGEST THAT THE COURT WOULD -- IF THE WITNESS DOES TESTIFY

08:35AM 3    ULTIMATELY, OR IS PERMITTED TO TESTIFY, THAT THE COURT WOULD

08:35AM 4    GIVE, UPON REQUEST BY THE GOVERNMENT, AN OPPORTUNITY TO REVIEW

08:35AM 5    THE DOCUMENTS THAT YOUR TEAM PROVIDES.

08:35AM 6        MS. SAHARIA:  SURE.  I'LL LET MS. TREFZ SPEAK AS TO

08:35AM 7    PARTICULAR EXHIBITS.

08:35AM 8        BUT AS TO THE CLIPS, I WOULD JUST NOTE THEY'RE NOT AUDIO

08:35AM 9    CLIPS, IT'S JUST VIDEO.  THERE IS NOT GOING TO BE ANY AUDIO

08:35AM 10   PLAYED WITH THOSE CLIPS, SO THEREFORE, THERE ARE NO RULE 106

08:36AM 11   ISSUES.  RULE 106 APPLIES TO STATEMENTS AND THERE ARE NO

08:36AM 12   STATEMENTS THAT ACCOMPANY THOSE CLIPS.

08:36AM 13       THE COURT:  ALL RIGHT.

08:36AM 14       MR. SCHENK, DO YOU WANT TO WAIT FOR THE DISCUSSION, OR DO

08:36AM 15   YOU WANT TO MAKE A COMMITMENT NOW AT MS. SAHARIA'S SUGGESTION?

08:36AM 16   OR WHAT ARE YOUR THOUGHTS?

08:36AM 17       MR. SCHENK:  YOUR HONOR, TWO THOUGHTS IN RESPONSE TO

08:36AM 18   THAT.

08:36AM 19       FIRST, I WOULD BE HAPPY TO COMMIT TO NOT AFFECTING OR

08:36AM 20   CHANGING THE GOVERNMENT'S CASE BASED ON STATEMENTS MADE THIS

08:36AM 21   MORNING.

08:36AM 22       I WILL NOTE, THOUGH, THAT THE DEFENSE HAS BEEN PUTTING ON

08:36AM 23   ITS CASE SINCE THE CROSS-EXAMINATION OF THE GOVERNMENT'S FIRST

08:36AM 24   WITNESS THE FIRST TIME MS. SPIVEY TESTIFIED.

08:36AM 25       I HAVEN'T DONE THE CALCULATION IN A COUPLE OF DAYS, BUT I

08:36AM    1    THINK THAT THE DEFENSE HAS HAD ABOUT 65 HOURS OF TRIAL

08:36AM    2    TRANSCRIPT TIME THROUGHOUT THE TRIAL, AND THE GOVERNMENT HAS

08:36AM    3    HAD ABOUT 53 HOURS.  THEY HAVE GONE WELL BEYOND THE SCOPE OF

08:36AM    4    THE DIRECT MANY TIMES AND THE COURT HAS ALLOWED THAT.

08:36AM    5         BUT THE DEFENSE CASE HAS BEGUN.  AND TO SUGGEST THAT THE

08:36AM    6    DEFENSE IS NOW GOING TO START PUTTING ON WITNESSES I THINK IS

08:36AM    7    DIFFERENT THAN WHAT THE RECORD SHOWS.

08:36AM    8         BUT I'M HAPPY TO AGREE TO NOT CHANGE THE GOVERNMENT'S CASE

08:37AM    9    BASED UPON ARGUMENT THIS MORNING.

08:37AM   10              THE COURT:  ALL RIGHT.  WELL, THANK YOU.

08:37AM   11         MS. SAHARIA, YOU HAVE THAT ASSURANCE.

08:37AM   12              MS. SAHARIA:  GREAT.

08:37AM   13              THE COURT:  WHAT WOULD YOU LIKE ME TO KNOW?

08:37AM   14              MS. SAHARIA:  GREAT.

08:37AM   15         WELL, LET ME DISCUSS THE RELEVANCE OF DR. BONANNI'S

08:37AM   16    TESTIMONY AND, MORE GENERALLY, EVENTS OCCURRING IN 2016 AND

08:37AM   17    LATER.

08:37AM   18         JUST FOR THE COURT'S BACKGROUND, DR. BONANNI WAS A BOARD

08:37AM   19    MEMBER AT THERANOS.  HE JOINED THE BOARD IN MAY 2016 AND HE

08:37AM   20    STAYED UNTIL THE END OF THE COMPANY IN 2018.  HE HELPED GUIDE

08:37AM   21    THE COMPANY AND MS. HOLMES THROUGH THE BUSINESS CHALLENGES THAT

08:37AM   22    THEY WERE FACING AT THE TIME.

08:37AM   23         HE OVERLAPPED ON THE BOARD WITH THE ONLY DIRECTOR THE

08:37AM   24    GOVERNMENT HAS CALLED IN THIS CASE, WHICH WAS GENERAL MATTIS.

08:37AM   25    THEY SERVED ON THE BOARD TOGETHER AT THE SAME TIME.

7023

08:37AM    1        AND HE SERVED ON THE BOARD AT THE TIME THAT THE GOVERNMENT

08:37AM    2   ALLEGES AT LEAST ONE OF THE CONSPIRACIES TOOK PLACE.  THE

08:37AM    3   GOVERNMENT'S ALLEGATIONS AND THE INDICTMENT IN PARAGRAPH 22 IS

08:37AM    4   THAT THE PATIENT FOCUSSED CONSPIRACY LASTED THROUGH 2016 AT A

08:38AM    5   TIME WHEN DR. BONANNI WAS ON THE BOARD.

08:38AM    6        THAT'S JUST BACKGROUND ON WHO HE IS.

08:38AM    7        THE GOVERNMENT HAS AT TIMES SUGGESTED THROUGHOUT THIS CASE

08:38AM    8   THAT EVENTS IN 2016 ARE NOT RELEVANT.  AS I'M GOING TO SHOW THE

08:38AM    9   COURT, THAT IS NOT A CONSISTENT POSITION THAT THEY HAVE TAKEN.

08:38AM   10   THEY HAVE THEMSELVES INJECTED THOSE EVENTS INTO THE CASE

08:38AM   11   THEMSELVES.

08:38AM   12        WE HAVE SOUGHT TO WORK AROUND THAT IN THEIR CASE AS -- IN

08:38AM   13   ORDER TO MOVE THE CASE ALONG, BUT AS WE'RE NOW ENTERING THE

08:38AM   14   DEFENSE CASE, IT IS CRITICAL THAT WE ARE PERMITTED TO PRESENT

08:38AM   15   WHAT WE VIEW AS CRITICAL DEFENSE EVIDENCE RELEVANT TO THE

08:38AM   16   CAPACITY OF THERANOS'S TECHNOLOGY AND RELEVANT TO MS. HOLMES'S

08:38AM   17   INTENT, AND THAT DIRECTLY REBUTS EVIDENCE THE GOVERNMENT

08:38AM   18   ELICITED IN ITS CASE.

08:38AM   19        LET ME START WITH HOW DR. BONANNI'S TESTIMONY WILL BE

08:38AM   20   RELEVANT TO THE CAPABILITIES OF THERANOS'S TECHNOLOGY.  THIS IS

08:38AM   21   AN ALLEGATION IN PARAGRAPH 12(A) OF THE INDICTMENT.  THAT

08:39AM   22   PARAGRAPH ALLEGES THAT MS. HOLMES KNOWINGLY MADE FALSE

08:39AM   23   STATEMENTS CONCERNING THE CAPABILITIES OF THERANOS'S

08:39AM   24   PROPRIETARY ANALYZER, THE TSPU, EDISON, OR MINILAB.

08:39AM   25        DR. BONANNI WE EXPECT WILL TESTIFY ABOUT THE CAPABILITIES

08:39AM 1    OF THE MINILAB.

08:39AM 2         THE GOVERNMENT ALSO PUT THIS AT ISSUE IN ITS OPENING

08:39AM 3    STATEMENT.  THIS IS AT PAGE 539 OF THE TRANSCRIPT.

08:39AM 4         "THE DEFENDANT DECEIVED INVESTORS ABOUT THE CAPABILITIES

08:39AM 5    AND READINESS OF THE THERANOS MINIATURE BLOOD ANALYZER.

08:39AM 6    THERANOS'S BLOOD ANALYZER WENT BY MANY NAMES, EDISON 3.5, 4.0,

08:39AM 7    4S MINILAB, AND THERANOS SAMPLE PROCESSING UNIT."

08:39AM 8         DURING THE ENTIRETY OF THE CONSPIRACY PERIOD IN THIS CASE,

08:39AM 9    THE MINILAB IS THE PRODUCT THAT THE COMPANY WAS WORKING ON.  IT

08:39AM 10   IS THE DEVICE THAT ROGER PARLOFF DESCRIBED YESTERDAY SEEING IN

08:39AM 11   THE BOIES SCHILLER OFFICES AND HAD HIS BLOOD TESTED ON.  IT IS

08:40AM 12   THE TECHNOLOGY THAT THERANOS OBTAINED AN FDA APPROVAL FOR IN

08:40AM 13   2015.  THAT EVIDENCE CAME INTO THE RECORD THROUGH MR. EDLIN.

08:40AM 14        IT IS THE SAME FUNDAMENTAL TECHNOLOGY THAT MS. HOLMES WAS

08:40AM 15   DESCRIBING TO INVESTORS DURING THE ALLEGED CONSPIRACY.

08:40AM 16        NOW, THE GOVERNMENT OFTEN MERGES THESE VARIOUS FORMS OF

08:40AM 17   TECHNOLOGY, AS THEY DID IN THAT PORTION OF THE OPENING

08:40AM 18   STATEMENT THAT I JUST READ.

08:40AM 19        SO WHEN MS. HOLMES IS DESCRIBING THERANOS TECHNOLOGY TO

08:40AM 20   INVESTORS AND THE CAPACITY OF THAT TECHNOLOGY, THE GOVERNMENT

08:40AM 21   WANTS TO LINK THAT TO THE EDISON DEVICE THAT WAS OPERATING IN

08:40AM 22   THE CLIA LAB WHICH, AS WE BY NOW KNOW, OPERATED A SMALL NUMBER

08:40AM 23   OF TESTS.

08:40AM 24        BUT, IN FACT, THE MINILAB TECHNOLOGY THAT THERANOS WAS

08:40AM 25   WORKING ON THROUGHOUT THE ENTIRE CONSPIRACY PERIOD HAD A MUCH

7025

08:40AM  1    GREATER CAPACITY.

08:40AM  2         DR. BONANNI IS FAMILIAR WITH THAT CAPACITY.  HE'S FAMILIAR

08:41AM  3    WITH THE MINILAB.  AND HE WILL COME IN AND TESTIFY ABOUT THE

08:41AM  4    CAPACITY OF THE MINILAB.

08:41AM  5         THE GOVERNMENT INVITED THIS TESTIMONY ITSELF DURING AN

08:41AM  6    ARGUMENT ABOUT THE ADMISSIBILITY OF MS. HOLMES'S STATEMENTS IN

08:41AM  7    2016 AT THE AAC CONFERENCE.  YOU PROBABLY REMEMBER THERE WAS A

08:41AM  8    LOT OF DISCUSSION ABOUT WHETHER WE COULD PRESENT HER ORAL

08:41AM  9    STATEMENTS AT THAT CONFERENCE, AND THE GOVERNMENT OBJECTED ON

08:41AM  10   THE GROUND THAT IT WAS HEARSAY AT TRANSCRIPT 4591.

08:41AM  11        "WE CERTAINLY OBJECT TO WHOLESALE STATEMENTS BY THE

08:41AM  12   DEFENDANT UNSWORN ABOUT WHAT HER TECHNOLOGY CAN DO.  IF SHE

08:41AM  13   WANTS TO STAND BY THOSE STATEMENTS, SHE SHOULD TAKE THE STAND

08:41AM  14   AND SAY IT UNDER OATH SUBJECT TO CROSS-EXAMINATION."

08:41AM  15        WE ARE BRINGING A WITNESS WHO WILL BE SUBJECT TO OATH,

08:41AM  16   SUBJECT TO CROSS-EXAMINATION TO DESCRIBE WHAT THAT TECHNOLOGY

08:41AM  17   CAN DO.

08:41AM  18        AND, AGAIN, THE TECHNOLOGY THAT DR. BONANNI WILL DESCRIBE

08:41AM  19   THAT HE BECAME FAMILIAR WITH IS THE SAME FUNDAMENTAL TECHNOLOGY

08:41AM  20   THAT THERANOS WAS WORKING ON THROUGHOUT THE CONSPIRACY PERIOD

08:42AM  21   AND THAT MS. HOLMES WAS DESCRIBING TO INVESTORS.

08:42AM  22             THE COURT:  WILL HE TESTIFY TO THAT, THE LAST POINT

08:42AM  23   THAT YOU JUST MADE?  DOES HE HAVE KNOWLEDGE OF THAT?

08:42AM  24             MS. SAHARIA:  I DON'T KNOW IF HE HIMSELF HAS

08:42AM  25   KNOWLEDGE OF THAT, BUT WE EXPECT THE DEFENSE CASE WILL

7026

08:42AM  1    ESTABLISH THAT FACT.

08:42AM  2         NOW, THE GOVERNMENT --

08:42AM  3              THE COURT:  PARDON ME.  IS IT PREMATURE FOR HIM TO

08:42AM  4    TESTIFY ABOUT THAT IF IT'S OUTSIDE OF HIS KNOWLEDGE?

08:42AM  5              MS. SAHARIA:  WELL, I DON'T BELIEVE SO, BECAUSE THE

08:42AM  6    GOVERNMENT ITSELF HAS PUT AT ISSUE THE CAPABILITY OF THE

08:42AM  7    MINILAB TECHNOLOGY IN 2016 IN ITS OWN CASE-IN-CHIEF.  IT DID

08:42AM  8    THAT THROUGH MR. EDLIN, AND IT DID THAT THROUGH SECRETARY

08:42AM  9    MATTIS.

08:42AM  10             THE COURT:  BUT THIS WITNESS WILL, YOU'RE SAYING HE

08:42AM  11   HAS THAT KNOWLEDGE AND HE WILL TESTIFY ABOUT HIS KNOWLEDGE OF

08:42AM  12   THE CAPABILITIES OF MINILAB, NOT EDISON, BUT MINILAB?

08:42AM  13             MS. SAHARIA:  CORRECT.

08:42AM  14             THE COURT:  AND HE WILL TESTIFY ABOUT THAT GIVEN HIS

08:42AM  15   TENURE ON THE BOARD?

08:42AM  16             MS. SAHARIA:  ABSOLUTELY, YOUR HONOR.

08:42AM  17             THE COURT:  OKAY.

08:42AM  18             MS. SAHARIA:  AND LET ME JUST POINT THE COURT TO THE

08:43AM  19   TESTIMONY OF MR. EDLIN AND SECRETARY MATTIS.  THE GOVERNMENT

08:43AM  20   TWICE ASKED MR. EDLIN IN DIRECT EXAMINATION, AND THEN IN

08:43AM  21   REDIRECT, WHY HE LEFT THE COMPANY, AND HE PROVIDED TESTIMONY

08:43AM  22   THAT HE LEFT THE COMPANY BECAUSE HE LOST CONFIDENCE IN THE

08:43AM  23   COMPANY'S REPRESENTATIONS ABOUT THE CAPACITY OF THE TECHNOLOGY.

08:43AM  24        HE LEFT THE COMPANY IN DECEMBER OF 2016.  AND I'LL JUST

08:43AM  25   READ INTO THE RECORD THE SECOND OF THESE COLLOQUIES BECAUSE I

08:43AM  1    THINK IT'S QUITE RELEVANT AT PAGE 3304.  THIS IS ON REDIRECT.

08:43AM  2    THIS WAS THE LAST Q AND A OF THE ENTIRE REDIRECT.

08:43AM  3         "QUESTION:  REMIND US WHEN YOU DECIDED TO LEAVE THERANOS.

08:43AM  4         "ANSWER:  DECEMBER OF 2016.

08:43AM  5         "QUESTION:  AND WHEN YOU MENTIONED THAT PART OF YOUR

08:43AM  6    REASON TO LEAVE WAS ABOUT THE DESIRE TO ATTEND BUSINESS SCHOOL?

08:43AM  7         "ANSWER:  YES.

08:43AM  8         "QUESTION:  AND WERE THERE ALSO THINGS ABOUT THERANOS OR

08:43AM  9    THINGS THAT YOU UNDERSTOOD THAT CAUSED YOU TO NO LONGER WANT TO

08:43AM  10   WORK THERE?

08:43AM  11        "ANSWER.  YES.

08:43AM  12        "QUESTION:  CAN YOU SUMMARIZE THOSE FOR US?

08:43AM  13        "ANSWER:  WELL, IN THE YEAR AFTER THE INITIAL

08:44AM  14   "WALL STREET JOURNAL" ARTICLES CAME OUT, THE COMPANY CLAIMED

08:44AM  15   THAT IT WOULD BE ABLE TO PROVE THAT THE TECHNOLOGY WORKED, AND

08:44AM  16   PROVE THAT THOSE CLAIMS WERE NOT TRUE, AND THAT THE COMPANY WAS

08:44AM  17   UNABLE TO CONVINCE ANYONE THAT THOSE CLAIMS WERE UNTRUE AND

08:44AM  18   THAT ITS TECHNOLOGY AND SCIENCE WORKED, AND THAT GAVE ME

08:44AM  19   SERIOUS DOUBTS AS TO WHETHER THE COMPANY WAS CAPABLE OF PROVING

08:44AM  20   THAT THE TECHNOLOGY WORKED.

08:44AM  21        "AND THERE WERE A NUMBER OF DIFFERENT OPPORTUNITIES THAT

08:44AM  22   THE COMPANY HAD TO PROVE ITSELF, AND THEY WERE ALL UNSUCCESSFUL

08:44AM  23   AND I ULTIMATELY REACHED THE CONCLUSION THAT THOSE ATTEMPTS

08:44AM  24   WERE UNSUCCESSFUL BECAUSE THEY COULDN'T HAPPEN AND THEY WERE

08:44AM  25   NEVER GOING TO HAPPEN."

7028

08:44AM 1        DR. BONANNI WILL REBUT THAT TESTIMONY.  HE WILL, WE

08:44AM 2    EXPECT, SAY THAT HE BELIEVED THE TECHNOLOGY AND SCIENCE WORKED.

08:44AM 3    HE WILL DESCRIBE THE EFFORTS THE COMPANY TOOK TO PROVE ITSELF,

08:44AM 4    AND HE WILL DESCRIBE WHAT HE VIEWED AS THE SUCCESSES IN THOSE

08:44AM 5    EFFORTS TO PROVE ITSELF.

08:44AM 6        THE COURT:  THOSE EFFORTS, WHAT IS THE TIMING OF

08:44AM 7    THOSE EFFORTS THAT HE WILL TESTIFY TO?

08:44AM 8        MS. SAHARIA:  I BELIEVE THEY ARE IN 2016, AND THEN

08:45AM 9    PERHAPS EVEN INTO 2017.  I'M NOT SURE ABOUT THE SPECIFIC TIMING

08:45AM 10   OF THOSE.

08:45AM 11       BUT THESE ARE THE SAME EFFORTS THAT MR. EDLIN WAS SAYING

08:45AM 12   WERE UNSUCCESSFUL AND MR. BONANNI IS GOING TO REBUT THE

08:45AM 13   TESTIMONY FROM MR. EDLIN.

08:45AM 14       THE COURT:  WELL, FIRST OF ALL, MR. EDLIN DIDN'T

08:45AM 15   TALK ABOUT 2017.

08:45AM 16       MS. SAHARIA:  THAT'S CORRECT.  HE WENT THROUGH THE

08:45AM 17   END OF DECEMBER OF 2016.

08:45AM 18       THE COURT:  RIGHT.  SO THERE SHOULD BE A LIMITATION

08:45AM 19   AS TO THE REBUTTAL.

08:45AM 20       MS. SAHARIA:  WELL, IF ALL HE'S DOING IS REBUTTING,

08:45AM 21   I WOULD -- PERHAPS.

08:45AM 22       BUT WE THINK HIS TESTIMONY MORE BROADLY SPEAKS TO

08:45AM 23   MS. HOLMES'S INTENT, WHICH I'M GOING TO REACH IN A MINUTE, AS

08:45AM 24   WELL AS THE CAPACITY OF THE TECHNOLOGY IN GENERAL.

08:45AM 25       AND WE'RE ALLOWED TO REBUT PARAGRAPH 12(A) OF THE

08:45AM 1    INDICTMENT WITH OUR OWN EVIDENCE, AND HIS TESTIMONY WILL SPEAK

08:45AM 2    TO THAT, TO THAT ALLEGATION.

08:45AM 3            THE COURT:  WHERE -- WHAT IS THE ISSUE AS TO

08:45AM 4    MS. HOLMES'S INTENT?

08:45AM 5            MS. SAHARIA:  SURE.

08:45AM 6            THE COURT:  AND WHAT IS THE INTENT ISSUE?

08:46AM 7            MS. SAHARIA:  WELL, SO THE INTENT ISSUE IS THAT THE

08:46AM 8    GOVERNMENT HAS, AGAIN, PUT INTO EVIDENCE THROUGH A SERIES OF

08:46AM 9    WITNESSES EVIDENCE INTENDING TO SUGGEST THAT MS. HOLMES'S

08:46AM 10   EFFORTS TO ADDRESS CONCERNS AFTER THOSE CONCERNS WERE RAISED

08:46AM 11   WERE NOT GENUINE.

08:46AM 12       THE GOVERNMENT HAS ARGUED THAT THOSE -- AND I'LL SPEAK TO

08:46AM 13   THOSE -- THAT THOSE ARE EVIDENCE OF CONSCIOUSNESS OF GUILT.

08:46AM 14   THEY HAVE SPECIFICALLY ARGUED THAT THE LACK OF GENUINENESS IS

08:46AM 15   EVIDENCE THAT SHE DID NOT BELIEVE THAT THE TECHNOLOGY WORKED,

08:46AM 16   AND THAT IT GOES TO HER STATE OF MIND.

08:46AM 17       AND LET ME JUST GIVE THE COURT THREE EXAMPLES.

08:46AM 18       FIRST OF ALL, GENERAL MATTIS.  THE GOVERNMENT ELICITED

08:46AM 19   TESTIMONY FROM GENERAL MATTIS -- THIS IS AT 1593 OF THE

08:46AM 20   TRANSCRIPT -- THAT HE AND OTHER MEMBERS OF THE BOARD

08:46AM 21   RECOMMENDED THAT THE COMPANY ENGAGED IN COMPARATIVE TESTING OR

08:46AM 22   BLIND TESTING OF THE DEVICES, AND THAT THAT DIDN'T HAPPEN.

08:47AM 23       THIS IS AN ALLEGATION IN THE GOVERNMENT'S 404(B) NOTICE

08:47AM 24   THAT THEY SERVED ON US A LONG TIME AGO WHERE THEY ARGUE THAT

08:47AM 25   THAT IS EVIDENCE OF CONSCIOUSNESS OF GUILT.

7030

08:47AM 1        DR. BONANNI, WHO SERVED ON THE BOARD AT THE SAME TIME AS

08:47AM 2    GENERAL MATTIS, WILL REBUT THAT TESTIMONY.  WE EXPECT HIM TO

08:47AM 3    DESCRIBE TO THE COMPANY -- TO DESCRIBE TO THE JURY THE

08:47AM 4    DIFFERENT OPTIONS AVAILABLE TO THERANOS FOLLOWING "THE

08:47AM 5    WALL STREET JOURNAL" ARTICLE, THE PROS AND CONS OF THOSE

08:47AM 6    APPROACHES, WHAT HE RECOMMENDED TO THE COMPANY, WHY HE

08:47AM 7    RECOMMENDED THAT THE COMPANY PURSUE FDA APPROVAL AS OPPOSED TO

08:47AM 8    THE COMPARATIVE TESTING THAT GENERAL MATTIS WAS SUGGESTING, AND

08:47AM 9    WHY THE COMPANY ULTIMATELY AGREED WITH DR. BONANNI'S APPROACH

08:47AM 10   AND NOT WITH GENERAL MATTIS'S APPROACH.

08:47AM 11       SO THAT TESTIMONY DIRECTLY REBUTS THE SUGGESTION FROM THE

08:47AM 12   GOVERNMENT THAT THE LACK OF ENGAGEMENT AND COMPARATIVE TESTING

08:47AM 13   SOMEHOW SHOWS CONSCIOUSNESS OF GUILT.

08:47AM 14       DR. DAS.

08:48AM 15       THE GOVERNMENT ELICITED TESTIMONY FROM DR. DAS AT 5824 AND

08:48AM 16   5834 ABOUT SUPPOSED PUSH BACK FROM MS. HOLMES THAT HE RECEIVED

08:48AM 17   WHEN HE RAISED ISSUES IN THE CLINICAL LAB.

