No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. XXXIX of LVII | ER-11034 to ER-11332

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

7474

09:40AM  1     HOW DID YOU PRESENT THIS?

09:40AM  2     A.   I THINK IT WAS ON A COMPUTER THAT WE HAD, AND WE WOULD

09:40AM  3     PULL UP SLIDES DURING THE DISCUSSION.

09:40AM  4     Q.   OKAY.  DID YOU REVIEW ALL OF THE SLIDES AT THE MEETING?

09:40AM  5     A.   NO.

09:40AM  6     Q.   LET ME ASK YOU TO LOOK AT PAGE 9 OF THE POWERPOINT.

09:40AM  7          DO YOU SEE THAT THIS SLIDE IS LABELLED VALIDATION OF

09:40AM  8     THERANOS SYSTEMS?

09:40AM  9     A.   I DO.

09:40AM  10    Q.   AND IN THE FIRST BULLET POINT IT SAYS, "THERANOS SYSTEMS

09:40AM  11    HAVE BEEN COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST

09:40AM  12    SEVEN YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL

09:40AM  13    COMPANIES."

09:40AM  14         DO YOU SEE THAT?

09:40AM  15    A.   I DO.

09:40AM  16    Q.   AND WHAT DID YOU MEAN TO CONVEY WHEN YOU SAID THAT

09:40AM  17    THERANOS SYSTEMS HAD BEEN COMPREHENSIVELY VALIDATED BY THESE

09:40AM  18    PHARMACEUTICAL COMPANIES?

09:40AM  19    A.   THAT OUR SYSTEMS, CHEMISTRIES, CARTRIDGES, DEVICES,

09:40AM  20    SOFTWARE HAD BEEN TESTED AGAINST STANDARDS BY THESE COMPANIES.

09:41AM  21    Q.   AND WAS -- WHEN YOU REFERRED TO THE TEN PHARMACEUTICAL

09:41AM  22    COMPANIES, WERE THEY -- WERE THE COMPANIES THAT WE DISCUSSED

09:41AM  23    YESTERDAY SOME OF THOSE COMPANIES?

09:41AM  24    A.   YES.

09:41AM  25    Q.   LET'S LOOK BACK FOR A MOMENT AT EXHIBIT 7742.

7475

09:41AM   1         AND I'D LIKE TO GO TO THE FOURTH PAGE OF THIS SLIDE, OF

09:41AM   2    THIS EXHIBIT.

09:41AM   3         AND DO YOU RECALL THAT WE DISCUSSED YESTERDAY THIS

09:41AM   4    DOCUMENT WHICH IS NOW ON THE SCREEN, WHICH WAS LABELLED "WHERE

09:41AM   5    IN THE WORLD IS THERANOS?"

09:41AM   6    A.   I DO.

09:41AM   7    Q.   AND IF YOU GO FORWARD A COUPLE OF PAGES FROM THERE, DO YOU

09:41AM   8    SEE THAT THIS IS A LIST OF WHAT ARE DESCRIBED AS COMPLETED

09:42AM   9    SUCCESSES?

09:42AM   10   A.   YES.

09:42AM   11   Q.   WERE THE PHARMACEUTICAL COMPANIES LISTED HERE, WERE THEY

09:42AM   12   SOME OF THE PHARMACEUTICAL COMPANIES THAT YOU WERE REFERRING TO

09:42AM   13   IN THE SLIDE DECK WHEN YOU REFERRED TO TEN PHARMACEUTICAL

09:42AM   14   COMPANIES VALIDATING THERANOS'S SYSTEMS?

09:42AM   15   A.   THEY ARE.

09:42AM   16        AND WHAT YOU CAN SEE HERE IS THAT THERE ARE ALL SORTS OF

09:42AM   17   DIFFERENT PARTS OF THE TECHNOLOGY THAT WAS EVALUATED AND

09:42AM   18   VALIDATED IN THOSE PROGRAMS.

09:42AM   19   Q.   OKAY.  LET'S GO NOW BACK TO EXHIBIT 278, WHICH WE WERE

09:42AM   20   DISCUSSING A MOMENT AGO, THE SLIDE DECK THAT WAS USED AT THE

09:42AM   21   INITIAL WALGREENS MEETING.

09:42AM   22        AND I'D LIKE TO ASK YOU TO GO FORWARD TO PAGE 31 OF THIS

09:43AM   23   DOCUMENT.

09:43AM   24        AND AT THE TOP OF THE DOCUMENT UNDER "LAUNCH OF THERANOS

09:43AM   25   SYSTEMS AT WALGREENS," IT READS, "THERANOS WOULD LIKE TO CEMENT

09:43AM   1    A PARTNERSHIP WITH WALGREENS BY END OF APRIL 2010 TO LAUNCH THE

09:43AM   2    GENERAL CHEMISTRY, INFLUENZA, AND FERTILITY TESTS IN Q4 2010."

09:43AM   3         DO YOU SEE THAT?

09:43AM   4    A.   I DO.

09:43AM   5    Q.   AND WAS THAT THE ORIGINAL IDEA THAT THERANOS WAS

09:43AM   6    SUGGESTING TO WALGREENS AND OTHER PHARMACEUTICAL PARTNERS?

09:43AM   7    A.   YES.

09:43AM   8    Q.   DID YOU UNDERSTAND THAT IT WOULD BE POSSIBLE BY THE FOURTH

09:43AM   9    QUARTER OF 2010 FOR THERANOS TO, TO LAUNCH ITS SERVICES IN THIS

09:43AM   10   WAY?

09:43AM   11   A.   YES.

09:43AM   12   Q.   THE REFERENCE AT THE END OF THE PARAGRAPH TO GENERAL

09:44AM   13   CHEMISTRY, INFLUENZA, AND FERTILITY TESTS, IS THAT A REFERENCE

09:44AM   14   TO ALL BLOOD TESTS?

09:44AM   15   A.   NO.

09:44AM   16   Q.   WHY WAS THERANOS PROPOSING THAT A LAUNCH OF THERANOS BE --

09:44AM   17   TECHNOLOGY BE DONE WITH -- IN CONNECTION WITH THOSE THREE TESTS

09:44AM   18   OR CATEGORIES OF TESTS?

09:44AM   19   A.   OUR IDEA FOR LAUNCHING OUR TECHNOLOGY AT WALGREENS WAS TO

09:44AM   20   HAVE TEST PANELS THAT COULD BE MEANINGFUL TO PEOPLE.

09:44AM   21        WE HAD DONE WORK IN THE PAST ON INFLUENZA AND FERTILITY

09:44AM   22   AND THOUGHT THAT THOSE COULD BE MEANINGFUL TO PEOPLE COMING

09:44AM   23   INTO WALGREENS, AND WE HAD BEEN WORKING ON THIS GENERAL

09:44AM   24   CHEMISTRY PANEL WITH SCIENTISTS INTERNALLY AND THOUGHT WE COULD

09:44AM   25   LAUNCH IT BY THE END OF THE YEAR.

7477

| 09:44AM | 1 | Q.   NOW, DURING THE COURSE OF THIS MEETING IN 2010 -- WHAT |
| 09:44AM | 2 | MONTH WAS THIS MEETING, IF YOU RECALL? |
| 09:45AM | 3 | A.   JUST LOOKING BACK AT THE EMAIL, I THINK IT WAS IN MARCH. |
| 09:45AM | 4 | END OF MARCH. |
| 09:45AM | 5 | Q.   NOW, DID WALGREENS EXPRESS AFTER THAT MEETING THAT THEY |
| 09:45AM | 6 | MIGHT BE INTERESTED IN EXPLORING A RELATIONSHIP WITH THERANOS? |
| 09:45AM | 7 | A.   YES. |
| 09:45AM | 8 | Q.   DID THEY ALSO EXPRESS TO THERANOS THAT THEY WOULD LIKE TO |
| 09:45AM | 9 | DO SOME DUE DILIGENCE TO EVALUATE WHETHER THERANOS WAS A |
| 09:45AM | 10 | PARTNER WITH WHOM WALGREENS THOUGHT IT COULD WORK? |
| 09:45AM | 11 | A.   THEY DID. |
| 09:45AM | 12 | Q.   OKAY.  NOW, I WANT TO FOCUS ON TWO REPORTS FROM |
| 09:45AM | 13 | PHARMACEUTICAL COMPANIES THAT YOU SENT TO WALGREENS IN 2010. |
| 09:45AM | 14 | DO YOU RECALL THAT THERE'S BEEN TESTIMONY ABOUT THOSE |
| 09:45AM | 15 | REPORTS? |
| 09:45AM | 16 | A.   I DO. |
| 09:45AM | 17 | Q.   ONE OF THOSE REPORTS WAS FROM SCHERING-PLOUGH; CORRECT? |
| 09:46AM | 18 | A.   YES. |
| 09:46AM | 19 | Q.   AND THE OTHER REPORT WAS FROM PFIZER; CORRECT? |
| 09:46AM | 20 | A.   YES. |
| 09:46AM | 21 | Q.   WHY DID YOU CHOOSE TO SEND THE SCHERING-PLOUGH REPORT TO |
| 09:46AM | 22 | WALGREENS AS PART OF ITS DUE DILIGENCE? |
| 09:46AM | 23 | A.   BECAUSE WE HAD WORKED WITH SCHERING-PLOUGH TO ESTABLISH |
| 09:46AM | 24 | VERY RIGOROUS STANDARDS AGAINST WHICH TO VALIDATE OUR TESTS, |
| 09:46AM | 25 | AND WE HAD RUN THOUSANDS OF CARTRIDGES SHOWING NOT ONLY THAT WE |

09:46AM  1    COULD MULTIPLEX THE TESTS ON A SINGLE CARTRIDGE, BUT ALSO THAT

09:46AM  2    WE COULD MEASURE MARKERS AT REALLY LOW LEVELS THAT ARE REALLY

09:46AM  3    HARD TO DO, AND I WANTED TO SHARE THAT DATA.

09:46AM  4    Q.   WHEN YOU SAY "MULTIPLEX," WHAT DO YOU MEAN?

09:46AM  5    A.   SORRY.  THE ABILITY TO RUN THE SAME TESTS ON A SINGLE

09:46AM  6    CARTRIDGE, OR MULTIPLE TESTS ON A SINGLE CARTRIDGE AT THE SAME

09:46AM  7    TIME.

09:46AM  8    Q.   OKAY.  AND WHY DID YOU CHOOSE TO SHARE THE PFIZER REPORT

09:46AM  9    WITH WALGREENS AS PART OF ITS DUE DILIGENCE PROCESS?

09:46AM  10   A.   BECAUSE, AGAIN, WE HAD WORKED WITH PFIZER FOR YEARS TO

09:47AM  11   DEVELOP A STUDY THAT WOULD MEASURE THESE VERY COMPLICATED

09:47AM  12   CANCER MARKERS IN PEOPLE'S HOMES, THE DEVICES WORKED, AND I

09:47AM  13   THOUGHT THE DATA WAS REALLY GOOD, AND I WANTED TO SHARE IT WITH

09:47AM  14   THEM.

09:47AM  15   Q.   DO YOU RECALL THAT THERE HAS BEEN TESTIMONY TO THE EFFECT

09:47AM  16   THAT THE LOGOS OF THOSE PHARMACEUTICAL COMPANIES WERE ADDED TO

09:47AM  17   THE TOP OF THOSE DOCUMENTS?

09:47AM  18   A.   I DO.

09:47AM  19   Q.   AND WHO ADDED THE LOGOS OF THOSE COMPANIES TO THE TOP OF

09:47AM  20   THOSE DOCUMENTS?

09:47AM  21   A.   I DID.

09:47AM  22   Q.   WHEN DID YOU DO THAT?

09:47AM  23   A.   JUST BEFORE SENDING THEM TO WALGREENS.

09:47AM  24   Q.   WHY DID YOU DO THAT?

09:47AM  25   A.   BECAUSE THIS WORK WAS DONE IN PARTNERSHIP WITH THOSE

09:47AM 1    COMPANIES, AND I WAS TRYING TO CONVEY THAT.

09:47AM 2    Q.   YOU'VE HEARD TESTIMONY FROM WITNESSES IN THIS CASE THAT

09:47AM 3    THEY THOUGHT THAT THE REPORTS THAT YOU SENT HAD BEEN PREPARED

09:47AM 4    BY THOSE PHARMACEUTICAL COMPANIES.

09:47AM 5        DO YOU RECALL THAT?

09:47AM 6    A.   I DO.

09:47AM 7    Q.   DID YOU INTEND TO GIVE THAT IMPRESSION WHEN YOU

09:47AM 8    TRANSMITTED THOSE REPORTS TO WALGREENS?

09:48AM 9    A.   NO.  BUT I'VE HEARD THAT TESTIMONY IN THIS CASE, AND I

09:48AM 10   WISH I HAD DONE IT DIFFERENTLY.

09:48AM 11   Q.   DID YOU -- AS OF 2010, SCHERING-PLOUGH NO LONGER EXISTED

09:48AM 12   AS AN INDEPENDENT PHARMACEUTICAL COMPANY; IS THAT RIGHT?

09:48AM 13   A.   CORRECT.

09:48AM 14   Q.   BUT PFIZER DID; RIGHT?

09:48AM 15   A.   YES.

09:48AM 16   Q.   DID YOU TRY TO CONCEAL FROM PFIZER THAT YOU HAD ADDED

09:48AM 17   PFIZER'S LOGO TO THE TOP OF THE REPORT THAT YOU SENT TO

09:48AM 18   WALGREENS IN 2010?

09:48AM 19   A.   NOT AT ALL.

09:48AM 20   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15048.

09:48AM 21       YOUR HONOR, I'M NOT SURE IF THIS IS IN YOUR NOTEBOOK?

09:48AM 22           THE COURT:  I DON'T BELIEVE IT IS.

09:48AM 23           MR. DOWNEY:  BUT MR. LEACH HAS A COPY.

09:48AM 24           THE COURT:  THANK YOU.

09:48AM 25           THE WITNESS:  I DON'T KNOW IF I HAVE IT.

| 09:48AM | 1 | MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR? |

09:48AM 1               MR. DOWNEY:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:48AM 2               THE COURT:  YES.

09:48AM 3  BY MR. DOWNEY:

09:48AM 4  Q.  (HANDING.)

09:49AM 5     HAVE YOU HAD AN OPPORTUNITY TO REVIEW 15048?

09:49AM 6  A.  THE FIRST PAGE, YES.

09:49AM 7  Q.  OKAY.  IS THE FIRST PAGE AN EMAIL BETWEEN CHRISTIAN HOLMES

09:49AM 8  AT THERANOS AND VARIOUS PEOPLE AT PFIZER DISCUSSING POTENTIAL

09:49AM 9  RELATIONSHIPS BETWEEN PFIZER AND THERANOS?

09:49AM 10  A.  YES.

09:49AM 11  Q.  AND ARE THERE VARIOUS ATTACHMENTS TO THAT DOCUMENT?

09:49AM 12  A.  THERE ARE.

09:49AM 13                MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

09:49AM 14  15048.

09:49AM 15                MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:49AM 16                THE COURT:  THE ENTIRE DOCUMENT?

09:49AM 17                MR. DOWNEY:  THE ENTIRE DOCUMENT.

09:49AM 18                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:50AM 19     (DEFENDANT'S EXHIBIT 15048 WAS RECEIVED IN EVIDENCE.)

09:50AM 20  BY MR. DOWNEY:

09:50AM 21  Q.  LET'S LOOK AT THE FIRST PAGE OF THE DOCUMENT.

09:50AM 22     DO YOU SEE THAT THIS IS AN EMAIL FROM CHRISTIAN HOLMES TO

09:50AM 23  A GROUP OF INDIVIDUALS AT PFIZER, AND THAT YOU WERE COPIED ON

09:50AM 24  THE EMAIL?

09:50AM 25  A.  YES.

| | | |
|---|---|---|
| 09:50AM | 1 | Q.   AND DO YOU SEE THAT THIS EMAIL WAS SENT IN JANUARY OF |
| 09:50AM | 2 | 2014? |
| 09:50AM | 3 | A.   I DO. |
| 09:50AM | 4 | Q.   AND DO YOU SEE THAT IN THE NOTE, CHRISTIAN HOLMES CONVEYS |
| 09:50AM | 5 | THAT ATTACHED TO THIS EMAIL IS A SLIDE DECK THAT YOU REQUESTED, |
| 09:50AM | 6 | AND THEN IN THE NEXT PARAGRAPH HE SAYS, ALSO ATTACHED IS A |
| 09:50AM | 7 | REPORT FROM OUR PROGRAM WITH PFIZER THAT WE RAN IN THE PAST FOR |
| 09:50AM | 8 | YOUR REFERENCE. |
| 09:50AM | 9 | DO YOU SEE THAT? |
| 09:50AM | 10 | A.   I DO. |
| 09:50AM | 11 | Q.   NOW, LET'S LOOK AT THE REPORT THAT IS ATTACHED. |
| 09:50AM | 12 | IS THIS DOCUMENT THE REPORT OF WORK THAT THERANOS DID |
| 09:51AM | 13 | TO -- WITH PFIZER? |
| 09:51AM | 14 | A.   IT IS. |
| 09:51AM | 15 | Q.   AND IS THIS THE VERSION OF THE REPORT THAT YOU TRANSMITTED |
| 09:51AM | 16 | TO WALGREENS SOMETIME AFTER MARCH OF 2010? |
| 09:51AM | 17 | A.   YES. |
| 09:51AM | 18 | Q.   AND DO YOU SEE THAT THE -- THIS VERSION OF THE DOCUMENT |
| 09:51AM | 19 | ALSO HAS THE PFIZER LOGO ON THE FIRST PAGE? |
| 09:51AM | 20 | A.   IT DOES. |
| 09:51AM | 21 | Q.   LET'S GO BACK TO THE EMAIL. |
| 09:51AM | 22 | AND IF YOU LOOK UP AT THE ADDRESS AT THE VERY TOP OF THE |
| 09:51AM | 23 | EMAIL, DO YOU SEE THAT THIS TRANSMISSION WAS MADE TO SEVERAL |
| 09:51AM | 24 | INDIVIDUALS AT PFIZER? |
| 09:51AM | 25 | A.   YES. |

09:51AM 1    Q.   WERE ANY OF THE INDIVIDUALS AT PFIZER INVOLVED WITH THE

09:51AM 2    PROGRAM THAT THERANOS DID WITH PFIZER IN BETWEEN 2006 AND 2008?

09:51AM 3    A.   YES.

09:51AM 4    Q.   AND WHICH OF THE ADDRESSEES WAS WORKING WITH THE

09:52AM 5    PFIZER-THERANOS RELATIONSHIP AS OF 2006 TO 2008?

09:52AM 6    A.   DR. SAKUL.

09:52AM 7    Q.   AND IS DR. SAKUL SOMEONE WITH WHOM YOU HAD DEALINGS WITH

09:52AM 8    PRIOR TO THE TIME THAT YOU TRANSMITTED THE REPORT?

09:52AM 9    A.   YES.

09:52AM 10   Q.   AND WAS HE SOMEONE WITH WHOM YOU HAD DEALINGS WITH AFTER

09:52AM 11   YOU HAD TRANSMITTED THE REPORT?

09:52AM 12   A.   YES.

09:52AM 13   Q.   LET'S TALK ABOUT OTHER DUE DILIGENCE THAT WAS DONE IN

09:52AM 14   CONNECTION WITH WALGREENS'S EXPLORATION OF A RELATIONSHIP WITH

09:52AM 15   THERANOS.

09:52AM 16        DO YOU RECALL AT SOME POINT THAT WALGREENS SAID THAT IT

09:52AM 17   WANTED TO HAVE THE TECHNOLOGY THAT THERANOS HAD BEEN USING

09:52AM 18   EVALUATED BY SCIENTISTS AT JOHNS HOPKINS?

09:52AM 19   A.   I DO.

09:52AM 20   Q.   AND WAS THAT SOMETHING THAT THERANOS WAS WILLING TO DO?

09:52AM 21   A.   YES.

09:52AM 22   Q.   AND CAN YOU EXPLAIN TO US, WHAT IS JOHNS HOPKINS?

09:53AM 23   A.   JOHNS HOPKINS IS A HEALTH SYSTEM, A HOSPITAL SYSTEM, AND A

09:53AM 24   RESEARCH ORGANIZATION THAT IS ONE OF THE BEST HEALTH SYSTEMS IN

09:53AM 25   THE WORLD.

09:53AM 1    Q.   AND WHAT DID YOU UNDERSTAND THE TEAM AT JOHNS HOPKINS WAS

09:53AM 2    ASKED TO DO IN CONNECTION WITH WALGREENS'S EVALUATION OF

09:53AM 3    THERANOS?

09:53AM 4    A.   THEY WERE ASKED TO EVALUATE OUR INVENTION AND ITS

09:53AM 5    CAPABILITIES.

09:53AM 6    Q.   AND DID YOU EVENTUALLY MEET WITH THOSE SCIENTISTS AT

09:53AM 7    JOHNS HOPKINS?

09:53AM 8    A.   YES.

09:53AM 9    Q.   AND IN ADVANCE OF MEETING WITH THOSE SCIENTISTS, DID YOU

09:53AM 10   TRANSMIT ANYTHING TO THEM FOR THEIR REVIEW RELATED TO THERANOS

09:53AM 11   AND ITS TECHNOLOGY?

09:53AM 12   A.   YES.

09:53AM 13   Q.   WHEN YOU HAD THE MEETING, WHO FROM JOHNS HOPKINS ATTENDED

09:53AM 14   THE MEETING?

09:53AM 15   A.   I REMEMBER DR. KICKLER, WHO WAS ONE OF THEIR LABORATORY

09:53AM 16   EXPERTS.  THERE WAS OTHER LABORATORY EXPERTS, OTHER PHYSICIANS,

09:54AM 17   AND LEADERS IN THE HOSPITAL SYSTEM.

09:54AM 18   Q.   AND WITH RESPECT TO THE MATERIALS THAT YOU TRANSMITTED IN

09:54AM 19   ADVANCE, DID YOU DO THAT SO THAT THEY WOULD HAVE AN OPPORTUNITY

09:54AM 20   TO UNDERSTAND THE SYSTEM IN PREPARATION FOR THE MEETING?

09:54AM 21   A.   YES.

09:54AM 22   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7109.

09:54AM 23   A.   OKAY.

09:54AM 24   Q.   IS EXHIBIT 7109 AN INTERNAL EMAIL BETWEEN YOURSELF AND

09:55AM 25   OTHERS AT THERANOS TRANSMITTING THE FINAL JOHNS HOPKINS REPORT?

7484

09:55AM 1    A.   YES.

09:55AM 2               MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

09:55AM 3    EXHIBIT 7109.

09:55AM 4               MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:55AM 5               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:55AM 6          (DEFENDANT'S EXHIBIT 7109 WAS RECEIVED IN EVIDENCE.)

09:55AM 7    BY MR. DOWNEY:

09:55AM 8    Q.   IF YOU TAKE A MOMENT JUST TO FLIP THROUGH EXHIBIT 7109, IS

09:55AM 9    THIS A SEVERAL HUNDRED PAGE DOCUMENT CONTAINING INFORMATION

09:55AM 10   ABOUT THERANOS'S TECHNOLOGY?

09:55AM 11   A.   IT IS.

09:55AM 12   Q.   AND LET'S TAKE A MOMENT JUST TO SEE AT A HIGH LEVEL WHAT

09:55AM 13   KIND OF INFORMATION THAT YOU TRANSMITTED TO THEM FOR THEIR

09:55AM 14   REVIEW.

09:55AM 15        LET'S LOOK FIRST AT PAGE 3, WHICH IS LABELLED ASSAY

09:56AM 16   DEVELOPMENT VALIDATION AND SELECTED CLINICAL REPORTS.

09:56AM 17        AND IF YOU GO FORWARD FROM HERE, YOU CAN JUST FLIP THROUGH

09:56AM 18   FROM HERE.

09:56AM 19        ARE THESE LISTS OF -- INFORMATION ABOUT VARIOUS CASE

09:56AM 20   STUDIES AND OTHER INFORMATION ABOUT REFERENCE THAT HAD BEEN

09:56AM 21   DONE IN -- AT THERANOS?

09:56AM 22   A.   YES.

09:56AM 23   Q.   AND DID YOU ALSO PROVIDE DATA REGARDING THE PERFORMANCE OF

09:56AM 24   THERANOS'S SYSTEMS TO JOHNS HOPKINS FOR THEIR REVIEW?

09:56AM 25   A.   YES.

7485

09:56AM  1   Q.   LET'S LOOK AT EXHIBIT -- AT PAGE 138 OF THAT SAME EXHIBIT.

09:56AM  2        AND IF YOU GO FORWARD TWO PAGES FROM HERE.

09:56AM  3        IS THIS -- ARE THESE CHARTS THAT WE'RE SEEING DISPLAYED

09:56AM  4   HERE, ARE THESE VARIOUS FORMS OF DATA ABOUT HOW THERANOS

09:57AM  5   TECHNOLOGIES PERFORMED RELATIVE TO VARIOUS REFERENCE SYSTEMS?

09:57AM  6   A.   YES.

09:57AM  7   Q.   WHY DID YOU SEND THIS INFORMATION TO HOPKINS IN

09:57AM  8   ANTICIPATION OF THE MEETING?

09:57AM  9   A.   BECAUSE WE WANTED THEM TO REVIEW OUR DATA AND THE DESIGNS

09:57AM  10  OF OUR TECHNOLOGY IN PREPARATION FOR THE MEETING.

09:57AM  11  Q.   OKAY.  AND CAN YOU TELL US WHAT HAPPENED AT THE MEETING

09:57AM  12  WHEN YOU WENT TO THE MEETING?

09:57AM  13  A.   YES.  WE HAD A VERY DETAILED DISCUSSION ABOUT DIFFERENT

09:57AM  14  ASPECTS OF THE TECHNOLOGY DESIGNS AND THE DATA ITSELF.

09:57AM  15       THE EXPERTS FROM HOPKINS ASKED A LOT OF QUESTIONS ABOUT

09:57AM  16  THE DATA AND ABOUT OUR DESIGNS, OUR METHODS FOR DEVELOPING NEW

09:57AM  17  TESTS, HOW WE WENT ABOUT THAT.

09:57AM  18       AND WE ANSWERED THEM.

09:57AM  19  Q.   AND, IF YOU KNOW, DID JOHNS HOPKINS PREPARE A REPORT FOR

09:57AM  20  WALGREENS COMMENTING ON JOHNS HOPKINS'S EVALUATION OF

09:58AM  21  THERANOS'S TECHNOLOGY?

09:58AM  22  A.   YES.

09:58AM  23  Q.   WAS THAT REPORT SHARED WITH YOU BY WALGREENS?

09:58AM  24  A.   IT WAS.

09:58AM  25  Q.   LET'S LOOK AT EXHIBIT 302, WHICH IS ALREADY IN EVIDENCE.

7486

| | | |
|---|---|---|
| 09:58AM | 1 | IS THIS THE JOHNS HOPKINS REPORT ON THERANOS THAT YOU ARE |
| 09:58AM | 2 | REFERRING TO? |
| 09:58AM | 3 | A.   YES. |
| 09:58AM | 4 | Q.   LET'S GO TO PAGE 2.  LET'S JUST BLOW UP THE SECTION CALLED |
| 09:58AM | 5 | KEY FINDINGS. |
| 09:58AM | 6 | IF YOU LOOK AT KEY FINDINGS, DO YOU SEE THAT THERE ARE |
| 09:58AM | 7 | SEVERAL COMMENTS UNDERNEATH IT ABOUT THERANOS TECHNOLOGY? |
| 09:58AM | 8 | A.   YES. |
| 09:58AM | 9 | Q.   AND DO YOU SEE THAT THE FIRST ONE IS "THE TECHNOLOGY IS |
| 09:58AM | 10 | NOVEL AND SOUND.  IT CAN ACCURATELY RUN A WIDE RANGE OF ROUTINE |
| 09:58AM | 11 | AND SPECIAL ASSAYS"? |
| 09:59AM | 12 | A.   I DO. |
| 09:59AM | 13 | Q.   AND DO YOU SEE THAT THE SECOND BULLET POINT SAYS, "THE |
| 09:59AM | 14 | TECHNOLOGY IS SIMPLE ENOUGH TO BE USED BY NON-SPECIALISTS IN |
| 09:59AM | 15 | THE FIELD"? |
| 09:59AM | 16 | A.   YES. |
| 09:59AM | 17 | Q.   AND THEN IT GOES ON IN THE THIRD BULLET POINT TO LIST SOME |
| 09:59AM | 18 | SPECIAL STRENGTHS OF THE TECHNOLOGY? |
| 09:59AM | 19 | A.   YES. |
| 09:59AM | 20 | Q.   AND DO YOU SEE THAT AMONGST THOSE IS ACCURACY? |
| 09:59AM | 21 | A.   YES. |
| 09:59AM | 22 | Q.   AND MINIATURIZATION? |
| 09:59AM | 23 | A.   YES. |
| 09:59AM | 24 | Q.   AND DO YOU SEE THE LAST ITEM COMMENTED ON IS THE COST PER |
| 09:59AM | 25 | STUDY WOULD BE SIGNIFICANTLY LOWER THAN CURRENTLY AVAILABLE? |

7487

09:59AM 1    A.   I DO.

09:59AM 2    Q.   OKAY.  WHAT DID YOU TAKE AWAY FROM THE FACT THAT THIS WAS

09:59AM 3    HOPKINS'S EVALUATION OF THERANOS'S TECHNOLOGY?

09:59AM 4    A.   OUR TEAM WAS REALLY EXCITED ABOUT THIS.  THIS WAS THE BEST

09:59AM 5    LABORATORY EXPERTS, SOME OF THE BEST LABORATORY EXPERTS IN THE

09:59AM 6    WORLD, AND WE HAD SENT THEM BINDERS OF MATERIAL TO REVIEW

09:59AM 7    BEFORE OUR MEETING, WE HAD GONE THROUGH EVERY ASPECT OF OUR

09:59AM 8    INVENTION IN DETAIL, AND GETTING THIS KIND OF FEEDBACK WAS

10:00AM 9    AMAZING.

10:00AM 10   Q.   AT SOME POINT DID WALGREENS INDICATE TO THERANOS THAT IT

10:00AM 11   WANTED TO NEGOTIATE AN AGREEMENT TO PUT THERANOS SERVICE

10:00AM 12   CENTERS IN ITS STORES?

10:00AM 13   A.   THEY DID.

10:00AM 14   Q.   WERE YOU INVOLVED IN THE NEGOTIATIONS BETWEEN THERANOS AND

10:00AM 15   WALGREENS THAT LED TO AN AGREEMENT?

10:00AM 16   A.   YES.

10:00AM 17   Q.   WHO ELSE FROM THERANOS WAS INVOLVED?

10:00AM 18   A.   SUNNY BALWANI AND OUR -- SOME OF OUR LAWYERS WHO WORKED AT

10:00AM 19   AN OUTSIDE FIRM.

10:00AM 20   Q.   OKAY.  WERE, WERE -- DURING THE COURSE OF THOSE

10:00AM 21   NEGOTIATIONS, DID THE COMPANIES EXCHANGE VARIOUS DRAFTS OF

10:00AM 22   AGREEMENTS WITH CHANGES TO PROPOSED AGREEMENTS?

10:00AM 23   A.   YES.

10:00AM 24   Q.   DID YOU SEE SOME OF THOSE DRAFTS WHICH WERE EXCHANGED

10:00AM 25   BETWEEN THE COMPANIES?

| | | |
|---|---|---|
| 10:00AM | 1 | A.   I DID. |
| 10:00AM | 2 | Q.   I WANT TO SHOW YOU ONE OF THOSE EXCHANGES.  I WANT TO SHOW |
| 10:01AM | 3 | YOU EXHIBIT 7117. |
| 10:01AM | 4 | A.   OKAY. |
| 10:01AM | 5 | Q.   IS 7117 AN EMAIL FROM YOU TO VARIOUS PEOPLE AT WALGREENS |
| 10:01AM | 6 | TRANSMITTING CERTAIN COMMENTS ON PROPOSED AGREEMENTS BETWEEN |
| 10:01AM | 7 | WALGREENS AND THERANOS? |
| 10:01AM | 8 | A.   YES. |
| 10:01AM | 9 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 10:01AM | 10 | 7117. |
| 10:01AM | 11 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 10:01AM | 12 | MR. DOWNEY:  IF YOU CAN TURN YOUR ATTENTION TO PAGE |
| 10:01AM | 13 | 18. |
| 10:01AM | 14 | THE COURT:  LET ME ADMIT IT FIRST. |
| 10:01AM | 15 | MR. DOWNEY:  WELL, SORRY, YOUR HONOR.  YOU ARE SO |
| 10:01AM | 16 | SOFT-SPOKEN. |
| 10:01AM | 17 | THE COURT:  WELL, I CAN CORRECT THAT. |
| 10:01AM | 18 | (LAUGHTER.) |
| 10:01AM | 19 | MR. DOWNEY:  I WON'T GO THERE. |
| 10:02AM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:02AM | 21 | (DEFENDANT'S EXHIBIT 7117 WAS RECEIVED IN EVIDENCE.) |
| 10:02AM | 22 | BY MR. DOWNEY: |
| 10:02AM | 23 | Q.   LET ME DIRECT YOUR ATTENTION TO PAGE 11, AND PARAGRAPH 18 |
| 10:02AM | 24 | RATHER. |
| 10:02AM | 25 | AND DO YOU SEE THAT PARAGRAPH LABELLED WARRANTY? |

7489

| | | |
|---|---|---|
| 10:02AM | 1 | A.   I DO. |
| 10:02AM | 2 | Q.   AND DO YOU SEE NEAR THE PARAGRAPH THERE ARE SOME CHANGES |
| 10:02AM | 3 | TO LANGUAGE ABOUT WARRANTIES ON CARTRIDGES? |
| 10:02AM | 4 | A.   YES. |
| 10:02AM | 5 | Q.   AND DO YOU SEE ON THE LEFT THERE'S A COMMENT BOX WITH |
| 10:02AM | 6 | THERANOS REACTING TO SOME OF THOSE PROPOSALS? |
| 10:02AM | 7 | A.   YES. |
| 10:02AM | 8 | Q.   AND DO YOU SEE THAT THE THERANOS COMMENT SAYS, "AS |
| 10:02AM | 9 | DISCUSSED, THIS IS A NEW PRODUCT, WE'LL OBVIOUSLY PROVIDE THE |
| 10:02AM | 10 | BEST TECHNOLOGY PERFORMANCE POSSIBLE BUT WE CANNOT COMMIT TO |
| 10:02AM | 11 | THINGS LIKE THIS WHICH HAVE NOT YET EVEN BEEN CHARACTERIZED." |
| 10:03AM | 12 | IS THAT A COMMENT THAT YOU SAW WHEN YOU WERE TRANSMITTING |
| 10:03AM | 13 | THIS DOCUMENT TO WALGREENS? |
| 10:03AM | 14 | A.   YES.  WE WROTE THIS. |
| 10:03AM | 15 | Q.   AND WHAT DID YOU MEAN WHEN YOU WROTE THIS COMMENT AS A |
| 10:03AM | 16 | CHANGE ON THE PROPOSED AGREEMENT WITH WALGREENS? |
| 10:03AM | 17 | A.   JUST THAT WE HADN'T EVEN CHARACTERIZED SOME OF THE |
| 10:03AM | 18 | PERFORMANCE REQUIREMENTS THAT THEY WERE ASKING US TO WARRANT, |
| 10:03AM | 19 | OR PROVIDE A WARRANTY TO, AND WE COULDN'T DO THAT BECAUSE WE |
| 10:03AM | 20 | HADN'T EVEN GOTTEN TO THE POINT OF CHARACTERIZING THOSE THINGS |
| 10:03AM | 21 | YET. |
| 10:03AM | 22 | Q.   AND WHEN YOU SAY "CHARACTERIZING THOSE THINGS," WHAT DO |
| 10:03AM | 23 | YOU MEAN? |
| 10:03AM | 24 | A.   MEANING WE WERE STILL IN THE DEVELOPMENT PROCESS AND WE |
| 10:03AM | 25 | NEEDED TO COMPLETE DEVELOPMENT AND DO THE STUDIES TO GET THE |

7490

10:03AM  1    DATA TO BE ABLE TO MAKE REPRESENTATIONS LIKE THIS.

10:03AM  2    Q.   OKAY.  DID THERE COME A POINT WHEN WALGREENS AND THERANOS

10:03AM  3    ACTUALLY ENTERED INTO AN AGREEMENT?

10:03AM  4    A.   YES.

10:03AM  5    Q.   AND WHEN WAS THAT?

10:03AM  6    A.   IN 2010.

10:03AM  7    Q.   OKAY.  NOW, TO GET THE RELATIONSHIP GOING AFTER YOU SIGNED

10:04AM  8    THE AGREEMENT, WAS THERE WORK LEFT TO DO?

10:04AM  9    A.   YES.

10:04AM  10   Q.   WHEN DID THE THERANOS SERVICE CENTERS ACTUALLY LAUNCH IN

10:04AM  11   WALGREENS STORES?

10:04AM  12   A.   IN 2013.

10:04AM  13   Q.   AND WHAT WORK WAS -- WERE WALGREENS AND THERANOS DOING

10:04AM  14   BETWEEN 2010 AND 2013 TO GET READY TO LAUNCH THOSE SERVICE

10:04AM  15   CENTERS?

10:04AM  16   A.   THERE WAS A HUGE AMOUNT OF WORK.  WE HAD TO DO THE

10:04AM  17   DEVELOPMENT OF THE TESTS FOR WHATEVER MENU WAS ULTIMATELY GOING

10:04AM  18   TO BE SELECTED FOR LAUNCH; WE HAD TO WORK WITH INSURANCE

10:04AM  19   COMPANIES TO GET CONTRACTED SO THAT PEOPLE WHO CAME TO THE

10:04AM  20   STORES WOULD BE ABLE TO BILL INSURANCE FOR THE TESTS; WE HAD TO

10:04AM  21   DEVELOP --

10:04AM  22   Q.   LET ME STOP YOU ON YOUR COMMENT ABOUT INSURANCE COMPANIES.

10:04AM  23   A.   YES.  OKAY.

10:04AM  24   Q.   WHY DID YOU -- WHY DID THERANOS AND WALGREENS HAVE TO

10:05AM  25   WORRY ABOUT THOSE INSURANCE CONTRACTS FOR PEOPLE WHO CAME TO

10:05AM  1    SERVICE CENTERS IN WALGREENS STORES?

10:05AM  2    A.    BECAUSE IN MANY WAYS THE INSURANCE COMPANY WAS ESSENTIALLY

10:05AM  3    THE CUSTOMER.   THEY'RE THE ONES WHO PAY FOR THE TESTS, AND SO

10:05AM  4    WE NEEDED -- AND IT WAS REALLY IMPORTANT TO WALGREENS THAT WE

10:05AM  5    MADE SURE THAT EACH OF THE BIG INSURANCE COMPANIES WERE

10:05AM  6    CONTRACTED SO THAT PATIENTS WOULD BE ABLE TO PRESENT AN

10:05AM  7    INSURANCE CARD, AND THEY WANTED US TO BE ABLE TO AUTOMATICALLY

10:05AM  8    BILL THOSE INSURANCE COMPANIES, WHICH WAS A WHOLE SET ALSO OF

10:05AM  9    CUSTOM SOFTWARE ONCE YOU GOT THE CONTRACT.

10:05AM  10   Q.    OKAY.   AND WAS THERANOS ABLE TO REACH AGREEMENTS WITH

10:05AM  11   THOSE INSURANCE COMPANIES?

10:05AM  12   A.    YES.

10:05AM  13   Q.    DO YOU RECALL THAT MR. GROSSMAN TESTIFIED LAST WEEK THAT

10:05AM  14   THERANOS'S RELATIONSHIP WITH THOSE INSURANCE COMPANIES WAS A

10:05AM  15   FACTOR WITH RESPECT TO PFM'S DECISION TO INVEST IN THE COMPANY?

10:06AM  16   A.    I DO.

10:06AM  17   Q.    AND HE SPECIFICALLY MENTIONED UNITED HEALTH.

10:06AM  18         DO YOU REMEMBER THAT?

10:06AM  19   A.    I DO.

10:06AM  20   Q.    AND DID THERANOS SUCCESSFULLY CONCLUDE AN AGREEMENT WITH

10:06AM  21   UNITED HEALTH FOR REIMBURSEMENT FOR BLOOD TESTS AT THERANOS

10:06AM  22   SERVICE CENTERS?

10:06AM  23   A.    WE DID.

10:06AM  24   Q.    LET ME ASK YOU TO LOOK AT EXHIBIT 14018.

10:06AM  25   A.    OKAY.

10:06AM  1    Q.   IS THIS THE AGREEMENT BETWEEN THERANOS AND UNITED HEALTH?

10:06AM  2    A.   IT IS.

10:06AM  3              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 14018.

10:06AM  4              MR. LEACH:  NO OBJECTION.

10:06AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:06AM  6         (DEFENDANT'S EXHIBIT 14018 WAS RECEIVED IN EVIDENCE.)

10:06AM  7    BY MR. DOWNEY:

10:06AM  8    Q.   NOW, WE WERE TALKING ABOUT THE WORK THAT WALGREENS AND

10:06AM  9    THERANOS DID BETWEEN 2010 AND 2013, AND YOU HAD MENTIONED

10:07AM  10   INSURANCE COMPANIES, AND THEN I INTERRUPTED YOU.

10:07AM  11   A.   SORRY.

10:07AM  12   Q.   AND WHAT OTHER WORK DID WALGREENS AND THERANOS HAVE TO DO

10:07AM  13   BETWEEN 2010 AND 2013?

10:07AM  14   A.   I WAS GOING TO TALK ABOUT THE SOFTWARE.  THERE WAS

10:07AM  15   SOFTWARE FOR BEING ABLE TO ELECTRONICALLY BILL; THERE WAS

10:07AM  16   SOFTWARE TO BE ABLE TO HAVE ALL OF THE LAB DATA GO INTO ALL OF

10:07AM  17   THESE DIFFERENT EMR, OR ELECTRONIC MEDICAL RECORDS; THERE WAS

10:07AM  18   SOFTWARE THAT WE WERE BUILDING FOR A GREAT CHECK-IN EXPERIENCE

10:07AM  19   AT RETAIL; THERE WAS SOFTWARE FOR HOW WE WERE HANDLING THE

10:07AM  20   ACCESSION OF SAMPLES IN THE LABORATORY.

10:07AM  21        AND SO THERE WAS A LOT ON THAT FRONT.

10:07AM  22        THERE WAS REGULATORY QUESTIONS ON WHAT THE RIGHT

10:07AM  23   REGULATORY APPROACH WAS FOR BEING ABLE TO LAUNCH OUR SERVICES.

10:07AM  24        AND THERE WAS ALL OF THE ORGANIZATIONS THAT WERE NEEDED TO

10:07AM  25   SUPPORT THE LAUNCH, LIKE CUSTOMER SERVICE CALL CENTERS AND SO

7493

| | | |
|---|---|---|
| 10:07AM | 1 | ON TO BE ABLE TO DO THIS. |
| 10:07AM | 2 | Q.   LET'S TALK FOR A MOMENT ABOUT THE REGULATORY ISSUES YOU |
| 10:08AM | 3 | MENTIONED. |
| 10:08AM | 4 | SO AM I CORRECT THAT THE CONCEPT WAS THAT THERANOS'S |
| 10:08AM | 5 | DEVICES WOULD ACTUALLY BE IN WALGREENS STORES? |
| 10:08AM | 6 | A.   YES. |
| 10:08AM | 7 | Q.   AND BLOOD WOULD BE DRAWN FROM PEOPLE IN WALGREENS STORES; |
| 10:08AM | 8 | IS THAT RIGHT? |
| 10:08AM | 9 | A.   EXACTLY.  THE IDEA WAS THAT YOU COULD COME IN, YOU COULD |
| 10:08AM | 10 | DO A FINGERSTICK, YOU WOULD TOUCH A CARTRIDGE, PUT IT INTO THE |
| 10:08AM | 11 | DEVICE, AND DATA WOULD BE SENT TO THE CLOUD. |
| 10:08AM | 12 | Q.   AND WHAT LEGAL OR REGULATORY ISSUES DID THAT INVOLVE? |
| 10:08AM | 13 | A.   IT MEANT WE NEEDED TO UNDERSTAND THE RIGHT APPROACH AS IT |
| 10:08AM | 14 | PERTAINS TO FDA AND CMS, THE TWO REGULATORY AGENCIES. |
| 10:08AM | 15 | Q.   AND DID WALGREENS AND THERANOS GO ABOUT TRYING TO FIGURE |
| 10:08AM | 16 | THAT OUT? |
| 10:08AM | 17 | A.   YES. |
| 10:08AM | 18 | Q.   AND AT THE OUTSET OF THE PARTNERSHIP, WAS WALGREENS |
| 10:08AM | 19 | AGREEABLE TO HAVING THE DEVICES IN, IN ITS STORES? |
| 10:08AM | 20 | A.   THEY WERE. |
| 10:08AM | 21 | Q.   DID THEIR VIEW CHANGE AS THE PERIOD BETWEEN 2010 AND 2013 |
| 10:09AM | 22 | PROGRESSED? |
| 10:09AM | 23 | A.   YES. |
| 10:09AM | 24 | Q.   TELL US HOW THEIR VIEW OF HOW THE PARTNERSHIP WOULD RUN |
| 10:09AM | 25 | CHANGED DURING THAT PERIOD? |

10:09AM   1       A.   WALGREENS HAD A LOT OF REGULATORY LAWYERS AND EXPERTS, AND

10:09AM   2   THEY ULTIMATELY DECIDED THAT WE SHOULD NOT PUT THE DEVICES IN

10:09AM   3   THE STORE BECAUSE OF FDA AND CMS REASONS, BUT INSTEAD, THAT WE

10:09AM   4   SHOULD BE A CENTRAL LAB WHERE SAMPLES ARE SHIPPED TO THE LAB.

10:09AM   5       Q.   AND DID THERANOS AGREE THAT THAT WAS NECESSARY?

10:09AM   6       A.   OUR LAWYERS HAD DIFFERENT OPINIONS, BUT WE AGREED TO DO

10:09AM   7   WHAT WALGREENS WANTED.

10:09AM   8       Q.   WHEN BETWEEN 2010 AND 2013 DID THAT ISSUE ARISE?

10:09AM   9       A.   I THINK IN -- CERTAINLY BY 2012.

10:09AM  10       Q.   OKAY.  DID THAT REQUIRE AN AMENDMENT TO THE AGREEMENT

10:10AM  11   BETWEEN WALGREENS AND THERANOS?

10:10AM  12       A.   IT DID.

10:10AM  13       Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 617, WHICH IS

10:10AM  14   ALREADY IN EVIDENCE.

10:10AM  15       A.   OH, OKAY.

10:10AM  16       Q.   AND DO YOU SEE THAT THIS IS AN AMENDMENT TO THAT

10:10AM  17   AGREEMENT --

10:10AM  18       A.   YES.

10:10AM  19       Q.   -- TO THE ORIGINAL AGREEMENT?

10:10AM  20       A.   I DO.

10:10AM  21       Q.   AND DO YOU SEE THAT IT WAS DATED JUNE OF 2012?

10:10AM  22       A.   YES.

10:10AM  23       Q.   AND SO FROM JUNE OF 2012 UNTIL SEPTEMBER OF 2013, DID

10:10AM  24   THERANOS AND WALGREENS WORK ON THE MODEL WHERE THERANOS WOULD

10:10AM  25   HAVE A CENTRAL LAB?

7495

| | | |
|---|---|---|
| 10:10AM | 1 | A.   YES. |
| 10:10AM | 2 | Q.   SO ABOUT A LITTLE OVER A YEAR? |
| 10:10AM | 3 | A.   YES. |
| 10:10AM | 4 | Q.   OKAY.  NOW, I WANT TO TALK ABOUT, INTERNALLY AT THERANOS, |
| 10:10AM | 5 | THE EFFORTS THAT WERE MADE TO BE READY WITH REGARD TO THE |
| 10:10AM | 6 | TECHNOLOGY FOR THAT LAUNCH IN WALGREENS STORES. |
| 10:11AM | 7 | FIRST OF ALL, LET ME ASK YOU, WERE YOU THE PERSON AT |
| 10:11AM | 8 | THERANOS WHO WAS PUT IN CHARGE OF DEVELOPING THE PROJECT PLAN |
| 10:11AM | 9 | FOR GETTING READY TO LAUNCH IN WALGREENS STORES? |
| 10:11AM | 10 | A.   NO. |
| 10:11AM | 11 | Q.   WHO WAS PUT IN CHARGE OF THAT PLAN? |
| 10:11AM | 12 | A.   DR. YOUNG. |
| 10:11AM | 13 | Q.   DR. YOUNG.  DR. DANIEL YOUNG? |
| 10:11AM | 14 | A.   YES. |
| 10:11AM | 15 | Q.   AND WHY WAS DR. YOUNG SELECTED AS THE PERSON WHO WOULD BE |
| 10:11AM | 16 | APPROPRIATE TO DO THAT? |
| 10:11AM | 17 | A.   HE IS AN INCREDIBLY SMART PERSON WHO HAD DONE GREAT WORK |
| 10:11AM | 18 | IN OUR INFORMATICS TEAM.  HE HAD SKILL SETS IN MODELING AND |
| 10:11AM | 19 | DATA, AND WE WANTED TO APPLY THEM TO THE WAY THAT WE WERE |
| 10:11AM | 20 | MANAGING THE PROJECT, AND TO R&D AND ENGINEERING MORE BROADLY. |
| 10:11AM | 21 | Q.   LET ME ASK YOU TO BREAK DOWN THE PIECES OF THE TECHNOLOGY |
| 10:12AM | 22 | AS WE HAVE BEEN TALKING ABOUT THEM, ASSAYS, HARDWARE, SOFTWARE. |
| 10:12AM | 23 | A.   YEAH. |
| 10:12AM | 24 | Q.   YOU TALKED A LITTLE WHILE AGO ABOUT THE TEST MENU AND |
| 10:12AM | 25 | DEVELOPMENT OF THE TEST MENU. |

7496

10:12AM 1      DID IT REMAIN THERANOS'S PLAN TO TRY TO OFFER SEVERAL

10:12AM 2   HUNDRED TESTS AT A WALGREENS STORE AT THE TIME OF THE INITIAL

10:12AM 3   LAUNCH?

10:12AM 4   A.   WE TRIED TO FIGURE OUT WHAT TESTS WOULD BE ORDERED BY

10:12AM 5   PEOPLE COMING INTO THE STORE, AND OUR GOAL WAS TO BE ABLE TO

10:12AM 6   PROVIDE ANYWHERE FROM 85 TO 95 PERCENT OF THE MOST COMMONLY

10:12AM 7   ORDERED TESTS.

10:12AM 8   Q.   AND HOW DID THE COMPANY GO ABOUT TRYING TO ANALYZE THAT

10:12AM 9   QUESTION?

10:12AM 10  A.   WE ASKED FOR DATA FROM OUR INSURANCE COMPANY PARTNERS, SO

10:12AM 11  BLUE CROSS BLUE SHIELD AND OTHERS, AS WELL AS FROM THE

10:12AM 12  RETAILERS THEMSELVES, ON WHAT TEST ORDERING PATTERNS THEY WERE

10:13AM 13  SEEING, MEANING WHEN SOMEONE GOT A LAB TEST DONE, WHAT TEST

10:13AM 14  WERE THEY ORDERING?

10:13AM 15      AND WE BEGAN THE WORK TO UNDERSTAND WHAT TESTS WERE MOST

10:13AM 16  COMMONLY ORDERED.

10:13AM 17  Q.   OKAY.  AND IS THAT AN ANALYSIS THAT DR. YOUNG PERFORMED?

10:13AM 18  A.   YES, WITH HIS, WITH HIS DATA ANALYSIS TEAM.

10:13AM 19  Q.   OKAY.  AND IN TERMS OF DEVELOPING THE ASSAYS, WHO AT THE

10:13AM 20  COMPANY WORKED AS LEADERS WITHIN THE ASSAY DEVELOPMENT GROUP?

10:13AM 21  A.   WE AT THIS POINT HAD FORMED FOUR GROUPS.  THERE WAS THE

10:13AM 22  IMMUNOASSAY GROUP, WHICH WAS LED BY SUREKHA GANGADKHEDKAR;

10:13AM 23  THERE WAS THE GENERAL CHEMISTRY GROUP, WHICH WAS LED BY

10:13AM 24  DR. PAUL PATEL; THERE WAS THE CYTOMETRY GROUP, WHICH WAS LED BY

10:13AM 25  DR. CHINMAY PANGARKAR; AND THERE WAS THE NUCLEIC ACID, OR

7497

10:14AM  1    PCR-LIKE GROUP, WE WERE BUILDING OUR OWN METHOD, WHICH WAS LED

10:14AM  2    BY DR. ANDREA CUPPOLETTI.

10:14AM  3    Q.   AND DID DR. GIBBONS CONTINUE TO PLAY A ROLE WITH REGARD TO

10:14AM  4    ASSAY DEVELOPMENT DURING THAT PERIOD?

10:14AM  5    A.   HE DID.

10:14AM  6    Q.   AND WHAT ROLE DID HE PLAY?

10:14AM  7    A.   HE SERVED AS THE CHIEF SCIENTIST TYPE OF PERSON WHO WAS

10:14AM  8    ADVISING THOSE FOUR TEAMS.

10:14AM  9    Q.   AND DID YOU BELIEVE THAT THERANOS WOULD BE ABLE TO DEVELOP

10:14AM  10   MOST BLOOD TESTS AS A RESULT OF THOSE EFFORTS?

10:14AM  11   A.   I DID.

10:14AM  12   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7230.

10:14AM  13   A.   OKAY.

10:14AM  14   Q.   IS THIS AN EMAIL FROM DR. YOUNG TO YOU IN 2012 UPDATING

10:14AM  15   YOU ON THE DEVELOPMENT OF TESTS AND THEIR ASSOCIATED BILLING

10:15AM  16   CODES?

10:15AM  17   A.   IT IS, YES.

10:15AM  18        MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

10:15AM  19   EXHIBIT 7230.

10:15AM  20        MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:15AM  21        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  22   (DEFENDANT'S EXHIBIT 7230 WAS RECEIVED IN EVIDENCE.)

10:15AM  23   BY MR. DOWNEY:

10:15AM  24   Q.   DO YOU SEE AT THE TOP THIS IS DR. YOUNG WRITING TO YOU IN

10:15AM  25   FEBRUARY OF 2012.

7498

10:15AM  1      AND DO YOU SEE THAT IN THE SECOND PARAGRAPH HE SAYS, "AS

10:15AM  2   YOU WILL SEE FROM THE CPT'S FROM," AND THEN HE GIVES A LONG

10:15AM  3   CODE FROM A LIST, NUMBERS EQUALLING 1138, "THERE ARE NUMBER

10:15AM  4   EQUAL 116 THAT ARE CURRENTLY CATEGORIZED AS 'NP,' NAMELY 'NOT

10:15AM  5   PLANNED WITH CURRENT TECHNOLOGY ON THERANOS DEVICES AT THIS

10:16AM  6   TIME.'"

10:16AM  7      CAN YOU EXPLAIN THIS IN A MORE UNDERSTANDABLE MEANING FOR

10:16AM  8   US?

10:16AM  9   A.   YES.   DR. YOUNG HAD A TEAM GO THROUGH ALL OF THE CPT

10:16AM  10  CODES, WHICH ARE THE BILLING CODES FOR TESTS, TO EVALUATE WHICH

10:16AM  11  TESTS WE COULD DO, AND HE'S SAYING HERE THAT THERE ARE JUST

10:16AM  12  OVER A THOUSAND CPT CODES THAT WE COULD DO.

10:16AM  13  Q.   OKAY.   SO HE'S SAYING THAT THERE ARE ABOUT 1138 CPT CODES,

10:16AM  14  BUT THERANOS WOULD NOT BE ABLE TO DO 116?

10:16AM  15  A.   EXACTLY.

10:16AM  16  Q.   NOW, WE LOOKED AT AN EMAIL EARLIER WHERE DR. GIBBONS HAD

10:16AM  17  COMMENTED ON THE SPEED WITH WHICH THERANOS WAS CAPABLE OF

10:16AM  18  DEVELOPING ASSAYS.

10:16AM  19      DO YOU RECALL THAT FROM YOUR TESTIMONY EARLIER THIS

10:16AM  20  MORNING?

10:16AM  21  A.   I DO.

10:16AM  22  Q.   AND DID YOU ATTRIBUTE THAT IN PART TO THE METHOD OF --

10:17AM  23  THAT THERANOS HAD DEVELOPED OF DEVELOPING ASSAYS?

10:17AM  24  A.   YES.

10:17AM  25  Q.   DID YOU SOMETIMES REFER TO THAT METHOD AS THERANIZING

7499

10:17AM 1    ASSAYS?

10:17AM 2    A.   YES.  THERANIZING ASSAYS WAS WHAT WE CALLED OUR FORMULA

10:17AM 3    FOR TURNING A TEST INTO A SMALL SAMPLE TEST.

10:17AM 4    Q.   OKAY.  AND IS THAT SOMETHING ON WHICH THERANOS ULTIMATELY

10:17AM 5    OBTAINED A PATENT?

10:17AM 6    A.   IT IS.

10:17AM 7    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 9649.

10:17AM 8    A.   OKAY.

10:17AM 9    Q.   CAN YOU JUST TAKE A MOMENT TO REVIEW THAT?

10:17AM 10   A.   OKAY.

10:17AM 11   Q.   IS THIS PATENT THE PATENT THAT THERANOS OBTAINED IN

10:18AM 12   CONNECTION WITH THERANIZING ITS ASSAYS?

10:18AM 13   A.   YES, I THINK IT'S ONE OF THEM.

10:18AM 14        MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

10:18AM 15   EXHIBIT 9649.

10:18AM 16        MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:18AM 17        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM 18   (DEFENDANT'S EXHIBIT 9649 WAS RECEIVED IN EVIDENCE.)

10:18AM 19   BY MR. DOWNEY:

10:18AM 20   Q.   LET ME ASK YOU TO LOOK AT THE FIRST PAGE.

10:18AM 21   AND DO YOU SEE THAT THIS IS A PATENT CALLED "METHODS FOR

10:18AM 22   IMPROVING ASSAYS OF BIOLOGICAL SAMPLES"?

10:18AM 23   A.   I DO.

10:18AM 24   Q.   AND THERE'S A FILE NUMBER 22, AND IT INDICATES THAT IT WAS

10:18AM 25   FILED ON JULY 25TH, 2014?

10:19AM  1    A.   YES.

10:19AM  2    Q.   I'D LIKE TO JUST GO FORWARD IN THE PATENT TO PAGE 15 OF

10:19AM  3    THE PATENT.

10:19AM  4         I'LL DIRECT YOUR ATTENTION TO THIS DIAGRAM, FIGURE 13 ON

10:19AM  5    PAGE 15.

10:19AM  6         WHAT DOES FIGURE 13 CONVEY?

10:19AM  7    A.   FIGURE 13 IS SHOWING A TRADITIONAL CHEMISTRY FOR MEASURING

10:19AM  8    CELL CYTOMETRY.

10:19AM  9         SO THIS WOULD BE SOMETHING LIKE A CBC TEST THAT YOU WOULD

10:19AM  10   DO.

10:19AM  11        AND ON THE LEFT-HAND SIDE IT'S SHOWING THE STEPS AND THE

10:19AM  12   TIME OF A TRADITIONAL ASSAY.

10:19AM  13        AND ON THE RIGHT-HAND SIDE IT'S SHOWING THE STEPS AND THE

10:19AM  14   TIME OF THE THERANOS SMALL SAMPLE ASSAY.

10:19AM  15   Q.   SO THE TIME IT TOOK FOR THE THERANOS ASSAY TO RUN WAS

10:19AM  16   ABOUT 11 AND A HALF MINUTES?

10:19AM  17   A.   YES.

10:19AM  18   Q.   AND THE TIME FOR A STANDARD ASSAY WAS ABOUT 31 MINUTES?

10:19AM  19   A.   YES.

10:19AM  20   Q.   AND THERE APPEAR TO BE THESE FEWER STEPS.  WHAT STEPS HAVE

10:20AM  21   BEEN -- WHAT KINDS OF STEPS HAVE BEEN REMOVED?

10:20AM  22   A.   THERE WERE SEVERAL KEY CHANGES TO THE SMALL SAMPLE FORMULA

10:20AM  23   WHICH HAD TO DO WITH CHANGING THE CONCENTRATION OF THE REAGENTS

10:20AM  24   OR THE CHEMICALS THAT WERE USED IN THE TEST, CHANGING

10:20AM  25   TEMPERATURE, AND CHANGING THE WAY YOU WOULD MIX OR INCUBATE A

10:20AM 1    SAMPLE.  IT JUST MEANS THE CHEMICAL SITTING TOGETHER WITH THE

10:20AM 2    SAMPLE FOR CERTAIN AMOUNTS OF TIME, AND THOSE TYPES OF THINGS

10:20AM 3    WERE MODIFIED HERE.

10:20AM 4    Q.   NOW, WERE THESE KINDS -- THIS KIND OF METHODOLOGY, WAS IT

10:20AM 5    USED AS -- IN CONNECTION WITH THE DEVELOPMENT OF ASSAYS WITHIN

10:20AM 6    THE COMPANY BETWEEN 2010 AND 2013?

10:20AM 7    A.   IT WAS.

10:20AM 8    Q.   AND WOULD THE LEADERS OF THE VARIOUS ASSAY TEAMS REPORT TO

10:20AM 9    YOU ON HOW MUCH PROGRESS THAT THEY HAD MADE IN DEVELOPING

10:20AM 10   ASSAYS DURING THAT PERIOD?

10:20AM 11   A.   THEY DID.

10:20AM 12   Q.   LET ME ASK FIRST ABOUT THE GENERAL CHEMISTRY TEAM.

10:21AM 13       DO YOU RECALL THAT YOU TESTIFIED A MOMENT AGO THAT WAS ONE

10:21AM 14   OF THE ASSAY TEAMS?

10:21AM 15   A.   YES.

10:21AM 16   Q.   AND THAT WAS LED BY DR. PAUL PATEL?

10:21AM 17   A.   IT WAS.

10:21AM 18   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7222.

10:21AM 19   A.   OKAY.

10:21AM 20   Q.   IS THIS AN EMAIL BETWEEN DR. YOUNG AND YOURSELF AND OTHERS

10:21AM 21   WHERE HE IS RELATED TO THE DEVELOPMENT OF GENERAL CHEMISTRY

10:21AM 22   ASSAYS?

10:21AM 23   A.   YES.

10:21AM 24           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT

10:21AM 25   EXHIBIT 7222.

7502

10:21AM  1              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:21AM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:21AM  3         (DEFENDANT'S EXHIBIT 7222 WAS RECEIVED IN EVIDENCE.)

10:21AM  4    BY MR. DOWNEY:

10:21AM  5    Q.   LET'S GO DOWN TO THE EMAIL AT 1:33 P.M.

10:21AM  6         AND DO YOU SEE THAT YOU ASK DR. PATEL ABOUT THE BREAKDOWN

10:22AM  7    OF ASSAY RUN TIME FOR ALL OF THE COLORIMETRY ASSAYS THAT

10:22AM  8    THERANOS HAD.

10:22AM  9         DO YOU SEE THAT?

10:22AM 10    A.   I DO.

10:22AM 11    Q.   AND THEN THAT EMAIL IS ACTUALLY ANSWERED ABOVE BY

10:22AM 12    DR. YOUNG, AND DR. YOUNG INDICATES IN RESPONSE -- THAT IN

10:22AM 13    RESPONSE TO YOUR EMAIL TO DR. PATEL, THAT HE'S FORWARDING A

10:22AM 14    RECENT UPDATE.

10:22AM 15         DO YOU SEE THAT?

10:22AM 16    A.   YES.

10:22AM 17    Q.   AND LET'S LOOK AT THE UPDATE THAT HE ATTACHES, WHICH IS IN

10:22AM 18    NATIVE FORM.

10:22AM 19         AND DO YOU SEE THAT ON THE LEFT-HAND SIDE THERE'S A LIST

10:22AM 20    OF BLOOD TESTS?

10:22AM 21    A.   YES.

10:22AM 22    Q.   AND IF YOU GO DOWN TO THE BOTTOM OF THAT LIST, IT LOOKS

10:23AM 23    LIKE THERE ARE ABOUT 48 BLOOD TESTS LISTED IN THE AREA OF

10:23AM 24    GENERAL CHEMISTRY AT THAT TIME.

10:23AM 25    A.   YES.

10:23AM 1    Q.   AND THEN THERE'S A -- IN THE MIDDLE COLUMN THERE'S A LIST

10:23AM 2    OF HOW LONG IT TAKES TO RUN THOSE ASSAYS.

10:23AM 3         DO YOU SEE THAT?

10:23AM 4    A.   I DO.

10:23AM 5    Q.   AND THEN ON THE NEXT COLUMN THERE'S A COLUMN LABELLED

10:23AM 6    ASSAY DEVELOPMENT COMPLETION DATE.

10:23AM 7         WHAT WAS THAT?

10:23AM 8    A.   IT LOOKS LIKE THIS IS JUST MARKING WHICH OF THESE TESTS

10:23AM 9    HAVE BEEN DEVELOPED.

10:23AM 10   Q.   AND IF YOU GO DOWN, WAS IT -- DOES THIS REPORT REFLECT

10:23AM 11   THAT ABOUT -- IT LOOKS LIKE ABOUT 42 OF THE 48 HAD BEEN

10:23AM 12   COMPLETED?

10:23AM 13   A.   YES, I THINK SO.

10:23AM 14   Q.   AND THEN THERE ARE DATES ASSOCIATED WITH THE ANTICIPATED

10:24AM 15   COMPLETION OF THE OTHERS?

10:24AM 16   A.   YES.

10:24AM 17   Q.   OKAY.  AND THIS IS A REPORT THAT YOU RECEIVED IN 2012?

10:24AM 18   A.   IT IS.

10:24AM 19   Q.   OKAY.  NOW, ANOTHER ASSAY GROUP WAS THE GROUP LED BY

10:24AM 20   DR. PANGARKAR THAT YOU MENTIONED; RIGHT?

10:24AM 21   A.   YES.

10:24AM 22   Q.   AND THAT WAS THE CYTOMETRY TEAM WITHIN THE COMPANY?

10:24AM 23   A.   IT WAS.

10:24AM 24   Q.   AND DID YOU ALSO PERIODICALLY RECEIVE REPORTS FROM

10:24AM 25   DR. PANGARKAR ABOUT THE PROGRESS OF DEVELOPMENT?

7504

| | | |
|---|---|---|
| 10:24AM | 1 | A.   I DID. |
| 10:24AM | 2 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7239. |
| 10:24AM | 3 | A.   OKAY. |
| 10:24AM | 4 | Q.   IS THIS AN EMAIL FROM DR. PANGARKAR TO YOU REPORTING ON |
| 10:24AM | 5 | THE PROGRESS OF ASSAY DEVELOPMENT IN THE CYTOMETRY TEAM? |
| 10:24AM | 6 | A.   IT IS. |
| 10:24AM | 7 | Q.   OKAY. |
| 10:25AM | 8 | YOUR HONOR, I MOVE TO ADMIT 7239. |
| 10:25AM | 9 | MR. LEACH:  NO OBJECTION. |
| 10:25AM | 10 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:25AM | 11 | (DEFENDANT'S EXHIBIT 7239 WAS RECEIVED IN EVIDENCE.) |
| 10:25AM | 12 | BY MR. DOWNEY: |
| 10:25AM | 13 | Q.   ALL RIGHT.  IF YOU LOOK AT THIS EMAIL, DO YOU SEE THAT |
| 10:25AM | 14 | IT'S FROM JUNE OF 2012? |
| 10:25AM | 15 | A.   I DO. |
| 10:25AM | 16 | Q.   AND DO YOU SEE THAT BELOW DR. PANGARKAR INDICATES THAT |
| 10:25AM | 17 | THERE HAVE BEEN ASSAY DEVELOPMENT AND CLINICAL STUDY SUMMARY |
| 10:25AM | 18 | REPORTS FOR ALL CYTOMETRY ASSAYS? |
| 10:25AM | 19 | A.   YES. |
| 10:25AM | 20 | Q.   AND THEN HE GOES ON TO MAKE SOME COMMENTS REGARDING THE |
| 10:25AM | 21 | DEVELOPMENT OF THOSE ASSAYS. |
| 10:25AM | 22 | DO YOU SEE THAT? |
| 10:25AM | 23 | A.   YES. |
| 10:25AM | 24 | Q.   AND IN THE -- UNDER THE FIRST BULLET POINT, THERE ARE A |
| 10:25AM | 25 | COUPLE OF BULLET POINTS, AND HE SAYS THAT "THERE IS SOUND |

| | | |
|---|---|---|
| 10:25AM | 1 | SCIENCE AND METHOD DEVELOPMENT BEHIND OUR ASSAYS"? |
| 10:26AM | 2 | A.   YES. |
| 10:26AM | 3 | Q.   AND THEN BELOW THAT HE SAYS "OUR ASSAYS GIVE RESULTS THAT |
| 10:26AM | 4 | AGREE WITH PREDICATE METHODS WITHIN CLIA PRESCRIBED LIMITS." |
| 10:26AM | 5 | DO YOU SEE THAT? |
| 10:26AM | 6 | A.   I DO. |
| 10:26AM | 7 | Q.   AND WHAT DID YOU TAKE AWAY FROM THIS EMAIL WHEN YOU |
| 10:26AM | 8 | RECEIVED IT AS TO THE PROGRESS OF THE DEVELOPMENT OF CYTOMETRY |
| 10:26AM | 9 | ASSAYS AT THERANOS? |
| 10:26AM | 10 | A.   THAT DR. PANGARKAR AND HIS TEAM HAD DEVELOPED ALL OF THE |
| 10:26AM | 11 | TESTS FOR CYTOMETRY THAT WERE RELEVANT FOR RETAIL; THAT THE |
| 10:26AM | 12 | ASSAYS WERE SOUND, THEY WERE GOOD; AND THAT THEY WERE |
| 10:26AM | 13 | PERFORMING IN A WAY THAT MET THE CLIA CRITERIA FOR THE TESTS. |
| 10:26AM | 14 | Q.   LET'S TALK ABOUT THE THIRD OF THE FOUR METHODS, THE |
| 10:26AM | 15 | IMMUNOASSAY METHOD. |
| 10:26AM | 16 | AGAIN, THAT TEAM WAS LED BY MS. GANGAKHEDKAR? |
| 10:26AM | 17 | A.   YES. |
| 10:26AM | 18 | Q.   AND DO YOU RECALL HER TESTIFYING BACK AT THE EARLIER PART |
| 10:26AM | 19 | OF EARLY SEPTEMBER? |
| 10:26AM | 20 | A.   I DO. |
| 10:26AM | 21 | Q.   AND WOULD SHE SOMETIMES PROVIDE UPDATES TO YOU ON THE |
| 10:27AM | 22 | DEVELOPMENTS OF IMMUNOASSAYS? |
| 10:27AM | 23 | A.   SHE DID. |
| 10:27AM | 24 | Q.   LET ME SHOW YOU EXHIBIT 7297, WHICH IS IN EVIDENCE. |
| 10:27AM | 25 | A.   OKAY. |

7506

| | | |
|---|---|---|
| 10:27AM | 1 | Q.   IF YOU'D LOOK AT THE FIRST PAGE HERE, DO YOU SEE THAT |
| 10:27AM | 2 | MS. GANGAKHEDKAR WROTE TO YOU, "PLEASE FIND THE UPDATES ON THE |
| 10:27AM | 3 | ELISA PROJECTS"? |
| 10:27AM | 4 | A.   I DO. |
| 10:27AM | 5 | Q.   AND IS ELISA ANOTHER WAY OF SAYING IMMUNOASSAY? |
| 10:27AM | 6 | A.   YES. |
| 10:27AM | 7 | Q.   AND THAT IS WHAT THE COMPANY HAD BEEN WORKING ON SINCE |
| 10:27AM | 8 | EARLY IN ITS LIFE; RIGHT? |
| 10:27AM | 9 | A.   YES. |
| 10:27AM | 10 | Q.   AND THERE IS ALSO A NATIVE ATTACHMENT TO THIS DOCUMENT. |
| 10:27AM | 11 | LET'S TAKE A LOOK AT THAT. |
| 10:27AM | 12 | AND DO YOU SEE HERE THAT THERE IS A LIST OF ASSAYS?  LET'S |
| 10:27AM | 13 | GO DOWN TO THE BOTTOM THERE AND SEE HOW MANY THERE ARE. |
| 10:27AM | 14 | THERE APPEAR TO BE A LIST OF ABOUT 93 ASSAYS OR BLOOD |
| 10:28AM | 15 | TESTS? |
| 10:28AM | 16 | A.   YES. |
| 10:28AM | 17 | Q.   AND DO YOU SEE ON THE BOTTOM TABS THAT THOSE ARE WITHIN |
| 10:28AM | 18 | THE COMPLETED LIST OF ASSAYS IN THIS DOCUMENT? |
| 10:28AM | 19 | A.   I DO. |
| 10:28AM | 20 | Q.   OKAY.  AND IF YOU LOOK BACK AT THE EMAIL THAT IS THE FIRST |
| 10:28AM | 21 | PAGE OF 7297, WAS THIS CONVEYED TO YOU IN EARLY -- OR IN LATE |
| 10:28AM | 22 | JUNE 2013? |
| 10:28AM | 23 | A.   YES. |
| 10:28AM | 24 | Q.   OKAY.  LET'S TALK ABOUT THE FOURTH ASSAY GROUP, FOURTH AND |
| 10:28AM | 25 | FINAL ASSAY GROUP, NUCLEIC ACID AMPLIFICATION. |

7507

10:28AM 1        AND THAT GROUP WAS RUN BY DR. PRANAV PATEL?

10:28AM 2     A.   AT THAT POINT, YES.

10:28AM 3     Q.   AND LET ME ASK YOU TO LOOK AT 7315.

10:28AM 4        AND WHEN YOU DO SO, MY QUESTION TO YOU WILL SIMPLY BE

10:28AM 5     WHETHER THAT'S A REPORT FROM DR. PRANAV PATEL ABOUT ASSAY

10:28AM 6     DEVELOPMENT IN THAT FOURTH ASSAY GROUP?

10:29AM 7     A.   IT IS.

10:29AM 8           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7315.

10:29AM 9           MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:29AM 10          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM 11       (DEFENDANT'S EXHIBIT 7315 WAS RECEIVED IN EVIDENCE.)

10:29AM 12    BY MR. DOWNEY:

10:29AM 13    Q.   DO YOU SEE THAT DR. PATEL WRITES IN THE FIRST PARAGRAPH OF

10:29AM 14    THIS EMAIL, "ATTACHED IS THE DOCUMENT STATING THE CURRENT

10:29AM 15    STATUS OF TNAA ASSAYS AND EXPECTED DATE OF COMPLETION"?

10:29AM 16    A.   I DO.

10:29AM 17    Q.   AND THIS IS AN EMAIL SENT TO YOU IN AUGUST OF 2013?

10:29AM 18    A.   YES.

10:29AM 19    Q.   OKAY.  LET'S GO TO THE ATTACHMENT, ALSO NATIVE ATTACHMENT.

10:29AM 20       AND DO YOU SEE THAT WITHIN THIS LIST THERE IS THE SAME

10:30AM 21    TYPE OF LIST OF ASSAYS WITH COMPLETION DATES UNDER COLUMN E?

10:30AM 22    A.   I DO.

10:30AM 23    Q.   AND DO YOU SEE THAT SEVERAL OF THE, IT LOOKS LIKE ABOUT 23

10:30AM 24    OF THEM HAVE BEEN COMPLETED?

10:30AM 25    A.   YES.

10:30AM 1    Q.   AND DO YOU SEE THAT THE EXPECTED COMPLETION DATES FOR THE

10:30AM 2    OTHER ASSAYS IS LATER IN AUGUST 2013?

10:30AM 3    A.   YES.

10:30AM 4    Q.   AND DID YOU UNDERSTAND AS A RESULT OF THAT THAT ALL OF THE

10:30AM 5    NUCLEIC ACID AMPLIFICATION ASSAYS WOULD BE DEVELOPED BY THE END

10:30AM 6    OF AUGUST OF 2013?

10:30AM 7    A.   I DID.

10:30AM 8    Q.   NOW, WHEN ALL OF THE BLOOD TESTS WITHIN THESE VARIOUS

10:30AM 9    ASSAY GROUPS WERE BEING DEVELOPED, HOW IS THE WORK BEING

10:30AM 10   DOCUMENTED?

10:30AM 11   A.   THE WORK WAS DOCUMENTED IN DEVELOPMENT AND VALIDATION

10:30AM 12   REPORTS.

10:31AM 13   Q.   AND WHO WOULD PREPARE THOSE REPORTS?

10:31AM 14   A.   THE SCIENTISTS IN EACH OF THE ASSAY TEAMS.

10:31AM 15   Q.   OKAY.  LET ME ASK YOU TO LOOK AT 15000.

10:31AM 16   A.   OKAY.

10:31AM 17   Q.   DO YOU HAVE THAT?

10:31AM 18   A.   I DO.

10:31AM 19   Q.   IS 15000 AN EMAIL BETWEEN YOU AND DR. YOUNG ABOUT THESE

10:31AM 20   ASSAY DEVELOPMENT REPORTS IN 2012?

10:31AM 21   A.   IT IS.

10:31AM 22        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:31AM 23   15000.

10:31AM 24        MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:31AM 25        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM   1          (DEFENDANT'S EXHIBIT 15000 WAS RECEIVED IN EVIDENCE.)

10:31AM   2     BY MR. DOWNEY:

10:31AM   3     Q.   DO YOU SEE THAT YOU WRITE TO DR. YOUNG IN OCTOBER OF 2012

10:32AM   4     AND YOU SAY TO HIM, "I'VE BEEN FOLLOWING UP WITH THE ASSAY

10:32AM   5     SYSTEMS TEAM LEADS."

10:32AM   6          FIRST OF ALL, IS THAT A REFERENCE TO THE FOUR INDIVIDUALS

10:32AM   7     THAT WE'VE DISCUSSED RECENTLY?

10:32AM   8     A.   IT IS.

10:32AM   9     Q.   AND YOU SAY, "ON THE REQUIREMENT THAT THEY MAKE THE KIND

10:32AM   10    OF CHANGES REQUIRED FOR THE ISSUES YOU CAUGHT THIS WEEKEND

10:32AM   11    BEFORE THE REPORTS EVER GET TO YOU OR ME."

10:32AM   12         DO YOU RECALL WHAT LED YOU TO SEND THIS EMAIL?

10:32AM   13    A.   I DO.

10:32AM   14    Q.   AND WHAT WAS THAT?

10:32AM   15    A.   WE WERE TRYING TO ENSURE THAT THE DEVELOPMENT AND

10:32AM   16    VALIDATION WAS DONE ACCORDING TO STANDARDS THAT WERE SET BY THE

10:32AM   17    FDA, AND WE WERE TRYING TO MAKE SURE THAT THE SCIENTISTS HAD

10:32AM   18    THE RIGHT TEMPLATES TO DO THAT.

10:32AM   19    Q.   OKAY.  AND THEN AT THE -- IN THE LAST SENTENCE YOU SAY,

10:32AM   20    "AT THIS STAGE, THESE TEMPLATES WILL BE FDA GUIDANCE DOCUMENTS

10:32AM   21    EFFECTIVELY."

10:32AM   22    A.   YES.

10:32AM   23    Q.   AND WHY WAS IT IMPORTANT TO YOU THAT THESE DOCUMENTS BE

10:32AM   24    DEVELOPED ACCORDING TO FDA STANDARDS?

10:32AM   25    A.   BECAUSE WE UNDERSTOOD THAT FDA STANDARDS WERE THE HIGHEST

7510

10:33AM   1     STANDARDS, AND WE WANTED TO VALIDATE OUR TESTS TO THE HIGHEST

10:33AM   2     STANDARDS.

10:33AM   3     Q.   DO YOU KNOW HOW MANY OF THESE REPORTS OF ASSAY DEVELOPMENT

10:33AM   4     WERE ULTIMATELY PREPARED AT THERANOS DURING YOUR TIME THERE?

10:33AM   5     A.   YES.

10:33AM   6     Q.   HOW MANY?

10:33AM   7     A.   OVER 300.

10:33AM   8     Q.   WHEN -- I THINK YOU'VE HEARD TESTIMONY DURING THE CASE

10:33AM   9     THAT VARIOUS PEOPLE OUTSIDE OF THERANOS WOULD, INVESTORS AND

10:33AM   10    OTHERS, WOULD TRY TO UNDERSTAND THERANOS'S WORK.

10:33AM   11         DO YOU RECALL SUCH TESTIMONY?

10:33AM   12    A.   I DO.

10:33AM   13    Q.   AND DID YOU OFTEN MAKE ASSAY DEVELOPMENT REPORTS

10:33AM   14    DOCUMENTING THERANOS'S WORK ON ASSAYS AVAILABLE TO THOSE WHO

10:33AM   15    WERE TRYING TO UNDERSTAND AND EVALUATE THERANOS'S WORK?

10:33AM   16    A.   YES.

10:33AM   17    Q.   DID YOU DO SO WITH SOME OF THE INFORMATION IN THOSE ASSAY

10:33AM   18    DEVELOPMENT REPORTS REDACTED?

10:33AM   19    A.   YES.

10:33AM   20    Q.   WHY WERE THERE REDACTIONS SOMETIMES?

10:34AM   21    A.   SOMETIMES THERE WAS TRADE SECRET OR CONFIDENTIAL

10:34AM   22    INFORMATION ABOUT THE TECHNOLOGY ITSELF.

10:34AM   23    Q.   NOW, WE'VE BEEN TALKING ABOUT THE DEVELOPMENT OF THE

10:34AM   24    ASSAYS.  LET'S SWITCH TO THE HARDWARE OF THE 4.0 SYSTEM THAT

10:34AM   25    WAS BEING DEVELOPED.

10:34AM  1          AND I WANTED TO JUST PUT UP THE TWO DOCUMENTS THAT ARE

10:34AM  2     ALREADY IN EVIDENCE, WHICH ARE 5388 AND 7747.

10:34AM  3          IS THE DEVICE ON THE LEFT, 5388, THE 3.0 SERIES?

10:34AM  4     A.   YES.

10:34AM  5     Q.   AND IS THE DEVICE ON THE RIGHT THE 4.0 SERIES?

10:34AM  6     A.   IT IS.

10:34AM  7     Q.   NOW, THAT'S THE OUTSIDE OF THE DEVICES, BUT I'D LIKE TO

10:35AM  8     ASK YOU TO LOOK IN A MOMENT AT THE INTERIOR OF THOSE DEVICES SO

10:35AM  9     THAT WE CAN UNDERSTAND WHAT THE DIFFERENCES BETWEEN THEM ARE.

10:35AM  10         FIRST OF ALL, LET ME SHOW YOU WHAT IS IN EVIDENCE AS

10:35AM  11    EXHIBIT 7746.

10:35AM  12         AND THEN I BELIEVE 15011 I ADMITTED YESTERDAY.  LET ME

10:35AM  13    CHECK.

10:35AM  14         BUT IF NOT, TAKE A LOOK AT 15011 AND SEE IF YOU CAN

10:35AM  15    IDENTIFY IT IN THE INTEREST OF TIME?

10:36AM  16    A.   OKAY.

10:36AM  17             MR. DOWNEY:  WAS THIS ADMITTED.

10:36AM  18             THE COURT:  I THINK IT WAS, YES.

10:36AM  19    BY MR. DOWNEY:

10:36AM  20    Q.   ALL RIGHT.  CAN YOU EXPLAIN THE TWO DEVICES THAT ARE

10:36AM  21    DISPLAYED HERE?

10:36AM  22    A.   YEAH, SO THE LEFT IS OUR 4 SERIES DEVICE.

10:36AM  23    Q.   77 -- 15011?  NO, 7746.  I'M SORRY.

10:36AM  24    A.   I DON'T KNOW.  I CAN'T SEE THE NUMBERS.  IT'S THE ONE --

10:36AM  25    DOES THE MOUSE WORK?  HERE WE GO.  OKAY.

10:36AM  1          SO THIS IS THE 4 SERIES DEVICE (INDICATING).

10:36AM  2          THIS IS THE 3 SERIES DEVICE (INDICATING).

10:36AM  3          THE 4 SERIES DEVICE HAS A ROBOT RIGHT HERE THAT IS

10:36AM  4     DESIGNED TO TAKE THE PARTS OUT OF THE CARTRIDGE AND MOVE THEM

10:36AM  5     AROUND (INDICATING).

10:36AM  6          THE ROBOT ON THE 3 SERIES IS HERE (INDICATING).  YOU CAN

10:36AM  7     SEE THE CARTRIDGE UNDERNEATH IT.  THE CARTRIDGE HAS A BAR CODE

10:36AM  8     ON IT.

10:36AM  9          WHEN THE DEVICE CALLS THE CLOUD TO SAY, WHAT DO I DO WITH

10:36AM 10     THIS CARTRIDGE, THE CLOUD SENDS THE INSTRUCTIONS THROUGH

10:36AM 11     ELECTRONICS THAT ARE IN THE BOX, TELLS THE ROBOT WHAT TO DO,

10:37AM 12     AND THE ROBOT RUNS THE TEST ACCORDING TO THOSE INSTRUCTIONS.

10:37AM 13          IT WILL PICK UP THESE LITTLE COMPONENTS, MOVE THEM AROUND,

10:37AM 14     MIX LIQUID TOGETHER, MOVE IT BACK TO BE SEATED, MOVE IT BACK TO

10:37AM 15     BE READ.

10:37AM 16          BACK HERE THERE'S A DETECTOR, WHICH IS A MEASUREMENT

10:37AM 17     DEVICE, CALLED A PMT (INDICATING).

10:37AM 18          ON THE 4 SERIES, THAT PMT IS HERE (INDICATING).  THERE ARE

10:37AM 19     ALSO OTHER DETECTORS FOR THE OTHER METHODS THAT WE HAVE TALKED

10:37AM 20     ABOUT, THE SPECTROMETER FOR GENERAL CHEMISTRY, THE FLUORESCENCE

10:37AM 21     BASED SYSTEM FOR PCR OR NUCLEIC ACID AMPLIFICATION, THE

10:37AM 22     MICROSCOPY SYSTEM, WHICH IS LIKE A MICROSCOPE THAT CAN RUN

10:37AM 23     ADVANCED CHEMISTRIES HERE, AND THE MINI CENTRIFUGE FOR

10:37AM 24     PROCESSING THOSE SAMPLES TO GET THEM READY TO BE ABLE TO DO

10:38AM 25     THOSE DIFFERENT METHODS BACK HERE (INDICATING).

10:38AM 1    Q.   NOW, IS THIS THE INSIDE OF A SINGLE 4.0 SERIES WHERE THERE

10:38AM 2    IS ALSO -- IS THAT RIGHT?

10:38AM 3    A.   IT IS.

10:38AM 4    Q.   ALL RIGHT.  WERE THERE ALSO DEVICES DEVELOPED WITHIN THE

10:38AM 5    4.0 SERIES THAT COMBINED SEVERAL ANALYZERS IN ONE DEVICE?

10:38AM 6    A.   YES, WE ENDED UP DEVELOPING AN ADDITIONAL DEVICE THAT WAS

10:38AM 7    CAPABLE OF RUNNING SIX SAMPLES AT A TIME, SO ESSENTIALLY IT WAS

10:38AM 8    LIKE BAYS OF THESE DEVICES THAT WERE REPLICATED SIX TIMES.

10:38AM 9    Q.   AND WHO WAS THE SCIENTIST WHO WAS RESPONSIBLE FOR LEADING

10:38AM 10   HARDWARE DEVELOPMENT AT THERANOS DURING THE PERIOD BETWEEN 2010

10:38AM 11   AND 2013?

10:38AM 12   A.   DR. YOUNG OVERSAW THE PROCESS.  WE HAD TONY NUGENT AT

10:38AM 13   THERANOS EARLY ON, AND THEN TIM SMITH.

10:38AM 14   Q.   OKAY.  AND WOULD YOU RECEIVE UPDATES ON THE DEVELOPMENT OF

10:39AM 15   THE HARDWARE BETWEEN 2010 AND 2013?

10:39AM 16   A.   YES.

10:39AM 17   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 12310.

10:39AM 18        I'M GOING TO ASK YOU IF THIS IS ONE SUCH UPDATE.

10:39AM 19   A.   OKAY.

10:39AM 20   Q.   IS THIS AN EMAIL FROM -- INTERNAL EMAIL FROM ENGINEERS AND

10:39AM 21   SCIENTISTS AT THERANOS UPDATING YOU ON THE DEVELOPMENT OF THE

10:39AM 22   HARDWARE IN THE 4.0 DEVICE?

10:39AM 23   A.   YES.

10:39AM 24        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:39AM 25   12310.

7514

10:39AM   1          MR. LEACH:  NO OBJECTION.

10:39AM   2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM   3          (DEFENDANT'S EXHIBIT 12310 WAS RECEIVED IN EVIDENCE.)

10:39AM   4   BY MR. DOWNEY:

10:39AM   5   Q.   LET'S LOOK FIRST AT THE TOP EMAIL, THE TOP ADDRESS.

10:40AM   6        DO YOU SEE THERE THAT THIS IS AN EMAIL FROM

10:40AM   7   SAMARTHA ANEKAL TO YOU --

10:40AM   8   A.   I DO.

10:40AM   9   Q.   -- IN 2012?

10:40AM   10  A.   YES.

10:40AM   11  Q.   AND WHO WAS SAMARTHA ANEKAL?

10:40AM   12  A.   DR. ANEKAL OVERSAW A TEAM WE CALLED SYSTEMS INTEGRATION

10:40AM   13  AND VALIDATION AND VERIFICATION.

10:40AM   14  Q.   WHAT IS THE REPORT THAT IS CONTAINED IN THIS EMAIL?  WHAT

10:40AM   15  IS BEING REPORTED ON?

10:40AM   16  A.   DR. ANEKAL -- LET'S SEE.  IT'S FROM DR. ANEKAL.  HE'S

10:40AM   17  TALKING ABOUT THE DEVICES THAT HAVE BEEN BROUGHT UP, SO ARE

10:40AM   18  READY FOR USE, OUT OF MANUFACTURING.

10:40AM   19  Q.   OKAY.  AND HE REFERS IN THE FIRST PARAGRAPH TO 19 MONOS

10:40AM   20  BEING BROUGHT UP.  WHAT ARE 19 MONOS?

10:40AM   21  A.   HE'S REFERRING TO THE MINILAB THAT PROCESSES A SINGLE

10:40AM   22  SAMPLE AT A TIME.

10:40AM   23  Q.   OKAY.  AND THEN IN THE NEXT PARAGRAPH HE SAYS, "AS FAR AS

10:41AM   24  MINILABS, ALL 46 BLADES WILL BE COMPLETED BY TOMORROW."

10:41AM   25       WHAT IS THAT A REFERENCE TO?

10:41AM 1    A.   THAT'S TALKING ABOUT THE DEVICES THAT CAN PROCESS SIX

10:41AM 2    SAMPLES AT A TIME.  SO INSIDE OF THOSE DEVICES WE CALLED EACH

10:41AM 3    SORT OF LAYER A BLADE, AND THAT WAS A COMPLETE DEVICE TO

10:41AM 4    PROCESS A SINGLE SAMPLE.

10:41AM 5    Q.   OKAY.  NOW, DID YOU CONTINUE TO RECEIVE REPORTS ABOUT THE

10:41AM 6    DEVELOPMENT OF THE HARDWARE AT THERANOS BETWEEN DECEMBER OF

10:41AM 7    2012 AND AUGUST OF 2013?

10:41AM 8    A.   I DID.

10:41AM 9    Q.   WAS IT ANTICIPATED THAT THERANOS WOULD BE MANUFACTURING

10:41AM 10   THESE DEVICES INTERNALLY OR THAT IT WOULD BE USING EXTERNAL

10:41AM 11   SOURCES TO MANUFACTURE THE DEVICES?

10:41AM 12   A.   WE MADE THE DECISION TO DO ALL OF THE MANUFACTURING

10:41AM 13   OURSELVES.

10:41AM 14   Q.   WHY DID YOU DECIDE THAT?

10:41AM 15   A.   WE RECOGNIZED THAT THIS WAS NEW TECHNOLOGY THAT HAD NEVER

10:41AM 16   BEEN MANUFACTURED BEFORE, AND THERE WERE A LOT OF INVENTIONS

10:42AM 17   THAT WERE GOING INTO THE MANUFACTURING PROCESS ITSELF THAT WE

10:42AM 18   WANTED TO BUILD THE EXPERTISE AROUND OURSELVES BECAUSE WE

10:42AM 19   THOUGHT THAT THAT WAS A COMPETITIVE ADVANTAGE.

10:42AM 20        WE THOUGHT THAT WE COULD BETTER CONTROL COST BY NOT HAVING

10:42AM 21   TO PAY SUPPLIERS, AND GETTING THE SYSTEM TO BE REALLY

10:42AM 22   INEXPENSIVE WAS ONE OF OUR CORE GOALS.

10:42AM 23        AND WE THOUGHT THAT WE COULD CONTROL QUALITY IN THE BEST

10:42AM 24   POSSIBLE WAY IF WE INVESTED IN REALLY EXPENSIVE VISION

10:42AM 25   INSPECTION SYSTEMS TO LOOK AT EVERY PART AND TRIED TO PUT A LOT

7516

10:42AM  1    OF AUTOMATION ON THE MANUFACTURING LINES THEMSELVES.

10:42AM  2    Q.   WHAT STEPS DID THERANOS HAVE TO TAKE TO BE IN A POSITION

10:42AM  3    TO DO ALL OF THAT MANUFACTURING ITSELF?

10:42AM  4    A.   WE HAD TO BUILD WHOLE NEW ORGANIZATIONS AROUND A MACHINE

10:42AM  5    SHOP WITH MACHINISTS, AND AUTOMATED CNC LINES, TOOL AND DIE

10:42AM  6    MAKERS, AND INJECTION MOULDING MACHINES TO BE ABLE TO PRODUCE

10:43AM  7    THE PLASTIC PARTS, AND PRODUCTION FACILITY.

10:43AM  8    Q.   OKAY.  HOW MANY PEOPLE WORKED IN MANUFACTURING AT

10:43AM  9    THERANOS?

10:43AM  10   A.   ULTIMATELY A COUPLE HUNDRED, PROBABLY.

10:43AM  11   Q.   OKAY.  NOW, AT SOME POINT DID THERE COME AN EFFORT TO

10:43AM  12   UNDERTAKE WHAT YOU REFERRED TO A MOMENT AGO AS SYSTEMS

10:43AM  13   INTEGRATION?

10:43AM  14   A.   YES.

10:43AM  15   Q.   AND WAS THIS TO INTEGRATE ALL OF THE ELEMENTS OF THE

10:43AM  16   TECHNOLOGY SO THAT YOU HAD A FINAL PRODUCT?

10:43AM  17   A.   YES.

10:43AM  18   Q.   AND WERE DR. YOUNG AND DR. ANEKAL STILL LEADING THAT

10:43AM  19   PROCESS IN 2013?

10:43AM  20   A.   THEY WERE.

10:43AM  21   Q.   AND WOULD THEY REPORT TO YOU AS THAT PROCESS OF SYSTEM

10:43AM  22   INTEGRATION WENT FORWARD?

10:43AM  23   A.   YES.

10:43AM  24   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7286.

10:44AM  25   A.   OKAY.

10:44AM   1      Q.   IS THIS AN EMAIL THAT YOU RECEIVED IN APRIL OF 2013

10:44AM   2      REPORTING ON SYSTEMS INTEGRATION EFFORTS AT THERANOS?

10:44AM   3      A.   IT IS.

10:44AM   4              MR. DOWNEY:  I WOULD MOVE TO ADMIT 7286.

10:44AM   5              MR. LEACH:  NO OBJECTION.

10:44AM   6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM   7          (DEFENDANT'S EXHIBIT 7286 WAS RECEIVED IN EVIDENCE.)

10:44AM   8      BY MR. DOWNEY:

10:44AM   9      Q.   IF YOU TAKE A LOOK ON THE SCREEN AT EXHIBIT 7286, DO YOU

10:44AM   10     SEE THAT THERE'S AN EMAIL FROM YOU -- FROM DR. YOUNG TO

10:44AM   11     MR. BALWANI AND THAT YOU'RE COPIED?

10:44AM   12     A.   I DO.

10:44AM   13     Q.   AND THEN DR. YOUNG REFERS IN THE FIRST PARAGRAPH SAYING

10:45AM   14     "FOR THE TOP 75 WHOLE BLOOD TESTS, ONLY THE FOLLOWING ARE STILL

10:45AM   15     UNDER DEVELOPMENT."

10:45AM   16         DO YOU SEE THAT REFERENCE TO "THE TOP 75 WHOLE BLOOD

10:45AM   17     TESTS"?

10:45AM   18     A.   YES.

10:45AM   19     Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT THAT MEANT?

10:45AM   20     A.   DR. YOUNG AND HIS TEAM HAD DONE ANALYSIS OF HOW MANY TESTS

10:45AM   21     WERE MOST COMMONLY ORDERED AT RETAIL, AND 75 OF THEM COULD

10:45AM   22     COVER SOMEWHERE BETWEEN 90 TO 95 PERCENT OF THE TESTS AT

10:45AM   23     RETAIL.

10:45AM   24         SO HE'S SAYING OF THAT LIST THAT BECAME THE TEST LIST THAT

10:45AM   25     OUR SCIENTISTS FOCUSSED ON, ONLY TWO WERE STILL UNDER

7518

| | | |
|---|---|---|
| 10:45AM | 1 | DEVELOPMENT. |
| 10:45AM | 2 | Q.   AND THEN HE GOES ON TO SAY THAT THERE WERE VARIOUS FLU |
| 10:45AM | 3 | TESTS THAT WERE 95 PERCENT COMPLETED AND THAT THEY ARE STILL |
| 10:45AM | 4 | COMPLETING PREVALIDATION BEFORE MOVING THE TESTS TO CLIA FOR |
| 10:46AM | 5 | VALIDATION. |
| 10:46AM | 6 | DO YOU SEE THAT? |
| 10:46AM | 7 | A.   I DO. |
| 10:46AM | 8 | Q.   AND DO YOU SEE THAT HE REPORTED PROGRESS ON THE NEXT SET |
| 10:46AM | 9 | OF ASSAYS AS MOVING WELL? |
| 10:46AM | 10 | A.   YES. |
| 10:46AM | 11 | Q.   OKAY.  NOW, HOW MANY OF -- IF YOU CAN TELL FROM THIS |
| 10:46AM | 12 | EMAIL, HOW MANY OF THOSE 75 TESTS THAT WERE COMPLETED, HOW MANY |
| 10:46AM | 13 | OF THEM HAD ALREADY BEEN INTEGRATED ON TO THE DEVICE? |
| 10:46AM | 14 | A.   FROM THIS EMAIL, ALL OF THEM EXCEPT FOR THE FOUR THAT |
| 10:46AM | 15 | DR. YOUNG LISTS THERE. |
| 10:46AM | 16 | Q.   OKAY.  AND WHAT IS THAT NUMBER? |
| 10:46AM | 17 | A.   FOUR. |
| 10:46AM | 18 | Q.   OKAY.  I THINK YOU'VE TESTIFIED ABOUT THERANOS'S EFFORT TO |
| 10:46AM | 19 | MULTIPLEX, TO USE A TECHNICAL TERM, TO MULTIPLEX ASSAYS ON A |
| 10:46AM | 20 | CARTRIDGE. |
| 10:46AM | 21 | A.   YES. |
| 10:46AM | 22 | Q.   AND THAT REFERRED TO PUTTING MULTIPLE BLOOD TESTS ON ONE |
| 10:46AM | 23 | CARTRIDGE, TAKING A BLOOD TEST AND PUTTING IT INTO THE DEVICE; |
| 10:47AM | 24 | RIGHT? |
| 10:47AM | 25 | A.   EXACTLY. |

7519

| | | |
|---|---|---|
| 10:47AM | 1 | Q.   WAS IT A FEATURE OF THIS TECHNOLOGY THAT WAS BEING |
| 10:47AM | 2 | INTEGRATED THAT IT WOULD BE MULTIPLEXED? |
| 10:47AM | 3 | A.   YES. |
| 10:47AM | 4 | Q.   OKAY.  DID YOU UNDERSTAND FROM THESE REPORTS THAT YOU |
| 10:47AM | 5 | RECEIVED BETWEEN 2010 AND 2013 THAT THE DEVELOPMENT OF THE |
| 10:47AM | 6 | TECHNOLOGY HAD BEEN SMOOTH AND THERE WERE NO PROBLEM WITH IT? |
| 10:47AM | 7 | A.   NO. |
| 10:47AM | 8 | Q.   AND WHAT WAS YOUR UNDERSTANDING OF THE CHALLENGES DURING |
| 10:47AM | 9 | THAT PERIOD? |
| 10:47AM | 10 | A.   IT'S NEVER SMOOTH.  THERE ARE ALWAYS CHALLENGES.  WE WERE |
| 10:47AM | 11 | CONSTANTLY WORKING TO MAKE SURE WE HAD THE RIGHT COMPONENTS IN |
| 10:47AM | 12 | THE DEVICE TO HANDLE ALL OF THE TESTS THAT WERE ULTIMATELY |
| 10:47AM | 13 | GOING TO BE THE TEST LIST FOR RETAIL.  THAT MEANT THERE WAS A |
| 10:47AM | 14 | LOT OF CHANGES TO THE DEVICE. |
| 10:47AM | 15 | OUR RETAIL PARTNERS WANTED US TO MAKE CUSTOMIZATIONS TO |
| 10:47AM | 16 | THE DEVICE, LIKE THE DEVICE THAT COULD PROCESS SIX SAMPLES AT A |
| 10:48AM | 17 | TIME, WHICH MEANT WE NEEDED TO BUILD WHOLE NEW CUSTOM DEVICES |
| 10:48AM | 18 | FOR THAT. |
| 10:48AM | 19 | AND AS THOSE THINGS CHANGED, WE WOULD CONSTANTLY GO |
| 10:48AM | 20 | THROUGH THE SYSTEMS INTEGRATION PROCESS AND VALIDATION |
| 10:48AM | 21 | REPEATEDLY. |
| 10:48AM | 22 | Q.   NOW, WAS IT THE PLAN BETWEEN JUNE OF 2012, WHEN YOU AGREED |
| 10:48AM | 23 | WITH WALGREENS THAT THERANOS WOULD OPERATE A CENTRAL LAB, UNTIL |
| 10:48AM | 24 | EARLY 2013 THAT THERANOS WOULD ACTUALLY TAKE ALL OF THESE |
| 10:48AM | 25 | DEVICES AND RUN THEM IN A CENTRAL LAB AT THERANOS? |

10:48AM 1     A.   THAT WAS OUR PLAN ONCE WE DECIDED TO MOVE TO THE CENTRAL

10:48AM 2     LAB MODEL, YES.

10:48AM 3     Q.   WERE THE DEVICES THAT THERANOS WAS DEVELOPING REALLY

10:48AM 4     INTENDED TO BE USED IN A CENTRAL LAB?

10:48AM 5     A.   NO.

10:48AM 6     Q.   WHAT WAS THEIR INTENDED USE?

10:48AM 7     A.   THEIR INTENDED USE WAS TO BE AT THE PLACE THE PATIENT WAS.

10:48AM 8     THERE WAS A TOUCHSCREEN ON EACH OF THEM FOR PATIENTS TO OPERATE

10:49AM 9     OR A TECHNICIAN TO OPERATE, AND THEY PROCESSED ONLY ONE SAMPLE

10:49AM 10    AT A TIME.

10:49AM 11    Q.   OKAY.  AS YOU ENTERED INTO 2013, DID YOU BEGIN TO MAKE

10:49AM 12    PLANS TO, TO ACTUALLY LAY OUT THE PHYSICAL DESIGN OF THE

10:49AM 13    CENTRAL LAB WHERE THESE SINGLE TEST DEVICES WOULD BE LOCATED?

10:49AM 14    A.   YES.

10:49AM 15    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7272.

10:49AM 16    A.   NO.

10:49AM 17    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND OTHERS AT

10:49AM 18    THERANOS RELATED TO LAYING OUT THE DESIGN OF THE CENTRAL LAB

10:49AM 19    USING ALL OF THESE INDIVIDUAL DEVICES?

10:49AM 20    A.   YES.

10:50AM 21            MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7272.

10:50AM 22            MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:50AM 23            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:50AM 24        (DEFENDANT'S EXHIBIT 7272 WAS RECEIVED IN EVIDENCE.)

10:50AM 25    BY MR. DOWNEY:

7521

10:50AM 1    Q.   LET ME ASK YOU TO LOOK AT THE EMAIL THAT IS SLIGHTLY BELOW

10:50AM 2    THE MIDDLE OF THE PAGE, AND THIS IS AN EMAIL FROM MR. BALWANI

10:50AM 3    TO A TIM KEMP, AND THEN YOURSELF AND DANIEL YOUNG ARE COPIED.

10:50AM 4        FIRST OF ALL, MR. BALWANI WAS THE CHIEF OPERATING OFFICER

10:50AM 5    AND PRESIDENT OF THERANOS AT THIS TIME; IS THAT RIGHT?

10:50AM 6    A.   HE WAS.

10:50AM 7    Q.   AND HE HAD BEEN AT THE COMPANY FOR A PERIOD OF YEARS?

10:50AM 8    A.   HE HAD.

10:50AM 9    Q.   AND MR. BALWANI WRITES TO A TIM KEMP.  WHO IS TIM KEMP?

10:50AM 10   A.   TIM KEMP OVERSAW SOME OF OUR SOFTWARE AND HARDWARE

10:50AM 11   PROJECTS.

10:50AM 12   Q.   OKAY.  AND IF YOU LOOK AT THE FIRST PARAGRAPH OF

10:50AM 13   MR. BALWANI'S EMAIL, HE ASKS A QUESTION.

10:50AM 14       DO YOU SEE THAT?

10:50AM 15   A.   I DO.

10:50AM 16   Q.   AND HE ASKS, "CAN YOU BALLPARK IF WE CAN FIT 15-20

10:51AM 17   NORMANDY CLUSTERS PLUS CLUNKERS LAB PLUS STORAGE FOR 100K-500K

10:51AM 18   CARTRIDGES PLUS CLIA LAB OFFICE SPACE IN EMC? "

10:51AM 19       CAN YOU EXPLAIN WHAT MR. BALWANI WAS ASKING IN THIS EMAIL?

10:51AM 20   A.   YES.  ONE OF THERANOS'S OFFICES WAS A BUILDING CALLED EMC.

10:51AM 21   SUNNY IS TRYING TO FIGURE OUT HERE IF WE COULD FIT 15 TO 20,

10:51AM 22   WHAT HE'S CALLING CLUSTERS, WHICH ARE BANKS OF THERANOS

10:51AM 23   DEVICES, AS WELL AS A LAB FOR TRADITIONAL TESTING AND STORAGE

10:51AM 24   IN THIS OFFICE CALLED EMC.

10:51AM 25   Q.   OKAY.  AND IF YOU GO TO THE EMAIL ABOVE, IT LOOKS LIKE

10:51AM 1    MR. KEMP RESPONDS.

10:51AM 2        AND DO YOU SEE THAT HE SAID "ATTACHED, PLEASE FIND A

10:51AM 3    DRAWING SHOWING A SAMPLE LAYOUT OF 19 MINILAB CLUSTERS THAT CAN

10:52AM 4    FIT ON TO THE GROUND FLOOR OF 3200 WITH MINIMAL RELOCATION OF

10:52AM 5    WALLS."

10:52AM 6        DO YOU SEE THAT?

10:52AM 7    A.   I DO.

10:52AM 8    Q.   LET'S TAKE A LOOK AT THE DRAWING THAT MR. KEMP REFERENCES.

10:52AM 9        CAN YOU SEE IF WE CAN BLOW THAT UP, MR. BENNETT.

10:52AM 10       NOW, IS THIS A DEPICTION OF WHAT THE LAYOUT OF THE CENTRAL

10:52AM 11   LAB OF THERANOS WOULD BE IF THE TESTS IN THAT LAB WERE OPERATED

10:52AM 12   ON THERANOS'S 4.0 DEVICES?

10:52AM 13   A.   YES.

10:52AM 14   Q.   AND WAS THIS THE PLAN FOR RUNNING THEM AT THE TIME OF THE

10:52AM 15   LAUNCH OF THERANOS SERVICE CENTERS IN WALGREENS STORES?

10:52AM 16   A.   THAT WAS OUR PLAN.

10:52AM 17   Q.   AND IF THERANOS WERE TO EXPAND THE NUMBER OF WALGREENS

10:53AM 18   STORES IN WHICH IT WAS OPERATING SERVICE CENTERS, WOULD IT HAVE

10:53AM 19   TO HAVE MORE AND MORE OF THESE INDIVIDUAL 4.0 DEVICES?

10:53AM 20   A.   YES.

10:53AM 21   Q.   AND DID THERE COME A TIME WHEN YOU ALSO LEARNED THAT THERE

10:53AM 22   MIGHT BE SOME PHYSICAL CHALLENGES WITH LAYING OUT THE MINILABS

10:53AM 23   IN CONNECTION, THE 4.0 DEVICES IN CONNECTION WITH OPERATING

10:53AM 24   THIS CENTRAL LAB?

10:53AM 25   A.   YES.

7523

10:53AM 1    Q.   LET ME ASK YOU TO LOOK BACK AT THE EMAIL THAT MR. KEMP

10:53AM 2    SENT IN RESPONSE TO MR. BALWANI'S EMAIL.

10:53AM 3         AND LET'S LOOK AT THE LAST PARAGRAPH.

10:53AM 4         AND DO YOU SEE THAT MR. KEMP REPORTS, "WE DO HAVE AN ISSUE

10:53AM 5    ABOUT POWER."

10:53AM 6         AND THEN HE GOES ON TO DISCUSS THE ISSUE THAT HE WAS

10:54AM 7    IDENTIFYING.

10:54AM 8         WHAT WAS THE ISSUE ABOUT POWER, IF YOU RECALL?

10:54AM 9    A.   TO PUT THIS MANY DEVICES IN A SINGLE ROOM LIKE THAT WOULD

10:54AM 10   REQUIRE VERY SIGNIFICANT ADJUSTMENTS TO THE BUILDING FOR POWER

10:54AM 11   AND FOR HEAT.  THEY GIVE OFF A HUGE AMOUNT OF HEAT.

10:54AM 12   Q.   OKAY.  NOW, IF YOU WERE OPERATING IN A WALGREENS STORE,

10:54AM 13   WOULD THE PATIENTS WHO CAME IN TO HAVE THEIR BLOOD TESTING

10:54AM 14   ARRIVE OVER THE COURSE OF A DAY?

10:54AM 15   A.   YES.

10:54AM 16   Q.   SO ONE MIGHT ARRIVE AT 2:30, ONE MIGHT ARRIVE AT 4:00, ET

10:54AM 17   CETERA?

10:54AM 18   A.   YES.

10:54AM 19   Q.   OKAY.  NOW, WHEN YOU ARE OPERATING A CENTRAL LAB, HOW DO

10:54AM 20   THE BLOOD SAMPLES ARRIVE ON DELIVERY?

10:54AM 21   A.   THEY ALL COME IN AT THE SAME TIME.

10:54AM 22   Q.   DID THAT PRESENT CHALLENGES FOR RUNNING THE 4.0 SERIES

10:54AM 23   DEVICES IN A CENTRAL LAB?

10:54AM 24   A.   VERY MUCH SO.

10:54AM 25   Q.   OKAY.  DID YOU BEGIN AT SOME POINT IN 2013 TO THINK ABOUT

7524

| | | |
|---|---|---|
| 10:55AM | 1 | WAYS OF RESPONDING TO THE DIFFICULTIES PRESENTED BY HAVING TO |
| 10:55AM | 2 | OPERATE ALL OF THESE INDIVIDUAL DEVICES WITHIN THE CENTRAL LAB? |
| 10:55AM | 3 | A.   WE DID. |
| 10:55AM | 4 | Q.   OKAY.  LET ME -- YOUR HONOR, MAYBE WE SHOULD BREAK HERE. |
| 10:55AM | 5 | IT'S A SENSIBLE TIME. |
| 10:55AM | 6 | THE COURT:  SURE.  WE'LL BREAK NOW. |
| 10:55AM | 7 | LADIES AND GENTLEMEN, WE'LL TAKE OUR MORNING BREAK NOW. |
| 10:55AM | 8 | SHOULD THIS BE 30 MINUTES, MR. DOWNEY? |
| 10:55AM | 9 | MR. DOWNEY:  YES.  THANK YOU, YOUR HONOR. |
| 10:55AM | 10 | THE COURT:  WE'LL TAKE A 30 MINUTE BREAK, PLEASE. |
| 10:55AM | 11 | WE'LL SEE YOU THEN.  THANK YOU. |
| 10:56AM | 12 | (RECESS FROM 10:56 A.M. UNTIL 11:37 A.M.) |
| 11:37AM | 13 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 11:37AM | 14 | WE'RE BACK IN SESSION.  ALL PARTIES PREVIOUSLY PRESENT ARE |
| 11:37AM | 15 | PRESENT ONCE AGAIN. |
| 11:37AM | 16 | MR. DOWNEY, YOU'D LIKE TO CONTINUE? |
| 11:37AM | 17 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 11:37AM | 18 | Q.   MS. HOLMES, DO YOU RECALL THIS MORNING THAT WE WERE |
| 11:37AM | 19 | TALKING ABOUT THE MODIFICATION TO THE AGREEMENT BETWEEN |
| 11:37AM | 20 | WALGREENS AND THERANOS WHERE THERANOS AGREED THAT THE INITIAL |
| 11:38AM | 21 | STEP TO OPEN THE CENTRAL LABORATORY WHERE BLOOD SAMPLES WOULD |
| 11:38AM | 22 | BE PROCESSED? |
| 11:38AM | 23 | A.   I DO. |
| 11:38AM | 24 | Q.   AND THEN AFTER FDA APPROVAL FOR THERANOS DEVICES WERE |
| 11:38AM | 25 | OBTAINED, IT WOULD PUT THOSE DEVICES IN STORES? |

7525

| | | |
|---|---|---|
| 11:38AM | 1 | A.   YES. |
| 11:38AM | 2 | Q.   AND IS THAT WHAT THERANOS AND WALGREENS BEGAN TO CALL |
| 11:38AM | 3 | PHASE I AND PHASE II? |
| 11:38AM | 4 | A.   EXACTLY, YES. |
| 11:38AM | 5 | Q.   PHASE I WAS THE PERIOD WHERE THERANOS WOULD OPERATE A |
| 11:38AM | 6 | CENTRAL LABORATORY? |
| 11:38AM | 7 | A.   YES. |
| 11:38AM | 8 | Q.   AND PHASE II WAS THE PERIOD WHERE THERANOS DEVICES WOULD |
| 11:38AM | 9 | BE PLACED IN WALGREENS STORES? |
| 11:38AM | 10 | A.   YES. |
| 11:38AM | 11 | Q.   WHEN YOU ENTERED INTO THAT AGREEMENT WITH WALGREENS IN THE |
| 11:38AM | 12 | SUMMER OF 2012, HOW LONG DID YOU ANTICIPATE THAT PHASE I OF |
| 11:39AM | 13 | THAT RELATIONSHIP WOULD LAST? |
| 11:39AM | 14 | A.   WE THOUGHT IT WOULD BE INCREDIBLY SHORT. |
| 11:39AM | 15 | Q.   DID YOU INTEND TO APPLY FOR FDA APPROVAL OF THERANOS'S |
| 11:39AM | 16 | TECHNOLOGY? |
| 11:39AM | 17 | A.   I DID. |
| 11:39AM | 18 | Q.   AND DID YOU ANTICIPATE THAT WHEN YOU RECEIVED IT, THE |
| 11:39AM | 19 | PARTIES' RELATIONSHIP WOULD MOVE TO A PHASE II RELATIONSHIP? |
| 11:39AM | 20 | A.   YES. |
| 11:39AM | 21 | Q.   I WANT TO JUST RETURN TO ONE SUBJECT WE TOUCHED ON BRIEFLY |
| 11:39AM | 22 | THIS MORNING, WHICH WAS THE ANALYSIS OF THE NUMBER OF TESTS |
| 11:39AM | 23 | THAT WOULD NEED TO BE PERFORMED IN WALGREENS STORES THAT WOULD |
| 11:39AM | 24 | COVER 90, OR 95 PERCENT OF THE TEST ORDERS. |
| 11:39AM | 25 | DO YOU REMEMBER THAT TESTIMONY EARLIER THIS MORNING? |

7526

| | | |
|---|---|---|
| 11:39AM | 1 | A.  I DO. |
| 11:39AM | 2 | Q.  AND I BELIEVE YOU TESTIFIED THAT DR. YOUNG LED THAT |
| 11:39AM | 3 | ANALYSIS. |
| 11:39AM | 4 | A.  YES. |
| 11:39AM | 5 | Q.  AND IS IT ACCURATE THAT DR. YOUNG HAD SOME EXPERTISE |
| 11:39AM | 6 | AROUND BIO STATISTICS? |
| 11:40AM | 7 | A.  HE DID, YES. |
| 11:40AM | 8 | Q.  AND HE WAS ALSO AN ENGINEER OF COURSE; CORRECT? |
| 11:40AM | 9 | A.  YES, HE HAD A PH.D. IN MECHANICAL ENGINEERING AND NEURO |
| 11:40AM | 10 | SCIENCE. |
| 11:40AM | 11 | Q.  OKAY.  I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7120. |
| 11:40AM | 12 | A.  OKAY. |
| 11:40AM | 13 | Q.  IS 7120 A SERIES OF EMAILS BETWEEN YOU AND DR. YOUNG |
| 11:40AM | 14 | RELATED TO TRYING TO IDENTIFY THE NUMBER OF TESTS THAT THERANOS |
| 11:40AM | 15 | WOULD NEED TO DEVELOP? |
| 11:40AM | 16 | A.  IT IS. |
| 11:40AM | 17 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:40AM | 18 | 7120. |
| 11:40AM | 19 | MR. LEACH:  NO OBJECTION. |
| 11:40AM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:40AM | 21 | (DEFENDANT'S EXHIBIT 7120 WAS RECEIVED IN EVIDENCE.) |
| 11:40AM | 22 | BY MR. DOWNEY: |
| 11:40AM | 23 | Q.  IF YOU, IF YOU LOOK AT THE BOTTOM EMAIL, DO YOU SEE THAT |
| 11:41AM | 24 | THIS WAS SENT TO YOU BY DR. YOUNG IN AUGUST OF 2010? |
| 11:41AM | 25 | A.  I DO. |

7527

| | | |
|---|---|---|
| 11:41AM | 1 | Q.   AND HE INDICATES THAT HE'S SENDING YOU AN ATTACHED LIST, |
| 11:41AM | 2 | WHICH APPEARS TO BE A LIST OF TESTS THAT HE'S REFERRING TO? |
| 11:41AM | 3 | A.   YES. |
| 11:41AM | 4 | Q.   OKAY.  AND THEN IF YOU GO ABOVE THAT TO THE NEXT EMAIL, |
| 11:41AM | 5 | IT'S ANOTHER EMAIL ACTUALLY FROM -- IN THE MIDDLE HERE, BUT |
| 11:41AM | 6 | FROM DR. YOUNG AT 11:30 A.M. |
| 11:41AM | 7 | DO YOU SEE THAT? |
| 11:41AM | 8 | A.   I DO. |
| 11:41AM | 9 | Q.   AND IN THAT EMAIL HE SAYS, "THE FIRST 43 TESTS |
| 11:41AM | 10 | (HIGHLIGHTED IN 'BLUE') COVER 90 PERCENT OF THE TEST VOLUME FOR |
| 11:41AM | 11 | ROUTINE TESTS." |
| 11:41AM | 12 | DO YOU SEE THAT? |
| 11:41AM | 13 | A.   YES. |
| 11:41AM | 14 | Q.   CAN YOU EXPLAIN WHAT YOU UNDERSTOOD THAT TO MEAN WHEN YOU |
| 11:41AM | 15 | RECEIVED IT IN 2010? |
| 11:41AM | 16 | A.   YES.  HE -- DR. YOUNG IS SAYING HERE THAT HE HAS REVIEWED |
| 11:41AM | 17 | THE DATA SETS THAT WE WERE TALKING ABOUT EARLIER, WHICH CAME |
| 11:42AM | 18 | FROM INSURANCE COMPANIES AND RETAIL PARTNERS, TO UNDERSTAND HOW |
| 11:42AM | 19 | MANY TESTS COVERED 90 PERCENT OF ALL OF THE TESTS THAT ARE RUN |
| 11:42AM | 20 | IN A RETAIL ENVIRONMENT. |
| 11:42AM | 21 | AND HE'S SAYING THERE ARE 43 TESTS TO GET TO 90 PERCENT OF |
| 11:42AM | 22 | THE TEST VOLUME FOR RETAIL, AND THEN HE'S IDENTIFYING WHAT |
| 11:42AM | 23 | THOSE TESTS ARE. |
| 11:42AM | 24 | Q.   AND WERE YOU DOING THIS ANALYSIS TO KNOW WHAT TESTS |
| 11:42AM | 25 | THERANOS WOULD NEED TO DEVELOP MOST QUICKLY? |

7528

| | | |
|---|---|---|
| 11:42AM | 1 | A.   YES, AND WHAT TESTS WOULD BE ABLE TO SERVE PEOPLE WHO WERE |
| 11:42AM | 2 | GOING TO COME TO RETAIL. |
| 11:42AM | 3 | Q.   DID DR. YOUNG CONTINUE TO REFINE THIS ANALYSIS IN THE |
| 11:42AM | 4 | PERIOD BETWEEN 2010 AND 2013? |
| 11:42AM | 5 | A.   HE DID. |
| 11:42AM | 6 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7137. |
| 11:43AM | 7 | A.   OKAY. |
| 11:43AM | 8 | Q.   IS 7137 ANOTHER EMAIL EXCHANGE BETWEEN YOU AND DR. YOUNG |
| 11:43AM | 9 | RELATED TO THE THERANOS TEST MENU? |
| 11:43AM | 10 | A.   YES. |
| 11:43AM | 11 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:43AM | 12 | 7137. |
| 11:43AM | 13 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:43AM | 14 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:43AM | 15 | (DEFENDANT'S EXHIBIT 7137 WAS RECEIVED IN EVIDENCE.) |
| 11:43AM | 16 | BY MR. DOWNEY: |
| 11:43AM | 17 | Q.   ALL RIGHT.  NOW, DO YOU SEE IN THIS -- DO YOU SEE AT THE |
| 11:43AM | 18 | TOP THERE'S AN EMAIL FROM DR. YOUNG TO YOU IN NOVEMBER OF 2010? |
| 11:43AM | 19 | A.   I DO. |
| 11:43AM | 20 | Q.   AND DO YOU SEE IN THE EMAIL DR. YOUNG SAYS THAT HE HAS PUT |
| 11:43AM | 21 | TOGETHER A NEW BASE LIST OF TESTS FOR WALGREENS BASED SOLELY ON |
| 11:43AM | 22 | THE FREQUENCY OF TESTS? |
| 11:44AM | 23 | A.   YES. |
| 11:44AM | 24 | Q.   AND DO YOU SEE THAT HE INDICATES THAT IF YOU WERE TO |
| 11:44AM | 25 | DEVELOP 102 TESTS, THAT THAT WOULD COVER 96 PERCENT OF TESTS? |

7529

| | | |
|---|---|---|
| 11:44AM | 1 | A.   I DO. |
| 11:44AM | 2 | Q.   CAN YOU EXPLAIN -- DID YOU HAVE AN UNDERSTANDING AT THE |
| 11:44AM | 3 | TIME OF WHY AN ADDITIONAL 60 OR SO TESTS WOULD NEED TO BE |
| 11:44AM | 4 | DEVELOPED TO MOVE FROM COVERING 90 PERCENT OF TESTS TO |
| 11:44AM | 5 | 96 PERCENT OF TESTS? |
| 11:44AM | 6 | A.   I DID. |
| 11:44AM | 7 | Q.   CAN YOU EXPLAIN THAT TO US? |
| 11:44AM | 8 | A.   YES.   THERE'S A VERY SMALL NUMBER OF TESTS THAT ARE MOST |
| 11:44AM | 9 | COMMONLY ORDERED.   MOST PEOPLE, WHEN THEY GO SEE A DOCTOR, |
| 11:44AM | 10 | MIGHT, FOR EXAMPLE, JUST GET A CBC, A CHEMICAL 14, AND MAYBE A |
| 11:44AM | 11 | LIPID PANEL. |
| 11:44AM | 12 | AS YOU START GETTING INTO THE RARE RESTS OR THE SPECIALTY |
| 11:44AM | 13 | TESTS, THERE'S A HUGE NUMBER OF THEM. |
| 11:44AM | 14 | SO DR. YOUNG'S LAST EMAIL THAT SAID 40 OR SO TESTS WOULD |
| 11:45AM | 15 | COVER 90 PERCENT.   TO GET TO 96 PERCENT OR ULTIMATELY |
| 11:45AM | 16 | 100 PERCENT, YOU HAVE A LOT MORE TESTS, SORT OF A LONG TAIL, IF |
| 11:45AM | 17 | YOU WILL, TO GET TO THOSE LAST PERCENTAGES. |
| 11:45AM | 18 | SO HE'S SAYING HERE FROM HIS REVIEW OF WALGREENS, SAFEWAY, |
| 11:45AM | 19 | AND BLUE CROSS DATA, THAT 102 TESTS WOULD COVER 96 PERCENT OF |
| 11:45AM | 20 | ALL OF THE TESTS THAT WE WOULD SEE AT RETAIL. |
| 11:45AM | 21 | Q.   AND DID YOU UNDERSTAND THAT HE WAS IN PART RELYING ON DATA |
| 11:45AM | 22 | THAT HAD BEEN GIVEN TO HIM BY INSURANCE COMPANIES? |
| 11:45AM | 23 | A.   I DID. |
| 11:45AM | 24 | Q.   AND WHAT OTHER DATA, IF YOU KNOW, WAS HE RELYING ON TO |
| 11:45AM | 25 | CONDUCT THESE ANALYSES? |

11:45AM 1    A.   IN THIS EMAIL DATA FROM WALGREENS AND SAFEWAY, WHICH WAS

11:45AM 2    DATA THAT THEY OBTAINED FROM THEIR INSURANCE COMPANIES, SO

11:45AM 3    CIGNA FOR SAFEWAY, AND I'M NOT SURE WHO IT WAS FOR WALGREENS,

11:45AM 4    AGAIN, LOOKING AT THE ORDERING PATTERNS, WHAT TESTS WERE

11:45AM 5    ORDERED IN THEIR POPULATION OF EMPLOYEES.

11:46AM 6    Q.   AND DID THERANOS THEN PRIORITIZE DEVELOPING THE TESTS THAT

11:46AM 7    WERE MOST COMMONLY ORDERED AS PART OF ITS DEVELOPMENT PLAN TO

11:46AM 8    LAUNCH?

11:46AM 9    A.   YES.

11:46AM 10   Q.   I WANT TO ASK YOU ALSO ANOTHER QUESTION ABOUT THE

11:46AM 11   DEVELOPMENT OF THE HARDWARE.

11:46AM 12       DO YOU RECALL THAT WE DISCUSSED EARLIER TODAY SOME REPORTS

11:46AM 13   THAT YOU RECEIVED OVER TIME FROM SCIENTISTS AND ENGINEERS ABOUT

11:46AM 14   THE PROGRESS OF DEVELOPMENT THERE?

11:46AM 15   A.   I DO.

11:46AM 16   Q.   NOW, I THINK YOU TESTIFIED YESTERDAY THAT IN A MUCH

11:46AM 17   EARLIER PHASE WITH THERANOS, THAT THERANOS HAD ENCOUNTERED A

11:46AM 18   SIGNIFICANT HARDWARE ISSUE WITH RESPECT TO ITS 1.0 DEVICE.

11:46AM 19       DO YOU RECALL THAT?

11:46AM 20   A.   YES.

11:46AM 21   Q.   AND THAT PROBLEM RELATED TO THE FACT THAT THE CARTRIDGES

11:46AM 22   WOULD BECOME UNSEALED UNDER CERTAIN CONDITIONS?

11:46AM 23   A.   YES.

11:46AM 24   Q.   DID YOU TRY TO TAKE STEPS DURING THE DEVELOPMENT OF THE

11:47AM 25   4.0 SERIES TO ENSURE THAT THERE WAS SUFFICIENT QUALITY CONTROL

7531

| | | |
|---|---|---|
| 11:47AM | 1 | TO MAKE SURE THAT THOSE KINDS OF PROBLEMS DIDN'T HAPPEN? |
| 11:47AM | 2 | A.   YES. |
| 11:47AM | 3 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7264. |
| 11:47AM | 4 | A.   OKAY. |
| 11:47AM | 5 | Q.   IS THIS AN EMAIL BETWEEN YOU AND DR. YOUNG REGARDING THE |
| 11:47AM | 6 | SHIPMENT OF THERANOS DEVICES? |
| 11:47AM | 7 | A.   IT IS, YES. |
| 11:47AM | 8 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:47AM | 9 | 7264. |
| 11:47AM | 10 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:47AM | 11 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:47AM | 12 | (DEFENDANT'S EXHIBIT 7264 WAS RECEIVED IN EVIDENCE.) |
| 11:47AM | 13 | BY MR. DOWNEY: |
| 11:47AM | 14 | Q.   IF WE GO DOWN TO THE BOTTOM OF THAT, DO YOU SEE AN EMAIL |
| 11:47AM | 15 | FROM YOU TO DR. YOUNG AND DR. ANEKAL ASKING, WHEN IS OUR NEXT |
| 11:48AM | 16 | DEVICE SHIPMENT PLANNED? |
| 11:48AM | 17 | A.   I DO. |
| 11:48AM | 18 | Q.   WAS THAT AN INQUIRY FROM YOU TO JUST DETERMINE WHEN THERE |
| 11:48AM | 19 | WOULD BE A SHIPMENT OF DEVICES? |
| 11:48AM | 20 | A.   YES.  WE WERE DOING SHIPMENTS OF DEVICES ON A REGULAR |
| 11:48AM | 21 | BASIS, AND I WAS ASKING WHEN THE NEXT ONE WAS. |
| 11:48AM | 22 | Q.   AND WHY WERE YOU DOING -- THIS APPEARS TO HAVE BEEN ABOUT |
| 11:48AM | 23 | A YEAR BEFORE THE LAUNCH IN WALGREENS STORES; IS THAT RIGHT? |
| 11:48AM | 24 | A.   YES. |
| 11:48AM | 25 | Q.   AND WHY WAS THERANOS DOING SHIPMENTS OF DEVICES IN OCTOBER |

7532

| | | |
|---|---|---|
| 11:48AM | 1 | OF 2012? |
| 11:48AM | 2 | A.   BECAUSE WE WANTED TO MAKE SURE THAT THE DEVICES WERE |
| 11:48AM | 3 | ROBUST AND THAT ANY ISSUES THAT COULD EMERGE WE KNEW ABOUT AND |
| 11:48AM | 4 | HAD FIXED. |
| 11:48AM | 5 | Q.   OKAY.  IF YOU GO UP THROUGH THAT EMAIL, DO YOU SEE AT THE |
| 11:48AM | 6 | TOP THAT YOU SEND AN EMAIL QUESTION ABOUT THE PROJECT PLAN AND |
| 11:48AM | 7 | WHAT IT CONTAINS WITH REGARD TO SYSTEM RELIABILITY? |
| 11:48AM | 8 | DO YOU SEE THAT? |
| 11:48AM | 9 | A.   YES. |
| 11:48AM | 10 | Q.   AND WHAT WERE YOU ASKING IN THIS EMAIL IN OCTOBER OF 2012? |
| 11:49AM | 11 | A.   I WANTED TO MAKE SURE THAT IN OUR PROJECT PLAN WE HAD |
| 11:49AM | 12 | TESTS WHERE WE WOULD RUN HUNDREDS, I WAS SAYING HERE GO UP TO |
| 11:49AM | 13 | 1,000 SAMPLES, JUST TO ASSESS THE RELIABILITY OF THE SYSTEM. |
| 11:49AM | 14 | SO TEST IT OVER AND OVER AND OVER AGAIN. |
| 11:49AM | 15 | Q.   NOW, I WANT TO RETURN TO WHERE WE LEFT OFF JUST BEFORE THE |
| 11:49AM | 16 | BREAK. |
| 11:49AM | 17 | AND DO YOU RECALL THAT WE WERE TALKING ABOUT THE POTENTIAL |
| 11:49AM | 18 | PLACEMENT OF THE 4.0 DEVICES THROUGHOUT THE CENTRAL LAB AT |
| 11:49AM | 19 | THERANOS? |
| 11:49AM | 20 | A.   I DO, YES. |
| 11:49AM | 21 | Q.   AND DID YOU BEGIN AT A CERTAIN POINT TO CONSIDER IT |
| 11:49AM | 22 | POTENTIALLY IMPRACTICAL FOR THESE DEVICES TO BE THE MEANS BY |
| 11:49AM | 23 | WHICH BLOOD TESTS WOULD BE RUN IN THAT CENTRAL LAB? |
| 11:49AM | 24 | A.   YES. |
| 11:49AM | 25 | Q.   AND CAN YOU TELL US THE REASONS FOR THAT? |

7533

11:49AM 1    A.   THE DEVICES WERE DESIGNED FOR THE POINT OF CARE.  THEY

11:50AM 2    WERE DESIGNED TO BE OPERATED BY A CONSUMER, A PERSON WHO WAS

11:50AM 3    EITHER A LAYPERSON OR A TECHNICIAN AT A STORE.  THEY OPERATED

11:50AM 4    WITH A TOUCHSCREEN THAT WAS DESIGNED TO GIVE INSTRUCTIONS TO

11:50AM 5    THE PATIENT ABOUT INSERTING SAMPLES INTO THE CARTRIDGE, AND

11:50AM 6    THEY ONLY PROCESSED A SINGLE SAMPLE AT A TIME.

11:50AM 7        IF YOU HAD THEM IN BANKS IN A CENTRAL LAB, YOU WOULD

11:50AM 8    EITHER NEED HUNDREDS OF PEOPLE SITTING THERE FEEDING CARTRIDGES

11:50AM 9    INTO EACH INSTRUMENT, OR WE INVESTED IN TRYING TO SEE IF WE

11:50AM 10   COULD BUILD ROBOTS THAT COULD DO THAT, AND IT WOULD BE A, A

11:50AM 11   HUGE PROJECT JUST TO DEAL WITH 1,000 OR 10,000 SAMPLES COMING

11:50AM 12   IN AT THE SAME TIME IN A MACHINE THAT WAS ONLY DESIGNED TO

11:50AM 13   PROCESS ONE SAMPLE AT A TIME.

11:50AM 14   Q.   BUT THE SAMPLES THAT WERE USED IN CONNECTION WITH

11:50AM 15   WALGREENS -- OR WITH THERANOS TECHNOLOGY WERE SMALL SAMPLES OF

11:51AM 16   BLOOD; RIGHT?

11:51AM 17   A.   THEY WERE.

11:51AM 18   Q.   THEY WERE TYPICALLY DRAWN FROM A FINGERSTICK DRAW?

11:51AM 19   A.   YES.

11:51AM 20   Q.   AND WERE THEY ALSO SOMETIMES DRAWN FROM A SMALL SAMPLE

11:51AM 21   DRAWN FROM THE ARM?

11:51AM 22   A.   YES.

11:51AM 23   Q.   WERE THERE A LOT OF OTHER DEVICES ON WHICH SMALL SAMPLES

11:51AM 24   OF BLOOD COULD BE ANALYZED AS OF 2013?

11:51AM 25   A.   NO.

7534

| | | |
|---|---|---|
| 11:51AM | 1 | Q.   DID YOU BEGIN TO CONSIDER ALTERNATE WAYS BY WHICH THOSE |
| 11:51AM | 2 | SMALL SAMPLES MIGHT BE PROCESSED IN A CENTRALIZED THERANOS LAB |
| 11:51AM | 3 | IN 2013? |
| 11:51AM | 4 | A.   YES. |
| 11:51AM | 5 | Q.   TELL US WHAT HAPPENED. |
| 11:51AM | 6 | A.   WE WERE TRYING TO FIGURE OUT THIS ISSUE OF HOW TO DEAL |
| 11:51AM | 7 | WITH HUGE NUMBERS OF SAMPLES COMING IN AT THE SAME TIME AND |
| 11:51AM | 8 | MAINTAIN OUR GOALS AROUND TURN AROUND TIME, HOW FAST WE COULD |
| 11:51AM | 9 | GET RESULTS BACK TO DOCTORS. |
| 11:51AM | 10 | WE FIRST STARTED LOOKING AT THE WAYS IN WHICH WE DEVELOPED |
| 11:51AM | 11 | MANY OF THESE CHEMISTRIES IN THE FIRST PLACE, WHICH WAS USING |
| 11:51AM | 12 | THOSE BIG TECAN ROBOTS WHERE WE HAD BEEN RUNNING CHEMISTRY FOR |
| 11:52AM | 13 | YEARS. |
| 11:52AM | 14 | THOSE ROBOTS COULD PROCESS MANY SAMPLES AT THE SAME TIME. |
| 11:52AM | 15 | AND WE THEN STARTED LOOKING AT OTHER WAYS WE MIGHT BE ABLE |
| 11:52AM | 16 | TO PROCESS THOSE SAMPLES AS WELL. |
| 11:52AM | 17 | Q.   AND WHAT OTHER WAYS DID YOU LOOK AT? |
| 11:52AM | 18 | A.   WE FIGURED OUT THAT THERE WERE TECHNOLOGIES MADE BY BIG |
| 11:52AM | 19 | MEDICAL DEVICE MANUFACTURERS THAT WERE CALLED OPEN PLATFORMS. |
| 11:52AM | 20 | THESE ARE DEVICES THAT WERE DESIGNED FOR COMPANIES TO PUT |
| 11:52AM | 21 | THEIR OWN PROPRIETARY CHEMISTRY ON. |
| 11:52AM | 22 | AND OUR ENGINEERS REALIZED THAT IF WE MADE SOME INVENTIONS |
| 11:52AM | 23 | AROUND HOW TO HANDLE A REALLY SMALL VOLUME OF FLUID ON THOSE |
| 11:52AM | 24 | DEVICES, WE COULD PUT OUR PROPRIETARY CHEMISTRIES ONTO THEM |
| 11:52AM | 25 | RUNNING OUR PROPRIETARY FORMULA, WHICH MEANT LOADING OUR, WHAT |

7535

| 11:52AM | 1 | WE CALLED PROTOCOL, WHICH IS LIKE THE SOFTWARE INSTRUCTIONS FOR |
| 11:52AM | 2 | RUNNING THE PROTOCOL. |
| 11:52AM | 3 | Q.   HAD ANY OTHER COMPANIES YET FIGURED OUT HOW TO DO THAT |
| 11:53AM | 4 | WITH A SMALL SAMPLE OF BLOOD? |
| 11:53AM | 5 | A.   NO. |
| 11:53AM | 6 | Q.   I'D LIKE TO ASK YOU TO LOOK BACK AT EXHIBIT 15010. |
| 11:53AM | 7 | A.   OH, OKAY. |
| 11:53AM | 8 | Q.   IS THIS THE TECAN DEVICE THAT YOU REFERRED TO JUST A |
| 11:53AM | 9 | MOMENT AGO? |
| 11:53AM | 10 | A.   YES. |
| 11:53AM | 11 | Q.   AND HOW WOULD YOU RUN A SMALL SAMPLE OF BLOOD ON THIS |
| 11:53AM | 12 | DEVICE? |
| 11:53AM | 13 | A.   ON THIS DEVICE WE COULD PUT A CUSTOM CONSUMABLE.  YOU SEE |
| 11:53AM | 14 | ON THE DEVICE THE BLUE OBJECT THAT IS UNDER THE ROBOT, THAT IS |
| 11:53AM | 15 | WHAT THEY CALL A PLATE.  IT'S THE PLACE WHERE YOUR REAGENTS AND |
| 11:53AM | 16 | YOUR SAMPLE COULD GO. |
| 11:53AM | 17 | WE COULD BUILD CUSTOM PLATES THAT WERE REALLY SIMILAR TO |
| 11:53AM | 18 | OUR CARTRIDGE WITH LITTLE VESSELS THAT COULD CONTAIN VERY SMALL |
| 11:53AM | 19 | AMOUNTS OF SAMPLE. |
| 11:53AM | 20 | Q.   OKAY.  AND WHO AT THERANOS WAS INVOLVED IN THE TECHNOLOGY |
| 11:54AM | 21 | THAT WAS NECESSARY TO RUN -- BUILDING THE TECHNOLOGY THAT WAS |
| 11:54AM | 22 | NECESSARY TO RUN SMALL BLOOD SAMPLES ON THE TECAN DEVICE? |
| 11:54AM | 23 | A.   MULTIPLE OF OUR SCIENTIFIC AND ENGINEERING TEAMS, OUR |
| 11:54AM | 24 | ASSAY TEAMS THAT WE TALKED ABOUT, ACROSS THE DIFFERENT METHODS; |
| 11:54AM | 25 | OUR HARDWARE TEAM TO DESIGN SPECIAL PIECES OF PLASTIC THAT |

11:54AM  1    COULD ACCOMMODATE REALLY SMALL VOLUMES OF FLUID.  THEY MOVE

11:54AM  2    DIFFERENTLY THAN BIG VOLUMES OF FLUID, SO YOU NEED SPECIAL

11:54AM  3    ENGINEERING FOR THAT.

11:54AM  4         OUR SOFTWARE TEAMS TO BE ABLE TO EXECUTE WHAT I WAS

11:54AM  5    CALLING THAT PROTOCOL OR THAT FORMULA, AND THE CODE THAT WOULD

11:54AM  6    RUN ON THIS DEVICE.

11:54AM  7    Q.   HOW QUICKLY WAS THE TEAM ABLE TO DEVELOP THE CAPACITY TO

11:54AM  8    DO THAT?

11:54AM  9    A.   FOR THIS DEVICE WE HAD EXPERIENCE WITH THAT FOR YEARS UP

11:54AM  10   TO THIS POINT BECAUSE WE HAD USED THESE DEVICES IN THE CONTEXT

11:54AM  11   OF R&D, SO WE ALREADY HAD THAT CAPABILITY.

11:55AM  12   Q.   OKAY.  YOU MENTIONED MODIFYING OTHER COMMERCIAL PLATFORMS.

11:55AM  13        WHAT SPECIFIC PLATFORMS DID YOU LOOK AT?

11:55AM  14   A.   WE LOOKED AT MANY.  WE ULTIMATELY FOCUSSED ON THE

11:55AM  15   SIEMENS ADVIA AND THE BECTON DICKINSON FORTESSA DEVICES.

11:55AM  16   Q.   AND WERE YOU SUCCESSFUL IN MODIFYING THOSE TO ANALYZE

11:55AM  17   SMALL SAMPLES OF BLOOD?

11:55AM  18   A.   WE DID.  WE MADE INVENTIONS THAT ALLOWED US TO RUN SMALL

11:55AM  19   SAMPLES OF BLOOD ON THOSE PLATFORMS.

11:55AM  20   Q.   LET ME ASK YOU TO LOOK AT THE PICTURE THAT IS ALREADY IN

11:55AM  21   EVIDENCE AS 5389.

11:55AM  22   A.   OKAY.

11:55AM  23   Q.   IS THIS THE SIEMENS ADVIA?

11:55AM  24   A.   YES.

11:55AM  25   Q.   NOW, HOW MANY SMALL SAMPLE TESTS AN HOUR COULD THAT

7537

| 11:55AM | 1 | SIEMENS TEST RUN? |
|---------|---|-------------------|

11:55AM  2    A.   I BELIEVE OVER 100.

11:55AM  3    Q.   OKAY.  AND, AND DO YOU KNOW, IS THAT THE NUMBER OF PATIENT

11:56AM  4    SAMPLES IT COULD RUN?

11:56AM  5    A.   YES.

11:56AM  6    Q.   AND HOW MANY BLOOD TESTS COULD IT ACTUALLY PERFORM WITHIN

11:56AM  7    THOSE 100 OR SO PATIENTS?

11:56AM  8    A.   DOZENS.

11:56AM  9    Q.   OKAY.  SO AS YOU WERE CONSIDERING HOW TO ACTUALLY OPERATE

11:56AM  10   THE LAB, DID YOU BEGIN TO COMPARE THESE MODIFIED COMMERCIAL

11:56AM  11   PLATFORMS AND THE TECAN TO POTENTIALLY OPERATE IN THE LAB WITH

11:56AM  12   THE 4.0 DEVICES?

11:56AM  13   A.   WE DID.

11:56AM  14   Q.   AND TELL US YOUR THOUGHT PROCESS AS TO WHICH APPEARED TO

11:56AM  15   BE THE WISER COURSE.

11:56AM  16   A.   IN THE CONTEXT OF PHASE I WHERE YOU HAVE REALLY LARGE

11:56AM  17   SAMPLES COMING IN AT THE SAME TIME, THIS MADE A LOT MORE SENSE

11:56AM  18   BECAUSE YOU COULD PROCESS ALL OF THOSE SAMPLES AT THE SAME

11:56AM  19   TIME, AS OPPOSED TO HAVING THESE HUGE BANK OF DEVICES AND HUMAN

11:56AM  20   OR ROBOT OPERATORS FOR EACH ONE AND WAITING UNTIL YOU COULD GET

11:57AM  21   THE NEXT SAMPLE IN THE MACHINE BASED ON THE FACT THAT THE

11:57AM  22   MACHINE ONLY PROCESSED ONE SAMPLE AT A TIME.

11:57AM  23   Q.   SO YOU ULTIMATELY DECIDED TO USE SOME OF THE MODIFIED

11:57AM  24   PLATFORMS AND THE TECAN DEVICES FOR A LOT OF THE SMALL SAMPLE

11:57AM  25   TESTS?

| | | |
|---|---|---|
| 11:57AM | 1 | A.   WE DID. |
| 11:57AM | 2 | Q.   NOW, THERE'S BEEN TESTIMONY FROM A NUMBER OF WITNESSES IN |
| 11:57AM | 3 | THE CASE THAT THEY WERE NOT AWARE THAT THERANOS WAS RUNNING |
| 11:57AM | 4 | BLOOD SAMPLES ON THESE -- OR ANALYZING BLOOD SAMPLES ON THESE |
| 11:57AM | 5 | KINDS OF PLATFORMS. |
| 11:57AM | 6 | DO YOU RECALL THAT? |
| 11:57AM | 7 | A.   I DO. |
| 11:57AM | 8 | Q.   DID THERANOS PUBLICLY DISCLOSE THAT IT WAS OPERATING THESE |
| 11:57AM | 9 | THIRD PARTY DEVICES? |
| 11:57AM | 10 | A.   NO. |
| 11:57AM | 11 | Q.   DID YOU TELL MANY PEOPLE OUTSIDE OF THERANOS? |
| 11:57AM | 12 | A.   NOT MANY. |
| 11:57AM | 13 | Q.   OKAY.  DID THERANOS SEEK PATENT PROTECTIONS FOR THOSE |
| 11:57AM | 14 | MODIFICATIONS? |
| 11:57AM | 15 | A.   WE DID.  WE SOUGHT WHAT IS CALLED NON-PUBLIC PATENT |
| 11:58AM | 16 | APPLICATIONS FOR THESE INVENTIONS AND WORKED TO PROTECT THEM AS |
| 11:58AM | 17 | TRADE SECRETS. |
| 11:58AM | 18 | Q.   AND DID YOU ULTIMATELY RECEIVE A PATENT IN CONNECTION WITH |
| 11:58AM | 19 | THAT APPLICATION FOR THESE DEVICES? |
| 11:58AM | 20 | A.   WE DID. |
| 11:58AM | 21 | Q.   DID YOU TELL WALGREENS THAT YOU WERE RUNNING THE TESTS ON |
| 11:58AM | 22 | THESE MODIFIED COMMERCIAL PLATFORMS? |
| 11:58AM | 23 | A.   NOT IN THIS WAY. |
| 11:58AM | 24 | Q.   AND WHY NOT? |
| 11:58AM | 25 | A.   BECAUSE THIS WAS AN INVENTION THAT WE UNDERSTOOD FROM OUR |

7539

11:58AM 1    COUNSEL WE HAD TO PROTECT AS A TRADE SECRET, AND THAT IF WE

11:58AM 2    DISCLOSED THAT INFORMATION, WE WOULD LOSE TRADE SECRET

11:58AM 3    PROTECTION.

11:58AM 4        THE BIG MEDICAL DEVICE COMPANIES LIKE SIEMENS COULD EASILY

11:58AM 5    REPRODUCE WHAT WE HAD DONE IF THEY KNEW WHAT WE WERE DOING.

11:58AM 6    THEY HAD MORE ENGINEERS THAN WE DID, AND A LOT MORE RESOURCES.

11:58AM 7        AND SO THE ADVICE WAS TO KEEP IT CONFIDENTIAL SO THAT

11:58AM 8    THERANOS WOULD HAVE THE CHANCE TO PROFIT OFF OF THAT INVENTION.

11:59AM 9    Q.   AND DO OTHER COMPANIES TODAY, AFTER DISCLOSURES ABOUT

11:59AM 10   THERANOS, RUN SMALL SAMPLES ON THOSE MODIFIED PLATFORMS?

11:59AM 11           MR. LEACH:  OBJECTION.  RELEVANCE.  403.

11:59AM 12           THE COURT:  SUSTAINED.

11:59AM 13   BY MR. DOWNEY:

11:59AM 14   Q.   NOW, ONE OF THE STEPS THAT YOU MENTIONED THAT YOU WOULD BE

11:59AM 15   TAKING IS APPLICATION FOR APPROVAL OF YOUR DEVICES TO THE FDA.

11:59AM 16       DO YOU RECALL THAT?

11:59AM 17   A.   YES.

11:59AM 18   Q.   AND DO YOU RECALL THAT AS PART OF YOUR EFFORT TO GET

11:59AM 19   APPROVAL FOR THE THERANOS DEVICES, YOU HAD CONVERSATIONS WITH

11:59AM 20   THE FDA ABOUT THE BUSINESS PLAN UNDER WHICH THERANOS WOULD

11:59AM 21   PROCEED?

11:59AM 22   A.   I DO.

11:59AM 23   Q.   DID YOU DISCLOSE TO THE FDA THAT YOU WERE USING THESE

11:59AM 24   MODIFIED PLATFORMS FOR PURPOSES OF RUNNING BLOOD SAMPLES AT

11:59AM 25   THERANOS?

| 11:59AM | 1 | A.   YES. |
| 11:59AM | 2 | Q.   WHY WERE YOU WILLING TO DISCLOSE TO THE FDA THAT YOU WERE |
| 12:00PM | 3 | USING THESE PLATFORMS, BUT NOT TO OTHER OUTSIDE AUDIENCES? |
| 12:00PM | 4 | A.   BECAUSE THE FDA ASSURED WE COULD HAVE TRADE SECRET |
| 12:00PM | 5 | PROTECTION OF THE INFORMATION THAT WE WERE DISCLOSING, THAT IT |
| 12:00PM | 6 | WOULD NOT BE SHARED PUBLICLY. |
| 12:00PM | 7 | Q.   OKAY.  LET'S RETURN TO THE SUBJECT OF SORT OF THE |
| 12:00PM | 8 | PLACEMENT OF VARIOUS DEVICES IN THE LAB -- |
| 12:00PM | 9 | A.   YES. |
| 12:00PM | 10 | Q.   -- AND THE FINAL DEVELOPMENT OF THE 4 SERIES DEVICE AND |
| 12:00PM | 11 | TECHNOLOGIES AT THERANOS. |
| 12:00PM | 12 | DID YOU ULTIMATELY MAKE A DECISION NOT TO USE THE 4 SERIES |
| 12:00PM | 13 | DEVICE WITHIN THE CLINICAL LAB AT THERANOS? |
| 12:00PM | 14 | A.   YES. |
| 12:00PM | 15 | Q.   AND DID THAT HAPPEN IN APPROXIMATELY 2013? |
| 12:00PM | 16 | A.   IT DID. |
| 12:00PM | 17 | Q.   AND APPROXIMATELY WHEN IN 2013 DID THAT HAPPEN? |
| 12:00PM | 18 | A.   IN THE SUMMER OF 2013. |
| 12:00PM | 19 | Q.   HAD THERANOS CONCLUDED SYSTEMS INTEGRATION OF THE SERIES 4 |
| 12:01PM | 20 | DEVICE IN THE SUMMER OF 2013? |
| 12:01PM | 21 | A.   WE HAD. |
| 12:01PM | 22 | Q.   BUT WERE THERE DELAYS IN FINALIZING THAT DEVICE'S |
| 12:01PM | 23 | READINESS TO LAUNCH? |
| 12:01PM | 24 | A.   YES.  THEY HAD NOT BEEN VALIDATED. |
| 12:01PM | 25 | Q.   SO WAS THE 4 SERIES DEVICE READY TO LAUNCH AT THE TIME OF |

| | | |
|---|---|---|
| 12:01PM | 1 | THE SOFT LAUNCH OF THERANOS'S CENTRAL LAB IN -- WELL, OF THE |
| 12:01PM | 2 | LAUNCH OF THERANOS SERVICE CENTERS IN SEPTEMBER OF 2013? |
| 12:01PM | 3 | A.  NO. |
| 12:01PM | 4 | Q.  DID YOU CONSIDER WHETHER YOU -- THE 4 SERIES |
| 12:01PM | 5 | IMPLEMENTATION WAS DELAYED, THAT THAT WAS A -- THERANOS |
| 12:01PM | 6 | ABANDONING IT'S 4 SERIES TECHNOLOGY? |
| 12:01PM | 7 | A.  NOT AT ALL. |
| 12:01PM | 8 | Q.  WHAT HAPPENED WITH THE DEVELOPMENT OF THE 4 SERIES DEVICE |
| 12:01PM | 9 | AFTER YOU MADE A DECISION TO DELAY ITS USE IN THE CLINICAL LAB? |
| 12:01PM | 10 | A.  WE IMMEDIATELY FOCUSSED ON GETTING THAT TECHNOLOGY INTO |
| 12:01PM | 11 | THE FDA AND ULTIMATELY FILING A LOT OF PRESUBMISSIONS WITH DATA |
| 12:02PM | 12 | TO INTRODUCE THE TECHNOLOGY TO THE FDA. |
| 12:02PM | 13 | Q.  AND WHEN YOU BELIEVED THAT THAT TECHNOLOGY WAS READY FOR |
| 12:02PM | 14 | CLINICAL USE, DID YOU APPLY TO THE FDA AND MAKE THOSE |
| 12:02PM | 15 | SUBMISSIONS TO THE FDA? |
| 12:02PM | 16 | A.  YES. |
| 12:02PM | 17 | Q.  DID YOU HAVE -- NOW, WE'LL TALK LATER. |
| 12:02PM | 18 | YOU ALSO MADE A DECISION TO USE CERTAIN OF THE 3 SERIES OF |
| 12:02PM | 19 | DEVICES IN CONNECTION WITH THE CLINICAL LAB; IS THAT RIGHT? |
| 12:02PM | 20 | A.  WE DID, YES. |
| 12:02PM | 21 | Q.  WHY DID THERANOS DO THAT? |
| 12:02PM | 22 | A.  WE HAD A LOT OF EXPERIENCE WITH THEM FOR YEARS AT THAT |
| 12:02PM | 23 | POINT, AND A LOT OF CONFIDENCE IN THE TECHNOLOGY, AND AS WE |
| 12:02PM | 24 | PREPARED FOR PHASE II OF OUR MODEL, WE THOUGHT WE COULD USE THE |
| 12:02PM | 25 | MANY DEVICES THAT WE'D BUILT IN COMBINATION WITH THE HIGH |

7542

| | | |
|---|---|---|
| 12:02PM | 1 | THROUGHPUT PLATFORMS IN THE LAB. |
| 12:02PM | 2 | Q.   OKAY.  NOW, DO YOU RECALL THAT IN SEPTEMBER OF 2013 THE |
| 12:03PM | 3 | LAUNCH OF THERANOS STORES IN WALGREENS -- LAUNCH OF THERANOS |
| 12:03PM | 4 | SERVICE CENTERS IN WALGREENS WAS ANNOUNCED? |
| 12:03PM | 5 | A.   YES. |
| 12:03PM | 6 | Q.   AND SHORTLY PRIOR TO THAT TIME, HAD THE CLIA LAB AT |
| 12:03PM | 7 | THERANOS BEEN WORKING TO VALIDATE VARIOUS ASSAYS IN CONNECTION |
| 12:03PM | 8 | WITH ITS EFFORTS TO OPEN FOR CLINICAL USE? |
| 12:03PM | 9 | A.   YES. |
| 12:03PM | 10 | Q.   AND STARTING IN AUGUST, WAS THERE WORK TO TRY TO BRING ALL |
| 12:03PM | 11 | OF THERANOS'S ASSAYS INTO THAT CLIA LAB FOR VALIDATION? |
| 12:03PM | 12 | A.   YES.  I THINK IT STARTED EVEN BEFORE THEN. |
| 12:03PM | 13 | Q.   WHO COORDINATED THAT PROJECT? |
| 12:03PM | 14 | A.   DR. YOUNG ON THE R&D SIDE, DR. ROSENDORFF ON THE CLINICAL |
| 12:03PM | 15 | LAB SIDE, AND SUNNY BALWANI FROM THE BUSINESS OPERATIONS SIDE. |
| 12:04PM | 16 | Q.   OKAY.  TO DATE AS YOU AND I HAVE BEEN DISCUSSING THE |
| 12:04PM | 17 | DEVELOPMENT OF THE TECHNOLOGY, HAVE WE BEEN DISCUSSING THE |
| 12:04PM | 18 | DEVELOPMENT OF THESE ASSAYS IN THE RESEARCH AND DEVELOPMENT LAB |
| 12:04PM | 19 | AT THERANOS? |
| 12:04PM | 20 | A.   WE HAVE. |
| 12:04PM | 21 | Q.   AND SO THIS WAS THE PROCESS OF A CLIA VALIDATION FOR |
| 12:04PM | 22 | PURPOSES OF OFFERING BLOOD TESTS TO THE PUBLIC; IS THAT RIGHT? |
| 12:04PM | 23 | A.   EXACTLY, YES. |
| 12:04PM | 24 | Q.   WAS DR. ROSENDORFF INVOLVED IN THE PROCESS OF CLIA |
| 12:04PM | 25 | VALIDATION AT THERANOS? |

| | | |
|---|---|---|
| 12:04PM | 1 | A.   YES. |
| 12:04PM | 2 | Q.   WELL, WHAT DO YOU RECALL ABOUT THE PROCESS AROUND CLIA |
| 12:04PM | 3 | VALIDATION IN THE SUMMER AND FALL OF 2013? |
| 12:04PM | 4 | A.   I RECALL THAT DR. ROSENDORFF ESTABLISHED A SERIES OF |
| 12:04PM | 5 | CRITERIA THAT NEEDED TO BE MET FOR VALIDATION; THAT THE |
| 12:04PM | 6 | SCIENTISTS WHO DEVELOPED THE TESTS WOULD WORK WITH HIM TO BRING |
| 12:04PM | 7 | THE TEST TO THE LAB, AND THEN RUN THESE EXPERIMENTS TO TRY TO |
| 12:04PM | 8 | MEET THE CRITERIA THAT HE HAD ESTABLISHED. |
| 12:05PM | 9 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7314. |
| 12:05PM | 10 | A.   OKAY. |
| 12:05PM | 11 | Q.   LET ME ASK YOU FIRST, WAS IT YOUR EXPECTATION THAT MOST OF |
| 12:05PM | 12 | THE ASSAYS THAT HAD BEEN VALIDATED FROM A RESEARCH AND |
| 12:05PM | 13 | DEVELOPMENT PERSPECTIVE WOULD BE VALIDATED QUICKLY ON A CLIA |
| 12:05PM | 14 | BASIS? |
| 12:05PM | 15 | A.   YES. |
| 12:05PM | 16 | Q.   LET ME ASK YOU TO LOOK AT THE EXHIBIT. |
| 12:05PM | 17 | IS THIS AN EMAIL FROM DR. YOUNG TO YOU IN AUGUST OF 2013? |
| 12:05PM | 18 | A.   IT IS. |
| 12:05PM | 19 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:05PM | 20 | 7314. |
| 12:05PM | 21 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:05PM | 22 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:05PM | 23 | (DEFENDANT'S EXHIBIT 7314 WAS RECEIVED IN EVIDENCE.) |
| 12:05PM | 24 | BY MR. DOWNEY: |
| 12:05PM | 25 | Q.   IF YOU LOOK AT THE ADDRESS OUTLINE OR THE ADDRESS HEADER |

7544

| 12:06PM | 1 | AT THE TOP, DO YOU SEE THAT IT'S DATED AUGUST 19TH, 2013? |
|---|---|---|
| 12:06PM | 2 | A.   I DO. |
| 12:06PM | 3 | Q.   THAT'S ABOUT THREE WEEKS BEFORE THE ANNOUNCEMENT OF |
| 12:06PM | 4 | THERANOS SERVICE CENTERS IN WALGREENS STORES? |
| 12:06PM | 5 | A.   YES. |
| 12:06PM | 6 | Q.   AND IS DR. YOUNG REPORTING TO YOU IN THIS EMAIL HIS |
| 12:06PM | 7 | EXPECTATION ABOUT THE NUMBER OF SMALL SAMPLE TESTS THAT WOULD |
| 12:06PM | 8 | BE AVAILABLE IN THOSE SERVICE CENTERS? |
| 12:06PM | 9 | A.   HE IS, YES. |
| 12:06PM | 10 | Q.   AND IF YOU WOULD LOOK AT THE BEGINNING OF THE EMAIL, HE |
| 12:06PM | 11 | SAYS, "THE CURRENT LAUNCH LIST COVERS 200 TESTS, IN BOTH BLOOD |
| 12:06PM | 12 | AND URINE SAMPLES.  THE COLLECTION OF THESE REPORTABLES COVERS |
| 12:06PM | 13 | MORE THAN 97 PERCENT OF TEST FREQUENCY FOR THESE TWO MATRICES." |
| 12:06PM | 14 | DO YOU SEE THAT? |
| 12:06PM | 15 | A.   I DO, YES. |
| 12:06PM | 16 | Q.   AND MATRICES IS JUST A REFERENCE TO THE BODILY SUBSTANCE |
| 12:06PM | 17 | THAT IS BEING ANALYZED? |
| 12:06PM | 18 | A.   YES, HE'S TALKING ABOUT BLOOD AND ALSO URINE. |
| 12:06PM | 19 | Q.   OKAY.  AND DID YOU UNDERSTAND HERE THAT 200 SMALL SAMPLE |
| 12:07PM | 20 | ASSAYS WOULD BE APPROVED AND LAUNCHED AT THE OUTSET OF THE |
| 12:07PM | 21 | THERANOS SERVICE CENTERS OPERATION? |
| 12:07PM | 22 | A.   YES, THAT WAS OUR PLAN. |
| 12:07PM | 23 | Q.   OKAY.  IF YOU LOOK BELOW HERE, HE REPORTS ON A NUMBER OF |
| 12:07PM | 24 | SPECIFIC PIECES OF -- NUMBER OF TESTS AND PIECES OF HARDWARE. |
| 12:07PM | 25 | DO YOU SEE THAT HE APPEARS TO BREAK OUT BY THE ASSAY |

| | | |
|---|---|---|
| 12:07PM | 1 | METHOD THE NUMBER OF SMALL SAMPLE TESTS THAT WILL BE PART OF |
| 12:07PM | 2 | THAT LAUNCH? |
| 12:07PM | 3 | A.   I DO. |
| 12:07PM | 4 | Q.   AND ARE ALL OF THE NUMBERS PROVIDED HERE SMALL SAMPLE |
| 12:07PM | 5 | ASSAYS AS OPPOSED TO TRADITIONAL SAMPLES? |
| 12:07PM | 6 | A.   YES. |
| 12:07PM | 7 | Q.   OKAY.  SO WAS IT YOUR EXPECTATION THAT AS OF AUGUST OF |
| 12:07PM | 8 | 2013 THAT THIS NUMBER OF SMALL SAMPLE ASSAYS WOULD BE LAUNCHED |
| 12:07PM | 9 | IN THERANOS SERVICE CENTERS? |
| 12:07PM | 10 | A.   IT WAS. |
| 12:07PM | 11 | Q.   WHO AT THERANOS WAS RESPONSIBLE FOR MAKING THE DECISION AS |
| 12:08PM | 12 | TO WHETHER OR NOT AN ASSAY WAS CLINICALLY VALIDATED UNDER CLIA? |
| 12:08PM | 13 | A.   THE LAB DIRECTOR. |
| 12:08PM | 14 | Q.   WAS THAT DR. ROSENDORFF AS OF AUGUST 2013? |
| 12:08PM | 15 | A.   IT WAS. |
| 12:08PM | 16 | Q.   WERE THERE OTHERS WHO WERE INVOLVED WITH HIM IN ASSISTING |
| 12:08PM | 17 | HIM IN PLAYING A ROLE IN THAT PROCESS? |
| 12:08PM | 18 | A.   YES. |
| 12:08PM | 19 | Q.   AND WHO ELSE WAS INVOLVED IN THAT PROCESS? |
| 12:08PM | 20 | A.   WITHIN THE CLINICAL LAB THERE WERE PEOPLE WHO WORKED FOR |
| 12:08PM | 21 | HIM WHO WERE SENIOR LABORATORY SCIENTISTS AND SUPERVISORS, AND |
| 12:08PM | 22 | ON THE R&D SIDE THERE WERE THE SCIENTISTS WHO HAD DEVELOPED AND |
| 12:08PM | 23 | VALIDATED THE TESTS IN R&D. |
| 12:08PM | 24 | Q.   AND IF THERE WERE A CLIA VALIDATION OF A TEST, HOW WOULD |
| 12:08PM | 25 | THAT BE DOCUMENTED? |

7546

| | | |
|---|---|---|
| 12:08PM | 1 | A.   IN A CLIA VALIDATION REPORT. |
| 12:08PM | 2 | Q.   AND WOULD THAT HAVE TO BE SIGNED OFF ON BY DR. ROSENDORFF? |
| 12:08PM | 3 | A.   IT WOULD, YES. |
| 12:08PM | 4 | Q.   AND ANY OTHERS? |
| 12:08PM | 5 | A.   YES. |
| 12:09PM | 6 | Q.   WHO? |
| 12:09PM | 7 | A.   THE CLINICAL LABORATORY SCIENTIST, THE GENERAL |
| 12:09PM | 8 | SUPERVISORS, TECHNICAL SUPERVISORS, SOMETIMES THE SCIENTISTS |
| 12:09PM | 9 | WHO DEVELOPED THE TESTS AND THEIR TEAM LEADS, SOMETIMES OTHER |
| 12:09PM | 10 | R&D LEADERSHIP, AND THEN DR. ROSENDORFF HIMSELF. |
| 12:09PM | 11 | Q.   OKAY.  DID YOU EVER PRESSURE DR. ROSENDORFF TO CLINICALLY |
| 12:09PM | 12 | VALIDATE TESTS THAT HE DID NOT WANT TO CLINICALLY VALIDATE? |
| 12:09PM | 13 | A.   NO. |
| 12:09PM | 14 | Q.   DID YOU EVER PRESSURE DR. YOUNG TO CONTRIBUTE TO |
| 12:09PM | 15 | CLINICALLY VALIDATING A TEST THAT HE DID NOT WANT CLINICALLY |
| 12:09PM | 16 | VALIDATED? |
| 12:09PM | 17 | A.   NO. |
| 12:09PM | 18 | Q.   DID YOU EVER PRESSURE ANYONE AT THERANOS TO SIGN OFF ON A |
| 12:09PM | 19 | CLINICAL OR CLIA VALIDATION WHERE THEY DID NOT WANT TO SIGN OFF |
| 12:09PM | 20 | ON THAT CLINICAL OR CLIA VALIDATION? |
| 12:09PM | 21 | A.   ABSOLUTELY NOT. |
| 12:09PM | 22 | Q.   DID YOU HAVE THE TRAINING TO MAKE A DECISION AS TO WHETHER |
| 12:11PM | 23 | OR NOT AN ASSAY WAS VALID FOR CLINICAL USE? |
| 12:11PM | 24 | A.   NO. |
| 12:11PM | 25 | Q.   ARE YOU AWARE OF ANY ASSAY BEING USED IN THE CLINICAL |

7547

12:11PM 1    LABORATORY AT THERANOS THAT WAS NOT VALIDATED AND APPROVED BY

12:11PM 2    THE LABORATORY DIRECTOR?

12:11PM 3    A.   I AM NOT.

12:11PM 4    Q.   WOULD YOU HAVE PERMITTED THAT?

12:11PM 5    A.   NO.

12:11PM 6    Q.   DO YOU RECALL THAT DR. ROSENDORFF TESTIFIED EARLIER IN

12:11PM 7    THIS TRIAL?

12:11PM 8    A.   I DO.

12:11PM 9    Q.   AND DO YOU RECALL THAT HE TESTIFIED ABOUT SOME

12:11PM 10   INTERACTIONS WITH YOU RAISING CONCERNS ABOUT WHETHER OR NOT IT

12:11PM 11   WAS POSSIBLE TO VALIDATE ON THE GIVEN SCHEDULE A CERTAIN NUMBER

12:11PM 12   OF ASSAYS?

12:11PM 13   A.   I DO.

12:11PM 14   Q.   WHAT DO YOU RECALL ABOUT, IF ANYTHING, ABOUT SUCH AN

12:11PM 15   INTERACTION WITH DR. ROSENDORFF?

12:11PM 16   A.   I RECALL TELLING DR. ROSENDORFF THAT WE'LL DO WHATEVER IT

12:11PM 17   TAKES TO GIVE HIM THE TIME THAT WE NEED TO BRING UP THE TEST

12:11PM 18   PROPERLY UNTIL HE WAS SATISFIED WITH SIGNING OFF ON THEM.

12:11PM 19   Q.   WITH RESPECT TO THE TESTS ABOUT WHICH HE RAISED CONCERNS,

12:11PM 20   DID YOU -- WAS THERE ANY DELAY IN THE LAUNCH OF THOSE TESTS?

12:11PM 21   A.   YES.

12:11PM 22   Q.   AND DO YOU KNOW HOW LONG THE LAUNCH OF THOSE TESTS WAS

12:11PM 23   DELAYED?

12:11PM 24   A.   MONTHS AFTER THAT TIME.

12:11PM 25   Q.   DID YOU UNDERSTAND THAT HE DID THE WORK THEREAFTER TO

| | | |
|---|---|---|
| 12:11PM | 1 | BECOME COMFORTABLE TO CLINICALLY VALIDATE THOSE ASSAYS BEFORE |
| 12:11PM | 2 | THEY WERE RELEASED FOR USE WITH MEMBERS OF THE PUBLIC? |
| 12:11PM | 3 | A.   I DO. |
| 12:11PM | 4 | Q.   DO YOU RECALL ALSO THAT DOCTOR -- THAT MS. GANGAKHEDKAR |
| 12:11PM | 5 | TESTIFIED ABOUT CONCERNS THAT SHE HAD AROUND THE TIME OF THE |
| 12:11PM | 6 | LAUNCH OF THE CLIA LAB AT THERANOS? |
| 12:11PM | 7 | A.   I DO. |
| 12:11PM | 8 | Q.   AND BY THAT TIME SHE WAS LEADING ONE OF THE ASSAY TEAMS IN |
| 12:11PM | 9 | THE RESEARCH AND DEVELOPMENT GROUP; RIGHT? |
| 12:11PM | 10 | A.   YES. |
| 12:11PM | 11 | Q.   SHE WAS THE HEAD OF THE IMMUNOASSAY GROUP? |
| 12:11PM | 12 | A.   YES. |
| 12:11PM | 13 | Q.   AND SHE RESIGNED IN SEPTEMBER OF 2013; IS THAT RIGHT? |
| 12:11PM | 14 | A.   SHE DID. |
| 12:11PM | 15 | Q.   DID YOU SPEAK WITH HER IN CONNECTION WITH HER INTENDED |
| 12:11PM | 16 | DEPARTURE FROM THERANOS? |
| 12:11PM | 17 | A.   I DID. |
| 12:11PM | 18 | Q.   WHAT DO YOU RECALL HER TELLING YOU AT THAT TIME? |
| 12:12PM | 19 | A.   SHE TOLD ME THAT SHE WAS STRESSED AND HAD HEALTH ISSUES. |
| 12:12PM | 20 | AND I SUGGESTED TO HER THAT SHE TAKE A LEAVE OF ABSENCE |
| 12:12PM | 21 | HOPING THAT SHE COULD ADDRESS THE HEALTH ISSUES. |
| 12:12PM | 22 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 13780. |
| 12:12PM | 23 | A.   OKAY. |
| 12:12PM | 24 | Q.   IS THIS AN EMAIL THAT WAS SENT TO YOU BY A THERANOS PERSON |
| 12:12PM | 25 | ABOUT MS. GANGAKHEDKAR'S DEPARTURE FROM THERANOS? |

7549

| | | |
|---|---|---|
| 12:12PM | 1 | A.   YES.  I THINK SHE'S TALKING ABOUT MS. GANGAKHEDKAR'S |
| 12:12PM | 2 | DEPARTURE AND ANOTHER EMPLOYEE'S DEPARTURE. |
| 12:12PM | 3 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13780. |
| 12:12PM | 4 | MR. LEACH:  NO OBJECTION. |
| 12:12PM | 5 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:12PM | 6 | (DEFENDANT'S EXHIBIT 13780 WAS RECEIVED IN EVIDENCE.) |
| 12:13PM | 7 | BY MR. DOWNEY: |
| 12:13PM | 8 | Q.   LOOKING AT THE BOTTOM EMAIL HERE, DO YOU SEE THAT THIS IS |
| 12:13PM | 9 | AN EMAIL FROM TINA NOYES. |
| 12:13PM | 10 | WAS SHE A THERANOS EMPLOYEE? |
| 12:13PM | 11 | A.   YES. |
| 12:13PM | 12 | Q.   AND DID SHE WORK WITH MS. GANGAKHEDKAR? |
| 12:13PM | 13 | A.   SHE DID. |
| 12:13PM | 14 | Q.   AND DO YOU SEE IN THAT EMAIL SHE HAD TOLD MS. GANGAKHEDKAR |
| 12:13PM | 15 | AND ANOTHER INDIVIDUAL THAT SHE WAS WRITING TO ADVISE OF HER |
| 12:13PM | 16 | RESIGNATION ON SEPTEMBER 5TH? |
| 12:13PM | 17 | A.   YES. |
| 12:13PM | 18 | Q.   AND THE OTHER INDIVIDUAL SHE SENT THIS TO IS A WOMAN NAMED |
| 12:13PM | 19 | MONA RAMAMURTHY. |
| 12:13PM | 20 | DO YOU SEE THAT? |
| 12:13PM | 21 | A.   YES. |
| 12:13PM | 22 | Q.   AND WHO IS MONA RAMAMURTHY? |
| 12:13PM | 23 | A.   SHE RAN OUR HUMAN RESOURCES. |
| 12:13PM | 24 | Q.   OKAY.  AND IF YOU GO ABOVE THAT EMAIL, THERE'S AN EMAIL |
| 12:13PM | 25 | FROM MS. RAMAMURTHY TO YOU. |

| 12:13PM | 1 | DO YOU SEE THAT? |
| 12:13PM | 2 | A.   I DO. |
| 12:13PM | 3 | Q.   AND IT'S ON THAT SAME DAY, SEPTEMBER 5TH? |
| 12:13PM | 4 | A.   YES. |
| 12:13PM | 5 | Q.   AND DO YOU SEE BELOW IN THE TEXT OF THE EMAIL, THE SECOND |
| 12:14PM | 6 | SENTENCE READS THAT, "SUREKHA," THAT'S REFERRING TO |
| 12:14PM | 7 | MS. GANGAKHEDKAR? |
| 12:14PM | 8 | A.   YES. |
| 12:14PM | 9 | Q.   "SUREKHA JUST CAME BY AND SAID SHE BELIEVES TINA IS |
| 12:14PM | 10 | RESIGNING BECAUSE OF HEALTH REASONS, FAMILY LIFE, AND STRESS. |
| 12:14PM | 11 | SHE SAID IT IS SIMILAR TO THE REASON SHE IS RESIGNING." |
| 12:14PM | 12 | DO YOU SEE THAT? |
| 12:14PM | 13 | A.   I DO. |
| 12:14PM | 14 | Q.   NOW, DURING THE CONVERSATION THAT YOU HAD WITH |
| 12:14PM | 15 | MS. GANGAKHEDKAR AROUND SEPTEMBER 5TH, DO YOU RECALL HER |
| 12:14PM | 16 | RAISING ANY CONCERN ABOUT THE VALIDITY OF THERANOS TECHNOLOGY, |
| 12:14PM | 17 | WHETHER IT BE ASSAYS OR IN ANY OTHER RESPECT? |
| 12:14PM | 18 | A.   NO. |
| 12:14PM | 19 | Q.   DID YOU TRY TO PERSUADE MS. GANGAKHEDKAR IN THAT |
| 12:14PM | 20 | CONVERSATION AND THEREAFTER TO REMAIN AT THERANOS? |
| 12:14PM | 21 | A.   I DID. |
| 12:14PM | 22 | Q.   DO YOU RECALL DURING THIS TRIAL THAT MS. GANGAKHEDKAR |
| 12:14PM | 23 | TESTIFIED ABOUT AN EMAIL EXCHANGE THAT SHE HAD HAD WITH |
| 12:14PM | 24 | MR. BALWANI A FEW DAYS BEFORE THIS SEPTEMBER 5TH, 2013 |
| 12:15PM | 25 | RESIGNATION? |

| | | |
|---|---|---|
| 12:15PM | 1 | A.   I DO. |
| 12:15PM | 2 | Q.   LET'S TAKE A MOMENT AND LOOK AT THAT EMAIL EXCHANGE. |
| 12:15PM | 3 | IF WE CAN BLOW UP THE BOTTOM EMAIL. |
| 12:15PM | 4 | WELL, ACTUALLY, IF WE CAN -- YEAH, IF WE CAN GO AND BLOW |
| 12:15PM | 5 | THAT EMAIL UP, IF YOU WOULD, MR. BENNETT. |
| 12:15PM | 6 | THE COURT:  THIS IS EXHIBIT? |
| 12:15PM | 7 | MR. DOWNEY:  I APOLOGIZE, YOUR HONOR.  IT'S |
| 12:15PM | 8 | EXHIBIT 3962. |
| 12:15PM | 9 | AND THIS IS IN EVIDENCE PREVIOUSLY. |
| 12:15PM | 10 | Q.   DO YOU SEE HERE IT SAYS, "PLEASE NOTE THAT THE SOFTWARE |
| 12:15PM | 11 | TEAM WAS HERE TILL 3:07 A.M. - AND IS ALREADY HERE NOW AT 10:00 |
| 12:15PM | 12 | A.M.," AND THEN HE GOES ON TO DESCRIBE HOW HARD THE SOFTWARE |
| 12:15PM | 13 | TEAM WAS WORKING. |
| 12:16PM | 14 | AND HE SAYS, "THE EDISON DEVICES IN THE EVENING WERE ALL |
| 12:16PM | 15 | SITTING IDLE AND I ALSO DIDN'T SEE ANYONE FROM CARTRIDGE |
| 12:16PM | 16 | MANUFACTURING IN THE EVENING." |
| 12:16PM | 17 | AND THEN IN THE LAST PARAGRAPH HE ASKS, "PLEASE ASK THE |
| 12:16PM | 18 | ELISA TEAM TO ORGANIZE, PLAN AND PUT IN THE HOURS THIS MONTH TO |
| 12:16PM | 19 | BRING UP ALL ASSAYS AND WORK AROUND ANY CHALLENGES THAT COME |
| 12:16PM | 20 | OUR WAY." |
| 12:16PM | 21 | DO YOU SEE THAT? |
| 12:16PM | 22 | A.   YES. |
| 12:16PM | 23 | Q.   IS THE ELISA TEAM THE TEAM THAT MS. GANGAKHEDKAR WAS |
| 12:16PM | 24 | RESPONSIBLE FOR RUNNING? |
| 12:16PM | 25 | A.   YES. |

7552

12:16PM   1   Q.   AND IF YOU GO ABOVE, DO YOU SEE THAT MS. GANGAKHEDKAR

12:16PM   2   RESPONDS TO THAT EMAIL?

12:16PM   3   A.   YES.

12:16PM   4   Q.   AND IF YOU LOOK AT THE SECOND EMAIL, DO YOU SEE THAT SHE

12:16PM   5   SAYS THE TEAM HAD BEEN WORKING HARD TOWARDS VALIDATION EFFORTS?

12:16PM   6   A.   I DO.

12:16PM   7   Q.   AND DO YOU SEE THAT SHE THEN WENT ON TO DESCRIBE SOME OF

12:16PM   8   THE DETAILS OF THAT HARD WORK?

12:16PM   9   A.   YES.

12:16PM  10   Q.   NOW, YOU'RE COPIED ON THIS EMAIL?

12:16PM  11   A.   YES.

12:16PM  12   Q.   DO YOU SEE THAT?

12:16PM  13        LOOKING BACK ON THIS NOW AND HAVING HEARD

12:16PM  14   MS. GANGAKHEDKAR'S TESTIMONY, WOULD YOU HANDLE THIS SITUATION

12:17PM  15   DIFFERENTLY?

12:17PM  16   A.   COMPLETELY.

12:17PM  17   Q.   WHY DO YOU SAY THAT?

12:17PM  18   A.   BECAUSE SUREKHA HAD WORKED WITH OUR TEAM AT OUR COMPANY

12:17PM  19   FOR YEARS.  SHE HAD DONE GREAT WORK, AND HER TEAM WAS WORKING

12:17PM  20   HARD, AND THIS IS THE WRONG WAY TO TREAT PEOPLE.

12:17PM  21   Q.   NOW, WHEN MS. GANGAKHEDKAR DEPARTED, WHO REPLACED HER?

12:17PM  22   A.   DR. SIVARAMAN.

12:17PM  23   Q.   HOW LONG DID DR. SIVARAMAN REMAIN AT THERANOS?

12:17PM  24   A.   UNTIL 2017 OR 2018.

12:17PM  25   Q.   NOW, YOU TESTIFIED ABOUT DR. ROSENDORFF'S -- THE

7553

| | | |
|---|---|---|
| 12:17PM | 1 | CONVERSATION WITH DR. ROSENDORFF AND YOUR CONVERSATION WITH |
| 12:17PM | 2 | MS. GANGAKHEDKAR, AND BOTH OF THEM REFERRING BOTH TO STRESS AND |
| 12:17PM | 3 | DR. ROSENDORFF SAYING HE WASN'T READY TO VALIDATE CERTAIN |
| 12:17PM | 4 | ASSAYS. |
| 12:17PM | 5 | TO THE EXTENT THAT THERE WERE THOSE CONCERNS, WHY DIDN'T |
| 12:17PM | 6 | THERANOS DELAY ITS COMMERCIAL LAUNCH? |
| 12:18PM | 7 | A.   WE DID DELAY THE VALIDATION OF ANY TEST OF WHICH THERE WAS |
| 12:18PM | 8 | A CONCERN. |
| 12:18PM | 9 | Q.   DID YOU IMPOSE ANY DEADLINE BY WHICH ASSAYS HAD TO BE |
| 12:18PM | 10 | VALIDATED? |
| 12:18PM | 11 | A.   NO. |
| 12:18PM | 12 | Q.   WERE YOU CONCERNED IF AN ASSAY HAD TO BE RUN ON A |
| 12:18PM | 13 | TRADITIONAL SAMPLE FOR A PERIOD OUT OF THE CLIA LAB? |
| 12:18PM | 14 | A.   NO. |
| 12:18PM | 15 | Q.   LET ME TURN FROM TALKING ABOUT THE CLIA LAB TO TALKING |
| 12:18PM | 16 | ABOUT THE OTHER ASPECTS OF THERANOS'S BUSINESS DURING THIS |
| 12:18PM | 17 | TIME. |
| 12:18PM | 18 | WAS THE LAUNCH OF THERANOS SERVICE CENTERS THE FIRST TIME |
| 12:18PM | 19 | THAT THERANOS WAS REALLY KNOWN TO THE PUBLIC? |
| 12:18PM | 20 | A.   YES. |
| 12:18PM | 21 | Q.   WHAT DID YOU DO TO PLAN TO MAKE THAT ANNOUNCEMENT? |
| 12:18PM | 22 | A.   WE WORKED WITH A TEAM OF MARKETING AND PUBLIC RELATIONS |
| 12:19PM | 23 | ADVISORS ON HOW TO INTRODUCE OUR COMPANY TO THE WORLD. |
| 12:19PM | 24 | Q.   OKAY.  AND WAS IT THE CASE THAT THE COMMERCIAL LAUNCH OF |
| 12:19PM | 25 | THERANOS SERVICE CENTERS HAD ORIGINALLY BEEN SCHEDULED FOR |

| | | |
|---|---|---|
| 12:19PM | 1 | MARCH OF 2013? |
| 12:19PM | 2 | A.   YES. |
| 12:19PM | 3 | Q.   AND WAS THAT DATE DELAYED UNTIL SEPTEMBER OF 2013? |
| 12:19PM | 4 | A.   IT WAS. |
| 12:19PM | 5 | Q.   WHY WAS THAT DATE DELAYED? |
| 12:19PM | 6 | A.   BECAUSE WE, THE TEAMS AT THERANOS AND AT WALGREENS, WERE |
| 12:19PM | 7 | NOT READY TO HIT THE INITIAL LAUNCH DATE.  THERE WERE PEOPLE |
| 12:19PM | 8 | WHO NEEDED TO BE TRAINED IN THE STORES, THERE WERE PROCESSES |
| 12:19PM | 9 | THAT NEEDED TO BE ESTABLISHED, WE WERE STILL BUILDING THE |
| 12:19PM | 10 | COURIER AND THE LOGISTICS INFRASTRUCTURE.  SO WE PUSHED THE |
| 12:19PM | 11 | LAUNCH DATE. |
| 12:19PM | 12 | Q.   OKAY.  WERE YOU ALSO STILL DEVELOPING MARKETING MATERIALS |
| 12:19PM | 13 | AND BRANDING MATERIALS ASSOCIATED WITH THE LAUNCH? |
| 12:19PM | 14 | A.   WE WERE. |
| 12:19PM | 15 | Q.   NOW, WHEN THERE WERE ULTIMATELY MARKETING MATERIALS IN |
| 12:19PM | 16 | PLACE, DID YOU HAVE THE OCCASION TO REVIEW VARIOUS FORMS OF |
| 12:19PM | 17 | MARKETING THAT THERANOS RELEASED TO THE PUBLIC? |
| 12:20PM | 18 | A.   I DID. |
| 12:20PM | 19 | Q.   DID YOU PERSONALLY RESEARCH OR VERIFY EVERY STATEMENT MADE |
| 12:20PM | 20 | IN THOSE MARKETING MATERIALS? |
| 12:20PM | 21 | A.   NO. |
| 12:20PM | 22 | Q.   DID YOU EVER APPROVE ANY MARKETING MATERIALS THAT YOU |
| 12:20PM | 23 | THOUGHT WERE INACCURATE? |
| 12:20PM | 24 | A.   NO. |
| 12:20PM | 25 | Q.   IN THE PERIOD BEFORE YOU STARTED WORKING WITH EXPERTS AND |

7555

12:20PM 1  CONSULTANTS IN THE AREA OF MARKETING AND BRANDING, HAD THERANOS

12:20PM 2  DEVOTED MUCH MONEY OR THOUGHT TO THE PROCESS OF MARKETING AND

12:20PM 3  BRANDING?

12:20PM 4  A.   WE HAD NOT.

12:20PM 5  Q.   WHAT WAS THE PUBLIC PRESENCE OF THERANOS IN THE YEARS 2004

12:20PM 6  TO 2013?

12:20PM 7  A.   IT WAS ALMOST NOTHING.

12:20PM 8  Q.   OKAY.  AND WHEN YOU LAUNCHED, YOU WOULD BE LAUNCHING AS

12:20PM 9  PART OF A PARTNERSHIP WITH WALGREENS?

12:20PM 10  A.   YES.

12:20PM 11  Q.   AND WAS WALGREENS ALREADY A COMPANY THAT WAS WELL

12:20PM 12  ESTABLISHED?

12:20PM 13  A.   YES.

12:20PM 14  Q.   DID YOU HAVE ANY CONCERNS WITH RESPECT TO THERANOS'S BRAND

12:20PM 15  BASED ON THE FACT THAT YOU WERE LAUNCHING WITH WALGREENS?

12:20PM 16  A.   WE DID.

12:21PM 17  Q.   WHAT WAS -- WHAT WERE THE CONCERNS THAT YOU HAD?

12:21PM 18  A.   WE WANTED THE CHANCE TO ESTABLISH OUR OWN BRAND AND BE

12:21PM 19  ABLE TO BUILD A COMPANY THAT WOULD NOT JUST BE INSIDE OF

12:21PM 20  WALGREENS, BUT THAT HOPEFULLY WOULD BE A PRODUCT THAT COULD BE

12:21PM 21  AVAILABLE TO PEOPLE WIDELY.

12:21PM 22  Q.   OKAY.  NOW, YOU MENTIONED WORKING WITH CONSULTANTS AND SO

12:21PM 23  FORTH.  WHO DID YOU HIRE TO HELP THERANOS WITH ITS MARKETING

12:21PM 24  AND BRANDING EFFORTS?

12:21PM 25  A.   WE HIRED TBWA/CHIAT/DAY, WHICH WAS A MARKETING AND

7556

| | | |
|---|---|---|
| 12:21PM | 1 | ADVERTISING AGENCY. |
| 12:21PM | 2 | Q.   AND IS THAT SOMETIMES CALLED CHIAT/DAY? |
| 12:21PM | 3 | A.   YES. |
| 12:21PM | 4 | Q.   AND TELL US WHAT YOU UNDERSTOOD CHIAT/DAY WAS WHEN YOU |
| 12:21PM | 5 | HIRED THEM. |
| 12:21PM | 6 | A.   I UNDERSTOOD THAT THEY WERE ONE OF THE BEST MARKETING |
| 12:21PM | 7 | FIRMS, THAT THEY HAD WORKED WITH COMPANIES LIKE APPLE ON THE |
| 12:21PM | 8 | LAUNCH OF MANY DIFFERENT PRODUCTS AND CREATED AMAZING |
| 12:21PM | 9 | ADVERTISEMENTS THAT INTRODUCED NEW BRANDS AND COMPANIES TO THE |
| 12:21PM | 10 | WORLD. |
| 12:21PM | 11 | Q.   AND WHAT ROLE DID YOU EXPECT THEM TO PLAY WITH REGARD TO |
| 12:22PM | 12 | BRANDING AND MARKETING OF THERANOS? |
| 12:22PM | 13 | A.   WE ASKED FOR THEIR HELP IN FIGURING OUT HOW TO INTRODUCE |
| 12:22PM | 14 | THERANOS TO THE WORLD. |
| 12:22PM | 15 | Q.   HOW LONG DID CHIAT/DAY AND THERANOS WORK TOGETHER? |
| 12:22PM | 16 | A.   OVER A YEAR. |
| 12:22PM | 17 | Q.   HOW MUCH DID THERANOS PAY CHIAT/DAY IN CONNECTION WITH ITS |
| 12:22PM | 18 | EFFORTS TO DEVELOP A BRAND FOR ITS TECHNOLOGY? |
| 12:22PM | 19 | A.   MILLIONS OF DOLLARS. |
| 12:22PM | 20 | Q.   DID YOU ATTEND ANY MEETINGS YOURSELF WITH CHIAT/DAY? |
| 12:22PM | 21 | A.   I DID. |
| 12:22PM | 22 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7755. |
| 12:22PM | 23 | A.   I'M NOT SURE IF I HAVE -- |
| 12:22PM | 24 | THE COURT:  I DON'T THINK IT'S IN THE BINDER. |
| 12:22PM | 25 | THE WITNESS:  7755? |

7557

| | | |
|---|---|---|
| 12:22PM | 1 | THE COURT:  7755? |
| 12:23PM | 2 | MR. DOWNEY:  7755. |
| 12:23PM | 3 | THE COURT:  45? |
| 12:23PM | 4 | MR. DOWNEY:  EXCUSE ME A MOMENT, YOUR HONOR. |
| 12:23PM | 5 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 12:23PM | 6 | BY MR. DOWNEY: |
| 12:23PM | 7 | Q.   LET ME PASS 7755, AND WE CAN COME BACK TO THAT. |
| 12:23PM | 8 | BUT I THINK YOU JUST TESTIFIED THAT YOU MET WITH THEM? |
| 12:23PM | 9 | A.   I DID. |
| 12:23PM | 10 | Q.   AND AS A RESULT OF THE MEETINGS THAT YOU HAD WITH THEM, |
| 12:23PM | 11 | WERE YOU ADVISED TO ENGAGE OTHER CONSULTANTS TO HELP WITH THE |
| 12:23PM | 12 | PUBLIC LAUNCH OF THERANOS? |
| 12:23PM | 13 | A.   YES. |
| 12:23PM | 14 | Q.   WHAT OTHER TYPES OF CONSULTANTS DID THERANOS ENGAGE TO |
| 12:23PM | 15 | HELP IT WITH THE PUBLIC LAUNCH OF ITSELF AS A RETAIL COMPANY? |
| 12:23PM | 16 | A.   THERE WERE SEVERAL DIFFERENT GROUPS.  THE ONE WE SPENT THE |
| 12:23PM | 17 | MOST TIME WITH WAS A COMPANY CALLED GROW THAT WAS A PUBLIC |
| 12:24PM | 18 | RELATIONS FIRM. |
| 12:24PM | 19 | Q.   AND WHAT KIND OF THINGS DOES GROW DO? |
| 12:24PM | 20 | A.   THEY HELP COMPANIES BUILD THEIR BRAND.  THEY ADVISE ON HOW |
| 12:24PM | 21 | TO DO MEDIA APPEARANCES, THEY COMMUNICATE WITH THE MEDIA ABOUT |
| 12:24PM | 22 | PIECES, AND WORK FOR THE COMPANY ON DOING MEDIA RELATIONS. |
| 12:24PM | 23 | Q.   DID THEY DO THAT KIND OF WORK FOR THERANOS WHEN YOU WERE |
| 12:24PM | 24 | THERE? |
| 12:24PM | 25 | A.   THEY DID. |

7558

12:24PM  1    Q.   WHEN THERANOS DECIDED TO ANNOUNCE THE PARTNERSHIP WITH

12:24PM  2    WALGREENS, WHAT DID IT DECIDE WAS THE BEST WAY TO MAKE THE

12:24PM  3    ANNOUNCEMENT THAT THERANOS WAS A COMPANY THAT WAS OUT THERE AND

12:24PM  4    DOING BUSINESS?

12:24PM  5    A.   THE ADVICE WE GOT WAS TO DO A COMPANY ANNOUNCEMENT AND

12:24PM  6    THEN SEPARATELY ANNOUNCE THE PARTNERSHIP WITH WALGREENS.

12:24PM  7    Q.   AND WHERE DID YOU DO THE COMPANY ANNOUNCEMENT?

12:24PM  8    A.   WE DID IT THROUGH A PIECE IN "THE WALL STREET JOURNAL" AND

12:24PM  9    THROUGH THE LAUNCH OF A NEW WEBSITE.

12:25PM  10   Q.   AND WAS THAT THE PIECE THAT WE'VE SEEN DURING THE COURSE

12:25PM  11   OF THE TRIAL THAT WAS PREPARED BY JOSEPH RAGO?

12:25PM  12   A.   IT IS.

12:25PM  13   Q.   AND WHY WAS MR. RAGO THE JOURNALIST WHO WROTE THAT ARGUE?

12:25PM  14   A.   HE WAS SOMEONE WHO OUR BOARD MEMBERS HAD KNOWN FOR SOME

12:25PM  15   TIME, AND HE FOCUSSED ON HEALTH CARE ECONOMICS, AND WHAT

12:25PM  16   THERANOS REALLY WANTED TO DO WAS TO CHANGE THE COST OF TESTING.

12:25PM  17       SO HE WAS SOMEONE WHO WE COULD TALK TO ABOUT THAT AND

12:25PM  18   ABOUT WHAT THAT WOULD MEAN FOR MEDICARE AND MEDICAID

12:25PM  19   SPECIFICALLY.

12:25PM  20   Q.   AND WERE YOU INTERVIEWED BY MR. RAGO?

12:25PM  21   A.   I WAS.

12:25PM  22   Q.   AND DID GROW MARKETING WORK WITH MR. RAGO IN PREPARATION

12:25PM  23   OF THAT PIECE?

12:25PM  24   A.   THEY DID.

12:25PM  25   Q.   DID MR. RAGO SPEAK WITH OTHERS AT THERANOS ABOUT

7559

| | | |
|---|---|---|
| 12:25PM | 1 | THERANOS'S OPERATIONS AND THERANOS AS A BUSINESS? |
| 12:25PM | 2 | A.   YES. |
| 12:25PM | 3 | Q.   DID HE SPEAK WITH BOARD MEMBERS? |
| 12:25PM | 4 | A.   YES. |
| 12:25PM | 5 | Q.   DID HE SPEAK WITH OTHER EMPLOYEES OF THE COMPANY? |
| 12:25PM | 6 | A.   YES. |
| 12:25PM | 7 | Q.   DID THERANOS HAVE AN OPPORTUNITY TO REVIEW HIS ARTICLE |
| 12:26PM | 8 | BEFORE IT WAS PUBLISHED? |
| 12:26PM | 9 | A.   YES. |
| 12:26PM | 10 | Q.   WERE YOU THE ONLY PERSON AT THERANOS WHO REVIEWED THAT |
| 12:26PM | 11 | DRAFT OF MR. RAGO'S ARTICLE? |
| 12:26PM | 12 | A.   NO. |
| 12:26PM | 13 | Q.   NOW, WHEN YOU BEGAN TO BE KNOWN AS A PUBLIC COMPANY, WAS |
| 12:26PM | 14 | IT SHORTLY AFTER -- WHEN I SAY "PUBLIC COMPANY," WHEN YOU BEGAN |
| 12:26PM | 15 | TO BE KNOWN IN THE PUBLIC AS A COMPANY, WAS IT SHORTLY AFTER |
| 12:26PM | 16 | THAT THAT THE WALGREENS PARTNERSHIP WAS ANNOUNCED? |
| 12:26PM | 17 | A.   YES. |
| 12:26PM | 18 | Q.   WITHIN THE COUPLE OF DAYS? |
| 12:26PM | 19 | A.   IT WAS. |
| 12:26PM | 20 | Q.   AND HOW WAS THAT ANNOUNCEMENT MADE? |
| 12:26PM | 21 | A.   THROUGH A JOINT PRESS RELEASE WITH WALGREENS. |
| 12:26PM | 22 | Q.   AND WHEN YOU ANNOUNCED THAT PARTNERSHIP, WHAT WERE THE |
| 12:26PM | 23 | FOCUS OF WHAT WALGREENS AND THERANOS TRIED TO CONVEY ABOUT THAT |
| 12:26PM | 24 | PARTNERSHIP? |
| 12:26PM | 25 | A.   THAT WE HAD A NEW KIND OF LABORATORY SERVICE; THAT WE |

7560

| | | |
|---|---|---|
| 12:26PM | 1 | WANTED TO FOCUS ON MAKING THE EXPERIENCE WONDERFUL FOR PEOPLE; |
| 12:27PM | 2 | THAT WE WANTED TO CHANGE THE COST OF TESTING, THE CONVENIENCE |
| 12:27PM | 3 | OF TESTING; THAT WE COULD DO SMALL SAMPLE TESTING; AND THAT WE |
| 12:27PM | 4 | WERE GOING TO INTRODUCE THIS PARTNERSHIP NATIONWIDE. |
| 12:27PM | 5 | Q.   AND WHY DID YOU FOCUS ON SMALL SAMPLES AS PART OF THAT |
| 12:27PM | 6 | ANNOUNCEMENT? |
| 12:27PM | 7 | A.   BECAUSE THIS WAS A UNIQUE INVENTION THAT THERANOS HAD, AND |
| 12:27PM | 8 | WE WERE GOING TO BE THE FIRST LAB TO MAKE IT POSSIBLE DOING |
| 12:27PM | 9 | FINGERSTICK INSTEAD OF VENOUS DRAWS WHEN PEOPLE CAME INTO |
| 12:27PM | 10 | RETAIL. |
| 12:27PM | 11 | Q.   OKAY.  SO THAT -- WHEN WOULD ALL OF THESE ANNOUNCEMENTS |
| 12:27PM | 12 | HAVE OCCURRED? |
| 12:27PM | 13 | A.   THEY OCCURRED IN SEPTEMBER OF 2013. |
| 12:27PM | 14 | Q.   OKAY.  NOW, AFTER THE LAUNCH AT WALGREENS OF THERANOS |
| 12:27PM | 15 | SERVICE CENTERS, DID THERANOS CONTINUE TO WORK WITH THE FDA TO |
| 12:27PM | 16 | TRY TO MAKE SUBMISSIONS IN CONNECTION WITH ITS TECHNOLOGY? |
| 12:27PM | 17 | A.   WE DID. |
| 12:27PM | 18 | Q.   AND YOU TESTIFIED THAT THERANOS HAD NOT -- DECIDED NOT TO |
| 12:28PM | 19 | USE THE 4 SERIES DEVICE IN THAT CLINICAL LABORATORY; CORRECT? |
| 12:28PM | 20 | A.   YES. |
| 12:28PM | 21 | Q.   BUT IT STILL INTENDED TO APPLY TO THE FDA FOR APPROVAL FOR |
| 12:28PM | 22 | THE 4 SERIES SYSTEM.  CORRECT? |
| 12:28PM | 23 | A.   YES, WE FOCUSSED THERE. |
| 12:28PM | 24 | Q.   AND DID YOU START THE PROCESS IN THE FALL OF 2013 OF |
| 12:28PM | 25 | ENGAGING WITH THE FDA ABOUT THAT? |

| | | |
|---|---|---|
| 12:28PM | 1 | A.   YES. |
| 12:28PM | 2 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15030. |
| 12:28PM | 3 | A.   OKAY.  I DON'T KNOW THAT I HAVE THAT ONE, EITHER. |
| 12:29PM | 4 | Q.   ALL RIGHT.  LET ME HAND IT TO YOU IN A MOMENT. |
| 12:29PM | 5 | A.   AWESOME. |
| 12:29PM | 6 | MR. DOWNEY:  YOUR HONOR, I'VE PASSED UP A NEW |
| 12:29PM | 7 | NOTEBOOK TO YOU AND EXHIBIT 15030 IS IN THERE. |
| 12:29PM | 8 | MAY I APPROACH THE WITNESS WITH HER COPY? |
| 12:29PM | 9 | THE COURT:  YES. |
| 12:29PM | 10 | THIS IS VOLUME 3 I BELIEVE.  IS THAT RIGHT? |
| 12:29PM | 11 | MR. DOWNEY:  VOLUME 3 WILL BE WITH YOU ONLY BRIEFLY |
| 12:29PM | 12 | BECAUSE IT CONSISTS OF SOME VERY LARGE DOCUMENTS, BUT I WILL -- |
| 12:29PM | 13 | (HANDING.) |
| 12:29PM | 14 | THE WITNESS:  WHAT WAS THE EXHIBIT NUMBER ONE MORE |
| 12:29PM | 15 | TIME. |
| 12:29PM | 16 | MR. DOWNEY:  IT'S 15030. |
| 12:30PM | 17 | THE WITNESS:  OKAY. |
| 12:30PM | 18 | BY MR. DOWNEY: |
| 12:30PM | 19 | Q.   IS 15030 AN EMAIL FORWARDING A SUBMISSION TO THE FDA IN |
| 12:30PM | 20 | CONNECTION WITH THERANOS'S TECHNOLOGY? |
| 12:30PM | 21 | A.   YES. |
| 12:30PM | 22 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:30PM | 23 | 15030. |
| 12:30PM | 24 | MR. LEACH:  ONE MOMENT, YOUR HONOR. |
| 12:30PM | 25 | (PAUSE IN PROCEEDINGS.) |

7562

| 12:30PM | 1 | MR. LEACH:  NO OBJECTION. |
|---|---|---|

12:30PM   1        MR. LEACH:  NO OBJECTION.

12:30PM   2        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:30PM   3        (DEFENDANT'S EXHIBIT 15030 WAS RECEIVED IN EVIDENCE.)

12:30PM   4    BY MR. DOWNEY:

12:30PM   5    Q.   LOOK AT THE EMAIL ON THE COVER OF THIS SUBMISSION.  THIS

12:30PM   6    IS AN EMAIL FROM YOU IN SEPTEMBER OF 2013 TO A SALLY HOJVAT.

12:30PM   7        WHO IS SALLY HOJVAT?

12:31PM   8    A.   SHE WAS THE HEAD OF THE MICROBIOLOGY DIVISION AT THE FDA

12:31PM   9    DEVICE CENTER.

12:31PM   10   Q.   AND IF YOU SEE WHAT APPEARS TO BE AN ATTACHMENT AT THE

12:31PM   11   BOTTOM OF THAT LINE, IT READS, "THERANOS CONFIDENTIAL PRE-SUB

12:31PM   12   REQUEST FOR PRE-SUBMISSION MEETING."

12:31PM   13       DO YOU SEE THAT?

12:31PM   14   A.   I DO.

12:31PM   15   Q.   AND WHAT WAS THAT?

12:31PM   16   A.   THIS WAS OUR PRESUBMISSION FOR A SERIES OF TESTS FOR

12:31PM   17   INFLUENZA MEASURING THE ANTIBODIES AND THE PCR TYPE TESTS.

12:31PM   18   Q.   AND CAN YOU, CAN YOU TURN TO PAGE 13 OF THE ATTACHMENT.

12:31PM   19   A.   OKAY.

12:31PM   20   Q.   AND IS THIS PART OF ACTUALLY THE TEXT OF WHAT WAS

12:31PM   21   SUBMITTED TO THE FDA AS PART OF PRESUBMISSION FOR THE THERANOS

12:32PM   22   TECHNOLOGY THAT IS THE SUBJECT OF THIS SUBMISSION?

12:32PM   23   A.   IT IS.

12:32PM   24   Q.   AND IF YOU LOOK AT THE FIRST PARAGRAPH HERE, IT DESCRIBES

12:32PM   25   THAT THIS IS A 510(K) PRESUBMISSION FOR AN AUTOMATED SAMPLE

7563

| | | |
|---|---|---|
| 12:32PM | 1 | PROCESSING AND ANALYSIS SYSTEM, WHICH IT CALLS THE THERANOS |
| 12:32PM | 2 | SYSTEM. |
| 12:32PM | 3 | AND IT GOES ON TO SAY THAT THAT IS COMPOSED OF TSPU'S, |
| 12:32PM | 4 | TLAS, AND TWO ASSAYS. |
| 12:32PM | 5 | DO YOU SEE THAT? |
| 12:32PM | 6 | A.   YES.   I THINK IT'S GROUPS OF ASSAYS. |
| 12:32PM | 7 | Q.   OKAY.   AND THOSE ARE THE THREE COMPONENTS OF THE |
| 12:32PM | 8 | TECHNOLOGY THAT WE HAVE BEEN TALKING ABOUT THROUGHOUT YOUR |
| 12:32PM | 9 | TECHNOLOGY? |
| 12:32PM | 10 | A.   YES. |
| 12:32PM | 11 | Q.   THAT IS THE HARDWARE, THE ASSAYS, AND THE SOFTWARE? |
| 12:32PM | 12 | A.   EXACTLY. |
| 12:32PM | 13 | Q.   AND IS THIS WHAT THERANOS INTENDED TO SUBMIT TO THE FDA |
| 12:32PM | 14 | FOR REVIEW AND APPROVAL? |
| 12:32PM | 15 | A.   THIS IS THE FIRST FILING IN THE PROCESS OF GETTING |
| 12:33PM | 16 | ULTIMATELY AN FDA APPROVAL. |
| 12:33PM | 17 | Q.   OKAY.   AND WE WON'T GO THROUGH THIS DOCUMENT, BUT DOES |
| 12:33PM | 18 | THIS DOCUMENT INCLUDE, AMONG OTHER THINGS, A GOOD DEAL OF DATA |
| 12:33PM | 19 | DOCUMENTING HOW THE THERANOS SYSTEM HAS PERFORMED IN ANALYZING |
| 12:33PM | 20 | BLOOD SAMPLES? |
| 12:33PM | 21 | A.   WE INCLUDED THAT HERE, YES. |
| 12:33PM | 22 | Q.   OKAY.   LET ME ASK YOU JUST TO LOOK AT PAGE 17.   AND IF YOU |
| 12:33PM | 23 | LOOK AT FIGURE 2, AND THEN THE DESCRIPTIONS UNDERNEATH. |
| 12:33PM | 24 | IS FIGURE 2 IN THIS SUBMISSION A DEPICTION OF THE INSIDE |
| 12:33PM | 25 | AND OUTSIDE OF THE 4.0 SERIES DEVICE? |

7564

| | | |
|---|---|---|
| 12:33PM | 1 | A.   YES. |
| 12:33PM | 2 | Q.   NOW, DID YOU BELIEVE AT THE TIME OF THIS SUBMISSION THAT |
| 12:33PM | 3 | THIS DEVICE HAD THE CAPACITY TO PERFORM ALL FOUR OF THE ASSAY |
| 12:34PM | 4 | METHODS THAT WE'VE BEEN DISCUSSING? |
| 12:34PM | 5 | A.   I DID. |
| 12:34PM | 6 | Q.   IS THAT WHY YOU MADE THIS SUBMISSION, PRESUBMISSION TO THE |
| 12:34PM | 7 | FDA? |
| 12:34PM | 8 | A.   YES, AND I BELIEVED IT WAS READY TO GET FDA APPROVAL. |
| 12:34PM | 9 | Q.   AND THE ASSAYS THAT ARE THE SUBJECT OF THIS PARTICULAR |
| 12:34PM | 10 | PRESUBMISSION, WHAT KIND OF ASSAYS ARE THEY AMONGST THE FOUR |
| 12:34PM | 11 | METHODS? |
| 12:34PM | 12 | A.   THIS PRESUBMISSION HAD A NUMBER OF INFLUENZA TESTS, FOR |
| 12:34PM | 13 | EXAMPLE, FOR INFLUENZA A, B, LOOKING AT THE ANTIBODIES, AND |
| 12:34PM | 14 | ALSO THE PCR FOR THOSE TESTS COMBINED. |
| 12:34PM | 15 | Q.   AND ARE THOSE IMMUNOASSAYS, CYTOMETRY, WHAT -- |
| 12:34PM | 16 | A.   IMMUNOASSAYS AND NUCLEIC ACID AMPLIFICATION ASSAYS, |
| 12:34PM | 17 | THERANOS HAD ITS OWN METHOD FOR PCR, WHICH IS WHY WE CALLED IT |
| 12:34PM | 18 | NUCLEIC ACID AMPLIFICATION. |
| 12:34PM | 19 | Q.   OKAY.  IF YOU LOOK AT THE SAME -- IN THE SAME NOTEBOOK AT |
| 12:35PM | 20 | EXHIBIT 15028. |
| 12:35PM | 21 | MY QUESTION WILL BE, IS THIS JUST ANOTHER PRESUBMISSION |
| 12:35PM | 22 | THAT YOU MADE IN CONNECTION WITH THE 4 SERIES SYSTEM TO THE |
| 12:35PM | 23 | FDA? |
| 12:35PM | 24 | A.   IT IS. |
| 12:35PM | 25 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |

7565

| | | |
|---|---|---|
| 12:35PM | 1 | 15028. |
| 12:35PM | 2 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:35PM | 3 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:35PM | 4 | (DEFENDANT'S EXHIBIT 15028 WAS RECEIVED IN EVIDENCE.) |
| 12:35PM | 5 | BY MR. DOWNEY: |
| 12:35PM | 6 | Q.   AND IF YOU LOOK AT EXHIBIT 7380.  LET ME KNOW WHEN YOU'RE |
| 12:35PM | 7 | THERE. |
| 12:35PM | 8 | A.   OKAY. |
| 12:35PM | 9 | Q.   AND IS THIS A SUBMISSION IN CONNECTION WITH ADDITIONAL |
| 12:36PM | 10 | ASSAYS MADE TO THE FDA AT THE END OF 2013? |
| 12:36PM | 11 | A.   YES. |
| 12:36PM | 12 | Q.   ULTIMATELY DID THERANOS FILE WITH THE FDA PRESUBMISSION IN |
| 12:36PM | 13 | CONNECTION WITH ITS 4.0 DEVICE AND ITS SOFTWARE SYSTEM IN |
| 12:36PM | 14 | CONNECTION WITH ASSAYS IN ALL FOUR CATEGORIES? |
| 12:36PM | 15 | A.   WE DID, YES. |
| 12:36PM | 16 | Q.   DID YOU ALSO MEET WITH THE FDA IN THE FALL OF 2013 TO |
| 12:36PM | 17 | DISCUSS THE BUSINESS MODEL UNDER WHICH THERANOS WAS OPERATING? |
| 12:36PM | 18 | A.   YES. |
| 12:36PM | 19 | Q.   WHY DID YOU DO THAT? |
| 12:36PM | 20 | A.   BECAUSE WE WANTED TO SHARE THAT MODEL WITH THEM AND BEGIN |
| 12:36PM | 21 | THE PROCESS OF WORKING WITH THEM ON TAKING LABORATORY DEVELOPED |
| 12:36PM | 22 | TESTS AND GETTING THEM FDA APPROVED. |
| 12:37PM | 23 | Q.   LET ME ASK YOU TO LOOK IN THE SAME NOTEBOOK AT |
| 12:37PM | 24 | EXHIBIT 1095. |
| 12:37PM | 25 | A.   OKAY. |

7566

12:37PM 1    Q.   IF YOU LOOK AT EXHIBIT 1095, IS THIS ANOTHER EMAIL THAT

12:37PM 2    YOU SENT TO MS. HOJVAT?

12:37PM 3    A.   YES.

12:37PM 4    Q.   AND AM I RIGHT THAT THIS EMAIL DOESN'T HAVE ANYTHING TO DO

12:37PM 5    WITH ASKING THE FDA TO APPROVE ANY PARTICULAR ASSAYS OR ANY

12:37PM 6    PARTICULAR TECHNOLOGY; IS THAT RIGHT?

12:37PM 7    A.   NO.   I THINK IT WAS A MORE GENERAL COMMUNICATION.

12:37PM 8    Q.   WAS THIS TO REQUEST A MEETING IN PART ABOUT THERANOS'S

12:38PM 9    BUSINESS MODEL?

12:38PM 10   A.   YES.

12:38PM 11          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:38PM 12   1095.

12:38PM 13          MR. LEACH:  NO OCTOBER.

12:38PM 14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:38PM 15       (GOVERNMENT'S EXHIBIT 1095 WAS RECEIVED IN EVIDENCE.)

12:38PM 16   BY MR. DOWNEY:

12:38PM 17   Q.   DO YOU SEE THE ADDRESS AT THE TOP, DO YOU SEE THAT THIS IS

12:38PM 18   AN EMAIL THAT YOU SENT MS. HOJVAT ON SEPTEMBER THE 6TH OF 2013?

12:38PM 19   A.   YES.

12:38PM 20   Q.   AND THAT WAS RIGHT AROUND THE TIME THAT THE PARTNERSHIP

12:38PM 21   WITH WALGREENS WAS ANNOUNCED; CORRECT?

12:38PM 22   A.   YES.

12:38PM 23   Q.   IF YOU LOOK AT THE EMAIL, AND YOU SAY IN THE FIRST

12:38PM 24   PARAGRAPH THAT YOU'RE REQUESTING A MEETING WITH THE FDA?

12:38PM 25   A.   I AM.

12:38PM  1      Q.   AND WAS THAT IN CONNECTION WITH DISCUSSING THERANOS'S

12:38PM  2      BUSINESS MODEL?

12:38PM  3      A.   YES.

12:38PM  4      Q.   NOW, IN THE THIRD PARAGRAPH OF THIS EMAIL, YOU SAY TO

12:39PM  5      MS. HOJVAT AND OTHERS -- WHICH IS SPELLED H-O-J-V-A-T -- THAT

12:39PM  6      "WE HAVE FIGURED OUT HOW TO EFFECTIVELY VIDEOTAPE THE INSIDE OF

12:39PM  7      OUR DEVICES EXECUTING NUCLEIC ACID AMPLIFICATION PROTOCOLS AND

12:39PM  8      HAVE BEEN BUILDING A SECURE WEBSITE TO POST THAT ON FOR YOU TO

12:39PM  9      ACCESS."

12:39PM  10          DO YOU SEE THAT?

12:39PM  11     A.   YES.

12:39PM  12     Q.   WHAT IS THAT REFERRING TO?

12:39PM  13     A.   THAT'S REFERRING TO THE FACT THAT WE WOULD VIDEO THE

12:39PM  14     INSIDE OF THE DEVICES ACTUALLY RUNNING THE TESTS FROM END TO

12:39PM  15     END AND WERE SHARING THAT WITH THE FDA.

12:39PM  16     Q.   AND DID YOU ULTIMATELY USE THAT VIDEO IN CONNECTION WITH

12:39PM  17     THE MEETINGS WITH THE FDA?

12:39PM  18     A.   YES.

12:39PM  19     Q.   NOW, I THINK YOU TESTIFIED EARLIER TODAY THAT IN

12:40PM  20     CONNECTION WITH A NUMBER OF OTHER AUDIENCES, YOU HAD CONCERNS

12:40PM  21     ABOUT TRADE SECRETS AND SO FORTH IN CONNECTION WITH THERANOS

12:40PM  22     TECHNOLOGY; IS THAT RIGHT?

12:40PM  23     A.   YES.

12:40PM  24     Q.   WHY WERE YOU WILLING TO SHOW THE FDA HOW THE INSIDE OF A

12:40PM  25     THERANOS DEVICE WORKED WHEN YOU HAD THOSE KINDS OF CONCERNS?

7568

| | | |
|---|---|---|
| 12:40PM | 1 | A. BECAUSE I UNDERSTOOD THAT THEY HAD MEANS TO PROTECT TRADE |
| 12:40PM | 2 | SECRETS FOR THE COMPANIES THAT WORKED WITH THE FDA. |
| 12:40PM | 3 | Q. DID YOU HAVE ANY CONCERN ABOUT SHARING THESE DETAILS ABOUT |
| 12:40PM | 4 | THERANOS TECHNOLOGY WITH THE FDA? |
| 12:40PM | 5 | A. NO. |
| 12:40PM | 6 | Q. DID YOU THINK THAT THEY MIGHT THINK THAT THE TECHNOLOGY |
| 12:40PM | 7 | DIDN'T WORK? |
| 12:40PM | 8 | A. NO. |
| 12:40PM | 9 | Q. LET ME ASK YOU NEXT TO LOOK AT EXHIBIT 1177. |
| 12:41PM | 10 | A. OKAY. |
| 12:41PM | 11 | Q. DO YOU HAVE THAT? |
| 12:41PM | 12 | A. I DO. |
| 12:41PM | 13 | Q. AND DO YOU SEE THAT THIS IS ANOTHER COMMUNICATION WITH THE |
| 12:41PM | 14 | FDA IN OCTOBER OF 2013? |
| 12:41PM | 15 | A. YES. |
| 12:41PM | 16 | Q. AND YOU SENT THIS COMMUNICATION TO THE FDA? |
| 12:41PM | 17 | A. I DID. |
| 12:41PM | 18 | MR. DOWNEY: YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:41PM | 19 | 1177. |
| 12:41PM | 20 | MR. LEACH: NO OBJECTION, YOUR HONOR. |
| 12:41PM | 21 | THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED. |
| 12:41PM | 22 | (GOVERNMENT'S EXHIBIT 1177 WAS RECEIVED IN EVIDENCE.) |
| 12:41PM | 23 | BY MR. DOWNEY: |
| 12:41PM | 24 | Q. NOW, AS YOU WERE HAVING THESE DISCUSSIONS WITH THE FDA, |
| 12:41PM | 25 | DID YOU WANT THEM TO CLEARLY UNDERSTAND THAT THERANOS INTENDED |

7569

| | | |
|---|---|---|
| 12:41PM | 1 | TO OPERATE IN TWO PHASES AT WALGREENS? |
| 12:41PM | 2 | A.   YES. |
| 12:41PM | 3 | Q.   DID YOU WANT THEM TO UNDERSTAND THAT IN PHASE I THERANOS |
| 12:41PM | 4 | WOULD RUN A CENTRAL LABORATORY WHERE SAMPLES WOULD BE ANALYZED? |
| 12:42PM | 5 | A.   YES. |
| 12:42PM | 6 | Q.   DID YOU WANT THEM TO UNDERSTAND THAT IN PHASE II YOU HOPED |
| 12:42PM | 7 | TO PLACE THERANOS DEVICES IN WALGREENS STORES? |
| 12:42PM | 8 | A.   YES. |
| 12:42PM | 9 | Q.   AND IN CONNECTION WITH THOSE DISCUSSIONS, DID THE FDA ASK |
| 12:42PM | 10 | YOU TO DETAIL HOW THERANOS WAS OPERATING DURING PHASE I? |
| 12:42PM | 11 | A.   YES, WE DETAILED IT FOR THEM. |
| 12:42PM | 12 | Q.   OKAY.  LET ME ASK YOU TO LOOK AT, FIRST OF ALL, THE COVER |
| 12:42PM | 13 | EMAIL.  THIS IS A COMMUNICATION THAT YOU SENT IN OCTOBER, |
| 12:42PM | 14 | RIGHT, ABOUT A MONTH OR SO AFTER THE ANNOUNCEMENT? |
| 12:42PM | 15 | A.   YES. |
| 12:42PM | 16 | Q.   AND IF YOU GO TO THE NEXT PAGE, DO YOU SEE IT DENOTES THAT |
| 12:42PM | 17 | THIS IS AN OVERVIEW OF THE SAMPLE PROCESSING WORKFLOW PREPARED |
| 12:42PM | 18 | FOR FDA. |
| 12:42PM | 19 | AND WHAT WERE YOU CONVEYING THERE? |
| 12:42PM | 20 | A.   I WAS CONVEYING HOW OUR PHASE I AND PHASE II OPERATIONS |
| 12:43PM | 21 | WERE PLANNED TO WORK. |
| 12:43PM | 22 | Q.   OKAY.  GO FORWARD FROM THERE. |
| 12:43PM | 23 | THERE'S A SLIDE LABELLED PHASE I CURRENT. |
| 12:43PM | 24 | CAN YOU TELL US WHAT PHASE I CURRENT DESCRIBES? |
| 12:43PM | 25 | A.   YES.  THIS IS A DESCRIPTION OF PHASE I, WHICH WAS HOW WE |

7570

12:43PM   1    WERE CURRENTLY OPERATING, AND THE TEXT IS REALLY HARD TO READ,

12:43PM   2    BUT IT'S ESSENTIALLY SHOWING HOW SAMPLES WERE COLLECTED BY

12:43PM   3    VENIPUNCTURE, FINGERSTICK, OR URINE, PHYSICALLY SHIPPED TO

12:43PM   4    THERANOS, AND THEN RUN IN THERANOS'S LAB EITHER ON CONVENTIONAL

12:43PM   5    ANALYZERS OR ON THE THERANOS -- HERE THEY'RE CALLED TSPU, SAME

12:43PM   6    THING AS MINILAB DEVICES.

12:43PM   7    Q.   OKAY.  AND IF YOU GO TO THE NEXT SLIDE.  AND CAN WE BLOW

12:44PM   8    THAT UP A LITTLE BIT FOR EASE OF READING.

12:44PM   9        THIS SLIDE IS TABLED PHASE II:  POST-FDA CLEARANCE.

12:44PM  10        DO YOU SEE THAT?

12:44PM  11    A.   YES.

12:44PM  12    Q.   AND WHAT IS THIS SLIDE CONVEYING?

12:44PM  13    A.   THIS CONVEYED PHASE II OF OUR PLAN, WHICH AFTER WE GOT FDA

12:44PM  14    CLEARANCE, ON THE LEFT IT DESCRIBES PUTTING THE MINILAB

12:44PM  15    PHYSICALLY INTO THE RETAIL STORE AND THEN TRANSMITTING THE DATA

12:44PM  16    TO OUR CENTRAL LABORATORY WHERE IT COULD BE REVIEWED BY

12:44PM  17    LABORATORIANS, OR STILL PHYSICALLY SHIPPING SAMPLES TO THE

12:44PM  18    THERANOS LAB FOR USE ON TRADITIONAL MACHINES.

12:44PM  19    Q.   OKAY.  AND IF YOU GO BACK TO THE PRIOR SLIDE, THE SLIDE

12:44PM  20    THAT IS LABELLED PHASE I?

12:45PM  21    A.   YES.

12:45PM  22    Q.   DID YOU HAVE ANY HESITATION ABOUT TELLING THE FDA THAT

12:45PM  23    THERE WERE CONVENTIONAL ANALYZERS BEING USED IN PHASE I OF

12:45PM  24    THERANOS'S OPERATIONS?

12:45PM  25    A.   NO.

7571

| | | |
|---|---|---|
| 12:45PM | 1 | Q.   AND THAT IS IN THE BOX THAT IS CONTAINED IN THE UPPER |
| 12:45PM | 2 | LEFT-HAND CORNER ON THE BOX ON THE RIGHT? |
| 12:45PM | 3 | A.   YES.  IT SAYS SAMPLES ARE PROCESSED AND RESULTS ARE |
| 12:45PM | 4 | GENERATED ON CONVENTIONAL ANALYZERS. |
| 12:45PM | 5 | Q.   AND DID YOU ALSO CONVEY TO THE FDA IN MORE EXPLICIT DETAIL |
| 12:45PM | 6 | WHAT TESTS WERE BEING RUN ON WHICH DEVICES? |
| 12:45PM | 7 | A.   YES. |
| 12:45PM | 8 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15029. |
| 12:46PM | 9 | A.   OKAY. |
| 12:46PM | 10 | Q.   IS 15029 ANOTHER COMMUNICATION FROM YOU TO FDA OFFICIALS |
| 12:46PM | 11 | IN THE FALL OF 2013? |
| 12:46PM | 12 | A.   IT IS. |
| 12:46PM | 13 |         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:46PM | 14 | 15029. |
| 12:46PM | 15 |         MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:46PM | 16 |         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:46PM | 17 |     (DEFENDANT'S EXHIBIT 15029 WAS RECEIVED IN EVIDENCE.) |
| 12:46PM | 18 | BY MR. DOWNEY: |
| 12:46PM | 19 | Q.   AND THIS EMAIL AGAIN IS FROM YOU TO MS. HOJVAT; CORRECT? |
| 12:46PM | 20 | A.   YES. |
| 12:46PM | 21 | Q.   AND ALSO TO A JOHN PEYTON HOBSON? |
| 12:46PM | 22 | A.   YES. |
| 12:46PM | 23 | Q.   AND WHO WAS MR. HOBSON? |
| 12:47PM | 24 | A.   HE WAS ANOTHER OFFICIAL WITHIN THE FDA. |
| 12:47PM | 25 | Q.   AND THIS IS SENT OCTOBER 23RD, 2013? |

7572

12:47PM  1    A.   YES.

12:47PM  2    Q.   AND THIS IS ABOUT FIVE WEEKS AFTER THE ANNOUNCEMENT OF THE

12:47PM  3    WALGREENS PARTNERSHIP?

12:47PM  4    A.   YES.

12:47PM  5    Q.   AND LET'S LOOK AT THE FIRST PARAGRAPH OF THE EMAIL THAT

12:47PM  6    YOU SENT.

12:47PM  7         YOU SAY, "IN FOLLOW UP TO OUR CONVERSATIONS ON WHICH

12:47PM  8    ASSAYS RUN ON THERANOS TSPU'S" -- ARE THERANOS TSPU'S, IS THAT

12:47PM  9    A REFERENCE TO THE 4.0 DEVICE?

12:47PM  10   A.   IT'S -- IN THIS SPECIFIC CONTEXT, WE'RE TALKING ABOUT THE

12:47PM  11   3 SERIES.  WE GENERALLY USED THESE WORDS INTERCHANGEABLY, WHICH

12:47PM  12   IS A BIT CONFUSING.

12:47PM  13   Q.   SO WAS ANY HARDWARE DEVICE AT THERANOS KNOWN AS A TSPU?

12:47PM  14   A.   YES.

12:47PM  15   Q.   AND IT GOES ON TO SAY, "WHICH ASSAYS ARE RUN ON THERANOS

12:47PM  16   TSPU'S IN THERANOS'S CLIA LAB DURING PHASE I OF THERANOS'S

12:48PM  17   OPERATIONS."

12:48PM  18        AND IT SAYS, "PLEASE FIND TWO DOCUMENTS ATTACHED TO THIS

12:48PM  19   EMAIL."

12:48PM  20        DO YOU SEE THAT?

12:48PM  21   A.   YES.

12:48PM  22   Q.   AND WHAT CONVERSATIONS DID YOU HAVE WITH MS. HOJVAT AND

12:48PM  23   MR. HOBSON THAT LED YOU TO SUBMIT THE LIST OF ASSAYS THAT IS

12:48PM  24   ATTACHED TO THIS EMAIL?

12:48PM  25   A.   I HAD REACHED OUT TO DR. HOJVAT TO ASK HER WHAT THE BEST

| | | |
|---|---|---|
| 12:48PM | 1 | WAY TO START WORKING WITH THE FDA WAS.  AS WE LAUNCHED OUR |
| 12:48PM | 2 | SERVICES, WE REQUESTED THE INFORMATIONAL MEETING IN THAT |
| 12:48PM | 3 | CONTEXT TO SHARE OUR PLANS, AND SHE SUGGESTED THAT I SEND AS |
| 12:48PM | 4 | MUCH INFORMATION AS I COULD ABOUT HOW WE WERE OPERATING. |
| 12:48PM | 5 | Q.   LET'S LOOK AT THE ATTACHMENT TO THE -- WELL, LET'S |
| 12:48PM | 6 | CONTINUE IN THE EMAIL JUST TO UNDERSTAND THE ATTACHMENT. |
| 12:48PM | 7 | DO YOU SEE IN THE SECOND PARAGRAPH THAT, "THE FIRST |
| 12:48PM | 8 | DOCUMENT LISTS ALL TESTS THAT HAVE BEEN RUN ON SAMPLES |
| 12:48PM | 9 | COLLECTED FROM PATIENTS IN THERANOS WELLNESS CENTERS SINCE THE |
| 12:49PM | 10 | WELLNESS CENTERS BEGAN OPERATION IN SEPTEMBER." |
| 12:49PM | 11 | DO YOU SEE THAT? |
| 12:49PM | 12 | A.   I DO. |
| 12:49PM | 13 | Q.   AND THEN IT GOES ON TO SAY, "THE SECOND DOCUMENT LISTS ALL |
| 12:49PM | 14 | TESTS CURRENTLY PLANNED TO POTENTIALLY BE RUN ON SAMPLES |
| 12:49PM | 15 | COLLECTED IN THERANOS WELLNESS CENTERS." |
| 12:49PM | 16 | DO YOU SEE THAT? |
| 12:49PM | 17 | A.   YES. |
| 12:49PM | 18 | Q.   AND THEN IF YOU GO TO THE ATTACHMENT ON TOP, DO YOU SEE |
| 12:49PM | 19 | THAT THERE'S A DIAGRAM OR A CHART THAT IS LABELLED "TESTS RUN |
| 12:49PM | 20 | IN THERANOS'S CLIA LABORATORY FROM SAMPLES COLLECTED IN |
| 12:49PM | 21 | THERANOS WELLNESS CENTERS"? |
| 12:49PM | 22 | DO YOU SEE THAT? |
| 12:49PM | 23 | A.   I DO. |
| 12:49PM | 24 | Q.   AND THERE ARE THREE COLUMNS? |
| 12:49PM | 25 | A.   YES. |

7574

| | | |
|---|---|---|
| 12:49PM | 1 | Q.   AND IN THE LEFT-HAND COLUMN THERE'S A LIST OF ASSAYS OR |
| 12:49PM | 2 | TESTS? |
| 12:49PM | 3 | A.   YES. |
| 12:49PM | 4 | Q.   AND IN THE MIDDLE THERE'S THE PHRASE CHEMISTRY. |
| 12:49PM | 5 | DO YOU SEE THAT? |
| 12:49PM | 6 | A.   I DO. |
| 12:49PM | 7 | Q.   AND WHAT DOES THAT REFER TO? |
| 12:49PM | 8 | A.   THAT REFERS TO THE ASSAY THAT THERANOS WAS RUNNING. |
| 12:50PM | 9 | Q.   OKAY.  AND IN THE RIGHT-HAND COLUMN THERE'S A REFERENCE TO |
| 12:50PM | 10 | DEVICE. |
| 12:50PM | 11 | WHAT DOES THAT REFER TO? |
| 12:50PM | 12 | A.   THE HARDWARE THAT WAS USED TO RUN THAT ASSAY. |
| 12:50PM | 13 | Q.   OKAY.  AND DO YOU SEE IN SOME OF THE RIGHT-HAND COLUMNS |
| 12:50PM | 14 | THERE ARE REFERENCES TO TSPU'S? |
| 12:50PM | 15 | DO YOU SEE THAT? |
| 12:50PM | 16 | A.   YES. |
| 12:50PM | 17 | Q.   AND THOSE ARE THERANOS DEVICES ON WHICH THOSE TESTS WERE |
| 12:50PM | 18 | BEING RUN? |
| 12:50PM | 19 | A.   YES. |
| 12:50PM | 20 | Q.   AND AT THIS POINT THOSE WERE THREE ASSAYS? |
| 12:50PM | 21 | A.   YES. |
| 12:50PM | 22 | Q.   AND THEN THERE ARE SOME TESTS THAT ARE DESIGNATED AS FDA |
| 12:50PM | 23 | CLEARED/APPROVED. |
| 12:50PM | 24 | DO YOU SEE THAT? |
| 12:50PM | 25 | A.   I DO. |

7575

| | | |
|---|---|---|
| 12:50PM | 1 | Q.   WHAT DOES THAT REFER TO? |
| 12:50PM | 2 | A.   THAT REFERS TO TRADITIONAL MACHINES RUNNING TRADITIONAL |
| 12:50PM | 3 | TESTS. |
| 12:50PM | 4 | Q.   OKAY.  AND SO IF YOU LOOK IN THE MIDDLE COLUMN AT |
| 12:50PM | 5 | CHEMISTRY ON THE BOTTOM HALF OF THE LIST STARTING WITH HBA1C? |
| 12:50PM | 6 | A.   YES. |
| 12:50PM | 7 | Q.   AND IN THE MIDDLE COLUMN IT ALSO SAYS FDA CLEARED/APPROVED |
| 12:51PM | 8 | UNDER CHEMISTRY. |
| 12:51PM | 9 |     WHAT DOES THAT MEAN, "UNDER CHEMISTRY"? |
| 12:51PM | 10 | A.   THAT MEANS THAT IT'S AN FDA APPROVED TEST. |
| 12:51PM | 11 | Q.   OKAY.  SO FOR THESE TESTS, HBA1C, URIC ACID, DHEA-S, |
| 12:51PM | 12 | TESTOSTERONE, TOTAL AND FREE TESTOSTERONE, ARE THOSE BOTH TESTS |
| 12:51PM | 13 | THAT WERE BEING RUN ON VENOUS SAMPLES ON COMMERCIAL MACHINES? |
| 12:51PM | 14 | A.   YES. |
| 12:51PM | 15 | Q.   AND THERE ARE THREE TESTS ABOVE THAT THAT ARE TSH, PSA, |
| 12:51PM | 16 | AND VITAMIN D. |
| 12:51PM | 17 |     DO YOU SEE THAT? |
| 12:51PM | 18 | A.   I DO. |
| 12:51PM | 19 | Q.   AND THOSE ARE RUN ON A THERANOS CHEMISTRY. |
| 12:51PM | 20 |     DO YOU SEE THAT? |
| 12:51PM | 21 | A.   YES. |
| 12:51PM | 22 | Q.   AND DOES THAT MEAN A CHEMISTRY THAT THERANOS DEVELOPED? |
| 12:51PM | 23 | A.   IT DOES. |
| 12:51PM | 24 | Q.   AND THE DEVICE REFERS TO A THERANOS DEVICE FOR THOSE; |
| 12:51PM | 25 | CORRECT? |

7576

| | | |
|---|---|---|
| 12:51PM | 1 | A.   YES. |
| 12:51PM | 2 | Q.   AND THEN IF YOU GO ABOVE THAT TO THE LIPID AND CMP, |
| 12:52PM | 3 | THERE'S A REFERENCE TO THERANOS PROTOCOL IN THE CHEMISTRY. |
| 12:52PM | 4 | DOES THAT MEAN IT WAS A THERANOS ASSAY? |
| 12:52PM | 5 | A.   YES.  IT MEANS THAT IT'S AN FDA CLEARED ASSAY THAT IS |
| 12:52PM | 6 | RUNNING WHAT WE CALLED A THERANOS PROTOCOL. |
| 12:52PM | 7 | SO IT'S RUNNING THE THERANOS FORMULA FOR THE SMALL SAMPLE |
| 12:52PM | 8 | TESTS. |
| 12:52PM | 9 | Q.   AND WHAT DEVICE WERE THOSE SMALL SAMPLES ANALYZED ON? |
| 12:52PM | 10 | A.   ON FDA APPROVED MACHINES. |
| 12:52PM | 11 | Q.   AND THEN THERE'S A TEST, CBC, AND THE CHEMISTRY IS |
| 12:52PM | 12 | THERANOS? |
| 12:52PM | 13 | A.   YES. |
| 12:52PM | 14 | Q.   AND THE DEVICE IS FDA CLEARED/APPROVED. |
| 12:52PM | 15 | DO YOU SEE THAT? |
| 12:52PM | 16 | A.   YES. |
| 12:52PM | 17 | Q.   AND THE CHEMISTRY MEANS THAT THERANOS DEVELOPED THAT |
| 12:52PM | 18 | ASSAY; CORRECT? |
| 12:52PM | 19 | A.   YES, AND ALL OF THE CHEMICALS OR THE REAGENTS THAT WENT |
| 12:52PM | 20 | INTO IT. |
| 12:52PM | 21 | Q.   OKAY.  AND THE DEVICE IS A -- |
| 12:52PM | 22 | A.   THE DEVICE IS AN FDA APPROVED DEVICE. |
| 12:52PM | 23 | Q.   OKAY.  NOW, WHEN YOU WERE SENDING THIS LIST, TELL US IN |
| 12:53PM | 24 | PRACTICAL TERMS, WHAT WERE YOU DISCLOSING TO THE FDA ABOUT THE |
| 12:53PM | 25 | OPERATIONS OF THERANOS'S CLINICAL LABORATORY AS OF THIS DATE? |

7577

12:53PM  1    A.    WE WERE SHARING WITH THE FDA ALL OF THE TESTS THAT HAD

12:53PM  2    BEEN RUN AS OF THAT DATE IN OUR CLIA LABORATORY, WHAT TESTS

12:53PM  3    THEY WERE, WHO MADE THE CHEMISTRY, AND WHAT MACHINE THEY WERE

12:53PM  4    RUN ON.

12:53PM  5    Q.    OKAY.  AND SO YOU WERE FORTHRIGHT WITH THEM THAT SOME OF

12:53PM  6    THE TESTS WERE TRADITIONAL TESTS, VENOUS TESTS BEING RUN ON

12:53PM  7    COMMERCIAL MACHINES?

12:53PM  8    A.    YES.

12:53PM  9    Q.    AND YOU ALSO DISCLOSED TO THEM, DID YOU, THAT SOME OF THE

12:53PM  10   THERANOS CHEMISTRIES WERE BEING USED ON TRADITIONAL COMMERCIAL

12:53PM  11   MACHINES?

12:53PM  12   A.    WE DID.

12:53PM  13   Q.    AND THEN FOR SOME OF THE TESTS, THEY WERE THERANOS

12:53PM  14   DEVELOPED TESTS THAT WERE RUNNING ON THERANOS DEVICES?

12:53PM  15   A.    EXACTLY.

12:53PM  16   Q.    AS FAR AS YOU KNOW, IS ALL OF THE INFORMATION IN THIS

12:53PM  17   DOCUMENT ACCURATE?

12:53PM  18   A.    YES.

12:53PM  19   Q.    AND DID YOU DISCLOSE THE MEANING OF THE VARIOUS

12:53PM  20   TERMINOLOGIES RELATED TO THERANOS PROTOCOL THAT YOU USED IN THE

12:54PM  21   FOOTNOTE?

12:54PM  22   A.    YES.

12:54PM  23   Q.    WERE THE ASSAYS THAT WERE BEING RUN ON COMMERCIAL DEVICES

12:54PM  24   THAT WERE -- WHERE THE CHEMISTRY AS DENOTED AS THERANOS

12:54PM  25   PROTOCOL, DO YOU SEE THAT?

7578

12:54PM   1    A.   I DO.

12:54PM   2    Q.   ARE THOSE TESTS THAT WERE USED IN CONNECTION WITH EITHER

12:54PM   3    THE ADVIA OR ONE OF THE OTHER COMMERCIAL MACHINES THAT YOU'VE

12:54PM   4    DESCRIBED?

12:54PM   5    A.   YES.  THE CMP AND THE LIPID TEST THAT ARE LABELLED

12:54PM   6    THERANOS PROTOCOL WERE RUNNING ON THE ADVIA.

12:54PM   7    Q.   OKAY.  AND IF WE GO TO THE NEXT PAGE OF EXHIBIT 15029.

12:54PM   8    YOU SEE THAT THIS CONTAINS A FURTHER CHART?

12:54PM   9    A.   YES.

12:54PM  10    Q.   AND EXPLAIN THIS CHART TO US.

12:54PM  11    A.   THIS CHART IS SHOWING ALL OF THE TESTS THAT WE PLANNED TO

12:54PM  12    RUN IN OUR CLIA LABORATORY, WHAT THE CHEMISTRY OR THE ASSAY

12:55PM  13    WOULD BE, WHAT DEVICE THE ASSAY WOULD RUN ON, WHAT THE METHOD

12:55PM  14    WAS ACROSS THE FOUR METHODS THAT WE WERE WORKING WITH, AND WHAT

12:55PM  15    TYPE OF SAMPLE WOULD BE USED, WHOLE BLOOD OR URINE, OR OTHERS.

12:55PM  16    Q.   OKAY.  SO, AGAIN, IN SOME INSTANCES HERE, WERE YOU

12:55PM  17    DISCLOSING THE THERANOS PLAN TO USE TRADITIONAL COMMERCIAL

12:55PM  18    DEVICES?

12:55PM  19    A.   YES.

12:55PM  20    Q.   AND SOMETIMES USED THEM WITH A VENOUS TEST?

12:55PM  21    A.   YES.

12:55PM  22    Q.   AND SOMETIMES USED THEM RUNNING SMALL SAMPLE TESTS THAT

12:55PM  23    THERANOS HAD DEVELOPED?

12:55PM  24    A.   YES.

12:55PM  25    Q.   AND THAT THOSE COMMERCIAL DEVICES HAD BEEN MODIFIED TO RUN

12:55PM 1    THOSE TESTS?

12:55PM 2    A.   YES.

12:55PM 3    Q.   AND YOU WERE ALSO DISCLOSING THAT IN SOME INSTANCES

12:55PM 4    THERANOS WOULD RUN TECHNOLOGY WITH THERANOS ASSAYS THAT WOULD

12:55PM 5    RUN ON A THERANOS DEVICE?

12:55PM 6    A.   EXACTLY.

12:55PM 7    Q.   AND AS FAR AS YOU KNOW, ALL OF THE INFORMATION IN THIS

12:55PM 8    SECOND ATTACHMENT IS ACCURATE AS WELL; CORRECT?

12:55PM 9    A.   YES.

12:55PM 10   Q.   ANY HESITATION ABOUT DISCLOSING THIS TO THE FDA?

12:56PM 11   A.   NO.

12:56PM 12   Q.   OKAY.  DID YOU HAVE SUBSEQUENT CONVERSATIONS IN WHICH YOU

12:56PM 13   DISCUSSED THE INFORMATION IN THESE ATTACHMENTS WITH

12:56PM 14   REPRESENTATIVES OF THE FDA?

12:56PM 15   A.   I DID.

12:56PM 16   Q.   AND AGAIN, WHY WERE YOU COMFORTABLE DOING THAT, BUT NOT

12:56PM 17   WITH WALGREENS, DISCUSSING IT WITH WALGREENS OR OTHERS WHO

12:56PM 18   WE'VE HEARD FROM IN THIS CASE?

12:56PM 19   A.   AGAIN, I UNDERSTOOD THAT THE FDA IS A GOVERNMENT AGENCY,

12:56PM 20   HAD THE MECHANISMS IN PLACE TO BE ABLE TO PROTECT TRADE SECRETS

12:56PM 21   FOR THE MANY COMPANIES THAT WORK WITH THE FDA.

12:56PM 22   Q.   OKAY.  LET'S TURN TO SOME OF THE OTHER AUDIENCES THAT

12:56PM 23   THERANOS -- WELL, LET'S ACTUALLY TALK FOR A MOMENT ABOUT --

12:56PM 24   LET'S TALK ABOUT DISCUSSIONS WITHIN THERANOS ABOUT THE USE OF

12:56PM 25   THE VARIOUS FORMS OF DEVICES.

7580

| | | |
|---|---|---|
| 12:56PM | 1 | AS OF OCTOBER OF 2013, WHO WAS THE NON-EXECUTIVE CHAIR OF |
| 12:57PM | 2 | THERANOS'S BOARD? |
| 12:57PM | 3 | A.   GEORGE SHULTZ. |
| 12:57PM | 4 | Q.   AND YOU WERE THE -- ACTUALLY THE CHAIRMAN, THE FORMAL |
| 12:57PM | 5 | CHAIRMAN OF THE BOARD? |
| 12:57PM | 6 | A.   OH, YES, SORRY.  HE WAS THE EXECUTIVE CHAIR.  I WAS THE |
| 12:57PM | 7 | FORMAL CHAIRMAN. |
| 12:57PM | 8 | Q.   OKAY.  HOW DID YOU COME TO KNOW SECRETARY SHULTZ? |
| 12:57PM | 9 | A.   THROUGH A PROFESSOR AT STANFORD. |
| 12:57PM | 10 | Q.   AND DID YOU ASK SECRETARY SHULTZ AT SOME POINT TO JOIN THE |
| 12:57PM | 11 | BOARD? |
| 12:57PM | 12 | A.   YES. |
| 12:57PM | 13 | Q.   AND WHY DID YOU ASK HIM TO BECOME A BOARD MEMBER AT |
| 12:57PM | 14 | THERANOS? |
| 12:57PM | 15 | A.   I FIRST LEARNED ABOUT HIS BOOK ON HEALTH CARE ECONOMICS |
| 12:57PM | 16 | AND WAS REALLY INTERESTED IN HIS INSIGHTS THERE, AND I KNEW |
| 12:57PM | 17 | THAT HE HAD BEEN A BOARD MEMBER OF GILEAD, WHICH IS A BIOTECH |
| 12:57PM | 18 | COMPANY I REALLY ADMIRED, AND OTHER GREAT COMPANIES. |
| 12:57PM | 19 | HE HAD BEEN A LEADER IN PUBLIC SERVICE, AND I THOUGHT I |
| 12:57PM | 20 | COULD LEARN FROM HIM. |
| 12:57PM | 21 | Q.   NOW, WE SPOKE EARLIER ABOUT MR. DON LUCAS. |
| 12:57PM | 22 | DO YOU RECALL THAT? |
| 12:57PM | 23 | A.   YES. |
| 12:57PM | 24 | Q.   AND HE HAD BEEN THE CHAIRMAN OF THE BOARD FOR A NUMBER OF |
| 12:58PM | 25 | YEARS? |

7581

12:58PM   1    A.   YES.

12:58PM   2    Q.   AND HE STEPPED BACK FOR HEALTH REASONS FROM THERANOS?

12:58PM   3    A.   HE DID.

12:58PM   4    Q.   AND AT THE TIME THAT SECRETARY SHULTZ BECAME THE

12:58PM   5    NON-EXECUTIVE CHAIRMAN, DID HE RECRUIT ADDITIONAL MEMBERS OF --

12:58PM   6    NEW MEMBERS TO THERANOS'S BOARD?

12:58PM   7    A.   YES.

12:58PM   8    Q.   WHAT OTHER MEMBERS DID HE RECRUIT TO THERANOS'S BOARD

12:58PM   9    AFTER HE BECAME THE CHAIRMAN?

12:58PM   10   A.   HE RECRUITED MANY PEOPLE.  HE RECRUITED DICK KOVACEVICH

12:58PM   11   FROM WELLS FARGO, GENERAL MATTIS, ADMIRAL ROUGHHEAD, SENATOR

12:58PM   12   SAM NUNN, DR. KISSINGER, DR. BILL PERRY, AND OTHERS.

12:58PM   13   Q.   WOULD YOU MEET WITH THOSE INDIVIDUALS BEFORE THEY JOINED

12:58PM   14   THE BOARD?

12:58PM   15   A.   YES.

12:58PM   16   Q.   AND DID THEY JOIN THE BOARD OVER THE COURSE OF 2013?

12:58PM   17   A.   YES.

12:58PM   18   Q.   AS BOARD MEMBERS, WOULD THERE BE COMPENSATION FOR THEM?

12:59PM   19   A.   YES.

12:59PM   20   Q.   HOW WERE THEY COMPENSATED?

12:59PM   21   A.   THEY EACH RECEIVED A SALARY OF $150,000 A YEAR, AS WELL AS

12:59PM   22   HALF A MILLION SHARES IN THE COMPANY.  AND SOME OF THEM ALSO

12:59PM   23   RECEIVED CONSULTING SALARIES OF, IN DR. KISSINGER'S CASE, HALF

12:59PM   24   A MILLION DOLLARS A YEAR.

12:59PM   25   Q.   HOW OFTEN DID THERANOS'S BOARD MEMBERS MEET IN THE PERIOD

| | | |
|---|---|---|
| 12:59PM | 1 | OF 2013 TO 2015? |
| 12:59PM | 2 | A.   FOUR TIMES A YEAR. |
| 12:59PM | 3 | Q.   I'D LIKE TO FOCUS YOUR ATTENTION ON SOME SPECIFIC BOARD |
| 12:59PM | 4 | MEETINGS THAT HAPPENED DURING THOSE YEARS. |
| 12:59PM | 5 | LET ME ASK YOU TO LOOK AT 4005. |
| 01:00PM | 6 | A.   OKAY. |
| 01:00PM | 7 | Q.   LET ME ASK YOU, DID THE THERANOS BOARD TYPICALLY MEET IN |
| 01:00PM | 8 | OCTOBER OF THE YEAR? |
| 01:00PM | 9 | A.   YES. |
| 01:00PM | 10 | Q.   AND DID THE THERANOS BOARD MEET IN OCTOBER 2013? |
| 01:00PM | 11 | A.   WE DID. |
| 01:00PM | 12 | Q.   AND WAS THAT JUST WEEKS AFTER THE LAUNCH OF THERANOS |
| 01:00PM | 13 | SERVICE CENTERS HAD BEEN ANNOUNCED? |
| 01:00PM | 14 | A.   YES. |
| 01:00PM | 15 | Q.   AND DO YOU RECALL DISCUSSING AT THAT BOARD MEETING SOME OF |
| 01:00PM | 16 | THE ISSUES IN CONNECTION WITH THE LAUNCH OF THERANOS SERVICE |
| 01:00PM | 17 | CENTERS? |
| 01:00PM | 18 | A.   I DO. |
| 01:00PM | 19 | Q.   IS EXHIBIT 4005 A COPY OF THE MINUTES OF THE MEETING IN |
| 01:00PM | 20 | OCTOBER 2013? |
| 01:00PM | 21 | A.   YES. |
| 01:01PM | 22 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 01:01PM | 23 | 4005. |
| 01:01PM | 24 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 01:01PM | 25 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |

7583

| | | |
|---|---|---|
| 01:01PM | 1 | (DEFENDANT'S EXHIBIT 4005 WAS RECEIVED IN EVIDENCE.) |
| 01:01PM | 2 | BY MR. DOWNEY: |
| 01:01PM | 3 | Q.   IF YOU LOOK AT THE FIRST PAGE, DO YOU SEE THAT GIVES THE |
| 01:01PM | 4 | DATE OF THAT BOARD MEETING AS OCTOBER 8TH, 2013? |
| 01:01PM | 5 | A.   YES. |
| 01:01PM | 6 | Q.   AND DO YOU RECALL THAT GENERAL MATTIS TESTIFIED IN THIS |
| 01:01PM | 7 | TRIAL THAT THIS WAS THE FIRST MEETING HE ATTENDED AFTER AN ALL |
| 01:01PM | 8 | NIGHT CROSS COUNTRY TRIP? |
| 01:01PM | 9 | A.   YES. |
| 01:01PM | 10 | Q.   IF YOU WOULD LOOK AT THE PAGES 2 -- PAGE 2, AND LOOK UNDER |
| 01:01PM | 11 | STRATEGIC PLAN. |
| 01:01PM | 12 | IF YOU COULD BLOW THAT UP. |
| 01:01PM | 13 | DO YOU SEE IN THE FIRST SENTENCE THERE IT SAYS THAT YOU |
| 01:02PM | 14 | DISCUSSED THE ANNOUNCEMENT OF THE COMPANY'S PARTNERSHIP WITH |
| 01:02PM | 15 | WALGREENS? |
| 01:02PM | 16 | A.   YES. |
| 01:02PM | 17 | Q.   AND DO YOU RECALL DOING THAT AT THAT MEETING? |
| 01:02PM | 18 | A.   I DO. |
| 01:02PM | 19 | Q.   AND THEN IT SAYS IN THE SECOND SENTENCE, "THE BOARD THEN |
| 01:02PM | 20 | DISCUSSED THE COMPANY'S APPROACH TO ITS RETAIL LAUNCH AND THE |
| 01:02PM | 21 | ASSOCIATED STEPS IT WAS TAKING TO BUILD A STRONG FOUNDATION ON |
| 01:02PM | 22 | WHICH TO GROW FOR THE LONG-TERM." |
| 01:02PM | 23 | DO YOU RECALL THAT? |
| 01:02PM | 24 | A.   YES. |
| 01:02PM | 25 | Q.   AND WHAT DO YOU RECALL HAPPENING WITH RESPECT TO THAT |

7584

01:02PM    1    DISCUSSION?

01:02PM    2    A.   I RECALL TALKING TO THE BOARD MEMBERS AND ASKING FOR THEIR

01:02PM    3    ADVICE ON HOW WE SET UP THIS BUSINESS TO BE SUCCESSFUL FOR THE

01:02PM    4    LONG-TERM, WHAT THINGS I SHOULD BE FOCUSSED ON INTERNALLY IN

01:02PM    5    ORDER TO DO SO.

01:02PM    6    Q.   DO YOU SEE IN THE NEXT SENTENCE IT SAYS, "MS. HOLMES THEN

01:02PM    7    REVIEWED WITH THE BOARD THE TRADE SECRET ELEMENTS OF THE

01:02PM    8    COMPANY'S WORK.   CERTAIN MATTERS DISCUSSED WITH THE BOARD WHICH

01:02PM    9    THE COMPANY NEEDED TO PROTECT FROM PUBLIC DISCLOSURE FOR

01:03PM   10    COMPETITIVE REASONS WERE HIGHLIGHTED."

01:03PM   11        DO YOU SEE THAT?

01:03PM   12    A.   YES.

01:03PM   13    Q.   WHAT DO YOU RECALL ABOUT THE DISCUSSION THAT IS MENTIONED

01:03PM   14    IN THOSE TWO SENTENCES?

01:03PM   15    A.   THAT WE WERE SHARING WITH THE BOARD THAT WE HAD THESE

01:03PM   16    TRADE SECRET INVENTIONS, THAT THEY WERE INVENTIONS THAT WE

01:03PM   17    THOUGHT WERE A BIG DEAL AND THAT WE NEEDED TO PROTECT BECAUSE

01:03PM   18    IF OTHER BIG COMPANIES IN THE INDUSTRY FOUND OUT ABOUT THEM,

01:03PM   19    THEY COULD PUT US OUT OF BUSINESS AND --

01:03PM   20    Q.   WHAT INVENTIONS WERE YOU -- SPECIFICALLY WERE YOU

01:03PM   21    DISCUSSING WITH THE BOARD AT THIS OCTOBER 2013 BOARD MEETING?

01:03PM   22    A.   THE INVENTION THAT WE COULD TAKE A SMALL SAMPLE AND BE

01:03PM   23    ABLE TO RUN THAT SAMPLE ON A TRADITIONAL MACHINE.

01:03PM   24    Q.   AND I THINK I INTERRUPTED YOUR ANSWER, BUT DO YOU RECALL

01:03PM   25    MORE ABOUT THAT DISCUSSION OF TRADE SECRETS AT THE BOARD

01:03PM  1    MEETING IN OCTOBER OF 2013?

01:03PM  2    A.   I DO.

01:03PM  3    Q.   TELL US WHAT YOU RECALL OF THAT DISCUSSION.

01:03PM  4    A.   I RECALL DISCUSSING WITH THE BOARD WHETHER THIS INVENTION

01:04PM  5    SHOULD, IN FACT, BE TREATED AS A TRADE SECRET OR WHETHER WE

01:04PM  6    SHOULD FILE IT THROUGH PUBLIC PATENTS, THE DECISION TO PRESERVE

01:04PM  7    IT AS A TRADE SECRET, AND TALKING ABOUT THE ACTIONS THAT WOULD

01:04PM  8    BE REQUIRED TO ACTUALLY MAINTAIN TRADE SECRET PROTECTION.

01:04PM  9    Q.   AND WAS THERE DISCUSSION AMONGST BOARD MEMBERS REGARDING

01:04PM  10   THAT ISSUE?

01:04PM  11   A.   THERE WAS.

01:04PM  12   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

01:04PM  13   A.   I RECALL THAT DAVID BOIES, WHO WAS OUR COUNSEL, SPOKE WITH

01:04PM  14   THE BOARD ABOUT THE TRADE SECRET RECOMMENDATION, AND THAT

01:04PM  15   ANOTHER ONE OF OUR BOARD MEMBERS, SENATOR NUNN, HAD BEEN ON THE

01:04PM  16   COCA-COLA BOARD AND HE TALKED WITH US ABOUT THE COCA-COLA

01:04PM  17   FORMULA AND HOW IT WAS PROTECTED AS A TRADE SECRET AND SOME OF

01:04PM  18   THE MEASURES THAT WENT INTO PROTECTING TRADE SECRETS SO THAT

01:04PM  19   PEOPLE DIDN'T FIND OUT ABOUT THE INVENTION.

01:05PM  20   Q.   NOW, IN CONNECTION WITH BOARD MEETINGS, WAS IT TYPICAL FOR

01:05PM  21   THE MANAGEMENT THAT THERANOS, YOURSELF OR OTHERS, TO CIRCULATE

01:05PM  22   TO BOARD MEMBERS PACKETS OF INFORMATION SO THAT THEY COULD

01:05PM  23   REVIEW THAT IN ADVANCE?

01:05PM  24   A.   WE DID SOMETIMES.

01:05PM  25   Q.   WAS THAT DONE TO YOUR KNOWLEDGE IN ADVANCE OF THE

7586

01:05PM  1    OCTOBER 2013 MEETING?

01:05PM  2    A.   I KNOW WE HAD A PACKET OF INFORMATION THAT WE SHARED WITH

01:05PM  3    THEM.  I'M NOT SURE WHEN WE SHARED IT.

01:05PM  4    Q.   OKAY.  LET ME ASK YOU TO LOOK AT A DOCUMENT THAT IS

01:05PM  5    ALREADY IN EVIDENCE, WHICH IS MARKED EXHIBIT 10516.

01:05PM  6    A.   OKAY.

01:05PM  7    Q.   DO YOU SEE THAT EXHIBIT 10516 IS TITLED AN INTELLECTUAL

01:05PM  8    PROPERTY PORTFOLIO STATUS REPORT?

01:05PM  9    A.   YES.

01:05PM  10   Q.   IS THIS A DOCUMENT THAT WAS PROVIDED TO THE BOARD OF

01:06PM  11   DIRECTORS IN CONNECTION WITH THE OCTOBER 2013 MEETING?

01:06PM  12   A.   IT IS.

01:06PM  13   Q.   AND IF YOU GO TO THE ATTACHMENTS TO THIS, I'D LIKE TO GO

01:06PM  14   FORWARD IN THESE TO PAGE 53.

01:06PM  15        AND CAN YOU EXPLAIN TO US WHAT THIS LIST IS ON PAGE 53 OF

01:06PM  16   EXHIBIT 10516?

01:06PM  17   A.   THIS IS A LIST OF ALL OF OUR PATENTS AND PATENT

01:06PM  18   APPLICATIONS AT THAT POINT IN TIME.

01:06PM  19   Q.   OKAY.  AND IF YOU LOOK AT THE -- I GUESS ABOUT MAYBE

01:06PM  20   ALMOST HALFWAY DOWN, DO YOU SEE THE -- THAT IN THE FAR

01:06PM  21   RIGHT-HAND COLUMN THERE ARE A NUMBER OF, THERE ARE A NUMBER OF

01:06PM  22   DATES.

01:06PM  23        DO YOU SEE THAT?

01:06PM  24   A.   I DO.

01:06PM  25   Q.   AND THEY'RE ALL UNDER THE COLUMN FILING DATE?

7587

01:06PM   1     A.   YES.

01:06PM   2     Q.   AND DO YOU SEE THAT THERE APPEAR TO BE A NUMBER OF FILING

01:07PM   3     DATES THAT ARE FROM SEPTEMBER OF 2013.

01:07PM   4          DO YOU SEE THAT?

01:07PM   5     A.   YES.

01:07PM   6     Q.   AND IF YOU GO TO THE NEXT PAGE.  I DON'T KNOW IF IT

01:07PM   7     CONTINUES OR NOT ACTUALLY.

01:07PM   8          YEAH, IF YOU HIGHLIGHT THE NEXT SEVERAL ON THE NEXT PAGE.

01:07PM   9     GO UP TO THERE.

01:07PM   10         AND IN THAT RIGHT-HAND COLUMN THERE APPEAR TO BE SEVERAL

01:07PM   11    DOZEN PATENTS WHICH WERE FILED IN SEPTEMBER 2013.

01:07PM   12         DO YOU SEE THAT?

01:07PM   13    A.   I DO.

01:07PM   14    Q.   AND IF YOU LOOK IN THE SECOND COLUMN, THERE'S A COLUMN

01:07PM   15    THAT IS DENOTED TITLE.

01:07PM   16         DO YOU SEE THAT?

01:07PM   17    A.   YES.

01:07PM   18    Q.   AND UNDER THAT ARE THE -- ARE THOSE THE NAMES THAT HAD

01:07PM   19    BEEN USED IN CONNECTION WITH THE PATENT APPLICATIONS?

01:07PM   20    A.   YES.

01:07PM   21    Q.   CAN YOU EXPLAIN WHAT ALL OF THESE PATENTS ARE THAT WERE

01:07PM   22    FILED IN -- PATENT APPLICATIONS THAT WERE FILED IN

01:08PM   23    SEPTEMBER 2013 BY THERANOS?

01:08PM   24    A.   YES.  THEY'RE PATENTS THAT ARE ASSOCIATED WITH THE

01:08PM   25    TECHNOLOGIES FOR THE LAUNCH OF OUR SERVICES AT WALGREENS.  I

01:08PM  1    CAN GO THROUGH A COUPLE OF THEM IF YOU WANTED.

01:08PM  2    Q.   WELL, JUST TELL US GENERALLY, WITHOUT GOING THROUGH THEM

01:08PM  3    INDIVIDUALLY, WHAT KINDS OF TECHNOLOGIES ARE THEY PATENTS FOR?

01:08PM  4    A.   THEY ARE PATENTS FOR THE COLLECTION DEVICES FOR DOING

01:08PM  5    FINGERSTICK OR VENOUS DRAWS IN THE STORE; THEY'RE PATENTS FOR

01:08PM  6    THE SYSTEMS THAT WE WOULD RUN IN THE LABORATORY AND SOME OF THE

01:08PM  7    SOFTWARE WE WERE USING FOR LABORATORY OVERSIGHT; AND THEY'RE

01:08PM  8    PATENTS FOR THE TESTING METHODS IN THE LABORATORY.

01:08PM  9    Q.   OKAY.   AND DO ANY OF THESE PATENT APPLICATIONS RELATE TO

01:08PM  10   THE INVENTIONS THAT YOU HAD DESCRIBED EARLIER TODAY WITH

01:08PM  11   RESPECT TO COMMERCIAL MACHINES AND SMALL SAMPLES?

01:09PM  12   A.   YES.

01:09PM  13   Q.   CAN YOU IDENTIFY THE PATENT APPLICATIONS THAT WERE

01:09PM  14   ASSOCIATED WITH THAT?

01:09PM  15   A.   THE FIRST ONE HERE IS DEVICES, METHODS, AND SYSTEMS FOR

01:09PM  16   REDUCING SAMPLE VOLUMES.   THAT HAD TO DO WITH THE INVENTION

01:09PM  17   THAT WOULD ALLOW US TO TAKE A REALLY SMALL AMOUNT OF FLUID AND

01:09PM  18   RUN THAT SAMPLE ON A TRADITIONAL MACHINE.

01:09PM  19   Q.   WHY WERE YOU SHARING THIS SUMMARY WITH THE BOARD OF

01:09PM  20   DIRECTORS IN OCTOBER OF 2013?

01:09PM  21   A.   WE SHARED UPDATES ON OUR PATENTS AT EVERY MEETING, AND

01:09PM  22   HERE WE WERE TALKING ABOUT THESE INVENTIONS THAT WERE

01:09PM  23   ASSOCIATED WITH THE LAUNCH AT WALGREENS, THE TECHNOLOGIES THAT

01:09PM  24   WE WERE GOING TO BE USING, AND IN THE CASE OF THAT INVENTION,

01:09PM  25   THE DECISION TO FILE IT AS A NONPUBLIC APPLICATION AS WE SOUGHT

7589

| | | |
|---|---|---|
| 01:09PM | 1 | TO MAINTAIN TRADE SECRET PROTECTION. |
| 01:09PM | 2 | Q.   HOW LONG WOULD BOARD MEETINGS TYPICALLY BE AT THERANOS? |
| 01:10PM | 3 | A.   A FULL DAY, AND SOMETIMES DINNERS THE NIGHT BEFORE AND |
| 01:10PM | 4 | AFTER. |
| 01:10PM | 5 | Q.   IF YOU WOULD IN THAT SAME NOTEBOOK, WOULD YOU GO TO THE |
| 01:10PM | 6 | EXHIBIT THAT HAS BEEN MARKED AS EXHIBIT 1172. |
| 01:10PM | 7 | A.   YES.  OKAY. |
| 01:10PM | 8 | Q.   IS THIS A SLIDE DECK THAT WAS PROVIDED TO THE BOARD OF |
| 01:10PM | 9 | DIRECTORS FOR PURPOSES OF THAT OCTOBER 2013 MEETING? |
| 01:10PM | 10 | A.   IT IS. |
| 01:10PM | 11 | Q.   I JUST WANT TO FOCUS YOU, WITHOUT GOING INTO DETAIL, I'M |
| 01:11PM | 12 | GOING TO BE DRAWING YOUR ATTENTION TO CERTAIN PAGES IN THE |
| 01:11PM | 13 | EXHIBIT THAT BEGIN AROUND PAGE 146. |
| 01:11PM | 14 | IF YOU COULD REVIEW THAT. |
| 01:11PM | 15 | YOUR HONOR, I'LL MOVE THE ADMISSION OF EXHIBIT 1172. |
| 01:11PM | 16 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 01:11PM | 17 | THE COURT:  IT'S ADMITTED. |
| 01:11PM | 18 | MR. DOWNEY:  I SHOULD SAY FOR PURPOSES OF CLARITY |
| 01:11PM | 19 | AND THE RECORD, WE PREVIOUSLY ADMITTED 1172A. |
| 01:11PM | 20 | I'M ADMITTING THE BALANCE OF 1172, AND FOR OUR PURPOSES, |
| 01:12PM | 21 | 1172 CAN REPLACE 1172A, WHICH WAS A PROVISIONAL EXHIBIT. |
| 01:12PM | 22 | THE COURT:  ANY OBJECTION TO THAT? |
| 01:12PM | 23 | MR. LEACH:  NO, YOUR HONOR. |
| 01:12PM | 24 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:12PM | 25 | WE'LL THEN REPLACE -- THIS WILL BE ADMITTED WITHOUT |

7590

| | | |
|---|---|---|
| 01:12PM | 1 | OBJECTION.  IT WILL REPLACE 1172A. |
| 01:12PM | 2 | (GOVERNMENT'S EXHIBIT 1172 WAS RECEIVED IN EVIDENCE.) |
| 01:12PM | 3 | MR. DOWNEY:  IF WE CAN PUBLISH THIS. |
| 01:12PM | 4 | Q.  IS THIS THE SLIDE DECK THAT WAS USED TO HELP DIRECT |
| 01:12PM | 5 | DISCUSSION AT THE OCTOBER 2013 BOARD MEETING? |
| 01:12PM | 6 | A.  IT IS. |
| 01:12PM | 7 | Q.  I'D LIKE YOU TO GO FORWARD IN THAT EXHIBIT TO PAGE 146. |
| 01:12PM | 8 | DO YOU HAVE THAT? |
| 01:12PM | 9 | WE CAN JUST PUT THAT UP ON THE SCREEN. |
| 01:12PM | 10 | A.  YES. |
| 01:12PM | 11 | Q.  AND DO YOU SEE THAT THAT IS A SLIDE LABELED CLINICAL DATA? |
| 01:12PM | 12 | A.  IT IS. |
| 01:12PM | 13 | Q.  AND IF YOU JUST PAGE THROUGH THAT GOING FORWARD, DO YOU |
| 01:12PM | 14 | SEE THAT THIS IS SEVERAL PAGES OF CHARTS OF PROVIDING WHAT |
| 01:12PM | 15 | SEEMS TO BE SOME FORM OF DATA? |
| 01:13PM | 16 | A.  YES. |
| 01:13PM | 17 | Q.  AND WHAT IS THAT? |
| 01:13PM | 18 | A.  THESE ARE WHAT WE CALLED CLINICAL CORRELATIONS, WHICH IS |
| 01:13PM | 19 | ACTUAL HUMAN SAMPLES RUN ON THE THERANOS TEST AND THE |
| 01:13PM | 20 | TRADITIONAL TEST, AND COMPARING THE RESULTS. |
| 01:13PM | 21 | Q.  WHY DID YOU PROVIDE THIS CLINICAL DATA TO THE BOARD OF |
| 01:13PM | 22 | DIRECTORS AT THERANOS? |
| 01:13PM | 23 | A.  BECAUSE WE WANTED THEM TO SEE THE ACTUAL DATA ON THE |
| 01:13PM | 24 | PERFORMANCE OF THE TESTS WE'D DEVELOPED. |
| 01:13PM | 25 | Q.  AFTER THIS OCTOBER 2013 MEETING, DID YOU TRY TO RECRUIT |

7591

| | | |
|---|---|---|
| 01:13PM | 1 | BOARD MEMBERS WHO HAD EXPERTISE IN THE MEDICAL AND BIOTECH |
| 01:13PM | 2 | AREAS? |
| 01:13PM | 3 | A.   I DID. |
| 01:13PM | 4 | Q.   AND WERE THOSE MEMBERS PRESENT AT THIS OCTOBER 2013 |
| 01:13PM | 5 | MEETING? |
| 01:13PM | 6 | A.   NO. |
| 01:13PM | 7 | Q.   WHO WERE THE MEMBERS THAT YOU RECRUITED SUBSEQUENT TO THIS |
| 01:13PM | 8 | MEETING? |
| 01:13PM | 9 | A.   DR. BILL FOEGE AND DR. BILL FRIST. |
| 01:14PM | 10 | Q.   WHO WAS DR. FOEGE? |
| 01:14PM | 11 | A.   DR. FOEGE HAD RAN THE CDC AND HAD BEEN AWARDED THE MEDAL |
| 01:14PM | 12 | OF FREEDOM FOR HIS WORK IN HELPING TO ERADICATE SMALLPOX. |
| 01:14PM | 13 | Q.   AND WHO IS DR. FRIST? |
| 01:14PM | 14 | A.   DR. FRIST IS A SURGEON.  HE HAD BEEN A SENATOR AND HE WAS |
| 01:14PM | 15 | AT THAT POINT A VENTURE CAPITAL INVESTOR IN A NUMBER OF HEALTH |
| 01:14PM | 16 | CARE TECHNOLOGY COMPANIES. |
| 01:14PM | 17 | Q.   AS OF THE 2013 MEETING -- STRIKE THAT. |
| 01:14PM | 18 | AT THE 2013 MEETING, DID THE DIRECTORS DISCUSS OR ASK |
| 01:14PM | 19 | QUESTIONS ABOUT THE CLINICAL DATA THAT HAD BEEN PROVIDED? |
| 01:14PM | 20 | A.   WE PRESENTED IT.  THERE WERE NOT QUESTIONS ASKED ABOUT IT. |
| 01:14PM | 21 | Q.   WHAT WERE THE DISCUSSIONS -- WHAT WAS THE USUAL SUBJECT OF |
| 01:14PM | 22 | DISCUSSIONS AT THERANOS BOARD MEETINGS IN 2013? |
| 01:14PM | 23 | A.   THE DIRECTORS MOSTLY FOCUSSED ON STRATEGIC QUESTIONS LIKE |
| 01:14PM | 24 | SHOULD WE FOCUS ON WORK IN HOSPITALS OR IN RETAIL, CERTAIN |
| 01:15PM | 25 | INTERNATIONAL PLANS THEY THOUGHT WE SHOULD CONSIDER, AND OTHER |

| | | |
|---|---|---|
| 01:15PM | 1 | PROJECTS THEY THOUGHT MIGHT BE IMPORTANT FOR THE COMPANY. |
| 01:15PM | 2 | Q.   OKAY.  DID -- AT SOME POINT AFTER THE OCTOBER 2013 BOARD |
| 01:15PM | 3 | MEETING -- WELL, LET ME, BEFORE I GET TO THAT, LET ME ASK YOU, |
| 01:15PM | 4 | AFTER THE LAUNCH OF THE THERANOS SERVICE CENTERS, WAS THE PLAN |
| 01:15PM | 5 | AT THAT TIME THAT THERE WOULD BE A NATIONAL ROLLOUT OF THERANOS |
| 01:15PM | 6 | SERVICE CENTERS IN WALGREENS STORES? |
| 01:15PM | 7 | A.   YES. |
| 01:15PM | 8 | Q.   AND DID YOU HAVE AN AGREEMENT WITH THERANOS IN PLACE AT |
| 01:15PM | 9 | THE TIME THAT THE PARTNERSHIP WAS PUBLICLY ANNOUNCED AS TO HOW |
| 01:15PM | 10 | THAT WOULD GO? |
| 01:15PM | 11 | A.   WITH WALGREENS, YES. |
| 01:15PM | 12 | Q.   AND DID YOU BEGIN TO HAVE DISCUSSIONS WITH THEM AROUND THE |
| 01:15PM | 13 | TIME OF THAT LAUNCH AS TO HOW TO MODIFY THE AGREEMENTS IN PLACE |
| 01:16PM | 14 | SO THAT YOU COULD AGREE IN MORE SPECIFIC TERMS AS TO HOW A |
| 01:16PM | 15 | ROLLOUT WOULD GO? |
| 01:16PM | 16 | A.   YES, AND SPECIFICALLY TO REALIZE OUR GOAL OF NATIONAL |
| 01:16PM | 17 | EXPANSION FASTER. |
| 01:16PM | 18 | Q.   OKAY.  LET ME SHOW YOU A DOCUMENT WHICH IS ALREADY IN |
| 01:16PM | 19 | EVIDENCE, WHICH IS EXHIBIT 7312. |
| 01:16PM | 20 | A.   OKAY. |
| 01:16PM | 21 | Q.   AND DO YOU SEE THAT THIS IS AN EMAIL THAT YOU SENT TO |
| 01:16PM | 22 | MR. MIQUELON IN AUGUST OF 2013? |
| 01:16PM | 23 | A.   YES. |
| 01:16PM | 24 | Q.   AND WAS MR. MIQUELON AT THIS TIME THE CHIEF FINANCIAL |
| 01:16PM | 25 | OFFICER AT WALGREENS? |

7593

| | | |
|---|---|---|
| 01:16PM | 1 | A.   HE WAS. |
| 01:16PM | 2 | Q.   AND DO YOU SEE THAT IN THIS EMAIL YOU DISCUSS WITH HIM |
| 01:17PM | 3 | WHAT YOU BELIEVE TO BE THE MOST EFFECTIVE ROLLOUT STRATEGY FOR |
| 01:17PM | 4 | THERANOS STORES IN -- THERANOS SERVICE CENTERS IN WALGREENS |
| 01:17PM | 5 | STORES? |
| 01:17PM | 6 | A.   I DO. |
| 01:17PM | 7 | Q.   LET'S GO TO PAGE 10 OF THIS EXHIBIT. |
| 01:17PM | 8 | DO YOU SEE PAGE 10? |
| 01:17PM | 9 | A.   I DO, YES. |
| 01:17PM | 10 | Q.   AND TELL US WHAT PAGE 10 IS DEPICTING ON THIS ROLLOUT PLAN |
| 01:17PM | 11 | PROPOSAL THAT YOU SENT TO WALGREENS IN AUGUST OF 2013? |
| 01:17PM | 12 | A.   THIS IS DEPICTING THE PLAN THAT WE HAD FOR THE FOURTH |
| 01:17PM | 13 | QUARTER OF 2014 AS TO HOW MANY STATES WE'D BE IN TO BEGIN |
| 01:17PM | 14 | MAKING UP THIS NATIONAL FOOTPRINT. |
| 01:17PM | 15 | Q.   SO ARE THE STATES THAT ARE IN GREEN ON THIS CHART THE |
| 01:18PM | 16 | STATES WHERE YOU THOUGHT THERANOS SERVICE CENTERS WOULD BE IN |
| 01:18PM | 17 | WALGREENS STORES? |
| 01:18PM | 18 | A.   BY THAT TIME, YES. |
| 01:18PM | 19 | Q.   OKAY.  AND HOW MANY WALGREENS LOCATIONS DID YOU PROPOSE |
| 01:18PM | 20 | THAT THERANOS SERVICE CENTERS WOULD BE IN BY THE FOURTH QUARTER |
| 01:18PM | 21 | OF 2014? |
| 01:18PM | 22 | A.   JUST OVER 6,000. |
| 01:18PM | 23 | Q.   AND YOU MADE THIS PROPOSAL IN AUGUST OF 2013? |
| 01:18PM | 24 | A.   YES. |
| 01:18PM | 25 | Q.   NOW, DID YOU, AFTER THE TIME THAT YOU MADE THIS PROPOSAL, |

7594

01:18PM  1    BEGIN TO NEGOTIATE WITH WALGREENS ABOUT THE NUMBER OF WALGREENS

01:18PM  2    STORES IN WHICH THERANOS SERVICE CENTERS WOULD OPERATE IN 2014

01:18PM  3    AND 2015?

01:18PM  4    A.   YES.

01:18PM  5    Q.   AND DID YOU SUBSEQUENTLY REACH AN AGREEMENT WITH WALGREENS

01:18PM  6    AS TO HOW THE ROLLOUT WOULD WORK OF THERANOS SERVICE CENTERS?

01:18PM  7    A.   YES.

01:18PM  8    Q.   AND DURING WHAT PERIOD WERE YOU NEGOTIATING THAT

01:19PM  9    AGREEMENT?

01:19PM  10   A.   THE FALL TO DECEMBER OF 2013.

01:19PM  11   Q.   OKAY.  AND DID YOU ULTIMATELY REACH AN AGREEMENT AT THE

01:19PM  12   END OF 2013?

01:19PM  13   A.   WE DID.

01:19PM  14   Q.   AND DID YOU COME TO AN AGREEMENT AS TO THE NUMBER OF

01:19PM  15   STORES IN WHICH THERANOS WOULD OPERATE IN 2014 AND 2015?

01:19PM  16   A.   YES.

01:19PM  17   Q.   AND WHAT NUMBER DID THERANOS AND WALGREENS AGREE TO AT THE

01:19PM  18   END OF 2013?

01:19PM  19   A.   I REMEMBER IT AS AT LEAST 3,000 STORES OVER THE NEXT TWO

01:19PM  20   YEARS.

01:19PM  21   Q.   AND FOR WALGREENS COMMITMENT TO LAUNCH THERANOS SERVICE

01:19PM  22   CENTERS, WHAT DID WALGREENS GET IN RETURN?

01:19PM  23   A.   WALGREENS GOT A PROMISE OF EXCLUSIVITY, WHICH MEANT THAT

01:19PM  24   WE WOULD NOT WORK WITH CERTAIN COMPETITORS THAT THEY HAD

01:19PM  25   IDENTIFIED WITHOUT THEIR PERMISSION.

7595

01:19PM 1    Q.    OKAY.  AND IN THE FIRST HALF OF 2014, WHAT DID YOU

01:20PM 2    UNDERSTAND ABOUT HOW THAT ROLLOUT BETWEEN WALGREENS AND

01:20PM 3    THERANOS WAS GOING?

01:20PM 4    A.    I UNDERSTOOD IT WAS GOING WELL.

01:20PM 5    Q.    DID YOU UNDERSTAND THAT THERE WERE ISSUES WITH IT?

01:20PM 6    A.    I UNDERSTOOD THAT ISSUES WERE COMING UP, YES.

01:20PM 7    Q.    AND DID YOU HEAR AT SOME POINTS ABOUT THE NUMBER OF VENOUS

01:20PM 8    DRAWS THAT WERE BEING REQUIRED IN SERVICE CENTERS, THERANOS

01:20PM 9    SERVICE CENTERS AT WALGREENS STORES.

01:20PM 10   A.    I DID.

01:20PM 11   Q.    AND DID YOU EVER UNDERSTAND THAT THAT WAS SOMETHING THAT

01:20PM 12   WOULD PREVENT OR SLOW DOWN THE ROLLOUT OF THERANOS SERVICE

01:20PM 13   CENTERS?

01:20PM 14   A.    NO.

01:20PM 15   Q.    NOW, YOU'RE AWARE THAT BY THE END OF 2014, ONLY 40

01:20PM 16   THERANOS SERVICE CENTERS HAD OPENED IN WALGREENS STORES?

01:20PM 17   A.    YES.

01:20PM 18   Q.    AND DID YOU BELIEVE THAT THAT WOULD SLOW THE PACE OF THE

01:20PM 19   NATIONAL ROLLOUT IN THE COMING YEARS?

01:20PM 20   A.    I DID NOT.

01:20PM 21   Q.    WHAT HAPPENED INSIDE OF WALGREENS IN THE MIDDLE OF 2014

01:21PM 22   THAT CHANGED TO SOME EXTENT THE RELATIONSHIP DYNAMICS WITH

01:21PM 23   WALGREENS?

01:21PM 24   A.    WALGREENS ACQUIRED A COMPANY CALLED BOOTS, AND THE BOOTS

01:21PM 25   LEADERSHIP ENDED UP REPLACING THE WALGREENS LEADERSHIP.

7596

01:21PM  1    Q.   AND WHAT HAPPENED TO MR. MIQUELON IN AUGUST OF 2014 WITH

01:21PM  2    REGARD TO A ROLE AT WALGREENS?

01:21PM  3    A.   HE LEFT WALGREENS.

01:21PM  4    Q.   AND WHO BECAME THE PRINCIPAL SENIOR EXECUTIVE RESPONSIBLE

01:21PM  5    FOR MANAGING THE RELATIONSHIP BETWEEN THERANOS AND WALGREENS AT

01:21PM  6    WALGREENS?

01:21PM  7    A.   ALEX GOURLAY.

01:21PM  8    Q.   AND DID YOU ENGAGE WITH MR. GOURLAY DURING 2014 ABOUT THE

01:21PM  9    ROLLOUT OF THERANOS SERVICE CENTERS?

01:21PM  10   A.   I DID.

01:21PM  11   Q.   TELL US ABOUT THOSE DISCUSSIONS.

01:21PM  12   A.   I WORKED WITH ALEX GOURLAY ON HOW TO ACHIEVE OUR GOALS OF

01:22PM  13   A NATIONAL ROLLOUT, AND ULTIMATELY ON THE IDEA THAT WE COULD

01:22PM  14   RENT SPACE WITHIN THE WALGREENS STORES TO BE ABLE TO ACHIEVE

01:22PM  15   THAT GOAL FASTER.

01:22PM  16   Q.   NOW, YOU'RE AWARE THAT MR. JHAVERI TESTIFIED THAT THERE

01:22PM  17   WERE ONLY -- THAT ONLY 40 SERVICE CENTERS OR SO HAD ROLLED OUT

01:22PM  18   BY AUGUST.

01:22PM  19        DO YOU RECALL THAT?

01:22PM  20   A.   I DO.

01:22PM  21   Q.   AND DO YOU RECALL THAT HE TESTIFIED THAT WALGREENS WAS NO

01:22PM  22   LONGER COMMITTED TO ROLLING OUT IN 3,000 STORES AT SOME POINT

01:22PM  23   BETWEEN JULY OF 2014 AND OCTOBER OF 2014?

01:22PM  24   A.   I HEARD THAT.

01:22PM  25   Q.   WAS THE TESTIMONY THAT MR. JHAVERI GAVE IN THIS CASE ON

7597

01:22PM 1    THE ISSUE OF THE NUMBER OF STORES THAT WOULD HAVE THERANOS

01:22PM 2    SERVICE CENTERS, WAS THAT CONSISTENT WITH THE CONVERSATIONS

01:22PM 3    THAT YOU WERE HAVING WITH MR. GOURLAY IN THE SECOND HALF OF

01:23PM 4    2014?

01:23PM 5    A.   NO.

01:23PM 6    Q.   WAS THERE EVER A TIME THAT YOU UNDERSTOOD BY THE END OF

01:23PM 7    2014 THAT WALGREENS WOULD NOT AGREE TO OPEN ADDITIONAL THERANOS

01:23PM 8    SERVICE CENTERS?

01:23PM 9    A.   THERE WAS NOT.

01:23PM 10   Q.   DID MR. JHAVERI EVER TELL YOU THAT WALGREENS PLANNED TO

01:23PM 11   SLOW ITS ROLLOUT OF STORES?

01:23PM 12   A.   HE DID NOT.

01:23PM 13   Q.   DID MR. BALWANI EVER TELL YOU THAT HE BELIEVED THAT

01:23PM 14   THERANOS WOULD NOT CONTINUE TO ROLL OUT SERVICE CENTERS IN

01:23PM 15   WALGREENS STORES?

01:23PM 16   A.   NO.

01:23PM 17   Q.   TO THE EXTENT THAT WALGREENS HAD MADE A DECISION TO THAT

01:23PM 18   EFFECT, WOULD YOU HAVE EXPECTED MR. GOURLAY OR OTHERS AT

01:23PM 19   WALGREENS TO COMMUNICATE THAT TO YOU?

01:23PM 20   A.   DEFINITELY, YES.

01:23PM 21   Q.   NOW, OVER THE COURSE OF THE TIME THAT THERANOS SERVICE

01:24PM 22   CENTERS WERE OPERATING IN WALGREENS STORES, DID YOU RECEIVE

01:24PM 23   REPORTS OF THERANOS'S PERFORMANCE IN THOSE WALGREENS SERVICE

01:24PM 24   CENTERS?

01:24PM 25   A.   I DID.

| | | |
|---|---|---|
| 01:24PM | 1 | Q.   AND DID YOU RECEIVE UPDATES ABOUT CUSTOMER REACTION? |
| 01:24PM | 2 | A.   YES. |
| 01:24PM | 3 | Q.   HOW OFTEN DID YOU RECEIVE THAT KIND OF FEEDBACK? |
| 01:24PM | 4 | A.   ON A REGULAR BASIS. |
| 01:24PM | 5 | Q.   AND HOW DID YOU RECEIVE THAT FEEDBACK? |
| 01:24PM | 6 | A.   THROUGH EMAILS FROM OUR TEAMS, AND ALSO MEETINGS WITH OUR |
| 01:24PM | 7 | TEAMS. |
| 01:24PM | 8 | Q.   DID YOU REVIEW THAT FEEDBACK WHEN YOU RECEIVED IT? |
| 01:24PM | 9 | A.   I DID. |
| 01:24PM | 10 | Q.   AND DID THAT IMPACT YOUR UNDERSTANDING OF THE WALGREENS |
| 01:24PM | 11 | RELATIONSHIP? |
| 01:24PM | 12 | A.   YES. |
| 01:24PM | 13 | Q.   AND DID IT IMPACT YOUR UNDERSTANDING OF WHETHER VENOUS |
| 01:24PM | 14 | DRAWS WERE IMPORTANT IN THE CONSIDERATION -- IN WALGREENS'S |
| 01:24PM | 15 | CONSIDERATION OF WHETHER IT WOULD CONTINUE TO ROLL OUT THERANOS |
| 01:24PM | 16 | SERVICE CENTERS? |
| 01:24PM | 17 | A.   YES. |
| 01:24PM | 18 | Q.   AND WHAT DID IT MAKE YOU CONCLUDE WITH REGARD TO THAT? |
| 01:24PM | 19 | A.   WE LAUNCHED THINKING THAT FINGERSTICK WAS GOING TO BE A |
| 01:25PM | 20 | REALLY BIG DEAL FOR CONSUMERS, AND WHAT WE LEARNED FROM THE |
| 01:25PM | 21 | DATA THAT WAS COMING BACK IN WAS THAT THE PRICE WAS FAR MORE |
| 01:25PM | 22 | SIGNIFICANT TO THE PEOPLE WHO WERE COMING TO VISIT US. |
| 01:25PM | 23 | Q.   DO YOU RECALL LEARNING THROUGH ANY OF THE FEEDBACK THAT |
| 01:25PM | 24 | WAS SENT TO YOU THAT THERE WERE INACCURATE TEST RESULTS AS PART |
| 01:25PM | 25 | OF THIS REGULAR FEEDBACK ABOUT WHAT WAS HAPPENING AT THERANOS |

01:25PM 1    SERVICE CENTERS?

01:25PM 2    A.   NO, NOT IN THOSE UPDATES.

01:25PM 3    Q.   AND THOSE WERE THE WEEKLY UPDATES OR BIWEEKLY UPDATES?

01:25PM 4    A.   I THINK THEY WERE AT LEAST WEEKLY.

01:25PM 5    Q.   OKAY.  WHEN DID THERANOS AND WALGREENS ULTIMATELY

01:25PM 6    TERMINATE THEIR PARTNERSHIP?

01:25PM 7    A.   IN 2016.

01:25PM 8    Q.   AND MR. MIQUELON HAD BEEN THE INDIVIDUAL WHO YOU HAD

01:25PM 9    ORIGINALLY HAD THE RELATIONSHIP, ALONG WITH DR. ROSAN; IS THAT

01:25PM 10   RIGHT?

01:25PM 11   A.   HE WAS.

01:25PM 12   Q.   AND DID YOU CONTINUE TO STAY IN TOUCH WITH MR. MIQUELON

01:26PM 13   AFTER 2016?

01:26PM 14   A.   I DID.

01:26PM 15   Q.   AND DID YOU CONTINUE TO STAY IN TOUCH WITH DR. ROSAN AFTER

01:26PM 16   2016?

01:26PM 17   A.   YES.

01:26PM 18   Q.   I WANT TO TURN NOW FROM TALKING ABOUT THE WALGREENS

01:26PM 19   RELATIONSHIP TO TALKING ABOUT THERANOS'S RELATIONSHIP WITH

01:26PM 20   CERTAIN OF ITS INVESTORS.

01:26PM 21   A.   OKAY.

01:26PM 22   Q.   DO YOU RECALL WE SPOKE EARLIER IN YOUR TESTIMONY ABOUT THE

01:26PM 23   OFFERING THAT THERANOS HAD DONE OF STOCK TO INVESTORS IN 2006?

01:26PM 24   A.   I DO.

01:26PM 25   Q.   AND IS IT ACCURATE THAT THERANOS HAD DONE ANOTHER OFFERING

7600

01:26PM 1    OF STOCK IN 2010?

01:26PM 2    A.   YES.

01:26PM 3    Q.   WHO INVESTED IN THE 2010 ROUND OF THERANOS STOCK?

01:26PM 4    A.   STRATEGIC ENTITIES, FOR LACK OF A BETTER WORD, INCLUDING

01:26PM 5    BLUE CROSS BLUE SHIELD, AND AN INVESTOR THAT WAS AFFILIATED

01:27PM 6    WITH INTERMOUNTAIN, A BIG HOSPITAL SYSTEM.

01:27PM 7    Q.   AND WHEN WAS THE NEXT TIME AFTER 2010 THAT THERANOS DID AN

01:27PM 8    OFFERING OF STOCK?

01:27PM 9    A.   2010?  I THINK THE NEXT ONE WAS IN 2013.

01:27PM 10   Q.   AND WAS THAT AFTER THE LAUNCH OF THERANOS SERVICE CENTERS

01:27PM 11   IN WALGREENS STORES?

01:27PM 12   A.   IT WAS, YES.

01:27PM 13   Q.   AND AS OF DECEMBER 2013, DID THERANOS NEED CAPITAL BY THE

01:27PM 14   END OF 2013?

01:27PM 15   A.   WE HAD RECEIVED $75 MILLION IN CAPITAL FROM WALGREENS, SO

01:27PM 16   WE DID NOT NEED CAPITAL AFTER THAT.

01:27PM 17   Q.   AND DID YOU NEVERTHELESS MAKE AN OFFERING AT THAT TIME

01:27PM 18   TOWARDS THE END OF 2013?

01:27PM 19   A.   WE DID.

01:27PM 20   Q.   AND WHY DID YOU -- WHO DID YOU INCLUDE IN THAT OFFERING OF

01:27PM 21   STOCK?

01:27PM 22   A.   WE INCLUDED ALL OF OUR EXISTING SHAREHOLDERS IN CASE THEY

01:28PM 23   WANTED TO BE ABLE TO BUY MORE SHARES.

01:28PM 24   Q.   THESE WERE PEOPLE WHO HAD ALREADY INVESTED AT SOME PRIOR

01:28PM 25   POINT IN THERANOS?

7601

```
01:28PM   1        A.   EXACTLY.

01:28PM   2        Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 5143.

01:28PM   3             THIS IS ALREADY IN EVIDENCE, YOUR HONOR.  HOLD ON.  THIS

01:28PM   4        IS ALREADY IN EVIDENCE?

01:28PM   5                  THE COURT:  YES, I THINK IT IS.

01:28PM   6                  THE WITNESS:  OKAY.

01:28PM   7        BY MR. DOWNEY:

01:28PM   8        Q.   DO YOU SEE THE EMAILS THAT ARE AT THE TOP OF PAGE 1 OF

01:28PM   9        EXHIBIT 5143?

01:28PM  10        A.   I DO.

01:28PM  11        Q.   AND DO YOU SEE THAT THIS IS AN EMAIL THAT IS DENOTED AS

01:28PM  12        BEING FROM THERANOS TO CHRISTOPHER LUCAS?

01:29PM  13             DO YOU SEE THAT?

01:29PM  14        A.   YES.

01:29PM  15        Q.   AND TO ANA AT BD VENTURES?

01:29PM  16        A.   YES.

01:29PM  17        Q.   AND IS ANA A REFERENCE TO ANNA QUINTANA?

01:29PM  18        A.   YES.

01:29PM  19        Q.   AND SHE WAS A COWORKER WITH MR. LUCAS AT BD VENTURES?

01:29PM  20        A.   SHE WAS.

01:29PM  21        Q.   AND THAT WAS HIS VENTURE CAPITAL FIRM, BLACK DIAMOND?

01:29PM  22        A.   YES.

01:29PM  23        Q.   AND WAS THIS A COMMUNICATION THAT WAS SENT NOT ONLY TO

01:29PM  24        MR. CHRIS LUCAS IN DECEMBER OF 2013, BUT ALSO TO -- WERE THERE

01:29PM  25        OTHER COMMUNICATIONS TO OTHER SHAREHOLDERS ABOUT AN OFFERING IN
```

7602

01:29PM 1    DECEMBER OF 2013?

01:29PM 2    A.   THERE WERE.

01:29PM 3    Q.   OKAY.  LET'S LOOK DOWN AT PAGE 2.  AND IF YOU BLOW UP THAT

01:29PM 4    UNDER THERANOS CONFIDENTIAL.

01:29PM 5         IF YOU LOOK AT THE FIRST PAGE, DO YOU SEE THERE'S A -- AT

01:30PM 6    THE FIRST PARAGRAPH RATHER, UNDER "DEAR THERANOS STOCKHOLDER,"

01:30PM 7    YOU'RE WRITING AT THIS TIME TO THE EXISTING SHAREHOLDERS;

01:30PM 8    RIGHT?

01:30PM 9    A.   YES.

01:30PM 10   Q.   AND THIS IS BECAUSE YOU'RE GOING TO MAKE AVAILABLE TO THEM

01:30PM 11   THE OPPORTUNITY TO PURCHASE SHARES?

01:30PM 12   A.   YES.

01:30PM 13   Q.   ADDITIONAL SHARES IN THERANOS?

01:30PM 14   A.   YES.

01:30PM 15   Q.   OKAY.  AND IN THAT PARAGRAPH, IN THE LAST SENTENCE YOU

01:30PM 16   SAY, "AS WE PREPARE FOR 2014 AND CLOSING YEAR END, WE ARE

01:30PM 17   ACTIVELY INVESTING IN INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY

01:30PM 18   THAT WE HAVE CREATED."

01:30PM 19        DO YOU SEE THAT?

01:30PM 20   A.   YES.

01:30PM 21   Q.   AND YOU GO ON IN THE NEXT SENTENCE -- OR PARAGRAPH, AND

01:30PM 22   THEN YOU SAY, "AS PART OF THIS INITIATIVE, WE ARE COMPLETING A

01:30PM 23   SERIES OF FINANCIAL TRANSACTIONS WITH STRATEGIC PARTNERS," IN

01:30PM 24   ORDER TO ACCELERATE OUR GROWTH.

01:30PM 25        DO YOU SEE THAT?

01:30PM  1    A.   YES.

01:30PM  2    Q.   AND WHAT WAS THERANOS REFERRING TO WHEN IT WAS SAYING "WE

01:31PM  3    ARE COMPLETING A SERIES OF FINANCIAL TRANSACTIONS WITH

01:31PM  4    STRATEGIC PARTNERS"?

01:31PM  5    A.   THE CONTRACT WAS WITH WALGREENS, AND WE WERE ALSO AT THAT

01:31PM  6    TIME WORKING TO COMPLETE AN INVESTMENT FROM A HOSPITAL SYSTEM

01:31PM  7    CALLED DIGNITY.

01:31PM  8    Q.   AND DID DIGNITY ULTIMATELY INVEST IN THERANOS?

01:31PM  9    A.   THEY DID.

01:31PM  10   Q.   OKAY.  NOW, DID YOU SEE DURING MR. LUCAS'S TESTIMONY THAT

01:31PM  11   HE HAD ASKED -- HE TESTIFIED THAT HE HAD ASKED FOR THE IDENTITY

01:31PM  12   OF THOSE STRATEGIC PARTNERS IN CONVERSATIONS WITH YOU IN LATE

01:31PM  13   DECEMBER OF 2013?

01:31PM  14   A.   YES.

01:31PM  15   Q.   AND THAT HE HAD RAISED THAT QUESTION BECAUSE SOME OF THE

01:31PM  16   INVESTORS IN HIS FUND HAD RAISED THAT QUESTION WITH HIM?

01:31PM  17   A.   YES.

01:31PM  18   Q.   AND DO YOU RECALL THAT HE TESTIFIED THAT YOU WOULD NOT

01:31PM  19   PROVIDE THE IDENTITY OF THE STRATEGIC PARTNERS TO HIM?

01:31PM  20   A.   YES.

01:31PM  21   Q.   AND WHY WAS IT THAT YOU DID NOT IDENTIFY THE STRATEGIC

01:31PM  22   PARTNERS WHEN MR. LUCAS ASKED YOU FOR THAT INFORMATION?

01:32PM  23   A.   BECAUSE WE HAD CONFIDENTIALITY AGREEMENTS WITH THOSE

01:32PM  24   COMPANIES WHO HAD ASKED US NOT TO DISCLOSE THAT WE WERE DOING

01:32PM  25   THE TRANSACTIONS.

7604

01:32PM  1    Q.   AND IN THE NEXT SENTENCE YOU SAY, "WE ARE ALSO COMPLETING

01:32PM  2    EQUITY TRANSACTIONS WITH STRATEGIC ENTITIES WHO HAD PREVIOUSLY

01:32PM  3    INVESTED IN THERANOS AND HAD THE OPTION TO INVEST ADDITIONAL

01:32PM  4    EQUITY IN THE COMPANY THROUGH THE END OF FISCAL 2013."

01:32PM  5         DO YOU SEE THAT?

01:32PM  6    A.   I DO.

01:32PM  7    Q.   AND WHAT DOES THAT REFER TO?

01:32PM  8    A.   I THINK THAT'S REFERRING TO THE WALGREENS CONTRACT

01:32PM  9    AMENDMENT WHERE THEY HAD THE OPPORTUNITY TO INVEST ADDITIONAL

01:32PM  10   EQUITY WITHIN THAT TIME PERIOD.

01:32PM  11   Q.   OKAY.  AND THEN YOU GO ON IN THE NEXT PARAGRAPH AND SAY --

01:32PM  12   YOU PROVIDE SOME DETAILS WITH REGARD TO A STOCK SPLIT; IS THAT

01:32PM  13   RIGHT?

01:32PM  14   A.   YES.

01:32PM  15   Q.   AND THEN YOU SAY THAT THE OFFERING HERE WILL BE AT $15 A

01:32PM  16   SHARE.

01:32PM  17        DO YOU SEE THAT?

01:32PM  18   A.   YES.

01:32PM  19   Q.   NOW, DO YOU RECALL TESTIMONY FROM MR. EISENMAN IN THIS

01:33PM  20   CASE; CORRECT?

01:33PM  21   A.   I DO.

01:33PM  22   Q.   AND YOU RECALL TESTIMONY FROM MR. TOLBERT IN THIS CASE;

01:33PM  23   CORRECT?

01:33PM  24   A.   I DO.

01:33PM  25   Q.   AND YOU RECALL TESTIMONY FROM MR. CHRIS LUCAS; CORRECT?

7605

01:33PM  1      A.    YES.

01:33PM  2      Q.    AND ALL THREE OF THEM RECEIVED THIS COMMUNICATION BECAUSE,

01:33PM  3      IN THE CASE OF MR. EISENMAN AND MR. LUCAS, THEY HAD PREVIOUSLY

01:33PM  4      BEEN INVESTORS; RIGHT?

01:33PM  5      A.    YES.

01:33PM  6      Q.    AND IN MR. TOLBERT'S CASE, HE HAD INVESTED IN MR. LUCAS'S

01:33PM  7      FUND IN THERANOS; IS THAT RIGHT?

01:33PM  8      A.    HE DID.

01:33PM  9      Q.    NOW, THE SECTION THAT WE READ ABOVE SAID IN THE LAST

01:33PM 10      SENTENCE THAT "WE ARE ACTIVELY INVESTING IN INFRASTRUCTURE TO

01:33PM 11      BUILD THIS NEW INDUSTRY."

01:33PM 12            DO YOU SEE THAT?

01:33PM 13      A.    YES.

01:33PM 14      Q.    WHAT DID THAT MEAN?

01:33PM 15      A.    THAT MEANT THAT WE WERE INVESTING IN EVERY PART OF OUR

01:33PM 16      BUSINESS AS WE TRIED TO GROW THE COMPANY.

01:34PM 17      Q.    AND YOU PRICED THE STOCK AT THIS $15 PER SHARE PRICE.

01:34PM 18            DO YOU SEE THAT?

01:34PM 19      A.    YES.

01:34PM 20      Q.    AND WHY WAS THAT THE PRICE?

01:34PM 21      A.    BECAUSE THAT WAS THE PRICE THAT WAS SET IN OUR AGREEMENTS

01:34PM 22      WITH WALGREENS AND SAFEWAY.

01:34PM 23      Q.    AND WERE THERE SUBSEQUENTLY OFFERINGS OF STOCK IN THERANOS

01:34PM 24      SHORTLY THEREAFTER IN 2014 AT WHICH THE STOCK PRICE WAS $17 A

01:34PM 25      SHARE?

| | | |
|---|---|---|
| 01:34PM | 1 | A.   YES. |
| 01:34PM | 2 | Q.   WITH RESPECT TO THE $15 SHARE PRICE, WAS THAT A SHARE |
| 01:34PM | 3 | PRICE THAT YOU DECIDED ON OR, OR HOW WAS THAT APPROVED WITHIN |
| 01:34PM | 4 | THERANOS? |
| 01:34PM | 5 | A.   IT WAS SET BY THE RETAILERS AND REVIEWED AND APPROVED BY |
| 01:34PM | 6 | OUR BOARD. |
| 01:34PM | 7 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10682. |
| 01:34PM | 8 | THE COURT:  MR. DOWNEY, SHOULD WE TAKE OUR BREAK |
| 01:34PM | 9 | BEFORE WE DO THAT? |
| 01:34PM | 10 | MR. DOWNEY:  SURE. |
| 01:34PM | 11 | THE COURT:  LET'S DO THAT. |
| 01:34PM | 12 | MR. DOWNEY:  YES.  THANK YOU, YOUR HONOR.  YES. |
| 01:34PM | 13 | THE COURT:  LET'S DO THAT.  LET'S TAKE 30 MINUTES, |
| 01:35PM | 14 | LADIES AND GENTLEMEN, 30 MINUTES. |
| 01:35PM | 15 | (RECESS FROM 1:35 P.M. UNTIL 2:12 P.M.) |
| 02:13PM | 16 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 02:13PM | 17 | MS. HOLMES IS ON THE STAND.  OUR JURY IS PRESENT. |
| 02:13PM | 18 | MR. DOWNEY, YOU'D LIKE TO CONTINUE? |
| 02:13PM | 19 | MR. DOWNEY:  YES, YOUR HONOR. |
| 02:13PM | 20 | BEFORE I BEGIN WITH MS. HOLMES, YOUR HONOR, JUST WHILE WE |
| 02:13PM | 21 | HAVE THE PRESENCE OF OUR JURY, JUST A FEW HOUSEKEEPING ISSUES |
| 02:13PM | 22 | WITH EXHIBITS. |
| 02:13PM | 23 | THE COURT:  SURE. |
| 02:13PM | 24 | MR. DOWNEY:  I WANTED TO MOVE THE ADMISSION OF 7751, |
| 02:13PM | 25 | WHICH IS SIMPLY A COLOR VERSION OF 1177, WHICH THE COURT |

7607

| | | |
|---|---|---|
| 02:13PM | 1 | ADMITTED, BUT IT MIGHT BE EASIER FOR PEOPLE TO READ IN THE |
| 02:13PM | 2 | FUTURE. |
| 02:13PM | 3 | THE COURT:  OKAY.  ANY OBJECTION TO THAT? |
| 02:13PM | 4 | MR. LEACH:  NO, YOUR HONOR.  THAT'S FINE. |
| 02:13PM | 5 | THE COURT:  IT'S ADMITTED. |
| 02:13PM | 6 | (DEFENDANT'S EXHIBIT 7751 WAS RECEIVED IN EVIDENCE.) |
| 02:13PM | 7 | MR. DOWNEY:  AND I WANTED TO MOVE THE ADMISSION OF |
| 02:13PM | 8 | 7380, WHICH WE HAD DISCUSSED A FOUNDATION FOR. |
| 02:13PM | 9 | THE COURT:  ALL RIGHT.  THAT WAS DISCUSSED.  YOU DID |
| 02:14PM | 10 | NOT MOVE IT INTO EVIDENCE.  I NOTED THAT. |
| 02:14PM | 11 | ANY OBJECTION? |
| 02:14PM | 12 | THIS IS ADDITIONAL ASSAYS AND PRESUBMISSION. |
| 02:14PM | 13 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 02:14PM | 14 | THE COURT:  THAT'S ADMITTED AT THIS TIME. |
| 02:14PM | 15 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 02:14PM | 16 | (DEFENDANT'S EXHIBIT 7380 WAS RECEIVED IN EVIDENCE.) |
| 02:14PM | 17 | BY MR. DOWNEY: |
| 02:14PM | 18 | Q.   MS. HOLMES, BEFORE THE BREAK WE WERE TALKING ABOUT THE |
| 02:14PM | 19 | PRICE THAT WAS OFFERED IN CONNECTION WITH THE DECEMBER 2013 |
| 02:14PM | 20 | OFFERING OF THERANOS SHARES, AND I WANTED TO ASK YOU ABOUT THE |
| 02:14PM | 21 | ROLE OF THERANOS'S BOARD OF DIRECTORS IN CONNECTION WITH THAT |
| 02:14PM | 22 | OFFERING IF I MIGHT. |
| 02:14PM | 23 | A.   YES. |
| 02:14PM | 24 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 10682. |
| 02:15PM | 25 | A.   OKAY. |

7608

02:15PM 1    Q.   NOW, IN CONNECTION WITH ANY OFFERING OF THERANOS SHARES,

02:15PM 2    IS THAT SOMETHING THAT THE BOARD WOULD HAVE TO CONSIDER AND

02:15PM 3    APPROVE?

02:15PM 4    A.   YES.

02:15PM 5    Q.   AND WAS THAT DONE IN CONNECTION WITH THE DECEMBER 31ST,

02:15PM 6    2013 CLOSING TRANSACTION?

02:15PM 7    A.   YES.

02:15PM 8    Q.   DO YOU RECALL THAT THERE WAS TESTIMONY IN THE CASE WHERE A

02:15PM 9    NUMBER OF INVESTORS TESTIFIED THAT THERE WAS A SHORT PERIOD

02:15PM 10   WITHIN WHICH THEY HAD TO CONSIDER THAT OFFERING.

02:15PM 11        DO YOU RECALL THAT?

02:15PM 12   A.   I DO.

02:15PM 13   Q.   AND WE LOOKED BEFORE THE BREAK AT THE COMMUNICATION THAT

02:15PM 14   THERANOS SENT TO SHAREHOLDERS ANNOUNCING THE OFFERING.

02:16PM 15        AND DO YOU RECALL THAT WAS ON DECEMBER 15TH?

02:16PM 16   A.   YES.

02:16PM 17   Q.   AND DO YOU RECALL THAT THAT OFFERING CLOSED ON

02:16PM 18   DECEMBER 31ST?

02:16PM 19   A.   YES.

02:16PM 20   Q.   SO THAT WAS A PERIOD OF JUST OVER -- A LITTLE OVER TWO

02:16PM 21   WEEKS AT THE END OF THE YEAR AND THE HOLIDAY SEASON; CORRECT?

02:16PM 22   A.   IT WAS.

02:16PM 23   Q.   WHAT WAS THE EXPLANATION FOR THAT SHORT WINDOW FOR THAT

02:16PM 24   SHARE OFFERING?

02:16PM 25   A.   WE WERE DOING THIS DEAL WITH WALGREENS, WHICH WE HAD BEEN

7609

02:16PM 1    NEGOTIATING.  WE LEARNED AT THAT POINT THAT WE WOULD BE CLOSING

02:16PM 2    THE DEAL BY DECEMBER 31ST, WHICH MEANT THAT THERE WAS A WINDOW

02:16PM 3    FOR SHAREHOLDERS TO BE ABLE TO INVEST, THAT WAS THE WINDOW, AND

02:16PM 4    WE WANTED TO SHARE IT WITH THEM WHEN WE KNEW.

02:16PM 5    Q.   WAS IT PRESENTED TO THERANOS'S BOARD OF DIRECTORS THAT THE

02:16PM 6    OFFERING OF STOCK WOULD CLOSE BY DECEMBER 31ST AFTER BEING

02:16PM 7    OFFERED ON DECEMBER 15TH?

02:16PM 8    A.   YES.

02:16PM 9    Q.   AND DID THEY APPROVE THAT?

02:16PM 10   A.   THEY DID.

02:16PM 11   Q.   WITH RESPECT TO 10682, IS THIS THE RECORD OF AN ACTION BY

02:17PM 12   THE BOARD OF DIRECTORS OF THERANOS IN CONNECTION WITH THAT

02:17PM 13   DECEMBER 31ST, 2013 STOCK CLOSING?

02:17PM 14   A.   IT IS.

02:17PM 15          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:17PM 16   10682.

02:17PM 17          MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:17PM 18          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:17PM 19    (DEFENDANT'S EXHIBIT 10682 WAS RECEIVED IN EVIDENCE.)

02:17PM 20   BY MR. DOWNEY:

02:17PM 21   Q.   WOULD YOU LOOK AT THE FIRST PAGE OF THIS DOCUMENT?  DO YOU

02:17PM 22   SEE THAT IT'S DESCRIBED AS AN ACTION BY THE UNANIMOUS WRITTEN

02:17PM 23   CONSENT OF THE BOARD OF DIRECTORS?

02:17PM 24   A.   YES.

02:17PM 25   Q.   AND DOES THAT MEAN AN ACTION THAT THE BOARD OF DIRECTORS

7610

02:17PM  1    TAKES WITHOUT BENEFIT OF A BOARD MEETING AND VOTE?

02:17PM  2    A.    YES, NORMALLY FOLLOWING SOME TYPE OF MEETING OR

02:17PM  3    DISCUSSION.

02:17PM  4    Q.    OKAY.  AND WAS THERE A MEETING AND DISCUSSION IN

02:17PM  5    CONNECTION WITH THIS DECEMBER 2013 OFFERING?

02:17PM  6    A.    YES.

02:17PM  7    Q.    LET ME ASK YOU TO LOOK AT PAGE 8 OF THIS DOCUMENT.

02:18PM  8          AND IF YOU LOOK UNDER THIS SECTION THAT IS ON THE BOTTOM

02:18PM  9    HALF OF THE PAGE LABELLED AMENDMENTS TO THE AMENDED AND

02:18PM  10   RESTATED C-1 PREFERRED STOCK PURCHASE AGREEMENT.

02:18PM  11         DO YOU SEE THAT?

02:18PM  12   A.    I DO.

02:18PM  13   Q.    AND DO YOU SEE THAT'S JUST REFERENCE SIMPLY TO THE WAY IN

02:18PM  14   WHICH THE TERMS OF THE AGREEMENT WOULD BE SET FOR OFFERING WITH

02:18PM  15   SHAREHOLDERS?

02:18PM  16   A.    YES.

02:18PM  17   Q.    IN THE FIRST PARAGRAPH IT SAYS, "WHEREAS," AND IT GOES ON

02:18PM  18   FROM THERE.  IT REFERS TO A PRICE OF $15 PER SHARE.

02:18PM  19         DO YOU SEE THAT?

02:18PM  20   A.    I DO.

02:18PM  21   Q.    AND IS THAT A REFERENCE TO THE $15 A SHARE PRICE THAT THE

02:19PM  22   BOARD WAS CONSIDERING IN CONNECTION WITH THIS OFFERING?

02:19PM  23   A.    YES.

02:19PM  24   Q.    AND IF YOU GO DOWN TO PAGE 9 THEREAFTER, WHICH IS THE NEXT

02:19PM  25   PAGE AND YOU LOOK AT THE FIRST PARAGRAPH THAT IS -- THE FIRST

7611

02:19PM   1    TWO PARAGRAPHS.

02:19PM   2         IF YOU LOOK AT THE SECOND PARAGRAPH WITHIN THAT, WHICH IS

02:19PM   3    RESOLVED FURTHER, DO YOU SEE THAT THE BOARD APPROVED THE SALE

02:19PM   4    AND ISSUANCE AT $15 PER SHARE?

02:19PM   5    A.   YES.

02:19PM   6    Q.   NOW, DID YOU -- YOU MENTIONED THAT THERE WERE SIMULTANEOUS

02:19PM   7    NEGOTIATIONS WITH WALGREENS GOING ON AT THE SAME TIME AS YOU

02:20PM   8    WERE DOING THIS SHARE OFFERING; IS THAT RIGHT?

02:20PM   9    A.   THERE WERE.

02:20PM  10    Q.   AND WERE THOSE THE NEGOTIATIONS THAT RELATED TO HOW THE

02:20PM  11    ROLLOUT PLAN WOULD WORK?

02:20PM  12    A.   YES.

02:20PM  13    Q.   AND WHAT DATE DID THAT TRANSACTION ULTIMATELY CLOSE?

02:20PM  14    A.   ON DECEMBER 31ST.

02:20PM  15    Q.   AND IS THAT THE SAME TIME THAT THIS OFFERING OF SHARES

02:20PM  16    ALSO CLOSED?

02:20PM  17    A.   IT IS.

02:20PM  18    Q.   AND DID YOU UNDERSTAND THAT THAT WAS NECESSARY UNDER

02:20PM  19    THERANOS'S AGREEMENTS WITH WALGREENS?

02:20PM  20    A.   I DID.

02:20PM  21    Q.   I WANT TO ASK YOU ABOUT SOME OF THE PARTICULAR INVESTMENTS

02:20PM  22    THAT WERE MADE IN CONNECTION WITH THAT DECEMBER 2013 OFFERING.

02:20PM  23         FIRST, LET ME JUST ASK YOU, DID YOU AT THERANOS REFER TO

02:20PM  24    THAT INVESTMENT ROUND AS THE C-1 INVESTMENT ROUND?

02:20PM  25    A.   YES.

7612

02:20PM 1    Q.   AND THAT'S THE ROUND IN WHICH MR. LUCAS AND MR. EISENMAN

02:21PM 2    AND MR. HALL INVESTED; IS THAT RIGHT?

02:21PM 3    A.   YES.

02:21PM 4    Q.   LET'S TALK ABOUT MR. LUCAS FIRST.

02:21PM 5         MR. LUCAS'S FIRM WAS CALLED BLACK DIAMOND VENTURES?

02:21PM 6    A.   IT WAS, YES.

02:21PM 7    Q.   AND DO YOU RECALL THAT YOU TESTIFIED ON FRIDAY ABOUT

02:21PM 8    MR. LUCAS'S INVESTMENT IN THERANOS IN 2006?

02:21PM 9    A.   I DO.

02:21PM 10   Q.   BETWEEN 2006 AND 2013, CAN YOU DESCRIBE THE INTERACTIONS

02:21PM 11   THAT YOU HAD WITH MR. LUCAS AROUND THERANOS?

02:21PM 12   A.   YES.  I WOULD SEE MR. LUCAS WITH HIS UNCLE, DON LUCAS, WHO

02:21PM 13   WAS OUR CHAIRMAN, OFTEN IN FAMILY GATHERINGS, AND MR. LUCAS

02:21PM 14   ALSO CAME TO WORK FOR THE COMPANY IN OUR FINANCE DEPARTMENT.

02:22PM 15   Q.   AND DO YOU KNOW WHEN HE CAME TO WORK AT THERANOS IN

02:22PM 16   CONNECTION WITH THE FINANCE DEPARTMENT?

02:22PM 17   A.   I THINK IT WAS AROUND 2008.

02:22PM 18   Q.   AND AFTER 2008, DID YOU HAVE PERIODIC CONTACT WITH

02:22PM 19   MR. CHRIS LUCAS?

02:22PM 20   A.   I DID.

02:22PM 21   Q.   WHY HAD MR. LUCAS BEEN INVOLVED IN PREPARING FINANCIAL

02:22PM 22   PROJECTIONS FOR THE COMPANY IN 2008 OR SO?

02:22PM 23   A.   OUR BOARD DID NOT THINK THAT I HAD THE RIGHT EXPERTISE TO

02:22PM 24   DO THAT, AND THEY WANTED TO HAVE SOMEONE WHO WAS SOPHISTICATED

02:22PM 25   IN THOSE MATTERS INTERNALLY, SO THEY ASKED AND SUGGESTED THAT

7613

02:22PM   1    CHRIS COME IN TO HELP US BUILD PROJECTIONS.

02:22PM   2    Q.   NOW, IN 2013 WHEN THIS OFFERING OF SHARES WAS MADE, DID

02:22PM   3    YOU HAVE THE CHANCE TO SPEAK ONE-ON-ONE WITH MR. LUCAS ABOUT

02:22PM   4    THIS OPPORTUNITY TO INVEST?

02:22PM   5    A.   I DID.

02:22PM   6    Q.   AND CAN YOU TELL US WHAT THOSE DISCUSSIONS WERE ABOUT.

02:23PM   7    A.   HE HAD A FEW QUESTIONS ABOUT WHO ELSE WAS DOING DEALS WITH

02:23PM   8    US AT THAT TIME THAT HAD BEEN RELAYED TO HIM FROM HIS

02:23PM   9    INVESTORS, AND HE ALSO WANTED TO TALK TO ME ABOUT MR. HALL

02:23PM   10   INVESTING DIRECTLY IN THERANOS AS OPPOSED TO THROUGH HIM.

02:23PM   11   Q.   AND WHAT DID YOU DISCUSS ABOUT MR. HALL INVESTING DIRECTLY

02:23PM   12   IN THERANOS?

02:23PM   13   A.   IF MR. HALL DID THAT, IT WOULD MEAN THAT WE WOULD HAVE AN

02:23PM   14   ADDITIONAL SHAREHOLDER, AND I SAID THAT WE WOULD, WE WOULD DO

02:23PM   15   THAT IF THAT'S WHAT HE WANTED.

02:23PM   16   Q.   OKAY.  DID MR. LUCAS ASK YOU ANY QUESTIONS ABOUT

02:23PM   17   THERANOS'S TECHNOLOGY IN THOSE CONVERSATIONS?

02:23PM   18   A.   NO.

02:23PM   19   Q.   DID HE ASK YOU ANY QUESTIONS ABOUT THERANOS'S BUSINESS

02:23PM   20   PLAN?

02:23PM   21   A.   NO.

02:23PM   22   Q.   LET'S TALK ABOUT MR. HALL FOR A MOMENT.

02:23PM   23        MR. HALL ALSO PARTICIPATED IN THE 2013 C-1 ROUND?

02:23PM   24   A.   HE DID.

02:23PM   25   Q.   AND WHAT DID YOU UNDERSTAND ABOUT MR. HALL AS OF THE TIME

7614

02:24PM 1    HE MADE THAT INVESTMENT IN DECEMBER OF 2013?

02:24PM 2    A.   THAT HE WAS A VERY SUCCESSFUL BUSINESS PERSON AND INVESTOR

02:24PM 3    WHO HAD INVESTED IN A NUMBER OF COMPANIES.

02:24PM 4        I UNDERSTOOD HE WAS THE LARGEST SHAREHOLDER OF AMERICAN

02:24PM 5    AIRLINES, AND ALSO OWNED A LARGE AMOUNT OF REAL ESTATE.

02:24PM 6    Q.   WE HEARD A RECORDING DURING THE COURSE OF THIS

02:24PM 7    CONVERSATION OF A CALL THAT YOU HAD WITH, AMONG OTHERS,

02:24PM 8    MR. TOLBERT.

02:24PM 9        DO YOU RECALL THAT?

02:24PM 10   A.   I DO.

02:24PM 11   Q.   AND DID MR. TOLBERT WORK FOR MR. HALL?

02:24PM 12   A.   YES.

02:24PM 13   Q.   PRIOR TO THE TIME OF THE CONVERSATION WHICH MR. TOLBERT

02:24PM 14   RECORDED IN DECEMBER OF 2013, WHEN IS THE LAST TIME THAT YOU

02:24PM 15   HAD SPOKEN TO MR. TOLBERT?

02:24PM 16   A.   I THINK IN 2006.

02:24PM 17   Q.   AND HOW MUCH, IF ANY, COMMUNICATION DID YOU HAVE WITH

02:25PM 18   EITHER MR. HALL OR MR. TOLBERT BETWEEN 2006 AND 2013?

02:25PM 19   A.   I DON'T THINK I HAD COMMUNICATION WITH THEM.

02:25PM 20   Q.   DID YOU HAVE ANY DISCUSSIONS THAT YOU RECALL WITH MR. HALL

02:25PM 21   AROUND THE TIME OF THE INVESTMENT?

02:25PM 22   A.   YES.

02:25PM 23   Q.   DID MR. HALL ASK ANY QUESTIONS ABOUT THE TECHNOLOGY THAT

02:25PM 24   YOU RECALL IN THAT CONVERSATION?

02:25PM 25   A.   HE DID NOT.

7615

| | | |
|---|---|---|
| 02:25PM | 1 | Q.   WHAT WERE YOUR CONVERSATIONS WITH MR. HALL ABOUT? |
| 02:25PM | 2 | A.   HE ASKED TO SPEAK WITH ME TO ASK IF WE WOULD ACCEPT HIM AS |
| 02:25PM | 3 | A DIRECT INVESTOR IN THERANOS, AS OPPOSED TO AN INVESTOR IN |
| 02:25PM | 4 | CHRIS LUCAS'S FUND. |
| 02:25PM | 5 | Q.   AND WAS THAT THE PRINCIPAL SUBJECT OF THE DISCUSSION AS |
| 02:25PM | 6 | YOU RECALL IT? |
| 02:25PM | 7 | A.   IT WAS. |
| 02:25PM | 8 | Q.   YOU ALSO RECALL THAT MR. EISENMAN TESTIFIED THAT HE |
| 02:25PM | 9 | INVESTED AS PART OF THIS C-1 ROUND? |
| 02:25PM | 10 | A.   I DO. |
| 02:25PM | 11 | Q.   AND YOU RECALL THAT YOU TESTIFIED ON FRIDAY THAT HE HAD |
| 02:25PM | 12 | INVESTED IN 2006? |
| 02:26PM | 13 | A.   YES. |
| 02:26PM | 14 | Q.   DID YOU SPEAK TO MR. EISENMAN IN 2013 ABOUT MAKING AN |
| 02:26PM | 15 | INVESTMENT IN THERANOS AS PART OF THE C-1 ROUND? |
| 02:26PM | 16 | A.   NO. |
| 02:26PM | 17 | Q.   DID YOU LEARN AT SOME POINT THAT MR. EISENMAN HAD DECIDED |
| 02:26PM | 18 | TO INVEST IN THAT C-1 ROUND? |
| 02:26PM | 19 | A.   I DID. |
| 02:26PM | 20 | Q.   DO YOU RECALL HOW YOU LEARNED THAT? |
| 02:26PM | 21 | A.   THROUGH SUNNY BALWANI. |
| 02:26PM | 22 | Q.   WHAT WAS YOUR REACTION WHEN YOU LEARNED THAT MR. EISENMAN |
| 02:26PM | 23 | HAD DECIDED TO INVEST AS PART OF THE C-1 ROUND? |
| 02:26PM | 24 | A.   I WAS SURPRISED. |
| 02:26PM | 25 | Q.   WHY DO YOU SAY YOU WERE SURPRISED? |

02:26PM    1      A.   WE HAD FOR YEARS BEEN COMMUNICATING WITH MR. EISENMAN

02:26PM    2   ABOUT SOME OF HIS QUESTIONS.  HE SEEMED TO HAVE A VERY LARGE

02:26PM    3   AMOUNT OF QUESTIONS HAVING TO DO WITH THE VALUATION OF HIS

02:26PM    4   STOCK SO THAT HE COULD POTENTIALLY SELL IT AT DIFFERENT POINTS

02:26PM    5   IN TIME.

02:26PM    6        WE HAD TRIED TO COMMUNICATE TO HIM THAT WE WERE NOT ABLE

02:27PM    7   TO CONVEY MUCH OF THE INFORMATION THAT HE WAS ASKING FOR.

02:27PM    8        AND WE HAD A LOT OF FRUSTRATIONS AROUND THOSE

02:27PM    9   INTERACTIONS, AND I KNOW HE HAD A LOT OF FRUSTRATIONS AROUND

02:27PM   10   THOSE INTERACTIONS.

02:27PM   11      Q.   BUT YOU LEARNED THAT HE ULTIMATELY INVESTED?

02:27PM   12      A.   I DID.

02:27PM   13      Q.   NOW, AFTER DECEMBER 31ST OF 2013, DID THERANOS GO FORWARD

02:27PM   14   AND OFFER ANOTHER ROUND OF INVESTMENT IN 2014?

02:27PM   15      A.   YES.

02:27PM   16      Q.   AND WAS THAT KNOWN AS THE C-2 ROUND?

02:27PM   17      A.   IT WAS.

02:27PM   18      Q.   AND WHAT IS THE SIGNIFICANCE OF THESE NUMBERS AND LETTERS,

02:27PM   19   C-1 AND C-2 IN CONNECTION WITH THESE STOCK OFFERINGS?

02:27PM   20      A.   C-1 AND C-2, IN TERMS OF HOW THEY WERE STRUCTURED, WERE

02:27PM   21   ESSENTIALLY EXTENSIONS OF THE SERIES C ROUND.  SO EARLIER ON WE

02:27PM   22   HAD DONE AN A, A B, AND A C.

02:27PM   23        AND INSTEAD OF DOING A WHOLE NEW ROUND, WE JUST ALLOWED

02:27PM   24   PEOPLE TO CONTINUE TO INVEST UNDER THE EXISTING DOCUMENTS.

02:28PM   25      Q.   IN CONNECTION WITH THE C-2 OFFERING IN 2014, DID THERANOS

7617

02:28PM 1    SOMETIMES PROVIDE SETS OF SLIDES TO POTENTIAL INVESTORS?

02:28PM 2    A.   YES.

02:28PM 3    Q.   DO YOU RECALL DOING THAT IN CONNECTION, FOR EXAMPLE, WITH

02:28PM 4    MR. MOSLEY?

02:28PM 5    A.   YES.

02:28PM 6    Q.   AND WERE THOSE SLIDES THE ONLY MEANS BY WHICH INVESTORS

02:28PM 7    LEARNED ABOUT THERANOS AS PART OF THE C-2 OFFERING?

02:28PM 8    A.   NO.

02:28PM 9    Q.   WERE THE SLIDES INTENDED TO GIVE POTENTIAL INVESTORS A

02:28PM 10   COMPREHENSIVE AND THOROUGH OVERVIEW OF THERANOS?

02:28PM 11   A.   NO.

02:28PM 12   Q.   WHY WERE THE SLIDES USED?

02:28PM 13   A.   WE USED THEM IN MEETINGS TO SUPPORT DIFFERENT DISCUSSION

02:28PM 14   POINTS BASED ON THE QUESTIONS THAT AN INVESTOR OR ANYONE WE

02:28PM 15   WERE MEETING WITH WOULD HAVE.

02:28PM 16   Q.   NOW, THOSE SETS OF SLIDES, YOU RECALL THAT WE HAVE SEEN

02:29PM 17   SOME OF THOSE IN EVIDENCE DURING THE COURSE OF THIS CASE?

02:29PM 18   A.   I DO.

02:29PM 19   Q.   ARE THOSE DOCUMENTS THAT YOU CREATED FROM SCRATCH AT THE

02:29PM 20   TIME THAT YOU WERE SENDING THEM?

02:29PM 21   A.   NO.

02:29PM 22   Q.   WHAT WAS THE PROCESS FOR THE CREATION OF THESE SLIDE DECKS

02:29PM 23   THAT WERE USED IN CONNECTION WITH INVESTORS IN 2014?

02:29PM 24   A.   IT DATES BACK ALMOST TO THE WORK THAT WE WERE DOING WITH

02:29PM 25   PHARMA COMPANIES.  WE HAD A SET OF SLIDES THAT WE DEVELOPED

02:29PM  1    THERE, AND WE KEPT ADDING TO THEM OVER THE YEARS.

02:29PM  2         WE REFERRED TO OUR DECK AS OUR INTERNAL DECK, AND AS THE

02:29PM  3    BUSINESS GREW AND WE HAD NEW CONTENT, WE WOULD ADD IT TO THE

02:29PM  4    DECK AND MAINTAIN IT ON A DRIVE AT THERANOS.

02:29PM  5    Q.   AND WERE THE DECKS USED ONLY WITH INVESTORS OR POTENTIAL

02:29PM  6    INVESTORS?

02:29PM  7    A.   NO.

02:29PM  8    Q.   WHO ELSE WERE THE DECKS USED WITH?

02:29PM  9    A.   ANYONE WITH WHOM WE WERE MEETING.  IT COULD BE A BUSINESS

02:29PM  10   PARTNER LIKE A HOSPITAL SYSTEM.  IT COULD BE BUSINESS PARTNERS

02:29PM  11   LIKE THE RETAILERS, THE INSURANCE COMPANIES.  ANY MEETING WE

02:30PM  12   WERE DOING.

02:30PM  13   Q.   WHO WAS INVOLVED IN DEVELOPING THE CONTENT THAT WENT INTO

02:30PM  14   THE SLIDE DECKS?

02:30PM  15   A.   OUR SCIENTISTS AND ENGINEERS.  WE PUT ALL OF OUR CLINICAL

02:30PM  16   DATA INTO THOSE DECKS.

02:30PM  17        OUR PROJECT MANAGERS, PRODUCT MANAGERS, SOME OF THE PEOPLE

02:30PM  18   ON THE BUSINESS DEVELOPMENT SIDE AND THE OPERATION SIDE.

02:30PM  19   Q.   NOW, YOU RECALL THAT THERE WAS TESTIMONY LAST WEEK FROM

02:30PM  20   MR. GROSSMAN?

02:30PM  21   A.   I DO.

02:30PM  22   Q.   AND HE WAS A REPRESENTATIVE OF THE INVESTMENT FUND PFM?

02:30PM  23   A.   YES.

02:30PM  24   Q.   AND WAS PFM ONE OF THE FIRMS THAT INVESTED IN THERANOS AS

02:30PM  25   PART OF THE C-2 OFFERING?

| | | |
|---|---|---|
| 02:30PM | 1 | A.   THEY WERE. |
| 02:30PM | 2 | Q.   AT THE TIME THAT YOU DID THE C-2 OFFERING, WERE HEDGE |
| 02:30PM | 3 | FUNDS THE TYPE OF INVESTORS THAT THERANOS WAS SEEKING FOR |
| 02:31PM | 4 | INVESTMENT? |
| 02:31PM | 5 | A.   NO. |
| 02:31PM | 6 | Q.   WHAT TYPE OF PARTNERS WERE YOU HOPING WOULD INVEST IN |
| 02:31PM | 7 | THERANOS AS PART OF THE C-2 OFFERING IN 2014? |
| 02:31PM | 8 | A.   I HOPED WE'D GET INVESTORS WHO WOULD HOLD OUR STOCK FOR A |
| 02:31PM | 9 | LONG TIME AND BE WITH US TO HELP BUILD THE COMPANY FOR THE |
| 02:31PM | 10 | LONG-TERM. |
| 02:31PM | 11 | Q.   WHY DID YOU WANT THAT? |
| 02:31PM | 12 | A.   BECAUSE WHAT WE WERE TRYING TO DO WAS A REALLY LONG-TERM |
| 02:31PM | 13 | MISSION, AND IT WAS GOING TO TAKE A HUGE AMOUNT OF WORK, AND TO |
| 02:31PM | 14 | REALLY REALIZE OUR VISION, IT WAS GOING TO TAKE A LONG TIME. |
| 02:31PM | 15 | Q.   DID YOU PERSONALLY MEET WITH MR. GROSSMAN AND OTHER |
| 02:31PM | 16 | REPRESENTATIVES OF PFM? |
| 02:31PM | 17 | A.   I DID. |
| 02:31PM | 18 | Q.   HOW MANY TIMES DID YOU MEET WITH THEM? |
| 02:31PM | 19 | A.   TWICE. |
| 02:31PM | 20 | Q.   AND WHAT WAS THE FIRST TIME THAT YOU MET WITH THEM? |
| 02:31PM | 21 | A.   IN DECEMBER OF 2013. |
| 02:31PM | 22 | Q.   AND WHAT DO YOU RECALL ABOUT THAT MEETING WITH |
| 02:31PM | 23 | MR. GROSSMAN AND OTHERS FROM PFM IN DECEMBER OF 2013? |
| 02:31PM | 24 | A.   I RECALL IT WAS AN INTRODUCTORY MEETING.  WE INTRODUCED |
| 02:32PM | 25 | OURSELVES.  THEY INTRODUCED THEMSELVES.  I SHARED MY VISION FOR |

7620

02:32PM   1    THERANOS, AND THEY SHARED THEIR EXPERIENCE IN HEALTH CARE,

02:32PM   2    THEIR DESIRE TO BE PART OF NEW TECHNOLOGY COMPANIES, AND THEIR

02:32PM   3    COMMITMENT TO BEING A LONG-TERM INVESTOR.

02:32PM   4    Q.   AFTER THAT THAT INITIAL MEETING IN DECEMBER OF 2013, WAS

02:32PM   5    THERE A SECOND MEETING BETWEEN THERANOS AND PFM?

02:32PM   6    A.   THERE WAS.

02:32PM   7    Q.   WHEN WAS THAT?

02:32PM   8    A.   IN JANUARY OF 2014.

02:32PM   9    Q.   AND DID YOU PARTICIPATE IN THAT MEETING?

02:32PM  10    A.   JUST THE BEGINNING OF IT.

02:32PM  11    Q.   AND WHAT DO YOU RECALL HAPPENING AT THE BEGINNING OF THAT

02:32PM  12    JANUARY 2014 MEETING WITH PFM?

02:32PM  13    A.   I RECALL THAT PFM HAD A SERIES OF QUESTIONS THAT THEY HAD

02:32PM  14    PREPARED THAT THEY WANTED US TO ANSWER FOCUSSED ON DIFFERENT

02:32PM  15    ASPECTS OF OUR BUSINESS, AND THAT WE WENT THROUGH THOSE

02:32PM  16    QUESTIONS.

02:32PM  17    Q.   OKAY.  AND AFTER THAT SECOND MEETING WITH PFM, DID

02:33PM  18    THERANOS MEET WITH PFM AGAIN?

02:33PM  19    A.   PEOPLE FROM THERANOS DID, YES.

02:33PM  20    Q.   DID YOU MEET WITH ANYONE FROM PFM BETWEEN THE TIME OF THE

02:33PM  21    SECOND JANUARY 2014 MEETING AND THEIR INVESTMENT?

02:33PM  22    A.   I DID NOT.

02:33PM  23    Q.   WHO WAS THE PRIMARY CONTACT BETWEEN PFM AND THERANOS IN

02:33PM  24    THE PERIOD BETWEEN THE SECOND MEETING AND THE TIME OF PFM'S

02:33PM  25    INVESTMENT?

7621

02:33PM  1    A.   SUNNY BALWANI.

02:33PM  2    Q.   AND IN JANUARY -- WHEN DID THAT C-2 ROUND -- OR WHEN DID

02:33PM  3    THAT C-2 OFFERING OF STOCK CLOSE FOR PFM IF YOU KNOW?

02:33PM  4    A.   I DO KNOW BECAUSE IT WAS MY BIRTHDAY.  FEBRUARY 3RD OF

02:33PM  5    THAT YEAR.

02:33PM  6    Q.   OKAY.  NOW, YOU ALSO RECALL THAT WE HEARD TESTIMONY FROM

02:33PM  7    MR. MOSLEY DURING THE COURSE OF THIS CASE?

02:33PM  8    A.   YES.

02:33PM  9    Q.   AND DID MR. MOSLEY INVEST IN THERANOS IN 2014?

02:34PM  10   A.   HE DID.

02:34PM  11   Q.   WHAT DID YOU UNDERSTAND ABOUT MR. MOSLEY WHEN YOU MET HIM

02:34PM  12   IN 2014?

02:34PM  13   A.   I UNDERSTOOD THAT HE WAS A VERY EXPERIENCED LAWYER.  HE

02:34PM  14   HAD WORKED WITH OUR LAWYER, DAVID BOIES, AT A FIRM CALLED

02:34PM  15   CRAVATH, WHICH I UNDERSTOOD TO BE ONE OF THE BEST LAW FIRMS IN

02:34PM  16   THE WORLD, AND I KNEW HE WAS DR. KISSINGER'S LAWYER.

02:34PM  17   Q.   HOW DID YOU COME TO MEET MR. MOSLEY?

02:34PM  18   A.   THROUGH DR. KISSINGER.

02:34PM  19   Q.   NOW, AFTER YOU MET WITH MR. MOSLEY, DID HE SUBSEQUENTLY

02:34PM  20   INTRODUCE YOU TO OTHER POTENTIAL INVESTORS IN THERANOS?

02:34PM  21   A.   HE DID.

02:34PM  22   Q.   AND DID YOU PROVIDE INFORMATION TO -- ABOUT THERANOS FOR

02:34PM  23   MR. MOSLEY TO REVIEW?

02:34PM  24   A.   I DID.

02:34PM  25   Q.   AND CAN YOU DESCRIBE WHAT INFORMATION YOU PROVIDED TO

7622

02:35PM  1    MR. MOSLEY TO REVIEW IN CONNECTION WITH THERANOS?

02:35PM  2    A.   INFORMATION ABOUT THE COMPANY IN THE FORM OF SOME OF OUR

02:35PM  3    INTERNAL SLIDE DECK AND OTHER BACKGROUND MATERIALS ON THE

02:35PM  4    COMPANY.

02:35PM  5    Q.   OKAY.  NOW, WE SAW DURING THE COURSE OF THE TRIAL THAT

02:35PM  6    MR. MOSLEY PREPARED A SUMMARY DOCUMENT CONCERNING THERANOS.

02:35PM  7         DO YOU RECALL THAT?

02:35PM  8    A.   I DO.

02:35PM  9    Q.   WERE YOU INVOLVED IN THE PREPARATION OF THE SUMMARY THAT

02:35PM  10   MR. MOSLEY PREPARED?

02:35PM  11   A.   NO.

02:35PM  12   Q.   DID YOU EVER DISCUSS THAT SUMMARY WITH MR. MOSLEY?

02:35PM  13   A.   NO.

02:35PM  14   Q.   HAD YOU EVER SEEN THAT SUMMARY PRIOR TO THIS CASE?

02:35PM  15   A.   I HAD NOT.

02:35PM  16   Q.   AT SOME POINT DID YOU -- WERE YOU INTRODUCED TO HIM OVER

02:35PM  17   THE TELEPHONE?

02:35PM  18   A.   I WAS.

02:35PM  19   Q.   AND DID YOU COME TO MEET HIM IN PERSON?

02:35PM  20   A.   YES.

02:35PM  21   Q.   AND WHERE DID YOU MEET HIM?

02:35PM  22   A.   AT A CONFERENCE CALLED THE BDT CONFERENCE IN CHICAGO.

02:35PM  23   Q.   AND WHAT WAS THE BDT CONFERENCE?

02:36PM  24   A.   IT WAS A CONFERENCE FOR FAMILIES THAT RAN FAMILY

02:36PM  25   CONTROLLED BUSINESSES AND OTHER PRIVATE EQUITY INVESTORS.

7623

02:36PM   1      Q.   AND WHAT WERE YOU DOING AT THAT BDT CONFERENCE?

02:36PM   2      A.   DR. TOBY COSGROVE AT THE CLEVELAND CLINIC ASKED ME TO COME

02:36PM   3      SPEAK THERE.

02:36PM   4      Q.   AND DURING THE COURSE OF BEING AT THAT CONFERENCE -- WHEN

02:36PM   5      DID THAT CONFERENCE TAKE PLACE?

02:36PM   6      A.   IN THE FALL OF 2014, I THINK SEPTEMBER OF 2014, MAYBE

02:36PM   7      OCTOBER.

02:36PM   8      Q.   DURING THE COURSE OF BEING AT THAT CONFERENCE, DID YOU

02:36PM   9      MEET WITH OTHER POTENTIAL INVESTORS IN THERANOS?

02:36PM  10      A.   I DID.

02:36PM  11      Q.   WHO COORDINATED YOUR MEETINGS WITH OTHER POTENTIAL

02:36PM  12      INVESTORS IN THERANOS?

02:36PM  13      A.   MR. MOSLEY.

02:36PM  14      Q.   WHAT OTHER POTENTIAL INVESTORS DID YOU MEET WITH DURING

02:36PM  15      THE COURSE OF THE BDT CONFERENCE IN THE FALL OF 2014?

02:37PM  16      A.   I MET WITH JERRY TUBERGEN, WHO WAS THE FUNDS MANAGER FOR

02:37PM  17      THE DEVOS FAMILY; AND I MET WITH ALEX TAYLOR, WHO WAS ONE OF

02:37PM  18      THE FAMILY MEMBERS FOR THE COX FAMILY.

02:37PM  19      Q.   AND WHAT DO YOU RECALL ABOUT THOSE MEETINGS WITH

02:37PM  20      MR. TUBERGEN AND MR. TAYLOR?

02:37PM  21      A.   I RECALL THAT WE SPENT A LOT OF TIME TALKING ABOUT THE

02:37PM  22      CHANGE WE WERE TRYING TO MAKE IN HEALTH CARE, WHAT IT WOULD

02:37PM  23      TAKE, AND WHY OUR INVENTIONS COULD REALIZE THAT VISION.

02:37PM  24      Q.   DID MR. MOSLEY PARTICIPATE IN THOSE MEETINGS?

02:37PM  25      A.   HE DID.

7624

02:37PM 1    Q.   WHEN THAT CONFERENCE CONCLUDED, DID YOU CONTINUE TO MEET

02:37PM 2    WITH OTHER REPRESENTATIVES OF THE COX FAMILY AND THE DEVOS

02:37PM 3    FAMILY?

02:37PM 4    A.   I DID.

02:37PM 5    Q.   DID MR. MOSLEY CONTINUE TO PARTICIPATE IN THOSE

02:37PM 6    DISCUSSIONS?

02:37PM 7    A.   YES.

02:37PM 8    Q.   OVER TIME, DID MR. MOSLEY INTRODUCE YOU TO OTHER POTENTIAL

02:37PM 9    INVESTORS IN THERANOS?

02:38PM 10   A.   HE DID.

02:38PM 11   Q.   WHAT OTHER POTENTIAL INVESTORS IN THERANOS DID HE

02:38PM 12   INTRODUCE YOU TO?

02:38PM 13   A.   HE INTRODUCED US TO ALICE WALTON IN THE WALTON FAMILY; TO

02:38PM 14   JOHN ELKANN, WHO WAS PART OF THE FIAT FAMILY; TO HANK SLACK,

02:38PM 15   WHO WAS PART OF THE OPPENHEIMER FAMILY; AND TO

02:38PM 16   ANDREAS DRACOPOULOS, WHO WAS PART OF THE NIARCHOS FAMILY.

02:38PM 17   Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHY MR. MOSLEY WAS

02:38PM 18   INTRODUCED YOU TO THESE POTENTIAL INVESTORS IN THERANOS?

02:38PM 19   A.   SOME OF THEM WERE PEOPLE THAT DR. KISSINGER KNEW THAT HE

02:38PM 20   RECOMMENDED WE CONNECT WITH.

02:38PM 21       OTHERS WERE CLIENTS OF MR. MOSLEY'S WHO MR. MOSLEY THOUGHT

02:38PM 22   WOULD BE INTERESTED IN THERANOS.

02:38PM 23   Q.   AND DID YOU UNDERSTAND THAT MR. MOSLEY WAS HAVING

02:38PM 24   COMMUNICATIONS WITH REPRESENTATIVES OF THOSE POTENTIAL

02:39PM 25   INVESTORS WHICH YOU WERE NOT PART OF?

7625

| | | |
|---|---|---|
| 02:39PM | 1 | A.   I DID. |
| 02:39PM | 2 | Q.   AND WHAT DID YOU UNDERSTAND AS TO THE ROLE THAT HE WAS |
| 02:39PM | 3 | PLAYING WITH RESPECT TO THE INVESTMENTS OF THOSE OTHER |
| 02:39PM | 4 | POTENTIAL INVESTORS? |
| 02:39PM | 5 | A.   I UNDERSTOOD HE WAS AN ADVISOR TO THEM. |
| 02:39PM | 6 | Q.   LET ME ASK YOU ABOUT THE TESTIMONY THAT MR. MOSLEY GAVE |
| 02:39PM | 7 | CONCERNING THE CONTENT OF THE REPORT THAT HE PREPARED. |
| 02:39PM | 8 | A.   YES. |
| 02:39PM | 9 | Q.   DO YOU RECALL THAT HE SAID THAT HE PREPARED THAT OUT OF |
| 02:39PM | 10 | MATERIALS THAT HAD BEEN SENT TO HIM BY THERANOS? |
| 02:39PM | 11 | A.   I DO. |
| 02:39PM | 12 | Q.   AND DO YOU RECALL THAT HE SAID HE FORWARDED THAT REPORT TO |
| 02:39PM | 13 | DR. KISSINGER? |
| 02:39PM | 14 | A.   I DO. |
| 02:39PM | 15 | Q.   DID HE ASK YOU IN ANY WAY, EVEN IF HE DIDN'T SHOW YOU THE |
| 02:40PM | 16 | REPORT, DID HE ASK YOU IN ANY WAY TO REVIEW OR CONSIDER |
| 02:40PM | 17 | ANYTHING THAT HE WAS SAYING IN THAT REPORT? |
| 02:40PM | 18 | A.   HE DID NOT. |
| 02:40PM | 19 | Q.   OKAY.  I WANT TO GO BACK FOR A MOMENT AND RETURN TO THE |
| 02:40PM | 20 | SUBJECT OF MARKETING, WHICH WE HAD DISCUSSED, BUT I NEGLECTED |
| 02:40PM | 21 | TO SHOW YOU ONE OF THE DOCUMENTS THAT I WANTED TO SHOW YOU IN |
| 02:40PM | 22 | CONNECTION WITH THAT SUBJECT, WHICH IS EXHIBIT 7755. |
| 02:40PM | 23 | A.   OKAY.  OKAY. |
| 02:40PM | 24 | Q.   IS EXHIBIT 7755 A DOCUMENT THAT YOU CAN IDENTIFY? |
| 02:40PM | 25 | A.   IT IS, YES. |

7626

02:41PM  1      Q.   AND WHAT IS EXHIBIT 7755?

02:41PM  2      A.   IT IS A PRESENTATION MADE TO THERANOS, AND TO ME, BY

02:41PM  3      CHIAT/DAY ON THEIR RECOMMENDATIONS FOR HOW TO LAUNCH OUR

02:41PM  4      COMPANY.

02:41PM  5              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:41PM  6      7755.

02:41PM  7              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:41PM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:41PM  9          (DEFENDANT'S EXHIBIT 7755 WAS RECEIVED IN EVIDENCE.)

02:41PM  10     BY MR. DOWNEY:

02:41PM  11     Q.   IS THE CONTENT THAT IS IN THIS EXHIBIT CONTENT THAT WAS

02:41PM  12     PREPARED BY CHIAT/DAY?

02:41PM  13     A.   YES.

02:41PM  14     Q.   AND DO YOU SEE IT REFERENCES THE DATE OF SEPTEMBER 12TH,

02:41PM  15     2011?

02:41PM  16     A.   I DO.

02:41PM  17     Q.   DID YOU MEET WITH REPRESENTATIVES OF CHIAT/DAY AROUND

02:41PM  18     SEPTEMBER 12TH, 2011?

02:41PM  19     A.   YES.

02:41PM  20     Q.   WHERE DID THAT MEETING TAKE PLACE?

02:41PM  21     A.   I THINK THIS WAS IN L.A.

02:41PM  22     Q.   IS THAT WHERE CHIAT/DAY WAS -- THE CHIAT/DAY OFFICE THAT

02:42PM  23     YOU WERE WORKING WITH WAS LOCATED?

02:42PM  24     A.   IT IS.

02:42PM  25     Q.   AND WERE THERE REPRESENTATIVES OF -- SEVERAL

7627

02:42PM  1    REPRESENTATIVES OF CHIAT/DAY PRESENT?

02:42PM  2    A.   YES.

02:42PM  3    Q.   AND WHO DO YOU RECALL BEING PRESENT FROM CHIAT/DAY?

02:42PM  4    A.   I REMEMBER CARISA BIANCHI, WHO WAS THE PERSON -- I THINK

02:42PM  5    SHE WAS LEADING CHIAT/DAY AT THAT POINT, AND THE PERSON WHO WAS

02:42PM  6    THE POINT ON THE PROJECT.

02:42PM  7    Q.   LET'S LOOK AT THE SLIDES THAT ARE PART OF THIS

02:42PM  8    PRESENTATION, AND LET ME ASK YOU TO GO TO THE SECOND SLIDE.

02:42PM  9         AND DO YOU SEE HERE THERE'S A REFERENCE TO OUR PHILOSOPHY?

02:42PM 10    A.   YES.

02:42PM 11    Q.   AND THAT'S APPARENTLY CHIAT/DAY'S PHILOSOPHY?

02:42PM 12    A.   YES.

02:42PM 13    Q.   AND THEN THEY MAKE A REFERENCE TO BRAND BELIEF AND BRAND

02:42PM 14    BEHAVIOR?

02:42PM 15    A.   YES.

02:42PM 16    Q.   ARE THOSE CONCEPTS THAT YOU DISCUSSED WITH CHIAT/DAY AT

02:43PM 17    THIS MEETING IN 2011?

02:43PM 18    A.   THEY ARE.

02:43PM 19    Q.   AND ARE THEY CONCEPTS THAT YOU DISCUSSED WITH THEM AFTER

02:43PM 20    THIS MEETING IN SEPTEMBER OF 2011?

02:43PM 21    A.   YES.

02:43PM 22    Q.   AND WHAT DID YOU UNDERSTAND WAS MEANT BY BRAND BELIEF?

02:43PM 23    A.   I UNDERSTOOD BRAND BELIEF IS A SYMBOL FOR WHAT YOU BELIEVE

02:43PM 24    IN AS A COMPANY AND A SYMBOL FOR WHAT YOU'RE TRYING TO DO,

02:43PM 25    TRYING TO CHANGE IN THE WORLD.

7628

| | | |
|---|---|---|
| 02:43PM | 1 | Q.   AND WAS THAT SOMETHING THAT CHIAT/DAY THOUGHT WAS |
| 02:43PM | 2 | IMPORTANT IN BRANDING AND MARKETING A COMPANY? |
| 02:43PM | 3 | A.   YES. |
| 02:43PM | 4 | Q.   AND DO YOU SEE THAT THERE'S A REFERENCE TO BRAND BEHAVIOR? |
| 02:43PM | 5 | A.   YES. |
| 02:43PM | 6 | Q.   AND WHAT DID YOU UNDERSTAND CHIAT/DAY MEANT BY BRAND |
| 02:43PM | 7 | BEHAVIOR? |
| 02:43PM | 8 | A.   I UNDERSTOOD THAT THESE WERE THE KEY TENETS OF HOW A BRAND |
| 02:43PM | 9 | OR A COMPANY OR A PRODUCT OPERATES TO REALIZE THAT BELIEF OR |
| 02:43PM | 10 | THAT SYMBOL OF WHAT YOU'RE TRYING TO DO. |
| 02:43PM | 11 | Q.   AND WHAT RECOMMENDATIONS DID CHIAT/DAY MAKE TO THERANOS AS |
| 02:44PM | 12 | TO HOW IT SHOULD TREAT ITS BRAND BELIEF AND BRAND BEHAVIOR? |
| 02:44PM | 13 | A.   THEY RECOMMENDED THAT WE TRY TO SIMPLIFY WHAT WE WERE |
| 02:44PM | 14 | DOING AND CONVEY IT IN IMAGES AND IN VERY FEW WORDS THAT WOULD |
| 02:44PM | 15 | ALLOW PEOPLE TO GRASP THE CHANGE THAT WE WERE TRYING TO MAKE. |
| 02:44PM | 16 | Q.   AND IS THAT A RECOMMENDATION THAT THERANOS TRIED TO CARRY |
| 02:44PM | 17 | OUT IN DEVELOPING MARKETING AND BRANDING MATERIAL? |
| 02:44PM | 18 | A.   IT IS. |
| 02:44PM | 19 | Q.   IF YOU SEE UNDER BRAND BELIEF IT SAYS, "DISRUPTION DEFINES |
| 02:44PM | 20 | A STRATEGY FOR GROWTH.  WE ARTICULATE THIS AS A BRAND BELIEF. |
| 02:44PM | 21 | IT SERVES AS A NORTH STAR FOR THE BRAND, AND HELPS TO GROUND |
| 02:44PM | 22 | EVERYONE WHO TOUCHES THE BRAND." |
| 02:44PM | 23 | DO YOU SEE THAT? |
| 02:44PM | 24 | A.   I DO. |
| 02:44PM | 25 | Q.   AND IS THAT -- WAS THERE A SPECIFIC RECOMMENDATION AS TO |

7629

02:45PM  1    HOW THERANOS SHOULD EXPRESS ITS BRAND BELIEF?

02:45PM  2    A.   YES, IN IMAGES OR SYMBOLS OF WHAT WE WANTED TO CHANGE AND

02:45PM  3    HOW WE WOULD CHANGE IT.

02:45PM  4    Q.   OKAY.  AND UNDER BRAND BEHAVIOR, IT SAYS THE BRAND

02:45PM  5    BEHAVIOR IS THE WAY THAT -- DEFINES THE WAY IN WHICH A BRAND

02:45PM  6    BEHAVES TO HONOR THIS BELIEF.  "THIS CAN AND SHOULD INFLUENCE

02:45PM  7    ALL ASPECTS OF A BRAND, INCLUDING MARKETING AND ADVERTISING,

02:45PM  8    PACKAGING, PRODUCT DEVELOPMENT AND INNOVATION."

02:45PM  9    DO YOU SEE THAT?

02:45PM  10   A.   YES.

02:45PM  11   Q.   AND WHAT SPECIFIC RECOMMENDATIONS DID CHIAT/DAY MAKE TO

02:45PM  12   THERANOS ABOUT BRAND BEHAVIOR?

02:45PM  13   A.   AGAIN, THAT WE SHOULD SIMPLIFY THE KEY TENETS ASSOCIATED

02:45PM  14   WITH OUR BRAND AND COMMUNICATE THEM, BE CONSISTENT ABOUT THEM

02:45PM  15   IN EVERY ASPECT OF WHAT WE DID.

02:46PM  16   SO OUR BELIEF WAS IN PROVIDING ACCESS TO TESTING.  ONE OF

02:46PM  17   THOSE KEY TENETS WAS IN PRICING AND LOW COST, WHICH MEANT THAT

02:46PM  18   IN EVERY ASPECT OF WHAT WE DID AS A COMPANY, WE WERE TRYING TO

02:46PM  19   REALIZE LOW COST TESTING FOR PATIENTS, AND WE TRIED TO BE

02:46PM  20   CONSISTENT WITH THAT ACROSS THE BOARD.

02:46PM  21   Q.   HAVE YOU SEEN THE EXHIBITS THAT HAVE BEEN INTRODUCED IN

02:46PM  22   THIS CASE WHICH CONTAIN IMAGES OF A SMALL SAMPLE OF BLOOD?

02:46PM  23   A.   I HAVE.

02:46PM  24   Q.   DO THOSE RELATE IN ANY WAY TO THESE RECOMMENDATIONS ABOUT

02:46PM  25   BRAND BELIEF AND BRAND BEHAVIOR?

7630

02:46PM 1    A.   YES.   THOSE WERE THE SYMBOLS OF THE PRODUCT THAT WE WERE

02:46PM 2    TRYING TO BUILD.

02:46PM 3    Q.   OKAY.   NOW, I WANT TO TALK ABOUT THE FACT THAT YOU WOULD

02:46PM 4    BE LAUNCHING IN SEPTEMBER OF 2013.   THIS MEETING SEEMS TO HAVE

02:46PM 5    BEEN IN SEPTEMBER OF 2011.

02:46PM 6         DID THERANOS ULTIMATELY BEGIN TO WORK WITH CHIAT/DAY IN

02:47PM 7    SEPTEMBER OF 2012?

02:47PM 8    A.   WE DID.

02:47PM 9    Q.   AND WAS THERE ANY ADVICE THAT CHIAT/DAY GAVE YOU ABOUT

02:47PM 10   LAUNCHING AS PART OF A -- AS BEING A SERVICE CENTER THAT WAS

02:47PM 11   PART OF WALGREENS STORES?

02:47PM 12   A.   YES.

02:47PM 13   Q.   AND WHAT ADVICE DID THEY GIVE YOU?

02:47PM 14   A.   WE TALKED A LOT ABOUT THIS BECAUSE THERE ARE A LOT OF

02:47PM 15   COMPANIES OR TECHNOLOGIES THAT BECOME GENERICS WITHIN A

02:47PM 16   PHARMACY, AND IT WAS REALLY IMPORTANT FOR THERANOS RIGHT OUT OF

02:47PM 17   THE GATE TO BE ABLE TO ESTABLISH ITS OWN BRAND AND ITS OWN

02:47PM 18   IDENTITY.   WE WERE WORRIED ABOUT BECOMING JUST A LAB OFFERING

02:47PM 19   WITHOUT REALLY BEING ABLE TO BUILD A TOTALLY DIFFERENT

02:47PM 20   EXPERIENCE FOR PEOPLE.

02:47PM 21        AND SO THEY GAVE US ADVICE ON HOW TO BUILD A STAND-ALONE

02:47PM 22   BRAND AS OPPOSED TO ONE THAT WOULD BE COPIED OR GENERICIZED OR

02:48PM 23   EMBEDDED IN SOME OTHER COMPANY.

02:48PM 24   Q.   WELL, WALGREENS WAS A PARTNER WITH THERANOS AT THIS POINT?

02:48PM 25   A.   THEY WERE.

7631

02:48PM 1    Q.   DID YOU HAVE ANY -- DID YOU HAVE CONCERN ABOUT BEING

02:48PM 2    ASSOCIATED WITH A NATIONAL BRAND LIKE THAT?

02:48PM 3    A.   NO.  WE WERE, WE WERE INCREDIBLY EXCITED TO BE ASSOCIATED

02:48PM 4    WITH A NATIONAL BRAND, BUT WE ALSO KNEW THAT WALGREENS COULD

02:48PM 5    EASILY REPLACE US.

02:48PM 6    Q.   AND DID YOU HAVE SPECIFIC CONCERNS ABOUT HOW THAT MIGHT

02:48PM 7    HAPPEN?

02:48PM 8    A.   THEY HAD TALKED AT CERTAIN POINTS ABOUT OPENING THEIR OWN

02:48PM 9    LABORATORIES AND OFFERING THOSE THROUGHOUT THE STORE, OR

02:48PM 10    WORKING WITH OTHER LABORATORY COMPANIES.

02:48PM 11    Q.   OKAY.  DID THE TEAM FROM CHIAT/DAY HELP THERANOS TO

02:48PM 12    DEVELOP SOME OF THE SPECIFIC MATERIALS THAT IT USED IN

02:48PM 13    CONNECTION WITH ITS MARKETING?

02:48PM 14    A.   YES.

02:48PM 15    Q.   DID THOSE INCLUDE WEBSITE MATERIALS?

02:48PM 16    A.   YES.

02:48PM 17    Q.   DID THEY INCLUDE OTHER MARKETING MATERIALS?

02:48PM 18    A.   YES.

02:48PM 19    Q.   AND DID CERTAIN IMAGES RECUR THROUGHOUT THOSE FORMS OF

02:49PM 20    MARKETING?

02:49PM 21    A.   YES.

02:49PM 22    Q.   AND WERE INDEED THOSE -- SOME OF THESE MATERIALS INCLUDED

02:49PM 23    IN THE SLIDE DECKS THAT WE WERE TALKING ABOUT FOR USE IN

02:49PM 24    CONNECTION WITH POTENTIAL INVESTORS AND OTHERS?

02:49PM 25    A.   THEY WERE.

7632

02:49PM   1    Q.   OKAY.  LET ME MOVE NEXT TO TALKING ABOUT THERANOS'S

02:49PM   2    RELATIONSHIP WITH SAFEWAY IN THE YEARS BETWEEN 2010 AND 2015.

02:49PM   3        TELL US FIRST HOW YOU CAME TO -- WAS SAFEWAY A RETAIL

02:49PM   4    STORE THAT THERANOS WAS INTERESTED IN PARTNERING WITH IN 2010?

02:49PM   5    A.   YES.

02:49PM   6    Q.   AND HOW DID THERANOS COME TO BE IN CONTACT WITH SAFEWAY IN

02:49PM   7    2010?

02:49PM   8    A.   DON LUCAS, OUR CHAIRMAN, WAS ON A BOARD WITH

02:49PM   9    ROBERT EDWARDS, WHO WAS THEN THE CFO OF SAFEWAY.

02:50PM  10    Q.   AND DID MR. LUCAS ASK MR. EDWARDS TO CONSIDER A POTENTIAL

02:50PM  11    RETAIL PARTNERSHIP?

02:50PM  12    A.   HE DID.

02:50PM  13    Q.   AND DID YOU BECOME INVOLVED IN DISCUSSIONS WITH SAFEWAY

02:50PM  14    ABOUT A POTENTIAL PARTNERSHIP IN 2010?

02:50PM  15    A.   YES.

02:50PM  16    Q.   NOW, THOSE DISCUSSIONS WERE IN THE FIRST QUARTER OR SO OF

02:50PM  17    2010; IS THAT RIGHT?

02:50PM  18    A.   YES.

02:50PM  19    Q.   AND AT THE TIME OF THOSE DISCUSSIONS, WAS THE IDEA THAT

02:50PM  20    THEY WOULD LAUNCH SERVICE CENTERS IN SAFEWAY STORES?

02:50PM  21    A.   YES.

02:50PM  22    Q.   DID THERANOS EVER END UP LAUNCHING TESTING SERVICES OR

02:50PM  23    SERVICE CENTERS IN SAFEWAY STORES?

02:50PM  24    A.   WE DID NOT.

02:50PM  25    Q.   WHEN DID THE PARTNERSHIP WITH SAFEWAY END?

7633

| | | |
|---|---|---|
| 02:50PM | 1 | A.   IN 2016. |
| 02:50PM | 2 | Q.   AND WHY DID THERANOS NEVER LAUNCH SERVICE CENTERS IN |
| 02:50PM | 3 | SAFEWAY STORES? |
| 02:51PM | 4 | A.   ULTIMATELY WHEN THERANOS RAN INTO LABORATORY AND |
| 02:51PM | 5 | REGULATORY ISSUES, WE TERMINATED THE RELATIONSHIP WITH SAFEWAY. |
| 02:51PM | 6 | Q.   WERE THERE THINGS THAT HAPPENED IN THE PERIOD BETWEEN 2010 |
| 02:51PM | 7 | AND 2016 THAT PRESENTED CHALLENGES IN THE RELATIONSHIP BETWEEN |
| 02:51PM | 8 | SAFEWAY AND THERANOS? |
| 02:51PM | 9 | A.   YES. |
| 02:51PM | 10 | Q.   AND WHAT WERE THOSE? |
| 02:51PM | 11 | A.   A BIG ONE WAS STEVE BURD'S DEPARTURE FROM SAFEWAY IN 2013, |
| 02:51PM | 12 | WHICH SORT OF RESET THE RELATIONSHIP IN MANY WAYS. |
| 02:51PM | 13 | Q.   OKAY.   AND BETWEEN 2010 AND THE MIDDLE OF 2013, WAS |
| 02:51PM | 14 | MR. BURD THE CEO? |
| 02:51PM | 15 | A.   HE WAS. |
| 02:51PM | 16 | Q.   AND WAS HE THE INDIVIDUAL AT SAFEWAY WITH WHOM YOU |
| 02:51PM | 17 | FREQUENTLY DISCUSSED THE PARTNERSHIP? |
| 02:51PM | 18 | A.   YES. |
| 02:51PM | 19 | Q.   LET'S TALK ABOUT THE EARLY INTERACTIONS THAT YOU HAD WITH |
| 02:51PM | 20 | MR. BURD PRIOR TO THE TIME THAT THERE WAS AN AGREEMENT. |
| 02:52PM | 21 | A.   YES. |
| 02:52PM | 22 | Q.   DO YOU RECALL HAVING A MEETING WITH HIM IN 2010? |
| 02:52PM | 23 | A.   I DO. |
| 02:52PM | 24 | Q.   AND DID YOU -- DID HE MAKE ANY REQUESTS OF YOU IN |
| 02:52PM | 25 | CONNECTION WITH EVALUATING THERANOS AS A POTENTIAL PARTNER? |

7634

02:52PM   1     A.   YES.

02:52PM   2     Q.   AND WHAT DID HE ASK?

02:52PM   3     A.   HE WANTED TO DO DILIGENCE ON THERANOS AND OUR TECHNOLOGY.

02:52PM   4     Q.   AND WHAT DID HE ASK YOU TO DO TO ALLOW HIM TO CONDUCT

02:52PM   5     DILIGENCE ON THERANOS AND ITS TECHNOLOGY?

02:52PM   6     A.   HE WANTED US TO MEET WITH UCSF TO REVIEW THE TECHNOLOGY.

02:52PM   7     Q.   AND DID YOU MEET WITH UCSF?

02:52PM   8     A.   I DID.

02:52PM   9     Q.   WERE YOU PERSONALLY INVOLVED IN THOSE MEETINGS?

02:52PM  10     A.   I WAS.

02:52PM  11     Q.   WHO AT UCSF DID YOU MEET WITH?

02:52PM  12     A.   I MET WITH SUE DESMOND-HELLMANN, WHO I THINK WAS THE

02:52PM  13     CHANCELLOR AT THAT POINT IN TIME.

02:53PM  14     Q.   AND WHAT WAS DR. DESMOND-HELLMANN'S BACKGROUND?

02:53PM  15     A.   SHE HAD BEEN AN EXECUTIVE AT GENENTECH AND WAS RESPONSIBLE

02:53PM  16     FOR HELPING WITH THE DEVELOPMENT OF SEVERAL AMAZING DRUGS.

02:53PM  17     Q.   WHAT DO YOU RECALL ABOUT YOUR MEETING WITH

02:53PM  18     DR. DESMOND-HELLMANN IN 2010?

02:53PM  19     A.   I REMEMBER REVIEWING THE DESIGNS FOR OUR TECHNOLOGY,

02:53PM  20     REVIEWING OUR DATA, BRINGING A DEVICE TO RUN THERE AND RUN A

02:53PM  21     SAMPLE AT UCSF FOR HER, AND DISCUSSING WHAT THE TECHNOLOGY

02:53PM  22     COULD DO.

02:53PM  23     Q.   PRIOR -- DID YOU ULTIMATELY SIGN AN AGREEMENT WITH SAFEWAY

02:53PM  24     IN 2010?

02:53PM  25     A.   YES.

7635

02:53PM   1    Q.   AND PRIOR TO THE TIME THAT YOU SIGNED THAT AGREEMENT, DID

02:53PM   2    MR. BURD ASK YOU TO DO ANYTHING ELSE WITH UCSF IN THAT WINDOW?

02:53PM   3    A.   I DON'T THINK SO.

02:53PM   4    Q.   DID SAFEWAY ALSO PERFORM FINANCIAL DUE DILIGENCE ON

02:54PM   5    THERANOS IN THE PERIOD IT WAS CONSIDERING A PARTNERSHIP WITH

02:54PM   6    THERANOS IN 2010?

02:54PM   7    A.   YES.

02:54PM   8    Q.   WHAT DO YOU RECALL ABOUT THAT FINANCIAL DUE DILIGENCE

02:54PM   9    PROCESS?

02:54PM   10   A.   THAT MR. EDWARDS HAD A SERIES OF MEETINGS WITH DON LUCAS,

02:54PM   11   OUR CHAIRMAN, AND THERE WERE EXECUTIVES WITHIN SAFEWAY WHO HAD

02:54PM   12   MEETINGS WITH SUNNY BALWANI TO DO FINANCIAL DILIGENCE AND

02:54PM   13   DEVELOP A MODEL OR A SERIES OF PROJECTIONS FOR WHAT WE COULD DO

02:54PM   14   WITH SAFEWAY.

02:54PM   15   Q.   LET ME ASK YOU TO LOOK IN THAT THIRD VOLUME AT THE EXHIBIT

02:54PM   16   THAT IS MARKED AS 10539.

02:54PM   17   A.   OKAY.

02:54PM   18   Q.   IS EXHIBIT 10539 AN EMAIL FROM MR. BALWANI TO CERTAIN

02:55PM   19   INDIVIDUALS AT SAFEWAY THAT YOU WERE COPIED ON?

02:55PM   20   A.   YES.

02:55PM   21   Q.   AND DOES THIS RELATE TO THE FINANCIAL DUE DILIGENCE THAT

02:55PM   22   SAFEWAY WAS PERFORMING BEFORE ENTERING A DEAL WITH THERANOS?

02:55PM   23   A.   YES.

02:55PM   24        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:55PM   25   10539.

7636

02:55PM 1          MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:55PM 2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55PM 3          (DEFENDANT'S EXHIBIT 10539 WAS RECEIVED IN EVIDENCE.)

02:55PM 4   BY MR. DOWNEY:

02:55PM 5   Q.   LOOK AT THE EMAIL.  IT'S MR. BALWANI WRITING TO AN

02:55PM 6   INDIVIDUAL NAMED BRAD WOLFSEN.

02:55PM 7          AND WHO WAS MR. WOLFSEN?

02:55PM 8   A.   HE WAS AN EXECUTIVE AT SAFEWAY.

02:55PM 9   Q.   AND HE SAYS IN THE EMAIL COMMUNICATION IN THE THIRD

02:56PM 10  PARAGRAPH THAT -- HE SAYS, "WE TOOK YOUR FINANCIAL MODEL BASED

02:56PM 11  ON SAFEWAY'S PROJECTIONS AND ADDED 3 MORE ROWS TO THE RETAIL RX

02:56PM 12  TAB."

02:56PM 13         DO YOU SEE THAT?

02:56PM 14  A.   I DO.

02:56PM 15  Q.   AND IS THIS AN EXERCISE THAT MR. BALWANI AND THE

02:56PM 16  EXECUTIVES AT SAFEWAY WERE GOING THROUGH REGARDING HOW TO

02:56PM 17  PROJECT REVENUES FROM THERANOS SERVICE CENTERS IN SAFEWAY

02:56PM 18  STORES?

02:56PM 19  A.   YES.

02:56PM 20  Q.   WHO AT THERANOS WAS PRINCIPALLY RESPONSIBLE FOR

02:56PM 21  SHEPHERDING THAT FINANCIAL DUE DILIGENCE IN THE PERIOD BEFORE

02:56PM 22  THE SAFEWAY AGREEMENT WAS SIGNED?

02:56PM 23  A.   SUNNY BALWANI WAS.

02:56PM 24  Q.   NOW, WE DISCUSSED THIS MORNING THE DEVELOPMENT OF

02:56PM 25  THERANOS'S TECHNOLOGY IN THE PERIOD BETWEEN 2010 AND 2013.

7637

02:57PM   1        DO YOU RECALL THAT?

02:57PM   2    A.   I DO.

02:57PM   3    Q.   AND DO YOU RECALL THAT YOU TESTIFIED THAT THERANOS WAS

02:57PM   4    WORKING TO EXPAND THE NUMBER OF ASSAYS IT WOULD HAVE AVAILABLE

02:57PM   5    IN THE PERIOD OF 2010 AND IN THE YEARS THEREAFTER?

02:57PM   6    A.   YES.

02:57PM   7    Q.   WHEN YOU MET WITH SAFEWAY IN 2010, WHAT DID YOU TELL THEM

02:57PM   8    ABOUT THERANOS'S TECHNOLOGY?

02:57PM   9    A.   I TOLD THEM THAT WE HAD DEVELOPED TECHNOLOGY IN THE PAST

02:57PM  10    TO BE ABLE TO RUN ASSAYS ON OUR DEVICES, AND THAT WE COULD RUN

02:57PM  11    ADDITIONAL ASSAYS WITH THE TECHNOLOGY WE WERE DEVELOPING TO BE

02:57PM  12    ABLE TO REALIZE THE GOAL OF DOING BROADER TESTS.

02:57PM  13    Q.   AND WAS THAT A REFERENCE TO THE SERIES 4.0 TECHNOLOGY

02:57PM  14    THERANOS WAS DEVELOPING AS OF 2010?

02:57PM  15    A.   YES.

02:57PM  16    Q.   AND DID YOU ULTIMATELY ENTER INTO AN AGREEMENT WITH

02:58PM  17    SAFEWAY?

02:58PM  18    A.   YES.

02:58PM  19    Q.   AND DID YOU PLAY A ROLE IN NEGOTIATING THAT AGREEMENT?

02:58PM  20    A.   I DID.

02:58PM  21    Q.   AND DID YOU NEGOTIATE WITH MR. BURD IN THAT AGREEMENT, IN

02:58PM  22    THAT DISCUSSION OF THE AGREEMENT?

02:58PM  23    A.   YES.

02:58PM  24    Q.   AND DID YOU HEAR THE TESTIMONY FROM MR. BURD DURING THIS

02:58PM  25    TRIAL THAT HE FELT IT WAS STRANGE THAT YOU DID NOT HAVE LEGAL

7638

02:58PM   1    COUNSEL PRESENT WITH YOU DURING THE COURSE OF THOSE

02:58PM   2    NEGOTIATIONS?

02:58PM   3    A.   YES.

02:58PM   4    Q.   WHY DID YOU HANDLE THOSE NEGOTIATIONS ON YOUR OWN AND NOT

02:58PM   5    HAVE LAWYERS PRESENT?

02:58PM   6    A.   THIS WAS A REALLY IMPORTANT RELATIONSHIP TO US.  I WANTED

02:58PM   7    TO TALK TO HIM DIRECTLY AND DO WHATEVER WE COULD TO MAKE THE

02:58PM   8    RELATIONSHIP HAPPEN IN THE CONTEXT OF AGREEING TO THINGS IN THE

02:58PM   9    NEGOTIATION, AND WE DIDN'T HAVE THE MONEY TO BE ABLE TO HAVE A

02:58PM  10    LOT OF LAWYERS.  WE WERE A SMALL COMPANY AT THAT POINT.

02:59PM  11    Q.   AND WERE YOU ULTIMATELY ABLE TO EXECUTE AN AGREEMENT WITH

02:59PM  12    SAFEWAY?

02:59PM  13    A.   WE WERE.

02:59PM  14    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 387, WHICH IS ALREADY IN

02:59PM  15    EVIDENCE.  AND I'LL SHOW YOU THE FIRST PAGE.

02:59PM  16        DO YOU SEE THAT THIS IS THE AGREEMENT THAT WAS ENTERED

02:59PM  17    INTO BETWEEN THERANOS AND SAFEWAY IN 2010?

02:59PM  18    A.   I DO.

02:59PM  19    Q.   I WANT TO DIRECT YOUR ATTENTION TO PAGE 8.

02:59PM  20        AND I WANT TO DIRECT YOUR ATTENTION SPECIFICALLY TO

02:59PM  21    NUMBER 3, THE PROGRAM PHASES.

02:59PM  22        IF YOU COULD JUST HIGHLIGHT THAT.

02:59PM  23        WAS THE THERANOS-SAFEWAY RELATIONSHIP SET TO OPERATE IN

03:00PM  24    PHASES AT THE TIME THAT YOU SIGNED THIS AGREEMENT?

03:00PM  25    A.   YES.

7639

03:00PM 1    Q.   WHAT WERE THE PHASES OF THE SAFEWAY AGREEMENT?

03:00PM 2    A.   THERE WERE THREE.  THERE WAS WHAT WAS CALLED HERE THE

03:00PM 3    PRE-PILOT PERIOD; THERE WAS A PILOT; AND THEN THERE WAS A BROAD

03:00PM 4    ROLLOUT OR LAUNCH PERIOD.

03:00PM 5    Q.   AND WHAT WAS TO HAPPEN DURING THE PRE-PILOT PERIOD?

03:00PM 6    A.   A LOT OF WORK TO DO, INCLUDING WE HAD AGREED TO CUSTOMIZE

03:00PM 7    OUR DEVICES AND TESTS FOR SAFEWAY AND TO BUILD CUSTOM SOFTWARE

03:00PM 8    FOR THEM.

03:00PM 9        WE HAD TO CONTRACT WITH INSURANCE COMPANIES, GET THE

03:00PM 10   CONTRACTS, NEGOTIATE PRICING RATES, BUILD THE SOFTWARE TO BE

03:00PM 11   ABLE TO INTERFACE WITH THEM AND THE ELECTRONIC MEDICAL RECORDS

03:00PM 12   WE WERE TALKING ABOUT EARLIER, AND BUILD THE ORGANIZATION TO

03:00PM 13   MEET SERVICE STANDARDS THAT SAFEWAY WAS GOING TO SET FOR

03:00PM 14   RETAIL, WHICH INCLUDED CUSTOMER SUPPORT, CUSTOMER SERVICE, AND

03:01PM 15   OTHER ORGANIZATIONS.

03:01PM 16   Q.   DO YOU SEE THAT UNDER THE AGREEMENT THE OBLIGATIONS DURING

03:01PM 17   THE PRE-PILOT PERIOD WERE IMPOSED ON SAFEWAY, OR ON THERANOS

03:01PM 18   RATHER?

03:01PM 19   A.   YES.

03:01PM 20   Q.   AND WHAT WOULD HAPPEN IF THERANOS DID NOT MEET THOSE

03:01PM 21   CONDITIONS?

03:01PM 22   A.   SAFEWAY COULD TERMINATE THE AGREEMENT.

03:01PM 23   Q.   AND WAS THERANOS PAID UNDER THE AGREEMENT?

03:01PM 24   A.   YES.

03:01PM 25   Q.   WHAT HAPPENED TO THE PAYMENT THAT THERANOS GOT UNDER THE

7640

03:01PM   1    AGREEMENT IF SAFEWAY TERMINATED THE AGREEMENT?

03:01PM   2    A.   SAFEWAY GOT THE PAYMENT BACK.

03:01PM   3    Q.   LET ME ASK YOU TO FOCUS SPECIFICALLY ON SOME OF THE

03:01PM   4    LANGUAGE OF THE REQUIREMENTS ON THIS PRE-PILOT PERIOD.

03:01PM   5         DO YOU SEE THAT NUMBER I REFERS TO THAT "THERANOS WILL

03:01PM   6    SECURE THE REGULATORY APPROVALS," AND IT GOES ON FROM THERE?

03:01PM   7    A.   I DO.

03:01PM   8    Q.   DO YOU SEE THAT?

03:01PM   9         AND WHAT REGULATORY APPROVALS IS THAT REFERRING TO?

03:01PM  10    A.   IT'S REFERRING TO WHATEVER REGULATORY APPROVALS WE NEEDED

03:02PM  11    TO BE ABLE TO LAUNCH A PILOT.

03:02PM  12    Q.   DO YOU SEE THE SECOND ENTRY THAT SAYS, "THERANOS WILL

03:02PM  13    CUSTOMIZE THE THERANOS SYSTEMS FOR SAFEWAY," AND THEN IT GOES

03:02PM  14    ON FROM THERE?

03:02PM  15    A.   YES.

03:02PM  16    Q.   AND SO DID THERANOS HAVE AN OBLIGATION TO CUSTOMIZE ITS

03:02PM  17    SYSTEM TO SATISFY WHATEVER SAFEWAY'S REQUIREMENTS WERE DURING

03:02PM  18    THE PRE-PILOT PERIOD?

03:02PM  19    A.   WE DID.

03:02PM  20    Q.   AND DID SAFEWAY DURING THE PRE-PILOT PERIOD MAKE REQUESTS

03:02PM  21    AS TO HOW THERANOS SYSTEMS 4.0 SHOULD BE CUSTOMIZED?

03:02PM  22    A.   YES.

03:02PM  23    Q.   AND WERE SOME OF THOSE CUSTOMIZATION REQUIREMENTS

03:02PM  24    DIFFICULT FOR THERANOS TO IMPLEMENT?

03:02PM  25    A.   YES.

7641

```
03:02PM   1      Q.   LET'S -- LET ME ASK YOU TO LOOK AT EXHIBIT 7174.

03:03PM   2      A.   OKAY.

03:03PM   3      Q.   NOW, LET ME FIRST ASK YOU, AS OF 2010, WAS THE 4 SERIES

03:03PM   4      DEVICE ENVISIONED TO BE THE DEVICE, THE SINGLE DEVICE THAT WE

03:03PM   5      LOOKED AT EARLIER TODAY?

03:03PM   6      A.   YES.

03:03PM   7      Q.   AND DID SAFEWAY MAKE REQUESTS FOR MODIFICATION OF THAT?

03:03PM   8      A.   YES.

03:03PM   9      Q.   WHAT DO YOU RECALL WERE THE MODIFICATIONS THAT SAFEWAY

03:03PM  10      REQUESTED OF THAT HARDWARE?

03:03PM  11      A.   THERE WERE SEVERAL.  THE FIRST WAS THAT INSTEAD OF

03:04PM  12      PROCESSING ONE SAMPLE AT A TIME, THEY ASKED THAT WE BUILD A

03:04PM  13      DEVICE THAT COULD PROCESS SIX SAMPLES AT A TIME.

03:04PM  14           THEY WANTED THE DEVICE TO BE WITHIN VERY SPECIFIC

03:04PM  15      DIMENSIONS THAT COULD FIT WITHIN CABINETRY THAT THEY WERE

03:04PM  16      BUILDING IN THEIR STORES, AND THERE WAS SPECIFIC VENTILATION

03:04PM  17      AND HEAT REQUIREMENTS AROUND THAT.

03:04PM  18      Q.   AND WAS THAT A DEVICE THAT THERANOS HAD BEEN WORKING ON

03:04PM  19      PRIOR TO ITS RELATIONSHIP WITH SAFEWAY?

03:04PM  20      A.   NO.

03:04PM  21      Q.   LET ME ASK YOU, IS EXHIBIT 7174 AN EMAIL FROM MR. BURD TO

03:04PM  22      YOU CONCERNING THE THERANOS-SAFEWAY RELATIONSHIP?

03:04PM  23      A.   YES.

03:04PM  24               MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7174.

03:04PM  25               MR. LEACH:  NO OBJECTION, YOUR HONOR.
```

7642

| | | |
|---|---|---|
| 03:04PM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 03:04PM | 2 | (DEFENDANT'S EXHIBIT 7174 WAS RECEIVED IN EVIDENCE.) |
| 03:05PM | 3 | BY MR. DOWNEY: |
| 03:05PM | 4 | Q.  DO YOU SEE THAT MR. BURD SENT THIS EMAIL TO YOU IN MAY OF |
| 03:05PM | 5 | 2011? |
| 03:05PM | 6 | A.  I DO. |
| 03:05PM | 7 | Q.  AND DO YOU SEE IN THE FIRST SENTENCE HE SAYS, "THE FIRST |
| 03:05PM | 8 | ATTACHMENT LABELLED MINILAB IS A CRUDE SKETCH OF WHAT I AM |
| 03:05PM | 9 | SUGGESTING"? |
| 03:05PM | 10 | A.  YES. |
| 03:05PM | 11 | Q.  AND THEN HE GOES ON TO SAY, "IGNORE THE SCREEN IN FRONT. |
| 03:05PM | 12 | I WOULD PREFER TO MOUNT THE SCREEN ON THE WALL TO THE LEFT OF |
| 03:05PM | 13 | THE UNIT." |
| 03:05PM | 14 | DO YOU SEE THAT? |
| 03:05PM | 15 | A.  I DO. |
| 03:05PM | 16 | Q.  AND LET'S LOOK AT WHAT IS ATTACHED TO THIS EMAIL IN 7174. |
| 03:05PM | 17 | LET'S LOOK AT THIS PAGE AND SEE IF WE CAN SPLIT IT WITH THE |
| 03:05PM | 18 | NEXT PAGE. |
| 03:05PM | 19 | ARE THESE THE ATTACHMENT DRAWINGS THAT MR. BURD SENT TO |
| 03:05PM | 20 | YOU? |
| 03:05PM | 21 | A.  YES. |
| 03:05PM | 22 | Q.  CAN YOU EXPLAIN WHAT YOU UNDERSTOOD MR. BURD WAS |
| 03:05PM | 23 | REQUESTING WITH REGARD TO THE THERANOS SYSTEM 4.0 WHEN HE SENT |
| 03:05PM | 24 | THESE DRAWINGS TO YOU? |
| 03:06PM | 25 | A.  YES.  THESE WERE THE DEVICES THAT HE WANTED US TO BUILD, |

7643

03:06PM   1    WITH SOME DETAILS ON THE KIND OF MATERIALS THAT HE THOUGHT WE

03:06PM   2    SHOULD BE USING FOR USE OF THE DEVICES IN HIS STORES.

03:06PM   3    Q.   AND CAN YOU SPECIFICALLY GO THROUGH THE DRAWINGS AND

03:06PM   4    EXPLAIN HOW THEY WERE DESIGNED TO WORK, AT LEAST AS HE

03:06PM   5    EXPLAINED IT?

03:06PM   6    A.   I CAN, YES.

03:06PM   7         ON THE LEFT WHERE YOU SEE THE CABINETRY, THERE'S A DRAWING

03:06PM   8    OF A SINGLE DEVICE THAT HAS A TOUCHSCREEN IN THE MIDDLE, AND

03:06PM   9    THERE'S LITTLE BAYS THERE.  DO YOU SEE THE BLOCKS THAT ARE

03:06PM   10   LITTLE RECTANGLES?  EACH ONE OF THOSE IS INTENDED TO REFLECT

03:06PM   11   WHERE YOU WOULD PUT IN A CARTRIDGE.

03:06PM   12        SO HE'S TALKING ABOUT A SINGLE DEVICE HERE THAT COULD

03:06PM   13   PROCESS 12 CARTRIDGES AT THE SAME TIME THAT WOULD FIT WITHIN A

03:06PM   14   CABINET LIKE THAT THAT WOULD NEED TO BE VENTILATED FOR THAT

03:06PM   15   TYPE OF TECHNOLOGY.

03:07PM   16        HIS COMMENTS IN THE EMAIL ABOUT WOOD AND STAINLESS STEEL

03:07PM   17   GET INTO THE MATERIALS THAT HE WANTED TO MATCH THE CABINETRY.

03:07PM   18        AND ON THE RIGHT YOU CAN SEE HIS OTHER SUGGESTION FOR THE

03:07PM   19   DESIGN, WHICH WAS TO MAKE THE DEVICE LIKE A KIOSK WHERE, AGAIN,

03:07PM   20   YOU HAVE A SINGLE TOUCHSCREEN, YOU HAVE 12 BAYS FOR INSERTING

03:07PM   21   12 DIFFERENT CARTRIDGES, AND THE DEVICE WOULD STAND ON ITS OWN.

03:07PM   22   Q.   AND DID HE COMMUNICATE TO YOU THAT IT WAS IMPORTANT FOR

03:07PM   23   HIM FOR THESE MODIFICATIONS TO BE MADE?

03:07PM   24   A.   YES.

03:07PM   25   Q.   DID MAKING THESE MODIFICATIONS PRESENT ANY CHALLENGE TO

03:07PM   1    THERANOS IN CONNECTION WITH ITS TECHNOLOGY?

03:07PM   2    A.   THIS IS A WHOLE NEW PRODUCT.

03:07PM   3    Q.   AND WHAT WOULD BE INVOLVED IN RECONFIGURING THE THERANOS

03:07PM   4    SYSTEM TO BE ABLE TO MEET THE REQUIREMENTS THAT HE WAS ASKING

03:07PM   5    FOR IN THIS COMMUNICATION?

03:07PM   6    A.   WE'D HAVE TO FIGURE OUT HOW TO PROCESS IN THIS CASE 12

03:08PM   7    SAMPLES AT A TIME.  WE ULTIMATELY SPLIT THIS INTO TWO DEVICES

03:08PM   8    THAT COULD EACH DO SIX SAMPLES AT A TIME.

03:08PM   9        THIS ENDED UP BEING VERY CHALLENGING BECAUSE THE SIX

03:08PM   10   SAMPLES ARE IN THE SAME DEVICE, AND ONE OF THE KEYS TO OUR

03:08PM   11   CHEMISTRY FORMULA IS THE TEMPERATURE AT WHICH YOU RUN THE

03:08PM   12   CHEMISTRY.

03:08PM   13       MANAGING THE THERMAL PROPERTIES OF THIS DEVICE WHEN YOU'RE

03:08PM   14   RUNNING SIX SAMPLES AT A TIME IS VERY COMPLEX.

03:08PM   15   Q.   OKAY.  DID THERANOS NEVERTHELESS ATTEMPT TO BUILD THESE

03:08PM   16   DEVICES?

03:08PM   17   A.   WE DID.

03:08PM   18   Q.   AND DID YOU, IN FACT, EXPERIENCE CHALLENGES WHILE BUILDING

03:08PM   19   THEM?

03:08PM   20   A.   WE DID.

03:08PM   21   Q.   DID YOU COMMUNICATE WITH MR. BURD THAT THERE WERE THESE

03:08PM   22   CHALLENGES?

03:08PM   23   A.   I DID.

03:08PM   24   Q.   AND DID MR. BURD OFFER THAT SAFEWAY WOULD ATTEMPT TO HELP

03:08PM   25   THERANOS IN CONNECTION WITH MEETING THE CHALLENGES IT WAS

7645

| | | |
|---|---|---|
| 03:08PM | 1 | EXPERIENCING? |
| 03:08PM | 2 | A.   HE DID. |
| 03:09PM | 3 | Q.   AND DID YOU TAKE HIM UP ON THAT OFFER? |
| 03:09PM | 4 | A.   FOR SOME PROBLEMS, YES. |
| 03:09PM | 5 |      FOR SOME PROBLEMS, NO. |
| 03:09PM | 6 | Q.   AND FOR THOSE YOU DIDN'T TAKE HIM UP ON THAT OFFER, WHY |
| 03:09PM | 7 | WAS THAT? |
| 03:09PM | 8 | A.   STEVE HAD SUGGESTED THAT SOME OF THE ENGINEERS WHO WORKED |
| 03:09PM | 9 | ON THE CONSTRUCTION OF HIS SPACES COULD HELP US WITH BUILDING |
| 03:09PM | 10 | THESE DEVICES, AND OUR ENGINEERS INTERNALLY FELT THAT WE HAD |
| 03:09PM | 11 | THE EXPERTISE, WE JUST NEEDED TO TRIAGE AND DEAL WITH THE |
| 03:09PM | 12 | ISSUES. |
| 03:09PM | 13 | Q.   WAS THERANOS ULTIMATELY ABLE TO BUILD A MULTI CARTRIDGE |
| 03:09PM | 14 | DEVICE? |
| 03:09PM | 15 | A.   WE DID. |
| 03:09PM | 16 | Q.   AND WHEN DID THERANOS COMPLETE THAT DEVICE? |
| 03:09PM | 17 | A.   I THINK IN 2012. |
| 03:09PM | 18 | Q.   NOW, I WANT TO TURN FROM TALKING ABOUT THE TECHNOLOGY |
| 03:09PM | 19 | UNDER THE AGREEMENT TO TALKING ABOUT THERANOS'S MARKETING |
| 03:09PM | 20 | EFFORTS WITH SAFEWAY. |
| 03:09PM | 21 |      DID MR. BURD ENCOURAGE THERANOS TO PUT MORE FOCUS ON |
| 03:09PM | 22 | MARKETING AND BRANDING IN THE PERIOD BETWEEN 2010 AND 2012? |
| 03:10PM | 23 | A.   HE DID. |
| 03:10PM | 24 | Q.   WAS THAT YOUR PRIORITY IN THAT PERIOD BETWEEN 2010 AND |
| 03:10PM | 25 | 2012? |

7646

| | | |
|---|---|---|
| 03:10PM | 1 | A.  NO. |
| 03:10PM | 2 | Q.  WHY WAS THAT? |
| 03:10PM | 3 | A.  BECAUSE WE HAD A VERY SIGNIFICANT AMOUNT OF WORK THAT WE |
| 03:10PM | 4 | NEEDED TO DO ON THE PRODUCT AND ON THE OPERATIONS TO GET READY |
| 03:10PM | 5 | TO LAUNCH THE SERVICE. |
| 03:10PM | 6 | Q.  AND DID YOU COMMUNICATE THAT TO MR. BURD? |
| 03:10PM | 7 | A.  I DID. |
| 03:10PM | 8 | Q.  DID THERANOS ULTIMATELY AGREE TO LAUNCH A PROGRAM WITH |
| 03:10PM | 9 | SAFEWAY WHERE THERANOS PROVIDED BLOOD TESTING SERVICES WITHIN |
| 03:10PM | 10 | THE SAFEWAY CORPORATE HEADQUARTERS? |
| 03:10PM | 11 | A.  YES. |
| 03:10PM | 12 | Q.  AND WHERE ARE THOSE HEADQUARTERS LOCATED? |
| 03:10PM | 13 | A.  IN PLEASANTON, CALIFORNIA. |
| 03:10PM | 14 | Q.  OKAY.  DID SUCH A SERVICE CENTER OPEN WITHIN THAT |
| 03:10PM | 15 | HEADQUARTERS? |
| 03:10PM | 16 | A.  YES. |
| 03:10PM | 17 | Q.  DO YOU RECALL WHEN THAT LAB SERVICE OPENED? |
| 03:10PM | 18 | A.  I THINK IT WAS IN 2012. |
| 03:11PM | 19 | Q.  OKAY.  NOW, WHEN THERANOS WAS OPERATING THAT SERVICE |
| 03:11PM | 20 | CENTER IN THE CORPORATE HEADQUARTERS OF SAFEWAY, WAS IT USING |
| 03:11PM | 21 | THE TECHNOLOGY THAT THERANOS WAS DEVELOPING AS PART OF SERIES |
| 03:11PM | 22 | 4.0? |
| 03:11PM | 23 | A.  NO. |
| 03:11PM | 24 | Q.  WHY NOT? |
| 03:11PM | 25 | A.  THE REQUEST FROM SAFEWAY WAS TO BE ABLE TO PROVIDE LAB |

7647

03:11PM 1    SERVICES AT THE PRICE POINTS WITH WHICH WE WERE CONTRACTING

03:11PM 2    WITH INSURERS, WHICH AT THAT TIME IT WAS 30 PERCENT OF THE COST

03:11PM 3    OF MEDICARE.

03:11PM 4        SO WE AGREED THAT THERANOS WOULD PROVIDE A TRADITIONAL LAB

03:11PM 5    SERVICE IN ORDER TO DO THAT BECAUSE WE WERE NOT READY TO LAUNCH

03:11PM 6    OUR TECHNOLOGY.

03:11PM 7    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7250.

03:12PM 8    A.   OKAY.

03:12PM 9    Q.   IS THIS ANOTHER EMAIL BETWEEN YOU AND MR. BURD CONCERNING

03:12PM 10   THE RELATIONSHIP BETWEEN SAFEWAY AND THERANOS?

03:12PM 11   A.   YES.

03:12PM 12       MR. DOWNEY:  I WOULD MOVE TO ADMIT THE EXHIBIT 7250,

03:12PM 13   YOUR HONOR.

03:12PM 14       MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:12PM 15       THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:12PM 16       (DEFENDANT'S EXHIBIT 7250 WAS RECEIVED IN EVIDENCE.)

03:12PM 17   BY MR. DOWNEY:

03:12PM 18   Q.   DO YOU SEE THAT THIS IS AN EMAIL THAT YOU SENT TO MR. BURD

03:12PM 19   IN SEPTEMBER OF 2012?

03:12PM 20   A.   YES.

03:12PM 21   Q.   AND LET ME ASK YOU TO LOOK AT THE EMAIL THAT WAS SENT AT

03:12PM 22   1:03 -- I'M SORRY, 3:03 A.M. ON SEPTEMBER 12TH.

03:13PM 23   A.   OKAY.

03:13PM 24   Q.   I'D LIKE YOU TO FOCUS ON THE LANGUAGE THAT SAYS -- YOU SAY

03:13PM 25   AT THE BEGINNING, "I THINK THAT'S FANTASTIC AS YOU KNOW.  I'LL

03:13PM  1    SEND YOU WHAT WE'RE CURRENTLY WORKING WITH."

03:13PM  2         AND THEN YOU SAY, "THE DINOSAUR LAB DOES NOT DO

03:13PM  3    100 PERCENT OF ALL TESTS YET.  OF COURSE WITH OUR SYSTEMS IT'S

03:13PM  4    A WHOLE DIFFERENT GAME ON TIME - WE'LL HAVE DATA OUT WITHIN

03:13PM  5    30 MINUTES OF SAMPLE BEING PROCESSED AS YOU ALSO KNOW."

03:13PM  6         DO YOU SEE THAT?

03:13PM  7    A.   I DO.

03:13PM  8    Q.   AND DO YOU SEE IN THE EMAIL BELOW THAT, WHICH MR. BURD HAD

03:13PM  9    SENT TO YOU, THAT HE REFERENCES A DINOSAUR LAB?

03:13PM  10   A.   I DO.

03:13PM  11   Q.   AND WHEN YOU WERE REFERRING TO A DINOSAUR LAB IN THESE

03:13PM  12   COMMUNICATIONS BACK AND FORTH WITH MR. BURD, WHAT WERE YOU

03:14PM  13   REFERRING TO?

03:14PM  14   A.   A TRADITIONAL LAB RUNNING TRADITIONAL TECHNOLOGY.

03:14PM  15   Q.   AND WAS THERANOS DOING THAT WITHIN THIS PERIOD OF 2012?

03:14PM  16   A.   YES.

03:14PM  17   Q.   AND WAS THAT SOMETHING THAT YOU HAD DISCUSSED WITH

03:14PM  18   MR. BURD?

03:14PM  19   A.   YES.

03:14PM  20   Q.   AND IT WAS SOMETHING THAT YOU BELIEVED THAT HE UNDERSTOOD

03:14PM  21   WHEN YOU WERE DISCUSSING IT WITH HIM?

03:14PM  22   A.   YES.

03:14PM  23   Q.   DID MR. BURD RAISE ANY QUESTIONS ABOUT THE ACCURACY OF THE

03:14PM  24   TESTS THAT THERANOS RAN IN THAT SERVICE CENTER IN THE CORPORATE

03:14PM  25   HEADQUARTERS OF SAFEWAY?

7649

03:14PM   1    A.   HE DID NOT.

03:14PM   2    Q.   DO YOU RECALL HIM RAISING SOME COMPLAINTS?

03:14PM   3    A.   YES.

03:14PM   4    Q.   AND WHAT DO YOU RECALL HIS COMPLAINTS WERE?

03:14PM   5    A.   HE WAS VERY FRUSTRATED ABOUT THE TURNAROUND TIME OF THE

03:14PM   6    RESULTS, HOW FAST THOSE RESULTS WERE GOING BACK TO PATIENTS,

03:14PM   7    AND HE THOUGHT THAT THAT MADE FOR A POOR PATIENT EXPERIENCE.

03:14PM   8    Q.   OKAY.  NOW, I WANT TO FOCUS ON THE TIME PERIOD SHORTLY

03:15PM   9    BEFORE MR. BURD LEFT SAFEWAY AND FOCUS ON DISCUSSIONS YOU HAD

03:15PM  10    WITH HIM IN THE TIME PERIOD PRECEDING THAT.

03:15PM  11         FIRST OF ALL, DO YOU RECALL THAT MR. BURD TESTIFIED THAT

03:15PM  12    HIS DEPARTURE FROM SAFEWAY WAS ANNOUNCED TOWARDS THE VERY END

03:15PM  13    OF 2012?

03:15PM  14    A.   I DO.

03:15PM  15    Q.   AND DO YOU RECALL THAT MR. BURD DISCUSSED A SERIES OF

03:15PM  16    EMAILS BETWEEN YOU AND HIM IN THE FALL OF 2012 TALKING ABOUT A

03:15PM  17    POTENTIAL LAUNCH DATE AT SAFEWAY?

03:15PM  18    A.   YES.

03:15PM  19    Q.   LET'S LOOK AT AN EMAIL IN WHICH MR. BURD COMMUNICATES WITH

03:15PM  20    YOU IN DECEMBER OF 2012, EXHIBIT 718, WHICH IS ALREADY IN

03:16PM  21    EVIDENCE.

03:16PM  22    A.   OKAY.

03:16PM  23    Q.   DO YOU SEE HERE THAT MR. BURD WRITES TO YOU ON

03:16PM  24    DECEMBER 18TH AND SAYS HE WOULD LIKE TO HAVE A PHONE CALL SO HE

03:16PM  25    COULD GET A BETTER SENSE FOR A POSSIBLE LAUNCH DATE?

7650

03:16PM   1    A.   YES.

03:16PM   2    Q.   AND HE SAYS HE IS NOT LOOKING FOR A FIRM DATE BECAUSE THAT

03:16PM   3    MAY BE PREMATURE?

03:16PM   4    A.   YES.

03:16PM   5    Q.   DO YOU SEE THAT?

03:16PM   6         ALL RIGHT.  NOW, LET'S GO DOWN TO THE NEXT PARAGRAPH TO

03:16PM   7    THE SENTENCE -- TO THE PHRASE THAT BEGINS, "IT IS CRYSTAL CLEAR

03:16PM   8    THAT EITHER THE RECENTLY COMMITTED DATES WERE FAR TOO AMBITIOUS

03:17PM   9    OR THERE HAVE BEEN SOME OVERWHELMING SURPRISES ALONG THE WAY.

03:17PM   10   I ALSO WORRY THAT THE DEMANDS OF YOUR CORE BUSINESS OR THE

03:17PM   11   NEWLY ACQUIRED DOD BUSINESS ARE CONSUMING RESOURCES THAT WOULD

03:17PM   12   OTHERWISE BE COMMITTED TO LAUNCH."

03:17PM   13        DO YOU SEE THAT?

03:17PM   14   A.   I DO.

03:17PM   15   Q.   NOW, THERE'S A REFERENCE IN THAT SENTENCE THAT MR. BURD

03:17PM   16   MAKES TO YOUR CORE BUSINESS.

03:17PM   17   A.   YES.

03:17PM   18   Q.   AND WHAT DID YOU UNDERSTAND MR. BURD TO BE REFERRING TO

03:17PM   19   WHEN HE REFERRED TO YOUR CORE BUSINESS?

03:17PM   20   A.   TO OUR WORK WITH WALGREENS.

03:17PM   21   Q.   AND WHAT WAS HAPPENING IN THE WALGREENS RELATIONSHIP IN

03:17PM   22   THE FALL OF 2012?

03:17PM   23   A.   WE HAD MOVED TO THE PHASE I, PHASE II MODEL THAT WE TALKED

03:17PM   24   ABOUT EARLIER, AND THERANOS WAS WORKING TO BUILD THE CENTRAL

03:17PM   25   LAB TO BE ABLE TO LAUNCH WITH SAMPLES BEING SHIPPED TO A

7651

| | | |
|---|---|---|
| 03:17PM | 1 | CENTRAL LAB INSTEAD OF PUTTING DEVICES IN THE STORES. |
| 03:17PM | 2 | Q.   AND AS BETWEEN SAFEWAY AND WALGREENS, THOUGH, WHICH OF THE |
| 03:17PM | 3 | TWO PARTNERS WAS DEVOTING MORE RESOURCES TO ALLOW THERANOS TO |
| 03:18PM | 4 | LAUNCH IN ITS STORES? |
| 03:18PM | 5 | A.   WALGREENS WAS. |
| 03:18PM | 6 | Q.   BETWEEN AUGUST OF 2012 AND DECEMBER OF 2012, DID MR. BURD |
| 03:18PM | 7 | PUSH FOR THERANOS TO LAUNCH SERVICE CENTERS IN SAFEWAY STORES? |
| 03:18PM | 8 | A.   HE DID. |
| 03:18PM | 9 | Q.   DID YOU EXPLAIN TO MR. BURD THAT THERE WERE ISSUES FOR |
| 03:18PM | 10 | THERANOS WITH PURSUING THAT MODEL IMMEDIATELY? |
| 03:18PM | 11 | A.   YES. |
| 03:18PM | 12 | Q.   AND WHAT ISSUES DID YOU SEE FOR THERANOS OF LAUNCHING |
| 03:18PM | 13 | THERANOS SERVICE CENTERS IN SAFEWAY STORES? |
| 03:18PM | 14 | A.   THE FIRST WAS THAT WE WERE NOW BUILDING OUR WHOLE BUSINESS |
| 03:18PM | 15 | AROUND THIS PHASE I, PHASE II MODEL, AND IF WE WERE GOING TO DO |
| 03:18PM | 16 | THAT WITH WALGREENS, WE HAD TO DO THAT WITH SAFEWAY BECAUSE WE |
| 03:18PM | 17 | COULDN'T BE INCONSISTENT BETWEEN THOSE TWO. |
| 03:18PM | 18 | ALSO, WE WERE NOT YET LAUNCHING WITH WALGREENS, AND SO WE |
| 03:19PM | 19 | COULDN'T BE LAUNCHING WITH SAFEWAY IF WE WERE LAUNCHING BEFORE |
| 03:19PM | 20 | WALGREENS. |
| 03:19PM | 21 | AND THERE WERE QUESTIONS FROM A REGULATORY PERSPECTIVE |
| 03:19PM | 22 | ABOUT WHAT THE RIGHT THING TO DO WAS. |
| 03:19PM | 23 | Q.   AND WERE THOSE ALL CONCEPTS THAT YOU EXPLAINED TO |
| 03:19PM | 24 | MR. BURD? |
| 03:19PM | 25 | A.   YES. |

7652

03:19PM  1    Q.   AND DID HE ENGAGE WITH YOU ON THOSE ISSUES?

03:19PM  2    A.   HE DID.

03:19PM  3    Q.   AND WHAT WAS HIS REACTION?

03:19PM  4    A.   HE REALLY WANTED TO PUSH FORWARD TO LAUNCH.

03:19PM  5    Q.   DID HE TELL YOU WHY HE WANTED TO LAUNCH?

03:19PM  6    A.   YES.

03:19PM  7    Q.   WHAT WAS THE REASON THAT HE GAVE YOU?

03:19PM  8    A.   THAT HE WOULD BE RETIRING FROM SAFEWAY SOON AND REALLY

03:19PM  9    WANTED TO LAUNCH BEFORE HIS RETIREMENT.

03:19PM  10        HE ALSO COMMUNICATED THAT SAFEWAY'S STOCK WAS SUFFERING

03:19PM  11   AND HE THOUGHT THAT THIS ANNOUNCEMENT COULD REALLY HELP

03:19PM  12   SAFEWAY'S STOCK PRICE.

03:19PM  13   Q.   DID YOU SEE IN EXHIBIT 718 THE REFERENCE TO NEWLY ACQUIRED

03:20PM  14   DOD BUSINESS?

03:20PM  15   A.   I DO.

03:20PM  16   Q.   AND DID YOU SEE THAT MR. BURD WAS REFERENCING THAT IN THE

03:20PM  17   DECEMBER 18, 2012?

03:20PM  18   A.   YES.

03:20PM  19   Q.   NOW, WAS THERE A NEWLY ACQUIRED BUSINESS WITH DOD THAT HAD

03:20PM  20   BEEN ACQUIRED IN OR AROUND DECEMBER OF 2012?

03:20PM  21   A.   YES.

03:20PM  22   Q.   AND WHAT WAS THAT?

03:20PM  23   A.   OUR CONTRACTS WITH SOCOM, CENTCOM, AND I THINK THIS MAY

03:20PM  24   HAVE BEEN AROUND THE TIME THAT WE WERE ALSO STARTING TO WORK

03:20PM  25   WITH AFRICOM.

7653

03:20PM   1    Q.   AND DID THERANOS INTEND TO DEVOTE RESOURCES TO DEVELOPING

03:20PM   2    TECHNOLOGIES FOR USE IN CONNECTION WITH THOSE PROGRAMS?

03:20PM   3    A.   WE DID.

03:20PM   4    Q.   DID YOU ALSO EXPLAIN THAT TO MR. BURD?

03:20PM   5    A.   YES.

03:20PM   6    Q.   ULTIMATELY DID MR. BURD LEAVE SAFEWAY?

03:20PM   7    A.   YES.

03:20PM   8    Q.   AND YOU HEARD HIS TESTIMONY DURING THIS TRIAL, DID YOU

03:21PM   9    NOT?

03:21PM   10   A.   I DID.

03:21PM   11   Q.   WERE YOU TRYING TO IGNORE OR HIDE ISSUES WITH RESPECT TO

03:21PM   12   THE TECHNOLOGY IN YOUR COMMUNICATIONS WITH MR. BURD?

03:21PM   13   A.   NO.

03:21PM   14   Q.   WAS LAUNCHING TEST SERVICES COMPLICATED FOR THERANOS AND

03:21PM   15   SAFEWAY?

03:21PM   16   A.   YES.

03:21PM   17   Q.   AND WHAT KIND OF CHALLENGES WERE YOU FACING TO GET THAT

03:21PM   18   OFF THE GROUND?

03:21PM   19   A.   WE HAD MANY.  THERE WAS THE TECHNOLOGY WORK AND BRINGING

03:21PM   20   THE TESTS UP THAT HAD TO HAPPEN; THERE WAS THE INSURANCE

03:21PM   21   COMPANY CONTRACTING THAT HAD TO HAPPEN; THE SOFTWARE, THE

03:21PM   22   ELECTRONIC MEDICAL RECORDS, A WHOLE SUITE OF SOFTWARE FOR THE

03:21PM   23   STORE, THE CHECK-IN PROCESS, ELIGIBILITY OF SCANNING THE

03:21PM   24   INSURANCE CARDS AND MAKE SURE THAT WE COULD CONNECT

03:21PM   25   ELECTRONICALLY; THE MARKETING WORK.

03:21PM 1      I COULD GO ON.

03:21PM 2   Q.   OKAY.  DO YOU FEEL THAT YOU WERE TRANSPARENT WITH MR. BURD

03:22PM 3   THAT YOU HAD AGREED TO THIS PHASE I, PHASE II RELATIONSHIP?

03:22PM 4   A.   YES.

03:22PM 5   Q.   LET ME ASK YOU TO LOOK BACK AT 715 ALREADY IN EVIDENCE.

03:22PM 6      DO YOU SEE THE EMAIL FROM YOU TO MR. BURD AT 8:30 P.M.?

03:22PM 7   A.   I DO.

03:22PM 8   Q.   AND DO YOU SEE IN THE THIRD PARAGRAPH WHERE YOU SAY,

03:22PM 9   "WHILE WE HAVE NEVER WANTED TO BE IN THE TRADITIONAL LAB

03:22PM 10  BUSINESS, WE DECIDED RECENTLY TO GET INTO IT AS WE DISCUSSED."

03:22PM 11     WHAT WAS THAT A REFERENCE TO?

03:22PM 12  A.   TO THE FACT THAT WE WERE MOVING FORWARD WITH THIS PHASE I

03:22PM 13  MODEL AS THE WAY THAT WE WERE GOING TO LAUNCH OUR SERVICES AT

03:22PM 14  RETAIL OPERATING AS A CENTRAL LAB OURSELVES EVEN THOUGH THAT

03:22PM 15  WAS NOT WHAT WE WANTED TO DO WITH OUR TECHNOLOGY.  IT WASN'T

03:22PM 16  THE PURPOSE OF OUR TECHNOLOGY.

03:22PM 17  Q.   WAS MR. BURD AMENABLE TO A MODEL WHERE THE SERVICE CENTERS

03:23PM 18  COLLECTED SAMPLES AND SENT THEM TO A CENTRAL LAB AT THERANOS?

03:23PM 19  A.   HE DID NOT LIKE IT LIKE HE LIKED PUTTING A DEVICE IN THE

03:23PM 20  STORE.

03:23PM 21  Q.   OKAY.  I WANT TO TALK ABOUT WHAT HAPPENED IN THE

03:23PM 22  SAFEWAY-THERANOS RELATIONSHIP AFTER MR. BURD ANNOUNCED HIS

03:23PM 23  RETIREMENT IN LATE 2012.

03:23PM 24     AFTER THAT POINT, DID THERE BEGIN TO BE SOME DISPUTES

03:23PM 25  BETWEEN THERANOS AND SAFEWAY?

7655

03:23PM  1    A.   YES.

03:23PM  2    Q.   AND DID MR. BALWANI BEGIN TO TAKE AN ACTIVE ROLE WITH

03:23PM  3    REGARD TO DISCUSSIONS WITH SAFEWAY?

03:23PM  4    A.   HE DID.

03:23PM  5    Q.   PRIOR TO THAT TIME, HAD YOU BEEN THE PRINCIPAL PERSON AT

03:23PM  6    THERANOS DEALING WITH SAFEWAY?

03:23PM  7    A.   I WAS WITH MR. BURD.

03:23PM  8    Q.   OKAY.  AND WHO AT SAFEWAY BECAME THE PRINCIPAL PERSON

03:23PM  9    DEALING WITH DISCUSSIONS BETWEEN SAFEWAY AND THERANOS AFTER

03:24PM  10   JANUARY OF 2013?

03:24PM  11   A.   ROBERT EDWARDS AND PEOPLE WHO WERE WORKING FOR HIM.

03:24PM  12   Q.   AND DID THERANOS REMAIN INTERESTED IN LAUNCHING ITS

03:24PM  13   TESTING SERVICES IN 2013?

03:24PM  14   A.   YES.

03:24PM  15   Q.   WOULD THERANOS HAVE BEEN ABLE TO LAUNCH IN SAFEWAY STORES

03:24PM  16   IN THE FALL OF 2013 AS IT DID IN WALGREENS STORES?

03:24PM  17   A.   WE COULD HAVE, YES.

03:24PM  18   Q.   DID THERE COME A TIME WHEN THE OWNERSHIP OF SAFEWAY

03:24PM  19   CHANGED?

03:24PM  20   A.   YES.

03:24PM  21   Q.   AND WHO WERE THE NEW OWNERS?

03:24PM  22   A.   A PRIVATE EQUITY FUND CALLED CERBERUS.

03:24PM  23   Q.   AND WHAT EFFECT, IF ANY, DID THAT HAVE ON THE RELATIONSHIP

03:24PM  24   BETWEEN THERANOS AND SAFEWAY?

03:24PM  25   A.   IT SEEMED TO COMPLICATE IT.  ROBERT EDWARDS, THE SAFEWAY

03:24PM  1    CEO, WAS IN DISCUSSIONS WITH CERBERUS ABOUT THEIR PRIORITIES,

03:24PM  2    AND I COULDN'T QUITE UNDERSTAND WHAT DECISIONS HE WAS MAKING OR

03:24PM  3    NOT MAKING BASED ON THOSE INTERACTIONS.

03:25PM  4    Q.   OKAY.  ULTIMATELY I BELIEVE YOU TESTIFIED A BIT AGO THERE

03:25PM  5    WERE NEVER THERANOS SERVICE CENTERS IN SAFEWAY STORES?

03:25PM  6    A.   THERE WERE NOT.

03:25PM  7    Q.   OKAY.  I WANT TO TAKE A MOMENT AND ASK YOU ABOUT VARIOUS

03:25PM  8    FINANCIAL PROJECTIONS THAT WERE SHOWN IN DOCUMENTS THAT WERE

03:25PM  9    SHARED WITH THE BOARD OF DIRECTORS OF THERANOS AND INVESTORS

03:25PM 10    AND OTHERS.

03:25PM 11         DO YOU RECALL TESTIMONY FROM MS. PETERSON ABOUT RECEIVING

03:25PM 12    CERTAIN FINANCIAL PROJECTIONS CONCERNING THERANOS?

03:25PM 13    A.   I DO.

03:25PM 14    Q.   LET ME ASK YOU, WAS THERE A PROCESS FOR PREPARING

03:25PM 15    FINANCIAL DOCUMENTS AT THERANOS?

03:25PM 16    A.   YES.

03:25PM 17    Q.   AND WHO WAS IN CHARGE OF PREPARATION OF FINANCIAL

03:26PM 18    DOCUMENTS AND PROJECTIONS AT THERANOS?

03:26PM 19    A.   SUNNY BALWANI.

03:26PM 20    Q.   WERE FINANCIAL UPDATES, INCLUDING PROJECTIONS, SOMETIMES

03:26PM 21    PROVIDED TO THERANOS'S BOARD?

03:26PM 22    A.   THEY WERE.

03:26PM 23    Q.   TYPICALLY HOW OFTEN WERE SUCH PROJECTIONS PROVIDED TO

03:26PM 24    THERANOS'S BOARD?

03:26PM 25    A.   FOUR TIMES A YEAR AT EACH BOARD MEETING.

7657

03:26PM  1    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 15032.

03:26PM  2    A.   OKAY.

03:26PM  3    Q.   IS EXHIBIT 15032 A PACKET OF MATERIALS THAT WAS PREPARED

03:27PM  4    FOR THE BOARD OF DIRECTORS OF THERANOS IN JULY OF 2014?

03:27PM  5    A.   IT IS.

03:27PM  6              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:27PM  7    15032.

03:27PM  8              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:27PM  9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:27PM  10        (DEFENDANT'S EXHIBIT 15032 WAS RECEIVED IN EVIDENCE.)

03:27PM  11             MR. DOWNEY:  YOUR HONOR, I SHOULD NOTE FOR THE

03:27PM  12   RECORD THAT I'M NOT SURE THAT 15032 INCLUDES ALL OF THE

03:27PM  13   MATERIALS IN THIS PACKET.  I HAVE NO OBJECTION TO THOSE BEING

03:27PM  14   ADDED, AND I'LL CONFER WITH MR. LEACH AND SEE IF HE HAS ANY

03:27PM  15   DESIRE TO DO THAT.  I'M ONLY GOING TO REFER TO A VERY SMALL

03:27PM  16   PORTION OF THIS.

03:27PM  17             THE COURT:  ALL RIGHT.  THIS SECTION ENDS AT BATES

03:27PM  18   541870?

03:27PM  19             MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

03:28PM  20             THE COURT:  ALL RIGHT.  IT'S ADMITTED.  IT MAY BE

03:28PM  21   PUBLISHED.  THANK YOU.

03:28PM  22   BY MR. DOWNEY:

03:28PM  23   Q.   LET ME GO TO -- DO YOU SEE THAT THESE ARE BOARD MATERIALS

03:28PM  24   FOR THAT JULY MEETING?

03:28PM  25   A.   YES.

7658

03:28PM 1    Q.   IF YOU GO TO THE NEXT PAGE, DO YOU SEE THAT THERE'S AN

03:28PM 2    AGENDA SET FORTH FOR THIS MEETING?

03:28PM 3    A.   I DO.

03:28PM 4    Q.   AND WOULD THERE TYPICALLY BE AN AGENDA FOR BOARD OF

03:28PM 5    DIRECTORS MEETINGS AT THERANOS?

03:28PM 6    A.   YES.

03:28PM 7    Q.   AND WOULD A FINANCIAL PLAN OR A FINANCIAL STRUCTURE FOR

03:28PM 8    THE COMPANY TYPICALLY BE ONE ITEM THAT WOULD BE DISCUSSED WITH

03:28PM 9    THE BOARD OF DIRECTORS?

03:28PM 10   A.   YES.

03:28PM 11   Q.   AND DO YOU SEE THAT THERE WAS AN ENTRY FOR, ON THE AGENDA

03:28PM 12   FOR A FINANCIAL PLAN AND STRUCTURE DISCUSSION BETWEEN 1:30 AND

03:28PM 13   3:00 P.M. AT THIS PARTICULAR BOARD MEETING?

03:28PM 14   A.   I DO.

03:28PM 15   Q.   LET ME ASK YOU TO GO FORWARD TO PAGE 5 OF THIS DOCUMENT.

03:29PM 16       AND DO YOU SEE THAT THIS DOCUMENT IS LABELLED PROJECTED

03:29PM 17   STATEMENT OF INCOME?

03:29PM 18   A.   I DO.

03:29PM 19   Q.   WHAT IS THIS DOCUMENT?

03:29PM 20   A.   THIS IS THE OUTPUT OF A MODEL SUNNY HAD WITH PROJECTIONS

03:29PM 21   ON WHAT OUR INCOME COULD BE FOR 2014 AND 2015.

03:29PM 22   Q.   AND WAS THIS PROVIDED TO THE BOARD OF DIRECTORS FOR

03:29PM 23   PURPOSES OF DISCUSSION AT THAT MEETING?

03:29PM 24   A.   IT WAS.

03:29PM 25   Q.   I'D LIKE TO ASK YOU TO LOOK AT THE ITEMS NEXT TO THE -- DO

7659

| | | |
|---|---|---|
| 03:29PM | 1 | YOU SEE ON THE LEFT-HAND COLUMN THERE'S A REVENUE COLUMN? |
| 03:29PM | 2 | A.   YES. |
| 03:29PM | 3 | Q.   AND DO YOU SEE UNDER THAT AT THE BOTTOM OF THAT SECTION |
| 03:29PM | 4 | THERE'S TOTAL REVENUE? |
| 03:29PM | 5 | A.   YES. |
| 03:29PM | 6 | Q.   AND DO YOU SEE IT PROJECTS $140 MILLION IN TOTAL REVENUE |
| 03:30PM | 7 | FOR 2014? |
| 03:30PM | 8 | A.   I DO. |
| 03:30PM | 9 | Q.   AND DO YOU SEE THAT IT PROJECTS $990 MILLION FOR 2015? |
| 03:30PM | 10 | A.   YES. |
| 03:30PM | 11 | Q.   AND IS THIS A PROJECTED INCOME STATEMENT FOR 2014 AND '15? |
| 03:30PM | 12 | A.   YES. |
| 03:30PM | 13 | Q.   LET ME ASK YOU TO LOOK NEXT AT PAGE 7 OF THE DOCUMENT. |
| 03:30PM | 14 | AND DO YOU SEE THAT ON PAGE 7 -- WHAT IS PAGE 7? |
| 03:30PM | 15 | A.   PAGE 7 LOOKS LIKE A BALANCE SHEET FOR THERANOS AS OF JULY |
| 03:30PM | 16 | OF 2014. |
| 03:30PM | 17 | Q.   AND DO YOU SEE UNDER THE -- ABOUT TWO-THIRDS OF THE WAY |
| 03:31PM | 18 | DOWN THERE'S A LINE ITEM FOR DEFERRED REVENUE AND CUSTOMERS' |
| 03:31PM | 19 | DEPOSITS? |
| 03:31PM | 20 | A.   YES. |
| 03:31PM | 21 | Q.   AND DO YOU SEE THE AMOUNT LISTED THERE? |
| 03:31PM | 22 | A.   I DO. |
| 03:31PM | 23 | Q.   AND WHAT IS THAT AMOUNT? |
| 03:31PM | 24 | A.   168 MILLION. |
| 03:31PM | 25 | Q.   IF YOU GO BACK TO PAGE 5, DO YOU SEE THAT THE -- WITHIN |

7660

| | | |
|---|---|---|
| 03:31PM | 1 | TOTAL REVENUE THERE APPEARS TO BE A PROJECTION OF |
| 03:31PM | 2 | $140 MILLION -- |
| 03:31PM | 3 | A.   YES. |
| 03:31PM | 4 | Q.   -- FOR THE BALANCE -- FOR THE YEAR END 2014? |
| 03:31PM | 5 | A.   I DO. |
| 03:31PM | 6 | Q.   AND YEAR END 2014 WOULD BE ABOUT SIX MONTHS OR SO AFTER |
| 03:31PM | 7 | THIS MEETING? |
| 03:31PM | 8 | A.   YES. |
| 03:31PM | 9 | Q.   DO YOU KNOW IF SOME OF THE REVENUE THAT WOULD BE -- |
| 03:31PM | 10 | CONSTITUTE PART OF THE $140 MILLION WOULD BE THAT $168 MILLION |
| 03:31PM | 11 | THAT IS ON THE BALANCE SHEET? |
| 03:31PM | 12 | A.   I UNDERSTOOD IT WAS, YES. |
| 03:31PM | 13 | Q.   DID YOU HAVE AN UNDERSTANDING WHEN AND HOW DEFERRED |
| 03:32PM | 14 | REVENUE COULD BE RECOGNIZED? |
| 03:32PM | 15 | A.   NOT SPECIFICALLY, JUST THAT THESE WERE MONIES THAT WE HAD |
| 03:32PM | 16 | ALREADY RECEIVED FROM CUSTOMERS. |
| 03:32PM | 17 | Q.   AND HAD THERANOS RECOGNIZED SOME PORTION OF THAT |
| 03:32PM | 18 | $168 MILLION, WOULD IT HAVE BEEN ABLE TO MEET THE PROJECTION |
| 03:32PM | 19 | FOR $140 MILLION THAT'S CONTAINED IN THIS DOCUMENT? |
| 03:32PM | 20 | A.   YES. |
| 03:32PM | 21 | Q.   NOW, I BELIEVE YOU TESTIFIED A MOMENT AGO THAT MR. BALWANI |
| 03:32PM | 22 | PREPARED THESE DOCUMENTS. |
| 03:32PM | 23 | A.   HE DID. |
| 03:32PM | 24 | Q.   LET ME SHOW YOU -- ASK YOU TO LOOK AT EXHIBIT 15031. |
| 03:33PM | 25 | A.   OKAY. |

03:33PM  1      Q.   AND IS THIS AN EMAIL FROM MR. BALWANI TO YOU?

03:33PM  2      A.   IT IS.

03:33PM  3                MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:33PM  4      15031.

03:33PM  5                MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:33PM  6                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:33PM  7           (DEFENDANT'S EXHIBIT 15031 WAS RECEIVED IN EVIDENCE.)

03:33PM  8      BY MR. DOWNEY:

03:33PM  9      Q.   THIS IS AN EMAIL WITH AN ATTACHMENT SENT BY YOU -- SENT TO

03:33PM  10     YOU BY MR. BALWANI.

03:33PM  11          DO YOU SEE THAT?

03:33PM  12     A.   I DO.

03:33PM  13     Q.   AND IF YOU LOOK AT THE ATTACHMENT BEGINNING ON PAGE 2 OF

03:33PM  14     THE DOCUMENT, DO YOU SEE PAGE 2?

03:33PM  15     A.   YES.

03:33PM  16     Q.   AND DO YOU SEE THAT THE ATTACHMENT TO THIS DOCUMENT IS THE

03:33PM  17     SAME CONTENT THAT IS THE FINANCIAL OR PROJECTED STATEMENT OF

03:33PM  18     INCOME CONTAINED WITHIN EXHIBIT 15032?

03:33PM  19     A.   I DO.

03:33PM  20     Q.   IN OTHER WORDS, THIS IS THE SAME CONTENT THAT WAS USED IN

03:34PM  21     CONNECTION WITH THE BOARD OF DIRECTORS MEETING?

03:34PM  22     A.   YES.

03:34PM  23     Q.   BUT AS YOU UNDERSTOOD IT, DID MR. BALWANI PREPARE THIS?

03:34PM  24     A.   HE DID.

03:34PM  25     Q.   NOW, I WOULD ASK YOU TO ALSO TAKE A MOMENT AND LOOK AT

03:34PM   1    EXHIBIT 1853, WHICH HAS ALREADY BEEN ADMITTED INTO EVIDENCE.

03:34PM   2        AND DO YOU REMEMBER THAT 1853 IS A DOCUMENT THAT

03:34PM   3    MS. PETERSON DISCUSSED DURING HER TESTIMONY HERE?

03:34PM   4    A.   I DO.

03:34PM   5    Q.   IF YOU LOOK AT THIS, IS THIS ALSO A PROJECTED STATEMENT OF

03:34PM   6    INCOME?

03:34PM   7    A.   YES.

03:34PM   8    Q.   AND IT HAS HANDWRITING ON THE DOCUMENT.

03:35PM   9        DO YOU SEE THAT?

03:35PM   10   A.   I DO.

03:35PM   11   Q.   AND OTHER THAN THIS HANDWRITING, IS THIS DOCUMENT

03:35PM   12   IDENTICAL TO THE DOCUMENT THAT MR. BALWANI SENT TO YOU AND THE

03:35PM   13   DOCUMENT THAT WAS SHARED WITH THE BOARD OF DIRECTORS OF

03:35PM   14   THERANOS IN JULY OF 2014?

03:35PM   15   A.   IT IS.

03:35PM   16   Q.   WHEN WAS YOUR MEETING WITH THE DEVOS FAMILY OR

03:35PM   17   REPRESENTATIVES OF THE DEVOS FAMILY, INCLUDING MS. PETERSON?

03:35PM   18   A.   I THINK IT WAS SEPTEMBER OF 2014, OR MAYBE OCTOBER OF

03:35PM   19   2014.

03:35PM   20   Q.   OKAY.  AND DID THE THERANOS BOARD MEET AGAIN IN OCTOBER OF

03:35PM   21   2014?

03:35PM   22   A.   YES.

03:35PM   23   Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 15033.

03:36PM   24   A.   OKAY.

03:36PM   25   Q.   IS THIS ANOTHER SET OF MATERIALS GIVEN TO THE BOARD?

7663

03:36PM   1      A.   IT IS.

03:36PM   2               MR. DOWNEY:  I MOVE THE ADMISSION OF 15033.

03:36PM   3               MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:36PM   4               THE COURT:  IT'S ADMITTED.

03:36PM   5          (DEFENDANT'S EXHIBIT 15033 WAS RECEIVED IN EVIDENCE.)

03:36PM   6      BY MR. DOWNEY:

03:36PM   7      Q.   DO YOU SEE THAT THIS IS DATED OCTOBER 21ST, 2014?

03:36PM   8      A.   I DO.

03:36PM   9      Q.   AND IF YOU GO TO THE NEXT PAGE.

03:36PM   10          DO YOU SEE ON THE AGENDA THERE'S ANOTHER SCHEDULED

03:36PM   11     DISCUSSION OF FINANCIAL PLAN AND STRUCTURE?

03:36PM   12     A.   YES.

03:36PM   13     Q.   AND IF YOU GO TO PAGE 5, DO YOU SEE THAT THERE'S ANOTHER

03:36PM   14     PROJECTED STATEMENT OF INCOME AS OF OCTOBER, 2014?

03:37PM   15     A.   I DO.

03:37PM   16     Q.   AND DO YOU SEE THAT IN THIS PROJECTED STATEMENT OF INCOME

03:37PM   17     THAT THE TOTAL REVENUE THAT IS BEING PROJECTED FOR 2014 IS

03:37PM   18     ABOUT $126,000?

03:37PM   19          DO YOU SEE THAT?

03:37PM   20     A.   YES.  I THINK IT'S 126 MILLION.

03:37PM   21     Q.   I'M SORRY, $126 MILLION.

03:37PM   22          AND THAT'S A LITTLE BIT LESS THAN WE HAD SEEN IN JULY?

03:37PM   23     A.   YES.

03:37PM   24     Q.   BUT THAT WAS -- WAS THAT STILL LESS THAN THE AMOUNT OF

03:37PM   25     DEFERRED REVENUE THAT WAS SITTING ON THE COMPANY'S BOOKS?

03:37PM 1    A.   IT IS.

03:37PM 2    Q.   NOW, DO YOU SEE IN THE RIGHT-HAND COLUMN HERE THAT THERE

03:37PM 3    IS ALSO A PROJECTION OF FINANCIAL PERFORMANCE FOR 2015?

03:37PM 4    A.   YES.

03:37PM 5    Q.   AND DID YOU SEE THAT THERE WERE PROJECTED PERFORMANCES FOR

03:37PM 6    2015 IN THE OTHER DOCUMENTS THAT WE LOOKED AT IN EXHIBIT 15 --

03:37PM 7    I'M SORRY, IN EXHIBIT 1853, THE DOCUMENT WITH -- GIVEN TO

03:38PM 8    MS. PETERSON?

03:38PM 9    A.   I DID.

03:38PM 10   Q.   AND IN EXHIBIT 15032, WHICH WERE THE PACKET GIVEN FOR THE

03:38PM 11   JULY 2014 BOARD MEETING?

03:38PM 12   A.   YES.

03:38PM 13   Q.   WHO PREPARED THOSE PROJECTIONS FOR 2015?

03:38PM 14   A.   MR. BALWANI.

03:38PM 15   Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO THE PROCESS HE

03:38PM 16   WENT THROUGH TO PREPARE THOSE PROJECTIONS?

03:38PM 17   A.   I DID GENERALLY.

03:38PM 18   Q.   CAN YOU DESCRIBE YOUR GENERAL UNDERSTANDING?

03:38PM 19   A.   YES.  HE BUILT A MODEL WITH A NUMBER OF ASSUMPTIONS ABOUT

03:38PM 20   HOW MANY STORES THERANOS WOULD ROLL OUT TO AND OTHER WORK WITH

03:38PM 21   PHYSICIANS OR HOSPITAL SYSTEMS SENDING US SAMPLES.

03:38PM 22        AND BASED ON THOSE ASSUMPTIONS, THESE WERE THE PROJECTIONS

03:38PM 23   FOR THAT MODEL.

03:38PM 24   Q.   AND DID YOU UNDERSTAND THAT HE WOULD ADJUST THE

03:38PM 25   PROJECTIONS BASED ON CHANGES IN ASSUMPTIONS?

03:38PM 1    A.   I DID.

03:38PM 2    Q.   AND WERE THOSE NUMBERS GENERATED BY THAT MODEL TYPICALLY

03:39PM 3    THE NUMBERS OF PROJECTED INCOME THAT WERE SHARED WITH INVESTORS

03:39PM 4    WHEN THEY ASKED FOR SUCH PROJECTIONS?

03:39PM 5    A.   YES.  I UNDERSTOOD HE ACTUALLY SHOWED THE MODEL ALSO AND

03:39PM 6    ITS OUTPUTS.

03:39PM 7    Q.   OKAY.  HOW DID YOU UNDERSTAND THAT?

03:39PM 8    A.   BECAUSE HE TOLD ME THAT.

03:39PM 9    Q.   LET ME TURN FROM THE SUBJECT OF PROJECTED STATEMENTS OF

03:39PM 10   INCOME TO THE SUBJECT OF THE DEPARTMENT OF DEFENSE.

03:39PM 11   A.   OKAY.

03:39PM 12   Q.   DO YOU RECALL THAT MR. EDLIN TESTIFIED ABOUT THERANOS'S

03:39PM 13   RELATIONSHIP WITH CERTAIN PARTS OF THE DEPARTMENT OF DEFENSE?

03:39PM 14   A.   I DO.

03:39PM 15   Q.   AND DO YOU RECALL GENERAL MATTIS TESTIFIED ON THAT SUBJECT

03:39PM 16   AS WELL?

03:39PM 17   A.   I DO.

03:39PM 18   Q.   YESTERDAY WHEN WE WERE TALKING ABOUT THE DEPARTMENT OF

03:39PM 19   DEFENSE, I ASKED YOU ABOUT THERANOS EXPLORING A RELATIONSHIP

03:39PM 20   WITH AN ENTITY CALLED TATRC.

03:39PM 21        DO YOU REMEMBER THAT?

03:39PM 22   A.   YES.

03:39PM 23   Q.   AND I THINK YOU TESTIFIED THAT THAT NEVER MATERIALIZED

03:40PM 24   INTO ANY KIND OF A RELATIONSHIP.

03:40PM 25   A.   I DID.

7666

03:40PM   1    Q.   AFTER 2010, WAS THERANOS WORKING ON ITS 4.0 SYSTEM?

03:40PM   2    A.   WE WERE.

03:40PM   3    Q.   AND DID THERANOS BEGIN TO TALK AGAIN TO REPRESENTATIVES OF

03:40PM   4    VARIOUS PARTS OF THE DEPARTMENT OF DEFENSE ABOUT POTENTIALLY

03:40PM   5    ENTERING INTO PARTNERSHIPS?

03:40PM   6    A.   YES.

03:40PM   7    Q.   WHAT WERE SOME OF THE OFFICES OR COMMANDS WITHIN THE

03:40PM   8    DEPARTMENT OF DEFENSE WHERE THERANOS PURSUED RELATIONSHIPS?

03:40PM   9    A.   AGAIN, THERE WERE SEVERAL.  THE THREE THAT WE FOCUSSED THE

03:40PM  10    MOST ON WERE CENTRAL COMMAND, SPECIAL OPERATIONS COMMAND, AND

03:40PM  11    AFRICA COMMAND.

03:40PM  12    Q.   AND YOU MENTIONED YESTERDAY THAT YOU HAD ESTABLISHED A

03:40PM  13    RELATIONSHIP THROUGH YOUR EFFORTS WITH TATRC WITH AN ARMY

03:41PM  14    PHYSICIAN NAMED DR. KEVIN CHUNG; IS THAT RIGHT?

03:41PM  15    A.   YES, YES.

03:41PM  16    Q.   AND WAS HE SOMEONE THAT YOU MET IN 2008 OR SO?

03:41PM  17    A.   I THINK SO.

03:41PM  18    Q.   AND DID THERANOS ULTIMATELY AGREE TO ENTER INTO A

03:41PM  19    PARTNERSHIP WITH DR. CHUNG?

03:41PM  20    A.   YES.

03:41PM  21    Q.   AND CAN YOU DESCRIBE WHAT WAS THE SUBJECT MATTER OF THE

03:41PM  22    PARTNERSHIP THAT DR. CHUNG AND THERANOS WERE WORKING ON

03:41PM  23    TOGETHER?

03:41PM  24    A.   YES.  THAT PARTNERSHIP WAS FOCUSSED ON BURN PATIENTS WHO

03:41PM  25    HAD UNDERGONE TRAUMA AND THE ABILITY TO PREDICT THE ONSET OF

03:41PM 1    INFECTION IN THOSE PATIENTS AND HOW WELL AN INFECTION COULD BE

03:41PM 2    MANAGED BASED ON PUTTING FILTERS INTO THEIR KIDNEYS.

03:41PM 3    Q.   AND WHAT ROLE DID DR. CHUNG WANT THERANOS TO PLAY WITH

03:41PM 4    REGARD TO HIS STUDY?

03:41PM 5    A.   DR. CHUNG ASKED US TO MEASURE SEVERAL MARKERS OF

03:41PM 6    INFLAMMATION ON VERY SMALL SAMPLES TO HELP QUANTIFY HOW WELL

03:42PM 7    THE KIDNEY FILTERS WERE WORKING.

03:42PM 8    Q.   AND WHERE WAS DR. CHUNG OPERATING THIS STUDY OUT OF?

03:42PM 9    A.   HE RAN IT OUT OF THE ARMY INSTITUTE FOR SURGICAL RESEARCH

03:42PM 10   IN TEXAS.

03:42PM 11   Q.   AND WERE OTHER HOSPITALS INVOLVED IN THAT STUDY OTHER THAN

03:42PM 12   THE ARMY INSTITUTE FOR SURGICAL RESEARCH?

03:42PM 13   A.   YES.

03:42PM 14   Q.   NOW, TO PARTICIPATE IN THAT STUDY WITH DR. CHUNG AND THE

03:42PM 15   ARMY INSTITUTE, DID THERANOS HAVE TO DEVELOP SPECIFIC

03:42PM 16   CARTRIDGES THAT WOULD BE REQUIRED FOR THE STUDY TO BE RUN?

03:42PM 17   A.   WE DID.

03:42PM 18   Q.   AND DID THE COMPANY DO THAT?

03:42PM 19   A.   YES.

03:42PM 20   Q.   AND DID DR. CHUNG PROCEED WITH THE STUDY OF BURN PATIENTS

03:42PM 21   AT SOME POINT AFTER 2010?

03:42PM 22   A.   HE DID.

03:42PM 23   Q.   HOW LONG DID THAT STUDY TAKE TO CONDUCT?

03:43PM 24   A.   SEVERAL YEARS.

03:43PM 25   Q.   CAN YOU TELL US THE ROLE THAT THERANOS DEVICES PLAYED

7668

03:43PM  1    WITHIN THE SITES WHERE THAT STUDY WAS BEING CONDUCTED?

03:43PM  2    A.   WE PLACED THERANOS DEVICES IN BURN HOSPITALS ACROSS THE

03:43PM  3    U.S.

03:43PM  4    Q.   AND WOULD THOSE DEVICES BE USED TO PERFORM BLOOD TESTS ON

03:43PM  5    PATIENTS, BURN PATIENTS WHO WERE THE OBJECT OF THE STUDY?

03:43PM  6    A.   THEY WERE.

03:43PM  7    Q.   HOW LONG DID THAT STUDY CONTINUE FOR?

03:43PM  8    A.   I WANT TO SAY FOUR YEARS.  I'M NOT QUITE SURE, BUT IT WAS

03:43PM  9    SEVERAL YEARS.

03:43PM  10   Q.   AND WHO WAS RESPONSIBLE FOR MANAGING THAT PROJECT AT

03:43PM  11   THERANOS?

03:43PM  12   A.   IT MIGHT HAVE BEEN SIX YEARS.

03:43PM  13        IT WAS MANAGED BY DR. YOUNG ON THE SCIENTIFIC SIDE AND BY

03:43PM  14   DAN EDLIN ON THE PROGRAM MANAGEMENT SIDE.

03:43PM  15   Q.   AND DID DR. CHUNG ULTIMATELY PREPARE THE RESULTS OF HIS

03:44PM  16   STUDY IN A PAPER?

03:44PM  17   A.   HE DID.

03:44PM  18   Q.   AND DID HE PUBLISH THE RESULTS OF THAT STUDY?

03:44PM  19   A.   YES.

03:44PM  20   Q.   AND WHAT DID YOU UNDERSTAND ABOUT THERANOS, THE ROLE --

03:44PM  21   WHAT DID YOU UNDERSTAND ABOUT THERANOS'S TECHNOLOGY AS A RESULT

03:44PM  22   OF THAT STUDY?

03:44PM  23   A.   I UNDERSTOOD THAT OUR SYSTEMS HAD PERFORMED WELL.

03:44PM  24        I UNDERSTOOD ALSO THAT BECAUSE IT IS SO HARD TO ENROLL

03:44PM  25   BURN PATIENTS INTO CLINICAL STUDIES, WE NEEDED MORE PATIENTS TO

7669

03:44PM 1    BE ABLE TO REALLY SEE TRENDS IN THESE MARKERS TO PREDICT HOW

03:44PM 2    WELL THE KIDNEY FILTERS WERE WORKING, AND THAT MORE STUDIES

03:44PM 3    WOULD BE REQUIRED.

03:44PM 4        BUT WE HAD BEEN RUNNING THE STUDY FOR SEVERAL YEARS, AND

03:44PM 5    SO DR. CHUNG MADE THE DECISION TO COMPLETE THE STUDY AT SOME

03:44PM 6    POINT.

03:44PM 7    Q.   NOW, WERE THE DEVICES THAT DR. CHUNG USED IN CONNECTION

03:44PM 8    WITH THAT STUDY, WERE THEY 4 SERIES DEVICES OR 3 SERIES

03:45PM 9    DEVICES?

03:45PM 10   A.   THEY WERE 3 SERIES DEVICES.

03:45PM 11   Q.   AND WHY WAS THAT?

03:45PM 12   A.   BECAUSE THE TECHNOLOGY THAT WE NEEDED TO MONITOR THE

03:45PM 13   MARKERS THAT DR. CHUNG WANTED TO MONITOR COULD BE DONE WITH THE

03:45PM 14   3 SERIES DEVICE.

03:45PM 15   Q.   AND WAS THERANOS PAID FOR THIS STUDY?

03:45PM 16   A.   YES.

03:45PM 17   Q.   AND DID THERANOS CONTINUE TO SEEK TO WORK WITH DR. CHUNG

03:45PM 18   IN OTHER CONTEXTS WITHIN DOD?

03:45PM 19   A.   WE DID.

03:45PM 20   Q.   ALL RIGHT.  AT SOME POINT DID THERANOS BEGIN TO PURSUE A

03:45PM 21   RELATIONSHIP WITH THE UNITED STATES AFRICAN COMMAND?

03:45PM 22   A.   YES.

03:45PM 23   Q.   AND THAT'S SOMETIMES REFERRED TO AS AFRICOM?

03:45PM 24   A.   YES.

03:45PM 25   Q.   WHEN DO YOU -- DID THERANOS FIRST BEGIN TALKING TO AFRICOM

03:45PM 1    ABOUT A POTENTIAL PARTNERSHIP?

03:46PM 2    A.   I THINK IT WAS IN 2012.

03:46PM 3    Q.   OKAY.  AND CAN YOU EXPLAIN WHAT AFRICOM IS, OR WHAT THAT

03:46PM 4    ABBREVIATION STANDS FOR?

03:46PM 5    A.   I UNDERSTAND IT TO BE THE UNITED STATES COMMAND FOR

03:46PM 6    OPERATIONS IN AFRICA.

03:46PM 7    Q.   DID YOU HAVE AN UNDERSTANDING OF WHAT THE U.S. -- WHAT

03:46PM 8    KINDS OF OPERATIONS THE U.S. MILITARY WAS RUNNING IN AFRICA AT

03:46PM 9    THAT TIME?

03:46PM 10   A.   I UNDERSTOOD THERE WERE SPECIAL OPERATIONS IN AFRICA.

03:46PM 11   Q.   WHO WAS THE PRIMARY PERSON FROM AFRICOM WHO YOU BEGAN TO

03:46PM 12   DISCUSS THIS PROJECT WITH?

03:46PM 13   A.   COLONEL GIVENS.

03:46PM 14   Q.   COLONEL GIBBONS?

03:46PM 15   A.   GIVENS.

03:46PM 16   Q.   AND WHO WAS COLONEL GIVENS?

03:46PM 17   A.   SHE WAS A -- I THINK SHE LED THE MEDICAL COMMAND FOR

03:46PM 18   SPECIAL OPERATIONS IN AFRICA.

03:46PM 19   Q.   AND HOW WERE YOU FIRST INTRODUCED TO HER?

03:47PM 20   A.   I THINK THROUGH OTHERS THAT WE HAD BEEN INTERACTING WITH

03:47PM 21   IN SPECIAL OPERATIONS COMMAND.

03:47PM 22   Q.   AND DID COLONEL GIVENS INDICATE TO YOU OR OTHERS AT

03:47PM 23   THERANOS THAT SHE WAS INTERESTED IN TESTING THERANOS'S

03:47PM 24   TECHNOLOGY IN AFRICA?

03:47PM 25   A.   SHE DID.

03:47PM 1    Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO WHAT SHE WANTED TO

03:47PM 2    TEST ABOUT THE DEVICE?

03:47PM 3    A.   YES.

03:47PM 4    Q.   AND WHAT DID SHE WANT TO TEST?

03:47PM 5    A.   SHE WANTED TO TEST HOW WELL THE DEVICE COULD BE

03:47PM 6    TRANSPORTED INTO VERY REMOTE AREAS, HOW WELL IT COULD WITHSTAND

03:47PM 7    VERY EXTREME TEMPERATURES AS HIGH AS 120 DEGREES, AND WHETHER

03:47PM 8    WE COULD BUILD AN APPLICATION OF SOFTWARE THAT COULD RUN ON THE

03:47PM 9    TOUCHSCREEN TO HELP PEOPLE WHO WERE NOT MEDICAL PERSONNEL

03:47PM 10   DIAGNOSE CONDITIONS IN REMOTE AREAS.

03:47PM 11   Q.   AND DID YOU ULTIMATELY ENTER INTO AN AGREEMENT WITH

03:47PM 12   AFRICOM TO RUN THAT TEST?

03:47PM 13   A.   YES.

03:48PM 14   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 12251.  THIS IS ALREADY

03:48PM 15   IN EVIDENCE.

03:48PM 16       AND DO YOU SEE THAT THIS IS AN EMAIL THAT DR. GIVENS SENT

03:48PM 17   TO YOU AND OTHERS AT THERANOS IN MAY OF 2012?

03:48PM 18   A.   I DO.

03:48PM 19   Q.   AND DO YOU SEE THAT SHE DESCRIBES IN THAT EMAIL THAT SHE

03:48PM 20   IS SENDING YOU A SHELL OF A PROTOCOL?

03:48PM 21   A.   YES.

03:48PM 22   Q.   AND WAS THIS THE PROTOCOL THAT WAS DESIGNED TO, TO GOVERN

03:48PM 23   THE TEST THAT DR. GIVENS WOULD RUN IN AFRICA?

03:48PM 24   A.   YES.

03:48PM 25   Q.   LET ME ASK YOU TO LOOK AT PAGE 3 OF THIS EXHIBIT.

| 03:48PM | 1 | AND DO YOU SEE THAT THE PROTOCOL NAME WAS THE "UTILITY OF |
| 03:49PM | 2 | PORTABLE ENHANCED LABORATORY DEVICE TO SUPPORT SOF FORCES IN |
| 03:49PM | 3 | AUSTERE ENVIRONMENTS ON THE AFRICAN CONTINENT"? |
| 03:49PM | 4 | A.   I DO. |
| 03:49PM | 5 | Q.   AND WHAT DID YOU UNDERSTAND SOF TO BE A REFERENCE TO? |
| 03:49PM | 6 | A.   SPECIAL OPERATIONS. |
| 03:49PM | 7 | Q.   AND THERE'S A RESEARCH SITE IDENTIFIED UNDERNEATH THAT? |
| 03:49PM | 8 | A.   YES. |
| 03:49PM | 9 | Q.   AND DO YOU SEE THAT IT IDENTIFIES MULTIPLE LOCATIONS |
| 03:49PM | 10 | WITHIN THE SOC AFRICA AREA? |
| 03:49PM | 11 | A.   I DO. |
| 03:49PM | 12 | Q.   AND IS THAT ANOTHER WAY OF DENOTING AFRICOM? |
| 03:49PM | 13 | A.   YES. |
| 03:49PM | 14 | Q.   AND DO YOU SEE THAT IT SAYS RESEARCH SITES WILL BE REMOTE |
| 03:49PM | 15 | AREAS OCCUPIED BY AFRICOM? |
| 03:49PM | 16 | A.   YES. |
| 03:49PM | 17 | Q.   AND IT NOTES THAT THOSE AREAS WILL NOT HAVE THE ENDEMIC |
| 03:49PM | 18 | MEDICAL FACILITIES THAT MEET WESTERN STANDARDS. |
| 03:49PM | 19 | DO YOU SEE THAT? |
| 03:49PM | 20 | A.   I DO. |
| 03:49PM | 21 | Q.   AND SO DID YOU UNDERSTAND THAT THESE WERE THE PROTOCOLS |
| 03:50PM | 22 | AND THE CONDITIONS UNDER WHICH THAT EVALUATION WOULD BE RUN? |
| 03:50PM | 23 | A.   YES. |
| 03:50PM | 24 | Q.   NOW, LET ME ASK YOU TO GO TO THE BOTTOM OF THAT SAME PAGE. |
| 03:50PM | 25 | IF WE CAN BLOW THIS PROSE UP. |

03:50PM  1      I WANT TO DIRECT YOUR ATTENTION TO THE SECOND PARAGRAPH

03:50PM  2   UNDER BACKGROUND.

03:50PM  3      AND DO YOU SEE THAT THAT PARAGRAPH SAYS "BECAUSE UNITS IN

03:50PM  4   AFRICA HAVE MINIMAL MEDICAL SUPPORT (MOST OFTEN A TEAM MEDIC)

03:50PM  5   IT IS NOT UNUSUAL FOR A PATIENT TO BE TRANSPORTED SIGNIFICANT

03:50PM  6   DISTANCES TO UNDERGO DIAGNOSTIC TESTS AND RECEIVE CARE."

03:50PM  7      DO YOU SEE THAT?

03:50PM  8   A.   I DO.

03:50PM  9   Q.   AND THEN IT GOES ON TO DISCUSS WHAT THE EFFECTS OF TRYING

03:50PM  10  TO MOVE THOSE PATIENTS ARE.

03:50PM  11     DO YOU SEE THAT?

03:50PM  12  A.   YES.

03:50PM  13  Q.   AND WHAT DID YOU UNDERSTAND WERE THE CHALLENGES THAT WERE

03:50PM  14  FACING THE UNITS THAT THE AMERICAN MILITARY THAT WERE SERVING

03:51PM  15  IN AFRICA WITH REGARD TO MEDICAL SUPPORT?

03:51PM  16  A.   I UNDERSTOOD THAT WHEN PEOPLE WERE SERVING IN REMOTE

03:51PM  17  AREAS, IF A MEDICAL ISSUE HAPPENED, THEY WOULD OFTEN HAVE TO BE

03:51PM  18  EVACUATED OUT OF CONTINENT, AND THERE WAS NOT EFFECTIVE LOCAL

03:51PM  19  TRIAGE AND DIAGNOSTIC CAPABILITY TO HELP TAKE CARE OF THEM.

03:51PM  20  Q.   OKAY.  AND IF YOU LOOK AT THE SENTENCE THAT BEGINS,

03:51PM  21  "CURRENTLY" TOWARDS THE BOTTOM OF THAT PAGE.

03:51PM  22     DO YOU SEE THAT IT READS, "CURRENTLY, SOC AFRICA PRACTICE

03:51PM  23  IS TO EVACUATE PERSONNEL WHO REQUIRE CONFIRMATORY LABORATORY

03:51PM  24  TESTING WHEN A CERTIFIED HOST NATION LABORATORY IS NOT

03:51PM  25  AVAILABLE."

| | | |
|---|---|---|
| 03:51PM | 1 | DO YOU SEE THAT? |
| 03:51PM | 2 | A.   I DO. |
| 03:51PM | 3 | Q.   AND DID YOU UNDERSTAND THAT THIS WAS SOMETHING WHICH |
| 03:51PM | 4 | UNFORTUNATELY WAS REQUIRED FREQUENTLY? |
| 03:51PM | 5 | A.   I DID. |
| 03:51PM | 6 | Q.   LET'S GO TO PAGE 4 OF THIS PROTOCOL THAT DR. GIVENS SENT |
| 03:52PM | 7 | TO THERANOS IN 2012. |
| 03:52PM | 8 | AND I'D LIKE TO LOOK AT THE LAST PARAGRAPH THERE THAT IS |
| 03:52PM | 9 | SHOWN ON THE SCREEN THAT BEGINS "THE INTENT OF THIS STUDY." |
| 03:52PM | 10 | DO YOU SEE THAT PARAGRAPH? |
| 03:52PM | 11 | A.   YES. |
| 03:52PM | 12 | Q.   AND IT SAYS, "THE INTENT OF THIS STUDY IS TO ESTABLISH |
| 03:52PM | 13 | OPERATIONAL FUNCTIONALITY OF THERANOS LABORATORY SYSTEMS AND |
| 03:52PM | 14 | QUANTIFY IMPACTS OF UTILIZING THESE SYSTEMS AT FORWARD DEPLOYED |
| 03:52PM | 15 | LOCATIONS.  IF THERANOS SYSTEMS ARE SHOWN TO BE OPERATIONALLY |
| 03:52PM | 16 | EFFECTIVE AND HAVE THE CAPACITY TO IMPROVE PATIENT CARE, REDUCE |
| 03:52PM | 17 | COSTS, AND MITIGATE RISKS, SERVICE MEMBERS THROUGHOUT THE |
| 03:52PM | 18 | ORGANIZATION WILL BENEFIT." |
| 03:52PM | 19 | DO YOU SEE THAT? |
| 03:52PM | 20 | A.   I DO. |
| 03:52PM | 21 | Q.   SO IS THAT THE GOAL OF THE PROGRAM THAT THERANOS WAS |
| 03:52PM | 22 | WORKING WITH DR. GIVENS TO DEVELOP IN AFRICA? |
| 03:53PM | 23 | A.   YES. |
| 03:53PM | 24 | Q.   AND DID THIS PROGRAM HAVE A HYPOTHESIS? |
| 03:53PM | 25 | A.   THE HYPOTHESIS WAS THAT IF WE COULD ENABLE TESTING IN |

03:53PM  1    REALLY REMOTE AREAS, WE COULD MAKE A REAL IMPACT ON SURVIVAL.

03:53PM  2    Q.   NOW, FOR PURPOSES OF THE STUDY THAT YOU WERE DISCUSSING

03:53PM  3    WITH DR. GIVENS, DID SHE INTEND TO ACTUALLY USE THERANOS

03:53PM  4    DEVICES IN AFRICA AT THIS TIME FOR DIAGNOSTIC TESTING?

03:53PM  5    A.   NOT IN OUR FIRST STUDY.

03:53PM  6    Q.   OKAY.  AND WAS THAT A SUBJECT OF DISCUSSION BETWEEN YOU

03:53PM  7    AND DR. GIVENS?

03:53PM  8    A.   IT WAS.

03:53PM  9    Q.   DID THE COMPANY AND DR. GIVENS AGREE TO GO FORWARD WITH

03:53PM  10   THIS STUDY IN AFRICA?

03:53PM  11   A.   YES.

03:53PM  12   Q.   AND IN CONNECTION WITH GETTING READY TO CONDUCT THAT

03:53PM  13   STUDY, DID THERANOS CUSTOMIZE DEVICES THAT COULD BE USED?

03:53PM  14   A.   YES.

03:53PM  15   Q.   AND DID, IN FACT, DR. GIVENS TAKE THERANOS DEVICES TO

03:54PM  16   AFRICA FOR PURPOSES OF CONDUCTING A STUDY?

03:54PM  17   A.   YES.

03:54PM  18   Q.   HOW LONG DID IT TAKE FROM THE TIME THAT YOU BEGAN

03:54PM  19   DISCUSSING THE POSSIBILITY OF THIS STUDY IN 2012, HOW LONG DID

03:54PM  20   IT TAKE FROM THEN UNTIL THE ACTUAL TRANSPORT OF THE DEVICES TO

03:54PM  21   AFRICA FOR STUDY?

03:54PM  22   A.   ABOUT A MONTH, I THINK.

03:54PM  23   Q.   SO WAS THERANOS READY TO DO THAT STUDY?

03:54PM  24   A.   WE, WE GOT READY, YES.

03:54PM  25   Q.   WHY WERE YOU ABLE TO MOVE SO QUICKLY WITH RESPECT TO THIS

7676

03:54PM   1    PARTICULAR ENGAGEMENT WITH DOD?

03:54PM   2    A.   BECAUSE THIS ENGAGEMENT DID NOT REQUIRE TESTING ACTUAL

03:54PM   3    HUMAN SAMPLES, WHICH WOULD HAVE LED TO A WHOLE SERIES OF

03:54PM   4    ADDITIONAL REVIEW BOARD AND OTHER APPROVALS.

03:54PM   5    Q.   AND CAN YOU TELL US WHAT YOU UNDERSTOOD DR. GIVENS WAS

03:54PM   6    TRYING TO EVALUATE ABOUT THE DEVICE?

03:54PM   7    A.   I UNDERSTOOD SHE WAS TRYING TO EVALUATE HOW WELL IT WOULD

03:55PM   8    FUNCTION IN AN EXTREME ENVIRONMENT IN WHICH MOST EQUIPMENT SHUT

03:55PM   9    DOWN.

03:55PM   10   Q.   DID THE THERANOS DEVICE HAVE TO BE CUSTOMIZED IN ORDER TO

03:55PM   11   ALLOW IT TO PREPARE -- TO PARTICIPATE IN THIS STUDY?

03:55PM   12   A.   IT DID.

03:55PM   13   Q.   AND WHAT CUSTOMIZATION HAD TO BE MADE TO THE DEVICE?

03:55PM   14   A.   WE HAD TO DO WORK IN ENSURING THE DEVICE COULD PERFORM

03:55PM   15   WITH EXTREME HEAT AND ENSURING THE DEVICE COULD HANDLE

03:55PM   16   VIBRATION THAT WAS SIGNIFICANT.

03:55PM   17   Q.   AFTER THE STUDY WAS CONCLUDED, DID YOU LEARN WHAT THE

03:55PM   18   RESULTS OF THAT STUDY WERE?

03:55PM   19   A.   YES.

03:55PM   20   Q.   DID YOU LEARN THOSE FROM DR. GIVENS?

03:55PM   21   A.   YES.

03:55PM   22   Q.   AND WHAT DID SHE REPORT?

03:55PM   23   A.   SHE REPORTED THAT THE DEVICE HELD UP WELL.  SHE HAD

03:55PM   24   FEEDBACK ON THE TOUCHSCREEN, THAT THE TOUCHSCREEN ITSELF WAS

03:55PM   25   DIFFICULT TO USE.

7677

03:55PM  1      Q.   OKAY.

03:55PM  2           YOUR HONOR, I'M GOING TO START A NEW SECTION.  IT'S ABOUT

03:55PM  3      FIVE MINUTES TO 4:00.

03:56PM  4           I'M HAPPY TO START THAT AND FINISH ON TUESDAY WITHIN THAT

03:56PM  5      SAME SECTION, BUT I WOULD LEAVE IT TO YOUR HONOR?

03:56PM  6           THE COURT:  WHY DON'T WE, WHY DON'T WE BREAK NOW.

03:56PM  7      THANK YOU.  LET'S DO THAT.

03:56PM  8           LADIES AND GENTLEMEN, WE'LL HAVE OUR LONG RECESS NOW, OUR

03:56PM  9      THANKSGIVING RECESS NOW.

03:56PM  10          PLEASE RECALL THAT WE'LL RETURN ON THE 29TH, MONDAY, THE

03:56PM  11     29TH.  I ANTICIPATE WE WON'T BE ABLE TO START UNTIL PROBABLY

03:56PM  12     10:00 TO 10:30, SO IF YOU COULD COLLECT YOURSELVES ACCORDINGLY.

03:56PM  13     MY SENSE IS THAT BY 10:30 WE WILL BE ABLE TO START.

03:56PM  14          MS. HOLMES, YOU WILL HAVE TO COME BACK FOR THAT ALSO.

03:56PM  15          LADIES AND GENTLEMEN, LET ME REMIND YOU OF THE ADMONITION.

03:56PM  16     PLEASE, DURING THIS LONG BREAK, DO NOT READ, LISTEN TO, TALK TO

03:56PM  17     ANYONE OR IN ANY WAY TRY TO LEARN ANYTHING ABOUT THIS CASE.

03:56PM  18          DO NOT FORM ANY OPINIONS ABOUT ANYTHING IN THIS CASE.

03:56PM  19          WE'RE GOING TO HAVE THANKSGIVING IN THE NEXT COUPLE OF

03:56PM  20     DAYS, AND I REALIZE THAT MEANS STRONG FELLOWSHIP WITH FAMILIES,

03:57PM  21     GETTING TOGETHER WITH FAMILIES AND FRIENDS.

03:57PM  22          I JUST WANTED TO SAY, AT LEAST IN MY MIND, ONE OF THE

03:57PM  23     OBVIOUS THINGS IS THAT YOU'RE GOING TO SEE FAMILY MAYBE YOU

03:57PM  24     HAVEN'T SEEN FOR QUITE SOME TIME AND THEY MIGHT ASK YOU, GEE,

03:57PM  25     WHAT HAVE YOU BEEN UP TO?

7678

03:57PM    1          (LAUGHTER.)

03:57PM    2              THE COURT:  AND IT CALLS UPON YOU TO REMEMBER,

03:57PM    3     PLEASE, THE ADMONITION.  YOU MAY BE ASKED QUESTIONS ABOUT THAT,

03:57PM    4     AND DO THE BEST YOU CAN TO PASS THE MASHED POTATOES AND NOT

03:57PM    5     ENGAGE ANY CONVERSATION WITH ANYONE.

03:57PM    6          YOU HAVE TO DO THAT.  I DON'T MEAN TO BE FLIP, BUT IT'S

03:57PM    7     IMPORTANT THAT YOU DISENGAGE.

03:57PM    8          AS I TOLD YOU IN THE PRELIMINARY INSTRUCTIONS, YOU'RE

03:57PM    9     PERMITTED TO TELL YOUR FAMILY, FRIENDS, AND EMPLOYERS THAT

03:57PM   10     YOU'RE IN A -- YOU'RE SERVING ON A JURY.  BUT YOU MAY NOT, YOU

03:57PM   11     MAY NOT DISCUSS ANYTHING ABOUT YOUR SERVICE HERE.

03:57PM   12          IT MAY BE THAT INDIVIDUALS TRY TO SPEAK TO YOU AND OFFER

03:57PM   13     OPINIONS AND THESE TYPES OF THINGS.  I WOULD ENCOURAGE YOU, YOU

03:58PM   14     JUST NEED TO WALK AWAY AS BEST YOU CAN.  AND MY SENSE IS THAT

03:58PM   15     YOUR FRIENDS AND FAMILY WILL RESPECT YOUR STATEMENTS WHEN YOU

03:58PM   16     TELL THEM YOU CAN'T DISCUSS THE CASE.

03:58PM   17          SO PLEASE BE CAREFUL ABOUT THAT.

03:58PM   18          ONE OTHER THING, TOO.  WE ARE STILL IN A PANDEMIC

03:58PM   19     SITUATION, AND WE'RE GETTING INTO THE FLU SEASON, SO PLEASE BE

03:58PM   20     SAFE.  MAKE GOOD CHOICES, ALL OF US.  THAT GOES TO ALL OF US.

03:58PM   21     PLEASE, PLEASE BE SAFE.  MAKE GOOD CHOICES.  DO WHAT YOU CAN TO

03:58PM   22     AVOID ANY POSSIBLE CONTACT WITH ANYTHING.  STAY HEALTHY.

03:58PM   23          WE WANT TO SEE YOU AGAIN MONDAY NEXT.

03:58PM   24          AND, AGAIN, WE'LL START ABOUT 10:00, 10:30, SOMETHING LIKE

03:58PM   25     THAT.

| | | |
|---|---|---|
| 03:58PM | 1 | SO DO ENJOY YOUR TIME WITH YOUR FAMILY AND YOUR FRIENDS. |
| 03:58PM | 2 | HAVE A GOOD LONG WEEKEND.  ENJOY.  WE'LL SEE YOU NEXT WEEK. |
| 03:58PM | 3 | THANK YOU. |
| 03:59PM | 4 | (JURY OUT AT 3:59 P.M.) |
| 03:59PM | 5 | THE COURT:  YOU CAN STAND DOWN.  THANK YOU, |
| 03:59PM | 6 | MS. HOLMES. |
| 03:59PM | 7 | PLEASE BE SEATED.  THANK YOU. |
| 03:59PM | 8 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 03:59PM | 9 | WEEKEND.  ALL COUNSEL AND MS. HOLMES ARE PRESENT. |
| 03:59PM | 10 | COUNSEL, ANYTHING ELSE TO DISCUSS BEFORE WE BREAK? |
| 03:59PM | 11 | MR. LEACH:  NOT FROM THE GOVERNMENT, YOUR HONOR. |
| 03:59PM | 12 | MR. DOWNEY:  YOUR HONOR, TWO QUICK THINGS. |
| 03:59PM | 13 | ONE IS THAT WE'RE GOING TO BE FILING A MOTION TO ADMIT |
| 03:59PM | 14 | SOME EVIDENCE WHICH IS NOT OF AN URGENT NATURE AT ALL, BUT JUST |
| 03:59PM | 15 | BECAUSE WE'RE NEAR COMPLETED WITH IT, WE MAY FILE IT TOMORROW, |
| 03:59PM | 16 | AND I ASSUME WE'LL TAKE IT UP AROUND ONE OF THE SESSIONS THAT |
| 03:59PM | 17 | WE HAVE EITHER NEXT WEEK OR WHENEVER THE COURT DAYS CONTINUE. |
| 03:59PM | 18 | SECOND, IN LIGHT OF THE HOLIDAY, I WANTED TO NOT ONLY WISH |
| 04:00PM | 19 | THE COURT A HAPPY THANKSGIVING, BUT WE RECOGNIZE THAT THIS |
| 04:00PM | 20 | PROCEEDING HAS BEEN AN EXTRAORDINARILY BURDEN FOR THE |
| 04:00PM | 21 | COURTHOUSE STAFF AND FOR THE COURTROOM STAFF, AND I KNOW THE |
| 04:00PM | 22 | GOVERNMENT TEAM JOINS US IN THANKING THE COURTROOM STAFF AND |
| 04:00PM | 23 | THANKING THE COURTHOUSE STAFF FOR THE MANY EXTRAORDINARY |
| 04:00PM | 24 | EFFORTS THAT HAVE BEEN ONGOING DURING THIS UNUSUAL CASE AT THIS |
| 04:00PM | 25 | UNUSUAL TIME. |

7680

| | | |
|---|---|---|
| 04:00PM | 1 | THE COURT:  WELL, THANK YOU.  THANK YOU FOR THAT. |
| 04:00PM | 2 | AND THANK YOU FOR RECOGNIZING STAFF. |
| 04:00PM | 3 | YOU KNOW, IT'S NO SECRET, I'M BLESSED WITH THE BEST STAFF |
| 04:00PM | 4 | IN THE BUILDING, AND I DON'T KNOW HOW THAT HAPPENED.  I JUST |
| 04:00PM | 5 | FELL VERY LUCKILY AND FORTUNATELY INTO IT.  EVERYTHING THAT WE |
| 04:00PM | 6 | DO HERE, EVERYTHING THAT I DO TO SERVE THE PUBLIC AND THE JOB I |
| 04:00PM | 7 | HAVE IS JUST BENEFITTED, I COULDN'T DO IT WITHOUT THIS |
| 04:00PM | 8 | WONDERFUL STAFF.  THANK YOU FOR RECOGNIZING THEM.  I APPRECIATE |
| 04:01PM | 9 | THAT. |
| 04:01PM | 10 | AND ON BEHALF OF THE STAFF, WE WISH ALL OF YOU A HAPPY |
| 04:01PM | 11 | THANKSGIVING.  BE WITH YOUR FAMILIES.  I KNOW SOME PEOPLE ARE |
| 04:01PM | 12 | TRAVELLING IN THIS CASE, AND OTHERS, I HOPE YOU CAN GET BACK TO |
| 04:01PM | 13 | SEE FAMILY.  I HOPE IT'S NOT A ZOOM THANKSGIVING, BUT SOMETHING |
| 04:01PM | 14 | A LITTLE RICHER THAN THAT.  BUT NONETHELESS, ENJOY. |
| 04:01PM | 15 | LET ME JUST EXTEND A THANKS, TOO, TO OUR FRIENDS WHO ARE |
| 04:01PM | 16 | HERE VISITING WITH THE LAPTOPS.  AGAIN, I'VE -- THOSE OF YOU |
| 04:01PM | 17 | WHO HAVE KEPT YOUR LAPTOPS QUIET AND HAVE TRIED TO KEEP YOUR |
| 04:01PM | 18 | TYPING DOWN, THANK YOU SO MUCH FOR THAT.  I REALLY APPRECIATE |
| 04:01PM | 19 | THAT. |
| 04:01PM | 20 | AND I'M SPEAKING ON BEHALF OF THE JURY PRIMARILY.  THEY |
| 04:01PM | 21 | ARE FOCUSSING, AND THEY DO, THROUGH MS. KRATZMANN, HAVE |
| 04:01PM | 22 | INDICATED THAT THEY REALLY APPRECIATE THE EFFORTS.  SO THOSE |
| 04:01PM | 23 | WHO HAVE DONE THAT, I'M GRATEFUL ON THEIR BEHALF. |
| 04:01PM | 24 | THOSE OF YOU WHO HAVE A BIT TO GO, PLEASE MODEL YOURSELF |
| 04:01PM | 25 | AFTER YOUR COLLEAGUES. |

7681

04:02PM      1           ENJOY THE HOLIDAY EVERYONE.  WE'LL SEE YOU NEXT WEEK.

04:02PM      2       THANK YOU.

04:02PM      3              THE CLERK:  COURT IS ADJOURNED.

04:02PM      4          (COURT ADJOURNED AT 4:02 P.M.)

             5

             6

             7

             8

             9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25

UNITED STATES COURT REPORTERS

**ER-11242**

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
17    CERTIFICATE NUMBER 8076

18    _____

19    LEE-ANNE SHORTRIDGE, CSR, CRR
      CERTIFICATE NUMBER 9595
20

21         DATED:  NOVEMBER 23, 2021

22

23

24

25

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                    )
                        PLAINTIFF,   )   SAN JOSE, CALIFORNIA
7                                    )
             VS.                     )   VOLUME 39
8                                    )
   ELIZABETH A. HOLMES,             )   NOVEMBER 29, 2021
9                                    )
                        DEFENDANT.   )   PAGES 7682 - 7921
10   _____ )

11                 TRANSCRIPT OF TRIAL PROCEEDINGS

12            BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE
13
   A P P E A R A N C E S:
14
   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                        BY:   JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:   ROBERT S. LEACH
18                              KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

   OFFICIAL COURT REPORTERS:
22                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
23                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER

```
1        A P P E A R A N C E S:  (CONT'D)

2

3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
4                                    LANCE A. WADE
                                     KATHERINE TREFZ
5                                    AMY SAHARIA
                                     ANDREW LEMENS
6                                    SEEMA ROPER
                                     J.R. FLEURMONT
7                                    RICHARD CLEARY
                                     PATRICK LOOBY
8                               725 TWELFTH STREET, N.W.
                                WASHINGTON, D.C. 20005
9
                                LAW OFFICE OF JOHN D. CLINE
10                              BY:  JOHN D. CLINE
                                ONE EMBARCADERO CENTER, SUITE 500
11                              SAN FRANCISCO, CALIFORNIA 94111

12
      ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
13                             BY:  ADELAIDA HERNANDEZ

14                             OFFICE OF THE U.S. ATTORNEY
                               BY:  LAKISHA HOLLIMAN, PARALEGAL
15                                  MADDI WACHS, PARALEGAL

16                             WILLIAMS & CONNOLLY
                               BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                               TBC
18                             BY:  BRIAN BENNETT, TECHNICIAN

19

20

21

22

23

24

25
```

7684

INDEX OF PROCEEDINGS

DEFENDANT'S:


**ELIZABETH HOLMES**
DIRECT EXAM BY MR. DOWNEY (RES.)          P. 7758

**ER-11246**

1                          INDEX OF EXHIBITS

2                                        IDENT.     EVIDENCE

3           GOVERNMENT'S:

4
            5387E                                     7835
5           5387F                                     7861

6

7           DEFENDANT'S:

8           7469                                      7759
            7514                                      7762
9           7623                                      7764
            13862 AND 13863                           7766
10          14207                                     7767
            14208                                     7768
11          7129                                      7782
            7228                                      7799
12          7282                                      7810
            7363                                      7812
13          7368                                      7814
            7421                                      7823
14          7434                                      7828
            1667                                      7830
15          7734                                      7852
            7731                                      7857
16          7534                                      7869
            7517                                      7873
17          13288                                     7887
            10677                                     7896
18          7673A, PAGE 52                            7897
            7680                                      7899
19          7719, LIMITED PURPOSE                     7903
            7718, LIMITED PURPOSE                     7904
20          7695, LIMITED PURPOSE                     7906
            7717, LIMITED PURPOSE                     7908
21          15027                                     7910
            15035                                     7916
22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    NOVEMBER 29, 2021

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 9:04 A.M.)

 4         (JURY OUT AT 9:04 A.M.)

 5              THE COURT:  I HOPE EVERYONE HAD A GOOD HOLIDAY.

 6    WELCOME BACK.

 7         WE'RE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE

 8    PRESENT.  MS. HOLMES IS PRESENT.

 9         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

10         WE'RE HERE TO TAKE UP A COUPLE OF MATTERS REGARDING

11    FILINGS.

12         LET ME FIRST INDICATE, PROBABLY COUNSEL ARE AWARE, THAT

13    WE'RE HAVING ANOTHER TECHNICAL PROBLEM TODAY.  I'M INFORMED

14    THAT THE JURY MONITORS ARE NOT OPERATIONAL AT THE MOMENT AND

15    THERE'S WORK BEING DONE BEHIND THE SCENES TO MAKE THOSE

16    AVAILABLE.

17         SO HOPEFULLY THAT WILL GET RESOLVED.

18         LET'S TAKE UP A COUPLE OF MATTERS THAT WERE FILED BY THE

19    DEFENSE LAST WEEK I BELIEVE.  AND THESE ARE DOCKET 1165, WHICH

20    IS MS. HOLMES'S RENEWED MOTION TO ADMIT EXHIBIT 14259, AND

21    DOCKET 1163, WHICH IS MS. HOLMES'S MOTION TO ADMIT PRIOR

22    TESTIMONY OF SUNNY BALWANI.

23         AND I HAVE READ 1166, WHICH IS THE GOVERNMENT'S OPPOSITION

24    TO ADMIT PRIOR TESTIMONY.

25         AND WE'LL TALK ABOUT THOSE THIS MORNING.
```

The timestamps in the left margin are: 09:04AM (lines 2-13), 09:05AM (lines 14-24), 09:06AM (line 25).

| | | |
|---|---|---|
| 09:06AM | 1 | BEFORE WE MOVE INTO THOSE, ARE THERE ANY OTHER THRESHOLD |
| 09:06AM | 2 | ISSUES THAT COUNSEL WANT TO RAISE ABOUT ANYTHING?  IF NOT, |
| 09:06AM | 3 | WE'LL, WE'LL -- LET'S DISCUSS THESE THEN. |
| 09:06AM | 4 | LET'S TAKE UP THE PRIOR TESTIMONY OF MR. BALWANI, WHICH IS |
| 09:06AM | 5 | 1163.  THAT ONE I HAVE OPPOSITION ON FROM THE GOVERNMENT. |
| 09:06AM | 6 | GOOD MORNING.  AND WHO APPEARS TO ADVANCE THE MOTION ON |
| 09:06AM | 7 | MS. HOLMES'S BEHALF? |
| 09:06AM | 8 | MR. FLEURMONT:  GOOD MORNING, YOUR HONOR. |
| 09:06AM | 9 | J.R. FLEURMONT ON BEHALF OF MS. HOLMES.  SHE IS PRESENT. |
| 09:06AM | 10 | THE COURT:  GOOD MORNING.  IT'S NICE TO SEE YOU |
| 09:06AM | 11 | AGAIN. |
| 09:06AM | 12 | AND WHO APPEARS ON BEHALF OF THE GOVERNMENT? |
| 09:06AM | 13 | MS. VOLKAR:  GOOD MORNING.  KELLY VOLKAR FOR THE |
| 09:06AM | 14 | UNITED STATES. |
| 09:06AM | 15 | THE COURT:  GOOD MORNING.  THANK YOU.  IT'S NICE TO |
| 09:07AM | 16 | SEE YOU AS WELL. |
| 09:07AM | 17 | COUNSEL, IF YOU WOULD LIKE TO TAKE YOUR MASKS OFF, YOU CAN |
| 09:07AM | 18 | TAKE YOUR MASKS OFF.  THAT MIGHT BE BENEFICIAL FOR OUR COURT |
| 09:07AM | 19 | REPORTERS. |
| 09:07AM | 20 | MS. VOLKAR:  THANK YOU, YOUR HONOR. |
| 09:07AM | 21 | MR. FLEURMONT:  THANK YOU, YOUR HONOR. |
| 09:07AM | 22 | THE COURT:  I GUESS THE ISSUE I HAVE, MR. FLEURMONT, |
| 09:07AM | 23 | IS THE TIMING OF THESE, THE MOTION VIS-A-VIS YOUR CLIENT'S |
| 09:07AM | 24 | TESTIMONY AND WHERE THIS MIGHT FIT IN, THAT IS, YOUR TWO |
| 09:07AM | 25 | MOTIONS, WHERE THIS EVIDENCE MIGHT FIT IN AND THE TIMELINE OF |

7688

09:07AM 1    THAT, IF YOU KNOW THAT, IF YOU'RE ABLE TO ANSWER THAT.

09:07AM 2            MR. FLEURMONT: YES, YOUR HONOR.

09:07AM 3       I THINK I UNDERSTAND THE COURT'S QUESTION TO BE, IF THE

09:07AM 4    MOTION WERE GRANTED, WHERE THE TESTIMONY WOULD FIT IN OR WHERE

09:07AM 5    THE EXHIBIT WOULD FIT IN.

09:07AM 6            THE COURT: RIGHT. RIGHT.

09:07AM 7            MR. FLEURMONT: WELL, YOUR HONOR, I CAN SAY THAT I

09:07AM 8    THINK I WOULD HAVE TO DISCUSS IT WITH MY TEAM EXACTLY WHEN WE

09:07AM 9    WOULD WANT TO ADMIT THIS TESTIMONY AND WHEN WE WOULD WANT TO

09:07AM 10   ADMIT THIS EXHIBIT.

09:07AM 11           THE COURT: SURE.

09:07AM 12           MR. FLEURMONT: AND I THINK THAT'S ALL I CAN SAY

09:07AM 13   ABOUT THAT POINT.

09:07AM 14           THE COURT: I ASK THAT FOR SELFISH REASONS, BECAUSE

09:07AM 15   YOUR ANSWER WILL INFORM NECESSITY AS TO WHEN YOU GET AN ANSWER

09:08AM 16   FROM ME.

09:08AM 17           MR. FLEURMONT: UNDERSTOOD.

09:08AM 18       IF I COULD, AFTER THE ARGUMENTS, CONFER WITH THE

09:08AM 19   HIGHER-UPS, I THINK I CAN SEE IF I COULD DO BETTER THAN WHAT

09:08AM 20   I'M DOING RIGHT NOW.

09:08AM 21           THE COURT: WELL, YOU'RE DOING FINE. THAT'S

09:08AM 22   GENEROUS FOR YOU TO CALL THEM YOUR HIGHER-UPS. THEY'RE YOUR

09:08AM 23   COLLEAGUES.

09:08AM 24           MR. FLEURMONT: FAIR ENOUGH.

09:08AM 25           THE COURT: SO WHAT SHOULD I KNOW ABOUT THIS?

09:08AM 1          MR. FLEURMONT:  SURE.  STARTING WITH THE MOTION TO

09:08AM 2    ADMIT PRIOR TESTIMONY OF SUNNY BALWANI, WE SUBMIT IT SHOULD BE

09:08AM 3    GRANTED UNDER 804.  THERE ARE TWO PROVISIONS AT PLAY HERE,

09:08AM 4    804(B), WHICH IS A STATEMENT AGAINST INTEREST, AND 804(B)(1),

09:08AM 5    WHICH IS TESTIMONY.

09:08AM 6          SO THE COURT KNOWS, THE FIRST ISSUE OR THE FIRST QUESTION

09:08AM 7    UNDER AN --

09:08AM 8          THE COURT:  THAT'S EASIER.

09:08AM 9          MR. FLEURMONT:  AS THE COURT KNOWS, THE FIRST

09:08AM 10   QUESTION UNDER THE 804 RULE ANALYSIS IS WHERE THE DECLARANT IS

09:08AM 11   UNAVAILABLE, SO I'D LIKE TO BRIEFLY START THERE.

09:09AM 12         UNDER RULE 804(A)(1), THE DECLARANT IS UNAVAILABLE IF THE

09:09AM 13   COURT FINDS THAT A PRIVILEGE APPLIES.

09:09AM 14         IN THIS CASE WE HAVE A SWORN DECLARATION FROM LANCE WADE

09:09AM 15   EXPLAINING THAT HE REACHED OUT TO MR. BALWANI'S ATTORNEY AND

09:09AM 16   ASKED ABOUT AVAILABILITY AND WAS TOLD, THROUGH THE PROFFER OF

09:09AM 17   THE ATTORNEY, THAT MR. BALWANI, IF CALLED IN THIS CASE, WOULD

09:09AM 18   EXERCISE HIS RIGHT UNDER THE FIFTH AMENDMENT NOT TO ANSWER ANY

09:09AM 19   RELEVANT QUESTION.

09:09AM 20         WE ALSO HAVE A PRIOR DEPOSITION IN THIS CASE THAT THE

09:09AM 21   COURT IS VERY FAMILIAR WITH, BECAUSE I UNDERSTAND THE COURT

09:09AM 22   PRESIDED OVER THE S.E.C. CASE IN WHICH MR. BALWANI, THROUGH HIS

09:09AM 23   COUNSEL, INVOKED THE FIFTH AMENDMENT UNDER A RELEVANT QUESTION.

09:09AM 24         AND OF COURSE WE HAVE SEVERAL PROCEEDINGS IN THIS CASE

09:09AM 25   WHERE THE COURT HAS HAD THE BENEFIT OF SEEING THE GOVERNMENT'S

09:09AM   1    THEORY OF THE DEFENSE AGAINST MR. BALWANI THROUGH RECENT MOTION

09:09AM   2    IN LIMINES FILED IN THE BALWANI CASE THAT EXPLAIN THEIR THEORY

09:09AM   3    OF CULPABILITY.  THAT GIVES THE COURT THE SPECIAL INFORMATION

09:09AM   4    OR SPECIAL UNDERSTANDING OF THIS CASE, WHICH WOULD ALLOW THE

09:09AM   5    COURT TO FIND THAT HE IS UNAVAILABLE BECAUSE HE WOULD INVOKE

09:09AM   6    HIS FIFTH AMENDMENT RIGHT.

09:09AM   7         SO WE BELIEVE HE'S UNAVAILABLE FOR THOSE REASONS.

09:10AM   8         IF THERE ARE NO QUESTIONS ON UNAVAILABILITY, I CAN MOVE TO

09:10AM   9    THE FIRST EXCEPTION.

09:10AM   10        THE COURT:  WELL, I DO HAVE SOME.

09:10AM   11        DO WE NEED TO -- IS THERE SUFFICIENT -- IS THERE A

09:10AM   12    SUFFICIENT SHOWING FOR UNAVAILABILITY NOW?

09:10AM   13        NOW, OF COURSE, EVERYONE KNOWS I SEVERED THE CASES FOR THE

09:10AM   14    REASONS INDICATED IN THE COURT'S ORDER.

09:10AM   15        MR. FLEURMONT:  CORRECT.

09:10AM   16        THE COURT:  HE HAS A TRIAL, HE, MR. BALWANI, HAS A

09:10AM   17    TRIAL PENDING NEXT MONTH -- EXCUSE ME, IN JANUARY.

09:10AM   18        MR. FLEURMONT:  UH-HUH.

09:10AM   19        THE COURT:  BUT DO I NEED TO KNOW -- I UNDERSTAND

09:10AM   20    THAT MR. WADE REACHED OUT TO HIM, BUT DO I NEED TO HAVE EITHER

09:10AM   21    HIS COUNSEL, MR. COOPERSMITH, OR MR. BALWANI COME INTO COURT

09:10AM   22    AND INDICATE TO ME, PERHAPS OUTSIDE OF THE PRESENCE OF THE

09:10AM   23    JURY, BUT NONETHELESS INFORM THE COURT THAT IF CALLED TO

09:10AM   24    TESTIFY, HE WOULD INVOKE HIS PRIVILEGE?  DO I NEED TO DO THAT?

09:10AM   25    IS THAT A THRESHOLD THAT NEEDS TO BE MET?

7691

09:11AM 1          MR. FLEURMONT:  NO, YOUR HONOR, YOU DON'T NEED TO

09:11AM 2   TAKE THAT STEP.  THAT'S NOT A REQUIREMENT UNDER (THE LAW.

09:11AM 3      THE GOVERNMENT IS CORRECT THAT TYPICALLY THE COURT SHOULD

09:11AM 4   UNDERSTAND OR HAVE THE DEFENDANT ENTER THE -- THE PERSON IN

09:11AM 5   RESPONSE TO SPECIFIC QUESTIONS.

09:11AM 6      BUT THERE'S AN EXCEPTION TO THAT RULE, AS I'M SURE THE

09:11AM 7   COURT IS VERY FAMILIAR WITH, AND THE COURT IS IN A POSITION TO

09:11AM 8   SAY THAT THE DEFENDANT, OR THE DECLARANT I SHOULD SAY, WOULD

09:11AM 9   RESPOND TO ANY QUESTION WITH AN INVOCATION OF THE FIFTH

09:11AM 10  AMENDMENT, AND BASED ON THE FACTS AND CIRCUMSTANCES OF THIS

09:11AM 11  CASE, WE BELIEVE THE COURT HAS EVERYTHING THAT IT NEEDS TO MAKE

09:11AM 12  THAT DETERMINATION NOW.

09:11AM 13          THE COURT:  THANK YOU.

09:11AM 14      AND THE SECOND PART OF THAT IS, DO I NEED TO KNOW WHAT

09:11AM 15  QUESTIONS WOULD BE POSED?  IN YOUR MOTION, YOU HAVE SAID IN

09:11AM 16  YOUR EXHIBITS A THROUGH C, I THINK THEY ARE --

09:11AM 17          MR. FLEURMONT:  CORRECT.

09:11AM 18          THE COURT:  -- YOU SAID THIS IS WHAT WE WANT TO --

09:11AM 19          MR. FLEURMONT:  ADMIT.

09:11AM 20          THE COURT:  -- INTRODUCE AND ADMIT IN FRONT OF THE

09:11AM 21  JURY.

09:11AM 22      AND I SEE THE -- I GUESS WHAT I'M SAYING IS THAT I SEE THE

09:11AM 23  ANSWERS, BUT I DON'T SEE THE QUESTIONS.

09:11AM 24      DO I NEED TO KNOW THE QUESTIONS THAT WOULD BE POSED TO THE

09:12AM 25  WITNESS BEFORE THE COURT CAN THEN DECIDE THAT, YES, THERE WOULD

7692

| | | |
|---|---|---|
| 09:12AM | 1 | BE A PROPER INVOCATION OF PRIVILEGE?  DON'T I NEED TO KNOW WHAT |
| 09:12AM | 2 | THOSE QUESTIONS WOULD BE? |
| 09:12AM | 3 | MR. FLEURMONT:  NO, YOUR HONOR, FOR TWO REASONS. |
| 09:12AM | 4 | GENERALLY THE COURT DOES NOT NEED TO KNOW THE QUESTIONS IF |
| 09:12AM | 5 | THERE'S SUFFICIENT INFORMATION TO FIND THAT IN RESPONSE TO ANY |
| 09:12AM | 6 | QUESTION, THE PERSON, THE DECLARANT WOULD INVOKE THE FIFTH |
| 09:12AM | 7 | AMENDMENT, AND THAT IS THE CASE HERE. |
| 09:12AM | 8 | BUT SECOND, JUST SEEING THE CONTEXT OF THIS CASE AND IN |
| 09:12AM | 9 | THE DEPOSITION PORTIONS THAT WE PROVIDED, THERE'S QUESTIONS |
| 09:12AM | 10 | THERE AND THERE ARE ANSWERS THERE.  WE THINK THE QUESTIONS ARE |
| 09:12AM | 11 | VERY CLEAR. |
| 09:12AM | 12 | AS THE COURT KNOWS, THERE ARE FOUR CATEGORIES OF |
| 09:12AM | 13 | INFORMATION THAT WE WOULD SEEK TO ADMIT.  THE FIRST IS RELATED |
| 09:12AM | 14 | TO RESPONSIBILITY IN THE CLIA LAB; THE SECOND IS HIS ROLE IN |
| 09:12AM | 15 | THE NULL PROTOCOL; THE THIRD IS HIS RESPONSIBILITY OF THE |
| 09:12AM | 16 | FINANCIAL PROJECTIONS, OR THE FINANCIAL MODEL I SHOULD SAY; AND |
| 09:12AM | 17 | THE FOURTH HAS TO DO WITH HIS ROLE AND RESPONSIBILITY IN THE |
| 09:12AM | 18 | SAFEWAY AND THE WALGREENS RELATIONSHIP. |
| 09:12AM | 19 | SO JUST TO REITERATE, GENERALLY THE COURT DOES NOT NEED TO |
| 09:13AM | 20 | DO THAT, BUT IN THIS CASE THE COURT DOES NOT NEED TO DO THAT |
| 09:13AM | 21 | BECAUSE WE UNDERSTAND EXACTLY THE ISSUES IT WOULD RAISE. |
| 09:13AM | 22 | THE COURT:  OKAY.  AND WE'LL GET INTO THE (B)(3) |
| 09:13AM | 23 | ANALYSIS AS WELL. |
| 09:13AM | 24 | MR. FLEURMONT:  YES. |
| 09:13AM | 25 | THE COURT:  I THINK I HAVE SOME QUESTIONS UNDER THAT |

7693

09:13AM 1    ANALYSIS AS WELL.

09:13AM 2        SO AS TO UNAVAILABILITY, YOU'RE SAYING THAT HE'S

09:13AM 3    UNAVAILABLE BECAUSE HE'S A CODEFENDANT IN THIS CASE.

09:13AM 4        THE COURT IS AWARE OF THE ISSUES SURROUNDING AND THE COURT

09:13AM 5    SHOULD FIND HIM UNAVAILABLE FOR PURPOSES OF ADMISSION OF THE

09:13AM 6    STATEMENTS?

09:13AM 7            MR. FLEURMONT:  YES, FOR THOSE REASONS, BUT ALSO WE

09:13AM 8    HAVE A DECLARATION, AND IT'S A SWORN DECLARATION UNDER PERJURY,

09:13AM 9    FROM MR. WADE BECAUSE OF THE PRIOR CONDUCT IN THE S.E.C. CASE

09:13AM 10   AND THE LAST DEPOSITION, AND THE COURT PRESIDED OVER THAT CASE

09:13AM 11   AS WELL.

09:13AM 12       SO IT'S NOT JUST -- AND THE CASE LAW SAYS THAT IF A COURT

09:13AM 13   HAS SPECIAL FAMILIARITY WITH THE CASE, IT CAN MAKE A

09:13AM 14   DETERMINATION.

09:13AM 15       BUT IN THIS CASE YOU HAVE FAMILIARITY WITH BOTH CASES, THE

09:13AM 16   S.E.C. CASE AND THE CRIMINAL OFFENSE.

09:13AM 17           THE COURT:  SO NO OFFENSE TO MR. WADE, HE PUT

09:13AM 18   HIMSELF AT PERIL OF THE RISK OF PERJURY BY FINDING AND SIGNING

09:13AM 19   THE DECLARATION AND SUBMITTING IT TO THE COURT.

09:14AM 20       BUT IF THE COURT WERE TO HAVE MR. COOPERSMITH COME IN AND

09:14AM 21   INFORM US, THAT IS, INFORM ALL OF US WHAT HIS INTENTION WOULD

09:14AM 22   BE, I'M SURE MR. WADE WOULD NOT TAKE ANY SLIGHT AT THAT.

09:14AM 23           MR. FLEURMONT:  YOUR HONOR, I DON'T MEAN TO IMPLY

09:14AM 24   THAT WE WOULD TAKE A SLIGHT AT THAT.  IF THE COURT FEELS THAT

09:14AM 25   THAT'S WHAT THE COURT NEEDS TO DO, WE WOULDN'T OPPOSE THAT.

09:14AM 1          WE'RE JUST SAYING THAT THERE'S NO REASON TO DO THAT BASED

09:14AM 2     ON THE CIRCUMSTANCES OF THIS CASE.

09:14AM 3               THE COURT:  OKAY.  OKAY.

09:14AM 4               MR. FLEURMONT:  OKAY.  ALL RIGHT.

09:14AM 5          NEXT I'LL MOVE TO THE FIRST EXCEPTION I WANT TO DISCUSS

09:14AM 6     TODAY, 804(B)(3), WHICH IS A STATEMENT AGAINST INTEREST.

09:14AM 7          SO 804(B)(3) DEFINES A STATEMENT OF INTEREST AS ONE,

09:14AM 8     QUOTE, A REASONABLE PERSON IN THE DECLARANT'S POSITION WOULD

09:14AM 9     HAVE MADE ONLY IF THE PERSON BELIEVED IT TO BE TRUE BECAUSE,

09:14AM 10    WHEN MADE, IT HAD SO GREAT A TENDENCY TO DISPOSE A DECLARANT TO

09:14AM 11    CIVIL OR CRIMINAL LIABILITY.  SUCH STATEMENTS ARE ADMISSIBLE IN

09:14AM 12    A CRIMINAL CASE IF SUPPORTED BY CORROBORATING CIRCUMSTANCES.

09:15AM 13         THE NINTH CIRCUIT HAS FURTHER EXPLAINED THAT WHETHER A

09:15AM 14    STATEMENT IS, IN FACT, AGAINST INTEREST MUST BE DETERMINED FROM

09:15AM 15    THE CIRCUMSTANCES OF EACH CASE AND CAN ONLY BE DETERMINED BY

09:15AM 16    VIEWING IT IN CONTEXT.  THAT'S UNITED STATES VERSUS PAGUIO,

09:15AM 17    P-A-G-U-I-O.

09:15AM 18         WHEN VIEWED IN CONTEXT OF THIS CASE, WE BELIEVE THE FOUR

09:15AM 19    CATEGORIES OF INFORMATION THAT WE DISCUSS ARE STATEMENTS

09:15AM 20    AGAINST INTEREST FOR THREE REASONS:

09:15AM 21         FIRST, MR. BALWANI WAS DEPOSED IN THE S.E.C. INVESTIGATION

09:15AM 22    AND EXPOSED TO AN INVESTIGATION FOR CIVIL DAMAGES.  THAT GOES

09:15AM 23    TO WHETHER THE DECLARANT BELIEVED THAT THERE WOULD BE A CIVIL

09:15AM 24    PENALTY.

09:15AM 25         THERANOS HAD RECEIVED FOUR SUBPOENAS FROM THE S.E.C.

| | | |
|---|---|---|
| 09:15AM | 1 | REQUESTING DOCUMENTS CONCERNING MANY OF THE ISSUES WE'RE |
| 09:15AM | 2 | DISCUSSING TODAY, SO THE ISSUE ABOUT HIS CONTROL OVER THE LAB, |
| 09:15AM | 3 | THE FINANCIALS, AS WELL AS THE WALGREENS AND SAFEWAY |
| 09:15AM | 4 | RELATIONSHIP. |
| 09:15AM | 5 | IT'S CLEAR AT THE TIME OF THE DEPOSITION THAT MR. BALWANI |
| 09:15AM | 6 | WAS A TARGET OF THE ENFORCEMENT ACTION. |
| 09:15AM | 7 | I SHOULD SAY THAT THESE DEPOSITIONS TOOK PLACE ON |
| 09:15AM | 8 | AUGUST 9TH, 2017, AUGUST 10TH, 2017, AND SEPTEMBER 7TH, 2017. |
| 09:16AM | 9 | THE COURT:  AND THE TIME IN THIS CASE WAS? |
| 09:16AM | 10 | MR. FLEURMONT:  JANUARY 11TH, 2016, YOUR HONOR, SO |
| 09:16AM | 11 | WELL OVER A YEAR BEFORE THAT. |
| 09:16AM | 12 | OKAY.  AS THE CEO OF THE COMPANY, THERE IS NO QUESTION |
| 09:16AM | 13 | THAT A REASONABLE PERSON IN HIS POSITION GOING INTO THIS S.E.C. |
| 09:16AM | 14 | DEPOSITION FACING CIVIL ENFORCEMENT ACTION WITH CIVIL PENALTIES |
| 09:16AM | 15 | WOULD BELIEVE, AND AFTER REVIEWING THE SUBPOENAS -- AT THAT |
| 09:16AM | 16 | POINT THERE WERE FIVE -- LET ME MAKE SURE I HAVE THIS RIGHT. |
| 09:16AM | 17 | AT THAT POINT THERE WERE FOUR SUBPOENAS FROM THE S.E.C. AND TWO |
| 09:16AM | 18 | FROM THE DOJ, ALL RELATING TO THE CATEGORIES OF INFORMATION |
| 09:16AM | 19 | THAT WE SEEK TO ADMIT. |
| 09:16AM | 20 | A REASONABLE PERSON IN THAT POSITION WOULD BELIEVE THAT |
| 09:16AM | 21 | THE STATEMENTS RELATED TO THOSE REQUESTS COULD PUT THEM IN |
| 09:16AM | 22 | CIVIL LIABILITY.  SO THAT'S THE FIRST REASON. |
| 09:16AM | 23 | THE SECOND REASON IS RELATED.  SO DURING THE TIME THAT |
| 09:16AM | 24 | MR. BALWANI WAS DEPOSED, HE WAS ALSO FACING GRAND JURY |
| 09:16AM | 25 | INVESTIGATION. |

09:16AM  1        THE FIRST -- YOUR HONOR, LET ME JUST CORRECT SOMETHING I

09:16AM  2   JUST SAID.  SO THE FIRST GRAND JURY SUBPOENA WAS ISSUED

09:16AM  3   JANUARY 11TH, 2016.

09:17AM  4        THE COURT ASKED ABOUT THE INDICTMENT, WHICH WAS IN

09:17AM  5   JANUARY -- IT WAS 2018, JUNE 2018, BELIEVE.  SO I JUST WANT TO

09:17AM  6   CORRECT THAT.

09:17AM  7             THE COURT:  RIGHT.  RIGHT.

09:17AM  8             MR. FLEURMONT:  OKAY.  SO AS I WAS SAYING, THE

09:17AM  9   SECOND REASON RELATED TO THE INVESTIGATION BY THE DOJ.

09:17AM 10   THERANOS HAD RECEIVED TWO SUBPOENAS FROM THE GRAND JURY BEFORE

09:17AM 11   MR. BALWANI WAS DEPOSED.

09:17AM 12        THE THIRD GRAND JURY SUBPOENA WAS ACTUALLY ISSUED THE DAY

09:17AM 13   BEFORE HIS LAST DAY OF DEPOSITION TESTIMONY.

09:17AM 14        THE GRAND JURY SUBPOENA COVERED MANY OF THE TOPICS ON

09:17AM 15   WHICH HE WAS QUESTIONED DURING THE DEPOSITION, AND INDEED, THE

09:17AM 16   S.E.C. SUBPOENAS, TWO OF THEM THAT WERE ISSUED AFTER THE GRAND

09:17AM 17   JURY SUBPOENA CONTAINED A PROVISION THAT SAID THAT THE S.E.C.

09:17AM 18   WOULD -- COULD SHARE THE INFORMATION WITH THE DOJ, WHICH IS

09:17AM 19   EXACTLY WHAT HAPPENED IN THIS CASE.  THAT'S AT EXHIBIT G AND H

09:17AM 20   TO THE DECLARATION OF AMY SAHARIA.

09:18AM 21        SO FACED WITH THE GRAND JURY SUBPOENAS AND EXPLANATION, WE

09:18AM 22   BELIEVE THAT A REASONABLE PERSON WOULD NOT TAKE OWNERSHIP OVER

09:18AM 23   THE CATEGORIES THAT MR. BALWANI DID KNOWING THAT HE WAS FACED

09:18AM 24   ALSO WITH CRIMINAL LIABILITY AS WELL.  SO THAT'S THE SECOND

09:18AM 25   REASON.

09:18AM 1    THE THIRD IS THE NATURE OF MR. BALWANI'S STATEMENTS.

09:18AM 2    THESE ARE NOT JUST STATEMENTS ABOUT SOME PARTICIPATION

09:18AM 3 WITH SOME OF THE AREAS THAT WE'RE TALKING ABOUT.  HE DESCRIBES

09:18AM 4 A LEADERSHIP ROLE IN THEM.

09:18AM 5    AS THE NINTH CIRCUIT HAS EXPLAINED, LEADERSHIP AND ALLEGED

09:18AM 6 WRONGDOING CAN BE PARTICULARLY INCULPATORY AND THAT'S THE

09:18AM 7 PAGUIO CASE.

09:18AM 8         THE COURT:  SO DO WE NEED TO LOOK AT THE STATEMENTS

09:18AM 9 TO SEE WHETHER OR NOT THERE'S A DISTINCTION BETWEEN EXCULPATORY

09:18AM 10 AND INCULPATORY?  DO WE NEED TO LOOK AT THAT?

09:18AM 11         MR. FLEURMONT:  SO THERE'S NOT A SIMPLE YES OR NO

09:18AM 12 ANSWER TO THAT, YOUR HONOR.

09:18AM 13    SO TYPICALLY IT REALLY DEPENDS ON THE STATEMENT.

09:18AM 14    SO, FOR EXAMPLE, IN THE PAGUIO CASE, THAT CASE INVOLVED --

09:19AM 15 IT WAS -- THE DEFENDANT WAS CHARGED WITH MISSTATEMENTS IN A

09:19AM 16 LOAN APPLICATION, BUT IT WAS A FATHER WHO ACTUALLY SUBMITTED

09:19AM 17 THE APPLICATION, THE FATHER THAT SUBMITTED THE W-2'S THAT WERE

09:19AM 18 FALSIFIED, AND IT WAS THE FATHER THAT SIGNED THE APPLICATION.

09:19AM 19    SO THE DEFENDANT WAS CHARGED, AND IN HIS SECOND TRIAL, THE

09:19AM 20 FATHER WAS A FUGITIVE SO HE WAS UNAVAILABLE, BUT HE SAID TO THE

09:19AM 21 DEFENDANT, THE DEFENDANT'S ATTORNEY, THAT THE SCHEME WAS MINE.

09:19AM 22 MY SON HAD NOTHING TO DO WITH IT.

09:19AM 23    AND IN THAT CASE THE ISSUE WAS NOT, THE SCHEME WAS MINE.

09:19AM 24 THE ISSUE WAS, MY SON HAD NOTHING TO DO WITH IT.

09:19AM 25    AND THE COURT HELD THAT WHEN SOMEONE TAKES SOLE

09:19AM 1    RESPONSIBILITY OVER A CERTAIN ISSUE, THAT CAN BE INCULPATORY AS

09:19AM 2    WELL, EVEN THOUGH IT'S INCULPATORY AS TO SOMEONE ELSE.

09:19AM 3            THE COURT:  IN THAT CASE, I THINK THE INITIAL TRIAL

09:19AM 4    JUDGE PARSED OUT THE SENTENCE, RIGHT, AND ONLY ALLOWED PART OF

09:19AM 5    IT.

09:19AM 6            MR. FLEURMONT:  RIGHT, AND HE WAS REVERSED,

09:19AM 7    YOUR HONOR.

09:19AM 8            THE COURT:  THANK YOU FOR TELLING ME THAT.

09:19AM 9        (LAUGHTER.)

09:19AM 10           MR. FLEURMONT:  WELL, BUT THAT WAS --

09:19AM 11           THE COURT:  HE WAS REVERSED.  AND WHAT THE APPELLATE

09:19AM 12   COURT SAID WAS IN THAT INSTANCE THE ENTIRETY OF THE STATEMENT

09:20AM 13   WAS INFORMATIVE AND IT SHOULDN'T HAVE BEEN PARSED OUT.

09:20AM 14           MR. FLEURMONT:  CORRECT, YOUR HONOR.  SO THAT'S WHAT

09:20AM 15   I'M SAYING.  IT'S NOT REALLY A YES OR NO ANSWER.  YOU REALLY

09:20AM 16   HAVE TO LOOK AT THE STATEMENT.

09:20AM 17       THE STATEMENT THAT WE HAVE HERE, AND I SHOULD SAY, I KNOW

09:20AM 18   THE GOVERNMENT HAS MADE A POINT THAT SOME OF THE STATEMENTS

09:20AM 19   HAVE EXTRANEOUS INFORMATION.

09:20AM 20       OUR APPROACH WAS TO, WHENEVER THERE WAS AN INCULPATORY

09:20AM 21   STATEMENT, WE INCLUDED THE FIRST QUESTION AND THE FULL ANSWER,

09:20AM 22   AND AS YOU HAVE SEEN, THERE WERE OTHER REDACTIONS AND DIFFERENT

09:20AM 23   QUESTIONS AND ANSWERS.  SO WE JUST WANTED TO INCLUDE THE FULL

09:20AM 24   QUESTION AND ANSWER.

09:20AM 25           THE COURT:  BUT THERE WERE SOME OTHER ISSUES THAT

09:20AM  1   THE COURT TOUCHED ON IN THAT CASE, IT WAS THE RELATIONSHIP, THE

09:20AM  2   LOVE RELATIONSHIP, IF YOU WILL, AND DIDN'T THE COURT LOOK AT TO

09:20AM  3   DISCERN WHETHER OR NOT THAT SHOULD BE CONSIDERED?

09:20AM  4        MR. FLEURMONT:  YES, YOUR HONOR.

09:20AM  5        BUT I PUSH BACK A LITTLE BIT BECAUSE IT WASN'T THE LOVE

09:20AM  6   RELATIONSHIP, IT WAS THE FAMILY RELATIONSHIP.  IN THAT CASE IT

09:20AM  7   WAS THE FATHER AND THE SON.

09:20AM  8        THE COURT:  OKAY.  SOMETIMES THE FATHERS LOVE SONS.

09:20AM  9        MR. FLEURMONT:  SOMETIMES THEY DON'T.

09:20AM 10        THE COURT:  YEAH, YEAH.

09:20AM 11        MR. FLEURMONT:  IN THE GADSON CASE THAT THE

09:20AM 12   GOVERNMENT CITES, THAT WAS THE RELATIONSHIP BETWEEN THE TWO

09:21AM 13   BOTHERS AND THE COURT LOOKED THERE FOR A FAMILY RELATIONSHIP.

09:21AM 14        AND THE REASON THE COURT WAS LOOKING AT THE RELATIONSHIP

09:21AM 15   IN BOTH OF THOSE CASES -- BECAUSE AS YOU KNOW, WHEN AN ELEMENT

09:21AM 16   UNDER THIS ANALYSIS IS COOPERATION, AND IN THE PAGUIO CASE THE

09:21AM 17   COURT SAID THERE IS A LOT OF CORROBORATION HERE, WE HAVE THE

09:21AM 18   LOAN OFFICER, WE HAVE THE ACCOUNTANT, WE HAVE THE ESCROW AGENT

09:21AM 19   ALL SAYING THAT IT WAS THE FATHER WHO SUBMITTED THIS

09:21AM 20   APPLICATION.

09:21AM 21        BUT ON THE OTHER HAND, WE HAVE THE FACT THAT IT'S THE

09:21AM 22   FATHER.  THE COURT SAID BECAUSE OF THE CORROBORATION, THAT WAS

09:21AM 23   SUFFICIENT FOR A FINDING THAT THE STATEMENT WAS ADMISSIBLE.

09:21AM 24        SO IN THOSE CASES, YES, THE FAMILY RELATIONSHIP IS

09:21AM 25   RELEVANT.

09:21AM 1      BUT THAT JUST GOES TO CORROBORATION.  THE COURT IS STILL

09:21AM 2 REQUIRED TO LOOK AT CORROBORATION TO SEE IF THE STATEMENTS ARE

09:21AM 3 INDEED RELIABLE.

09:21AM 4      THE COURT:  OKAY.

09:21AM 5      MR. FLEURMONT:  BUT AS I WAS SAYING ABOUT THE PAGUIO

09:21AM 6 CASE ORIGINALLY, THERE THE QUESTION WAS ABOUT PARSING OUT THE

09:21AM 7 DIFFERENT STATEMENTS.

09:21AM 8      SO HERE IF YOU LOOK AT THE FULL QUESTION AND ANSWER, IT'S

09:21AM 9 VERY CLEAR WHICH STATEMENTS ARE INCULPATORY.

09:22AM 10      THE FACT THAT SOME STATEMENTS MAY BE EXCULPATORY, I DON'T

09:22AM 11 THINK THERE'S MANY IN THERE, BUT THE ONE STATEMENT AT ISSUE

09:22AM 12 THAT I THINK THE GOVERNMENT IS POINTING AT IS THE NULL PROTOCOL

09:22AM 13 SAYING SHE DID NOT KNOW ABOUT IT.

09:22AM 14      BUT IN THAT CASE IT'S JUST THE TWO OF THEM.

09:22AM 15      SO IT WOULD BE DIFFERENT IF THERE WAS -- IT WOULD BE

09:22AM 16 DIFFERENT IF THERE WAS A STATEMENT IN WHICH HE TOOK NO

09:22AM 17 RESPONSIBILITY FOR THE STATEMENT AND JUST PUSHES IT ON SOMEBODY

09:22AM 18 ELSE.  IN THAT CASE, YES, YOUR HONOR, WE WOULD SAY THAT

09:22AM 19 STATEMENT WOULD NOT COME IN.

09:22AM 20      BUT THAT'S NOT WHAT WE HAVE HERE.

09:22AM 21      THE COURT:  SO SOME OF THE STATEMENTS I'M LOOKING

09:22AM 22 AT, LET'S SEE, I THINK IT'S ON PAGE 4 OF YOUR MOTION AT

09:22AM 23 LINE 15.

09:22AM 24      I THINK YOU START THE BULLET POINTS OF THE --

09:22AM 25      MR. FLEURMONT:  SURE.

7701

| 09:22AM | 1 | THE COURT:  -- OF THE STATEMENTS. |
|---|---|---|
| 09:22AM | 2 | AND I SUPPOSE IN THE COURSE OF OUR CONVERSATION, |
| 09:22AM | 3 | MS. VOLKAR WILL HELP US WITH THOSE AND WE'LL GO THROUGH THESE |
| 09:23AM | 4 | TO SEE -- ARE THESE -- SOME OF THESE, CANDIDLY, I HAD SOME |
| 09:23AM | 5 | QUESTIONS WHETHER OR NOT THEY WERE MORE EXCULPATORY, OR |
| 09:23AM | 6 | ACTUALLY SOME OF THEM ACTUALLY JUST LOOKED LIKE STATEMENTS OF |
| 09:23AM | 7 | FACT, LIKE A FACT WITNESS. |
| 09:23AM | 8 | MR. FLEURMONT:  OKAY. |
| 09:23AM | 9 | THE COURT:  AND THERE'S NO BASIS TO ADMIT THEM OTHER |
| 09:23AM | 10 | THAN AS A FACT WITNESS.  SO THAT'S SOME OF THE ISSUES THAT I |
| 09:23AM | 11 | HAD. |
| 09:23AM | 12 | MR. BALWANI'S PRIOR TESTIMONY ABOUT HIS ROLE IN THE |
| 09:23AM | 13 | SAFEWAY RELATIONSHIP, THE WALGREENS RELATIONSHIP, HE WAS |
| 09:23AM | 14 | RESPONSIBLE FOR THE CLIA LAB. |
| 09:23AM | 15 | BUT WE KNOW THAT HE DIDN'T TELL THEM WHAT TO DO.  I THINK |
| 09:23AM | 16 | THAT'S -- YOU KNOW, HE SAID YES, THEY DID WHAT THEY WERE GOING |
| 09:23AM | 17 | TO DO, BUT I COULDN'T TELL THEM WHAT TO DO, ET CETERA. |
| 09:23AM | 18 | MS. VOLKAR WILL HELP US IN A MOMENT WITH THOSE |
| 09:23AM | 19 | DISTINCTIONS. |
| 09:23AM | 20 | MR. FLEURMONT:  SURE. |
| 09:23AM | 21 | THE COURT:  BUT THAT'S SOMETHING THAT I'M FOCUSSED |
| 09:23AM | 22 | ON IN LOOKING AT IT. |
| 09:23AM | 23 | MR. FLEURMONT:  UNDERSTOOD. |
| 09:23AM | 24 | THE COURT:  OKAY. |
| 09:23AM | 25 | MR. FLEURMONT:  BUT I'M PREPARED TO ANSWER THOSE |

7702

09:24AM  1     QUESTIONS, YOUR HONOR.

09:24AM  2          I'M SORRY.  LET ME JUST GET BACK ON TRACK.  WE'VE

09:24AM  3     DISCUSSED CORROBORATION.

09:24AM  4          SO IN TERMS OF EACH CATEGORY OF STATEMENT, WE HAVE

09:24AM  5     EVIDENCE IN THE TRIAL RECORD THAT IT'S CORROBORATED BY

09:24AM  6     TESTIMONY OF CERTAIN WITNESSES, AND THAT GOES TO THE

09:24AM  7     CORROBORATION THAT WE JUST DISCUSSED, FOR EXAMPLE, THAT

09:24AM  8     HAPPENED IN PAGUIO.

09:24AM  9          AND THEN WE'LL -- AS THE COURT SAYS, WE CAN TALK ABOUT

09:24AM 10     EACH STATEMENT AND ABOUT EXACTLY WHAT IT SAYS.

09:24AM 11          OKAY.  I'D LIKE TO MOVE TO THE NEXT EXCEPTION.  OKAY.

09:24AM 12          SO THIS EXCEPTION IS UNDER 804(B)(1), WHICH PROVIDES THAT

09:24AM 13     PRIOR TESTIMONY FROM AN UNAVAILABLE WITNESS IS ADMISSIBLE WHEN

09:24AM 14     GIVEN AT A LAWFUL DEPOSITION AND IF OFFERED AGAINST A PARTY WHO

09:24AM 15     HAD AN OPPORTUNITY AND SIMILAR MOTIVE TO DEVELOP THAT TESTIMONY

09:24AM 16     BY DIRECT, CROSS, OR REDIRECT.

09:24AM 17          SO THE FIRST QUESTION IS WHETHER THE S.E.C. AND THE DOJ

09:24AM 18     ARE THE SAME PARTY.

09:24AM 19          WE SUBMIT THEY ARE IN THIS CASE, YOUR HONOR.  IT WAS --

09:24AM 20     ALTHOUGH IT WAS THE S.E.C. WHO DEPOSED MR. BALWANI, BECAUSE OF

09:25AM 21     THE COORDINATION BETWEEN THE UNITED STATES AND THE S.E.C., WE

09:25AM 22     BELIEVE THAT FOR THE PURPOSES OF THIS RULE THAT THEY'RE THE

09:25AM 23     SAME PARTY.

09:25AM 24          AND ADMITTEDLY, THERE'S NOT MUCH CASE LAW IN THE

09:25AM 25     NINTH CIRCUIT ON THIS ISSUE, BUT WHAT THE CASES THAT WE HAVE

09:25AM  1    REVIEWED SAY OR GUIDE THE COURT IS THAT WHAT THE COURT IS

09:25AM  2    REALLY LOOKING FOR IS COORDINATION BETWEEN THE TWO PARTIES,

09:25AM  3    BOTH COORDINATION OF LAW AND COORDINATION IN FACT.

09:25AM  4         SO I'D LIKE TO START WITH COORDINATION IN FACT IN THIS

09:25AM  5    CASE.

09:25AM  6         IN THIS CASE THE S.E.C. AND THE DOJ HAVE INVESTIGATED THIS

09:25AM  7    CASE JOINTLY.  THE S.E.C. AND THE DOJ HAVE JOINTLY INTERVIEWED

09:25AM  8    OVER 50 WITNESSES.  THE DOJ RECEIVED ACCESS TO THE

09:25AM  9    INVESTIGATIVE AND NONPUBLIC FILES RELATED TO THERANOS.  THE

09:25AM  10   GOVERNMENT HAS REVIEWED MILLIONS OF PAGES OF THE S.E.C.

09:25AM  11        AND LASTLY, AS I MADE A POINT OF BEFORE, THERE WAS A

09:25AM  12   PROVISION IN THE S.E.C. SUBPOENAS THAT SAY THAT THEY COULD

09:25AM  13   SHARE THE INFORMATION WITH THE DOJ, WHICH IS EXACTLY WHAT

09:25AM  14   HAPPENED IN THIS CASE.

09:25AM  15        THAT'S COORDINATION IN FACT.  THAT SEPARATES THIS CASE

09:26AM  16   FROM SOME OF THE OTHER CASES THAT, BOTH THE DEFENSE SIDE AND

09:26AM  17   THE GOVERNMENT SIDE, THE BAKER CASE, B-A-K-E-R, THE MARTOVA

09:26AM  18   CASE, M-A-R-T-O-V-A.

09:26AM  19        COORDINATION IN LAW.  SO THE NINTH CIRCUIT HAS RECOGNIZED

09:26AM  20   THAT FEDERAL SECURITIES LAWS AUTHORIZE THE S.E.C. TO TRANSMIT

09:26AM  21   EVIDENCE THAT IS GATHERED TO THE UNITED STATES ATTORNEY'S

09:26AM  22   OFFICE TO FACILITATE CRIMINAL INVESTIGATION FOR THE

09:26AM  23   UNITED STATES ATTORNEY.

09:26AM  24        THAT MAKES SENSE, RIGHT?  BECAUSE THE S.E.C. DOESN'T HAVE

09:26AM  25   CRIMINAL ENFORCEMENT ACTION, SO AS THEY GATHER FACTS THAT

7704

| | | |
|---|---|---|
| 09:26AM | 1 | RELATE TO A CRIMINAL INVESTIGATION, THEY TYPICALLY WILL SEND |
| 09:26AM | 2 | THOSE FACTS TO THE UNITED STATES ATTORNEY'S OFFICE TO ENFORCE |
| 09:26AM | 3 | THEM CRIMINALLY.  SO THEY BOTH HAVE A ROLE IN THE CRIMINAL |
| 09:26AM | 4 | ENFORCEMENT OF ALLEGED FACTS THAT SUPPORT A CRIMINAL ACTION. |
| 09:26AM | 5 | OKAY.  BASED ON THAT COORDINATION, WE BELIEVE THE FACTS OF |
| 09:26AM | 6 | THIS CASE MAKE CLEAR THAT THE S.E.C. AND THE DOJ ARE THE SAME |
| 09:26AM | 7 | PARTY FOR THE PURPOSES OF THE RULE. |
| 09:26AM | 8 | THE COURT:  WAS THE -- AT THE DEPOSITION, THE S.E.C. |
| 09:27AM | 9 | DEPOSITIONS, WAS THERE A UNITED STATES ATTORNEY REPRESENTING |
| 09:27AM | 10 | DOJ OR THE PROSECUTION PRESENT? |
| 09:27AM | 11 | MR. FLEURMONT:  YOUR HONOR, WE DON'T BELIEVE SO. |
| 09:27AM | 12 | I HAVE REVIEWED THE TRANSCRIPTS, AND I TOOK ANOTHER LOOK |
| 09:27AM | 13 | AT THEM LAST NIGHT AND I ACTUALLY LOOKED AT THE COVER PAGE TO |
| 09:27AM | 14 | LOOK AT THAT EXACT QUESTION.  THEIR APPEARANCES WEREN'T THERE. |
| 09:27AM | 15 | AND ALSO IN THE GOVERNMENT'S BRIEF, IT MAKES A VERY |
| 09:27AM | 16 | LIMITED STATEMENT SAYING THAT, ONE, IT PHYSICALLY WASN'T |
| 09:27AM | 17 | PRESENT THERE; AND, TWO, IT DID NOT HAVE ANY INPUT INTO THE |
| 09:27AM | 18 | QUESTIONS, WHICH WE KNOW IS A VERY LIMITED STATEMENT.  IT |
| 09:27AM | 19 | DOESN'T SAY ANYTHING ABOUT BEING INVOLVED WITH THE STRATEGY, |
| 09:27AM | 20 | BEING INVOLVED IN THE TOPICS OF WHAT IS GOING ON, AND, YOU |
| 09:27AM | 21 | KNOW -- |
| 09:27AM | 22 | THE COURT:  THAT WAS MY QUESTION:  IS THERE ANY |
| 09:27AM | 23 | EVIDENCE, ANYTHING IN THE RECORD THAT SUGGESTS THAT THE |
| 09:27AM | 24 | GOVERNMENT PROVIDED QUESTIONS, GAVE STRATEGY TO THE S.E.C.? |
| 09:27AM | 25 | WE KNOW THAT IN THE COURSE OF, OF COURSE, DOJ |

| | | |
|---|---|---|
| 09:27AM | 1 | INVESTIGATIONS AND ANCILLARY S.E.C. INVESTIGATIONS, SOMETIMES |
| 09:27AM | 2 | THOSE ARE CONCURRENT, AND THEY JUST HAPPEN OF FACT, IT'S A |
| 09:28AM | 3 | CONCURRENCE THAT HAPPENS, AND SOMETIMES THERE'S A SHARING OF |
| 09:28AM | 4 | INFORMATION, SOMETIMES THERE'S NOT. |
| 09:28AM | 5 | SOMETIMES THE INFORMATION SHARED IS, CAN WE TALK TO YOU? |
| 09:28AM | 6 | NO, I'M GOING TO BE IN A DEPOSITION. |
| 09:28AM | 7 | OKAY. WELL, GET BACK TO ME WHEN YOU'RE DONE. |
| 09:28AM | 8 | SOMETIMES IT'S RICHER AND DEEPER THAN THAT. WOULD YOU |
| 09:28AM | 9 | MIND ASKING THE WITNESS THESE QUESTIONS? THAT WOULD BE |
| 09:28AM | 10 | HELPFUL. |
| 09:28AM | 11 | THAT'S WHAT I'M TRYING TO DISCERN WHERE THAT IS HERE. |
| 09:28AM | 12 | FIRST OF ALL, WE KNOW THERE WAS NO, AT LEAST FROM WHAT I |
| 09:28AM | 13 | UNDERSTAND, THERE WAS NO -- NONE OF THE ATTORNEYS INVOLVED IN |
| 09:28AM | 14 | THIS PROSECUTION WERE AT THAT DEPOSITION IN THIS COURTHOUSE IS |
| 09:28AM | 15 | MY UNDERSTANDING. |
| 09:28AM | 16 | MR. FLEURMONT: THAT'S OUR -- THAT'S OUR |
| 09:28AM | 17 | UNDERSTANDING. THE GOVERNMENT REPRESENTED THAT'S THE CASE AND |
| 09:28AM | 18 | WE TAKE THEM AT THEIR REPRESENTATION. |
| 09:28AM | 19 | THE COURT: AND I DON'T SEE ANY EVIDENCE THAT |
| 09:28AM | 20 | SUGGESTS THAT THEY PROVIDED QUESTIONS TO THE S.E.C. TO GUIDE |
| 09:28AM | 21 | THEIR INVESTIGATION. |
| 09:28AM | 22 | AND AS YOU POINTED OUT, THE S.E.C. INVESTIGATION, THEIR |
| 09:28AM | 23 | DEPOSITION WAS AT LEAST A YEAR, PERHAPS MORE, EARLIER THAN THE |
| 09:29AM | 24 | ULTIMATE INDICTMENT. |
| 09:29AM | 25 | MR. FLEURMONT: CORRECT, YOUR HONOR. BUT IT WAS |

7706

09:29AM  1    OVER A YEAR AND A HALF AFTER THE GRAND JURY SUBPOENA.

09:29AM  2        SO THE GRAND JURY -- THE CRIMINAL INVESTIGATION WAS WELL

09:29AM  3    UNDERWAY AT THE TIME OF THE DEPOSITION, ALTHOUGH THE COURT IS

09:29AM  4    CORRECT THAT THE FORMAL INDICTMENT DID NOT HAPPEN UNTIL LATER.

09:29AM  5            THE COURT:  AND IS THERE ALSO AN ISSUE ABOUT SIMILAR

09:29AM  6    MOTIVE?

09:29AM  7            MR. FLEURMONT:  YES, YES, YOUR HONOR, THERE IS.

09:29AM  8        SO -- WHICH IS KIND OF THE LAST ISSUE THAT RELATES TO THIS

09:29AM  9    PROVISION.

09:29AM  10        OKAY.  SO THE NINTH CIRCUIT HAS EXPLAINED THAT THE

09:29AM  11   QUESTION OF WHETHER A PARTY HAS A SIMILAR MOTIVE IS, QUOTE,

09:29AM  12   "INHERENTLY A FACTUAL INQUIRY BASED ON THE SIMILARITY OF THE

09:29AM  13   UNDERLYING ISSUES AND ON THE CONTEXT OF THE QUESTIONS."

09:29AM  14        IDENTICAL -- I'M SORRY.  THAT IS UNITED STATES V. DUENAS,

09:29AM  15   D-U-E-N-E-S, AT 691 F.3D 1089, NINTH CIRCUIT, 2012.

09:30AM  16            THE COURT:  IS DUENAS THE CASE IN GUAM?

09:30AM  17            MR. FLEURMONT:  YOUR HONOR, I STUDIED EVERYTHING

09:30AM  18   ABOUT THAT CASE EXCEPT FOR EXACTLY WHERE IT WAS, SO I DON'T

09:30AM  19   HAVE THE ANSWER TO THAT QUESTION.

09:30AM  20            THE COURT:  IS THAT THE CASE IN GUAM WHERE THERE WAS

09:30AM  21   AN INVESTIGATION OF STOLEN PROPERTY AND METHAMPHETAMINE?

09:30AM  22            MR. FLEURMONT:  YES, YES, YES, YOUR HONOR.  THAT IS

09:30AM  23   A DRUG CASE.  I KNOW THAT MUCH.

09:30AM  24            THE COURT:  AND THE ISSUE WAS THE -- I THINK THE

09:30AM  25   JUDGE, THE COURT WAS CRITICAL OF THE INVESTIGATION IN THAT

09:30AM   1    CASE.  IT SEEMED LIKE DURING THE SEARCH, ITEMS WERE PUT OUT ON

09:30AM   2    THE FRONT LAWN, THE PRESS WAS GIVEN ACCESS TO THE GROUNDS, THEY

09:30AM   3    WERE GIVEN TREATMENT, THERE WAS REALLY A DEARTH OF RECORD OF

09:30AM   4    WHO WAS IN CHARGE IN THE INVESTIGATION.

09:30AM   5         AND THEN MR. DUENAS WANTED TO TALK TO A COLLEAGUE OF HIS,

09:30AM   6    FORMER FRIEND OF HIS, WHO WAS PART OF LAW ENFORCEMENT, AND

09:30AM   7    THAT'S REALLY WHERE THE ISSUE WAS, THAT CONVERSATION BETWEEN

09:30AM   8    MR. DUENAS AND THE LAW ENFORCEMENT OFFICER.

09:30AM   9              MR. FLEURMONT:  THAT'S CORRECT.

09:31AM   10        SO THE LAW ENFORCEMENT OFFICER TESTIFIED AT A SUPPRESSION

09:31AM   11   HEARING.  BETWEEN THE SUPPRESSION HEARING AND THE ACTUAL TRIAL,

09:31AM   12   UNFORTUNATELY HE DIED, AND SO THE GOVERNMENT WANTED TO USE SOME

09:31AM   13   OF THE STATEMENTS THAT HE OBTAINED FROM MR. DUENAS IN THE

09:31AM   14   TRIAL.

09:31AM   15             THE COURT:  HE WAS KILLED BY A DRUNK DRIVER AS I

09:31AM   16   RECALL.

09:31AM   17             MR. FLEURMONT:  YES, THAT'S RIGHT.

09:31AM   18             THE COURT:  AND THEN THE QUESTION OF WHETHER OR NOT

09:31AM   19   THAT TESTIMONY WOULD BE ADMISSIBLE AT THE SUBSEQUENT EVENT, AND

09:31AM   20   THE ISSUE WAS ABOUT, IS TRIAL THE SAME AS SUPPRESSION?  IS THAT

09:31AM   21   WHAT IT WAS?

09:31AM   22             MR. FLEURMONT:  EXACTLY, YOUR HONOR.  SO THE COURT

09:31AM   23   HELD THAT THE STATEMENTS -- FIRST OFF, THE NINTH CIRCUIT SAID

09:31AM   24   THE LOWER COURT DID NOT DO THE APPROPRIATE ANALYSIS.  THE

09:31AM   25   APPROPRIATE ANALYSIS THERE IS WHETHER --

| | | |
|---|---|---|
| 09:31AM | 1 | THE COURT:  ARE YOU TELLING ME HE GOT REVERSED |
| 09:31AM | 2 | AGAIN? |
| 09:31AM | 3 | MR. FLEURMONT:  WE CHOOSE OUR CASES WISELY. |
| 09:31AM | 4 | SO THE COURT SAYS THE ANALYSIS IS THIS:  WHETHER THE |
| 09:31AM | 5 | FUNDAMENTAL OBJECTIVE WAS THE SAME IN BOTH PROCEEDINGS, AND IN |
| 09:31AM | 6 | THE SUPPRESSION IN DUENAS, THE SUPPRESSION HEARING, THE |
| 09:31AM | 7 | FUNDAMENTAL OBJECTION WAS TWO-FOLD BY THE DEFENSE ATTORNEY: |
| 09:32AM | 8 | ONE TO SEE IF THE STATEMENT WAS VOLUNTARY; AND, TWO, TO REVIEW |
| 09:32AM | 9 | THE PROTOCOL TO SEE IF THE STATEMENT WAS APPROPRIATE UNDER |
| 09:32AM | 10 | MIRANDA. |
| 09:32AM | 11 | THE DEFENSE ATTORNEY DIDN'T ACTUALLY GO INTO THE SUBSTANCE |
| 09:32AM | 12 | OF THE STATEMENT AND DIDN'T REALLY PROBE THE STATEMENT FOR |
| 09:32AM | 13 | THINGS THAT A DEFENSE ATTORNEY WOULD PROBE, WHERE DID IT |
| 09:32AM | 14 | HAPPEN?  WAS IT RELIABLE? |
| 09:32AM | 15 | SO ALTHOUGH THE COURT ALLOWED THE STATEMENT IN, THE LOWER |
| 09:32AM | 16 | COURT ALLOWED THE STATEMENT IN, THE NINTH CIRCUIT SAID, NO, THE |
| 09:32AM | 17 | OBJECTIVES WERE DIFFERENT. |
| 09:32AM | 18 | AND SO THAT'S THE ANALYSIS THAT WE'RE ASKING FOR THE COURT |
| 09:32AM | 19 | TO APPLY HERE, TO SEE IF THE FUNDAMENTAL OBJECTIVE BETWEEN THE |
| 09:32AM | 20 | S.E.C. AND THE DOJ WERE SIMILAR IN BOTH PROCEEDINGS. |
| 09:32AM | 21 | AND HERE THE MOTIVATIONS WE BELIEVE WERE.  SO -- AND THAT |
| 09:32AM | 22 | WAS -- THE FUNDAMENTAL OBJECTIVE WAS DEVELOP INCRIMINATING |
| 09:32AM | 23 | EVIDENCE AGAINST MR. BALWANI AND MS. HOLMES. |
| 09:32AM | 24 | THE UNDERLYING ISSUES IN THE S.E.C. ACTION ARE THE SAME IN |
| 09:32AM | 25 | THIS CASE.  MR. BALWANI AND MS. HOLMES WERE TARGETS OF BOTH |

09:32AM 1      INVESTIGATIONS.

09:32AM 2          THIS IS CRITICAL.  THIS POINT IS CRITICAL.  THE S.E.C. AND

09:32AM 3      THE DOJ WERE INVESTIGATING THE SAME UNDERLYING CONDUCT.

09:33AM 4          IF YOU LOOK AT THE S.E.C. COMPLAINT, THIS IS AT

09:33AM 5      PARAGRAPH 91B OF THE COMPLAINT, THIS IS HOW THEY DESCRIBE THE

09:33AM 6      SECOND CLAIM, THAT MS. HOLMES AND MR. BALWANI EMPLOYED A SCHEME

09:33AM 7      TO DEFRAUD, TO, QUOTE, OBTAIN MONEY OR PROPERTY BY MEANS OF

09:33AM 8      UNTRUE STATEMENTS OF MATERIAL FACT.

09:33AM 9          AND THROUGHOUT THE COMPLAINT, THE S.E.C. COMPLAINT, THE

09:33AM 10     ALLEGATIONS RELATED TO THE ALLEGED FACT THAT THE RETAIL

09:33AM 11     PARTNERSHIP RELATIONSHIP STALLED, WHICH WAS THE EXACT SAME WORD

09:33AM 12     USED IN PARAGRAPH 12 OF THE INDICTMENT IN THIS CASE; IT

09:33AM 13     DISCUSSES ALLEGED MISSTATEMENTS ABOUT THERANOS TECHNOLOGY; AND

09:33AM 14     ALSO MISREPRESENTATIONS CONCERNING FINANCIAL NUMBERS.

09:33AM 15         YOU CAN LINE UP PARAGRAPH 12 OF THE INDICTMENT WITH THE

09:33AM 16     COMPLAINT IN THE S.E.C. AND THE VEN DIAGRAM IS PRETTY MUCH ONE.

09:33AM 17         AND THAT'S IMPORTANT IN THIS CASE.  THE GOVERNMENT HAS

09:33AM 18     REPRESENTED IN ITS OPPOSITION THAT, QUOTE, CRITICALLY THE

09:33AM 19     S.E.C. FOCUSSED ON SECURITIES FRAUD, WHEREAS THE INDICTMENT

09:33AM 20     ALSO ALLEGES A CONSPIRACY TO DEFRAUD PATIENTS.

09:33AM 21         THAT TOTALLY IGNORES THE FIRST CONSPIRACY, WHICH WE SUBMIT

09:34AM 22     THERE'S A LOT OF OVERLAP.

09:34AM 23         SO THAT GOES TO THE ELEMENT OF THE SIMILARITY OF THE

09:34AM 24     UNDERLYING ISSUES.

09:34AM 25         THE SECOND ELEMENT IS THE CONTEXT OF THE QUESTIONING.

09:34AM 1    IN THIS CASE, AS THE COURT PROBABLY NOTICED FROM THE

09:34AM 2    DEPOSITION CLIPS THAT WE PROVIDED, THESE ARE LEADING QUESTIONS

09:34AM 3    ABOUT STATEMENTS MADE BY MR. BALWANI.

09:34AM 4    THEY'RE ALSO LEADING QUESTIONS ABOUT INFORMATION KNOWN BY

09:34AM 5    MS. HOLMES.  ON THE FINANCIAL MODEL ISSUE, THE S.E.C. ATTORNEYS

09:34AM 6    SAID, WELL, MS. HOLMES KNEW ABOUT THE ASSUMPTIONS.  MS. HOLMES

09:34AM 7    KNEW ABOUT THE FINANCIAL MODEL.  WHAT DID SHE EVER HAVE?  DID

09:34AM 8    SHE EVER ACTUALLY HAVE THE FINANCIAL MODEL?

09:34AM 9    AND HE SAID NO.

09:34AM 10   SO THE TYPES OF QUESTIONING ALSO SUPPORTS THAT THERE WAS A

09:34AM 11   FUNDAMENTAL OBJECTIVE FOR THIS.

09:34AM 12   SO IF I COULD QUICKLY JUST TALK ABOUT THE S.E.C. VERSUS

09:34AM 13   JASPER CASE, WHICH WAS AN OPTIONS BACKDATING CASE.  IN THAT

09:34AM 14   CASE, THE COURT AND THE NINTH CIRCUIT DID FIND THAT THERE WAS

09:34AM 15   NOT A SIMILAR MOTIVE, AND THE COURT SAID --

09:34AM 16       THE COURT:  THAT THERE WAS NOT A SIMILAR MOTIVE?

09:34AM 17       MR. FLEURMONT:  THERE WAS NOT A SIMILAR MOTIVE

09:35AM 18   BETWEEN THE S.E.C. AND THE DOJ.

09:35AM 19   AND IN THAT CASE, THE COURTS SAY THAT THERE ARE INHERENTLY

09:35AM 20   DIFFERENT MOTIVES INVOLVED IN AN EARLIER INVESTIGATION IN WHICH

09:35AM 21   OPEN-ENDED QUESTIONS ARE TYPICALLY ASKED WITHOUT EXPECTATION

09:35AM 22   THAT THE WITNESS WILL BE NEEDED AT TRIAL.

09:35AM 23   THAT IS NOTHING LIKE THE DEPOSITION THAT OCCURRED IN THIS

09:35AM 24   CASE.  MR. BALWANI WAS A TARGET.  THERE WERE NOT OPEN-ENDED

09:35AM 25   QUESTIONS.  AND THE QUESTIONS THAT WERE ASKED WERE, AS YOU CAN

09:35AM  1      SEE IN THE COMPLAINT, AIMED AT FINDING ABOUT WHETHER THERE WERE

09:35AM  2      MISSTATEMENTS, AIMED AT THE CATEGORIES THAT WE CITED IN OUR

09:35AM  3      BRIEF.

09:35AM  4              THE COURT:  ALL RIGHT.  THANK YOU.

09:35AM  5          LET ME TURN TO YOUR COLLEAGUE OPPOSITE, MS. VOLKAR.

09:35AM  6          MS. VOLKAR, DO YOU HAVE ANYTHING TO SAY OR CAN YOU HELP US

09:35AM  7      ON SOME OF THESE ISSUES?

09:35AM  8              MS. VOLKAR:  ABSOLUTELY, YOUR HONOR.  THANK YOU.

09:35AM  9          FIRST I WANT TO START WITH THE TIMELINE BECAUSE I DO THINK

09:35AM  10     THAT IS REALLY CRITICAL, ESPECIALLY WHERE MY COLLEAGUE JUST

09:35AM  11     ENDED IN TALKING ABOUT THE S.E.C. VERSUS JASPER CASE.

09:35AM  12         IN THIS CASE, IN 2016 THERE WERE CONCURRENT INVESTIGATIONS

09:35AM  13     ONGOING, INCLUDING BY THE S.E.C., INCLUDING BY THE GRAND JURY

09:36AM  14     SUBPOENAS, BUT THERE WERE NO CRIMINAL OR, AS FAR AS I KNOW,

09:36AM  15     CIVIL ENFORCEMENT CHARGES BY THE S.E.C. AT THAT TIME.

09:36AM  16         THEN THE INVESTIGATIVE TESTIMONY BY MR. BALWANI THAT'S AT

09:36AM  17     ISSUE HERE OCCURS IN AUGUST AND SEPTEMBER OF 2017.

09:36AM  18         THE FIRST TIME ANY ENFORCEMENT PROCEEDINGS ARE BROUGHT IS

09:36AM  19     MARCH 2018 WHEN THE S.E.C. FILES ITS COMPLAINT.  AND, OF COURSE

09:36AM  20     YOUR HONOR IS VERY FAMILIAR WITH THAT CASE.  IT IS PENDING

09:36AM  21     BEFORE YOU.

09:36AM  22         BUT THAT COMPLAINT WAS NOT FILED UNTIL MARCH OF 2018, AND

09:36AM  23     THAT CHANGES WHAT S.E.C. VERSUS JASPER TALKS ABOUT, THE S.E.C.

09:36AM  24     PROCEEDINGS FROM THE INVESTIGATORY STAGE TO THE ENFORCEMENT

09:36AM  25     ACTION STAGE.  SO THAT'S THE S.E.C.

7712

09:36AM 1      NOW, FOR THE DOJ'S PART, THE CRIMINAL INDICTMENT IN THIS

09:36AM 2  CASE WAS ENTERED BY THE -- OR ISSUED BY THE GRAND JURY I

09:36AM 3  BELIEVE JUNE 2018.  SO AGAIN, CRITICALLY AFTER THE TESTIMONY IN

09:37AM 4  THIS CASE.

09:37AM 5      AND AS THE DEFENSE POINTED OUT IN THEIR MOTION, WHEN

09:37AM 6  MR. BALWANI WAS BROUGHT BACK IN 2019, HE OF COURSE INVOKED HIS

09:37AM 7  FIFTH AMENDMENT RIGHTS BECAUSE NOW HE WAS UNDER THESE

09:37AM 8  ENFORCEMENT PROCEEDINGS, BOTH THE S.E.C. ENFORCEMENT PROCEEDING

09:37AM 9  AND THE CRIMINAL INDICTMENT BY THE DOJ.

09:37AM 10      SO I THINK THAT TIMELINE IS VERY CRITICAL.

09:37AM 11      AND THEN WITH THAT IN MIND, I WANTED TO TALK ABOUT HOW ALL

09:37AM 12  THE CATEGORIES OF STATEMENTS THAT THEY'RE SEEKING TO ADMIT IN

09:37AM 13  THE TESTIMONY REALLY FALL INTO THREE BUCKETS WHICH AT THE END

09:37AM 14  OF THE DAY MAKE NONE OF THEM ADMISSIBLE.

09:37AM 15      AND THOSE THREE BUCKETS ARE -- MOST OF THEM ARE NOT

09:37AM 16  NECESSARILY SELF-INCULPATORY BECAUSE THEY'RE SHARING BLAME OR

09:37AM 17  DEFLECTING BLAME, AND THE NINTH CIRCUIT HAS TOLD US THAT THOSE

09:37AM 18  ARE NOT THE TYPE OF STATEMENTS THAT 804(B)(3) INTENDS TO

09:37AM 19  PERMIT.

09:37AM 20      THEY ARE ALSO NOT CORROBORATED OR UNTRUSTWORTHY, AND I'LL

09:37AM 21  COME BACK TO THAT IN JUST A MOMENT.

09:37AM 22      AND THEN TO THE EXTENT THAT ANY OF THEM ARE CORROBORATED,

09:37AM 23  THEY'RE REALLY CUMULATIVE AND THEY'RE FACT WITNESS TESTIMONY,

09:38AM 24  AS YOUR HONOR POINTED OUT, THAT ESSENTIALLY IS JUST ANOTHER WAY

09:38AM 25  OF TRYING TO REINFORCE TESTIMONY OF PRIOR WITNESSES WITHOUT

7713

09:38AM  1    CALLING THE PERSON HERE TO TALK ABOUT IT.

09:38AM  2         NOW, ONE EXAMPLE, OR ONE VERY CLEAR EXAMPLE THAT I THINK

09:38AM  3    HIGHLIGHTS THE ISSUES IN WHAT DEFENSE IS TRYING TO SEEK TO

09:38AM  4    ADMIT HERE IS EXHIBIT C, DOCKET 1163-4.  THE TWO PAGES THAT

09:38AM  5    THEY WANT TO ADMIT ARE ALL ABOUT WHO RAN THE LAB.  THAT'S THEIR

09:38AM  6    CATEGORY.

09:38AM  7         AND THE QUESTION FROM THE S.E.C. IS, WHO AT THERANOS MADE

09:38AM  8    THE DETERMINATION OF WHAT DEVICE TO USE FOR PATIENT TESTING IN

09:38AM  9    THE CLIA LAB?  THAT WOULD BE AN IMPORTANT QUESTION, I THINK, IN

09:38AM  10   OUR CASE WHERE WE HAVE THE PATIENT CONSPIRACY.

09:38AM  11        MR. BALWANI DOES NOT SAY, IT WAS ME, I DID IT, MS. HOLMES

09:38AM  12   HAD NOTHING TO DO WITH IT.

09:38AM  13        IF THAT WAS THE STATEMENT WE WERE LOOKING AT, WE WOULD BE

09:38AM  14   HAVING A VERY DIFFERENT CONVERSATION.

09:38AM  15        WHAT HE SAYS IN SUBSTANCES IN HIS ANSWER WAS IT WAS THE

09:39AM  16   LAB DIRECTOR AND THE SCIENTISTS AND THE ENGINEERS MADE ALL OF

09:39AM  17   THE TECHNICAL DECISIONS, AND THE TSPU WAS MODIFIED, AND WHETHER

09:39AM  18   OR NOT IT WAS USED, THAT WAS UP TO THE LAB DIRECTOR.

09:39AM  19        AND WAS THAT TRUE THROUGHOUT YOUR TIME AT THERANOS?

09:39AM  20        YES.

09:39AM  21        THERE'S NOTHING IN THIS STATEMENT THAT SAYS ANYTHING OTHER

09:39AM  22   THAN WHAT THE DEFENSE HAS BEEN PRESENTING IN THIS CASE THUS

09:39AM  23   FAR, WHICH IS IT WAS THE LAB DIRECTOR WHO WAS INVOLVED IN

09:39AM  24   PATIENT TESTING.

09:39AM  25        SO AS FAR AS 804(B)(3) GOES, THERE'S NOTHING IN EXHIBIT C

7714

09:39AM   1      THAT MOVES INTO THE REALM THAT 804(B)(3) IS MEANT TO COVER.

09:39AM   2              THE COURT:  MS. VOLKAR, LET ME ALSO INTERRUPT YOU

09:39AM   3      FOR JUST A MOMENT TO SUGGEST THAT AS I READ THROUGH THIS, I WAS

09:39AM   4      REMINDED OF ALL OLD FRIEND, FEDERAL RULE OF EVIDENCE 106, AND

09:39AM   5      WHETHER OR NOT THAT WAS GOING TO COME INTO PLAY HERE AS TO ANY

09:39AM   6      OF THESE STATEMENTS.

09:39AM   7          AND, YOU KNOW, COUNSEL, FEEL FREE TO RAISE THAT ISSUE.

09:39AM   8          I NOTE THE EXHIBITS, THEY'RE REDACTED.  AND I LOOKED AT

09:40AM   9      THAT AND THOUGHT, WELL, WE'VE BEEN THROUGH THIS BEFORE, AND

09:40AM   10     SOMETIMES THE REDACTIONS ARE UNREDACTED TO PROVIDE CONTEXT I

09:40AM   11     THINK IS HOW WE'VE CALLED IT THROUGHOUT THIS TRIAL.

09:40AM   12         SO I'M BEARING THAT IN MIND, TOO.

09:40AM   13         SO PLEASE CONTINUE.  THANK YOU.

09:40AM   14             MS. TREFZ:  YES.  THANK YOU, YOUR HONOR.

09:40AM   15         I DO WANT TO, FOR THE RECORD, STATE THAT WE RECEIVED THIS

09:40AM   16     MOTION SHORTLY BEFORE THE THANKSGIVING HOLIDAY.  WE WERE NOT

09:40AM   17     GIVEN ANY ADVANCE WARNING BY DEFENSE COUNSEL, NOR WERE WE GIVEN

09:40AM   18     ANY INDICATION OF WHAT PORTIONS THEY WERE GOING TO SEEK TO

09:40AM   19     ADMIT SUCH THAT WE COULD GIVE OUR RULE 106 SUGGESTIONS.

09:40AM   20         SO BASED ON HOW THE COURT RULES, WE WOULD ASK THE

09:40AM   21     OPPORTUNITY TO DO THAT.  AND CANDIDLY, THERE'S A LOT GOING ON

09:40AM   22     DURING THE TRIAL, BUT, OF COURSE, IF YOUR HONOR IS INCLINED TO

09:40AM   23     ADMIT ANY PORTIONS, WE WOULD LIKE THE OPPORTUNITY TO REVIEW FOR

09:40AM   24     106 PURPOSES.

09:40AM   25             THE COURT:  SURE.  AND THIS CIRCLES BACK TO MY

09:40AM 1    INITIAL QUESTION ABOUT TIMING OF WHERE WE ARE, AND YOU NEED TO

09:40AM 2    TALK TO YOUR COLLEAGUES ABOUT THAT AS YOU SAID, RIGHT?

09:41AM 3         MS. VOLKAR:  YOUR HONOR, WITHOUT GOING TOO FAR WITH

09:41AM 4    MS. HOLMES ON THE STAND, I'M NOT ENTIRELY CLEAR WHY THE MOTION

09:41AM 5    HAD TO BE HEARD TODAY, BUT I BELIEVE MY -- I'M SURE MY

09:41AM 6    COLLEAGUES HAD GOOD REASON FOR IT.

09:41AM 7         NOW, THE OTHER PART THAT I WANT TO MENTION IS REALLY THE

09:41AM 8    CASES.  AND I THINK WE HAVE PRETTY GOOD NINTH CIRCUIT -- OR

09:41AM 9    INDICATION FROM THE NINTH CIRCUIT OF WHERE WE SHOULD LAND, OR

09:41AM 10   WHERE THE COURT SHOULD LAND IN THIS CASE.

09:41AM 11        AND ALTHOUGH MY COLLEAGUES, I RESPECT THEM FOR LOOKING FOR

09:41AM 12   CASES WHERE THE COURT WAS REVERSED OR OVERTURNED, IN DOING SO,

09:41AM 13   THEY OVERLOOKED OR PUSHED TO THE SIDE CASES THAT ARE MUCH MORE

09:41AM 14   FACTUALLY SIMILAR TO WHAT WE HAVE HERE.

09:41AM 15        AND ENDING WHERE MY COLLEAGUE BEGAN, WITH S.E.C. V.

09:41AM 16   JASPER, I THINK THAT'S A RIGHT ON POINT EXAMPLE OF WHAT I MEAN.

09:41AM 17        SO IN S.E.C. V. JASPER, WE HAVE ALMOST THE EXACT SAME

09:41AM 18   SCENARIO AS WE DO HERE WHERE THERE WAS AN S.E.C. INVESTIGATORY

09:42AM 19   PROCEEDING AND THEN THERE WAS THE S.E.C. ENFORCEMENT ACTION.

09:42AM 20        AND THIS WAS A CASE WHERE THE DEFENSE WANTED TO USE

09:42AM 21   TESTIMONY GATHERED DURING THE S.E.C.'S INVESTIGATORY FUNCTION

09:42AM 22   AGAINST THE S.E.C. IN THE ENFORCEMENT ACTION THAT IT HAD AT

09:42AM 23   TRIAL LATER IN THE SAME CASE.

09:42AM 24        SO THIS WAS, AS I SAID, AS FAR AS I COULD TELL, PRETTY

09:42AM 25   MUCH ON ALL FOURS WITH WHAT WE HAVE HERE BUT FOR WE'RE NOT THE

09:42AM 1    S.E.C.

09:42AM 2        WE'RE APPEARING BEFORE YOUR HONOR ON BEHALF OF THE DOJ, SO

09:42AM 3    WE'RE ONE STEP REMOVED.  IN FACT, AS I ARGUED IN MY BRIEF, I

09:42AM 4    THINK THE S.E.C. AND THE DOJ ARE NOT PROPERLY CONSIDERED TO BE

09:42AM 5    THE SAME PARTY, AND THAT COULD BE A THRESHOLD ISSUE.

09:42AM 6        BUT EVEN IF YOUR HONOR WANTS TO DO, AS MANY COURTS HAVE,

09:42AM 7    AND SKIP THAT QUESTION, MOVING TO THE SIMILAR MOTIVE, I DON'T

09:42AM 8    SEE HOW THIS CASE IS DIFFERENT AND NOT ON ALL FOURS WITH

09:42AM 9    S.E.C. V. JASPER WHERE THE COURT SAID THAT THE INVESTIGATORY

09:43AM 10   TESTIMONY COULD NOT BE USED AGAINST THE S.E.C. IN THE LATER

09:43AM 11   ENFORCEMENT ACTION, AND WE ASK THAT THE S.E.C. TESTIMONY NOT BE

09:43AM 12   PERMITTED TO BE USED AGAINST THE DOJ IN ITS CRIMINAL ACTION

09:43AM 13   WITHOUT THE BENEFIT OF CROSS-EXAMINATION.

09:43AM 14       SO THAT'S 804(B)(1).

09:43AM 15       AND THEN JUST TO CIRCLE BACK TO 804(B)(3), THERE IS THE

09:43AM 16   GADSON CASE, AND ALTHOUGH MY COLLEAGUE IS CORRECT THAT THE

09:43AM 17   CASES WITH LOVE AND RELATIONSHIPS FREQUENTLY ARE FAMILY

09:43AM 18   RELATIONSHIPS, I THINK THAT THE UNDERLYING POINT THAT THE COURT

09:43AM 19   IS MAKING CAN BE APPLICABLE TO A ROMANTIC RELATIONSHIP,

09:43AM 20   PARTICULARLY A ROMANTIC RELATIONSHIP THAT SPANNED MORE THAN A

09:43AM 21   DECADE.

09:43AM 22       AND THE DEFENDANTS TALK IN THEIR TEXT MESSAGES ABOUT HOW

09:43AM 23   WE'VE HAD A RELATIONSHIP FOR LONGER THAN MOST MARRIAGES SURVIVE

09:43AM 24   AND ISN'T THAT REALLY WONDERFUL?

09:43AM 25       AND THEY CLEARLY HAVE THIS LOVING RELATIONSHIP, AND MAYBE

09:43AM   1    THERE WERE NON-LOVING PARTS OF IT, I'M NOT GETTING INTO THAT

09:43AM   2    RIGHT NOW, BUT THEY DID HAVE A LOVING RELATIONSHIP TO WHERE

09:44AM   3    LESS THAN A YEAR -- OR, I'M SORRY, APPROXIMATELY A YEAR BEFORE

09:44AM   4    MR. BALWANI IS GIVING THIS TESTIMONY BEFORE THE S.E.C., HE IS

09:44AM   5    SAYING THAT I WANT, I WANT TO, YOU KNOW, DEVOTE MYSELF TO YOU,

09:44AM   6    I WANT TO HELP YOU IN ANY WAY, SHAPE, OR FORM THAT I CAN.

09:44AM   7         NOW, IF THE COURT IS NOT -- DOESN'T FEEL THAT THE RECORD

09:44AM   8    IS SUFFICIENTLY DEVELOPED TO QUESTION THE TRUSTWORTHINESS OF

09:44AM   9    THE STATEMENTS BASED ON LOVE, WE CAN ALSO JUST LOOK AT THE

09:44AM   10   FACTS, AND THE FACTS DON'T NECESSARILY CORROBORATE WHAT I WOULD

09:44AM   11   ASSUME ARE THE KEY PIECES THAT THE DEFENSE COUNSEL WANT IN.

09:44AM   12        AND WHAT DO I MEAN BY THAT?  THERE ARE TWO INSTANCES WHERE

09:44AM   13   MR. BALWANI ACTUALLY SAYS THAT MS. HOLMES WASN'T INVOLVED, AND

09:44AM   14   I BELIEVE MY COUNSEL CORRECTLY IDENTIFIED THEM.  SHE WASN'T

09:44AM   15   INVOLVED IN THE FINANCIAL MODELS, AND SHE WASN'T AWARE OF THE

09:44AM   16   NULL PROTOCOL.

09:44AM   17        THOSE ARE THE ONLY TWO TIMES THAT I COULD FIND WHERE HE

09:44AM   18   DIRECTLY SAYS THAT, AND AS MY COLLEAGUE WAS TALKING ABOUT THE

09:44AM   19   PAGUIO CASE, THAT'S THE CRITICAL SECOND HALF OF THE SENTENCE

09:45AM   20   THAT THE COURT SAID, IT WAS ME AND NOT MY SON.

09:45AM   21        SO WHEN WE'RE JUST LOOKING AT THESE TWO INSTANCES OF

09:45AM   22   PRESUMABLY BALWANI SAYING IT WAS ME AND NOT MS. HOLMES, AND

09:45AM   23   THEN LET'S LOOK AT WHAT EVIDENCE THERE IS TO CORROBORATE THAT

09:45AM   24   OTHER THAN THE LOVE OR LOVING RELATIONSHIP THAT MIGHT HAVE LED

09:45AM   25   HIM TO SAY THAT.

7718

09:45AM 1    IF WE LOOK AT THE EVIDENCE IN THE TRIAL ON THE NULL

09:45AM 2    PROTOCOL, WE HAVE DANIEL EDLIN SAYING, YEAH, I KNEW WHAT THE

09:45AM 3    NULL PROTOCOL WAS, LET ME EXPLAIN IT FOR YOU, EVEN THOUGH

09:45AM 4    MR. BALWANI SAID ONLY THE ENGINEERS CAN UNDERSTAND THIS

09:45AM 5    CONCEPT, SO THE IMPLICATION BEING THERE'S NO WAY MS. HOLMES

09:45AM 6    COULD HAVE UNDERSTOOD THIS CONCEPT.

09:45AM 7    AND THEN THE SECOND THING IS WE HAVE TRIAL TRANSCRIPTS IN

09:45AM 8    THIS CASE THAT ARE FORWARDED FROM MR. BALWANI TO MS. HOLMES, OR

09:45AM 9    FROM MR. EDLIN TO MS. HOLMES DISCUSSING WHETHER OR NOT THEY

09:45AM 10   SHOULD USE THE NULL PROTOCOL DURING SPECIFIC DEMOS OR

09:45AM 11   DEMONSTRATIONS.

09:45AM 12       THE COURT:  THAT WAS -- I WAS CURIOUS ABOUT THAT AND

09:45AM 13   I WANTED TO ASK ABOUT THAT.  I HAVEN'T PORED THROUGH THE

09:46AM 14   TRANSCRIPT TO THAT POINT, BUT IT DID STICK IN MY MIND AND MY

09:46AM 15   NOTES SEEM TO SUGGEST THAT DURING MR. EDLIN'S I BELIEVE

09:46AM 16   TESTIMONY, HE SPOKE ABOUT THE NULL PROTOCOL AND I THINK HE

09:46AM 17   SPOKE SPECIFICALLY ABOUT A VIP VISIT AND WHETHER OR NOT, I

09:46AM 18   THINK IT WAS WHETHER, THEY WERE GOING TO AND HOW THEY WERE

09:46AM 19   GOING TO INVOKE THE NULL PROTOCOL FOR THAT VISIT.

09:46AM 20       AND I CAN'T REMEMBER EXACTLY WHETHER OR NOT THAT WENT UP

09:46AM 21   THE CHAIN SUCH THAT IT WAS CONNECTED TO MS. HOLMES OR TO

09:46AM 22   MR. BALWANI.  PERHAPS YOU KNOW THAT ANSWER THIS MORNING.  I'M

09:46AM 23   HAPPY TO HEAR IF YOU DO.

09:46AM 24       MS. VOLKAR:  I DO, YOUR HONOR.

09:46AM 25   I CAN THINK OF TWO DOCUMENTS, AND WITH THE COURT'S

09:46AM 1    INDULGENCE I CAN COME UP WITH THE TRIAL EXHIBIT NUMBERS FOR

09:46AM 2    THOSE DOCUMENTS.  I APOLOGIZE, I DON'T HAVE THEM RIGHT IN FRONT

09:46AM 3    OF ME.

09:46AM 4         BUT I'M THINKING OF TWO DOCUMENTS, BOTH FROM MR. EDLIN,

09:46AM 5    AND AT LEAST IN ONE HE'S DISCUSSING THE DOCUMENT IN THE PORTION

09:46AM 6    OF THE TRANSCRIPT THAT I CITED FOR THE COURT.

09:46AM 7         THE COURT:  RIGHT.

09:47AM 8         MS. VOLKAR:  THE FIRST ONE IS A DISCUSSION AMONG

09:47AM 9    EDLIN AND I BELIEVE SOFTWARE ENGINEERS, SO ENGINEERS AT THE

09:47AM 10   COMPANY, ABOUT WHETHER TO USE THE DEMO APP OR THE NULL PROTOCOL

09:47AM 11   AND WHICH DEVICE TO USE, THE 4.0 OR THE 3S, ET CETERA.

09:47AM 12        AND I BELIEVE IT'S DANIEL YOUNG RESPONDS AND SAYS THAT ONE

09:47AM 13   OF THE OPTIONS IS NOT AVAILABLE, AND MR. BALWANI IS ON THE

09:47AM 14   CHAIN THE ENTIRE TIME, I BELIEVE, AND HE FORWARDS THAT CHAIN TO

09:47AM 15   MS. HOLMES AND SAYS VERY FRUSTRATING.

09:47AM 16        NOW, AS WE KNOW, UNLESS MS. HOLMES TESTIFIES TO IT, WE

09:47AM 17   DON'T KNOW WHETHER SHE FULLY UNDERSTOOD THE CONTEXT OF THAT OR

09:47AM 18   WHAT HAVE YOU, BUT SHE AT LEAST WAS BEING LOOPED IN BY

09:47AM 19   MR. BALWANI INTO THE DISCUSSION.

09:47AM 20        SIMILARLY, THERE'S A SECOND DOCUMENT WHERE MR. EDLIN, IF

09:47AM 21   MY MEMORY SERVES, IS SENDING IT DIRECTLY TO MS. HOLMES AND

09:47AM 22   MR. BALWANI AND TALKING ABOUT HERE ARE THE DIFFERENT OPTIONS

09:47AM 23   THAT WE CAN USE, INCLUDING THE NULL PROTOCOL AND ONE OF THE

09:47AM 24   DEVICES, AND I BELIEVE MS. HOLMES RESPONDS TO THE SUGGESTION OF

09:48AM 25   USE THE 3.0 OR SOMETHING LIKE THAT.

09:48AM 1        NOW, AGAIN, IS THAT SHOWING THAT SHE HAS A DETAILED

09:48AM 2   KNOWLEDGE OF THE NULL PROTOCOL?  I'M NOT SURE.

09:48AM 3        BUT, AGAIN, WHEN IT COMES TO WHETHER THERE'S CORROBORATION

09:48AM 4   FOR MR. BALWANI'S TESTIMONY, MR. EDLIN DID NOT SAY ON

09:48AM 5   CROSS-EXAMINATION THAT MS. HOLMES DID NOT KNOW WHAT THE NULL

09:48AM 6   PROTOCOL WAS.  THAT WAS AT LEAST THE INDICATION THAT I GOT FROM

09:48AM 7   THE BRIEFING, AND WHEN I LOOKED AT THAT CITE, THAT'S NOT THERE.

09:48AM 8        AND, IN FACT, IT'S THE OPPOSITE.  MR. EDLIN TALKS ABOUT

09:48AM 9   WHAT THE NULL PROTOCOL IS, EVEN THOUGH HE'S NOT AN ENGINEER,

09:48AM 10  AND HE'S ON A NUMBER OF THESE DOCUMENTS THAT ARE SHARED WITH

09:48AM 11  MS. HOLMES.

09:48AM 12       I THINK IT'S AT LEAST A FAIR INFERENCE THAT MS. HOLMES

09:48AM 13  MIGHT HAVE KNOWN WHAT THE NULL PROTOCOL WAS, AND EVEN IF WE

09:48AM 14  DON'T HAVE TO GET INTO THAT REALM, THERE'S CERTAINLY NO

09:48AM 15  CORROBORATION YET IN THE EVIDENCE THAT SHE DID NOT KNOW WHAT

09:48AM 16  THE NULL PROTOCOL WAS, AND THIS TESTIMONY WOULD BE THE FIRST,

09:48AM 17  AND AS FAR AS I'M AWARE THE ONLY, SUCH TESTIMONY OR EVIDENCE IN

09:48AM 18  THE CASE TO BRING IN THAT PIECE.

09:48AM 19       NOW, I WANT TO GO TO THE SECOND POINT, WHICH IS -- IF IT'S

09:49AM 20  OKAY, YOUR HONOR?

09:49AM 21            THE COURT:  YES.

09:49AM 22            MS. VOLKAR:  -- WHICH IS THE FINANCIAL MODELS, AND

09:49AM 23  THAT'S ANOTHER INSTANCE WHERE I BELIEVE IT'S AT THE END OF

09:49AM 24  EXHIBIT B IF MY MEMORY IS SERVING.  IT IS.

09:49AM 25       THE VERY LAST PAGE OF EXHIBIT B WHERE HE EXPLICITLY -- THE

09:49AM 1    S.E.C. IS ASKING MR. BALWANI WHETHER OR NOT MS. HOLMES HAD

09:49AM 2    KNOWLEDGE OF THE FINANCIAL MODELS, AND HIS LAST ANSWER IS, TO

09:49AM 3    THE BEST OF MY KNOWLEDGE NO.

09:49AM 4         NOW, AGAIN, I'M PUTTING THESE CATEGORIES OF STATEMENTS

09:49AM 5    INTO THE PAGUIO LAND, WHICH IS THE NOT ME -- OR IT WAS ME, NOT

09:49AM 6    MY SON.

09:49AM 7         NOW, HERE HE SAYS, TO THE BEST OF MY KNOWLEDGE, NO, SHE

09:49AM 8    DID NOT EDIT THE MODEL OR SHE WAS NOT FAMILIAR WITH THE MODEL.

09:49AM 9         BUT WE ALSO HAVE IN -- WE ALSO HAVE IN EVIDENCE, I BELIEVE

09:49AM 10   IT'S IN THE PART THAT WAS ADMITTED, THE TEXT MESSAGES WHERE

09:49AM 11   RIGHT BEFORE THE 2013 INVESTMENTS AND THE 2013 PERIOD WHEN

09:49AM 12   THEY'RE TALKING TO POTENTIAL INVESTORS, BALWANI IS --

09:50AM 13   MR. BALWANI IS IN INDIA, AND HE'S TEXTING MS. HOLMES PRESUMABLY

09:50AM 14   TO SAY I CAN'T BE THERE FOR THIS PHONE CALL OR I CAN'T BE THERE

09:50AM 15   FOR THIS MEETING, AND HE SAYS, CAN YOU GET COMFORTABLE WITH THE

09:50AM 16   FINANCIAL MODEL OR DO YOU WANT ME TO COVER IT WITH PRESUMABLY

09:50AM 17   AN INVESTOR LATER IN TIME?

09:50AM 18        AND SHE RESPONDS, I CAN GET COMFORTABLE WITH IT.

09:50AM 19        NOW, ALTHOUGH THAT MAY AGAIN NOT DIRECTLY CONTRADICT WHAT

09:50AM 20   IS HERE, IT'S CERTAINLY NOT CORROBORATING IT.

09:50AM 21        AND I GO BACK TO IT LEAVES OPEN ROOM FOR MULTIPLE

09:50AM 22   INFERENCES, AND THIS PIECE WOULD BE THE FIRST PIECE OF EVIDENCE

09:50AM 23   TO BRING IN SOMETHING DIFFERENT THAT IS NOT NECESSARILY

09:50AM 24   DIRECTLY CORROBORATED BY ANYTHING IN THE RECORD.

09:50AM 25        AND THAT'S WHERE I GO TO IT DOES MATTER THE

7722

| | | |
|---|---|---|
| 09:50AM | 1 | TRUSTWORTHINESS OF THESE STATEMENTS IF WE'RE TALKING ABOUT |
| 09:50AM | 2 | 804(B)(3), AND THE KEY POINTS THAT THEY WOULD WANT TO BRING IN |
| 09:50AM | 3 | FROM THIS TESTIMONY THAT SAYS NO, NOT MS. HOLMES, THERE'S NOT A |
| 09:50AM | 4 | SUFFICIENT INDICATION OF TRUSTWORTHINESS. |
| 09:50AM | 5 | AND A LOT OF THE OTHER STATEMENTS, IT WAS THE LAB |
| 09:51AM | 6 | DIRECTOR, MS. HOLMES HAD THE CLOSER RELATIONSHIP WITH |
| 09:51AM | 7 | STEVE BURD AND SAFEWAY, I WAS INVOLVED WITH WALGREENS, BUT WE |
| 09:51AM | 8 | WERE BOTH INVOLVED AT THE START, A LOT OF THOSE STATEMENTS HAVE |
| 09:51AM | 9 | BEEN BROUGHT IN THROUGH OTHER FACT WITNESSES AND DON'T REALLY |
| 09:51AM | 10 | MOVE THE BALL FORWARD AND THAT'S WHY WE MADE THE CUMULATIVE |
| 09:51AM | 11 | ARGUMENT. |
| 09:51AM | 12 | BUT I REALLY WANTED TO FOCUS THE COURT ON WHAT I THINK ARE |
| 09:51AM | 13 | THE KEY DECISION POINTS HERE, AND I THINK THOSE TWO ARE IT, AND |
| 09:51AM | 14 | I THINK THEY DON'T HAVE THE SUFFICIENT INDICIA OF |
| 09:51AM | 15 | TRUSTWORTHINESS FOR 804(B)(3). |
| 09:51AM | 16 | THE COURT:  OKAY.  THANK YOU. |
| 09:51AM | 17 | MR. FLEURMONT:  SURE, YOUR HONOR.  A COUPLE OF |
| 09:51AM | 18 | POINTS. |
| 09:51AM | 19 | I THINK I SHOULD START WITH KIND OF EXPLAINING WHAT -- MY |
| 09:51AM | 20 | UNDERSTANDING OF WHAT CORROBORATION MEANS.  CORROBORATION DOES |
| 09:51AM | 21 | NOT MEAN YOU HAVE ANOTHER WITNESS OR ANOTHER DOCUMENT THAT SAYS |
| 09:51AM | 22 | EXACTLY WHAT THE PERSON SAYS. |
| 09:51AM | 23 | CORROBORATION MEANS THAT THERE ARE EXHIBITS OR EVIDENCE |
| 09:51AM | 24 | THAT SUPPORT THAT WHAT THE PERSON SAID IS RELIABLE. |
| 09:51AM | 25 | IN THE PAGUIO CASE THERE WAS NOT -- THERE WAS |

7723

09:51AM 1    CORROBORATION IN THAT CASE, BUT IT WASN'T THAT THE LOAN

09:51AM 2    OFFICERS OR THE ESCROW AGENT OR THE ACCOUNTANT SAYS THIS MAN

09:52AM 3    TOLD ME IT WAS ONLY HIS SCHEME.  IT WAS, NO, I ONLY SAW HIM DO

09:52AM 4    THIS, I NEVER SAW HIS SON.

09:52AM 5        SO CORROBORATION DOES NOT MEAN THAT THERE WAS EVIDENCE OR

09:52AM 6    AN EXHIBIT THAT SAYS EXACTLY WHAT THE PERSON SAYS.  SO I JUST

09:52AM 7    WANT TO START THERE.

09:52AM 8        IN TERMS OF THE CORROBORATION THAT WE DO HAVE IN THIS

09:52AM 9    CASE, FIRST MY COLLEAGUE MENTIONED THAT SHE BELIEVED THAT SOME

09:52AM 10   OF THE EVIDENCE IS CUMULATIVE OF SOME OF HIS STATEMENTS.

09:52AM 11       WELL, IT CANNOT BE THAT THE EVIDENCE IS CUMULATIVE OF THE

09:52AM 12   STATEMENTS AND THEN THERE IS ALSO NO CORROBORATION.  EITHER THE

09:52AM 13   CORROBORATION IS SUPPORTED SUCH THAT THE PROVISION APPLIES OR

09:52AM 14   THERE'S NOTHING IN THE RECORD THAT SUPPORTS IT.

09:52AM 15           THE COURT:  SO YOUR ARGUMENT IS THAT, WELL, IF IT'S

09:52AM 16   IN, AS MS. VOLKAR SUGGESTS, THEN WHAT'S THE HARM OF BRINGING IT

09:52AM 17   IN AGAIN I THINK IS THE CUMULATIVE ARGUMENT.

09:52AM 18           MR. FLEURMONT:  NOT QUITE, YOUR HONOR.  THE ARGUMENT

09:52AM 19   IS THAT IF IT'S IN, THEN IT'S CORROBORATED, NOT THAT THERE'S NO

09:52AM 20   HARM.  IF IT'S IN, IT'S CORROBORATED, AND THEREFORE THE

09:52AM 21   EXCEPTION APPLIES.

09:52AM 22       SO THAT'S ON THE CUMULATIVE POINT.

09:52AM 23       AND ON THE -- IF I CAN, I WOULD LIKE TO DISCUSS THE

09:52AM 24   PORTIONS OF THE DEPOSITIONS THAT WE PUT IN.

09:52AM 25           THE COURT:  SURE.

7724

09:53AM 1          MR. FLEURMONT:  OKAY.  ON THE LAB.

09:53AM 2      SO I FEEL LIKE THE FRAMEWORK HAS BEEN -- I THINK THE

09:53AM 3   QUESTION THAT WE'RE ALL TALKING ABOUT IS, ARE THERE STATEMENTS

09:53AM 4   THAT SAID, ONE, I HAD RESPONSIBILITY FOR THIS PARTICULAR

09:53AM 5   PORTION; AND, TWO, ARE THERE ALSO STATEMENTS -- WELL, THREE

09:53AM 6   STATEMENTS.  ONE IS A STATEMENT THAT SAYS I TOOK

09:53AM 7   RESPONSIBILITY; TWO, IS THERE A STATEMENT THAT SAYS I TOOK

09:53AM 8   RESPONSIBILITY AND SHE DIDN'T; AND THREE ARE THE STATEMENTS

09:53AM 9   THAT SAY SOMEONE ELSE TOOK RESPONSIBILITY.

09:53AM 10      WE ARGUE THAT THE FIRST TWO CATEGORIES OF STATEMENTS ARE

09:53AM 11   CLEARLY ADMISSIBLE, AND WE AGREE THAT THE THIRD, SOMEONE ELSE

09:53AM 12   TOOK RESPONSIBILITY, WOULD NOT.

09:53AM 13      IN TERMS OF THE CLIA LAB, THE STATEMENTS THAT WE POINTED

09:53AM 14   OUT ARE ALL STATEMENTS WHERE HE SAYS THESE PEOPLE REPORTED TO

09:53AM 15   ME, EVEN IF THERE WAS A DECISION MADE BY THE LAB DIRECTOR.

09:53AM 16   FROM A BUSINESS PERSPECTIVE, FOR A BUSINESS MODEL, I WAS THE

09:53AM 17   PERSON THAT THEY HAD TO REPORT TO.

09:53AM 18      SO ALTHOUGH HE MENTIONS PARTICULAR INSTANCES IN WHICH

09:53AM 19   THERE WAS A LAB DIRECTOR'S DECISION, HE ULTIMATELY CLAIMS

09:53AM 20   RESPONSIBILITY OVER THE LAB BY SAYING THAT THEY REPORTED TO

09:53AM 21   HIM.

09:53AM 22      AND I CAN POINT THE COURT TO PLACES IN THE DEPOSITION THAT

09:54AM 23   WE HAVE THAT.

09:54AM 24          THE COURT:  AND SO THIS RELATES TO THE WHETHER OR

09:54AM 25   NOT THE STATEMENT IS EXCULPATORY OR NOT?

7725

09:54AM 1      MR. FLEURMONT:  I THINK THAT'S WHERE MY COLLEAGUE IS

09:54AM 2  GOING, WHETHER OR NOT IT'S SUFFICIENT -- NOT REALLY

09:54AM 3  EXCULPATORY, BUT SUFFICIENTLY --

09:54AM 4      THE COURT:  OR INCULPATORY.

09:54AM 5      MR. FLEURMONT:  -- INCULPATORY SUCH THAT THE

09:54AM 6  PROVISION WOULD APPLY.

09:54AM 7      THE COURT:  RIGHT.  THAT'S WHERE WE'RE LOOKING AT.

09:54AM 8  THAT'S WHAT I HAVE TO SEE, RIGHT?

09:54AM 9      MR. FLEURMONT:  YES, YOUR HONOR.

09:54AM 10      THE COURT:  TO DISCERN WHETHER OR NOT, DOES IT

09:54AM 11  REALLY INVOKE A FIFTH AMENDMENT PRIVILEGE OR IS IT REALLY, AS

09:54AM 12  MS. VOLKAR SAID, AND I MADE REFERENCE TO EARLIER, IS IT JUST

09:54AM 13  FACT TESTIMONY?

09:54AM 14      MR. FLEURMONT:  CORRECT, YOUR HONOR.

09:54AM 15    AND I JUST WANTED TO SEPARATE TWO CONCEPTS.  YOU'RE

09:54AM 16  CORRECT THAT AN INCULPATORY STATEMENT WOULD INVOKE THE FIFTH

09:54AM 17  AMENDMENT PRIVILEGE, BUT THAT'S A SEPARATE ANALYSIS THAT IS MET

09:54AM 18  FOR THE REASONS I SAID.

09:54AM 19    WHAT WE'RE TALKING ABOUT HERE ARE THE STATEMENTS BEING

09:54AM 20  WOULD THEY EXPOSE HIM TO CRIMINAL OR CIVIL LIABILITY SUCH THAT

09:54AM 21  THEY'RE ADMISSIBLE UNDER PROVISION 804(B)(3)?

09:55AM 22    SO IF I COULD JUST POINT THE COURT TO FIRST -- IF I COULD

09:55AM 23  USE THE ELMO, IT'S PROBABLY BEST.  I'M NOT SURE IF IT WORKS

09:55AM 24  RIGHT NOW.

09:55AM 25      THE COURT:  I DON'T KNOW EITHER.

7726

09:55AM   1          THE CLERK:  JUST ONE MOMENT, COUNSEL.

09:55AM   2          (PAUSE IN PROCEEDINGS.)

09:55AM   3          MR. FLEURMONT:  SO WHAT I HAVE IS EXHIBIT A THAT IS

09:55AM   4    DOCKET 1163-2 AT PAGE 6.  I'M JUST GOING TO PUT THIS ON THE

09:55AM   5    ELMO.

09:55AM   6          (DISCUSSION OFF THE RECORD.)

09:55AM   7          THE COURT:  I SEE.  ALL RIGHT.  THANK YOU.

09:55AM   8       SO I UNDERSTAND THAT THEY'RE WORKING ON OUR SYSTEM, SO THE

09:56AM   9    AUDIENCE IS NOT GOING TO BE ABLE TO SEE THIS AS WELL.

09:56AM  10          MR. FLEURMONT:  OKAY.  CAN THE COURT SEE IT?

09:56AM  11          THE COURT:  I CAN, YES.  THANK YOU.  THAT'S THE MOST

09:56AM  12    IMPORTANT THING YOU SAID, RIGHT?

09:56AM  13          MR. FLEURMONT:  OKAY.  AND SO WHAT WE'RE LOOKING AT

09:56AM  14    HERE IS A QUESTION AND ANSWER RELATED TO THE FINANCIAL MODEL.

09:56AM  15       AND AS I'VE MENTIONED BEFORE, WE'VE INCLUDED, WHENEVER

09:56AM  16    THERE WAS AN INCULPATORY STATEMENT, THE FULL QUESTION AND

09:56AM  17    ANSWER.

09:56AM  18       SO THE QUESTION STARTS, WHAT WERE YOUR RESPONSIBILITIES

09:56AM  19    WITH RESPECT TO THE COMPANY'S FINANCIALS WHEN YOU EARLY ON IN

09:56AM  20    THAT PRESIDENT AND CEO THE ROLE?

09:56AM  21       AND HE DISCUSSES HIS RESPONSIBILITIES ABOUT FINANCIAL

09:56AM  22    INFORMATION, BUT THE KEY STATEMENT TOWARDS THE BOTTOM IS THAT

09:56AM  23    HE HELPED -- I'M SORRY, THAT HE STARTED BUILDING A FINANCIAL

09:56AM  24    MODEL WITH HELP INITIALLY.

09:56AM  25       BUT THEN HE SAYS THAT, I OWNED.

7727

```
09:56AM   1          AND THEN THE S.E.C. ATTORNEY ASKS, BY SAYING YOU OWNED,

09:56AM   2    YOU MEAN YOU WERE RESPONSIBLE FOR THE COMPANY'S FINANCIAL

09:56AM   3    PROJECTIONS THAT YOU JUST DESCRIBED?

09:56AM   4          AND HE SAYS, THE FINANCIAL MODEL.

09:57AM   5          AND WE'VE HEARD A LOT OF TESTIMONY FROM MR. GROSSMAN AND

09:57AM   6    OTHERS ABOUT THE FINANCIAL MODEL.  AND SO HE WAS SAYING THAT HE

09:57AM   7    OWNED THE FINANCIAL MODEL.

09:57AM   8          THE OTHER STATEMENTS THAT WE PUT IN RELATE TO IF ANYONE

09:57AM   9    HAD ANY INPUT IN THAT MODEL, IF ANYONE HAD ANY EDITS IN THAT

09:57AM  10    MODEL, AND HE ALWAYS COMES BACK AND SAYS, YOU KNOW, IT'S MY

09:57AM  11    FINANCIAL MODEL, I OWN THE MODEL.

09:57AM  12          AND SO THAT'S THE REASON THAT WE PUT THAT STATEMENT IN.

09:57AM  13          THE COURT:  SO HOW DOES THAT COMPLY WITH 804(B)(3)?

09:57AM  14    WHAT IS IT ABOUT THAT THAT GIVES IT THAT CHARACTERISTIC?

09:57AM  15          MR. FLEURMONT:  OF AN INCULPATORY STATEMENT?

09:57AM  16          THE COURT:  RIGHT.  OR ADVERSE TO HIS PENAL

09:57AM  17    INTEREST?

09:57AM  18          MR. FLEURMONT:  WELL, FOR A FEW REASONS, YOUR HONOR.

09:57AM  19          ONE, IN THE -- SEVERAL OF THE SUBPOENAS ISSUED TO THERANOS

09:57AM  20    HAD QUESTIONS ABOUT FINANCIAL, THE QUESTIONS ABOUT THE

09:57AM  21    FINANCIAL MODEL.

09:57AM  22          AND, YOU KNOW, IT'S A CASE ABOUT -- THE S.E.C. CASE IS

09:57AM  23    ABOUT CIVIL ENFORCEMENT.  THE FINANCIALS ARE OBVIOUSLY A BIG

09:57AM  24    PART OF THE COMPANY.  HE WAS THE CEO AND HE WAS RESPONSIBLE FOR

09:57AM  25    IT.
```

7728

09:57AM 1        AND SOMEONE IN THAT POSITION REASONABLY WOULD NOT SAY THAT

09:58AM 2   THEY OWNED THE FINANCIALS AND THE FINANCIAL MODEL WITHOUT

09:58AM 3   UNDERSTANDING THEY WERE SUBJECT TO CIVIL LIABILITY.

09:58AM 4        AND THAT'S BORNE OUT BY THE ALLEGATIONS BOTH IN THE

09:58AM 5   COMPLAINT AND IN THIS CASE IN THE INDICTMENT.

09:58AM 6            THE COURT:  WELL, WHAT RELATIONSHIP DOES THAT HAVE,

09:58AM 7   HIS ANSWER HAVE TO THIS CASE?

09:58AM 8            MR. FLEURMONT:  YOUR HONOR, THE ALLEGATIONS ARE THAT

09:58AM 9   THERANOS HAS MISREPRESENTED THEIR FINANCIAL NUMBERS, AND WE'VE

09:58AM 10  HEARD TESTIMONY THAT THE FINANCIAL MODEL, HOW IT WAS IMPORTANT

09:58AM 11  TO OTHER PEOPLE.  YOU HEARD TESTIMONY ABOUT THE ASSUMPTIONS IN

09:58AM 12  THE FINANCIAL MODEL AND HOW THAT DROVE THE VALUATION OF

09:58AM 13  THERANOS.  THAT WAS ALL CONTROLLED BY MR. BALWANI.

09:58AM 14            THE COURT:  OKAY.  THAT'S ONE THING I WANT TO ASK

09:58AM 15  ABOUT AND WHETHER WE NEED TO DRILL DOWN TO MODEL AS OPPOSED

09:58AM 16  TO --

09:58AM 17            MR. FLEURMONT:  PROJECTIONS.

09:58AM 18            THE COURT:  -- STATEMENTS AND PROJECTIONS AND

09:58AM 19  THINGS.  I THINK THEY'RE TWO DIFFERENT THINGS.  MAYBE NOT.  BUT

09:58AM 20  YOU'LL HELP ME WITH THAT.

09:58AM 21            MR. FLEURMONT:  SURE, YOUR HONOR.

09:58AM 22       WELL, IN THE MODEL, INHERENT IN THE MODEL ARE FOUND

09:58AM 23  STATEMENTS AND SOME OTHER PROJECTIONS, AND THE QUESTION OF, YOU

09:58AM 24  KNOW, WHO RECEIVED THE MODEL, IF IT WAS IMPORTANT TO THEM, WHAT

09:59AM 25  WAS IN THE MODEL ALL RELATES -- I THINK IT'S ONE OF THE CORE

09:59AM 1    ALLEGATIONS OF THE GOVERNMENT'S CASE -- ALL RELATES TO THE

09:59AM 2    MODEL AND THAT'S SOMETHING THAT MR. BALWANI SAID THAT HE DID.

09:59AM 3            THE COURT:  CAN I TURN TO YOUR COLLEAGUE OPPOSITE

09:59AM 4    WHILE WE'RE ON THIS SO WE DON'T LOSE IT?

09:59AM 5            MR. FLEURMONT:  SURE.

09:59AM 6            THE COURT:  MS. VOLKAR.

09:59AM 7            MS. VOLKAR:  THANK YOU.

09:59AM 8        I THINK THAT IS THE KEY ISSUE, THE MODEL VERSUS

09:59AM 9    PROJECTIONS.  AND I WOULD ACTUALLY ARGUE THAT THAT'S PART OF

09:59AM 10   WHAT TAKES THIS STATEMENT THAT MY COLLEAGUE JUST POINTED US TO

09:59AM 11   AND MOVES US TO THE LAND THAT GADSON WAS TALKING ABOUT, THE

09:59AM 12   NINTH CIRCUIT CASE GADSON, WHERE THE PERSON IS DEFLECTING OR

09:59AM 13   SHARING BLAME, AND IT'S NOT NECESSARILY A TRUE INCULPATORY

09:59AM 14   STATEMENT.

09:59AM 15       WHAT DO I MEAN BY THAT?  HE SAYS, I OWNED THE MODEL THAT

09:59AM 16   HE SAYS HE BUILT WITH SAFEWAY AND WALGREENS, SO HE'S STILL NOT

09:59AM 17   TAKING FULL OWNERSHIP.  HE'S SHARING BLAME FOR THIS MODEL,

09:59AM 18   ASSUMING THAT THE MODEL IS SOMETHING AT ISSUE IN THE CASE,

09:59AM 19   WHICH I'M GOING TO CIRCLE BACK TO IN JUST A MOMENT.

09:59AM 20       AND THEN WHEN THE S.E.C. TRIES TO BRING IT BACK TO

09:59AM 21   PROJECTS, HE SAYS -- HE CORRECTS THEM AND HE SAYS FINANCIAL

09:59AM 22   MODEL.  AND THEN THE NEXT PAGE, PAGE 7 OF EXHIBIT A THAT WE

10:00AM 23   WERE JUST LOOKING AT IS TALKING ABOUT, OKAY, WELL, WHO DECIDED

10:00AM 24   TO CALL IT PROJECTIONS?

10:00AM 25       BECAUSE AT THE TOP OF THE SHEET, AND WHAT WE HAVE HEARD A

10:00AM 1    LOT OF TESTIMONY FROM THE INVESTOR VICTIMS ABOUT WAS SEEING A

10:00AM 2    PAGE -- A DOCUMENT THAT HAD FINANCIAL PROJECTS AT THE TOP OF

10:00AM 3    IT, AND THEY BELIEVED THEY WERE PROJECTIONS.

10:00AM 4        AND WE'VE HEARD A LOT ON CROSS-EXAMINATION ABOUT IN THE

10:00AM 5    STOCK PURCHASE AGREEMENT, YOU SEE HOW IT SAYS PROJECTIONS ARE

10:00AM 6    INHERENTLY SPECULATIVE, ET CETERA.

10:00AM 7        A LOT OF THE TESTIMONY IN THIS CASE HAS BEEN ABOUT

10:00AM 8    PROJECTIONS, NOT ABOUT A MODEL.

10:00AM 9        SO HERE IN THE KEY QUESTION, WHO LABELLED IT PROJECTIONS?

10:00AM 10       MR. BALWANI NEVER SAYS, I DID.

10:00AM 11       HE SAYS THAT THERE WERE A LOT OF PEOPLE THAT EDITED THIS

10:00AM 12   DOCUMENT.  DANISE YAM WAS IN CHARGE OF THE FINANCES; BDT EDITED

10:00AM 13   IT A LOT; THEY CLEANED UP A LOT OF TYPOS.

10:00AM 14       HE DOESN'T SAY HERE WHAT WOULD BE SORT OF THE CRITICAL

10:00AM 15   ANSWER THAT I MADE THE, I MADE THE DECISION TO MAKE FINANCIAL

10:00AM 16   PROJECTIONS AND MS. HOLMES DIDN'T HAVE ANYTHING TO DO WITH

10:01AM 17   THAT.

10:01AM 18       HE'S TALKING ABOUT OWNING A FINANCIAL MODEL AND WHY HE

10:01AM 19   THOUGHT THAT CERTAIN ASSUMPTIONS WERE IMPORTANT FOR THE MODEL.

10:01AM 20       SO THIS IS STILL A DEFLECTING OR A SHARING OF BLAME

10:01AM 21   SITUATION THAT GADSON TALKS ABOUT.

10:01AM 22       AND I DO THINK THAT THE MODEL VERSUS PROJECTIONS MATTER

10:01AM 23   BECAUSE A FINANCIAL MODEL -- AND THE S.E.C. PICKED UP ON THIS

10:01AM 24   LOOKING FOR INVESTMENT FRAUD -- A FINANCIAL MODEL IS TALKING

10:01AM 25   ABOUT, THIS IS WHAT THE BUSINESS COULD LIKE, COULD BE LIKE IF

10:01AM 1     CERTAIN ASSUMPTIONS ARE MET AND YOU CAN, YOU CAN ESSENTIALLY

10:01AM 2     ADD DIFFERENT THINGS INTO IT TO SAY THAT THERE ARE THIS MANY

10:01AM 3     PATIENTS THAT COME INTO A LAB.

10:01AM 4          MR. BALWANI TALKS ABOUT SOME OF THAT IN HIS INVESTIGATIVE

10:01AM 5     TESTIMONY.

10:01AM 6          WHEREAS PROJECTIONS, AND ESPECIALLY WHEN PROJECTIONS ARE

10:01AM 7     BEING PRESENTED TO INVESTORS, AND WE HEARD INVESTORS TESTIFY

10:01AM 8     ABOUT THIS, THIS IS WHAT WE EXPECT THE COMPANY WILL BE ABLE TO

10:01AM 9     MAKE IN TERMS OF REVENUE, AND WE'VE HEARD SEVERAL INVESTORS

10:01AM 10    TALK ABOUT HOW BEING CASH FLOW POSITIVE OR CASH FLOW NEUTRAL IN

10:01AM 11    THE EARLIER YEARS WAS IMPORTANT TO THEM BECAUSE IT MEANT THAT

10:02AM 12    THIS COMPANY WASN'T JUST A STARTUP THAT WAS STILL STRUGGLING

10:02AM 13    FOR CASH.  IT WASN'T A COMPANY THAT NEEDED CAPITAL IN ORDER TO

10:02AM 14    SURVIVE.

10:02AM 15         THIS WAS A COMPANY THAT WAS PROJECTING REVENUES AND INCOME

10:02AM 16    OF ALMOST A BILLION DOLLARS IN A YEAR FROM THEN AND PROJECTING

10:02AM 17    REVENUES OF -- I'M WORRIED I'M GOING TO MESS UP THE NUMBER --

10:02AM 18    BUT SEVERAL HUNDRED MILLION DOLLARS BY THE END OF 2014 WHEN IT

10:02AM 19    WAS PRESENTED TO RDV IN OCTOBER OF 2014, AND THEY THOUGHT THAT

10:02AM 20    THAT MEANT THAT THE COMPANY COULD HIT THOSE PROJECTIONS.

10:02AM 21         SO --

10:02AM 22              THE COURT:  WERE FINANCIAL MODELS EVER USED?  IS

10:02AM 23    THERE EVIDENCE THAT FINANCIAL MODELS WERE USED TO -- IN

10:02AM 24    CONVERSATIONS WITH INVESTORS?  WAS IT FINANCIAL MODELS THAT

10:02AM 25    WERE SENT?  WAS IT PROJECTIONS?  WAS IT SOMETHING ELSE?

7732

10:02AM  1          MS. VOLKAR:  I WOULD SAY FOR THE LARGE PART IT WAS

10:02AM  2     PROJECTIONS, AND THE EXHIBIT THAT I HAVE IN MIND WAS

10:02AM  3     PROJECTIONS, THE ONE THAT TALKS ABOUT THE PROJECTED REVENUE FOR

10:02AM  4     2014, 2015.

10:02AM  5          MY COLLEAGUE DID SAY BRIAN GROSSMAN DID TALK ABOUT A

10:03AM  6     FINANCIAL MODEL, AND HE ACTUALLY SPECIFICALLY TALKED ABOUT

10:03AM  7     HAVING A SPREADSHEET WORKING WITH MR. BALWANI, TALKING ABOUT

10:03AM  8     VARIOUS ASSUMPTIONS, AND PFM BUILT THEIR OWN MODEL BASED ON

10:03AM  9     INFORMATION THAT THEY GOT FROM MR. BALWANI, BUT MR. GROSSMAN

10:03AM  10    HAS ALREADY TESTIFIED TO THAT.

10:03AM  11         SO I GUESS THAT GOES BACK TO, WOULD THIS INFORMATION BE

10:03AM  12    CORROBORATED OR CONSISTENT WITH THAT?

10:03AM  13         I DON'T THINK THAT THIS TESTIMONY PER SE IS INCONSISTENT.

10:03AM  14         BUT I DO GO BACK TO THE INHERENT UNTRUSTWORTHINESS NOT

10:03AM  15    NECESSARILY BECAUSE OF LACK OF CORROBORATION, BUT POINTING THE

10:03AM  16    FINGER AND DEFLECTING THE BLAME, AND IT'S NOT NECESSARILY

10:03AM  17    MR. BALWANI SAYING IT WAS ALL ME WHO BUILT THIS.

10:03AM  18         AND THAT IS STILL CONSISTENT -- YOU KNOW, MR. GROSSMAN

10:03AM  19    ALSO SAID THAT THEY WORKED WITH HIM IN TERMS OF PUTTING THE

10:03AM  20    MODELS TOGETHER.

10:03AM  21         BUT I WANT TO NOT LOSE SIGHT OF THE FACT THAT THE

10:04AM  22    PROJECTIONS IS WHAT MOST INVESTORS TALKED ABOUT AND WHAT MOST

10:04AM  23    INVESTORS WERE RELYING UPON, AND HE SPECIFICALLY DISCLAIMS

10:04AM  24    HAVING ANY ROLE IN LABELLING THE PROJECTIONS.

10:04AM  25         THE COURT:  MR. GROSSMAN SOUGHT FINANCIAL

7733

| | | |
|---|---|---|
| 10:04AM | 1 | INFORMATION FROM MR. BALWANI AND RECEIVED THAT, AND THEN DID |
| 10:04AM | 2 | HIS FIRM -- HIS FIRM DID THEIR OWN FINANCIAL ANALYSIS BEFORE |
| 10:04AM | 3 | THEY MADE THEIR INVESTMENT DECISION. |
| 10:04AM | 4 | MS. VOLKAR:  THAT'S MY UNDERSTANDING OF HIS |
| 10:04AM | 5 | TESTIMONY, YOUR HONOR, YES. |
| 10:04AM | 6 | THE COURT:  OKAY.  THANK YOU. |
| 10:04AM | 7 | MR. FLEURMONT? |
| 10:04AM | 8 | MR. FLEURMONT:  SURE, YOUR HONOR. |
| 10:04AM | 9 | ON THE MODEL, HE'S ASKED ABOUT THE FINANCIAL MODEL, HE |
| 10:04AM | 10 | SAYS HE OWNS IT AT EXHIBIT B AT PAGE 5.  SO THIS IS DOCKET |
| 10:04AM | 11 | 1163-3.  HE ASKS IF ANYONE ELSE -- EXCUSE ME.  HE ASKS IF |
| 10:04AM | 12 | ANYONE ELSE FROM THERANOS IS WORKING ON THE MODEL AND HE SAYS |
| 10:04AM | 13 | HE DOESN'T THINK SO. |
| 10:04AM | 14 | HE ASKS IF ANYONE ELSE HAD DIRECT ACCESS TO THE MODEL, HE |
| 10:04AM | 15 | DIDN'T THINK ANYONE MODIFIED IT. |
| 10:04AM | 16 | SO I THINK IT'S CLEAR FROM THE PORTIONS THAT WE POINTED |
| 10:04AM | 17 | OUT THAT HE WAS IN CONTROL AND HE PERSONALLY HAD ACCESS TO THE |
| 10:05AM | 18 | MODEL. |
| 10:05AM | 19 | AS I SAID BEFORE, WE INCLUDED THE FULL QUESTION AND |
| 10:05AM | 20 | ANSWER. |
| 10:05AM | 21 | IF THE COURT HAS ISSUE WITH SOME OF THE FACTS, WE CAN |
| 10:05AM | 22 | REVISIT SOME OF THE KIND OF BACKGROUND FACTS OR THE CONTEXT |
| 10:05AM | 23 | AROUND IT. |
| 10:05AM | 24 | BUT WE JUST WANT TO MAKE SURE THAT THE COURT HAD THE FULL |
| 10:05AM | 25 | CONTEXT OF THE QUESTION AND THE ANSWER. |

7734

10:05AM  1          THE COURT:  OKAY.

10:05AM  2              MS. VOLKAR:  AND, YOUR HONOR, IF I MAY ON THAT

10:05AM  3    POINT?

10:05AM  4       SO WHEN MY COLLEAGUE SWITCHED TO EXHIBIT B IN THE LAST

10:05AM  5    PAGE, THAT WAS THE ONE THAT I WAS REFERRING TO BEFORE THAT

10:05AM  6    DOESN'T HAVE ANY CORROBORATION.  SO I JUST WANT TO BE CLEAR

10:05AM  7    ABOUT THAT.  WE WERE TALKING ABOUT EXHIBIT A AND THOSE

10:05AM  8    PORTIONS.

10:05AM  9          THE COURT:  RIGHT.

10:05AM  10             MS. VOLKAR:  AND THE MODEL VERSUS PROJECTIONS.

10:05AM  11      WHEN WE SWITCH TO PAGE 6 OF EXHIBIT B, THAT'S THE PORTION

10:05AM  12   THAT I WAS SAYING DOES NOT HAVE ANY CORROBORATION.

10:05AM  13      IN FACT, IN THE TEXT MESSAGES, THERE'S MR. BALWANI SHARING

10:05AM  14   THE MODEL WITH MS. HOLMES.

10:05AM  15      SO I JUST WANTED TO MAKE SURE THAT I WAS CLEAR ON THE

10:05AM  16   RECORD.

10:05AM  17         THE COURT:  OKAY.

10:05AM  18      MR. FLEURMONT?

10:05AM  19             MR. FLEURMONT:  JUST ON THAT POINT, WE DIDN'T

10:05AM  20   INCLUDE THIS PORTION OF THE DEPOSITION BECAUSE WE DIDN'T THINK

10:05AM  21   IT FELL INTO THE REQUIREMENTS OF 804(B)(3).

10:06AM  22      BUT THERE'S -- HE'S ASKED ABOUT THAT QUESTION, AND THERE'S

10:06AM  23   A BACK AND FORTH, AND WHAT HE SAYS IS THAT I THOUGHT THAT I

10:06AM  24   WOULD NOT BE AVAILABLE FOR THIS INTERVIEW, AND IT TURNS OUT

10:06AM  25   THAT I WAS AVAILABLE FOR THE INTERVIEW.

10:06AM  1    SO IT'S NOT INCLUDED BECAUSE WE DON'T THINK IT FALLS UNDER

10:06AM  2    WHAT THEY MEANT HERE.

10:06AM  3          MS. VOLKAR:  YOUR HONOR, JUST ONE POINT I FORGOT TO

10:06AM  4    MAKE EARLIER AND I WANT TO MAKE SURE IT'S ON THE RECORD.

10:06AM  5    I DO THINK THE UNAVAILABILITY IS A THRESHOLD.  I'M NOT

10:06AM  6    SAYING IT'S A THRESHOLD THAT THE OTHER SIDE CAN'T OVERCOME,

10:06AM  7    THEY CERTAINLY CAN.

10:06AM  8    BUT IF YOU LOOK AT THE CASE LAW, IT IS CLEAR THAT THERE

10:06AM  9    SHOULD BE A SUBPOENA OR THE DEFENSE SHOULD CALL THE PERSON TO

10:06AM  10   TESTIFY, AND THE COURT SHOULD NOT SPECULATE WHETHER OR NOT THE

10:06AM  11   PERSON WOULD INVOKE THE FIFTH AMENDMENT.

10:06AM  12   AND I WOULD AGAIN GO BACK TO MY FIRST EXAMPLE.  I THINK

10:06AM  13   THERE ARE SOME QUESTIONS WHERE IT'S AT LEAST FEASIBLE THAT

10:06AM  14   MR. BALWANI WOULD NOT PLEAD THE FIFTH.  FOR EXAMPLE, IF THE

10:06AM  15   QUESTION WAS, IS THE LAB DIRECTOR THE PERSON RESPONSIBLE FOR

10:06AM  16   ALL PATIENT TESTING IN THE CLIA LAB?  HE MAY VERY WELL ANSWER

10:06AM  17   YES.

10:06AM  18   AND EARLIER WE HEARD, WELL, HE SAID HE'S THE BUSINESS

10:06AM  19   PERSON ON TOP OF THAT.

10:07AM  20   WELL, MS. HOLMES WAS THE BUSINESS PERSON WHO HE DIRECTLY

10:07AM  21   REPORTED TO, SO, OF COURSE, THERE WAS A CHAIN OF COMMAND, AND I

10:07AM  22   DO THINK THOSE DISTINCTIONS MATTER SO I WANTED TO RAISE THAT

10:07AM  23   UNAVAILABILITY IS A THRESHOLD.

10:07AM  24          THE COURT:  I THINK THAT'S RIGHT, AND I THINK YOU

10:07AM  25   AGREED WITH THAT AS WELL.

10:07AM 1        AND I'M CURIOUS, THE REMEDY FOR THAT, SHOULD WE -- AS I

10:07AM 2    SAID EARLIER, SHOULD WE ASK YOU TO PRESENT THE QUESTIONS

10:07AM 3    THAT -- AT LEAST SOME THRESHOLD QUESTIONS SUCH THAT -- LET ME

10:07AM 4    JUST THROW A HYPOTHETICAL OUT.

10:07AM 5        LET'S ASSUME THAT CODEFENDANT'S COUNSEL, FOR SOME REASON,

10:07AM 6    HAS AN INTEREST IN THIS CASE AND IS ATTENDING THIS CASE.  IS IT

10:07AM 7    POSSIBLE THAT WE COULD REACH OUT TO THE AUDIENCE AND BRING HIS

10:07AM 8    COUNSEL FORWARD?  IS IT APPROPRIATE TO DO THAT AND SAY, TELL US

10:07AM 9    WHAT YOUR CLIENT WOULD SAY?  TELL US WHAT YOUR CLIENT WOULD DO.

10:07AM 10        SOMEONE MIGHT BE BENDING DOWN AND TYING THEIR SHOES RIGHT

10:07AM 11   NOW IN THE AUDIENCE.

10:08AM 12        MR. FLEURMONT:  YOUR HONOR, I WANT TO RESPOND TO

10:08AM 13   YOUR QUESTION DIRECTLY.  YOU DON'T NEED TO DO THAT IN THIS CASE

10:08AM 14   BECAUSE OF THE INFORMATION THAT WE HAVE HERE.

10:08AM 15        TO MY COLLEAGUE'S SUGGESTION THAT THERE WERE CERTAIN

10:08AM 16   QUESTIONS THAT HE MIGHT ANSWER TO, I WOULD JUST POINT THE COURT

10:08AM 17   TO HIS LATEST DEPOSITION AT EXHIBIT D, AND ON PAGE 4 THERE'S A

10:08AM 18   QUESTION AND ANSWER.

10:08AM 19        MR. BALWANI, YOU JOINED THERANOS IN 2009?

10:08AM 20        ANSWER TO THAT QUESTION:  I INSTRUCT MR. BALWANI NOT TO

10:08AM 21   ANSWER THAT QUESTION BASED UPON FIFTH AMENDMENT RIGHTS.

10:08AM 22        THE QUESTION IS, DID YOU EVEN JOIN AT A CERTAIN TIME

10:08AM 23   PERIOD, AND THAT QUESTION WASN'T EVEN ANSWERED.  AND BASED ON

10:08AM 24   THAT AND BASED ON THE COURT'S FAMILIARITY WITH THE CASE, AND

10:08AM 25   BASED ON THE DECLARATION THAT WE HAVE FROM MR. WADE, THAT'S ALL

7737

| 10:08AM | 1 | THE COURT NEEDS. |

10:08AM    2        WE'RE NOT OPPOSED TO GETTING A DECLARATION FROM

10:08AM    3    MR. COOPERSMITH.  WE JUST DON'T FEEL LIKE IT'S NECESSARY IN

10:08AM    4    THIS CASE, BUT WE'RE NOT OPPOSED TO IT.

10:08AM    5            THE COURT:  OKAY.

10:08AM    6        MS. VOLKAR, SHOULD WE HAIL MR. COOPERSMITH FORWARD AND ASK

10:08AM    7    HIM SOME QUESTIONS?  IS THIS THE RIGHT TIME TO DO THAT, OR

10:08AM    8    SHOULD THAT BE DONE AT A DIFFERENT TIME?

10:09AM    9            MS. VOLKAR:  YOUR HONOR, JUST LOOKING AT THE TIME,

10:09AM   10    THE GOVERNMENT'S POSITION WOULD BE THAT WE SHOULD MOVE FORWARD

10:09AM   11    WITH THE EVIDENCE.

10:09AM   12        WE WANT TO BE RESPECTFUL OF THE JURY'S TIME, AND WE'RE NOT

10:09AM   13    SURE IF THE JURY IS HERE, BUT WE KNOW IT'S A POSSIBILITY, AND I

10:09AM   14    THINK THERE IS STILL OTHER ISSUES TO BE ARGUED FROM MS. HOLMES.

10:09AM   15        THAT BEING SAID, I DO THINK IT'S APPROPRIATE.  MY

10:09AM   16    UNDERSTANDING IS THAT MR. COOPERSMITH OR REPRESENTATIVES FROM

10:09AM   17    MR. BALWANI HAVE ATTENDED LARGE PORTIONS, IF NOT ALL, OF THIS

10:09AM   18    TRIAL, AND I DO THINK IT WOULD NOT NECESSARILY BE A BIG BURDEN,

10:09AM   19    IF THE DEFENSE IS ACTUALLY SERIOUS ABOUT CALLING MR. BALWANI,

10:09AM   20    TO DO SO AND HAVE HIS COUNSEL REPRESENT TO THE COURT WHAT HAS

10:09AM   21    BEEN REPRESENTED.

10:09AM   22        AND AGAIN, I GO BACK TO NOT ANY DISBELIEF OF MR. WADE'S

10:09AM   23    DECLARATION.

10:09AM   24            THE COURT:  OH, RIGHT.

10:09AM   25            MS. VOLKAR:  THAT'S NOT WHERE THIS IS COMING FROM.

7738

10:09AM 1       I'M READING THE CASE LAW, AND I HAVEN'T FOUND A CASE WHERE

10:09AM 2   THAT HASN'T BEEN THE PROCEEDING, WHERE IT HASN'T BEEN THE

10:09AM 3   DEFENSE CALLING A WITNESS AND SUBPOENAING THE WITNESS, AND WE

10:09AM 4   HAVE NEITHER OF THOSE IN THIS CASE.

10:09AM 5           THE COURT:  IT MAKES FOR A FULSOME RECORD WHERE THAT

10:10AM 6   HAS ACTUALLY OCCURRED AND THAT HAS HAPPENED.

10:10AM 7       AND YOUR SUGGESTION IS THAT, WELL, WE'RE GETTING CLOSE TO

10:10AM 8   SUMMONING THE JURY IN.  PERHAPS YOU'VE HEARD MR. COOPERSMITH

10:10AM 9   ANSWER A QUESTION BEFORE, AND IT MIGHT BE -- IT MIGHT TAKE SOME

10:10AM 10  TIME, BUT --

10:10AM 11          MS. VOLKAR:  I'M HONESTLY NOT SURE ABOUT THAT,

10:10AM 12  YOUR HONOR.

10:10AM 13      I AM JUST THOUGHTFUL OF THE TIME.

10:10AM 14      AND ALSO IF IT WERE, FOR EXAMPLE, THE NORMAL COURSE OF THE

10:10AM 15  TRIAL, JUST ME PLAYING IT OUT IN A HYPOTHETICAL, MS. HOLMES CAN

10:10AM 16  WRAP UP HER TESTIMONY AND THE DEFENSE COULD STAND UP AND SAY,

10:10AM 17  THE DEFENSE WOULD LIKE TO CALL MR. BALWANI.

10:10AM 18      NOW, I ALSO UNDERSTAND IF THEY WANT TO DO IT OUTSIDE OF

10:10AM 19  THE PRESENCE OF THE JURY, THAT SEEMS TO BE SUPPORTED BY THE

10:10AM 20  CASE LAW AS WELL.

10:10AM 21      BUT MY POINT IS THAT THERE IS TIME TO MAKE THE ACTUAL

10:10AM 22  RECORD AT LEAST THAT I'VE SEEN THAT IS TYPICALLY BEFORE THE

10:10AM 23  NINTH CIRCUIT.

10:10AM 24          THE COURT:  OKAY.  THANK YOU.

10:10AM 25      AND WE STILL -- IT'S ABOUT TEN AFTER 10:00 NOW.  WE

7739

| | | |
|---|---|---|
| 10:10AM | 1 | PROMISED OUR JURY WE WOULD START AT 10:30.  I DON'T KNOW IF -- |
| 10:10AM | 2 | ARE THEY HERE? |
| 10:11AM | 3 | (DISCUSSION OFF THE RECORD.) |
| 10:11AM | 4 | THE COURT:  RIGHT.  I'M INFORMED THAT OUR JURY IS |
| 10:11AM | 5 | HERE NOW, SO THEY'RE READY TO GO.  REGRETTABLY OUR EQUIPMENT |
| 10:11AM | 6 | ISN'T. |
| 10:11AM | 7 | SO I'D LIKE TO FINISH OUR DISCUSSION -- I DON'T WANT TO |
| 10:11AM | 8 | PRECLUDE ANYONE FROM PRESENTING ANYTHING THEY FEEL IS |
| 10:11AM | 9 | NECESSARY. |
| 10:11AM | 10 | MR. FLEURMONT:  SURE. |
| 10:11AM | 11 | THE COURT:  BECAUSE I WANT TO TALK A LITTLE BIT |
| 10:11AM | 12 | ABOUT THE OTHER MOTION. |
| 10:11AM | 13 | I DON'T THINK, MS. VOLKAR, YOUR TEAM HAS HAD OCCASION TO |
| 10:11AM | 14 | FILE ANY OBJECTION TO THAT YET. |
| 10:11AM | 15 | MS. VOLKAR:  WE DID NOT HAVE TIME, YOUR HONOR. |
| 10:11AM | 16 | MY COLLEAGUE, MR. BOSTIC, WHO IS RESPONSIBLE FOR THE |
| 10:11AM | 17 | RELEVANT WITNESS, WILL BE ADDRESSING THAT MOTION, AND WE'RE |
| 10:11AM | 18 | HAPPY TO DO THAT NOW, OR IF THERE IS ANY FURTHER DISCUSSION ON |
| 10:11AM | 19 | THIS THAT WOULD BE HELPFUL. |
| 10:11AM | 20 | THE COURT:  ALL RIGHT.  WELL, LET ME GIVE -- LET ME |
| 10:11AM | 21 | TURN TO THE DEFENSE. |
| 10:11AM | 22 | MR. FLEURMONT:  JUST A COUPLE OF POINTS.  I WANT TO |
| 10:11AM | 23 | BE RESPECTFUL OF THE JURY'S TIME.  I'LL BE QUICK. |
| 10:11AM | 24 | FIRST, ON CALLING MR. BALWANI TO HAVE HIM INVOKE THE FIFTH |
| 10:11AM | 25 | AMENDMENT, THE CASE LAW MAKES CLEAR AND IT IS CLEARLY |

7740

10:11AM 1    ESTABLISHED THAT THE DEFENSE IS NOT PERMITTED TO CALL A WITNESS

10:12AM 2    JUST FOR THE PURPOSE OF HAVING THEM INVOKE.

10:12AM 3              THE COURT:  RIGHT, RIGHT.

10:12AM 4              MR. FLEURMONT:  SO WE THINK THAT'S NOT THE

10:12AM 5    APPROPRIATE COURSE OF ACTION.

10:12AM 6        IF I COULD JUST -- IN TERMS OF THE STATEMENT OR THE

10:12AM 7    PORTIONS THAT WE SEEK TO ADMIT DURING DEPOSITION, I CAN JUST

10:12AM 8    POINT THE COURT.

10:12AM 9        SO IN EXHIBIT A WE HAVE THE STATEMENT RELATED TO A

10:12AM 10   LEADERSHIP ROLE OF THE CONTRACT NEGOTIATIONS WITH WALGREENS AND

10:12AM 11   SAFEWAY, PARTICULAR AT PAGE 4.

10:12AM 12       IN EXHIBIT A, WE HAVE STATEMENTS RELATED TO THE FINANCIAL

10:12AM 13   MODEL AT PAGES 6 TO 7.

10:12AM 14       EXHIBIT A, WE HAVE STATEMENTS RELATED TO THE CLIA LAB AND

10:12AM 15   HOW THE LAB DIRECTORS REPORTED TO HIM, MR. BALWANI, PAGES 9

10:12AM 16   THROUGH 10.

10:12AM 17       IN EXHIBIT A, WE HAVE STATEMENTS ABOUT THE NULL PROTOCOL

10:12AM 18   AT PAGES 10.

10:12AM 19       IN EXHIBIT B WE HAVE STATEMENTS ABOUT THE FINANCIAL MODEL

10:12AM 20   THAT NO ONE ELSE EDITED, PAGES 3 TO 6.

10:13AM 21       AND EXHIBIT C -- THIS IS THE LAST ONE -- THERE ARE

10:13AM 22   STATEMENTS ABOUT THE CLIA LAB AND THAT HE TOOK AN ACTIVE ROLE

10:13AM 23   IN THE CLIA LAB AT PAGES 3 TO 4.

10:13AM 24       AND I PROVIDE THOSE EXCERPTS SO THE COURT CAN TAKE A LOOK

10:13AM 25   AND SEE ABOUT THE STATEMENTS HE MAKES ABOUT A LEADERSHIP ROLE

7741

10:13AM  1    AND TAKE RESPONSIBILITY ABOUT CERTAIN OF THOSE TOPICS.

10:13AM  2         AND THOSE ARE THE STATEMENTS, THOSE ARE THE STATEMENTS

10:13AM  3    THAT WE'RE FOCUSSED ON.  THE STATEMENTS AROUND PROVIDE CONTEXT,

10:13AM  4    BUT WE'RE FOCUSSED ON THOSE STATEMENTS.

10:13AM  5         WE SUBMIT THAT WE SHOULD NOT REDACT THE CONTEXT AROUND

10:13AM  6    THEM BECAUSE THEY DON'T HAVE MUCH EVIDENTIARY VALUE, AND THE

10:13AM  7    JURY NEEDS TO UNDERSTAND WHAT THE STATEMENTS MEAN IN CONTEXT.

10:13AM  8         BUT THOSE ARE THE STATEMENTS.

10:13AM  9         THE COURT:  OKAY.  GETTING BACK TO THE THRESHOLD

10:13AM  10   ISSUE, THE UNAVAILABILITY, THAT'S YOUR BURDEN, RIGHT?

10:13AM  11        MR. FLEURMONT:  YES, YOUR HONOR, I BELIEVE THAT'S

10:13AM  12   CORRECT.

10:13AM  13        THE COURT:  IT'S YOUR BURDEN TO SHOW THAT THE

10:13AM  14   WITNESS WAS UNAVAILABLE?

10:13AM  15        MR. FLEURMONT:  YES.

10:13AM  16        THE COURT:  AND TO THAT EXTENT, AS WE WERE TALKING

10:13AM  17   ABOUT, WHAT DO YOU DO TO FULFILL THAT BURDEN?  DO YOU CALL THE

10:13AM  18   WITNESS AND HAVE HE OR SHE, HE IN THIS CASE, TESTIFY?

10:14AM  19        I DON'T THINK THAT'S NECESSARY AS YOU POINT OUT.  I THINK

10:14AM  20   MS. VOLKAR RECOGNIZES THAT.

10:14AM  21        BUT I THINK WHAT MS. VOLKAR SUGGESTS AND WHAT I'M PROBING

10:14AM  22   IS MAYBE WE NEED MORE THAN A DECLARATION SAYING, "I TALKED TO

10:14AM  23   THE LAWYER, THE LAWYER TOLD ME HE'LL TAKE THE FIFTH."

10:14AM  24        YOU'VE PROBABLY BEEN IN CASES, TOO, WHERE THE LAWYER IS

10:14AM  25   CALLED FORWARD AND YOU SAY, LOOK, WE WANT TO ASK YOUR CLIENT

7742

| | | |
|---|---|---|
| 10:14AM | 1 | THESE QUESTIONS, WE WANT TO ASK THESE QUESTIONS, MAYBE NOT THE |
| 10:14AM | 2 | SPECIFIC QUESTIONS, BUT WE'D LIKE TO ASK YOUR CLIENT QUESTIONS |
| 10:14AM | 3 | ABOUT A CLIA LAB, ABOUT HIS PREPARATION OF FINANCIAL MODELS. |
| 10:14AM | 4 | WE'D LIKE TO ASK HIM A QUESTION ABOUT WHAT HE WAS RESPONSIBLE |
| 10:14AM | 5 | FOR.  WHEN CAN HE BE AVAILABLE? |
| 10:14AM | 6 | MR. FLEURMONT:  YOUR HONOR, UNDER THE NINTH CIRCUIT, |
| 10:14AM | 7 | WE DON'T BELIEVE THAT'S NECESSARY.  BUT WE UNDERSTAND IF THAT'S |
| 10:14AM | 8 | THE DIRECTION THAT THE COURT WANTS US TO TAKE, WE CAN MOVE |
| 10:14AM | 9 | APPROPRIATELY. |
| 10:14AM | 10 | THE COURT:  OKAY.  ALL RIGHT. |
| 10:14AM | 11 | MS. VOLKAR, ANYTHING FURTHER? |
| 10:14AM | 12 | MS. VOLKAR:  JUST THE CATEGORY OF STATEMENTS THAT MY |
| 10:14AM | 13 | COLLEAGUE MENTIONED, WE THINK WE ADEQUATELY RESPOND TO THEM ON |
| 10:15AM | 14 | PAGES 3 TO 4 OF OUR BRIEF. |
| 10:15AM | 15 | AND I JUST WANT TO REITERATE ONE OF THE POINTS DRIVING THE |
| 10:15AM | 16 | NINTH CIRCUIT'S DECISION IN S.E.C. VERSUS JASPER, WHICH IS |
| 10:15AM | 17 | GIVEN THE CATEGORY OF STATEMENTS AND THE PERSON'S INVOLVEMENT |
| 10:15AM | 18 | IN THE CASE, IT'S UNFAIR TO PRESENT THIS TYPE OF TESTIMONY |
| 10:15AM | 19 | WITHOUT GIVING THE GOVERNMENT THE OPPORTUNITY TO CROSS-EXAMINE. |
| 10:15AM | 20 | SO I THINK ALL OF THAT IS COVERED IN MY BRIEF, BUT I |
| 10:15AM | 21 | WANTED TO END ON THAT POINT. |
| 10:15AM | 22 | THE COURT:  OKAY.  GREAT. |
| 10:15AM | 23 | MR. FLEURMONT:  YOUR HONOR, I'M SORRY, JUST ON THAT |
| 10:15AM | 24 | JASPER CASE. |
| 10:15AM | 25 | IN THAT CASE, THE FACTS OF THAT CASE ARE VERY IMPORTANT TO |

10:15AM  1    THE POINT THAT MS. VOLKAR JUST MADE.

10:15AM  2        THE PERSON WAS AVAILABLE IN A PRIOR PROCEEDING AND A

10:15AM  3    DEPOSITION -- THE DECLARANT WAS AVAILABLE IN A PRIOR

10:15AM  4    PROCEEDING, AND THEN A DEPOSITION OCCURRED IN WHICH THE PERSON

10:15AM  5    TOOK THE FIFTH, AND IT WAS THAT.

10:15AM  6        SO THE PROPONENT WANTED THE INFORMATION FROM THE FIRST

10:15AM  7    PROCEEDING, BUT OBVIOUSLY THE OPPONENT WAS NOT ABLE TO

10:15AM  8    CROSS-EXAMINE THE PERSON.

10:15AM  9        SO THAT IS A LITTLE DIFFERENT THAN WHAT WE HAVE HERE.

10:15AM  10       THE PORTIONS THAT WE SEEK TO ADMIT, WE'RE DOING AN

10:15AM  11   INVESTIGATION AND A DEPOSITION OF THE S.E.C. IN WHICH THEY WERE

10:16AM  12   THE PEOPLE WHO ASKED THE QUESTIONS AND THEY WERE LEADING

10:16AM  13   QUESTIONS AS THE COURT KNOWS.

10:16AM  14       SO I DON'T WANT TO PROLONG THIS, BUT I JUST WANTED TO

10:16AM  15   RESPOND.

10:16AM  16           THE COURT:  NO.  THAT'S FINE.

10:16AM  17       MS. VOLKAR?

10:16AM  18           MS. VOLKAR:  AS WE SAID, I DON'T THINK THIS IS IN

10:16AM  19   DISPUTE, BUT NO ONE ON OUR PROSECUTION TEAM WAS THERE, AND SO I

10:16AM  20   THINK THAT IS WHERE IT COMES TO A POINT WHERE IT REALLY DOES

10:16AM  21   MATTER THAT THE DOJ WAS NOT INVOLVED IN THE QUESTIONS THAT WERE

10:16AM  22   ASKED, SO THE DOJ, AND SPECIFICALLY THE U.S. ATTORNEY'S OFFICE,

10:16AM  23   DID NOT GET THE OPPORTUNITY TO ASK QUESTIONS OR FOLLOW-UP

10:16AM  24   QUESTIONS, AND AS I SAID IN THE BRIEF, PARTICULARLY ABOUT THE

10:16AM  25   PATIENT SIDE FOR EXAMPLE.

7744

| | | |
|---|---|---|
| 10:16AM | 1 | THE COURT:  OKAY.  THANK YOU. |
| 10:16AM | 2 | ARE YOU HANDLING THE NEXT MOTION AS WELL? |
| 10:16AM | 3 | MR. FLEURMONT:  I AM, YOUR HONOR. |
| 10:16AM | 4 | THE COURT:  OKAY.  AND MR. BOSTIC -- THANK YOU, |
| 10:16AM | 5 | MS. VOLKAR. |
| 10:16AM | 6 | MS. VOLKAR:  THANK YOU. |
| 10:16AM | 7 | THE COURT:  I THOUGHT, MR. FLEURMONT, YOU WOULD HAVE |
| 10:16AM | 8 | AN OPPORTUNITY IN THIS BREAK TO CHAT WITH YOUR TEAM ABOUT THE |
| 10:16AM | 9 | TIMING QUESTION, BUT YOU'LL HAVE AN OPPORTUNITY TO DO THAT I |
| 10:16AM | 10 | THINK. |
| 10:16AM | 11 | MR. FLEURMONT:  YES, YOUR HONOR. |
| 10:16AM | 12 | THE COURT:  SO WHAT ABOUT THIS?  THIS IS A RENEWED |
| 10:17AM | 13 | MOTION TO ADMIT SOME DOCUMENTS. |
| 10:17AM | 14 | MR. FLEURMONT:  THAT'S CORRECT, RENEWED MOTION TO |
| 10:17AM | 15 | ADMIT EXHIBIT TX 14259, A MAY 2015 EMAIL ABOUT THE TEST RESULTS |
| 10:17AM | 16 | OF E.T. PATIENT IN COUNT TEN. |
| 10:17AM | 17 | AS THE COURT RECALLS, WE ATTEMPTED TO INTRODUCE THIS |
| 10:17AM | 18 | DOCUMENT THROUGH OUR SUMMARY WITNESS.  THE GOVERNMENT OBJECTED. |
| 10:17AM | 19 | THE COURT SUSTAINED THE OBJECTION. |
| 10:17AM | 20 | AT THE TIME WE WERE IN THE PRESENCE OF THE JURY AND WE |
| 10:17AM | 21 | SAID AND WE EXPLAINED THAT WE WOULD LIKE TO DRAW THE COURT'S |
| 10:17AM | 22 | ATTENTION TO A SIMILAR EXHIBIT THAT WAS ADMITTED AND MAKE A |
| 10:17AM | 23 | COMPARISON OUTSIDE OF THE PRESENCE OF THE JURY. |
| 10:17AM | 24 | THAT'S AT TRANSCRIPT 71 -- PAGE 7160 OF THE TRIAL |
| 10:17AM | 25 | TRANSCRIPT, THAT'S 7160, NOVEMBER 19TH, '21, WHERE WE EXPLAINED |

| | | |
|---|---|---|
| 10:17AM | 1 | WE WOULD LIKE AN OPPORTUNITY TO DRAW A COMPARISON. |
| 10:17AM | 2 | SO WE WANTED TO PUT BOTH DOCUMENTS IN FRONT OF THE COURT |
| 10:17AM | 3 | AND ALLOW YOU TO REVIEW BOTH DOCUMENTS, THE SECOND ONE BEING TX |
| 10:18AM | 4 | 4415, AND TO EXPLAIN IN WRITING WHY WE THINK THAT THE COURT'S |
| 10:18AM | 5 | RULING ON TX 4415 SIMILARLY APPLIES TO TX 14259. |
| 10:18AM | 6 | I DON'T WANT TO TAKE TOO MUCH TIME BECAUSE I KNOW THE |
| 10:18AM | 7 | JURY'S TIME IS PRECIOUS.  I WOULD JUST SAY IN COMPARISON OF THE |
| 10:18AM | 8 | TWO EXHIBITS, IT'S CLEAR THAT THEY'RE FROM THE SAME TIMEFRAME. |
| 10:18AM | 9 | ONE WAS SENT WITHIN A MONTH OF THE OTHER, AND BOTH CONTAIN THE |
| 10:18AM | 10 | SAME DISTRIBUTION GROUP.  THAT'S LAB ESCALATE. |
| 10:18AM | 11 | AND THEY CONTAINING OVERLAPPING RECIPIENTS, AND THAT'S |
| 10:18AM | 12 | MR. BALWANI AND DAN FLOREY, AND FUNDAMENTALLY, BOTH EMAILS |
| 10:18AM | 13 | PROVIDE CONTEXT OR AN EXPLANATION FOR THE UNDERLYING RESULTS |
| 10:18AM | 14 | THAT THE EMAILS DISCUSS. |
| 10:18AM | 15 | IN THE CASE OF EXHIBIT 4415, THAT'S THE RESULTS OF M.E., |
| 10:18AM | 16 | AND IN THE CASE OF TX 14259, RESULTS OF E.T. |
| 10:18AM | 17 | THE GOVERNMENT, WHEN WE MOVED -- WE OBJECTED WHEN THE |
| 10:19AM | 18 | GOVERNMENT ATTEMPTED TO ADMIT TX 4415, THAT WAS THROUGH |
| 10:19AM | 19 | DR. BURNES, WHO HAD NOT SEEN THE DOCUMENT AND NEVER READ IT AND |
| 10:19AM | 20 | DIDN'T KNOW ANYTHING ABOUT IT. |
| 10:19AM | 21 | THE GOVERNMENT SAID THAT PRIOR FOUNDATION HAD BEEN LAID |
| 10:19AM | 22 | THROUGH DR. DAS, DR. ROSENDORFF, MS. CHEUNG, AND I BELIEVE |
| 10:19AM | 23 | MR. EDLIN THAT WOULD ALLOW THE DOCUMENT TO COME IN. |
| 10:19AM | 24 | AND THE GOVERNMENT HEARD THE EXPERT AND WE REVIEWED THE |
| 10:19AM | 25 | TRANSCRIPTS.  IN THAT TRANSCRIPT THERE ARE CERTAIN TESTIMONY |

7746

10:19AM 1      ABOUT CERTAIN EMAIL GROUPS AND THERE'S TESTIMONY ABOUT CERTAIN

10:19AM 2      EMAILS.

10:19AM 3              THE COURT:  THIS IS 803(6).

10:19AM 4              MR. FLEURMONT:  803(6) WAS THE PROVISION THAT THE

10:19AM 5      COURT ALLOWED.

10:19AM 6              THE COURT:  RIGHT.  I THINK THE COURT FOUND THERE

10:19AM 7      WAS FOUNDATION FOR A BUSINESS RECORD, IF YOU WILL.

10:19AM 8              MR. FLEURMONT:  CORRECT, YOUR HONOR, THROUGH THE

10:19AM 9      PRIOR TESTIMONY OF THE PEOPLE THAT I JUST MENTIONED, EVEN

10:19AM 10     THOUGH THE WITNESS ON THE STAND HAD NEVER SEEN THE DOCUMENT

10:19AM 11     BEFORE.

10:19AM 12             THE COURT:  RIGHT.

10:19AM 13             MR. FLEURMONT:  SO WE SUBMIT THE SITUATIONS ARE

10:19AM 14     ANALOGOUS.  WE HAVE A DOCUMENT WITH -- I'M NOT GOING TO REPEAT.

10:19AM 15     I DON'T WANT TO WASTE THE COURT'S TIME.

10:20AM 16             THE COURT:  YOU'RE NOT WASTING MY TIME.  THIS IS

10:20AM 17     IMPORTANT.

10:20AM 18             MR. FLEURMONT:  OKAY.  SO THE SITUATIONS ARE

10:20AM 19     ANALOGOUS.  IT'S -- THE DOCUMENT IS CLOSE IN TIME ABOUT

10:20AM 20     RESULTS OF SOMEONE WHO HAS AN ACCOUNT IN THIS CASE WITH THE

10:20AM 21     SAME LAB GROUPS DESCRIBING SOME OF THE SAME THINGS, WHICH IS

10:20AM 22     KIND OF AN EXPLANATION OF WHAT IS GOING ON.

10:20AM 23       WE THINK THAT IT'S PARTICULARLY IMPORTANT IN THIS EXHIBIT.

10:20AM 24     AS THE COURT KNOWS, THIS IS A VERY IMPORTANT EXHIBIT BECAUSE

10:20AM 25     THE PATIENT COUNT E.T. DID NOT HAVE A DOCTOR COME IN TO EXPLAIN

10:20AM 1    HER TEST RESULTS, AND THIS DOCUMENT PROVIDES SOME CONTEXT AND

10:20AM 2    EXPLANATION FOR THOSE RESULTS THAT WE DO NOT HAVE IN THIS CASE

10:20AM 3    BECAUSE WE WERE NOT PROVIDED AN OPPORTUNITY TO CROSS-EXAMINE

10:20AM 4    THE DOCTORS PRESUMABLY, BECAUSE AS THE EMAIL SHOWS, THE DOCTOR

10:20AM 5    AGREED WITH THERANOS OR UNDERSTOOD THERANOS'S PROTOCOL TO BE

10:20AM 6    MORE PRECISE.

10:20AM 7        SO WE'RE JUST -- WE JUST WANTED TO PUT THIS INFORMATION IN

10:20AM 8    FRONT OF THE COURT AS WE SAID WE WOULD WHEN WE FIRST TRIED TO

10:20AM 9    ADMIT THE EXHIBIT AND GIVE THE COURT AN OPPORTUNITY TO REVIEW

10:20AM 10   BOTH EXHIBITS AND UNDERSTAND EXACTLY THE POINTS THAT WE WANTED

10:21AM 11   TO MAKE.

10:21AM 12           THE COURT:  OKAY.  THANK YOU.

10:21AM 13       SO, MR. BOSTIC, HASN'T THE FOUNDATION BEEN LAID, AND WHAT

10:21AM 14   IS THE HARM IN ALLOWING THESE TO COME IN?

10:21AM 15           MR. BOSTIC:  YES, YOUR HONOR.

10:21AM 16       I THINK THERE ARE SOME DIFFERENCES BETWEEN THESE TWO

10:21AM 17   EXHIBITS, BOTH IN THE SUBSTANCE AND THE CONTENT OF THE EXHIBITS

10:21AM 18   THEMSELVES, BUT ALSO HOW THE PARTIES INTEND TO USE THEM, AND I

10:21AM 19   THINK ILLUSTRATED BY THE COMMENTS OF DEFENSE COUNSEL JUST NOW.

10:21AM 20       SO FIRST, EXHIBIT 4415, WHICH WAS ADMITTED, WAS ADMITTED

10:21AM 21   WITH DR. BURNES ON THE STAND.  ALTHOUGH HE WAS NOT A PARTY TO

10:21AM 22   THAT EMAIL, THE EMAIL INCLUDED A REFERENCE TO AND A DESCRIPTION

10:21AM 23   OF A CONVERSATION THAT HE WAS A PART OF.

10:21AM 24       IN CONTRAST, 14259, WHICH THE DEFENSE IS SEEKING TO ADMIT

10:21AM 25   NOW, WAS DISCUSSED WITH MS. TOMPKINS ON THE STAND, BUT WAS NOT

10:21AM 1    MOVED INTO EVIDENCE, AND I DON'T BELIEVE THE DEFENSE OFFERED IT

10:21AM 2    INTO EVIDENCE WHEN SHE WAS ON THE STAND.

10:21AM 3        14259 DISCUSSES CONVERSATIONS WITH MS. TOMPKINS, BUT ALSO

10:22AM 4    WITH DR. ASIN, WHO IS NOT A TESTIFYING WITNESS IN THIS CASE.

10:22AM 5        SO THAT'S THE DIFFERENCE THERE IN TERMS OF THE CONTENT OF

10:22AM 6    THOSE EXHIBITS AND THE NEXUS BETWEEN ACTUALLY WHAT IS HAPPENING

10:22AM 7    AT TRIAL AND WHETHER THERE'S A WITNESS COMPETENT TO TESTIFY

10:22AM 8    ABOUT THE CONTENT OF THOSE EXHIBITS.

10:22AM 9        MAYBE MORE IMPORTANTLY, THOUGH, WHEN IT COMES TO THE

10:22AM 10   RELEVANCE OF THESE TWO EXHIBITS, THERE IS A DIFFERENCE, AND

10:22AM 11   THAT'S THAT 4415 INCLUDES INTERNAL DISCUSSION ABOUT THE

10:22AM 12   POSSIBLE REASONS FOR THE ERRONEOUS THERANOS LAB RESULT.

10:22AM 13       THERE'S A DISCUSSION OF POTENTIAL HEMOLYSIS OR SAMPLE

10:22AM 14   INTEGRITY ISSUES.  THERE'S A DISCUSSION ABOUT A POSSIBLE MIXUP

10:22AM 15   BETWEEN TWO SAMPLES.

10:22AM 16       SO THAT BASIS, THE BASIS FOR THAT KIND OF CONTENT AS A

10:22AM 17   BUSINESS RECORD HAD BEEN LAID PREVIOUSLY IN THE TRIAL.  THE

10:22AM 18   COURT HAS SEEN AND THE JURY HAS SEEN NUMEROUS EXAMPLES OF

10:23AM 19   INSTANCES WHERE BAD TEST RESULTS CAME IN AND THERE WAS AN

10:23AM 20   INTERNAL DISCUSSION AT THERANOS ABOUT WHAT THE POSSIBLE CAUSE

10:23AM 21   OR EXPLANATION MIGHT BE.

10:23AM 22       TO MY EYES, 14259 CONTAINS NONE OF THAT.  IT DOESN'T SERVE

10:23AM 23   THE SAME PURPOSE INTERNALLY AT THERANOS.  INSTEAD, IT SEEMS TO

10:23AM 24   RELATE SOLELY TO THE SUBSTANCE OF THESE COMMUNICATIONS BETWEEN

10:23AM 25   THERANOS CUSTOMER SERVICE PERSONNEL AND DR. ASIN AND

10:23AM 1    ERIN TOMPKINS, THE PATIENT.

10:23AM 2       THAT'S WHAT MAKES ONE USEFUL FOR THE JURY AND RELEVANT TO

10:23AM 3    THIS CASE AS A BUSINESS RECORD AND THE OTHER ONE NOT.  I THINK

10:23AM 4    THAT'S WHY THE COURT'S DECISION ON THESE TWO EXHIBITS WAS RIGHT

10:23AM 5    IN THE FIRST INSTANCE.

10:23AM 6       I THINK WHEN IT COMES TO THE DESCRIPTION IN 14259 OF

10:23AM 7    THERANOS'S CONVERSATION WITH DR. ASIN, I THINK THAT MAKES 14259

10:23AM 8    ESPECIALLY CONCERNING FROM A HEARSAY STANDPOINT.

10:24AM 9       EVEN IF IT WERE ADMISSIBLE AS A RECORD OF A CONVERSATION

10:24AM 10    WITH MS. TOMPKINS, WHO TESTIFIED, IT IS CONCERNING THAT IT ALSO

10:24AM 11    INCLUDES A LINE PURPORTING TO EXPRESS A VIEW THAT DR. ASIN

10:24AM 12    CONVEYED DURING A CONVERSATION THAT WAS, OF COURSE, HEARSAY, A

10:24AM 13    CONVERSATION THAT WAS NOT HAD BY A TESTIFYING WITNESS, AND THE

10:24AM 14    COMMENTS BY MR. FLEURMONT ILLUSTRATE THE PROBLEMS WITH THAT.

10:24AM 15       I THINK THE DEFENSE WANTS TO GET THIS IN AS A SUBSTITUTE

10:24AM 16    FOR DR. ASIN TAKING THE STAND BECAUSE THEY WANT THE JURY TO

10:24AM 17    KNOW HOW DR. ASIN VIEWED THESE TEST RESULTS.

10:24AM 18       NOW, THERE ARE A COUPLE OF PROBLEMS WITH THAT.  FIRST, THE

10:24AM 19    LANGUAGE IN THE EMAIL IS ACTUALLY VAGUE ON THAT POINT.  I THINK

10:24AM 20    IT SAYS THAT THE DOCTOR UNDERSTOOD THEIR PROCESS AND WAS FINE

10:24AM 21    WITH IT.

10:24AM 22       THAT'S A SECONDHAND REPORT OF AN OUT-OF-COURT

10:24AM 23    CONVERSATION.  I'M NOT SURE WHAT SIGNIFICANCE THAT CARRIES OR

10:24AM 24    WHAT IT ACTUALLY MEANS.

10:25AM 25       EVEN IF IT WERE A RELIABLE INDICATOR OF HOW THE DOCTOR

10:25AM  1     FELT ABOUT THAT TEST RESULT, WELL, THEN THAT'S A HEARSAY

10:25AM  2     STATEMENT THAT'S COMING IN AS AN OPINION OF A NONTESTIFYING

10:25AM  3     WITNESS WHO HASN'T BEEN QUALIFIED TO GIVE AN EXPERT OPINION ON

10:25AM  4     THAT TOPIC.

10:25AM  5          SO I THINK THAT LINE IN THAT EMAIL IS OF SPECIAL CONCERN,

10:25AM  6     AND I THINK THE EXACT PURPOSE FOR WHICH THE DEFENSE TRIES TO

10:25AM  7     ADMIT IT SHOWS WHY IT CAN'T COME IN.

10:25AM  8          AND THEN THE FINAL POINT IS A MINOR ONE, WHICH IS THE 4415

10:25AM  9     ALSO INCLUDED MS. HOLMES ON THAT EMAIL, SO IT WAS ADMISSIBLE,

10:25AM  10    IF FOR NOTHING ELSE, TO SHOW NOTICE TO HER.

10:25AM  11         THE SAME IS NOT TRUE FOR 14259.

10:25AM  12              THE COURT:  THANK YOU.

10:25AM  13         I WAS WONDERING ABOUT YOUR COMMENTS ABOUT DR. ASIN ON THIS

10:25AM  14    EMAIL, AND THE THOUGHT OCCURRED TO ME, WELL, DO WE REDACT THAT?

10:25AM  15    CAN WE DO THAT?  IS THAT SOMETHING THAT WE CAN DO?

10:25AM  16         IF IT'S ADMITTED FOUNDATIONALLY, DOES THE WHOLE THING HAVE

10:26AM  17    TO COME IN OR CAN THE COURT LOOK AT IT AND SAY, BUT NOT FOR

10:26AM  18    THAT PURPOSE?

10:26AM  19         THAT'S A QUESTION FOR BOTH OF YOU, BUT IT'S YOUR TURN,

10:26AM  20    MR. FLEURMONT.

10:26AM  21              MR. FLEURMONT:  SURE, YOUR HONOR.

10:26AM  22         FIRST, WE BELIEVE A FOUNDATION HAS BEEN LAID.  IT'S

10:26AM  23    ADMISSIBLE AS A BUSINESS RECORD.

10:26AM  24         AND WE THINK THAT TYPICALLY IF THERE'S -- IF A DOCUMENT

10:26AM  25    COMES IN THROUGH BUSINESS RECORDS AND THERE'S SOMETHING THAT

7751

| | | |
|---|---|---|
| 10:26AM | 1 | THE COURT THINKS, UNDER 403, SHOULD NOT BE INCLUDED, THE |
| 10:26AM | 2 | TYPICAL PROTOCOL IS TO REDACT IT. |
| 10:26AM | 3 | WE DON'T THINK THAT THIS STATEMENT FALLS UNDER THAT. |
| 10:26AM | 4 | I CAN READ YOU THE EXACT STATEMENT, "DR. ASIN COMPLETELY |
| 10:26AM | 5 | UNDERSTOOD OUR TESTING PROTOCOL AND HAD NO ISSUES." |
| 10:26AM | 6 | THAT'S NOT AN EXPERT STATEMENT.  IT'S JUST A STATEMENT OF |
| 10:26AM | 7 | FACT THAT THEY UNDERSTOOD WHAT THE PROTOCOL WAS. |
| 10:26AM | 8 | I THINK I BELIEVE HIS ISSUE IS -- ONE OF HIS ISSUES IS |
| 10:26AM | 9 | THAT IT'S MORE OF A SPECIALIZED EXPERT STATEMENT, AND WE DON'T |
| 10:26AM | 10 | THINK THAT'S THE CASE. |
| 10:26AM | 11 | IN TERMS OF MR. BOSTIC'S COMMENTS ABOUT NOT HAVING A |
| 10:27AM | 12 | TESTIFYING WITNESS, I THINK WE ALL KNOW WHY DR. ASIN WASN'T |
| 10:27AM | 13 | CALLED IN THIS CASE. |
| 10:27AM | 14 | BUT ALSO, THE EMAIL TALKS ABOUT NOT JUST WHAT DR. ASIN |
| 10:27AM | 15 | SAYS, BUT THE INFORMATION THAT WAS RELAYED TO E.T. |
| 10:27AM | 16 | MR. BOSTIC JUST EXPLAINED THAT 4415, THAT INFORMATION THAT |
| 10:27AM | 17 | WAS RELAYED TO DR. BURNES AND SO IN THAT CASE THERE'S ANOTHER |
| 10:27AM | 18 | SIMILARITY BETWEEN THE TWO DOCUMENTS. |
| 10:27AM | 19 | THE COURT:  OKAY. |
| 10:27AM | 20 | MR. BOSTIC? |
| 10:27AM | 21 | MR. BOSTIC:  SO, YOUR HONOR, ON THE STATEMENT ABOUT |
| 10:27AM | 22 | DR. ASIN, I'M NOT SURE WHAT THE VALUE OR THE SIGNIFICANCE OF |
| 10:27AM | 23 | THAT STATEMENT IS IF IT'S NOT PRESENTED BY THE DEFENSE TO THE |
| 10:27AM | 24 | JURY IN AN EFFORT TO CONVEY THE IMPRESSION THAT THE DOCTOR WAS |
| 10:27AM | 25 | OKAY WITH THE THERANOS TEST RESULTS OR THAT HE SOMEHOW BLESSED |

7752

10:27AM 1    THEM OR THAT HE DIDN'T VIEW THEM AS INACCURATE.

10:27AM 2         AND JUST SO IT'S CLEAR FOR THE RECORD, MY UNDERSTANDING

10:27AM 3    FROM CONVERSATIONS WITH DR. ASIN IS THAT HE DOES VIEW THE

10:27AM 4    THERANOS RESULT AS AN INACCURATE RESULT.  IT INDICATED THE

10:28AM 5    PRESENCE OF HIV ANTIBODIES IN A PATIENT'S BLOODSTREAM WHERE

10:28AM 6    THERE WAS NO REASON FOR THOSE ANTIBODIES TO EXIST AND WHERE A

10:28AM 7    SUBSEQUENT TEST INDICATED THEY WERE NOT PRESENT.

10:28AM 8         SO I DON'T BELIEVE THERE'S ANYTHING THAT WOULD BE IN

10:28AM 9    DR. ASIN'S TESTIMONY THAT WOULD BE INCONSISTENT WITH WHAT HAS

10:28AM 10   BEEN PRESENTED TO THE JURY.

10:28AM 11        THAT ASIDE THOUGH, A HEARSAY STATEMENT IS NOT A WAY TO

10:28AM 12   CORRECT THE RECORD EVEN IF THE RECORD WERE IMBALANCED AS IT

10:28AM 13   STANDS TODAY.

10:28AM 14             THE COURT:  OKAY.

10:28AM 15             MR. FLEURMONT:  WE'RE NOT TRYING TO CORRECT THE

10:28AM 16   RECORD.

10:28AM 17        WE'RE TRYING TO ADMIT A DOCUMENT THAT WE BELIEVE IS

10:28AM 18   ADMISSIBLE UNDER 803(6) BECAUSE OF THE COURT'S PAST RULING.

10:28AM 19        THERE'S SEVERAL PARALLELS TO THIS DOCUMENT, 4415.  I'VE

10:28AM 20   HEARD SOME DISTINCTIONS, BUT WE BELIEVE THOSE DISTINCTIONS

10:28AM 21   DON'T MAKE A DIFFERENCE WHEN IT COMES TO THE ADMISSIBILITY OF

10:28AM 22   THIS DOCUMENT.

10:28AM 23             THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU VERY

10:28AM 24   MUCH.

10:28AM 25             MR. FLEURMONT:  THANK YOU.

| | | |
|---|---|---|
| 10:28AM | 1 | THE COURT:  NOW I NEED TO ASK THE DEFENSE ABOUT |
| 10:28AM | 2 | TIMING TO THE EXTENT THAT YOU CAN INFORM ME.  SHOULD WE TAKE A |
| 10:28AM | 3 | BREAK AND LET ME CHECK UP AND SEE HOW WE'RE DOING ON THE |
| 10:29AM | 4 | MONITORS, AND THEN MAYBE I'LL COME BACK AND WE CAN HAVE ANOTHER |
| 10:29AM | 5 | DISCUSSION BEFORE WE BRING THE JURY IN. |
| 10:29AM | 6 | OKAY.  WE'LL BE IN RECESS.  THANK YOU. |
| 10:29AM | 7 | THE CLERK:  COURT IS IN RECESS. |
| 10:29AM | 8 | (RECESS FROM 10:29 A.M. UNTIL 11:11 A.M.) |
| 11:12AM | 9 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE |
| 11:12AM | 10 | BACK ON THE RECORD. |
| 11:12AM | 11 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.  WE |
| 11:12AM | 12 | ARE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:12AM | 13 | I JUST WANTED TO ASK COUNSEL ABOUT TIMING FOR TODAY. |
| 11:12AM | 14 | WE'LL GET STARTED HERE IN ABOUT FIVE MINUTES. |
| 11:12AM | 15 | MR. DOWNEY? |
| 11:12AM | 16 | MR. DOWNEY:  YOUR HONOR, I EXPECT THAT MS. HOLMES'S |
| 11:12AM | 17 | DIRECT EXAMINATION WILL CONCLUDE TODAY.  I'VE SPOKEN TO |
| 11:12AM | 18 | MR. LEACH.  OBVIOUSLY I HAVEN'T CONCLUDED THE DIRECT |
| 11:12AM | 19 | EXAMINATION -- |
| 11:12AM | 20 | THE COURT:  SURE. |
| 11:12AM | 21 | MR. DOWNEY:  -- BUT HE THOUGHT CROSS-EXAMINATION WAS |
| 11:12AM | 22 | GOING TO GO AT LEAST SUBSTANTIALLY INTO TOMORROW, AND PERHAPS |
| 11:12AM | 23 | CONSUME TOMORROW. |
| 11:12AM | 24 | SO IT LOOKS LIKE PERHAPS THERE WOULD BE EITHER REDIRECT AT |
| 11:12AM | 25 | THE END OF THE DAY TOMORROW, OR IF THERE'S A TAIL TO |

| | | |
|---|---|---|
| 11:12AM | 1 | CROSS-EXAMINATION, THAT MIGHT HAPPEN ON THE FIRST DAY OF COURT |
| 11:12AM | 2 | NEXT WEEK, WHICH I THINK IS TUESDAY. |
| 11:12AM | 3 | THE COURT:  RIGHT.  ALL RIGHT.  THANK YOU FOR THAT. |
| 11:13AM | 4 | I ASK THAT QUESTION PRIMARILY TO GET AN UNDERSTANDING OF |
| 11:13AM | 5 | WHEN YOU SHOULD -- WHEN YOU WANT AN ORDER, A DECISION BASED ON |
| 11:13AM | 6 | THIS MORNING'S MOTIONS, AND WHETHER OR NOT THAT IMPACTS YOUR |
| 11:13AM | 7 | CASE, I EXPECT IT DOES, AND THE PRESENTATION OF YOUR EVIDENCE. |
| 11:13AM | 8 | MR. DOWNEY:  YOUR HONOR, I THINK IT DOES. |
| 11:13AM | 9 | I THINK IDEALLY IF WE COULD BE IN A POSITION TO READ THAT, |
| 11:13AM | 10 | IF THE COURT WERE TO GRANT AT LEAST PART OF THE RELIEF WE'RE |
| 11:13AM | 11 | ASKING FOR, IF WE CAN DO IT AT THE CONCLUSION OF MS. HOLMES'S |
| 11:13AM | 12 | TESTIMONY, THAT MIGHT BE SOMETHING THAT WE WOULD CHOOSE TO DO. |
| 11:13AM | 13 | I DON'T THINK THAT REALISTICALLY WOULD BE TOMORROW.  SO |
| 11:13AM | 14 | MONDAY OR TUESDAY OF NEXT WEEK IS WHEN I WOULD EXPECT. |
| 11:13AM | 15 | THE COURT:  I SEE.  CONCLUSION OF HER TESTIMONY, |
| 11:13AM | 16 | INCLUDING CROSS YOU MEAN? |
| 11:13AM | 17 | MR. DOWNEY:  INCLUDING CROSS-EXAMINATION, YES. |
| 11:13AM | 18 | THE COURT:  ALL RIGHT. |
| 11:13AM | 19 | MR. DOWNEY:  AND ANY REDIRECT OR RECROSS? |
| 11:13AM | 20 | THE COURT:  SURE.  I ALSO WANTED TO ASK THE |
| 11:13AM | 21 | GOVERNMENT ABOUT, I WAS TALKING ABOUT -- I KNOW MS. VOLKAR IS |
| 11:13AM | 22 | STILL HERE, I WAS ASKING ABOUT A 106 OPPORTUNITY, I THINK |
| 11:14AM | 23 | MS. VOLKAR SAID SHE WOULD APPRECIATE A 106 -- OR EXCUSE ME, AN |
| 11:14AM | 24 | OPPORTUNITY TO REVIEW SOME TRANSCRIPTS.  AND I DON'T KNOW WHAT |
| 11:14AM | 25 | THE GOVERNMENT'S POSITION IS ON THAT. |

7755

11:14AM 1         MR. BOSTIC, IS THAT SOMETHING THAT YOU WANT TO TALK TO

11:14AM 2  MS. VOLKAR ABOUT, OR IS THERE STILL A DESIRE TO REVIEW ANY

11:14AM 3  RECORD FOR THAT PURPOSE?

11:14AM 4         MR. BOSTIC:  YES, YOUR HONOR, I THINK THERE WOULD

11:14AM 5  BE.

11:14AM 6      I THINK THE GOVERNMENT'S CENTRAL POSITION IS THAT THE

11:14AM 7  OFFERED MATERIAL IS NOT ADMISSIBLE, OF COURSE.

11:14AM 8         THE COURT:  SURE.

11:14AM 9         MR. BOSTIC:  BUT IF THE COURT IS INCLINED TO ADMIT

11:14AM 10  ANY, YES, I UNDERSTAND WE WOULD LIKE A BRIEF OPPORTUNITY TO GO

11:14AM 11  THROUGH AND MAKE ANY 106 DESIGNATIONS.

11:14AM 12         THE COURT:  WELL, I THINK JUST TO PROVIDE BOTH SIDES

11:14AM 13  AN OPPORTUNITY TO HAVE A FULL PRESENTATION, I WOULD BE INCLINED

11:14AM 14  TO DO THAT.  I JUST WANT TO FIGURE OUT THE TIMING OF THAT.

11:14AM 15      AND I'M NOT SUGGESTING I'M GRANTING/DENYING, BUT I JUST

11:14AM 16  WANT TO GIVE THE PARTIES AN OPPORTUNITY TO DO WHAT YOU NEED TO

11:14AM 17  DO TO RESPOND TO THE COURT.

11:15AM 18      SO LET'S -- LET ME TELL YOU, I'M NOT GOING TO GET AN ORDER

11:15AM 19  OUT TODAY.

11:15AM 20         MR. DOWNEY:  YES.

11:15AM 21         THE COURT:  BUT LET'S REVISIT THINGS TOMORROW

11:15AM 22  MORNING AND SEE WHERE WE ARE, AND MAYBE THAT GIVES YOUR TEAM,

11:15AM 23  MR. BOSTIC, AN OPPORTUNITY TO REVIEW AS WELL.

11:15AM 24      SO LET'S TOUCH BASE TOMORROW MORNING THEN ON THIS.

11:15AM 25      IS THAT ALL RIGHT?

| | | |
|---|---|---|
| 11:15AM | 1 | MR. DOWNEY:  THAT'S FINE. |
| 11:15AM | 2 | MR. BOSTIC:  UNDERSTOOD. |
| 11:15AM | 3 | MR. DOWNEY:  WE'LL TALK IN THE INTERIM. |
| 11:15AM | 4 | THE COURT:  THAT SOUNDS GOOD. |
| 11:15AM | 5 | ANYTHING ELSE BEFORE WE BRING THE JURY IN? |
| 11:15AM | 6 | MR. DOWNEY:  NOTHING FROM US, YOUR HONOR. |
| 11:15AM | 7 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 11:15AM | 8 | LET'S BRING THEM IN. |
| 11:15AM | 9 | MR. DOWNEY:  YOUR HONOR, I THOUGHT WE MIGHT BREAK |
| 11:15AM | 10 | AROUND 1:15. |
| 11:15AM | 11 | THE COURT:  THAT SOUNDS GOOD. |
| 11:15AM | 12 | MR. DOWNEY, ARE WE STAYING WITH VOLUME 3? |
| 11:15AM | 13 | MR. DOWNEY:  YOU ARE, YOUR HONOR, AND BECAUSE OF THE |
| 11:15AM | 14 | SMALL -- |
| 11:15AM | 15 | THE COURT:  YES. |
| 11:17AM | 16 | (PAUSE IN PROCEEDINGS.) |
| 11:17AM | 17 | (JURY IN AT 11:17 A.M.) |
| 11:17AM | 18 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:17AM | 19 | SEATED.  THANK YOU. |
| 11:17AM | 20 | WE ARE BACK ON THE RECORD IN THE HOLMES MATTER.  ALL |
| 11:17AM | 21 | COUNSEL AND MS. HOLMES ARE PRESENT. |
| 11:17AM | 22 | OUR JURY IS PRESENT.  GOOD MORNING, LADIES AND GENTLEMEN. |
| 11:17AM | 23 | IT'S NICE TO SEE YOU ALL AGAIN.  I HOPE YOU ALL HAD A GOOD |
| 11:18AM | 24 | HOLIDAY, ENJOYED TIME WITH FAMILY AND FRIENDS, AND THAT YOU'RE |
| 11:18AM | 25 | ALL HEALTHY.  IT'S GOOD TO SEE YOU HERE. |

| | | |
|---|---|---|
| 11:18AM | 1 | LET ME ASK THAT QUESTION AGAIN.  DURING OUR BREAK, DURING |
| 11:18AM | 2 | THE BREAK IN THE PROCEEDINGS, DID ANY OF YOU HAVE CAUSE TO HAVE |
| 11:18AM | 3 | BROUGHT TO YOUR ATTENTION ANY MEDIA, ANY READING, DISCUSSION, |
| 11:18AM | 4 | OR ANY REVIEW OR KNOWLEDGE ABOUT ANYTHING TO DO WITH THIS CASE? |
| 11:18AM | 5 | IF SO, PLEASE RAISE YOUR HAND. |
| 11:18AM | 6 | I SEE NO HANDS.  THANK YOU VERY MUCH FOR YOUR CONTINUED |
| 11:18AM | 7 | FIDELITY TO THE ADMONITION.  I APPRECIATE THAT, AS DO COUNSEL |
| 11:18AM | 8 | HERE. |
| 11:18AM | 9 | WE ARE -- I THINK WE'RE GOING UNTIL 4:00 TODAY.  I |
| 11:18AM | 10 | APOLOGIZE FOR THE LATE START.  I KNOW THIS WILL SURPRISE YOU |
| 11:18AM | 11 | AND SHOCK YOU, BUT WE HAD SOME MECHANICAL PROBLEMS WITH YOUR |
| 11:18AM | 12 | SCREENS.  AND I THINK THERE IS SOME TAPE DOWN THAT IS ON THE |
| 11:18AM | 13 | FLOOR.  I'M TOLD THAT THE I.T. PEOPLE DID A BYPASS THAT WILL |
| 11:19AM | 14 | WORK FOR OUR PURPOSES TODAY. |
| 11:19AM | 15 | AFTER TODAY, THIS EVENING THEY WILL CORRECT THE PROBLEM. |
| 11:19AM | 16 | AGAIN, I APOLOGIZE FOR THESE CONTINUED DISRUPTIONS, BUT I THINK |
| 11:19AM | 17 | WE CAN GO FORWARD. |
| 11:19AM | 18 | MS. HOLMES, MAY I ASK YOU TO RESUME THE STAND, PLEASE. |
| 11:19AM | 19 | (PAUSE IN PROCEEDINGS.) |
| 11:19AM | 20 | THE COURT:  THANK YOU.  MAKE YOURSELF COMFORTABLE |
| 11:19AM | 21 | AGAIN. |
| 11:19AM | 22 | THE WITNESS:  THANK YOU. |
| 11:19AM | 23 | THE COURT:  YOU'RE WELCOME. |
| 11:19AM | 24 | WHEN YOU ARE COMFORTABLE, WOULD YOU JUST STATE YOUR NAME, |
| 11:19AM | 25 | PLEASE. |

7758

| | | |
|---|---|---|
| 11:19AM | 1 | THE WITNESS: YES. MY NAME IS ELIZABETH HOLMES. |
| 11:19AM | 2 | THE COURT: THANK YOU. I'LL REMIND YOU THAT YOU ARE |
| 11:19AM | 3 | STILL UNDER OATH. |
| 11:19AM | 4 | THE WITNESS: THANK YOU. |
| 11:19AM | 5 | **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY** |
| 11:19AM | 6 | **SWORN.)** |
| 11:19AM | 7 | THE COURT: AND YOU CAN REMOVE YOUR MASK IF YOU |
| 11:19AM | 8 | WISH. |
| 11:19AM | 9 | THE WITNESS: THANK YOU. |
| 11:19AM | 10 | THE COURT: YOU'RE WELCOME. |
| 11:19AM | 11 | MR. DOWNEY. |
| 11:19AM | 12 | **DIRECT EXAMINATION (RESUMED)** |
| 11:19AM | 13 | BY MR. DOWNEY: |
| 11:19AM | 14 | Q. GOOD MORNING, MS. HOLMES. |
| 11:19AM | 15 | A. GOOD MORNING. |
| 11:19AM | 16 | Q. DO YOU RECALL LAST WEEK DURING YOUR TESTIMONY WE WERE |
| 11:19AM | 17 | TALKING ABOUT SOME OF THE INDIVIDUALS FROM WALGREENS WITH WHOM |
| 11:20AM | 18 | YOU INTERACTED ON BEHALF OF THERANOS? |
| 11:20AM | 19 | A. I DO. |
| 11:20AM | 20 | Q. AND ONE OF THOSE INDIVIDUALS WAS DR. JAY ROSAN? |
| 11:20AM | 21 | A. YES. |
| 11:20AM | 22 | Q. AND DID YOU STAY IN TOUCH WITH DR. ROSAN THROUGHOUT THE |
| 11:20AM | 23 | PERIOD WHEN THERANOS AND WALGREENS WERE WORKING IN PARTNERSHIP? |
| 11:20AM | 24 | A. YES. |
| 11:20AM | 25 | Q. I'D LIKE TO ASK YOU TO LOOK AT AN EXHIBIT THAT IS MARKED |

11:20AM 1    7469, AND I'VE PLACED NEAR YOU A VOLUME OF EXHIBITS THAT'S

11:20AM 2    MARKED 4, WHICH IS A THINNER BINDER THAN THE BINDER THAT YOU

11:20AM 3    WERE LOOKING AT LAST WEEK, AND THE DOCUMENT SHOULD BE IN THAT

11:20AM 4    BINDER.

11:20AM 5    A.   GREAT.  GOT IT.

11:21AM 6    Q.   AND IS THIS AN EMAIL THAT DR. ROSAN SENT TO YOU IN 2014

11:21AM 7    RELATED TO WALGREENS, THERANOS SERVICE CENTERS AT WALGREENS?

11:21AM 8    A.   YES.

11:21AM 9              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

11:21AM 10   7469.

11:21AM 11             MR. LEACH:  YOUR HONOR, I DON'T HAVE THIS IN MY

11:21AM 12   BINDER.

11:21AM 13             THE COURT:  OH.  IT'S IN VOLUME 4.

11:21AM 14             MR. LEACH:  I'VE NOT BEEN PROVIDED WITH VOLUME 4.

11:21AM 15             THE COURT:  OH.  THAT WILL BE CORRECTED.

11:21AM 16             MR. DOWNEY:  I'M TERRIBLY SORRY.

11:21AM 17             THE COURT:  YES, THAT WILL BE CORRECTED.

11:22AM 18        (PAUSE IN PROCEEDINGS.)

11:22AM 19             MR. LEACH:  HEARSAY, YOUR HONOR.

11:22AM 20             THE COURT:  IS THIS CC'D TO MS. HOLMES?

11:22AM 21             MR. DOWNEY:  SHE'S AN ADDRESSEE ON THE TO LINE.

11:22AM 22             THE COURT:  YES, I SEE THAT.

11:22AM 23        ALL RIGHT.  I'LL OVERRULE THE OBJECTION.  IT'S ADMITTED.

11:22AM 24        (DEFENDANT'S EXHIBIT 7469 WAS RECEIVED IN EVIDENCE.)

11:22AM 25             MR. DOWNEY:  CAN WE DISPLAY 7469.

11:22AM 1      Q.   DO YOU SEE AT THE TOP THIS IS THE FORWARDING OF AN EMAIL

11:22AM 2      FROM DR. ROSAN TO YOU AND MR. BALWANI IN AUGUST OF 2014?

11:22AM 3      A.   YES.

11:22AM 4      Q.   AND IF YOU LOOK AT THE BOTTOM EMAIL, DO YOU SEE THAT HE

11:22AM 5      HAS FORWARDED A REPORT?

11:22AM 6      A.   I DO.

11:22AM 7      Q.   AND IF YOU LOOK AT THE FIRST LINE OF THE EMAIL THAT'S BEEN

11:23AM 8      FORWARDED, DO YOU SEE WHERE IT SAYS, "DR. J, WANTED TO LET YOU

11:23AM 9      KNOW I DID SOME RECENT BLOOD WORK AT THERANOS AND I'M A

11:23AM 10     BELIEVER."

11:23AM 11     A.   YES.

11:23AM 12     Q.   AND THEN IN THE LAST SENTENCE OF THAT PARAGRAPH, SHE GOES

11:23AM 13     ON TO SAY, "I TOLD MY DOCTOR I REFUSE TO GO TO QUEST AND SHE

11:23AM 14     HAS TO ACCEPT THESE RESULTS FROM THERANOS.  WE'LL BE PROMOTING

11:23AM 15     THERANOS WHENEVER WE CAN."

11:23AM 16          DO YOU SEE THAT?

11:23AM 17     A.   I DO.

11:23AM 18     Q.   NOW, THIS BOTTOM EMAIL IS FROM LISA MAKI, M-A-K-I?

11:23AM 19     A.   YES.

11:23AM 20     Q.   IS THAT SOMEONE THAT YOU KNEW?

11:23AM 21     A.   NO.

11:23AM 22     Q.   LET'S LOOK AT DR. ROSAN'S EMAIL ON TOP.  DO YOU SEE THAT

11:23AM 23     HE SAYS, "THOUGHT YOU MIGHT WANT TO READ THIS TESTIMONIAL FROM

11:23AM 24     A CEO THAT WE RESPECT"?

11:23AM 25     A.   I DO.

11:23AM  1      Q.   IS -- DID YOU GET FEEDBACK FROM DR. ROSAN DURING THE

11:24AM  2      COURSE OF THE WALGREENS PARTNERSHIP AS TO OTHER POSITIVE

11:24AM  3      EXPERIENCES THAT PATIENTS WERE HAVING AT THERANOS SERVICE

11:24AM  4      CENTERS?

11:24AM  5      A.   I DID.

11:24AM  6      Q.   OKAY.  NOW, I BELIEVE A NUMBER OF TIMES DURING YOUR

11:24AM  7      TESTIMONY TO DATE YOU'VE TALKED ABOUT THE CONCEPT OF ACCESS FOR

11:24AM  8      PATIENTS.  I WANT TO ASK YOU WHAT THAT MEANS.

11:24AM  9           WHAT WAS THERANOS TRYING TO DO BY PROVIDING GREATER

11:24AM  10     ACCESS?

11:24AM  11     A.   IT MEANS THAT PEOPLE HAVE A FUNDAMENTAL RIGHT TO THEIR OWN

11:24AM  12     HEALTH INFORMATION AND MAKING IT EASIER FOR PEOPLE TO GET THAT

11:24AM  13     INFORMATION THROUGH CONVENIENCE OF LOCATIONS, THROUGH SMALLER

11:24AM  14     SAMPLES, THROUGH COST, THROUGH OWNERSHIP OF THEIR DATA, HAD THE

11:24AM  15     POTENTIAL TO CHANGE THE WAY THAT PEOPLE ENGAGED WITH THEIR OWN

11:24AM  16     HEALTH INFORMATION.

11:24AM  17     Q.   AND WAS ONE OF THE POPULATIONS TO WHOM -- WELL, WHAT ARE

11:24AM  18     SOME OF THE POPULATIONS TO WHOM THERANOS WANTED TO INCREASE

11:25AM  19     ACCESS?

11:25AM  20     A.   WE WANTED TO HELP PEOPLE WHO WERE SCARED OF NEEDLES.  THAT

11:25AM  21     INCLUDED CHILDREN, IT INCLUDED ELDERLY PERSONS OR CANCER

11:25AM  22     PATIENTS WHO HAD A REALLY DIFFICULT TIME GETTING BLOOD TESTS

11:25AM  23     AND WOULD OFTEN BE REALLY BRUISED FROM HAVING TO DO REPEATED

11:25AM  24     BLOOD TESTS.  SOMETIMES YOU SEE THAT WITH WOMEN WHO UNDERGO

11:25AM  25     FERTILITY TREATMENT WHO ARE GETTING BLOOD DRAWN ALL OF THE TIME

| | | |
|---|---|---|
| 11:25AM | 1 | AND THEY HAVE TO WEAR LONG SLEEVES SO THAT THEY CAN COVER UP |
| 11:25AM | 2 | THE BRUISES. |
| 11:25AM | 3 | Q.   AND DID YOU GET REPORTS DURING THE COURSE OF THE |
| 11:25AM | 4 | WALGREENS/THERANOS PARTNERSHIP THAT THERANOS WAS HAVING SUCCESS |
| 11:25AM | 5 | IN EXPANDING THAT KIND OF ACCESS? |
| 11:25AM | 6 | A.   YES. |
| 11:25AM | 7 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7514, WHICH IS ALSO IN |
| 11:25AM | 8 | VOLUME 4. |
| 11:26AM | 9 | A.   OKAY. |
| 11:26AM | 10 | Q.   WHO IS ELENA SCHEER? |
| 11:26AM | 11 | A.   ELENA SCHEER WORKED IN CUSTOMER SERVICE FOR THERANOS. |
| 11:26AM | 12 | Q.   AND IS 7514 AN EMAIL THAT SHE SENT YOU ABOUT SOME FEEDBACK |
| 11:26AM | 13 | ON SOMETHING THAT HAD HAPPENED IN CONNECTION WITH A THERANOS |
| 11:26AM | 14 | SERVICE CENTER? |
| 11:26AM | 15 | A.   YES. |
| 11:26AM | 16 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:26AM | 17 | 7514. |
| 11:26AM | 18 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:26AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:26AM | 20 | (DEFENDANT'S EXHIBIT 7514 WAS RECEIVED IN EVIDENCE.) |
| 11:26AM | 21 | BY MR. DOWNEY: |
| 11:26AM | 22 | Q.   AND I JUST WANT TO ASK YOU, WITHOUT GOING THROUGH THIS |
| 11:26AM | 23 | EMAIL, IS THIS A REPORT THAT YOU RECEIVED ON A PATIENT WHO GOT |
| 11:26AM | 24 | GREATER ACCESS AS A RESULT OF THE FINGERSTICK METHOD OR THE |
| 11:26AM | 25 | SMALL SAMPLE METHOD THERANOS WAS USING? |

| | | |
|---|---|---|
| 11:26AM | 1 | A.   IT IS. |
| 11:26AM | 2 | Q.   AND DID YOU OCCASIONALLY OR ON OCCASION GET REPORTS OF |
| 11:27AM | 3 | THIS KIND DURING THE TIME THAT YOU WERE THE CEO OF THERANOS? |
| 11:27AM | 4 | A.   I DID. |
| 11:27AM | 5 | Q.   DID YOU ALSO GET REPORTS DURING THAT PERIOD THAT PATIENTS |
| 11:27AM | 6 | GOING TO THERANOS SERVICE CENTERS IN WALGREENS WERE FINDING |
| 11:27AM | 7 | THAT THE TEST RESULTS THAT THEY GOT WERE MORE ACCURATE THAN THE |
| 11:27AM | 8 | TEST RESULTS THAT WERE PROVIDED BY SOME OTHER CLINICAL BLOOD |
| 11:27AM | 9 | TESTING SERVICES? |
| 11:27AM | 10 | A.   I DID. |
| 11:27AM | 11 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7623.  THAT SHOULD ALSO |
| 11:27AM | 12 | BE IN THAT SAME VOLUME. |
| 11:27AM | 13 | A.   OKAY. |
| 11:27AM | 14 | Q.   I WANT TO ASK YOU TO LOOK JUST AT THE BOTTOM EMAIL, AND MY |
| 11:27AM | 15 | QUESTION FOR YOU WITH REGARD TO THIS DOCUMENT IS SIMPLY WHETHER |
| 11:28AM | 16 | THE ANECDOTE RECOUNTED IN THIS EMAIL IS SOMETHING THAT YOU |
| 11:28AM | 17 | BECAME FAMILIAR WITH DURING THE COURSE OF YOUR TIME AS THE CEO |
| 11:28AM | 18 | AT THERANOS? |
| 11:28AM | 19 | A.   IT IS. |
| 11:28AM | 20 | Q.   AND HOW DID YOU COME TO LEARN THIS ANECDOTE? |
| 11:28AM | 21 | A.   I WAS TOLD ABOUT THIS BY OUR FIELD REPRESENTATIVES AND |
| 11:28AM | 22 | PEOPLE WHO WERE GATHERING FEEDBACK FROM PEOPLE IN THE FIELD, |
| 11:28AM | 23 | RYAN KARPEL ON THIS EMAIL. |
| 11:28AM | 24 | Q.   OKAY.  AND DID YOU RECEIVE, RECALL RECEIVING AT LEAST ONE |
| 11:28AM | 25 | REPORT WHERE A THERANOS TEST HAD DETECTED A CONDITION WITH |

7764

| 11:28AM | 1 | REGARD TO A PATIENT THAT HAD BEEN MISSED BY BLOOD TESTS OFFERED |
| 11:28AM | 2 | BY OTHER BLOOD TESTING SERVICES? |
| 11:28AM | 3 | A.   YES. |
| 11:28AM | 4 | Q.   AND TELL US WHAT YOU RECALL LEARNING IN THAT INSTANCE. |
| 11:28AM | 5 | A.   IN THIS SPECIFIC INSTANCE? |
| 11:28AM | 6 | Q.   YES. |
| 11:28AM | 7 | A.   THIS IS A PATIENT WHO HAD BEEN CHRONICALLY DOING THYROID |
| 11:29AM | 8 | TESTING AND HAD NOT DISCOVERED AN ISSUE WITH I THINK IT WAS HER |
| 11:29AM | 9 | PITUITARY GLAND, AND UPON GETTING A SERIES OF LAB DATA BACK |
| 11:29AM | 10 | FROM THERANOS AND LOOKING AT THE WAY THAT WE PRESENT THAT DATA |
| 11:29AM | 11 | IN THE APP THAT SHE HAD ACCESS TO, SHE AND HER PHYSICIAN WERE |
| 11:29AM | 12 | ABLE TO DISCOVER A MEDICAL ISSUE THAT SHE HAD NOT SEEN BEFORE |
| 11:29AM | 13 | AND SHE WAS REALLY EXCITED ABOUT THE SERVICE BASED ON THOSE |
| 11:29AM | 14 | RESULTS. |
| 11:29AM | 15 | Q.   OKAY.  AND WAS THIS THE ONLY INCIDENT OF THIS KIND THAT |
| 11:29AM | 16 | YOU RECALL? |
| 11:29AM | 17 | A.   NO. |
| 11:29AM | 18 | Q.   DO YOU RECALL OTHER INCIDENTS WHERE PATIENTS REPORTED |
| 11:29AM | 19 | DETECTED CONDITIONS THAT OTHER BLOOD TESTING SERVICES HAD BEEN |
| 11:29AM | 20 | UNABLE TO DETECT? |
| 11:29AM | 21 | A.   I DO. |
| 11:29AM | 22 | MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 7623. |
| 11:29AM | 23 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:29AM | 24 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:29AM | 25 | (DEFENDANT'S EXHIBIT 7623 WAS RECEIVED IN EVIDENCE.) |

7765

| | | |
|---|---|---|
| 11:30AM | 1 | BY MR. DOWNEY: |
| 11:30AM | 2 | Q.   DO YOU SEE THIS IS AN EMAIL THAT RECOUNTS WHAT OCCURRED |
| 11:30AM | 3 | WITH REGARD TO THE PARTICULAR PATIENT THAT WE HAVE BEEN |
| 11:30AM | 4 | DISCUSSING? |
| 11:30AM | 5 | A.   YES. |
| 11:30AM | 6 | Q.   AND DO YOU SEE THAT ABOUT FIVE LINES DOWN INTO THE THIRD |
| 11:30AM | 7 | PARAGRAPH THE REPORT IS THAT SHE, REFERRING TO THE PATIENT, |
| 11:30AM | 8 | "HAS BEEN FRUSTRATED WITH HAVING SYMPTOMS WITH NO RESOLUTION OR |
| 11:30AM | 9 | DIAGNOSIS AS TO WHAT THE ROOT CAUSE WAS." |
| 11:30AM | 10 | DO YOU SEE THAT? |
| 11:30AM | 11 | A.   YES, I DO. |
| 11:30AM | 12 | Q.   AND SHE TOOK THE INFORMATION THAT SHE HAD GATHERED FROM |
| 11:30AM | 13 | HER THERANOS RESULT AND ENCOURAGED HER PRIMARY CARE DOCTOR TO |
| 11:30AM | 14 | ORDER AN ULTRASOUND. |
| 11:30AM | 15 | DO YOU SEE THAT? |
| 11:30AM | 16 | A.   YES. |
| 11:30AM | 17 | Q.   AND DO YOU SEE THAT THE DOCTOR, UPON PERFORMING THE |
| 11:30AM | 18 | ULTRASOUND, DISCOVERED SHE HAD A TUMOR IN HER PITUITARY GLAND |
| 11:31AM | 19 | AND TWO MORE IN HER BRAIN? |
| 11:31AM | 20 | A.   YES. |
| 11:31AM | 21 | Q.   AND THEN DO YOU SEE THAT THIS EMAIL GOES ON TO REPORT THAT |
| 11:31AM | 22 | SHE FELT STRONGLY THAT HAD SHE NOT BEEN ABLE TO GET HER BLOOD |
| 11:31AM | 23 | TEST RESULTS AND BE PROACTIVE, HER PRIMARY CARE DOCTOR WOULD |
| 11:31AM | 24 | NOT HAVE ORDERED AN ULTRASOUND? |
| 11:31AM | 25 | A.   I DO. |

11:31AM  1    Q.   AND DO YOU SEE THAT SHE, IN THE LAST SENTENCE, REPORTED

11:31AM  2    SHE WOULD NEVER GO TO ANOTHER COMPANY?

11:31AM  3    A.   YES.

11:31AM  4    Q.   LET ME ASK YOU IN THE ADDRESS OF THIS EMAIL IN THE

11:31AM  5    BEGINNING, WHO IS -- IF YOU WOULD JUST BLOW UP THE ADDRESS

11:31AM  6    BLOCK THERE.

11:31AM  7         WHO IS BRANDI LUZANIA?

11:31AM  8    A.   BRANDI WAS ONE OF OUR CERTIFIED PHLEBOTOMIST WHO WOULD

11:31AM  9    SERVE PATIENTS IN OUR WELLNESS CENTERS.

11:32AM 10    Q.   NOW, MS. HOLMES, I JUST WANT TO TURN TO ONE MATTER WITH

11:32AM 11    RESPECT TO AN EXHIBIT THAT HAD BEEN CONDITIONALLY ADMITTED BY

11:32AM 12    YOUR HONOR PREVIOUSLY.

11:32AM 13         YOUR HONOR, WE HAD, THROUGH ANOTHER WITNESS, PROVISIONALLY

11:32AM 14    ADMITTED 13862 AND 13863.

11:32AM 15         SO IF YOU WOULD LOOK AT THOSE, MS. HOLMES.

11:32AM 16    A.   OKAY.

11:32AM 17    Q.   DO THESE REFLECT CALENDAR ENTRIES FROM YOUR CALENDAR WHILE

11:32AM 18    YOU WERE THE CEO OF THERANOS?

11:32AM 19    A.   YES.

11:32AM 20              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 13862 AND

11:32AM 21    13863.

11:33AM 22              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:33AM 23              THE COURT:  THEY'RE ADMITTED.  THEY MAY BE

11:33AM 24    PUBLISHED.

11:33AM 25              (DEFENDANT'S EXHIBITS 13862 AND 13863 WERE RECEIVED IN

7767

11:33AM  1     EVIDENCE.)

11:33AM  2     BY MR. DOWNEY:

11:33AM  3     Q.   DURING THE COURSE OF YOUR TIME AT THERANOS, DID YOU ALSO

11:33AM  4     HAVE OCCASIONS TO REVIEW PORTIONS OF THE WALGREENS WEBSITE THAT

11:33AM  5     DISCUSSED THERANOS'S SERVICES IN WALGREENS STORES?

11:33AM  6     A.   I DID.

11:33AM  7     Q.   LET ME ASK YOU TO LOOK AT 14207, WHICH SHOULD BE IN

11:33AM  8     VOLUME 4 OF WHAT IS WITH YOU.

11:33AM  9     A.   OKAY.

11:33AM  10    Q.   DO YOU HAVE THAT?

11:33AM  11    A.   I DO.

11:33AM  12    Q.   IS 14207 PART OF THE WALGREENS WEBSITE THAT RAN DURING THE

11:33AM  13    TIME THAT THERANOS SERVICE CENTERS WERE BEING OFFERED IN

11:33AM  14    WALGREENS STORES?

11:33AM  15    A.   YES.

11:33AM  16    Q.   AND DO YOU SEE THAT THE DATE IN THE UPPER RIGHT-HAND

11:33AM  17    CORNER APPEARS TO BE OCTOBER 9TH, 2014?

11:34AM  18    A.   YES.

11:34AM  19             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

11:34AM  20    14207.

11:34AM  21             MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:34AM  22             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:34AM  23        (DEFENDANT'S EXHIBIT 14207 WAS RECEIVED IN EVIDENCE.)

11:34AM  24    BY MR. DOWNEY:

11:34AM  25    Q.   AND DID YOU ALSO ON OCCASION REVIEW PORTIONS OF THE

7768

| | | |
|---|---|---|
| 11:34AM | 1 | THERANOS WEBSITE IN CONNECTION WITH SERVICES AT WALGREENS? |
| 11:34AM | 2 | A.   I DID. |
| 11:34AM | 3 | Q.   IF YOU WOULD TAKE A MINUTE TO TURN TO THE NEXT EXHIBIT, |
| 11:34AM | 4 | WHICH IS 14208. |
| 11:34AM | 5 | A.   YES. |
| 11:34AM | 6 | Q.   IS THIS A PORTION OF THE THERANOS WEBSITE THAT RAN DURING |
| 11:34AM | 7 | THE TIME THAT THERANOS SERVICE CENTERS WERE OPERATING IN |
| 11:34AM | 8 | WALGREENS STORES? |
| 11:34AM | 9 | A.   IT IS. |
| 11:34AM | 10 | Q.   AND DO YOU SEE IN THE UPPER RIGHT-HAND CORNER IT APPEARS |
| 11:34AM | 11 | TO INDICATE THE DATE IS AUGUST 19TH, 2014? |
| 11:34AM | 12 | A.   YES. |
| 11:34AM | 13 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:35AM | 14 | 14208. |
| 11:35AM | 15 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:35AM | 16 | THE COURT:  IT'S ADMITTED. |
| 11:35AM | 17 | (DEFENDANT'S EXHIBIT 14208 WAS RECEIVED IN EVIDENCE.) |
| 11:35AM | 18 | BY MR. DOWNEY: |
| 11:35AM | 19 | Q.   WHEN WE LEFT OFF ON FRIDAY, WE WERE TALKING ABOUT |
| 11:35AM | 20 | THERANOS'S WORK WITH VARIOUS PARTS OF THE DEPARTMENT OF |
| 11:35AM | 21 | DEFENSE. |
| 11:35AM | 22 | DO YOU RECALL THAT? |
| 11:35AM | 23 | A.   I DO. |
| 11:35AM | 24 | Q.   DURING THE COURSE OF THE TIME YOU WERE AT THERANOS, DID |
| 11:35AM | 25 | THERANOS WORK WITH THE UNITED STATES CENTRAL COMMAND? |

7769

| | | |
|---|---|---|
| 11:35AM | 1 | A.   YES. |
| 11:35AM | 2 | Q.   AND IS THAT SOMETIMES ABBREVIATED AS CENTCOM? |
| 11:35AM | 3 | A.   IT IS. |
| 11:35AM | 4 | Q.   DID THERANOS ENTER INTO AN AGREEMENT WITH CENTCOM? |
| 11:35AM | 5 | A.   WE DID, YES. |
| 11:35AM | 6 | Q.   LET ME ASK YOU TO LOOK AT A DOCUMENT THAT IS ALREADY IN |
| 11:35AM | 7 | EVIDENCE, AND I'LL PUT ON THE SCREEN, WHICH IS EXHIBIT 10457. |
| 11:35AM | 8 | THAT ALSO SHOULD BE IN VOLUME 3 OF THE MATERIALS. |
| 11:36AM | 9 | IF YOU WOULD JUST TAKE A MOMENT TO LOOK THROUGH THE |
| 11:36AM | 10 | DOCUMENTS AND ITS ATTACHMENTS. |
| 11:36AM | 11 | A.   VOLUME 3.  I'M SORRY, THE NUMBER WAS? |
| 11:36AM | 12 | Q.   104 -- |
| 11:36AM | 13 | A.   GOT IT -- 57.  OKAY. |
| 11:36AM | 14 | Q.   AND IF YOU LOOK AT THE -- HAVE YOU HAD A CHANCE TO LOOK |
| 11:36AM | 15 | THROUGH THAT? |
| 11:36AM | 16 | A.   YEAH, BRIEFLY. |
| 11:36AM | 17 | Q.   IF YOU LOOK AT THE EMAIL THAT IS THE FIRST PAGE OF THE |
| 11:36AM | 18 | EXHIBIT, DO YOU SEE THAT THAT'S -- IT'S DATED DECEMBER 3RD, |
| 11:36AM | 19 | 2012? |
| 11:36AM | 20 | A.   YES. |
| 11:36AM | 21 | Q.   WAS IT AROUND NOVEMBER OR DECEMBER OF 2012 WHEN THERANOS |
| 11:36AM | 22 | ENTERED INTO AN AGREEMENT WITH CENTCOM? |
| 11:37AM | 23 | A.   IT WAS. |
| 11:37AM | 24 | Q.   HOW LONG PRIOR TO DECEMBER 2012 HAD THERANOS BEEN TALKING |
| 11:37AM | 25 | TO CENTCOM ABOUT THE PROSPECT OF ENTER INTO AN AGREEMENT? |

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023