No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XL of LVII | ER-11333 to ER-11632

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

11:37AM  1    A.   ABOUT A YEAR AND A HALF.

11:37AM  2    Q.   AND WAS THAT THE RESULT OF THE INTRODUCTION THAT

11:37AM  3    GENERAL MATTIS HAD MADE TO CENTCOM?

11:37AM  4    A.   IT WAS.

11:37AM  5    Q.   AND WAS THIS AGREEMENT THE CULMINATION OF THOSE

11:37AM  6    DISCUSSIONS OVER THE COURSE OF A YEAR AND A HALF?

11:37AM  7    A.   YES.

11:37AM  8    Q.   LET ME ASK YOU TO LOOK AT PAGE 3 OF THE DOCUMENT.

11:37AM  9        AND DO YOU SEE THAT THERE'S A TITLE ON THE TOP THAT SAYS

11:37AM  10   "U.S. ARMY MEDICAL RESEARCH AND MATERIEL COMMAND."

11:37AM  11       CAN YOU EXPLAIN WHAT THAT IS AND WHAT IT HAS TO DO WITH

11:38AM  12   CENTCOM?

11:38AM  13   A.   MY UNDERSTANDING IS THAT THIS IS THE GROUP WITHIN THE

11:38AM  14   MILITARY THAT WAS RESPONSIBLE FOR THE IRB APPROVAL, WHICH IS

11:38AM  15   THE INSTITUTIONAL REVIEW BOARD THAT IS LISTED HERE, WHICH IS

11:38AM  16   ONE OF THE APPROVALS THAT WE NEEDED TO BE ABLE TO DO A STUDY IN

11:38AM  17   WHICH WE WERE TESTING HUMAN SAMPLES.

11:38AM  18   Q.   OKAY.  AND WHEN YOU ULTIMATELY WERE ABLE TO AGREE ON A

11:38AM  19   STUDY, WHAT WAS THE, WHAT WAS THE STUDY THAT WAS TO BE

11:38AM  20   PERFORMED?

11:38AM  21   A.   THE STUDY THAT WAS TO BE PERFORMED WAS TO SHIP OUR SYSTEMS

11:38AM  22   TO AFGHANISTAN WHERE THEY WOULD BE TESTED AGAINST TRADITIONAL

11:38AM  23   REFERENCE METHODS TO EVALUATE THEIR USE IN SETTINGS IN

11:38AM  24   AFGHANISTAN AND OTHER REMOTE PLACES.

11:38AM  25   Q.   AND IN THE PERIOD THAT WAS FROM THE MIDDLE OF 2011 UNTIL

| | | |
|---|---|---|
| 11:38AM | 1 | THE END OF 2012 WHEN YOU WERE DISCUSSING THE POSSIBILITY OF |
| 11:39AM | 2 | THIS, WHAT WAS HAPPENING DURING THOSE MONTHS PRIOR TO ACTUAL |
| 11:39AM | 3 | ENTRY OF AN AGREEMENT? |
| 11:39AM | 4 | A.   THERE WAS A LOT OF WORK IN FIGURING OUT HOW TO GET THE |
| 11:39AM | 5 | RIGHT APPROVALS TO DO A STUDY LIKE THIS; UNDERSTANDING THE |
| 11:39AM | 6 | RELEVANT REGULATORY RESTRICTIONS THAT WE NEEDED TO WORK THROUGH |
| 11:39AM | 7 | WITH CENTCOM; UNDERSTANDING THE TEST LIST THAT THEY ACTUALLY |
| 11:39AM | 8 | WANTED US TO DEVELOP FOR THEM, WE HAD A NUMBER OF CHANGES TO |
| 11:39AM | 9 | THAT OVER TIME; UNDERSTANDING HOW THIS WORK MIGHT BE COMBINED |
| 11:39AM | 10 | WITH OR OTHERWISE INTERFACE WITH OTHER CONVERSATIONS WE WERE |
| 11:39AM | 11 | HAVING WITHIN DOD; HOW TO CONTRACT WITH THEM, WHETHER WE NEEDED |
| 11:39AM | 12 | TO CONTRACT THROUGH A SUBCONTRACTOR. |
| 11:39AM | 13 | THERE WAS A WHOLE SERIES OF WORK STREAMS THAT HAD TO BE |
| 11:39AM | 14 | DEALT WITH. |
| 11:39AM | 15 | Q.   OKAY.  AND IF YOU LOOK AT PAGE 4, THERE'S A SECTION HERE |
| 11:40AM | 16 | THAT IS LISTED AS STUDY FACILITIES. |
| 11:40AM | 17 | DO YOU SEE THAT? |
| 11:40AM | 18 | A.   I DO. |
| 11:40AM | 19 | Q.   AND UNDER THAT IT SAYS -- IT ASKS FOR A LIST OF LOCATIONS |
| 11:40AM | 20 | WHERE STUDY PROCEDURES WILL BE PERFORMED. |
| 11:40AM | 21 | DO YOU SEE THAT? |
| 11:40AM | 22 | A.   YES. |
| 11:40AM | 23 | Q.   AND THE LOCATION FOR THIS STUDY WAS TO BE THE COMBINED |
| 11:40AM | 24 | JOINT THEATRE HOSPITAL AT BAGRAM AIR FORCE BASE IN AFGHANISTAN? |
| 11:40AM | 25 | A.   YES. |

7772

| 11:40AM | 1 | Q.   AND AFTER THE EXECUTION -- WELL, LET ME DIRECT YOUR |
| 11:40AM | 2 | ATTENTION TO ACTUALLY ONE OTHER PORTION OF THE -- OF THIS |
| 11:40AM | 3 | DOCUMENT. |
| 11:40AM | 4 | IF WE CAN LOOK AT PAGE 8 OF THE EXHIBIT. |
| 11:40AM | 5 | DO YOU SEE THE SECTION THERE THAT IS LABELLED 4 AND IT |
| 11:40AM | 6 | SAYS BACKGROUND AND SIGNIFICANCE? |
| 11:40AM | 7 | A.   YES. |
| 11:40AM | 8 | Q.   AND DID YOU UNDERSTAND THAT THIS WAS A PROVISION IN THE |
| 11:40AM | 9 | AGREEMENT THAT SUMMARIZED WHY THIS STUDY WAS TO BE PERFORMED |
| 11:41AM | 10 | BETWEEN THERANOS AND THE DEPARTMENT OF DEFENSE? |
| 11:41AM | 11 | A.   I DID. |
| 11:41AM | 12 | Q.   AND IF YOU LOOK AT THE LAST PARAGRAPH, DO YOU SEE THAT |
| 11:41AM | 13 | WHERE IT BEGINS "SUGGESTED AREAS OF USE"? |
| 11:41AM | 14 | A.   I DO. |
| 11:41AM | 15 | Q.   AND IT LISTS A VARIETY OF PLACES WHERE POTENTIAL USE FOR |
| 11:41AM | 16 | THE THERANOS DEVICES IS SET FORTH. |
| 11:41AM | 17 | DO YOU SEE THAT? |
| 11:41AM | 18 | A.   YES. |
| 11:41AM | 19 | Q.   AND THERE'S A LIST OF ROLE III FACILITIES IN ROMAN |
| 11:41AM | 20 | NUMBERS? |
| 11:41AM | 21 | A.   YES. |
| 11:41AM | 22 | Q.   DO YOU KNOW WHAT THAT REFERS TO? |
| 11:41AM | 23 | A.   I THINK THAT IS THE SAME KIND OF BASE AS THE BAGRAM |
| 11:41AM | 24 | AIR FORCE BASE WHERE MEDICAL CARE IS BEING PROVIDED TO PEOPLE |
| 11:41AM | 25 | IN FIELD. |

7773

| | | |
|---|---|---|
| 11:41AM | 1 | Q.   AND THEN DO YOU SEE THAT ANOTHER SUGGESTED AREA IS MEDEVAC |
| 11:42AM | 2 | PLATFORMS? |
| 11:42AM | 3 | A.   YES. |
| 11:42AM | 4 | Q.   AND DO YOU SEE THEN THAT THERE'S A REFERENCE TO ANOTHER |
| 11:42AM | 5 | USE BEING IN CONNECTION WITH SOF UNITS? |
| 11:42AM | 6 |   DO YOU SEE THAT? |
| 11:42AM | 7 | A.   I DO. |
| 11:42AM | 8 | Q.   AND DO YOU SEE THE REFERENCE TO MORTUARY AFFAIRS AFTER |
| 11:42AM | 9 | THAT? |
| 11:42AM | 10 | A.   YES. |
| 11:42AM | 11 | Q.   I'M REFERRING TO USE IN CONNECTION -- FOR IDENTIFICATION |
| 11:42AM | 12 | IN CONNECTION WITH DECEASED PERSONNEL? |
| 11:42AM | 13 | A.   YES. |
| 11:42AM | 14 | Q.   AND THEN DO YOU SEE THAT THE NEXT PARAGRAPH OF THE |
| 11:42AM | 15 | BACKGROUND SECTION TALKS ABOUT THE POTENTIAL THAT MIGHT BE |
| 11:42AM | 16 | REALIZED FROM THE THERANOS SYSTEM IF DEPLOYED IN THOSE |
| 11:42AM | 17 | CIRCUMSTANCES? |
| 11:42AM | 18 | A.   I DO. |
| 11:42AM | 19 | Q.   NOW, THIS WAS EXECUTED IN LATE 2012; CORRECT? |
| 11:42AM | 20 | A.   YES. |
| 11:42AM | 21 | Q.   AND YOU MENTIONED THE REGULATORY PROCESSES AND OTHER |
| 11:43AM | 22 | THINGS THAT TOOK PLACE PRIOR TO THE AGREEMENT BEING SIGNED. |
| 11:43AM | 23 |   WHAT HAPPENED AFTER THE AGREEMENT WAS SIGNED WITH RESPECT |
| 11:43AM | 24 | TO THIS STUDY? |
| 11:43AM | 25 | A.   THEN WE NEEDED TO START THE CUSTOMIZATION WORK FOR DOD. |

7774

11:43AM  1    WE INVESTED IN BUILDING A CUSTOM DEVICE THAT COULD MEET

11:43AM  2    THESE GOALS OF BEING ABLE TO BE USED IN VERY REMOTE AREAS OR

11:43AM  3    ULTIMATELY ON MEDEVAC.

11:43AM  4    WE INVESTED IN DEVELOPING THE CHEMISTRIES AND THE TESTS

11:43AM  5    THAT WERE OF VALUE FOR TRIAGE IN THESE SITUATIONS, A WHOLE NEW

11:43AM  6    SOFTWARE SUITE.  THERE WAS VIBRATION CONFIGURATIONS THAT NEEDED

11:43AM  7    TO BE DONE FOR THE DEVICE; BIO SAFETY CONFIGURATIONS TO MAKE IT

11:43AM  8    ACT LIKE A BIO PORTAL ALMOST, A HEPA FILTER TYPE SYSTEM THAT

11:43AM  9    WAS BUILT IN, AND ALL OF THE ENGINEERING AND SCIENTIFIC WORK

11:44AM  10   THAT WENT INTO CREATING IT.

11:44AM  11   Q.   AT ANY TIME DURING THE PROCESS OF ENGAGING WITH CENTCOM,

11:44AM  12   DID PERSONNEL FROM CENTCOM VISIT THERANOS?

11:44AM  13   A.   YES.

11:44AM  14   Q.   AND DID THEY, DURING THE COURSE OF THAT VISIT, LOOK AT

11:44AM  15   THERANOS TECHNOLOGY?

11:44AM  16   A.   THEY DID.

11:44AM  17   Q.   AND DURING THE COURSE OF THE RELATIONSHIP, DID THERANOS

11:44AM  18   SEND DEVICES SO THAT CENTCOM COULD EVALUATE THEIR USEFULNESS IN

11:44AM  19   CONNECTION WITH POTENTIAL DEPLOYMENT?

11:44AM  20   A.   WE SENT DEVICES ONCE WE HAD BUILT THE SECURITY SOFTWARE

11:44AM  21   AND MADE THE CHANGES TO THE DEVICE FOR THAT TO THEIR AIR FORCE

11:44AM  22   BASE IN FLORIDA.

11:44AM  23   Q.   OKAY.  NOW, DID YOU CONTINUE THROUGHOUT 2013 WORKING ON A

11:44AM  24   DEPLOYMENT IN CONNECTION WITH THE USE OF THE THERANOS DEVICES

11:44AM  25   IN THE CONFLICT IN AFGHANISTAN?

| | | |
|---|---|---|
| 11:44AM | 1 | A.  WE DID.  WE CONTINUED INVESTING A TREMENDOUS AMOUNT IN IT. |
| 11:44AM | 2 | Q.  AND WHEN YOU SAY "INVESTING A TREMENDOUS AMOUNT," WHAT |
| 11:44AM | 3 | KIND OF DOLLAR FIGURE ARE YOU REFERRING TO? |
| 11:45AM | 4 | A.  TENS OF MILLIONS OF DOLLARS. |
| 11:45AM | 5 | Q.  AND WHAT IN PARTICULAR WERE YOU WORKING TO DEVELOP AS A |
| 11:45AM | 6 | RESULT OF THAT INVESTMENT? |
| 11:45AM | 7 | A.  THE DEVICE THAT WOULD BE SPECIFIC TO DOD REQUIREMENTS FOR |
| 11:45AM | 8 | SIZE, FOR PORTABILITY, FOR USE IN REMOTE AREAS, FOR USE ON |
| 11:45AM | 9 | FLIGHT AND ALL OF THE TESTS THAT WERE MOST MEANINGFUL TO BE |
| 11:45AM | 10 | ABLE TO BE USED IN THAT SETTING, ALL OF THE SOFTWARE THAT WOULD |
| 11:45AM | 11 | BE USED BY PEOPLE IN THOSE SETTINGS, AND THEN THE |
| 11:45AM | 12 | CONFIGURATIONS FOR THOSE ENVIRONMENTS WHICH WERE VERY DIFFERENT |
| 11:45AM | 13 | THAN A RETAIL STORE. |
| 11:45AM | 14 | Q.  AND WERE YOU STILL WORKING ON THAT PROJECT AS OF THE END |
| 11:45AM | 15 | OF 2013? |
| 11:45AM | 16 | A.  WE WERE. |
| 11:45AM | 17 | Q.  AND DID YOU CONTINUE TO WORK ON THAT PROJECT UNTIL WELL |
| 11:45AM | 18 | INTO 2014? |
| 11:45AM | 19 | A.  YES. |
| 11:45AM | 20 | Q.  DID THERANOS EVER HAVE A DEVICE TESTED WITHIN AFGHANISTAN? |
| 11:46AM | 21 | A.  NO. |
| 11:46AM | 22 | Q.  WAS -- WHY NOT? |
| 11:46AM | 23 | A.  WE WEREN'T ABLE TO FINISH THE WORK IN TIME BASED ON THE |
| 11:46AM | 24 | TIMELINES IN THE CONTRACT. |
| 11:46AM | 25 | Q.  OKAY.  WHAT OTHER ACTIVITIES WAS THERANOS UNDERTAKING IN |

7776

| | | |
|---|---|---|
| 11:46AM | 1 | 2013 AND '14? |
| 11:46AM | 2 | A.   WE WERE LAUNCHING OUR SERVICES AT RETAIL. |
| 11:46AM | 3 | Q.   WERE YOU DISAPPOINTED THAT THE TESTS NEVER WERE COMPLETED? |
| 11:46AM | 4 | A.   VERY MUCH SO, BUT I CONTINUED TO BELIEVE THAT WE WOULD SEE |
| 11:46AM | 5 | IT THROUGH. |
| 11:46AM | 6 | Q.   NOW, LET'S TALK ABOUT ANY RELATIONSHIP BETWEEN THERANOS |
| 11:46AM | 7 | AND THE UNITED STATES SPECIAL OPERATIONS COMMAND. |
| 11:46AM | 8 | ARE YOU FAMILIAR WITH THAT? |
| 11:46AM | 9 | A.   I AM, YES. |
| 11:46AM | 10 | Q.   AND IS THE SPECIAL OPERATIONS COMMAND SOMETIMES |
| 11:46AM | 11 | ABBREVIATED SOCOM? |
| 11:46AM | 12 | A.   IT IS. |
| 11:46AM | 13 | Q.   AND THAT'S SEPARATE FROM CENTCOM? |
| 11:46AM | 14 | A.   YES. |
| 11:46AM | 15 | Q.   AND DID THERANOS DEVELOP A RELATIONSHIP WITH SOCOM? |
| 11:47AM | 16 | A.   WE DID. |
| 11:47AM | 17 | Q.   WHEN DID THERANOS BEGIN TO TRY TO WORK WITH SOCOM? |
| 11:47AM | 18 | A.   IN 2012 AS WELL, I THINK. |
| 11:47AM | 19 | Q.   AND DID THERANOS ULTIMATELY ENTER INTO AN AGREEMENT WITH |
| 11:47AM | 20 | SOCOM AS WELL? |
| 11:47AM | 21 | A.   YES. |
| 11:47AM | 22 | Q.   OKAY.  WERE THE TIMELINES FOR THAT PROJECT PUSHED BACK? |
| 11:47AM | 23 | A.   YES. |
| 11:47AM | 24 | Q.   AND WHY WAS THAT? |
| 11:47AM | 25 | A.   AGAIN, WE NEEDED THE TIME TO REALLY DEVELOP THIS NEW |

7777

| | | |
|---|---|---|
| 11:47AM | 1 | DEVICE THE RIGHT WAY, AND ALSO ACCOMMODATE A DIFFERENT TEST |
| 11:47AM | 2 | MENU THAT THEY HAD REQUESTED FOR USE IN THEIR SETTINGS. |
| 11:47AM | 3 | Q.   DID THE DEVICE THAT YOU WERE DEVELOPING TO USE IN |
| 11:47AM | 4 | CONNECTION WITH THESE MILITARY PROGRAMS, DID IT HAVE A NAME? |
| 11:47AM | 5 | A.   IT DID. |
| 11:47AM | 6 | Q.   AND WHAT WAS ITS NAME? |
| 11:47AM | 7 | A.   WE CALLED IT THE 4S DEVICE. |
| 11:47AM | 8 | Q.   DID THERANOS EVER DELIVERED A 4S DEVICE TO SOCOM? |
| 11:47AM | 9 | A.   YES. |
| 11:47AM | 10 | Q.   AND WHAT DID THERANOS DELIVER TO SOCOM? |
| 11:47AM | 11 | A.   WE SHIPPED I THINK TWO OR MORE 4S DEVICES TO A SOCOM |
| 11:48AM | 12 | FACILITY. |
| 11:48AM | 13 | Q.   HOW MANY PERSONNEL AT THERANOS WERE INVOLVED IN WORKING ON |
| 11:48AM | 14 | THE DEVELOPMENT OF THIS MILITARY SPECIFIC SET OF DEVICES? |
| 11:48AM | 15 | A.   DOZENS OF ENGINEERS AND SCIENTISTS. |
| 11:48AM | 16 | Q.   NOW, DO YOU RECALL DURING THE COURSE OF THE CASE THERE'S |
| 11:48AM | 17 | BEEN TESTIMONY ABOUT STATEMENTS THAT YOU MADE REGARDING |
| 11:48AM | 18 | THERANOS DEVICES ON MEDEVACS? |
| 11:48AM | 19 | A.   I DO. |
| 11:48AM | 20 | Q.   DO YOU RECALL THAT TESTIMONY? |
| 11:48AM | 21 | A.   YES. |
| 11:48AM | 22 | Q.   AND WERE THERANOS DEVICES USED FOR CLINICAL CARE ON |
| 11:48AM | 23 | MEDEVACS? |
| 11:48AM | 24 | A.   NO. |
| 11:48AM | 25 | Q.   DID YOU TELL ANYONE THAT? |

11:48AM  1      A.   I DON'T THINK I DID.

11:48AM  2      Q.   DID YOU TALK ABOUT THERANOS AND MEDEVACS AND A PROGRAM AT

11:48AM  3      THERANOS INVOLVING MEDEVACS?

11:49AM  4      A.   YES.

11:49AM  5      Q.   AND WHAT DO YOU RECALL YOU WERE TRYING TO CONVEY?

11:49AM  6      A.   I WAS TRYING TO CONVEY THAT WE WERE DOING A LOT OF WORK ON

11:49AM  7      DEVELOPING THIS NEW DEVICE FOR USE ON MEDEVACS AND IN REMOTE

11:49AM  8      AREAS.

11:49AM  9           IT WAS SOMETHING THAT I WAS INCREDIBLY PROUD OF THE WORK

11:49AM  10     THE TEAM WAS DOING AND INCREDIBLY EXCITED ABOUT BECAUSE WE HAD

11:49AM  11     CONTRACTS TO DO THIS AND WERE WORKING WITH ORGANIZATIONS IN THE

11:49AM  12     MILITARY TO BE ABLE TO TEST THE TECHNOLOGY TO ULTIMATELY

11:49AM  13     POTENTIALLY USE IT IN THESE SETTINGS.

11:49AM  14     Q.   DID YOU TALK IN THOSE CONVERSATIONS ABOUT POTENTIAL

11:49AM  15     APPLICATIONS FOR THERANOS'S DEVICE, HOW IT MIGHT BE USED IF IT

11:49AM  16     WERE CAPABLE OF BEING DEPLOYED?

11:49AM  17     A.   DEFINITELY.

11:49AM  18     Q.   AND WAS THAT SOMETHING THAT YOU FREQUENTLY SPOKE ABOUT?

11:49AM  19     A.   I SPOKE ABOUT IT ON OCCASION.

11:49AM  20           BUT WE ALSO WOULD TALK ABOUT THE FACT THAT WE WERE

11:50AM  21     GENERALLY PRIORITIZING OUR RETAIL INITIATIVES OVER ANYTHING

11:50AM  22     ELSE AT THAT POINT.

11:50AM  23     Q.   LET ME TURN TO THE SUBJECT OF DEMONSTRATIONS OF THERANOS'S

11:50AM  24     TECHNOLOGY.

11:50AM  25           DO YOU RECALL SOME DISCUSSION OF THAT DURING THE COURSE OF

7779

| 11:50AM | 1 | THE CASE? |
| 11:50AM | 2 | A.   I DO. |

11:50AM  3    Q.   AND DID THERANOS PROVIDE DEMONSTRATIONS TO OUTSIDERS OF

11:50AM  4    ITS TECHNOLOGY DURING THE TIME THAT YOU WERE THERE?

11:50AM  5    A.   YES.

11:50AM  6    Q.   AND WHY DID THERANOS CONDUCT THOSE DEMONSTRATIONS?

11:50AM  7    A.   WE CONDUCTED DEMONSTRATIONS TO SHOW PEOPLE DIFFERENT

11:50AM  8    ASPECTS OF OUR INVENTIONS AND TECHNOLOGY BASED ON WHAT WE WERE

11:50AM  9    TALKING WITH THEM ABOUT AND WHAT THEY WERE INTERESTED IN.

11:50AM  10   Q.   AND WHEN DID YOU START CONDUCTING THOSE DEMONSTRATIONS?

11:50AM  11   A.   PROBABLY AT THE BEGINNING OF THE COMPANY WHEN WE FIRST

11:50AM  12   STARTED.

11:50AM  13   Q.   AND OVER WHAT PERIOD OF TIME DID YOU CONTINUE TO OFFER

11:50AM  14   DEMONSTRATIONS OF THERANOS'S TECHNOLOGY?

11:50AM  15   A.   THROUGHOUT THE COMPANY'S LIFETIME.

11:51AM  16   Q.   HOW MANY DEMONSTRATIONS OF THERANOS'S TECHNOLOGY WERE YOU

11:51AM  17   PERSONALLY INVOLVED IN DURING THE COURSE OF YOUR TIME AT

11:51AM  18   THERANOS?

11:51AM  19   A.   PROBABLY HUNDREDS.

11:51AM  20   Q.   NOW, YOU TALKED ABOUT THE APPLICATIONS THAT THE PERSON

11:51AM  21   RECEIVING THE DEMONSTRATION MIGHT BE INTERESTED IN.

11:51AM  22        WHAT DO YOU MEAN BY THAT?  WERE DIFFERENT AUDIENCES

11:51AM  23   INTERESTED IN DIFFERENT ASPECTS OF THERANOS'S TECHNOLOGY?

11:51AM  24   A.   YES, THEY WERE.

11:51AM  25   Q.   AND DID YOU TRY TO CUSTOMIZE DEVICES, CUSTOMIZE

7780

| | | |
|---|---|---|
| 11:51AM | 1 | PRESENTATIONS TO ACCOMMODATE THAT? |
| 11:51AM | 2 | A.   WE DID.   IN SOME CIRCUMSTANCES PEOPLE MIGHT BE INTERESTED |
| 11:51AM | 3 | IN SEEING THE PROCESS THAT WE WERE PLANNING OR RUNNING AT |
| 11:51AM | 4 | RETAIL, AND WE WOULD TRY TO REPLICATE OR MIMIC THAT IN OUR |
| 11:51AM | 5 | BUILDING. |
| 11:51AM | 6 | IN SOME CASES, LIKE IN THE CASE OF THE MILITARY, THERE |
| 11:51AM | 7 | WERE QUESTIONS ABOUT HOW YOU COULD TAKE A DEVICE IN FIELD OR TO |
| 11:51AM | 8 | A REMOTE LOCATION AND WE WOULD FOCUS ON THE DEVICE. |
| 11:52AM | 9 | IN SOME CASES THERE WERE QUESTIONS ABOUT WHETHER AN |
| 11:52AM | 10 | UNTRAINED PERSON COULD FIGURE OUT HOW TO USE THE DEVICE, AND WE |
| 11:52AM | 11 | WOULD FOCUS ON THE TOUCHSCREEN AND HOW TO DO THE COLLECTION |
| 11:52AM | 12 | PROCESS, FOR EXAMPLE. |
| 11:52AM | 13 | Q.   OKAY.   NOW, LET'S TALK ABOUT THE LOCATION OF THESE |
| 11:52AM | 14 | DEMONSTRATIONS THAT YOU DID. |
| 11:52AM | 15 | DID YOU ALWAYS DO THE DEMONSTRATIONS IN THERANOS'S OFFICE? |
| 11:52AM | 16 | A.   NO. |
| 11:52AM | 17 | Q.   WOULD YOU TAKE THEM OUT ON THE ROAD TO USE IN OTHER |
| 11:52AM | 18 | PEOPLE'S OFFICES? |
| 11:52AM | 19 | A.   YES. |
| 11:52AM | 20 | Q.   AND DID THAT INCLUDE DEMONSTRATIONS OF THE 3.0 SERIES |
| 11:52AM | 21 | DEVICE? |
| 11:52AM | 22 | A.   IT DID. |
| 11:52AM | 23 | Q.   AND WAS THE 3.0 SERIES OF DEVICE THE DEVICE THAT YOU |
| 11:52AM | 24 | PERSONALLY DEMONSTRATED BETWEEN 2006 AND 2011 OR SO? |
| 11:52AM | 25 | A.   YES. |

7781

11:52AM 1    Q.   WHEN YOU CONDUCTED THOSE DEVICES AT REMOTE LOCATIONS, DID

11:53AM 2    YOU ALWAYS REPORT THE RESULTS OF THE DEMONSTRATION TO THE

11:53AM 3    PERSON WHO WAS INVOLVED IN RECEIVING IT?

11:53AM 4    A.   YES.

11:53AM 5    Q.   AND DID YOU HAVE MEETINGS IN CONNECTION WITH VARIOUS

11:53AM 6    PHARMACEUTICAL PARTNERS OVER A PERIOD OF TIME?

11:53AM 7    A.   WE DID, YES.

11:53AM 8    Q.   AND DID YOU TAKE THE DEVICE WITH YOU ALSO ON SOME

11:53AM 9    OCCASIONS SIMPLY FOR PEOPLE TO LOOK AT?

11:53AM 10   A.   YES.

11:53AM 11   Q.   AND THE TYPES OF PEOPLE WHO WERE RECEIVING DEMONSTRATIONS,

11:53AM 12   GIVE US AN IDEA OF WHO YOU MIGHT DEMONSTRATE THE TECHNOLOGY TO.

11:53AM 13   A.   WE WOULD DEMONSTRATE IT TO HOSPITAL SYSTEMS OR HEALTH

11:53AM 14   SYSTEMS THAT WE WERE MEETING WITH; TO PEOPLE WHO MIGHT BECOME

11:53AM 15   ADVISORS TO THERANOS; TO PARTNERS OR POTENTIAL PARTNERS; TO

11:53AM 16   INVESTORS OR POTENTIAL INVESTORS; TO PEOPLE WHO WE WANTED TO

11:53AM 17   GET INVOLVED WITH WORKING WITH THE COMPANY IN SOME WAY OR WERE

11:53AM 18   OTHERWISE INTERESTED IN WORKING WITH.

11:54AM 19   Q.   AND YOU BROUGHT A DEVICE TO YOUR MEETING WITH

11:54AM 20   JOHNS HOPKINS DURING THE WALGREENS DUE DILIGENCE PROCESS?

11:54AM 21   A.   YES.

11:54AM 22   Q.   AND DID YOU BRING A DEVICE TO UCSF IN CONNECTION WITH THE

11:54AM 23   SAFEWAY DILIGENCE PROCESS?

11:54AM 24   A.   I DID.

11:54AM 25   Q.   IN ADDITION TO CONDUCTING DEMONSTRATIONS, DID THERANOS

| | | |
|---|---|---|
| 11:54AM | 1 | SOMETIMES GIVE ITS TECHNOLOGY TO VARIOUS PEOPLE FOR THEM TO |
| 11:54AM | 2 | RETAIN AND EXAMINE? |
| 11:54AM | 3 | A.   YES. |
| 11:54AM | 4 | Q.   DO YOU RECALL WHETHER ONE OF THOSE INSTITUTIONS WAS |
| 11:54AM | 5 | WALGREENS? |
| 11:54AM | 6 | A.   IT WAS. |
| 11:54AM | 7 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7129. |
| 11:54AM | 8 | A.   IS THIS 3 OR? |
| 11:54AM | 9 | Q.   VOLUME 4. |
| 11:54AM | 10 | A.   VOLUME 4.   OKAY. |
| 11:55AM | 11 | Q.   WAS RENAAT VANDENHOOFF AN EXECUTIVE AT WALGREENS WITH WHOM |
| 11:55AM | 12 | YOU DEALT? |
| 11:55AM | 13 | A.   YES. |
| 11:55AM | 14 | Q.   IS THIS AN EMAIL ABOUT THE AGREEMENT BETWEEN WALGREENS AND |
| 11:55AM | 15 | THERANOS FROM 2010? |
| 11:55AM | 16 | A.   IT IS. |
| 11:55AM | 17 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 11:55AM | 18 | 7129. |
| 11:55AM | 19 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 11:55AM | 20 | THE COURT:  IT'S ADMITTED. |
| 11:55AM | 21 | (DEFENDANT'S EXHIBIT 7129 WAS RECEIVED IN EVIDENCE.) |
| 11:55AM | 22 | BY MR. DOWNEY: |
| 11:55AM | 23 | Q.   AND DO YOU SEE IN THE FIRST TWO SENTENCES MR. VANDENHOOFF |
| 11:55AM | 24 | ASKS MR. BALWANI AND YOURSELF IF WALGREENS COULD HAVE A FEW |
| 11:56AM | 25 | DEVICES FOR DEMOS THE WEEK BEFORE SO WE CAN DO A FEW TESTS. |

7783

11:56AM  1          DO YOU SEE THAT?

11:56AM  2     A.   I DO.

11:56AM  3     Q.   AND WAS THIS IN CONNECTION WITH SOMETHING THAT WALGREENS

11:56AM  4     WAS DOING WITHOUT THERANOS, IF YOU KNOW?

11:56AM  5     A.   YES.

11:56AM  6     Q.   AND IF YOU LOOK AT THE SECOND SENTENCE, MR. VANDENHOOFF

11:56AM  7     SAYS, "I ASSUME WE WON'T HAVE THE MULTI-BAY DEVICES YET SO WE

11:56AM  8     WILL STILL BE LIMITED HOW MANY WE CAN DO AT ONE TIME."

11:56AM  9          DO YOU SEE THAT?

11:56AM  10    A.   YES.

11:56AM  11    Q.   AND WHAT DEVICES DID YOU SEND TO WALGREENS IN RESPONSE TO

11:56AM  12    THIS REQUEST?

11:56AM  13    A.   WE SENT 3 SERIES DEVICES.

11:56AM  14    Q.   WHY DID YOU SEND 3 SERIES DEVICES AT THIS TIME?

11:56AM  15    A.   BECAUSE THOSE WERE THE DEVICES THAT WE HAD BEEN USING IN

11:56AM  16    OUR PROGRAMS WITH PHARMACEUTICAL COMPANIES AND OTHERS.

11:56AM  17    Q.   OKAY.  WHEN YOU SEE -- WHEN MR. VANDENHOOFF SAYS HE

11:56AM  18    ASSUMES THAT YOU WON'T HAVE THE MULTI-BAY DEVICES, IS THAT

11:57AM  19    SOMETHING THAT YOU HAD COMMUNICATED WITH INDIVIDUALS AT

11:57AM  20    WALGREENS?

11:57AM  21    A.   IT IS.

11:57AM  22    Q.   NOW, I WANT TO FOCUS ON THE PERIOD BETWEEN 2011 AND 2016

11:57AM  23    AND THE DEMONSTRATIONS THAT YOU AND OTHERS AT THERANOS

11:57AM  24    CONDUCTED DURING THAT PERIOD.

11:57AM  25         WHO WAS INVOLVED IN PREPARING AND CONDUCTING

7784

11:57AM  1    DEMONSTRATIONS AT THERANOS?

11:57AM  2    A.   OUR SCIENTISTS AND ENGINEERS FROM THE VARIOUS TECHNICAL

11:57AM  3    TEAMS, AND OUR PROJECT AND PRODUCT MANAGERS.

11:57AM  4    Q.   DID THAT INCLUDE MR. EDLIN?

11:57AM  5    A.   IT DID.

11:57AM  6    Q.   AND WAS DR. YOUNG INVOLVED AS WELL?

11:57AM  7    A.   HE WAS.

11:57AM  8    Q.   WHO ROLE DID HE PLAY?

11:57AM  9    A.   DR. YOUNG OVERSAW THE DEMO PROCESS AND THE REVIEW OF

11:57AM  10   RESULTS BEFORE THEY WERE RELEASED.

11:57AM  11   Q.   OKAY.  NOW, WERE YOU AT EVERY DEMONSTRATION THAT THERANOS

11:58AM  12   CONDUCTED?

11:58AM  13   A.   NO.

11:58AM  14   Q.   WERE YOU AT MANY OF THEM?

11:58AM  15   A.   I WAS.

11:58AM  16   Q.   AND WERE THE DEMONSTRATIONS CONDUCTED ACCORDING TO AN

11:58AM  17   IDENTICAL PROCESS?

11:58AM  18   A.   NO.

11:58AM  19   Q.   HOW DID THEY VARY?

11:58AM  20   A.   THEY VARIED BASED ON THE DISCUSSION WE WERE HAVING AND THE

11:58AM  21   PURPOSE OF THE DEMONSTRATION, WHAT SOMEONE WANTED TO SEE.

11:58AM  22        SO WE WOULD CUSTOMIZE THAT BASED ON GENERALLY THEIR

11:58AM  23   REQUESTS.

11:58AM  24   Q.   WELL, IN SOME INSTANCES WOULD PEOPLE SAY, I'D LIKE TO HAVE

11:58AM  25   MY BLOOD DRAWN AND HAVE IT READ?

11:58AM 1    A.   EXACTLY.

11:58AM 2    Q.   WERE THERE OTHER INSTANCES WHEN PEOPLE WEREN'T INTERESTED

11:58AM 3    IN DOING THAT?

11:58AM 4    A.   YES, THERE WERE OTHER INSTANCES WHERE PEOPLE ACTUALLY DID

11:58AM 5    NOT WANT TO GIVE BLOOD OR DO A FINGERSTICK, BUT THEY WANTED TO

11:58AM 6    UNDERSTAND, FOR EXAMPLE, HOW THE DEVICES WORKED AND WHAT IT

11:58AM 7    WOULD BE LIKE FOR SOMEONE TO USE THE DEVICE.

11:58AM 8    Q.   OKAY.  AND CAN YOU EXPLAIN IF THE -- IF THERE WAS NOT AN

11:59AM 9    ACTUAL BLOOD SAMPLE DRAWN, WHAT WOULD THAT PROCESS LOOK LIKE TO

11:59AM 10   SOMEONE RECEIVING A DEMONSTRATION?

11:59AM 11   A.   IF NO SAMPLE WAS DRAWN, THE DEVICE WOULD BE CONFIGURED TO

11:59AM 12   BE ABLE TO RECEIVE A CARTRIDGE, EVEN THOUGH THERE WASN'T A

11:59AM 13   SAMPLE IN THE CARTRIDGE, SO THAT WE COULD SHOW THE TOUCHSCREEN

11:59AM 14   WITH ALL OF THE INPUTS THAT A PERSON COULD PUT IN ABOUT THEIR

11:59AM 15   HEALTH OR OTHER INFORMATION THAT COULD BE THEN INTEGRATED IN

11:59AM 16   THE APP.

11:59AM 17   Q.   AND WHAT WOULD HAPPEN IF YOU, IN THE ORDINARY COURSE IF

11:59AM 18   YOU PUT A CARTRIDGE IN WITH NO BLOOD SAMPLE IN IT?

11:59AM 19   A.   THE MACHINE WOULD REJECT IT.

11:59AM 20   Q.   AND WOULD YOU BE ABLE TO RUN THE PROCESS OF THE MACHINE

11:59AM 21   WORKING ITS WAY THROUGH TO THE END OF THE TEST?

11:59AM 22   A.   NO.

11:59AM 23   Q.   AND I THINK YOU MENTIONED A PROTOCOL WOULD ALLOW FOR THAT?

11:59AM 24   A.   YES.

11:59AM 25   Q.   DO YOU NOW UNDERSTAND THAT THAT'S WHAT HAS BEEN REFERRED

7786

| | | |
|---|---|---|
| 12:00PM | 1 | TO AS THE NULL PROTOCOL? |
| 12:00PM | 2 | A.   I UNDERSTAND THAT NOW. |
| 12:00PM | 3 | Q.   DID YOU UNDERSTAND THAT -- DID YOU HEAR THAT TERM AT THE |
| 12:00PM | 4 | TIME? |
| 12:00PM | 5 | A.   I DID. |
| 12:00PM | 6 | Q.   DID YOU HAVE ANY CONCERN AT THE TIME THAT THIS METHOD OF |
| 12:00PM | 7 | DEMONSTRATION WAS MISLEADING? |
| 12:00PM | 8 | A.   NOT AT ALL. |
| 12:00PM | 9 | Q.   DID ANYONE AT THERANOS EVER EXPRESS A CONCERN TO YOU THAT |
| 12:00PM | 10 | THEY THOUGHT YOU WERE MISLEADING PEOPLE BY CONDUCTING |
| 12:00PM | 11 | DEMONSTRATIONS IN THIS WAY? |
| 12:00PM | 12 | A.   NOT AT ALL. |
| 12:00PM | 13 | Q.   NOW, WE'VE TALKED ABOUT THE FACT THAT IN YOUR RELATIONSHIP |
| 12:00PM | 14 | WITH WALGREENS, THERE WAS A PHASE I AND A PHASE II. |
| 12:00PM | 15 | DO YOU RECALL THAT DISCUSSION? |
| 12:00PM | 16 | A.   I DO. |
| 12:00PM | 17 | Q.   AND IN PHASE I, THE SAMPLES THAT WERE DRAWN FROM PATIENTS |
| 12:00PM | 18 | WOULD BE TESTED IN THE CENTRAL LABORATORY AT THERANOS; IS THAT |
| 12:00PM | 19 | RIGHT? |
| 12:00PM | 20 | A.   YES. |
| 12:00PM | 21 | Q.   AND COULD YOU -- IF CONDUCTING A DEMONSTRATION IN |
| 12:00PM | 22 | THERANOS'S HEADQUARTERS, COULD YOU REPLICATE THE PHASE I |
| 12:00PM | 23 | PROCESS FOR SOMEONE RECEIVING THE DEMONSTRATION? |
| 12:01PM | 24 | A.   WE DID, YES. |
| 12:01PM | 25 | Q.   AND TELL US HOW YOU WENT ABOUT DOING THAT. |

12:01PM 1    A.   WE PHYSICALLY CONSTRUCTED WELLNESS CENTERS INSIDE OF

12:01PM 2    THERANOS WHERE PEOPLE COULD COME INTO A ROOM THAT WAS DESIGNED

12:01PM 3    TO LOOK LIKE A WALGREENS SERVICE CENTER, HAVE A PHLEBOTOMIST

12:01PM 4    CHECK THEM IN, DO A COLLECTION OF THE FINGERSTICK JUST LIKE YOU

12:01PM 5    WOULD DO IN THE STORE, AND HAVE THOSE SAMPLES TRANSPORTED TO

12:01PM 6    OUR LAB.

12:01PM 7    Q.   OKAY.  AND PHASE II OF THE RELATIONSHIP WAS TO BE A

12:01PM 8    SITUATION WHERE THE TESTING WOULD ACTUALLY BE PERFORMED IN THE

12:01PM 9    STORE; IS THAT RIGHT?

12:01PM 10   A.   YES.

12:01PM 11   Q.   AND WERE YOU ALSO ABLE TO DEMONSTRATE TO PEOPLE RECEIVING

12:01PM 12   DEMONSTRATIONS HOW THAT PROCESS WOULD WORK?

12:01PM 13   A.   WE DID.

12:01PM 14   Q.   AND COULD YOU EXPLAIN HOW THAT WOULD WORK?

12:01PM 15   A.   YES.  IN THAT CASE YOU HAVE THE DEVICE RIGHT WHERE THE

12:01PM 16   PATIENT IS, AND YOU CAN DO A FINGERSTICK AND PUT THE SAMPLE

12:01PM 17   DIRECTLY INTO A CARTRIDGE AND RUN THAT CARTRIDGE ON THE DEVICE

12:02PM 18   RIGHT THERE ON THE SPOT.

12:02PM 19   Q.   AND WOULD THAT REPORT RESULTS?

12:02PM 20   A.   IT DID.

12:02PM 21   Q.   AND IN SOME INSTANCES, WOULD THOSE RESULTS BE REPORTED ON

12:02PM 22   A THERANOS APPLICATION IF THE PERSON RECEIVING THE

12:02PM 23   DEMONSTRATION HAD DOWNLOADED THAT APPLICATION?

12:02PM 24   A.   THEY COULD BE, OR ON THE TOUCHSCREEN OF THE DEVICE

12:02PM 25   THEMSELVES.

12:02PM  1    Q.   OKAY.  NOW, YOU MENTIONED THAT DR. YOUNG WAS THE PERSON

12:02PM  2    RESPONSIBLE FOR REVIEWING THE RESULTS; IS THAT RIGHT?

12:02PM  3    A.   HE WAS.

12:02PM  4    Q.   AND WAS DR. YOUNG THE HEAD OF RESEARCH AND DEVELOPMENT AT

12:02PM  5    THE COMPANY AT THAT TIME?

12:02PM  6    A.   YES.

12:02PM  7    Q.   WHY WAS THE CLIA LAB NOT TYPICALLY INVOLVED IN

12:02PM  8    DEMONSTRATIONS?

12:02PM  9    A.   MUCH OF THE DEMONSTRATIONS WERE BEFORE THE CLIA LAB WAS

12:02PM 10    OPERATIONAL AT RETAIL.

12:02PM 11        BUT THEN OTHERWISE THE DEMONSTRATIONS WERE GENERALLY TO

12:02PM 12    SHOW TECHNOLOGY OR OTHERWISE NEW THINGS THAT THE COMPANY WAS

12:03PM 13    WORKING ON.

12:03PM 14        SO WE HAD A SEPARATE PROCESS FOR TECHNOLOGY DEMONSTRATIONS

12:03PM 15    AS OPPOSED TO A PHYSICIAN ORDERING A LAB TEST FOR A PATIENT.

12:03PM 16    Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 966, WHICH IS

12:03PM 17    ALREADY IN EVIDENCE.

12:03PM 18    A.   OKAY.

12:03PM 19    Q.   AND THAT WOULD BE IN VOLUME 3 OF YOUR -- AND I WANT TO

12:03PM 20    DIRECT YOUR ATTENTION TO PAGE 3 OF THIS EXHIBIT.

12:03PM 21    A.   OKAY.

12:03PM 22    Q.   AND DO YOU SEE AT THE TOP THAT THIS IS LABELLED "THERANOS

12:03PM 23    TEST REPORT TECHNOLOGY DEMONSTRATION"?

12:03PM 24    A.   I DO.

12:03PM 25    Q.   AND DO YOU SEE THAT UNDER ORDERING M.D., THERE'S AN

7789

| | | |
|---|---|---|
| 12:03PM | 1 | INDICATION TECHNOLOGY DEMONSTRATION? |
| 12:03PM | 2 | A.   YES. |
| 12:03PM | 3 | Q.   IN YOUR EXPERIENCE, WERE THE REPORTS RELATED TO THESE |
| 12:03PM | 4 | RESULTS GENERALLY LABELLED ALONG THOSE LINES? |
| 12:03PM | 5 | A.   THEY WERE. |
| 12:03PM | 6 | Q.   WERE THERE INSTANCES WHERE THE CLIA LAB GOT INVOLVED WITH |
| 12:04PM | 7 | THE DEMONSTRATIONS THAT WERE BEING PERFORMED? |
| 12:04PM | 8 | A.   YES. |
| 12:04PM | 9 | Q.   AND WHAT CIRCUMSTANCES WOULD LEAD TO THAT? |
| 12:04PM | 10 | A.   GENERALLY CIRCUMSTANCES WHERE A PATIENT MIGHT SHOW UP AT A |
| 12:04PM | 11 | WALGREENS WITH THE PHYSICIAN ORDER OR OTHERWISE DOING TESTING |
| 12:04PM | 12 | THROUGH THE WALGREENS LOCATIONS. |
| 12:04PM | 13 | Q.   WE SAW OR HEARD SOME TESTIMONY DURING THE GOVERNMENT'S |
| 12:04PM | 14 | CASE RELATED TO, TO CHANGING RESULTS OR MAKING EDITS TO |
| 12:04PM | 15 | RESULTS. |
| 12:04PM | 16 | DO YOU RECALL THAT? |
| 12:04PM | 17 | A.   I DO. |
| 12:04PM | 18 | Q.   AND SOMETIMES THERE WERE INSTANCES WHERE YOU WERE PART OF |
| 12:04PM | 19 | THOSE EMAIL DISCUSSIONS. |
| 12:04PM | 20 | DO YOU RECALL THAT? |
| 12:04PM | 21 | A.   I DO. |
| 12:04PM | 22 | Q.   WHY WERE RESULTS CHANGED OR MODIFIED FROM THE TESTS RUN |
| 12:04PM | 23 | DURING DEMONSTRATIONS? |
| 12:04PM | 24 | A.   MY UNDERSTANDING IS THAT THERE'S A PROCESS FOR THE PEOPLE |
| 12:04PM | 25 | WHO ARE OVERSEEING THE RESULTS TO MAKE SURE THAT THE RESULTS |

7790

| | | |
|---|---|---|
| 12:04PM | 1 | ARE CORRECT. |
| 12:05PM | 2 | SOMETIMES ADJUSTMENTS NEED TO BE MADE TO A REFERENCE |
| 12:05PM | 3 | RANGE, OR IF THERE'S CONCERN ABOUT A RESULT, MY UNDERSTANDING |
| 12:05PM | 4 | IS THAT THAT RESULT SHOULD NOT BE RELEASED. |
| 12:05PM | 5 | AND DR. YOUNG IN THE R&D CONTEXT, OR THE CLINICAL |
| 12:05PM | 6 | LABORATORY, HAD RULES OF HOW TO DO THAT PROPERLY. |
| 12:05PM | 7 | Q.   AND DID YOU UNDERSTAND THAT DR. YOUNG, OR SOMEONE ACTING |
| 12:05PM | 8 | IN HIS PLACE, APPROVED THE RESULTS OF EVERY DEMONSTRATION? |
| 12:05PM | 9 | A.   I DID. |
| 12:05PM | 10 | Q.   IS IT YOUR UNDERSTANDING THAT ON SOME OCCASIONS, ANOTHER |
| 12:05PM | 11 | SCIENTIST WOULD FILL IN IN OVERSEEING THE DEMONSTRATION IF |
| 12:05PM | 12 | DR. YOUNG WAS NOT AVAILABLE? |
| 12:05PM | 13 | A.   YES. |
| 12:05PM | 14 | Q.   DID YOU EVER OVERRULE ANY MEMBER OF THE R&D TEAM OR ANY |
| 12:05PM | 15 | SCIENTIST AS TO WHAT THE RESULTS OF A DEMONSTRATION SHOULD BE? |
| 12:05PM | 16 | A.   NO. |
| 12:05PM | 17 | Q.   WAS THERE EVER ANY INSTANCE WHERE YOU DIRECTED THE |
| 12:06PM | 18 | SCIENTIFIC TEAM TO ENTER RESULTS THAT YOU THOUGHT WERE CONTRARY |
| 12:06PM | 19 | TO WHAT THEY THOUGHT THE APPROPRIATE RESULT WAS? |
| 12:06PM | 20 | A.   NO. |
| 12:06PM | 21 | Q.   NOW, AFTER 2016, DID THE COMPANY CONTINUE TO CONDUCT |
| 12:06PM | 22 | DEMONSTRATIONS? |
| 12:06PM | 23 | A.   YES. |
| 12:06PM | 24 | Q.   AND DID THAT -- |
| 12:06PM | 25 | MR. LEACH:  OBJECTION.  RELEVANCE.  RELEVANCE. |

7791

| | | |
|---|---|---|
| 12:06PM | 1 | THE COURT:  MR. DOWNEY? |
| 12:06PM | 2 | MR. DOWNEY:  I JUST HAVE TWO QUESTIONS, YOUR HONOR. |
| 12:06PM | 3 | THEY RELATE TO A CHANGE IN THE PROCESS AND THAT'S IT. |
| 12:06PM | 4 | THE COURT:  I'LL ALLOW IT. |
| 12:06PM | 5 | BY MR. DOWNEY: |
| 12:06PM | 6 | Q.   AND DID THE PROCESS OF CONDUCTING DEMONSTRATIONS CHANGE AT |
| 12:06PM | 7 | ALL DURING THAT PERIOD? |
| 12:06PM | 8 | A.   YES. |
| 12:06PM | 9 | Q.   AND IN WHAT WAY DID THE PROCESS CHANGE? |
| 12:06PM | 10 | A.   IT CHANGED IN THAT WE OPENED UP THE DEVICE TO ACTUALLY SEE |
| 12:06PM | 11 | THE INSIDE OF THE DEVICE WORKING. |
| 12:06PM | 12 | Q.   NOW, WHEN WE SPOKE A WEEK AGO, WE TALKED ABOUT |
| 12:07PM | 13 | CONVERSATIONS THAT YOU HAD WITH VARIOUS INVESTORS. |
| 12:07PM | 14 | DO YOU RECALL THAT? |
| 12:07PM | 15 | A.   I DO. |
| 12:07PM | 16 | Q.   AND DO YOU RECALL THAT SOME OF YOUR TESTIMONY RELATED TO |
| 12:07PM | 17 | THE INTELLECTUAL PROPERTY THAT THERANOS HAD DEVELOPED? |
| 12:07PM | 18 | A.   YES. |
| 12:07PM | 19 | Q.   AND DO YOU RECALL THAT YOU TESTIFIED THAT SOME INVESTORS |
| 12:07PM | 20 | HAD LOOKED VERY CAREFULLY AT THE PATENTS THAT THERANOS HAD FOR |
| 12:07PM | 21 | ITS TECHNOLOGY? |
| 12:07PM | 22 | A.   YES. |
| 12:07PM | 23 | Q.   DID THAT OCCUR THROUGHOUT THE TIME THAT YOU WERE AT |
| 12:07PM | 24 | THERANOS? |
| 12:07PM | 25 | A.   IT DID. |

| 12:07PM | 1 | Q.   AND DID THERANOS ITSELF AT ANY TIME EVER TRY TO VALUE ITS |
| 12:07PM | 2 | INTELLECTUAL PROPERTY AND MAKE A DETERMINATION OF HOW MUCH THAT |
| 12:07PM | 3 | INTELLECTUAL PROPERTY WAS WORTH? |
| 12:07PM | 4 | A.   YES. |
| 12:07PM | 5 | Q.   WHEN DO YOU RECALL THAT OCCURRING? |
| 12:07PM | 6 | A.   SOME ANALYSIS WAS DONE BY OUR BOARD AROUND 2010 AND AGAIN |
| 12:08PM | 7 | LATER IN 2017. |
| 12:08PM | 8 | Q.   OKAY.  AND TELL US WHAT PROCESS YOU UNDERSTAND WAS |
| 12:08PM | 9 | UNDERTAKEN IN 2010. |
| 12:08PM | 10 | A.   OUR CHAIRMAN HAD EXPERIENCE WORKING WITH MEDICAL DEVICE |
| 12:08PM | 11 | COMPANIES THAT WERE VERY PATENT HEAVY, AND HE HAD PREVIOUSLY |
| 12:08PM | 12 | HAD WILSON SONSINI DO AN ANALYSIS OF OUR PATENT PORTFOLIO AND |
| 12:08PM | 13 | ITS STRENGTHS AND CAME UP WITH A NUMBER THAT HE THOUGHT WAS |
| 12:08PM | 14 | REPRESENTATIVE OF THE VALUE OF THAT IP. |
| 12:08PM | 15 | Q.   AND THIS WAS A VALUATION AS OF 2010? |
| 12:08PM | 16 | A.   YES. |
| 12:08PM | 17 | Q.   AND WAS THAT AROUND THE TIME THAT YOU WERE HAVING |
| 12:08PM | 18 | CONVERSATIONS WITH WALGREENS AND SAFEWAY? |
| 12:08PM | 19 | A.   IT WAS. |
| 12:08PM | 20 | Q.   AND WHAT VALUE WAS ATTRIBUTED TO THERANOS'S PATENT |
| 12:08PM | 21 | PORTFOLIO AT THAT TIME AS OF 2010? |
| 12:08PM | 22 | A.   OVER A BILLION DOLLARS. |
| 12:08PM | 23 | Q.   AND DID YOU -- DID THERANOS CONTINUE TO TRY TO ASSESS THE |
| 12:08PM | 24 | VALUE OF ITS PATENT PORTFOLIO AS IT WENT THROUGH THE PERIOD |
| 12:09PM | 25 | FOLLOWING 2010? |

7793

| | | |
|---|---|---|
| 12:09PM | 1 | A.   WE DID. |
| 12:09PM | 2 | Q.   AND YOU MENTIONED THERE WAS A SUBSEQUENT VALUATION OF |
| 12:09PM | 3 | THERANOS'S PATENT IN 2017. |
| 12:09PM | 4 | A.   YES. |
| 12:09PM | 5 | Q.   WHY WAS THAT UNDERTAKEN? |
| 12:09PM | 6 | MR. LEACH:  YOUR HONOR, OBJECTION.  RELEVANCE.  403. |
| 12:09PM | 7 | THE COURT:  I'M NOT CERTAIN OF THE RELEVANCE OF THE |
| 12:09PM | 8 | 2017 VALUATION. |
| 12:09PM | 9 | MR. DOWNEY:  WELL, YOUR HONOR, I THINK THERE ARE |
| 12:09PM | 10 | OPPORTUNITIES FOR -- I'M RELUCTANT TO DISCUSS IT NOW, BUT MAYBE |
| 12:09PM | 11 | WE CAN -- |
| 12:09PM | 12 | THE COURT:  SURE.  OF COURSE.  MAYBE YOU CAN MOVE TO |
| 12:09PM | 13 | ANOTHER TOPIC. |
| 12:09PM | 14 | MR. DOWNEY:  MAYBE I CAN MOVE TO ANOTHER TOPIC AND |
| 12:09PM | 15 | WE CAN RETURN TO IT.  I THINK IT WOULD REQUIRE A LITTLE MORE |
| 12:09PM | 16 | DISCUSSION THAN WOULD BE APPROPRIATE AT THIS TIME. |
| 12:09PM | 17 | THE COURT:  THAT WOULD BE HELPFUL.  PARDON ME FOR |
| 12:09PM | 18 | INTERRUPTING YOUR EXAMINATION, BUT LET'S PASS THIS TOPIC AND |
| 12:09PM | 19 | MOVE ON TO SOMETHING ELSE. |
| 12:09PM | 20 | MR. DOWNEY:  OKAY.  FAIR ENOUGH, YOUR HONOR. |
| 12:09PM | 21 | Q.   LET'S TALK ABOUT THE CLINICAL LABORATORY AT THERANOS. |
| 12:09PM | 22 | A.   YES. |
| 12:09PM | 23 | Q.   DURING WHAT PERIOD DID THERANOS OPERATE A CLINICAL BLOOD |
| 12:10PM | 24 | TESTING LABORATORY? |
| 12:10PM | 25 | A.   FROM 2011 TO 2016. |

7794

| | | |
|---|---|---|
| 12:10PM | 1 | Q.   AND AS PART OF THE PROCESS OF OFFERING CLINICAL BLOOD |
| 12:10PM | 2 | TESTING SERVICES, ARE LABS SOMETIMES REQUIRED TO BE CERTIFIED |
| 12:10PM | 3 | BY THE CENTER FOR MEDICARE AND MEDICAID SERVICES? |
| 12:10PM | 4 | A.   YES. |
| 12:10PM | 5 | Q.   AND DID THERANOS MAKE EFFORTS TO BECOME CERTIFIED BY THE |
| 12:10PM | 6 | CENTER FOR MEDICAID AND MEDICARE SERVICES? |
| 12:10PM | 7 | A.   WE DID. |
| 12:10PM | 8 | Q.   AND CENTER FOR MEDICAID AND MEDICARE SERVICES IS |
| 12:10PM | 9 | ABBREVIATED AS CMS? |
| 12:10PM | 10 | A.   YES. |
| 12:10PM | 11 | Q.   AND THAT'S WHAT WE'VE BEEN HEARING ABOUT DURING THE COURSE |
| 12:10PM | 12 | OF THE CASE? |
| 12:10PM | 13 | A.   IT IS. |
| 12:10PM | 14 | Q.   AND WHY DID THERANOS -- WHEN DID THERANOS SEEK THAT |
| 12:10PM | 15 | CERTIFICATION? |
| 12:10PM | 16 | A.   WE SOUGHT THE CERTIFICATION IN 2011. |
| 12:10PM | 17 | Q.   NOW, I THINK YOU PREVIOUSLY TESTIFIED THAT THE AGREEMENT |
| 12:10PM | 18 | TO PERFORM TESTING OF BLOOD SAMPLES WITH WALGREENS DIDN'T TAKE |
| 12:11PM | 19 | PLACE UNTIL 2012.  IS THAT RIGHT? |
| 12:11PM | 20 | A.   YES. |
| 12:11PM | 21 | Q.   AND WHY WAS THERANOS OPENING A CLINICAL LABORATORY IN 2011 |
| 12:11PM | 22 | IF THE BLOOD TESTS WERE GOING TO BE RUN IN WALGREENS STORES AT |
| 12:11PM | 23 | THAT TIME? |
| 12:11PM | 24 | A.   WE UNDERSTOOD WE NEEDED TO DO THAT AS PART OF THE |
| 12:11PM | 25 | REGULATORY PROCESS, AND WE ALSO UNDERSTOOD THAT THERE WERE |

| | | |
|---|---|---|
| 12:11PM | 1 | GOING TO BE SOME TESTS THAT WERE NOT ORDERED THAT FREQUENTLY |
| 12:11PM | 2 | THAT WE WOULD NEED A TRADITIONAL LAB TO BE ABLE TO RUN. |
| 12:11PM | 3 | Q.   OKAY.  NOW, DID THE, DID THE DECISION TO CONDUCT THE BLOOD |
| 12:11PM | 4 | TESTING AT THERANOS CHANGE THE SCOPE OF WHAT WAS REQUIRED TO |
| 12:11PM | 5 | BUILD A CLINICAL LABORATORY AND DEVELOP A CLINICAL LABORATORY |
| 12:11PM | 6 | AT THERANOS? |
| 12:11PM | 7 | A.   VERY MUCH. |
| 12:11PM | 8 | Q.   AND HOW DID IT CHANGE THAT? |
| 12:11PM | 9 | A.   IT MEANT THAT NOW WE NEEDED A CENTRAL LAB FACILITY THAT |
| 12:11PM | 10 | WAS GOING TO HANDLE ALL OF THE SAMPLES THAT WERE COMING FROM |
| 12:12PM | 11 | THE STORES, AND THAT ALL OF THESE SAMPLES WOULD BE COMING IN AT |
| 12:12PM | 12 | THE SAME TIME, AS OPPOSED TO IN A RETAIL STORE WITH A DEVICE |
| 12:12PM | 13 | WHERE ONE PATIENT AT A TIME WAS PLACING A SAMPLE INTO THE |
| 12:12PM | 14 | DEVICE, RUNNING IT, AND THEN YOU WOULD GET THE NEXT PATIENT. |
| 12:12PM | 15 | Q.   OKAY.  AND WAS A PROCESS UNDERTAKEN TO EXPAND THE SCOPE OF |
| 12:12PM | 16 | THE CLINICAL LABORATORY BETWEEN 2011 AND THE TIME THAT THE |
| 12:12PM | 17 | CLINICAL LAB BEGAN ANALYZING SAMPLES FROM WALGREENS? |
| 12:12PM | 18 | A.   IT WAS, YES. |
| 12:12PM | 19 | Q.   WERE YOU INVOLVED IN OVERSEEING THE CLINICAL LABORATORY ON |
| 12:12PM | 20 | A DAY-TO-DAY BASIS? |
| 12:12PM | 21 | A.   NO. |
| 12:12PM | 22 | Q.   WHO WAS RESPONSIBLE FOR THE OPERATIONAL MANAGEMENT OF THE |
| 12:12PM | 23 | LAB? |
| 12:12PM | 24 | A.   SUNNY BALWANI. |
| 12:12PM | 25 | Q.   AND WHEN I SAY "OPERATIONAL MANAGEMENT," DO YOU UNDERSTAND |

7796

12:12PM 1    THAT I MEAN NOT SCIENTIFIC, BUT THINGS LIKE PERSONNEL AND

12:12PM 2    EXPENDITURE AND MANAGEMENT OF DAY-TO-DAY ACTIVITIES?

12:13PM 3    A.   I DO.  WE CALL IT SORT OF THE BUSINESS PARTS OF IT.

12:13PM 4    Q.   OKAY.  AND WHO WAS RESPONSIBLE FOR THE CLINICAL SCIENTIFIC

12:13PM 5    DECISION MAKING IN THE CLINICAL LAB?

12:13PM 6    A.   THE LABORATORY DIRECTOR AND LABORATORY LEADERSHIP.

12:13PM 7    Q.   OKAY.  NOW, WHEN THE CLINICAL LAB WAS FIRST SET UP, DID

12:13PM 8    YOU HAVE SOME INVOLVEMENT WITH THAT?

12:13PM 9    A.   I DID.

12:13PM 10   Q.   AND WHAT INVOLVEMENT DID YOU HAVE?

12:13PM 11   A.   I WORKED WITH OUR REGULATORY LAWYERS TO TRY TO FIND THE

12:13PM 12   BEST LAB EXPERT IN THE SPACE TO HELP US SET UP THE LAB THE

12:13PM 13   RIGHT WAY AND PUT THE SYSTEMS IN PLACE, THE QUALITY SYSTEM AND

12:13PM 14   ALL OF THE PROCEDURES TO BE ABLE TO RUN THE LAB IN THE BEST WAY

12:13PM 15   POSSIBLE.

12:13PM 16   Q.   WERE YOU ABLE TO FIND SOMEONE TO HELP YOU?

12:13PM 17   A.   YES.

12:13PM 18   Q.   AND WHO DID HE -- WHO WAS THAT?

12:13PM 19   A.   THAT WAS I THINK DR. JERRY HURST.

12:14PM 20   Q.   AND DID MR. HURST THEN WORK TO SET UP A LAB TO YOUR

12:14PM 21   UNDERSTANDING THAT FIT THE DESCRIPTION OF WHAT YOU WERE

12:14PM 22   SEEKING?

12:14PM 23   A.   HE DID.

12:14PM 24   Q.   AS PART OF THAT PROCESS, DO YOU UNDERSTAND THAT THERANOS

12:14PM 25   DEVELOPED POLICIES AND PROCEDURES FOR THE RUNNING OF THE

7797

| | | |
|---|---|---|
| 12:14PM | 1 | LABORATORY? |
| 12:14PM | 2 | A.   YES. |
| 12:14PM | 3 | Q.   AND AS PART OF THAT PROCESS, DID THERANOS HIRE LAB |
| 12:14PM | 4 | PERSONNEL WHO HAD EXPERTISE IN OPERATING A CLINICAL LAB? |
| 12:14PM | 5 | A.   YES. |
| 12:14PM | 6 | Q.   AND AS PART OF THAT PROCESS, DID THERANOS UNDERTAKE STEPS |
| 12:14PM | 7 | TO PREPARE TO BE ABLE TO DEAL WITH INSPECTIONS AND EVALUATIONS |
| 12:14PM | 8 | BY REGULATORY AUTHORITIES? |
| 12:14PM | 9 | A.   WE DID. |
| 12:14PM | 10 | Q.   AND WERE ALL OF THOSE THINGS ACTIONS THAT DR. HURST WAS |
| 12:14PM | 11 | INVOLVED IN? |
| 12:14PM | 12 | A.   YES. |
| 12:14PM | 13 | Q.   NOW, AM I RIGHT THAT THERANOS WAS ULTIMATELY ABLE TO |
| 12:14PM | 14 | OBTAIN A CERTIFICATION IN CONNECTION WITH ITS CLINICAL LAB? |
| 12:14PM | 15 | A.   YES. |
| 12:14PM | 16 | Q.   AND THAT'S REFERRED TO AS A CLIA CERTIFICATION? |
| 12:15PM | 17 | A.   IT IS. |
| 12:15PM | 18 | Q.   AND ARE THERE DIFFERENT LEVELS OF CLIA CERTIFICATION? |
| 12:15PM | 19 | A.   YES. |
| 12:15PM | 20 | Q.   AND CAN YOU EXPLAIN YOUR UNDERSTANDING OF WHAT THOSE |
| 12:15PM | 21 | DIFFERENT LEVELS ARE? |
| 12:15PM | 22 | A.   I'M FAMILIAR WITH TWO.  ONE IS A MODERATE COMPLEXITY |
| 12:15PM | 23 | LABORATORY, AND ONE IS A HIGH COMPLEXITY LABORATORY. |
| 12:15PM | 24 | OUR LABORATORY IN CALIFORNIA WAS A HIGH COMPLEXITY |
| 12:15PM | 25 | LABORATORY. |

7798

| | | |
|---|---|---|
| 12:15PM | 1 | Q.   AND WHAT DID YOU UNDERSTANDING BEING A HIGH COMPLEXITY |
| 12:15PM | 2 | LABORATORY MEANT? |
| 12:15PM | 3 | A.   IT MEANT THAT THERE WERE HIGHER STANDARDS THAT WE HAD TO |
| 12:15PM | 4 | ACHIEVE IN THE OPERATION OF OUR LABORATORY, AND IT MEANT THAT |
| 12:15PM | 5 | THE LABORATORY WAS ABLE TO DEVELOP ITS OWN TESTS, WHICH WE |
| 12:15PM | 6 | CALLED LDT'S, OR LABORATORY DEVELOPED TESTS. |
| 12:15PM | 7 | Q.   NOW AFTER -- AND DID YOU SAY THAT THE LABORATORY ACTUALLY |
| 12:15PM | 8 | OFFICIALLY OPENED IN 2011? |
| 12:15PM | 9 | A.   YES, WE WERE CERTIFIED IN 2011. |
| 12:15PM | 10 | Q.   OKAY.  WELL, LET'S TALK ABOUT THAT PROCESS OF |
| 12:16PM | 11 | CERTIFICATION. |
| 12:16PM | 12 | AROUND THE TIME THAT THE LAB WAS CERTIFIED, DID -- WAS |
| 12:16PM | 13 | THERE AN INSPECTION DONE BY CMS OF THE LAB? |
| 12:16PM | 14 | A.   YES. |
| 12:16PM | 15 | Q.   AND DID YOU RECEIVE REPORTS OF THE RESULTS OF THAT |
| 12:16PM | 16 | INSPECTION? |
| 12:16PM | 17 | A.   YES. |
| 12:16PM | 18 | Q.   AND WHAT DO YOU RECALL ABOUT THE RESULTS OF THAT |
| 12:16PM | 19 | INSPECTION? |
| 12:16PM | 20 | A.   I RECALL THAT THERE WERE NO DEFICIENCIES IDENTIFIED. |
| 12:16PM | 21 | Q.   ALL RIGHT.  LET ME ASK YOU TO LOOK AT EXHIBIT 7728. |
| 12:16PM | 22 | THAT'S IN VOLUME 3. |
| 12:16PM | 23 | A.   OKAY. |
| 12:16PM | 24 | Q.   I'M SORRY, DID I SAY 7728? |
| 12:16PM | 25 | A.   YEAH. |

| | | |
|---|---|---|
| 12:16PM | 1 | Q.  IT'S 7728. |
| 12:17PM | 2 | A.  7728. |
| 12:17PM | 3 | I'VE GOT 7282. |
| 12:17PM | 4 | Q.  IN VOLUME 3, DO YOU HAVE -- |
| 12:17PM | 5 | A.  OH, I FOUND IT.  OKAY. |
| 12:17PM | 6 | Q.  ALL RIGHT.  WHO WAS ARNOLD GELB? |
| 12:17PM | 7 | A.  DR. GELB WAS OUR FIRST LABORATORY DIRECTOR. |
| 12:17PM | 8 | Q.  AND IS 7228 AN EMAIL FROM DR. GELB TO YOU ABOUT THE CLIA |
| 12:17PM | 9 | LAB AT THERANOS? |
| 12:17PM | 10 | A.  IT IS. |
| 12:17PM | 11 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:17PM | 12 | 7228. |
| 12:17PM | 13 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:17PM | 14 | THE COURT:  IT'S ADMITTED. |
| 12:17PM | 15 | (DEFENDANT'S EXHIBIT 7228 WAS RECEIVED IN EVIDENCE.) |
| 12:18PM | 16 | BY MR. DOWNEY: |
| 12:18PM | 17 | Q.  ALL RIGHT.  DO YOU SEE THIS IS AN EMAIL WHERE DR. GELB IS |
| 12:18PM | 18 | FORWARDING YOU A REPORT IN JANUARY OF 2012? |
| 12:18PM | 19 | A.  I DO. |
| 12:18PM | 20 | Q.  AND IN THE FIRST BULLET POINT OF THE EMAIL, IT SAYS, "THE |
| 12:18PM | 21 | REPORT SHOW'S NO DEFICIENCIES BY VIRTUE OF THE FACT IT SAYS WE |
| 12:18PM | 22 | ARE IN COMPLIANCE AND NO DEFICIENCIES ARE LISTED." |
| 12:18PM | 23 | DO YOU SEE THAT? |
| 12:18PM | 24 | A.  I DO. |
| 12:18PM | 25 | Q.  AND DID THIS FOLLOW AN INSPECTION THAT WAS CONDUCTED BY |

| | | |
|---|---|---|
| 12:18PM | 1 | CMS IN LATE 2011? |
| 12:18PM | 2 | A.   YES. |
| 12:18PM | 3 | Q.   LET ME ASK YOU TO LOOK AT PAGE 2 OF THIS DOCUMENT.  IF YOU |
| 12:18PM | 4 | COULD JUST BLOW UP THE TOP HALF OF THE DOCUMENT. |
| 12:18PM | 5 | AND DO YOU SEE THAT THIS IS A FORM THAT IS -- THAT IT HAS |
| 12:18PM | 6 | ON THE HEADER THAT IT'S FROM THE DEPARTMENT OF HEALTH AND HUMAN |
| 12:18PM | 7 | SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES? |
| 12:18PM | 8 | A.   YES. |
| 12:18PM | 9 | Q.   AND THEN DO YOU SEE THAT THERE'S AN INDICATION IN THE |
| 12:19PM | 10 | LEFT-HAND COLUMN THAT DEFICIENCIES -- THERE'S A PLACE FOR |
| 12:19PM | 11 | DEFICIENCIES TO BE NOTED? |
| 12:19PM | 12 | A.   I DO. |
| 12:19PM | 13 | Q.   AND DO YOU SEE THE INITIAL COMMENTS THAT ARE CONTAINED |
| 12:19PM | 14 | UNDER THAT COLUMN? |
| 12:19PM | 15 | A.   YES. |
| 12:19PM | 16 | Q.   AND DO YOU SEE THAT NO DEFICIENCIES WERE IDENTIFIED IN THE |
| 12:19PM | 17 | LAB BY CMS AS OF THAT DATE? |
| 12:19PM | 18 | A.   YES. |
| 12:19PM | 19 | Q.   AND WHAT DID YOU UNDERSTAND WITH RESPECT TO THERANOS'S |
| 12:19PM | 20 | CLIA LAB AT THE BEGINNING OF 2012 AFTER RECEIVING THIS |
| 12:19PM | 21 | DOCUMENT? |
| 12:19PM | 22 | A.   I UNDERSTOOD THAT THE POLICIES AND PROCEDURES IN THE |
| 12:19PM | 23 | SYSTEM, THE QUALITY SYSTEM THAT WE PUT IN PLACE FOR THE |
| 12:19PM | 24 | LABORATORY WAS GOOD. |
| 12:19PM | 25 | Q.   YOU MENTIONED THAT MR. HURST HAD ASSISTED YOU -- OR |

7801

| | | |
|---|---|---|
| 12:19PM | 1 | DR. HURST HAD ASSISTED YOU IN ESTABLISHING SOME OF THOSE |
| 12:19PM | 2 | PROCEDURES; IS THAT RIGHT? |
| 12:19PM | 3 | A.   HE DID. |
| 12:19PM | 4 | Q.   AND WAS DR. GELB ALSO INVOLVED IN PROMULGATING SOME OF THE |
| 12:20PM | 5 | PROCEDURES? |
| 12:20PM | 6 | A.   YES. |
| 12:20PM | 7 | Q.   DO YOU KNOW HOW MANY STANDARD OPERATING PROCEDURES WERE |
| 12:20PM | 8 | PUT IN PLACE IN THE CLIA LABORATORY DURING THIS PERIOD? |
| 12:20PM | 9 | A.   I DON'T KNOW EXACTLY, BUT MY IMPRESSION WAS HUNDREDS. |
| 12:20PM | 10 | Q.   WERE YOU AWARE OF ALL OF THE TOPICS THAT THOSE VARIOUS |
| 12:20PM | 11 | PROCEDURES COVERED? |
| 12:20PM | 12 | A.   NO. |
| 12:20PM | 13 | Q.   DID YOU HAVE ANY ROLE IN REVIEWING OR APPROVING STANDARD |
| 12:20PM | 14 | OPERATING PROCEDURES FOR HOW THE LAB WAS TO WORK? |
| 12:20PM | 15 | A.   I DID NOT. |
| 12:20PM | 16 | Q.   WHO DID? |
| 12:20PM | 17 | A.   DR. HURST, DR. GELB, THE LABORATORY EXPERTS THAT DR. GELB |
| 12:20PM | 18 | WAS HIRING FOR THE CLIA LAB; AND AS TO TESTS THAT MIGHT BE |
| 12:20PM | 19 | DEVELOPED BY THERANOS ITSELF, DR. YOUNG AND OTHER SCIENTISTS |
| 12:20PM | 20 | FROM R&D. |
| 12:20PM | 21 | Q.   AND WHAT UNDERSTANDING DID YOU HAVE ABOUT THE STANDARD |
| 12:20PM | 22 | OPERATING PROCEDURES? |
| 12:20PM | 23 | A.   THAT I HAD SOMEONE IN DR. HURST WHO UNDERSTOOD WHAT A BEST |
| 12:21PM | 24 | IN CLASS PROCEDURE WAS AND THAT HE WAS WORKING WITH DR. GELB TO |
| 12:21PM | 25 | MAKE SURE THAT WE HAD THOSE PROCEDURES IN PLACE. |

7802

| | | |
|---|---|---|
| 12:21PM | 1 | Q.   OKAY.  LET'S TALK ABOUT THE PERSONNEL THAT WERE HIRED INTO |
| 12:21PM | 2 | THE CLIA LABORATORY IN 2012 AND 2013. |
| 12:21PM | 3 | FIRST OF ALL, JUST AS TO PERSONNEL IN THE LAB, DID YOU |
| 12:21PM | 4 | HAVE AN UNDERSTANDING AS TO WHO WAS RESPONSIBLE WITHIN THE LAB |
| 12:21PM | 5 | FOR ASSURING THAT THE RESULTS THAT THE LAB GENERATED WERE |
| 12:21PM | 6 | ACCURATE AND RELIABLE? |
| 12:21PM | 7 | A.   I DID. |
| 12:21PM | 8 | Q.   WHO DID YOU UNDERSTAND THAT WAS? |
| 12:21PM | 9 | A.   ULTIMATELY THE LAB DIRECTOR. |
| 12:21PM | 10 | Q.   BUT DID YOU HAVE AN UNDERSTANDING THAT THERE WERE OTHER |
| 12:21PM | 11 | PERSONNEL WHO WORKED IN THE LAB AS WELL? |
| 12:21PM | 12 | A.   I DID. |
| 12:21PM | 13 | Q.   AND DID YOU UNDERSTAND THE ROLE THAT SOME OF THEM PLAYED? |
| 12:21PM | 14 | A.   YES.  I UNDERSTOOD THE LAB DIRECTOR COULD DELEGATE |
| 12:22PM | 15 | RESPONSIBILITY, AND I UNDERSTOOD THAT YOU COULD PUT A HIGHLY |
| 12:22PM | 16 | QUALIFIED TEAM IN PLACE AROUND THE LAB DIRECTOR OF GENERAL |
| 12:22PM | 17 | SUPERVISORS, TECHNICAL SUPERVISORS, AND CLINICAL LAB SCIENTISTS |
| 12:22PM | 18 | WHO COULD DO THE SAME. |
| 12:22PM | 19 | Q.   AND DR. ROSENDORFF WAS THE LAB DIRECTOR AT THE TIME THAT |
| 12:22PM | 20 | THERANOS SERVICES IN WALGREENS STORES WERE LAUNCHED? |
| 12:22PM | 21 | A.   HE WAS. |
| 12:22PM | 22 | Q.   WE'LL TALK ABOUT HIM IN A MOMENT. |
| 12:22PM | 23 | DID YOU HAVE AN UNDERSTANDING OF WHAT KIND OF PEOPLE WERE |
| 12:22PM | 24 | HIRED TO WORK IN THE CLINICAL LAB AT THE TIME OF THE WALGREENS |
| 12:22PM | 25 | LAUNCH ALONGSIDE DR. ROSENDORFF? |

12:22PM    1    A.   I DID.

12:22PM    2    Q.   AND DID YOU HAVE AN UNDERSTANDING AS TO THEIR

12:22PM    3    QUALIFICATIONS?

12:22PM    4    A.   GENERALLY.

12:22PM    5    Q.   AND WHAT DID YOU UNDERSTAND?

12:22PM    6    A.   I UNDERSTOOD THAT THESE ROLES OF TECHNICAL SUPERVISOR,

12:22PM    7    GENERAL SUPERVISOR, AND CLINICAL LAB SCIENTIST WERE ROLES THAT

12:22PM    8    YOU HAD TO BE LICENSED BY THE STATE FOR, THAT YOU HAD TO HAVE A

12:22PM    9    LOT OF EXPERIENCE IN THE CLINICAL LABORATORY TO GET THOSE

12:22PM   10    CERTIFICATIONS, AND THAT DR. ROSENDORFF WAS HIRING TO FILL

12:23PM   11    THOSE ROLES AND HAVING MULTIPLE PEOPLE IN THE ORGANIZATION WHO

12:23PM   12    COULD FILL EACH OF THOSE ROLES, AND THAT ALSO HE WAS BRINGING

12:23PM   13    IN A QUALIFIED QUALITY CONTROL MANAGER WHO HIMSELF HAD BEEN A

12:23PM   14    CAP INSPECTOR BEFORE.

12:23PM   15    Q.   DO YOU ACTUALLY RECALL THE PROCESS OF HIRING

12:23PM   16    DR. ROSENDORFF TO SERVE AS THE LAB DIRECTOR?

12:23PM   17    A.   I REMEMBER MEETING HIM.

12:23PM   18    Q.   AND WHAT WERE YOUR PERCEPTIONS OF HIM WHEN YOU FIRST MET

12:23PM   19    HIM?

12:23PM   20    A.   I WAS REALLY EXCITED TO MEET HIM.  I THOUGHT IT WAS

12:23PM   21    WONDERFUL THAT HE HAD WORKED IN A CHILDREN'S HOSPITAL WITH

12:23PM   22    SMALL SAMPLES BEFORE.  HE SEEMED TO BE A REALLY QUALIFIED

12:23PM   23    DOCTOR, AND HAD THIS ADDITIONAL LABORATORY EXPERIENCE IN A

12:23PM   24    CHILDREN'S HOSPITAL IN PENNSYLVANIA AND SEEMED TO HAVE PERFECT

12:23PM   25    EXPERTISE FOR WHAT WE WANTED TO DO.

7804

| | | |
|---|---|---|
| 12:23PM | 1 | Q.   WHEN HE WAS HIRED, WAS HE HIRED TO SERVE FULL TIME OR PART |
| 12:24PM | 2 | TIME AS THE LAB DIRECTOR? |
| 12:24PM | 3 | A.   FULL TIME. |
| 12:24PM | 4 | Q.   YOU MENTIONED THAT, ALONG WITH DR. ROSENDORFF, A QUALITY |
| 12:24PM | 5 | CONTROL PERSON WAS HIRED IN CONNECTION WITH THE CLIA LAB. |
| 12:24PM | 6 | A.   YES. |
| 12:24PM | 7 | Q.   AND WHO WAS THAT? |
| 12:24PM | 8 | A.   LANGLY GEE. |
| 12:24PM | 9 | Q.   AND WHAT WAS MR. GEE'S BACKGROUND BEFORE HE JOINED |
| 12:24PM | 10 | THERANOS? |
| 12:24PM | 11 | A.   HE HAD WORKED AT OTHER CLINICAL LABORATORIES AND HELPED |
| 12:24PM | 12 | BUILD AND OVERSEE THEIR QUALITY SYSTEMS, AND HE HAD ALSO SERVED |
| 12:24PM | 13 | AS A CAP INSPECTOR, WHICH IS ONE OF THE BODIES THAT INSPECTS |
| 12:24PM | 14 | CLIA LABORATORIES. |
| 12:24PM | 15 | Q.   WHAT DOES CAP STAND FOR? |
| 12:24PM | 16 | A.   COLLEGE OF AMERICAN PATHOLOGISTS. |
| 12:24PM | 17 | Q.   AND WHEN HE WAS HIRED AT THERANOS, WHO AT THERANOS DID HE |
| 12:24PM | 18 | REPORT TO? |
| 12:24PM | 19 | A.   HE REPORTED TO DR. ROSENDORFF. |
| 12:24PM | 20 | Q.   AND DID YOU INTERACT REGULARLY WITH MR. GEE RELATING TO |
| 12:24PM | 21 | HIS WORK? |
| 12:24PM | 22 | A.   I DID NOT. |
| 12:25PM | 23 | Q.   WHAT UNDERSTANDING DID YOU HAVE ABOUT THE QUALITY CONTROL |
| 12:25PM | 24 | PROGRAM AT THERANOS BEGINNING IN 2013 AND 2015? |
| 12:25PM | 25 | A.   I UNDERSTOOD THAT MR. GEE WAS MAINTAINING OR OVERSEEING |

7805

12:25PM 1    THAT PROGRAM ACCORDING TO THE PROCEDURES THAT WE'D SET UP, THAT

12:25PM 2    HE WOULD REVIEW DATA AND TRY TO CREATE AN ENVIRONMENT IN WHICH

12:25PM 3    WE COULD IDENTIFY AND TRIAGE ISSUES, FIX THEM SO THAT THEY

12:25PM 4    WOULDN'T RECUR, AND THAT LABORATORY LEADERSHIP WAS ACTIVELY

12:25PM 5    INVOLVED IN THAT.

12:25PM 6    Q.   WE'VE HEARD THE TERM DURING THE COURSE OF THIS TRIAL

12:25PM 7    "PROFICIENCY TESTING."

12:25PM 8         DO YOU RECALL HEARING TESTIMONY ABOUT THAT SUBJECT?

12:25PM 9    A.   I DO.

12:25PM 10   Q.   AND WHILE YOU WERE AT THERANOS, DID YOU HAVE AN

12:25PM 11   UNDERSTANDING OF WHAT PROFICIENCY TESTING WAS?

12:25PM 12   A.   GENERALLY, YES.

12:25PM 13   Q.   AND WHAT DID YOU UNDERSTAND?

12:25PM 14   A.   I UNDERSTOOD THAT IT WAS A SET OF TESTS THAT NEEDED TO BE

12:25PM 15   RUN BY CLIA LABORATORIES TO COMPARE COMMERCIALLY AVAILABLE

12:25PM 16   MACHINES TO HOW THEY WERE PERFORMING AGAINST OTHER MACHINES OF

12:26PM 17   THE EXACT SAME TYPE.

12:26PM 18   Q.   AND DID -- TO YOUR KNOWLEDGE, DID THERANOS HAVE IN PLACE

12:26PM 19   STANDARD OPERATING PROCEDURES RELATED TO PROFICIENCY TESTING?

12:26PM 20   A.   YES.

12:26PM 21   Q.   DID YOU BECOME AWARE THAT THERANOS HAD SOME UNIQUE

12:26PM 22   PROCESSES WITH REGARD TO ITS PROFICIENCY TESTING PROGRAM?

12:26PM 23   A.   I DID.

12:26PM 24   Q.   AND IN WHAT WAY WERE -- WAS THERANOS'S PROGRAM UNIQUE?

12:26PM 25   A.   I LEARNED THAT PROFICIENCY TESTING WAS SPECIFIC TO

7806

12:26PM   1    COMMERCIALLY AVAILABLE MACHINES WHERE YOU COULD TEST THE

12:26PM   2    MACHINE AGAINST THE EXACT SAME MACHINE RUN SOMEWHERE ELSE, AND

12:26PM   3    THAT IF YOU WERE TO DEVELOP A TEST OR A SYSTEM FOR WHICH THERE

12:26PM   4    WAS NO EXACT SAME COMMERCIALLY AVAILABLE MACHINE TO COMPARE IT

12:26PM   5    TO, YOU NEEDED TO FOLLOW A PROCESS CALLED AAP, WHICH WAS FOR

12:26PM   6    LABORATORY DEVELOPED TESTS.

12:26PM   7    Q.   AND WERE -- WAS DR. ROSENDORFF INVOLVED IN THE, TO YOUR

12:27PM   8    KNOWLEDGE, IN THE PROCESS OF COMING UP WITH STANDARD OPERATING

12:27PM   9    PROCEDURES FOR AAP?

12:27PM  10    A.   YES.

12:27PM  11    Q.   AND WAS DR. YOUNG INVOLVED IN THAT PROCESS?

12:27PM  12    A.   YES.

12:27PM  13    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 12478, WHICH IS ALREADY

12:27PM  14    IN EVIDENCE.

12:27PM  15        IF YOU LOOK AT THIS EMAIL IN THE -- TOWARDS THE BOTTOM OF

12:27PM  16    THE PAGE.  IT'S AN EMAIL FROM DR. YOUNG TO DR. ROSENDORFF, AND

12:27PM  17    YOU AND MR. BALWANI ARE COPIED.

12:27PM  18        DO YOU SEE THAT?

12:27PM  19    A.   I DO.

12:27PM  20    Q.   AND THERE UNDERNEATH THAT, DO YOU SEE IN THE SECOND

12:27PM  21    PARAGRAPH THAT DR. YOUNG SAYS, "FOR OUR LDT'S, ALL OF WHICH ARE

12:28PM  22    CLIA REGULATED AT THE MOMENT, WE NEED SOP'S FOR PT."

12:28PM  23        DO YOU SEE THAT?

12:28PM  24    A.   I DO.

12:28PM  25    Q.   SO WAS DR. YOUNG INDICATING THAT HE NEEDED TO DEVELOP

7807

12:28PM   1    STANDARD OPERATING PROCEDURES FOR ITS PROFICIENCY TESTING ON

12:28PM   2    ITS OWN DEVICES?

12:28PM   3    A.   YES.

12:28PM   4    Q.   AND DR. YOUNG IN THE NEXT SENTENCE GOES ON TO SAY,

12:28PM   5    "HOWEVER, THERE ARE SEVERAL FACTORS THAT PREVENT US FROM

12:28PM   6    ENROLLING IN THE TRADITIONAL PT PROGRAMS."

12:28PM   7         DO YOU SEE THAT?

12:28PM   8    A.   I DO.

12:28PM   9    Q.   AND HE GOES ON TO IDENTIFY SOME OF THOSE FACTORS.

12:28PM  10         DO YOU SEE THAT?

12:28PM  11    A.   YES.

12:28PM  12    Q.   AND DID YOU FORM AN UNDERSTANDING OF WHY THERANOS COULD

12:28PM  13    NOT HAVE TRADITIONAL PT PROGRAMS?

12:28PM  14    A.   I DID.

12:28PM  15    Q.   AND IS IT WHAT YOU DESCRIBED BEFORE RELATED TO THE, TO THE

12:28PM  16    SMALL SAMPLE SIZE AND THE FACT THAT THERE WEREN'T TESTS TO

12:28PM  17    WHICH THERANOS COULD COMPARE?

12:28PM  18    A.   YES, THAT OUR ANALYZERS AND ANALYST METHODS WERE

12:29PM  19    PROPRIETARY AND THERE WAS NOT, AS DR. YOUNG DESCRIBES HERE, A

12:29PM  20    PEER GROUP.

12:29PM  21    Q.   BUT EVEN THOUGHT THAT FORM OF PROFICIENCY TESTING WAS NOT

12:29PM  22    SEEN AS POSSIBLE, DID DR. YOUNG PROPOSE HOW TO DO PROFICIENCY

12:29PM  23    TESTING?

12:29PM  24    A.   YES.

12:29PM  25    Q.   AND IF YOU'LL LOOK AT THE NEXT PARAGRAPH, WHICH IS

7808

| | | |
|---|---|---|
| 12:29PM | 1 | LABELLED PROPOSAL. |
| 12:29PM | 2 | AND DO YOU SEE IN THE FIRST SENTENCE HE SAYS THAT, "WE |
| 12:29PM | 3 | MUST INITIATE AN ALTERNATIVE ASSESSMENT PROCEDURE, AAP"? |
| 12:29PM | 4 | A.   I DO. |
| 12:29PM | 5 | Q.   AND THEN HE GOES ON TO DESCRIBE HOW THAT AAP WOULD WORK IN |
| 12:29PM | 6 | THE BALANCE OF THE PARAGRAPH? |
| 12:29PM | 7 | A.   YES. |
| 12:29PM | 8 | Q.   AND IF YOU GO UP TO THE TOP EMAIL FROM -- DO YOU SEE ON |
| 12:29PM | 9 | THE TOP THERE'S AN EMAIL RESPONDING TO THIS FROM |
| 12:30PM | 10 | DR. ROSENDORFF? |
| 12:30PM | 11 | A.   I DO. |
| 12:30PM | 12 | Q.   AND DR. ROSENDORFF WRITES, "DANIEL:  THANKS. |
| 12:30PM | 13 | "I'LL WRITE UP THE SOP AND INCORPORATE WHAT WE HAVE |
| 12:30PM | 14 | DISCUSSED." |
| 12:30PM | 15 | A.   YES. |
| 12:30PM | 16 | Q.   AND DID YOU UNDERSTAND THAT DR. ROSENDORFF HAD DEVELOPED |
| 12:30PM | 17 | STANDARD OPERATING PROCEDURES FOR PROFICIENCY TESTING BASED ON |
| 12:30PM | 18 | DR. YOUNG'S RECOMMENDATION? |
| 12:30PM | 19 | A.   YES. |
| 12:30PM | 20 | Q.   AND DID YOU EXPECT THAT DR. ROSENDORFF WAS IMPLEMENTING |
| 12:30PM | 21 | THAT PROGRAM THROUGHOUT 2013 AND 2014? |
| 12:30PM | 22 | A.   I DID. |
| 12:30PM | 23 | Q.   DID YOU HAVE AN UNDERSTANDING OF HOW THERANOS WAS |
| 12:30PM | 24 | PERFORMING IN ITS PROFICIENCY TESTING? |
| 12:30PM | 25 | A.   I DID. |

7809

| 12:30PM | 1 | Q. AND WHAT UNDERSTANDING DID YOU HAVE? |

12:30PM 1    Q.   AND WHAT UNDERSTANDING DID YOU HAVE?

12:30PM 2    A.   THAT WE WERE PERFORMING EXTREMELY WELL.

12:30PM 3    Q.   OKAY.  NOW, AT SOME POINT IN -- EARLY IN THE LIFE OF THE

12:31PM 4    CLIA LAB, DID CMS CONDUCT ANOTHER INSPECTION OF THERANOS'S

12:31PM 5    CLINICAL LAB?

12:31PM 6    A.   THEY DID.

12:31PM 7    Q.   SO I THINK WE LOOKED A MOMENT AGO THAT THERANOS HAD OPENED

12:31PM 8    THE LAB IN 2011; CORRECT?

12:31PM 9    A.   YES.

12:31PM 10   Q.   AND AN INSPECTION WAS DONE THEN?

12:31PM 11   A.   YES.

12:31PM 12   Q.   AND THEN IN 2013 THERANOS LAUNCHED ITS TESTING SERVICES AT

12:31PM 13   WALGREENS; CORRECT?

12:31PM 14   A.   YES.

12:31PM 15   Q.   AND A CLINICAL, A CMS INSPECTION WAS CONDUCTED SHORTLY

12:31PM 16   AFTER THAT?

12:31PM 17   A.   YES.

12:31PM 18   Q.   IN ADDITION TO CMS, DID SOME STATE REGULATORS ALSO INSPECT

12:31PM 19   THERANOS'S CLIA LAB IN 2013?

12:31PM 20   A.   YES.

12:31PM 21   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7282 IN VOLUME 3.

12:31PM 22   A.   OKAY.

12:31PM 23   Q.   IS 7282 AN EMAIL FROM MR. BALWANI TO CLINICAL LAB STAFF AT

12:32PM 24   THERANOS IN APRIL OF 2013?

12:32PM 25   A.   YES.

7810

| | | |
|---|---|---|
| 12:32PM | 1 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:32PM | 2 | 7282. |
| 12:32PM | 3 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:32PM | 4 | THE COURT:  IT'S ADMITTED. |
| 12:32PM | 5 | (DEFENDANT'S EXHIBIT 7282 WAS RECEIVED IN EVIDENCE.) |
| 12:32PM | 6 | BY MR. DOWNEY: |
| 12:32PM | 7 | Q.   IF WE JUST LOOK AT THE FIRST PARAGRAPH, DO YOU SEE THAT |
| 12:32PM | 8 | MR. BALWANI REPORTS, "CONGRATULATIONS TO ALL OF YOU FOR THE |
| 12:32PM | 9 | NEW YORK INSPECTION TODAY.  JOB WELL DONE.  I HOPE YOU ALL FEEL |
| 12:32PM | 10 | GOOD ABOUT THIS AND FOUND THIS TO BE AN EDUCATIONAL EXPERIENCE. |
| 12:32PM | 11 | OUR COMMITMENT AS A COMPANY IS TO RAISE OUR OWN STANDARDS EVEN |
| 12:32PM | 12 | MORE AND HAVE THE BEST LAB IN THE WORLD WITH HIGHEST QUALITY |
| 12:32PM | 13 | AND SAFETY," AND HE GOES ON FROM THERE. |
| 12:33PM | 14 | DO YOU SEE THAT? |
| 12:33PM | 15 | A.   I DO. |
| 12:33PM | 16 | Q.   AND WHAT WAS MR. BALWANI -- WHAT WAS YOUR UNDERSTANDING OF |
| 12:33PM | 17 | WHAT MR. BALWANI WAS REPORTING ON HERE? |
| 12:33PM | 18 | A.   HE'S CONGRATULATING THE TEAM ON THE NEW YORK INSPECTION |
| 12:33PM | 19 | BECAUSE THE NEW YORK INSPECTION STANDARDS WERE SOME OF THE MOST |
| 12:33PM | 20 | DIFFICULT, AND HE'S SAYING THAT OUR COMMITMENT AS A COMPANY IS |
| 12:33PM | 21 | TO RAISE OUR OWN STANDARDS TO TRY TO BUILD THE BEST LAB IN THE |
| 12:33PM | 22 | WORLD. |
| 12:33PM | 23 | Q.   NOW, THERANOS'S LAB WAS LOCATED IN CALIFORNIA? |
| 12:33PM | 24 | A.   WE WERE. |
| 12:33PM | 25 | Q.   AND WHY WOULD A STATE INSPECTOR FROM NEW YORK INSPECT |

7811

| 12:33PM | 1 | THERANOS'S LAB? |
|---|---|---|

12:33PM  2   A.   WE WERE FILING FOR CERTIFICATION IN ALL 50 STATES IN

12:33PM  3   ANTICIPATION OF A NATIONAL ROLLOUT, AND NEW YORK WAS A SPECIAL

12:33PM  4   STATE BECAUSE IT HAS THE HIGHEST STANDARDS, OR THE MOST

12:33PM  5   DIFFICULT STANDARDS TO MEET, AND WE WANTED TO GET THAT

12:33PM  6   CERTIFICATION.

12:33PM  7   Q.   DID YOU EXPECT THAT THE STATES IN WHICH THERANOS SOUGHT A

12:34PM  8   LICENSE WOULD ALSO INSPECT THERANOS'S CLINICAL LAB?

12:34PM  9   A.   YES.

12:34PM  10   Q.   NOW, SHORTLY -- WELL, LATER IN 2013 DID CMS AGAIN INSPECT

12:34PM  11   THERANOS'S CLINICAL LAB?

12:34PM  12   A.   THEY DID.

12:34PM  13   Q.   AND WAS THAT THE SECOND INSPECTION THAT THEY HAD DONE?

12:34PM  14   A.   YES.

12:34PM  15   Q.   DID YOU HAVE AN UNDERSTANDING OF HOW OFTEN CMS TYPICALLY

12:34PM  16   PERFORMS INSPECTIONS OF HIGH COMPLEXITY LABS?

12:34PM  17   A.   I DID.

12:34PM  18   Q.   AND WHAT -- HOW OFTEN?

12:34PM  19   A.   EVERY TWO YEARS.

12:34PM  20   Q.   IN CONNECTION WITH THE INSPECTION IN 2013, WERE YOU

12:34PM  21   INVOLVED IN PREPARATION FOR THAT?

12:34PM  22   A.   I WAS.

12:34PM  23   Q.   WHAT WAS YOUR INVOLVEMENT IN PREPARATION FOR THAT

12:34PM  24   INSPECTION?

12:34PM  25   A.   TRYING TO HELP MAKE SURE ALL OF THE RIGHT RESOURCES WERE

7812

| | | |
|---|---|---|
| 12:34PM | 1 | DEDICATED TO THE INSPECTION, MAKE SURE THAT DR. HURST AND OTHER |
| 12:34PM | 2 | EXPERTS WERE AVAILABLE FOR THE TEAM, AND THAT WE WERE SET UP AS |
| 12:34PM | 3 | BEST AS POSSIBLE FOR THE INSPECTION. |
| 12:35PM | 4 | Q.   LET ME ASK YOU TO LOOK AT 7363. |
| 12:35PM | 5 | A.   YES. |
| 12:35PM | 6 | Q.   IS EXHIBIT 7363 AN EMAIL SENT TO YOU BY SURAJ SAKSENA IN |
| 12:35PM | 7 | PREPARATION FOR THE 2013 CLIA AUDIT? |
| 12:35PM | 8 | A.   YES. |
| 12:35PM | 9 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:35PM | 10 | 7363. |
| 12:35PM | 11 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:35PM | 12 | THE COURT:  IT'S ADMITTED. |
| 12:35PM | 13 | (DEFENDANT'S EXHIBIT 7363 WAS RECEIVED IN EVIDENCE.) |
| 12:35PM | 14 | BY MR. DOWNEY: |
| 12:35PM | 15 | Q.   WHO WAS SURAJ SAKSENA? |
| 12:35PM | 16 | A.   DR. SAKSENA WAS A SCIENTIST WHO HAD WORKED IN R&D AND THEN |
| 12:35PM | 17 | MOVED TO THE CLIA LAB AND WAS THE INDIVIDUAL THAT SUNNY |
| 12:36PM | 18 | SUGGESTED SHOULD ULTIMATELY BECOME ONE OF THE LEADERS IN THE |
| 12:36PM | 19 | LABORATORY. |
| 12:36PM | 20 | Q.   AND IN CONNECTION WITH THIS EMAIL, HE GIVES YOU A LIST OF |
| 12:36PM | 21 | DIFFERENT TASKS. |
| 12:36PM | 22 | DO YOU SEE THAT? |
| 12:36PM | 23 | A.   YES. |
| 12:36PM | 24 | Q.   AND WHAT IS THE PURPOSE OF HIM GIVING YOU THIS LIST OF |
| 12:36PM | 25 | COMPLETED TESTS? |

7813

| | | |
|---|---|---|
| 12:36PM | 1 | A.   HE WAS CONVEYING TO US READINESS FOR THE INSPECTION. |
| 12:36PM | 2 | Q.   NOW, I WANT TO LOOK AT THE FIRST BULLET POINT WHERE IT |
| 12:36PM | 3 | SAYS "SOP'S FOR THE 4 LDT ASSAYS HAVE BEEN REVIEWED AND |
| 12:36PM | 4 | SIGNED." |
| 12:36PM | 5 | DO YOU SEE THAT? |
| 12:36PM | 6 | A.   I DO. |
| 12:36PM | 7 | Q.   AND WHAT ARE -- WHAT -- SOP'S REFERS TO THE STANDARD |
| 12:36PM | 8 | OPERATING PROCEDURES? |
| 12:36PM | 9 | A.   YES. |
| 12:36PM | 10 | Q.   AND WHEN HE REFERS TO 4 LDT ASSAYS, WHAT DID YOU |
| 12:36PM | 11 | UNDERSTAND THAT TO REFER TO? |
| 12:36PM | 12 | A.   FOUR OF THE PROPRIETARY TESTS THAT THERANOS HAD DEVELOPED |
| 12:36PM | 13 | AND VALIDATED IN ITS CLIA LAB. |
| 12:37PM | 14 | Q.   AND WHY WAS IT NECESSARY FOR THE STANDARD OPERATING |
| 12:37PM | 15 | PROCEDURES FOR THOSE ASSAYS TO BE READY IN CONNECTION WITH THE |
| 12:37PM | 16 | 2013 CMS AUDIT? |
| 12:37PM | 17 | A.   SO THAT WE COULD REVIEW WITH THE INSPECTORS, THE TEAMS |
| 12:37PM | 18 | COULD REVIEW WITH THE INSPECTORS THE OPERATING PROCEDURES FOR |
| 12:37PM | 19 | THOSE LABORATORY DEVELOPED TESTS. |
| 12:37PM | 20 | Q.   NOW, IN CONNECTION WITH THAT 2013 CMS AUDIT, DID YOU |
| 12:37PM | 21 | INSTRUCT ANY THERANOS PERSONNEL TO HIDE ANY ASPECT OF THE |
| 12:37PM | 22 | OPERATIONS IN THE THERANOS CLINICAL LABS? |
| 12:37PM | 23 | A.   ABSOLUTELY NOT. |
| 12:37PM | 24 | Q.   DID YOU UNDERSTAND THAT THE INSPECTORS WOULD BE MADE AWARE |
| 12:37PM | 25 | OF ALL OF THE INFORMATION THAT THEY NEEDED TO APPROPRIATELY |

| | | |
|---|---|---|
| 12:37PM | 1 | CONCLUDE THEIR DUTIES? |
| 12:37PM | 2 | A.   OF COURSE. |
| 12:37PM | 3 | Q.   AND DID YOU, AT THE CONCLUSION OF THE INSPECTION, RECEIVE |
| 12:37PM | 4 | A REPORT FROM DR. YOUNG AS TO HIS NOTES ON WHAT HAD HAPPENED |
| 12:37PM | 5 | DURING THE COURSE OF THAT INSPECTION? |
| 12:37PM | 6 | A.   I DID. |
| 12:37PM | 7 | Q.   LET ME ASK YOU TO LOOK AT 7368, WHICH IS IN THE LARGER |
| 12:38PM | 8 | VOLUME 3. |
| 12:38PM | 9 | A.   OKAY. |
| 12:38PM | 10 | Q.   AND IF YOU WOULD JUST TAKE A MOMENT TO LOOK THROUGH THAT. |
| 12:38PM | 11 | A.   OKAY. |
| 12:38PM | 12 | Q.   IS THIS AN EMAIL THAT DR. YOUNG SENT TO YOU ABOUT THE CMS |
| 12:38PM | 13 | INSPECTION IN DECEMBER OF 2013? |
| 12:38PM | 14 | A.   IT IS. |
| 12:38PM | 15 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:38PM | 16 | 7368. |
| 12:38PM | 17 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:38PM | 18 | THE COURT:  IT'S ADMITTED. |
| 12:38PM | 19 | (DEFENDANT'S EXHIBIT 7368 WAS RECEIVED IN EVIDENCE.) |
| 12:38PM | 20 | BY MR. DOWNEY: |
| 12:38PM | 21 | Q.   SO IF YOU GO TO THE FIRST PAGE, DO YOU SEE THIS IS AN |
| 12:39PM | 22 | EMAIL TO YOU FROM DR. YOUNG? |
| 12:39PM | 23 | A.   I DO. |
| 12:39PM | 24 | Q.   AND THEN HE SAYS IN THE FIRST PARAGRAPH, "HERE ARE MY |
| 12:39PM | 25 | NOTES FROM THE AUDIT YESTERDAY"? |

7815

| | | |
|---|---|---|
| 12:39PM | 1 | A.   YES. |
| 12:39PM | 2 | Q.   AND THEN IF YOU CONTINUE THROUGH THE DOCUMENT TO PAGE 2 OF |
| 12:39PM | 3 | THE ATTACHMENT. |
| 12:39PM | 4 | A.   YES. |
| 12:39PM | 5 | Q.   I'M SORRY, REALLY PAGE 1 OF THE ATTACHMENT, PAGE 2 OF THE |
| 12:39PM | 6 | DOCUMENT. |
| 12:39PM | 7 | A.   OKAY. |
| 12:39PM | 8 | Q.   COULD WE HIGHLIGHT THE SUBJECT -- THE SENTENCE THAT IS |
| 12:39PM | 9 | LABELLED "TESTS." |
| 12:39PM | 10 | AND DO YOU SEE THAT DR. YOUNG REPORTS THERE "THE AUDITOR |
| 12:40PM | 11 | ASKED IF WE HAVE ANY NEW TESTS OFFERED SINCE THE LAST AUDIT"? |
| 12:40PM | 12 | A.   YES. |
| 12:40PM | 13 | Q.   AND YOU UNDERSTOOD WHEN YOU WERE RECEIVING THIS THAT THIS |
| 12:40PM | 14 | WAS THE PERSONNEL FROM CMS THAT WAS ASKING THE QUESTION? |
| 12:40PM | 15 | A.   YES. |
| 12:40PM | 16 | Q.   AND THEN HE SAYS IN THE NEXT SUBPARAGRAPH, "ADAM SAID |
| 12:40PM | 17 | YES." |
| 12:40PM | 18 | DO YOU SEE THAT? |
| 12:40PM | 19 | A.   YES. |
| 12:40PM | 20 | Q.   AND WAS THAT A REFERENCE TO DR. ROSENDORFF? |
| 12:40PM | 21 | A.   IT IS. |
| 12:40PM | 22 | Q.   AND THEN HE GOES ON TO SAY, "ADAM SAID YES AND SPOKE ABOUT |
| 12:40PM | 23 | ALL LDT'S (GC, CYTO, ELISA)." |
| 12:40PM | 24 | IN THAT INSTANCE, WHAT ARE LDT'S WITH THOSE ABBREVIATIONS |
| 12:40PM | 25 | THEREAFTER REFERRING TO? |

12:40PM 1      A.    THESE ARE PROPRIETARY TESTS THAT THERANOS DEVELOPED AND

12:40PM 2      VALIDATED IN ITS LABORATORY FOR THREE GROUPS OF TESTS OR

12:40PM 3      METHODS, GENERAL CHEMISTRY, CYTOMETRY, AND ELISA.

12:40PM 4      Q.    OKAY.  SO WERE THOSE, THOSE ASSAYS OR DEVICES THAT ARE --

12:41PM 5      THERE'S A REFERENCE TO THERE?

12:41PM 6      A.    THESE ARE ASSAY METHODS.

12:41PM 7      Q.    OKAY.  AND UNDER THAT THERE'S ANOTHER ENTRY AND IT SAYS,

12:41PM 8      "MENTIONED EDISON 3.5."

12:41PM 9          AND THAT'S THE DEVICE THAT YOU HAD BEGUN TO USE IN THE

12:41PM 10     CLINICAL LAB IN CONNECTION WITH WALGREENS; IS THAT RIGHT?

12:41PM 11     A.    IT IS.

12:41PM 12     Q.    AND THEN HE GOES ON TO SAY, "FLOW CYTOMETER, ADVIA, AND

12:41PM 13     NORMANDY LAB."

12:41PM 14         DO YOU SEE THAT?

12:41PM 15     A.    I DO.

12:41PM 16     Q.    AND WHAT DOES THAT REFER TO?

12:41PM 17     A.    THAT REFERS TO THE MODIFICATIONS WE HAD MADE TO

12:41PM 18     TRADITIONAL COMMERCIALLY AVAILABLE MACHINES TO BE ABLE TO RUN

12:41PM 19     OUR PROPRIETARY SMALL SAMPLE CHEMISTRIES ON THOSE MACHINES.

12:41PM 20     Q.    AND ARE THESE THE MACHINES THAT YOU HAD DESCRIBED LAST

12:41PM 21     WEEK AS INVOLVING A TRADE SECRET THAT THERANOS HAD -- RELATED

12:41PM 22     TO TECHNOLOGY THERANOS DEVELOPED IN CONNECTION WITH THE LAUNCH?

12:41PM 23     A.    THEY ARE.

12:41PM 24     Q.    AND IN THIS INSTANCE THEY APPEAR TO BE BEING DISCLOSED TO

12:42PM 25     THE CMS AUDITOR.

7817

```
12:42PM   1          WAS THAT YOUR UNDERSTANDING OF WHAT HAPPENED?

12:42PM   2     A.   YES.

12:42PM   3     Q.   AND WHY WAS THERANOS COMFORTABLE COMMUNICATING TO THE

12:42PM   4     AUDITOR THAT THESE METHODS HAD EXISTED?

12:42PM   5     A.   BECAUSE, AGAIN, THIS IS A GOVERNMENT REGULATOR.  THEY HAD

12:42PM   6     METHODS IN PLACE TO BE ABLE TO PROTECT TRADE SECRETS, AND WE

12:42PM   7     COULD MAKE THESE DISCLOSURES AND STILL MAINTAIN THE PROTECTION

12:42PM   8     OF OUR TRADE SECRETS.

12:42PM   9     Q.   OKAY.  DID YOU UNDERSTAND AS A RESULT OF THIS REPORT THAT

12:42PM   10    ALL OF THE TECHNOLOGIES THAT THERANOS WAS USING IN ITS CLIA LAB

12:42PM   11    HAD BEEN DISCLOSED TO CMS IN 2013?

12:42PM   12    A.   YES.

12:42PM   13    Q.   LET ME ASK YOU TO LOOK AT THE NEXT PAGE OF THE EXHIBIT

12:42PM   14    UNDER NUMBER 11, WHICH IS LDT VALIDATION.

12:43PM   15    A.   OKAY.

12:43PM   16    Q.   AND DO YOU SEE IT ASKS, UNDER LDT VALIDATION, "AUDITOR

12:43PM   17    ASKED TO SEE A REPRESENTATIVE LDT VALIDATION REPORT"?

12:43PM   18          DO YOU SEE THAT?

12:43PM   19    A.   I DO.

12:43PM   20    Q.   AND WHAT IS THAT A REFERENCE TO?

12:43PM   21    A.   IT'S A REFERENCE TO SHOWING THE AUDITOR ONE OF THE

12:43PM   22    VALIDATION REPORTS FOR A PROPRIETARY TEST IN THE CLIA LAB.

12:43PM   23    Q.   AND THEN DR. YOUNG GOES ON TO REPORT THAT "SHE PICKED

12:43PM   24    CREATININE AS AN EXAMPLE."

12:43PM   25          DO YOU SEE THAT?
```

| | | |
|---|---|---|
| 12:43PM | 1 | A.   YES. |
| 12:43PM | 2 | Q.   AND DO YOU KNOW WHAT DEVICE THAT WAS RUN ON AT THIS TIME |
| 12:43PM | 3 | IN THE CLINICAL LAB? |
| 12:43PM | 4 | A.   YES. |
| 12:43PM | 5 | Q.   WHAT DEVICE? |
| 12:43PM | 6 | A.   THE MODIFIED ADVIA MACHINE. |
| 12:43PM | 7 | Q.   OKAY.  AND THEN DR. YOUNG GOES ON FROM THERE TO SAY, "THIS |
| 12:43PM | 8 | REPORT DID NOT APPEAR TO BE THE LATEST WITH THE LINEARITY |
| 12:44PM | 9 | DATA." |
| 12:44PM | 10 |      DO YOU SEE THAT? |
| 12:44PM | 11 | A.   I DO. |
| 12:44PM | 12 | Q.   AND HE'S SUGGESTING AN ACTION THAT IT BE UPDATED TO MAKE |
| 12:44PM | 13 | SURE THE LATEST DATA GETS INTO THESE REPORTS; IS THAT RIGHT? |
| 12:44PM | 14 | A.   YES. |
| 12:44PM | 15 | Q.   OKAY.  SEPARATE FROM THIS DOCUMENT, DID YOU ALSO |
| 12:44PM | 16 | UNDERSTAND FROM THE CONVERSATIONS THAT YOU HAD WITH DR. YOUNG |
| 12:44PM | 17 | THAT THESE TESTS AND DEVICES WERE DISCLOSED TO CMS AS PART OF |
| 12:44PM | 18 | THEIR INSPECTION IN 2013? |
| 12:44PM | 19 | A.   I DID. |
| 12:44PM | 20 | Q.   OVER THE COURSE OF THE TIME THAT THERANOS OPERATED SERVICE |
| 12:44PM | 21 | CENTERS IN WALGREENS STORES, DID YOU COME TO UNDERSTAND HOW |
| 12:44PM | 22 | MANY TESTS HAD BEEN OFFERED TO PATIENTS? |
| 12:44PM | 23 | A.   I DID. |
| 12:44PM | 24 | Q.   WHAT WAS YOUR UNDERSTANDING IN THAT REGARD? |
| 12:44PM | 25 | A.   NUMBERS BETWEEN 8 AND 12 MILLION TESTS. |

7819

| | | |
|---|---|---|
| 12:44PM | 1 | Q.   AND DID YOU UNDERSTAND -- |
| 12:44PM | 2 | MR. LEACH:  YOUR HONOR, OBJECTION.  VAGUE AS TO |
| 12:45PM | 3 | TIME. |
| 12:45PM | 4 | THE COURT:  WHY DON'T YOU LAY A BETTER FOUNDATION AS |
| 12:45PM | 5 | TO THE TIME. |
| 12:45PM | 6 | BY MR. DOWNEY: |
| 12:45PM | 7 | Q.   DID YOU LEARN IN 2016, AS A RESULT OF THE CMS INSPECTION |
| 12:45PM | 8 | AND OTHER DEVELOPMENTS AT THERANOS, HOW MANY TESTS HAD BEEN |
| 12:45PM | 9 | PERFORMED AT THERANOS SERVICE CENTERS IN WALGREENS STORES? |
| 12:45PM | 10 | A.   I DID. |
| 12:45PM | 11 | Q.   AND WHAT DID YOU UNDERSTAND IN THAT REGARD? |
| 12:45PM | 12 | A.   I UNDERSTOOD BETWEEN 8 TO 12 MILLION TESTS HAD BEEN |
| 12:45PM | 13 | PERFORMED THROUGH THERANOS STORES. |
| 12:45PM | 14 | Q.   AND OVER THE COURSE OF TIME BETWEEN 2013 AND 2015, DID YOU |
| 12:45PM | 15 | HAVE AN UNDERSTANDING OF HOW MANY TESTS WERE BEING PERFORMED |
| 12:45PM | 16 | WITHIN THE LAB? |
| 12:45PM | 17 | A.   YES. |
| 12:45PM | 18 | MR. LEACH:  OBJECTION, YOUR HONOR.  VAGUE AS TO "THE |
| 12:45PM | 19 | LAB."  THERE ARE MULTIPLE LABS HERE. |
| 12:45PM | 20 | MR. DOWNEY:  THE CLINICAL LAB. |
| 12:45PM | 21 | MR. LEACH:  YOUR HONOR, OBJECTION.  IT'S STILL |
| 12:45PM | 22 | VAGUE. |
| 12:45PM | 23 | THE COURT:  WHY DON'T YOU NARROW DOWN THE SITE OF |
| 12:45PM | 24 | THE LAB IF YOU CAN. |
| 12:45PM | 25 | MR. DOWNEY:  YEAH. |

7820

| | | |
|---|---|---|
| 12:45PM | 1 | Q.   HOW MANY -- DID YOU HAVE AN UNDERSTANDING -- IF YOU |
| 12:46PM | 2 | DIDN'T, THAT'S FINE, TOO.  DID YOU HAVE AN UNDERSTANDING HOW |
| 12:46PM | 3 | MANY TESTS WERE BEING OFFERED IN THE PERIOD WHEN THE LAB WAS |
| 12:46PM | 4 | OPERATING BETWEEN 2013 AND 2015? |
| 12:46PM | 5 | A.   YES. |
| 12:46PM | 6 | MR. LEACH:  OBJECTION, YOUR HONOR. |
| 12:46PM | 7 | THE COURT:  WHAT LAB ARE YOU REFERRING TO? |
| 12:46PM | 8 | MR. DOWNEY:  THE CLINICAL LAB. |
| 12:46PM | 9 | THE COURT:  AT? |
| 12:46PM | 10 | MR. DOWNEY:  AT THERANOS, YES. |
| 12:46PM | 11 | THE COURT:  OKAY.  THANK YOU. |
| 12:46PM | 12 | THE WITNESS:  YES. |
| 12:46PM | 13 | BY MR. DOWNEY: |
| 12:46PM | 14 | Q.   AND WHAT WAS THAT UNDERSTANDING? |
| 12:46PM | 15 | A.   BETWEEN 8 TO 12 MILLION TESTS. |
| 12:46PM | 16 | Q.   OKAY.  WERE THERE TIMES WHEN YOU LEARNED THAT |
| 12:46PM | 17 | DR. ROSENDORFF HAD DECIDED TO STOP OFFERING PARTICULAR TESTS? |
| 12:46PM | 18 | A.   YES. |
| 12:46PM | 19 | Q.   DID YOU INTERFERE WITH DECISIONS THAT HE MADE IN THAT |
| 12:46PM | 20 | REGARD? |
| 12:46PM | 21 | A.   NO. |
| 12:46PM | 22 | Q.   WHY NOT? |
| 12:46PM | 23 | A.   BECAUSE HE HAD THE EXPERTISE TO MAKE THOSE DECISIONS. |
| 12:46PM | 24 | Q.   TO YOUR KNOWLEDGE, WERE ANY TESTS OFFERED IN THE CLIA |
| 12:46PM | 25 | LABORATORY WITHOUT THE APPROVAL OF THE PERSON SERVING AS |

7821

| | | |
|---|---|---|
| 12:46PM | 1 | LABORATORY DIRECTOR AT THE TIME? |
| 12:46PM | 2 | A.  NO. |
| 12:47PM | 3 | Q.  TO YOUR KNOWLEDGE, DID MR. BALWANI EVER LEARN ABOUT |
| 12:47PM | 4 | CIRCUMSTANCES WHERE A TEST WAS BEING OFFERED WITHOUT THE |
| 12:47PM | 5 | APPROVAL OF THE LABORATORY DIRECTOR? |
| 12:47PM | 6 | A.  NO. |
| 12:47PM | 7 | Q.  DID YOU EVER OVERRULE DR. ROSENDORFF, OR ANY OTHER LAB |
| 12:47PM | 8 | DIRECTOR FOR THAT MATTER, AS TO WHETHER PATIENTS SHOULD GET THE |
| 12:47PM | 9 | RESULTS OF A PARTICULAR TEST? |
| 12:47PM | 10 | A.  NO. |
| 12:47PM | 11 | Q.  TO YOUR KNOWLEDGE, DID MR. BALWANI? |
| 12:47PM | 12 | A.  NO. |
| 12:47PM | 13 | Q.  NOW, YOU RECALL THAT AT THE -- EARLIER IN THE TRIAL |
| 12:47PM | 14 | ERIKA CHEUNG TESTIFIED. |
| 12:47PM | 15 | DO YOU REMEMBER THAT? |
| 12:47PM | 16 | A.  I DO. |
| 12:47PM | 17 | Q.  DO YOU RECALL EVER HAVING ANY COMMUNICATIONS WITH |
| 12:47PM | 18 | MS. CHEUNG WHILE SHE WAS WORKING AT THERANOS? |
| 12:47PM | 19 | A.  NO. |
| 12:47PM | 20 | Q.  DO YOU RECALL EVER HEARING ABOUT ANY CONCERNS THAT SHE HAD |
| 12:47PM | 21 | PRIOR TO THE TIME THAT SHE LEFT THERANOS? |
| 12:48PM | 22 | A.  NO. |
| 12:48PM | 23 | Q.  DO YOU RECALL THAT MS. CHEUNG SO TESTIFIED ABOUT CONCERNS |
| 12:48PM | 24 | THAT WERE COMMUNICATED TO HER BY ANOTHER THERANOS EMPLOYEE |
| 12:48PM | 25 | NAMED TYLER SHULTZ? |

7822

| | | |
|---|---|---|
| 12:48PM | 1 | A.   I DO. |
| 12:48PM | 2 | Q.   AND DID MR. SHULTZ WORK AT THERANOS? |
| 12:48PM | 3 | A.   HE DID. |
| 12:48PM | 4 | Q.   DID YOU KNOW TYLER SHULTZ DURING THE TIME PERIOD WHILE HE |
| 12:48PM | 5 | WAS WORKING AT THERANOS? |
| 12:48PM | 6 | A.   YES. |
| 12:48PM | 7 | Q.   AND HOW DID YOU COME TO KNOW TYLER SHULTZ? |
| 12:48PM | 8 | A.   HE WAS MR. SHULTZ'S GRANDSON AND GEORGE WAS ON OUR BOARD. |
| 12:48PM | 9 | Q.   DID YOU LEARN AT SOME POINT THAT TYLER SHULTZ WAS RAISING |
| 12:48PM | 10 | QUESTIONS TO DR. YOUNG AND OTHERS ABOUT THERANOS'S TESTS? |
| 12:48PM | 11 | A.   I DID. |
| 12:48PM | 12 | Q.   WHAT DID YOU DO IN RESPONSE? |
| 12:48PM | 13 | A.   I ASKED DR. YOUNG AND OUR SCIENTISTS TO LOOK INTO HIS |
| 12:48PM | 14 | CONCERNS SERIOUSLY AND EVALUATE EACH OF THE CONCERNS THAT HE |
| 12:48PM | 15 | HAD RAISED. |
| 12:48PM | 16 | Q.   AND DO YOU RECALL LEARNING THAT DR. YOUNG MET WITH |
| 12:49PM | 17 | MR. SHULTZ? |
| 12:49PM | 18 | A.   YES. |
| 12:49PM | 19 | Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 7421. |
| 12:49PM | 20 | A.   OKAY. |
| 12:49PM | 21 | Q.   JUST TAKE A MOMENT TO REVIEW THAT EMAIL. |
| 12:49PM | 22 | A.   OKAY. |
| 12:49PM | 23 | Q.   IS THIS AN EMAIL EXCHANGE ON WHICH YOU APPEAR ON THE TOP |
| 12:49PM | 24 | EMAIL RELATED TO CONCERNS THAT MR. SHULTZ HAD RAISED? |
| 12:49PM | 25 | A.   IT IS. |

7823

| | | |
|---|---|---|
| 12:49PM | 1 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 12:49PM | 2 | 7421. |
| 12:49PM | 3 | MR. LEACH:  801, 802, YOUR HONOR. |
| 12:50PM | 4 | THE COURT:  THE ENTIRETY OF THIS DOCUMENT, THIS |
| 12:50PM | 5 | CHAIN? |
| 12:50PM | 6 | MR. DOWNEY:  YES, YOUR HONOR. |
| 12:50PM | 7 | THE COURT:  IS THIS AN 803(6) EMAIL? |
| 12:50PM | 8 | MR. DOWNEY:  IT IS AN 803(6) EMAIL, AMONGST OTHER |
| 12:50PM | 9 | REASONS WHY IT WOULD COME IN. |
| 12:50PM | 10 | THE COURT:  I'LL OVERRULE THE OBJECTION.  IT'S |
| 12:50PM | 11 | ADMITTED. |
| 12:50PM | 12 | (DEFENDANT'S EXHIBIT 7421 WAS RECEIVED IN EVIDENCE.) |
| 12:50PM | 13 | BY MR. DOWNEY: |
| 12:50PM | 14 | Q.   LET'S LOOK AT THE TOP OF 7421. |
| 12:51PM | 15 | DO YOU SEE THAT THIS IS AN EMAIL EXCHANGE WITH SEVERAL |
| 12:51PM | 16 | EMAILS BENEATH IT, BUT IT'S BETWEEN YOURSELF AND MR. BALWANI |
| 12:51PM | 17 | AND DR. YOUNG? |
| 12:51PM | 18 | A.   IT IS. |
| 12:51PM | 19 | Q.   OKAY.  LET ME ASK YOU TO GO TO THE BOTTOM OF PAGE 2 OF |
| 12:51PM | 20 | THE -- YES, THAT EMAIL.  AND THEN THAT CARRIES OVER ON THE NEXT |
| 12:51PM | 21 | PAGE. |
| 12:51PM | 22 | BUT LET'S LOOK AT, LET'S LOOK AT THE TOP FIRST.  IS THIS |
| 12:51PM | 23 | EMAIL A REPORT BY DR. YOUNG TO YOU AND MR. BALWANI ABOUT A |
| 12:51PM | 24 | MEETING THAT HE HAD WITH MR. TYLER -- MR. TYLER SHULTZ? |
| 12:51PM | 25 | A.   YES. |

7824

12:51PM   1     Q.   AND WAS THAT THE MEETING THAT YOU HAD REQUESTED DR. YOUNG

12:51PM   2     TO HAVE TO UNDERSTAND WHAT MR. SHULTZ'S CONCERNS WERE?

12:52PM   3     A.   YES.

12:52PM   4     Q.   IF YOU GO TO THE BODY OF THE EMAIL, DR. YOUNG REPORTS AT

12:52PM   5     THE TOP THAT HE'S UPDATING YOU ABOUT THE MEETING.

12:52PM   6          DO YOU SEE THAT?

12:52PM   7     A.   YES.

12:52PM   8     Q.   AND THEN IN THE SECOND PARAGRAPH HE GOES ON TO SAY THAT,

12:52PM   9     "I EXPLAINED OUR CALCULATION METHODS AND HE WAS SLOW TO

12:52PM  10     UNDERSTAND.  I'M GOING TO FOLLOW-UP AGAIN WITH HIM, AS HE DOES

12:52PM  11     NOT UNDERSTAND THE REASONING BEHIND RUNNING REPLICATES."

12:52PM  12          DO YOU SEE THAT?

12:52PM  13     A.   I DO.

12:52PM  14     Q.   AND DO YOU SEE THAT HE GOES ON IN THE NEXT PARAGRAPH TO

12:52PM  15     DESCRIBE A DIFFERENT QUESTION THAT MR. SHULTZ HAD RAISED IN HIS

12:52PM  16     RESPONSE TO THAT QUESTION?

12:52PM  17     A.   YES.

12:52PM  18     Q.   AND THEN IF YOU LOOK AT THE LAST SENTENCE OF DR. YOUNG'S

12:52PM  19     EMAIL ON PAGE 3, HE SAYS, "I AM REVIEWING HOW WE COMPARE TO

12:52PM  20     THIS PREDICATE AND THEN MEET WITH HIM AGAIN."

12:53PM  21     A.   YES.

12:53PM  22     Q.   OKAY.  AND THEN IF WE GO BACK TO THE HEADER OF THIS

12:53PM  23     PARTICULAR EMAIL, DO YOU SEE THAT THAT WAS SENT ON AROUND

12:53PM  24     FEBRUARY 21ST IN THE MORNING?  I'M SORRY, FEBRUARY 20TH, AT

12:53PM  25     LEAST WITH AN A.M. STAMP?

7825

| | | |
|---|---|---|
| 12:53PM | 1 | A.   YES.  THE ONE WE HAVE ON THE SCREEN OR THE -- |
| 12:53PM | 2 | Q.   I'M SORRY.  IT'S A P.M. |
| 12:53PM | 3 | A.   YES, YES. |
| 12:53PM | 4 | Q.   YES.  ALL RIGHT.  LET ME GO TO THE MIDDLE OF PAGE 1 NOW. |
| 12:53PM | 5 | AND IF WE CAN BLOW UP FROM THE MIDDLE OF THAT TO THE BOTTOM OF |
| 12:54PM | 6 | THAT PAGE OF THE EMAIL FROM DR. YOUNG. |
| 12:54PM | 7 | ALL RIGHT.  AND DO YOU SEE THAT DR. YOUNG REPORTS ON A |
| 12:54PM | 8 | FOLLOW-UP DISCUSSION THAT HE HAD WITH MR. SHULTZ? |
| 12:54PM | 9 | A.   YES. |
| 12:54PM | 10 | Q.   DO YOU SEE THAT? |
| 12:54PM | 11 | DO YOU SEE THAT HE REPORTS, "HE ACKNOWLEDGED NOW |
| 12:54PM | 12 | UNDERSTANDING THE CALCULATIONS, SO THE ISSUE IS CLOSED"? |
| 12:54PM | 13 | A.   I DO. |
| 12:54PM | 14 | Q.   AND DO YOU SEE IN THE SECOND PARAGRAPH HE GOES ON AND |
| 12:54PM | 15 | REPORTS THAT HE REVIEWED THE APPROACH OF MEETING REQUIREMENTS |
| 12:54PM | 16 | AND THAT MR. SHULTZ WAS IMPRESSED, ACCORDING TO DR. YOUNG? |
| 12:54PM | 17 | A.   YES. |
| 12:54PM | 18 | Q.   AND THEN IF YOU GO TO THE FOURTH BULLET POINT, ABOUT |
| 12:54PM | 19 | HALFWAY DOWN THROUGH THAT BULLET POINT, DO YOU SEE THAT |
| 12:54PM | 20 | DR. YOUNG REPORTED THAT, "OUR OBJECTIVE IS TO OUTPERFORM OTHER |
| 12:54PM | 21 | LAB SERVICES PROVIDING THESE TESTS IN NATIONAL WAY BY |
| 12:55PM | 22 | MAINTAINING CONTROL AND MONITORING THE ENTIRE PROCESS.  "HE," |
| 12:55PM | 23 | REFERRING TO MR. SHULTZ, "EXPRESSED UNDERSTANDING THE POWER OF |
| 12:55PM | 24 | THIS APPROACH, SUCH AS THE ABILITY TO TREND RESULTS OVER TIME." |
| 12:55PM | 25 | A.   YES. |

7826

| | | |
|---|---|---|
| 12:55PM | 1 | Q.   AND THEN DO YOU SEE HE GOES ON TO REPORT ABOUT HIS |
| 12:55PM | 2 | CONVERSATION AND MR. SHULTZ'S RESPONSE DURING THIS SECOND |
| 12:55PM | 3 | MEETING? |
| 12:55PM | 4 | A.   YES. |
| 12:55PM | 5 | Q.   AND DO YOU SEE THAT IN THE SIXTH BULLET POINT, HE REPORTS |
| 12:55PM | 6 | THAT MR. SHULTZ HAD RAISED PROFICIENCY TESTING. |
| 12:55PM | 7 | DO YOU SEE THAT? |
| 12:55PM | 8 | A.   I DO. |
| 12:55PM | 9 | Q.   AND HE HAD RAISED SOME QUESTIONS ABOUT HOW PROFICIENCY |
| 12:55PM | 10 | TESTING SHOULD BE DONE. |
| 12:55PM | 11 | DO YOU SEE THAT? |
| 12:55PM | 12 | A.   YES. |
| 12:55PM | 13 | Q.   AND THEN DR. YOUNG REPORTS THAT, "BY THE WAY, THIS GOES |
| 12:56PM | 14 | AGAINST OUR CLIA STANDARD OPERATING PROCEDURES AS I NOTED IN |
| 12:56PM | 15 | THE OTHER EMAIL." |
| 12:56PM | 16 | AND HE GOES ON IN THE LAST SENTENCE BEFORE THE BULLET |
| 12:56PM | 17 | POINT TO SAY THAT HE HAD EXPLAINED THE PROFICIENCY TESTING |
| 12:56PM | 18 | POLICY TO MR. SHULTZ. |
| 12:56PM | 19 | DO YOU SEE THAT? |
| 12:56PM | 20 | A.   YES. |
| 12:56PM | 21 | Q.   OKAY.  AND THEN IF YOU GO -- WHAT DID YOU UNDERSTAND AS TO |
| 12:56PM | 22 | MR. SHULTZ'S CONCERNS AS A RESULT OF THESE TWO EMAILS FROM |
| 12:56PM | 23 | DR. YOUNG? |
| 12:56PM | 24 | A.   I UNDERSTOOD THAT MR. SHULTZ HAD BEEN CONFUSED ABOUT |
| 12:56PM | 25 | CERTAIN ISSUES AND THAT DR. YOUNG WAS ABLE TO ADEQUATELY GET |

| | | |
|---|---|---|
| 12:56PM | 1 | INTO THOSE CONCERNS WITH HIM AND ALLAY HIS CONCERNS. |
| 12:56PM | 2 | Q.   AND IF YOU LOOK AT PAGE 1 OF THE EMAIL, YOU SEE THAT |
| 12:57PM | 3 | THERE'S AN EMAIL FROM YOU -- I'M SORRY, THE ONE RIGHT BELOW |
| 12:57PM | 4 | THAT.   RIGHT, RIGHT THERE. |
| 12:57PM | 5 | AND YOU ASK, "DID HE UNDERSTAND THE PT POINT?" |
| 12:57PM | 6 | AND THAT'S THE COMMENT ON PROFICIENCY TESTING? |
| 12:57PM | 7 | A.   YES. |
| 12:57PM | 8 | Q.   AND RIGHT ABOVE THAT, DO YOU SEE THERE'S A RESPONSE FROM |
| 12:57PM | 9 | DR. YOUNG? |
| 12:57PM | 10 | A.   YES. |
| 12:57PM | 11 | Q.   AND HE SAYS, "YES, HE WAS AGAIN HAPPY TO UNDERSTAND THAT |
| 12:57PM | 12 | THERE WAS A SOLID PLAN AND PROCESS IN PLACE (OTHER THAN WHAT HE |
| 12:57PM | 13 | UNDERSTOOD BEFOREHAND)." |
| 12:57PM | 14 | A.   I SEE THAT. |
| 12:57PM | 15 | Q.   OKAY.   NOW, AFTER DR. YOUNG REPORTED TO YOU IN THIS VEIN, |
| 12:58PM | 16 | DID MR. SHULTZ SUBSEQUENTLY RAISE CONCERNS WITH YOU AGAIN ABOUT |
| 12:58PM | 17 | TESTING AT THERANOS? |
| 12:58PM | 18 | A.   HE DID. |
| 12:58PM | 19 | Q.   AND LET ME ASK YOU TO LOOK AT 7434. |
| 12:58PM | 20 | A.   OKAY. |
| 12:58PM | 21 | Q.   AND DO YOU SEE THAT THAT'S AN EMAIL FROM MR. SHULTZ TO YOU |
| 12:58PM | 22 | DISCUSSING THE EARLIER MEETINGS HE HAD HAD WITH DR. YOUNG AND |
| 12:58PM | 23 | RAISING SOME CONCERNS? |
| 12:58PM | 24 | A.   YES. |
| 12:58PM | 25 | Q.   AND YOU THEN RESPONDED TO THAT EMAIL? |

7828

| | | |
|---|---|---|
| 12:58PM | 1 | A.   YES. |
| 12:58PM | 2 | MR. DOWNEY:  YOUR HONOR, I'D LIKE TO MOVE THE |
| 12:58PM | 3 | ADMISSION OF 7434. |
| 12:58PM | 4 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 12:58PM | 5 | THE COURT:  IT'S ADMITTED. |
| 12:58PM | 6 | (DEFENDANT'S EXHIBIT 7434 WAS RECEIVED IN EVIDENCE.) |
| 12:58PM | 7 | BY MR. DOWNEY: |
| 12:58PM | 8 | Q.   SO IF WE LOOK AT THE BOTTOM OF PAGE 1, WITHOUT GOING |
| 12:58PM | 9 | THROUGH THE EMAIL, DO YOU SEE MR. SHULTZ SENT YOU AN EMAIL AND |
| 12:58PM | 10 | HE TALKS ABOUT HIS MEETINGS WITH DR. YOUNG, AND HE THEN GOES ON |
| 12:59PM | 11 | TO ADDRESS WHETHER HE THOUGHT THAT MR. YOUNG'S EXPLANATION WAS |
| 12:59PM | 12 | SUFFICIENT. |
| 12:59PM | 13 | DO YOU SEE THAT? |
| 12:59PM | 14 | A.   YES. |
| 12:59PM | 15 | Q.   AND THAT WAS ON APRIL 11TH AROUND 3:38. |
| 12:59PM | 16 | DO YOU SEE THAT? |
| 12:59PM | 17 | A.   I DO. |
| 12:59PM | 18 | Q.   AND THEN YOU RESPOND AT ABOUT TWO HOURS LATER. |
| 12:59PM | 19 | DO YOU SEE THAT? |
| 12:59PM | 20 | A.   YES. |
| 12:59PM | 21 | Q.   AND YOU WROTE THAT, "TYLER: |
| 12:59PM | 22 | "THESE ARE VERY, VERY SERIOUS COMMENTS AND ALLEGATIONS |
| 12:59PM | 23 | YOU'RE MAKING.  I'M GOING TO HAVE THE TEAMS GO THROUGH THIS |
| 12:59PM | 24 | LINE BY LINE SO IT WILL TAKE SOME TIME BEFORE I GET BACK TO YOU |
| 12:59PM | 25 | ON THIS." |

| | | |
|---|---|---|
| 12:59PM | 1 | DO YOU SEE THAT? |
| 12:59PM | 2 | A.  I DO. |
| 12:59PM | 3 | Q.  AND DID YOU THEN ASK THE TEAMS TO GO THROUGH MR. SHULTZ'S |
| 12:59PM | 4 | CONCERNS? |
| 12:59PM | 5 | A.  I DID. |
| 12:59PM | 6 | Q.  OKAY.  AND WHO DID YOU ASK TO DO THAT? |
| 12:59PM | 7 | A.  I ASKED DR. YOUNG TO LEAD THAT WORK. |
| 12:59PM | 8 | Q.  OKAY.  AND DID YOU, DID YOU SEND THE COMMENTS THAT |
| 01:00PM | 9 | MR. SHULTZ HAD MADE TO DR. YOUNG? |
| 01:00PM | 10 | A.  I DID. |
| 01:00PM | 11 | Q.  LET ME ASK YOU TO LOOK AT 1667. |
| 01:00PM | 12 | IS THIS AN EMAIL BETWEEN YOU AND DR. YOUNG DISCUSSING THE |
| 01:00PM | 13 | CONCERNS THAT MR. SHULTZ RAISED? |
| 01:00PM | 14 | A.  I'M SORRY.  WHICH BINDER IS IT IN? |
| 01:00PM | 15 | Q.  1667 SHOULD BE IN THE THIRD VOLUME. |
| 01:00PM | 16 | A.  OKAY. |
| 01:00PM | 17 | Q.  DO YOU HAVE THAT? |
| 01:00PM | 18 | A.  I'VE GOT IT, YEP. |
| 01:00PM | 19 | Q.  OKAY. |
| 01:01PM | 20 | A.  OKAY. |
| 01:01PM | 21 | Q.  MY QUESTION TO YOU WAS, AFTER YOU HAVE A MOMENT TO LOOK AT |
| 01:01PM | 22 | IT, IS WHETHER THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND |
| 01:01PM | 23 | DR. YOUNG DISCUSSING THE CONCERNS THAT MR. SHULTZ RAISED IN |
| 01:01PM | 24 | APRIL OF 2014? |
| 01:01PM | 25 | A.  IT IS. |

7830

01:01PM 1          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:01PM 2     1667.

01:01PM 3          MR. LEACH:  NO OBJECTION, YOUR HONOR.

01:01PM 4          THE COURT:  IT'S ADMITTED.

01:01PM 5     (DEFENDANT'S EXHIBIT 1667 WAS RECEIVED IN EVIDENCE.)

01:01PM 6     BY MR. DOWNEY:

01:01PM 7     Q.   AND IF YOU LOOK AT THE VERY TOP HERE, YOU CAN SEE THAT

01:01PM 8     THIS IS ANOTHER SERIES OF EXCHANGES ABOUT MR. YOUNG'S

01:01PM 9     CONCERNS -- OR MR. SHULTZ'S CONCERNS BETWEEN YOURSELF,

01:01PM 10    DR. YOUNG, AND MR. BALWANI?

01:01PM 11    A.   YES.

01:01PM 12    Q.   AND THEN IF YOU LOOK AT THE BOTTOM OF THE PAGE, DO YOU SEE

01:01PM 13    THAT THERE'S AN EMAIL FROM YOU TO DR. YOUNG AND YOU ARE SAYING

01:01PM 14    TO HIM, "TAKE A LOOK AT THIS.  LET ME KNOW WHERE ALL THIS DATA

01:01PM 15    IS FROM/WHAT THE DATA IS, WHETHER YOU HAD EXCHANGES WITH HIM IN

01:02PM 16    WHICH HE FORWARDED MARKETING ARTICLES, AND ALSO COMMENTS LINE

01:02PM 17    BY LINE ON THE BELOW."

01:02PM 18         AND IF YOU LOOK BELOW, YOU SEEM TO HAVE FORWARDED

01:02PM 19    MR. SHULTZ'S EMAIL TO DR. YOUNG; IS THAT RIGHT?

01:02PM 20    A.   I DID.

01:02PM 21    Q.   AND DID DR. YOUNG THEN RESPOND AND ADDRESS THE CONCERNS

01:02PM 22    THAT MR. SHULTZ WAS RAISING?

01:02PM 23    A.   HE DID.

01:02PM 24    Q.   LET'S LOOK AT THE NEXT EMAIL UP.

01:02PM 25         DO YOU SEE THAT DR. YOUNG SAYS "MY COMMENTS ARE IN RED.

| | | |
|---|---|---|
| 01:02PM | 1 | PLEASE LET ME KNOW IF YOU HAVE ANY FURTHER THOUGHTS OR WANT TO |
| 01:02PM | 2 | DISCUSS ANY OF THIS." |
| 01:02PM | 3 | DO YOU SEE THAT? |
| 01:02PM | 4 | A.   YES. |
| 01:02PM | 5 | Q.   AND THEN IF YOU GO UP TO THE TOP OF THE PAGE, DO YOU SEE |
| 01:02PM | 6 | THAT DR. YOUNG AGAIN EMAILS AND HE SAYS, "I WANTED TO MENTION |
| 01:02PM | 7 | AGAIN THAT TYLER'S CONCERN ABOUT PT WAS RAISED RIGHT AFTER WE |
| 01:03PM | 8 | LEARNED THAT CLIA HAD SPLIT THE ACTUAL PT SAMPLE THEY HAD |
| 01:03PM | 9 | RECEIVED." |
| 01:03PM | 10 | AND THEN HE GOES ON TO SAY, "AS I HAD EXPLAINED TO TYLER, |
| 01:03PM | 11 | THIS WAS THE WRONG THING TO DO." |
| 01:03PM | 12 | DO YOU SEE THAT? |
| 01:03PM | 13 | A.   I DO. |
| 01:03PM | 14 | Q.   AND DID YOU UNDERSTAND THAT DR. YOUNG WAS SATISFIED THAT |
| 01:03PM | 15 | HE HAD ADDRESSED THE CONCERNS THAT MR. SHULTZ HAD RAISED AS TO |
| 01:03PM | 16 | PROFICIENCY TESTING? |
| 01:03PM | 17 | A.   I DID. |
| 01:03PM | 18 | Q.   AND WERE YOU SATISFIED TO ACCEPT DR. YOUNG'S EXPLANATION? |
| 01:03PM | 19 | A.   I WAS. |
| 01:03PM | 20 | Q.   AND WHY WERE YOU WILLING TO ACCEPT DR. YOUNG'S |
| 01:03PM | 21 | EXPLANATION? |
| 01:03PM | 22 | A.   BECAUSE I UNDERSTOOD THAT HE HAD STUDIED THE REGULATIONS, |
| 01:03PM | 23 | WORKED WITH OUR REGULATORY PERSONS TO MAKE SURE THIS WAS |
| 01:03PM | 24 | UNDERSTOOD PROPERLY, WORKED WITH DR. ROSENDORFF AND LABORATORY |
| 01:03PM | 25 | LEADERSHIP, AND THAT THEY WERE ALL ALIGNED ON DR. YOUNG'S |

01:04PM   1    EXPLANATION.

01:04PM   2    Q.   OKAY.  LET'S TURN BACK FOR A MOMENT TO DISCUSSING

01:04PM   3    DR. ROSENDORFF.

01:04PM   4         DO YOU RECALL THE TESTIMONY EARLIER IN THE CASE THAT

01:04PM   5    DR. ROSENDORFF DEPARTED IN NOVEMBER OF 2014?

01:04PM   6    A.   I DO.

01:04PM   7    Q.   AND DURING THE PERIOD THAT HE WAS SERVING AS THE LAB

01:04PM   8    DIRECTOR, HOW OFTEN DID YOU INTERACT ONE ON ONE WITH

01:04PM   9    DR. ROSENDORFF?

01:04PM   10   A.   ON OCCASION.  WHENEVER HE WANTED OR NEEDED TO MEET WITH

01:04PM   11   ME.

01:04PM   12   Q.   TO WHOM DID DR. ROSENDORFF DIRECTLY REPORT?

01:04PM   13   A.   TO SUNNY BALWANI.

01:04PM   14   Q.   DID YOU HAVE A CHANCE ON SOME OCCASIONS TO OBSERVE THE

01:04PM   15   WORKING RELATIONSHIP BETWEEN MR. BALWANI AND DR. ROSENDORFF?

01:04PM   16   A.   I DID.

01:04PM   17   Q.   WHAT DID YOU OBSERVE?

01:04PM   18   A.   THAT THERE WAS FRUSTRATION IN THAT RELATIONSHIP.

01:04PM   19   Q.   DID YOU ALSO HAVE OCCASION TO INTERACT IN THE RELATIONSHIP

01:05PM   20   BETWEEN -- OR TO OBSERVE INTERACTIONS BETWEEN DR. ROSENDORFF

01:05PM   21   AND DR. YOUNG?

01:05PM   22   A.   I DID.

01:05PM   23   Q.   AND WHAT WERE YOUR OBSERVATIONS AS TO THE NATURE OF THAT

01:05PM   24   RELATIONSHIP?

01:05PM   25   A.   THAT THEY WOULD OFTEN DISAGREE BEFORE COMING TO A DECISION

7833

01:05PM  1    TOGETHER.

01:05PM  2    Q.   OKAY.  DID THERE COME A TIME WHEN DR. ROSENDORFF TOLD YOU

01:05PM  3    THAT HE WAS GOING TO LEAVE THERANOS?

01:05PM  4    A.   YES.

01:05PM  5    Q.   AND WHEN WAS THAT?

01:05PM  6    A.   AT THE END OF 2014.

01:05PM  7    Q.   WHAT DO YOU RECALL ABOUT HIM TELLING YOU HE WAS GOING TO

01:05PM  8    LEAVE THERANOS?

01:05PM  9    A.   THAT HE HAD ANOTHER JOB THAT HE WANTED TO TAKE AND THAT HE

01:05PM  10   WANTED TO TRANSITION OUT AS FAST AS HE COULD TO BE ABLE TO

01:05PM  11   START AT THAT NEW COMPANY.

01:05PM  12   Q.   AND DID HE TELL THAT TO BOTH YOU AND MR. BALWANI?

01:05PM  13   A.   YES.

01:05PM  14   Q.   HOW DID MR. BALWANI REACT TO DR. ROSENDORFF'S STATEMENT

01:05PM  15   THAT HE INTENDED TO RESIGN?

01:06PM  16   A.   HE ASKED US TO GIVE HIM THE THREE MONTHS THAT HAD BEEN

01:06PM  17   AGREED UPON IN HIS EMPLOYMENT CONTRACT BEFORE LEAVING.

01:06PM  18   Q.   AND DID DR. ROSENDORFF CONTINUE TO SERVE AS THE CLINICAL

01:06PM  19   LABORATORY DIRECTOR AFTER HE GAVE THAT NOTICE THAT HE INTENDED

01:06PM  20   TO LEAVE?

01:06PM  21   A.   HE DID.

01:06PM  22   Q.   AND WHAT, IF ANY, OBSERVATIONS DID YOU HAVE OF HIS

01:06PM  23   BEHAVIOR AFTER HE HAD GIVEN NOTICE THAT HE HAD INTENDED TO

01:06PM  24   DEPART?

01:06PM  25   A.   IT WAS VERY DIFFERENT THAN HOW HE HAD BEHAVED BEFOREHAND,

7834

| | | |
|---|---|---|
| 01:06PM | 1 | AND HE WAS INCREASINGLY AGITATED IN ASKING TO BE ABLE TO LEAVE. |
| 01:06PM | 2 | Q.   AND DO YOU RECALL THAT DURING THE COURSE OF THE TRIAL |
| 01:06PM | 3 | DR. ROSENDORFF TESTIFIED THAT HE HAD SENT YOU AN EMAIL THAT HE |
| 01:06PM | 4 | WAS UNCOMFORTABLE IN HIS ROLE AS LABORATORY DIRECTOR? |
| 01:06PM | 5 | A.   I DO. |
| 01:06PM | 6 | Q.   WHAT WAS YOUR REACTION TO RECEIVING THAT EMAIL? |
| 01:06PM | 7 | A.   I WAS REALLY TAKEN ABACK BECAUSE HE HAD NOT RAISED WITH ME |
| 01:07PM | 8 | THE CONCERNS THAT HE WAS IDENTIFYING IN THAT EMAIL, AND I HAD |
| 01:07PM | 9 | TRIED TO MAKE IT REALLY CLEAR TO HIM THAT ANYTHING THAT HE |
| 01:07PM | 10 | NEEDED TO DO OR NEEDED IN TERMS OF RESOURCES OR OTHERWISE TO BE |
| 01:07PM | 11 | ABLE TO RUN THE LAB IN THE BEST WAY POSSIBLE I WANTED TO MAKE |
| 01:07PM | 12 | AVAILABLE FOR HIM. |
| 01:07PM | 13 | Q.   DID DR. ROSENDORFF EVER TELL YOU THAT HIS RESIGNATION WAS |
| 01:07PM | 14 | RELATED TO THERANOS REFUSING TO IMPLEMENT PROFICIENCY TESTING |
| 01:07PM | 15 | FOR ITS PROPRIETARY TESTS? |
| 01:07PM | 16 | A.   NO. |
| 01:07PM | 17 | Q.   DID DR. ROSENDORFF EVER TELL YOU THAT HIS RESIGNATION WAS |
| 01:07PM | 18 | RELATED TO HIM BEING DENIED RESOURCES THAT HE NEEDED TO RUN THE |
| 01:07PM | 19 | CLINICAL LABORATORY? |
| 01:07PM | 20 | A.   NO. |
| 01:07PM | 21 | Q.   WERE YOU, AS THE CEO OF THE COMPANY, WERE YOU PREPARED FOR |
| 01:07PM | 22 | DR. ROSENDORFF'S DEPARTURE AT THE TIME THAT HE DEPARTED? |
| 01:07PM | 23 | A.   NO. |
| 01:07PM | 24 | Q.   HOW DID THE COMPANY REACT TO THE DEPARTURE OF |
| 01:08PM | 25 | DR. ROSENDORFF? |

7835

| | | |
|---|---|---|
| 01:08PM | 1 | A.   WE WENT BACK TO DR. HURST AND ASKED HIM TO GET INVOLVED |
| 01:08PM | 2 | WITH THE COMPANY AGAIN.   SUNNY BALWANI SAID THAT HE WAS GOING |
| 01:08PM | 3 | TO START SPENDING A VERY SIGNIFICANT AMOUNT OF HIS TIME AT |
| 01:08PM | 4 | NEWARK TO DIG INTO WHAT ISSUES EXISTED AND TO FIX THEM GOING |
| 01:08PM | 5 | FORWARD. |
| 01:08PM | 6 | Q.   AND DID MR. BALWANI SUBSEQUENTLY REPORT TO YOU THAT HE WAS |
| 01:08PM | 7 | SPENDING TIME IN THE CLIA LAB AND DIGGING INTO ISSUES? |
| 01:08PM | 8 | A.   HE WAS, YES. |
| 01:08PM | 9 | MR. DOWNEY:   YOUR HONOR, IN CONNECTION WITH |
| 01:08PM | 10 | EXHIBIT 5387, THIS IS THE TEXT MESSAGES THAT WE'VE ADMITTED BIT |
| 01:08PM | 11 | BY BIT.   THIS WOULD BE 5387E. |
| 01:08PM | 12 | Q.   I'LL JUST ASK YOU TO LOOK AT THAT IN THE THIRD VOLUME OF |
| 01:09PM | 13 | THE BINDER THAT YOU HAVE, MS. HOLMES. |
| 01:09PM | 14 | A.   OKAY. |
| 01:09PM | 15 | Q.   OKAY.   IS THIS A SERIES OF TEXT MESSAGES BETWEEN YOU AND |
| 01:09PM | 16 | MR. BALWANI IN NOVEMBER OF 2014? |
| 01:09PM | 17 | A.   YES. |
| 01:09PM | 18 | MR. DOWNEY:   YOUR HONOR, I MOVE THE ADMISSION OF |
| 01:09PM | 19 | 5387E. |
| 01:09PM | 20 | MR. LEACH:   NO OBJECTION, YOUR HONOR. |
| 01:09PM | 21 | THE COURT:   IT'S ADMITTED. |
| 01:09PM | 22 | (GOVERNMENT'S EXHIBIT 5387E WAS RECEIVED IN EVIDENCE.) |
| 01:09PM | 23 | MR. DOWNEY:   AND IF YOU WOULD JUST DISPLAY THIS. |
| 01:09PM | 24 | Q.   NOW, DR. ROSENDORFF LEFT AROUND NOVEMBER 20TH OR SO. |
| 01:09PM | 25 | DO YOU RECALL THAT? |

7836

01:09PM  1    A.   YES.

01:09PM  2    Q.   AND DO YOU SEE THAT THIS IS A TEXT FROM MR. BALWANI TO YOU

01:09PM  3    ON NOVEMBER 25TH?

01:09PM  4    A.   YES.

01:09PM  5    Q.   AND DO YOU SEE THAT HE'S "HEADING OUT TO NEWARK.  LOVE"?

01:10PM  6    A.   YES.

01:10PM  7    Q.   AND IN THE NEXT EMAIL, NEXT TEXT HE REPORTS, "I'M ON MY

01:10PM  8    WAY TO NEWARK.  OFFICE IS YOURS"?

01:10PM  9    A.   YES.

01:10PM  10   Q.   AND THE NEWARK FACILITY, WAS THAT THE FACILITY THAT HAD

01:10PM  11   THE CLINICAL LAB?

01:10PM  12   A.   IT WAS.

01:10PM  13   Q.   AND THAT WAS SEPARATE FROM THERANOS'S HEADQUARTERS?

01:10PM  14   A.   YES.

01:10PM  15   Q.   AND TO THIS POINT, MR. BALWANI HAD LARGELY WORKED IN

01:10PM  16   THERANOS'S HEADQUARTERS OR HAD HE WORKED IN BOTH LOCATIONS?

01:10PM  17   A.   HE WORKED IN BOTH LOCATIONS, BUT HE WAS MOSTLY IN

01:10PM  18   THERANOS'S HEADQUARTERS.

01:10PM  19   Q.   OKAY.  AND AFTER MR. BALWANI SPENT TIME AT THE LAB IN

01:10PM  20   NEWARK, DO YOU RECALL RECEIVING REPORTS FROM HIM AS TO HIS

01:10PM  21   PERCEPTION OF WHAT THE CONDITION OF THE LAB WAS?

01:10PM  22   A.   YES.

01:10PM  23   Q.   LET ME ASK YOU TO LOOK AT 5387B, WHICH IS ALREADY IN

01:11PM  24   EVIDENCE.

01:11PM  25        ALL RIGHT.  IF WE CAN JUST BLOW THIS UP SO IT'S A LITTLE

7837

01:11PM 1    MORE VISIBLE.  ALL RIGHT.

01:11PM 2        DO YOU SEE THAT HE REPORTS, "NORMANDY LAB IS A F'ING

01:11PM 3    DISASTER ZONE.  GLAD I CAME HERE.  WILL WORK ON FIXING THIS."

01:11PM 4        DO YOU SEE THAT?

01:11PM 5    A.   YES.

01:11PM 6    Q.   AND THEN A FEW LINES DOWN HE SAYS, "IN NORMANDY.  WILL

01:11PM 7    CALL WHEN I LEAVE."

01:11PM 8        DO YOU SEE THAT?

01:11PM 9    A.   YES.

01:11PM 10   Q.   AND THEN HE GOES DOWN TOWARDS THE BOTTOM AND SAYS, "WE

01:11PM 11   BUILT SOFTWARE TO REMOVE HUMAN ERROR AND HUMAN JUDGEMENT.  ALL

01:11PM 12   DAY I SAW THESE PEOPLE USE THEIR JUDGMENTS TO WORK AROUND OUR

01:11PM 13   PROCESSES."

01:11PM 14       DO YOU SEE THAT?

01:11PM 15   A.   YES.

01:11PM 16   Q.   AND DID, IN ADDITION TO THESE TEXTS, DID MR. BALWANI ALSO

01:11PM 17   REPORT TO YOU ORALLY ON HIS OBSERVATIONS OF THE LAB AT THAT

01:12PM 18   TIME?

01:12PM 19   A.   HE DID.

01:12PM 20   Q.   AND WHAT WAS HIS REPORT?

01:12PM 21   A.   HIS REPORT WAS THAT HE FELT THE LABORATORY WAS POORLY

01:12PM 22   MANAGED AND THAT HE WAS MAKING SURE THAT IT WOULD BE PROPERLY

01:12PM 23   MANAGED AND PEOPLE WOULD FOLLOW THE PROCEDURES THAT WE HAD IN

01:12PM 24   PLACE.

01:12PM 25   Q.   DID THERANOS SUBSEQUENTLY HIRE A LABORATORY DIRECTOR TO

7838

| | | |
|---|---|---|
| 01:12PM | 1 | REPLACE DR. ROSENDORFF? |
| 01:12PM | 2 | A.   WE DID. |
| 01:12PM | 3 | Q.   AND WHO WAS THAT? |
| 01:12PM | 4 | A.   WE HIRED DR. SAWYER AND DR. DHAWAN. |
| 01:12PM | 5 | Q.   AND DID YOU HAVE CONVERSATIONS ABOUT DR. DHAWAN AND |
| 01:12PM | 6 | DR. SAWYER WITH MR. BALWANI? |
| 01:12PM | 7 | A.   I DID. |
| 01:12PM | 8 | Q.   AND WHAT DID HE TELL YOU ABOUT DR. DHAWAN AND DR. SAWYER? |
| 01:12PM | 9 | A.   HE SAID THAT THEY WOULD BE SERVING TEMPORARILY BECAUSE WE |
| 01:12PM | 10 | HAD A CANDIDATE INTERNALLY WHO WOULD TAKE OVER THE LAB DIRECTOR |
| 01:12PM | 11 | POSITION FORMALLY AS SOON AS HIS CERTIFICATIONS WERE ISSUED. |
| 01:13PM | 12 | Q.   AND WHO WAS THAT? |
| 01:13PM | 13 | A.   DR. SAKSENA. |
| 01:13PM | 14 | Q.   AND DID HE OFFER REFLECTIONS ON DR. SAKSENA'S |
| 01:13PM | 15 | QUALIFICATIONS TO SERVE AS LAB DIRECTOR? |
| 01:13PM | 16 | A.   HE DID. |
| 01:13PM | 17 | Q.   WHAT DID HE SAY? |
| 01:13PM | 18 | A.   HE SAID THAT DR. SAKSENA WAS QUALIFIED, AND THAT HE HAD |
| 01:13PM | 19 | NOW SEVERAL YEARS OF WORKING IN THE CLIA LAB AND NEEDED |
| 01:13PM | 20 | PAPERWORK TO BE ABLE TO OFFICIALLY ASSUME THE ROLE, BUT THAT HE |
| 01:13PM | 21 | WAS ALREADY ACTING EFFECTIVELY IN THAT CAPACITY. |
| 01:13PM | 22 | Q.   AND DID YOU UNDERSTAND THAT DR. SAWYER WORKED WITH |
| 01:13PM | 23 | JERRY HURST, WHO WAS YOUR CONSULTANT? |
| 01:13PM | 24 | A.   I DID. |
| 01:13PM | 25 | Q.   AND HOW -- WHAT WERE YOUR EXPECTATIONS AS TO HOW LONG |

| 01:13PM | 1 | DR. DHAWAN AND DR. SAWYER WOULD SERVE IN THEIR ROLES WHEN THEY |
| 01:13PM | 2 | WERE HIRED AS LABORATORY DIRECTOR? |
| 01:13PM | 3 | A.   A VERY SHORT PERIOD OF TIME. |
| 01:13PM | 4 | Q.   DID YOU PLAY ANY ROLE IN THEIR SELECTION AS LABORATORY |
| 01:13PM | 5 | DIRECTOR? |
| 01:13PM | 6 | A.   I DID NOT. |
| 01:13PM | 7 | Q.   LET ME ASK YOU LAST ABOUT THE DECISION TO -- MADE WITHIN |
| 01:14PM | 8 | THE CLIA LABORATORY TO REMOVE CERTAIN TESTS FROM BEING TESTED |
| 01:14PM | 9 | ON THE THERANOS 3.5 DEVICES. |
| 01:14PM | 10 | DO YOU RECALL THAT TESTIMONY? |
| 01:14PM | 11 | A.   I DO. |
| 01:14PM | 12 | Q.   SO WAS THERE A PERIOD DURING THE OPERATION OF THE CLINICAL |
| 01:14PM | 13 | LAB WHERE TESTS WOULD BE EVALUATED ON THE 3.5 DEVICES? |
| 01:14PM | 14 | A.   YES. |
| 01:14PM | 15 | Q.   AND OVER TIME WERE SOME OF THOSE TESTS REMOVED FROM BEING |
| 01:14PM | 16 | ANALYZED ON THE 3.5 DEVICES AND ANALYZED USING A DIFFERENT |
| 01:14PM | 17 | ANALYZER? |
| 01:14PM | 18 | A.   YES. |
| 01:14PM | 19 | Q.   DID YOU OCCASIONALLY RECEIVE INPUT OR GUIDANCE FROM |
| 01:14PM | 20 | SCIENTISTS AS TO THE PERFORMANCE OF THOSE TESTS IN THE CLINICAL |
| 01:14PM | 21 | LAB? |
| 01:14PM | 22 | A.   I RECEIVED COMMENTARY ABOUT IT, YES. |
| 01:14PM | 23 | Q.   OKAY.  AND DID THAT INCLUDE FROM DR. YOUNG? |
| 01:14PM | 24 | A.   YES. |
| 01:14PM | 25 | Q.   AND DR. PANGARKAR? |

7840

| | | |
|---|---|---|
| 01:14PM | 1 | A.   IT DID. |
| 01:14PM | 2 | Q.   AND DR. SIVARAMAN? |
| 01:15PM | 3 | A.   YES. |
| 01:15PM | 4 | Q.   AND DR. PATEL? |
| 01:15PM | 5 | A.   YES. |
| 01:15PM | 6 | Q.   AND DR. SAKSENA? |
| 01:15PM | 7 | A.   YES. |
| 01:15PM | 8 | Q.   AND DID YOU VIEW IT AS APPROPRIATE FOR THEM TO ADVISE ON |
| 01:15PM | 9 | WHAT SHOULD BE DONE WITH RESPECT TO THE 3.5 DEVICE, THE TESTS |
| 01:15PM | 10 | BEING OPERATED ON IT? |
| 01:15PM | 11 | A.   I DID. |
| 01:15PM | 12 | Q.   DID ANY OF THESE SCIENTISTS EXPRESS ANY CONCERNS TO YOU |
| 01:15PM | 13 | THAT THERANOS'S TESTS WEREN'T SUFFICIENTLY RELIABLE TO OFFER IT |
| 01:15PM | 14 | TO PATIENTS? |
| 01:15PM | 15 | A.   NO. |
| 01:15PM | 16 | Q.   DID THEY EXPRESS ANY CONCERN THAT THERANOS'S TESTS WERE |
| 01:15PM | 17 | NOT SUFFICIENTLY ACCURATE TO BE OFFERED TO PATIENTS? |
| 01:15PM | 18 | A.   NO. |
| 01:15PM | 19 | Q.   WERE YOU INVOLVED IN THE DECISION TO REMOVE TESTS FROM THE |
| 01:15PM | 20 | 3.5 SERIES DEVICE? |
| 01:15PM | 21 | A.   I DID NOT MAKE THAT DECISION. |
| 01:15PM | 22 | Q.   AND DO YOU KNOW WHY THAT DECISION WAS MADE? |
| 01:15PM | 23 | A.   I DON'T IN ALL CASES.  I KNEW GENERALLY THAT THE |
| 01:15PM | 24 | LABORATORY LEADERSHIP WAS EVALUATING THE TESTS AND MAKING |
| 01:15PM | 25 | DECISIONS ABOUT WHAT TESTS WERE LIVE AND WHAT PLATFORM AT ANY |

7841

| | | |
|---|---|---|
| 01:15PM | 1 | GIVEN POINT IN TIME. |
| 01:16PM | 2 | MR. DOWNEY:  YOUR HONOR, THIS MIGHT BE A GOOD TIME |
| 01:16PM | 3 | FOR OUR BREAK IF IT SUITS THE COURT. |
| 01:16PM | 4 | THE COURT:  ALL RIGHT.  WE'LL TAKE A BREAK NOW. |
| 01:16PM | 5 | WILL 30 MINUTES DO, MR. DOWNEY? |
| 01:16PM | 6 | MR. DOWNEY:  THAT WILL BE FINE.  THANK YOU, |
| 01:16PM | 7 | YOUR HONOR. |
| 01:16PM | 8 | THE COURT:  LET'S TAKE 30 MINUTES NOW, LADIES AND |
| 01:16PM | 9 | GENTLEMEN, 30 MINUTES. |
| 01:16PM | 10 | (RECESS FROM 1:16 P.M. UNTIL 1:56 P.M.) |
| 01:56PM | 11 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 01:56PM | 12 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 01:57PM | 13 | MR. DOWNEY, YOU'D LIKE TO CONTINUE? |
| 01:57PM | 14 | MR. DOWNEY:  YES, SIR. |
| 01:57PM | 15 | Q.  MS. HOLMES, EARLIER TODAY, DO YOU RECALL TALKING ABOUT THE |
| 01:57PM | 16 | 2011 AND 2013 CMS AUDITS AT THERANOS? |
| 01:57PM | 17 | A.  I DO. |
| 01:57PM | 18 | Q.  DID CMS PERFORM ANOTHER INSPECTION OF THERANOS IN THE FALL |
| 01:57PM | 19 | OF 2015? |
| 01:57PM | 20 | A.  YES. |
| 01:57PM | 21 | Q.  DID THERANOS EXPECT THAT THERE WOULD BE AN INSPECTION |
| 01:57PM | 22 | THEN? |
| 01:57PM | 23 | A.  WE KNEW GENERALLY THAT THERE WAS A TWO YEAR INSPECTION |
| 01:57PM | 24 | COMING UP. |
| 01:57PM | 25 | Q.  DID THERANOS TAKE STEPS TO PREPARE FOR THAT INSPECTION IN |

7842

| | | |
|---|---|---|
| 01:57PM | 1 | 2015? |
| 01:57PM | 2 | A.   YES. |
| 01:57PM | 3 | Q.   WHAT, TO YOUR KNOWLEDGE, DID THERANOS DO? |
| 01:57PM | 4 | A.   WE ASKED DR. HURST TO COME IN AND MAKE SURE THAT WE WERE |
| 01:57PM | 5 | READY FOR THE INSPECTION AND WORK WITH OUR TEAMS ON CONDUCTING |
| 01:57PM | 6 | MOCK AUDITS. |
| 01:57PM | 7 | Q.   PRIOR TO THE TIME OF THE INSPECTION, DID MR. BALWANI |
| 01:57PM | 8 | COMMUNICATE TO YOU WHAT HE EXPECTED THE RESULTS OF THE |
| 01:58PM | 9 | INSPECTION WOULD BE? |
| 01:58PM | 10 | A.   HE DID. |
| 01:58PM | 11 | Q.   WHAT DID HE SAY? |
| 01:58PM | 12 | A.   THAT THE LAB WAS IN GREAT SHAPE AND THAT THERE WAS -- THE |
| 01:58PM | 13 | AUDIT SHOULD GO VERY WELL. |
| 01:58PM | 14 | Q.   NOW, DID AN INSPECTION OF THERANOS COMMENCE AFTER ALL OF |
| 01:58PM | 15 | THOSE PREPARATIONS? |
| 01:58PM | 16 | A.   YES. |
| 01:58PM | 17 | Q.   AND WERE YOU INVOLVED IN INTERACTING WITH PERSONNEL FROM |
| 01:58PM | 18 | CMS DURING THAT INSPECTION? |
| 01:58PM | 19 | A.   I WAS. |
| 01:58PM | 20 | Q.   AND WHAT DO YOU RECALL ABOUT THAT INSPECTION? |
| 01:58PM | 21 | A.   THAT INSPECTORS HAD COME TO VISIT THERANOS SOMETIME I |
| 01:58PM | 22 | THINK IN SEPTEMBER OF 2015 AND THAT OUR TEAM HAD EXPRESSED THAT |
| 01:58PM | 23 | THERE WERE CONCERNS, SO I SAT IN THE BACK OF THE ROOM DURING |
| 01:58PM | 24 | THE SECOND PART OF THAT INSPECTION, WHICH WAS LATER IN NOVEMBER |
| 01:58PM | 25 | OF 2015, TO TRY TO OBSERVE IT. |

7843

| 01:58PM | 1 | Q. OKAY. LET'S TAKE IT IN STAGES. |

01:58PM 2      DID YOU PARTICIPATE WHEN -- AT ALL IN INTERACTIONS WITH

01:59PM 3  CMS WHEN THE INSPECTION WAS CONDUCTED IN SEPTEMBER?

01:59PM 4  A. I DID NOT.

01:59PM 5  Q. DID YOU RECEIVE REPORTS ABOUT HOW THAT INSPECTION HAD

01:59PM 6  GONE?

01:59PM 7  A. I DID.

01:59PM 8  Q. WHAT DID YOU LEARN AS A RESULT OF THE REPORTS?

01:59PM 9  A. THAT IT WAS NOT AS WE HAD EXPECTED AND THAT THE

01:59PM 10  INVESTIGATORS SEEMED TO BE IDENTIFYING A NUMBER OF ISSUES THAT

01:59PM 11  WERE UNEXPECTED.

01:59PM 12  Q. AND YOU SAY THAT WAS IN SEPTEMBER OF 2015?

01:59PM 13  A. YES.

01:59PM 14  Q. WAS IT ABOUT A MONTH AFTER THAT INSPECTION THAT THERANOS

01:59PM 15  BEGAN TO RECEIVE CONSIDERABLE NEGATIVE MEDIA COVERAGE?

01:59PM 16  A. YES.

01:59PM 17  Q. AND WHAT DO YOU RECALL HAPPENING IN THAT REGARD?

01:59PM 18  A. AN ARTICLE WAS PUBLISHED THAT WAS VERY NEGATIVE ABOUT

01:59PM 19  THERANOS, AND CONTINUED ARTICLES WERE PUBLISHED IMMEDIATELY

01:59PM 20  FOLLOWING IT THAT WERE ATTRACTING A LOT OF ATTENTION.

02:00PM 21  Q. PRIOR TO THE TIME THERANOS -- PRIOR TO THE TIME THE

02:00PM 22  ARTICLE ABOUT THERANOS WAS PUBLISHED, DID THERANOS KNOW THERE

02:00PM 23  WAS GOING TO BE AN ARTICLE THAT WOULD RUN?

02:00PM 24  A. YES.

02:00PM 25  Q. AND HOW DID THERANOS RESPOND TO THE KNOWLEDGE THAT THE

7844

| | | |
|---|---|---|
| 02:00PM | 1 | ARTICLE WAS GOING TO RUN? |
| 02:00PM | 2 | A.   WE BEGAN INTERACTING WITH THE PUBLISHER OVER THE COURSE OF |
| 02:00PM | 3 | SEVERAL MONTHS. |
| 02:00PM | 4 | Q.   AND DID YOU DEVELOP CONCERNS ABOUT WHAT YOU UNDERSTOOD |
| 02:00PM | 5 | WOULD BE REPORTED? |
| 02:00PM | 6 | A.   YES. |
| 02:00PM | 7 | Q.   AND HOW DID YOU REACT -- WHAT CONCERNS SPECIFICALLY DID |
| 02:00PM | 8 | YOU DEVELOP? |
| 02:00PM | 9 | A.   PRIMARILY THAT WE UNDERSTOOD THAT TRADE SECRETS THAT WE |
| 02:00PM | 10 | HAD BEEN TRYING TO PROTECT HAD BEEN DISCLOSED AND COULD BE |
| 02:00PM | 11 | DISCLOSED THROUGH THIS PIECE. |
| 02:00PM | 12 | Q.   AND DID YOU TAKE STEPS TO REACT IN RESPONSE TO THAT? |
| 02:00PM | 13 | A.   YES. |
| 02:00PM | 14 | Q.   AND WOULD YOU CHARACTERIZE THE STEPS THAT YOU TOOK IN |
| 02:00PM | 15 | RESPONSE AS AGGRESSIVE? |
| 02:00PM | 16 | A.   YES. |
| 02:00PM | 17 | Q.   SITTING HERE TODAY, WOULD YOU HAVE HANDLED THE RESPONSE TO |
| 02:01PM | 18 | THAT DIFFERENTLY? |
| 02:01PM | 19 | A.   VERY MUCH SO. |
| 02:01PM | 20 | Q.   AND HOW SO? |
| 02:01PM | 21 | A.   I THINK WE WERE TOO AGGRESSIVE.  I THINK WE WERE SO |
| 02:01PM | 22 | FOCUSSED ON TRYING TO PROTECT THESE INVENTIONS AND TRADE |
| 02:01PM | 23 | SECRETS THAT WE LOST SIGHT OF THE BIG PICTURE, AND IN TRYING TO |
| 02:01PM | 24 | PROTECT THE TRADE SECRETS CREATED ALL SORTS OF IMPRESSIONS |
| 02:01PM | 25 | ABOUT THERANOS THAT WERE INCORRECT. |

7845

| | | |
|---|---|---|
| 02:01PM | 1 | Q.   DID YOU -- YOU MENTIONED THAT THERE HAD BEEN A CMS |
| 02:01PM | 2 | INSPECTION IN SEPTEMBER? |
| 02:01PM | 3 | A.   YES. |
| 02:01PM | 4 | Q.   AND THEN DID THE ARTICLE RUN IN OCTOBER? |
| 02:01PM | 5 | A.   YES. |
| 02:01PM | 6 | Q.   AND THEN WAS THE FOLLOWUP TO THE CMS INSPECTION IN |
| 02:01PM | 7 | NOVEMBER? |
| 02:01PM | 8 | A.   YES. |
| 02:01PM | 9 | Q.   AND I THINK YOU TESTIFIED THAT YOU DID PARTICIPATE DURING |
| 02:01PM | 10 | SOME OF THE MEETINGS THAT TOOK PLACE WITH CMS PERSONNEL DURING |
| 02:01PM | 11 | THAT NOVEMBER PORTION OF THE INSPECTION? |
| 02:01PM | 12 | A.   I DID. |
| 02:01PM | 13 | Q.   AND WAS YOUR ROLE PRINCIPALLY TO OBSERVE OR WERE YOU |
| 02:02PM | 14 | INTERACTING WITH THE INSPECTORS? |
| 02:02PM | 15 | A.   I WAS OBSERVING. |
| 02:02PM | 16 | Q.   AND WHAT DO YOU RECALL OBSERVING DURING THE COURSE OF THAT |
| 02:02PM | 17 | INSPECTION? |
| 02:02PM | 18 | A.   I REMEMBER OUR TEAM BEING UNABLE TO PRODUCE DOCUMENTS THAT |
| 02:02PM | 19 | THE INSPECTORS WERE ASKING FOR AND BEING SURPRISED AND |
| 02:02PM | 20 | FRUSTRATED THAT WE WERE NOT ABLE TO SHOW THE DOCUMENTATION THAT |
| 02:02PM | 21 | WAS BEING DISCUSSED. |
| 02:02PM | 22 | Q.   AND DID YOU -- DID THERANOS GET FEEDBACK FROM THE |
| 02:02PM | 23 | INSPECTORS DURING THE COURSE OF THAT NOVEMBER INSPECTION OR |
| 02:02PM | 24 | SHORTLY AFTER? |
| 02:02PM | 25 | A.   YES. |

7846

| | | |
|---|---|---|
| 02:02PM | 1 | Q.   AND DID YOU COME TO LEARN WHAT THAT FEEDBACK WAS? |
| 02:02PM | 2 | A.   I DID. |
| 02:02PM | 3 | Q.   AND WHAT DID YOU LEARN THE FEEDBACK WAS? |
| 02:02PM | 4 | A.   THAT THE INSPECTORS HAD CONCERNS, AND THEY HAD CONCERNS |
| 02:02PM | 5 | ABOUT OUR DOCUMENTATION, OR LACK OF DOCUMENTATION; THEY HAD |
| 02:02PM | 6 | CONCERNS ABOUT SOME OF THE PEOPLE IN OUR LABORATORY. |
| 02:02PM | 7 | Q.   AND HOW DID WHAT YOU UNDERSTOOD ABOUT THEIR FEEDBACK |
| 02:02PM | 8 | COMPARE TO WHAT MR. BALWANI HAD TOLD YOU IN SEPTEMBER AS TO HIS |
| 02:03PM | 9 | EXPECTATIONS? |
| 02:03PM | 10 | A.   IT WAS COMPLETELY DIFFERENT. |
| 02:03PM | 11 | Q.   LET'S TALK FOR A LITTLE BIT ABOUT MR. BALWANI'S ROLE AT |
| 02:03PM | 12 | THERANOS. |
| 02:03PM | 13 | WHEN DID MR. BALWANI START WORKING AT THERANOS? |
| 02:03PM | 14 | A.   IN 2009. |
| 02:03PM | 15 | Q.   AND WHEN DID MR. BALWANI LEAVE THERANOS? |
| 02:03PM | 16 | A.   IN 2016. |
| 02:03PM | 17 | Q.   NOW, YOU RECALL DURING THE COURSE OF THE GOVERNMENT'S CASE |
| 02:03PM | 18 | THAT THEY ASKED SOME WITNESSES, INCLUDING MR. EDLIN, IF YOU |
| 02:03PM | 19 | WERE IN A ROMANTIC RELATIONSHIP WITH MR. BALWANI. |
| 02:03PM | 20 | DO YOU RECALL THAT? |
| 02:03PM | 21 | A.   I DO. |
| 02:03PM | 22 | Q.   AND DO YOU RECALL THAT SEPARATE WITNESSES WERE ASKED |
| 02:03PM | 23 | WHETHER MR. BALWANI DEFERRED TO YOU IN CERTAIN CONTEXTS? |
| 02:03PM | 24 | DO YOU RECALL THAT? |
| 02:03PM | 25 | A.   YES. |

7847

| 02:03PM | 1 | Q.   WAS IT YOUR EXPERIENCE THAT MR. BALWANI DEFERRED TO YOU IN |
| 02:03PM | 2 | ALL CONTEXTS? |
| 02:03PM | 3 | A.   NO. |
| 02:03PM | 4 | Q.   WHEN DID YOU FIRST MEET MR. BALWANI? |
| 02:04PM | 5 | A.   RIGHT AFTER I GRADUATED HIGH SCHOOL. |
| 02:04PM | 6 | Q.   AND WHERE DID YOU MEET HIM? |
| 02:04PM | 7 | A.   IN CHINA. |
| 02:04PM | 8 | Q.   HOW OLD WERE YOU AT THE TIME? |
| 02:04PM | 9 | A.   I WAS 18. |
| 02:04PM | 10 | Q.   AND HOW OLD WAS HE? |
| 02:04PM | 11 | A.   HE WAS 38. |
| 02:04PM | 12 | Q.   WHAT DID YOU UNDERSTAND ABOUT MR. BALWANI'S BACKGROUND |
| 02:04PM | 13 | WHEN YOU MET HIM? |
| 02:04PM | 14 | A.   I UNDERSTOOD THAT HE HAD BEEN A REALLY SUCCESSFUL BUSINESS |
| 02:04PM | 15 | PERSON, THAT HE HAD WORKED WITH BILL GATES IN THE EARLY DAYS OF |
| 02:04PM | 16 | MICROSOFT, BUILT A SUCCESSFUL COMPANY WHICH HE SOLD TO BIG |
| 02:04PM | 17 | COMPANIES. |
| 02:04PM | 18 | Q.   AND DID YOU INTERACT WITH HIM SOME DURING THE COURSE OF |
| 02:04PM | 19 | THAT SUMMER AFTER YOUR SENIOR YEAR IN HIGH SCHOOL? |
| 02:04PM | 20 | A.   I DID. |
| 02:04PM | 21 | Q.   TELL US WHAT THOSE INTERACTIONS WERE LIKE. |
| 02:04PM | 22 | A.   I TALKED TO HIM ABOUT WANTING TO START A COMPANY, A |
| 02:04PM | 23 | COMPANY THAT I TRIED TO BUILD IN HIGH SCHOOL, AND ASKED FOR HIS |
| 02:04PM | 24 | ADVICE. |
| 02:04PM | 25 | Q.   AND AFTER THAT SUMMER, DID YOU START YOUR FRESHMAN YEAR AT |

7848

| | | |
|---|---|---|
| 02:04PM | 1 | STANFORD? |
| 02:04PM | 2 | A.   I DID. |
| 02:04PM | 3 | Q.   AND DURING THE COURSE OF THE -- YOUR FRESHMAN YEAR AT |
| 02:05PM | 4 | STANFORD, DID YOU HAVE ANY OCCASION TO BE IN CONTACT WITH |
| 02:05PM | 5 | MR. BALWANI? |
| 02:05PM | 6 | A.   YES. |
| 02:05PM | 7 | Q.   WAS -- WAS THAT BY EMAIL OR BY SOME OTHER MEANS? |
| 02:05PM | 8 | A.   YES, HE WOULD EMAIL ME OVER THE COURSE OF THE YEAR. |
| 02:05PM | 9 | Q.   OKAY.  NOW, WE SPOKE AT THE OUTSET OF YOUR TESTIMONY ABOUT |
| 02:05PM | 10 | YOUR TIME AT STANFORD AND YOUR WORK WITH DR. ROBERTSON. |
| 02:05PM | 11 | DO YOU RECALL THAT? |
| 02:05PM | 12 | A.   I DO. |
| 02:05PM | 13 | Q.   AND I ASKED YOU, WHEN YOU TESTIFIED THAT YOU LEFT STANFORD |
| 02:05PM | 14 | DURING YOUR SOPHOMORE YEAR, WHETHER PURSUIT OF YOUR BUSINESS |
| 02:05PM | 15 | WAS THE REASON THAT YOU LEFT STANFORD. |
| 02:05PM | 16 | DO YOU RECALL? |
| 02:05PM | 17 | A.   I DO. |
| 02:05PM | 18 | Q.   AND DO YOU RECALL THAT YOU SAID THAT THAT WAS ONE OF THE |
| 02:05PM | 19 | REASONS? |
| 02:05PM | 20 | A.   YES. |
| 02:05PM | 21 | Q.   AND WHAT WERE THE OTHER REASONS THAT YOU HAD DEPARTED |
| 02:05PM | 22 | STANFORD? |
| 02:05PM | 23 | A.   I WAS RAPED WHEN I WAS AT STANFORD, AND I DECIDED TO LEAVE |
| 02:05PM | 24 | TO POUR MYSELF INTO BUILDING THERANOS. |
| 02:06PM | 25 | Q.   AND CAN YOU TELL US WHAT EXPERIENCE -- WHAT EFFECT THAT |

7849

| | | |
|---|---|---|
| 02:06PM | 1 | EXPERIENCE THAT YOU SUFFERED THERE HAD ON YOUR ATTITUDE TOWARDS |
| 02:06PM | 2 | BEING A CONTINUED STUDENT AT STANFORD? |
| 02:06PM | 3 | A.   YES.  I, I WASN'T GOING TO CLASS, AND I WAS QUESTIONING |
| 02:06PM | 4 | WHAT -- HOW I WAS GOING TO BE ABLE TO PROCESS THAT EXPERIENCE |
| 02:06PM | 5 | AND WHAT I WANTED TO DO WITH MY LIFE, AND I DECIDED THAT I WAS |
| 02:06PM | 6 | GOING TO BUILD A LIFE BY BUILDING THIS COMPANY. |
| 02:06PM | 7 | Q.   OKAY.  AROUND THE TIME THAT YOU WERE DEPARTING FROM |
| 02:06PM | 8 | STANFORD, DID YOU COME INTO CLOSER CONTACT WITH MR. BALWANI? |
| 02:06PM | 9 | A.   I DID. |
| 02:06PM | 10 | Q.   AND DURING THAT PERIOD, DID YOU SPEAK WITH MR. BALWANI |
| 02:07PM | 11 | ABOUT YOUR ASPIRATIONS TO BUILD A BUSINESS OUT OF THE PATENT |
| 02:07PM | 12 | APPLICATION THAT YOU FILED? |
| 02:07PM | 13 | A.   I DID. |
| 02:07PM | 14 | Q.   AND DID HE OFFER ASSISTANCE TO YOU IN CONNECTION WITH |
| 02:07PM | 15 | THAT? |
| 02:07PM | 16 | A.   YES. |
| 02:07PM | 17 | Q.   AND AT SOME POINT DURING THE COURSE OF THOSE CONVERSATIONS |
| 02:07PM | 18 | WITH HIM, DID YOU FORM AN INTIMATE RELATIONSHIP WITH |
| 02:07PM | 19 | MR. BALWANI? |
| 02:07PM | 20 | A.   I DID. |
| 02:07PM | 21 | Q.   AND DID YOU DISCUSS THE TRAUMA THAT YOU'D EXPERIENCED AT |
| 02:07PM | 22 | STANFORD AS PART OF YOUR INTERACTIONS WITH MR. BALWANI? |
| 02:07PM | 23 | A.   YES. |
| 02:07PM | 24 | Q.   AND DO YOU RECALL WHAT MR. BALWANI SAID IN REACTION TO |
| 02:07PM | 25 | THAT? |

7850

| | | |
|---|---|---|
| 02:07PM | 1 | A.   YES. |
| 02:07PM | 2 | Q.   AND WHAT DID HE SAY? |
| 02:07PM | 3 | A.   HE SAID THAT I WAS SAFE NOW THAT I HAD MET HIM. |
| 02:07PM | 4 | Q.   AT SOME POINT AFTER YOU AND MR. BALWANI BECAME INVOLVED |
| 02:07PM | 5 | WITH EACH OTHER, DID YOU LIVE WITH MR. BALWANI? |
| 02:07PM | 6 | A.   I DID. |
| 02:07PM | 7 | Q.   AND WHEN WAS THAT? |
| 02:07PM | 8 | A.   STARTING IN 2005 THROUGH 2016. |
| 02:08PM | 9 | Q.   NOW, YOU TESTIFIED THAT MR. BALWANI BEGAN WORKING AT |
| 02:08PM | 10 | THERANOS IN 2009. |
| 02:08PM | 11 | A.   YES. |
| 02:08PM | 12 | Q.   SO THAT WAS SOME PERIOD OF YEARS AFTER YOU AND HE HAD |
| 02:08PM | 13 | BECOME INVOLVED? |
| 02:08PM | 14 | A.   YES. |
| 02:08PM | 15 | Q.   BUT DURING THE PERIOD PRIOR TO HIS WORK AT THERANOS, DID |
| 02:08PM | 16 | YOU HAVE CONVERSATIONS ABOUT THE DEVELOPMENT OF THE BUSINESS AT |
| 02:08PM | 17 | THERANOS? |
| 02:08PM | 18 | A.   YES. |
| 02:08PM | 19 | Q.   AND DID HE GIVE YOU HIS REFLECTIONS ON WHETHER HE THOUGHT |
| 02:08PM | 20 | YOU HAD THE TALENTS TO SUCCEED AS THE EXECUTIVE IN A COMPANY |
| 02:08PM | 21 | LIKE THERANOS THAT YOU WERE TRYING TO BUILD AND DEVELOP? |
| 02:08PM | 22 | A.   HE DID. |
| 02:08PM | 23 | Q.   WHAT DID HE TELL YOU? |
| 02:08PM | 24 | A.   HE TOLD ME THAT I DIDN'T KNOW WHAT I WAS DOING IN |
| 02:08PM | 25 | BUSINESS, THAT MY CONVICTIONS WERE WRONG, THAT HE WAS |

02:09PM 1    ASTONISHED AT MY MEDIOCRITY, AND THAT IF I FOLLOWED MY

02:09PM 2    INSTINCTS I WAS GOING TO FAIL, AND THAT I NEEDED TO KILL THE

02:09PM 3    PERSON THAT I WAS TO BECOME WHAT HE WOULD CALL A NEW ELIZABETH

02:09PM 4    WHO COULD BE A SUCCESSFUL ENTREPRENEUR.

02:09PM 5    Q.   AND DID HE OFFER THOSE REFLECTIONS TO YOU ORALLY?

02:09PM 6    A.   YES.

02:09PM 7    Q.   AND SOMETIMES IN WRITING?

02:09PM 8    A.   YES.

02:09PM 9    Q.   AND AMONG WHAT HE SAID TO YOU, DID HE TELL YOU HOW YOU

02:09PM 10   SHOULD SPEND YOUR TIME TO BECOME A SUCCESSFUL EXECUTIVE?

02:09PM 11   A.   HE DID.  HE WAS VERY DESCRIPTIVE.

02:09PM 12   Q.   AND WHAT DID HE SAY HOW YOU SHOULD SPEND YOUR TIME?

02:09PM 13   A.   HE SAID IF I WANTED TO BE A GOOD ENTREPRENEUR, I NEEDED TO

02:09PM 14   SPEND ALL OF MY TIME ON THE BUSINESS, AND THAT I SHOULD ONLY BE

02:09PM 15   SPENDING TIME WITH PEOPLE WHO COULD HELP THE BUSINESS TO BE

02:09PM 16   SUCCESSFUL; THAT I NEEDED TO BE WORKING SEVEN DAYS A WEEK, I

02:10PM 17   NEEDED TO BE IN THE OFFICE SEVEN DAYS A WEEK; AND I NEEDED TO

02:10PM 18   BE ONLY DOING THINGS THAT COULD CONTRIBUTE TO MAKING THE

02:10PM 19   COMPANY SUCCESSFUL, WHICH MEANT NOT SLEEPING VERY MUCH, EATING

02:10PM 20   ONLY FOODS THAT WOULD MAKE ME PURE OR ABLE TO HAVE THE MOST

02:10PM 21   ENERGY POSSIBLE FOR THE COMPANY; HAVING A VERY DISCIPLINED AND

02:10PM 22   INTENSE LIFESTYLE.

02:10PM 23   Q.   AND ON SOME OCCASIONS DID HE PROVIDE YOU WITH WRITTEN

02:10PM 24   MATERIALS SO THAT YOU WOULD BE ABLE TO UNDERSTAND WHAT HE WAS

02:10PM 25   TELLING YOU WOULD MAKE YOU SUCCESSFUL?

7852

| | | |
|---|---|---|
| 02:10PM | 1 | A.   HE DID. |
| 02:10PM | 2 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7734.  THAT SHOULD BE IN |
| 02:10PM | 3 | THE SMALLER THINNER NOTEBOOK. |
| 02:11PM | 4 | A.   OKAY. |
| 02:11PM | 5 | Q.   DO YOU RECOGNIZE THE -- DO YOU SEE THAT IT'S A HANDWRITTEN |
| 02:11PM | 6 | DOCUMENT? |
| 02:11PM | 7 | A.   I DO. |
| 02:11PM | 8 | Q.   DO YOU RECOGNIZE THE HANDWRITING THAT IS REFLECTED IN |
| 02:11PM | 9 | EXHIBIT 7734? |
| 02:11PM | 10 | A.   YES. |
| 02:11PM | 11 | Q.   WHOSE HANDWRITING IS IT? |
| 02:11PM | 12 | A.   IT'S SUNNY'S. |
| 02:11PM | 13 | Q.   IS THIS A SET OF NOTES THAT MR. BALWANI GAVE YOU AT SOME |
| 02:11PM | 14 | POINT IN THE PERIOD BETWEEN 2005 AND 2009? |
| 02:11PM | 15 | A.   YES. |
| 02:11PM | 16 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 02:11PM | 17 | 7734. |
| 02:11PM | 18 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 02:11PM | 19 | THE COURT:  IT'S ADMITTED. |
| 02:11PM | 20 | (DEFENDANT'S EXHIBIT 7734 WAS RECEIVED IN EVIDENCE.) |
| 02:11PM | 21 | BY MR. DOWNEY: |
| 02:11PM | 22 | Q.   I WANT TO DIRECT YOUR ATTENTION FIRST TO THE TOP OF |
| 02:11PM | 23 | PAGE 1. |
| 02:11PM | 24 | DO YOU SEE THAT THE -- IN THESE NOTES IT'S LABELLED |
| 02:12PM | 25 | "NON-NEGOTIABLES (PEOPLE)". |

7853

| | | |
|---|---|---|
| 02:12PM | 1 | DO YOU SEE THAT? |
| 02:12PM | 2 | A.   I DO. |
| 02:12PM | 3 | Q.   AND HE BEGINS BY SAYING, EVERY MORNING.  I WILL FORCE |
| 02:12PM | 4 | MYSELF OUT OF BED AND SPEND 30 MINUTES TO WRITE WHAT I WANT |
| 02:12PM | 5 | FROM MY DAY. |
| 02:12PM | 6 | DO YOU SEE THAT? |
| 02:12PM | 7 | A.   YES. |
| 02:12PM | 8 | Q.   AND THEN IN THE BOTTOM RIGHT THERE'S A LITTLE BIT OF A |
| 02:12PM | 9 | QUADRANT. |
| 02:12PM | 10 | DO YOU SEE THAT? |
| 02:12PM | 11 | A.   YES. |
| 02:12PM | 12 | Q.   AND CAN YOU EXPLAIN WHAT THAT -- WHAT YOU UNDERSTOOD THAT |
| 02:12PM | 13 | MEANT? |
| 02:12PM | 14 | A.   THIS WAS SUNNY DESCRIBING WHERE A GOOD LEADER SHOULD SPEND |
| 02:12PM | 15 | THEIR TIME, AND HE'S SAYING THAT THE BEST LEADERS ALWAYS SPEND |
| 02:12PM | 16 | THEIR TIME IN WHAT HE LABELLED QUADRANT 2, WHICH IS ON |
| 02:12PM | 17 | IMPORTANT BUT NOT URGENT THINGS, MEANING FOCUSSING ON THE |
| 02:12PM | 18 | VISION AND THE BIG PICTURE. |
| 02:13PM | 19 | Q.   AND IF YOU GO TO THE NEXT PARAGRAPH, IT BEGINS, "I WILL |
| 02:13PM | 20 | NEVER MEET WITH ANYONE FOR MORE THAN 5 MINUTES UNLESS I HAVE |
| 02:13PM | 21 | WRITTEN DOWN WHY." |
| 02:13PM | 22 | DO YOU SEE THAT? |
| 02:13PM | 23 | A.   YES. |
| 02:13PM | 24 | Q.   AND THEN IN THE LAST SENTENCE HE SAYS, "MY FOCUS IS ON HOW |
| 02:13PM | 25 | THEY WILL SERVE THE COMPANY MORE." |

7854

02:13PM  1      DO YOU SEE THAT?

02:13PM  2      A.   YES.

02:13PM  3      Q.   AND WHAT DID YOU UNDERSTAND MR. BALWANI TO BE

02:13PM  4      COMMUNICATING HERE?

02:13PM  5      A.   HE WAS REACTING TO WHAT I WAS DESCRIBING ABOUT MEETINGS I

02:13PM  6      WAS HAVING WITH PEOPLE IN THE COMPANY, AND HE WAS SAYING THAT I

02:13PM  7      WAS SPENDING TOO MUCH TIME ON IT, AND THAT I WASN'T FOCUSSED

02:13PM  8      ENOUGH, AND THAT I SHOULD NOT BE ENGAGING WITH PEOPLE IN DETAIL

02:13PM  9      LIKE THAT, BUT RATHER DOING VERY RAPID MEETINGS AND ONLY

02:13PM  10     FOCUSSING ON SPECIFIC ACTION ITEMS OR GOALS IN THOSE

02:13PM  11     INTERACTIONS.

02:13PM  12     Q.   OKAY.  IF YOU GO TO THE THIRD PARAGRAPH, HE BEGINS BY

02:13PM  13     SAYING, "I WILL ALWAYS GIVE CRISP, CLEAN GOALS AND FEEDBACK TO

02:14PM  14     MY SUBORDINATES."

02:14PM  15     A.   YES.

02:14PM  16     Q.   AND WHAT DID YOU UNDERSTAND HIM TO BE COMMUNICATING HERE?

02:14PM  17     A.   AGAIN, THAT I NEEDED TO BE MORE FOCUSSED IN MY

02:14PM  18     COMMUNICATION; THAT I NEEDED TO BE CRISP AND CLEAR ABOUT WHAT

02:14PM  19     PEOPLE'S GOALS WERE; AND BE VERY POINTED IN FEEDBACK TO PEOPLE.

02:14PM  20     Q.   NOW, YOU TESTIFIED A FEW MINUTES AGO THAT MR. BALWANI

02:14PM  21     THOUGHT THAT YOU HAD SOME CHARACTERISTICS THAT MIGHT PRESENT A

02:14PM  22     PROBLEM FOR YOU IN SUCCEEDING AS AN EXECUTIVE.

02:14PM  23     DID HE GIVE YOU ADVICE AS TO HOW TO OVERCOME, OR DID HE

02:14PM  24     TELL YOU HOW TO OVERCOME THOSE CHARACTERISTICS AND BE

02:14PM  25     SUCCESSFUL?

7855

| | | |
|---|---|---|
| 02:14PM | 1 | A.   HE DID.  HE TOLD ME THAT HE COULD TEACH ME HOW TO OVERCOME |
| 02:14PM | 2 | MY LIMITATIONS. |
| 02:14PM | 3 | Q.   LET'S LOOK AT PAGE 2 OF THE DOCUMENT. |
| 02:15PM | 4 | DO YOU SEE THAT THIS PAGE IS LABELLED "PURSUIT OF SUCCESS |
| 02:15PM | 5 | IN BUSINESS"? |
| 02:15PM | 6 | A.   YES. |
| 02:15PM | 7 | Q.   AND IF YOU GO DOWN TO THE MIDDLE OF THE -- ALMOST HALFWAY |
| 02:15PM | 8 | DOWN, DO YOU SEE THAT THERE'S A SENTENCE THAT BEGINS, "EVEN |
| 02:15PM | 9 | PEOPLE"? |
| 02:15PM | 10 | A.   I DO. |
| 02:15PM | 11 | Q.   DO YOU SEE, "EVEN PEOPLE WHO SUCCEED DON'T REFLECT ON |
| 02:15PM | 12 | THEIR SUCCESS IN BUSINESS AND FINANCE AND ATTRIBUTE THIS TO |
| 02:15PM | 13 | THEIR GUT OR HUNCH." |
| 02:15PM | 14 | DO YOU SEE THAT? |
| 02:15PM | 15 | A.   YES. |
| 02:15PM | 16 | Q.   AND THEN A LITTLE DOWN FROM THERE, HE ASKS A QUESTION |
| 02:15PM | 17 | ALMOST AT THE BOTTOM OF THE PAGE.  DO YOU SEE AT THE BOTTOM OF |
| 02:16PM | 18 | PAGE 2 OF THE EXHIBIT, DIRECTING YOUR ATTENTION TO WHERE IT |
| 02:16PM | 19 | BEGINS, "SO, WHAT ABOUT PEOPLE WHO DON'T HAVE THE NATURAL |
| 02:16PM | 20 | INSTINCT FOR BUSINESS"? |
| 02:16PM | 21 | DO YOU SEE THAT? |
| 02:16PM | 22 | A.   I DO. |
| 02:16PM | 23 | Q.   AND WHAT WAS THIS PARAGRAPH ADDRESSING? |
| 02:16PM | 24 | A.   HE WAS TALKING ABOUT ME AND THE IDEA THAT EVEN IF I DIDN'T |
| 02:16PM | 25 | HAVE A NATURAL INSTINCT FOR BUSINESS, THAT I COULD BE TAUGHT TO |

| | | |
|---|---|---|
| 02:16PM | 1 | OVERCOME THAT THROUGH A FORMULA FOR SUCCESS IN BUSINESS THAT HE |
| 02:16PM | 2 | TOLD ME ABOUT AND SAID THAT HE WOULD TEACH ME. |
| 02:16PM | 3 | Q.   OKAY.  LET'S GO TO THE NEXT PAGE. |
| 02:16PM | 4 | AND THEN DO YOU SEE THE NEXT PAGE BEGINS, "THE SINGLE MOST |
| 02:16PM | 5 | IMPORTANT INGREDIENT TO THIS SECRET SAUCE IS DISCIPLINE." |
| 02:16PM | 6 | DO YOU SEE THAT? |
| 02:16PM | 7 | A.   YES. |
| 02:16PM | 8 | Q.   AND THEN HE GOES ON TO TALK ABOUT SELF DISCOVERY. |
| 02:17PM | 9 | DO YOU SEE THAT? |
| 02:17PM | 10 | A.   YES. |
| 02:17PM | 11 | Q.   AND WHAT DID YOU UNDERSTAND HIM TO BE COMMUNICATING IN |
| 02:17PM | 12 | THIS PAGE OF THE NOTES? |
| 02:17PM | 13 | A.   HE'S TALKING ABOUT LIVING A DISCIPLINED LIFE, SOME OF THE |
| 02:17PM | 14 | TENETS THAT I WAS TALKING ABOUT AROUND THE WAY YOU BEHAVE, THE |
| 02:17PM | 15 | WAY YOU SLEEP, THE WAY YOU WORK, AND THIS IDEA THAT WRITING AND |
| 02:17PM | 16 | WRITING OUT THESE TENETS ON A REGULAR BASIS WAS A KEY TO |
| 02:17PM | 17 | SUCCESS. |
| 02:17PM | 18 | Q.   AND DID MR. BALWANI PRESCRIBE FOR YOU A PARTICULAR |
| 02:17PM | 19 | SCHEDULE THAT YOU SHOULD KEEP TO IN ORDER TO SUCCEED IN |
| 02:17PM | 20 | BUSINESS? |
| 02:17PM | 21 | A.   HE DID. |
| 02:17PM | 22 | Q.   AND LET ME ASK YOU TO LOOK AT EXHIBIT 7731. |
| 02:18PM | 23 | ARE THESE NOTES MADE IN YOUR HANDWRITING? |
| 02:18PM | 24 | A.   YES. |
| 02:18PM | 25 | Q.   AND ARE THEY MADE AT SOME POINT BETWEEN 2005 AND 2009? |

02:18PM  1    A.   YES.

02:18PM  2              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:18PM  3    7731.

02:18PM  4              MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:18PM  5              THE COURT:  IT'S ADMITTED.

02:18PM  6         (DEFENDANT'S EXHIBIT 7731 WAS RECEIVED IN EVIDENCE.)

02:18PM  7              MR. DOWNEY:  IF YOU COULD JUST BLOW THAT UP ON THE

02:18PM  8    SCREEN.

02:18PM  9    Q.   I'M JUST SHOWING YOU THE TOP HALF OF THIS DOCUMENT WITH

02:18PM  10   TIMES.

02:18PM  11        WHAT IS THIS DOCUMENT?

02:18PM  12   A.   THIS IS MY SCHEDULE FOR HOW I WOULD WORK EVERY DAY AND GET

02:18PM  13   READY TO GO INTO THE OFFICE WITH SOME OF THE KEY TENETS ABOUT

02:18PM  14   HOW I WOULD BE OR WHAT I WOULD FOCUS ON.

02:19PM  15   Q.   AND IF YOU GO TO THE, TO THE VERY BOTTOM OF THE FIRST HALF

02:19PM  16   OF THIS, DO YOU SEE THAT -- YOU CAN BLOW THAT UP AGAIN,

02:19PM  17   MR. BENNETT.

02:19PM  18        DO YOU SEE THAT THERE'S A REFERENCE TO LUNCH AND DINNER?

02:19PM  19   A.   YES.

02:19PM  20   Q.   AND WHY IS THAT THERE?

02:19PM  21   A.   THIS WAS PART OF FOCUSSING ONLY ON FOODS THAT COULD GIVE

02:19PM  22   ME THE MOST ENERGY TO BE THE BEST ENTREPRENEUR AND THE MOST

02:19PM  23   SUCCESSFUL THAT I COULD BE WORKING ALL OF THE TIME.

02:19PM  24   Q.   AND THEN IF YOU GO TO THE SECOND HALF OF THE PAGE.

02:19PM  25        CAN YOU EXPLAIN WHAT THIS IS?

7858

| | | |
|---|---|---|
| 02:19PM | 1 | A.   THIS IS ME WRITING OUT THOSE TENETS THAT I WOULD PROVIDE |
| 02:19PM | 2 | CRISP AND CONCISE FEEDBACK, THAT I WOULD BE SUPER DISCIPLINED |
| 02:20PM | 3 | ABOUT BEING ON TIME AT MEETINGS, AND BEING IN THE OFFICE, THAT |
| 02:20PM | 4 | I WOULD BE FOCUSSED ONLY ON BUSINESS AND NOT GET DISTRACTED BY |
| 02:20PM | 5 | OTHER AREAS, THAT I WOULD WRITE OUT IN THE MORNINGS TO KEEP ME |
| 02:20PM | 6 | FOCUSSED ON THESE THINGS. |
| 02:20PM | 7 | Q.   OKAY.  IF YOU SEE THE VERY TOP OF THE PORTION THAT IS |
| 02:20PM | 8 | HIGHLIGHTED -- I DON'T THINK WE CAN SEE THAT ON THE SCREEN, |
| 02:20PM | 9 | MR. BENNETT. |
| 02:20PM | 10 | IF WE CAN JUST HIGHLIGHT THAT PORTION JUST BELOW THERE, |
| 02:20PM | 11 | JUST A LINE BELOW THERE. |
| 02:20PM | 12 | DO YOU SEE AFTER THE DIET THERE'S A "I DO EVERYTHING I SAY |
| 02:20PM | 13 | WORD FOR WORD"? |
| 02:20PM | 14 | A.   YES. |
| 02:20PM | 15 | Q.   AND DO YOU SEE THAT THE NEXT ENTRY, OR TWO ENTRIES DOWN, |
| 02:20PM | 16 | SAYS "I SHOW NO EXCITEMENT"? |
| 02:20PM | 17 | A.   YES. |
| 02:20PM | 18 | Q.   "CALM, DIRECT, POINTED, NONEMOTIONAL." |
| 02:20PM | 19 | IS THAT SOMETHING THAT MR. BALWANI TOLD YOU WOULD BE |
| 02:21PM | 20 | HELPFUL TO YOU IN YOUR WORK? |
| 02:21PM | 21 | A.   YES. |
| 02:21PM | 22 | Q.   AND HAD HE MENTIONED TO YOU THAT HE OBSERVED YOU SHOWING |
| 02:21PM | 23 | EXCITEMENT ON SOME CIRCUMSTANCES? |
| 02:21PM | 24 | A.   HE DID.  HE FELT LIKE I CAME ACROSS AS A LITTLE GIRL AND |
| 02:21PM | 25 | THAT I NEEDED TO BE MORE SERIOUS AND POINTED AND NOT BE GIDDY |

7859

| | | |
|---|---|---|
| 02:21PM | 1 | IN MY INTERACTIONS. |
| 02:21PM | 2 | Q.   NOW, ARE THE TENETS THAT ARE SET FORTH IN EXHIBIT 7731 AND |
| 02:21PM | 3 | THE PRIOR SET OF NOTES, 7734, ARE THEY TENETS THAT YOU OBSERVED |
| 02:21PM | 4 | MR. BALWANI AS LIVING BY? |
| 02:21PM | 5 | A.   NO. |
| 02:21PM | 6 | Q.   DID YOU BELIEVE THAT IF YOU LIVED BY THESE TENETS, THEY |
| 02:21PM | 7 | WOULD HELP YOU BE SUCCESSFUL AS AN EXECUTIVE? |
| 02:21PM | 8 | A.   I DID. |
| 02:21PM | 9 | Q.   DID YOU IMPLEMENT WHAT MR. BALWANI TOLD YOU WOULD LEAD TO |
| 02:21PM | 10 | SUCCESS IN YOUR EFFORTS TO MAKE THERANOS A SUCCESSFUL COMPANY? |
| 02:21PM | 11 | A.   I TRIED TO. |
| 02:22PM | 12 | Q.   WERE THERE SITUATIONS WHERE YOU WERE UNSUCCESSFUL IN |
| 02:22PM | 13 | COMPLYING WITH THE SCHEDULE AND THE OTHER TENETS THAT ARE SET |
| 02:22PM | 14 | FORTH IN THESE TWO DOCUMENTS? |
| 02:22PM | 15 | A.   YES. |
| 02:22PM | 16 | Q.   AND HOW WOULD MR. BALWANI RESPOND TO THAT? |
| 02:22PM | 17 | A.   HE WOULD GET VERY ANGRY WITH ME AND WOULD YELL AT ME ABOUT |
| 02:22PM | 18 | THE FACT THAT HE WAS SO DISAPPOINTED IN MY MEDIOCRITY AND THE |
| 02:22PM | 19 | FACT THAT HE WAS TRYING AND TRYING TO TEACH ME HOW TO BE BETTER |
| 02:22PM | 20 | AND I WASN'T LISTENING TO HIM AND THAT I WAS NEVER GOING TO BE |
| 02:22PM | 21 | SUCCESSFUL. |
| 02:22PM | 22 | Q.   AND IF -- WERE THERE TIMES AFTER THOSE YELLING INCIDENTS |
| 02:23PM | 23 | WHERE HE WOULD TAKE FURTHER STEPS TO TRY TO HELP YOU COMPLY |
| 02:23PM | 24 | WITH WHAT HE HAD TOLD YOU TO DO? |
| 02:23PM | 25 | A.   YES.  HE WOULD GET VERY ANGRY WITH ME, AND THEN HE WOULD |

7860

02:23PM  1    SOMETIMES COME UPSTAIRS TO OUR BEDROOM AND HE WOULD FORCE ME TO

02:23PM  2    HAVE SEX WITH HIM WHEN I DIDN'T WANT TO BECAUSE HE WOULD SAY

02:23PM  3    THAT HE WANTED ME TO KNOW THAT HE STILL LOVED ME.

02:23PM  4    Q.    AND, MS. HOLMES, WAS THAT BEHAVIOR BEHAVIOR THAT PERSISTED

02:23PM  5    THROUGHOUT THE COURSE OF YOUR RELATIONSHIP?

02:23PM  6    A.    YES.

02:23PM  7    Q.    SO WAS THAT BETWEEN 2005 AND 2016?

02:23PM  8    A.    YES.

02:23PM  9    Q.    AT THE OUTSET OF YOUR TESTIMONY A WEEK AGO FRIDAY, I HAD

02:24PM  10   ASKED YOU ABOUT YOUR FAMILY GROWING UP.

02:24PM  11       DO YOU RECALL THAT?

02:24PM  12   A.    I DO.

02:24PM  13   Q.    AND YOU SAID THAT YOU HAD A CLOSE FAMILY?

02:24PM  14   A.    I DO.

02:24PM  15   Q.    HOW DID YOUR RELATIONSHIP WITH YOUR FAMILY DEVELOP AFTER

02:24PM  16   YOU BECAME INVOLVED WITH MR. BALWANI?

02:24PM  17   A.    I SAW THEM LESS THAN I HAD EVER SEEN THEM BEFORE, AND I

02:24PM  18   SPOKE TO THEM LESS THAN I HAD EVER TALKED TO THEM BEFORE.

02:24PM  19   Q.    AND WHY WAS THAT?

02:24PM  20   A.    BECAUSE I WAS TRYING TO FOCUS ALL OF MY TIME ON THE

02:24PM  21   COMPANY AND ONLY DOING THINGS THAT WERE DIRECTLY RELEVANT TO

02:24PM  22   THE STRATEGY OF THE COMPANY, AND SUNNY WOULD GET VERY UPSET IF

02:24PM  23   I WAS WITH MY FAMILY BECAUSE HE SAID IT WAS A DISTRACTION TO

02:24PM  24   THE BUSINESS.

02:24PM  25   Q.    AND WOULD HE SOMETIMES COMPLAIN THAT YOU WERE NEGLECTING

7861

| | | |
|---|---|---|
| 02:24PM | 1 | FOCUS ON HIM AND WHAT HE WAS ADVISING YOU IN RESPONSE TO YOUR |
| 02:24PM | 2 | SPENDING TIME WITH YOUR FAMILY? |
| 02:24PM | 3 | A.   YES. |
| 02:24PM | 4 | Q.   LET ME ASK YOU TO LOOK AT A SERIES OF TEXT EXCHANGES. |
| 02:25PM | 5 |      I SHOULD ASK YOU, DID THAT PATTERN WITH RESPECT TO YOUR |
| 02:25PM | 6 | SPENDING TIME WITH YOUR FAMILY, DID THAT CONTINUE THROUGHOUT |
| 02:25PM | 7 | THE COURSE OF THE RELATIONSHIP? |
| 02:25PM | 8 | A.   IT DID. |
| 02:25PM | 9 | Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 5387F. |
| 02:25PM | 10 |      YOUR HONOR, THIS IS JUST ANOTHER PORTION OF 5387. |
| 02:25PM | 11 | A.   SORRY.  IT'S IN THE THIRD BINDER? |
| 02:25PM | 12 | Q.   IT SHOULD BE IN THE FOURTH BINDER, MS. HOLMES. |
| 02:25PM | 13 | A.   OKAY. |
| 02:25PM | 14 | Q.   IT SHOULD BE ABOUT THE FOURTH DOCUMENT. |
| 02:25PM | 15 | A.   OKAY.  I SEE IT. |
| 02:25PM | 16 | Q.   IS THIS A SERIES OF TEXT EXCHANGES BETWEEN YOU AND |
| 02:26PM | 17 | MR. BALWANI IN NOVEMBER OF 2013? |
| 02:26PM | 18 | A.   IT IS. |
| 02:26PM | 19 |           MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 5387 F. |
| 02:26PM | 20 |           MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 02:26PM | 21 |           THE COURT:  IT'S ADMITTED. |
| 02:26PM | 22 |      (GOVERNMENT'S EXHIBIT 5387F WAS RECEIVED IN EVIDENCE.) |
| 02:26PM | 23 | BY MR. DOWNEY: |
| 02:26PM | 24 | Q.   ALL RIGHT.  AND DO YOU SEE THAT AT THE TOP HERE, THE |
| 02:26PM | 25 | CONVERSATION BEGINS ABOUT YOUR FAMILY AND YOUR FAMILY WAS |

7862

| | | |
|---|---|---|
| 02:26PM | 1 | BEING, QUOTE-UNQUOTE, HERE? |
| 02:26PM | 2 | DO YOU SEE THAT? |
| 02:26PM | 3 | A.   YES. |
| 02:26PM | 4 | Q.   AND THEN IF WE GO TO THE NEXT PAGE, THERE'S A SERIES OF |
| 02:26PM | 5 | ADDITIONAL TEXTS FROM MR. BALWANI ON THAT SUBJECT. |
| 02:26PM | 6 | DO YOU SEE THAT THE DATE OF THIS IS NOVEMBER 30TH, 2013? |
| 02:26PM | 7 | A.   YES. |
| 02:26PM | 8 | Q.   AND DO YOU SEE THAT THAT WAS JUST -- DO YOU RECALL THAT |
| 02:27PM | 9 | THAT WAS JUST A VERY SHORT TIME AFTER THE LAUNCH OF SERVICES TO |
| 02:27PM | 10 | THE PUBLIC IN THERANOS SERVICE CENTERS IN WALGREENS STORES? |
| 02:27PM | 11 | A.   IT WAS. |
| 02:27PM | 12 | Q.   AND CAN YOU EXPLAIN WHAT IS HAPPENING DURING THE COURSE OF |
| 02:27PM | 13 | THESE TEXT EXCHANGES WITH MR. BALWANI IN 2013? |
| 02:27PM | 14 | A.   HE'S ANGRY WITH ME BECAUSE HE FEELS LIKE WHEN MY FAMILY |
| 02:27PM | 15 | CAME FOR THANKSGIVING THAT I WAS NOT PAYING ATTENTION TO HIM |
| 02:27PM | 16 | AND THAT I WAS DISTANT FROM HIM AND THAT HE DOESN'T WANT TO |
| 02:27PM | 17 | ENGAGE WITH ME ANYMORE BECAUSE HE FEELS LIKE I HAVEN'T CHANGED |
| 02:27PM | 18 | AND NOW HE'S EXHAUSTED AND HE'S NOT OKAY WITH IT. |
| 02:27PM | 19 | Q.   AND DO YOU RECALL AFTER THIS EXCHANGE IN 2013 ANYTHING |
| 02:27PM | 20 | THAT HAPPENED WITH RESPECT TO MR. BALWANI? |
| 02:27PM | 21 | A.   I DO. |
| 02:27PM | 22 | Q.   AND WHAT IS THAT? |
| 02:27PM | 23 | A.   THIS IS ONE OF THE NIGHTS WHERE HE CAME UPSTAIRS AND DID |
| 02:28PM | 24 | THINGS TO ME THAT I DIDN'T WANT AND HE HURT ME. |
| 02:28PM | 25 | Q.   NOW, WE'VE HEARD TESTIMONY FROM SEVERAL WITNESSES WHO HAVE |

7863

| | | |
|---|---|---|
| 02:28PM | 1 | TESTIFIED TO OBSERVING THE TWO OF YOU WHILE YOU WERE IN THE |
| 02:28PM | 2 | OFFICE TOGETHER. |
| 02:28PM | 3 | DO YOU RECALL HEARING SOME OF THAT TESTIMONY? |
| 02:28PM | 4 | A.   I DO. |
| 02:28PM | 5 | Q.   AND YOU'VE TESTIFIED TODAY THAT MR. BALWANI WOULD |
| 02:28PM | 6 | FREQUENTLY CRITICIZE YOU AND MAKE COMMENTS ON VARIOUS FAILINGS |
| 02:28PM | 7 | IN YOUR WORK AS AN EXECUTIVE? |
| 02:28PM | 8 | A.   HE DID. |
| 02:28PM | 9 | Q.   WHERE WOULD THOSE EXCHANGES TYPICALLY TAKE PLACE? |
| 02:29PM | 10 | A.   AT HOME AFTER WE WOULD COME HOME FROM WORK. |
| 02:29PM | 11 | Q.   AND YOU TESTIFIED THAT YOU WOULD -- MR. BALWANI HAD SAID |
| 02:29PM | 12 | TO YOU THAT ONE OF THE PROCESSES YOU SHOULD ENGAGE IN IS TO |
| 02:29PM | 13 | KILL THE OLD ELIZABETH. |
| 02:29PM | 14 | DID I UNDERSTAND THAT CORRECTLY? |
| 02:29PM | 15 | A.   YES. |
| 02:29PM | 16 | Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN? |
| 02:29PM | 17 | A.   THAT MEANT THAT WHO I WAS WAS NEVER GOING TO BE A PERSON |
| 02:29PM | 18 | THAT COULD SUCCEED IN LIFE OR IN BUSINESS, AND I NEEDED TO KILL |
| 02:29PM | 19 | THAT PERSON AND BECOME A NEW ELIZABETH WHO WOULD EMBODY THESE |
| 02:29PM | 20 | TENETS AND HAVE A CHANCE AT ACHIEVING MY VISION. |
| 02:29PM | 21 | Q.   DID MR. BALWANI MAKE COMMENTS ALONG THOSE LINES EVEN WHEN |
| 02:29PM | 22 | YOU WERE SERVING AS THE CEO OF THERANOS? |
| 02:29PM | 23 | A.   HE DID. |
| 02:29PM | 24 | Q.   LET ME ASK YOU TO LOOK AT, WITHIN 5387, AT THE PAGE |
| 02:30PM | 25 | NUMBERED 63 ON THE BATES LABELS -- |

| | | |
|---|---|---|
| 02:30PM | 1 | A.   YES. |
| 02:30PM | 2 | Q.   -- ON THE RIGHT-HAND COLUMN.  WE'LL DRAW IT UP. |
| 02:30PM | 3 |      DO YOU SEE THE TEXT FROM YOU THERE THAT SAYS, "MY NEW LIFE |
| 02:30PM | 4 | AS OF THIS NIGHT AND FOREVER MORE"? |
| 02:30PM | 5 | A.   YES. |
| 02:30PM | 6 | Q.   AND THEN YOU LIST A VARIETY OF CHARACTERISTICS THAT YOU'LL |
| 02:30PM | 7 | TRY TO EMBODY AFTER THAT? |
| 02:30PM | 8 | A.   YES. |
| 02:30PM | 9 | Q.   AND IS THAT SOMETHING THAT YOU SENT TO MR. BALWANI IN |
| 02:30PM | 10 | REACTION TO CONVERSATIONS THAT YOU AND HE WERE HAVING? |
| 02:30PM | 11 | A.   YES. |
| 02:30PM | 12 | Q.   AND DO YOU SEE UNDERNEATH THAT YOU WRITE, ABOUT TEN |
| 02:30PM | 13 | MINUTES AFTER YOU SENT THE TEXT, "NO RESPONSE?" |
| 02:30PM | 14 | A.   YES. |
| 02:30PM | 15 | Q.   AND THEN MR. BALWANI RESPONDS AT 2:46, "AWESOME.  U R |
| 02:31PM | 16 | LISTENING AND PAYING ATTENTION." |
| 02:31PM | 17 |      DO YOU SEE THAT? |
| 02:31PM | 18 | A.   I DO. |
| 02:31PM | 19 | Q.   AND WERE EXCHANGES OF THIS KIND, ORALLY OR AT HOME, COMMON |
| 02:31PM | 20 | WHEN MR. BALWANI WAS DISAPPOINTED WITH SOMETHING RELATED TO |
| 02:31PM | 21 | WHAT WAS GOING ON AT WORK? |
| 02:31PM | 22 | A.   YES. |
| 02:31PM | 23 | Q.   NOW, WE ALSO HEARD TESTIMONY THAT PEOPLE DID NOT SEE YOU |
| 02:31PM | 24 | DISAGREE DURING THE COURSE OF MEETINGS WHILE YOU WERE AT WORK. |
| 02:31PM | 25 |      DO YOU RECALL SOME INSTANCES WHERE YOU DISAGREED AT |

7865

```
02:31PM   1    MEETINGS AND WORK AND MR. BALWANI REACTED?

02:31PM   2    A.   I DO.

02:31PM   3    Q.   LET ME ASK YOU TO LOOK AT THE PAGES THAT ARE BATES

02:31PM   4    LABELLED 63 AND 64.

02:31PM   5    A.   OKAY.

02:32PM   6    Q.   AND IS THIS A TEXT FROM YOU TO MR. BALWANI ON NOVEMBER

02:32PM   7    THE 8TH, 2014?

02:32PM   8    A.   YES.

02:32PM   9    Q.   AND THEN IF YOU LOOK AT THE ENTIRE BODY OF TEXTS

02:32PM  10    THEREAFTER, IF YOU GO DOWN, AND JUST CONCLUDING WITH THE TEXT

02:32PM  11    THAT SAYS, "ARE YOU LEAVING BECAUSE OF US FIGHTING?"

02:32PM  12         CAN YOU EXPLAIN TO US WHAT IS GOING ON IN THIS EXCHANGE?

02:32PM  13    A.   SUNNY IS MAD AT ME BECAUSE HE FELT LIKE I INTERRUPTED HIM

02:32PM  14    IN FRONT OF OTHER PEOPLE IN A MEETING, AND I WAS SAYING TO HIM

02:32PM  15    THAT HE WAS MAKING FACES AT ME THAT WERE REALLY VISIBLE TO

02:32PM  16    PEOPLE, WHICH WAS CREATING A VERY STRANGE DYNAMIC IN THE

02:32PM  17    MEETING AND THAT THE ONLY TIME -- THE ONLY REASON I DID THAT

02:32PM  18    WAS BECAUSE I WAS TRYING TO SMOOTH OVER THE SITUATION WITH THE

02:32PM  19    FACES THAT HE WAS MAKING AT ME, AND HE'S WALKING OUT OF THE

02:32PM  20    OFFICE.

02:32PM  21    Q.   AND WOULD MR. BALWANI ALSO ON OCCASION CRITICIZE YOU FOR

02:33PM  22    YOUR PERFORMANCE IN MEETINGS WHILE THE MEETING WAS ONGOING?

02:33PM  23    A.   YES.

02:33PM  24    Q.   WOULD HE SOMETIMES DO THAT BY TEXT?

02:33PM  25    A.   YES.
```

7866

| | | |
|---|---|---|
| 02:33PM | 1 | Q.   LET'S LOOK AT BATES LABEL 148 IN THE SAME EXHIBIT. |
| 02:33PM | 2 | DO YOU SEE THAT HE SAYS "YOU ARE SPEAKING WITH EVERYONE IN |
| 02:33PM | 3 | YOUR GIDDY VOICE - EXCESSIVE USE OF 'AWESOME'"? |
| 02:33PM | 4 | A.   YES. |
| 02:33PM | 5 | Q.   AND YOU RESPOND "THANK YOU THANK YOU"? |
| 02:33PM | 6 | A.   YES. |
| 02:33PM | 7 | Q.   AND THEN "FOREVER." |
| 02:33PM | 8 | DO YOU SEE THAT? |
| 02:33PM | 9 | A.   YES. |
| 02:33PM | 10 | Q.   AND LET'S LOOK NEXT AT 246. |
| 02:34PM | 11 | AND DO YOU SEE THIS IS A TEXT FROM HIM TO YOU IN JUNE OF |
| 02:34PM | 12 | 2015? |
| 02:34PM | 13 | A.   I DO. |
| 02:34PM | 14 | Q.   AND DO YOU SEE HE SAYS, "U R RAMBLING NOW.  LET'S STAY |
| 02:34PM | 15 | FOCUSSED"? |
| 02:34PM | 16 | A.   YES. |
| 02:34PM | 17 | Q.   NOW, AT THE TIME IN 2014, 2015, THERANOS WAS CERTAINLY |
| 02:34PM | 18 | ENJOYING A LOT OF SUCCESS AS A COMPANY. |
| 02:34PM | 19 | IS THAT FAIR TO SAY? |
| 02:34PM | 20 | A.   WE WERE. |
| 02:34PM | 21 | Q.   AND THERE WERE POSITIVE FEEDBACK ABOUT THE COMPANY COMING |
| 02:34PM | 22 | FROM A NUMBER OF SOURCES? |
| 02:34PM | 23 | A.   YES. |
| 02:34PM | 24 | Q.   WAS MR. BALWANI'S REACTION TO THAT THAT YOU WERE |
| 02:34PM | 25 | RESPONSIBLE FOR THERANOS'S SUCCESS OR SOMETHING ELSE? |

7867

| | | |
|---|---|---|
| 02:34PM | 1 | A.   IT WAS THAT HE WAS, THAT HE HAD BUILT ME INTO WHO I WAS. |
| 02:35PM | 2 | Q.   LET ME ASK YOU TO LOOK AT THE BATES LABEL 207? |
| 02:35PM | 3 | A.   OKAY. |
| 02:35PM | 4 | Q.   DO YOU RECALL BEING INVITED TO HARVARD UNIVERSITY TO GIVE |
| 02:35PM | 5 | A TALK ABOUT WOMEN IN ENGINEERING? |
| 02:35PM | 6 | A.   I DO. |
| 02:35PM | 7 | Q.   AND ARE THESE TEXTS THAT YOU SENT AROUND THE TIME OF THAT |
| 02:35PM | 8 | PRESENTATION? |
| 02:35PM | 9 | A.   YES. |
| 02:35PM | 10 | Q.   AND WERE YOU GIVING -- TELLING HIM HOW PLEASED YOU WERE |
| 02:35PM | 11 | THAT YOU WERE GETTING -- THERE WAS INTEREST IN WOMEN IN |
| 02:35PM | 12 | ENGINEERING IN CONNECTION WITH THE PRESENTATION THAT YOU WERE |
| 02:35PM | 13 | GIVING? |
| 02:35PM | 14 | A.   YES, I WAS TALKING ABOUT ALL OF THESE GIRLS COMING UP TO |
| 02:36PM | 15 | ME AND SAYING THAT THEY WERE INSPIRED. |
| 02:36PM | 16 | Q.   AND DO YOU SEE HIS COMMENT AT 11:06 AND HE'S SAYING "I |
| 02:36PM | 17 | HAVE MOLDED YOU"? |
| 02:36PM | 18 | A.   YES. |
| 02:36PM | 19 | Q.   AND WHAT DID YOU UNDERSTAND THAT WOULD MEAN? |
| 02:36PM | 20 | A.   THAT HE MOLDED ME, THAT HE BUILT ME INTO WHO I WAS, AND |
| 02:36PM | 21 | THAT IF PEOPLE WERE INSPIRED BY ME, IT WAS BECAUSE OF THAT. |
| 02:36PM | 22 | Q.   AND IF YOU SEE BELOW IN THE BOTTOM FOUR TEXTS, YOU RESPOND |
| 02:36PM | 23 | WITH SOME TEXTS THAT SEEM FAIRLY LOVING. |
| 02:36PM | 24 | DO YOU SEE THAT? |
| 02:36PM | 25 | A.   YES. |

7868

| | | |
|---|---|---|
| 02:36PM | 1 | Q.   AND CAN YOU EXPLAIN THOSE RESPONSES? |
| 02:36PM | 2 | A.   THAT HE WAS HAPPY WITH ME.  HE SAID, "U R MY MADIBA NOW," |
| 02:36PM | 3 | AND THAT MEANT THAT I COULD BE HIS, THAT I HAD SATISFIED HIS |
| 02:36PM | 4 | GOALS FOR ME. |
| 02:36PM | 5 | Q.   LET ME ASK YOU TO LOOK BACK AT 87 TO 88, THOSE BATES |
| 02:37PM | 6 | LABELS. |
| 02:37PM | 7 | A.   OKAY. |
| 02:37PM | 8 | Q.   ALL RIGHT.  AND DO YOU SEE THIS IS A TEXT FROM MR. BALWANI |
| 02:37PM | 9 | TO YOU IN DECEMBER OF 2014? |
| 02:37PM | 10 | A.   YES. |
| 02:37PM | 11 | Q.   AND DO YOU SEE THAT HE SENDS YOU A LOVING MESSAGE ABOUT |
| 02:37PM | 12 | ADMIRING YOU AND YOUR WISDOM AND STRENGTH? |
| 02:37PM | 13 | A.   YES. |
| 02:37PM | 14 | Q.   LET'S LOOK AT YOUR RESPONSE. |
| 02:37PM | 15 | AND YOU SAY, "YOU KNOW WHAT THESE THINGS COMING FROM YOU |
| 02:37PM | 16 | MEAN TO ME.  WHAT YOU SAY TO ME EQUALS MY CONFIDENCE." |
| 02:37PM | 17 | DO YOU SEE THAT? |
| 02:37PM | 18 | A.   YES. |
| 02:37PM | 19 | Q.   AND THEN HE OFFERS SOME RESPONSES. |
| 02:37PM | 20 | AND DO YOU SEE AT THE BOTTOM, "I MEAN WHAT I TEXTED YOU |
| 02:37PM | 21 | LITERALLY." |
| 02:37PM | 22 | DO YOU SEE THAT? |
| 02:37PM | 23 | A.   YES. |
| 02:37PM | 24 | Q.   AND WHAT WERE YOU REFERRING TO THERE? |
| 02:38PM | 25 | A.   THAT HOW HE FELT ABOUT ME WAS MY CONFIDENCE. |

| 02:38PM | 1 | Q.   NOW, YOU TESTIFIED A FEW MOMENTS AGO THAT THERE WOULD BE |

02:38PM  1   Q.   NOW, YOU TESTIFIED A FEW MOMENTS AGO THAT THERE WOULD BE

02:38PM  2   INSTANCES WHERE MR. BALWANI WOULD ACTUALLY VERBALLY BERATE YOU?

02:38PM  3   A.   YES.

02:38PM  4   Q.   AND WERE THERE OCCASIONS ON WHICH YOU WOULD SOMETIMES

02:38PM  5   WRITE DOWN YOUR THOUGHTS AFTER SOME OF THOSE INCIDENTS?

02:38PM  6   A.   YES.

02:38PM  7   Q.   AND WHERE WOULD YOU TYPICALLY DO THAT?

02:38PM  8   A.   ON MY IPHONE IN MY NOTES.

02:38PM  9   Q.   AND I'LL ASK YOU TO LOOK AT EXHIBIT 7534.

02:38PM  10   A.   IN THE FOURTH BINDER?

02:38PM  11   Q.   YES.

02:38PM  12   A.   OKAY.  OKAY.

02:39PM  13        YES.

02:39PM  14   Q.   ARE THESE NOTES FROM YOUR IPHONE FROM AROUND APRIL OF

02:39PM  15   2015?

02:39PM  16   A.   YES.

02:39PM  17   Q.   AND DO THEY RELATE TO AN INTERACTION THAT YOU HAD HAD WITH

02:39PM  18   MR. BALWANI?

02:39PM  19   A.   YES.

02:39PM  20        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:39PM  21   7534.

02:39PM  22        MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:39PM  23        THE COURT:  IT'S ADMITTED.

02:39PM  24   (DEFENDANT'S EXHIBIT 7534 WAS RECEIVED IN EVIDENCE.)

02:39PM  25   BY MR. DOWNEY:

7870

02:39PM 1   Q.   I'LL ASK YOU TO TAKE A MOMENT TO LOOK AT THAT AND ASK YOU

02:39PM 2   IF YOU CAN RECALL THE INCIDENT THAT LED YOU TO TAKE THESE

02:39PM 3   NOTES.

02:40PM 4   A.   YES, I CAN.

02:40PM 5   Q.   TELL US WHAT HAPPENED.

02:40PM 6   A.   THAT SUNNY FELT THAT THE WAY I WAS RUNNING R&D WAS A

02:40PM 7   DISASTER AND HE WAS GIVING ME FEEDBACK ON WHAT HE EXPECTED FROM

02:40PM 8   ME.

02:40PM 9   Q.   LET'S JUST LOOK AT THE FIRST SERIES OF STATEMENTS IN THERE

02:40PM 10  BEGINNING WITH, "I EXPECT," DOWN TO "CONVINCED NEVER."

02:40PM 11      ALL RIGHT.  AND DO YOU SEE THAT HE HAS A SERIES OF

02:40PM 12  COMMENTS HERE ABOUT EXPECTING THINGS AND EXPECTING EXCELLENCE,

02:40PM 13  ET CETERA.

02:40PM 14      WHEN YOU WERE WRITING THESE NOTES, WHAT WERE YOU

02:40PM 15  RECORDING?

02:40PM 16  A.   I WAS RECORDING WHAT HE WAS SAYING SO THAT HE WOULD SEE

02:40PM 17  THAT I WAS LISTENING TO HIM.

02:40PM 18  Q.   AND IF YOU GO ABOUT HALFWAY DOWN, BEGINNING WITH THE

02:40PM 19  PARAGRAPH THAT BEGINS "FOCUS."

02:41PM 20      DO YOU SEE THAT IT READS, "NOT PRIDE IN MULTI TASK.  NO

02:41PM 21  MIND.  PRESENT.  WOMEN BATTLE DRESS LIKE MEN.  SAME TRAINING.

02:41PM 22  TOUGHEN UP.  BECOME MASCULINE IN BATTLE.  MASCULINE GAME.

02:41PM 23  BUSINESS MASCULINE GAME."

02:41PM 24      DO YOU SEE THAT?

02:41PM 25  A.   YES.

7871

02:41PM 1    Q.   AND WHAT WAS THAT RECORDING?

02:41PM 2    A.   AGAIN, THAT SUNNY FELT THAT I WAS TOO FEMININE, THAT I WAS

02:41PM 3    LIKE A LITTLE GIRL, AND THAT I NEEDED TO BE MORE LIKE A MAN IF

02:41PM 4    I WANTED TO BE IN BUSINESS.

02:41PM 5    Q.   AND IF YOU GO UNDER "COMMAND," WHERE IT BEGINS, "I'M SO

02:41PM 6    SICK."

02:41PM 7    A.   YES.

02:41PM 8    Q.   AND DO YOU SEE WHERE IT SAYS, "I'M SO SICK AND TIRED"?

02:41PM 9    A.   YES.

02:41PM 10   Q.   AND THE FIRST SENTENCE READS, "I'M SO SICK AND TIRED OF

02:41PM 11   THIS MEDIOCRITY YOU CREATE.  IT'S ASTONISHING.  YOU'LL NEVER

02:42PM 12   HOLD ANYBODY RESPONSIBLE FOR ANY ACTIONS.  YOU'LL NEVER DO

02:42PM 13   THAT.  I DON'T WANT TO WORK WITH YOU ANYMORE."

02:42PM 14        DO YOU SEE THAT?

02:42PM 15   A.   YES.

02:42PM 16   Q.   AND WHAT WERE YOU RECORDING THERE?

02:42PM 17   A.   WHAT SUNNY WAS SAYING TO ME, THAT HE WAS ASTONISHED BY MY

02:42PM 18   MEDIOCRITY AND THAT HE WAS EXHAUSTED WORKING WITH ME BECAUSE I

02:42PM 19   COULDN'T BE SUCCESSFUL.  I WAS A MONKEY THAT WAS TRYING TO FLY

02:42PM 20   A SPACESHIP.

02:42PM 21   Q.   OKAY.  AND IF YOU GO DOWN TO THE BOTTOM FOUR SENTENCES

02:42PM 22   BEGINNING WITH "I DON'T ENJOY."

02:42PM 23        DO YOU SEE THAT?

02:42PM 24   A.   I DO.

02:42PM 25   Q.   AND HE SAYS, "I DON'T ENJOY BEING IN A COMPANY THAT'S NOT

7872

| | | |
|---|---|---|
| 02:42PM | 1 | GOING TO WIN.  I DON'T HAVE THE FAITH." |
| 02:42PM | 2 | DO YOU SEE IT GOES ON FROM THERE? |
| 02:42PM | 3 | A.  YES. |
| 02:43PM | 4 | Q.  AND ARE THESE ALSO COMMENTS THAT MR. BALWANI MADE TO YOU? |
| 02:43PM | 5 | A.  YES. |
| 02:43PM | 6 | Q.  DO YOU SEE IN THE SECOND PARAGRAPH HE SAYS, "BIGGEST |
| 02:43PM | 7 | FAILURE OF MY LIFE.  REGRET COMING.  STAYED BECAUSE I LOVE |
| 02:43PM | 8 | YOU." |
| 02:43PM | 9 | DO YOU SEE THAT? |
| 02:43PM | 10 | A.  YES. |
| 02:43PM | 11 | Q.  CAN YOU EXPLAIN WHAT MR. BALWANI WAS COMMUNICATING THERE? |
| 02:43PM | 12 | A.  THAT HE HAD BEEN TELLING ME WHAT TO DO AND HOW TO BECOME |
| 02:43PM | 13 | THE SUCCESSFUL PERSON BECAUSE HE LOVED ME, BUT THAT HE WAS |
| 02:43PM | 14 | INCREDIBLY ANGRY WITH ME BECAUSE I WASN'T EVER ABLE TO BECOME |
| 02:43PM | 15 | THAT. |
| 02:43PM | 16 | Q.  NOW, I ASKED YOU A MOMENT AGO IN CONNECTION WITH THESE |
| 02:43PM | 17 | NOTES ABOUT BEING VERBALLY BERATED AND RECORDING IT IN IPHONE |
| 02:44PM | 18 | NOTES. |
| 02:44PM | 19 | I WANT TO ASK YOU, IF I MIGHT, JUST FOR A MOMENT ABOUT THE |
| 02:44PM | 20 | INCIDENTS THAT YOU HAD DESCRIBED WITH MR. BALWANI OF FORCED |
| 02:44PM | 21 | INTERCOURSE. |
| 02:44PM | 22 | DID YOU SOMETIMES TAKE IPHONE NOTES IN THE WAKE OF SOME OF |
| 02:44PM | 23 | THOSE INCIDENTS? |
| 02:44PM | 24 | A.  I DID. |
| 02:44PM | 25 | Q.  LET ME ASK YOU TO LOOK AT EXHIBIT 7517. |

7873

02:44PM   1      A.   OKAY.

02:44PM   2      Q.   IS THIS ANOTHER SET OF NOTES THAT YOU RECORDED AFTER AN

02:44PM   3      INCIDENT WITH MR. BALWANI?

02:44PM   4      A.   YES.

02:44PM   5           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

02:44PM   6      7517.

02:44PM   7           MR. LEACH:  NO OBJECTION, YOUR HONOR.

02:45PM   8           THE COURT:  IT'S ADMITTED.

02:45PM   9      (DEFENDANT'S EXHIBIT 7517 WAS RECEIVED IN EVIDENCE.)

02:45PM   10     BY MR. DOWNEY:

02:45PM   11     Q.   AND WE SHOW THE DATE HERE AS BEING FEBRUARY 11TH, 2015.

02:45PM   12          DO YOU SEE THAT?

02:45PM   13     A.   I DO.

02:45PM   14     Q.   AND I WANT TO JUST FOCUS ON THE FIRST THREE LINES OF THIS

02:45PM   15     IPHONE NOTE AND ASK YOU TO REVIEW THOSE AND ASK YOU IF YOU CAN

02:45PM   16     DESCRIBE WHAT YOU WERE REACTING TO AND WRITING HERE.

02:45PM   17     A.   I'M REACTING TO ONE OF THOSE INCIDENTS WITH MR. BALWANI

02:45PM   18     AND I'M WRITING ABOUT THE FACT THAT I COULDN'T MOVE AND I

02:45PM   19     COULDN'T SIT UP AND THAT I WAS LYING THERE SWOLLEN AND THAT I

02:45PM   20     COULDN'T UNDERSTAND WHY I WAS HURTING MYSELF, WHY I WASN'T

02:45PM   21     LEAVING.

02:45PM   22     Q.   NOW, IF YOU LOOK BACK AT 53 -- IF YOU NOTICE ON THESE

02:46PM   23     DOCUMENTS, THESE DOCUMENTS APPEAR TO BE CREATED ON

02:46PM   24     FEBRUARY 11TH OF 2015 UP AND THROUGH FEBRUARY 13TH OF 2015.

02:46PM   25          DO YOU SEE THAT?

7874

02:46PM 1    A.   I DO.

02:46PM 2    Q.   LET'S LOOK BACK AT EXHIBIT 5387F AT BATES LABEL 121.

02:46PM 3         IF WE CAN JUST BLOW THAT UP SO THERE'S A BETTER VIEW ON

02:46PM 4    THE SCREEN.

02:46PM 5         IS THE TOP TEXT FROM YOU TO MR. BALWANI IN THAT TIMEFRAME?

02:46PM 6    A.   YES.

02:46PM 7    Q.   AND DO YOU SEE YOU WRITE TO HIM, "I'M SORRY I WASN'T

02:46PM 8    STRONGER FOR YOU THIS MORNING.  THAT IS MY RESPONSIBILITY AND

02:46PM 9    MY ROLE.  I WILL NEVER LET THAT HAPPEN AGAIN."

02:46PM 10        DO YOU SEE THAT?

02:46PM 11   A.   I DO.

02:46PM 12   Q.   AND THEN HE RESPONDS, "I AM STRONG ENOUGH FOR ME AND U AND

02:47PM 13   THEN SOME.  I DON'T NEED U TO BE STRONG FOR ME."

02:47PM 14        DO YOU SEE THAT?

02:47PM 15   A.   YES.

02:47PM 16   Q.   AND THEN THE NEXT LINE YOU SAY, "I HAVE THE PRIVILEGE OF

02:47PM 17   BEING ABLE TO CALM YOU AS A MOTHER ENERGY."

02:47PM 18        DO YOU SEE THAT?

02:47PM 19   A.   YES.

02:47PM 20   Q.   AND WHEN YOU REFER THERE TO "AS A MOTHER ENERGY," WHAT IS

02:47PM 21   THAT A REFERENCE TO?

02:47PM 22   A.   THAT I THOUGHT MY ROLE WAS TO CALM HIM WHEN HE WAS ANGRY

02:47PM 23   AND THAT I HADN'T BEEN ABLE TO DO THAT, THAT I HADN'T BEEN ABLE

02:47PM 24   TO TAKE IT.

02:47PM 25   Q.   AND THEN IF YOU LOOK AT THE BOTTOM -- SECOND TO THE BOTTOM

7875

02:47PM  1    TEXT, YOU SAY, "MY JOB IS TO LOVE YOU WHEN YOU'RE STRESSED."

02:47PM  2         DO YOU SEE THAT?

02:47PM  3    A.   YES.

02:47PM  4    Q.   AND MR. BALWANI RESPONDS, "I KNOW."

02:47PM  5         DO YOU SEE THAT?

02:47PM  6    A.   YES.

02:47PM  7    Q.   AND WAS THIS AN EXCHANGE THAT IS TYPICAL OF WHAT WOULD

02:47PM  8    HAPPEN IN THE WAKE OF THESE INCIDENTS?

02:47PM  9    A.   YES.

02:47PM  10   Q.   AND THIS IS FROM FEBRUARY OF 2015?

02:48PM  11   A.   YES.

02:48PM  12   Q.   AND HAD THESE INCIDENTS BEEN OCCURRING THROUGHOUT THE

02:48PM  13   RELATIONSHIP?

02:48PM  14   A.   YES.

02:48PM  15   Q.   NOW, YOU MENTIONED THAT WHEN YOU MET HIM WHEN YOU WERE AN

02:48PM  16   18 YEAR OLD, YOU THOUGHT THAT HE WAS AN IMPRESSIVE EXECUTIVE.

02:48PM  17        DURING THE TIME PERIOD THAT WE'RE CONCERNED WITH, THE

02:48PM  18   PERIOD FROM 2010 TO 2016, HOW DID YOU PERCEIVE MR. BALWANI'S

02:48PM  19   CAPABILITIES AS A BUSINESS PERSON AND WHAT EFFECT DID YOUR

02:48PM  20   RELATIONSHIP HAVE ON THAT?

02:48PM  21   A.   HE HAD TAUGHT ME EVERYTHING THAT I THOUGHT I KNEW ABOUT

02:48PM  22   BUSINESS, AND I THOUGHT HE WAS THE BEST BUSINESS PERSON THAT I

02:48PM  23   KNEW.

02:48PM  24        AND I THINK THAT I DIDN'T QUESTION HIM IN THE WAY THAT I

02:49PM  25   OTHERWISE WOULD HAVE.

7876

02:49PM 1    Q.   DID THAT REMAIN YOUR VIEW UNTIL 2016?

02:49PM 2    A.   IT DID.

02:49PM 3    Q.   DID THAT VIEW CHANGE IN 2016?

02:49PM 4    A.   IT DID.

02:49PM 5    Q.   WHAT HAPPENED TO CHANGE THAT VIEW?

02:49PM 6    A.   THE CMS INSPECTION.  I HAD GONE INTO THAT INSPECTION

02:49PM 7    THINKING THAT WE HAD ONE OF THE BEST LABS IN THE WORLD, AND THE

02:49PM 8    FINDINGS FROM THOSE INSPECTIONS WERE SO FUNDAMENTALLY DIFFERENT

02:49PM 9    FROM WHAT I BELIEVED THAT IT COULDN'T BE THE CASE THAT OUR

02:49PM 10   OPERATIONS WERE RUNNING LIKE ONE OF THE BEST COMPANIES IN THE

02:49PM 11   WORLD.

02:49PM 12   Q.   WELL, HOW DID YOU RESPOND TO LEARNING THAT CMS WAS

02:49PM 13   CRITICAL OF THE COMPANY'S LAB OPERATIONS?

02:49PM 14   A.   BY BRINGING IN AS MANY EXPERTS AS I COULD, HIRING TWO NEW

02:50PM 15   LAB DIRECTORS AND BRINGING IN A NUMBER OF LABORATORY EXPERTS TO

02:50PM 16   LOOK AT THE FINDINGS AND TRY TO UNDERSTAND THEM AND TRY TO FIX

02:50PM 17   THEM.

02:50PM 18   Q.   AND HOW DID MR. BALWANI RESPOND TO THOSE CHANGES WITHIN

02:50PM 19   THE COMPANY?

02:50PM 20   A.   HE DIDN'T LIKE THEM.

02:50PM 21   Q.   WAS THERE A PERIOD AFTER YOU LEARNED OF THE CMS VIEW OF

02:50PM 22   THE THERANOS LAB WHERE YOU WERE STILL SUPPORTIVE OF MR. BALWANI

02:50PM 23   AND SUPPORTIVE OF THE WORK THAT HAD BEEN DONE IN THE LAB?

02:50PM 24   A.   I -- FOR SOME TIME, YES.

02:50PM 25   Q.   AND MR. BALWANI ULTIMATELY LEFT THE COMPANY IN MAY OF

7877

02:50PM   1      2016; IS THAT RIGHT?

02:50PM   2      A.   HE DID.

02:50PM   3      Q.   AND TELL US WHAT HAPPENED IN THE -- WITH YOUR PERCEPTION

02:50PM   4      OF MR. BALWANI BETWEEN THE INITIAL RESPONSE AND THE TIME THAT

02:50PM   5      HE LEFT THE COMPANY AS TO YOUR VIEW OF HIM AS A CAPABLE

02:50PM   6      EXECUTIVE.

02:50PM   7      A.   HE WASN'T WHO I THOUGHT HE WAS, AND I REALIZED THAT IF I

02:51PM   8      WAS GOING TO FIX THE ISSUES AND ALLOW THE COMPANY TO SEE

02:51PM   9      THROUGH ITS POTENTIAL, I HAD TO DO THAT WITHOUT HIM IN THE

02:51PM  10      COMPANY.

02:51PM  11      Q.   DID YOU CONTINUE YOUR PERSONAL RELATIONSHIP WITH

02:51PM  12      MR. BALWANI AFTER HE LEFT THE COMPANY?

02:51PM  13      A.   NO.

02:51PM  14      Q.   WERE YOU LIVING WITH HIM IN 2016?

02:51PM  15      A.   YES.

02:51PM  16      Q.   DID YOU MOVE OUT OF THAT LIVING ARRANGEMENT?

02:51PM  17      A.   I DID.

02:51PM  18      Q.   AND WHEN DID YOU DO THAT?

02:51PM  19      A.   IN MAY OF 2016.

02:51PM  20      Q.   DID ANYONE HELP YOU WITH THAT?

02:51PM  21      A.   YES.

02:51PM  22      Q.   WHO HELPED YOU?

02:51PM  23      A.   MY BROTHER.

02:51PM  24      Q.   DID YOU TELL MR. BALWANI IN ADVANCE THAT YOU WERE MOVING

02:51PM  25      OUT?

7878

02:51PM  1    A.   NO.

02:51PM  2    Q.   WHERE WAS MR. BALWANI WHEN YOU MOVED OUT OF THE HOME THAT

02:51PM  3    YOU SHARED?

02:51PM  4    A.   HE WAS IN, I THINK, THAILAND.

02:51PM  5    Q.   AT SOME POINT DID YOU MAKE HIM AWARE WHILE HE WAS IN

02:52PM  6    THAILAND THAT YOU HAD MOVED OUT?

02:52PM  7    A.   YES.

02:52PM  8    Q.   HOW DID HE REACT?

02:52PM  9    A.   HE SAID HE WAS GETTING ON A PLANE TO COME BACK.

02:52PM  10   Q.   AND AFTER THAT PERIOD OF TIME IN LATE MAY AND EARLY

02:52PM  11   JUNE 2000 -- DID YOU HAVE A RELATIONSHIP OF ANY KIND WITH

02:52PM  12   MR. BALWANI?

02:52PM  13   A.   NO.

02:52PM  14   Q.   I WANT TO TALK ABOUT THE FINDINGS IN THE LAB AND THE

02:52PM  15   RESPONSE WITH SOME MORE SPECIFICITY IN A MOMENT, BUT WITH

02:52PM  16   RESPECT TO THE TESTIMONY THAT YOU'VE JUST GIVEN, YOU HAD A

02:52PM  17   PROFESSION RELATIONSHIP WITH MR. BALWANI FOR ALMOST SEVEN

02:52PM  18   YEARS; RIGHT?

02:52PM  19   A.   I DID.

02:52PM  20   Q.   AND YOU HAD A PERSONAL RELATIONSHIP WITH HIM FOR 13 YEARS?

02:52PM  21   A.   YES, ABOUT THAT.

02:52PM  22   Q.   ARE YOU SAYING THAT MR. BALWANI FORCED YOU TO MAKE THE

02:52PM  23   STATEMENTS TO INVESTORS THAT YOU MADE DURING THE COURSE OF THIS

02:52PM  24   CASE?

02:52PM  25   A.   NO.

7879

02:52PM   1       Q.   ARE YOU SAYING THAT HE FORCED YOU TO MAKE CERTAIN

02:53PM   2   STATEMENTS TO JOURNALISTS THAT WE'VE HEARD ABOUT DURING THE

02:53PM   3   COURSE OF THE CASE?

02:53PM   4       A.   NO.

02:53PM   5       Q.   ARE YOU SAYING THAT HE CONTROLLED YOUR INTERACTIONS WITH,

02:53PM   6   FOR EXAMPLE, WALGREENS AND SAFEWAY EXECUTIVES?

02:53PM   7       A.   NO.

02:53PM   8       Q.   ARE YOU SAYING THAT HE CONTROLLED YOUR INTERACTIONS WITH

02:53PM   9   MEMBERS OF THE THERANOS BOARD IN THE PERIOD BETWEEN 2010 AND

02:53PM   10  2016?

02:53PM   11      A.   NO.

02:53PM   12      Q.   WHAT IMPACT, IF ANY, DID YOUR PERSONAL RELATIONSHIP WITH

02:53PM   13  MR. BALWANI HAVE ON YOUR WORK AT THERANOS IN YOUR VIEW?

02:53PM   14      A.   I DON'T KNOW.  HE IMPACTED EVERYTHING ABOUT WHO I WAS, AND

02:53PM   15  I DON'T FULLY UNDERSTAND THAT.

02:53PM   16      Q.   DID YOU HAVE CONFIDENCE IN HIM IN THE AREAS FOR WHICH HE

02:53PM   17  WAS RESPONSIBLE DURING THAT PERIOD?

02:53PM   18      A.   COMPLETELY.

02:53PM   19      Q.   DID YOU OFTEN OVERRULE HIM IN THE AREAS FOR WHICH HE WAS

02:54PM   20  RESPONSIBLE?

02:54PM   21      A.   NO.

02:54PM   22      Q.   LET'S TALK ABOUT THE FINDINGS OF CMS AND YOUR RESPONSE TO

02:54PM   23  THEM IN THE FALL OF 2015 THROUGH THE FIRST HALF OF 2016.

02:54PM   24           YOU MENTIONED THAT YOU HIRED TWO LAB DIRECTORS?

02:54PM   25      A.   I DID.

7880

02:54PM  1    Q.   AND WHAT WAS THE -- WHAT HAPPENED TO THE REPORTING

02:54PM  2    STRUCTURE FOR LAB DIRECTORS AT THERANOS AT THAT POINT?

02:54PM  3    A.   I HAD THEM REPORT TO ME DIRECTLY.

02:54PM  4    Q.   WHY DID YOU DO THAT?

02:54PM  5    A.   BECAUSE I WANTED TO MAKE SURE THAT WE FIXED WHATEVER

02:54PM  6    ISSUES EXISTED IN THE LABORATORY SO THAT THE COMPANY COULD MOVE

02:54PM  7    FORWARD.

02:54PM  8    Q.   AT SOME POINT DID YOU HIRE DR. DAS AS ANOTHER LABORATORY

02:54PM  9    DIRECTOR?

02:54PM  10   A.   I DID.

02:55PM  11   Q.   AND WAS THE COMPANY CONTINUING TO INTERACT WITH CMS ABOUT

02:55PM  12   ITS INSPECTION?

02:55PM  13   A.   YES.

02:55PM  14   Q.   AND DID THE COMPANY EXPECT THAT AT SOME POINT IT WOULD

02:55PM  15   RECEIVE A REPORT FROM CMS OF WHAT CMS'S CONCLUSIONS WERE?

02:55PM  16   A.   YES.

02:55PM  17   Q.   AND DID YOU DISCUSS ALL OF THOSE ISSUES WITH DR. DAS AND

02:55PM  18   THE OTHER LABORATORY DIRECTORS THAT YOU HIRED?

02:55PM  19   A.   I DID.

02:55PM  20   Q.   AND AT SOME POINT, DID CMS ISSUE A REPORT ON ITS

02:55PM  21   CONCLUSIONS ABOUT THERANOS?

02:55PM  22   A.   YES.

02:55PM  23   Q.   DID YOU DISCUSS THAT REPORT WITH DR. DAS AND WITH THE

02:55PM  24   OTHER CLINICIANS AND SCIENTISTS AT THE COMPANY?

02:55PM  25   A.   I DID.

7881

02:55PM 1      Q.   AND WAS DR. DAS HIMSELF ALSO TRYING TO EVALUATE THE

02:55PM 2      PERFORMANCE OF THE LAB AT THAT TIME?

02:55PM 3      A.   HE WAS.

02:55PM 4      Q.   AND DO YOU RECALL THAT DR. DAS TESTIFIED THAT THERE WAS A

02:55PM 5      MEETING IN MARCH OF 2016 RELATED TO CMS'S CONCLUSIONS WITH

02:56PM 6      REGARD TO -- OR TENTATIVE CONCLUSIONS WITH REGARD TO THERANOS'S

02:56PM 7      LAB?

02:56PM 8      A.   YES.

02:56PM 9      Q.   WHAT -- AND DID YOU ATTEND THAT MEETING?

02:56PM 10     A.   I DID.

02:56PM 11     Q.   OTHER THAN YOURSELF AND DR. DAS, WHO WAS PRESENT AT THAT

02:56PM 12     MEETING?

02:56PM 13     A.   DR. YOUNG, DR. PANGARKAR, SEVERAL MEMBERS OF OUR

02:56PM 14     REGULATORY AND LEGAL TEAM, AND I THINK A FEW OTHER SCIENTISTS

02:56PM 15     FROM THE COMPANY.

02:56PM 16     Q.   WHAT DO YOU RECALL HAPPENING AT THAT MEETING?

02:56PM 17     A.   THAT DR. DAS MADE THE RECOMMENDATION THAT WE VOID CERTAIN

02:56PM 18     TESTS, AND WE DISCUSSED THAT, AS WELL AS SOME OF THE R&D TEAM'S

02:56PM 19     FEEDBACK ON THE PERFORMANCE OF THE TESTS.

02:56PM 20     Q.   AND WHAT WAS YOUR RESPONSE TO DR. DAS'S RECOMMENDATION

02:56PM 21     THAT THE TESTS BE VOIDED?

02:56PM 22     A.   THAT IF THAT WAS HIS RECOMMENDATION, WE SHOULD DO IT.

02:56PM 23     Q.   WERE ANY OF THE OTHER INDIVIDUALS AT THE MEETING, DID ANY

02:56PM 24     OF THE OTHER INDIVIDUALS RAISE QUESTIONS ABOUT WHAT DR. DAS HAD

02:57PM 25     RECOMMENDED?

7882

02:57PM 1    A.   YES.

02:57PM 2    Q.   WHAT DO YOU RECALL IN THAT REGARD?

02:57PM 3    A.   THAT MEMBERS OF OUR R&D TEAM BELIEVED THAT THE TESTS

02:57PM 4    THEMSELVES WERE GOOD, BUT THAT THE OPERATIONS OF THE LAB HAD

02:57PM 5    FAILED.   QUALITY SYSTEMS HAD FAILED.

02:57PM 6    Q.   AND WHAT DID THAT SUGGEST THAT THERANOS OUGHT TO DO WITH

02:57PM 7    REGARD TO THE TEST RESULTS THAT HAD BEEN RENDERED IN ITS CLIA

02:57PM 8    LAB?

02:57PM 9    A.   THAT OUT OF AN ABUNDANCE OF CAUTION TO BE SURE THAT NO ONE

02:57PM 10   GOT A RESULT THAT WAS WRONG, WE VOID ALL OF THE RESULTS.

02:57PM 11   Q.   NOW, MR. BALWANI, IN ADDITION TO BEING AN EXECUTIVE, HE

02:57PM 12   WAS ALSO ON THE BOARD OF DIRECTORS FOR A TIME AT THERANOS; IS

02:57PM 13   THAT RIGHT?

02:57PM 14   A.   HE WAS.

02:57PM 15   Q.   AND WE SPOKE ABOUT HIS DEPARTURE AS AN EXECUTIVE.

02:57PM 16        DID HE LEAVE THE BOARD OF DIRECTORS AT THE SAME TIME?

02:57PM 17   A.   HE DID.

02:57PM 18   Q.   WERE THERE OTHER CHANGES TO THE BOARD OF DIRECTORS OF

02:58PM 19   THERANOS IN THAT FIRST PART OF 2016?

02:58PM 20   A.   YES.

02:58PM 21   Q.   WERE NEW MEMBERS RECRUITED?

02:58PM 22   A.   YES.

02:58PM 23   Q.   WHAT NEW MEMBERS WERE RECRUITED?

02:58PM 24   A.   DR. BONANNI AND DAN WARMENHOVEN, AND WE HAD A COUPLE OF

02:58PM 25   OTHER DIRECTORS WHO HAD PREVIOUSLY SERVED ON THE BOARD AS WELL.

02:58PM  1    Q.   AND WHY DID YOU RECRUIT DR. BONANNI AND MR. WARMENHOVEN?

02:58PM  2    A.   DR. BONANNI WAS THE HEAD OF OPERATIONS FOR AMGEN, WHICH IS

02:58PM  3    A MAJOR PHARMACEUTICAL COMPANY, AND HE HAD A VERY DEEP

02:58PM  4    BACKGROUND IN NOT ONLY OPERATIONS BUT ALSO QUALITY SYSTEMS,

02:58PM  5    COMPLIANCE, AND REGULATORY PROGRAMS, AND THAT WAS THE AREA OF

02:58PM  6    FOCUS FOR US AT THAT POINT IN TIME.

02:58PM  7         MR. WARMENHOVEN WAS A BOARD MEMBER OF A NUMBER OF TECH

02:58PM  8    COMPANIES AND HE HAD BEEN ON THE BOARD OF BECHTEL, WHICH WAS

02:59PM  9    ONE OF THE PRIVATE COMPANIES THAT WE RESPECTED.  RILEY BECHTEL

02:59PM 10    HAD BEEN ON OUR BOARD, AND DAN WOULD BE ABLE TO SUCCEED HIM.

02:59PM 11    Q.   AND WHAT ABOUT DR. FOEGE'S NEW ROLE?

02:59PM 12    A.   DR. FOEGE WAS ONE OF THE BEST MEDICAL EXPERTS THAT WE

02:59PM 13    KNEW.  HE HAD BEEN AWARDED THE MEDAL OF FREEDOM FOR HIS WORK IN

02:59PM 14    ERADICATING SMALL POX AND HAD RUN THE CDC, AND ONE OF OUR CORE

02:59PM 15    AREAS WAS IN INFECTIOUS DISEASES, SO HAVING HIM THERE AND

02:59PM 16    ACTIVELY ENGAGED WAS REALLY IMPORTANT AS WE TRIED TO SEE THE

02:59PM 17    COMPANY THROUGH AND REFOCUSSED.

02:59PM 18    Q.   OTHER THAN CHANGES AT THE BOARD OF DIRECTORS, WERE THERE

02:59PM 19    ALSO CHANGES AT THE EXECUTIVE LEVEL?

02:59PM 20    A.   YES.

02:59PM 21    Q.   AND WHAT WERE THOSE CHANGES?

02:59PM 22    A.   I HIRED A NEW SENIOR VICE PRESIDENT OF OPERATIONS, A NEW

02:59PM 23    HEAD SENIOR VICE PRESIDENT OF REGULATORY AND QUALITY, A CHIEF

02:59PM 24    COMPLIANCE OFFICER, A NEW HEAD OF PRODUCT, A NEW HEAD OF

02:59PM 25    COMMUNICATIONS, PUT A NEW MANAGEMENT TEAM IN PLACE.

7884

| | | |
|---|---|---|
| 03:00PM | 1 | Q.   AND AFTER THESE CHANGES WERE MADE, DID THE COMPANY DISCUSS |
| 03:00PM | 2 | POTENTIAL CHANGES TO ITS BUSINESS STRATEGY? |
| 03:00PM | 3 | A.   WE DID. |
| 03:00PM | 4 | Q.   AND DID THE BUSINESS STRATEGY CHANGE? |
| 03:00PM | 5 | A.   YES. |
| 03:00PM | 6 | Q.   FOR A NUMBER OF YEARS THE COMPANY HAD BEEN INVOLVED WITH |
| 03:00PM | 7 | OPERATING A CLINICAL LAB IN CONNECTION WITH RETAIL STORES; IS |
| 03:00PM | 8 | THAT RIGHT? |
| 03:00PM | 9 | A.   THAT'S RIGHT. |
| 03:00PM | 10 | Q.   AND HOW DID THAT STRATEGY CHANGE IN 2016? |
| 03:00PM | 11 | A.   WE FOCUSSED THE COMPANY ON WHAT WOULD HAVE BEEN PHASE II |
| 03:00PM | 12 | OF OUR MODEL AND PLACING DEVICES IN THE FIELD IN DIFFERENT |
| 03:00PM | 13 | APPLICATIONS. |
| 03:00PM | 14 | Q.   NOW, LET ME ASK YOU ABOUT FDA APPROVAL. |
| 03:00PM | 15 |     DID THERANOS GET FDA APPROVAL FOR SOME OF ITS TECHNOLOGY |
| 03:00PM | 16 | IN 2015? |
| 03:00PM | 17 | A.   WE DID. |
| 03:00PM | 18 | Q.   AND HAD THERANOS CONTINUED TO WORK ON ITS 4 SERIES DEVICE |
| 03:01PM | 19 | AFTER THE TIME OF THE CLINICAL LAUNCH IN RETAIL STORES IN 2013? |
| 03:01PM | 20 | A.   YES. |
| 03:01PM | 21 | Q.   AND DID THERE COME A TIME WHEN THERANOS WAS COMFORTABLE |
| 03:01PM | 22 | SUBMITTING AN APPLICATION FOR APPROVAL OF ITS 4 SERIES SYSTEM |
| 03:01PM | 23 | IN ONE OF ITS ASSAYS? |
| 03:01PM | 24 | A.   YES. |
| 03:01PM | 25 | Q.   I'M GOING TO SHOW YOU AN EXHIBIT RELATED TO THAT, WHICH IS |

7885

| | | |
|---|---|---|
| 03:01PM | 1 | EXHIBIT 13288. |
| 03:01PM | 2 | YOUR HONOR, THAT IS NOT IN YOUR NOTEBOOK BECAUSE IT IS AN |
| 03:01PM | 3 | EXTREMELY LARGE EXHIBIT. |
| 03:01PM | 4 | I HAVE SHOWN IT TO MR. LEACH IN ADVANCE, AND WE'LL DISPLAY |
| 03:01PM | 5 | THE PORTIONS OF IT THAT WE NEED TO DISCUSS IF IT'S ADMITTED. |
| 03:01PM | 6 | MR. LEACH:  SO LONG AS IT'S NOT COMING IN FOR THE |
| 03:01PM | 7 | TRUTH, YOUR HONOR, I DON'T MIND.  IT'S OVER 500 PAGES. |
| 03:01PM | 8 | THE COURT:  WHAT IS THE DOCUMENT? |
| 03:01PM | 9 | MR. DOWNEY:  THIS IS THE SUBMISSION THAT SHE, |
| 03:01PM | 10 | MS. HOLMES, JUST TESTIFIED TO. |
| 03:01PM | 11 | THE COURT:  I SEE.  ALL RIGHT.  AND DO YOU HAVE AN |
| 03:01PM | 12 | IDEA OF HOW MANY PAGES THAT YOU'RE SEEKING TO ADMIT? |
| 03:02PM | 13 | MR. DOWNEY:  WELL, I WOULD JUST AS SOON I WOULD |
| 03:02PM | 14 | ADMIT THE WHOLE DOCUMENT, BUT I'M ONLY GOING TO DISPLAY TODAY, |
| 03:02PM | 15 | YOU KNOW, FOR PURPOSES OF TODAY'S DISCUSSION, ABOUT SIX OR |
| 03:02PM | 16 | SEVEN PAGES. |
| 03:02PM | 17 | SO I'M HAPPY, IF THERE ARE OBJECTIONS TO THE BALANCE OF |
| 03:02PM | 18 | THE DOCUMENT, BUT I DON'T WANT TO ADMIT ONLY THE PARTS THAT I'M |
| 03:02PM | 19 | DISPLAYING BECAUSE THERE'S A LARGE AMOUNT OF DATA AND SO FORTH |
| 03:02PM | 20 | SUBMITTED TO SUPPORT THOSE. |
| 03:02PM | 21 | THE COURT:  SURE.  THANK YOU. |
| 03:02PM | 22 | I'M JUST CURIOUS ABOUT WHAT GETS ADMITTED INTO EVIDENCE |
| 03:02PM | 23 | THAT THE JURY WOULD THEN FEEL OBLIGATED TO REVIEW FOR PURPOSES |
| 03:02PM | 24 | OF EVIDENTIARY VALUE IN THEIR DETERMINATION. |
| 03:02PM | 25 | MR. DOWNEY:  YEAH.  WELL, WE CAN, WE CAN ADMIT |

7886

| | | |
|---|---|---|
| 03:02PM | 1 | THE -- I CAN DISPLAY THE PAGES, I CAN PREPARE A SHORTENED |
| 03:02PM | 2 | VERSION OF THE EXHIBIT -- |
| 03:02PM | 3 | THE COURT:  OKAY. |
| 03:02PM | 4 | MR. DOWNEY:  -- THAT HAS ONLY THE PORTIONS I WANT. |
| 03:02PM | 5 | I'LL TRY TO DO THAT IN A WAY THAT DOESN'T LEAVE ANY |
| 03:02PM | 6 | CONFUSION IN THE JURY'S MIND THAT SOMETHING MATERIAL HAS BEEN |
| 03:03PM | 7 | OMITTED, AND I'LL SHARE THAT WITH MR. LEACH. |
| 03:03PM | 8 | THE COURT:  IS THAT ALL RIGHT WITH YOU, MR. LEACH? |
| 03:03PM | 9 | MR. LEACH:  THAT'S FINE, YOUR HONOR. |
| 03:03PM | 10 | BUT I HAVE A HEARSAY OBJECTION.  IF IT'S COMING IN FOR THE |
| 03:03PM | 11 | PURPOSE THAT THEY FILED THIS, FINE. |
| 03:03PM | 12 | IF IT'S FOR SOME OTHER PURPOSE, WE WOULD OBJECT. |
| 03:03PM | 13 | THE COURT:  SO IS THIS COMING IN FOR THE FACT THAT |
| 03:03PM | 14 | THIS DOCUMENT WAS FILED AND PROOF OF THAT AND EVIDENCE OF THAT? |
| 03:03PM | 15 | MR. DOWNEY:  IT'S COMING IN FOR EVIDENCE OF THE |
| 03:03PM | 16 | FILING AND THE EFFECT THAT THAT HAD ON THIS DEFENDANT'S INTENT. |
| 03:03PM | 17 | THE COURT:  I SEE.  ALL RIGHT. |
| 03:03PM | 18 | SO THIS IS NOT FOR THE TRUTH -- |
| 03:03PM | 19 | MR. DOWNEY:  EVIDENCE OF HER INTENT. |
| 03:03PM | 20 | THE COURT:  IT GOES TO EVIDENCE OF HER INTENT. |
| 03:03PM | 21 | MR. DOWNEY:  YES. |
| 03:03PM | 22 | THE COURT:  NOT SO MUCH FOR THE TRUTH OF THE MATTER |
| 03:03PM | 23 | ASSERTED. |
| 03:03PM | 24 | MR. DOWNEY:  NO.  THAT'S RIGHT. |
| 03:03PM | 25 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, YOU'VE |

7887

03:03PM 1    HEARD ME SAY THIS BEFORE WITH CERTAIN EVIDENCE, BUT THESE

03:03PM 2    DOCUMENTS OR THESE PAGES ARE GOING TO BE ADMITTED.  THEY ARE

03:03PM 3    ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

03:03PM 4    DOCUMENTS, BUT RATHER FOR THE EFFECT OF THE STATE OF MIND AS TO

03:03PM 5    THE INTENT OF MS. HOLMES.

03:03PM 6         AND WITH THAT QUALIFICATION, THEY ARE ADMITTED AND THEY

03:03PM 7    MAY BE PUBLISHED.

03:03PM 8              MR. DOWNEY:  YOUR HONOR, IF I MAY JUST RETRIEVE IT

03:04PM 9    AND APPROACH THE WITNESS?

03:04PM 10             THE COURT:  SURE.

03:04PM 11        DO YOU HAVE THIS, MR. LEACH?

03:04PM 12             MR. LEACH:  I'VE HAD AN OPPORTUNITY TO REVIEW A COPY

03:04PM 13   OVER THE BREAK.  CURRENTLY I DON'T HAVE ONE.

03:04PM 14             MR. DOWNEY:  LET ME JUST ASK BEFORE YOU DISPLAY

03:04PM 15   ANYTHING.

03:04PM 16   Q.   IS THIS THE HSV, THE SUBMISSION OF THERANOS?

03:04PM 17   A.   IT IS.

03:04PM 18             MR. DOWNEY:  ALL RIGHT.  YOUR HONOR, I FORMALLY,

03:04PM 19   SUBJECT TO OUR PRIOR DISCUSSION, MOVE TO ADMIT 13288.

03:04PM 20             THE COURT:  IT'S ADMITTED, AND IT CAN BE PUBLISHED,

03:04PM 21   THOSE PAGES.  THANK YOU.

03:04PM 22        (DEFENDANT'S EXHIBIT 13288 WAS RECEIVED IN EVIDENCE.)

03:05PM 23             MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:05PM 24   Q.   I'LL ASK YOU TO DESCRIBE A BIT ABOUT THIS DOCUMENT SO THAT

03:05PM 25   MAYBE WE CAN MINIMIZE WHAT IS NECESSARY TO GO TO THE JURY.

7888

| | | |
|---|---|---|
| 03:05PM | 1 | IS THIS A SUBMISSION THAT THE COMPANY MADE IN NOVEMBER OF |
| 03:05PM | 2 | 2014 RELATED TO ITS SERIES 4.0 ANALYZER, ITS SOFTWARE ASPECTS |
| 03:05PM | 3 | OF ITS TECHNOLOGY, AND THE ASSAY FOR HERPES SIMPLEX VIRUS-1? |
| 03:05PM | 4 | A.   YES.   THIS IS THE FDA SUBMISSION FOR THE NANOTAINER, THE |
| 03:05PM | 5 | CARTRIDGE, THE ANALYZER, THE SOFTWARE, AND THE HSV-1 ASSAY. |
| 03:05PM | 6 | Q.   AND WITHIN THIS DOCUMENT, IF YOU WOULD JUST TAKE A MOMENT |
| 03:05PM | 7 | TO LOOK AT IT, IS THERE A -- DOES IT HAVE THE FOLLOWING |
| 03:06PM | 8 | COMPONENTS?   IS THERE A DESCRIPTION WITHIN IT OF THE TECHNOLOGY |
| 03:06PM | 9 | THAT GOES INTO DETAIL ABOUT HOW THE TECHNOLOGY WORKS? |
| 03:06PM | 10 | A.   THERE IS. |
| 03:06PM | 11 | Q.   AND IS THIS -- WAS THERE DATA PROVIDED TO THE FDA IN |
| 03:06PM | 12 | CONNECTION WITH THIS SUBMISSION ABOUT THE PERFORMANCE OF THE |
| 03:06PM | 13 | SYSTEM IN CONNECTION WITH THE HSV-1 ASSAY? |
| 03:06PM | 14 | A.   YES. |
| 03:06PM | 15 | Q.   AND HOW MANY INDIVIDUALS AT THERANOS WORKED ON COMPILING |
| 03:06PM | 16 | THE MATERIAL THAT WENT INTO FILING EXHIBIT 13288? |
| 03:06PM | 17 | A.   IT WAS A HUGE EFFORT.   DOZENS OF SCIENTISTS AND ENGINEERS |
| 03:06PM | 18 | AT LEAST, AS WELL AS PEOPLE THROUGHOUT THE COMPANY FROM ALMOST |
| 03:06PM | 19 | EVERY GROUP. |
| 03:06PM | 20 | Q.   AND WITH REGARD TO THE PRESENTATION OF DATA THAT IS SET |
| 03:06PM | 21 | FORTH ABOUT THE PERFORMANCE OF THE 4 SERIES DEVICE, WAS THAT |
| 03:06PM | 22 | CERTIFIED AS TRUTHFUL AND ACCURATE BY SCIENTISTS AT THERANOS? |
| 03:07PM | 23 | A.   IT WAS. |
| 03:07PM | 24 | Q.   LET ME ASK YOU TO LOOK AT PAGE 34.   1713. |
| 03:07PM | 25 | AND IS IT DR. YOUNG WHO PROVIDES THAT CERTIFICATION? |

7889

03:07PM    1    A.   IT IS.

03:07PM    2    Q.   OKAY.  I WANT TO DIRECT YOUR ATTENTION TO JUST A FEW PARTS

03:07PM    3    OF THIS TO HELP US UNDERSTAND WHAT WAS BEING PROVIDED TO THE

03:07PM    4    FDA IN CONNECTION WITH THIS SUBMISSION.

03:07PM    5         IF YOU LOOK FIRST AT PAGE 49, THERE'S A SECTION LABELLED

03:07PM    6    10.02.  AND WE'LL PUT IT UP ON THE SCREEN.

03:07PM    7         AND DO YOU SEE THAT THIS SECTION IS LABELLED "THE THERANOS

03:07PM    8    SYSTEM"?

03:07PM    9    A.   I DO.

03:07PM   10    Q.   AND THEN THERE'S A CHART, OR I SHOULD SAY A DRAWING

03:08PM   11    UNDERNEATH THAT IS LABELLED FIGURE 10-1.

03:08PM   12    A.   YES.

03:08PM   13    Q.   CAN YOU EXPLAIN WHAT THIS SECTION 10.02 AND THE

03:08PM   14    ACCOMPANYING FIGURE CONVEY?

03:08PM   15    A.   YES.  THIS SECTION GOES THROUGH THE DESIGN OR THE

03:08PM   16    ARCHITECTURE OF THE DESIGN AND ALL OF ITS COMPONENTS.  THE

03:08PM   17    DIAGRAM IS SHOWING HOW IT WORKS.

03:08PM   18         SO AT THE TOP, COLLECTING A SAMPLE FROM A SUBJECT; THAT

03:08PM   19    SAMPLE IS PUT INTO A LITTLE NANOTAINER; ONCE THAT IS DONE, THE

03:08PM   20    NANOTAINER IS INSERTED INTO THE CARTRIDGE, WHICH IS INSERTED

03:08PM   21    INTO THE TSPU.

03:08PM   22         AND HERE THIS DIAGRAM IS SHOWING THE BREAKDOWN OF STEPS IN

03:08PM   23    THE TSPU, SO WHAT HAPPENS ON THE ACTUAL DEVICE, AND WHAT

03:09PM   24    HAPPENS THEN IN THE SOFTWARE, THE TLAS, OR THE LAB AUTOMATION

03:09PM   25    SYSTEM, AND IT'S SHOWING THAT THE SAMPLE PREPARATION, THE

7890

| | | |
|---|---|---|
| 03:09PM | 1 | ADDITION OF CHEMICALS IS HAPPENED ON THE TSPU, BUT THEN ALL OF |
| 03:09PM | 2 | THE ANALYSIS AND THE OVERSIGHT OF THE MACHINE IS BEING DONE |
| 03:09PM | 3 | ELECTRONICALLY OR WIRELESSLY THROUGH SOFTWARE THAT SITS IN THE |
| 03:09PM | 4 | CLOUD. |
| 03:09PM | 5 | Q.   OKAY.  SO THIS IS BASICALLY A DESCRIPTION OF THE HARDWARE |
| 03:09PM | 6 | AND THE SOFTWARE SYSTEM AND HOW THEY WORK TOGETHER? |
| 03:09PM | 7 | A.   IT IS. |
| 03:09PM | 8 | Q.   LET ME -- YOU CAN PUT THAT ASIDE AND LOOK INSTEAD AT |
| 03:09PM | 9 | PAGE 52, WHICH IS LABELLED 10.03. |
| 03:09PM | 10 | DO YOU SEE THERE'S A PHOTOGRAPH HERE OF FIGURE 10-2? |
| 03:09PM | 11 | A.   I DO. |
| 03:09PM | 12 | Q.   AND THEN THERE'S A LIST OF ITEMS FROM 1 TO 10 BELOW THAT. |
| 03:10PM | 13 | WHAT IS THIS CONVEYING IN CONNECTION WITH APPLICATION TO |
| 03:10PM | 14 | THE FDA FOR APPROVAL OF THE 4 SERIES SYSTEM ON HSV-1? |
| 03:10PM | 15 | A.   THIS IS AN OVERVIEW OF THE TSPU ITSELF, AND THE |
| 03:10PM | 16 | TECHNOLOGIES THAT ARE CONTAINED IN IT, LISTING FROM 1 THROUGH |
| 03:10PM | 17 | 10 HERE, SOME OF THOSE TECHNOLOGIES THAT WE HAVE LOOKED AT |
| 03:10PM | 18 | BEFORE, THE ROBOT OR THE LIQUID HANDLING MODULE; THE LITTLE |
| 03:10PM | 19 | MINIATURE CENTRIFUGE AND SONICATOR FOR PROCESSING SAMPLES; THE |
| 03:10PM | 20 | MAGNET TOOL FOR PROCESSING SAMPLES; AND THEN THESE VARIOUS |
| 03:10PM | 21 | DETECTORS FOR BEING ABLE TO RUN THE DIFFERENT SMALL SAMPLE |
| 03:10PM | 22 | METHODS ON THE DEVICE, AS WELL AS THE THERMAL CONTROL SYSTEM |
| 03:10PM | 23 | FOR HEATING AND COOLING TO BE ABLE TO REACH THE TEMPERATURES |
| 03:10PM | 24 | THAT WOULD BE NEEDED FOR THIS SMALL SAMPLE CHEMISTRY TO RUN. |
| 03:10PM | 25 | Q.   AND WERE THOSE COMPONENTS AMONG THE COMPONENTS IDENTIFIED |

7891

03:10PM  1    IN THE DRAWINGS AND PHOTOGRAPHS FROM 2010 THAT WE LOOKED AT

03:11PM  2    LAST WEEK?

03:11PM  3    A.   THEY ARE.

03:11PM  4    Q.   LET'S LOOK AT PAGE 54.  I JUST WANT TO LOOK AT A FEW OF

03:11PM  5    THOSE COMPONENTS.

03:11PM  6        THIS IS WHAT YOU REFERRED TO A MOMENT AGO AS THE LIQUID

03:11PM  7    HANDLING THE MODULE; IS THAT RIGHT?

03:11PM  8    A.   IT IS.

03:11PM  9    Q.   AND WHAT DOES THAT DO IN CONNECTION WITH THE TEST?

03:11PM  10   A.   THIS IS THE ROBOT THAT IS CAPABLE OF PICKING UP THE LITTLE

03:11PM  11   COMPONENTS FROM THE CARTRIDGE FOR HANDLING SMALL VOLUMES OF

03:11PM  12   FLUID.

03:11PM  13       THERE'S LITTLE TIPS THAT ATTACH TO IT THAT ALLOW YOU TO

03:11PM  14   SUCK UP VERY SMALL AMOUNTS OF LIQUID, DISPENSE THEM, MIX THEM

03:11PM  15   WITH OTHER LITTLE VOLUMES OF FLUID, AND THEN TRANSPORT THEM TO

03:11PM  16   VARIOUS PLACES IN THE DEVICE TO BE HEATED OR PROCESSED OR READ

03:11PM  17   ON ONE OF THE DETECTERS.

03:11PM  18   Q.   AND WAS THERE ALSO A CAMERA WITHIN THIS DEVICE?

03:12PM  19   A.   THERE IS.  YES, THERE WAS.

03:12PM  20   Q.   LET ME ASK TO YOU LOOK AT PAGE 63, COMPONENT NUMBER 11.

03:12PM  21       AND THERE'S A DESCRIPTION THERE, THE MACHINE VISION

03:12PM  22   SYSTEM?

03:12PM  23   A.   YES.

03:12PM  24   Q.   AND THE FIRST SENTENCE READS, "THE TSPU IS CONFIGURED TO

03:12PM  25   INCLUDE SENSORS WITHIN THE ENCLOSURE FOR THE TLAS TO MONITOR

7892

03:12PM  1    DEVICE STATUS AND OPERATION."

03:12PM  2         THE TLAS IS A REFERENCE TO THE SOFTWARE SYSTEM?

03:12PM  3    A.   IT IS.

03:12PM  4    Q.   AND IS THIS OTHERWISE A DESCRIPTION OF CAMERAS WITHIN THE

03:12PM  5    DEVICE?

03:12PM  6    A.   IT IS.  IT'S A DESCRIPTION OF THE CAMERAS, THE THINGS THAT

03:12PM  7    THEY CAN MONITOR AND THEN COMMUNICATE TO THE TLAS TO ENSURE

03:12PM  8    THAT THE SAMPLE IS GOOD AND THAT THE DEVICE IS PERFORMING WELL.

03:12PM  9    Q.   OKAY.  NOW, IN CONNECTION WITH RUNNING AN ASSAY ON THIS

03:13PM  10   DEVICE, ARE THERE PROTOCOLS THAT WERE SUBMITTED TO THE FDA AS

03:13PM  11   PART OF THE REQUEST FOR APPROVAL?

03:13PM  12   A.   THERE WERE.

03:13PM  13   Q.   LET ME ASK YOU TO LOOK AT PAGE 70.  IT'S BATES LABELLED

03:13PM  14   1749.

03:13PM  15        THIS IS LABELLED AS THE "PROTOCOL FOR HSV-1 ASSAY (CENTRAL

03:13PM  16   CLIA-LABORATORY MODEL)."

03:13PM  17        DO YOU SEE THAT?

03:13PM  18   A.   I DO.

03:13PM  19   Q.   AND CAN YOU DESCRIBE WHAT THIS SECTION IS DESCRIBING?

03:13PM  20   A.   YES.  THERE WERE MULTIPLE MODELS THAT WE SUBMITTED TO THE

03:13PM  21   FDA REFLECTIVE OF OUR PHASE I AND OUR PHASE II.

03:13PM  22        SO THIS IS THE PHASE I OF OUR MODEL WHERE THE SAMPLE IS

03:13PM  23   PHYSICALLY SHIPPED TO A CLIA LAB AND THEN THESE ARE THE STEPS

03:13PM  24   ASSOCIATED WITH RUNNING THAT SAMPLE ON THIS DEVICE IN A CLIA

03:14PM  25   LABORATORY.

7893

| | | |
|---|---|---|
| 03:14PM | 1 | Q.   AND THEN IF YOU LOOK AT PAGE BATES LABELLED 1752, 10.07.3. |
| 03:14PM | 2 | CAN YOU DESCRIBE WHAT THIS IS? |
| 03:14PM | 3 | A.   YES.   THIS IS OUR PHASE II OR FIELD MODEL WHERE WE WERE |
| 03:14PM | 4 | DESCRIBING WHAT THE STEPS ARE ASSOCIATED WITH A SAMPLE BEING |
| 03:14PM | 5 | INSERTED INTO THE CARTRIDGE AND THEN PUT INTO THE DEVICE WHEN |
| 03:14PM | 6 | THE DEVICE IS IN THE FIELD. |
| 03:14PM | 7 | Q.   WERE BOTH PROTOCOLS APPROVED AS PART OF THIS APPLICATION? |
| 03:14PM | 8 | A.   THEY WERE. |
| 03:14PM | 9 | Q.   OKAY.   LET'S GO BACK TO 2016. |
| 03:14PM | 10 | WHEN WAS THIS APPROVAL GRANTED? |
| 03:14PM | 11 | A.   THIS APPROVAL WAS GRANTED IN 2015. |
| 03:14PM | 12 | Q.   OKAY.   AND DID YOU VIEW THAT AS RELATING TO POSSIBLE |
| 03:14PM | 13 | IMPLEMENTATION OF PHASE II? |
| 03:15PM | 14 | A.   YES. |
| 03:15PM | 15 | Q.   HOW LONG AFTER THAT APPROVAL DID THE CMS INSPECTION THAT |
| 03:15PM | 16 | WE'VE DISCUSSED BEGIN? |
| 03:15PM | 17 | A.   I THINK JUST OVER A MONTH. |
| 03:15PM | 18 | Q.   OKAY.   NOW, IF WE RETURN TO 2016, WE WERE TALKING ABOUT |
| 03:15PM | 19 | THE COMPANY'S CHANGE IN BUSINESS STRATEGY. |
| 03:15PM | 20 | DO YOU ALSO RECALL THAT THERE WAS TESTIMONY DURING THE |
| 03:15PM | 21 | COURSE OF THE CASE FROM VARIOUS INDIVIDUALS SAYING THAT THEY |
| 03:15PM | 22 | THOUGHT IT WOULD BE A GOOD IDEA FOR THERANOS TO HAVE ITS |
| 03:15PM | 23 | TECHNOLOGY REVIEWED BY ACADEMIC INSTITUTIONS OR PEER REVIEWED |
| 03:15PM | 24 | OR LOOKED AT BY SOME OTHER THIRD PARTY? |
| 03:15PM | 25 | DO YOU RECALL THAT? |

7894

```
03:15PM  1     A.   I DO.

03:15PM  2     Q.   AND OVER THE COURSE OF TIME, HAD THERANOS'S TECHNOLOGY

03:15PM  3     BEEN LOOKED AT BY THIRD PARTIES?

03:15PM  4     A.   YES.

03:15PM  5     Q.   HOW MANY THIRD PARTIES HAD LOOKED AT THERANOS'S TECHNOLOGY

03:15PM  6     DURING THE YEARS BETWEEN 2006 AND 2016?

03:16PM  7     A.   DOZENS.

03:16PM  8     Q.   BUT DID YOU TRY TO TAKE STEPS TO RESPOND TO ADVICE ABOUT

03:16PM  9     MAKING THERANOS MORE TRANSPARENT WITH RESPECT TO ITS

03:16PM 10     TECHNOLOGY?

03:16PM 11     A.   I DID.

03:16PM 12     Q.   AND DO YOU RECALL THAT THERE WAS TESTIMONY ABOUT AN

03:16PM 13     APPEARANCE THAT YOU MADE AT A CONFERENCE CALLED THE AACC

03:16PM 14     CONFERENCE?

03:16PM 15          DO YOU REMEMBER THAT?

03:16PM 16     A.   I DO.

03:16PM 17     Q.   AND WHAT IS THE AACC CONFERENCE?

03:16PM 18     A.   IT'S THE BIG ANNUAL CONFERENCE FOR THE AMERICAN

03:16PM 19     ASSOCIATION OF CLINICAL CHEMISTRY.

03:16PM 20     Q.   AND WERE YOU INVITED TO GIVE A PRESENTATION ABOUT

03:16PM 21     THERANOS'S TECHNOLOGY AT THAT CONFERENCE?

03:16PM 22     A.   I WAS.

03:16PM 23     Q.   AND WHEN DID THAT CONFERENCE TAKE PLACE?

03:16PM 24     A.   IN 2016.

03:16PM 25     Q.   AND WHY DID YOU CHOOSE THAT FORUM AS A FORUM WITHIN WHICH
```

7895

| | | |
|---|---|---|
| 03:16PM | 1 | TO DISCUSS THERANOS'S TECHNOLOGY IN THE MONTHS AFTER THERE WAS |
| 03:17PM | 2 | MEDIA AND REGULATORY CRITICISM? |
| 03:17PM | 3 | A.   BECAUSE THERE HAD BEEN A LOT OF HOSTILE COMMENTARY ABOUT |
| 03:17PM | 4 | THERANOS FROM THE LABORATORY INDUSTRY AND THIS WAS THE |
| 03:17PM | 5 | LABORATORY INDUSTRY'S MAIN CONFERENCE, SO WE WANTED TO GO THERE |
| 03:17PM | 6 | AND PRESENT OUR DATA DIRECTLY. |
| 03:17PM | 7 | Q.   AND DID YOU, IN FACT, DO THAT? |
| 03:17PM | 8 | A.   I DID. |
| 03:17PM | 9 | Q.   AND DID OTHER THERANOS EMPLOYEES PARTICIPATE WITH YOU IN |
| 03:17PM | 10 | GIVING THAT PRESENTATION? |
| 03:17PM | 11 | A.   YES. |
| 03:17PM | 12 | Q.   DO YOU REMEMBER ALL OF THE THERANOS EMPLOYEES WHO WERE |
| 03:17PM | 13 | PART OF THAT PRESENTATION? |
| 03:17PM | 14 | A.   IT WAS A VERY BIG TEAM WITHIN THERANOS THAT WORKED FOR |
| 03:17PM | 15 | MONTHS ON THE STUDIES FOR THAT PRESENTATION AND THE ASSOCIATED |
| 03:17PM | 16 | DATA. |
| 03:17PM | 17 | Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 10677. |
| 03:18PM | 18 | A.   OKAY.  I SEE IT.  OKAY. |
| 03:18PM | 19 | Q.   IS 10677 A PHOTOGRAPH OF YOU AND OTHERS FROM THERANOS AT |
| 03:18PM | 20 | THE AACC CONFERENCE IN 2016? |
| 03:18PM | 21 | A.   IT IS. |
| 03:18PM | 22 | MR. DOWNEY:  MOVE TO ADMIT 10677. |
| 03:18PM | 23 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 03:18PM | 24 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 03:18PM | 25 | (DEFENDANT'S EXHIBIT 10677 WAS RECEIVED IN EVIDENCE.) |

7896

03:18PM 1    BY MR. DOWNEY:

03:18PM 2    Q.   AND IF YOU WOULD JUST LOOK.  SOME OF THESE INDIVIDUALS ARE

03:18PM 3    INDIVIDUALS WHO WORK AT THERANOS?

03:18PM 4    A.   YES.

03:18PM 5    Q.   OR WHO WORKED AT THERANOS AT THAT TIME.

03:18PM 6         CAN YOU JUST IDENTIFY WHO THAT IS?

03:18PM 7    A.   I'M SITTING IN THE MIDDLE, AND TO MY LEFT IS DR. YOUNG,

03:18PM 8    AND THEN DR. ANEKAL, AND DR. PANGARKAR.

03:18PM 9    Q.   AND CAN YOU REMIND US WHAT DR. ANEKAL'S WORK WAS AT

03:19PM 10   THERANOS?

03:19PM 11   A.   YES.  DR. ANEKAL RAN SYSTEMS INTEGRATION AND VALIDATION

03:19PM 12   AND VERIFICATION FOR THERANOS.

03:19PM 13   Q.   AND AS OF THIS TIME, WHAT WAS DR. PANGARKAR'S ROLE AT

03:19PM 14   THERANOS?

03:19PM 15   A.   DR. PANGARKAR RAN BOTH OUR IMMUNOASSAY TEAM, AS WELL AS

03:19PM 16   OUR CYTOMETRY TEAM.

03:19PM 17   Q.   AND DID DR. YOUNG REMAIN THE HEAD OF RESEARCH AND

03:19PM 18   DEVELOPMENT AT THIS TIME?

03:19PM 19   A.   YES.

03:19PM 20   Q.   AND WAS THERE INTERACTION BETWEEN THE THERANOS EMPLOYEES

03:19PM 21   AND CRITICS OF THERANOS IN THIS FORUM?

03:19PM 22   A.   YES.

03:19PM 23   Q.   AND DID THERANOS ALSO OPEN UP ITS TECHNOLOGY AND PRESENT,

03:19PM 24   BY MEANS OF A PRESENTATION, WHAT WAS INSIDE SO THAT IT COULD BE

03:19PM 25   SEEN BY THIRD PARTIES?

7897

03:19PM    1    A.   WE DID.

03:19PM    2              MR. DOWNEY:  YOUR HONOR, I'M GOING TO SHOW

03:19PM    3    MS. HOLMES A SINGLE SLIDE FROM A LARGER POWERPOINT.  I ONLY

03:20PM    4    WANT TO ADMIT THE SINGLE SLIDE, WHICH IS 7673A, BUT IT IS PART

03:20PM    5    OF A LARGER PRESENTATION.

03:20PM    6         FOR COMPLETENESS, I'VE INCLUDED IN YOUR BINDER THE FULL

03:20PM    7    PRESENTATION, BUT I'M ONLY INTERESTED IN PAGE 52.

03:20PM    8              THE COURT:  IT'S 7673 DID YOU SAY?

03:20PM    9              MR. DOWNEY:  7673A IT'S DESIGNATED.

03:20PM   10              THE WITNESS:  WHAT BINDER IS THAT?

03:20PM   11              MR. DOWNEY:  IT SHOULD BE IN THE THINNER BINDER, THE

03:20PM   12    BINDER THAT IS LABELLED AS VOLUME 4.

03:20PM   13              THE WITNESS:  OKAY.  GOT IT.

03:20PM   14              THE COURT:  MR. LEACH?

03:20PM   15              MR. LEACH:  I'M SORRY, WHICH PAGE?

03:20PM   16              MR. DOWNEY:  IT'S PAGE 52 OF THE POWERPOINT.

03:20PM   17              MR. LEACH:  NO OBJECTION.

03:21PM   18              THE COURT:  PAGE 52 OF 7673A IS ADMITTED.

03:21PM   19         (DEFENDANT'S EXHIBIT 7673A, PAGE 52 WAS RECEIVED IN

03:21PM   20    EVIDENCE.)

03:21PM   21    BY MR. DOWNEY:

03:21PM   22    Q.   AND CAN YOU TELL US WHAT THIS DIAGRAM DEPICTS?

03:21PM   23    A.   YES.  THIS IS THE 4 SERIES MINILAB AND ALL OF THE

03:21PM   24    COMPONENTS IN IT BLOWN UP SO THAT YOU CAN SEE EACH OF THE

03:21PM   25    INDIVIDUAL COMPONENTS.

03:21PM  1    Q.   OKAY.  AND IN ADDITION TO THE AACC CONFERENCE, WAS

03:21PM  2    THERANOS ALSO WORKING TO HAVE ITS TECHNOLOGY EVALUATED IN OTHER

03:21PM  3    FORUMS IN RESPONSE TO THE CRITICISMS THAT HAD BEEN RAISED?

03:21PM  4    A.   WE WERE.

03:21PM  5    Q.   AND DID THERANOS APPOINT A TECHNOLOGY ADVISORY BOARD?

03:21PM  6    A.   YES.

03:21PM  7    Q.   AND WHAT WAS THE TECHNOLOGY ADVISORY BOARD?

03:22PM  8    A.   THEY WERE MEMBERS OF THE NATIONAL ACADEMY OF ENGINEERING

03:22PM  9    AND OTHER ENGINEERING LEADERS WHO CAME TOGETHER TO HELP OVERSEE

03:22PM  10   OUR PRODUCT DEVELOPMENT EFFORTS AND THE PUBLICATION OF DATA ON

03:22PM  11   THE TECHNOLOGY.

03:22PM  12   Q.   DID DR. ROBERTSON PLAY A ROLE WITH REGARD TO THE

03:22PM  13   TECHNOLOGY ADVISORY BOARD?

03:22PM  14   A.   HE DID.

03:22PM  15   Q.   AND WHAT ROLE DID HE PLAY?

03:22PM  16   A.   HE WAS ONE OF THE CO-CHAIRS.

03:22PM  17   Q.   AND DO YOU KNOW WHAT INFORMATION WAS PRESENTED TO THE

03:22PM  18   MEMBERS OF THAT TECHNOLOGY ADVISORY BOARD?

03:22PM  19   A.   I DO.

03:22PM  20   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7680?

03:23PM  21   A.   OKAY.

03:23PM  22   Q.   IS THIS AN EMAIL FROM DR. ROBERTSON THAT YOU AND OTHERS

03:23PM  23   RECEIVED IN 2016 ABOUT THE TECHNOLOGY ADVISORY BOARD?

03:23PM  24   A.   IT IS.

03:23PM  25            MR. DOWNEY:  I MOVE THE ADMISSION OF 7680.

7899

| | | |
|---|---|---|
| 03:23PM | 1 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 03:23PM | 2 | THE COURT:  IT'S ADMITTED. |
| 03:23PM | 3 | (DEFENDANT'S EXHIBIT 7680 WAS RECEIVED IN EVIDENCE.) |
| 03:23PM | 4 | BY MR. DOWNEY: |
| 03:23PM | 5 | Q.   DO YOU SEE IN THE FIRST SENTENCE THAT MR. ROBERTSON WAS |
| 03:23PM | 6 | IDENTIFYING PEOPLE THAT HE THOUGHT WOULD BE APPROPRIATE FOR THE |
| 03:23PM | 7 | TECHNOLOGY ADVISORY BOARD? |
| 03:23PM | 8 | A.   I DO. |
| 03:23PM | 9 | Q.   AND THEN IF YOU GO TO THE PARAGRAPH BELOW THAT, HE |
| 03:23PM | 10 | DESCRIBES WHAT SHOULD BE PROVIDED TO THOSE INDIVIDUALS. |
| 03:23PM | 11 | DO YOU SEE THAT? |
| 03:23PM | 12 | A.   YES. |
| 03:23PM | 13 | Q.   AND DO YOU SEE IN THE -- THERE'S A LIST OF FOUR ITEMS |
| 03:24PM | 14 | THERE? |
| 03:24PM | 15 | A.   YES. |
| 03:24PM | 16 | Q.   AND DO YOU SEE THAT THE SECOND ITEM WAS "DETAILED |
| 03:24PM | 17 | TECHNICAL PRESENTATIONS"? |
| 03:24PM | 18 | A.   YES. |
| 03:24PM | 19 | Q.   DO YOU SEE THAT? |
| 03:24PM | 20 | AND THAT'S ALSO -- HE'S SUGGESTING THAT FROM DR. ANEKAL, |
| 03:24PM | 21 | DR. YOUNG, AND DR. PANGARKAR? |
| 03:24PM | 22 | A.   YES. |
| 03:24PM | 23 | Q.   AND THEN HE SUGGESTS THAT THE RESEARCH AND DEVELOPMENT |
| 03:24PM | 24 | LABS IN THE CLIA LAB BE TOURED BY THOSE INDIVIDUALS? |
| 03:24PM | 25 | A.   YES. |

03:24PM  1     Q.   AND WAS A GROUP LIKE THIS FORMED AND CONTINUED TO PROVIDE

03:24PM  2     ADVICE TO THERANOS IN CONNECTION WITH ITS TECHNOLOGY?

03:24PM  3     A.   IT WAS.

03:24PM  4     Q.   NOW, DO YOU RECALL THAT AT THE END OF MR. EDLIN'S

03:24PM  5     TESTIMONY, HE TESTIFIED THAT HE HAD LEFT THERANOS BECAUSE HE

03:24PM  6     FELT THAT THERANOS WAS NOT GOING TO BE ABLE TO MAKE SHOWINGS TO

03:25PM  7     ANY THIRD PARTIES THAT SUBSTANTIATED ITS CLAIMS ABOUT ITS

03:25PM  8     TECHNOLOGY?

03:25PM  9     A.   I DO.

03:25PM  10    Q.   I'D LIKE TO ASK YOU, DURING THE PERIOD DURING WHICH

03:25PM  11    THERANOS WAS RESPONDING TO CRITICISM FROM THE MEDIA AND

03:25PM  12    CRITICISM FROM REGULATORS, DID THERANOS SUBMIT PAPERS TO PEER

03:25PM  13    REVIEWED PUBLICATIONS TO REVIEW ITS TECHNOLOGY AND THE

03:25PM  14    FUNCTIONALITY AND EFFECTIVENESS OF ITS TECHNOLOGY?

03:25PM  15    A.   WE DID.

03:25PM  16    Q.   AND WERE SOME OF THOSE PAPERS THE RESULT OF COLLABORATIONS

03:25PM  17    BETWEEN THERANOS AND SOME OUTSIDE THIRD PARTY?

03:25PM  18    A.   YES.

03:25PM  19    Q.   AND IN SOME CASES WERE THEY ACADEMIC INSTITUTIONS?

03:25PM  20    A.   YES.

03:25PM  21    Q.   AND IN SOME CASES WERE THEY INDUSTRY PERSONNEL?

03:25PM  22    A.   YES.

03:25PM  23    Q.   AND WERE THERE OTHER MANUSCRIPTS RELATED TO THERANOS'S

03:25PM  24    TECHNOLOGY THAT WERE SUBMITTED FOR PUBLICATION TO VARIOUS

03:26PM  25    PROFESSIONAL JOURNALS?

03:26PM  1    A.   YES.

03:26PM  2    Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7719.

03:26PM  3    A.   OKAY.

03:26PM  4    Q.   CAN YOU TELL US WHAT 7719 IS?

03:26PM  5    A.   YES.  THIS IS A PEER REVIEWED PAPER ON THE MINILAB THAT

03:26PM  6    WAS WRITTEN FOLLOWING A NUMBER OF STUDIES SHOWING THE MINILAB'S

03:26PM  7    CAPABILITY TO PERFORM EACH OF THE DIFFERENT FOUR METHODS THAT

03:26PM  8    WE'VE TALKED ABOUT.

03:26PM  9    Q.   AND WHERE WAS THIS STUDY PUBLISHED?

03:26PM  10   A.   IT WAS PUBLISHED IN A JOURNAL CALLED "ALCHEMY."  IT'S A

03:26PM  11   BIO ENGINEERING AND MEDICINE TRANSITION JOURNAL.

03:26PM  12   Q.   AND DO YOU KNOW WHAT THIS STUDY CONCLUDED WITH REGARD TO

03:26PM  13   THERANOS TECHNOLOGY?

03:27PM  14        MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.  401

03:27PM  15   AND 403 BASED ON THE DATES AT THE TOP.

03:27PM  16        AND IF WE'RE GOING TO HAVE TESTIMONY ABOUT THIS, WE SHOULD

03:27PM  17   ADMIT THE DOCUMENT.

03:27PM  18        MR. DOWNEY:  WELL, I'LL MOVE TO ADMIT THE DOCUMENT.

03:27PM  19        THE COURT:  I'M SORRY?

03:27PM  20        MR. DOWNEY:  I'LL MOVE TO ADMIT THE DOCUMENT.

03:27PM  21        MR. LEACH:  401, 403, RELEVANCE.

03:27PM  22        THE COURT:  AS TO THE ADMISSION OF THE DOCUMENT?

03:27PM  23        MR. LEACH:  YES, FOR THE SUBSTANCE OF IT.

03:27PM  24        THE COURT:  IS THIS GOING TO THE ISSUE OF WHETHER OR

03:27PM  25   NOT PEER REVIEWED PAPERS WERE ADMITTED AND THAT ISSUE ONLY, AS

7902

03:27PM  1    OPPOSED TO THE CONTENT?  YOU ASKED THIS WITNESS, I THINK THE

03:27PM  2    LAST QUESTION WAS, WELL, WHAT WAS THE OPINION OF THE PAPER?

03:27PM  3            MR. DOWNEY:  WELL, I THINK THE TESTIMONY THAT THIS

03:27PM  4    PAPER WAS RESPONSIVE TO IS THAT THERANOS COULD NOT PARTICIPATE

03:27PM  5    IN A PEER REVIEWED STUDY THAT WOULD SHOW THE EFFECTIVENESS OF

03:27PM  6    ITS TECHNOLOGY.  I THINK I'M DESIGNED TO -- OR ALLOWED TO REBUT

03:27PM  7    THAT.

03:27PM  8            THE COURT:  WELL, I'LL PERMIT YOU TO ADMIT THIS FOR

03:28PM  9    PURPOSES OF FOLLOWING UP ON YOUR QUESTION OF WHETHER OR NOT

03:28PM 10    PEER REVIEW WAS PROVIDED, THE PAPER WAS SUBMITTED.  I THINK

03:28PM 11    THAT WAS YOUR QUESTION.

03:28PM 12            MR. DOWNEY:  WELL, I DID ASK IF IT WAS SUBMITTED.

03:28PM 13        AND I ALSO, IN FAIRNESS, YOUR HONOR, ASKED IF IT WAS

03:28PM 14    PUBLISHED, AND MS. HOLMES DID TESTIFY THAT IT WAS PUBLISHED.

03:28PM 15    SO I DID ELICIT, WITHOUT OBJECTION, THAT TESTIMONY.

03:28PM 16            THE COURT:  RIGHT.  RIGHT.  SO THAT CAN COME IN.

03:28PM 17        I'M GOING TO SUSTAIN THE OBJECTION AS TO THE OPINION.

03:28PM 18    IT'S NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED AT THAT

03:28PM 19    POINT, BUT TO PROVE THAT THERE WERE PEER REVIEWED DOCUMENTS

03:28PM 20    SUBMITTED.

03:28PM 21        SO IT'S ADMITTED FOR THAT LIMITED PURPOSE, LADIES AND

03:28PM 22    GENTLEMEN, NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE

03:28PM 23    PAPER.

03:28PM 24        (DEFENDANT'S EXHIBIT 7719 WAS RECEIVED IN EVIDENCE FOR A

03:28PM 25    LIMITED PURPOSE.)

| | | |
|---|---|---|
| 03:28PM | 1 | BY MR. DOWNEY: |
| 03:28PM | 2 | Q.   AND JUST IF WE TAKE A LOOK AT 7719 FOR A MOMENT. |
| 03:28PM | 3 | DO YOU SEE THIS IS THE PUBLICATION HEADED "ENGINEERING OF |
| 03:28PM | 4 | A MINIATURIZED, ROBOTIC CLINICAL LABORATORY"? |
| 03:28PM | 5 | A.   YES. |
| 03:28PM | 6 | Q.   AND DO YOU RECOGNIZE SOME OF THE NAMES OF SOME OF THE |
| 03:29PM | 7 | SCIENTISTS LISTED UNDERNEATH AS INDIVIDUALS WHO WORKED AT |
| 03:29PM | 8 | THERANOS? |
| 03:29PM | 9 | A.   THEY ARE. |
| 03:29PM | 10 | Q.   AND WERE THERE INDIVIDUALS WHO ALSO DID NOT WORK AT |
| 03:29PM | 11 | THERANOS WHO TOOK PART IN THE PUBLICATION OF THIS -- IN THE |
| 03:29PM | 12 | WORK THAT LED TO THIS SUBMISSION? |
| 03:29PM | 13 | A.   YES. |
| 03:29PM | 14 | Q.   AND WHERE WERE THE OTHER INDIVIDUALS FROM? |
| 03:29PM | 15 | A.   I BELIEVE THEY WERE COLLABORATORS WHO RAN THE STUDIES OR |
| 03:29PM | 16 | HELPED US WITH THE STUDIES THAT WERE IN THIS PROGRAM.  I WOULD |
| 03:29PM | 17 | NEED TO LOOK AT IT TO FIND THEM. |
| 03:29PM | 18 | Q.   WE'LL DO THE FOOTNOTES LATER ON.  IT'S NOT THAT IMPORTANT, |
| 03:29PM | 19 | MS. HOLMES.  I DON'T MEAN TO OPPRESS YOU, BUT IT'S WITHIN THE |
| 03:30PM | 20 | DOCUMENT, SO IF WE NEED THAT, WE CAN GET TO IT. |
| 03:30PM | 21 | LET ME ASK YOU NEXT TO LOOK AT EXHIBIT 7718. |
| 03:30PM | 22 | CAN YOU IDENTIFY -- THAT SHOULD ALSO BE IN THE SMALLER |
| 03:30PM | 23 | NOTEBOOK THAT I GAVE YOU -- |
| 03:30PM | 24 | A.   YEP. |
| 03:30PM | 25 | Q.   -- TODAY. |

03:30PM 1     A.   I HAVE IT.

03:30PM 2     Q.   AND IS THIS ALSO -- WELL, CAN YOU IDENTIFY 7718?

03:30PM 3     A.   YES.  IT'S A PEER REVIEWED PUBLICATION IN "THE JOURNAL OF

03:30PM 4     VIROLOGICAL METHODS" THAT WE PUBLISHED.

03:30PM 5               MR. DOWNEY:  SUBJECT TO YOUR HONOR'S PRIOR

03:30PM 6     RESTRICTION ON THE PRIOR EXHIBIT, I MOVE TO ADMIT 7718.

03:30PM 7               MR. LEACH:  SAME OBJECTIONS, YOUR HONOR.  HEARSAY,

03:31PM 8     401, 403.

03:31PM 9               THE COURT:  ALL RIGHT.  THANK YOU.

03:31PM 10         I'LL ALLOW IT TO BE ADMITTED.  IT GOES TO THE PREVIOUS

03:31PM 11    QUESTION THAT WAS ASKED REGARDING PEER REVIEWS.

03:31PM 12         IT'S NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED,

03:31PM 13    LADIES AND GENTLEMEN, AND IT IS OTHERWISE ADMISSIBLE UNDER A

03:31PM 14    403 ANALYSIS.  IT DOES PROVE UP THE POINT THAT THE QUESTION

03:31PM 15    ASKS, SO I'LL ALLOW IT, NOT FOR THE TRUTH OF THE MATTER

03:31PM 16    ASSERTED, BUT JUST AS TO THE ISSUE OF PEER REVIEWED DOCUMENTS

03:31PM 17    THAT WERE SUBMITTED.

03:31PM 18         (DEFENDANT'S EXHIBIT 7718 WAS RECEIVED IN EVIDENCE FOR A

03:31PM 19    LIMITED PURPOSE.)

03:31PM 20    BY MR. DOWNEY:

03:31PM 21    Q.   AND IF WE CAN JUST DISPLAY THE FIRST PAGE OF 7718.

03:31PM 22         CAN YOU EXPLAIN WHAT THIS PEER REVIEWED WORK WAS?

03:31PM 23    A.   YES.

03:31PM 24    Q.   AND WHAT WAS IT?

03:31PM 25    A.   THIS IS A PAPER ON SOME OF THE CHEMICALS THAT WE DEVELOPED

7905

03:31PM   1    FOR USE IN OUR SMALL SAMPLE TEST METHODS.  SO WE WOULD ACTUALLY

03:31PM   2    MAKE MANY OF THE CHEMICALS THAT WOULD GO INTO THE SMALL SAMPLE

03:32PM   3    TESTS THEMSELVES IN ORDER TO REALIZE BETTER TEST PERFORMANCE,

03:32PM   4    AND THIS IS A PAPER ON A TEST FOR HSV-2 SHOWING THE PERFORMANCE

03:32PM   5    OF THESE CHEMICALS OR REAGENTS NEXT TO COMMERCIALLY AVAILABLE

03:32PM   6    CHEMICALS.

03:32PM   7    Q.   OKAY.  LET ME ASK YOU TO LOOK NEXT IN THE SAME THIN

03:32PM   8    NOTEBOOK AT 7695.

03:32PM   9    A.   OKAY.

03:32PM  10    Q.   DO YOU RECOGNIZE EXHIBIT 7695?

03:32PM  11    A.   I DO.

03:32PM  12    Q.   AND WHAT IS 7695?

03:32PM  13    A.   IT'S A PEER REVIEWED PAPER IN A JOURNAL CALLED "CUREUS"

03:32PM  14    ABOUT SOME OF OUR ALGORITHMS AND INFORMATICS USED IN OUR

03:32PM  15    SYSTEMS.

03:33PM  16              MR. DOWNEY:  YOUR HONOR, I MOVE 7695.

03:33PM  17              MR. LEACH:  SAME OBJECTIONS, YOUR HONOR.

03:33PM  18              THE COURT:  THANK YOU.  I'LL OVERRULE THE OBJECTION.

03:33PM  19        THIS IS ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED,

03:33PM  20    LADIES AND GENTLEMEN, BUT AS EVIDENCE OF THE PREVIOUS QUESTION

03:33PM  21    WHETHER OR NOT PEER REVIEWED PAPERS WERE SUBMITTED, AND UNDER

03:33PM  22    403 THIS IS MORE PROBATIVE OF THAT ISSUE.

03:33PM  23        SO IT'S ADMITTED.

03:33PM  24        (DEFENDANT'S EXHIBIT 7695 WAS RECEIVED IN EVIDENCE FOR A

03:33PM  25    LIMITED PURPOSE.)

03:33PM 1    BY MR. DOWNEY:

03:33PM 2    Q.   IF WE CAN LOOK BRIEFLY AT THE FIRST PAGE OF THIS STUDY.

03:33PM 3    ARE THERE THERANOS SCIENTISTS LISTED IN THE AUTHOR LINE OF THIS

03:33PM 4    PAPER?

03:33PM 5    A.   YES.

03:33PM 6    Q.   AND WHAT JOURNAL WAS THIS PUBLISHED IN?

03:33PM 7    A.   "CUREUS."

03:33PM 8    Q.   AND WHAT IS "CUREUS"?

03:33PM 9    A.   IT'S AN OPEN ACCESS JOURNAL THAT PUBLISHES TECHNICAL

03:33PM 10   PAPERS.

03:34PM 11   Q.   LET ME ASK YOU TO LOOK NEXT AT -- WELL, LET ME ASK YOU, IN

03:34PM 12   CONNECTION WITH SOME OTHER WORK THAT THERANOS WAS DOING TO

03:34PM 13   DEMONSTRATE ITS TECHNOLOGY, DID THERANOS SUBMIT SOME PAPERS,

03:34PM 14   PREPARE PAPERS AS A RESULT OF STUDIES THAT ENDED UP NOT BEING

03:34PM 15   PUBLISHED?

03:34PM 16   A.   YES.

03:34PM 17   Q.   AND DID ONE OF THOSE PAPERS RELATE TO A COLLABORATION

03:34PM 18   BETWEEN UCSF AND THERANOS?

03:34PM 19   A.   YES.

03:34PM 20   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7717.

03:34PM 21   A.   OKAY.

03:34PM 22   Q.   ARE YOU ABLE TO IDENTIFY THAT?

03:34PM 23   A.   YES.

03:34PM 24   Q.   AND WHAT IS IT?

03:34PM 25   A.   THIS IS A SUBMISSION FOR PEER REVIEW FROM A STUDY THAT WAS

7907

03:34PM 1    RUN BY UCSF ON THE PERFORMANCE OF THERANOS'S MINILAB COMPARED

03:34PM 2    TO UCSF'S LABORATORY AND ANOTHER LABORATORY.

03:34PM 3            MR. DOWNEY:  OKAY.  YOUR HONOR, I MOVE THE ADMISSION

03:35PM 4    OF 7717.

03:35PM 5            MR. LEACH:  YOUR HONOR, THIS IS FROM 2017.  WE

03:35PM 6    OBJECT ON RELEVANCE, 403, AND HEARSAY.

03:35PM 7            THE COURT:  IS THIS -- YOU PREVIOUSLY ASKED WHETHER

03:35PM 8    PAPERS WERE SUBMITTED FOR PEER REVIEW.

03:35PM 9            MR. DOWNEY:  YES.

03:35PM 10           THE COURT:  AND WAS THIS SUBMITTED ALSO FOR PEER

03:35PM 11   REVIEW?

03:35PM 12           MR. DOWNEY:  IT WAS, YES, I BELIEVE SO.

03:35PM 13           THE COURT:  ALL RIGHT.  BUT IT SOUNDS LIKE IT WAS

03:35PM 14   REJECTED.

03:35PM 15           MR. DOWNEY:  WELL, IT WASN'T REJECTED, BUT IT

03:35PM 16   WASN'T --

03:35PM 17           THE COURT:  WHY DON'T YOU CLEAR THAT UP FOR ME?  I'M

03:35PM 18   NOT -- I'M SORRY.

03:35PM 19           MR. DOWNEY:  YEAH, IT WAS NOT REJECTED.  IT WAS

03:35PM 20   JUST -- IT WAS SUBMITTED, BUT IT WAS NOT PUBLISHED IN A

03:35PM 21   PUBLICATION.

03:35PM 22           THE COURT:  SO THERE WAS NO ACTION TAKEN ON THIS?

03:35PM 23           MR. DOWNEY:  NO ACTION, NO.

03:35PM 24           THE COURT:  SO THE RELEVANCE OF THIS IS?

03:35PM 25           MR. DOWNEY:  WELL, WE WERE WILLING TO MAKE THE

7908

03:35PM  1   TECHNOLOGY AVAILABLE TO THE UNIVERSITY THAT ONE OF THE

03:35PM  2   INVESTORS IN THIS CASE --

03:35PM  3         THE COURT:  SO THIS IS A DOCUMENT THAT IS ANOTHER

03:35PM  4   DOCUMENT OF A PEER REVIEWED ARTICLE THAT WAS SUBMITTED?

03:36PM  5         MR. DOWNEY:  THAT'S CORRECT.

03:36PM  6         THE COURT:  FOR THAT PURPOSE ONLY?

03:36PM  7         MR. DOWNEY:  YES.

03:36PM  8         THE COURT:  I'LL ADMIT IT FOR THAT LIMITED PURPOSE,

03:36PM  9   LADIES AND GENTLEMEN.  THIS IS ANOTHER PAPER, PEER REVIEWED

03:36PM  10  PAPER THAT WAS SUBMITTED.  IT'S NOT OFFERED FOR THE TRUTH OF

03:36PM  11  ANY OF THE MATTER ASSERTED IN THE PAPER.

03:36PM  12      (DEFENDANT'S EXHIBIT 7717 WAS RECEIVED IN EVIDENCE.)

03:36PM  13  BY MR. DOWNEY:

03:36PM  14  Q.  AND IN ADDITION TO SUBMITTING MATTERS FOR A PEER REVIEW,

03:36PM  15  DID THERANOS ALSO MAKE ADDITIONAL PRESENTATIONS ABOUT ASPECTS

03:36PM  16  OF ITS TECHNOLOGY AT PROFESSIONAL CONFERENCES?

03:36PM  17  A.  YES.

03:36PM  18  Q.  AND I'D LIKE TO ASK YOU TO LOOK AT EXHIBITS 7690 AND 7693.

03:36PM  19  A.  OKAY.

03:36PM  20  Q.  AND ARE THEY DOCUMENTS WITH WHICH YOU'RE FAMILIAR?

03:36PM  21  A.  THEY ARE.

03:36PM  22  Q.  AND WHAT IS EXHIBIT 7690?

03:37PM  23  A.  IT IS A POSTER FROM A SCIENTIFIC CONFERENCE ON THE ZIKA

03:37PM  24  TEST THAT RAN ON MINILAB AS COMPARED TO TRADITIONAL METHODS.

03:37PM  25  Q.  AND WHAT IS 7693?

7909

03:37PM 1    A.   IT IS ANOTHER POSTER ON THE CHEMISTRY FOR THE SMALL SAMPLE

03:37PM 2    MEASUREMENT OF ZIKA.

03:37PM 3    Q.   OKAY.

03:37PM 4         YOUR HONOR, I MOVE THE ADMISSION OF 7690 AND 7693.

03:37PM 5              MR. LEACH:   SAME OBJECTIONS, YOUR HONOR.   HEARSAY,

03:37PM 6    RELEVANCE, 403.

03:37PM 7              THE COURT:   I THINK THERE'S A LACK OF FOUNDATION ON

03:37PM 8    THESE, SO I'LL SUSTAIN THE OBJECTION.

03:37PM 9              MR. DOWNEY:   OKAY.   ALL RIGHT.

03:37PM 10   Q.   MS. HOLMES, I WANT TO TALK ABOUT YOUR OWN OWNERSHIP OF

03:38PM 11   SHARES WHILE YOU WERE AT THERANOS IN A MINUTE, BUT BEFORE I DO

03:38PM 12   THAT, I WANT TO ASK YOU ABOUT A COUPLE OF ITEMS THAT WE

03:38PM 13   DISCUSSED LAST WEEK.

03:38PM 14        DO YOU RECALL THAT WE WERE TALKING ABOUT THE RELATIONSHIP

03:38PM 15   BETWEEN THERANOS AND SAFEWAY?

03:38PM 16   A.   I DO.

03:38PM 17   Q.   AND DO YOU RECALL THAT YOU TESTIFIED THAT AT SOME POINT

03:38PM 18   AFTER MR. BURD LEFT, YOU BECAME LESS INVOLVED WITH THAT

03:38PM 19   RELATIONSHIP?

03:38PM 20   A.   YES.

03:38PM 21   Q.   I'D LIKE TO JUST ASK YOU TO LOOK AT EXHIBIT 15027.

03:38PM 22   A.   WHICH BINDER IS THAT IN?

03:38PM 23   Q.   THAT SHOULD BE, I BELIEVE, IN THE LARGER BINDER THAT YOU

03:39PM 24   HAVE?

03:39PM 25   A.   OKAY.

7910

03:39PM   1      Q.   VOLUME 3.

03:39PM   2      A.   OKAY.

03:39PM   3      Q.   IS THIS AN EMAIL FROM MR. BALWANI TO YOU ABOUT THE SAFEWAY

03:39PM   4   RELATIONSHIP?

03:39PM   5      A.   YES.

03:39PM   6           MR. DOWNEY:   YOUR HONOR, I MOVE THE ADMISSION OF

03:39PM   7   15027.

03:39PM   8           MR. LEACH:   NO OBJECTION, YOUR HONOR.

03:39PM   9           THE COURT:   IT'S ADMITTED.

03:39PM  10       (DEFENDANT'S EXHIBIT 15027 WAS RECEIVED IN EVIDENCE.)

03:39PM  11           MR. DOWNEY:   AND IF WE CAN JUST DISPLAY THAT FOR A

03:39PM  12   MOMENT.

03:39PM  13      Q.   DO YOU SEE THAT THIS EMAIL IS DATED MARCH 13TH OF 2014?

03:39PM  14   HAD MR. BALWANI TAKEN OVER PRINCIPAL -- BEING THE PRINCIPAL

03:39PM  15   INTERFACE WITH SAFEWAY BY THIS DATE?

03:40PM  16      A.   HE HAD.

03:40PM  17      Q.   AND THERE'S A REFERENCE HERE TO BOB GORDON AT SAFEWAY.

03:40PM  18           DO YOU SEE THAT?

03:40PM  19      A.   YES.

03:40PM  20      Q.   AND DID YOU UNDERSTAND THAT BOB GORDON WAS HIS -- HAD

03:40PM  21   BECOME HIS PRIMARY CONTACT?

03:40PM  22      A.   YES.

03:40PM  23      Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:40PM  24           WE SPOKE ALSO LAST WEEK ABOUT THE THERANOS BOARD OF

03:40PM  25   DIRECTORS IN 2013 AND '14, AND YOU MENTIONED

7911

| | | |
|---|---|---|
| 03:40PM | 1 | SECRETARY SHULTZ'S ROLE WITH REGARD TO THAT BOARD. |
| 03:40PM | 2 | A.   YES. |
| 03:40PM | 3 | Q.   AND I BELIEVE YOU TESTIFIED THAT HE WOULD COMMUNICATE WITH |
| 03:40PM | 4 | YOU IN SOME INSTANCES ORALLY; IS THAT RIGHT? |
| 03:40PM | 5 | A.   YES. |
| 03:40PM | 6 | Q.   AND IN SOME INSTANCES WOULD HE COMMUNICATE WITH YOU BY |
| 03:40PM | 7 | LETTER? |
| 03:40PM | 8 | A.   YES. |
| 03:40PM | 9 | Q.   I WANT TO ASK YOU TO TAKE A LOOK AT 15035. |
| 03:41PM | 10 | A.   GOT IT. |
| 03:41PM | 11 | Q.   AND DO YOU RECOGNIZE 15035? |
| 03:41PM | 12 | A.   I DO. |
| 03:41PM | 13 | Q.   AND COULD YOU TELL US WHAT 15035 IS? |
| 03:41PM | 14 | A.   IT'S A LETTER FROM MR. SHULTZ ASKING ME TO MEET WITH |
| 03:41PM | 15 | SOMEONE FROM JAPAN ABOUT DEPLOYING OUR SYSTEMS IN JAPAN. |
| 03:41PM | 16 | Q.   OKAY.  AND I JUST WANT TO ASK IF COMMUNICATIONS FROM |
| 03:41PM | 17 | MR. SHULTZ TO YOU BY LETTER WERE FREQUENT? |
| 03:41PM | 18 | A.   THEY WERE. |
| 03:41PM | 19 | Q.   AND WHAT SUBJECT MATTERS WOULD THEY COVER? |
| 03:41PM | 20 | A.   THEY WOULD COVER TOPICS LIKE THIS WHERE MR. SHULTZ THOUGHT |
| 03:41PM | 21 | THAT WE SHOULD BE FOCUSSED ON INTERNATIONAL EXPANSION, |
| 03:41PM | 22 | INTERNATIONAL OPPORTUNITIES AND MEETING WITH PEOPLE FROM |
| 03:41PM | 23 | DIFFERENT COUNTRIES TO BE ABLE TO PURSUE THAT. |
| 03:41PM | 24 | THEY WOULD FOCUS ON OUR BOARD MEETINGS AND TOPICS HE |
| 03:42PM | 25 | THOUGHT SHOULD BE COVERED IN THE BOARD MEETINGS WHERE HE |

7912

03:42PM   1    THOUGHT WE SHOULD FOCUS IN THOSE MEETINGS.

03:42PM   2         THEY WOULD BE FOCUSSED ON MEETINGS HE WAS OTHERWISE HAVING

03:42PM   3    OR TRIPS HE WAS TAKING THAT HE WOULD WANT ME TO JOIN OR PRESENT

03:42PM   4    ON, AND ON EVENTS HE WAS HOSTING WHERE HE WOULD ASK ME TO COME

03:42PM   5    AND MEET WITH CERTAIN PEOPLE.

03:42PM   6    Q.   OKAY.  LET ME TURN NOW TO TALKING ABOUT JUST ONE INVESTOR

03:42PM   7    WHO WE TOUCHED ON ONLY BRIEFLY, WHICH IS THE RDV INVESTOR.

03:42PM   8    A.   YES.

03:42PM   9    Q.   THAT WAS THE INVESTMENT VEHICLE FOR THE DEVOS FAMILY.

03:42PM  10         DO YOU RECALL THAT?

03:42PM  11    A.   I DO.

03:42PM  12    Q.   AND I BELIEVE THERE WAS TESTIMONY FROM MS. PETERSON TO THE

03:42PM  13    EFFECT OF IN YOUR FIRST CONVERSATION THAT SHE PARTICIPATED IN

03:42PM  14    WITH YOU THAT THERE WAS A DISCUSSION OF YOUR VISION FOR

03:42PM  15    THERANOS.

03:42PM  16    A.   YES.

03:42PM  17    Q.   AND WAS THERE A -- WAS THE DISCUSSION OF YOUR VISION A

03:42PM  18    SUBJECT OF CONVERSATION BETWEEN INVESTORS AND YOURSELF IN

03:43PM  19    SITUATIONS OTHER THAN WITH MS. PETERSON AND MR. TUBERGEN?

03:43PM  20    A.   YES.

03:43PM  21    Q.   AND WHAT WOULD YOU TYPICALLY -- DID YOU HAVE THINGS YOU

03:43PM  22    WOULD TYPICALLY SAY ABOUT THERANOS AND YOUR VISION FOR IT IN

03:43PM  23    THOSE MEETINGS?

03:43PM  24    A.   YES.

03:43PM  25    Q.   AND WHAT WOULD YOU TYPICALLY TALK ABOUT WITH RESPECT TO

03:43PM  1    YOUR VISION FOR THERANOS WHEN YOU WERE ASKED BY POTENTIAL

03:43PM  2    INVESTORS TO DISCUSS YOUR VISION?

03:43PM  3    A.   I WOULD TALK ABOUT HOW WE COULD CHANGE PEOPLE'S ACCESS TO

03:43PM  4    TESTING, AND THAT IF PEOPLE COULD GET BETTER ACCESS TO TESTING,

03:43PM  5    WE COULD MAKE EARLY DETECTION OF DISEASE MORE OF A REALITY.

03:43PM  6         I WOULD TALK ABOUT THE COMPANY TENETS TO ACCESS, CHANGING

03:43PM  7    THE COST OF TESTING, CHANGING THE CONVENIENCE OF TESTING,

03:43PM  8    CHANGING PEOPLE'S ACCESS TO AND OWNERSHIP OF THEIR OWN HEALTH

03:43PM  9    DATA, CHANGING WHAT IT MEANT TO GET A BLOOD DRAW AND BEING ABLE

03:44PM  10   TO MAKE THAT EXPERIENCE A WONDERFUL ONE.

03:44PM  11        AND I WOULD TALK ABOUT THE TECHNOLOGIES THAT WE INVENTED

03:44PM  12   TO DO THAT, HOW IT WOULD CHANGE PEOPLE'S ACCESS TO TESTING.

03:44PM  13   Q.   AND DID YOU SOMETIMES TALK ABOUT HOW A PLAN MIGHT BE

03:44PM  14   IMPLEMENTED TO MAKE TESTING MORE ACCESSIBLE?

03:44PM  15   A.   YES.

03:44PM  16   Q.   DOES THAT INCLUDE SOME OF THE SLIDES THAT WE LOOKED AT

03:44PM  17   WHERE THERE WAS A DESCRIPTION OF THERANOS BEING WITHIN A --

03:44PM  18   SOME NUMBER OF MILES OF EVERY AMERICAN WHO MIGHT NEED BLOOD

03:44PM  19   TESTING SERVICES?

03:44PM  20   A.   IT DOES.

03:44PM  21   Q.   AND IS IT FAIR TO SAY THAT DURING THOSE CONVERSATIONS YOU

03:44PM  22   WOULD TALK A LOT ABOUT WHERE YOU THOUGHT THERANOS COULD TAKE

03:44PM  23   HEALTH CARE IN THE FUTURE?

03:44PM  24   A.   I DID.

03:44PM  25   Q.   AND DID YOU TALK ABOUT HOW THERANOS'S TECHNOLOGY MIGHT

7914

03:44PM   1    OVER TIME DECREASE OR INCREASE AUTOMATION DURING THE PROCESS?

03:45PM   2    A.   I DID.

03:45PM   3    Q.   NOW, YOU ALSO HAVE USED A PHRASE TALKING TODAY, AND ONCE

03:45PM   4    EARLIER, CALLED THE LONGITUDINAL IMPACT OF THERANOS'S TESTING.

03:45PM   5         CAN YOU EXPLAIN WHAT THAT MEANS?

03:45PM   6    A.   YES.  WHAT I WAS TALKING ABOUT WAS THE ABILITY TO LOOK AT

03:45PM   7    LAB DATA OVER TIME AND HOW IT CHANGES, THE IDEA BEING THAT IF

03:45PM   8    YOU COULD SEE A TIME SERIES OR A TREND, YOU COULD START TO GET

03:45PM   9    INSIGHT INTO WHERE SOMEONE'S HEALTH WAS HEADED.

03:45PM  10         AND IF YOU COULD SEE THAT EARLY ENOUGH, YOU COULD DO

03:45PM  11    SOMETHING ABOUT IT.

03:45PM  12    Q.   OKAY.  LET ME ASK YOU ABOUT YOUR OWNERSHIP OF SHARES IN

03:45PM  13    THERANOS AS A COMPANY.

03:45PM  14         WHEN THERANOS WAS VALUED FOR THE OFFERING OF SHARES TO

03:46PM  15    INVESTORS IN 2014, WHAT WAS THE VALUATION ATTRIBUTED TO THE

03:46PM  16    COMPANY?

03:46PM  17    A.   $9 BILLION.

03:46PM  18    Q.   WHAT PERCENTAGE OF SHARES DID YOU OWN IN THE COMPANY AT

03:46PM  19    THAT TIME?

03:46PM  20    A.   I THINK CLOSE TO 50 PERCENT.

03:46PM  21    Q.   WHAT WAS YOUR NET WORTH ON PAPER AS A RESULT OF THAT?

03:46PM  22    A.   IT WOULD HAVE BEEN 4 AND A HALF BILLION DOLLARS.

03:46PM  23    Q.   DID YOU HAVE OPPORTUNITIES DURING THE TIME THAT YOU WERE

03:46PM  24    RUNNING THERANOS TO SELL YOUR STOCK IN THERANOS?

03:46PM  25    A.   I DID.

03:46PM  1    Q.   WERE THERE INSTANCES DATING BACK TO THE EARLY YEARS OF THE

03:46PM  2    COMPANY WHERE THAT WAS TRUE?

03:46PM  3    A.   YES.

03:46PM  4    Q.   AND CAN YOU DESCRIBE SOME OF THE INSTANCES WHERE YOU HAD

03:46PM  5    AN OPPORTUNITY TO SELL SHARES IN THE COMPANY?

03:46PM  6    A.   YES.   SOME OF OUR BOARD MEMBERS WOULD BE INTERESTED IN

03:46PM  7    BRINGING IN NEW SHAREHOLDERS OR INVESTORS AND WOULD ASK IF I

03:46PM  8    WOULD SELL SOME OF MY SHARES TO THOSE PEOPLE TO BE ABLE TO

03:47PM  9    BRING IN NEW INVESTORS.

03:47PM  10        IN CERTAIN CASES, SOME OF OUR BOARD MEMBERS WANTED TO DO

03:47PM  11   TENDER OFFERS OR BUY BACKS IN WHICH THEY WOULD SUGGEST THAT I,

03:47PM  12   AND OTHERS IN MANAGEMENT, SELL SHARES, AND DIRECTORS WOULD SELL

03:47PM  13   SHARES TO HAVE SOME LIQUIDITY IN OUR LIVES.

03:47PM  14        IN OTHER CASES THERE WERE EXTERNAL GROUPS LIKE A

03:47PM  15   SHARESPOST OR OTHER ENTITIES THAT WANTED TO BUY SHARES TO BE

03:47PM  16   ABLE TO SELL THEM TO THIRD PARTIES.

03:47PM  17   Q.   DID YOU EVER SELL A SHARE OF YOUR STOCK IN THERANOS?

03:47PM  18   A.   I DID NOT.

03:47PM  19   Q.   WHY NOT?

03:47PM  20   A.   I DID NOT WANT TO.   I BELIEVED IN THE COMPANY AND I WANTED

03:47PM  21   TO PUT EVERYTHING THAT I HAD INTO IT.

03:47PM  22   Q.   AND DO THOSE SHARES HAVE ANY VALUE NOW?

03:47PM  23   A.   NO.

03:47PM  24        MR. DOWNEY:   YOUR HONOR, I MIGHT BE FINISHED, BUT

03:47PM  25   MAY I HAVE A MOMENT TO CONSULT WITH MY COLLEAGUES?

7916

| | | |
|---|---|---|
| 03:48PM | 1 | THE COURT:  YES. |
| 03:48PM | 2 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 03:48PM | 3 | MR. DOWNEY:  YOUR HONOR, JUST TWO HOUSEKEEPING |
| 03:48PM | 4 | MATTERS. |
| 03:48PM | 5 | THE COURT:  YES. |
| 03:48PM | 6 | MR. DOWNEY:  ONE IS THAT I DON'T THINK THAT I MOVED |
| 03:48PM | 7 | TO ADMIT 10535, WHICH WAS THE LETTER FROM SECRETARY SHULTZ. |
| 03:48PM | 8 | THE COURT:  YOU DID NOT, NO. |
| 03:48PM | 9 | MR. DOWNEY:  SO I WOULD LIKE TO MOVE TO ADMIT THAT. |
| 03:48PM | 10 | MR. LEACH:  NO OBJECTION, YOUR HONOR. |
| 03:48PM | 11 | THE COURT:  THAT'S ADMITTED. |
| 03:48PM | 12 | (DEFENDANT'S EXHIBIT 15035 WAS RECEIVED IN EVIDENCE.) |
| 03:48PM | 13 | MR. DOWNEY:  AND THEN SECOND, YOUR HONOR, IN |
| 03:48PM | 14 | CONNECTION WITH EXHIBIT 7710, I JUST WOULD -- |
| 03:49PM | 15 | THE COURT:  THAT HASN'T BEEN DISCUSSED. |
| 03:49PM | 16 | MR. DOWNEY:  THE SUBJECT MATTER RELATED TO 7710 HAS |
| 03:49PM | 17 | BEEN DISCUSSED.  I WANT TO FORMALLY MOVE ITS ADMISSION, BUT I |
| 03:49PM | 18 | THINK WHEN YOUR HONOR LOOKS AT IT -- |
| 03:49PM | 19 | THE COURT:  MR. LEACH? |
| 03:49PM | 20 | MR. LEACH:  WE OBJECT, YOUR HONOR.  401, |
| 03:50PM | 21 | PARTICULARLY AS TO THE DATE; 403; HEARSAY; AND 702. |
| 03:50PM | 22 | THE COURT:  MR. DOWNEY, I'M GOING TO SUSTAIN THE |
| 03:50PM | 23 | OBJECTIONS. |
| 03:50PM | 24 | MR. DOWNEY:  YES, YOUR HONOR. |
| 03:50PM | 25 | THE COURT:  I THINK THERE'S TESTIMONY, BUT I'M GOING |

7917

03:50PM  1    TO SUSTAIN THE OBJECTIONS.

03:50PM  2              MR. DOWNEY:  UNDERSTOOD, YOUR HONOR.

03:50PM  3         ALL RIGHT.  WITH THAT, YOUR HONOR, I'VE CONCLUDED THE

03:50PM  4    DIRECT EXAMINATION OF THE WITNESS.

03:50PM  5              THE COURT:  ALL RIGHT.  THANK YOU.

03:50PM  6         DO YOU WANT TO COLLECT YOUR BINDERS?

03:50PM  7              MR. DOWNEY:  I DO.  IF I MIGHT JUST --

03:50PM  8              THE COURT:  SURE.

03:51PM  9         (PAUSE IN PROCEEDINGS.)

03:51PM  10             THE COURT:  MR. LEACH, DO YOU HAVE

03:51PM  11   CROSS-EXAMINATION?

03:51PM  12             MR. LEACH:  YES, YOUR HONOR.

03:51PM  13             THE COURT:  WOULD YOU LIKE TO BEGIN THAT NOW OR

03:51PM  14   WOULD YOU LIKE --

03:51PM  15             MR. LEACH:  GIVEN THE HOUR, YOUR HONOR, AND THE

03:51PM  16   EXPECTED LENGTH, IT PROBABLY MAKES SENSE TO START TOMORROW.

03:51PM  17             THE COURT:  WELL, I THINK I SEE A LOT OF BINDERS

03:51PM  18   THERE, AND JUST OWING TO THE TRAVEL TIME TO GET THOSE BINDERS

03:51PM  19   TO THE WITNESS --

03:51PM  20         (LAUGHTER.)

03:51PM  21             THE COURT:  -- I THINK WHAT WE SHOULD DO IS TAKE OUR

03:51PM  22   AFTERNOON RECESS NOW.

03:51PM  23         LET'S DO THAT, LADIES AND GENTLEMEN.

03:51PM  24         WE'RE MEETING TOMORROW AT 9:00 O'CLOCK, COUNSEL?

03:51PM  25         9:00 O'CLOCK.  AND TOMORROW WILL BE A FULL DAY UNTIL

7918

03:51PM  1    4:00 O'CLOCK TOMORROW, PLEASE.

03:51PM  2        SO DURING THE BREAK, LADIES AND GENTLEMEN, PLEASE, I

03:51PM  3    REMIND YOU OF THE ADMONITION, DO NOT, DO NOT DO ANYTHING TO

03:52PM  4    LEARN, INVESTIGATE, DISCUSS ON SOCIAL MEDIA, ON NEWSPAPER,

03:52PM  5    RADIO, THE INTERNET, OR ANYTHING ELSE, ANYTHING TO DO WITH THIS

03:52PM  6    CASE.

03:52PM  7        DO NOT FORM ANY OPINIONS ON ANYTHING YOU HAVE HEARD.

03:52PM  8        TOMORROW I'LL ASK YOU IF ANY OF YOU HAVE SUCCUMBED TO ANY

03:52PM  9    OF THOSE.  SO HOPEFULLY YOU WON'T.  YOU'LL CONTINUE WITH YOUR

03:52PM  10   FIDELITY TO THE ADMONITION.

03:52PM  11       HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW MORNING.

03:52PM  12   THANK YOU.

03:52PM  13       (JURY OUT AT 3:52 P.M.)

03:52PM  14        THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:52PM  15       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:52PM  16   EVENING.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

03:53PM  17       I DID WANT TO ASK A QUESTION FOLLOWING UP ON OUR

03:53PM  18   DISCUSSION THIS MORNING REGARDING I BELIEVE IT WAS DEFENSE

03:53PM  19   MOTION, I THINK IT'S IN 1163.  BUT EXHIBIT A, 1163-2,

03:53PM  20   EXHIBIT A, IT SEEMS TO ME BASED ON THE TESTIMONY THIS AFTERNOON

03:53PM  21   THAT THE -- AND I CALL YOUR ATTENTION TO PAGE 10 OF THAT

03:53PM  22   DOCUMENT -- THE -- THIS IS REGARDING THE DEFENSE REQUEST TO

03:53PM  23   INTRODUCE THE S.E.C. TRANSCRIPT.

03:53PM  24       MY THOUGHT IS THAT THIS IS MOOT AS TO THE NULL PROTOCOL

03:53PM  25   ISSUE.  MS. HOLMES TESTIFIED THIS AFTERNOON ABOUT HER KNOWLEDGE

7919

03:53PM 1     OF IT, OR AT LEAST AROUND THE NULL PROTOCOL.

03:53PM 2         IT SEEMS TO ME THAT THIS, AT LEAST THE DEFENSE REQUEST FOR

03:53PM 3     THIS TO COME IN IS NOW MOOT.  I'LL LET YOU POSIT THAT OVER THE

03:53PM 4     EVENING IF YOU WOULD LIKE, BUT IT SEEMS TO ME THAT AT LEAST

03:54PM 5     FROM YOUR REQUEST, AND I DON'T SEE COUNSEL HERE TO ARGUE THIS.

03:54PM 6         MAYBE I SHOULD WAIT UNTIL TOMORROW MORNING.

03:54PM 7             MR. DOWNEY:  YEAH, I THINK THAT -- WE WOULD

03:54PM 8     APPRECIATE THAT IF YOU WOULD.

03:54PM 9             THE COURT:  YEAH, YOU --

03:54PM 10            MR. DOWNEY:  I UNDERSTAND YOUR HONOR'S COMMENT AND

03:54PM 11    WE'LL LOOK AT THAT TONIGHT, AND THEN MR. CLEARY WILL BE HERE IN

03:54PM 12    THE MORNING TO DISCUSS THAT.

03:54PM 13            THE COURT:  WELL, MR. FLEURMONT -- NOT MR. CLEARY.

03:54PM 14            MR. DOWNEY:  I'M SORRY, MR. FLEURMONT.

03:54PM 15            THE COURT:  RIGHT.  HE'S THE OTHER BRILLIANT LAWYER

03:54PM 16    ON YOUR TEAM, BUT HE HAS ALL OF THE KNOWLEDGE ON THIS TOPIC,

03:54PM 17    AND MAYBE WE'LL WAIT UNTIL TOMORROW TO ALLOW HIM TO ADDRESS IT.

03:54PM 18        IT SEEMS TO ME IT'S MOOT THOUGH.

03:54PM 19        MS. VOLKAR IS STANDING AND SHE'S HERE.

03:54PM 20        GOOD AFTERNOON, MS. VOLKAR.

03:54PM 21            MS. VOLKAR:  GOOD AFTERNOON, YOUR HONOR.  THANK YOU.

03:54PM 22        I AGREE IT -- I'M NOT SURE IF "MOOT" IS THE RIGHT WORD,

03:54PM 23    BUT I JUST WANT TO REITERATE MY ARGUMENT FROM THIS MORNING,

03:54PM 24    WHICH IS I THINK A LOT OF THE PORTIONS OF THE S.E.C.

03:54PM 25    INVESTIGATIVE TESTIMONY THAT THEY SEEK TO ADMIT IS CUMULATIVE

7920

03:55PM  1    AND DUPLICATIVE OF OTHER EVIDENCE IN THE CASE, AND I THINK THIS

03:55PM  2    IS ANOTHER INSTANCE OF THAT NOW THAT MS. HOLMES HAS TESTIFIED

03:55PM  3    TO THAT FACT.

03:55PM  4        SO I'M HAPPY TO ARGUE IT FURTHER TOMORROW MORNING WHEN MY

03:55PM  5    COLLEAGUE OPPOSITE IS BACK HERE, BUT I FIGURED I MIGHT AS WELL

03:55PM  6    PUT THAT ON THE RECORD SINCE YOUR HONOR NOTED IT.

03:55PM  7             THE COURT:  NO.  THAT WAS MY INQUIRY.

03:55PM  8        WE'LL HAVE SOME DISCUSSION ON THIS TOMORROW MORNING WHEN

03:55PM  9    THE JURY COMES.  MY SENSE IS THAT IT WILL BE A BRIEF

03:55PM 10    DISCUSSION.

03:55PM 11        ANYTHING ELSE?

03:55PM 12        THANK YOU, MS. VOLKAR.

03:55PM 13             MS. VOLKAR:  NO, YOUR HONOR.

03:55PM 14             MR. DOWNEY:  YOUR HONOR, I APOLOGIZE FOR THIS, BUT

03:55PM 15    MY EYESIGHT IS DECLINING AS THE TRIAL PROCEEDS AND I APPARENTLY

03:55PM 16    MISREAD THE NUMBER OF THAT LAST EXHIBIT, AND I JUST WANT TO

03:55PM 17    MAKE SURE THE RECORD IS CLEAR.

03:55PM 18        IT WAS 15035.

03:55PM 19             THE COURT:  THE SHULTZ LETTER?

03:55PM 20             MR. DOWNEY:  YES.

03:56PM 21             THE COURT:  YES.  I THINK THAT'S RIGHT.  15035 WAS

03:56PM 22    ADMITTED.

03:56PM 23             MR. DOWNEY:  OKAY.  THANK YOU.

03:56PM 24        NOT AS BAD AS I THOUGHT.

03:56PM 25             THE COURT:  RIGHT.  ANYTHING FURTHER FROM THE

7921

03:56PM   1    GOVERNMENT?

03:56PM   2              MR. LEACH:  NO, YOUR HONOR.

03:56PM   3              THE COURT:  ALL RIGHT.  THANK YOU.

03:56PM   4        I'M INFORMED THAT WE'LL HAVE THE -- THIS ISSUE ABOUT

03:56PM   5    MONITORS FIXED THIS EVENING, TOO, SO WE DON'T HAVE TO USE THE

03:56PM   6    CABLES HERE, BUT WE'LL KEEP OUR FINGERS CROSSED.

03:56PM   7        THANK YOU.  HAVE A GOOD EVENING EVERYONE.  WE'LL SEE YOU

03:56PM   8    TOMORROW MORNING.

03:56PM   9            (COURT ADJOURNED AT 3:56 P.M.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
 1

 2

 3                        CERTIFICATE OF REPORTERS

 4

 5

 6

 7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10     HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12     A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13     ABOVE-ENTITLED MATTER.

14

15

16                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8076
17

18

19                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
20

21                        DATED:  NOVEMBER 29, 2021

22

23

24

25
```

7922

1

2                   UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                      SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                   )
                    PLAINTIFF,      )  SAN JOSE, CALIFORNIA
7                                   )
            VS.                     )  VOLUME 40
8                                   )
   ELIZABETH A. HOLMES,             )  NOVEMBER 30, 2021
9                                   )
                    DEFENDANT.      )  PAGES 7922 - 8213
10  _____)

11                TRANSCRIPT OF TRIAL PROCEEDINGS
12           BEFORE THE HONORABLE EDWARD J. DAVILA
                UNITED STATES DISTRICT JUDGE
13
   A P P E A R A N C E S:
14
   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                        BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:  ROBERT S. LEACH
18                             KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

   OFFICIAL COURT REPORTERS:
22                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                          CERTIFICATE NUMBER 8074
23                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
 4                                 LANCE A. WADE
                                   KATHERINE TREFZ
 5                                 AMY SAHARIA
                                   SEEMA ROPER
 6                                 J.R. FLEURMONT
                                   RICHARD CLEARY
 7                                 ANDREW LEMENS
                                   PATRICK LOOBY
 8                            725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
 9
                              LAW OFFICE OF JOHN D. CLINE
10                            BY:  JOHN D. CLINE
                              ONE EMBARCADERO CENTER, SUITE 500
11                            SAN FRANCISCO, CALIFORNIA 94111

12    FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                              BY:  JEFFREY COOPERSMITH
13                                 AMANDA MCDOWELL
                              701 FIFTH AVENUE, SUITE 5600
14                            SEATTLE, WASHINGTON 98104

15
      ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
16                           BY:  ADELAIDA HERNANDEZ

17                           OFFICE OF THE U.S. ATTORNEY
                             BY:  LAKISHA HOLLIMAN, PARALEGAL
18                                MADDI WACHS, PARALEGAL

19                           WILLIAMS & CONNOLLY
                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
20
                             TBC
21                           BY:  BRIAN BENNETT, TECHNICIAN

22

23

24

25
```

1

2                          <u>INDEX OF PROCEEDINGS</u>

3        DEFENDANT'S:

4

5        **ELIZABETH HOLMES**

         CROSS-EXAM BY MR. LEACH                    P. 7963

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXHIBITS

 2
                                          IDENT.      EVIDENCE
 3         GOVERNMENT'S:

 4         1675                                         7987
           5645                                         7989
 5         5704                                         8000
           5254                                         8024
 6         5663                                         8090
           5541                                         8099
 7         5652                                         8108
           5512                                         8112
 8         3970                                         8116
           5537                                         8166
 9         5538                                         8168
           5646                                         8177
10         5387G                                        8181

11

12

13         DEFENDANT'S:

14         14259                                        8212

15

16

17

18

19

20

21

22

23

24

25
```

|  |  |  |  |
|---|---|---|---|

```
            1    SAN JOSE, CALIFORNIA                    NOVEMBER 30, 2021

08:31AM     2                    P R O C E E D I N G S

08:31AM     3         (COURT CONVENED AT 8:31 A.M.)

08:31AM     4         (JURY OUT AT 8:31 A.M.)

08:31AM     5              THE COURT:  WE'RE ON THE RECORD IN THE HOLMES

08:31AM     6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:31AM     7    WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

08:31AM     8         MR. LEACH IS NOT PRESENT.

08:31AM     9         OKAY.  WE'RE ON THE RECORD OUTSIDE OF THE PRESENCE OF THE

08:32AM    10    JURY.  WE WERE GOING TO HAVE A HEARING THIS MORNING ABOUT THE

08:32AM    11    DEFENSE CONTINUED MOTION 1163, DOCUMENT 1163.

08:32AM    12         BUT I JUST WANTED TO ASK -- MR. FLEURMONT, I SEE YOU HERE.

08:32AM    13    THANK YOU FOR COMING IN THIS MORNING, SIR.  I HAD CONVERSATION

08:32AM    14    WITH YOUR COLLEAGUES YESTERDAY, AND THEY SUGGESTED THAT WE WAIT

08:32AM    15    UNTIL YOU COME IN.

08:32AM    16         I JUST WANTED TO ASK MS. VOLKAR, IS THIS A GOOD TIME TO DO

08:32AM    17    THIS NOW, OR SHOULD WE WAIT?

08:32AM    18              MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:32AM    19         I'M HAPPY TO -- SO THE GOVERNMENT HAS NOT HAD THE TIME TO

08:32AM    20    COMPLETE THE RULE 106 REVIEW.  WE HAVE STARTED IT.  IT IS ABOUT

08:32AM    21    1300 PAGES OF TRANSCRIPT.  SO I HAVE NOT, CANDIDLY, COMPLETED

08:32AM    22    IT.

08:32AM    23         THAT BEING SAID, I AM MORE THAN HAPPY TO PICK UP THE

08:32AM    24    CONVERSATION WE ENDED WITH YESTERDAY, WHICH IS WHETHER SOME

08:32AM    25    PARTS ARE EITHER MOOT OR CUMULATIVE, AND I THINK THAT THAT
```

| | | |
|---|---|---|
| 08:32AM | 1 | WOULD ACTUALLY HELP NARROW, EVEN IF YOUR HONOR WOULD BE WILLING |
| 08:33AM | 2 | TO GIVE A TENTATIVE, OR WHICH SECTIONS YOU MIGHT PERMIT OR |
| 08:33AM | 3 | GRANT OR DENY, IT WOULD, OF COURSE, NARROW THE WORK FOR THE |
| 08:33AM | 4 | RULE 106 PURPOSES.  SO THAT DISCUSSION COULD BE HELPFUL THIS |
| 08:33AM | 5 | MORNING. |
| 08:33AM | 6 | BUT I MOSTLY WANTED TO LET THE COURT KNOW THAT I DID NOT |
| 08:33AM | 7 | OVERNIGHT GET ALL OF THE RULE 106 COMPLETENESS WORK DONE. |
| 08:33AM | 8 | THE COURT:  ALL RIGHT.  THANK YOU FOR THAT. |
| 08:33AM | 9 | THE QUESTIONS THAT WE DISCUSSED IN YOUR ABSENCE, |
| 08:33AM | 10 | MR. FLEURMONT, WERE QUESTIONS THAT I HAD ABOUT THE EXHIBITS AND |
| 08:33AM | 11 | THE STATEMENTS IN THE EXHIBITS. |
| 08:33AM | 12 | PLEASE RECALL THAT MY CONCERNS WERE TWO.  ONE, I THINK WE |
| 08:33AM | 13 | TALKED ABOUT WHETHER OR NOT UNAVAILABILITY HAS BEEN SHOWN.  WE |
| 08:33AM | 14 | TALKED ABOUT YOUR COLLEAGUE'S DECLARATION.  I THINK I TOLD YOU |
| 08:33AM | 15 | I WANT SOMETHING MORE THAN THAT. |
| 08:33AM | 16 | SO THAT WILL GIVE YOU -- YOU CAN TAKE YOUR MASKS OFF IF |
| 08:33AM | 17 | YOU'RE COMFORTABLE WITH THAT. |
| 08:33AM | 18 | MS. VOLKAR:  THANK YOU, YOUR HONOR. |
| 08:33AM | 19 | MR. FLEURMONT:  THANK YOU, YOUR HONOR. |
| 08:34AM | 20 | THE COURT:  SO THAT WAS THE ONE QUESTION ON THE |
| 08:34AM | 21 | UNAVAILABILITY. |
| 08:34AM | 22 | THE OTHER QUESTION THAT IS PERHAPS MOST PRESSING IS AS TO |
| 08:34AM | 23 | THE EXHIBITS AND THE STATEMENTS, PLEASE RECALL THAT I WAS |
| 08:34AM | 24 | SAYING, WELL, SHOULDN'T I KNOW THE QUESTION SO I CAN KNOW WHAT |
| 08:34AM | 25 | THE CONTEXT IS. |

08:34AM 1       I GUESS WHAT I NEED TO KNOW IS WHAT IS, AS TO EACH OF

08:34AM 2   THESE EXHIBITS AND THE COLLOQUIES THAT ARE CONTAINED IN THEM,

08:34AM 3   WHERE IS THE -- I JUST -- I DON'T SEE, AND I NEED SOME HELP AS

08:34AM 4   TO WHAT IS THE STATEMENT AGAINST INTEREST?  I DON'T SEE IT.

08:34AM 5       I THINK WHAT I'M SEEING HERE, AND I'M GIVING YOU THE

08:34AM 6   BENEFIT SO YOU CAN HELP, WHAT I SEE IS A FACT WITNESS.  I DON'T

08:34AM 7   SEE ANY PARTICULAR PENAL OR PECUNIARY INTEREST OR A STATEMENT

08:34AM 8   AGAINST AN INTEREST.  IT JUST -- I DON'T SEE IT.  SO THAT'S

08:34AM 9   WHAT I NEED SOME HELP ON.

08:34AM 10          MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:34AM 11      OKAY.  SO I THINK IT'S PROBABLY BEST IF WE JUST WALK

08:35AM 12  THROUGH EACH OF THE EXHIBITS.

08:35AM 13          THE COURT:  SURE.

08:35AM 14          MR. FLEURMONT:  AND I CAN POINT TO THE COURT

08:35AM 15  STATEMENTS AGAINST INTEREST.

08:35AM 16          THE COURT:  SURE.  THANK YOU.

08:35AM 17          MR. FLEURMONT:  SO LET'S START WITH EXHIBIT A.

08:35AM 18      OKAY.  STARTING, YOUR HONOR, WITH EXHIBIT A, THE FIRST

08:35AM 19  QUESTION AND ANSWER, THIS IS STARTING AT PAGE 3 TO PAGE 4,

08:35AM 20  RELATES TO THE WALGREENS AND SAFEWAY RELATIONSHIP.

08:35AM 21          THE COURT:  RIGHT.

08:35AM 22          MR. FLEURMONT:  IF YOU LOOK AT PAGE 4, LINES 3

08:35AM 23  AND 4.

08:35AM 24          THE COURT:  THIS IS ECF PAGE 4?

08:35AM 25          MR. FLEURMONT:  YES, YOUR HONOR.

08:35AM  1                    THE COURT:  RIGHT.

08:35AM  2                    MR. FLEURMONT:  "I TOOK THE LEADERSHIP ROLE THERE IN

08:35AM  3      NEGOTIATIONS AND CONTRACTS."

08:35AM  4           AND THAT'S A STATEMENT SAYING HE TOOK A LEADERSHIP ROLE IN

08:36AM  5      REGARDS TO THE SAFEWAY AND WALGREENS CONTRACTS.

08:36AM  6           AND WALGREENS, AS YOU KNOW, IS ALLEGED IN PARAGRAPH 12(D)

08:36AM  7      OF THE INDICTMENT.

08:36AM  8           OKAY.  HE CONTINUES AND HE GETS ASKED A QUESTION "WHAT

08:36AM  9      ABOUT SAFEWAY?"  THAT'S AT LINE 12.

08:36AM 10           AT LINE 13, "YES, YEAH, SAME THING ON SAFEWAY."

08:36AM 11                    THE COURT:  OKAY.  HOW DOES THAT -- TELL ME ABOUT

08:36AM 12      THAT.  SO HE'S SAYING IN LINES 2 -- LET'S GO BACK.

08:36AM 13           THE START OF THIS WAS ON LINE -- PAGE 3, "YOU MENTIONED

08:36AM 14      OVER TIME YOUR RESPONSIBILITIES GREW.  CAN YOU BRIEFLY EXPLAIN

08:36AM 15      WHAT GOT ADDED TO YOUR PORTFOLIO?"  THAT'S ON PAGE ECF 3.

08:36AM 16           AND THAT GOES DOWN.  HE STARTS TALKING ABOUT HARDWARE, AND

08:37AM 17      HE LEARNED ABOUT THE BUSINESS, HE WAS ON THE ROAD MEETING WITH

08:37AM 18      THE RETAIL BUSINESS.  "AND AS THAT EVOLVED, I TOOK THE

08:37AM 19      LEADERSHIP ROLE THERE IN NEGOTIATIONS AND CONTRACTS."

08:37AM 20           AND THAT STATEMENT, I GUESS, IS WHAT YOU'RE SAYING EXPOSES

08:37AM 21      HIM TO SOME LIABILITY AGAINST HIS INTEREST BECAUSE.

08:37AM 22                    MR. FLEURMONT:  BECAUSE, YOUR HONOR, AS WE MENTIONED

08:37AM 23      YESTERDAY, WHEN RECEIVING THE SUBPOENAS FROM THE S.E.C. AND THE

08:37AM 24      SUBPOENAS FROM THE GRAND JURY, THERE WERE REQUESTS IN THERE

08:37AM 25      ABOUT THE ROLE IN THE RETAIL PARTNERSHIPS.

08:37AM   1           AND THE GOVERNMENT HAS ALLEGED, AS YOU KNOW, THAT, YOU

08:37AM   2   KNOW, WALGREENS, SAFEWAY ARE BOTH INVESTORS IN THIS CASE

08:37AM   3   THROUGH MISREPRESENTATIONS MADE TO WALGREENS AND SAFEWAY.

08:37AM   4           AND HE IS SAYING THAT HE TOOK A LEADERSHIP ROLE IN

08:37AM   5   NEGOTIATIONS IN THE CONTRACTS, AND IN NEGOTIATIONS OBVIOUSLY

08:38AM   6   STATEMENTS WERE MADE.

08:38AM   7               THE COURT:  AND BECAUSE OF THAT HIS LIABILITY IS --

08:38AM   8   A JURY COULD FIND THAT HE MADE MISREPRESENTATIONS TO WALGREENS

08:38AM   9   IN THE CONTEXT OF THOSE NEGOTIATIONS AND CONTRACTS?

08:38AM  10               MR. FLEURMONT:  YES, YOUR HONOR.  HE COULD FACE

08:38AM  11   CIVIL LIABILITY UNDER THE S.E.C.

08:38AM  12               THE COURT:  I SEE.  OKAY.

08:38AM  13           AND THEN THE QUESTION IS, I GUESS PHARMACIES, DO YOU MEAN

08:38AM  14   WALGREENS PRIMARILY?

08:38AM  15           YES.

08:38AM  16           AND THEN HE TALKS ABOUT SAFEWAY.

08:38AM  17               MR. FLEURMONT:  YES, YOUR HONOR.

08:38AM  18           THAT'S WHY WE INCLUDED THE FULL CONTEXT AGENCY BECAUSE YOU

08:38AM  19   CAN SEE EXACTLY WHAT RETAIL PARTNERSHIPS HE'S DISCUSSING AND

08:38AM  20   JUST TO GIVE THE COURT FULL CONTEXT FOR THE STATEMENTS.

08:38AM  21               THE COURT:  RIGHT.  AND THEN HE SAYS HE

08:38AM  22   TOOK RESPONSES -- THIS IS ON PAGE 5.  "YOU TOOK OVER

08:38AM  23   RESPONSIBILITY FOR THE SAFEWAY RELATIONSHIP MORE SO AFTER

08:38AM  24   MR. BURD LEFT SAFEWAY?"

08:38AM  25               MR. FLEURMONT:  YES, YOUR HONOR.

7931

08:38AM 1          THE COURT:  AND HE SAYS, "PRETTY MUCH RIGHT AFTER

08:39AM 2    THAT."

08:39AM 3          SO THAT WOULD BE AFTER THAT CONTRACT RELATIONSHIP WAS

08:39AM 4    COMPLETED; RIGHT?

08:39AM 5          MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.  THERE

08:39AM 6    WERE DEALINGS WITH SAFEWAY AFTER MR. BURD LEFT.

08:39AM 7          THE COURT:  BUT THE CONTRACT WAS COMPLETED.  WASN'T

08:39AM 8    THERE EVIDENCE -- ISN'T THERE EVIDENCE THAT YOUR CLIENT

08:39AM 9    NEGOTIATED THE CONTRACT WITH MR. BURD?

08:39AM 10         MR. FLEURMONT:  I'D HAVE TO LOOK BACK AT THE RECORD

08:39AM 11   JUST TO CONFIRM THAT, YOUR HONOR, BUT THERE WAS EVIDENCE IN THE

08:39AM 12   TRIAL ABOUT MS. HOLMES AND MR. BURD AND THEIR DISCUSSIONS

08:39AM 13   DURING THE CONTRACT.

08:39AM 14         THE COURT:  RIGHT.  IT SOUNDS LIKE THIS COLLOQUY IS

08:39AM 15   HE'S SAYING I TOOK OVER RESPONSIBILITIES OR INCREASED MY

08:39AM 16   RESPONSIBILITIES WITH SAFEWAY AT SOME POINT IN TIME.

08:39AM 17         BUT WHAT I'M CURIOUS ABOUT, IT SEEMS AT THAT POINT IN TIME

08:39AM 18   IS SUBSEQUENT TO THE ACTUAL FORMATION OF THE CONTRACT, THE

08:39AM 19   CONSUMMATION OF THE DEAL.

08:39AM 20         AND IF THAT'S THE CASE, THEN IF THE LIABILITY IS THE

08:39AM 21   NEGOTIATION OF THE CONTRACT LIKE WE WERE TALKING ABOUT WITH

08:40AM 22   WALGREENS, THEN THIS IS POST THAT, AND IT'S NOT PARTICULARLY

08:40AM 23   RELEVANT TO HIS -- AGAINST HIS INTEREST.

08:40AM 24         MR. FLEURMONT:  WELL, THEY'RE STATEMENTS MADE AFTER

08:40AM 25   THE CONTRACT, AND THERE WAS STILL A RELATIONSHIP AFTER THE

7932

08:40AM 1    CONTRACT.  SO I DON'T -- I PUSH BACK A LITTLE BIT THAT AFTER

08:40AM 2    THE CONTRACT WAS SIGNED THAT ALL LIABILITY CEASES.

08:40AM 3         THE COURT:  ALL RIGHT.  YOU'RE SAYING THAT HIS

08:40AM 4    CONTINUED COMMUNICATIONS WITH SAFEWAY WERE -- IT'S A LITTLE ODD

08:40AM 5    BECAUSE IT'S ALMOST LIKE SAYING, WELL, IT'S AGAINST HIS

08:40AM 6    INTEREST BECAUSE, JUDGE, THAT'S EVIDENCE THAT -- YOU'RE NOT

08:40AM 7    SAYING THIS, THERE'S NO ADMISSION HERE.  LET ME BE STRAIGHT

08:40AM 8    ABOUT THIS.

08:40AM 9        BUT THAT COULD BE VIEWED BY THE JURY AS COCONSPIRATOR

08:40AM 10   CONDUCT IN THAT HE KEPT TALKING TO THEM, SAFEWAY, TO KEEP THEM

08:40AM 11   FOOLED -- I'LL JUST USE THAT WORD AS PART OF THE CRIMINAL

08:41AM 12   INTENT OF THAT -- AND HE WAS PART OF IT.

08:41AM 13       IS THAT WHAT YOU'RE SAYING?

08:41AM 14        MR. FLEURMONT:  NOT AT ALL, YOUR HONOR.

08:41AM 15       FIRST, THE PERSPECTIVE THAT WE'RE LOOKING AT HERE IS THE

08:41AM 16   PERSPECTIVE OF THE DECLARANT.  AND SO THE QUESTION IS WHETHER A

08:41AM 17   REASONABLE PERSON IN DECLARANT'S POSITION BELIEVED THAT

08:41AM 18   STATEMENTS WERE MADE THAT WERE SUBJECT TO EITHER CIVIL OR

08:41AM 19   CRIMINAL LIABILITY.  AND THEY CAN BE BOTH CIVIL OR CRIMINAL

08:41AM 20   LIABILITY.  SO WE'RE NOT JUST TALKING ABOUT WHAT A JURY WOULD

08:41AM 21   THINK IN A CRIMINAL CASE.

08:41AM 22        THE COURT:  SO HIS WORRY WOULD NOT BE IF THIS COMES

08:41AM 23   OUT, THEN I COULD BE FOUND AS A COCONSPIRATOR BECAUSE I WAS

08:41AM 24   CONTINUING THE RUSE, IF YOU WILL?

08:41AM 25        MR. FLEURMONT:  EXACTLY.  I DON'T THINK THAT THE

7933

08:41AM  1    CONCERN.  IT'S KIND OF AN OBJECTIVE INQUIRY ABOUT WHETHER A

08:41AM  2    PERSON IN HIS POSITION IN AN S.E.C. DEPOSITION WHERE HE'S

08:41AM  3    GOTTEN SUBPOENAS ABOUT THIS TOPIC WOULD SAY SOMETHING THAT

08:41AM  4    WOULD -- HE SAID IT TRUTHFULLY.

08:41AM  5         THE COURT:  OKAY.

08:41AM  6         MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD ABOUT THIS

08:42AM  7    PORTION BEFORE WE MOVE ON TO THE NEXT PORTION?

08:42AM  8         THE COURT:  YES.  LET ME LET MR. FLEURMONT FINISH

08:42AM  9    HIS COMMENT, AND THEN WE'LL DO THIS BACK AND FORTH.

08:42AM  10        MR. FLEURMONT, DO YOU WANT TO FINISH YOUR THOUGHT?

08:42AM  11        MR. FLEURMONT:  THAT IS IT.  THAT IS WHAT I HAVE TO

08:42AM  12   SAY ON THAT TOPIC.

08:42AM  13        THE COURT:  OKAY.

08:42AM  14        MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:42AM  15        SO JUST FOCUSSING ON PAGES 3 TO 5 BECAUSE I THOUGHT IT

08:42AM  16   WOULD BE EASIEST TO DO IT IN CHUNKS, WHICH IS WHAT I BELIEVE

08:42AM  17   ALSO IS WHAT MR. FLEURMONT INTENDS TO DO.

08:42AM  18        THE COURT:  RIGHT.

08:42AM  19        MS. VOLKAR:  SO WHAT WAS SKIPPED OVER WAS ON PAGE 3

08:42AM  20   THERE'S A LOT OF DISCUSSION ABOUT THE SUPPLY CHAIN AND HOW

08:42AM  21   MR. BALWANI CAME TO LEARN MORE ABOUT THE SUPPLY CHAIN DURING

08:42AM  22   HIS EARLIER YEARS WITH THE COMPANY.

08:42AM  23        FIRST OF ALL, I'M NOT ENTIRELY SURE IF THAT IS DIRECTLY

08:42AM  24   INCULPATORY.  HE'S NOT SAYING I CREATED THE DEVICE.  IT COULD

08:42AM  25   CERTAINLY BE A PIECE IN THE PUZZLE ON THE WAY THERE.  SO I TAKE

7934

| | | |
|---|---|---|
| 08:42AM | 1 | COUNSEL'S POINT THAT MAYBE THIS IS A PIECE IN THE PUZZLE, BUT I |
| 08:42AM | 2 | REPRESENT THAT THE GOVERNMENT HAS NOT COMPLETED ITS RULE 106 |
| 08:42AM | 3 | REVIEW YET.  I HAVE GOTTEN THROUGH SOME PORTIONS RELATED TO |
| 08:42AM | 4 | THIS SECTION.  AND LATER ON IN THE SAME TESTIMONY MR. BALWANI |
| 08:43AM | 5 | TALKS ABOUT HOW MS. HOLMES HAD CREATED THE INTERNAL WORKINGS OF |
| 08:43AM | 6 | THE TSPU BEFORE HE EVEN JOINED THE COMPANY AND WAS USING IT FOR |
| 08:43AM | 7 | PHARMA COMPANIES. |
| 08:43AM | 8 | ALSO RIGHT AFTER TALKING -- LITERALLY THE NEXT ANSWER ON |
| 08:43AM | 9 | PAGE 5 TALKING ABOUT WALGREENS AND SAFEWAY, THE QUESTIONER ASKS |
| 08:43AM | 10 | WHAT ABOUT OTHER PHARMACIES? |
| 08:43AM | 11 | AND HE SAID, I HAD NO ROLE IN THAT, MS. HOLMES HANDLED |
| 08:43AM | 12 | THOSE. |
| 08:43AM | 13 | SO IN TERMS OF WHEN WE GET TO RULE 106, ONE OF THE THINGS |
| 08:43AM | 14 | THAT I REALIZED VERY QUICKLY IS THAT WE CAN GET INTO |
| 08:43AM | 15 | CONFRONTATION CLAUSE ISSUES WHERE HE IS SAYING I HAD THESE |
| 08:43AM | 16 | RESPONSIBILITIES AND SHE HAD THOSE RESPONSIBILITIES, AND, OF |
| 08:43AM | 17 | COURSE, THAT'S CONSISTENT WITH THE GOVERNMENT'S THEORY WHICH IS |
| 08:43AM | 18 | THAT THEY WERE COCONSPIRATORS AND THEY BOTH HAD ROLES REVOLVING |
| 08:43AM | 19 | AROUND DIFFERENT PIECES. |
| 08:43AM | 20 | TO GET TO THE SPECIFIC INCULPATORY STATEMENT THAT I HEARD |
| 08:43AM | 21 | MR. FLEURMONT SAY ON PAGE 4, THE "I TOOK LEADERSHIP ROLE IN THE |
| 08:43AM | 22 | NEGOTIATIONS AND CONTRACTS FOR WALGREENS," THIS IS PART OF WHY |
| 08:44AM | 23 | I WANTED TO POINT OUT THE SORT OF CUMULATIVE NATURE TO THE |
| 08:44AM | 24 | LIMITED BENEFIT THAT THIS TESTIMONY MIGHT BRING. |
| 08:44AM | 25 | THEY'RE BOTH WALGREENS WITNESSES.  MR. MIQUELON AND |

08:44AM 1    MR. JHAVERI, I THINK, TESTIFIED THAT MOST OF THEIR

08:44AM 2    CONVERSATIONS WERE WITH MR. BALWANI.  THEY ALSO TESTIFIED THAT

08:44AM 3    THEY HAD SOME CONVERSATIONS WITH MS. HOLMES.

08:44AM 4        WE'LL GET TO PFM AND BRIAN GROSSMAN LATER, BUT WE'LL HAVE

08:44AM 5    THE SAME SITUATION THERE WHERE SOMETIMES SOME OF THE INVESTORS

08:44AM 6    SPOKE MORE WITH ONE OF THE COCONSPIRATORS, AND OTHER INVESTORS

08:44AM 7    LIKE SAFEWAY SPOKE WITH THE OTHER COCONSPIRATOR.  THAT'S ALL

08:44AM 8    CONSISTENT WITH THE TESTIMONY TO DATE.

08:44AM 9        AGAIN, I GET BACK TO THE POINT THAT YOUR HONOR WAS TALKING

08:44AM 10   ABOUT WITH RESPECT TO SAFEWAY.  HE'S SAYING THAT THEY BOTH HAD

08:44AM 11   THE RELATIONSHIP AND THE KEY PART OF THE RELATIONSHIP, WHEN THE

08:44AM 12   STATEMENTS WERE MADE THAT INDUCED THE POTENTIAL INVESTOR TO

08:44AM 13   RELY AND PART WITH MONEY WHEN SAFEWAY PAID THE MONEY IN THE

08:44AM 14   CONTRACT, THAT RELATIONSHIP WAS OWNED BY MS. HOLMES.

08:45AM 15       SO I DO THINK THAT YOUR HONOR IS PICKING UP ON A KEY

08:45AM 16   DISTINCTION.

08:45AM 17       MR. BALWANI IS SAYING THAT HE TOOK OVER THE RELATIONSHIP

08:45AM 18   AT A LATER PERIOD OF TIME.  THAT'S NOT NECESSARILY THE CORE

08:45AM 19   PERIOD OF TIME WHEN STATEMENTS WERE MADE THAT WOULD INDUCE AN

08:45AM 20   INVESTOR OR A POTENTIAL INVESTOR TO PART WITH MONEY.

08:45AM 21       THE COURT:  OKAY.  THANK YOU.

08:45AM 22       MR. FLEURMONT:  JUST A BRIEF RESPONSE.

08:45AM 23       THE COURT:  SURE.

08:45AM 24       MR. FLEURMONT:  I THINK THAT'S A BIT OF TWO SHIPS IN

08:45AM 25   THE NIGHT PASSING RIGHT HERE.

7936

08:45AM  1    WE'VE INCLUDED THE FULL QUESTION AND ANSWER SO THE COURT

08:45AM  2    COULD HAVE CONTEXT.  SO THE STATEMENTS ABOUT MANUFACTURING AND

08:45AM  3    PRODUCTION IN THE BEGINNING, THAT'S JUST PART OF HIS ANSWER TO

08:45AM  4    THE QUESTION, AND WE THINK IT WOULD BE INAPPROPRIATE FOR

08:45AM  5    RULE 106 DESIGNATIONS AS TO PORTIONS OF THE QUESTION AND ANSWER

08:45AM  6    THEY'RE NOT EVEN SAYING ARE INCULPATORY.  SO I JUST WANT TO

08:45AM  7    CLARIFY THAT.

08:45AM  8         THE COURT:  SURE.

08:45AM  9         MR. FLEURMONT:  AND I THINK PART OF THIS EXERCISE IS

08:45AM  10   BECAUSE THE COURT WANTS TO KNOW EXACTLY WHAT THEY THINK IS A

08:45AM  11   STATEMENT AGAINST INTEREST, AND WE'D HAVE TO REVIEW THE 106

08:45AM  12   DESIGNATIONS BASED ON -- I DON'T WANT TO PROLONG TIME BUT THE

08:46AM  13   POINT --

08:46AM  14        THE COURT:  NO, NO, NO.  I'M SMILING BECAUSE I SEE A

08:46AM  15   TENNIS MATCH HERE.  WE'RE GOING TO GO BACK AND FORTH WITH THIS,

08:46AM  16   WHICH WE'LL HAVE TO DO.  LET ME JUST -- LET ME BE SERIOUS.

08:46AM  17   IT'S AN IMPORTANT POINT TO YOUR CASE AND THE GOVERNMENT'S AS

08:46AM  18   WELL.  I DO THINK THERE ARE SOME 106 ISSUES THAT PROBABLY NEED

08:46AM  19   TO BE FLESHED OUT, AND THE TWO OF YOU ARE GOING TO HAVE TO MEET

08:46AM  20   AND CONFER AND LOOK AT THOSE, AND THEN WE'RE GOING TO HAVE

08:46AM  21   ANOTHER CONVERSATION ABOUT THAT AT SOME POINT.

08:46AM  22        MR. FLEURMONT:  ABSOLUTELY, YOUR HONOR.

08:46AM  23    I JUST WANT TO CLARIFY THAT JUST BECAUSE THERE'S A PORTION

08:46AM  24   IN A QUESTION AND AN ANSWER THAT SPEAKS TO AN ISSUE THAT WE'RE

08:46AM  25   NOT SAYING IS INCULPATORY DOES NOT MEAN THAT, ONE, THE

7937

| | | |
|---|---|---|
| 08:46AM | 1 | GOVERNMENT SHOULD BE ABLE TO DESIGNATE UNDER RULE 106 OTHER, |
| 08:46AM | 2 | BECAUSE THAT IS KIND OF NOT REALLY AN ISSUE, BUT ALSO PART OF |
| 08:46AM | 3 | THIS EXERCISE, I BELIEVE, IS TO KIND OF FIGURE OUT WHAT WE'RE |
| 08:46AM | 4 | POINTING AT. |
| 08:46AM | 5 | AND IF IT BECOMES A CASE THAT THE COURT THINKS THAT WE |
| 08:46AM | 6 | SHOULD JUST INCLUDE EXACTLY WHAT WE'RE SAYING IS EXCULPATORY |
| 08:46AM | 7 | AND SOME LANGUAGE AROUND FOR CONTEXT, THEN THAT MIGHT BE THE |
| 08:47AM | 8 | DIRECTION THAT WE GO. |
| 08:47AM | 9 | THE COURT:  RIGHT. |
| 08:47AM | 10 | MR. FLEURMONT:  BUT I JUST WANT TO MAKE VERY CLEAR |
| 08:47AM | 11 | THAT JUST BECAUSE THERE ARE OTHER STATEMENTS ABOUT OTHER TOPICS |
| 08:47AM | 12 | THAT ARE RELATED IN THE QUESTION AND ANSWER THAT WERE -- IT'S |
| 08:47AM | 13 | FINE FOR THE GOVERNMENT TO DESIGNATE 106 ON THAT ISSUE, AND |
| 08:47AM | 14 | ALSO THAT WE, THAT WE -- IT'S NECESSARY FOR US TO GET THAT |
| 08:47AM | 15 | PORTION OF THE STATEMENT. |
| 08:47AM | 16 | THE COURT:  OKAY.  IT SOUNDS LIKE WE'RE GOING TO DO |
| 08:47AM | 17 | SOME MORE WORK ON THAT WITH YOUR HELP, WITH YOUR HELP.  IT |
| 08:47AM | 18 | SOUNDS THAT WAY. |
| 08:47AM | 19 | AND 106, THE COMPANY'S FINANCIALS AND YOUR ROLE? |
| 08:47AM | 20 | MR. FLEURMONT:  YES, YOUR HONOR.  I HAVE THAT PAGE |
| 08:47AM | 21 | IN MY BAG ACTUALLY. |
| 08:48AM | 22 | MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD BRIEFLY FOR |
| 08:48AM | 23 | THE RECORD BEFORE WE MOVE ON? |
| 08:48AM | 24 | THE COURT:  SURE. |
| 08:48AM | 25 | MS. VOLKAR:  I RESPECTFULLY DISAGREE WITH MY |

7938

08:48AM 1    COLLEAGUE'S STATEMENT ABOUT RULE 106.

08:48AM 2        MY UNDERSTANDING OF RULE 106 IS TO MAKE A COMPLETE ANSWER

08:48AM 3    OR PICTURE SO THAT TESTIMONY WON'T BE CONFUSING TO THE JURY.

08:48AM 4        I DON'T BELIEVE THAT THEY CAN CHERRY PICK CERTAIN ANSWERS

08:48AM 5    IF THEY'RE GOING TO READ THE FULL PORTION.  EVEN IF THEY

08:48AM 6    CONCLUDED -- OR EVEN IF THEY INCLUDED THE WHOLE ANSWER SO AS TO

08:48AM 7    GIVE A FULSOME ANSWER, THAT MEANS RULE 106 APPLIES TO ANY PARTS

08:48AM 8    OF THAT ANSWER OR WHAT THEY WOULD READ OUT LOUD TO THE JURY.

08:48AM 9        SO I JUST WANTED TO MAKE SURE THE RECORD IS CLEAR FROM

08:48AM 10   THE GOVERNMENT'S POSITION ON THAT.

08:48AM 11        THE COURT:  THANK YOU.

08:48AM 12        MR. FLEURMONT:  I THINK YOU UNDERSTAND OUR POSITION

08:48AM 13   SO I WON'T BELABOR THAT.

08:48AM 14        SO ON TO PAGE 6 OF EXHIBIT A.  THE PORTION THAT WE'RE

08:49AM 15   POINTING TO AND THAT SHOWS ONE RESPONSIBILITY OVER A RELEVANT

08:49AM 16   ALLEGATION IS THE FINANCIAL MODEL, AND I'M LOOKING AT PAGE 6,

08:49AM 17   LINES 17 THROUGH 20.

08:49AM 18        AND AS YOU CAN SEE THERE, THEY'RE TALKING ABOUT THE

08:49AM 19   FINANCIAL MODEL, HOW HE BUILT IT.

08:49AM 20        AND THEN HE SAYS, HE SAYS HE OWNED THE FINANCIAL MODEL.

08:49AM 21   AND THEN THERE'S A QUESTION ABOUT "BY SAYING YOU OWNED, YOU

08:49AM 22   MEAN YOU WERE THE PERSON RESPONSIBLE FOR THE COMPANY'S

08:49AM 23   FINANCIAL PROJECTIONS AS YOU'VE JUST DESCRIBED?"

08:49AM 24        HE SAYS, "FINANCIAL MODEL.

08:49AM 25        "QUESTION:  FINANCIAL MODEL?

7939

08:49AM   1          "ANSWER:  YES."

08:49AM   2          AND THEN ON PAGE 7, LINES 18 THROUGH 21.

08:49AM   3          "SO I WAS USING THIS AS A PLANNING TOOL AND SOME OF THE

08:50AM   4     TABS IN THE MODEL WOULD SPIT OUT AS THE END RESULTS OR, YOU

08:50AM   5     KNOW, CHANGING ANY ASSUMPTIONS IN THE MODEL," SHOWING THAT HE

08:50AM   6     WAS THE ONE USING THE MODEL AS A FINANCIAL TOOL.

08:50AM   7          WE'VE HEARD TESTIMONY ABOUT THE FINANCIAL MODEL REFERRED

08:50AM   8     TO BY MR. GROSSMAN.  THE PROJECTIONS IN THE MODEL ARE

08:50AM   9     ESSENTIALLY ONE AND THE SAME BECAUSE MANY OF THE PROJECTIONS

08:50AM   10    AND THE NUMBERS IN THE PROJECTIONS ARE ACTUALLY IN THE

08:50AM   11    FINANCIAL MODEL, AND THIS PORTION HERE SHOWS THAT HE'S A PERSON

08:50AM   12    WHO OWNS THE MODEL, HE'S A PERSON THAT WORKS WITH THE

08:50AM   13    ASSUMPTIONS, AND TAKES RESPONSIBILITY FOR THAT MODEL.

08:50AM   14          AND GOING BACK TO THE POINT I MADE EARLIER ABOUT THE

08:50AM   15    SUBPOENAS HE RECEIVED FROM THE S.E.C., THOSE ASKED ABOUT

08:50AM   16    QUESTIONS ABOUT THE COMPANY'S FINANCIALS.

08:50AM   17          THE COURT:  AND BECAUSE HE CREATED THE MODEL, THAT

08:50AM   18    EXPOSES HIM -- THAT'S AGAINST HIS INTEREST BECAUSE?

08:51AM   19          MR. FLEURMONT:  SURE.  I GUESS FOR TWO REASONS,

08:51AM   20    YOUR HONOR.

08:51AM   21          ONE, A REASONABLE PERSON WHO CREATED A FINANCIAL MODEL AND

08:51AM   22    GAVE THAT MODEL TO INVESTORS KNOWING THAT THE INVESTORS WERE

08:51AM   23    USING THE MODEL AND SOME OF THEIR DECISIONS AND WOULD NOT SAY

08:51AM   24    AND KNOWING THAT THEY'RE IN AN S.E.C. DEPOSITION FACED WITH

08:51AM   25    LIABILITY ABOUT THE FINANCES OF THE COMPANY, WOULD NOT OUTRIGHT

7940

08:51AM 1    SAY, "I OWN THIS, THIS WAS MINE, I'M THE PERSON WHO DID THE

08:51AM 2    ASSUMPTIONS," WITHOUT KNOWING THAT THEY COULD PUT THEM AT CIVIL

08:51AM 3    LIABILITY.

08:51AM 4          THE COURT:  DO WE NEED TO LOOK AT THE RECORD TO SEE

08:51AM 5    WHETHER OR NOT THERE'S A DISTINCTION BETWEEN THE MODEL BEING

08:51AM 6    SENT TO INVESTORS AS OPPOSED TO PROJECTIONS?

08:51AM 7          MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:51AM 8      I THINK THAT BECAUSE THE MODEL HAS THE SAME -- SOME OF THE

08:51AM 9    SAME NUMBERS AS THE PROJECTIONS, THAT ESSENTIALLY, PARTICULARLY

08:51AM 10   FOR THIS PART, THEY'RE ONE AND THE SAME.

08:51AM 11     BUT HE TAKES OWNERSHIP OVER THE MODEL, AND THAT'S THE

08:52AM 12   QUESTION THAT WE'RE CONCERNED WITH HERE.

08:52AM 13         THE COURT:  SO THE MODEL IS A PREDECESSOR IN TIME TO

08:52AM 14   THE PROJECTIONS AND THEN THE PROJECTIONS ARE WHAT WAS SENT TO

08:52AM 15   THE INVESTORS BY YOUR CLIENT?  IS THAT HOW THAT WORKED?

08:52AM 16         MR. FLEURMONT:  I DON'T THINK SO, YOUR HONOR.

08:52AM 17     I THINK THAT HE'S SAYING THAT HE MADE THE MODEL VERY EARLY

08:52AM 18   ON, AND PART OF THE MODEL IS LOOKING AT THE PROJECTIONS.

08:52AM 19         THE COURT:  OKAY.

08:52AM 20         MR. FLEURMONT:  SO I DON'T THINK THAT THAT'S

08:52AM 21   ENTIRELY RIGHT.

08:52AM 22     I THINK THAT THE FOCUS IS ON THE FACT THAT THE MODEL WAS

08:52AM 23   SENT TO INVESTORS, PARTICULARLY MR. GROSSMAN, AND THE FACT THAT

08:52AM 24   MR. BALWANI IS CLAIMING OWNERSHIP OVER THAT MODEL.

08:52AM 25         THE COURT:  OKAY.

08:52AM   1           MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:52AM   2       I THINK THERE ARE TWO KEY ISSUES WITH RESPECT TO

08:52AM   3   804(B)(3).  WHEN IT COMES TO THE MODEL INSTRUCTION, AND THERE'S

08:52AM   4   ONE PAGE IN A LATER EXHIBIT THAT ALSO TOUCHES ON THIS TOPIC.

08:52AM   5   SO IN MY MIND I'M GOING TO GROUP THEM TOGETHER FOR A MOMENT.

08:53AM   6       FIRST, THE MODEL VERSUS PROJECTIONS IS KEY BECAUSE THE

08:53AM   7   WORD "PROJECTIONS" MEANT SOMETHING TO THE INVESTORS.  IT WAS

08:53AM   8   PROJECTED REVENUE.  THAT WAS THE TITLE OF THE SLIDE THAT MOST

08:53AM   9   REVENUES, THAT MOST INVESTORS, RDV, MR. MOSLEY, I BELIEVE --

08:53AM   10   I'M FORGETTING THE THIRD INVESTOR THAT SPECIFICALLY TALKED

08:53AM   11   ABOUT THE SLIDE, BUT MULTIPLE INVESTORS TALKED ABOUT -- AND

08:53AM   12   I'LL PUT PFM AND MR. GROSSMAN IN A SEPARATE CATEGORY BECAUSE

08:53AM   13   THEY BUILT THEIR OWN MODEL AND THAT WAS SLIGHTLY DIFFERENT SO I

08:53AM   14   WILL COME BACK TO THAT.

08:53AM   15       BUT MOST INVESTORS SAW FINANCIAL PROJECTIONS, AND THAT

08:53AM   16   MEANT SOMETHING.  THAT WAS NOT "THIS IS A THEORETICAL WORLD

08:53AM   17   THAT COULD EXIST IF A BUNCH OF ASSUMPTIONS ARE MET."  THAT WAS,

08:53AM   18   "THIS IS WHAT WE PROJECT THE REVENUE OF THE COMPANY TO BE."

08:53AM   19       NOW, THAT DISTINCTION IS KEY, BECAUSE WHAT MR. BALWANI IS

08:53AM   20   SAYING HERE IS ACTUALLY THAT HE HAD NOTHING TO DO WITH

08:53AM   21   PROJECTIONS, AND HE'S NOT EVEN SURE WHO CHANGED THE WORD OR THE

08:54AM   22   TITLE OF THE SLIDE TO BE PROJECTIONS, RATHER HE BUILT A MODEL

08:54AM   23   THAT HAD A BUNCH OF ASSUMPTIONS, AND HE'S NOT EVEN SAYING IN

08:54AM   24   THE LINES THAT MR. FLEURMONT READ, HE'S NOT EVEN SAYING HE

08:54AM   25   HIMSELF ENTIRELY BUILT THE MODEL.  HE'S SHARING BLAME WITH

08:54AM   1    MULTIPLE INVESTORS, WALGREENS, SAFEWAY, EVEN DANISE YAM.

08:54AM   2         AND LATER HE TALKS ABOUT HOW BDT FOLKS MADE EDITS, AND

08:54AM   3    HE'S NOT SURE WHO CHANGED THE NAME AT SOME POINT TO

08:54AM   4    PROJECTIONS, BUT AGAIN, THAT IS A BIG DISTINCTION TO PEOPLE

08:54AM   5    WITH FINANCIAL BACKGROUND.

08:54AM   6         SO FIRST AND FOREMOST ON THE PENAL INTEREST, THERE'S NOT

08:54AM   7    NECESSARILY ANY DIRECT INCULPATORY STATEMENTS HERE, RATHER

08:54AM   8    THERE'S DEFLECTING AND SHARING BLAME THAT WE KNOW FROM GADSON

08:54AM   9    IS INAPPROPRIATE.

08:54AM  10         NOW, I WANT TO TALK ABOUT PFM BRIEFLY BEFORE WE MOVE --

08:54AM  11    BEFORE I MOVE TO THE SECOND POINT.

08:54AM  12         SO WITH PFM THAT ONE SPECIFIC INVESTOR, I KNOW

08:55AM  13    MR. FLEURMONT KEEPS REFERENCING THEM, BUT IT WAS ONE INVESTOR.

08:55AM  14    THEY WORKED WITH MR. BALWANI TO TAKE SOME OF THOSE BASE

08:55AM  15    ASSUMPTIONS AND BUILD THEIR OWN MODEL, WHICH AGAIN, WAS WHAT IS

08:55AM  16    THE RESPONSIBILITIES FOR THIS COMPANY.

08:55AM  17         AND THAT IS NOT WHAT IS THE COMPANY PROJECTING ITS REVENUE

08:55AM  18    TO BE.  THAT'S GIVEN THE FIELD AND THE SPACE THAT THEY'RE

08:55AM  19    ENTERING, IF WE BUILT -- AND I THINK MR. GROSSMAN TESTIFIED

08:55AM  20    ABOUT THREE DIFFERENT SCENARIOS THAT THEY BUILT OUT IN TERMS OF

08:55AM  21    WHAT POSSIBLE GROWTH THERE WAS FOR THIS COMPANY.

08:55AM  22         AND MAYBE BECAUSE I MYSELF AM NOT A FINANCIER, I'M NOT

08:55AM  23    NECESSARILY SEPARATING THE TWO VERY WELL.  BUT ONE IS HERE IS

08:55AM  24    EXPECTED PROJECTED REVENUE, MAYBE WE'LL FALL SHORT, BUT WE'RE

08:55AM  25    NOT GOING TO FALL A BILLION DOLLARS SHORT, AND HERE'S A MODEL

7943

08:55AM 1    WHICH IS JUST ABOUT WHAT IS THE SPHERE, WHAT IS THE SPACE IN

08:55AM 2    THE MARKET THAT THIS COMPANY IS IN, AND, THEREFORE, WHAT IS THE

08:55AM 3    FULLEST POTENTIAL?  NOT WHAT DO WE EXPECT, BUT WHAT IS

08:56AM 4    POSSIBLE?  AND THAT'S KIND OF ONE OF THE KEY DIFFERENCES

08:56AM 5    BETWEEN THE TWO OF THEM.

08:56AM 6        AND PFM DID WORK WITH MR. BALWANI ON THAT.  WE HEARD

08:56AM 7    MR. GROSSMAN'S TESTIMONY ABOUT THAT.  AGAIN, I DON'T KNOW IF

08:56AM 8    THAT IS PER SE IN DISPUTE AND THERE IS ALREADY TESTIMONY ON

08:56AM 9    THAT TOPIC.

08:56AM 10       THE SECOND POINT THAT I WANTED TO MAKE THAT CAUSES MORE

08:56AM 11   CONCERN ABOUT THIS PARTICULAR TOPIC IS THAT THIS PART, AND THE

08:56AM 12   KEY PART THAT I THINK THEY WANT, I BELIEVE IT IS EXHIBIT B.  I

08:56AM 13   KNOW WE HAVE NOT GOTTEN THERE YET, BUT I BELIEVE IT'S PORTIONS

08:56AM 14   OF EXHIBIT B.  426 IS THE PART WHERE IT SAYS THAT MS. HOLMES

08:56AM 15   DIDN'T HAVE ANY KNOWLEDGE OF THE PROJECTIONS OR THE MODEL, OR

08:56AM 16   DIDN'T ADD ANY EDITS TO IT.

08:56AM 17       AND THE PART OF 804(B)(3) THAT REQUIRES TRUSTWORTHINESS OR

08:56AM 18   CORROBORATION, THAT PART IS PARTICULARLY CONCERNING TO THE

08:56AM 19   GOVERNMENT BECAUSE WE HAVE TEXT MESSAGES WHERE MR. BALWANI IS

08:56AM 20   ASKING MS. HOLMES ABOUT THE SAME PROJECTION, THE SAME MODEL,

08:57AM 21   AND THEY'RE TALKING TO EACH OTHER, AND SHE SAYS, I CAN GET

08:57AM 22   COMFORTABLE WITH IT AND I CAN ESSENTIALLY UNDERSTAND IT AND

08:57AM 23   REPEAT IT TO INVESTORS.

08:57AM 24       AND THERE'S NO TESTIMONY FROM MR. GROSSMAN.  THERE'S NO

08:57AM 25   TESTIMONY FROM ANY OTHER INVESTOR THAT MS. HOLMES DIDN'T

7944

08:57AM  1     UNDERSTAND OR KNOW HOW TO TALK ABOUT THIS MODEL.

08:57AM  2         SO THERE'S SIMPLY NOTHING TO CORROBORATE OR INDICATE

08:57AM  3     TRUSTWORTHINESS OF WHAT I WOULD IMAGINE IS THE KEY PART ABOUT

08:57AM  4     THE FINANCIAL STUFF THAT THEY WANT.

08:57AM  5         SO, AGAIN, I KNOW IT'S TWO SLIGHTLY DIFFERENT THINGS.  BUT

08:57AM  6     THERE'S THE PART WHERE IT'S FINANCIAL PROJECTIONS VERSUS MODELS

08:57AM  7     AND MR. BALWANI IS DEFLECTING BLAME THERE, NOT ACTUALLY OWNING

08:57AM  8     THAT HE IS THE ONE WHO CREATED PROJECTIONS PER SE.

08:57AM  9         HE'S TALKING ABOUT HIS PART IN CREATING A MODEL, THAT'S

08:57AM  10    NOT WHAT WAS SAID TO INVESTORS, THAT'S NOT ABOUT THE STATEMENTS

08:57AM  11    THAT WERE MADE, AND THEN THERE'S THE LATER PART WHERE IT SAYS

08:57AM  12    MS. HOLMES HAD NO KNOWLEDGE IN IT, AND THAT PART SIMPLY DOESN'T

08:57AM  13    HAVE ANY CORROBORATION.

08:57AM  14             THE COURT:  OKAY.  THANK YOU.

08:57AM  15             MR. FLEURMONT:  JUST A COUPLE OF POINTS.

08:57AM  16        ON THE FINANCIAL MODEL, THE FINANCIAL MODEL AS

08:58AM  17    MR. GROSSMAN CAME -- AS CAME OUT DURING MR. GROSSMAN'S

08:58AM  18    TESTIMONY, THAT DROVE THE VALUATION, RIGHT?  AND SO THAT WAS

08:58AM  19    SOMETHING THAT WAS IMPORTANT.

08:58AM  20        IN MR. GROSSMAN'S MODEL, THERE IS A TAB THAT HAS

08:58AM  21    MR. BALWANI'S FINANCIAL MODEL IN IT, SO IT'S PART OF HIS MODEL

08:58AM  22    AS WELL.

08:58AM  23        ON CORROBORATION, THE RULE REQUIRES CORROBORATING

08:58AM  24    CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS.

08:58AM  25        ON MS. VOLKAR'S LAST POINT, WE HAVE TESTIMONY FROM

08:58AM   1    GENERAL MATTIS THAT WHEN THE MODEL WAS DISCUSSED IN THE

08:58AM   2    MEETINGS, IT WAS DISCUSSED BY MR. BALWANI, NOT MS. HOLMES.

08:58AM   3        AND WE HAVE THAT SAME EXACT TESTIMONY IN MR. BALWANI'S

08:58AM   4    S.E.C. DEPOSITION THAT SAYS THAT WHEN HE WENT TO THE BOARD, I

08:58AM   5    BELIEVE ON THE VERY NEXT PAGE -- YES, THE VERY NEXT PAGE -- I'M

08:58AM   6    LOOKING AT PAGE 8, LINES 1 THROUGH 6 WHERE HE DISCUSSES WHEN

08:58AM   7    HE'S AT THE BOARD SHARING THE FINANCIAL MODEL WITH THE BOARD

08:59AM   8    ANY ASSUMPTIONS, NOT MS. HOLMES.

08:59AM   9        AND I THINK WE SHOULD ALSO -- I NEGLECTED TO SAY, OR I'M

08:59AM  10    NEGLECTING TO SAY THAT WHEN LOOKING FOR CORROBORATING

08:59AM  11    CIRCUMSTANCES THAT INDICATE TRUSTWORTHINESS, TYPICALLY IN CASES

08:59AM  12    WHERE YOU HAVE THE STATEMENT AGAINST INTEREST EXCEPTION, WE'RE

08:59AM  13    TALKING ABOUT STATEMENTS MADE TO OTHER WITNESSES, STATEMENTS

08:59AM  14    MADE TO LAWYERS SOMETIMES, AND STATEMENTS MADE SOMETIMES TO

08:59AM  15    POLICE OFFICERS.

08:59AM  16        THESE ARE STATEMENTS MADE IN THE SWORN TESTIMONY.

08:59AM  17        AND THERE'S ACTUALLY ANOTHER EXCEPTION ABOUT STATEMENTS

08:59AM  18    MADE AND IT DOESN'T REQUIRE CORROBORATION BECAUSE I THINK

08:59AM  19    THAT'S JUST A REFLECTION OF THE FACT THAT WHEN YOU'RE MAKING A

08:59AM  20    STATEMENT IN SWORN TESTIMONY, IT'S KIND OF PRESUMED TO BE

08:59AM  21    TRUSTWORTHY BECAUSE YOU HAVE ALL OF THE OTHER PENALTIES.

08:59AM  22        SO THAT'S ON THE CORROBORATION POINT AND THE FINANCIAL

08:59AM  23    AUDIT POINT.

08:59AM  24            THE COURT:  OKAY.  ANYTHING FURTHER ON THIS,

08:59AM  25    MS. VOLKAR?

7946

08:59AM    1          MS. VOLKAR:  ONLY THAT 804(B)(3) AND THE

08:59AM    2   NINTH CIRCUIT IS CLEAR WHAT THE THREE REQUIREMENTS ARE, AND ONE

09:00AM    3   OF THEM IS CORROBORATION AND TRUSTWORTHINESS.  AND I DON'T

09:00AM    4   THINK IT'S AN ACCIDENT THAT A LOT OF THE CASE LAW IN THE

09:00AM    5   NINTH CIRCUIT TALKS ABOUT WHEN THERE ARE TWO COCONSPIRATORS AND

09:00AM    6   ONE WANTS TO USE, OR SOMETIMES THE GOVERNMENT WANTS TO USE, ONE

09:00AM    7   COCONSPIRATOR STATEMENT AGAINST THE OTHER, THERE'S A LARGE BODY

09:00AM    8   OF LAW ABOUT THIS, AND THERE DOES NEED TO BE TRUSTWORTHINESS

09:00AM    9   BECAUSE THERE CAN BE ULTERIOR MOTIVES WHEN IT IS TWO

09:00AM   10   COCONSPIRATORS, AND I DO THINK THAT WE HAVE TO CONSIDER THAT

09:00AM   11   HERE.

09:00AM   12          THE COURT:  OKAY.  I THINK MOST OF THE CASES ARE THE

09:00AM   13   LATTER AS YOU SAY, THE GOVERNMENT TRYING TO GET COCONSPIRATOR

09:00AM   14   STATEMENTS IN.  IT WAS KIND OF A MIRROR IMAGE OF THAT HERE.

09:00AM   15      OKAY.

09:00AM   16          MR. FLEURMONT:  SHOULD WE CONTINUE OR?

09:00AM   17          THE COURT:  WELL, IT'S ABOUT 9:00 O'CLOCK NOW.

09:00AM   18   LET'S FINISH THIS.  LET'S FINISH EXHIBIT A.  LET'S DO THAT.

09:00AM   19          MR. FLEURMONT:  WE HAVE ONE MORE PORTION,

09:00AM   20   YOUR HONOR.

09:00AM   21          THE COURT:  SURE.

09:00AM   22          MR. FLEURMONT:  SO NOW I'M LOOKING AT PAGE 9.  AND

09:00AM   23   THIS RELATES TO RESPONSIBILITY ABOUT THE CLIA LAB.

09:00AM   24      THE QUESTION AT LINES 4 THROUGH 5, DID YOU SUPERVISE

09:01AM   25   THERANOS'S CLIA LAB?

7947

09:01AM 1          AND AS I SAID BEFORE, WE INCLUDED THE ENTIRE ANSWER.  WHAT

09:01AM 2     WE'RE MOST INTERESTED IN IS LINE 10, "HOWEVER, ALL LABS REPORT

09:01AM 3     ULTIMATELY TO BUSINESS," AND THEN LINES 19 THROUGH 21, "SO ALL

09:01AM 4     OF THAT CAME TO ME, REPORTED TO ME BUT THERE WERE OTHER PEOPLE

09:01AM 5     MANAGING IT," TALKING ABOUT THE LAB DIRECTORS, "BUT THEY

09:01AM 6     REPORTED UNDER ME."

09:01AM 7          AND I THINK THAT'S ONE OF THE MORE CLEAR STATEMENTS,

09:01AM 8     YOUR HONOR, HIM TAKING RESPONSIBILITY FOR THE CLIA LAB, WHICH

09:01AM 9     WE KNOW IS AT ISSUE IN THIS CASE.

09:01AM 10         TO BE SURE, THERE ARE OTHER STATEMENTS IN HERE ABOUT THE

09:01AM 11    LAB DIRECTOR, BUT THE STATEMENT THAT WE'RE INTERESTED IN IS HIM

09:01AM 12    SAYING "ALL OF THAT CAME TO ME, THEY REPORTED TO ME."

09:01AM 13         WE THINK THAT ONE IS ONE OF THE MORE CLEAR ISSUES.

09:01AM 14              THE COURT:  19 THROUGH 21?

09:01AM 15              MR. FLEURMONT:  SO, YOUR HONOR, WE THINK THE WHOLE

09:02AM 16    THING SHOULD COME IN.  I THINK YOU UNDERSTAND MY POINT AND I'M

09:02AM 17    JUST BEING FRANK WITH, YOUR HONOR.

09:02AM 18              THE COURT:  RIGHT.

09:02AM 19              MR. FLEURMONT:  JUST TO HEAR THAT, IT DOESN'T REALLY

09:02AM 20    MAKE SENSE WITHOUT HEARING THE FULL STATEMENT.

09:02AM 21         BUT THE QUESTION FROM THE COURT WAS, WHICH PART OF THE

09:02AM 22    STATEMENT IS?

09:02AM 23              THE COURT:  I APPRECIATE YOUR CANDOR.  THANK YOU.

09:02AM 24              MR. FLEURMONT:  AND THAT'S WHAT WE'RE LOOKING FOR.

09:02AM 25              THE COURT:  RIGHT.

7948

09:02AM 1    MS. VOLKAR:  YOUR HONOR, I'LL PREVIEW ANOTHER

09:02AM 2 RULE 106 SUGGESTION, AND POSSIBLY IT MAY BECOME A DEBATE.

09:02AM 3   EARLIER IN THE TESTIMONY HE SAYS HE'S THE PRESIDENT AND

09:02AM 4 COO AND HE REPORTED DIRECTLY TO MS. HOLMES AND THEY WERE THE

09:02AM 5 TWO BUSINESS ASPECTS OF THE COMPANY.

09:02AM 6   AND I THINK THAT THIS TESTIMONY IS ENTIRELY CONSISTENT

09:02AM 7 WITH THAT, AS WELL AS, TO BE FRANK, CONSISTENT WITH TESTIMONY

09:02AM 8 THAT WE HAVE HEARD THROUGHOUT THIS TRIAL, WHICH IS BOTH OF

09:02AM 9 THEM, BOTH DEFENDANTS, BELIEVE THE CLIA LAB DIRECTOR WAS THE

09:02AM 10 PERSON RESPONSIBLE FOR THE DECISIONS IN THE LAB.

09:02AM 11   AND THAT'S THE MAJORITY OF THIS ANSWER AND THE MAJORITY OF

09:03AM 12 THE SIMILAR ANSWER IN EXHIBIT C.

09:03AM 13   BUT THE KEY PART THAT THEY WANT IS THAT THE LAB REPORTED

09:03AM 14 TO HIM, AND HE REPORTED TO MS. HOLMES.  AND THAT'S THE RULE 106

09:03AM 15 PART THAT THEY HAVE NOT INCLUDED IN THESE EXCERPTS, BUT IS IN

09:03AM 16 THE TESTIMONY.

09:03AM 17   IT'S ALSO, TO BE FRANK, WHAT HAS COME OUT DURING THE

09:03AM 18 TESTIMONY OF THIS CASE, AND INCLUDING IN EXHIBIT -- I CITED IT

09:03AM 19 IN MY BRIEF AND I'M WORRIED I'LL MESS UP THE NUMBER -- BUT

09:03AM 20 4528, THE POWERPOINT PRESENTATION THAT THEY PRESENTED TO CMS,

09:03AM 21 DEFENSE BROUGHT THAT OUT ON CROSS OF ONE OF THE LAB DIRECTORS

09:03AM 22 THAT THE LAB REPORTED TO MR. BALWANI AND MR. BALWANI REPORTED

09:03AM 23 TO MS. HOLMES.

09:03AM 24   SO I JUST -- ONE, I DON'T THINK THAT'S IN DISPUTE IN THE

09:03AM 25 CASE; AND, TWO, IF THIS PART IS GOING TO COME IN, THEN IN

| | | |
|---|---|---|
| 09:03AM | 1 | FAIRNESS, AS WE'LL GET TO THE RULE 106, IT SHOULD BE THAT HE |
| 09:03AM | 2 | ALSO REPORTED TO MS. HOLMES AND TOLD HER WHAT WAS GOING ON IN |
| 09:03AM | 3 | THE LAB. |
| 09:03AM | 4 | THE COURT:  OKAY. |
| 09:03AM | 5 | MR. FLEURMONT:  ONE LAST BRIEF POINT. |
| 09:03AM | 6 | MS. VOLKAR HAS SAID A FEW TIMES THAT CERTAIN PARTS ARE |
| 09:04AM | 7 | CUMULATIVE, AND THAT JUST MEANS IT'S CORROBORATED.  YOU KNOW, |
| 09:04AM | 8 | JUST POINTING THAT OUT. |
| 09:04AM | 9 | THE COURT:  OKAY. |
| 09:04AM | 10 | MS. VOLKAR:  YOUR HONOR, MAY I RESPOND TO THAT? |
| 09:04AM | 11 | THE COURT:  YEAH, SURE. |
| 09:04AM | 12 | MS. VOLKAR:  I'M NOT SURE THAT I SAID THIS |
| 09:04AM | 13 | YESTERDAY, AND I HOPE THAT I DID.  ONE THING THAT I TRIED TO DO |
| 09:04AM | 14 | IN THE BRIEF, BUT PERHAPS FAILED TO DO, THERE ARE PORTIONS THAT |
| 09:04AM | 15 | ARE CUMULATIVE, AND THOSE ARE REALLY THE PORTIONS OF WHAT |
| 09:04AM | 16 | YOUR HONOR IS DEEMING FACT TESTIMONY, AND IT'S NOT THE |
| 09:04AM | 17 | INCULPATORY OR AGAINST PENAL INTEREST PORTIONS OF IT, OR MAYBE |
| 09:04AM | 18 | THERE'S SOME SLIGHT OVERLAP THERE. |
| 09:04AM | 19 | BUT I THINK THE KEY PORTIONS THAT THEY WANT, THE PART THAT |
| 09:04AM | 20 | SAYS, "AND NOT MS. HOLMES," THOSE PARTS ARE NOT CORROBORATED |
| 09:04AM | 21 | AND WE'RE NOT SAYING THEY'RE CUMULATIVE. |
| 09:04AM | 22 | THERE'S NO EVIDENCE TO SUPPORT THEM.  IF ANYTHING, IT'S |
| 09:04AM | 23 | EVIDENCE TO THE CONTRARY.  SO THERE ARE TWO BUCKETS HERE WHEN |
| 09:04AM | 24 | IT COMES TO THAT. |
| 09:04AM | 25 | AND TO THE EXTENT THAT MY COMMENTS ARE CONFUSING OR HAVE |

09:04AM  1    CONFLATED THEM, I JUST WANT TO BE VERY CLEAR.  THERE ARE

09:04AM  2    SEVERAL OF THE STATEMENTS THAT ARE CUMULATIVE, AND

09:05AM  3    MR. FLEURMONT WOULD CALL THAT CORROBORATED, BUT I WOULD CALL

09:05AM  4    THAT, GIVEN ALL OF THE OTHER ISSUES AND THE FACT THAT THEY'RE

09:05AM  5    NOT AGAINST PENAL INTEREST IN MOST CASES, WE THINK THAT IT'S

09:05AM  6    JUST ANOTHER REASON TO EXCLUDE THEM.

09:05AM  7         SO THAT'S THE GOVERNMENT'S POINT IN ITS BRIEF WAS EVEN IF

09:05AM  8    WE GET PAST THE HEARSAY ISSUES, THERE'S STILL A 403 ISSUE.

09:05AM  9    THOSE ARE SEPARATE REASONS TO EXCLUDE THIS.

09:05AM  10        SO I JUST WANT TO MAKE SURE THAT WE'RE NOT -- THAT I'M

09:05AM  11   BEING AS CLEAR AS I CAN BE THAT THOSE ARE TWO DIFFERENT REASONS

09:05AM  12   TO EXCLUDE SOMETIMES WHAT WE'RE TALKING ABOUT AS THE SAME

09:05AM  13   TESTIMONY.

09:05AM  14             THE COURT:  OKAY.  THANK YOU.

09:05AM  15             MR. FLEURMONT:  QUICKLY.

09:05AM  16        WE ARE INTERESTED IN STATEMENTS THAT TAKE RESPONSIBILITY

09:05AM  17   AND STATEMENTS THAT ARE INCULPATORY.

09:05AM  18        IF THOSE STATEMENTS ALSO SAY "AND NOT MS. HOLMES," THE

09:05AM  19   CASE LAW IS CLEAR THAT'S FINE.

09:05AM  20        BUT THIS IS NOT AN EXERCISE TO PUT IN STATEMENTS THAT SAY

09:05AM  21   "AND NOT MS. HOLMES."

09:05AM  22        ALL OF THE STATEMENTS WE HAVE PUT IN HAVE BEEN MR. BALWANI

09:05AM  23   TAKING RESPONSIBILITY OVER A CRITICAL ALLEGATION IN THIS CASE,

09:06AM  24   AND I'LL JUST LEAVE IT AT THAT.

09:06AM  25             THE COURT:  ALL RIGHT.  WHAT ABOUT THE NULL

7951

| | | |
|---|---|---|
| 09:06AM | 1 | PROTOCOL?  DARE I GO THERE?  I ASKED YESTERDAY, IS THIS MOOT |
| 09:06AM | 2 | NOW? |
| 09:06AM | 3 | MR. FLEURMONT:  WITHOUT CONCEDING ANY ARGUMENTS, |
| 09:06AM | 4 | WE'LL WITHDRAW THAT PORTION. |
| 09:06AM | 5 | THE COURT:  ANY OBJECTION? |
| 09:06AM | 6 | MS. VOLKAR:  NO OBJECTION FROM THE GOVERNMENT. |
| 09:06AM | 7 | THANK YOU. |
| 09:06AM | 8 | THE COURT:  WELL, LET'S CONTINUE OUR DISCUSSION ON B |
| 09:06AM | 9 | AND C AT SOME OTHER TIME IF THAT'S ALL RIGHT WITH YOU, COUNSEL? |
| 09:06AM | 10 | MR. FLEURMONT:  YES, YOUR HONOR. |
| 09:06AM | 11 | THE COURT:  GREAT.  LET'S DO THAT THEN. |
| 09:06AM | 12 | I'LL STEP DOWN AND WE'LL -- ANYTHING FURTHER ON THIS? |
| 09:06AM | 13 | WE'LL FIND A TIME WHEN WE CAN CONTINUE THIS MAYBE DURING OUR |
| 09:06AM | 14 | BREAK OR SOMETHING. |
| 09:06AM | 15 | MR. FLEURMONT:  THAT SOUNDS GOOD, YOUR HONOR. |
| 09:06AM | 16 | THE COURT:  GREAT. |
| 09:06AM | 17 | MS. VOLKAR:  THANK YOU, YOUR HONOR. |
| 09:06AM | 18 | THE COURT:  LET ME ASK BEFORE WE BRING THE JURY OUT, |
| 09:06AM | 19 | ANYTHING WE NEED TO TALK ABOUT BEFORE THE JURY COMES OUT, |
| 09:06AM | 20 | MR. LEACH? |
| 09:06AM | 21 | YOU'RE PREPARED FOR CROSS-EXAMINATION? |
| 09:06AM | 22 | MR. LEACH:  I AM, YOUR HONOR.  IF WE CAN HAVE MAYBE |
| 09:06AM | 23 | FIVE EXTRA MINUTES TO GET THE BINDERS AND THINGS? |
| 09:06AM | 24 | THE COURT:  SURE. |
| 09:06AM | 25 | MR. DOWNEY? |

7952

09:06AM  1          MR. DOWNEY:  I DIDN'T KNOW YESTERDAY WHAT

09:06AM  2   MR. LEACH'S EXHIBITS WILL BE.  HE DID DISCLOSE SOME EXHIBITS

09:07AM  3   WHICH IMPLICATE THE COURT'S PRIOR RULING ON WEALTH, THE MOTION

09:07AM  4   IN LIMINE ON 798.

09:07AM  5          I DON'T KNOW HIS INTENDED USE OF THEM.  I CAN IMAGINE USES

09:07AM  6   THAT GO BOTH WAYS, BUT I JUST WANTED TO SENSITIZE THE COURT TO

09:07AM  7   THAT BECAUSE I KNOW THAT THE COURT'S RULING WILL NOT

09:07AM  8   NECESSARILY BE TOP OF MIND IN THE HEAT OF THE MOMENT, AND WE

09:07AM  9   HAD A SUBSTANTIAL DISCUSSION OF IT AT THE TIME.

09:07AM  10         AMONG THE EXHIBITS HE'S DISCLOSED, FOR EXAMPLE, TRAVEL

09:07AM  11   ITINERARIES FOR BOARD MEMBERS WHERE MS. HOLMES TRAVELLED TO

09:07AM  12   WASHINGTON, D.C. WITH BOARD MEMBERS.

09:07AM  13         WHEN WE HAD THE MOTION IN LIMINE HEARING, THE MODE OF

09:07AM  14   TRAVEL, THE SPECIFIC ITINERARY WAS A SPECIFIC DISCUSSION

09:07AM  15   BETWEEN YOUR HONOR AND MR. BOSTIC AND SOMETHING THAT I OBJECTED

09:07AM  16   TO IN THAT ARGUMENT.

09:07AM  17         I THINK THAT'S EXCLUDED UNDER THE COURT'S RULINGS, SO I

09:07AM  18   JUST WANT TO SENSITIZE THE COURT TO THAT.

09:07AM  19         AND MR. LEACH CAN PERHAPS EDUCATE US AS TO HIS INTENTIONS.

09:08AM  20          THE COURT:  MR. LEACH?

09:08AM  21          MR. LEACH:  YOUR HONOR, I THINK THE FACT THAT THE

09:08AM  22   DEFENDANT HAS ACTUALLY ASSERTED HER 12.2 DEFENSE AND PUT AT

09:08AM  23   ISSUE HER LIVING CONDITIONS WITH MR. BALWANI, PUT AT ISSUE HER

09:08AM  24   AGENCY OVER WHAT SHE ATE, HER AGENCY OVER WHAT SHE WORE, YOU

09:08AM  25   KNOW, HER RELATIVE POWER WITHIN THE RELATIONSHIP, HER

7953

09:08AM 1    RELATIONSHIP WITH OTHER VERY POWERFUL PEOPLE WHO WERE THERE IN

09:08AM 2    A POSITION TO SUPPORT HER, ALL ESSENTIALLY MOOT MANY OF THE

09:08AM 3    ARGUMENTS THAT WERE MADE AT THE MOTION IN LIMINE STAGE.

09:08AM 4        THEY HAVE NOT JUST OPENED THE DOOR, THEY HAVE OPENED THE

09:08AM 5    FLOODGATES TO THAT RESPECTFULLY, AND IT IS MY INTENTION TO PUT

09:08AM 6    IN ITINERARIES WITH TRAVEL WITH BOARD MEMBERS THAT WERE PAID BY

09:08AM 7    THE COMPANY, TRIPS TO MEXICO ON JETS PAID FOR BY THE COMPANY

09:08AM 8    FOR BUSINESS PURPOSES.

09:08AM 9        MR. BALWANI AND MS. HOLMES OWNED A HOME TOGETHER THROUGH

09:08AM 10   AN LLC.  I THINK THAT'S RELEVANT TO HER RELATIVE AUTHORITY

09:09AM 11   WITHIN THE RELATIONSHIP.

09:09AM 12       I UNDERSTAND WHY SOME OF THESE MIGHT PRESENT 403 ISSUES IF

09:09AM 13   SHE'S NOT RAISING THIS, BUT SHE'S PUT THE ENTIRETY OF THEIR

09:09AM 14   RELATIONSHIP AT ISSUE.  SHE'S PUT HER RELATIVE POWER WITHIN THE

09:09AM 15   RELATIONSHIP AT ISSUE, AND THE GOVERNMENT MUST BE PERMITTED TO

09:09AM 16   COMBAT THOSE ASSERTIONS.

09:09AM 17            MR. DOWNEY:  12.2 IN THIS CONTEXT, YOUR HONOR,

09:09AM 18   RELATES TO DISCLOSURE OF POTENTIAL EXPERT TESTIMONY.  THAT IS

09:09AM 19   NOT SOMETHING THAT IS AT ISSUE YET IN THE COURSE OF THE CASE.

09:09AM 20            THE COURT:  PARDON ME FOR INTERRUPTING YOU.  I

09:09AM 21   WANTED TO ASK THAT THRESHOLD QUESTION, AND I DON'T KNOW IF

09:09AM 22   YOU'RE PREPARED TO ANSWER THAT.  AND IF YOU'RE NOT, THAT'S

09:09AM 23   FINE.

09:09AM 24       BUT IS 12.2 AN ISSUE IN THIS CASE YET?

09:09AM 25            MR. DOWNEY:  I'M NOT PREPARED TO ANSWER IT.  WE'LL

7954

09:09AM  1    SEE WHERE WE ARE AT THE END OF MS. HOLMES'S TESTIMONY.

09:09AM  2              THE COURT:  OKAY.  SO I ASKED THAT QUESTION,

09:09AM  3    MR. LEACH, BECAUSE, OF COURSE, A PARTY, A DEFENDANT IS REQUIRED

09:09AM  4    UNDER THE RULES TO GIVE NOTICE, AND WE HAD THAT DISCUSSION OVER

09:10AM  5    THE LAST YEAR.  THAT NOTICE WAS GIVEN APPROPRIATELY ACCORDING

09:10AM  6    TO THE RULES.

09:10AM  7         BUT WHETHER OR NOT A PARTY DECIDES TO ENGAGE THAT DEFENSE

09:10AM  8    IS STILL AN ISSUE.

09:10AM  9         AND LET ME JUST ASK THE QUESTION, IS THAT, IS THAT A 12.2

09:10AM  10   DEFENSE ENGAGED BY VIRTUE OF CALLING AN EXPERT TO SPEAK TO IT?

09:10AM  11             MR. LEACH:  WELL, YOUR HONOR, I DON'T THINK IT'S

09:10AM  12   MERELY CALLING THE EXPERT.  I MEAN, THE WITNESS TESTIFIED

09:10AM  13   YESTERDAY, "BALWANI CONTROLLED WHAT I ATE."  SHE TESTIFIED

09:10AM  14   YESTERDAY, "I DON'T KNOW WHAT IMPACT THE RELATIONSHIP HAD ON

09:10AM  15   ME."  SHE TESTIFIED TO FEAR GOING HOME AND WHAT WAS GOING TO

09:10AM  16   HAPPEN.

09:10AM  17        THE GOVERNMENT MUST BE ABLE TO TEST THAT, AND WHETHER

09:10AM  18   SHE'S DOING IT IN THE GUISE OF A NOTICE EXPERT, WE'RE SIMPLY

09:11AM  19   RAISING THESE FACTS AND CLAIMING THROUGH A NUMBER OF STATEMENTS

09:11AM  20   THAT "I DIDN'T HAVE AGENCY," THAT "I WAS FEARFUL OF HIM," THAT

09:11AM  21   "I DIDN'T HAVE POWER IN THE RELATIONSHIP."

09:11AM  22        WHETHER OR NOT SHE CALLS AN EXPERT TO BOLSTER THAT -- AND

09:11AM  23   WE'VE HAD THAT CONVERSATION A NUMBER OF TIMES -- I DON'T THINK

09:11AM  24   IT MATTERS AT ALL.

09:11AM  25        SHE SAID SHE DIDN'T CONTROL WHAT SHE ATE.  THERE'S AMPLE

7955

09:11AM  1    EVIDENCE TO SUGGEST THAT SHE DID.  THE GOVERNMENT SHOULD BE

09:11AM  2    ABLE TO CONFRONT HER WITH THAT.

09:11AM  3        THE COURT'S MOTION IN LIMINE ON THE TRAVEL I THOUGHT WAS

09:11AM  4    ANYTHING THAT THE COMPANY PAID FOR IN TERMS OF JETS, HOTELS ON

09:11AM  5    THE COMPANY DIME WAS FAIR GAME.

09:11AM  6        DANISE YAM TESTIFIED TO EXPENSES THAT WERE INCURRED THERE.

09:11AM  7        I DON'T THINK IT MATTERS WHETHER THEY CALL AN EXPERT OR

09:11AM  8    NOT.  THIS WITNESS TESTIFIED TO THOSE MATTERS ON HER DIRECT

09:11AM  9    EXAMINATION.

09:11AM 10            THE COURT:  SO TWO POINTS HERE THAT I'M CURIOUS

09:11AM 11    ABOUT.  LET ME JUST STATE THE FIRST ONE.

09:11AM 12        IF NO EXPERT IS CALLED THEN, AND IF YOU STOOD UP AND SAID,

09:11AM 13    YOUR HONOR, I WOULD LIKE TO STRIKE ALL OF THE TESTIMONY ABOUT

09:12AM 14    MR. BALWANI AND MS. HOLMES'S TESTIMONY ABOUT THAT BECAUSE IT'S

09:12AM 15    NOT RELEVANT IF THERE'S NO 12.2 -- I'M BEING HYPOTHETICAL

09:12AM 16    HERE -- I'M THINKING AHEAD, BUT THAT'S POTENTIALLY SOMETHING

09:12AM 17    THAT COULD HAPPEN.

09:12AM 18        WHAT IS THE RELEVANCE?  I'M NOT ASKING YOU TO RESPOND.

09:12AM 19    BUT WHAT IS THE RELEVANCE OF THAT TESTIMONY WITHOUT SUPPORTING

09:12AM 20    12.2 EXPERT, ET CETERA, ET CETERA?  I DON'T KNOW THE ANSWER TO

09:12AM 21    THAT, AND MAYBE WE'LL BE DISCUSSING THAT.  I DON'T KNOW.

09:12AM 22        TO YOUR POINT, AND MR. DOWNEY, TO THE GOVERNMENT'S POINT,

09:12AM 23    YOUR CLIENT HAS TESTIFIED AS TO CERTAIN THINGS ABOUT THE

09:12AM 24    RELATIONSHIP.

09:12AM 25        AND ON CROSS-EXAMINATION THE GOVERNMENT SHOULD BE ABLE TO

09:12AM  1    TEST AND PROBE THOSE, SOME OF THOSE THINGS.

09:12AM  2         AND HE SHOULD BE PERMITTED TO DO THAT.  AND I DON'T THINK

09:12AM  3    YOU'RE SAYING THAT.  THIS IS ABOUT EXPENSES SPECIFICALLY.

09:12AM  4         MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.  THERE'S NO

09:12AM  5    QUESTION, THERE'S NO QUESTION THAT HE CAN CROSS-EXAMINE AROUND

09:13AM  6    THAT.

09:13AM  7         THE COURT:  THE ORDER IN 798 AS TO THE EXTRAVAGANCE

09:13AM  8    WAS RELATED TO WHETHER OR NOT THE GOVERNMENT, IN THEIR

09:13AM  9    CASE-IN-CHIEF, COULD PUT ON EVIDENCE THAT SHE SHOPPED AT, IF

09:13AM  10   SHE DID, AT DESIGNER STORES, IF SHE ATE AT FIVE STAR

09:13AM  11   RESTAURANTS, WHATEVER THAT IS, SOMETHING THAT MIGHT CAUSE THE

09:13AM  12   JURY TO THINK THAT SHE WAS LIVING AN EXTRAVAGANT LIFESTYLE, ET

09:13AM  13   CETERA.

09:13AM  14        THE ORDER SAID, DIDN'T IT, THAT THE GOVERNMENT COULD AND

09:13AM  15   EVIDENCE COULD BE INTRODUCED THAT I THINK I SAID IN THE ORDER

09:13AM  16   THAT IT'S COMMON KNOWLEDGE THAT CEO'S OF LARGE COMPANIES LIVE A

09:13AM  17   LIFESTYLE VERY DIFFERENT THAN THE GENERAL PUBLIC AND ALL OF

09:13AM  18   OURS.

09:13AM  19        MR. DOWNEY:  SURE.

09:13AM  20        THE COURT:  I THINK THAT'S COMMON KNOWLEDGE.

09:13AM  21   INCLUDED IN THAT KNOWLEDGE IS THE FACT THAT CEO'S TRAVEL

09:13AM  22   ON PRIVATE JETS SOMETIMES.  THAT'S WHAT THEY DO.  THEY DON'T

09:14AM  23   FLY COACH.

09:14AM  24        AND IN THE ORDER I THINK THAT'S PERMITTED TO TALK ABOUT

09:14AM  25   WHAT DO NORMAL, WHAT DO NORMAL PEOPLE DO, WHATEVER THAT IS?

7957

09:14AM   1    WHATEVER THE NORMAL LIFE OF A CEO OF A MAJOR COMPANY IS, I

09:14AM   2    DON'T KNOW WHAT THAT IS.

09:14AM   3        BUT WHAT I WAS -- AND I THINK IN RECOGNITION OF THE

09:14AM   4    DEFENSE OBJECTION THERE, IS IT RELEVANT THAT SHE SHOPPED AT,

09:14AM   5    AND THIS IS JUST -- I DON'T KNOW ANY EVIDENCE ABOUT IT, BUT IS

09:14AM   6    IT RELEVANT THAT SHE BREAKFASTED AT VAN CLEEF & ARPELS, IS IT

09:14AM   7    RELEVANT THAT SHE HAD CAVIAR FLOWN IN EVERY DAY, EVERY HOUR.

09:14AM   8        THERE'S NO EVIDENCE OF THAT, AND I'M NOT INDICATING THERE

09:14AM   9    IS, BUT I'M SUGGESTING THAT TYPE OF EXTRAVAGANCE IS SOMETHING

09:14AM  10    THAT THE JURY SHOULDN'T HEAR ABOUT BECAUSE THAT DOESN'T HAVE

09:14AM  11    RELEVANCE TO THE CASE.

09:14AM  12        BUT IF THERE ARE TRAVELS THAT ARE COMMENSURATE WITH CEO

09:15AM  13    TRAVEL, IF IT'S A BUSINESS TRAVEL, THAT'S, THAT'S KIND OF THE

09:15AM  14    WAY SILICON VALLEY OPERATES.

09:15AM  15            MR. DOWNEY:  WELL, OF COURSE, YOUR HONOR, IF IT'S

09:15AM  16    RELEVANT FOR SOME PURPOSE TO COMMENT ON A TRIP AND EVENTS ON

09:15AM  17    THE TRIP ARE RELEVANT, WE HAD SOME OF THAT WITH RESPECT TO

09:15AM  18    ANOTHER WITNESS WHO TESTIFIED DURING THE CASE, IT WASN'T -- A

09:15AM  19    MAJOR ISSUE WASN'T MADE OF IT.

09:15AM  20        THAT'S NOT WHAT THIS IS.  THIS IS THE INTRODUCTION OF

09:15AM  21    EVIDENCE ABOUT TRAVEL ON PRIVATE PLANES PURELY, PURELY FOR THE

09:15AM  22    PURPOSE PROHIBITED BY 401 AND 403.  IT DOESN'T HAVE ANY

09:15AM  23    RELEVANCE TO THE CASE.  THESE TRIPS ARE NOT RELEVANT TO

09:15AM  24    ANYTHING THAT ANYONE HAS TALKED ABOUT.  THEY'RE NOT RELEVANT TO

09:15AM  25    ANYTHING THAT MS. HOLMES HAS TALKED ABOUT.

7958

09:15AM 1     THEY'RE ONLY BEING INTRODUCED TO SHOW THAT PRIVATE PLANE

09:15AM 2     TRAVEL WAS INCLUDED.  MR. LEACH JUST CONCEDED THEY'RE FOR

09:15AM 3     BUSINESS PURPOSES.  THEY'RE BUSINESS APPROVED TRAVEL.  WHY DOES

09:16AM 4     THE JURY NEED TO HEAR ABOUT THAT?

09:16AM 5         I THINK IN TERMS OF BRANDS, I DON'T KNOW MR. LEACH, I MUST

09:16AM 6     SAY THAT YOUR HONOR'S REFERENCE FLOWED RIGHT OVER ME.

09:16AM 7             THE COURT:  YOU DON'T SHOP THERE, MR. DOWNEY?

09:16AM 8             MR. DOWNEY:  I COULDN'T REPEAT WHAT YOU SAID.

09:16AM 9         (LAUGHTER.)

09:16AM 10            MR. DOWNEY:  BUT I, I -- YOU KNOW, I -- IT'S JUST

09:16AM 11    NOT NECESSARY.

09:16AM 12        OF COURSE HE'S ENTITLED TO CROSS-EXAMINE HER ABOUT HER

09:16AM 13    STATEMENTS AND SO FORTH AND TO EXPLORE THE TRUTH OF THEM.

09:16AM 14        BUT THIS ISN'T BEING OFFERED FOR THAT PURPOSE.  THIS IS

09:16AM 15    BEING OFFERED FOR INFLAMMATION OF THE JURY.

09:16AM 16            MR. LEACH:  NO, YOUR HONOR.  THIS IS BEING OFFERED

09:16AM 17    FOR MOTIVE.  THIS WITNESS HAS TESTIFIED I HAD A VISION, I WAS

09:16AM 18    DOING THIS, THE THRUST OF WHICH IS FOR ALTRUISTIC PURPOSES, I

09:16AM 19    DIDN'T SELL A SHARE OF STOCK.

09:16AM 20        THERE'S ANOTHER SIDE TO THAT COIN.  SHE WAS FLYING AROUND

09:16AM 21    THE WORLD MEETING WITH SOME OF THE MOST POWERFUL PEOPLE IN THE

09:16AM 22    UNITED STATES ON THE COMPANY'S DIME, AND THAT IS RELEVANT TO

09:16AM 23    HER MOTIVE.  SHE COVETED FAME.  SHE COVETED ATTENTION.  SHE

09:17AM 24    COVETED THE ABILITY TO INTERACT WITH MANY OF THESE PEOPLE.

09:17AM 25        THAT'S A VERY POWERFUL PART OF THE MOTIVE HERE, AND IT'S

09:17AM 1    SQUARELY WITHIN WHAT THE COURT HELD.

09:17AM 2         SO I -- AND THESE ARE BUSINESS TRIPS.  THESE ARE RELEVANT

09:17AM 3    TO THE ALLEGATIONS IN THE INDICTMENT.  ONE OF THEM IS A TRIP TO

09:17AM 4    MEET A POTENTIAL INVESTOR.  ONE OF THEM IS A TRIP TO ACCEPT AN

09:17AM 5    AWARD.

09:17AM 6         AT THE SAME TIME, SHE'S WRITING DOWN THAT SHE HAS -- I

09:17AM 7    DON'T WANT TO USE THE EXPLETIVE -- BUT A COMPANY NOT WORTHY OF

09:17AM 8    THAT.

09:17AM 9         ALL OF THIS GOES DIRECTLY TO HER MOTIVE AND HER STATE OF

09:17AM 10   MIND.  YES, THEY MIGHT APPEAR TO A LAYPERSON AS BEING OUTSIDE

09:17AM 11   OF THE NORMAL COURSE OF WHAT PEOPLE DO.

09:17AM 12        BUT WE SHOULDN'T SANITIZE THINGS HERE.  THIS IS PART OF

09:17AM 13   THE MOTIVE.

09:17AM 14             THE COURT:  IF, IF -- THANK YOU.

09:17AM 15        IF -- IT WOULD SEEM TO ME, MR. DOWNEY, THAT THERE MIGHT BE

09:17AM 16   SOME FINANCIAL RELEVANCE TO THE FINANCIAL STATE OF THE COMPANY

09:18AM 17   AND WHETHER OR NOT AN INDIVIDUAL WHO HAS A LEADERSHIP ROLE WITH

09:18AM 18   THE COMPANY WAS EXPENDING MONIES IN SOME MANNER.  THAT MIGHT

09:18AM 19   HAVE SOME RELEVANCE AS TO INTENT.

09:18AM 20             MR. DOWNEY:  WELL, I SUPPOSE, EXCEPT THAT THE

09:18AM 21   RELEVANCE THAT MR. LEACH JUST ARTICULATED IS EXACTLY WHAT IS

09:18AM 22   PROHIBITED UNDER NINTH CIRCUIT CASE LAW.  ONE IS NOT IN THE

09:18AM 23   POSITION OF THE GOVERNMENT ENTITLED TO SAY THAT THE ALLEGED

09:18AM 24   CONDUCT WAS UNDERTAKEN TO IMPROVE ONE'S FINANCIAL SITUATION OR

09:18AM 25   TO GAIN THE BENEFITS ASSOCIATED WITH THAT.

7960

09:18AM 1        SO WE HAVEN'T HEARD THAT PURPOSE YET.

09:18AM 2            THE COURT:  RIGHT.

09:18AM 3            MR. LEACH:  YOUR HONOR, MR. BOSTIC IS REMINDING ME

09:18AM 4    THAT THE GOVERNMENT MAY INTRODUCE EVIDENCE THAT HOLMES ENJOYED

09:18AM 5    A LIFESTYLE AS THERANOS'S CEO THAT IS COMPARABLE TO OTHER TECH

09:18AM 6    COMPANY'S CEOS.  THIS INCLUDES TRAVEL, SALARY, CELEBRITY AND

09:19AM 7    PERKS AND OTHER BENEFITS COMMENSURATE WITH THE POSITION.

09:19AM 8        THOSE ARE EXACTLY WHAT THOSE ARE, AND I THINK YOUR HONOR

09:19AM 9    MADE A POINT THAT THE JURY SHOULD BE ABLE TO DRAW INFERENCES

09:19AM 10   FROM THE FACT THAT THEY ARE SPENDING TENS OF THOUSANDS OF

09:19AM 11   DOLLARS OF THIS RATHER THAN HIRING A LAB DIRECTOR OF THE

09:19AM 12   GREATER STATURE OF THE ONES THAT THEY HIRED IN THE RELEVANT

09:19AM 13   TIME PERIOD.

09:19AM 14       SO NOTHING HAS CHANGED IN THE COURT'S ORDER OTHER THAN

09:19AM 15   THEY'VE OPENED THE FLOODGATES ON DOES THIS WITNESS HAVE CONTROL

09:19AM 16   AND AGENCY OVER WHAT SHE DOES.

09:19AM 17           MR. DOWNEY:  I MUST SAY THAT THAT MIGHT BE THE MOST

09:19AM 18   AGGRESSIVE RUNNING OVER OF AN ORDER THAT I'VE SEEN IN RECENT

09:19AM 19   TIME.  I THINK THE POINT OF THE ORDER WAS -- EVIDENCE IS GOING

09:19AM 20   TO COME IN ABOUT CELEBRITY, EVIDENCE IS GOING TO BE RELEVANT IN

09:19AM 21   A CASE LIKE THIS, AND WE CAN'T USE THIS ARGUMENT AS A BARRIER

09:19AM 22   TO INTRODUCING THAT ARGUMENT.

09:19AM 23       BUT WHEN THE EVIDENCE IS BEING INTRODUCED EXACTLY FOR THE

09:19AM 24   REASON THAT MR. LEACH ARTICULATED THIS MORNING, WHICH IS THAT

09:19AM 25   IT'S ABOUT MOTIVE AND SO FORTH, THAT IS PROHIBITED.

09:19AM  1      WE'VE HAD EVIDENCE IN THE CASE ABOUT CELEBRITY, WE'VE HAD

09:20AM  2   EVIDENCE IN THE CASE ABOUT PRIVATE TRAVEL.  I HAVEN'T OBJECTED

09:20AM  3   TO ANY OF THAT.  BUT THIS IS DIFFERENT.

09:20AM  4           THE COURT:  ANYTHING FURTHER?

09:20AM  5           MR. LEACH:  NOT ON THAT POINT, YOUR HONOR.

09:20AM  6      BUT I DO WANT TO GO BACK TO THE CLOTHING PART.  SHE'S

09:20AM  7   SAYING --

09:20AM  8           MR. DOWNEY:  SPEAK AT A HIGH LEVEL FOR MY BENEFIT.

09:20AM  9           MR. LEACH:  IT'S ABOVE MY PAY GRADE, TOO.

09:20AM  10          THE COURT:  START AT MACY'S.

09:20AM  11          MR. LEACH:  THE POINT OF THE EVIDENCE IS NOT THAT

09:20AM  12  SHE WENT TO A PARTICULAR STORE OR BOUGHT A PARTICULAR BRAND.

09:20AM  13     THE POINT IS THAT SHE'S DOING THIS WITHOUT MR. BALWANI.

09:20AM  14  THE POINT IS THAT SHE AND HER ASSISTANT ARE MAKING DECISIONS

09:20AM  15  OVER WHERE TO GO AND WHAT TO GET.

09:20AM  16          THE COURT:  YEAH.  AND THAT'S A FAIR POINT, YES, I

09:20AM  17  AGREE.

09:20AM  18     AND I THINK MR. DOWNEY WOULD, I'M NOT ASKING HIM TO, BUT I

09:20AM  19  THINK HE WOULD HAVE TO CONCEDE THAT POINT, THAT'S RIGHT.

09:20AM  20     AND BASED ON THE TESTIMONY THAT WE HEARD YESTERDAY, I

09:20AM  21  THINK THAT'S WHAT YOU'RE TALKING ABOUT FROM MS. HOLMES, YOU'RE

09:20AM  22  ENTITLED TO PROBE THAT FOR THOSE ISSUES, THOSE INDEPENDENT

09:21AM  23  ISSUES, IF YOU WILL, I'LL CALL IT THAT, AND I THINK YOU'RE

09:21AM  24  RIGHT, YOU'RE RIGHT ON THAT.

09:21AM  25     AND I THINK MR. DOWNEY HAS TOLD US THAT YOU'RE ENTITLED TO

7962

09:21AM 1    PROBE ON THOSE THINGS.

09:21AM 2        MY SENSE IS THAT THE TERRITORIAL BORDER HERE IS

09:21AM 3    EXTRAVAGANT EXPENSES, TWO DIFFERENT THINGS, BUT PERHAPS THERE'S

09:21AM 4    CROSSOVER AND A VEN DIAGRAM ON THAT.

09:21AM 5        BUT FOR THE PURPOSE, FOR THE PURPOSE, I GUESS, IS WHAT

09:21AM 6    YOU'LL HAVE TO SPEAK TO IF YOU SEEK TO INTRODUCE THIS EVIDENCE,

09:21AM 7    AND I DON'T KNOW IF THIS WILL COME IN THIS MORNING OR SOMETIME

09:21AM 8    LATER TODAY.

09:21AM 9            MR. LEACH:  I IMAGINE IT WILL BE AFTER THE BREAK,

09:21AM 10   YOUR HONOR.

09:21AM 11           THE COURT:  THAT'S MY SENSE OF IT.

09:21AM 12       OKAY.

09:21AM 13           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 14           THE COURT:  WELL, THANK YOU FOR BRINGING IT TO MY

09:21AM 15   ATTENTION.

09:21AM 16       ANYTHING ELSE THEN?

09:21AM 17       WE'LL BREAK AT ABOUT 11:00 O'CLOCK, WE'LL TAKE A BREAK,

09:21AM 18   AND THEN AGAIN ANOTHER ONE AT ABOUT 1:30 IF THAT WORKS.

09:21AM 19           MR. LEACH:  THANK YOU, YOUR HONOR.

09:21AM 20           MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:21AM 21           THE COURT:  THANK YOU.

09:21AM 22           THE CLERK:  COURT IS IN RECESS.

09:22AM 23       (RECESS FROM 9:22 A.M. UNTIL 9:33 A.M.)

09:33AM 24       (JURY IN AT 9:33 A.M.)

09:33AM 25           THE COURT:  GOOD MORNING.  WE'RE BACK ON THE RECORD

HOLMES CROSS BY MR. LEACH (RES.)                                    7963

09:33AM   1     IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  OUR JURY IS

09:33AM   2     PRESENT.  MS. HOLMES IS ON THE STAND.

09:33AM   3         LADIES AND GENTLEMEN, GOOD MORNING.  LET ME, BEFORE WE

09:33AM   4     BEGIN, LET ME ASK YOU THE QUESTION AGAIN.  DURING THE EVENING,

09:33AM   5     DID ANY OF YOU HAVE CAUSE TO COME ACROSS INFORMATION, SPEAK TO

09:33AM   6     ANYONE, READ, OR DISCUSS ANYTHING ABOUT THIS CASE?

09:34AM   7         IF SO, COULD YOU PLEASE RAISE YOUR HAND.

09:34AM   8         I SEE NO HANDS.

09:34AM   9         THANK YOU VERY MUCH.

09:34AM  10         MS. HOLMES, IF YOU COULD JUST STATE YOUR NAME, PLEASE.

09:34AM  11             THE WITNESS:  MY NAME IS ELIZABETH HOLMES.

09:34AM  12             THE COURT:  THANK YOU.

09:34AM  13         AND, MR. LEACH, DO YOU HAVE EXAMINATION?

09:34AM  14             MR. LEACH:  I DO, YOUR HONOR.  THANK YOU.

09:34AM  15             THE COURT:  AND YOU'RE STILL UNDER OATH, MS. HOLMES.

09:34AM  16             THE WITNESS:  THANK YOU.

09:34AM  17             THE COURT:  AND YOU CAN REMOVE YOUR MASK IF YOU

09:34AM  18     WISH.

09:34AM  19             THE WITNESS:  THANK YOU.

09:34AM  20             THE COURT:  YOU'RE WELCOME.

09:34AM  21         **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**

09:34AM  22     **SWORN.)**

09:34AM  23                     **CROSS-EXAMINATION (RESUMED)**

09:34AM  24     BY MR. LEACH:

09:34AM  25     Q.   GOOD MORNING, MS. HOLMES.

HOLMES CROSS BY MR. LEACH (RES.)                                    7964

09:34AM   1      A.   GOOD MORNING.

09:34AM   2      Q.   YESTERDAY YOU TESTIFIED THAT WHEN YOU LEARNED "THE

09:34AM   3    WALL STREET JOURNAL" MIGHT BE WRITING A NEGATIVE STORY ABOUT

09:34AM   4    THERANOS IN 2015, YOUR RESPONSE WAS AGGRESSIVE.

09:34AM   5          DO YOU RECALL THAT TESTIMONY?

09:34AM   6      A.   I DO.

09:34AM   7      Q.   I'D LIKE TO EXPLORE A LITTLE BIT ABOUT WHAT THAT MEANS.

09:34AM   8    YOU LEARNED THAT JOHN CARREYROU, A REPORTER WITH "THE

09:35AM   9    WALL STREET JOURNAL," WAS WORKING ON SOME FORM OF STORY IN OR

09:35AM  10    ABOUT APRIL OF 2015; IS THAT CORRECT?

09:35AM  11      A.   YES.

09:35AM  12      Q.   AND AFTER LEARNING THIS, YOU AND MR. BALWANI TOOK STEPS TO

09:35AM  13    CONTROL MR. CARREYROU'S EXPERIENCE AT A WELLNESS CENTER IN

09:35AM  14    ARIZONA; ISN'T THAT RIGHT?

09:35AM  15      A.   I DON'T THINK SO.

09:35AM  16      Q.   WELL, LET'S LOOK AT THAT.

09:35AM  17          YOU WERE WORRIED THAT MR. CARREYROU MIGHT GO TO A WELLNESS

09:35AM  18    CENTER AND GET A VEIN DRAW, WEREN'T YOU?

09:35AM  19      A.   I DON'T REMEMBER THAT.

09:35AM  20      Q.   OKAY.

09:35AM  21          MAY I APPROACH, YOUR HONOR?

09:35AM  22              THE COURT:  YES.

09:35AM  23    BY MR. LEACH:

09:35AM  24      Q.   (HANDING.)

09:35AM  25          MR. HOLMES, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS,

UNITED STATES COURT REPORTERS

**ER-11529**

HOLMES CROSS BY MR. LEACH (RES.)                                    7965

| | | |
|---|---|---|
| 09:35AM | 1 | AND I'D LIKE TO DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS |
| 09:35AM | 2 | 5387D. |
| 09:36AM | 3 | IF YOU COULD PLEASE GO TO PAGE 50. |
| 09:36AM | 4 | MS. HOLLIMAN, IF WE CAN DISPLAY THAT ON THE SCREEN? |
| 09:36AM | 5 | A.   GOT IT.  OKAY. |
| 09:36AM | 6 | Q.   ONE MOMENT WHILE WE PULL IT UP ON THE SCREEN. |
| 09:36AM | 7 | A.   WAS THERE A PAGE? |
| 09:36AM | 8 | Q.   PAGE 50. |
| 09:36AM | 9 | A.   OKAY. |
| 09:36AM | 10 | Q.   AND TO THE RIGHT YOU SHOULD SEE PRH 175, AND YOU ALSO |
| 09:36AM | 11 | SHOULD HAVE THAT ON YOUR SCREEN. |
| 09:36AM | 12 | MS. HOLLIMAN, IF WE COULD PLEASE EXPAND THE SUBSTANCE OF |
| 09:36AM | 13 | THE TEXT WITH THE DATE. |
| 09:37AM | 14 | DO YOU SEE WHERE YOU TEXTED, "RE YOUR EMAIL"? |
| 09:37AM | 15 | A.   I DO. |
| 09:37AM | 16 | Q.   AND THEN YOU WROTE "WSJ GUY MIGHT SHOW UP TOMORROW"? |
| 09:37AM | 17 | A.   YES. |
| 09:37AM | 18 | Q.   AND THAT'S A REFERENCE TO MR. CARREYROU, ISN'T IT? |
| 09:37AM | 19 | A.   I THINK SO. |
| 09:37AM | 20 | Q.   AND THEN YOU WROTE, "THAT IS THE THING." |
| 09:37AM | 21 | AND MR. BALWANI RESPONDS, "WE NEED TOMORROW TO TEST AND |
| 09:37AM | 22 | THEN THE TEAM CAN PUSH IT IN PRODUCTION TOMORROW NIGHT." |
| 09:37AM | 23 | DO YOU SEE THAT? |
| 09:37AM | 24 | A.   I DO. |
| 09:37AM | 25 | Q.   AND YOU WROTE, "OK. |

HOLMES CROSS BY MR. LEACH (RES.)                              7966

09:37AM  1          "COULD JUST DO FOR HIM ONLY IF HE SHOWS UP --"

09:37AM  2          AND MR. BALWANI SAYS, "HARD TO KNOW WHO HE IS AND WHAT

09:37AM  3   ORDER HE BRINGS.

09:37AM  4          "BETTER A PERFECT VENIPUNCTURE THAN BAD FINGERSTICK."

09:37AM  5          DOES THIS REFRESH YOUR RECOLLECTION THAT YOU AND

09:37AM  6   MR. BALWANI WERE TAKING STEPS TO CONTROL MR. CARREYROU'S

09:37AM  7   EXPERIENCE AT THE WELLNESS CENTER?

09:37AM  8   A.   NO.

09:37AM  9   Q.   YOU GO ON TO WRITE, "IT'S POSSIBLE HE TALKS TO DOCS FIRST

09:38AM 10   DAY AND DOES DRAW SECOND DAY."

09:38AM 11          YOU'RE TALKING ABOUT MR. CARREYROU GOING TO A DOCTOR FIRST

09:38AM 12   AND THEN GOING TO GET A DRAW ON THE SECOND DAY OF HIS VISIT IN

09:38AM 13   ARIZONA, AREN'T YOU?

09:38AM 14   A.   I THINK SO, YES.

09:38AM 15   Q.   OKAY.  "SEEMS LIKE THIS GUY IS LOOKING TO WRITE SOMETHING

09:38AM 16   NEGATIVE."

09:38AM 17          IS THAT WHAT MR. BALWANI WROTE TO YOU?

09:38AM 18   A.   YES.

09:38AM 19   Q.   AND "THAT'S WHAT HE DOES."

09:38AM 20          IS THAT ALSO A REFERENCE TO MR. CARREYROU?

09:38AM 21   A.   I THINK SO.

09:38AM 22   Q.   "EVEN THEN.  WE DON'T WHAT TESTS HE WILL DO.

09:38AM 23          "BUT WE CAN TURN IT INTO PIECE ABOUT WHAT" -- AND THEN CAN

09:38AM 24   YOU HELP US OUT WITH THAT ACRONYM THERE?

09:38AM 25   A.   I THINK IT SAYS SQL.

HOLMES CROSS BY MR. LEACH (RES.)                                    7967

09:38AM  1    Q.   OKAY.  YOU THEN WROTE, "OUR OPPO GUY KNOWS HIM WELL.

09:38AM  2         "I KNOW."

09:38AM  3         THE OPPO GUY IS PETER FRITSCH, ISN'T IT?

09:38AM  4    A.   I THINK SO, YES.

09:38AM  5    Q.   AND HE WORKS WITH A COMPANY CALLED FUSIONGPS; IS THAT

09:38AM  6    CORRECT?

09:38AM  7    A.   HE DID.

09:38AM  8    Q.   AND YOU AND THERANOS ENGAGED FUSIONGPS TO DO OPPOSITION

09:39AM  9    RESEARCH ON JOHN CARREYROU WHEN YOU LEARNED HE WAS WRITING A

09:39AM  10   NEGATIVE STORY?

09:39AM  11   A.   NO.

09:39AM  12   Q.   WELL, LET'S LOOK AT THE TEXT.  I'LL DRAW YOUR ATTENTION TO

09:39AM  13   PAGE 53.

09:39AM  14        DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

09:39AM  15   A.   I'M JUST LOOKING AT THE SCREEN.

09:39AM  16   Q.   OKAY.  DO YOU SEE THE TEXT AT 4-25-2015, "HAVE A

09:39AM  17   10:00 A.M. WITH FUSIONGPS"?

09:39AM  18   A.   I DO.

09:39AM  19   Q.   AND THAT IS A REFERENCE TO MR. FRITSCH?

09:39AM  20   A.   I THINK SO, YES.

09:39AM  21   Q.   AND YOU HIRED THEM AFTER LEARNING THAT MR. CARREYROU WAS

09:39AM  22   WRITING THIS STORY?

09:39AM  23   A.   I DON'T KNOW.

09:39AM  24   Q.   WELL, LET'S LOOK FURTHER.

09:39AM  25        YOU WRITE DOWN AT THE BOTTOM, "WE'LL GET KILLER PACKAGE

09:39AM  1    FOR WHEN MEET WITH CARREYROU TO TURN THIS INTO OUR STORY.

09:39AM  2         "GOOD."

09:40AM  3         DO YOU SEE THAT?

09:40AM  4    A.   I DO.

09:40AM  5    Q.   AND THAT'S A REFERENCE TO YOUR WORK WITH FUSIONGPS?

09:40AM  6    A.   I CAN'T TELL FROM THESE TEXT MESSAGES.

09:40AM  7    Q.   AFTER RETAINING FUSIONGPS YOU AND MR. BALWANI JOKED ABOUT

09:40AM  8    MR. CARREYROU'S HERITAGE; IS THAT CORRECT?

09:40AM  9    A.   COULD YOU TELL ME WHAT YOU MEAN?

09:40AM 10    Q.   DO YOU REMEMBER JOKING AT ALL ABOUT HIS HERITAGE?

09:40AM 11    A.   I DON'T.

09:40AM 12    Q.   LET'S LOOK AT PAGE 63 OF 5387D.

09:40AM 13         DO YOU SEE THE TEXT AT 4-29-2015?

09:40AM 14    A.   I DO.

09:40AM 15    Q.   AND YOU WROTE "CARREYROU IS FRENCH"?

09:40AM 16    A.   YES.

09:40AM 17    Q.   AND SUNNY BALWANI RESPONDED, "VERY FUNNY.  EXPLAIN

09:40AM 18    EVERYTHING"?

09:40AM 19    A.   YES.

09:40AM 20    Q.   "HE IS PROUD OF BEING FRENCH?"  IS THAT WHAT MR. BALWANI

09:41AM 21    WROTE?

09:41AM 22    A.   YES.

09:41AM 23    Q.   AND YOU WROTE "I KNOW.

09:41AM 24         "AND PROUD OF IT.

09:41AM 25         PROUD CYNIC."

HOLMES CROSS BY MR. LEACH (RES.)                                    7969

09:41AM   1        THOSE WERE YOUR WORDS; RIGHT?

09:41AM   2   A.   YES.

09:41AM   3   Q.   AND YOU AND MR. BALWANI ATTEMPTED TO FIGURE OUT WHO

09:41AM   4   MR. CARREYROU'S SOURCES FOR HIS ARTICLE WERE, DIDN'T YOU?

09:41AM   5   A.   WE DID.

09:41AM   6   Q.   YOU EXPRESSED A NEED TO GET AHEAD OF IT; ISN'T THAT RIGHT?

09:41AM   7   A.   I'M NOT QUITE SURE WHAT YOU MEAN BY THAT, BUT WE WERE

09:41AM   8   CERTAINLY ACTIVELY ENGAGED WITH MR. CARREYROU ON HIS REPORTING.

09:41AM   9   Q.   OKAY.  YOU WANTED TO GET AHEAD OF THE STORY, DIDN'T YOU?

09:41AM  10   A.   WE WANTED TO MAKE SURE OUR TRADE SECRETS WEREN'T

09:41AM  11   DISCLOSED.

09:41AM  12   Q.   I UNDERSTAND YOUR ANSWER ABOUT TRADE SECRETS.  I'D LIKE AN

09:41AM  13   ANSWER TO MY QUESTION, PLEASE.

09:41AM  14        YOU WANTED TO GET AHEAD OF IT, DIDN'T YOU?

09:41AM  15   A.   I'M SORRY.  I DON'T QUITE KNOW WHAT YOU MEAN BY "AHEAD OF

09:41AM  16   IT."

09:41AM  17   Q.   WELL, LET'S LOOK AT YOUR TEXTS.  IF I COULD DRAW YOUR

09:41AM  18   ATTENTION TO PLEASE TO PAGE 76 --

09:42AM  19   A.   OKAY.

09:42AM  20   Q.   -- OF 5387D.

09:42AM  21        AND I DRAW YOUR ATTENTION TO THE BOTTOM EMAIL FROM

09:42AM  22   MR. BALWANI ON MAY 13TH, 2015.

09:42AM  23        DO YOU SEE WHERE HE WRITES, "I AM NARROWING THIS DOWN IN

09:42AM  24   CLIA.  DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THERE'S AN

09:42AM  25   EXPLETIVE.

| | | |
|---|---|---|
| 09:42AM | 1 | DO YOU SEE THAT? |
| 09:42AM | 2 | A.   I DO. |
| 09:42AM | 3 | Q.   AND THEN IF WE CAN LOOK AT THE NEXT PAGE, PAGE 77. |
| 09:42AM | 4 | AM I RIGHT YOU RESPOND, "WHO DO U THINK. |
| 09:42AM | 5 | "NOW WE HAVE LEGAL GROUNDS." |
| 09:42AM | 6 | AND MR. BALWANI RESPONDS, "YES." |
| 09:42AM | 7 | DO YOU SEE THAT? |
| 09:42AM | 8 | A.   I DO. |
| 09:42AM | 9 | Q.   AND THAT'S A REFERENCE TO YOUR EFFORT TO FIGURE OUT WHO |
| 09:42AM | 10 | MR. CARREYROU'S SOURCES ARE, ISN'T IT? |
| 09:43AM | 11 | A.   NO.  I THINK THAT WAS REFERRING TO SUNNY'S COMMENTS ABOUT |
| 09:43AM | 12 | A GLASS DOOR POST. |
| 09:43AM | 13 | Q.   YOU SAW WHERE HE WROTE, "I'M NARROWING THIS DOWN IN CLIA, |
| 09:43AM | 14 | DOWN TO 5 PEOPLE.  WILL NAIL THIS," AND THEN THE EXPLETIVE? |
| 09:43AM | 15 | A.   I DO. |
| 09:43AM | 16 | Q.   AND YOUR REFERENCE, THAT'S TO A GLASS DOOR POST? |
| 09:43AM | 17 | A.   I THINK SO.  IF YOU COULD SWITCH BACK TO THE OTHER TEXT |
| 09:43AM | 18 | RIGHT ABOVE IT, IT WAS TALKING ABOUT GLASS DOOR. |
| 09:43AM | 19 | Q.   AND YOU'RE PAYING ATTENTION, WHATEVER THE CONTEXT OF THIS |
| 09:43AM | 20 | TEXT, YOU'RE PAYING ATTENTION TO THE GLASS DOOR REVIEWS BECAUSE |
| 09:43AM | 21 | YOU KNEW THAT WAS SOMETHING THAT MR. CARREYROU MIGHT BE LOOKING |
| 09:43AM | 22 | AT? |
| 09:43AM | 23 | A.   NO. |
| 09:43AM | 24 | Q.   LET'S LOOK FURTHER ON PAGE 77. |
| 09:43AM | 25 | DO YOU SEE WHERE IT SAYS, "IF TYLER THINKING ABT GEORGE |

09:43AM   1      FYI AT RIGHT TIME."

09:43AM   2           YOU WROTE THAT?

09:43AM   3      A.   I DID.

09:43AM   4      Q.   TYLER IS A REFERENCE TO TYLER SHULTZ?

09:43AM   5      A.   YES.

09:43AM   6      Q.   AND YOU TESTIFIED ABOUT MR. SHULTZ ON DIRECT EXAMINATION?

09:43AM   7      A.   I DID.

09:43AM   8      Q.   AND THE GEORGE IS A REFERENCE TO GEORGE SHULTZ?

09:43AM   9      A.   IT IS.

09:44AM  10      Q.   AND THIS IS YOU EXPRESSING YOU MIGHT GO TO GEORGE SHULTZ

09:44AM  11      AT SOME POINT IF THE SOURCE IS TYLER?

09:44AM  12      A.   IT COULD BE.

09:44AM  13      Q.   YOU THEN WROTE, "BUT ALSO LOTS OF LEGAL ELEMENTS HERE.

09:44AM  14           "NEED TO GET AHEAD OF ALL OF IT."

09:44AM  15           DOES THAT REFRESH YOUR MEMORY THAT YOU WERE TRYING TO GET

09:44AM  16      AHEAD OF ALL OF IT?

09:44AM  17      A.   IT DOESN'T.

09:44AM  18      Q.   READING THESE WORDS ON THE PAGE DOESN'T REFRESH YOUR

09:44AM  19      MEMORY AT ALL?

09:44AM  20      A.   I HAVE MEMORY OF THIS, BUT I DON'T KNOW EXACTLY WHAT I

09:44AM  21      MEANT BY GETTING AHEAD OF IT.

09:44AM  22      Q.   OKAY.  YOU WEREN'T WORRIED ABOUT MR. CARREYROU'S STORY?

09:44AM  23      A.   WE WERE VERY WORRIED ABOUT MR. CARREYROU'S STORY.

09:44AM  24      Q.   YOU THEN WROTE, "OUT OF ALL CHALLENGES ARE GREATEST

09:44AM  25      OPPORTUNITIES."

HOLMES CROSS BY MR. LEACH (RES.)                                      7972

| | | |
|---|---|---|
| 09:44AM | 1 | AND MR. BALWANI RESPONDS, "ABSOLUTELY.  THIS ONE IS FAIRLY |
| 09:44AM | 2 | EASY TO GET AHEAD OF.  THIS ENTIRE EMAIL IS BASED ON TYLER," |
| 09:44AM | 3 | AND THEN WE'VE REDACTED, "AND MAYBE ADAM." |
| 09:45AM | 4 | THE ADAM IS DR. ROSENDORFF; CORRECT? |
| 09:45AM | 5 | A.   IT IS. |
| 09:45AM | 6 | Q.   AND MR. BALWANI THEN WROTE FURTHER DOWN, "EXTREMELY |
| 09:45AM | 7 | SERIOUS LEGAL IMPLICATIONS.  HE BASICALLY VIOLATED AND SHARED |
| 09:45AM | 8 | OUR TRADE SECRETS DOWN TO MACHINE NAMES. |
| 09:45AM | 9 | "AND ASSAYS IN WHAT DEVICE. |
| 09:45AM | 10 | "IT IS TYLER, ERIKA, AND ADAM." |
| 09:45AM | 11 | DO YOU SEE THAT LANGUAGE? |
| 09:45AM | 12 | A.   I DO. |
| 09:45AM | 13 | Q.   AND YOU AND MR. BALWANI SURMISED THAT ERIKA CHEUNG WAS ONE |
| 09:45AM | 14 | OF JOHN CARREYROU'S SOURCES? |
| 09:45AM | 15 | A.   YES. |
| 09:45AM | 16 | Q.   AND THE ERIKA THERE IS ERIKA CHEUNG; AM I RIGHT ABOUT |
| 09:45AM | 17 | THAT? |
| 09:45AM | 18 | A.   IT IS, YES. |
| 09:45AM | 19 | Q.   AND SO AT THIS POINT YOU KNEW WHO ERIKA CHEUNG WAS? |
| 09:45AM | 20 | A.   I DID. |
| 09:45AM | 21 | Q.   YOU DON'T RESPOND BY WRITING SOMETHING LIKE, WHO IS ERIKA |
| 09:45AM | 22 | AND WHY WOULD MR. CARREYROU WANT TO BE TALKING TO HER? |
| 09:45AM | 23 | A.   NO, I DID NOT. |
| 09:45AM | 24 | Q.   AND YOU RECALL THAT MS. CHEUNG TESTIFIED IN THIS TRIAL; |
| 09:45AM | 25 | CORRECT? |

HOLMES CROSS BY MR. LEACH (RES.)                              7973

09:45AM    1    A.   I DO.

09:45AM    2    Q.   SHE WORKED AT THERANOS FROM 2013 TO 2014?

09:45AM    3    A.   THAT SOUNDS ABOUT RIGHT.

09:46AM    4    Q.   DO YOU RECALL HER TESTIFYING ABOUT EXAMPLES OF THERANOS

09:46AM    5    RUNNING PATIENT SAMPLES AFTER FAILING QUALITY CONTROL?

09:46AM    6    A.   I DO.

09:46AM    7    Q.   AND YOU RECALL HER TESTIFYING ABOUT HOW THERANOS'S TSPU,

09:46AM    8    THE EDISON DEVICE, WAS FAILING QUALITY CONTROL REPEATEDLY.

09:46AM    9         YOU RECALL THAT TESTIMONY?

09:46AM   10    A.   I DO.

09:46AM   11    Q.   AND YOU KNOW THAT IN 2015 AND 2016, THOSE TWO ISSUES WERE

09:46AM   12    ALSO RAISED BY CMS IN THEIR REPORT TO YOU; IS THAT CORRECT?

09:46AM   13    A.   YES.

09:46AM   14    Q.   ERIKA CHEUNG WAS RIGHT WHEN SHE WAS RAISING ISSUES ABOUT

09:46AM   15    THE 3.5, WASN'T SHE?

09:46AM   16    A.   I DON'T THINK SHE WAS RIGHT ABOUT THE SPECIFIC ISSUES THAT

09:46AM   17    SHE WAS RAISING BASED ON MY UNDERSTANDING, BUT I SURE AS HELL

09:46AM   18    WISH WE HAD TREATED HER DIFFERENTLY AND LISTENED TO HER.

09:46AM   19    Q.   YOU DON'T THINK THE CMS REPORT VINDICATES HER IN ANY WAY?

09:46AM   20    A.   I THINK IN A WAY IT DOES.

09:46AM   21    Q.   BUT THERANOS CHOSE NOT TO LISTEN TO HER AT THE TIME?

09:46AM   22    A.   MY UNDERSTANDING IS THAT WE DID LISTEN TO HER, BUT THE

09:47AM   23    TEAM BELIEVED THE SPECIFIC ISSUES SHE HAD IDENTIFIED WERE NOT

09:47AM   24    ACTUALLY CORRECTLY IDENTIFIED.

09:47AM   25    Q.   THERANOS CHOSE NOT TO LISTEN TO HER; ISN'T THAT CORRECT,

HOLMES CROSS BY MR. LEACH (RES.)                                    7974

09:47AM   1    MS. HOLMES?

09:47AM   2    A.   NO.

09:47AM   3    Q.   THERANOS DIDN'T MAKE A DECISION NOT TO LISTEN TO HER?

09:47AM   4    THAT'S YOUR TESTIMONY?

09:47AM   5    A.   THAT'S NOT MY MEMORY OF IT.

09:47AM   6    Q.   OKAY.  YOU CHOSE NOT TO LISTEN TO ERIKA CHEUNG AND WHAT

09:47AM   7    SHE WAS RAISING?

09:47AM   8    A.   I DON'T THINK I THOUGHT THAT THERE WERE ISSUES AT THAT

09:47AM   9    TIME.  I THOUGHT THAT THE TEAM'S ANALYSIS WAS THAT THOSE WERE

09:47AM  10    ACTUALLY NOT ISSUES THAT SHE WAS RAISING.

09:47AM  11    Q.   YOU DIDN'T ASK MR. BALWANI AT THE TIME, WHAT IS SHE

09:47AM  12    TALKING ABOUT?

09:47AM  13    A.   I ASKED DR. YOUNG TO MAKE -- TO LOOK INTO IT, AND MY

09:47AM  14    UNDERSTANDING WAS THAT THE ISSUES THAT SHE WAS RAISING WERE NOT

09:47AM  15    ISSUES THAT DR. YOUNG AGREED WITH.

09:47AM  16    Q.   OKAY.  BUT YOU KNOW TODAY THAT MS. CHEUNG WAS RIGHT; ISN'T

09:47AM  17    THAT FAIR?

09:47AM  18    A.   YES.

09:47AM  19    Q.   AND INSTEAD OF LISTENING TO MS. CHEUNG, THERANOS CHOSE TO

09:47AM  20    RETALIATE AGAINST HER; ISN'T THAT CORRECT?

09:48AM  21    A.   NO.

09:48AM  22    Q.   THERANOS DIDN'T HIRE DAVID BOIES'S LAW FIRM TO TRACK HER

09:48AM  23    DOWN AND SERVE HER WITH LEGAL PROCESS?

09:48AM  24    A.   WE DID HIRE DAVID BOIES'S LAW FIRM TO SERVE HER WITH THE

09:48AM  25    SUBPOENA.

HOLMES CROSS BY MR. LEACH (RES.)                              7975

| | | |
|---|---|---|
| 09:48AM | 1 | Q.   OKAY.  YOU CHOSE TO THREATEN HER? |
| 09:48AM | 2 | A.   NO. |
| 09:48AM | 3 | Q.   THERANOS CHOSE TO THREATEN HER? |
| 09:48AM | 4 | A.   I DON'T THINK SO. |
| 09:48AM | 5 | Q.   THERANOS CHOSE TO THREATEN HER WITH A LAWSUIT; IS THAT |
| 09:48AM | 6 | FAIR? |
| 09:48AM | 7 | A.   I'M NOT SURE. |
| 09:48AM | 8 | Q.   WELL, LET'S LOOK. |
| 09:48AM | 9 | CAN I DRAW YOUR ATTENTION TO PAGE 85 OF THE TEXTS? |
| 09:48AM | 10 | A.   OKAY. |
| 09:48AM | 11 | Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015? |
| 09:48AM | 12 | A.   I DO. |
| 09:48AM | 13 | Q.   DO YOU SEE WHERE IT SAYS, "I AM OK SENDING LETTER TO ERIKA |
| 09:48AM | 14 | AS IN HEATHERS EMAIL." |
| 09:48AM | 15 | A.   I DO. |
| 09:48AM | 16 | Q.   AND THAT'S FROM MR. BALWANI? |
| 09:49AM | 17 | A.   YES. |
| 09:49AM | 18 | Q.   AND HEATHER IS A REFERENCE TO HEATHER KING, THE GENERAL |
| 09:49AM | 19 | COUNSEL? |
| 09:49AM | 20 | A.   IT IS. |
| 09:49AM | 21 | Q.   OKAY.  I'D LIKE TO SHOW YOU WHAT IS IN EVIDENCE AS |
| 09:49AM | 22 | EXHIBIT 2567. |
| 09:49AM | 23 | A.   OKAY.  GOT IT. |
| 09:49AM | 24 | Q.   DO YOU SEE THE DATE OF JUNE 26TH, 2015? |
| 09:49AM | 25 | A.   I DO. |

HOLMES CROSS BY MR. LEACH (RES.)                                    7976

| | | |
|---|---|---|
| 09:49AM | 1 | Q.   THAT'S THE SAME DATE OF THE TEXT THAT WE WERE JUST LOOKING |
| 09:49AM | 2 | AT? |
| 09:49AM | 3 | A.   I DIDN'T REMEMBER THAT, BUT I'M SURE YOU'RE RIGHT. |
| 09:49AM | 4 | Q.   OKAY.  AND DO YOU SEE THE HEADING BOIES, SCHILLER & |
| 09:49AM | 5 | FLEXNER AT THE TOP? |
| 09:49AM | 6 | A.   I DO. |
| 09:49AM | 7 | Q.   AND THAT'S DAVID BOIES'S LAW FIRM? |
| 09:49AM | 8 | A.   IT IS. |
| 09:49AM | 9 | Q.   ONE OF THE MOST POWERFUL LAW FIRMS IN THE WORLD? |
| 09:49AM | 10 | A.   I THOUGHT THAT. |
| 09:49AM | 11 | Q.   YOU THOUGHT THAT AT THE TIME? |
| 09:50AM | 12 | A.   I DID. |
| 09:50AM | 13 | Q.   AND THAT'S WHY YOU WERE SENDING THEM AFTER ERIKA CHEUNG? |
| 09:50AM | 14 | A.   NO. |
| 09:50AM | 15 | Q.   WELL, DOESN'T THIS SAY THAT "YOU'RE DIRECTED TO |
| 09:50AM | 16 | IMMEDIATELY CEASE AND DESIST FROM THESE ACTIVITIES.  UNLESS |
| 09:50AM | 17 | THIS IS RESOLVED, WE'LL CONSIDER ALL APPROPRIATE REMEDIES IN |
| 09:50AM | 18 | FILING SUIT AGAINST YOU"? |
| 09:50AM | 19 | DIDN'T THERANOS THREATEN HER WITH A LAWSUIT IN OR AROUND |
| 09:50AM | 20 | JUNE OF 2015? |
| 09:50AM | 21 | A.   I SEE THAT HERE. |
| 09:50AM | 22 | Q.   AND YOU KNEW IT WAS HAPPENING AT THE TIME? |
| 09:50AM | 23 | A.   I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO MAKE SURE |
| 09:50AM | 24 | THAT SHE STOPPED DISCLOSING TRADE SECRET INFORMATION. |
| 09:50AM | 25 | Q.   YOU KNEW IT WAS HAPPENING AT THE TIME.  THAT WAS MY |

HOLMES CROSS BY MR. LEACH (RES.)                                    7977

09:50AM   1    QUESTION.  IS THAT FAIR?

09:50AM   2    A.   AGAIN, I KNEW OUR LAWYERS WERE FOLLOWING UP WITH HER TO

09:50AM   3    MAKE SURE SHE STOPPED DISCLOSING TRADE SECRET INFORMATION.

09:50AM   4    Q.   YOU KEEP INJECTING THAT COMMENT OF TRADE SECRETS INTO YOUR

09:50AM   5    ANSWER, AND WE'LL GET TO THAT.

09:50AM   6         MY QUESTION IS THAT YOU WERE AWARE THAT THIS WAS HAPPENING

09:50AM   7    AT THE TIME?

09:50AM   8    A.   THAT BOIES SCHILLER WAS SENDING HER A LETTER?  YES.

09:50AM   9    Q.   WERE YOU ALSO AWARE THAT THERANOS PAID TWO PRIVATE

09:51AM  10    INVESTIGATION FIRMS NEARLY $150,000 TO AID IN THIS EFFORT TO

09:51AM  11    RETALIATE AGAINST MS. CHEUNG?

09:51AM  12    A.   I'M NOT SURE.

09:51AM  13    Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:51AM  14         LET ME DRAW YOUR ATTENTION TO PAGE -- OR EXHIBIT 5482.

09:51AM  15    A.   I'M NOT SURE IF I HAVE 5482.

09:51AM  16              MR. LEACH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

09:51AM  17              THE COURT:  YES.

09:51AM  18              THE WITNESS:  OH, I'M SORRY.  I DO.  SORRY.

09:51AM  19    BY MR. LEACH:

09:51AM  20    Q.   I'M NOT SURE I HAVE 5482, SO IF I CAN LOOK AT YOURS?

09:51AM  21    A.   OH, YES.  IT'S RIGHT HERE (HANDING).

09:52AM  22    Q.   MS. HOLMES, I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST

09:52AM  23    PAGE OF EXHIBIT 5482, AND I'LL RETURN THIS TO YOU IN A SECOND.

09:52AM  24    A.   OKAY.

09:52AM  25    Q.   AND THERE'S A LINE IN ROUGHLY THE MIDDLE OF THE PAGE WITH

HOLMES CROSS BY MR. LEACH (RES.)                                    7978

09:52AM   1    A REFERENCE TO SOME NAMES AND SOME DOLLAR FIGURES.

09:52AM   2         AND MY QUESTION TO YOU IS, DOES THIS REFRESH YOUR

09:52AM   3    RECOLLECTION?

09:52AM   4    A.   OKAY.

09:52AM   5    Q.   (HANDING.)

09:52AM   6    A.   THANK YOU.

09:52AM   7    Q.   YOU'RE WELCOME.

09:52AM   8         HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE LINE THAT I

09:53AM   9    REFERRED TO?

09:53AM  10    A.   YOU SAID THE FIRST PAGE?

09:53AM  11    Q.   FIRST PAGE?

09:53AM  12    A.   YES.

09:53AM  13    Q.   ROUGHLY HALFWAY DOWN?

09:53AM  14    A.   YES, I SEE IT.  I SEE IT.

09:53AM  15    Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS

09:53AM  16    PAID TWO PRIVATE INVESTIGATION FIRMS NEARLY $150,000 TO AID IN

09:53AM  17    ITS EFFORT AGAINST MS. CHEUNG?

09:53AM  18    A.   IT DOES NOT.

09:53AM  19    Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN OCTOBER OF 2015,

09:53AM  20    YOU TRIED TO DISMISS ERIKA CHEUNG AS A LOW LEVEL DISGRUNTLED

09:53AM  21    EMPLOYEE; IS THAT CORRECT?

09:53AM  22    A.   WE DID.

09:53AM  23    Q.   IS THAT ANOTHER THING YOU WISH YOU HAD DONE DIFFERENTLY?

09:53AM  24    A.   100 PERCENT.  I THINK I MISHANDLED THE ENTIRE PROCESS OF

09:53AM  25    "THE WALL STREET JOURNAL" REPORTING.

HOLMES CROSS BY MR. LEACH (RES.)                                          7979

09:53AM   1    Q.   YOU ALSO SURMISED THAT ONE OF MR. CARREYROU'S SOURCES WAS

09:53AM   2    TYLER SHULTZ; ISN'T THAT RIGHT?

09:53AM   3    A.   YES.

09:53AM   4    Q.   AND TYLER SHULTZ WAS THE GRANDSON OF GEORGE SHULTZ?

09:54AM   5    A.   HE WAS.

09:54AM   6    Q.   GEORGE SHULTZ WAS ONE OF YOUR MENTORS; IS THAT CORRECT?

09:54AM   7    A.   HE WAS.

09:54AM   8    Q.   HE WAS ON YOUR BOARD?

09:54AM   9    A.   YES.

09:54AM  10    Q.   YOU WERE VERY CLOSE TO HIM?

09:54AM  11    A.   I WAS.

09:54AM  12    Q.   YOU WERE ALSO VERY CLOSE WITH HIS WIFE, CHARLOTTE; ISN'T

09:54AM  13    THAT RIGHT?

09:54AM  14    A.   I, I WOULD LIKE TO THINK SO.  I KNEW HER LESS WELL.

09:54AM  15    Q.   YOU HAD WEEKLY MEETINGS AT GEORGE AND CHARLOTTE SHULTZ'S

09:54AM  16    HOUSE?

09:54AM  17    A.   I DID.

09:54AM  18    Q.   YOU WOULD MEET WITH HIM ONE ON ONE ALMOST EVERY WEEK?

09:54AM  19    A.   YES.

09:54AM  20    Q.   AND HE WOULD GIVE YOU ADVICE ON HOW TO RUN THE BUSINESS?

09:54AM  21    A.   HE DID.

09:54AM  22    Q.   YOU ATTENDED HOLIDAY PARTIES AT THE SHULTZ'S RESIDENCE;

09:54AM  23    ISN'T THAT RIGHT?

09:54AM  24    A.   I DID.

09:54AM  25    Q.   AND TYLER CAME TO WORK AT THERANOS IN 2013.

| | | |
|---|---|---|
| 09:54AM | 1 | DOES THAT SOUND ABOUT RIGHT? |
| 09:54AM | 2 | A.   YES. |
| 09:54AM | 3 | Q.   AND HE WENT DIRECTLY TO YOU WITH PROBLEMS THAT HE WAS |
| 09:54AM | 4 | OBSERVING WITH THE THERANOS DEVICE, THE EDISON 3.5; ISN'T THAT |
| 09:54AM | 5 | RIGHT? |
| 09:54AM | 6 | A.   HE DID. |
| 09:54AM | 7 | Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AS |
| 09:55AM | 8 | EXHIBIT 7421.  THIS IS A DOCUMENT THAT MR. DOWNEY SHOWED YOU |
| 09:55AM | 9 | THE OTHER DAY.  IT'S NOT IN YOUR BINDER, BUT PERHAPS WE CAN |
| 09:55AM | 10 | SHOW IT ON THE SCREEN. |
| 09:55AM | 11 | A.   YEAH. |
| 09:55AM | 12 | Q.   MAYBE THE ELMO IS THE BEST WAY TO GO FOR THIS. |
| 09:55AM | 13 | MAY I HAVE A MOMENT, YOUR HONOR? |
| 09:55AM | 14 | THE COURT:  YES. |
| 09:56AM | 15 | (PAUSE IN PROCEEDINGS.) |
| 09:56AM | 16 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 09:56AM | 17 | Q.   MS. HOLMES, ARE YOU ABLE TO SEE 7421 ON THE SCREEN? |
| 09:56AM | 18 | A.   I AM. |
| 09:56AM | 19 | Q.   AND THIS STARTS WITH AN EMAIL FROM DANIEL YOUNG TO YOU AND |
| 09:57AM | 20 | MR. BALWANI REGARDING SYPHILIS VALIDATIONS; IS THAT CORRECT? |
| 09:57AM | 21 | A.   YES. |
| 09:57AM | 22 | Q.   AND GOING ON PAGE 1 LATER THAT DAY, OR LATER IN FEBRUARY, |
| 09:57AM | 23 | DR. YOUNG REPORTS ON A CONVERSATION THAT HE HAD HAD WITH TYLER |
| 09:57AM | 24 | REGARDING SYPHILIS; IS THAT FAIR? |
| 09:57AM | 25 | A.   YES. |

HOLMES CROSS BY MR. LEACH (RES.)                                    7981

09:57AM   1    Q.   AND MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT SOME OF THE

09:57AM   2    BULLETS ON THIS.  I'D LIKE TO DRAW YOUR ATTENTION TO THE FIFTH

09:57AM   3    BULLET WHERE IT SAYS, "REGARDING PERFORMANCE CLAIMS, HE SEEMED

09:57AM   4    VERY SURPRISED AND I ASKED HIM WHERE HE THOUGHT WE CLAIMED

09:57AM   5    SUPERIOR PERFORMANCE OVER OTHER TESTS."

09:57AM   6        DO YOU SEE THAT LANGUAGE?

09:57AM   7    A.   I DO.

09:57AM   8    Q.   AND THEN DR. YOUNG REPORTED, "THE BEST HE" -- THAT'S A

09:57AM   9    REFERENCE TO TYLER -- "THE BEST HE COULD COME UP WITH WAS

09:58AM  10    SAYING HE THOUGHT SUPERIOR ACCURACY WAS MENTIONED IN SOME OF

09:58AM  11    THE ARTICLES THAT HAVE BEEN WRITTEN ABOUT THERANOS.  I ASKED

09:58AM  12    HIM TO FOLLOW UP AND HIGHLIGHT THESE SPECIFICALLY FOR ME."

09:58AM  13        DO YOU SEE THAT LANGUAGE?

09:58AM  14    A.   I DO.

09:58AM  15    Q.   AND YOU UNDERSTOOD THAT MR. SHULTZ, IN ADDITION TO RAISING

09:58AM  16    ISSUES ABOUT SYPHILIS AND PT, HE WAS ALSO RAISING ISSUES ABOUT

09:58AM  17    SOME OF THE PUBLIC CLAIMS THAT WERE OUT THERE ABOUT THERANOS?

09:58AM  18    A.   I DID.

09:58AM  19    Q.   FURTHER UP IN THE CHAIN, MR. BALWANI ASKED, "HOW LONG DID

09:58AM  20    YOU SPEND WITH HIM?  THIS SEEMS TO BE AN OVERKILL."

09:58AM  21        DO YOU SEE THAT LANGUAGE?

09:58AM  22    A.   I DO.

09:58AM  23    Q.   AND WHAT DID YOU UNDERSTAND "OVERKILL" TO MEAN?

09:58AM  24    A.   THAT SUNNY THOUGHT THAT DANIEL WAS SPENDING TOO MUCH TIME

09:58AM  25    WITH HIM.

HOLMES CROSS BY MR. LEACH (RES.)                                    7982

| | | |
|---|---|---|
| 09:58AM | 1 | Q.   TOO MUCH TIME RESPONDING TO TYLER SHULTZ'S COMPLAINTS? |
| 09:58AM | 2 | A.   YES. |
| 09:58AM | 3 | Q.   YOU THEN WROTE, "DID HE UNDERSTAND WITH THE PT POINT? |
| 09:58AM | 4 | AGREE WITH THE BELOW." |
| 09:58AM | 5 | DID I READ THAT CORRECTLY? |
| 09:59AM | 6 | A.   YOU DID. |
| 09:59AM | 7 | Q.   AND THAT'S A REFERENCE TO THE ISSUE WHERE THERANOS SPLIT |
| 09:59AM | 8 | SOME OF THE PT SAMPLES -- THAT'S A REFERENCE TO AN EVENT IN |
| 09:59AM | 9 | 2014 WHEN THERANOS SPLIT SOME OF THE PT SAMPLES AND RAN THEM ON |
| 09:59AM | 10 | THE EDISON DEVICE; IS THAT RIGHT? |
| 09:59AM | 11 | A.   YES.  I THINK IT WAS AN EXPERIMENT, NOT ACTUAL PT SAMPLES. |
| 09:59AM | 12 | Q.   I'D NEXT LIKE TO DRAW YOUR ATTENTION IN THIS CONVERSATION |
| 09:59AM | 13 | ABOUT MR. SHULTZ, MS. HOLMES, TO EXHIBIT 1660. |
| 09:59AM | 14 | A.   OKAY. |
| 09:59AM | 15 | Q.   AND I BELIEVE 1660 IS IN EVIDENCE. |
| 09:59AM | 16 | THE COURT:  YES, IT IS. |
| 09:59AM | 17 | MR. LEACH:  IF WE COULD PLEASE DISPLAY THAT, |
| 10:00AM | 18 | MS. HOLLIMAN.  ARE YOU ABLE TO DISPLAY THAT?  GREAT. |
| 10:00AM | 19 | Q.   DO YOU SEE THIS IS AN EMAIL FROM TYLER SHULTZ TO YOU ON |
| 10:00AM | 20 | APRIL 11TH, 2014, MS. HOLMES? |
| 10:00AM | 21 | A.   I DO. |
| 10:00AM | 22 | Q.   AND SO THIS IS AFTER THE EXCHANGE THAT WE JUST SAW IN THE |
| 10:00AM | 23 | PRIOR EXHIBIT? |
| 10:00AM | 24 | A.   I THINK SO. |
| 10:00AM | 25 | Q.   AND MR. SHULTZ STILL HAS CONCERNS ABOUT WHAT IS GOING ON |

HOLMES CROSS BY MR. LEACH (RES.)                                    7983

10:00AM   1    OVER AT THERANOS; IS THAT FAIR?

10:00AM   2    A.   YES.

10:00AM   3    Q.   AND LET ME START AT THE BEGINNING OF THE EMAIL CHAIN.  IF

10:00AM   4    WE COULD PLEASE GO TO PAGE 6.

10:00AM   5         DO YOU SEE WHERE HE WROTE, "WHEN YOU HAVE TIME COULD I

10:00AM   6    POSSIBLY HAVE HALF AN HOUR TO FOLLOW UP ON OUR PREVIOUS MEETING

10:00AM   7    ABOUT RPR TEST?  I KNOW YOU ARE EXTREMELY BUSY, SO I WOULDN'T

10:00AM   8    MIND WAITING UNTIL AN EVENING AFTER THE CRAZINESS OF THE WORK

10:00AM   9    DAY DIES DOWN."

10:00AM  10         DO YOU SEE THAT LANGUAGE?

10:00AM  11    A.   I DO.

10:00AM  12    Q.   AND NOW IF WE COULD GO TO PAGE 5 -- OR EXCUSE ME, PAGE 1.

10:01AM  13         AND I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH.

10:01AM  14         DO YOU SEE WHERE HE WROTE, "WHILE I UNDERSTAND THAT

10:01AM  15    CALCULATING CV BASED ON THE MEDIANS IS RELEVANT FOR COMPARING

10:01AM  16    OUR SYSTEM TO SYSTEMS OF OUR COMPETITORS, THE FACT THAT THE CV

10:01AM  17    OF OUR CUT OFF LEVEL FOR SYPHILIS RPR DROPS FROM 43 PERCENT TO

10:01AM  18    LESS THAN 20 PERCENT BY MOVING FROM CV OF THE ENTIRE DATA SET

10:01AM  19    TO CV OF THE MEDIANS TELLS ME THAT THE SIGNIFICANT PORTION OF

10:01AM  20    OUR DATA IS JUST NOISE."

10:01AM  21         DO YOU SEE THAT LANGUAGE?

10:01AM  22    A.   I DO.

10:01AM  23    Q.   AND THAT WAS THE THRUST OF THE CONCERN THAT MR. SHULTZ WAS

10:01AM  24    RAISING ABOUT SYPHILIS?

10:01AM  25    A.   I DON'T REMEMBER THAT.  I REMEMBER IT BEING A CONCERN OF

HOLMES CROSS BY MR. LEACH (RES.)                                    7984

10:01AM   1    HOW WE WERE SETTING OUR EQUIVOCAL ZONE, BUT I SEE THAT HE'S

10:01AM   2    ALSO RAISING THIS CONCERN.

10:01AM   3    Q.   OKAY.  AND IF WE GO TO THE NEXT PARAGRAPH.

10:02AM   4         DO YOU SEE WHERE HE WROTE, "IN OUR VALIDATION REPORTS,"

10:02AM   5    ROUGHLY IN THE MIDDLE, "THERE IS NEVER ANY MENTION OF HOW MANY

10:02AM   6    ATTEMPTS OF PRECISION OR COMPARABILITY TESTING IT TOOK TO GET

10:02AM   7    THE DATA THAT'S PRESENTED."

10:02AM   8         DO YOU SEE THAT LANGUAGE?

10:02AM   9    A.   I DO.

10:02AM  10    Q.   I NEXT WANT TO DRAW YOUR ATTENTION TO THE FOURTH

10:02AM  11    PARAGRAPH.  MR. SHULTZ IS WRITING, "I THEN ASKED DANIEL IF HE

10:02AM  12    THOUGHT OUR SYPHILIS TEST WAS TRULY THE MOST ACCURATE AND MOST

10:02AM  13    PRECISE SYPHILIS TEST ON THE MARKET.  HE SAID THAT THERANOS

10:02AM  14    DOES NOT CLAIM TO HAVE THE MOST ACCURATE OR PRECISE TESTS, AND

10:02AM  15    THAT IF I COULD FIND ANY MARKETING MATERIALS THAT MAKE SUCH

10:02AM  16    CLAIMS, THAT I SHOULD FORWARD THEM TO HIM."

10:02AM  17         DID I READ THAT CORRECTLY?

10:02AM  18    A.   YES.

10:02AM  19    Q.   "A QUICK GOOGLE SEARCH YIELDS A HANDFUL OF ARTICLES THAT

10:02AM  20    EXPLICITLY MAKE THESE CLAIMS.  DANIEL AGREED THAT THE AUTHORS

10:02AM  21    MAKE SWEEPING STATEMENTS ABOUT OUR ASSAYS PERFORMANCES, BUT

10:03AM  22    NOTED THAT THERANOS NEVER DIRECTLY MADE ANY OF THESE CLAIMS."

10:03AM  23         DO YOU SEE THAT LANGUAGE?

10:03AM  24    A.   I DO.

10:03AM  25    Q.   "IF WELL-ESTABLISHED INSTITUTIONS SUCH AS 'THE

HOLMES CROSS BY MR. LEACH (RES.)                                    7985

10:03AM   1    WALL STREET JOURNAL' HAVE PUBLISHED MISINFORMATION ABOUT

10:03AM   2    THERANOS, IT SEEMS IT WOULD BE IN OUR BEST LONG-TERM INTEREST

10:03AM   3    TO CORRECT THIS INFORMATION IN ORDER TO UPHOLD OUR IMAGE OF

10:03AM   4    BRINGING TRANSPARENCY TO BLOOD TESTING."

10:03AM   5         DID I READ THAT CORRECTLY?

10:03AM   6    A.   YOU DID.

10:03AM   7    Q.   AND THE TIMING OF THIS IS APRIL OF 2014; CORRECT?

10:03AM   8    A.   IT IS.

10:03AM   9    Q.   SO THIS IS AFTER MR. RAGO WROTE HIS PIECE ABOUT THERANOS

10:03AM   10   IN "THE WALL STREET JOURNAL" IN SEPTEMBER OF 2013?

10:03AM   11   A.   YES.

10:03AM   12   Q.   THIS WAS AFTER YOU SAT DOWN WITH ERIC TOPOL AND TALKED TO

10:03AM   13   HIM ABOUT THERANOS'S TECHNOLOGY AND WHAT YOU THOUGHT IT COULD

10:03AM   14   DO?

10:03AM   15   A.   IT IS.

10:03AM   16   Q.   AND THIS IS AFTER THE PRESS RELEASES ABOUT THE WALGREENS

10:03AM   17   RELATIONSHIP; CORRECT?

10:03AM   18   A.   IT IS.

10:03AM   19   Q.   OKAY.  THIS IS BEFORE YOU TALKED TO ROGER PARLOFF.  AM I

10:03AM   20   RIGHT ABOUT THAT PART?

10:03AM   21   A.   I THINK -- YES.

10:04AM   22   Q.   OKAY.

10:04AM   23   A.   RIGHT AROUND THE SAME TIME.

10:04AM   24   Q.   RIGHT AROUND THE SAME TIME?

10:04AM   25   A.   YEP.

HOLMES CROSS BY MR. LEACH (RES.)                                    7986

10:04AM   1    Q.    TYLER SHULTZ IS SAYING THERE'S STUFF IN THE PUBLIC DOMAIN

10:04AM   2    ABOUT ACCURACY, THERANOS IS NOT SAYING THIS, BUT MAYBE WE

10:04AM   3    SHOULD BE WORRIED ABOUT THAT.

10:04AM   4         IS THAT A FAIR SUMMARY OF HIS CONCERNS?

10:04AM   5    A.    YES.

10:04AM   6    Q.    HE THEN WROTE, "I THEN THOUGHT BACK TO OUR PREVIOUS

10:04AM   7    DISCUSSION WHEN I ASKED ABOUT OUR CLAIM OF HAVING LESS THAN

10:04AM   8    10 PERCENT CV FOR ASSAYS."

10:04AM   9         MAYBE IF WE COULD PULL THAT UP, MS. HOLLIMAN.

10:04AM   10        DO YOU SEE THAT LANGUAGE?

10:04AM   11   A.    I DO.

10:04AM   12   Q.    AND HAVING A LOW CV IS GENERALLY DESIRABLE FOR A BLOOD

10:04AM   13   TESTING COMPANY?

10:04AM   14   A.    IT IS.

10:04AM   15   Q.    "WE CHECKED THE THERANOS WEBSITE TOGETHER AND FOUND THAT

10:04AM   16   WE ONLY MAKE THIS CLAIM FOR VITAMIN D.  I CHECKED THE 2-TIP

10:04AM   17   VALIDATION DATA (WE WERE RUNNING 2-TIP PROTOCOL AT THE TIME)

10:04AM   18   AND FOUND THAT THE CV'S FOR OUR 3 LEVELS WERE 18 PERCENT,

10:05AM   19   16 PERCENT, AND 19 PERCENT WHEN CALCULATED BASED ON THE MEDIAN

10:05AM   20   OF EACH PRECISION RUN AND 23 PERCENT, 23 PERCENT, AND

10:05AM   21   25 PERCENT WHEN CALCULATED BASED ON THE ENTIRE DATA SET."

10:05AM   22        DID I READ THAT CORRECTLY?

10:05AM   23   A.    YOU DID.

10:05AM   24   Q.    "HERE ARE SCATTER PLOTS FOR THE RESULTS OF VITAMIN D

10:05AM   25   PRECISION TESTING, THEY DON'T SEEM TO MEET THE STANDARD WE

10:05AM 1    CLAIM ON OUR WEBSITE FOR VITAMIN D."

10:05AM 2         DO YOU SEE THAT?

10:05AM 3    A.   I DO.

10:05AM 4    Q.   AND THERANOS ALSO MADE CLAIMS ABOUT ITS CV FOR VITAMIN D

10:05AM 5    IN INVESTOR POWERPOINTS?

10:05AM 6    A.   WE DID.

10:05AM 7    Q.   YOU'VE SEEN SOME OF THOSE SLIDES IN THIS TRIAL, HAVEN'T

10:05AM 8    YOU, MS. HOLMES?

10:05AM 9    A.   YES.

10:05AM 10   Q.   AFTER RECEIVING THIS EMAIL FROM MR. SHULTZ, I UNDERSTAND

10:05AM 11   YOU FORWARDED THIS TO SUNNY BALWANI AND DANIEL YOUNG.  AM I

10:05AM 12   RIGHT?

10:05AM 13   A.   I DID.

10:05AM 14   Q.   AND YOU ASKED DR. YOUNG TO LOOK INTO THIS?

10:06AM 15   A.   I DID.

10:06AM 16   Q.   AND I DRAW YOUR ATTENTION TO EXHIBIT 67 -- 1675.

10:06AM 17   A.   OKAY.

10:06AM 18   Q.   IS THIS AN EMAIL EXCHANGE BETWEEN TYLER SHULTZ, YOU,

10:06AM 19   MR. BALWANI, AND DANIEL YOUNG ON OR ABOUT APRIL 15TH, 2014?

10:06AM 20   A.   IT IS.

10:06AM 21        MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

10:06AM 22   EXHIBIT 1675.

10:06AM 23        MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:06AM 24        THE COURT:  IT'S ADMITTED.

10:06AM 25        (GOVERNMENT'S EXHIBIT 1675 WAS RECEIVED IN EVIDENCE.)

HOLMES CROSS BY MR. LEACH (RES.)                                   7988

| | | |
|---|---|---|
| 10:06AM | 1 | BY MR. LEACH: |
| 10:06AM | 2 | Q.   LET ME DRAW YOUR ATTENTION TO THE SECOND EMAIL FROM THE |
| 10:06AM | 3 | TOP, MS. HOLMES, THE ONE FROM SUNNY BALWANI AT 4:48 P.M. |
| 10:06AM | 4 |      DO YOU SEE THAT? |
| 10:06AM | 5 | A.   I DO. |
| 10:06AM | 6 | Q.   AND MR. BALWANI WROTE TO MR. SHULTZ WITH A COPY TO YOU, |
| 10:07AM | 7 | "TYLER. |
| 10:07AM | 8 |      "WE SAW YOUR EMAIL TO ELIZABETH. |
| 10:07AM | 9 |      "BEFORE I GET INTO SPECIFICS, LET ME SHARE WITH YOU THAT |
| 10:07AM | 10 | HAD THIS EMAIL COME FROM ANYONE ELSE IN THE COMPANY, I WOULD |
| 10:07AM | 11 | HAVE ALREADY HELD THEM ACCOUNTABLE FOR THE ARROGANT AND |
| 10:07AM | 12 | PATRONIZING TONE AND RECKLESS COMMENTS." |
| 10:07AM | 13 |      DO YOU SEE THAT LANGUAGE? |
| 10:07AM | 14 | A.   I DO. |
| 10:07AM | 15 | Q.   YOU REVIEWED THIS AND COMMENTED ON IT BEFORE IT WENT TO |
| 10:07AM | 16 | MR. SHULTZ; ISN'T THAT CORRECT? |
| 10:07AM | 17 | A.   I'M NOT SURE IF IT WAS THIS EMAIL SPECIFICALLY, BUT ON THE |
| 10:07AM | 18 | SUBSTANCE OF THE TECHNICAL QUESTIONS THAT WERE IN MR. SHULTZ |
| 10:07AM | 19 | EMAIL. |
| 10:07AM | 20 | Q.   WELL, LET'S SEE IF I CAN REFRESH YOUR MEMORY. |
| 10:07AM | 21 |      MAY I APPROACH, YOUR HONOR? |
| 10:07AM | 22 |           THE COURT:  YES. |
| 10:07AM | 23 | BY MR. LEACH: |
| 10:07AM | 24 | Q.   (HANDING.) |
| 10:07AM | 25 | A.   THANK YOU. |

HOLMES CROSS BY MR. LEACH (RES.)                                      7989

10:08AM  1    Q.   YOU'RE WELCOME.

10:08AM  2         MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WE HAVE MARKED AS

10:08AM  3    EXHIBIT 5645.

10:08AM  4         DOES THIS APPEAR TO BE AN EARLIER ITERATION OF THE EMAIL

10:08AM  5    THAT WE'RE LOOKING AT IN 1675 WITH SOME COMMENTS TO THE RIGHT?

10:08AM  6    A.   YES.

10:08AM  7              MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

10:08AM  8    5645.

10:08AM  9              MR. DOWNEY:  NO OBJECTION.

10:08AM  10             THE COURT:  IT'S ADMITTED.

10:08AM  11        (GOVERNMENT'S EXHIBIT 5645 WAS RECEIVED IN EVIDENCE.)

10:08AM  12   BY MR. LEACH:

10:08AM  13   Q.   AND DO YOU SEE UP AT THE TOP, MS. HOLMES --

10:09AM  14        AND IF WE COULD, MS. HOLLIMAN, ALSO GRAB THE COMMENTS TO

10:09AM  15   THE RIGHT.

10:09AM  16        DO YOU SEE THIS PARAGRAPH BEGINS, "BEFORE I GET INTO

10:09AM  17   SPECIFICS, LET ME SHARE WITH YOU HAD THIS EMAIL COME FROM

10:09AM  18   ANYONE ELSE IN THE COMPANY, I WOULD HAVE ALREADY" -- AND

10:09AM  19   THERE'S REFERENCE TO THE ARROGANT AND INSULTING ATTITUDE.

10:09AM  20        DO YOU SEE THAT LANGUAGE?

10:09AM  21   A.   I DO.

10:09AM  22   Q.   AND IS YOUR COMMENT IN THE RIGHT IN THE EH1 BOX?

10:09AM  23   A.   IT LOOKS LIKE IT, YES.

10:09AM  24   Q.   OKAY.  YOUR COMMENT WAS, "STRONGER - EMPHASIZE WHAT HE DID

10:09AM  25   FIRST ESPECIALLY IN LIGHT OF MY COMMENT ON ACCURACY BELOW."

HOLMES CROSS BY MR. LEACH (RES.)                                    7990

10:09AM   1        DO YOU SEE THAT?

10:09AM   2    A.   I SEE THAT.

10:09AM   3    Q.   SO YOU'RE ENCOURAGING MR. BALWANI TO BE FORCEFUL WITH

10:09AM   4    MR. SHULTZ IN THIS EMAIL.

10:09AM   5        IS THAT FAIR?

10:09AM   6    A.   I THINK I'M TRYING TO SAY WE NEED TO EXPLAIN WHAT THE

10:10AM   7    ISSUE IS, WHAT HE DID IN THE CONTEXT OF THE EMAIL BELOW.

10:10AM   8    Q.   WELL, LET'S GO BACK TO 1565.

10:10AM   9        AND IF WE CAN ZOOM BACK IN ON THE SECOND EMAIL FROM THE

10:10AM   10   TOP.

10:10AM   11       DO YOU SEE AFTER MR. BALWANI WRITES, "I WOULD HAVE ALREADY

10:10AM   12   HELD THEM ACCOUNTABLE FOR THE ARROGANT AND PATRONIZING TONE AND

10:10AM   13   RECKLESS COMMENTS," HE WROTE, "IN YOUR CASE, I AM GIVING YOU

10:10AM   14   THE BENEFIT OF THE DOUBT THAT YOUR INTENTIONS ARE IN THE RIGHT

10:10AM   15   PLACE, AND AM TAKING THE TIME TO RESPOND, EVEN THOUGH YOUR TONE

10:10AM   16   IN THIS EMAIL ALL OF THE WAY THROUGH THE LAST PARAGRAPH IS NOT

10:10AM   17   THAT OF SOMEONE SEEKING TO UNDERSTAND, BUT RATHER SOMEONE

10:10AM   18   STANDING AT HIGHER PERCH OF MORALITY AND BUSINESS WISDOM."

10:11AM   19       DO YOU SEE THAT LANGUAGE?

10:11AM   20   A.   I DO.

10:11AM   21   Q.   AND YOU APPROVED THIS GOING OUT TO MR. SHULTZ BEFORE

10:11AM   22   MR. BALWANI SENT THIS?

10:11AM   23   A.   I KNEW IT WAS GOING OUT, YES.

10:11AM   24   Q.   FURTHER DOWN BELOW DOES MR. BALWANI INTERLINEATE RESPONSES

10:11AM   25   TO TYLER SHULTZ, CERTAIN POINTS THAT TYLER SHULTZ IS MAKING IN

HOLMES CROSS BY MR. LEACH (RES.)                                    7991

10:11AM   1      HIS EMAIL?

10:11AM   2      A.   HE DOES.

10:11AM   3      Q.   AND LET'S LOOK BRIEFLY DOWN AT THAT AT THE BOTTOM.

10:11AM   4           SO DO YOU SEE THE FIRST PARAGRAPH, "HI ELIZABETH.

10:11AM   5           "IN MY MEETINGS WITH DANIEL."

10:11AM   6      A.   I DO.

10:11AM   7      Q.   AND THAT'S IN MR. SHULTZ'S EMAIL TO YOU?

10:11AM   8      A.   YES.

10:11AM   9      Q.   AND YOUR NEXT PARAGRAPH BEGINS, "YOUR BASIC UNDERSTANDING

10:11AM  10      OF STATISTICS IS STILL LOW."

10:11AM  11           THAT'S SOMETHING THAT MR. BALWANI INTERLINEATED IN HIS

10:12AM  12      RESPONSE TO MR. SHULTZ; IS THAT CORRECT?

10:12AM  13      A.   HE DID.

10:12AM  14      Q.   LET'S GO BACK UP TO THE TOP.

10:12AM  15           AND IN RESPONSE TO THE EMAIL FROM MR. BALWANI, YOU, AND

10:12AM  16      DR. YOUNG, MR. SHULTZ REPLIED, "I DO NOT EXPECT TO BE TREATED

10:12AM  17      ANY DIFFERENTLY BECAUSE OF WHO I AM RELATED TO.  THERANOS IS

10:12AM  18      CLEARLY NOT THE PLACE FOR ME.  CONSIDER THIS MY TWO WEEK

10:12AM  19      NOTICE.  IF YOU PREFER I LEAVE TODAY THAT'S FINE WITH ME TOO."

10:12AM  20           DO YOU SEE THAT LANGUAGE?

10:12AM  21      A.   I DO.

10:12AM  22      Q.   AND MR. SHULTZ LEFT SHORTLY AFTER THIS EMAIL; CORRECT?

10:12AM  23      A.   HE DID.

10:12AM  24      Q.   NOW, SITTING HERE TODAY, YOU KNOW THAT IN 2016 FOLLOWING

10:12AM  25      THE CMS INSPECTION, THERANOS VOIDED ALL OF THE VITAMIN D TESTS

HOLMES CROSS BY MR. LEACH (RES.)                               7992

10:12AM   1    THAT WERE RUN ON THE TSPU OR THE EDISON 3.5?

10:12AM   2    A.   I DO, YES.

10:12AM   3    Q.   YOU KNOW THAT SITTING HERE TODAY?

10:12AM   4    A.   I DO.

10:12AM   5    Q.   OKAY.  TYLER SHULTZ WAS RIGHT ABOUT PROBLEMS WITH THE

10:12AM   6    EDISON 3.5, WASN'T HE?

10:13AM   7    A.   I DON'T THINK THE CONCERNS HE RAISED WERE CORRECT.

10:13AM   8    Q.   HE WAS RAISING CONCERNS ABOUT VITAMIN D; ISN'T THAT RIGHT?

10:13AM   9    A.   HE DID.

10:13AM   10   Q.   AND THERANOS ULTIMATELY VOIDED ALL OF THE VITAMIN D TESTS;

10:13AM   11   ISN'T THAT CORRECT?

10:13AM   12   A.   WE DID.

10:13AM   13   Q.   AND THERANOS CHOSE NOT TO LISTEN TO HIM AT THE TIME;

10:13AM   14   CORRECT?

10:13AM   15   A.   NO.

10:13AM   16   Q.   YOU CHOSE NOT TO LISTEN TO HIM AT THE TIME?

10:13AM   17   A.   NO.

10:13AM   18   Q.   INSTEAD YOU ELECTED TO RETALIATE AGAINST MR. SHULTZ; IS

10:13AM   19   THAT RIGHT?

10:13AM   20   A.   NO.

10:13AM   21   Q.   YOU DIDN'T HIRE DAVID BOIES'S FIRM TO THREATEN A LAWSUIT

10:13AM   22   AGAINST MR. SHULTZ?

10:13AM   23   A.   WE DID HIRE DAVID BOIES'S FIRM, AND WE DID ASK

10:13AM   24   DAVID BOIES'S FIRM TO FOLLOW UP ON THE DISCLOSURE OF TRADE

10:13AM   25   SECRETS.

HOLMES CROSS BY MR. LEACH (RES.)                                      7993

10:13AM  1          I SAW THE LANGUAGE IN THE LETTER THAT YOU JUST POINTED TO,

10:13AM  2     AND IT WOULDN'T SURPRISE ME IF THERE WAS A SIMILAR LETTER THAT

10:13AM  3     WENT TO MR. SHULTZ.

10:13AM  4     Q.   AND IT WOULDN'T SURPRISE YOU, SITTING HERE TODAY, THAT

10:13AM  5     DAVID BOIES'S LAW FIRM LURED TYLER SHULTZ TO HIS GRANDFATHER'S

10:13AM  6     HOUSE TO TRY TO GET HIM TO SIGN DOCUMENTS IDENTIFYING CARREYROU

10:14AM  7     SOURCES?

10:14AM  8     A.   I DON'T THINK THAT'S HOW IT HAPPENED.

10:14AM  9     Q.   DIDN'T YOU GET A CALL FROM GEORGE SHULTZ THE NIGHT THAT

10:14AM  10    THAT HAPPENED?

10:14AM  11    A.   I'M SURE I DID.

10:14AM  12    Q.   OKAY.  DIDN'T GEORGE SHULTZ CALL YOU FROM HIS HOUSE AND

10:14AM  13    TELL YOU THAT THERE WERE LAWYERS FROM BOIES SCHILLER TRYING TO

10:14AM  14    GET TYLER TO SIGN DOCUMENTS IN AN INTIMIDATING WAY?

10:14AM  15    A.   THAT'S NOT MY MEMORY OF IT.

10:14AM  16    Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:14AM  17         MAY I APPROACH, YOUR HONOR?

10:14AM  18             THE COURT:  YES.

10:15AM  19    BY MR. LEACH:

10:15AM  20    Q.   MS. HOLMES, I'VE PLACED BEFORE YOU A DOCUMENT THAT WE'VE

10:15AM  21    MARKED AS EXHIBIT 5520.

10:15AM  22         DO YOU HAVE A GENERAL UNDERSTANDING OF WHAT IS ON THE

10:15AM  23    COVER PAGE OF 5520?

10:15AM  24    A.   I DO.

10:15AM  25    Q.   OKAY.  SO YOU UNDERSTAND THE CONTEXT FOR WHAT THIS IS?

HOLMES CROSS BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 10:15AM | 1 | A.   I DO. |
| 10:15AM | 2 | Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE THIRD PAGE, DO |
| 10:15AM | 3 | YOU SEE THE BATES NUMBER IN THE BOTTOM 14159? |
| 10:15AM | 4 | A.   YES. |
| 10:15AM | 5 | Q.   AND DO YOU SEE THE WORD "APPEARANCES" UP AT THE TOP? |
| 10:15AM | 6 | A.   I DO. |
| 10:15AM | 7 | Q.   AND IF WE GO TO THE NEXT PAGE, 14160, DO YOU SEE A |
| 10:16AM | 8 | REFERENCE TO YOUR NAME? |
| 10:16AM | 9 | A.   I DO. |
| 10:16AM | 10 | Q.   AND AN INDIVIDUAL ASSOCIATED WITH YOU? |
| 10:16AM | 11 | A.   YES. |
| 10:16AM | 12 | Q.   LET ME DRAW YOUR ATTENTION TO PAGE 55 OF WHAT WE'RE |
| 10:16AM | 13 | LOOKING AT, AND THE BATES NUMBER IN THE BOTTOM RIGHT CORNER IS |
| 10:16AM | 14 | 14210. |
| 10:16AM | 15 | A.   OKAY. |
| 10:16AM | 16 | Q.   AND I'D LIKE FOR YOU TO READ TO YOURSELF LINE 7, |
| 10:16AM | 17 | CONTINUING TO PAGE 56, LINE 15? |
| 10:17AM | 18 | A.   OKAY.  I'M SORRY.  YOU WERE ASKING ABOUT 14210? |
| 10:17AM | 19 | Q.   I'M SORRY.  14211? |
| 10:17AM | 20 | A.   14211.  OKAY. |
| 10:17AM | 21 | Q.   IF YOU COULD READ FROM LINE 7? |
| 10:17AM | 22 | A.   OKAY. |
| 10:17AM | 23 | Q.   TO THE NEXT PAGE AT LINE 15? |
| 10:17AM | 24 | A.   OKAY. |
| 10:18AM | 25 | (PAUSE IN PROCEEDINGS.) |

HOLMES CROSS BY MR. LEACH (RES.)                                  7995

10:18AM    1                    THE WITNESS:  OKAY.

10:18AM    2          BY MR. LEACH:

10:18AM    3          Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT BOIES SCHILLER

10:18AM    4          LAWYERS WENT TO GEORGE SHULTZ'S HOUSE IN AN EFFORT TO HAVE

10:18AM    5          TYLER SHULTZ SIGN AN AFFIDAVIT DISCLOSING JOHN CARREYROU

10:18AM    6          SOURCES?

10:18AM    7          A.   I KNOW THAT THAT HAPPENED, YES.

10:18AM    8          Q.   OKAY.  AND YOU KNOW THAT GEORGE SHULTZ CALLED YOU THAT

10:18AM    9          NIGHT AND SAID THAT THIS IS UNACCEPTABLE?

10:18AM   10          A.   NO.

10:18AM   11          Q.   YOU KNOW THAT GEORGE SHULTZ CALLED YOU AND SAID THAT THE

10:18AM   12          BOIES SCHILLER LAWYERS WERE ACTING IN A TOTALLY UNACCEPTABLE

10:18AM   13          WAY?

10:18AM   14          A.   I KNOW THAT I LATER FELT THAT.

10:18AM   15          Q.   HE LATER STORMED OUT OF A BOARD MEETING BECAUSE OF THAT;

10:18AM   16          ISN'T THAT RIGHT?

10:18AM   17          A.   NO.

10:18AM   18          Q.   HE LATER COMPLAINED TO YOU ABOUT THAT; ISN'T THAT RIGHT?

10:18AM   19          A.   YES.

10:18AM   20          Q.   AND DIDN'T GEORGE SHULTZ TELL YOU IT WAS ONE OF THE WORST

10:18AM   21          LITTLE THINGS HE HAD SEEN ANYBODY TRY TO DO?

10:18AM   22          A.   NO.

10:18AM   23          Q.   YOU DENY THAT HE SAID THAT?

10:18AM   24          A.   I DON'T REMEMBER THAT.

10:18AM   25          Q.   YOU CAN'T SAY ONE WAY OR THE OTHER IF HE SAID THAT?

HOLMES CROSS BY MR. LEACH (RES.)                                    7996

10:19AM  1    A.   AGAIN, IT'S NOT MY MEMORY OF THE INTERACTIONS WITH HIM.

10:19AM  2    Q.   BUT YOU KNEW HE WAS ANGRY ABOUT IT?

10:19AM  3    A.   I DO.

10:19AM  4    Q.   AND YOU WROTE TO MR. BALWANI ABOUT SOME OF THESE

10:19AM  5    INTERACTIONS IN THE TEXT MESSAGES; ISN'T THAT RIGHT?

10:19AM  6    A.   I'M NOT SURE.

10:19AM  7    Q.   WELL, LET'S LOOK.

10:19AM  8         IF WE CAN GO BACK TO 5387D, AND I DRAW YOUR ATTENTION TO

10:19AM  9    PAGE 82.

10:19AM  10   A.   OKAY.

10:19AM  11   Q.   DO YOU SEE THE TEXT ON MAY 31ST, 2015 FROM MR. BALWANI,

10:19AM  12   "YOU NOT CALLING GEORGE BACK ALSO SENDS A MESSAGE THAT WE ARE

10:19AM  13   ABOUT TO SUIT."

10:20AM  14        DO YOU SEE THAT?

10:20AM  15   A.   I DO.

10:20AM  16   Q.   GEORGE IS A REFERENCE TO GEORGE SHULTZ; CORRECT?

10:20AM  17   A.   I'M NOT SURE, BUT IT COULD BE.

10:20AM  18   Q.   OKAY.  THIS IS THE GENERAL TIME PERIOD OF WHEN THE

10:20AM  19   BOIES SCHILLER LAWYERS AMBUSHED TYLER AT GEORGE SHULTZ'S HOUSE,

10:20AM  20   ISN'T IT?

10:20AM  21   A.   I DON'T THINK THEY AMBUSHED HIM, BUT, YES, THIS IS

10:20AM  22   GENERALLY THE TIME PERIOD THAT THEY MET WITH TYLER.

10:20AM  23   Q.   YOU AGREE WITH ME THAT THEY TRIED TO FORCE HIM TO SIGN

10:20AM  24   DOCUMENTS IDENTIFYING CARREYROU SOURCES; CORRECT?

10:20AM  25   A.   I KNOW THAT THEY ASKED HIM TO SIGN DOCUMENTS.  MY MEMORY

HOLMES CROSS BY MR. LEACH (RES.)                          7997

10:20AM   1    WAS THAT IT WAS AN AGREEMENT TO STOP DISCLOSING TRADE SECRETS

10:20AM   2    TO "THE JOURNAL."

10:20AM   3    Q.   OKAY.  AND YOU KNOW THAT HE ULTIMATELY AGREED NOT TO DO

10:20AM   4    THAT?

10:20AM   5    A.   I THINK THAT'S RIGHT, YEAH.

10:20AM   6    Q.   AND YOU WROTE IN RESPONSE TO MR. BALWANI'S TEXT, "EXACTLY

10:20AM   7    WAS THINKING SAME."

10:20AM   8    A.   OKAY.

10:20AM   9    Q.   DID I READ THAT CORRECTLY?

10:20AM  10    A.   YOU DID.

10:20AM  11    Q.   LET'S PLEASE LOOK AT PAGE 84.

10:21AM  12         DO YOU SEE A TEXT A FEW DAYS LATER ON JUNE 5TH, 2015,

10:21AM  13    "DON'T TALK IN THIS MEETING.  U SHD TALK TO DAVID FIRST."

10:21AM  14    A.   I DO.

10:21AM  15    Q.   AND YOU RESPOND, "GEORGE WANTS TO KNOW WHAT TYLER HAS

10:21AM  16    DONE.  WOULD YOU ASK DAVID IF I SHOULD SAY OR TELL HIM WE'LL

10:21AM  17    LET HIM KNOW," I THINK YOU MEANT LATER, "AND TEXT ME BACK."

10:21AM  18         DO YOU SEE THAT LANGUAGE?

10:21AM  19    A.   I DO.

10:21AM  20    Q.   THE REFERENCE TO GEORGE THERE IS A REFERENCE TO

10:21AM  21    GEORGE SHULTZ; CORRECT?

10:21AM  22    A.   YES.

10:21AM  23    Q.   AND THE REFERENCE TO DAVID THERE IS A REFERENCE TO

10:21AM  24    DAVID BOIES; IS THAT CORRECT?

10:21AM  25    A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                              7998

10:21AM   1     Q.   AFTER THE CARREYROU ARTICLE CAME OUT IN 2015, YOU

10:22AM   2     CONTINUED TO DISMISS TYLER SHULTZ AS A LOW LEVEL DISGRUNTLED

10:22AM   3     EMPLOYEE; IS THAT CORRECT?

10:22AM   4     A.   YES.

10:22AM   5     Q.   AND SITTING HERE TODAY, YOU KNOW THAT YOUR INTERACTIONS

10:22AM   6     WITH TYLER SHULTZ CAUSED SIGNIFICANT ANGST IN THE RELATIONSHIP

10:22AM   7     BETWEEN TYLER AND HIS GRANDFATHER?

10:22AM   8     A.   I DO.

10:22AM   9     Q.   YOU KNOW THAT TODAY?

10:22AM   10    A.   I DO.

10:22AM   11    Q.   IS THAT ANOTHER THING THAT YOU WISH YOU WOULD HAVE DONE

10:22AM   12    DIFFERENTLY?

10:22AM   13    A.   AGAIN, I COULDN'T SAY MORE STRONGLY THE WAY WE HANDLED

10:22AM   14    "THE WALL STREET JOURNAL" PROCESS WAS A DISASTER.  WE TOTALLY

10:22AM   15    MESSED IT UP.

10:22AM   16    Q.   YOU ALSO TRIED TO INTIMIDATE MR. CARREYROU; CORRECT?

10:22AM   17    A.   I DON'T THINK SO.

10:22AM   18    Q.   YOU TRIED TO QUASH THE STORY; ISN'T THAT CORRECT?

10:22AM   19    A.   WE DID.

10:22AM   20    Q.   YOU HAD DAVID BOIES GO TO "THE WALL STREET JOURNAL"'S

10:22AM   21    OFFICES AND THREATEN LITIGATION, DIDN'T YOU?

10:22AM   22    A.   I'M NOT SURE HE THREATENED LITIGATION, BUT I KNOW HE MET

10:23AM   23    WITH PEOPLE AT "THE JOURNAL."

10:23AM   24    Q.   YOU HAD DAVID BOIES WRITE LETTERS TO "THE JOURNAL"

10:23AM   25    THREATENING LITIGATION, DIDN'T YOU?

HOLMES CROSS BY MR. LEACH (RES.)                                    7999

10:23AM  1    A.   AGAIN, I DON'T KNOW IF HE WAS THREATENING LITIGATION, BUT

10:23AM  2    I KNOW THAT HE WAS ACTIVELY MEETING WITH PEOPLE AT "THE

10:23AM  3    JOURNAL."

10:23AM  4    Q.   AND WRITING TO THEM?

10:23AM  5    A.   YES.

10:23AM  6    Q.   AND WHEN NONE OF THAT WORKED, YOU PERSONALLY WENT TO THE

10:23AM  7    OWNER OF "THE WALL STREET JOURNAL" TO TRY TO GET HIM TO QUASH

10:23AM  8    THE STORY; ISN'T THAT CORRECT?

10:23AM  9    A.   I DID.

10:23AM 10    Q.   LET'S LOOK AT THAT.  I DRAW YOUR ATTENTION TO PAGE 110 OF

10:23AM 11    THE TEXT MESSAGES AT 5387D.

10:23AM 12         I'M SORRY.  MAY I APPROACH, YOUR HONOR?

10:23AM 13              THE COURT:  YES.

10:24AM 14    BY MR. LEACH:

10:24AM 15    Q.   (HANDING.)

10:24AM 16    A.   THANK YOU.

10:24AM 17    Q.   I'VE PLACED BEFORE YOU, MS. HOLMES, WHAT WE HAVE MARKED AS

10:24AM 18    EXHIBIT 5074.

10:24AM 19         DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL?

10:24AM 20    A.   I DO.

10:24AM 21    Q.   AND DO YOU SEE RUPERT MURDOCH'S NAME IN THE TO LINE?

10:24AM 22    A.   I DO.

10:24AM 23    Q.   HE WAS THE OWNER OF "THE WALL STREET JOURNAL" IN SEPTEMBER

10:24AM 24    OF 2015?

10:24AM 25    A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                    8000

10:24AM  1    Q.   AND WAS THIS PART OF YOUR EFFORT TO GET MR. MURDOCH TO

10:24AM  2    QUASH THE STORY THAT JOHN CARREYROU WAS WRITING?

10:24AM  3    A.   IT WAS PART OF MY EFFORT TO GET MR. MURDOCH TO MAKE SURE

10:24AM  4    THAT OUR TRADE SECRETS WERE NOT PUBLISHED.

10:25AM  5    Q.   YOU KEEP INJECTING TRADE SECRETS, AND I PROMISE WE WILL

10:25AM  6    GET TO TRADE SECRETS.

10:25AM  7         MY QUESTION WAS, YOU TESTIFIED THAT YOU ATTEMPTED TO QUASH

10:25AM  8    THE STORY.  I'M JUST TRYING TO UNDERSTAND, IS THIS PART OF THAT

10:25AM  9    EFFORT?

10:25AM  10   A.   NO.  I THINK AT THIS POINT WE WERE NOT TRYING TO QUASH IT.

10:25AM  11   Q.   YOU WERE TRYING TO QUASH IT SOMETIME LATER?

10:25AM  12   A.   ONCE WE UNDERSTOOD THAT OUR TRADE SECRETS WERE GOING TO BE

10:25AM  13   DISCLOSED.

10:25AM  14   Q.   WELL, LET'S LOOK AT WHAT YOU WROTE.

10:25AM  15        YOUR HONOR, I NEED TO DISPLAY IT ON THE ELMO.  I'M PUTTING

10:25AM  16   A POST IT OVER SOMETHING THAT I DON'T THINK IS PUBLIC.

10:25AM  17             THE COURT:  ARE YOU MOVING THIS IN?

10:25AM  18             MR. LEACH:  IF I HAVE NOT MOVED IT IN, I MOVE IT IN.

10:25AM  19             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:25AM  20             THE COURT:  AND JUST TO BE CLEAR, THIS IS

10:25AM  21   EXHIBIT 5704?

10:26AM  22             MR. LEACH:  YES, YOUR HONOR.

10:26AM  23             THE COURT:  ALL RIGHT.  THANK YOU.  IT'S ADMITTED.

10:26AM  24        (GOVERNMENT'S EXHIBIT 5704 WAS RECEIVED IN EVIDENCE.)

10:26AM  25   BY MR. LEACH:

HOLMES CROSS BY MR. LEACH (RES.)                                      8001

10:26AM  1     Q.   DO YOU SEE YOUR NAME AT THE TOP, MS. HOLMES?

10:26AM  2     A.   I DO.

10:26AM  3     Q.   AND DO YOU SEE MR. MURDOCH'S NAME IN THE TO LINE?

10:26AM  4     A.   YES.

10:26AM  5     Q.   AND THE DATE IS SEPTEMBER 8TH, 2015.  THAT'S ROUGHLY A

10:26AM  6     MONTH BEFORE "THE WALL STREET JOURNAL" ARTICLE COMES OUT?

10:26AM  7     A.   IT IS.

10:26AM  8     Q.   AND AT THIS POINT IN TIME, YOU KNOW THAT CMS INSPECTORS

10:26AM  9     ARE COMING TO LOOK AT THE CALIFORNIA CLIA LAB; CORRECT?

10:26AM 10     A.   I KNOW IT WAS SOMETIME IN SEPTEMBER.

10:26AM 11     Q.   OKAY.  YOU ALSO KNOW THAT THIS IS AFTER AN FDA INSPECTION

10:26AM 12     OF YOUR CLIA LAB; CORRECT?

10:26AM 13     A.   I THINK IT'S ONGOING AT THIS POINT, YEAH.

10:26AM 14     Q.   ONGOING OR AROUND THE SAME TIME?

10:26AM 15     A.   YEAH.

10:26AM 16     Q.   OKAY.  AND THIS IS AFTER TYLER SHULTZ IS -- HAD A

10:27AM 17     CONFRONTATION AT GEORGE SHULTZ'S HOUSE ABOUT SIGNING DOCUMENTS;

10:27AM 18     IS THAT CORRECT?

10:27AM 19     A.   YES.

10:27AM 20     Q.   AND YOU WROTE -- AND YOU KNEW MR. MURDOCH WAS ALSO A

10:27AM 21     SHAREHOLDER OF THERANOS AT THE TIME?

10:27AM 22     A.   HE WAS.

10:27AM 23     Q.   A SIGNIFICANT SHAREHOLDER?

10:27AM 24     A.   HE WAS.

10:27AM 25     Q.   MORE THAN $100 MILLION?

HOLMES CROSS BY MR. LEACH (RES.)                                      8002

10:27AM   1    A.   YES.

10:27AM   2    Q.   YOU WROTE, "I HOPE ALL IS WONDERFUL WITH YOU AND THAT YOU

10:27AM   3    HAD A WONDERFUL LABOR DAY.  I HAVE VERY MUCH BEEN LOOKING

10:27AM   4    FORWARD TO SEEING YOU WHEN YOU ARE OUT THIS WAY AGAIN.

10:27AM   5         "FOR PURPOSE OF KEEPING YOU IN THE LOOP, I WANTED TO SHARE

10:27AM   6    THE ATTACHED DOCUMENTS WITH YOU, INCLUDING A BRIEFING DOCUMENT

10:27AM   7    THAT WAS SENT FROM DAVID TO GERARD AT WSJ TODAY IN THE HOPES

10:27AM   8    THAT GERARD MIGHT MEET WITH OUR TEAM."

10:27AM   9    A.   YES.

10:27AM  10    Q.   AND DO YOU SEE THAT?

10:27AM  11    A.   I DO.

10:27AM  12    Q.   AND DAVID IS A REFERENCE TO DAVID BOIES?

10:27AM  13    A.   YES.

10:27AM  14    Q.   AND GERARD IS A REFERENCE TO A SENIOR OFFICER WITHIN "THE

10:27AM  15    WALL STREET JOURNAL"?

10:27AM  16    A.   IT IS.

10:27AM  17    Q.   AND THEN YOU SAID, "I'VE ALSO ATTACHED THE MATERIAL THAT

10:28AM  18    THERANOS HAS SHARED WITH WSJ (RESPONSIVE TO QUESTIONS FROM

10:28AM  19    JOHN CARREYROU) SINCE THE MATERIALS I GAVE YOU IN JULY.  AS

10:28AM  20    I'VE REFLECTED ON THIS, I THOUGHT THAT WERE I IN YOUR SHOES I

10:28AM  21    WOULD WANT TO KNOW/BE IN THE LOOP ON THIS ONE, AND SINCE YOU

10:28AM  22    HAD THE PRIOR MATERIALS FROM JULY, WANTED TO GIVE YOU THE

10:28AM  23    COMPLETE SET."

10:28AM  24         DO YOU SEE THAT LANGUAGE?

10:28AM  25    A.   I DO.

HOLMES CROSS BY MR. LEACH (RES.)                                    8003

10:28AM   1      Q.   OKAY.  AFTER "THE WALL STREET JOURNAL" ARTICLE BY

10:28AM   2      MR. CARREYROU CAME OUT IN OCTOBER OF 2015, YOU ALSO WROTE

10:28AM   3      MR. MURDOCH EXPRESSING YOUR DISPLEASURE; IS THAT FAIR?

10:28AM   4      A.   I'M NOT SURE, BUT I COULD HAVE.

10:28AM   5      Q.   NO REASON TO DOUBT THAT YOU DID THAT?

10:28AM   6      A.   NO REASON TO DOUBT IT.

10:28AM   7      Q.   NOW, MR. DOWNEY ASKED YOU ON DIRECT EXAMINATION HOW MANY

10:28AM   8      ASSAYS WERE OFFERED WHERE THE ANALYSIS WAS PERFORMED ON A

10:29AM   9      MINIATURIZED THERANOS DEVICE IN THE CLIA LAB.

10:29AM  10           DO YOU REMEMBER THAT QUESTION?

10:29AM  11      A.   I DO.

10:29AM  12      Q.   AND YOUR ANSWER WAS 12?

10:29AM  13      A.   YES.

10:29AM  14      Q.   IS THAT CORRECT?

10:29AM  15      A.   YES.

10:29AM  16      Q.   IS IT ALSO CORRECT THAT THAT WAS ONE OF THE CENTRAL

10:29AM  17      QUESTIONS RAISED BY "THE WALL STREET JOURNAL"?

10:29AM  18      A.   THAT WAS ONE OF THE QUESTIONS.

10:29AM  19      Q.   OKAY.  AND YOU WERE ASKED POINT-BLANK BY JIM CRAMER ON

10:29AM  20      "MAD MONEY" WHETHER IT WAS TRUE THAT IT WAS ONLY 12 OR 15 TESTS

10:29AM  21      ON YOUR DEVICE; ISN'T THAT RIGHT?

10:29AM  22      A.   I DON'T REMEMBER THE QUESTION, BUT I REMEMBER HE WAS

10:29AM  23      ASKING ME ABOUT THE CONTENT OF "THE WALL STREET JOURNAL"

10:29AM  24      ARTICLE.

10:29AM  25      Q.   WELL, LET'S PLAY THE CLIP WHICH IS IN EVIDENCE AS

HOLMES CROSS BY MR. LEACH (RES.)                                    8004

10:29AM  1      EXHIBIT 2851-3.

10:29AM  2              THE COURT:  IS THIS THE VIDEO CLIP?

10:29AM  3              MR. LEACH:  YES.

10:29AM  4              THE COURT:  AND THIS IS THE VIDEO CLIP THAT WAS

10:29AM  5      PREVIOUSLY PLAYED?

10:29AM  6              MR. LEACH:  YES.

10:29AM  7              THE COURT:  ALL RIGHT.  THANK YOU.

10:29AM  8          THERE WILL BE NO TRANSCRIPTION OF THIS AGAIN.

10:30AM  9              MR. LEACH:  YES, YOUR HONOR.

10:30AM  10             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE'LL

10:30AM  11     PLAY THIS CLIP.

10:30AM  12         (VIDEO PLAYING OFF THE RECORD.)

10:32AM  13     BY MR. LEACH:

10:32AM  14     Q.  MS. HOLMES, THAT WAS YOU ON THAT VIDEO; CORRECT?

10:32AM  15     A.  IT IS.

10:32AM  16     Q.  AND YOU HEARD MR. CRAMER ASK YOU THE QUESTION HOW MANY

10:32AM  17     TESTS COULD BE PERFORMED ON THE EDISON?

10:32AM  18     A.  I DID.

10:32AM  19     Q.  AND I DIDN'T HEAR THE NUMBER 12 IN THAT CLIP.  DID YOU

10:32AM  20     HEAR IT?

10:32AM  21     A.  I DID NOT.

10:32AM  22     Q.  OKAY.  YOU WERE THE FOUNDER OF THERANOS; CORRECT?

10:32AM  23     A.  I -- YES.

10:32AM  24     Q.  YOU WERE ITS CHIEF EXECUTIVE OFFICER?

10:32AM  25     A.  YES.

HOLMES CROSS BY MR. LEACH (RES.)                              8005

10:32AM  1    Q.    THROUGH 2016, YOU WERE THE ONLY CHIEF EXECUTIVE OFFICER

10:32AM  2    THAT THERANOS EVER HAD; IS THAT CORRECT?

10:32AM  3    A.    I WAS.

10:32AM  4    Q.    OKAY.  AND BEFORE 2016 YOU OWNED A MAJORITY OF THE VOTING

10:33AM  5    SHARES?

10:33AM  6    A.    AT VARIOUS POINTS IN TIMES, YES.

10:33AM  7    Q.    NO ONE WAS MORE INVESTED IN THE COMPANY THAN YOU WERE; IS

10:33AM  8    THAT FAIR?

10:33AM  9    A.    I TRIED TO BE.  WE HAD A LOT OF PEOPLE WORKING REALLY

10:33AM 10    HARD.

10:33AM 11    Q.    NO ONE OWNED MORE STOCK THAN YOU; CORRECT?

10:33AM 12    A.    CORRECT.

10:33AM 13    Q.    AND YOU TAKE RESPONSIBILITY FOR THE COMPANY; IS THAT YOUR

10:33AM 14    TESTIMONY?

10:33AM 15    A.    I DO.

10:33AM 16    Q.    AND YOU AGREE WITH ME THAT ANYTHING THAT HAPPENS IN YOUR

10:33AM 17    COMPANY IS YOUR RESPONSIBILITY AT THE END OF THE DAY; ISN'T

10:33AM 18    THAT RIGHT?

10:33AM 19    A.    THAT'S HOW I FELT.

10:33AM 20    Q.    YOU COULD FIRE THE BOARD OF DIRECTORS, COULDN'T YOU?

10:33AM 21    A.    I MEAN, TECHNICALLY, YES.  THEY COULD ALSO FIRE ME.

10:33AM 22    Q.    WELL, YOU OWNED 51 PERCENT OF THE COMPANY, RIGHT,

10:33AM 23    MS. HOLMES?

10:33AM 24    A.    I DID.

10:33AM 25    Q.    AND AS THE 51 PERCENT SHAREHOLDER OF THE COMPANY, YOU

HOLMES CROSS BY MR. LEACH (RES.)                                         8006

10:33AM  1    COULD OUTVOTE ANYBODY ON WHO WAS ON THE BOARD; ISN'T THAT

10:33AM  2    RIGHT?

10:33AM  3    A.   I COULD.

10:33AM  4    Q.   OKAY.  AND IF YOU DIDN'T WANT GEORGE SHULTZ THERE, YOU

10:34AM  5    COULD, THROUGH THE WORKING OF THE LEGAL DOCUMENTS, GET HIM OFF

10:34AM  6    THE BOARD; ISN'T THAT RIGHT?

10:34AM  7    A.   YES.

10:34AM  8    Q.   AND YOU COULD DO THAT FOR ANY OF THE BOARD MEMBERS AT

10:34AM  9    THERANOS?

10:34AM  10   A.   WE COULD.

10:34AM  11   Q.   YOU COULD; CORRECT?

10:34AM  12   A.   I COULD.

10:34AM  13   Q.   OKAY.  NOW, SUNNY BALWANI REPORTED TO YOU; CORRECT?

10:34AM  14   A.   HE DID.

10:34AM  15   Q.   AND HE WAS AN AT WILL EMPLOYEE; IS THAT RIGHT?

10:34AM  16   A.   YES.

10:34AM  17   Q.   YOU COULD FIRE HIM AT ANY TIME?

10:34AM  18   A.   YES.

10:34AM  19   Q.   AND YOU AGREE WITH ME THAT YOU AND MR. BALWANI WERE

10:34AM  20   MANAGING THE COMPANY TOGETHER AND MAKING DECISIONS FOR THE

10:34AM  21   COMPANY TOGETHER; ISN'T THAT RIGHT?

10:34AM  22   A.   WE DID.

10:34AM  23   Q.   IT'S YOUR TESTIMONY, IS IT NOT, THAT YOU LET HIM RUN THE

10:34AM  24   COMPANY AND RUN OPERATIONS?

10:34AM  25   A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                    8007

10:34AM  1    Q.   YOU ALSO COULD HIRE OR FIRE THE LAB DIRECTOR; ISN'T THAT

10:35AM  2    CORRECT?

10:35AM  3    A.   YES.

10:35AM  4    Q.   IF YOU WERE UNHAPPY WITH ARNOLD GELB'S PERFORMANCE, YOU

10:35AM  5    COULD FIRE HIM?

10:35AM  6    A.   CORRECT.

10:35AM  7    Q.   AND IF YOU WERE UNHAPPY WITH ADAM ROSENDORFF'S

10:35AM  8    PERFORMANCE, YOU COULD FIRE HIM?

10:35AM  9    A.   YES.

10:35AM  10   Q.   AND IF YOU WERE UNHAPPY WITH LYNETTE SAWYER'S PERFORMANCE,

10:35AM  11   YOU COULD FIRE HER?

10:35AM  12   A.   YES.

10:35AM  13   Q.   AND IF YOU WERE UNHAPPY WITH SUNIL DHAWAN'S PERFORMANCE,

10:35AM  14   YOU COULD FIRE HIM, TOO; CORRECT?

10:35AM  15   A.   CORRECT.

10:35AM  16   Q.   AND YOU WERE RESPONSIBLE AT THE END OF THE DAY FOR

10:35AM  17   ALLOCATING RESOURCES TO ALL OF THE DEPARTMENTS WITHIN THERANOS

10:35AM  18   SO THAT THEY COULD DO THEIR JOBS EFFECTIVELY; IS THAT CORRECT?

10:35AM  19   A.   ULTIMATELY, YES.  THEY CAN'T ALL REPORT TO ME, BUT YES.

10:35AM  20   Q.   OKAY.  BUT NOT EVERYBODY IN A COMPANY REPORTS DIRECTLY TO

10:35AM  21   THE CEO; RIGHT?

10:35AM  22   A.   CORRECT.

10:35AM  23   Q.   BUT ULTIMATELY ALL ROADS, AS THE CEO, LEAD TO YOU?

10:35AM  24   A.   YES.

10:35AM  25   Q.   AND IS IT FAIR THAT THE BUCK STOPS WITH YOU?

HOLMES CROSS BY MR. LEACH (RES.)                        8008

10:35AM  1      A.   I FELT THAT.

10:35AM  2      Q.   YOU COULD HIRE OR FIRE DANISE YAM IF YOU WANTED TO?

10:35AM  3      A.   YES.

10:35AM  4      Q.   AND YOU COULD HIRE OR FIRE A CFO IF YOU WANTED TO?

10:36AM  5      A.   YES.

10:36AM  6      Q.   AND FROM 2010 TO APPROXIMATELY 2016, THERANOS HAD NO CFO?

10:36AM  7      A.   CORRECT.

10:36AM  8      Q.   YOU MADE A DECISION TO HIRE CHIAT/DAY; ISN'T THAT RIGHT?

10:36AM  9      A.   YES.

10:36AM  10     Q.   AND IF YOU WERE UNHAPPY WITH ANYTHING CHIAT/DAY WAS DOING,

10:36AM  11     YOU COULD FIRE THEM, TOO; CORRECT?

10:36AM  12     A.   YES.

10:36AM  13     Q.   YOU ALSO COULD HIRE OR FIRE THE HEAD OF MARKETING; ISN'T

10:36AM  14     THAT RIGHT?

10:36AM  15     A.   YES.

10:36AM  16     Q.   IF YOU WERE UNHAPPY WITH THE DECISIONS YOUR MARKETING

10:36AM  17     DIRECTOR WAS MAKING, YOU COULD GET RID OF THE MARKETING

10:36AM  18     DIRECTOR; IS THAT FAIR?

10:36AM  19     A.   YES, YES.

10:36AM  20     Q.   YOU HAD THAT POWER?

10:36AM  21     A.   I DID.

10:36AM  22     Q.   YOU ALSO MADE THE DECISION TO HIRE BOIES SCHILLER; IS THAT

10:36AM  23     CORRECT?

10:36AM  24     A.   I DID.

10:36AM  25     Q.   AND YOU MADE THE DECISION TO HIRE THERANOS'S LEGAL TEAM?

HOLMES CROSS BY MR. LEACH (RES.)                                    8009

10:36AM  1    A.  YES.

10:36AM  2    Q.  YOU BROUGHT IN HEATHER KING AS THE GENERAL COUNSEL IN

10:36AM  3    2015?

10:36AM  4    A.  I DID.

10:36AM  5    Q.  YOU MADE THAT DECISION?

10:36AM  6    A.  YES.

10:36AM  7    Q.  AND YOU'RE THE ONE WHO SIGNED SUNIL DHAWAN'S OFFER LETTER;

10:37AM  8    ISN'T THAT CORRECT?

10:37AM  9    A.  I THINK SO.

10:37AM 10    Q.  DO YOU AGREE WITH ME THAT YOU WERE GENERALLY KEPT APPRISED

10:37AM 11    OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE CLINICAL LAB?

10:37AM 12    A.  DEFINITELY IN THE PRODUCTS AREA, AND AT A HIGH LEVEL IN

10:37AM 13    THE CLINICAL LAB.

10:37AM 14    Q.  WELL, YOU WERE ASKED THAT QUESTION BEFORE, WEREN'T YOU,

10:37AM 15    MS. HOLMES?

10:37AM 16    A.  I COULD HAVE BEEN.

10:37AM 17           MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:37AM 18           THE COURT:  YES.

10:37AM 19    BY MR. LEACH:

10:37AM 20    Q.  (HANDING.)

10:37AM 21    A.  THANK YOU.

10:37AM 22    Q.  YOU'RE WELCOME.

10:37AM 23      MS. HOLMES, THIS IS NOT THE FIRST TIME THAT YOU'VE

10:37AM 24    TESTIFIED IN MATTERS RELATING TO THERANOS; ISN'T THAT RIGHT?

10:37AM 25    A.  IT'S NOT.

HOLMES CROSS BY MR. LEACH (RES.)                                    8010

10:37AM   1    Q.   YOU TESTIFIED BEFORE THE SECURITIES AND EXCHANGE

10:38AM   2    COMMISSION IN JULY OF 2017 AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM   3    A.   I DID.

10:38AM   4    Q.   AND YOU PROVIDED TESTIMONY OVER THE COURSE OF THREE DAYS

10:38AM   5    IN JULY AND AUGUST OF 2017; IS THAT CORRECT?

10:38AM   6    A.   I DID.

10:38AM   7    Q.   AND OVER THE COURSE OF THOSE THREE DAYS, YOU TOOK AN OATH?

10:38AM   8    A.   YES.

10:38AM   9    Q.   AND YOU SWORE TO TELL THE TRUTH?

10:38AM   10   A.   I DID.

10:38AM   11   Q.   AND YOU TOOK THAT OATH SERIOUSLY?

10:38AM   12   A.   I DO.

10:38AM   13   Q.   THE SAME OATH THAT YOU'RE TAKING TODAY?

10:38AM   14   A.   EXACTLY.

10:38AM   15   Q.   EXACTLY THE SAME OATH.

10:38AM   16        AND YOU WERE REPRESENTED BY COUNSEL AT THAT TIME; CORRECT?

10:38AM   17   A.   I WAS.

10:38AM   18   Q.   YOU HAD SIX LAWYERS STANDING BY YOUR SIDE; IS THAT

10:38AM   19   CORRECT?

10:38AM   20   A.   SOUNDS RIGHT.

10:38AM   21   Q.   OKAY.  A GENTLEMAN NAMED STEVE NEAL FROM COOLEY GODWARD?

10:38AM   22   A.   YES.

10:38AM   23   Q.   A VERY RESPECTED TRIAL LAWYER?

10:38AM   24   A.   I THOUGHT SO.

10:38AM   25   Q.   AND A LAWYER NAMED BILL MCLUCAS, FORMER HEAD OF

HOLMES CROSS BY MR. LEACH (RES.)                                    8011

10:38AM   1    ENFORCEMENT AT THE S.E.C., IN D.C.?

10:38AM   2    A.   YES.

10:38AM   3    Q.   AND A VERY RESPECTED LAWYER?

10:38AM   4    A.   YES.

10:38AM   5    Q.   AND ALL SIX OF THOSE LAWYERS WERE THERE IN THE S.E.C.

10:39AM   6    TESTIMONY GIVING YOU ADVICE?

10:39AM   7    A.   THEY WERE THERE IN THE S.E.C. TESTIMONY.

10:39AM   8    Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO --

10:39AM   9    I'VE PLACED BEFORE YOU A RED BINDER.  DOES THIS APPEAR TO BE A

10:39AM   10   TRANSCRIPT OF YOUR TESTIMONY BEFORE THE S.E.C.?

10:39AM   11   A.   IT IS.

10:39AM   12   Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE BATES NUMBER

10:39AM   13   ENDING 5268.  IT SHOULD BE ON THE FIRST DAY.

10:39AM   14   A.   OKAY.

10:39AM   15   Q.   AND I WANT TO DRAW YOUR ATTENTION TO PAGE 58 OF THIS

10:40AM   16   TRANSCRIPT.

10:40AM   17            MR. DOWNEY:  WHAT'S THE BATES NUMBER?

10:40AM   18            MR. LEACH:  5268.

10:40AM   19            THE COURT:  AND THE PAGE NUMBER?

10:40AM   20            MR. LEACH:  48.

10:40AM   21            THE COURT:  48.  THANK YOU.

10:40AM   22            MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

10:40AM   23   LINES 10 THROUGH 12 ON PAGE 48.

10:40AM   24            THE COURT:  THIS IS IN REGARDS TO THE WITNESS'S LAST

10:40AM   25   ANSWER TO YOUR QUESTION?

HOLMES CROSS BY MR. LEACH (RES.)                              8012

| | | |
|---|---|---|
| 10:40AM | 1 | MR. LEACH:  YES, YOUR HONOR. |
| 10:40AM | 2 | THE COURT:  YOU MAY READ THAT. |
| 10:40AM | 3 | BY MR. LEACH: |
| 10:40AM | 4 | Q.  MS. HOLMES, YOU WERE ASKED THE QUESTION, "WERE YOU KEPT |
| 10:40AM | 5 | APPRISED OF DEVELOPMENTS IN THE PRODUCTS AREA AND IN THE |
| 10:40AM | 6 | CLINICAL LAB?" |
| 10:40AM | 7 | AND YOUR ANSWER WAS "GENERALLY YES." |
| 10:40AM | 8 | WAS THAT CORRECT? |
| 10:40AM | 9 | A.  YES. |
| 10:40AM | 10 | Q.  I'D LIKE TO TALK WITH YOU A LITTLE BIT ABOUT HOW YOU WERE |
| 10:41AM | 11 | COMPENSATED AT THERANOS. |
| 10:41AM | 12 | AM I RIGHT THAT YOUR WAGES IN 2010 WERE ABOUT $200,000? |
| 10:41AM | 13 | A.  YES. |
| 10:41AM | 14 | Q.  AND YOUR WAGES IN 2011 WERE APPROXIMATELY $200,000? |
| 10:41AM | 15 | A.  YES. |
| 10:41AM | 16 | Q.  AND YOUR WAGES IN 2012 WERE APPROXIMATELY $200,000? |
| 10:41AM | 17 | A.  YES. |
| 10:41AM | 18 | Q.  YOUR WAGES IN 2013 WERE ABOUT $200,000? |
| 10:41AM | 19 | A.  YES. |
| 10:41AM | 20 | Q.  YOUR WAGES IN 2014 WERE ABOUT $360,000? |
| 10:41AM | 21 | A.  THAT SOUNDS RIGHT. |
| 10:41AM | 22 | Q.  WELL, I'D LIKE TO BE SURE.  WHY DON'T YOU LOOK IN YOUR |
| 10:41AM | 23 | BINDER AT EXHIBIT 3249, PARTICULARLY PAGE 7. |
| 10:42AM | 24 | A.  3249? |
| 10:42AM | 25 | Q.  3249, PAGE 7. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8013

10:42AM   1      A.   GOT IT.  OKAY.

10:42AM   2      Q.   DO YOU SEE A TABLE DOWN AT THE BOTTOM OF PAGE 7?

10:42AM   3      A.   I DO.

10:42AM   4      Q.   DO YOU RECOGNIZE THIS AS A SWORN STATEMENT THAT YOU

10:42AM   5      PROVIDED IN PRIOR LITIGATION?

10:42AM   6      A.   I DON'T, BUT I DON'T HAVE ANY REASON TO DOUBT IT.

10:42AM   7      Q.   OKAY.  WELL, LET'S LOOK AT THE LAST PAGE.  IS THAT YOUR

10:42AM   8      SIGNATURE ON PAGE 29 OF 3249?

10:43AM   9      A.   IT IS.

10:43AM  10      Q.   OKAY.  ARE YOU SATISFIED THAT THIS IS A SWORN STATEMENT

10:43AM  11      THAT YOU PROVIDED IN PRIOR LITIGATION?

10:43AM  12      A.   YEAH, I DON'T HAVE ANY REASON TO DOUBT IT.

10:43AM  13      Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT YOUR WAGES

10:43AM  14      IN 2014 WERE $360,229.36?

10:43AM  15      A.   AGAIN, IT SOUNDS RIGHT, YES.

10:43AM  16      Q.   AND YOUR WAGES IN 2015 WERE APPROXIMATELY $390,182.80?

10:43AM  17      A.   YES.

10:43AM  18      Q.   AND AT THE END OF 2016 YOU HELD MORE THAN 250 MILLION

10:43AM  19      SHARES OF CLASS B COMMON STOCK AT THERANOS?

10:43AM  20      A.   I DID.

10:43AM  21      Q.   THAT WAS MORE THAN 51 PERCENT OF THE SHARES?

10:43AM  22      A.   I THINK SO.

10:43AM  23      Q.   YESTERDAY YOU SAID CLOSE TO 50 PERCENT.  LET'S BE CLEAR.

10:43AM  24      IT WAS ABOVE 50 PERCENT; RIGHT?

10:44AM  25      A.   IT PROBABLY WAS.

HOLMES CROSS BY MR. LEACH (RES.)                                8014

10:44AM   1     Q.   WELL, LOOK AT 3249, PAGE 7.

10:44AM   2     A.   OKAY.

10:44AM   3     Q.   WERE YOU ASKED THE QUESTION, DESCRIBE YOUR OWNERSHIP STAKE

10:44AM   4     IN THERANOS INCLUDING WITHOUT LIMITATION ANY STOCK OPTIONS?

10:44AM   5     A.   YES.

10:44AM   6     Q.   AND WAS YOUR ANSWER, "SHE HOLDS 250,658,055 SHARES OF

10:44AM   7     CLASS B COMMON STOCK, APPROXIMATELY 51 PERCENT OF THERANOS'S

10:44AM   8     OUTSTANDING SHARES"?

10:44AM   9     A.   YES.

10:44AM   10    Q.   THAT WAS YOUR ANSWER THEN?

10:44AM   11    A.   YES.

10:44AM   12    Q.   AND NO REASON TO DOUBT THAT NOW?

10:44AM   13    A.   NO REASON.

10:44AM   14    Q.   AND NO ONE AT THE COMPANY OWNED MORE THAN YOU DID?

10:44AM   15    A.   CORRECT.

10:44AM   16    Q.   AND I BELIEVE YOU TESTIFIED THAT YOU UNDERSTOOD AT LEAST

10:44AM   17    BY THE END OF 2014, OR THE LAST ROUND OF C-2 INVESTMENT, THAT

10:45AM   18    YOUR SHARES WERE VALUED AT MORE THAN $4 BILLION?

10:45AM   19    A.   I DID.

10:45AM   20    Q.   I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT WHAT I HOPE ARE

10:45AM   21    AGREEMENTS THAT WE MAY HAVE ABOUT SOME OF THE DEVICES AND SOME

10:45AM   22    TESTING AND SOME OF THE MATTERS THAT YOU TESTIFIED TO IN YOUR

10:45AM   23    DIRECT EXAMINATION.

10:45AM   24         YOU RECALL TALKING AT LENGTH WITH MR. DOWNEY ABOUT A

10:45AM   25    MINILAB; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                    8015

| | | |
|---|---|---|
| 10:45AM | 1 | A.   I DO. |
| 10:45AM | 2 | Q.   AND THAT'S PART OF THE 4 SERIES? |
| 10:45AM | 3 | A.   IT IS. |
| 10:45AM | 4 | Q.   THE MINILAB AND THE 4 SERIES WERE NEVER USED FOR PATIENT |
| 10:45AM | 5 | TESTING; IS THAT CORRECT? |
| 10:45AM | 6 | A.   THAT'S RIGHT. |
| 10:45AM | 7 | Q.   THE MINILAB AND THE 4S WERE NEVER PUT IN THE CLIA LAB IN |
| 10:45AM | 8 | CALIFORNIA? |
| 10:45AM | 9 | A.   CORRECT. |
| 10:45AM | 10 | Q.   THEY WERE NEVER PUT IN THE CLIA LAB IN ARIZONA? |
| 10:45AM | 11 | A.   CORRECT. |
| 10:45AM | 12 | Q.   JOHN CARREYROU'S ARTICLE CAME OUT ON OCTOBER 15TH, 2015. |
| 10:46AM | 13 | AT THAT POINT IN TIME, THE FDA HAD APPROVED USE OF THE |
| 10:46AM | 14 | MINILAB FOR A SINGLE ASSAY; IS THAT CORRECT? |
| 10:46AM | 15 | A.   YES. |
| 10:46AM | 16 | Q.   AND THAT ASSAY WAS THE HERPES ASSAY? |
| 10:46AM | 17 | A.   THAT'S RIGHT. |
| 10:46AM | 18 | Q.   OTHER THAN THAT ONE ASSAY, THE MINILAB AND THE 4S WERE NOT |
| 10:46AM | 19 | APPROVED BY THE FDA? |
| 10:46AM | 20 | A.   CORRECT. |
| 10:46AM | 21 | Q.   AND THE ONLY THERANOS MANUFACTURED ANALYZER THAT WAS EVER |
| 10:46AM | 22 | USED IN THE CLIA LAB IN CALIFORNIA WAS THE EDISON 3.5? |
| 10:46AM | 23 | A.   THAT'S RIGHT. |
| 10:46AM | 24 | Q.   AND THE EDISON 3.5 WAS LIMITED TO IMMUNOASSAYS? |
| 10:46AM | 25 | A.   YES.  WELL, THAT'S HOW WE USED IT. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8016

10:46AM 1    Q.   YOU DIDN'T USE IT FOR ANY PURPOSE OTHER THAN IMMUNOASSAYS?

10:46AM 2    A.   IN THE CLINICAL LAB.

10:46AM 3    Q.   IN THE CLINICAL LAB YOU DIDN'T USE IT FOR GENERAL

10:46AM 4    CHEMISTRY?

10:46AM 5    A.   THAT'S RIGHT.

10:46AM 6    Q.   YOU DIDN'T USE IT FOR CYTOMETRY?

10:46AM 7    A.   CORRECT.

10:46AM 8    Q.   AND YOU DID NOT USE IT FOR NUCLEIC ACID AMPLIFICATION?

10:46AM 9    A.   THAT'S RIGHT.

10:46AM 10   Q.   JUST IMMUNOASSAYS?

10:46AM 11   A.   YES.

10:46AM 12   Q.   AND THE EDISON 3.5 WAS ONLY USED FOR 12 ASSAYS IN THE

10:47AM 13   CALIFORNIA CLIA LAB BETWEEN SEPTEMBER 2013 AND JUNE OF 2015; IS

10:47AM 14   THAT CORRECT?

10:47AM 15   A.   I BELIEVE SO, THAT'S CORRECT.

10:47AM 16   Q.   AND THAT'S THE 12 NUMBER THAT YOU STARTED WITH IN YOUR

10:47AM 17   TESTIMONY?

10:47AM 18   A.   EXACTLY.

10:47AM 19   Q.   THE ONE THAT YOU DIDN'T GIVE TO JIM CRAMER WHEN HE ASKED

10:47AM 20   YOU ABOUT IT?

10:47AM 21   A.   YES.

10:47AM 22   Q.   AND BY THE TIME OF THE CMS INSPECTION IN SEPTEMBER OF

10:47AM 23   2015, THERANOS HAD STOPPED USING THE EDISON 3.5 IN THE CLIA LAB

10:47AM 24   ALTOGETHER?

10:47AM 25   A.   THAT'S RIGHT.

HOLMES CROSS BY MR. LEACH (RES.)                                    8017

10:47AM  1    Q.   IT WASN'T USING IT AT ALL?

10:47AM  2    A.   YES.

10:47AM  3    Q.   SO THERANOS WASN'T USING ANY OF ITS MANUFACTURED ANALYZERS

10:47AM  4    IN THE CLIA LAB AT THE TIME THAT THE CMS INSPECTORS COME IN?

10:47AM  5    A.   CORRECT.

10:47AM  6    Q.   AFTER THE CARREYROU ARTICLE YOU WERE ASKED SOME QUESTIONS

10:47AM  7    PUBLICLY ABOUT EDISON AND EDISON 3.5.

10:47AM  8         DO YOU RECALL GETTING QUESTIONS ABOUT THOSE?

10:47AM  9    A.   GENERALLY, YES.

10:47AM  10   Q.   OKAY.  AND YOU TOLD PEOPLE IN LATE 2015 AFTER THE

10:48AM  11   CARREYROU ARTICLE CAME OUT THAT EDISON WAS A CODE NAME FOR ONE

10:48AM  12   OF THERANOS'S EARLIEST VERSIONS OF YOUR DEVICES AND YOU HAD NOT

10:48AM  13   BEEN USING EDISON FOR ANYTHING FOR A FEW YEARS.

10:48AM  14        DO YOU RECALL SAYING THAT PUBLICLY?

10:48AM  15   A.   I DO.

10:48AM  16   Q.   THAT WAS LESS THAN FORTHRIGHT, WASN'T IT?

10:48AM  17   A.   IT WAS TOO DEEP IN THE WEEDS.  IT WAS HOW I WAS THINKING

10:48AM  18   ABOUT WHAT THE EDISON WAS, BUT, OF COURSE WE WERE USING THE 3.5

10:48AM  19   IN THE CLINICAL LAB.

10:48AM  20   Q.   OKAY.  IS THAT ANOTHER THING YOU WISHED YOU HAD DONE

10:48AM  21   DIFFERENTLY?

10:48AM  22   A.   YEAH.

10:48AM  23   Q.   YOU -- SO YOU HAD BEEN USING THE EDISON 3.5 IN THE

10:48AM  24   CALIFORNIA CLIA LAB IN 2015?

10:48AM  25   A.   WE DID.

HOLMES CROSS BY MR. LEACH (RES.)                                    8018

10:48AM  1    Q.    THE SAME YEAR THAT YOU GOT ASKED THAT QUESTION?

10:48AM  2    A.    YES.

10:48AM  3    Q.    AND YOU STOPPED USING THE EDISON.  YOU ONLY EVER USED IT

10:48AM  4    FOR 12 TESTS, BUT YOU WEREN'T USING IT IN SEPTEMBER OF 2015?

10:48AM  5    A.    THAT'S RIGHT.

10:49AM  6    Q.    AND THE NEWER VERSION, THE 4 SERIES, YOU NEVER USED THAT

10:49AM  7    IN THE CLIA LAB?

10:49AM  8    A.    THAT'S RIGHT.

10:49AM  9    Q.    NOW, ON TOP OF THE 12 EDISON 3.5 TESTS IN THE CALIFORNIA

10:49AM 10    CLIA LAB, THERANOS AT ITS PEAK PERFORMED AN ADDITIONAL 58

10:49AM 11    ASSAYS ON MODIFIED THIRD PARTY MACHINES LIKE THE SIEMENS ADVIA;

10:49AM 12    IS THAT CORRECT?

10:49AM 13    A.    THAT SOUNDS RIGHT.

10:49AM 14    Q.    AND FOR THOSE TESTS YOU WERE DEPENDENT ON THIRD PARTY

10:49AM 15    EQUIPMENT?

10:49AM 16    A.    YES.

10:49AM 17    Q.    YOU WERE DEPENDENT ON DEVICES FROM THE LIKES OF SIEMENS?

10:49AM 18    A.    YES.

10:49AM 19    Q.    AND YOU WERE DEPENDENT ON THE DEVICES FROM THE LIKES OF

10:49AM 20    BECKMAN COULTER?

10:49AM 21    A.    I DON'T THINK WE USED BECKMAN COULTER MACHINES, BUT WE

10:49AM 22    WERE MODIFYING THIRD PARTY MACHINES.

10:49AM 23    Q.    OKAY.  GIVE ME ANOTHER EXAMPLE OF A THIRD PARTY MACHINE

10:49AM 24    YOU MODIFIED.

10:49AM 25    A.    BECTON DICKINSON.

HOLMES CROSS BY MR. LEACH (RES.)                              8019

10:49AM  1    Q.   OKAY.  AND YOU WERE RELYING ON THOSE PRODUCTS TO DO THE

10:49AM  2    TESTING?

10:49AM  3    A.   YES.

10:49AM  4    Q.   AM I RIGHT THAT THERANOS'S OVERALL TEST MENU IN OR ABOUT

10:50AM  5    OCTOBER OF 2015 WAS SOMEWHERE IN THE NEIGHBORHOOD OF 200 TESTS?

10:50AM  6    A.   IT SOUNDS RIGHT.

10:50AM  7    Q.   SO THE MAJORITY OF THOSE 200 TESTS WERE DONE ON ORDINARY

10:50AM  8    COMMERCIAL EQUIPMENT.  CAN WE AGREE ON THAT?

10:50AM  9    A.   YES.

10:50AM 10    Q.   NOW, YOU ALSO HAD AN ARIZONA LAB?

10:50AM 11    A.   WE DID.

10:50AM 12    Q.   WHEN DID THE ARIZONA LAB OPEN?

10:50AM 13    A.   I THINK IN 2014.  MAYBE 2015.

10:50AM 14    Q.   AND THAT WAS WHAT IS CALLED A MODERATE COMPLEXITY LAB?

10:50AM 15    A.   IT WAS.

10:50AM 16    Q.   AND IT ONLY USED COMMERCIALLY AVAILABLE EQUIPMENT;

10:50AM 17    CORRECT?

10:50AM 18    A.   YES.

10:50AM 19    Q.   IT ONLY USED FDA APPROVED MACHINES USING FDA CHEMISTRIES

10:50AM 20    IN WAYS IN ACCORDANCE WITH THE FDA APPROVAL?

10:50AM 21    A.   EXACTLY.

10:50AM 22    Q.   NO MAGICAL THERANOS TECHNOLOGY IN THE ARIZONA LAB?

10:50AM 23    A.   NO.

10:50AM 24    Q.   AND YOU NEVER PUT A MINILAB IN THE ARIZONA LAB?

10:50AM 25    A.   WE DID NOT.

HOLMES CROSS BY MR. LEACH (RES.)                                    8020

10:50AM   1      Q.   YOU NEVER PUT AN EDISON 3.5 IN THE ARIZONA LAB?

10:51AM   2      A.   THAT'S RIGHT.

10:51AM   3      Q.   YOU NEVER USED MODIFIED SIEMENS ADVIAS IN THE CLIA LAB --

10:51AM   4      THE ARIZONA CLIA LAB?

10:51AM   5      A.   CORRECT.

10:51AM   6      Q.   YOU NEVER DID SMALL SAMPLE TESTING ON MODIFIED THIRD PARTY

10:51AM   7      MACHINES IN THE ARIZONA LAB?

10:51AM   8      A.   WE DID NOT.

10:51AM   9      Q.   YOU DIDN'T DO ANYTHING IN THE ARIZONA LAB THAT ANY OTHER

10:51AM  10      LAB PROVIDER COULD DO; ISN'T THAT FAIR?

10:51AM  11      A.   WE INVESTED A LOT IN AUTOMATION IN THE LABORATORY THAT WE

10:51AM  12      THOUGHT AT THE TIME WAS CUTTING EDGE, BUT IT WAS ALL

10:51AM  13      COMMERCIALLY AVAILABLE MACHINES THAT WE WERE RUNNING.

10:51AM  14      Q.   OKAY.  AND YOU TESTIFIED YESTERDAY TO AN 8 MILLION NUMBER

10:51AM  15      IN TERMS OF TESTS THAT THERANOS HAD PERFORMED; IS THAT RIGHT?

10:51AM  16      A.   I DID.

10:51AM  17      Q.   OKAY.  YOU KNOW AT THE TIME OF JOHN CARREYROU'S ARTICLE IN

10:51AM  18      OCTOBER OF 2015 THAT THAT NUMBER WAS 3.5 MILLION?

10:52AM  19      A.   I DID NOT KNOW THAT, BUT I DON'T DOUBT YOU.

10:52AM  20      Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

10:52AM  21           MAY I APPROACH, YOUR HONOR?

10:52AM  22                THE COURT:  YES.

10:52AM  23      BY MR. LEACH:

10:52AM  24      Q.   (HANDING.)

10:52AM  25           I'VE PLACED BEFORE YOU A DOCUMENT THAT WE HAVE MARKED FOR

HOLMES CROSS BY MR. LEACH (RES.)                                    8021

10:52AM   1    IDENTIFICATION PURPOSES AS EXHIBIT 5702.

10:52AM   2         DO YOU HAVE THAT IN FRONT OF YOU?

10:52AM   3    A.  I DO.

10:52AM   4    Q.  AND DO YOU SEE A HEADING AT THE TOP OF THIS MEMO?

10:52AM   5    A.  I DO.

10:52AM   6    Q.  AND DO YOU SEE A DATE OF OCTOBER 22ND, 2015?

10:52AM   7    A.  YES.

10:52AM   8    Q.  OKAY.  AND I DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

10:53AM   9    KIND OF INDENTED BELOW THE LINE, "AS WE PROVIDE THESE ANSWERS,"

10:53AM  10    AND TAKE A MOMENT TO READ THAT THIRD PARAGRAPH TO YOURSELF,

10:53AM  11    THAT FIRST LINE.

10:53AM  12    A.  OKAY.

10:53AM  13    Q.  DOES THIS REFRESH YOUR MEMORY THAT AT THE TIME OF THE

10:53AM  14    CARREYROU ARTICLE THERANOS HAD PERFORMED 3.5 MILLION TESTS?

10:53AM  15    A.  I THINK SO, YES.

10:53AM  16    Q.  SO 4.5 MILLION OF THE 8 MILLION NUMBER THAT YOU TALKED

10:53AM  17    ABOUT YESTERDAY, THAT'S DONE AFTER THE CARREYROU ARTICLE COMES

10:53AM  18    OUT?

10:53AM  19    A.  YES.

10:53AM  20    Q.  AND YOU KNOW THAT BY OCTOBER OF 2015 THERANOS WAS NOT

10:53AM  21    DOING ANY SMALL SAMPLE TESTING IN THE CALIFORNIA CLIA LAB?

10:53AM  22    A.  THAT'S RIGHT.

10:53AM  23    Q.  AND YOU KNOW THAT THE 4.5 MILLION THAT COME AFTER OCTOBER

10:54AM  24    OF 2015, THAT IS ALL RUN ON COMMERCIALLY AVAILABLE EQUIPMENT;

10:54AM  25    IS THAT RIGHT?

HOLMES CROSS BY MR. LEACH (RES.)                                    8022

10:54AM   1    A.   YES.

10:54AM   2    Q.   YOU ALSO KNOW THAT 90 PERCENT OF THE TESTING WAS DONE IN

10:54AM   3    THE ARIZONA LAB?

10:54AM   4    A.   I DON'T KNOW THAT.

10:54AM   5    Q.   MAYBE AFTER A BREAK WE'LL REFRESH YOUR MEMORY ABOUT THAT

10:54AM   6    POINT.

10:54AM   7        BUT CAN WE AGREE THAT THE VAST MAJORITY OF THE TESTING WAS

10:54AM   8    DONE IN THE ARIZONA CLIA LAB?

10:54AM   9    A.   I MEAN, I DON'T HAVE ANY REASON TO DOUBT IT.  I JUST

10:54AM  10    DIDN'T KNOW THAT STAT.

10:54AM  11    Q.   YOU KNEW THAT THE ANNUAL VOLUME OF TESTS IN THE CALIFORNIA

10:54AM  12    CLIA LAB WHERE YOU WERE USING THE EDISON 3.5 AND THE MODIFIED

10:54AM  13    THIRD PARTY MACHINES WAS ONLY DOING ABOUT 800,000 ANNUAL

10:54AM  14    VOLUME?  YOU KNOW THAT?

10:54AM  15    A.   I'M NOT SURE.

10:54AM  16    Q.   WELL, YOU WERE HERE WHEN DR. DAS TESTIFIED TO THAT,

10:55AM  17    WEREN'T YOU?

10:55AM  18    A.   I WAS.  I HEARD THAT.

10:55AM  19    Q.   AND SITTING HERE TODAY, YOU DON'T HAVE ANY REASON TO DOUBT

10:55AM  20    THAT?

10:55AM  21    A.   I DON'T.

10:55AM  22    Q.   AND YOU KNOW THAT THE VAST MAJORITY OF THE 8 MILLION

10:55AM  23    NUMBER THAT YOU TESTIFIED TO YESTERDAY HAS ABSOLUTELY NOTHING

10:55AM  24    TO DO WITH THE MINILAB?

10:55AM  25    A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                    8023

| | | |
|---|---|---|
| 10:55AM | 1 | Q.   AND IT HAS ABSOLUTELY NOTHING TO DO WITH THE EDISON 3.5? |
| 10:55AM | 2 | A.   I DO. |
| 10:55AM | 3 | Q.   AND IT HAS NOTHING TO DO WITH THE TSPU? |
| 10:55AM | 4 | A.   YES. |
| 10:55AM | 5 | MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO A NEW |
| 10:55AM | 6 | TOPIC AREA.  THIS MIGHT BE A GOOD TIME FOR A BREAK. |
| 10:55AM | 7 | THE COURT:  LET'S TAKE OUR BREAK.  WE'LL TAKE A 30 |
| 10:55AM | 8 | MINUTE MORNING BREAK.  WE'LL TAKE A MORNING BREAK OF |
| 10:55AM | 9 | 30 MINUTES, PLEASE. |
| 11:33AM | 10 | (RECESS FROM 10:56 A.M. UNTIL 11:33 A.M.) |
| 11:35AM | 11 | THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE |
| 11:35AM | 12 | RECORD.  ALL COUNSEL ARE PRESENT.  OUR JURY IS PRESENT. |
| 11:36AM | 13 | MR. LEACH, YOU'D LIKE TO CONTINUE? |
| 11:36AM | 14 | MR. LEACH:  I WOULD, YOUR HONOR.  THANK YOU. |
| 11:36AM | 15 | Q.   GOOD MORNING AGAIN, MS. HOLMES. |
| 11:36AM | 16 | A.   GOOD MORNING. |
| 11:36AM | 17 | Q.   BEFORE THE BREAK, WE WERE TALKING A LITTLE BIT ABOUT |
| 11:36AM | 18 | 90 PERCENT OF THE TESTING AND WHETHER YOU REMEMBERED THAT |
| 11:36AM | 19 | NUMBER OR NOT. |
| 11:36AM | 20 | I'D LIKE TO SHOW YOU A DOCUMENT AND SEE IF THIS REFRESHES |
| 11:36AM | 21 | YOUR RECOLLECTION. |
| 11:36AM | 22 | MAY I APPROACH, YOUR HONOR? |
| 11:36AM | 23 | THE COURT:  YES. |
| 11:36AM | 24 | BY MR. LEACH: |
| 11:36AM | 25 | Q.   (HANDING.) |

| | | |
|---|---|---|
| 11:36AM | 1 | DO YOU SEE THAT THIS APPEARS TO BE A MESSAGE FROM |
| 11:37AM | 2 | BROOKE BUCHANAN TO YOU ON OR ABOUT JANUARY 28TH, 2016, |
| 11:37AM | 3 | MS. HOLMES? |
| 11:37AM | 4 | A.   YES. |
| 11:37AM | 5 | Q.   AND MS. BUCHANAN IS WRITING BACK TO AN EMAIL THAT YOU SENT |
| 11:37AM | 6 | ON AT 7:41 ON THAT DATE? |
| 11:37AM | 7 | A.   YES. |
| 11:37AM | 8 | MR. LEACH:  I MOVE THE ADMISSION OF 5254, |
| 11:37AM | 9 | YOUR HONOR. |
| 11:37AM | 10 | MR. DOWNEY:  NO OBJECTION. |
| 11:37AM | 11 | THE COURT:  IT'S ADMITTED. |
| 11:37AM | 12 | (GOVERNMENT'S EXHIBIT 5254 WAS RECEIVED IN EVIDENCE.) |
| 11:37AM | 13 | BY MR. LEACH: |
| 11:37AM | 14 | Q.   MS. HOLMES, IF I COULD PLEASE DRAW YOUR ATTENTION -- |
| 11:37AM | 15 | MAY I USE THE ELMO, MS. KRATZMANN? |
| 11:37AM | 16 | THE CLERK:  SURE. |
| 11:37AM | 17 | BY MR. LEACH: |
| 11:37AM | 18 | Q.   DO YOU SEE THE EMAIL AT 7:41 A.M. TO YOU FROM |
| 11:37AM | 19 | BROOKE BUCHANAN? |
| 11:37AM | 20 | A.   I DO. |
| 11:37AM | 21 | Q.   YOU HIRED MS. BUCHANAN IN LATE 2015 TO HELP WITH MEDIA |
| 11:38AM | 22 | RESPONSE? |
| 11:38AM | 23 | A.   I DID. |
| 11:38AM | 24 | Q.   AND YOU WROTE HERE -- LET ME ASK A BETTER QUESTION AND USE |
| 11:38AM | 25 | THE MICROPHONE. |

11:38AM   1        YOU WROTE HERE, "THIS WORK HERE IS INDEPENDENT OF

11:38AM   2   THERANOS'S ARIZONA LAB WHICH IS CLIA CERTIFIED AND GOOD

11:38AM   3   STANDING WHERE OVER 90 PERCENT OF ALL THERANOS SAMPLES ARE

11:38AM   4   PROCESSED."

11:38AM   5        DO YOU SEE THAT LANGUAGE?

11:38AM   6   A.   I DO.

11:38AM   7   Q.   AND DOES THIS REFRESH YOUR MEMORY THAT 90 PERCENT OF THE

11:38AM   8   TESTING WAS DONE IN THE ARIZONA LAB?

11:38AM   9   A.   IT DOES AS OF THAT TIME.

11:38AM  10   Q.   NOW, I NEED TO ASK YOU SOME QUESTIONS ABOUT YOUR

11:38AM  11   RELATIONSHIP WITH MR. BALWANI.

11:38AM  12        DO YOU RECALL TESTIFYING ABOUT THAT YESTERDAY, MS. HOLMES?

11:38AM  13   A.   I DO.

11:38AM  14   Q.   IS IT FAIR TO SAY THAT YOUR RELATIONSHIP WITH SUNNY WAS AT

11:38AM  15   TIMES LOVING AND AT TIMES NOT SO LOVING?

11:39AM  16   A.   YES.

11:39AM  17   Q.   THERE WERE TIMES WHEN HE WAS COMPLIMENTARY AND LOVING OF

11:39AM  18   YOU?

11:39AM  19   A.   THERE WERE.

11:39AM  20   Q.   AND THERE WERE TIMES WHEN HE WAS LESS SO?

11:39AM  21   A.   YES.

11:39AM  22   Q.   AND YOU WERE OFTEN COMPLIMENTARY AND LOVING TO HIM; IS

11:39AM  23   THAT RIGHT?

11:39AM  24   A.   I WAS.

11:39AM  25   Q.   AND AT TIMES IT WAS LESS SO?

HOLMES CROSS BY MR. LEACH (RES.)                                          8026

11:39AM   1     A.   I WOULD GET UPSET SOMETIMES.

11:39AM   2     Q.   I'D LIKE TO LOOK AT SOME EXAMPLES OF THOSE.

11:39AM   3          MAY I APPROACH, YOUR HONOR?

11:39AM   4              THE COURT:  YES.

11:39AM   5     BY MR. LEACH:

11:39AM   6     Q.   (HANDING.)

11:39AM   7          MS. HOLMES, I'VE PLACED BEFORE YOU WHAT WAS MARKED FOR

11:39AM   8     IDENTIFICATION PURPOSES EARLIER AS EXHIBIT 5387.

11:39AM   9          YOU WERE HERE WHEN MR. OFFEN TESTIFIED ABOUT 5387?

11:40AM  10     A.   I WAS HERE WHEN MR. OFTEN TESTIFIED.  I DON'T REMEMBER

11:40AM  11     5387, BUT --

11:40AM  12     Q.   DO YOU REMEMBER HIM TESTIFYING TO THE PROCESS BY WHICH HE

11:40AM  13     IDENTIFIED TEXT MESSAGES BETWEEN YOU AND MR. BALWANI?

11:40AM  14     A.   I DO.  I DO.

11:40AM  15     Q.   OKAY.  AND DO YOU UNDERSTAND THE DOCUMENT THAT I'VE PLACED

11:40AM  16     BEFORE YOU TO BE TEXTS, IOS AND SKYPE MESSAGES, OR IOS MESSAGES

11:40AM  17     INVOLVING YOU AND MR. BALWANI?

11:40AM  18     A.   YES.

11:40AM  19     Q.   AND YOU UNDERSTAND THAT THESE MESSAGES WERE OBTAINED FROM

11:40AM  20     DEVICES THAT YOU USED WHILE YOU WERE AT THERANOS?

11:40AM  21     A.   I DO.

11:40AM  22     Q.   AND THESE DEVICES INCLUDED AN IPHONE 6S THAT YOU USED?

11:40AM  23     A.   IT INCLUDED AN IPHONE.  I DON'T KNOW WHAT IPHONE IT WAS.

11:40AM  24     Q.   OKAY.  THIS EXHIBIT IS 449 PAGES LONG.  IS THAT CORRECT?

11:40AM  25     A.   OKAY, YES.

HOLMES CROSS BY MR. LEACH (RES.)                                    8027

11:40AM   1    Q.   AND DO YOU RECALL MR. OFFEN TESTIFYING THAT THERE WERE

11:40AM   2    OVER 12,000 INDIVIDUAL MESSAGES IN THIS DOCUMENT?

11:40AM   3    A.   I RECALL HIM TESTIFYING.  I DIDN'T REMEMBER THAT EXACT

11:41AM   4    NUMBER.

11:41AM   5    Q.   AND DO YOU AGREE WITH ME THAT YOU DON'T HAVE ANY REASON TO

11:41AM   6    DOUBT THAT THE NUMBER OF TEXT MESSAGES IN 5387?

11:41AM   7    A.   I DON'T.

11:41AM   8    Q.   AND YOU AGREE THAT WHATEVER THE NUMBER, 12,000, THEY SPAN

11:41AM   9    A TIME PERIOD 2011 ALL OF THE WAY THROUGH 2016?

11:41AM   10   A.   YES.

11:41AM   11   Q.   SO APPROXIMATELY FIVE YEARS OF YOUR RELATIONSHIP?

11:41AM   12   A.   YES.

11:41AM   13   Q.   AND CAN WE AGREE THAT THERE ARE MANY MESSAGES IN HERE

11:41AM   14   WHERE MR. BALWANI IS EXPRESSING LOVE AND AFFECTION TO YOU?

11:41AM   15   A.   YES.

11:41AM   16   Q.   BEFORE WE LOOK AT 5387, THERE ARE SOME ADDITIONAL MESSAGES

11:41AM   17   THAT I WANT TO GO THROUGH THAT HAVEN'T BEEN ADMITTED, BUT I'D

11:41AM   18   LIKE TO DRAW YOUR ATTENTION TO, IN YOUR BINDER, 5387D AT

11:41AM   19   PAGE 19, AND THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

11:42AM   20        AND IF WE CAN DISPLAY THAT, MS. HOLLIMAN.

11:42AM   21        (PAUSE IN PROCEEDINGS.)

11:42AM   22        MR. LEACH:  MS. HOLLIMAN, CAN WE GO BACK A COUPLE OF

11:42AM   23   PAGES.  ONE MORE.  ONE MORE.  OR ONE MORE.

11:43AM   24   Q.   WELL, MS. HOLMES, LET ME -- I'LL USE 5387.

11:43AM   25        IF I COULD DRAW YOUR ATTENTION TO PAGE 19 OF 5387.

HOLMES CROSS BY MR. LEACH (RES.)                                    8028

| | | |
|---|---|---|
| 11:43AM | 1 | A.   THERE'S NOTHING ON MY MONITOR.  I DON'T KNOW IF IT SHOULD |
| 11:43AM | 2 | BE. |
| 11:43AM | 3 | Q.   IT'S NOT IN EVIDENCE YET. |
| 11:43AM | 4 | A.   OH, OKAY. |
| 11:43AM | 5 | Q.   SO WE'RE GOING TO USE THIS UNTIL WE GET TO -- |
| 11:43AM | 6 | A.   GOT IT.  OKAY. |
| 11:43AM | 7 | Q.   -- UNTIL ANYTHING HAS BEEN ADMITTED OR WE HAVE PERMISSION |
| 11:43AM | 8 | TO DISPLAY. |
| 11:43AM | 9 | A.   PAGE 19? |
| 11:43AM | 10 | Q.   YES, PLEASE. |
| 11:43AM | 11 | YOUR HONOR, I'M -- YOUR HONOR, MY INTENTION IS TO MOVE TO |
| 11:43AM | 12 | ADMIT A NUMBER OF ADDITIONAL PAGES FROM 5387 THAT ARE NOT |
| 11:43AM | 13 | ALREADY IN EVIDENCE.  RATHER THAN DO IT ONE BY ONE, I'D SEEK |
| 11:43AM | 14 | PERMISSION TO DISPLAY WHAT I INTEND TO ADMIT, AND THEN AT THE |
| 11:43AM | 15 | END ADMIT IT IN ONE DOCUMENT SO WE DON'T HAVE MORE PIECES OF |
| 11:43AM | 16 | PAPER THAN NECESSARY FOR THE JURY. |
| 11:44AM | 17 | THE COURT:  SURE.  THAT'S FINE. |
| 11:44AM | 18 | MR. DOWNEY:  YOUR HONOR, THE ONLY ISSUE IS THAT I |
| 11:44AM | 19 | HAVE NOT HAD A CHANCE -- I DON'T KNOW THESE PAGES OR THESE |
| 11:44AM | 20 | SEGMENTS, SO I DON'T KNOW WHAT IS COMING. |
| 11:44AM | 21 | THE COURT:  I WAS GOING TO ASK IF YOU HAD SHARED |
| 11:44AM | 22 | THIS WITH DEFENSE COUNSEL. |
| 11:44AM | 23 | MR. LEACH:  I HAVE, YOUR HONOR. |
| 11:44AM | 24 | THE COURT:  YOU HAVE? |
| 11:44AM | 25 | MR. LEACH:  I HAVE, YOUR HONOR.  IT IS |

HOLMES CROSS BY MR. LEACH (RES.)                                    8029

11:44AM   1    CROSS-EXAMINATION, SO I DIDN'T --

11:44AM   2              THE COURT:  OKAY.  THAT'S FINE.

11:44AM   3              MR. LEACH:  AND I'M HAPPY TO WORK WITH MR. DOWNEY ON

11:44AM   4    RULE 106 COMPLETIONS.

11:44AM   5              THE COURT:  THAT'S FINE.

11:44AM   6              MR. LEACH:  MAY I DISPLAY PAGE 19.

11:44AM   7    Q.   MS. HOLMES, DO YOU SEE ON THE LEFT SIDE OF THE DOCUMENT,

11:44AM   8    THERE'S NUMBERS FOR THE PARTICULAR TEXT MESSAGES?

11:44AM   9    A.   YES.

11:44AM   10   Q.   OKAY.

11:44AM   11   A.   WAIT, SORRY.  THE RECORD?

11:44AM   12   Q.   YEAH, THERE'S A HOLMES, MACBOOKAIR_SKYPE AND THEN?

11:44AM   13   A.   OKAY, I DO.

11:45AM   14   Q.   I WANT TO DRAW YOUR ATTENTION TO THE TEXT STARTING ON 129.

11:45AM   15   A.   129.

11:45AM   16   Q.   PERFECT.  THANK YOU.

11:45AM   17        DO YOU SEE THE MESSAGE ON MAY 9TH, 2020, 12 --

11:45AM   18              THE COURT:  I'M SORRY.  WHAT IS THE DATE AGAIN?

11:45AM   19              MR. LEACH:  MAY 9TH, 2020 -- 2012.  I'M SORRY.

11:45AM   20   EXCUSE ME.

11:46AM   21   Q.   DO YOU SEE THE MESSAGE I'M TALKING ABOUT, MS. HOLMES?

11:46AM   22   A.   YES.

11:46AM   23   Q.   WOULD YOU MIND READING ME FOR THE MESSAGES DOWN FROM 129

11:46AM   24   TO MESSAGE 121?

11:46AM   25   A.   129 TO 121?

HOLMES CROSS BY MR. LEACH (RES.)                                    8030

11:46AM  1    Q.   YES?

11:46AM  2    A.   YES.  I GUESS I CAN DO IT HERE.

11:46AM  3         "MISSING YOU.  THIS BUSINESS CANNOT BE BUILD BY EITHER YOU

11:46AM  4    OR I ALONE.  THAT'S WHY THE UNIVERSE BROUGHT US TOGETHER (AMONG

11:46AM  5    OTHER BILLION REASONS).  NO ONE BUT YOU AND I CAN BUILD THIS

11:46AM  6    BUSINESS.

11:46AM  7         "TOGETHER.

11:46AM  8         "I KNOW.

11:46AM  9         "WE HAVE TO WORK TOGETHER ON THE REV PIECE.

11:46AM  10        "WITHOUT, SEEMS LIKE HALF MY ENERGY IS GONE AND THE

11:46AM  11   BUILDING IS AN EMPTY SHELL.

11:46AM  12        "WITHOUT U."

11:46AM  13        AND THEN I'M NOT SURE WHAT THAT IS.

11:46AM  14        "I KNOW THE FEELING.

11:46AM  15        "YOU ARE THE COMPANY.  WE NEED REVENUE PLUS FEW SENIOR

11:46AM  16   LEVEL MANAGERS - EXPERIENCED EVEN IF THEY ONLY WORK 11 HOURS

11:46AM  17   TIMES 5."

11:46AM  18   Q.   THANK YOU.  YOU WROTE "WE HAVE TO WORK TOGETHER ON THE REV

11:47AM  19   PIECE."  IS THAT A REFERENCE TO REVENUE?

11:47AM  20   A.   I'M NOT SURE.

11:47AM  21   Q.   FURTHER DOWN BELOW, MR. BALWANI WROTE, "YOU ARE THE

11:47AM  22   COMPANY.  WE NEED REVENUE PLUS FEW SENIOR LEVEL MANAGERS."

11:47AM  23        DOES THAT HELP YOU UNDERSTAND THAT THE REV PIECE ABOVE

11:47AM  24   REFERS TO REVENUE?

11:47AM  25   A.   IT COULD.

HOLMES CROSS BY MR. LEACH (RES.)                                      8031

11:47AM   1    Q.   YOU HAVE NO REASON TO DOUBT THAT SITTING HERE TODAY?

11:47AM   2    A.   WHEN I READ IT THE FIRST TIME I WAS THINKING REV LIKE

11:47AM   3    REVISIONS OF TECHNOLOGY, BUT IT TOTALLY COULD BE REVENUE.

11:47AM   4    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO

11:47AM   5    PAGE 341 OF 5387.

11:47AM   6         YOUR HONOR, PERMISSION TO DISPLAY 341?

11:48AM   7              THE COURT:  YES.

11:48AM   8    BY MR. LEACH:

11:48AM   9    Q.   I WANT TO DRAW YOUR ATTENTION TO MESSAGE 4698 BEGINNING,

11:48AM  10    "ALL MY LOVE."

11:48AM  11    A.   I'M SORRY, WHAT?  I DON'T -- WHICH ONE IS IT.

11:48AM  12    Q.   PAGE 341?

11:48AM  13    A.   IT'S NOT WHAT IS ON THE SCREEN?

11:48AM  14    Q.   IT'S NOT WHAT IS ON THE SCREEN.  I THINK WE HAVE 248 ON

11:48AM  15    THE SCREEN.

11:48AM  16    A.   OKAY.

11:48AM  17    Q.   WE'RE LOOKING FOR PAGE 341.

11:48AM  18    A.   GOT IT.  YEP.

11:48AM  19    Q.   AND JUST ONE MOMENT WHILE --

11:48AM  20         MS. HOLLIMAN, IF WE CAN GO TO 341.

11:49AM  21         (PAUSE IN PROCEEDINGS.)

11:49AM  22         MS. KRATZMANN, MAY I TRY THE ELMO?

11:50AM  23         (PAUSE IN PROCEEDINGS.)

11:50AM  24              MR. LEACH:  I'M NOT SEEING ANYTHING ON MY SCREEN.

11:50AM  25              THE CLERK:  LET ME DO A QUICK RESET.

HOLMES CROSS BY MR. LEACH (RES.)                                                  8032

| | | |
|--|--|--|
| 11:50AM | 1 | BY MR. LEACH: |
| 11:50AM | 2 | Q.   ARE YOU ABLE TO SEE THAT ON THE SCREEN, MS. HOLMES? |
| 11:50AM | 3 | A.   I AM. |
| 11:50AM | 4 | Q.   OKAY.  AND DO YOU SEE THE MESSAGE AT 10-21-2015 STARTING |
| 11:50AM | 5 | "ALL MY LOVE" FROM MR. BALWANI? |
| 11:50AM | 6 | A.   I DO, YES. |
| 11:50AM | 7 | Q.   AND WOULD YOU PLEASE READ FOR US DOWN TO THE BOTTOM IN THE |
| 11:50AM | 8 | LAST TEXT MESSAGE ON THE PAGE. |
| 11:50AM | 9 | A.   "I LOVE YOU. |
| 11:50AM | 10 | "LOVE YOU.  I PRAYED FROM THE BOTTOM OF MY HEART FOR YOU. |
| 11:50AM | 11 | I HAVE NEVER PRAYED WITH THIS INTENSITY IN MY LIFE FOR ANYTHING |
| 11:51AM | 12 | AND ANYONE.  YOU WILL SHINE. |
| 11:51AM | 13 | "WAS JUST THINKING ABOUT YOU AND MEDITATING ON MY TIGRESS. |
| 11:51AM | 14 | "GOOD. |
| 11:51AM | 15 | "I LOVE THIS. |
| 11:51AM | 16 | "IT IS US TOGETHER. |
| 11:51AM | 17 | "PERFECTION. |
| 11:51AM | 18 | "AND DIVINITY. |
| 11:51AM | 19 | "ON WAY TO HOTEL TO DO NYT. |
| 11:51AM | 20 | "GOOD CALL WITH AZ REPUBLIC AND DEUCY. |
| 11:51AM | 21 | "SMILEY FACE. |
| 11:51AM | 22 | "MY NIRVANA." |
| 11:51AM | 23 | Q.   AND THAT'S YOU WRITING "MY NIRVANA" AT THE END; RIGHT? |
| 11:51AM | 24 | A.   IT IS. |
| 11:51AM | 25 | Q.   NOW, IF WE COULD PLEASE CONTINUE ON TO THE NEXT PAGE, 342. |

| 11:51AM | 1 | DO YOU SEE THERE ARE SOME ADDITIONAL TEXT MESSAGES ON |
| 11:52AM | 2 | 10-21? |
| 11:52AM | 3 | A.   I DO. |
| 11:52AM | 4 | Q.   DO YOU SEE AT THE TOP MR. BALWANI IS WRITING "U R GOD'S |
| 11:52AM | 5 | TIGRESS AND WARRIOR.  YOU ARE EXTRAORDINARY"? |
| 11:52AM | 6 | A.   I DO. |
| 11:52AM | 7 | Q.   OKAY.  WOULD YOU CONTINUE READING WITH YOUR RESPONSE ALL |
| 11:52AM | 8 | OF THE WAY DOWN TO THE MESSAGE "WORRIED ABOUT YOUR ALL |
| 11:52AM | 9 | FINGERSTICKS ON TECHNOLOGY" COMMENT? |
| 11:52AM | 10 | A.   "YOU ARE GOD'S TIGRESS AND WARRIOR.  YOU ARE |
| 11:52AM | 11 | EXTRAORDINARY. |
| 11:52AM | 12 | "COMING FROM MY TIGER MEANS THE WHOLE UNIVERSE TO ME. |
| 11:52AM | 13 | "I LOVE YOU. |
| 11:52AM | 14 | "I WORSHIP YOU.  BE YOURSELF. |
| 11:52AM | 15 | "ME AMORE. |
| 11:52AM | 16 | "ALL MY AND THE INFINITE STRENGTH OF THE UNIVERSE WITH U. |
| 11:53AM | 17 | "I LOVE YOU. |
| 11:53AM | 18 | "I LOVE YOU. |
| 11:53AM | 19 | "VERY CHOPPY. |
| 11:53AM | 20 | "YOU SEEMED AWESOME. |
| 11:53AM | 21 | "DID YOU SEE IT? |
| 11:53AM | 22 | "HOW DID PEOPLE REACT? |
| 11:53AM | 23 | "HMFR. |
| 11:53AM | 24 | "HMFR TIGER. |
| 11:53AM | 25 | "WORRIED ABOUT YOUR ALL FINGERSTICKS ON OUR TECHNOLOGY |

HOLMES CROSS BY MR. LEACH (RES.)                                8034

11:53AM  1    COMMENT.  SENT AN EMAIL.  THE WEB DOCUMENT IS FINE."

11:53AM  2    Q.   YOU CAN STOP THERE, MS. HOLMES.  THAT'S WHERE I WAS

11:53AM  3    LOOKING FOR.

11:53AM  4        THERE ARE A COUPLE OF COMMENTS I WANT TO MAKE SURE WE

11:53AM  5    UNDERSTAND.

11:53AM  6        THERE'S AN ACRONYM, HMFR.  WHAT DOES THAT MEAN?

11:53AM  7    A.   IT'S ARABIC.  IT'S A PRAYER IN ARABIC.  IN ARABIC IT'S

11:53AM  8    HADHA MIN FADLI RABBI, WHICH MEANS THIS TOO IS MY GOD'S GLORY.

11:53AM  9    Q.   AND IS THIS -- FAIR TO SAY THIS IS AN EXAMPLE OF

11:54AM  10   MR. BALWANI EXPRESSING LOVE AND AFFECTION TOWARDS YOU?

11:54AM  11   A.   IT IS.

11:54AM  12   Q.   THERE'S A COMMENT, "WORRIED ABOUT YOUR ALL FINGERSTICKS ON

11:54AM  13   OUR TECHNOLOGY" COMMENT."

11:54AM  14        DO YOU SEE THAT?

11:54AM  15   A.   YEAH.

11:54AM  16   Q.   AND YOU KNOW ON THIS DAY YOU WERE GIVING A SPEECH AT A

11:54AM  17   CONFERENCE BY "THE WALL STREET JOURNAL" WHERE YOU WERE

11:54AM  18   RESPONDING TO SOME OF THE CRITICISMS IN MR. CARREYROU'S

11:54AM  19   ARTICLE; IS THAT RIGHT?

11:54AM  20   A.   I DIDN'T KNOW IT WAS THAT DAY, BUT IT'S AROUND THAT TIME,

11:54AM  21   YES.

11:54AM  22   Q.   OKAY.  AND MR. BALWANI IS EXPRESSING CONCERN ABOUT ONE OF

11:54AM  23   THE STATEMENTS THAT YOU MADE; IS THAT FAIR?

11:54AM  24   A.   IT LOOKS LIKE IT, YES.

11:54AM  25   Q.   OKAY.  AND HE'S NOT CONCEALING ANYTHING FROM YOU THERE, IS

11:54AM   1     HE?

11:54AM   2     A.   WHAT DO YOU MEAN BY THAT?

11:54AM   3     Q.   HE'S NOT HIDING FROM YOU THE FACT THAT HE'S WORRIED ABOUT

11:54AM   4     A COMMENT THAT YOU MADE THERE?

11:54AM   5     A.   NO.

11:54AM   6     Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE AT

11:54AM   7     5387D.

11:55AM   8          BEFORE I GO THERE, LET ME DRAW YOUR ATTENTION TO PAGE 72.

11:55AM   9     A.   OF THIS DOCUMENT?

11:55AM  10     Q.   YES, PLEASE.

11:55AM  11          MS. HOLMES, ARE THESE ADDITIONAL TEXT MESSAGES BETWEEN YOU

11:55AM  12     AND MR. BALWANI IN THE NOVEMBER 27TH, 2014 TIME PERIOD?

11:56AM  13     A.   THEY ARE.

11:56AM  14     Q.   AND MR. BALWANI TALKS ABOUT, FIRST OF ALL, MESSAGE 20398,

11:56AM  15     IT SAYS, "RUPERT SAID SAME THING AS YOU AND I TALKED ABOUT ON

11:56AM  16     SEPARATE R&D BUCKET."

11:56AM  17          DO YOU SEE THAT LANGUAGE?

11:56AM  18     A.   I DO.

11:56AM  19     Q.   OKAY.  AND IN OR AROUND THIS TIME WERE YOU SEEKING A

11:56AM  20     POTENTIAL INVESTMENT FROM MR. MURDOCH?

11:56AM  21     A.   YES.

11:56AM  22     Q.   AND MR. BALWANI WRITES "AWESOME."

11:56AM  23          YOU REPLY, "I KNOW.

11:56AM  24          FURTHER DOWN YOU ASK, "QUESTION:  PROMISE HONEST ANSWER?"

11:56AM  25          DO YOU SEE THAT?

HOLMES CROSS BY MR. LEACH (RES.)                                    8036

```
11:56AM   1      A.   I DO.

11:56AM   2      Q.   AND MR. BALWANI WRITES, "OF COURSE.  WHEN HAVE I NOT?"

11:56AM   3           DO YOU SEE THAT LANGUAGE?

11:56AM   4      A.   YES.

11:56AM   5      Q.   AND THEN YOU HAVE A SMILEY FACE?

11:56AM   6      A.   YES.

11:56AM   7      Q.   AND THEN YOU WROTE, "WHY I LOVE YOU, AMONGST ALL OTHER

11:56AM   8      REASONS.  COULDN'T STOP THINKING ABOUT YOU WHOLE TIME I WAS

11:57AM   9      THERE TODAY.

11:57AM  10           "I LOVE YOU TOO DARLING.

11:57AM  11           "WHAT'S UR QUESTION?"

11:57AM  12           YOUR QUESTION WAS, "WOULD YOU BE OK IF I SAW JESSE AND

11:57AM  13      LAURA SEPARATELY IN THE A.M. TOMORROW, HOME BY LATEST 11:15

11:57AM  14      A.M."

11:57AM  15           DO YOU SEE THAT?

11:57AM  16      A.   I DO.

11:57AM  17      Q.   AND WHO WAS LAURA?

11:57AM  18      A.   LAURA WAS A FRIEND OF MINE.

11:57AM  19      Q.   AND "WHEN YOU FINISH THE GEORGE THING," WHAT WAS THAT A

11:57AM  20      REFERENCE TO?

11:57AM  21      A.   I DON'T KNOW.  I ASSUME SOMETHING WITH GEORGE.

11:57AM  22      Q.   GEORGE SHULTZ?

11:57AM  23      A.   YES.

11:57AM  24      Q.   AND IS THIS TEXT MESSAGE EXCHANGE ANOTHER EXAMPLE OF

11:57AM  25      MR. BALWANI BEING LOVING TO YOU?
```

HOLMES CROSS BY MR. LEACH (RES.)                    8037

11:57AM   1    A.   I THINK IT'S ME ASKING HIM FOR PERMISSION TO SEE MY

11:57AM   2    FRIENDS.

11:57AM   3    Q.   OKAY.  IS IT REPRESENTATIVE OF MANY OTHER TEXTS IN

11:57AM   4    EXHIBIT 5387?

11:57AM   5    A.   I DON'T KNOW BECAUSE I HAVEN'T GONE THROUGH THE WHOLE

11:57AM   6    THING, BUT I WOULD OFTEN TRY TO ASK HIM IF IT WOULD BE OKAY IF

11:57AM   7    I COULD SEE A FRIEND BEFORE GOING BACK TO THE OFFICE OR GOING

11:57AM   8    TO A WORK MEETING.

11:57AM   9    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 129.

11:58AM  10    A.   OKAY.

11:58AM  11         MR. LEACH:  PERMISSION TO DISPLAY, YOUR HONOR?

11:58AM  12         THE COURT:  YES.

11:58AM  13    BY MR. LEACH:

11:58AM  14    Q.   DO YOU SEE THE MESSAGE AT THE TOP, "LOVE U TOO" FROM

11:58AM  15    MR. BALWANI?

11:58AM  16    A.   I DO.

11:58AM  17    Q.   AND WOULD YOU PLEASE READ FOR ME DOWN TO THE BOTTOM OF THE

11:58AM  18    PAGE STARTING WITH YOUR RESPONSE?

11:58AM  19    A.   "I LOVE YOU.

11:58AM  20         "XX.

11:58AM  21         "LET'S GO TO JAPAN TOGETHER THIS YEAR.

11:58AM  22         "OK.

11:58AM  23         "HEADING TO AIRPORT.

11:58AM  24         "LOVING YOU.

11:58AM  25         "ME TOO.

HOLMES CROSS BY MR. LEACH (RES.)                                    8038

| | | |
|---|---|---|
| 11:58AM | 1 | "WAS JUST THINKING ABOUT U. |
| 11:58AM | 2 | "I MISS YOU. |
| 11:59AM | 3 | "ME MORE. |
| 11:59AM | 4 | "CAN YOU RESPOND TO MY SLIM AND WISENBAKER EMAILS? |
| 11:59AM | 5 | "CAN YOU TALK. |
| 11:59AM | 6 | "WASN'T SURE WHAT YOU WERE ASKING FOR." |
| 11:59AM | 7 | Q.   YOU JUST SAID CAN YOU RESPOND TO MY SLIM AND WISENBAKER |
| 11:59AM | 8 | EMAIL. |
| 11:59AM | 9 | "CAN YOU TALK? |
| 11:59AM | 10 | "WASN'T SURE WHAT YOU WERE ASKING FOR. |
| 11:59AM | 11 | "HOME. |
| 11:59AM | 12 | "WILL DROP BY FOR A BIT. |
| 11:59AM | 13 | "LOVING YOU. |
| 11:59AM | 14 | "ON MY WAY HEADING HOME TO RECEIVE MY MOM. |
| 11:59AM | 15 | "YOU EATING THERE I ASSUME? |
| 11:59AM | 16 | "YES.  RAJU AND HIS FAMILY HERE ALSO JUST FYI. |
| 12:00PM | 17 | "I HAVE ORDERED JANTA FOR THEM BUT SAPNA BROUGHT FOOD |
| 12:00PM | 18 | ALSO. |
| 12:00PM | 19 | "K. |
| 12:00PM | 20 | "HERE LOVING YOU. |
| 12:00PM | 21 | "ALL MY LOVE AND HUGS FOR MY QUEEN. |
| 12:00PM | 22 | "GETTING ON CVS CALL. |
| 12:00PM | 23 | "ABOUT TO LEAVE.  CONGRESS UNANIMOUS VOTE IN FAVOR. |
| 12:00PM | 24 | "UNANIMOUS VOTE IN FAVOR OF YOU BABY. |
| 12:00PM | 25 | "TAKING OFF TO COME HOME. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8039

| | | |
|---|---|---|
| 12:00PM | 1 | "OK." |
| 12:00PM | 2 | IS THIS ANOTHER EXAMPLE OF MR. BALWANI BEING LOVING AND |
| 12:00PM | 3 | SUPPORTING OF YOU? |
| 12:00PM | 4 | A.   YES. |
| 12:00PM | 5 | Q.   AND WOULD YOU AGREE WITH ME THAT THERE ARE MANY TIMES IN |
| 12:00PM | 6 | THESE TEXT MESSAGES WHERE YOU ARE LOVING AND SUPPORTIVE TO HIM? |
| 12:00PM | 7 | A.   I WAS. |
| 12:00PM | 8 | Q.   LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 208. |
| 12:01PM | 9 | A.   OKAY. |
| 12:01PM | 10 | MR. LEACH:  PERMISSION TO DISPLAY, YOUR HONOR? |
| 12:01PM | 11 | THE COURT:  YES. |
| 12:01PM | 12 | BY MR. LEACH: |
| 12:01PM | 13 | Q.   IS THIS A STRING OF MESSAGES, MS. HOLMES, FROM THE |
| 12:01PM | 14 | MAY 2015 TIME PERIOD? |
| 12:01PM | 15 | A.   IT IS. |
| 12:01PM | 16 | Q.   OKAY.  AND I THINK YOU MAY HAVE TALKED A LITTLE BIT WITH |
| 12:01PM | 17 | MR. DOWNEY ABOUT SOME OF THIS, BUT DO YOU SEE WHERE IT SAYS UP |
| 12:01PM | 18 | AT THE TOP, "BEING YOUR MADIBA MATTERS MORE THAN ANYTHING TO |
| 12:01PM | 19 | ME"? |
| 12:01PM | 20 | A.   YES. |
| 12:01PM | 21 | Q.   AND FURTHER DOWN YOU WROTE -- DO YOU SEE THE MESSAGE |
| 12:02PM | 22 | RELATING TO "WHAT AN AMAZING GIFT TO MEET A MAN I FALL MADLY IN |
| 12:02PM | 23 | LOVE WITH"? |
| 12:02PM | 24 | A.   I DO. |
| 12:02PM | 25 | Q.   AND THAT'S YOU EXPRESSING LOVE AND AFFECTION TO |

| | | |
|---|---|---|
| 12:02PM | 1 | MR. BALWANI? |
| 12:02PM | 2 | A.   YES. |
| 12:02PM | 3 | Q.   FURTHER DOWN THERE'S A MESSAGE, "DID YOU GET MY TEXT A |
| 12:02PM | 4 | WHILE AGO ABOUT FALLING IN LOVE W YOU?" |
| 12:02PM | 5 | DO YOU SEE THAT? |
| 12:02PM | 6 | A.   YES. |
| 12:02PM | 7 | Q.   AND HE WRITES BACK TO YOU ABOUT HIS KIND WORDS OF |
| 12:02PM | 8 | AFFECTION FOR YOU.  IS THAT FAIR? |
| 12:02PM | 9 | A.   YES. |
| 12:02PM | 10 | Q.   WOULD YOU AGREE WITH ME THAT THERE ARE MANY OTHER EXAMPLES |
| 12:02PM | 11 | WITHIN 5387 OF YOU EXPRESSING LOVE AND AFFECTION TO |
| 12:02PM | 12 | MR. BALWANI? |
| 12:02PM | 13 | A.   I'M SURE THERE ARE. |
| 12:02PM | 14 | Q.   OKAY.  DO YOU KNOW HOW MANY TIMES THE WORD "LOVE" APPEARS |
| 12:02PM | 15 | IN 5387? |
| 12:02PM | 16 | A.   NO. |
| 12:02PM | 17 | Q.   WOULD IT SURPRISE YOU TO LEARN THAT THE WORD "LOVE" |
| 12:03PM | 18 | APPEARS MORE THAN 594 TIMES? |
| 12:03PM | 19 | A.   NO. |
| 12:03PM | 20 | Q.   HAVE YOU EVER TRIED TO COUNT THEM UP? |
| 12:03PM | 21 | A.   NO. |
| 12:03PM | 22 | Q.   ANY REASON TO DOUBT THAT IT'S IN THE 500'S? |
| 12:03PM | 23 | A.   NO. |
| 12:03PM | 24 | Q.   OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT THE WORD |
| 12:03PM | 25 | "LOVING" IS IN THERE 105 TIMES? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8041

12:03PM   1    A.   NO.

12:03PM   2    Q.   IS IT FAIR TO SAY THAT YOU AND MR. BALWANI HAD A SPIRITUAL

12:03PM   3    CONNECTION?

12:03PM   4    A.   I THOUGHT WE DID.

12:03PM   5    Q.   YOU BELIEVED THAT AT THE TIME?

12:03PM   6    A.   I DID.

12:03PM   7    Q.   OKAY.  CAN I ASK YOU, PLEASE, TO LOOK AT PAGE 11 TO 12 OF

12:03PM   8    5387.

12:04PM   9         DO YOU HAVE THAT IN FRONT OF YOU, MS. HOLMES?

12:04PM  10    A.   I DO, YES.

12:04PM  11    Q.   DOWN AT THE BOTTOM DO YOU SAY -- AND IS THIS A SKYPE

12:04PM  12    EXCHANGE FROM THE 2011 TIME PERIOD?

12:04PM  13    A.   YES.

12:04PM  14    Q.   AND DO YOU SEE WHERE IT SAYS, "THRU SKYPE WE R TOGETHER.

12:04PM  15    CAN'T BE APART FROM U FOR EVEN FEW HOURS"?

12:04PM  16    A.   I DO.

12:04PM  17    Q.   AND THAT'S SOMETHING THAT MR. BALWANI WROTE?

12:04PM  18    A.   YES.

12:04PM  19    Q.   YOU REPLY WITH AMAZEMENT AND THEN MR. BALWANI SAYS,

12:05PM  20    "ULTIMATE BLESSINGS."

12:05PM  21         DO YOU SEE THOSE WORDS?

12:05PM  22    A.   I DO.

12:05PM  23    Q.   AND IS THIS A SPIRITUAL CONNECTION THAT YOU FELT WITH

12:05PM  24    MR. BALWANI AT THE TIME?

12:05PM  25    A.   I THINK THE SPIRITUAL CONNECTION WAS MORE BELIEVING THAT

HOLMES CROSS BY MR. LEACH (RES.)                                      8042

12:05PM   1    GOD HAD PUT HIM IN MY LIFE AT A TIME THAT IT REALLY MATTERED.

12:05PM   2    Q.   YOU AND MR. BALWANI WERE ROMANTICALLY INVOLVED FOR MORE

12:05PM   3    THAN TEN YEARS?

12:05PM   4    A.   YES.

12:05PM   5    Q.   AND YOUR RELATIONSHIP WAS ON AND OFF TO THE TIME PERIOD

12:05PM   6    PRIOR TO HIM JOINING THE COMPANY AND THEN AFTER HE JOINED THE

12:05PM   7    COMPANY?

12:05PM   8    A.   IT WAS.

12:05PM   9    Q.   ON AND OFF DURING BOTH OF THOSE PERIODS OF TIME?

12:05PM   10   A.   YES.

12:05PM   11   Q.   AND YOU LIVED TOGETHER FROM 2005 TO 2016?

12:05PM   12   A.   YES.

12:05PM   13   Q.   AND THE ROMANTIC RELATIONSHIP DIED BEFORE HE LEFT THE

12:05PM   14   COMPANY?

12:06PM   15   A.   YES.

12:06PM   16   Q.   AND YOU ENDED THE RELATIONSHIP WITH MR. BALWANI?

12:06PM   17   A.   I DID.

12:06PM   18   Q.   YOU MADE THAT CHOICE?

12:06PM   19   A.   I DID.

12:06PM   20   Q.   HOW DID IT END?

12:06PM   21   A.   WHAT PART?

12:06PM   22   Q.   THE ROMANTIC RELATIONSHIP?

12:06PM   23   A.   COULD YOU TELL ME WHAT YOU WOULD LIKE ME TO TALK ABOUT?

12:06PM   24   Q.   I'M ASKING A QUESTION.  HOW DID THE ROMANTIC RELATIONSHIP

12:06PM   25   END?

HOLMES CROSS BY MR. LEACH (RES.)                                    8043

12:06PM   1    A.   UM, I THINK WHEN I STARTED TO REALIZE THAT THIS PERSON

12:06PM   2    THAT I HAD BELIEVED IN MORE THAN ANYTHING WASN'T WHO HE WAS TO

12:06PM   3    ME, THEN NOTHING WAS REAL ANYMORE.

12:06PM   4         MY WHOLE FOUNDATION FOR LIFE, WHAT I BELIEVED IN, THE

12:06PM   5    DEVOTION TO THE COMPANY WAS BASED ON BELIEVING THAT HE WAS THIS

12:07PM   6    PERSON THAT HE HAD CONVEYED HIMSELF TO BE TO ME, AND WHEN I

12:07PM   7    STARTED TO REALIZE THAT, THEN I REALIZED THAT NOT ONLY WAS HE

12:07PM   8    NOT THE PERSON WHO HE SAID HE WAS TO ME PERSONALLY, BUT ALSO

12:07PM   9    THAT THERE WAS NO WAY I COULD SAVE OUR COMPANY IF HE WAS THERE.

12:07PM   10        AND SO THAT WAS IT.

12:07PM   11   Q.   I APPRECIATE THAT ANSWER, MS. HOLMES.

12:07PM   12        YOU, YOU KNOW YOU'VE BEEN ASKED THAT QUESTION BEFORE, HOW

12:07PM   13   DID THE RELATIONSHIP END; IS THAT CORRECT?

12:07PM   14   A.   I'M SURE I HAVE.

12:07PM   15   Q.   WOULD YOU PLEASE LOOK AT YOUR RED BINDER?

12:07PM   16   A.   YEAH.

12:07PM   17   Q.   IF I COULD DRAW YOUR ATTENTION TO THE BATES NUMBER ENDING

12:07PM   18   5567.

12:08PM   19   A.   OKAY.

12:08PM   20   Q.   EXCUSE ME.  55 -- PAGE 5568, PAGE 853?

12:08PM   21   A.   OKAY.

12:08PM   22        MR. LEACH:  YOUR HONOR, I SEEK PERMISSION TO READ

12:08PM   23   FROM LINE 13 THROUGH LINE 1 ON 854.

12:08PM   24        THE COURT:  YES.

12:08PM   25   BY MR. LEACH:

HOLMES CROSS BY MR. LEACH (RES.)                                    8044

12:08PM  1    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTION AND DID

12:08PM  2    YOU GIVE THE FOLLOWING ANSWER:

12:08PM  3         "QUESTION:  HOW DID IT END?

12:08PM  4         "ANSWER:  THE PERSONAL RELATIONSHIP?

12:08PM  5         "QUESTION:  YES.

12:08PM  6         "ANSWER:  YOU KNOW, I THINK WHEN HE JOINED THE COMPANY IT

12:09PM  7    WAS -- WE HAD SPENT I THINK IT WAS FOUR OR FIVE YEARS TOGETHER

12:09PM  8    BY THAT POINT AND REALLY UNDERSTOOD THAT OUR CONNECTION WAS

12:09PM  9    ABOUT TRYING TO CREATE AND WORK TOGETHER.  IT WASN'T REALLY

12:09PM 10    ABOUT THE ROMANTIC PART.

12:09PM 11         "AND ONCE WE STARTED WORKING TOGETHER, IT WAS A VERY

12:09PM 12    INTENSE WORKING RELATIONSHIP.  AND THERE -- THE ROMANTIC PIECE

12:09PM 13    THAT WAS THERE AT THE VERY BEGINNING DIED.

12:09PM 14         "I DIDN'T THINK IT HAPPENED IN ONE MOMENT, BUT IT WAS VERY

12:09PM 15    CLEAR THAT WE WERE COLLEAGUES."

12:09PM 16         WAS THAT YOUR TESTIMONY BEFORE THE S.E.C.?

12:09PM 17    A.   IT IS.

12:09PM 18    Q.   AND WHEN YOU TESTIFIED ABOUT YOUR ROMANTIC RELATIONSHIP

12:09PM 19    WITH MR. BALWANI, AM I RIGHT YOU DIDN'T MENTION THE CMS

12:09PM 20    INSPECTION?

12:09PM 21    A.   I THINK THIS IS TALKING ABOUT WHEN HE JOINED THE COMPANY,

12:09PM 22    WHAT WAS THE TERMINATION OF THE ROMANTIC RELATIONSHIP AT THAT

12:09PM 23    POINT.

12:09PM 24    Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE PERSONAL

12:09PM 25    RELATIONSHIP, AND YOU DID NOT MENTION CMS; IS THAT FAIR?

HOLMES CROSS BY MR. LEACH (RES.)                                    8045

12:09PM   1    A.   I DON'T THINK SO.  I HAVEN'T RE-READ MY TESTIMONY, BUT I

12:10PM   2    DON'T THINK SO.

12:10PM   3    Q.   YOU'RE SAYING THAT YOU HAVEN'T RE-READ YOUR TESTIMONY IN

12:10PM   4    PREPARING FOR TODAY?

12:10PM   5    A.   I'VE LOOKED AT PORTIONS OF IT, BUT I HAVE NOT READ ALL OF

12:10PM   6    MY TESTIMONY.

12:10PM   7    Q.   OKAY.  BUT SITTING HERE TODAY, YOU DON'T HAVE A MEMORY OF

12:10PM   8    TELLING THE S.E.C. THAT CMS HAD SOMETHING TO DO WITH THE END OF

12:10PM   9    THE RELATIONSHIP?

12:10PM  10    A.   I DON'T.

12:10PM  11    Q.   WHEN YOU BROKE OFF THE RELATIONSHIP IN 2016, YOU WERE NOT

12:10PM  12    SEEING ANY MENTAL HEALTH PROFESSIONALS; IS THAT RIGHT?

12:10PM  13    A.   I WAS NOT.

12:10PM  14    Q.   OKAY.  YOU WEREN'T SEEING A PSYCHOLOGIST?

12:10PM  15    A.   NO.

12:10PM  16    Q.   YOU WEREN'T SEEING A PSYCHIATRIST?

12:10PM  17    A.   NO.

12:10PM  18    Q.   WHATEVER WAS KEEPING YOU AND MR. BALWANI TOGETHER, YOU

12:10PM  19    WERE ABLE TO MAKE A BREAK IN 2016?

12:10PM  20    A.   I DID.

12:10PM  21    Q.   AND IS IT TRUE THAT MR. BALWANI DID NOT CONCEAL FROM YOU

12:10PM  22    THE REALITY OF WHAT WAS HAPPENING AT THERANOS?

12:10PM  23    A.   WHAT DO YOU MEAN BY THAT?

12:10PM  24    Q.   PROBLEMS IN THE LAB, ISSUES WITH WALGREENS, FRUSTRATIONS

12:11PM  25    WITH THERANOS NOT HAVING A PRODUCT, HE DIDN'T CONCEAL THESE

12:11PM   1    THINGS FROM YOU, DID HE?

12:11PM   2    A.   I DIDN'T THINK HE DID.

12:11PM   3    Q.   WELL, LET'S LOOK AT A DOCUMENT THAT YOUR ATTORNEY SHOWED

12:11PM   4    YOU YESTERDAY.

12:11PM   5         IF WE COULD GO TO EXHIBIT 7534.

12:11PM   6         DO YOU HAVE THAT, MS. HOLMES?  IT WAS IN YOUR, IN YOUR

12:11PM   7    COUNSEL'S BINDER YESTERDAY.

12:11PM   8    A.   I DON'T HAVE THOSE ANYMORE.

12:11PM   9              THE COURT:  THAT WAS COLLECTED, I THINK.

12:11PM  10              THE WITNESS:  OH.

12:11PM  11              THE COURT:  AND THIS IS IN EVIDENCE.

12:12PM  12              MR. LEACH:  YEAH, PERHAPS WE CAN DISPLAY IT.  AND IF

12:12PM  13    WE CAN GO TO PAGE 3, PLEASE, MS. HOLLIMAN.

12:12PM  14    Q.   THIS IS A NOTE THAT YOU MADE TO YOURSELF IN THE APRIL 2015

12:12PM  15    TIME PERIOD, MS. HOLMES?

12:12PM  16    A.   IT IS.

12:12PM  17    Q.   OKAY.  AND YOU'RE TRYING TO RECOUNT A CONVERSATION THAT

12:12PM  18    YOU HAD HAD WITH MR. BALWANI?

12:12PM  19    A.   I'M TAKING NOTES AS HE'S TALKING TO ME.

12:12PM  20    Q.   OKAY.  INCLUDING STATEMENTS THAT HE'S MAKING TO YOU?

12:12PM  21    A.   EXACTLY.

12:12PM  22    Q.   OKAY.  AND YOU WROTE, "CONVINCED NEVER HAPPEN EVER.  NOT

12:12PM  23    THANKSGIVING NOT EVER.  PUT HIS DOLLARS ON IT."

12:12PM  24         DO YOU SEE THAT LANGUAGE?

12:12PM  25    A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                      8047

12:12PM   1    Q.   THOSE WERE WORDS THAT MR. BALWANI WAS EXPRESSING TO YOU IN

12:12PM   2    THE APRIL 2015 TIME PERIOD?

12:12PM   3    A.   YES.

12:12PM   4    Q.   AND THEN THERE'S A PARAGRAPH, "FOCUS.  CLARITY.

12:13PM   5    DIRECTION.  COMMUNICATION.  BRINGING EVERYONE TOGETHER AND

12:13PM   6    EXECUTION.  PLANS COME TO FRUITION.  GC AND ELISA AND CBC."

12:13PM   7         YOU RECOGNIZE GC AND ELISA AND CBC TO BE REFERENCE TO

12:13PM   8    ASSAYS WITHIN THE LAB?

12:13PM   9    A.   I THINK HE'S TALKING ABOUT R&D HERE.

12:13PM  10         BUT, YES, I RECOGNIZE THOSE THREE METHODS.

12:13PM  11    Q.   OKAY.  THEN YOU SEE A REFERENCE TO A PRODUCT PERSON.

12:13PM  12         DO YOU SEE THAT?

12:13PM  13    A.   I DO.

12:13PM  14    Q.   "KNOW HOW TO SHIP.  BASIC THINGS.  FLAWLESS.  ENOUGH

12:13PM  15    FOCUS."

12:13PM  16         DO YOU SEE THAT LANGUAGE?

12:13PM  17    A.   I DO.

12:13PM  18    Q.   THEN IN THE NEXT PARAGRAPH, DO YOU SEE WHERE YOU WROTE,

12:13PM  19    "NOT FOCUS ANY TIME ON NONCRITICAL PATH PLAN.  NOT TAKING

12:13PM  20    TANGENT.  NOT TRY SOLVE EVERY PROBLEM UP FRONT BEFORE PROCEED.

12:13PM  21    SOLVE ONCE DONE.  PREPARING 3 YEARS NOT WORRIES ABT."

12:14PM  22         DO YOU SEE THAT LANGUAGE?

12:14PM  23    A.   I DO.

12:14PM  24    Q.   OKAY.  THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM  25    A.   YES.

12:14PM  1      Q.   AND THEN THERE'S A REFERENCE, "EAH GETTING PRODUCT DONE.

12:14PM  2      SUNNY SW."

12:14PM  3           IS THAT A REFERENCE TO SOFTWARE?

12:14PM  4      A.   YES.

12:14PM  5      Q.   "RULE WORLD."

12:14PM  6           DO YOU SEE THAT?

12:14PM  7      A.   I DO.

12:14PM  8      Q.   AND THEN THE WORD "COMMAND"?

12:14PM  9      A.   YES.

12:14PM  10     Q.   AND THEN DOWN TOWARDS THE BOTTOM, DO YOU SEE WHERE HE

12:14PM  11     WROTE -- OR YOU WROTE, "SO ANGRY AT MYSELF FOR COMING.  SO

12:14PM  12     ANGRY SPENT 5 YEARS OF MY LIFE.  BIGGEST FAILURE OF MY LIFE.

12:14PM  13     REGRET COMING.  STAYED BECAUSE I LOVE YOU."

12:14PM  14          THOSE ARE WORDS THAT MR. BALWANI SAID TO YOU?

12:14PM  15     A.   YES.

12:14PM  16     Q.   "NO ONE TOLD RESPONSIBLE."  AND THEN THERE'S AN EXPLETIVE,

12:14PM  17     "MEDIOCRE QUALITY OF THIS," AND THERE'S A REFERENCE TO THE

12:15PM  18     COMPANY; CORRECT?

12:15PM  19     A.   YES.

12:15PM  20     Q.   AND THE COMPANY THERE IS THERANOS; RIGHT?

12:15PM  21     A.   YES.

12:15PM  22     Q.   AND HE'S NOT HIDING FROM YOU HIS VIEWS OF THE COMPANY

12:15PM  23     DURING THIS TIME PERIOD, IS HE?

12:15PM  24     A.   HE'S NOT.

12:15PM  25     Q.   HE'S BEING OPEN WITH YOU ABOUT PROBLEMS THAT HE'S SEEING?

| | | |
|---|---|---|
| 12:15PM | 1 | A.   HE'S VERY ANGRY WITH ME BECAUSE HE FEELS LIKE I HAVE |
| 12:15PM | 2 | CREATED MEDIOCRITY. |
| 12:15PM | 3 | Q.   AND HE'S TELLING YOU THAT? |
| 12:15PM | 4 | A.   YES. |
| 12:15PM | 5 | Q.   HE'S TELLING YOU ABOUT PROBLEMS AT THERANOS? |
| 12:15PM | 6 | A.   HE'S TELLING ME ABOUT PROBLEMS WITH ME. |
| 12:15PM | 7 | Q.   DO YOU SEE THE REFERENCE TO "COMPANY" THERE? |
| 12:15PM | 8 | A.   YES. |
| 12:15PM | 9 | Q.   OKAY.  THAT'S NOT A REFERENCE TO YOU, THAT'S A REFERENCE |
| 12:15PM | 10 | TO THE COMPANY, ISN'T IT? |
| 12:15PM | 11 | A.   THAT IS A REFERENCE TO THE COMPANY. |
| 12:15PM | 12 | Q.   OKAY. |
| 12:15PM | 13 | IF WE CAN PLEASE DISPLAY WHAT IS IN EVIDENCE AT |
| 12:15PM | 14 | EXHIBIT 5387D, PAGE 58 AND 59. |
| 12:16PM | 15 | MS. HOLMES, DO YOU SEE THE DATE OF THESE TEXT MESSAGES |
| 12:16PM | 16 | FROM APRIL 28TH, 2015? |
| 12:16PM | 17 | A.   I DO. |
| 12:16PM | 18 | Q.   OKAY.  SO THIS IS AFTER THE EXHIBIT THAT WE JUST LOOKED AT |
| 12:16PM | 19 | WHERE MR. BALWANI IS DESCRIBING HIS VIEW OF THE COMPANY IN THE |
| 12:16PM | 20 | APRIL 2015 TIME PERIOD? |
| 12:16PM | 21 | A.   I THINK SO. |
| 12:16PM | 22 | Q.   AND HE WROTE TO YOU, "IT IS MOST MADDENING THERE IS NO |
| 12:16PM | 23 | FOCUS IN ANY CHEM TEAMS AND NO PRODUCT COMING OUT." |
| 12:16PM | 24 | DO YOU SEE THAT LANGUAGE? |
| 12:16PM | 25 | A.   I DO. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8050

12:16PM   1    Q.   AND YOU WROTE BACK, "I KNOW;" CORRECT?

12:16PM   2    A.   YES.

12:16PM   3    Q.   AND YOU REPLIED, "LEADERSHIP;" CORRECT?

12:16PM   4    A.   YES.

12:16PM   5    Q.   AND THE REFERENCE TO "NO PRODUCT COMING OUT," THAT'S A

12:16PM   6    REFERENCE TO THE MINILAB OR THE TSPU?

12:16PM   7    A.   I THINK SO.

12:17PM   8    Q.   OKAY.  HE'S NOT HIDING HIS VIEW OF THAT FROM YOU HERE, IS

12:17PM   9    HE?

12:17PM  10    A.   I THINK -- I'M NOT SURE IF IT'S A REFERENCE TO THE

12:17PM  11    MINILAB.

12:17PM  12         NO, HE'S NOT HIDING HIS VIEW.

12:17PM  13    Q.   COULD WE PLEASE LOOK AT PAGE 77 TO 78.

12:17PM  14         AND WE LOOKED A LITTLE BIT AT THIS EARLIER.  DO YOU SEE

12:17PM  15    WHERE YOU WROTE "WHO DO U THINK.

12:17PM  16         "NOW WE HAVE LEGAL GROUNDS."

12:17PM  17         THIS IS IN THE MAY 2015 TIME PERIOD?

12:17PM  18    A.   YES.

12:17PM  19    Q.   THIS IS A REFERENCE TO YOUR EFFORT TO FIND OUT WHO'S ONE

12:17PM  20    OF MR. CARREYROU'S RESOURCES?

12:17PM  21    A.   I'M NOT SURE ABOUT THAT.

12:17PM  22    Q.   IS THIS ROUGHLY IN THAT TIME PERIOD?

12:17PM  23    A.   IT IS.

12:18PM  24    Q.   IF WE COULD GO DOWN, PLEASE, MS. HOLLIMAN.

12:18PM  25         AND DO YOU SEE MORE REFERENCES TO TYLER AND ERIKA AND

HOLMES CROSS BY MR. LEACH (RES.)                                    8051

12:18PM    1    ADAM?

12:18PM    2    A.   I DO.

12:18PM    3    Q.   OKAY.  HE'S GIVING YOU HIS VIEWS ABOUT WHO MIGHT BE BEHIND

12:18PM    4    THE CARREYROU ARTICLE?

12:18PM    5    A.   HE IS.

12:18PM    6    Q.   OKAY.  AND IF WE CAN GO DOWN FURTHER, PLEASE.

12:18PM    7         DO YOU SEE WHERE HE WROTE, "YEAH.  AND WE WILL ALSO TAKE

12:18PM    8    LEGAL ACTION ONCE THIS IS BEHIND US.  VIOLATING TRADE SECRETS

12:18PM    9    IS NOT OK."

12:18PM   10         DO YOU SEE THAT LANGUAGE?

12:18PM   11    A.   I DO.

12:18PM   12    Q.   OKAY.  LET'S CONTINUE TO PAGE 78.  ZOOM IN ON THE TOP.

12:18PM   13         DO YOU SEE WHERE MR. BALWANI WROTE, "SECONDLY.  WE NEED A

12:19PM   14    BETTER STRATEGY FOR NORMANDY.  FOR A LONG TIME TO COME WE WILL

12:19PM   15    HAVE HYBRID SOLUTIONS."

12:19PM   16         DO YOU SEE THAT LANGUAGE?

12:19PM   17    A.   I DO.

12:19PM   18    Q.   OKAY.  AND YOU KNEW NORMANDY WAS THE PORTION OF THE

12:19PM   19    CALIFORNIA CLIA LAB WHERE THERANOS PERFORMED ITS LDT'S?

12:19PM   20    A.   I DID.

12:19PM   21    Q.   THE TESTS ON THE MODIFIED DEVICE, THE TEST ON THE SIEMENS

12:19PM   22    DEVICE?

12:19PM   23    A.   YES.

12:19PM   24    Q.   AND MR. BALWANI IS TELLING YOU HERE THAT YOU'RE GOING TO

12:19PM   25    HAVE HYBRID SOLUTIONS FOR A LONG TIME TO COME?

HOLMES CROSS BY MR. LEACH (RES.)                                8052

12:19PM  1    A.   YES.

12:19PM  2    Q.   MEANING YOU'RE NOT GOING TO BE ABLE TO RUN TESTS JUST ON

12:19PM  3    THE MINILAB, YOU'RE GOING TO HAVE A NUMBER OF DIFFERENT

12:19PM  4    SOLUTIONS FOR A LONG PERIOD OF TIME?

12:19PM  5    A.   I THINK HE'S SAYING THAT WE SHOULD HAVE THOSE SOLUTIONS

12:19PM  6    FOR A LONG PERIOD OF TIME.

12:19PM  7    Q.   HE'S SAYING YOU WILL HAVE THESE HYBRID SOLUTIONS, NOT --

12:19PM  8    A.   EXACTLY.

12:19PM  9    Q.   -- NOT ONE DEVICE THAT YOU WERE TRYING TO DO IN PHASE II?

12:19PM  10   A.   RIGHT.

12:19PM  11   Q.   OKAY.  AND HE'S SAYING THAT IS GOING TO TAKE A LONG TIME?

12:20PM  12   A.   NO.  HE'S SAYING THAT FOR A LONG TIME WE'RE GOING TO BE

12:20PM  13   DOING THIS TESTING ON THESE MODIFIED TYPE INVENTIONS IN THE

12:20PM  14   CLIA LAB.

12:20PM  15   Q.   I THINK WE'RE SAYING THE SAME THING.

12:20PM  16   A.   OKAY.

12:20PM  17   Q.   BUT YOU AGREE WITH ME HE'S BEING OPEN ABOUT THAT HERE?

12:20PM  18   A.   YES.

12:20PM  19   Q.   HE'S TELLING THAT TO YOU?

12:20PM  20   A.   YES.

12:20PM  21   Q.   HE'S NOT DECEIVING YOU ABOUT THAT?

12:20PM  22   A.   NO.

12:20PM  23   Q.   FURTHER DOWN YOU WROTE, "MOST LIKELY 2 PLUS WE NEED TO SUE

12:20PM  24   FOR DEFAMATION."

12:20PM  25        YOU WROTE, "I MEANT NORMANDY."

HOLMES CROSS BY MR. LEACH (RES.)                              8053

12:20PM  1          AND THEN "I AGREE."

12:20PM  2          AM I RIGHT YOU BOTH HERE ARE TALKING ABOUT THE HYBRID

12:20PM  3   SOLUTIONS THAT ARE GOING TO BE THERE FOR A LONG TIME TO COME

12:20PM  4   AND THE EFFORT TO FIND OUT WHO IS BEHIND THE CARREYROU ARTICLE?

12:20PM  5   A.   I'M NOT SURE I UNDERSTOOD THOSE PORTIONS OF THE PRIOR

12:20PM  6   TEXT.  I DON'T KNOW IF I FOLLOW THIS EXACTLY.

12:20PM  7   Q.   WELL, YOU UNDERSTAND "I MEANT NORMANDY" TO BE A REFERENCE

12:21PM  8   TO THE CALIFORNIA CLIA LAB?

12:21PM  9   A.   YES.

12:21PM  10  Q.   OKAY.  LET'S LOOK AT PAGE 54.

12:21PM  11         DO YOU SEE THE TEXT, "PETER (ONE OF THESE 2 GUYS) MET WITH

12:21PM  12  RON CONWAY."

12:21PM  13         DO YOU SEE THAT LANGUAGE?

12:21PM  14  A.   I DO.

12:21PM  15  Q.   AND IT GOES ON TO SAY "RON COMMENTED THAT THERE IS TOO

12:21PM  16  MUCH HYPE AROUND THERANOS AND YOU."

12:21PM  17         DO YOU SEE THAT LANGUAGE?

12:21PM  18  A.   I DO.

12:21PM  19  Q.   MR. BALWANI IS COMMUNICATING THIS TO YOU?

12:21PM  20  A.   YES.

12:21PM  21  Q.   HE'S NOT HIDING IT FROM YOU?

12:21PM  22  A.   NO.

12:21PM  23  Q.   "I AM WORRIED ABOUT OVER EXPOSURE WITHOUT SOLID SUBSTANCE

12:21PM  24  WHICH IS LACKING RIGHT NOW.  WE CAN TALK TOMORROW ABOUT OVER

12:21PM  25  EXPOSURE."

HOLMES CROSS BY MR. LEACH (RES.)                                    8054

12:21PM  1          DO YOU SEE THAT LANGUAGE?

12:21PM  2     A.   YES.

12:21PM  3     Q.   HE'S NOT HIDING FROM YOU HIS VIEW THAT HE THOUGHT THERANOS

12:22PM  4     WAS OVER EXPOSURE WITHOUT SOLID SUBSTANCE?

12:22PM  5     A.   CORRECT.

12:22PM  6     Q.   IF WE COULD SCROLL DOWN A LITTLE BIT MORE, MS. HOLLIMAN.

12:22PM  7          YOU WROTE BACK AT 7:54, "THAT MEDIA IS WHY WE'RE GETTING

12:22PM  8     AMERICARE."

12:22PM  9          DO YOU SEE THAT?

12:22PM  10    A.   YES.

12:22PM  11    Q.   AND YOU'RE SAYING THE MEDIA EXPOSURE IS A REASON WHY

12:22PM  12    THERANOS MIGHT HAVE POTENTIAL BUSINESS?

12:22PM  13    A.   I'M NOT SURE.

12:22PM  14    Q.   OKAY.  YOU AREN'T TALKING ABOUT POTENTIAL UPSIDE OF THE

12:22PM  15    MEDIA STRATEGY THAT YOU AND MR. BALWANI DISAGREED ON?

12:22PM  16    A.   I COULD BE.  I'M JUST NOT SURE WHAT THIS IS REFERRING TO.

12:23PM  17    Q.   SITTING HERE TODAY, YOU DON'T HAVE AN EXPLANATION OTHER

12:23PM  18    THAN THAT?

12:23PM  19    A.   I DON'T.

12:23PM  20    Q.   FURTHER DOWN MR. BALWANI WROTE, "WE NEED FDA CLEARANCE AND

12:23PM  21    CTN CLEARANCE B."

12:23PM  22          DO YOU SEE THAT?

12:23PM  23    A.   YES.

12:23PM  24    Q.   CTN IS A REFERENCE TO THE NANOTAINER?

12:23PM  25    A.   IT IS.

12:23PM   1    Q.   THE COLLECTION -- OR WHERE THE BLOOD WAS STORED FOR USE IN

12:23PM   2    EDISONS OR MINILABS?

12:23PM   3    A.   YES.

12:23PM   4    Q.   OKAY.  AND HE'S NOT HIDING FROM YOU HIS VIEW, "WE NEED FDA

12:23PM   5    CLEARANCE AND CTN CLEARANCE" HERE, IS HE?

12:23PM   6    A.   HE'S NOT.

12:23PM   7    Q.   LET'S LOOK AT PAGE 56 TO 57.

12:23PM   8         DO YOU SEE WHERE IT SAYS, "PHENOMENAL CRAMER STORY"?

12:24PM   9    A.   YES.

12:24PM  10    Q.   OKAY.  YOU WERE ON "MAD MONEY" AND THE JIM CRAMER SHOW

12:24PM  11    SOME TIME BEFORE OCTOBER OF 2015 AND YOU WERE REFERENCING A

12:24PM  12    CONVERSATION YOU HAD WITH MR. CRAMER?

12:24PM  13    A.   I'M NOT SURE IT WAS WITH MR. CRAMER, BUT IT WAS A STORY

12:24PM  14    THAT I HEARD WHEN I WAS AT THAT INTERVIEW.

12:24PM  15    Q.   OKAY.  AND IF WE COULD SCROLL DOWN, PLEASE, MS. HOLLIMAN.

12:24PM  16         DO YOU SEE WHERE MR. BALWANI WROTE, "YOU WERE FLAWLESS IN

12:24PM  17    MAD MONEY.  JUST PERFECT.

12:24PM  18         "IF I WAS COMPETING WITH YOU I WOULD BE SCARED."

12:24PM  19         DO YOU SEE THAT LANGUAGE?

12:24PM  20    A.   I DO.

12:24PM  21    Q.   AND THEN RIGHT AFTER HE WRITES, "GOT TO GET MORE ASSAYS ON

12:24PM  22    FINGERSTICK."

12:24PM  23         DO YOU SEE THAT?

12:24PM  24    A.   YES.

12:24PM  25    Q.   AND HE'S EXPRESSING A VIEW THAT THERANOS NEEDS TO BUMP UP

HOLMES CROSS BY MR. LEACH (RES.)                                  8056

12:25PM   1      THE NUMBER OF SMALL SAMPLE TESTING THAT IT'S DOING IN ITS CLIA

12:25PM   2      LAB?

12:25PM   3      A.   YES.

12:25PM   4      Q.   HE'S NOT HIDING FROM YOU THE NEED TO DO THAT, IS HE?

12:25PM   5      A.   NO.

12:25PM   6      Q.   HE THEN SAYS, "YOU CAME ACROSS AS A PURE STATESMAN."

12:25PM   7           DO YOU SEE THAT?

12:25PM   8      A.   I DO.

12:25PM   9      Q.   AND YOU REPLIED, "LOVED SEEING THIS SO MUCH.

12:25PM  10           "EXACTLY.

12:25PM  11           "THAT IS OUR KEY POINT NOW."

12:25PM  12           IS THAT WHAT YOU WROTE?

12:25PM  13      A.   YES.

12:25PM  14      Q.   LET'S LOOK AT PAGE 42 TO 44.

12:25PM  15           DO YOU SEE WHERE MR. BALWANI WROTE, "WHEN WE LAUNCH IN NY

12:25PM  16      WE CAN LAUNCH WITH CVS AND GIVE THEM ONCE WE HAVE 50 E DONE, WE

12:25PM  17      WILL BE INVINCIBLE."

12:26PM  18           DO YOU SEE THAT?

12:26PM  19      A.   I DO.

12:26PM  20      Q.   AND WHAT IS 50 E?

12:26PM  21      A.   I DON'T KNOW.

12:26PM  22      Q.   OKAY.  AND IN THIS TIME PERIOD, ARE YOU HAVING DISCUSSIONS

12:26PM  23      WITH CVS ABOUT A POTENTIAL BUSINESS RELATIONSHIP?

12:26PM  24      A.   I'M NOT SURE.  I -- I'M NOT SURE.

12:26PM  25      Q.   OKAY.  YOU RECALL AT SOME POINT HAVING A CONVERSATION WITH

HOLMES CROSS BY MR. LEACH (RES.)                           8057

12:26PM  1    CVS ABOUT A POTENTIAL RELATIONSHIP?

12:26PM  2    A.   WE DID.

12:26PM  3    Q.   OKAY.  AFTER YOU HAD A DEAL WITH WALGREENS?

12:26PM  4    A.   AND BEFORE.

12:26PM  5    Q.   AND AS THE WALGREENS RELATIONSHIP WAS -- I'LL USE MY

12:26PM  6    WORD -- SLOWING IN 2014, YOU STARTED TO TURN TO CVS IN ORDER TO

12:26PM  7    STRIKE UP A BUSINESS RELATIONSHIP WITH THEM; ISN'T THAT RIGHT?

12:26PM  8    A.   NO.

12:26PM  9    Q.   YOU DIDN'T HAVE CONVERSATIONS WITH CVS IN THE 2015 TIME

12:26PM  10   PERIOD?

12:26PM  11   A.   WE PROBABLY DID.  WE HAD CONVERSATIONS WITH THEM FROM THE

12:26PM  12   DAY WE MET THEM ALL OF THE WAY THROUGH TO THE DAY WE SHUT DOWN

12:26PM  13   OUR LAB.

12:26PM  14   Q.   EVEN AS YOU'RE WORKING ON HYBRID SOLUTIONS WITHIN THE CLIA

12:27PM  15   LAB, YOU WERE TRYING TO INDUCE CMS -- CVS INTO SOME TYPE OF

12:27PM  16   BUSINESS ARRANGEMENT?

12:27PM  17   A.   YES.

12:27PM  18   Q.   IF WE COULD SCROLL DOWN, PLEASE, TO THE BOTTOM PORTION,

12:27PM  19   MS. HOLLIMAN.

12:27PM  20        DO YOU SEE AT THE BOTTOM WHERE IT SAYS, "THE POINT ABOUT

12:27PM  21   NARROWING DOWN MENU TO HIT HIGH FS PERCENTAGE CAME LIKE A GIFT

12:27PM  22   FROM GOD"?

12:27PM  23   A.   I DO.

12:27PM  24   Q.   AND THAT'S MR. BALWANI EXPRESSING TO YOU HIS IDEA TO

12:27PM  25   INCREASE THE FINGERSTICK PERCENTAGE AT WALGREENS STORES?

HOLMES CROSS BY MR. LEACH (RES.)                          8058

| | | |
|---|---|---|
| 12:27PM | 1 | A.   YES. |
| 12:27PM | 2 | Q.   AND HE'S NOT HIDING FROM YOU HIS IDEAS ABOUT HOW TO DO |
| 12:27PM | 3 | THAT, IS HE? |
| 12:28PM | 4 | A.   NO. |
| 12:28PM | 5 | Q.   HE'S BEING OPEN WITH YOU ABOUT IDEAS ON HOW TO INCREASE |
| 12:28PM | 6 | THE FINGERSTICK PERCENTAGE AT WALGREENS? |
| 12:28PM | 7 | A.   HE IS. |
| 12:28PM | 8 | Q.   HE'S TALKING OPENLY ABOUT THIS ISSUE IN THE 2015 TIME |
| 12:28PM | 9 | PERIOD WITH YOU? |
| 12:28PM | 10 | A.   YES. |
| 12:28PM | 11 | Q.   LET'S GO ON TO THE NEXT PAGE, PLEASE. |
| 12:28PM | 12 | DO YOU SEE WHERE HE WROTE, "I WAS MEDITATING ON THIS |
| 12:28PM | 13 | MEETING ALL NIGHT AND ALL DAY"? |
| 12:28PM | 14 | A.   I DO. |
| 12:28PM | 15 | Q.   AND YOU REPLIED TO HIM, "YOU NAILED IT"? |
| 12:28PM | 16 | A.   YES. |
| 12:28PM | 17 | Q.   AND MR. BALWANI SAYS, "WE MUST HIT OUR VOLUME GOALS NOW. |
| 12:28PM | 18 | "WE NEED TO MAKE IT A MATTER OF LIFE AND DEATH. |
| 12:28PM | 19 | "SURVIVAL.  WE MUST NOT LOSE." |
| 12:28PM | 20 | THAT'S WHAT MR. BALWANI WROTE? |
| 12:28PM | 21 | A.   YES. |
| 12:28PM | 22 | Q.   LET'S LOOK AT PAGE 44, PLEASE.  AND IF WE CAN ZOOM IN ON |
| 12:29PM | 23 | THE SUBSTANCE, MS. HOLLIMAN. |
| 12:29PM | 24 | DO YOU SEE THE FIRST TEXT ON APRIL 11TH, 2015, "I HAVE |
| 12:29PM | 25 | EXTREME CLARITY ON HOW WE WILL WIN AGAINST QUEST AND LABCORP"? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8059

| | | |
|---|---|---|
| 12:29PM | 1 | A.   I DO. |
| 12:29PM | 2 | Q.   AND THEN HE WROTE, "EXTREME HARD WORK BUT NO SHORTCUTS ON |
| 12:29PM | 3 | THIS ONE ANYWAY"? |
| 12:29PM | 4 | A.   YES. |
| 12:29PM | 5 | Q.   "FOR NEXT 3 YEARS 2015-16-17 DO ONLY CALIFORNIA NY AZ AND |
| 12:29PM | 6 | CENTRAL PEN." |
| 12:29PM | 7 |      DO YOU SEE THAT LANGUAGE? |
| 12:29PM | 8 | A.   I DO. |
| 12:29PM | 9 | Q.   AND THAT'S LIMITING THE NATIONAL ROLLOUT OR THE NATIONAL |
| 12:29PM | 10 | AMBITIONS THAT YOU HAD, AT LEAST WITH WALGREENS, IN THE 2015 |
| 12:29PM | 11 | TIME PERIOD? |
| 12:29PM | 12 | A.   THAT WOULD HAVE. |
| 12:29PM | 13 | Q.   AND YOU WROTE, "I SO AGREE." |
| 12:29PM | 14 |      IS THAT CORRECT? |
| 12:29PM | 15 | A.   YES. |
| 12:29PM | 16 | Q.   "CAN'T WAIT TO DISCUSS." |
| 12:30PM | 17 |      IS THAT WHAT YOU WROTE? |
| 12:30PM | 18 | A.   YES. |
| 12:30PM | 19 | Q.   "HAVE A LOT OF IDEAS ON THAT BTW FROM THESE LAST COUPLE |
| 12:30PM | 20 | DAYS." |
| 12:30PM | 21 |      AND THEN YOU WROTE "EXACTLY." |
| 12:30PM | 22 |      AND THEN MR. BALWANI WROTE, "BUILD INCREDIBLE SOFTWARE." |
| 12:30PM | 23 |      DO YOU SEE THAT? |
| 12:30PM | 24 | A.   I DO. |
| 12:30PM | 25 | Q.   AND WHAT IS THE NEXT ACRONYM? |

HOLMES CROSS BY MR. LEACH (RES.)                              8060

| | | |
|---|---|---|
| 12:30PM | 1 | A.  D2C. |
| 12:30PM | 2 | Q.  WHAT IS D2C? |
| 12:30PM | 3 | A.  DIRECT TO CONSUMER. |
| 12:30PM | 4 | Q.  "SOCRATES."  WHAT IS THAT A REFERENCE TO? |
| 12:30PM | 5 | A.  IT'S A PIECE OF SOFTWARE THAT WE BUILT THAT DID DECISION |
| 12:30PM | 6 | SUPPORT FOR PEOPLE TO BE ABLE TO UNDERSTAND THEIR LAB DATA. |
| 12:30PM | 7 | Q.  AND THEN HE WROTE, "100 TO 200 FINGERSTICKS ON 4.1." |
| 12:30PM | 8 | IS THAT A REFERENCE TO THE MINILAB AND THE 4 SERIES? |
| 12:30PM | 9 | A.  YES. |
| 12:30PM | 10 | Q.  "AND CAPTURE 100 PERCENT CA AND MY." |
| 12:30PM | 11 | DO YOU THINK THAT'S NY? |
| 12:30PM | 12 | A.  I DO. |
| 12:30PM | 13 | Q.  HE'S BEING OPEN ABOUT HIS PLANS AND HIS IDEAS HERE, IS HE |
| 12:31PM | 14 | NOT? |
| 12:31PM | 15 | A.  YES.  I WOULDN'T CALL THIS A PLAN, BUT THIS IDEA, YES. |
| 12:31PM | 16 | Q.  OKAY.  HE'S COMMUNICATING WITH YOU OPENLY ABOUT IDEAS AND |
| 12:31PM | 17 | POSSIBILITIES AND WAYS TO MOVE THE BUSINESS? |
| 12:31PM | 18 | A.  HE IS. |
| 12:31PM | 19 | Q.  OKAY.  LET'S LOOK AT PAGES 46 AND 48. |
| 12:31PM | 20 | IS THIS ANOTHER EXCHANGE BETWEEN YOU AND MR. BALWANI IN |
| 12:31PM | 21 | LATE APRIL 2015? |
| 12:31PM | 22 | A.  IT IS. |
| 12:31PM | 23 | Q.  YOU WROTE, "WE NEED TO DECIDE AND THEN OPERATIONALIZE THE |
| 12:31PM | 24 | STRATEGY WE WERE TALKING ABOUT REWORKING WITH MANY." |
| 12:31PM | 25 | WHO IS THE MANY? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8061

12:31PM  1     A.   I'M NOT SURE.

12:31PM  2     Q.   MR. BALWANI WROTE, "FS IS OUR COMPETITIVE ADVANTAGE AND

12:31PM  3     PRICE TRANSPARENCY."

12:31PM  4          FS, THAT'S A REFERENCE TO FINGERSTICK?

12:32PM  5     A.   YES.

12:32PM  6     Q.   AND THEN FURTHER DOWN YOU WROTE, "AND GET FS LIVE NMW."

12:32PM  7     WHAT IS NMW?

12:32PM  8     A.   I DON'T KNOW.

12:32PM  9     Q.   ARE YOU EXPRESSING A NEED TO GET FINGERSTICK LIVE WITHIN

12:32PM  10    THE CLIA LAB?

12:32PM  11    A.   YES.  I'M NOT SURE IF THIS IS TALKING ABOUT THE CLIA LAB,

12:32PM  12    BUT DEFINITELY GETTING FINGERSTICK LIVE.

12:32PM  13    Q.   OKAY.  LET'S GO TO PAGE 48.

12:32PM  14         DO YOU SEE WHERE YOU WROTE, "CAN WE TAKE FS LIE TOMORROW"?

12:32PM  15         DID YOU MEAN LIVE?

12:32PM  16    A.   I THINK SO.

12:32PM  17    Q.   AND THEN MR. BALWANI RESPONDS QUESTION MARK.

12:32PM  18         "U MEAN GC?"

12:33PM  19         DO YOU SEE THAT?

12:33PM  20    A.   I DO.

12:33PM  21    Q.   AND THEN MR. BALWANI RESPONDS "VERY RISKY.  WE NEED MORE

12:33PM  22    SOFTWARE TESTING."

12:33PM  23         DO YOU SEE THAT?

12:33PM  24    A.   I DO.

12:33PM  25    Q.   AND YOU REPLY "YES"?

HOLMES CROSS BY MR. LEACH (RES.)                                    8062

12:33PM   1     A.   YES.

12:33PM   2     Q.   AND THEN MR. BALWANI WRITES, "CHECKING BUT VERY RISKY."

12:33PM   3          DO YOU SEE THAT?

12:33PM   4     A.   I DO.

12:33PM   5     Q.   AND MR. BALWANI IS TALKING OPENLY WITH YOU ABOUT RISKS HE

12:33PM   6     SEES HERE WITH SOMETHING THAT YOU HAD PROPOSED?

12:33PM   7     A.   HE IS.

12:33PM   8     Q.   LET'S LOOK AT PAGES 87 TO 89 OF 5387D.

12:33PM   9          DO YOU SEE WHERE MR. BALWANI ASKS THE QUESTION "BOARD

12:33PM  10     MEETING OK?"

12:33PM  11     A.   I DO.

12:33PM  12     Q.   AND YOUR RESPONSE IS "WE'LL CATCH UP"?

12:33PM  13     A.   YES.

12:33PM  14     Q.   AND DO YOU RECALL THAT THERE WAS A CONTENTIOUS BOARD

12:33PM  15     MEETING IN JULY OF 2015?

12:33PM  16     A.   I DO.

12:33PM  17     Q.   LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:34PM  18          DO YOU SEE WHERE MR. BALWANI WROTE, "LOVE YOU.  BE STRONG

12:34PM  19     TODAY.  MY ADVISE.  DON'T TALK TO HEATHER ABOUT YESTERDAY

12:34PM  20     MEETING.  MAKE THIS SOMETHING ABOVE HER ROLE."

12:34PM  21          DO YOU SEE THAT?

12:34PM  22     A.   YES.

12:34PM  23     Q.   AND HEATHER THERE IS A REFERENCE TO HEATHER KING?

12:34PM  24     A.   I THINK SO.

12:34PM  25     Q.   AND THEN MR. BALWANI WROTE, "I WORKED FOR 6 YEARS DAY AND

HOLMES CROSS BY MR. LEACH (RES.)                                      8063

12:34PM  1     NIGHT TO HELP YOU.  I AM SAD AT WHERE YOU AND I ARE.  I THOUGHT

12:34PM  2     IT WOULD BE BETTER.  I KNOW U R ANGRY IN UR WAY.  AND UPSET

12:34PM  3     WITH ME FOR NOT DOING EVERYTHING YOU WANTED ME TO DO."

12:34PM  4          DO YOU SEE THAT LANGUAGE?

12:34PM  5     A.  I DO.

12:34PM  6     Q.  AND YOU RESPOND WITH SOME QUESTION MARKS?

12:34PM  7     A.  YES.

12:34PM  8     Q.  LATER ON YOU WROTE, "IT'S JUST HARD TO TRANSITION."

12:35PM  9          DO YOU SEE THAT LANGUAGE?

12:35PM  10    A.  YES.

12:35PM  11    Q.  AND MR. BALWANI REPLIES, "I AM RESPONSIBLE FOR EVERYTHING

12:35PM  12    AT THERANOS.  ALL HAVE BEEN MY DECISIONS TOO."

12:35PM  13         DO YOU SEE THAT LANGUAGE?

12:35PM  14    A.  I DO.

12:35PM  15    Q.  OKAY.  HE'S SAYING YOUR DECISIONS ARE HIS DECISIONS, TOO.

12:35PM  16    A.  HE'S SAYING THAT ALL OF THE THERANOS DECISIONS WERE HIS

12:35PM  17    DECISIONS TOO.

12:35PM  18    Q.  OKAY.  AND THEY WERE YOUR DECISIONS TOO?

12:35PM  19    A.  YES.

12:35PM  20    Q.  BECAUSE YOU'RE THE CEO?

12:35PM  21    A.  EXACTLY.

12:35PM  22    Q.  "BUT GETTING THROUGH YESTERDAY WILL MAKE IT EASIER TO DO

12:35PM  23    SO NOW.

12:35PM  24         "I WON'T TRANSITION UNTIL U R IN A PERFECT PLACE.  U KNOW

12:35PM  25    THAT."

HOLMES CROSS BY MR. LEACH (RES.)                                          8064

| | | |
|---|---|---|
| 12:35PM | 1 | DO YOU SEE WHERE MR. BALWANI WROTE THAT? |
| 12:35PM | 2 | A.   I DO. |
| 12:35PM | 3 | Q.   OKAY.  AND IF WE CAN BLOW UP THE SECOND HALF OF THE PAGE, |
| 12:35PM | 4 | MS. HOLLIMAN. |
| 12:35PM | 5 | AND IF WE CAN GET -- CAN YOU JUST READ THIS TEXT EXCHANGE |
| 12:35PM | 6 | FOR US, MS. HOLMES? |
| 12:35PM | 7 | A.   "NO SUCH THING... THAT WAS THE POINT WE TALKED ABOUT. |
| 12:36PM | 8 | "IT'S OK - JUST EMOTIONAL BUT AM READY. |
| 12:36PM | 9 | "AND I COMPLETELY GET IT. |
| 12:36PM | 10 | "ON THE CHALLENGES. |
| 12:36PM | 11 | "UNFORTUNATELY U DON'T AND BRAKES MY HEART TO SEE U LIKE |
| 12:36PM | 12 | THIS. |
| 12:36PM | 13 | "QUESTION MARK. |
| 12:36PM | 14 | "I AM NOT LEAVING UNTIL WE BREAK EVEN.  WE WILL DO THIS |
| 12:36PM | 15 | TOGETHER AND I WILL BE BY YOURSELF UNTIL THEN.  CAN'T LEAVE |
| 12:36PM | 16 | LIKE THIS. |
| 12:36PM | 17 | "U R WRONG THAT YESTERDAYS MEETING MAKES IT EASIER.  IT |
| 12:36PM | 18 | DIDN'T. |
| 12:36PM | 19 | "FOR ME TO EMOTIONALLY HANDLE IT. |
| 12:36PM | 20 | "THE TRANSITION. |
| 12:36PM | 21 | "NO.  U R UNDERESTIMATING. |
| 12:36PM | 22 | "I CAN LEAVE IT IF THAT GIVES U EMOTIONAL PEACE BUT YOU |
| 12:36PM | 23 | KNOW WE HAVE TO SACRIFICE." |
| 12:36PM | 24 | Q.   MR. BALWANI IS TELLING YOU HERE YOU ARE UNDERESTIMATING; |
| 12:36PM | 25 | IS THAT RIGHT? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8065

12:36PM   1     A.   HE IS.

12:36PM   2     Q.   LET'S ZOOM OUT.

12:36PM   3          AND IF WE CAN GO TO THE NEXT PAGE.

12:37PM   4          DO YOU SEE WHERE HE WROTE, "AND YES.  I DO DISLIKE THE

12:37PM   5     DIRECTION U HAVE TAKEN WITH ALL THIS PR AND ALL LEGAL WORK AND

12:37PM   6     A LOT OF OTHER THINGS BUT HOPEFULLY WE CAN TALK AND FIND

12:37PM   7     PERFECT FOCUS AND PERFECT PLAN AND EXECUTE HEADS DOWN AND BUILD

12:37PM   8     PRODUCT AND BREAK EVEN.

12:37PM   9          "I CAN LEAVE THEN."

12:37PM  10          DO YOU SEE THAT LANGUAGE?

12:37PM  11     A.   I DO.

12:37PM  12     Q.   HE'S REFERRING TO HIS DISLIKE FOR THE DIRECTION THAT YOU

12:37PM  13     TOOK ON PR AND LEGAL MATTERS; IS HE NOT?

12:37PM  14     A.   AND A LOT OF OTHER THINGS.

12:37PM  15     Q.   SO THE ANSWER TO MY QUESTION WAS YES?

12:37PM  16     A.   YES.

12:37PM  17     Q.   OKAY.  THANK YOU.

12:37PM  18          HE THEN WRITES, "THINGS ARE DIFFERENT NOW.  WE NEED TO GET

12:37PM  19     THE BUSINESS TO BREAK EVEN AND THEN I WILL LEAVE.  WE R

12:37PM  20     DIFFERENT WHEN IT COMES TO BUSINESS.  WE WILL BE HAPPIER THAT

12:37PM  21     WAY.  BUT FOR NOW, U AND I BOTH ARE ON THE SAME PAGE BECAUSE OF

12:38PM  22     YESTERDAY THAT WE NEED TO BREAK EVEN."

12:38PM  23          DO YOU SEE THAT LANGUAGE?

12:38PM  24     A.   I DO.

12:38PM  25     Q.   AND THEN WHAT WAS YOUR REPLY?

HOLMES CROSS BY MR. LEACH (RES.)                                    8066

12:38PM   1      A.   "I THOUGHT THE THING WAS IF WE DID THAT THEN YOU WOULDN'T

12:38PM   2      WANT TO LEAVE."

12:38PM   3      Q.   AND THEN HE REPLIES, "STAY INTERNALLY FOCUSSED AND ONLY

12:38PM   4      MEET WITH PEOPLE WHO HAVE DEALS IN HAND.  THE PR STRATEGY IS

12:38PM   5      WRONG AND I HAVE BEEN SAYING THAT.  WE NEED TO GO ON OFFENSE

12:38PM   6      AND NOT BE DEFENSIVE."

12:38PM   7           IS THIS AGAIN MR. BALWANI DISAGREEING WITH YOU ABOUT THE

12:38PM   8      PR STRATEGY THAT YOU WERE IMPLEMENTING?

12:38PM   9      A.   YES.

12:38PM   10     Q.   LET'S GO TO THE NEXT PAGE, PLEASE.

12:38PM   11          DO YOU SEE A SERIES OF TEXTS FROM JULY 28TH, 2015,

12:39PM   12     MS. HOLMES?

12:39PM   13     A.   I DO.

12:39PM   14     Q.   AND THIS IS ROUGHLY TWO WEEKS AFTER THE EXCHANGE THAT WE

12:39PM   15     JUST LOOKED AT FOLLOWING THE CONTENTIOUS BOARD MEETING?

12:39PM   16     A.   YES.

12:39PM   17     Q.   AND MR. BALWANI WROTE TO YOU, "WE NEED TO COMMIT TO EACH

12:39PM   18     OTHER AND GET OUT OF THIS HELL SO WE CAN LIVE IN PARADISE WE

12:39PM   19     BOTH HAVE."

12:39PM   20          DO YOU SEE THAT LANGUAGE?

12:39PM   21     A.   I DO.

12:39PM   22     Q.   AND YOU WROTE BACK TO HIM, "I HAVE LITERALLY BEEN

12:39PM   23     MEDITATING ON EXACT SAME.  WHOLE TIME I WAS RUNNING WAS

12:39PM   24     THINKING OF THAT."

12:39PM   25          IS THAT WHAT YOU WROTE?

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023