No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
### VOL. XLII of LVII | ER-11932 to ER-12231

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

HOLMES CROSS BY MR. LEACH (RES.)                                          8362

| | | |
|---|---|---|
| 09:56AM | 1 | Q.   AND THAT WAS HERE IN THE UNITED STATES; CORRECT? |
| 09:56AM | 2 | A.   YES. |
| 09:56AM | 3 | Q.   AND THAT CONTRACT AMOUNTED TO SOMEWHERE IN THE |
| 09:56AM | 4 | NEIGHBORHOOD OF $200,000? |
| 09:56AM | 5 | A.   SOMETHING LIKE THAT. |
| 09:56AM | 6 | Q.   OKAY.  AND YOU ADMIT THAT WITH RESPECT TO THE DOD, ASIDE |
| 09:56AM | 7 | FROM THAT BURN STUDY WITH THE INSTITUTE FOR SURGICAL RESEARCH, |
| 09:56AM | 8 | THERANOS DID NOT FULFILL ANY OF THE CONTRACT OPPORTUNITIES THAT |
| 09:56AM | 9 | IT HAD? |
| 09:56AM | 10 | A.   I THINK WE FULFILLED THE AFRICOM, AND I THINK WE SUBMITTED |
| 09:56AM | 11 | AN INVOICE, BUT I DON'T THINK WE DID ANY WORK PAST THAT. |
| 09:56AM | 12 | Q.   BUT YOU DIDN'T EARN ANY MONEY FROM AFRICOM; CORRECT? |
| 09:56AM | 13 | A.   I DON'T THINK SO. |
| 09:56AM | 14 | Q.   OKAY.  AND IN THE END, YOU WEREN'T ABLE TO DEPLOY THERANOS |
| 09:56AM | 15 | SERVICES WITH THE DOD AT THE END OF THE DAY? |
| 09:56AM | 16 | A.   WE DID NOT. |
| 09:56AM | 17 | Q.   AND AM I RIGHT THAT YOUR TESTIMONY IS THAT YOU NEVER TOLD |
| 09:56AM | 18 | INVESTORS OR POTENTIAL INVESTORS IN 2013 OR 2014 THAT ANALYZERS |
| 09:57AM | 19 | THAT THERANOS MANUFACTURED WERE DEPLOYED IN THE BATTLEFIELD? |
| 09:57AM | 20 | A.   I DON'T THINK I DID. |
| 09:57AM | 21 | Q.   YOU NEVER TOLD INVESTORS OR POTENTIAL INVESTORS THAT? |
| 09:57AM | 22 | A.   I DON'T THINK I DID. |
| 09:57AM | 23 | Q.   OKAY.  AND YOU WOULDN'T HAVE TOLD POTENTIAL INVESTORS THAT |
| 09:57AM | 24 | BECAUSE YOU KNEW IT WASN'T TRUE? |
| 09:57AM | 25 | A.   YES. |

HOLMES CROSS BY MR. LEACH (RES.)                                        8363

| | | |
|---|---|---|
| 09:57AM | 1 | Q.   AND YOUR TESTIMONY IS YOU NEVER TOLD INVESTORS OR |
| 09:57AM | 2 | POTENTIAL INVESTORS IN 2013 OR 2014 THAT ANALYZERS THAT |
| 09:57AM | 3 | THERANOS MANUFACTURED WERE DEPLOYED IN AFGHANISTAN; CORRECT? |
| 09:57AM | 4 | A.   CORRECT. |
| 09:57AM | 5 | Q.   YOU NEVER TOLD INVESTORS OR POTENTIAL INVESTORS THAT? |
| 09:57AM | 6 | A.   CORRECT. |
| 09:57AM | 7 | Q.   AND YOUR TESTIMONY IS YOU DID NOT TELL STEVE BURD, |
| 09:57AM | 8 | SAFEWAY'S CEO, THAT THERANOS HAD DEPLOYED ITS TSPU ON THE |
| 09:57AM | 9 | BATTLEFIELD? |
| 09:57AM | 10 | A.   CORRECT. |
| 09:57AM | 11 | Q.   AND YOU NEVER HEARD SUNNY BALWANI SAY SOMETHING LIKE THAT |
| 09:58AM | 12 | TO MR. BURD; CORRECT? |
| 09:58AM | 13 | A.   I DID NOT. |
| 09:58AM | 14 | Q.   AND THAT STATEMENT WOULD NOT HAVE BEEN TRUE IN 2011; |
| 09:58AM | 15 | CORRECT? |
| 09:58AM | 16 | A.   IT WAS NOT. |
| 09:58AM | 17 | Q.   IT WOULDN'T HAVE BEEN TRUE IN 2012 OR 2013 OR 2014; |
| 09:58AM | 18 | CORRECT? |
| 09:58AM | 19 | A.   THAT'S RIGHT. |
| 09:58AM | 20 | Q.   OKAY.  NOW, MR. DOWNEY ASKED YOU ON DIRECT EXAMINATION IF |
| 09:58AM | 21 | YOU TOLD ANYONE THAT THERANOS DEVICES WERE USED FOR CLINICAL |
| 09:58AM | 22 | CARE ON MEDEVACS.  HE ASKED YOU IF YOU TOLD ANYBODY THAT, AND I |
| 09:58AM | 23 | THINK YOUR ANSWER WAS "I DON'T THINK I DID;" CORRECT? |
| 09:58AM | 24 | A.   YES. |
| 09:58AM | 25 | Q.   YOU WERE HERE WHEN MR. BURD TESTIFIED; CORRECT? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8364

09:58AM  1        A.   I WAS.

09:58AM  2        Q.   AND YOU RECALL STEVE BURD TESTIFYING, "SHE TOLD ME THAT

09:58AM  3   THEY HAD BEEN DOING SOME WORK FOR THE DEPARTMENT OF DEFENSE,

09:58AM  4   THAT HER DEVICE WAS IN MEDEVAC UNITS AROUND THE WORLD IN

09:58AM  5   PLACES, YOU KNOW, A LOT OF AMERICANS DIDN'T KNOW WHERE WE

09:58AM  6   WERE."

09:59AM  7        YOU HEARD HIM TESTIFY TO THAT; CORRECT?

09:59AM  8        A.   I DID.

09:59AM  9        Q.   AND YOU WERE ALSO HERE WHEN LISA PETERSON TESTIFIED;

09:59AM 10   CORRECT?

09:59AM 11        A.   I WAS.

09:59AM 12        Q.   AND YOU RECALL MS. PETERSON TESTIFYING THAT YOU SAID THAT

09:59AM 13   THERANOS WAS USING THEM ON MILITARY HELICOPTERS.  YOU WERE HERE

09:59AM 14   WHEN SHE SAID THAT; CORRECT?

09:59AM 15        A.   I WAS.

09:59AM 16        Q.   AND YOU WERE HERE WHEN BRIAN GROSSMAN TESTIFIED; CORRECT?

09:59AM 17        A.   YES.

09:59AM 18        Q.   AND YOU RECALL MR. GROSSMAN SAYING THAT MR. BALWANI AND

09:59AM 19   YOU TOLD PFM THAT THE TECHNOLOGY HAD BEEN USED IN THE

09:59AM 20   BATTLEFIELD ON MEDEVACS?  YOU WERE HERE WHEN MR. GROSSMAN

09:59AM 21   TESTIFIED TO THAT?

09:59AM 22        A.   I WAS.

09:59AM 23        Q.   AND YOU WERE ALSO HERE WHEN ROGER PARLOFF TESTIFIED;

09:59AM 24   CORRECT?

09:59AM 25        A.   I WAS.

HOLMES CROSS BY MR. LEACH (RES.)                                    8365

09:59AM  1    Q.   AND YOU RECALL ROGER PARLOFF TESTIFYING THAT THE DEVICE

09:59AM  2    HAD BEEN USED IN THE MILITARY, BY THE MILITARY IN AFGHANISTAN;

09:59AM  3    CORRECT?  YOU WERE HERE WHEN HE SAID THAT?

10:00AM  4    A.   I WAS HERE DURING ROGER'S TESTIMONY, YES.

10:00AM  5    Q.   OKAY.  YOU RECALL HIM TESTIFYING THAT HE REMEMBERS YOU

10:00AM  6    TELLING HIM THAT THE DEVICE HAD BEEN USED BY THE MILITARY IN

10:00AM  7    AFGHANISTAN?

10:00AM  8    A.   MY MEMORY OF WHAT HE SAID IS A LITTLE BIT DIFFERENT THAN

10:00AM  9    THAT.

10:00AM  10   Q.   YOU WERE HERE WHEN HE WAS TALKING ABOUT STATEMENTS THAT

10:00AM  11   YOU MADE ABOUT THE MILITARY; CORRECT?

10:00AM  12   A.   YES.

10:00AM  13   Q.   OKAY.  AND YOU WERE ALSO HERE WHEN BRIAN TOLBERT

10:00AM  14   TESTIFIED; CORRECT?

10:00AM  15   A.   I WAS.

10:00AM  16   Q.   AND YOU RECALL THE RECORDING THAT MR. TOLBERT MADE OF THE

10:00AM  17   CALL THAT YOU HAD WITH SOME POTENTIAL INVESTORS AT THE END OF

10:00AM  18   2013; CORRECT?

10:00AM  19   A.   I DO.

10:00AM  20   Q.   AND YOU WERE NOT AWARE THAT MR. TOLBERT WAS RECORDING YOU

10:00AM  21   AT THE TIME; CORRECT?

10:00AM  22   A.   I WASN'T.

10:00AM  23   Q.   OKAY.  SO YOU WERE HERE FOR STEVE BURD, LISA PETERSON, AND

10:00AM  24   BRIAN GROSSMAN AND BRIAN TOLBERT, BUT YOUR TESTIMONY IS THAT

10:00AM  25   YOU DON'T THINK YOU TOLD ANYONE THAT THERANOS DEVICES WERE USED

HOLMES CROSS BY MR. LEACH (RES.)                                    8366

| | | |
|---|---|---|
| 10:00AM | 1 | FOR CLINICAL CARE ON MEDEVACS; RIGHT? |
| 10:01AM | 2 | A.   AGAIN, I DON'T THINK I DID. |
| 10:01AM | 3 | Q.   AND YOU UNDERSTOOD AT THE TIME THAT IT WOULD BE WRONG TO |
| 10:01AM | 4 | TELL AN INVESTOR THAT A DEVICE WAS USED FOR CLINICAL CARE ON |
| 10:01AM | 5 | MEDEVACS? |
| 10:01AM | 6 | A.   YES. |
| 10:01AM | 7 | Q.   THAT WOULD NOT BE TRUE? |
| 10:01AM | 8 | A.   CORRECT. |
| 10:01AM | 9 | Q.   AND YOU UNDERSTOOD THAT AT THE TIME? |
| 10:01AM | 10 | A.   YES. |
| 10:01AM | 11 | Q.   OKAY.  YOU ALSO SPOKE TO AN INVESTOR NAMED CRAIG HALL; |
| 10:01AM | 12 | CORRECT? |
| 10:01AM | 13 | A.   I DID. |
| 10:01AM | 14 | Q.   OKAY.  AND YOU SPOKE TO CRAIG HALL AROUND THE TIME OF THE |
| 10:01AM | 15 | CALL WITH MR. TOLBERT THAT THE JURY HAS LISTENED TO; CORRECT? |
| 10:01AM | 16 | A.   YES. |
| 10:01AM | 17 | Q.   AND DO YOU DISPUTE TELLING CRAIG HALL THAT THERANOS |
| 10:01AM | 18 | DEVICES WERE ON MEDEVAC HELICOPTERS? |
| 10:01AM | 19 | A.   I DO. |
| 10:01AM | 20 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO -- STRIKE |
| 10:01AM | 21 | THAT. |
| 10:01AM | 22 | YOUR TESTIMONY IS THAT SIMPLY DIDN'T HAPPEN, YOU WOULD |
| 10:01AM | 23 | NEVER TELL AN INVESTOR THAT? |
| 10:01AM | 24 | A.   MY TESTIMONY IS THAT I DON'T THINK I SAID THAT.  I'M HAPPY |
| 10:02AM | 25 | TO GO INTO WHAT I THINK I SAID IF YOU WOULD LIKE ME TO DO THAT. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8367

| | | |
|---|---|---|
| 10:02AM | 1 | Q.   I JUST WANT TO ESTABLISH THAT YOU UNDERSTOOD AT THE TIME |
| 10:02AM | 2 | THAT IT WOULD BE WRONG TO TELL SOMEBODY THAT THE DEVICE WAS |
| 10:02AM | 3 | ACTUALLY ON A MEDEVAC HELICOPTER. |
| 10:02AM | 4 | A.   YES, OUR DEVICES WERE NOT BEING USED ON MEDEVAC |
| 10:02AM | 5 | HELICOPTERS. |
| 10:02AM | 6 | Q.   OKAY.  AM I RIGHT THAT FROM TIME TO TIME YOU WERE KEPT |
| 10:02AM | 7 | APPRISED OF THE CAPABILITIES OF THE MINILAB? |
| 10:02AM | 8 | A.   I WAS. |
| 10:02AM | 9 | Q.   WE SAW A LOT OF PHOTOS AND VIDEOS DURING YOUR DIRECT |
| 10:02AM | 10 | EXAMINATION OF THE INTERIOR OF THE DEVICE, OF THE MINILAB. |
| 10:02AM | 11 | AND THOSE WEREN'T THINGS THAT YOU'VE LEARNED ABOUT AS A |
| 10:02AM | 12 | RESULT OF THIS CASE; CORRECT? |
| 10:02AM | 13 | A.   NO. |
| 10:02AM | 14 | Q.   THOSE ARE THINGS THAT YOU LIVED AND BREATHED DURING YOUR |
| 10:02AM | 15 | TIME OF WORK AT THERANOS? |
| 10:02AM | 16 | A.   YES. |
| 10:02AM | 17 | Q.   AND YOU UNDERSTOOD WHAT THE MINILAB IN 2010 WAS CAPABLE |
| 10:02AM | 18 | OF, WHAT IT WAS CAPABLE OF IN 2011; IS THAT FAIR? |
| 10:03AM | 19 | A.   I DID. |
| 10:03AM | 20 | Q.   AND YOU UNDERSTOOD WHAT THE MINILAB WAS CAPABLE OF IN 2013 |
| 10:03AM | 21 | AND 2014? |
| 10:03AM | 22 | A.   YES. |
| 10:03AM | 23 | Q.   AND THOSE WEREN'T THINGS THAT WERE HIDDEN FROM YOU DURING |
| 10:03AM | 24 | YOUR TIME AT THERANOS? |
| 10:03AM | 25 | A.   NO. |

HOLMES CROSS BY MR. LEACH (RES.)                                        8368

10:03AM   1    Q.   YOU UNDERSTOOD THAT THE MINILAB WAS NEVER USED FOR PATIENT

10:03AM   2    TESTING?

10:03AM   3    A.   I DID.

10:03AM   4    Q.   AND YOU NEVER TOLD AN INVESTOR THAT THE MINILAB HAD

10:03AM   5    ACTUALLY BEEN USED FOR PATIENT TESTING?

10:03AM   6    A.   CORRECT.

10:03AM   7    Q.   BECAUSE YOU UNDERSTOOD THAT THAT WOULD BE NOT CORRECT?

10:03AM   8    A.   YES.

10:03AM   9    Q.   AND FOR THE 2010 TIME PERIOD, DO YOU KNOW HOW MANY TESTS

10:03AM   10   WERE ACTUALLY PUT ON THE MINILAB?

10:03AM   11   A.   I DON'T.

10:03AM   12   Q.   AM I RIGHT THAT YOU WERE FOCUSSED ON DEMONSTRATING THE

10:03AM   13   ABILITY TO ADD ADDITIONAL DETECTION SYSTEMS AND ESSENTIALLY A

10:03AM   14   PROOF OF CONCEPT FOR THE MINILAB IN THIS 2010 TIME PERIOD?

10:03AM   15   A.   YES.

10:04AM   16   Q.   YOU WERE ALSO FAMILIAR WITH THE EDISON 3.5 DEVICE IN THE

10:04AM   17   2013 TIME PERIOD; CORRECT?

10:04AM   18   A.   I WAS.

10:04AM   19   Q.   AND YOU WERE FAMILIAR WITH THE EDISON 3.5 IN THE 2014 TIME

10:04AM   20   PERIOD?

10:04AM   21   A.   YES.

10:04AM   22   Q.   AND THE SAME WOULD BE TRUE FOR THE 2015 TIME PERIOD?

10:04AM   23   A.   YES.

10:04AM   24   Q.   YOU KNEW WHAT THE EDISON 3.5 COULD DO AND WHAT IT COULDN'T

10:04AM   25   DO; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                    8369

```
10:04AM   1       A.   I DID.

10:04AM   2       Q.   AND YOU UNDERSTOOD THAT THE 3.5 DEVICE WAS --

10:04AM   3            (CELL PHONE RINGING.)

10:04AM   4                THE COURT:  I'M SORRY.  I BEG YOUR PARDON.

10:04AM   5            WHOEVER HAS THAT DEVICE, PLEASE LEAVE THE COURTROOM.

10:04AM   6       PLEASE LEAVE THE COURTROOM NOW.

10:05AM   7            (PAUSE IN PROCEEDINGS.)

10:05AM   8                THE COURT:  ALL RIGHT.  THANK YOU.  I APOLOGIZE,

10:05AM   9       MR. LEACH.

10:05AM  10                MR. LEACH:  NO.  THANK YOU, YOUR HONOR.

10:05AM  11       Q.   SORRY FOR THAT INTERRUPTION, MS. HOLMES.

10:05AM  12       A.   NO.

10:05AM  13       Q.   YOU WERE FAMILIAR WITH WHAT THE 3.5 DEVICE COULD DO AND

10:05AM  14       COULDN'T DO IN THE 2015 TIME PERIOD?

10:05AM  15       A.   I WAS.

10:05AM  16       Q.   OKAY.  YOU KNEW THAT IT WAS LIMITED TO IMMUNOASSAYS?

10:05AM  17       A.   THAT'S WHAT WE WERE DOING WITH IT, YES.

10:05AM  18       Q.   OKAY.  AND YOU NEVER TOLD ANYONE THAT THE EDISON 3.5 DID

10:05AM  19       SOMETHING OTHER THAN IMMUNOASSAYS; CORRECT?

10:05AM  20       A.   IT DEPENDS ON THE CONTEXT.

10:05AM  21       Q.   WHY DOES THAT DEPEND ON THE CONTEXT?

10:05AM  22       A.   BECAUSE THE EDISON 3.5 WAS CAPABLE OF DOING GENERAL

10:05AM  23       CHEMISTRY AND ASSAYS, FOR EXAMPLE, BUT WE WEREN'T USING IT THAT

10:05AM  24       WAY IN THE CLINICAL LAB.

10:06AM  25       Q.   OKAY.  BUT YOU NEVER TOLD AN INVESTOR THAT THERANOS WAS
```

HOLMES CROSS BY MR. LEACH (RES.)                                    8370

10:06AM  1    ACTUALLY USING THE 3.5 DEVICE FOR SOMETHING OTHER THAN

10:06AM  2    IMMUNOASSAYS?

10:06AM  3    A.   NO.

10:06AM  4    Q.   BECAUSE THAT WOULD NOT BE A CORRECT STATEMENT; RIGHT?

10:06AM  5    A.   YOU MEAN IN THE CLINICAL LAB?

10:06AM  6    Q.   CORRECT.

10:06AM  7    A.   CORRECT.

10:06AM  8    Q.   AND IT WOULD BE INCORRECT TO TELL SOMEBODY IN 2013 OR 2014

10:06AM  9    OR 2015 THAT THE EDISON 3.5 WAS BEING USED TO DO ALL OF

10:06AM 10    THERANOS'S TESTING?

10:06AM 11    A.   IN THE CLINICAL LAB?

10:06AM 12    Q.   YES.

10:06AM 13    A.   CORRECT, YEAH.

10:06AM 14    Q.   THE CLINICAL LAB IS WHERE YOU'RE ACTUALLY PERFORMING THE

10:06AM 15    SERVICE FOR PATIENTS; CORRECT?

10:06AM 16    A.   THAT'S RIGHT.

10:06AM 17    Q.   YOU CAN'T PERFORM THAT SERVICE ANY OTHER PLACE BUT THE

10:06AM 18    CLINICAL LAB; IS THAT CORRECT?

10:06AM 19    A.   EXACTLY.

10:06AM 20    Q.   OKAY.  IS IT FAIR TO SAY THAT YOU HAD A GENERAL SENSE OF

10:06AM 21    WHAT ASSAYS WERE BEING BROUGHT UP IN THE CLINICAL LAB FROM TIME

10:06AM 22    TO TIME?

10:06AM 23    A.   I DID.

10:06AM 24    Q.   LET'S EXPLORE THAT.  YOU SHOULD HAVE TWO WHITE BINDERS UP

10:06AM 25    THERE, VOLUME 3 AND VOLUME 4.

ER-11941

HOLMES CROSS BY MR. LEACH (RES.)                                    8371

| | | |
|---|---|---|
| 10:07AM | 1 | A.  OKAY. |
| 10:07AM | 2 | Q.  IF YOU COULD PLEASE LOOK IN VOLUME 3 FOR EXHIBIT 5126. |
| 10:07AM | 3 | A.  YES.  OKAY. |
| 10:07AM | 4 | Q.  DO YOU HAVE THAT IN FRONT OF YOU? |
| 10:07AM | 5 | A.  I DO. |
| 10:07AM | 6 | Q.  GREAT.  DOES EXHIBIT 5126, DO YOU SEE AT THE TOP THERE'S |
| 10:07AM | 7 | AN EMAIL MESSAGE FROM DANIEL YOUNG? |
| 10:07AM | 8 | A.  I DO. |
| 10:07AM | 9 | Q.  AND DO YOU SEE THE DATE OCTOBER 22ND, 2013? |
| 10:07AM | 10 | A.  YES. |
| 10:07AM | 11 | Q.  AND DO YOU SEE YOUR NAME IN THE TO LINE? |
| 10:07AM | 12 | A.  I DO. |
| 10:07AM | 13 | Q.  AND THE SUBJECT HERE IS CLIA UPDATES? |
| 10:07AM | 14 | A.  YES. |
| 10:07AM | 15 | Q.  OKAY. |
| 10:07AM | 16 | YOUR HONOR, I OFFER EXHIBIT 5126. |
| 10:07AM | 17 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 10:07AM | 18 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:07AM | 19 | (GOVERNMENT'S EXHIBIT 5126 WAS RECEIVED IN EVIDENCE.) |
| 10:08AM | 20 | BY MR. LEACH: |
| 10:08AM | 21 | Q.  SO, MS. HOLMES, WE'RE LOOKING AT AN EMAIL FROM OCTOBER OF |
| 10:08AM | 22 | 2013.  THIS IS ABOUT A MONTH AFTER THERANOS ISSUED A PRESS |
| 10:08AM | 23 | RELEASE ANNOUNCING THE WALGREENS PARTNERSHIP; IS THAT CORRECT? |
| 10:08AM | 24 | A.  YES. |
| 10:08AM | 25 | Q.  OKAY.  AND IF I COULD DRAW YOUR ATTENTION DOWN TO THE |

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8372

| | | |
|---|---|---|
| 10:08AM | 1 | BOTTOM OF THE PAGE, DO YOU SEE THERE'S AN EMAIL FROM |
| 10:08AM | 2 | DANIEL YOUNG THAT CONTINUES ON TO PAGE 2? |
| 10:08AM | 3 | A.   I DO. |
| 10:08AM | 4 | Q.   AND IF WE COULD GO TO PAGE 2, PLEASE. |
| 10:08AM | 5 | DO YOU SEE WHERE DR. YOUNG WRITES, "I WANTED TO SEND A FEW |
| 10:08AM | 6 | UPDATES RELATED TO CLIA OPERATIONS TO MAKE SURE YOU ARE |
| 10:08AM | 7 | UPDATED"? |
| 10:08AM | 8 | A.   I DO. |
| 10:08AM | 9 | Q.   OKAY.  AND FURTHER DOWN IN PARAGRAPH E, DO YOU SEE WHERE |
| 10:08AM | 10 | HE WROTE, "WE DISCUSSED QC NEEDS FOR THE NEW THERANOS LDT'S." |
| 10:09AM | 11 | DO YOU SEE THAT LINE? |
| 10:09AM | 12 | A.   I DO. |
| 10:09AM | 13 | Q.   AND LDT STANDS FOR LAB DEVELOPED TEST? |
| 10:09AM | 14 | A.   YES. |
| 10:09AM | 15 | Q.   AND A LAB DEVELOPED TEST IS SOMETHING THAT THERANOS |
| 10:09AM | 16 | CREATES IN ITS OWN LAB AND USES EITHER ON ITS EDISON DEVICE OR |
| 10:09AM | 17 | A MODIFIED THIRD PARTY DEVICE; IS THAT CORRECT? |
| 10:09AM | 18 | A.   THAT'S WHAT WE DID, YES. |
| 10:09AM | 19 | Q.   OKAY.  AND AN LDT IS ANOTHER WAY OF SAYING THAT IT'S NOT |
| 10:09AM | 20 | APPROVED BY THE FDA YET; CORRECT? |
| 10:09AM | 21 | A.   CORRECT. |
| 10:09AM | 22 | Q.   AND DR. YOUNG IS TALKING TO YOU ABOUT QC NEEDS FOR THE |
| 10:09AM | 23 | LDT'S. |
| 10:09AM | 24 | DO YOU SEE THAT LANGUAGE? |
| 10:09AM | 25 | A.   I DO, YES. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8373

10:09AM  1      Q.   AND FURTHER DOWN THERE'S LANGUAGE FOR PROFICIENCY TESTING.

10:09AM  2           DO YOU SEE THAT?

10:09AM  3      A.   YES.

10:09AM  4      Q.   AND DO YOU SEE WHERE HE WROTE, "I HAVE NOT DISCUSSED

10:09AM  5      PROFICIENCY TESTING YET WITH CLIA FOR LDT'S"?

10:10AM  6      A.   I DO.

10:10AM  7      Q.   OKAY.  AND DR. YOUNG IN THIS TIME PERIOD, HE'S RUNNING

10:10AM  8      R&D; CORRECT?

10:10AM  9      A.   HE WAS.

10:10AM 10      Q.   HE DIDN'T HAVE A FORMAL ROLE WITHIN THE CLIA LAB; CORRECT?

10:10AM 11      A.   ONLY AS THE PERSON OVERSEEING THE LDT'S FROM THE R&D SIDE

10:10AM 12      AS THEY WERE TRANSFERRED INTO THE CLIA LAB.

10:10AM 13      Q.   OKAY.  SO HE'S ON THE R&D SIDE, IT MOVES INTO THE CLIA

10:10AM 14      LAB, BUT OVER THERE HE DOESN'T HAVE SOME FORMAL ROLE THE WAY

10:10AM 15      DR. ROSENDORFF WOULD?

10:10AM 16      A.   CORRECT.

10:10AM 17      Q.   FURTHER DOWN THERE'S A SECTION "ELECTROLYTE/ISE."

10:10AM 18           DO YOU SEE THAT AT THE BOTTOM OF PAGE 2?

10:10AM 19      A.   I DO.

10:10AM 20      Q.   AND DR. YOUNG WROTE "OUR NA, K, CL TEST RESULTS ARE STILL

10:10AM 21      NOT AS RELIABLE AS I WOULD LIKE."

10:10AM 22           DO YOU SEE THAT LANGUAGE?

10:10AM 23      A.   I DO.

10:10AM 24      Q.   AND NA IS AN ABBREVIATION FOR SODIUM?

10:10AM 25      A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                          8374

| | | |
|---|---|---|
| 10:10AM | 1 | Q.   AND K IS AN ABBREVIATION FOR POTASSIUM? |
| 10:11AM | 2 | A.   YES. |
| 10:11AM | 3 | Q.   AND CL, IS THAT CHLORIDE? |
| 10:11AM | 4 | A.   YES. |
| 10:11AM | 5 | Q.   AND IF WE GO BACK TO PAGE 1, YOU WROTE BACK, "WHAT ARE THE |
| 10:11AM | 6 | ISSUES?" |
| 10:11AM | 7 | DO YOU SEE THAT IN THE MIDDLE OF THIS DOCUMENT? |
| 10:11AM | 8 | A.   I DO. |
| 10:11AM | 9 | Q.   AND THEN AT THE TOP DO YOU SEE WHERE DANIEL YOUNG WROTE, |
| 10:11AM | 10 | "BASICALLY THERE HAVE BEEN RESULTS FOR WHICH ALL ISE RESULTS |
| 10:11AM | 11 | ARE OUT OF RANGE.  FOR EXAMPLE, K IS HIGH, AND CL AND NA ARE |
| 10:11AM | 12 | LOW RELATIVE TO THE REFERENCE RANGE." |
| 10:11AM | 13 | DO YOU SEE THAT LANGUAGE? |
| 10:11AM | 14 | A.   I DO. |
| 10:11AM | 15 | Q.   AND IS SODIUM AN EXAMPLE OF AN ISE? |
| 10:11AM | 16 | A.   I THINK SO. |
| 10:11AM | 17 | Q.   AND WHAT IS AN ISE? |
| 10:11AM | 18 | A.   IT IS A TEST WHICH WAS RUN WITH ELECTRODES, ESSENTIALLY, |
| 10:11AM | 19 | AS THE WAY TO READ IT OUT. |
| 10:12AM | 20 | Q.   OKAY.  AND YOU WERE STARTING TO RUN ISE'S ON THE MODIFIED |
| 10:12AM | 21 | ADVIA MACHINES DURING THIS TIME PERIOD; IS THAT CORRECT? |
| 10:12AM | 22 | A.   WE WERE. |
| 10:12AM | 23 | Q.   AND THIS IS AN EXAMPLE OF DANIEL YOUNG KEEPING YOU |
| 10:12AM | 24 | APPRISED OF UPDATES IN THE CLIA LAB; CORRECT? |
| 10:12AM | 25 | A.   I THINK HE'S KEEPING ME APPRISED OF UPDATES WITH THE LDT'S |

10:12AM  1     THAT ARE TRANSITIONING INTO THE CLIA LAB.

10:12AM  2     Q.   OKAY.  WELL, THE TITLE THIS EMAIL IS "CLIA UPDATES."

10:12AM  3     A.   SURE.  YEAH, YEAH.

10:12AM  4     Q.   CORRECT.  AND THIS IS YOU BEING KEPT APPRISED OF

10:12AM  5     DEVELOPMENTS IN THE CLIA LAB; IS THAT FAIR?

10:12AM  6     A.   YES.

10:12AM  7     Q.   LET'S LOOK AT THE NEXT DOCUMENT IN YOUR BINDER,

10:12AM  8     EXHIBIT 5127.

10:12AM  9     A.   OKAY.

10:12AM 10     Q.   DO YOU SEE DANIEL YOUNG'S NAME IN THE FROM LINE ON THIS?

10:12AM 11     A.   I DO.

10:12AM 12     Q.   AND DO YOU SEE YOUR NAME IN THE TO LINE OF THIS EMAIL?

10:12AM 13     A.   YES.

10:13AM 14     Q.   AND IS THIS DATED OCTOBER 22ND, 2013?

10:13AM 15     A.   IT IS.

10:13AM 16     Q.   AND THE SUBJECT OF THIS EMAIL IS "TESTS IN THE CLIA LAB"?

10:13AM 17     A.   YES.

10:13AM 18          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5127.

10:13AM 19          THE COURT:  IN ITS ENTIRETY, INCLUDING THE FOLLOWING

10:13AM 20     PAGES?

10:13AM 21          MR. LEACH:  YES, YOUR HONOR.

10:13AM 22          MR. DOWNEY:  THAT'S FINE, YOUR HONOR.  NO OBJECTION.

10:13AM 23          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM 24          (GOVERNMENT'S EXHIBIT 5127 WAS RECEIVED IN EVIDENCE.)

10:13AM 25     BY MR. LEACH:

HOLMES CROSS BY MR. LEACH (RES.)                                    8376

10:13AM   1        Q.   MS. HOLMES, LET ME DRAW YOUR ATTENTION TO THE BOTTOM

10:13AM   2        PORTION OF THE PAGE.

10:13AM   3             ACTUALLY, IF WE COULD GO TO PAGE 3, MS. HOLLIMAN.

10:13AM   4             MS. HOLMES, DO YOU SEE THE EMAIL WHERE DANIEL YOUNG WRITES

10:14AM   5        TO YOU, "HI ELIZABETH,

10:14AM   6             "ATTACHED IS A SPREADSHEET THAT LISTS ALL TESTS THAT HAVE

10:14AM   7        BEEN PERFORMED ON SUBJECTS SINCE 9/9/2013."

10:14AM   8             DO YOU SEE THAT LANGUAGE?

10:14AM   9        A.   I DO.

10:14AM  10        Q.   AND 9/9/2013 IS ROUGHLY THE DATE THAT THERANOS ANNOUNCED

10:14AM  11        ITS PARTNERSHIP WITH WALGREENS; CORRECT?

10:14AM  12        A.   I THINK SO.

10:14AM  13        Q.   OKAY.   AND DR. YOUNG WROTE, "I ORGANIZED IT FOR NOW AS

10:14AM  14        FOLLOWS:"

10:14AM  15             AND THEN IF WE CAN GO TO PAGE 2, DOWN AT THE BOTTOM

10:14AM  16        THERE'S A CHART.

10:14AM  17             DO YOU SEE THAT, MS. HOLMES?

10:14AM  18        A.   I DO.

10:14AM  19        Q.   AND DANIEL YOUNG WROTE, "HOW DOES THIS LOOK FOR THE 'HAVE

10:14AM  20        DONE' TAB?"

10:14AM  21             DO YOU SEE THAT?

10:14AM  22        A.   I DO.

10:14AM  23        Q.   AND YOU UNDERSTOOD "HAVE DONE" TO MEAN TESTS THAT THERANOS

10:15AM  24        HAD ACTUALLY PERFORMED IN THE CLIA LAB SINCE EARLY SEPTEMBER?

10:15AM  25        A.   I THINK SO.   THAT'S HOW I READ IT NOW.


                             UNITED STATES COURT REPORTERS


                                   **ER-11947**

HOLMES CROSS BY MR. LEACH (RES.)                                      8377

10:15AM  1    Q.   OKAY.  TO THE LEFT THERE'S A COLUMN "TEST."

10:15AM  2         DO YOU SEE THAT?

10:15AM  3    A.   I DO.

10:15AM  4    Q.   AND THEN THERE'S A COLUMN IN THE MIDDLE, "CHEMISTRY."

10:15AM  5         DO YOU SEE THAT?

10:15AM  6    A.   YES.

10:15AM  7    Q.   AND THE REFERENCE TO THERANOS WOULD MEAN A CHEMISTRY THAT

10:15AM  8    THERANOS HAD DEVELOPED?

10:15AM  9    A.   YES.

10:15AM  10   Q.   AS OPPOSED TO FDA APPROVED, WHICH WOULD BE A CHEMISTRY

10:15AM  11   THAT SOME OTHER MANUFACTURER HAD DEVELOPED?

10:15AM  12   A.   YES.

10:15AM  13   Q.   AND TO THE RIGHT THERE'S A COLUMN FOR "DEVICE."

10:15AM  14        DO YOU SEE THAT?

10:15AM  15   A.   I DO.

10:15AM  16   Q.   AND THAT LANGUAGE "FDA APPROVED" WOULD BE A DEVICE THAT

10:15AM  17   HAD BEEN NOT A THERANOS MANUFACTURED ANALYZER, BUT SOMETHING

10:15AM  18   THAT HAD BEEN APPROVED BY THE FDA?

10:15AM  19   A.   YES.

10:15AM  20   Q.   SUCH AS A SIEMENS ADVIA?

10:15AM  21   A.   YES.

10:15AM  22   Q.   FURTHER DOWN THERE'S THE ACRONYM, TSPU.

10:16AM  23        DO YOU SEE THAT?

10:16AM  24   A.   I DO.

10:16AM  25   Q.   AND THAT'S THERANOS SAMPLE PROCESSING UNIT?

| | | |
|---|---|---|
| 10:16AM | 1 | A.   IT IS. |
| 10:16AM | 2 | Q.   THAT'S A REFERENCE TO THE EDISON IN THIS CONTEXT, THE |
| 10:16AM | 3 | EDISON 3.5? |
| 10:16AM | 4 | A.   IT IS. |
| 10:16AM | 5 | Q.   AND AM I READING THIS RIGHT, THAT THIS REFLECTS IN THE |
| 10:16AM | 6 | OCTOBER 2013 TIME PERIOD FOUR ASSAYS ARE BEING RUN ON THE |
| 10:16AM | 7 | EDISON 3.5 OR THE TSPU? |
| 10:16AM | 8 | A.   THERE'S -- I THINK THERE'S THREE THAT ARE LISTED HERE. |
| 10:16AM | 9 | Q.   I STAND CORRECTED.  SO THREE ASSAYS DURING THIS TIME |
| 10:16AM | 10 | PERIOD? |
| 10:16AM | 11 | A.   YES. |
| 10:16AM | 12 | Q.   AND YOU KNEW THAT THAT GREW TO 12? |
| 10:16AM | 13 | A.   I DID. |
| 10:16AM | 14 | Q.   AND THAT WAS SOMETHING THAT YOU KNEW AND UNDERSTOOD AT THE |
| 10:16AM | 15 | TIME? |
| 10:16AM | 16 | A.   I KNEW THAT THERE WERE THREE LISTED HERE, YES. |
| 10:16AM | 17 | Q.   OKAY.  BUT YOU ALSO WERE KEPT GENERALLY APPRISED OF WHAT |
| 10:16AM | 18 | WAS GOING ON IN CLIA THROUGHOUT 2014 AND 2015? |
| 10:17AM | 19 | A.   I WAS. |
| 10:17AM | 20 | Q.   THAT WASN'T HIDDEN FROM YOU? |
| 10:17AM | 21 | A.   NO. |
| 10:17AM | 22 | Q.   AND YOU HAD A GENERAL SENSE AT ANY GIVEN POINT IN TIME HOW |
| 10:17AM | 23 | MANY ASSAYS THAT THERANOS WAS RUNNING ON THE EDISON 3.5 IN THE |
| 10:17AM | 24 | CLIA LAB? |
| 10:17AM | 25 | A.   I'M NOT SURE ABOUT "ANY POINT IN TIME," BUT I WAS |

HOLMES CROSS BY MR. LEACH (RES.)                                    8379

10:17AM   1      DEFINITELY GIVEN UPDATES ON AN ONGOING BASIS.

10:17AM   2      Q.   OKAY.  SO IT MAY CHANGE FROM ONE MONTH HERE TO ONE MONTH

10:17AM   3      THERE, BUT OVER THE COURSE, THAT 12 NUMBER WOULDN'T SURPRISE

10:17AM   4      YOU IN 2015?

10:17AM   5      A.   I DON'T THINK IT WOULD HAVE.

10:17AM   6      Q.   LET ME DRAW YOUR ATTENTION --

10:17AM   7           MS. HOLLIMAN, CAN WE DRAW UP THE EXCEL, THE NATIVE FOR

10:17AM   8      THIS ATTACHMENT.

10:17AM   9           I WANT TO FOCUS ON THE ATTACHMENT TO THIS EMAIL,

10:17AM  10      MS. HOLMES, AND I THINK IT MAY BE EASIER TO LOOK AT THE NATIVE

10:17AM  11      ON THE SCREEN.

10:17AM  12      A.   OKAY.

10:17AM  13      Q.   DO YOU SEE DOWN AT THE BOTTOM THERE ARE TWO TABS TO THIS

10:18AM  14      EXCEL WORKBOOK, "HAVE DONE" AND "PLAN TO DO"?

10:18AM  15      A.   I DO.

10:18AM  16      Q.   OKAY.  AND ON THE "PLAN TO DO" TAB, DO YOU SEE THAT THERE

10:18AM  17      ARE SOME ROWS FOR CPT, TEST NAME, CHEMISTRY, DEVICE, METHOD,

10:18AM  18      AND MATRIX?

10:18AM  19      A.   I DO.

10:18AM  20      Q.   AND CHEMISTRY AND DEVICE, THOSE ARE THE SAME CATEGORIES

10:18AM  21      THAT WE SAW IN THE TABLE OF THE BODY OF THE EMAIL?

10:18AM  22      A.   YES.

10:18AM  23      Q.   AND METHOD REFERS TO IS THIS AN IMMUNOASSAY, IS THIS

10:18AM  24      CYTOMETRY, IS THIS NUCLEIC ACID AMPLIFICATION?  IS THAT WHAT

10:18AM  25      THAT IS GETTING AT?

HOLMES CROSS BY MR. LEACH (RES.)                           8380

10:18AM  1    A.   YES.

10:18AM  2    Q.   AND THE MATRIX, THIS IS GETTING AT WHETHER THIS IS BLOOD

10:18AM  3    VERSUS URINE VERSUS SOME OTHER TYPE OF SAMPLE?

10:18AM  4    A.   YES, AND I THINK WHAT KIND OF BLOOD.

10:18AM  5    Q.   OKAY.  AND NOW IF WE CAN GO TO THE -- AND AM I RIGHT THAT

10:19AM  6    YOU UNDERSTOOD AT THE TIME THAT THESE WERE ASSAYS THAT WERE

10:19AM  7    PLANNED FOR THE FUTURE, BUT WHICH THERANOS WASN'T ACTUALLY

10:19AM  8    DOING AT THE TIME?

10:19AM  9    A.   CORRECT.

10:19AM  10   Q.   THAT'S HOW YOU READ THIS SPREADSHEET?

10:19AM  11   A.   YES.

10:19AM  12   Q.   OKAY.  LET'S GO TO THE "HAVE DONE" TAB, PLEASE.

10:19AM  13        AND DO YOU SEE AN IMAGE ON THAT TABLE DOWN AT THE BOTTOM

10:19AM  14   ON THE "HAVE DONE," MS. HOLMES?

10:19AM  15   A.   I DO.

10:19AM  16   Q.   THE TABLE THAT IS IN THE BODY OF THE EMAIL?

10:19AM  17   A.   YES.

10:19AM  18   Q.   AND IF WE CAN GO UP TO THE TOP, MS. HOLLIMAN.

10:19AM  19        DO YOU SEE IN COLUMN A, THERE'S A SOURCE, WAGFS?

10:19AM  20   A.   I DO.

10:19AM  21   Q.   AND DOES THAT REFER TO WAG FINGERSTICK?

10:19AM  22   A.   I WOULD ASSUME SO.

10:19AM  23   Q.   AND THE TEST IN COLUMN C, CBC, IS THAT COMPLETE BLOOD

10:19AM  24   COUNT?

10:19AM  25   A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                    8381

| | | |
|---|---|---|
| 10:19AM | 1 | Q.   AND AIC, CAN YOU TELL US WHAT THAT IS? |
| 10:20AM | 2 | A.   I'M ASSUMING IT'S HEMOGLOBIN AIC. |
| 10:20AM | 3 | Q.   AND THE VISIT DATE AND THE REPORT DATE, DOES THAT REFLECT |
| 10:20AM | 4 | WHEN THE PATIENT CAME INTO A WELLNESS CENTER? |
| 10:20AM | 5 | A.   I THINK THAT'S WHAT THE VISIT DATE REFLECTS, YES. |
| 10:20AM | 6 | Q.   AND THE REPORT DATE, THAT'S WHEN THERANOS REPORTED RESULTS |
| 10:20AM | 7 | TO EITHER THE PHYSICIAN OR THE PATIENT?  IS THAT HOW YOU READ |
| 10:20AM | 8 | THIS? |
| 10:20AM | 9 | A.   I'M NOT SURE. |
| 10:20AM | 10 | Q.   OKAY.  TO THE RIGHT THERE'S SOME COLUMNS, AGB, HCT, RBC. |
| 10:20AM | 11 | A.   YES. |
| 10:20AM | 12 | Q.   ARE THOSE TYPES OF THIRD PARTY DEVICES? |
| 10:20AM | 13 | A.   GENERALLY, YES. |
| 10:20AM | 14 | Q.   AND IN COLUMN K, UNDER "WBC_DIFF," IS THAT WHOLE BLOOD |
| 10:20AM | 15 | COUNT? |
| 10:20AM | 16 | A.   I THINK IT'S WHITE CELL BLOOD COUNTS. |
| 10:21AM | 17 | Q.   OKAY.  AND THE TEST IS A REFERENCE TO THE THIRD PARTY |
| 10:21AM | 18 | MACHINE THAT IS BEING USED FOR THAT ASSAY? |
| 10:21AM | 19 | A.   YES. |
| 10:21AM | 20 | Q.   AND TO THE RIGHT, "MHC/MCHC," IS THAT ANOTHER REFERENCE TO |
| 10:21AM | 21 | AN ASSAY? |
| 10:21AM | 22 | A.   YES. |
| 10:21AM | 23 | Q.   AND IS BECKMAN COULTER ANOTHER REFERENCE TO A THIRD PARTY |
| 10:21AM | 24 | DEVICE BEING USED FOR THAT ASSAY? |
| 10:21AM | 25 | A.   IT IS. |

ER-11952

HOLMES CROSS BY MR. LEACH (RES.)                                    8382

10:21AM  1    Q.   IF WE CAN SCROLL DOWN A LITTLE BIT.

10:21AM  2         AM I RIGHT TO READ THESE FIRST ROUGHLY 34 ROWS TO MEAN

10:21AM  3    THERANOS IS DOING TESTING ON THIRD PARTY DEVICES FOR CBC AND

10:21AM  4    A1C?

10:21AM  5         IS THAT HOW YOU READ THIS?

10:21AM  6    A.   YES, THAT'S HOW I READ THIS.

10:21AM  7    Q.   AND IF WE CAN SCROLL -- AND I DIDN'T TALK ABOUT DCA

10:21AM  8    VANTAGE, BUT IS THAT ANOTHER THIRD PARTY DEVICE?

10:21AM  9    A.   YES.

10:21AM 10    Q.   AND IF WE CAN SCROLL DOWN, PLEASE, MS. HOLLIMAN.  AND MOVE

10:21AM 11    UP JUST A LITTLE BIT MORE.

10:22AM 12         DO YOU SEE IN THE FAR RIGHT THERE ARE SOME NEW WORDS IN

10:22AM 13    THE COLUMN O, P_ADVIA?

10:22AM 14    A.   YES.

10:22AM 15    Q.   AND WHAT DOES P_ADVIA MEAN?

10:22AM 16    A.   SOMETHING RELATED TO THE ADVIA.

10:22AM 17    Q.   OKAY.  THAT'S DISTINGUISHED FROM THE TH_ADVIA.  IS THAT

10:22AM 18    DRAWING A DISTINCTION BETWEEN THERANOS CHEMISTRIES AND A THIRD

10:22AM 19    PARTY'S CHEMISTRIES?

10:22AM 20    A.   I'M NOT SURE.

10:22AM 21    Q.   OKAY.  AND THEN IN THE FAR RIGHT FOR VITAMIN D, THERE'S A

10:22AM 22    COLUMN FOR EDISON.

10:22AM 23         DO YOU SEE THAT?

10:22AM 24    A.   I DO.

10:22AM 25    Q.   AND THAT'S A REFERENCE TO THE EDISON 3.5?

HOLMES CROSS BY MR. LEACH (RES.)                                        8383

10:22AM   1        A.   IT IS.

10:22AM   2        Q.   AND BY THIS OCTOBER OF 2013 TIME PERIOD, THREE ASSAYS ARE

10:22AM   3        BEING USED ON THE EDISON 3.5?

10:22AM   4        A.   I THINK SO.

10:22AM   5        Q.   AND DR. YOUNG IS REPORTING THIS TO YOU IN OCTOBER OF 2013?

10:22AM   6        A.   YES.  I SAW THOSE LISTED AS JUST DEMOS, SO I'M NOT SURE IF

10:23AM   7        THEY WERE UP OR NOT.  BUT I THINK THIS IS A REFERENCE TO EDISON

10:23AM   8        AS THE DEVICE FOR THEM.

10:23AM   9        Q.   OKAY.  AND THIS IS EXEMPLARY OF DR. YOUNG AND OTHERS

10:23AM  10        KEEPING YOU APPRISED OF WHAT IS GOING ON IN THE CLIA LAB;

10:23AM  11        CORRECT?

10:23AM  12        A.   YES.

10:23AM  13        Q.   AND DR. YOUNG NEVER TOLD YOU, FOR EXAMPLE, WE'RE DOING ALL

10:23AM  14        OF THE TESTING AT THERANOS ON SMALL SAMPLES; CORRECT?

10:23AM  15        A.   IN OUR CLIA LAB, NO.

10:23AM  16        Q.   AND HE NEVER TOLD YOU, IN THE CLIA LAB WE'RE DOING ALL OF

10:23AM  17        THE TESTING ON THE EDISON 3.5?

10:23AM  18        A.   NO.

10:23AM  19        Q.   AND WE'RE AGREED THAT BETWEEN 2010 AND 2014, THERANOS

10:23AM  20        BOUGHT ANALYZERS FROM THIRD PARTIES?

10:23AM  21        A.   WE DID.

10:23AM  22        Q.   AND IT BOUGHT MACHINES FROM SIEMENS?

10:23AM  23        A.   YES.

10:23AM  24        Q.   AND IT BOUGHT MACHINES FROM BECKMAN COULTER?

10:24AM  25        A.   YES.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8384

10:24AM   1      Q.   AND IT BOUGHT MACHINES FROM DCA VANTAGE?

10:24AM   2      A.   YES.

10:24AM   3      Q.   AND THAT WASN'T HIDDEN FROM YOU?

10:24AM   4      A.   NO.

10:24AM   5      Q.   AND YOU KNEW THAT ALL OF THOSE MACHINES WERE BEING USED TO

10:24AM   6      DO SOME FORM OF PATIENT TESTING?

10:24AM   7      A.   I DON'T THINK I FOCUSSED ON ALL OF THEM, BUT THE

10:24AM   8      INFORMATION WAS AVAILABLE HERE.

10:24AM   9      Q.   IT WASN'T A SURPRISE TO YOU THAT THERANOS WAS DOING

10:24AM  10      TESTING ON THIRD PARTY MACHINES?

10:24AM  11      A.   NO.

10:24AM  12      Q.   AND YOU KNEW IN THE 2014 TIME PERIOD THAT IT WOULD BE

10:24AM  13      INCORRECT TO SAY THAT THERANOS DID NOT BUY ANALYZERS FROM THIRD

10:24AM  14      PARTIES?

10:24AM  15      A.   CORRECT.  WE BOUGHT ANALYZERS FROM THIRD PARTIES.

10:24AM  16      Q.   AND YOU KNEW IT WOULD BE INCORRECT TO TELL AN INVESTOR

10:24AM  17      THAT?

10:24AM  18      A.   YES.

10:24AM  19      Q.   YOU ALSO UNDERSTOOD IN 2014 THAT BECAUSE THERANOS WAS

10:24AM  20      USING THIRD PARTY ANALYZERS AT THE TIME, LIKE FROM SIEMENS, IT

10:25AM  21      WASN'T CURRENTLY THE CASE THAT THE FOOTPRINT IN YOUR LABORATORY

10:25AM  22      WAS A SMALL FRACTION OF THE FOOTPRINT OF A TYPICAL CENTRAL

10:25AM  23      LABORATORY?

10:25AM  24      A.   AS TO THOSE MACHINES, NO.

10:25AM  25      Q.   YOU KNEW AT THE TIME THAT YOU HAD THOSE MACHINES IN YOUR

HOLMES CROSS BY MR. LEACH (RES.)                                    8385

10:25AM   1      LAB; CORRECT?

10:25AM   2      A.   YES.

10:25AM   3      Q.   AND YOU KNEW AT THE TIME THAT THE FOOTPRINT WAS ROUGHLY

10:25AM   4      THE SAME AS A TYPICAL CENTRAL LABORATORY?

10:25AM   5      A.   OF COURSE.

10:25AM   6      Q.   AND YOU HAD ASPIRATIONS OF ONE DAY USING ONLY THE MINILAB;

10:25AM   7      CORRECT?

10:25AM   8      A.   YES.

10:25AM   9      Q.   AND YOU HAD ASPIRATIONS THAT ONE DAY, BECAUSE YOU WERE

10:25AM  10      USING THE MINILAB, YOUR FOOTPRINT WOULD BE SUBSTANTIALLY LESS

10:25AM  11      THAN THE FOOTPRINT OF A TRADITIONAL LAB; RIGHT?

10:25AM  12      A.   YES, A MINILAB OUTSIDE OF THE LAB.

10:25AM  13      Q.   BUT IN 2014, YOU HADN'T ACTUALLY DONE THAT?

10:25AM  14      A.   CORRECT.

10:25AM  15      Q.   AM I RIGHT THAT YOUR TESTIMONY IS THAT IN 2014, THERANOS

10:26AM  16      COULD RUN APPROXIMATELY 30 TESTS FROM A SINGLE FINGERSTICK

10:26AM  17      BLOOD DRAW IF THE MAXIMUM AMOUNT OF BLOOD WAS EXTRACTED FROM

10:26AM  18      THE FINGER?

10:26AM  19      A.   WHAT DO YOU MEAN BY THAT?  LIKE IN THE CLINICAL LAB OR --

10:26AM  20      Q.   IN THE CLINICAL LAB.

10:26AM  21      A.   I DON'T HAVE REASON TO DOUBT THAT.

10:26AM  22           YOU SAID 2014?

10:26AM  23      Q.   LET'S FOCUS ON THE 2013 TO 2014 TIME PERIOD.

10:26AM  24      A.   YES.

10:26AM  25      Q.   AND I'M TRYING TO UNDERSTAND IF YOU KNEW THAT THERANOS

HOLMES CROSS BY MR. LEACH (RES.)                                          8386

10:26AM   1    COULD RUN APPROXIMATELY 30 TESTS FROM A SINGLE STICK BLOOD IN

10:26AM   2    THE CLIA LAB.

10:26AM   3    A.   OKAY.  I THINK SOMEWHERE IN THAT TIME PERIOD IT WAS MORE

10:26AM   4    THAN THAT, BUT, YES, WE SHOULD HAVE BEEN ABLE TO RUN 30 TESTS.

10:26AM   5    Q.   WE TALKED EARLIER ABOUT THE TOTAL NUMBER OF SMALL SAMPLES

10:26AM   6    THAT YOU DID FROM FINGERSTICKS IN THE CLIA LAB, AND I THINK WE

10:26AM   7    SETTLED THAT THE NUMBER WAS ABOUT 70; CORRECT?

10:27AM   8    A.   YES.

10:27AM   9    Q.   TWELVE ON THE 3.5, AND ANOTHER 58 ON MODIFIED SIEMENS

10:27AM  10    MACHINES; CORRECT?

10:27AM  11    A.   OR OTHER MODIFIED MACHINES, YES.

10:27AM  12    Q.   THANK YOU.

10:27AM  13         AND WHAT I'M TRYING TO GET AT IS HOW MANY TESTS YOU COULD

10:27AM  14    DO FROM THAT, A SINGLE FINGERSTICK DRAW.  AND I DON'T WANT YOU

10:27AM  15    TO GUESS.  I WANT TO MAKE SURE THAT WE'RE TALKING ABOUT THE

10:27AM  16    SAME THING.

10:27AM  17    A.   OKAY.

10:27AM  18    Q.   BUT THE TOTAL NUMBER OF TESTS YOU COULD DO FROM THAT

10:27AM  19    SINGLE DRAW WAS 30; ISN'T THAT RIGHT?

10:27AM  20    A.   I'M NOT SURE.

10:27AM  21    Q.   OKAY.  DO YOU HAVE THE RED BINDER OF YOUR S.E.C.

10:27AM  22    TESTIMONY?

10:27AM  23    A.   I DO.

10:27AM  24    Q.   LET'S ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 200.  IT'S

10:27AM  25    PAGE 200 OF YOUR TESTIMONY, AND IT WOULD BE BATES NUMBER ENDING

HOLMES CROSS BY MR. LEACH (RES.)                                    8387

| | | |
|---|---|---|
| 10:27AM | 1 | 5306. |
| 10:28AM | 2 | A.   OKAY. |
| 10:28AM | 3 | Q.   AND I WOULD LIKE YOU TO READ TO YOURSELF LINES 24 TO 11. |
| 10:28AM | 4 | MR. DOWNEY:  I'M SORRY, MR. LEACH.  WHICH PAGE? |
| 10:28AM | 5 | MR. LEACH:  BATES 5306, PAGE 200, LINE 24, TO |
| 10:28AM | 6 | PAGE 201, LINE 7. |
| 10:28AM | 7 | Q.   HAVE YOU READ THAT TO YOURSELF, MS. HOLMES? |
| 10:28AM | 8 | A.   I HAVE. |
| 10:28AM | 9 | Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS WAS |
| 10:28AM | 10 | ABLE TO RUN 30-SOMETHING TESTS ON A SINGLE FINGERSTICK DRAW OF |
| 10:28AM | 11 | BLOOD SO LONG AS IT WAS THE MAXIMUM AMOUNT? |
| 10:28AM | 12 | A.   YES, I THINK THIS TESTIMONY IS CORRECT. |
| 10:28AM | 13 | Q.   AND THAT WAS YOUR UNDERSTANDING AT THE TIME? |
| 10:28AM | 14 | A.   I ASSUME SO.  I DON'T REMEMBER. |
| 10:28AM | 15 | Q.   OKAY.  YOU WERE HERE FOR LISA PETERSON'S TESTIMONY; |
| 10:29AM | 16 | CORRECT? |
| 10:29AM | 17 | A.   I WAS. |
| 10:29AM | 18 | Q.   AND YOU REMEMBER SPEAKING TO MS. PETERSON ON THE PHONE IN |
| 10:29AM | 19 | SEPTEMBER OR OCTOBER OF 2014? |
| 10:29AM | 20 | A.   GENERALLY, YES. |
| 10:29AM | 21 | Q.   AND YOU REMEMBER MEETING WITH MS. PETERSON IN CALIFORNIA |
| 10:29AM | 22 | IN ABOUT OCTOBER OF 2014? |
| 10:29AM | 23 | A.   I DO. |
| 10:29AM | 24 | Q.   AND YOU WERE HERE WHEN MS. PETERSON TESTIFIED THAT SHE |
| 10:29AM | 25 | LEARNED FROM CONVERSATIONS WITH YOU THAT THERANOS USES THEIR |

HOLMES CROSS BY MR. LEACH (RES.)                                    8388

10:29AM   1    OWN ANALYZE EQUIPMENT; CORRECT?

10:29AM   2    A.   YES.

10:29AM   3    Q.   YOU WERE HERE WHEN SHE SAID THAT?

10:29AM   4    A.   YES.

10:29AM   5    Q.   AND YOU WERE HERE WHEN MS. PETERSON TESTIFIED THAT YOU

10:29AM   6    SAID THAT THERANOS WAS USING ITS DEVICES ON MILITARY

10:29AM   7    HELICOPTERS?

10:29AM   8    A.   YES.

10:29AM   9    Q.   AM I RIGHT THAT YOU DON'T THINK YOU TOLD RDV IN LATE 2014

10:29AM  10    THAT THERANOS'S REVENUE FOR 2015 WAS PROJECTED TO BE

10:30AM  11    $990 MILLION; CORRECT?

10:30AM  12    A.   I THINK THAT WAS THE OUTPUT OF THE MODEL THAT WAS

10:30AM  13    DISCUSSED WITH THEM.

10:30AM  14    Q.   AND YOU RECALL DISCUSSING THE MODEL WITH THEM?

10:30AM  15    A.   I DON'T.  I JUST HAVE SEEN THE TESTIMONY HERE.

10:30AM  16    Q.   SO DID YOU TELL RDV, THROUGH THE MODEL OR THROUGH

10:30AM  17    CONVERSATIONS, THAT THERANOS'S REVENUE FOR 2015 WAS PROJECTED

10:30AM  18    TO BE 990 MILLION?

10:30AM  19    A.   I DON'T THINK I DID, NO.

10:30AM  20    Q.   OKAY.  AND YOU DON'T REMEMBER SUNNY BALWANI EVER MAKING

10:30AM  21    THAT STATEMENT; CORRECT?

10:30AM  22    A.   I DON'T.

10:30AM  23    Q.   AND THAT'S BECAUSE YOU DON'T HAVE A MEMORY OF THE

10:30AM  24    CONVERSATIONS WITH RDV?

10:30AM  25    A.   I REMEMBER SOME PARTS OF THAT CONVERSATION, BUT I DON'T

HOLMES CROSS BY MR. LEACH (RES.)                                    8389

10:30AM   1    REMEMBER TALKING ABOUT REVENUE WITH THEM.

10:30AM   2    Q.    YOUR TESTIMONY IS THAT YOU CAN'T REMEMBER TELLING RDV THAT

10:30AM   3    THERANOS WOULD OPEN OR WAS ON THE PATH TO OPENING 900 WALGREENS

10:30AM   4    STORES IN 2015?

10:30AM   5    A.    I DON'T REMEMBER THAT.

10:31AM   6    Q.    AND YOU DON'T REMEMBER MR. BALWANI MAKING THAT STATEMENT?

10:31AM   7    A.    I DON'T.

10:31AM   8    Q.    AND YOUR TESTIMONY IS THAT YOU DON'T KNOW IF YOU TOLD RDV

10:31AM   9    IN LATE 2014 THAT THERANOS USES ITS OWN ANALYZER EQUIPMENT?

10:31AM  10    A.    I DON'T.  AND WE WERE USING OUR OWN ANALYZER EQUIPMENT, SO

10:31AM  11    I WOULDN'T BE SURPRISED IF I SAID THAT.

10:31AM  12    Q.    AND YOU DON'T KNOW IF SUNNY BALWANI SAID THAT BECAUSE YOU

10:31AM  13    DON'T RECALL THE SPECIFICS OF THE CONVERSATION?

10:31AM  14    A.    CORRECT.

10:32AM  15    Q.    AND AM I RIGHT THAT YOU CAN'T REMEMBER WHETHER YOU TOLD

10:32AM  16    RDV IN LATE 2015 THAT THE THERANOS ANALYZER WAS A SMALL

10:32AM  17    FRACTION OF THE SIZE OF THE CURRENT LAB?

10:32AM  18    A.    THAT'S SOMETHING THAT I WOULD HAVE SAID IN THE CONTEXT OF

10:32AM  19    DISCUSSING THE MINILAB, BUT I DON'T THINK WE DISCUSSED THE

10:32AM  20    CLINICAL LAB.

10:32AM  21    Q.    OKAY.  AND YOU TOLD THE S.E.C. THAT YOU DON'T REMEMBER

10:32AM  22    TELLING RDV IN LATE 2014 THAT THE THERANOS ANALYZER WAS A SMALL

10:32AM  23    FRACTION OF THE SIZE OF A CURRENT LAB?

10:32AM  24    A.    THAT MAKES SENSE.

10:32AM  25    Q.    OKAY.  LET ME DRAW YOUR ATTENTION -- THIS WILL BE IN

HOLMES CROSS BY MR. LEACH (RES.)                                    8390

| 10:32AM | 1 | VOLUME 4 OF YOUR WHITE BINDERS UP THERE -- TO WHAT IS IN |
| 10:32AM | 2 | EVIDENCE AS EXHIBIT 1853. |
| 10:32AM | 3 | A.   OKAY.  ONE SECOND. |
| 10:33AM | 4 |      OKAY. |
| 10:33AM | 5 | Q.   AND IT'S ON THE SCREEN IF THAT'S EASIER. |
| 10:33AM | 6 | A.   YEAH.  YEAH, THAT'S FINE. |
| 10:33AM | 7 | Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED ABOUT THIS |
| 10:33AM | 8 | PROJECTED STATEMENT OF INCOME THAT WAS PROVIDED TO RDV? |
| 10:33AM | 9 | A.   I WAS. |
| 10:33AM | 10 | Q.   AND YOU SEE THE HANDWRITTEN NOTES UP AT THE TOP, 900 |
| 10:33AM | 11 | LOCATIONS? |
| 10:33AM | 12 | A.   I DO. |
| 10:33AM | 13 | Q.   BUT YOUR TESTIMONY IS THAT YOU CAN'T REMEMBER TELLING RDV |
| 10:33AM | 14 | THAT THERANOS WOULD OPEN OR WAS ON THE PATH TO OPENING 900 |
| 10:33AM | 15 | WALGREENS STORES BY 2015? |
| 10:33AM | 16 | A.   I DON'T THINK I WOULD HAVE BEEN THE PERSON SPEAKING TO |
| 10:33AM | 17 | THIS. |
| 10:33AM | 18 | Q.   AND LAST WEEK WE TALKED A LITTLE BIT ABOUT EXHIBIT 5633, |
| 10:33AM | 19 | AN EMAIL THAT MR. BALWANI FORWARDED TO YOU IN AUGUST OF 2014 |
| 10:33AM | 20 | FROM NIMESH JHAVERI. |
| 10:33AM | 21 |      DO YOU RECALL TESTIFYING ABOUT THAT? |
| 10:33AM | 22 | A.   I DO. |
| 10:33AM | 23 | Q.   AND DO YOU RECALL MR. JHAVERI SAYING THERE WAS A NEED FOR |
| 10:34AM | 24 | A DETAILED PLAN ON HOW TO REDUCE THE NUMBER OF VENOUS DRAWS? |
| 10:34AM | 25 | A.   I DO. |

HOLMES CROSS BY MR. LEACH (RES.)                                        8391

10:34AM   1      Q.   AND NONE OF THAT CAME UP IN THIS MEETING WITH MS. PETERSON

10:34AM   2      IN OCTOBER OF 2014; CORRECT?

10:34AM   3      A.   I DON'T THINK SO.

10:34AM   4      Q.   OKAY.  ON THE PROJECTED STATEMENT OF INCOME, THERE'S -- DO

10:34AM   5      YOU SEE WHERE IT PROJECTS 400 MILLION OF REVENUE FROM

10:34AM   6      PHARMACEUTICAL SERVICES?

10:34AM   7      A.   I THINK IT SAYS 40.

10:34AM   8      Q.   CORRECT.  THANK YOU.  40 MILLION?

10:34AM   9      A.   YEAH.

10:34AM   10     Q.   AND YOU CAN'T IDENTIFY A SINGLE PHARMACEUTICAL CONTRACT

10:34AM   11     ENTERED AS OF OCTOBER 2014 THAT WOULD GET ANYWHERE NEAR TO

10:34AM   12     40 MILLION; CORRECT?

10:34AM   13     A.   NO.

10:34AM   14     Q.   OKAY.  THERE'S ALSO A LINE FOR --

10:34AM   15     A.   TO BE CLEAR, I DON'T THINK THAT'S CORRECT.

10:34AM   16     Q.   YOU HAD NO REVENUE FROM PHARMACEUTICAL COMPANIES IN 2014;

10:34AM   17     CORRECT?

10:34AM   18     A.   WE DID NOT.

10:34AM   19     Q.   AND YOU HAD NO EXISTING CONTRACT IN 2014 THAT WOULD GET

10:35AM   20     YOU TO $40 MILLION?

10:35AM   21     A.   I THINK WE DID.

10:35AM   22     Q.   NAME THE PHARMACEUTICAL COMPANY THAT YOU THINK YOU COULD

10:35AM   23     HAVE DONE THAT WITH, MS. HOLMES.

10:35AM   24     A.   THE GSK BIOLOGICALS CONTRACT THAT WE HAD FROM BEFORE.

10:35AM   25     Q.   BACK IN 2010?

HOLMES CROSS BY MR. LEACH (RES.)                                    8392

10:35AM   1      A.   I'M NOT SURE WHEN IT WAS SIGNED, BUT FROM A FEW YEARS

10:35AM   2      BEFORE, A COUPLE YEARS BEFORE.

10:35AM   3      Q.   AND YOU WERE HERE WHEN MS. SPIVEY TESTIFIED THAT THERANOS

10:35AM   4      DIDN'T RECOGNIZE A SINGLE DOLLAR FROM GSK; CORRECT?

10:35AM   5      A.   YES.

10:35AM   6      Q.   NOT IN 2007; CORRECT?

10:35AM   7      A.   CORRECT.

10:35AM   8      Q.   NOT IN 2008?

10:35AM   9      A.   YES.

10:35AM   10     Q.   NOT IN 2009?

10:35AM   11     A.   YES.

10:35AM   12     Q.   NOT IN 2010?

10:35AM   13     A.   YES.

10:35AM   14     Q.   NOT IN 2011?

10:35AM   15     A.   CORRECT.

10:35AM   16     Q.   NOT IN 2012?

10:35AM   17     A.   CORRECT.

10:35AM   18     Q.   AND NOT IN 2013?

10:35AM   19     A.   CORRECT.

10:35AM   20     Q.   AND THERE'S ALSO A LINE FOR LAB REVENUE SERVICES FROM

10:35AM   21     HOSPITALS.

10:35AM   22          DO YOU SEE THAT?

10:35AM   23     A.   YES.

10:35AM   24     Q.   AND AM I RIGHT THAT THERANOS NEVER RECOGNIZED ANY REVENUE

10:35AM   25     FROM HOSPITALS?

HOLMES CROSS BY MR. LEACH (RES.)                                    8393

| | | |
|---|---|---|
| 10:35AM | 1 | A.   I THINK WE HAD DEFERRED REVENUE THAT WAS ASSOCIATED WITH |
| 10:36AM | 2 | CONTRACTS THAT COULD COVER HOSPITAL SHIPMENTS. |
| 10:36AM | 3 | Q.   AND MY QUESTION WAS NOT RELATED TO DEFERRED REVENUE, |
| 10:36AM | 4 | MS. HOLMES. |
| 10:36AM | 5 | MY QUESTION WAS, YOU NEVER RECOGNIZED ANY REVENUE FROM |
| 10:36AM | 6 | HOSPITAL SERVICES; CORRECT? |
| 10:36AM | 7 | A.   I'M NOT SURE. |
| 10:36AM | 8 | Q.   AND YOU NEVER PUT A MINILAB OR AN EDISON IN A HOSPITAL; |
| 10:36AM | 9 | CORRECT? |
| 10:36AM | 10 | A.   NOT FOR CLINICAL CARE, NO. |
| 10:36AM | 11 | Q.   AND NOT TO PERFORM THE SERVICES THAT THERANOS WAS |
| 10:36AM | 12 | ADVERTISING TO THE PUBLIC; CORRECT? |
| 10:36AM | 13 | A.   CORRECT. |
| 10:36AM | 14 | Q.   AND YOU NEVER PUT A MINILAB OR AN EDISON IN A PHYSICIAN |
| 10:36AM | 15 | OFFICE FOR CLINICAL CARE; CORRECT? |
| 10:36AM | 16 | A.   CORRECT. |
| 10:36AM | 17 | Q.   OKAY.  TO THE RIGHT COLUMN, THERE'S A TOTAL REVENUE NUMBER |
| 10:36AM | 18 | OF $990 MILLION. |
| 10:36AM | 19 | DO YOU SEE THAT? |
| 10:36AM | 20 | A.   YES. |
| 10:36AM | 21 | Q.   AND WE CAN AGREE THAT THERANOS ACTUALLY NEVER ACHIEVED |
| 10:36AM | 22 | THAT LEVEL OF REVENUE; CORRECT? |
| 10:37AM | 23 | A.   WE DID NOT. |
| 10:37AM | 24 | Q.   AND AM I RIGHT THAT TWO MONTHS AFTER PROVIDING THIS |
| 10:37AM | 25 | REVENUE PROJECTION OF 990 MILLION TO RDV, YOU PROVIDED |

UNITED STATES COURT REPORTERS

**ER-11964**

HOLMES CROSS BY MR. LEACH (RES.)                                    8394

10:37AM   1        SUBSTANTIALLY LOWER REVENUE PROJECTIONS TO ARANCA, YOUR STOCK

10:37AM   2        OPTION VALUATION FIRM?

10:37AM   3        A.   PROBABLY.

10:37AM   4        Q.   YOU WERE HERE WHEN MS. SPIVEY TESTIFIED ABOUT THAT?

10:37AM   5        A.   I WAS.  I WAS.

10:37AM   6        Q.   OKAY.  LET'S LOOK AT WHAT IS IN EVIDENCE AS EXHIBIT 5190.

10:37AM   7        A.   YES.

10:37AM   8        Q.   LET ME JUST MAKE SURE I HAVE THE RIGHT BINDER, MS. HOLMES.

10:37AM   9        ONE MOMENT.

10:37AM  10        A.   YES.

10:37AM  11        Q.   DO YOU RECALL MS. SPIVEY TESTIFYING ABOUT THIS EMAIL?

10:38AM  12        A.   I DO.

10:38AM  13        Q.   OKAY.  AND SHE WENT BY DANISE YAM AT THE TIME?

10:38AM  14        A.   SHE DID.

10:38AM  15        Q.   AND THE SUBJECT OF THIS IS 409A REPORT.

10:38AM  16             DO YOU SEE THAT?

10:38AM  17        A.   YES.

10:38AM  18        Q.   AND THE DATE IS DECEMBER 31ST, 2014.

10:38AM  19             DO YOU SEE THAT?

10:38AM  20        A.   I DO.

10:38AM  21        Q.   AND THIS IS ROUGHLY TWO OR THREE MONTHS AFTER YOUR MEETING

10:38AM  22        WITH MS. PETERSON IN CALIFORNIA ABOUT RDV?

10:38AM  23        A.   YES.

10:38AM  24        Q.   LET ME DRAW YOUR ATTENTION TO PAGE 5.

10:38AM  25             PAGE 2, MS. HOLLIMAN.

HOLMES CROSS BY MR. LEACH (RES.)                                    8395

10:38AM   1            AND THE HARD COPY IS IN VOLUME 2 IF YOU WANT TO SEE THAT.

10:38AM   2       A.   THANK YOU.

10:38AM   3       Q.   AND DO YOU SEE WHERE IT SAYS, "AN ARANCA REPORT, THERANOS

10:38AM   4       INC., MFV OF COMMON STOCK AS OF DECEMBER 15TH, 2014"?

10:38AM   5       A.   I DO.

10:38AM   6       Q.   AND IF I COULD FOCUS YOU ON PAGE 5.

10:39AM   7            DO YOU SEE THE BULLET UNDER 1.2 WHERE ARANCA WROTE, "WE

10:39AM   8       UNDERSTAND THIS REPORT AND ITS CONCLUSIONS WOULD BE USED BY THE

10:39AM   9       COMPANY'S BOARD OF DIRECTORS (AND AUTHORIZED BOARD COMMITTEES)

10:39AM   10      SOLELY IN CONNECTION WITH DETERMINING THE EXERCISE PRICE FOR

10:39AM   11      GRANTING OPTIONS TO ITS EMPLOYEES TO COMPLY WITH," A PROVISION

10:39AM   12      OF THE INTERNAL REVENUE CODE.

10:39AM   13           DO YOU SEE THAT?

10:39AM   14      A.   I DO.

10:39AM   15      Q.   AND DO YOU SEE IN THE SECOND BULLET THERE'S A DESCRIPTION

10:39AM   16      OF THE PARTICULAR PROVISION OF THE INTERNAL REVENUE CODE THAT

10:39AM   17      ARANCA IS TRYING TO ADDRESS WITH ITS REPORT?

10:39AM   18           DO YOU SEE THAT BULLET?

10:39AM   19      A.   I DO.

10:39AM   20      Q.   AND LET ME DRAW YOUR ATTENTION TO PAGE 31.

10:39AM   21      A.   OKAY.

10:39AM   22      Q.   DO YOU SEE THERE'S A TABLE FOR INCOME STATEMENT?

10:40AM   23      A.   I DO.

10:40AM   24      Q.   AND IT SAYS, "BASED ON THE REVENUE AND EXPENSE PROJECTIONS

10:40AM   25      BELOW IS THE ESTIMATED INCOME STATEMENT FOR THERANOS."

HOLMES CROSS BY MR. LEACH (RES.)                                    8396

| | | |
|---|---|---|
| 10:40AM | 1 | DO YOU SEE THAT LANGUAGE? |
| 10:40AM | 2 | A.   YEP. |
| 10:40AM | 3 | Q.   AND DO YOU SEE FOR DECEMBER '14 -- YOU READ THAT TO BE |
| 10:40AM | 4 | 2014? |
| 10:40AM | 5 | A.   I DO. |
| 10:40AM | 6 | Q.   OKAY.  IT HAS REVENUES OF $150,000? |
| 10:40AM | 7 | A.   YES. |
| 10:40AM | 8 | Q.   AND DO YOU SEE TO THE RIGHT, FOR THE END OF 2015 IT'S |
| 10:40AM | 9 | PROJECTING $113 MILLION IN REVENUE? |
| 10:40AM | 10 | A.   I DO. |
| 10:40AM | 11 | Q.   AND, MS. HOLLIMAN, IF WE COULD DISPLAY AT THE SAME TIME |
| 10:40AM | 12 | EXHIBIT 1853 AGAINST THIS PAGE OF 5190. |
| 10:41AM | 13 | THANK YOU, MS. HOLLIMAN. |
| 10:41AM | 14 | SO, MS. HOLMES, AM I RIGHT THAT ON 1853, THE TOTAL |
| 10:41AM | 15 | PROJECTION IS $990 BILLION? |
| 10:41AM | 16 | A.   MILLION. |
| 10:41AM | 17 | Q.   THANK YOU.  CLOSE TO 1 BILLION, 990 MILLION.  I APPRECIATE |
| 10:41AM | 18 | YOUR ATTENTION TO THE ZEROS HERE. |
| 10:41AM | 19 | A.   YES. |
| 10:41AM | 20 | Q.   AND FOR THE ARANCA PROJECTION IN DECEMBER, IT'S HUNDREDS |
| 10:41AM | 21 | OF MILLIONS OF DOLLARS LOWER AT 113 MILLION? |
| 10:42AM | 22 | A.   THAT'S RIGHT. |
| 10:42AM | 23 | Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT IS IN |
| 10:42AM | 24 | EVIDENCE AS EXHIBIT 2623. |
| 10:42AM | 25 | MS. HOLMES, DO YOU SEE THIS IS AN EMAIL FROM MS. YAM, OR |

10:42AM   1     MS. SPIVEY, TO YOU IN THE JULY 2015 TIME PERIOD RELATED TO THE

10:42AM   2     409A REPORTS?

10:42AM   3     A.   I DO.

10:42AM   4     Q.   AND, IN FACT, IF WE CAN LOOK AT PAGE 2, DO YOU SEE THE

10:42AM   5     EMAIL FROM MS. YAM WITH THE SUBJECT "SUNIL DHAWAN" IN THE

10:42AM   6     MIDDLE?

10:42AM   7     A.   I DO.

10:42AM   8     Q.   AND YOU UNDERSTOOD AT THE TIME THAT SUNIL DHAWAN WAS

10:43AM   9     COMING ON TO BE THE LAB DIRECTOR IN THE CLIA LAB?

10:43AM  10     A.   I DID.

10:43AM  11     Q.   OKAY.  DID YOU KNOW HE WAS DOCTOR -- OR MR. BALWANI'S

10:43AM  12     DERMATOLOGIST?

10:43AM  13     A.   I DID.

10:43AM  14     Q.   OKAY.  AND YOU UNDERSTOOD THAT, AS PART OF HIS EMPLOYMENT

10:43AM  15     AGREEMENT, THAT HE WAS GOING TO BE GRANTED OPTIONS?

10:43AM  16     A.   I THINK AT THAT POINT WE WERE GOING TO ISSUE RSU'S, NOT

10:43AM  17     GRANT OPTIONS.

10:43AM  18     Q.   OKAY.  WELL, DOESN'T IT SAY ON PAGE 3, "AS WE BRIEFLY

10:43AM  19     TOUCHED BASE LAST NIGHT, ALL OPTION GRANTS WOULD BE PENDING ON

10:43AM  20     THE 409A VALUATION."

10:43AM  21          AM I READING THAT RIGHT?

10:43AM  22     A.   YOU ARE.

10:43AM  23               THE COURT:  MR. LEACH.

10:43AM  24               MR. LEACH:  I'LL REPHRASE MY QUESTION.

10:43AM  25     Q.   AM I RIGHT THAT ON PAGE 3, MS. YAM IS WRITING, "AS WE

HOLMES CROSS BY MR. LEACH (RES.)                                    8398

10:43AM   1      BRIEFLY TOUCHED BASE LAST NIGHT, ALL OPTION GRANTS WOULD BE

10:43AM   2      PENDING ON THE 409A VALUATION."

10:43AM   3          DID I READ THAT LANGUAGE CORRECTLY?

10:44AM   4      A.   YOU DID.

10:44AM   5      Q.   AND IF WE COULD GO BACK TO PAGE 2, DO YOU SEE WHERE

10:44AM   6      MS. YAM WRITES, "PLEASE SEE ATTACHED FOR THE FULL PROJECTION

10:44AM   7      MODEL.  THE QUICKEST TURN AROUND TIME IS TWO WEEKS, DEPENDING

10:44AM   8      ON HOW MUCH CHANGES TO THE ASSUMPTIONS WE ARE MAKING.  THE

10:44AM   9      ASSUMPTIONS WE HAD BEEN USING SINCE SEPTEMBER 2014 WERE AS

10:44AM  10      FOLLOWS."

10:44AM  11          DO YOU SEE THAT LANGUAGE?

10:44AM  12      A.   I DO.

10:44AM  13      Q.   AND DO YOU SEE IN THE TABLE SHE LISTS THAT THE ASSUMPTION

10:44AM  14      THAT THERANOS HAD BEEN USING SINCE SEPTEMBER OF 2014 FOR 2015

10:44AM  15      REVENUE WAS $113 MILLION?

10:44AM  16      A.   I DO.

10:44AM  17      Q.   OKAY.  AND MS. YAM IS TELLING YOU THIS AT THE TIME TO GET

10:44AM  18      GUIDANCE FROM YOU; CORRECT?

10:44AM  19      A.   YES.

10:44AM  20      Q.   IF WE CAN GO TO PAGE 1, PLEASE, MS. HOLLIMAN, AND FOCUS ON

10:45AM  21      THAT FIRST EMAIL.

10:45AM  22          MS. HOLMES, DO YOU SEE WHERE MS. YAM WROTE, "REVISED THE

10:45AM  23      REVENUE NUMBERS PER DISCUSSION AND UPDATED THE MODEL.  I WILL

10:45AM  24      SEND THIS TO ARANCA.

10:45AM  25          "WE STILL NEED TO KNOW HOW MANY OPTIONS WILL BE GRANTED AT

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                        8399

| | | |
|---|---|---|
| 10:45AM | 1 | THE NEW VALUE (WHETHER AND HOW MANY TO INCLUDE FOR YOU AND |
| 10:45AM | 2 | SB)." |
| 10:45AM | 3 | DO YOU SEE THAT? |
| 10:45AM | 4 | A.  I DO. |
| 10:45AM | 5 | Q.  OKAY.  AND THE SB THERE IS MR. BALWANI; CORRECT? |
| 10:45AM | 6 | A.  YES. |
| 10:45AM | 7 | Q.  AND DOES IT APPEAR FROM THE TABLE THAT THE PROJECTED |
| 10:45AM | 8 | REVENUE FOR 2015 HAS NOW GONE DOWN IN THIS JULY 2015 TIME |
| 10:45AM | 9 | PERIOD FROM $113 MILLION DOWN TO $53 MILLION? |
| 10:45AM | 10 | A.  YES. |
| 10:45AM | 11 | Q.  AND THAT IS FOLLOWING DISCUSSIONS THAT YOU HAD WITH |
| 10:45AM | 12 | MS. YAM? |
| 10:45AM | 13 | A.  I DON'T KNOW. |
| 10:45AM | 14 | Q.  DO YOU SEE WHERE SHE WROTE, "HI ELIZABETH, |
| 10:46AM | 15 | "WE REVISED THE REVENUE NUMBERS PER DISCUSSION"? |
| 10:46AM | 16 | A.  I DO. |
| 10:46AM | 17 | Q.  AND SITTING HERE TODAY, YOU DON'T RECALL THE DISCUSSION? |
| 10:46AM | 18 | A.  I DON'T. |
| 10:46AM | 19 | Q.  AND YOU ALSO MET WITH SOMEONE NAMED BRIAN GROSSMAN; |
| 10:46AM | 20 | CORRECT? |
| 10:46AM | 21 | A.  YES. |
| 10:46AM | 22 | Q.  AND YOU MET WITH HIM ONCE IN DECEMBER OF 2013? |
| 10:46AM | 23 | A.  I DID. |
| 10:46AM | 24 | Q.  AND YOU MET WITH HIM AGAIN IN JANUARY OF 2014? |
| 10:46AM | 25 | A.  YES. |

HOLMES CROSS BY MR. LEACH (RES.)                                          8400

| | | |
|---|---|---|
| 10:46AM | 1 | Q.   AND AM I RIGHT THAT YOU AND MR. BALWANI TOLD HIM THAT |
| 10:46AM | 2 | THERANOS COULD DO OVER 1,000 CPT CODES WITH THERANOS'S |
| 10:46AM | 3 | TECHNOLOGY? |
| 10:46AM | 4 | A.   I DON'T REMEMBER THE SPECIFICS OF THAT DISCUSSION, BUT |
| 10:46AM | 5 | THAT WAS A TOPIC OF DISCUSSION THAT WE WOULD FREQUENTLY HAVE. |
| 10:46AM | 6 | Q.   YOU DON'T REMEMBER SAYING THAT? |
| 10:46AM | 7 | A.   I DON'T. |
| 10:46AM | 8 | Q.   AND YOU AND MR. BALWANI TOLD MR. GROSSMAN THAT THERANOS |
| 10:46AM | 9 | WAITED TO LAUNCH ITS RETAIL PRODUCT BECAUSE IT WANTED TO MAKE |
| 10:47AM | 10 | SURE THAT THERANOS HAD COMPLETE COVERAGE, 100 PERCENT COVERAGE |
| 10:47AM | 11 | OF WHAT QUEST AND LABCORP COULD OFFER; CORRECT? |
| 10:47AM | 12 | A.   AGAIN, I DON'T REMEMBER THE SPECIFICS OF THE DISCUSSION. |
| 10:47AM | 13 | I'M NOT SURE. |
| 10:47AM | 14 | Q.   DO YOU DISPUTE THAT YOU TOLD -- YOU AND MR. BALWANI TOLD |
| 10:47AM | 15 | BRIAN GROSSMAN THAT -- DO YOU DISPUTE THAT YOU AND MR. BALWANI |
| 10:47AM | 16 | TOLD BRIAN GROSSMAN THAT THERANOS DID A LITTLE OVER 200 MILLION |
| 10:47AM | 17 | IN REVENUES, MOSTLY FROM DOD, THAT HAD SUSTAINED THERANOS PRIOR |
| 10:47AM | 18 | TO THE LAUNCH? |
| 10:47AM | 19 | A.   I DON'T THINK WE SAID THAT. |
| 10:47AM | 20 | Q.   AND ISN'T IT TRUE THAT YOU TOLD -- YOU AND MR. BALWANI |
| 10:47AM | 21 | TOLD MR. GROSSMAN THAT YOU AND THERANOS COULD SUPPORT THE |
| 10:47AM | 22 | ENTIRE COMMERCIAL ROLLOUT IN THE PHOENIX MARKET IN 200 SQUARE |
| 10:48AM | 23 | FEET BECAUSE YOUR SYSTEMS WERE SO MUCH SMALLER? |
| 10:48AM | 24 | A.   AGAIN, I DON'T REMEMBER THE SPECIFICS OF THE CONVERSATION. |
| 10:48AM | 25 | THAT COULD BE RELATED TO MINILAB DEPLOYMENT IF WE DID TALK |

HOLMES CROSS BY MR. LEACH (RES.)                                    8401

10:48AM   1    ABOUT SOMETHING LIKE THAT.

10:48AM   2    Q.   BUT YOU DON'T REMEMBER SAYING THAT BECAUSE YOU DON'T

10:48AM   3    REMEMBER THE SPECIFICS OF THE CONVERSATION; CORRECT?

10:48AM   4    A.   I DON'T.

10:48AM   5    Q.   AND YOU UNDERSTOOD IN THE JANUARY 2014 TIME PERIOD THAT

10:48AM   6    BRIAN GROSSMAN WAS ASKING VERY SPECIFIC QUESTIONS ABOUT THE

10:48AM   7    GROSS MARGIN FOR THE THERANOS ANALYZER; CORRECT?

10:48AM   8    A.   I DON'T THINK I HAD THAT CONVERSATION WITH HIM.

10:48AM   9    Q.   WELL, LET'S LOOK AT WHAT IS IN EVIDENCE AS EXHIBIT 1404.

10:48AM   10        WOULD YOU LIKE A HARD COPY, MS. HOLMES, OR ARE YOU

10:48AM   11   COMFORTABLE PROCEEDING ON THE SCREEN?

10:48AM   12   A.   SURE, IF YOU HAVE A HARD COPY, THAT'S GREAT.

10:49AM   13            MR. LEACH:  MAY I APPROACH, YOUR HONOR?

10:49AM   14            THE COURT:  YES.

10:49AM   15   BY MR. LEACH:

10:49AM   16   Q.   (HANDING.)

10:49AM   17   A.   THANK YOU.

10:49AM   18   Q.   YOU'RE WELCOME.

10:49AM   19        MS. HOLMES, LET ME DRAW YOUR ATTENTION, PLEASE, TO THE

10:49AM   20   BOTTOM PORTION OF THIS EMAIL.  DO YOU SEE WHERE BRIAN GROSSMAN

10:49AM   21   IS EMAILING YOU AND SUNNY BALWANI WITH A COPY TO CHRIS JAMES

10:49AM   22   WITH DUE DILIGENCE QUESTIONS?

10:49AM   23   A.   I DO.

10:49AM   24   Q.   AND THIS IS AFTER YOUR INITIAL MEETING WITH MR. GROSSMAN

10:49AM   25   IN DECEMBER OF 2013?

HOLMES CROSS BY MR. LEACH (RES.)                                    8402

10:49AM    1        A.   IT IS.

10:50AM    2        Q.   AND IF I REMEMBER YOUR TESTIMONY, YOU WERE THERE FOR SOME

10:50AM    3   PORTION OF A MEETING WITH MR. GROSSMAN IN JANUARY OF 2014.

10:50AM    4        A.   I WAS.

10:50AM    5        Q.   AND DO YOU SEE THE SUBJECT OF THIS IS "DUE DILIGENCE

10:50AM    6   QUESTIONS"?

10:50AM    7        A.   I DO.

10:50AM    8        Q.   AND IF I COULD FOCUS YOUR ATTENTION ON PAGE 4.

10:50AM    9             DO YOU SEE IN BULLET 7, THERE ARE A NUMBER OF QUESTIONS

10:50AM   10   RELATING TO FINANCIAL MODEL/PROJECTIONS?

10:50AM   11        A.   I DO.

10:50AM   12        Q.   DO YOU SEE WHERE IT SAYS, "WHAT IS THE CURRENT COST OF A

10:50AM   13   WALGREENS'S ANALYZER?"

10:50AM   14        A.   I DO.

10:50AM   15        Q.   DO YOU SEE WHERE IT SAYS, "WHAT ARE GM ON THE ANALYZER,

10:50AM   16   THE TESTS?"

10:50AM   17        A.   I DO.

10:50AM   18        Q.   AND DO YOU SEE WHERE IT SAYS, "WHAT ARE THE OTHER

10:50AM   19   SIGNIFICANT OPERATING COSTS AND HOW THEY WILL CHANGE OVER

10:50AM   20   TIME?"

10:50AM   21        A.   YES.

10:50AM   22        Q.   AND YOU ACKNOWLEDGE THAT THERANOS NEVER TOLD PFM THAT

10:51AM   23   THERANOS WAS USING THIRD PARTY MACHINES; CORRECT?

10:51AM   24        A.   NO, NOT IN THOSE WORDS.

10:51AM   25        Q.   I'M NOT SURE MY QUESTION WAS THE BEST QUESTION.

8403
HOLMES CROSS BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 10:51AM | 1 | YOU NEVER TOLD PFM THAT THERANOS WAS USING THIRD PARTY |
| 10:51AM | 2 | MACHINES? |
| 10:51AM | 3 | A.   CORRECT. |
| 10:51AM | 4 | Q.   AM I RIGHT THAT YOUR TESTIMONY IS THAT YOU DON'T THINK THE |
| 10:51AM | 5 | PFM SLIDE DECK DOES A VERY GOOD JOB OF DESCRIBING THE PHASE I, |
| 10:51AM | 6 | PHASE II DISTINCTION ON A STAND ALONE BASIS AS YOU TALKED ABOUT |
| 10:51AM | 7 | IN YOUR DIRECT TESTIMONY? |
| 10:51AM | 8 | A.   THE SLIDE DECK DOES NOT. |
| 10:51AM | 9 | AND I SHOULD CLARIFY.  I THINK WE DID TALK ABOUT |
| 10:51AM | 10 | COMMERCIAL ANALYZERS TO THE EXTENT THAT WE WERE TALKING ABOUT |
| 10:51AM | 11 | VENOUS TESTING. |
| 10:51AM | 12 | Q.   OKAY.  BUT YOU NEVER TOLD PFM THAT YOU WERE MODIFYING |
| 10:51AM | 13 | THIRD PARTY MACHINES TO DO TESTING? |
| 10:51AM | 14 | A.   EXACTLY, YES. |
| 10:51AM | 15 | Q.   I WANT TO MAKE SURE WE WERE NOT SPEAKING OVER EACH OTHER |
| 10:52AM | 16 | ON THE LAST QUESTION. |
| 10:52AM | 17 | A.   YEAH. |
| 10:52AM | 18 | Q.   YOU'VE SEEN, AS A RESULT OF PRIOR PROCEEDINGS AND THE |
| 10:52AM | 19 | RESULT OF THE TRIAL HERE, THE POWERPOINT THAT WENT TO PFM; |
| 10:52AM | 20 | CORRECT? |
| 10:52AM | 21 | A.   I HAVE. |
| 10:52AM | 22 | Q.   AND AM I RIGHT, SITTING HERE TODAY, YOU DON'T THINK THAT |
| 10:52AM | 23 | SLIDE DECK DOES A GOOD JOB OF DESCRIBING THE PHASE I, PHASE II |
| 10:52AM | 24 | DISTINCTION? |
| 10:52AM | 25 | A.   I DON'T. |

UNITED STATES COURT REPORTERS

ER-11974

HOLMES CROSS BY MR. LEACH (RES.)                                      8404

| | | |
|---|---|---|
| 10:52AM | 1 | Q.   YOU WERE HERE FOR ROGER PARLOFF'S TESTIMONY; CORRECT? |
| 10:52AM | 2 | A.   I WAS. |
| 10:52AM | 3 | Q.   AND YOU RECALL MEETING WITH HIM EITHER TELEPHONICALLY OR |
| 10:52AM | 4 | IN PERSON ON THE NUMEROUS OCCASIONS IN ADVANCE OF THE ARTICLE |
| 10:52AM | 5 | THAT HE PUBLISHED; CORRECT? |
| 10:52AM | 6 | A.   I DO. |
| 10:52AM | 7 | Q.   AND YOU READ THE PARLOFF ARTICLE AFTER IT WAS PUBLISHED; |
| 10:52AM | 8 | CORRECT? |
| 10:52AM | 9 | A.   I DID. |
| 10:52AM | 10 | Q.   OKAY.  YOU DON'T HAVE A MEMORY OF FORWARDING THE PARLOFF |
| 10:52AM | 11 | ARTICLE TO INVESTORS OR POTENTIAL INVESTORS; CORRECT? |
| 10:52AM | 12 | A.   I DON'T. |
| 10:52AM | 13 | Q.   OKAY.  LET'S SEE IF WE CAN REFRESH YOUR MEMORY. |
| 10:53AM | 14 | LET ME DRAW YOUR ATTENTION TO EXHIBIT 5727, WHICH SHOULD |
| 10:53AM | 15 | BE IN VOLUME 3. |
| 10:53AM | 16 | A.   ONE SECOND.  OKAY. |
| 10:53AM | 17 | Q.   DO YOU SEE IN THE FROM LINE IT SAYS THERANOS? |
| 10:53AM | 18 | A.   I DO. |
| 10:53AM | 19 | Q.   AND THE DATE IS JUNE 12TH, 2014? |
| 10:53AM | 20 | A.   YES. |
| 10:53AM | 21 | Q.   AND I THINK WE'VE REDACTED A NUMBER OF THE EMAIL |
| 10:54AM | 22 | ADDRESSES, BUT IN YOUR COPY, DO YOU RECOGNIZE THE EMAILS AS A |
| 10:54AM | 23 | NUMBER OF THERANOS INVESTORS? |
| 10:54AM | 24 | A.   I DO. |
| 10:54AM | 25 | Q.   OKAY.  AND DOES THIS RELATE TO MR. PARLOFF'S ARTICLE IN |

UNITED STATES COURT REPORTERS

**ER-11975**

HOLMES CROSS BY MR. LEACH (RES.)                                    8405

10:54AM  1    JUNE OF 2014?

10:54AM  2    A.   YES.

10:54AM  3              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5727.

10:54AM  4              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:54AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:54AM  6         (GOVERNMENT'S EXHIBIT 5727 WAS RECEIVED IN EVIDENCE.)

10:55AM  7         (PAUSE IN PROCEEDINGS.)

10:55AM  8              MR. LEACH:  YOUR HONOR, WE HAVEN'T MADE THE

10:55AM  9    REDACTIONS TO 5727 IN THE EMAIL LINE, SO WE'RE GOING TO SHOW

10:55AM 10    JUST THE BOTTOM PORTION OF PAGE 2.

10:55AM 11    Q.   MS. HOLMES, THIS IS AN EMAIL THAT THERANOS SENT ON

10:55AM 12    JUNE 12TH, 2014?

10:55AM 13    A.   IT IS.

10:55AM 14    Q.   AND IT'S WRITING, "TO OUR SHAREHOLDERS:

10:55AM 15         "LAST SEPTEMBER, WE INTRODUCED OUR PRODUCTS TO THE

10:55AM 16    CONSUMER AND CLINICAL MARKETS AFTER 10 YEARS OF INCREDIBLE WORK

10:55AM 17    AND THE DEDICATION OF SO MANY PEOPLE.

10:55AM 18         "WITH THIS EMAIL, WE'RE VERY PLEASED TO SHARE WITH YOU

10:55AM 19    THIS MONTH'S 'FORTUNE' MAGAZINE COVER STORY."

10:55AM 20         DO YOU SEE THAT LANGUAGE?

10:55AM 21    A.   I DO.

10:55AM 22    Q.   AND YOU WERE SHARING THIS WITH YOUR INVESTORS SO THEY

10:56AM 23    COULD UNDERSTAND THE CURRENT DEVELOPMENTS AT THERANOS?

10:56AM 24    A.   YES.

10:56AM 25    Q.   AND YOU ALSO REFERRED TO THE PARLOFF ARTICLE IN

HOLMES CROSS BY MR. LEACH (RES.)                                    8406

10:56AM   1      POWERPOINTS THAT YOU PROVIDED TO POTENTIAL INVESTORS; ISN'T

10:56AM   2      THAT CORRECT?

10:56AM   3      A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:56AM   4      Q.   YOU ALSO REFERRED TO THE PARLOFF ARTICLE IN POWERPOINTS

10:56AM   5      THAT YOU PROVIDED TO POTENTIAL INVESTORS?

10:56AM   6      A.   I THINK SO.

10:56AM   7      Q.   NOW, AM I RIGHT THAT YOU DON'T THINK YOU EVER TOLD

10:56AM   8      ROGER PARLOFF THAT YOU WERE MODIFYING COMMERCIALLY AVAILABLE

10:56AM   9      MACHINES TO CONDUCT PATIENT TESTING?

10:56AM  10      A.   CORRECT.

10:56AM  11      Q.   AND AT THE TIME, IF I UNDERSTAND YOUR TESTIMONY, YOU WERE

10:56AM  12      NOT WORRIED THAT IF PARLOFF WROTE AN ARTICLE ONLY MENTIONING

10:56AM  13      THERANOS'S MANUFACTURING DEVICES, THAT PEOPLE WOULD BE GIVEN AN

10:56AM  14      INACCURATE IMPRESSION OF HOW THERANOS WAS CONDUCTING ITS

10:56AM  15      PATIENT TESTING?

10:56AM  16      A.   I WAS NOT.

10:56AM  17      Q.   AND DO I UNDERSTAND YOUR TESTIMONY THAT TODAY YOU WISH YOU

10:57AM  18      HAD HANDLED YOUR COMMUNICATIONS WITH MR. PARLOFF DIFFERENTLY?

10:57AM  19      A.   I DO.  I THINK I COULD HAVE HANDLED THOSE COMMUNICATIONS

10:57AM  20      DIFFERENTLY.

10:57AM  21      Q.   AND THAT'S WHAT YOU TOLD THE S.E.C.; CORRECT?

10:57AM  22      A.   I DON'T REMEMBER WHAT I SAID TO THE S.E.C., BUT PROBABLY.

10:57AM  23      Q.   YOU DON'T REMEMBER TELLING THEM THAT YOU WISHED YOU HAD

10:57AM  24      HANDLED THE COMMUNICATION WITH PARLOFF DIFFERENTLY?

10:57AM  25      A.   I DON'T, BUT I'M NOT SURPRISED THAT I SAID THAT.


                          UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                              8407

| | | |
|---|---|---|
| 10:57AM | 1 | Q.   OKAY.  AND YOU CERTAINLY DON'T DISAGREE WITH THAT HERE |
| 10:57AM | 2 | TODAY? |
| 10:57AM | 3 | A.   I DON'T. |
| 10:57AM | 4 | Q.   LET ME DRAW YOUR ATTENTION TO CERTAIN STATEMENTS IN THE |
| 10:57AM | 5 | PARLOFF ARTICLE. |
| 10:57AM | 6 |      IF WE CAN PLEASE GO TO WHAT IS IN EVIDENCE AS |
| 10:57AM | 7 | EXHIBIT 1776. |
| 10:58AM | 8 | A.   IS THAT IN THE BINDERS OR IS IT JUST ON THE SCREEN? |
| 10:58AM | 9 | Q.   IT SHOULD BE IN VOLUME 4. |
| 10:58AM | 10 | A.   YES.  I'VE GOT IT. |
| 10:59AM | 11 |      (PAUSE IN PROCEEDINGS.) |
| 10:59AM | 12 | BY MR. LEACH: |
| 10:59AM | 13 | Q.   MS. HOLMES, LET ME DRAW YOUR ATTENTION TO PAGE 9 OF |
| 10:59AM | 14 | EXHIBIT 1776. |
| 10:59AM | 15 | A.   OKAY. |
| 10:59AM | 16 | Q.   PAGE 9. |
| 10:59AM | 17 |      IF WE CAN ZOOM OUT, MS. HOLLIMAN. |
| 10:59AM | 18 |      I'D LIKE TO FOCUS ON THE PARAGRAPH BEGINNING |
| 10:59AM | 19 | "IMPORTANTLY." |
| 10:59AM | 20 |      DO YOU SEE WHERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE |
| 10:59AM | 21 | BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS |
| 10:59AM | 22 | THERANOS USES TO PERFORM THE TESTS.  THEY TAKE UP A SMALL |
| 10:59AM | 23 | FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB |
| 10:59AM | 24 | TODAY." |
| 10:59AM | 25 |      DO YOU SEE THAT LANGUAGE? |

| | | |
|---|---|---|
| 10:59AM | 1 | A.   I DO. |
| 10:59AM | 2 | Q.   AND YOU AGREE WITH ME THAT THE STATEMENT -- THAT THAT |
| 10:59AM | 3 | STATEMENT AS OF JULY 2014 WAS NOT TRUE AS TO THE COMMERCIALLY |
| 10:59AM | 4 | AVAILABLE MACHINES THAT THERANOS WAS USING? |
| 10:59AM | 5 | A.   IT WAS NOT. |
| 10:59AM | 6 | Q.   AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO PAGE 11. |
| 11:00AM | 7 | A.   OKAY. |
| 11:00AM | 8 | Q.   IN THE THIRD PARAGRAPH THERE'S A LINE, "THERANOS, WHICH |
| 11:00AM | 9 | DOES NOT BUY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A |
| 11:00AM | 10 | UNIQUE POSITION." |
| 11:00AM | 11 | THAT STATEMENT, "THERANOS DOES NOT BUY ANALYZERS FROM |
| 11:00AM | 12 | THIRD PARTIES," YOU AGREE WITH ME THAT WAS NOT TRUE AS OF JULY |
| 11:00AM | 13 | OF 2014? |
| 11:00AM | 14 | A.   CORRECT. |
| 11:00AM | 15 | Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 6 -- OR I'M |
| 11:01AM | 16 | SORRY, PAGE 5.  AND I DRAW YOUR ATTENTION TO THE PARAGRAPH AT |
| 11:01AM | 17 | THE BOTTOM. |
| 11:01AM | 18 | DO YOU SEE WHERE IT SAYS, "THERANOS RUNS WHAT'S CALLED A |
| 11:01AM | 19 | HIGH-COMPLEXITY LABORATORY"? |
| 11:01AM | 20 | A.   YES. |
| 11:01AM | 21 | Q.   AND THEN IN THAT SECOND SENTENCE IT SAYS, "IT CURRENTLY |
| 11:01AM | 22 | OFFERS MORE THAN 200 - AND IS RAMPING UP TO OFFER MORE THAN |
| 11:01AM | 23 | 1,000 - OF THE MOST COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS, |
| 11:01AM | 24 | ALL WITHOUT THE NEED FOR A SYRINGE." |
| 11:02AM | 25 | DO YOU SEE THAT LANGUAGE? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8409

```
11:02AM   1      A.   I DO.

11:02AM   2      Q.   AND YOU AGREE WITH ME THAT WAS NOT A CORRECT STATEMENT AS

11:02AM   3    OF JULY 2014?

11:02AM   4      A.   I DON'T THINK IT IS NOW.

11:02AM   5      Q.   THERANOS OFFERED MANY TESTS WITH THE NEED FOR A SYRINGE;

11:02AM   6    CORRECT?

11:02AM   7      A.   NO, WE DID NOT.

11:02AM   8      Q.   WELL, THERANOS OFFERED A NUMBER OF VENOUS DRAWS RUN ON

11:02AM   9    COMMERCIALLY AVAILABLE MACHINES; CORRECT?

11:02AM  10      A.   WE DID.

11:02AM  11      Q.   AND JUST TO BE CLEAR, YOU AGREE THAT THE STATEMENT IN THE

11:02AM  12    PARLOFF ARTICLE WAS INCORRECT AT THE TIME?

11:02AM  13      A.   I BELIEVE THAT NOW.

11:02AM  14      Q.   LET ME DRAW YOUR ATTENTION TO PAGE 10, AND IF WE CAN LOOK

11:03AM  15    AT THE FIRST PARAGRAPH AT THE TOP.

11:03AM  16           DO YOU SEE THERE'S A REFERENCE TO A STATEMENT BY DR. LARET

11:03AM  17    AT UCSF, AND THEN A REFERENCE TO MILITARY EVACUATION

11:03AM  18    HELICOPTERS, MS. HOLMES?

11:03AM  19      A.   YES, I'M JUST READING IT.

11:03AM  20           I DO.

11:03AM  21      Q.   OKAY.  AND IN PARENTHESIS IT SAYS, "THE ANALYZERS LOOK

11:03AM  22    LIKE LARGE DESKTOP COMPUTER TOWERS.  HOLMES DECLINES TO EXPLAIN

11:03AM  23    HOW THEY WORK, OR EVEN ALLOW THEM TO BE PHOTOGRAPHED, CITING

11:03AM  24    THE NEED TO PROTECT TRADE SECRETS."

11:03AM  25           DO YOU SEE THAT?
```

HOLMES CROSS BY MR. LEACH (RES.)                                  8410

| | | |
|---|---|---|
| 11:03AM | 1 | A.   I DO. |
| 11:03AM | 2 | Q.   WAS THAT TRUE, THAT YOU DECLINED TO HAVE THE DEVICES EVEN |
| 11:03AM | 3 | PHOTOGRAPHED TO PROTECT TRADE SECRETS? |
| 11:03AM | 4 | A.   I THINK SO. |
| 11:03AM | 5 | Q.   AND THAT'S BECAUSE YOU KNEW THIS ARTICLE WOULD BE GOING |
| 11:04AM | 6 | OUT TO A LARGE AUDIENCE? |
| 11:04AM | 7 | A.   YES. |
| 11:04AM | 8 | Q.   AND THAT'S TRUE BECAUSE YOU UNDERSTOOD THIS WOULD BE |
| 11:04AM | 9 | PUBLIC WITH PEOPLE WHO WEREN'T BOUND BY CONFIDENTIALITY |
| 11:04AM | 10 | AGREEMENTS? |
| 11:04AM | 11 | A.   YES. |
| 11:04AM | 12 | Q.   LET ME ASK YOU SOME QUESTIONS ABOUT SAFEWAY. |
| 11:04AM | 13 | DO I UNDERSTAND YOUR TESTIMONY CORRECTLY, YOU DON'T THINK |
| 11:04AM | 14 | YOU EVER TOLD INVESTORS OR POTENTIAL INVESTORS IN 2014 THAT THE |
| 11:04AM | 15 | SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS WOULD BE |
| 11:04AM | 16 | ROLLING OUT TO SAFEWAY STORES IN EARLY 2015? |
| 11:04AM | 17 | A.   I DON'T REMEMBER SPECIFIC CONVERSATIONS NOW. |
| 11:04AM | 18 | THE COURT:  MR. LEACH, BEFORE YOU ASK YOUR NEXT |
| 11:04AM | 19 | QUESTION, SHOULD WE TAKE OUR MORNING BREAK NOW? |
| 11:04AM | 20 | MR. LEACH:  YES. |
| 11:04AM | 21 | THE COURT:  LET'S DO THAT.  LET'S TAKE 30 MINUTES, |
| 11:04AM | 22 | LADIES AND GENTLEMEN, 30 MINUTES. |
| 11:45AM | 23 | (RECESS FROM 11:05 A.M. UNTIL 11:45 A.M.) |
| 11:46AM | 24 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 11:46AM | 25 | PLEASE BE SEATED. |

| | | |
|---|---|---|
| 11:46AM | 1 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:46AM | 2 | MR. LEACH, YOU'D LIKE TO CONTINUE? |
| 11:46AM | 3 | MR. LEACH: YES, YOUR HONOR. THANK YOU. |
| 11:46AM | 4 | Q. GOOD MORNING AGAIN, MS. HOLMES. |
| 11:46AM | 5 | A. GOOD MORNING. |
| 11:46AM | 6 | Q. BEFORE WE BROKE I WAS ASKING SOME QUESTIONS ABOUT SAFEWAY. |
| 11:46AM | 7 | DID YOU TELL INVESTORS OR POTENTIAL INVESTORS IN 2014 THAT |
| 11:46AM | 8 | THE SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS WOULD BE |
| 11:46AM | 9 | ROLLING OUT TO SAFEWAY STORES IN EARLY 2015? |
| 11:46AM | 10 | A. I DON'T REMEMBER SAYING THAT SPECIFICALLY. |
| 11:46AM | 11 | Q. OKAY. AND DID YOU EVER HEAR MR. BALWANI SAY THAT? |
| 11:46AM | 12 | A. I DON'T THINK SO. |
| 11:46AM | 13 | Q. AND WOULD THAT STATEMENT HAVE BEEN TRUE IN 2014? |
| 11:46AM | 14 | A. I THINK SO. THAT'S WHAT WE WERE PLANNING TO DO, YES. |
| 11:47AM | 15 | Q. WELL, LET ME ASK YOU TO LOOK IN YOUR RED BINDER, PLEASE. |
| 11:47AM | 16 | A. YES. |
| 11:47AM | 17 | Q. AND IF YOU COULD PLEASE GO TO PAGE 5565. |
| 11:47AM | 18 | A. OKAY. |
| 11:47AM | 19 | Q. AND I DRAW YOUR ATTENTION TO PAGE 841, BEGINNING AT |
| 11:47AM | 20 | LINE 22. |
| 11:47AM | 21 | A. YES. |
| 11:47AM | 22 | MR. LEACH: YOUR HONOR, I ASK PERMISSION TO READ |
| 11:47AM | 23 | FROM LINE 22 ON PAGE 841 TO LINE 7 ON PAGE 842. |
| 11:48AM | 24 | THE COURT: YES. |
| 11:48AM | 25 | BY MR. LEACH: |

11:48AM  1    Q.   MS. HOLMES, YOU WERE ASKED THE FOLLOWING QUESTIONS AND

11:48AM  2    GAVE THE FOLLOWING ANSWERS:

11:48AM  3         "DID YOU TELL INVESTORS OR POTENTIAL INVESTORS IN 2014

11:48AM  4    THAT THE SAFEWAY CONTRACT WAS GOING WELL AND THAT THERANOS

11:48AM  5    WOULD BE ROLLING OUT TO SAFEWAY STORES IN EARLY 2015?

11:48AM  6         "ANSWER:  I DON'T THINK SO.

11:48AM  7         "QUESTION:  DID YOU EVER HEAR MR. BALWANI SAY THAT?

11:48AM  8         "ANSWER:  I DON'T THINK SO.

11:48AM  9         "QUESTION:  WOULD THAT STATEMENT HAVE BEEN TRUE IN 2014?

11:48AM 10         "ANSWER:  I DON'T KNOW ABOUT THE SECOND PART IN TERMS OF

11:48AM 11    WHETHER WE THOUGHT WE WOULD BE ROLLING OUT, AND I DON'T THINK

11:48AM 12    WE THOUGHT IT WAS GOING WELL."

11:48AM 13         DID I READ THAT CORRECTLY?

11:48AM 14    A.   YES, YOU DID.

11:48AM 15    Q.   LET ME DRAW YOUR ATTENTION TO WHAT IS -- SO YOUR TESTIMONY

11:48AM 16    BEFORE THE S.E.C. WAS THAT YOU DIDN'T THINK THE SAFEWAY

11:48AM 17    RELATIONSHIP WAS GOING WELL IN 2014?

11:49AM 18    A.   YES.

11:49AM 19    Q.   LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS

11:49AM 20    EXHIBIT 2166.

11:49AM 21    A.   JUST TO CLARIFY, I THINK THIS SAY THE CONTRACT IS GOING

11:49AM 22    WELL.

11:49AM 23    Q.   FAIR ENOUGH.

11:49AM 24         MS. HOLMES, I'M DISPLAYING ON THE SCREEN WHAT HAS THE

11:49AM 25    TITLE "RDV APPROVAL DOCUMENT."

HOLMES CROSS BY MR. LEACH (RES.)                                    8413

| | | |
|---|---|---|
| 11:49AM | 1 | DO YOU RECALL MS. PETERSON TESTIFYING ABOUT THIS? |
| 11:49AM | 2 | A.   I DO. |
| 11:49AM | 3 | Q.   OKAY.  IF WE COULD GO TO PAGE 3. |
| 11:49AM | 4 | DO YOU SEE THE LINE IN THE GROWTH PLANS, IN THE SECOND |
| 11:49AM | 5 | LINE WHERE IT SAYS, "THERANOS IS ALSO UNDER CONTRACT WITH |
| 11:49AM | 6 | SAFEWAY FOR A NATIONAL ROLLOUT TO A SUBSTANTIAL NUMBER OF THEIR |
| 11:49AM | 7 | STORES WITH PLANS TO OPEN 300 SAFEWAY LOCATIONS DURING 2015." |
| 11:50AM | 8 | DO YOU SEE THAT LANGUAGE? |
| 11:50AM | 9 | A.   I DO. |
| 11:50AM | 10 | Q.   AND THEN IF YOU LOOK DOWN AT THE BOTTOM RIGHT. |
| 11:50AM | 11 | IF YOU CAN ZOOM OUT, MS. HOLLIMAN. |
| 11:50AM | 12 | DO YOU SEE THE SECTION FOR FINANCIAL NOTES? |
| 11:50AM | 13 | A.   YES. |
| 11:50AM | 14 | Q.   AND DO YOU SEE WHERE IT SAYS, "EVERYTHING IN THE 2015 |
| 11:50AM | 15 | FORECAST HAS CONTRACTS WITH PHARMACIES, PHYSICIANS, HOSPITALS, |
| 11:50AM | 16 | AND PAYORS TO SUPPORT THE PROJECTED REVENUES. |
| 11:50AM | 17 | "2015 ASSUMES THEY OPEN APPROXIMATELY 1200 LOCATIONS |
| 11:50AM | 18 | ACROSS WALGREENS (900) AND SAFEWAY (300) RETAIL NETWORKS." |
| 11:50AM | 19 | DO YOU SEE THAT LANGUAGE? |
| 11:50AM | 20 | A.   I DO. |
| 11:50AM | 21 | Q.   I'D LIKE TO ASK YOU SOME ADDITIONAL QUESTIONS ABOUT |
| 11:50AM | 22 | JOHNS HOPKINS. |
| 11:50AM | 23 | DO YOU REMEMBER TALKING ABOUT JOHNS HOPKINS IN YOUR DIRECT |
| 11:50AM | 24 | EXAMINATION? |
| 11:50AM | 25 | A.   I DO. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8414

| | | |
|---|---|---|
| 11:50AM | 1 | Q.   THERANOS DID NOT HIRE JOHNS HOPKINS; CORRECT? |
| 11:50AM | 2 | A.   CORRECT. |
| 11:50AM | 3 | Q.   WE CAN TAKE THIS DOWN. |
| 11:50AM | 4 | WALGREENS WAS THE ONE WHO HIRED JOHNS HOPKINS; AM I RIGHT? |
| 11:51AM | 5 | A.   YES. |
| 11:51AM | 6 | Q.   AND YOU MET WITH JOHNS HOPKINS ON ONE OCCASION? |
| 11:51AM | 7 | A.   WE MET WITH THEM SEVERAL TIMES. |
| 11:51AM | 8 | Q.   OKAY.  YOU MET WITH THEM IN APRIL OF 2010? |
| 11:51AM | 9 | A.   I DID. |
| 11:51AM | 10 | Q.   AND THAT APRIL 2010 MEETING IS THE BASIS FOR THE SUMMARY |
| 11:51AM | 11 | THAT YOU TALKED ABOUT IN YOUR EXAMINATION? |
| 11:51AM | 12 | A.   IT IS. |
| 11:51AM | 13 | Q.   THAT ONE AND ONLY MEETING? |
| 11:51AM | 14 | A.   YES, AND IN ADDITION TO I THINK SOME REVIEW OF MATERIALS |
| 11:51AM | 15 | THAT THEY HAD DONE PRIOR TO THE MEETING. |
| 11:51AM | 16 | Q.   OKAY.  YOU SENT SOME DATA IN ADVANCE OF THAT MEETING? |
| 11:51AM | 17 | A.   WE DID. |
| 11:51AM | 18 | Q.   BUT YOU MET WITH THEM ON THAT ONE DAY, AND THEN THEY |
| 11:51AM | 19 | PREPARED THEIR SUMMARY? |
| 11:51AM | 20 | A.   EXACTLY. |
| 11:51AM | 21 | Q.   OKAY.  AND ALL OF THE DATA THAT YOU GAVE TO JOHNS HOPKINS |
| 11:51AM | 22 | WAS GENERATED BY THERANOS; CORRECT? |
| 11:51AM | 23 | A.   I THINK SO. |
| 11:51AM | 24 | Q.   CAN WE PLEASE DISPLAY WHAT IS IN EVIDENCE AS EXHIBIT 7109. |
| 11:51AM | 25 | DO YOU RECALL TESTIFYING ON DIRECT EXAMINATION ABOUT THIS |

HOLMES CROSS BY MR. LEACH (RES.)                                    8415

| | | |
|---|---|---|
| 11:52AM | 1 | EMAIL FROM JUNE OF 2010? |
| 11:52AM | 2 | A.   I DO. |
| 11:52AM | 3 | Q.   AND IT WAS YOUR TESTIMONY THAT THIS POWERPOINT INCLUDES |
| 11:52AM | 4 | THE DATA THAT WAS PROVIDED TO HOPKINS? |
| 11:52AM | 5 | A.   YES. |
| 11:52AM | 6 | Q.   OKAY.  LET'S GO TO PAGE 4, PLEASE. |
| 11:52AM | 7 | DO YOU SEE DR. GIBBONS INCLUDED A CONFIDENTIAL INFORMATION |
| 11:52AM | 8 | NOTIFICATION IN THIS POWERPOINT? |
| 11:52AM | 9 | A.   I DO. |
| 11:52AM | 10 | Q.   OKAY.  IT SAYS, "PLEASE NOTE THAT THIS PRESENTATION IS |
| 11:52AM | 11 | STRICTLY CONFIDENTIAL AND DISCLOSES THERANOS INFORMATION NOT IN |
| 11:52AM | 12 | THE PUBLIC DOMAIN," IN ITALICS. |
| 11:52AM | 13 | DO YOU SEE THAT? |
| 11:52AM | 14 | A.   YES. |
| 11:52AM | 15 | Q.   "THE TECHNOLOGY DESCRIBED IS THE SUBJECT OF PENDING U.S. |
| 11:52AM | 16 | AND INTERNATIONAL PATENTS, WHICH THERANOS WILL ACTIVELY |
| 11:52AM | 17 | ENFORCE." |
| 11:52AM | 18 | IS THAT A CORRECT STATEMENT? |
| 11:52AM | 19 | A.   YES. |
| 11:52AM | 20 | Q.   OKAY.  "THE INFORMATION CAN ONLY BE PROVIDED TO THOSE |
| 11:53AM | 21 | COVERED BY VALIDLY EXECUTED CONFIDENTIAL DISCLOSURE AGREEMENTS |
| 11:53AM | 22 | ON A NEED-TO-KNOW BASIS." |
| 11:53AM | 23 | DO YOU SEE THAT LANGUAGE? |
| 11:53AM | 24 | A.   I DO. |
| 11:53AM | 25 | Q.   AND YOU BROUGHT A DEVICE TO HOPKINS; CORRECT? |

HOLMES CROSS BY MR. LEACH (RES.)                                      8416

11:53AM   1       A.   YES.

11:53AM   2       Q.   IT WAS NOT THE 4 SERIES YOU WERE MAKING.  IT WAS A 3

11:53AM   3   SERIES; CORRECT?

11:53AM   4       A.   CORRECT.

11:53AM   5       Q.   AND YOU PROVIDED THEM SOME DATA FROM THE 4 SERIES;

11:53AM   6   CORRECT?

11:53AM   7       A.   WE DID.

11:53AM   8       Q.   IN THIS LENGTHY POWERPOINT THAT YOU SHARED WITH HOPKINS;

11:53AM   9   RIGHT?

11:53AM  10       A.   YES.

11:53AM  11       Q.   AND YOU WERE COMFORTABLE DOING THAT BECAUSE THEY HAD A

11:53AM  12   CONFIDENTIALITY RELATIONSHIP WITH WALGREENS; CORRECT?

11:53AM  13       A.   YES.

11:53AM  14       Q.   AND YOU ASKED THEM TO SIGN DOCUMENTS BEFORE YOU SHOWED

11:53AM  15   THEM THE DEVICE AND DISPLAYED THIS POWERPOINT?

11:53AM  16       A.   I DON'T KNOW.

11:53AM  17       Q.   WOULD IT SURPRISE YOU IF YOU DIDN'T?

11:53AM  18       A.   NOT NECESSARILY IF IT WAS COVERED BY THE WALGREENS

11:53AM  19   RELATIONSHIP.

11:53AM  20       Q.   YOU WANTED TO BE CAREFUL TO PROTECT THE INFORMATION IN

11:53AM  21   HERE BECAUSE IT INVOLVED TRADE SECRETS?

11:53AM  22       A.   OR PATENTS THAT WE WERE STILL WORKING ON.

11:53AM  23       Q.   CONFIDENTIAL INFORMATION RELATING TO THERANOS, AND YOU

11:54AM  24   WANTED TO MAKE SURE IT DIDN'T GET OUT THERE?

11:54AM  25       A.   YEAH, EXACTLY.


                          UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 11:54AM | 1 | Q.   OKAY.  AND YOU WERE COMFORTABLE SHARING THAT WITH HOPKINS? |
| 11:54AM | 2 | A.   WE WERE. |
| 11:54AM | 3 | Q.   OKAY.  MR. DOWNEY ALSO SHOWED YOU THE SUMMARY THAT HOPKINS |
| 11:54AM | 4 | PROVIDED YOU; CORRECT? |
| 11:54AM | 5 | A.   HE DID. |
| 11:54AM | 6 | Q.   AND YOU ACTUALLY GOT THAT FROM WALGREENS; CORRECT? |
| 11:54AM | 7 | A.   YES. |
| 11:54AM | 8 | Q.   AND THAT SUMMARY INCLUDES A DISCLAIMER DOWN AT THE BOTTOM |
| 11:54AM | 9 | OF THE TEXT, DOESN'T IT? |
| 11:54AM | 10 | A.   I'M NOT SURE, BUT I'M SURE YOU'LL TELL ME. |
| 11:54AM | 11 | Q.   DOESN'T IT HAVE A DISCLAIMER THAT THIS IS NOT AN |
| 11:54AM | 12 | ENDORSEMENT BY HOPKINS? |
| 11:54AM | 13 | A.   I DON'T KNOW.  I DON'T REMEMBER. |
| 11:54AM | 14 | Q.   YOU DON'T REMEMBER? |
| 11:54AM | 15 | A.   I DON'T. |
| 11:54AM | 16 | Q.   IT'S A TWO PAGE DOCUMENT THAT YOU DON'T REMEMBER HOPKINS |
| 11:54AM | 17 | SAYING "WE DON'T ENDORSE THIS"? |
| 11:54AM | 18 | A.   I DON'T REMEMBER THE DISCLAIMER. |
| 11:54AM | 19 | Q.   OKAY.  WELL, IN ANY EVENT, YOU DID NOT THINK THAT THE |
| 11:54AM | 20 | JOHNS HOPKINS ASSESSMENT WAS VALIDATING THE DEVICE; CORRECT? |
| 11:54AM | 21 | A.   I THOUGHT IT WAS VALIDATING THERANOS'S TECHNOLOGIES. |
| 11:55AM | 22 | Q.   WELL, DO YOU HAVE THE RED BINDER, MS. HOLMES? |
| 11:55AM | 23 | A.   I DO. |
| 11:55AM | 24 | Q.   AND YOU REMEMBER THIS IS YOUR TESTIMONY BEFORE THE |
| 11:55AM | 25 | SECURITIES AND EXCHANGE COMMISSION? |

11:55AM  1    A.   IT IS.

11:55AM  2    Q.   AND YOU TOOK AN OATH THERE; CORRECT?

11:55AM  3    A.   I DID.

11:55AM  4    Q.   AND THIS WAS IN 2017 WHEN YOU TESTIFIED THERE?

11:55AM  5    A.   IT WAS.

11:55AM  6    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 839.

11:55AM  7         THE COURT:  IS THAT BATES 5564?

11:55AM  8         MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

11:55AM  9    I'D SEEK PERMISSION TO READ QUESTION -- OR LINES 15

11:55AM 10    THROUGH 23 ON PAGE 839.

11:55AM 11         THE COURT:  YES.

11:55AM 12    BY MR. LEACH:

11:55AM 13    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTIONS AND DID

11:56AM 14    YOU GIVE THE FOLLOWING ANSWERS:

11:56AM 15         "QUESTION:  DID YOU EVER TELL INVESTORS OR PROSPECTIVE

11:56AM 16    INVESTORS THAT JOHNS HOPKINS HAD VALIDATED THERANOS'S DEVICES?

11:56AM 17         "ANSWER:  I DON'T REMEMBER USING THOSE WORDS, NO.

11:56AM 18         "QUESTION:  DID YOU EVER HEAR MR. BALWANI SAY THAT?

11:56AM 19         "ANSWER:  I DON'T THINK SO.

11:56AM 20         "QUESTION:  WOULD THAT HAVE BEEN TRUE IN 2013 AND 2014?

11:56AM 21         "ANSWER:  AS YOU KNOW, THEY'D DONE AN ASSESSMENT.  I DON'T

11:56AM 22    THINK WE THOUGHT OF IT AS VALIDATING THE DEVICE."

11:56AM 23         DID I READ THAT CORRECTLY?

11:56AM 24    A.   YOU DID.

11:56AM 25    Q.   OKAY.  YOU KNEW THAT WALGREENS NEVER OPENED MORE THAN 41

HOLMES CROSS BY MR. LEACH (RES.)                          8419

| | | |
|---|---|---|
| 11:56AM | 1 | WELLNESS CENTERS; CORRECT? |
| 11:56AM | 2 | A.   CORRECT. |
| 11:56AM | 3 | Q.   AND LAST WEEK WE SAW AN EMAIL FROM MR. JHAVERI THAT WAS |
| 11:56AM | 4 | FORWARDED TO YOU IN AUGUST OF 2014 WHERE YOU WERE ADVISED THAT |
| 11:57AM | 5 | WALGREENS HAD TWO AREAS OF FOCUS THAT REQUIRED A DOCUMENTED |
| 11:57AM | 6 | DETAILED PLAN AS A PREREQUISITE EXPANSION. |
| 11:57AM | 7 | DO YOU RECALL LOOKING AT THAT DOCUMENT? |
| 11:57AM | 8 | A.   I RECALL THE DOCUMENT.  I UNDERSTOOD IT DIFFERENTLY. |
| 11:57AM | 9 | Q.   OKAY.  WELL, YOU SAW A REFERENCE IN THE DOCUMENT TO VENOUS |
| 11:57AM | 10 | PERCENTAGE NEEDS TO GET UNDER 10 PERCENT; CORRECT? |
| 11:57AM | 11 | A.   I DID. |
| 11:57AM | 12 | Q.   OKAY.  AND LATER IN 2014, MR. BALWANI TOLD YOU THAT |
| 11:57AM | 13 | THERANOS COULD NOT SCALE WITH WALGREENS; CORRECT? |
| 11:57AM | 14 | A.   I DON'T REMEMBER IT LIKE THAT. |
| 11:57AM | 15 | Q.   OKAY.  WELL, LET'S LOOK AT THE -- LET'S LOOK AT THE |
| 11:57AM | 16 | DOCUMENT. |
| 11:57AM | 17 | IF WE COULD PLEASE CALL UP EXHIBIT 5387D AND GO TO |
| 11:57AM | 18 | PAGE 24.  ACTUALLY, ZOOM IN ON -- |
| 11:57AM | 19 | MS. HOLMES -- |
| 11:58AM | 20 | ACTUALLY, THAT WAS FINE, MS. HOLLIMAN.  I'M SORRY.  I |
| 11:58AM | 21 | MISSPOKE. |
| 11:58AM | 22 | MS. HOLMES, DO YOU SEE A SERIES OF TEXT MESSAGES BETWEEN |
| 11:58AM | 23 | YOU AND MR. BALWANI IN THE NOVEMBER 19TH, 2014 TIME PERIOD ON |
| 11:58AM | 24 | THE SCREEN? |
| 11:58AM | 25 | A.   I DO. |

ER-11990

HOLMES CROSS BY MR. LEACH (RES.)                                    8420

11:58AM  1   Q.   OKAY.  AND THE FIRST MESSAGE SAYS, "WE NEED CALL CENTER

11:58AM  2   MANAGER, NEW CALL CENTER TEAM, GET RECURRENT CREW OUT OF DOCS

11:58AM  3   FACING COMMUNICATIONS."

11:58AM  4        DO YOU SEE THAT?

11:58AM  5   A.   I DO.

11:58AM  6   Q.   AND THEN THE THIRD TEXT READS, "FUNDAMENTALLY WE NEED TO

11:58AM  7   STOP FIGHTING FIRES BY NOT CREATING THEM."

11:58AM  8        DO YOU SEE THAT?

11:58AM  9   A.   YES.

11:58AM  10  Q.   AND FURTHER DOWN YOU WROTE SIMILAR WORDS, "FUNDAMENTALLY

11:58AM  11  WE NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM."

11:58AM  12       DO YOU SEE THAT?

11:58AM  13  A.   I DO.

11:58AM  14  Q.   AND YOU WROTE, "NEED TO FIX ROOT CAUSE HERE."

11:58AM  15       DO YOU SEE THAT?

11:58AM  16  A.   I DO.

11:58AM  17  Q.   AND THEN DOWN AT THE BOTTOM, DO YOU SEE WHERE MR. BALWANI

11:58AM  18  WROTE, "WE CAN'T SCALE WITH WAG"?

11:59AM  19  A.   I DO.

11:59AM  20  Q.   W-A-G IS AN ABBREVIATION YOU WOULD USE FOR WALGREENS FROM

11:59AM  21  TIME TO TIME; CORRECT?

11:59AM  22  A.   IT IS.

11:59AM  23  Q.   AND YOU WERE ALSO TOLD IN THIS LATE 2014 TIME PERIOD THAT

11:59AM  24  WALGREENS DID NOT INTEND TO OPEN MORE PSC'S UNTIL JULY OF 2014

11:59AM  25  BECAUSE THERANOS MISSED THE INTEGRATION DEADLINE; ISN'T THAT

UNITED STATES COURT REPORTERS

11:59AM  1    CORRECT?

11:59AM  2    A.   I DON'T THINK SO.

11:59AM  3    Q.   WELL, LET'S LOOK FURTHER BELOW.

11:59AM  4         IF WE CAN ZOOM OUT, MS. HOLLIMAN.

11:59AM  5         SO AFTER THE TEXT, "WE CAN'T SCALE WITH WAG," MR. BALWANI

11:59AM  6    WROTE, "THEY ARE TERRIBLE AND WE NEED SWY AND CVS."

11:59AM  7         DO YOU SEE THAT?

11:59AM  8    A.   YES.

11:59AM  9    Q.   S-W-Y WAS AN ACRONYM THAT YOU USED FROM TIME TO TIME FOR

12:00PM  10   SAFEWAY; IS THAT CORRECT?

12:00PM  11   A.   I DON'T KNOW IF THAT'S WHAT I DID, BUT THAT'S WHAT IT

12:00PM  12   MEANS HERE.

12:00PM  13   Q.   AND CVS IS AN ACRONYM FOR A WALGREENS COMPETITOR?

12:00PM  14   A.   IT IS.

12:00PM  15   Q.   AND YOU WROTE, "IT IS TIME.

12:00PM  16        "LET'S GET SWY DONE THIS WEEK.

12:00PM  17        "WE CAN DO IT."

12:00PM  18        AND THEN THERE'S A TEXT FROM MR. BALWANI, "THEY TOLD OUR

12:00PM  19   TEAM IN WAG MEETING THAT THEY DON'T INTEND TO OPEN MORE PSC'S

12:00PM  20   UNTIL JULY BECAUSE WE MISSED THEIR I.T. INTEGRATION DEADLINE."

12:00PM  21        DO YOU SEE THAT?

12:00PM  22   A.   I DO.

12:00PM  23   Q.   AND YOU RESPOND, AND THEN MR. BALWANI SAYS, "WHICH IS GOOD

12:00PM  24   BECAUSE WE CAN FOCUS ON SWY AND CVS."

12:00PM  25        DID I READ THAT LAST TEXT CORRECTLY?

HOLMES CROSS BY MR. LEACH (RES.)                                    8422

12:00PM  1      A.   YOU DID.

12:00PM  2      Q.   AND THIS IS THE NOVEMBER OF 2014 TIME PERIOD; CORRECT?

12:00PM  3      A.   IT IS.

12:00PM  4      Q.   OKAY.  AND IN THIS LATE NOVEMBER, EARLY DECEMBER 2014 TIME

12:00PM  5      PERIOD, YOU'RE STILL RAISING MONEY FROM INVESTORS; CORRECT?

12:00PM  6      A.   YES.

12:00PM  7      Q.   AND THAT WOULD INCLUDE THE WALTON FAMILY?

12:01PM  8      A.   I THINK SO.

12:01PM  9      Q.   OKAY.  THAT WOULD INCLUDE RUPERT MURDOCH?

12:01PM 10      A.   YES.

12:01PM 11      Q.   YOU TALKED IN YOUR DIRECT EXAMINATION ABOUT PHASE I AND

12:01PM 12      PHASE II OF THE ROLLOUT.

12:01PM 13           DO YOU RECALL THAT TESTIMONY?

12:01PM 14      A.   I DO.

12:01PM 15      Q.   AND THE IDEA BEHIND PHASE I WAS YOU'RE GOING TO HAVE A

12:01PM 16      CENTRAL LAB TO DO ALL OF THE TESTING, AND AT SOME POINT IN TIME

12:01PM 17      AFTER THE FDA APPROVES THE DEVICE, YOU WILL PUT THE DEVICE IN

12:01PM 18      ACTUAL WALGREENS STORES.

12:01PM 19           HAVE I GOT THE THRUST OF THAT CORRECTLY?

12:01PM 20      A.   YES.

12:01PM 21      Q.   OKAY.  AND YOUR AMENDED CONTRACT WITH WALGREENS WAS IN

12:01PM 22      JUNE OR JULY OF 2012?

12:01PM 23      A.   ONE OF THEM WAS.

12:01PM 24      Q.   OKAY.  THE AMENDMENT THAT SPELLS OUT PHASE I AND PHASE II?

12:01PM 25      A.   YES.

HOLMES CROSS BY MR. LEACH (RES.)                                    8423

12:01PM   1     Q.   OKAY.  SO BY JUNE OF 2012, YOU HAD THIS CONCEPT OF, WE'RE

12:02PM   2     GOING TO HAVE A CENTRAL LAB IN PHASE I WHERE ALL OF THE TESTING

12:02PM   3     IS DONE IN A CLIA LAB IN ONE SETTING, AND PHASE II IS GOING TO

12:02PM   4     BE WHERE WE PUT THE DEVICES INTO ACTUAL WALGREENS STORES?

12:02PM   5     A.   YES.

12:02PM   6     Q.   OKAY.  AND I THINK YOU TESTIFIED THAT YOUR HOPE WAS THAT

12:02PM   7     PHASE I WOULD BE SHORT?

12:02PM   8     A.   IT WAS.

12:02PM   9     Q.   OKAY.  BECAUSE YOU WANTED TO PUT MINILABS IN WALGREENS?

12:02PM   10    A.   YES.

12:02PM   11    Q.   RIGHT?  THAT WAS SOMETHING THAT YOU HAD WANTED TO DO SINCE

12:02PM   12    2010; CORRECT?

12:02PM   13    A.   YES.

12:02PM   14    Q.   THAT'S BECAUSE YOU VIEWED THE MINILAB AS THE CORE OF

12:02PM   15    THERANOS'S TECHNOLOGY?

12:02PM   16    A.   ONE OF THEM, YES.

12:02PM   17    Q.   WELL, IS IT FAIR TO SAY THAT THE MINILAB AND ALL OF THE

12:02PM   18    CHEMISTRIES AND EVERYTHING THAT WORKS IN THERE WAS MORE

12:02PM   19    IMPORTANT TO THERANOS'S FUTURE THAN ANYTHING BEING DONE IN

12:02PM   20    PHASE I?

12:02PM   21    A.   YES.

12:02PM   22    Q.   AND AM I RIGHT THAT THERANOS ACTUALLY GAVE MINILABS TO

12:02PM   23    WALGREENS AT CERTAIN POINTS?  CORRECT?

12:02PM   24    A.   WE DID.

12:03PM   25    Q.   IN FACT, YOU GAVE TWO OF THEM TO WALGREENS?

HOLMES CROSS BY MR. LEACH (RES.)                                    8424

12:03PM   1    A.   AT LEAST, YES.

12:03PM   2    Q.   OKAY.  YOU SENT THE MINILAB TO CHICAGO, OR THE ILLINOIS

12:03PM   3    AREA, FOR WALGREENS EXECUTIVES TO HAVE AND TO LOOK AT AND TO

12:03PM   4    UNDERSTAND; CORRECT?

12:03PM   5    A.   YES.

12:03PM   6    Q.   AND YOU DID THAT BECAUSE YOU HAD A CONFIDENTIALITY

12:03PM   7    AGREEMENT WITH WALGREENS; CORRECT?

12:03PM   8    A.   AND OTHER REASONS, YES.

12:03PM   9    Q.   OKAY.  THEY PROMISED TO KEEP YOUR SECRETS; RIGHT?

12:03PM  10    A.   THEY DID.

12:03PM  11    Q.   AND YOU HAD PROMISED TO KEEP WALGREENS'S SECRETS?

12:03PM  12    A.   YES.

12:03PM  13    Q.   AND THAT'S BECAUSE YOU WERE PARTNERS IN THIS RELATIONSHIP?

12:03PM  14    A.   CORRECT.

12:03PM  15    Q.   AND YOU TRUSTED THEM TO HONOR THEIR AGREEMENTS?

12:03PM  16    A.   WE DID.

12:03PM  17    Q.   YOU TRUSTED THEM NOT TO REVERSE ENGINEER THE MINILAB?

12:03PM  18    A.   CORRECT.

12:03PM  19    Q.   YOU TRUSTED THEM NOT TO OPEN IT UP, LOOK AT THE

12:03PM  20    SPECTROMETER, LOOK AT THE CENTRIFUGE, AND TRY TO COME AWAY WITH

12:03PM  21    AN IDEA OF HOW TO REVERSE ENGINEER THAT; CORRECT?

12:04PM  22    A.   CORRECT.

12:04PM  23    Q.   AND THAT WOULD VIOLATE YOUR CONFIDENTIALITY AGREEMENTS IF

12:04PM  24    YOU DID THAT -- IF WALGREENS DID THAT; CORRECT?

12:04PM  25    A.   YES.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8425

12:04PM   1        AND JUST TO BE CLEAR, THE VERSIONS THAT WE SENT THEM WERE

12:04PM   2   THE 3 SERIES VERSIONS.

12:04PM   3   Q.   OKAY.  AND YOU WERE USING 3 SERIES VERSIONS IN THE CLIA

12:04PM   4   LAB AT SOME POINT?

12:04PM   5   A.   WE WERE.

12:04PM   6   Q.   OKAY.  SO THIS WAS TECHNOLOGY THAT YOU WERE ACTUALLY

12:04PM   7   USING?

12:04PM   8   A.   YES.

12:04PM   9   Q.   OKAY.  AND YOU KNEW THAT UNDER THE AGREEMENTS, WALGREENS

12:04PM  10   COULDN'T TAKE APART THE DEVICE, COULDN'T STUDY IT, COULDN'T

12:04PM  11   REVERSE ENGINEER IT.  YOU TRUSTED THEM TO KEEP YOUR SECRETS?

12:04PM  12   A.   WE DID.

12:04PM  13   Q.   ON THIS VERY, VERY IMPORTANT PIECE OF THERANOS TECHNOLOGY?

12:04PM  14   A.   YES.

12:04PM  15        (PAUSE IN PROCEEDINGS.)

12:04PM  16        THE COURT:   JUST A SECOND.

12:04PM  17        THANK YOU, MS. KRATZMANN.

12:04PM  18        LET'S MAKE SURE THAT PEN IS WORKING.

12:05PM  19        MR. LEACH:   THANK YOU, YOUR HONOR.

12:05PM  20   Q.   AND AM I RIGHT THAT WITHOUT THOSE ASSURANCES OF

12:05PM  21   CONFIDENTIALITY FROM WALGREENS, YOU WOULD NOT HAVE BEEN

12:05PM  22   COMFORTABLE GIVING THEM -- JUST HAVING A MINILAB THERE IN

12:05PM  23   CHICAGO WHERE THEY COULD DO ANYTHING THEY WANTED WITH IT?

12:05PM  24   A.   PROBABLY NOT.

12:05PM  25   Q.   OKAY.  LET ME ASK YOU ABOUT SOME OF YOUR INTERACTIONS WITH

UNITED STATES COURT REPORTERS

**ER-11996**

HOLMES CROSS BY MR. LEACH (RES.)                                    8426

| | | |
|---|---|---|
| 12:05PM | 1 | MS. SPIVEY. |
| 12:05PM | 2 | IF I UNDERSTOOD YOUR TESTIMONY, IT'S THAT MR. BALWANI |
| 12:05PM | 3 | PRIMARILY INTERFACED WITH MS. SPIVEY ON FINANCIAL OPERATIONS |
| 12:05PM | 4 | AND CASH MANAGEMENT. |
| 12:05PM | 5 | A.   HE DID. |
| 12:05PM | 6 | Q.   OKAY.  NOW, YOU WERE HERE IN COURT WHEN MS. SPIVEY |
| 12:05PM | 7 | TESTIFIED THAT SHE REPORTED TO YOU FROM THE 2008, 2009 TIME |
| 12:05PM | 8 | PERIOD ALL OF THE WAY UP THROUGH 2016? |
| 12:05PM | 9 | A.   YES. |
| 12:05PM | 10 | Q.   OKAY.  AND YOU'RE NOT SAYING THAT YOU HAD NO INTERACTIONS |
| 12:06PM | 11 | WITH MS. SPIVEY ABOUT THERANOS'S FINANCIAL CONDITION; CORRECT? |
| 12:06PM | 12 | A.   CORRECT. |
| 12:06PM | 13 | Q.   YOU HAD REGULAR INTERACTIONS WITH HER; CORRECT? |
| 12:06PM | 14 | A.   I DID. |
| 12:06PM | 15 | Q.   OKAY.  SHE WOULD PROVIDE YOU FINANCIAL STATEMENTS FROM |
| 12:06PM | 16 | TIME TO TIME? |
| 12:06PM | 17 | A.   MY MEMORY IS THAT SHE WOULD SEND THE CASH BALANCE ON A |
| 12:06PM | 18 | REGULAR BASIS. |
| 12:06PM | 19 | MR. LEACH:  MAY I APPROACH, YOUR HONOR? |
| 12:06PM | 20 | THE COURT:  YES. |
| 12:06PM | 21 | BY MR. LEACH: |
| 12:06PM | 22 | Q.   (HANDING.) |
| 12:06PM | 23 | A.   THANK YOU. |
| 12:06PM | 24 | Q.   I'M PLACING BEFORE YOU, MS. HOLMES, WHAT WE'VE MARKED AS |
| 12:06PM | 25 | EXHIBITS 615 AND 792. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8427

12:06PM  1    A.   YES.

12:06PM  2    Q.   LET ME DRAW YOUR ATTENTION TO 615.

12:07PM  3         DO YOU SEE MS. YAM'S NAME AT THE TOP OF THIS EMAIL?

12:07PM  4    A.   I DO.

12:07PM  5    Q.   AND DO YOU SEE YOUR NAME IN THE TO LINE?

12:07PM  6    A.   I DO.

12:07PM  7    Q.   AND THE DATE OF THIS IS JUNE 4TH, 2012?

12:07PM  8    A.   IT IS.

12:07PM  9    Q.   AND DO YOU SEE THAT THERE'S AN ATTACHMENT "FINANCIAL

12:07PM  10   STATEMENT ANALYSIS TEMPLATE-THERANOS" PDF?

12:07PM  11   A.   I DO.

12:07PM  12        MR. LEACH:  YOUR HONOR, I MOVE THE ADMISSION OF

12:07PM  13   EXHIBIT 615.

12:07PM  14        THE CLERK:  THESE HAVE BEEN ADMITTED, YOUR HONOR.

12:07PM  15   THEY ARE ADMITTED.

12:07PM  16        MR. LEACH:  OH, I COULD HAVE SAVED A FEW SECONDS

12:07PM  17   THERE.  MY APOLOGIES, YOUR HONOR.

12:07PM  18        THE COURT:  THEY ARE IN EVIDENCE AND THEY CAN BE

12:07PM  19   PUBLISHED.

12:07PM  20        MR. LEACH:  OKAY.  LET'S DISPLAY 615.

12:07PM  21   Q.   MS. HOLMES, THIS IS AN EMAIL BETWEEN JUST YOU AND

12:08PM  22   MS. SPIVEY; CORRECT?

12:08PM  23   A.   YES.

12:08PM  24   Q.   AND IN THE ATTACHMENT, IT SAYS FS 123111.

12:08PM  25        DO YOU SEE THAT?

UNITED STATES COURT REPORTERS

**ER-11998**

HOLMES CROSS BY MR. LEACH (RES.)                                   8428

| | | |
|---|---|---|
| 12:08PM | 1 | A.   I DO. |
| 12:08PM | 2 | Q.   AND YOU UNDERSTOOD THAT TO BE A REFERENCE TO THERANOS'S |
| 12:08PM | 3 | 2011 FINANCIAL STATEMENTS? |
| 12:08PM | 4 | A.   YES. |
| 12:08PM | 5 | Q.   AND IF WE COULD PLEASE LOOK AT PAGE 3, DO YOU SEE THAT |
| 12:08PM | 6 | THERE'S A BALANCE SHEET HERE? |
| 12:08PM | 7 | A.   I DO. |
| 12:08PM | 8 | Q.   AND YOU WERE FAMILIAR WITH BALANCE SHEETS DURING YOUR TIME |
| 12:08PM | 9 | AT THERANOS; CORRECT? |
| 12:08PM | 10 | A.   GENERALLY, YES. |
| 12:08PM | 11 | Q.   THERANOS WAS AUDITED FOR A SMALL PERIOD OF TIME; RIGHT? |
| 12:08PM | 12 | A.   WE WERE. |
| 12:08PM | 13 | Q.   AND YOU HAD TO SIGN PAPERWORK IN CONNECTION WITH THAT |
| 12:08PM | 14 | AUDIT; CORRECT? |
| 12:08PM | 15 | A.   PROBABLY, YES. |
| 12:08PM | 16 | Q.   CERTIFYING THE FINANCIAL STATEMENTS AS TRUE AND CORRECT? |
| 12:08PM | 17 | A.   I DON'T REMEMBER DOING THAT, BUT I DON'T DOUBT IT. |
| 12:08PM | 18 | Q.   OKAY.  AND ISN'T THIS AN EXAMPLE OF MS. SPIVEY FROM TIME |
| 12:09PM | 19 | TO TIME PROVIDING YOU NOT JUST CASH FORECASTS OR CASH BALANCES, |
| 12:09PM | 20 | BUT THE COMPANY'S ACTUAL FINANCIAL STATEMENTS? |
| 12:09PM | 21 | A.   YES. |
| 12:09PM | 22 | Q.   IF I COULD ASK YOU TO PLEASE LOOK AT EXHIBIT 792. |
| 12:09PM | 23 | MS. KRATZMANN, IS 792 IN? |
| 12:09PM | 24 | THE CLERK:  IT IS. |
| 12:09PM | 25 | MR. LEACH:  OKAY.  AND IF WE CAN DISPLAY THIS, |

HOLMES CROSS BY MR. LEACH (RES.)                                    8429

12:09PM   1      PLEASE.

12:09PM   2      Q.   IF I COULD DRAW YOUR ATTENTION TO THE BOTTOM, MS. HOLMES,

12:09PM   3      DO YOU SEE YOU WROTE, "SOMETIME AGO WE MET WITH STANFORD AND

12:09PM   4      SHARED SOME FINANCIAL INFORMATION IN A TEMPLATE THEY REQUESTED

12:09PM   5      THAT YOU AND I REVIEWED TOGETHER.  I AM MEETING AGAIN WITH THEM

12:09PM   6      TOMORROW.  CAN YOU UPDATE THAT TEMPLATE FOR WHERE WE ARE

12:09PM   7      NOW/2013 AND SEND TO SUNNY AND ME AS WELL AS THE DOCUMENT WE

12:09PM   8      SHARED WITH THEM LAST YEAR."

12:09PM   9          DO YOU SEE THAT?

12:09PM  10      A.   I DO.

12:09PM  11      Q.   AND IS THIS ANOTHER EXAMPLE OF MS. SPIVEY PROVIDING TO YOU

12:10PM  12      THE FINANCIAL STATEMENTS OF THERANOS?

12:10PM  13      A.   YES.

12:10PM  14      Q.   AND YOU KNEW AT THE END OF THE DAY THAT YOU WERE

12:10PM  15      ULTIMATELY RESPONSIBLE FOR THERANOS'S FINANCIAL CONDITION AS

12:10PM  16      THE CEO?

12:10PM  17      A.   I DID.

12:10PM  18      Q.   OKAY.  AND YOUR TESTIMONY IS THAT THERE MAY HAVE BEEN

12:10PM  19      INSTANCES IN WHICH YOU OPENED A COMPUTER FILE CONTAINING ONE OF

12:10PM  20      MR. BALWANI'S FINANCIAL MODELS AND REVIEWED IT; CORRECT?

12:10PM  21      A.   I'M NOT SURE.

12:10PM  22      Q.   LET ME DRAW YOUR ATTENTION TO THE BINDER.

12:10PM  23      A.   YES.

12:10PM  24      Q.   AND IF YOU COULD LOOK, PLEASE, AT -- IT'S PAGE 524 OF THE

12:10PM  25      TESTIMONY.  THE BATES NUMBER IS ENDING 5435.

HOLMES CROSS BY MR. LEACH (RES.)                              8430

12:11PM  1    A.   OKAY.

12:11PM  2    Q.   AND I DRAW YOUR ATTENTION TO LINE 18 THROUGH 24.

12:11PM  3    A.   YES.

12:11PM  4         MR. LEACH:  PERMISSION TO READ THESE, YOUR HONOR?

12:11PM  5         THE COURT:  YES.

12:11PM  6    BY MR. LEACH:

12:11PM  7    Q.   MS. HOLMES, WERE YOU ASKED THE FOLLOWING QUESTIONS AND DID

12:11PM  8    YOU GIVE THE FOLLOWING ANSWERS:

12:11PM  9         "QUESTION:  WERE THERE OTHER INSTANCES IN WHICH YOU MIGHT

12:11PM  10   HAVE OPENED A FILE AND REVIEWED IT?

12:11PM  11        "ANSWER:  YES.

12:11PM  12        "QUESTION:  AND OTHER INSTANCES IN WHICH YOU MIGHT HAVE

12:11PM  13   OPENED A FINANCIAL MODEL THAT SUNNY BALWANI WAS WORKING ON AND

12:11PM  14   REVIEWED IT?

12:11PM  15        "ANSWER:  COULD HAVE BEEN."

12:11PM  16        DID I READ THAT CORRECTLY?

12:11PM  17   A.   YOU DID.

12:11PM  18   Q.   AND THAT WAS YOUR TESTIMONY BACK THEN?

12:11PM  19   A.   YES.

12:11PM  20   Q.   OKAY.  AND THERE WERE ALSO INSTANCES WHEN YOU TOLD

12:11PM  21   MR. BALWANI THAT YOU WOULD GET COMFORTABLE WITH THE FINANCIAL

12:11PM  22   MODEL THAT WAS BEING PROVIDED TO AN INVESTOR?

12:12PM  23   A.   THERE WAS ONE INSTANCE I'M AWARE OF IT.

12:12PM  24   Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO -- WELL, LET

12:12PM  25   ME ASK THE QUESTION FIRST.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8431

12:12PM   1         YOU KNEW THAT WHEN POTENTIAL INVESTORS WERE CONSIDERING

12:12PM   2    INVESTMENTS IN THERANOS, THAT THEY WOULD OFTEN BE PROVIDED A

12:12PM   3    POWERPOINT DESCRIBING THERANOS'S BUSINESS; CORRECT?

12:12PM   4    A.   YES.

12:12PM   5    Q.   OKAY.   AND YOU ON OCCASION WOULD GO THROUGH THAT

12:12PM   6    POWERPOINT WITH INVESTORS?

12:12PM   7    A.   WE WOULD LOOK AT A SLIDE OR SOME SLIDES FROM IT.

12:12PM   8    Q.   OKAY.   BUT YOU HAD THE AUTHORITY TO EITHER SEND IT OUT OR

12:12PM   9    NOT SEND IT OUT; CORRECT?

12:12PM  10    A.   CORRECT.

12:12PM  11    Q.   AND DAN EDLIN WORKED CLOSELY WITH YOU ON THAT; CORRECT?

12:12PM  12    A.   HE DID.

12:12PM  13    Q.   HE WOULDN'T SEND SOMETHING OUT WITHOUT YOUR BLESSING;

12:12PM  14    CORRECT?

12:12PM  15    A.   I THINK HE GENERALLY TRIED TO GET MY BLESSING.

12:12PM  16    Q.   OKAY.   AND PEOPLE MAY HAVE CONTRIBUTED TO THE SLIDES, BUT

12:13PM  17    AT THE END OF THE DAY, IT'S YOUR DECISION TO SEND THEM OUT;

12:13PM  18    CORRECT, MS. HOLMES?

12:13PM  19    A.   ULTIMATELY.

12:13PM  20    Q.   IF YOU DISAGREED WITH ANYTHING IN THE SLIDES, YOU HAD THE

12:13PM  21    ABILITY TO ORDER THEM CHANGED OR NOT SENT OUT AT ALL.

12:13PM  22         IS THAT FAIR?

12:13PM  23    A.   OF COURSE.

12:13PM  24    Q.   OKAY.   WE'VE LOOKED A COUPLE OF TIMES AT -- WELL, LET ME

12:13PM  25    ASK IT THIS WAY:   AM I RIGHT THAT YOU WERE AWARE IN 2014 AND

                          UNITED STATES COURT REPORTERS


                                 **ER-12002**

HOLMES CROSS BY MR. LEACH (RES.)                                    8432

| | | |
|---|---|---|
| 12:13PM | 1 | 2015 THAT THE REPORTS RELATING TO PFIZER, SCHERING-PLOUGH, AND |
| 12:13PM | 2 | GSK WERE BEING INCLUDED IN INVESTOR MATERIALS? |
| 12:13PM | 3 | A.   I WAS. |
| 12:13PM | 4 | Q.   AND IF I COULD DRAW YOUR ATTENTION TO EXHIBIT 5728. |
| 12:14PM | 5 | A.   WHICH BINDER? |
| 12:14PM | 6 | I THINK I FOUND IT. |
| 12:14PM | 7 | THE COURT:  3. |
| 12:14PM | 8 | THE WITNESS:  YEAH. |
| 12:14PM | 9 | MR. LEACH:  VOLUME 3.  MY APOLOGIES. |
| 12:14PM | 10 | THE WITNESS:  GOT IT. |
| 12:14PM | 11 | BY MR. LEACH: |
| 12:14PM | 12 | Q.   DO YOU SEE THE THERANOS LOGO AT THE TOP OF PAGE 1 OF 5728? |
| 12:14PM | 13 | A.   I DO. |
| 12:14PM | 14 | Q.   AND DO YOU SEE IN THE BOTTOM A BATES NUMBER KRM_SEC? |
| 12:14PM | 15 | A.   I DO. |
| 12:14PM | 16 | Q.   OKAY.  AND ON PAGE 3, DO YOU SEE A DOCUMENT WITH THE |
| 12:15PM | 17 | PFIZER LOGO AND THE THERANOS LOGO? |
| 12:15PM | 18 | A.   I DO. |
| 12:15PM | 19 | Q.   AND IF WE GO TO PAGE 38, DO YOU ALSO SEE SOME REFERENCES |
| 12:15PM | 20 | TO ANOTHER PHARMACEUTICAL COMPANY? |
| 12:15PM | 21 | A.   I DO. |
| 12:15PM | 22 | Q.   OKAY.  AND THE BATES RANGE KRM, DO YOU HAVE ANY REASON TO |
| 12:15PM | 23 | DOUBT THAT THAT IS ASSOCIATED WITH RUPERT MURDOCH? |
| 12:15PM | 24 | A.   I DON'T KNOW. |
| 12:15PM | 25 | Q.   YOU HAVE NO REASON TO DOUBT IT THOUGH? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8433

12:15PM   1      A.   I DON'T, NO.

12:15PM   2      Q.   AND DOES THIS LOOK LIKE MATERIALS THAT WERE PROVIDED TO

12:15PM   3      INVESTORS?

12:15PM   4      A.   I THINK SO.

12:15PM   5              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5728.

12:15PM   6              MR. DOWNEY:  YOUR HONOR, I HAVE TO OBJECT TO THE

12:15PM   7      FOUNDATION ON THIS ONE.

12:16PM   8              THE COURT:  COULD YOU ASK A FEW MORE QUESTIONS

12:16PM   9      REGARDING FOUNDATION?

12:16PM   10     BY MR. LEACH:

12:16PM   11     Q.   YOU RECOGNIZE THE THERANOS LOGO ON THE FIRST PAGE; RIGHT,

12:16PM   12     MS. HOLMES?

12:16PM   13     A.   I DO.

12:16PM   14     Q.   OKAY.  AND DO YOU SEE THE LINE "THERANOS CONFIDENTIAL" ON

12:16PM   15     PAGE 1 KIND OF DIAGONAL?

12:16PM   16     A.   I DO.

12:16PM   17     Q.   YOU KNOW THAT THERANOS, FROM TIME TO TIME, WOULD APPLY

12:16PM   18     THAT TO SOME OF ITS DOCUMENTS TO MAKE SURE THE READER WOULD

12:16PM   19     KNOW THAT THIS WAS CONFIDENTIAL?

12:16PM   20     A.   I DO.

12:16PM   21     Q.   DO YOU SEE THE HEADING IN THE MIDDLE OF THE FIRST PAGE OF

12:16PM   22     PAGE 1?  I DON'T WANT TO READ IT BECAUSE IT'S NOT IN EVIDENCE

12:16PM   23     YET, BUT DO YOU SEE THAT?

12:16PM   24     A.   YEAH, I DO.

12:16PM   25     Q.   AND IS THAT CONSISTENT WITH THE FORMAT THAT YOU WOULD SEE

ER-12004

HOLMES CROSS BY MR. LEACH (RES.)                                8434

| | | |
|---|---|---|
| 12:16PM | 1 | BEING PROVIDED TO INVESTORS WHEN THEY WERE GIVEN BINDERS OF |
| 12:16PM | 2 | MATERIALS? |
| 12:16PM | 3 | A.   I THINK SO. |
| 12:17PM | 4 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5728. |
| 12:17PM | 5 | THE COURT:  I'LL ADMIT IT OVER OBJECTION.  IT MAY BE |
| 12:17PM | 6 | PUBLISHED. |
| 12:17PM | 7 | (GOVERNMENT'S EXHIBIT 5728 WAS RECEIVED IN EVIDENCE.) |
| 12:18PM | 8 | BY MR. LEACH: |
| 12:18PM | 9 | Q.   MS. HOLMES, JUST TO GO OVER SOME OF THE QUESTIONS THAT I |
| 12:18PM | 10 | HAD WITHOUT THE BENEFIT OF THIS ON THE SCREEN, DO YOU SEE WHERE |
| 12:18PM | 11 | IT SAYS "EXEMPLARY REPORTS FROM PHARMACEUTICAL PARTNERS"? |
| 12:18PM | 12 | A.   I DO. |
| 12:18PM | 13 | Q.   AND YOU KNOW SITTING HERE TODAY THAT THIS FORMAT WOULD BE |
| 12:18PM | 14 | USED FROM TIME TO TIME IN THE INVESTOR PACKAGE THAT WOULD GO |
| 12:18PM | 15 | OUT TO POTENTIAL INVESTORS? |
| 12:18PM | 16 | A.   I THINK SO. |
| 12:18PM | 17 | Q.   OKAY.  AND IF WE CAN GO TO PAGE 2, PLEASE. |
| 12:18PM | 18 | AND IS THIS A COPY OF THE THERANOS ANGIOGENESIS STUDY |
| 12:18PM | 19 | REPORT WITH THE PFIZER LOGO AND THE THERANOS LOGO ON IT? |
| 12:18PM | 20 | A.   IT IS. |
| 12:18PM | 21 | Q.   OKAY.  IF WE COULD PLEASE GO TO PAGE 38. |
| 12:18PM | 22 | IS THIS A COPY OF A REPORT RELATING TO SCHERING-PLOUGH |
| 12:18PM | 23 | WITH THE SCHERING-PLOUGH LOGO AND THE THERANOS LOGO? |
| 12:18PM | 24 | A.   IT IS. |
| 12:18PM | 25 | Q.   OKAY.  IF WE CAN ZOOM OUT, PLEASE, MS. HOLLIMAN. |

HOLMES CROSS BY MR. LEACH (RES.)                                      8435

```
12:19PM   1          THERE'S A BATES NUMBER IN THE BOTTOM RIGHT-HAND CORNER

12:19PM   2     KRM_SEC.

12:19PM   3          DO YOU SEE THAT?

12:19PM   4     A.   I DO.

12:19PM   5     Q.   BUT THAT PREFIX DOESN'T MEAN ANYTHING TO YOU SITTING HERE

12:19PM   6     TODAY?

12:19PM   7     A.   IT DOESN'T.

12:19PM   8     Q.   YOU DO KNOW THAT YOU PROVIDED AN INVESTOR BINDER TO

12:19PM   9     RUPERT MURDOCH; CORRECT?

12:19PM  10     A.   I DO.

12:19PM  11     Q.   AND YOU REVIEWED THAT BEFORE IT WENT OUT; CORRECT?

12:19PM  12     A.   I DON'T KNOW IF I PERSONALLY REVIEWED IT, BUT I WAS AWARE

12:19PM  13     OF IT GOING OUT.

12:19PM  14     Q.   OKAY.  WE TALKED A LITTLE BIT LAST WEEK ABOUT GSK.

12:19PM  15          DO YOU RECALL TESTIFYING ABOUT GSK?

12:19PM  16     A.   I DO.

12:19PM  17     Q.   WAS THE THERANOS DEVICE EVER USED IN A GSK CLINICAL TRIAL?

12:19PM  18     A.   JUST THE TIME WE SHIPPED THE DEVICES TO GSK FOR THE STUDY

12:19PM  19     THAT WE RAN.

12:19PM  20     Q.   OKAY.  THAT'S THE STUDY THAT WAS SUMMARIZED IN THE

12:19PM  21     DOCUMENTS THAT WE WERE LOOKING AT DURING --

12:19PM  22     A.   EXACTLY.

12:19PM  23     Q.   OKAY.  BUT THAT WASN'T A CLINICAL TRIAL; RIGHT?

12:19PM  24     A.   I WASN'T SURE EXACTLY WHAT YOU MEANT BY THAT.

12:19PM  25     Q.   OKAY.
```

HOLMES CROSS BY MR. LEACH (RES.)                                      8436

12:19PM  1      A.   BUT IT WAS A STUDY THAT WE RAN AT GSK.

12:20PM  2      Q.   WELL, YOU UNDERSTAND WHAT A CLINICAL TRIAL IS; CORRECT?

12:20PM  3      A.   I DO.  I ASSUME YOU MEAN A DRUG TRIAL.

12:20PM  4      Q.   CORRECT.

12:20PM  5      A.   YES, IT WAS NOT USED IN A DRUG TRIAL.

12:20PM  6      Q.   OKAY.  THANK YOU.

12:20PM  7           PRIOR TO 2015, YOU UNDERSTOOD THAT THE FDA DID NOT

12:20PM  8      APPROVE -- HAD NOT APPROVED THE MINILAB FOR ANY ASSAY IN ANY

12:20PM  9      WAY, SHAPE, OR FASHION; CORRECT?

12:20PM 10      A.   CORRECT.

12:20PM 11      Q.   AND IN 2015 YOU OBTAINED AN APPROVAL FOR THE SINGLE ASSAY,

12:20PM 12      THAT WAS THE HERPES ASSAY; CORRECT?

12:20PM 13      A.   CORRECT.

12:20PM 14      Q.   AND THAT WAS IN THE MIDDLE OF 2015, SO BEFORE THAT NO FDA

12:20PM 15      APPROVAL OF THE MINILAB OR THE EDISON 3.5?

12:20PM 16      A.   THAT'S RIGHT.

12:20PM 17      Q.   AND THE FDA DID NOT REVIEW IN ANY WAY, SHAPE, OR FORM THE

12:20PM 18      OTHER LDT'S THAT THERANOS WAS PERFORMING IN ITS LAB; CORRECT?

12:20PM 19      A.   CERTAINLY NOT A 510K REVIEW.

12:21PM 20      Q.   WELL, THEY DIDN'T COME INTO YOUR LAB AND LOOK AT THE

12:21PM 21      TESTS, RIGHT, UNTIL SEPTEMBER OR AUGUST OF 2015?

12:21PM 22      A.   CORRECT.

12:21PM 23      Q.   OKAY.  I'M LOOKING AT THE PERIOD BEFORE THEN.

12:21PM 24           THE FDA DIDN'T COME IN AND SAY, WE'VE SEEN ALL OF YOUR

12:21PM 25      LDT'S, THIS IS GREAT, YOU HAVE OUR STAMP OF APPROVAL?

HOLMES CROSS BY MR. LEACH (RES.)                                    8437

12:21PM   1      A.   CORRECT.

12:21PM   2      Q.   OKAY.  AND YOU ALSO KNEW WHEN YOU GOT YOUR CLIA

12:21PM   3   CERTIFICATION IN 2011 THAT YOU WEREN'T PERFORMING ANY LDT'S AT

12:21PM   4   THAT POINT IN TIME; CORRECT?

12:21PM   5      A.   CORRECT.

12:21PM   6      Q.   AND YOU WEREN'T PERFORMING ANY LDT'S IN 2012; CORRECT?

12:21PM   7      A.   CORRECT.

12:21PM   8      Q.   AND YOU TALKED ABOUT A NEW YORK INSPECTION IN EARLY -- YOU

12:21PM   9   TALKED ABOUT A NEW YORK INSPECTION DURING YOUR DIRECT

12:21PM  10   EXAMINATION.

12:21PM  11          DO YOU RECALL THAT?

12:21PM  12      A.   I DID.

12:21PM  13      Q.   AND DO YOU KNOW THAT THAT INSPECTION WAS IN EARLY 2013?

12:21PM  14      A.   I ASSUME SO.  I THINK THAT'S RIGHT.

12:21PM  15      Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 7282.  IT SHOULD BE IN

12:22PM  16   VOLUME 3.  THIS IS IN EVIDENCE.

12:22PM  17      A.   OKAY.

12:22PM  18      Q.   AND IF WE CAN JUST FOCUS ON THE TOP PORTION, THE HEADER,

12:22PM  19   MS. HOLLIMAN.

12:22PM  20          DO YOU RECALL TESTIFYING ABOUT THIS IN DIRECT EXAMINATION?

12:22PM  21      A.   I DO.

12:22PM  22      Q.   AND IT'S MR. BALWANI GIVING CONGRATULATIONS FOR THE

12:22PM  23   NEW YORK INSPECTION?

12:22PM  24      A.   YES.

12:22PM  25      Q.   THE DATE IS APRIL 4TH, 2013; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                      8438

12:22PM   1    A.   IT IS.

12:22PM   2    Q.   THAT'S BEFORE YOU'RE DOING ANY LDT TESTING IN THE CLIA

12:22PM   3    LAB; RIGHT?

12:22PM   4    A.   EXACTLY, YES.

12:22PM   5    Q.   OKAY.  SO THIS INSPECTION WOULD RELATE TO ORDINARY FDA

12:22PM   6    MACHINES RUNNING ORDINARY FDA APPROVED TESTS; CORRECT?

12:22PM   7    A.   AND OUR QUALITY SYSTEMS.

12:22PM   8    Q.   BUT NO LDT'S?

12:22PM   9    A.   CORRECT.

12:22PM  10    Q.   YOU'RE NOT USING THE EDISON DEVICE?

12:22PM  11    A.   CORRECT.

12:22PM  12    Q.   AND YOU'RE NOT MODIFYING SIEMENS MACHINES AT THIS POINT IN

12:22PM  13    TIME?

12:22PM  14    A.   CORRECT.

12:22PM  15    Q.   AND YOU ALSO TESTIFIED THAT THERE WAS AN INSPECTION IN

12:23PM  16    DECEMBER OF 2013; CORRECT?

12:23PM  17    A.   I DID.

12:23PM  18    Q.   AND YOU UNDERSTAND THAT WAS BY THE STATE OF CALIFORNIA;

12:23PM  19    CORRECT?

12:23PM  20    A.   I DO.

12:23PM  21    Q.   OKAY.  YOU WERE SAYING CMS IN YOUR DIRECT EXAMINATION, BUT

12:23PM  22    I JUST WANT TO BE CLEAR, IT WAS THE STATE THAT CAME IN;

12:23PM  23    CORRECT?

12:23PM  24    A.   GOT IT.  SORRY, I USE THOSE INTERCHANGEABLY.

12:23PM  25    Q.   AND AT THAT POINT IN TIME, THERANOS WAS DOING A SMALL

HOLMES CROSS BY MR. LEACH (RES.)                                        8439

12:23PM   1    NUMBER OF LDT'S; CORRECT?

12:23PM   2    A.   CORRECT.

12:23PM   3    Q.   I THINK, BASED ON WHAT WE WERE LOOKING AT EARLIER, IT'S

12:23PM   4    SOMEWHERE IN THE NEIGHBORHOOD OF THREE TO FOUR?

12:23PM   5    A.   I THINK THAT'S RIGHT.

12:23PM   6    Q.   OKAY.  AND SOME OF THOSE ARE ON THE EDISON 3.5, OTHERS

12:23PM   7    MIGHT BE ON MODIFIED THIRD PARTY MACHINES?

12:23PM   8    A.   YES.

12:23PM   9    Q.   AND I THINK YOU WERE SHOWN A DOCUMENT ON YOUR DIRECT

12:23PM  10    EXAMINATION WHERE YOU GOT NOTES FROM DANIEL YOUNG REPORTING ON

12:23PM  11    THE INSPECTION.

12:23PM  12         DO YOU REMEMBER THAT?

12:23PM  13    A.   I DO.

12:23PM  14    Q.   AND THAT REPORT SAID THAT THE INSPECTORS LOOKED AT A

12:23PM  15    SINGLE VALIDATION REPORT FOR AN LDT; CORRECT?

12:24PM  16    A.   THAT'S RIGHT.

12:24PM  17    Q.   AND THAT WAS CREATININE?

12:24PM  18    A.   I DON'T REMEMBER, BUT I DON'T DOUBT YOU.

12:24PM  19    Q.   OKAY.  WELL, WE'RE NOT GOING TO CALL UP THE DOCUMENT, BUT

12:24PM  20    YOU REMEMBER ONE LDT?

12:24PM  21    A.   I REMEMBER THE REFERENCE TO AN LDT REPORT BEING REVIEWED

12:24PM  22    BY THE INSPECTOR.

12:24PM  23    Q.   OKAY.  AND THAT LDT WAS NOT AN EDISON ONE, IT WAS ONE ON

12:24PM  24    THE MODIFIED SIEMENS MACHINE; CORRECT?

12:24PM  25    A.   EXACTLY, YES.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8440

12:24PM   1    Q.   AND YOU HAVE NO REASON TO THINK THAT THE INSPECTOR

12:24PM   2    ACTUALLY SAW AN EDISON DEVICE DURING THAT 2013 INSPECTION?

12:24PM   3    A.   I'M NOT SURE.  I REMEMBER THE REFERENCE THERE TO

12:24PM   4    DISCUSSING -- THE FACT THAT THE TEAM DISCUSSED THEM WITH THE

12:24PM   5    INSPECTORS.

12:24PM   6    Q.   OKAY.  THEY DISCUSSED THE FACT THAT THERE WERE LDT'S.  YOU

12:24PM   7    DON'T RECALL ANY REFERENCE IN THAT DOCUMENT FROM THE INSPECTOR

12:24PM   8    ACTUALLY LOOKING AND INSPECTING THE EDISON 3.5?

12:24PM   9    A.   I DON'T REMEMBER.

12:24PM   10   Q.   OKAY.  AND AT THIS POINT IN TIME, YOU'RE SCALING UP THE

12:25PM   11   NUMBER OF LDT'S AND THERE'S NO FDA APPROVAL, CMS ISN'T GOING TO

12:25PM   12   COME BACK FOR ANOTHER TWO YEARS, YOU'RE RAMPING UP ON LDT'S,

12:25PM   13   BUT THE ONLY THING, FOR LACK OF A BETTER WORD, CHECKING THAT IS

12:25PM   14   THERANOS; CORRECT?

12:25PM   15   A.   AND THE PROCESS THAT WE ENGAGED IN FOR PT AND AAP AND THE

12:25PM   16   ONGOING QUALITY SYSTEMS OVERSIGHT.

12:25PM   17   Q.   OKAY.  BUT NOBODY FROM CMS AND NOBODY FROM THE STATE AND

12:25PM   18   NOBODY FROM THE FDA IS COMING IN AND LOOKING AT THE DEVICE AS A

12:25PM   19   NEW LDT COMES ON BOARD AND SAYING, OKAY, YOU CAN GO AHEAD AND

12:25PM   20   DO THAT; CORRECT?

12:25PM   21   A.   CORRECT.

12:25PM   22   Q.   IT'S ALL THERANOS SAYING WE'VE GONE THROUGH THE PROCESS,

12:25PM   23   WE'RE READY TO TAKE THIS LIVE?

12:25PM   24   A.   CORRECT, AND ENGAGING WITH FDA AND CMS IN D.C.

12:25PM   25   Q.   OKAY.  BUT YOU TOLD CMS IN D.C. THAT YOU WERE DOING THIS.

HOLMES CROSS BY MR. LEACH (RES.)                                    8441

12:25PM  1    YOU DIDN'T PROVIDE THEM THE VALIDATION REPORTS OR THE DATA OR

12:26PM  2    ANYTHING LIKE THAT?

12:26PM  3    A.   I DON'T THINK SO.

12:26PM  4    Q.   OKAY.  AND YOUR TESTIMONY IS THAT YOU DON'T RECALL

12:26PM  5    SUREKHA GANGADKHEDKAR COMING TO YOU IN SEPTEMBER OF 2013 SAYING

12:26PM  6    THAT THERANOS ISN'T READY; CORRECT?

12:26PM  7    A.   I DO NOT.

12:26PM  8    Q.   AND DO YOU DENY THAT SHE TOLD YOU -- OR YOU TOLD HER THAT

12:26PM  9    THERANOS DIDN'T HAVE MUCH OF A CHOICE, THAT YOU HAVE A PROMISE

12:26PM  10   TO DELIVER TO THE CUSTOMER?

12:26PM  11   A.   I DON'T REMEMBER SAYING THAT, BUT THAT'S SOMETHING THAT I

12:26PM  12   COULD HAVE SAID.

12:26PM  13   Q.   YOU JUST HAVE NO MEMORY OF IT?

12:26PM  14   A.   I DON'T.

12:26PM  15   Q.   AND YOU DON'T DISPUTE THAT ADAM ROSENDORFF TOLD YOU IN THE

12:26PM  16   FALL OF 2013 THAT HE WAS BEING ASKED TO VOUCH FOR RESULTS THAT

12:26PM  17   HE WAS NOT CONFIDENT IN?

12:26PM  18   A.   I REMEMBER AN EMAIL THAT -- I'M SORRY, IN NOVEMBER OF

12:26PM  19   2013?

12:26PM  20   Q.   I SAID THE FALL OF -- I MEANT TO SAY THE FALL OF 2014.

12:26PM  21   A.   THE FALL OF 2014.  I REMEMBER THAT EMAIL.

12:26PM  22   Q.   YOU REMEMBER AN EMAIL FROM DR. ROSENDORFF WHERE HE SAID, I

12:27PM  23   CAN'T VOUCH FOR THE TEST, OR I'M BEING ASKED TO VOUCH FOR

12:27PM  24   RESULTS I'M NOT CONFIDENT IN?

12:27PM  25   A.   YES, I REMEMBER THAT.

HOLMES CROSS BY MR. LEACH (RES.)                                    8442

12:27PM   1        Q.   OKAY.  LET'S LOOK AT THAT.  IT'S EXHIBIT 4330.  I THINK I

12:27PM   2    HAVE IT.  IT'S IN EVIDENCE, BUT I HAVE A COPY.

12:27PM   3             IF I MAY APPROACH, YOUR HONOR?

12:27PM   4                  THE COURT:  YES.

12:27PM   5    BY MR. LEACH:

12:27PM   6        Q.   (HANDING.)

12:27PM   7        A.   THANK YOU.

12:27PM   8        Q.   LET'S LOOK AT PAGE 2, MS. HOLLIMAN.  AND IF WE CAN ZOOM IN

12:27PM   9    ON THE TOP EMAIL, PLEASE.

12:27PM  10             MS. HOLMES, DO YOU SEE WHERE DR. ROSENDORFF WROTE, "I FEEL

12:28PM  11    REALLY UNCOMFORTABLE WITH WHAT IS HAPPENING RIGHT NOW IN THIS

12:28PM  12    COMPANY.  IS THERE ANY WAY YOU CAN GET SPENCER BACK ON THE CLIA

12:28PM  13    LICENSE AND TAKE ME OFF?"

12:28PM  14             YOU UNDERSTOOD SPENCER TO BE A REFERENCE TO

12:28PM  15    SPENCER HIRAKI?

12:28PM  16        A.   I DO.

12:28PM  17        Q.   HE WAS THE LAB DIRECTOR FOR A BRIEF PERIOD OF TIME IN THE

12:28PM  18    2011 TO 2013 TIME PERIOD?

12:28PM  19        A.   HE WAS.

12:28PM  20        Q.   "I AM FEELING PRESSURED TO VOUCH FOR RESULTS THAT I CANNOT

12:28PM  21    BE CONFIDENT IN, AND ALSO IN A NUMBER OF CASES WHERE I GET

12:28PM  22    QUESTIONS ABOUT ASSAYS, I DO NOT KNOW WHAT METHOD IS BEING USED

12:28PM  23    IE VACUTAINERS ALIQUOTTED INTO CTN'S, ET CETERA."

12:28PM  24             THIS WAS THE TESTIMONY THAT YOU TALKED ABOUT ON YOUR

12:28PM  25    DIRECT EXAMINATION; CORRECT?

12:28PM  1    A.   IT IS THE ONE I'M TALKING ABOUT RIGHT NOW, YES.

12:28PM  2    Q.   AND IF WE CAN START WHERE THIS DIALOGUE BEGINS ON PAGE 3,

12:28PM  3    THE SUBJECT MATTER OF THIS EMAIL IS EBOLA.

12:29PM  4         DO YOU SEE THAT?

12:29PM  5    A.   I DO.

12:29PM  6    Q.   AND DR. ROSENDORFF WROTE, "SUNNY/ELIZABETH,

12:29PM  7         "I AM HEARING THAT THERANOS INTENDS TEST SAMPLES TO RULE

12:29PM  8    OUT OR DIAGNOSE EBOLA AT 7373 GATEWAY.

12:29PM  9         "CAN YOU PLEASE CONFIRM THAT THIS IS CORRECT.  IF SO, I'M

12:29PM 10    WONDERING WHY AS LAB DIRECTOR I WAS NOT INVOLVED IN THE

12:29PM 11    DECISION AND PLANNING?"

12:29PM 12         DO YOU SEE THAT LANGUAGE?

12:29PM 13    A.   I DO.

12:29PM 14    Q.   AND IF WE GO TO PAGE 2, YOU WROTE, "THAT IS NOT CORRECT.

12:29PM 15    WHO SAID THIS?"

12:29PM 16         DO YOU SEE THAT?

12:29PM 17    A.   YES.

12:29PM 18    Q.   AND DR. ROSENDORFF REPLIES, "PERHAPS A COMPANY WIDE EMAIL

12:29PM 19    IS AN ORDER TO QUASH THIS RUMOR?"

12:29PM 20         DO YOU SEE THAT?

12:29PM 21    A.   I DO.

12:29PM 22    Q.   AND YOU WROTE BACK, "NO ONE AT ANY OF OUR OTHER SITES IS

12:29PM 23    UNDER THIS IMPRESSION FYI.  THERE ARE MANY DIFFERENT

12:29PM 24    ORGANIZATIONS IN OUR COMPANY OUTSIDE OF CLIA LAB -- SUNNY WILL

12:29PM 25    FOLLOW UP WITH GODFRED."

| | | |
|---|---|---|
| 12:29PM | 1 | DO YOU SEE THAT LANGUAGE? |
| 12:29PM | 2 | A.   I DO. |
| 12:29PM | 3 | Q.   THERANOS WAS DOING A LOT OF WORK TO DEPLOY AN EBOLA ASSAY; |
| 12:30PM | 4 | ISN'T THAT RIGHT, MS. HOLMES? |
| 12:30PM | 5 | A.   WE WERE. |
| 12:30PM | 6 | Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5733. |
| 12:30PM | 7 | MAY I APPROACH, YOUR HONOR? |
| 12:30PM | 8 | THE COURT:  YES. |
| 12:30PM | 9 | BY MR. LEACH: |
| 12:30PM | 10 | Q.   (HANDING.) |
| 12:30PM | 11 | A.   THANK YOU. |
| 12:30PM | 12 | Q.   DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL, MS. HOLMES? |
| 12:30PM | 13 | A.   I DO. |
| 12:30PM | 14 | Q.   AND THIS APPEARS TO BE TO SOMEONE NAMED GARY ROUGHHEAD. |
| 12:30PM | 15 | DO YOU SEE THAT? |
| 12:30PM | 16 | A.   I DO. |
| 12:30PM | 17 | Q.   AND ADMIRAL ROUGHHEAD WAS ON YOUR PARDON? |
| 12:30PM | 18 | A.   HE WAS. |
| 12:30PM | 19 | Q.   AND DOES THIS RELATION TO THERANOS'S EFFORTS TO |
| 12:30PM | 20 | OPERATIONALIZE EBOLA? |
| 12:31PM | 21 | A.   I'M JUST LOOKING AT IT. |
| 12:31PM | 22 | YES. |
| 12:31PM | 23 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5733. |
| 12:31PM | 24 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:31PM | 25 | THE COURT:  IT'S ADMITTED. |

HOLMES CROSS BY MR. LEACH (RES.)                                    8445

12:31PM  1                    (GOVERNMENT'S EXHIBIT 5733 WAS RECEIVED IN EVIDENCE.)

12:31PM  2                    MR. LEACH:  MS. KRATZMANN, CAN I USE THE ELMO?

12:31PM  3        Q.   DO YOU SEE THE DATE OF THIS IS SEPTEMBER 29TH, 2014,

12:31PM  4        MS. HOLMES?

12:31PM  5        A.   I DO.

12:31PM  6        Q.   AND THAT'S ROUGHLY TWO OR THREE MONTHS BEFORE THE EMAIL

12:31PM  7        WHERE DR. ROSENDORFF IS RAISING QUESTIONS ABOUT EBOLA?

12:31PM  8        A.   IT IS.

12:31PM  9        Q.   AND YOU'RE WRITING AT THE TOP HERE, "WE ARE WORKING ON

12:31PM  10       GETTING HIM TO PALO ALTO.  HE WAS TIED UP THROUGH OCTOBER."

12:32PM  11            I THINK THAT'S A REFERENCE TO SOMEONE DOWN ON THE BOTTOM.

12:32PM  12            "FYI -- GATES, CDC, AND ANDY WEBER'S TEAM FROM DOD ARE ALL

12:32PM  13       COMING OUT TO THERANOS ON WEDNESDAY TO MEET ON OPERATIONALIZING

12:32PM  14       EBOLA."

12:32PM  15            DID I READ THAT CORRECTLY?

12:32PM  16       A.   YOU DID.

12:32PM  17       Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 5731.

12:32PM  18            MAY I APPROACH, YOUR HONOR?

12:32PM  19                    THE COURT:  YES.

12:32PM  20       BY MR. LEACH:

12:32PM  21       Q.   (HANDING.)

12:32PM  22       A.   THANK YOU.

12:32PM  23       Q.   MS. HOLMES, DO YOU SEE YOUR NAME AT THE TOP OF THIS EMAIL?

12:32PM  24       A.   I DO.

12:32PM  25       Q.   AND DO YOU SEE BILL FOEGE'S NAME IN THE TO LINE?

                              UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8446

| 12:32PM | 1  | A.   I DO. |
| 12:33PM | 2  | Q.   DR. FOEGE HAD SOME INVOLVEMENT WITH THERANOS AND ITS BOARD |
| 12:33PM | 3  | AT THE TIME? |
| 12:33PM | 4  | A.   HE DID. |
| 12:33PM | 5  | Q.   AND THIS ALSO RELATES TO THERANOS'S EFFORTS WITH RESPECT |
| 12:33PM | 6  | TO EBOLA? |
| 12:33PM | 7  | A.   IT DOES. |
| 12:33PM | 8  |        MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5731. |
| 12:33PM | 9  |        MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:33PM | 10 |        THE COURT:  IT'S ADMITTED. |
| 12:33PM | 11 |   (GOVERNMENT'S EXHIBIT 5731 WAS RECEIVED IN EVIDENCE.) |
| 12:33PM | 12 | BY MR. LEACH: |
| 12:33PM | 13 | Q.   MS. HOLMES, I WANT TO DRAW YOUR ATTENTION TO THE FIRST |
| 12:33PM | 14 | EMAIL. |
| 12:33PM | 15 |   FIRST OF ALL, DO YOU SEE THE DATE OF OCTOBER 7TH, 2014? |
| 12:33PM | 16 | A.   I DO. |
| 12:33PM | 17 | Q.   AND SO THIS IS A WEEK OR SO AFTER THE EMAIL THAT WE JUST |
| 12:33PM | 18 | SAW, AND A COUPLE OF MONTHS BEFORE DR. ROSENDORFF COMES TO YOU |
| 12:33PM | 19 | WITH HIS CONCERNS? |
| 12:33PM | 20 | A.   I THINK SO. |
| 12:33PM | 21 | Q.   AND YOU WROTE TO DR. FOEGE, "WONDERFUL CONNECT FRIDAY.  WE |
| 12:33PM | 22 | HAVE ALL OF OUR ASSAY DEVELOPMENT TEAMS ON DECK FOR BRINGING UP |
| 12:33PM | 23 | THE BEST COMBINATION OF TESTS FOR AN EBOLA SOLUTION." |
| 12:34PM | 24 |   DID I READ THAT CORRECTLY? |
| 12:34PM | 25 | A.   YOU DID. |

8447

HOLMES CROSS BY MR. LEACH (RES.)

12:34PM  1    Q.   DR. FOEGE WRITES BACK, "SORRY.  MISSED THIS.  IF A CBC CAN

12:34PM  2    BE EASILY DONE, THERE ARE TIMES WHEN IT WOULD BE USEFUL SO I

12:34PM  3    WOULD INCLUDE IT.  YOU AVOID THE CLINICIAN WANTING IT AFTER

12:34PM  4    SEEING THE INITIAL RESULTS AND HAVING TO REPEAT THE

12:34PM  5    FINGERSTICK.  THANKS, BILL."

12:34PM  6         DID I READ THAT CORRECTLY?

12:34PM  7    A.   YOU DID.

12:34PM  8    Q.   AND YOU WROTE BACK, "WE AGREE.  WE THINK IT COULD ALSO BE

12:34PM  9    USEFUL IN THE INFECTION TRIAGE AND MANAGEMENT.  WE WILL PLAN ON

12:34PM  10   INCLUDING IT IN THE STAGED DEPLOYMENTS."

12:34PM  11        DO YOU SEE THAT?

12:34PM  12   A.   I DO.

12:34PM  13   Q.   AND THIS IS YOU AND DR. FOEGE TALKING ABOUT STAGED

12:34PM  14   DEPLOYMENTS OF AN EBOLA SOLUTION; CORRECT?

12:34PM  15   A.   YES.

12:34PM  16        MR. LEACH:  MAY I APPROACH, YOUR HONOR?

12:34PM  17        THE COURT:  YES.

12:34PM  18   BY MR. LEACH:

12:34PM  19   Q.   (HANDING.)

12:34PM  20   A.   THANK YOU.

12:34PM  21   Q.   IS THIS ANOTHER EMAIL EXCHANGE BETWEEN YOU AND DR. FOEGE

12:35PM  22   RELATING TO EBOLA, MS. HOLMES?

12:35PM  23   A.   IT IS.

12:35PM  24   Q.   AND IS THIS IN THE OCTOBER 2013 TIME PERIOD?

12:35PM  25   A.   IT IS.

ER-12018

HOLMES CROSS BY MR. LEACH (RES.)                                    8448

12:35PM  1              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5730.

12:35PM  2              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:35PM  3              THE COURT:  IT'S ADMITTED.

12:35PM  4         (GOVERNMENT'S EXHIBIT 5730 WAS RECEIVED IN EVIDENCE.)

12:35PM  5    BY MR. LEACH:

12:35PM  6    Q.   SO LET ME START WITH THE INITIAL EMAIL, MS. HOLMES.  IT

12:35PM  7    LOOKS LIKE THIS IS FROM SOMEONE NAMED GERRIT VAN ROEKEL ABOUT

12:35PM  8    THERANOS NOT GETTING WORK TO PURSUE A COLLABORATION WITH EBOLA.

12:36PM  9         AM I READING THAT CORRECTLY?

12:36PM 10    A.   NOT GETTING THE GATES FOUNDATION GRANT.

12:36PM 11    Q.   OKAY.  YOU HAD BEEN SEEKING A GRANT TO GET MONEY TO

12:36PM 12    CONDUCT EBOLA TESTING, BUT YOU WERE UNSUCCESSFUL?

12:36PM 13    A.   WE DIDN'T SEEK A GRANT.  THEY CAME TO SEE WHETHER WE

12:36PM 14    SHOULD APPLY FOR IT, AND WE DID NOT.

12:36PM 15    Q.   AND DR. FOEGE WRITES BACK, "ELIZABETH, I AM SORRY THIS

12:36PM 16    FIRST VENTURE DID NOT WORK OUT.  I WOULD ENCOURAGE YOU TO

12:36PM 17    CONTINUE ENGAGEMENT WITH THEM AND RESPOND TO THEIR INVITATION.

12:36PM 18    THERE IS NOTHING LOST IN SEEING WHAT THEY ARE DOING AND IT MAY

12:36PM 19    LEAD TO A DIFFERENT KIND OF ENGAGEMENT IN THE FUTURE.  IT WILL

12:36PM 20    CERTAINLY LEAD TO OTHER CONTACTS."

12:36PM 21         HE THEN WRITES, "CONCERNING CDC, I RECOGNIZE THAT IT IS

12:36PM 22    EASIER FOR YOU TO HAVE THE SPECIMENS IN PALO ALTO."

12:36PM 23         DO YOU SEE THAT LANGUAGE?

12:36PM 24    A.   I DO.

12:36PM 25    Q.   AND THIS IS IN RELATION TO POTENTIAL WORK ON EBOLA;

| 12:37PM | 1 | CORRECT? |
| 12:37PM | 2 | A.   YES. |
| 12:37PM | 3 | Q.   LAST WEEK I ASKED YOU SOME QUESTIONS ABOUT WHETHER YOU AND |
| 12:37PM | 4 | MR. BALWANI DISCUSSED WHAT WOULD HAVE HAPPENED -- WHAT WOULD |
| 12:37PM | 5 | HAPPEN IF JOHN CARREYROU, "THE WALL STREET JOURNAL" REPORTER, |
| 12:37PM | 6 | WENT TO PHOENIX WELLNESS CENTER TO HAVE HIS BLOOD DRAWN. |
| 12:37PM | 7 | DO YOU RECALL THAT TOPIC COMING UP AND GOING THROUGH SOME |
| 12:37PM | 8 | MESSAGES ON THAT? |
| 12:37PM | 9 | A.   I DO. |
| 12:37PM | 10 | Q.   AND WE LOOKED AT SOME TEXTS WHERE YOU DISCUSSED THE |
| 12:37PM | 11 | CONCEPT OF IT BEING BETTER TO HAVE A PERFECT VENIPUNCTURE THAN |
| 12:37PM | 12 | A BAD FINGERSTICK. |
| 12:37PM | 13 | DO YOU RECALL THAT? |
| 12:37PM | 14 | A.   I DO. |
| 12:37PM | 15 | Q.   AND THAT WAS IN THE APRIL 25TH, 2015 TIME PERIOD, OR IN |
| 12:38PM | 16 | THE EARLY 2015 TIME PERIOD? |
| 12:38PM | 17 | A.   I THINK SO. |
| 12:38PM | 18 | Q.   AND PRIOR TO THAT, YOU TOOK STEPS TO CONCEAL FROM |
| 12:38PM | 19 | POTENTIAL INVESTORS THERANOS'S RELIANCE ON VENOUS DRAWS; ISN'T |
| 12:38PM | 20 | THAT CORRECT? |
| 12:38PM | 21 | A.   NO. |
| 12:38PM | 22 | Q.   LET'S LOOK AT EXHIBIT 2065, WHICH IS IN YOUR BINDER.  IT |
| 12:38PM | 23 | SHOULD BE VOLUME 3. |
| 12:38PM | 24 | A.   OKAY. |
| 12:38PM | 25 | Q.   DO YOU SEE CHRISTIAN HOLMES'S NAME IN THE FROM LINE? |

HOLMES CROSS BY MR. LEACH (RES.)                                            8450

| | | |
|---|---|---|
| 12:38PM | 1 | A.   I DO. |
| 12:38PM | 2 | Q.   AND DO YOU SEE YOUR AND MR. BALWANI'S NAME IN THE TO LINE? |
| 12:38PM | 3 | A.   I DO. |
| 12:39PM | 4 | Q.   AND THE SUBJECT IS "BDT VISITORS TO WAG SATURDAY"? |
| 12:39PM | 5 | A.   YES. |
| 12:39PM | 6 | Q.   AND YOU WERE PURSUING -- YOU WERE HAVING DISCUSSIONS WITH |
| 12:39PM | 7 | BDT ABOUT A POTENTIAL INVESTMENT IN THIS TIMEFRAME? |
| 12:39PM | 8 | A.   YES. |
| 12:39PM | 9 | Q.   AND BDT WAS A FUND RUN BY SOMEONE NAMED BYRON TROTT? |
| 12:39PM | 10 | A.   BYRON TROTT, YES. |
| 12:39PM | 11 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2065. |
| 12:39PM | 12 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:39PM | 13 | THE COURT:  IT'S ADMITTED. |
| 12:39PM | 14 | (GOVERNMENT'S EXHIBIT 2065 WAS RECEIVED IN EVIDENCE.) |
| 12:39PM | 15 | BY MR. LEACH: |
| 12:39PM | 16 | Q.   SO THIS APPEARS TO BE AN EMAIL FROM YOUR BROTHER, |
| 12:39PM | 17 | CHRISTIAN HOLMES? |
| 12:39PM | 18 | A.   IT IS. |
| 12:39PM | 19 | Q.   HE WAS A PROJECT MANAGER? |
| 12:39PM | 20 | A.   HE WAS. |
| 12:39PM | 21 | Q.   DID HE REPORT TO YOU? |
| 12:39PM | 22 | A.   HE DID NOT.  HE REPORTED TO SUNNY AT THIS TIME. |
| 12:39PM | 23 | Q.   AND AT ANY POINT DID HE REPORT TO YOU? |
| 12:39PM | 24 | A.   YES. |
| 12:39PM | 25 | Q.   THE SUBJECT IS "BDT VISITORS TO WAG SATURDAY." |

HOLMES CROSS BY MR. LEACH (RES.)                                8451

| | | |
|---|---|---|
| 12:39PM | 1 | DO YOU SEE THAT? |
| 12:39PM | 2 | A.  I DO. |
| 12:39PM | 3 | Q.  AND IN THE FIRST PARAGRAPH IT SAYS -- WELL, LET'S WORK OUR |
| 12:40PM | 4 | WAY UP FROM THE TOP.  IF WE CAN GO TO PAGE 2. |
| 12:40PM | 5 | DO YOU SEE THE INITIAL EMAIL, MS. HOLMES, WHERE CHRISTIAN |
| 12:40PM | 6 | IS WRITING, "WHERE CAN I FIND THE LIST OF NAMES YOU MENTIONED |
| 12:40PM | 7 | FROM BDT WHO WOULD COME INTO WAG ON SATURDAY?" |
| 12:40PM | 8 | DID I READ THAT CORRECTLY? |
| 12:40PM | 9 | A.  YOU DID. |
| 12:40PM | 10 | Q.  "WE WILL SEND OVER THE DIFFERENT WORK FLOWS FOR HOW WE |
| 12:40PM | 11 | WILL ACCOMMODATE FINGERSTICK REGARDLESS OF WHAT'S ON THE ORDER, |
| 12:40PM | 12 | AND POSSIBLE ISSUES ASSOCIATED, AS REQUESTED." |
| 12:40PM | 13 | DID I READ THAT CORRECTLY? |
| 12:40PM | 14 | A.  YOU DID. |
| 12:40PM | 15 | Q.  OKAY.  AND THEN THERE'S A RESPONSE FROM MR. BALWANI. |
| 12:40PM | 16 | AND THEN IF WE CAN GO BACK TO CHRISTIAN HOLMES'S RESPONSE |
| 12:41PM | 17 | ON PAGE 1. |
| 12:41PM | 18 | DO YOU SEE WHERE IT SAYS, "ALSO WANTED TO SEND ALONG OUR |
| 12:41PM | 19 | THOUGHTS FOR HOW TO ACCOMPLISH THE FS IN THE SCENARIO THEIR |
| 12:41PM | 20 | ORDERS PROMPT VENOUS." |
| 12:41PM | 21 | DO YOU SEE THAT LANGUAGE? |
| 12:41PM | 22 | A.  I DO. |
| 12:41PM | 23 | Q.  AND FS IS AN ACRONYM FOR FINGERSTICK? |
| 12:41PM | 24 | A.  IT IS. |
| 12:41PM | 25 | Q.  "ASSUMPTIONS HERE FROM EAH ARE THAT WE MUST NOT DO VENOUS |

UNITED STATES COURT REPORTERS

ER-12022

HOLMES CROSS BY MR. LEACH (RES.)                                    8452

12:41PM  1    DRAW, AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS

12:41PM  2    IF IT DOES."

12:41PM  3         DID I READ THAT SENTENCE CORRECTLY?

12:41PM  4    A.   YOU DID.

12:41PM  5    Q.   AND EAH IS AN ACRONYM FOR YOU; CORRECT?

12:41PM  6    A.   IT'S MY INITIALS.

12:41PM  7    Q.   THOSE ARE YOUR INITIALS?

12:41PM  8    A.   YES.

12:41PM  9    Q.   AND PEOPLE WOULD REFER TO YOU AS EAH FROM TIME TO TIME?

12:41PM 10    A.   THEY DID.

12:41PM 11    Q.   OKAY.  AND AFTER MR. HOLMES WRITES, "WE CANNOT TELL THEM

12:41PM 12    THAT THEIR ORDER PROMPTS VENOUS IF IT DOES," HE SAYS, "THE

12:41PM 13    FOLLOWING IS THE ACTION PLANNING TO ACCOMPLISH THIS."

12:41PM 14         DO YOU SEE THAT?

12:41PM 15    A.   I DO.

12:42PM 16    Q.   AND IF WE GO FURTHER BELOW, THERE ARE SOME PREP ACTIONS.

12:42PM 17         DO YOU SEE THAT?

12:42PM 18    A.   I DO.

12:42PM 19    Q.   AND IT LISTS "ANAM/ROBIN HAVE A LIST OF NAMES WHICH

12:42PM 20    INCLUDES POSSIBLE PATIENTS FROM BDT."

12:42PM 21         DO YOU SEE THAT?

12:42PM 22    A.   I DO.

12:42PM 23    Q.   AND ANAM AND ROBIN WERE THE FOLKS IN THE WELLNESS CENTER

12:42PM 24    WHO WOULD BE GREETING THE BDT INDIVIDUALS?

12:42PM 25    A.   I THINK THEY'RE PEOPLE IN THE CALL CENTER.

HOLMES CROSS BY MR. LEACH (RES.)                                      8453

12:42PM   1    Q.   OKAY.  "NISHIT IS BRIEFED TO BE ABLE TO HANDLE ANY MANUAL

12:42PM   2    ACTIONS NECESSARY IN THE LAB WHEN SAMPLES ARRIVE."

12:42PM   3         NISHIT IS NISHIT DOSHI?

12:42PM   4    A.   YES.

12:42PM   5    Q.   HE WORKS IN THE CLINICAL LAB?

12:42PM   6    A.   HE DID.

12:42PM   7    Q.   OKAY.  AND THEN "CIARA WILL BE BRIEFED WITH BDT NAMES,

12:42PM   8    TOLD TO EXPECT A CALL FROM US SHOULD THERE NEED TO BE ANY

12:42PM   9    WORKFLOW CHANGES, WHICH COULD INCLUDE DRAWING EXTRA

12:42PM  10    FINGERSTICKS, OTHERWISE INSTRUCTION IS TO COLLECT THE CTN'S

12:42PM  11    REQUESTED IN THE APP BY AS FEW FINGERSTICKS AS POSSIBLE."

12:43PM  12         DO YOU SEE THAT LANGUAGE?

12:43PM  13    A.   I DO.

12:43PM  14    Q.   AND CTN IS A REFERENCE TO THE COLLECTION DEVICE?

12:43PM  15    A.   IT IS.

12:43PM  16    Q.   AND THEN IF WE CAN GO DOWN, DO YOU SEE THAT THERE ARE TWO

12:43PM  17    SCENARIOS LAID OUT ON HOW TO DEAL WITH THIS BDT VIP VISIT?

12:43PM  18    A.   I DO.

12:43PM  19    Q.   AND FOR "SCENARIO 1:  SCANNED ORDER FROM BDT VIP CONTAINS

12:43PM  20    TESTS THAT PROMPT FOR VENOUS DRAW."

12:43PM  21         DO YOU SEE THAT SCENARIO LISTED?

12:43PM  22    A.   I DO.

12:43PM  23    Q.   AND DO YOU SEE THAT THERE ARE TWO CASES FOR THIS SCENARIO,

12:43PM  24    A CASE A AND A CASE B?

12:43PM  25    A.   I DO.

HOLMES CROSS BY MR. LEACH (RES.)                                    8454

12:43PM  1    Q.   AND CASE A IS "WHAT TO DO IF VENOUS IS PROMPTED DUE TO

12:43PM  2    SOME TESTS NOT BEING ON FS, BUT WOULD OTHERWISE PROMPT FS."

12:43PM  3         DO YOU SEE THAT BULLET?

12:43PM  4    A.   I DO.

12:43PM  5    Q.   AND THEN SOME NEGATIVES FOR THIS CASE ARE LISTED.  "NEED

12:43PM  6    TO EITHER TELL THE PATIENT AT THE STORE THAT WE WILL NOT RUN A

12:44PM  7    FEW TESTS, OR TELL THEM ON THE BACK END THAT WE COULD NOT RUN

12:44PM  8    CERTAIN TESTS."

12:44PM  9         IS THAT WHAT IS REFLECTED IN THE FIRST BULLET UNDER

12:44PM 10    "NEGATIVE"?

12:44PM 11    A.   IT IS.

12:44PM 12    Q.   AND DOES USE CASE B INVOLVE WHAT WOULD HAPPEN IF A VENOUS

12:44PM 13    IS PROMPTED DUE TO THE VOLUME OF TESTS, BUT TESTS INDIVIDUALLY

12:44PM 14    WOULD PROMPT A FINGERSTICK?

12:44PM 15    A.   IT DOES.

12:44PM 16    Q.   IN THAT SCENARIO, DANIEL OR MAX WILL DETERMINE WHAT

12:44PM 17    COMBINATION OF CTN'S WERE NEEDED IN ORDER TO FULFILL THE ORDER;

12:44PM 18    CORRECT?

12:44PM 19    A.   EXACTLY.

12:44PM 20    Q.   AND IN THAT SCENARIO, CIARA WOULD COLLECT THE NUMBER OF

12:44PM 21    CTN'S WITH AS FEW STICKS AS POSSIBLE; CORRECT?

12:44PM 22    A.   YES.

12:44PM 23    Q.   AND THEN IT LAYS OUT SOME NEGATIVES FOR THIS SCENARIO IF

12:44PM 24    THAT'S WHAT HAPPENS FROM THE BDT ORDER; CORRECT?

12:44PM 25    A.   YES.

UNITED STATES COURT REPORTERS

8455
HOLMES CROSS BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 12:44PM | 1 | Q.   AND SOME OF THE NEGATIVES ARE BDT VIP -- AND THAT'S VERY |
| 12:44PM | 2 | IMPORTANT PERSON? |
| 12:45PM | 3 | A.   I THINK SO, YES. |
| 12:45PM | 4 | Q.   -- IS A SELF-PAY PATIENT, THEN THE RECEIPT PRINTED BY THE |
| 12:45PM | 5 | APP WILL ONLY SHOW THE TESTS TRANSCRIBED, WHICH WILL NOT |
| 12:45PM | 6 | INCLUDE ALL OF THE TESTS FOR THE ORDER. |
| 12:45PM | 7 | WAS THAT ONE OF THE NEGATIVES LISTED FOR THIS CASE B? |
| 12:45PM | 8 | A.   IT IS. |
| 12:45PM | 9 | Q.   AND IF THEY NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY |
| 12:45PM | 10 | ASK THE WAG TECH ABOUT IT. |
| 12:45PM | 11 | WAS THAT ALSO A NEGATIVE LISTED FOR THIS SCENARIO? |
| 12:45PM | 12 | A.   IT IS. |
| 12:45PM | 13 | Q.   AND THEN THERE'S DISCUSSION OF A WORST CASE, THEY WOULD |
| 12:45PM | 14 | MAKE A CALL TO CS. |
| 12:45PM | 15 | IS THAT CUSTOMER SUPPORT? |
| 12:45PM | 16 | A.   I THINK SO. |
| 12:45PM | 17 | Q.   OKAY.   CUSTOMER SUPPORT IN PALO ALTO? |
| 12:45PM | 18 | A.   I GUESS, YES. |
| 12:45PM | 19 | Q.   OKAY.   AND ANAM WOULD TELL THEM EVERYTHING IS FINE. |
| 12:45PM | 20 | CIARA WILL ALSO BE ABLE TO COME OUT WITH THE DRAW ROOM |
| 12:45PM | 21 | ONCE CHECK-IN IS COMPLETE AND WELCOME THEM INTO THE ROOM AND |
| 12:45PM | 22 | DISTRACT FROM LOOKING AT THE RECEIPT. |
| 12:45PM | 23 | DO YOU SEE THAT? |
| 12:45PM | 24 | A.   I DO. |
| 12:45PM | 25 | Q.   AND THEN THOSE ARE THE CASE A AND B IF THE BDT VIP ASKS |

HOLMES CROSS BY MR. LEACH (RES.)                                    8456

12:45PM   1      FOR TESTS THAT PROMPTED VENOUS DRAW; CORRECT?

12:46PM   2      A.   A VENOUS DRAW.  BUT IF YOU COULD COLLECT MORE CTN'S, IT

12:46PM   3      WOULD BE FINGERSTICK.

12:46PM   4      Q.   OKAY.  AND MR. HOLMES AT THE TOP IS SAYING THAT SOME OF

12:46PM   5      THE ASSUMPTIONS FOR HOW TO DEAL WITH BDT ARE YOU MUST NOT DO A

12:46PM   6      VENOUS DRAW, AND YOU CAN'T TELL THEM IF THEIR ORDER PROMPTS

12:46PM   7      VENOUS IF IT DOES.

12:46PM   8           DID I READ THAT LANGUAGE CORRECT?

12:46PM   9      A.   YES.

12:46PM  10      Q.   YOU WANTED BDT TO HAVE A GOOD EXPERIENCE IN THE WELLNESS

12:46PM  11      CENTER?

12:46PM  12      A.   YES.

12:46PM  13      Q.   YOU WANTED TO PUT YOUR BEST FOOT FORWARD WITH THEM;

12:46PM  14      CORRECT?

12:46PM  15      A.   YES.

12:46PM  16      Q.   DID BDT END UP INVESTING?

12:46PM  17      A.   NO.

12:46PM  18      Q.   YOU TESTIFIED -- I'D LIKE TO GO BACK TO THIS IDEA OF

12:46PM  19      PHASE I AND PHASE II.

12:47PM  20           PHASE I IS IN THE JUNE OR JULY 2012 WALGREENS AMENDMENTS?

12:47PM  21      THAT'S WHEN THIS IDEA OF PHASE I GETS MEMORIALIZED?

12:47PM  22      A.   IT IS.

12:47PM  23      Q.   AND YOUR HOPE WAS THAT PHASE I WOULD BE SHORT?

12:47PM  24      A.   IT WAS.

12:47PM  25      Q.   OKAY.  BECAUSE YOU WANTED TO PUT THE MINILAB IN WALGREENS

HOLMES CROSS BY MR. LEACH (RES.)                                      8457

12:47PM   1    STORES AFTER THE FDA APPROVED IT?

12:47PM   2    A.   WE DID.

12:47PM   3    Q.   OKAY.  AND PHASE I STARTS IN JUNE OF 2012, JUNE OR JULY OF

12:47PM   4    2012; CORRECT?

12:47PM   5    A.   THAT'S WHEN THE IDEA CAME, YES.

12:47PM   6    Q.   OKAY.  BUT THE IDEA TO MODIFY THE SIEMENS MACHINES, THE

12:47PM   7    ADVIA'S, THAT DOESN'T COME UP UNTIL JULY OF 2013; CORRECT?

12:47PM   8    A.   YES.

12:47PM   9    Q.   OKAY.  SO TWO MONTHS BEFORE THE WALGREENS LAUNCH IS THE

12:48PM  10    FIRST TIME YOU'RE PURSUING THIS IDEA OF MODIFYING THE SIEMENS

12:48PM  11    MACHINES?

12:48PM  12    A.   YES.

12:48PM  13    Q.   AND ONE OF THE REASONS THAT YOU'RE PURSUING MODIFYING THE

12:48PM  14    SIEMENS MACHINES IS BECAUSE THE MINILAB ISN'T READY?

12:48PM  15    A.   YES, IT WASN'T VALIDATED.

12:48PM  16    Q.   IN FACT, IT NEVER GOT VALIDATED; RIGHT?

12:48PM  17    A.   IN THE CLIA LAB.

12:48PM  18    Q.   AND YOU WERE STILL HAVING DEMONSTRATIONS WITH WALGREENS IN

12:48PM  19    THE JULY 2013 TIME PERIOD WITH THE MINILAB AND THE EDISON 3.5

12:48PM  20    AND OTHER THERANOS MANUFACTURED ANALYZERS; CORRECT?

12:48PM  21    A.   WHAT DO YOU MEAN BY THAT?

12:48PM  22    Q.   YOU WERE HAVING DEMONSTRATIONS WITH THE FOLKS FROM

12:48PM  23    WALGREENS IN JULY AND AUGUST OF 2013 WITH THE MINILAB AND THE

12:48PM  24    EDISON 3.5; CORRECT?

12:48PM  25    A.   WE SHOWED THEM THOSE DEVICES.

| 12:48PM | 1  | Q.   OKAY.  AND YOU DIDN'T SHOW THEM ANY MODIFIED SIEMENS |
| 12:49PM | 2  | MACHINES? |
| 12:49PM | 3  | A.   NO. |
| 12:49PM | 4  | Q.   OKAY.  AND AM I RIGHT IN JULY OF 2013, WALGREENS WAS |
| 12:49PM | 5  | PUSHING YOU REALLY HARD TO GO LIVE AS SOON AS POSSIBLE? |
| 12:49PM | 6  | A.   THEY WERE. |
| 12:49PM | 7  | Q.   AM I RIGHT THAT YOU TOLD SAFEWAY IN OR AROUND JUNE OF 2013 |
| 12:49PM | 8  | THAT THE MINILAB OR THE DEVICE WAS WHAT WAS GOING TO BE USED IN |
| 12:49PM | 9  | THE CLIA LAB? |
| 12:49PM | 10 | A.   I THINK SO. |
| 12:49PM | 11 | Q.   WELL, LET ME SHOW YOU WHAT HAS BEEN MARKED AS |
| 12:49PM | 12 | EXHIBIT 5536.  IT SHOULD BE IN VOLUME 2. |
| 12:50PM | 13 | A.   OKAY. |
| 12:50PM | 14 | Q.   IS -- |
| 12:50PM | 15 | MR. DOWNEY:  MR. LEACH, I'M SORRY TO INTERRUPT YOU. |
| 12:50PM | 16 | I DON'T THINK I HAVE THIS ONE. |
| 12:50PM | 17 | MR. LEACH:  5536. |
| 12:50PM | 18 | THE CLERK:  VOLUME 3. |
| 12:50PM | 19 | MR. LEACH:  IN VOLUME 3. |
| 12:50PM | 20 | Q.   DOES THIS APPEAR TO BE AN EMAIL FROM MR. BALWANI TO YOU |
| 12:50PM | 21 | DATED JUNE 28TH, 2013? |
| 12:50PM | 22 | A.   YES. |
| 12:50PM | 23 | Q.   AND IS THE SUBJECT "SAFEWAY/THERANOS - MEETING"? |
| 12:51PM | 24 | A.   IT IS. |
| 12:51PM | 25 | Q.   AND IS HE FORWARDING YOU MINUTES OF A MEETING THAT YOU HAD |

HOLMES CROSS BY MR. LEACH (RES.)                                    8459

12:51PM    1    WITH BOB GORDON AND ROBERT EDWARDS AT SAFEWAY?

12:51PM    2    A.   I THINK IT'S NOTES FROM BOB GORDON.

12:51PM    3    Q.   OKAY.  AND YOU'RE BEING ASKED TO COMMENT ON THESE NOTES?

12:51PM    4    A.   YES.

12:51PM    5    Q.   OKAY.

12:51PM    6         YOUR HONOR, I OFFER EXHIBIT 5536.

12:51PM    7            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:51PM    8            THE COURT:  IT'S ADMITTED.

12:51PM    9         (GOVERNMENT'S EXHIBIT 5536 WAS RECEIVED IN EVIDENCE.)

12:51PM   10    BY MR. LEACH:

12:51PM   11    Q.   LET'S LOOK AT THE BOTTOM EMAIL FIRST.

12:51PM   12         BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY, MS. HOLMES?

12:51PM   13    A.   HE WAS.

12:51PM   14    Q.   AND HE'S WRITING TO YOU AND MR. BALWANI, "ELIZABETH AND

12:51PM   15    SUNNY,

12:51PM   16         "AS WE DISCUSSED, I AM ATTACHING MY NOTES FROM THE MEETING

12:51PM   17    ON WEDNESDAY.  PLEASE MAKE ANY SUGGESTED REVISIONS THAT ARE

12:52PM   18    NECESSARY TO MAKE THIS AN ACCURATE SUMMARY OF OUR DISCUSSIONS."

12:52PM   19         DO YOU SEE THAT LANGUAGE?

12:52PM   20    A.   I DO.

12:52PM   21    Q.   AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO PAGE 2 OF

12:52PM   22    THE DOCUMENT, IT'S THE FIRST PAGE OF THE NOTES.

12:52PM   23         IF WE COULD CAPTURE THE FIRST THREE PARAGRAPHS,

12:52PM   24    MS. HOLLIMAN.  PERFECT.

12:52PM   25         DO YOU SEE THE DATE OF JUNE 26TH, 2013, MS. HOLMES?

HOLMES CROSS BY MR. LEACH (RES.)                                    8460

12:52PM  1    A.   I DO.

12:52PM  2    Q.   AND THERE'S A HEADING HERE "CENTRAL LAB MODEL.

12:52PM  3         "CONTRARY TO IMPRESSIONS THAT SOME SAFEWAY PEOPLE HAD,

12:52PM  4    THERE IS NO TECHNOLOGICAL PROBLEM WITH THE DEVICES AND NO PLAN

12:52PM  5    TO GO WITHOUT THE DEVICES IN THE STORES.  THERANOS HAS

12:52PM  6    DETERMINED THAT THE USE OF THE CENTRAL LAB MODEL PROVIDES THE

12:52PM  7    QUICKEST AND EASIEST WAY TO EXPAND GEOGRAPHICALLY."

12:53PM  8         DID I READ THAT CORRECTLY?

12:53PM  9    A.   YOU DID.

12:53PM  10   Q.   AND THAT'S WHAT MR. GORDON IS ASKING YOU IN THIS LATE

12:53PM  11   JUNE 2013 TIME PERIOD TO COMMENT ON?

12:53PM  12   A.   YES.

12:53PM  13   Q.   "THE CENTRAL LAB CONTAINS THE DEVICE; IN FACT, THE DEVICE

12:53PM  14   IS THE ONLY WAY OF OBTAINING RESULTS FROM THE NANOTAINERS.  THE

12:53PM  15   LONG-TERM PLAN IS THAT THE DEVICES WILL BE MIGRATED INTO STORES

12:53PM  16   AS DEMAND, DEMOGRAPHICS, AND MARKETING FULFILLMENT REQUIRE."

12:53PM  17        DID I READ THAT CORRECTLY?

12:53PM  18   A.   YOU DID.

12:53PM  19   Q.   AND AM I UNDERSTANDING THAT AT SOME POINT IN JULY OF 2013

12:53PM  20   YOU MAKE THE DECISION TO ATTEMPT TO MODIFY ADVIA MACHINES TO

12:53PM  21   SUPPORT SOME OF THE TESTING IN THE CLIA LAB?

12:53PM  22   A.   YES.

12:53PM  23   Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5611.

12:54PM  24        AND IF I COULD DRAW YOUR ATTENTION TO THE FIRST PAGE -- OR

12:54PM  25   THE SECOND PAGE OF 5611, MS. HOLMES.

HOLMES CROSS BY MR. LEACH (RES.)                                8461

| | | |
|---|---|---|
| 12:54PM | 1 | A.   OKAY. |
| 12:54PM | 2 | Q.   DO YOU SEE WHAT APPEARS TO BE AN EMAIL FROM YOU TO |
| 12:54PM | 3 | WILLIAM WESTRICK? |
| 12:54PM | 4 | A.   I DO. |
| 12:54PM | 5 | Q.   OKAY.  AND DOES THE REMAINDER OF THE DOCUMENT INCLUDE |
| 12:54PM | 6 | DIALOGUE INVOLVING MR. WESTRICK AND YOU, MR. BALWANI, AND THEN |
| 12:54PM | 7 | DANIEL YOUNG? |
| 12:54PM | 8 | A.   YES. |
| 12:54PM | 9 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5611. |
| 12:54PM | 10 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:54PM | 11 | THE COURT:  IT'S ADMITTED. |
| 12:54PM | 12 | (GOVERNMENT'S EXHIBIT 5611 WAS RECEIVED IN EVIDENCE.) |
| 12:54PM | 13 | MR. LEACH:  IF YOU COULD PLEASE GO TO PAGE 2, |
| 12:55PM | 14 | MS. HOLLIMAN. |
| 12:55PM | 15 | Q.   THERE'S AN EMAIL HERE FROM YOU, MS. HOLMES, TO |
| 12:55PM | 16 | MR. WESTRICK WITH NO SUBJECT THAT SAYS, "WILLIAM: |
| 12:55PM | 17 | "WE WANT TO PUT YOU ON POINT ON A CRITICAL PATH PROJECT. |
| 12:55PM | 18 | DANIEL WILL BE CONNECTING WITH YOU (IF HE HASN'T ALREADY) ON |
| 12:55PM | 19 | THE SELECTION AND PROCUREMENT OF ADDITIONAL LIQUID HANDLING |
| 12:55PM | 20 | SYSTEMS FOR THIS PROJECT.  PLEASE FOCUS ON GETTING THIS DONE |
| 12:55PM | 21 | ASAP.  IT IS A TOP PRIORITY." |
| 12:55PM | 22 | DO YOU SEE THAT? |
| 12:55PM | 23 | A.   I DO. |
| 12:55PM | 24 | Q.   AND IS THIS AN EMAIL IN CONNECTION WITH YOUR DECISION TO |
| 12:55PM | 25 | MODIFY THE ADVIA MACHINES? |

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8462

| | | |
|---|---|---|
| 12:55PM | 1 | A.   NO. |
| 12:55PM | 2 | Q.   WELL, LET'S LOOK AT -- DID YOU EVER DESCRIBE HERE THE |
| 12:55PM | 3 | ADVIA SOLUTION DESCRIBED AS A STOPGAP SOLUTION? |
| 12:55PM | 4 | A.   I'M SORRY, WHERE IS IT? |
| 12:55PM | 5 | Q.   IT'S NOT IN THIS EMAIL.  IT'S JUST A QUESTION. |
| 12:55PM | 6 | A.   OH.  OH. |
| 12:55PM | 7 | Q.   DID MR. WESTRICK END UP DOING WORK ON ADVIA'S IN |
| 12:55PM | 8 | CONNECTION WITH MAKING MODIFICATIONS TO THE DEVICES? |
| 12:55PM | 9 | A.   I'M NOT SURE. |
| 12:55PM | 10 | Q.   OKAY.  DID YOU EVER HEAR THE MODIFICATIONS TO THE ADVIA'S |
| 12:56PM | 11 | BEING CALLED A STOPGAP SOLUTION? |
| 12:56PM | 12 | A.   IT COULD HAVE. |
| 12:56PM | 13 | Q.   OKAY.  STOPGAP MEANING TO GET US TO PHASE II? |
| 12:56PM | 14 | A.   YES. |
| 12:56PM | 15 | Q.   LET ME DRAW YOUR ATTENTION TO EXHIBIT 5090.  THIS SHOULD |
| 12:56PM | 16 | BE IN VOLUME 3. |
| 12:56PM | 17 | A.   OKAY. |
| 12:56PM | 18 | MR. LEACH:  MS. HOLLIMAN -- OR, MS. KRATZMANN, I |
| 12:56PM | 19 | BELIEVE EXHIBIT 5090 IS IN EVIDENCE. |
| 12:57PM | 20 | THE CLERK:  NO, IT IS NOT, COUNSEL. |
| 12:57PM | 21 | MR. LEACH:  OKAY.  MY APOLOGIES. |
| 12:57PM | 22 | Q.   DO YOU SEE YOUR NAME IN THE TO LINE, MS. HOLMES? |
| 12:57PM | 23 | A.   I DO. |
| 12:57PM | 24 | Q.   AND THIS IS FROM DANIEL YOUNG? |
| 12:57PM | 25 | A.   YES. |

HOLMES CROSS BY MR. LEACH (RES.)                                          8463

| | | |
|---|---|---|
| 12:57PM | 1 | Q.   OKAY.  AND DOES THIS RELATE TO A DEMONSTRATION IN THE |
| 12:57PM | 2 | JULY 2013 TIME PERIOD? |
| 12:57PM | 3 | A.   IT DOES. |
| 12:57PM | 4 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5090. |
| 12:57PM | 5 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 12:57PM | 6 | THE COURT:  IT'S ADMITTED. |
| 12:57PM | 7 | (GOVERNMENT'S EXHIBIT 5090 WAS RECEIVED IN EVIDENCE.) |
| 12:57PM | 8 | BY MR. LEACH: |
| 12:57PM | 9 | Q.   DO YOU SEE THE DATE AS JULY 11TH, 2013, MS. HOLMES? |
| 12:57PM | 10 | A.   I DO. |
| 12:57PM | 11 | Q.   AND THIS IS A DATE OF A DEMONSTRATION FOR WALGREENS, ISN'T |
| 12:57PM | 12 | IT? |
| 12:57PM | 13 | A.   I DON'T KNOW. |
| 12:57PM | 14 | Q.   OKAY.  YOU GAVE A PRESENTATION TO WALGREENS IN PALO ALTO |
| 12:57PM | 15 | ON JUNE 11TH, 2013; CORRECT? |
| 12:57PM | 16 | A.   JULY 11TH? |
| 12:57PM | 17 | Q.   JULY 11TH, EXCUSE ME. |
| 12:58PM | 18 | A.   I DON'T KNOW.  I KNOW WE WERE MEETING WITH THEM THAT |
| 12:58PM | 19 | SUMMER. |
| 12:58PM | 20 | Q.   OKAY.  AND WHEN YOU WERE MEETING WITH THEM, YOU WERE |
| 12:58PM | 21 | SHOWING THEM MINILABS, 3.5'S, BUT NOT THE MODIFIED SIEMENS |
| 12:58PM | 22 | MACHINES? |
| 12:58PM | 23 | A.   YES. |
| 12:58PM | 24 | Q.   OKAY.  AND THIS IS DANIEL YOUNG WRITING HERE, "4S IS READY |
| 12:58PM | 25 | FOR CBC, USE CARTRIDGE ON TOP OF DEVICE." |

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                    8464

12:58PM   1          DID I READ THAT CORRECTLY?

12:58PM   2     A.   YES.

12:58PM   3     Q.   4S IS THE SERIES OF THE MINILAB THAT YOU WERE CREATING FOR

12:58PM   4     THE MILITARY?

12:58PM   5     A.   IT IS.

12:58PM   6     Q.   "MINILAB WITH CARTRIDGE ON TOP WILL RUN NULL PROTOCOL."

12:58PM   7          DO YOU SEE THAT?

12:58PM   8     A.   YES.

12:58PM   9     Q.   AND YOU HEARD MR. EDLIN TESTIFYING ABOUT THE NULL

12:58PM  10     PROTOCOL?

12:58PM  11     A.   I DID.

12:58PM  12     Q.   AND I THINK YOU TESTIFIED ON YOUR DIRECT EXAMINATION THAT,

12:58PM  13     SITTING HERE TODAY, YOU'RE FAMILIAR WITH THE NULL PROTOCOL?

12:58PM  14     A.   I AM.

12:58PM  15     Q.   "SECOND MINILAB SHOULD NOT BE USED.

12:58PM  16          "IF WE HAVE ANOTHER 30 MINUTES, WE CAN MOVE THE THIRD

12:58PM  17     MINILAB IN AND RUN VIT D ON IT."

12:59PM  18          IS THAT VITAMIN D?

12:59PM  19     A.   YES.

12:59PM  20     Q.   "LET ME KNOW."

12:59PM  21          AND IF I COULD NOW DRAW YOUR ATTENTION TO EXHIBIT 905,

12:59PM  22     WHICH IS IN VOLUME 4.

12:59PM  23     A.   OKAY.

12:59PM  24             MR. LEACH:  I BELIEVE THIS IS IN EVIDENCE.

12:59PM  25             THE CLERK:  YES.

                    UNITED STATES COURT REPORTERS


                        ER-12035

HOLMES CROSS BY MR. LEACH (RES.)                        8465

12:59PM   1              MR. LEACH:  WE CAN DISPLAY THIS, MS. HOLLIMAN.

12:59PM   2              THE WITNESS:  OKAY.

12:59PM   3      BY MR. LEACH:

12:59PM   4      Q.   DO YOU SEE THAT THERE ARE SOME DEMO -- THIS EMAIL RELATES

12:59PM   5      TO DEMO RESULTS FOR 7/11?

12:59PM   6      A.   I DO.

12:59PM   7      Q.   AND THAT'S THE DATE OF THE EMAIL THAT WE JUST LOOKED AT?

12:59PM   8      A.   YES.

12:59PM   9      Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION TO PAGE 5, DO

01:00PM  10      YOU SEE THE EMAIL FROM DANIEL EDLIN TO YOU AND DANIEL YOUNG?

01:00PM  11      A.   I DO.

01:00PM  12      Q.   AND HE'S WRITING ABOUT THE RESULTS FROM THESE DEMOS,

01:00PM  13      INCLUDING THE FACT THAT VITAMIN D HAS BEEN REMOVED, TT4 AND TT3

01:00PM  14      HAVE BEEN REMOVED FROM ALL THYROID PANELS, AND FT4 HAS BEEN

01:00PM  15      REMOVED FROM A THYROID PANEL IN ONE PATIENT; CORRECT?

01:00PM  16      A.   YES.

01:00PM  17      Q.   AND DAN YOUNG IS PROVIDING INPUT ON WHAT TO INCLUDE ON THE

01:00PM  18      REPORTS THAT ARE EVENTUALLY GOING TO GO OUT TO THE PEOPLE

01:00PM  19      RECEIVING THE DEMOS; CORRECT?

01:00PM  20      A.   YES.

01:00PM  21      Q.   OKAY.  AND IF WE GO TO PAGE -- THE TOP OF PAGE 5, DO YOU

01:01PM  22      SEE WHERE DANIEL YOUNG IS WRITING, "I AM CONCERNED ABOUT THE

01:01PM  23      TSH VALUES F2, MF, AND M6 WHICH WERE ALL DONE ON THE THYROID

01:01PM  24      PANEL.  I DO THINK THESE ARE ALL RUNNING LOW.  TO BE

01:01PM  25      CONSERVATIVE, I WOULD REMOVE ALL OF THESE THREE RESULTS."

HOLMES CROSS BY MR. LEACH (RES.)                                   8466

01:01PM   1        YOU CAN'T TELL FROM THIS EMAIL THAT THIS RELATES TO

01:01PM   2   WALGREENS; CORRECT?

01:01PM   3   A.   I DON'T THINK SO.

01:01PM   4   Q.   OKAY.  WE'LL GET TO WHETHER YOU'RE MEETING WITH WALGREENS

01:01PM   5   ON THIS DATE OR NOT.

01:01PM   6        BUT AM I RIGHT THAT YOU NEVER TOLD WALGREENS ABOUT ISSUES

01:01PM   7   THAT THERANOS WAS HAVING WITH ITS VITAMIN D ASSAY?

01:01PM   8   A.   I DON'T THINK SO.

01:01PM   9   Q.   AND YOU DIDN'T TELL WALGREENS FOLLOWING THIS DEMO THAT

01:01PM  10   THERANOS WAS HAVING ISSUES WITH THE TT4 ASSAY?

01:01PM  11   A.   I DON'T THINK SO.

01:01PM  12   Q.   AND YOU DIDN'T TELL WALGREENS THAT THERANOS WAS HAVING

01:02PM  13   ISSUES WITH THE TT3 ASSAY?

01:02PM  14   A.   I DON'T THINK SO.

01:02PM  15   Q.   AND YOU DIDN'T TELL WALGREENS THAT THERANOS WAS HAVING

01:02PM  16   ISSUES WITH THE FT4 ASSAY?

01:02PM  17   A.   I DON'T THINK SO.

01:02PM  18   Q.   THERE'S ALSO REFERENCES TO CHLORIDE AND ALKALINE PHOSPHATE

01:02PM  19   IN THIS.  YOU DIDN'T TELL WALGREENS THAT YOU WERE HAVING ISSUES

01:02PM  20   WITH THOSE ASSAYS, DID YOU?

01:02PM  21   A.   I DON'T THINK SO.

01:02PM  22   Q.   OKAY.  AND RATHER THAN TELL WALGREENS ABOUT THOSE ISSUES,

01:02PM  23   YOU ELECTED SIMPLY TO REMOVE THOSE RESULTS FROM THE REPORT;

01:02PM  24   CORRECT?

01:02PM  25   A.   I HAVEN'T READ ALL OF THIS, BUT WE WOULD HAVE FOLLOWED

HOLMES CROSS BY MR. LEACH (RES.)                                    8467

01:02PM    1    DR. YOUNG'S GUIDANCE.

01:02PM    2    Q.   AND RATHER THAN HAVING A FRANK DISCUSSION WITH THEM ABOUT

01:02PM    3    ISSUES THAT YOU WERE HAVING WITH ASSAYS, YOU JUST TOOK THEM

01:02PM    4    OUT?

01:02PM    5    A.   NO.  I THINK IF DR. YOUNG WAS SAYING THERE WAS A CONCERN

01:02PM    6    ABOUT A RESULT, WE WOULD NOT REPORT THE RESULT, AND THEN THE

01:02PM    7    TEAM WOULD DO WHATEVER INVESTIGATION WAS NECESSARY TO

01:02PM    8    UNDERSTAND IF THERE WAS AN ISSUE.

01:02PM    9    Q.   OKAY.  BUT YOU NEVER TOLD WALGREENS, FOLLOWING THIS JULY

01:03PM   10    DEMO, THAT THERANOS WAS HAVING ISSUES WITH THESE ASSAYS;

01:03PM   11    CORRECT?

01:03PM   12    A.   I DON'T THINK SO.

01:03PM   13    Q.   OKAY.  LET'S LOOK AT EXHIBIT 5623.

01:03PM   14    A.   THE THIRD BINDER?

01:03PM   15    Q.   THIS IS IN VOLUME 3.

01:03PM   16         DOES THIS APPEAR TO BE AN EMAIL FROM CHRISTIAN HOLMES TO

01:03PM   17    YOU AND SUNNY BALWANI DATED JULY 11TH, 2013?

01:03PM   18    A.   YES.

01:04PM   19    Q.   AND THE SUBJECT MATTER IS "DECK FOR BOOTS MEETING

01:04PM   20    TOMORROW"?

01:04PM   21    A.   YES.

01:04PM   22    Q.   AND BOOTS IS ANOTHER NAME FOR WALGREENS?  OR BOOTS IS

01:04PM   23    AFFILIATED WITH WALGREENS?

01:04PM   24    A.   YES.

01:04PM   25              MR. LEACH:  OKAY.  YOUR HONOR, I OFFER EXHIBIT 5623.

| | | |
|---|---|---|
| 01:04PM | 1 | MR. DOWNEY:  NO OBJECTION, YOUR HONOR. |
| 01:04PM | 2 | THE COURT:  IT'S ADMITTED. |
| 01:04PM | 3 | (GOVERNMENT'S EXHIBIT 5623 WAS RECEIVED IN EVIDENCE.) |
| 01:04PM | 4 | BY MR. LEACH: |
| 01:04PM | 5 | Q.   AND DO YOU SEE THE DATE JULY 11TH, 2013, MS. HOLMES? |
| 01:04PM | 6 | A.   I DO. |
| 01:04PM | 7 | Q.   AND IS THIS ROUGHLY THE TIME PERIOD OF THE DEMONSTRATIONS |
| 01:04PM | 8 | THAT WE JUST LOOKED AT? |
| 01:04PM | 9 | A.   IT IS. |
| 01:04PM | 10 | Q.   AND DOES THIS REFRESH YOUR MEMORY THAT IN THIS TIME PERIOD |
| 01:04PM | 11 | WALGREENS EXECUTIVES WERE COMING THROUGH FOR DEMONSTRATIONS? |
| 01:04PM | 12 | A.   AGAIN, NOT SPECIFICALLY AS TO THE DATE, BUT I KNOW THAT WE |
| 01:04PM | 13 | WERE MEETING WITH THEM THAT SUMMER. |
| 01:04PM | 14 | Q.   OKAY. |
| 01:04PM | 15 | YOUR HONOR, WE'VE MARKED THE POWERPOINT TO THIS AS A |
| 01:04PM | 16 | SEPARATE EXHIBIT, EXHIBIT 5609. |
| 01:05PM | 17 | IF I COULD ASK MS. HOLMES TO LOOK AT IT. |
| 01:05PM | 18 | A.   YES. |
| 01:05PM | 19 | OKAY. |
| 01:05PM | 20 | Q.   DO YOU SEE THE DATE JULY 11TH, 2013? |
| 01:05PM | 21 | A.   I DO. |
| 01:05PM | 22 | Q.   AND DO YOU SEE THE NAMES THERANOS, ALLIANCE, BOOTS, AND |
| 01:05PM | 23 | WALGREENS ON THIS POWER POINT? |
| 01:05PM | 24 | A.   I DO. |
| 01:05PM | 25 | Q.   AND YOU WOULD HAVE BEEN PRESENTING TO WALGREENS IN THIS |

| | | |
|---|---|---|
| 01:05PM | 1 | TIME PERIOD ABOUT THE THERANOS RELATIONSHIP? |
| 01:05PM | 2 | A.   WE WOULD HAVE BEEN MEETING WITH THEM ON OUR PARTNERSHIP. |
| 01:05PM | 3 | MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5609. |
| 01:05PM | 4 | MR. DOWNEY:  YOUR HONOR, NO OBJECTION FROM ME, BUT |
| 01:05PM | 5 | MINE IS ACTUALLY NOT READABLE. |
| 01:05PM | 6 | MR. LEACH:  IF WE CAN USE THE NATIVE ON THE SCREEN. |
| 01:05PM | 7 | MR. DOWNEY:  MAYBE IT IS A NATIVE EXHIBIT. |
| 01:05PM | 8 | MR. LEACH:  I THINK THE PRINTOUT CAME OUT IN A WAY |
| 01:05PM | 9 | THAT IS NOT READABLE, YOUR HONOR.  BUT WE HAVE A NATIVE COPY |
| 01:05PM | 10 | THAT I THINK WILL BE DISPLAYABLE. |
| 01:06PM | 11 | THE COURT:  SOME OF THESE PAGES DO HAVE SOME -- |
| 01:06PM | 12 | MR. LEACH:  YEAH, I CAN'T EXPLAIN IT.  BUT I'VE |
| 01:06PM | 13 | PERSONALLY REVIEWED THE NATIVE AND I THINK MR. DOWNEY'S CONCERN |
| 01:06PM | 14 | WILL BE ALLAYED. |
| 01:06PM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:06PM | 16 | AND YOU'RE GOING TO DISPLAY THE NATIVE? |
| 01:06PM | 17 | MR. LEACH:  YES. |
| 01:06PM | 18 | THE COURT:  IT'S ADMITTED. |
| 01:06PM | 19 | (GOVERNMENT'S EXHIBIT 5609 WAS RECEIVED IN EVIDENCE.) |
| 01:06PM | 20 | MR. LEACH:  MAY I HAVE ONE MOMENT, YOUR HONOR? |
| 01:06PM | 21 | (DISCUSSION OFF THE RECORD.) |
| 01:06PM | 22 | MR. LEACH:  WHILE MS. HOLLIMAN IS WORKING ON THAT, |
| 01:06PM | 23 | IF I COULD USE THE ELMO? |
| 01:06PM | 24 | Q.   MS. HOLMES, I'M DISPLAYING THE FINAL PAGE OF EXHIBIT 5609, |
| 01:07PM | 25 | THE TITLE IS "OVERVIEW:  THERANOS SYSTEMS." |

HOLMES CROSS BY MR. LEACH (RES.)                    8470

01:07PM   1          DO YOU SEE THAT ON THE SCREEN?

01:07PM   2     A.   I DO.

01:07PM   3     Q.   AND TO THE LEFT THERE'S THERANOS SYSTEMS AND IMAGES OF TWO

01:07PM   4     THINGS DESCRIBED AS THERANOS ANALYZERS.

01:07PM   5          DO YOU SEE THAT?

01:07PM   6     A.   I DO.

01:07PM   7     Q.   AND IS THAT THE 3.5 TO THE LEFT?

01:07PM   8     A.   YES.

01:07PM   9     Q.   AND WHAT IS THE ONE TO THE RIGHT?

01:07PM  10     A.   ONE OF THE MINILABS.

01:07PM  11     Q.   AND THIS IS FROM JULY OF 2013, THE TIME PERIOD WHEN YOU'RE

01:07PM  12     MODIFYING THE SIEMENS ADVIA MACHINES; CORRECT?

01:07PM  13     A.   YES.

01:07PM  14     Q.   AND AT NO POINT IN TIME DID YOU TELL WALGREENS THAT YOU

01:07PM  15     WERE MODIFYING SIEMENS MACHINES TO GO FORWARD WITH THE LAUNCH?

01:07PM  16     A.   WE DID NOT.

01:07PM  17     Q.   AND YOU DIDN'T PROVIDE THEM THE IMAGE LIKE WE HAVE HERE OF

01:07PM  18     A THERANOS ANALYZER CONSISTING OF A THIRD PARTY MODIFIED

01:07PM  19     DEVICE; CORRECT?

01:07PM  20     A.   CORRECT.

01:08PM  21     Q.   YOU ALSO HELD OUT TO WALGREENS THE FACT THAT YOU HAD A

01:08PM  22     CLIA LICENSE; CORRECT?

01:08PM  23     A.   WE DISCUSSED THAT WITH THEM.

01:08PM  24     Q.   AND THAT'S IN THE CONTRACT, THERANOS NEEDS TO GET -- BE

01:08PM  25     LICENSED BY CLIA IN ORDER TO DO THE TESTING?

                    UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8471

01:08PM  1      A.    IT SOUNDS RIGHT.

01:08PM  2      Q.    AND AT THIS POINT IN TIME, JULY OF 2013, YOU HAD NOT

01:08PM  3   VALIDATED A SINGLE ASSAY FOR USE IN THE CLIA LAB USING ANY

01:08PM  4   DEVICE; CORRECT?

01:08PM  5      A.    CORRECT, YES.

01:08PM  6      Q.    AND THAT WAS ALL WORK THAT WAS STILL TO COME?

01:08PM  7      A.    YES.

01:08PM  8      Q.    OKAY.  AT SOME POINT AT OR AFTER SEPTEMBER OF 2013?

01:08PM  9      A.    AT SOME POINT AT OR AFTER JULY OF 2013.

01:08PM 10      Q.    OKAY.  YOU MENTIONED -- YOU MENTIONED SOME NAMES IN YOUR

01:08PM 11   DIRECT EXAMINATION THAT I WANTED TO ASK SOME FOLLOW-UP

01:09PM 12   QUESTIONS ABOUT.  ONE OF THEM WAS IAN GIBBONS.

01:09PM 13          DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT

01:09PM 14   IAN GIBBONS?

01:09PM 15      A.    I DO.

01:09PM 16      Q.    AND BEFORE I GET TO IAN GIBBONS, I THINK WE'VE

01:09PM 17   SUCCESSFULLY PUT THE NATIVE OF THE POWERPOINT ON THE SLIDE.  IF

01:09PM 18   I CAN WALK THROUGH SOME OF THOSE PAGES WITH YOU.

01:09PM 19          DO YOU SEE THE DATE OF JULY 11TH, 2013?

01:09PM 20      A.    I DO.

01:09PM 21      Q.    OKAY.  AND IF WE COULD PLEASE GO TO PAGE 7.

01:09PM 22          DO YOU SEE THERE'S A SLIDE TALKING ABOUT BACKGROUND ON

01:09PM 23   THERANOS, TRANSFORMING THE CLINICAL LABORATORY, CONSUMER

01:09PM 24   MARKETING?

01:09PM 25      A.    I DO.

HOLMES CROSS BY MR. LEACH (RES.)                                8472

01:09PM   1    Q.   AND THIS WAS -- YOU DON'T HAVE A MEMORY OF GIVING THIS

01:09PM   2    PRESENTATION TO WALGREENS?

01:09PM   3    A.   I DO NOT.

01:09PM   4    Q.   BUT YOU DON'T HAVE ANY REASON TO DOUBT THAT YOU DID?

01:09PM   5    A.   I THINK WE PROBABLY SPOKE TO SOME OF THE SLIDES.  WE

01:10PM   6    DIDN'T GENERALLY GO THROUGH A DECK.

01:10PM   7    Q.   OKAY.  LET'S LOOK AT PAGE 8.

01:10PM   8         DO YOU SEE WHERE IT SAYS, "TRANSFORMING THE CLINICAL LAB"?

01:10PM   9    A.   I DO.

01:10PM  10    Q.   AND TO THE RIGHT IT SAYS, "THE 5 PERCENT CV YIELDED IN

01:10PM  11    THERANOS'S ANALYSIS RESULTS FROM ELIMINATION OF PRE-ANALYTIC

01:10PM  12    ERRORS, AND PROVIDES FOR PRECISE AND ACTIONABLE INFORMATION

01:10PM  13    THAT WAS PREVIOUSLY INACCESSIBLE."

01:10PM  14         DID I READ THAT CORRECTLY?

01:10PM  15    A.   YOU DID.

01:10PM  16    Q.   AND AT THIS TIME YOU'RE STILL WORKING ON VALIDATING YOUR

01:10PM  17    ASSAYS FOR USE ON THE EDISON OR THE MODIFIED THIRD PARTY

01:10PM  18    MACHINES IN THE CLIA LAB?

01:10PM  19    A.   YES.  AS OF JULY 11TH, I'M NOT SURE THAT THE MODIFIED WORK

01:10PM  20    HAD STARTED YET.

01:10PM  21         BUT THE LDT VALIDATION HAD NOT HAPPENED YET.

01:10PM  22    Q.   OKAY.  AND IF WE COULD GO TO THE NEXT SLIDE, PLEASE.

01:10PM  23         DO YOU SEE WHERE IT SAYS, "NEW POSSIBILITIES IN LAB"?

01:11PM  24    A.   I DO.

01:11PM  25    Q.   "ALL 2000 PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE

HOLMES CROSS BY MR. LEACH (RES.)                                    8473

01:11PM   1     THROUGH THERANOS."

01:11PM   2          DID I READ THAT CORRECTLY ON THE LEFT?

01:11PM   3     A.   YOU DID.

01:11PM   4     Q.   "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

01:11PM   5     LABORATORIES."

01:11PM   6          THAT'S WHAT IS ON THIS SLIDE FOR WALGREENS IN THE JULY

01:11PM   7     2013 TIME PERIOD?

01:11PM   8     A.   IT IS.

01:11PM   9     Q.   AND IF WE COULD GO TO PAGE 12.

01:11PM   10         DO YOU SEE WHERE IT SAYS, "VALIDATION OF THERANOS"?

01:11PM   11    A.   I DO.

01:11PM   12    Q.   AND THIS IS A SLIDE RELATING TO PHARMACEUTICAL COMPANIES

01:11PM   13    THAT YOU WOULD OFTEN PROVIDE AT INVESTOR PRESENTATIONS;

01:11PM   14    CORRECT?

01:11PM   15    A.   IT'S THE SAME DECK THAT WE WOULD GENERALLY SHARE WITH

01:11PM   16    PEOPLE.

01:11PM   17    Q.   OKAY.  YOU CAN PUT THAT EXHIBIT TO THE SIDE, MS. HOLMES.

01:11PM   18    A.   OKAY.

01:11PM   19    Q.   AND I'D LIKE TO GO BACK TO IAN GIBBONS.

01:12PM   20    A.   YES.

01:12PM   21    Q.   IAN GIBBONS WAS ONE OF THE FIRST EMPLOYEES AT THERANOS?

01:12PM   22    A.   VERY EARLY.

01:12PM   23    Q.   DO YOU REMEMBER WHAT EMPLOYEE NUMBER HE WAS?

01:12PM   24    A.   OH, GOSH.  NO, BUT IT WAS 2005, I THINK.

01:12PM   25    Q.   OKAY.  AND HE LEFT THERANOS IN 2010?

HOLMES CROSS BY MR. LEACH (RES.)                                    8474

01:12PM   1     A.   I DON'T THINK SO.

01:12PM   2     Q.   DID HE -- HE DIDN'T LEAVE AT ANY POINT BETWEEN 2010 AND

01:12PM   3     2013?

01:12PM   4     A.   NO.

01:12PM   5     Q.   OKAY.  HE PASSED AWAY IN 2013; CORRECT?

01:12PM   6     A.   HE DID.

01:12PM   7     Q.   OKAY.  AND YOU TESTIFIED THAT EXHIBIT 7098 WAS A

01:12PM   8     POWERPOINT THAT YOU RECEIVED FROM DR. GIBBONS ABOUT THE

01:12PM   9     CAPABILITIES OF THERANOS TECHNOLOGY.

01:12PM   10         DO YOU RECALL THAT TESTIMONY?

01:12PM   11    A.   I DO.

01:12PM   12    Q.   OKAY.  LET'S LOOK AT EXHIBIT 7098.

01:13PM   13    A.   IS THAT ONE UP HERE?

01:13PM   14    Q.   IT'S IN VOLUME 4.

01:13PM   15    A.   OKAY.  OKAY.

01:13PM   16    Q.   AND YOU TESTIFIED THAT AS A RESULT OF --

01:13PM   17         AND THIS IS IN EVIDENCE, MS. HOLLIMAN, SO WE CAN DISPLAY

01:13PM   18    THIS.

01:13PM   19         YOU TESTIFIED ON DIRECT EXAMINATION THAT AS A RESULT OF

01:13PM   20    THE PRESENTATION THAT YOU RECEIVED IN FEBRUARY OF 2010, YOU

01:13PM   21    UNDERSTOOD THAT THE 4 SERIES COULD DO ANY BLOOD TEST.

01:13PM   22         DO I HAVE THAT RIGHT?

01:13PM   23    A.   YES.

01:13PM   24    Q.   OKAY.  NOW, YOU DIDN'T HAVE A WORKING 4.0 SYSTEM AT THIS

01:13PM   25    POINT; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                8475

01:13PM  1     A.   ONLY PROTOTYPES.

01:13PM  2     Q.   ONLY PROTOTYPES.

01:13PM  3          SO LET'S LOOK AT PAGE 2.  OR EXCUSE ME, IT'S PAGE 3.

01:14PM  4          DR. GIBBONS WROTE HERE, "SYSTEM 4.0 WILL BE CAPABLE OF

01:14PM  5     PERFORMING ANY MEASUREMENT REQUIRED IN A DISTRIBUTED TEST

01:14PM  6     SETTING."

01:14PM  7          HE'S USING THE FUTURE TENSE THERE; CORRECT?

01:14PM  8     A.   HE DID.

01:14PM  9     Q.   AND HE WROTE, "IT IS ENVISAGED THAT SEVERAL DISTINCT

01:14PM 10     MEASUREMENT TECHNOLOGIES WILL BE INCORPORATED."

01:14PM 11          THAT'S SOMETHING THAT IS GOING TO HAPPEN IN THE FUTURE;

01:14PM 12     RIGHT?

01:14PM 13     A.   YES.

01:14PM 14     Q.   IT'S A VISION OF WHAT IS GOING TO HAPPEN IN THE FUTURE?

01:14PM 15     A.   IT'S WHAT WE WERE DOING IN THE LAB, BUT YES.

01:14PM 16     Q.   OKAY.  "THE SYSTEM WILL BE BROADLY BASED ON THE EXISTING

01:14PM 17     CARTRIDGE AND READER CONCEPTS."

01:14PM 18          THAT, AGAIN, IS THE FUTURE TENSE THAT DR. GIBBONS IS USING

01:14PM 19     THERE; CORRECT?

01:14PM 20     A.   IT IS.

01:14PM 21     Q.   AND THEN IT SAYS, "THE NUMBER OF TOTAL MEASUREMENTS PER

01:14PM 22     SAMPLE WILL BE INCREASED BY 2 TO 3-FOLD (TARGET: 15 ASSAYS?)."

01:14PM 23          AGAIN, HE'S SAYING WILL BE INCREASED, SO THAT'S THE FUTURE

01:15PM 24     TENSE; CORRECT?

01:15PM 25     A.   HE DID.

HOLMES CROSS BY MR. LEACH (RES.)                          8476

01:15PM  1    Q.   OKAY.  IF WE CAN LOOK AT THE NEXT PAGE, PLEASE.

01:15PM  2         DO YOU SEE THE SLIDE TITLED "ASSAY MENU"?

01:15PM  3    A.   I DO.

01:15PM  4    Q.   AND DO YOU SEE WHERE IT SAYS, "IN THE FIELD OF IMMUNOASSAY

01:15PM  5    WE HAVE GOOD INFORMATION AND EXPERIENCE.

01:15PM  6         "IN OTHER FIELDS, WE HAVE LESS SECURE INFORMATION."

01:15PM  7         DID I READ THAT CORRECTLY?

01:15PM  8    A.   YOU DID.

01:15PM  9    Q.   AND THE OTHER FIELDS INCLUDE TYPES OF TESTING LIKE GENERAL

01:15PM 10    CHEMISTRY AND NUCLEIC ACID AMPLIFICATION, AREAS OUTSIDE OF

01:15PM 11    IMMUNOASSAYS THAT YOU HAD SOME EXPERIENCE IN?

01:15PM 12    A.   HE'S SAYING WE HAVE LESS EXPERIENCE IN THOSE AREAS AND

01:15PM 13    OTHER AREAS.

01:15PM 14    Q.   OKAY.  LESS SECURE INFORMATION?

01:15PM 15    A.   YES.

01:15PM 16    Q.   OKAY.  AND IF WE LOOK AT PAGE 5, DO YOU SEE WHERE

01:15PM 17    DR. GIBBONS IS USING THE HEADING "CANDIDATE TECHNOLOGIES"?

01:15PM 18    A.   YES.

01:15PM 19    Q.   AND THESE ARE CANDIDATES; RIGHT?

01:16PM 20    A.   YES.

01:16PM 21    Q.   AND I BELIEVE YOU TESTIFIED THAT DR. GIBBONS WAS

01:16PM 22    SUGGESTING THAT WE REVIEW THESE AS POSSIBLE METHODS TO RUN ON

01:16PM 23    THE SYSTEM?

01:16PM 24    A.   HE DID.

01:16PM 25    Q.   OKAY.  LET'S LOOK AT PAGE 6.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                8477

01:16PM  1           DO YOU SEE THAT THERE'S A LISTING OF GENERAL SYSTEM

01:16PM  2      REQUIREMENTS?

01:16PM  3      A.   I DO.

01:16PM  4      Q.   AND SOME OF THE THINGS LIKE SIZE AND ASSAY TIMES AND OTHER

01:16PM  5      CAPABILITIES WERE TBD?

01:16PM  6      A.   YES.

01:16PM  7      Q.   TBD MEANS TO BE DETERMINED?

01:16PM  8      A.   IT DOES.

01:16PM  9      Q.   OKAY.  AND THROUGHOUT THESE FIRST COUPLE OF SLIDES,

01:16PM 10      DR. GIBBONS IS USING THE FUTURE TENSE AND REFERENCING

01:16PM 11      CANDIDATES AND TALKING ABOUT THINGS THAT ARE YET TO BE

01:16PM 12      DETERMINED; CORRECT?

01:16PM 13      A.   YES.

01:16PM 14      Q.   OKAY.  BUT YOU UNDERSTOOD FROM THIS THAT THERANOS COULD

01:16PM 15      RUN ANY BLOOD TEST?

01:16PM 16      A.   I UNDERSTOOD THAT THIS WAS THE BEGINNING OF AFFIRMING WE

01:17PM 17      WERE CAPABLE OF DOING THAT, YES.

01:17PM 18      Q.   OKAY.  SO WHEN YOU TESTIFIED THAT AFTER REVIEWING THIS YOU

01:17PM 19      UNDERSTOOD THAT THE 4 SERIES COULD DO ANY BLOOD TESTS, WHAT YOU

01:17PM 20      MEANT IS THAT THIS WAS THE BEGINNING OF SOMETHING THAT MIGHT BE

01:17PM 21      ABLE TO DO THAT?

01:17PM 22      A.   WHEN I TESTIFIED THAT I BELIEVED THIS MEANT THAT WE COULD

01:17PM 23      DO IT, I WAS CORRECT, I BELIEVE IT MEANT THAT WE COULD DO IT.

01:17PM 24      Q.   OKAY.  YOU UNDERSTOOD THAT THIS WAS SOMETHING THAT YOU

01:17PM 25      MIGHT BE ABLE TO DO IN THE FUTURE?

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8478

01:17PM   1         IS THAT WHAT YOU'RE SAYING?

01:17PM   2    A.   I UNDERSTOOD FROM THE WORK THAT THIS TEAM OF SCIENTISTS

01:17PM   3    AND ENGINEERS AND DR. GIBBONS DID THAT WE COULD DO ANY METHOD

01:17PM   4    ON THE MINILAB THE WAY THAT WE WERE PROPOSING TO BUILD IT AND

01:17PM   5    TAKE IT FORWARD.

01:17PM   6    Q.   WASN'T THIS A PROOF OF CONCEPT?

01:17PM   7    A.   AT THIS STAGE, THE PROTOTYPES FOR SURE.

01:17PM   8    Q.   OKAY.  SO YOU HAVE A PROTOTYPE, YOU HAVE A PROOF OF

01:17PM   9    CONCEPT, YOU HAVE WILL BE'S, YOU HAVE TBD'S, YOU HAVE

01:17PM  10    CANDIDATES.  BUT IT REMAINS TO BE SEEN WHETHER YOU'RE GOING TO

01:18PM  11    MAKE IT ALL COME TOGETHER.  IS THAT A FAIR WAY OF LOOKING AT

01:18PM  12    THIS?

01:18PM  13    A.   THERE WAS STILL WORK TO BE DONE.

01:18PM  14    Q.   WELL, LET'S LOOK AT SLIDE 7.

01:18PM  15         DO YOU SEE THE HEADING "PROPOSAL FOR THE BASIS OF SYSTEM

01:18PM  16    4.0"?

01:18PM  17    A.   I DO.

01:18PM  18    Q.   OKAY.  THIS WAS A PROPOSAL; RIGHT?

01:18PM  19    A.   YES.

01:18PM  20    Q.   AND THERE'S -- THE FIRST BULLET SAYS, "REVIEW AVAILABLE

01:18PM  21    TECHNOLOGIES:  DONE."

01:18PM  22         "DEFINE REQUIREMENTS?

01:18PM  23         "FIRST PASS PROPOSAL."

01:18PM  24         AND THEN THERE'S SOMETHING CALLED AN "ENGINEERING REVIEW"

01:18PM  25    WHICH THERANOS HAS TO UNDERTAKE.

UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                              8479

01:18PM  1        IS THAT WHAT THIS SLIDE IS CONVEYING?

01:18PM  2   A.   IT IS.

01:18PM  3   Q.   LET'S LOOK AT PAGE 9.

01:19PM  4        DO YOU SEE THE BOX "COMPARISON OF PHYSICAL TECHNOLOGIES

01:19PM  5   USED FOR ASSAYS"?

01:19PM  6   A.   I DO.

01:19PM  7   Q.   AND THERE'S A ROW FOR SOMETHING CALLED NON-SEPARATION,

01:19PM  8   IT'S THE FOURTH ROW DOWN.

01:19PM  9        DO YOU SEE THAT?

01:19PM 10   A.   I DO.

01:19PM 11   Q.   AND TO THE RIGHT IT SAYS, IN THE COLUMN, I.T./LICENSING

01:19PM 12   REQUIRED.

01:19PM 13        DO YOU SEE THAT?

01:19PM 14   A.   I DO.

01:19PM 15   Q.   AND YOU UNDERSTOOD THAT TO MEAN THAT THERE WAS STILL SOME

01:19PM 16   INTELLECTUAL PROPERTY THAT NEEDED TO BE SECURED BY THERANOS IN

01:19PM 17   ORDER TO TURN THIS PROTOTYPE INTO SOMETHING MORE WORKABLE?

01:19PM 18   A.   NO.

01:19PM 19   Q.   WELL, LET'S LOOK AT PAGE 10.

01:19PM 20        IS THIS A DESCRIPTION OF "SEPARATION OF RED CELLS AND

01:19PM 21   WASHING"?

01:19PM 22   A.   I'M JUST READING IT.

01:19PM 23        YES.

01:19PM 24   Q.   AND IS DR. GIBBONS IDENTIFYING CERTAIN SOLUTIONS TO THIS

01:20PM 25   PROBLEM IN THE THIRD BULLET?

HOLMES CROSS BY MR. LEACH (RES.)                                    8480

01:20PM   1      A.   I'M JUST LOOKING AT IT.

01:20PM   2           YES.

01:20PM   3      Q.   AND THERE'S THREE POSSIBLE SOLUTIONS.  THE THIRD ONE SAYS,

01:20PM   4      "SEPARATE PLASMA AND USE A VERY LOW VOLUME MEASUREMENT

01:20PM   5      TECHNOLOGY (I.E. NANODROP).

01:20PM   6           "WILL REQUIRE REVERSE ENGINEERING AND/OR A LICENSE?"

01:20PM   7           DID I READ THAT CORRECTLY?

01:20PM   8      A.   YOU DID.

01:20PM   9      Q.   DO YOU SEE ON THIS SLIDE FOR THE "SPECIAL PROBLEM FOR

01:20PM  10      BLOOD SAMPLES," THERE ARE A COUPLE OF ELLIPSES IN THE

01:20PM  11      POWERPOINT THAT ARE NOT ANSWERED OR THAT AREN'T CLEAR WHAT

01:20PM  12      THEY'RE GETTING AT HERE?

01:20PM  13      A.   I SEE THEM.

01:20PM  14      Q.   OKAY.  HOW ABOUT PAGE 12?

01:21PM  15           DO YOU SEE HERE THERE'S A DISCUSSION OF "SEPARATION VERSUS

01:21PM  16      NON-SEPARATION TECHNOLOGIES," AND THERE ARE THREE TECHNOLOGIES

01:21PM  17      THAT ARE VERY SENSITIVE AND GENERAL, INCLUDING ONES BY SIEMENS,

01:21PM  18      DISCOVERRX, AND PACKARD?

01:21PM  19      A.   YES.

01:21PM  20      Q.   SO DR. GIBBONS IS TALKING ABOUT THE NEED FOR LICENSING A

01:21PM  21      REVERSE ENGINEERING.  THERE'S UNCLEAR ELLIPSES IN THIS.

01:21PM  22      THERE'S A DISCUSSION OF TRADEOFFS AND LIMITS.

01:21PM  23           BUT YOUR TESTIMONY IS, FROM THIS, THAT YOU THOUGHT

01:21PM  24      THERANOS COULD DO ANY BLOOD TESTS?

01:21PM  25      A.   HE'S TALKING HERE ABOUT THE FACT THAT THERE'S OTHER WAYS

HOLMES CROSS BY MR. LEACH (RES.)                                    8481

01:22PM  1    TO DO IMMUNOASSAYS THAN WHAT WE'VE DONE BEFORE AND DESCRIBING

01:22PM  2    SOME OF THE OTHER IMMUNOASSAY TECHNOLOGIES THAT EXIST.

01:22PM  3    Q.   OKAY.  BUT, AGAIN, YOU VIEWED THIS AS A PROTOTYPE;

01:22PM  4    CORRECT?

01:22PM  5    A.   YES.

01:22PM  6    Q.   OKAY.  YOU DIDN'T THINK YOU COULD GO OUT AND -- WELL, YOU

01:22PM  7    DIDN'T HAVE -- YOU DIDN'T THINK THAT YOU COULD GO OUT AND SELL

01:22PM  8    YOUR PROTOTYPE IN FEBRUARY OF 2010; CORRECT?

01:22PM  9    A.   WE WEREN'T READY TO LAUNCH IT IN FEBRUARY OF 2010.

01:22PM  10   Q.   OKAY.  BUT BY MARCH OF 2010, YOU'RE READY TO TALK TO

01:22PM  11   WALGREENS AND YOU'RE READY TO TALK TO SAFEWAY?

01:22PM  12   A.   YES.

01:22PM  13   Q.   OKAY.  DR. GIBBONS PASSED AWAY IN 2013?

01:22PM  14   A.   HE DID.

01:22PM  15   Q.   DID YOU HAVE ANY REASON TO THINK THAT HIS VIEWS OF

01:22PM  16   THERANOS'S TECHNOLOGY HAD CHANGED BY THAT POINT IN TIME?

01:22PM  17   A.   I DID NOT.

01:22PM  18   Q.   OKAY.  YOU DIDN'T BEGIN TO SUSPECT THAT ROCHELLE GIBBONS

01:22PM  19   WAS ONE OF THE SOURCES FOR MR. CARREYROU?

01:23PM  20   A.   I DON'T THINK MR. CARREYROU CAME INTO OUR LIFE UNTIL TWO

01:23PM  21   YEARS LATER.

01:23PM  22   Q.   OKAY.  BUT WHEN HE DOES, YOU STARTED TO SUSPECT THAT

01:23PM  23   ROCHELLE GIBBONS WAS ONE OF THE SOURCES FOR THE CARREYROU

01:23PM  24   ARTICLE?

01:23PM  25   A.   I LEARNED THAT AT SOME POINT.

HOLMES CROSS BY MR. LEACH (RES.)                              8482

01:23PM   1    Q.   OKAY.  DID THERE COME A POINT IN TIME WHEN YOU STARTED TO

01:23PM   2    SUSPECT THAT ROCHELLE GIBBONS WAS ONE OF THE SOURCES?

01:23PM   3    A.   I DON'T KNOW IF I SUSPECTED IT.  I KNOW THAT I LEARNED

01:23PM   4    THAT SHE WAS AT SOME POINT.

01:23PM   5    Q.   OKAY.  YOU DID TELL MR. CARREYROU THAT BY 2013,

01:23PM   6    DR. GIBBONS'S WORK WAS NOT LIVING UP TO WHAT IT HAD BEEN IN THE

01:23PM   7    PAST.

01:23PM   8        IS THAT FAIR?

01:23PM   9    A.   I DON'T KNOW.

01:23PM  10    Q.   I'LL COME BACK TO THAT ONE, MS. HOLMES.

01:24PM  11        BEFORE I GET TO THAT, LET ME ASK YOU -- DID I HEAR YOU SAY

01:24PM  12    YOU LEARNED ROCHELLE GIBBONS WAS A SOURCE FOR MR. CARREYROU IN

01:24PM  13    THE 2015 TIME PERIOD?

01:24PM  14    A.   THAT'S WHAT I REMEMBER.

01:24PM  15    Q.   LET ME -- YOU TALKED IN YOUR DIRECT EXAMINATION ABOUT

01:24PM  16    PATENTS, AND I THINK YOU TALKED A LITTLE BIT ABOUT ONE OF YOUR

01:24PM  17    FIRST PATENTS, WHICH HAD SOMETHING TO DO WITH AN INGESTIBLE

01:24PM  18    PILL AND A PATCH, OR SOMETHING THAT WOULD GO ON THE ARM TO

01:24PM  19    MEASURE BLOOD.

01:24PM  20    A.   YES.

01:24PM  21    Q.   OKAY.  AND YOU WERE AWARDED A PATENT FOR THAT?

01:24PM  22    A.   I WAS.

01:24PM  23    Q.   CORRECT?

01:24PM  24        AND WE SAW THAT AT EXHIBIT 9501?

01:24PM  25    A.   I DON'T KNOW THE EXHIBIT, BUT PROBABLY.

| | | |
|---|---|---|
| 01:24PM | 1 | Q.   WELL, WE CAN DISPLAY IT, AND I'LL BRING YOU A COPY. |
| 01:25PM | 2 | A.   OKAY. |
| 01:25PM | 3 | MR. LEACH:  MAY I APPROACH, YOUR HONOR? |
| 01:25PM | 4 | THE COURT:  YES. |
| 01:25PM | 5 | BY MR. LEACH: |
| 01:25PM | 6 | Q.   (HANDING.) |
| 01:25PM | 7 | A.   THANK YOU. |
| 01:25PM | 8 | Q.   DO YOU SEE THE DATE OF NOVEMBER 6TH, 2007 ON THIS PATENT, |
| 01:25PM | 9 | MS. HOLMES? |
| 01:25PM | 10 | A.   I DO. |
| 01:25PM | 11 | Q.   AND IF WE COULD GO TO PAGE 2, THERE'S AN ABSTRACT IN THE |
| 01:25PM | 12 | FAR -- IN THE RIGHT COLUMN. |
| 01:25PM | 13 | A.   OKAY. |
| 01:25PM | 14 | Q.   DO YOU SEE THE HEADING "ABSTRACT"? |
| 01:25PM | 15 | A.   I DO. |
| 01:25PM | 16 | Q.   AND DO YOU SEE WHERE IT SAYS, "THE INVENTION RELATES TO AN |
| 01:25PM | 17 | INGESTIBLE, IMPLANTABLE, OR WEARABLE MEDICAL DEVICE COMPRISING |
| 01:25PM | 18 | A MICRO ARRAY WHICH COMPRISES," AND THEN IT CONTINUES. |
| 01:25PM | 19 | DO YOU SEE THAT? |
| 01:25PM | 20 | A.   I DO. |
| 01:25PM | 21 | Q.   AND YOU GOT A PATENT FOR THIS IDEA? |
| 01:26PM | 22 | A.   YES. |
| 01:26PM | 23 | Q.   OKAY.  I WANT TO TALK ABOUT THE PROCESS FOR THAT. |
| 01:26PM | 24 | SO TO GET THE PATENT, YOU SENT IN SOME PAPERWORK TO THE |
| 01:26PM | 25 | U.S. PATENT AND TRADEMARK OFFICE? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8484

| | | |
|---|---|---|
| 01:26PM | 1 | A.   YES. |
| 01:26PM | 2 | Q.   THEY DIDN'T COME TO THERANOS'S OFFICE; RIGHT? |
| 01:26PM | 3 | A.   NOT FOR THIS ONE. |
| 01:26PM | 4 | Q.   THEY DIDN'T REVIEW THE INGESTIBLE, IMPLANTABLE, OR |
| 01:26PM | 5 | WEARABLE DEVICE IN THERANOS'S OFFICES; CORRECT? |
| 01:26PM | 6 | A.   I DON'T THINK SO. |
| 01:26PM | 7 | Q.   AND THEY DIDN'T TURN ON ANY DEVICE AND SEE IF IT COULD RUN |
| 01:26PM | 8 | SAMPLES OR WORK THE WAY THAT IS CLAIMED IN THE PIECE OF PAPER; |
| 01:26PM | 9 | CORRECT? |
| 01:26PM | 10 | A.   CORRECT. |
| 01:26PM | 11 | Q.   AND WHAT THEY DID DO WAS COMPARE YOUR SUBMISSION, YOUR |
| 01:26PM | 12 | FILING, AGAINST SOMETHING CALLED PRIOR ART; CORRECT? |
| 01:26PM | 13 | A.   YES. |
| 01:26PM | 14 | Q.   THEY WERE TRYING TO SEE IF THIS WAS A NEW IDEA OR AN OLD |
| 01:26PM | 15 | IDEA? |
| 01:26PM | 16 | A.   YES. |
| 01:26PM | 17 | Q.   OKAY.  AND HOLDING A PATENT DOES NOT NECESSARILY MEAN THE |
| 01:26PM | 18 | INVENTION DESCRIBED IN THE PATENT WORKS; CORRECT? |
| 01:26PM | 19 | A.   CORRECT. |
| 01:26PM | 20 | Q.   FOR EXAMPLE, YOU DON'T HAVE AN INGESTIBLE PILL THAT |
| 01:27PM | 21 | ENABLES YOU TO, TO MEASURE LIPIDS IN THE BLOOD; CORRECT? |
| 01:27PM | 22 | A.   NOT YET. |
| 01:27PM | 23 | Q.   NOT YET. |
| 01:27PM | 24 | AND YOU KNEW THAT AT THE TIME?  THIS WAS AN IDEA, YOU HAVE |
| 01:27PM | 25 | A PATENT, BUT THAT DOESN'T MEAN IT WORKS? |

HOLMES CROSS BY MR. LEACH (RES.)                                8485

01:27PM  1      A.  CORRECT.

01:27PM  2      Q.  AND YOU DON'T HAVE AN IMPLANTABLE PATCH THAT, YET, CAN

01:27PM  3      MEASURE BLOOD; RIGHT?

01:27PM  4      A.  CORRECT.

01:27PM  5      Q.  YOU HAVE A PATENT FOR THAT?

01:27PM  6      A.  YES.

01:27PM  7      Q.  BUT IT DOESN'T QUITE WORK YET?

01:27PM  8      A.  YES.

01:27PM  9      Q.  OKAY.

01:27PM  10         YOUR HONOR, I'M ABOUT TO MOVE INTO A DIFFERENT TOPIC AREA.

01:27PM  11     I THINK IT MIGHT BE A GOOD TIME.

01:27PM  12             THE COURT:  LET'S TAKE A BREAK NOW.  LET'S TAKE

01:27PM  13     30 MINUTES, LADIES AND GENTLEMEN.  WE'LL TAKE OUR AFTERNOON

01:27PM  14     BREAK OF 30 MINUTES.

01:27PM  15             THE CLERK:  COURT IS IN RECESS.

01:27PM  16         (RECESS FROM 1:27 P.M. UNTIL 2:04 P.M.)

02:04PM  17             THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

02:04PM  18     PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:04PM  19         MR. LEACH, YOU'D LIKE TO CONTINUE?

02:04PM  20             MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

02:04PM  21     Q.  GOOD AFTERNOON, MS. HOLMES.

02:04PM  22     A.  GOOD AFTERNOON.

02:04PM  23     Q.  BEFORE THE BREAK WE WERE TALKING ABOUT IAN GIBBONS.  I

02:04PM  24     WANTED TO SEE IF I COULD REFRESH YOUR MEMORY ON SOME ITEMS

02:04PM  25     RELATING TO HIM.

                    UNITED STATES COURT REPORTERS


                              **ER-12056**

| | | |
|---|---|---|
| 02:04PM | 1 | IF YOU COULD PLEASE TURN TO EXHIBIT 5720, WHICH SHOULD BE |
| 02:04PM | 2 | IN VOLUME 3. |
| 02:05PM | 3 | A.   OKAY. |
| 02:05PM | 4 | Q.   DO YOU SEE YOUR NAME IN THE TO LINE UP AT THE TOP? |
| 02:05PM | 5 | A.   I DO. |
| 02:05PM | 6 | Q.   AND DO YOU SEE THE DATE OF THIS DOCUMENT? |
| 02:05PM | 7 | A.   I DO. |
| 02:05PM | 8 | Q.   OKAY.  I WANT TO DRAW YOUR ATTENTION TO THE BOTTOM PORTION |
| 02:05PM | 9 | OF -- ARE YOU ABLE TO UNDERSTAND THE CONTEXT OF THIS FROM THE |
| 02:05PM | 10 | TOP PORTION OF THE DOCUMENT? |
| 02:05PM | 11 | A.   I THINK SO. |
| 02:05PM | 12 | Q.   OKAY.  I WANTED TO DRAW YOUR ATTENTION TO THE BOTTOM |
| 02:05PM | 13 | PORTION.  THERE'S A BOLD HEADING DOWN TOWARDS THE BOTTOM, AND |
| 02:05PM | 14 | THEN THREE ADDITIONAL LINES. |
| 02:05PM | 15 | DO YOU SEE THAT? |
| 02:05PM | 16 | A.   I DO. |
| 02:05PM | 17 | Q.   OKAY.  AND IF YOU COULD PLEASE TURN TO THE NEXT PAGE AND |
| 02:06PM | 18 | READ TO YOURSELF THE FIRST TWO COMPLETE PARAGRAPHS ON THE TOP |
| 02:06PM | 19 | OF PAGE 2. |
| 02:06PM | 20 | A.   OKAY. |
| 02:06PM | 21 | (PAUSE IN PROCEEDINGS.) |
| 02:06PM | 22 | THE WITNESS:  OKAY. |
| 02:06PM | 23 | BY MR. LEACH: |
| 02:06PM | 24 | Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT DR. GIBBONS WAS |
| 02:06PM | 25 | FREQUENTLY ABSENT FROM WORK IN THE LAST FEW YEARS OF HIS LIFE? |

HOLMES CROSS BY MR. LEACH (RES.)                                    8487

02:06PM   1      A.   IT DOESN'T REFRESH MY RECOLLECTION.

02:06PM   2      Q.   DOES IT REFRESH YOUR RECOLLECTION THAT THERANOS TOLD "THE

02:07PM   3      WALL STREET JOURNAL" THAT IN OR AROUND OCTOBER OF 2015?

02:07PM   4      A.   NO.

02:07PM   5      Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT DR. GIBBONS WAS

02:07PM   6      FREQUENTLY ABSENT FROM SCIENTIFIC MEETINGS WITH HIS OWN TEAM?

02:07PM   7      A.   NO.

02:07PM   8      Q.   DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS TOLD

02:07PM   9      "THE WALL STREET JOURNAL" THAT IN OCTOBER OF 2015?

02:07PM   10     A.   IT DOES NOT.

02:07PM   11     Q.   OKAY.  DOES THIS REFRESH YOUR RECOLLECTION THAT THERANOS

02:07PM   12     TOLD "THE WALL STREET JOURNAL," DR. GIBBONS IS NOT A CREDIBLE

02:07PM   13     SOURCE FOR INFORMATION ABOUT THERANOS'S TECHNOLOGY, BUSINESS

02:07PM   14     PLANS, AND ANY OTHER INFORMATION?

02:07PM   15     A.   I DON'T THINK THAT'S WHAT THIS SAYS.

02:07PM   16     Q.   OKAY.  THIS DOESN'T REFRESH YOUR MEMORY THAT THERANOS TOLD

02:07PM   17     "THE WALL STREET JOURNAL" IN OCTOBER OF 2015 NEITHER

02:07PM   18     DR. GIBBONS NOR ROCHELLE IS A CREDIBLE SOURCE OF INFORMATION

02:07PM   19     ABOUT THERANOS'S TECHNOLOGY?

02:07PM   20     A.   IT DOES NOT.

02:07PM   21     Q.   OKAY.  YOU CAN PUT THAT TO THE SIDE.

02:07PM   22          YOU WERE ASKED SOME QUESTIONS ABOUT EXHIBIT 7623, WHICH

02:08PM   23     SHOULD BE IN VOLUME 4.

02:08PM   24     A.   OKAY.

02:08PM   25             THE CLERK:  THAT EXHIBIT NUMBER AGAIN, PLEASE,

                        UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8488

02:08PM   1      COUNSEL.

02:08PM   2              MR. LEACH:   7623.

02:08PM   3      Q.   THIS IS AN OCTOBER -- WELL, DOES THIS INCLUDE AN

02:08PM   4      OCTOBER 7TH, 2015 EMAIL ABOUT A PATIENT'S EXPERIENCE AT A

02:08PM   5      WALGREENS RELATING TO THYROID RESULTS?

02:08PM   6      A.   IT DOES.

02:08PM   7      Q.   AND YOU RECALL -- YOU TESTIFIED THAT YOU RECEIVED SOME

02:08PM   8      POSITIVE FEEDBACK ABOUT THIS PATIENT EXPERIENCE IN OR AROUND

02:08PM   9      OCTOBER OF 2015.

02:08PM  10      A.   YES.

02:08PM  11      Q.   OKAY.  AT THIS POINT IN TIME, OCTOBER OF 2015, THIS WAS

02:08PM  12      AFTER THE FDA INSPECTION OF THERANOS IN AUGUST?

02:09PM  13      A.   IT IS.

02:09PM  14      Q.   AND AT THIS POINT IN TIME, THERANOS WAS NOT PERFORMING ANY

02:09PM  15      TESTS IN ITS CALIFORNIA CLIA LAB FROM ITS FINGERSTICK

02:09PM  16      TECHNOLOGY; CORRECT?

02:09PM  17      A.   WE WERE NOT USING THE NANOTAINER.

02:09PM  18      Q.   OKAY.  AND SO YOU WEREN'T USING THE NANOTAINER TO TEST FOR

02:09PM  19      THYROID?

02:09PM  20      A.   I DON'T THINK SO, NO.

02:09PM  21      Q.   OKAY.  SO THIS WOULD HAVE BEEN RUN ON AN ORDINARY FDA

02:09PM  22      MACHINE?

02:09PM  23      A.   I THINK SO.

02:09PM  24      Q.   OKAY.  THIS WOULD NOT HAVE HAD ANYTHING TO DO WITH THE

02:09PM  25      EDISON?

UNITED STATES COURT REPORTERS

ER-12059

HOLMES CROSS BY MR. LEACH (RES.)                                    8489

02:09PM   1      A.   I DON'T -- YES, CORRECT.

02:09PM   2      Q.   AND IT WOULD NOT HAVE HAD ANYTHING TO DO WITH YOUR SMALL

02:09PM   3      SAMPLE TESTING?

02:09PM   4      A.   I BELIEVE THAT'S CORRECT.

02:09PM   5      Q.   AND YOU BELIEVE THAT TO BE CORRECT BASED ON THE TIMING OF

02:09PM   6      THE DATE OF THE VISIT?

02:09PM   7      A.   YES.

02:09PM   8      Q.   OKAY.  I ALSO WANTED TO DRAW YOUR ATTENTION TO 7718.

02:10PM   9      A.   OKAY.

02:10PM  10      Q.   DO YOU RECALL TESTING ABOUT -- TESTING.

02:10PM  11           DO YOU RECALL TESTIFYING ABOUT THIS ARTICLE IN "THE

02:10PM  12      JOURNAL OF VIROLOGICAL METHODS"?

02:10PM  13      A.   I DO.

02:10PM  14      Q.   AND I WANTED TO DRAW YOUR ATTENTION DOWN TO THE BOTTOM

02:10PM  15      PORTION.

02:10PM  16           DO YOU SEE THAT THERE ARE RECEIVED AND REVISED AND

02:10PM  17      ACCEPTED DATES DOWN IN THE VERY BOTTOM OF THIS DOCUMENT?

02:10PM  18      A.   I DO.

02:10PM  19      Q.   AND THE RECEIVED DATE OF EXHIBIT 7718 IS JULY 17TH, 2017;

02:10PM  20      CORRECT?

02:10PM  21      A.   YES.

02:10PM  22      Q.   SO 2017, THAT'S AFTER THE FDA INSPECTION IN AUGUST OF

02:10PM  23      2015?

02:10PM  24      A.   YES.

02:10PM  25      Q.   AND THAT'S AFTER THE CMS INSPECTION THAT STARTS IN

                         UNITED STATES COURT REPORTERS


                              **ER-12060**

HOLMES CROSS BY MR. LEACH (RES.)                                8490

02:10PM   1       SEPTEMBER AND CONCLUDES AT SOME POINT IN NOVEMBER OF 2015?

02:10PM   2       A.   YES.

02:10PM   3       Q.   AND THAT'S AFTER YOU RECEIVED THE CMS REPORT?

02:10PM   4       A.   IT IS.

02:10PM   5       Q.   AND THAT'S AFTER ALL OF THE NEGATIVE PUBLICITY FROM "THE

02:11PM   6       WALL STREET JOURNAL" ARTICLE?

02:11PM   7       A.   IT IS.

02:11PM   8       Q.   AND THIS IS AFTER INVESTORS STARTED ASKING YOU QUESTIONS

02:11PM   9       ABOUT WHAT WAS HAPPENING AND WHAT WAS GOING ON WITH THE

02:11PM  10       TECHNOLOGY; CORRECT?

02:11PM  11       A.   IT IS.

02:11PM  12       Q.   OKAY.  AND THE ACCEPTED DATE OF THIS ARTICLE IS

02:11PM  13       OCTOBER 25TH, 2017.

02:11PM  14            AM I RIGHT ABOUT THAT?

02:11PM  15       A.   YES.

02:11PM  16       Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO 719, OR 7719.

02:11PM  17       A.   OKAY.

02:11PM  18            THE COURT:  DID YOU WANT THESE PUBLISHED?  THESE ARE

02:11PM  19       IN EVIDENCE.

02:11PM  20            MR. LEACH:  THESE ARE IN EVIDENCE.  I DON'T NEED TO

02:11PM  21       PUBLISH THEM.  I JUST WANT TO GO THROUGH THE DATES, YOUR HONOR.

02:11PM  22       Q.   IS THIS ANOTHER JOURNAL ARTICLE THAT YOU TESTIFIED TO ON

02:11PM  23       YOUR DIRECT EXAMINATION?

02:11PM  24       A.   IT IS.

02:11PM  25       Q.   OKAY.  AND ARE THERE DATES AT THE TOP OF 7719?

HOLMES CROSS BY MR. LEACH (RES.)                                          8491

02:11PM  1     A.   YES.

02:11PM  2     Q.   AND IS THE RECEIVED DATE FOR 7719 SEPTEMBER 28TH, 2017?

02:11PM  3     A.   IT IS.

02:11PM  4     Q.   AND THAT'S ROUGHLY TWO YEARS AFTER "THE

02:12PM  5     WALL STREET JOURNAL" ARTICLE RAISING QUESTIONS ABOUT THERANOS'S

02:12PM  6     TECHNOLOGY?

02:12PM  7     A.   IT IS.

02:12PM  8     Q.   OKAY.  AND THAT'S ROUGHLY TWO YEARS AFTER SOME OF YOUR

02:12PM  9     INVESTORS STARTED ASKING SOME QUESTIONS ABOUT WHAT WAS GOING ON

02:12PM  10    WITH THE TECHNOLOGY?

02:12PM  11    A.   YES.

02:12PM  12    Q.   OKAY.  LET'S ALSO PLEASE LOOK AT 7695.

02:12PM  13    A.   OKAY.

02:12PM  14    Q.   IS THIS ANOTHER JOURNAL ARTICLE THAT YOU TESTIFIED TO ON

02:12PM  15    YOUR DIRECT EXAMINATION?

02:12PM  16    A.   IT IS.

02:12PM  17    Q.   AND DO YOU SEE THE DATES OF THIS JOURNAL ARTICLE DOWN IN

02:12PM  18    THE BOTTOM LEFT CORNER?

02:12PM  19    A.   I DO.

02:12PM  20    Q.   AND IS THE RECEIVED DATE NOVEMBER 18TH, 2017?

02:12PM  21    A.   IT IS.

02:12PM  22    Q.   AND THE PUBLISHED DATE IS DECEMBER 19TH, 2017; CORRECT?

02:12PM  23    A.   YES.

02:12PM  24    Q.   SO, AGAIN, THIS IS WELL AFTER "THE WALL STREET JOURNAL"

02:12PM  25    ARTICLE THAT RAISED SOME CRITICISMS ABOUT THERANOS?

HOLMES CROSS BY MR. LEACH (RES.)                                    8492

02:13PM   1       A.   IT IS.

02:13PM   2       Q.   AND THIS IS ROUGHLY TWO YEARS AFTER SOME OF YOUR INVESTORS

02:13PM   3       STARTED ASKING QUESTIONS ABOUT YOUR TECHNOLOGY?

02:13PM   4       A.   YES.

02:13PM   5       Q.   FINALLY, 7717.  I BELIEVE YOU TESTIFIED THIS WAS SOMETHING

02:13PM   6       THAT WAS NOT ACTUALLY PUBLISHED; IS THAT CORRECT?

02:13PM   7       A.   YES.

02:13PM   8       Q.   OKAY.  AND THE DATE THAT THIS WAS SUBMITTED, IF YOU LOOK

02:13PM   9       AT PAGE 2, IS DECEMBER 20TH, 2017?

02:13PM   10      A.   YES.

02:13PM   11      Q.   AND AGAIN, THAT'S ROUGHLY TWO YEARS AFTER INVESTORS

02:13PM   12      STARTED ASKING QUESTIONS ABOUT SOME OF THE CLAIMS THERANOS HAD

02:13PM   13      BEEN MAKING?

02:13PM   14      A.   I DON'T REMEMBER IT AS ASKING QUESTIONS ABOUT THE CLAIMS,

02:13PM   15      BUT, YES, IT'S TWO YEARS AFTER THE NEGATIVE REPORTING ABOUT

02:13PM   16      THERANOS.

02:13PM   17      Q.   OKAY.  I BELIEVE YOU TESTIFIED ON DIRECT EXAMINATION THAT

02:13PM   18      YOU CAME TO THE CONCLUSION AFTER RECEIVING THE CMS REPORT THAT

02:14PM   19      MR. BALWANI WAS NOT THE BUSINESSMAN YOU THOUGHT HE WAS AND THAT

02:14PM   20      YOU MADE THE DECISION TO PUSH HIM OUT FROM THERANOS AND END

02:14PM   21      YOUR PERSONAL RELATIONSHIP WITH HIM.

02:14PM   22           IS THAT A FAIR SUMMARY?

02:14PM   23      A.   OVERALL, YES.

02:14PM   24      Q.   OKAY.  BUT IT'S TRUE, ISN'T IT, MS. HOLMES, THAT YOU WERE

02:14PM   25      TOLD IN SEPTEMBER OF 2015 WHILE THE CMS INSPECTION WAS GOING ON

HOLMES CROSS BY MR. LEACH (RES.)                                    8493

02:14PM    1      THAT IT WAS GOING BADLY; CORRECT?

02:14PM    2      A.   I WAS TOLD AROUND THEN, YES.

02:14PM    3      Q.   OKAY.  YOU WERE TOLD IN SEPTEMBER OF 2015 THAT THE CMS

02:14PM    4      INSPECTORS WERE VERY HOSTILE SO FAR, THEY HAVE COMPLAINTS;

02:15PM    5      CORRECT?

02:15PM    6      A.   YES.

02:15PM    7      Q.   AND YOU WERE TOLD, OUR VALIDATION REPORTS ARE TERRIBLE,

02:15PM    8      REALLY PAINFUL GOING THROUGH THIS PROCESS, SAME ISSUES FDA

02:15PM    9      POINTED OUT.

02:15PM   10           CORRECT?

02:15PM   11      A.   YES.

02:15PM   12      Q.   YOU WERE TOLD THAT IN SEPTEMBER OF 2015?

02:15PM   13      A.   I DON'T REMEMBER EXACTLY, BUT THAT SOUNDS RIGHT.

02:15PM   14      Q.   AS THE INSPECTION IS GOING ON?

02:15PM   15      A.   I THINK SO.

02:15PM   16      Q.   OKAY.  AND YOU WERE TOLD DANIEL HAS NOTHING READY, TOLD ME

02:15PM   17      EVERYTHING IS IN BINDERS, NOT THERE.

02:15PM   18           YOU WERE TOLD THAT DURING THE INSPECTION; CORRECT?

02:15PM   19      A.   I DON'T REMEMBER THAT, BUT THAT SOUNDS LIKE A TEXT FROM

02:15PM   20      SUNNY, SO I'M ASSUMING.

02:15PM   21      Q.   OKAY.  SO NO REASON TO DOUBT THAT YOU WERE TOLD THAT IN

02:15PM   22      SEPTEMBER OF 2015 AS THE INSPECTION WAS GOING ON?

02:15PM   23      A.   I DON'T.

02:15PM   24      Q.   AND YOU WERE TOLD -- YOU KNOW THE INSPECTORS CAME BACK IN

02:15PM   25      NOVEMBER OF 2015; CORRECT?

HOLMES CROSS BY MR. LEACH (RES.)                                        8494

02:15PM   1      A.   I DO.

02:15PM   2      Q.   THEY WERE THERE FOR TWO DAYS AROUND NOVEMBER 17TH AND 18TH

02:16PM   3      OF 2015?

02:16PM   4      A.   YES.

02:16PM   5      Q.   AND YOU WERE THERE FOR ONE OF THE DAYS; CORRECT?

02:16PM   6      A.   I THINK SO.

02:16PM   7      Q.   OKAY.  THE FIRST DAY YOU ACTUALLY TRAVELLED BY CORPORATE

02:16PM   8      JET TO FLORIDA TO PICK UP SOME AWARD; CORRECT?

02:16PM   9      A.   I DON'T KNOW.

02:16PM  10      Q.   OKAY.  WELL, LET'S LOOK AT 5635.

02:16PM  11      A.   WHICH BINDER?

02:16PM  12      Q.   IT SHOULD BE IN VOLUME 3.

02:17PM  13      A.   OKAY.

02:17PM  14      Q.   DO YOU SEE THE DATE AT THE TOP OF THIS EMAIL?

02:17PM  15      A.   I DO.

02:17PM  16      Q.   AND DO YOU RECOGNIZE THIS AS AN EMAIL FROM YOUR ASSISTANT

02:17PM  17      TO YOU?

02:17PM  18      A.   I DO.

02:17PM  19      Q.   AND IF YOU LOOK AT NUMBER 5, DO YOU SEE A DISCUSSION OF

02:17PM  20      SOME FLIGHT OPTIONS TO FLORIDA?

02:17PM  21      A.   I DO.

02:17PM  22      Q.   OKAY.  AND IF YOU LOOK AT PAGE 6, DO YOU SEE AN AGENDA FOR

02:17PM  23      A MEETING IN FLORIDA ON NOVEMBER 17TH?

02:17PM  24      A.   I DO.

02:17PM  25      Q.   OKAY.  DOES THIS REFRESH YOUR MEMORY THAT YOU TRAVELLED TO

HOLMES CROSS BY MR. LEACH (RES.)                                    8495

02:17PM  1    FLORIDA ON OR AROUND NOVEMBER 17TH BY CORPORATE JET TO ACCEPT

02:17PM  2    AN AWARD BY SOMETHING CALLED CME GROUP?

02:17PM  3    A.    IT DOESN'T.   I GENERALLY REMEMBER GOING TO FLORIDA FOR

02:17PM  4    THAT, BUT I DIDN'T REMEMBER THE DATES.

02:17PM  5    Q.    OKAY.

02:17PM  6         WELL, YOUR HONOR, I OFFER PAGE 1 OF 5635, AND PAGES 6 AND

02:18PM  7    7 OF 5635.

02:18PM  8         (PAUSE IN PROCEEDINGS.)

02:18PM  9              MR. DOWNEY:  YOUR HONOR, I DON'T OBJECT TO IT BEING

02:18PM  10   REDACTED SO THAT THE TWO ENTRIES THAT HE'S REFERRING TO CAN BE

02:18PM  11   INTRODUCED INTO EVIDENCE.

02:18PM  12        THERE'S A LOT OF OTHER DISCUSSION OF OTHER ISSUES THAT

02:18PM  13   RAISE 403 AND 801, 802 ISSUES, ET CETERA.

02:18PM  14        BUT I DON'T -- IF HE CAN REDACT IT DOWN OR JUST DISPLAY

02:18PM  15   THE PART THAT HE'S REFERRED TO, THOSE PARTS, I HAVE NO

02:18PM  16   OBJECTION TO THEM COMING IN.

02:18PM  17             THE COURT:  MR. LEACH?

02:18PM  18             MR. LEACH:  I'M NOT 100 PERCENT CLEAR ON WHAT I

02:19PM  19   COULD DISPLAY, YOUR HONOR, BUT I'M TALKING ABOUT THE ENTIRETY

02:19PM  20   OF PAGE 6 AND PAGE 7, AND I CAN WORK WITH MR. DOWNEY TO REDACT

02:19PM  21   APPROPRIATE PORTIONS OF PAGE 1.

02:19PM  22             MR. DOWNEY:  WELL, I THOUGHT THAT HE HAD REFERRED TO

02:19PM  23   NUMBER 5 ON PAGE 1 AND TO THE BOTTOM HALF WITH A FLIGHT AGENDA

02:19PM  24   ON PAGE 6.

02:19PM  25             THE COURT:  WHY DON'T YOU -- CAN YOU GO TO -- WHY

HOLMES CROSS BY MR. LEACH (RES.)

| | | |
|---|---|---|
| 02:19PM | 1 | DON'T YOU SHOW MR. DOWNEY WHAT IT IS THAT YOU'RE TALKING ABOUT |
| 02:19PM | 2 | FOR A MOMENT. |
| 02:19PM | 3 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 02:19PM | 4 | (DISCUSSION AMONGST COUNSEL OFF THE RECORD.) |
| 02:20PM | 5 | MR. DOWNEY:  YOUR HONOR, I SEE WHAT MR. LEACH IS |
| 02:20PM | 6 | ATTEMPTING TO DO. |
| 02:20PM | 7 | I WOULD SAY I OBJECT TO THE MATERIAL UNDER THE RECEIVED |
| 02:20PM | 8 | LINE UNDER THE COURT'S PRIOR RULING AT 798, BUT I HAVE NO |
| 02:20PM | 9 | OBJECTION TO THE BODY OF THAT EMAIL AND THE TOP OF PAGE 6 BEING |
| 02:20PM | 10 | ADMITTED. |
| 02:20PM | 11 | THE COURT:  AND PAGE 1 THERE'S NO OBJECTION? |
| 02:20PM | 12 | MR. DOWNEY:  I DON'T THINK HE THINKS HE NEEDS |
| 02:20PM | 13 | PAGE 1. |
| 02:20PM | 14 | THE COURT:  I THOUGHT HE DID.  SORRY. |
| 02:20PM | 15 | MR. LEACH:  I WOULD LIKE PAGE 1, YOUR HONOR, BUT |
| 02:20PM | 16 | IT'S ONLY BULLETS NUMBER 3 AND 5, BUT I DON'T THINK I CAN |
| 02:20PM | 17 | REDACT THAT ON THE FLY IN A MEANINGFUL WAY. |
| 02:20PM | 18 | MR. DOWNEY:  WELL, YOUR HONOR, THAT'S THE 798 AND |
| 02:20PM | 19 | 403. |
| 02:20PM | 20 | THE COURT:  SO WITHOUT FOUNDATION -- YOU'RE FAMILIAR |
| 02:20PM | 21 | WITH THE COURT'S ORDER ON 798 ON THIS? |
| 02:21PM | 22 | MR. LEACH:  YES. |
| 02:21PM | 23 | THE COURT:  AND IF THERE'S INFORMATION, IF THERE'S |
| 02:21PM | 24 | INFORMATION REGARDING THE LIFESTYLE OF CEO'S I THINK IS HOW |
| 02:21PM | 25 | IT'S PHRASED IN 798, THAT'S THE FOUNDATION THAT NEEDS TO BE |

| | | |
|---|---|---|
| 02:21PM | 1 | LAID, WHETHER OR NOT THIS WAS NORMAL IN THE INDUSTRY.  LET ME |
| 02:21PM | 2 | PUT IT THAT WAY. |
| 02:21PM | 3 | MR. LEACH:  OKAY.  I'LL TRY TO LAY A FOUNDATION FOR |
| 02:21PM | 4 | 6 AND 7. |
| 02:21PM | 5 | Q.  MS. HOLMES, ON PAGE 6, DO YOU SEE AN EMAIL FROM |
| 02:21PM | 6 | LISA DURKIN TO YOU? |
| 02:21PM | 7 | A.  I DO. |
| 02:21PM | 8 | Q.  AND IS SHE LAYING OUT YOUR TRAVEL ARRANGEMENTS FOR A TRIP |
| 02:21PM | 9 | TO FLORIDA TO ACCEPT SOMETHING CALLED THE CME GROUP AWARD? |
| 02:21PM | 10 | A.  SHE'S MAKING SUGGESTIONS. |
| 02:21PM | 11 | Q.  OKAY.  AND SHE WOULD MAKE SUGGESTIONS TO YOU FROM TIME TO |
| 02:21PM | 12 | TIME ABOUT TRAVEL LOGISTICS AND HOW TO GET FROM A TO B, HOW TO |
| 02:21PM | 13 | GET TO AN INVESTOR MEETING, THINGS LIKE THAT? |
| 02:21PM | 14 | A.  SHE DID. |
| 02:21PM | 15 | Q.  OKAY.  AND IS THIS ANYTHING OUT OF THE ORDINARY OF HOW YOU |
| 02:22PM | 16 | WOULD CONDUCT BUSINESS WITH MS. DURKIN? |
| 02:22PM | 17 | A.  NO. |
| 02:22PM | 18 | Q.  AND IS THIS EXEMPLATIVE OF HOW YOU ON OCCASIONS WOULD MAKE |
| 02:22PM | 19 | ARRANGEMENTS WITH MS. DURKIN TO FULFILL YOUR RESPONSIBILITIES |
| 02:22PM | 20 | AS CEO OF THERANOS? |
| 02:22PM | 21 | A.  SOMETIMES. |
| 02:22PM | 22 | Q.  OKAY.  AND YOU -- |
| 02:22PM | 23 | WELL, YOUR HONOR, I OFFER PAGES 6 AND 7. |
| 02:22PM | 24 | THE COURT:  I THINK -- |
| 02:22PM | 25 | MR. DOWNEY:  I DON'T THINK THAT CURES THE 798 ISSUE, |

HOLMES CROSS BY MR. LEACH (RES.)                                    8498

02:22PM   1        BUT THAT'S MY REMAINING OBJECTION, YOUR HONOR.

02:22PM   2                THE COURT:  ALL RIGHT.  THANK YOU.

02:22PM   3        I'M GOING TO ADMIT IT.  I DO THINK THE SPIRIT OF 798 HAS

02:22PM   4    BEEN SATISFIED.  IT WAS WHETHER OR NOT ANYTHING IS

02:22PM   5    EXTRAORDINARY FROM CEO'S, AND THE TESTIMONY LAYS THE FOUNDATION

02:22PM   6    FOR THAT.

02:22PM   7        SO IT'S ADMITTED, NOTING THE OBJECTION.

02:22PM   8                MR. LEACH:  THANK YOU, YOUR HONOR.

02:22PM   9        (GOVERNMENT'S EXHIBIT 5635, PAGES 6 AND 7, WAS RECEIVED IN

02:22PM  10    EVIDENCE.)

02:22PM  11    BY MR. LEACH:

02:22PM  12    Q.   SO, MS. HOLMES, IF WE CAN ZOOM IN ON THE TOP PORTION OF

02:22PM  13    THIS EMAIL.

02:23PM  14        DO YOU SEE THE REFERENCE TO -- OR THIS IS FROM

02:23PM  15    LISA DURKIN.  SHE WAS YOUR ASSISTANT AT THE TIME?

02:23PM  16    A.   YES.

02:23PM  17    Q.   AND THERE'S SOMEBODY NAMED PAIGE WILLIAMS COPIED ON THIS.

02:23PM  18    WHO IS THAT?

02:23PM  19    A.   SHE ALSO WORKED FOR ME.

02:23PM  20    Q.   AND THERE'S A DISCUSSION OF DIFFERENT FLIGHT OPTIONS IN

02:23PM  21    THE ATTACHMENTS.

02:23PM  22        DO YOU SEE THOSE REFERENCES THERE?

02:23PM  23    A.   I DO.

02:23PM  24    Q.   AND FROM TIME TO TIME, SHE WOULD COME TO YOU WITH

02:23PM  25    SUGGESTIONS ABOUT HOW TO TRAVEL AND GIVE YOU THE CHOICE OF

HOLMES CROSS BY MR. LEACH (RES.)                                8499

02:23PM  1    ULTIMATELY WHAT TO DO?

02:23PM  2    A.   YES.

02:23PM  3    Q.   OKAY.  AND THERE'S AN AGENDA HERE FOR NOVEMBER 17TH OF

02:23PM  4    2015.

02:23PM  5         DO YOU SEE THAT?

02:23PM  6    A.   YES.

02:23PM  7    Q.   AND YOU UNDERSTOOD THAT WAS THE FIRST DAY OF THE CMS

02:23PM  8    INSPECTION WHEN THE INSPECTORS CAME BACK?

02:23PM  9    A.   AGAIN, I DON'T REMEMBER THE DATES.

02:23PM 10    Q.   OKAY.  WELL, CAN YOU LOOK AT EXHIBIT 5387D, SPECIFICALLY

02:24PM 11    PAGE 118.

02:24PM 12    A.   I HAVE 5387.

02:24PM 13    Q.   5387D, PAGE 118.

02:24PM 14    A.   I DON'T KNOW IF I HAVE THAT.

02:24PM 15    Q.   THIS IS IN BINDER 4.  5387D, PAGE 118.

02:24PM 16    A.   I'VE GOT IT.

02:24PM 17    Q.   5387D, PAGE 118.

02:24PM 18         DO YOU SEE THE DATE OF NOVEMBER 19TH, 2015?

02:25PM 19    A.   I DO.

02:25PM 20    Q.   AND DO YOU SEE SOME REFERENCES TO GOING NOT WELL, THESE

02:25PM 21    GUYS DIDN'T KEEP MOST CALIBRATION INFORMATION, EVEN A MACHINE

02:25PM 22    FROM THREE WEEKS AGO, GOING OKAY.

02:25PM 23         DO YOU SEE THAT LANGUAGE?

02:25PM 24    A.   I DO.

02:25PM 25    Q.   AND DO YOU SEE SOME REFERENCE TO WHO IS THE BEST PERSON TO

HOLMES CROSS BY MR. LEACH (RES.)                              8500

02:25PM   1     ANSWER 1800 QUESTIONS?

02:25PM   2     A.   I DO.

02:25PM   3     Q.   AND YOU BELIEVE THAT TO BE A REFERENCE TO THE ADVIA?

02:25PM   4     A.   YES.

02:25PM   5     Q.   AND THESE ARE TEXT EXCHANGES RELATING TO THE CMS

02:25PM   6     INSPECTION; CORRECT?

02:25PM   7     A.   I THINK SO.  I'M NOT COMPLETELY SURE.

02:25PM   8     Q.   OKAY.  BUT YOU THINK SO?

02:25PM   9     A.   I THINK SO.

02:25PM   10    Q.   OKAY.  AND DOES THIS REFRESH YOUR MEMORY THAT YOU WERE

02:25PM   11    ONLY THERE FOR THE SECOND DAY OF THE CMS INSPECTION?

02:26PM   12    A.   IT DOESN'T.

02:26PM   13    Q.   OKAY.  THERE WAS -- BUT YOU WERE TOLD DURING THE CMS

02:26PM   14    INSPECTION THAT DAY TWO, OR THE SECOND PORTION, WAS NOT GOING

02:26PM   15    WELL; CORRECT?

02:26PM   16    A.   I'M SORRY, I DON'T COMPLETELY FOLLOW.

02:26PM   17    Q.   WHETHER YOU WERE THERE OR YOU WEREN'T, OR WHETHER YOU WERE

02:26PM   18    THERE FOR ONE DAY OR TWO DAYS, YOU REMEMBER BEING TOLD THAT THE

02:26PM   19    CMS INSPECTION WASN'T GOING WELL IN NOVEMBER OF 2015?

02:26PM   20    A.   I REMEMBER BEING TOLD AT SOME POINT, WHICH IS WHY I SAT IN

02:26PM   21    ON THE INSPECTION IN NOVEMBER.

02:26PM   22    Q.   OKAY.  AND AT THE CONCLUSION OF THE INSPECTION IN NOVEMBER

02:26PM   23    OF 2015, THERE WAS AN EXIT INTERVIEW WITH SOME OF THE CMS

02:26PM   24    INSPECTORS; ISN'T THAT CORRECT?

02:26PM   25    A.   THERE WAS.

HOLMES CROSS BY MR. LEACH (RES.)                    8501

02:26PM   1    Q.   AND YOU ATTENDED THAT EXIT INTERVIEW; CORRECT?

02:26PM   2    A.   I DID.

02:26PM   3    Q.   AND THAT WAS WITH SARAH BENNETT?

02:26PM   4    A.   YES.

02:26PM   5    Q.   AND GARY YAMAMOTO?

02:27PM   6    A.   YES.

02:27PM   7    Q.   AND THEY TOLD YOU IN THIS EXIT INTERVIEW THAT THEY WERE

02:27PM   8    CONTEMPLATING FINDING IMMEDIATE JEOPARDY AT THERANOS'S LAB;

02:27PM   9    CORRECT?

02:27PM  10    A.   I'M NOT SURE.

02:27PM  11    Q.   WELL, LET'S SEE IF WE CAN REFRESH YOUR MEMORY.

02:27PM  12         WOULD YOU PLEASE LOOK AT EXHIBIT 5717.

02:27PM  13    A.   YES.

02:27PM  14    Q.   DO YOU HAVE 5717 IN FRONT OF YOU?

02:27PM  15    A.   ALMOST.

02:27PM  16    Q.   OKAY.  I JUST WANT YOU TO REVIEW TO YOURSELF THE FIRST

02:28PM  17    FOUR LINES IN THE BODY UP AT THE TOP.

02:28PM  18    A.   OKAY.

02:28PM  19    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE SECOND PAGE.

02:28PM  20    A.   YES.

02:28PM  21    Q.   TAKE A MOMENT TO READ THE SECOND TO THE LAST PARAGRAPH

02:28PM  22    STARTING WITH THE SIXTH LINE FROM THE BOTTOM.  IF YOU COULD

02:28PM  23    JUST READ THAT CAREFULLY TO YOURSELF, AND THEN I WILL ASK MY

02:28PM  24    QUESTION.

02:28PM  25    A.   OKAY.

HOLMES CROSS BY MR. LEACH (RES.)                                    8502

02:29PM    1            (PAUSE IN PROCEEDINGS.)

02:29PM    2                 THE WITNESS:  OKAY.

02:29PM    3      BY MR. LEACH:

02:29PM    4      Q.   DOES THIS REFRESH YOUR MEMORY THAT AT THE END OF THE

02:29PM    5      INSPECTION IN NOVEMBER OF 2015, CMS TOLD YOU THAT THEY WERE

02:29PM    6      CONSIDERING IMMEDIATE JEOPARDY?

02:29PM    7      A.   IT DOESN'T.  I REMEMBER DISCUSSION OF POSSIBLE CITATIONS

02:29PM    8      AT THAT TIME.

02:29PM    9      Q.   OKAY.  AND YOU REMEMBER A DISCUSSION OF POSSIBLE STANDARD

02:29PM   10      LEVEL CITATIONS AND CERTAIN CONDITION LEVEL CITATIONS; CORRECT?

02:29PM   11      A.   I DON'T REMEMBER THE DESIGNATIONS.

02:29PM   12      Q.   YOU WERE URGING THEM TO FIND A LOWER CATEGORY OF

02:29PM   13      CITATIONS; ISN'T THAT CORRECT?

02:29PM   14      A.   I DON'T THINK SO.  I THINK WE WERE TALKING TO THEM ABOUT

02:29PM   15      WHAT WE BELIEVED WE'D DONE PROPERLY IN THE LAB.

02:29PM   16      Q.   OKAY.  AND YOU DON'T REMEMBER THE CMS INSPECTOR TELLING

02:29PM   17      YOU AT THAT POINT IN TIME THAT THEY WERE CONSIDERING AN

02:30PM   18      IMMEDIATE JEOPARDY FINDING?

02:30PM   19      A.   I DON'T.

02:30PM   20      Q.   YOU KNEW, BY VIRTUE OF YOUR WORK IN THE INDUSTRY, WHAT THE

02:30PM   21      CONSEQUENCES OF AN IMMEDIATE JEOPARDY FINDING WERE; CORRECT?

02:30PM   22      A.   I LEARNED THAT AT SOME POINT.

02:30PM   23      Q.   OKAY.  AND THE CMS REPORT COMES OUT IN JANUARY OF 2016?

02:30PM   24      A.   IT DID.

02:30PM   25      Q.   OKAY.  AND BY THE END OF APRIL OF 2016, YOU HAD MADE THE

                          UNITED STATES COURT REPORTERS

HOLMES CROSS BY MR. LEACH (RES.)                                    8503

02:30PM   1    DECISION TO -- THAT MR. BALWANI SHOULD LEAVE THE COMPANY;

02:30PM   2    CORRECT?

02:30PM   3    A.   YES.

02:30PM   4    Q.   AND ISN'T IT RIGHT THAT EVEN AFTER DOING THAT, YOU

02:30PM   5    CONTINUED TO MINIMIZE THE CMS FINDINGS TO LISA PETERSON?

02:30PM   6    A.   I DON'T THINK I DID.

02:30PM   7    Q.   WELL, LET ME SEE IF I CAN REFRESH YOUR MEMORY.

02:30PM   8         COULD YOU LOOK AT EXHIBIT 31 -- OR 3165.

02:31PM   9         MAY I APPROACH, YOUR HONOR?

02:31PM  10             THE COURT:  YES.

02:31PM  11    BY MR. LEACH:

02:31PM  12    Q.   (HANDING.)

02:31PM  13    A.   THANK YOU.

02:31PM  14    Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED; CORRECT?

02:31PM  15    A.   I WAS.

02:31PM  16    Q.   AND YOU WERE HERE WHEN SHE DESCRIBED HER MEETING WITH YOU

02:31PM  17    AT THE END OF APRIL OF 2016; CORRECT?

02:31PM  18    A.   YES.

02:31PM  19    Q.   AND IF I COULD DRAW YOUR ATTENTION TO THE TOP PARAGRAPH OF

02:31PM  20    PAGE 4 OF 3165.

02:31PM  21    A.   OKAY.

02:31PM  22    Q.   TAKE A MOMENT TO READ PARAGRAPH 1 TO YOURSELF.

02:32PM  23    A.   OKAY.

02:32PM  24    Q.   DOES THIS REFRESH YOUR MEMORY THAT YOU TOLD LISA PETERSON

02:32PM  25    THAT CARREYROU'S PRIMARY SOURCES WERE TWO DISGRUNTLED LOW LEVEL

HOLMES CROSS BY MR. LEACH (RES.)                                              8504

02:32PM   1    EMPLOYEES?

02:32PM   2    A.   NO.  I BELIEVE OUR COUNSEL WAS DOING A LOT OF THE TALKING

02:32PM   3    AT THIS MEETING.

02:32PM   4    Q.   WELL, DOES THIS REFRESH YOUR MEMORY THAT YOUR COUNSEL SAID

02:32PM   5    THAT?

02:32PM   6    A.   I DON'T REMEMBER HER SAYING THAT.

02:32PM   7    Q.   YOU WERE IN THE ROOM AT THE TIME?

02:32PM   8    A.   I WAS.

02:32PM   9    Q.   SO IT WAS YOU, MS. PETERSON, HEATHER KING, YOUR GENERAL

02:32PM  10    COUNSEL?

02:32PM  11    A.   YES.

02:32PM  12    Q.   DAN EDLIN WAS THERE?

02:32PM  13    A.   YES.

02:32PM  14    Q.   JERRY TUBERGEN WAS THERE?

02:32PM  15    A.   I SEE THAT HERE.

02:32PM  16    Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF YOU OR YOUR GENERAL

02:32PM  17    COUNSEL SAYING CARREYROU'S PRIMARY SOURCES WERE TWO DISGRUNTLED

02:32PM  18    LOWER LEVEL FORMER EMPLOYEES?

02:33PM  19    A.   I REMEMBER HEATHER TALKING ABOUT THIS TOPIC.

02:33PM  20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PARAGRAPH 2.

02:33PM  21    A.   OKAY.

02:33PM  22    Q.   WELL, BEFORE I DRAW YOUR ATTENTION TO PARAGRAPH 2, LET ME

02:33PM  23    DRAW YOUR ATTENTION TO 3A.

02:33PM  24         DO YOU SEE THAT?

02:33PM  25    A.   I DO.

UNITED STATES COURT REPORTERS

ER-12075

HOLMES CROSS BY MR. LEACH (RES.)                                    8505

02:33PM   1    Q.   DO YOU RECALL THAT BY THIS POINT IN TIME, APRIL 28TH,

02:33PM   2    2016, SUNNY BALWANI HAD BEEN ASKED TO LEAVE THE COMPANY?

02:33PM   3    A.   YES.

02:33PM   4    Q.   AND IF I DRAW YOUR ATTENTION TO PARAGRAPH 2E, IF YOU COULD

02:33PM   5    TAKE A MOMENT TO READ THAT TO YOURSELF?

02:33PM   6    A.   YES.

02:33PM   7    Q.   DOES THIS REFRESH YOUR MEMORY THAT THERANOS TOLD

02:33PM   8    LISA PETERSON AT THIS MEETING, "THERANOS CAN'T TRIVIALIZE THE

02:34PM   9    CMS ISSUES IN THE PRESS, BUT IN REALITY THEY DON'T FEEL THE

02:34PM  10    ISSUES ARE MAJOR, AND THEY WOULD BE SHOCKED IF SANCTIONS WERE

02:34PM  11    IMPOSED"?

02:34PM  12    A.   IT DOES NOT.

02:34PM  13    Q.   YOU WERE HERE WHEN MS. PETERSON TESTIFIED ABOUT THIS

02:34PM  14    MEETING; CORRECT?

02:34PM  15    A.   I WAS.

02:34PM  16    Q.   OKAY.  AND YOU DON'T HAVE A MEMORY OF TRIVIALIZING THE CMS

02:34PM  17    INSPECTION TO HER; IS THAT WHAT YOU'RE SAYING?

02:34PM  18    A.   I DON'T THINK I DID THAT.

02:34PM  19              MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

02:34PM  20              THE COURT:  YES.

02:34PM  21         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:34PM  22              MR. LEACH:  THANK YOU, YOUR HONOR.

02:34PM  23         I HAVE NO FURTHER QUESTIONS.

02:34PM  24         THANK YOU, MS. HOLMES.

02:34PM  25              THE COURT:  LET ME ASK YOU ABOUT, I THINK IT'S 5365.

UNITED STATES COURT REPORTERS

**ER-12076**

HOLMES CROSS BY MR. LEACH (RES.)                                8506

02:34PM   1      I WANT TO CLARIFY WHAT WAS ADMITTED THERE, WHAT YOU HAD

02:35PM   2      REDACTED.

02:35PM   3                  MR. LEACH:  I THINK IT'S PAGES 6 AND 7 AND NOTHING

02:35PM   4      MORE, YOUR HONOR.

02:35PM   5                  THE COURT:  I'M SORRY, THE ENTIRETY OF PAGES 6 AND

02:35PM   6      7?

02:35PM   7                  MR. LEACH:  YES, WHICH I BELIEVE WERE ADMITTED OVER

02:35PM   8      THE DEFENSE OBJECTION.

02:35PM   9                  THE COURT:  THAT'S RIGHT.

02:35PM  10          AND THEN PAGE 1?

02:35PM  11                  MR. LEACH:  I'LL WITHDRAW PAGE 1, YOUR HONOR.  IT'S

02:35PM  12      NOT --

02:35PM  13                  THE COURT:  ALL RIGHT.  PAGE 1 IS WITHDRAWN.

02:35PM  14          THE ENTIRETY OF 6 AND 7 WERE ADMITTED OVER OBJECTION.

02:35PM  15      THESE WERE NOT PUBLISHED YET.  DID YOU WANT TO PUBLISH THESE?

02:35PM  16                  MR. LEACH:  NO.  I THINK THAT'S FINE.

02:35PM  17                  THE COURT:  OKAY.  AND PAGES 6 AND 7 WERE ADMITTED

02:35PM  18      OVER DEFENSE OBJECTION.

02:35PM  19          ALL RIGHT.  THANK YOU.

02:36PM  20          MR. DOWNEY?

02:36PM  21                  MR. DOWNEY:  YOUR HONOR, MAY I JUST HAVE A MOMENT TO

02:36PM  22      TRANSITION HERE?

02:36PM  23                  THE COURT:  YES.

02:36PM  24          FOLKS, FEEL FREE TO STRETCH AND STAND IF YOU WOULD LIKE.

02:36PM  25          (STRETCHING.)

UNITED STATES COURT REPORTERS

**ER-12077**

02:36PM   1        THE COURT:  MS. KRATZMANN HAS CALLED OUR

02:36PM   2    MAINTENANCE.  I THINK THE HEAT IS UP HERE A LITTLE BIT, SO

02:36PM   3    WE'RE GOING TO TRY TO GET SOME AIR CONDITIONING IN HERE.

02:37PM   4        (PAUSE IN PROCEEDINGS.)

02:37PM   5        THE COURT:  MR. DOWNEY?

02:37PM   6                    **REDIRECT EXAMINATION**

02:37PM   7    BY MR. DOWNEY:

02:37PM   8    Q.   GOOD AFTERNOON, MS. HOLMES.

02:37PM   9    A.   GOOD AFTERNOON.

02:37PM   10         MR. DOWNEY:  YOUR HONOR, MAY I APPROACH THE WITNESS?

02:37PM   11         THE COURT:  YES.

02:37PM   12    BY MR. DOWNEY:

02:37PM   13    Q.   (HANDING.)

02:37PM   14    A.   THANK YOU.

02:37PM   15    Q.   MS. HOLMES, WERE YOU TOLD HOW MANY SMALL SAMPLE TESTS

02:37PM   16    THERANOS WOULD HAVE TO DEVELOP IN ITS CLIA MINILAB TO COVER

02:37PM   17    93 PERCENT OF TESTS?

02:37PM   18    A.   I WAS.

02:37PM   19    Q.   WHAT WERE YOU TOLD?

02:37PM   20    A.   I REMEMBER JUST OVER 40 TESTS WAS ABOUT 90 PERCENT OF THE

02:37PM   21    TESTS.

02:37PM   22    Q.   HOW MANY TESTS WAS THERANOS OFFERING IN ITS CLINICAL LAB

02:38PM   23    THAT USED A SMALL SAMPLE FINGERSTICK BETWEEN 2013 AND 2015?

02:38PM   24    A.   I THINK ABOUT 70.

02:38PM   25    Q.   TO THE PATIENT WHO GETS A BLOOD TEST, DOES IT MATTER IN

8508

HOLMES REDIRECT BY MR. DOWNEY

02:38PM  1    THEIR EXPERIENCE WHAT DEVICE THEIR BLOOD IS BEING ANALYZED ON?

02:38PM  2    A.   NO.

02:38PM  3              MR. LEACH:  OBJECTION, YOUR HONOR.  FOUNDATION.

02:38PM  4    BY MR. DOWNEY:

02:38PM  5    Q.   WELL, DO THEY EVEN SEE --

02:38PM  6              THE COURT:  DO YOU WANT TO WITHDRAW THAT?

02:38PM  7              MR. DOWNEY:  I'LL WITHDRAW IT, YEAH.

02:38PM  8    Q.   DO THEY SEE THE ANALYZER THAT THEIR BLOOD TEST IS BEING

02:38PM  9    PERFORMED ON IN THE CENTRAL LAB?

02:38PM  10   A.   THEY DO NOT.

02:38PM  11   Q.   NOW, WHO AT THERANOS WAS RESPONSIBLE FOR VALIDATING TESTS

02:38PM  12   BEFORE THEY WERE OFFERED IN THE CLINICAL LAB?

02:38PM  13   A.   THE LABORATORY DIRECTOR.

02:38PM  14   Q.   AND DID ALL LDT'S HAVE TO BE VALIDATED BEFORE THEY WERE

02:38PM  15   OFFERED TO PATIENTS?

02:38PM  16   A.   YES.

02:38PM  17   Q.   ARE YOU AWARE OF ANY TEST BEING OFFERED IN THE CLIA LAB AT

02:39PM  18   THERANOS THAT WAS NOT VALIDATED?

02:39PM  19   A.   I AM NOT.

02:39PM  20   Q.   WAS THERE ANY INSTANCE WHERE YOU SOUGHT TO OVERRULE THE

02:39PM  21   LAB DIRECTOR OR ANY LAB PERSONNEL AS TO WHAT COULD AND COULDN'T

02:39PM  22   BE OFFERED?

02:39PM  23   A.   NO.

02:39PM  24   Q.   AND YOU TESTIFIED JUST A FEW MOMENTS AGO ABOUT THE CMS

02:39PM  25   INSPECTION IN NOVEMBER OF 2015.

ER-12079

HOLMES REDIRECT BY MR. DOWNEY                                    8509

02:39PM  1        DO YOU RECALL THAT?

02:39PM  2    A.   I DO.

02:39PM  3    Q.   AND WHAT DID YOU UNDERSTAND ABOUT THE PERFORMANCE OF

02:39PM  4    THERANOS'S CLINICAL LAB PRIOR TO THE FALL OF 2015?

02:39PM  5    A.   THAT IT WAS EXCELLENT.

02:39PM  6    Q.   WHAT DID MR. BALWANI TELL YOU ABOUT THE PERFORMANCE OF

02:39PM  7    THAT LAB PRIOR TO THE FALL OF 2015?

02:39PM  8    A.   THAT IT WAS ONE OF THE BEST LABS IN THE WORLD.

02:39PM  9    Q.   NOW, DID YOU UNDERSTAND IN THE PERIOD BETWEEN 2013 AND

02:39PM  10   2015 THAT ISSUES MIGHT COME UP WITH PARTICULAR TESTS?

02:39PM  11   A.   OF COURSE.

02:39PM  12   Q.   AND WHAT DID YOU UNDERSTAND ABOUT HOW THOSE ISSUES WERE

02:40PM  13   HANDLED IN THE CLINICAL LAB AT THERANOS WHEN THEY CAME UP?

02:40PM  14   A.   I UNDERSTOOD THERE WAS A TEAM OF GENERAL SUPERVISORS,

02:40PM  15   TECHNICAL SUPERVISORS, OTHER EXPERTS IN THE CLINICAL LAB WHO

02:40PM  16   WOULD WORK TO IDENTIFY ISSUES, ELEVATE THEM, DO SOME TYPE OF

02:40PM  17   ROOT CAUSE ANALYSIS TO UNDERSTAND WHAT THEY WERE, FIX THEM, AND

02:40PM  18   TAKE REMEDIAL ACTION SO THAT THE SAME ISSUE WOULD NOT HAPPEN

02:40PM  19   AGAIN.

02:40PM  20   Q.   AS BETWEEN YOU AND MR. BALWANI, WHO WAS RESPONSIBLE FOR

02:40PM  21   THE OPERATIONAL MANAGEMENT OF THE LAB?

02:40PM  22   A.   MR. BALWANI.

02:40PM  23   Q.   NOW, DO YOU RECALL DR. DAS TESTIFYING IN THIS MATTER?

02:40PM  24   A.   I DO.

02:40PM  25   Q.   AND DR. DAS BEGAN HIS WORK AT THERANOS IN THE TIME PERIOD

HOLMES REDIRECT BY MR. DOWNEY                                    8510

02:40PM   1      SHORTLY AFTER THE CMS INSPECTION THAT YOU JUST TESTIFIED ABOUT?

02:40PM   2      A.   HE DID.

02:40PM   3      Q.   DO YOU RECALL HIM PRESENTING YOU WITH THE FACT THAT HE

02:40PM   4      THOUGHT THAT ALL OF THE TESTS THAT HAD BEEN RUN ON THERANOS'S

02:41PM   5      EDISON DEVICE IN THE CLINICAL LAB SHOULD BE VOIDED?

02:41PM   6      A.   I DO.

02:41PM   7      Q.   DID YOU ACCEPT THAT DECISION?

02:41PM   8      A.   I DID.

02:41PM   9      Q.   PRIOR TO THE POINT AT WHICH MR. DAS TOLD YOU THAT, DR. DAS

02:41PM  10      TOLD YOU THAT, DID YOU EVER HAVE ANY ISSUE OR ANY SUGGESTION

02:41PM  11      THAT THERE WAS SOME TYPE OF SYSTEMIC OR REPEATED PROBLEM WITH

02:41PM  12      THERANOS'S EDISON DEVICE?

02:41PM  13      A.   NO.

02:41PM  14      Q.   I WANT TO TALK FOR A MOMENT ABOUT SOME OF THE DIFFERENT

02:41PM  15      FUNCTIONS AT THERANOS IN RESPONSE TO SOME OF WHAT MR. LEACH

02:41PM  16      COVERED WITH YOU.

02:41PM  17           DO YOU RECALL MR. LEACH SHOWING YOU SOME DOCUMENTS THAT

02:41PM  18      RELATED TO DR. ROSENDORFF'S QUESTIONS ABOUT EBOLA?

02:41PM  19      A.   I DO.

02:41PM  20      Q.   NOW, WHAT WAS DR. ROSENDORFF'S ROLE AT THERANOS WHEN HE

02:41PM  21      WAS THERE?

02:41PM  22      A.   HE WAS THE CLINICAL LAB DIRECTOR.

02:41PM  23      Q.   DID HE PLAY ANY ROLE WITH REGARD TO THE RESEARCH AND

02:42PM  24      DEVELOPMENT EFFORTS AT THERANOS?

02:42PM  25      A.   HE DID NOT.

HOLMES REDIRECT BY MR. DOWNEY                                    8511

02:42PM   1    Q.   WHERE WAS THE CLINICAL LAB OF THERANOS LOCATED WHEN YOU

02:42PM   2    RECEIVED THAT EMAIL FROM DR. ROSENDORFF IN 2014?

02:42PM   3    A.   ON GATEWAY BOULEVARD IN NEWARK, CALIFORNIA.

02:42PM   4    Q.   LET ME ASK THAT EXHIBIT 4330, WHICH WAS INTRODUCED INTO

02:42PM   5    EVIDENCE, BE BROUGHT UP.  AND I'D LIKE TO GO TO THE LAST PAGE,

02:42PM   6    PAGE 3 OF THIS EMAIL.  IF I COULD JUST HIGHLIGHT THE FIRST

02:42PM   7    SENTENCE OF THE EMAIL FROM DR. ROSENDORFF TO YOU.

02:42PM   8         DO YOU RECALL DISCUSSING THIS SENTENCE WITH MR. LEACH?

02:42PM   9    A.   I DO.

02:43PM  10    Q.   AND IS 7373 GATEWAY THE NEWARK FACILITY?

02:43PM  11    A.   IT IS.

02:43PM  12    Q.   WAS DR. ROSENDORFF ASKING YOU WHETHER THE EBOLA SAMPLES

02:43PM  13    WERE BEING TESTED AT THE NEWARK FACILITY?

02:43PM  14    A.   HE IS.

02:43PM  15    Q.   AND THEN DO YOU RECALL THAT MR. LEACH THEN SHOWED YOU SOME

02:43PM  16    DOCUMENTS ABOUT EBOLA SAMPLES?

02:43PM  17    A.   I DO.

02:43PM  18    Q.   AND DO YOU RECALL THAT THE REFERENCE IN THOSE DOCUMENTS

02:43PM  19    WAS THAT THE EBOLA SAMPLES WOULD BE STORED IN PALO ALTO?

02:43PM  20    A.   I DO.

02:43PM  21    Q.   WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO?

02:43PM  22    A.   THE R&D LABORATORY IN PALO ALTO.

02:43PM  23    Q.   WAS YOUR REPRESENTATION TO DR. ROSENDORFF IN NOVEMBER OF

02:43PM  24    2014 ABOUT THE EBOLA SAMPLES CORRECT?

02:43PM  25    A.   YES.

HOLMES REDIRECT BY MR. DOWNEY                                          8512

02:43PM   1    Q.   I WANT TO TALK FOR A MOMENT ABOUT THE MODIFIED DEVICES

02:44PM   2    THAT YOU DISCUSSED WITH MR. LEACH ON YOUR CROSS-EXAMINATION.

02:44PM   3         I THINK IT'S FAIR TO SAY THAT HE ASKED YOU REPEATEDLY

02:44PM   4    ABOUT WHETHER SEVERAL DIFFERENT PEOPLE WERE MADE AWARE OF

02:44PM   5    THERANOS'S USE OF THOSE MODIFIED DEVICES.

02:44PM   6         DO YOU RECALL THAT?

02:44PM   7    A.   I DO.

02:44PM   8    Q.   AND, AND HAD THERANOS MODIFIED THOSE DEVICES SO THAT IT

02:44PM   9    COULD RUN FINGERSTICK SAMPLES IN HIGH VOLUME?

02:44PM  10    A.   YES.

02:44PM  11    Q.   WHY HAD THERANOS DONE THAT AS OPPOSED TO USING ITS

02:44PM  12    THERANOS ANALYZER IN THE CLINICAL LAB?

02:44PM  13    A.   MULTIPLE REASONS, THE FIRST BEING THAT WE NEEDED A WAY TO

02:44PM  14    HANDLE POTENTIALLY TENS OF THOUSANDS OF SAMPLES COMING IN AT

02:44PM  15    THE SAME TIME, AND WE DID NOT HAVE A SCALEABLE WAY TO DO THAT

02:44PM  16    AT THAT TIME.

02:44PM  17         THE 4 SERIES ON THE ONE HAND WAS NOT VALIDATED YET FOR THE

02:45PM  18    CLINICAL LAB; AND ON THE OTHER HAND WE REALIZED THAT ALL OF THE

02:45PM  19    LOGISTICAL ISSUES WITH TRYING TO PUT DEVICES THAT WERE DESIGNED

02:45PM  20    TO HANDLE ONE SAMPLE AT A TIME IN A CLINICAL LAB DIDN'T MAKE

02:45PM  21    SENSE.

02:45PM  22    Q.   NOW, DID YOU, IN FACT, SHARE THE FACT THAT THERANOS WAS

02:45PM  23    USING THOSE DEVICES WITH ANYONE?

02:45PM  24    A.   THE MODIFIED SYSTEMS?

02:45PM  25    Q.   YES.

HOLMES REDIRECT BY MR. DOWNEY                                          8513

02:45PM  1    A.   NO.

02:45PM  2    Q.   DID YOU SHARE IT WITH THE BOARD OF DIRECTORS OF THERANOS?

02:45PM  3    A.   OH, SORRY.  YES, WE DID.

02:45PM  4    Q.   DID YOU SHARE IT WITH THE FDA?

02:45PM  5    A.   YES.

02:45PM  6    Q.   AS PART OF THEIR REGULATION OF THERANOS?

02:45PM  7    A.   YES, YES.

02:45PM  8    Q.   DID YOU SHARE IT WITH CMS DURING THEIR INSPECTION IN THE

02:45PM  9    FALL OF 2013?

02:45PM 10    A.   YES.

02:45PM 11    Q.   DO YOU RECALL THAT MR. LEACH SAID TO YOU THAT THE

02:45PM 12    INSPECTION THAT WAS CONDUCTED IN THE FALL OF 2013 WAS CONDUCTED

02:45PM 13    BY THE STATE OF CALIFORNIA?

02:45PM 14    A.   I DO.

02:45PM 15    Q.   DO YOU UNDERSTAND THAT CMS SOMETIMES CONTRACTS WITH THE

02:46PM 16    STATES TO PERFORM INSPECTIONS ON ITS BEHALF?

02:46PM 17    A.   I DO.

02:46PM 18    Q.   WAS THE INSPECTION IN THE FALL OF 2013 THAT WAS CONDUCTED

02:46PM 19    OF THERANOS'S CLIA LABORATORY ON BEHALF OF CMS?

02:46PM 20    A.   IT WAS.

02:46PM 21    Q.   OKAY.  LET ME ASK YOU NEXT ABOUT THE CASH POSITION OF

02:46PM 22    THERANOS AT VARIOUS POINTS IN TIME.

02:46PM 23         DO YOU RECALL THAT MR. LEACH SHOWED YOU A SPREADSHEET FROM

02:46PM 24    THE SECOND HALF OF 2013?

02:46PM 25    A.   I DO.

HOLMES REDIRECT BY MR. DOWNEY                                         8514

02:46PM   1    Q.   AND DO YOU RECALL THAT HE SHOWED YOU THAT THE CASH

02:46PM   2    POSITION WAS SUCH THAT THE AMOUNT OF CASH IN THE COMPANY WAS

02:46PM   3    DECREASING AND THEN THERE WAS AN INVESTMENT FROM PEER VENTURES

02:46PM   4    AND LVG?

02:46PM   5    A.   I DO.

02:46PM   6    Q.   AND THOSE INVESTORS ARE A VENTURE FIRM THAT INVESTED AND

02:46PM   7    AN ENTITY AFFILIATED WITH DON LUCAS?

02:47PM   8    A.   YES.

02:47PM   9    Q.   NOW, DON LUCAS HAD BEEN THE CHAIRMAN OF THE BOARD;

02:47PM   10   CORRECT?

02:47PM   11   A.   HE WAS.

02:47PM   12   Q.   OKAY.  NOW, PRIOR TO THAT TIME, DID THERANOS KNOW THAT IT

02:47PM   13   WAS ABOUT TO ENTER INTO AN AGREEMENT UNDER WHICH IT WOULD

02:47PM   14   RECEIVE A SUBSTANTIAL PAYMENT FROM WALGREENS?

02:47PM   15   A.   WE DID.

02:47PM   16   Q.   AND WAS A CONTRACT ASSOCIATED WITH THAT ENTERED INTO IN

02:47PM   17   CONNECTION WITH THE LAUNCH OF THERANOS SERVICE CENTERS IN

02:47PM   18   WALGREENS STORES?

02:47PM   19   A.   YES.

02:47PM   20   Q.   AND HOW MUCH WAS THERANOS TO RECEIVE UNDER THAT CONTRACT?

02:47PM   21   A.   $75 MILLION.

02:47PM   22   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1083, WHICH IS IN

02:47PM   23   EVIDENCE, BUT IT SHOULD BE IN YOUR NOTEBOOK IN HARD COPY AS

02:47PM   24   WELL.

02:48PM   25        DO YOU SEE THAT THIS IS AN EMAIL FROM MR. MIQUELON TO YOU

HOLMES REDIRECT BY MR. DOWNEY                                           8515

```
02:48PM   1     IN SEPTEMBER OF 2013?

02:48PM   2     A.   I DO.

02:48PM   3     Q.   AND THEN IF YOU GO FORWARD, DO YOU SEE THAT HE ATTACHES TO

02:48PM   4     THIS A FRAMEWORK OR TERM SHEET, PROPOSED TERM SHEET?

02:48PM   5     A.   YES.

02:48PM   6     Q.   AND DO YOU SEE -- IF YOU GO TO PAGE 3 OF THIS TERM SHEET,

02:48PM   7     DO YOU SEE PARAGRAPH 2 THERE?

02:48PM   8     A.   I DO.

02:48PM   9     Q.   AND DOES THAT SET FORTH THE ANTICIPATED PAYMENTS FROM

02:48PM   10    WALGREENS AS OF SEPTEMBER 5TH, 2013?

02:48PM   11    A.   IT DOES.

02:48PM   12    Q.   SO AT THE TIME THAT -- IN THE PERIOD WHERE MR. LEACH WAS

02:48PM   13    SHOWING YOU THE SPREADSHEET AND THE CASH POSITION, WERE YOU

02:48PM   14    EXPECTING AT THAT TIME TO BEGIN TO RECEIVE PAYMENTS IN

02:48PM   15    CONNECTION WITH THE THERANOS LAUNCH?

02:49PM   16    A.   YES.

02:49PM   17    Q.   LET ME ASK YOU ABOUT THE QUESTIONS THAT MR. LEACH ASKED

02:49PM   18    YOU ABOUT, THE FINANCIAL MODEL.

02:49PM   19         DO YOU RECALL THOSE?

02:49PM   20    A.   I DO.

02:49PM   21    Q.   AND YOU TESTIFIED THAT THE FINANCIAL MODEL WAS SOMETHING

02:49PM   22    THAT MR. BALWANI DEVELOPED; IS THAT RIGHT?

02:49PM   23    A.   IT IS.

02:49PM   24    Q.   AND DID HE MODIFY IT OVER TIME?

02:49PM   25    A.   HE DID.
```

HOLMES REDIRECT BY MR. DOWNEY                                          8516

| | | |
|---|---|---|
| 02:49PM | 1 | Q.   DID YOU EVER MADE MODIFICATION TO IT? |
| 02:49PM | 2 | A.   NO. |
| 02:49PM | 3 | Q.   WHEN YOU HAD TO MAKE A -- WHEN YOU HAD TO PREPARE |
| 02:49PM | 4 | MATERIALS FOR BOARD MEETINGS, WOULD THEY TYPICALLY INCLUDE |
| 02:49PM | 5 | FINANCIAL PROJECTIONS TO BE SHARED WITH DIRECTORS? |
| 02:49PM | 6 | A.   YES. |
| 02:49PM | 7 | Q.   WHERE WOULD YOU GET THOSE FINANCIAL PROJECTIONS? |
| 02:49PM | 8 | A.   FROM MR. BALWANI. |
| 02:49PM | 9 | Q.   AND WOULD YOU SOMETIMES INCLUDE IN PRESENTATIONS SENT TO |
| 02:49PM | 10 | OUTSIDERS, INCLUDING INVESTORS, INCLUDE FINANCIAL DATA? |
| 02:50PM | 11 | A.   YES. |
| 02:50PM | 12 | Q.   AND WHERE WOULD YOU GET THAT DATA? |
| 02:50PM | 13 | A.   FROM MR. BALWANI. |
| 02:50PM | 14 | Q.   DID YOU UNDERSTAND SOME ASPECTS OF HOW THAT MODEL WORKED? |
| 02:50PM | 15 | A.   I DID. |
| 02:50PM | 16 | Q.   DID YOU HAVE ENOUGH FAMILIARITY WITH IT TO MODIFY IT IF |
| 02:50PM | 17 | YOU WANTED TO MODIFY IT? |
| 02:50PM | 18 | A.   GENERALLY I HAD SOME FAMILIARITY WITH IT. |
| 02:50PM | 19 | Q.   AND DO YOU RECALL SEEING THE TEXT IN WHICH MR. BALWANI |
| 02:50PM | 20 | SAID TO YOU -- WAS HAVING AN EXCHANGE WITH YOU AND YOU WERE |
| 02:50PM | 21 | TALKING BETWEEN THE TWO OF YOU ABOUT YOU GETTING COMFORTABLE |
| 02:50PM | 22 | WITH THE MODEL? |
| 02:50PM | 23 | A.   I DO. |
| 02:50PM | 24 | Q.   CAN YOU EXPLAIN WHAT WAS GOING ON THERE? |
| 02:50PM | 25 | A.   YES. |

HOLMES REDIRECT BY MR. DOWNEY                                          8517

02:50PM   1           THERE WAS A MEETING THAT I WAS GOING TO DO WHEN SUNNY WAS

02:50PM   2      TRAVELLED INTERNATIONALLY, AND SUNNY NORMALLY WOULD BE THE

02:50PM   3      PERSON WHO SHARED THE MODEL THAT HE HAD, AND HE WAS SUGGESTING

02:50PM   4      THAT THE TIME OF THE MEETING WAS NOT IDEAL FOR HIS SCHEDULE.

02:51PM   5      AND I WAS TRYING TO SAY, WELL, I COULD GET MYSELF COMFORTABLE

02:51PM   6      WITH IT IF YOU DON'T WANT TO DO THIS.

02:51PM   7           I'M NOT SURE THAT THAT ACTUALLY HAPPENED.

02:51PM   8      Q.   GENERALLY IN CONNECTION WITH THE INVESTOR PRESENTATIONS,

02:51PM   9      DO YOU RECALL MR. LEACH ASKING YOU IF YOU COULD DECIDE WHETHER

02:51PM  10      A PRESENTATION WAS SENT OR NOT SENT TO INVESTORS?

02:51PM  11      A.   I DO.

02:51PM  12      Q.   AND IT'S TRUE THAT YOU COULD DECIDE THAT; RIGHT?

02:51PM  13      A.   YES.

02:51PM  14      Q.   BUT MUCH OF THE CONTENT OF THOSE PRESENTATIONS WAS

02:51PM  15      PREPARED BY OTHERS; IS THAT FAIR TO SAY?

02:51PM  16      A.   IT WAS.

02:51PM  17      Q.   FOR EXAMPLE, IF THERE WAS SCIENTIFIC CONTENT IN THE

02:51PM  18      REPORTS, WHO WOULD PREPARE THAT?

02:51PM  19      A.   IT WAS PREPARED BY OUR SCIENTISTS AND ENGINEERS.

02:51PM  20      Q.   IF THERE WERE ASSERTIONS ABOUT THE CAPABILITIES OF

02:51PM  21      TECHNOLOGY OR CERTAIN TESTS, WOULD YOU ASK THOSE SCIENTISTS OR

02:51PM  22      ENGINEERS TO REVIEW IT?

02:52PM  23      A.   YES.

02:52PM  24      Q.   OKAY.  AND WITH RESPECT TO ANY FINANCIAL REPORTS, WERE

02:52PM  25      THEY ALWAYS PREPARED BY MR. BALWANI?

                         UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                    8518

02:52PM    1        A.   YES.

02:52PM    2        Q.   DO YOU RECALL THAT MR. LEACH REVIEWED WITH YOU A SERIES --

02:52PM    3    A DOCUMENT THAT RELATED TO A GROUP CALLED ARANCA?

02:52PM    4        A.   I DO.

02:52PM    5        Q.   AND DO YOU RECALL THAT HE SHOWED YOU IN CONNECTION WITH

02:52PM    6    ARANCA'S WORK THEY HAD BEEN PROVIDED WITH A REVENUE NUMBER THAT

02:52PM    7    WAS DIFFERENT THAN THE PROJECTED REVENUE NUMBER PROVIDED TO THE

02:52PM    8    INVESTOR RDV.

02:52PM    9        DO YOU RECALL THAT?

02:52PM   10        A.   YES.

02:52PM   11        Q.   AND CAN YOU TELL US WHETHER THE REVENUE NUMBERS THAT WERE

02:52PM   12    SHARED WITH RDV WERE PROVIDED TO -- THE PROJECTED REVENUE

02:52PM   13    NUMBERS THAT WERE PROVIDED TO RDV WERE PROVIDED TO THERANOS'S

02:52PM   14    BOARD OF DIRECTORS?

02:52PM   15        A.   THEY WERE.

02:52PM   16        Q.   AND AT THE SAME TIME, WERE THE ARANCA PROJECTIONS OF

02:53PM   17    REVENUE FOR THE FOLLOWING YEAR PROVIDED TO THE BOARD OF

02:53PM   18    DIRECTORS?

02:53PM   19        A.   THEY WERE.

02:53PM   20        Q.   DID YOU UNDERSTAND THAT THE ANALYSES THAT WERE BEING

02:53PM   21    PERFORMED WERE DIFFERENT BETWEEN THOSE TWO EXERCISES?

02:53PM   22        A.   I DID.

02:53PM   23        Q.   I WANT TO ASK YOU NOW ABOUT THE REPORTS THAT WENT TO

02:53PM   24    WALGREENS THAT CONTAINED A DISCUSSION ABOUT THE LOGOS

02:53PM   25    THROUGHOUT THE TRIAL.

HOLMES REDIRECT BY MR. DOWNEY                                          8519

02:53PM   1        DO YOU RECALL THAT?

02:53PM   2   A.   I DO.

02:53PM   3   Q.   AND MR. LEACH WENT THROUGH SEVERAL EMAILS THAT YOU

02:53PM   4   EXCHANGED WITH PFIZER AND ASKED YOU ABOUT THOSE.

02:53PM   5        DO YOU RECALL THAT?

02:53PM   6   A.   I DO.

02:53PM   7   Q.   I'D LIKE TO PUT BACK UP A DOCUMENT THAT IS IN EVIDENCE,

02:53PM   8   EXHIBIT 15048.

02:54PM   9        DO YOU SEE AT THE TOP OF THIS EMAIL, THIS IS AN EMAIL SENT

02:54PM  10   BY CHRISTIAN HOLMES TO SOME PEOPLE FROM PFIZER AND YOU'RE

02:54PM  11   COPIED?

02:54PM  12   A.   YES.

02:54PM  13   Q.   AND DO YOU SEE THAT DR. SAKUL IS ONE OF THE RECIPIENTS?

02:54PM  14   A.   I DO.

02:54PM  15   Q.   AND HOW LONG HAD HE BEEN INVOLVED IN THE THERANOS/PFIZER

02:54PM  16   RELATIONSHIP?

02:54PM  17   A.   I THINK BACK TO AS EARLY AS 2005.

02:54PM  18   Q.   AND THIS DOCUMENT WAS BEING SENT IN JANUARY OF 2014?

02:54PM  19   A.   YES.

02:54PM  20   Q.   OKAY.  LET'S GO TO THE NEXT PAGE OF 15048, AND LET'S GO TO

02:54PM  21   THE ATTACHMENT.

02:54PM  22        DO YOU SEE THAT THIS IS A COPY OF THE REPORT THAT HAS BEEN

02:55PM  23   THE SUBJECT OF DISCUSSION THROUGHOUT THIS TRIAL?

02:55PM  24   A.   YES.

02:55PM  25   Q.   AND DO YOU SEE THAT THIS CONTAINS BOTH THE PFIZER LOGO AND

HOLMES REDIRECT BY MR. DOWNEY                                    8520

02:55PM 1    THE THERANOS LOGO?

02:55PM 2    A.   IT DOES.

02:55PM 3    Q.   TAKE A MOMENT TO REVIEW THAT ATTACHMENT.

02:55PM 4         IS THAT THE SAME DOCUMENT THAT YOU SENT TO WALGREENS IN

02:55PM 5    2010?

02:55PM 6    A.   IT IS.

02:55PM 7    Q.   DID ANYONE FROM PFIZER HAVE ANY REACTION TO THIS, TO YOUR

02:55PM 8    KNOWLEDGE, THE FACT THAT YOU HAD ATTACHED THEIR LOGO TO THIS

02:55PM 9    DOCUMENT?

02:55PM 10   A.   NO.  I REMEMBER IT AS BEING POSITIVE, THAT THEY WERE

02:55PM 11   LOOKING AT THE PROGRAM THAT WE DID WITH THEM.

02:55PM 12   Q.   LET ME ASK YOU NEXT ABOUT -- AND BY THE WAY, AM I RIGHT

02:55PM 13   THAT THE WORK SUMMARIZED IN THIS DOCUMENT IS WORK THAT THERANOS

02:55PM 14   HAS ACTUALLY DONE?

02:55PM 15   A.   IT IS.

02:55PM 16   Q.   AND CAN YOU REMIND US WHAT THAT WORK WAS?

02:55PM 17   A.   YES.  WE RAN A STUDY OVER A COURSE OF I THINK IT WAS

02:56PM 18   MULTIPLE YEARS IN WHICH WE DEPLOYED OUR SYSTEMS TO PATIENTS'

02:56PM 19   HOMES IN RURAL AREAS, IN TENNESSEE, KENTUCKY, AND I THINK

02:56PM 20   PENNSYLVANIA, AND WERE ABLE TO DO TESTING IN THE HOME AND IN A

02:56PM 21   CLINIC AND HAVE DATA COLLECTED OVER TIME THAT COULD HELP SHOW

02:56PM 22   TRENDS IN PEOPLE'S BLOOD MARKERS THAT WE THOUGHT COULD BE

02:56PM 23   USEFUL FOR SEEING THE PROGRESSION OF DISEASE BETTER.

02:56PM 24   Q.   OKAY.  NEXT LET'S TALK ABOUT GLAXOSMITHKLINE.  IT'S

02:56PM 25   REFERRED TO AS GSK ON YOUR CROSS-EXAMINATION.

HOLMES REDIRECT BY MR. DOWNEY                                  8521

02:56PM   1      A.   YES.

02:56PM   2      Q.   AND THAT'S A PHARMACEUTICAL COMPANY WITH WHICH THERANOS

02:56PM   3      HAD A PARTNERSHIP?

02:56PM   4      A.   IT IS.

02:56PM   5      Q.   AND AT ONE POINT THERANOS -- AM I RIGHT THAT THERANOS

02:56PM   6      ASKED GSK TO EXAMINE ITS TECHNOLOGY FOR PURPOSES OF DETERMINING

02:57PM   7      WHETHER IT COULD BE VALIDATED?

02:57PM   8      A.   WE DID.

02:57PM   9      Q.   AND DID GSK UNDERTAKE THAT?

02:57PM  10      A.   THEY DID.

02:57PM  11      Q.   WHAT WERE THE CONCLUSIONS OF THAT?

02:57PM  12      A.   I REMEMBER THE CONCLUSION WAS THAT THE SCIENTISTS THERE

02:57PM  13      THOUGHT THAT OUR MINILAB ELIMINATED THE NEED FOR A LAB.

02:57PM  14      Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 112.  GO TO THE

02:57PM  15      ATTACHED SUMMARY.

02:57PM  16           DID YOU SEE ON THE FIRST PAGE, THIS IS A DESCRIPTION OF

02:57PM  17      HOW THEY -- THE METHODOLOGY?

02:57PM  18      A.   YES.

02:57PM  19      Q.   IF WE GO TO THE NEXT PAGE, DO YOU SEE IN THE OVERALL

02:58PM  20      CONCLUSIONS, IS IT CORRECT THAT THEY REPORTED THAT THEY HAD A

02:58PM  21      FAVORABLE IMPRESSION OF THE TECHNOLOGY AND SYSTEM?

02:58PM  22      A.   YES.

02:58PM  23      Q.   AND THAT IT PROVIDED QUALITY DATA?

02:58PM  24      A.   YES.

02:58PM  25      Q.   NOW, MR. LEACH ASKED YOU IF -- WELL, DO YOU RECALL THAT

                            UNITED STATES COURT REPORTERS

8522

HOLMES REDIRECT BY MR. DOWNEY

02:58PM 1    YOU TRANSMITTED A COPY OF THIS REPORT WHICH ALSO HAD THE GSK

02:58PM 2    LOGO ON IT AND THE THERANOS LOGO?

02:58PM 3         DO YOU RECALL THAT?

02:58PM 4    A.   I DO.

02:58PM 5    Q.   AND IF YOU LOOK BACK AT THE FIRST PAGE, WHICH WE WERE

02:58PM 6    LOOKING AT A MOMENT AGO, GO TO THE NEXT PAGE.

02:58PM 7         DO YOU SEE THAT THERE'S NO HEADER OF ANY ORGANIZATION ON

02:58PM 8    THIS DOCUMENT?

02:58PM 9    A.   I DO.

02:58PM 10   Q.   BUT WHO PREPARED THIS DOCUMENT, GSK OR THERANOS?

02:59PM 11   A.   GSK.

02:59PM 12   Q.   ALL RIGHT.  NOW, LET ME ASK YOU TO LOOK NEXT AT

02:59PM 13   EXHIBIT 291.

02:59PM 14        THIS IS ALREADY IN EVIDENCE.

02:59PM 15        DO YOU SEE THAT THIS IS AN EMAIL FROM YOU TRANSMITTING THE

02:59PM 16   DOCUMENTS TO REPRESENTATIVES OF WALGREENS?

02:59PM 17   A.   YES.

02:59PM 18   Q.   AND THEN LET'S GO TO PAGE 2.

02:59PM 19        AND DO YOU SEE THAT THIS DOCUMENT IS A COPY OF THE SAME

02:59PM 20   DOCUMENT WITH THE GSK AND THERANOS LOGOS AT THE TOP?

02:59PM 21   A.   YES.

02:59PM 22   Q.   AND I BELIEVE YOU TESTIFIED ON YOUR DIRECT EXAMINATION

02:59PM 23   THAT YOU DON'T KNOW WHEN THAT WAS DONE OR WHEN THOSE LOGOS WERE

02:59PM 24   ADDED.

02:59PM 25   A.   I DON'T.

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                    8523

02:59PM   1    Q.   LET ME ASK YOU IF YOU HAD DEALINGS WHEN YOU WERE AT

03:00PM   2    THERANOS WITH A REPRESENTATIVE OF GSK NAMED AIDEN FLYNN?

03:00PM   3    A.   YES.

03:00PM   4    Q.   AND WHO WAS AIDEN FLYNN?

03:00PM   5    A.   HE WAS A MEMBER OF GSK -- I THINK HE MAY HAVE WORKED WITH

03:00PM   6    GSK BIOLOGICALS.  I'M NOT SURE.  HE WAS ANOTHER MEMBER OF THE

03:00PM   7    SCIENTIFIC TEAM FROM GSK.

03:00PM   8    Q.   AND IS GSK -- WERE YOU CONTINUING, AFTER THIS REPORT WAS

03:00PM   9    PREPARED, TO SEEK WORK FROM GSK?

03:00PM   10   A.   YES.

03:00PM   11   Q.   AND DID YOU CONTINUE TO -- DID YOU HAVE CONTACT WITH

03:00PM   12   DR. FLYNN ABOUT THAT?

03:00PM   13   A.   I DID.

03:00PM   14   Q.   AND DID THERE COME A TIME WHEN YOU ASKED YOUR -- WELL, LET

03:00PM   15   ME ASK YOU TO JUST LOOK AT EXHIBIT 15066.

03:01PM   16   A.   OKAY.

03:01PM   17   Q.   AND LET ME ASK YOU, DID THERE COME A TIME WHEN YOU ASKED

03:01PM   18   YOUR ASSISTANT TO -- I'M SORRY.

03:01PM   19        DID THERE COME A TIME WHEN YOU ASKED SOMEONE ELSE AT

03:01PM   20   THERANOS TO TRANSMIT THE REPORT THAT GSK HAD PREPARED FOR

03:01PM   21   THERANOS BACK TO GSK?

03:01PM   22   A.   I DID.

03:01PM   23   Q.   AND DID YOU ASK MS. BALKENHOL TO DO THAT?

03:01PM   24   A.   I DID.

03:01PM   25   Q.   AND WAS SHE AN EMPLOYEE AT THERANOS WHO WORKED WITH

03:01PM  1    PHARMACEUTICAL COMPANIES?

03:01PM  2    A.   YES.

03:01PM  3    Q.   AND IS EXHIBIT 15066 A TRANSMISSION AS YOU UNDERSTAND IT

03:01PM  4    IN RESPONSE TO THAT QUESTION?

03:01PM  5    A.   IT IS.

03:01PM  6              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:01PM  7    15066.

03:01PM  8              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:01PM  9              THE COURT:  IT'S ADMITTED WITHOUT OBJECTION.

03:02PM 10         (DEFENDANT'S EXHIBIT 15066 WAS RECEIVED IN EVIDENCE.)

03:02PM 11    BY MR. DOWNEY:

03:02PM 12    Q.   ALL RIGHT.  DO YOU SEE IN THE COVER EMAIL, THIS IS AN

03:02PM 13    EMAIL FROM MS. BALKENHOL TO DR. FLYNN?

03:02PM 14    A.   I DO.

03:02PM 15    Q.   AND THEN IF YOU LOOK AT THE THIRD LINE, THE SECOND LINE,

03:02PM 16    YOU SEE MS. BALKENHOL WRITES, "ELIZABETH ASKED ME TO FORWARD

03:02PM 17    YOU THIS GSK REPORT, AS WELL, FOR YOUR REVIEW."

03:02PM 18         DO YOU SEE THAT?

03:02PM 19    A.   I DO.

03:02PM 20    Q.   NOW, LET'S GO TO THE NEXT PAGE OF 15066.

03:02PM 21         AND JUST TAKE A MOMENT TO REVIEW THAT.

03:02PM 22         IS THIS THE SAME DOCUMENT THAT YOU TRANSMITTED TO

03:02PM 23    WALGREENS IN APRIL OF 2010?

03:02PM 24    A.   YES.

03:02PM 25    Q.   AND IF YOU GO BACK TO THE -- DO YOU SEE IT HAS THE GSK

HOLMES REDIRECT BY MR. DOWNEY                                        8525

03:03PM   1    LOGO AND THE THERANOS LOGO ON TOP?

03:03PM   2    A.   I DO.

03:03PM   3    Q.   AND IF YOU GO BACK TO THE EMAIL ON PAGE 1, DO YOU SEE THAT

03:03PM   4    THIS IS DATED MARCH OF 2009?

03:03PM   5    A.   I DO.

03:03PM   6    Q.   AND THAT'S ABOUT A YEAR BEFORE YOU TRANSMITTED THIS TO

03:03PM   7    WALGREENS?

03:03PM   8    A.   YES.

03:03PM   9    Q.   DID DR. FLYNN OR ANYONE ELSE AT GSK CONVEY TO YOU THAT

03:03PM   10   THEY THOUGHT IT WAS INAPPROPRIATE THAT YOU HAD ATTACHED THEIR

03:03PM   11   LOGO TO THIS REPORT?

03:03PM   12   A.   NOT AT ALL.

03:03PM   13   Q.   AND THE WORK THAT WAS DONE IN CONNECTION WITH THE REPORT

03:03PM   14   WAS ACTUALLY WORK THAT THEY HAD DONE; IS THAT CORRECT?

03:03PM   15   A.   IT IS.

03:03PM   16   Q.   AND DID THEY HAVE ANY OBJECTION TO YOU PUTTING YOUR LOGO

03:03PM   17   UP THERE NEXT TO GSK?

03:03PM   18   A.   THEY DID NOT.

03:03PM   19   Q.   LET ME ASK YOU TO LOOK NEXT AT EXHIBIT 15058.

03:04PM   20   A.   OKAY.

03:04PM   21   Q.   OTHER THAN DR. FLYNN, DID YOU HAVE CONTACTS WITH OTHER

03:04PM   22   SCIENTISTS AT GSK WHO PARTICIPATED IN CLINICAL TRIALS AND OTHER

03:04PM   23   WORK THAT THERANOS WANTED TO BE A PART OF?

03:04PM   24   A.   I DID.

03:04PM   25   Q.   CAN YOU TELL US WHO THOMAS BREUER WAS?

HOLMES REDIRECT BY MR. DOWNEY                                      8526

03:04PM   1      A.   HE IS THE PHYSICIAN OR SCIENTIST THAT WAS PART OF GSK BIO.

03:04PM   2      I THINK DR. FLYNN MAY HAVE BEEN PART OF A DIFFERENT GROUP

03:04PM   3      WITHIN GSK.

03:04PM   4      Q.   AND DO YOU RECOGNIZE EXHIBIT 15058?

03:04PM   5      A.   I DO.

03:04PM   6      Q.   AND IS THAT AN EMAIL THAT IS TRANSMITTING A POWERPOINT FOR

03:04PM   7      A PRESENTATION?

03:04PM   8      A.   YES.

03:04PM   9              MR. DOWNEY:   YOUR HONOR, I MOVE THE ADMISSION OF

03:05PM  10      15058.

03:05PM  11              MR. LEACH:   NO OBJECTION, YOUR HONOR.

03:05PM  12              THE COURT:   IT'S ADMITTED.

03:05PM  13         (DEFENDANT'S EXHIBIT 15058 WAS RECEIVED IN EVIDENCE.)

03:05PM  14      BY MR. DOWNEY:

03:05PM  15      Q.   AND DO YOU SEE THIS?   THIS IS SENT FROM YOU TO DR. BREUER

03:05PM  16      IN DECEMBER OF 2009.

03:05PM  17         DO YOU SEE THAT?

03:05PM  18      A.   YES.

03:05PM  19      Q.   AND THEN IT LISTS A VARIETY OF ATTACHMENTS, AND I'M

03:05PM  20      INTERESTED FOR PRESENT PURPOSES IN LOOKING AT PAGE 6 AT BATES

03:05PM  21      LABEL 779.

03:05PM  22         AND ON PAGE 6, DO YOU SEE THAT IT'S LABELLED THERANOS AND

03:05PM  23      GSK?

03:05PM  24      A.   YES.

03:05PM  25      Q.   AND DO YOU SEE THAT THE FIRST BULLET POINT SAYS, "GSK

HOLMES REDIRECT BY MR. DOWNEY                                           8527

```
03:05PM   1    COMPLETED A COMPREHENSIVE VALIDATION OF THERANOS SYSTEMS IN

03:06PM   2    2008"?

03:06PM   3    A.   I DO.

03:06PM   4    Q.   AND IS THAT PART OF A POWERPOINT THAT YOU AUTHORIZED TO BE

03:06PM   5    SENT TO GSK?

03:06PM   6    A.   IT IS.

03:06PM   7    Q.   AND YOU DESCRIBED THAT VALIDATION IN THIS REPORT AS A

03:06PM   8    COMPREHENSIVE VALIDATION?

03:06PM   9    A.   I DID.

03:06PM  10    Q.   DID ANYONE FROM GSK REFLECT ANY DISAGREEMENT OR ISSUE WITH

03:06PM  11    THAT STATEMENT?

03:06PM  12    A.   NO.

03:06PM  13    Q.   AND AM I RIGHT THAT YOU CONTINUED TO HAVE A RELATIONSHIP

03:06PM  14    WITH GSK FOR A FEW MORE YEARS AFTER THIS?

03:06PM  15    A.   YES.

03:06PM  16    Q.   I WANT TO TALK IN A LITTLE BIT ABOUT GSK BIOLOGICS --

03:06PM  17    A.   YES.

03:06PM  18    Q.   -- BUT WE'LL DO THAT IN CONNECTION WITH ANOTHER SUBJECT.

03:06PM  19         I WANT TO TALK NOW ABOUT THE QUESTIONS THAT MR. LEACH

03:07PM  20    ASKED YOU THE OTHER DAY ABOUT SOME OF YOUR REACTION TO THE

03:07PM  21    QUESTIONS THAT WERE BEING RAISED IN CONNECTION WITH PREPARATION

03:07PM  22    OF A "WALL STREET JOURNAL" ARTICLE.

03:07PM  23         DO YOU RECALL THAT?

03:07PM  24    A.   I DO.

03:07PM  25    Q.   AND IN RESPONSE TO SEVERAL OF HIS QUESTIONS, YOU SAID THAT
```

HOLMES REDIRECT BY MR. DOWNEY                                          8528

03:07PM   1    ONE OF THE THINGS THAT YOU WERE CONCERNED ABOUT WAS THAT

03:07PM   2    THERANOS HAD TRADE SECRETS WHICH YOU THOUGHT YOU HAD TO

03:07PM   3    PROTECT?

03:07PM   4    A.   YES.

03:07PM   5    Q.   AND I WANT TO ASK YOU A FEW QUESTIONS ABOUT WHAT YOU MEANT

03:07PM   6    BY THAT.

03:07PM   7        DID THERE COME A TIME IN 2011 OR 2012 WHERE THERANOS BEGAN

03:07PM   8    TO BECOME HIGHLY CONCERNED ABOUT PROTECTING ITS TRADE SECRETS?

03:07PM   9    A.   YES.

03:07PM  10    Q.   AND WHY WAS THAT?

03:07PM  11    A.   BECAUSE WE HAD A HUGE AMOUNT OF INVENTION THAT WAS

03:08PM  12    HAPPENING IN OUR LABORATORIES.  WE HAD TEAMS OF SCIENTISTS AND

03:08PM  13    ENGINEERS THAT WERE WORKING REALLY HARD ON COMING UP WITH NEW

03:08PM  14    IDEAS FOR PATENTS AND TRADE SECRETS, AND WE NEEDED TO FIGURE

03:08PM  15    OUT HOW TO PROTECT THEM.

03:08PM  16    Q.   AND DID YOU INTERNALLY ASK FOR GUIDANCE FROM YOUR HUMAN

03:08PM  17    RESOURCES PERSONNEL AND OTHERS ABOUT HOW TO PROTECT TRADE

03:08PM  18    SECRETS OF THE COMPANY?

03:08PM  19    A.   I DID.

03:08PM  20    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15054.

03:08PM  21    A.   OKAY.

03:08PM  22    Q.   AND DO YOU RECOGNIZE THIS AS AN EMAIL TO ANOTHER THERANOS

03:09PM  23    EMPLOYEE ASKING THEM TO REFLECT THE TRADE SECRET POLICY IN

03:09PM  24    WRITING?

03:09PM  25    A.   YES.

HOLMES REDIRECT BY MR. DOWNEY                                                8529

03:09PM   1              MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:09PM   2    15054.

03:09PM   3              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:09PM   4              THE COURT:  IT'S ADMITTED.

03:09PM   5         (DEFENDANT'S EXHIBIT 15054 WAS RECEIVED IN EVIDENCE.)

03:09PM   6    BY MR. DOWNEY:

03:09PM   7    Q.   ALL RIGHT.  DO YOU SEE THIS BOTTOM EMAIL, YOU SENT IT TO A

03:09PM   8    DAVID DOYLE IN APRIL OF 2012?

03:09PM   9    A.   YES.

03:09PM  10    Q.   AND WHO WAS DAVID DOYLE?

03:09PM  11    A.   HE WAS A COUNSEL AT THERANOS.

03:09PM  12    Q.   AND IF YOU LOOK IN THE SECOND SENTENCE, YOU WRITE -- I'M

03:09PM  13    HAVING A LITTLE TROUBLE WITH MY MONITOR, BUT I THINK IT SAYS,

03:09PM  14    "IN ESSENCE, THIS DOCUMENT SHOULD HIGHLIGHT THE EXTRA

03:09PM  15    CONFIDENTIALITY PROCEDURES (EVEN INSIDE A GIVEN TEAM) THAT NEED

03:10PM  16    TO BE IN PLACE AROUND METHODOLOGIES THAT WE WON'T PATENT THAT

03:10PM  17    SOLVE COMPLEX CHALLENGES.  PLEASE TAKE A PASS AT THIS AND SEND

03:10PM  18    IT OVER."

03:10PM  19         DO YOU SEE THAT?

03:10PM  20    A.   YES.

03:10PM  21    Q.   AND WERE THERE PARTICULAR METHODOLOGIES THAT THERANOS DID

03:10PM  22    NOT PLAN TO FILE A PATENT APPLICATION FOR?

03:10PM  23    A.   YES.

03:10PM  24    Q.   BUT DID IT OTHERWISE HOPE TO PROTECT THOSE INVENTIONS FROM

03:10PM  25    BEING COPIED BY OTHERS?

                          UNITED STATES COURT REPORTERS


                              **ER-12100**

HOLMES REDIRECT BY MR. DOWNEY                                    8530

03:10PM  1    A.   VERY MUCH SO.

03:10PM  2    Q.   HOW DID YOU UNDERSTAND YOU WOULD BE ABLE TO DO THAT?

03:10PM  3    A.   BY PROTECTING THEM AS A TRADE SECRET, WHICH REQUIRED US TO

03:10PM  4    TAKE A NUMBER OF STEPS TO ENSURE THAT THERE WAS NEVER A PUBLIC

03:10PM  5    DISCLOSURE OF THOSE INVENTIONS.

03:10PM  6    Q.   LET ME ASK YOU TO LOOK NEXT AT EXHIBIT 15055.

03:10PM  7    A.   OKAY.

03:10PM  8    Q.   DO YOU RECOGNIZE EXHIBIT 15055 AS A RESPONSE FROM

03:11PM  9    MR. DOYLE TO YOU IN RESPONSE TO THE EMAIL THAT YOU HAD SENT HIM

03:11PM  10   THAT WE JUST LOOKED AT?

03:11PM  11   A.   I DO.

03:11PM  12           MR. DOWNEY:  I MOVE THE ADMISSION OF 15055.

03:11PM  13           MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:11PM  14           THE COURT:  IT'S ADMITTED.

03:11PM  15       (DEFENDANT'S EXHIBIT 15055 WAS RECEIVED IN EVIDENCE.)

03:11PM  16   BY MR. DOWNEY:

03:11PM  17   Q.   IF YOU'D LOOK, THIS IS AN EMAIL FROM MR. DOYLE TO YOU IN

03:11PM  18   MAY OF 2012?

03:11PM  19   A.   YES.

03:11PM  20   Q.   AND IN THE FIRST SENTENCE HE NOTES THAT HE'S SENDING YOU A

03:11PM  21   DRAFT.

03:11PM  22       DO YOU SEE THAT?

03:11PM  23   A.   I DO.

03:11PM  24   Q.   I'D LIKE TO DRAW YOUR ATTENTION TO THE PARAGRAPHS BELOW IN

03:11PM  25   THE DRAFT.

                        UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                    8531

03:11PM   1       AND DO YOU SEE THAT HE BEGINS THIS -- AND THIS WAS

03:12PM   2   DESIGNED TO GO TO ALL EMPLOYEES?  IS THAT THE GIST OF IT?

03:12PM   3   A.   YES.

03:12PM   4   Q.   AND DO YOU SEE THAT HE SAYS THAT THE COMPANY VIGOROUSLY

03:12PM   5   PURSUES AND ENFORCES ITS PATENT PROTECTION FOR IP, WHENEVER IT

03:12PM   6   MAKES SENSE TO DO SO?

03:12PM   7   A.   YES.

03:12PM   8   Q.   BUT THEN HE GOES ON TO SAY THAT EVEN WHEN PATENTS WERE

03:12PM   9   PENDING, AND EVEN WHERE THEY MAY ULTIMATELY BE UNAVAILABLE,

03:12PM  10   TRADE SECRET LAWS PROVIDE ANOTHER CRITICAL LAYER FOR OUR IP?

03:12PM  11   A.   YES.

03:12PM  12   Q.   AND THEN HE GOES ON TO SAY THIS REMINDS ALL EMPLOYEES HOW

03:12PM  13   IT WORKS.

03:12PM  14       DO YOU SEE THAT?

03:12PM  15   A.   YES, I DO.

03:12PM  16   Q.   AND THEN IF WE GO TO THE NEXT PARAGRAPH, DO YOU SEE THAT

03:12PM  17   HE DEFINES WHAT A TRADE SECRET IS?  HE SAYS A TRADE SECRET IS

03:12PM  18   ANY INFORMATION AN OWNER MAKES REASONABLE EFFORTS TO KEEP

03:13PM  19   SECRET?

03:13PM  20   A.   YES.

03:13PM  21   Q.   AND HE SAYS IT HAS ECONOMIC VALUE BECAUSE IT'S NOT

03:13PM  22   GENERALLY KNOWN TO THE PUBLIC OR A COMPETITOR.

03:13PM  23       DO YOU SEE THAT?

03:13PM  24   A.   I DO.

03:13PM  25   Q.   ALL RIGHT.  AND THEN IF YOU GO DOWN TO THE NEXT PARAGRAPH,

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                        8532

03:13PM   1    DO YOU SEE THAT HE CONTINUES HIS DISCUSSION OF HOW TO PROTECT

03:13PM   2    TRADE SECRETS?

03:13PM   3    A.   YES.

03:13PM   4    Q.   AND DO YOU SEE THE SECOND SENTENCE THERE THAT BEGINS, "THE

03:13PM   5    DEFINING CHARACTERISTIC"?

03:13PM   6    A.   I DO.

03:13PM   7    Q.   AND DO YOU SEE THAT IT READS, "THE DEFINING CHARACTERISTIC

03:13PM   8    OF A TRADE SECRET, IN FACT, IS THAT IT IS NEVER," NEVER

03:13PM   9    UNDERLINED, "NEVER DISCLOSED PUBLICLY.  THAT DISTINGUISHES

03:13PM   10   THESE RIGHTS FROM PATENTS AND TRADEMARKS, WHICH MUST BE

03:13PM   11   PUBLICLY DISCLOSED TO SECURE PROTECTION."

03:13PM   12        DO YOU SEE THAT?

03:13PM   13   A.   I DO.

03:13PM   14   Q.   AND THEN IF YOU GO DOWN TO THE BULLET POINT SECTION, DO

03:14PM   15   YOU SEE THAT HE THEN LISTS A NUMBER OF THINGS THAT HAVE TO BE

03:14PM   16   DONE TO ENSURE TRADE SECRETS AREN'T DISCLOSED?

03:14PM   17   A.   YES.

03:14PM   18   Q.   AND THEN IN THE FIRST PARAGRAPH, HE TALKS ABOUT PROTECTING

03:14PM   19   THE PHYSICAL SECURITY OF THERANOS FACILITIES?

03:14PM   20   A.   YES.

03:14PM   21   Q.   AND THEN IN THE SECOND HE TALKS ABOUT ALL OF THE STEPS

03:14PM   22   THAT HAVE TO BE TAKEN TO PROTECT THERANOS'S RECORDS AND

03:14PM   23   DATABASES AND SO FORTH.

03:14PM   24        DO YOU SEE THAT?

03:14PM   25   A.   YES.

HOLMES REDIRECT BY MR. DOWNEY                                    8533

03:14PM  1    Q.   AND THEN DO YOU SEE IN THE THIRD PARAGRAPH HE SAYS, IT'S

03:14PM  2    REQUIRED THAT ALL VISITORS TO THERANOS SIGN A CONFIDENTIALITY

03:14PM  3    AGREEMENT ON THEIR OWN BEHALF, A CDA.

03:14PM  4        DO YOU SEE THAT?

03:14PM  5    A.   I DO.

03:14PM  6    Q.   AND DO YOU SEE NEXT HE SAYS THAT ALL VENDORS AND PARTNERS

03:15PM  7    HAVE TO SIGN A CDA?

03:15PM  8    A.   YES.

03:15PM  9    Q.   AND THEN HE GOES ON TO SAY THAT EMPLOYEES HAVE TO SIGN A

03:15PM  10   CDA.

03:15PM  11       DO YOU SEE THAT?

03:15PM  12   A.   I DO.

03:15PM  13   Q.   NOW, WHEN YOU ANSWERED MR. LEACH BY REFERRING TO TRADE

03:15PM  14   SECRETS AS ONE OF THE CONCERNS THAT YOU HAD WHEN YOU WERE

03:15PM  15   GETTING QUESTIONS ABOUT THERANOS'S CLIA LAB IN 2015, CAN YOU

03:15PM  16   EXPLAIN TO US WHAT YOUR CONCERN WAS?

03:15PM  17   A.   MY CONCERN WAS THAT IF THERE WAS A PUBLIC DISCLOSURE OF

03:15PM  18   THIS INFORMATION, WE WOULD LOSE THE TRADE SECRET PROTECTION

03:15PM  19   THAT WE HAD WORKED SO HARD TO SECURE AND PROTECT FOR YEARS

03:15PM  20   PRIOR TO THAT POINT.

03:15PM  21   Q.   AND WAS IT THE CASE THAT MR. LEACH ASKED YOU ABOUT

03:15PM  22   THERANOS'S PARTNERSHIP WITH WALGREENS?

03:15PM  23       DO YOU RECALL THAT?

03:16PM  24   A.   HE DID.

03:16PM  25   Q.   AND HE ASKED YOU ABOUT THE, THE 3.0 DEVICE BEING SENT TO

HOLMES REDIRECT BY MR. DOWNEY                                          8534

03:16PM   1    WALGREENS; IS THAT RIGHT?

03:16PM   2    A.   YES.

03:16PM   3    Q.   NOW, THAT HAD BEEN DONE IN 2010, HADN'T IT?

03:16PM   4    A.   IT WAS.

03:16PM   5    Q.   BUT THE INVENTION TO MODIFY THE DEVICES DIDN'T TAKE PLACE

03:16PM   6    UNTIL 2013; IS THAT RIGHT?

03:16PM   7    A.   CORRECT.

03:16PM   8    Q.   AND THAT WAS AFTER THE DATE OF THE ADVICE THAT WAS

03:16PM   9    RENDERED IN THIS MEMORANDUM FROM MR. DOYLE TO YOU; IS THAT

03:16PM   10   RIGHT?

03:16PM   11   A.   IT WAS.

03:16PM   12   Q.   AND EVEN THOUGH WALGREENS HAD A NONDISCLOSURE AGREEMENT

03:16PM   13   WITH THERANOS, DID ALL OF THEIR INDIVIDUAL EMPLOYEES SIGN

03:16PM   14   NONDISCLOSURE AGREEMENTS WITH THERANOS?

03:16PM   15   A.   NO.

03:16PM   16   Q.   NOW, DID YOU KEEP SECRET FROM THE FACT THAT -- FROM

03:17PM   17   INVESTORS THE FACT THAT THERE WERE ASPECTS OF THERANOS'S

03:17PM   18   BUSINESS THAT YOU COULDN'T DISCLOSE TO THEM BECAUSE OF A

03:17PM   19   CONCERN ABOUT TRADE SECRETS?

03:17PM   20   A.   NO.

03:17PM   21   Q.   AND DO YOU RECALL BEING ASKED ABOUT MS. PETERSON ON YOUR

03:17PM   22   CROSS-EXAMINATION?

03:17PM   23   A.   I DO.

03:17PM   24   Q.   AND MS. PETERSON WORKED FOR THE RDV ENTITY; CORRECT?

03:17PM   25   A.   YES.

03:17PM   1     Q.   AND THAT'S AN INVESTMENT VEHICLE FOR THE DEVOS FAMILY?

03:17PM   2     A.   IT IS.

03:17PM   3     Q.   AND DO YOU -- DID YOU UNDERSTAND THAT MR. MOSLEY -- DO YOU

03:17PM   4     RECALL HIM TESTIFYING?

03:17PM   5     A.   I DO.

03:17PM   6     Q.   AND DID HE ALSO HAVE A ROLE WITH REGARD TO THE DEVOS

03:17PM   7     FAMILY?

03:17PM   8     A.   HE DID.

03:17PM   9     Q.   I WANT TO ASK YOU WHAT HIS ROLE WAS.

03:17PM   10    A.   I UNDERSTOOD THAT HE WAS THEIR LAWYER AND HE WAS ADVISING

03:17PM   11    THEM ON THE INVESTMENT.

03:18PM   12    Q.   OKAY.  I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 14186.

03:18PM   13    A.   OKAY.

03:18PM   14    Q.   AND IS THIS AN EMAIL BETWEEN MR. MOSLEY AND YOURSELF

03:18PM   15    DISCUSSING NEED FOR CONFIDENTIALITY FOR TECHNOLOGY AT THERANOS?

03:18PM   16    A.   IT IS.

03:18PM   17    Q.   AND WAS THIS DURING THE PERIOD WHEN MR. MOSLEY WAS AN

03:18PM   18    INVESTOR AT THERANOS?

03:18PM   19    A.   IT IS.

03:18PM   20          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:18PM   21    14186.

03:18PM   22          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:18PM   23          THE COURT:  IT'S ADMITTED.

03:18PM   24    (DEFENDANT'S EXHIBIT 14186 WAS RECEIVED IN EVIDENCE.)

03:18PM   25    BY MR. DOWNEY:

HOLMES REDIRECT BY MR. DOWNEY                                          8536

03:18PM  1    Q.   DO YOU SEE THIS EMAIL FROM MR. MOSLEY IN DECEMBER OF 2014?

03:19PM  2    AND I'M INTERESTED HERE IN THE SECOND PARAGRAPH, AND HE REFERS

03:19PM  3    IN THE FIRST SENTENCE TO A "NEW YORKER" ARTICLE.

03:19PM  4         DO YOU SEE THAT?

03:19PM  5    A.   YES.

03:19PM  6    Q.   AND WAS THAT A PUBLICATION ABOUT THERANOS?

03:19PM  7    A.   YES.

03:19PM  8    Q.   AND THEN HE GOES ON -- IN THE SECOND SENTENCE, HE SAYS HE

03:19PM  9    SAW THE AUTHOR ON T.V. THAT MORNING.

03:19PM  10        DO YOU SEE THAT?

03:19PM  11   A.   YES.

03:19PM  12   Q.   AND THEN HE SAYS IT WAS POSITIVE, BUT THEY SPENT TOO MUCH

03:19PM  13   TIME SPECULATING AS TO WHY YOUR TECHNOLOGY -- YOUR PROCESS AND

03:19PM  14   TECHNOLOGY IS BEING KEPT CONFIDENTIAL, WHICH SHOULD BE OBVIOUS

03:19PM  15   TO ANYONE.

03:19PM  16        DO YOU SEE THAT?

03:19PM  17   A.   I DO.

03:19PM  18   Q.   AND WHAT DID YOU UNDERSTAND MR. MOSLEY TO BE COMMUNICATING

03:19PM  19   IN CONNECTION WITH THIS EMAIL?

03:19PM  20   A.   THAT OUR DECISION TO PROTECT OUR TRADE SECRET PROCESSES BY

03:19PM  21   NOT COMMUNICATING THEM AND THE DECISION TO KEEP CERTAIN ASPECTS

03:20PM  22   OF OUR TECHNOLOGY CONFIDENTIAL SHOULD BE OBVIOUS BECAUSE OF HOW

03:20PM  23   IMPORTANT IT WAS TO THE SURVIVAL AND ABILITY TO MAINTAIN A

03:20PM  24   COMPETITIVE ADVANTAGE FOR THE BUSINESS.

03:20PM  25   Q.   NOW, WERE YOU -- AS THE CEO AND FOUNDER OF THERANOS, WERE

8537
HOLMES REDIRECT BY MR. DOWNEY

03:20PM   1    YOU ALSO SUBJECT TO THE REQUIREMENT THAT THERANOS NOT DISCLOSE

03:20PM   2    TRADE SECRETS?

03:20PM   3    A.   I WAS.

03:20PM   4    Q.   DID YOU ACTUALLY SIGN A CONTRACT WITH THE COMPANY THAT

03:20PM   5    SAID THAT?

03:20PM   6    A.   I DID.

03:20PM   7    Q.   AND WAS THAT A CONTRACT THAT YOU REPRESENTED TO INVESTORS

03:20PM   8    THAT YOU HAD SIGNED?

03:20PM   9    A.   YES.

03:20PM   10   Q.   MR. LEACH WENT THROUGH ON HIS CROSS-EXAMINATION EARLIER

03:20PM   11   TODAY A LIST OF PARTIES TO WHOM YOU ACKNOWLEDGED YOU DID NOT

03:20PM   12   DISCLOSE THE FACT THAT THERANOS HAD MODIFIED ITS COMMERCIAL

03:21PM   13   DEVICES TO PERFORM FINGERSTICK ASSAYS.

03:21PM   14       DO YOU RECALL THAT?

03:21PM   15   A.   I DO.

03:21PM   16   Q.   AND IT INCLUDED MR. PARLOFF, FOR EXAMPLE?

03:21PM   17   A.   YES.

03:21PM   18   Q.   DO YOU RECALL THAT?

03:21PM   19       AND MR. GROSSMAN, FOR EXAMPLE?

03:21PM   20   A.   YES.

03:21PM   21   Q.   IS THERE A REASON THAT YOU DID NOT DISCLOSE THAT TO THOSE

03:21PM   22   INDIVIDUALS?

03:21PM   23   A.   IT WOULD HAVE BEEN A VIOLATION OF OUR OWN TRADE SECRET

03:21PM   24   POLICY AND MY OWN AGREEMENT TO PROTECT OUR TRADE SECRETS.

03:21PM   25   Q.   NOW, MR. LEACH ASKED YOU ON DIRECT EXAMINATION WHETHER YOU

HOLMES REDIRECT BY MR. DOWNEY                                    8538

03:21PM   1   WERE AGGRESSIVE IN PROTECTING THE COMPANY'S INTELLECTUAL

03:21PM   2   PROPERTY AND YOU SAID YES.

03:21PM   3        DO YOU RECALL THAT?

03:21PM   4   A.   I DO.

03:21PM   5   Q.   AND WHEN YOU SAID YOU WERE AGGRESSIVE IN PROTECTING THE

03:21PM   6   COMPANY'S INTELLECTUAL PROPERTY, WHAT DID YOU MEAN?

03:21PM   7   A.   I MEANT THAT WE TRIED TO TAKE EVERY STEP POSSIBLE TO

03:21PM   8   PROTECT THE INTELLECTUAL PROPERTY, AND THAT INCLUDED POLICIES

03:21PM   9   LIKE THE ONE THAT WE JUST LOOKED AT; IT INCLUDED MAKING SURE

03:22PM  10   THAT WE HAD THE RIGHT AGREEMENTS WITH EMPLOYEES; AND IT

03:22PM  11   INCLUDED TAKING THE ACTIONS THAT I UNDERSTOOD WE WERE OBLIGATED

03:22PM  12   TO TAKE TO MAINTAIN TRADE SECRET PROTECTION IF WE BECAME AWARE

03:22PM  13   THAT THERE HAD BEEN SOME BREACH OF THOSE AGREEMENTS.

03:22PM  14   Q.   AND DID YOU UNDERSTAND THAT DOING THAT WAS NECESSARY TO

03:22PM  15   PROTECT VALUE, THE VALUE OF THE COMPANY?

03:22PM  16   A.   I DID.  I UNDERSTOOD THAT IF WE DIDN'T DO IT, WE WOULD

03:22PM  17   LOSE TRADE SECRET PROTECTION AND THAT WOULD BE DEVASTATING TO

03:22PM  18   THE COMPANY.

03:22PM  19   Q.   I WANT TO TURN FROM THAT SUBJECT TO TALKING ABOUT THE

03:22PM  20   SUBJECT OF VENOUS DRAWS OF BLOOD.

03:22PM  21   A.   YES.

03:22PM  22   Q.   YOU RECALL DISCUSSING WITH MR. LEACH, ON YOUR

03:22PM  23   CROSS-EXAMINATION, DISCUSSIONS BETWEEN WALGREENS AND THERANOS

03:22PM  24   ABOUT THE PERCENTAGE OF VENOUS BLOOD?

03:22PM  25   A.   I DO.

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                8539

```
03:22PM    1    Q.   I WANT TO TALK, FIRST OF ALL, JUST ABOUT THE DRAWING OF

03:23PM    2    VENOUS BLOOD AT THERANOS SERVICE CENTERS.

03:23PM    3         HOW WOULD -- HOW WAS VENOUS BLOOD TYPICALLY DRAWN AT A

03:23PM    4    THERANOS SERVICE CENTER IN A WALGREENS STORE?

03:23PM    5    A.   IT WAS DRAWN THROUGH WHAT WE CALLED A MICRO SAMPLE, WHICH

03:23PM    6    WAS TAKEN BY A BUTTERFLY NEEDLE INTO A SMALLER TUBE THAN WHAT

03:23PM    7    WOULD TRADITIONALLY BE USED.

03:23PM    8    Q.   AND WHY DID YOU USE THAT METHOD OF DRAWING BLOOD RATHER

03:23PM    9    THAN A TRADITIONAL VENIPUNCTURE?

03:23PM   10    A.   BECAUSE IT WAS LESS PAINFUL AND MORE HUMANE.

03:23PM   11    Q.   WERE ALL OF THE TESTS RUN ON THE MODIFIED DEVICES,

03:23PM   12    FINGERSTICK TESTS?

03:23PM   13    A.   FOR THE MOST PART.

03:23PM   14    Q.   AND WERE THE TESTS RUN ON THE EDISON DEVICE FINGERSTICK

03:23PM   15    TESTS?

03:23PM   16    A.   ALSO FOR THE MOST PART.

03:23PM   17    Q.   DID YOU TAKE STEPS AT ANY TIME TO HIDE THE FACT THAT THERE

03:24PM   18    WERE SOME VENOUS DRAWS BEING RUN AT WALGREENS SERVICE CENTER,

03:24PM   19    AT THERANOS SERVICE CENTERS AT WALGREENS STORES?

03:24PM   20    A.   NO.

03:24PM   21    Q.   DID THERANOS, IN FACT, DISCLOSE ON ITS WEBSITE THAT THERE

03:24PM   22    WERE VENOUS DRAWS AT ITS SERVICE CENTERS IN WALGREENS STORES?

03:24PM   23    A.   WE DID.

03:24PM   24    Q.   AND WAS THAT SOMETHING THAT WAS ACKNOWLEDGED PUBLICLY IN

03:24PM   25    OTHER PLACES AS WELL?
```

HOLMES REDIRECT BY MR. DOWNEY                                    8540

03:24PM   1       A.   YES.

03:24PM   2       Q.   MR. LEACH SHOWED YOU SOME EMAILS ABOUT A DEMONSTRATION

03:24PM   3   WHERE THERE WAS A DISCUSSION OF POTENTIAL VENOUS TESTS.

03:24PM   4            DO YOU RECALL THAT?

03:24PM   5       A.   I DO.

03:24PM   6       Q.   AND AT THE TIME THAT THAT DEMONSTRATION WAS TAKING PLACE,

03:24PM   7   IS IT ACCURATE THAT THERE WERE DISCLOSURES ABOUT VENOUS TESTING

03:24PM   8   AT THERANOS THAT EXISTED IN THE PUBLIC DOMAIN?

03:24PM   9       A.   YES.

03:24PM  10       Q.   IS IT THE CASE THAT SOMETIMES WHEN POTENTIAL PARTNERS OF

03:25PM  11   THERANOS CAME TO THE COMPANY OR WENT TO A WALGREENS STORE THEY

03:25PM  12   WANTED TO GET A FINGERSTICK EXPERIENCE?

03:25PM  13       A.   YES.

03:25PM  14       Q.   AND WOULD THE COMPANY TAKE STEPS TO TRY TO ACCOMMODATE

03:25PM  15   THEIR REQUEST THAT THEY HAVE THE FINGERSTICK EXPERIENCE IN THE

03:25PM  16   STORE?

03:25PM  17       A.   WE DID.

03:25PM  18       Q.   AND AM I RIGHT THAT ANYONE COULD WALK INTO A WALGREENS

03:25PM  19   SERVICE CENTER -- A THERANOS SERVICE CENTER AT WALGREENS AND

03:25PM  20   GET THEIR BLOOD TESTED WITHOUT THERANOS'S HELP?

03:25PM  21       A.   OF COURSE.

03:25PM  22       Q.   AND THAT HAPPENED ON OCCASIONS, DIDN'T IT?

03:25PM  23       A.   YES.

03:25PM  24       Q.   SOMEONE HAD AN INTEREST IN THERANOS, WOULD SHOW UP, AND

03:25PM  25   JUST GET A TEST; IS THAT RIGHT?

HOLMES REDIRECT BY MR. DOWNEY                                    8541

03:25PM   1    A.   YES.

03:25PM   2    Q.   ALL RIGHT.  I WANT TO NEXT ASK ABOUT THE EMAILS THAT

03:25PM   3    MR. LEACH SHOWED YOU RELATED TO TYLER SHULTZ.

03:26PM   4         DO YOU RECALL THAT DISCUSSION WITH MR. LEACH?

03:26PM   5    A.   I DO.

03:26PM   6    Q.   NOW, MR. SHULTZ, YOU HAVE NOT SEEN HIM TESTIFYING HERE; IS

03:26PM   7    THAT RIGHT?

03:26PM   8    A.   I HAVE NOT.

03:26PM   9    Q.   BUT YOU RECALL SOME DOCUMENTS BEING INTRODUCED THAT WERE

03:26PM  10    EMAILS FROM HIM?

03:26PM  11    A.   YES.

03:26PM  12    Q.   AND DO YOU RECALL THAT ONE OF THE QUESTIONS THAT MR. LEACH

03:26PM  13    ASKED YOU ON LAST TUESDAY WAS ABOUT VALIDATION OF THERANOS'S

03:26PM  14    SYPHILIS ASSAY?

03:26PM  15    A.   I DO.

03:26PM  16    Q.   AND DO YOU RECALL THAT HE ALSO ASKED YOU QUESTIONS ABOUT

03:26PM  17    MR. SHULTZ RAISING CONCERNS ABOUT MEDIA STATEMENTS THAT

03:26PM  18    THERANOS HAD MADE?

03:26PM  19    A.   I DO.

03:26PM  20    Q.   AND DO YOU ALSO RECALL THAT HE HAD ASKED YOU QUESTIONS

03:26PM  21    LAST TUESDAY ABOUT A COEFFICIENT OF VARIATION FOR A PARTICULAR

03:27PM  22    ASSAY?

03:27PM  23         DO YOU RECALL THAT?

03:27PM  24    A.   I DO.

03:27PM  25    Q.   AND IS IT FAIR TO SAY THAT IN ALL THREE OF THOSE

03:27PM   1        CATEGORIES, MR. SHULTZ WAS RAISING SOME CONCERN ABOUT

03:27PM   2        THERANOS'S WORK?

03:27PM   3        A.   HE WAS.

03:27PM   4        Q.   NOW, YOU TESTIFIED DURING YOUR DIRECT EXAMINATION THAT

03:27PM   5        MR. SHULTZ HAD FIRST RAISED THOSE QUESTIONS IN FEBRUARY OF

03:27PM   6        2014.

03:27PM   7             DO YOU REMEMBER THAT?

03:27PM   8        A.   YES.

03:27PM   9        Q.   AND I THINK WE LOOKED AT A SERIES OF EMAILS WHERE

03:27PM  10        DR. YOUNG PROVIDED ANSWERS TO MR. SHULTZ'S CONCERNS; IS THAT

03:27PM  11        RIGHT?

03:27PM  12        A.   YES.

03:27PM  13        Q.   AND THEN THE ISSUE DIED FOR A WHILE.

03:27PM  14             DO YOU RECALL THAT?

03:27PM  15        A.   I DO.

03:27PM  16        Q.   AND THEN IN APRIL, MR. SHULTZ AGAIN RAISED AN ISSUE

03:27PM  17        DIRECTLY WITH YOU.

03:27PM  18             DO YOU RECALL THAT?

03:27PM  19        A.   I DO.

03:27PM  20        Q.   AND WE LOOKED AT YOU ASKING DR. YOUNG TO GET INVOLVED AND

03:27PM  21        TRY TO UNDERSTAND THE CONCERNS THAT MR. SHULTZ WAS RAISING.

03:28PM  22             DO YOU RECALL THAT?

03:28PM  23        A.   YES.

03:28PM  24        Q.   AND DO YOU RECALL THAT DR. YOUNG DID PROVIDE EMAIL

03:28PM  25        COMMUNICATIONS TO YOU AND TO MR. BALWANI THAT ADDRESSED THE

HOLMES REDIRECT BY MR. DOWNEY                                    8543

03:28PM   1    CONCERNS THAT MR. SHULTZ WAS RAISING?

03:28PM   2    A.   I DO.

03:28PM   3    Q.   ALL RIGHT.  I WANT TO LOOK AT LOOK AT SOME OF THOSE EMAIL

03:28PM   4    COMMUNICATIONS IN LIGHT OF THE QUESTIONS THAT MR. LEACH ASKED

03:28PM   5    YOU.

03:28PM   6         LET'S LOOK AT EXHIBIT 1667, WHICH IS IN EVIDENCE.

03:28PM   7    A.   OKAY.

03:28PM   8    Q.   SO I'M INTERESTED IN THE THIRD EMAIL HERE FROM MS. HOLMES

03:28PM   9    AT 4:35 ON APRIL 11TH.

03:28PM  10         IF WE CAN JUST BLOW THAT UP.

03:28PM  11         AND DO YOU SEE THAT THIS IS YOU, IN RESPONSE TO

03:29PM  12    MR. SHULTZ'S EMAIL RAISING CONCERNS, ASKING DR. YOUNG TO TAKE A

03:29PM  13    LOOK AT IT?

03:29PM  14    A.   YES.

03:29PM  15    Q.   AND HE SAYS DID YOU -- YOU RAISE A QUESTION WITH HIM, DID

03:29PM  16    HE TALK TO -- HAD DR. YOUNG TALKED TO MR. SHULTZ TO SAY THAT

03:29PM  17    WHAT THE MEDIA REFERENCES TO THERANOS'S ACCURACY WERE, WERE

03:29PM  18    ABOUT THERANOS'S INFRASTRUCTURE AND ITS LONGITUDINAL POWER IN

03:29PM  19    THE CONTEXT OF LAB TO LAB VARIABILITY.

03:29PM  20         DO YOU SEE THAT?

03:29PM  21    A.   I DO.

03:29PM  22    Q.   NOW, MR. SHULTZ WAS RAISING A CONCERN THAT THERANOS WAS

03:29PM  23    PUBLICLY SAYING THAT ITS TESTS WERE ACCURATE AND RELIABLE, AND

03:29PM  24    IN SOME CASES MORE ACCURATE AND RELIABLE; IS THAT RIGHT?

03:29PM  25    A.   YES.

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                        8544

03:29PM   1    Q.    AND YOU WERE COMMENTING TO DR. YOUNG ABOUT THE QUESTIONS

03:29PM   2    THAT MR. SHULTZ RAISED ON THAT; IS THAT RIGHT?

03:29PM   3    A.    I AM.

03:29PM   4    Q.    AND YOU SAY, WELL, THOSE ARE REFERENCES TO OUR PRACTICE'S

03:30PM   5    LONGITUDINAL POWER IN THE CONTEXT OF LAB TO LAB VARIABILITY.

03:30PM   6          IS THAT WHAT IS HAPPENING HERE?

03:30PM   7    A.    YES.

03:30PM   8    Q.    AND WHEN YOU SAID THAT THOSE COMMENTS ABOUT ACCURACY AND

03:30PM   9    RELIABILITY ARE ABOUT LONGITUDINAL POWER IN THE CONTEXT OF LAB

03:30PM  10    TO LAB VARIABILITY, WHAT DID THAT MEAN?

03:30PM  11    A.    IT MEANT THAT WE WERE BUILDING A LAB AND MINILAB THAT WERE

03:30PM  12    DESIGNED TO BE STANDARDIZED AND THAT PEOPLE WOULD BE ABLE TO

03:30PM  13    GET TESTS ACROSS LOCATIONS AND SEE TRENDS IN THEIR DATA THAT

03:30PM  14    SHOULD HELP TO SHOW THEM THE ONSET AND PROGRESSION OF DISEASE

03:30PM  15    IN WAYS THAT YOU COULD NOT SEE IF YOU DIDN'T HAVE STANDARDIZED

03:30PM  16    TECHNOLOGY OR STANDARDIZED LABS LIKE WE WERE WORKING TO BUILD.

03:30PM  17    Q.    AND WHY WAS -- WHY WOULD THAT BE TRUE WITH RESPECT TO

03:30PM  18    THERANOS TECHNOLOGY IN PARTICULAR?

03:30PM  19    A.    WITH RESPECT TO MINILAB, BECAUSE WE WERE FACTORY

03:31PM  20    CALIBRATING THE DEVICES; AND WITH RESPECT TO THE LABORATORY,

03:31PM  21    BECAUSE WE WERE STANDARDIZING THE EQUIPMENT IN THE AUTOMATION

03:31PM  22    AMONGST ALL OF THE OTHER LABS WE INTENDED TO BUILD.

03:31PM  23    Q.    AND WHEN YOU OR THE COMPANY MADE STATEMENTS PUBLICLY ABOUT

03:31PM  24    ACCURACY AND RELIABILITY, IS THAT SOMETHING THAT YOU WERE

03:31PM  25    REFERRING TO?

UNITED STATES COURT REPORTERS

ER-12115

HOLMES REDIRECT BY MR. DOWNEY                                    8545

03:31PM   1      A.   YES.

03:31PM   2      Q.   LET'S LOOK ABOVE THIS EMAIL IN THE SAME EMAIL CHAIN JUST

03:31PM   3      TO THIS APRIL 11TH EMAIL FROM DR. YOUNG, AND HE SAYS THAT HE

03:31PM   4      HAS RESPONDED AND INTERLACED HIS COMMENTS IN RESPONSE TO

03:31PM   5      MR. SHULTZ.

03:31PM   6           DO YOU SEE THAT?

03:31PM   7      A.   I DO.

03:31PM   8      Q.   AND THEN IF WE GO DOWN INTO THE BODY OF THE EMAIL, IF WE

03:31PM   9      GO TO THE TOP OF PAGE 2, WE SEE A LITTLE BIT OF THE DIALOGUE

03:31PM  10      BETWEEN MR. YOUNG -- DR. YOUNG AND MR. SHULTZ.

03:32PM  11           DO YOU SEE THAT?

03:32PM  12      A.   I DO.

03:32PM  13      Q.   AND IF YOU LOOK AT THE PARAGRAPH THAT IS AT THE TOP OF THE

03:32PM  14      SCREEN NOW BEGINNING, "CALCULATING THE MEDIAN DOES NOT IGNORE

03:32PM  15      ANY DATA."

03:32PM  16           DO YOU SEE THAT PARAGRAPH?

03:32PM  17      A.   YES.

03:32PM  18      Q.   AND DO YOU SEE THAT IN THE THIRD LINE IT BEGINS, "TYLER

03:32PM  19      STILL JUST DOES NOT GRASP THE MEANING OF THE CV"?

03:32PM  20      A.   I DO.

03:32PM  21      Q.   AND IS THIS DR. YOUNG'S RESPONSE TO THE CONCERNS THAT

03:32PM  22      MR. SHULTZ HAD RAISED ABOUT THERANOS'S CALCULATION ABOUT THE

03:32PM  23      COEFFICIENT OF VARIATION?

03:32PM  24      A.   IT IS.

03:32PM  25      Q.   AND WHAT DID YOU UNDERSTAND DR. YOUNG TO BE SAYING ABOUT

HOLMES REDIRECT BY MR. DOWNEY                                    8546

03:32PM  1    MR. SHULTZ'S CONCERNS AND THEIR VALIDITY?

03:32PM  2    A.   THAT HE WAS NOT ABLE TO GET MR. SHULTZ TO UNDERSTAND THE

03:32PM  3    CONCEPT OF COEFFICIENT OF VARIATION AND THE MATH BEHIND HOW IT

03:33PM  4    WAS CALCULATED, AND THAT MR. SHULTZ WAS CONFUSED ABOUT THAT.

03:33PM  5    Q.   AND IF YOU GO THEN TO THE MIDDLE OF PAGE 2, WHICH YOU

03:33PM  6    TALKED ABOUT, WHICH IS THE NEXT EMAIL WHICH BEGINS, "DANIEL

03:33PM  7    ALSO TOLD ME."

03:33PM  8         DO YOU SEE THAT?

03:33PM  9    A.   I DO.

03:33PM  10   Q.   AND AGAIN, THAT THE -- THIS IS RAISING ANOTHER CONCERN

03:33PM  11   ABOUT THE CV AND ABOUT SPECIFICALLY WITH REGARD TO SENSITIVITY

03:33PM  12   TESTING DONE IN CONNECTION WITH THE SYPHILIS ASSAY.

03:33PM  13        DO YOU SEE THAT?

03:33PM  14   A.   YES.

03:33PM  15   Q.   AND THEN DO YOU SEE IN THE SECOND PARAGRAPH IN THE LATER

03:33PM  16   TEXT, IS THAT DR. YOUNG'S RESPONSE?

03:33PM  17   A.   YES.

03:33PM  18   Q.   AND DR. YOUNG RESPONDS, "HE MAKES IT SOUND LIKE SOMETHING

03:34PM  19   INAPPROPRIATE IS BEING DONE, WHICH IT IS NOT.  EQUIVOCAL ZONES

03:34PM  20   ARE COMMONLY USED, AND EXPECTED IN SUCH QUALITATIVE ASSAYS.

03:34PM  21   THE APPROACH BEING USED FOR SETTING OURS WAS BASED ON COMMON

03:34PM  22   TECHNIQUES."

03:34PM  23        DO YOU SEE THAT?

03:34PM  24   A.   YES.

03:34PM  25   Q.   AND THEN IN THE SECOND PARAGRAPH, DO YOU SEE THAT HE

                                                                    8547
HOLMES REDIRECT BY MR. DOWNEY

03:34PM   1    SAYS -- HE COMMENTS FURTHER AND SAYS THAT, "I DON'T KNOW THAT

03:34PM   2    ANY STUDY WAS SIMPLY REPEATED WITH THE ORIGINAL DATA BEING

03:34PM   3    IGNORED."

03:34PM   4        IS THAT A RESPONSE TO A CONCERN THAT MR. SHULTZ HAD

03:34PM   5    RAISED?

03:34PM   6    A.   IT IS.

03:34PM   7    Q.   OKAY.   NOW, I WANT TO NEXT GO TO THE BOTTOM OF PAGE 2.

03:34PM   8        AND I WANT TO FOCUS FIRST ON THE CONCERN THAT MR. SHULTZ

03:34PM   9    RAISES IN THE DARKER TEXT IN THE PARAGRAPH THAT BEGINS, "I THEN

03:34PM   10   ASKED."

03:34PM   11       DO YOU SEE THAT?

03:34PM   12   A.   I DO.

03:34PM   13   Q.   AND HE SAID, "I THEN ASKED DANIEL IF HE THOUGHT OUR

03:35PM   14   SYPHILIS TEST WAS TRULY THE MOST ACCURATE AND MOST PRECISE

03:35PM   15   SYPHILIS TEST ON THE MARKET.   HE SAID THAT THERANOS DOES NOT

03:35PM   16   CLAIM TO HAVE THE MOST ACCURATE OR PRECISE TESTS, AND THAT IF I

03:35PM   17   COULD FIND ANY MARKETING MATERIALS I SHOULD FORWARD THEM TO

03:35PM   18   HIM."

03:35PM   19       AND THEN MR. -- AND HE GOES ON AND INDICATES THAT HE HAS

03:35PM   20   DONE THAT, AND HE COMMENTS ON THERANOS NEVER DIRECTLY MAKING

03:35PM   21   THOSE CLAIMS.

03:35PM   22       DO YOU SEE THEN THAT DR. YOUNG RESPONDS TO THAT BY SAYING,

03:35PM   23   "I DID NOTE TO TYLER THAT THERANOS WILL HAVE A SUPERIOR PRODUCT

03:35PM   24   BY CONTROLLING/MONITORING/REDUCING VARIANCE ACROSS OUR

03:35PM   25   COUNTRY-WIDE INFRASTRUCTURE.   THIS WILL ENABLE US TO

HOLMES REDIRECT BY MR. DOWNEY                                    8548

03:35PM  1    TRACK/TREND TEST RESULTS FOR PATIENTS IN A MUCH MORE ROBUST

03:35PM  2    MANNER COMPARED TO WHAT IS AVAILABLE NOW TO PATIENTS."

03:35PM  3         DO YOU SEE THAT?

03:35PM  4    A.   I DO.

03:35PM  5    Q.   AND, AGAIN, IS THAT THIS IDEA THAT THERE'S CALIBRATION

03:35PM  6    BETWEEN INSTRUMENTS THAT ARE THERANOS INSTRUMENTS NO MATTER

03:36PM  7    WHERE THE DEVICE WAS LOCATED?

03:36PM  8    A.   IT IS.

03:36PM  9    Q.   AND THEN IF YOU GO TO THE NEXT PARAGRAPH, DO YOU SEE

03:36PM  10   MR. SHULTZ IS RAISING AN ISSUE ABOUT THE PREVIOUS DISCUSSION

03:36PM  11   RELATED TO THE CV CLAIM OF LESS THAN 10 PERCENT?

03:36PM  12   A.   I DO.

03:36PM  13   Q.   AND HE SAYS THAT THAT'S NOT ACCURATE UNDER THE MEDIAN.

03:36PM  14        DO YOU SEE THAT?

03:36PM  15   A.   YES.

03:36PM  16   Q.   AND DR. YOUNG RESPONDS AND SAYS MEDIAN IS NOT USED HERE,

03:36PM  17   AVERAGES ARE.

03:36PM  18        DO YOU SEE THAT?

03:36PM  19   A.   YES.

03:36PM  20   Q.   AND THEN MR. LEACH SHOWED YOU LAST TUESDAY A DRAFT

03:36PM  21   RESPONSE TO MR. SHULTZ THAT WAS PREPARED IN COMMUNICATIONS

03:36PM  22   BETWEEN YOU AND DR. YOUNG AND MR. BALWANI.

03:36PM  23        DO YOU RECALL THAT?

03:36PM  24   A.   I DO.

03:36PM  25   Q.   AND THERE WAS A DRAFT WHERE YOU HAD PROVIDED SOME

ER-12119

HOLMES REDIRECT BY MR. DOWNEY                                    8549

03:37PM   1     COMMENTS?

03:37PM   2     A.   YES.

03:37PM   3     Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15070.

03:37PM   4     A.   OKAY.

03:37PM   5     Q.   AND IS EXHIBIT 15070 A -- RELATE TO THE COMMENTS THAT WERE

03:37PM   6     BEING EXCHANGED BETWEEN YOURSELF AND DR. YOUNG AND MR. BALWANI

03:37PM   7     RESPONDING TO MR. SHULTZ?

03:37PM   8     A.   IT DOES.

03:37PM   9              MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 15070.

03:37PM  10              MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:37PM  11              THE COURT:  IT'S ADMITTED.

03:37PM  12         (DEFENDANT'S EXHIBIT 15070 WAS RECEIVED IN EVIDENCE.)

03:38PM  13     BY MR. DOWNEY:

03:38PM  14     Q.   AND IF YOU LOOK AT PAGE 2, THIS IS -- IF YOU LOOK AT THE

03:38PM  15     FIRST PAGE, THIS IS AN EMAIL WHERE MR. BALWANI SAYS HE'S

03:38PM  16     PROVIDING A DOCUMENT THAT -- WHERE HE HAS ADDED A RESPONSE THAT

03:38PM  17     HE'S GOING TO GIVE TO MR. SHULTZ.

03:38PM  18         DO YOU SEE THAT?

03:38PM  19     A.   YES.

03:38PM  20     Q.   AND THEN IF YOU LOOK AT THE ATTACHMENT, DO YOU SEE THE

03:38PM  21     COMMENT ON THE RIGHT-HAND SIDE, AND THIS IS THE COMMENT THAT

03:38PM  22     MR. LEACH HAD DRAWN YOUR ATTENTION TO WHERE IT SEEMS TO SPIN

03:38PM  23     OUT FROM THE FIRST SENTENCE, AND YOU SAY, "STRONGER - EMPHASIZE

03:38PM  24     WHAT HE DID FIRST ESPECIALLY IN LIGHT OF MY COMMENT ON ACCURACY

03:38PM  25     BELOW."

HOLMES REDIRECT BY MR. DOWNEY                                         8550

03:38PM   1          DO YOU SEE THAT?

03:38PM   2     A.   I DO.

03:38PM   3     Q.   NOW, YOU REFERRED THERE TO A COMMENT ON ACCURACY BELOW,

03:39PM   4     AND I WANT TO SEE IF WE CAN TAKE A LOOK AT THAT COMMENT BY

03:39PM   5     LOOKING AT EXHIBIT 7349.

03:39PM   6     A.   7439?

03:39PM   7     Q.   7439.

03:39PM   8     A.   GOT IT.  OKAY.

03:39PM   9     Q.   AND IS THIS ANOTHER VERSION WITH A LITTLE BIT OF A

03:39PM  10     DIFFERENT FORMULATION OF THESE EMAIL COMMUNICATIONS BETWEEN

03:39PM  11     YOURSELF AND DR. YOUNG AND MR. BALWANI?

03:39PM  12     A.   IT IS.

03:39PM  13     Q.   AND IF YOU LOOK THROUGH THAT DOCUMENT --

03:39PM  14          WELL, YOUR HONOR, I MOVE TO ADMIT EXHIBIT 7439 SO WE CAN

03:40PM  15     PUT IT UP.

03:40PM  16          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:40PM  17          THE COURT:  IT'S ADMITTED.

03:40PM  18     (DEFENDANT'S EXHIBIT 7439 WAS RECEIVED IN EVIDENCE.)

03:40PM  19     BY MR. DOWNEY:

03:40PM  20     Q.   OKAY.  DO YOU SEE THAT THE FIRST PAGE IS MR. BALWANI

03:40PM  21     FORWARDING EDITS AND MR. YOUNG SAYING THAT THOSE EDITS LOOK

03:40PM  22     VERY GOOD?

03:40PM  23     A.   I DO.

03:40PM  24     Q.   AND ATTACHED ARE EDITS?

03:40PM  25     A.   YES.

HOLMES REDIRECT BY MR. DOWNEY                                                8551

03:40PM   1    Q.   BUT WHAT I WANT TO FOCUS YOU ON IS THE COMMENT THAT YOU

03:40PM   2    HAD MADE WHICH YOU WERE REFERRING TO IN THE PRIOR EXHIBIT,

03:40PM   3    WHICH IS ON PAGE 5 OF THE EXHIBIT.

03:40PM   4         AND IF YOU COULD BLOW UP THE COMMENT ON THE RIGHT-HAND

03:40PM   5    SIDE.

03:40PM   6         DO YOU SEE THAT THIS IS A COMMENT THAT YOU ENTERED ON A

03:40PM   7    SENTENCE IN THE RESPONSE TO MR. SHULTZ?

03:40PM   8    A.   YES.

03:40PM   9    Q.   AND DO YOU SEE THAT IT'S COMMENTING ABOUT THAT A LARGE

03:41PM  10    NUMBER OF OTHER ASSAYS -- DOES THAT MEAN OTHER ASSAYS FROM

03:41PM  11    OTHER COMPANIES?

03:41PM  12    A.   WHERE ARE YOU IN THE --

03:41PM  13    Q.   SORRY.  THE SENTENCE THAT BEGINS, "THE SAME APPLIES FOR AN

03:41PM  14    OVERWHELMINGLY LARGE NUMBER OF ASSAYS?

03:41PM  15    A.   YES, GOT IT.

03:41PM  16    Q.   "THE CV'S FOR THESE IS USUALLY MUCH HIGHER WHEN YOU

03:41PM  17    MEASURE IT ACROSS MULTIPLE DEVICES, DIFFERENT REAGENT LOTS AND

03:41PM  18    DIFFERENT DAYS."

03:41PM  19         DO YOU SEE THAT?

03:41PM  20    A.   I DO.

03:41PM  21    Q.   TELL US WHAT THAT IS A REFERENCE TO.

03:41PM  22    A.   IT'S TALKING ABOUT OTHER ASSAYS OR TESTS AND THE

03:41PM  23    COEFFICIENT OF VARIATION BEING MUCH HIGHER THAN WHAT'S OFTEN

03:41PM  24    REPORTED WHEN IT'S MEASURED ACROSS DIFFERENT LABS OR DIFFERENT

03:41PM  25    ANALYZERS, DIFFERENT LOTS OF REAGENTS AND DIFFERENT DAYS, THAT

HOLMES REDIRECT BY MR. DOWNEY                                        8552

03:41PM  1      YOU DON'T SEE THAT LOWER CV IN ACTUAL PERFORMANCE.

03:41PM  2      Q.   OKAY.   AND LET'S LOOK AT THE COMMENT THAT YOU MAKE IN THE

03:42PM  3      RIGHT-HAND COLUMN.

03:42PM  4           DO YOU SEE THAT YOU WRITE, "ADD PRE-ANALYTICAL ERROR AND

03:42PM  5      VARIANCE POINT - THIS IS WHAT THE" "WALL STREET JOURNAL,"

03:42PM  6      "WSJ," "WALL STREET JOURNAL," "AND EVERYONE ELSE IS TALKING

03:42PM  7      ABOUT BY THE WORD 'ACCURACY.'"

03:42PM  8           DO YOU SEE THAT?

03:42PM  9      A.   I DO.

03:42PM 10      Q.   AND IS THAT A REFERENCE TO THE ARTICLE THAT HAD RUN IN

03:42PM 11      SEPTEMBER OF 2013 ABOUT THERANOS, WRITTEN BY JOE RAGO?

03:42PM 12      A.   IT IS.

03:42PM 13      Q.   AND IN THIS SENTENCE YOU SAY THAT "THE

03:42PM 14      WALL STREET JOURNAL" IS TALKING ABOUT PRE-ANALYTICAL ERROR.

03:42PM 15           FIRST, WHAT DOES THAT MEAN?

03:42PM 16      A.   IT MEANS ALL OF THE ERRORS THAT CAN GO INTO A TEST FROM

03:42PM 17      SAMPLE COLLECTION, TRANSPORTING THE SAMPLE, ACCESSIONING THE

03:42PM 18      SAMPLE IN THE LAB BEFORE IT'S EVEN RUN ON A MACHINE.

03:42PM 19      Q.   AND DID YOU UNDERSTAND THAT THERANOS'S 4.0 SYSTEM, WHEN

03:43PM 20      IMPLEMENTED, WOULD ELIMINATE THOSE ERRORS?

03:43PM 21      A.   YES.

03:43PM 22      Q.   AND YOU THEN GO ON TO SAY, AFTER PRE-ANALYTICAL ERROR, AND

03:43PM 23      VARIANCE POINT.

03:43PM 24           WHAT WERE YOU REFERRING TO THERE?

03:43PM 25      A.   AGAIN, THE SAME POINT, THAT IF YOU COULD LOOK AT LAB DATA

HOLMES REDIRECT BY MR. DOWNEY                                    8553

03:43PM  1    OVER TIME, THERE WAS AN OPPORTUNITY TO SEE THE ONSET OF

03:43PM  2    DISEASE.

03:43PM  3        BUT TO DO THAT, YOU NEEDED TO STANDARDIZE THE DEVICES OR

03:43PM  4    THE PLATFORMS ON WHICH YOU WERE MEASURING, AND THAT WAS

03:43PM  5    SOMETHING THAT THERANOS HAD CREATED IN ITS TECHNOLOGIES, AND WE

03:43PM  6    THOUGHT WE COULD CHANGE IN THE WAY THAT PEOPLE COULD USE LAB

03:43PM  7    DATA.

03:43PM  8    Q.   AND THEN IF YOU GO TO -- YOU SAY THAT, "READ THE ARTICLES,

03:43PM  9    THEY EXPOUND ON EXACTLY THIS, THIS IS OUR WHOLE POINT AND

03:43PM  10   MISSION ON ACTIONABLE INFORMATION AND WHAT WE ALWAYS TALK ABOUT

03:43PM  11   WHEN TALKING ABOUT ACCURACY AS YOU CAN SEE FROM THE CONTEXT

03:43PM  12   AROUND ANY PERFORMANCE CLAIM, INCLUDING ON OUR WEBSITE AND IN

03:44PM  13   ARTICLES."

03:44PM  14       DO YOU SEE THAT?

03:44PM  15   A.   I DO.

03:44PM  16   Q.   WERE YOU, IN THIS COMMENT THAT YOU MADE IN APRIL OF 2014,

03:44PM  17   REFERRING TO COMMENTS ON THE THERANOS WEBSITE AS THEY THEN

03:44PM  18   EXISTED?

03:44PM  19   A.   I WAS.

03:44PM  20   Q.   AND WERE THOSE COMMENTS TO THE EFFECT THAT THERANOS'S

03:44PM  21   TECHNOLOGY WAS MORE ACCURATE AND RELIABLE THAN THOSE OF THE

03:44PM  22   TECHNOLOGY OF COMPETITORS?

03:44PM  23   A.   YES.

03:44PM  24   Q.   AND WHEN YOU SAID IN THIS DOCUMENT IN YOUR FIRST COMMENT

03:44PM  25   THAT MR. BALWANI SHOULD BE STRONGER AND SHOULD EMPHASIZE, WERE

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                    8554

03:44PM   1     YOU REFERRING TO THIS COMMENT ABOUT ACCURACY AND RELIABILITY IN

03:44PM   2     YOUR INTENTION IN SAYING IT?

03:44PM   3     A.   I WAS.  AND JUST LOOKING AT IT, THAT PART OF THE SENTENCE

03:44PM   4     REFERS TO WHAT IS WRITTEN THERE, WHICH IS GIVING HIM THE

03:44PM   5     BENEFIT OF THE DOUBT THAT HIS INTENTIONS ARE IN THE RIGHT

03:45PM   6     PLACE.

03:45PM   7     Q.   LET ME ASK YOU TO JUST TAKE A LOOK QUICK AT THE NEXT PAGE

03:45PM   8     OF THIS EXHIBIT.

03:45PM   9          AND REALLY I'M INTERESTED IN THE LAST PARAGRAPH HERE

03:45PM  10     BEGINNING, "I THEN THOUGHT."

03:45PM  11          DO YOU SEE THAT?

03:45PM  12     A.   I DO.

03:45PM  13     Q.   AND DO YOU SEE THE FIRST PARAGRAPH HERE BEGINNING, "I THEN

03:45PM  14     THOUGHT BACK TO OUR PREVIOUS DISCUSSION," IS THAT A REFERENCE

03:45PM  15     FROM A PARAGRAPH PREPARED BY MR. SHULTZ?

03:45PM  16     A.   YES.

03:45PM  17     Q.   AND HE SAYS, WE CHECKED THE THERANOS WEBSITE AND FOUND

03:45PM  18     THAT WE ONLY MAKE THIS CLAIM FOR VITAMIN D, BUT THEN HE GOES ON

03:45PM  19     TO SAY, BUT THE CV LEVELS WERE HIGHER THAN 10 PERCENT, AND HE

03:45PM  20     LISTS A VARIETY OF NUMBERS, WHEN CALCULATED ON THE MEDIAN OF

03:45PM  21     EACH PRECISION RUN AND HIGHER THAN 10 AGAIN WHEN CALCULATED

03:45PM  22     BASED ON THE ENTIRE DATA SET.

03:46PM  23          DO YOU SEE THAT?

03:46PM  24     A.   I DO.

03:46PM  25     Q.   AND DO YOU SEE THAT DR. YOUNG RESPONDED TO THAT?

                          UNITED STATES COURT REPORTERS


                              **ER-12125**

HOLMES REDIRECT BY MR. DOWNEY                                      8555

03:46PM  1      A.   I DO.

03:46PM  2      Q.   AND DO YOU SEE THAT HIS RESPONSE IS THAT THE DATA APPEARS

03:46PM  3   TO BE FROM THE 2-TIP PRECISION DATA, INCLUDING EACH TIP VALUE.

03:46PM  4        WHY WAS THAT RELEVANT AS PART OF HIS RESPONSE?

03:46PM  5      A.   BECAUSE THAT'S AN INCORRECT WAY TO CALCULATE COEFFICIENT

03:46PM  6   OF VARIATION.

03:46PM  7      Q.   AND THEN HE SAYS, "AS NOTED SEVERAL TIMES, THE CV METRIC

03:46PM  8   ACROSS THAT DATA IS NOT HOW WE QUANTIFY OUR ASSAY SYSTEM CV.

03:46PM  9   WE HAVE REFERENCED OUR 6-TIP VITAMIN D PRECISION BELOW IN

03:46PM 10   REFERENCE TO THE TABLE SUMMARIES."

03:46PM 11        DO YOU SEE THAT?

03:46PM 12      A.   YES.

03:46PM 13      Q.   HE GOES ON TO SAY, "YOU WERE WRONG HERE, MEDIAN WAS NOT

03:46PM 14   USED HERE - AVERAGES ARE.  THIS IS WHY YOU ARE GENERATING WRONG

03:47PM 15   NUMBERS."

03:47PM 16        AND DID YOU UNDERSTAND THAT THIS WAS DR. YOUNG'S RESPONSE

03:47PM 17   TO MR. SHULTZ'S CONCERNS?

03:47PM 18      A.   I DID.

03:47PM 19      Q.   AND WAS THIS THE THIRD OR FOURTH TIME THAT DR. YOUNG AND

03:47PM 20   MR. SHULTZ HAD HAD CONVERSATIONS ON THESE SAME SUBJECTS?

03:47PM 21      A.   IT WAS.

03:47PM 22      Q.   LET ME TURN FROM TALKING ABOUT MR. SHULTZ TO TALKING FOR A

03:47PM 23   MOMENT ABOUT MS. CHEUNG.

03:47PM 24        DO YOU RECALL THAT MS. CHEUNG TESTIFIED VERY CLOSE TO THE

03:47PM 25   BEGINNING OF THE TRIAL?

HOLMES REDIRECT BY MR. DOWNEY                                    8556

| | | |
|---|---|---|
| 03:47PM | 1 | DO YOU RECALL THAT? |
| 03:47PM | 2 | A.   I DO. |
| 03:47PM | 3 | Q.   AND AM I RIGHT THAT YOU DID NOT KNOW MS. CHEUNG WHEN SHE |
| 03:47PM | 4 | WORKED AT THERANOS? |
| 03:47PM | 5 | A.   I DID NOT. |
| 03:47PM | 6 | Q.   AND YOU DID NOT KNOW THAT SHE RAISED ANY CONCERNS ABOUT |
| 03:47PM | 7 | THE QUALITY OF THERANOS TESTING WHILE SHE WAS AT THERANOS; IS |
| 03:47PM | 8 | THAT RIGHT? |
| 03:47PM | 9 | A.   I DID NOT. |
| 03:47PM | 10 | Q.   AND IS IT RIGHT THAT YOU DID NOT LEARN THAT UNTIL A |
| 03:48PM | 11 | CONSIDERABLE AMOUNT OF TIME LATER? |
| 03:48PM | 12 | A.   YES. |
| 03:48PM | 13 | Q.   AND YOU WERE ASKED ON CROSS-EXAMINATION ABOUT THERANOS'S |
| 03:48PM | 14 | RESPONSE, DO YOU RECALL THAT, TO LEARNING THAT MS. CHEUNG WAS |
| 03:48PM | 15 | TALKING TO A REPORTER FROM "THE WALL STREET JOURNAL"? |
| 03:48PM | 16 | A.   I DO. |
| 03:48PM | 17 | Q.   AND DO YOU RECALL THAT MR. LEACH ASKED IF YOU HAD A LAWYER |
| 03:48PM | 18 | SEND A LETTER TO MS. CHEUNG. |
| 03:48PM | 19 | DO YOU RECALL THAT? |
| 03:48PM | 20 | A.   I DO. |
| 03:48PM | 21 | Q.   NOW, I WANT TO ASK YOU, IN REGARD TO MS. CHEUNG'S TIME AT |
| 03:48PM | 22 | THERANOS, IS IT ACCURATE THAT SHE SIGNED A NONDISCLOSURE |
| 03:48PM | 23 | AGREEMENT AGREEING TO KEEP INFORMATION ABOUT THERANOS |
| 03:48PM | 24 | CONFIDENTIAL? |
| 03:48PM | 25 | A.   SHE DID. |

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY                                              8557

03:48PM  1      Q.   AND WAS THAT REQUIRED OF EVERY EMPLOYEE?

03:49PM  2      A.   YES.

03:49PM  3      Q.   WHEN YOU LEARNED THAT MS. CHEUNG WAS HAVING CONVERSATIONS

03:49PM  4      ABOUT THERANOS AND WHAT YOU BELIEVED TO BE CONFIDENTIAL

03:49PM  5      INFORMATION, WAS YOUR -- WAS THE FIRST REACTION YOU HAD TO HAVE

03:49PM  6      A LAWYER SEND HER A LETTER?

03:49PM  7      A.   NO.

03:49PM  8      Q.   DID YOU ASK THAT THERANOS'S HUMAN RESOURCES DEPARTMENT

03:49PM  9      REACH OUT TO HER?

03:49PM  10     A.   I DID.

03:49PM  11     Q.   AND DID YOU UNDERSTAND THAT THEY DID THAT?

03:49PM  12     A.   YES.

03:49PM  13     Q.   HOW MANY TIMES, IN YOUR UNDERSTANDING, DID THE HEAD OF

03:49PM  14     PERSONNEL AT THERANOS REACH OUT TO MS. CHEUNG?

03:49PM  15     A.   MULTIPLE TIMES.

03:49PM  16     Q.   AND DID MS. CHEUNG RESPOND TO ANY OF THOSE CALLS?

03:49PM  17     A.   NO.

03:49PM  18     Q.   LET ME SWITCH FROM THE SUBJECT OF THE RESPONSE TO "THE

03:50PM  19     WALL STREET JOURNAL" ARTICLE IN CONNECTION WITH EMPLOYEES TO

03:50PM  20     TALK ABOUT THE BOARD OF DIRECTORS.

03:50PM  21          DO YOU RECALL THAT?

03:50PM  22     A.   YES.

03:50PM  23     Q.   AND MR. LEACH ASKED YOU ABOUT A JULY 2015 BOARD MEETING.

03:50PM  24          DO YOU RECALL THAT?

03:50PM  25     A.   I DO.

| | | |
|---|---|---|
| 03:50PM | 1 | Q.   AND DO YOU RECALL THAT WHEN GENERAL MATTIS TESTIFIED, HE |
| 03:50PM | 2 | GAVE SOME TESTIMONY ABOUT THAT SAME BOARD MEETING? |
| 03:50PM | 3 | DO YOU RECALL THAT? |
| 03:50PM | 4 | A.   I DO. |
| 03:50PM | 5 | Q.   AND DO YOU RECALL THAT GENERAL MATTIS TESTIFIED THAT HE |
| 03:50PM | 6 | WAS A LITTLE BIT OFFENDED THAT THERE WAS A SLIDE AS PART OF A |
| 03:50PM | 7 | PRESENTATION AT THAT MEETING THAT REFERRED TO THE DUTY OF |
| 03:50PM | 8 | LOYALTY. |
| 03:50PM | 9 | DO YOU REMEMBER THAT TESTIMONY? |
| 03:50PM | 10 | A.   I DO. |
| 03:50PM | 11 | Q.   AND DO YOU RECALL THAT HE FELT THAT HE WAS SOMEONE WHO HAD |
| 03:50PM | 12 | SERVED THE COUNTRY FOR A LONG TIME AND HE DIDN'T NEED TO BE |
| 03:51PM | 13 | TOLD ABOUT A DUTY OF LOYALTY? |
| 03:51PM | 14 | DO YOU RECALL THAT? |
| 03:51PM | 15 | A.   I DO.  HE HAS. |
| 03:51PM | 16 | Q.   AND DO YOU RECALL THAT HE WAS SHOWN THAT REFERENCE TO A |
| 03:51PM | 17 | DUTY OF LOYALTY IN REDACTED FASHION? |
| 03:51PM | 18 | A.   IN HIS TESTIMONY? |
| 03:51PM | 19 | Q.   YES. |
| 03:51PM | 20 | A.   YES. |
| 03:51PM | 21 | Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 15062. |
| 03:51PM | 22 | A.   OKAY. |
| 03:51PM | 23 | Q.   IS 15062 A DECK THAT WAS PROVIDED TO DIRECTORS OF THERANOS |
| 03:51PM | 24 | IN CONNECTION WITH ITS JULY 2015 MEETING? |
| 03:51PM | 25 | A.   YES. |

HOLMES REDIRECT BY MR. DOWNEY                                              8559

03:51PM   1                    MR. DOWNEY:  YOUR HONOR, I MOVE TO ADMIT 15062.

03:52PM   2                    MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:52PM   3                    THE COURT:  IT'S ADMITTED.

03:52PM   4              (DEFENDANT'S EXHIBIT 15062 WAS RECEIVED IN EVIDENCE.)

03:52PM   5     BY MR. DOWNEY:

03:52PM   6     Q.   AND IF YOU LOOK AT THE SECOND PAGE HERE, DO YOU SEE

03:52PM   7     THERE'S AN AGENDA FOR THE BOARD OF DIRECTORS THAT IS SET FORTH

03:52PM   8     FOR A MEETING?

03:52PM   9     A.   YES.

03:52PM  10     Q.   I'D LIKE TO ASK YOU TO FLIP FORWARD IN THIS DOCUMENT TO

03:52PM  11     PAGE 12 OF THE DOCUMENTS.

03:52PM  12     A.   OKAY.

03:52PM  13     Q.   AND DO YOU SEE THAT THIS IS LABELLED "CHARTERING THE BOARD

03:52PM  14     OF COUNSELORS"?

03:52PM  15     A.   YES.

03:52PM  16     Q.   AND CAN YOU EXPLAIN WHAT WAS GOING ON HERE?

03:53PM  17     A.   WE WERE FORMALIZING AN ADVISORY BOARD TO THE COMPANY,

03:53PM  18     WHICH WE WERE CALLING THE BOARD OF COUNSELORS, AND WE WERE

03:53PM  19     TALKING ABOUT THE CORE ASPECTS OF THE BOARD OF COUNSELORS AND

03:53PM  20     THEIR AGREEMENT WITH THE COMPANY.

03:53PM  21     Q.   OKAY.  AND THE FIRST ITEM IS DUTY OF LOYALTY.

03:53PM  22          DO YOU SEE THAT?

03:53PM  23     A.   YES.

03:53PM  24     Q.   AND THEN IF YOU GO TO THE NEXT SLIDE, DO YOU SEE THAT THE

03:53PM  25     FULL DISCUSSION HERE REFLECTS DISCUSSION ABOUT THE LEGAL

HOLMES REDIRECT BY MR. DOWNEY                                    8560

03:53PM   1     REQUIREMENTS THAT ARE IMPOSED ON DIRECTORS OF A COMPANY?

03:53PM   2     A.   YES.

03:53PM   3     Q.   AND DID YOU UNDERSTAND THAT THIS WAS INFORMATION THAT YOU

03:53PM   4     WERE TO SHARE WITH THE BOARD OF DIRECTORS TO MAKE SURE THAT ALL

03:53PM   5     OF THE LEGAL RESPONSIBILITIES THAT THEY HAD WERE UNDERSTOOD?

03:53PM   6     A.   YES.

03:53PM   7     Q.   NOW, MR. LEACH ALSO ASKED YOU ABOUT GENERAL MATTIS'S

03:54PM   8     RESIGNATION FROM THERANOS IN 2016.

03:54PM   9          DO YOU RECALL THAT?

03:54PM   10    A.   I DO.

03:54PM   11    Q.   AND DID YOU HAVE AN UNDERSTANDING IN 2016 WHY

03:54PM   12    GENERAL MATTIS HAD RESIGNED?

03:54PM   13    A.   YES.

03:54PM   14    Q.   DID YOU CONTINUE TO SPEAK WITH GENERAL MATTIS AFTER HE

03:54PM   15    LEFT THE BOARD IN 2016?

03:54PM   16    A.   I DID.

03:54PM   17    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 15061.

03:54PM   18    A.   OKAY.

03:54PM   19    Q.   AND IS EXHIBIT 15061 A SERIES OF EMAILS ABOUT THE

03:55PM   20    DEPARTURE OF GENERAL MATTIS AS A DIRECTOR?

03:55PM   21    A.   YES.

03:55PM   22          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

03:55PM   23    15061.

03:55PM   24          MR. LEACH:  NO OBJECTION, YOUR HONOR.

03:55PM   25          THE COURT:  IT'S ADMITTED.

HOLMES REDIRECT BY MR. DOWNEY                                        8561

03:55PM   1            (DEFENDANT'S EXHIBIT 15061 WAS RECEIVED IN EVIDENCE.)

03:55PM   2                 MR. DOWNEY:  WE'LL BRING THAT UP, YOUR HONOR.

03:55PM   3       Q.   DO YOU SEE THIS IS AN EMAIL FROM GENERAL MATTIS AND YOU'RE

03:55PM   4       COPIED ON THE EMAIL FROM DECEMBER 2016?

03:55PM   5       A.   YES.

03:55PM   6       Q.   DO YOU SEE THAT?

03:55PM   7       A.   YES, YES.

03:55PM   8       Q.   AND WAS THIS AROUND THE TIME THAT GENERAL MATTIS WAS

03:55PM   9       NOMINATED TO SERVE AS SECRETARY OF DEFENSE?

03:55PM  10       A.   IT IS.

03:55PM  11       Q.   AND DO YOU SEE THAT IN GENERAL MATTIS'S EMAIL, HE SAYS,

03:55PM  12       "DUE TO MY STATUS OF PENDING NOMINATION AND POSSIBLY GOING INTO

03:55PM  13       A CONFIRMATION PROCESS, I NEED TO RECUSE MYSELF FROM THE BOARD

03:56PM  14       MEETING.  SORRY."

03:56PM  15            DO YOU SEE THAT?

03:56PM  16       A.   I DO.

03:56PM  17       Q.   AND AFTER THE TIME OF HIS NOMINATION, DID HE CEASE

03:56PM  18       PARTICIPATING IN BOARD AFFAIRS OF THERANOS?

03:56PM  19       A.   HE DID.

03:56PM  20       Q.   NOW, YOU ALSO RECALL THAT GENERAL MATTIS TESTIFIED THAT HE

03:56PM  21       HOPED THAT THERANOS WOULD PURSUE HAVING SOME EFFORTS TO HAVE

03:56PM  22       PEER REVIEW OF WORK DONE IN CONNECTION WITH ITS TECHNOLOGY.

03:56PM  23            DO YOU RECALL THAT?

03:56PM  24       A.   I DO.

03:56PM  25       Q.   AND WAS THAT ADVICE THAT THE COMPANY TOOK TO HEART IN

                            UNITED STATES COURT REPORTERS

                                  ER-12132

HOLMES REDIRECT BY MR. DOWNEY                                        8562

03:56PM   1      2016?

03:56PM   2      A.   WE DID.

03:56PM   3      Q.   AND WERE THE STUDIES THAT MR. LEACH SHOWED YOU ON YOUR

03:56PM   4      CROSS-EXAMINATION, WERE THEY IN PART AN EFFORT TO RESPOND TO

03:56PM   5      THE ADVICE THAT YOU GOT FROM GENERAL MATTIS AND OTHERS?

03:56PM   6      A.   YES.

03:56PM   7      Q.   LET ME MOVE TO TALKING A LITTLE BIT ABOUT THE WEBSITE OF

03:57PM   8      THERANOS IN SOME OF THE EMAILS THAT YOU WERE SHOWN DURING YOUR

03:57PM   9      CROSS-EXAMINATION.

03:57PM   10         DO YOU RECALL THAT MR. LEACH SHOWED YOU EMAILS WHERE

03:57PM   11     LAWYERS WERE COMMENTING ON DRAFTS OF THE WEBSITE?

03:57PM   12     A.   I DO.

03:57PM   13     Q.   AND YOU RECALL THAT YOU HAD ASKED LAWYERS TO REVIEW THE

03:57PM   14     CONTENT OF THE WEBSITE BEFORE IT WENT LIVE?

03:57PM   15     A.   I DID.

03:57PM   16     Q.   AND WAS THAT LAWYERS FROM ONE LAW FIRM OR MORE THAN ONE

03:57PM   17     LAW FIRM?

03:57PM   18     A.   MULTIPLE LAW FIRMS.

03:57PM   19     Q.   AND WHY DID YOU WANT LAWYERS TO REVIEW THE CONTENT OF THE

03:57PM   20     WEBSITE?

03:57PM   21     A.   BECAUSE I WANTED TO MAKE SURE THAT WHAT WE WERE PUTTING UP

03:57PM   22     WAS RIGHT.

03:57PM   23     Q.   WERE THERE NONLAWYERS ALSO INVOLVED IN THE PROCESS OF

03:57PM   24     REVIEWING THERANOS'S WEBSITE?

03:57PM   25     A.   YES.  THERE WERE MULTIPLE TEAMS OF PEOPLE INVOLVED.

HOLMES REDIRECT BY MR. DOWNEY

03:58PM  1    Q.   AND WERE THE TWO EMAILS THAT YOU WERE SHOWN BY MR. LEACH,

03:58PM  2    WERE THEY THE ONLY ADVICE THAT YOU RECEIVED IN CONNECTION WITH

03:58PM  3    THE CONTENT OF THE WEBSITE?

03:58PM  4    A.   NO.

03:58PM  5    Q.   NOW, YOU RECALL THAT CERTAIN CHANGES WERE SUGGESTED IN

03:58PM  6    THAT EMAIL?

03:58PM  7    A.   YES.

03:58PM  8    Q.   DID YOU TRACK ALL OF THOSE AND GO INTO THE WEBSITE AND

03:58PM  9    MAKE THOSE CHANGES YOURSELF?

03:58PM  10   A.   NO.

03:58PM  11   Q.   WHO WAS RESPONSIBLE FOR DOING THAT?

03:58PM  12   A.   THERE WAS A TEAM OF PROJECT MANAGERS AND OTHER PEOPLE

03:58PM  13   WITHIN THE COMPANY WHO DID THAT.

03:58PM  14   Q.   AND DID YOU RECALL THAT THE DOCUMENT REFERRED TO HAVING

03:58PM  15   CLAIMS SUBSTANTIATED ON THE WEBSITE?

03:58PM  16   A.   I DO.

03:58PM  17   Q.   AND IN OTHER WORDS, DO YOU RECALL THAT THE LAWYERS WERE

03:58PM  18   SAYING, BEFORE WE SIGN OFF ON THIS BEING RUN, WE WOULD LIKE TO

03:58PM  19   SEE SOME SUBSTANTIATION?

03:58PM  20   A.   I DO.

03:58PM  21   Q.   AND WAS THAT A COMMON PROCESS THAT YOU OBSERVED AT

03:58PM  22   THERANOS?

03:58PM  23   A.   YES.

03:58PM  24   Q.   AND DO YOU KNOW WHETHER SPECIFICALLY IN CONNECTION WITH

03:59PM  25   THE CONCERNS THAT WERE RAISED IN THAT EMAIL SUBSTANTIATION WAS

HOLMES REDIRECT BY MR. DOWNEY                                    8564

03:59PM  1      PROVIDED TO THE LAWYERS?

03:59PM  2      A.   I DO.  I KNOW THERE WAS MUCH ONGOING DISCUSSION AFTER

03:59PM  3      THAT.

03:59PM  4      Q.   AND WHO WAS IN CHARGE OF COORDINATING THE PROCESS OF ENTRY

03:59PM  5      OF CHANGES INTO THE WEBSITE BEFORE IT WENT LIVE?

03:59PM  6      A.   ONE OF OUR PROJECT MANAGERS OR A FEW OF OUR PROJECT

03:59PM  7      MANAGERS IN COMMUNICATION WITH OUR TECHNICAL TEAM, THE

03:59PM  8      REGULATORY TEAM, THE LEGAL TEAM, AND THE MARKETING TEAM.

03:59PM  9      Q.   ALL RIGHT.  NOW I WANT TO ASK YOU ABOUT SOME OF THE TEXTS

03:59PM  10     THAT MR. LEACH REVIEWED WITH YOU BETWEEN YOURSELF AND

03:59PM  11     MR. BALWANI.

03:59PM  12          DO YOU RECALL DISCUSSING THAT DURING THE COURSE OF YOUR --

03:59PM  13     A.   I DO.

03:59PM  14     Q.   -- EXAMINATION?

03:59PM  15          ONE SERIES OF TEXTS --

03:59PM  16               THE COURT:  EXCUSE ME, MR. DOWNEY.  I'M SORRY.

04:00PM  17     SHOULD WE BREAK FOR THE AFTERNOON?  IS THIS GOING TO BE --

04:00PM  18               MR. DOWNEY:  OH, IT'S LATER THAN I REALIZED IT WAS,

04:00PM  19     YOUR HONOR.

04:00PM  20               THE COURT:  NO, IT'S QUITE ALL RIGHT.  IT SOUNDS

04:00PM  21     LIKE THIS WILL BE A BIT OF A LENGTH.

04:00PM  22               MR. DOWNEY:  PROBABLY TOO LONG TO KEEP THE JURY,

04:00PM  23     YEAH.

04:00PM  24               THE COURT:  LET'S TAKE OUR EVENING RECESS, LADIES

04:00PM  25     AND GENTLEMEN.  LET'S RESUME OUR REDIRECT EXAMINATION TOMORROW

8565

| | | |
|---|---|---|
| 04:00PM | 1 | MORNING AT 9:00 A.M. |
| 04:00PM | 2 | I'M GOING TO ASK YOU TO CONTINUE TO BE SUCCESSFUL IN YOUR |
| 04:00PM | 3 | EFFORTS NOT TO DISCUSS, LEARN, DO ANY RESEARCH ABOUT THIS CASE, |
| 04:00PM | 4 | NOR FORM ANY OPINION ABOUT IT OVERNIGHT. |
| 04:00PM | 5 | I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER OR NOT ANY OF |
| 04:00PM | 6 | THOSE THINGS HAVE HAPPENED. |
| 04:00PM | 7 | WE'LL BE IN RECESS.  TOMORROW IS A 4:00 P.M. DAY, I |
| 04:00PM | 8 | BELIEVE.  I BELIEVE WE'RE GOING UNTIL 4:00 P.M. TOMORROW. |
| 04:00PM | 9 | I'LL HAVE AN UPDATE.  I'M GOING TO TALK WITH THE LAWYERS |
| 04:00PM | 10 | TONIGHT WHEN YOU LEAVE AND A LITTLE TOMORROW MORNING AND GIVE |
| 04:00PM | 11 | YOU AN UPDATE ON SCHEDULING.  I KNOW THAT MAY BE ON YOUR MIND. |
| 04:00PM | 12 | SO HAVE A GOOD EVENING AND WE'LL SEE YOU TOMORROW MORNING. |
| 04:01PM | 13 | HAVE A GOOD NIGHT. |
| 04:01PM | 14 | YOU MAY STAND DOWN, MS. HOLMES. |
| 04:01PM | 15 | (JURY OUT AT 4:01 P.M.) |
| 04:01PM | 16 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 04:01PM | 17 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 04:01PM | 18 | EVENING. |
| 04:01PM | 19 | SO COUNSEL, LET ME JUST CHECK IN.  FIRST OF ALL, ON |
| 04:01PM | 20 | SCHEDULE, WHAT CAN I TELL -- WHAT DO YOU THINK I COULD TELL THE |
| 04:01PM | 21 | JURY NOW?  IS IT PREMATURE TO GIVE THEM AN UPDATE ON OUR |
| 04:01PM | 22 | SCHEDULE? |
| 04:01PM | 23 | I KNOW THAT'S A REALLY TROUBLESOME QUESTION, ISN'T IT?  IT |
| 04:02PM | 24 | REQUIRES SOME THOUGHT. |
| 04:02PM | 25 | MR. DOWNEY:  WELL, WITH MS. HOLMES I ONLY HAVE ABOUT |

**ER-12136**

8566

04:02PM  1    HALF AN HOUR, I WOULD SAY, AND I DON'T KNOW HOW LONG MR. LEACH

04:02PM  2    PLANS TO TAKE.

04:02PM  3            THE COURT:  OKAY.

04:02PM  4            MR. DOWNEY:  I IMAGINE NOT LONG ON HIS RECROSS.

04:02PM  5            THE COURT:  THANK YOU.

04:02PM  6            MR. LEACH:  LIMITED, YOUR HONOR.

04:02PM  7            THE COURT:  OKAY.  AND THEN YOU MIGHT HAVE ANOTHER

04:02PM  8    WITNESS TO CALL?

04:02PM  9            MR. DOWNEY:  WE'LL SEE WHERE WE ARE AT THE END OF

04:02PM 10    THE DEFENDANT'S TESTIMONY, BUT I WANT TO LOOK AT THE TRANSCRIPT

04:02PM 11    TONIGHT AND SEE WHERE WE ARE AS TO OTHER WITNESSES.

04:02PM 12            THE COURT:  OKAY.  OKAY.

04:02PM 13            MR. DOWNEY:  SO I MIGHT HAVE AN UPDATE ON THAT AS

04:02PM 14    SOON AS WHEN MS. HOLMES FINISHES.

04:02PM 15            THE COURT:  OKAY.  AND THEN WE STILL HAVE SOME

04:02PM 16    CONVERSATION REGARDING INSTRUCTIONS.  WE STILL NEED TO DO THAT.

04:02PM 17            MR. DOWNEY:  YES.

04:02PM 18            THE COURT:  LET'S NOT SCHEDULE SOMETHING NOW.  I

04:02PM 19    JUST WANT TO PUT IT ON YOUR RADAR.  WE NEED TO BE LOOKING AT A

04:02PM 20    SCHEDULE WHEN WE CAN COMPLETE OUR DISCUSSIONS.

04:02PM 21        MY SENSE IS THAT YOU'VE BEEN SUCCESSFULLY MEETING AND

04:02PM 22    CONFERRING REGARDING OUR LAST CONVERSATION ON FRIDAY.

04:02PM 23            MR. LEACH:  I THINK THAT'S GENERALLY FAIR,

04:02PM 24    YOUR HONOR.

04:02PM 25            MR. DOWNEY:  I THINK WE FEEL THAT WAY BECAUSE WE'RE

04:03PM  1    NOT DIRECTLY PARTICIPATING IN IT, BUT WE FEEL IT'S GOING VERY

04:03PM  2    WELL, YES.

04:03PM  3         (LAUGHTER.)

04:03PM  4         MR. LEACH:  SHARING WITH MY COLLEAGUES, YOUR HONOR,

04:03PM  5    WE SENT A FORMAT OF A DRAFT ON FRIDAY AFTER OUR HEARING.  WE

04:03PM  6    RECEIVED SOME RESPONSES ON SUNDAY, WHICH WE'RE STILL REVIEWING.

04:03PM  7         THE COURT:  SURE.

04:03PM  8         MR. LEACH:  AND A FEW OTHER FILINGS WITHIN THE LAST

04:03PM  9    COUPLE OF DAYS WHICH HAVE CAUGHT OUR ATTENTION, TOO.

04:03PM 10    BUT WE ARE -- I WOULD -- I'M NOT SURE IF I WOULD USE THE

04:03PM 11    WORD "PRODUCTIVE," BUT WE'RE EXCHANGING DRAFTS AND WE'LL HAVE

04:03PM 12    SOMETHING TO PRESENT TO THE COURT IN THE NEAR FUTURE.

04:03PM 13         THE COURT:  THANK YOU.  I'M ASKING TO KEEP US GOING.

04:03PM 14    I KNOW SCHEDULES ARE IMPORTANT THIS TIME OF YEAR.

04:03PM 15    I KNOW WE'RE UNAVAILABLE NEXT TUESDAY AND WEDNESDAY.

04:03PM 16    SO, OKAY, ANYTHING FURTHER BEFORE WE BREAK?

04:03PM 17         MR. DOWNEY:  YOUR HONOR, JUST ONE ISSUE I MIGHT TALK

04:03PM 18    TO YOU AND MR. SCHENK ABOUT THAT RELATES TO SCHEDULING.

04:03PM 19         THE COURT:  A SCHEDULING ISSUE?  SURE, OKAY.

04:04PM 20    OKAY.  THANK YOU.  WE'LL SEE YOU TOMORROW.

04:04PM 21         THE CLERK:  COURT IS ADJOURNED.

04:04PM 22    (COURT ADJOURNED AT 4:04 P.M.)

23

24

25

1

2

3                              CERTIFICATE OF REPORTERS

4

5

6

7           WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                    IRENE RODRIGUEZ, CSR, CRR
                      CERTIFICATE NUMBER 8076
17

18

19                    LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
20

21                    DATED:  DECEMBER 7, 2021

22

23

24

25

8568

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-18-00258-EJD |
| | ) | |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| | ) | |
| VS. | ) | VOLUME 43 |
| | ) | |
| ELIZABETH A. HOLMES, | ) | DECEMBER 8, 2021 |
| | ) | |
| DEFENDANT. | ) | PAGES 8568 – 8660 |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

     (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
          TRANSCRIPT PRODUCED WITH COMPUTER

ER-12140

```
 1        A P P E A R A N C E S: (CONT'D)
 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   AMY SAHARIA
                                     SEEMA ROPER
 6                                   J.R. FLEURMONT
                                     RICHARD CLEARY
 7                                   PATRICK LOOBY
                                725 TWELFTH STREET, N.W.
 8                              WASHINGTON, D.C. 20005

 9                              LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
10                              ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
11

12     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
13
                                OFFICE OF THE U.S. ATTORNEY
14                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
15
                                WILLIAMS & CONNOLLY
16                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

17                              TBC
                                BY:  BRIAN BENNETT, TECHNICIAN
18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

DEFENDANT'S:


**ELIZABETH HOLMES**
REDIRECT EXAM BY MR. DOWNEY (RES.)        P. 8573
RECROSS-EXAM BY MR. LEACH                 P. 8615

UNITED STATES COURT REPORTERS

**ER-12142**

```
 1                          INDEX OF EXHIBITS

 2                                    IDENT.      EVIDENCE

 3       GOVERNMENT'S:

 4

 5

 6

 7       DEFENDANT'S:

 8       7476                                     8580
         14259                                    8581
 9       7586A, PAGE 1, LIMITED PURPOSE           8641
         13288A, LIMITED PURPOSE                  8641
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ER-12143**

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
|         | 1  | SAN JOSE, CALIFORNIA                    DECEMBER 8, 2021              |
| 09:04AM | 2  | P R O C E E D I N G S                                                |
| 09:04AM | 3  | (COURT CONVENED AT 9:04 A.M.)                                        |
| 09:04AM | 4  | (JURY IN AT 9:04 A.M.)                                               |
| 09:04AM | 5  | THE COURT:  WE ARE BACK ON THE RECORD IN THE HOLMES                  |
| 09:04AM | 6  | MATTER.  ALL LADIES AND GENTLEMEN OF THE JURY ARE PRESENT.           |
| 09:04AM | 7  | ALL COUNSEL ARE PRESENT, AND MS. HOLMES IS PRESENT.                  |
| 09:04AM | 8  | IN JUST A MOMENT I'LL ASK MS. HOLMES TO RESUME THE STAND.            |
| 09:04AM | 9  | LADIES AND GENTLEMEN, LET ME ASK YOU, DURING THE EVENING,            |
| 09:04AM | 10 | DID ANY OF YOU MEMBERS OF OUR JURY HAVE CAUSE TO COME ACROSS,        |
| 09:04AM | 11 | DISCUSS, LISTEN TO, READ OR SEE ANYTHING HAVING TO DO WITH THIS      |
| 09:04AM | 12 | CASE?  IF SO, PLEASE, RAISE YOUR HAND.                               |
| 09:04AM | 13 | THANK YOU.  I SEE NO HANDS.  THANK YOU VERY MUCH.                    |
| 09:05AM | 14 | MS. HOLMES, MAY I INVITE YOU BACK TO THE STAND, PLEASE.              |
| 09:05AM | 15 | PLEASE TAKE A SEAT.  MAKE YOURSELF COMFORTABLE AGAIN.                |
| 09:05AM | 16 | I'LL REMIND YOU THAT YOU'RE STILL UNDER OATH.                        |
| 09:05AM | 17 | THE WITNESS:  THANK YOU.                                             |
| 09:05AM | 18 | THE COURT:  YOU'RE WELCOME.  IF YOU COULD JUST STATE                 |
| 09:05AM | 19 | YOUR NAME, PLEASE.                                                   |
| 09:05AM | 20 | THE WITNESS:  MY NAME IS ELIZABETH HOLMES.                           |
| 09:05AM | 21 | **(DEFENDANT'S WITNESS, ELIZABETH HOLMES, WAS PREVIOUSLY**           |
| 09:05AM | 22 | **SWORN.)**                                                         |
| 09:05AM | 23 | THE COURT:  MR. DOWNEY, WOULD YOU LIKE TO CONTINUE?                  |
| 09:05AM | 24 | MR. DOWNEY:  YES, YOUR HONOR.  THANK YOU.                            |
| 09:05AM | 25 | ///                                                                 |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8573

| | | |
|---|---|---|
| 09:05AM | 1 | **REDIRECT EXAMINATION (RESUMED)** |
| 09:05AM | 2 | BY MR. DOWNEY: |
| 09:05AM | 3 | Q.   GOOD MORNING, MS. HOLMES. |
| 09:05AM | 4 | A.   GOOD MORNING. |
| 09:05AM | 5 | MR. DOWNEY:  YOUR HONOR, BEFORE I BEGIN, I'D LIKE TO |
| 09:05AM | 6 | TAKE CARE OF A HOUSEKEEPING MATTER RELATED TO MS. HOLMES'S |
| 09:05AM | 7 | EXAMINATION. |
| 09:05AM | 8 | YOUR HONOR WILL RECALL THAT I MOVED TO ADMIT |
| 09:06AM | 9 | EXHIBIT 13288, WHICH WAS THE FDA SUBMISSION IN CONNECTION WITH |
| 09:06AM | 10 | THE THERANOS 4.0 SYSTEM AND THE ASSAY, AND THAT WAS QUITE A |
| 09:06AM | 11 | LENGTHY DOCUMENT.  YOUR HONOR ASKED ME TO REDUCE IT TO ITS |
| 09:06AM | 12 | ESSENTIAL PARTS, WHICH I'VE DONE AND I'VE SHOWN TO MR. LEACH. |
| 09:06AM | 13 | I WILL MOVE TO ADMIT IT AS EXHIBIT 13288A AND SUGGEST, |
| 09:06AM | 14 | WITH THE GOVERNMENT'S CONSENT, REQUEST THE COURT STRIKE ANY |
| 09:06AM | 15 | PRIOR VERSION OF 13288 OR 13288A. |
| 09:06AM | 16 | THE COURT:  MR. LEACH? |
| 09:06AM | 17 | MR. LEACH:  YOUR HONOR, I RECEIVED THIS ABOUT |
| 09:06AM | 18 | 20 MINUTES AGO.  I DON'T OBJECT TO IT COMING IN FOR A |
| 09:06AM | 19 | NONHEARSAY PURPOSE, AND I WOULD JUST LIKE THE OPPORTUNITY TO |
| 09:06AM | 20 | REVIEW IT IN DUE COURSE TO SEE IF THERE ARE ADDITIONS FROM THE |
| 09:06AM | 21 | GOVERNMENT'S PERSPECTIVE. |
| 09:06AM | 22 | BUT SUBJECT TO THE PRIOR LIMITATIONS, I HAVE NO OBJECTION. |
| 09:06AM | 23 | MR. DOWNEY:  THAT'S FINE OF COURSE, YOUR HONOR. |
| 09:06AM | 24 | THE COURT:  ARE YOU GOING TO REFER TO THIS? |
| 09:06AM | 25 | MR. DOWNEY:  NO. |

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8574

09:07AM   1          I JUST WANTED TO --

09:07AM   2                THE COURT:  THANK YOU FOR THAT.  WE'LL TAKE IT UNDER

09:07AM   3     SUBMISSION FOR ADMISSION.

09:07AM   4          MR. LEACH, I'LL GIVE YOUR TEAM AN OPPORTUNITY TO REVIEW

09:07AM   5     IT, EXCUSE ME, AND FORMALLY INTRODUCE IT.

09:07AM   6          THAT IS BEFORE YOUR CASE ENDS, WE'LL TAKE CARE OF THAT.

09:07AM   7                MR. LEACH:  THANK YOU, YOUR HONOR.

09:07AM   8                THE COURT:  ALSO, LET ME DRAW ATTENTION, SINCE WE'RE

09:07AM   9     DOING HOUSEKEEPING HERE, EXHIBIT 14259 WAS A DOCUMENT THAT WAS

09:07AM  10     AN EXHIBIT THAT WAS GOING TO BE INTRODUCED, I THINK.  WE HAD

09:07AM  11     SOME DISCUSSION ABOUT THAT.  THE COURT MADE A RULING ON IT

09:07AM  12     OUTSIDE OF THE PRESENCE OF THE JURY.

09:07AM  13          ARE YOU SEEKING ADMISSION OF THAT?

09:07AM  14                MR. DOWNEY:  WE ARE, YOUR HONOR.  AND I WAS GOING TO

09:07AM  15     HAVE -- JUST DO A BRIEF MOTION TO MOVE THE ADMISSION OF THAT IN

09:07AM  16     A FEW MOMENTS.

09:07AM  17                THE COURT:  ALL RIGHT.  THAT'S FINE.  I JUST WANTED

09:07AM  18     TO REMIND THE PARTIES OF THAT.

09:07AM  19     BY MR. DOWNEY:

09:07AM  20     Q.   MS. HOLMES, DO YOU RECALL THAT ON YOUR CROSS-EXAMINATION,

09:07AM  21     MR. LEACH WAS ASKING YOU ABOUT THE STATE OF THERANOS'S

09:08AM  22     RELATIONSHIP WITH WALGREENS IN 2014 AND 2015?

09:08AM  23     A.   I DO.

09:08AM  24     Q.   AND DO YOU RECALL THAT HE SHOWED YOU AN EMAIL THAT

09:08AM  25     MR. JHAVERI SENT TO MR. BALWANI IN AUGUST OF 2014 THAT

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8575

09:08AM  1   IDENTIFIED PATIENT SUCCESS AND SATISFACTION AS ONE OF THE

09:08AM  2   CRITERIA FOR THE PARTNERSHIP GOING FORWARD?

09:08AM  3   A.   I DO.

09:08AM  4   Q.   NOW, I THINK YOU TESTIFIED ON YOUR DIRECT EXAMINATION THAT

09:08AM  5   YOU RECEIVED FEEDBACK ABOUT THERANOS'S PERFORMANCE AT WALGREENS

09:08AM  6   PERIODICALLY.

09:08AM  7   A.   YES.

09:08AM  8   Q.   LET ME ASK YOU TO LOOK AT AN EXHIBIT, WHICH IS 7586A.

09:08AM  9        YOUR HONOR, MAY I APPROACH THE WITNESS?

09:08AM  10            THE COURT:  YES.

09:09AM  11  BY MR. DOWNEY:

09:09AM  12  Q.   (HANDING.)

09:09AM  13  A.   THANK YOU.

09:09AM  14  Q.   AND DO YOU SEE THAT 7586A IS AN EMAIL FROM SOMEONE NAMED

09:09AM  15  RYAN KARPEL TO YOU FROM AUGUST OF 2015, AND IT ATTACHES -- HAS

09:09AM  16  AN ATTACHMENT TO IT?

09:09AM  17  A.   I DO.

09:09AM  18  Q.   AND IS THIS SOMETHING THAT YOU RECEIVED IN OR AROUND

09:09AM  19  AUGUST OF 2015?

09:09AM  20  A.   YES.

09:09AM  21  Q.   IS IT SOMETHING THAT YOU REVIEWED AT THAT TIME?

09:09AM  22  A.   IT IS.

09:09AM  23  Q.   AND DOES THIS ATTACHMENT CONTAIN -- IS THIS A REDACTED

09:09AM  24  VERSION OF FEEDBACK FROM PATIENTS ABOUT THEIR EXPERIENCES AT

09:10AM  25  WALGREENS?

| | | |
|---|---|---|
| 09:10AM | 1 | A.   YES. |
| 09:10AM | 2 | MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF |
| 09:10AM | 3 | 7586A. |
| 09:10AM | 4 | MR. LEACH:  YOUR HONOR, 401, 403, AND I BELIEVE THIS |
| 09:10AM | 5 | WAS PART OF AN EARLIER DISCUSSION. |
| 09:11AM | 6 | (PAUSE IN PROCEEDINGS.) |
| 09:11AM | 7 | THE COURT:  MR. DOWNEY, I'M GOING TO NEED SOME |
| 09:11AM | 8 | CONVERSATION WITH YOU ABOUT THIS BEFORE I ADMIT IT. |
| 09:11AM | 9 | IS IT POSSIBLE FOR YOU TO MOVE TO ANOTHER TOPIC? |
| 09:11AM | 10 | MR. DOWNEY:  IT CERTAINLY IS, YOUR HONOR.  AND WE |
| 09:11AM | 11 | CAN DO THAT AT A BREAK. |
| 09:12AM | 12 | THE COURT:  THANK YOU. |
| 09:12AM | 13 | BY MR. DOWNEY: |
| 09:12AM | 14 | Q.   LET ME ASK YOU, THE DOCUMENT THAT IS 7586A IS SOMETHING |
| 09:12AM | 15 | THAT INFORMED YOUR VIEWS ABOUT CURRENT AND FUTURE PROSPECTS |
| 09:12AM | 16 | ABOUT A ROLLOUT OF THERANOS SERVICE CENTERS AT WALGREENS |
| 09:12AM | 17 | STORES? |
| 09:12AM | 18 | A.   IT DID. |
| 09:12AM | 19 | Q.   NOW, THE TIME PERIOD THAT YOU WERE DISCUSSING WITH |
| 09:12AM | 20 | MR. LEACH ON YOUR CROSS-EXAMINATION RELATED TO HOW THE |
| 09:12AM | 21 | PARTNERSHIP WITH WALGREENS WAS GOING WAS THE FALL OF 2014. |
| 09:12AM | 22 | DO YOU RECALL THAT? |
| 09:12AM | 23 | A.   I DO. |
| 09:12AM | 24 | Q.   I'D LIKE TO ASK YOU TO LOOK AT ANOTHER EXHIBIT FROM THAT |
| 09:12AM | 25 | TIME PERIOD. |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                    8577

09:12AM   1        YOUR HONOR, MAY I APPROACH THE WITNESS AGAIN?

09:12AM   2              THE COURT:  YES.

09:12AM   3    BY MR. DOWNEY:

09:12AM   4    Q.   (HANDING.)

09:12AM   5    A.   THANK YOU.

09:12AM   6    Q.   AND DO YOU SEE WHEN YOU LOOK AT THE ADDRESS ON THE FIRST

09:13AM   7    PAGE OF THIS DOCUMENT THAT IT'S AN EMAIL FROM JEFFREY BLICKMAN?

09:13AM   8    A.   YES.

09:13AM   9    Q.   AND THAT YOU AND SEVERAL OTHERS AT THERANOS ARE RECIPIENTS

09:13AM  10    OF THE EMAIL?

09:13AM  11    A.   I DO.

09:13AM  12    Q.   AND CAN -- DO YOU RECOGNIZE THIS DOCUMENT?

09:13AM  13    A.   I DO.

09:13AM  14    Q.   AND WHAT IS THE DOCUMENT?

09:13AM  15    A.   IT'S A POWERPOINT PRESENTATION THAT WAS SENT TO US SHOWING

09:14AM  16    THE FEEDBACK FROM PEOPLE IN THE STORES, POSITIVE AND NEGATIVE,

09:14AM  17    THAT WAS BEING COLLECTED.

09:14AM  18    Q.   AND WHO PREPARED AND SENT THIS DOCUMENT TO YOU?

09:14AM  19    A.   I BELIEVE IT'S ORIGINALLY PREPARED BY THE PROJECT MANAGERS

09:14AM  20    WHO WERE INTERFACING WITH PEOPLE IN ARIZONA, AND THEN

09:14AM  21    JEFF BLICKMAN, WHO IS ANOTHER ONE OF THE PROJECT MANAGEMENT

09:14AM  22    TEAM, SENT IT TO ME.

09:14AM  23              MR. DOWNEY:  OKAY.

09:14AM  24        YOUR HONOR, I MOVE THE ADMISSION OF 7476.

09:14AM  25              MR. LEACH:  SAME OBJECTIONS, 401, 403, AND I THINK

                    UNITED STATES COURT REPORTERS

                           **ER-12149**

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8578

09:14AM   1    THIS IS THE SAME WITH THE PRIOR EXHIBIT.

09:15AM   2         (PAUSE IN PROCEEDINGS.)

09:15AM   3              THE COURT:  MR. DOWNEY, I THINK THE DEFENSE HAD AN

09:15AM   4    EXHIBIT PREVIOUSLY THAT WAS SIMILAR TO THIS.

09:15AM   5              MR. DOWNEY:  THERE WERE SOME EXHIBITS INTRODUCED

09:15AM   6    THROUGH MR. JHAVERI WHO WAS PRIVY TO THE SAME TYPES OF

09:15AM   7    COMMUNICATIONS.

09:15AM   8         I DON'T THINK THE EMAIL THAT IS ON THE FIRST PAGE OF THE

09:15AM   9    EXHIBIT REFLECTING THE TRANSMISSION IS PART OF THE RECORD.

09:15AM  10              THE COURT:  RIGHT.  I'M TRYING TO -- I JUST DON'T

09:15AM  11    HAVE IT AT MY FINGERTIPS NOW.

09:15AM  12         MAYBE, MR. LEACH, YOU RECALL WHETHER OR NOT THERE WERE

09:15AM  13    SIMILAR DOCUMENTS THAT WERE INTRODUCED AT SOME OTHER TIME.

09:15AM  14         MR. DOWNEY, DO YOU KNOW?

09:15AM  15              MR. DOWNEY:  I THINK MR. JHAVERI'S TESTIMONY IS WHEN

09:15AM  16    SOME SIMILAR DOCUMENTS WITH THE, WITH THE FEEDBACK, FOR

09:15AM  17    EXAMPLE, THERE'S SOME GRAPHIC IMAGES.

09:15AM  18              THE COURT:  RIGHT.

09:15AM  19              MR. DOWNEY:  I THINK THAT WAS DURING HIS TESTIMONY

09:15AM  20    BACK SEVERAL MONTHS AGO.

09:15AM  21              THE COURT:  MR. LEACH, DO YOU HAVE RECOLLECTION OF

09:15AM  22    THIS?

09:15AM  23              MR. LEACH:  I DON'T, YOUR HONOR.  I APOLOGIZE.

09:16AM  24              THE COURT:  OKAY.  AND THESE WOULD BE INTRODUCED FOR

09:16AM  25    WHAT PURPOSE?

HOLMES REDIRECT BY MR. DOWNEY (RES.)

```
09:16AM   1              MR. DOWNEY:  THIS IS FOR HER UNDERSTANDING OF THE
09:16AM   2    STATE OF THE THERANOS/WALGREENS PARTNERSHIP AT THE TIME THAT --
09:16AM   3    OTHER DOCUMENTS WERE INTRODUCED YESTERDAY ON THE SAME ISSUE BY
09:16AM   4    MR. LEACH.
09:16AM   5              THE COURT:  SO THIS IS NOT INTRODUCED FOR THE TRUTH
09:16AM   6    OF THE MATTERS ASSERTED HERE, BUT YOU'RE SUGGESTING THAT THIS
09:16AM   7    IS -- THE RELEVANCE OF THIS IS TO SHOW WHETHER OR NOT THIS
09:16AM   8    INFORMED MS. HOLMES AS TO HER KNOWLEDGE OF THE WALGREENS
09:16AM   9    ENDEAVOR AT THIS PARTICULAR MOMENT IN TIME?
09:16AM  10              MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.  AND I DON'T
09:16AM  11    HAVE THE EXHIBIT AT MY FINGERTIPS, BUT I ACTUALLY THINK THAT
09:16AM  12    THE ATTACHMENTS, AT LEAST A SUBSTANTIAL PART OF THEM, WAS, AS
09:17AM  13    YOUR HONOR SAYS, ALREADY INTRODUCED, AND I'LL GET THE EXHIBIT
09:17AM  14    NUMBER AT A BREAK.
09:17AM  15         REALLY THE POINT OF THIS IS JUST TO REFLECT THAT IT WAS
09:17AM  16    COMMUNICATED TO MS. HOLMES.
09:17AM  17              THE COURT:  ALL RIGHT.  THANK YOU.
09:17AM  18         I'LL ADMIT IT FOR THAT LIMITED PURPOSE.
09:17AM  19         LADIES AND GENTLEMEN, THE DOCUMENTS THAT YOU'RE ABOUT TO
09:17AM  20    SEE, AND THEY CONSIST OF CHARTS AND GRAPHS AND THINGS, THEY'RE
09:17AM  21    ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE
09:17AM  22    DOCUMENTS BUT THEIR RELEVANCE, AND THEY'RE ADMITTED ONLY AS TO
09:17AM  23    THE ISSUE OF MS. HOLMES'S KNOWLEDGE, STATE OF MIND AS TO THE
09:17AM  24    MERGER, THE WALGREENS ENGAGEMENT AT THIS PARTICULAR MOMENT IN
09:17AM  25    TIME.
```

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                    8580

09:17AM    1          AND THEY WILL BE ADMITTED FOR THAT LIMITED PURPOSE.

09:17AM    2          THEY CAN BE PUBLISHED.

09:17AM    3          (DEFENDANT'S EXHIBIT 7476, LIMITED PURPOSE, WAS RECEIVED

09:17AM    4     IN EVIDENCE.)

09:17AM    5               MR. DOWNEY:  IF WE CAN DISPLAY THE EMAIL ON THE

09:17AM    6     COVER.

09:18AM    7     Q.   AND IF YOU LOOK, DO YOU SEE THAT THIS IS AN EMAIL THAT

09:18AM    8     MR. BLICKMAN SENT TO YOU IN OCTOBER OF 2014?

09:18AM    9     A.   YES.

09:18AM   10     Q.   AND DO YOU SEE IN THE FIRST PARAGRAPH HE INDICATES THAT

09:18AM   11     HE'S ATTACHING EXPERIENCE SURVEY RESULTS FOR ESSENTIALLY THE

09:18AM   12     MONTH OF SEPTEMBER?

09:18AM   13     A.   I DO.

09:18AM   14     Q.   AND THEN IF YOU GO TO THE ATTACHMENTS ON PAGE 2, DO YOU

09:18AM   15     SEE THAT THERE'S AN EXPERIENCE SURVEY SUMMARY?

09:18AM   16     A.   YES.

09:18AM   17     Q.   AND IN YOUR UNDERSTANDING, DID THIS RESULT FROM PATIENTS

09:18AM   18     GRADING THEIR EXPERIENCE ON A SCALE OF 1 TO 5 FOR VARIOUS

09:18AM   19     FACTORS?

09:18AM   20     A.   IT DID.

09:18AM   21     Q.   AND DID YOU UNDERSTAND THAT, AS OF OCTOBER 2014, THAT THIS

09:18AM   22     WAS THE LEVEL OF PATIENT SATISFACTION FOR PATIENTS WHO HAD

09:18AM   23     VISITED DURING THE MONTH OF SEPTEMBER?

09:19AM   24     A.   I DID.

09:19AM   25     Q.   OKAY.  YOU CAN TAKE THAT DOWN, MR. BENNETT.

UNITED STATES COURT REPORTERS

8581
HOLMES REDIRECT BY MR. DOWNEY (RES.)

09:19AM   1          DO YOU RECALL EARLIER IN THE TRIAL THAT MS. TOMPKINS

09:19AM   2    TESTIFIED, WHO WAS A PATIENT WHO GOT AN HIV TEST AT A THERANOS

09:19AM   3    SERVICE CENTER?

09:19AM   4    A.   I DO.

09:19AM   5    Q.   AND DO YOU KNOW WHETHER THE HIV TEST AT THERANOS WAS

09:19AM   6    OFFERED ON THERANOS PROPRIETARY EQUIPMENT OR ON A COMMERCIAL

09:19AM   7    MACHINE?

09:19AM   8    A.   IT WAS ON A COMMERCIAL MACHINE.

09:19AM   9    Q.   I'D LIKE TO DISPLAY EXHIBIT --

09:19AM  10          I'D LIKE TO MOVE EXHIBIT 14259 INTO EVIDENCE, WHICH IS THE

09:19AM  11    EXHIBIT THAT YOUR HONOR MENTIONED EARLIER THIS MORNING.

09:19AM  12               THE COURT:   THAT WILL BE ADMITTED.

09:19AM  13          (DEFENDANT'S EXHIBIT 14259 WAS RECEIVED IN EVIDENCE.)

09:19AM  14               MR. LEACH:   YOUR HONOR, I DON'T OBJECT TO ADMISSION

09:19AM  15    OF THE DOCUMENT.

09:19AM  16          I DO THINK THAT THIS IS BEYOND THE SCOPE OF THE DIRECT --

09:19AM  17    OF THE CROSS.

09:19AM  18               MR. DOWNEY:   WELL, THAT'S FINE.  I WON'T DISPLAY IT.

09:20AM  19    WE CAN DISCUSS IT LATER.

09:20AM  20               THE COURT:   THAT'S FINE.

09:20AM  21    BY MR. DOWNEY:

09:20AM  22    Q.   NOW, DO YOU RECALL THAT DURING THE CROSS-EXAMINATION THAT

09:20AM  23    YOU -- WHERE YOU AND MR. LEACH HAD A DISCUSSION ABOUT SOME TEXT

09:20AM  24    MESSAGES RELATED TO THE WALGREENS/THERANOS RELATIONSHIP FROM

09:20AM  25    NOVEMBER OF 2014?

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                8582

| | | |
|---|---|---|
| 09:20AM | 1 | A.   I DO. |
| 09:20AM | 2 | Q.   AND DO YOU REMEMBER THAT ONE OF THOSE TEXT MESSAGES FROM |
| 09:20AM | 3 | MR. BALWANI SAID TO YOU, "WE CAN'T SCALE WITH WAG"? |
| 09:20AM | 4 | DO YOU RECALL THAT? |
| 09:20AM | 5 | A.   I DO. |
| 09:20AM | 6 | Q.   AND WAG WAS A REFERENCE THERE TO WALGREENS? |
| 09:20AM | 7 | A.   YES. |
| 09:20AM | 8 | Q.   NOW, DURING THE SAME PERIOD THAT YOU RECEIVED THAT TEXT |
| 09:20AM | 9 | FROM MR. BALWANI, WERE YOU ALSO IN CONTACT WITH SENIOR |
| 09:20AM | 10 | EXECUTIVES FROM WALGREENS? |
| 09:20AM | 11 | A.   YES. |
| 09:20AM | 12 | Q.   AND WAS ONE OF THOSE INDIVIDUALS ALEX GOURLAY? |
| 09:21AM | 13 | A.   YES. |
| 09:21AM | 14 | Q.   AND WAS HE AN ULTIMATE DECISION-MAKER WITH REGARD TO THE |
| 09:21AM | 15 | THERANOS/WALGREENS PARTNERSHIP? |
| 09:21AM | 16 | A.   HE WAS. |
| 09:21AM | 17 | Q.   AFTER THE DATE OF MR. BALWANI'S TEXT TO YOU ON |
| 09:21AM | 18 | NOVEMBER 19TH, 2014, DID YOU MEET WITH MR. GOURLAY TO DISCUSS |
| 09:21AM | 19 | THE STATE OF THE THERANOS/WALGREENS PARTNERSHIP? |
| 09:21AM | 20 | A.   I DID. |
| 09:21AM | 21 | Q.   WHEN DID YOU HAVE THAT MEETING? |
| 09:21AM | 22 | A.   IN DECEMBER 2014. |
| 09:21AM | 23 | Q.   AND CAN YOU DESCRIBE WHAT HAPPENED AT THAT MEETING? |
| 09:21AM | 24 | A.   YES.  WE DISCUSSED MOVING FORWARD WITH A RENT MODEL IN |
| 09:21AM | 25 | WHICH THERANOS WOULD TAKE OWNERSHIP OF THE SPACES IN THE STORE |

| | | |
|---|---|---|
| 09:21AM | 1 | SO THAT THEY COULD BE DESIGNED AND CUSTOMIZED FOR THE |
| 09:21AM | 2 | EXPERIENCE THAT WE WERE TRYING TO BUILD AND PROCEED WITH A |
| 09:21AM | 3 | NATIONAL ROLLOUT. |
| 09:21AM | 4 | Q.   WAS WALGREENS AMENABLE TO THAT PROPOSAL? |
| 09:21AM | 5 | A.   YES. |
| 09:21AM | 6 | Q.   YOU WERE ALSO ASKED IN THE SAME SEQUENCE OF QUESTIONS BY |
| 09:22AM | 7 | MR. LEACH ABOUT INTERACTIONS THAT MR. BALWANI WAS HAVING WITH |
| 09:22AM | 8 | CVS. |
| 09:22AM | 9 | DO YOU RECALL THAT? |
| 09:22AM | 10 | A.   I DO. |
| 09:22AM | 11 | Q.   AND YOU TESTIFIED THAT THAT WAS HAPPENING DURING THE |
| 09:22AM | 12 | COURSE OF YOUR PARTNERSHIP WITH WALGREENS TO ROLL OUT THERANOS |
| 09:22AM | 13 | SERVICE CENTERS IN WALGREENS. |
| 09:22AM | 14 | DO YOU RECALL THAT? |
| 09:22AM | 15 | A.   YES. |
| 09:22AM | 16 | Q.   WAS YOUR -- WERE THE DISCUSSIONS THAT THERANOS WAS HAVING |
| 09:22AM | 17 | WITH CVS INCONSISTENT WITH ANY OBLIGATIONS THAT THERANOS HAD TO |
| 09:22AM | 18 | WALGREENS? |
| 09:22AM | 19 | A.   NO. |
| 09:22AM | 20 | Q.   WHY WERE YOU HAVING DISCUSSIONS WITH CVS AT THE SAME TIME |
| 09:22AM | 21 | THAT YOU WERE IN PARTNERSHIP WITH WALGREENS? |
| 09:22AM | 22 | A.   THAT PARTICULAR DISCUSSION, I THINK, HAD TO DO WITH THE |
| 09:22AM | 23 | DEPLOYMENT FOR BLUE CROSS BLUE SHIELD INSURANCE CONTRACT THAT |
| 09:22AM | 24 | WE HAD IN PENNSYLVANIA, AND WALGREENS DID NOT WANT TO OPEN |
| 09:22AM | 25 | STORES IN THAT GEOGRAPHY, SO WE WERE PROCEEDING WITH CVS |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8584

09:23AM  1    ACCORDING TO THE TERMS OF OUR CONTRACT WITH WALGREENS.

09:23AM  2    Q.   AND DID YOU DISCLOSE THAT TO WALGREENS?

09:23AM  3    A.   YES.

09:23AM  4    Q.   I WANT TO TURN FROM TALKING ABOUT WALGREENS TO TALKING

09:23AM  5    ABOUT THE PROCESS OF DEVELOPING THE 4.0 SERIES DEVICE AT

09:23AM  6    THERANOS AND THE QUESTIONS THAT MR. LEACH ASKED YOU ABOUT THAT.

09:23AM  7        DO YOU RECALL THAT MR. LEACH SHOWED YOU THE DOCUMENT THAT

09:23AM  8    I HAD SHOWED YOU ON DIRECT EXAMINATION, WHICH WAS A

09:23AM  9    PRESENTATION THAT DR. GIBBONS GAVE IN FEBRUARY OF 2010?

09:23AM  10   A.   I DO.

09:23AM  11   Q.   AND DO YOU RECALL THAT MR. LEACH ASKED YOU, WAS THAT THE

09:23AM  12   MONTH PRIOR TO THE TIME THAT YOU HAD MET WITH WALGREENS AND

09:23AM  13   SAFEWAY, AND YOU ANSWERED THAT IT WAS?

09:23AM  14   A.   YES.

09:23AM  15   Q.   WAS THE PRESENTATION THAT YOU RECEIVED FROM DR. GIBBONS

09:23AM  16   THE FIRST TIME THAT THERE WAS A DISCUSSION INSIDE OF THERANOS

09:23AM  17   ABOUT EXPANDING THE CAPABILITIES OF THERANOS SYSTEMS?

09:23AM  18   A.   NO.

09:23AM  19   Q.   WAS THERE A PROCESS THAT WAS ONGOING AS OF FEBRUARY 2010?

09:24AM  20   A.   THERE WAS.

09:24AM  21   Q.   HOW LONG HAD THAT PROCESS BEEN ONGOING AT THERANOS AT THAT

09:24AM  22   TIME?

09:24AM  23   A.   SINCE 2008.

09:24AM  24   Q.   NOW, MR. LEACH MENTIONED THE CONVERSATIONS THAT YOU HAD IN

09:24AM  25   CLOSE PROXIMITY TO THE POWERPOINT PRESENTATION BY DR. GIBBONS.

HOLMES REDIRECT BY MR. DOWNEY (RES.)

09:24AM   1          I'D LIKE TO ASK YOU WHETHER YOU TALKED TO SCIENTISTS AND

09:24AM   2     ENGINEERS AT WALGREENS BEFORE YOU MET WITH THOSE ENTITIES TO

09:24AM   3     UNDERSTAND WHAT COULD AND COULD NOT BE REPRESENTED.

09:24AM   4          DID YOU DO THAT?

09:24AM   5     A.   SCIENTISTS AND ENGINEERS AT THERANOS?

09:24AM   6     Q.   YES.

09:24AM   7     A.   I DID.

09:24AM   8     Q.   I'D LIKE TO BRING UP EXHIBIT 7100, WHICH IS ALREADY IN

09:24AM   9     EVIDENCE.

09:24AM  10          AND I DIRECT YOUR ATTENTION TO THE BOTTOM EMAIL, WHICH IS

09:25AM  11     AN EMAIL FROM YOU TO DR. GIBBONS AND MR. BALWANI AND

09:25AM  12     MR. FRENZEL WAS COPIED.

09:25AM  13          DR. GIBBONS AND MR. FRENZEL WERE TWO OF THE PEOPLE WORKING

09:25AM  14     ON THE 4.0 SYSTEM?

09:25AM  15     A.   YES.

09:25AM  16     Q.   AND IN THE FIRST PARAGRAPH YOU SAY, "HERE'S THE GENERAL

09:25AM  17     CHEMISTRY PANEL WE WANT TO HAVE," AND THEN YOU LIST A SERIES OF

09:25AM  18     TESTS.

09:25AM  19          DO YOU RECALL SENDING THAT TO DR. GIBBONS AND MR. FRENZEL?

09:25AM  20     A.   I DO.

09:25AM  21     Q.   AND WHAT WAS YOUR PURPOSE IN SENDING THESE EMAILS TO THEM?

09:25AM  22     A.   THESE WERE TESTS WE WANTED TO DISCUSS WITH OUR RETAIL

09:25AM  23     PARTNERS, AND I WANTED TO MAKE SURE BEFORE SAYING WE COULD DO

09:25AM  24     THEM THAT OUR SCIENTISTS AND ENGINEERS BELIEVED WE COULD ON THE

09:25AM  25     TIMEFRAME THAT WE WERE DISCUSSING WITH THE RETAIL PARTNERS.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8586

09:25AM   1      Q.   AND LET'S LOOK AT THE RESPONSE TO THAT ABOVE.

09:25AM   2           AND DO YOU SEE THAT DR. GIBBONS RESPONDED TO YOU IN THIS

09:25AM   3      EMAIL FROM FEBRUARY OF 2010?

09:26AM   4      A.   I DO.

09:26AM   5      Q.   AND DO YOU SEE THE FIRST PARAGRAPH WHERE HE RESPONDED,

09:26AM   6      "THE ATTACHED PRESENTS MY ANALYSIS OF HOW THE ANALYTES YOU

09:26AM   7      LISTED WOULD BE MEASURED IN SYSTEM 4.0.  ESSENTIALLY ALL ARE

09:26AM   8      POSSIBLE IN THE PROPOSED SYSTEM."

09:26AM   9           DO YOU SEE THAT?

09:26AM  10      A.   YES.

09:26AM  11      Q.   AND DID THAT INFORM REPRESENTATIONS THAT YOU SUBSEQUENTLY

09:26AM  12      MADE TO WALGREENS AND SAFEWAY ABOUT THE CAPABILITIES THAT

09:26AM  13      THERANOS WOULD BE ABLE TO DEVELOP?

09:26AM  14      A.   YES.

09:26AM  15      Q.   LET ME ALSO ASK YOU TO LOOK AT EXHIBIT 15004, WHICH IS

09:26AM  16      ALREADY IN EVIDENCE.

09:26AM  17           AND I WANT TO DIRECT YOUR ATTENTION TO THE EMAIL IN THE

09:26AM  18      MIDDLE OF THE PAGE.

09:26AM  19           DO YOU SEE THAT THIS IS AN EMAIL, AND IF YOU LOOK AT THE

09:26AM  20      TOP OF THE PAGE, ON THIS EXCHANGE ARE YOURSELF AND THEN

09:26AM  21      DR. YOUNG, AND MR. FRENZEL, AND DR. GIBBONS, AND OTHERS?

09:27AM  22      A.   YES.

09:27AM  23      Q.   OKAY.  LET'S RETURN TO THE MIDDLE.

09:27AM  24           AND THEN DO YOU SEE THAT YOU'VE LANDED AND YOU DIRECT A

09:27AM  25      QUESTION TO THAT GROUP AND SAY, "I WILL WANT TO HIGHLIGHT AND

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8587

09:27AM  1    QUANTIFY NUMERICALLY AS POSSIBLE."

09:27AM  2         AND YOU ASK A SERIES OF QUESTIONS.

09:27AM  3         DO YOU SEE THAT?

09:27AM  4    A.   I DO.

09:27AM  5    Q.   AND DO YOU SEE THE FIRST QUESTION IS, "WHY AND HOW OUR

09:27AM  6    PLATFORM WILL BE CAPABLE OF THE FULL RANGE OF ASSAYS AND BE AT

09:27AM  7    LEAST AS GOOD AS THE CRO."

09:27AM  8         DO YOU SEE THAT?

09:27AM  9    A.   I DO.

09:27AM 10    Q.   AND WHAT IS THE CRO?

09:27AM 11    A.   IT'S THE CONTRACT RESEARCH ORGANIZATION.  IN THIS CASE

09:27AM 12    IT'S THE TRADITIONAL LAB THAT WOULD OTHERWISE BE USED.

09:27AM 13    Q.   OKAY.  AND THEN IF WE LOOK ABOVE THAT EMAIL, DO YOU SEE

09:27AM 14    THAT DR. GIBBONS RESPONDED TO THAT QUESTION?

09:27AM 15    A.   YES.

09:27AM 16    Q.   AND DO YOU THINK -- DO YOU SEE THAT IN THE FIRST SENTENCE

09:27AM 17    HE SAYS, "I THINK WE HAVE DEMONSTRATED CAPABILITIES FULLY

09:27AM 18    EQUIVALENT TO LAB METHODS IN AREAS WHERE WE HAVE DONE ASSAY

09:28AM 19    DEVELOPMENT"?

09:28AM 20    A.   YES.

09:28AM 21    Q.   AND DO YOU SEE THAT HE THEN GOES ON TO COMPARE THE

09:28AM 22    THERANOS 4.0 SYSTEM FAVORABLY TO OTHER LABS AT THAT TIME?

09:28AM 23    A.   YES.

09:28AM 24    Q.   AND DO YOU SEE THE SUBJECT MATTER HERE IS GSK?

09:28AM 25    A.   YES.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8588

09:28AM   1    Q.   AND THAT'S A REFERENCE TO THE PHARMACEUTICAL COMPANY?

09:28AM   2    A.   IT IS.

09:28AM   3    Q.   AND DO YOU RECALL DISCUSSING GSK IN CONNECTION WITH THE

09:28AM   4    LOGO ISSUE YESTERDAY?

09:28AM   5    A.   I DO.

09:28AM   6    Q.   AND WAS THIS A PRESENTATION THAT YOU WERE MAKING TO THEM

09:28AM   7    AT THAT TIME?

09:28AM   8    A.   YES.

09:28AM   9    Q.   YOU CAN PUT THAT ASIDE.

09:28AM   10        I JUST WANT TO MAKE SURE THAT WE PROPERLY DATE SOME OF THE

09:28AM   11   DOCUMENTS THAT YOU WERE ASKED ABOUT YESTERDAY DURING YOUR

09:28AM   12   CROSS-EXAMINATION ABOUT WHEN TESTS WERE OFFERED IN THE LAB.

09:28AM   13        DO YOU RECALL HAVING DISCUSSION WITH MR. LEACH ABOUT THE

09:28AM   14   DATES ON WHICH TESTS REFERRED TO AS ISE'S BEGAN TO BE OFFERED

09:29AM   15   IN THE LAB?

09:29AM   16   A.   I DO.

09:29AM   17   Q.   AND THE ISE'S WERE SODIUM, CALCIUM, AND POTASSIUM?

09:29AM   18   A.   I THINK SO, YES.

09:29AM   19   Q.   AND HE SHOWED YOU A REPORT FROM DR. YOUNG.

09:29AM   20        DO YOU RECALL THAT?

09:29AM   21   A.   I DO.

09:29AM   22   Q.   AND THAT REPORT WAS FROM OCTOBER.

09:29AM   23        DO YOU RECALL THAT?

09:29AM   24   A.   YES.

09:29AM   25   Q.   WERE THOSE ASSAYS ULTIMATELY VALIDATED TO RUN ON THE

HOLMES REDIRECT BY MR. DOWNEY (RES.)                    8589

09:29AM   1      THERANOS PROPRIETARY ANALYZER?

09:29AM   2      A.   ON ONE OF OUR METHODS, YES.

09:29AM   3      Q.   LET ME SHOW YOU EXHIBIT 9086, WHICH IS ALREADY IN

09:29AM   4      EVIDENCE.

09:29AM   5           AND DO YOU RECOGNIZE THIS AS A VALIDATION REPORT FOR THE

09:29AM   6      CALCIUM ASSAY?

09:29AM   7      A.   I DO.

09:29AM   8      Q.   AND THIS CALCIUM ASSAY WAS TO BE RUN ON THE MODIFIED

09:29AM   9      DEVICE.

09:29AM   10          DO YOU SEE THAT?

09:29AM   11     A.   YES.

09:30AM   12     Q.   AND THEN BELOW DO YOU SEE SIGNATURES BY DR. YOUNG AND

09:30AM   13     DR. ROSENDORFF AT THE BOTTOM?

09:30AM   14     A.   I DO.

09:30AM   15     Q.   AND DO YOU SEE THAT THOSE ARE -- APPEAR TO BE DATED

09:30AM   16     NOVEMBER 7TH, 2013?

09:30AM   17     A.   YES.

09:30AM   18     Q.   SO WOULD THE CALCIUM ASSAY HAVE BEEN OFFERED ON THE

09:30AM   19     SIEMENS ANALYZER AT SOME POINT AFTER THAT DATE?

09:30AM   20     A.   IT WOULD HAVE.

09:30AM   21     Q.   LET ME ASK YOU TO LOOK NEXT AT EXHIBIT 9098.

09:30AM   22          AND DO YOU SEE THIS IS A VALIDATION REPORT FOR CHLORIDE?

09:30AM   23     A.   I DO.

09:30AM   24     Q.   AND DO YOU SEE THAT AT THE BOTTOM IT'S ALSO SIGNED BY

09:30AM   25     DR. YOUNG AND DR. ROSENDORFF?

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8590

09:30AM  1    A.   YES.

09:30AM  2    Q.   AND DO YOU SEE THAT THE LATER SIGNATURE IS DR. YOUNG'S ON

09:30AM  3    NOVEMBER 8TH?

09:30AM  4    A.   I DO.

09:30AM  5    Q.   AND WAS THIS ALSO VALIDATED AT THIS DATE FOR RUNNING ON

09:31AM  6    THE MODIFIED SIEMENS MACHINES?

09:31AM  7    A.   IT WAS.

09:31AM  8    Q.   AND TO YOUR KNOWLEDGE, NO ASSAYS WERE RUN PRIOR TO THE

09:31AM  9    TIME THAT THEY WERE VALIDATED BY DR. ROSENDORFF AT THIS TIME;

09:31AM  10   IS THAT RIGHT?

09:31AM  11   A.   CORRECT.

09:31AM  12   Q.   AND NO ASSAYS WERE EVER OFFERED IN THE CLIA LAB THAT

09:31AM  13   WEREN'T VALIDATED BY THE LAB DIRECTOR; CORRECT?

09:31AM  14   A.   THAT'S RIGHT.

09:31AM  15   Q.   AND IN EACH INSTANCE, A REVIEWER OR A RESEARCH AND

09:31AM  16   DEVELOPMENT PERSON LIKE DR. YOUNG WOULD ALSO REVIEW AND APPROVE

09:31AM  17   THE OFFERING OF THE ASSAY; IS THAT RIGHT?

09:31AM  18   A.   YES.

09:31AM  19   Q.   LET'S LOOK AT POTASSIUM NEXT AT EXHIBIT 9098.  THIS IS

09:31AM  20   ALREADY IN EVIDENCE ALSO.  IF WE COULD DISPLAY THE FIRST PAGE.

09:32AM  21          THE COURT:  WHAT IS THE EXHIBIT NUMBER?

09:32AM  22          MR. DOWNEY:  9098.

09:32AM  23          THE COURT:  THAT'S NOT WHAT WE WERE JUST LOOKING AT?

09:32AM  24          MR. DOWNEY:  NO.

09:32AM  25      I'M SORRY, YOUR HONOR.  I THINK THAT'S MY MISTAKE.  I

                        UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8591

09:32AM   1        THINK THAT'S WHAT WE WERE JUST LOOKING AT.

09:32AM   2                THE COURT:  I THOUGHT SO, YES.

09:32AM   3                MR. DOWNEY:  ALL RIGHT.

09:32AM   4        Q.   LET ME JUST ASK YOU A FEW QUESTIONS ABOUT MR. PARLOFF.

09:32AM   5        A.   YES.

09:32AM   6        Q.   DO YOU RECALL MR. LEACH ASKING YOU ABOUT THE STATEMENT IN

09:32AM   7        MR. PARLOFF'S ARTICLE THAT THERANOS DID NOT BUY THIRD PARTY

09:32AM   8        ANALYZERS FROM OTHERS?

09:32AM   9        A.   I DO.

09:32AM  10        Q.   DID YOU EVER SAY TO MR. PARLOFF THAT THERANOS NEVER IN ANY

09:32AM  11        CONTEXT BOUGHT THIRD PARTY ANALYZERS?

09:32AM  12        A.   NO.

09:32AM  13        Q.   DID YOU SAY TO HIM THAT THERANOS INTENDED TO SEEK APPROVAL

09:32AM  14        FROM THE FDA FOR ITS 4 SERIES SYSTEM?

09:33AM  15        A.   I DID.

09:33AM  16        Q.   DID YOU TELL HIM THAT ALL OF THE TESTS THAT WOULD BE PART

09:33AM  17        OF THOSE FDA SUBMISSIONS WOULD BE DEVELOPED AND MANUFACTURED BY

09:33AM  18        THERANOS?

09:33AM  19        A.   I DID.

09:33AM  20        Q.   DID YOU TELL HIM THAT THE ANALYZER THAT WOULD BE PART OF

09:33AM  21        THOSE FDA SUBMISSIONS WOULD BE DEVELOPED AND MANUFACTURED BY

09:33AM  22        THERANOS?

09:33AM  23                MR. LEACH:  LEADING, YOUR HONOR.

09:33AM  24                THE COURT:  THEY ARE LEADING IN THE FORM OF THE

09:33AM  25        QUESTION.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                           8592

| | | |
|---|---|---|
| 09:33AM | 1 | I'LL ALLOW YOU TO ANSWER THE QUESTION, MS. HOLMES. YOU |
| 09:33AM | 2 | CAN ANSWER THE LAST QUESTION. |
| 09:33AM | 3 | THE WITNESS: OKAY. |
| 09:33AM | 4 | YES, I DID. |
| 09:33AM | 5 | MR. DOWNEY: LET ME ASK THE QUESTION DIFFERENTLY. |
| 09:33AM | 6 | Q. WHAT DID HE TELL YOU -- WHAT DID YOU TELL HIM AS TO HOW |
| 09:33AM | 7 | THE ANALYZER WOULD BE -- THAT WAS BEING USED IN CONNECTION WITH |
| 09:33AM | 8 | FDA SUBMISSIONS WOULD BE DEVELOPED AND MANUFACTURED? |
| 09:33AM | 9 | A. I TOLD HIM THAT WE WERE COMPLETELY VERTICALLY INTEGRATED, |
| 09:33AM | 10 | THAT IT WAS ALL MANUFACTURED IN HOUSE BY THERANOS. |
| 09:33AM | 11 | Q. AND THAT WAS -- WAS THAT REFERRING TO THE THERANOS |
| 09:33AM | 12 | PROPRIETARY ANALYZER? |
| 09:34AM | 13 | A. YES. |
| 09:34AM | 14 | Q. I'D LIKE YOU ALSO TO LOOK AT THE DOCUMENT THAT MR. LEACH |
| 09:34AM | 15 | SHOWED YOU THAT WAS EXHIBIT 5727. |
| 09:34AM | 16 | ON THE FIRST PAGE, DO YOU SEE THAT THIS IS THE EMAIL WHICH |
| 09:34AM | 17 | THERANOS TRANSMITTED TO INVESTORS IN THERANOS A COPY OF PARLOFF |
| 09:34AM | 18 | ARTICLE? |
| 09:34AM | 19 | A. I THINK SO, YES. |
| 09:34AM | 20 | Q. I'D LIKE TO ASK YOU TO LOOK NOW AT THE SECOND PAGE OF THAT |
| 09:34AM | 21 | EXHIBIT, I BELIEVE. |
| 09:34AM | 22 | AND UNDER THE -- IN THE TEXT DO YOU SEE THAT THE -- IN THE |
| 09:35AM | 23 | SECOND PARAGRAPH THAT BEGINS, "WITH THIS EMAIL"? |
| 09:35AM | 24 | A. YES. |
| 09:35AM | 25 | Q. DO YOU SEE THAT YOU SHARE IN THE FIRST SENTENCE THE |

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8593

```
09:35AM   1      "FORTUNE" MAGAZINE STORY?

09:35AM   2      A.   YES.

09:35AM   3      Q.   AND THEN IN THE SECOND SENTENCE IT READS, "FORTUNE DID

09:35AM   4      IN-DEPTH RESEARCH TO UNDERSTAND THE IMPACT OUR WORK WILL HAVE

09:35AM   5      ON THE WORLD."

09:35AM   6           DO YOU SEE THAT?

09:35AM   7      A.   YES.

09:35AM   8      Q.   AND IN THE SECOND PART YOU SAY, "WE SELECTIVELY SHARED

09:35AM   9      MORE OF OUR WORK FOR THIS PIECE."

09:35AM  10           DO YOU SEE THAT?

09:35AM  11      A.   I DO.

09:35AM  12      Q.   AND I'D LIKE TO ASK YOU ABOUT BOTH PIECES OF THAT.

09:35AM  13           WHAT DID YOU UNDERSTAND WAS MEANT BY THE IMPACT THAT

09:35AM  14      THERANOS'S WORK WOULD HAVE ON THE WORLD?

09:35AM  15      A.   HOW OUR SYSTEMS COULD HELP PEOPLE AND THE IMPACT IT WOULD

09:35AM  16      MAKE IN HEALTH CARE.

09:35AM  17      Q.   AND WAS THAT SOMETHING THAT YOU WANTED YOUR INVESTORS TO

09:35AM  18      KNOW ABOUT?

09:35AM  19      A.   VERY MUCH SO.

09:35AM  20      Q.   AND THEN YOU REFERENCE SELECTIVELY SHARING MORE OF

09:36AM  21      THERANOS'S WORK FOR THE PIECE.

09:36AM  22           DO YOU SEE THAT?

09:36AM  23      A.   YES.

09:36AM  24      Q.   AND WHAT DID THAT MEAN IN THIS CONTEXT?

09:36AM  25      A.   THAT OVER TIME WE HAD PLANNED TO INTRODUCE MORE AND MORE
```

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8594

09:36AM   1    OF OUR TECHNOLOGY AND PROCESSES, AND FOR THIS PIECE WE HAD

09:36AM   2    DISCUSSED SOME OF THEM, WHICH WE WOULD NOW BE SHARING PUBLICLY,

09:36AM   3    BUT NOT ALL OF THEM.

09:36AM   4    Q.   ALL RIGHT.  LET ME TURN TO ASKING YOU ABOUT THE INSPECTION

09:36AM   5    IN 2013 THAT MR. LEACH ASKED YOU ABOUT YESTERDAY.

09:36AM   6    A.   YES.

09:36AM   7    Q.   IS IT THE CASE THAT CMS INSPECTS LABORATORIES EVERY TWO

09:36AM   8    YEARS?

09:36AM   9    A.   THAT'S MY UNDERSTANDING.

09:36AM   10   Q.   AND WAS THIS INSPECTION PART OF THAT REGULAR CYCLE?

09:36AM   11   A.   YES.

09:36AM   12   Q.   AND AT THE TIME THAT THIS INSPECTION TOOK PLACE, THERANOS

09:37AM   13   WAS OPERATING AS A CLINICAL LAB SERVING PATIENTS; IS THAT

09:37AM   14   RIGHT?

09:37AM   15   A.   YES.

09:37AM   16   Q.   MR. LEACH ASKED YOU WHETHER THE INSPECTOR EVER SAW A 3.5

09:37AM   17   DEVICE.

09:37AM   18       DO YOU RECALL THAT?

09:37AM   19   A.   YES.

09:37AM   20   Q.   I'D LIKE TO ASK YOU TO LOOK AT EXHIBIT 7368, WHICH IS

09:37AM   21   ALREADY IN EVIDENCE.

09:37AM   22       AND DO YOU SEE THAT THIS IS THE DOCUMENT WHERE DR. YOUNG

09:37AM   23   SENT YOU NOTES FROM HIS PARTICIPATION IN THAT AUDIT?

09:37AM   24   A.   I DO.

09:37AM   25   Q.   AND IF YOU GO TO THE SECOND PAGE, THE NUMBERED 5, IF WE

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                    8595

09:37AM   1    COULD BLOW THAT UP.

09:37AM   2         AND DO YOU SEE THAT IT REFERS TO THE AUDITOR?

09:37AM   3    A.   YES.

09:37AM   4    Q.   AND IT SAYS, "THE AUDITOR ASKED IF WE HAVE ANY NEW TESTS

09:37AM   5    OFFERED SINCE THE LAST AUDIT"?

09:37AM   6    A.   YES.

09:37AM   7    Q.   AND WAS THE LAST AUDIT IN 2011?

09:38AM   8    A.   IT WAS.

09:38AM   9    Q.   AND THAT WAS THE -- WAS THAT THE AUDIT THAT YOU AND I

09:38AM  10    DISCUSSED ON DIRECT EXAMINATION WHERE THERE WERE NO

09:38AM  11    DEFICIENCIES IN THE THERANOS LAB?

09:38AM  12    A.   YES.

09:38AM  13    Q.   AND THEN IT SAYS, "ADAM."

09:38AM  14         DOES THAT REFER TO DR. ROSENDORFF?

09:38AM  15    A.   YES.

09:38AM  16    Q.   AND IT SAYS, "SAID YES AND SPOKE ABOUT ALL OF THE LDT'S."

09:38AM  17         DO YOU SEE THAT?

09:38AM  18    A.   YES.

09:38AM  19    Q.   AND HE "MENTIONED EDISON 3.5, FLOW CYTOMETER, ADVIA, AND

09:38AM  20    NORMANDY LAB."

09:38AM  21         DO YOU SEE THAT?

09:38AM  22    A.   I DO.

09:38AM  23    Q.   AND IS THAT A REFERENCE TO ALL OF THE LDT'S IN THERANOS'S

09:38AM  24    LABS?

09:38AM  25    A.   IT IS.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8596

09:38AM 1    Q.   AND DO YOU KNOW ONE WAY OR ANOTHER WHETHER THE AUDITOR, IN

09:38AM 2    RESPONSE TO BEING INFORMED OF THESE, ASKED TO SEE THOSE

09:38AM 3    TECHNOLOGIES?

09:38AM 4    A.   I DON'T.

09:38AM 5    Q.   AND DO YOU KNOW, FROM REVIEW OF THE NOTES, THAT THE

09:38AM 6    AUDITOR DID ASK TO SEE VALIDATION REPORTS AND DATA ABOUT THEIR

09:38AM 7    PERFORMANCE?

09:39AM 8    A.   YES.

09:39AM 9    Q.   DID YOU UNDERSTAND THAT AN INSPECTOR WHO IS CONDUCTING AN

09:39AM 10   INSPECTION FOR CMS CAN ASK TO LOOK AT ANYTHING IN A LAB THAT

09:39AM 11   THEY WANT?

09:39AM 12   A.   OF COURSE.

09:39AM 13   Q.   I WANT TO ASK YOU JUST BRIEFLY ABOUT THE QUESTIONS THAT

09:39AM 14   MR. LEACH ASKED YOU LAST WEEK ABOUT YOUR RELATIONSHIP WITH

09:39AM 15   MR. BALWANI.

09:39AM 16        DO YOU RECALL THOSE QUESTIONS?

09:39AM 17   A.   I DO.

09:39AM 18   Q.   AND DO YOU RECALL THAT HE ASKED YOU A LARGE NUMBER OF

09:39AM 19   QUESTIONS ABOUT WHETHER, WHEN MR. BALWANI TOLD YOU SOMETHING,

09:39AM 20   HE WAS HIDING SOMETHING FROM YOU?

09:39AM 21        DO YOU RECALL THAT?

09:39AM 22   A.   I DO.

09:39AM 23   Q.   DID MR. BALWANI FREQUENTLY SHARE IDEAS WITH YOU?

09:39AM 24   A.   YES.

09:39AM 25   Q.   AND DID HE DO THAT BY TEXT?

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8597

09:39AM   1        A.   YES.

09:39AM   2        Q.   DID HE DO IT ORALLY AS WELL?

09:39AM   3        A.   HE DID.

09:39AM   4        Q.   AND DID HE ON OCCASION VENT HIS FRUSTRATION ABOUT EVENTS

09:40AM   5   AT THERANOS?

09:40AM   6        A.   HE DID.

09:40AM   7        Q.   DID HE DO THAT BY TEXT?

09:40AM   8        A.   YES.

09:40AM   9        Q.   AND DID HE DO THAT IN PERSON ORALLY ON SOME OCCASIONS?

09:40AM  10        A.   HE DID.

09:40AM  11        Q.   DID HE CRITICIZE INDIVIDUALS AT THERANOS AS BEING

09:40AM  12   INCOMPETENT?

09:40AM  13        A.   HE DID.

09:40AM  14        Q.   DID HE CRITICIZE YOU IN YOUR PERFORMANCE?

09:40AM  15        A.   YES.

09:40AM  16        Q.   WE SAW SEVERAL INSTANCES IN WHICH MR. LEACH SHOWED YOU

09:40AM  17   WHERE MR. BALWANI RAISED AN ISSUE ABOUT A PROBLEM OR AN ISSUE

09:40AM  18   THAT HE SAW AT THERANOS, AND IN RESPONSIVE TEXTS YOU SEEMED TO

09:40AM  19   AGREE WITH HIM.

09:40AM  20        DO YOU RECALL THAT?

09:40AM  21        A.   I DO.

09:40AM  22        Q.   I WANT TO JUST SHOW YOU A FEW OF THOSE BACK AND FORTHS TO

09:40AM  23   GIVE YOU AN OPPORTUNITY TO COMMENT ON WHAT WAS GOING ON.

09:40AM  24        SO I'D LIKE TO PUT UP 5387D, WHICH WAS INTRODUCED BY THE

09:41AM  25   GOVERNMENT, AND SHOW YOU ONE OF THOSE EXCHANGES.

HOLMES REDIRECT BY MR. DOWNEY (RES.)

09:41AM   1          IF WE GO TO PAGE 24, AND WE BLOW UP SORT OF THE TOP HALF

09:41AM   2     THERE.

09:41AM   3          DO YOU SEE THAT THIS IS A SERIES OF EXCHANGES BETWEEN YOU

09:41AM   4     AND MR. BALWANI WHERE HE'S TALKING ABOUT THE CALL CENTER

09:41AM   5     MANAGER, AND THE CALL CENTER TEAM?

09:41AM   6          DO YOU SEE THAT?

09:41AM   7     A.   YES.

09:41AM   8     Q.   AND WHAT IS THE CALL CENTER AT THERANOS?

09:41AM   9     A.   THE CALL CENTER SUPPORTED THE CLINICAL LAB AND WAS A PLACE

09:41AM   10    FOR PATIENTS AND PHYSICIANS TO CALL IF THEY HAD QUESTIONS OR

09:41AM   11    WANTED TO SPEAK WITH SOMEONE IN THE LABORATORY.

09:41AM   12    Q.   AND WAS THAT A FUNCTION THAT YOUR BROTHER WAS INVOLVED

09:41AM   13    WITH AT THIS TIME?

09:41AM   14    A.   HE WAS.

09:41AM   15    Q.   ALL RIGHT.  AND DO YOU SEE THAT HE BEGINS BY SAYING, "WE

09:41AM   16    NEED THE CALL CENTER MANAGER, NEW CALL CENTER TEAM, GET

09:41AM   17    RECURRENT CREW OUT OF DOCS FACING COMMUNICATIONS"?

09:42AM   18         DO YOU SEE THAT?

09:42AM   19    A.   I DO.

09:42AM   20    Q.   AND DO YOU SEE A COUPLE TEXTS DOWN HE SAYS, "FUNDAMENTALLY

09:42AM   21    WE NEED TO STOP FIGHTING FIRES BY NOT CREATING THEM"?

09:42AM   22         DO YOU SEE THAT?

09:42AM   23    A.   I DO.

09:42AM   24    Q.   AND THEN YOU AGREE AND SAY, "YES."

09:42AM   25         AND THEN THERE'S MORE DISCUSSION ABOUT THE CALL CENTER.

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                    8599

09:42AM   1        DO YOU SEE THAT?

09:42AM   2   A.   I DO.

09:42AM   3   Q.   AND THEN IF WE GO DOWN TO 5:52 A.M., THERE'S A TEXT FROM

09:42AM   4   YOU TO HIM WHERE YOU SAY, "FUNDAMENTALLY WE NEED TO STOP

09:42AM   5   FIGHTING FIRES BY NOT CREATING THEM."

09:42AM   6        CAN YOU EXPLAIN THAT EXCHANGE WHERE YOU'RE REPEATING WHAT

09:42AM   7   IT LOOKS LIKE WORD FOR WORD WHAT MR. BALWANI HAD TEXT YOU ABOUT

09:42AM   8   45 MINUTES BEFORE?

09:42AM   9   A.   YES.  SUNNY WOULD OFTEN BLOW OFF STEAM OR VENT THROUGH

09:42AM  10   TEXTS, AND I TRIED TO NOT IGNITE HIM IN THE WAY THAT I

09:43AM  11   RESPONDED.

09:43AM  12        AND I KNEW THAT REPEATING BACK TO HIM THINGS THAT HE HAD

09:43AM  13   SAID TO ME SHOWED THAT I WAS PAYING ATTENTION, THAT I WAS

09:43AM  14   LISTENING TO HIM, AND I WOULD DO THAT TO SHOW HIM THAT I

09:43AM  15   UNDERSTOOD THE POINT THAT HE WAS MAKING, I'M PAYING ATTENTION,

09:43AM  16   I'M LISTENING.

09:43AM  17   Q.   OKAY.  I THINK JUST FOR THE -- IN THE INTEREST OF CLARITY

09:43AM  18   OF THE RECORD, I SAID 45 MINUTES LATER AND I THINK IT'S ABOUT

09:43AM  19   3 MINUTES LATER.

09:43AM  20        DO YOU SEE THAT?

09:43AM  21   A.   I DO.

09:43AM  22   Q.   OKAY.  LET ME ASK YOU, WERE THERE SITUATIONS AFTER HE

09:43AM  23   VENTED A CONCERN THAT HE WOULD TALK ABOUT WHAT HE WOULD DO IN

09:43AM  24   RESPONSE TO THAT CONCERN?

09:43AM  25   A.   YES.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8600

09:43AM  1    Q.   AND WHAT DID HE TYPICALLY SAY?

09:43AM  2    A.   THAT HE WAS GOING TO PERSONALLY TAKE OVER WHATEVER AREA HE

09:43AM  3    WAS UPSET ABOUT AND OWN IT AND FIX WHATEVER PROBLEMS EXISTED.

09:43AM  4    Q.   AND DID YOU GENERALLY ACCEPT THAT IF HE MADE THAT

09:43AM  5    PROPOSAL?

09:43AM  6    A.   I DID.

09:43AM  7    Q.   LET'S LOOK AT PAGE 9 OF THE SAME EXHIBIT, 5387D.  I WANT

09:44AM  8    TO LOOK AT THE SECOND TEXT HERE WHICH BEGINS ON MAY 9TH AT

09:44AM  9    1:13:39 A.M.

09:44AM  10       DO YOU SEE THAT?

09:44AM  11   A.   I DO.

09:44AM  12   Q.   AND DO YOU SEE THERE'S A TEXT FROM MR. BALWANI TO YOU THAT

09:44AM  13   SAYS, "I NEED ABOUT A MONTH OF TOTAL FREE TIME TO TAKE OVER

09:44AM  14   DEVICE COMPLETELY AND MOVE IT 100 PERCENT TO .NET."

09:44AM  15       DO YOU SEE THAT?

09:44AM  16   A.   I DO.

09:44AM  17   Q.   AND DO YOU SEE THAT THIS IS DATED MAY 2012?

09:44AM  18   A.   YES.

09:44AM  19   Q.   AND IS .NET, WHAT IS THAT A REFERENCE TO?

09:44AM  20   A.   IT'S A SOFTWARE.  HE'S TALKING ABOUT REWRITING ALL OF THE

09:44AM  21   SOFTWARE ON THE DEVICE.

09:44AM  22   Q.   AND IS THE DEVICE SOMETHING THAT YOU HAD BEEN INVOLVED IN

09:44AM  23   MANAGING THE PROCESS RELATED TO IT?

09:44AM  24   A.   YES.

09:44AM  25   Q.   AND WHAT WAS HE PROPOSING AT THIS POINT?

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8601

| | | |
|---|---|---|
| 09:44AM | 1 | A.   THAT HE TAKE IT OVER AND, AS PART OF DOING THAT |
| 09:45AM | 2 | TRANSITION, THE SOFTWARE THAT WE WERE USING TO NEW SOFTWARE. |
| 09:45AM | 3 | Q.   AND IF YOU LOOK AT THREE TEXTS DOWN FROM THAT, THE TEXT |
| 09:45AM | 4 | THAT BEGINS, "I AM EXHAUSTED." |
| 09:45AM | 5 | A.   YES. |
| 09:45AM | 6 | Q.   AND DO YOU SEE THAT HE SAYS, "I AM EXHAUSTED TRYING TO |
| 09:45AM | 7 | ENCOURAGE MEDEI AND LOREN" -- |
| 09:45AM | 8 | WHO ARE THEY? |
| 09:45AM | 9 | A.   TWO OF OUR SOFTWARE DEVELOPERS. |
| 09:45AM | 10 | Q.   -- "TO GET THE JOB DONE." |
| 09:45AM | 11 | AND HE MENTIONS TWO OTHER INDIVIDUALS.  WHO ARE THEY? |
| 09:45AM | 12 | A.   TWO MORE SOFTWARE DEVELOPERS. |
| 09:45AM | 13 | Q.   AND THEN IN THE LAST LINE HE SAYS, "WE WILL BE DONE IN A |
| 09:45AM | 14 | MONTH WITH THIS." |
| 09:45AM | 15 | DO YOU SEE THAT? |
| 09:45AM | 16 | A.   I DO. |
| 09:45AM | 17 | Q.   AND THEN YOU RESPOND "AMAZING"? |
| 09:45AM | 18 | DO YOU SEE THAT? |
| 09:45AM | 19 | A.   YES. |
| 09:45AM | 20 | Q.   AND THEN "MY JOB IS TO HELP YOU SPEND THE TIME ON THAT." |
| 09:45AM | 21 | DO YOU SEE THAT? |
| 09:45AM | 22 | A.   YES. |
| 09:45AM | 23 | Q.   AND WHAT WERE YOU COMMUNICATING TO HIM ON THAT? |
| 09:45AM | 24 | A.   I WAS TRYING TO BE SUPPORTIVE AND SAY, GREAT, LET ME HELP |
| 09:45AM | 25 | YOU SPEND TIME ON THAT SO YOU CAN SOLVE WHATEVER PROBLEMS YOU |

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8602

| | | |
|---|---|---|
| 09:46AM | 1 | SEE AND GET IT DONE WITHIN A MONTH. |
| 09:46AM | 2 | Q.   OKAY.  NOW, LET ME ASK YOU SPECIFICALLY ABOUT THE TEXTS |
| 09:46AM | 3 | THAT MR. BALWANI SENT TO YOU THAT MR. LEACH SHOWED TO YOU |
| 09:46AM | 4 | RELATED TO MR. ROSENDORFF'S DEPARTURE AND ISSUES AROUND THE |
| 09:46AM | 5 | NORMANDY LAB AT THAT TIME. |
| 09:46AM | 6 | DO YOU RECALL THAT EXCHANGE WITH MR. LEACH? |
| 09:46AM | 7 | A.   I DO. |
| 09:46AM | 8 | Q.   LET ME GO TO PAGE 29 OF THESE TEXTS. |
| 09:46AM | 9 | AND DO YOU SEE WHERE HE SAYS, "NORMANDY LAB IS A DISASTER |
| 09:46AM | 10 | ZONE," MORE OR LESS HE SAYS THAT, AND THEN HE SAYS, "GLAD I |
| 09:46AM | 11 | CAME HERE.  WILL WORK ON FIXING THIS"? |
| 09:46AM | 12 | DO YOU SEE THAT? |
| 09:46AM | 13 | A.   I DO. |
| 09:46AM | 14 | Q.   AND THEN YOUR RESPONSE WAS, "MEANT TO BE THAT YOU'RE THERE |
| 09:46AM | 15 | APPARENTLY -- WHAT HAPPENED." |
| 09:46AM | 16 | DO YOU SEE THAT? |
| 09:46AM | 17 | A.   YES. |
| 09:46AM | 18 | Q.   AND THEN HE GOES DOWN A COUPLE TEXTS DOWN AND SAYS HE'S |
| 09:47AM | 19 | "IN NORMANDY." |
| 09:47AM | 20 | AND THAT'S A REFERENCE TO THE LAB; IS THAT RIGHT? |
| 09:47AM | 21 | A.   IT IS. |
| 09:47AM | 22 | Q.   AND THEN HE SAYS HE'LL CALL WHEN HE LEAVES? |
| 09:47AM | 23 | A.   YES. |
| 09:47AM | 24 | Q.   AND A COUPLE LINES DOWN FROM THAT, HE SAYS, "I WILL GET |
| 09:47AM | 25 | TINA OUT." |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8603

```
09:47AM   1            WHO WAS TINA?

09:47AM   2       A.   SHE WAS A PERSON IN PRODUCT MANAGEMENT.

09:47AM   3       Q.   AND WAS THAT SOMEBODY -- WAS SHE PLAYING A ROLE WITH

09:47AM   4       REGARD TO THE CLINICAL LAB?

09:47AM   5       A.   SHE WAS.  SHE WAS ASSIGNED TO THE LABORATORY DEVELOPED

09:47AM   6       TESTS.

09:47AM   7       Q.   AND THEN IN THE SECOND SENTENCE HE SAYS, "WE NEED A

09:47AM   8       SOFTWARE PERSON RUNNING THIS."

09:47AM   9            DO YOU SEE THAT?

09:47AM  10       A.   YES.

09:47AM  11       Q.   AND SOFTWARE PEOPLE WERE PEOPLE WHO WORKED FOR

09:47AM  12       MR. BALWANI; IS THAT RIGHT?

09:47AM  13       A.   THEY WERE.

09:47AM  14       Q.   WERE THEY TYPICALLY PEOPLE THAT HE HAD HIRED INTO

09:47AM  15       THERANOS?

09:47AM  16       A.   YES.

09:47AM  17       Q.   AND THEN HE SAYS, "BETWEEN TINA AND MAX WE HAVE A MESS."

09:47AM  18            IS THAT MAX FOSQUE?

09:47AM  19       A.   YES.

09:47AM  20       Q.   IS THIS A POINT WHERE MR. BALWANI BEGAN TO TAKE A MORE

09:47AM  21       ACTIVE ROLE AT THE LAB?

09:48AM  22       A.   HE DID.

09:48AM  23       Q.   LET ME SHOW YOU ONE MORE SERIES OF TEXTS FROM APRIL OF

09:48AM  24       2015.  THIS IS ON PAGE 59 ON 5387D.

09:48AM  25            DO YOU SEE THIS BEGINS WITH MR. BALWANI TEXTING YOU
```

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8604

09:48AM   1     SAYING, "IT IS MOST MADDENING THERE IS NO FOCUS ON ANY CHEM

09:48AM   2     TEAMS AND NO PRODUCT COMING OUT."

09:48AM   3          WHAT IS CHEM TEAMS A REFERENCE TO?

09:48AM   4     A.   HE'S TALKING ABOUT ONE OF THE R&D CHEMISTRY TEAMS.

09:48AM   5     Q.   AND IS R&D A FUNCTION THAT YOU HAD BEEN IN CHARGE OF

09:48AM   6     HISTORICALLY AT THE COMPANY?

09:48AM   7     A.   IT IS.

09:48AM   8     Q.   AND HE'S CRITICIZING THE FOCUS WITHIN THAT TEAM?

09:48AM   9     A.   YES.

09:48AM  10     Q.   AND YOU RESPONDED, "I KNOW.

09:49AM  11          "LEADERSHIP."

09:49AM  12     A.   YES.

09:49AM  13     Q.   AND HE SAYS, "I AM TAKING OVER ALL CHEM TEAMS PER

09:49AM  14     DISCUSSION AND WILL BEGIN DOING DAILY MEETINGS."

09:49AM  15          DO YOU SEE THAT?

09:49AM  16     A.   I DO.

09:49AM  17     Q.   AND IS THIS ANOTHER AREA WHERE HE TOOK CONTROL AT THIS

09:49AM  18     TIME AFTER COMPLAINING ABOUT THE PERFORMANCE OF THE PEOPLE

09:49AM  19     WORKING IN THE AREA?

09:49AM  20     A.   HE DID.

09:49AM  21     Q.   NOW, I WANT TO ASK YOU ABOUT THE SERIES OF QUESTIONS THAT

09:49AM  22     MR. LEACH ASKED YOU ABOUT WHETHER MR. BALWANI WAS OPEN WITH

09:49AM  23     YOU.

09:49AM  24          DO YOU RECALL THAT?

09:49AM  25     A.   I DO.

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8605

09:49AM   1     Q.   AND, OF COURSE, WHEN YOU HEARD HE HAD A CONCERN, YOU

09:49AM   2     UNDERSTOOD THE CONCERN THAT HE WAS EXPRESSING; IS THAT RIGHT?

09:49AM   3     A.   I THINK SO.

09:49AM   4     Q.   BUT DO YOU KNOW WHETHER AT THE TIME HE WAS TELLING YOU OF

09:49AM   5     EVERY ISSUE THAT HE SAW?

09:49AM   6     A.   NO.

09:49AM   7     Q.   DO YOU KNOW WHETHER HE WAS TELLING YOU OF EVERY ISSUE

09:49AM   8     THERE WAS UNDER HIS LEADERSHIP?

09:49AM   9     A.   NO.

09:49AM   10    Q.   DID HE TEND TO BE SELF-CRITICAL IN CONNECTION WITH HIS

09:49AM   11    MANAGEMENT OF AREAS?

09:49AM   12    A.   HE WAS NOT.

09:49AM   13    Q.   DID YOU EVENTUALLY LEARN THAT CONDITIONS IN SOME OF HIS

09:50AM   14    FUNCTIONS WERE WORSE THAN YOU HAD BELIEVED FOR MOST OF HIS TIME

09:50AM   15    AT THERANOS?

09:50AM   16    A.   I DID.

09:50AM   17    Q.   WERE SOME OF THOSE IN CONNECTION WITH PERFORMANCE OF THE

09:50AM   18    CLIA LAB?

09:50AM   19    A.   YES.

09:50AM   20    Q.   MR. LEACH ALSO ASKED YOU ABOUT ADVISORS THAT YOU WORKED

09:50AM   21    WITH AND INTERACTED WITH WHILE YOU WERE AT THERANOS.

09:50AM   22         DO YOU RECALL THAT?

09:50AM   23    A.   I DO.

09:50AM   24    Q.   AND HE ASKED YOU ABOUT, FOR EXAMPLE, GENERAL MATTIS.

09:50AM   25         DO YOU RECALL?

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                    8606

| | | |
|---|---|---|
| 09:50AM | 1 | A.   I DO, YES. |
| 09:50AM | 2 | Q.   AND MR. KISSINGER, AND MR. SHULTZ, AND OTHERS. |
| 09:50AM | 3 | DO YOU RECALL? |
| 09:50AM | 4 | A.   YES. |
| 09:50AM | 5 | Q.   AND MOST OF THOSE INDIVIDUALS WERE MEMBERS OF THE BOARD OF |
| 09:50AM | 6 | DIRECTORS; IS THAT RIGHT? |
| 09:50AM | 7 | A.   THEY WERE. |
| 09:50AM | 8 | Q.   AND YOU WOULD TALK TO THEM IN CONNECTION WITH BOARD |
| 09:50AM | 9 | AFFAIRS; IS THAT RIGHT? |
| 09:50AM | 10 | A.   I DID. |
| 09:50AM | 11 | Q.   BUT IN THE PERIOD BETWEEN 2010 AND 2015, HOW FREQUENTLY |
| 09:50AM | 12 | DID YOU TALK TO MR. BALWANI ABOUT EVENTS AT THERANOS? |
| 09:50AM | 13 | A.   ALL OF THE TIME. |
| 09:50AM | 14 | Q.   WHO WAS THE MOST IMPORTANT ADVISOR TO YOU IN CONNECTION |
| 09:51AM | 15 | WITH THERANOS? |
| 09:51AM | 16 | A.   SUNNY WAS. |
| 09:51AM | 17 | Q.   I WANT TO ASK YOU LASTLY ABOUT THE END OF THE |
| 09:51AM | 18 | RELATIONSHIP. |
| 09:51AM | 19 | MR. LEACH SHOWED YOU SOME TEXTS WHERE YOU HAD SOME TEXTS |
| 09:51AM | 20 | AFTER YOU DEPARTED FROM THE HOME THAT YOU HAD SHARED WITH |
| 09:51AM | 21 | MR. BALWANI. |
| 09:51AM | 22 | DO YOU RECALL THAT? |
| 09:51AM | 23 | A.   I DO. |
| 09:51AM | 24 | Q.   AND SOME OF THOSE TEXTS EXPRESSED, YOU KNOW, STILL |
| 09:51AM | 25 | AFFECTIONATE FEELINGS TOWARD MR. BALWANI. |

UNITED STATES COURT REPORTERS

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8607

| | | |
|---|---|---|
| 09:51AM | 1 | DO YOU RECALL THAT? |
| 09:51AM | 2 | A.   I DO. |
| 09:51AM | 3 | Q.   DID YOU END THAT RELATIONSHIP IN A SINGLE MOMENT, OR WAS |
| 09:51AM | 4 | IT A PROCESS OF GETTING OUT OF THAT RELATIONSHIP? |
| 09:51AM | 5 | A.   IT WAS A PROCESS. |
| 09:51AM | 6 | Q.   AND AFTER YOU WERE ABLE TO END YOUR RELATIONSHIP WITH |
| 09:51AM | 7 | MR. BALWANI, DID YOU SEE HIM AGAIN PRIOR TO, LET'S SAY, JUNE OF |
| 09:51AM | 8 | 2018? |
| 09:51AM | 9 | A.   I DID. |
| 09:51AM | 10 | Q.   ON WHAT OCCASIONS DID YOU SEE HIM? |
| 09:51AM | 11 | A.   HE SHOWED UP AT THE CHURCH I WOULD GO TO AT NIGHT AND AT |
| 09:52AM | 12 | THE DISH, WHICH WAS WHERE I USED TO RUN AROUND STANFORD, THE |
| 09:52AM | 13 | PLACES I WOULD GO OUTSIDE OF WORK. |
| 09:52AM | 14 | Q.   AND DID YOU HAVE ANY CONTACT WITH HIM? |
| 09:52AM | 15 | MR. LEACH:  YOUR HONOR -- YOUR HONOR, OBJECTION. |
| 09:52AM | 16 | THE COURT:  EXCUSE ME. |
| 09:52AM | 17 | MR. LEACH:  RELEVANCE, 403 AS TO THE TIME PERIOD. |
| 09:52AM | 18 | THE COURT:  DO YOU WANT TO -- |
| 09:52AM | 19 | MR. DOWNEY:  I DON'T NEED TO EXPAND FURTHER. |
| 09:52AM | 20 | THE COURT:  OKAY.  ALL RIGHT. |
| 09:52AM | 21 | BY MR. DOWNEY: |
| 09:52AM | 22 | Q.   I WANT TO ALSO ASK YOU ABOUT THE LLC THAT MR. LEACH ASKED |
| 09:52AM | 23 | YOU ABOUT. |
| 09:52AM | 24 | DO YOU RECALL THAT? |
| 09:52AM | 25 | A.   I DO. |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8608

09:52AM 1      Q.   AND HE SHOWED YOU A DOCUMENT THAT INDICATED THAT YOU AND

09:52AM 2      MR. BALWANI HAD 50 PERCENT OWNERSHIP EACH IN CONNECTION WITH AN

09:52AM 3      LLC.

09:52AM 4          DO YOU REMEMBER THAT?

09:52AM 5      A.   I DO.

09:52AM 6      Q.   AND THAT LLC WAS CALLED HMFR?

09:52AM 7      A.   IT WAS.

09:52AM 8      Q.   AND THEN MR. LEACH SHOWED YOU A PICTURE OF A HOUSE;

09:52AM 9      CORRECT?

09:52AM 10     A.   HE DID.

09:52AM 11     Q.   AND HE ASKED YOU, DO YOU RECALL, IF THAT HOUSE WAS SOLD?

09:52AM 12     A.   YES.

09:52AM 13     Q.   AND DO YOU RECALL HIM ASKING YOU IF THE LLC OWNED THE

09:53AM 14     HOUSE?

09:53AM 15     A.   YES.

09:53AM 16     Q.   ALL RIGHT.  AND WAS THAT LLC DISSOLVED?

09:53AM 17     A.   YES.

09:53AM 18     Q.   AND DOES IT EXIST TODAY?

09:53AM 19     A.   NO.

09:53AM 20     Q.   WHEN THE LLC DISSOLVED, DID YOU GET ANY PROCEEDS IN

09:53AM 21     CONNECTION WITH THE SALE OF THAT HOUSE?

09:53AM 22     A.   NO.

09:53AM 23             MR. LEACH:  OBJECTION.  RELEVANCE, 403.

09:53AM 24             MR. DOWNEY:  HE OPENED THE DOOR TO THIS ON DIRECT --

09:53AM 25     ON CROSS-EXAMINATION.  I THINK I'M ENTITLED TO --

HOLMES REDIRECT BY MR. DOWNEY (RES.)                           8609

```
09:53AM   1              THE COURT:  THERE WAS SOME TESTIMONY.  I'LL ALLOW
09:53AM   2    THAT QUESTION TO BE ANSWERED.
09:53AM   3         REASK THE QUESTION.
09:53AM   4              MR. DOWNEY:  RIGHT.
09:53AM   5    Q.  DID YOU REALIZE ANY MONIES FROM THE ASSETS THAT WERE SOLD
09:53AM   6    AS PART OF THAT LLC?
09:53AM   7    A.  NO.
09:53AM   8    Q.  I WANT TO ASK YOU FINALLY JUST SOME QUESTIONS ABOUT THE
09:53AM   9    RESEARCH AND DEVELOPMENT PROCESS AT THERANOS AND ABOUT YOUR
09:53AM  10    ROLE WITH REGARD TO THE RESEARCH AND DEVELOPMENT PROCESS.
09:53AM  11         I THINK YOU'VE TESTIFIED ON A FEW OCCASIONS THAT YOU SPENT
09:54AM  12    MUCH MORE OF YOUR TIME WORKING ON RESEARCH AND DEVELOPMENT THAN
09:54AM  13    IN CONNECTION WITH THE CLINICAL LAB; IS THAT FAIR?
09:54AM  14    A.  I DID.
09:54AM  15    Q.  AND THE RESEARCH AND DEVELOPMENT LAB WAS DEVELOPING
09:54AM  16    PROPRIETARY TECHNOLOGY; IS THAT RIGHT?
09:54AM  17    A.  YES.
09:54AM  18    Q.  DID YOU RECEIVE REGULAR UPDATES ABOUT THAT PROGRESS IN THE
09:54AM  19    PERIOD -- WITH RESPECT TO RESEARCH AND DEVELOPMENT IN THE
09:54AM  20    PERIOD BETWEEN 2010 AND 2013?
09:54AM  21    A.  I DID.
09:54AM  22    Q.  AND WERE THOSE UPDATES FROM THE SCIENTISTS WHO LED THE
09:54AM  23    VARIOUS TECHNOLOGY TEAMS WITHIN THERANOS?
09:54AM  24    A.  YES.
09:54AM  25    Q.  AND DO YOU HAVE ANY REASON TO DOUBT THEIR SINCERITY IN
```

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8610

| | | |
|---|---|---|
| 09:54AM | 1 | REPORTING TO YOU WHERE THEY THOUGHT THE PROGRESS OF THAT |
| 09:54AM | 2 | TECHNOLOGY WAS DURING THAT PERIOD? |
| 09:54AM | 3 | A.   NOT AT ALL. |
| 09:54AM | 4 | Q.   AND YOU ALSO -- DID YOU RECEIVE UPDATES IN CONNECTION WITH |
| 09:54AM | 5 | THERANOS'S EFFORT TO HAVE THE 4.0 DEVICE AND THE 4.0 SYSTEM |
| 09:55AM | 6 | READY TO SUBMIT AN APPLICATION TO THE FDA FOR APPROVAL FOR? |
| 09:55AM | 7 | A.   I DID. |
| 09:55AM | 8 | Q.   AND DID THEY -- DO YOU HAVE ANY REASON TO DOUBT WHAT |
| 09:55AM | 9 | THEY -- THE SINCERITY OF WHAT THEY REPORTED TO YOU IN THAT |
| 09:55AM | 10 | REGARD? |
| 09:55AM | 11 | A.   I DO NOT. |
| 09:55AM | 12 | Q.   WHEN YOU SPOKE TO OUTSIDERS, PARTNERS, AND POTENTIAL |
| 09:55AM | 13 | INVESTORS, WAS WHAT YOU SAID ABOUT THERANOS'S TECHNOLOGY |
| 09:55AM | 14 | CAPABILITIES INFORMED BY WHAT YOU WERE HEARING FROM THOSE |
| 09:55AM | 15 | INDIVIDUALS WITHIN THERANOS? |
| 09:55AM | 16 | A.   YES. |
| 09:55AM | 17 | Q.   AND DID YOU UNDERSTAND THAT THE COMPANY HAD DEVELOPED A |
| 09:55AM | 18 | REAL PRODUCT THAT COULD BE USED IN CONNECTION WITH ANALYSIS OF |
| 09:55AM | 19 | BLOOD SAMPLES? |
| 09:55AM | 20 | A.   I DID. |
| 09:55AM | 21 | Q.   WHEN YOU HAD QUESTIONS TO VERIFY WHETHER OR NOT THE |
| 09:55AM | 22 | TECHNOLOGY AT THERANOS HAD A PARTICULAR CAPABILITY, WHO DID YOU |
| 09:55AM | 23 | ASK? |
| 09:55AM | 24 | A.   I ASKED OUR SCIENTISTS AND ENGINEERS AND MEMBERS OF THE |
| 09:55AM | 25 | TECHNICAL TEAMS FOR DIFFERENT TYPES OF TESTS. |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                                8611

09:56AM   1     Q.   YOU TESTIFIED WHEN MR. LEACH WAS EXAMINING YOU THAT IN

09:56AM   2     YOUR ROLE AS CEO, YOU THOUGHT THAT THE BUCK STOPPED WITH YOU;

09:56AM   3     IS THAT RIGHT?

09:56AM   4     A.   I DID.

09:56AM   5     Q.   AND IS THAT AN ACCURATE STATEMENT OF HOW YOU FEEL?

09:56AM   6     A.   IT IS.

09:56AM   7     Q.   BUT IS IT ALSO AN ACCURATE STATEMENT THAT BETWEEN 2010 AND

09:56AM   8     2016, WERE YOU AWARE OF EVERYTHING THAT HAPPENED AT THERANOS?

09:56AM   9     A.   NO.

09:56AM  10     Q.   AND BETWEEN 2010 AND 2016, WERE YOU INVOLVED IN ALL OF THE

09:56AM  11     DECISIONS THAT THE COMPANY MADE?

09:56AM  12     A.   I WAS NOT.

09:56AM  13     Q.   DID YOU EVER AT ANY TIME TAKE STEPS TO TRY TO MISLEAD

09:56AM  14     PEOPLE WHO INVESTED IN THERANOS?

09:56AM  15     A.   NEVER.

09:56AM  16     Q.   AND YOU RECOGNIZED THAT THEY INVESTED IN THE VISION THAT

09:56AM  17     YOU ARTICULATED AND ULTIMATELY LOST YOUR MONEY -- LOST THEIR

09:56AM  18     MONEY?

09:56AM  19          MR. LEACH:  OBJECTION.  OBJECTION.  LEADING.

09:56AM  20          THE COURT:  SUSTAINED.

09:56AM  21     BY MR. DOWNEY:

09:56AM  22     Q.   WELL, DO YOU RECOGNIZE THAT THEY LOST MONEY?

09:57AM  23     A.   I DO.

09:57AM  24     Q.   WAS THAT THE RESULT OF YOUR ATTEMPTING TO MISLEAD THEM IN

09:57AM  25     CONNECTION WITH ASKING THEM TO INVEST IN THERANOS?

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8612

| | | |
|---|---|---|
| 09:57AM | 1 | A.   OF COURSE NOT. |
| 09:57AM | 2 | Q.   YOU ALSO TALKED FREQUENTLY ABOUT THE BENEFITS FOR PATIENTS |
| 09:57AM | 3 | OF THERANOS SYSTEMS. |
| 09:57AM | 4 | DO YOU REMEMBER THAT? |
| 09:57AM | 5 | A.   I DO. |
| 09:57AM | 6 | Q.   AND DID YOU AT ANY TIME TRY TO LEAD PATIENTS TO BELIEVE |
| 09:57AM | 7 | THAT THERANOS COULD OFFER ACCURATE AND RELIABLE SERVICES WHEN |
| 09:57AM | 8 | YOU KNEW IT COULDN'T? |
| 09:57AM | 9 | A.   OF COURSE NOT. |
| 09:57AM | 10 | Q.   IN CONNECTION WITH GAINING CONFIDENCE IN THE CAPABILITIES |
| 09:57AM | 11 | OF THERANOS AND WHAT YOU WERE SAYING ABOUT IT, YOU'VE TESTIFIED |
| 09:57AM | 12 | SEVERAL TIMES THAT YOU HIRED A NUMBER OF SCIENTIFIC LEADERS. |
| 09:57AM | 13 | DO YOU RECALL THAT? |
| 09:57AM | 14 | A.   I DO. |
| 09:57AM | 15 | Q.   AND DID THAT INCLUDE DR. YOUNG? |
| 09:57AM | 16 | A.   YES. |
| 09:57AM | 17 | Q.   AND DR. PANGARKAR? |
| 09:57AM | 18 | A.   YES. |
| 09:57AM | 19 | Q.   AND DR. ANEKAL? |
| 09:58AM | 20 | A.   YES. |
| 09:58AM | 21 | Q.   AND DR. SIVARAMAN? |
| 09:58AM | 22 | A.   YES. |
| 09:58AM | 23 | Q.   AND DR. SAKSENA? |
| 09:58AM | 24 | A.   YES. |
| 09:58AM | 25 | Q.   AND WERE ALL OF THEM LEADERS OF VARIOUS RESEARCH GROUPS |

HOLMES REDIRECT BY MR. DOWNEY (RES.)                          8613

09:58AM   1        WITHIN THERANOS?

09:58AM   2        A.   THEY WERE.

09:58AM   3        Q.   AND ARE ALL OF THEM WORKING TODAY IN CONNECTION WITH OTHER

09:58AM   4        TECHNOLOGY AND BIOTECH VENTURES?

09:58AM   5        A.   THEY ARE.

09:58AM   6        Q.   AND YOU ALSO WERE COUNSELLED BY CAPABLE EXPERTS IN

09:58AM   7        MARKETING; IS THAT FAIR TO SAY?

09:58AM   8        A.   YES.

09:58AM   9        Q.   AND DID THERANOS HAVE IN-HOUSE LAWYERS TO CONSULT IT IN

09:58AM  10        CONNECTION WITH ITS ACTIVITIES?

09:58AM  11        A.   WE DID.

09:58AM  12        Q.   MR. LEACH ASKED YOU A NUMBER OF QUESTIONS ABOUT THE NUMBER

09:58AM  13        OF SHARES THAT YOU OWNED IN THERANOS.

09:58AM  14             DO YOU REMEMBER THAT?

09:58AM  15        A.   I DO.

09:58AM  16        Q.   AND HE SHOWED YOU A PARTICULAR NUMBER.  IT WAS SEVERAL

09:58AM  17        HUNDRED MILLION SHARES.

09:58AM  18             DO YOU RECALL THAT?

09:58AM  19        A.   YES.

09:58AM  20        Q.   AND WAS IT EVER THE CASE AT ANY TIME BETWEEN THE FOUNDING

09:58AM  21        OF THE COMPANY AND THE TIME THAT THE COMPANY CEASED ITS

09:58AM  22        EXISTENCE IN 2018 THAT YOU EVER SOLD A SINGLE SHARE OF THAT

09:59AM  23        STOCK?

09:59AM  24        A.   NO.

09:59AM  25        Q.   WHEN YOU WERE OUT ASKING OTHERS TO INVEST IN THE COMPANY

HOLMES REDIRECT BY MR. DOWNEY (RES.)                              8614

09:59AM   1    THAT YOU HAD FOUNDED, WHAT DID YOU TYPICALLY WANT TO CONVEY TO

09:59AM   2    THEM AS A QUESTION OF WHY THEY SHOULD INVEST IN THERANOS?

09:59AM   3    A.   I WANTED TO CONVEY THE IMPACT THE COMPANY COULD MAKE FOR

09:59AM   4    PEOPLE AND FOR HEALTH CARE.  THEY WERE PEOPLE WHO WERE

09:59AM   5    LONG-TERM INVESTORS, AND I WANTED TO TALK ABOUT WHAT THIS

09:59AM   6    COMPANY COULD DO A YEAR FROM NOW, FIVE YEARS FROM NOW, TEN

09:59AM   7    YEARS FROM NOW.

09:59AM   8        THEY WEREN'T INTERESTED IN TODAY OR TOMORROW OR NEXT

09:59AM   9    MONTH.  THEY WERE INTERESTED IN WHAT KIND OF CHANGE WE COULD

09:59AM  10    MAKE.

09:59AM  11    Q.   WELL, DID YOU EVER FOCUS IN YOUR COMMENTARY ON THE CURRENT

09:59AM  12    TEST MENU IN THE CLIA LAB, FOR EXAMPLE?

09:59AM  13    A.   I DID NOT.

09:59AM  14    Q.   DID YOU FOCUS IN YOUR COMMENTS ON THE TECHNOLOGY THAT

09:59AM  15    THERANOS HAD INVENTED AND ITS CAPABILITIES OVER THE LONG RUN?

10:00AM  16    A.   I DID.  I TALKED ABOUT WHAT WE'D CREATED AND WHAT IT COULD

10:00AM  17    DO, WHAT WAS POSSIBLE.

10:00AM  18    Q.   OKAY.

10:00AM  19        YOUR HONOR, MAY I JUST HAVE ONE MOMENT?  I WANT TO GET ONE

10:00AM  20    DOCUMENT.

10:00AM  21            THE COURT:  YES.

10:00AM  22        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:00AM  23            MR. DOWNEY:  YOUR HONOR, I JUST WANTED TO MAKE SURE

10:00AM  24    I RESERVE THE ABILITY TO CLEAR UP ANY ISSUES TO THE REDUCED

10:00AM  25    EXHIBIT, AND THEN I'LL BE DONE.

HOLMES RECROSS BY MR. LEACH                                          8615

| | | |
|---|---|---|
| 10:00AM | 1 | THE COURT:  OKAY.  THAT'S FINE.  THANK YOU. |
| 10:00AM | 2 | MR. DOWNEY:  THANK YOU, MS. HOLMES. |
| 10:00AM | 3 | THE WITNESS:  THANK YOU. |
| 10:00AM | 4 | THE COURT:  DO YOU HAVE RECROSS? |
| 10:00AM | 5 | MR. LEACH:  BRIEFLY, YOUR HONOR, YES. |
| 10:01AM | 6 | **RECROSS-EXAMINATION** |
| 10:01AM | 7 | BY MR. LEACH: |
| 10:01AM | 8 | Q.   GOOD MORNING, MS. HOLMES. |
| 10:01AM | 9 | A.   GOOD MORNING. |
| 10:01AM | 10 | Q.   YOU WERE ASKED A NUMBER OF QUESTIONS ON REDIRECT |
| 10:01AM | 11 | EXAMINATION ABOUT 15055, AN EMAIL REGARDING TRADE SECRET POLICY |
| 10:01AM | 12 | REMINDER. |
| 10:01AM | 13 | DO YOU RECALL TESTIFYING ABOUT THAT? |
| 10:01AM | 14 | A.   I DO. |
| 10:01AM | 15 | MR. LEACH:  MS. KRATZMANN, IF I COULD USE THE ELMO |
| 10:02AM | 16 | FOR THIS? |
| 10:02AM | 17 | THE CLERK:  YES, COUNSEL. |
| 10:02AM | 18 | BY MR. LEACH: |
| 10:02AM | 19 | Q.   DO YOU SEE THE DATE OF MAY 2ND, 2012, MS. HOLMES, ON THIS |
| 10:02AM | 20 | EMAIL? |
| 10:02AM | 21 | A.   I DO. |
| 10:02AM | 22 | Q.   AND THIS IS FROM ONE OF YOUR ATTORNEYS, DAVID DOYLE? |
| 10:02AM | 23 | A.   IT IS. |
| 10:02AM | 24 | Q.   HE WAS IN-HOUSE AT THERANOS? |
| 10:02AM | 25 | A.   HE WAS. |

HOLMES RECROSS BY MR. LEACH                                    8616

10:02AM    1     Q.   AND IN THIS TIME PERIOD, YOU WERE EMBROILED IN A PATENT

10:02AM    2     LAWSUIT REGARDING SOME OF YOUR TECHNOLOGY; CORRECT?

10:02AM    3     A.   WE WERE.

10:02AM    4     Q.   OKAY.  AND THE IDEA OF TRADE SECRETS WAS TOP OF MIND TO

10:02AM    5     YOU IN THIS TIME PERIOD.

10:02AM    6          DID I HEAR YOU TESTIFY TO THAT?

10:02AM    7     A.   IT WAS.

10:02AM    8     Q.   OKAY.  AND YOU WERE ASKING MR. DOYLE TO PUT TOGETHER A

10:02AM    9     POLICY SO THAT PEOPLE UNDERSTOOD WHAT THEY COULD DO, WHAT THEY

10:02AM   10     COULDN'T DO, AND WHAT THEY SHOULD DO; CORRECT?

10:02AM   11     A.   I DID.

10:02AM   12     Q.   OKAY.  AND PART OF THAT POLICY SAYS, "A TRADE SECRET IS"

10:02AM   13     INFORMATION" -- "IS SIMPLY ANY INFORMATION THAT:  (A) THE OWNER

10:03AM   14     MAKES REASONABLE EFFORTS TO KEEP SECRET; AND, (B) HAS ECONOMIC

10:03AM   15     VALUE BECAUSE IT IS NOT GENERALLY KNOWN (TO THE PUBLIC OR A

10:03AM   16     COMPETITOR);" CORRECT?

10:03AM   17     A.   YES.

10:03AM   18     Q.   NOW, WALGREENS WAS NOT YOUR COMPETITOR; CORRECT?

10:03AM   19     A.   THEY WERE NOT.

10:03AM   20     Q.   THEY WERE YOUR PARTNER?

10:03AM   21     A.   THEY WERE.  WE WERE WORRIED ABOUT THEM POTENTIALLY GETTING

10:03AM   22     INTO THE LAB BUSINESS DIRECTLY, BUT THEY WERE A PARTNER.

10:03AM   23     Q.   THEY WERE YOUR PARTNER.

10:03AM   24          AND YOU HAD A CONFIDENTIALITY AGREEMENT WITH THEM?

10:03AM   25     A.   WE DID.

HOLMES RECROSS BY MR. LEACH                                        8617

10:03AM   1        Q.   AND THEY WEREN'T THE PUBLIC, THEY WERE YOUR PARTNER?

10:03AM   2        A.   YES.

10:03AM   3        Q.   AND LATER ON THE POLICY THAT YOU PUT TOGETHER WITH

10:03AM   4   MR. DOYLE SAYS, "THE DEFINING CHARACTERISTIC OF A TRADE SECRET,

10:03AM   5   IN FACT, IS THAT IT IS NEVER DISCLOSED PUBLICLY;" CORRECT?

10:03AM   6        A.   YES.

10:03AM   7        Q.   AND YOU SAID MANY THINGS TO WALGREENS THAT YOU DIDN'T SAY

10:03AM   8   PUBLICLY; CORRECT?

10:03AM   9        A.   CORRECT.

10:03AM  10        Q.   AND IT ALSO SAYS, "PROVIDED THE HOLD" -- LET ME START

10:03AM  11   AGAIN.  "PROVIDED THE HOLDER EMPLOYS REASONABLE EFFORTS TO

10:04AM  12   PROTECT A TRADE SECRET, HE OR SHE MAY FILE SUIT WHENEVER THE

10:04AM  13   SECRET IS DISCLOSED THROUGH 'IMPROPER MEANS.'"

10:04AM  14        DO YOU SEE "IMPROPER MEANS" IN QUOTES?

10:04AM  15        A.   I DO.

10:04AM  16        Q.   AND IMPROPER MEANS INCLUDES "THEFT, BRIBERY,

10:04AM  17   MISREPRESENTATION, BREACH OF A DUTY (CONTRACTUAL OR

10:04AM  18   OTHERWISE)."

10:04AM  19        DO YOU SEE THAT?

10:04AM  20        A.   I DO.

10:04AM  21        Q.   AND YOU UNDERSTOOD THIS TO MEAN THAT IMPROPER MEANS MIGHT

10:04AM  22   BE IF A PARTY HAS A CONFIDENTIALITY AGREEMENT, BUT BREACHES IT?

10:04AM  23        A.   YES.

10:04AM  24        Q.   AND PART OF THE MEASURES YOU AND MR. DOYLE ARE DISCUSSING

10:04AM  25   HERE ARE REQUIRING VISITORS TO THERANOS FACILITIES TO SIGN A

HOLMES RECROSS BY MR. LEACH                                          8618

10:04AM   1     CDA.  THAT'S A CONFIDENTIAL DISCLOSURE AGREEMENT?

10:04AM   2     A.   IT IS.

10:04AM   3     Q.   AND ANOTHER ONE YOU'RE TALKING ABOUT REQUIRING ALL VENDORS

10:04AM   4     OR OTHER POTENTIAL BUSINESS PARTNERS TO SIGN AN ENTITY CDA

10:04AM   5     PRIOR TO COMMENCING DISCUSSIONS OF ANY THERANOS CONFIDENTIAL

10:05AM   6     INFORMATION; CORRECT?

10:05AM   7     A.   YES.

10:05AM   8     Q.   AND SO YOUR POLICY CONTEMPLATED DISCLOSING CONFIDENTIAL

10:05AM   9     INFORMATION TO PARTNERS WITH A CDA; CORRECT?

10:05AM  10     A.   YES, YES.

10:05AM  11     Q.   AND, IN FACT, YOU TOLD WALGREENS MANY CONFIDENTIAL ASPECTS

10:05AM  12     OF YOUR BUSINESS; CORRECT?

10:05AM  13     A.   WE DID.

10:05AM  14     Q.   AND YOU TOLD PHARMACEUTICAL COMPANIES MANY CONFIDENTIAL

10:05AM  15     ASPECTS OF YOUR BUSINESS; CORRECT?

10:05AM  16     A.   YES.

10:05AM  17     Q.   BECAUSE YOU HAD AN AGREEMENT WITH THEM WHERE THEY AGREED

10:05AM  18     TO KEEP YOUR SECRETS; CORRECT?

10:05AM  19     A.   WE HAD A CONFIDENTIALITY AGREEMENT WITH THEM.

10:05AM  20     Q.   YEAH.  AND YOU WERE COMFORTABLE WITH THAT?

10:05AM  21     A.   I WAS.

10:05AM  22     Q.   ANOTHER PROVISION HERE IS REQUIRING ALL NEW AND EXISTING

10:05AM  23     EMPLOYEES, CONSULTANTS, AND OTHER TEAM MEMBERS TO SIGN

10:05AM  24     INDIVIDUAL CDA'S, AS WELL AS PROJECT SPECIFIC CDA'S.

10:05AM  25         DO YOU SEE THAT?

HOLMES RECROSS BY MR. LEACH                                            8619

| | | |
|---|---|---|
| 10:05AM | 1 | A.   YES. |
| 10:05AM | 2 | Q.   AND SO YOUR POLICY CONTEMPLATED GIVING CONFIDENTIAL |
| 10:06AM | 3 | INFORMATION TO CONSULTANTS WHO WERE NOT EMPLOYEES OF THERANOS; |
| 10:06AM | 4 | CORRECT? |
| 10:06AM | 5 | A.   IT DID. |
| 10:06AM | 6 | Q.   AND YOU HAD A NUMBER OF CONSULTANTS WHO WORKED WITHIN THE |
| 10:06AM | 7 | FOUR WALLS OF THERANOS, BUT YOU GAVE THEM CONFIDENTIAL |
| 10:06AM | 8 | INFORMATION; CORRECT? |
| 10:06AM | 9 | A.   YES. |
| 10:06AM | 10 | Q.   AND PURSUANT TO THOSE AGREEMENTS, YOU TRUSTED THEM TO |
| 10:06AM | 11 | HONOR THOSE SECRETS; CORRECT? |
| 10:06AM | 12 | A.   YES. |
| 10:06AM | 13 | Q.   YOUR POLICY ALSO CONTEMPLATED PROACTIVELY EDUCATING NEW |
| 10:06AM | 14 | EMPLOYEES, PARTNERS, AND OTHERS AS APPROPRIATE ABOUT YOUR |
| 10:06AM | 15 | CONFIDENTIALITY EXPECTATIONS; CORRECT? |
| 10:06AM | 16 | A.   YES. |
| 10:06AM | 17 | Q.   AND SO YOUR POLICY IS CONTEMPLATING TALKING TO PARTNERS |
| 10:06AM | 18 | ABOUT THEIR CONFIDENTIALITY OBLIGATIONS; CORRECT? |
| 10:06AM | 19 | A.   YES. |
| 10:06AM | 20 | Q.   AND WALGREENS WAS A PARTNER? |
| 10:06AM | 21 | A.   THEY WERE. |
| 10:06AM | 22 | Q.   AND YOU ALSO TALKED ABOUT REMINDING PARTNERS OF THEIR |
| 10:06AM | 23 | ONGOING CONFIDENTIALITY OBLIGATIONS. |
| 10:06AM | 24 | WAS THAT A PART OF THE POLICY -- |
| 10:06AM | 25 | A.   YES. |

HOLMES RECROSS BY MR. LEACH                                                    8620

| | | |
|---|---|---|
| 10:06AM | 1 | Q.   -- IN THAT LAST BULLET? |
| 10:06AM | 2 | A.   YES. |
| 10:06AM | 3 | Q.   SO IF YOUR RELATIONSHIP WITH WALGREENS FOR WHATEVER REASON |
| 10:07AM | 4 | ENDED, THIS CONTEMPLATES TALKING TO YOUR PARTNER ABOUT THEIR |
| 10:07AM | 5 | CONFIDENTIALITY AGREEMENTS, THE SECRETS THAT YOU SHARED WITH |
| 10:07AM | 6 | THEM? |
| 10:07AM | 7 | A.   IT DOES. |
| 10:07AM | 8 | Q.   OKAY.  YOU WERE ALSO ASKED SOME QUESTIONS ABOUT GSK. |
| 10:07AM | 9 | DO YOU RECALL GSK? |
| 10:07AM | 10 | A.   I DO. |
| 10:07AM | 11 | Q.   OKAY.  AND I WANT TO SHOW YOU WHAT IS IN EVIDENCE AS |
| 10:07AM | 12 | 14111. |
| 10:07AM | 13 | DO YOU RECALL SOME TESTIMONY ABOUT THIS AGREEMENT? |
| 10:07AM | 14 | A.   MY TESTIMONY? |
| 10:07AM | 15 | Q.   YES. |
| 10:07AM | 16 | A.   YES. |
| 10:07AM | 17 | Q.   AND ARE YOU AWARE OF ANY OTHER AGREEMENTS WITH GSK? |
| 10:07AM | 18 | A.   I AM. |
| 10:07AM | 19 | Q.   WHICH ONE? |
| 10:07AM | 20 | A.   THERE'S A MASTER SERVICES AGREEMENT THAT IS ENTERED INTO I |
| 10:07AM | 21 | THINK IN 2010 OR SO. |
| 10:07AM | 22 | Q.   OKAY.  OTHER THAN THAT MASTER SERVICES AGREEMENT, ANYTHING |
| 10:07AM | 23 | ELSE? |
| 10:07AM | 24 | A.   YES. |
| 10:07AM | 25 | Q.   WHICH ONE? |

HOLMES RECROSS BY MR. LEACH                                          8621

```
10:07AM   1       A.   THERE'S A STATEMENT OF WORK THAT IS ENTERED INTO WITH GSK

10:07AM   2       BIOLOGICALS.

10:07AM   3       Q.   IN WHAT YEAR?

10:08AM   4       A.   I THINK 2010ISH.

10:08AM   5       Q.   OKAY.

10:08AM   6       A.   I'M NOT EXACTLY SURE.

10:08AM   7       Q.   OKAY.  OTHER THAN THAT, ANYTHING ELSE?

10:08AM   8       A.   NO.

10:08AM   9       Q.   OKAY.  AND YOU -- THIS AGREEMENT TALKS ABOUT -- LET ME

10:08AM  10       START WITH PARAGRAPH 6.

10:08AM  11            DO YOU SEE THE HEADING "CONFIDENTIALITY"?

10:08AM  12       A.   I DO.

10:08AM  13       Q.   AND MANY OF YOUR PHARMA AGREEMENTS WOULD HAVE

10:08AM  14       CONFIDENTIALITY AGREEMENTS GOVERNING THE SHARE OF INFORMATION?

10:08AM  15       A.   YES.

10:08AM  16       Q.   AND THIS ONE SAYS IN 6.2, "THERANOS AND GSK EACH HEREBY

10:08AM  17       RECOGNIZE AND ACKNOWLEDGE THAT THE OTHER PARTY'S CONFIDENTIAL

10:08AM  18       INFORMATION CONSTITUTES VALUABLE AND PROPRIETARY INFORMATION."

10:08AM  19            CORRECT?

10:08AM  20       A.   IT DOES.

10:08AM  21       Q.   AND YOU WERE COMFORTABLE SHARING VALUABLE AND PROPRIETARY

10:08AM  22       INFORMATION WITH GSK AND OTHER PHARMACEUTICAL COMPANIES BECAUSE

10:08AM  23       YOU KNEW THAT YOU HAD THESE AGREEMENTS WHERE THEY WOULD KEEP

10:08AM  24       YOUR SECRETS?

10:09AM  25       A.   I WAS.
```

HOLMES RECROSS BY MR. LEACH                                         8622

| | | |
|---|---|---|
| 10:09AM | 1 | Q.   OKAY.  YOU WERE ALSO ASKED SOME QUESTIONS ABOUT A RENT |
| 10:09AM | 2 | MODEL WITH WALGREENS. |
| 10:09AM | 3 | A.   YES. |
| 10:09AM | 4 | Q.   AND YOU HAD DISCUSSIONS WITH MR. GOURLAY ABOUT THAT? |
| 10:09AM | 5 | A.   I DID. |
| 10:09AM | 6 | Q.   NOTHING EVER CAME OF THE RENT MODEL; CORRECT? |
| 10:09AM | 7 | A.   NO. |
| 10:09AM | 8 | Q.   YOU NEVER MODIFIED YOUR AGREEMENT WITH WALGREENS? |
| 10:09AM | 9 | A.   WE STARTED TO.  WE WERE GOING THROUGH CONTRACT AMENDMENTS. |
| 10:09AM | 10 | Q.   OKAY.  BUT YOU NEVER CONSUMMATED ANYTHING; CORRECT? |
| 10:09AM | 11 | A.   WE DID NOT. |
| 10:09AM | 12 | Q.   OKAY.  AND YOU NEVER EXPANDED BEYOND THE 41 STORES THAT WE |
| 10:09AM | 13 | TALKED ABOUT ON CROSS-EXAMINATION? |
| 10:09AM | 14 | A.   THAT'S RIGHT. |
| 10:09AM | 15 | Q.   OKAY.  YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT |
| 10:09AM | 16 | THERANOS'S CASH POSITION IN SEPTEMBER OF 2013 ON REDIRECT. |
| 10:09AM | 17 | DO YOU RECALL THAT TESTIMONY? |
| 10:09AM | 18 | A.   I DO. |
| 10:09AM | 19 | Q.   OKAY.  AND I'D LIKE TO SHOW YOU EXHIBIT -- THE NATIVE FILE |
| 10:09AM | 20 | FOR EXHIBIT 5172. |
| 10:10AM | 21 | DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS ON |
| 10:10AM | 22 | CROSS-EXAMINATION, MS. HOLMES? |
| 10:10AM | 23 | A.   I DO. |
| 10:10AM | 24 | Q.   AND MR. DOWNEY SHOWED YOU AN EMAIL FROM WADE MIQUELON IN |
| 10:10AM | 25 | THE SEPTEMBER 2013 TIME PERIOD WITH A DRAFT TERM SHEET ON IT; |

HOLMES RECROSS BY MR. LEACH                                          8623

10:10AM   1      CORRECT?

10:10AM   2      A.   HE DID.

10:10AM   3      Q.   OKAY.  AND THAT'S EXHIBIT 1083.  IS THAT CONSISTENT WITH

10:10AM   4      YOUR MEMORY?

10:10AM   5      A.   I DON'T KNOW.

10:10AM   6      Q.   OKAY.  BUT HE SHOWED YOU AN EMAIL WITH A DRAFT AGREEMENT

10:10AM   7      FROM THE SEPTEMBER TIME PERIOD; CORRECT?

10:10AM   8      A.   HE DID.

10:10AM   9      Q.   AND THE ACTUAL AGREEMENT THAT YOU REACHED WITH WALGREENS

10:10AM  10      IS AT THE END OF DECEMBER 2013; CORRECT?

10:10AM  11      A.   YES.

10:10AM  12      Q.   AND THE 75 MILLION THAT YOU'RE TALKING ABOUT IN THAT

10:10AM  13      DECEMBER 2013 AGREEMENT DOESN'T COME IN UNTIL JANUARY OF 2014;

10:10AM  14      ISN'T THAT CORRECT?

10:10AM  15      A.   I'M NOT -- I REMEMBERED IT AS DECEMBER 31ST, BUT IT COULD

10:10AM  16      HAVE BEEN JANUARY.

10:10AM  17      Q.   LET'S LOOK AT THE SPREADSHEET.

10:11AM  18           DO YOU SEE IN COLUMN EN WHERE THERANOS HAS $587,000 IN ITS

10:11AM  19      COMERICA BANK ACCOUNT?

10:11AM  20      A.   I DO.

10:11AM  21      Q.   AND THIS IS THE END OF SEPTEMBER OF 2013?

10:11AM  22      A.   YES.

10:11AM  23      Q.   AND IF WE COULD ZOOM OUT A LITTLE BIT, MS. HOLLIMAN.  A

10:11AM  24      LITTLE BIT MORE.  THANK YOU.

10:11AM  25           AND IF WE CAN SCROLL DOWN A LITTLE BIT MORE TO THE OTHER.

HOLMES RECROSS BY MR. LEACH                                          8624

| | | |
|---|---|---|
| 10:11AM | 1 | THANK YOU. |
| 10:11AM | 2 | AND WE TALKED A LITTLE BIT ON DIRECT EXAMINATION ABOUT THE |
| 10:11AM | 3 | MONIES THAT COME IN FOR OPTION/STOCK PROCEEDS AT THE END OF |
| 10:11AM | 4 | SEPTEMBER. |
| 10:11AM | 5 | DO YOU RECALL THAT TESTIMONY? |
| 10:11AM | 6 | A.   OPTION/STOCK PROCEEDS?  I DO.  I DO. |
| 10:12AM | 7 | Q.   IF YOU LOOK IN ROW 27, AND IN EL, THAT'S THE MONEY FROM |
| 10:12AM | 8 | PEER VENTURES AND DON LUCAS JUNIOR'S FUND? |
| 10:12AM | 9 | A.   IT IS. |
| 10:12AM | 10 | Q.   AND IF WE SCROLL TO THE RIGHT, MS. HOLLIMAN.  RIGHT THERE. |
| 10:12AM | 11 | DO YOU SEE IN F, COLUMN FC, THERE'S THE AMOUNT IN ROW 26 |
| 10:12AM | 12 | OF $75 MILLION? |
| 10:12AM | 13 | A.   YEP. |
| 10:12AM | 14 | Q.   THAT'S THE INNOVATION FEE THAT WALGREENS ADVANCED AT THE |
| 10:12AM | 15 | END OF 2013, BEGINNING PART OF 2014; CORRECT? |
| 10:12AM | 16 | A.   IT IS. |
| 10:12AM | 17 | Q.   SO THAT MONEY DOES NOT COME IN IN SEPTEMBER, IT COMES IN |
| 10:12AM | 18 | IN JANUARY OF 2014? |
| 10:12AM | 19 | A.   CORRECT. |
| 10:12AM | 20 | Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE SALE OF |
| 10:12AM | 21 | 227 PARK LANE IN ATHERTON. |
| 10:12AM | 22 | DO YOU RECALL THAT TESTIMONY? |
| 10:12AM | 23 | A.   I DO. |
| 10:12AM | 24 | Q.   THAT HAPPENS IN 2018, DOESN'T IT? |
| 10:13AM | 25 | A.   I HAVE NO IDEA WHEN IT WAS SOLD. |

HOLMES RECROSS BY MR. LEACH                                          8625

| | | |
|---|---|---|
| 10:13AM | 1 | Q.   THAT HAPPENS IN 2018 WELL -- AT THE SAME TIME PERIOD THAT |
| 10:13AM | 2 | YOU AND MR. BALWANI ARE UNDER SOME SCRUTINY BY THE S.E.C.; |
| 10:13AM | 3 | ISN'T THAT CORRECT? |
| 10:13AM | 4 | A.   I DO NOT KNOW IF HE SOLD HIS HOUSE. |
| 10:13AM | 5 | Q.   YOU DON'T KNOW THE TIME PERIOD OF WHEN THAT LLC WAS |
| 10:13AM | 6 | DISSOLVED? |
| 10:13AM | 7 | A.   I FOUND OUT THAT IT WAS DISSOLVED LATER. |
| 10:13AM | 8 | Q.   BUT YOU DON'T KNOW WHEN? |
| 10:13AM | 9 | A.   I DON'T. |
| 10:13AM | 10 | Q.   OKAY.  AND YOU DON'T KNOW WHETHER IT WAS AT A TIME PERIOD |
| 10:13AM | 11 | WHEN BOTH YOU AND MR. BALWANI WERE UNDER SCRUTINY BY THE |
| 10:13AM | 12 | S.E.C.; CORRECT? |
| 10:13AM | 13 | A.   I DON'T.  I DIDN'T DISSOLVE IT. |
| 10:13AM | 14 | Q.   YOU WERE ASKED QUESTIONS ABOUT WHAT INVESTORS EXPECTED |
| 10:13AM | 15 | FROM YOU IN TERMS OF YOUR -- WHAT YOU WERE TRYING TO |
| 10:13AM | 16 | COMMUNICATE TO THEM IN TERMS OF YOUR VISION. |
| 10:13AM | 17 | DO YOU RECALL SOME TESTIMONY AT THE END ABOUT THAT? |
| 10:13AM | 18 | A.   I DO. |
| 10:13AM | 19 | Q.   YOU MADE REPRESENTATIONS TO THERANOS INVESTORS ABOUT |
| 10:14AM | 20 | THERANOS'S CURRENT CAPABILITIES, DIDN'T YOU? |
| 10:14AM | 21 | A.   I'M SURE IN SOME CASES WE TALKED ABOUT IT. |
| 10:14AM | 22 | Q.   OKAY.  AND YOU UNDERSTOOD THAT THEY WERE ENTITLED TO |
| 10:14AM | 23 | TRUTHFUL ANSWERS ABOUT THERANOS'S CURRENT CAPABILITIES; |
| 10:14AM | 24 | CORRECT? |
| 10:14AM | 25 | A.   OF COURSE. |

8626

| | | |
|---|---|---|
| 10:14AM | 1 | MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR? |
| 10:14AM | 2 | THE COURT:  YES. |
| 10:14AM | 3 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 10:14AM | 4 | MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR. |
| 10:14AM | 5 | THANK YOU, MS. HOLMES. |
| 10:14AM | 6 | THE WITNESS:  THANK YOU. |
| 10:14AM | 7 | MR. DOWNEY:  NOTHING FURTHER. |
| 10:14AM | 8 | THE COURT:  MR. DOWNEY? |
| 10:14AM | 9 | MR. DOWNEY:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS |
| 10:14AM | 10 | SUBJECT TO HOW YOUR HONOR WANTS TO HANDLE THAT EXHIBIT THAT I |
| 10:14AM | 11 | PASSED UP IN THE BINDER. |
| 10:15AM | 12 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:15AM | 13 | LET ME ASK YOU, SHOULD WE HAVE MS. HOLMES THEN STAND DOWN |
| 10:15AM | 14 | NOW?  DO YOU NEED HER? |
| 10:15AM | 15 | MR. DOWNEY:  IF -- I DON'T NEED HER FURTHER, I |
| 10:15AM | 16 | THINK, TO AUTHENTICATE IT, SO I THINK WE COULD HAVE THAT |
| 10:15AM | 17 | DISCUSSION WITHOUT MS. HOLMES. |
| 10:15AM | 18 | THE COURT:  ALL RIGHT. |
| 10:15AM | 19 | YOU CAN STAND DOWN.  THANK YOU. |
| 10:15AM | 20 | LET ME ASK YOU, MR. DOWNEY, DO WE NEED TO RESOLVE THIS |
| 10:15AM | 21 | BEFORE I ASK YOU ABOUT ANY OTHER EVIDENCE? |
| 10:15AM | 22 | MR. DOWNEY:  I THINK THAT MIGHT BE USEFUL, |
| 10:15AM | 23 | YOUR HONOR. |
| 10:15AM | 24 | THE COURT:  OKAY.  ALL RIGHT.  THANK YOU. |
| 10:15AM | 25 | LET'S TAKE JUST A COUPLE OF MINUTES, LADIES AND GENTLEMEN. |

| | | |
|---|---|---|
| 10:15AM | 1 | WE'RE GOING TO TAKE A RECESS.  I NEED TO TALK TO THE LAWYERS |
| 10:15AM | 2 | ABOUT SOMETHING. |
| 10:15AM | 3 | SO WE'LL TAKE A BRIEF RECESS. |
| 10:16AM | 4 | (JURY OUT AT 10:16 A.M.) |
| 10:16AM | 5 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 10:16AM | 6 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.  ALL |
| 10:16AM | 7 | COUNSEL AND MS. HOLMES REMAIN IN THE COURTROOM. |
| 10:16AM | 8 | AND THIS IS -- LET'S SEE.  THIS IS REGARDING IS IT 7586A? |
| 10:16AM | 9 | IS THAT THE EXHIBIT? |
| 10:16AM | 10 | MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.  I THINK WHAT |
| 10:16AM | 11 | HAD HAPPENED BEFORE, BUT I DON'T WANT TO -- |
| 10:16AM | 12 | THE COURT:  COME ON UP. |
| 10:16AM | 13 | MR. DOWNEY:  I THINK WE SOUGHT TO ADMIT AND WE LAID |
| 10:16AM | 14 | THE FOUNDATION.  I DON'T KNOW IF YOUR HONOR FORMALLY ADMITTED |
| 10:16AM | 15 | IT.  I THINK IT WAS JUST A QUESTION OF MAKING IT MORE USER |
| 10:16AM | 16 | FRIENDLY. |
| 10:16AM | 17 | BUT I CERTAINLY WANT TO GIVE HIM AN OPPORTUNITY TO REVIEW |
| 10:16AM | 18 | IT.  I KNOW HE HAS REVIEWED IT HISTORICALLY, AND IT'S THE |
| 10:16AM | 19 | DESCRIPTION OF THE INVENTION THAT IS IN THERE. |
| 10:16AM | 20 | I THINK THE REST OF IT MS. HOLMES TESTIFIED ABOUT, SO WE |
| 10:16AM | 21 | DON'T NEED A FURTHER ENTRY OF THAT PART OF THE EXHIBIT. |
| 10:16AM | 22 | THE COURT:  THIS IS 7 -- |
| 10:16AM | 23 | MR. DOWNEY:  I'M SORRY, YOUR HONOR.  YOU'RE TALKING |
| 10:17AM | 24 | ABOUT THE -- I'M SORRY.  I'M CONFUSED BETWEEN MY EXHIBITS. |
| 10:17AM | 25 | YEAH, YOUR HONOR WAS TALKING ABOUT THE CUSTOMER SERVICE, |

| | | |
|---|---|---|
| 10:17AM | 1 | YEAH. |
| 10:17AM | 2 | THE COURT: RIGHT. |
| 10:17AM | 3 | MR. DOWNEY: WE HAVE MOVED TO ADMIT THOSE EXHIBITS, |
| 10:17AM | 4 | AND I HAVE THEM IN UNREDACTED FORM IF THAT'S THE PREFERENCE FOR |
| 10:17AM | 5 | SOME REASON OF THE GOVERNMENT. I SUSPECT NOT. |
| 10:17AM | 6 | I THINK THE REDACTIONS WERE DESIGNED TO BE CONSISTENT WITH |
| 10:17AM | 7 | SEVERAL DISCUSSIONS THAT YOUR HONOR HAD. |
| 10:17AM | 8 | THE COURT: WELL, LET'S TALK ABOUT THIS FIRST, |
| 10:17AM | 9 | 7586A. |
| 10:17AM | 10 | MR. LEACH, I INDICATED I WOULD ALLOW YOUR TEAM TO LOOK AT |
| 10:17AM | 11 | THIS. I DON'T KNOW IF YOU'VE HAD OCCASION TO DO THAT, IF |
| 10:17AM | 12 | YOU'RE PREPARED TO DISCUSS THIS. |
| 10:17AM | 13 | MR. LEACH: YOUR HONOR, I'M SORRY. I HAVEN'T LOOKED |
| 10:17AM | 14 | AT IT. THIS WAS A 5-, 600 PAGE DOCUMENT. THE DEFENSE GAVE ME |
| 10:17AM | 15 | A BINDER OF EXCERPTS FROM IT. |
| 10:17AM | 16 | MR. DOWNEY: I THINK WE'RE TALKING ABOUT A DIFFERENT |
| 10:17AM | 17 | EXHIBIT NOW. |
| 10:17AM | 18 | MR. LEACH: OH. |
| 10:17AM | 19 | THE COURT: THIS IS THE ONE THAT WAS ENTERED -- |
| 10:17AM | 20 | SOUGHT TO BE INTRODUCED TODAY, THIS MORNING. |
| 10:17AM | 21 | MR. DOWNEY: YEAH. |
| 10:18AM | 22 | MR. LEACH: WE OBJECT ON 401, 403, HEARSAY, AND |
| 10:18AM | 23 | OTHER GROUNDS, YOUR HONOR. |
| 10:18AM | 24 | I THINK THIS TOUCHES ON THE ISSUE OF, YOU KNOW, WHAT IS |
| 10:18AM | 25 | THE RELEVANCE OF A CUSTOMER HAVING A POSITIVE EXPERIENCE IN THE |

8629

10:18AM  1    WELLNESS CENTER BEFORE THEY GET THEIR BLOOD TESTS.

10:18AM  2        I THINK THIS DOESN'T GO AT ALL TO THE ACCURACY OF THE

10:18AM  3    TESTS.

10:18AM  4        THE EMAIL THAT THEY'RE OFFERING HERE IS FROM AUGUST OF

10:18AM  5    2015, WHICH IS IN A TIME PERIOD WHEN THEY'RE UNDER SCRUTINY BY

10:18AM  6    THE FDA, CMS, AND "THE WALL STREET JOURNAL."

10:18AM  7        SO I THINK THERE ARE REASONS TO WONDER WHY THIS FEEDBACK

10:18AM  8    IS BEING CIRCULATED AND GENERATED.

10:18AM  9        I DON'T SEE HOW IT GOES TO MS. HOLMES'S STATE OF MIND

10:18AM  10   ABOUT REPRESENTATIONS OF THE TECHNOLOGY TO INVESTORS IN THE

10:18AM  11   2014 AND EARLY 2015 TIME PERIOD.

10:18AM  12       SO FOR ALL OF THE REASONS WE'VE DISCUSSED, WE RENEW OUR

10:19AM  13   OBJECTIONS TO THIS.

10:19AM  14       BUT I DON'T THINK I HAVE ANYTHING FURTHER THAN WHAT

10:19AM  15   MR. BOSTIC AND MS. VOLKAR HAVE ARTICULATED.

10:19AM  16       THE COURT:  AND MR. BOSTIC AND MS. VOLKAR'S

10:19AM  17   OBJECTIONS, THEY'RE STATED IN 1184 AS TO THE PRIOR DOCUMENT.

10:19AM  18       I THINK THOSE ARE TRANSFERRABLE, IF YOU WILL, IF I CAN USE

10:19AM  19   THAT PHRASE, FOR THIS PIECE ALSO.

10:19AM  20       MR. LEACH:  YES.

10:19AM  21       THE COURT:  I DO NOTE THAT MS. HOLMES DID TESTIFY

10:19AM  22   JUST A FEW MINUTES AGO ABOUT THE SAME ISSUES THAT ARE INVOLVED

10:19AM  23   IN THESE DOCUMENTS.  SHE WAS INFORMED ABOUT CUSTOMER SERVICE.

10:19AM  24   AS A MATTER OF FACT, I INTRODUCED A CUSTOMER SERVICE DOCUMENT

10:19AM  25   OVER OBJECTION OF THE GOVERNMENT, AND THAT DISPLAYED CUSTOMER

ER-12201

8630

| | |
|---|---|
| 10:19AM | 1 | SATISFACTION. |

10:19AM 1    SATISFACTION.

10:19AM 2        SHE TESTIFIED TO THE EXTENT THAT THAT INFORMED HER STATE

10:19AM 3    OF MIND AS TO THE RELATIONSHIP WITH WALGREENS AT THAT MOMENT IN

10:19AM 4    TIME.

10:19AM 5        SO I DO THINK THAT THAT IS IN EVIDENCE, AND THE DEFENSE

10:20AM 6    HAS THAT TO DO WITH IT WHATEVER THEY WISH.

10:20AM 7        I'M LOOKING AT THESE, AND I DO, I DO THINK THAT I'M GOING

10:20AM 8    TO SUSTAIN THE OBJECTION AS TO THESE.  I LOOK AT THE TIME

10:20AM 9    PERIOD OF THESE VIS-A-VIS THE CASE AND THAT CAUSES SOME

10:20AM 10   CONCERN.

10:20AM 11       I ALSO LOOK AT THESE AND THEY'RE INVOLVING -- FIRST OF

10:20AM 12   ALL, THEY'RE FROM PHLEBOTOMISTS, AND THEY TALK ABOUT THEIR

10:20AM 13   CUSTOMER EXPERIENCE AT THE STORES.

10:20AM 14       THEY DON'T RELATE -- I HAVEN'T SEEN ONE -- AND IF THERE IS

10:20AM 15   ONE, PLEASE POINT IT OUT TO ME, MR. DOWNEY.

10:20AM 16       I DON'T SEE ANY RESPONSE HERE THAT SPEAKS TO ACCURACY AND

10:20AM 17   RELIABILITY.  THESE SEEM TO ALL BE RELATED TO THE PRICING.

10:20AM 18       AND THERE'S A COUPLE OF COMMENTS HERE ABOUT THE EXTRACTION

10:20AM 19   EXPERIENCE AND WHAT A POSITIVE EVENT THAT WAS.

10:20AM 20       BUT THEY SEEM TO RELATE TO PRICING.

10:21AM 21       AND INCORPORATING THE COMMENTS THAT THE COURT MADE AS TO

10:21AM 22   THE OTHER DOCUMENT, I JUST DON'T SEE THE RELEVANCE OF THAT.

10:21AM 23       I DO NOTE, AND I THINK THE RECORD REFLECTS, THAT YOUR

10:21AM 24   CLIENT WAS NOT DEPRIVED OR DENIED THE OPPORTUNITY TO DISCUSS

10:21AM 25   CUSTOMER EXPERIENCE AT WALGREENS.  SHE DID THAT ON YOUR, ON

10:21AM  1     YOUR REDIRECT, AND I ALLOWED THAT EXHIBIT TO COME IN.

10:21AM  2         SO I DO THINK THE RECORD REFLECTS THAT SHE DOES HAVE THAT,

10:21AM  3     AND SHE DID SPEAK TO THAT, FOR WHATEVER VALUE THAT HAS.

10:21AM  4         BUT I'M GOING TO DENY -- OR SUSTAIN THE OBJECTION, PARDON

10:21AM  5     ME, AS TO 7586A.

10:21AM  6         I SUPPOSE FOR HOUSEKEEPING WE SHOULD TURN TO THE OTHER

10:21AM  7     DOCUMENT AS WELL.

10:21AM  8             MR. DOWNEY:  YOUR HONOR, I DON'T WANT TO BELABOR IT,

10:21AM  9     BUT I JUST WANT TO SAY FOR THE RECORD THAT IN 7586A, THE FIRST

10:21AM  10    ENTRY IN THE EMAIL WHICH IS THEN REFLECTED IN THE ATTACHMENT,

10:21AM  11    WHICH IS A REPORT SET, IS A REPORT ON A PATIENT COMPARING HIS

10:22AM  12    TEST RESULTS TO THE TEST RESULTS FROM ANOTHER LAB THAT HE USES

10:22AM  13    AS A PHYSICIAN, AND HE FINDS THE RESULTS TO BE -- THE WORD HE

10:22AM  14    USES IS "CONGRUENT," WHICH I THINK HE MEANS THEY'RE EFFECTIVELY

10:22AM  15    THE SAME.

10:22AM  16        SO I ONLY HIGHLIGHT THAT TO SAY THAT WE DID ACTUALLY TRY

10:22AM  17    TO INCLUDE SEVERAL INSTANCES WHERE THERE WERE COMMENTS AS TO

10:22AM  18    ACCURACY, AND YOUR HONOR IS FAMILIAR WITH ALL OF THE COMMENTS

10:22AM  19    WE HAVE MADE BEFORE ABOUT WHAT RETURN VISITS REFLECT.

10:22AM  20        BUT PUTTING THAT TO THE SIDE, THERE ARE COMMENTS IN HERE

10:22AM  21    THAT GO TO THE ACCURACY ISSUE.

10:22AM  22        I WOULD SAY IT'S A BIT OF A -- IT LEAVES US AT A BIT OF A

10:22AM  23    DISPARITY WITH THE GOVERNMENT EVIDENCE WHERE THEY HAVE BEEN

10:22AM  24    ABLE TO INTRODUCE ANECDOTES THAT THE DEFENDANT KNOWS NOTHING

10:22AM  25    ABOUT WHERE A PATIENT COMES IN AND SAYS, I HAVE GOTTEN AN

10:23AM  1    INACCURATE RESULT.

10:23AM  2        WE HAVE EVIDENCE THAT THE DEFENDANT KNEW ABOUT WHERE

10:23AM  3    SOMEONE WITH FAMILIARITY WITH THE BLOOD TESTING PROCESS SAYS, I

10:23AM  4    THINK THESE RESULTS ARE VERY ACCURATE, AND WE CAN'T INTRODUCE

10:23AM  5    THAT.

10:23AM  6        SO THAT DOES LEAVE US AT A DISPARITY, BUT I DON'T WANT TO

10:23AM  7    BELABOR THE ISSUE.

10:23AM  8            THE COURT:  WELL, LET ME REVISIT THAT, AND THANK YOU

10:23AM  9    FOR POINTING THAT OUT.

10:23AM 10        I LOOK AT THE ACTUAL COMMENTS FROM THE PHLEBOTOMISTS, AND

10:23AM 11    THOSE WERE WHAT I WAS LOOKING AT IN THE OTHER DOCUMENT, AND

10:23AM 12    THOSE WERE PHLEBOTOMIST REPORTS.

10:23AM 13        WE TALKED ABOUT THE PHLEBOTOMIST BEING EMPLOYEES OF THE

10:23AM 14    COMPANY, AND THEY WERE WRITING THEIR COMMENTS FROM THE PATIENTS

10:23AM 15    THAT CAME IN.

10:23AM 16        THOSE EXPERIENCES WERE REALLY RELATED TO THE CUSTOMER

10:23AM 17    EXPERIENCE OF THE DRAW, THE LIGHTING, ALL OF THAT TYPE OF

10:23AM 18    THING.  THAT'S WHAT WE DISCUSSED PREVIOUSLY.

10:23AM 19        AS I NOTED, THERE WEREN'T -- IN THAT PREVIOUS SET, THERE

10:23AM 20    DID NOT SEEM TO BE ANYTHING, ANYTHING AS TO ACCURACY.

10:23AM 21        MR. DOWNEY, YOU POINT OUT IN THE FIRST, WHERE IT SAYS

10:24AM 22    HIGHLIGHTS, GUEST QUOTE, THIS MR. KARPEL IS FORWARDING THIS

10:24AM 23    EMAIL.

10:24AM 24        AND I DO SEE THAT LAST SENTENCE, LAB CROSS-CHECKED

10:24AM 25    CONGRUENT.

8633

| | | |
|---|---|---|
| 10:24AM | 1 | AND YOU SUGGEST THAT THAT IS A STATEMENT THAT POSSIBLY |
| 10:24AM | 2 | RELATES TO ACCURACY? |
| 10:24AM | 3 | MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR. |
| 10:24AM | 4 | THE COURT:  OKAY. |
| 10:24AM | 5 | MR. LEACH, ANY COMMENT? |
| 10:24AM | 6 | MR. LEACH:  NO.  WE'LL STAND ON OUR PRIOR ARGUMENTS, |
| 10:24AM | 7 | YOUR HONOR, OTHER THAN I THINK WHAT THEY REALLY WANT THIS IN |
| 10:24AM | 8 | FOR IS THE TRUTH, A COMMENT BY AN ANONYMOUS PHYSICIAN ABOUT |
| 10:24AM | 9 | UNKNOWN TESTS ON UNKNOWN DATES. |
| 10:24AM | 10 | AND WHATEVER THE WORD "CONGRUENT" MEANS COMPARED TO OTHER |
| 10:24AM | 11 | LABS IS REALLY IN 403 LAND, I SUBMIT, AND THIS STRAY COMMENT |
| 10:24AM | 12 | AND LENGTHY EXHIBIT I REALLY DON'T THINK HAS THE PROBATIVE |
| 10:24AM | 13 | VALUE THAT THEY'RE ARGUING FOR. |
| 10:25AM | 14 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:25AM | 15 | WELL, LET ME SAY THAT YOU WOULD NOT INTRODUCE THIS FOR THE |
| 10:25AM | 16 | TRUTH OF THE MATTER ASSERTED, BUT JUST AS TO INFORM MS. HOLMES |
| 10:25AM | 17 | AS TO HER INFORMATION AND BASE OF KNOWLEDGE FOR HOW THE LABS |
| 10:25AM | 18 | WERE PERFORMING ON AUGUST 23RD, 2015? |
| 10:25AM | 19 | MR. DOWNEY:  WELL, I THINK IF IT'S ADMISSIBLE, IT'S |
| 10:25AM | 20 | ADMISSIBLE UNDER SOME EXCEPTION, SO I WILL SAY IT CERTAINLY IS |
| 10:25AM | 21 | RELEVANT TO THAT. |
| 10:25AM | 22 | AND I DON'T THINK THAT I CAN OFFER IT FOR THE TRUTH OF THE |
| 10:25AM | 23 | MATTER ASSERTED, BUT I DO THINK IT GOES TO HER STATE OF MIND. |
| 10:25AM | 24 | I THINK THE OTHER TESTIMONY, JUST TO REMIND YOUR HONOR, IS |
| 10:25AM | 25 | THAT THIS IS A ROUTINE WEEKLY OR BIWEEKLY TRANSMISSION, SO I |

| | | |
|---|---|---|
| 10:25AM | 1 | THINK IT WOULD QUALIFY AS A BUSINESS RECORD AS WELL. |
| 10:25AM | 2 | BUT -- |
| 10:25AM | 3 | THE COURT:  WELL, I DON'T KNOW IF THERE WAS A |
| 10:25AM | 4 | FOUNDATION FOR THIS PARTICULAR DOCUMENT.  THAT MAY HAVE GONE |
| 10:25AM | 5 | FOR THE OTHERS, AND AS I SAID BEFORE WHEN WE WERE TALKING ABOUT |
| 10:25AM | 6 | THAT OTHER PACKET, THERE WAS NO EVIDENCE THAT MS. HOLMES |
| 10:25AM | 7 | ACTUALLY READ THAT.  THAT WAS THAT THICK STACK OF PHLEBOTOMIST |
| 10:26AM | 8 | REPORTS AND -- |
| 10:26AM | 9 | MR. DOWNEY:  WHAT I OFFERED TODAY WAS JUST A SUBSET. |
| 10:26AM | 10 | THE COURT:  CORRECT, CORRECT.  I UNDERSTOOD THAT. |
| 10:26AM | 11 | MR. DOWNEY:  YEAH, YEAH. |
| 10:26AM | 12 | THE COURT:  RIGHT. |
| 10:26AM | 13 | SO LET ME DO THIS, I'M GOING TO REVISIT -- I WILL ADMIT |
| 10:26AM | 14 | THE FIRST PAGE, THE EMAIL. |
| 10:26AM | 15 | MR. DOWNEY:  OKAY. |
| 10:26AM | 16 | THE COURT:  AND THAT WILL BE ADMITTED NOT FOR THE |
| 10:26AM | 17 | TRUTH OF THE MATTER ASSERTED, BUT SOLELY FOR THE ISSUE OF |
| 10:26AM | 18 | INFORMING MS. HOLMES'S KNOWLEDGE, STATE OF MIND AS TO |
| 10:26AM | 19 | WALGREENS'S RELATIONSHIP IN THE DRAWS AND THE TESTING THAT WAS |
| 10:26AM | 20 | GOING THERE. |
| 10:26AM | 21 | THE JURY CAN GIVE IT WHATEVER WEIGHT THEY FEEL IS |
| 10:26AM | 22 | APPROPRIATE, AND SO I'LL ADMIT THAT ONLY. |
| 10:26AM | 23 | I'M NOT GOING TO ADMIT THE OTHER PHLEBOTOMIST REPORTS FOR |
| 10:26AM | 24 | THE SAME REASONS THAT I INDICATED IN THE OTHER DOCUMENTS. |
| 10:26AM | 25 | AND AS TO THE REQUEST TO -- THE RENEWED REQUEST, YES, IT'S |

10:27AM   1    1180, TO ADMIT CUSTOMER FEEDBACK RECORDS, I'VE READ 1180 AND

10:27AM   2    THE GOVERNMENT'S 1184 AS TO THAT, AND I'M NOT GOING TO DISTURB

10:27AM   3    THE COURT'S PREVIOUS ORDER.

10:27AM   4         I THINK THAT THE COURT'S PREVIOUS ORDER SUSTAINING THE

10:27AM   5    OBJECTION WILL REMAIN.  I HAVEN'T HEARD ANYTHING THAT CHANGES

10:27AM   6    THE COURT'S POSITION ON THAT.

10:27AM   7         AS I SAID, I WAS CURIOUS WHETHER OR NOT THERE WOULD BE

10:27AM   8    TESTIMONY ABOUT ACTUAL DOCUMENTS AND THAT SET BEING READ, AND

10:27AM   9    THE RECORD REFLECTS -- I DON'T THINK THERE'S A RECORD OF THAT.

10:27AM  10         SO I'M NOT GOING TO DISTURB THAT ORDER.

10:27AM  11         BUT I WILL ADMIT THIS.  WE CAN DO THAT IN FRONT OF THE

10:27AM  12    JURY WHEN THEY RETURN.

10:27AM  13              MR. DOWNEY:  YOUR HONOR, I CAN HIGHLIGHT THESE.

10:27AM  14         BUT IN THE, IN THE ATTACHMENT -- I THINK THERE HAS BEEN

10:27AM  15    PRIOR TESTIMONY IN THE CASE FROM MR. EDLIN THAT THE SOURCES OF

10:28AM  16    THESE COMMENTS IN THESE ATTACHMENTS ARE TWO-FOLD.

10:28AM  17         ONE IS THAT THERE'S PHLEBOTOMIST FEEDBACK, AND IF -- ON

10:28AM  18    THE PAGES THAT WE'LL NUMBER, I'M ACTUALLY LOOKING AT THE FULL

10:28AM  19    EXHIBIT, BUT BETWEEN 1784 AND 1865, THOSE ARE PHLEBOTOMIST

10:28AM  20    COMMENTS.

10:28AM  21         SOME OF THE OTHER COMMENTS ARE DIRECT COMMENTS FROM THE

10:28AM  22    PATIENTS THEMSELVES.

10:28AM  23         SO THAT'S ONE THING THAT I WANT TO SAY.

10:28AM  24         THE OTHER -- THE OTHER, YOU KNOW, WHERE THEIR QUOTES ARE

10:28AM  25    EMBODIED OR EMBEDDED IN WHAT WAS SAID.

8636

| | | |
|---|---|---|
| 10:28AM | 1 | THE OTHER THING I WANT TO MENTION, YOUR HONOR, IS SIMILAR |
| 10:28AM | 2 | TO THE FIRST ENTRY, WHEN WE DID THIS REDACTION, SOME OF THE |
| 10:28AM | 3 | ENTRIES REFLECT COMMENTARY FROM PATIENTS THAT I ALSO ENDEAVORED |
| 10:28AM | 4 | TO EXCLUDE THINGS ACCORDING TO CERTAIN CRITERIA, BUT THINGS |
| 10:28AM | 5 | WHICH RELATED TO ACCURACY, I THINK THERE WERE A FEW MORE THAN |
| 10:28AM | 6 | JUST THIS FIRST EMAIL ENTRY. |
| 10:29AM | 7 | SO IF I TOOK A MOMENT, I COULD GO THROUGH THEM AND |
| 10:29AM | 8 | IDENTIFY THOSE FOR YOUR HONOR.  BUT THEY'RE TO THE SAME EFFECT, |
| 10:29AM | 9 | I THINK, AND WOULD COME IN UNDER THE SAME THEORY. |
| 10:29AM | 10 | THE COURT:  WELL, I SEE ON 48542, THAT'S THE EMAIL |
| 10:29AM | 11 | THAT I JUST ADMITTED.  THIS IS NOT PAGINATED, I'M SORRY. |
| 10:29AM | 12 | MR. DOWNEY:  RIGHT. |
| 10:29AM | 13 | THE COURT:  IT'S THE AUGUST 15TH, 2015. |
| 10:29AM | 14 | AND WE DON'T KNOW -- I KNOW THERE'S BEEN SOME TESTIMONY |
| 10:29AM | 15 | THAT THE PHLEBOTOMISTS TOOK INFORMATION FROM THE PATIENTS AND |
| 10:29AM | 16 | THEN PRESUMABLY THEY ENTERED IT INTO WHATEVER THAT DATABASE IS. |
| 10:29AM | 17 | I THINK THERE'S SOME TESTIMONY THAT THE TECHNOLOGY ALLOWED |
| 10:29AM | 18 | A CUSTOMER, A PATIENT, TO SELF -- |
| 10:29AM | 19 | MR. DOWNEY:  THAT'S RIGHT. |
| 10:29AM | 20 | THE COURT:  -- ADD THAT INFORMATION.  WE DON'T KNOW |
| 10:29AM | 21 | WHICH IS WHICH HERE. |
| 10:30AM | 22 | I DON'T THINK THERE'S A -- I SUPPOSE WE COULD LOOK AT THE |
| 10:30AM | 23 | GRAMMAR AND KIND OF INTUIT THAT, BUT -- |
| 10:30AM | 24 | MR. DOWNEY:  I THINK THAT IS THE NATURE OF IT, |
| 10:30AM | 25 | YOUR HONOR. |

**ER-12208**

8637

```
10:30AM   1              THE COURT:  RIGHT.  RIGHT.

10:30AM   2         SO LOOKING AT THE RELIABILITY OF THAT, I THINK THAT ALSO

10:30AM   3    INFORMS THE COURT AS TO ITS DECISION.

10:30AM   4         SO I THINK BY ADMITTING THE DOCUMENT, THE EMAIL, AS I

10:30AM   5    SAID, IT DID CAPTURE ONE OF THE ACCURACIES THAT YOU'VE SHOWN

10:30AM   6    HERE.  IT'S ACTUALLY A -- THE ACTUAL REPORT.

10:30AM   7         ALL RIGHT.  THANK YOU.

10:30AM   8         ANYTHING FURTHER ON THIS THEN?

10:30AM   9              MR. LEACH:  NO, YOUR HONOR.

10:30AM  10              MR. DOWNEY:  NO, YOUR HONOR.

10:30AM  11         SHOULD WE HANDLE THE FDA DOCUMENT?  I DON'T HAVE THE

10:30AM  12    EXHIBIT NUMBER WITH ME.

10:30AM  13              THE COURT:  WHY DON'T WE -- WE SHOULD DO THAT IN

10:30AM  14    FRONT OF THE JURY.

10:30AM  15              MR. DOWNEY:  YES.

10:30AM  16              THE COURT:  I THINK WE WILL ADMIT THAT.

10:30AM  17              MR. DOWNEY:  AND MAYBE MR. LEACH CAN LET US KNOW

10:30AM  18    BEFORE WE RESUME WITH THE JURY WHERE HE IS ON THAT.

10:30AM  19              THE COURT:  OKAY.

10:30AM  20         MR. LEACH?

10:30AM  21              MR. LEACH:  AS I WAS SAYING, YOUR HONOR, IT'S A 500

10:30AM  22    PAGE DOCUMENT.  I GOT THE EXCERPTS AT 8:40 THIS MORNING.  I

10:30AM  23    WANT TO BRIEFLY REVIEW THE EXCERPTS TO MAKE SURE THAT --

10:31AM  24              THE COURT:  RIGHT.

10:31AM  25              MR. LEACH:  -- THERE'S NOT SOME LEVEL OF CHERRY
```

8638

```
10:31AM   1      PICKING, WHICH I NEVER THINK MY COLLEAGUES WOULD DO.
10:31AM   2          BUT I JUST HAVE NOT HAD TIME TO LOOK AT IT AND I
10:31AM   3      RESPECTFULLY REQUEST FIVE OR TEN MINUTES TO DO THAT.
10:31AM   4              MR. DOWNEY:  YEAH.
10:31AM   5          AND I WILL SAY -- MR. LEACH WOULDN'T APPRECIATE THIS GIVEN
10:31AM   6      THAT HE WAS DOING OTHER THINGS, IT'S JUST THE FIRST 167 PAGES
10:31AM   7      OF THE DESCRIPTION, WHICH IS MOSTLY DIAGRAMS.
10:31AM   8              THE COURT:  YOU HAVE THREE MINUTES, MR. LEACH.
10:31AM   9              MR. DOWNEY:  I THINK HE'S READ IT BEFORE, UNLESS I
10:31AM  10      DON'T KNOW MY MAN.
10:31AM  11              THE COURT:  CHERRY PICKING USED TO BE THE COIN OF
10:31AM  12      THE REALM HERE IN THE VALLEY OF THE HEART'S DELIGHT.  THAT WAS
10:31AM  13      MANY DECADES AGO.  BUT HOPEFULLY THERE'S NO ORCHARD IN THE
10:31AM  14      COURTROOM, SO --
10:31AM  15          ALL RIGHT.  WHAT SHOULD WE DO?  SHOULD WE TAKE A BREAK NOW
10:31AM  16      BEFORE WE --
10:31AM  17              MR. DOWNEY:  I THINK IT WOULD BE HELPFUL, FOR
10:31AM  18      EFFICIENCY, IF WE CAN HAVE ABOUT ANOTHER 20 MINUTES.
10:31AM  19          IS THAT ALL RIGHT?
10:31AM  20              THE COURT:  SURE.  AND YOU'LL TELL US WHETHER OR NOT
10:32AM  21      WE HAVE ANOTHER WITNESS?
10:32AM  22              MR. DOWNEY:  YES.
10:32AM  23              THE COURT:  ALL RIGHT.  LET'S DO THAT.  THANK YOU.
10:32AM  24              THE CLERK:  COURT IS IN RECESS.
10:32AM  25          (RECESS FROM 10:32 A.M. UNTIL 11:03 A.M.)
```

ER-12210

8639

| | | |
|---|---|---|
| 11:04AM | 1 | THE COURT:  WE'RE BACK ON THE RECORD IN THE HOLMES |
| 11:04AM | 2 | MATTER.  ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT. |
| 11:04AM | 3 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:04AM | 4 | MR. LEACH, DID YOU HAVE AN OPPORTUNITY TO REVIEW THE |
| 11:04AM | 5 | EXHIBIT? |
| 11:04AM | 6 | MR. LEACH:  I DID, YOUR HONOR, AND I HAVE NO |
| 11:04AM | 7 | OBJECTION TO 1328A -- THE MASKS AND DISTANCE ARE CONSPIRING |
| 11:04AM | 8 | AGAINST ME. |
| 11:04AM | 9 | I HAVE NO OBJECTION TO THE ADMISSION OF 1328A FOR THE |
| 11:04AM | 10 | NONHEARSAY PURPOSE OF THIS BEING FILED AND SUBMITTED TO THE |
| 11:04AM | 11 | FDA, WHICH I THINK WAS THE LIMITATION IMPOSED BY THE COURT |
| 11:04AM | 12 | PREVIOUSLY. |
| 11:04AM | 13 | BUT I'VE REVIEWED THE EXCERPTS AND I DON'T OBJECT TO THE |
| 11:04AM | 14 | EXCERPTS. |
| 11:04AM | 15 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:04AM | 16 | MR. DOWNEY, THIS IS BEING INTRODUCED FOR WHAT PURPOSE? |
| 11:04AM | 17 | MR. DOWNEY:  IT'S BEING INTRODUCED TO REBUT THE |
| 11:05AM | 18 | GOVERNMENT'S CLAIM THAT THE DEFENDANT BELIEVED THAT THE SERIES |
| 11:05AM | 19 | 4 DID NOT FUNCTION PROPERLY, AND THIS EVIDENCE DEMONSTRATES |
| 11:05AM | 20 | WHAT A LARGE GROUP OF PEOPLE AT THERANOS BELIEVED ABOUT THAT |
| 11:05AM | 21 | SYSTEM AND FILED. |
| 11:05AM | 22 | SO IT CLEARLY GOES TO HER STATE OF MIND, AMONGST OTHER |
| 11:05AM | 23 | THINGS. |
| 11:05AM | 24 | THE COURT:  SO IS IT OFFERED, AGAIN, FOR THE TRUTH |
| 11:05AM | 25 | OF THE MATTER ASSERTED IN THE DOCUMENT? |

| | | |
|---|---|---|
| 11:05AM | 1 | MR. DOWNEY:  IT'S NOT OFFERED FOR THE TRUTH, |
| 11:05AM | 2 | YOUR HONOR. |
| 11:05AM | 3 | THE COURT:  ALL RIGHT.  AS TO HER UNDERSTANDING OF |
| 11:05AM | 4 | THE DEVICES, SHOULD I CALL IT, OR -- |
| 11:05AM | 5 | MR. DOWNEY:  THE SYSTEM I THINK IS THE APPROPRIATE |
| 11:05AM | 6 | DESIGNATION. |
| 11:05AM | 7 | AND I WOULD SAY THE CORRECT TERM IS "VALIDITY." |
| 11:05AM | 8 | THE COURT:  MR. LEACH? |
| 11:05AM | 9 | MR. LEACH:  SUBJECT TO THAT, YOUR HONOR, WE'RE FINE. |
| 11:05AM | 10 | THE COURT:  OKAY.  ALL RIGHT. |
| 11:06AM | 11 | SHOULD WE BRING THE JURY IN THEN? |
| 11:06AM | 12 | MR. LEACH:  YES, YOUR HONOR. |
| 11:06AM | 13 | MR. DOWNEY:  AND SHALL I MOVE WHEN THE JURY COMES IN |
| 11:06AM | 14 | 7586A AND 1328A. |
| 11:06AM | 15 | THE COURT:  YES, LET'S DO THAT. |
| 11:06AM | 16 | MR. DOWNEY:  THANK YOU. |
| 11:08AM | 17 | (JURY IN AT 11:08 A.M.) |
| 11:08AM | 18 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:08AM | 19 | PLEASE BE SEATED.  WE'RE BACK ON THE RECORD.  ALL COUNSEL |
| 11:08AM | 20 | ARE PRESENT.  OUR JURY IS PRESENT.  MS. HOLMES IS PRESENT. |
| 11:08AM | 21 | MR. DOWNEY, YOU HAD -- YOU WOULD LIKE TO MOVE SOME PIECES |
| 11:08AM | 22 | INTO EVIDENCE, SOME DOCUMENTS INTO EVIDENCE? |
| 11:08AM | 23 | MR. DOWNEY:  YES, SIR. |
| 11:08AM | 24 | I THINK WE HAVE PENDING MOTIONS TO ADMIT EXHIBIT 7586A. |
| 11:08AM | 25 | THE COURT:  YES.  AND SUBJECT TO YOUR COMMENTS, |

8641

| | | |
|---|---|---|
| 11:09AM | 1 | MR. LEACH, ANYTHING FURTHER ON THIS? |
| 11:09AM | 2 | MR. LEACH:  NO, YOUR HONOR. |
| 11:09AM | 3 | THE COURT:  ALL RIGHT.  I'LL NOTE THOSE COMMENTS. |
| 11:09AM | 4 | I'LL ADMIT 7586A, THE FIRST PAGE, WHICH IS THE EMAIL. |
| 11:09AM | 5 | AND THIS IS ADMITTED, LADIES AND GENTLEMEN, AGAIN, NOT FOR |
| 11:09AM | 6 | THE TRUTH OF THE MATTER ASSERTED IN THE EMAIL, BUT AS TO THE |
| 11:09AM | 7 | STATE OF MIND, AS IT INFORMS THE STATE OF MIND OF MS. HOLMES AS |
| 11:09AM | 8 | TO THE ARRANGEMENT WITH WALGREENS. |
| 11:09AM | 9 | AND FOR THAT LIMITED PURPOSE IT'S ADMITTED. |
| 11:09AM | 10 | (DEFENDANT'S EXHIBIT 7586A, PAGE 1, LIMITED PURPOSE ONLY, |
| 11:09AM | 11 | WAS RECEIVED IN EVIDENCE.) |
| 11:09AM | 12 | THE COURT:  AND YOU HAVE ANOTHER DOCUMENT? |
| 11:09AM | 13 | MR. DOWNEY:  YES, YOUR HONOR.  WE STILL HAVE PENDING |
| 11:09AM | 14 | THE MOTION TO ADMIT 13288A. |
| 11:09AM | 15 | THE COURT:  ALL RIGHT.  MR. LEACH? |
| 11:09AM | 16 | MR. LEACH:  NOTHING FURTHER. |
| 11:09AM | 17 | THE COURT:  ALL RIGHT.  THAT WILL BE ADMITTED. |
| 11:09AM | 18 | THIS IS ADMITTED FOR THE SAME REASON AS THE OTHER PURPOSE, |
| 11:09AM | 19 | RATHER, AS THE OTHER DOCUMENT, AS TO THE STATE OF MIND OF |
| 11:10AM | 20 | MS. HOLMES.  NOT FOR THE TRUTH OF THE MATTER ASSERTED IN THE |
| 11:10AM | 21 | DOCUMENT, BUT ONLY AS TO THE ISSUE OF THE STATE OF MIND OF |
| 11:10AM | 22 | MS. HOLMES AS TO SYSTEM VALIDITY. |
| 11:10AM | 23 | AND FOR THAT LIMITED PURPOSE ONLY, THAT IS ADMITTED. |
| 11:10AM | 24 | (DEFENDANT'S EXHIBIT 13288A, LIMITED PURPOSE, WAS RECEIVED |
| 11:10AM | 25 | IN EVIDENCE.) |

UNITED STATES COURT REPORTERS

**ER-12213**

| | | |
|---|---|---|
| 11:10AM | 1 | MR. DOWNEY:  AND, YOUR HONOR, WITH THAT RESOLVED, |
| 11:10AM | 2 | MS. HOLMES RESTS. |
| 11:10AM | 3 | THE COURT:  ALL RIGHT. |
| 11:10AM | 4 | LADIES AND GENTLEMEN, THIS MEANS THAT THE DEFENSE HAS |
| 11:10AM | 5 | RESTED.  THEY HAVE PUT ALL IN OF THE EVIDENCE THAT THEY WISH IN |
| 11:10AM | 6 | THE CASE. |
| 11:10AM | 7 | I'LL NOW TURN TO THE GOVERNMENT AND ASK IF THE GOVERNMENT |
| 11:10AM | 8 | HAS ANY REBUTTAL EVIDENCE? |
| 11:10AM | 9 | MR. SCHENK:  YOUR HONOR, NO, THE GOVERNMENT HAS NO |
| 11:10AM | 10 | REBUTTAL CASE. |
| 11:10AM | 11 | THE COURT:  ALL RIGHT.  THE GOVERNMENT HAS |
| 11:10AM | 12 | PREVIOUSLY RESTED. |
| 11:10AM | 13 | LADIES AND GENTLEMEN, WHAT THIS MEANS THEN IS THAT ALL OF |
| 11:10AM | 14 | THE EVIDENCE THAT THE JURY WILL NEED AND REQUIRE TO DELIBERATE |
| 11:10AM | 15 | AND MAKE THEIR DECISIONS IS NOW COMPLETED. |
| 11:10AM | 16 | THE NEXT PHASE OF THE CASE IS FOR YOU TO HEAR CLOSING |
| 11:11AM | 17 | ARGUMENTS IN THE MATTER. |
| 11:11AM | 18 | BEFORE YOU HEAR THE CLOSING ARGUMENTS -- AFTER YOU HEAR |
| 11:11AM | 19 | THE CLOSING ARGUMENTS YOU'LL HEAR THE INSTRUCTIONS, PARDON ME. |
| 11:11AM | 20 | BUT WE HAVE NOT COMPLETED THE INSTRUCTIONS YET, AND I NEED |
| 11:11AM | 21 | TO TALK WITH THE LAWYERS ABOUT GOING OVER THOSE INSTRUCTIONS |
| 11:11AM | 22 | AND TO PREPARE THOSE SO THAT WE CAN THEN PRESENT THE ARGUMENT |
| 11:11AM | 23 | TO YOU AND HAVE YOU BEGIN YOUR DELIBERATIONS. |
| 11:11AM | 24 | I WANT TO TALK ABOUT TIMING FOR THIS FOR JUST A MOMENT |
| 11:11AM | 25 | WITH YOU. |

| | | |
|---|---|---|
| 11:11AM | 1 | MY SENSE IS THAT COUNSEL AND THE COURT WILL MOST LIKELY |
| 11:11AM | 2 | MEET THIS WEEK TO ACCOMPLISH THIS TASK OF COMPLETING THE JURY |
| 11:11AM | 3 | INSTRUCTIONS, REVIEWING THE LAW THAT APPLIES TO THE CASE, |
| 11:11AM | 4 | PREPARING THOSE FINAL INSTRUCTIONS THAT YOU WILL HAVE. |
| 11:11AM | 5 | MY SENSE IS THAT IT WILL LIKELY TAKE THE REST OF THIS WEEK |
| 11:11AM | 6 | TO ACCOMPLISH THAT. |
| 11:12AM | 7 | I'M LOOKING AT THE SCHEDULE, AND I -- IT SEEMS TO ME THAT |
| 11:12AM | 8 | WE MAY BE ABLE TO ENGAGE CLOSING ARGUMENTS -- AND LET ME ASK |
| 11:12AM | 9 | COUNSEL TO CHIME IN ON THIS -- PERHAPS DECEMBER 16TH AND 17TH. |
| 11:12AM | 10 | BUT LET ME JUST -- KUNYU, DO YOU HAVE A CALENDAR FOR ME? |
| 11:12AM | 11 | THE CLERK:  (HANDING.) |
| 11:12AM | 12 | THE COURT:  THANK YOU. |
| 11:12AM | 13 | OF COURSE I RECOGNIZE THAT THE HOLIDAY SEASON PRESENTS |
| 11:12AM | 14 | SOME ISSUES, BUT I DO WANT TO SUGGEST SOMETHING TO YOU, LADIES |
| 11:12AM | 15 | AND GENTLEMEN OF THE JURY.  I'M PROBABLY GOING TO BREAK FOR A |
| 11:12AM | 16 | MOMENT AND ALLOW YOU TO THINK ABOUT THIS, MAKE PHONE CALLS AND |
| 11:12AM | 17 | LOOK AT YOUR SCHEDULES. |
| 11:12AM | 18 | BUT WHAT I WOULD CONTEMPLATE IS THAT WE, REGRETTABLY, ARE |
| 11:13AM | 19 | NOT AVAILABLE ON THE 14TH AND 15TH OF NEXT WEEK. |
| 11:13AM | 20 | SO AS I SAID, MY THOUGHT IS THAT -- AND I'M GOING TO TALK |
| 11:13AM | 21 | TO THE LAWYERS SOME MORE, BUT IT SEEMS LIKE IF WE AIM, IF WE |
| 11:13AM | 22 | AIM TOWARDS THE 16TH AND 17TH FOR CLOSING ARGUMENTS -- |
| 11:13AM | 23 | AND LET ME ASK COUNSEL, DO COUNSEL THINK THAT CLOSING |
| 11:13AM | 24 | ARGUMENTS WILL -- WE SHOULD RESERVE TWO DAYS FOR THAT? |
| 11:13AM | 25 | MR. SCHENK:  YES, YOUR HONOR, I THINK THAT'S |

8644

```
11:13AM   1        APPROPRIATE.

11:13AM   2                MR. DOWNEY:  THAT MAKES SENSE TO US, YOUR HONOR.

11:13AM   3                THE COURT:  ALL RIGHT.  THANK YOU.

11:13AM   4        SO IT LOOKS LIKE THOSE TWO DATES WOULD BE THE EARLIEST

11:13AM   5    DATE THAT WE WOULD ENGAGE CLOSING FINAL ARGUMENTS FROM BOTH

11:13AM   6    SIDES, RECOGNIZING THEN THAT DELIBERATIONS WOULD BEGIN THE WEEK

11:13AM   7    OF THE 20TH.

11:13AM   8        NOW, LET ME SAY, THAT'S A HOLIDAY WEEK.  I RECOGNIZE THAT.

11:13AM   9    AND I WANT YOU TO KNOW THAT I WOULD -- WE WON'T BE IN

11:13AM  10    DELIBERATIONS ON THE 24TH.  LET ME JUST SAY THAT AT THE

11:13AM  11    OUTRIGHT.

11:13AM  12        IT COULD BE THAT WE DON'T HAVE TO SCHEDULE DELIBERATIONS

11:14AM  13    ON THE 23RD AS WELL.

11:14AM  14        IF WE GO INTO THE FOLLOWING WEEK, AGAIN, WE COULD SCHEDULE

11:14AM  15    DELIBERATIONS NOT EVERY DAY, BUT YOU COULD SCHEDULE THOSE AS

11:14AM  16    YOU, AS YOU NEED AND AS YOU DESIRE.

11:14AM  17        I'M LOOKING AT THIS SCHEDULE, BUT I KNOW THIS EXCEEDS THE

11:14AM  18    TIME THAT WE TOLD YOU THIS TRIAL WOULD TAKE, HOW MUCH TIME YOU

11:14AM  19    WOULD NEED TO INVEST.  THIS EXTENDS BEYOND THAT.

11:14AM  20        I DON'T KNOW IF ANY OF YOU HAVE MADE PLANS FOR THE

11:14AM  21    HOLIDAYS THAT MIGHT CAUSE A DISRUPTION IN THIS SCHEDULE, BUT I

11:14AM  22    WANTED TO SHARE THIS SCHEDULE WITH YOU NOW.

11:14AM  23        AND I'LL ASK MS. KRATZMANN TO -- I THINK WE HAVE SOME

11:14AM  24    CALENDARS THAT WE CAN PROVIDE.

11:14AM  25        PERHAPS, COUNSEL, WE'LL TAKE ANOTHER RECESS TO ALLOW THE
```

| | | |
|---|---|---|
| 11:14AM | 1 | JURY TO ABSORB THIS. |
| 11:14AM | 2 | LOOK AT YOUR SCHEDULES, AND IF YOU NEED TO MAKE PHONE |
| 11:15AM | 3 | CALLS, THAT TYPE OF THING, I'LL INVITE YOU TO DO THAT.  AND |
| 11:15AM | 4 | THEN WE'LL COME BACK AND I CAN ASK YOU WHETHER OR NOT THE |
| 11:15AM | 5 | SCHEDULE THAT I'VE PROPOSED HERE IS GOING TO CREATE AN ISSUE |
| 11:15AM | 6 | FOR YOU OR ANY PROBLEMS, AND WE CAN DISCUSS FURTHER. |
| 11:15AM | 7 | THIS IS REALLY REGARDING YOUR AVAILABILITY FOR THE |
| 11:15AM | 8 | DELIBERATIONS. |
| 11:15AM | 9 | SO, AGAIN, IT'S ANTICIPATED THAT FINAL ARGUMENTS WOULD |
| 11:15AM | 10 | ENCOMPASS THE 16TH AND 17TH OF DECEMBER, WHICH MEANS THAT IF WE |
| 11:15AM | 11 | BROKE TODAY, WE WOULDN'T SEE YOU AGAIN FOR ANOTHER WEEK. |
| 11:15AM | 12 | WE WOULD BE BACK IN SESSION ON THE 16TH AND 17TH.  YOU |
| 11:15AM | 13 | WOULD GET THE CASE FRIDAY, THE 17TH, AND THEN BEGIN |
| 11:15AM | 14 | DELIBERATIONS THE FOLLOWING WEEK AND THE WEEK AFTER THAT AS |
| 11:15AM | 15 | NEEDED. |
| 11:15AM | 16 | THERE IS AN ALTERNATIVE.  I JUST WANT TO SHARE THIS WITH |
| 11:15AM | 17 | YOU ALSO.  IT'S POSSIBLE THAT WE CAN GO BEYOND THE 25TH OF |
| 11:15AM | 18 | DECEMBER AND THE 31ST IF NEEDED AND START DELIBERATIONS IN |
| 11:16AM | 19 | JANUARY.  THAT'S PROBABLY NOT THE PREFERABLE, BUT THAT'S |
| 11:16AM | 20 | AVAILABLE. |
| 11:16AM | 21 | BUT I JUST WANT YOU TO CONSIDER THAT. |
| 11:16AM | 22 | SO LET'S -- COUNSEL, ANYTHING YOU WANT TO ADD TO THIS |
| 11:16AM | 23 | REGARDING SCHEDULING? |
| 11:16AM | 24 | MR. SCHENK:  NO.  THANK YOU. |
| 11:16AM | 25 | MR. DOWNEY:  NOTHING FROM US, YOUR HONOR. |

UNITED STATES COURT REPORTERS

**ER-12217**

| | | |
|---|---|---|
| 11:16AM | 1 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:16AM | 2 | LADIES AND GENTLEMEN, LET ME LET YOU TAKE A BREAK, LET YOU |
| 11:16AM | 3 | ABSORB THIS, AND WE'LL COME BACK AT ABOUT THE BOTTOM OF THE |
| 11:16AM | 4 | HOUR AND WE CAN HAVE FURTHER DISCUSSIONS AND YOU CAN INFORM THE |
| 11:16AM | 5 | COURT OF ANY THOUGHTS THAT THE JURY HAS. |
| 11:16AM | 6 | SO WE'LL BE IN RECESS. |
| 11:16AM | 7 | (JURY OUT AT 11:16 A.M.) |
| 11:17AM | 8 | THE COURT:  ALL RIGHT.  PLEASE BE SEATED. |
| 11:17AM | 9 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE |
| 11:17AM | 10 | BREAK. |
| 11:17AM | 11 | LET ME JUST TURN TO COUNSEL.  ANYTHING THAT COUNSEL WANTS |
| 11:17AM | 12 | TO PUT ON THE RECORD? |
| 11:17AM | 13 | MR. DOWNEY:  YOUR HONOR, SINCE WE'VE REACHED THE |
| 11:17AM | 14 | CLOSE OF EVIDENCE, MS. HOLMES RENEWS THE MOTION FILED UNDER |
| 11:17AM | 15 | RULE 29 AT THE CONCLUSION OF THE GOVERNMENT'S CASE, AND I'LL |
| 11:17AM | 16 | SAY THAT FOR THE RECORD. |
| 11:17AM | 17 | THE COURT:  I NOTE THAT.  THANK YOU. |
| 11:17AM | 18 | I DON'T KNOW IF -- DOES THE GOVERNMENT WISH TO BE HEARD ON |
| 11:17AM | 19 | THE RULE 29 SUBMISSION?  THE PARTIES -- LET ME ASK, DO THE |
| 11:17AM | 20 | PARTIES WANT ADDITIONAL BRIEFING ON THIS? |
| 11:17AM | 21 | THIS IS ANOTHER ISSUE THAT MIGHT AFFECT OUR DISCUSSIONS ON |
| 11:17AM | 22 | THE INSTRUCTIONS AS WELL, THE TIMING OF THIS, ALTHOUGH WE COULD |
| 11:17AM | 23 | ENGAGE A HEARING OR A DISCUSSION AT SOME OTHER TIME. |
| 11:17AM | 24 | MR. LEACH? |
| 11:17AM | 25 | MR. LEACH:  I'LL BE GUIDED BY THE COURT, YOUR HONOR. |

11:18AM  1      I DON'T HAVE A PARTICULAR ARGUMENT TO MAKE AT THIS POINT,

11:18AM  2   BUT IF THERE'S AN ISSUE THAT THE COURT WANTS BRIEFING OR

11:18AM  3   ARGUMENTS ON FROM THE GOVERNMENT, WE'RE HAPPY TO SUBMIT THAT ON

11:18AM  4   ANY SCHEDULE THE COURT WISHES.

11:18AM  5          THE COURT:  OKAY.  THANK YOU.

11:18AM  6      MS. SAHARIA?

11:18AM  7          MS. SAHARIA:  ONE MOMENT, YOUR HONOR.  I COME WITH A

11:18AM  8   LOT OF BAGGAGE.

11:18AM  9      GOOD MORNING, YOUR HONOR.

11:18AM 10      WHEN WE FIRST MOVED AT THE END OF THE GOVERNMENT'S CASE,

11:18AM 11   WE DEFERRED ARGUMENT ON THAT MOTION.  THE COURT RESERVED

11:18AM 12   RULING.

11:18AM 13      WE'RE HAPPY TO -- WE DID NOT FILE A WRITTEN MOTION AT THAT

11:18AM 14   TIME.

11:18AM 15          THE COURT:  RIGHT.

11:18AM 16          MS. SAHARIA:  IF YOUR HONOR WOULD LIKE A MOTION IN

11:18AM 17   WRITING, WE CAN CERTAINLY PROVIDE ONE.  WE COULD ARGUE ORALLY

11:18AM 18   SOMETIME THIS WEEK IF THE COURT WANTS TO HEAR ORAL ARGUMENT, OR

11:18AM 19   THE COURT COULD RESERVE AND WE CAN BRIEF IT POST VERDICT IF

11:18AM 20   THAT BECOMES NECESSARY.

11:18AM 21      IT'S THE COURT'S PREFERENCE.

11:18AM 22          THE COURT:  ALL RIGHT.  THANK YOU.

11:18AM 23      ANY OBJECTIONS TO THAT POST-VERDICT CONVERSATION ON THE --

11:19AM 24   IT HAS BEEN PRESERVED AND RESERVED, AND I DO REFLECT THAT ON

11:19AM 25   THE RECORD, OF COURSE.

```
11:19AM   1              MR. LEACH:  IT'S BEEN PRESERVED AT THE CLOSE OF THE

11:19AM   2    GOVERNMENT'S CASE, AS WELL AS THE CLOSE OF THE DEFENSE CASE.

11:19AM   3         WE HAVE NO OBJECTION TO DOING IT POST VERDICT.

11:19AM   4              THE COURT:  ALL RIGHT.  IT SEEMS TO ME THAT, BECAUSE

11:19AM   5    OF THE COMPRESSION OF TIME, I'D LIKE YOUR TEAMS TO DEVOTE SOME

11:19AM   6    ATTENTION TO THE INSTRUCTIONS.

11:19AM   7              MS. SAHARIA:  I AGREE, YOUR HONOR.

11:19AM   8              THE COURT:  AND THEN WE CAN TAKE UP ANY OTHER ISSUE

11:19AM   9    AS WE NEED IT.

11:19AM  10         AS TO INSTRUCTIONS, MY THOUGHT IS TO GIVE YOU A DEADLINE

11:19AM  11    ON FILING INSTRUCTIONS.  MY THOUGHT WAS THAT WE WOULD PROBABLY

11:19AM  12    RESERVE THIS FRIDAY, THE 10TH, TO BEGIN DISCUSSION OF THOSE.

11:19AM  13    MONDAY, THE 13TH, IS AVAILABLE AS WELL.

11:19AM  14              MS. SAHARIA:  I THINK THAT MAKES SENSE, YOUR HONOR.

11:19AM  15         WE HAVE BEEN MEETING AND CONFERRING WITH THE GOVERNMENT

11:19AM  16    WITH THE GOAL OF GIVING THE COURT ONE FILING THAT WOULD BE A

11:20AM  17    JOINT FILING FROM BOTH PARTIES THAT WOULD REFLECT WHICH

11:20AM  18    INSTRUCTIONS ARE NOT IN DISPUTE.

11:20AM  19         AND THEN AS WE DID WITH THE PRELIMINARY ONES, I THINK OUR

11:20AM  20    INTENTION WOULD BE TO HIGHLIGHT FOR THE COURT THE LANGUAGE THAT

11:20AM  21    IS IN DISPUTE.  AND THERE MAY BE A FEW INSTRUCTIONS WHERE WE

11:20AM  22    NEED TO SUBMIT COMPETING INSTRUCTIONS TO THE COURT.

11:20AM  23         WE, WE EXCHANGED DRAFTS OVER THE WEEKEND.  WE LAST

11:20AM  24    EXCHANGED OUR DRAFT WITH THE GOVERNMENT ON SUNDAY.  WE'RE

11:20AM  25    WAITING TO HEAR BACK FROM THE GOVERNMENT.
```

8649

| | | |
|---|---|---|
| 11:20AM | 1 | ASSUMING THEY CAN RESPOND TODAY, MY GOAL WAS TO FILE BY |
| 11:20AM | 2 | TONIGHT, OR MAYBE AT THE EARLIEST TOMORROW MORNING, THIS JOINT |
| 11:20AM | 3 | DRAFT THAT THE COURT COULD THEN HAVE TOMORROW WITH, AND WE CAN |
| 11:20AM | 4 | MEET ON FRIDAY, AND I THINK THAT WILL HELP STREAMLINE OUR |
| 11:20AM | 5 | DISCUSSION, ASSUMING THAT PROPOSAL IS STILL ACCEPTABLE TO THE |
| 11:20AM | 6 | GOVERNMENT. |
| 11:20AM | 7 | MR. LEACH:  IT IS. |
| 11:20AM | 8 | THE COURT:  OKAY.  WELL, THAT'S VERY GENEROUS OF |
| 11:20AM | 9 | YOU. |
| 11:20AM | 10 | I HAD -- IN MY NOTES HERE, I REFLECTED NOON TOMORROW TO |
| 11:20AM | 11 | HAVE A FILING. |
| 11:20AM | 12 | MS. SAHARIA:  THAT WOULD BE -- I THINK THAT WOULD BE |
| 11:20AM | 13 | SATISFACTORY, YOUR HONOR. |
| 11:20AM | 14 | THE COURT:  DOES THAT WORK FOR YOU? |
| 11:21AM | 15 | MR. LEACH:  IT DOES, YOUR HONOR.  THANK YOU. |
| 11:21AM | 16 | THE COURT:  LET'S DO THAT THEN.  IF YOU COULD FILE |
| 11:21AM | 17 | YOUR JOINT SUBMISSION TOMORROW BY NOON, THAT WOULD GIVE MY TEAM |
| 11:21AM | 18 | AN OPPORTUNITY TO LOOK AT IT AND SEE WHAT WE COULD DO, AND THEN |
| 11:21AM | 19 | WE'LL HAVE DISCUSSIONS ON -- BEGIN DISCUSSIONS ON FRIDAY |
| 11:21AM | 20 | MORNING AND SEE WHERE WE GO. |
| 11:21AM | 21 | LET ME ASK -- ANYTHING FURTHER ON THAT?  ON THE |
| 11:21AM | 22 | INSTRUCTIONS? |
| 11:21AM | 23 | MS. SAHARIA:  NO, YOUR HONOR.  9:00 O'CLOCK ON |
| 11:21AM | 24 | FRIDAY I ASSUME? |
| 11:21AM | 25 | THE COURT:  YES.  YES. |

ER-12221

8650

| 11:21AM | 1 | LET ME ASK YOUR THOUGHTS ABOUT SCHEDULING.  YOU HEARD ME |
|---|---|---|
| 11:21AM | 2 | TELL THE JURY ABOUT POTENTIAL SCHEDULES. |
| 11:21AM | 3 | IT SEEMS LIKE -- JUST THE WAY THAT WE'RE GOING, IT SEEMS |
| 11:21AM | 4 | LIKE THE 16TH AND 17TH WOULD BE THE DAYS, PROBABLY THE EARLIEST |
| 11:21AM | 5 | DAYS WE COULD GET ARGUMENT. |
| 11:21AM | 6 | AND THEN DEPENDING ON THE JURY'S AVAILABILITY, THEY WOULD |
| 11:21AM | 7 | GO OUT AND FORMALLY BEGIN DELIBERATIONS I SHOULD SAY ON THE |
| 11:21AM | 8 | WEEK OF THE 20TH IF THEY'RE AVAILABLE. |
| 11:22AM | 9 | ANY COMMENTS ABOUT THIS SCHEDULE AND/OR IF FOR SOME REASON |
| 11:22AM | 10 | THE JURY THINKS THAT THEY SHOULD TAKE A CHRISTMAS BREAK AND |
| 11:22AM | 11 | COME BACK AFTER THE NEW YEAR BEGINS? |
| 11:22AM | 12 | ANY THOUGHTS ABOUT THAT? |
| 11:22AM | 13 | MS. SAHARIA:  I'LL DEFER THAT TO MR. DOWNEY. |
| 11:22AM | 14 | MR. LEACH:  I THINK MR. SCHENK AND I HAVE THE SAME |
| 11:22AM | 15 | VIEWS, BUT I'LL LET HIM EXPRESS THEM. |
| 11:22AM | 16 | THE COURT:  OKAY. |
| 11:22AM | 17 | MR. SCHENK:  JUST TWO THOUGHTS. |
| 11:22AM | 18 | FIRST, IF THE CLOSINGS COMPLETE EARLY ENOUGH ON FRIDAY, |
| 11:22AM | 19 | THE 17TH, I THINK WE CAN ENCOURAGE THEM TO BEGIN DELIBERATIONS |
| 11:22AM | 20 | THAT DAY.  I KNOW THE COURT HAS BEEN SUGGESTING THAT THE |
| 11:22AM | 21 | DELIBERATIONS BEGIN THE WEEK OF THE 20TH, BUT IT'S POSSIBLE WE |
| 11:22AM | 22 | WOULD NOT NEED TWO FULL DAYS AND, AS A RESULT, I THINK THEY |
| 11:22AM | 23 | COULD BEGIN THEIR DELIBERATIONS ON THE 17TH. |
| 11:22AM | 24 | OTHERWISE I THINK THE SCHEDULE MAKES SENSE. |
| 11:22AM | 25 | THE QUESTION OF WHETHER, IF THE JURY IS UNAVAILABLE THE |

```
11:22AM   1    WEEK OF THE 20TH AND ALSO UNAVAILABLE THE WEEK OF THE 27TH,

11:23AM   2    WHETHER WE SHOULD DEFER THE ARGUMENTS TO JANUARY, IN ADDITION

11:23AM   3    TO DELIBERATION, I THINK IS SOMETHING THAT WE SHOULD TAKE UP IF

11:23AM   4    WE REACH THAT, THAT EVENTUALITY.

11:23AM   5        AT THIS POINT, I CHOOSE TO REMAIN OPTIMISTIC THAT THE JURY

11:23AM   6    IS GOING TO BE AVAILABLE TO DELIBERATE SOME DAYS EACH OF THOSE

11:23AM   7    WEEKS, AND I THINK IF WE'RE FACED WITH A SITUATION WHERE

11:23AM   8    THEY'RE COMPLETELY UNAVAILABLE FOR TWO FULL WEEKS, THEN WE

11:23AM   9    SHOULD DISCUSS WHAT MAKES SENSE FOR ARGUMENT.

11:23AM  10            THE COURT:  OKAY.  THANK YOU.

11:23AM  11            MR. DOWNEY:  I THINK IT'S SENSIBLE TO AWAIT THEIR

11:23AM  12    SCHEDULE.  CERTAINLY THE FIRST PART OF THE SCHEDULE IS FINE,

11:23AM  13    AND HOPEFULLY THEY ARE AVAILABLE DURING THE WEEK OF THE 20TH,

11:23AM  14    AND FROM THERE I THINK LET'S SEE WHAT THEIR AVAILABILITY IS.

11:23AM  15            THE COURT:  OKAY.  OKAY.

11:23AM  16            MR. DOWNEY:  THANKS, YOUR HONOR.

11:23AM  17            THE COURT:  GREAT.  THANK YOU.

11:23AM  18        WE'LL SEE YOU AT THE BOTTOM OF THE HOUR.

11:23AM  19            MR. DOWNEY:  THANK YOU.

11:23AM  20            THE CLERK:  COURT IS IN RECESS.

11:23AM  21        (RECESS FROM 11:23 A.M. UNTIL 11:33 A.M.)

11:33AM  22            THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

11:33AM  23    AND MS. HOLMES ARE PRESENT.

11:33AM  24        WE'RE OUTSIDE THE PRESENCE OF THE JURY.

11:33AM  25        TWO JURORS COMMUNICATED TO MS. KRATZMANN THEIR
```

8652

| | | |
|---|---|---|
| 11:34AM | 1 | AVAILABILITY. |
| 11:34AM | 2 | JUROR NUMBER 7 I THINK IS UNAVAILABLE THE 22ND OF |
| 11:34AM | 3 | DECEMBER, BUT IS OTHERWISE AMENABLE TO THE SCHEDULE THE COURT |
| 11:34AM | 4 | PROPOSED. |
| 11:34AM | 5 | JUROR NUMBER 5 HAS AN APPOINTMENT ON THE 16TH OF DECEMBER, |
| 11:34AM | 6 | BUT WILL ENDEAVOR TO RESCHEDULE THAT SUCH THAT JUROR NUMBER 5 |
| 11:34AM | 7 | COULD PARTICIPATE AS WELL. |
| 11:34AM | 8 | THOSE WERE THE ONLY TWO COMMUNICATIONS, MS. KRATZMANN, |
| 11:34AM | 9 | THAT YOU RECEIVED FROM THE JURY? |
| 11:34AM | 10 | THE CLERK:  YES, YOUR HONOR. |
| 11:34AM | 11 | THE COURT:  SO IT SOUNDS LIKE THE JURY IS OTHERWISE |
| 11:34AM | 12 | AVAILABLE. |
| 11:34AM | 13 | WE'LL BRING THEM IN NOW AND I'LL FORMALLY ASK AVAILABILITY |
| 11:34AM | 14 | AND WE'LL HEAR FROM THEM. |
| 11:34AM | 15 | ANYTHING FURTHER BEFORE WE BRING THE JURY IN? |
| 11:35AM | 16 | MR. DOWNEY:  NOT FROM US, YOUR HONOR. |
| 11:35AM | 17 | MR. LEACH:  YOUR HONOR, NOT RELATING TO THE |
| 11:35AM | 18 | SCHEDULE. |
| 11:35AM | 19 | THERE IS A POSSIBLE MOTION THAT WE WANTED TO TALK ABOUT |
| 11:35AM | 20 | WITH THE COURT.  WE CAN EITHER DO IT NOW -- |
| 11:35AM | 21 | THE COURT:  SURE.  LET'S TALK ABOUT IT NOW, SURE. |
| 11:35AM | 22 | MR. LEACH:  THE COURT HAS NOTED IN A COUPLE |
| 11:35AM | 23 | INSTANCES POTENTIAL ISSUES RELATING TO TESTIMONY BY MS. HOLMES |
| 11:35AM | 24 | RELATING TO EVENTS IN 2003 AND EVENTS VIS-A-VIS HER AND |
| 11:35AM | 25 | MR. BALWANI AND WHETHER THOSE ARE ADMISSIBLE WITHOUT EXPERT |

8653

| | | |
|---|---|---|
| 11:35AM | 1 | TESTIMONY. |
| 11:35AM | 2 | THE DEFENSE HAS ELECTED NOT TO CALL THAT EXPERT. |
| 11:35AM | 3 | IT IS THE GOVERNMENT'S INTENTION TO MOVE TO STRIKE |
| 11:35AM | 4 | PORTIONS OF THE TESTIMONY, AND WE WANTED TO RAISE THIS ISSUE |
| 11:35AM | 5 | WITH THE COURT AS WE'RE TALKING ABOUT SCHEDULE AND TALK ABOUT |
| 11:35AM | 6 | THE APPROPRIATE WAY FOR US TO DO THAT AND TIMING FOR THAT. |
| 11:35AM | 7 | I THINK TOP OF MIND ARE THERE WERE A NUMBER OF ALLEGATIONS |
| 11:35AM | 8 | ABOUT AN INCIDENT AT STANFORD IN 2003, MORE THAN SEVEN YEARS |
| 11:36AM | 9 | BEFORE THE CONSPIRACY, THAT DOES NOT HAVE ANY APPARENT |
| 11:36AM | 10 | RELEVANCE AND RAISES SIGNIFICANT 403 CONCERNS. |
| 11:36AM | 11 | I THINK THAT ALSO TIES WITH A NUMBER OF OTHER INCIDENTS |
| 11:36AM | 12 | THAT WERE DESCRIBED IN THE DIRECT EXAMINATION. |
| 11:36AM | 13 | I HAVEN'T HAD TIME TO GATHER THE PARTICULAR CASE CITES, |
| 11:36AM | 14 | BUT WE WANT TO DO THAT IN WHATEVER FORM OR MANNER THE COURT |
| 11:36AM | 15 | WOULD FIND USEFUL. |
| 11:36AM | 16 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:36AM | 17 | WELL, THIS MIGHT INTERPLAY WITH OUR SCHEDULE AS FAR AS |
| 11:36AM | 18 | INSTRUCTIONS, BECAUSE DEPENDING ON THE COURT'S RULING, THAT |
| 11:36AM | 19 | COULD AFFECT THE INSTRUCTIONS AND WHETHER OR NOT THERE'S |
| 11:36AM | 20 | MODIFICATION OF INSTRUCTIONS. |
| 11:36AM | 21 | MR. LEACH:  WE COULD HAVE SOMETHING ON FILE AT THE |
| 11:36AM | 22 | NOON DEADLINE TOMORROW IF THAT SUITS THE COURT. |
| 11:36AM | 23 | THE COURT:  WELL, IF YOU WANT TO FILE SOMETHING |
| 11:36AM | 24 | INITIALLY, THAT WOULD BE HELPFUL, I THINK, AS TO WHAT YOUR |
| 11:36AM | 25 | POSITION IS. |

ER-12225

8654

| 11:36AM | 1 | MR. LEACH: OKAY. |

11:36AM   2          THE COURT: AND THEN, MR. DOWNEY, ANYTHING YOU WANT

11:36AM   3   TO SAY?

11:36AM   4

11:37AM   5          MR. DOWNEY: WE'LL AWAIT THE MOTION, YOUR HONOR.

11:37AM   6      BUT I THINK WE OUGHT TO GET IT RESOLVED QUICKLY AND, OF

11:37AM   7   COURSE, THE -- I DON'T THINK WITH RESPECT TO ANYTHING THAT

11:37AM   8   MR. LEACH MENTIONED THAT IT WAS OBJECTED TO CONTEMPORANEOUSLY,

11:37AM   9   SO THERE'S OBVIOUSLY BEEN A BIG EFFECT ON THE RECORD BY THE

11:37AM  10   FAILURE TO DO THAT, INCLUDING THAT WE DID NOT OBJECT TO

11:37AM  11   CORRESPONDING CROSS-EXAMINATION.

11:37AM  12      SO WE'LL DISCUSS THOSE ISSUES IN THE CONTEXT OF THE

11:37AM  13   MERITS, BUT I'M SURPRISED TO HEAR THAT MOTION AFTER THE CLOSE

11:37AM  14   OF EVIDENCE.

11:37AM  15      BUT IF MR. LEACH FILES BY NOON TOMORROW, WE WOULD BE HAPPY

11:37AM  16   TO TRY TO AT LEAST HAVE A DISCUSSION, EVEN IF WE'RE NOT ABLE IN

11:37AM  17   A POSITION TO FILE SOMETHING BEFORE FRIDAY, WE WOULD BE IN A

11:37AM  18   POSITION TO HAVE A DISCUSSION WITH YOUR HONOR ON FRIDAY ON THAT

11:37AM  19   SUBJECT.

11:37AM  20          THE COURT: ALL RIGHT.

11:37AM  21      MR. LEACH?

11:37AM  22          MR. LEACH: NOTHING MORE THAN I THINK THE COURT

11:37AM  23   NOTED IN ITS ORDER TO SEVER THE CASE, AND I THINK IT'S OBVIOUS

11:37AM  24   FROM SOME OF THE ISSUES THAT WERE RAISED, THERE WAS CONDITIONAL

11:38AM  25   RELEVANCE TO SOME OF WHAT SHE WAS TESTIFYING TO IF THERE WAS

8655

| 11:38AM | 1 | EXPERT TESTIMONY.  BUT NOW THAT THERE'S NONE, I THINK THAT |
| 11:38AM | 2 | ISSUE NEEDS TO BE ADDRESSED. |
| 11:38AM | 3 | SO I DON'T THINK THERE'S ANYTHING IN THE TIMING AS WE'RE |
| 11:38AM | 4 | RAISING THIS THAT IS INAPPROPRIATE. |
| 11:38AM | 5 | I THINK THE DEFENSE HAS HEARD THE COURT'S COMMENTS A |
| 11:38AM | 6 | NUMBER OF TIMES ON THIS ISSUE, AND SO WE'LL PUT OUR SUBMISSION |
| 11:38AM | 7 | TOGETHER AND GET THAT ON FILE TOMORROW. |
| 11:38AM | 8 | THE COURT:  ALL RIGHT. |
| 11:38AM | 9 | IT SEEMS LIKE A MR. LEACH'S POINT IS THAT THERE WAS A 12.2 |
| 11:38AM | 10 | NOTICE MADE, AS IS REQUIRED BY THE RULES, AND THAT ENGAGED |
| 11:38AM | 11 | CERTAIN NOTICE AND THE PARTIES TOOK CERTAIN ACTIONS BECAUSE OF |
| 11:38AM | 12 | THAT. |
| 11:38AM | 13 | AND I'LL JUST WAIT TO HEAR, MR. LEACH, YOUR THOUGHTS ABOUT |
| 11:38AM | 14 | THE STATE OF THE EVIDENCE AND HOW ALL OF THAT RELATES TO THE |
| 11:38AM | 15 | TESTIMONY. |
| 11:38AM | 16 | MR. LEACH:  WILL DO, YOUR HONOR. |
| 11:38AM | 17 | THE COURT:  OKAY.  ALL RIGHT. |
| 11:38AM | 18 | MR. DOWNEY:  THANK YOU, YOUR HONOR. |
| 11:38AM | 19 | THE COURT:  OKAY. |
| 11:40AM | 20 | (PAUSE IN PROCEEDINGS.) |
| 11:40AM | 21 | (JURY IN AT 11:40 A.M.) |
| 11:40AM | 22 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:41AM | 23 | PLEASE BE SEATED.  WE ARE BACK ON THE RECORD.  ALL PARTIES |
| 11:41AM | 24 | PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:41AM | 25 | OUR JURY IS PRESENT. |

11:41AM  1      LADIES AND GENTLEMEN, I UNDERSTAND THAT -- MS. KRATZMANN

11:41AM  2   HAS INFORMED ME THAT TWO JURORS HAVE INDICATED COMMENTS ON THE

11:41AM  3   SCHEDULE THAT I PROPOSED.

11:41AM  4      I UNDERSTAND ONE JUROR IS NOT AVAILABLE ON THE 22ND OF

11:41AM  5   DECEMBER, BUT OTHERWISE WOULD BE AVAILABLE TO DELIBERATE IF WE

11:41AM  6   WERE NOT IN SESSION ON THAT DATE.

11:41AM  7      AND MY SENSE IS THAT THE COURT WOULD ACCOMMODATE THAT

11:41AM  8   SCHEDULE SHOULD THAT BE HELPFUL TO THE JUROR.

11:41AM  9      I ALSO AM INFORMED THAT ONE JUROR HAS A MEDICAL ISSUE --

11:41AM 10   APPOINTMENT, PARDON ME, I SHOULD SAY AN APPOINTMENT -- ON THE

11:42AM 11   16TH OF DECEMBER, BUT IS -- IT SOUNDS LIKE THAT COULD BE

11:42AM 12   RESCHEDULED, AND I THINK EFFORTS ARE GOING TO BE MADE TO

11:42AM 13   RESCHEDULE THAT SUCH THAT, AT LEAST FOR NOW, THAT JUROR WOULD

11:42AM 14   BE -- CAN I ASK, WILL THAT JUROR BE AVAILABLE -- THIS IS JUROR

11:42AM 15   NUMBER 5.

11:42AM 16      DO YOU THINK YOU WILL BE AVAILABLE ON THE 16TH, JUROR

11:42AM 17   NUMBER 5?

11:42AM 18           JUROR:  YES, YOUR HONOR.

11:42AM 19           THE COURT:  ALL RIGHT.  THANK YOU.

11:42AM 20      SO, COUNSEL, IT SOUNDS LIKE THE SCHEDULE THAT I PROPOSED

11:42AM 21   COULD BE ENGAGED SAVE FOR THE 22ND.  THE 22ND WOULD BE A DAY

11:42AM 22   THAT THE JURY WOULD NOT BE DELIBERATING ON.

11:42AM 23      LET ME JUST ASK THE JURY COLLECTIVELY, IF I RECOGNIZE THAT

11:42AM 24   YOU WOULD NOT BE IN SESSION ON THE 22ND, AND THAT JUROR

11:42AM 25   NUMBER 5 IS GOING TO RESCHEDULE THE APPOINTMENT ON THE 16TH,

8657

11:42AM  1    DOES THE SCHEDULE THAT THE COURT PROPOSED TO YOU -- IS THERE

11:43AM  2    ANYONE THAT HAS ANY OTHER ISSUE WITH THAT SCHEDULE?

11:43AM  3        IF SO, IF YOU WOULD JUST RAISE YOUR HAND.

11:43AM  4        YOU ARE SO GOOD AT NOT RAISING YOUR HANDS WHEN I ASK YOU

11:43AM  5    MY QUESTIONS.

11:43AM  6        SO THANK YOU.  THANK YOU VERY MUCH.

11:43AM  7        SO WE'LL ADOPT THAT SCHEDULE.

11:43AM  8        SO, LADIES AND GENTLEMEN, LET'S DO THIS.  WE WILL BREAK

11:43AM  9    NOW, AND THE NEXT TIME THAT WE WILL SEE YOU, UNLESS YOU'RE

11:43AM 10    NOTIFIED OF ANY OTHER EXTENSION, THE NEXT TIME THAT WE WOULD

11:43AM 11    SEE YOU WOULD BE ON DECEMBER 16TH, DECEMBER 16TH AT 9:00 A.M.,

11:43AM 12    AND THAT WOULD BE FOR CLOSING ARGUMENTS, CLOSING FINAL

11:43AM 13    ARGUMENTS.

11:43AM 14        SO I WOULD ASK YOU TO ADJUST YOUR SCHEDULES APPROPRIATELY

11:43AM 15    FOR THAT.

11:43AM 16        I ANTICIPATE THE ARGUMENTS MAY TAKE TWO DAYS.  WE MAY GO

11:43AM 17    INTO THE 17TH.  IT MAY NOT TAKE US UNTIL THE END OF THE DAY ON

11:44AM 18    THE 17TH.

11:44AM 19        IF THAT OCCURS, IF THERE IS TIME REMAINING ON THE 17TH, I

11:44AM 20    WILL THEN INSTRUCT YOU, I'LL READ YOU THE INSTRUCTIONS, AND YOU

11:44AM 21    CAN BEGIN THE DELIBERATIONS AS SOON AS THE COURT HAS GIVEN YOU

11:44AM 22    THE FINAL INSTRUCTIONS.

11:44AM 23        SO WITH THAT, WE'LL BE IN RECESS FOR TODAY.  WE'LL SEE YOU

11:44AM 24    AGAIN NEXT ON DECEMBER 16TH AT 9:00 A.M. IF YOU WOULD COLLECT

11:44AM 25    YOURSELVES ACCORDINGLY.

11:44AM  1          AND MS. KRATZMANN WILL BE IN TOUCH WITH YOU SHOULD THERE

11:44AM  2     BE ANY DEVIATION OR CHANGE IN THIS SCHEDULE.

11:44AM  3          AND SHOULD ANYTHING OCCUR IN YOUR SCHEDULES, I WOULD

11:44AM  4     INVITE YOU TO PLEASE CONTACT MS. KRATZMANN AND LET HER KNOW SO

11:44AM  5     THAT WE CAN, WE CAN HAVE NOTICE OF THAT.

11:44AM  6          SO WE'LL SEE YOU NEXT WEEK.

11:44AM  7          BUT LET ME TELL YOU AND REMIND YOU, IT'S EVER SO IMPORTANT

11:44AM  8     NOW FOR YOU TO PLEASE DO NOT DISCUSS WITH ANYONE, DO NOT DO ANY

11:45AM  9     RESEARCH, DO NOT LISTEN TO, READ, OR IN ANY WAY COME INTO ANY

11:45AM 10     INFORMATION ABOUT THIS CASE.

11:45AM 11          DO NOT MAKE ANY OPINIONS ABOUT IT, AND DO NOT MAKE ANY

11:45AM 12     DECISIONS ABOUT THIS CASE.

11:45AM 13          YOU MAY ONLY DO THAT FOLLOWING THE ARGUMENTS AND FOLLOWING

11:45AM 14     THE INSTRUCTIONS, AND YOU MAY BEGIN ANY DELIBERATION ONLY WHEN

11:45AM 15     YOU'VE BEEN GIVEN THE CASE AND YOU'VE RETIRED TO THE

11:45AM 16     DELIBERATION ROOM TO BEGIN THEN YOUR DISCUSSIONS AND SHARING

11:45AM 17     INFORMATION AND THOUGHTS ABOUT THE CASE.

11:45AM 18          BUT DO NOT REACH ANY CONCLUSION ABOUT THIS CASE UNTIL

11:45AM 19     THEN.

11:45AM 20          SO PLEASE, WITH THAT ADMONISHMENT, WE WILL RECESS TODAY,

11:45AM 21     AND WE'LL SEE YOU BACK ON THE 16TH.

11:45AM 22          AGAIN, THE FIRST THING I'M GOING TO ASK YOU IS THAT

11:45AM 23     QUESTION AGAIN, WHETHER OR NOT ANY OF YOU SHOULD RAISE YOUR

11:45AM 24     HANDS REGARDING CONTACT WITH ANY INFORMATION THAT YOU MAY HAVE

11:45AM 25     SEEN.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Amy Mason Saharia*
A<small>MY</small> M<small>ASON</small> S<small>AHARIA</small>

April 17, 2023