08:48AM 18       AND WHEN WE HAD ARGUMENT ABOUT THAT AND ARGUMENT ABOUT THE

08:48AM 19   VOIDING ISSUE IN PARTICULAR, THE GOVERNMENT ARGUED, THIS IS A

08:48AM 20   QUOTE, DR. DAS WILL SAY THAT WHEN HE TOLD MS. HOLMES WE NEED TO

08:48AM 21   VOID THE TESTS, HE GOT PUSH BACK.  SHE DID NOT WANT TO DO THAT.

08:48AM 22   SHE CAME UP WITH ALTERNATIVE REASONS FOR IT, AND THAT PUSH BACK

08:48AM 23   IS CONSCIOUSNESS OF GUILT.  IT GOES TO HER STATE OF MIND ABOUT

08:48AM 24   THERANOS'S TECHNOLOGY."  THAT'S AT 5589 AND -90.

08:48AM 25       AND THEN ON THE NEXT PAGE AGAIN THE GOVERNMENT SAYS, "THE

08:48AM  1    WHOLE TRUTH HERE IS THEY CAME UP WITH AN EXPLANATION FOR WHY

08:48AM  2    THEY WERE VOIDING THE TESTS, THEY MINIMIZED THOSE ISSUES TO

08:48AM  3    THEIR INVESTORS, AND WHEN SHE'S GOING TO ACC AND THESE OTHER

08:48AM  4    THINGS, IT'S A PR SPIN, NOT GENUINE INDICATION OF CONFIDENCE IN

08:49AM  5    HER TECHNOLOGY.  IT GOES RIGHT TO HER STATE OF MIND."  THAT'S

08:49AM  6    AT 5590.

08:49AM  7        AND THEN WE HEARD FROM LISA PETERSON THE SAME TYPE OF

08:49AM  8    EVIDENCE, THAT SHE BELIEVED THAT MS. HOLMES WAS NOT BEING

08:49AM  9    FORTHCOMING, THAT SHE WAS DOWNPLAYING THE ISSUES THAT WERE

08:49AM 10    OCCURRING IN THE PRESS THAT SUGGESTED THAT MS. HOLMES WAS NOT

08:49AM 11    TAKING THESE ISSUES SERIOUSLY, AGAIN, AS EVIDENCE OF

08:49AM 12    CONSCIOUSNESS OF GUILT.

08:49AM 13        DR. BONANNI WILL REBUT ALL OF THIS TESTIMONY.  HE WILL

08:49AM 14    SPEAK TO MS. HOLMES'S STATE OF MIND IN, IN SEEKING PROACTIVELY

08:49AM 15    TO CORRECT ISSUES IN THE COMPANY.  HE WILL TESTIFY TO HER

08:49AM 16    ACTIONS IN 2016 AND BRINGING OUTSIDERS INTO THE COMPANY TO

08:49AM 17    EXAMINE THE TECHNOLOGY, NEW DIRECTORS, LIKE HIMSELF, WITH

08:49AM 18    RELEVANT EXPERTISE IN THE AREA OF MEDICAL TECHNOLOGY, MEMBERS

08:49AM 19    OF THE SCIENTIFIC AND MEDICAL ADVISORY BOARD, AND MEMBERS OF

08:50AM 20    THE TECHNOLOGY ADVISORY BOARD.

08:50AM 21        HE WAS TESTIFY TO HER EFFORTS TO OBTAIN FDA APPROVAL FOR

08:50AM 22    THE MINILAB TECHNOLOGY DURING THIS TIME, TO PRESENT THAT

08:50AM 23    TECHNOLOGY TO THE FDA FOR REVIEW.

08:50AM 24        HE, WE EXPECT, WILL BE TESTIFYING TO HER WILLINGNESS TO

08:50AM 25    EXPOSE THE TECHNOLOGY TO INDUSTRY SCRUTINY AT THE AAC

7032

08:50AM  1    CONFERENCE.

08:50AM  2          AND HE WILL TESTIFY THAT SHE BELIEVED IN THE TECHNOLOGY

08:50AM  3    UNTIL THE VERY END.

08:50AM  4          THE COURT:  AND SO, MS. SAHARIA, LET ME ASK YOU, HOW

08:50AM  5    WILL HE TESTIFY AS TO THOSE ISSUES?  IS HE GOING TO SAY

08:50AM  6    "ELIZABETH HOLMES TOLD ME X"?  IS THAT THE PROPOSED TESTIMONY?

08:50AM  7          MS. SAHARIA:  NO.  HE HAS PERSONAL KNOWLEDGE OF ALL

08:50AM  8    OF THOSE ACTIONS.

08:50AM  9          THE COURT:  WELL, HE COULD -- IF SHE SAID THAT TO

08:50AM 10    HIM, THAT'S PERSONAL KNOWLEDGE.

08:50AM 11          SO I'M JUST TRYING TO DETERMINE WHAT, WHAT IS THE NATURE

08:50AM 12    OF THAT?  WILL HE BE TALKING ABOUT HIS OBSERVATIONS?

08:50AM 13          MS. SAHARIA:  OF COURSE, YOUR HONOR.  HE WAS THERE

08:50AM 14    AT THE COMPANY ADVISING MS. HOLMES, INTERACTING WITH OTHER,

08:50AM 15    OTHER MEMBERS OF THE COMPANY.

08:51AM 16          HE HAS PERSONAL KNOWLEDGE NOT JUST BECAUSE SHE TOLD HIM.

08:51AM 17    HE HAS PERSONAL KNOWLEDGE FROM HIS OWN ACTIONS AT THE COMPANY.

08:51AM 18          THE COURT:  DO YOU SEE WHAT I'M PROBING AS TO

08:51AM 19    WHETHER OR NOT THERE'S GOING TO BE HEARSAY OBJECTIONS AS TO

08:51AM 20    WHAT SHE TOLD HIM?

08:51AM 21          MS. SAHARIA:  THE GOVERNMENT, IN MY VIEW, HAS AN

08:51AM 22    OVERLY BROAD VIEW OF HEARSAY, SO WE MAY VERY WELL MAY HAVE

08:51AM 23    OBJECTIONS.  BUT I THINK THAT'S AN ISSUE TO TAKE UP ON A

08:51AM 24    QUESTION BY QUESTION BASIS.

08:51AM 25          RIGHT NOW WE'RE JUST HERE TALKING ABOUT RELEVANCE, AND HE

7033

08:51AM   1    DOES HAVE PERSONAL KNOWLEDGE OF THESE ISSUES.

08:51AM   2              THE COURT:  NO, THAT'S RIGHT.  JUST BECAUSE THE

08:51AM   3    JUDGE TYPICALLY GETS TO MANAGE THE COURSE OF EVIDENCE.

08:51AM   4              MS. SAHARIA:  UNDERSTOOD.

08:51AM   5              THE COURT:  AND WE HAVE LIMITED DAYS AVAILABLE TO US

08:51AM   6    AS THE HOLIDAYS LOOM, I'M TRYING TO DETERMINE HOW MUCH TIME WE

08:51AM   7    NEED TO SET ASIDE FOR ANY PROPOSED TESTIMONY AND ANTICIPATE

08:51AM   8    WHETHER OR NOT THERE'S GOING TO BE LENGTHY DISCUSSION ABOUT

08:51AM   9    ADMISSIBILITY ISSUES.

08:51AM  10              MS. SAHARIA:  I WOULD HOPE NOT, YOUR HONOR.

08:51AM  11              THE COURT:  THAT'S WHY I'M ASKING THE QUESTION.  BUT

08:51AM  12    HOPE SPRINGS ETERNAL, DOESN'T IT?  AND WE'VE LEARNED THAT.

08:51AM  13         SO TO THE EXTENT THAT WE CAN RESOLVE THOSE ISSUES IN

08:52AM  14    ADVANCE, I WOULD BE GRATEFUL.  I KNOW THE JURY WOULD BE

08:52AM  15    GRATEFUL.

08:52AM  16              MS. SAHARIA:  UNDERSTOOD, YOUR HONOR.

08:52AM  17              THE COURT:  THAT ALSO POINTS TO -- PARDON ME FOR

08:52AM  18    INTERRUPTING YOU.  BUT THAT ALSO POINTS TO RESOLVING ANY

08:52AM  19    EVIDENTIARY ISSUES IN ADVANCE, LIKE WE'RE DOING NOW IN THE

08:52AM  20    MORNING, INCLUDING, FROM THE GOVERNMENT'S PERSPECTIVE, LATE

08:52AM  21    DISCLOSURES WHICH CAUSES DELAY AS WE KNOW.

08:52AM  22         I'M NOT BEING CRITICAL HERE.  I'M POINTING OUT WHAT HAS

08:52AM  23    BEEN BROUGHT TO MY ATTENTION THIS MORNING.

08:52AM  24              MS. SAHARIA:  I THINK ALL PARTIES HAVE OPERATED IN

08:52AM  25    GOOD FAITH DURING TRIAL.  I KNOW WE HAVE RECEIVED NEW EXHIBITS

7034

08:52AM  1      FROM THE GOVERNMENT LATE THE NIGHT BEFORE.  IT'S A FACT OF

08:52AM  2      TRIAL, YOUR HONOR.

08:52AM  3              THE COURT:  IT'S A PHENOMENON OF TRIALS, THAT'S

08:52AM  4      RIGHT.

08:52AM  5              MS. SAHARIA:  YES, IT IS.

08:52AM  6              THE COURT:  I RECOGNIZE THAT.

08:52AM  7              MS. SAHARIA:  LET ME JUST, IF I MAY MAKE CLEAR, YOUR

08:52AM  8      HONOR, IRRESPECTIVE OF THE FACT THAT WE THINK THE GOVERNMENT

08:52AM  9      HAS PUT INTO ISSUE HER STATE OF MIND IN 2016, DR. BONANNI WE

08:52AM  10     EXPECT WILL TESTIFY TO ACTIONS OF SOMEONE THAT, THAT GENUINELY

08:52AM  11     BELIEVES IN THE CAPABILITIES OF HER TECHNOLOGY.

08:53AM  12         IF MS. HOLMES DID NOT BELIEVE IN THE CAPABILITY OF THE

08:53AM  13     MINILAB, OF THERANOS'S TECHNOLOGY, OUR ARGUMENT IS THAT SHE

08:53AM  14     WOULD NOT HAVE BROUGHT IN INDUSTRY EXPERTS TO SCRUTINIZE THAT

08:53AM  15     TECHNOLOGY.  SHE WOULD NOT HAVE EXPOSED IT TO INDUSTRY PUBLICLY

08:53AM  16     AT A CONFERENCE.  SHE WOULD NOT HAVE CONTINUED ENGAGING WITH

08:53AM  17     THE FDA TO OBTAIN FDA APPROVAL FOR THAT TECHNOLOGY.

08:53AM  18         THAT IS A CORE ELEMENT OF OUR DEFENSE.  IT GOES DIRECTLY

08:53AM  19     TO HER STATE OF MIND, AND IMPOSING SOME SORT OF ARBITRARY TIME

08:53AM  20     LIMIT ON DEFENSE EVIDENCE, INCLUDING MR. BONANNI, WOULD DEPRIVE

08:53AM  21     US OF OUR CONSTITUTIONAL RIGHT TO PRESENT THE DEFENSE OF OUR

08:53AM  22     CHOOSING.

08:53AM  23              THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM  24              MR. SCHENK:  A FEW RESPONSES.

08:53AM  25          FIRST, YOUR HONOR, THE DEFENSE HAS SUGGESTED TO THE COURT

7035

08:53AM 1    THAT THEY ANTICIPATE DR. BONANNI TO TESTIFY IN CERTAIN WAYS.  I

08:53AM 2    FIND THAT SURPRISING.  WE HAVE NOT RECEIVED ANY JENCKS

08:53AM 3    STATEMENTS REGARDING WHAT DR. BONANNI WOULD TESTIFY TO.

08:53AM 4         MY UNDERSTANDING IS THAT THEY HAVEN'T MET WITH HIM AND

08:54AM 5    ASKED HIM THESE QUESTIONS.  OTHERWISE I'M SURE WE WOULD HAVE

08:54AM 6    RECEIVED THOSE STATEMENTS.

08:54AM 7         SO I'M SURPRISED TO HEAR THAT THEY HAVE A VIEW ON WHAT HIS

08:54AM 8    TESTIMONY WOULD BE.

08:54AM 9         SECOND, MS. SAHARIA STARTED HER ARGUMENT BY SAYING TO THE

08:54AM 10   COURT THAT THE PATIENT CONSPIRACY WENT INTO 2016, AND THEN SHE

08:54AM 11   PIVOTED TO TELLING THE COURT REPRESENTATIONS THAT MS. HOLMES

08:54AM 12   MADE TO INVESTORS ARE WHAT MAKES DR. BONANNI'S TESTIMONY

08:54AM 13   RELEVANT.

08:54AM 14        THE GOVERNMENT ALLEGED THAT THE INVESTOR CONSPIRACY ENDED

08:54AM 15   IN 2015.  MS. HOLMES'S LULLING STATEMENTS AFTER THE FACT ARE

08:54AM 16   RELEVANT AND THE GOVERNMENT HAS ALWAYS BEEN CONSISTENT WITH THE

08:54AM 17   COURT ON THAT POSITION.

08:54AM 18        BUT TO SUGGEST THAT THE PATIENT CONSPIRACY WENT INTO 2016

08:54AM 19   AND DR. BONANNI SHOULD NOW BE ALLOWED TO TESTIFY BECAUSE HE CAN

08:54AM 20   PROVIDE USEFUL INSIGHT INTO WHAT MS. HOLMES'S INTENT WAS FOR

08:54AM 21   THE INVESTOR SCHEME FOR STATEMENTS MADE TO INVESTORS IN 2013 OR

08:54AM 22   2014 DOES NOT CONNECT.  AND I THINK WE NOW SEE WHY THE COURT

08:55AM 23   CAN EXCLUDE THIS TESTIMONY.

08:55AM 24        ONE FINAL POINT.  THE REPRESENTATIONS REGARDING THE

08:55AM 25   RELEVANCE OF DR. BONANNI'S TESTIMONY, INCLUDING STATEMENTS SUCH

7036

08:55AM  1    AS THERE WAS A DISPUTE AT THERANOS ABOUT WHETHER YOU SHOULD,

08:55AM  2    ACCORDING TO GENERAL MATTIS, SEEK COMPARATIVE TESTING.

08:55AM  3    DR. BONANNI'S PREFERENCE WAS FDA.

08:55AM  4        I'M NOT SURE HOW DR. BONANNI GETTING ON THE STAND AND

08:55AM  5    SAYING, "MY PREFERENCE WAS TO PURSUE THE FDA PATH" SAYS

08:55AM  6    ANYTHING ABOUT MS. HOLMES'S STATE OF MIND.

08:55AM  7        AGAIN, DR. BONANNI'S STATEMENTS, IF THE COURT ALLOWED THEM

08:55AM  8    IN, WON'T SPEAK TO WHAT WAS IN MS. HOLMES'S MIND VIS-A-VIS

08:55AM  9    PREFERENCES, WHAT SHE WANTED TO DO VERSUS AN AVENUE OF FUTURE

08:55AM 10    PURSUANT FOR THERANOS THAT SHE DIDN'T WANT TO DO.

08:55AM 11        THEY'RE GOING TO CALL SOMEONE WHO CAME ON TO THE SCENE

08:55AM 12    AFTER THE CRIME HAD BEEN COMMITTED TO SAY WHAT THE LANDSCAPE

08:55AM 13    LOOKED LIKE AT THAT TIME.

08:55AM 14        HE WON'T HAVE ANYTHING RELEVANT TO SAY ABOUT THE INVESTOR

08:55AM 15    SIDE, WHICH, AGAIN, IS WHAT HE REALLY DOES SPEAK TO, EVEN TO

08:56AM 16    THE EXTENT THAT THE DEFENSE PROFFERS IT.  IT'S INVESTOR SIDE

08:56AM 17    TESTIMONY, IT'S NOT PATIENT SIDE TESTIMONY.

08:56AM 18        AND AS MS. SAHARIA JUST CORRECTLY POINTED OUT TO THE

08:56AM 19    COURT, IT'S THE PATIENT SIDE CONSPIRACY THAT GOES INTO 2016.

08:56AM 20    THAT'S WHY I STARTED MY ARGUMENT THIS MORNING WITH YOUR HONOR

08:56AM 21    FOCUSSING ON DR. DAS, WHO DESCRIBED THE VOIDING OF THE TESTS OF

08:56AM 22    THERANOS IN THE MARCH TIMEFRAME OF 2016.

08:56AM 23        MS. SAHARIA:  JUST I THINK THREE POINTS,

08:56AM 24    YOUR HONOR -- FOUR POINTS.

08:56AM 25        WE HAVE COMPLIED WITH OUR JENCKS OBLIGATION.  WE HAVE NO

08:56AM  1    WRITTEN STATEMENTS FROM MR. BONANNI TO PRODUCE OTHER THAN WHAT

08:56AM  2    WE HAVE PRODUCED TO THE GOVERNMENT.  I DON'T KNOW WHAT ELSE TO

08:56AM  3    SAY.  WE'RE IN COMPLIANCE WITH OUR JENCKS OBLIGATION.

08:56AM  4        I HEARD MR. SCHENK ARGUE THAT LULLING STATEMENTS THAT

08:56AM  5    OCCURRED IN 2016 ARE RELEVANT.

08:56AM  6        IF THAT'S THE CASE, I DON'T SEE HOW THE GOVERNMENT CAN

08:56AM  7    ARGUE THAT MR. BONANNI CAN'T TESTIFY TO SIMILAR ACTIONS BY

08:56AM  8    MS. HOLMES THAT SHOW THAT SHE WAS NOT INTENDING TO LULL

08:56AM  9    INVESTORS, THAT SHE WAS NOT INTENDING TO DECEIVE THE PUBLIC IN

08:57AM  10   2016, THAT SHE WAS ENGAGED IN GOOD FAITH IN TRYING TO CORRECT

08:57AM  11   ISSUES AT THE COMPANY.

08:57AM  12       WITH RESPECT TO THE ISSUE OF HIS PREFERENCE AS TO WHAT

08:57AM  13   ACTIONS THE COMPANY SHOULD TAKE WITH RESPECT TO FDA APPROVAL

08:57AM  14   VERSUS COMPARATIVE TESTING, THE GOVERNMENT ELICITED FROM

08:57AM  15   GENERAL MATTIS WHAT HIS PREFERENCE WAS, AND THEY WANT TO USE

08:57AM  16   THAT, AS THEY'VE MADE VERY CLEAR IN THEIR 404(B) NOTICE, TO

08:57AM  17   ARGUE TO THE JURY THAT MS. HOLMES HAD THE INTENT TO DECEIVE

08:57AM  18   BECAUSE SHE DIDN'T PUT HER TECHNOLOGY TO COMPARATIVE TESTING

08:57AM  19   AND THAT REFLECTS HER KNOWLEDGE THAT THE TECHNOLOGY WAS NOT

08:57AM  20   CAPABLE OF DOING WHAT SHE HAD SAID.

08:57AM  21       IT'S HIGHLY RELEVANT TO HER STATE OF MIND THAT SHE

08:57AM  22   RECEIVED COMPETING ADVICE FROM ANOTHER MEMBER OF HER BOARD.

08:57AM  23       AND THAT, BY THE WAY, IS THE ADVICE THAT THE COMPANY

08:57AM  24   ULTIMATELY TOOK.  THAT'S, OF COURSE, RELEVANT TO HER STATE OF

08:57AM  25   MIND AND TO REBUTTING THE GOVERNMENT'S THEORY.

7038

08:58AM   1        AND THEN ON THE POINT OF THE INVESTOR CONSPIRACY, AS I

08:58AM   2    SAID, HE WILL TESTIFY TO THE CAPACITY OF THE MINILAB

08:58AM   3    TECHNOLOGY.  IT'S CLEARLY RELEVANT TO THE INVESTOR CONSPIRACY.

08:58AM   4    IT'S ALLEGED IN THE INDICTMENT AT PARAGRAPH 12(A), AND WE'RE

08:58AM   5    ENTITLED TO BRING A WITNESS TO DESCRIBE TO THE JURY WHAT THAT

08:58AM   6    TECHNOLOGY WAS CAPABLE OF DOING.

08:58AM   7        MR. SCHENK:  JUST BRIEFLY ON THE JENCKS ISSUE,

08:58AM   8    YOUR HONOR.

08:58AM   9        IT SOUNDS LIKE THE DEFENSE HAS MET WITH WITNESSES, BUT

08:58AM  10    JUST IS NOT WRITING THINGS DOWN.  I CANNOT IMAGINE THAT THE

08:58AM  11    DEFENSE WOULD HAVE FOUND THAT AN ACCEPTABLE POSITION FOR THE

08:58AM  12    GOVERNMENT TO TAKE IN THIS CASE.  THAT TROUBLES ME.  AND I'M

08:58AM  13    SURPRISED TO HEAR THAT THAT'S AN OKAY POSITION ONE WAY WHEN

08:58AM  14    JENCKS OBLIGATIONS ARE RECIPROCAL.

08:58AM  15        MS. SAHARIA:  JENCKS APPLIES TO WRITTEN STATEMENTS.

08:58AM  16    THE GOVERNMENT HAS BRADY OBLIGATION THAT APPLY TO ORAL

08:58AM  17    STATEMENTS.  SO HE'S COMPARING APPLES TO ORANGES, YOUR HONOR.

08:58AM  18        THE COURT:  WELL, THE COMPARISON REALLY IS ABOUT

08:58AM  19    WHAT THE SEARCH FOR TRUTH IN A TRIAL IS, ISN'T IT?  IT'S

08:59AM  20    RESPONSIBILITY, IT'S ACCURACY, IT'S FAIRNESS.

08:59AM  21        AND SOMETIMES WE GET, IN TRIALS, WE GET INTO THESE ISSUES

08:59AM  22    ABOUT FAIRNESS.  IS IT FAIR FOR ONE SIDE TO INTERVIEW A WITNESS

08:59AM  23    FOR 30 HOURS, BUT YET NOT WRITE ANYTHING DOWN SUCH THAT THEY DO

08:59AM  24    AVOID ANY OBLIGATION THAT THE STATUTE REQUIRES TO PROVIDE

08:59AM  25    WRITTEN -- I SUPPOSE SOMEONE COULD DO THAT.

7039

```
08:59AM   1              MS. SAHARIA:  I THINK THAT'S DONE ALL THE TIME,
08:59AM   2      YOUR HONOR, TO BE HONEST.
08:59AM   3              THE COURT:  YES, I THINK IT IS.
08:59AM   4          AND IT'S SUPPOSEDLY -- I GUESS WE CAN LOOK AT IT AND SAY,
08:59AM   5      WELL, IT'S NOT IN THE TRUE SPIRIT OF RECIPROCAL DISCOVERY, IS
08:59AM   6      IT?  IT DOESN'T ALLOW WHAT JENCKS AND RECIPROCAL JENCKS SOUGHT
08:59AM   7      TO DO, WHICH IS TO ALLOW EACH SIDE AN OPPORTUNITY TO PREPARE
08:59AM   8      ACCORDINGLY SO THE TRIAL AND THE JURY CAN BE APPROPRIATELY
08:59AM   9      INFORMED.
08:59AM  10          BUT --
08:59AM  11              MS. SAHARIA:  YOUR HONOR, JENCKS REQUIRES PRODUCTION
09:00AM  12      OF WRITTEN STATEMENTS OF A WITNESS.
09:00AM  13              THE COURT:  I'M --
09:00AM  14              MS. SAHARIA:  WE HAVE PRODUCED ANY WRITTEN
09:00AM  15      STATEMENTS WE HAVE FROM MR. BONANNI.
09:00AM  16              THE COURT:  I UNDERSTAND.
09:00AM  17              MS. SAHARIA:  THE GOVERNMENT HAS PROTOCOLS THAT IT,
09:00AM  18      IT --
09:00AM  19              THE COURT:  YOU DON'T HAVE TO --
09:00AM  20              MS. SAHARIA:  OKAY.
09:00AM  21              THE COURT:  PERHAPS YOU'RE RESPONDING TO MY HIGH
09:00AM  22      LEVEL OBSERVATIONS.  WE KNOW WHAT JENCKS SAYS.  YOU HAVE TO
09:00AM  23      GIVE WRITTEN STATEMENTS.
09:00AM  24          AND AS I SAID, SOMETIMES PEOPLE INTERVIEW A WITNESS FOR
09:00AM  25      DAYS AND THEY DON'T TAKE A NOTEPAD, THEY DON'T TAKE A LAPTOP.
```

09:00AM 1    THEY SOMEHOW AVOID WRITING SOMETHING DOWN SUCH THAT THEY DON'T

09:00AM 2    HAVE AN OBLIGATION.  THAT HAPPENS.  I UNDERSTAND.

09:00AM 3         ALL RIGHT.  WHAT ELSE?

09:00AM 4              MR. SCHENK:  SUBMITTED.  THANK YOU.

09:00AM 5              THE COURT:  WHAT ELSE?

09:00AM 6              MS. SAHARIA:  THAT'S IT.

09:00AM 7              THE COURT:  LET ME ASK YOU, MS. SAHARIA, I'M

09:00AM 8    CONCERNED ABOUT THE TIMING MAYBE, THE INVESTORS AND THE PATIENT

09:00AM 9    DISTINCTION AND WHAT THE WITNESS WOULD TESTIFY ABOUT THAT, AND

09:00AM 10   IF THERE'S A CROSSOVER BLENDING OF THOSE TWO.

09:00AM 11             MS. SAHARIA:  WELL, THERE ABSOLUTELY IS BECAUSE THE

09:01AM 12   INTENT ISSUES THAT HE WILL SPEAK TO WE THINK GO ACROSS THE

09:01AM 13   ENTIRE INDICTMENT.

09:01AM 14        HE WILL SPEAK TO MS. HOLMES'S GOOD FAITH EFFORTS AT THE

09:01AM 15   COMPANY AFTER ISSUES WERE RAISED, WHICH SPEAK TO HER STATE OF

09:01AM 16   MIND BOTH WITH RESPECT TO WHAT SHE BELIEVED ABOUT THE

09:01AM 17   TECHNOLOGY AND THE REPRESENTATIONS THAT SHE WAS MAKING TO

09:01AM 18   INVESTORS, BUT ALSO I THINK SPEAK JUST AS EASILY TO WHAT SHE

09:01AM 19   BELIEVED ABOUT THE CAPACITIES OF THE LABORATORY.

09:01AM 20        AS I SAID, ONE OF THE THINGS THAT HE WILL TALK ABOUT IS

09:01AM 21   THE FACT THAT SHE BROUGHT IN A SCIENTIFIC AND MEDICAL ADVISORY

09:01AM 22   BOARD, AND THOSE PEOPLE WERE PEOPLE WITH EXPERTISE IN

09:01AM 23   LABORATORY SCIENCE AND MEDICINE IN PARTICULAR.

09:01AM 24        AND SO THE FACT THAT SHE BROUGHT THAT -- THOSE PEOPLE IN

09:01AM 25   TO EXAMINE THE WORK OF THE LABORATORY SPEAKS JUST AS HIGHLY TO

09:01AM 1    HER, TO HER INTENT TO FIX ISSUES AFTER THEY CAME TO LIGHT AND

09:01AM 2    HER LACK OF KNOWLEDGE THAT THOSE ISSUES EXISTED BEFORE.

09:01AM 3    OTHERWISE SHE WOULDN'T HAVE BROUGHT IN THESE HIGHLY QUALIFIED

09:01AM 4    PEOPLE, INCLUDING DR. DAS FOR THAT MATTER, TO TURN OVER THOSE

09:02AM 5    ROCKS.

09:02AM 6        SO DR. BONANNI -- MR. BONANNI'S TESTIMONY ON INTENT WILL

09:02AM 7    GO ACROSS THE INDICTMENT TO BOTH THE PATIENT CONSPIRACY AND THE

09:02AM 8    INVESTOR CONSPIRACY.

09:02AM 9        THE COURT:  AND I SUPPOSE YOU'RE SAYING, AND THE

09:02AM 10   GOVERNMENT, JUDGE, COULD ARGUE JUST THE CONTRARY.  THE

09:02AM 11   GOVERNMENT COULD ARGUE ONCE SHE FOUND OUT THAT THE LID WAS OFF

09:02AM 12   AND EVERYTHING WAS IN PUBLIC EYE, SHE SCRAMBLED, SHE DID

09:02AM 13   EVERYTHING SHE COULD TO COVER UP, TO MAKE HERSELF LOOK LIKE IT

09:02AM 14   WAS LEGITIMATE, AND THAT, IN FACT, WOULD BE A JURY QUESTION.

09:02AM 15       MS. SAHARIA:  FOR SURE, YOUR HONOR.

09:02AM 16       THE COURT:  AND THE GOVERNMENT IS PREPARED TO MAKE

09:02AM 17   THAT ARGUMENT, THAT ONCE SOMEBODY IS FOUND OUT TO HAVE DONE

09:02AM 18   WRONG AND THEY'RE IN THE DARK, THEY START TO LIGHT CANDLES.

09:02AM 19       MS. SAHARIA:  THAT'S AN ARGUMENT THAT THEY CAN MAKE

09:02AM 20   TO THE JURY AND WE THINK WE'RE ENTITLED TO MAKE A COMPETING

09:02AM 21   ARGUMENT TO THE JURY, BUT WE NEED THIS EVIDENCE TO MAKE OUR

09:03AM 22   DEFENSE.

09:03AM 23       THE COURT:  LET ME ASK YOU THE QUESTION ABOUT THIS

09:03AM 24   FROM MR. SCHENK'S POSITION.  RECEIPT OF INFORMATION AS LATE AS

09:03AM 25   10:00 P.M. LAST NIGHT, IT SEEMS TO ME THAT IT WOULD ONLY BE

7042

09:03AM  1    FAIR TO ALLOW THE GOVERNMENT SOME TIME TO REVIEW THIS BEFORE

09:03AM  2    THIS WITNESS TESTIFIES.

09:03AM  3          MS. SAHARIA:  YOUR HONOR, I'M GOING TO DEFER THAT TO

09:03AM  4    MS. TREFZ WHO KNOWS WHAT THE PARTICULAR EXHIBITS ARE.  I'M JUST

09:03AM  5    NOT PREPARED TO SPEAK TO THAT ISSUE.

09:03AM  6          THE COURT:  OKAY.  THANK YOU.

09:03AM  7          MS. TREFZ:  GOOD MORNING.

09:03AM  8          THE COURT:  GOOD MORNING.

09:03AM  9          MS. TREFZ:  GOOD MORNING, YOUR HONOR.

09:03AM 10          THE COURT:  SO LET ME ASK YOU THE QUESTION I ASKED

09:03AM 11    YOUR COLLEAGUE.  SHOULD I GIVE THE GOVERNMENT SOME TIME TO

09:03AM 12    REVIEW THESE DOCUMENTS THAT WERE REVEALED AS LATE AS 10:00 P.M.

09:03AM 13    LAST NIGHT?

09:03AM 14          MS. TREFZ:  WE FREQUENTLY RECEIVED DOCUMENTS DURING

09:03AM 15    THE GOVERNMENT'S CASE THAT WERE PROVIDED TO US LATE THE NIGHT

09:03AM 16    BEFORE.

09:03AM 17          THE COURT:  IS THAT A YES OR A NO?  I'M SORRY.

09:03AM 18          MS. TREFZ:  I'M SORRY, YOUR HONOR.

09:03AM 19       IT DEPENDS.  I'M NOT SURE WHICH DOCUMENTS THEY'RE

09:03AM 20    PARTICULARLY CONCERNED ABOUT.  THERE ARE MANY OF THE ISSUES --

09:04AM 21    MANY OF THE ITEMS THAT WE DISCLOSED TO THEM THROUGHOUT THIS FOR

09:04AM 22    DR. BONANNI MAY ONLY BE OFFERED FOR DEMONSTRATIVE PURPOSES AS

09:04AM 23    OPPOSED TO EVIDENCE.

09:04AM 24          THE COURT:  SURE.

09:04AM 25          MS. TREFZ:  SO I'M HAPPY TO DISCUSS IT WITH THEM.  I

09:04AM  1    HAVEN'T YET RECEIVED AN INDICATION OF WHAT THAT IS.

09:04AM  2            THE COURT:  WELL, MY CONCERN IS THAT WHEN THIS

09:04AM  3    HAPPENS, AND I RECOGNIZE -- YOU KNOW, AS MS. SAHARIA POINTS

09:04AM  4    OUT, THIS IS THE PHENOMENON OF TRIALS, THINGS HAPPEN AND IT'S A

09:04AM  5    MOVEABLE FEAST.

09:04AM  6        BUT WHEN WE'RE ON THE EVE OF A POTENTIAL WITNESS'S

09:04AM  7    TESTIMONY -- AND I DON'T KNOW HOW MUCH LONGER MR. CLINE HAS.

09:04AM  8    I'M NOT SURE WHAT VALUE I CAN GIVE THE TIME ESTIMATES ANYMORE,

09:04AM  9    BUT I DON'T KNOW HOW MUCH TIME MR. CLINE HAS LEFT, AND THEN

09:04AM 10    THERE WILL BE SOME REDIRECT, AND THEN WE'LL SEE WHETHER THE

09:04AM 11    GOVERNMENT WISHES TO PUT ADDITIONAL EVIDENCE ON, OR WHETHER

09:04AM 12    IT'S YOUR TEAMS TURN TO PUT EVIDENCE ON IF YOU WISH.

09:04AM 13        IT SOUNDS LIKE, IF THE GOVERNMENT RESTS THIS MORNING, THAT

09:05AM 14    IT WILL BE YOUR TURN TO PUT SOME -- A WITNESS ON.

09:05AM 15        IT SOUNDS LIKE THIS WITNESS THAT WE'RE TALKING ABOUT WOULD

09:05AM 16    BE THE SECOND WITNESS THAT YOU WOULD CALL.

09:05AM 17            MS. TREFZ:  CORRECT.

09:05AM 18            THE COURT:  AND THAT'S WHY I'M SAYING IF THE

09:05AM 19    GOVERNMENT NEEDS AN OPPORTUNITY TO REVIEW SOMETHING THAT THEY

09:05AM 20    RECEIVED LATE IN THE EVENING, I'M INCLINED TO GIVE IT TO THEM.

09:05AM 21            MS. TREFZ:  IF THE GOVERNMENT IS GOING TO ASK FOR AN

09:05AM 22    ADJOURNMENT IN ORDER TO DO SO, YOUR HONOR, WE'RE HAPPY TO

09:05AM 23    PROVIDE THEM THAT OPPORTUNITY.

09:05AM 24        WHAT I WOULD --

09:05AM 25            THE COURT:  I'M NOT ASKING FOR AN ADJOURNMENT.  I'M

7044

```
09:05AM   1     SAYING CALL ANOTHER WITNESS.
09:05AM   2              MS. TREFZ:  WELL, YOUR HONOR, I WOULD PUSH BACK IN
09:05AM   3     TWO WAYS, RESPECTFULLY.
09:05AM   4         ONE IS THAT I DON'T BELIEVE THAT THE PARTICULAR -- AGAIN,
09:05AM   5     I DON'T KNOW WHAT PARTICULAR EVIDENCE THEY'RE CONCERNED ABOUT.
09:05AM   6     I'D LIKE TO KNOW WHAT IT IS.
09:05AM   7         SECOND, I WOULD JUST NOTE THAT IT SHOULD NOT BE -- THE
09:05AM   8     GOVERNMENT SHOULD NOT BE ABLE TO DETERMINE THE ORDER THAT THE
09:05AM   9     DEFENSE CALLS WITNESSES IN.
09:06AM  10              THE COURT:  I GET TO DO THAT TO SOME EXTENT, DON'T
09:06AM  11     I?
09:06AM  12              MS. TREFZ:  I'M -- IT DEPENDS, YOUR HONOR.  IT
09:06AM  13     DEPENDS ON --
09:06AM  14              THE COURT:  RIGHT.  I DON'T WANT TO MESS WITH EITHER
09:06AM  15     OF YOUR CASES.  I REALLY DON'T.
09:06AM  16              MS. TREFZ:  YES.
09:06AM  17              THE COURT:  MY CONCERN IS TO KEEP THE TRIAL MOVING
09:06AM  18     IN AN ORDERLY FASHION SUCH THAT UNNECESSARY TIME IS TAKEN FROM
09:06AM  19     THE JURY.
09:06AM  20         AND WE'VE HAD A LOT OF TIME.  I COMMENTED ON SOME
09:06AM  21     STATISTICS THE OTHER DAY.  YOU KNOW, I JUST POINT THOSE OUT.
09:06AM  22     THAT'S SOMETHING THAT -- YOU KNOW, MR. SCHENK TOLD US ABOUT
09:06AM  23     SOME OTHER STATISTICS.
09:06AM  24         I DON'T WANT TO BREAK UP THE TRIAL.  I DON'T WANT TO
09:06AM  25     INTERFERE WITH THE DEFENSE CASE.  I RECOGNIZE THIS.  THAT'S
```

09:06AM 1    SACROSANCT.  JUDGES SHOULD NOT INTERFERE IN EITHER SIDE'S CASE.

09:06AM 2    WE SHOULDN'T DO THAT.

09:06AM 3        THERE'S TENSION BETWEEN THE JUDGE TRYING TO MANAGE A CASE

09:06AM 4    WHEN SHE IS TRYING TO GET ALL OF THE EVIDENCE IN AND THEN ALLOW

09:06AM 5    A JURY TO HEAR THE CASE AND TO BE MINDFUL OF THE JURY, THEIR

09:06AM 6    INCONVENIENCE SUCH THAT THEY HAVE CLARITY, SUCH THAT THEY DO

09:06AM 7    NOT LOSE INTEREST, THEY BECOME DISINTERESTED IN BOTH SIDES IN

09:07AM 8    THE TRIAL.

09:07AM 9        AND IT BECOMES DIFFICULT TO MANAGE THAT WHEN THESE TYPES

09:07AM 10   OF ISSUES COME UP.  SO IF THERE'S A WITNESS PROBLEM HERE -- AND

09:07AM 11   YOU SAID ADJOURNMENT.  IF THERE'S AN ADJOURNMENT, YOU KNOW, I

09:07AM 12   MAY HAVE TO TELL THEM, "LADIES AND GENTLEMEN, THERE WAS A LATE

09:07AM 13   DISCLOSURE ABOUT A PIECE OF EVIDENCE AND I NEED TO, IN ALL

09:07AM 14   FAIRNESS, I NEED TO ALLOW ONE SIDE TO LOOK AT THIS BEFORE

09:07AM 15   ANOTHER WITNESS IS CALLED."

09:07AM 16       THAT'S THE TYPE OF THING WHEN WE HAVE BACK-UP WITNESSES

09:07AM 17   WHERE WE CAN SAY, ALL RIGHT, WE CAN PUT THIS WITNESS ON.

09:07AM 18       IT'S NOT AN INVITATION TO CONTINUE AN EXAMINATION TO

09:07AM 19   STRETCH TIME AS THEY DO IN RADIO.  AND I'M PULLING MY HANDS

09:07AM 20   APART FROM LEFT TO RIGHT, WHICH IS A SIGN IN THE RADIO BUSINESS

09:07AM 21   OF STRETCH THINGS OUT AS MUCH AS YOU CAN.

09:07AM 22       IT'S NOT AN INVITATION TO DO THAT.  IT'S AN INVITATION TO

09:07AM 23   CONTINUE WITH EFFICIENCY WITHOUT DISRUPTING, WITHOUT DISRUPTING

09:08AM 24   THE PRESENTATION OF EITHER CASE IN A NEGATIVE WAY.

09:08AM 25            MS. TREFZ:  I COMPLETELY UNDERSTAND, YOUR HONOR.

09:08AM 1    MY POINT WAS SIMPLY THAT I WOULD LIKE TO KNOW WHAT THEIR

09:08AM 2    CONCERN ACTUALLY IS.  I'M NOT SURE WHAT MR. SCHENK WAS

09:08AM 3    REFERRING TO THAT WAS PROVIDED THIS MORNING.

09:08AM 4    IT MAY BE THAT THE EVIDENCE THAT THEY'RE POINTING TO OR

09:08AM 5    THE PARTICULAR EXHIBIT, IT MAY BE THAT IT'S SOMETHING THAT WE

09:08AM 6    ACTUALLY WILL NOT OFFER AND SO IT MAY NOT BE AN ISSUE.  I JUST,

09:08AM 7    I DO NOT KNOW WHAT IT IS.

09:08AM 8    THE VIDEO CLIPS, YOU KNOW, I CAN EXPLAIN THAT, YOU KNOW,

09:08AM 9    WHAT THEY ARE ARE VIDEOS OF THE TECHNOLOGY THAT'S BEEN

09:08AM 10   DESCRIBED MULTIPLE TIMES IN THE CASE.  THE GOVERNMENT HAS LONG

09:08AM 11   HAD NOTICE OF THE PARTICULAR VIDEO, ON THE -- THE FULL VIDEO ON

09:08AM 12   THE WITNESS LIST, OR THE EXHIBIT LIST.

09:08AM 13   WE ARE ONLY PLAYING SMALL -- WE INTEND TO PLAY FOR

09:08AM 14   DEMONSTRATIVE PURPOSES SMALL CLIPS THAT DR. BONANNI CAN, YOU

09:09AM 15   KNOW, EXPLAIN WHAT IS HAPPENING SO THAT THE JURY UNDERSTANDS

09:09AM 16   HOW THIS TECHNOLOGY WORKS AND PROVIDE VISUAL EVIDENCE AND --

09:09AM 17   YOU KNOW, RATHER THAN SIMPLY A WITNESS DESCRIPTION.

09:09AM 18   SO MANY OF THE VIDEOS -- THERE ARE FOUR VERY SHORT CLIPS,

09:09AM 19   AND THEY WILL -- MY INTENTION WAS TO OFFER THEM FOR

09:09AM 20   DEMONSTRATIVE PURPOSES.

09:09AM 21   AGAIN, I'M HAPPY TO HEAR WHAT THE CONCERNS ARE.  I THINK A

09:09AM 22   GENERAL STATEMENT THAT THERE WAS LATE DISCLOSURE IS A LITTLE

09:09AM 23   BIT -- IS PERHAPS AN OVERSTATEMENT, AND I WOULD LIKE THE

09:09AM 24   OPPORTUNITY TO ADDRESS WITH THE GOVERNMENT WHAT THE PARTICULAR

09:09AM 25   CONCERNS THEY HAVE ARE BECAUSE WE MAY BE ABLE TO ADDRESS THEM.

7047

09:09AM  1      AND SO I JUST -- I DON'T WANT THE COURT TO BE LEFT WITH

09:09AM  2   THE MISIMPRESSION THAT THERE WAS SOMEHOW NO DISCLOSURE HERE.

09:10AM  3   THE MAJORITY OF THE EXHIBITS THAT WE HAVE PROVIDED HAVE BEEN ON

09:10AM  4   OUR LIST SINCE ONE OF THE VERY FIRST DISCLOSURES IN THE CASE,

09:10AM  5   AND THERE ARE OTHER ITEMS THAT HAVE COME UP AS THE TRIAL

09:10AM  6   PROGRESSES, AS IS ALWAYS THE CASE.

09:10AM  7      AND SO I, I DIDN'T MEAN TO SUGGEST THAT, YOU KNOW, THAT

09:10AM  8   THERE SHOULD BE SOME KIND OF, YOU KNOW, ADJOURNMENT.

09:10AM  9      MY INITIAL POINT, AND STILL MY POSITION, IS THAT WE --

09:10AM  10  WHAT WE SHOULD HAVE THE OPPORTUNITY TO DO IS TO TALK WITH THE

09:10AM  11  GOVERNMENT AND TO UNDERSTAND WHAT THEIR CONCERNS ARE.

09:10AM  12     ANOTHER OPTION WOULD BE, YOU KNOW, IF THEY'RE ACTUALLY --

09:10AM  13  IF THEY HAVE CONCERNS AND THEY WOULD LIKE THE OPPORTUNITY TO

09:10AM  14  RECALL THE WITNESS ON CROSS TO PUT IN MORE -- PUT IN MORE

09:10AM  15  EVIDENCE, THAT COULD POTENTIALLY BE SOMETHING TO DO AS WELL.

09:10AM  16     I JUST -- I'M HESITANT TO ACCEPT THE REPRESENTATION THAT

09:10AM  17  THERE IS SOME KIND OF UNFAIRNESS HERE BECAUSE I DON'T BELIEVE

09:10AM  18  THAT THAT'S THE CASE.

09:11AM  19        THE COURT:  ALL RIGHT.  WELL, WE'RE TEN AFTER 9:00.

09:11AM  20     MR. SCHENK, DO YOU WANT TO SAY ANYTHING BEFORE --

09:11AM  21        MR. SCHENK:  I CAN QUICKLY SUPPLEMENT THE RECORD.

09:11AM  22     10679 WAS DISCLOSED THIS MORNING, 7673B AND C WERE NOT

09:11AM  23  PREVIOUSLY DISCLOSED, 9819A THROUGH D ARE THE VIDEOS.

09:11AM  24     AND PART OF THE PROBLEM HERE IS THAT WITHOUT ANY JENCKS

09:11AM  25  STATEMENTS, WE CAN'T READ WHAT THE WITNESS WOULD SAY.  SO WE

09:11AM  1   HAVE NO INSIGHT INTO HOW THESE EXHIBITS WOULD BE USED.

09:11AM  2          AND WITH THAT I WOULD SUBMIT.  IT'S AFTER 9:00 AND WE

09:11AM  3   SHOULD GET STARTED.

09:11AM  4              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR THIS

09:11AM  5   COLLOQUY.

09:11AM  6       WE HAVE -- LET'S SEE.  I THINK MR. CLINE IS STILL IN HIS

09:11AM  7   CROSS-EXAMINATION.  I DON'T KNOW HOW LONG THAT'S GOING TO BE.

09:12AM  8       FOLLOWING THAT, WE'LL SEE IF THE GOVERNMENT HAS ANY

09:12AM  9   REDIRECT AND WHETHER OR NOT THE GOVERNMENT HAS ANY ADDITIONAL

09:12AM 10   EVIDENCE.

09:12AM 11       WE'LL THEN TURN TO THE DEFENSE TO SEE IF THEY HAVE ANY

09:12AM 12   EVIDENCE TO OFFER.

09:12AM 13       WE'LL PROBABLY TAKE A BREAK BECAUSE THE DEFENSE MAY HAVE A

09:12AM 14   MOTION OR WISH TO PUT SOMETHING ON THE RECORD, AND WE CAN

09:12AM 15   CERTAINLY DO THAT.

09:12AM 16       MY COMMENTS ABOUT TIME ARE -- LET ME JUST SAY, YOU'RE ALL

09:12AM 17   EXPERIENCED TRIAL LAWYERS.  YOU ALL KNOW THIS.  I DON'T THINK

09:12AM 18   ANY OF YOU -- I HOPE NONE OF YOU ARE BEING STRATEGIC AS FAR AS

09:12AM 19   TIMING.

09:12AM 20       AND I SAY THAT BECAUSE MY SENSE IS THAT NONE OF YOU WANT

09:12AM 21   THIS JURY TO BE DELIBERATING THIS CASE ON THE HOLIDAY WEEK IN

09:12AM 22   DECEMBER, THE THIRD WEEK IN DECEMBER OR ANY WEEK LIKE THAT.  MY

09:12AM 23   SENSE IS THAT YOU DON'T WANT THAT.

09:12AM 24       AND I -- LET ME JUST CALL YOUR ATTENTION TO THAT.  I'M NOT

09:12AM 25   SUGGESTING -- I HAVEN'T TALKED TO THE JURY AT ALL.  WE JUST SEE

09:12AM  1   THEM WHEN THEY COME IN, OF COURSE.

09:12AM  2        JURORS DON'T -- I DON'T THINK THEY ASCRIBE BLAME TO

09:13AM  3   THINGS.  THEY MIGHT LOOK AT RESPONSIBILITY, WHY ARE WE TAKING

09:13AM  4   SO LONG, AND WHAT IS THIS, AND WHY ARE THINGS GOING?  I DON'T

09:13AM  5   KNOW.  I DON'T TALK TO THEM.

09:13AM  6        WE ALL KNOW THAT, THOUGH.  WE'RE CONCERNED ABOUT THE JURY

09:13AM  7   AND THEIR COMFORT LEVEL AND KEEPING THEM ENGAGED.  I THINK YOU

09:13AM  8   ALL KNOW WHAT HAPPENS WHEN WE HAVE A JURY THAT GOES OUT ON A

09:13AM  9   HOLIDAY WEEK.  THAT DOESN'T BENEFIT EITHER SIDE.

09:13AM 10        AND I KNOW THAT BOTH SIDES ARE DOING EVERYTHING THAT YOU

09:13AM 11   CAN TO AVOID THAT AND NOT INCONVENIENCE THE JURY.

09:13AM 12        IT SEEMS LIKE WE'RE GOING TO GO -- WE'RE GOING TO EXCEED

09:13AM 13   OUR SCHEDULE.  I THINK WE TOLD THEM WE WOULD BE FINISHED BY THE

09:13AM 14   6TH.  MY SENSE IS THAT WE'RE GOING TO HAVE TO GO AT LEAST

09:13AM 15   ANOTHER WEEK BEYOND THAT BASED ON MY UNDERSTANDING OF WHERE

09:13AM 16   THINGS ARE.

09:13AM 17        AND SO I THINK THIS JURY HAS BEEN ENGAGED.  I THINK

09:13AM 18   THEY'RE THOROUGHLY INVESTED IN THIS CASE.  THEY'RE A GOOD JURY.

09:13AM 19   I'VE SEEN NO HANDS WHEN I ASK THAT QUESTION EVERY DAY, WHICH

09:14AM 20   TELLS ME THAT THEY'RE -- THEY OWE FIDELITY TO THE COURT AND TO

09:14AM 21   YOU AND TO THE TRIAL AND TO ALL OF YOU.  SO I HOPE WE CAN

09:14AM 22   CONTINUE THAT TRUST IN A RECIPROCAL MANNER.

09:14AM 23        THANK YOU VERY MUCH.  I'LL STEP DOWN AND WE'LL BRING THEM

09:14AM 24   IN AND WE'LL SEE WHERE WE GO THIS MORNING.

09:14AM 25             MR. SCHENK:  THANK YOU.

7050

| | | |
|---|---|---|
| 09:14AM | 1 | THE CLERK:  COURT IS IN RECESS. |
| 09:14AM | 2 | (RECESS FROM 9:14 A.M. UNTIL 9:21 A.M.) |
| 09:21AM | 3 | (JURY IN AT 9:21 A.M.) |
| 09:21AM | 4 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 09:21AM | 5 | WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 09:21AM | 6 | ARE PRESENT AGAIN. |
| 09:21AM | 7 | ALL COUNSEL ARE PRESENT.  OUR JURY IS PRESENT. |
| 09:21AM | 8 | GOOD MORNING, LADIES AND GENTLEMEN.  LET ME ASK YOU THAT |
| 09:21AM | 9 | QUESTION AGAIN. |
| 09:21AM | 10 | DURING THE EVENING, DID ANY OF YOU HAVE CAUSE TO COME |
| 09:21AM | 11 | ACROSS, DISCUSS, READ, INVESTIGATE, OR LEARN ABOUT ANYTHING |
| 09:21AM | 12 | ABOUT THIS CASE OTHER THAN WHAT YOU'VE BEEN LEARNING HERE IN |
| 09:21AM | 13 | THE COURTROOM? |
| 09:21AM | 14 | IF SO, PLEASE RAISE YOUR HAND. |
| 09:21AM | 15 | I SEE NO HANDS. |
| 09:21AM | 16 | THANK YOU VERY MUCH. |
| 09:21AM | 17 | LET ME -- WE'RE GOING TO CALL OUR WITNESS, MR. PARLOFF, |
| 09:21AM | 18 | BACK IN IN JUST A MOMENT. |
| 09:21AM | 19 | I DO WANT TO TALK A LITTLE BIT ABOUT SCHEDULING, AND I |
| 09:22AM | 20 | THINK MS. KRATZMANN PROVIDED YOU WITH A CALENDAR TODAY. |
| 09:22AM | 21 | LET ME SAY THAT I'VE BEEN WORKING WITH THE LAWYERS.  THE |
| 09:22AM | 22 | LAWYERS HAVE BEEN VERY COOPERATIVE.  WE'RE LOOKING AT |
| 09:22AM | 23 | SCHEDULING.  I HAVE TO TELL YOU, I DO THINK THAT I'M NOT GOING |
| 09:22AM | 24 | TO BE ABLE TO MEET THE DECEMBER 6TH DEADLINE THAT I TOLD YOU |
| 09:22AM | 25 | ABOUT. |

7051

09:22AM   1        IT LOOKS LIKE WE'RE GOING TO EXCEED THAT DEADLINE, JUST

09:22AM   2   OUT OF NECESSITY.  AND THAT'S THE WAY TRIALS ARE SOMETIMES.  I

09:22AM   3   JUST WANT TO LET YOU KNOW THAT.

09:22AM   4        WE'RE GOING TO CONTINUE TO WORK, BOTH TEAMS ARE GOING TO

09:22AM   5   CONTINUE TO WORK WITH ME TO ENSURE THAT THINGS HAPPEN

09:22AM   6   EFFICIENTLY SO THAT WE CAN MANAGE THE CASE AS BEST AS WE CAN

09:22AM   7   AND GET WHAT NEEDS TO BE DONE ACCOMPLISHED IN AN EFFICIENT

09:22AM   8   MANNER FOR YOU.

09:22AM   9        SO I JUST WANT TO LET YOU KNOW THAT AND GIVE YOU A HEADS

09:22AM  10   UP.  WE MAY HAVE TO EXTEND A FEW DAYS, AND I'LL KEEP YOU

09:22AM  11   APPRISED OF THAT THROUGH MS. KRATZMANN AND OUR OTHER

09:22AM  12   DISCUSSIONS.

09:22AM  13        SO ON BEHALF OF THE LAWYERS, LET ME SAY, AND ON BEHALF OF

09:23AM  14   MYSELF AND OUR STAFF, I WANT TO THANK YOU SO MUCH FOR YOUR

09:23AM  15   CONSIDERATION, AND WE'LL KEEP YOU INFORMED OF HOW THINGS ARE

09:23AM  16   GOING.

09:23AM  17        OKAY.  THANK YOU.  LET'S BRING IN THE WITNESS.

09:23AM  18        GOOD MORNING, MR. PARLOFF.  I'LL INVITE YOU TO TAKE A SEAT

09:23AM  19   AGAIN.

09:23AM  20        AGAIN, MAKE YOURSELF COMFORTABLE.  YOU HAVE SOME -- I

09:23AM  21   THINK THERE'S A HOT BEVERAGE THERE FOR YOU.

09:23AM  22             THE WITNESS:  YES.  THANK YOU.

09:23AM  23             THE COURT:  AND -- NO, YOU CAN TAKE THAT OFF.

09:23AM  24   THAT'S FINE.  THANK YOU.

09:23AM  25        WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME,

PARLOFF CROSS BY MR. CLINE (RES.)                    7052

09:23AM  1      PLEASE.

09:23AM  2              THE WITNESS:  ROGER PARLOFF.

09:23AM  3              THE COURT:  THANK YOU.

09:23AM  4              THE WITNESS:  P-A --

09:24AM  5              THE COURT:  OH, THAT'S OKAY.

09:24AM  6          **(GOVERNMENT'S WITNESS, ROGER PARLOFF, WAS PREVIOUSLY**

09:24AM  7      **SWORN.)**

09:24AM  8              THE COURT:  MR. CLINE.

09:24AM  9                   **CROSS-EXAMINATION (RESUMED)**

09:24AM  10     BY MR. CLINE:

09:24AM  11     Q.   GOOD MORNING.  I HOPE YOU'RE FEELING BETTER AND THE

09:24AM  12     ALLERGIES ARE A LITTLE BETTER THIS MORNING.

09:24AM  13     A.   THEY'RE GOOD.  THANK YOU.

09:24AM  14     Q.   I JUST HAVE A FEW -- BY THE WAY, DO YOU STILL HAVE THE TWO

09:24AM  15     NOTEBOOKS UP THERE?

09:24AM  16     A.   YES.

09:24AM  17     Q.   OKAY.  GOOD.  I HAVE A FEW TOPICS I WANT TO COVER WITH YOU

09:24AM  18     BEFORE WE FINISH UP FOR TODAY.

09:24AM  19          THE FIRST ONE HAS TO DO WITH YOUR DISCUSSIONS WITH

09:24AM  20     MS. HOLMES ABOUT THE MILITARY.

09:24AM  21     A.   YEAH.

09:24AM  22     Q.   DO YOU REMEMBER THAT SUBJECT COMING UP --

09:24AM  23     A.   UH-HUH, YES.

09:24AM  24     Q.   -- YESTERDAY?

09:24AM  25          TO BE CLEAR, YOU AND MS. HOLMES AGREED THAT NOTHING THAT

PARLOFF CROSS BY MR. CLINE (RES.)                              7053

09:24AM   1    SHE SAID TO YOU ABOUT THERANOS AND THE MILITARY WOULD APPEAR IN

09:24AM   2    THE ARTICLE; CORRECT?

09:24AM   3    A.   THAT'S RIGHT.

09:24AM   4    Q.   AND, IN FACT, YOU DIDN'T -- EXCUSE ME.  NOW I'VE GOT THE

09:24AM   5    ALLERGIES.

09:24AM   6         IN FACT, YOU DIDN'T USE ANYTHING THAT SHE OR OTHERS AT

09:24AM   7    THERANOS TOLD YOU ABOUT THERANOS AND THE MILITARY IN THE

09:24AM   8    ARTICLE; RIGHT?

09:24AM   9    A.   CORRECT, ABOUT THE ACTUAL DEPLOYMENTS, YEAH.

09:25AM  10    Q.   AND WHAT YOU SAID IN THE ARTICLE -- AND I'M GOING TO QUOTE

09:25AM  11    IT TO YOU, AND IF YOU NEED ME TO REFER IT TO YOU, I CAN -- YOU

09:25AM  12    SAID, "THE SMALL THERANOS DEVICE MAKES IT POSSIBLE TO IMAGINE

09:25AM  13    ONE DAY PLACING HOLMES'S LABS RIGHT BY THE OPERATING ROOMS IN

09:25AM  14    HOSPITALS OR IN MILITARY EVACUATION HELICOPTERS, OR ON SHIPS

09:25AM  15    AND SUBMARINES OR IN REFUGEE CAMPS OR IN TENTS IN THE AFRICAN

09:25AM  16    BUSH."

09:25AM  17         RIGHT?

09:25AM  18    A.   THAT'S CORRECT.

09:25AM  19    Q.   SO WHAT YOU TALKED ABOUT IN THE ARTICLE IS THAT THE

09:25AM  20    THERANOS DEVICE MAKES IT POSSIBLE TO IMAGINE ONE DAY DOING

09:25AM  21    THOSE THINGS; RIGHT?

09:25AM  22    A.   THAT'S RIGHT.

09:25AM  23    Q.   NOW, YOU TESTIFIED YESTERDAY, I BELIEVE, THAT MS. HOLMES

09:25AM  24    TOLD YOU, OFF THE RECORD AND NOT FOR USE IN YOUR ARTICLE, THAT

09:26AM  25    THE THERANOS DEVICE HAD BEEN USED IN AFGHANISTAN.

PARLOFF CROSS BY MR. CLINE (RES.)                          7054

09:26AM   1      A.   YES.

09:26AM   2      Q.   NOW, YOU MET -- WE TALKED YESTERDAY ABOUT THAT FIRST

09:26AM   3      MEETING YOU HAD WITH THE GOVERNMENT IN NEW YORK.

09:26AM   4           DO YOU REMEMBER THAT?

09:26AM   5      A.   YES.

09:26AM   6      Q.   DO YOU REMEMBER THE TOPIC COMING UP YESTERDAY?

09:26AM   7      A.   I THINK SO, YES.

09:26AM   8      Q.   ALL RIGHT.  AND THIS WAS YOUR FIRST INTERACTION WITH THE

09:26AM   9      GOVERNMENT, AT LEAST FACE TO FACE; RIGHT?

09:26AM   10     A.   YES.

09:26AM   11     Q.   AND YOU MET WITH THEM IN NEW YORK AT THE U.S. ATTORNEY'S

09:26AM   12     OFFICE THERE?

09:26AM   13     A.   YEAH, YES.

09:26AM   14     Q.   AND MR. BOSTIC WAS THERE AND AN FBI AGENT WAS THERE;

09:26AM   15     RIGHT?

09:26AM   16     A.   YES.

09:26AM   17     Q.   ALL RIGHT.  AND IN THAT MEETING, THAT FIRST MEETING, THE

09:26AM   18     SUBJECT CAME UP OF THERANOS AND THE MILITARY; RIGHT?

09:26AM   19     A.   YES.

09:26AM   20     Q.   AND WHAT YOU TOLD THE GOVERNMENT IN THAT MEETING IN APRIL

09:26AM   21     WAS THAT MS. HOLMES HAD ADVISED YOU IN ONE OF YOUR

09:26AM   22     CONVERSATIONS WITH HER BACK BEFORE YOU WROTE YOUR ARTICLE THAT

09:26AM   23     SHE CANNOT DISCUSS ACTUAL USE IN AFGHANISTAN, BUT SHE COULD

09:27AM   24     DISCUSS OTHER THINGS, AND THAT THAT GAVE YOU THE IMPRESSION

09:27AM   25     THAT SOMETHING WAS HAPPENING; RIGHT?

PARLOFF CROSS BY MR. CLINE (RES.)                                7055

09:27AM    1     A.   THAT MAY BE RIGHT.  THAT MUST BE WHAT I SAID.

09:27AM    2     Q.   ALL RIGHT.  WOULD IT HELP YOU IF I SHOWED YOU THAT PART OF

09:27AM    3     THE MEMORANDUM, OR CAN YOU ACCEPT THAT AS WHAT YOU TOLD THE

09:27AM    4     GOVERNMENT?

09:27AM    5     A.   I CAN ACCEPT THAT'S WHAT I SAID THEN.

09:27AM    6     Q.   ALL RIGHT.  AND THE FIRST TIME YOU TOLD THE GOVERNMENT

09:27AM    7     THAT MS. HOLMES HAD TOLD YOU THAT THERE WAS ACTUAL USE IN

09:27AM    8     AFGHANISTAN WAS TWO DAYS AGO; RIGHT?

09:27AM    9     A.   NO, I DON'T THINK SO.

09:27AM   10     Q.   WELL, YOU, YOU MET WITH THE GOVERNMENT TWO DAYS AGO;

09:27AM   11     RIGHT?

09:27AM   12     A.   YES.

09:27AM   13     Q.   OR MET -- HAD A VIDEO CONFERENCE WITH THEM; RIGHT?

09:27AM   14     A.   YEAH.

09:27AM   15     Q.   AND IN THAT VIDEO CONFERENCE, YOU TOLD THEM THAT

09:27AM   16     MS. HOLMES HAD MADE THAT COMMENT; RIGHT?

09:27AM   17     A.   YES.

09:27AM   18     Q.   YOU HADN'T TOLD THEM THAT IN ANY OF YOUR PREVIOUS

09:28AM   19     DISCUSSIONS WITH THEM, HAD YOU?

09:28AM   20     A.   I THOUGHT WE HAD HAD -- I THOUGHT IT HAD COME UP IN

09:28AM   21     PREVIOUS DISCUSSIONS.

09:28AM   22     Q.   SHALL WE GO THROUGH THOSE?

09:28AM   23     A.   OKAY.

09:28AM   24     Q.   THE FIRST ONE WAS APRIL 2018; RIGHT?

09:28AM   25     A.   YES.

PARLOFF CROSS BY MR. CLINE (RES.)                                    7056

09:28AM   1      Q.   AND THAT'S THE MEETING WHERE YOU TOLD THE GOVERNMENT THAT

09:28AM   2      MS. HOLMES HAD TOLD YOU THAT SHE COULDN'T DISCUSS USE IN

09:28AM   3      AFGHANISTAN, AND YOU HAD THE IMPRESSION THAT THERE WAS USE

09:28AM   4      GOING ON; RIGHT?

09:28AM   5      A.   YES.

09:28AM   6      Q.   ALL RIGHT.  THE NEXT TIME YOU SPOKE WITH THE GOVERNMENT

09:28AM   7      WAS A VIDEO CONFERENCE ON SEPTEMBER THE 3RD, 2021, THIS YEAR;

09:28AM   8      RIGHT?

09:28AM   9      A.   YES.

09:28AM   10     Q.   AND MR. BOSTIC AND OTHERS PARTICIPATED FOR THE GOVERNMENT;

09:28AM   11     RIGHT?

09:28AM   12     A.   YES.

09:28AM   13     Q.   AND FOR THAT ONE YOU HAD A LAWYER WHO PARTICIPATED; RIGHT?

09:28AM   14     A.   YES.

09:28AM   15     Q.   AND IN THAT FIRST MEETING, YOU DIDN'T HAVE A LAWYER, BUT

09:29AM   16     NOW YOU DID; RIGHT?

09:29AM   17     A.   YEAH, UH-HUH.

09:29AM   18     Q.   AND THAT'S NOT MR. KOLTUN, THE LAWYER WHO HAS BEEN HERE IN

09:29AM   19     COURT WITH YOU, THAT WAS A MR. KORZENIK; RIGHT?

09:29AM   20     A.   YES.

09:29AM   21     Q.   AND AGAIN, THE SUBJECT OF MILITARY USE OF THERANOS

09:29AM   22     TECHNOLOGY CAME UP; RIGHT?

09:29AM   23     A.   I CAN'T REMEMBER.

09:29AM   24     Q.   LET ME HELP YOU WITH THAT.

09:29AM   25          MAY I APPROACH?

PARLOFF CROSS BY MR. CLINE (RES.)                                    7057

09:29AM   1                    THE COURT:  YES.

09:29AM   2        BY MR. CLINE:

09:29AM   3        Q.   (HANDING.)

09:29AM   4             I'M GOING TO HAND YOU A MEMORANDUM OF THAT INTERVIEW, AND

09:29AM   5        I'M GOING TO REFER YOU TO PAGE 7, WHICH I THINK IS THE LAST

09:29AM   6        PAGE, AND ASK YOU TO READ THE LAST PARAGRAPH TO YOURSELF.

09:29AM   7        DON'T READ IT ALOUD.

09:30AM   8        A.   OKAY.

09:30AM   9        Q.   HAVE YOU HAD A CHANCE TO READ THAT?

09:30AM   10       A.   YEAH.

09:30AM   11       Q.   ALL RIGHT.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT

09:30AM   12       ON SEPTEMBER 3RD, 2021, YOU AGAIN TOLD THE GOVERNMENT THAT

09:30AM   13       MS. HOLMES'S COMMENTS LEFT YOU WITH THE IMPRESSION THAT THERE

09:30AM   14       WAS USE IN AFGHANISTAN?

09:30AM   15       A.   YES.

09:30AM   16       Q.   ALL RIGHT.  AND THEN YOU TALKED AGAIN WITH THE GOVERNMENT?

09:31AM   17       A.   IT'S A PRETTY STRONG INFERENCE.  I MEAN, SHE WAS STATING,

09:31AM   18       DON'T TELL GENERAL MATTIS ABOUT THE DEPLOYMENTS IN AFGHANISTAN.

09:31AM   19             YOU KNOW, IT'S AN INFERENCE, BUT IT'S -- I MEAN, WHY -- TO

09:31AM   20       ME, IT'S, IT'S A, IT'S A VERY STRONG INFERENCE.  IT'S DON'T

09:31AM   21       TELL THEM ABOUT -- WELL --

09:31AM   22       Q.   MR. PARLOFF --

09:31AM   23       A.   YEAH.

09:31AM   24       Q.   -- MS. HOLMES TOLD YOU THAT SHE COULDN'T DISCUSS USE IN

09:31AM   25       AFGHANISTAN; RIGHT?

PARLOFF CROSS BY MR. CLINE (RES.)                    7058

09:31AM   1    A.   RIGHT.

09:31AM   2    Q.   AND THAT LEFT YOU WITH THE IMPRESSION THAT SOMETHING WAS

09:31AM   3    GOING ON; RIGHT?

09:31AM   4    A.   YES, AND THE FACT THAT SHE TOLD ME NOT TO -- THAT HE WOULD

09:31AM   5    NOT BE ABLE TO DISCUSS THAT AND I SHOULDN'T ASK HIM ABOUT IT.

09:31AM   6    Q.   SHE NEVER ACTUALLY TOLD YOU THAT THERE WAS USE IN

09:32AM   7    AFGHANISTAN, DID SHE?

09:32AM   8    A.   I THOUGHT SHE DID.

09:32AM   9    Q.   SO YOU THOUGHT YOU HAD MORE THAN JUST THE IMPRESSION THAT

09:32AM  10    YOU DESCRIBED TO THE GOVERNMENT IN THOSE FIRST TWO MEETINGS?

09:32AM  11    A.   WELL, IT IS SEVEN YEARS AGO.  IT MIGHT HAVE BEEN A VERY

09:32AM  12    STRONG IMPRESSION.  I, I -- I'M NOT CERTAIN.

09:32AM  13    Q.   ALL RIGHT.  I WANT TO TURN NOW TO THE QUESTION OF THE

09:32AM  14    NUMBER OF TESTS.

09:32AM  15         MAY I RETRIEVE THAT FROM YOU, THAT DOCUMENT?  I JUST DON'T

09:32AM  16    WANT IT TO BE DISTRACTING.

09:32AM  17         MAY I APPROACH?

09:32AM  18              THE COURT:  YES.

09:32AM  19              THE WITNESS:  (HANDING.)

09:32AM  20    BY MR. CLINE:

09:32AM  21    Q.   THANKS.

09:32AM  22         DO YOU REMEMBER -- MR. PARLOFF, WE ARE SWITCHING TOPICS A

09:32AM  23    LITTLE BIT HERE.

09:32AM  24         THERE WAS DISCUSSION YESTERDAY ABOUT THE NUMBER OF TESTS

09:33AM  25    THAT THERANOS COULD PERFORM.

PARLOFF CROSS BY MR. CLINE (RES.)                          7059

09:33AM   1        DO YOU REMEMBER THAT?

09:33AM   2   A.   YES.

09:33AM   3   Q.   AND DO YOU REMEMBER THE NUMBERS 200 AND 1,000?

09:33AM   4   A.   YES.

09:33AM   5   Q.   NOW, IN YOUR JUNE 2014 ARTICLE -- AND, AGAIN, I'M GOING TO

09:33AM   6   QUOTE IT TO YOU, BUT IF YOU NEED TO LOOK AT IT, NO PROBLEM --

09:33AM   7   YOU SAID THAT THERANOS, AND I'M QUOTING NOW, "CURRENTLY

09:33AM   8   OFFERING MORE THAN 200 AND IS RAMPING UP TO OFFER MORE THAN

09:33AM   9   1,000 OF THE MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS, ALL

09:33AM  10   WITHOUT NEED FOR A SYRINGE."

09:33AM  11        THAT'S WHAT YOU SAID IN THE ARTICLE; RIGHT?

09:33AM  12   A.   YES.

09:33AM  13   Q.   ALL RIGHT.  NOW, THE GOVERNMENT PLAYED YESTERDAY FOR YOU A

09:33AM  14   CLIP FROM MAY 21, 2014, AN AUDIO CLIP OF ONE OF YOUR

09:33AM  15   CONVERSATIONS WITH MS. HOLMES WHERE THE 200 AND 1,000 NUMBERS

09:34AM  16   CAME UP.

09:34AM  17   A.   YES.

09:34AM  18   Q.   AND I WANT TO JUST PLAY FOR YOU THE FIRST PART OF THAT

09:34AM  19   CLIP WHERE THOSE NUMBERS ARE FIRST BROACHED.  SO JUST HOLD ON A

09:34AM  20   SECOND AND I'M GOING TO PLAY IT FOR YOU.  OKAY?

09:34AM  21        THIS IS EXHIBIT 5474AB2 STARTING AT THE BEGINNING OF THE

09:34AM  22   CLIP THE GOVERNMENT PLAYED, AND THEN WE'LL STOP IT WHEN WE GET

09:34AM  23   TO THE POINT.

09:34AM  24        GO AHEAD.

09:34AM  25        (AUDIO RECORDING PLAYED OFF THE RECORD.)

PARLOFF CROSS BY MR. CLINE (RES.)                    7060

09:35AM   1              MR. CLINE:  STOP, STOP.

09:35AM   2    Q.   NOW, MR. PARLOFF, DID YOU HEAR YOUR REFERENCE THERE TO

09:35AM   3    MORE THAN 1,000 CPT'S?

09:35AM   4    A.   YES.

09:35AM   5    Q.   BACK IN MAY OF 2014, DID YOU KNOW WHAT A CPT WAS?

09:35AM   6    A.   UH, SHE TOLD ME.

09:35AM   7    Q.   IT'S A BILLING CODE; RIGHT?

09:35AM   8    A.   YES.

09:35AM   9    Q.   AND IN MAY OF 2014, DID YOU UNDERSTAND THE DIFFERENCE

09:35AM  10    BETWEEN A TEST AND A CPT?

09:35AM  11    A.   ROUGHLY.

09:35AM  12    Q.   DID YOU UNDERSTAND IN MAY OF 2014 THAT A SINGLE TEST COULD

09:35AM  13    BE PART OF MANY DIFFERENT CPT CODES?

09:35AM  14    A.   I THINK I, I THINK I -- I KNEW THAT SOME CPT CODES WERE

09:35AM  15    FOR PANELS AND SOME WERE FOR INDIVIDUAL TESTS.

09:36AM  16         SO, YES.

09:36AM  17    Q.   IN YOUR ARTICLE, THE LANGUAGE THAT YOU USE IN THE ARTICLE,

09:36AM  18    YOU DON'T DISTINGUISH WHEN YOU'RE USING THAT 1,000 FIGURE

09:36AM  19    BETWEEN TESTS AND CPT'S, DO YOU?

09:36AM  20    A.   NO.

09:36AM  21         BUT I DON'T THINK I KNEW WHICH WAY IT -- WHICH DIRECTION.

09:36AM  22    I KNEW IT WOULDN'T BE AN IDENTICAL NUMBER, BUT I DIDN'T KNOW IF

09:36AM  23    THE CPT'S WOULD BE MORE THAN A THOUSAND.

09:36AM  24         I THINK THAT WAS MY IMPRESSION THAT, BECAUSE THEY COULD --

09:36AM  25    BUT ANYWAY.

PARLOFF CROSS BY MR. CLINE (RES.)                                    7061

09:36AM   1      Q.   WELL, WHAT YOU SAID IN THE ARTICLE --

09:36AM   2      A.   YEAH, RIGHT.

09:36AM   3      Q.   -- WAS A THOUSAND TESTS; RIGHT?

09:36AM   4      A.   RIGHT.

09:36AM   5      Q.   YOU DIDN'T SAY A THOUSAND CPT'S?

09:36AM   6      A.   RIGHT.

09:36AM   7      Q.   I WANT TO MOVE NOW TO A DIFFERENT TOPIC.

09:36AM   8      A.   AND SHE HAD ALSO SAID THERE WAS SOME FUZZINESS ABOUT, WAS

09:36AM   9      IT A THOUSAND, WAS IT 1200?

09:36AM   10     Q.   YOU'RE TALKING ABOUT CPT'S; RIGHT?

09:37AM   11     A.   YES.

09:37AM   12     Q.   NOW, I WANT TO GET BACK A LITTLE BIT TO THE RESEARCH THAT

09:37AM   13     YOU DID.

09:37AM   14     A.   AND SHE NEVER TRIED TO CORRECT IT AFTERWARDS AS WELL.  SHE

09:37AM   15     DIDN'T CALL ME AND SAY, "OH, TERRIFIC ARTICLE, BUT YOU GOT ONE

09:37AM   16     LITTLE THING WRONG, IT WAS REALLY A THOUSAND CPT'S, NOT A

09:37AM   17     THOUSAND TESTS."

09:37AM   18     Q.   ARE WE FINISHED WITH THAT TOPIC?

09:37AM   19     A.   UP TO YOU.

09:37AM   20     Q.   ALL RIGHT.  LET'S MOVE TO A DIFFERENT TOPIC, WHICH IS YOUR

09:37AM   21     RESEARCH LEADING UP TO THE JUNE 2014 ARTICLE.

09:37AM   22     A.   YES.

09:37AM   23     Q.   WE TALKED ABOUT THAT YESTERDAY, AND THERE ARE JUST A FEW

09:37AM   24     ADDITIONAL POINTS THAT I WANT TO TOUCH ON THERE.

09:37AM   25          FIRST OF ALL, I WANT TO SHOW YOU AN EXHIBIT THAT IS NOT IN

PARLOFF CROSS BY MR. CLINE (RES.)                              7062

| | | |
|---|---|---|
| 09:37AM | 1 | YOUR BOOK AND SO I'M GOING TO HAVE TO HAND IT UP TO YOU, WHICH |
| 09:37AM | 2 | IS EXHIBIT 14271. |
| 09:38AM | 3 | MAY I APPROACH? |
| 09:38AM | 4 | THE COURT:  YES. |
| 09:38AM | 5 | BY MR. CLINE: |
| 09:38AM | 6 | Q.  (HANDING.) |
| 09:38AM | 7 | MR. PARLOFF, TAKE A MOMENT AND LOOK AT THAT. |
| 09:38AM | 8 | (PAUSE IN PROCEEDINGS.) |
| 09:39AM | 9 | BY MR. CLINE: |
| 09:39AM | 10 | Q.  I DON'T MEAN TO RUSH YOU, BUT HAVE YOU HAD A CHANCE TO |
| 09:39AM | 11 | LOOK AT THIS? |
| 09:39AM | 12 | A.  I'M SORRY, I'M STILL -- |
| 09:39AM | 13 | Q.  OH, TAKE YOUR TIME.  TAKE YOUR TIME. |
| 09:39AM | 14 | (PAUSE IN PROCEEDINGS.) |
| 09:39AM | 15 | THE WITNESS:  YEAH.  YES. |
| 09:39AM | 16 | BY MR. CLINE: |
| 09:39AM | 17 | Q.  ALL RIGHT.  THIS IS A MAY 9TH, 2014 EMAIL FROM YOU TO |
| 09:39AM | 18 | MS. HOLMES? |
| 09:39AM | 19 | A.  YES. |
| 09:39AM | 20 | Q.  AND THE SUBJECT IS UPDATE? |
| 09:39AM | 21 | A.  YES. |
| 09:39AM | 22 | Q.  AND YOU'RE DESCRIBING TO HER SORT OF WHERE THINGS ARE ON A |
| 09:39AM | 23 | NUMBER OF FRONTS -- |
| 09:39AM | 24 | A.  YES. |
| 09:39AM | 25 | Q.  -- IN YOUR RESEARCH; RIGHT? |

PARLOFF CROSS BY MR. CLINE (RES.)                                    7063

09:39AM  1     A.   UH-HUH.

09:39AM  2               MR. CLINE:  YOUR HONOR, I OFFER 14271.

09:39AM  3               MR. BOSTIC:  NO OBJECTION.

09:39AM  4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM  5          (DEFENDANT'S EXHIBIT 14271 WAS RECEIVED IN EVIDENCE.)

09:39AM  6     BY MR. CLINE:

09:39AM  7     Q.   LET'S JUST BLOW UP THE WHOLE THING, AND WE'LL QUICKLY WORK

09:39AM  8     OUR WAY THROUGH IT.

09:39AM  9          CAN YOU SEE THAT OKAY?

09:40AM  10    A.   YES.  THANKS.

09:40AM  11    Q.   ALL RIGHT.  THIS WAS ONE OF A NUMBER OF EMAILS THAT YOU

09:40AM  12    EXCHANGED WITH MS. HOLMES IN THE COURSE OF -- BETWEEN APRIL AND

09:40AM  13    JUNE OF 2014 AS YOU WORKED ON YOUR ARTICLE; RIGHT?

09:40AM  14    A.   YES.

09:40AM  15    Q.   AND WE LOOKED AT A FEW YESTERDAY, BUT THERE WERE A

09:40AM  16    SIGNIFICANT NUMBER OF EMAILS BACK AND FORTH AS YOU ATTEMPTED TO

09:40AM  17    GATHER INFORMATION.

09:40AM  18         FAIR?

09:40AM  19    A.   YES.

09:40AM  20    Q.   SO LET'S JUST QUICKLY TICK THROUGH WHAT YOU'RE UPDATING

09:40AM  21    HER ON HERE.

09:40AM  22         TO BEGIN, YOU SAY YOU HAD LENGTHY DISCUSSIONS YESTERDAY --

09:40AM  23    I'M SORRY, WEDNESDAY WITH OFFICIALS AT A CERTAIN SIGNIFICANT

09:40AM  24    PLAYER IN THE BLOOD ANALYTICS INDUSTRY.

09:40AM  25         DO YOU SEE THAT?

PARLOFF CROSS BY MR. CLINE (RES.)                          7064

```
09:40AM   1    A.   YES.

09:40AM   2    Q.   AND THAT REFERS TO ONE OF THERANOS'S COMPETITORS?

09:40AM   3    A.   IT REFERS TO A SIGNIFICANT PLAYER IN THE BLOOD ANALYTICS

09:40AM   4    INDUSTRY.

09:40AM   5    Q.   WAS THAT ONE OF THERANOS'S COMPETITORS?

09:40AM   6    A.   THIS IS -- I THINK THIS IS -- I DON'T THINK IT'S

09:41AM   7    APPROPRIATE FOR ME TO ANSWER.

09:41AM   8    Q.   DO YOU HAVE YOUR LAWYER HERE TODAY?

09:41AM   9    A.   YES.

09:41AM   10           MR. CLINE:  YOUR HONOR, COULD WE HAVE A BRIEF SECOND

09:41AM   11   HERE FOR HIM TO CHAT WITH HIS LAWYER?

09:41AM   12           THE COURT:  DO YOU FEEL YOU NEED TO TALK TO YOUR

09:41AM   13   LAWYER, SIR, ABOUT THE --

09:41AM   14           THE WITNESS:  I GUESS VERY BRIEFLY.

09:41AM   15           THE COURT:  SURE.  OKAY.  WE'LL TAKE A STANDING

09:41AM   16   BREAK.

09:41AM   17           MR. CLINE:  SURE, YOUR HONOR.

09:41AM   18       (STANDING BREAK.)

09:41AM   19           MR. KOLTUN:  DO YOU HAVE A COPY OF IT?

09:41AM   20       (STANDING BREAK.)

09:42AM   21           THE COURT:  FOLKS, FEEL FREE TO STAND FOR A MOMENT

09:42AM   22   AND STRETCH IF YOU WOULD LIKE.

09:42AM   23       (STRETCHING.)

09:42AM   24       (PAUSE IN PROCEEDINGS.)

09:42AM   25           THE COURT:  MR. CLINE, DO YOU WANT TO STEP OUT AND
```

PARLOFF CROSS BY MR. CLINE (RES.)                    7065

09:42AM  1    JUST SEE IF THEY NEED ANY OF YOUR ASSISTANCE?

09:42AM  2              MR. CLINE:  I'LL BE OF LIMITED VALUE, BUT I'M HAPPY

09:42AM  3    TO TRY.

09:42AM  4              THE COURT:  OH, YOU UNDERESTIMATE YOUR SKILLS,

09:42AM  5    MR. CLINE.

09:42AM  6         (LAUGHTER.)

09:43AM  7         (PAUSE IN PROCEEDINGS.)

09:43AM  8              MR. CLINE:  I'LL TAKE FULL CREDIT FOR THAT,

09:43AM  9    YOUR HONOR.

09:43AM 10              THE COURT:  ALL RIGHT.  THANK YOU.

09:43AM 11         MR. PARLOFF, YOU'RE BACK ON THE STAND.  YOU'VE HAD

09:43AM 12    OCCASION TO SPEAK WITH YOUR ATTORNEY?

09:43AM 13              THE WITNESS:  YES, YOUR HONOR.  THANK YOU.

09:43AM 14              THE COURT:  YOU'RE WELCOME.

09:43AM 15         YOU CAN TAKE YOUR MASK OFF IF YOU WOULD LIKE.

09:43AM 16              THE WITNESS:  THANK YOU.

09:43AM 17              THE COURT:  MR. CLINE.

09:43AM 18    BY MR. CLINE:

09:43AM 19    Q.   MR. PARLOFF, ARE YOU ABLE TO ANSWER MY QUESTION?

09:43AM 20    A.   YEAH.  TO THE EXTENT THAT ANY SIGNIFICANT PLAYER IN THE

09:43AM 21    BLOOD ANALYTICS INDUSTRY WOULD BE CONSIDERED A COMPETITOR, YES.

09:43AM 22    Q.   ALL RIGHT.  SO YOU HAD HAD, AS YOU DESCRIBED, LENGTHY

09:43AM 23    DISCUSSIONS WITH AN ENTITY THAT YOU CONSIDERED TO BE A

09:43AM 24    COMPETITOR OF THERANOS; RIGHT?

09:43AM 25    A.   YES.

PARLOFF CROSS BY MR. CLINE (RES.)                                    7066

```
09:44AM   1    Q.   AND YOU WANTED TO GET TOGETHER AND TALK WITH MS. HOLMES;

09:44AM   2    RIGHT?

09:44AM   3    A.   YES.

09:44AM   4    Q.   AND --

09:44AM   5    A.   WELL, A PHONE CALL.

09:44AM   6    Q.   YES.  AND AT LEAST PART OF YOUR REASON FOR WANTING TO TALK

09:44AM   7    WITH HER WAS TO DISCUSS ISSUES THAT THIS COMPETITOR HAD RAISED?

09:44AM   8    A.   YES, UH-HUH.

09:44AM   9    Q.   ALL RIGHT.  AND SO THEN THERE ARE A SERIES OF SORT OF

09:44AM  10    SPECIFIC ITEMS, AND LET'S JUST VERY QUICKLY TICK THROUGH THOSE.

09:44AM  11         YOU WANTED TO TALK TO GENERAL MATTIS; RIGHT?

09:44AM  12    A.   YES.

09:44AM  13    Q.   AND YOU WERE LOOKING FOR CONTACT INFORMATION FROM

09:44AM  14    MS. HOLMES; RIGHT?

09:44AM  15    A.   YES.

09:44AM  16    Q.   WHICH SHE PROVIDED AND THEN YOU TALKED TO GENERAL MATTIS;

09:44AM  17    RIGHT?

09:44AM  18    A.   THAT'S RIGHT.  THERE ARE CERTAIN LIMITATIONS ON WHAT I

09:44AM  19    COULD ASK.

09:44AM  20    Q.   AND THEN YOU NOTE THAT YOU WERE BOOKED TO SEE

09:44AM  21    HENRY KISSINGER; RIGHT?

09:44AM  22    A.   YES.

09:44AM  23    Q.   AND DID YOU ACTUALLY MEET FACE TO FACE WITH

09:44AM  24    HENRY KISSINGER?

09:44AM  25    A.   I DID.
```

PARLOFF CROSS BY MR. CLINE (RES.)                    7067

09:44AM  1    Q.  AND THAT'S, AGAIN, SOMETHING THAT THERANOS AND MS. HOLMES

09:44AM  2    HELPED ARRANGE?

09:44AM  3    A.  YES.

09:44AM  4    Q.  AND THEN ITEM 2, YOU SAY IT WOULD BE GREAT IF I COULD

09:44AM  5    VISIT YOUR FUNCTIONING LAB IN PHOENIX.

09:45AM  6        DO YOU SEE THAT?

09:45AM  7    A.  YES.

09:45AM  8    Q.  AND WAS THIS AT A TIME WHEN THE LAB WASN'T UP AND RUNNING?

09:45AM  9    A.  THAT'S RIGHT.

09:45AM  10   Q.  ALL RIGHT.  AND SO THAT VISIT DIDN'T HAPPEN; RIGHT?

09:45AM  11   A.  THAT'S RIGHT.

09:45AM  12   Q.  AND THEN THIRD YOU SAY, I'D LIKE TO CONTACT INTERMOUNTAIN

09:45AM  13   TO DISCUSS HOW FAR ALONG THEY ARE AND THEIR PLANS.

09:45AM  14       AND INTERMOUNTAIN WAS ANOTHER HOSPITAL CHAIN?

09:45AM  15   A.  YES.

09:45AM  16   Q.  AND WITH WHICH THERANOS WAS IN DISCUSSIONS; IS THAT RIGHT?

09:45AM  17   A.  YES.

09:45AM  18   Q.  AND YOU SAY, YOU COULD JUST CALL THEIR PR PEOPLE, BUT IF

09:45AM  19   YOU WOULD RATHER I APPROACH IT A DIFFERENT WAY, LET ME KNOW;

09:45AM  20   RIGHT?

09:45AM  21   A.  YES.

09:45AM  22   Q.  AND DID MS. HOLMES PROVIDE A CONTACT AT INTERMOUNTAIN?

09:45AM  23   A.  YES.

09:45AM  24   Q.  AND DID THAT CONTACT OCCUR?

09:45AM  25   A.  YES.

PARLOFF CROSS BY MR. CLINE (RES.)                    7068

09:45AM   1    Q.   ALL RIGHT.  YOU DON'T HAVE TO NAME NAMES, BUT YOU TALKED

09:45AM   2    TO SOMEONE AT INTERMOUNTAIN ABOUT THE RELATIONSHIP WITH

09:45AM   3    THERANOS; RIGHT?

09:45AM   4    A.   YES.

09:45AM   5    Q.   AND THEN THE FINAL POINT IS YOU SAY, I FOUND SOME HELPFUL

09:45AM   6    STUFF ON THE CMS AND FDA SITES REGARDING REGULATORY MATTERS.

09:46AM   7         DO YOU SEE THAT?  ITEM 4?

09:46AM   8    A.   YEAH, UH-HUH, YES.

09:46AM   9    Q.   AND THAT GOES BACK TO THE INTERNET RESEARCH THAT WE WERE

09:46AM  10    TALKING ABOUT BRIEFLY YESTERDAY; RIGHT?

09:46AM  11    A.   YES.

09:46AM  12    Q.   AND THEN YOU SAY, "AND SOMEBODY AT THE FDA HAS ALSO BEEN

09:46AM  13    HELPFUL IN ORIENTING ME THERE."

09:46AM  14         DO YOU SEE THAT?

09:46AM  15    A.   YES.

09:46AM  16    Q.   AND THAT --

09:46AM  17    A.   THAT WAS JUST A PR PERSON.

09:46AM  18    Q.   ALL RIGHT.  BUT YOU DID HAVE SOME SORT OF CONTACT AT THE

09:46AM  19    FDA; RIGHT?

09:46AM  20    A.   WELL, VIRTUALLY MINIMAL.  I MEAN, IT WAS JUST SHE SAID, I

09:46AM  21    CAN'T TELL YOU ANYTHING.  I CAN SHOW YOU WHAT IS ON THE SITE.

09:46AM  22    Q.   ALL RIGHT.  AND SO SHE HELPED YOU NAVIGATE THE SITE?

09:46AM  23    A.   EXACTLY.

09:46AM  24    Q.   ALL RIGHT.

09:46AM  25    A.   AND SHE GAVE ME THE LINKS.

PARLOFF CROSS BY MR. CLINE (RES.)                                7069

09:46AM   1      Q.   YES.  ALL RIGHT.  SO WE COULD PUT THAT ONE ASIDE.

09:46AM   2           AND I WANT TO GO TO ANOTHER ONE.  I'M HOPING THIS WON'T

09:46AM   3      PRESENT A PROBLEM, BUT IT MIGHT.

09:47AM   4           MAY I APPROACH?  YOUR HONOR, MAY I APPROACH?

09:47AM   5                THE COURT:  YES.

09:47AM   6      BY MR. CLINE:

09:47AM   7      Q.   (HANDING.)

09:47AM   8           MR. PARLOFF, I'VE HANDED YOU WHAT HAS BEEN MARKED AS

09:47AM   9      EXHIBIT 10592.  DO YOU HAVE THAT?

09:47AM  10      A.   YES.

09:47AM  11      Q.   AND IF YOU START -- IT ACTUALLY STARTS ON THE BACK.

09:47AM  12      A.   YES.

09:47AM  13      Q.   IT'S DOUBLE SIDED.

09:47AM  14           AND THERE'S AN EMAIL THERE BETWEEN YOU AND A

09:47AM  15      DR. ERIC TOPOL.

09:47AM  16           DO YOU SEE THAT?

09:47AM  17      A.   YES.

09:47AM  18      Q.   AND THEN IF YOU WORKED YOUR WAY UP THE CHAIN, YOU SEE THAT

09:47AM  19      DR. TOPOL HAS RESPONDED TO YOUR EMAIL; RIGHT?

09:47AM  20      A.   YES.

09:48AM  21      Q.   AND THEN YOU SEE THAT DR. TOPOL HAS FORWARDED HIS EXCHANGE

09:48AM  22      WITH YOU ON TO MS. HOLMES; RIGHT?

09:48AM  23      A.   YES.

09:48AM  24      Q.   ALL RIGHT.  I WILL -- AND THIS IS MAY 9TH AND 10TH, 2014;

09:48AM  25      RIGHT?

PARLOFF CROSS BY MR. CLINE (RES.)                        7070

09:48AM  1    A.   YES.

09:48AM  2    Q.   DURING THE PERIOD THAT YOU'RE DOING THE RESEARCH FOR YOUR

09:48AM  3    JUNE 2014 ARTICLE?

09:48AM  4    A.   THAT'S RIGHT.

09:48AM  5         MR. CLINE:  YOUR HONOR, I OFFER 10592.

09:48AM  6    BY THE WAY, ONE THING I WANT TO MAKE CLEAR, AFTER

09:48AM  7    DISCUSSING THIS WITH MR. BOSTIC, THE PORTION AT THE BOTTOM

09:48AM  8    WHERE DR. TOPOL IS RESPONDED TO QUESTIONS, IT'S NOT BEING

09:48AM  9    OFFERED FOR ITS TRUTH.

09:48AM 10         MR. BOSTIC:  AND, YOUR HONOR, I APPRECIATE THAT.  I

09:48AM 11    WOULD SAY 801 AS TO THAT PORTION.

09:48AM 12    I WOULD JUST LIKE TO BETTER UNDERSTAND WHY IT IS COMING IN

09:48AM 13    AND THE PURPOSE.

09:48AM 14         MR. CLINE:  AND I'M HAPPY TO EXPLAIN.

09:48AM 15    WE'RE OFFERING THIS, YOUR HONOR, TO SHOW A COUPLE OF

09:49AM 16    THINGS:  THE INDEPENDENT RESEARCH THAT MR. PARLOFF UNDERTOOK AS

09:49AM 17    HE DID THIS ARTICLE, IN OTHER WORDS, HE WASN'T JUST TALKING TO

09:49AM 18    MS. HOLMES, HE WAS TALKING TO A VARIETY OF OTHER PEOPLE,

09:49AM 19    INCLUDING EXPERTS; AND ALSO TO SHOW MS. HOLMES'S AWARENESS OF

09:49AM 20    THOSE EFFORTS AS THE ARTICLE PROGRESSED.

09:49AM 21    SO IT'S NOT BEING OFFERED FOR THE TRUTH OF ANYTHING THAT

09:49AM 22    DR. TOPOL TELLS HIM.  SIMPLY FOR STATE OF MIND AND TO SHOW THE

09:49AM 23    EXTENT OF DR. PARLOFF'S -- NOT DR. PARLOFF'S -- MR. PARLOFF'S

09:49AM 24    RESEARCH.

09:49AM 25         THE COURT:  ISN'T IT IN EVIDENCE ALREADY THAT

PARLOFF CROSS BY MR. CLINE (RES.)                                  7071

```
09:49AM   1         MS. HOLMES SUGGESTED HE SPEAK WITH OTHER PEOPLE?

09:49AM   2              MR. CLINE:  THAT IS.  THIS PARTICULAR PERSON IS NOT,

09:49AM   3    AND THIS IS AN INDEPENDENT EXPERT, A MEDICAL DOCTOR AT A

09:49AM   4    PRESTIGIOUS INSTITUTION, AND THAT'S WHY WE WANTED TO PUT THAT

09:49AM   5    IN.

09:49AM   6              THE COURT:  YOU JUST DID.

09:49AM   7              MR. CLINE:  WELL, UNFORTUNATELY WHAT I SAY IS NOT

09:50AM   8    EVIDENCE.  I WISH IT WERE.

09:50AM   9              THE COURT:  ALL RIGHT.  I'LL ALLOW THIS TO COME IN.

09:50AM  10         LADIES AND GENTLEMEN, IT'S ONLY COMING IN NOT FOR THE

09:50AM  11    TRUTH OF THE MATTER ASSERTED.

09:50AM  12         IS THAT WHAT YOU'RE TELLING THE JURY?

09:50AM  13              MR. CLINE:  YES.

09:50AM  14              THE COURT:  BUT ONLY TO SHOW KNOWLEDGE THAT

09:50AM  15    MS. HOLMES KNEW THAT THIS WITNESS WAS DOING ADDITIONAL RESEARCH

09:50AM  16    AT HER SUGGESTION?

09:50AM  17              MR. CLINE:  WELL, ON THIS PARTICULAR PERSON, I'M NOT

09:50AM  18    SURE.  WE'LL FIND OUT.

09:50AM  19         BUT IN GENERAL, YES.

09:50AM  20              THE COURT:  OKAY.  SO, LADIES AND GENTLEMEN, THIS IS

09:50AM  21    OFFERED NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT ONLY TO

09:50AM  22    SHOW THE STATE OF MIND OF MS. HOLMES, THAT IS, AS TO KNOWLEDGE

09:50AM  23    OF THIS WITNESS'S ENGAGING IN ADDITIONAL RESEARCH.

09:50AM  24         (DEFENDANT'S EXHIBIT 10592 WAS RECEIVED IN EVIDENCE.)

09:50AM  25              THE COURT:  ALL RIGHT.
```

PARLOFF CROSS BY MR. CLINE (RES.)                              7072

09:50AM  1              MR. CLINE:  THANK YOU.

09:50AM  2     Q.   ALL RIGHT.  MR. PARLOFF, IF YOU LOOK AT THIS DOCUMENT --

09:50AM  3     WE CAN PUT IT UP NOW.  IF WE CAN GO TO THE BOTTOM EMAIL THERE.

09:50AM  4          THIS, THIS RUNS OVER ON TO THE BACK PAGE, AND I'M NOT SURE

09:51AM  5     IF THERE'S ANYTHING THAT YOU CAN DO ABOUT THAT TO DISPLAY IT.

09:51AM  6          DO YOU SEE THAT THIS IS -- YOU'VE HAD AN EXCHANGE WITH A

09:51AM  7     DR. ERIC TOPOL.

09:51AM  8          DO YOU SEE THAT?

09:51AM  9     A.   YES.

09:51AM  10    Q.   AND WAS HE SOMEONE THAT MS. HOLMES HAD REFERRED YOU TO?

09:51AM  11    A.   YES.

09:51AM  12    Q.   AND DR. TOPOL IS -- HE'S A MEDICAL DOCTOR; RIGHT?

09:51AM  13    A.   YES.

09:51AM  14    Q.   AND HE'S AT THE SCRIPPS -- HE'S A -- AT THE SCRIPPS

09:51AM  15    TRANSLATIONAL SCIENCE INSTITUTE; RIGHT?

09:51AM  16    A.   YEAH, HE CERTAINLY WAS THEN.

09:51AM  17    Q.   I'M SORRY?

09:51AM  18    A.   AND HE MAY STILL BE THERE.

09:51AM  19    Q.   OF COURSE.  WE'RE TALKING ABOUT MAY OF 2014 WHEN YOU WERE

09:51AM  20    TALKING WITH HIM; RIGHT?

09:51AM  21    A.   YES.

09:51AM  22    Q.   HE'S A PROFESSOR OF GENOMICS AT THE SCRIPPS RESEARCH

09:51AM  23    INSTITUTE; IS THAT RIGHT?

09:51AM  24    A.   YES.

09:51AM  25    Q.   AND HE IS AN EXPERT THAT YOU WERE TALKING TO, ALONG WITH

PARLOFF CROSS BY MR. CLINE (RES.)                                   7073

```
09:51AM   1    DR. HELFET WHO WE WERE DISCUSSING YESTERDAY, TO GET A READ ON

09:52AM   2    THERANOS'S WORK; RIGHT?

09:52AM   3    A.   YES.

09:52AM   4    Q.   AND YOU SENT HIM AN EMAIL, THIS IS THE BOTTOM EMAIL IN

09:52AM   5    THIS CHAIN; RIGHT?

09:52AM   6    A.   YES.

09:52AM   7    Q.   AND YOU SAY, "ERIC --

09:52AM   8        "I'M THE 'FORTUNE' REPORTER YOU SPOKE WITH A COUPLE OF

09:52AM   9    WEEKS," I THINK YOU MEANT TO SAY AGO, "ABOUT THERANOS AND

09:52AM  10    ELIZABETH HOLMES."  YOU GO ON, "I HAVE HAD SOME BACKGROUND

09:52AM  11    DISCUSSION WITH SOME OFFICIALS WITH AN INCUMBENT BLOOD

09:52AM  12    ANALYTICS COMPANY."

09:52AM  13        RIGHT?

09:52AM  14    A.   YES.

09:52AM  15    Q.   AND CAN WE SAY THAT THAT IS ONE OF THERANOS'S COMPETITORS?

09:52AM  16    A.   YES.

09:52AM  17    Q.   AND YOU SAY, "NOT SURPRISINGLY, THEY WERE POOH-POOH'ING

09:52AM  18    WHAT THEY UNDERSTAND TO BE THERANOS'S ACCOMPLISHMENTS IN A

09:52AM  19    NUMBER OF WAYS."

09:52AM  20        RIGHT?

09:52AM  21    A.   YES.

09:52AM  22    Q.   AND YOU LIST A NUMBER OF WAYS THAT THEY WERE POOH-POOH'ING

09:52AM  23    THE ACCOMPLISHMENTS IN NUMBER POINTS; RIGHT?

09:52AM  24    A.   YES.

09:53AM  25    Q.   AND DR. TOPOL RESPONDS TO YOU; RIGHT?
```

PARLOFF CROSS BY MR. CLINE (RES.)                    7074

09:53AM  1      A.   YES.

09:53AM  2      Q.   AND THAT'S THE NEXT EMAIL UP?

09:53AM  3      A.   IT LOOKS LIKE -- OH, YEAH, UH-HUH.

09:53AM  4      Q.   ALSO ON MAY 9TH, 2014; RIGHT?

09:53AM  5      A.   YES.

09:53AM  6      Q.   AND HE SAYS, "HI ROGER,

09:53AM  7           "THANKS FOR YOUR NOTE - NOT SURPRISING THAT THE THREATENED

09:53AM  8      ENTITIES WOULD COME BACK WITH THESE POINTS."

09:53AM  9           AND THEN HE INTERLINEATES HIS RESPONSES TO YOUR COMMENTS;

09:53AM 10      RIGHT?

09:53AM 11      A.   YES.

09:53AM 12      Q.   AND ALTHOUGH YOU'RE NOT COPIED ON THE EMAIL, THIS GETS

09:53AM 13      FORWARDED ON TO MS. HOLMES; RIGHT?

09:53AM 14           DO YOU SEE THAT?

09:53AM 15      A.   YES.

09:54AM 16      Q.   ALL RIGHT.  WE CAN TAKE THAT DOWN.

09:54AM 17           THE LAST THING I WANT TO DO -- AND I'M HOPING THAT WE CAN

09:54AM 18      TICK THROUGH THESE QUICKLY -- I WANT TO GET THESE DATES IN THE

09:54AM 19      RECORD.

09:54AM 20           IF YOU CAN REFER TO YOUR DOCUMENT, IT WILL BE TAB 1646 IN

09:54AM 21      THE NOTEBOOK THERE, AND I CAN POINT YOU TO PARTICULAR PAGES IF

09:54AM 22      YOU NEED ME TO REFRESH YOUR RECOLLECTION.

09:54AM 23           WE TALKED YESTERDAY ABOUT THE NUMBER OF HOURS TOTAL THAT

09:54AM 24      YOU SPENT TALKING WITH MS. HOLMES; RIGHT?

09:54AM 25      A.   YES.

7075
PARLOFF CROSS BY MR. CLINE (RES.)

09:54AM   1    Q.   AND WHAT I WANT TO DO HERE IS QUICKLY TICK THROUGH THE

09:54AM   2    DATES, THE NUMBER OF INTERACTIONS THAT YOU HAD BETWEEN THE

09:54AM   3    FIRST ONE ON APRIL THE 7TH AND THE PUBLICATION OF YOUR ARTICLE

09:54AM   4    IN JUNE OF 2014.

09:54AM   5    A.   OKAY.

09:54AM   6    Q.   ALL RIGHT.  LET'S RUN THROUGH THESE DATES AND SEE IF WE

09:54AM   7    CAN JUST AGREE ON THEM QUICKLY.  OKAY?

09:54AM   8    A.   OKAY.

09:54AM   9    Q.   THE FIRST INTERVIEW WAS APRIL THE 7TH; RIGHT?

09:54AM   10   A.   YES.

09:54AM   11   Q.   AND YOU TALKED WITH MS. HOLMES FOR A COUPLE OF HOURS THAT

09:54AM   12   DAY?

09:54AM   13   A.   WHATEVER IS -- YEAH.

09:54AM   14   Q.   ALL RIGHT.  WE DON'T HAVE TO NAIL IT DOWN --

09:55AM   15   A.   YEAH.

09:55AM   16   Q.   -- BUT YOU RECORDED SOME OF THAT INTERACTION; RIGHT?

09:55AM   17   A.   YEAH.

09:55AM   18   Q.   AND YOU HAD DINNER WITH MS. HOLMES THAT EVENING; RIGHT?

09:55AM   19   A.   YES.

09:55AM   20   Q.   AND THEN APRIL THE 8TH YOU SPOKE AGAIN WITH MS. HOLMES?

09:55AM   21   A.   YES, UH-HUH.

09:55AM   22   Q.   AND THE 7TH AND THE 8TH, THOSE ARE THE TWO DAYS THAT YOU

09:55AM   23   WERE ACTUALLY AT THERANOS; RIGHT?

09:55AM   24   A.   YES.  I THINK I WAS THERE THE 10TH AS WELL.

09:55AM   25   Q.   OKAY.

PARLOFF CROSS BY MR. CLINE (RES.)                              7076

09:55AM   1   A.   AND I MIGHT HAVE SHOWN UP FOR PARTS OF THE 9TH, BUT TO SEE

09:55AM   2   OTHER PEOPLE.

09:55AM   3   Q.   ALL RIGHT.  SO YOU THINK A TOTAL OF FOUR DAYS --

09:55AM   4   A.   YEAH.

09:55AM   5   Q.   -- IN WHOLE OR IN PART YOU WERE IN CAMPUS THERE AT

09:55AM   6   THERANOS?

09:55AM   7   A.   YEAH, UH-HUH.

09:55AM   8   Q.   AND THAT'S WHEN YOU HAD THE TOUR THAT YOU DESCRIBED;

09:55AM   9   RIGHT?

09:55AM   10  A.   I DON'T KNOW WHICH DAY IT WAS.

09:55AM   11  Q.   BUT SOMEWHERE IN THAT FOUR DAY STRETCH?

09:55AM   12  A.   YES.

09:55AM   13  Q.   AND YOU ALSO SAT IN ON A PRODUCT MEETING OF SOME KIND?

09:55AM   14  A.   YES.

09:55AM   15  Q.   AND THAT WAS SOMETHING, EVEN THOUGH YOU WERE ABLE TO SIT

09:55AM   16  ON IT, IT WAS OFF THE RECORD AND YOU WERE NOT ABLE TO REPORT IT

09:55AM   17  IN YOUR ARTICLE; RIGHT?

09:55AM   18  A.   THAT'S RIGHT.

09:56AM   19  Q.   AM I REMEMBERING THAT RIGHT?

09:56AM   20  A.   AND THERE WERE NO NOTES OR TAPES.

09:56AM   21  Q.   AND THIS IS A MEETING WHERE MS. HOLMES IS MEETING WITH HER

09:56AM   22  TEAM AND THEY'RE TALKING ABOUT SOME ISSUE WITH THE TECHNOLOGY;

09:56AM   23  RIGHT?

09:56AM   24  A.   YES.

09:56AM   25  Q.   SO WE HAVE THE 7TH AND THE 8TH.

7077

PARLOFF CROSS BY MR. CLINE (RES.)

| | | |
|---|---|---|
| 09:56AM | 1 | AND THEN YOU SPOKE AGAIN WITH MS. HOLMES ON THE 10TH; |
| 09:56AM | 2 | RIGHT? |
| 09:56AM | 3 | A.   YES. |
| 09:56AM | 4 | Q.   APRIL 10TH, 2014, JUST SO THE RECORD IS CLEAR HERE. |
| 09:56AM | 5 | AND YOU SPOKE WITH HER AGAIN ON APRIL 22ND, 2014? |
| 09:56AM | 6 | A.   UM -- |
| 09:56AM | 7 | Q.   THIS IS AT PAGE 60 OF THAT DOCUMENT IF YOU WANT TO REFER |
| 09:56AM | 8 | TO IT. |
| 09:56AM | 9 | A.   PAGE 60.  YES. |
| 09:56AM | 10 | Q.   APRIL 29TH, 2014.  THAT'S AT PAGE 61? |
| 09:56AM | 11 | A.   YES. |
| 09:56AM | 12 | Q.   MAY 5TH, 2014.  THAT'S AT PAGE 65? |
| 09:56AM | 13 | A.   YES. |
| 09:56AM | 14 | Q.   MAY 12TH, 2014.  THAT'S AT PAGE 67? |
| 09:56AM | 15 | A.   YES. |
| 09:56AM | 16 | Q.   MAY 14TH, 2014.  THAT'S AT 84? |
| 09:56AM | 17 | A.   YES. |
| 09:57AM | 18 | Q.   MAY 21ST, 2014.  THAT'S AT 85? |
| 09:57AM | 19 | A.   YES. |
| 09:57AM | 20 | Q.   MAY 20 -- |
| 09:57AM | 21 | A.   MAY 21ST?  YES. |
| 09:57AM | 22 | Q.   MAY 28TH, 2014.  THAT'S ALSO AT 85? |
| 09:57AM | 23 | A.   YEAH. |
| 09:57AM | 24 | Q.   AND THEN AGAIN ON JUNE THE 2ND, 2014.  AND UNFORTUNATELY, |
| 09:57AM | 25 | I'M GOING TO RELY ON YOUR MEMORY FOR THAT ONE.  I DON'T HAVE A |

PARLOFF REDIRECT BY MR. BOSTIC                                    7078

09:57AM   1    NOTE THAT I CAN POINT YOU TO.

09:57AM   2    A.   WHICH ONE WAS IT?

09:57AM   3    Q.   JUNE 2ND, 2014.

09:57AM   4    A.   THAT SOUNDS RIGHT.

09:57AM   5    Q.   AND AS WE DISCUSSED, IN ADDITION TO THESE CALLS AND

09:57AM   6    MEETINGS, THERE WERE A WHOLE SERIES OF EMAIL EXCHANGES, SOME OF

09:57AM   7    WHICH WE'VE SEEN; RIGHT?

09:57AM   8    A.   YES.

09:57AM   9    Q.   ALL RIGHT.

09:57AM   10        THAT'S ALL OF MY QUESTIONS, YOUR HONOR.  THANK YOU.

09:57AM   11             THE COURT:  REDIRECT?

09:57AM   12             MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:57AM   13                    **REDIRECT EXAMINATION**

09:57AM   14   BY MR. BOSTIC:

09:58AM   15   Q.   GOOD MORNING, MR. PARLOFF.

09:58AM   16   A.   GOOD MORNING.

09:58AM   17             MR. BOSTIC:  YOUR HONOR, A BRIEF HOUSEKEEPING MATTER

09:58AM   18   FROM YESTERDAY AND TODAY.  THE PARTIES HAVE PLAYED AUDIO

09:58AM   19   EXCERPTS INTO THE RECORD.  WOULD THE COURT ORDER THAT THE

09:58AM   20   TRANSCRIPTS OF THOSE RECORDS BE APPENDED TO THE RECORD IN THIS

09:58AM   21   CASE?

09:58AM   22        I HAVE SPOKEN TO MR. CLINE AND I UNDERSTAND THERE'S NO

09:58AM   23   OBJECTION.

09:58AM   24             MR. CLINE:  NO OBJECTION TO IT BEING APPENDED TO THE

09:58AM   25   RECORD.  IT WILL NOT BE EVIDENCE IN THE CASE.

09:58AM   1        MR. BOSTIC:  AGREED, YOUR HONOR.

09:58AM   2        THE COURT:  YOU HAVE TRANSCRIPTS, INDEPENDENT

09:58AM   3   TRANSCRIPTS YOU'RE SPEAKING OF?

09:58AM   4        MR. BOSTIC:  YES, YOUR HONOR.  THE PARTIES CAN AGREE

09:58AM   5   ON THEM AND PROVIDE THEM IN DUE COURSE.

09:58AM   6        THE COURT:  ALL RIGHT.  THANK YOU.

09:58AM   7        MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:58AM   8        THE COURT:  AND THAT'S APPROVED, YES.

09:58AM   9   BY MR. BOSTIC:

09:58AM  10   Q.   MR. PARLOFF, DO YOU RECALL DISCUSSIONS WITH MR. CLINE

09:59AM  11   ABOUT YOUR CONVERSATIONS WITH MS. HOLMES ABOUT USE OF THE

09:59AM  12   THERANOS TECHNOLOGY BY THE U.S. MILITARY?

09:59AM  13   A.   YES.

09:59AM  14   Q.   MR. CLINE PLAYED FOR YOU A CLIP YESTERDAY WHERE THAT TOPIC

09:59AM  15   CAME UP.

09:59AM  16        DO YOU REMEMBER THAT CLIP GENERALLY?

09:59AM  17   A.   YES.

09:59AM  18   Q.   AND IN THAT CLIP, IN RESPONSE TO A QUESTION BY YOU ABOUT

09:59AM  19   THE MILITARY, MS. HOLMES SAID SOMETHING TO THE EFFECT OF THAT

09:59AM  20   THE BEST WAY TO SAY THAT WAS IN TERMS OF DECENTRALIZING AND

09:59AM  21   THAT THE APPLICATION OF THAT MIGHT INCLUDE THE MILITARY.

09:59AM  22        DO YOU RECALL THAT?

09:59AM  23   A.   YES.

09:59AM  24   Q.   IN YOUR --

09:59AM  25   A.   IT MIGHT INCLUDE A MILITARY.

PARLOFF REDIRECT BY MR. BOSTIC                                    7080

```
09:59AM   1    Q.   THAT THE APPLICATION, ONE OF THE APPLICATIONS MIGHT BE THE

09:59AM   2    MILITARY?

09:59AM   3    A.   YES, YEAH.

09:59AM   4    Q.   THAT STATEMENT BY MS. HOLMES WAS CONSISTENT WITH WHAT

09:59AM   5    ENDED UP IN YOUR ARTICLE, CORRECT, THAT USE OF THE TECHNOLOGY

09:59AM   6    BY THE MILITARY IS SOMETHING THAT ONE COULD IMAGINE?

09:59AM   7    A.   YES.

10:00AM   8    Q.   THAT CONVERSATION WAS RECORDED; IS THAT RIGHT?

10:00AM   9    A.   I BELIEVE SO.

10:00AM  10    Q.   AND WE LISTENED TO A CLIP FROM IT?

10:00AM  11    A.   YEAH.

10:00AM  12    Q.   WHEN YOU RECORDED CONVERSATIONS WITH MS. HOLMES, DID YOU

10:00AM  13    MAKE A POINT OF MAKING SURE SHE KNEW THAT THAT RECORDING WAS

10:00AM  14    TAKING PLACE?

10:00AM  15    A.   YES, UH-HUH.

10:00AM  16    Q.   DID THAT HAPPEN EACH TIME?

10:00AM  17    A.   YES.

10:00AM  18    Q.   AND DID THE TOPIC OF THERANOS'S USE -- EXCUSE ME, THE

10:00AM  19    MILITARY USE OF THERANOS'S TECHNOLOGY ALSO COME UP IN

10:00AM  20    UNRECORDED CONVERSATIONS?

10:00AM  21    A.   YES.

10:00AM  22    Q.   LET ME ASK YOU A QUESTION ABOUT -- OR A COUPLE OF

10:00AM  23    QUESTIONS ABOUT YOUR SHORTHAND AND SPEED WRITING TECHNIQUES.

10:00AM  24    A.   YES.

10:00AM  25    Q.   DO YOU RECALL DISCUSSING THAT BOTH ON DIRECT AND CROSS?
```

PARLOFF REDIRECT BY MR. BOSTIC                                    7081

| | | |
|---|---|---|
| 10:00AM | 1 | A.   YES. |
| 10:00AM | 2 | Q.   AND JUST TO CLARIFY, THE TECHNIQUE THAT YOU USE, ARE YOU |
| 10:00AM | 3 | JUST WRITING DOWN YOUR IMPRESSIONS OF WHAT THE SUBJECT IS |
| 10:00AM | 4 | TELLING YOU, OR ARE YOU MAKING YOUR BEST EFFORTS TO ACTUALLY |
| 10:00AM | 5 | CAPTURE THE WORDS THAT ARE BEING USED? |
| 10:00AM | 6 | A.   IT ATTEMPTS TO BE VERBATIM, THE WORDS, THE EXACT WORDS. |
| 10:01AM | 7 | Q.   THANK YOU. |
| 10:01AM | 8 | A.   YEP. |
| 10:01AM | 9 | Q.   AND YOU USED THAT PRACTICE IN RECORDING AND MEMORIALIZING |
| 10:01AM | 10 | YOUR CONVERSATIONS WITH MS. HOLMES AND THE STATEMENTS THAT SHE |
| 10:01AM | 11 | MADE TO YOU? |
| 10:01AM | 12 | A.   YES. |
| 10:01AM | 13 | Q.   AND YOU PRESERVE THOSE NOTES AFTERWARDS? |
| 10:01AM | 14 | A.   YES. |
| 10:01AM | 15 | Q.   AND HAVE YOU REVIEWED THOSE NOTES SINCE YOUR CONVERSATIONS |
| 10:01AM | 16 | WITH MS. HOLMES AND BEFORE TESTIFYING IN THIS TRIAL? |
| 10:01AM | 17 | A.   YES. |
| 10:01AM | 18 | Q.   MULTIPLE TIMES? |
| 10:01AM | 19 | A.   YES. |
| 10:01AM | 20 | Q.   NO FURTHER QUESTIONS. |
| 10:01AM | 21 | THANK YOU, MR. PARLOFF. |
| 10:01AM | 22 | MR. CLINE:  NOTHING MORE, YOUR HONOR. |
| 10:01AM | 23 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 10:01AM | 24 | MR. BOSTIC:  YES. |
| 10:01AM | 25 | MR. CLINE:  YES. |

7082

| | | |
|---|---|---|
| 10:01AM | 1 | THE COURT:  SIR, YOU'RE EXCUSED.  YOU CAN JUST LEAVE |
| 10:01AM | 2 | ALL OF THAT THERE ON THE COUNTER. |
| 10:02AM | 3 | ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT |
| 10:02AM | 4 | MR. PARLOFF HAS LEFT THE COURTROOM NOW. |
| 10:02AM | 5 | DOES THE GOVERNMENT HAVE AN ADDITIONAL WITNESS TO CALL? |
| 10:02AM | 6 | MR. SCHENK:  YOUR HONOR, MAY I? |
| 10:02AM | 7 | THE COURT:  PLEASE. |
| 10:02AM | 8 | MR. SCHENK:  A COUPLE OF THINGS FIRST. |
| 10:02AM | 9 | THE GOVERNMENT MOVES INTO EVIDENCE EXHIBIT 4859.  I |
| 10:02AM | 10 | BELIEVE THE DEFENSE AGREES. |
| 10:02AM | 11 | MR. WADE:  THIS IS THE CONDITIONAL? |
| 10:02AM | 12 | NO OBJECTION. |
| 10:02AM | 13 | THE COURT:  THAT'S ADMITTED WITHOUT OBJECTION. |
| 10:02AM | 14 | (GOVERNMENT'S EXHIBIT 4859 WAS RECEIVED IN EVIDENCE.) |
| 10:02AM | 15 | MR. SCHENK:  SECOND, AS THE COURT KNOWS, BECAUSE ONE |
| 10:02AM | 16 | PATIENT WILL NOT TESTIFY IN THIS TRIAL, THE GOVERNMENT MOVES TO |
| 10:02AM | 17 | DISMISS, WITHOUT PREJUDICE, COUNT NINE AS TO THIS DEFENDANT. |
| 10:02AM | 18 | THE COURT:  ALL RIGHT.  COUNT NINE OF THE THIRD |
| 10:02AM | 19 | SUPERSEDING INDICTMENT AS TO THIS DEFENDANT, MS. HOLMES? |
| 10:02AM | 20 | MR. SCHENK:  YES, YOUR HONOR. |
| 10:02AM | 21 | THE COURT:  ANY OBJECTION? |
| 10:03AM | 22 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:03AM | 23 | THE COURT:  ALL RIGHT.  THANK YOU.  THAT'S GRANTED. |
| 10:03AM | 24 | THEN COUNT NINE, COUNT NINE, LADIES AND GENTLEMEN, THE |
| 10:03AM | 25 | GOVERNMENT HAS MOVED TO DISMISS COUNT NINE OF THE THIRD |

10:03AM 1    SUPERSEDING INDICTMENT.  THAT IS GRANTED, AND THAT WILL NOT BE

10:03AM 2    BEFORE YOU FOR DECISION.

10:03AM 3        THANK YOU.

10:03AM 4            MR. SCHENK:  THANK YOU, YOUR HONOR.

10:03AM 5        AND FINALLY, THE UNITED STATES RESTS.

10:03AM 6            THE COURT:  ALL RIGHT.  THANK YOU.  THE GOVERNMENT

10:03AM 7    RESTS.

10:03AM 8        LADIES AND GENTLEMEN, WHAT THAT MEANS IS THAT THE

10:03AM 9    GOVERNMENT HAS PRESENTED THEIR ENTIRE CASE TO YOU NOW.

10:03AM 10       AT THIS TIME, LET ME CALL ON THE DEFENSE.

10:03AM 11       MR. DOWNEY, DO YOU HAVE A WITNESS TO CALL?

10:03AM 12           MR. DOWNEY:  YOUR HONOR, BEFORE THAT BEGINS, THE

10:03AM 13   DEFENSE HAS SOME MOTIONS TO RAISE WITH THE COURT.

10:03AM 14           THE COURT:  OKAY.

10:03AM 15           MR. DOWNEY:  WE WILL NOT NEED THE PRESENCE OF THE

10:03AM 16   JURY FOR THAT.

10:03AM 17           THE COURT:  ALL RIGHT.

10:03AM 18           MR. DOWNEY:  SO IF WE CAN TAKE A BRIEF ADJOURNMENT

10:03AM 19   AND BEGIN WITH THAT?

10:03AM 20           THE COURT:  LET'S DO THAT.

10:03AM 21       WE'LL TAKE A BREAK, LADIES AND GENTLEMEN.  I NEED TO TALK

10:03AM 22   WITH THE LAWYERS ABOUT THE NEXT STEPS, SO WE'LL TAKE A BREAK.

10:04AM 23       THIS WILL PROBABLY BE ABOUT -- WELL, I DON'T KNOW.  I'M

10:04AM 24   NOT GOING TO MAKE ANY TIMING PROMISES, BUT WE'LL TAKE A BREAK

10:04AM 25   AND WE'LL CALL YOU BACK IN WHEN NECESSARY.

7084

| | | |
|---|---|---|
| 10:04AM | 1 | THANK YOU. |
| 10:04AM | 2 | (JURY OUT AT 10:04 A.M.) |
| 10:04AM | 3 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 10:04AM | 4 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE |
| 10:04AM | 5 | COURTROOM.  ALL PARTIES REMAIN.  COUNSEL AND MS. HOLMES REMAIN. |
| 10:04AM | 6 | MR. DOWNEY, SHOULD I HEAR FROM MS. SAHARIA NOW? |
| 10:04AM | 7 | MR. DOWNEY:  YES, YOUR HONOR.  MS. SAHARIA IS GOING |
| 10:04AM | 8 | TO SPEAK TO THE COURT ABOUT ISSUES UNDER RULE 29, AS WELL AS |
| 10:05AM | 9 | SOME OTHER ISSUES RELATED TO THE RECORD TO DATE IN THE CASE. |
| 10:05AM | 10 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:05AM | 11 | GOOD MORNING AGAIN, MS. SAHARIA. |
| 10:05AM | 12 | MS. SAHARIA:  GOOD MORNING AGAIN, YOUR HONOR. |
| 10:05AM | 13 | WE DO INTEND TO MOVE FOR JUDGMENT OF ACQUITTAL UNDER |
| 10:05AM | 14 | RULE 29, BUT BEFORE I DO THAT -- AND I THINK THE INTENT TODAY |
| 10:05AM | 15 | IS TO DO THAT GENERALLY AND IN THE INTEREST OF MOVING ALONG, |
| 10:05AM | 16 | AND THEN WE CAN TAKE UP THE ARGUMENT AT A LATER DATE IF THAT'S |
| 10:05AM | 17 | THE COURT'S PREFERENCE. |
| 10:05AM | 18 | BUT BEFORE I DO THAT, WE HAVE THREE HOUSEKEEPING MATTERS |
| 10:05AM | 19 | TO RAISE WITH RESPECT TO THE EVIDENCE THAT HAS COME INTO THE |
| 10:05AM | 20 | GOVERNMENT'S CASE, AND MR. LOOBY IS GOING TO ADDRESS THE FIRST |
| 10:05AM | 21 | OF THOSE HOUSEKEEPING MATTERS. |
| 10:05AM | 22 | THE COURT:  OKAY. |
| 10:05AM | 23 | MS. SAHARIA:  AND THEN I'LL RETURN FOR THE OTHER |
| 10:05AM | 24 | TWO. |
| 10:05AM | 25 | THE COURT:  ALL RIGHT.  THANK YOU. |

| 10:05AM | 1 | MR. LOOBY?  SHOULD I SAY IT'S NICE TO SEE YOU AGAIN AS |
| 10:05AM | 2 | WELL, MR. LOOBY? |
| 10:05AM | 3 | MR. LOOBY:  YES, YOUR HONOR, IT'S WONDERFUL TO BE |
| 10:06AM | 4 | BACK UP HERE.  GOOD MORNING. |
| 10:06AM | 5 | WE'RE DISCUSSING THE CMS REPORT AGAIN. |
| 10:06AM | 6 | SO THIS EVIDENTIARY RULING THE DEFENSE IS MOVING TO |
| 10:06AM | 7 | STRIKE, UNDER RULE 403 AND THE CONFRONTATION CLAUSE, THE |
| 10:06AM | 8 | PORTIONS OF THE JANUARY 25, 2016 CMS FORM 2567 AND COVER LETTER |
| 10:06AM | 9 | AND RELATED TESTIMONY THAT WERE ADMITTED DURING THE TESTIMONY |
| 10:06AM | 10 | OF DR. DAS, AND THAT'S EXHIBIT 4621 AS REDACTED, AND I BELIEVE |
| 10:06AM | 11 | IT CAME IN AS 4621A AND 4621B. |
| 10:06AM | 12 | WE MAKE THIS MOTION NOW THAT THE GOVERNMENT HAS RESTED. |
| 10:06AM | 13 | THERE ARE TWO REASONS WHY THE GOVERNMENT'S CASE, NOW THAT WE |
| 10:06AM | 14 | HAVE SEEN IT, THE COMPLETE CASE, CANNOT JUSTIFY ADMISSION OF |
| 10:06AM | 15 | THE REPORT. |
| 10:06AM | 16 | THE FIRST AND PROBABLY THE MOST IMPORTANT IS THE |
| 10:06AM | 17 | GOVERNMENT HAS RESTED WITHOUT CALLING A CMS WITNESS.  THIS |
| 10:06AM | 18 | RAISES 403 AND CONFRONTATION CLAUSE CONCERNS. |
| 10:06AM | 19 | THE GOVERNMENT HAD PREVIOUSLY NOTED THAT THIS TESTIMONY IS |
| 10:07AM | 20 | A NECESSARY PREREQUISITE TO THE REPORT'S ADMISSION.  THE FACT |
| 10:07AM | 21 | THAT A CMS INSPECTOR WOULD TESTIFY WAS THE PRIMARY REASON WHY |
| 10:07AM | 22 | THE GOVERNMENT ASKED THE COURT TO REJECT OUR RULE 403 ARGUMENTS |
| 10:07AM | 23 | WHEN WE FIRST LITIGATED THIS MATTER PRETRIAL, AND THAT'S AT |
| 10:07AM | 24 | DOCKET 675. |
| 10:07AM | 25 | SO THEY SAID FUNDAMENTALLY THE EVIDENCE IS NOT EXCLUDABLE |

7086

| | | |
|---|---|---|
| 10:07AM | 1 | BECAUSE IT'S SUBJECTIVE.  THE REMEDY IS CROSS-EXAMINATION.  AND |
| 10:07AM | 2 | THAT'S AT PAGE 8 OR 9, 8 TO 9.  AND AGAIN AT PAGE 8, MS. HOLMES |
| 10:07AM | 3 | REMAINS FREE TO CROSS-EXAMINE THE CMS WITNESSES AND ATTEMPT TO |
| 10:07AM | 4 | UNDERCUT THEIR OBSERVATIONS. |
| 10:07AM | 5 | THIS CONCESSION FROM THE GOVERNMENT PRETRIAL, IT MAKES |
| 10:07AM | 6 | SENSE, THE CMS REPORT POSES SEVERAL ISSUES AS A PIECE OF |
| 10:07AM | 7 | EVIDENCE, MANY OF WHICH WE HAVE ALREADY DISCUSSED, THAT MAKE IT |
| 10:07AM | 8 | DANGEROUS WITHOUT CONTEXT FROM ITS AUTHORS.  THAT'S THE |
| 10:08AM | 9 | TECHNICAL NATURE, THE FACT THAT IT SETS FORTH OBSERVATIONS OF |
| 10:08AM | 10 | REGULATORY VIOLATIONS THAT ARE DETERMINED BY THE INSPECTORS |
| 10:08AM | 11 | THEMSELVES, AND ALSO THAT WE WOULD PROFFER THAT THE CMS |
| 10:08AM | 12 | INSPECTORS WOULD HAVE TESTIFIED THAT A LOT OF THOSE |
| 10:08AM | 13 | OBSERVATIONS, INCLUDING WHETHER OR NOT A LAB PRACTICE IS |
| 10:08AM | 14 | DEFICIENT, WHETHER A LAB, DEFICIENT LAB PRACTICE RISES TO A |
| 10:08AM | 15 | STANDARD OR A CONDITION LEVEL, AND WHETHER IMMEDIATE JEOPARDY |
| 10:08AM | 16 | IS FOUND OR INHERENTLY SUBJECTIVE OBSERVATIONS. |
| 10:08AM | 17 | THE REPORT HAS BEEN ADMITTED AND MS. HOLMES DID NOT HAVE |
| 10:08AM | 18 | AN OPPORTUNITY TO CONFRONT THE AUTHORS ON THOSE POINTS. |
| 10:08AM | 19 | AND I'LL BE BRIEF ON THIS POINT, BUT THE SECOND REASON, |
| 10:08AM | 20 | AND IT DOVETAILS WITH THE FIRST, IS THAT THE GOVERNMENT MOVED |
| 10:08AM | 21 | TO ADMIT THE REPORT AS BEARING ON MS. HOLMES'S STATE OF MIND |
| 10:08AM | 22 | AND NOTICE TO HER, AND THAT IS AT -- THE FIRST OF THOSE |
| 10:08AM | 23 | EXCHANGES WITH THE COURT AND MR. LEACH WAS AT 5810 OF THE |
| 10:08AM | 24 | TRANSCRIPT. |
| 10:09AM | 25 | THE ISSUE THAT THIS PRESENTS IS THAT IT'S ONLY NOTICE AND |

10:09AM 1    STATE OF MIND AS OF JANUARY 25TH, 2016, AND THE GOVERNMENT HAS

10:09AM 2    NOT IDENTIFIED WHAT STATEMENTS OR ACTIONS THE DEFICIENT LAB

10:09AM 3    PRACTICES IN THE REPORT ARE RELEVANT TO AND WHETHER OR NOT

10:09AM 4    MS. HOLMES MADE STATEMENTS ABOUT THESE PARTICULAR ISSUES ON THE

10:09AM 5    PORTIONS THAT WERE ADMITTED AFTERWARDS.

10:09AM 6        OF COURSE, NONE OF THE KNOWLEDGE THAT WOULD HAVE COME IN

10:09AM 7    THE JANUARY 25TH, 2016 REPORT CAN BE TRANSPORTED BACK IN TIME.

10:09AM 8    SO I DON'T THINK THAT THE GOVERNMENT HAS ACTUALLY LINKED UP THE

10:09AM 9    NOTICE PORTION FOR WHAT IT ADMITTED IT FOR TO ANY RELEVANT

10:09AM 10   STATEMENT OR POINT IN ITS CASE.

10:09AM 11       AND SO GIVEN THAT ITS PROBATIVE VALUE ON THIS POINT IS

10:09AM 12   EITHER ZERO OR AT THE MINIMUM VERY LOW AND THAT THE 403

10:09AM 13   CONCERNS ARE NOW HEIGHTENED GIVEN THE WAY THAT IT CAME IN,

10:09AM 14   WITHOUT CONTEXT AND WITHOUT THE TESTIMONY OF A SMS WITNESS, WE

10:10AM 15   MOVE TO STRIKE THE REPORT AND THE RELATED TESTIMONY.

10:10AM 16       WE'RE PREPARED TO IDENTIFIED FOR THE COURT EXACTLY WHAT

10:10AM 17   PORTIONS OF THOSE TESTIMONY FROM DR. DAS THAT WOULD BE.  IT'S

10:10AM 18   SOME OF HIS TESTIMONY ABOUT THIS, BUT NOT ALL OF IT.

10:10AM 19       AND IT WOULD BE, YOU KNOW, QUESTIONS WHERE THE GOVERNMENT

10:10AM 20   READ PORTIONS OF THE REPORT INTO EVIDENCE AND ASKED DR. DAS IF

10:10AM 21   HE HAD SAW AND READ THEM; QUESTIONS WHERE THE GOVERNMENT ASKED

10:10AM 22   DR. DAS IF HE EVER TOLD CMS THAT HE DISAGREED WITH A PARTICULAR

10:10AM 23   FINDING; AND QUESTIONS WHERE THE GOVERNMENT ASKED DR. DAS TO

10:10AM 24   EXPLAIN WHAT HE HAD UNDERSTOOD CERTAIN TERMS IN THE REPORT TO

10:10AM 25   MEAN.

7088

10:10AM  1        SO UNLESS THE COURT HAS FURTHER QUESTIONS?

10:10AM  2            THE COURT:  NO.

10:10AM  3        LET ME ASK THE GOVERNMENT TO RESPOND IF THEY WISH.

10:10AM  4            MR. LEACH:  BRIEFLY, YOUR HONOR.

10:10AM  5        ALL OF THE ARGUMENTS I JUST HEARD FROM MR. LOOBY WERE

10:10AM  6   RAISED AND REJECTED BY THE COURT ON MULTIPLE OCCASIONS.  I

10:11AM  7   THINK THIS MIGHT BE THE FOURTH OR FIFTH MOTION RELATING TO THE

10:11AM  8   CMS REPORT.

10:11AM  9        THERE WAS AN OBJECTION IN THE MOMENT.  IT WAS OVERRULED.

10:11AM  10  THE RULING WAS CORRECT.

10:11AM  11       DR. DAS -- IT WAS RELEVANT TO MS. HOLMES'S STATE OF MIND,

10:11AM  12  THE SPEED AND ATTENTION WITH WHICH SHE RESPONDS TO THE REPORT,

10:11AM  13  HER CONVERSATIONS WITH DR. DAS ABOUT WHETHER THE FINDINGS ARE

10:11AM  14  CORRECT OR INCORRECT, DR. DAS'S TESTIMONY ABOUT THE REASON FOR

10:11AM  15  THE VOIDING AND WHETHER MS. HOLMES WAS TRYING TO MINIMIZE IT OR

10:11AM  16  NOT MINIMIZE IT, THE STATEMENTS MS. HOLMES MAKES TO

10:11AM  17  MS. PETERSON ATTEMPTING TO MINIMIZE WHAT CMS IS FINDING

10:11AM  18  SUGGESTS THAT SHE DIDN'T TAKE THE REGULATORY ISSUES SERIOUSLY.

10:11AM  19       SO FOR ALL OF THOSE REASONS IT WAS RELEVANT AND

10:11AM  20  APPROPRIATE TO COME IN.

10:11AM  21       THIS IS THE FIRST TIME THAT I'M HEARING ABOUT A RENEWED

10:11AM  22  MOTION, AND I THINK IT'S QUITE PREJUDICIAL TO DO IT AT THIS

10:11AM  23  POINT RATHER THAN WHEN DR. DAS HAD COMPLETED HIS TESTIMONY.

10:11AM  24       I WOULD ALSO SAY THE IDEA OF IMMEDIATE JEOPARDY FIRST CAME

10:12AM  25  INTO EVIDENCE DURING THE PLAYING OF THE "TODAY SHOW" INTERVIEW,

7089

10:12AM  1    WHICH WAS ADDED IN RESPONSE TO THE DEFENDANT'S RULE OF

10:12AM  2    COMPLETENESS ARGUMENTS.

10:12AM  3         SO I DON'T THINK THERE'S SOMETHING PARTICULARLY

10:12AM  4    PREJUDICIAL ABOUT THE LETTER OR DR. DAS'S REVIEW, REPORT TO

10:12AM  5    MS. HOLMES, AND ULTIMATE CONCURRENCE WITH THE OBSERVATIONS BY

10:12AM  6    CMS.

10:12AM  7         I'M HAPPY TO RESPOND MORE FULSOMELY IN WRITING IF THE

10:12AM  8    COURT WISHES, BUT FOR ALL OF THOSE REASONS AND OTHERS, THE

10:12AM  9    MOTION SHOULD BE DENIED.

10:12AM 10              THE COURT:  THANK YOU.

10:12AM 11         DO YOU WISH TO COMMENT NOW OR AT SOME OTHER TIME ON THE

10:12AM 12    CONFRONTATION ISSUE?

10:12AM 13              MR. LEACH:  YES, YOUR HONOR.

10:12AM 14         FIRST, THE CMS REPORT IS NOT TESTIMONIAL, SO THE

10:12AM 15    CONFRONTATION CLAUSE DOESN'T COME INTO PLAY AT ALL.  THAT'S THE

10:12AM 16    FIRST REASON.

10:12AM 17         THE SECOND REASON IS IT CAME IN FOR ITS STATE OF MIND ON

10:12AM 18    MS. HOLMES, AND WE ASKED QUESTIONS OF DR. DAS THAT TOUCHED ON

10:12AM 19    HER STATE OF MIND.

10:12AM 20         SO IT CAME IN FOR A NONHEARSAY PURPOSE.  THERE'S NO POINT

10:13AM 21    TO CROSS-EXAMINING THE CMS WITNESS ABOUT IT, AND IT'S REALLY

10:13AM 22    DR. DAS'S AGREEMENT AND, FRANKLY, MS. HOLMES'S AGREEMENT ON

10:13AM 23    SOME LEVEL TO VOID THE TESTS THAT MADE ALL OF THIS RELEVANT,

10:13AM 24    AND DR. DAS'S SUBSEQUENT INVESTIGATION TO SEE IF THESE WERE

10:13AM 25    ABERRATIONS OR NOT ABERRATIONS.

7090

10:13AM 1        SO THERE WOULD HAVE BEEN NO POINT TO CROSS-EXAMINING

10:13AM 2    SARAH BENNETT FOR THE PURPOSE FOR WHICH IT CAME IN.

10:13AM 3        BUT THE CONFRONTATION CLAUSE DOESN'T COME INTO PLAY AT ALL

10:13AM 4    BECAUSE THE CMS REPORT IS NOT TESTIMONIAL, WHICH IS ONE OF THE

10:13AM 5    REQUIREMENTS FOR THE SIXTH AMENDMENT ANALYSIS.

10:13AM 6        THE COURT:  THANK YOU.

10:13AM 7        MR. LOOBY:  YOUR HONOR, AND THE DEFENSE BELIEVES

10:13AM 8    THAT THE CMS REPORT AND ITS OBSERVATIONS WERE TESTIMONIAL

10:13AM 9    BECAUSE THEY WERE PREPARED IN ADVANCE WITH AN EYE TOWARDS

10:13AM 10   LITIGATION AND POTENTIAL CRIMINAL LITIGATION.

10:13AM 11       THIS IS AN ISSUE, YOU KNOW, THAT WE DISCUSSED AS IT

10:13AM 12   RELATED TO THE HEARSAY ISSUES.  INITIALLY THE DEFENSE JUST

10:13AM 13   REITERATES AND PRESERVES ITS POSITION ON THAT.

10:14AM 14       AND THEN AS FOR THE NONHEARSAY PURPOSE IN WHICH IT CAME

10:14AM 15   IN, I THINK, YOU KNOW, EVEN IF -- THE REPORT ITSELF CAME IN FOR

10:14AM 16   NONHEARSAY, BUT THEN THE GOVERNMENT ASKED DR. DAS WHETHER OR

10:14AM 17   NOT HE AGREED WITH CERTAIN PORTIONS OF IT.

10:14AM 18       SO I THINK THE 403 CONCERNS ARE STILL PRESENT, AND WE

10:14AM 19   DISAGREE THAT THEY CAN BE ALLEVIATED OR ADDRESSED WITHOUT THE

10:14AM 20   TESTIMONY OF A CMS INSPECTOR, THE PEOPLE WHO MADE THE FINDINGS.

10:14AM 21       AND SO WE SUBMIT THAT IT'S BOTH THE 403 AND THE

10:14AM 22   CONFRONTATION REASONS ARE WHY THE REPORT MUST BE EXCLUDED.

10:14AM 23       AND WE'RE MAKING THIS MOTION NOW AT THE CONCLUSION OF THE

10:14AM 24   GOVERNMENT'S CASE JUST BECAUSE WE HAVE SEEN HOW IT WAS USED AND

10:14AM 25   WHICH EVIDENCE DID AND DIDN'T COME IN.

7091

| | | |
|---|---|---|
| 10:14AM | 1 | THE COURT:  UNDERSTOOD.  ALL RIGHT.  THANK YOU. |
| 10:14AM | 2 | ANYTHING FURTHER, MR. LEACH? |
| 10:14AM | 3 | MR. LEACH:  NO, YOUR HONOR. |
| 10:14AM | 4 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 10:14AM | 5 | YOU FOR THAT. |
| 10:15AM | 6 | MS. SAHARIA. |
| 10:15AM | 7 | MS. SAHARIA:  THANK YOU, YOUR HONOR. |
| 10:15AM | 8 | JUST TWO MORE BRIEF HOUSEKEEPING MATTERS.  I HOPE THE |
| 10:15AM | 9 | COURT CAN APPRECIATE THAT WE FEEL COMPELLED TO MAKE THE RECORD |
| 10:15AM | 10 | NOW TO PRESERVE THESE ARGUMENTS NOW THAT THE GOVERNMENT HAS |
| 10:15AM | 11 | RESTED. |
| 10:15AM | 12 | SO A SECOND POINT IS THAT WE MOVE TO STRIKE THE TESTIMONY |
| 10:15AM | 13 | OF E.T., THIS IS THE PATIENT THAT TESTIFIED THIS WEEK, NOW THAT |
| 10:15AM | 14 | THE GOVERNMENT HAS RESTED WITHOUT CALLING THE CORRESPONDING |
| 10:15AM | 15 | DOCTOR, DR. ASIN.  E.T. IS NOT QUALIFIED TO INTERPRET THE |
| 10:15AM | 16 | COMPLEX HIV TEST REPORT THAT SHE RECEIVED, THEREFORE, IT POSES |
| 10:15AM | 17 | ISSUES WITH RESPECT TO LAY OPINION THAT IS NOT -- FOR SOMEONE |
| 10:15AM | 18 | WHO IS NOT QUALIFIED TO OFFER THAT OPINION. |
| 10:15AM | 19 | AND IT ALSO POSES VERY SEVERE 403 CONCERNS WHERE A WITNESS |
| 10:15AM | 20 | WHO DOES NOT KNOW HOW TO INTERPRET THIS REPORT HAS OFFERED |
| 10:15AM | 21 | ESSENTIALLY AN OPINION THAT SHE RECEIVED INACCURATE TEST |
| 10:16AM | 22 | RESULTS WITHOUT A PERSON QUALIFIED TO OFFER THAT OPINION TO THE |
| 10:16AM | 23 | JURY. |
| 10:16AM | 24 | I'LL JUST NOTE A COUPLE OF THINGS FROM THE HISTORY OF THE |
| 10:16AM | 25 | LITIGATION OF THIS ISSUE.  I KNOW YOUR HONOR KNOWS THAT WE'VE |

7092

10:16AM  1    BEEN LITIGATING THESE ISSUES AROUND THESE PATIENTS AND DOCTORS

10:16AM  2    NOW FOR QUITE A LONG TIME, AND THE, THE GOVERNMENT PREVIOUSLY

10:16AM  3    RECOGNIZED THE IMPORTANCE OF CALLING DOCTORS FOR THE PURPOSE OF

10:16AM  4    EXPLAINING WHETHER A TEST WAS INACCURATE.  THIS IS AT ECF 660.

10:16AM  5         AT TRIAL, THE GOVERNMENT WILL PRESENT TESTIMONY FROM

10:16AM  6    SEVERAL OF THE PATIENT VICTIMS, ALONG WITH PATIENT TESTIMONY.

10:16AM  7    THE GOVERNMENT PLANS TO INTRODUCE TESTIMONY FROM TREATING

10:16AM  8    PHYSICIANS.  SUCH TESTIMONY WILL BE AN ESSENTIAL PART OF THE

10:16AM  9    GOVERNMENT'S PROOF AT TRIAL BECAUSE THOSE PHYSICIANS ARE

10:16AM  10   QUALIFIED AND EQUIPPED TO DELIVER RELIABLE OPINIONS THAT

10:16AM  11   CERTAIN THERANOS TEST RESULTS WERE DEMONSTRABLY INACCURATE.

10:16AM  12        AGAIN, AT THE HEARING ON THAT MOTION -- THIS IS MAY 4TH,

10:17AM  13   2021 -- AT PAGES 130 AND 131, THE GOVERNMENT DISTINGUISHED

10:17AM  14   PATIENT TESTIMONY FROM DOCTOR TESTIMONY.  THE GOVERNMENT SAID,

10:17AM  15   A PATIENT CAN TESTIFY ABOUT THE PROMOTIONAL MATERIALS OR THE

10:17AM  16   MARKETING MATERIALS THAT THEY WERE EXPOSED TO FROM THERANOS,

10:17AM  17   ABOUT THEIR REASONS FOR CHOOSING THERANOS, ABOUT THEIR

10:17AM  18   EXPERIENCES WITH THE COMPANY, THE REASONS -- THE RESULTS THAT

10:17AM  19   THEY GOT.  BUT HER DOCTOR IS THE ONE WHO IS IN THE BEST

10:17AM  20   POSITION TO TESTIFY REGARDING WHAT AN HCG TEST WAS -- THEY WERE

10:17AM  21   DISCUSSING THERE THE PREGNANCY TEST -- HOW IT WAS USED, WHY IT

10:17AM  22   WAS ORDERED IN THIS SPECIFIC PATIENT'S CASE, AND ALSO TO

10:17AM  23   EXPLAIN WHAT RESULTS MEAN, SO INCLUDING THE SIGNIFICANCE OF THE

10:17AM  24   SPECIFIC RESULTS RECEIVED BY THAT PARTICULAR PATIENT AT ISSUE.

10:17AM  25        AND THEN JUST EARLIER THIS WEEK IN AN ARGUMENT ON THE

7093

| | | |
|---|---|---|
| 10:17AM | 1 | CUSTOMER SPREADSHEETS THAT WE DISCUSSED, THE GOVERNMENT |
| 10:17AM | 2 | EXPLAINED TO THE COURT, I SHOULD SAY, THAT EVEN AFTER A PATIENT |
| 10:17AM | 3 | RECEIVES A RESULT, I THINK THE EVIDENCE IN THE CASE HAS SHOWN |
| 10:18AM | 4 | THAT IT IS NOT ALWAYS CLEAR WHETHER THE RESULT IS ACCURATE OR |
| 10:18AM | 5 | NOT.  A PATIENT LOOKING AT A SHEET OF RESULTS CANNOT BE COUNTED |
| 10:18AM | 6 | ON TO SAY, HERE'S AN INACCURATE ONE, I'M THEREFORE NOT GOING TO |
| 10:18AM | 7 | GIVE THERANOS A POSITIVE REVIEW WHEN I FILL OUT THIS SURVEY. |
| 10:18AM | 8 | WE JUST DON'T HAVE ACCURATE AND RELIABLE TESTIMONY IN THIS |
| 10:18AM | 9 | RECORD THAT E.T. RECEIVED AN INACCURATE RESULT.  THE TEST |
| 10:18AM | 10 | RESULT THAT SHE RECEIVED HAD A SERIES OF DIFFERENT RESULTS. |
| 10:18AM | 11 | ONE WAS REACTIVE, OTHERS WERE NONREACTIVE. |
| 10:18AM | 12 | NO ONE QUALIFIED HAS COME BEFORE THE JURY TO EXPLAIN WHAT |
| 10:18AM | 13 | THAT MEANS, AND FOR THAT REASON WE MOVE TO EXCLUDE HER |
| 10:18AM | 14 | TESTIMONY. |
| 10:18AM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:18AM | 16 | MR. BOSTIC? |
| 10:18AM | 17 | MR. BOSTIC:  THANK YOU, YOUR HONOR. |
| 10:18AM | 18 | THE GOVERNMENT OPPOSES THIS MOTION.  THE TESTIMONY OF -- |
| 10:18AM | 19 | I'LL USE HER NAME BECAUSE SHE TESTIFIED UNDER HER NAME. |
| 10:18AM | 20 | THE TESTIMONY OF MS. TOMPKINS SHOULD REMAIN IN THE RECORD. |
| 10:18AM | 21 | FIRST OF ALL, THE DEFENSE IS ARGUING ABOUT LAY OPINIONS AS |
| 10:19AM | 22 | TO THE ACCURACY OF THE TEST IN THIS CASE, BUT TO MY MEMORY, |
| 10:19AM | 23 | THIS WITNESS DID NOT OFFER ANY LAY OPINIONS OR CONCLUSIONS |
| 10:19AM | 24 | ABOUT THE ACCURACY OF THE TEST. |
| 10:19AM | 25 | I IMAGINE THAT SUCH TESTIMONY, HAD IT BEEN OFFERED, WOULD |

10:19AM  1      HAVE DRAWN AN OBJECTION FROM THE DEFENSE THAT THIS WITNESS DID

10:19AM  2      NOT HAVE A BASIS TO REACH A CONCLUSION ON THAT ULTIMATE ISSUE.

10:19AM  3           SO I THINK THE DEFENSE IN THAT RESPECT IS POINTING TO A

10:19AM  4      PROBLEM THAT DOESN'T EXIST WITH THIS TESTIMONY.

10:19AM  5           THIS PATIENT WAS QUALIFIED TO TALK ABOUT HER EXPERIENCE

10:19AM  6      WITH THE THERANOS TEST AND PRESENT TO THE JURY THE RESULTS THAT

10:19AM  7      SHE OBTAINED.

10:19AM  8           IN THE PAST THE GOVERNMENT HAS NOTED THAT IN NOT EVERY

10:19AM  9      CASE IS IT POSSIBLE TO TELL WHETHER TEST RESULTS ARE ACCURATE

10:19AM  10     OR NOT.

10:19AM  11          IN SOME CASES, EVEN A DOCTOR OR AN EXPERT CANNOT TELL

10:20AM  12     AFTER THE FACT AND AT THE TIME WHETHER RESULTS ARE ACCURATE OR

10:20AM  13     NOT.

10:20AM  14          OTHER RESULTS REQUIRE THE TESTIMONY AND THE EXPERT OPINION

10:20AM  15     OF SOMEONE WHO KNOWS HOW THAT TEST WORKS AND WHO CAN PROVIDE

10:20AM  16     THE JURY WITH BACKGROUND INFORMATION ABOUT THE SIGNIFICANCE OF

10:20AM  17     CERTAIN RESULTS VERSUS OTHER RESULTS AND WHAT THEY CORRESPOND

10:20AM  18     TO IN THE BODY OF THE PATIENT.

10:20AM  19          OTHER TEST RESULTS SPEAK FOR THEMSELVES.  A RESULT THAT

10:20AM  20     TELLS THE PATIENT THAT THERE ARE HIV ANTIBODIES PRESENT IN HER

10:20AM  21     BLOODSTREAM IS INCOMPATIBLE WITH ANOTHER TEST RESULT THAT SAYS

10:20AM  22     THE OPPOSITE.  THEY CANNOT BOTH BE CORRECT.

10:20AM  23          EXPERT TESTIMONY IS NOT NECESSARY TO, YOU KNOW, EXPLAIN

10:20AM  24     HOW THE VIRUS WORKS OR HOW THE TEST IS PERFORMED IN ORDER FOR

10:20AM  25     THOSE TWO CONFLICTING RESULTS TO HAVE PROBATIVE VALUE FOR THE

7095

10:20AM 1    JURY.  AND THAT'S WHAT THIS IS ABOUT.

10:20AM 2        I WOULD ALSO ADD ON THAT, THOUGH, THAT THE TESTIMONY OF

10:21AM 3    MS. TOMPKINS IS ADMISSIBLE AND THE COUNT THAT IS BASED ON HER

10:21AM 4    WIRE IS STILL A VALID COUNT EVEN IF THAT TEST RESULT WAS NOT

10:21AM 5    INACCURATE.

10:21AM 6        THIS WAS A WIRE IN FURTHERANCE OF THE SCHEME TO DEFRAUD

10:21AM 7    PATIENTS, SO IT IS NOT NECESSARY THAT IT RELATE TO A TEST

10:21AM 8    RESULT THAT THE JURY MUST FIND TO BE INACCURATE.  THAT'S NOT A

10:21AM 9    FINDING THAT THE JURY IS REQUIRED TO MAKE IN ORDER TO RULE ON

10:21AM 10   ANY OF THESE COUNTS.

10:21AM 11       AS THE COURT KNOWS, THE WIRE UNDERLYING A WIRE FRAUD COUNT

10:21AM 12   DOES NOT NEED TO CONVEY ANY FALSE OR FRAUDULENT INFORMATION.

10:21AM 13   IT MERELY NEEDS TO BE IN FURTHERANCE OF THE SCHEME TO DEFRAUD.

10:21AM 14       SO THAT IS, I THINK, A FINAL REASON WHY I THINK THIS

10:21AM 15   MOTION SHOULD NOT BE GRANTED.

10:21AM 16           THE COURT:  OKAY.  THANK YOU.

10:21AM 17       MS. SAHARIA?

10:21AM 18           MS. SAHARIA:  HER TEST RESULT DOES NOT SPEAK FOR

10:22AM 19   ITSELF, YOUR HONOR.  THERE WERE MULTIPLE LEVELS OF TEST RESULTS

10:22AM 20   ON THE DOCUMENT THAT WAS PUT INTO EVIDENCE.  IT WAS A DIFFERENT

10:22AM 21   WAY OF TESTING FOR HIV THAN THE ONE THAT MS. TOMPKINS RECEIVED

10:22AM 22   RECENTLY WHERE THE TEST WAS A DIFFERENT KIND OF TEST.

10:22AM 23       MS. TREFZ TRIED TO WALK THROUGH WITH THE WITNESS THE CDC

10:22AM 24   ALGORITHM THAT THERE IS A SCREENING STEP THAT PROMPTS YOU TO

10:22AM 25   FURTHER ANALYSES.

7096

10:22AM   1        OF COURSE THAT WITNESS WAS NOT QUALIFIED TO TALK ABOUT

10:22AM   2   THAT SCREENING ALGORITHM, BUT THERE'S NO ONE QUALIFIED IN THIS

10:22AM   3   COURTROOM TO TELL US WHAT THAT TEST RESULT MEANS OR WHETHER

10:22AM   4   THAT TEST RESULT CONFLICTS WITH HER LATER ONE.

10:22AM   5        SO AT A MINIMUM, HER TESTIMONY ABOUT THAT TEST RESULT

10:22AM   6   SHOULD NOT BE A PART OF THIS RECORD BECAUSE THE ONLY IMPRESSION

10:22AM   7   THAT IT WILL LEAVE THE JURY WITH IS A MISLEADING ONE, THAT

10:22AM   8   THERE WAS IN FACT AN INACCURATE HIV TEST RESULT, WHICH IS

10:22AM   9   SOMETHING THAT WE JUST DON'T KNOW FROM THE CURRENT RECORD.

10:22AM  10        THE COURT:  IS IT SUFFICIENT THEN FOR HER TO -- FOR

10:22AM  11   THE JURY TO HAVE THESE TWO DIFFERENT TESTS AND THEN THEY

10:23AM  12   DETERMINE?

10:23AM  13        MS. SAHARIA:  I DON'T THINK THEY'RE QUALIFIED TO

10:23AM  14   MAKE THAT DETERMINATION EITHER, YOUR HONOR.

10:23AM  15        THE COURT:  WITHOUT EXPERT TESTIMONY --

10:23AM  16        MS. SAHARIA:  EXACTLY.

10:23AM  17        THE COURT:  -- TO SAY WHAT IT IS.

10:23AM  18        THE DOCUMENTS, I THINK MR. BOSTIC SUGGESTS, THEY SPEAK FOR

10:23AM  19   THEMSELVES.

10:23AM  20        IS THAT SUFFICIENT?

10:23AM  21        MS. SAHARIA:  I DON'T BELIEVE THAT A COMPLICATED LAB

10:23AM  22   REPORT THAT DOESN'T SAY, YES, YOU HAVE HIV, NO, YOU DON'T HAVE

10:23AM  23   HIV, THAT'S NOT WHAT THAT REPORT SAYS.

10:23AM  24        IT SAID ONE WAS REACTIVE, OTHERS WERE NONREACTIVE.  IT

10:23AM  25   DIDN'T SAY, YES, YOU HAVE HIV, NO, YOU DON'T.

10:23AM  1      I DON'T KNOW HOW THE JURY COULD INTERPRET THOSE RESULTS

10:23AM  2  WITHOUT AN EXPERT TO TELL THEM WHAT THEY MEAN.

10:23AM  3          THE COURT:  THANK YOU.

10:23AM  4      AND THEN FURTHER TO MR. BOSTIC'S POINT, THAT MIGHT NOT BE

10:23AM  5  RELEVANT IF IT'S IN FURTHERANCE OF THE SCHEME.

10:23AM  6          MS. SAHARIA:  SO I DO THINK THAT RAISES SOME ISSUES

10:23AM  7  THAT WE CAN DISCUSS WHEN WE ARGUE THE MOTION FOR JUDGMENT OF

10:23AM  8  ACQUITTAL, BUT I THINK AT A MINIMUM SHE CAN -- I THINK HER

10:23AM  9  TESTIMONY ABOUT WHY SHE CAME TO THERANOS AND WHAT WAS IMPORTANT

10:23AM 10  TO HER MAY STILL BE RELEVANT TESTIMONY.

10:24AM 11      BUT I, I DON'T BELIEVE THAT IT IS PROPER TO LEAVE IN HER

10:24AM 12  TESTIMONY ABOUT THE TEST RESULTS THEMSELVES AND THE

10:24AM 13  CORRESPONDING EXHIBITS BECAUSE THE JURY IS JUST AS EQUALLY

10:24AM 14  UNQUALIFIED TO INTERPRET THOSE EXHIBITS AS SHE WAS.

10:24AM 15      AND WE CAN PROVIDE THOSE EXHIBIT NUMBERS FOR THE RECORD.

10:24AM 16  I'M NOT SURE I HAVE THEM IN FRONT OF ME, YOUR HONOR.

10:24AM 17          THE COURT:  THE TEST RESULTS?

10:24AM 18          MS. SAHARIA:  THE TWO TEST RESULTS, YOUR HONOR.

10:24AM 19          THE COURT:  RIGHT.  THEY WERE ADMITTED WITHOUT

10:24AM 20  OBJECTION IF I RECALL.

10:24AM 21          MS. SAHARIA:  WELL, WE OBJECTED IN ADVANCE OF HER

10:24AM 22  TESTIMONY TO THE FACT THAT THE GOVERNMENT HAD INDICATED THAT

10:24AM 23  THEY MAY NOT CALL MR. ASIN.  MS. TREFZ DID RAISE THAT ISSUE AND

10:24AM 24  OUR OBJECTION TO CALLING THE WITNESS WITHOUT THE DOCTOR.  THAT

10:24AM 25  WAS AN OBJECTION THAT WAS MADE ON THE RECORD.

10:24AM  1    THE GOVERNMENT REFUSED AT THAT TIME TO COMMIT TO WHETHER

10:24AM  2  THEY WERE CALLING HIM OR NOT.

10:24AM  3    NOW THAT WE KNOW THAT THEY'RE NOT CALLING HIM, THAT'S WHY

10:24AM  4  I'M MAKING THIS MOTION.

10:24AM  5         THE COURT:  OKAY.  THANK YOU.

10:24AM  6         MR. BOSTIC:  YOUR HONOR?

10:24AM  7         THE COURT:  YES.

10:24AM  8         MR. BOSTIC:  THE COURT IS CORRECT THEY WERE ADMITTED

10:24AM  9  WITHOUT OBJECTION.  THE DEFENSE COULD HAVE MADE A REQUEST THAT

10:24AM  10  THEY BE CONDITIONALLY ADMITTED AT THAT TIME.  THEY DID NOT DO

10:25AM  11  SO.

10:25AM  12    MS. SAHARIA JUST SAID THAT THE REPORTS DON'T SAY THAT YOU

10:25AM  13  DON'T HAVE HIV OR YOU DO HAVE HIV.  THAT'S NOT HOW THESE

10:25AM  14  REPORTS WERE PRESENTED TO THE JURY IN THE MOMENT, AND THAT'S

10:25AM  15  NOT HOW THEY'LL BE ARGUED BECAUSE, THAT'S CORRECT, THEY DO NOT

10:25AM  16  SAY THOSE THINGS.

10:25AM  17    HOWEVER, THEY ARE TWO TESTS FOR HIV ANTIBODIES.  ONE CAME

10:25AM  18  BACK REACTIVE.  THE OTHER CAME BACK NEGATIVE.  THOSE ARE TWO

10:25AM  19  CONFLICTING RESULTS.

10:25AM  20    THIS IS NOT THE ONLY TIME IN THIS CASE THAT SPECIFIC

10:25AM  21  INSTANCES OF INCONSISTENT OR CONFLICTING RESULTS HAVE BEEN PUT

10:25AM  22  IN FRONT OF THE JURY WITHOUT THE DEFENSE OBJECTING.

10:25AM  23    THE JURY HAS SEEN EMAILS INTERNAL AT THERANOS RELATING TO

10:25AM  24  RESULTS THAT CAME BACK ON DIFFERENT ASSAYS WHERE THE PATIENT

10:25AM  25  GOT ONE RESULT FROM THERANOS AND A DIFFERENT RESULT FROM

7099

| | | |
|---|---|---|
| 10:25AM | 1 | ANOTHER LAB. |
| 10:25AM | 2 | IN THOSE CASES -- LET'S BE CLEAR.  IN EACH OF THOSE CASES, |
| 10:25AM | 3 | WE WOULD HAVE BEEN COMPARING TEST RESULTS GENERATED BY |
| 10:26AM | 4 | DIFFERENT METHODS OF RUNNING THE TESTS BY DEFINITION.  THAT'S |
| 10:26AM | 5 | THE POINT OF THIS EVIDENCE IS THAT THE THERANOS TEST METHOD |
| 10:26AM | 6 | WAS, AS SHOWN BY THESE CASES, PROBLEMATIC OR HAD ACCURACY |
| 10:26AM | 7 | PROBLEMS NOT EXPERIENCED BY TRADITIONAL METHODS. |
| 10:26AM | 8 | SO WHEN THE EDISON MACHINE PRODUCED A RESULT THAT WAS |
| 10:26AM | 9 | INCONSISTENT WITH A RESULT PRODUCED BY A CONVENTIONAL MACHINE |
| 10:26AM | 10 | FROM ANOTHER LAB, THAT'S THE SAME KIND OF I THINK WHAT |
| 10:26AM | 11 | MS. SAHARIA WOULD CALL HERE AN APPLES TO ORANGES COMPARISON, |
| 10:26AM | 12 | BUT IT'S NOT. |
| 10:26AM | 13 | THESE ARE TWO DIFFERENT METHODS AIMED AT MEASURING THE |
| 10:26AM | 14 | SAME THING, AIMED AT TESTING THE SAME THING, AND IF THEY |
| 10:26AM | 15 | PRODUCE CONFLICTING RESULTS, THEY CAN'T BOTH BE CORRECT. |
| 10:26AM | 16 | IT'S FAIR FOR THE JURY TO INFER THAT, BASED ON ALL OF THE |
| 10:26AM | 17 | EVIDENCE IN THE CASE, THE THERANOS RESULTS WERE INCORRECT. |
| 10:26AM | 18 | EXPERT TESTIMONY IS NOT REQUIRED FOR THAT. |
| 10:26AM | 19 | BUT I'LL ALSO POINT OUT ONE MORE TIME THAT THE JURY IS NOT |
| 10:26AM | 20 | REQUIRED TO MAKE A FINDING AS TO THE ACCURACY OF EACH TEST |
| 10:26AM | 21 | PRESENTED TO THEM, EVEN IF THOSE ARE TESTS IN CONNECTION WITH |
| 10:27AM | 22 | COUNTS ALLEGED IN THE INDICTMENT. |
| 10:27AM | 23 | THE COURT:  THANK YOU. |
| 10:27AM | 24 | MS. SAHARIA:  JUST VERY BRIEFLY. |
| 10:27AM | 25 | IF THAT'S THE CASE, THEN THERE'S NO REASON TO HAVE THESE |

7100

10:27AM 1    MISLEADING TEST RESULTS IN FRONT OF THE JURY WITHOUT AN EXPERT

10:27AM 2    TO INTERPRET THEM.

10:27AM 3        I'LL NOTE THAT THE HIV TEST WAS NOT RUN ON THE EDISON

10:27AM 4    TECHNOLOGY, SO THAT COMPARISON DOES NOT WORK.

10:27AM 5        BUT PUTTING THAT ASIDE, THE EMAILS THAT MR. BOSTIC

10:27AM 6    REFERRED TO WERE ADMITTED THROUGH KNOWLEDGEABLE WITNESSES AT

10:27AM 7    THE COMPANY WITH PERCIPIENT KNOWLEDGE OF THEM WHO DEALT WITH

10:27AM 8    THOSE EVERY DAY AND KNEW HOW TO INTERPRET THOSE EMAILS.

10:27AM 9        MS. TOMPKINS DOES NOT KNOW HOW TO INTERPRET THOSE HIV

10:27AM 10   REPORTS AND THEY JUST DON'T SPEAK FOR THEMSELVES.

10:27AM 11           THE COURT:  OKAY.  ALL RIGHT.

10:27AM 12       THANK YOU VERY MUCH.  THANK YOU.

10:27AM 13           MS. SAHARIA:  JUST ONE FINAL HOUSEKEEPING MATTER,

10:27AM 14   YOUR HONOR, AND THIS ONE IS TRULY IN AN ABUNDANCE OF CAUTION

10:27AM 15   AND TO PRESERVE OUR RIGHTS GOING FORWARD ON THIS ISSUE.

10:28AM 16       WE RESPECTFULLY RENEW OUR MOTION TO SUPPRESS EVIDENCE OF

10:28AM 17   CUSTOMER COMPLAINTS AND TESTING RESULTS, AS WELL AS FINDINGS IN

10:28AM 18   THE CMS REPORT WHICH WAS FILED AT ECF 810.

10:28AM 19       THE COURT HAS DENIED THIS MOTION.  THIS WAS A PRETRIAL

10:28AM 20   MOTION THAT WAS SUBMITTED TO THE COURT BASED ON A PAPER RECORD.

10:28AM 21   THE COURT DENIED THAT AT 886 AND 887.

10:28AM 22       WE INCORPORATE BY REFERENCE ALL OF OUR PRIOR ARGUMENTS AND

10:28AM 23   THE PRIOR EVIDENCE.

10:28AM 24       AND JUST TO BE COMPLETE, THAT'S AT 810, 811, 850, 851, AS

10:28AM 25   WELL AS AT THE ORAL ARGUMENT ON JULY 7TH.

10:28AM  1      I'LL JUST STATE FOR THE RECORD THAT THAT MOTION AND THE

10:28AM  2   REQUESTED RELIEF, WHICH WAS THE MOTION TO SUPPRESS, AND NOW WE

10:28AM  3   RENEW THAT AND MOVE TO STRIKE THE FOLLOWING CATEGORIES OF

10:28AM  4   EVIDENCE:  TESTIMONY AND EXHIBITS OFFERED BY PATIENTS

10:28AM  5   RELATED TO THEIR SPECIFIC TESTING RESULTS; TESTIMONY AND

10:28AM  6   EXHIBITS OFFERED BY DOCTORS OR OTHER MEDICAL PROFESSIONALS

10:29AM  7   RELATED TO CUSTOMER'S SPECIFIC RESULTS; THE CMS REPORTS

10:29AM  8   DISCUSSION OF QUALITY CONTROL RESULTS AND OTHER TESTING DATA

10:29AM  9   MAINTAINED IN THE LIS; ALL OTHER CUSTOMER COMPLAINTS AND

10:29AM 10   TESTING RESULTS OFFERED THROUGH THERANOS WITNESSES; AND ALL

10:29AM 11   TESTIMONY AND EXHIBITS RELATING TO QUALITY CONTROL DATA AND

10:29AM 12   OTHER DATA IN THE LIS OFFERED BY THERANOS WITNESSES.

10:29AM 13      I'LL NOTE FOR THE RECORD THAT THAT MOTION WAS MADE UNDER

10:29AM 14   BOTH THE DUE PROCESS CLAUSE AND THE BALANCING TESTS SET FORTH

10:29AM 15   IN UNITED STATES VERSUS LOUD HAWK, WHICH IS A NINTH CIRCUIT

10:29AM 16   CASE FROM 1979.

10:29AM 17      AS THE COURT WILL RECALL, THE LOUD HAWK CASE INVOLVED A

10:29AM 18   BALANCING TEST BETWEEN THE QUALITY OF THE GOVERNMENT'S CONDUCT

10:29AM 19   AND THE PREJUDICE TO THE DEFENDANT AND THE NATURE OF THAT

10:29AM 20   EVIDENCE.

10:29AM 21      WE HAVE NOT CURRENTLY PUT AT ISSUE AT TRIAL THE

10:30AM 22   GOVERNMENT'S CONDUCT.  WE HAVE NOT PUT ANY EVIDENCE FORWARD ON

10:30AM 23   THAT PRONG OF THAT ANALYSIS.

10:30AM 24      SO THAT RECORD IS EXACTLY WHERE IT WAS AT THE TIME THAT WE

10:30AM 25   FIRST MADE THIS MOTION.

7102

10:30AM 1    HOWEVER, ON THE OTHER SIDE OF THE LEDGER, THERE HAS BEEN

10:30AM 2    EVIDENCE ADDUCED AT TRIAL THAT GOES TO THE POTENTIALLY

10:30AM 3    EXCULPATORY NATURE OF THE LIS AND THE AMOUNT OF PREJUDICE TO

10:30AM 4    MS. HOLMES ASSOCIATED WITH THE LOSS OF THAT DATABASE.

10:30AM 5        I WOULD RESPECTFULLY INCORPORATE THAT EVIDENCE INTO OUR

10:30AM 6    MOTION JUST TO PRESERVE THE RECORD AS IT NOW STANDS.  THAT

10:30AM 7    TESTIMONY INCLUDES THE TESTIMONY OF MS. CHEUNG, DR. ROSENDORFF,

10:30AM 8    AND DR. SAWYER, AS WELL AS EXHIBIT 13655, WHICH PROVIDE

10:30AM 9    EVIDENCE ABOUT THE WAY THE LIS DATABASE COULD BE USED TO

10:30AM 10   INVESTIGATE BOTH PARTICULAR PATIENT OR DOCTOR INQUIRIES, BUT

10:30AM 11   ALSO TO CONDUCT MORE STATISTICAL ANALYSES ACROSS PATIENTS AND

10:30AM 12   TESTS, AND DR. ROSENDORFF IN PARTICULAR TESTIFIED TO THAT.

10:31AM 13       A SIGNIFICANT AMOUNT OF EVIDENCE HAS COME OUT AT TRIAL

10:31AM 14   BASED ON THE LIS DATA.  AS THE COURT KNOWS, THAT DATA IS

10:31AM 15   UNAVAILABLE.  WE'VE BEEN UNABLE TO USE THAT DATA TO CHECK THE

10:31AM 16   PATIENT ASSESSMENT WORK OF DR. DAS.  WE HAVE BEEN UNABLE TO

10:31AM 17   PROBE THE ANECDOTAL EMAILS SENT BY DR. ROSENDORFF WITH RESPECT

10:31AM 18   TO CERTAIN TESTS OR TO CONFRONT OTHER ANECDOTAL EVIDENCE

10:31AM 19   WITHOUT THAT DATABASE.

10:31AM 20       SO WE JUST RESPECTFULLY RENEW THAT MOTION TO PRESERVE IT

10:31AM 21   BASED ON THE CURRENT RECORD.

10:31AM 22           THE COURT:  ALL RIGHT.  THANK YOU.

10:31AM 23       MR. BOSTIC?

10:31AM 24       MR. BOSTIC:  YOUR HONOR, JUST BRIEFLY.

10:31AM 25   THE UNITED STATES OPPOSES THIS MOTION AS WELL, OF COURSE.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023