No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XLIV of LVII | ER-12532 to ER-12831

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

CLOSING ARGUMENT BY MR. SCHENK                                    8954

| | | |
|---|---|---|
| 10:18AM | 1 | TO DO MORE PROFICIENCY TESTING. |
| 10:18AM | 2 | WHO THEY REPLACE HIM WITH IS SUNNY BALWANI'S DERMATOLOGIST |
| 10:18AM | 3 | WHO WORKS FIVE HOURS OVER SIX OR SEVEN MONTHS, AND |
| 10:18AM | 4 | LYNETTE SAWYER, WHO WORKS LESS. |
| 10:18AM | 5 | YOU CAN TELL WHAT THEY VALUE AND WHAT THEIR INTENT IS BY |
| 10:18AM | 6 | WHO THEY GET TO RUN THE LAB, AND YOU KNOW THE DIFFERENCE IN LAB |
| 10:18AM | 7 | DIRECTORS, JUST THE ENGAGEMENT -- I DON'T MEAN AS PEOPLE, I |
| 10:18AM | 8 | JUST MEAN THE LEVEL OF ENGAGEMENT, THE KINDS OF ISSUES THAT ARE |
| 10:18AM | 9 | RAISED TO THE LAB DIRECTOR AND THE KIND OF ISSUES THAT THE LAB |
| 10:18AM | 10 | DIRECTOR RAISES ARE VERY DIFFERENT BETWEEN ROSENDORFF AND |
| 10:18AM | 11 | DHAWAN AND SAWYER. |
| 10:18AM | 12 | SO THE SECOND ELEMENT FOR A CONSPIRACY FOR PATIENTS IS THE |
| 10:18AM | 13 | SAME, MEMBERSHIP IN THE CONSPIRACY, KNOWLEDGE OF THE OBJECTIVE, |
| 10:18AM | 14 | AND INTENT TO ACCOMPLISH IT. |
| 10:18AM | 15 | AGAIN, YOU GATHER THIS EVIDENCE FROM THE TEXT MESSAGES. |
| 10:19AM | 16 | THERE'S A TEXT MESSAGE THAT YOU PROBABLY REMEMBER, WE'LL LOOK |
| 10:19AM | 17 | AT IT A COUPLE OF TIMES, WHERE MR. BALWANI TELLS MS. HOLMES |
| 10:19AM | 18 | THAT THE LAB IS A DISASTER.  THERE'S AN EXPLETIVE IN THE TEXT. |
| 10:19AM | 19 | AND THERE ARE EMAILS WHERE MS. HOLMES AND MR. BALWANI ARE |
| 10:19AM | 20 | INFORMED OF ALL OF THE PROBLEMS IN THE LAB. |
| 10:19AM | 21 | AND THEN INTENT, AGAIN, THE KINDS OF FALSE STATEMENTS THAT |
| 10:19AM | 22 | THEY'RE COMMUNICATING TO PATIENTS THROUGH THE PRESS, THE MEDIA |
| 10:19AM | 23 | AND THE WEBSITE, ARE THE KIND THAT WOULD GET THE PATIENT TO GO |
| 10:19AM | 24 | THERE ABOUT ACCURACY, RELIABILITY, SPEED, PRICE, THINGS LIKE |
| 10:19AM | 25 | THAT, FINGERSTICK, THOSE ARE ALL THINGS THAT ARE SAID TO |

CLOSING ARGUMENT BY MR. SCHENK                                    8955

10:19AM   1    ENCOURAGE SOMEONE TO PURCHASE BLOOD TESTS.

10:19AM   2         HERE'S THE TEXT THAT I JUST REFERRED TO.  THE NORMANDY LAB

10:19AM   3    IS A DISASTER ZONE, MR. BALWANI SAYS TO MS. HOLMES.  THIS IS IN

10:19AM   4    NOVEMBER OF 2014.  I'LL MAKE A POINT OF NOTING THAT FOR YOU A

10:19AM   5    LITTLE BIT LATER ON THIS MORNING.

10:19AM   6         IN 2014, AND ACTUALLY EARLIER, IN 2014 MS. HOLMES IS TOLD

10:20AM   7    ABOUT PROBLEMS IN THE LAB AND THEY GO ON FURTHER TO DISCUSS THE

10:20AM   8    USE OF HUMAN JUDGMENT, OF PEOPLE IN THE LAB MAKING THE

10:20AM   9    DECISIONS.

10:20AM  10         RECALL ONE OF THE PITCHES, ONE OF THE BENEFITS TO THE

10:20AM  11    THERANOS DEVICE WAS THAT IT DID ALL OF THE WORK ON ITS OWN SO

10:20AM  12    YOU DIDN'T HAVE TO HAVE PEOPLE IN THE LAB MAKING JUDGMENTS,

10:20AM  13    MAKING DECISIONS.

10:20AM  14         THIS SORT OF PREANALYTICAL PHASE WHERE THERE WERE A LOT OF

10:20AM  15    ERRORS IN LAB TESTING OCCUR, THE BENEFIT THAT INVESTORS AND

10:20AM  16    PATIENTS WERE TOLD WAS THAT THERANOS ELIMINATED THAT.

10:20AM  17         IN FACT, WHAT THEY SEE IS INDIVIDUALS, PEOPLE IN THE LAB

10:20AM  18    USING THEIR JUDGMENT BECAUSE THE DEVICE DOESN'T WORK THAT WAY.

10:20AM  19         PRICE.

10:20AM  20         THE THERANOS PRICE WAS ADVERTISED.  THIS IS IN A BINDER OF

10:20AM  21    DOCUMENTS SENT TO INVESTORS, BUT YOU'LL SEE TESTIMONY FROM

10:20AM  22    EDLIN SAYING IT'S THE SAME KIND OF INFORMATION THAT APPEARED ON

10:20AM  23    THERANOS'S WEBSITE.

10:21AM  24         ANOTHER SLIDE ABOUT PRICE.

10:21AM  25         IN THE MEDIA, THIS IS THE PARLOFF ARTICLE, THE 2014

CLOSING ARGUMENT BY MR. SCHENK                                    8956

10:21AM 1      "FORTUNE" ARTICLE.  THE STATEMENTS THAT MS. HOLMES MADE TO

10:21AM 2      MR. PARLOFF MAKE IT INTO THE ARTICLE AND THEN ARE AVAILABLE FOR

10:21AM 3      POTENTIAL PATIENTS TO READ AND USE TO MAKE DECISIONS TO USE THE

10:21AM 4      SERVICE, AND IT SAYS THINGS LIKE THE COST, TRANSPARENCY,

10:21AM 5      ADVERTISING OF THE PRICE, THINGS LIKE THAT.

10:21AM 6          THIS IS THE EMAIL THAT I MENTIONED A MOMENT AGO WHERE

10:21AM 7      RIGHT BEFORE THE WEBSITE GOES LIVE, AN ATTORNEY SENDS

10:21AM 8      MS. HOLMES AN EMAIL SAYING, REMOVE THIS STUFF FROM YOUR

10:21AM 9      WEBSITE, THESE WORDS, THESE PHRASES, THINGS LIKE "ALL TESTS,"

10:21AM 10     BECAUSE IT IS UNLIKELY THAT A LAB CAN PERFORM EVERY CONCEIVABLE

10:21AM 11     TEST.

10:21AM 12         AND THEN THESE COMPARATIVE WORDS, REPLACE "FASTER AND

10:21AM 13     EASIER" WITH "FAST AND EASY," ALL TO AVOID MISLEADING PEOPLE.

10:22AM 14         AND YOU HEARD MS. HOLMES WHEN SHE WAS ON THE STAND TALK

10:22AM 15     ABOUT THIS, AND WHAT SHE SAID WAS, IT WAS SOMEBODY ELSE'S JOB

10:22AM 16     AT THERANOS TO MAKE THE CHANGES TO THE WEBSITE.

10:22AM 17         DAN EDLIN TOLD YOU HOW INVOLVED SHE WAS IN THE WEBSITE.

10:22AM 18         BUT THAT ALSO MISSES THE POINT.

10:22AM 19         SHE'S INFORMED ABOUT THE MISLEADING NATURE OF THESE WORDS,

10:22AM 20     HOW SOMEONE MIGHT GET THE WRONG IMPRESSION AND THINK THAT

10:22AM 21     THERANOS COULD ACTUALLY DO ALL OF THE TESTS BY USING THESE

10:22AM 22     PHRASES.  IT'S STRONG INTENT EVIDENCE FOR THAT REASON.

10:22AM 23         EDLIN TOLD YOU MS. HOLMES WAS INVOLVED IN THE WEBSITE.  SO

10:22AM 24     IT WASN'T THAT MS. HOLMES NEVER LOOKED AT THE WEBSITE, HAD NO

10:22AM 25     IDEA THAT PATIENTS OR POTENTIAL PATIENTS MIGHT LOOK AT IT.  SHE

CLOSING ARGUMENT BY MR. SCHENK

```
10:22AM   1    WAS INVOLVED IN THAT ALSO.

10:22AM   2         THE QUESTIONS ABOUT QUALITY APPEARED ON THE LEFT IN AN

10:22AM   3    INVESTOR BINDER.  BUT DAN EDLIN SAID, I ALSO RECOGNIZE THAT AS

10:22AM   4    SOMETHING THAT APPEARED ON THE WEBSITE.

10:22AM   5         SO IT WASN'T JUST PRICE THAT THEY ADVERTISED TO LURE

10:23AM   6    PATIENTS.  QUALITY.  ACCURACY.

10:23AM   7         NOW WE'LL MOVE ON TO THE WIRE FRAUD COUNTS.

10:23AM   8         THE CRIME OF WIRE FRAUD HAS FOUR ELEMENTS.  I TOLD YOU

10:23AM   9    THAT THERE ARE SIX COUNTS RELATED TO INVESTORS, AND THEN THREE

10:23AM  10    COUNTS RELATED TO PATIENTS.

10:23AM  11         LET'S START BY FOCUSSING ON THE COUNTS RELATED TO

10:23AM  12    INVESTORS.

10:23AM  13         THE FOUR ELEMENTS ARE THAT MS. HOLMES KNOWINGLY

10:23AM  14    PARTICIPATED IN A SCHEME OR PLAN TO DEFRAUD, OR A SCHEME OR

10:23AM  15    PLAN FOR OBTAINING MONEY OR PROPERTY BY FALSE REPRESENTATIONS.

10:23AM  16         IT MIGHT BE EASIER TO BREAK THAT INTO TWO, TO ACTUALLY

10:23AM  17    FOCUS ON THE EXISTENCE OF A SCHEME OR PLAN, AND THEN KNOWLEDGE.

10:23AM  18    SO THAT'S THE WAY THAT WE WILL TALK ABOUT IT.

10:23AM  19         THE SECOND ELEMENT IS MATERIALITY, THAT THE FALSE

10:23AM  20    STATEMENTS WERE THE KIND OF FALSE STATEMENTS THAT COULD WOULD

10:23AM  21    CAUSE SOMEONE TO SPEND MONEY OR PART WITH MONEY.

10:23AM  22         THE THIRD ELEMENT IS THAT MS. HOLMES ACTED WITH THE INTENT

10:23AM  23    TO DEFRAUD.

10:23AM  24         AND THE FOURTH ELEMENT IS THAT INTERSTATE ELEMENT THAT I

10:24AM  25    MENTIONED TO YOU EARLIER, AN INTERSTATE WIRE.
```

CLOSING ARGUMENT BY MR. SCHENK                                      8958

10:24AM   1          HERE'S A SLIDE THAT I'M GOING TO ASK YOU TO TAKE A FEW

10:24AM   2    NOTES ON IF YOU'LL ALLOW ME TO MAKE THAT REQUEST.

10:24AM   3          THE VERDICT FORM FOR THESE COUNTS SAYS COUNT THREE, THE

10:24AM   4    DATE -- SO FOR COUNT THREE, DECEMBER 30TH, 2013 -- AND THE

10:24AM   5    AMOUNT, THE DOLLAR AMOUNT.

10:24AM   6          THE VERDICT FORM DOES NOT SAY THE NAME OF THE INVESTOR,

10:24AM   7    AND WE ALL WANT TO MAKE SURE THAT YOU REACH THE VERDICT THAT

10:24AM   8    YOU HAD WANT TO REACH.

10:24AM   9          IF YOU INTEND TO CONVICT HER OF THE EISENMAN COUNT AND

10:24AM  10    ACQUIT HER OF THE BLACK DIAMOND OR THE LUCAS COUNT, KNOWING

10:24AM  11    WHICH COUNT APPLIES TO WHICH INVESTOR IS USEFUL.

10:24AM  12          SO COUNT THREE IS EISENMAN;

10:24AM  13          COUNT FOUR IS LUCAS, OR BDV, BLACK DIAMOND VENTURES.

10:24AM  14    LUCAS INVESTED A LITTLE OVER 5 MILLION;

10:24AM  15          COUNT FIVE IS BRYAN TOLBERT, OR THE HALL GROUP, AND THEY

10:25AM  16    INVESTED A LITTLE UNDER 5 MILLION;

10:25AM  17          COUNT SIX IS BRIAN GROSSMAN, OR PFM, AND THIS WIRE, THIS

10:25AM  18    INVESTMENT WAS A LITTLE OVER $38 MILLION;

10:25AM  19          COUNT SEVEN WAS LISA PETERSON, OR RDV, THIS WAS ABOUT

10:25AM  20    $100 MILLION; AND,

10:25AM  21          COUNT EIGHT WAS DAN MOSLEY, AND HIS INVESTMENT WAS JUST

10:25AM  22    UNDER $6 MILLION.

10:25AM  23          SO YOU SEE WHICH COUNT APPLIES TO WHICH INVESTOR.

10:25AM  24          I TOLD YOU THAT THE FALSE STATEMENTS THAT WERE MADE IN

10:25AM  25    THIS CASE FALL INTO DIFFERENT CATEGORIES.  THERE ARE DIFFERENT

CLOSING ARGUMENT BY MR. SCHENK                                    8959

```
10:25AM   1    KINDS OF FALSE STATEMENTS THAT MS. HOLMES MADE IN ORDER TO

10:25AM   2    DEFRAUD INVESTORS, AND SOME INVESTORS HEARD MORE THAN ONE OF

10:25AM   3    THEM, SOME HEARD ONE, BUT NOT ANOTHER.  IT'S NOT THE CASE THAT

10:25AM   4    EVERY INVESTOR HEARD EVERY STATEMENT.

10:25AM   5         THERE ARE CERTAIN KINDS OF STATEMENTS, THOUGH, I THINK

10:25AM   6    THAT ARE A THREAD THROUGH THIS SCHEME, ESPECIALLY THIS FIRST

10:26AM   7    ONE ABOUT THE CAPABILITIES OF THE ANALYZER, AND IN PARTICULAR

10:26AM   8    ITS ACCURACY.

10:26AM   9         AND, IN FACT, THE ACCURACY OF THE TESTING ALSO WAS A FALSE

10:26AM  10    STATEMENT ON THE PATIENT SIDE.  IT'S SORT OF THE UNDERLYING

10:26AM  11    FALSE STATEMENT IN THE CASE, BUT IT IS CERTAINLY NOT THE ONLY

10:26AM  12    FALSE STATEMENT.

10:26AM  13         THERE ARE FALSE STATEMENTS IN MANY CATEGORIES ABOUT THE

10:26AM  14    FULL RANGE OF TESTS, ABOUT WHAT DEVICE THEY USED, THAT THE

10:26AM  15    TESTING WAS DONE ON THE FINGERSTICK.

10:26AM  16         THERE'S FALSE STATEMENTS ABOUT THE FINANCIAL STABILITY OR

10:26AM  17    THE FINANCIAL HEALTH OF THE COMPANY.

10:26AM  18         THERE ARE FALSE STATEMENTS ABOUT MISLEADING

10:26AM  19    DEMONSTRATIONS, OR YOU MAY RECALL THAT ON OCCASION VIP'S -- AT

10:26AM  20    THERANOS A VIP WAS A POTENTIAL INVESTOR.  A VIP WOULD COME INTO

10:26AM  21    THERANOS AND HAVE A DEMONSTRATION OF THE BLOOD TEST AND THAT

10:26AM  22    WOULD OFTEN BE DONE ON A DEVICE THAT THERANOS DID NOT USE AT

10:26AM  23    WALGREENS, THE 4 SERIES DEVICE.

10:26AM  24         OFTEN THE TESTING OF THAT BLOOD WAS NOT DONE ON THE DEVICE

10:26AM  25    IN THE ROOM.  IT WAS DONE BACK AT THE LAB, AND WE'LL GO THROUGH
```

CLOSING ARGUMENT BY MR. SCHENK

10:27AM 1      SOME EMAILS ON THAT.

10:27AM 2          SO THIS -- THE PROCESS, THE SETTING UP AND USING OF THE

10:27AM 3      DEMONSTRATIONS WAS ALSO A WAY THAT THERANOS DEFRAUDED POTENTIAL

10:27AM 4      INVESTORS.

10:27AM 5          OTHER CATEGORIES.

10:27AM 6          THE WALGREENS RELATIONSHIP, THAT IT WAS HEALTHY AND

10:27AM 7      EXPANDING; THE DEPARTMENT OF DEFENSE WORK, THAT THE TECHNOLOGY

10:27AM 8      HAD BEEN DEPLOYED ON THE BATTLEFIELD; THE USE OF THIRD PARTY

10:27AM 9      DEVICES, OR THE NOT REVEALING THE FACT THAT THEY USED THIRD

10:27AM 10     PARTY DEVICES; VALIDATION BY LARGE PHARMACEUTICAL COMPANIES,

10:27AM 11     YOU KNOW THAT FOR PEOPLE LIKE DAN MOSLEY WAS IMPORTANT; AND

10:27AM 12     THEN THE USE OF FALSE STATEMENTS IN THE MEDIA.

10:27AM 13         I TOLD YOU THAT SOME OF THE WORK WASN'T DONE JUST BY

10:27AM 14     HOLMES AND BALWANI MAKING FALSE STATEMENTS TO POTENTIAL

10:27AM 15     INVESTORS, BUT MS. HOLMES WOULD MAKE FALSE STATEMENTS TO RAGO

10:27AM 16     OR PARLOFF AND IT WOULD APPEAR IN AN ARTICLE AND THEN THEY

10:27AM 17     WOULD SENT THAT ARTICLE TO POTENTIAL INVESTORS.

10:28AM 18         THAT FIRST CATEGORY, THE CAPABILITIES OF THE ANALYZER.

10:28AM 19         FIRST LET'S TALK ABOUT WHERE YOU CAN FIND THAT FALSE

10:28AM 20     STATEMENT.  IF YOU ARE A POTENTIAL INVESTOR, WHERE ARE THE

10:28AM 21     PLACES YOU MAY HAVE SEEN IT?  THE INVESTOR BINDERS THERE ARE

10:28AM 22     FALSE STATEMENTS IN.

10:28AM 23         IT ALSO APPEARED IN THE PRESENTATION TO THE BOARD.  THE

10:28AM 24     BOARD WAS TOLD THINGS ABOUT THE CAPABILITIES OF THE ANALYZER

10:28AM 25     THAT INVESTORS WERE ALSO -- AND YOU CAN THINK OF THAT SIMILARLY

8961
CLOSING ARGUMENT BY MR. SCHENK

10:28AM  1   TO THE WAY THAT AT THE BEGINNING THIS MORNING I ASKED YOU TO

10:28AM  2   THINK ABOUT FALSE STATEMENTS MADE TO SAFEWAY OR THE DEPARTMENT

10:28AM  3   OF DEFENSE.

10:28AM  4        IT IS ALL THE SAME SCHEME.  IT IS ALL THE SAME KIND OF

10:28AM  5   FALSE STATEMENTS THAT ARE BEING TOLD TO INVESTORS AND TO THE

10:28AM  6   BOARD AND ON OCCASION TO PATIENTS.

10:28AM  7        YOU FIND THE FALSE STATEMENTS IN INTERVIEWS AND IN THE

10:28AM  8   MEDIA.  WE'LL LOOK AT SOME PORTIONS OF THE ARTICLES.

10:28AM  9        AND THEN DIRECTLY.  THERE WERE OCCASIONS -- YOU HEARD A

10:28AM 10   RECORDING ALREADY THIS MORNING -- WHERE MS. HOLMES IS SPEAKING

10:28AM 11   TO POTENTIAL INVESTORS.

10:28AM 12        SO IT'S WRITTEN, IT'S SPOKEN.

10:28AM 13        HERE'S ONE OF THE FIRST LOCATIONS.  THIS IS WITHIN A

10:29AM 14   BINDER, AN INVESTOR BINDER.  INVESTORS ARE TOLD THAT THERANOS'S

10:29AM 15   PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

10:29AM 16   FROM A FINGERSTICK AND FROM MICRO-SAMPLES.

10:29AM 17        AND THEN YOU SEE THE LITTLE CHART ON THE LOWER LEFT SHOWS

10:29AM 18   YOU WHICH INVESTOR, WHICH EXHIBIT NUMBER.  IT WAS IN THE MOSLEY

10:29AM 19   BINDER, IT WAS IN THE PETERSON BINDER, AND IT WAS IN THE

10:29AM 20   MURDOCH BINDER.  YOU'VE HEARD ABOUT THE MURDOCH BINDER THROUGH

10:29AM 21   TESTIMONY.

10:29AM 22        THESE EXHIBIT NUMBERS ARE GOING TO REPEAT IN MANY OF THE

10:29AM 23   SLIDES.

10:29AM 24        THIS IMAGE ABOUT THE SAME TESTS, A WHOLE NEW APPROACH.

10:29AM 25   THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES AND

CLOSING ARGUMENT BY MR. SCHENK                                    8962

10:29AM   1    PROCESSES ALL SAMPLE TYPES.

10:29AM   2         AND THEN THIS IMAGE SORT OF COMPARING THE VERY SMALL BLOOD

10:29AM   3    DRAW AT THERANOS VERSUS THE FOUR VIALS OF BLOOD THAT

10:29AM   4    TRADITIONAL LABS USE TO FURTHER PAINT THE IMAGE OR LAND THE

10:30AM   5    POINT THAT THERANOS'S TECHNOLOGY IS DIFFERENT AND IT'S -- THE

10:30AM   6    HALLMARK OF IT IS FINGERSTICK WITH MUCH SMALLER BLOOD.

10:30AM   7         IT APPEARS IN THESE OCCASIONS.  IN FACT, ON SOME

10:30AM   8    OCCASIONS, SOME OF THE IMAGES LOOK A LITTLE DIFFERENT BETWEEN

10:30AM   9    THE INVESTOR BINDERS.  SOMETIMES THEY DIDN'T HAVE A VERSUS

10:30AM  10    PHRASE OR ABBREVIATION BETWEEN THE TWO IMAGES, BUT IMAGES LIKE

10:30AM  11    THIS APPEARED IN THESE LOCATIONS.

10:30AM  12         THE BOARD GOT IT, INVESTORS GOT IT, EVEN ROGER PARLOFF GOT

10:30AM  13    IT.

10:30AM  14         THERE WERE FALSE STATEMENTS ABOUT THE QUALITY, THERANOS

10:30AM  15    AUTOMATES PRE- AND POST-ANALYTICAL PROCESSES, AND IT REDUCES

10:30AM  16    ERROR.  AGAIN, HERE ARE THE LOCATIONS THAT THAT APPEARED.  THEY

10:30AM  17    WERE COMMUNICATING THIS CONCEPT TO THE INVESTORS, TO THE BOARD,

10:30AM  18    AND TO MR. PARLOFF.

10:30AM  19         ACCURACY AND SPEED.

10:30AM  20         THESE WERE COMMUNICATED.  THE HIGHEST LEVELS OF ACCURACY,

10:30AM  21    AND SPEED, FASTER ANSWERS, FASTER RESULTS.

10:31AM  22         BUT YOU KNOW THAT IF THERANOS TESTING ACTUALLY WAS THE

10:31AM  23    BLOOD DRAW OCCURRED IN A WALGREENS, AND THEN IT WAS SHIPPED TO

10:31AM  24    A CENTRAL LAB IN CALIFORNIA AND RUN ON AN UNMODIFIED THIRD

10:31AM  25    PARTY DEVICE, IT WOULDN'T BE FASTER, NOR ACCURACY FOR A MOMENT,

CLOSING ARGUMENT BY MR. SCHENK                                8963

10:31AM  1      NOR RELIABILITY FOR A MOMENT, IT WOULD BE WHAT LABCORP AND

10:31AM  2      QUEST ALREADY ARE.  THERE WOULD BE NO COMPARATIVE ADVANTAGE TO

10:31AM  3      THERANOS FOR THAT PORTION OF THINGS IN ISOLATION.

10:31AM  4          FINANCIAL STABILITY.

10:31AM  5          MR. EISENMAN TOLD YOU THAT HE WAS TOLD THERANOS BECAME

10:31AM  6      CASH FLOW POSITIVE BY THE END OF 2008.

10:31AM  7          YOU KNOW FROM THE EXCEL DOCUMENTS THAT THAT ISN'T TRUE.

10:31AM  8      THERANOS WAS NOT MAKING ENOUGH MONEY TO SURVIVE BASED ON ITS

10:31AM  9      PRIOR WORK, MILITARY WORK OR PHARMA WORK.

10:31AM 10          MR. MOSLEY RECEIVED A LETTER ON TOP OF THE BINDER FROM

10:31AM 11      MS. HOLMES THAT TOLD HIM THAT THERANOS'S WORK WAS, IN THE PAST,

10:31AM 12      FOCUSSED ON CONTRACTS WITH PHARMACEUTICAL AND MILITARY CLIENTS

10:32AM 13      AND IT'S GROWN CASH FROM CONTRACTS FOR SOME TIME.

10:32AM 14          AGAIN, YOU KNOW AND YOU HAVE SEEN FROM THE EXCEL DOCUMENTS

10:32AM 15      THAT THERANOS LOSING AND DECREASING THE AMOUNT OF REVENUE OR

10:32AM 16      ASSETS IT HAD AND THE NEED TO GO GET INVESTOR MONEY TO REFILL

10:32AM 17      THE COFFERS.

10:32AM 18          MR. TOLBERT TOLD US THAT HE HEARD STATEMENTS ABOUT THIS.

10:32AM 19      LET'S TAKE A LISTEN.

10:32AM 20          (AN AUDIOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

10:32AM 21              MR. SCHENK:  YOU HEARD THE CONCEPT THAT I WAS JUST

10:32AM 22      EXPLAINING TO YOU, THAT THEY WERE COMMUNICATING TO INVESTORS

10:32AM 23      THAT THERANOS WAS MAKING MONEY, WAS MAKING MONEY TO GROW CASH

10:33AM 24      FROM ITS OPERATIONS DOING THE PHARMACEUTICAL WORK.

10:33AM 25          BUT YOU THEN HEARD FROM THE PHARMACEUTICAL COMPANY

8964
CLOSING ARGUMENT BY MR. SCHENK

10:33AM  1    EMPLOYEES SAYING WE WEREN'T INTERESTED IN FURTHER WORK WITH

10:33AM  2    THERANOS.

10:33AM  3         THERANOS WASN'T MAKING MONEY FROM PHARMACEUTICAL COMPANIES

10:33AM  4    TO SURVIVE.  THERANOS WENT -- AND YOU HEARD TESTIMONY ABOUT

10:33AM  5    GOING TO PEER VENTURES AT ONE POINT.  I THINK IT WAS RELATED TO

10:33AM  6    DON LUCAS, TO GET MONEY AT A POINT WHEN THEY WERE PARTICULARLY

10:33AM  7    LOW.

10:33AM  8         THE DEMOS THAT I MENTIONED A MOMENT AGO.

10:33AM  9         DAN EDLIN WAS INVOLVED IN SETTING UP THOSE DEMOS AND HE

10:33AM  10   TOLD YOU THAT THE CHOICE, THE DECISION OF WHICH DEVICE TO PUT

10:33AM  11   IN THE CONFERENCE ROOM WAS MADE BY EITHER HOLMES OR BALWANI.

10:33AM  12        AND IN THIS EMAIL, EXHIBIT 871, THERE'S A DISCUSSION ABOUT

10:33AM  13   WHICH DEVICES TO PUT IN THERE, A MINILAB, A 4S, OR A MONOBAY

10:33AM  14   WITH THE NORMANDY SHELL.

10:33AM  15        SO 4S, MONOBAY, THOSE WERE NOT DEVICES THAT THERANOS USED

10:33AM  16   TO TEST PATIENT BLOOD.  SO BRING AN INVESTOR IN THE ROOM AND

10:34AM  17   PUT A DEVICE IN THE ROOM AND THAT ISN'T A DEVICE THAT THEY USED

10:34AM  18   TO TEST PATIENT BLOOD, AND THEN THEY PUT SOMETHING ON THE

10:34AM  19   DEVICE, SOMETHING CALLED A NORMANDY SHELL.

10:34AM  20        AND YOU'VE SEEN WHAT THAT IS.  THE DEMO APP OR THE

10:34AM  21   NORMANDY APP IN THIS EMAIL, WHICH IS 959, IT TALKS ABOUT THE

10:34AM  22   VALUE OF THAT NORMANDY OR DEMO APP AT THE BOTTOM.

10:34AM  23        SO THE PROCESS LOOKS EFFORTLESS IN FRONT OF THE CLIENT,

10:34AM  24   AND AT THE TOP IT SAYS, "THE DEMO APP MERELY SHIELDS PROTOCOL

10:34AM  25   FAILURES FROM THE CLIENT."

CLOSING ARGUMENT BY MR. SCHENK

10:34AM 1        ALSO IN THERE YOU SEE A DESCRIPTION OF THE COLLECTION

10:34AM 2    PROCESS.  "MOST LIKELY WE WILL COLLECT A NUMBER OF SAMPLES AND

10:34AM 3    STORE THEM IN THE SHIPPING CONTAINER LIKE THE LAST MEETING WE

10:34AM 4    HAD, AND THEN PROCESS THEM SEPARATELY IN THE LAB."

10:34AM 5        SO THE BLOOD ISN'T BEING TESTED ON THE DEVICES IN THE

10:34AM 6    ROOM, BUT BLOOD IS BEING TAKEN TO THE THERANOS LAB FOR TESTING.

10:34AM 7        THE WALGREENS PARTNERSHIP.

10:34AM 8        YOU HEARD FROM LISA PETERSON THAT SHE WAS TOLD THERANOS

10:35AM 9    EXPECTED TO HAVE 900 WALGREENS STORES IN 2015.  AND THAT

10:35AM 10   NUMBER, 900, WAS IMPORTANT BECAUSE SHE RECEIVED THIS DOCUMENT.

10:35AM 11       AND MR. MOSLEY ALSO RECEIVED THIS DOCUMENT.

10:35AM 12       THIS IS MS. PETERSON'S HANDWRITING ON IT.  AND YOU SEE

10:35AM 13   ABOVE THE 2015 NUMBERS, SHE WRITES, 900 LOCATIONS, SORT OF THE

10:35AM 14   REVENUE PROJECTION.  THE $990 MILLION REVENUE PROJECTION WAS

10:35AM 15   BASED ON THERANOS GOING INTO 900 WALGREENS STORES IN 2015, AND

10:35AM 16   IT'S FALSE, AND IT'S FALSE FOR A COUPLE OF REASONS.

10:35AM 17       ONE, BECAUSE HOLMES AND BALWANI WERE BEING TOLD BY

10:35AM 18   WALGREENS THAT THEY WEREN'T GOING TO EXPAND FURTHER, THEY

10:35AM 19   NEEDED THE FINGERSTICK NUMBERS TO GET MUCH HIGHER, THE VEIN

10:35AM 20   DRAW NUMBERS TO GET MUCH LOWER.

10:35AM 21       BUT IT'S ALSO FALSE BECAUSE HOLMES AND BALWANI KNOW THAT

10:35AM 22   THE WALGREENS RELATIONSHIP WILL INEVITABLY FAIL.  THE WALGREENS

10:35AM 23   RELATIONSHIP WAS BASED ON FALSE STATEMENTS.

10:35AM 24       WALGREENS LOOKED AT THE THINGS LIKE THE PFIZER REPORT FOR

10:36AM 25   VALIDATION.

CLOSING ARGUMENT BY MR. SCHENK                                    8966

```
10:36AM   1        WALGREENS IS SITTING THERE WAITING FOR THE VENOUS NUMBERS

10:36AM   2   TO DROP BECAUSE WALGREENS THINKS THAT THERANOS IS A FINGERSTICK

10:36AM   3   BLOOD TESTING COMPANY.

10:36AM   4        SO TO SUGGEST TO A POTENTIAL INVESTOR THAT IT IS EVEN

10:36AM   5   POSSIBLE THAT WE MIGHT HIT A BILLION DOLLARS OF REVENUE NEXT

10:36AM   6   YEAR -- REMEMBER, THIS IS COMMUNICATED AROUND OCTOBER OF

10:36AM   7   2014 -- TO SUGGEST THAT YOU'RE GOING TO GET A BILLION DOLLARS

10:36AM   8   OF REVENUE WITH WALGREENS AND 900 STORES SUGGESTS TO THE

10:36AM   9   INVESTOR THAT IT'S REASONABLE THAT YOU MIGHT HIT 900 STORES.

10:36AM  10        AND THAT IS OBVIOUSLY FALSE WHEN WALGREENS IS SAYING,

10:36AM  11   WE'RE MONITORING THE VENOUS DRAW NUMBERS, AND WHEN THE

10:36AM  12   RELATIONSHIP WAS BASED ON FALSE STATEMENTS THAT WALGREENS WAS

10:36AM  13   PROVIDED.

10:36AM  14        DOD.

10:36AM  15        MS. HOLMES LOOKED AT, ACCORDING TO DAN EDLIN, THIS

10:36AM  16   DOCUMENT.  THIS SPECIFIC DOCUMENT WAS REVIEWED AND APPROVED BY

10:36AM  17   ELIZABETH HOLMES.  THIS WAS SENT TO SPECIAL OPERATIONS COMMAND

10:36AM  18   US SOC, AND IN IT THERANOS IS DESCRIBING THE FINGERSTICK BLOOD

10:37AM  19   TESTING TECHNOLOGY, HIGHER QUALITY DATA THAN PREVIOUSLY

10:37AM  20   POSSIBLE.

10:37AM  21        BUT LOOK AT THAT FIRST BULLET, "EACH THERANOS DEVICE CAN

10:37AM  22   RUN EVERY TEST CURRENTLY AVAILABLE THROUGH THE TRADITIONAL AND

10:37AM  23   CENTRALIZED OR HOSPITAL LABORATORY INFRASTRUCTURE."

10:37AM  24        THERE'S NO AMBIGUITY HERE.  THE DEPARTMENT OF DEFENSE IS

10:37AM  25   COMMUNICATING AND BEING TOLD THE SAME THING THAT THE INVESTORS
```

CLOSING ARGUMENT BY MR. SCHENK                          8967

10:37AM  1    TESTIFIED THAT THEY UNDERSTOOD, THAT EACH THERANOS DEVICE COULD

10:37AM  2    RUN ANY TEST.

10:37AM  3        IT WASN'T SOME ASPIRATIONAL STATEMENT.  IT WASN'T SOME

10:37AM  4    CLEARLY DELINEATED, NO, I MEAN THE 4 SERIES WHEN WE EVENTUALLY

10:37AM  5    GET THERE.

10:37AM  6        WHAT WAS TOLD TO THE DEPARTMENT OF DEFENSE WAS THE SAME

10:37AM  7    FALSE STATEMENT THAT WAS TOLD TO INVESTORS:  EACH THERANOS

10:37AM  8    DEVICE CAN RUN EVERY TEST CURRENTLY AVAILABLE IN TRADITIONAL

10:37AM  9    LABS.  YOU KNOW THAT WAS FALSE.

10:38AM 10        ANOTHER PORTION OF THE TOLBERT RECORDING TALKS ABOUT THE

10:38AM 11    MILITARY, THE DEPARTMENT OF DEFENSE, AND HERE'S THAT CLIP.

10:38AM 12        (AN AUDIOTAPE WAS PLAYED IN COURT OFF THE RECORD.)

10:40AM 13            MR. SCHENK:  YOU HEARD IN THERE MS. HOLMES STARTS BY

10:40AM 14    TELLING MR. TOLBERT AND OTHERS THAT THE MILITARY IS A BIG DEAL

10:40AM 15    FOR US.

10:40AM 16        YOU'VE ACTUALLY SEEN NOW THE CONTRACTS AND THE LACK OF

10:40AM 17    WORK THERE.

10:40AM 18        SHE SAID CONFIDENTIALLY, SAID TO TRY TO DISCOURAGE FURTHER

10:40AM 19    DISCUSSION.

10:40AM 20        THERE'S ALSO, I'LL SHOW YOU A LITTLE BIT LATER,

10:40AM 21    COMMUNICATIONS TO GENERAL MATTIS THAT ARE SIMILAR.  ONE IS IN

10:40AM 22    THE CONTEXT OF WORK IN THE MIDDLE EAST, AND SPECIFICALLY IN

10:40AM 23    AFGHANISTAN.

10:40AM 24        MS. HOLMES TESTIFIED THAT THERE WASN'T WORK IN THE MIDDLE

10:40AM 25    EAST OR AFGHANISTAN.

CLOSING ARGUMENT BY MR. SCHENK

10:40AM 1        AND SHE ALSO SAYS THAT WE'VE BEEN DOING A LOT OF WORK

10:40AM 2   THERE WHEN SHE TALKS ABOUT MEDEVACS.

10:40AM 3        SHE'S MAKING FALSE STATEMENT AFTER FALSE STATEMENT ABOUT

10:40AM 4   WORK THAT THERANOS HAD DONE, WAS DOING WITH THE DEPARTMENT OF

10:40AM 5   DEFENSE IN ORDER TO GET INVESTORS TO INVEST, FOR INVESTORS TO

10:40AM 6   BELIEVE THAT THE TECHNOLOGY WORKED WASN'T JUST VALIDATED BY ITS

10:41AM 7   WORK WITH PHARMACEUTICAL COMPANIES, BUT ALSO THROUGH ITS WORK

10:41AM 8   WITH THE DEPARTMENT OF DEFENSE.

10:41AM 9        LISA PETERSON TOLD YOU THAT SHE THOUGHT, BECAUSE SHE WAS

10:41AM 10  TOLD, THAT THERANOS WAS USING THE DEVICES ON MILITARY

10:41AM 11  HELICOPTERS.

10:41AM 12       CHRIS LUCAS TOLD YOU THAT HE WAS TOLD THAT THE THERANOS

10:41AM 13  ANALYZER WAS ACTIVELY BEING USED BY THE MILITARY TO TREAT

10:41AM 14  SOLDIERS IN THE FIELD.

10:41AM 15       IN THE LETTER TO DAN MOSLEY, MR. MOSLEY WAS TOLD THAT

10:41AM 16  THERANOS'S PRIOR WORK WAS FOCUSSED ON CONTRACTS WITH MILITARY

10:41AM 17  CLIENTS.

10:41AM 18       BRIAN GROSSMAN WAS TOLD THAT WITH REGARD TO THE DEPARTMENT

10:41AM 19  OF DEFENSE, THE TECHNOLOGY HAD BEEN USED IN THE BATTLEFIELD ON

10:41AM 20  MEDEVACS.

10:41AM 21       THERE IS ALSO FALSE STATEMENTS THAT FALL INTO THIS

10:41AM 22  CATEGORY ABOUT THE USE OF THIRD PARTY DEVICES.

10:41AM 23       BRYAN TOLBERT TOLD YOU THAT HE DID NOT KNOW THAT THERANOS

10:41AM 24  USED THIRD PARTY TESTING OR THIRD PARTY MACHINES TO DO SOME OR

10:42AM 25  THE MAJORITY OF ITS TESTING.

UNITED STATES COURT REPORTERS

**ER-12547**

8969

CLOSING ARGUMENT BY MR. SCHENK

10:42AM  1      AND HE DID NOT KNOW THAT THE TSPU, THE THERANOS SAMPLE

10:42AM  2   PROCESSING UNIT, THAT IT COULD ONLY DO 12 TESTS.

10:42AM  3      LET ME REMIND YOU WHAT YOU HEARD FROM MS. HOLMES WAS, THE

10:42AM  4   REASON THAT I DIDN'T TELL INDIVIDUALS, LIKE INVESTORS, ABOUT

10:42AM  5   THE USE OF THIRD PARTY DEVICES WAS TO PROTECT TRADE SECRETS.

10:42AM  6      I MENTIONED TO YOU THAT THAT WOULD NOT APPLY TO THE

10:42AM  7   UNMODIFIED TRADE SECRETS.  THAT WAS JUST A SECRET AT THERANOS.

10:42AM  8      BUT ALSO THERE WAS THE OPPORTUNITY TO SIGN CDA'S, THE

10:42AM  9   CONFIDENTIAL DISCLOSURE AGREEMENTS, THAT WOULD STILL COVER THE

10:42AM  10  TRADE SECRET, THAT REALLY THE TRADE SECRET EXCUSE IS A RED

10:42AM  11  HERRING.  IT IS TO NOW JUSTIFY TO YOU WHY THEY DIDN'T TELL

10:42AM  12  INVESTORS ABOUT THE USE OF THIRD PARTY DEVICES.  IT WAS NOT THE

10:42AM  13  REASON AT THE TIME.

10:42AM  14     ALAN EISENMAN TOLD YOU THAT HE DID NOT KNOW THAT THERANOS

10:42AM  15  WAS PURCHASING ANALYZERS FROM OTHER MANUFACTURERS.

10:43AM  16     BRIAN GROSSMAN GOT EVEN A LITTLE MORE NUANCED.  HE ASKED,

10:43AM  17  WHAT IS THE SQUARE FOOTAGE THAT IT WOULD TAKE TO COVER THE

10:43AM  18  PHOENIX, THE MARKET IN ARIZONA?  HOW BIG A LAB DO YOU NEED?

10:43AM  19  AND HE'S TOLD 200 SQUARE FEET.

10:43AM  20     AND THAT -- HIS UNDERSTANDING IS THAT'S ONLY POSSIBLE

10:43AM  21  BECAUSE THERANOS DOES ITS TESTING USING ITS SMALL DEVICES.

10:43AM  22     AND THERE'S EVEN SORT OF AN ADDITIONAL LEVEL AT WHICH THIS

10:43AM  23  IS DECEPTIVE.  YOU'VE HEARD THAT LABS HAVE DIFFERENT

10:43AM  24  COMPLEXITIES, THAT CLIA CERTIFIES SOME AS HIGH COMPLEXITY AND

10:43AM  25  SOME AS MODERATE COMPLEXITY.

8970

CLOSING ARGUMENT BY MR. SCHENK

| | |
|---|---|
| 10:43AM 1 | YOU HEARD THAT THE LAB IN CALIFORNIA WAS HIGH COMPLEXITY |
| 10:43AM 2 | AND THEREFORE COULD RUN LDT'S, LAB DEVELOPED TESTS, LIKE THE |
| 10:43AM 3 | EDISON DEVICE OR LIKE MODIFIED THIRD PARTY DEVICES. |
| 10:43AM 4 | THE LAB IN ARIZONA WAS MODERATE COMPLEXITY, SO IT COULD |
| 10:43AM 5 | NOT RUN THE MODIFIED THIRD PARTIES OR THE EDISON. |
| 10:44AM 6 | SO THE LAB, THE KIND OF AUTHORIZATION, THE CERTIFICATION |
| 10:44AM 7 | THAT THE LAB IN ARIZONA HAD, MODERATE, WOULDN'T HAVE ALLOWED IT |
| 10:44AM 8 | TO USE THE EDISON DEVICES. |
| 10:44AM 9 | SO NOT ONLY IN ARIZONA, OR THERANOS GENERALLY, THEY |
| 10:44AM 10 | WEREN'T DOING THE TESTING BY THE SMALL BOX TO COVER THE MARKET |
| 10:44AM 11 | IN 200 SQUARE FEET, BUT IT WASN'T EVEN THAT KIND OF LAB TO USE |
| 10:44AM 12 | THE EDISON DEVICE. |
| 10:44AM 13 | VALIDATION BY PHARMACEUTICAL COMPANIES. |
| 10:44AM 14 | FIRST, IT'S COMMUNICATED IN THE INVESTOR BINDER THAT |
| 10:44AM 15 | THERANOS HAD BEEN COMPREHENSIVELY VALIDATED OVER THE COURSE OF |
| 10:44AM 16 | THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST PHARMACEUTICAL |
| 10:44AM 17 | COMPANIES. |
| 10:44AM 18 | YOU THEN HEARD FROM SEVERAL PHARMACEUTICAL COMPANIES THAT |
| 10:44AM 19 | CAME INTO COURT AND TOLD YOU THAT THEY DID NOT VALIDATE THE |
| 10:44AM 20 | THERANOS TECHNOLOGY. |
| 10:44AM 21 | YOU'VE SEEN THESE DOCUMENTS.  EXHIBIT 291 IS THE VERSION |
| 10:44AM 22 | SENT TO WALGREENS.  YOU KNOW SOME OF THESE WENT TO INVESTORS, |
| 10:44AM 23 | MOSLEY, PETERSON, FOR INSTANCE. |
| 10:45AM 24 | BUT THE VERSION THAT WENT TO PFIZER AND SCHERING-PLOUGH |
| 10:45AM 25 | HAD THE PFIZER -- I'M SORRY, DID NOT HAVE THE PFIZER OR THE |

CLOSING ARGUMENT BY MR. SCHENK                                8971

10:45AM   1      SCHERING-PLOUGH LOGO.

10:45AM   2           THE VERSION THAT WENT TO WALGREENS DID.

10:45AM   3           THE FALSE STATEMENTS MADE IN THE MEDIA.

10:45AM   4           MS. HOLMES SENT THE RAGO ARTICLE TO SHAREHOLDERS IN THIS

10:45AM   5      EXHIBIT, 1102.  THIS IS THE RAGO ARTICLE GOING TO SHAREHOLDERS.

10:45AM   6           HERE'S THE RAGO ARTICLE GOING TO THE BOARD OF DIRECTORS.

10:45AM   7           AND HERE'S THE RAGO ARTICLE.  IN IT, IT SAYS THE DEVICE

10:45AM   8      AUTOMATES AND MINIATURIZES MORE THAN A THOUSAND LAB TESTS.

10:45AM   9           REMEMBER THERE WAS DISCUSSION ABOUT DOES A THOUSAND MEAN

10:45AM  10      CPT CODES AND, THEREFORE, NOT REALLY A THOUSAND TESTS?

10:45AM  11           MS. HOLMES IS INTERVIEWED FOR AN ARTICLE IN "THE

10:45AM  12      WALL STREET JOURNAL" AND THAT THAT ARTICLE A THOUSAND TESTS.

10:45AM  13           IT ALSO SAYS, QUOTE, RUNS ANY COMBINATION OF TESTS,

10:45AM  14      INCLUDING SETS OF FOLLOW-ON TESTS, ALL FROM A SINGLE

10:46AM  15      MICRO-SAMPLE, READ OUT IN AS LITTLE AS TWO HOURS, AND

10:46AM  16      THERANOS'S TECHNOLOGY IS AUTOMATED, STANDARDIZED, AND ATTEMPTS

10:46AM  17      TO SUBTRACT HUMAN MORE FROM THE PROCESS.  IT CAN THUS ACHIEVE

10:46AM  18      MUCH LOWER VARIANCE RANGES FOR A GIVEN TEST.

10:46AM  19           THIS ARTICLE I'VE SHOWN YOU WAS SENT TO POTENTIAL

10:46AM  20      INVESTORS.

10:46AM  21           THE "FORTUNE" ARTICLE ALSO WAS SHARED WITH POTENTIAL

10:46AM  22      INVESTORS.  THAT IS THE COVER OF THE "FORTUNE" ARTICLE ON THE

10:46AM  23      RIGHT.  THE TITLE OF IT IS THE SECOND ONE DOWN, "THIS CEO IS

10:46AM  24      OUT FOR BLOOD."

10:46AM  25           AND THEN THOSE ARE EXHIBIT NUMBERS WHERE THIS WAS SENT IN

CLOSING ARGUMENT BY MR. SCHENK

10:46AM   1   THE INVESTOR BINDER TO INVESTORS.

10:46AM   2       IN THE PARLOFF ARTICLE THERE ARE MANY INSTANCES OF

10:46AM   3   STATEMENTS THAT THE GOVERNMENT BELIEVES ARE FALSE.  HERE'S JUST

10:46AM   4   A COUPLE:  THE TESTS CAN BE PERFORMED ON JUST A FEW DROPS OF

10:46AM   5   BLOOD, AND THAT THERANOS DOES NOT BUY ANY ANALYZERS FROM THIRD

10:46AM   6   PARTIES.

10:46AM   7       EVEN IF THERE IS A TRADE SECRET EXCUSE THERE, YOU DON'T

10:47AM   8   HAVE TO MAKE FALSE STATEMENTS TO ROGER PARLOFF TO APPEAR IN THE

10:47AM   9   ARTICLE THAT THEN DECEIVE INVESTORS.

10:47AM  10       SO I TOLD YOU THE CATEGORIES OF FALSE STATEMENTS AND WHAT

10:47AM  11   THOSE CATEGORIES WERE.  HERE'S A REPEAT OF THOSE CATEGORIES.

10:47AM  12       NOW WE'RE GOING TO TALK ABOUT MS. HOLMES'S KNOWLEDGE OF

10:47AM  13   THE FALSITY OF THOSE STATEMENTS.  HERE'S THE SECOND HALF OF

10:47AM  14   THOSE CATEGORIES.

10:47AM  15       YOU CAN FIND KNOWLEDGE, EVIDENCE PROVING THAT

10:47AM  16   ELIZABETH HOLMES KNEW THAT THESE CATEGORIES WERE FALSE IN THESE

10:47AM  17   LOCATIONS.  I'M GOING TO GO THROUGH SOME OF THEM, BUT I WANT

10:47AM  18   YOU TO UNDERSTAND THAT THERE -- YOU WILL HAVE THE EXHIBITS BACK

10:47AM  19   THERE WITH YOU, AND THERE ARE INSTANCES IN THESE EXHIBIT

10:47AM  20   NUMBERS WHERE ELIZABETH HOLMES HAS KNOWLEDGE THAT THESE CERTAIN

10:47AM  21   FALSE STATEMENTS ARE FALSE.

10:47AM  22       THERE IS ONE HERE I WANT TO MENTION TO YOU, AND I'LL SHOW

10:47AM  23   YOU IN A MOMENT, THE THIRD EXHIBIT NUMBER, 1660, IS ONE OF

10:47AM  24   THOSE INSTANCES WHEN AN EXHIBIT WOULD GET ADMITTED FOR A

10:47AM  25   LIMITED PURPOSE AND THE JUDGE WOULD TURN TO YOU AND SAY, THIS

CLOSING ARGUMENT BY MR. SCHENK

10:48AM   1    EXHIBIT NOT COMING IN FOR THE TRUTH, BUT IT IS COMING IN FOR,

10:48AM   2    AND THEN THE REASON, KNOWLEDGE IN THIS INSTANCE.

10:48AM   3        SO I'M GOING TO SHOW YOU AN EXHIBIT THAT WAS NOT ADMITTED

10:48AM   4    FOR THE TRUTH.  THE CONTENT OF THE EMAIL IS NOT FACTUALLY TRUE

10:48AM   5    FOR YOU, BUT IT'S USED FOR KNOWLEDGE, FOR WHAT WE'RE TALKING

10:48AM   6    ABOUT RIGHT NOW.

10:48AM   7        ERIKA CHEUNG SAID THAT THE DEVICE COULD ONLY DO BETWEEN 4

10:48AM   8    AND 12 TESTS.  ELIZABETH HOLMES KNEW THAT.  IN FACT, SHE

10:48AM   9    TESTIFIED TO THAT ALSO.

10:48AM  10        SO WHEN INVESTORS ARE TOLD A THOUSAND TESTS, OR AS THAT

10:48AM  11    SPECIAL OPERATIONS COMMAND, ALL OF THE TESTS, SHE KNOWS THAT'S

10:48AM  12    FALSE.  SHE KNOWS THE LIMITS.

10:48AM  13        IN THIS EMAIL EXCHANGE BETWEEN MS. HOLMES AND

10:48AM  14    SUREKHA GANGADKHEDKAR RIGHT BEFORE THEY ROLL OUT WITH

10:48AM  15    WALGREENS -- SO THIS IS THE END OF AUGUST OF 2013 -- MS. HOLMES

10:48AM  16    IS ASKING, WHAT IS THE TOTAL NUMBER OF IMMUNOCHEMISTRY MICRO

10:48AM  17    SAMPLE ASSAYS?

10:48AM  18        YOU HEARD THAT THERE ARE FOUR DIFFERENT KINDS OF ASSAYS.

10:48AM  19    IMMUNOASSAYS WERE THE ONLY KIND THAT THE 3 SERIES EDISON COULD

10:49AM  20    DO.

10:49AM  21        SO MS. HOLMES IS ASKING, WHAT IS THE NUMBER OF THEM THAT

10:49AM  22    HAVE COMPLETED VALIDATION WITH THE ADVIA OR WITH THERANOS?  AND

10:49AM  23    SHE'S TOLD 11.

10:49AM  24        SO, AGAIN, STATEMENTS THAT CLAIM MORE, ALL OF THE TESTS,

10:49AM  25    IS A KNOWINGLY FALSE STATEMENT.

CLOSING ARGUMENT BY MR. SCHENK                                    8974

| | | |
|---|---|---|
| 10:49AM | 1 | MS. HOLMES ASKS SOMEONE ELSE AT THERANOS, ROSE EDMONDS, |
| 10:49AM | 2 | ABOUT GENERAL CHEMISTRY ASSAYS, A SECOND KIND OF ASSAY, WHAT IS |
| 10:49AM | 3 | THE NUMBER OF GENERAL CHEMISTRY MICRO SAMPLE ASSAYS THAT HAVE |
| 10:49AM | 4 | COMPLETED VALIDATION? |
| 10:49AM | 5 | AND ROSE TELLS HER, AS OF RIGHT NOW, NONE. |
| 10:49AM | 6 | IN TEXT MESSAGES, MS. HOLMES IS ALSO ALERTED TO THE |
| 10:49AM | 7 | MISLEADING NATURE OR THE INCORRECT NATURE OF SOME CONTENT. |
| 10:49AM | 8 | HERE BALWANI IS SAYING, YOU SHOULD REVISIT THE NEW.COM, THE |
| 10:49AM | 9 | WEBSITE COPY, IN LIGHT OF US DOING ABOUT 50 PERCENT |
| 10:49AM | 10 | FINGERSTICKS. |
| 10:49AM | 11 | ESSENTIALLY THE POINT BEING YOU READ THE CONTENT AND IT |
| 10:49AM | 12 | SEEMS LIKE WE DO FINGERSTICK.  THAT ISN'T THE REALITY. |
| 10:50AM | 13 | MS. HOLMES IS ASKING MR. BALWANI IF THEY CAN TAKE |
| 10:50AM | 14 | FINGERSTICK -- I THINK THE WORD SHOULD BE LIVE -- TOMORROW. |
| 10:50AM | 15 | MR. BALWANI CLARIFIES, GENERAL CHEMISTRY?  YOU MEAN GC? |
| 10:50AM | 16 | VERY RISKY.  WE NEED TO DO MORE SOFTWARE TESTING. |
| 10:50AM | 17 | THIS IS ALL THE WAY INTO 2015.  SO EVEN IN THE SECOND |
| 10:50AM | 18 | CATEGORY OF ASSAYS THERE'S CONCERNS ABOUT. |
| 10:50AM | 19 | MR. BALWANI TELLS HER THAT HE'S WORRIED ABOUT YOUR "ALL |
| 10:50AM | 20 | FINGERSTICKS ON OUR TECHNOLOGY" COMMENT. |
| 10:50AM | 21 | AGAIN, WHEN MS. HOLMES COMMUNICATES STATEMENTS ABOUT THE |
| 10:50AM | 22 | CAPABILITIES OF THE TECHNOLOGY, THOSE ARE FALSE STATEMENTS AND |
| 10:50AM | 23 | THEY ARE KNOWINGLY FALSE STATEMENTS. |
| 10:50AM | 24 | MS. GANGADKHEDKAR ALSO TESTIFIED THAT SHE HAD MEETINGS |
| 10:50AM | 25 | WITH ELIZABETH HOLMES WHERE SHE DESCRIBED TO MS. HOLMES |

CLOSING ARGUMENT BY MR. SCHENK

10:50AM   1    RELIABILITY ISSUES WITH THE 3.0 AND THE 3.5 DEVICES, THINGS

10:50AM   2    LIKE THEIR INABILITY TO GIVE CONSISTENT RESULTS, AND THESE WERE

10:50AM   3    ISSUES THAT WERE DISCUSSED WITH ELIZABETH HOLMES.

10:51AM   4        AGAIN, MORE EVIDENCE THAT THESE WERE NOT JUST FALSE

10:51AM   5    STATEMENTS, THEY WERE KNOWINGLY FALSE STATEMENTS.

10:51AM   6        DR. ROSENDORFF SAID THAT IN THE MIDDLE OF 2014, HE HAD

10:51AM   7    CONVERSATIONS WITH MS. HOLMES ABOUT QC, QUALITY CONTROL

10:51AM   8    FAILURES AT THERANOS.  AND IT INCLUDED THE HIGH FAILURE RATE ON

10:51AM   9    THE EDISON.

10:51AM   10       AGAIN, MORE KNOWLEDGE EVIDENCE.

10:51AM   11       THIS IS THE 1660 EMAIL THAT I SAID CAME IN FOR A LIMITED

10:51AM   12   PURPOSE.  YOU'VE HEARD THAT TYLER SHULTZ WORKED AT THERANOS AND

10:51AM   13   HE COMMUNICATED WITH MS. HOLMES, AND ALSO SOMEONE NAMED

10:51AM   14   DANIEL YOUNG, SOME OF HIS CONCERNS, THINGS THAT HE WAS SEEING

10:51AM   15   THAT WERE PROBLEMS AT THERANOS.

10:51AM   16       AND, AGAIN, THE CONTENT OF THE EMAIL, THE THINGS THAT HE

10:51AM   17   SAYING THAT HE SEES AS A PROBLEM, THAT IS NOT IN FOR THE TRUTH.

10:51AM   18       WHAT IT IS IN FOR, THOUGH, IS KNOWLEDGE FOR MS. HOLMES.

10:51AM   19   WHEN SHE'S GIVEN THIS EMAIL BY TYLER SHULTZ RAISING THESE

10:51AM   20   PROBLEMS, THEN YOU CAN SORT OF INFER OR UNDERSTAND THAT SHE

10:51AM   21   BECOMES AWARE OF THAT FOR THINGS LIKE HER KNOWLEDGE.

10:51AM   22       MS. YAM TOLD MS. HOLMES ABOUT THE FINANCIAL CONDITION OF

10:52AM   23   THE COMPANY.  SO WHEN MS. HOLMES MAKES FALSE STATEMENTS TO

10:52AM   24   OTHER PEOPLE ABOUT THE FINANCIAL HEALTH, IT'S A KNOWINGLY FALSE

10:52AM   25   STATEMENT.

CLOSING ARGUMENT BY MR. SCHENK                                    8976

10:52AM  1          MS. YAM ALSO SHOWED YOU THE TRUE REVENUE NUMBERS FOR

10:52AM  2     THERANOS.  IN '13, NONE; IN '12, NONE; IN 2011, ABOUT 500,000.

10:52AM  3          YOU'VE SEEN THIS SPREADSHEET FROM MS. YAM.  IT'S THAT WEEK

10:52AM  4     IN SEPTEMBER OF 2013 WHEN THERANOS WAS DOWN TO ABOUT

10:52AM  5     $14 MILLION, BUT YOU HEARD THAT 7 AND A HALF OF IT WAS A LETTER

10:52AM  6     OF CREDIT.  SO IT WASN'T FREE MONEY TO SPEND FOR ANY PURPOSE,

10:52AM  7     WHICH BRINGS THE TOTAL DOWN CLOSER TO ABOUT $7 MILLION, THAT

10:52AM  8     THERANOS AT THIS POINT WAS DOWN TO ABOUT $7 MILLION, AND

10:52AM  9     MS. YAM TOLD YOU THAT THINGS AT THERANOS WERE GETTING TIGHT.

10:52AM 10          YOU ALSO SAW MS. YAM'S TRACKING OF THE WORK THAT THERANOS

10:53AM 11     HAD DONE AND THE REVENUE THAT IT RECEIVED FROM THE

10:53AM 12     PHARMACEUTICAL COMPANIES.

10:53AM 13          AND IN HERE YOU SEE THE NAME OF THE PHARMACEUTICAL

10:53AM 14     COMPANY, AND THEN THAT MIDDLE COLUMN IS THE LAST PAYMENT DATE,

10:53AM 15     THE LAST TIME THAT THEY RECEIVED MONEY FROM THAT COMPANY.

10:53AM 16          SO CELGENE, THE LAST TIME WAS IN JUNE OF 2011; PFIZER,

10:53AM 17     IT'S NOVEMBER OF 2008; SCHERING-PLOUGH, MAY OF 2009.

10:53AM 18          AND THEN THOSE TOTALS, THE TOTAL AMOUNT IF YOU ADD ALL OF

10:53AM 19     THE TIMES THAT THERANOS RECEIVED MONEY FROM THESE

10:53AM 20     PHARMACEUTICAL COMPANIES, AND THEN YOU SEE WHY STATEMENTS LIKE

10:53AM 21     WE'RE GROWING CASH FROM OPERATIONS OR WE HAVE BEEN GROWING CASH

10:53AM 22     FROM OPERATIONS FROM OUR PHARMA WORK ARE NOT JUST FALSE

10:53AM 23     STATEMENTS, THEY'RE KNOWINGLY FALSE STATEMENTS.

10:53AM 24          EDLIN TALKED TO YOU ABOUT THE DEMOS AND WHO WAS INVOLVED

10:53AM 25     IN THE DECISION WHICH DEVICES TO PUT IN THE ROOM, AND THEN TOLD

CLOSING ARGUMENT BY MR. SCHENK                                    8977

10:53AM  1    YOU IT WAS HOLMES AND BALWANI.  AGAIN, NOT JUST FALSE

10:53AM  2    STATEMENTS, KNOWINGLY FALSE STATEMENTS.

10:54AM  3        MS. HOLMES DIDN'T JUST DECIDE WHAT DEVICE TO PUT IN THE

10:54AM  4    ROOM.  SHE ALSO PLAYED A ROLE IN THE REPORTS THAT WERE SENT OUT

10:54AM  5    AFTER THE DEMO, WHAT RESULTS TO PUT INTO THE REPORT, AND

10:54AM  6    MS. HOLMES SAYS, OKAY, LET'S SET IT OUT AFTER THESE CHANGES.

10:54AM  7        SO SHE JUST DOESN'T JUST PICK THE DEVICE, SHE ALSO PLAYS A

10:54AM  8    ROLE IN EVALUATING OR REVIEWING THE RESULTS THAT GO BACK TO THE

10:54AM  9    VIP AFTERWARDS.

10:54AM 10        IN TEXT MESSAGES, MS. HOLMES BECOME AWARE ABOUT PROBLEMS

10:54AM 11    WITH WALGREENS.

10:54AM 12        MR. BALWANI TELLS HER IN NOVEMBER OF 2014, "WE CAN'T SCALE

10:54AM 13    WITH WAG."

10:54AM 14        "THEY TOLD OUR TEAM IN WAG MEETING THAT THEY DON'T INTEND

10:54AM 15    TO OPEN MORE PSC'S," PATIENT SERVICE CENTERS, "UNTIL JULY."

10:54AM 16        AGAIN, WHEN MS. HOLMES WAS ON THE STAND, SHE TOLD YOU, I

10:54AM 17    SAW THAT TEXT, BUT MR. BALWANI WAS UNAWARE OF THE FACT THAT I

10:54AM 18    WAS COMMUNICATING WITH SOMEONE ELSE AT WALGREENS AND HIS NAME

10:55AM 19    WAS ALEX GOURLAY AND HE WAS SAYING POSITIVE THINGS TO ME.  SO

10:55AM 20    THIS DID NOT PUT ME ON NOTICE THAT WALGREENS WAS COLLAPSING

10:55AM 21    BECAUSE I WAS HEARING DIFFERENT THINGS FROM GOURLAY, AND EVEN

10:55AM 22    MIQUELON BEFORE HIM.

10:55AM 23        BUT I EXPLAINED TO YOU WHY THAT ARGUMENT FAILS.  IT'S ONLY

10:55AM 24    A MATTER OF TIME BEFORE WALGREENS FIGURES OUT THE PROBLEM.  SHE

10:55AM 25    DOESN'T NEED TO HEAR WALGREENS TELL HER THAT THE RELATIONSHIP

CLOSING ARGUMENT BY MR. SCHENK                                    8978

```
10:55AM   1    IS FAILING.

10:55AM   2         SHE KNOWS WHAT SHE TOLD WALGREENS TO BAIT THE HOOK.  SHE

10:55AM   3    KNOWS THAT WALGREENS THINKS THAT THEY'RE A FINGERSTICK BLOOD

10:55AM   4    TESTING COMPANY THAT CAN ACCURATELY TEST BLOOD.

10:55AM   5         IT'S ONLY A MATTER OF TIME BEFORE WALGREENS REALIZES THAT,

10:55AM   6    AND WALGREENS IS REALIZING THAT.  THEY'RE TRACKING THE VENOUS

10:55AM   7    DRAWS NUMBERS.  THEY'RE STOPPING FURTHER ROLLOUTS.

10:55AM   8         SO IT ISN'T THAT MS. HOLMES GETS TO SAY, GOURLAY WAS STILL

10:55AM   9    TELLING ME GOOD THINGS AND, THEREFORE, IF I TELL THE INVESTORS

10:55AM  10    THAT THE ROLLOUT WITH WALGREENS WAS GOING WELL, THAT WASN'T A

10:55AM  11    KNOWINGLY FALSE STATEMENT.

10:55AM  12         SHE DOESN'T NEED GOURLAY TO DISCOVER THE FRAUD.  SHE KNOWS

10:56AM  13    THAT THEY'RE NOT GOING TO HAVE A NATIONAL ROLLOUT WITH

10:56AM  14    WALGREENS.

10:56AM  15         MR. BALWANI TELLS HER THAT HE'S ABOUT TO GO INTO A

10:56AM  16    WALGREENS MEETING.  THIS IS IN APRIL OF 2015.

10:56AM  17         THEN AFTERWARDS, IT WAS A MOSLEY TERRIBLE MEETING, BUT

10:56AM  18    "THE POINT ABOUT NARROWING DOWN MENU TO HIT HIGH FINGERSTICK

10:56AM  19    PERCENT CAME TO ME LIKE GIFT FROM GOD."

10:56AM  20         THE POINT HERE IS THAT MS. HOLMES KNOWS THAT WALGREENS

10:56AM  21    CARES ABOUT FINGERSTICK NUMBERS.  SHE DID NOT GO TO THE

10:56AM  22    MEETINGS BETWEEN JHAVERI AND BALWANI WHERE THEY TRACKED THE

10:56AM  23    FINGERSTICK NUMBER.

10:56AM  24         BUT THAT'S NOT A FACT SHE WAS UNAWARE OF.  SHE KNEW

10:56AM  25    WALGREENS TRACKED AND CARED ABOUT THE FINGERSTICK NUMBERS, AND
```

CLOSING ARGUMENT BY MR. SCHENK                                    8979

10:56AM  1    THEY'RE EVEN TALKING ABOUT WAYS THAT THEY CAN IMPROVE THEIR

10:56AM  2    FINGERSTICK NUMBERS OTHER THAN MORE FINGERSTICK TESTING, OTHER

10:56AM  3    THAN ACTUALLY DEVELOPING THE TECHNOLOGY TO TEST BLOOD VIA

10:56AM  4    FINGERSTICK, NARROW THE MENU DOWN SO THE PERCENT BECOMES A

10:56AM  5    HIGHER NUMBER, A SMALLER TOTAL.

10:57AM  6        HERE'S THE DOCUMENT I WAS JUST REFERENCING WHERE WALGREENS

10:57AM  7    IS TRACKING VENOUS DRAWS.  THE FIRST IS IN FEBRUARY OF 2014.

10:57AM  8    IT'S AT 43 PERCENT OF THE TIME IT'S A VENOUS DRAW.  BY MAY IT'S

10:57AM  9    ONLY DROPPED TO 39 PERCENT.

10:57AM 10        SO IT IS NOT MOVING SIGNIFICANTLY, AND THIS IS SOMETHING

10:57AM 11    THAT WALGREENS, BALWANI, AND JHAVERI ARE PAYING ATTENTION TO,

10:57AM 12    BUT YOU SEE IT COMMUNICATED IN TEXT MESSAGES TO MS. HOLMES.

10:57AM 13        THIS IS AN EMAIL ALSO I MENTIONED EARLIER WHERE JHAVERI

10:57AM 14    ORIGINALLY SENDS THE EMAIL JUST TO MR. BALWANI SAYING,

10:57AM 15    "PATIENTS PER DAY WITH A 4 PLUS EXPERIENCE AND VENOUS PERCENT

10:57AM 16    IN THE 10 PERCENT RANGE."

10:57AM 17        THEY NEED, WALGREENS AND THERANOS, A DOCUMENTED DETAILED

10:57AM 18    PLAN ON BOTH, THE PATIENT EXPERIENCE AND THE VENOUS DRAW, OR IT

10:57AM 19    WILL BE DIFFICULT FOR ME TO CONVINCE EXPANSION BEYOND ARIZONA.

10:57AM 20        AND THEN YOU SEE MR. BALWANI FORWARDS THIS EMAIL TO

10:58AM 21    MS. HOLMES.  SO SHE KNOWS FURTHER EXPANSION WITH WALGREENS IS

10:58AM 22    DEPENDENT ON SOMETHING THAT IS NOT GOING TO HAPPEN, AND THAT IS

10:58AM 23    MORE FINGERSTICK.

10:58AM 24        FOR DOD, MR. EDLIN CONFIRMED FOR YOU THAT THE THERANOS

10:58AM 25    ANALYZER WAS NOT USED BY THE MILITARY FOR CLINICAL TESTING ON

CLOSING ARGUMENT BY MR. SCHENK                                    8980

10:58AM  1    SOLDIERS.

10:58AM  2        AND MS. HOLMES ALSO, WHEN SHE WAS ON THE STAND, CONFIRMED

10:58AM  3    THIS FACT FOR YOU.  SO STATEMENTS TO INVESTORS TO THE CONTRARY

10:58AM  4    WERE NOT JUST FALSE, THEY WERE KNOWINGLY FALSE.

10:58AM  5        MR. EDLIN TOLD YOU THAT ELIZABETH HOLMES WAS VERY INVOLVED

10:58AM  6    IN THE COMMUNICATIONS BETWEEN THERANOS AND THE MILITARY.

10:58AM  7        THE USE OF THIRD PARTY DEVICES, THAT ALSO WAS KNOWINGLY

10:58AM  8    FALSE WHEN SHE HIDES THAT FACT BECAUSE SHE KNOWS THAT THEY'RE

10:58AM  9    USING THIRD PARTY DEVICES AND THAT GETS DISCUSSED HERE WHEN

10:58AM  10   THEY'RE TALKING ABOUT A REPORTER FROM "THE WALL STREET JOURNAL"

10:58AM  11   SHOWING UP AND THEY DON'T KNOW WHERE HE'S GOING TO SHOW UP OR

10:59AM  12   WHEN.

10:59AM  13       AND THERE'S A QUESTION ABOUT WHAT KIND OF DRAW HE'S GOING

10:59AM  14   TO GET AND THEY'RE SAYING BETTER A PERFECT VENIPUNCTURE THAN A

10:59AM  15   BAD FINGERSTICK OR MISS A TEST.

10:59AM  16       SO THE USE OF THIRD PARTY DEVICES, THE DEVICES THAT WOULD

10:59AM  17   TEST THE VEIN DRAW BLOOD, WAS SOMETHING THAT MS. HOLMES KNEW.

10:59AM  18   SO WHEN SHE COMMUNICATES STATEMENTS TO INVESTORS TO THE

10:59AM  19   CONTRARY, THOSE ARE KNOWINGLY FALSE STATEMENTS.

10:59AM  20       BRIAN GROSSMAN TOLD YOU THAT WHEN HE TOURED THE CLIA LAB,

10:59AM  21   HE SAW THE THERANOS DEVICES.  HE DIDN'T SEE SIEMENS OR THIRD

10:59AM  22   PARTY DEVICES.  THEY'RE HIDING THAT FACT.

10:59AM  23       AND THEN VALIDATION BY PHARMACEUTICAL COMPANIES.

10:59AM  24       MR. WEBER TOLD YOU THAT HE TOLD ELIZABETH HOLMES BACK IN

10:59AM  25   2009 THAT PFIZER DID NOT HAVE MORE WORK FOR THERANOS IN THE

CLOSING ARGUMENT BY MR. SCHENK                                    8981

10:59AM  1    FORESEEABLE FUTURE.

10:59AM  2         AND MS. HOLMES IS COMMUNICATING SOMETHING DIFFERENT TO

10:59AM  3    INVESTORS.  SO THAT'S, AGAIN, NOT JUST A FALSE STATEMENT, BUT A

11:00AM  4    KNOWINGLY FALSE STATEMENT.

11:00AM  5         THERE ARE EMAILS BETWEEN MS. HOLMES AND DR. SUNG WHERE

11:00AM  6    CELGENE IS COMMUNICATING THE SAME THING, THIS TIME IN 2012,

11:00AM  7    THAT CELGENE IS NOT INTERESTED IN THE CURRENT GENERATION OF

11:00AM  8    THERANOS TECHNOLOGY.

11:00AM  9         SAME THING FROM SCHERING-PLOUGH.

11:00AM 10         DR. CULLEN TOLD YOU THAT ESSENTIALLY THIS WORK JUST DIED

11:00AM 11    ON THE VINE, THERE WASN'T, AFTER A CERTAIN DATE, MORE

11:00AM 12    COMMUNICATION, MORE WORK BETWEEN SCHERING-PLOUGH AND THERANOS.

11:00AM 13         THE USE OF THE MEDIA.

11:00AM 14         I TOLD YOU THAT THERE WERE TWO ARTICLES THAT WERE RELEVANT

11:00AM 15    FOR THIS, THE RAGO AND THE PARLOFF ARTICLE.

11:00AM 16         HERE'S AN EXAMPLE.  BEFORE RAGO PUBLISHES THE ARTICLE, HE

11:00AM 17    SENDS LANGUAGES, PARAPHRASES AND FACTUAL STATEMENTS, TO

11:00AM 18    ELIZABETH HOLMES TO REVIEW BEFORE PUBLISHING.

11:00AM 19         SO THINGS LIKE THE THOUSAND TESTS, DOCUMENTS, FACTS ABOUT

11:00AM 20    THERANOS WERE PROVIDED TO MS. HOLMES BEFOREHAND, SO WHEN SHE'S

11:00AM 21    USING THE RAGO ARTICLE TO RECRUIT INVESTORS AND IT CONTAINS

11:01AM 22    FALSE STATEMENTS, IT ISN'T JUST THE USE OF THE FALSE

11:01AM 23    STATEMENTS, THEY'RE KNOWINGLY FALSE, AND SHE KNOWS THAT THOSE

11:01AM 24    STATEMENTS ARE IN THE ARTICLE, AND SHE KNEW THAT THEY WERE

11:01AM 25    GOING TO BE IN THE ARTICLE BEFORE IT WAS PUBLISHED.

CLOSING ARGUMENT BY MR. SCHENK                                          8982

11:01AM  1          PARLOFF TOLD YOU THAT HE TALKED TO MS. HOLMES ABOUT THEIR

11:01AM  2      WORK WITH THE MILITARY, AND IN FACT, SHE TOLD HIM THAT SHE

11:01AM  3      WASN'T SUPPOSED TO PRINT IT, TO USE IT IN THE PIECE BECAUSE IT

11:01AM  4      WAS SENSITIVE, BUT THAT THERANOS'S TECHNOLOGY HAD BEEN USED BY

11:01AM  5      THE MILITARY IN AFGHANISTAN.

11:01AM  6          HE ALSO ASKED QUESTIONS OF MS. HOLMES ABOUT ITS USE OF

11:01AM  7      PURCHASING TESTS, WHERE IT GOT ITS TESTS FROM.  AND SHE SAYS

11:01AM  8      OTHER LABS BUY THEIR TESTS, BUT AT THERANOS WE MAKE ALL OF OUR

11:01AM  9      TESTS.

11:01AM  10         MR. PARLOFF ASKS HER, WHEN AN INDIVIDUAL GOES TO A

11:02AM  11     WALGREENS AND GETS A VEIN DRAW, HELP ME UNDERSTAND WHY THAT

11:02AM  12     HAPPENS.  WHY IS IT THE CASE THAT SOMEONE AT A WALGREENS MIGHT

11:02AM  13     GET A VEIN DRAW?

11:02AM  14         YOU, AS THE JURY, NOW KNOW THE ANSWER.  THE ANSWER IS

11:02AM  15     BECAUSE THERANOS COULD ONLY RUN ON ITS DEVICE A VERY SMALL

11:02AM  16     NUMBER OF TESTS, AND A LITTLE BIT BIGGER NUMBER ON THE MODIFIED

11:02AM  17     THIRD PARTY.

11:02AM  18         BUT IT COULD NOT RUN ALL OF THE TESTS ON ITS TECHNOLOGY

11:02AM  19     AND NEEDED TO DO VEIN DRAWS.  THAT'S THE HONEST ANSWER IS, WE

11:02AM  20     CAN'T RUN ALL OF THE TESTS.

11:02AM  21         BUT LISTEN TO WHAT SHE SAYS.

11:02AM  22         (AN AUDIOTAPE PLAYED IN OPEN COURT OFF THE RECORD.)

11:06AM  23         MR. SCHENK:  PARLOFF KEEPS GOING AFTER IT.

11:06AM  24     I DON'T UNDERSTAND.  WHEN SOMEONE COMES INTO A WALGREENS,

11:06AM  25     HELP ME UNDERSTAND THE SITUATION WHEN THEY GET A VEIN DRAW,

CLOSING ARGUMENT BY MR. SCHENK                                      8983

```
11:06AM  1    WHEN YOU WOULD HAVE VENIPUNCTURE, IS IT BECAUSE YOU CAN'T DO

11:06AM  2    THE TEST?  YOU DON'T YET HAVE THAT TEST?

11:06AM  3        AND SHE SAYS, IT'S A VOLUME QUESTION, SORT OF SUGGESTING

11:06AM  4    WE'RE GETTING SO MANY REQUESTS FOR BLOOD TESTS THAT WE CAN'T

11:06AM  5    HANDLE THAT VOLUME.  NOT, WE DON'T HAVE THE ABILITY TO RUN THAT

11:06AM  6    TEST ON OUR TECHNOLOGY, OUR DEVICE DOES 12 TESTS.  SHE DOESN'T

11:06AM  7    SAY THAT.

11:06AM  8        SHE MAKES HIM BELIEVE, CONSISTENT WITH WHAT ALL OF THE

11:06AM  9    INVESTORS BELIEVED, WAS THAT THEY HAD THE ABILITY, THEIR

11:06AM 10    TECHNOLOGY RUNS ALL OF THESE BLOOD TESTS, CONSISTENT WITH WHAT

11:06AM 11    WAS SAID IN THAT BULLET POINT TO SPECIAL OPERATIONS COMMAND.

11:06AM 12        AND PARLOFF KEEPS GOING AFTER IT BECAUSE IT DOESN'T MAKE

11:06AM 13    SENSE TO HIM THAT A FINGERSTICK COMPANY IS DOING VEIN DRAWS IN

11:06AM 14    A WALGREENS, AND WHAT HE'S TOLD IS THAT IT'S A QUESTION OF

11:07AM 15    VOLUME.  IT'S, ALL OF THIS BLOOD COMING IN AND WE NEED TO RUN

11:07AM 16    IT ON OTHER KINDS OF DEVICES, ON VOLUME DEVICES, AND YOU KNOW

11:07AM 17    THAT ISN'T WHAT ACTUALLY IS TRUE.  THEY COULD DO 12 TESTS.

11:07AM 18        THE NEXT ELEMENT FOR WIRE FRAUD IS MATERIALITY.  THE IDEA

11:07AM 19    THAT THE FALSE STATEMENTS, THESE CATEGORIES OF FALSE STATEMENTS

11:07AM 20    WERE THE KIND OF FALSE STATEMENTS THAT WOULD CAUSE AN INVESTOR

11:07AM 21    TO INVEST IN THIS CASE WERE NOT ABOUT SOMETHING IMMATERIAL.

11:07AM 22        WE'RE GOING TO RUN THROUGH SOME OF THE FALSE STATEMENTS

11:07AM 23    THAT EACH INVESTOR SAID MATTERED TO THEM, BUT MATERIALITY

11:07AM 24    DOESN'T REQUIRE ACTUAL RELIANCE.  IT IS NOT THAT A PARTICULAR

11:07AM 25    FALSE STATEMENT WAS COMMUNICATED TO AN INVESTOR AND THEN THE
```

CLOSING ARGUMENT BY MR. SCHENK

11:07AM 1    INVESTOR CONFIRMS THAT THAT FALSE STATEMENT IS WHAT CAUSED HER

11:07AM 2    OR HIM TO INVEST.  IT'S THE KIND OF STATEMENT THAT IS CAPABLE

11:07AM 3    OF INFLUENCING.

11:07AM 4        MR. TOLBERT TOLD YOU ABOUT THE IMPORTANCE OF THE MILITARY,

11:07AM 5    THE WORK THERANOS WAS DOING WITH THE MILITARY WAS IMPORTANT TO

11:08AM 6    MR. TOLBERT AND THE HALL GROUP.

11:08AM 7        MS. PETERSON TALKED ABOUT THE SAMPLE SIZE, THE SMALL

11:08AM 8    VOLUME OF BLOOD.

11:08AM 9        MR. MOSLEY TALKED ABOUT THE PFIZER REPORT.  HERE'S THE

11:08AM 10   MOSLEY OUTLINE WHERE HE SAYS THAT THE PFIZER REPORT WAS THE

11:08AM 11   MOST EXTENSIVE EVIDENCE SUPPLIED REGARDING THE RELIABILITY OF

11:08AM 12   THE THERANOS TECHNOLOGY AND ITS APPLICATION IN A STUDY REPORT

11:08AM 13   PREPARED BY PFIZER BASED ON A CLINICAL CANCER TREATMENT TRIAL.

11:08AM 14       YOU KNOW THAT REPORT WAS NOT PREPARED BY PFIZER.  YOU KNOW

11:08AM 15   PFIZER DID NOT AUTHORIZE THE USE OF ITS LOGO.

11:08AM 16       IT WASN'T JUST SENT TO WALGREENS.  THE PFIZER REPORT WAS

11:08AM 17   ALSO SENT TO INVESTORS LIKE MR. MOSLEY, AND IT MATTERED TO

11:08AM 18   INVESTORS LIKE MR. MOSLEY.

11:08AM 19       MR. EISENMAN TOLD YOU THAT ACCURACY WAS IMPORTANT,

11:08AM 20   ACCURACY OF THE DEVICE WAS IMPORTANT IN HIS DECISION TO INVEST.

11:09AM 21       MR. LUCAS TALKED ABOUT ACCURACY AND AUTOMATION AS BEING

11:09AM 22   IMPORTANT IN HIS DECISION TO INVEST.

11:09AM 23       MR. GROSSMAN TALKED ABOUT THE REVENUE THAT THERANOS

11:09AM 24   CLAIMED IT HAD AS RECENTLY AS 2013 FROM PHARMACEUTICAL

11:09AM 25   COMPANIES, THAT THAT WAS IMPORTANT IN PFM'S DECISION TO INVEST.

CLOSING ARGUMENT BY MR. SCHENK

11:09AM  1        THE THIRD ELEMENT IS INTENT, THAT THE DEFENDANT HAD THE

11:09AM  2    INTENT TO DEFRAUD.

11:09AM  3        AND WE'LL LOOK THROUGH SOME OF THE INTENT EVIDENCE, BUT

11:09AM  4    MUCH OF THE EVIDENCE THAT WE'VE BEEN DISCUSSING TODAY IS ALSO

11:09AM  5    RELEVANT FOR INTENT.

11:09AM  6        HERE YOU SEE MS. HOLMES ASKING ABOUT THE CONTENT OF

11:09AM  7    CERTAIN BINDERS.  ARE THERE ANY MATERIALS IN THE BINDERS YOU

11:09AM  8    THINK SHOULD BE REMOVED FOR MURDOCH?

11:09AM  9        SO WHEN I SHOWED YOU INSTANCES OF THINGS THAT WERE IN THE

11:09AM 10    MURDOCH BINDER, MS. HOLMES IS WONDERING, SHE'S THINKING ABOUT

11:09AM 11    AHEAD OF TIME WHAT IS GOING TO GO TO MURDOCH AND WHAT IS NOT

11:09AM 12    GOING TO GO TO HIM.

11:09AM 13        AND THIS IS ONE OF THE THINGS THAT WENT TO HIM, THAT

11:10AM 14    THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE

11:10AM 15    BLOOD TESTS FROM A FINGERSTICK.

11:10AM 16        BUT IT DIDN'T JUST GO TO MR. MURDOCH.  IT ALSO WENT TO

11:10AM 17    MOSLEY AND PETERSON AND, IN FACT, THE BOARD.

11:10AM 18        YOU SEE, I'M SHOWING YOU AGAIN BECAUSE THIS IS ALSO INTENT

11:10AM 19    EVIDENCE, THE LAWYER TELLING MS. HOLMES CERTAIN PHRASES ON YOUR

11:10AM 20    WEBSITE SHOULD BE REMOVED, COINCIDENTALLY, PHRASES THAT

11:10AM 21    INVESTORS ALSO HEARD, BUT BECAUSE PEOPLE ARE GOING TO LEAVE

11:10AM 22    WITH THE IMPRESSION THAT THE LAB CAN PERFORM EVERY TEST.

11:10AM 23        THE UBS EMAIL THAT WE TALKED ABOUT EARLIER WHERE EISENMAN

11:10AM 24    SAYS THIS ANALYST IS REACHING SORT OF CONCLUSIONS ABOUT

11:10AM 25    THERANOS.  WHAT SAY YOU?

CLOSING ARGUMENT BY MR. SCHENK

11:10AM 1         AND MR. BALWANI SAYS, SOUNDS LIKE AN UNINFORMED

11:10AM 2     CONSULTANT.

11:10AM 3         THAT'S FORWARDED TO MS. HOLMES.  THAT'S ALSO INTENT

11:10AM 4     EVIDENCE.

11:10AM 5         THE AMOUNT OF REVENUE THAT THERANOS AND, IN THIS INSTANCE,

11:11AM 6     MS. HOLMES COMMUNICATES TO SAFEWAY HERE, THE REVENUE FOR '11 IS

11:11AM 7     $220 MILLION; '12 IS 460 MILLION; AND 2013 IS AGAIN GETTING

11:11AM 8     CLOSE TO A BILLION DOLLARS.  IT'S NOT JUST BALWANI WHO IS

11:11AM 9     COMMUNICATING THESE KNOWINGLY FALSE REVENUE NUMBERS.

11:11AM 10        THE PETERSON NUMBER, AND THEN YOU SEE IN THE LOWER LEFT

11:11AM 11    CORNER, MOSLEY RECEIVED THIS DOCUMENT, NOT WITH THE PETERSON

11:11AM 12    HANDWRITING ON IT, BUT THE SAME INCORRECT, KNOWINGLY FALSE

11:11AM 13    REVENUE NUMBERS WERE SENT BOTH TO PETERSON AND MOSLEY.

11:11AM 14        THERE ARE THESE TEXT MESSAGES WHERE THEY TALK ABOUT

11:11AM 15    FINANCIAL STABILITY, THE NEED TO BREAK EVEN.  THIS IS IN JULY

11:11AM 16    OF 2015 WHERE MR. BALWANI IS TALKING ABOUT BREAKING EVEN.  "WE

11:11AM 17    NEED TO GET THE BUSINESS TO BREAK EVEN AND THEN I WILL LEAVE.

11:11AM 18        "BUT I CAN'T LEAVE.  I WILL TRY TO FIX THIS.

11:11AM 19        "I KNOW BUT UR SAYING EVEN IF WE FIX DON'T WANT TO BE

11:12AM 20    HERE.

11:12AM 21        "CORRECT.  ONLY FIX IS CASH AND BREAK EVEN."

11:12AM 22        I KNOW ABOUT THE FINANCIAL PROBLEMS BEFORE 2009 AND 2010,

11:12AM 23    2013 AND STILL IN 2015.

11:12AM 24        THE DEMOS AS WELL.  YOU'VE SEEN EMAILS AND YOU'VE HEARD

11:12AM 25    TESTIMONY ABOUT MS. HOLMES'S INVOLVEMENT IN THE DEMOS AND IN

CLOSING ARGUMENT BY MR. SCHENK

11:12AM  1      THE SELECTION OF THE DEVICES, THE USE OF THAT APP, THE DEMO APP

11:12AM  2   TO SHIELD FAILURES FROM THE VIP'S, HOW THE APP SHIELDS THOSE

11:12AM  3   FROM THE CLIENT AND TO MAKE THE PROCESS LOOK EFFORTLESS.

11:12AM  4      THIS IS THE JHAVERI EMAIL THAT GETS FORWARDED TO HOLMES

11:12AM  5   SAYING THAT WALGREENS, IN ORDER TO CONVINCE EXPANSION BEYOND

11:12AM  6   ARIZONA, NEEDS TO GET THE VENOUS DRAW IN THE 10 PERCENT RANGE.

11:12AM  7      THAT IS SHARED WITH MS. HOLMES.  MORE INTENT EVIDENCE.

11:13AM  8      SO WHEN INVESTORS HEAR SOMETHING TO THE CONTRARY, IT'S

11:13AM  9   BECAUSE IT IS SENT, IT IS SHARED WITH AN INTENT TO DEFRAUD THE

11:13AM  10   INVESTORS.

11:13AM  11      LUCAS TOLD YOU THAT WHEN HE WAS SPEAKING WITH THERANOS IN

11:13AM  12   DECEMBER OF 2013, HIS UNDERSTANDING WAS THAT THE PARTNERSHIP

11:13AM  13   WITH WALGREENS WAS GOING WELL, WAS EXPANDING.

11:13AM  14      AGAIN, CONTRARY TO WHAT MS. HOLMES AND MR. BALWANI KNEW,

11:13AM  15   IN FACT, TO BE THE TRUTH.

11:13AM  16      THIS IS THE SPECIAL OPERATIONS COMMAND EMAIL.  I WANTED

11:13AM  17   TO -- I'M SORRY.  EMAIL.  I WANTED TO SHOW YOU IT AGAIN BECAUSE

11:13AM  18   IT APPLIES TO BOTH KNOWLEDGE AND TO INTENT.  WHEN THEY'RE

11:13AM  19   SHARING THESE KIND OF FALSE STATEMENTS, IT'S BECAUSE THESE ARE

11:13AM  20   THE TYPE OF FALSE STATEMENTS THAT INVESTORS ARE HEARING WITH

11:13AM  21   THE INTENT TO DEFRAUD THOSE INVESTORS.

11:13AM  22      GENERAL MATTIS CONFIRMED FOR YOU THE LACK OF USE BY THE

11:13AM  23   MILITARY OF CERTAIN DEVICES.  WHEN GENERAL MATTIS TESTIFIED,

11:13AM  24   THAT WAS BEFORE EDLIN AND BEFORE MS. HOLMES HERSELF TESTIFIED,

11:14AM  25   SO YOU WERE STILL LEARNING THESE FACTS, WHETHER, IN FACT, THE

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. SCHENK                                    8988

11:14AM   1    DEVICE HAD BEEN USED THAT WAY, AND NOW YOU'VE HEARD NOT JUST

11:14AM   2    FROM GENERAL MATTIS, YOU'VE HEARD THAT FROM EDLIN AND FROM THE

11:14AM   3    DEFENDANT HERSELF.

11:14AM   4         BUT CHRIS LUCAS TOLD YOU THAT HE UNDERSTOOD FROM

11:14AM   5    MS. HOLMES THAT THE ANALYZER WAS ACTIVELY BEING USED BY

11:14AM   6    MILITARY TO TREAT SOLDIERS IN THE FIELD.

11:14AM   7         HE ALSO SAID THAT HE WOULD HAVE BEEN SURPRISED TO LEARN

11:14AM   8    THAT IT WASN'T -- AND HIS UNDERSTANDING WAS THAT THEY HAD SENT

11:14AM   9    AN ANALYZER TO THE MIDDLE EAST, AND HE WOULD HAVE BEEN

11:14AM  10    SURPRISED TO HEAR THAT THEY, IN FACT, HAD NOT.

11:14AM  11         LISA PETERSON TOLD YOU THAT SHE UNDERSTOOD THAT THE DEVICE

11:14AM  12    WAS USED ON MILITARY HELICOPTERS.

11:14AM  13         AND IN THE "FORTUNE" ARTICLE, INVESTORS, WHEN THEY

11:14AM  14    RECEIVED THE ARTICLE, ARE TOLD THAT THERANOS DOES NOT BUY

11:14AM  15    ANALYZERS FROM THIRD PARTIES.

11:14AM  16         AGAIN, A FALSE STATEMENT THAT WAS KNOWINGLY FALSE AND

11:15AM  17    COMMUNICATED WITH THE INTENT TO DEFRAUD BECAUSE THAT PLAYED A

11:15AM  18    ROLE IN THE INVESTORS' DECISIONS.  THEY THOUGHT THEY WERE

11:15AM  19    INVESTING IN A FINGERSTICK BLOOD TESTING TECHNOLOGY THAT USED

11:15AM  20    ITS OWN TECHNOLOGY TO TEST BLOOD.

11:15AM  21         MS. PETERSON CONFIRMED THAT FOR YOU, THAT HER

11:15AM  22    UNDERSTANDING WAS THAT THERANOS USED ITS OWN ANALYZER

11:15AM  23    EQUIPMENT.  SHE GOT THAT FROM ELIZABETH HOLMES.  IT'S IN THE

11:15AM  24    ARTICLE, BUT MS. PETERSON ALSO LEARNED THAT FROM CONVERSATIONS

11:15AM  25    WITH ELIZABETH HOLMES.

8989
CLOSING ARGUMENT BY MR. SCHENK

11:15AM   1        THE USE OF THE PFIZER LOGO, LET'S TALK ABOUT THAT FOR A

11:15AM   2    MOMENT.

11:15AM   3        THE DOCUMENT ON THE LEFT IS THE DOCUMENT THAT WAS SENT TO

11:15AM   4    PFIZER.  THE DOCUMENT ON THE RIGHT IS THE DOCUMENT THAT WAS

11:15AM   5    SENT TO WALGREENS.

11:15AM   6        THE DOCUMENT ON THE LEFT IS THE DOCUMENT THAT WAS SENT TO

11:15AM   7    SCHERING-PLOUGH.  THE DOCUMENT ON THE RIGHT IS THE DOCUMENT

11:15AM   8    THAT WAS SENT TO WALGREENS.

11:15AM   9        THE CONCLUSIONS IN THE SCHERING-PLOUGH DOCUMENT WERE

11:15AM  10    ENHANCED.  THE VERSION THAT WAS SENT TO SCHERING-PLOUGH IS THE

11:16AM  11    ONE ON TOP.

11:16AM  12        THE VERSION THAT WAS SENT TO WALGREENS HAD ADDITIONAL

11:16AM  13    LANGUAGE IN IT, THAT THE THERANOS TESTS WERE MORE ACCURATE THAN

11:16AM  14    THE CURRENT GOLD STANDARD REFERENCE.  SO IT WASN'T JUST ADDING

11:16AM  15    THE LOGO, IT WAS ACTUALLY ALSO DOCTORING OR ENHANCING THE

11:16AM  16    CONCLUSIONS IN THE REPORT.

11:16AM  17        AND NOW LOOK AT WHAT MS. HOLMES SAID TO WALGREENS ABOUT

11:16AM  18    THESE REPORTS.  MS. HOLMES TOLD YOU ON THE STAND THAT SHE

11:16AM  19    APPLIED THE LOGOS TO THOSE DOCUMENTS, I THINK FROM THAT TO

11:16AM  20    SUGGEST I NEVER WOULD HAVE INTENDED -- THOUGHT I WAS DEFRAUDING

11:16AM  21    ANYBODY IF I HAD GIVEN IT BACK TO THE PHARMA COMPANIES.

11:16AM  22        FIRST, IT CERTAINLY ISN'T ON THE PHARMA COMPANIES TO

11:16AM  23    DISCOVER THAT, TO REPORT IT BACK TO THERANOS, BUT IT ALSO

11:16AM  24    MISSES THE POINT.

11:16AM  25        LOOK AT WHAT USE MS. HOLMES IS MAKING OF THESE DOCUMENTS.

UNITED STATES COURT REPORTERS

**ER-12568**

CLOSING ARGUMENT BY MR. SCHENK                                        8990

11:16AM   1    SHE WRITES IN AN EMAIL TO WALGREENS, "ATTACHED PER OUR

11:16AM   2    DISCUSSION PLEASE FIND THREE INDEPENDENT DUE DILIGENCE REPORTS

11:17AM   3    ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.  THESE REPORTS ARE

11:17AM   4    FROM GLAXOSMITHKLINE, PFIZER, AND SCHERING-PLOUGH AFTER THEIR

11:17AM   5    OWN TECHNICAL VALIDATION AND EXPERIENCE WITH THERANOS SYSTEMS

11:17AM   6    IN THE FIELD."

11:17AM   7        SHE WANTS WALGREENS, AND THEN THESE WERE ALSO SENT TO

11:17AM   8    PETERSON AND MOSLEY, TO CONCLUDE THAT THEY ARE INDEPENDENT DUE

11:17AM   9    DILIGENCE REPORTS, THAT THE PHARMA COMPANIES PREPARED THE

11:17AM  10    REPORTS AFTER THEIR OWN TECHNICAL VALIDATION.

11:17AM  11        DR. CULLEN TOLD YOU THAT FOR THE SCHERING-PLOUGH WORK, THE

11:17AM  12    DEVICE WAS AT THERANOS; THAT THAT'S WHERE THE TESTING WAS DONE.

11:17AM  13    SO NOT ONLY WERE THE CONCLUSIONS IN THE SCHERING-PLOUGH

11:17AM  14    DOCUMENTS THERANOS'S, THEY COULD NOT HAVE BEEN

11:17AM  15    SCHERING-PLOUGH'S, BECAUSE SCHERING-PLOUGH WASN'T THE ONE WHO

11:17AM  16    DID THE WORK.

11:17AM  17        PETERSON RECEIVED THE PFIZER DOCUMENT.  AND YOU KNOW

11:18AM  18    MOSLEY RECEIVED THE PFIZER DOCUMENT ALSO.

11:18AM  19        THE USE OF THE MILITARY.  THIS CHART -- I'M SORRY, USE OF

11:18AM  20    THE MEDIA.

11:18AM  21        THIS CHART SHOWS YOU SORT OF THE THREE RELEVANT FACTS

11:18AM  22    ABOUT EACH OF THE ARTICLES, "THE WALL STREET JOURNAL" AND THE

11:18AM  23    PARLOFF.

11:18AM  24        AT THE TOP YOU SEE THERANOS EMAILING THE RAGO ARTICLE TO

11:18AM  25    SHAREHOLDERS, AND THEN YOU SEE THE LOCATIONS AND EXHIBITS WHERE

UNITED STATES COURT REPORTERS

ER-12569

CLOSING ARGUMENT BY MR. SCHENK                                    8991

11:18AM   1    YOU CAN FIND THE RAGO ARTICLE, AND THEN YOU SEE THERANOS

11:18AM   2    SENDING THE RAGO ARTICLE OR INCLUDING THE RAGO ARTICLE IN

11:18AM   3    PRESENTATIONS TO THE BOARD.

11:18AM   4         AND THEN EQUALLY TRUE FOR THE "FORTUNE" ARTICLE.  YOU SEE

11:18AM   5    LOCATIONS IN THE EVIDENCE IN THE EXHIBITS WHERE YOU CAN FIND

11:18AM   6    THE "FORTUNE" ARTICLE, YOU SEE WHERE THE "FORTUNE" ARTICLE IS

11:18AM   7    SENT TO SHAREHOLDERS, AND YOU SEE WHERE THE "FORTUNE" ARTICLE

11:18AM   8    IS REFERENCED OR INCLUDED IN THE INVESTOR BINDERS.

11:19AM   9         RAGO SHARES THE ARTICLE OR THE CONTENT BEFORE IT'S

11:19AM  10    PUBLISHED WITH MS. HOLMES.  IT'S NOT JUST KNOWLEDGE EVIDENCE, I

11:19AM  11    SHOWED YOU THIS A MOMENT AGO FOR KNOWLEDGE.  IT'S ALSO THE

11:19AM  12    CONTENT.  SHE KNOWS THE CONTENT OF THE ARTICLE, SHE KNOWS THERE

11:19AM  13    ARE FALSE STATEMENTS IN THE ARTICLE, AND AS YOU SAW A MOMENT

11:19AM  14    AGO, IT GETS SENT TO SHAREHOLDERS.  INTENT.

11:19AM  15         GENERAL MATTIS WAS GOING TO TALK TO A REPORTER FROM "THE

11:19AM  16    NEW YORKER," AND HE WANTED TO PREP WITH MS. HOLMES TO

11:19AM  17    COMMUNICATE WITH HER BEFOREHAND WHAT HE CAN SAY AND WHAT HE

11:19AM  18    CAN'T SAY, AND SOME OF THAT PREP HAPPENS OVER EMAIL.

11:19AM  19         AND MS. HOLMES TELLS HIM ANY QUESTIONS HE ASKS YOU ABOUT

11:19AM  20    HOW OUR TECHNOLOGY WORKS, I.E., THAT THERE IS A SINGLE DEVICE

11:19AM  21    THAT DOES ALL TESTS, YOU CAN LET HIM KNOW WE DON'T TALK ABOUT

11:19AM  22    THESE ON THE RECORD.

11:19AM  23         YOU KNOW THAT AN HONEST STATEMENT WOULD HAVE BEEN THAT OUR

11:19AM  24    DEVICE CAN'T DO THAT.  WE DON'T HAVE A SINGLE DEVICE THAT DOES

11:19AM  25    ALL OF THE TESTS.  THAT'S NOT WHAT SHE'S COMMUNICATING TO

8992

CLOSING ARGUMENT BY MR. SCHENK

11:20AM   1    GENERAL MATTIS AND WHAT THEN, PRESUMABLY THE GOAL IS, WHAT

11:20AM   2    APPEAR NOW IN ANOTHER ARTICLE, "A NEW YORKER" ARTICLE.

11:20AM   3         SO THE CONTENT OF THESE ARTICLES IN THE MEDIA CONTAINING

11:20AM   4    FALSE STATEMENTS WAS INTENTIONAL.  SHE WANTED THEM TO CONTAIN

11:20AM   5    FALSE STATEMENTS.  AND THEN SENDING THE ARTICLE TO INVESTORS TO

11:20AM   6    USE TO HELP THEM IN THEIR EVALUATION OF WHETHER OR NOT TO

11:20AM   7    INVEST WAS ALSO DONE WITH AN INTENT TO DEFRAUD.

11:20AM   8         MOSLEY SPECIFICALLY TOLD YOU THAT THE "FORTUNE" ARTICLE

11:20AM   9    WAS IN HIS BINDER, AND HE THOUGHT THAT IF THERANOS WAS

11:20AM   10   INCLUDING IT IN HIS BINDER, THAT MEANT THAT EITHER THEY AGREED

11:20AM   11   WITH IT OR THEY THOUGHT IT WAS SORT OF VALUABLE, ACCURATE

11:20AM   12   REPRESENTATIONS OF THE THERANOS TECHNOLOGY, AND THAT'S WHY THEY

11:20AM   13   WOULD INCLUDE IT.

11:20AM   14        HERE'S THE EMAIL TO SHAREHOLDERS, POTENTIAL INVESTORS WITH

11:20AM   15   THE "FORTUNE" ARTICLE.  YOU'VE SEEN THE ONE WITH THE RAGO

11:20AM   16   ARTICLE.  HERE'S THE "FORTUNE" EMAIL AND THE RAGO ARTICLE AS

11:21AM   17   WELL.

11:21AM   18        THE LAST ELEMENT FOR WIRE FRAUD FOR INVESTORS IS THE

11:21AM   19   INTERSTATE NEXUS, THE FEDWIRE, THAT THE INVESTORS WIRED MONEY

11:21AM   20   TO THERANOS, AND THAT WIRE CROSSED STATE LINES.

11:21AM   21        YOU'VE SEEN THIS ALL WITHIN EXHIBIT 4845.  YOU'VE SEEN THE

11:21AM   22   DOCUMENTS THAT SHOW THE USE OF THE FEDWIRE.  SO EVEN IF IN

11:21AM   23   THEORY THE INVESTOR'S BANK WAS IN CALIFORNIA AND IT WENT TO --

11:21AM   24   EVEN IF THE THERANOS BANK WAS IN CALIFORNIA, THE USE OF FEDWIRE

11:21AM   25   STILL CAUSES AN INTERSTATE WIRE.

8993

CLOSING ARGUMENT BY MR. SCHENK

11:21AM   1        YOU'VE HEARD IN THIS CASE INSTANCES WHERE THE WIRE ITSELF

11:21AM   2    ORIGINATED OUTSIDE OF CALIFORNIA BECAUSE MOSLEY SENT IT FROM

11:21AM   3    NEW YORK OR PETERSON SENT IT FROM MICHIGAN, BUT THE USE OF THE

11:21AM   4    FEDWIRE SYSTEM.

11:21AM   5        AND MR. AMENTA'S TESTIMONY PROVIDED THE EVIDENCE TO YOU

11:21AM   6    THAT THE WIRES THAT ARE CHARGED IN COUNT THREE; AND THIS IS

11:21AM   7    COUNT FOUR FOR LUCAS; AND THIS IS COUNT FIVE FOR THE HALL

11:22AM   8    GROUP'S INVESTMENT FROM BRYAN TOLBERT; AND THIS IS COUNT SIX,

11:22AM   9    GROSSMAN'S PFM INVESTMENT; COUNT SEVEN, LISA PETERSON'S RDV

11:22AM   10   INVESTMENT; COUNT EIGHT, MOSLEY'S INVESTMENT.

11:22AM   11       NOW WE MOVE ON TO THE WIRE FRAUD FOR PATIENTS.

11:22AM   12       YOUR HONOR, THIS MIGHT BE A GOOD TIME FOR A BREAK IF WE'RE

11:22AM   13   THINKING OF TAKING ONE?

11:22AM   14           THE COURT:  SURE.  LET'S DO THAT.

11:22AM   15       THANK YOU, MR. SCHENK.

11:22AM   16       LADIES AND GENTLEMEN, LET'S TAKE OUR MORNING BREAK.

11:22AM   17   SHOULD WE TAKE ABOUT 30 MINUTES THEN, ABOUT 30 MINUTES?

11:22AM   18       I JUST WANT YOU TO KNOW, LADIES AND GENTLEMEN, WE WILL

11:22AM   19   FINISH NO LATER THAN 4:00.  WE WILL NOT GO BEYOND 4:00 O'CLOCK

11:22AM   20   TODAY, AND I ANTICIPATE THAT WE WILL START TOMORROW AT 9:00, SO

11:22AM   21   JUST TO LET THE PARTIES KNOW.

11:22AM   22       LET'S TAKE 30 MINUTES, PLEASE.  THANK YOU.

11:22AM   23           THE CLERK:  COURT IS IN RECESS.

11:22AM   24       (RECESS FROM 11:22 A.M. UNTIL 12:01 P.M.)

12:01PM   25           THE COURT:  PLEASE BE SEATED.  LADIES AND GENTLEMEN,

CLOSING ARGUMENT BY MR. SCHENK

| | | |
|---|---|---|
| 12:01PM | 1 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT, MS. HOLMES |
| 12:01PM | 2 | IS PRESENT.  OUR JURY IS BACK. |
| 12:01PM | 3 | COUNSEL, I THINK WE'LL TAKE OUR NEXT BREAK AT 1:30.  DOES |
| 12:01PM | 4 | THAT WORK FOR COUNSEL? |
| 12:01PM | 5 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:01PM | 6 | MR. DOWNEY:  THAT'S FINE, YOUR HONOR. |
| 12:01PM | 7 | THE COURT:  ALL RIGHT.  OUR NEXT BREAK WILL BE AT |
| 12:01PM | 8 | 1:30, LADIES AND GENTLEMEN. |
| 12:01PM | 9 | WE'RE BACK ON THE RECORD. |
| 12:01PM | 10 | MR. SCHENK, WOULD YOU LIKE TO CONTINUE WITH YOUR OPENING |
| 12:01PM | 11 | ARGUMENT? |
| 12:02PM | 12 | MR. SCHENK:  YES.  THANK YOU. |
| 12:02PM | 13 | WHEN WE LEFT OFF, WE WERE ABOUT TO TRANSITION TO SPEAKING |
| 12:02PM | 14 | ABOUT THE WIRE FRAUD COUNTS RELATED TO PATIENTS.  LET ME |
| 12:02PM | 15 | REVISIT AND JUST SAY ONE ADDITIONAL THING. |
| 12:02PM | 16 | ON THE INVESTOR SIDE, WE SAW EVIDENCE ABOUT WALGREENS AND |
| 12:02PM | 17 | SAFEWAY, AND I TALKED TO YOU A LITTLE BIT ABOUT THE WAYS THAT |
| 12:02PM | 18 | YOU CAN USE THAT EVIDENCE, AND I MENTIONED THAT WALGREENS WAS |
| 12:02PM | 19 | ALSO AN INVESTOR. |
| 12:02PM | 20 | I THINK THERE MAY BE EVIDENCE IN THE RECORD AS WELL WITH |
| 12:02PM | 21 | REGARD TO SAFEWAY, THAT SAFEWAY ALSO MAY HAVE BEEN AN INVESTOR. |
| 12:02PM | 22 | SO THEY'RE INVESTOR VICTIMS OF THE SCHEME.  YOU JUST |
| 12:02PM | 23 | AREN'T DELIBERATING ABOUT COUNTS RELATING TO WALGREENS AND |
| 12:02PM | 24 | SAFEWAY.  I SUGGESTED TO YOU THAT WALGREENS WAS AN INVESTOR.  I |
| 12:02PM | 25 | THINK THERE MAY BE SOME EVIDENCE IN THE RECORD AS WELL ABOUT |

CLOSING ARGUMENT BY MR. SCHENK

12:02PM  1    SAFEWAY.

12:02PM  2        LET'S MOVE ON NOW TO THE WIRE FRAUD COUNTS AS THEY RELATE

12:03PM  3    TO PATIENTS.  THE SAME COUNTS -- I'M SORRY, THE SAME ELEMENTS

12:03PM  4    APPLY FOR THE WIRE FRAUD TO PATIENTS AS THEY DID WIRE FRAUD TO

12:03PM  5    INVESTORS, THE SAME FOUR ELEMENTS.

12:03PM  6        HERE ARE THE PATIENT COUNTS.

12:03PM  7        THE FIRST COUNT, COUNT TEN, IS ERIN TOMPKINS.  YOU RECALL

12:03PM  8    THAT SHE RECEIVED THE HIV TEST.  ON THE VERDICT FORM IT HAS HER

12:03PM  9    INITIALS E.T.

12:03PM  10        COUNT ELEVEN IS ELLSWORTH, MEHRL ELLSWORTH'S PSA TEST.

12:03PM  11    IT'S M.E. ON THE VERDICT FORM.

12:03PM  12        AND THEN COUNT TWELVE IS AN ELECTRONIC FUNDS TRANSFER FOR

12:03PM  13    THE PURCHASE OF A MEDIA BUY IN THE ARIZONA MARKET.

12:03PM  14        AND THE WIRES FOR TEN AND ELEVEN ARE ACTUALLY FAXES, A FAX

12:03PM  15    OF LAB REPORTS FROM CALIFORNIA TO THE DOCTOR'S OFFICES IN

12:03PM  16    ARIZONA.

12:03PM  17        SO THE FIRST ELEMENT IS THAT A SCHEME OR PLAN EXISTED.

12:04PM  18        AND WE'VE ACTUALLY COVERED A FAIR AMOUNT OF THIS ALREADY,

12:04PM  19    BUT THE SCHEME VIS-A-VIS PATIENTS INVOLVE BOTH ELECTRONIC WIRES

12:04PM  20    TO PURCHASE ADVERTISEMENTS TO INDUCE OR ENCOURAGE PATIENTS TO

12:04PM  21    USE THE SERVICE, THAT'S SOMETHING LIKE COUNT 12 IN THE

12:04PM  22    INDICTMENT, AND ALSO THE USE OF THE THERANOS WEBSITE OR

12:04PM  23    ARTICLES IN THE MEDIA THAT SAID ACCURATE TESTING, LOW COST

12:04PM  24    TESTING, FINGERSTICK TESTING, THE KINDS OF THINGS THAT WOULD

12:04PM  25    INDUCE A PATIENT TO GO TO THE THERANOS PATIENT SERVICE CENTER

CLOSING ARGUMENT BY MR. SCHENK                                    8996

12:04PM  1    INSIDE OF A WALGREENS STORES.

12:04PM  2         AND THEN FINALLY, TO SEND THE LAB RESULTS.  THEY USED

12:04PM  3    ELECTRONIC WIRES.  THERANOS USED ELECTRONIC WIRES TO SEND THE

12:04PM  4    LAB RESULTS FROM THEIR LAB TO THE DOCTOR'S OFFICE KNOWING THAT

12:04PM  5    THOSE LAB RESULTS WERE LIKELY TO CONTAIN INACCURATE OR

12:04PM  6    UNRELIABLE RESULTS.

12:05PM  7         SO THE ADVERTISEMENT LOOKED LIKE THIS.

12:05PM  8         DAN EDLIN SAID THAT THIS EXHIBIT, EXHIBIT 3696, WAS IN AN

12:05PM  9    INVESTOR BINDER, BUT THIS WAS ALSO THE KIND OF THIS THING THAT

12:05PM 10    APPEARED ON THE THERANOS WEBSITE, AND IT ADVERTISES THE HIGHEST

12:05PM 11    LEVELS OF ACCURACY, THERANOS OFFERS TESTS WITH THE HIGHEST

12:05PM 12    LEVELS OF ACCURACY.

12:05PM 13         YOU EVEN HEARD BRITTANY GOULD TOLD YOU THAT THEY WENT TO

12:05PM 14    THERANOS BECAUSE THEY THOUGHT THEY WOULD PROVIDE HIGH LEVELS OF

12:05PM 15    ACCURACY.

12:05PM 16         RESULTS IN HOURS, NOT DAYS.  THAT TESTS ARE PERFORMED AT

12:05PM 17    AMAZING SPEED.  FASTER THAN PREVIOUSLY POSSIBLE.

12:05PM 18         AGAIN, EDLIN SUGGESTED WHILE THIS SLIDE WAS SENT TO

12:05PM 19    INVESTORS, IT WAS ALSO DISPLAYED ON THE WEBSITE.

12:05PM 20         IN ARTICLES.  THIS IS THE RAGO ARTICLE.  IT TALKS ABOUT

12:05PM 21    THERANOS PROCESSES BEING FASTER, CHEAPER, MORE ACCURATE THAN

12:05PM 22    CONVENTIONAL METHODS, REQUIRING ONLY A MICROSCOPIC BLOOD

12:06PM 23    VOLUME, NOT VIAL AFTER VIAL OF THE STUFF LIKE A TRADITIONAL LAB

12:06PM 24    WOULD REQUIRE.

12:06PM 25         MS. HOLMES ESTIMATES THAT PATIENTS AND DOCTORS WILL

CLOSING ARGUMENT BY MR. SCHENK                                    8997

12:06PM   1    RECEIVE READOUTS IN AS LITTLE AS TWO HOURS.

12:06PM   2         AND THEN THE TECHNOLOGY IS AUTOMATED, STANDARDIZED,

12:06PM   3    ATTEMPTING TO SUBTRACT HUMAN ERROR FROM THE PROCESS TO ACHIEVE

12:06PM   4    LOWER VARIANCE IN THE RANGES FOR A GIVEN TEST.

12:06PM   5         AND THEN YOU ALSO SEE STATEMENTS IN THE PARLOFF ARTICLE,

12:06PM   6    THINGS LIKE THE TESTS CAN BE PERFORMED ON JUST A FEW DROPS OF

12:06PM   7    BLOOD, A FRACTION OF THE AMOUNT ORDINARILY REQUIRED.  AND THEY

12:06PM   8    TALK ABOUT THE DRAW FROM A FINGERSTICK AND THE RESULTS WITHIN

12:06PM   9    HOURS.

12:06PM   10        SO, AGAIN, THE SAME KIND OF STATEMENTS THAT ARE ON THE

12:06PM   11   WEBSITE ARE ALSO IN ARTICLES IN THE MEDIA.

12:06PM   12        THE FALSE CLAIMS REGARDING ACCURACY.  MS. HOLMES KNEW THAT

12:07PM   13   THAT WAS LIKELY TO OCCUR, AND THE WAY SHE KNEW IT IS FROM

12:07PM   14   SEVERAL PLACES.

12:07PM   15        NOW WE'RE LOOKING AT TEXT MESSAGES.  AND IN THIS INSTANCE

12:07PM   16   WE'RE SEEING A TEXT MESSAGE WHERE MR. BALWANI SAYS, "WE CAN

12:07PM   17   MARKET OUR LAB AND EVERYTHING AND PEOPLE WILL TALK ABOUT OUR

12:07PM   18   FINGERSTICK WITHOUT US TALKING ABOUT IT."

12:07PM   19        SO THERE'S AN UNDERSTANDING ON THEIR PART THAT FIRST

12:07PM   20   PEOPLE READ WHAT IS MARKETED AND ALSO THAT THE STORY OF

12:07PM   21   THERANOS BEING FINGERSTICK IS ALREADY OUT THERE.  THE MEDIA HAS

12:07PM   22   DONE AND THE DEFENDANTS THEMSELVES HAVE DONE THE WORK.

12:07PM   23        SO NOW THAT THE PUBLIC IS SEEING LOW OR HIGH VENOUS DRAW

12:07PM   24   NUMBERS, LOW FINGERSTICK NUMBERS, WE CAN CHANGE THE THINGS WE

12:07PM   25   SAY.  WE DON'T HAVE TO SAY FINGERSTICK, AND THAT'S ALREADY THE

12:07PM  1    NARRATIVE.  THE STORY OF THERANOS HAS BEEN TOLD.  PEOPLE GET

12:07PM  2    IT.  WE DON'T NEED TO SAY IT.

12:07PM  3        IN ADVERTISING MS. HOLMES WRITES THEN TEXT MESSAGE, "I

12:07PM  4    THINK WE SHOULD SHOW THEM THE FIRST AD THAT'S GOING TO RUN IN

12:08PM  5    ARIZONA.  IT DOESN'T MENTION NANOTAINERS OR FINGERSTICK.  JUST

12:08PM  6    LESS BLOOD WHICH I WILL MAKE A BIG DEAL ABOUT BEING ABOUT

12:08PM  7    BUTTERFLY AND SMALLER NEEDLES.  BETTER FOR US TO SHOW THAN

12:08PM  8    NOT."

12:08PM  9        ACTUALLY, YOU'VE SEEN IN THIS COURTROOM AN ARGUMENT SORT

12:08PM 10    OF SIMILAR TO THAT, THE IDEA THAT WHEN WE SAID "SMALL VOLUMES"

12:08PM 11    OR "SMALL NEEDLES," WE ALSO MEANT BUTTERFLY NEEDLES, A VERY

12:08PM 12    SMALL PEDIATRIC NEEDLE THAT CAN GO IN THE ARM.

12:08PM 13        BACK IN 2015 THEY ALREADY WERE INCLUDING THIS IN PART OF

12:08PM 14    THE SCHEME.  THEY APPRECIATED THAT THE NARRATIVE OUT THERE WAS

12:08PM 15    SMALL BLOOD DRAWS, VERY SMALL VIALS, COMPARED TO VIAL AFTER

12:08PM 16    VIAL OF THE STUFF, AND THEN TRY TO RATIONALIZE AWAY WHERE WHAT

12:08PM 17    THEY'RE ACTUALLY DOING CAN ATTEMPT TO STILL BE CONSISTENT WITH

12:08PM 18    THE NARRATIVE.  THEY KNOW WHAT PEOPLE THINK, AND THEY'RE TRYING

12:08PM 19    TO COME UP WITH A WAY OF TRYING TO MAKE THE CURRENT STATE OF

12:08PM 20    THE OFFERING CONSISTENT WITH THE FALSE NARRATIVE THAT HAS BEEN

12:08PM 21    TOLD.  THE ACCURACY AND INACCURACY AND RELIABILITY AND

12:09PM 22    UNRELIABILITY OF THE ASSAYS ON THE DEVICE.

12:09PM 23        THE FIRST DOCUMENT I'M SHOWING YOU CAME IN I BELIEVE

12:09PM 24    THROUGH DR. DAS.  AFTER THE CMS INSPECTION, THERANOS WAS GOING

12:09PM 25    THROUGH, YOU'VE HEARD THE PROCESS OF, VOIDING TESTS AND TAKING

CLOSING ARGUMENT BY MR. SCHENK                                          8999

12:09PM  1      OTHER ACTIONS, INTERACTING WITH CMS.

12:09PM  2          AND IN THIS DOCUMENT ABOUT THE IMPACT ON PATIENTS THEY

12:09PM  3      WRITE, THIS IS THERANOS YOU SEE, "THE QC FAILURES IDENTIFIED BY

12:09PM  4      THIS COMPREHENSIVE RETROSPECTIVE ANALYSIS REFLECT A GLOBAL AND

12:09PM  5      LONG-TERM FAILURE OF THE QUALITY CONTROL PROGRAM FOR THIS

12:09PM  6      INSTRUMENTALITY, AS WELL AS FAILURES OF RELATED QUALITY

12:09PM  7      ASSURANCE PROCEDURES THAT SHOULD HAVE ALERTED THE LABORATORY TO

12:09PM  8      CORRECT SUCH AN UNSTABLE PROCESS.  THEREFORE, THE LABORATORY

12:09PM  9      HAS CONCLUDED THAT THERE IS A POSSIBLE PATIENT IMPACT FOR EVERY

12:09PM 10      TEST REPORTED FROM THE LABORATORIES PTS," THERANOS PROCESSING

12:10PM 11      SYSTEM,  "3.5 INSTRUMENTS."

12:10PM 12          SO THIS DOES NOT PROVE KNOWLEDGE EARLIER ON.  THIS

12:10PM 13      DOCUMENT CAME IN 2015.  BUT IT HELPS IDENTIFY THE INACCURACY,

12:10PM 14      THE PROBLEMS WITH THE TESTS THAT OCCURRED WHEN THEY WERE

12:10PM 15      TESTING PATIENTS USING THE THERANOS DEVICES.

12:10PM 16          DR. DAS TOLD YOU THAT 50- TO 60,000 TESTS WERE VOIDED AND

12:10PM 17      THAT THAT WAS THE TOTAL UNIVERSE OF TESTS RUN ON THE EDISON

12:10PM 18      DEVICE IN THE CLIA LAB.

12:10PM 19          HE TOLD YOU THERE WERE INSTANCES WHEN THEY WERE REPORTING

12:10PM 20      PATIENT RESULTS FROM THE EDISON DEVICE EVEN AFTER QUALITY

12:10PM 21      CONTROL FAILURE.

12:10PM 22          YOU HEARD THROUGH SOME OF THE INFORMATION OF

12:10PM 23      DR. ROSENDORFF THAT QC WAS THE CHECK ON INACCURATE RESULTS

12:10PM 24      GOING OUT.  AND DR. DAS SAID THAT ACTUALLY DIDN'T HAPPEN.

12:10PM 25      THERE WERE INSTANCES WHEN RESULTS WENT OUT EVEN AFTER QC

CLOSING ARGUMENT BY MR. SCHENK                                                    9000

12:11PM   1       FAILURES.

12:11PM   2              DR. DAS ALSO TALKED TO YOU ABOUT A CONVERSATION THAT HE

12:11PM   3       HAD WITH MS. HOLMES WHEN THEY WERE MAKING THE DECISION TO VOID

12:11PM   4       THE TESTS, SORT OF WHAT THEY WOULD SAY, WHAT THE REASON WAS

12:11PM   5       THAT THEY WERE VOIDING.

12:11PM   6              AND DR. DAS SAID THERE WAS SORT OF A DISCUSSION ABOUT

12:11PM   7       WHETHER IT WAS BECAUSE OF QUALITY CONTROL OR QUALITY ASSURANCE

12:11PM   8       FAILURES, MORE SYSTEMIC THINGS IN THE LAB, OR IF THERE WAS A

12:11PM   9       FUNDAMENTAL PROBLEM WITH THE DEVICE.

12:11PM  10              AND DR. DAS SAID THAT MS. HOLMES DID NOT WANT TO SAY THAT

12:11PM  11       THERE WAS A FUNDAMENTAL PROBLEM WITH A DEVICE, AND THIS IS A

12:11PM  12       CONCEPT THAT I'LL COME BACK TO A LITTLE BIT LATER, BUT DR. DAS

12:11PM  13       REACHED A DIFFERENT CONCLUSION.

12:11PM  14              DR. DAS TOLD YOU THAT THERE WERE INSTANCES WHEN THE

12:11PM  15       DEVICES WERE REPORTING PSA RESULTS FOR FEMALES.  DR. DAS TOLD

12:11PM  16       YOU THERE WERE INSTANCES WHEN THE DEVICE WAS FUNDAMENTALLY

12:11PM  17       FLAWED.  IT WASN'T A QC OR A QA PROBLEM, IT WAS A MORE BROAD

12:12PM  18       PROBLEM.

12:12PM  19              I WANT TO WALK THROUGH A COUPLE OF TIMELINES.  THE FIRST

12:12PM  20       IS WITH THE ASSAY HCG, THAT'S THE PREGNANCY TEST THAT

12:12PM  21       BRITTANY GOULD GOT.  THE VALIDATION FOR HCG OCCURRED IN MARCH

12:12PM  22       OF 2014, AND YOU'VE SEEN THE VALIDATION DOCUMENTS.

12:12PM  23              TESTING BEGAN ON THE EDISON A MONTH AND A HALF LATER, THE

12:12PM  24       BEGINNING OF MAY.  YOU'VE SEEN THE DOCUMENT THAT HAS SHOWED YOU

12:12PM  25       THAT DATE, MAY 9TH, 2014.

CLOSING ARGUMENT BY MR. SCHENK                                          9001

12:12PM    1        DR. ROSENDORFF THEN HALTED TESTING OF HCG ON THE EDISON

12:12PM    2    DEVICE IN THIS EMAIL 4147.  DR. ROSENDORFF SENDS OUT AN EMAIL

12:12PM    3    STOPPING FURTHER TESTING.

12:12PM    4        THEY STILL ARE RECEIVING EMAILS FROM CUSTOMER COMPLAINING.

12:12PM    5    THOSE GO TO MS. HOLMES.  IN FACT, THIS ONE, CHRISTIAN HOLMES,

12:12PM    6    HER BROTHER, IS TALKING TO HER ABOUT, "JUST FYI -- HCG RIGHT

12:13PM    7    NOW CAUSING SOME SERIOUS ISSUES AND PATIENT COMPLAINTS.  BEEN

12:13PM    8    SPENDING ALL MORNING TALKING TO DOCS ABOUT JUST HCG AND WILL

12:13PM    9    CONTINUE TO DO SO...IT'S A SENSITIVE ONE OBVIOUSLY BECAUSE OF

12:13PM   10    PEOPLE FINDING OUT IF PREGNANT."

12:13PM   11        JUNE OF 2014 MS. HOLMES IS INFORMED BY HER BROTHER ABOUT

12:13PM   12    PROBLEMS WITH THE HCG TEST.

12:13PM   13        THE HCG -- I'M SORRY, THE EDISON DEVICE IS FAILING QC.

12:13PM   14    FOR HCG YOU SEE THIS EMAIL HERE, EXHIBIT 5421, THAT TALKS ABOUT

12:13PM   15    THE NUMBERS, THE NUMBER OF EDISONS RUN AND THEN THE NUMBER OF

12:13PM   16    QC FAILURES, AND IT LISTS ASSAYS AND THE THIRD ASSAY LISTED IS

12:13PM   17    HCG.

12:13PM   18        MORE EMAILS OF CUSTOMER COMPLAINTS TO ELIZABETH HOLMES AND

12:13PM   19    SHE'S LEFT WITH ASKING "HOW DID THAT HAPPEN?"

12:13PM   20        BRITTANY GOULD THEN RECEIVED HER INACCURATE TEST.  YOU

12:13PM   21    HEARD HER TESTIMONY, AND SHE TALKED ABOUT THAT PROCESS.

12:14PM   22        AND THEN LATER, THE BEGINNING OF THE NEXT YEAR, IN

12:14PM   23    JANUARY, TESTING OF HCG ON THE EDISON IS TERMINATED.

12:14PM   24        HER DOCTOR, BRITTANY GOULD'S DOCTOR, DR. ZACHMAN, TALKED

12:14PM   25    TO YOU ABOUT ACCURACY OR INACCURACY OF BRITTANY GOULD'S

CLOSING ARGUMENT BY MR. SCHENK                                    9002

12:14PM  1    SPECIFIC TESTS IN LIGHT OF THE OTHER FACTS THAT WERE KNOWN.

12:14PM  2         LET'S DO THAT FOR PSA.

12:14PM  3         PSA TESTING IS HELPFUL IN DETERMINING PROSTATE CANCER.

12:14PM  4    THE VALIDATION REPORT FOR PSA ON THE EDISON WAS IN SEPTEMBER OF

12:14PM  5    2013.  YOU'VE SEEN THAT DOCUMENT.  THERE WAS AN INTERNAL

12:14PM  6    RESULTS COMPARISON.  YOU'VE HEARD SOME TESTIMONY THERE WAS A

12:14PM  7    DISAGREEMENT AT THERANOS ABOUT WHETHER THIS WAS REAL PT,

12:14PM  8    WHETHER THIS WAS REAL PROFICIENCY TESTING, AND THERE WAS

12:14PM  9    DISAGREEMENT OR DISCUSSION ABOUT WHETHER IT ACTUALLY WAS

12:14PM  10   PROFICIENCY TESTING.

12:14PM  11        NEVERTHELESS, IT STILL WAS A RESULTS COMPARISON.  THEY HAD

12:14PM  12   A KNOWN PSA SAMPLE AND TESTED IT ON A PREDICATE DEVICE, A THIRD

12:15PM  13   PARTY DEVICE, AND ALSO THE THERANOS DEVICE.  AND NOTICE, THE

12:15PM  14   PREDICATE DEVICE IS RUN THE FIRST TIME AND IT SCORES A 3.1, AND

12:15PM  15   IT'S RERUN AND GETS A 3.1.

12:15PM  16        THEN THEY TEST ANOTHER SAMPLE ON THE PREDICATE DEVICE,

12:15PM  17   7.5.  THEY RERUN IT AND THEY GET A 7.5.

12:15PM  18        WHEN THEY ARE USING THE THERANOS DEVICE, THEY GET A 1.9

12:15PM  19   THE FIRST TIME AND THEN A 2.6.

12:15PM  20        WHEN THEY TEST THE NEXT SAMPLE THEY GET A 4.9 AND THEN A

12:15PM  21   7.2.  THERE'S EARLY INDICATIONS ABOUT THE PROBLEM OF TESTING

12:15PM  22   PSA ON THERANOS DEVICES.

12:15PM  23        THEN DR. ELLSWORTH GETS HIS PSA TESTS IN MAY, IN JUNE OF

12:15PM  24   2015.  THE FIRST ONE IS FAXED ON MAY 16TH.  THAT'S A COUNT IN

12:15PM  25   THE INDICTMENT.

CLOSING ARGUMENT BY MR. SCHENK

| | | |
|---|---|---|
| 12:15PM | 1 | THEN THEY CEASE TESTING OF PSA ON THE EDISON DEVICE |
| 12:15PM | 2 | JUNE OF 2015. |
| 12:15PM | 3 | AFTER THAT DR. ELLSWORTH GETS HIS FINAL RESULT.  THIS WAS |
| 12:16PM | 4 | FROM THERANOS WAS RUN ON A PREDICATE DEVICE, ON A THIRD PARTY |
| 12:16PM | 5 | DEVICE.  HERE IS THAT -- THE VERY LAST TEST THAT DR. ELLSWORTH |
| 12:16PM | 6 | GETS, IT'S THE ONE THAT IS BELOW A 1. |
| 12:16PM | 7 | AND THEN DR. DAS TOLD YOU THAT ONE OF THE EXAMPLES THAT HE |
| 12:16PM | 8 | USED WHEN HE WAS COMMUNICATING WITH MS. HOLMES ABOUT THE |
| 12:16PM | 9 | PROBLEMS WITH THE TECHNOLOGY, THE PROPENSITY TO RETURN |
| 12:16PM | 10 | ERRONEOUS RESULTS WAS PSA, BECAUSE PSA SHOULD BE DETECTABLE IN |
| 12:16PM | 11 | MALES, NOT FEMALES, AND IT WAS OFTEN DETECTED -- OR "OFTEN" |
| 12:16PM | 12 | MIGHT NOT BE A FAIR WORD -- IT WAS DETECTED IN FEMALES, AND |
| 12:16PM | 13 | THAT WAS NOTIFIABLE TO DR. DAS.  AND HE USED THAT AS AN EXAMPLE |
| 12:16PM | 14 | WHEN HE WAS INTERACTING WITH MS. HOLMES ON THIS SUBJECT. |
| 12:16PM | 15 | THERE ARE OTHER TEXT MESSAGES AND THERE ARE OTHER WAYS |
| 12:16PM | 16 | THAT MS. HOLMES HAD KNOWLEDGE OF THESE PROBLEMS THAT IS |
| 12:16PM | 17 | GENERATING ACCURATE AND RELIABLE RESULTS. |
| 12:16PM | 18 | IN TEXT MESSAGES MR. BALWANI TELLS HER, "WE NEED THE LAB |
| 12:16PM | 19 | AND CALL CENTER FIXED." |
| 12:17PM | 20 | THIS IS BACK IN 2014. |
| 12:17PM | 21 | "WE NEED PROFESSIONALS ACROSS THE BOARD." |
| 12:17PM | 22 | MR. BALWANI TELLS HER "WE NEED THE CTN," THE CAPILLARY |
| 12:17PM | 23 | TUBE AND NANOTAINER, "FIXED.  OUR ROOT CAUSE OF ISSUES." |
| 12:17PM | 24 | THE EXPLETIVE TEXT, THE ONE YOU'VE SEEN BEFORE, WHERE |
| 12:17PM | 25 | MR. BALWANI TELLS HER THAT THE NORMANDY LAB, WHERE THEY USE THE |

CLOSING ARGUMENT BY MR. SCHENK                                          9004

12:17PM  1     EDISON DEVICE TO TEST PATIENTS, IS A DISASTER ZONE, AND HE

12:17PM  2     SEES, INSTEAD OF REMOVING HUMAN JUDGMENT, PEOPLE IN THE LAB

12:17PM  3     MAKING THEIR -- MAKING DECISIONS AND SORT OF BEING THE OPPOSITE

12:17PM  4     OF WHAT THE DEVICE WAS PITCHED AT BEING ABLE TO DO.

12:17PM  5         IT'S ALSO KNOWLEDGE OF THESE PROBLEMS IS ALSO FOUND IN

12:17PM  6     EMAILS.  THIS IS BEFORE THE LAUNCH.  THIS IS IN AUGUST OF 2013.

12:17PM  7         MS. HOLMES IS TALKING TO THE VARIOUS TEAMS ABOUT

12:17PM  8     DEVELOPING THE ELISA, THE IMMUNOASSAYS, AND IT'S THE ONLY

12:17PM  9     PRIORITY OF THE ENTIRE ELISA TEAM MOVING FORWARD.  WE HAVE 61

12:18PM  10    ASSAYS TO VALIDATE ON THE 3.X AND 27 ON THE SIEMENS.  THIS IS

12:18PM  11    AUGUST 21ST, 2013.

12:18PM  12        THEY GO LIVE WITH PATIENT TESTING AT WALGREENS AROUND

12:18PM  13    SEPTEMBER 9TH, 2013, A COUPLE WEEKS LATER.

12:18PM  14        MS. GANGAKHEDKAR IS COMMUNICATING WITH ELIZABETH HOLMES IN

12:18PM  15    THE SAME TIMEFRAME, AUGUST OF 2013, AND SHE IS TELLING

12:18PM  16    MS. HOLMES, "WE HAD ISSUES WITH ALL RUNS ON THE 3.5 YESTERDAY

12:18PM  17    AS NONE OF THE RUNS COMPLETED DUE TO TEMPERATURE NOT BEING

12:18PM  18    REACHED AND PIPETTE INITIALIZATION ERRORS."  THESE RUNS WERE

12:18PM  19    FOR VITAMIN D.

12:18PM  20        BEFORE THEY EVEN LAUNCH WITH WALGREENS, THEY ARE RUSHING

12:18PM  21    TO VALIDATE THE ELISA ASSAYS, AND THEY'RE HAVING PROBLEMS.

12:18PM  22        MS. GANGAKHEDKAR ALSO SAID THAT SHE COMMUNICATED WITH

12:18PM  23    MS. HOLMES ABOUT RELIABILITY ISSUES WITH THE 3 AND THE 3.5.

12:18PM  24    THEY HAD PROBLEMS GIVING CONSISTENT RESULTS.  AND THESE WERE

12:19PM  25    DISCUSSED WITH MS. HOLMES.

CLOSING ARGUMENT BY MR. SCHENK                                          9005

12:19PM   1        AGAIN, IN 2013 MS. HOLMES KNEW ABOUT PROBLEMS ON THE

12:19PM   2    3 AND THE 3.5, THE DEVICES USED FOR PATIENT TESTING.

12:19PM   3        MS. GANGAKHEDKAR WENT FURTHER AND SAID THAT SHE DIDN'T

12:19PM   4    BELIEVE THAT THERE WAS MUCH IN THE WAY OF A MARKED IMPROVEMENT

12:19PM   5    BETWEEN THE 3 AND THE 3.5.  SO LEST YOU THINK THAT THE 3.5 WAS

12:19PM   6    SOME SIGNIFICANT ADVANCEMENT OVER THE 3, EVEN BEFORE THEY GO

12:19PM   7    LIVE WITH WALGREENS, MS. GANGAKHEDKAR BELIEVES THAT BOTH OF

12:19PM   8    THEM HAVE PROBLEMS, AND SHE EXPRESSED THESE CONCERNS TO

12:19PM   9    MS. HOLMES.

12:19PM  10        IN FACT, SHE EXPRESSED CONCERNS TO MS. HOLMES, YOU SEE AT

12:19PM  11    THE BOTTOM HERE, ABOUT EVEN THE COLLECTION DEVICE, THE

12:19PM  12    NANOTAINER, THE BLOOD COLLECTION DEVICE, ALSO HAVING PROBLEMS

12:19PM  13    PRETTY MUCH EACH DAY.  IT'S NOT JUST THE DEVICE THAT TESTS THE

12:19PM  14    BLOOD BUT ALSO THE DEVICE THAT IS COLLECTING THE BLOOD.

12:19PM  15        DR. ROSENDORFF RIGHT BEFORE THE LAUNCH SAYS TO MS. HOLMES,

12:19PM  16    "I HAVE SOME MEDICAL AND OPERATIONAL CONCERNS ABOUT OUR

12:20PM  17    READINESS FOR 9/9," THE WALGREENS LAUNCH.

12:20PM  18        "I WOULD LIKE US TO BE THE BEST THAT WE CAN BE.  A FEW

12:20PM  19    MORE WEEKS TO SORT THROUGH THESE MEDICAL AND LOGISTICAL ISSUES,

12:20PM  20    AND GETTING THE PROPER LEVEL OF TRAINING AND STAFFING WOULD

12:20PM  21    HELP US TREMENDOUSLY."

12:20PM  22        EVEN BEFORE THEY LAUNCH, HER LAB DIRECTOR IS SAYING LET'S

12:20PM  23    PAUSE, LET'S WAIT.

12:20PM  24        DR. ROSENDORFF SAID THAT -- THE EMAIL THAT YOU JUST SAW

12:20PM  25    WAS IN AUGUST OF '13.  NOW WE MOVE TO THE MIDDLE OF 2014, HE'S

CLOSING ARGUMENT BY MR. SCHENK                                    9006

12:20PM 1    SAYING I HAD DISCUSSIONS ABOUT QC FAILURES WITH MS. HOLMES AT

12:20PM 2    THAT POINT ABOUT THE HIGH FAILURE RATE OF THE EDISONS.

12:20PM 3        SO IT ISN'T AS THOUGH THEY DELAYED THE LAUNCH.  THEY

12:20PM 4    LAUNCHED AROUND 9/9.  THEY LAUNCHED, AND THEY STILL HAD

12:20PM 5    QC PROBLEMS AND OTHER FAILURES WITH THE EDISON.

12:20PM 6        DR. ROSENDORFF DESCRIBED ONE PARTICULAR OCCASION TO YOU

12:20PM 7    THAT MIGHT BE MEMORABLE.  HE SAID ELIZABETH HOLMES CAME TO HIM

12:20PM 8    AND SAID HOW IT GOING?

12:21PM 9        AND DR. ROSENDORFF SAID I WAS FREAKED OUT.

12:21PM 10       AND MS. HOLMES SAYS WHY?

12:21PM 11       AND DR. ROSENDORFF TOLD HER ABOUT THE HCG ISSUE THAT HE

12:21PM 12   AND MS. HOLMES WERE DISCUSSING.

12:21PM 13       MS. HOLMES SAID DON'T BE FREAKED OUT OR -- YOU KNOW, SHE

12:21PM 14   DIDN'T SEEM ALARMED BY IT.

12:21PM 15       SHE KNEW ABOUT PROBLEMS IN THE LAB BEFORE THE LAUNCH AND

12:21PM 16   ALL THROUGH '14 AND '15.

12:21PM 17       THERE WERE EMAILS ON SPECIFIC ISSUES THAT WERE SENT TO

12:21PM 18   HER.  THIS ONE IS ABOUT A LAB SAYING THERE'S A PATIENT WHOSE

12:21PM 19   TEST CAME BACK NEGATIVE.  WE HAD HER DISCONTINUE HER CURRENT

12:21PM 20   MEDICATIONS AND BEGAN GETTING HER READY FOR HER NEXT CYCLE.

12:21PM 21       OUR CONCERN IS THAT YOUR LAB TOLD US THAT SHE HAD A

12:21PM 22   NEGATIVE PREGNANCY.  WE RELAYED THAT TO OUR PATIENT AND

12:21PM 23   CONTINUED OUR PROTOCOL AS SHE WASN'T PREGNANT.

12:21PM 24       AND MS. HOLMES IS LEFT TO SAY "HOW DID THAT HAPPEN?"

12:21PM 25       IN THIS INSTANCE AN HCG RESULT GETS FORWARDED UP.

CLOSING ARGUMENT BY MR. SCHENK

| | | |
|---|---|---|
| 12:22PM | 1 | DANIEL YOUNG SAYS THE RESULT WAS RUN ON EDISON, THAT HCG |
| 12:22PM | 2 | PATIENT FOR THE VALUE WAS HIGH ON MAY 21ST INDICATING A |
| 12:22PM | 3 | PREGNANCY, AND THEN DROPPED VERY, VERY LOW ON MAY 23RD, |
| 12:22PM | 4 | POSSIBLY INDICATING A MISCARRIAGE OR ABORTION.  SO WE WANT TO |
| 12:22PM | 5 | BE CAREFUL WITH THIS ONE. |
| 12:22PM | 6 | AND MS. HOLMES IS LEFT TO SAY I'VE DONE MANY MEETINGS ON |
| 12:22PM | 7 | THIS TODAY. |
| 12:22PM | 8 | IT WASN'T JUST HCG.  YOU'VE HEARD ABOUT ISE'S, ANOTHER |
| 12:22PM | 9 | GROUP OF ASSAYS.  SHE'S TOLD IN THIS ONE THAT THERE ARE A LOT |
| 12:22PM | 10 | OF ISSUES THAT ARE CAUSING US A LOT OF PAIN NOW WITH REGARD TO |
| 12:22PM | 11 | THE ISE. |
| 12:22PM | 12 | IN THIS INSTANCE THE LIST OF ASSAYS WITH PROBLEMS IS |
| 12:22PM | 13 | COMMUNICATED JUST TO MR. BALWANI.  THIS PARTICULAR LIST DOESN'T |
| 12:22PM | 14 | GO TO MS. HOLMES.  THIS ONE IS PT INR, HCG, TESTOSTERONE, |
| 12:22PM | 15 | VITAMIN B12, OTHERS.  BUT YOU'VE SEEN INSTANCES WHERE |
| 12:22PM | 16 | MR. BALWANI IS COMMUNICATING PROBLEMS IN THE LAB TO MS. HOLMES, |
| 12:23PM | 17 | AND YOU CAN SEE FROM THE KIND OF INFORMATION THAT MR. BALWANI |
| 12:23PM | 18 | GETS THE SORT OF BASKET OF INFORMATION HE IS DRAWING UPON WHEN |
| 12:23PM | 19 | HE COMMUNICATES INFORMATION TO MS. HOLMES.  THE KINDS OF |
| 12:23PM | 20 | PROBLEMS IN THE LAB THAT SHE WOULD HEAR ABOUT FROM MR. BALWANI |
| 12:23PM | 21 | WOULD COME FROM SOURCES LIKE THIS WE CAN TRACE BACK WHERE |
| 12:23PM | 22 | MR. BALWANI LEARNED AND FOUND OUT ABOUT PROBLEMS. |
| 12:23PM | 23 | IN THIS INSTANCE THEY'RE TALKING ABOUT VOIDED C02 RESULTS. |
| 12:23PM | 24 | DR. ROSENDORFF SAYS, "I AM THINKING THAT SINCE WE VOID ALL |
| 12:23PM | 25 | ABNORMAL BICARBONATE RESULTS, THE TEST HAS LOST ANY DIAGNOSTIC |

CLOSING ARGUMENT BY MR. SCHENK

12:23PM 1    VALUE, AND PROBABLY ALSO RELIABILITY WHEN RESULTS ARE REPORTED

12:23PM 2    IN THE NORMAL RANGE.  FOR INSTANCE THE CORRECT BICARB VALUE IN

12:23PM 3    THE PATIENT MAY IN FACT BE HIGH, AND DUE TO OUTGASSING, THE

12:23PM 4    BICARB MIGHT NORMALIZE, AND WE WOULD BE REPORTING A FALSELY

12:23PM 5    NORMAL BICARB WHEN IN FACT IT SHOULD BE HIGH.

12:23PM 6        "PROBABLY SHOULD DISCONTINUE THIS METHOD UNTIL WE HAVE

12:24PM 7    WORKED IT OUT BETTER."

12:24PM 8        MR. BALWANI FORWARDS THIS EMAIL TO ELIZABETH HOLMES.  THE

12:24PM 9    PROBLEMS ARE NOT LIMITED TO ONE ASSAY, AND THE PROBLEMS ARE NOT

12:24PM 10   HIDDEN FROM MS. HOLMES.

12:24PM 11       IN THIS INSTANCE THEY ARE TALKING ABOUT AN ISSUE WITH

12:24PM 12   PT INR, AND MR. BALWANI IS LEFT SAYING TO MS. HOLMES, "ALWAYS

12:24PM 13   ANOTHER STUDY AFTER THE FACT."

12:24PM 14       THEY CAN'T STOP THE PROBLEMS ON THE FRONT END.  THEY

12:24PM 15   DISCOVERY THE PROBLEMS WHEN THE TESTS GO OUT, AND THEN THEY'RE

12:24PM 16   LEFT DOING THE STUDIES AFTER THE FACT.

12:24PM 17       IN THIS CASE DR. ROSENDORFF SAYS "I EXPECT OUR HDL ASSAY

12:24PM 18   HAS FAILED AND I DO NOT WANT TO REPORT OUT THIS RESULT UNTIL WE

12:24PM 19   FIX IT."

12:24PM 20       IN THIS EMAIL THAT IS SENT TO MS. HOLMES, DANIEL YOUNG

12:24PM 21   TALKS ABOUT HOW THE HDL QC DATA HAS BEEN RUNNING CONSISTENTLY

12:25PM 22   LOW, ROUGHLY 10 PERCENT.  THESE QC DATA SHOULD HAVE RAISED AN

12:25PM 23   ALARM FLAG SEVERAL WEEKS AGO.  THE QC RESULTS SEEM SIMILAR FOR

12:25PM 24   BOTH THE DEFAULT SIEMENS PROTOCOL, AS WELL AS FOR THE THERANOS

12:25PM 25   DILUTED PROTOCOL.

CLOSING ARGUMENT BY MR. SCHENK                                        9009

```
12:25PM   1        IN THIS INSTANCE MS. HOLMES IS INFORMED ABOUT PROBLEMS

12:25PM   2   WITH THE HDL TESTING.  DR. ROSENDORFF WANTS TO DISCONTINUE HDL

12:25PM   3   TESTING.

12:25PM   4        MR. BALWANI RESPONDS, WE CAN'T NOT -- I THINK IT MIGHT BE

12:25PM   5   WE CANNOT REVERT BACK TO VENIPUNCTURE FOR HDL.  WHICH WAY ARE

12:25PM   6   THEY GOING TO DO THE TESTING?  THEY'RE DISCOURAGING USING THE

12:25PM   7   TRADITIONAL METHOD, THE VEIN DRAW.

12:25PM   8        IN THIS INSTANCE THEY'RE SEEING MORE PROBLEMS WITH THE

12:25PM   9   ISE'S AND THE NEED FOR RERUNS.  THERE'S A DISCUSSION HERE ABOUT

12:25PM  10   IMPLEMENTING A BIAS CORRECTION TO HELP FIX IT.

12:25PM  11        AND MS. HOLMES WRITES, "I'LL TAKE A LOOK.  IF THE BIAS

12:25PM  12   CORRECTION IS ROBUST, WE SHOULD IMPLEMENT IT."

12:26PM  13        NOT ONLY IS SHE NOT HANDS OFF IN THE LAB, YOU HAVE HEARD

12:26PM  14   THAT SHE WAS INVOLVED IN THE R&D SIDE AND YOU'VE NOW SEEN

12:26PM  15   EMAILS EARLIER THIS MORNING AND NOW WHERE THERE'S INVOLVED IN

12:26PM  16   THE CLIA SIDE WHERE SHE KNOWS THAT THERE ARE PROBLEMS AND SHE'S

12:26PM  17   WEIGHING IN ON HOW THEY'RE GOING TO FIX THOSE PROBLEMS.

12:26PM  18        IN THIS INSTANCE DR. ROSENDORFF IS RAISING A CONCERN ABOUT

12:26PM  19   THE POTASSIUM ASSAY THAT WAS OPTIMIZED ON MAY 24TH.  HE SENDS

12:26PM  20   THIS EMAIL A MONTH LATER, JUNE 25TH, "TOO MANY POTASSIUMS ARE

12:26PM  21   FLAGGING HIGH, TOO FEW ARE FLAGGING LOW, OUR TEST IS CURRENTLY

12:26PM  22   NOT CAPABLE OF DIFFERENTIATING TRUE CRITICAL POTASSIUM."

12:26PM  23        AND THIS IS FORWARDED TO MS. HOLMES.

12:26PM  24        IN THIS INSTANCE MS. HOLMES IS ASKING MEMBERS OF HER

12:26PM  25   EMPLOYEES AT THERANOS ABOUT THIS PARTICULAR PROBLEM WITH AN INR
```

CLOSING ARGUMENT BY MR. SCHENK                                    9010

12:27PM   1    TEST WHERE SOMEBODY GETS A RESULT AT THERANOS AND IMMEDIATELY

12:27PM   2    GOES TO LABCORP AND GETS A DIFFERENT RESULT.  AND MR. FOSQUE IS

12:27PM   3    SAYING HE'LL WORK WITH ELIZABETH HOLMES ON SCRIPTING.

12:27PM   4        SO SHE WAS INVOLVED IN MAKING DECISIONS ABOUT THE BIAS

12:27PM   5    CORRECTION AND WHETHER THAT SHOULD BE IMPLEMENTED AND ALSO ON

12:27PM   6    THE BACK END WHEN A PHYSICIAN HAS A CONCERN ABOUT WHETHER A

12:27PM   7    RESULT IS PROBLEMATIC, WHAT THERANOS WAS GOING TO COMMUNICATE

12:27PM   8    TO THAT PHYSICIAN.  ELIZABETH HOLMES IS INVOLVED IN THAT

12:27PM   9    SCRIPTING AS WELL.

12:27PM  10        THE SECOND ELEMENT FOR THE WIRE FRAUD FOR PATIENTS IS

12:27PM  11    MATERIALITY, THAT IS, THAT THE FALSE STATEMENTS WERE CAPABLE OF

12:27PM  12    INFLUENCING A DECISION TO SPEND MONEY, TO BUY A TEST.

12:27PM  13        YOU DON'T NEED ACTUAL RELIANCE IN THIS INSTANCE, JUST THAT

12:27PM  14    THEY WERE THE KIND OF STATEMENTS THAT WOULD BE CAPABLE OF

12:27PM  15    INFLUENCING.

12:27PM  16        MS. TOMPKINS TOLD YOU THAT SHE WENT TO THERANOS.  SHE

12:27PM  17    COUNTS ON A LAB'S ABILITY TO RETURN ACCURATE RESULTS, RELIABLE

12:27PM  18    RESULTS.

12:27PM  19        AGAIN, I APPRECIATE IT'S OBVIOUS THAT PATIENTS WOULD SAY I

12:28PM  20    ASSUMED I WOULD GET AN ACCURATE RESULT IF I HAD MY BLOOD TESTED

12:28PM  21    HERE AND THIS IS THE MATERIALITY CONCEPT.

12:28PM  22        DR. ELLSWORTH, THE SAME THING, HE SAID HE EXPECTED THE

12:28PM  23    RESULTS THAT HE RECEIVED FROM TESTS AT THERANOS TO BE ACCURATE

12:28PM  24    AND ACCURACY WITH LAB RESULTS OBVIOUSLY IS IMPORTANT.

12:28PM  25        BRITTANY GOULD ALSO TALKED ABOUT SORT OF WHAT SHE SAW IN

CLOSING ARGUMENT BY MR. SCHENK                                    9011

12:28PM  1    MARKETING MATERIALS FOR THERANOS, WHY THOSE -- THAT INFORMATION

12:28PM  2    WAS IMPORTANT TO HER AND AFFECTED HER DECISION TO GO GET

12:28PM  3    TESTING AT THERANOS, THINGS LIKE ACCURACY.

12:28PM  4         THE NEXT AND THE THIRD ELEMENT IS AN INTENT TO DEFRAUD,

12:28PM  5    THAT THE FALSE STATEMENTS, THAT THE KNOWINGLY FALSE STATEMENTS

12:28PM  6    WERE COMMUNICATED WITH THE INTENT TO DEFRAUD.

12:28PM  7         MUCH OF THE EVIDENCE WE LOOKED AT HERE APPLIES HERE.  WE

12:28PM  8    SEE INSTANCES WHERE MS. HOLMES KNOWS THAT THERE ARE PROBLEMS IN

12:28PM  9    THE LAB WITH REGARD TO GENERATING ACCURATE AND RELIABLE TESTS,

12:28PM 10    AND YET THE COMMUNICATION CONTINUES.  INDIVIDUALS, PATIENTS ARE

12:29PM 11    STILL LED TO BELIEVE THAT THERANOS CAN TEST BLOOD ACCURATELY

12:29PM 12    AND RELIABLY.

12:29PM 13         SHE'S TOLD IN THIS INSTANCE IN 2014 BY MR. BALWANI ABOUT

12:29PM 14    PROBLEMS WITH THE COLLECTION DEVICE, THAT THAT'S THE ROOT CAUSE

12:29PM 15    OF ISSUES.

12:29PM 16         THE EXPLETIVE TEXT ALSO IS IMPORTANT IN THIS IDEA AND THIS

12:29PM 17    CONCEPT.  SHE KNOWS THERE ARE PROBLEMS AND PATIENTS CONTINUE TO

12:29PM 18    GO TO THERANOS.

12:29PM 19         SHE'S TOLD THAT THEIR VALIDATION REPORTS ARE TERRIBLE.

12:29PM 20         DR. ROSENDORFF TOLD YOU ABOUT AN INSTANCE WHEN HE WENT

12:29PM 21    INTO HER OFFICE AND SHE HAD TAPED TO THE WALL NUMBERS SORT OF

12:29PM 22    COUNTING DOWN THE DATES UNTIL THE LAUNCH.

12:29PM 23         AND THEN HE SAYS I TOLD HER THAT THE POTASSIUM WAS

12:29PM 24    UNRELIABLE, THE SODIUM WAS UNRELIABLE, THE GLUCOSE WAS

12:29PM 25    UNRELIABLE.

12:29PM  1        EXPLAIN WHY.

12:29PM  2        SHE WAS VERY NERVOUS.  SHE WAS NOT HER USUAL COMPOSED

12:30PM  3   SELF.  SHE WAS TREMBLING A LITTLE BIT.  HER KNEE WAS TAPPING.

12:30PM  4   HER VOICE WAS BREAKING UP.  SHE WAS CLEARLY UPSET.  SHE DIDN'T

12:30PM  5   SEEM SURPRISED TO ME.  SHE JUST SEEMED NERVOUS AND UPSET BEFORE

12:30PM  6   THE LAUNCH.

12:30PM  7        SUREKHA GANGADKHEDKAR TOLD YOU THAT SHE RAISED CONCERNS

12:30PM  8   ALSO BEFORE THE LAUNCH ABOUT THE 3 SERIES GIVING -- HAVING

12:30PM  9   PROBLEMS, EVEN IN THOSE LAST FEW DAYS BEFORE THE LAUNCH, AND

12:30PM 10   THAT MS. HOLMES'S RESPONSE WAS THAT SHE HAD MADE A PROMISE TO

12:30PM 11   DELIVER TO THE CUSTOMER, AND SHE DIDN'T HAVE MUCH CHOICE BUT TO

12:30PM 12   GO AHEAD WITH THE LAUNCH.

12:30PM 13        DR. ROSENDORFF BEFORE THE LAUNCH SAYS LET'S DELAY IT.  I

12:30PM 14   HAVE MEDICAL AND OPERATIONAL CONCERNS FOR OUR READINESS FOR

12:30PM 15   9/9, AND HE SENT THIS BEFORE THE LAUNCH.

12:30PM 16        IN 2014 MS. HOLMES'S BROTHER WRITES HER THIS EMAIL:

12:30PM 17   "HEY -- WANTED TO HAVE JUST A MORE CANDID CONVERSATION ABOUT

12:31PM 18   THIS WITH YOU.  I AM ALWAYS CONFIDENT IN OUR TECHNOLOGY, BUT

12:31PM 19   IT'S PRETTY OBVIOUS THAT WE HAVE ISSUES WITH CALCIUM,

12:31PM 20   POTASSIUM, AND SODIUM SPECIFICALLY.

12:31PM 21        "I'M 1,000 PERCENT CONFIDENT THIS IS AN EASILY SOLVABLE

12:31PM 22   ISSUE AND ONE THAT WE WILL FIX, BUT JUST MORE A QUESTION AROUND

12:31PM 23   THE COST/BENEFIT OF CONTINUING TO SEND THESE RESULTS TO DOCS

12:31PM 24   WHEN THERE SEEM TO BE ISSUES WITH THEIR ACCURACY.

12:31PM 25        "I AM ALSO BRINGING THIS UP BECAUSE I HAVEN'T HEARD ANY

9013

CLOSING ARGUMENT BY MR. SCHENK

12:31PM 1    REASON OR ROOT CAUSE FOR WHY THESE TESTS ARE OFF.  I JUST GET A

12:31PM 2    RESPONSE FROM DANIEL THAT WE 'ARE AWARE OF THE ISSUES AND ARE

12:31PM 3    CONDUCTING A STUDY.'  LEAVES ME A BIT HANDS TIED WITH THE

12:31PM 4    DOCS -- OBVIOUSLY I CAN'T TELL THEM WE ARE WRONG, BUT THEY

12:31PM 5    CONTINUE TO SEND PATIENTS TO QUEST AFTER WE REPORT HIGH, AND

12:31PM 6    THE PATIENTS RESULTS COME BACK NORMAL."

12:31PM 7        SHE HEARD IT NOT FROM MR. BALWANI, BUT SHE HEARD IT FROM

12:32PM 8    HER BROTHER WHO ASKED TO HAVE A CANDID CONVERSATION ABOUT THE

12:32PM 9    ACCURACY PROBLEMS OF THEIR TESTING IN 2014.

12:32PM 10        DR. ROSENDORFF SAID THAT HE HAD CONCERNS ABOUT WHETHER THE

12:32PM 11   PARTICULAR MESSAGE HERE, THE SCRIPTING, WAS ACCURATE; THAT WHAT

12:32PM 12   WAS APPROVED TO SAY WAS IN THE SHORT TERM DON'T PUT ANY COMMENT

12:32PM 13   OR NOTE ON THE RESULT IF C02 VALUES ARE VOIDED.  BUT IF DOCTORS

12:32PM 14   CALL, YOU SHOULD SAY THE SCRIPT, AND THE SCRIPT IS C02 RESULTS

12:32PM 15   WERE NOT REPORTED DUE TO TEMPORARY UNAVAILABILITY OF THIS TEST

12:32PM 16   FOR THIS SAMPLE.  WE ARE GROWING AS FAST AS WE CAN AND ARE

12:32PM 17   WORKING TO ENSURE THIS DOES NOT HAPPEN GOING FORWARD.  WE

12:32PM 18   APOLOGIZE FOR THE TEMPORARY INCONVENIENCE.

12:32PM 19        DR. ROSENDORFF TOLD YOU I DIDN'T THINK THAT SCRIPTING WAS

12:32PM 20   ACCURATE BECAUSE HE FIRMLY BELIEVED THAT THIS WOULD BE A

12:32PM 21   PERMANENT PROBLEM, THAT THIS WAS NOT A TEMPORARY PROBLEM, AND

12:33PM 22   HE DID NOT THINK THAT THIS SCRIPTING APPROVED BY MS. HOLMES WAS

12:33PM 23   APPROPRIATE.

12:33PM 24        THERE'S A QUESTION HERE.  THIS IS ACTUALLY A VIP VISIT

12:33PM 25   WHERE THEY WERE NOT ABLE TO GENERATE RESULTS, AND THERE'S A

UNITED STATES COURT REPORTERS

12:33PM   1    DISCUSSION ABOUT WHY THAT WAS, WHY THEY WEREN'T ABLE TO

12:33PM   2    GENERATE RESULTS.

12:33PM   3        AND MS. HOLMES IS TOLD HERE BY CHRISTIAN HOLMES THE ROOT

12:33PM   4    CAUSE FROM TINA, THE CONTAMINATION OF THE CTN IS NOT DUE TO ANY

12:33PM   5    HUMAN ERROR.

12:33PM   6        MS. HOLMES RESPONDS, YOU CAN SAY WE DO RUN THOSE ASSAYS,

12:33PM   7    BUT WE'RE NOT ABLE TO RUN THEM ON THIS SAMPLE, APPARENTLY DUE

12:33PM   8    TO HUMAN ERROR IN SAMPLE HANDLING.

12:33PM   9        SHE'S SPECIFICALLY TOLD THAT THE ISSUE WAS NOT HUMAN ERROR

12:33PM  10    AND THEN SHE SPECIFICALLY SAYS TO SAY IT WAS.

12:33PM  11        IN THIS EXCHANGE DR. ROSENDORFF IS TELLING HOLMES AND

12:33PM  12    BALWANI, WE ARE STILL VOIDING CRITICAL ISE RESULTS AND ASKING

12:34PM  13    FOR REDRAW.  THIS MEANS WE WOULD MISS A TRULY CRITICAL ISE

12:34PM  14    RESULT.  BY THE SAME TOKEN, IT CALLS INTO QUESTION THE ACCURACY

12:34PM  15    OF EVEN THE NORMAL ISE RESULTS.

12:34PM  16        ARE YOU BOTH COMFORTABLE WITH THIS?

12:34PM  17        AND MR. BALWANI WRITES TO MS. HOLMES, "WE NEED TO RESPOND

12:34PM  18    TO HIM NOW AND CUT HIM MONDAY."

12:34PM  19        THEY'RE GOING TO GET RID OF THE LAB DIRECTOR WHO ACTUALLY

12:34PM  20    RAISES QUESTIONS, WHO HAS CONCERNS, WHO PUSHES FOR PT TESTING.

12:34PM  21    AND WHO DO THEY REPLACE HIM WITH?  THEY REPLACE HIM WITH

12:34PM  22    MR. BALWANI'S DERMATOLOGIST, WHO WORKS FIVE HOURS OVER THE

12:34PM  23    COURSE OF SEVEN MONTHS, AND DR. SAWYER WHO WORKS EVEN LESS.

12:34PM  24        DR. DHAWAN DURING CROSS, THE CROSS-EXAMINATION OF

12:34PM  25    DR. DHAWAN -- YOU MAY RECALL THIS LINE OF QUESTIONING --

CLOSING ARGUMENT BY MR. SCHENK                                        9015

12:34PM  1    MR. WADE WAS ASKING DR. DHAWAN IF HE EVER MET SOMEONE OR IF HE

12:34PM  2    KNEW SOMEONE NAMED DR. SAWYER.

12:34PM  3        "YOU NEVER MET HER, SO IT MAY HAVE BEEN SHE WAS DOING

12:35PM  4    SEPARATE FUNCTIONS FROM THE FUNCTIONS YOU PERFORMED AT

12:35PM  5    THERANOS; IS THAT FAIR?"

12:35PM  6        AND THEN THE DISCUSSION CONTINUES SUGGESTING TO DR. DHAWAN

12:35PM  7    THAT HE DIDN'T WORK THAT MUCH AT THERANOS, BUT THERE WAS A

12:35PM  8    CO-LAB DIRECTOR, DR. SAWYER, AND YOU DON'T KNOW, DR. DHAWAN,

12:35PM  9    WHETHER SHE WAS THE ONE WHO WAS MINDING THE STORE WHILE YOU

12:35PM 10    WEREN'T?

12:35PM 11        THEN DR. SAWYER CAME AND TESTIFIED AND SHE TOLD YOU, IF

12:35PM 12    YOU CAN BELIEVE IT, I DID LESS.  SHE NEVER WENT TO THE LAB, SHE

12:35PM 13    DIDN'T SEE THE THERANOS DEVICE, SHE NEVER SPOKE TO A PATIENT,

12:35PM 14    SHE NEVER SPOKE TO A DOCTOR.  SHE WAS NEVER ASKED ABOUT

12:35PM 15    CRITICAL VALUES.

12:35PM 16        IF IT'S POSSIBLE, SHE WAS LESS INVOLVED THAN DR. DHAWAN.

12:35PM 17        THERE ARE OTHER EXAMPLES.  THERE ARE EMAILS WHERE

12:35PM 18    MS. HOLMES IS INCLUDED ON THE EMAIL AND ISSUES WITH CERTAIN

12:35PM 19    ASSAYS WERE SENT TO HER.  A GROUP INVOLVING THE HCG ASSAYS, A

12:36PM 20    GROUP INVOLVING THE ISE ASSAYS, PT INR, HDL, POTASSIUM, AND

12:36PM 21    BICARB.  THERE ARE MORE EMAILS THAT TALK ABOUT THIS.

12:36PM 22        THE NEXT IS THE INTERSTATE NEXUS, THAT THE WIRES THAT ARE

12:36PM 23    THE SUBJECT OF THESE COUNTS CROSSED STATE LINES.

12:36PM 24        THIS IS THE LAB REPORT THAT WENT TO MS. TOMPKINS, THE HIV

12:36PM 25    TESTING.  AND YOU SEE THE FAX WENT FROM THERANOS, THE 650, TO

CLOSING ARGUMENT BY MR. SCHENK

12:36PM   1    ACTUALLY DR. ASIN, THE PHYSICIAN FOR ERIN TOMPKINS, HIS OFFICE

12:36PM   2    IN ARIZONA ON INTERSTATE WIRE.

12:36PM   3        DR. ELLSWORTH, THE SAME THING.  HIS REPORT WENT FROM

12:36PM   4    THERANOS TO DR. ELLSWORTH'S PHYSICIAN, DR. BURNES.  DR. BURNES

12:36PM   5    HAD AN OFFICE IN ARIZONA.  AND, IN FACT, YOU HAVE AN EMAIL

12:36PM   6    WHERE IT TELLS YOU THE SPECIFIC DEVICE THAT DR. ELLSWORTH'S

12:36PM   7    TEST WAS RUN ON.  YOU KNOW FROM THIS EMAIL THAT THE PSA TEST

12:36PM   8    WAS RUN ON A THERANOS EDISON DEVICE FROM EXHIBIT 4415.

12:37PM   9        AND THEN DR. BURNES DURING HIS TESTIMONY TOLD YOU WHERE

12:37PM  10    HIS OFFICE WAS LOCATED AND THAT HE WOULD HAVE LAB RESULTS FAXED

12:37PM  11    TO HIS OFFICE, TO COMPLETE THE CIRCLE OF THAT INTERSTATE WIRE.

12:37PM  12        THE LAST COUNT INVOLVES THE PURCHASE OF AD TIME IN

12:37PM  13    ARIZONA.

12:37PM  14        MR. AMENTA ALSO PROVIDED TESTIMONY TO YOU ON THIS SUBJECT,

12:37PM  15    THAT THE WIRE -- IT WAS CALLED HORIZON MEDIA -- THAT THERANOS

12:37PM  16    SENT ABOUT A MILLION DOLLARS TO, THAT THAT USED FEDWIRE AND

12:37PM  17    CROSSED STATE LINES AS WELL.

12:37PM  18        AND THEN MS. YAM CAME BACK AND TESTIFIED AT THE END OF THE

12:37PM  19    GOVERNMENT'S CASE AND TALKED ABOUT THIS EMAIL, 5454, WHERE THIS

12:37PM  20    PARTICULAR WIRE WAS FOR THE PHOENIX MEDIA PLAN.  AND THEN IT

12:37PM  21    TALKED ABOUT WHAT SOME OF THE FUNDS WERE USED FOR:  CINEMA, IT

12:37PM  22    TALKS ABOUT OUTDOOR, STATIC, AND DIGITAL, AND "PEOPLE" MAGAZINE

12:38PM  23    AND COVER WRAP, AND THEN ARIZONA REPUBLIC.

12:38PM  24        I WANT TO TAKE A BREAK, AS I TOLD YOU, FROM THE SLIDES AND

12:38PM  25    COVER A FEW ADDITIONAL TOPICS, AND THEN WE'LL RETURN TO THE

CLOSING ARGUMENT BY MR. SCHENK                                    9017

12:38PM   1    SLIDES VERY BRIEFLY AT THE END.

12:38PM   2         THE DEFENSE HAS MADE SOME COMMENTS TO YOU DURING THE

12:38PM   3    COURSE OF THE TRIAL THAT I WANT TO SPEND A MOMENT DISCUSSING.

12:38PM   4         NO, THEY DON'T HAVE TO SPEAK.  THE DEFENSE DOESN'T HAVE

12:38PM   5    TO GIVE AN OPENING.  THEY DON'T HAVE TO CROSS-EXAMINE ANY

12:38PM   6    WITNESSES OR CALL ANY WITNESSES ON THEIR OWN.

12:38PM   7         THE BURDEN IS ON THE GOVERNMENT.  THAT NEVER CHANGES.

12:38PM   8         THE DEFENSE HAS MADE SOME ARGUMENTS, AND I WANT TO RESPOND

12:38PM   9    TO A COUPLE OF THEM.

12:38PM  10         THE FIRST ARGUMENT THAT YOU'VE HEARD IS THAT BUSINESS

12:38PM  11    FAILURE IS NOT FRAUD.  BUSINESSES FAIL AND THAT DOESN'T PROVE

12:38PM  12    THAT FRAUD HAPPENED.

12:38PM  13         TO THE EXTENT THAT YOU MIGHT BE DISAPPOINTED IN SOME OF

12:38PM  14    THE ACTIONS THAT OCCURRED AT THERANOS, YOU SHOULD ATTRIBUTE IT

12:38PM  15    TO MS. HOLMES'S INEXPERIENCE.

12:38PM  16         FIRST, IT IS CERTAINLY TRUE THAT BUSINESSES FAIL, AND THAT

12:38PM  17    IS NOT PROOF OF FRAUD.  THE GOVERNMENT HAS NO QUARREL WITH THAT

12:38PM  18    IDEA.  JUST BECAUSE IT'S A TRUE STATEMENT DOESN'T MEAN IT

12:39PM  19    APPLIES TO THIS CASE.

12:39PM  20         I STARTED THIS MORNING BY TELLING YOU THAT THERE WERE

12:39PM  21    INSTANCES WHEN THERANOS WAS RUNNING OUT OF MONEY, WHEN THEY

12:39PM  22    WERE ON THE PHONE WITH BANKERS ABOUT CLEARING CHECKS EARLY.

12:39PM  23         IF MS. HOLMES HAD JUST ALLOWED THERANOS TO FAIL, IF SHE

12:39PM  24    HAD NOT CHOSEN TO GO DOWN THE PATH OF FRAUD, THEN I THINK THAT

12:39PM  25    STATEMENT WOULD APPLY THAT BUSINESSES FAIL AND THAT DOESN'T

CLOSING ARGUMENT BY MR. SCHENK

```
12:39PM  1     MEAN THAT THERE IS FRAUD.  THAT'S NOT PROOF OF FRAUD BY ITSELF.

12:39PM  2          BUT WHAT HAPPENED HERE IS SORT OF WHEN FACED WITH THE

12:39PM  3     POTENTIAL OF BUSINESS FAILURE, MS. HOLMES CHOSE A DIFFERENT

12:39PM  4     PATH, AND THAT'S WHERE THE FRAUD COMES IN.

12:39PM  5          THE DEFENSE ALSO, I THINK, WOULD LIKE TO FREEZE TIME, HAVE

12:39PM  6     YOU THINK OF MS. HOLMES AS THE 19-YEAR-OLD-COLLEGE DROPOUT THAT

12:39PM  7     STARTED THERANOS THE ENTIRE TIME SHE WAS AT THERANOS.

12:39PM  8          BUT THE TRUTH IS BY THE TIME THE INVESTORS WHO INVESTED IN

12:39PM  9     2013 OR 2014 WERE INTERACTING WITH HER, SHE WAS NEARLY 30 AND

12:39PM 10     HAD BEEN CEO FOR A DECADE AT THAT POINT.  THEY WERE NOT

12:40PM 11     INTERACTING WITH SOMEONE WHO HAD INEXPERIENCE RUNNING HER

12:40PM 12     COMPANY.

12:40PM 13          THERANOS DIDN'T NEED MORE EXPERIENCE TO AVOID FRAUD HERE.

12:40PM 14     THEY DIDN'T NEED ONE MORE M.D. OR ONE MORE PH.D. TO AVOID THE

12:40PM 15     FRAUD.  IT WASN'T A QUESTION OF EXPERIENCE.  THEY NEEDED A CEO

12:40PM 16     AND A COO WHO INTERACTED WITH PEOPLE HONESTLY, WHO TOLD THEM

12:40PM 17     THE TRUTH ABOUT WHAT THERANOS COULD AND WHAT IT COULDN'T DO.

12:40PM 18     IT WASN'T A QUESTION OF EXPERIENCE OR A LACK OF PH.D.'S OR

12:40PM 19     M.D.'S AT THERANOS.

12:40PM 20          THE DEFENSE HAS ARGUED TO YOU THAT ELIZABETH HOLMES NEVER

12:40PM 21     SOLD HER STOCK.  I THINK FROM THAT THEY WOULD SUGGEST THAT IF

12:40PM 22     THIS WAS A FRAUD AND IF SHE KNEW IT WAS A FRAUD, THEN WHY

12:40PM 23     DIDN'T SHE SELL STOCK?  AND I'M NOT SURE WHAT THE NEXT ACTION

12:40PM 24     AFTER THAT IS, SELL STOCK AND -- THE EVIDENCE IS STILL THERE.

12:40PM 25     SO EVEN IF SHE HAD SOLD HER STOCK, THE EVIDENCE THAT YOU HAVE
```

CLOSING ARGUMENT BY MR. SCHENK                                    9019

12:40PM  1    HEARD ABOUT IN THE CASE IS HERE.

12:40PM  2         THERE ARE AS MANY DIFFERENT REACTIONS TO FRAUD AS THERE

12:40PM  3    ARE FRAUDSTERS.  BECAUSE SHE DIDN'T PICK A PARTICULAR RESPONSE

12:41PM  4    WHEN FACED WITH FRAUD I DON'T THINK SUGGESTS THAT FRAUD DID NOT

12:41PM  5    HAPPEN HERE.

12:41PM  6         BUT DAN MOSLEY ALSO PROVIDED YOU SOME INSIGHT INTO THIS

12:41PM  7    PARTICULAR QUESTION.  RECALL DAN MOSLEY TOLD YOU THAT THERE

12:41PM  8    WERE DIFFERENT KINDS OF STOCK, THERE WAS COMMON AND THERE WAS

12:41PM  9    PREFERRED.

12:41PM 10         MR. MOSLEY TOLD YOU THAT INVESTORS LIKE HIMSELF BOUGHT

12:41PM 11    PREFERRED SHARES.  AND THAT MEANT THAT IF THERE WAS A

12:41PM 12    BANKRUPTCY OR LIQUIDATION EVENT OF SOME KIND, THE PREFERRED

12:41PM 13    SHAREHOLDERS GOT TO GO TO THE FRONT OF THE LINE TO RECOVER

12:41PM 14    ASSETS.

12:41PM 15         AND HE TOLD THAT YOU MS. HOLMES DID NOT HAVE THAT KIND OF

12:41PM 16    STOCK.  SHE HAD COMMON STOCK.  AND WHAT SHE GAVE UP IN THOSE

12:41PM 17    PREFERENCE RIGHTS, SHE GAINED IN VOTING RIGHTS.

12:41PM 18         THE COMMON STOCK HAD 100 VOTES FOR EVERY SHARE.  THE

12:41PM 19    PREFERRED HAD ONE VOTE FOR EVERY SHARE.

12:41PM 20         SO IF MS. HOLMES SOLD HER STOCK, SHE WASN'T JUST SELLING

12:41PM 21    IT FOR MONEY, SHE WAS SELLING ACCESS TO INFORMATION.

12:41PM 22         AND WHEN THERANOS WAS A HOUSE OF CARDS, WHEN IT WAS FRAUD,

12:42PM 23    SHE COULD NOT GIVE SOMEONE ELSE THE POWER THAT CAME WITH THOSE

12:42PM 24    VOTING RIGHTS, THE POWER TO ASK QUESTIONS TO GET REAL ANSWERS.

12:42PM 25    MS. HOLMES COULDN'T SELL HER STOCK.

CLOSING ARGUMENT BY MR. SCHENK                                   9020

| | |
|---|---|
| 12:42PM | 1 |   THE DEFENSE HAS ARGUED TO YOU AND MADE THIS ARGUMENT IN
| 12:42PM | 2 | OPENING THAT THE GOVERNMENT WAS LOOKING AT THE CASE THROUGH A
| 12:42PM | 3 | DIRTY LENS; THAT JUST WAIT AND YOU'LL SEE THE EVIDENCE IN THE
| 12:42PM | 4 | CASE, AND YOU'LL SEE THAT THERE'S A LOT OF JUST INNOCENT
| 12:42PM | 5 | EVENTS; AND ONLY WHEN YOU PUT ON THE GOVERNMENT'S LENS AND LOOK
| 12:42PM | 6 | THROUGH THE GOVERNMENT'S EYES WILL YOU SEE SOME NEFARIOUS
| 12:42PM | 7 | INTENT OR BAD CONDUCT.
| 12:42PM | 8 |   HERE THAT ARGUMENT -- IT MIGHT WORK IN A CASE WHERE
| 12:42PM | 9 | WITNESS AFTER WITNESS IS A GOVERNMENT EMPLOYEE, LAW ENFORCEMENT
| 12:42PM | 10 | OR A GOVERNMENT REGULATOR WHO IS DESCRIBING FACTS TO YOU AND
| 12:42PM | 11 | WANTS YOU TO APPRECIATE THOSE FACTS THROUGH THEIR EYES.
| 12:42PM | 12 |   BUT THINK FOR A MOMENT ABOUT THE WITNESSES THAT TESTIFIED
| 12:42PM | 13 | IN THIS CASE.  YOU HEARD FROM FORMER EMPLOYEES THAT
| 12:42PM | 14 | ELIZABETH HOLMES HIRED.  YOU HEARD FROM INVESTORS THAT
| 12:43PM | 15 | ELIZABETH HOLMES RECRUITED.  YOU HEARD FROM PATIENTS THAT
| 12:43PM | 16 | ELIZABETH HOLMES ADVERTISED TO.  YOU HEARD FROM STRATEGIC
| 12:43PM | 17 | PARTNERS, THE WALGREENS AND SAFEWAYS OF THE WORLD THAT
| 12:43PM | 18 | ELIZABETH HOLMES NEGOTIATED WITH.
| 12:43PM | 19 |   YOU'RE NOT BEING ASKED TO LOOK AT THE FACTS OF THIS CASE
| 12:43PM | 20 | THROUGH THE GOVERNMENT'S EYES, THROUGH THE LENS THAT THE
| 12:43PM | 21 | GOVERNMENT PUTS ON.
| 12:43PM | 22 |   YOU'RE BEING ASKED TO HEAR AND EVALUATE THE TESTIMONY OF
| 12:43PM | 23 | WITNESSES THAT AT LEAST AT ONE POINT IN TIME THE DEFENDANT
| 12:43PM | 24 | HERSELF SELECTED.
| 12:43PM | 25 |   I WANT TO SAY A FEW WORDS ABOUT THE WITNESSES THAT THE

CLOSING ARGUMENT BY MR. SCHENK                                    9021

12:43PM   1      DEFENSE CALLED.  THEY CALLED THREE WITNESSES.

12:43PM   2          THE FIRST WITNESS WAS TRENT MIDDLETON.  YOU MAY RECALL

12:43PM   3      THAT MR. MIDDLETON WORKS FOR THE LAW FIRM THAT IS REPRESENTING

12:43PM   4      THE DEFENDANT HERE IN COURT.  AND HE TESTIFIED ABOUT SOME

12:43PM   5      SUMMARY CHARTS THAT HE HAD CREATED, AND HE TOLD YOU THAT THE

12:43PM   6      DATA FOR THE CHARTS WAS GATHERED, BUT I DON'T KNOW THAT HE KNEW

12:43PM   7      WHO GATHERED THAT DATA.  THAT WASN'T SOMETHING THAT HE WAS

12:43PM   8      FAMILIAR WITH.

12:44PM   9          HE DIDN'T KNOW ANY OF THE FACTS ABOUT THERANOS.  HE WASN'T

12:44PM  10      WORKING ON THE THERANOS CASE.  HE DIDN'T HAVE ANYTHING TO ADD

12:44PM  11      TO THAT.

12:44PM  12          AND ALSO THE STRUCTURE, THE WORDS THAT WERE ON THE SUMMARY

12:44PM  13      CHART, WERE NOT CHOSEN BY MR. MIDDLETON.  I THINK HE SAID IT

12:44PM  14      WAS CHOSEN BY THE LAWYERS HERE.

12:44PM  15          AND IF THEY SHOW THEM TO YOU, NOTICE THAT WHEN THEY TALK

12:44PM  16      ABOUT INVESTORS, THEY CALLED THEM ENTITIES.  HOPEFULLY YOU WILL

12:44PM  17      REMEMBER THAT THE CASE IS ABOUT REAL PEOPLE WHO LOST REAL

12:44PM  18      MONEY.

12:44PM  19          AND WHEN THEY TALK ABOUT PATIENTS, THEY DON'T CALL THEM

12:44PM  20      PATIENTS.  THEY CALL THEM CUSTOMERS.  THESE ARE REAL PEOPLE WHO

12:44PM  21      PAID REAL MONEY FOR REAL BLOOD TESTS HERE.

12:44PM  22          THE NEXT PERSON THE DEFENSE CALLED WAS DR. BONANNI.  YOU

12:44PM  23      RECALL THAT DR. BONANNI JOINED THE THERANOS BOARD IN 2014.  SO

12:44PM  24      AFTER "THE WALL STREET JOURNAL" IN 2015, AFTER CMS INSPECTION

12:44PM  25      AND THEN REPORT IN 2016.

CLOSING ARGUMENT BY MR. SCHENK                                    9022

12:44PM   1          DR. BONANNI JOINED THERANOS AT A TIME WHEN THEY ARE

12:44PM   2    FIGURATIVELY POURING BLEACH ON ALL OF THE SURFACES TO CLEAN

12:44PM   3    THINGS UP, AND DR. BONANNI TOLD YOU THAT HIS TESTIMONY WAS

12:45PM   4    EXCLUSIVELY FOCUSSED ON THE 4 SERIES DEVICE, NOT A DEVICE USED

12:45PM   5    AT WALGREENS OR FOR PATIENT TESTING.  HE WAS TALKING TO YOU

12:45PM   6    ABOUT THE 4 SERIES DEVICE.

12:45PM   7          HE WORKED THERE ABOUT A DAY A WEEK, I THINK HE SAID.  AND

12:45PM   8    STILL IN ONLY A COUPLE OF MONTHS, DR. BONANNI FOUND PROBLEMS

12:45PM   9    WITH THE DATA FOR A ZIKA VIRUS ASSAY.  HE TOLD YOU THAT WHEN HE

12:45PM  10    WAS AT THERANOS, THEY WERE WORKING ON DEVELOPING AN ASSAY TO

12:45PM  11    TEST FOR THE ZIKA VIRUS, AND HE TALKED TO MS. HOLMES ABOUT THAT

12:45PM  12    DATA.

12:45PM  13          SO HE WASN'T TALKING TO YOU ABOUT THE DEVICE USED FOR

12:45PM  14    PATIENT TESTING, AND EVEN THIS NEXT GENERATION DEVICE, THE 4

12:45PM  15    SERIES DEVICE, ONLY WORKING ONE DAY A WEEK, IT TOOK HIM A

12:45PM  16    COUPLE OF MONTHS TO FIND PROBLEMS WITH THAT DEVICE.

12:45PM  17          THE NEXT WITNESS AND THE LAST WITNESS IN THE CASE WAS THE

12:45PM  18    DEFENDANT HERSELF.  A FEW THINGS ON THAT.

12:45PM  19          THE JUDGE WILL READ YOU JURY INSTRUCTIONS AND THEY WILL

12:45PM  20    COVER THINGS LIKE BIAS AND CREDIBILITY OF WITNESSES, AND YOU

12:46PM  21    CAN CONCLUDE THAT THERE IS NO WITNESS THAT TESTIFIED IN THIS

12:46PM  22    CASE THAT HAS MORE BIAS, MORE INTEREST IN THE OUTCOME OF THE

12:46PM  23    PROCEEDINGS THAN THE DEFENDANT HERSELF.  THAT MEANS THAT YOU

12:46PM  24    SHOULD LOOK SKEPTICALLY AT ANYTHING THAT SHE TESTIFIED ABOUT

12:46PM  25    THAT WAS SELF-SERVING.

CLOSING ARGUMENT BY MR. SCHENK                                9023

12:46PM   1        WHEN SHE WAS ON THE STAND, MR. DOWNEY SHOWED HER A NUMBER

12:46PM   2   OF EMAILS FROM PEOPLE LIKE IAN GIBBONS OR DANIEL YOUNG THAT

12:46PM   3   WERE COMMUNICATING POSITIVE OR FAVORABLE DEVELOPMENTS AT

12:46PM   4   THERANOS.

12:46PM   5        AND I THINK THE CONCLUSION THAT IS HOPED THAT YOU WOULD

12:46PM   6   DRAW IS MS. HOLMES RECEIVED POSITIVE NEWS, GOOD THINGS

12:46PM   7   HAPPENING AT THERANOS, SO WHEN SHE COMMUNICATED GOOD THINGS OR

12:46PM   8   POSITIVE NEWS TO INVESTORS, SHE WASN'T INTENDING TO DEFRAUD

12:46PM   9   THEM, SHE WAS MERELY A FUNNEL OR CONDUIT OF INFORMATION.  SHE

12:46PM  10   HEARD IT FROM PEOPLE WHO WORKED FOR HER AND SHE PASSED IT ON

12:46PM  11   AND SHARED IT WITH INVESTORS.  NO INTENT TO DEFRAUD.

12:47PM  12        THE PROBLEM IS THAT'S INCONSISTENT WITH THE FACTS AND THE

12:47PM  13   EVIDENCE THAT YOU HAVE SEEN.  YOU HAVE ALSO SEEN EMAIL AFTER

12:47PM  14   EMAIL, EXAMPLE AFTER EXAMPLE WHERE SHE IS TOLD NEGATIVE THINGS,

12:47PM  15   POOR DEVELOPMENTS, UNFORTUNATE THINGS THAT ARE HAPPENING AT

12:47PM  16   THERANOS, AND THOSE THINGS ARE NOT BEING COMMUNICATED TO

12:47PM  17   INVESTORS.

12:47PM  18        SHE IS DECIDING WHAT IS THE KIND OF INFORMATION TO OR

12:47PM  19   SHOULD BE COMMUNICATED AND WHAT ISN'T.

12:47PM  20        THINK ABOUT IT ANOTHER WAY.  IF YOU WENT AFTER THE FACT

12:47PM  21   AND SORT OF GATHERED UP ALL OF THE STATEMENTS THAT THE

12:47PM  22   INVESTORS HEARD, IF THERE WAS NO INTENT HERE, IF THEY WERE JUST

12:47PM  23   TOLD WHATEVER SHE KNEW, YOU WOULD EXPECT THERE TO BE A RANDOM

12:47PM  24   DISTRIBUTION OF SOME STATEMENTS SAYING POSITIVE THINGS THAT SHE

12:47PM  25   HEARD AND SOME SAYING NEGATIVE THINGS THAT SHE HEARD.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. SCHENK                                        9024

12:47PM   1        BUT WHEN THE WITNESSES, THE VICTIM INVESTORS TESTIFIED,

12:47PM   2   YOU HEARD FAVORABLE AND FALSE OVER AND OVER, A FAVORABLE THING

12:47PM   3   ABOUT THERANOS THAT WASN'T TRUE, BUT NOT THE, WE'RE HAVING

12:48PM   4   PROBLEMS TESTING PATIENTS OR THIS -- WE SHOULDN'T LAUNCH.  MY

12:48PM   5   LAB DIRECTOR IS TELLING ME WE SHOULDN'T LAUNCH AND WE SHOULD

12:48PM   6   DELAY THE LAUNCH.

12:48PM   7        THERE'S ANOTHER WORD FOR THAT, AND THAT'S INTENT.  SHE'S

12:48PM   8   CHOOSING WHICH ARE THE KIND OF FACTS TO COMMUNICATE AND WHICH

12:48PM   9   ARE THE KIND OF FACTS THAT SHOULD NOT BE COMMUNICATED.

12:48PM  10        I WANT TO READ TO YOU JUST VERY BRIEFLY ONE PORTION OF HER

12:48PM  11   DIRECT TESTIMONY.  WHEN SHE WAS ON THE STAND, AND MR. DOWNEY

12:48PM  12   ASKED HER:

12:48PM  13        "NOW, YOU MENTIONED THAT WHEN YOU MET HIM WHEN YOU WERE AN

02:48PM  14   18 YEAR OLD, YOU THOUGHT THAT HE WAS AN IMPRESSIVE EXECUTIVE.

02:48PM  15        DURING THE TIME PERIOD THAT WE'RE CONCERNED WITH, THE

02:48PM  16   PERIOD FROM 2010 TO 2016, HOW DID YOU PERCEIVE MR. BALWANI'S

02:48PM  17   CAPABILITIES AS A BUSINESS PERSON AND WHAT EFFECT DID YOUR

02:48PM  18   RELATIONSHIP HAVE ON THAT?"

12:48PM  19        MS. HOLMES RESPONDS:  "HE HAD TAUGHT ME EVERYTHING THAT I

12:48PM  20   THOUGHT I KNEW ABOUT BUSINESS, AND I THOUGHT HE WAS THE BEST

12:49PM  21   BUSINESS PERSON THAT I KNEW.

12:49PM  22        "AND I THINK THAT I DIDN'T QUESTION HIM IN THE WAY THAT I

12:49PM  23   OTHERWISE WOULD HAVE.

12:49PM  24        "DID THAT REMAIN YOUR VIEW UNTIL 2006?

12:49PM  25        "IT DID.

CLOSING ARGUMENT BY MR. SCHENK                                    9025

12:49PM  1          "DID THAT VIEW CHANGE IN 2016?

12:49PM  2          "IT DID.

12:49PM  3          "WHAT HAPPENED TO CHANGE THAT VIEW?

12:49PM  4          " THE CMS INSPECTION.  I HAD GONE INTO THAT INSPECTION

02:49PM  5    THINKING THAT WE HAD ONE OF THE BEST LABS IN THE WORLD, AND THE

02:49PM  6    FINDINGS FROM THOSE INSPECTIONS WERE SO FUNDAMENTALLY DIFFERENT

02:49PM  7    FROM WHAT I BELIEVED THAT IT COULDN'T BE THE CASE THAT OUR

02:49PM  8    OPERATIONS WERE RUNNING LIKE ONE OF THE BEST COMPANIES IN THE

02:49PM  9    WORLD."

12:49PM 10          THAT'S FROM PAGE 7875.

12:49PM 11          MS. HOLMES GOT ON THE STAND AND TOLD YOU WHEN CMS DID

12:49PM 12    THEIR INSPECTION AND ISSUED A REPORT, THAT REPORT WAS A LIGHT

12:49PM 13    BULB MOMENT.  THAT'S WHEN SHE DISCOVERED THERE WERE PROBLEMS IN

12:49PM 14    THE LAB.

12:49PM 15          THERE'S A FUNDAMENTAL PROBLEM WITH THAT TESTIMONY.  THAT

12:50PM 16    TESTIMONY IS NOT TRUE.

12:50PM 17          YOU HAVE SEEN EXAMPLE AFTER EXAMPLE OF MS. HOLMES BEING

12:50PM 18    TOLD BY MR. BALWANI, SOMETIMES IN TEXT MESSAGES, BUT ALSO

12:50PM 19    THROUGH REQUESTS FOR CANDID CONVERSATIONS BY HER OWN BROTHER

12:50PM 20    ABOUT PROBLEMS IN THE LAB.

12:50PM 21          MS. HOLMES TOLD YOU THAT IN 2016 SHE DISCOVERED THERE WERE

12:50PM 22    PROBLEMS, BECAUSE IF SHE KNEW ABOUT THEM EARLIER, THEN THE

12:50PM 23    FALSE STATEMENTS TO INVESTORS AND TO PATIENTS WERE NOT JUST

12:50PM 24    FALSE, THEY WERE KNOWINGLY FALSE.

12:50PM 25          MS. HOLMES ALSO TALKED TO YOU ABOUT HER RELATIONSHIP WITH

CLOSING ARGUMENT BY MR. SCHENK                                        9026

```
12:50PM   1    MR. BALWANI AND SHE TOLD YOU THAT THERE WAS VIOLENCE IN THAT

12:50PM   2    RELATIONSHIP.

12:50PM   3        SHE TOLD YOU THAT THERE WERE TWO PEOPLE WHO KNEW ABOUT

12:50PM   4    THAT, WHO WOULD KNOW ABOUT IT AND WHO WERE PRESENT FOR THAT.

12:50PM   5        I CERTAINLY AM NOT ONE OF THEM.

12:50PM   6        IF YOU RETURN A VERDICT OF GUILTY, YOU'RE NOT SAYING THAT

12:50PM   7    WE, THE JURY, DO NOT BELIEVE MS. HOLMES'S CLAIMS OF ABUSE.

12:50PM   8        IF YOU RETURN A VERDICT OF NOT GUILTY, YOU ARE NOT SAYING

12:51PM   9    WE, THE JURY, BELIEVE MS. HOLMES'S CLAIMS OF ABUSE.

12:51PM  10        YOUR VERDICT DOES NOT VALIDATE HER CLAIMS OF ABUSE.  YOU

12:51PM  11    DO NOT NEED TO DECIDE WHETHER THAT ABUSE HAPPENED IN ORDER TO

12:51PM  12    REACH A VERDICT.

12:51PM  13        THE CASE IS ABOUT FALSE STATEMENTS MADE TO INVESTORS AND

12:51PM  14    FALSE STATEMENTS MADE TO PATIENTS.  YOU DO NOT NEED TO DECIDE

12:51PM  15    THE QUESTION ABOUT WHETHER THAT ABUSE HAPPENED.

12:51PM  16        I WANT TO SAY A COUPLE OF WORDS ABOUT THE JURY

12:51PM  17    INSTRUCTIONS.  THE JUDGE WILL READ YOU INSTRUCTIONS TO GUIDE

12:51PM  18    YOUR DELIBERATIONS.  THEY WILL COVER TOPICS LIKE REASONABLE

12:51PM  19    DOUBT, A PHRASE THAT YOU PROBABLY HAVE HEARD BEFORE, THE

12:51PM  20    STANDARD USED IN CRIMINAL CASES THROUGHOUT THE COUNTRY.  THE

12:51PM  21    JUDGE WILL INFORM YOU THAT IT'S A DOUBT BASED ON REASON AND

12:51PM  22    COMMON SENSE, NOT PURELY ON SPECULATION.

12:51PM  23        THAT MEANS WHEN YOU LEAVE THIS ROOM AND GO BACK TO

12:51PM  24    DELIBERATE, YOU BRING YOUR COMMON SENSE WITH YOU.  YOU USE THAT

12:51PM  25    TO LOOK AT AND EVALUATE THE EVIDENCE.
```

9027
CLOSING ARGUMENT BY MR. SCHENK

12:51PM  1      THE JUDGE WILL READ YOU AN INSTRUCTION ABOUT PUNISHMENT.

12:52PM  2   I THINK WE -- THE JUDGE HAS SPOKEN TO YOU ABOUT THAT BEFORE.

12:52PM  3   THE JUDGE WILL TELL YOU IT SHOULD PLAY NO ROLE IN YOUR

12:52PM  4   DELIBERATIONS.  IT IS EXCLUSIVELY THE PROVINCE OF THE COURT

12:52PM  5   SHOULD IT EVER GET THERE.  YOU ARE READ THE LAW ON THINGS LIKE

12:52PM  6   THE CRIME OF CONSPIRACY OR WIRE FRAUD.  YOU ARE NOT GIVEN THE

12:52PM  7   RULES OR THE GUIDELINES FOR PUNISHMENT, AND THAT MAKES SENSE

12:52PM  8   BECAUSE IT SHOULD PLAY NO ROLE IN YOUR DELIBERATIONS.

12:52PM  9      THERE ARE ALSO INSTRUCTIONS ON THINGS LIKE AIDING AND

12:52PM 10   ABETTING, OR INSTANCES WHEN MORE THAN ONE PERSON COMMITS A

12:52PM 11   CRIME, THE CRIME OF CONSPIRACY OR THE CRIME OF WIRE FRAUD, AND

12:52PM 12   IN THOSE INSTRUCTIONS THERE ARE ELEMENTS AS WELL AND WE ASK

12:52PM 13   THAT YOU PAY ATTENTION TO THOSE AS WELL.

12:52PM 14      THE STORY OF THERANOS IS IN SOME WAYS A TRAGEDY.  WHAT

12:52PM 15   HAPPENED TO THE INVESTORS AND TO THE PATIENTS SHOULD NOT HAVE

12:52PM 16   HAPPENED.  THEY SHOULD HAVE BEEN ENGAGED WITH HONESTLY.

12:52PM 17      BUT IT'S ALSO THE STORY OF INDIVIDUALS ACTING WITH

12:53PM 18   REMARKABLE INTEGRITY.  ERIKA CHEUNG TOLD YOU THAT THIS WAS HER

12:53PM 19   FIRST JOB OUT OF COLLEGE.  SHE SAID DURING THE INTERVIEW WITH

12:53PM 20   MS. HOLMES SHE WAS STAR STRUCK.  ERIKA DEEPLY HOPED THAT THIS

12:53PM 21   COMBINATION OF TECHNOLOGY AND HEALTH CARE WOULD WORK.  IT WAS

12:53PM 22   VERY INTERESTING TO HER.

12:53PM 23      BUT AFTER NOT WORKING THERE VERY LONG, SHE BEGAN TO SEE

12:53PM 24   PROBLEMS WITH THE DEVICE, WITH THE TESTING, AND SHE RAISED

12:53PM 25   THOSE CONCERNS FIRST TO HER IMMEDIATE SUPERVISORS, AND THEN

CLOSING ARGUMENT BY MR. SCHENK                                9028

12:53PM   1    DIRECTLY TO MR. BALWANI.

12:53PM   2         I THINK SHE TOLD YOU THAT SHE WAS FRIENDS WITH

12:53PM   3    TYLER SHULTZ AND SHE KNEW THAT TYLER HAD SPOKEN TO MS. HOLMES,

12:53PM   4    TO ELIZABETH HOLMES, AND SO SHE, ERIKA, DECIDED TO GO TO

12:53PM   5    MR. BALWANI, AND ERIKA DESCRIBED HOW SHE ASSUMED THAT

12:53PM   6    MANAGEMENT WOULD WANT TO HEAR THESE THINGS, THAT THEY WOULD

12:53PM   7    WANT TO KNOW ABOUT THE PROBLEMS AND FIX THEM.

12:53PM   8         BUT SURPRISINGLY, THAT WAS NOT ERIKA'S EXPERIENCE.

12:53PM   9         MR. BALWANI DID NOT SEEM SURPRISED BY HER COMPLAINTS, BUT

12:53PM  10    INSTEAD A LITTLE FRUSTRATED THAT SHE WAS RAISING THEM.

12:53PM  11         AND ERIKA DECIDED TO QUIT.  SHE DIDN'T HAVE ANOTHER JOB TO

12:54PM  12    GO TO.  ERIKA SAID, I DON'T WANT TO BE A PART OF THIS COMPANY'S

12:54PM  13    FUTURE AND I'M GOING TO QUIT, AND SHE LEFT.

12:54PM  14         SUREKHA GANGADKHEDKAR.  SHE WAS PROUD OF THE WORK THAT SHE

12:54PM  15    HAD DONE OVER THE YEARS DEVELOPING ASSAYS AT THERANOS.

12:54PM  16         BUT WHEN SHE RETURNED FROM VACATION IN AROUND AUGUST OF

12:54PM  17    2013 AND DISCOVERED THAT THERANOS WAS ABOUT TO BEGIN TESTING

12:54PM  18    PATIENTS' BLOOD USING ITS DEVICES, ITS COLLECTION, SHE WENT TO

12:54PM  19    MS. HOLMES AND SAID THERE ARE PROBLEMS, THERE'S PROBLEMS WITH

12:54PM  20    THE DEVICE, WE CAN'T TEST ACCURATELY.

12:54PM  21         AND WHEN MS. HOLMES ESSENTIALLY SAID THE TRAIN IS ON THE

12:54PM  22    TRACKS, I CAN'T STOP IT, SUREKHA QUIT.  SHE ALSO DID NOT WANT

12:54PM  23    TO BE A PART OF THERANOS'S FUTURE.

12:54PM  24         DR. ROSENDORFF.  HE WAS THE LAB DIRECTOR DURING THAT FIRST

12:54PM  25    YEAR AT THERANOS.  HE -- YOU SAW IN EMAILS WHERE HE WARNS ABOUT

CLOSING ARGUMENT BY MR. SCHENK                                    9029

12:54PM  1    THEIR READINESS TO LAUNCH, AND THEN DURING THAT YEAR WHEN HE IS

12:54PM  2    LAB DIRECTOR, HE IS SENDING EMAILS ABOUT TESTS THAT NO LONGER

12:55PM  3    CAN ACCURATELY EVALUATE THE ASSAY, THE THING THAT THEY'RE

12:55PM  4    TESTING FOR.  HE ENCOURAGES MORE PROFICIENCY TESTING.

12:55PM  5         AND THEN HE SAYS THERE CAME A POINT IN TIME WHEN I

12:55PM  6    REALIZED THAT MANAGEMENT CARED MORE ABOUT PR AND FUNDRAISING

12:55PM  7    THAN IT DID PATIENT CARE, AND HE LEFT.  DR. ROSENDORFF DID NOT

12:55PM  8    WANT TO BE A PART OF THERANOS'S FUTURE.

12:55PM  9         IT IS THE STORY OF A TRAGEDY, BUT IT IS ALSO THE STORY OF

12:55PM 10    SOME PEOPLE ACTING WITH REALLY REMARKABLE INTEGRITY.

12:55PM 11         FRAUD IS SORT OF LIKE A HEAD START ON THE TRUTH.  FOR A

12:55PM 12    LONG TIME, HOLMES AND BALWANI KNEW THE TRUTH.  THEY KNEW WHAT

12:55PM 13    THERANOS COULD DO AND WHAT IT COULDN'T DO, AND THE PEOPLE THAT

12:55PM 14    THEY INTERACTED WITH, THE INVESTORS AND THE PATIENTS, DID NOT.

12:55PM 15         AND THEY TOOK ADVANTAGE OF THAT SORT OF GAP IN

12:55PM 16    INFORMATION.  AND FOR THAT, THEY WERE ABLE TO COMMIT FRAUD, AND

12:55PM 17    BECAUSE OF THAT, YOU SHOULD FIND ELIZABETH HOLMES GUILTY OF THE

12:55PM 18    CHARGED OFFENSES.

12:55PM 19         BUT YOU SHOULDN'T FIND HER GUILTY BECAUSE OF MY WORDS.

12:56PM 20    YOU SHOULD FIND HER GUILTY BECAUSE OF HER WORDS.

12:56PM 21         DECEMBER 27TH, 2014, JUST A FEW DAYS BEFORE -- NEW YEAR'S

12:56PM 22    IS A TIME FOR REFLECTION AND MAYBE A NEW YEAR'S RESOLUTION OR

12:56PM 23    TWO.  HOLMES AND BALWANI ARE TEXTING EACH EITHER SAYING THAT

12:56PM 24    THIS YEAR, 2015, WILL BE OUR YEAR; THAT THIS YEAR, WE WILL

12:56PM 25    EXECUTE.

CLOSING ARGUMENT BY MR. SCHENK                                    9030

12:56PM  1          THE PROBLEM IS THAT BY DECEMBER 27TH, 2014, EVERY INVESTOR

12:56PM  2     THAT YOU HAD HEARD FROM HAD ALREADY INVESTED.

12:56PM  3          BY DECEMBER 27TH, 2014, THERANOS WAS TESTING PATIENTS'

12:56PM  4     BLOOD THROUGH WALGREENS FOR MORE THAN A YEAR AT THAT POINT, AND

12:56PM  5     THOSE INDIVIDUALS, PATIENTS, INVESTORS, THEY ALL THOUGHT THAT

12:56PM  6     THEY WERE ENGAGING WITH A COMPANY THAT HAD BEEN EXECUTING, THAT

12:56PM  7     DIDN'T NEED TO HOPE THAT THEY WOULD FINALLY EXECUTE.

12:56PM  8          AND BECAUSE OF THAT, THERE REALLY IS ONLY ONE VERDICT

12:56PM  9     SUPPORTED BY THE EVIDENCE, AND THAT'S GUILTY ON ALL COUNTS.

12:56PM 10          THANK YOU.

12:57PM 11               THE COURT:  THANK YOU, MR. SCHENK.

12:57PM 12          DOES THE DEFENSE HAVE AN ARGUMENT?

12:57PM 13               MR. DOWNEY:  WE DO, YOUR HONOR.  I BELIEVE IT WILL

12:57PM 14     TAKE US A FEW MINUTES TO GET THE TECHNOLOGY TRANSFERRED.  I

12:57PM 15     DON'T KNOW IF YOU WANT TO TAKE A STANDING BREAK.

12:57PM 16               THE COURT:  SURE.  LADIES AND GENTLEMEN, WHY DON'T

12:57PM 17     YOU TAKE A STANDING BREAK WHILE WE DO THE CHANGE HERE.  THANK

12:57PM 18     YOU.

12:58PM 19          (PAUSE IN PROCEEDINGS.)

12:59PM 20               THE COURT:  MR. DOWNEY, I JUST WANT TO REMIND YOU

12:59PM 21     THAT WE'LL BREAK AT 1:30 JUST FOR YOUR INFORMATION.

12:59PM 22               MR. DOWNEY:  THANK YOU, YOUR HONOR.

12:59PM 23          MAY I TAKE THE MASK OFF?

12:59PM 24               THE COURT:  YES.  PLEASE.  PLEASE.

12:59PM 25     ///

CLOSING ARGUMENT BY MR. DOWNEY                                    9031

12:59PM   1        **(MR. DOWNEY GAVE HIS CLOSING ARGUMENT ON BEHALF OF**

12:59PM   2    **MS. HOLMES.)**

12:59PM   3            MR. DOWNEY:  MAY IT PLEASE THE COURT, LADIES AND

12:59PM   4    GENTLEMEN.

12:59PM   5        ELIZABETH HOLMES WAS BUILDING A BUSINESS AND NOT A

12:59PM   6    CRIMINAL ENTERPRISE.

12:59PM   7        THE GOVERNMENT WOULD HAVE YOU BELIEVE THAT THE ENTITY THAT

12:59PM   8    SHE PRESIDED OVER AS CEO WAS BUILT BY LIES, BY SWINDLING, BY

12:59PM   9    HALF-TRUTHS, BY MISREPRESENTATIONS THAT WERE CARRIED OUT OVER

12:59PM  10    YEARS AND YEARS AND YEARS.

12:59PM  11        IN FACT, THERANOS WAS BUILT AND ITS BUSINESS WAS CONDUCTED

12:59PM  12    BY A LARGE GROUP OF PEOPLE WHO SHARED MANY CHARACTERISTICS.

12:59PM  13    THEY WERE BRIGHT, THEY WERE INTELLIGENT, THEY WERE CREATIVE.

12:59PM  14    THEY BELIEVED IN THE MISSION THAT THERANOS BELIEVED IN.

01:00PM  15        THEY WANTED TO INVENT AND THEN TO MAKE A PRODUCT OF

01:00PM  16    TECHNOLOGY THAT COULD BE USED TO MAKE BLOOD TESTING SERVICES

01:00PM  17    MORE CONVENIENT, MORE AFFORDABLE, CHEAPER, AND AT THE END OF

01:00PM  18    THE DAY, MAKE PEOPLE HEALTHIER.

01:00PM  19        NOW, I RECALL AT THE BEGINNING OF THE CASE, AS MR. SCHENK

01:00PM  20    DID, THAT MR. WADE TOLD YOU TO UNDERSTAND THE CASE YOU HAD TO

01:00PM  21    UNDERSTAND THE PERSPECTIVE THAT THERE ARE TWO SIDES AND THAT

01:00PM  22    THE GOVERNMENT MIGHT BE LOOKING AT EVENTS THROUGH A DIRTY LENS,

01:00PM  23    AND HE ASKED YOU TO BE PATIENT AND LISTEN UNTIL ALL OF THE

01:00PM  24    EVIDENCE CAME IN BECAUSE YOU MIGHT HAVE A DIFFERENT VIEW.

01:00PM  25        MR. SCHENK JUST SAID TO YOU THAT WE CAN'T MEET THAT

**ER-12610**

CLOSING ARGUMENT BY MR. DOWNEY                                          9032

01:00PM   1    CHALLENGE BECAUSE THIS IS NOT THAT KIND OF CASE.

01:00PM   2         I ACCEPT THAT CHALLENGE, LADIES AND GENTLEMEN, BECAUSE I

01:00PM   3    THINK WHEN I GO THROUGH ALL OF THE EVIDENCE WITH YOU AND ASK

01:00PM   4    YOU TO REVIEW THE EVIDENCE AS PART OF YOUR DELIBERATIONS, I

01:01PM   5    THINK YOU WILL SEE THAT THE FULL PICTURE REVEALS SOMETHING VERY

01:01PM   6    DIFFERENT FROM WHAT THE GOVERNMENT HAS BEEN PRESENTING TO YOU

01:01PM   7    FOR THREE MONTHS AND, INDEED, FOR THE LAST THREE HOURS.

01:01PM   8         LET ME BEGIN BY TAKING ONE EXAMPLE, AND THIS IS ONLY ONE

01:01PM   9    EXAMPLE OF THE EVIDENCE THAT THE GOVERNMENT PRESENTED TO YOU,

01:01PM  10    MR. SCHENK DISCUSSED JUST NOW, AND THIS IS THE ISSUE THAT HAS

01:01PM  11    BEEN DISCUSSED THROUGHOUT THE CASE OF THERANOS'S PARTNERSHIP

01:01PM  12    WITH PHARMACEUTICAL COMPANIES.

01:01PM  13         YOU'LL RECALL THAT THERANOS HAD PARTNERSHIPS WITH

01:01PM  14    COMPANIES THAT ARE HOUSEHOLD NAMES NOW, PFIZER AND OTHERS, AND

01:01PM  15    THAT HAS BEEN DISCUSSED THROUGHOUT THE CASE.

01:01PM  16         BUT WHAT IS THERANOS CHARGED WITH -- WHAT IS MS. HOLMES

01:01PM  17    CHARGED WITH IN CONNECTION WITH PHARMACEUTICAL COMPANIES?

01:01PM  18         WELL, SHE'S NOT CHARGED WITH DEFRAUDING THEM.  SHE'S NOT

01:01PM  19    CHARGED WITH DOING ANYTHING WITH PATIENTS IN CONNECTION WITH

01:01PM  20    CLINICAL TRIALS THAT IS UNTOWARD.

01:01PM  21         WHAT MS. HOLMES IS CHARGED WITH IS, SHE'S CHARGED WITH

01:02PM  22    MAKING FALSE REPRESENTATIONS TO SUBSEQUENT INVESTORS ABOUT

01:02PM  23    WHETHER THERANOS HAD PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES

01:02PM  24    AND WHETHER THOSE PHARMACEUTICAL COMPANIES DURING THE COURSE OF

01:02PM  25    THAT PARTNERSHIP EXAMINED, USED, AND VALIDATED THERANOS'S

UNITED STATES COURT REPORTERS

```
01:02PM   1    TECHNOLOGY.

01:02PM   2         NOW, WHERE DOES THAT THEORY COME FROM?  WELL, MR. SCHENK

01:02PM   3    JUST SHOWED IT TO YOU DURING THE COURSE OF HIS OPENING TO YOU,

01:02PM   4    AND I'LL SHOW IT TO YOU AGAIN.

01:02PM   5         THIS IS A SLIDE THAT WAS SHOWN AS PART OF A PRESENTATION

01:02PM   6    TO WALGREENS IN MARCH OF 2010, AND THE GOVERNMENT'S THEORY AS

01:02PM   7    JUST EXPRESSED BY MR. SCHENK AND THROUGHOUT THE CASE IS THAT

01:02PM   8    THIS IS THE POINT AT WHICH THE CONSPIRACY TO DEFRAUD PEOPLE

01:02PM   9    REALLY BEGAN.

01:02PM  10         THE REPRESENTATION WAS THAT THERANOS SYSTEMS HAD BEEN

01:02PM  11    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

01:02PM  12    YEARS BY 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES.

01:03PM  13         NOW, IN THE GOVERNMENT'S CASE YOU HEARD ABOUT ONLY THREE

01:03PM  14    OF -- I'LL TAKE THIS.

01:03PM  15              THE COURT:  I APOLOGIZE, MR. DOWNEY.  I THINK OUR

01:03PM  16    EQUIPMENT IS -- THAT MICROPHONE DOESN'T SEEM TO BE WORKING FOR

01:03PM  17    SOME REASON.

01:03PM  18              MR. DOWNEY:  IS THAT A LITTLE BETTER?

01:03PM  19         THROUGHOUT THE COURSE OF THE GOVERNMENT'S CASE, YOU HEARD

01:03PM  20    ABOUT THREE PHARMACEUTICAL COMPANIES:  PFIZER, GLAXOSMITHKLINE,

01:03PM  21    AND SCHERING-PLOUGH.

01:03PM  22         YOU MIGHT HAVE THOUGHT AS A RESULT OF THAT PRESENTATION

01:03PM  23    THAT THOSE WERE THE ONLY PARTNERSHIPS WITH PHARMACEUTICAL

01:03PM  24    COMPANIES THAT THERANOS EVER HAD.

01:03PM  25         AND FROM THE EVIDENCE THAT WAS PRESENTED, YOU MIGHT HAVE
```

CLOSING ARGUMENT BY MR. DOWNEY                                    9034

01:03PM   1        THOUGHT THAT ALL THREE OF THOSE PARTNERSHIPS WENT VERY POORLY.

01:04PM   2            WHAT DOES THE EVIDENCE, IN FACT, SHOW?

01:04PM   3            THE EVIDENCE SHOWS THAT IN THE YEARS BETWEEN 2005 AND

01:04PM   4    2010, THERANOS HAD A NUMBER OF SUCCESSFUL PARTNERSHIPS WITH

01:04PM   5    PHARMACEUTICAL COMPANIES, AND THAT INDIVIDUALS WITHIN THERANOS

01:04PM   6    BELIEVED THAT, TALKED ABOUT IT, REPRESENTED IT TO EACH OTHER,

01:04PM   7    AND TALKED ABOUT IT EXTERNALLY.

01:04PM   8            EXHIBIT 7742, WHICH IS IN FRONT OF YOU, IS A SLIDE

01:04PM   9    PREPARED BY STEFAN HRISTU, WHO WAS AN INDIVIDUAL WHO WORKED

01:04PM  10    FULL TIME ON PHARMACEUTICAL PRODUCTS WITHIN THERANOS.

01:04PM  11            YOU'LL SEE THAT WITHIN THIS SLIDE THERE ARE

01:04PM  12    REPRESENTATIONS ABOUT 11 DIFFERENT PROGRAMS THAT WERE COMPLETED

01:04PM  13    SUCCESSES.  ON THE NEXT PAGE THERE ARE A LIST OF ADDITIONAL

01:04PM  14    PROGRAMS THAT WERE ONGOING.

01:04PM  15            IF YOU LOOK THEN TO THE NEXT SLIDE, WHAT I'LL SHOW YOU IS

01:05PM  16    THAT DURING THE COURSE OF MS. HOLMES'S TESTIMONY, YOU LEARNED A

01:05PM  17    LOT ABOUT THESE PARTNERSHIPS THAT YOU DIDN'T KNOW AS A RESULT

01:05PM  18    OF THE GOVERNMENT'S CASE.  IN FACT, THERE WERE 12 CONTRACTS

01:05PM  19    BETWEEN THERANOS AND PHARMACEUTICAL COMPANIES IN WHICH THOSE

01:05PM  20    PHARMACEUTICAL COMPANIES WERE IN SOME FORM OR ANOTHER

01:05PM  21    EXAMINING, USING, OR TRYING TO VALIDATE THERANOS'S TECHNOLOGY.

01:05PM  22            WHAT WAS THE RESULT OF THESE 12 CONTRACTS?  WELL, LET'S

01:05PM  23    TAKE A LOOK.

01:05PM  24            THERE ARE A NUMBER OF PARTNERSHIPS AND A NUMBER OF THE

01:05PM  25    CONTRACTS THAT I JUST SHOWED YOU WHERE IT'S NOT AT ALL DISPUTED

9035
CLOSING ARGUMENT BY MR. DOWNEY

01:05PM  1    THAT THOSE COMPANIES EXAMINED, USED, AND VALIDATED THERANOS'S

01:05PM  2    TECHNOLOGY.

01:05PM  3         YOU HEARD NOTHING OF THIS IN THE GOVERNMENT'S CASE.  THOSE

01:05PM  4    ARE SEVEN COMPANIES:  ASTRAZENECA, NOVARTIS, GLAXOSMITHKLINE,

01:05PM  5    DIICHI, CENTOCOR, MERCK, AND BRISTOL MYERS, LARGE NATIONAL OR

01:06PM  6    MULTINATIONAL PHARMACEUTICAL COMPANIES.

01:06PM  7         MS. HOLMES TALKED ABOUT THAT DURING HER DIRECT EXAM

01:06PM  8    RECENTLY.  DURING ITS TWO DAY CROSS-EXAMINATION, THE GOVERNMENT

01:06PM  9    DIDN'T ASK HER A QUESTION ABOUT THOSE PROGRAMS.

01:06PM 10         NEXT, THERE WERE PARTNERS WHERE THE GOVERNMENT WITNESSES

01:06PM 11    CONCEDED THAT ALTHOUGH THE GOVERNMENT WITNESSES HAVE NEGATIVE

01:06PM 12    THINGS TO SAY ABOUT THERANOS'S TECHNOLOGY, THAT THOSE WITNESSES

01:06PM 13    DID NOT SAY THAT THEY HAD CONVEYED ANY OF THAT NEGATIVE

01:06PM 14    FEEDBACK TO MS. HOLMES, AND THAT'S PFIZER AND SCHERING-PLOUGH

01:06PM 15    WHO WE WILL TALK ABOUT IN A MINUTE.

01:06PM 16         THEN WE'LL TALK ALSO ABOUT CELGENE, WHICH WAS THE THIRD

01:06PM 17    COMPANY THAT THE GOVERNMENT MENTIONED DURING ITS CASE, AND

01:06PM 18    THAT'S THE CASE WHERE DR. SUNG TESTIFIED ABOUT A PARTNERSHIP.

01:06PM 19         IN THAT INSTANCE, THERE WAS -- THE SELECTION OF DR. SUNG

01:06PM 20    AS A WITNESS, I WOULD SUGGEST TO YOU, VERY MUCH OBSCURED THE

01:07PM 21    FULL PICTURE AS TO WHAT WAS OCCURRING IN THOSE PARTNERSHIPS.

01:07PM 22         NOW, LET'S LOOK AT THE TWO COMPANIES THAT WERE A PART OF

01:07PM 23    THE GOVERNMENT'S PRESENTATION ABOUT LOGOS.

01:07PM 24         FIRST, THIS IS THE CONTRACT WITH PFIZER.

01:07PM 25         NOW, THERE'S A SUGGESTION IN THE GOVERNMENT'S CASE,

9036
CLOSING ARGUMENT BY MR. DOWNEY

01:07PM   1    THROUGH QUESTIONING OF WITNESSES, THAT IT IS SUSPICIOUS THAT

01:07PM   2    THERANOS DRAFTED THIS REPORT RATHER THAN PFIZER, AND THAT, IN

01:07PM   3    FACT, THE IMPLICATION WAS CREATED THAT IT WAS EVIDENCE OF BAD

01:07PM   4    FAITH ON THERANOS'S PART, THAT IT WAS A FRAUD AND THEY WERE

01:07PM   5    USING IT TO TELL PEOPLE THAT THEY HAD PARTNERED WITH PFIZER AND

01:07PM   6    HAD HAD SUCCESS.

01:07PM   7         IN FACT, THE CONTRACT BETWEEN PFIZER AND THERANOS

01:07PM   8    SPECIFIED THAT THERANOS SHOULD PREPARE THE REPORT AND IT SHOULD

01:08PM   9    SUBMIT THE REPORT AT THE END OF THE PROGRAM FOR AN ASSESSMENT

01:08PM  10    BY PFIZER.

01:08PM  11         THIS IS THE WAY A NUMBER OF CONTRACTS BETWEEN

01:08PM  12    PHARMACEUTICAL COMPANIES AND THERANOS WORKED.  WE'VE PLACED

01:08PM  13    THEM ALL IN EXHIBITS, AND YOU'LL BE ABLE TO SEE THEM AT 7753

01:08PM  14    AND ELSEWHERE.

01:08PM  15         WITH RESPECT TO CELGENE, THE GOVERNMENT FOCUSSED ON ONLY

01:08PM  16    ONE OF SEVERAL CONTRACTS THAT THERANOS HAD WITH CELGENE.

01:08PM  17         FIRST OF ALL, THEY DIDN'T EVEN MENTION A 3.25 MILLION BIO

01:08PM  18    MATHEMATICAL MODELING CONTRACT THAT TOOK PLACE.  DR. SUNG WAS

01:08PM  19    NOT INVOLVED WITH THAT PROJECT AND KNEW NOTHING ABOUT IT.

01:08PM  20         AS TO THE PK ASSAY THAT DR. SUNG TOUCHED ON, THAT CONTRACT

01:08PM  21    WAS, IN FACT, A SUCCESS.  CELGENE ACCEPTED THE REPORT THAT

01:08PM  22    THERANOS PREPARED DEMONSTRATING VALIDATION.  THE CONTRACT TERMS

01:09PM  23    PROVIDED IF IT ACCEPTED IT, IT WAS OBLIGATED TO PAY THERANOS.

01:09PM  24    IT ACCEPTED IT AS A VALIDATION, AND IT PAID THERANOS.

01:09PM  25         DR. SUNG TESTIFIED REALLY FOR A VERY SIMPLE REASON.  SHE

CLOSING ARGUMENT BY MR. DOWNEY                                   9037

01:09PM  1    WASN'T INVOLVED AT ALL IN CONNECTION WITH ANY OF THE MANY

01:09PM  2    UNDERLYING PROJECTS THAT TOOK PLACE BETWEEN CELGENE AND

01:09PM  3    THERANOS.

01:09PM  4         BUT SHE HAD WITNESSED ON A COUPLE OF OCCASIONS, IN

01:09PM  5    CONNECTION WITH A PROJECT THAT THERANOS WORKED ON OF

01:09PM  6    DEVELOPMENT OF AN ASSAY, SOME NEGATIVE COMMENTARY FROM ANOTHER

01:09PM  7    CELGENE EMPLOYEE.  SHE DID NOT KNOW ABOUT THE PROGRAM, WHETHER

01:09PM  8    THERE WAS A VALIDATION IN CONNECTION WITH THE BIO MODELING

01:09PM  9    CONTRACT, AND SHE DID NOT KNOW ABOUT ANY WORK ON THE ORIGINAL

01:09PM  10   PK ASSAY.

01:09PM  11        SIMILARLY WITH RESPECT TO PFIZER WHERE I JUST SHOWED YOU

01:09PM  12   THE CONTRACT.  THIS WAS NO ERROR THAT DR. WEBER COULD -- HAD NO

01:09PM  13   KNOWLEDGE.  HE WASN'T THAT INVOLVED WITH RESPECT TO THIS

01:10PM  14   CONTRACT.

01:10PM  15        THIS WAS A CONTRACT THAT WAS SIGNED IN 2006.  THE

01:10PM  16   AGREEMENT WAS THAT THERANOS WOULD DEPLOY DEVICES IN REMOTE

01:10PM  17   AREAS OF TENNESSEE AND THAT THAT WOULD TAKE PLACE OVER THE

01:10PM  18   COURSE OF MORE THAN A YEAR.

01:10PM  19        ALL THAT WAS DONE.  DEVICES WERE PLACED IN PATIENTS'

01:10PM  20   HOMES, AND THE DRUG THAT WAS BEING EVALUATED BY PFIZER RELATED

01:10PM  21   TO CANCER PATIENTS, DATA WAS GENERATED, THE DATA THAT THERANOS

01:10PM  22   GENERATED WAS COMPARED TO THE DATA FROM A REFERENCE MODEL OR

01:10PM  23   FROM A STANDARD BLOOD TESTING RESULT, AND THERANOS PREPARED THE

01:10PM  24   REPORT THAT YOU'VE SEEN MANY TIMES IN THE CASE STATING THAT THE

01:10PM  25   COMPARISON WAS FAVORABLE.

CLOSING ARGUMENT BY MR. DOWNEY                                      9038

01:10PM   1          WITH THIS CONTRACT, AS WITH THE OTHER CONTRACTS, THERE IS

01:10PM   2     NO DEMONSTRATION BY DR. WEBER THAT HE EVER CONVEYED TO THERANOS

01:10PM   3     THE NEGATIVE FEEDBACK OR THE NEGATIVE VIEW THAT HE TESTIFIED

01:11PM   4     ABOUT ON THE STAND.  HE ADMITTED THAT HE HADN'T.

01:11PM   5          SO WHAT IS THE SUM TOTAL OF WHAT YOU SAW IN THE

01:11PM   6     GOVERNMENT'S CASE?  YOU SAW A 14-MONTH PARTNERSHIP BETWEEN

01:11PM   7     THERANOS AND PFIZER WHICH, DURING THE FIRST 14 MONTHS OF THAT

01:11PM   8     PARTNERSHIP, DR. WEBER HAD NO INVOLVEMENT AT ALL.

01:11PM   9          HE WAS THEN INVOLVED FOR A PERIOD OF THREE MONTHS TO

01:11PM  10     REVIEW THE REPORT.  HE HAD A NEGATIVE REACTION TO THAT, AND HE

01:11PM  11     REPORTED IT UP.  HIS INVOLVEMENT CEASED THREE MONTHS LATER.

01:11PM  12          WHAT DO WE KNOW ABOUT ACTUALLY THE ENTIRETY OF THE

01:11PM  13     RELATIONSHIP BETWEEN THERANOS AND PFIZER?

01:11PM  14          WELL, AS I MENTIONED, IT BEGINS IN DECEMBER OF 2006.  IN

01:11PM  15     2007 TO 2008, THE STUDY RUNS FOR 16 MONTHS.  FROM NOVEMBER 2008

01:11PM  16     TO JANUARY 2009 IS THE WINDOW DURING WHICH DR. WEBER WAS

01:12PM  17     INVOLVED.

01:12PM  18          NOW, DR. WEBER SAID HE WASN'T AWARE OF CONTACT BETWEEN

01:12PM  19     THERANOS AND PFIZER AFTER THAT DAY.  HE WAS NOT AWARE OF

01:12PM  20     THERANOS EVER BEING IN DISCUSSIONS OF ANY KIND WITH PFIZER

01:12PM  21     AFTER JANUARY OF 2009.

01:12PM  22          WELL, OTHERS AT THERANOS -- OTHERS AT PFIZER KNEW ABOUT

01:12PM  23     CONTACT WITH THERANOS.  TWO OF THE PRINCIPAL PERSONS WHO HAD

01:12PM  24     BEEN INVOLVED IN THE STUDY PROJECT BETWEEN PFIZER AND THERANOS

01:12PM  25     REMAINED IN CONTACT WITH THERANOS FOR THE FOLLOWING SIX YEARS.

CLOSING ARGUMENT BY MR. DOWNEY

01:12PM   1        THEY HAD CONTACT IN AS CLOSE A PROXIMITY TO THIS JANUARY

01:12PM   2    '09 DATE WHEN DR. WEBER SAID CONTACT HAD CEASED AS AUGUST OF

01:12PM   3    2009.

01:12PM   4        AND WHY DID THEY CONTACT THERANOS?  BECAUSE THEY WANTED

01:12PM   5    THEM TO DO A CLINICAL TRIAL.

01:13PM   6        NOW, THAT DOES NOT SUGGEST SKEPTICISM OR A NEGATIVE VIEW

01:13PM   7    OF THERANOS'S TECHNOLOGY AS DR. WEBER'S TESTIMONY WOULD HAVE

01:13PM   8    CONVEYED.  MAKE NO MISTAKE ABOUT IT.

01:13PM   9        I'M NOT CRITICIZING DR. WEBER.  BUT DR. WEBER HAD A VERY

01:13PM  10    LIMITED VIEW OF THE RELATIONSHIP BETWEEN PFIZER AND THERANOS.

01:13PM  11        WE SEE, GOING FORWARD FOR A PERIOD OF SEVERAL YEARS,

01:13PM  12    DR. LIPSET AND DR. SAKUL, WHO WERE THE INDIVIDUALS INVOLVED, TO

01:13PM  13    CONTINUE TO HAVE CONTACT WITH THERANOS, INCLUDING AFTER

01:13PM  14    THERANOS ENGAGED IN ITS RETAIL LAUNCH, AND THEY CONTINUED TO

01:13PM  15    STATE THAT THEY HAD AN INTEREST IN WORKING WITH THERANOS.

01:13PM  16        LOOK AT THIS COMMUNICATION IN FEBRUARY OF 2015.  AND

01:13PM  17    THEY'RE TALKING ABOUT THERANOS'S RETAIL STORES BEING USED --

01:13PM  18    THE THERANOS SERVICE CENTERS IN RETAIL STORES BEING USED AS A

01:14PM  19    BASIS TO CONDUCT CLINICAL STUDIES.

01:14PM  20        THE IMPLICATION FROM THE GOVERNMENT IS THE RELATIONSHIP

01:14PM  21    WITH PFIZER WENT POORLY.  THEY DID NOT EXAMINE, USE, AND

01:14PM  22    VALIDATE THERANOS'S TECHNOLOGY.

01:14PM  23        THE FULL FACTS AS TO THIS SUGGEST OTHERWISE.

01:14PM  24        NOW, LET'S LOOK AT THE SCHERING-PLOUGH EXAMPLE.  AS YOU

01:14PM  25    KNOW, DR. CULLEN FROM SCHERING-PLOUGH TESTIFIED.  AND SHE

CLOSING ARGUMENT BY MR. DOWNEY                                    9040

01:14PM   1    TESTIFIED THAT THERE WAS A CONTRACT FOR A COMPREHENSIVE

01:14PM   2    VALIDATION OF A MULTIPLEX, SO-CALLED MULTIPLEX ASSAY.

01:14PM   3         NOW, UNDER THAT CONTRACT, AS UNDER THE PFIZER CONTRACT,

01:14PM   4    THERANOS WAS TO PREPARE A REPORT, SUBMIT IT TO SCHERING-PLOUGH,

01:14PM   5    AND IF SCHERING-PLOUGH AGREED THAT THERE WAS A VALIDATION, THEY

01:14PM   6    WERE TO PAY THERANOS.

01:14PM   7         WHAT HAPPENED?  THERANOS COMPLETED THE STUDY, THEY

01:14PM   8    COMPLETED THE REPORT, SUBMITTED IT TO SCHERING-PLOUGH, AND THEY

01:15PM   9    WERE PAID.

01:15PM   10        THERE WAS NO NEGATIVE FEEDBACK CONVEYED FROM DR. CULLEN TO

01:15PM   11   THERANOS, AND SHE CONCEDED THAT THE VIEWS THAT SHE EXPRESSED

01:15PM   12   HERE ON THE STAND AS TO THE TECHNOLOGY WERE NEVER CONVEYED TO

01:15PM   13   MS. HOLMES.

01:15PM   14        NOW, I WANT TO REALLY FOCUS ON WHAT THE GOVERNMENT HAS

01:15PM   15   FOCUSSED ON WITH RESPECT TO THE LOGOS.

01:15PM   16        BUT WHAT DOES WHAT HAVE I JUST SHOWN YOU IMPLY WITH REGARD

01:15PM   17   TO THE EVIDENCE THAT THE GOVERNMENT HAS PRESENTED TO YOU IN

01:15PM   18   THIS CASE?

01:15PM   19        IF THERE HAD NOT BEEN A DEFENSE CASE, YOU WOULD NOT HAVE

01:15PM   20   KNOWN ABOUT MANY, MANY PHARMACEUTICAL PROJECTS THAT THERANOS

01:15PM   21   HAD AND COMPLETED SUCCESSFULLY.

01:15PM   22        YOU WOULD NOT KNOW THAT WITNESSES LIKE DR. WEBER HAD A

01:15PM   23   VERY LIMITED VIEW OF WHAT HAPPENED BECAUSE THEY WERE ONLY

01:15PM   24   INVOLVED FOR A BRIEF PERIOD OF TIME.

01:15PM   25        AND YOU WOULD NOT KNOW THAT FOR MANY YEARS IN THE

CLOSING ARGUMENT BY MR. DOWNEY

01:16PM 1   RELATIONSHIP BETWEEN PFIZER AND CELGENE, THERE WAS A GREAT DEAL

01:16PM 2   OF SUCCESS.  YOU WOULD KNOW NONE OF THAT.

01:16PM 3       YOU ONLY KNOW THAT BECAUSE THERE WAS A PRESENTATION ON

01:16PM 4   THAT FROM THE DEFENSE.

01:16PM 5       SO WHEN I ASK YOU TO WAIT AND HEAR THE FULL STORY AND TO

01:16PM 6   GO THROUGH THE EVIDENCE WITH ME, AND TO GO THROUGH THE EVIDENCE

01:16PM 7   WHEN YOU GO BACK TO DELIBERATE IN THE JURY ROOM, REMEMBER THAT

01:16PM 8   EXAMPLE WHERE THE PICTURE CAN CHANGE QUITE A GOOD DEAL AS THE

01:16PM 9   RESULT OF WAITING FOR THE FULL STORY AND LOOKING THROUGH THE

01:16PM 10  FULL MATERIAL.

01:16PM 11      NOW, LET ME TALK ABOUT THIS LOGO ISSUE.  YOU HAVE HEARD

01:16PM 12  ABOUT IT THROUGHOUT THE CASE, THAT MS. HOLMES ADDED LOGOS TO

01:16PM 13  THREE PHARMACEUTICAL REPORTS, AND THIS WAS DONE FOR THE PURPOSE

01:16PM 14  OF DECEIVING A VARIETY OF PEOPLE.

01:16PM 15      BUT THE FIRST GROUP THAT IT WAS SUPPOSEDLY DESIGNED TO

01:16PM 16  FOOL AND DEFRAUD WAS WALGREENS.

01:17PM 17      NOW, MS. HOLMES ADMITTED TO YOU THAT SHE ADDED THE LOGOS

01:17PM 18  AND DID IT WITHOUT THINKING THERE WAS ANYTHING WRONG WITH IT.

01:17PM 19      WELL, WHY WOULD THAT BE HER STATE OF MIND?

01:17PM 20      WELL, LET'S CONSIDER HOW MS. HOLMES COMMUNICATED WITH

01:17PM 21  INVESTORS ABOUT THESE PHARMACEUTICAL RELATIONSHIPS.

01:17PM 22      IF INVESTORS WANTED TO KNOW ABOUT PARTICULAR

01:17PM 23  PHARMACEUTICAL PROJECTS, YOU WOULD THINK, TO LISTEN TO THE

01:17PM 24  GOVERNMENT'S CASE, THAT SHE WOULD SAY, OH, NO, YOU CAN'T TALK

01:17PM 25  TO THE PHARMACEUTICAL COMPANY.

CLOSING ARGUMENT BY MR. DOWNEY                                    9042

01:17PM  1        BUT, IN FACT, SHE PUTS INVESTORS IN TOUCH WITH PFIZER WHEN

01:17PM  2   THEY ASK FOR THAT INFORMATION, AS IN THIS EXHIBIT 15016 WHERE

01:17PM  3   AN INVESTOR EXPRESSES CURIOSITY ABOUT WHAT IS GOING ON BETWEEN

01:17PM  4   PFIZER AND THERANOS, AND THEY'RE GIVING CONTACT INFORMATION FOR

01:17PM  5   SOMEBODY AT PFIZER TO TALK TO.

01:17PM  6        OR IN THIS INSTANCE WHERE ANOTHER POTENTIAL INVESTOR

01:18PM  7   EXPRESSES INTEREST IN TALKING TO SEVERAL PHARMACEUTICAL

01:18PM  8   PARTNERS, MS. HOLMES NOT ONLY SAYS THAT'S FINE WITH HER, SHE

01:18PM  9   GIVES THE CONTACT INFORMATION, WHICH IS REDACTED HERE, FOR A

01:18PM 10   LARGE GROUP OF PHARMACEUTICAL COMPANIES:  PFIZER,

01:18PM 11   GLAXOSMITHKLINE, BRISTOL MYERS, NOVARTIS.

01:18PM 12        MS. HOLMES HAS NO INTENT TO DECEIVE PEOPLE OR HIDE FROM

01:18PM 13   PEOPLE THINGS THAT ARE GOING ON IN THOSE RELATIONSHIPS,

01:18PM 14   CONTRARY TO THE GOVERNMENT'S ASSERTIONS.

01:18PM 15        NOW, I WANT TO TALK VERY SPECIFICALLY AND VERY -- I'LL ASK

01:18PM 16   YOU TO LOOK VERY MUCH AT THE RELATIONSHIP BETWEEN

01:18PM 17   GLAXOSMITHKLINE AND THERANOS BECAUSE THAT IS THE COMPANY, ONE

01:18PM 18   OF THE THREE COMPANIES, ON WHICH A LOGO FROM THERANOS WAS

01:18PM 19   ADDED.

01:18PM 20        NOW, WE DIDN'T HEAR MUCH ABOUT THE

01:19PM 21   GLAXOSMITHKLINE/THERANOS -- THE ACTUAL RELATIONSHIP DURING THE

01:19PM 22   GOVERNMENT'S CASE.

01:19PM 23        BUT, IN FACT, IT'S FAIRLY IMPORTANT TO UNDERSTAND WHAT IS

01:19PM 24   GOING ON WHEN MS. HOLMES INTERACTS WITH INVESTORS AND WHAT SHE

01:19PM 25   UNDERSTANDS WHEN SHE'S PARTICIPATING IN DISCUSSIONS WITH

CLOSING ARGUMENT BY MR. DOWNEY                                        9043

01:19PM   1    WALGREENS IN 2010.

01:19PM   2         FIRST OF ALL, IN 2008, THERANOS SENT ITS DEVICES TO

01:19PM   3    GLAXOSMITHKLINE AND SAID, WE WANT YOU TO EVALUATE OUR

01:19PM   4    TECHNOLOGY TO SEE IF THAT TECHNOLOGY CAN BE VALIDATED.

01:19PM   5         SO THEY SENT THE TECHNOLOGY TO GLAXOSMITHKLINE TO EXAMINE

01:19PM   6    AND ASK, IS THIS A TECHNOLOGY THAT YOU THINK WOULD BE USEFUL IN

01:19PM   7    CONNECTION WITH CONDUCTING BLOOD TESTING SERVICES?

01:19PM   8         THAT REPORT WAS SENT BACK BY GSK.  THAT REPORT DID NOT

01:19PM   9    HAVE LOGOS OF EITHER THERANOS OR GSK ON IT.

01:20PM  10         THEN AT SOME DATE IN BETWEEN JUNE 2008 AND MARCH 2009,

01:20PM  11    THERANOS ADDED THE LOGOS OF BOTH THERANOS AND GSK.  MIND YOU,

01:20PM  12    THIS IS A YEAR, AT LEAST A YEAR BEFORE THE GOVERNMENT SAYS SHE

01:20PM  13    ADDED LOGOS TO DEFRAUD WALGREENS IN THEIR NEGOTIATION.

01:20PM  14         AT SOME POINT THOSE LOGOS ARE ADDED TO THE REPORT.  WE

01:20PM  15    DON'T KNOW FROM THE EVIDENCE WHEN THAT HAPPENED.

01:20PM  16         NOW, DOES MS. HOLMES FEEL LIKE SHE'S COMMITTING A FRAUD IN

01:20PM  17    CONNECTION WITH ADDING GSK'S LOGO TO THE REPORT?

01:20PM  18         WELL, APPARENTLY NOT, BECAUSE IN MARCH OF 2009, ONE FULL

01:20PM  19    YEAR BEFORE SHE SENDS THAT REPORT, SHE'S ADDED THE LOGO TO

01:21PM  20    WALGREENS, SHE SENDS IT TO GSK WITH BOTH THE THERANOS LOGO AND

01:21PM  21    THE GSK LOGO ON IT.  AND YOU CAN SEE THAT IN EXHIBIT 15066.

01:21PM  22         THAT'S A YEAR BEFORE THE LOGOS ARE TRANSMITTED TO

01:21PM  23    WALGREENS AND THE GOVERNMENT SAYS THAT THE FRAUD BEGAN.

01:21PM  24         THEN IN DECEMBER OF 2009, SHE SENDS IT AGAIN.  AND YOU CAN

01:21PM  25    LOOK AT EXHIBIT 15058 TO SEE THAT.


                         UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY                                    9044

01:21PM   1      AND THEN IN MARCH OF 2010, BECAUSE YOU ALREADY KNOW AND

01:21PM   2   WHAT WAS PRESENTED IN THE GOVERNMENT'S CASE, IS THAT SHE SENDS

01:21PM   3   A COPY OF THAT REPORT WITH BOTH LOGOS TO WALGREENS AS PART OF

01:21PM   4   THEIR DISCUSSIONS ABOUT WHETHER OR NOT THEY'LL HAVE A

01:21PM   5   PARTNERSHIP.

01:21PM   6      AGAIN, JUST LIKE PUTTING PEOPLE IN TOUCH WITH THE

01:21PM   7   PHARMACEUTICAL COMPANIES TO TALK ABOUT THE WORK THAT THERANOS

01:21PM   8   WAS DOING, SHE FEELS NO SELF-CONSCIOUSNESS ABOUT EXPRESSING

01:22PM   9   THAT IN THESE JOINT PROJECTS, THEY ARE JOINT PROJECTS OF BOTH

01:22PM  10   THERANOS AND THE PHARMACEUTICAL COMPANY.

01:22PM  11      THAT'S GSK.

01:22PM  12      NOW, I SHOULD MENTION WITH RESPECT TO GSK, MR. SCHENK

01:22PM  13   MENTIONED IN PASSING, HE TALKS ABOUT THE WORDS COMPREHENSIVE

01:22PM  14   VALIDATION.

01:22PM  15      IN CONNECTION WITH GSK, THERANOS HAD THE OPPORTUNITY TO

01:22PM  16   GIVE A PRESENTATION TO GSK ABOUT WHAT IT UNDERSTOOD GSK HAD

01:22PM  17   DONE AS PART OF THE RELATIONSHIP BETWEEN GSK AND THERANOS.

01:22PM  18      AND WHAT DID SHE CONVEY IN EXHIBIT 15058?  SHE SAID THAT

01:22PM  19   GSK HAD COMPLETED A COMPREHENSIVE VALIDATION OF THERANOS

01:22PM  20   SYSTEMS IN 2008, EXACTLY THE CLAIM THAT SHE MAKES IN CONNECTION

01:22PM  21   WITH SOME OF THE CONVERSATIONS THAT THE GOVERNMENT IS FOCUSSED

01:23PM  22   ON.

01:23PM  23      DOES GSK DISAGREE WITH THAT?  DOES GSK SAY, WE'RE SHOCKED

01:23PM  24   TO SEE THAT?  DOES GSK SAY, WE'RE SHOCKED TO SEE THAT AND WE'RE

01:23PM  25   SHOCKED TO SEE OUR LOGO ON THIS?  NOT AT ALL.  NOT AT ALL.

CLOSING ARGUMENT BY MR. DOWNEY                                9045

01:23PM   1    THEY RECEIVED ALL OF THAT INFORMATION AND TREATED IT AS

01:23PM   2    PERFECTLY NORMAL.

01:23PM   3          NOW, LET'S MOVE ON TO THE PFIZER SITUATION.  VERY

01:23PM   4    SIMILARLY.  I SHOWED YOU THAT MS. HOLMES WAS NOT SELF-CONSCIOUS

01:23PM   5    ABOUT PUTTING INVESTORS IN TOUCH WITH PFIZER.

01:23PM   6          BUT SPECIFICALLY WITH RESPECT TO THE LOGOS, WE KNOW THAT

01:23PM   7    MS. HOLMES APPLIED THE PFIZER LOGO AND SENT THE DOCUMENT WITH

01:23PM   8    BOTH THE PFIZER LOGO AND THE THERANOS LOGO BACK TO PFIZER.

01:23PM   9          NOW, WE DON'T KNOW IF PFIZER WAS NOT SURPRISED BY THAT

01:23PM  10    BECAUSE THEY KNEW IT WAS A JOINT PROJECT OR BECAUSE THEY HAD

01:23PM  11    READ THE REPORT MANY TIMES AND THOUGHT OF IT AS THEIR JOINT

01:24PM  12    WORK.  WE DON'T KNOW.

01:24PM  13          BUT WHAT WE DO KNOW IS THAT PFIZER CERTAINLY DIDN'T REACT

01:24PM  14    AS IF ANYTHING UNTOWARD HAD HAPPENED.  THEY RECEIVED THE REPORT

01:24PM  15    WITH BOTH LOGOS ON IT, AND AS I SHOWED YOU A MOMENT AGO,

01:24PM  16    CONVERSATIONS CONTINUED BETWEEN PFIZER AND THERANOS ABOUT

01:24PM  17    WORKING TOGETHER INTO 2015 ON LARGE PROJECTS.

01:24PM  18          PFIZER AS WELL SAW NOTHING UNTOWARD IN THE ADDING OF ITS

01:24PM  19    LOGO TO THE REPORT.

01:24PM  20          WHAT ABOUT SCHERING-PLOUGH?

01:24PM  21          NOW, WE KNOW THAT WITH RESPECT TO SCHERING-PLOUGH,

01:24PM  22    DR. CULLEN TESTIFIED THAT SHE HAD A NEGATIVE VIEW OF THE WORK

01:24PM  23    THAT THERANOS HAD DONE.

01:24PM  24          WE ALSO KNOW THAT SHE TESTIFIED THAT SHE DIDN'T ACTUALLY

01:24PM  25    CONCEDE THAT -- OR SHE DIDN'T CONVEY THAT TO MS. HOLMES.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY

01:24PM  1        BUT WHAT DID MS. HOLMES UNDERSTAND WAS DR. CULLEN'S

01:25PM  2    REACTION TO THE THERANOS VALIDATION PROJECT?

01:25PM  3        WHAT IS THE EVIDENCE WHICH WOULD TEACH US, HERE'S WHAT

01:25PM  4    MS. HOLMES THOUGHT AS PART OF HER STATE OF MIND AS TO WHAT

01:25PM  5    HAPPENED IN THAT PROJECT AND HOW IT WAS VIEWED BY

01:25PM  6    SCHERING-PLOUGH?

01:25PM  7        WELL, YOU CAN SEE THAT IN EXHIBIT 15045 WHERE AN EMPLOYEE

01:25PM  8    OF THERANOS WHO ALSO WORKED ALMOST FULL TIME ON PHARMACEUTICAL

01:25PM  9    PROJECTS REPORTS TO MS. HOLMES THAT SHE HAS HAD A CONVERSATION

01:25PM 10    WITH DR. CULLEN, AND IT WAS A GREAT CALL.  AND DURING THE

01:25PM 11    COURSE OF THE CALL SHE SUGGESTS THAT DR. CULLEN HAS READ THE

01:25PM 12    REPORT AND SHE'S PLANNING TO PASS IT AROUND IN HER NEW COMPANY,

01:25PM 13    MERCK, AND IT MAY BE USEFUL IN GENERATING FURTHER WORK FOR

01:25PM 14    THERANOS.

01:25PM 15        THERE'S NO SUGGESTION THAT MS. HOLMES THOUGHT OR BELIEVED

01:25PM 16    THAT SCHERING-PLOUGH HAD INVALIDATED ITS TECHNOLOGY UNDER THE

01:25PM 17    TERMS OF THAT CONTRACT.

01:26PM 18        SO WHAT DO WE HAVE?  WE HAVE THE GOVERNMENT PRESENTING

01:26PM 19    THREE WITNESSES WHO CONVEY A VIEW OF THE WORLD ABOUT THERANOS

01:26PM 20    AND ITS PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES.  THAT VIEW

01:26PM 21    IS THERANOS'S TECHNOLOGY IS NO GOOD, MS. HOLMES KNEW IT, AND

01:26PM 22    SHE HAD NO BASIS FOR MAKING THOSE STATEMENTS.

01:26PM 23        WHAT DO WE, IN FACT, KNOW?

01:26PM 24        THERANOS HAD AT LEAST 11 PARTNERSHIPS WITH PHARMACEUTICAL

01:26PM 25    COMPANIES THEY BELIEVED WERE SUCCESSFUL, THAT FOR MANY OF THOSE

                    CLOSING ARGUMENT BY MR. DOWNEY                    9047

01:26PM   1      PARTNERSHIPS THE GOVERNMENT HAS NOT DISPUTED THAT THOSE

01:26PM   2      PARTNERSHIPS WERE SUCCESSFUL.

01:26PM   3           AND WITH REGARD TO THE THREE COMPANIES WHERE THE COMPANY

01:26PM   4      HAS -- WHERE THE GOVERNMENT HAS RAISED AN ISSUE, WITH THE

01:26PM   5      EXCEPTION OF DR. CULLEN, THE WITNESSES AREN'T EVEN THE PEOPLE

01:26PM   6      WHO WERE PRIMARILY INVOLVED IN THE RELATIONSHIP.

01:26PM   7           THAT SHOULD CAUSE YOU TO BEGIN TO QUESTION AND TAKE ON A

01:26PM   8      WILLINGNESS AS YOU EXAMINE THE EVIDENCE AS PART OF YOUR JURY

01:27PM   9      DELIBERATIONS TO LOOK AT BOTH SIDES OF THE STORY, BECAUSE IT'S

01:27PM  10      EASY TO MAKE THAT ACCUSATION.  IT COULD TAKE SOME EFFORT AND

01:27PM  11      TIME TO UNPACK IT.

01:27PM  12           NOW, THAT'S ONE EXAMPLE.  ONE EXAMPLE.

01:27PM  13           BUT THAT PATTERN WILL RUN THROUGHOUT THE CASE.  THE

01:27PM  14      GOVERNMENT IS SHOWING AN EVENT LOOKS BAD, BUT AT THE END OF THE

01:27PM  15      DAY WHEN ALL OF THE EVIDENCE FLOWS TOGETHER, IT ISN'T SO BAD.

01:27PM  16           I WILL SAY TO YOU THAT YOU ARE GOING TO SEE THAT WITH

01:27PM  17      REGARD TO SEVERAL ISSUES AS I CONTINUE TO GO THROUGH THE

01:27PM  18      EVIDENCE WITH YOU TODAY.

01:27PM  19           BUT I WANT TO TALK FIRST ABOUT THE ROLE THAT YOU

01:27PM  20      ULTIMATELY PLAY WHEN YOU GO BACK TO THE JURY ROOM, AND THEN I

01:27PM  21      WANT TO TALK ABOUT WHAT I THINK IS THE CRITICAL ISSUE IN THE

01:27PM  22      CASE AND EXAMINE THE EVIDENCE IN LIGHT OF IT, AND THAT IS

01:27PM  23      MS. HOLMES'S INTENT, WHAT SHE UNDERSTOOD AND BELIEVED WHY SHE

01:28PM  24      DID WHAT SHE DID.

01:28PM  25           AND I'LL GO THROUGH THAT SYSTEMATICALLY BECAUSE I THINK I

CLOSING ARGUMENT BY MR. DOWNEY

01:28PM   1    WILL BE HELPFUL TO YOU IF I COMPARE THAT, THE ELEMENTS OF WHAT

01:28PM   2    THE OFFENSES ARE, AND EXPLAIN HOW THEY RELATE TO WHAT THE

01:28PM   3    EVIDENCE IS.

01:28PM   4         AND I'LL ASK YOU THAT YOU REMEMBER FROM OUR ORIGINAL JURY

01:28PM   5    INSTRUCTIONS THAT YOU HAD AN OBLIGATION, WHICH YOU ALL

01:28PM   6    UNDERTOOK AND WHICH YOU'VE ALL DONE, TO MAINTAIN A PRESUMPTION

01:28PM   7    OF INNOCENCE THROUGHOUT THIS CASE.

01:28PM   8         AS YOU KNOW, MS. HOLMES IS PRESUMED INNOCENT UNTIL EACH

01:28PM   9    AND EVERY ONE OF YOU DETERMINES BEYOND A REASONABLE DOUBT THAT

01:28PM  10    SHE HAS COMMITTED EVERY ELEMENT OF THE OFFENSES WITH WHICH SHE

01:28PM  11    IS CHARGED.

01:28PM  12         SHE NEVER HAS TO PROVE HER INNOCENCE.  SHE NEVER HAS TO

01:28PM  13    EVEN OFFER A DEFENSE, ALTHOUGH THAT WAS DONE IN THIS CASE.

01:29PM  14         IF YOU HAVE A REASONABLE DOUBT AS TO WHETHER MS. HOLMES

01:29PM  15    COMMITTED ANY ELEMENT OF THE OFFENSE, YOU SHOULD FIND HER NOT

01:29PM  16    GUILTY.

01:29PM  17         NOW, MR. SCHENK MENTIONED IT IN PASSING, BUT I WANT TO

01:29PM  18    TALK ABOUT IT A LITTLE MORE AND IN A LITTLE MORE DEPTH, AND

01:29PM  19    THAT IS THE CONCEPT OF REASONABLE DOUBT.  WE HEAR THAT PHRASE

01:29PM  20    ALL OF THE TIME.

01:29PM  21         WHAT DOES REASONABLE DOUBT MEAN?

01:29PM  22         WELL, I THINK YOU CAN THINK OF REASONABLE DOUBT AS A --

01:29PM  23    REALLY AS A STANDARD.  IF YOU THINK ABOUT THE DIFFERENT

01:29PM  24    ELEMENTS OF PROOF OR THE DIFFERENT BURDENS OF PROOF THAT APPLY

01:29PM  25    IN THE LAW, I JUST WANT TO EXPLAIN HOW THE CONCEPT OF THE

CLOSING ARGUMENT BY MR. DOWNEY                                    9049

01:29PM   1    REASONABLE DOUBT FITS WITHIN THAT.

01:29PM   2         IF YOU LOOK AT THE EVIDENCE AS AN ASCENDING STAIRCASE,

01:29PM   3    THIS IS WHAT IT WOULD LOOK LIKE AS COMPARED TO THE BURDENS THAT

01:30PM   4    SOMEONE FACES IN CONNECTION WITH A CASE.

01:30PM   5         AT THE BOTTOM YOU HAVE NO EVIDENCE, SO THERE IS NOTHING TO

01:30PM   6    DO.

01:30PM   7         ABOVE THAT WE HAVE WHAT IS CALLED A SCINTILLA OF EVIDENCE,

01:30PM   8    WHICH IS JUST A TINY BIT OF EVIDENCE WHICH MIGHT RAISE WITH

01:30PM   9    SOMEONE A CONCERN, BUT IT'S NOT MUCH EVIDENCE.

01:30PM  10         NOW, ABOVE THAT IS REASONABLE SUSPICION.  REASONABLE

01:30PM  11    SUSPICION IS EVIDENCE FROM WHICH A REASONABLE PERSON COULD

01:30PM  12    CONCLUDE THAT A CRIME HAS BEEN COMMITTED.  NOT EVERY PERSON

01:30PM  13    WOULD HAVE TO CONCLUDE THAT, BUT A REASONABLE PERSON COULD

01:30PM  14    CONCLUDE FROM THE EVIDENCE THAT IS PRESENTED.

01:30PM  15         PROBABLE CAUSE IS NEXT ABOVE THAT, AND THAT TAKES US TO

01:30PM  16    THE POINT WHERE PEOPLE -- WHERE A COURT MAKES A DETERMINATION

01:30PM  17    THAT THERE'S ENOUGH EVIDENCE OF AN OFFENSE THAT CERTAIN ACTIONS

01:30PM  18    MIGHT BE JUSTIFIED, FOR EXAMPLE, A SEARCH OF SOMEONE'S HOME.

01:31PM  19    BUT IT IS NOT, IT IS NOT REQUIRED THAT THERE BE A HIGHER LEVEL

01:31PM  20    OF PROOF.

01:31PM  21         NOW, WHAT IS ABOVE THAT?  WHAT IS ABOVE THAT IS A CONCEPT

01:31PM  22    THAT SOME OF YOU ARE FAMILIAR WITH BECAUSE I KNOW YOU'VE SERVED

01:31PM  23    ON CIVIL JURIES IN CONNECTION WITH OTHER TRIALS, AND THAT'S A

01:31PM  24    PREPONDERANCE OF THE EVIDENCE.  IF SOMEONE IS FOUND TO HAVE

01:31PM  25    PROVEN BY A PREPONDERANCE OF THE EVIDENCE SOMETHING, THEY'VE

CLOSING ARGUMENT BY MR. DOWNEY                                    9050

01:31PM   1    PROVEN THAT WHEN EVIDENCE IS WEIGHED, IT'S A LITTLE MORE LIKELY

01:31PM   2    THAT SOMETHING IS TRUE THAN FALSE.  THAT'S A PREPONDERANCE OF

01:31PM   3    EVIDENCE.

01:31PM   4        ABOVE THAT IS THE CLEAR AND CONVINCING STANDARD.  NOW, YOU

01:31PM   5    MEET THE CLEAR AND CONVINCING STANDARD IF YOU ARE FIRMLY

01:31PM   6    CONVINCED THAT SOMETHING HAPPENS, YOU ARE FIRMLY CONVINCED THAT

01:31PM   7    SOMETHING HAPPENS.

01:31PM   8        THAT DOESN'T MEAN IT HAS TO BE BEYOND A REASONABLE DOUBT

01:31PM   9    THAT IT HAPPENED, BUT YOU ARE FIRMLY CONVINCED OF IT.

01:32PM   10       REASONABLE DOUBT IS ABOVE THAT.  IT'S A HIGHER STANDARD OF

01:32PM   11   PROOF.  AND REASONABLE DOUBT MEANS NOT BEYOND SPECULATION, BUT

01:32PM   12   BEYOND ANY REASONABLE DOUBT THAT A PERSON WOULD HAVE, THEY

01:32PM   13   DETERMINED THAT THE EVIDENCE DOES NOT ALLOW FOR A DETERMINATION

01:32PM   14   THAT THE PERSON DID NOT COMMIT AN OFFENSE.

01:32PM   15       THAT IS THE HIGHEST BURDEN IN THE LAW.

01:32PM   16       THAT IS THE BURDEN WHICH THE GOVERNMENT BEARS IN THIS CASE

01:32PM   17   AND THEY ACCEPT.  YOU SHOULD EXAMINE THE EVIDENCE WITH THAT

01:32PM   18   BURDEN IN MIND.

01:32PM   19       THIS IS NOT A CASE WHERE YOU'RE EVALUATING, DO I THINK IT

01:32PM   20   IS MORE LIKELY THAN NOT THAT MS. HOLMES HAS COMMITTED AN

01:32PM   21   OFFENSE?  AM I FIRMLY CONVINCED THAT MS. HOLMES HAS COMMITTED

01:32PM   22   AN OFFENSE?

01:32PM   23       THIS IS A CASE IN WHICH YOU ARE QUESTIONING, IS IT BEYOND

01:32PM   24   A REASONABLE DOUBT THAT MS. HOLMES HAS COMMITTED THE OFFENSES

01:32PM   25   OF WHICH SHE IS ACCUSED?

9051

CLOSING ARGUMENT BY MR. DOWNEY

01:33PM 1      NOW, I WANT TO TALK A LITTLE BIT, AND I WON'T GO INTO THEM

01:33PM 2   IN DEPTH BECAUSE I THINK MR. SCHENK HOPEFULLY SPUN OUT FOR YOU

01:33PM 3   THE ELEMENTS THAT ARE AT ISSUE HERE, BUT I WANT TO PAY

01:33PM 4   ATTENTION TO A FEW OF THE ELEMENTS.

01:33PM 5      AS MR. SCHENK TOLD YOU, WIRE FRAUD REQUIRES THAT THE

01:33PM 6   GOVERNMENT PROVE THAT SOMEONE HAS KNOWINGLY DEVISED A SCHEME TO

01:33PM 7   DEFRAUD; AND THEY'VE MADE MATERIAL FALSE STATEMENTS AS PART OF

01:33PM 8   THAT; AND THAT THEY ACTED WITH THE INTENT TO DEFRAUD, I'LL

01:33PM 9   RETURN TO THAT; AND AS MR. SCHENK SAID, THEY USED INTERSTATE

01:33PM 10  WIRES TO CARRY OUT AN ESSENTIAL PART OF THAT SCHEME.

01:33PM 11     LET'S FOCUS ON THE INTENT AND WHAT THAT MEANS IN THIS

01:33PM 12  CONTEXT.  INTENT TO DEFRAUD MEANS THE INTENT TO DEPRIVE SOMEONE

01:33PM 13  OF MONEY OR PROPERTY BY MEANS OF A DECEPTION.

01:33PM 14     IF SOMEONE IS ACTING IN GOOD FAITH OR SOMEONE DOES NOT

01:33PM 15  BELIEVE THAT WHAT THEY ARE DOING ACTUALLY IS PART OF A SCHEME

01:34PM 16  TO DEFRAUD, THEN THE CORRECT VERDICT IS A NOT GUILTY VERDICT.

01:34PM 17     LET'S TALK BRIEFLY ABOUT CONSPIRACY, AND THEN WE'LL TAKE

01:34PM 18  OUR BREAK.

01:34PM 19     CONSPIRACY REQUIRES THAT YOU FIND THAT SOMEONE AGREED WITH

01:34PM 20  SOMEONE ELSE TO COMMIT WIRE FRAUD AND THAT THE PERSON BECAME A

01:34PM 21  MEMBER OF THAT CONSPIRACY BY WILLFULLY PARTICIPATING IN AN

01:34PM 22  UNLAWFUL PLAN WITH INTENT TO COMMIT WIRE FRAUD.

01:34PM 23     LET'S FOCUS ON THAT WORD "WILLFULLY."

01:34PM 24     WILLFULLY MEANS THAT SOMEONE IS ACTING WITH THE KNOWLEDGE

01:34PM 25  THAT THEIR CONDUCT IS ILLEGAL.  THEY'RE DOING SOMETHING WITH

CLOSING ARGUMENT BY MR. DOWNEY                                           9052

01:34PM   1    THE INTENT TO DO SOMETHING THAT THE LAW FORBIDS.

01:34PM   2        IF SOMEONE IS ACTING IN GOOD FAITH, YOU HAVE NO REASON TO

01:34PM   3    FIND THEM GUILTY, EVEN IF THE OTHER ELEMENTS OF AN OFFENSE ARE

01:34PM   4    FOUND.

01:34PM   5        I THINK, LADIES AND GENTLEMEN, THAT THE CONCEPTS OF INTENT

01:35PM   6    AND WILLFULNESS ARE GOING TO INFORM YOUR EVALUATION OF A LOT OF

01:35PM   7    THE EVIDENCE IN THIS CASE, AND WHEN WE COME BACK, I WILL GO

01:35PM   8    THROUGH SOME OF THAT EVIDENCE WITH YOU.

01:35PM   9        THE COURT:  LET'S TAKE OUR BREAK NOW.  LET'S TAKE

01:35PM  10    30 MINUTES, LADIES AND GENTLEMEN, 30 MINUTES.  THANK YOU.

01:35PM  11        THE CLERK:  COURT IS IN RECESSION.

01:35PM  12    (RECESS FROM 1:35 P.M. UNTIL 2:08 P.M.)

02:08PM  13        THE COURT:  THANK YOU.  PLEASE BE SEATED.

02:08PM  14    WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

02:08PM  15    MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:08PM  16        MR. DOWNEY, DO YOU HAVE A NEW BATTERY AND THE MICROPHONE

02:08PM  17    IS OPERATIONAL?

02:08PM  18        MR. DOWNEY:  THAT'S WHAT I UNDERSTAND, YES.

02:08PM  19        THE COURT:  GREAT.  WOULD YOU LIKE TO CONTINUE WITH

02:08PM  20    YOUR ARGUMENT?

02:08PM  21        MR. DOWNEY:  YES, SIR.

02:08PM  22    GOOD AFTERNOON.  I TOLD YOU BEFORE WE BROKE THAT I WAS

02:08PM  23    GOING TO START TO TALK ABOUT EVIDENCE OF INTENT, AND I AM GOING

02:08PM  24    TO DO THAT, BUT I WANTED TO TAKE A MOMENT BEFORE WE RESUMED TO

02:08PM  25    THANK ALL OF YOU FOR SERVING IN THE ROLE THAT YOU HAVE SERVED

CLOSING ARGUMENT BY MR. DOWNEY                                    9053

02:08PM   1    FOR THE LAST THREE AND A HALF, ALMOST FOUR MONTHS.

02:08PM   2         I KNOW THAT AT THE 4TH OF JULY, IF SOMEONE ASKED YOU, HOW

02:08PM   3    ARE YOU GOING TO SPEND THE SECOND HALF OF THE YEAR, YOU

02:08PM   4    WOULDN'T SAY, I'M GOING TO BE SPENDING THREE OR FOUR OR FIVE

02:08PM   5    DAYS A WEEK IN A COURTHOUSE IN DOWNTOWN SAN JOSE.

02:08PM   6         BUT YOU'VE DONE IT.  YOU'VE PAID CLOSE ATTENTION, YOU'VE

02:08PM   7    LISTENED, AND I KNOW YOU WILL FULFILL THE RESPONSIBILITIES OF

02:08PM   8    YOUR OATH WITH PROPER APPROACH.

02:09PM   9         AND I SAY TO YOU, BEFORE I GET BACK INTO THE EVIDENCE, I

02:09PM   10   KNOW, BECAUSE THERE HAVE BEEN SOME EXTRAORDINARY PROCEEDINGS IN

02:09PM   11   CONNECTION WITH THIS MATTER, THAT YOU'RE ALL AWARE THERE HAS

02:09PM   12   BEEN A LOT OF ATTENTION TO THE CASE.  WE DISCUSSED SOME OF THAT

02:09PM   13   IN VOIR DIRE.

02:09PM   14        BUT YOU HAVE A PARTICULARLY IMPORTANT ROLE BECAUSE ALL OF

02:09PM   15   YOU HAVE SEEN IN THE CONTEXT OF THIS CASE THE EVIDENCE, THE

02:09PM   16   FULL EVIDENCE.  AND YOU WILL BE IN A POSITION TO DECIDE WHETHER

02:09PM   17   MS. HOLMES IS GUILTY OF AN OFFENSE OR NOT.

02:09PM   18        IT'S NOT A LIGHT RESPONSIBILITY, BUT I KNOW YOU'VE

02:09PM   19   UNDERTAKEN IT WITH A LOT OF SERIOUSNESS AND I AM GRATEFUL TO

02:09PM   20   YOU, AND I KNOW MR. SCHENK JOINS ME IN THAT.

02:09PM   21        LET ME RETURN TO THE SUBJECT OF MS. HOLMES'S INTENT, WHICH

02:09PM   22   I WAS DISCUSSING BEFORE THE BREAK.

02:10PM   23        AND I WOULD SAY TO YOU THAT IN ORDER TO UNDERSTAND

02:10PM   24   MS. HOLMES'S INTENT, THERE ARE REALLY FIVE BODIES OF EVIDENCE

02:10PM   25   THAT HAVE BEEN INTRODUCED IN CONNECTION WITH THE CASE THAT GIVE

CLOSING ARGUMENT BY MR. DOWNEY                                    9054

02:10PM   1    YOU THE CLOSEST AND THE CLEAREST PICTURE OF WHAT MS. HOLMES WAS

02:10PM   2    THINKING DURING THE YEARS FROM 2010 TO 2016, AND THEY ARE FIRST

02:10PM   3    THE INTERACTIONS THAT SHE AND THERANOS HAD WITH THE FOOD AND

02:10PM   4    DRUG ADMINISTRATION AND THE PURSUIT OF APPROVAL FOR THE

02:10PM   5    TECHNOLOGY AT THE FOOD AND DRUG ADMINISTRATION.

02:10PM   6         SECOND, THE FEEDBACK WHICH SHE GOT OVER MANY YEARS FROM

02:10PM   7    THE PEOPLE WHO WORKED INSIDE THERANOS WITH HER, HOW DID THEY

02:10PM   8    FEEL ABOUT THE TECHNOLOGY THAT THE COMPANY WAS INVENTING, AND

02:10PM   9    HOW DID THEY TALK WITH MS. HOLMES ABOUT IT?

02:10PM  10         THIRD IS THE FEEDBACK THAT THE COMPANY GOT FROM OUTSIDERS,

02:11PM  11    WHAT TYPES OF INSTITUTIONS LOOKED AT THERANOS'S TECHNOLOGY, AND

02:11PM  12    WHAT DID THEY CONCLUDE?

02:11PM  13         FOURTH, I THINK YOU SHOULD TAKE INTO ACCOUNT MS. HOLMES'S

02:11PM  14    REPEATED WILLINGNESS TO EXPOSE THERANOS'S TECHNOLOGY TO OUTSIDE

02:11PM  15    REVIEW, WHAT THIRD PARTIES SHE TALKED TO, WHAT THIRD PARTIES

02:11PM  16    ACTUALLY LOOKED AT THERANOS'S TECHNOLOGY, WHAT FEEDBACK DID

02:11PM  17    THEY GIVE?

02:11PM  18         AND LAST, I WANT TO TALK ABOUT MS. HOLMES'S REACTION TO

02:11PM  19    THE DETERMINATION THAT THERE WERE ISSUES WITH RESPECT TO THE

02:11PM  20    PERFORMANCE OF THERANOS'S LAB AND THE ACTIONS SHE TOOK

02:11PM  21    THEREAFTER THROUGHOUT BEGINNING IN 2016.

02:11PM  22         SO LET'S START FIRST WITH HER INTERACTIONS WITH THE FDA

02:11PM  23    AND THE PURSUIT OF FDA APPROVAL FOR SOME OF THERANOS'S

02:12PM  24    TECHNOLOGY.

02:12PM  25         YOU KNOW THAT THE FDA HAS BEEN A SUBJECT OF SOME

CLOSING ARGUMENT BY MR. DOWNEY                                    9055

02:12PM   1    DISCUSSION IN CONNECTION WITH THE CASE.

02:12PM   2         BUT MS. HOLMES'S INTERACTIONS WITH IT PROFOUNDLY INFORMED

02:12PM   3    HER BELIEF ABOUT WHERE THERANOS WAS AS A COMPANY, AND THE

02:12PM   4    CLEAREST MEASURE OF WHAT SHE BELIEVED IS BY MATCHING UP HOW SHE

02:12PM   5    WAS INTERACTING WITH THE FOOD AND DRUG ADMINISTRATION AND THE

02:12PM   6    STATEMENTS THAT SHE WAS MAKING WHICH MR. SCHENK READ TO YOU IN

02:12PM   7    GREAT LENGTH DURING HIS SUMMATION THIS MORNING.

02:12PM   8         MS. HOLMES WORKED PROACTIVELY BETWEEN 2013 AND 2015 TO GET

02:12PM   9    THERANOS'S SYSTEM 4.0 APPROVED BY THE FOOD AND DRUG

02:13PM   10   ADMINISTRATION.

02:13PM   11        IF YOU LOOK AT SLIDE 29, YOU SEE THE REFERENCE TO EXHIBIT

02:13PM   12   NUMBERS WHICH REFLECT THAT IN THE FALL OF 2013, THERANOS'S 4.0

02:13PM   13   SYSTEM OF TECHNOLOGY HAD REACHED A POINT WHERE THE COMPANY WAS

02:13PM   14   WILLING TO GO TO THE FOOD AND DRUG ADMINISTRATION AND SAY, WE

02:13PM   15   WANT TO BEGIN THE PROCESS OF BRINGING THIS TECHNOLOGY TO

02:13PM   16   MARKET, AND WE WANT TO HAVE A DIALOGUE WITH YOU.

02:13PM   17        AND THEY DID THAT IN CONNECTION WITH ALL OF THE DIFFERENT

02:13PM   18   METHODS OF ASSAYS, WHICH WE'LL DISCUSS IN A BIT.

02:13PM   19        THEN IN NOVEMBER OF 2014, THERANOS ACTUALLY SUBMITTED WHAT

02:13PM   20   IS CALLED A PREMARKET NOTIFICATION, WHICH YOU SAW DURING HER

02:13PM   21   DIRECT TESTIMONY, SAYING WE'RE READY NOW TO BRING THIS

02:13PM   22   MARKET -- THIS PROCESS, THIS TECHNOLOGY AND THIS SYSTEM TO

02:13PM   23   MARKET, PLEASE GIVE US AN APPROVAL.

02:14PM   24        AND OF COURSE THEN, AS YOU'VE HEARD A FEW TIMES IN THE

02:14PM   25   CASE, IN JULY OF 2015, THE FDA DID APPROVE THERANOS'S

CLOSING ARGUMENT BY MR. DOWNEY                                         9056

02:14PM   1    TECHNOLOGY IN CONNECTION WITH THE HSV ASSAY.  MS. HOLMES'S

02:14PM   2    INTENT WAS PROFOUNDLY AFFECTED BY THAT.

02:14PM   3        HOW DID SHE DEAL WITH THE FDA WHEN SHE TALKED TO THEM?

02:14PM   4        WELL, FIRST OF ALL, I WOULD SAY THAT SHE MADE VERY BROAD

02:14PM   5    DISCLOSURES.  SHE DISCLOSED WHAT WAS GOING ON IN CONNECTION

02:14PM   6    WITH THERANOS'S BUSINESS IN GREAT DETAIL TO THE FDA.  SHE

02:14PM   7    EXPLAINED TO THEM THE CONCEPT THAT THERE WOULD BE TWO PHASES TO

02:14PM   8    THE BUSINESS, PHASE I, THERANOS WOULD OPERATE A CENTRAL LAB;

02:14PM   9    AND PHASE II, AFTER THERANOS HAD GAINED APPROVAL FROM THE FDA,

02:14PM   10   THEY WOULD BEGIN TO ACTUALLY PLACE THEIR DEVICES AT LOCATIONS.

02:15PM   11       BLOOD TESTS.

02:15PM   12       SHE EXPLAINED THAT HERE IN THE FALL OF 2013.  AND ALTHOUGH

02:15PM   13   A LOT HAS BEEN MADE THROUGHOUT THE CASE AND A LOT WAS SUGGESTED

02:15PM   14   THIS MORNING IN MR. SCHENK'S PRESENTATION, SHE WAS SENSITIVE

02:15PM   15   ABOUT PEOPLE KNOWING THAT THE CLIA LAB AT THERANOS WAS USING

02:15PM   16   THIRD PARTY DEVICES.

02:15PM   17       IN FACT, WHEN SHE WENT TO THE FDA IN THE FALL OF 2013, SHE

02:15PM   18   EXPLAINED THAT DURING THE PHASE I PROCESS, NOT ONLY WAS THAT

02:15PM   19   GOING TO HAPPEN, BUT THAT WAS HAPPENING.

02:15PM   20       IF YOU LOOK AT EXHIBIT 15029, SHE LAYS OUT EVERY TEST THAT

02:15PM   21   THE COMPANY WAS OFFERING, THE KIND OF DEVICE THAT TEST WAS

02:15PM   22   OFFERED ON, AND THE TYPE OF ASSAY THAT WAS PERFORMED, WHETHER

02:15PM   23   IT WAS A THERANOS ASSAY OR SOMEONE ELSE'S.

02:15PM   24       SO SHE WAS VERY CLEAR CUT IN THESE DISCUSSIONS WITH THE

02:16PM   25   FDA ABOUT WHAT WAS GOING ON.

CLOSING ARGUMENT BY MR. DOWNEY                                    9057

02:16PM  1        SECOND, AS I MENTIONED, SHE SUBMITTED -- SHE CAUSED

02:16PM  2   THERANOS TO SUBMIT EVERY FORM OF ASSAY IT COULD DO TO THE FDA

02:16PM  3   FOR APPROVAL IN THE FALL OF 2013, AROUND THE TIME THAT THERANOS

02:16PM  4   LAUNCHED ITS SERVICE CENTERS IN WALGREENS STORES.

02:16PM  5        SO THEY WERE COMPREHENSIVELY SAYING TO THE FDA, WE WANT TO

02:16PM  6   BEGIN THE PROCESS WITH YOU OF GAINING APPROVAL FOR ALL OF OUR

02:16PM  7   TECHNOLOGY.

02:16PM  8        NEXT, THE 4.0 SYSTEM AS A WHOLE WAS SUBMITTED IN NOVEMBER

02:16PM  9   OF 2014.

02:16PM  10       WHY WAS THAT -- WHY IS THAT IMPORTANT?  WHAT WE'VE HEARD

02:16PM  11  THIS MORNING FROM MR. SCHENK AND THROUGHOUT THE CASE IS THAT

02:16PM  12  REPRESENTATIONS WERE MADE DURING THE FALL OF 2014 THAT WERE

02:16PM  13  FALSE AS TO THE CAPACITIES OF THERANOS'S TECHNOLOGY.

02:17PM  14       AT THE TIME THAT MS. HOLMES WAS HAVING THOSE

02:17PM  15  CONVERSATIONS, SHE WAS SUBMITTING TO THE FDA AN APPLICATION FOR

02:17PM  16  APPROVAL OF THE TECHNOLOGY THAT CONTAINED A FULL DESCRIPTION OF

02:17PM  17  ITS CAPABILITIES AND THAT MADE THE ARGUMENT THAT THIS WAS

02:17PM  18  TECHNOLOGY THAT WAS READY TO BE PLACED AT LOCAL LOCATIONS TO

02:17PM  19  CONDUCT BLOOD TESTING SERVICES.  THAT'S EXHIBIT 13288A.

02:17PM  20       AND WE'LL TALK ABOUT SCIENTISTS AT THERANOS IN A MINUTE,

02:17PM  21  BUT YOU WILL SEE THAT THAT WAS A VERY THOROUGH PRESENTATION TO

02:17PM  22  THE FDA OF WHAT THERANOS THOUGHT ITS ABILITIES WERE, HOW THE

02:17PM  23  SYSTEM WORKED, THE DATA THAT HAD BEEN GENERATED TO PROVE THAT

02:17PM  24  THE TECHNOLOGY WORKED.  EVERYTHING YOU WOULD EXPECT DONE IN A

02:17PM  25  COMPREHENSIVE WAY.

CLOSING ARGUMENT BY MR. DOWNEY                                9058

02:17PM  1        NOW, I THINK THERE'S A SUGGESTION GENERALLY AS PART OF THE

02:17PM  2   GOVERNMENT'S CASE, AND I WANT TO DISPEL IT, WHICH IS THAT

02:18PM  3   THERANOS WAS RELUCTANT TO SHOW ITS TECHNOLOGY TO REALLY ANYONE.

02:18PM  4        YOU NOTICE THAT MR. SCHENK MENTIONED THIS MORNING THAT

02:18PM  5   THERANOS DID NOT SEND DEVICES TO SCHERING-PLOUGH AS PART OF THE

02:18PM  6   WORK THAT THEY DID TOGETHER.

02:18PM  7        I THINK YOU SHOULD NOT INFER FROM ANY PARTICULAR SITUATION

02:18PM  8   SOME HESITATION ON MS. HOLMES'S PART TO EXPOSE THE TECHNOLOGY.

02:18PM  9        IN FACT, WHEN SHE DEALT WITH THE FDA, SHE WENT TO THEM

02:18PM 10   WITH A PRESENTATION WHICH GAVE THEM A VIDEO OF THE ENTIRE

02:18PM 11   OPERATION OF THE INTERNAL PARTS OF THE SERIES 4.0 DEVICE SO

02:18PM 12   THEY COULD WATCH, FROM SOUP TO NUTS, HOW DOES THIS DEVICE WORK?

02:18PM 13   WHY WAS THERANOS CLAIMING THAT THE SYSTEM WAS READY FOR MARKET?

02:18PM 14        NOW, THE DATE ON WHICH THE THERANOS 4.0 SYSTEM AND THE

02:19PM 15   HSV-1 ASSAY WERE APPROVED WAS IN THE SUMMER OF 2015.

02:19PM 16        I THINK YOU SAW DURING THE COURSE OF THE CASE THIS EMAIL

02:19PM 17   FROM MS. HOLMES.  YOU SEE HER REACTION AND THE PRIDE THAT SHE

02:19PM 18   EXPRESSES THAT THE 4 SYSTEM HSV ASSAY BE APPROVED.  THIS IS

02:19PM 19   FOUR MONTHS BEFORE THE DIFFICULTIES THAT HAD AROSE DURING THE

02:19PM 20   FALL THAT HAVE BEEN THE SUBJECT OF SO MUCH DISCUSSION.

02:19PM 21        NOW, THAT'S WHAT IS REFLECTED IN HER DEALINGS WITH THE

02:19PM 22   FDA, TRANSPARENCY, COMPREHENSIVENESS, THE PRESENTATION OF DATA.

02:19PM 23   THE ENTIRE SYSTEM IS PRESENTED TO THE FDA FOR APPROVAL.

02:19PM 24        BUT I WANT TO LOOK NOW AT WHAT WAS HAPPENING INSIDE OF

02:19PM 25   THERANOS, NOT WHAT WAS HAPPENING EXTERNALLY WITH RESPECT TO THE

CLOSING ARGUMENT BY MR. DOWNEY                              9059

02:20PM   1    FDA OR OTHER OUTSIDE PARTIES.

02:20PM   2         AND I WANT TO DRAW TO YOUR ATTENTION A SIMPLE FACT IN

02:20PM   3    CONNECTION WITH THIS CASE THAT MIGHT NOT BE AS NOTICEABLE WHEN

02:20PM   4    YOU SIT THROUGH THE CASE DAY AFTER DAY AFTER DAY.

02:20PM   5         BUT I THINK YOU KNOW, AND MS. HOLMES TESTIFIED TO THIS,

02:20PM   6    THAT SHE BELIEVED, STARTING AS EARLY AS 2010, THAT THERANOS WAS

02:20PM   7    GOING TO BE CAPABLE OF PUTTING IN PLACE THIS 4.0 TECHNOLOGY

02:20PM   8    THAT WOULD BE CAPABLE OF PERFORMING ANY BLOOD TEST.

02:20PM   9         AND I THINK YOU ALSO SAW, AND I'LL SHOW YOU IN A MOMENT

02:20PM  10    SOME EXAMPLES OF IT, THAT OVER THE COURSE OF THE NEXT THREE TO

02:20PM  11    FIVE YEARS, SHE RECEIVED REGULAR UPDATES ABOUT WHERE THAT

02:20PM  12    TECHNOLOGY WAS.

02:20PM  13         THAT'S FUNDAMENTAL AND CENTRAL TO HER THINKING WHEN SHE

02:20PM  14    GOES OUT AND MAKES PUBLIC STATEMENTS.

02:20PM  15         NOW, ASK YOURSELF, DURING THE COURSE OF THE GOVERNMENT'S

02:20PM  16    CASE, HOW MANY WITNESSES WHO ACTUALLY WORKED ON THE BUILDING OF

02:21PM  17    THERANOS'S TECHNOLOGY TESTIFIED?  WE WERE HERE FOR THREE AND A

02:21PM  18    HALF MONTHS.  HOW MANY WITNESSES?

02:21PM  19         THE ANSWER IS ONE.  THERE WAS NOT ONE SINGLE WITNESS THAT

02:21PM  20    THE GOVERNMENT CALLED WHO TESTIFIED ABOUT THE DEVELOPMENT OF

02:21PM  21    THE HARDWARE THAT YOU HAVE HEARD SO MUCH ABOUT DURING THE

02:21PM  22    COURSE OF THE CASE.

02:21PM  23         THERE WAS NOT A SINGLE WITNESS WHO WAS CALLED WHO WORKED

02:21PM  24    ON THE BUILDING OF THE TECHNOLOGY THAT WENT INTO THE SOFTWARE

02:21PM  25    THAT WAS PART OF THE 4.0 SYSTEM.

CLOSING ARGUMENT BY MR. DOWNEY                          9060

02:21PM   1        AND WITH RESPECT TO THE ASSAYS THAT WERE DISCUSSED A LOT

02:21PM   2   DURING THE CASE, THE ONLY WITNESS WHO WAS CALLED WHO WORKED ON

02:21PM   3   THE DEVELOPMENT OF ASSAYS WAS MS. GANGAKHEDKAR, WHO I WILL

02:21PM   4   DISCUSS IN A LITTLE BIT.

02:21PM   5        BUT THE OTHER SCIENTISTS WHO WORKED ON THE DEVELOPMENT OF

02:21PM   6   THE ASSAYS, THEY DIDN'T COME AND TESTIFY AT ALL ABOUT WHAT THEY

02:21PM   7   BELIEVED THE CAPABILITIES OF THERANOS'S TECHNOLOGY WAS.

02:22PM   8        SO IT WAS NOT UNTIL DOCUMENTS WERE INTRODUCED DURING

02:22PM   9   MS. HOLMES'S TESTIMONY THAT YOU REALLY BEGAN TO SEE WHAT THE

02:22PM  10   BELIEFS WERE OF THE ENGINEERS AND THE SCIENTISTS WITHIN

02:22PM  11   THERANOS AS TO WHAT THE COMPANY BELIEVED IT WAS CAPABLE OF

02:22PM  12   TECHNOLOGICALLY.

02:22PM  13        AND LET ME LOOK A LITTLE BIT AT THE TECHNOLOGY HERE, WHICH

02:22PM  14   IS THE DRAWING OF THE 4.0 SYSTEM THAT I SHOWED YOU.  LOOK AT

02:22PM  15   ALL OF THE NAMES OF PEOPLE THAT YOU'VE SEEN ON DOCUMENTS THAT

02:22PM  16   SURROUND THIS TECHNOLOGY.  THESE ARE THE NAMES OF PEOPLE WHO

02:22PM  17   APPEAR ON DOCUMENTS IN THE CASE AS CONTRIBUTING TO BUILDING

02:22PM  18   THIS SYSTEM.

02:22PM  19        AND I THINK YOU WILL CONFIRM WHEN YOU REVIEW THAT THAT THE

02:22PM  20   ONLY WITNESS WHO CAME AND TESTIFIED WAS MS. GANGAKHEDKAR.

02:22PM  21        BUT THAT DOESN'T LEAVE US COMPLETELY IGNORANT AS TO WHAT

02:22PM  22   THEY THOUGHT.  AND LET ME SHOW YOU FROM 2008 FORWARD WHAT

02:23PM  23   MS. HOLMES WAS TOLD.

02:23PM  24        FIRST, AS YOU KNOW, THERE WAS A 3.0 SERIES BEFORE THERE

02:23PM  25   WAS A 4.0 SERIES.  AND THAT'S THE DEVICE THAT WAS USED IN

CLOSING ARGUMENT BY MR. DOWNEY                                    9061

02:23PM   1     CONNECTION WITH, FOR EXAMPLE, PHARMACEUTICAL COMPANIES.

02:23PM   2          AND IN CONNECTION WITH THAT, YOU SEE HERE THE REPORTS

02:23PM   3     BEGAN TO COME IN TO MS. HOLMES IN CONNECTION WITH THE PROJECTS

02:23PM   4     THAT THE COMPANY WAS DOING, THAT THE PERFORMANCE DESIGN GOALS

02:23PM   5     WERE BEING DEMONSTRATED IN THE WORK THAT THERANOS WAS DOING.

02:23PM   6          THE SYSTEM WAS BEING EVALUATED AT SEVERAL SITES, AND THAT

02:23PM   7     THE RESULTS WERE EXCELLENT.

02:23PM   8          THAT'S WHAT MS. HOLMES WAS TOLD ABOUT THE 3.0 DEVICE AND

02:23PM   9     ITS PERFORMANCE DURING THE COURSE OF THE YEARS 2008 TO 2013.

02:23PM  10          AND THIS IS THE OUTSET.  THAT'S THE 3.0 DEVICE.

02:23PM  11          NOW, THAT 3.0 DEVICE ITSELF HAD A LOT OF CAPACITY.  IT

02:24PM  12     COULDN'T DO EVERY BLOOD TEST.  IT COULD ONLY DO SOME BLOOD

02:24PM  13     TESTS.  IT COULD DO THE CLASS OF BLOOD TESTS OR THE METHOD OF

02:24PM  14     BLOOD TESTING CALLED THE IMMUNOASSAYS.  AND YOU'VE HEARD THAT

02:24PM  15     TERM THROUGHOUT THE COURSE OF THE CASE.

02:24PM  16          I WANT YOU TO BEAR IN MIND THAT THE 3 SYSTEM WAS DOING

02:24PM  17     IMMUNOASSAYS AS WE GO FORWARD AND LOOK AT SOME OF THE

02:24PM  18     REPRESENTATIONS TO INVESTORS.

02:24PM  19          BUT DESPITE ITS LIMITATIONS IN METHOD, IT PERFORMED VERY

02:24PM  20     WELL.  IT WAS PART OF -- IT WAS DEPLOYED AND USED AS PART OF

02:24PM  21     CLINICAL STUDIES.  YOU SAW EVIDENCE ABOUT THE ARMY BURN STUDY.

02:24PM  22     YOU SAW THE EVIDENCE ABOUT THE PERFORMANCE WITH STANFORD

02:24PM  23     UNIVERSITY CONDUCTED A STUDY.

02:24PM  24          THE REPORTS THAT MS. HOLMES GOT DURING THAT WINDOW WAS

02:24PM  25     THAT THIS TECHNOLOGY, ALTHOUGH IT'S LIMITED TO ONE CLASS, IS

UNITED STATES COURT REPORTERS

**ER-12640**

CLOSING ARGUMENT BY MR. DOWNEY                                    9062

02:24PM   1    EFFECTIVE.

02:24PM   2         AND THEN IN 2009, LADIES AND GENTLEMEN, WHAT THE EVIDENCE

02:24PM   3    SHOWED YOU IS THAT THE ENGINEERS AND SCIENTISTS AT THERANOS

02:25PM   4    BEGAN TO THINK, WE COULD DO MORE THAN THIS.  WE COULD DO

02:25PM   5    MULTIPLE METHODS OF BLOOD TESTING.  AND IF WE COULD COMBINE THE

02:25PM   6    RIGHT METHODS OF BLOOD TESTING, THEN WE CAN PERFORM THE SAME

02:25PM   7    KINDS OF TESTS THAT ARE PERFORMED BY A CONVENTIONAL LAB.

02:25PM   8         BUT CONVENTIONAL LABS CAN'T PERFORM THOSE TESTS AT THE

02:25PM   9    POINT OF CARE.  THEY CAN'T DO THEM IN A RETAIL STORE.  THEY

02:25PM  10    CAN'T DO THEM IN A DOCTOR'S OFFICE WITHOUT BEING SENT TO A

02:25PM  11    CENTRAL LABORATORY.

02:25PM  12         AND IN EARLY 2010, AS MS. HOLMES TOLD YOU, AND THESE

02:25PM  13    DOCUMENTS REFLECT, MS. HOLMES WAS TOLD THAT THE RESULTS OF THAT

02:25PM  14    EFFORT TO DEVELOP THAT TECHNOLOGY HAD BEEN SUCCESSFUL.

02:25PM  15         I'D LIKE TO ASK YOU TO FOCUS IN PARTICULAR ON THIS

02:25PM  16    EXHIBIT, EXHIBIT 7098, WHICH IS THE REPORT THAT WAS WIDELY

02:25PM  17    CIRCULATED AMONGST THE SCIENTIFIC AND ENGINEERING TEAMS AT

02:26PM  18    THERANOS, AND SHARED WITH MS. HOLMES AS ATTACHED TO THIS

02:26PM  19    EXHIBIT.

02:26PM  20         IN THIS DOCUMENT DR. GIBBONS, WHO WAS LEADING ASSAYS AT

02:26PM  21    THAT TIME, REPORTS THAT THE 4.0 SYSTEM WILL BE CAPABLE OF

02:26PM  22    PERFORMING ANY MEASUREMENT, ANY MEASUREMENT REQUIRED IN A

02:26PM  23    DISTRIBUTED TEST SETTING.

02:26PM  24         HE THEN GOES ON TO TALK ABOUT HOW THAT WILL BE DONE,

02:26PM  25    DIFFERENT FORMS OF TECHNOLOGY ARE GOING TO BE USED, AND THAT

CLOSING ARGUMENT BY MR. DOWNEY                                    9063

02:26PM   1    THIS WILL BE OPEN ARCHITECTURE, MEANING THAT MORE ASSAYS CAN BE

02:26PM   2    ADDED TO IT OVER TIME AS THE ASSAYS ARE DEVELOPED.

02:26PM   3         MS. HOLMES WAS TOLD THAT ABOUT THE 4.0 SYSTEM AS EARLY AS

02:26PM   4    4.0 -- AS EARLY AS 2010.

02:26PM   5         NOW, YOU HAVE TO BEAR IN MIND THOSE REPRESENTATIONS TO

02:26PM   6    MS. HOLMES AS YOU ASK ABOUT WHY WAS SHE TALKING IN THE WAY THAT

02:26PM   7    SHE WAS TALKING EXTERNALLY ABOUT THE CAPACITIES OF THERANOS'S

02:26PM   8    TECHNOLOGY.

02:26PM   9         NOW, OVER THE COURSE OF TIME AFTER THE 4.0 SYSTEM WAS

02:27PM  10    DEVELOPED, IT WASN'T JUST THAT THE TECHNOLOGIES WERE COMBINED

02:27PM  11    TO ALLOW THEM TO DO THIS, TO GIVE THEM THE CAPABILITY TO DO

02:27PM  12    EVERY BLOOD TEST, BUT ACTUALLY IN THE RESEARCH AND DEVELOPMENT

02:27PM  13    LAB AT THERANOS, HUNDREDS AND HUNDREDS OF ASSAYS WERE

02:27PM  14    VALIDATED.

02:27PM  15         WHEN MS. GANGAKHEDKAR TESTIFIED BACK IN SEPTEMBER, SHE

02:27PM  16    TOLD YOU THAT THEY HAD VALIDATED 300 PROPRIETARY ASSAYS WITHIN

02:27PM  17    THE ASSAY TEAM IN THE RESEARCH AND DEVELOPMENT FUNCTION.

02:27PM  18         SO THEY THOUGHT THEY HAD A SYSTEM.  THEY THOUGHT THEY HAD

02:27PM  19    300 VALID ASSAYS THAT THEY COULD PERFORM.

02:27PM  20         THEY ALSO CAME TO UNDERSTAND THAT NOT ONLY HAD THEY

02:27PM  21    VALIDATED THEM FOR R&D PURPOSES, BUT THEY WOULD BE ABLE, WITH

02:28PM  22    THESE 300 ASSAYS, TO VALIDATE THEM ON A VERY QUICK BASIS WHEN

02:28PM  23    THEY TOOK THEM INTO THE CLIA LAB.

02:28PM  24         NOW, YOU'VE HEARD THAT THAT DIDN'T HAPPEN AND THERE WERE

02:28PM  25    DIFFICULTIES IN CONNECTION WITH THE 3 SYSTEM VALIDATING ASSAYS.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY                                        9064

02:28PM   1        BUT THEY BELIEVED THAT WITH RESPECT TO THE ASSAYS THAT

02:28PM   2    THEY HAD DEVELOPED FOR THE 4 SYSTEM, THEY COULD BE VALIDATED

02:28PM   3    VERY QUICKLY.

02:28PM   4        IN THIS REPORT AT EXHIBIT 7329, DR. PANGARKAR REPORTED TO

02:28PM   5    MS. HOLMES THAT THEY -- IF YOU LOOK AT THE BULLET POINT, HE'S

02:28PM   6    REPORTING ON THE NUMBERS OF ASSAYS THAT THEY HAVE VALIDATED.

02:28PM   7        AND IN THE LAST BULLET POINT HE REPORTS TO MS. HOLMES, OUR

02:28PM   8    ASSAYS GIVE RESULTS THAT AGREE WITH PREDICATE METHODS WITHIN

02:28PM   9    CLIA PRESCRIBED LIMITS.

02:28PM  10        YOU'VE HEARD A LOT OF DISCUSSION ABOUT THE FOUR DIFFERENT

02:29PM  11    METHODS, AND I'M NOT GOING TO TAKE YOU THROUGH THIS, BUT I DO

02:29PM  12    WANT YOU TO TAKE DOWN THE EXHIBIT NUMBERS BECAUSE I DID SHOW

02:29PM  13    YOU, THROUGH MS. HOLMES'S TESTIMONY, REPORTS OF EVERY FORM OF

02:29PM  14    TECHNOLOGY THAT MS. HOLMES WAS GETTING AS TO ITS PROGRESS AND

02:29PM  15    HOW COMPLETE IT WAS.  THESE ARE EXHIBITS 7239, 7286, 7297,

02:29PM  16    7222, AND 7315.

02:29PM  17        ACROSS THOSE IN THE YEARS 2011, '12, AND '13, SHE WAS

02:29PM  18    RECEIVING REGULAR REPORTS THAT THESE ASSAYS ARE READY AND WILL

02:29PM  19    BE CAPABLE OF PERFORMING BLOOD TESTS ON THE 4.0 SERIES.

02:29PM  20        SHE WAS ALSO TOLD THAT BY THE TIME THE PROCESS WAS DONE,

02:29PM  21    MORE THAN 3,000 -- MORE THAN 1,000 CPT CODES WOULD BE COVERED

02:29PM  22    BY THE ASSAYS THAT WOULD BE VALIDATED.

02:29PM  23        FROM ALL OF THIS, WHAT DID MS. HOLMES TAKE AWAY?

02:29PM  24        WELL, SHE TOOK AWAY THAT THERANOS HAD A TECHNOLOGY.  THAT

02:30PM  25    THE TECHNOLOGY HAD THIS CAPACITY.  AND WHEN SHE TALKED ABOUT IT

CLOSING ARGUMENT BY MR. DOWNEY                                    9065

02:30PM   1    TO WHATEVER AUDIENCE, SHE WAS REPRESENTING WHAT WAS HAPPENING

02:30PM   2    INTERNALLY AT THERANOS.

02:30PM   3         IT'S VERY DIFFICULT TO EVALUATE THAT WITHOUT HEARING FROM

02:30PM   4    THE SCIENTISTS AND ENGINEERS WHO WORKED ON DEVELOPING IT WITH

02:30PM   5    HER.

02:30PM   6         AT THE TIME OF THE LAUNCH, MR. SCHENK SHOWED YOU THIS

02:30PM   7    MORNING SOME DOCUMENTS THAT REFLECTED THAT CERTAIN NUMBERS OF

02:30PM   8    ASSAYS HAD BEEN VALIDATED.

02:30PM   9         YOU'LL RECALL THAT THE POINT OF HIS PRESENTATION WAS THAT

02:30PM   10   WHEN THERE WAS A LAUNCH IN 2013, THAT THE NUMBER OF ASSAYS IN

02:30PM   11   VARIOUS GROUPS WAS EITHER ZERO OR A SMALL NUMBER THAT HAD BEEN

02:30PM   12   VALIDATED.

02:30PM   13        BUT AT THE SAME TIME THAT MS. HOLMES WAS TOLD THAT, SHE

02:30PM   14   WAS TOLD THAT 200 PROPRIETARY TESTS WOULD BE VALIDATED AND

02:30PM   15   WOULD BE PART OF THE LAUNCH MENU.

02:30PM   16        SHE'S TOLD THAT HERE BY DR. YOUNG ON AUGUST 19TH, 2013,

02:31PM   17   ALMOST AT THE SAME TIME THAT THEY'RE REPORTING ON THE STATUS OF

02:31PM   18   THOSE CLINICAL VALIDATIONS.

02:31PM   19        SO MS. HOLMES WAS LIVING PRINCIPALLY IN A WORLD WITHIN

02:31PM   20   THERANOS FOCUSSED ON RESEARCH AND DEVELOPMENT, AND IN THAT

02:31PM   21   RESEARCH AND DEVELOPMENT FUNCTION AT THERANOS, THEY THOUGHT

02:31PM   22   THAT THEY HAD INVENTED A TECHNOLOGY WITH MASSIVE CAPABILITY,

02:31PM   23   AND MS. HOLMES WAS TELLING THE WORLD ABOUT THAT.

02:31PM   24        LET ME FOCUS ALSO ON THE FEEDBACK THAT THERANOS GOT FROM

02:31PM   25   OUTSIDERS DURING THE TIME PERIOD THAT THE CONSPIRACY COVERS.

CLOSING ARGUMENT BY MR. DOWNEY                                    9066

02:31PM   1        LET'S LOOK FIRST JUST VERY BASICALLY AT A HUMAN LEVEL, THE

02:31PM   2    FEEDBACK THAT MS. HOLMES GETS FROM PEOPLE SHE REALLY RESPECTS

02:31PM   3    ABOUT WHAT THERANOS'S TECHNOLOGY IS CAPABLE OF DOING, BUT LET'S

02:31PM   4    NOT DO IT IN CONNECTION WITH HER TESTIMONY ABOUT CONVERSATIONS

02:32PM   5    THAT SHE HAD, BUT IN CONNECTION WITH THE TESTIMONY OF OTHERS

02:32PM   6    WHO INTERACTED WITH THE SAME PEOPLE SHE WAS INTERACTING WITH.

02:32PM   7        YOU'LL RECALL THAT BRIAN GROSSMAN, WHO WAS THE PRINCIPAL

02:32PM   8    OF PFM, ONE OF THE INVESTORS, TESTIFIED THAT HE WANTED TO

02:32PM   9    UNDERSTAND THE TECHNOLOGY, AND THAT ACTUALLY, WITHOUT

02:32PM  10    MS. HOLMES'S KNOWLEDGE, HE REACHED OUT TO HER MENTOR,

02:32PM  11    CHANNING ROBERTSON.

02:32PM  12        AND RECALL WHAT CHANNING ROBERTSON IS REPORTED TO HAVE

02:32PM  13    SAID ABOUT THE TECHNOLOGY, THAT THERE WAS NOT ANY TECHNICAL

02:32PM  14    RISK IN THEIR CORE TECHNOLOGY, AND THAT THERE WAS NOTHING THE

02:32PM  15    TECHNOLOGY COULDN'T DO.

02:32PM  16        THAT TYPE OF REVIEW WAS SIMILAR, I MENTIONED TO YOU THIS

02:32PM  17    MORNING, OR EARLIER TODAY, THEY SENT THE TECHNOLOGY TO GSK AND

02:32PM  18    IT VALIDATED IT AND SAID IT WOULD ELIMINATE THE NEED FOR A LAB.

02:32PM  19        THEY HAD POSITIVE FEEDBACK IN THEIR PARTNERSHIP WITH THE

02:33PM  20    MAYO CLINIC WHERE DEVICES WERE DEPLOYED AT THE MAYO CLINIC AND

02:33PM  21    USED AND COMMENTS OF THE PHYSICIANS PARTICIPATING IN THOSE

02:33PM  22    PROGRAMS WERE VERY POSSIBLE.

02:33PM  23        AND YOU'LL READ, AS PART OF THIS ARTICLE THAT THE

02:33PM  24    GOVERNMENT HAS BEEN MENTIONING BY MR. PARLOFF, WHAT A NUMBER OF

02:33PM  25    OTHER MEDICAL EXPERTS SAID ABOUT THERANOS'S TECHNOLOGY DURING

CLOSING ARGUMENT BY MR. DOWNEY                                    9067

02:33PM  1      THE PERIOD OF THE SUPPOSED CONSPIRACY.

02:33PM  2           I THINK WHAT YOU WILL SEE UPON REVIEW OF THOSE, AND

02:33PM  3      PARTICULARLY THE INTERNAL DOCUMENTS WRITTEN BY WITNESSES YOU

02:33PM  4      DID NOT HEAR FROM, THAT THERE WAS A STRONG BELIEF THAT THIS

02:33PM  5      TECHNOLOGY HAD THE CAPABILITY TO PERFORM A BROAD RANGE OF

02:33PM  6      TESTING.

02:33PM  7           IT'S ALSO TRUE, AND YOU'LL LEARN IN CONNECTION WITH THE

02:33PM  8      PARTNERSHIP BETWEEN THERANOS AND WALGREENS, YOU'VE LEARNED THAT

02:33PM  9      WALGREENS ASKED JOHNS HOPKINS, MAYBE THE -- CERTAINLY ONE OF

02:33PM 10      THE TOP TEN MEDICAL FACILITIES IN THE UNITED STATES, TO LOOK AT

02:34PM 11      THE TECHNOLOGY.

02:34PM 12           NOW, I VIEW THIS NOT SO MUCH THROUGH THE LENS OF WHAT DID

02:34PM 13      JOHNS HOPKINS SAY ABOUT THE TECHNOLOGY.  YOU KNOW IT WAS

02:34PM 14      POSITIVE THINGS.

02:34PM 15           BUT I ALSO WANT YOU TO THINK ABOUT IT FROM THE PERSPECTIVE

02:34PM 16      OF WHAT DOES IT SAY ABOUT MS. HOLMES, THAT SHE WAS WILLING TO

02:34PM 17      TAKE THE TECHNOLOGY TO AN INSTITUTION LIKE JOHNS HOPKINS AND

02:34PM 18      HAVE IT EVALUATED?

02:34PM 19           WE KNOW WHAT THE WRITTEN RECORD REFLECTS AS TO WHAT

02:34PM 20      JOHNS HOPKINS'S IMPRESSIONS WERE.  THEY SAID -- YOU KNOW, THEY

02:34PM 21      WERE ASKED, AS PART OF WHAT THEY WERE BEING TASKED TO DO, TO

02:34PM 22      COMMENT ON THE VALIDITY AND THE USEFULNESS OF THERANOS'S

02:34PM 23      TECHNOLOGY, AND THEY CONCLUDED THAT THE TECHNOLOGY WAS NOVEL

02:34PM 24      AND SOUND, THAT IT COULD REPLACE A CENTRAL LAB, AND THAT IT

02:34PM 25      DIDN'T HAVE ANY MAJOR WEAKNESSES.

CLOSING ARGUMENT BY MR. DOWNEY                                    9068

02:34PM   1        THAT SAYS A LOT ABOUT THE TECHNOLOGY, BUT WHAT DOES IT SAY

02:35PM   2    ABOUT MS. HOLMES?

02:35PM   3        SHE WASN'T AFRAID TO HAVE THIS TECHNOLOGY VALIDATED.

02:35PM   4        SIMILARLY, IN CONNECTION WITH THE PARTNERSHIP WITH

02:35PM   5    SAFEWAY, YOU LEARNED THAT SAFEWAY DID NOT WANT TO PROCEED WITH

02:35PM   6    THE PARTNERSHIP WITH THERANOS UNLESS ONE OF THE LEADING

02:35PM   7    CLINICAL RESEARCHERS OF THE LAST 50 YEARS HAD THE OPPORTUNITY

02:35PM   8    TO LEAD A GROUP THAT EVALUATED THE TECHNOLOGY,

02:35PM   9    DR. SUE DESMOND-HELLMANN.

02:35PM  10        MS. HOLMES WASN'T AFRAID TO SUBMIT THE DATA THAT

02:35PM  11    MS. HOLMES HAD PREPARED, OR TO SUBMIT THE TECHNOLOGY FOR

02:35PM  12    REVIEW, INCLUDING DR. DESMOND-HELLMANN PERSONALLY.

02:35PM  13        THAT SAYS THAT SHE THOUGHT THE TECHNOLOGY MATCHED WHAT SHE

02:35PM  14    WAS SAYING ABOUT THE TECHNOLOGY CERTAINLY TO WALGREENS,

02:35PM  15    SAFEWAY, BUT ALSO SUBSEQUENTLY TO OTHERS.

02:35PM  16        NOW, I WANT TO TALK LAST, IN YOUR EVALUATION OF

02:35PM  17    MS. HOLMES'S INTENT, ABOUT WHAT HAPPENED AFTER PROBLEMS WERE

02:35PM  18    IDENTIFIED BY CMS IN CONNECTION WITH THERANOS'S CLINICAL

02:36PM  19    LABORATORY OPERATIONS AND HOW SHE REACTED, WHAT THOSE REACTIONS

02:36PM  20    MEAN AND WHAT THEY SHOULD LEAD YOU TO CONCLUDE WITH RESPECT TO

02:36PM  21    WHAT MS. HOLMES HAS BEEN CHARGED WITH HERE.

02:36PM  22        WELL, ONE OF THE FIRST THINGS THAT MS. HOLMES DID, ONE OF

02:36PM  23    THE FIRST THINGS WAS TO ASK A LARGE GROUP OF NATIONAL

02:36PM  24    SCIENTISTS, INCLUDING CLINICAL LABORATORY EXPERTS, TO COME TO

02:36PM  25    THERANOS AND EVALUATE THE TECHNOLOGY, THE DATA, THE TECHNOLOGY

CLOSING ARGUMENT BY MR. DOWNEY                                    9069

02:36PM  1      ITSELF.

02:36PM  2           WHAT DID THEY THINK WAS WRONG WITH THE TECHNOLOGY?  WHAT

02:36PM  3      DID THEY THINK SHOULD BE DONE IN REACTION TO THE FINDINGS OF

02:36PM  4      CMS?

02:36PM  5           AND YOU SAW SOME OF THAT.  THAT WAS IN CONNECTION WITH THE

02:36PM  6      SCIENTIFIC AND MEDICAL ADVISORY BOARD.  WE WENT THROUGH THAT

02:36PM  7      AND WE LOOKED AT SOME OF THOSE EMAILS.

02:36PM  8           BUT SHE WAS NOT JUST ASKING HER INTERNAL PEOPLE TO

02:37PM  9      EVALUATE WHAT HAPPENED.  SHE WANTED TO KNOW THE VIEWS OF PEOPLE

02:37PM 10      LIKE THE JOHNS HOPKINS SCIENTISTS WHO HAD DONE THE ORIGINAL

02:37PM 11      REVIEW.

02:37PM 12           AND SHE ASKED THE BOARD MEMBER WITH THE MOST KNOWLEDGE OF

02:37PM 13      CLINICAL MEDICINE, DR. FOEGE, WHO WAS THE FORMER DIRECTOR OF

02:37PM 14      THE CENTER OF DISEASE CONTROL, TO LEAD THESE EFFORTS TO

02:37PM 15      EVALUATE WHAT THE RESPONSE SHOULD BE.

02:37PM 16           IT'S HARD TO SEE HOW SOMEONE ACTING WITH BAD INTENT WOULD

02:37PM 17      UNDERTAKE THOSE STEPS IN RESPONSE TO THE TYPE OF CRITICISM THAT

02:37PM 18      SHE WAS SUFFERING.

02:37PM 19           NOW, CONSIDER ALSO WITH RESPECT TO HER RESPONSE THE ROLE

02:37PM 20      OF DR. DAS.  YOU HEARD MR. SCHENK TALK ABOUT DR. DAS TODAY AND

02:37PM 21      HIS CONCLUSIONS AND SO FORTH.

02:38PM 22           AND HE SAID TO YOU THAT WHAT DR. DAS DID AND WHAT

02:38PM 23      MS. HOLMES'S REACTION WAS TO WHAT DR. DAS DID, THAT THAT WAS

02:38PM 24      EVIDENCE OF NOTICE TO MS. HOLMES OF AN ISSUE.

02:38PM 25           AND THAT'S TRUE, DR. DAS DID COME TO MS. HOLMES IN MARCH

CLOSING ARGUMENT BY MR. DOWNEY                                    9070

02:38PM   1    OF 2016 AND SAY THAT, I THINK LAB RESULTS GENERATED IN

02:38PM   2    CONNECTION WITH THE 3 SERIES DEVICE IN THE CLINICAL LAB AT

02:38PM   3    THERANOS SHOULD BE VOIDED.

02:38PM   4         AND WHAT DID MS. HOLMES DO IN RESPONSE TO THAT?  HOW LONG

02:38PM   5    DID IT TAKE HER TO REACT TO THAT BY VOIDING ALL OF THE TESTS IN

02:38PM   6    THE CLINICAL LAB THAT HAD BEEN RUN ON THE EDISON DEVICE?  NO

02:38PM   7    TIME AT ALL.  SHE TURNED ON A DIME.

02:38PM   8         AND YOU KNOW WHY SHE HAD DONE THAT?  BECAUSE, AS WE'LL

02:38PM   9    DISCUSS IN CONNECTION WITH THE LAB, SHE DIDN'T ASK DR. DAS TO

02:38PM   10   COME IN AND TELL HER WHAT SHE WANTED TO HEAR.  SHE ASKED

02:39PM   11   DR. DAS TO COME IN, AND AS HE TESTIFIED, TURN OVER EVERY ROCK,

02:39PM   12   TURN OVER EVERY ROCK.

02:39PM   13        AND DR. DAS CONCLUDED, AS PART OF THAT PROCESS, THAT STEP

02:39PM   14   SHOULD BE TAKEN, AND SHE REACTED BY DOING EXACTLY WHAT HE HAD

02:39PM   15   ADVISED.

02:39PM   16        RECALL ALSO THAT AFTER THAT TIME, THE COMPANY RESTRUCTURED

02:39PM   17   ITSELF.  YOU HEARD FROM DR. BONANNI, AND DR. BONANNI TESTIFIED

02:39PM   18   THAT HE UNDERTOOK A WIDE RANGE OF REFORMS IN THE STRUCTURE OF

02:39PM   19   THE COMPANY, THE COMPLIANCE PROCEDURES, THE SYSTEMS FOR

02:39PM   20   EVALUATING TECHNOLOGY, AND HE DESCRIBED THOSE AS MAJOR EFFORTS.

02:39PM   21        AND HE SAID THIS WAS MS. HOLMES'S FOCUS IN RESPONSE TO THE

02:39PM   22   CRITICISM THAT THE COMPANY HAD SUFFERED.

02:39PM   23        NOW, WE ALSO HEARD, DURING THE COURSE OF THE GOVERNMENT'S

02:39PM   24   CASE, A PRESENTATION THAT WOULD HAVE LED ME TO BELIEVE THAT

02:39PM   25   THERANOS WAS TRYING TO HIDE FROM THIRD PARTY REVIEW OF ITS

CLOSING ARGUMENT BY MR. DOWNEY                                        9071

02:40PM   1    TECHNOLOGY IN CONNECTION WITH PEER REVIEW OR EVALUATION BY

02:40PM   2    OTHERS, AND THAT IT WAS NEVER ABLE TO SUCCESSFULLY CONCLUDE AN

02:40PM   3    EFFORT LIKE THAT, AND PERHAPS NEVER EVEN ABLE TO UNDERTAKE AN

02:40PM   4    EFFORT LIKE THAT.

02:40PM   5         WITNESSES WHO TESTIFIED ABOUT THAT -- GENERAL MATTIS

02:40PM   6    ACTUALLY MENTIONED IT IN PASSING, AS DID MR. EDLIN.

02:40PM   7         LADIES AND GENTLEMEN, THAT'S NOT TRUE.  THOSE WITNESSES

02:40PM   8    DON'T KNOW WHAT HAPPENED BECAUSE THEY WEREN'T THERE THE

02:40PM   9    FOLLOWING YEAR WHEN, AS I SHOWED YOU DURING THE COURSE OF

02:40PM  10    MS. HOLMES'S DIRECT, SEVERAL PEER REVIEW ARTICLES WERE

02:40PM  11    PUBLISHED.  THERE WAS DATA AND RESEARCH SUBMITTED FOR PEER

02:40PM  12    REVIEW.  AND THE EXHIBIT NUMBERS ARE REFLECTED THERE.

02:40PM  13         NOW, AGAIN I SAY, WHAT IS THE QUALITY OF THE GOVERNMENT'S

02:41PM  14    EVIDENCE ON THAT INTENT POINT?

02:41PM  15         YOU DID NOT HEAR IN THE GOVERNMENT'S CASE FROM THE

02:41PM  16    INDIVIDUALS WHO PARTICIPATED WITH THE TECHNOLOGY IN SUBMITTING

02:41PM  17    IT FOR THESE PEER REVIEWS FOR EVALUATION, ET CETERA.

02:41PM  18         YOU HEARD FROM TWO WITNESSES WHO LEFT AND STOPPED THEIR

02:41PM  19    INVOLVEMENT WITH THE COMPANY BEFORE THOSE PEER REVIEW ARTICLES

02:41PM  20    WERE PUBLISHED.  THOSE WERE THE WITNESSES WHO WERE ASKED BY THE

02:41PM  21    GOVERNMENT ABOUT THE PROCESS OF GAINING PEER REVIEW FOR

02:41PM  22    THERANOS TECHNOLOGY AFTERWARDS.

02:41PM  23         CONSIDER THAT IN EVALUATING WHETHER YOU SHOULD HAVE A

02:41PM  24    REASONABLE DOUBT AS TO THE EVIDENCE THAT THE GOVERNMENT HAS

02:41PM  25    PROVIDED YOU WITH.

9072

CLOSING ARGUMENT BY MR. DOWNEY

02:41PM 1    NOW, WE TALKED A LITTLE BIT AGO ABOUT WHAT EFFECT DOES ALL

02:41PM 2    OF THIS EVIDENCE HAVE IN YOUR PERCEPTION OF THE UNDERLYING

02:41PM 3    OFFENSES?

02:41PM 4    WELL, AT THE END OF THE DAY, THE QUESTION YOU'RE REALLY

02:41PM 5    ASKING YOURSELF IS, WHAT WAS MS. HOLMES'S INTENT?  WAS SHE

02:42PM 6    TRYING TO DEFRAUD PEOPLE?  DID SHE BELIEVE IN GOOD FAITH IN HER

02:42PM 7    TECHNOLOGY?  DID SHE RESPOND TO EVENTS IN A WAY THAT SUGGESTS

02:42PM 8    SHE KNEW SHE HAD BEEN CAUGHT?

02:42PM 9    I WOULD SAY TO YOU, LADIES AND GENTLEMEN, THAT THIS

02:42PM 10   EVIDENCE, TAKEN IN AGGREGATE, SAYS TO YOU THE FOLLOWING:  SHE

02:42PM 11   BELIEVED THAT SHE HAD INVENTED A VERY VALID FORM OF TECHNOLOGY

02:42PM 12   THAT SHE WAS SUBMITTING TO THE FOOD AND DRUG ADMINISTRATION FOR

02:42PM 13   APPROVAL TO TAKE TO THE MARKET.

02:42PM 14   IT SAYS THAT SHE BELIEVED THAT OTHERS OUTSIDE OF THE

02:42PM 15   COMPANY SHARED THAT VIEW, AND SHE HAD NO FEAR OF SHOWING THAT

02:42PM 16   TECHNOLOGY TO PEOPLE OUTSIDE OF THE COMPANY.

02:42PM 17   AND IT SAYS TO YOU THAT AS SOON AS SOMEONE SAID, NO, THERE

02:42PM 18   ARE PROBLEMS HERE, HER REACTION WAS TO INVITE PEOPLE IN TO LOOK

02:42PM 19   FOR THOSE PROBLEMS AND ROOT THOSE PROBLEMS OUT.

02:42PM 20   THE QUESTION YOU WILL BE ASKING YOURSELF ULTIMATELY AS

02:42PM 21   PART OF DELIBERATION HERE IS, ARE THOSE THE ACTIONS OF SOMEONE

02:42PM 22   WHO HAD BEEN ENGAGED IN A CONSPIRACY TO DEFRAUD PEOPLE?

02:43PM 23   IF YOU FIND THAT THEY ARE NOT, THIS IS THE EFFECT ON YOUR

02:43PM 24   VERDICT FORM.

02:43PM 25   IF THE GOVERNMENT FAILS TO PROVE THAT ONE ELEMENT BEYOND A

CLOSING ARGUMENT BY MR. DOWNEY                              9073

02:43PM   1    REASONABLE DOUBT, THEN WITH RESPECT TO THE COUNTS THAT ARE IN

02:43PM   2    YOUR VERDICT FORM, YOU SHOULD RETURN A VERDICT OF NOT GUILTY.

02:43PM   3         NOW, HAVING REVIEWED THE EVIDENCE THAT I THINK ACCURATELY

02:43PM   4    REFLECTS WHAT MS. HOLMES'S INTENT WAS DURING THIS PERIOD, I

02:43PM   5    WANT TO TAKE A MOMENT TO LOOK AT THE EVIDENCE THAT THE

02:43PM   6    GOVERNMENT STRONGLY RELIED ON THROUGHOUT THE COURSE OF THE CASE

02:43PM   7    AND REALLY AS PART OF MR. SCHENK'S PRESENTATION OF EVIDENCE

02:43PM   8    THIS MORNING.

02:43PM   9         AND I THINK IT'S FAIR TO SAY THAT THE GOVERNMENT HAS FIVE,

02:43PM   10   SIX, SEVEN DIFFERENT AREAS THAT THEY'VE EMPHASIZED WHERE THEY

02:43PM   11   SAY THERE WAS A NONDISCLOSURE, OR THEY SAY THAT THERE WAS AN

02:44PM   12   OVERSTATEMENT, OR THEY SAY THAT THERE WAS SOME TYPE OF ACTIVITY

02:44PM   13   ON MS. HOLMES'S PART THAT WAS DESIGNED TO CONCEAL SOMETHING.

02:44PM   14        SO I WANT TO TAKE THOSE ONE BY ONE.

02:44PM   15        FIRST, YOU HEARD THIS MORNING FROM MR. SCHENK THAT

02:44PM   16   THERANOS DID NOT HAVE THE TESTING CAPABILITIES THAT MS. HOLMES

02:44PM   17   WAS PUBLICLY SAYING THAT IT HAD, AND HE PRESENTED THIS EVIDENCE

02:44PM   18   ACROSS A WIDE RANGE OF EMAILS AND TESTIMONY AND SO FORTH.

02:44PM   19        AND THE GIST OF IT WAS THAT MS. HOLMES FREQUENTLY SAID

02:44PM   20   FORMULATIONS LIKE WE CAN DO MORE THAN 1,000 LABORATORY TESTS,

02:44PM   21   WE CAN DO ANY LAB TEST, WE CAN DO ANY TEST AVAILABLE, ET

02:44PM   22   CETERA.

02:44PM   23        I HAVEN'T PUT EVERY ONE THAT MR. SCHENK MENTIONED, BUT I

02:44PM   24   THINK YOU GET THE GIST OF IT.  THAT IS THE STATEMENT THAT HE IS

02:44PM   25   VERY FOCUSSED ON.

CLOSING ARGUMENT BY MR. DOWNEY                                    9074

02:44PM   1        NOW, HOW DO WE KNOW THAT MS. HOLMES ACTUALLY BELIEVED THAT

02:45PM   2    STATEMENT TO BE TRUE?

02:45PM   3        WELL, I'VE BEGUN TO TELL YOU THE STORY OF THE 4.0 SERIES,

02:45PM   4    AND I'LL TELL YOU IT MORE IN CONNECTION WITH THE PARTNERSHIP

02:45PM   5    WITH WALGREENS.

02:45PM   6        BUT YOU KNOW AS A BACKDROP THAT THERE WAS AN INVENTION AND

02:45PM   7    DEVELOPMENT OF TECHNOLOGY IN THERANOS THAT, AS OF 2013, HAD

02:45PM   8    BEEN GOING ON FOR YEARS WHERE PEOPLE IN THE COMPANY ARE WIDELY

02:45PM   9    TALKING ABOUT THE TECHNOLOGY AS HAVING THE CAPABILITY TO

02:45PM  10    PERFORM ANY BLOOD TEST.

02:45PM  11        HOW DOES THE GOVERNMENT TRY TO AVOID FOCUSSING ON THAT AS

02:45PM  12    PART OF ITS CASE?

02:45PM  13        IT FOCUSES ON WHAT WAS GOING ON IN THE CLINICAL LAB DURING

02:45PM  14    WHAT MS. HOLMES TOLD YOU SHE THOUGHT WOULD BE A VERY BRIEF

02:45PM  15    PERIOD BEFORE APPROVAL OF THE TECHNOLOGY AND SAYS THAT THERE

02:45PM  16    WERE DIFFICULTIES WITH THE 3.0 SERIES BECAUSE THE NUMBER OF

02:45PM  17    TESTS APPROVED IN CONNECTION WITH THAT WAS INSUFFICIENT.

02:45PM  18        NOW, IS THAT A PROBLEM THAT MS. HOLMES WAS NOT TRANSPARENT

02:46PM  19    ABOUT WITH OUTSIDERS WHEN THE ISSUE CAME UP?

02:46PM  20        WELL, LET'S LOOK AT WHAT HAPPENED IN HER EXCHANGES WITH

02:46PM  21    ROGER PARLOFF, PARTS OF WHICH WERE SHOWN TO YOU BY MR. SCHENK

02:46PM  22    THIS MORNING.

02:46PM  23        HERE IS HER EXCHANGE WITH MR. PARLOFF WHERE MR. PARLOFF IS

02:46PM  24    TRYING TO UNDERSTAND WHAT IS GOING ON IN CONNECTION WITH HOW

02:46PM  25    TESTS ARE OFFERED IN THERANOS SERVICE CENTERS AT THIS MOMENT.

CLOSING ARGUMENT BY MR. DOWNEY

02:46PM  1          AND HE ASKS HER A QUESTION ABOUT THAT.

02:46PM  2          AND SHE SAYS, WELL, WE HAVE VALIDATION REPORTS FOR THESE

02:46PM  3     TESTS THAT GO BACK MANY YEARS.  SHE'S REFERRING TO THE 300

02:46PM  4     VALIDATION REPORTS THAT YOU HAVE LEARNED ABOUT AS EVIDENCE IN

02:46PM  5     MS. HOLMES'S TESTIMONY.

02:46PM  6          AND THEN HE SAID ONE OF THE TESTS WE'RE GOING TO DO -- SHE

02:46PM  7     SAID ONE OF THE TESTS -- I THINK THAT'S ONE OF THE TESTS

02:47PM  8     THEY'RE GOING TO DO TODAY IS POTASSIUM, AND THE POTASSIUM

02:47PM  9     REPORT IS FROM I THINK 2012.  THAT'S TRUE FOR THE R&D

02:47PM 10     VALIDATION REPORT.

02:47PM 11          AND SHE SAYS, WE HAVE LOTS OF TESTS THAT WE HAVE VALIDATED

02:47PM 12     ON OUR SYSTEMS A LONG TIME AGO.

02:47PM 13          MR. PARLOFF SAYS, UH-HUH.

02:47PM 14          MS. HOLMES RESPONDS, BUT WE HAVEN'T BROUGHT INTO THE LAB

02:47PM 15     YET.  WE'RE CONTINUALLY BRINGING INTO THE LAB.

02:47PM 16          SHE SAYS, THESE TESTS ARE NOT PART OF OUR OFFERING IN THE

02:47PM 17     CLINICAL LAB.  WE HAVE NOT YET BEEN ABLE, AS THE TERMINOLOGY IS

02:47PM 18     USED BY ALL OF THE CLINICAL LAB PERSONNEL, WE HAVE NOT BROUGHT

02:47PM 19     THEM UP IN THE LAB.

02:47PM 20          AND THEN IF YOU GO TO THE NEXT PART, THE SYSTEMS CAN RUN

02:47PM 21     ALL OF THESE TESTS, BUT THE SPEED WITH WHICH WE BRING UP NEW

02:47PM 22     AND MORE FINGERSTICK TESTS IN OUR LAB IS SOMETHING THAT WE'RE

02:47PM 23     CONSTANTLY WORKING TO PUT MORE AND MORE ON THE PLATFORM.

02:47PM 24          THAT'S A PERFECT DEMONSTRATION OF HER UNDERSTANDING OF THE

02:48PM 25     TECHNOLOGY.  THE TECHNOLOGY HAS THE CAPABILITY, BUT OVER TIME

CLOSING ARGUMENT BY MR. DOWNEY                                              9076

02:48PM   1    THEY WILL ADD TO THAT BY VALIDATING INDIVIDUAL ASSAYS.

02:48PM   2         NOW, IT'S ALSO THE CASE THAT THERE HAS BEEN SPECIFIC FOCUS

02:48PM   3    ON A NUMBER OF THERANOS'S CAPABILITIES AS THEY RELATE TO CPT

02:48PM   4    CODES, ET CETERA.

02:48PM   5         THIS IS REALLY A VERY SIMPLE ISSUE.  CPT CODES RELATE TO

02:48PM   6    BILLING NUMBERS.

02:48PM   7         THERE'S NOT EVEN EVIDENCE REALLY OF HOW MANY BLOOD TESTS

02:48PM   8    THERE ARE IN THE WORLD, BUT THERE HASN'T BEEN A LOT OF EVIDENCE

02:48PM   9    SUGGESTING THAT THE THOUSAND ASSAYS WOULD BE WANTED OR NEEDED

02:48PM  10    IN CONNECTION WITH OPERATING A STANDARD CLINICAL LAB.

02:48PM  11         A THOUSAND CPT CODES WERE PLANNED TO BE COVERED.

02:48PM  12         YOU SEE HERE DR. YOUNG REPORTED IN 2012 TO MS. HOLMES THAT

02:48PM  13    MORE THAN A THOUSAND WOULD BE ON THE LIST THAT WOULD BE

02:48PM  14    OFFERED.  THERE WERE ABOUT 116 THAT WOULDN'T BE OFFERED.

02:48PM  15         SO WHEN SHE USES THIS NUMBER A THOUSAND EXTERNALLY, SHE'S

02:49PM  16    REFERRING BACK TO HER CONVERSATIONS WITH DR. YOUNG ABOUT THAT.

02:49PM  17         THREE HUNDRED SAMPLES WERE VALIDATED.  YOU KNOW THAT.

02:49PM  18    SEVENTY ASSAYS, SMALL SAMPLE ASSAYS WERE USED IN THE CLIA

02:49PM  19    LABORATORY.  AND THEY THOUGHT, AS A RESULT OF REPORTING BY

02:49PM  20    DR. YOUNG, THAT 43 TESTS WOULD COVER 90 PERCENT OF RETAIL

02:49PM  21    ORDERS.

02:49PM  22         YOU LOOK AT THE STATEMENTS THAT MS. HOLMES MADE OVER TIME,

02:49PM  23    AND YOU SEE IF THEY'RE CONSISTENT WITH THAT.  AND I SUBMIT TO

02:49PM  24    YOU THEY WILL BE BECAUSE SHE IS TALKING ABOUT THE 4.0 DEVICE,

02:49PM  25    AND SHE IS TALKING ABOUT CAPACITIES THAT TIE BACK TO WHAT SHE

CLOSING ARGUMENT BY MR. DOWNEY                                    9077

02:49PM   1    WAS BEING TOLD IN THE CLINICAL LAB.

02:49PM   2         NOW, THERE'S SOME SUGGESTION BY MR. SCHENK THAT, YOU KNOW,

02:49PM   3    THE DIFFERENCE BETWEEN TESTS AND CPT CODES DOESN'T MATTER.

02:49PM   4         I DON'T THINK THAT'S A FAIR CHARACTERIZATION.  INVESTORS

02:49PM   5    TESTIFIED IN THE CASE THAT THEY UNDERSTOOD THAT.

02:49PM   6         MR. GROSSMAN SAID -- WAS ASKED THAT AND HE SAID HE KNEW

02:50PM   7    THERE WAS A DIFFERENCE BETWEEN A CPT CODE AND A TEST.

02:50PM   8         AND MR. PARLOFF, IN HIS REPORTING, REPORTS THAT A THOUSAND

02:50PM   9    CPT CODES AS A THOUSAND TESTS, AND THAT'S BEEN FOCUSSED ON TO A

02:50PM   10   GREAT DEGREE BY THE GOVERNMENT.

02:50PM   11        BUT HOW DID THAT REALLY HAPPEN?

02:50PM   12        WELL, IT HAPPENED, AS WE'LL SEE IN A BIT, THAT MS. HOLMES

02:50PM   13   ACTUALLY TOLD MR. PARLOFF WE CAN DO A THOUSAND CPT CODES, BUT

02:50PM   14   HE TRANSLATED THAT IN HIS REPORTING INTO A THOUSAND TESTS.

02:50PM   15        NOW, THE SECOND CATEGORY OF STATEMENTS THAT THE GOVERNMENT

02:50PM   16   IS FOCUSSED ON IS STATEMENTS ABOUT ACCURACY AND AUTOMATION AND

02:50PM   17   HOW ACCURATE THERANOS'S TESTS WERE, AND HOW AUTOMATED

02:50PM   18   THERANOS'S TESTS WERE.  AND YOU'VE HEARD THAT AND YOU'VE HEARD

02:50PM   19   IT AGAIN THIS MORNING.

02:50PM   20        I WANT TO GIVE YOU A VERY SIMPLE AND CLEAR EXPLANATION OF

02:50PM   21   WHAT MS. HOLMES UNDERSTOOD ABOUT THE AUTOMATION OF THERANOS

02:51PM   22   TECHNOLOGY, BECAUSE WITHOUT ARGUING ABOUT WHAT ACCURACY IS

02:51PM   23   RETROSPECTIVELY, AS THE GOVERNMENT'S CASE DOES, WE KNOW WHAT

02:51PM   24   MS. HOLMES BELIEVED SHE WAS SAYING WHEN SHE SAID THERANOS'S

02:51PM   25   TECHNOLOGY WAS MORE ACCURATE.

9078

CLOSING ARGUMENT BY MR. DOWNEY

02:51PM 1        SHE SAID THERE WERE TWO ASPECTS TO IT.  RECALL THIS.  THIS

02:51PM 2    WAS JUST INTRODUCED IN THE CASE DURING MS. HOLMES'S TESTIMONY

02:51PM 3    LAST WEEK.

02:51PM 4        A CLAIM IS BROUGHT UP BY TYLER SHULTZ AND HE SAYS, YOU'RE

02:51PM 5    SAYING YOU'RE MORE ACCURATE, BUT I DON'T THINK YOU'RE MORE

02:51PM 6    ACCURATE BASED ON MY ANALYSES.

02:51PM 7        MS. HOLMES COMMENTS ON HIS COMMENT AND SHE USES SCIENTIFIC

02:51PM 8    TERMINOLOGY IN RESPONSE TO THAT.  SHE SAID, "ADD PRE-ANALYTICAL

02:51PM 9    ERROR AND VARIANCE POINT.  THIS IS WHAT 'THE

02:51PM 10   WALL STREET JOURNAL' AND EVERYONE ELSE IS TALKING ABOUT BY THE

02:51PM 11   WORD 'ACCURACY.'"

02:51PM 12       SECOND ASPECT OF WHAT THEY MEAN BY THAT IS VARIABILITY

02:52PM 13   OVER TIME.

02:52PM 14       NOW, WHAT DOES THAT MEAN?  WELL, SHE'S LINKING THE IDEA OF

02:52PM 15   AUTOMATION AND ACCURACY TO THE COMMENTS THAT SHE HAS MADE

02:52PM 16   PUBLICLY.

02:52PM 17       WHAT DO THOSE COMMENTS MEAN?

02:52PM 18       WELL, WHEN SHE TALKS ABOUT AUTOMATION, WHAT SHE'S TALKING

02:52PM 19   ABOUT IS THE CONCEPT THAT IN THE 4.0 SYSTEM, THERE WON'T BE,

02:52PM 20   FOR EXAMPLE, THE TRANSPORT OF SAMPLES BACK TO A CENTRALIZED

02:52PM 21   CLINICAL LAB.

02:52PM 22       THE TEST WILL BE RUN ON SITE.

02:52PM 23       THE ONLY HUMAN PARTICIPATION IN THOSE TESTS WILL BE

02:52PM 24   INSERTING THE SAMPLE INTO THE 4.0 DEVICE.

02:52PM 25       IN CONNECTION WITH THERANOS'S ACTIVITIES OVER TIME, THEY

CLOSING ARGUMENT BY MR. DOWNEY                                    9079

02:52PM   1    TALKED ABOUT THIS CONCEPT A LOT.

02:52PM   2        YOU SEE HERE AN ARTICLE WAS SENT TO MS. HOLMES IN 2012

02:52PM   3    TALKING ABOUT THE HUMAN INTERVENTION WAS THE SOURCE OF ERROR.

02:53PM   4    AND THIS NUMBER IS USED A LOT INSIDE OF THE DOCUMENTS THAT YOU

02:53PM   5    SEE INSIDE OF THERANOS.

02:53PM   6        93 PERCENT OF TESTING ERRORS WERE BELIEVED TO COME FROM

02:53PM   7    HUMAN PARTICIPATION IN THE PROCESS OF BLOOD TESTING.

02:53PM   8        SO IF THE 4.0 SYSTEM WERE APPROVED AND PLACED AT THE SITE

02:53PM   9    OF TESTING, THOSE ERRORS WOULD PRESUMABLY BE ELIMINATED.

02:53PM  10        THAT IS WHAT MS. HOLMES WAS TALKING ABOUT WHEN SHE TALKED

02:53PM  11    TO REPORTERS.

02:53PM  12        HOW DO WE KNOW THAT?  WELL, IF YOU LOOK AT THE BACK AND

02:53PM  13    FORTH BETWEEN THERANOS AND "THE WALL STREET JOURNAL," BEFORE

02:53PM  14    "THE WALL STREET JOURNAL" ARTICLE WAS PUBLISHED IN SEPTEMBER OF

02:53PM  15    2013, THEY'RE ASKED, THEY TRANSMIT THROUGH GROW MARKETING,

02:53PM  16    WHICH AS YOU HEARD WAS MANAGING THERANOS'S RELATIONSHIP WITH

02:53PM  17    THE REPORTER, THEY'RE ASKING ABOUT, WHY ARE YOU USING THE

02:53PM  18    STATIC OF 93 PERCENT OF ERRORS, AND IS THERE A MORE RECENT

02:54PM  19    STATIC?

02:54PM  20        MS. HOLMES'S BROTHER RESPONDS AND HE CITES THE 1993

02:54PM  21    ARTICLE, BUT HE THEN GOES ON TO CITE OTHER ARTICLES TALKING

02:54PM  22    ABOUT THIS PRECISE CONCEPT.

02:54PM  23        THAT'S WHAT MS. HOLMES CLEARLY WAS TALKING ABOUT WHEN SHE

02:54PM  24    SPOKE, AND IT IS CLEAR FROM THE CONTEMPORANEOUS DOCUMENTS

02:54PM  25    THAT'S WHAT SHE UNDERSTOOD SHE WAS SAYING.

UNITED STATES COURT REPORTERS

**ER-12658**

CLOSING ARGUMENT BY MR. DOWNEY                                          9080

02:54PM   1        WHAT IS THE OTHER CONCEPT THAT SHE WAS TRYING TO CONVEY?

02:54PM   2        WELL, SHE MENTIONED IT IN THAT OTHER LITTLE COMMENT IN

02:54PM   3    RESPONSE TO TYLER SHULTZ.  SHE'S TALKING ABOUT VARIABILITY OVER

02:54PM   4    TIME.

02:54PM   5        WHAT DOES THAT MEAN?  WELL, WHAT THAT MEANS IS THAT

02:54PM   6    THERANOS WAS DESIGNING A PROCESS FOR THE MANUFACTURE OF ITS 4.0

02:54PM   7    DEVICES WHERE THEY WOULD BE WHAT IS CALLED CALIBRATED TO EACH

02:54PM   8    OTHER, SO THAT A DESIRE WOULD BE THAT EVERY 4.0 DEVICE WOULD

02:54PM   9    GENERATE RESULTS THAT WERE SIMILAR AND MEASURED IN THE SAME

02:55PM  10    RANGE AS EVERY OTHER DEVICE.

02:55PM  11        SO IF ONE WENT TO A THERANOS SERVICE CENTER OVER YEARS, IT

02:55PM  12    WOULD BE ABLE TO KEEP VERY GOOD TRACK OF WHERE YOUR SODIUM

02:55PM  13    LEVEL WAS AND OTHER NORMAL MEASUREMENTS THAT YOU TRY TO TAKE

02:55PM  14    ACCOUNT FOR.

02:55PM  15        IS THAT TRUE TODAY?  AS MS. HOLMES TESTIFIED, YOU MAY BE

02:55PM  16    SURPRISED TO LEARN THAT IT'S NOT.  WHEN YOU GET ONE BLOOD TEST,

02:55PM  17    IT MIGHT BE ON ONE FORM OF MACHINE.  WHEN YOU GET THE SECOND

02:55PM  18    BLOOD TEST, IT MIGHT BE ON A DIFFERENT FORM OF MACHINE, AND THE

02:55PM  19    COMPARISON OF THOSE TWO RESULTS MAY NOT BE AS MEANINGFUL AS YOU

02:55PM  20    THINK.

02:55PM  21        WHEN SHE TALKED ABOUT ACCURACY, SHE WAS TALKING ABOUT THIS

02:55PM  22    CONCEPT OF VARIATION AND THE VARIABILITY OF RESULTS OVER TIME.

02:55PM  23        AND WE SEE HERE, LEST THERE BE ANY DOUBT ABOUT WHAT SHE

02:55PM  24    WAS TALKING ABOUT, THIS CONCEPT WAS EXPLAINED IN THE SLIDE DECK

02:55PM  25    SENT TO MANY OF THE INVESTORS.  IT'S DONE THROUGH THE

CLOSING ARGUMENT BY MR. DOWNEY                                    9081

02:56PM  1    STANDARDIZATION OF A SYSTEM AS THEY EMERGE OVER TIME.

02:56PM  2         LET'S TALK NEXT ABOUT SOME OF THE PARTICULAR ISSUES WHICH

02:56PM  3    WERE FOCUSSED ON BY MR. SCHENK THIS MORNING THAT APPEARED ON

02:56PM  4    THE WEBSITE.

02:56PM  5         MR. SCHENK QUESTIONS THE BASIS FOR THE REPRESENTATION THAT

02:56PM  6    APPEARED ON THE WEBSITE ABOUT THE COEFFICIENT OF VARIATION, AND

02:56PM  7    THE QUESTION IS, WHERE DID THIS COME FROM AND WHY DID

02:56PM  8    MS. HOLMES BELIEVE THAT THAT SLIDE, WHICH APPEARED AS MR. EDLIN

02:56PM  9    TESTIFIED AND AS APPEARS IN CERTAIN DECKS, WHY DID SHE BELIEVE

02:56PM 10    THAT WAS A VALID STATEMENT TO MAKE?

02:56PM 11         WELL, BECAUSE MR. EDLIN TALKED TO DR. YOUNG ABOUT IT, AND

02:56PM 12    HE CONVEYED WHAT THE ACCURATE SCIENCE WAS IN RESPONSE.

02:57PM 13         YOU SEE THAT HERE IN COMMENTARY BY DR. YOUNG IN RESPONSE

02:57PM 14    TO QUESTIONS SPECIFICALLY ON THE COEFFICIENT OF VARIATION WITH

02:57PM 15    RESPECT TO THE VITAMIN D RANGE.

02:57PM 16         ALSO, THERE WAS A QUESTION ABOUT HOW CAN YOU SAY YOUR

02:57PM 17    SAMPLES REMAIN FRESH AND YOU GET BETTER TESTS, THAT HAS BEEN

02:57PM 18    QUESTIONED BY THE GOVERNMENT DURING THE COURSE OF THE CASE, AND

02:57PM 19    THE EVIDENCE SHOWED YOU THAT FAR FROM BEING CAVALIER ABOUT

02:57PM 20    ADVICE THAT MS. HOLMES RECEIVED AS TO WHAT WAS SAID ON THE

02:57PM 21    WEBSITE, SHE REACTED TO IT IN A VERY PARTICULAR WAY.

02:57PM 22         SO LET'S LOOK AT THIS INTERACTION BETWEEN HER AND

02:57PM 23    DR. YOUNG WHERE DR. YOUNG WAS MAKING A PARTICULAR CLAIM BASED

02:57PM 24    ON A SET OF ASSUMPTIONS AS TO HOW LONG SAMPLES WERE STORED

02:57PM 25    WITHIN THE THERANOS LAB DURING THE TIME THAT IT WAS PHASE I AND

CLOSING ARGUMENT BY MR. DOWNEY                                    9082

02:58PM   1    WHAT WAS THAT BEING COMPARED TO.

02:58PM   2         DR. YOUNG GAVE A NUMBER.  MS. HOLMES SAID, WELL, WHAT DOES

02:58PM   3    THAT MEAN IN TERMS OF WHETHER IT'S REFRIGERATED OR NOT?

02:58PM   4         DR. YOUNG RESPONDED, AND SHE CAME BACK AND SAID, WE SHOULD

02:58PM   5    REFLECT THAT WE'RE MAKING AN ACCURATE CLAIM.

02:58PM   6         SHE ACTUALLY WAS WITHIN THE COMPANY MONITORING WHAT THE

02:58PM   7    SCIENTISTS SAID AND MAKING SURE THAT THE ADDITIONS REFLECTED

02:58PM   8    ACCURATE INFORMATION.

02:58PM   9         SIMILARLY, MR. SCHENK FOCUSSED TODAY ON STATEMENTS ABOUT

02:58PM  10    SPEED.  THAT'S BEEN FOCUSSED ON THROUGHOUT THE CASE.  HOW CAN

02:58PM  11    YOU MAKE THESE CLAIMS ABOUT SPEED?

02:58PM  12         OF COURSE THOSE CLAIMS IN THE MAIN RELATED TO POINT OF

02:58PM  13    CARE SERVICE AS OPPOSED TO SERVICE IN A CLINICAL LAB.  THAT WAS

02:58PM  14    NO MYSTERY TO THE INVESTORS WITH WHOM MS. HOLMES WAS TALKING.

02:58PM  15         WE SEE -- WE SAW IN MR. GROSSMAN'S TESTIMONY THAT HE KNEW

02:58PM  16    THERANOS WASN'T DOING ITS TESTING WITHIN FOUR HOURS, EVEN

02:59PM  17    THOUGH THAT WAS ON THE SLIDE DECK THAT WAS SENT TO HIM.

02:59PM  18         SIMILARLY, MR. MIQUELON TESTIFIED THAT CONTEXT IS

02:59PM  19    IMPORTANT FOR THESE KINDS OF REPRESENTATIONS.

02:59PM  20         THE LAST ISSUE THAT MR. SCHENK MENTIONED WITH REGARD TO

02:59PM  21    SCIENTIFIC CLAIMS ARE CLAIMS ABOUT THE CONCEPT OF REFLEX

02:59PM  22    TESTING.

02:59PM  23         WHY WAS THERANOS SAYING, WE CAN REACT, AS IT APPEARS IN

02:59PM  24    MR. RAGO'S ARTICLE, WE CAN PERFORM FOLLOW-ON TESTS?

02:59PM  25         WELL, ITS TEST MENU DID OFFER THESE KINDS OF TESTS.  LOOK

CLOSING ARGUMENT BY MR. DOWNEY                                        9083

02:59PM   1        AT EXHIBIT 3741A.  THIS IS THE TEST MENU THAT IS AVAILABLE TO

02:59PM   2    ANYONE WHO LOOKS FOR IT ON A VISIT TO A THERANOS STORE, AND IT

03:00PM   3    TELLS YOU WHICH TEST OFFERED REFLEX TESTING AND WHICH TESTS

03:00PM   4    DIDN'T.

03:00PM   5        THE SUGGESTION THAT MS. HOLMES MADE A CLAIM THAT WAS

03:00PM   6    BROADER IN "THE WALL STREET JOURNAL" ARTICLE IS TEMPERED BY THE

03:00PM   7    FACT THAT THOSE WHO WENT TO GET TESTS KNEW EXACTLY WHAT TESTS

03:00PM   8    WERE AVAILABLE AND THOSE WHERE IT WAS UNAVAILABLE.

03:00PM   9        NOW, LET'S TALK A LITTLE MORE ABOUT SOME OF THE BIGGER

03:00PM  10    CONCEPTS THAT I THINK ARE IMPORTANT IN THE CASE.

03:00PM  11        IN ADDITION TO ALL OF THESE TECHNICAL AND SCIENTIFIC

03:00PM  12    ISSUES, THERE'S A BASIC CLAIM MADE AGAIN THIS MORNING THAT

03:00PM  13    MS. HOLMES DID NOT DISCLOSE TO INVESTORS THE EXISTENCE OF THE

03:00PM  14    PHASE I CENTRAL LABORATORY MEASURE.

03:00PM  15        MR. SCHENK SHOWED YOU AN EMAIL FROM MR. EISENMAN WHERE HE

03:00PM  16    WAS SAYING, I DON'T KNOW WHETHER THE TESTING IS PERFORMED IN

03:00PM  17    THE WALGREENS STORE OR WHETHER IT'S PERFORMED OFF SITE.  I

03:00PM  18    THOUGHT IT WAS IN THE WALGREENS STORE.

03:01PM  19        WELL, THAT'S NOT FOR THE LACK OF PUBLIC INFORMATION ABOUT

03:01PM  20    THAT FACT.  IF YOU LOOK AT THE RAGO ARTICLE, MR. RAGO HIMSELF

03:01PM  21    SAYS THE TESTING WAS DONE IN A THERANOS LABORATORY.

03:01PM  22        WHEN MS. HOLMES SPOKE TO MR. PARLOFF, SHE TALKED TO HIM

03:01PM  23    ABOUT THE PHASE I, PHASE II MODEL.  HE WAS AWARE THAT THE

03:01PM  24    TESTING WAS DONE NOT IN THE STORES BUT IN A CENTRALIZED LAB

03:01PM  25    LOCATION.

CLOSING ARGUMENT BY MR. DOWNEY                                    9084

03:01PM  1          INDIVIDUALS WHO WALKED INTO THE STORES KNEW THAT THE

03:01PM  2    TESTING WAS NOT PERFORMED WITHIN THE STORES.

03:01PM  3          MR. EISENMAN LIVES IN HOUSTON AND HAD NOT VISITED A

03:01PM  4    WALGREENS STORE.

03:01PM  5          NEXT, THERE WAS A LONG DISCUSSION TODAY ABOUT THE

03:01PM  6    DISCLOSURE OF WHETHER OR NOT VENOUS TESTING WAS BEING PERFORMED

03:01PM  7    AND WHY VENOUS TESTING WAS BEING PERFORMED, ET CETERA.

03:02PM  8          LET ME FIRST DEAL WITH THE QUESTION OF WHETHER IT WAS

03:02PM  9    KNOWN TO INVESTORS AND OTHERS THAT THERANOS WAS DOING VENOUS

03:02PM 10    TESTING, AS WELL AS OTHER FORMS OF TESTING.

03:02PM 11          THE ANSWER IS THAT IT'S CLEAR FROM THE RECORD THAT HAS

03:02PM 12    BEEN PRESENTED, THIS WAS NO SECRET.  THE FDA WAS TOLD IN THE

03:02PM 13    SUBMISSION THAT WENT TO THE FDA IN THE FALL OF 2013 THAT VENOUS

03:02PM 14    TESTING WAS BEING PERFORMED.

03:02PM 15          AS I MENTIONED BEFORE, THE SPECIFIC MACHINES BEING USED

03:02PM 16    WERE IDENTIFIED.

03:02PM 17          AGAIN, THE TEST MENU THAT WAS IN THERANOS STORES DISCLOSED

03:02PM 18    AND OFFERED THE OPPORTUNITY FOR VENOUS TESTS AS INDICATED HERE

03:02PM 19    WERE THOSE FORMS MARKED OFF TRADITIONAL PHLEBOTOMY SHOWING THAT

03:02PM 20    WAS A TRADITIONAL FORM OF TESTING THAT THERANOS WAS DOING.

03:02PM 21          IN THE PRESS RELEASE THAT WAS DONE JOINTLY BY THERANOS AND

03:02PM 22    WALGREENS BEFORE TESTING BEGAN, IT SAID THAT TRADITIONAL

03:03PM 23    METHODS, MEANING VENOUS METHODS, WILL BE USED IN CONNECTION

03:03PM 24    WITH THE PROGRAM THAT IS BEING RUN IN WALGREENS STORES.

03:03PM 25          THERE WAS A PRESS RELEASE ISSUED BY THERANOS IN NOVEMBER

CLOSING ARGUMENT BY MR. DOWNEY                                    9085

03:03PM   1    OF 2013, AND THEY SAID, WE SOMETIMES USE TRADITIONAL METHODS

03:03PM   2    LIKE VENOUS TESTING.

03:03PM   3        THE FACT THAT THERANOS WAS USING VENOUS TESTING WAS

03:03PM   4    DISCLOSED ON ITS WEBSITE AS YOU SEE HERE.

03:03PM   5        AND IN FACT, THE DISCLOSURE THAT WAS PROPOSED TO BE

03:03PM   6    INCLUDED WAS A DISCLOSURE WHICH SAID, WHICH PUT IN A FOOTNOTE

03:03PM   7    THE COMMENT THAT THERE WERE TRADITIONAL METHODS BEING USED.

03:03PM   8        HOW DID MS. HOLMES REACT TO THAT SUGGESTION?  THIS EMAIL

03:03PM   9    REFLECTS HOW SHE REACTED.

03:03PM  10        SHE SAID, "IF WE ARE GOING TO SAY SOMETHING LIKE THIS WE

03:04PM  11    NEED TO OWN IT.  THIS COPY SHOULD BE UPDATED."

03:04PM  12        WE SHOULD SAY THIS, AND WE SHOULD SAY IT IN THE TEXT.

03:04PM  13        THAT IS CLEAR EVIDENCE OF WHAT MS. HOLMES'S INTENT WAS AS

03:04PM  14    TO SUPPOSED NONCONCEALMENT OR NONDISCLOSURE OF A FACT IN

03:04PM  15    CONNECTION WITH THERANOS'S OPERATIONS.

03:04PM  16        ALSO, THE FACT THAT THERE WAS VENOUS TESTING, OF COURSE,

03:04PM  17    IS PUBLISHED ELSEWHERE ON THE WEBSITE.

03:04PM  18        AND IT WAS DISCLOSED SEPARATELY ON THE WALGREENS WEBSITE.

03:04PM  19        IT'S JUST NOT CREDIBLE THAT INVESTORS WERE UNAWARE OF THE

03:04PM  20    REVIEW, OF THE PROVISION OF THE VENOUS TESTING METHODS.

03:04PM  21        THOSE WHO SAID SO, FOR EXAMPLE, MS. PETERSON ACKNOWLEDGED

03:04PM  22    THAT SHE HAD READ THE WEBSITE, AND, OF COURSE, ON THE WEBSITE

03:04PM  23    THERE'S A DISCLOSURE OF IT.

03:04PM  24        OTHER INVESTORS WENT TO WALGREENS STORES AND HAD THEIR

03:04PM  25    BLOOD TESTED, AND THEY HAD VENOUS TESTS ON SOME OCCASIONS.

CLOSING ARGUMENT BY MR. DOWNEY                                    9086

03:05PM   1    THAT WAS TRUE FOR MR. TOLBERT, MR. GROSSMAN, AND MR. LUCAS.

03:05PM   2        ALSO IN CONNECTION WITH THE EVALUATION BY PFM OF ITS

03:05PM   3    INVESTMENT IN THERANOS, THEY DISCUSSED WHAT SIGNIFICANCE DOES

03:05PM   4    IT HAVE THAT THERE IS VENOUS TESTING?  WILL THAT AFFECT OUR

03:05PM   5    INVESTMENT?

03:05PM   6        YOU KNOW WHY THEY DID THAT?  BECAUSE THE FACT THAT THERE

03:05PM   7    WAS VENOUS TESTING WAS DISCLOSED IN THE SLIDE DECK THAT WAS

03:05PM   8    SENT TO THEM AS YOU SEE HERE WITH THE PICTURE IN THE LOWER

03:05PM   9    RIGHT HAND CORNER SHOWING THE DRAWING OF A VENOUS SAMPLE.

03:05PM  10        MR. BURD, WHO WAS MENTIONED THIS MORNING, HE TESTIFIED

03:05PM  11    THAT HE SPOKE WITH MS. HOLMES ABOUT THE FACT THAT THERANOS WAS

03:05PM  12    GOING TO BE OPERATING WHAT WAS CALLED A DINOSAUR LAB, MEANING A

03:05PM  13    LAB USING THE OLD METHODS, THE VENOUS METHODS, AND HOW HE WAS

03:06PM  14    NOT INTERESTED IN OPERATING THAT KIND OF -- PARTICIPATING WITH

03:06PM  15    THAT KIND OF A LAB.

03:06PM  16        NOW, THE OTHER ISSUE WITH REGARD TO VENOUS, JUST TO BE

03:06PM  17    CLEAR, IS THAT THERE'S A SUGGESTION THAT THERE WERE TOO MANY

03:06PM  18    VENOUS TESTS, AND THAT WAS GOING TO AFFECT THE WALGREENS

03:06PM  19    PARTNERSHIP BECAUSE, AS MR. JHAVERI SUGGESTED, THE NUMBER OF

03:06PM  20    PATIENTS WHO RECEIVED THOSE TESTS NEEDED TO COME DOWN FOR THE

03:06PM  21    PARTNERSHIP TO SUCCEED.

03:06PM  22        I WANT TO EXPLAIN TO YOU WHY THE NUMBER OF VENOUS TESTS

03:06PM  23    GREW TO BE WHAT IT WAS AS OPPOSED TO THE ISSUE THAT MR. JHAVERI

03:06PM  24    DISCLOSED -- WITH MR. JHAVERI DISCLOSING IT.

03:06PM  25        LET ME SHOW YOU THIS DIAGRAM.  THIS IS -- IF WE ASSUME

                       UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY                                      9087

03:07PM  1    THAT A PATIENT COMES IN FOR TEN DIFFERENT ASSAYS DURING A VISIT

03:07PM  2    TO A WALGREENS STORE TO HAVE THEIR BLOOD TESTED, IF ALL TEN

03:07PM  3    METHODS ARE AVAILABLE ON FINGERSTICK, THEN THE BLOOD OF THAT

03:07PM  4    PATIENT IS DRAWN ON FINGERSTICK.

03:07PM  5         BUT IF ONLY NINE OF THOSE TESTS ARE AVAILABLE WITH THE

03:07PM  6    FINGERSTICK METHOD, OR TEN, BUT THE ELEVENTH IS VENOUS, THEN IT

03:07PM  7    HAD TO BE DRAWN BY VENOUS BECAUSE YOU NEEDED THE VENOUS BLOOD

03:07PM  8    DRAW TO PERFORM THE TESTS THAT REQUIRED A VENOUS DRAW.

03:07PM  9         THAT HAD A MUCH MORE PROFOUND EFFECT, AS MS. HOLMES

03:07PM  10   TESTIFIED, ON THE NUMBER OF TESTS THAT WERE BEING PERFORMED BY

03:07PM  11   VENOUS DRAW THAN DID THE NUMBER OF ASSAYS THAT THERANOS COULD

03:07PM  12   DO ON A SMALL SAMPLE.

03:07PM  13        NOW, I THINK AS WELL, JUST TO CLEAR UP THE DISCUSSION WITH

03:08PM  14   MR. PARLOFF, I THINK IT'S CLEAR AS WELL THAT MR. PARLOFF WAS

03:08PM  15   WELL AWARE THAT THE CAPACITY OF THERANOS WAS BEING SUPPLEMENTED

03:08PM  16   WITH VENIPUNCTURE.

03:08PM  17        I SHOWED YOU BEFORE THAT SHE HAD TOLD HIM SOME OF THE

03:08PM  18   TESTS WEREN'T AVAILABLE IN THE CLIA LAB, AND SHE EXPLAINED TO

03:08PM  19   YOU THAT SHE WAS SUPPLEMENTING THE CAPACITY IN THE CLIA LAB

03:08PM  20   WITH VENIPUNCTURE.

03:08PM  21        SO WHAT HAS THE GOVERNMENT DONE IN CONNECTION WITH

03:08PM  22   MS. HOLMES'S INTENT HERE?  THEY'VE COMBINED A LARGE BODY OF

03:08PM  23   EVIDENCE THAT DOES TWO THINGS.  THEY'VE TAKEN SOME PEOPLE WHO

03:08PM  24   KNOW -- WHO SAY, I DIDN'T KNOW THAT THERE WAS VENOUS TESTING,

03:08PM  25   EVEN THOUGH THERE WAS WIDESPREAD PUBLIC DISCLOSURE OF VENOUS

CLOSING ARGUMENT BY MR. DOWNEY                                9088

```
03:08PM   1    TESTING BY THERANOS, AND OTHER PEOPLE WHO SAY, WELL, I DIDN'T

03:08PM   2    WANT VENOUS TESTING, LIKE MR. JHAVERI.

03:08PM   3         THE TRUTH IS THAT IN BOTH INSTANCES THE GOVERNMENT'S CLAIM

03:08PM   4    REALLY DOESN'T HOLD EVIDENCE -- HOLD WATER AS TO MS. HOLMES'S

03:09PM   5    INTENT.

03:09PM   6         MS. HOLMES KNEW THAT THERE WERE DISCLOSURES OF VENOUS

03:09PM   7    TESTING.  SHE OBVIOUSLY WAS FAMILIAR WITH THE ONES THAT I'VE

03:09PM   8    JUST MENTIONED TO YOU.

03:09PM   9         BUT AS WELL, MS. HOLMES KNEW THAT IF A SMALL NUMBER OF

03:09PM  10    ADDITIONAL ASSAYS WERE FINALIZED BY THERANOS, AND AS SHE SAID,

03:09PM  11    BROUGHT UP TO THE LAB, IT COULD HAVE A PROFOUND EFFECT ON THE

03:09PM  12    AVAILABILITY OF FINGERSTICK TESTS WITHIN THE THERANOS SERVICE

03:09PM  13    CENTERS.

03:09PM  14         NOW, HAVING GONE THROUGH THE INTENT EVIDENCE FROM BOTH

03:09PM  15    PARTIES, I WANT TO TAKE TIME NOW TO TAKE YOU THROUGH THE STORY

03:09PM  16    NOT BY HURLING AT YOU A NUMBER OF EMAILS THAT ARE OUT OF

03:09PM  17    CONTEXT, I WANT TO TELL YOU THE STORY OF WHAT ACTUALLY HAPPENED

03:09PM  18    AT THERANOS AND HOW THE UNDERSTANDING OF PEOPLE AT THERANOS

03:09PM  19    DEVELOPED.

03:09PM  20         YOU ALREADY KNOW FROM MS. HOLMES'S TESTIMONY A LOT OF THIS

03:09PM  21    STORY FROM THE EARLY YEARS, AND I WON'T REPEAT IT.

03:09PM  22         YOU KNOW THAT SHE HAD AN IDEA AS A YOUNG PERSON THAT THEN

03:10PM  23    BECAME A PATENT, AND THAT THAT PATENT ULTIMATELY BECAME A

03:10PM  24    PRODUCT, AND THAT PRODUCT WAS PART OF A COMPANY THAT SHE

03:10PM  25    STARTED AND WAS DEVELOPING.
```

CLOSING ARGUMENT BY MR. DOWNEY                                    9089

03:10PM   1        AND AFTER THAT BECAME A PRODUCT, MS. HOLMES ORGANIZED THE

03:10PM   2    COMPANY EARLY IN ITS LIFE AND FOREVER THEREAFTER TO FOCUS ON

03:10PM   3    THREE DIFFERENT THINGS:  THE ASSAYS, THE TESTS; THE HARDWARE;

03:10PM   4    AND THE SOFTWARE.

03:10PM   5        THERE WAS A LOT OF PROGRESS IN THE EARLY YEARS.  AS YOU

03:10PM   6    KNOW, THERE WAS THE 3 SERIES, THE 1, THE 2, AND THE 3, AND

03:10PM   7    MS. HOLMES SHOWED YOU DURING THE COURSE OF HER TESTIMONY SOME

03:10PM   8    EXCITING DEVELOPMENTS.

03:10PM   9        YOU RECALL THAT I SHOWED YOU A PICTURE OF SOME

03:10PM  10    DEMONSTRATION IN SWITZERLAND, BUT SHE ALSO TOLD YOU THAT THEY

03:10PM  11    HAD A LOT OF MAJOR SETBACKS, INCLUDING IN CONNECTION WITH THEIR

03:11PM  12    1 SERIES DEVICE, WHERE THE CARTRIDGES COULDN'T MAINTAIN

03:11PM  13    SEALANT, AND THEY HAD TO REINVENT THE DEVICES TO ACCOMMODATE

03:11PM  14    THAT.

03:11PM  15        THEN IN EARLY 2010, AS WE DISCUSSED A FEW MOMENTS AGO,

03:11PM  16    THERE WAS THIS EXTRAORDINARY BREAKTHROUGH WHERE SCIENTISTS AND

03:11PM  17    ENGINEERS IN A LARGE NUMBER BEGAN TO BELIEVE THAT THEY HAD

03:11PM  18    INVENTED THE TECHNOLOGY THAT WOULD REALIZE THERANOS'S GOAL.

03:11PM  19        THAT, AS YOU KNOW, ULTIMATELY BECAME A REAL PRODUCT AS I

03:11PM  20    DEMONSTRATED TO YOU IN THE PICTURE THAT WAS SHOWN TO YOU DURING

03:11PM  21    MS. HOLMES'S TESTIMONY.

03:11PM  22        NOW, THE POINT AT WHICH THAT EXCITEMENT ABOUT THAT

03:11PM  23    INVENTION WAS CIRCULATING WITHIN THE COMPANY WHERE PEOPLE

03:11PM  24    BELIEVED THAT THEY HAD ACTUALLY BROKEN THROUGH AND INVENTED THE

03:11PM  25    METHODOLOGY TO DO ANY BLOOD TEST, THAT IS THE MOMENT AT WHICH

CLOSING ARGUMENT BY MR. DOWNEY                                    9090

03:11PM   1    THE GOVERNMENT SAYS A CRIMINAL CONSPIRACY BEGAN WITHIN

03:12PM   2    THERANOS.

03:12PM   3        THE GOVERNMENT FOCUSES ON THE PARTNERSHIP THAT THERANOS

03:12PM   4    HAD WITH WALGREENS AND SAYS THAT WALGREENS WAS MISLED IN

03:12PM   5    MATERIAL WAYS BY THERANOS IN ENTERING INTO THAT RELATIONSHIP.

03:12PM   6        AND YOU'LL RECALL MR. MIQUELON TESTIFIED, WHO WAS THE CFO

03:12PM   7    OF WALGREENS.

03:12PM   8        WE DIDN'T HEAR DURING THE COURSE OF THE GOVERNMENT'S

03:12PM   9    PRESENTATION FROM DR. JAY ROSAN, WHO WAS ACTUALLY THE PRINCIPAL

03:12PM  10    PERSON AT WALGREENS WHO MANAGED THE RELATIONSHIP WITH THERANOS,

03:12PM  11    HAD A LOT OF MEDICAL EXPERTISE.  HE BOTH INITIATED THE

03:12PM  12    RELATIONSHIP AND HAD THE MOST CONTACT WITH THE COMPANY OVER

03:12PM  13    TIME.  HE PARTICIPATED IN LOOKING AT ALL OF THE TECHNOLOGY,

03:12PM  14    UNDERSTANDING THE TECHNOLOGY IN ITS CAPACITIES, AND HE

03:12PM  15    INTERACTED WITH MS. HOLMES FOR YEARS THEREAFTER.

03:12PM  16        BUT THE PROPOSITION IS THAT THERANOS IN 2010 DEFRAUDED

03:13PM  17    WALGREENS.

03:13PM  18        BEFORE I GET INTO THE DETAILS OF WHAT HAPPENED BETWEEN THE

03:13PM  19    COMPANIES, LET ME JUST ASK YOU ABOUT YOUR THOUGHTS ABOUT THE

03:13PM  20    PLAUSIBILITY OF THAT ALLEGATION.

03:13PM  21        WALGREENS, AS YOU ALL KNOW, IS A BIG PUBLICLY TRADED

03:13PM  22    COMPANY.  IT'S GOT A LOT OF STORES.  IT OPERATES IN RETAIL

03:13PM  23    ACROSS THE COUNTRY.  IT'S AVAILABLE UNDER DIFFERENT BRAND NAMES

03:13PM  24    OVERSEAS.

03:13PM  25        THERANOS AT THIS TIME WAS A 6 YEAR OLD COMPANY WITH A

CLOSING ARGUMENT BY MR. DOWNEY                                  9091

03:13PM  1    26 YEAR OLD CEO, HAD NO PUBLIC PRESENCE, AND NO RETAIL

03:13PM  2    EXPERIENCE.

03:13PM  3        BUT THE GOVERNMENT SAYS THERANOS CAME TO NEGOTIATE, AND

03:13PM  4    DURING THE COURSE OF THOSE NEGOTIATIONS, DEFRAUDED WALGREENS.

03:13PM  5        HOW?

03:13PM  6        WELL, THE GOVERNMENT FOCUSES ON TWO THINGS THAT WERE SAID

03:13PM  7    DURING THE COURSE OF THOSE NEGOTIATIONS.  I ALREADY TALKED TO

03:13PM  8    YOU EARLIER ABOUT THE REPRESENTATION THAT IS THE THIRD ITEM ON

03:13PM  9    THIS SLIDE, ABOUT THE 10 TO 15 PHARMACEUTICAL COMPANIES AND WHY

03:13PM  10   THAT REPRESENTATION IS NOT ONLY MADE IN GOOD FAITH, BUT THE

03:14PM  11   EVIDENCE IS CONSISTENT WITH IT BEING ACCURATE.

03:14PM  12       THE OTHER CLAIM IS THAT THE FIRST BULLET POINT HERE IS

03:14PM  13   FALSE, THAT THERANOS COULD RUN COMPREHENSIVE BLOOD TESTS ACROSS

03:14PM  14   A WIDE RANGE OF TECHNOLOGIES.

03:14PM  15       NOW, YOU KNOW WHERE THAT STATEMENT CAME FROM?  IT'S FROM

03:14PM  16   THE DISCUSSIONS WITH DR. GIBBONS AND OTHERS IN THE EARLY PART

03:14PM  17   OF 2010.

03:14PM  18       NOW, THE GOVERNMENT SAYS, WELL, YOU SHOULD NOW NOT HAVE

03:14PM  19   MADE THIS REPRESENTATION, BECAUSE AT THAT TIME THE ONLY DEVICE

03:14PM  20   THAT YOU ACTUALLY OPERATIONALIZED WAS THE 3 DEVICE, AND THE

03:14PM  21   3 DEVICE COULD ONLY DO IMMUNOASSAYS, NOT ALL FORMS OF ASSAYS.

03:14PM  22       SO HOW DID WALGREENS TESTIFY THROUGH MR. MIQUELON WHEN

03:14PM  23   THEY CAME TO COURT IN THIS PROCEEDING TO EXPLAIN WHAT THEY

03:15PM  24   UNDERSTOOD THERANOS'S TECHNICAL CAPACITY WAS?

03:15PM  25       MR. MIQUELON WAS ASKED, "WHAT DID YOU UNDERSTAND 'RUNS

CLOSING ARGUMENT BY MR. DOWNEY                                       9092

03:15PM 1    COMPREHENSIVE BLOOD TESTS' TO MEAN?

03:15PM 2        HE SAYS, "MY UNDERSTANDING WAS A PRETTY BROAD RANGE OF

03:15PM 3    IMMUNOASSAY TESTS, YOU KNOW, BLOOD TESTS, THAT EXACTLY."

03:15PM 4        IN OTHER WORDS, MR. MIQUELON UNDERSTOOD AND COULD

03:15PM 5    ARTICULATE 11 YEARS LATER THAT THERANOS'S CAPACITY IN 2010 WHEN

03:15PM 6    HE TALKED WITH THEM WAS TO PERFORM IMMUNOASSAYS, WHICH IS

03:15PM 7    CONSISTENT WITH EXACTLY WHERE THERANOS'S 3.0 SYSTEM WAS AT THAT

03:15PM 8    TIME.

03:15PM 9        HE WAS ALSO ASKED, WELL, DID YOU UNDERSTAND THE TECHNOLOGY

03:15PM 10   WAS GOING TO DEVELOP FURTHER INTO FURTHER GENERATIONS OF A

03:15PM 11   MINILAB?

03:15PM 12       HE SAID HE WAS.  THE TECHNOLOGY IS ALWAYS AN EVOLUTION.

03:15PM 13       HARD TO SEE THAT SERIES OF REPRESENTATIONS TO HIM AS FALSE

03:15PM 14   IN LIGHT OF WHAT YOU KNOW ABOUT THE DEVELOPMENT OF TECHNOLOGY

03:16PM 15   WITHIN THERANOS.

03:16PM 16       NOW, I THINK IT'S ALSO TRUE, IF WE LOOK AT WHAT MS. HOLMES

03:16PM 17   WAS DOING DURING THIS PERIOD, THAT SHE WAS ACTUALLY CLEAR IN

03:16PM 18   OTHER PARTS OF THE POWERPOINT AS TO EXACTLY WHAT THERANOS WAS

03:16PM 19   PROPOSING.

03:16PM 20       IN THAT SAME DOCUMENT, SHE DIDN'T PROPOSE AS OF 2010,

03:16PM 21   LET'S LAUNCH A BLOOD TESTING SERVICE WHERE WE'RE DOING ALL

03:16PM 22   FORMS OF BLOOD TESTING OR ALL TESTS.

03:16PM 23       SHE PROPOSED THAT A LIMITED NUMBER OF TESTS BE DONE,

03:16PM 24   GENERAL CHEMISTRY, INFLUENZA, AND FERTILITY, AND THAT THEY BE

03:16PM 25   OFFERED LATER THAT YEAR, AND SHE ALSO EXPLAINED THAT THE

CLOSING ARGUMENT BY MR. DOWNEY                                    9093

03:16PM   1    TECHNOLOGY WOULD HAVE TO BE CUSTOMIZED TO GET THERE.

03:16PM   2         THAT'S WHERE HER HEAD WAS, AND THAT REMAINED THE CASE

03:16PM   3    THROUGHOUT AS WHEN SHE WAS COMMENTING ON THE DRAFT AGREEMENT IN

03:16PM   4    CONNECTION WITH THE TECHNOLOGY AND SHE WAS VERY DIRECT IN

03:16PM   5    SAYING THIS IS A NEW PRODUCT THAT IS GOING TO BE DEPLOYED IN

03:17PM   6    CONNECTION.  WE DON'T KNOW AND CAN'T MAKE COMMITMENTS WHERE THE

03:17PM   7    CAPACITIES OF THE TECHNOLOGY HAVEN'T EVEN YET BEEN, AS SHE

03:17PM   8    SAID, CHARACTERIZED.

03:17PM   9         NOW, THE IDEA IS THAT WALGREENS WOULD NEVER HAVE ENTERED

03:17PM   10   INTO ITS JULY 2010 AGREEMENT IF IT HAD KNOWN ACCURATELY WHAT

03:17PM   11   THERANOS'S TECHNOLOGY WAS AT THAT TIME.

03:17PM   12        I THINK IT'S FAIRLY CLEAR THE EVIDENCE SHOWS IT DID KNOW.

03:17PM   13        BUT IN ANY EVENT, WHEN THAT AGREEMENT WAS NEGOTIATED, IT'S

03:17PM   14   HARD TO SEE HOW WALGREENS WAS DEFRAUDED.

03:17PM   15        I THINK IT'S FAIRLY CLEAR THAT THEY GOT THE BETTER END OF

03:17PM   16   THE DEAL, THAT WALGREENS MADE A NUMBER OF COMMITMENTS TO IT, TO

03:17PM   17   DEMONSTRATE THE EFFECTIVENESS OF ITS TECHNOLOGY, TO OBTAIN

03:17PM   18   REGULATORY APPROVALS, OTHER THINGS THAT THERANOS HAD TO DO AS

03:17PM   19   PART OF ITS OBLIGATIONS UNDER THE CONTRACT.

03:17PM   20        AND IF, IF THERANOS COULD NOT PERFORM THAT, THEN WALGREENS

03:18PM   21   WOULD GET ITS MONEY BACK UNDER THE CONTRACT.

03:18PM   22        HARD TO SEE THAT AS A PROCESS OF DEFRAUDING WALGREENS.

03:18PM   23        NOW, AS YOU KNOW, THE RELATIONSHIP WENT FORWARD FROM

03:18PM   24   THERE.  THE PARTIES WORKED ON GETTING READY TO LAUNCH IN A

03:18PM   25   RETAIL SYSTEM UNTIL EARLY 2012 WHEN WALGREENS BEGAN TO BECOME

CLOSING ARGUMENT BY MR. DOWNEY                                    9094

03:18PM   1   UNCOMFORTABLE WITH THE PROSPECT THAT DEVICES MIGHT BE LAUNCHED

03:18PM   2   IN ITS STORES WITHOUT YET HAVING FDA APPROVAL.

03:18PM   3        THE PARTIES DECIDED TO GO TO THE PHASE I, PHASE II MODEL,

03:18PM   4   WHICH THEY -- WHICH THERANOS DISCLOSED TO THE FDA, THE CONCEPT

03:18PM   5   BEING PHASE I IS TESTING IN THE CENTRAL LAB AFTER THE BLOOD IS

03:18PM   6   DRAWN IN THE STORES, PHASE II BEING BLOOD IS DRAWN IN THE

03:18PM   7   STORES AND THAT TESTING IS PERFORMED ON SITE AT THE STORES.

03:18PM   8        THAT CHANGE, LADIES AND GENTLEMEN, WAS FOUNDATIONAL, I

03:19PM   9   THINK, TO A LOT OF THE CONFUSION THAT HAS PERVADED THIS CASE,

03:19PM  10   BECAUSE IT'S CLEAR THAT WHEN MS. HOLMES WAS TALKING ABOUT

03:19PM  11   THERANOS TECHNOLOGY, SHE WAS TALKING ABOUT THE 4.0 SYSTEM AND

03:19PM  12   ITS FULL IMPLEMENTATION AND ITS FULL CAPACITY.

03:19PM  13        NOW, AFTER THE CONTRACT WAS ENTERED AND AFTER THESE

03:19PM  14   MODIFICATIONS TO THE CONTRACT WERE NEGOTIATED, THE LONG PROCESS

03:19PM  15   OF DEVELOPING THAT TECHNOLOGY, YOU SAW THAT IN LATE 2010

03:19PM  16   MS. HOLMES REPORTED TO THE BOARD THAT THIS NEW TECHNOLOGY WAS

03:19PM  17   BEING DEVELOPED, ALL OF THE CAPACITIES OF THE TECHNOLOGY, WHAT

03:19PM  18   IT WOULD TAKE, YOU SAW THAT THE RESEARCH AND DEVELOPMENT TEAM

03:19PM  19   AT THERANOS WAS RESTRUCTURED, THAT A HUGE AMOUNT OF EMPLOYEES

03:19PM  20   WERE ADDED TO DEVELOP THIS TECHNOLOGY.

03:19PM  21        AND YOU SAW THAT BY THE TIME THAT PROCESS WAS IN FULL

03:19PM  22   GEAR, MS. HOLMES WAS RELYING ON A LARGE NUMBER OF VERY HIGHLY

03:20PM  23   QUALIFIED SCIENTISTS TO LEAD THAT R&D EFFORT, MOSLEY PH.D.'S,

03:20PM  24   BUT OTHERS WITH SKILLS IN OTHER AREAS.  I'VE GIVEN YOU THE

03:20PM  25   EXHIBIT NUMBERS FOR SOME OF THE IMPORTANT DOCUMENTS AS TO WHAT

CLOSING ARGUMENT BY MR. DOWNEY                                    9095

03:20PM    1     THEY REPORTED DURING THAT PERIOD.

03:20PM    2           BUT WHAT INDIVIDUAL WOULD BE THE MOST KNOWLEDGEABLE ON

03:20PM    3     THIS LIST OF INDIVIDUALS AS TO WHAT HAPPENED WITH RESPECT TO

03:20PM    4     THERANOS'S TECHNOLOGY, WELL, THAT WOULD BE DANIEL YOUNG.

03:20PM    5           YOU'VE HEARD HIS NAME THROUGHOUT THE COURSE OF THE CASE.

03:20PM    6     HE APPEARS ON SOMETHING LIKE 200 EXHIBITS DURING THE COURSE OF

03:20PM    7     THE CASE.  HE WAS EFFECTIVELY THE CHIEF TECHNOLOGY OFFICER OF

03:20PM    8     THERANOS DURING THIS PERIOD.

03:20PM    9           AND HE OVERSAW AND DEVELOPED AND REPORTED TO MS. HOLMES

03:20PM   10     REPEATEDLY AS TO WHAT THERANOS'S TECHNOLOGY WAS CAPABLE OF.

03:20PM   11           YOU DID NOT HEAR FROM DR. YOUNG DURING THE COURSE OF THE

03:20PM   12     CASE EXCEPT THROUGH THOSE EMAILS IN WHICH HE REPORTED TO

03:21PM   13     MS. HOLMES THAT 200 ASSAYS WOULD BE AVAILABLE IN THE CLIA LAB

03:21PM   14     ON THE FINGERSTICK, FOR EXAMPLE; ABOUT DEVELOPMENTS WITH

03:21PM   15     RESPECT TO THE HARDWARE DEVICE.

03:21PM   16           HE WAS NOT CALLED, AND SO YOU DON'T KNOW WHAT HIS

03:21PM   17     TESTIMONY WOULD BE WITH RESPECT TO THERANOS'S TECHNOLOGY.

03:21PM   18           BUT YOU KNOW WHAT HE SAID IN REALTIME, AND YOU KNOW WHAT

03:21PM   19     MS. HOLMES TESTIFIED TO AS TO HER UNDERSTANDING OF THOSE

03:21PM   20     CAPACITIES.

03:21PM   21           NOW, I MENTIONED TO YOU A FEW MOMENTS AGO, WHY DID THE

03:21PM   22     VENOUS DRAW PERCENTAGE BECOME HIGHER THAN WHAT WAS EXPECTED?

03:21PM   23           AND I THINK THAT REALLY RESULTS FROM ANALYTICAL ERROR,

03:21PM   24     ALTHOUGH I THINK THE PEOPLE AT THERANOS WERE VERY SMART.

03:21PM   25     SOMETIMES YOU CAN MAKE AN ERROR THAT IS VERY BASIC.

CLOSING ARGUMENT BY MR. DOWNEY                                      9096

03:21PM   1         I THINK WHEN THERANOS WENT TO BUILD THE MENU FOR THE TESTS

03:21PM   2    IT WOULD OFFER IN ITS STORES, IT TRIED TO ANALYZE WHAT TESTS

03:21PM   3    THE PEOPLE ACTUALLY ORDER, AND DR. YOUNG PERFORMED THAT

03:22PM   4    ANALYSIS AND HE SAID, WELL, IF WE VALIDATE ABOUT 43 TESTS,

03:22PM   5    WE'LL BE OFFERING ABOUT 90 PERCENT OF THE TESTS THAT ARE

03:22PM   6    ORDERED, AND IF WE DO 102, WE'LL BE COVERING ABOUT 96 PERCENT

03:22PM   7    OF THE RETAIL TESTS THAT ARE ACTUALLY OFFERED.

03:22PM   8         AND THERANOS WENT TO WORK ON THAT.

03:22PM   9         AS IT TURNED OUT, THAT ASSUMPTION AS TO HOW THE PROCESS

03:22PM  10    WOULD WORK WAS WRONG, BUT I THINK THAT WAS BELIEVED IN GOOD

03:22PM  11    FAITH AND ANALYZED BY DR. YOUNG IN GREAT DETAIL.

03:22PM  12         SO THERANOS WENT ABOUT DEVELOPING THOSE ASSAYS IN THE

03:22PM  13    PERIOD BEFORE THE LAUNCH.

03:22PM  14         AS YOU HEARD BOTH FROM DR. -- FROM MS. GANGAKHEDKAR AND

03:22PM  15    SAW IN THE DOCUMENTS, THERANOS HAD A VERY RIGOROUS PROCESS FOR

03:22PM  16    DEVELOPING AND VALIDATING ITS ASSAYS IN RESEARCH AND

03:22PM  17    DEVELOPMENT.  MS. HOLMES WAS RECEIVING REGULAR UPDATES ABOUT

03:22PM  18    WHAT HAPPENED DURING THE COURSE OF THOSE VALIDATIONS.

03:23PM  19         YOU'LL RECALL SHE RECEIVED A NUMBER OF EXCEL SPREADSHEETS.

03:23PM  20    WE VALIDATED THIS NUMBER, WE VALIDATED THIS NUMBER, THIS NUMBER

03:23PM  21    IS READY, TO THE POINT WHERE ULTIMATELY ALMOST ALL OF THE

03:23PM  22    ASSAYS WERE REPORTED AS BEING VALIDATED.

03:23PM  23         IMPORTANTLY ALSO, THERANOS DECIDED TO ACTUALLY BUILD A

03:23PM  24    MANUFACTURING UNIT WHERE THEY WOULD DO THEIR MANUFACTURING FOR

03:23PM  25    THEIR OWN DEVICE IN HOUSE, AND THAT HAPPENED DURING THIS

CLOSING ARGUMENT BY MR. DOWNEY                                    9097

03:23PM  1    PERIOD.

03:23PM  2         ALL OF THAT WAS A HUGE AMOUNT OF ACTIVITY.  THE REPORTING

03:23PM  3    TO MS. HOLMES DURING THIS PERIOD WAS ITERATIVELY, AS MR. SCHENK

03:23PM  4    SAYS, CERTAINLY THERE WERE ISSUES, BUT THE REPORTING WAS THAT

03:23PM  5    THE COMPANY WAS HEADED TOWARDS FINALIZATION OF A 4.0 SERIES

03:23PM  6    DEVICE.

03:23PM  7         AND BECAUSE OF THAT, THE PLAN THAT WAS DEVELOPED

03:23PM  8    ORIGINALLY WHEN THERANOS WAS GOING TO OPERATE A CENTRAL LAB WAS

03:23PM  9    WE'LL JUST TAKE ALL OF THE INDIVIDUAL DEVICES THAT WE

03:23PM 10    MANUFACTURE AND WE WILL PUT THEM IN THE CENTRAL LAB, AND WE

03:24PM 11    WILL RUN THE TESTS ON THOSE INDIVIDUAL DEVICES WITHIN THE

03:24PM 12    CENTRAL LAB.

03:24PM 13         NOW, AS THIS DIAGRAM, EXHIBIT 7272, SHOWS, THEY BEGAN TO

03:24PM 14    WORK ON THAT PLAN.

03:24PM 15         AND WHAT HAPPENED AS A RESULT OF THEIR WORK ON THAT PLAN?

03:24PM 16    WELL, A NUMBER OF THINGS HAPPENED IN TERMS OF THEIR REALIZATION

03:24PM 17    OF HOW USING INDIVIDUAL SERIES 4 DEVICES IN A CENTRAL LAB WAS

03:24PM 18    NOT SENSIBLE OR THE BEST WAY TO OPERATE THAT LAB.

03:24PM 19         WHY?  THE 4 SERIES DEVICE WORKS GREAT WHEN IT'S AT A POINT

03:24PM 20    OF CARE.  SOMEBODY COULD HAVE THEIR BLOOD DRAWN, AND THEIR

03:24PM 21    BLOOD IS PUT RIGHT IN THE DEVICE, THE TEST RUNS, THE RESULTS

03:24PM 22    ARE GENERATED.

03:24PM 23         BUT THE DEVICE TAKES A WHILE TO RUN.  SO IT'S FINE AT THE

03:24PM 24    POINT OF CARE WHERE TEN CUSTOMERS MIGHT COME IN ONE DAY AND ONE

03:24PM 25    PATIENT GETS TESTED AND ANOTHER PATIENT GETS TESTED AT A

CLOSING ARGUMENT BY MR. DOWNEY                                            9098

03:25PM   1      DIFFERENT TIME, ET CETERA.

03:25PM   2           BUT AT A CENTRAL LAB, THE SAMPLES WOULD ALL ARRIVE AT THE

03:25PM   3      SAME TIME, AND LITERALLY A PROCESS WOULD BE REQUIRED WHERE

03:25PM   4      THOSE INDIVIDUAL SAMPLES WERE MOVED, SOMETIMES TENS OF

03:25PM   5      THOUSANDS OF SAMPLES WERE EXPECTED, AND THEY WERE EXPECTED TO

03:25PM   6      MOVE THEM ACROSS A LAB AND PERFORM TESTING.

03:25PM   7           THAT BECAME IMPRACTICAL AND THEY STARTED TO LOOK FOR, IS

03:25PM   8      THERE A WAY, WHILE WE'RE OPERATING A CENTRAL LAB, THAT WE CAN

03:25PM   9      DO THIS IN A MORE EFFICIENT WAY?

03:25PM  10           AND WHAT DID THAT RESULT IN?  LADIES AND GENTLEMEN, YOU'VE

03:25PM  11      HEARD FROM MS. HOLMES THAT THEY BEGAN TO LOOK AT COMMERCIAL

03:25PM  12      MACHINES AND ASK, CAN WE MODIFY THESE IN SOME WAY SO THAT WE

03:25PM  13      CAN RUN SMALL SAMPLES ON THEM?  AND THEY WERE ABLE TO DESIGN

03:25PM  14      THOSE MODIFICATIONS.

03:25PM  15           DR. ROSENDORFF TESTIFIED HE WAS AWARE OF THAT.  MANY

03:25PM  16      OTHERS WITHIN THERANOS WERE AWARE OF IT.  IN FACT, NO ONE

03:25PM  17      WITHIN THERANOS TESTIFIED THAT THEY HAD ANY DISCOMFORT ABOUT

03:26PM  18      THAT PROCESS BEING USED.

03:26PM  19           AND MS. HOLMES AND MR. BALWANI CAME TO BELIEVE THAT WHILE

03:26PM  20      THIS WAS AN INGENIOUS INVENTION THAT THERANOS HAD COME UP WITH,

03:26PM  21      IT WAS ALSO AN INVENTION THAT WAS AN INCREDIBLY IMPORTANT TRADE

03:26PM  22      SECRET.

03:26PM  23           WHY?  WELL, MODIFIED MACHINES WERE BASED ON COMMERCIAL

03:26PM  24      MACHINES THAT ANYONE ELSE COULD BUY, AND IF A COMPETITOR KNEW

03:26PM  25      THAT THOSE DEVICES COULD BE MODIFIED TO RUN THE TYPES OF SMALL

CLOSING ARGUMENT BY MR. DOWNEY                                    9099

```
03:26PM   1    SAMPLES THAT THERANOS WAS RUNNING, THEN THEY COULD TAKE THE

03:26PM   2    FINGERSTICK BUSINESS, WHETHER IT BE QUEST OR LABCORP, WHICH

03:26PM   3    ALREADY HAD ALL OF THE INFRASTRUCTURE TO RUN A LAB BUSINESS, OR

03:26PM   4    INDEED WHETHER IT EVEN BE WALGREENS ITSELF, WHICH MIGHT SAY,

03:26PM   5    WHY DO WE NEED TO HAVE THERANOS WHEN WE CAN USE A CENTRAL LAB

03:26PM   6    WITH THIS NEW FORM OF TECHNOLOGY.

03:27PM   7        CONTRARY TO WHAT MR. SCHENK TOLD YOU THIS MORNING, THE

03:27PM   8    EVIDENCE IN THE CASE IS CLEAR THAT INSIDE THERANOS THEY THOUGHT

03:27PM   9    THIS WAS AN INCREDIBLY IMPORTANT AND INCREDIBLY VALUABLE TRADE

03:27PM  10    SECRET THAT NEEDED PROTECTION.

03:27PM  11        LOOK AT THIS EMAIL FROM MR. BALWANI IN MAY OF 2014 JUST

03:27PM  12    TALKING ABOUT THE MODIFIED DEVICES.  HE SAYS THIS IS A BIG

03:27PM  13    COMPETITIVE ADVANTAGE.  HE TALKS ABOUT KEEPING EVERYTHING AS A

03:27PM  14    TRADE SECRET.  HE SAYS THERE'S NO ONE IN THE INDUSTRY WHO CAN

03:27PM  15    DO THAT BECAUSE WE'VE HAD MASSIVE TRIAL AND ERROR AND WE NEED

03:27PM  16    TO PROTECT IT.

03:27PM  17        AND HE WANTED FURTHER SIGNATURES ON TRADE SECRET

03:27PM  18    DOCUMENTS.

03:27PM  19        NOW, ONCE YOU BEGIN TO TREAT SOMETHING LIKE THIS AS A

03:27PM  20    TRADE SECRET, HOW DO YOU HAVE TO BEHAVE?

03:27PM  21        WELL, MS. HOLMES HAD RECEIVED GUIDANCE IN CONNECTION WITH

03:27PM  22    THAT WHEN SHE ASKED THAT A POLICY BE PREPARED FOR THE COMPANY,

03:28PM  23    AND THERE WAS -- WITHIN THE DRAFT POLICY THAT WAS SENT TO HER,

03:28PM  24    SHE GOT A BASIC OUTLINE OF WHAT THE COMPANY HAD TO DO TO

03:28PM  25    PREPARE -- TO PRESERVE ITS TRADE SECRETS.
```

CLOSING ARGUMENT BY MR. DOWNEY                                       9100

03:28PM   1        YOU SAW THAT IN EXHIBIT 15055.

03:28PM   2        AND MR. DOYLE, WHO WAS AN ATTORNEY AT THE COMPANY WHO WAS

03:28PM   3   WORKING ON THIS POLICY, REPORTED AS PART OF THE DRAFT THAT IN

03:28PM   4   CASES WHERE OUR PATENTS ARE PENDING, TRADE SECRETS PROVIDE

03:28PM   5   ANOTHER CRITICAL LAYER OF PROTECTION.

03:28PM   6        AND HE CHARACTERIZED, WHY IS SOMETHING A TRADE SECRET?

03:28PM   7        SOMETHING IS A TRADE SECRET BECAUSE THE OWNER HAS TO KEEP

03:28PM   8   IT SECRET AND BECAUSE IT'S REALLY VALUABLE.  IT'S CLEAR THAT

03:28PM   9   THE MODIFIED MACHINES WERE REALLY VALUABLE, AND SO THERANOS

03:28PM  10   DETERMINED THAT IT HAD TO KEEP IT SECRET.

03:28PM  11        THE QUESTION IS, TO WHOM CAN YOU DISCLOSE THIS?

03:29PM  12        YOU HEARD MR. LEACH IMAGINE THAT THERE WERE A LOT OF THIRD

03:29PM  13   PARTIES YOU COULD DISCLOSE IT TO IF THEY JUST SIGNED AN

03:29PM  14   AGREEMENT.

03:29PM  15        BUT WHAT THIS MEMO FROM MR. DOYLE SAYS IS THAT THE

03:29PM  16   DEFINING CHARACTERISTIC OF A TRADE SECRET IN FACT IS THAT IT IS

03:29PM  17   NEVER DISCLOSED PUBLICLY.

03:29PM  18        THAT'S HOW ZEALOUS THERANOS THOUGHT IT HAD TO BE WITH

03:29PM  19   RESPECT TO THESE MODIFIED MACHINE DEVICES.

03:29PM  20        AND THEN YOU HEARD DURING THE COURSE OF THE CASE, YOU

03:29PM  21   KNOW, SOME CRITICISM OF SOME OF THE INTERNAL SECURITY

03:29PM  22   PROCEDURES AND SO FORTH AT THERANOS.  YOU KNOW AS A RESULT OF

03:29PM  23   SEEING MR. DOYLE'S COMMUNICATIONS TO MS. HOLMES THAT THAT

03:29PM  24   DIDN'T COME FROM SOME DESIRE ON MS. HOLMES'S PART TO KEEP SOME

03:29PM  25   CRIMINAL SECRET.

CLOSING ARGUMENT BY MR. DOWNEY                                       9101

03:29PM    1          IT CAME FROM THE FACT THAT THEIR TRADE SECRET POLICY

03:29PM    2   REQUIRED THEM TO PRESERVE THIS AND OTHER TRADE SECRETS.

03:29PM    3          NOW, I THINK THAT THE ONLY ANSWER THAT THE GOVERNMENT HAS

03:30PM    4   TO THIS IS THAT THEY SAY, WELL, YOU COULD HAVE GOTTEN PEOPLE TO

03:30PM    5   SIGN NONDISCLOSURE AGREEMENTS, AND YOU COULD HAVE ASKED THEM TO

03:30PM    6   BE BOUND BY THE SAME PROTECTIONS YOU ARE.

03:30PM    7          I DON'T THINK THERE'S MUCH EVIDENCE FOR THAT EVEN AS A

03:30PM    8   PRACTICAL MATTER IN THE REAL WORLD.  I DON'T THINK IF YOU LOOK

03:30PM    9   AT THE DISCUSSION THAT MS. HOLMES DESCRIBED IN THE BOARD

03:30PM   10   MEETING WHEN THIS ISSUE CAME UP, SENATOR NUNN, WHO WAS A BOARD

03:30PM   11   MEMBER AND SERVED ON THE COCA-COLA BOARD, AND HE SAID THIS IS

03:30PM   12   JUST LIKE THE SECRET FORMULA FOR COCA-COLA.  I DON'T THINK

03:30PM   13   COCA-COLA IS SIGNING NONDISCLOSURE AGREEMENTS WITH BURGER KING

03:30PM   14   AND MCDONALDS AND THE OTHER PLACES THAT IT HAS PARTNERSHIPS TO

03:30PM   15   SELL ITS PRODUCT CONTENT TO KEEP THAT TRADE SECRET MERELY BY

03:30PM   16   THE FACT THAT THEY AS AN OUTSIDER HAVE SIGNED A CONFIDENTIALITY

03:30PM   17   AGREEMENT.

03:30PM   18          NOW, WHERE DID MS. HOLMES DISCLOSE THIS?  DID SHE TRY TO

03:31PM   19   KEEP IT A SECRET TO HERSELF?

03:31PM   20          THAT'S WHAT THE GOVERNMENT'S PRESENTATION TO YOU WOULD

03:31PM   21   SUGGEST, THAT BECAUSE THIS WAS A CRIME, SHE DIDN'T WANT ANYONE

03:31PM   22   TO KNOW.

03:31PM   23          WELL, THE EVIDENCE SUGGESTS THAT SHE DID DISCLOSE IT IN

03:31PM   24   THREE PLACES, AND THOSE THREE PLACES HAD A COMMON

03:31PM   25   CHARACTERISTIC.

                            UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY                              9102

```
03:31PM   1        THE FIRST PLACE SHE TALKED ABOUT IT IS IN CONNECTION WITH

03:31PM   2    THE BOARD MEETING THAT FOLLOWED THE LAUNCH WITH WALGREENS.  AND

03:31PM   3    YOU WERE SHOWN THE MINUTES OF THAT MEETING IN WHICH IT'S

03:31PM   4    RECORDED THAT MS. HOLMES TALKED TO THE BOARD ABOUT TRADE SECRET

03:31PM   5    ELEMENTS OF THE COMPANY'S WORK AND CERTAIN MATTERS THAT WERE

03:31PM   6    DISCUSSED NEEDED TO BE PROTECTED FROM DISCLOSURE FOR

03:31PM   7    COMPETITIVE REASONS.

03:31PM   8        WE THEN LOOKED AT THE ATTACHMENT TO THAT AND AMONGST THOSE

03:31PM   9    TRADE SECRETS DISCUSSED AT THAT TIME WAS THE INVENTION

03:31PM  10    ASSOCIATED WITH THE MODIFIED DEVICE.

03:31PM  11        THE GOVERNMENT'S ANSWER TO THAT IS THAT IT SUGGESTS THAT

03:32PM  12    GENERAL MATTIS DIDN'T RECALL THAT, AND I DON'T QUESTION THAT.

03:32PM  13    I THINK GENERAL MATTIS'S TESTIMONY WAS THAT THIS WAS HIS FIRST

03:32PM  14    BOARD MEETING AT THERANOS; THAT HE HAD TAKEN AN ALL-NIGHT

03:32PM  15    FLIGHT TO PARTICIPATE IN THAT BOARD MEETING; AND HE TESTIFIED

03:32PM  16    IT WAS ACTUALLY POSSIBLE EVEN THAT HE WASN'T AT THAT BOARD

03:32PM  17    MEETING.

03:32PM  18        SO I DON'T THINK THAT GENERAL MATTIS'S LACK OF

03:32PM  19    RECOLLECTION IS IN CONTRAST WITH WHAT MS. HOLMES SAID.  I THINK

03:32PM  20    IT REFLECTS WHERE HE WAS IN HIS SERVICE AT THERANOS AT THAT

03:32PM  21    TIME.

03:32PM  22        YOU KNOW THAT THE MODIFIED DEVICES WERE DISCLOSED TO THE

03:32PM  23    FOOD AND DRUG ADMINISTRATION.

03:32PM  24        WHY?  THAT'S A LEGAL REQUIREMENT IMPOSED IN THAT

03:32PM  25    CIRCUMSTANCE.  YOU CAN'T BE DISHONEST IF THE FDA ASKS YOU TO
```

CLOSING ARGUMENT BY MR. DOWNEY                                    9103

03:32PM   1    REVEAL DEVICES WHICH YOU'RE USING.

03:33PM   2         AND YOU ALSO SAW WITH CMS THAT THERANOS DISCLOSED THAT

03:33PM   3    THEY WERE PERFORMING BLOOD TESTS ON THIS FORM OF TECHNOLOGY.

03:33PM   4         NOW, THE, THE PROPOSAL OF THE GOVERNMENT IS THAT, WELL,

03:33PM   5    EVEN THOUGH THIS WAS A TRADE SECRET, YOU SHOULD HAVE FOUND SOME

03:33PM   6    WAY TO DISCLOSE IT TO YOUR INVESTORS.

03:33PM   7         BUT THE EVIDENCE SUGGESTS AT THE TIME THAT THE INVESTORS

03:33PM   8    WERE VERY WELL AWARE THAT THERANOS HAD TRADE SECRETS OF WHICH

03:33PM   9    THEY DID NOT HAVE KNOWLEDGE.

03:33PM  10         LET'S LOOK AT THIS EMAIL FROM MR. MOSLEY REACTING TO AN

03:33PM  11    ARTICLE ABOUT MS. HOLMES IN "THE NEW YORKER."

03:33PM  12         HE SAYS, YOU KNOW, I THOUGHT THE PIECE WAS POSITIVE, BUT

03:33PM  13    THEY SPENT TOO MUCH TIME SPECULATING AS TO WHY YOUR TECHNOLOGY

03:33PM  14    IS CONFIDENTIAL, WHICH SHOULD BE OBVIOUS TO ANYONE.

03:33PM  15         THAT'S A COMMENT FROM MR. MOSLEY, WHO IS ONE OF THE

03:33PM  16    INVESTORS YOU SAW TESTIFY HERE.

03:34PM  17         NOW, AFTER THE DECISION WAS MADE TO USE THESE MODIFIED

03:34PM  18    MACHINES, THE SHIFT IN FOCUS CAME IN CONNECTION WITH THE 4

03:34PM  19    SERIES.  I TALKED ABOUT THAT WITH YOU A LITTLE EARLIER IN MY

03:34PM  20    PRESENTATION.

03:34PM  21         AT THAT POINT THERANOS'S FOCUS WAS NOT TO GET THE 4.0

03:34PM  22    DEVICE INTO THE LAB.  IT WASN'T READY AT THE TIME OF THE LAUNCH

03:34PM  23    WITH WALGREENS, AS MS. HOLMES TOLD YOU.

03:34PM  24         AND THERANOS DECIDED THAT THE PATH THAT IT WOULD PURSUE

03:34PM  25    WITH THE 4.0 DEVICE WAS TO GET APPROVAL FROM THE FDA AS SOON AS

CLOSING ARGUMENT BY MR. DOWNEY                                    9104

03:34PM   1    AND AS BROADLY AS IT COULD BECAUSE WHEN IT ACHIEVED THAT, IT

03:34PM   2    COULD TAKE THOSE DEVICES AND THEN DEPLOY THEM IN THE STORE.

03:34PM   3        NOW, WALGREENS DID LAUNCH IN SEPTEMBER OF 2013.  THERE WAS

03:34PM   4    A LOT OF FOCUS ON DATES IN CONNECTION WITH THIS LAUNCH.

03:34PM   5        I THINK IT'S FAIR TO SAY, WITHOUT CHARACTERIZING THINGS,

03:34PM   6    THAT THE LAUNCH OF SERVICES IN SEPTEMBER WAS A SOFT LAUNCH OR A

03:35PM   7    LIMITED LAUNCH WHERE IT WAS FRIENDS AND FAMILY WHO WERE ABLE TO

03:35PM   8    USE THE SERVICES.  YOU SAW THAT VERY FEW PEOPLE WERE ACTUALLY

03:35PM   9    BEING TESTED AT THAT TIME.

03:35PM   10       THERANOS WORKED ON A MARKETING PITCH WITH CHIAT/DAY, YOU

03:35PM   11   HEARD TESTIMONY ABOUT THAT, AND THEIR ADVICE WAS THAT THERANOS

03:35PM   12   OUGHT TO HAVE PUBLICITY WHICH EXPLAINED WHAT THERANOS WAS.

03:35PM   13       WHY?  WELL, THERANOS WAS LAUNCHING AS PART OF ANOTHER

03:35PM   14   RETAIL STORE.  THERANOS WAS IN WALGREENS.

03:35PM   15       AND IF YOU WALK INTO A WALGREENS AND YOU GET A BLOOD TEST,

03:35PM   16   UNLESS IT WAS THOUGHT OF AS A SEPARATE BRAND, PEOPLE LOSE TRACK

03:35PM   17   OF YOU.  THEY THOUGHT IT WAS WALGREENS WHO WAS PERFORMING THE

03:35PM   18   TESTS.

03:35PM   19       SO THE WORK BEGAN TO TRY TO PUBLICIZE THERANOS THROUGH

03:35PM   20   NEWSPAPER ARTICLES AND SO FORTH, AND THE FIRST OF THOSE

03:35PM   21   ARTICLES IS THE ARTICLE THAT WAS WRITTEN BY JOSEPH RAGO IN THE

03:35PM   22   FALL OF 2013.

03:35PM   23       THAT'S THE EXPLANATION FOR WHAT HAPPENED PRIOR TO AND AT

03:36PM   24   THE TIME OF THE LAUNCH.

03:36PM   25       NOW, YOU KNOW THAT THERANOS DID LAUNCH, AND THERE WAS

CLOSING ARGUMENT BY MR. DOWNEY                                    9105

03:36PM  1    TESTIMONY IN THE CASE BY MR. JHAVERI THAT AT SOME POINT, IN HIS

03:36PM  2    PERCEPTION, THE ROLLOUT OF STORES RUN BY THERANOS WITHIN

03:36PM  3    WALGREENS WAS SLOWING AND THAT IT WASN'T GOING TO RECOVER DUE

03:36PM  4    TO VENOUS DRAWS.

03:36PM  5         LET ME COMMENT ON THAT A BIT.  I THINK IT'S MAYBE AN

03:36PM  6    UNDERREPRESENTATION OF THE RECORD.

03:36PM  7         FIRST OF ALL, WHEN MR. JHAVERI INTERACTED WITH MS. HOLMES,

03:36PM  8    ALL OF THE INTERACTIONS WERE VERY POSITIVE AND OPTIMISTIC AS IN

03:36PM  9    THIS EMAIL THAT HE SENT TO HER IN SEPTEMBER OF 2014, WHICH IS

03:36PM  10   PRECISELY THE TIME IN WHICH HE SAYS THAT THE LAUNCH WAS BEING

03:36PM  11   SLOWED.

03:36PM  12        BUT LET ME PUT THIS WHOLE DEBATE AND DISCUSSION IN A

03:36PM  13   BROADER CONTEXT WITH RESPECT TO SOMETHING THAT MR. SCHENK DID

03:37PM  14   NOT MENTION AS PART OF HIS REMARKS.

03:37PM  15        WALGREENS AND THERANOS HAD A CONTRACT UNDER WHICH THERANOS

03:37PM  16   WAS TO LAUNCH IN 3,000 STORES IN THE 24 MONTHS FOLLOWING

03:37PM  17   DECEMBER 31ST, 2013.  THEY HAD AGREED THAT THE ROLLOUT WOULD

03:37PM  18   CONSIST OF 3,000 STORES IN THAT TIMEFRAME.

03:37PM  19        THERE WAS A LITTLE BIT OF A MODIFICATION IN THAT NUMBER

03:37PM  20   OVER TIME.  IN MARCH OF 2014, THE NUMBER WAS LOWERED TO ABOUT

03:37PM  21   500 BASED ON, BASED ON PROGRESS AND DECISIONS AS TO WHAT

03:37PM  22   GEOGRAPHY THE ROLLOUT WOULD TAKE PLACE IN.

03:37PM  23        BUT ALL OF THIS WAS GOVERNED NOT BY THE PERCEPTIONS OF ONE

03:37PM  24   EMPLOYEE OF WALGREENS OR THE TESTIMONY OF SOMEONE TODAY, IT WAS

03:37PM  25   DEFINED BY THIS CONTRACT WHICH DISCUSSED WHAT THE EXPECTATIONS

CLOSING ARGUMENT BY MR. DOWNEY                                    9106

03:38PM   1      OF THE PARTIES WERE.

03:38PM   2           NOW, MR. JHAVERI, THE BASIC THRUST OF MR. JHAVERI'S

03:38PM   3      TESTIMONY WAS, WELL, IF THE PERCENTAGE OF VENOUS DRAWS IN OUR

03:38PM   4      STORES DIDN'T GO DOWN, WE WEREN'T GOING TO CONTINUE TO ROLLOUT.

03:38PM   5           WELL, THE CONTRACT DIDN'T CONTAIN ANY LANGUAGE OR ANY

03:38PM   6      REQUIREMENT THAT THERANOS MEET A CERTAIN NUMBER OF TESTS.

03:38PM   7           THERE WAS NOT A METRIC THAT WAS DEFINED BETWEEN THE

03:38PM   8      PARTIES AT ALL AS TO WHETHER STORES WOULD CONTINUE TO ROLLOUT.

03:38PM   9           IT WASN'T IDENTIFIED AS ANY KIND OF PERFORMANCE STANDARD

03:38PM  10      THAT THERANOS HAD TO MEET.  IT IS SIMPLY AN ISSUE THAT CAME UP

03:38PM  11      AS PART OF MR. JHAVERI'S DISCUSSIONS WITH MR. BALWANI.

03:38PM  12           MS. HOLMES, IN FACT, UNDERSTOOD THAT THE PARTNERSHIP

03:38PM  13      BETWEEN WALGREENS AND THERANOS WAS GOING WELL.  IN 2014, AS YOU

03:38PM  14      RECALL, SHE WAS SENT THESE, THESE CUSTOMER FEEDBACK SLIDES

03:39PM  15      WHICH COMMENTED ON THE EXPERIENCE OF PATIENTS WHO VISITED

03:39PM  16      WALGREENS STORES.

03:39PM  17           THE OVERALL EXPERIENCE OF THOSE PATIENTS WAS EXCELLENT,

03:39PM  18      ABOUT 4.85 OUT OF 5.

03:39PM  19           AND WITH RESPECT TO MR. JHAVERI'S COMMENTS ABOUT HIS

03:39PM  20      INTERACTIONS WITH MR. BALWANI, MS. HOLMES CONTINUED TO ENGAGE

03:39PM  21      WITH WALGREENS EXECUTIVES HERSELF.  SHE TESTIFIED ABOUT HER

03:39PM  22      MEETINGS WITH MR. GOURLAY.

03:39PM  23           THE GOVERNMENT SAYS THAT SHE KNEW THAT STORES WEREN'T

03:39PM  24      GOING TO CONTINUE TO ROLLOUT BECAUSE OF ONE TEXT THAT SHE

03:39PM  25      RECEIVED IN NOVEMBER OF 2014, ONE TEXT THAT SHE RECEIVED FROM

CLOSING ARGUMENT BY MR. DOWNEY                                9107

03:39PM   1    MR. BALWANI WHICH THEY HAVE REPEATEDLY SHOWN.

03:39PM   2        WHAT DO WE KNOW ABOUT THE TIMING OF THAT TEXT?  WE KNOW

03:39PM   3    THAT TWO WEEKS LATER MS. HOLMES HAD A MEETING WITH AN

03:39PM   4    INDIVIDUAL TO WHOM MR. JHAVERI REPORTED IN WALGREENS, AND THAT

03:40PM   5    THEY AGREED AT THAT MEETING THAT THERANOS WOULD CONTINUE TO

03:40PM   6    ROLL OUT IN WALGREENS STORES.  THIS IS WELL AFTER ANY OF THE

03:40PM   7    INVESTORS WHO WERE THE SUBJECT OF TESTIMONY TESTIFIED DURING

03:40PM   8    THE COURSE OF THIS CASE.

03:40PM   9        THERE SIMPLY IS NOT EVIDENCE THAT MS. HOLMES IN 2014

03:40PM  10    THOUGHT THERE WAS NOT GOING TO BE A WALGREENS PARTNERSHIP.

03:40PM  11        NOW, I WANT TO ASK A BASIC QUESTION ABOUT THE CONDUCT OF

03:40PM  12    MS. HOLMES WITHIN THERANOS, BUT NOT WITH THE EMPLOYEES.

03:40PM  13        I WANT TO ASK A QUESTION OF YOU TO CONSIDER AS TO IF

03:40PM  14    MS. HOLMES WERE A CRIMINAL, AS THE GOVERNMENT ALLEGES, WHAT

03:40PM  15    KIND OF A BOARD OF DIRECTORS WOULD SHE APPOINT?  WOULD SHE

03:40PM  16    APPOINT CRONIES OR PEOPLE WHO MIGHT FOLLOW HER INSTRUCTIONS?

03:40PM  17    YOU WOULD THINK SO.

03:41PM  18        BUT SHE APPOINTED THESE PEOPLE, AN INCREDIBLY ILLUSTRIOUS

03:41PM  19    GROUP OF PEOPLE, WHO HAD EXPERIENCE OVER TIME IN THE TECHNOLOGY

03:41PM  20    INDUSTRY, IN THE MEDICAL INDUSTRY, IN GOVERNMENT, IN RETAIL,

03:41PM  21    MANY, MANY DIFFERENT AREAS THAT TOUCHED ON THERANOS'S OPERATION

03:41PM  22    AND IN WHICH SHE COULD GET CANDID AND DIRECT FEEDBACK.

03:41PM  23        GENERAL MATTIS TESTIFIED THE BOARD WAS VERY ENGAGED, THEY

03:41PM  24    WERE VERY STRONG INDIVIDUALS, THEY GAVE FEEDBACK, THEY WERE

03:41PM  25    CAPABLE OF ASKING QUESTIONS.

CLOSING ARGUMENT BY MR. DOWNEY                                    9108

03:41PM  1        IT'S CLEAR FROM THE BOARD DOCUMENTS OVER TIME THAT THE

03:41PM  2    BOARD WAS TOLD ABOUT THE DEVELOPMENT OF THE 4.0 SERIES AS EARLY

03:41PM  3    AS 2010.  THEY SAW THE INSIDE OF THE DEVICE, JUST AS YOU HAVE

03:41PM  4    SEEN DURING THE COURSE OF THIS TRIAL.

03:41PM  5        NOW, I WANT TO ASK A QUESTION WITH RESPECT TO THE LIST OF

03:41PM  6    INDIVIDUALS THAT YOU LOOKED AT.  DO YOU THINK THAT MS. HOLMES,

03:42PM  7    IN CONNECTION WITH UNDERTAKING HER WORK AT THERANOS, DECIDED

03:42PM  8    THAT SHE WOULD ASSEMBLE THAT GROUP OF INDIVIDUALS FOR PURPOSES

03:42PM  9    OF CONDUCTING A CRIMINAL CONSPIRACY?

03:42PM 10        THAT SEEMS TO ME, LADIES AND GENTLEMEN, TO BE VERY, VERY

03:42PM 11    UNLIKELY.  AND THAT'S AN ADDITIONAL JUDGMENT OF HER INTENT THAT

03:42PM 12    YOU CAN CONSIDER AS PART OF YOUR DELIBERATIONS.

03:42PM 13        YOUR HONOR, I'M AT SORT OF A BREAKING POINT THERE.  I KNOW

03:42PM 14    YOU WANTED TO BREAK AT 3:45.

03:42PM 15            THE COURT:  WELL, LET'S DO THAT.  LET'S TAKE OUR

03:42PM 16    EVENING BREAK NOW IF THIS IS A GOOD TIME FOR YOU, MR. DOWNEY.

03:42PM 17        WE'LL DO THAT AND WE'LL RESUME AGAIN AT 9:00 A.M.

03:42PM 18    TOMORROW, LADIES AND GENTLEMEN.

03:42PM 19        WE'LL RESUME AGAIN TOMORROW AT 9:00 A.M., LADIES AND

03:43PM 20    GENTLEMEN, AND WE'LL CONTINUE WITH CLOSING ARGUMENTS THEN AND

03:43PM 21    ANY REBUTTAL THAT THE GOVERNMENT HAS.

03:43PM 22        SO DURING THE BREAK, DURING THE EVENING, PLEASE AGAIN --

03:43PM 23    IT'S EVER MORE IMPORTANT NOW THAT YOU'RE IN THE MIDDLE OF

03:43PM 24    ARGUMENTS TO AVOID, DO NOT DISCUSS, DO NOT READ, LISTEN TO, OR

03:43PM 25    IN ANY WAY TRY TO INFORM YOURSELVES ABOUT ANY INFORMATION ABOUT

03:43PM   1    THIS CASE OTHER THAN WHAT YOU'VE LEARNED HERE IN THIS

03:43PM   2    COURTROOM.

03:43PM   3        TOMORROW MORNING I WILL ASK YOU THE QUESTION OF WHETHER OR

03:43PM   4    NOT ANY OF THAT HAS HAPPENED AS TO EACH OF YOU.

03:43PM   5        SO ANYTHING FURTHER BEFORE WE BREAK FOR THE AFTERNOON?

03:43PM   6            MR. DOWNEY:  NOT FROM US, YOUR HONOR.

03:43PM   7            THE COURT:  MR. SCHENK?

03:43PM   8            MR. SCHENK:  NO, YOUR HONOR.

03:43PM   9            THE COURT:  ALL RIGHT.  WE'LL BREAK THIS AFTERNOON

03:43PM  10    NOW.  HAVE A GOOD EVENING.

03:43PM  11        WE'LL SEE YOU TOMORROW MORNING, LADIES AND GENTLEMEN.

03:44PM  12        (JURY OUT AT 3:44 P.M.)

03:44PM  13            THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

03:44PM  14    YOU.

03:44PM  15        THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

03:44PM  16    DAY.

03:44PM  17        BEFORE WE RECESS FOR THE DAY, LET ME CALL ON THE PARTIES,

03:44PM  18    ANYTHING FURTHER FROM THE GOVERNMENT?

03:44PM  19            MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

03:44PM  20            THE COURT:  MR. DOWNEY?

03:44PM  21            MR. DOWNEY:  NOTHING FROM US, YOUR HONOR.

03:44PM  22            THE COURT:  IS 9:00 O'CLOCK TOMORROW A GOOD TIME TO

03:44PM  23    START THEN?

03:44PM  24        I'LL BE HERE EARLY.  IF THE PARTIES NEED TO BRING ANYTHING

03:44PM  25    TO OUR ATTENTION, WE CAN TAKE THAT UP.

CLOSING ARGUMENT BY MR. DOWNEY                                    9110

03:44PM    1            HAVE A GOOD EVENING.

03:44PM    2                 MR. SCHENK:   THANK YOU, YOUR HONOR.

03:44PM    3                 MR. LEACH:   THANK YOU, YOUR HONOR.

03:44PM    4                 MR. DOWNEY:   THANK YOU, YOUR HONOR.

03:44PM    5                 MR. WADE:   THANK YOU, YOUR HONOR.

03:44PM    6                 THE CLERK:   COURT IS ADJOURNED.

03:44PM    7            (COURT ADJOURNED AT 3:44 P.M.)

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25


                        UNITED STATES COURT REPORTERS

```
 1
 2
 3                        CERTIFICATE OF REPORTERS
 4
 5
 6
 7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
 8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10     HEREBY CERTIFY:
11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12     A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13     ABOVE-ENTITLED MATTER.
14
15
16          _____
            IRENE RODRIGUEZ, CSR, CRR
17          CERTIFICATE NUMBER 8076
18
19          _____
            LEE-ANNE SHORTRIDGE, CSR, CRR
20          CERTIFICATE NUMBER 9595
21          DATED:  DECEMBER 16, 2021
22
23
24
25
```

9111

```
 1

 2                        UNITED STATES DISTRICT COURT

 3                       NORTHERN DISTRICT OF CALIFORNIA

 4                             SAN JOSE DIVISION

 5
      UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
 6                                     )
                      PLAINTIFF,       )  SAN JOSE, CALIFORNIA
 7                                     )
              VS.                      )  VOLUME 47
 8                                     )
      ELIZABETH A. HOLMES,             )  DECEMBER 17, 2021
 9                                     )
                      DEFENDANT.       )  PAGES 9111 - 9353
10    _____ )

11                    TRANSCRIPT OF TRIAL PROCEEDINGS
12                 BEFORE THE HONORABLE EDWARD J. DAVILA
                     UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14
      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
      OFFICIAL COURT REPORTERS:
22                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                 CERTIFICATE NUMBER 8074
23                               LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER
```

ER-12691

9112

```
1      A P P E A R A N C E S:  (CONT'D)

2

3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                             BY:  KEVIN M. DOWNEY
4                                 LANCE A. WADE
                                  KATHERINE TREFZ
5                                 SEEMA ROPER
                                  J.R. FLEURMONT
6                                 AMY SAHARIA
                                  ANDREW LEMENS
7                                 RICHARD CLEARY
                                  PATRICK LOOBY
8                            725 TWELFTH STREET, N.W.
                             WASHINGTON, D.C. 20005
9
                             LAW OFFICE OF JOHN D. CLINE
10                           BY:  JOHN D. CLINE
                             ONE EMBARCADERO CENTER, SUITE 500
11                           SAN FRANCISCO, CALIFORNIA 94111

12

13   ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                             BY:  ADELAIDA HERNANDEZ

14                           OFFICE OF THE U.S. ATTORNEY
                             BY:  LAKISHA HOLLIMAN, PARALEGAL
15                                MADDI WACHS, PARALEGAL

16                           WILLIAMS & CONNOLLY
                             BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                             TBC
18                           BY:  BRIAN BENNETT, TECHNICIAN

19

20

21

22

23

24

25
```

ER-12692

9113

1

2                            INDEX OF PROCEEDINGS

3

4     CLOSING ARGUMENT BY MR. DOWNEY (RES.)          P. 9136

5     REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC          P.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER-12693**

```
         1    SAN JOSE, CALIFORNIA                    DECEMBER 17, 2021

08:36AM  2                    P R O C E E D I N G S

08:36AM  3         (COURT CONVENED AT 8:36 A.M.)

08:36AM  4         (JURY OUT AT 8:36 A.M.)

08:36AM  5              THE COURT:  WE'RE ON THE RECORD IN THE HOLMES

08:36AM  6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:36AM  7         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

08:36AM  8         BEFORE WE BRING THE JURY IN, I JUST WANTED TO TALK ABOUT A

08:36AM  9    COUPLE OF THINGS THAT CAME TO MY ATTENTION YESTERDAY, AND I

08:36AM  10   HAVE SOME QUESTIONS FOR COUNSEL.

08:36AM  11        MR. DOWNEY, THIS INVOLVES YOUR ARGUMENT, SIR.

08:36AM  12        I GUESS I NEED SOME HELP ON YOUR ARGUMENT.  IT APPEARS

08:37AM  13   THAT DURING YOUR ARGUMENT YOU TALKED ABOUT TRADE SECRETS, AND

08:37AM  14   PLEASE RECALL THAT DURING OUR DISCUSSION ABOUT JURY

08:37AM  15   INSTRUCTIONS, YOU -- YOUR TEAM INFORMED US THAT, THE COURT AND

08:37AM  16   YOUR COLLEAGUE OPPOSITE, THAT YOU'D LIKE TO WITHDRAW THE TRADE

08:37AM  17   SECRET INSTRUCTION.

08:37AM  18             MR. DOWNEY:  YES, YES.

08:37AM  19             THE COURT:  WHICH WAS DONE.  I GRANTED THAT.

08:37AM  20        NOW IT APPEARS THAT THE ISSUE OF TRADE SECRETS IS IN FRONT

08:37AM  21   OF THE JURY THROUGH YOUR ARGUMENT.  NOT EVIDENCE, I RECOGNIZE

08:37AM  22   THAT.

08:37AM  23        CONCURRENT WITH THAT IS -- AND I'M CURIOUS ABOUT THERE'S A

08:37AM  24   MIL, I THINK IT WAS NUMBER 5, THAT TALKED ABOUT ADVICE OF

08:37AM  25   COUNSEL AND THE REQUIREMENTS FOR ADVICE OF COUNSEL.
```

08:37AM  1          AND IT SEEMS LIKE WE'RE CLOSE TO THAT NOW FROM YOUR

08:37AM  2   ARGUMENT.

08:37AM  3          MR. DOWNEY:  YEAH.  YOUR HONOR, I THINK WHAT THE

08:38AM  4   ARGUMENT CONVEYED RELATES NOT TO EVEN THE ACCURACY OF THE VIEW

08:38AM  5   WHAT A TRADE SECRET IS, BUT RATHER JUST, WITHIN THE COMPANY,

08:38AM  6   WHAT THEY UNDERSTOOD UNDER THEIR POLICY WAS A TRADE SECRET.

08:38AM  7          AND SO IT'S AN ISSUE THAT REALLY GOES TO INTENT, NOT TO

08:38AM  8   THE ACCURACY OR TO THE FULLNESS OF ANY ADVICE.

08:38AM  9          WE WOULD REQUEST -- WOULDN'T REQUEST AN ADVICE OF COUNSEL

08:38AM 10   INSTRUCTION WITH THAT, NOR WOULD WE ASK FOR AN INSTRUCTION ON

08:38AM 11   THE ELEMENTS BECAUSE I THINK MS. HOLMES IS CONTAINED IN THE

08:38AM 12   POLICY MEMO AND WHICH I REFERENCED DURING ARGUMENT YESTERDAY.

08:38AM 13          THE COURT:  ARE YOU ADVANCING A TRADE SECRETS

08:38AM 14   DEFENSE?

08:38AM 15          MR. DOWNEY:  WELL, I'M ADVANCING IT AS AN INTENT

08:38AM 16   DEFENSE ONLY, WHICH IS TO EXPLAIN THE REASONS THAT THE

08:39AM 17   DEFENDANT ACTED AS SHE DID.

08:39AM 18          I DON'T THINK THERE'S PER SE A TRADE SECRET DEFENSE IN

08:39AM 19   THIS CONTEXT, BUT I'M NOT SEEKING THE COURT'S IMPRIMATUR THAT

08:39AM 20   THAT IS A -- THAT HER UNDERSTANDING WAS CORRECT OR INCORRECT.

08:39AM 21          I'M JUST INTRODUCING THE EVIDENCE AND ARGUING ABOUT THE

08:39AM 22   EVIDENCE THAT IS PART OF THE RECORD.

08:39AM 23          THE COURT:  THANK YOU.

08:39AM 24          MY CONCERN IS THAT THE JURY, THEY'VE HEARD US TALK ABOUT,

08:39AM 25   YOU TALK ABOUT TRADE SECRETS BOTH IN YOUR EXAMINATIONS AND

08:39AM 1    CROSS-EXAMINATIONS -- AND I'M GOING TO ASK THE GOVERNMENT'S

08:39AM 2    THOUGHTS ON THIS, TOO -- BUT IT OCCURRED TO ME THAT THIS JURY

08:39AM 3    HAS BEEN -- HAS HEARD THIS TERM "TRADE SECRETS" AS WITNESSES

08:39AM 4    HAVE DESCRIBED IT, AS THE LAWYERS HAVE DESCRIBED IT, BUT THEY

08:39AM 5    WILL NOT HAVE ANY INSTRUCTION FROM THE COURT AS TO WHAT A TRADE

08:39AM 6    SECRET IS SUCH THAT THAT COULD GUIDE THEIR DELIBERATIONS.

08:40AM 7         THAT'S THE CONCERN I HAVE AS THE JUDICIAL OFFICER MAKING

08:40AM 8    SURE THAT THE JUDGE HAS -- EXCUSE ME, THE JURY HAS SUFFICIENT

08:40AM 9    INFORMATION SUCH THAT THEY CAN DELIBERATE FULLY ON THE ISSUES

08:40AM 10   BEFORE THEM.

08:40AM 11        THE TRADE SECRETS INSTRUCTION THAT WAS OFFERED BY YOU

08:40AM 12   WOULD SUGGEST THAT THAT, AT LEAST INITIALLY, WAS AN ISSUE THAT

08:40AM 13   YOU FELT, YOUR TEAM FELT, THAT THE COURT SHOULD INSTRUCT ON

08:40AM 14   BECAUSE THAT WAS GOING TO BE OF SOME MOMENT IN THE CASE.

08:40AM 15        WHEN YOU WITHDREW THAT INSTRUCTION, I SUPPOSE A REASONABLE

08:40AM 16   INFERENCE COULD BE THAT THAT'S NO LONGER THE CASE, THAT THAT

08:40AM 17   WOULDN'T BE AT LEAST BECAUSE WE WOULDN'T NEED TO INSTRUCT THE

08:40AM 18   JURY AS TO TRADE SECRET ISSUES.

08:40AM 19        AND NOW AT THIS JUNCTURE, AND PLEASE RECALL THAT THE

08:40AM 20   EXHIBIT THAT WE'VE REFERENCED, WHAT IS IT, 105?  I WAS LOOKING

08:40AM 21   AND I WAITED ON MY COMMENTS BECAUSE I WANTED TO READ THE

08:40AM 22   TRANSCRIPT AGAIN LAST NIGHT.

08:40AM 23             MR. DOWNEY:  YES.

08:41AM 24             THE COURT:  I COULDN'T RECALL IF YOU HAD ACTUALLY

08:41AM 25   UTTERED THE PHRASE "ADVICE OF COUNSEL" OR NOT, AND YOU DIDN'T.

08:41AM   1            MR. DOWNEY:  NO, I DIDN'T.

08:41AM   2            THE COURT:  IT'S 15055.

08:41AM   3            MR. DOWNEY:  YES.

08:41AM   4            THE COURT:  AND WE HAD SOME DISCUSSION ABOUT THIS,

08:41AM   5    AND THE GOVERNMENT OBJECTED ON RULE 16 GROUNDS AND WE HAD SOME

08:41AM   6    DISCUSSION ABOUT THIS AND IT ULTIMATELY WAS ADMITTED.  AND

08:41AM   7    THAT'S THE FOCUS OF BACK TO THIS TRADE SECRET.

08:41AM   8        SO I'M JUST CURIOUS, NOW THIS JURY HAS HEARD TRADE

08:41AM   9    SECRETS, WHAT THEY KNOW FROM TRADE SECRETS IS FROM THAT

08:41AM  10    DOCUMENT, WHICH ADMITTEDLY IS A DRAFT, I UNDERSTAND THAT, BUT

08:41AM  11    WILL THERE BE JURY CONFUSION, JUROR CONFUSION REGARDING THE

08:41AM  12    ISSUE OF TRADE SECRETS AND WHETHER OR NOT THEY NEED TO BE

08:41AM  13    INFORMED, INSTRUCTED AS TO A TRADE SECRET AND HOW THAT COMES

08:41AM  14    INTO PLAY WITH ANY GOOD FAITH ARGUMENT, ET CETERA?

08:42AM  15        THAT'S THE QUESTION.

08:42AM  16            MR. DOWNEY:  YEAH, I THINK THE DYNAMICS OF WHERE WE

08:42AM  17    ARE ON THIS, YOUR HONOR, IS THAT, AS MR. SCHENK SAID IN HIS

08:42AM  18    CLOSING YESTERDAY, THAT THE DISCUSSION AND EXPLANATION OF

08:42AM  19    CERTAIN CONDUCT AS BEING MOTIVATED BY A TRADE SECRET CONCERN

08:42AM  20    WAS A RETROSPECTIVE EXPLANATION.

08:42AM  21        I THINK THE EVIDENCE IS ONLY OFFERED TO SHOW THE STATE OF

08:42AM  22    MIND OF THE DEFENDANT.  IT'S NOT REALLY A QUESTION OF WHETHER

08:42AM  23    HER UNDERSTANDING IS CONSISTENT WITH ANY INSTRUCTION THE COURT

08:42AM  24    WOULD GIVE AS TO WHAT A TRADE SECRET IS OR IS NOT.

08:42AM  25        I DON'T THINK THE COURT -- I DON'T THINK THE JURY NEEDS TO

08:42AM   1    RESOLVE THAT QUESTION.

08:42AM   2         I THINK WHAT THE JURY NEEDS TO RESOLVE IS, IN LOOKING AT

08:42AM   3    THE EXHIBIT, DO THEY THINK THAT WAS SOMETHING WHICH INFORMED

08:42AM   4    HER INTENT OR DO THEY THINK IT WASN'T?

08:42AM   5         AND IF THEY THINK IT WAS SOMETHING, ARE HER ACTIONS

08:42AM   6    CONSISTENT WITH WHAT THE POLICY OF THE COMPANY WAS?

08:43AM   7         I THINK -- FOR EXAMPLE, I DON'T KNOW THAT THIS IS THE

08:43AM   8    SITUATION, BUT YOU COULD IMAGINE THE POLICY OF THE COMPANY

08:43AM   9    BEING INCONSISTENT WITH WHAT YOUR HONOR WOULD INSTRUCT, AND I

08:43AM  10    DON'T KNOW WHAT THE BENEFIT WOULD BE IN THAT CASE OF HAVING AN

08:43AM  11    INSTRUCTION ONE WAY OR THE OTHER.

08:43AM  12         SO IT SEEMS TO ME THAT THE COURT GIVING SUCH AN

08:43AM  13    INSTRUCTION DOESN'T ADDRESS A QUESTION THAT THE JURY REALLY

08:43AM  14    NEEDS TO RESOLVE.

08:43AM  15         I THINK WHAT THE JURY NEEDS TO RESOLVE IS BASED ON THE

08:43AM  16    FACTS OF THE CASE.

08:43AM  17            THE COURT:  DO I NEED TO TELL THE JURY THAT, LADIES

08:43AM  18    AND GENTLEMEN, TO REMIND THEM THAT THE COMMENTS OF COUNSEL ARE

08:43AM  19    NOT EVIDENCE, AND THAT THERE HAS BEEN NO LEGAL DEFENSE

08:43AM  20    PROFFERED REGARDING TRADE SECRETS?

08:43AM  21            MR. DOWNEY:  I CERTAINLY WOULD VIEW THAT AS CALLING

08:43AM  22    OUT ONE ISSUE FOR COMMENT.

08:43AM  23         I THINK THEY DON'T -- I THINK I HAVE NO ISSUE WITH THEM

08:43AM  24    BEING TOLD DURING INSTRUCTIONS THAT THERE IS NOT AN ISSUE FOR

08:43AM  25    THEM TO RESOLVE AS TO WHAT THE LAW OF TRADE SECRETS IS, THAT

| | | |
|---|---|---|
| 08:44AM | 1 | EVIDENCE THAT HAS BEEN INTRODUCED ON THAT SUBJECT MERELY IS |
| 08:44AM | 2 | EVIDENCE INTRODUCED RELEVANT TO THE DEFENDANT'S INTENT. |
| 08:44AM | 3 | IT SEEMS TO ME THAT I DON'T KNOW THAT THAT IS NECESSARY, |
| 08:44AM | 4 | BUT I DON'T KNOW WHAT -- I DON'T REALLY KNOW WHAT THE COURT |
| 08:44AM | 5 | WOULD HOPE THE JURY TO RESOLVE AS A RESULT OF THAT INSTRUCTION |
| 08:44AM | 6 | OTHER THAN COMPARING IT TO WHAT WAS SAID, WHICH I THINK DOES |
| 08:44AM | 7 | HAVE THE DIFFICULTY OF RUNNING, POTENTIALLY OF RUNNING SOME |
| 08:44AM | 8 | PREJUDICE TO THE DEFENDANT. |
| 08:44AM | 9 | THE COURT:  WELL -- |
| 08:44AM | 10 | MR. DOWNEY:  AND I SAY THAT HYPOTHETICALLY, |
| 08:44AM | 11 | YOUR HONOR.  I DON'T KNOW THAT THAT IS TRUE.  IT WOULD |
| 08:44AM | 12 | OBVIOUSLY DEPEND ON THE CONTENT AND SO FORTH. |
| 08:44AM | 13 | THE COURT:  SURE.  BUT LET ME FIRST SAY I'M NOT |
| 08:44AM | 14 | TRYING TO INTERJECT MYSELF IN EITHER OF YOUR CASES HERE. |
| 08:44AM | 15 | MR. DOWNEY:  YES. |
| 08:44AM | 16 | THE COURT:  BUT, AGAIN, MY POSITION IS MAKING SURE |
| 08:44AM | 17 | THE JURY IS FULLY INFORMED, THIS CROSSED MY MIND.  THERE WERE |
| 08:44AM | 18 | TWO ISSUES, THE TRADE SECRETS.  YOU HAD ADVOCATED INITIALLY FOR |
| 08:44AM | 19 | AN INSTRUCTION ON TRADE SECRETS.  WE HAD DISCUSSION.  I LOOKED |
| 08:45AM | 20 | AT YOUR PROFFER AND YOUR PROFFER SUGGESTED THAT WE ASK THE JURY |
| 08:45AM | 21 | TO DEFINE CALIFORNIA LAW.  YOU RECALL THAT. |
| 08:45AM | 22 | MR. DOWNEY:  RIGHT, RIGHT. |
| 08:45AM | 23 | THE COURT:  AND I SAID I DON'T THINK THAT'S FAIR. |
| 08:45AM | 24 | AND YOUR TEAM WITHDREW THAT INSTRUCTION. |
| 08:45AM | 25 | MR. DOWNEY:  THAT'S RIGHT. |

08:45AM  1        I THINK YOUR HONOR WAS ALSO CONCERNED WHAT, WHAT RELEVANCE

08:45AM  2    DOES IT HAVE IF IT DOESN'T INFORM THE FACTS OF THE CASE

08:45AM  3    DIRECTLY.

08:45AM  4            THE COURT:  WELL, I'M CONCERNED ABOUT THAT, AND I'M

08:45AM  5    ALSO CONCERNED ABOUT SOMETHING BEING LEFT PREGNANT FOR THE JURY

08:45AM  6    FOR THEM TO DECIDE AN ISSUE BASED ON A LACK OF FULSOME

08:45AM  7    INSTRUCTION AS TO WHAT THEY SHOULD DO.

08:45AM  8        AGAIN, THE ADVICE OF COUNSEL ISSUE IS ONE OF CONCERN.  I

08:45AM  9    KNOW THE MIL ORDER SAID IT WAS PREMATURE.  THE GOVERNMENT ASKED

08:45AM  10   THAT I GRANT THEIR MOTION SAYING THAT THERE COULD BE NO ADVICE

08:45AM  11   OF COUNSEL DEFENSE.

08:45AM  12       I SAID, WELL, IT'S PREMATURE TO MAKE THAT DECISION NOW.

08:45AM  13   WE HAVEN'T STARTED THE EVIDENCE YET.

08:45AM  14       YOU KNOW WHAT THE FOUNDATIONS ARE BASED ON THE

08:45AM  15   NINTH CIRCUIT'S CASES, AND IF YOU DECIDE TO DO THAT, INTRODUCE

08:46AM  16   AN ADVICE OF COUNSEL DEFENSE, WHICH WOULD GO TO GOOD FAITH,

08:46AM  17   IT'S NOT AN ABSOLUTE DEFENSE, OF COURSE.  IT'S SOMETHING THAT

08:46AM  18   THE JURY CAN CONSIDER WHEN THEY CONSIDER INTENT.

08:46AM  19       YOU DIDN'T DO THAT IN YOUR CASE.  I DON'T RECALL THAT.

08:46AM  20           MR. DOWNEY:  NOR IS IT MY INTENT TO ASK FOR THAT

08:46AM  21   INSTRUCTION.

08:46AM  22           THE COURT:  RIGHT.  RIGHT.

08:46AM  23       BUT THERE'S A LITTLE BIT OF A -- ARE WE CLOSE TO THAT?

08:46AM  24   ARE WE IN THAT NEIGHBORHOOD NOW?  ARE WE IN THE NEIGHBORHOOD OF

08:46AM  25   TRADE SECRETS?  ARE WE IN THE NEIGHBORHOOD OF ADVICE OF COUNSEL

08:46AM   1    SUCH THAT WE NEED TO GIVE DIRECTION TO THE JURY?  THAT'S MY

08:46AM   2    CONCERN HERE.

08:46AM   3        LET ME CALL ON THE GOVERNMENT.  I DON'T KNOW IF THEY HAVE

08:46AM   4    A COMMENT.  MAYBE THEY'LL TELL ME I'M COUNTING TOO MANY ANGELS

08:46AM   5    ON PINHEADS.  I DON'T KNOW.

08:46AM   6              MR. LEACH:  CAN THE COURT HEAR ME?

08:46AM   7              THE COURT:  I PROBABLY COULD IF YOU SPEAK INTO THIS

08:46AM   8    ONE (INDICATING).

08:46AM   9              MR. LEACH:  I'M TOLD THIS MICROPHONE DOESN'T WORK

08:46AM  10    AND I NEED TO TURN THIS ON SOMEHOW.

08:46AM  11              MR. DOWNEY:  HERE.

08:46AM  12              MR. LEACH:  MR. DOWNEY HAS EXPERIENCE.

08:46AM  13              THE COURT:  HE'S GOT EXPERIENCE IN THIS.

08:46AM  14              MR. LEACH:  HOW ABOUT NOW?

08:47AM  15              THE COURT:  LOUD AND CLEAR.  THANK YOU.

08:47AM  16              MR. LEACH:  THANK YOU, YOUR HONOR.

08:47AM  17        I'LL ADDRESS THIS BECAUSE I WAS HANDLING THE JURY

08:47AM  18    INSTRUCTION ON THIS POINT.

08:47AM  19              THE COURT:  YES.

08:47AM  20              MR. LEACH:  OUR CONCERN WITH THE TRADE SECRET

08:47AM  21    INSTRUCTION AT THE TIME WAS, FIRST, IT WAS AN INCOMPLETE

08:47AM  22    STATEMENT OF THE LAW.  IT DIDN'T ADDRESS ASPECTS OF THE LAW

08:47AM  23    LIKE THE NOSAL CASE WHICH SAYS THAT YOU CAN PROTECT A TRADE

08:47AM  24    SECRET WITH A CONFIDENTIALITY AGREEMENT.

08:47AM  25        SO OUR OBJECTION WAS THAT IT WAS INCOMPLETE, AND IT ALSO

9122

08:47AM  1    HIGHLIGHTED A PARTICULAR PIECE OF EVIDENCE IN WHAT WE THOUGHT

08:47AM  2    WAS A MISLEADING WAY.

08:47AM  3        OUR POSITION IS THAT THE DISCUSSION ABOUT TRADE SECRET IS

08:47AM  4    THE PRETEXT TO SIMPLY DISCLOSE INFORMATION THAT THEY --

08:47AM  5        (CELL PHONE RINGING.)

08:47AM  6            THE COURT:  DON'T LET HIM BACK IN.

08:47AM  7            MR. LEACH:  AT THE TIME THE ARGUMENT THAT WE CAN'T

08:47AM  8    DISCLOSE TO WALGREENS OR OTHERS WAS A PRETEXT, AND A CONVENIENT

08:47AM  9    REASON NOT TO DISCLOSE WHAT THEY DIDN'T WANT TO DISCLOSE.

08:47AM  10       AND THAT'S OUR ARGUMENT.  WE'RE GOING TO ARGUE THAT BASED

08:48AM  11   ON THE FACTS.

08:48AM  12       I DO THINK THAT THE COURT HAS TOUCHED ON AN ISSUE THAT

08:48AM  13   MIGHT BE APPROPRIATE IN TERMS OF ADVICE OF COUNSEL

08:48AM  14   DISASSOCIATED FROM NECESSARILY THE TRADE SECRET ISSUE.

08:48AM  15       THEY HAVEN'T PROFFERED AN ADVICE OF COUNSEL DEFENSE.

08:48AM  16   THERE ARE ELEMENTS FOR ESTABLISHING THE ADVICE OF COUNSEL

08:48AM  17   DEFENSE.

08:48AM  18       WHAT I HEARD FROM MR. DOWNEY RIGHT NOW IS THAT THEY'RE NOT

08:48AM  19   ASSERTING AN ADVICE OF COUNSEL DEFENSE.

08:48AM  20       SO I DO THINK IT MIGHT BE APPROPRIATE TO CRAFT SOMETHING

08:48AM  21   ALONG THE LINES OF WHAT YOUR HONOR WAS SUGGESTING,

08:48AM  22   DISASSOCIATED FROM THE TRADE SECRET ISSUE, BECAUSE I WORRY IF

08:48AM  23   THE COURT IS GOING TO WEIGH IN ON THAT TERM, IT, IT COULD BE

08:48AM  24   PUTTING A STAMP ON A FACTUAL ISSUE THAT I THINK COULD CUT

08:48AM  25   EITHER WAY FOR BOTH PARTIES.

**ER-12702**

9123

08:48AM   1            THE COURT:  YES, I DON'T WANT TO DO THAT.  I DON'T

08:48AM   2    WANT TO INTERJECT MYSELF INTO YOUR CASES.

08:48AM   3            MR. DOWNEY:  AND LET ME SAY, I AGREE WITH THAT

08:48AM   4    CONCERN.

08:48AM   5        I THINK AT THIS POINT THE GOVERNMENT'S CASE-IN-CHIEF, JUST

08:48AM   6    TO BE PRACTICAL AND HAVE THIS DISCUSSION ALONG THE LINES THAT

08:48AM   7    MR. LEACH IS DISCUSSING, THEY RAISED THE SUGGESTION THAT A LOT

08:49AM   8    OF BEHAVIORS IN THE COMPANY WERE SECRETIVE AND CONCEALING AND

08:49AM   9    SO FORTH.

08:49AM   10       I'M CERTAINLY ENTITLED TO PRESENT AN UNDERSTANDING THAT

08:49AM   11   THE DEFENDANT HAD OF WHAT SHE UNDERSTOOD AS TO WHAT THE

08:49AM   12   REQUIREMENTS WERE AND SO FORTH WITHOUT REGARD TO ANY ADVICE OF

08:49AM   13   COUNSEL DEFENSE.

08:49AM   14       AND THE JURY HAS EVIDENCE IN FRONT OF IT WHERE IT CAN

08:49AM   15   EVALUATE WHETHER SHE ACTED CONSISTENT WITH THAT UNDERSTANDING

08:49AM   16   OR NOT.

08:49AM   17       I THINK TO INSTRUCT RUNS THE RISK THAT THERE IS, YOU

08:49AM   18   KNOW --

08:49AM   19           THE COURT:  WELL, WE'RE HERE IN THIS MORASS NOW

08:49AM   20   BECAUSE THAT'S WHERE THE EVIDENCE HAS TAKEN US.

08:49AM   21       LET ME GET BACK TO MR. LEACH.

08:49AM   22           MR. DOWNEY:  SORRY.

08:49AM   23           THE COURT:  NO, NO.

08:49AM   24           MR. LEACH:  THE GOVERNMENT WOULD BE FINE WITH SOME

08:49AM   25   FORM OF INSTRUCTION THAT MS. HOLMES IS NOT ASSERTING AN ADVICE

9124

08:49AM  1    OF COUNSEL DEFENSE AND AN ADVICE OF COUNSEL DEFENSE REQUIRES --

08:49AM  2    I DON'T HAVE THE MODEL IN FRONT OF ME -- BUT THERE'S

08:49AM  3    ESSENTIALLY THREE ELEMENTS, A FULL DISCLOSURE OF THE FACTS OF

08:49AM  4    THE LAWYER FOLLOWING THE ADVICE AND NOT KNOWING SOME ADDITIONAL

08:50AM  5    INFORMATION.

08:50AM  6        I DON'T THINK THAT INSTRUCTING ON THE NUANCES OF TRADE

08:50AM  7    SECRET LAW WOULD AID THE JURY AT THIS POINT.  I THINK IT'S MORE

08:50AM  8    A FACTUAL MATTER.

08:50AM  9        BUT ADDING CLARITY THROUGH THE INSTRUCTIONS THAT THERE'S

08:50AM  10   NO ADVICE OF COUNSEL DEFENSE AT ISSUE I THINK COULD BE

08:50AM  11   BENEFICIAL.

08:50AM  12       (DISCUSSION OFF THE RECORD.)

08:50AM  13          THE COURT:  SO TODAY I WAS CURIOUS WHETHER WE HAD

08:50AM  14   THE CONVERSATION, I WANTED TO HAVE IT, I WAS CURIOUS,

08:50AM  15   MR. DOWNEY, WHETHER YOU WOULD SAY THERE HAS BEEN A FULSOME

08:50AM  16   MEETING OF THE NINTH CIRCUIT REQUIREMENTS IN THE CASE BECAUSE

08:50AM  17   BY THE FACT THAT ON DIRECT EXAMINATION MS. HOLMES INDICATED

08:50AM  18   THAT SHE SPOKE WITH COUNSEL, HOUSE COUNSEL.

08:50AM  19       YOU WOULD TELL ME THAT THAT ACTS AS A WAIVER OF THE

08:50AM  20   PRIVILEGE, WHICH IS ONE OF THE REQUIREMENTS, AND THAT SHE THEN

08:51AM  21   ACTED ON -- THERE MIGHT BE SOME FOUNDATIONAL REQUIREMENTS I

08:51AM  22   THINK THAT ARE MISSING FROM NINTH CIRCUIT CASE LAW ON WHAT THAT

08:51AM  23   IS.

08:51AM  24       I JUST AM CURIOUS WHETHER OR NOT THE JURY IS GOING TO

08:51AM  25   BE -- NOT HAVE ALL OF THE INFORMATION THAT THEY NEED.  I DON'T

08:51AM  1    WANT TO SAY MISLED, BUT I WILL SAY NOT HAVE ALL OF THE

08:51AM  2    INFORMATION THAT THEY NEED BASED ON THE ARGUMENT AND ON THE

08:51AM  3    STATE OF THE EVIDENCE.

08:51AM  4         MR. DOWNEY:  WELL, YOUR HONOR, I WOULD TAKE STRONG

08:51AM  5    EXCEPTION TO THAT.

08:51AM  6      I THINK WE HAD DISCUSSION OF WHETHER WE WOULD WANT TO

08:51AM  7    ASSERT AN ADVICE OF COUNSEL DEFENSE.  WE DON'T.

08:51AM  8      THE GOVERNMENT RAISED IN ITS CASE, WHICH IT'S PERFECTLY

08:51AM  9    ENTITLED TO DO, THE IMPLICATION THAT A LOT OF THE BEHAVIORS IN

08:51AM 10    THE COMPANY SUGGESTED CRIMINALITY BECAUSE THEY WERE SECRETIVE.

08:51AM 11      WE HAVE INTRODUCED EVIDENCE WHICH DEMONSTRATES THAT THE

08:51AM 12    UNDERSTOOD POLICIES OF THE COMPANY WERE WHAT THEY WERE IN

08:51AM 13    REGARD TO THOSE ISSUES, IN TERMS OF ACCESS AND DIGITAL THINGS,

08:52AM 14    ET CETERA.

08:52AM 15      I THINK THE SUGGESTION THAT WE IN ANY WAY MISLED THEM

08:52AM 16    IS -- HAS NO BASIS IN THE RECORD.

08:52AM 17      AND I APPRECIATE THE ISSUE THAT YOUR HONOR IS DISCUSSING,

08:52AM 18    BUT I WOULD TAKE STRONG EXCEPTION TO THE SENSE THAT THEY'VE

08:52AM 19    BEEN MISLED.

08:52AM 20         THE COURT:  WELL, I SAID I'M NOT USING THE WORD

08:52AM 21    "MISLED," BUT SOMETIMES BY SAYING IT, IT SUGGESTS SOMETHING,

08:52AM 22    DOESN'T IT?

08:52AM 23      AND THAT GOES FULL CIRCLE TO THE ARGUMENT HERE I THINK,

08:52AM 24    WHAT I DON'T WANT THE JURY TO HAVE.

08:52AM 25      I LOOKED AT THE TRANSCRIPT ON PAGE 9099 AT LINE 21,

9126

08:52AM  1      "MS. HOLMES HAD RECEIVED GUIDANCE IN CONNECTION WITH THAT WHEN

08:52AM  2      SHE ASKED THAT A POLICY BE PREPARED FOR THE COMPANY."

08:52AM  3              MR. DOWNEY:  RIGHT.

08:52AM  4              THE COURT:  "AND THEN THE DRAFT POLICY WAS SENT TO

08:52AM  5      HER.  SHE GOT A BASIC OUTLINE OF WHAT THE COMPANY HAD TO DO TO

08:52AM  6      PREPARE TO PRESERVE ITS TRADE SECRETS."  THAT'S AT LINES 21

08:52AM  7      THROUGH 25.

08:52AM  8          AND ON PAGE 9100, YOU REFERENCED 15055, AND THEN YOU SAY

08:53AM  9      AT LINE 2, "HE WAS AN ATTORNEY AT THE COMPANY WHO WAS WORKING

08:53AM 10      ON THE POLICY AND REPORTED AS PART OF THE DRAFT," AND YOU SAY

08:53AM 11      IT'S A DRAFT, AND HE CHARACTERIZED WHY IS SOMETHING A TRADE

08:53AM 12      SECRET?

08:53AM 13          SO HIS DEFINITION OF THAT WAS INTERJECTED --

08:53AM 14              MR. DOWNEY:  RIGHT.

08:53AM 15              THE COURT:  -- AT LEAST ARGUED TO THE JURY.

08:53AM 16          AND THEN YOU TALK ABOUT THE MEMO DEFINING AGAIN TRADE

08:53AM 17      SECRETS.

08:53AM 18          I THINK LATER ON YOU SUGGEST THAT YOUR CLIENT RECEIVED IT,

08:53AM 19      MS. HOLMES RECEIVED IT, AND THAT THEN I SUPPOSE INFORMS THE --

08:53AM 20              MR. DOWNEY:  I THINK THAT'S REFLECTED ON THE

08:53AM 21      DOCUMENT, YES.

08:53AM 22              THE COURT:  RIGHT.  RIGHT.

08:53AM 23          SO THIS IS THE ISSUE THAT I WAS CONCERNED ABOUT.

08:53AM 24          BUT DO I NEED TO TELL THIS JURY WHAT ADVICE OF COUNSEL IS?

08:53AM 25      IF YOU'RE GOING TO ARGUE THAT SHE RELIED ON ADVICE OF COUNSEL,

**ER-12706**

9127

08:54AM  1    SHE RELIED ON THE MEMO, IS THAT ADVICE OF COUNSEL?  AND IS THAT

08:54AM  2    SOMETHING THAT I NEED TO ADDRESS TO THE JURY AS TO WHETHER OR

08:54AM  3    NOT ADVICE OF COUNSEL HAS BEEN ACTUALLY MET HERE?

08:54AM  4         MR. DOWNEY:  I DON'T SEE A BASIS OR REASON TO DO

08:54AM  5    THAT.  I HAVEN'T REQUESTED IT.

08:54AM  6       I THINK THE DEFENSE GOES TO INTENT.

08:54AM  7       OBVIOUSLY THE COURT WILL GIVE AN INTENT INSTRUCTION IN ANY

08:54AM  8    EVENT, BUT I THINK IT'S AN UNNECESSARY INSTRUCTION IN THIS

08:54AM  9    CONTEXT.

08:54AM  10        THE COURT:  WELL, I'VE GIVEN YOUR TEAM, YOU KNOW,

08:54AM  11   YOUR REQUEST FOR GOOD FAITH OVER VEHEMENT --

08:54AM  12        MR. DOWNEY:  RIGHT.

08:54AM  13        THE COURT:  -- OBJECTIONS.

08:54AM  14        MR. DOWNEY:  APPROPRIATELY.

08:54AM  15        THE COURT:  YES.  AND I'VE GIVEN THE INSTRUCTIONS

08:54AM  16   YOU WANT ON WILLFULLY ALSO.

08:54AM  17      AND MR. LEACH WAS RED IN THE FACE WHEN HE WAS OBJECTING TO

08:54AM  18   BOTH OF THOSE.

08:54AM  19        MR. DOWNEY:  WE'LL KNOW BETTER IN THE FUTURE WHAT

08:54AM  20   THE LAW IS.

08:54AM  21        THE COURT:  HE'S GOT THOSE.

08:54AM  22      ANYWAY, MR. LEACH?

08:54AM  23        MR. LEACH:  I THINK AN INSTRUCTION THAT MS. HOLMES

08:55AM  24   IS NOT ASSERTING AN ADVICE OF COUNSEL DEFENSE, AND AN ADVICE OF

08:55AM  25   COUNSEL DEFENSE REQUIRES THE ELEMENTS SET FORTH IN THE MODEL

9128

08:55AM  1    WOULD BE APPROPRIATE.

08:55AM  2        I DO THINK THE ARGUMENT COUNSEL MADE, IF NOT STATING, WAS

08:55AM  3    STRONGLY IMPLYING SHE RELIED ON THE ADVICE OF AN ATTORNEY.

08:55AM  4        I WOULD CAUTION AGAIN A REFERENCE TO TRADE SECRETS BECAUSE

08:55AM  5    IT MIGHT GIVE SOME VALIDITY TO THE DEFENSE THAT ANIMATED THE

08:55AM  6    GOVERNMENT'S CONCERN IN THE FIRST INSTANCE.

08:55AM  7        SO WE THINK AN INSTRUCTION THAT THAT IS NOT AN ISSUE IN

08:55AM  8    THE CASE MIGHT BE APPROPRIATE.

08:55AM  9            MR. DOWNEY:  YOUR HONOR, I THINK THE INSTRUCTIONS AS

08:55AM  10   WE HAVE THEM ARE FINE.  I THINK IF THEY'RE GOING TO BE ALTERED

08:55AM  11   IN ANY WAY, EITHER AROUND ADVICE OF COUNSEL OR TRADE SECRETS,

08:55AM  12   I'D WANT TO TALK TO MS. SAHARIA AND OTHERS ON OUR TEAM.

08:55AM  13            THE COURT:  SHE'S IN THE ROOM.

08:55AM  14            MR. DOWNEY:  BUT I THINK THAT -- I DON'T SEE THE

08:55AM  15   NEED FOR THEM WHEN WE'RE NOT ARGUING, AND I DON'T THINK IT'S

08:55AM  16   APPROPRIATE TO INFORM THE JURY OF DEFENSES WE'RE NOT ASSERTING.

08:56AM  17   THERE ARE MANY DEFENSES WE'RE NOT ASSERTING IN THIS CONTEXT.

08:56AM  18       AND I THINK TO SUGGEST A POLICY WHICH STATES WHAT THE

08:56AM  19   COMPANY'S POLICY IS AND INFORMS THE DEFENDANT'S INTENT

08:56AM  20   IMPLICATES THE ADVICE OF COUNSEL DEFENSE IS TO SUGGEST IT'S NOT

08:56AM  21   VALID FOR THE INTENT DEFENSE, WHICH I DON'T THINK THERE'S ANY

08:56AM  22   DISPUTE THAT IT IS.

08:56AM  23            THE COURT:  SO ARE YOU -- AM I HEARING YOU SAY,

08:56AM  24   "JUDGE, I'M GOING TO STAY AWAY, I'M NOT GOING TO SAY 'ADVICE OF

08:56AM  25   COUNSEL,' I'M NOT GOING TO SAY SHE RELIED ON HER ATTORNEY'S

9129

08:56AM   1    ADVICE"?

08:56AM   2              MR. DOWNEY:  I WASN'T REALLY PLANNING TO RETURN TO

08:56AM   3    THAT SUBJECT.

08:56AM   4              THE COURT:  "I'M GOING TO AVOID THAT AND I'M NOT

08:56AM   5    GOING TO GO BACK TO THAT IN MY ARGUMENT.  MY ARGUMENT IS WELL

08:56AM   6    BEYOND THAT AND I HAVE OTHER THINGS TO TALK ABOUT IN THE TIME

08:56AM   7    REMAINING."

08:56AM   8              MR. DOWNEY:  YES.

08:56AM   9              THE COURT:  AND I WOULD EXPECT THAT AND I WOULD

08:56AM  10    OTHERWISE ENCOURAGE, IF THEY WISH, THE GOVERNMENT IN THEIR

08:56AM  11    REBUTTAL TO SPEAK TO THIS ISSUE IF THEY WISH AND TO SUGGEST

08:56AM  12    THAT THERE'S A DEFICIT IN THE EVIDENCE AS TO ADVICE OF COUNSEL

08:56AM  13    AND THEY MAY NOT CONSIDER IT AND IT'S ARGUMENT, AND IT'S NOT

08:57AM  14    EVIDENCE, BUT IT'S ARGUMENT, AND THAT WOULD SUFFICE TO INFORM

08:57AM  15    THE JURY AS TO ANY CONCERNS THAT THEY MIGHT HAVE ABOUT WHETHER

08:57AM  16    OR NOT THEY SHOULD RELY ON AN ADVICE OF COUNSEL?

08:57AM  17              MR. DOWNEY:  WELL, I DON'T HAVE ANY BURDEN WITH

08:57AM  18    REGARD TO THE INTENT DEFENSE, SO SOME OF THAT ARGUMENTATION I

08:57AM  19    WOULD THINK IS IMPROPER.

08:57AM  20         AND I DON'T THINK IT'S PROPER TO GIVE AN ADVICE OF COUNSEL

08:57AM  21    DEFENSE SO THE REFERENCE OF DEFICIT OF EVIDENCE ON THE PART OF

08:57AM  22    THE DEFENDANT, WHO HAS NO BURDEN, I THINK WOULD BE

08:57AM  23    INAPPROPRIATE.

08:57AM  24         I THINK -- THEY'RE CERTAINLY ENTITLED TO COMMENT ON THE

08:57AM  25    EVIDENCE IN THE RECORD AS TO WHETHER, YOU KNOW, I DON'T KNOW

08:57AM 1    WHAT, AS TO WHETHER OTHER EVIDENCE IN THE RECORD INFORMS HER

08:57AM 2    KNOWLEDGE OR INTENT WITH RESPECT TO THE ISSUE THAT I RAISED.

08:57AM 3        THE TRUTH IS THAT THEY RAISED THIS ISSUE AS TO SOME OF

08:57AM 4    THESE BEHAVIORS FIRST AND WE SIMPLY WERE REBUTTING IT IN THE

08:57AM 5    COURSE OF THE DEFENSE CASE.

08:57AM 6        I DON'T THINK THAT THAT ENTITLES -- IF THEY WANTED TO

08:57AM 7    DEMONSTRATE AS PART OF THEIR BURDEN OF PROOF THAT IT WAS NOT

08:58AM 8    TRADE SECRET, OR A TRADE SECRET CONCERN THAT ANIMATED THAT

08:58AM 9    ACTIVITY, THEY SHOULD HAVE PROVEN IT IN THEIR CASE, OR IN THEIR

08:58AM 10   REBUTTAL CASE FOR THAT MATTER.

08:58AM 11       THE COURT:  SO MY QUESTION WAS, SHOULD WE JUST RELY

08:58AM 12   ON THE GOVERNMENT TO -- THEY KNOW WHAT THIS ISSUE IS, AND IF

08:58AM 13   THEY WANT TO TALK ABOUT IT, THEY CAN ADDRESS IT IN THEIR

08:58AM 14   REBUTTAL.

08:58AM 15       MR. DOWNEY:  THEY'VE ADDUCED PLENTY OF EVIDENCE AND

08:58AM 16   THEY CAN ADDRESS IT WITH THAT EVIDENCE.

08:58AM 17       MR. LEACH:  IT CERTAINLY IS AN ISSUE THAT WE INTEND

08:58AM 18   TO ADDRESS ON REBUTTAL, YOUR HONOR, AND I CONTINUE TO ASSERT

08:58AM 19   THAT SOME FORM OF ADVICE OF COUNSEL IS NOT AN ISSUE IN THIS

08:58AM 20   CASE WOULD BE APPROPRIATE.

08:58AM 21       BUT WE'RE PREPARED TO ARGUE IT AS WELL.

08:58AM 22       THE COURT:  OKAY.  WELL, THANK YOU.

08:58AM 23       I RAISED THIS ISSUE, AS I SAID, BECAUSE I GET TO, I

08:58AM 24   SUPPOSE, BUT THERE ARE ISSUES THAT CAME UP AS I LISTENED

08:58AM 25   YESTERDAY AFTERNOON AND I HAD CONCERN THAT IT MIGHT CREATE AN

08:58AM 1    ISSUE IN THE TRIAL SUCH THAT I WANTED TO ADDRESS IT BEFORE,

08:59AM 2    BEFORE THE CLOSE OF YOUR ARGUMENTS.

08:59AM 3        I, I THINK YOU ALL KNOW AND YOU'RE PROBABLY IN AGREEMENT

08:59AM 4    THAT IT'S REALLY DISADVANTAGEOUS TO THE JURY, TO ALL OF US, TO

08:59AM 5    TRY TO CREATE AN INSTRUCTION AT LITERALLY THE ELEVENTH HOUR.

08:59AM 6        AND THE INSTRUCTIONS THAT WE HAVE MET THREE DAYS ON THEM,

08:59AM 7    EXCHANGED EMAILS ON THEM, THEY'RE A SET PACKAGE NOW, THEY'RE

08:59AM 8    NUMBERED, THEY'RE PAGINATED.  I THINK WE HAVE COPIES FOR THE

08:59AM 9    JURY.

08:59AM 10       I EXPECT THAT I'M GOING TO INSTRUCT ABOUT 2:00 O'CLOCK

08:59AM 11   THIS AFTERNOON IS WHAT I'M GUESSING.  IT'S JUST DISRUPTIVE TO

08:59AM 12   INTERRUPT THAT PROCESS.

08:59AM 13       BUT I WANTED TO MAKE SURE, AND I RAISE MY CONCERNS HERE

08:59AM 14   BECAUSE THEY'RE SERIOUS CONCERNS.

08:59AM 15       I WAS CONCERNED, MR. DOWNEY, A LITTLE BIT ABOUT, ARE YOU

08:59AM 16   GOING TOO FAR HERE?  ARE YOU ARGUING ADVICE OF COUNSEL WITHOUT

08:59AM 17   REALLY SAYING IT?  IS IT -- ARE YOU PLANTING THE SEED WITHOUT

08:59AM 18   SAYING SOMETHING?

09:00AM 19       AND I JUST LOOK AT THAT AND I WAS A LITTLE CONCERNED ABOUT

09:00AM 20   THE EQUITIES OF DOING THAT AND INVOLVING THAT IN FRONT OF THE

09:00AM 21   JURY.

09:00AM 22       THAT'S WHY I RAISED THIS.

09:00AM 23           MR. DOWNEY:  WELL, I DON'T HAVE ACCESS, YOUR HONOR,

09:00AM 24   TO THE EXTENT -- I DON'T HAVE ACCESS TO ANY INFORMATION ABOUT

09:00AM 25   THIS SUBJECT THAT THE GOVERNMENT DOESN'T.

9132

```
09:00AM   1        SO I DON'T SEE THAT IT IS SOME INEQUITY, BUT I TAKE

09:00AM   2   YOUR HONOR'S GENERAL POINT, BUT I DON'T SEE IT AS AN INEQUITY

09:00AM   3   IN THE CASE.

09:00AM   4        THE COURT:  WELL, IT'S NOT SO MUCH THE CASE.

09:00AM   5   I THINK IT'S THE ARGUMENT TO THE JURY.

09:00AM   6   LET ME BE FRANK.  DOES IT STATE TOO MUCH THAT'S NOT THERE?

09:00AM   7   THAT WAS MY CONCERN.  ARE WE TALKING --

09:00AM   8        MR. DOWNEY:  AND MY ONLY POINT, YOUR HONOR, WAS THAT

09:00AM   9   IF, IF THE -- I DON'T HAVE DIFFERENT EVIDENCE THAT SUGGESTS

09:00AM  10   WHAT THE DEFENDANT'S STATE OF MIND WAS ON THESE ISSUES THAT I'M

09:00AM  11   AWARE OF THAT WOULD DISPROVE THE ASSERTIONS THAT I MADE, SO I'M

09:01AM  12   NOT SITTING HERE PREVENTING THE DISCOVERY OF ANY INFORMATION

09:01AM  13   THAT IS, THAT IS CONTRARY TO WHAT I ARGUED, WHICH I THINK IS

09:01AM  14   THE SPIRIT IN SOME WAYS OF, OF CERTAIN REQUIREMENTS AROUND

09:01AM  15   ADVICE OF COUNSEL.

09:01AM  16   THAT'S MY ONLY POINT.

09:01AM  17        THE COURT:  WELL, THAT WAS MY POINT.  THAT'S WHAT

09:01AM  18   CAUSED MY CONCERN.

09:01AM  19        MR. DOWNEY:  YES.

09:01AM  20        THE COURT:  WE'RE DANCING AROUND IT.

09:01AM  21        MR. DOWNEY:  YEAH.

09:01AM  22        THE COURT:  WE KNOW THE MUSIC, AND IT SEEMS LIKE

09:01AM  23   YOU'RE DANCING, AND HOW CLOSE ARE YOU GETTING TO THE LINE?  ARE

09:01AM  24   YOU WITHIN THE MARGINS OR OUTSIDE OF THE MARGINS?

09:01AM  25        MR. DOWNEY:  NO.  I THINK THE DOCUMENTS THAT I KNOW
```

9133

```
09:01AM  1      ABOUT FROM THIS WERE PRODUCED BY THE GOVERNMENT AS FAR AS I

09:01AM  2      KNOW.

09:01AM  3              THE COURT:  NO, NO, NO, NO.  I UNDERSTAND.

09:01AM  4        WE'RE TALKING ABOUT TWO DIFFERENT THINGS HERE, THOUGH.

09:01AM  5      WE'RE TALKING ABOUT THE EVIDENCE HERE AND NOW WE'RE TALKING

09:01AM  6      ABOUT WHAT IS OUR DESCRIPTION OF THE EVIDENCE FOR THE JURY'S

09:01AM  7      BEHALF.

09:01AM  8              MR. DOWNEY:  RIGHT.

09:01AM  9              THE COURT:  AND THOSE ARE TWO -- I UNDERSTAND.  YOU

09:01AM  10     KNOW, IT'S AN ADVERSARY POSITION.  YOU HAVE DIFFERENT OPINIONS

09:01AM  11     ABOUT WHAT THE EVIDENCE IS.

09:01AM  12             MR. DOWNEY:  YEAH.

09:01AM  13             THE COURT:  BUT I'M NOT SAYING THAT YOU HAVE GREATER

09:01AM  14     EVIDENCE THAN THEY DO OR THEY THAN YOU.

09:01AM  15        I'M SAYING THE COMMENT, THE FAIR COMMENT ABOUT THE

09:02AM  16     EVIDENCE FOR THE JURY'S INFORMATION IS WHAT I'M CONCERNED

09:02AM  17     ABOUT.

09:02AM  18             MR. DOWNEY:  YES.  UNDERSTOOD.

09:02AM  19             THE COURT:  ABOUT WHETHER OR NOT IT'S APPROPRIATE

09:02AM  20     TO -- WHETHER I HAVE TO TAKE ANY MEASURE.

09:02AM  21             MR. DOWNEY:  YES.

09:02AM  22             THE COURT:  THAT'S MY CONCERN NOW.

09:02AM  23        BUT YOU'VE TOLD ME THAT YOU'VE MOVED WELL ON FROM ANY

09:02AM  24     ADVICE OF COUNSEL.

09:02AM  25             MR. DOWNEY:  I WON'T BE BACK TO THAT SUBJECT.  I
```

| | | |
|---|---|---|
| 09:02AM | 1 | WON'T MENTION THE ISSUE. |
| 09:02AM | 2 | BUT I WILL SAY, IN MY OWN REVIEW OF YESTERDAY'S |
| 09:02AM | 3 | TRANSCRIPT, I DID REVIEW ON ONE ISSUE WHICH I WILL CORRECT, BUT |
| 09:02AM | 4 | I'LL LET THE COURT AWAIT THAT RATHER THAN -- |
| 09:02AM | 5 | THE COURT:  OKAY. |
| 09:02AM | 6 | MR. DOWNEY:  -- THERE WAS ONE ISSUE THAT I DID WANT |
| 09:02AM | 7 | TO ADDRESS AND CORRECT BECAUSE I THINK I MISSPOKE ON AN ISSUE |
| 09:02AM | 8 | AND IT COULD BE IMPORTANT AND I WANT TO CORRECT IT. |
| 09:02AM | 9 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 09:02AM | 10 | ANYTHING FURTHER? |
| 09:02AM | 11 | MR. LEACH:  NO, YOUR HONOR.  THANK YOU FOR RAISING |
| 09:02AM | 12 | IT. |
| 09:02AM | 13 | THE COURT:  THANK YOU FOR THE CONVERSATION THIS |
| 09:02AM | 14 | MORNING.  AS I'VE SAID, I'VE TOLD YOU MY CONCERNS AND MY |
| 09:02AM | 15 | OBSERVATIONS.  THAT'S WHY WE'RE MEETING OUTSIDE OF THE PRESENCE |
| 09:02AM | 16 | OF THE JURY.  I WANTED YOUR INPUT -- |
| 09:02AM | 17 | MR. DOWNEY:  I APPRECIATE IT. |
| 09:02AM | 18 | THE COURT:  -- TO INFORM ME ABOUT WHAT MY THOUGHTS |
| 09:02AM | 19 | ARE. |
| 09:02AM | 20 | SO LET'S GO BACK TO TIMING. |
| 09:02AM | 21 | MR. DOWNEY:  YES. |
| 09:02AM | 22 | THE COURT:  WE'LL BRING OUR JURY IN IN ABOUT TWO |
| 09:03AM | 23 | MINUTES HERE. |
| 09:03AM | 24 | YOU THINK YOU'LL PROBABLY, MR. DOWNEY, WRAP UP BY THE |
| 09:03AM | 25 | FIRST BREAK. |

9135

| | | |
|---|---|---|
| 09:03AM | 1 | MR. DOWNEY:  I WOULD THINK SO, YOUR HONOR, YEAH. |
| 09:03AM | 2 | THE COURT:  AND OUR FIRST BREAK IS AT 11:30 AGAIN? |
| 09:03AM | 3 | MR. DOWNEY:  YEAH.  IF I'M DONE BEFORE THEN, YOU MAY |
| 09:03AM | 4 | DECIDE TO TAKE IT EARLIER.  WE'LL SEE. |
| 09:03AM | 5 | THE COURT:  ALL RIGHT.  AND THEN WILL THE GOVERNMENT |
| 09:03AM | 6 | HAVE ANY REBUTTAL?  YOU KNOW, MAYBE I'M BEING PRESUMPTUOUS. |
| 09:03AM | 7 | MR. LEACH:  I'LL RELY ON MY COLLEAGUE, MR. BOSTIC, |
| 09:03AM | 8 | BUT I ANTICIPATE HE HAS REBUTTAL SOMEWHERE IN THE NEIGHBORHOOD |
| 09:03AM | 9 | OF AN HOUR TO AN HOUR AND A HALF. |
| 09:03AM | 10 | THE COURT:  OKAY.  FAIR ENOUGH.  ALL RIGHT. |
| 09:03AM | 11 | MR. DOWNEY:  I'LL JUST TAKE A MINUTE AFTER |
| 09:03AM | 12 | YOUR HONOR STEPS DOWN TO GET MIKED UP AND THEN WE'LL BE READY. |
| 09:03AM | 13 | THE COURT:  SHOW HIM HOW TO DO THAT. |
| 09:03AM | 14 | MR. DOWNEY:  YES. |
| 09:03AM | 15 | (DISCUSSION OFF THE RECORD.) |
| 09:03AM | 16 | THE CLERK:  COURT IS IN RECESS. |
| 09:03AM | 17 | (RECESS FROM 9:03 A.M. UNTIL 9:14 A.M.) |
| 09:14AM | 18 | (JURY IN AT 9:14 A.M.) |
| 09:14AM | 19 | THE COURT:  WE'RE BACK ON THE RECORD.  COUNSEL IS |
| 09:14AM | 20 | PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT. |
| 09:14AM | 21 | GOOD MORNING, LADIES AND GENTLEMEN. |
| 09:14AM | 22 | BEFORE I ASK MR. DOWNEY TO CONTINUE WITH HIS ARGUMENTS, |
| 09:14AM | 23 | LET ME ASK YOU, DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO |
| 09:14AM | 24 | DISCUSS, READ, LEARN, LISTEN TO, OR IN ANY WAY COME ACROSS ANY |
| 09:15AM | 25 | INFORMATION ABOUT THIS CASE?  IF SO, PLEASE RAISE YOUR HAND. |

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                   9136

09:15AM   1          I SEE NO HANDS.

09:15AM   2          THANK YOU VERY MUCH.

09:15AM   3          MR. DOWNEY, WOULD YOU LIKE TO CONTINUE WITH YOUR ARGUMENT?

09:15AM   4              MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:15AM   5          **(MR. DOWNEY RESUMED HIS CLOSING ARGUMENT ON BEHALF OF**

09:15AM   6   **MS. HOLMES.)**

09:15AM   7              MR. DOWNEY:  GOOD MORNING, LADIES AND GENTLEMEN.

09:15AM   8          I WANT TO PICK UP WHERE I LEFT OFF AND I WANT TO GO

09:15AM   9   THROUGH WITH YOU SOME OF THE PARTICULAR COUNTS THAT ARE IN THE

09:15AM  10   INDICTMENT AND THAT MS. HOLMES IS CHARGED WITH.

09:15AM  11          BEFORE I DO THAT, I WANT TO CLARIFY ONE THING THAT I SAID

09:15AM  12   TO YOU YESTERDAY WITH REGARD TO THE STANDARDS OF PROOF THAT YOU

09:15AM  13   SHOULD CONSIDER AS YOU RETURN TO DELIBERATE.

09:15AM  14          IF YOU REMEMBER YESTERDAY, I USED THIS ILLUSTRATION WITH

09:15AM  15   YOU OF THE STEPS THAT YOU SHOULD GO UP TO TRY TO MAKE A

09:16AM  16   DETERMINATION OF WHETHER A CRIME HAS BEEN PROVEN BEYOND A

09:16AM  17   REASONABLE DOUBT, AND I WANT TO MAKE SURE THAT I'M CLEAR AS TO

09:16AM  18   THE DIFFERENCE BETWEEN THE CLEAR AND CONVINCING STANDARD AND

09:16AM  19   THE HIGHER STANDARD, WHICH IS THE BEYOND A REASONABLE DOUBT

09:16AM  20   STANDARD.

09:16AM  21          LET ME SHOW YOU A SLIDE IN CONNECTION WITH THAT.  THE

09:16AM  22   CLEAR AND CONVINCING STANDARD REQUIRES A "FIRM BELIEF OR

09:16AM  23   CONVICTION THAT IT IS HIGHLY PROBABLE THAT FACTUAL CONTENTIONS

09:16AM  24   ARE TRUE."  A FIRM BELIEF THAT IT IS HIGHLY PROBABLE.

09:16AM  25          BEYOND A REASONABLE DOUBT MEANS THAT YOU ARE "FIRMLY

UNITED STATES COURT REPORTERS

**ER-12716**

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                        9137

09:16AM   1    CONVINCED" THAT THE DEFENDANT IS GUILTY.  THOSE ARE THE

09:16AM   2    DIFFERENT STANDARDS.

09:16AM   3        SO IF THE DEFENDANT IN YOUR MIND IS IN A PLACE WHERE SHE

09:16AM   4    IS -- YOU HAVE A FIRM BELIEF THAT IT IS HIGHLY PROBABLE THAT

09:16AM   5    THE CONTENTIONS THAT THE GOVERNMENT MAKES HERE ARE TRUE, THAT

09:17AM   6    DOES NOT MEET THE BEYOND A REASONABLE DOUBT STANDARD, AND YOU

09:17AM   7    SEE THERE THE BEYOND A REASONABLE DOUBT STANDARD.

09:17AM   8        SO WITH THAT IN MIND, LET'S LOOK AT SOME OF THE PARTICULAR

09:17AM   9    COUNTS THAT ARE IN THE INDICTMENT AND SOME OF THE PARTICULAR

09:17AM  10    INVESTORS.

09:17AM  11        LET ME TALK ABOUT SOMETHING THAT THE GOVERNMENT REALLY

09:17AM  12    DIDN'T TALK ABOUT YESTERDAY, WHICH IS WHEN MS. HOLMES ENTERED

09:17AM  13    CONVERSATIONS WITH INVESTORS, WHAT WAS SHE THINKING ABOUT?

09:17AM  14    WHAT TYPES OF INVESTORS DID SHE WANT TO HAVE INVEST IN THE

09:17AM  15    COMPANY AND WHAT DID SHE THEREFORE FOCUS ON AS PART OF HER

09:17AM  16    CONVERSATIONS WITH THEM?

09:17AM  17        WELL, AS YOU REMEMBER, SHE TESTIFIED DURING THE COURSE OF

09:17AM  18    HER DIRECT EXAMINATION THAT SHE WAS LOOKING FOR PEOPLE WHO WERE

09:17AM  19    LONG-TERM INVESTORS, AND SO SHE WAS TALKING ABOUT WHAT THE

09:17AM  20    COMPANY WOULD LOOK LIKE IN FIVE OR TEN YEARS, OR A YEAR, NOT

09:18AM  21    REPORTING, AS ANOTHER COMPANY MIGHT, ON THE PRESENT PERFORMANCE

09:18AM  22    OF THE COMPANY.

09:18AM  23        THAT'S IMPORTANT, LADIES AND GENTLEMEN, BECAUSE IT REALLY

09:18AM  24    REFLECTS A FUNDAMENTAL DISCONNECT BETWEEN THE GOVERNMENT'S

09:18AM  25    UNDERSTANDING OF THE FACTS AND OUR UNDERSTANDING OF THE FACTS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9138

09:18AM  1        IN THE GOVERNMENT'S VIEW, THE CASE IS REALLY ABOUT WHAT

09:18AM  2    THE TEST MENU WAS IN THE CLIA LABORATORY DURING THIS PHASE I

09:18AM  3    PERIOD, WHICH MS. HOLMES TOLD YOU SHE BELIEVED WOULD BE A BRIEF

09:18AM  4    PERIOD.

09:18AM  5        THAT WAS AN OLD DEVICE THAT WAS BEING USED FOR A PERIOD IN

09:18AM  6    THAT LAB.  IT WAS NOT THE PRIMARY MODE OF ANALYSIS FOR

09:18AM  7    FINGERSTICK TESTS.  THE MODIFIED MACHINES WERE.

09:18AM  8        BUT THE GOVERNMENT MAKES MUCH OF THE FACT THAT THIS WAS A

09:18AM  9    LIMITED DEVICE.  THAT'S, IN ESSENCE, THE THEORY OF THEIR CASE.

09:18AM 10        IF YOU GO BACK AND READ THE MATERIALS THAT MS. HOLMES

09:18AM 11    SHARED WITH INVESTORS AND YOU RECONSIDER WHAT SHE SAID TO

09:19AM 12    INVESTORS, YOU'LL SEE THAT SHE WAS TALKING ABOUT THE SERIES 4

09:19AM 13    DEVICE, THE SERIES 4 BEING THE DEVICE THAT SHE HAD FOCUSSED ON

09:19AM 14    IN CONNECTION WITH HER EFFORTS TO GET APPROVAL FROM THE FDA.

09:19AM 15        AND SHE WAS TALKING ABOUT PHASE II, FOR THE MOST PART, OF

09:19AM 16    THERANOS'S OPERATIONS.

09:19AM 17        THAT'S THE DISCONNECT.  SHE WAS NOT CONCEALING THE NUMBER

09:19AM 18    OF TESTS THAT WERE DONE ON THE PARTICULAR METHOD OF THE 3.5

09:19AM 19    DEVICE IN THE LAB.  SHE WAS NOT EVEN DISCLOSING THE MODIFIED

09:19AM 20    DEVICES FOR REASONS THAT WE DISCUSSED YESTERDAY.

09:19AM 21        SO THAT IS REALLY THE FUNDAMENTAL DISCONNECT THAT I THINK

09:19AM 22    EXISTS IN THE CASE AS TO HOW THE EVIDENCE IS PRESENTED.

09:19AM 23        AND WHEN YOU GO BACK, YOU HAVE TO ASK YOURSELF, HAS THE

09:19AM 24    GOVERNMENT PROVEN BEYOND A REASONABLE DOUBT THAT MS. HOLMES WAS

09:19AM 25    REALLY ATTEMPTING TO DECEIVE PEOPLE IN THE WAY THAT SHE TALKED

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                        9139

09:19AM  1    ABOUT THERANOS'S TECHNOLOGY BY NOT ACKNOWLEDGING THE 3 DEVICE

09:19AM  2    AT THAT TIME.

09:19AM  3        LET ME TALK NOW GENERALLY ABOUT THE PEOPLE WHO INVESTED IN

09:20AM  4    THERANOS.

09:20AM  5        AS YOU KNOW, YOU HEARD FROM SIX PEOPLE WHO HAD SOME

09:20AM  6    INVOLVEMENT WITH AN INVESTMENT IN THERANOS.  FOUR WERE ACTUALLY

09:20AM  7    INVESTORS, AND TWO WERE PEOPLE WHO WERE IN SOME WAY AFFILIATED

09:20AM  8    WITH INVESTORS:  MR. TOLBERT AND MS. PETERSON.

09:20AM  9        THERE WERE ACTUALLY MANY PEOPLE WHO INVESTED IN THERANOS

09:20AM  10   OVER TIME.  BY THE END OF THE TIME THAT THERANOS WAS AN

09:20AM  11   OPERATING COMPANY, THERE HAD BEEN ABOUT 275 PEOPLE OR ENTITIES

09:20AM  12   THAT INVESTED IN THERANOS.

09:20AM  13       NOW, PEOPLE LOST MONEY.  I DON'T MINCE WORDS ABOUT THAT.

09:20AM  14   MS. HOLMES CERTAINLY DID NOT INTEND FOR PEOPLE TO LOSE MONEY.

09:20AM  15   THAT'S A BAD EVENT AND A FAILURE ON HER PART.

09:20AM  16       IT SHOULD NOT BE SOMETHING THAT YOU HEAR AS US EXCUSING

09:20AM  17   ANYTHING IN HER BEHAVIOR WITH REGARD TO THAT ISSUE.

09:20AM  18       BUT THAT'S NOT THE ISSUE THAT WE'RE CONCERNED WITH IN THIS

09:21AM  19   TRIAL.

09:21AM  20       THE ISSUE WE'RE CONCERNED WITH IS, DID SHE INTENTIONALLY

09:21AM  21   MAKE MISREPRESENTATIONS TO PEOPLE FOR THE PURPOSE OF INDUCING

09:21AM  22   THEM TO INVEST IN HER COMPANY?

09:21AM  23       AND AS WE REVIEW THE EVIDENCE, I THINK THE EVIDENCE IS

09:21AM  24   FAIRLY CLEAR THAT SHE DID NOT, MUCH LESS SATISFY YOU BEYOND A

09:21AM  25   REASONABLE DOUBT, THAT SHE WAS ENGAGED IN THAT TYPE OF

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9140

09:21AM   1      DECEPTION THAT THE GOVERNMENT CLAIMS.

09:21AM   2          SO LET'S LOOK AT THE PEOPLE THAT WE HEARD FROM IN

09:21AM   3      CONNECTION WITH THE CASE.

09:21AM   4          AS YOU RECALL, THERE WERE TWO INVESTMENTS, C1 INVESTORS:

09:21AM   5      MR. EISENMAN, MR. TOLBERT, AND MR. LUCAS; AND THE C2 INVESTORS

09:21AM   6      THAT INVESTED IN 2014:  MR. GROSSMAN, MR. MOSLEY, AND

09:21AM   7      MS. PETERSON.

09:21AM   8          LET ME -- I'LL TALK ABOUT EACH OF THEM AND TALK ABOUT EACH

09:21AM   9      OF THEIR INVESTMENTS IN A MOMENT, BUT I WANT TO REVIEW WITH YOU

09:21AM  10      SOME THINGS THAT THEY ALL HAD IN COMMON.

09:22AM  11          FIRST, AND I THINK MOST IMPORTANTLY, ALL OF THE

09:22AM  12      RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS WERE NOT

09:22AM  13      GOVERNED BY THE DISCUSSIONS THAT THE GOVERNMENT FOCUSES ON OR

09:22AM  14      NEWSPAPER ARTICLES.

09:22AM  15          THE RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS

09:22AM  16      WERE GOVERNED BY A CONTRACT, THE STOCK PURCHASE AGREEMENT THAT

09:22AM  17      YOU SAW AS PART OF OUR CROSS-EXAMINATIONS OF EACH OF THE

09:22AM  18      INVESTOR WITNESSES.

09:22AM  19          AND THE STOCK PURCHASE AGREEMENT HAD A LOT OF PROVISIONS

09:22AM  20      THAT ARE RELEVANT TO THE CASE THAT THE GOVERNMENT PRESENTS

09:22AM  21      HERE.

09:22AM  22          WHAT WERE THOSE?

09:22AM  23          WELL, FIRST OF ALL, AS THE WITNESSES TESTIFIED, THIS IS

09:22AM  24      NOT LIKE AN INVESTMENT THAT WOULD BE MADE IN A STOCK IN A

09:22AM  25      PUBLIC COMPANY WHERE THE PUBLIC COMPANY IS ROUTINELY DISCLOSING

                  CLOSING ARGUMENT BY MR. DOWNEY (RES.)

09:22AM   1     INFORMATION ABOUT ITS OPERATIONS.

09:22AM   2         THIS IS AN INVESTMENT IN A PRIVATE COMPANY WHERE THE

09:23AM   3     INFORMATION THAT IS PROVIDED IS LIMITED.  IT MAY BE

09:23AM   4     EPISODICALLY PROVIDED.  THERE MAY BE INFORMATION THAT THE

09:23AM   5     COMPANY KNOWS THAT IS NOT KNOWN TO THE INVESTORS IN THE

09:23AM   6     COMPANY.

09:23AM   7         SO WHAT DOES A COMPANY IN THAT CIRCUMSTANCE RELY ON TO

09:23AM   8     MAKE SURE THAT THE INVESTORS ARE CAPABLE OF MAKING THE

09:23AM   9     INVESTMENT?

09:23AM  10         WELL, THEY TELL THE INVESTORS THAT AND THEY SAY, WE WANT

09:23AM  11     YOU TO REPRESENT TO US THAT YOU ARE A SOPHISTICATED ENOUGH

09:23AM  12     INVESTOR AND YOU HAVE ENOUGH EXPERIENCE INVESTING IN THIS AREA

09:23AM  13     THAT YOU'RE CAPABLE OF EVALUATING THESE RISKS.

09:23AM  14         AND THERE WERE INVESTORS LIKE THAT IN CONNECTION WITH

09:23AM  15     THIS.  YOU SAW MR. LUCAS TESTIFY.  HE WAS NOT ONLY AN

09:23AM  16     EXPERIENCED TECHNOLOGY INVESTOR, BUT HE HAD INVESTED

09:23AM  17     SPECIFICALLY IN BIO MEDICAL DEVICES.

09:23AM  18         MANY OF THE INVESTOR WITNESSES WERE PEOPLE WHO WERE

09:23AM  19     PROFESSIONAL INVESTMENT ADVISORS, NOT THEMSELVES INVESTORS AT

09:23AM  20     ALL.

09:23AM  21         SEVERAL OF THE INVESTORS TESTIFIED TO CONCLUSIONS THAT

09:23AM  22     THEY DREW FROM MS. HOLMES'S TESTIMONY ABOUT THE STATE OF THE

09:24AM  23     TECHNOLOGY, HOW DEVELOPED IT WAS, WHAT CERTAIN EVENTS MEANT FOR

09:24AM  24     WHAT HAD BEEN PROVEN WITH REGARD TO THE TECHNOLOGY, AS IF THIS

09:24AM  25     CONTRACT DID NOT CONTAIN THE FOLLOWING PROVISION, WHICH IS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                           9142

09:24AM   1      PROVISION 4.4, SPECULATIVE NATURE OF THE INVESTMENT.

09:24AM   2          IN EVERY STOCK PURCHASE AGREEMENT, THE INVESTORS WERE

09:24AM   3      TOLD, THIS IS A COMPANY THAT HAS A VERY LIMITED AND FINANCIAL,

09:24AM   4      OPERATING AND FINANCIAL HISTORY.  THAT WAS OBVIOUS TO THE

09:24AM   5      INVESTORS ANYWAY.  THERANOS WAS BECOMING INVOLVED IN A RETAIL

09:24AM   6      BUSINESS THAT WAS BRAND NEW.

09:24AM   7          AT THE TIME THE C1 INVESTORS MADE THEIR INVESTMENT,

09:24AM   8      THERANOS HAD ONLY BEEN OPERATING IN THE RETAIL SECTOR FOR ONLY

09:24AM   9      ABOUT A MONTH, AND LESS THAN A YEAR WHEN ALL OF THE INVESTORS

09:24AM   10     INVESTED.  SO THEY KNEW THIS WAS A NEW VENTURE AND THEY KNEW IT

09:24AM   11     WAS SPECULATIVE AND THEY KNEW IT INVOLVED SUBSTANTIAL RISK.

09:25AM   12         THEY ALSO DISCLAIMED ANY REPRESENTATIONS THAT THERANOS WAS

09:25AM   13     MAKING AS THE BASIS FOR THEIR INVESTMENT.

09:25AM   14         IF YOU SEE SECTION 4.5, THE INVESTORS ACKNOWLEDGE THAT

09:25AM   15     THEY UNDERSTOOD THAT THE INFORMATION INVESTED -- PROVIDED BY

09:25AM   16     THE COMPANY WAS NOT INTENDED TO DESCRIBE EVERYTHING ABOUT THE

09:25AM   17     COMPANY.  IT WAS DESCRIBING CERTAIN ASPECTS ABOUT WHAT THE

09:25AM   18     COMPANY WAS DOING.

09:25AM   19         AND WHEN THEY TESTIFIED, YOU'LL RECALL THAT THE INVESTORS

09:25AM   20     ACKNOWLEDGED THAT THEY KNEW THIS.

09:25AM   21         MR. GROSSMAN, WHO WAS ONE OF THE MORE RECENT INVESTORS TO

09:25AM   22     TESTIFY, HE WAS ASKED, DID YOU KNOW THAT THERE WERE ASPECTS OF

09:25AM   23     THEIR OPERATIONS THAT THEY WERE NOT DISCLOSING TO YOU?

09:25AM   24         AND HE SAID, YES, THEY TOLD ME THAT AND I KNEW THAT, IN

09:25AM   25     ADDITION TO IT BEING A PROVISION OF THE CONTRACT.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9143

09:25AM   1        THEY ALSO SPECIFICALLY, SPECIFICALLY WERE TOLD, WE ARE

09:26AM   2    TELLING YOU WHAT WE THINK AS THERANOS ABOUT THE BUSINESS, HOW

09:26AM   3    IT WILL PERFORM IN THE FUTURE, WHAT WE THINK WE WILL EARN, WHAT

09:26AM   4    BUSINESS LINES WE THINK WE WILL HAVE.  AND WE'RE TELLING THAT

09:26AM   5    TO YOU TO INFORM YOU.

09:26AM   6        BUT YOU SHOULD UNDERSTAND THAT BECAUSE WE'RE A NEW COMPANY

09:26AM   7    AND A SPECULATIVE COMPANY, BUSINESS PLANS MAY CHANGE.

09:26AM   8        AND THAT'S IN SECTION 4.5 OF EVERY STOCK PURCHASE

09:26AM   9    AGREEMENT WHERE EACH INVESTOR SAYS, I KNOW THAT THOSE BUSINESS

09:26AM  10    PLANS ARE SPECULATIVE, I KNOW THAT PROJECTIONS THAT YOU PROVIDE

09:26AM  11    ME MAY NOT MATERIALIZE, AND THAT WHAT I AM BEING TOLD AS TO

09:26AM  12    WHAT YOU PROJECT MAY ACTUALLY BE SIGNIFICANTLY DIFFERENT FROM

09:26AM  13    THE RESULTS THAT YOU'RE ACTUALLY ABLE TO GENERATE.

09:26AM  14        SO WHEN WE LOOK AT SOME OF THE ISSUES WITH SPECIFIC

09:26AM  15    INVESTORS AROUND FINANCIAL PROJECTIONS THEY RECEIVED AND

09:26AM  16    BUSINESSES THAT THERANOS THOUGHT IT WOULD BE ABLE TO DEVELOP,

09:26AM  17    BEAR THAT IN MIND.  THAT'S THE CONTRACT UNDER WHICH EVERY

09:27AM  18    INVESTOR MAKES THEIR INVESTMENT.

09:27AM  19        NOW, LET ME TALK ABOUT EACH INVESTOR INDIVIDUALLY JUST FOR

09:27AM  20    A FEW MOMENTS WITH EACH.

09:27AM  21        FIRST, YOU'LL RECALL THAT MR. EISENMAN, WHO TESTIFIED

09:27AM  22    ABOUT HIS INVESTMENT AS PART OF THE C1 ROUND OF INVESTMENTS.

09:27AM  23    MR. EISENMAN IS SOMEONE WHO HAS BEEN INVOLVED IN THE FINANCIAL

09:27AM  24    INDUSTRY AND MAKING INVESTMENTS ON BEHALF OF HIMSELF AND OTHERS

09:27AM  25    FOR ESSENTIALLY HIS WHOLE PROFESSIONAL CAREER, 35 YEARS OR SO.

9144
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

09:27AM 1        HE WAS NOT ONLY INVOLVED IN ADVISING OTHERS, BUT HE WAS

09:27AM 2    SIGNIFICANTLY INVOLVED IN HIS WIFE'S FAMILY'S PRIVATE OFFICE

09:27AM 3    WHERE THEY MADE INVESTMENTS IN CONNECTION WITH PRIVATE

09:27AM 4    COMPANIES, MADE INVESTMENTS WITH COMPANIES LIKE THERANOS ALL OF

09:27AM 5    THE TIME, AND HE ACKNOWLEDGED THAT WHEN HE TESTIFIED.

09:27AM 6        HE ALSO ACKNOWLEDGED THAT HE WAS FAMILIAR WITH SPECULATIVE

09:27AM 7    INVESTMENTS AND THE RISKS THAT THEY BORE, AND FOR THAT REASON

09:27AM 8    HE SAID HE WOULD NEVER ADVISE ONE OF HIS OWN CLIENTS TO INVEST

09:28AM 9    IN A PRIVATE COMPANY LIKE THERANOS BECAUSE HE THOUGHT THE RISK

09:28AM 10   FOR THEM WOULD BE TOO HIGH.

09:28AM 11       SO IN MAKING THE INVESTMENT, HE UNDERSTOOD THE NATURE OF

09:28AM 12   THE COMPANY THAT THIS WAS.

09:28AM 13       NOW, WHAT DID HE TESTIFY ABOUT AND WHAT DID THE EVIDENCE

09:28AM 14   SHOW ABOUT HIS INVESTMENT IN THERANOS?

09:28AM 15       ALTHOUGH HE TESTIFIED ON DIRECT EXAMINATION FOR QUITE A

09:28AM 16   WHILE, THE EVIDENCE IS ACTUALLY FAIRLY CLEAR ABOUT HIS CONTACT

09:28AM 17   WITH MS. HOLMES IN CONNECTION WITH EACH INVESTMENT THAT HE

09:28AM 18   MADE.

09:28AM 19       YOU RECALL THAT HE INVESTED IN 2006, WHICH IS BEFORE THE

09:28AM 20   CONSPIRACY PERIOD, AND THEN HE INVESTED AGAIN IN 2013.  LET'S

09:28AM 21   LOOK AT EACH OF THOSE INDIVIDUAL INVESTMENTS.

09:28AM 22       IN CONNECTION WITH HIS 2006 INVESTMENT, AND YOU MAY RECALL

09:28AM 23   THIS EXCHANGE, HE INVESTED ON OCTOBER 13TH, 2006.  HE TESTIFIED

09:28AM 24   ABOUT A NUMBER OF CONVERSATIONS THAT HE RECALLED HAVING WITH

09:28AM 25   MS. HOLMES.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                            9145

09:28AM   1        BUT, IN FACT, THE DOCUMENTS FROM THE TIME REFLECTED THAT

09:29AM   2   HE HAD ONLY SPOKEN TO HER ONCE.  HE HAD SPOKEN TO HER FOR ABOUT

09:29AM   3   FIVE MINUTES, AND THAT THE FOCUS OF THE CALL WAS A CHAT, AND

09:29AM   4   THAT HIS IMPRESSIONS WERE THAT SHE WAS A TERRIFIC PERSON, AND

09:29AM   5   THEY OBVIOUSLY CHATTED ABOUT THE FACT THAT THEY HAD A COMMON

09:29AM   6   BACKGROUND.

09:29AM   7        NOT MUCH WAS REFLECTED IN THE CONTEMPORANEOUS RECORD AS TO

09:29AM   8   WHAT HE WAS TOLD IN CONNECTION WITH HIS 2006 INVESTMENT BY

09:29AM   9   MS. HOLMES.

09:29AM  10        THEN THE INVESTMENT THAT IS THE SUBJECT OF OUR CHARGE HERE

09:29AM  11   IS THE INVESTMENT THAT HE MADE IN LATE DECEMBER OF 2013.  AND

09:29AM  12   MR. EISENMAN DID NOT SPEAK TO MS. HOLMES AT ALL IN CONNECTION

09:29AM  13   WITH THAT INVESTMENT.  HE TESTIFIED HE HAD NO CONTACT WITH HER

09:29AM  14   IN CONNECTION WITH THAT INVESTMENT.

09:29AM  15        AND, IN FACT, I THINK THE RECORD SHOWED HE HAD NOT HAD

09:29AM  16   CONTACT WITH HER PERSONALLY FOR A NUMBER OF YEARS BEFORE THAT

09:29AM  17   INVESTMENT.

09:29AM  18        HE ALSO TOLD YOU THAT HE HAD TALKED TO MS. HOLMES OVER A

09:30AM  19   NUMBER OF YEARS BETWEEN 2006 AND 2010, BUT THAT WHEN HE MADE

09:30AM  20   HIS INVESTMENT DECISION IN 2013, NONE OF THAT WAS RELEVANT TO

09:30AM  21   THE DECISION HE WAS MAKING.  HE TESTIFIED HE WAS RELYING ON THE

09:30AM  22   CURRENT INFORMATION THAT HE HAD.

09:30AM  23        SO MS. HOLMES AND ANY PERSONAL CONTACT BETWEEN HER AND

09:30AM  24   MR. EISENMAN WERE NOT PARTICULARLY RELEVANT TO HIS DECISION TO

09:30AM  25   INVEST.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 09:30AM | 1 | NOW, WHAT WAS -- WHY WAS HE INVESTING?  WHAT CONTACT DID |
| 09:30AM | 2 | HE HAVE? |
| 09:30AM | 3 | WELL, YOU'LL REMEMBER THAT HE HAD CONTACT WITH MR. BALWANI |
| 09:30AM | 4 | IN CONNECTION WITH MAKING HIS INVESTMENT IN 2013, AND HE |
| 09:30AM | 5 | TESTIFIED THAT THOSE INTERACTIONS WERE PLEASANT AND THAT |
| 09:30AM | 6 | MR. BALWANI WAS SOLICITOUS OF HIM AND MR. BALWANI HAD BEEN VERY |
| 09:30AM | 7 | UNFRIENDLY WITH HIM IN CONNECTION WITH OTHER DEALINGS THAT THEY |
| 09:30AM | 8 | HAD, AND I THINK THE RECORD WAS CERTAINLY CONSISTENT WITH THE |
| 09:31AM | 9 | FACT THAT MR. BALWANI HAD BEEN UNFRIENDLY WITH HIM IN |
| 09:31AM | 10 | CONNECTION WITH THEIR OTHER INTERACTIONS. |
| 09:31AM | 11 | BUT WHAT DOES THE RECORD OF WHAT HAPPENED AT THE TIME SHOW |
| 09:31AM | 12 | AS TO WHAT HAPPENED BETWEEN MR. BALWANI AND MR. EISENMAN? |
| 09:31AM | 13 | WELL, WE KNOW THAT MR. EISENMAN ASKED FOR INFORMATION FROM |
| 09:31AM | 14 | MR. BALWANI IN CONNECTION WITH HIS INVESTMENT, AND THAT IS HERE |
| 09:31AM | 15 | IN EXHIBIT 1371. |
| 09:31AM | 16 | AND THESE WERE HIS QUESTIONS: |
| 09:31AM | 17 | WHAT IS THE SIZE OF THIS ROUND? |
| 09:31AM | 18 | ARE DIRECTORS PARTICIPATING IN THIS ROUND? |
| 09:31AM | 19 | IN OTHER WORDS, WHILE I'M INVESTING, IS THE OTHER BOARD OF |
| 09:31AM | 20 | DIRECTORS INVESTING AT THE SAME TIME? |
| 09:31AM | 21 | AND AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF |
| 09:31AM | 22 | $200 MILLION IN JANUARY AT A HIGHER PRICE? |
| 09:31AM | 23 | WAS MR. BALWANI'S RESPONSE FRIENDLY AS MR. EISENMAN |
| 09:31AM | 24 | DESCRIBED? |
| 09:31AM | 25 | IT WAS NOT.  HE SAID, "WE CAN'T ANSWER YOUR QUESTIONS |

9147
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

| | | |
|---|---|---|
| 09:32AM | 1 | ABOUT DIRECTORS, OTHER INVESTORS, AND CERTAINLY NOT ABOUT ANY |
| 09:32AM | 2 | FUTURE INVESTMENT ROUNDS AND SPECULATE ABOUT WHAT THOSE |
| 09:32AM | 3 | VALUATIONS MAY BE." |
| 09:32AM | 4 | NOW, THAT'S SIGNIFICANT IN PART BECAUSE IT SHOWS THAT |
| 09:32AM | 5 | REALLY VERY FEW REPRESENTATIONS WERE MADE TO MR. EISENMAN IN |
| 09:32AM | 6 | CONNECTION WITH HIS DECISION TO INVEST. |
| 09:32AM | 7 | BUT MORE SIGNIFICANTLY, IT REALLY SUGGESTS TO YOU WHAT |
| 09:32AM | 8 | MATTERED TO MR. EISENMAN IN CONNECTION WITH MAKING INVESTMENT |
| 09:32AM | 9 | DECISIONS. |
| 09:32AM | 10 | CONTRARY TO WHAT THE GOVERNMENT TRIED TO ELICIT FROM HIS |
| 09:32AM | 11 | TESTIMONY NOW, WHAT MATTERED TO MR. EISENMAN, WHICH IS |
| 09:32AM | 12 | PERFECTLY FAIR, IS, IS WHAT WERE OTHER SOPHISTICATED INVESTORS |
| 09:32AM | 13 | DOING WITH RESPECT TO THIS ROUND OF INVESTMENT? |
| 09:32AM | 14 | WERE DIRECTORS ALSO INVESTING? |
| 09:32AM | 15 | WERE THERE OTHERS WHO WERE INTERESTED IN THE INVESTMENT |
| 09:32AM | 16 | WHO WOULD INVEST AT A HIGHER PRICE SOON? |
| 09:32AM | 17 | NOW, THE ANSWER TO THOSE QUESTIONS WERE KNOWN TO |
| 09:33AM | 18 | MR. BALWANI, AND IT MIGHT HAVE BEEN FAVORABLE FOR HIM TO TELL |
| 09:33AM | 19 | MR. EISENMAN. |
| 09:33AM | 20 | WE KNOW THAT AFTER THE FIRST OF THE YEAR THERE WAS AN |
| 09:33AM | 21 | ADDITIONAL ROUND, AND THAT WAS AT A HIGHER PRICE. |
| 09:33AM | 22 | BUT HE DIDN'T PROVIDE THAT INFORMATION TO MR. EISENMAN |
| 09:33AM | 23 | BECAUSE HE DIDN'T THINK IT WAS AN APPROPRIATE REQUEST ON |
| 09:33AM | 24 | MR. EISENMAN'S PART, AND HE DIDN'T THINK THAT HE SHOULD PROVIDE |
| 09:33AM | 25 | IT SIMPLY TO MR. EISENMAN AND NOT TO OTHER INVESTORS. |

9148
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

09:33AM  1    WHAT DOES THIS SHOW YOU?  IT SHOWS YOU THAT ALL OF THE

09:33AM  2   REPRESENTATIONS THAT THE GOVERNMENT HAS FOCUSSED ON WERE NOT ON

09:33AM  3   MR. EISENMAN'S MIND AT THE TIME.  HE WASN'T INTERESTED IN THE

09:33AM  4   TECHNOLOGY.  HE WASN'T INTERESTED IN THE RELATIONSHIP BETWEEN

09:33AM  5   THERANOS AND THE DEPARTMENT OF DEFENSE, HE WASN'T INTERESTED IN

09:33AM  6   THERANOS'S PHARMACEUTICAL COMPANY.

09:33AM  7    HE WAS INTERESTED IN KNOWING ABOUT THE FINANCIAL DETAILS

09:33AM  8   OF WHAT WAS HAPPENING AT THERANOS SO THAT HE COULD EVALUATE

09:33AM  9   WHETHER THIS IS A STOCK THAT HE COULD BUY AND POTENTIALLY

09:33AM 10   QUICKLY SELL.

09:33AM 11    THAT'S PERFECTLY FINE.  THAT'S A PERFECTLY FINE DECISION

09:34AM 12   AND A PERFECTLY FINE JUDGMENT ON HIS PART.

09:34AM 13    BUT IT DOESN'T RELATE TO WHAT IS CLAIMED BY THE GOVERNMENT

09:34AM 14   HERE, THAT HE WAS DEFRAUDED IN CONNECTION WITH REPRESENTATIONS

09:34AM 15   ON A NUMBER OF ISSUES THAT HE SHOWED NO INTEREST IN AT THE

09:34AM 16   TIME.

09:34AM 17    WHAT IS THE REAL GIST OF MR. EISENMAN'S CLAIM, AS WELL AS

09:34AM 18   THE ACCOUNT INVOLVING MR. EISENMAN, AS WELL AS MANY OF THE

09:34AM 19   OTHER INVESTORS?

09:34AM 20    WELL, IT'S REALLY THE EVIDENCE THAT I WENT OVER YESTERDAY.

09:34AM 21   HE SAYS HE READ "THE WALL STREET JOURNAL" ARTICLE, HE SAYS HE

09:34AM 22   LOOKED AT THE WEBSITE AND HE DREW CERTAIN INFORMATION FROM THAT

09:34AM 23   ABOUT WHERE THERANOS WAS.

09:34AM 24    AS I SHOWED YOU YESTERDAY, MANY OF THE THINGS THAT HE AND

09:34AM 25   OTHERS CLAIMED THAT THEY DIDN'T KNOW WAS KNOWN PUBLICLY.

9149

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

09:34AM 1         MR. PARLOFF HAD BEEN TOLD, FOR EXAMPLE, ABOUT PHASE I AND

09:34AM 2    PHASE II AFTER MR. EISENMAN'S INVESTMENT, WHICH WAS THE SUBJECT

09:34AM 3    OF HIS QUESTION TO MR. BALWANI.

09:34AM 4         IT WAS PUBLICLY KNOWN THAT THERE WAS VENOUS TESTING, ET

09:34AM 5    CETERA, ET CETERA.

09:34AM 6         ALL OF THE ISSUES THAT WERE FREQUENTLY REHEARSED THROUGH

09:35AM 7    MEDIA ARTICLES WITH THE INVESTORS, THERE WAS OTHER INFORMATION

09:35AM 8    OUT THERE THAT WOULD HAVE PROVIDED MR. EISENMAN WITH WHAT HE

09:35AM 9    CLAIMED HE DIDN'T KNOW.

09:35AM 10        LET'S LOOK AT THE NEXT INVESTOR, MR. LUCAS.

09:35AM 11        MR. LUCAS WAS ALSO A PROFESSIONAL INVESTOR.  HE WAS A

09:35AM 12   VENTURE CAPITALIST WHO INVESTED FULL TIME IN TECHNOLOGY.

09:35AM 13        HE OPERATED HIS OWN VENTURE CAPITAL FIRM, BLACK DIAMOND

09:35AM 14   VENTURES, AND HE INVESTED IN TECHNOLOGY AND IN MEDICAL DEVICE

09:35AM 15   COMPANIES.

09:35AM 16        AND HE KNEW A LOT ABOUT THERANOS BECAUSE HE HAD BEEN

09:35AM 17   INVOLVED WITH THERANOS FOR A NUMBER OF YEARS, AND HIS UNCLE WAS

09:35AM 18   THE CHAIRMAN OF THE BOARD OF THERANOS.

09:35AM 19        BUT UNLIKE THE OTHER INVESTORS, LIKE MR. EISENMAN, FOR

09:35AM 20   EXAMPLE, HE WAS INTERESTED IN THERANOS'S TECHNOLOGY, AND HE DID

09:35AM 21   ASK QUESTIONS THAT WERE SPECIFIC TO THERANOS'S TECHNOLOGY.

09:36AM 22        AND WHAT DOES THE RECORD REFLECT?

09:36AM 23        WELL, THE RECORD REFLECTS WHEN HE ASKED THOSE QUESTIONS,

09:36AM 24   HE GOT ACCURATE ANSWERS THAT MATCH WHAT YOU KNOW ABOUT WHAT WAS

09:36AM 25   GOING ON AT THERANOS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9150

09:36AM   1          FIRST OF ALL, YEARS BEFORE HE MADE THIS 2013 INVESTMENT

09:36AM   2     THAT IS THE SUBJECT OF THE COUNT IN THE INDICTMENT, IT WAS

09:36AM   3     EXPLAINED TO HIM THAT THERE WOULD BE VARIOUS SERIES OF DEVICES

09:36AM   4     ON WHICH BLOOD TESTS WOULD BE RUN THAT THERANOS WAS INVENTING,

09:36AM   5     THAT THOSE WOULD GROW GRADUALLY MORE AND MORE SOPHISTICATED,

09:36AM   6     BUT THAT THIS WAS A PROCESS THAT WAS GOING TO DEVELOP OVER

09:36AM   7     TIME.

09:36AM   8          HE CERTAINLY WAS A SOPHISTICATED TECHNOLOGY INVESTOR.  HE

09:36AM   9     KNEW THAT.

09:36AM  10          HE ALSO TESTIFIED THAT HE KNEW ACCURATELY WHAT THE

09:36AM  11     GOVERNMENT CLAIMS NO ONE KNEW, WHICH IS HE WAS ASKED, DID YOU

09:36AM  12     KNOW HOW MANY FINGERSTICK SAMPLES THERANOS HAD ACTUALLY

09:36AM  13     DEVELOPED ASSAYS WITH?

09:36AM  14          AND HE SAID -- HIS ESTIMATE WAS THAT IT WAS DOZENS, AND AT

09:37AM  15     LEAST IT WOULD HAVE BEEN DOZENS OF TESTS BECAUSE IT COULD DO

09:37AM  16     THE MAJORITY OF THE MOST COMMON TESTS OUT THERE.

09:37AM  17          WELL, YOU KNEW WHAT THE DIALOGUE WAS INSIDE OF THERANOS

09:37AM  18     BECAUSE OF THE EVIDENCE THAT YOU HAVE SEEN.  THEY TRIED TO

09:37AM  19     FIGURE OUT, WHAT ARE THE 43 OR THE 60 OR THE 70 TESTS THAT

09:37AM  20     WOULD ALLOW US TO DO THE MOST COMMON BLOOD TESTS?  THAT'S WHAT

09:37AM  21     THEY DID, AND THAT'S WHAT THEY OFFERED OUT OF THEIR CLIA LAB,

09:37AM  22     AND THOSE DEVICES -- AND THOSE WERE ANALYZED EITHER ON THE

09:37AM  23     MODIFIED MACHINES OR ON THE DEVICES.

09:37AM  24          MR. LUCAS WAS CLEARLY TOLD, THAT'S THE AMOUNT OF

09:37AM  25     FINGERSTICK SAMPLES THAT WE HAVE.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                        9151

```
09:37AM   1        SO FOR INVESTORS WHO EVIDENCED AN INTEREST IN THE
09:37AM   2   TECHNOLOGY, THEY GOT ACCURATE INFORMATION.
09:37AM   3        AND THAT WAS TRUE OF MR. LUCAS AND IT REFLECTS, I THINK,
09:37AM   4   WHAT THE INTENT OF MS. HOLMES AND OTHERS WAS WITH RESPECT TO
09:37AM   5   INTERACTING WITH INVESTORS ON THESE ISSUES.
09:37AM   6        I THINK MR. LUCAS ALSO TESTIFIED ABOUT OTHER ELEMENTS OF
09:37AM   7   THERANOS THAT WERE IMPORTANT TO HIM, AND ONE OF THEM I THINK IS
09:38AM   8   QUITE IMPORTANT.
09:38AM   9        AND HE TESTIFIED I THINK PARTICULARLY POINTEDLY ABOUT IT.
09:38AM  10   WHEN INVESTORS WERE INVESTING, THIS WAS NOT A QUESTION OF THE
09:38AM  11   PRESENT TEST MENU OR A QUESTION OF THE PRESENT CAPACITY ON THE
09:38AM  12   NUMBER OF FINGERSTICK SAMPLES.  THEY WERE LOOKING AT WHAT IS --
09:38AM  13   WHERE IS MS. HOLMES TAKING THIS COMPANY?  IS THIS SOMETHING
09:38AM  14   WORTH INVESTING IN?
09:38AM  15        AND I THINK MR. LUCAS DESCRIBED THAT TO YOU IN SOME
09:38AM  16   DETAIL.
09:38AM  17        HE DESCRIBE MS. HOLMES'S PASSION, THAT HER INTEREST WAS
09:38AM  18   NOT IN MAKING MONEY, AND THAT SHE HAD A MISSION TO BRING THIS
09:38AM  19   TECHNOLOGY TO THE WORLD, AND THAT WAS ATTRACTIVE TO HIM.  HE
09:38AM  20   WANTED TO BE PART OF THAT INVESTMENT BECAUSE HE BELIEVED IT
09:38AM  21   WOULD SUCCEED, AND IF IT SUCCEEDED, IT WOULD NOT ONLY BE A
09:38AM  22   PROFITABLE VENTURE, BUT A VENTURE WORTH INVESTING IN.
09:38AM  23        LET ME ALSO MENTION ONE OTHER THING WITH MR. LUCAS, AND I
09:38AM  24   WON'T SAY THIS WITH RESPECT TO EVERY INVESTOR, BUT I THINK IT'S
09:39AM  25   TRUE ACROSS THEM.
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9152

09:39AM   1          WHEN INVESTORS WERE INVESTING IN 2013 OR 2014, WHY DID

09:39AM   2     THEY INVEST?

09:39AM   3          THE PRINCIPAL REASON THEY INVESTED WAS NOT ABOUT ANY

09:39AM   4     PARTICULAR TECHNOLOGY OR ANY PARTICULAR NUMBER OF FINGERSTICK

09:39AM   5     TESTS.

09:39AM   6          THE REASON THAT THEY INVESTED WAS THEY KNEW THAT WALGREENS

09:39AM   7     HAD AGREED TO PUT THERANOS'S TECHNOLOGY IN THEIR STORES

09:39AM   8     EVENTUALLY AND TO OPERATE THERANOS SERVICE CENTERS.

09:39AM   9          THAT JUDGMENT WAS ALL THEY NEEDED TO KNOW BECAUSE THAT

09:39AM  10     MEANT TWO THINGS TO THEM.  ONE, IT MEANT THAT A BIG NATIONAL

09:39AM  11     COMPANY HAD EVALUATED THERANOS AND MADE A DECISION TO BECOME A

09:39AM  12     PARTNER WITH THERANOS IN BRINGING ITS TECHNOLOGY TO THE PUBLIC

09:39AM  13     MARKET.

09:39AM  14          THAT'S A BIG DEAL.  THAT'S A MUCH BIGGER DEAL THAN THE

09:39AM  15     NUMBER OF PARTICULAR TESTS AT ANY GIVEN MOMENT.  IT'S A

09:39AM  16     STATEMENT THAT THIS TECHNOLOGY COMPANY IS GOING TO BE ABLE TO

09:39AM  17     MAKE ITS TECHNOLOGY WIDELY AVAILABLE.

09:40AM  18          SECOND, WHAT DID THEY ASSUME, WHICH WAS AN ACCURATE

09:40AM  19     ASSUMPTION?  THEY ASSUMED THAT A COMPANY LIKE WALGREENS WOULD

09:40AM  20     HAVE LOOKED AT THERANOS AND ITS TECHNOLOGY IN GREAT DETAIL.

09:40AM  21          AND YOU KNOW THAT'S TRUE.  YOU KNOW THAT THERE WAS A LOT

09:40AM  22     OF TECHNICAL DUE DILIGENCE THROUGH THE JOHNS HOPKINS STUDY, THE

09:40AM  23     JOHNS HOPKINS DUE DILIGENCE AND THE OTHER LAB CONSULTANTS THAT

09:40AM  24     WALGREENS WORKED WITH AS PART OF ITS EVALUATION OF THERANOS.

09:40AM  25          THAT'S WHAT WAS REALLY DRIVING THESE INVESTMENTS.  AND

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9153

09:40AM    1        MR. LUCAS DURING HIS TESTIMONY ACKNOWLEDGED THAT.

09:40AM    2        WHAT DID IT MEAN FINANCIALLY FOR THEM THAT THERE WAS THIS

09:40AM    3    WALGREENS PARTNERSHIP?

09:40AM    4        WELL, THAT WAS TALKED ABOUT WITH RESPECT TO WHAT THE

09:40AM    5    PRICING WAS OF THEIR SHARES AND HOW MUCH THEY RECOGNIZED IT AS

09:40AM    6    OF THE TIME THAT THEY WERE BEING OFFERED THE OPPORTUNITY TO

09:40AM    7    INVEST AT $15.

09:40AM    8        REMEMBER THAT MR. LUCAS, MR. EISENMAN, AND MR. TOLBERT, OR

09:40AM    9    MR. HALL WHO MR. TOLBERT WORKED FOR, THEY WERE ALL INDIVIDUALS

09:41AM   10    WHO EITHER DIRECTLY OR INDIRECTLY HAD INVESTED IN THERANOS

09:41AM   11    YEARS BEFORE THESE 2013 INVESTMENTS.

09:41AM   12        AND BY THE TIME THEY WERE BEING OFFERED THIS SECOND

09:41AM   13    OPPORTUNITY TO INVEST, THEY KNEW THAT WALGREENS, OR SOME

09:41AM   14    STRATEGIC PARTNER OF THERANOS, WAS NOW WILLING TO INVEST AT $15

09:41AM   15    A SHARE, WHICH WAS ACTUALLY $75 A SHARE BECAUSE IT WAS A SPLIT

09:41AM   16    SHARE.

09:41AM   17        THEY HAD INVESTED AT NUMBERS LIKE 2.82 A SHARE, AND IN

09:41AM   18    MR. LUCAS'S CASE, $0.92 A SHARE.

09:41AM   19        SO THEY ASSUMED, AT THE TIME THAT THEY WERE MAKING THIS

09:41AM   20    INVESTMENT DECISION, THAT THEY HAD ALREADY -- THEY ASSUMED

09:41AM   21    ACCURATELY THAT THEY HAD ALREADY REALIZED A SUBSTANTIAL RETURN

09:41AM   22    ON THEIR INVESTMENT WITH THERANOS.

09:41AM   23        THIS WAS REALLY A DECISION AS TO WHETHER THEY WANTED TO

09:41AM   24    INVEST AS WELL AT THIS INCREASED PRICE.  THAT'S HOW THEY WERE

09:41AM   25    EVALUATING THIS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9154

09:41AM   1        THEY ALSO KNEW, AS YOU SAW, ALTHOUGH NOT TOLD BY

09:42AM   2   MR. BALWANI OR MS. HOLMES, THEY SUSPECTED THAT THERE WOULD BE

09:42AM   3   ANOTHER OFFERING IN THE NEW YEAR AND THE PRICE WOULD BE HIGHER.

09:42AM   4   THAT WAS, IN FACT, TRUE.  THE C2 ROUND WAS OFFERED AT $17 A

09:42AM   5   SHARE.

09:42AM   6        SO THEY WERE LOOKING AT AN OPPORTUNITY TO INVEST AT $15 A

09:42AM   7   SHARE, RECOGNIZING THAT THE PRICE OF THERANOS STOCK WAS LIKELY

09:42AM   8   TO GO TO $17 A SHARE, WHICH, IN FACT, NEW OFFERINGS WERE HELD

09:42AM   9   AT THAT PRICE.

09:42AM  10        AND THAT'S THE WAY THAT THEY WERE VIEWING THIS INVESTMENT.

09:42AM  11        THEY VIEWED THAT AS POSSIBLE BECAUSE OF THE WALGREENS

09:42AM  12   PARTNERSHIP, WHICH WAS ALSO ACCURATE.

09:42AM  13        THE ARGUMENT THAT THEY WERE REALLY LOOKING OR MAKING AN

09:42AM  14   INVESTMENT IN THERANOS BECAUSE THEY WERE RELYING ON WHAT WAS

09:42AM  15   SAID IN A NEWSPAPER ARTICLE WHEN, IN FACT, WE KNOW WHAT THE

09:42AM  16   RECORD REFLECTS THEY WERE LOOKING AT, WHICH IS THE EFFECT OF

09:42AM  17   OTHER INVESTMENTS, THE EFFECT OF FUTURE INVESTMENTS, THE EFFECT

09:42AM  18   OF THE WALGREENS PARTNERSHIP DOESN'T SUGGEST WHAT WAS, IN FACT,

09:43AM  19   MATERIAL TO THEM.

09:43AM  20        LET'S LOOK NOW AT MR. TOLBERT.

09:43AM  21        MR. TOLBERT WAS NOT HIMSELF AN INVESTOR.  AND MR. TOLBERT

09:43AM  22   WORKS FOR A GENTLEMAN NAMED CRAIG HALL, WHO IS A TEXAS REAL

09:43AM  23   ESTATE INVESTOR, AND MR. HALL DID NOT TESTIFY OR EXPLAIN THE

09:43AM  24   REASONS HIMSELF AS TO WHY HE WAS SUPPORTIVE OF MAKING AN

09:43AM  25   INVESTMENT IN THERANOS.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                    9155

```
09:43AM   1        IN 2006 THEY HAD INVESTED WITH MR. LUCAS, NOT DIRECTLY IN

09:43AM   2   THERANOS, BUT THEY HAD INVESTED THROUGH MR. LUCAS IN THERANOS.

09:43AM   3        I THINK IT'S FAIR TO SAY THAT BECAUSE THEIR ORIGINAL

09:43AM   4   INVESTMENT WAS THROUGH MR. LUCAS, IT WOULD HAVE BEEN REASONABLE

09:43AM   5   FOR THERANOS GENERALLY, AND FOR MS. HOLMES IN PARTICULAR, TO

09:44AM   6   ASSUME THAT INFORMATION THAT WAS BEING PASSED TO MR. LUCAS

09:44AM   7   WOULD BE PASSED ON TO MR. TOLBERT AND ULTIMATELY ON TO

09:44AM   8   MR. HALL.

09:44AM   9        BUT WHEN YOU HEARD THE EVIDENCE, IF YOU COMPARE WHAT

09:44AM  10   MR. LUCAS KNEW ABOUT THERANOS, THINGS LIKE THEY WERE OFFERING

09:44AM  11   NOT EVERY TEST ON FINGERSTICK BUT SOME DOZENS OF TESTS ON

09:44AM  12   FINGERSTICK, AND WHEN YOU COMPARE THAT TO WHAT MR. TOLBERT

09:44AM  13   KNEW, THEY DON'T MATCH, AND I ACKNOWLEDGE THAT.

09:44AM  14        AND I DON'T KNOW WHETHER THAT'S BECAUSE THERE WAS A GAP IN

09:44AM  15   INFORMATION BETWEEN MR. LUCAS AND MR. TOLBERT, OR WHETHER

09:44AM  16   MR. TOLBERT'S RECOLLECTION OF WHAT MR. LUCAS TOLD HIM HAS JUST

09:44AM  17   LEFT HIS MEMORY WITH THE PASSAGE OF TIME.

09:44AM  18        BUT IN ANY EVENT, ESSENTIALLY WHAT WAS PASSED ON TO

09:44AM  19   MR. LUCAS BY MS. HOLMES AND OTHERS, I THINK SHE PRESUMED WOULD

09:44AM  20   HAVE BEEN KNOWN BY MR. HALL AND BY MR. TOLBERT AS WELL.

09:45AM  21        MR. TOLBERT HAD NO DIRECT CONVERSATIONS WITH MS. HOLMES AT

09:45AM  22   ALL AFTER THE HALL GROUP'S FIRST INVESTMENT THROUGH MR. LUCAS

09:45AM  23   IN 2006.  NONE.  HE HAD NO CONTACT WITH HER AT ALL BETWEEN 2006

09:45AM  24   AND 2013.

09:45AM  25        NOR IN CONNECTION WITH HIS INVESTMENT IN 2013 DID HE HAVE
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9156

09:45AM   1    A DIRECT CONVERSATION WITH MS. HOLMES.

09:45AM   2         SO WE'RE NOT REALLY FOCUSSED ON DIRECT INTERPERSONAL

09:45AM   3    DEALINGS BETWEEN THEM.

09:45AM   4         WHAT THE GOVERNMENT FOCUSES ON HERE IS THE TAPE RECORDING

09:45AM   5    THAT YOU HEARD OF THE DECEMBER 20TH CALL, WHICH IS A TELEPHONE

09:45AM   6    CALL THAT MR. TOLBERT PARTICIPATED IN.  AS YOU RECALL, HE

09:45AM   7    TESTIFIED THAT THERE WERE MANY PARTICIPANTS IN THE CALL, THAT

09:45AM   8    HE SECRETLY TAPE RECORDED THAT INFORMATION FOR THE BENEFIT OF

09:45AM   9    MR. HALL, AND NO ONE ELSE BUT HE KNEW THAT HE WAS TAPING THE

09:46AM  10    CALL.

09:46AM  11         THE MAIN FOCUS, I THINK, REALLY OF THIS CALL, AND THE MAIN

09:46AM  12    FOCUS OF THE GOVERNMENT'S PRESENTATION OF EVIDENCE HERE IS THE

09:46AM  13    STATEMENT THAT MS. HOLMES MADE DURING THAT TAPE RECORDING ABOUT

09:46AM  14    THERANOS'S RELATIONSHIPS WITH THE MILITARY AND WHAT THE USE OF

09:46AM  15    THERANOS DEVICES WAS IN CONNECTION WITH MEDEVACS, ET CETERA.

09:46AM  16         I WANT TO GO THROUGH THAT WITH YOU IN A MOMENT, BUT I WANT

09:46AM  17    TO ALSO REMIND YOU THAT THE CONVERSATION THAT IS HAD ON THAT

09:46AM  18    TAPE WHERE MS. HOLMES IS DISCUSSING THE RELATIONSHIP BETWEEN

09:46AM  19    THERANOS AND THE DEPARTMENT OF DEFENSE IS NOT SOMETHING THAT

09:46AM  20    MS. HOLMES BROUGHT UP OR INTRODUCED INTO THE CONVERSATION.

09:46AM  21         THE COMMENTS SHE MADE WERE IN QUESTION -- WERE IN RESPONSE

09:46AM  22    TO A QUESTION BY ANOTHER INVESTOR WHO ASKED HER, IS THERE A

09:47AM  23    MILITARY ASPECT THAT THERANOS IS GOING TO PURSUE?

09:47AM  24         AND MS. HOLMES SAYS AS PART OF HER ANSWER THAT, WELL, YOU

09:47AM  25    KNOW, THE COMPANY DOES HAVE ACTIVITIES IN THAT REGARD, BUT THAT

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9157

09:47AM   1    THE COMPANY'S FOCUS GOING FORWARD IS GOING TO BE ON THE RETAIL

09:47AM   2    MARKET WITH WALGREENS AND HOPEFULLY WITH OTHER RETAIL PARTNERS.

09:47AM   3         BUT I WANT TO LOOK AT WHAT MS. HOLMES ACTUALLY SAYS ON

09:47AM   4    THAT TAPE, WHICH YOU HEARD AS PART OF THE TAPE, AND OF COURSE

09:47AM   5    YOU CAN HEAR AGAIN AS PART OF YOUR DELIBERATIONS.

09:47AM   6         AND I WANT TO BREAK IT DOWN AND COMPARE IT TO WHAT WAS

09:47AM   7    ACTUALLY GOING ON WITH THERANOS'S MILITARY PROGRAMS SO THAT YOU

09:47AM   8    UNDERSTAND WHAT WAS BEING CONVEYED AS PART OF THIS

09:47AM   9    CONVERSATION.

09:47AM  10         LET'S LOOK AT WHAT MS. HOLMES ACTUALLY SAYS.  THERE REALLY

09:47AM  11    ARE TWO PARTS TO THIS.  THERE'S A PART WHERE THERE'S A

09:47AM  12    DISCUSSION OF THE WORK THAT THERANOS WAS DOING IN CONNECTION

09:48AM  13    WITH AFGHANISTAN, AND THEN THERE'S A SEPARATE DISCUSSION ABOUT

09:48AM  14    THERANOS'S WORK WITH SPECIAL OPERATIONS.

09:48AM  15         SO WHAT DOES MS. HOLMES SAY ON THAT TAPE IF YOU ACTUALLY

09:48AM  16    RECALL WHAT SHE SAID?  IT'S REALLY BROKEN DOWN INTO THREE

09:48AM  17    PARTS.

09:48AM  18         FIRST, SHE SAYS THAT ONE PIECE OF WORK THAT THEY WERE

09:48AM  19    DOING IS IN THE CONTEXT OF WORK IN THE MIDDLE EAST, AND

09:48AM  20    SPECIFICALLY IN AFGHANISTAN.

09:48AM  21         AND THEN SHE GOES ON TO DESCRIBE A SIGNIFICANT MEDICAL

09:48AM  22    PROBLEM THAT EXISTED WITH GETTING MEDICAL TREATMENT FOR

09:48AM  23    SOLDIERS ON A TIMELY BASIS.

09:48AM  24         SHE THEN GOES ON TO SAY, WELL, THE ABILITY TO PLACE AND

09:48AM  25    TAKE A TECHNOLOGY LIKE THIS AND PUT IT IN FLIGHT HAS THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9158

09:48AM   1        POTENTIAL TO CHANGE SURVIVAL RATES.

09:48AM   2             SO THERE'S A POTENTIAL PLACEMENT THAT COULD SAVE LIVES.

09:48AM   3             THIRD, SHE SAYS WE'VE BEEN DOING A LOT OF WORK THERE.

09:48AM   4             NOW, WHY WOULD SHE SAY THAT?

09:49AM   5             WELL, LET'S LOOK AT THE WORK THAT THERANOS WAS ACTUALLY

09:49AM   6        DOING IN CONNECTION WITH THE PROGRAM IN AFGHANISTAN AT THAT

09:49AM   7        TIME.

09:49AM   8             FIRST, WAS THERE WORK THAT THERANOS WAS DOING IN

09:49AM   9        CONNECTION WITH DEPLOYING ITS DEVICES IN AFGHANISTAN?  YOU KNOW

09:49AM  10        THAT THERE WAS.  THERANOS HAD ENTERED A CONTRACT ABOUT A YEAR

09:49AM  11        BEFORE THIS CALL WITH CENTCOM, AND THE IDEA WAS THAT THE

09:49AM  12        DEVICES WOULD BE EVALUATED AT BAGRAM AIR FORCE BASE IN

09:49AM  13        AFGHANISTAN.

09:49AM  14             WHAT I'M SHOWING YOU NOW AS PART OF EXHIBIT 10457 IS THE

09:49AM  15        DOCUMENT THAT REFLECTED THE WORK THAT WAS TO BE DONE.

09:49AM  16             THEN WAS THERE GOING TO BE, AS PART OF THIS PROGRAM,

09:49AM  17        POTENTIAL PLACEMENT ON MEDEVAC HELICOPTERS THAT COULD SAVE

09:49AM  18        LIVES?  YES.  IF YOU READ THE LANGUAGE, THERE'S A NUMBER OF

09:49AM  19        DIFFERENT USES OF THERANOS DEVICES IN THIS CONTEXT THAT WERE

09:49AM  20        CONSIDERED AND WERE DESCRIBED AS PART OF THE PROCESS.

09:49AM  21             AS YOU SEE HERE, THERE'S A SUGGESTED USES COULD INCLUDE

09:50AM  22        MEDEVAC, BUT IT COULD INCLUDE MULTIPLE PLATFORMS ON LAND, AIR,

09:50AM  23        SEA, ET CETERA.

09:50AM  24             NOW, WAS THERANOS DOING ANY WORK TOWARDS THIS GOAL OR WAS

09:50AM  25        THIS, AS I THINK THE GOVERNMENT SUGGESTS, JUST A FANTASY OF

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9159

09:50AM   1     MS. HOLMES?

09:50AM   2          WELL, THE TRUTH IS, AND YOU'VE HEARD TESTIMONY DURING THE

09:50AM   3     CASE, THERANOS WAS DOING A LOT OF WORK TOWARDS THIS GOAL.

09:50AM   4          THERANOS WAS DEVELOPING A SPECIFIC DEVICE FOR PURPOSES OF

09:50AM   5     DEPLOYMENT WITH THE MILITARY, NOT ONLY IN AFGHANISTAN, BUT IN

09:50AM   6     OTHER LOCATIONS, CALLED A 4S DEVICE, A PROGRAM ON WHICH

09:50AM   7     THERANOS SPENT TENS OF MILLIONS OF DOLLARS AND WHICH IS PART

09:50AM   8     OF -- PART OF WHICH IS THIS WORK THAT IS DESCRIBED IN THE

09:50AM   9     CONTRACT THAT IS 10547, AND YOU CAN LOOK AT THAT AS PART OF

09:50AM  10     YOUR DELIBERATIONS.

09:50AM  11          NOW, LET'S GO ON TO THE SECOND PART OF WHAT SHE SAYS,

09:50AM  12     WHICH IS IN CONNECTION WITH SPECIAL OPERATIONS COMMAND.  SHE

09:51AM  13     SAYS, SEPARATELY, WE'VE BEEN DOING A LOT OF WORK WITH SPECIAL

09:51AM  14     OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE AREAS.

09:51AM  15          SHE TALKS ABOUT THE PROBLEM OF THERE BEING AN ABSENCE OF

09:51AM  16     MEDICAL CARE AND PEOPLE BEING EVACUATED GENERALLY OUT OF

09:51AM  17     CONTINENT.

09:51AM  18          AND THEN SHE GOES ON TO SAY WE, AS THERANOS, CREATED A

09:51AM  19     DISTRIBUTED SYSTEM THAT CAN BE REMOVED -- THAT CAN BE USED IN

09:51AM  20     REMOTE AREAS.

09:51AM  21          WHAT IS SHE TALKING ABOUT HERE?

09:51AM  22          WELL, HERE SHE'S TALKING ABOUT THE CONTRACT -- TWO

09:51AM  23     DIFFERENT CONTRACTS.  ONE IS THE PROGRAM THAT HAD ALREADY BEEN

09:51AM  24     DONE WITH SPECIAL OPERATIONS FORCES IN AFRICA.  YOU'LL REMEMBER

09:51AM  25     THAT THERE WAS A PROGRAM UNDER WHICH DEVICES WERE TAKEN TO

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9160

09:51AM   1    REMOTE LOCATIONS IN AFRICA AND THEY WERE EVALUATED AS TO

09:51AM   2    WHETHER THEY COULD SUSTAIN THE CONDITIONS OF REMOTE AREAS.

09:51AM   3    THOSE LOCATIONS ARE IDENTIFIED HERE IN EXHIBIT 12251.

09:52AM   4        AGAIN, THE DESCRIPTION SHE GIVES OF CURRENTLY AVAILABLE

09:52AM   5    TECHNOLOGIES BEING UNSUITABLE ON THE CALL IS EXACTLY MATCHED BY

09:52AM   6    SOME OF THE LANGUAGE THAT'S IN THE CONTRACT THAT THERANOS HAD

09:52AM   7    WITH AFRICOM AT THIS TIME.

09:52AM   8        WHAT ABOUT SPECIAL OPERATIONS COMMAND IN PARTICULAR?

09:52AM   9        SIMILARLY THERE WAS AN ARRANGEMENT WITH SPECIAL OPERATIONS

09:52AM  10    COMMAND, WHICH I'LL TALK ABOUT IN A MOMENT.

09:52AM  11        NOW, YOU HEARD FROM MR. EDLIN ABOUT THE SUBSTANTIAL WORK

09:52AM  12    THAT THERANOS WAS DOING IN CONNECTION WITH DEPLOYING THESE

09:52AM  13    DEVICES.  YOU ALSO HEARD ABOUT IT FROM MS. HOLMES.

09:52AM  14        AND YOU KNOW THAT THERANOS HAD DESIGNED DEVICES THAT COULD

09:52AM  15    BE USED IN AN EXTREME ENVIRONMENT.

09:52AM  16        SO WHEN MS. HOLMES WAS TALKING ABOUT THIS ON THIS CALL,

09:52AM  17    THIS IS WHAT SHE WAS TALKING ABOUT, THOSE POINTS.

09:52AM  18        MR. TOLBERT WAS ASKED DURING HIS TESTIMONY, WHAT DID YOU

09:53AM  19    UNDERSTAND, WHAT DID YOU TAKE AWAY FROM THIS CONVERSATION THAT

09:53AM  20    MS. HOLMES WAS TELLING YOU?

09:53AM  21        WELL, LET'S RECALL HIS TESTIMONY WHERE HE WAS ASKED THAT

09:53AM  22    QUESTION.  AND HE SAID, WELL, HE UNDERSTOOD FIRST THAT THERE

09:53AM  23    WAS SIGNIFICANT WORK BEING DONE TO DEPLOY THE THERANOS SYSTEM

09:53AM  24    IN THEATRE.

09:53AM  25        THAT WAS ACCURATE.  AS I SAY, THERANOS WAS SPENDING TENS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9161

09:53AM   1    OF MILLIONS OF DOLLARS AND HAD A HIGH NUMBER OF PEOPLE WORKING

09:53AM   2    ON THIS PROJECT.

09:53AM   3         HE THEN WAS ASKED, WHAT DID YOU TAKE HER STATEMENTS ABOUT

09:53AM   4    SPECIAL OPERATIONS COMMAND?

09:53AM   5         AND HE SAYS THE UNDERSTANDING WAS THAT THEY HAD BEEN

09:53AM   6    WORKING WITH SPECIAL OPERATIONS COMMAND, AND IT CERTAINLY

09:53AM   7    REPRESENTED A CAPABILITY AND A BUSINESS THAT THE COMPANY HAD

09:53AM   8    PURSUED.

09:53AM   9         THAT IS ALSO ACCURATE.  YOU KNOW THAT FROM THE TESTIMONY

09:53AM  10    OF MR. EDLIN AND FROM MS. HOLMES'S TESTIMONY, AND FROM THE MANY

09:53AM  11    DOCUMENTS THAT HAVE BEEN PRODUCED DURING THE COURSE OF THE

09:53AM  12    CASE.

09:53AM  13         NOW, THIS TAPE, WHICH THE GOVERNMENT INTRODUCED, IS THE

09:54AM  14    BEST EVIDENCE, ALONG WITH THE TAPES FROM MR. PARLOFF, ABOUT HOW

09:54AM  15    MS. HOLMES TALKED ABOUT THERANOS'S RELATIONSHIPS WITH THE

09:54AM  16    DEPARTMENT OF DEFENSE AND HOW IT TALKED ABOUT ITS ASPIRATIONS,

09:54AM  17    HOW IT TALKED ABOUT PROGRAMS THAT IT HAD WITH SPECIAL

09:54AM  18    OPERATIONS COMMAND, HOW IT TALKED ABOUT THE WORK THAT IT WAS

09:54AM  19    DOING IN AFGHANISTAN.

09:54AM  20         BUT THESE PROJECTS WERE REAL PROJECTS.  THERE WAS A LOT OF

09:54AM  21    INVESTMENT THAT THE COMPANY MADE IN THIS.  THE COMPANY DEALT

09:54AM  22    WITH NUMEROUS PEOPLE IN THE DEPARTMENT OF DEFENSE.  YOU SAW

09:54AM  23    THAT IN EMAILS THAT WERE INTRODUCED DURING MR. EDLIN'S

09:54AM  24    TESTIMONY.

09:54AM  25         THESE PROGRAMS WENT ON FOR YEARS.  THERANOS HAD BEEN

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

TALKING WITH THE DEPARTMENT OF DEFENSE ABOUT THESE DEPLOYMENTS SINCE 2011.

YOU KNOW, AS A RESULT OF HIS TESTIMONY, THAT THERANOS TOOK ITS 4 SERIES DEVICES TO MACDILL AIR FORCE BASE FOR EVALUATION BY CENTCOM AND THEY WERE FURTHER MODIFIED IN RESPONSE TO THAT MEETING.

YOU KNOW THAT THERANOS ACTUALLY DELIVERED SERIES 4 DEVICES TO SPECIAL OPERATIONS COMMAND, WHICH SPECIAL OPERATIONS COMMAND ULTIMATELY DECIDED NOT TO USE, BUT THEY WERE BUILT.

AND DURING DECEMBER OF 2013 WHEN THIS CALL WAS HAPPENING, MS. HOLMES WAS VERY MUCH AWARE THAT THESE PROGRAMS WERE MIDSTREAM.  THE SOCOM DEVICES WOULD BE DELIVERED TO SPECIAL OPERATIONS COMMAND ABOUT FOUR OR FIVE MONTHS AFTER THIS CALL.

THERANOS HAD AGREED WITH CENTCOM THAT IT WOULD DELIVER DEVICES IN AFGHANISTAN ABOUT EIGHT MONTHS -- SCHEDULED TO BE DELIVERED ABOUT EIGHT MONTHS AFTER THIS CALL.

THESE ARE THE CONTACTS -- THIS IS THE CONTEXT IN WHICH THESE STATEMENTS WERE BEING MADE.  THERANOS WAS, IN FACT, REALLY DOING THE WORK WHICH MS. HOLMES DESCRIBED.

AS YOU SEE FROM THE TAPE, SHE DID NOT SAY THESE DEVICES ARE IN FLIGHT FOR CLINICAL USE, WHICH IS HOW MANY OF THE WITNESSES HAVE BEEN QUESTIONED.

SHE TALKS ABOUT THE WORK THAT THERANOS WAS DOING IN CONNECTION WITH THESE PROGRAMS.

SHE ALSO SAYS, THIS IS NOT GOING TO BE OUR BUSINESS.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9163

09:56AM   1    WE'LL DO A LITTLE BIT HERE, BUT THIS IS NOT GOING TO BE OUR

09:56AM   2    BUSINESS.

09:56AM   3         SO FROM THE PERSPECTIVE OF INVESTORS, THEY ARE BEING TOLD,

09:56AM   4    I THINK ACCURATELY, WHAT THE STATE OF THERANOS'S BUSINESS WAS.

09:56AM   5         LET'S LOOK AT THE CONTRACTS THAT THERANOS HAD WITH THE

09:56AM   6    MILITARY OVER TIME.

09:56AM   7         THERE'S THE CENTCOM CONTRACT, WHICH I MENTIONED, WHICH

09:56AM   8    WAS, AS I SAY, ACTIVE DURING THIS PERIOD.

09:56AM   9         THERE WAS THE SPECIAL OPERATIONS COMMAND CONTRACT, WHICH

09:56AM  10    WAS ENTERED IN 2012, MODIFIED IN 2013.

09:56AM  11         AND THERE WAS THE PROGRAM WITH AFRICOM WHICH YOU WILL

09:56AM  12    RECALL SEEING TESTIMONY ABOUT DURING THE COURSE OF MR. EDLIN'S

09:57AM  13    TESTIMONY.

09:57AM  14         AND I WANT TO SHOW YOU SOME OF THE INTERACTIONS THAT

09:57AM  15    THERANOS HAD AS PART OF THAT PROGRAM, WHICH YOU'LL REMEMBER.

09:57AM  16         IF WE LOOK AT SLIDE 33, AND THIS IS EXHIBIT 13986 --

09:57AM  17    SORRY, 34.  THIS IS A REPORT FROM THE COMMAND SURGEON OF

09:57AM  18    AFRICOM ABOUT THERANOS'S DEVICES AND THEIR DEPLOYMENT TO

09:57AM  19    AFRICOM.

09:57AM  20         SHE WRITES IN DECEMBER OF -- OR JULY OF 2012 TO MR. EDLIN,

09:57AM  21    COPYING MS. HOLMES, THAT SHE HAS BEEN TO AFRICA AND SHE HAS

09:57AM  22    TAKEN THE DEVICE TO AFRICA WHERE THE DEVICE TRAVELLED WELL AND

09:57AM  23    IT FUNCTIONED WELL.

09:57AM  24         SHE TALKED ABOUT DIFFICULTIES WITH THE FUNCTIONALITY OF

09:57AM  25    THE SCREEN, BUT SHE REPORTED THAT SHE HAD TAKEN THE DEVICE AND

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                         9164

09:57AM   1    USED IT IN CAMEROON AND IN UGANDA AND SOUTH SUDAN.

09:58AM   2         THIS WAS NOT A FICTION THAT MS. HOLMES WAS MAKING UP AND

09:58AM   3    SHE WAS NOT INTENDING TO EXAGGERATE WHAT WORK HAD BEEN DONE.

09:58AM   4    THIS WAS VERY MUCH A PART OF THE WORK THAT THERANOS WAS DOING.

09:58AM   5         I THINK MR. TOLBERT'S TESTIMONY SHOWS YOU WHAT WAS REALLY

09:58AM   6    UNDERSTOOD AS PART OF THESE CONVERSATIONS WITH PEOPLE WHO HEARD

09:58AM   7    HER TALK ABOUT THESE DEVICES.

09:58AM   8         NOW, I WANT TO TALK ALSO ABOUT WHAT THE GOVERNMENT DID NOT

09:58AM   9    DO IN CONNECTION WITH ITS CASE ON THIS SUBJECT.

09:58AM  10         THEY INTRODUCED, AS MR. SCHENK DETAILED YESTERDAY,

09:58AM  11    TESTIMONY FROM, I DON'T KNOW, FIVE, SIX, SEVEN PEOPLE WHO SAID,

09:58AM  12    SHE TOLD ME THAT THERE WAS A DEVICE AND IT WAS IN FLIGHT AND

09:58AM  13    BEING CLINICALLY USED IN THAT CONTEXT, ET CETERA.

09:58AM  14         BUT THE GOVERNMENT DIDN'T CALL A SINGLE PERSON FROM THE

09:58AM  15    DEPARTMENT OF DEFENSE WHO WORKED ON THESE CONTRACTS WHO WOULD

09:59AM  16    HAVE BEEN ABLE TO GIVE ACCURATE DESCRIPTIONS OF THE STATE OF

09:59AM  17    THOSE PROGRAMS, WHAT THEY WERE TRYING TO DO IN CONNECTION WITH

09:59AM  18    THOSE PROGRAMS.  NOTHING.

09:59AM  19         THEY ASKED GENERAL MATTIS WHEN HE TESTIFIED WHETHER HE

09:59AM  20    KNEW THAT THOSE PROGRAMS HAD SUCCEEDED.  OF COURSE HE WAS NOT

09:59AM  21    INVOLVED IN THOSE PROJECTS BECAUSE, AS HE TOLD YOU, AFTER HE

09:59AM  22    CAME TO THERANOS, HE RECUSED HIMSELF FROM ALL ACTIVITIES WITH

09:59AM  23    THE DEPARTMENT OF DEFENSE.

09:59AM  24         THAT'S NOT THE ONLY TIME THAT MS. HOLMES TALKED ABOUT THIS

09:59AM  25    MEDEVAC ISSUE AND IT WAS CAPTURED ON TAPE.

9165
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

09:59AM   1          REMEMBER THAT MR. PARLOFF ALSO TALKED ABOUT THE MEDEVAC

09:59AM   2    ISSUE, AND THAT WAS CAPTURED ON A TAPE OF A CONVERSATION

09:59AM   3    BETWEEN MS. HOLMES AND MR. PARLOFF.

09:59AM   4          AND YOU CAN LOOK AT WHAT WAS SAID AS PART OF THAT

09:59AM   5    CONVERSATION.

09:59AM   6          MR. PARLOFF ASKED MS. HOLMES, ARE YOU DOING STUFF OVERSEAS

09:59AM   7    ALREADY?

09:59AM   8          AND MS. HOLMES SAID, WE HAVE DONE WORK OVERSEAS FOR

10:00AM   9    PHARMACEUTICAL COMPANIES AND A LITTLE BIT WITH FOREIGN

10:00AM  10    GOVERNMENTS IN THE PAST, BUT WE'VE GOT OUR WORK CUT OUT FOR US

10:00AM  11    HERE.

10:00AM  12          SHE DOESN'T MENTION WORK ABROAD IN CONNECTION WITH ANY

10:00AM  13    MILITARY PROGRAM.

10:00AM  14          BUT IN RESPONSE TO THEIR CONVERSATION AS IT CONTINUES,

10:00AM  15    TOWARDS THE END OF IT SHE DOES TALK ABOUT SOME POTENTIAL

10:00AM  16    APPLICATIONS WITH THE MILITARY.  AND REMEMBER, THIS IS IN 2014.

10:00AM  17          SHE SAYS TO HIM, THERE'S MILITARY-SPECIFIC APPLICATIONS,

10:00AM  18    TOO, THAT ARE QUITE PROMISING.  THAT ARE QUITE PROMISING.

10:00AM  19    SOMETHING THAT MIGHT HAPPEN IN THE FUTURE.

10:00AM  20          NOW, YOU SEE THAT THAT IS SORT OF SIMILAR LANGUAGE TO HOW

10:00AM  21    SHE TALKED ABOUT, YOU KNOW, THE POTENTIAL IMPLICATIONS, THERE

10:00AM  22    COULD BE SOME PROMISE IN THAT, ET CETERA.

10:00AM  23          BUT THEN SHE GOES ON TO TALK ABOUT IT MORE SPECIFICALLY.

10:00AM  24          COULD THERE BE A MILITARY USE FOR THIS?  COULD THERE BE A

10:01AM  25    MEDEVAC USE FOR IT, ET CETERA?

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9166

10:01AM   1        AND LET'S SEE WHAT SHE SAYS.  WELL, "I MEAN, AND -- AND

10:01AM   2    THAT -- THAT HAS IMPLICATIONS, BROADLY."  THIS IS 2014.  SHE'S

10:01AM   3    SAYING THAT THERE'S A POTENTIAL APPLICATION IN THE FUTURE WITH

10:01AM   4    THE MILITARY.

10:01AM   5        NOW, WE KNOW WHAT MR. PARLOFF UNDERSTOOD AS A RESULT OF

10:01AM   6    THIS CONVERSATION BECAUSE WE KNOW WHAT HE WROTE IN HIS ARTICLE,

10:01AM   7    WHICH IS IN EXHIBIT 1776.  AND HE SAYS, "THAT MAKES IT POSSIBLE

10:01AM   8    TO IMAGINE ONE DAY PLACING HOLMES'S LABS RIGHT BY THE OPERATING

10:01AM   9    ROOMS IN HOSPITALS OR IN MILITARY EVACUATION HELICOPTERS."

10:01AM  10        ONE DAY IN THE FUTURE.  THIS IS A CAPACITY THAT THERANOS

10:01AM  11    MIGHT BE CAPABLE OF ACHIEVING.

10:01AM  12        NOW, WHAT DID THE TESTIMONY IN THIS CASE LOOK LIKE

10:02AM  13    COMPARED TO THE TAPES?

10:02AM  14        WELL, IN BOTH OF THE TAPES YOU SEE SOME COMMONALITIES.

10:02AM  15    SHE NEVER SAYS THERANOS DEVICES ARE BEING CURRENTLY BEING USED.

10:02AM  16        SHE NEVER TALKS ABOUT THESE ACTUALLY BEING IN FLIGHT WITH

10:02AM  17    CLINICAL USE.

10:02AM  18        SHE TALKS ABOUT POTENTIAL APPLICATIONS.  SHE DESCRIBES

10:02AM  19    PROJECTS THAT YOU KNOW ARE REAL PROJECTS.

10:02AM  20        HER WORDS TRACK THE CONTRACT LANGUAGE VERY CLOSELY.  SHE

10:02AM  21    DESCRIBES USE IN REMOTE AREAS.  SHE DESCRIBES THE PROBLEMS THAT

10:02AM  22    THEY'RE TRYING TO SOLVE.

10:02AM  23        AND IN EVERY SITUATION SHE SAYS, THIS ISN'T OUR FOCUS.

10:02AM  24    OUR FOCUS IS ON WALGREENS AND OTHER ASPECTS OF THE RETAIL

10:02AM  25    MARKET.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9167

10:02AM  1         NOW, YOU'LL RECALL THAT MR. PARLOFF TALKED ABOUT HAVING A

10:02AM  2    CONVERSATION WITH MS. HOLMES THAT WASN'T CAPTURED ON THE TAPE.

10:02AM  3    AND HE SAID IN CONNECTION WITH THAT CONVERSATION, WHICH WAS I

10:03AM  4    GUESS A THIRD CONVERSATION -- THE FIRST AND SECOND CONVERSATION

10:03AM  5    ARE REFLECTED ON TAPE AND YOU KNOW WHAT WAS SAID AS PART OF

10:03AM  6    THAT.

10:03AM  7         BUT HE TESTIFIED THAT HE WAS TOLD BY MS. HOLMES NOT ON

10:03AM  8    TAPE THAT A THERANOS DEVICE WAS BEING USED IN AFGHANISTAN.  HE

10:03AM  9    DIDN'T HAVE ANY NOTES OF THAT CONVERSATION THAT HE STILL

10:03AM  10   POSSESSED AT ALL.

10:03AM  11        NOW, THAT'S, THAT'S -- THAT WOULD BE ODD, HONESTLY,

10:03AM  12   BECAUSE HE INTERVIEWED HER, AS HE TESTIFIED, FOR ABOUT 13 HOURS

10:03AM  13   OVER 11 DAYS, HAD ABOUT 10 HOURS OF TAPED CONVERSATIONS WITH

10:03AM  14   HER, AND HE TAPED TWO CONVERSATIONS WITH HER THAT REFLECT

10:03AM  15   DISCUSSION OF THIS.

10:03AM  16        BUT HE SAYS IN A THIRD CONVERSATION SHE SAYS SOMETHING

10:03AM  17   DIFFERENT.

10:03AM  18        MR. SCHENK ON DIRECT EXAMINATION, AS HE QUOTED YESTERDAY,

10:03AM  19   ELICITED TESTIMONY FROM -- I'M SORRY, MR. BOSTIC DID, FROM

10:04AM  20   MR. PARLOFF WHERE HE SAID, NO, SHE TOLD ME THAT THIS IS IN USE

10:04AM  21   ON A MEDEVAC.

10:04AM  22        BUT THEN ON CROSS-EXAMINATION WHEN MR. CLINE ASKED HIM

10:04AM  23   ABOUT THAT, HE SAID, SHE NEVER ACTUALLY TOLD YOU THAT IT WAS --

10:04AM  24   THERE WAS USE IN AFGHANISTAN, DID SHE?

10:04AM  25        HE RESPONDED, "I THOUGHT SHE DID."

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9168

10:04AM   1        HE THEN WAS ASKED, "SO YOU THOUGHT YOU HAD MORE THAN JUST

10:04AM   2    THE IMPRESSION THAT YOU DESCRIBED TO THE GOVERNMENT IN THOSE

10:04AM   3    FIRST TWO MEETINGS?"

10:04AM   4        HE SAID, "WELL, IT IS SEVEN YEARS AGO.  IT MIGHT HAVE BEEN

10:04AM   5    A VERY STRONG IMPRESSION.  I, I -- I'M NOT CERTAIN."

10:04AM   6        NOW, I DON'T FAULT MR. PARLOFF FOR THAT.  THAT'S THE

10:04AM   7    EVOLUTION OF MEMORY IN THE CONTEXT OF EVERYTHING THAT HAS

10:04AM   8    HAPPENED.

10:04AM   9        BUT WE KNOW FROM THE CONTEMPORANEOUS RECORD WHAT WAS TOLD

10:04AM   10   ABOUT MEDEVACS.  WE KNOW THAT HE WAS TOLD THAT THESE WERE

10:04AM   11   APPLICATIONS THAT THERANOS WAS PURSUING AS A POTENTIAL IN THE

10:04AM   12   FUTURE.

10:04AM   13       AND I THINK THE COMMENTARY ON THIS SUBJECT, WITH THE

10:05AM   14   BENEFIT OF WHAT MS. HOLMES ACTUALLY SAID ON BOTH RECORDINGS,

10:05AM   15   YOU SHOULD HEAR ALL OF THAT, ALL OF THE TESTIMONY ABOUT THAT IN

10:05AM   16   CONNECTION WITH THAT THOUGHT.

10:05AM   17       IT SHOULD RAISE, I THINK IN YOUR MIND, SOME QUESTION ABOUT

10:05AM   18   TESTIMONY THAT WITNESSES HAVE OFFERED ON THIS MEDEVAC ISSUE.

10:05AM   19       IN ANY EVENT, YOU KNOW THAT IN EVERY ISSUE -- IN EVERY

10:05AM   20   CIRCUMSTANCE MS. HOLMES WAS SAYING TO INVESTORS, THIS SHOULDN'T

10:05AM   21   BE MATERIAL TO YOUR INVESTMENT DECISION.

10:05AM   22       SO THOSE ARE THE THREE INVESTORS IN THE C1 ROUND,

10:05AM   23   MR. EISENMAN, MR. LUCAS, AND MR. TOLBERT.

10:05AM   24       LET ME TALK NOW ABOUT THE C2 ROUND.

10:05AM   25       YOU HEARD FROM MR. GROSSMAN, WHO WAS ONE INVESTOR.  I

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                   9169

10:05AM   1    THINK THE POINTS WITH MR. GROSSMAN CAN BE SUMMARIZED FAIRLY

10:05AM   2    SUCCINCTLY.

10:05AM   3         FIRST, HE INVESTED WITH A LARGE TEAM OF PEOPLE.  THERE

10:05AM   4    WERE THREE PEOPLE WHO HAD A LOT OF EXPERIENCE IN THE AREAS THAT

10:06AM   5    HE WAS EVALUATING WITH THERANOS, INCLUDING DR. RABODZEY, WHO HE

10:06AM   6    TESTIFIED ABOUT WHO EVALUATED THERANOS'S TECHNOLOGY QUITE

10:06AM   7    CLOSELY.

10:06AM   8         MR. GROSSMAN'S INTERACTIONS WITH MS. HOLMES IN CONNECTION

10:06AM   9    WITH HIS INVESTMENT WERE, IN FACT, QUITE LIMITED.  HE HAD AN

10:06AM  10    HOUR INTRODUCTORY MEETING WITH MR. BALWANI AND MS. HOLMES IN

10:06AM  11    DECEMBER OF 2013.  HE TESTIFIED NOTHING REALLY CONFIDENTIAL WAS

10:06AM  12    DISCUSSED THERE BECAUSE HE HADN'T SIGNED A CONFIDENTIALITY

10:06AM  13    DISCLOSURE AGREEMENT.

10:06AM  14         HE HAD A MEETING ABOUT A MONTH LATER THAT LASTED ABOUT

10:06AM  15    90 MINUTES PERHAPS WITH MS. HOLMES, AND SHE LEFT.

10:06AM  16         AND THEN HE HAD A FOLLOW-ON MEETING WITH MR. BALWANI AND

10:06AM  17    OTHERS.

10:06AM  18         THOSE ARE THE ONLY TWO INTERACTIONS THAT MR. GROSSMAN HAD.

10:06AM  19         BUT IN THE PERIOD FOLLOWING THEREAFTER, MR. GROSSMAN'S

10:06AM  20    FIRM CONDUCTED NEARLY DAILY DUE DILIGENCE AND DAILY ANALYSIS AS

10:07AM  21    YOU WOULD EXPECT HIS BUSINESS, WHICH IS A HEDGE FUND, TO DO IN

10:07AM  22    CONNECTION WITH ITS INVESTMENT, AND THEN ULTIMATELY MADE THE

10:07AM  23    DECISION TO INVEST IN EARLY FEBRUARY OF 2014.

10:07AM  24         NOW, WHAT DID THEY LOOK AT IN THAT PERIOD AND WHAT DID

10:07AM  25    THEY KNOW ABOUT THERANOS?

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9170

10:07AM  1       WELL, THEY KNEW A LOT.  IN FACT, THEY REALLY KNEW ALMOST

10:07AM  2   EVERYTHING ABOUT THERANOS BEFORE THEY MADE A DECISION TO

10:07AM  3   INVEST.

10:07AM  4       YOU SAW THAT THEY LOOKED AT AND ANALYZED ALL OF THE

10:07AM  5   REGULATORY ISSUES, THEY LOOKED AT ALL OF THE ISSUES ABOUT THE

10:07AM  6   LAB INDUSTRY, THEY SPOKE TO MR. BALWANI ABOUT HOW MANUFACTURING

10:07AM  7   WOULD WORK, THEY TOURED THE CLIA LAB.

10:07AM  8       ALL OF THIS TOOK PLACE AFTER MS. HOLMES INTERACTED WITH

10:07AM  9   MR. GROSSMAN.  SHE DID NOT INTERACT WITH HIM AGAIN.  ALL OF

10:07AM 10   THAT KIND OF ANALYSIS.

10:07AM 11       AND THE OTHER THING THAT WE KNOW IS THAT DR. RABODZEY

10:07AM 12   ANALYZED THERANOS'S TECHNOLOGY.

10:08AM 13       HOW?  WITH THE INFORMATION THAT THERANOS GAVE HIM.  THEY

10:08AM 14   SAID, HERE IS OUR DATA IN CONNECTION WITH HOW OUR TESTS

10:08AM 15   PERFORM, AND HE LOOKED AT THAT AND DID THAT ANALYSIS IN DETAIL,

10:08AM 16   AND HE SAID, YOU KNOW, I THINK THIS DATA MAY NOT DEMONSTRATE AS

10:08AM 17   GOOD A PERFORMANCE AS YOU MIGHT EXPECT.

10:08AM 18       SO PFM, AS YOU RECALL, MR. GROSSMAN'S FIRM SAID, WELL,

10:08AM 19   WE'VE GOT TO FIND OUT MORE ABOUT THE TECHNOLOGY.

10:08AM 20       SO WITHOUT MS. HOLMES'S KNOWLEDGE, THEY REACHED OUT

10:08AM 21   THROUGH MR. GROSSMAN'S FATHER-IN-LAW TO TALK TO DR. ROBERTSON,

10:08AM 22   MS. HOLMES'S MENTOR FROM STANFORD WHO WAS A COLLEAGUE OF

10:08AM 23   MR. GROSSMAN'S FATHER-IN-LAW.

10:08AM 24       AND MR. GROSSMAN SPOKE WITH PROFESSOR ROBERTSON.  YOU SEE

10:08AM 25   HIM REPORTING HERE TO HIS COLLEAGUE THAT IN CONNECTION WITH

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

10:08AM   1    ASKING HIM ABOUT THE TECHNOLOGY, HE HAD A MIND BLOWING CALL

10:08AM   2    WITH ELIZABETH'S PROFESSOR WHO HELPED HER START THIS AND WHO

10:09AM   3    WAS AN ORIGINAL BOARD MEMBER.

10:09AM   4        AND THEN IF YOU LOOK AT THE NEXT SLIDE YOU SEE WHAT HE

10:09AM   5    REPORTS.

10:09AM   6        MR. ROBERTSON REPORTS THAT HE WAS TOLD -- I'M SORRY.

10:09AM   7        MR. GROSSMAN REPORTS THAT HE WAS TOLD BY DR. ROBERTSON

10:09AM   8    THAT THERE IS NO TECHNICAL RISK AT ALL IN THEIR CORE

10:09AM   9    TECHNOLOGY; THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS TO

10:09AM  10    MATCH A FULL MENU; THERE IS NOTHING THAT THE TECHNOLOGY CAN'T

10:09AM  11    DO.

10:09AM  12        MR. GROSSMAN OBVIOUSLY RELIED ON THAT INFORMATION AS HIS

10:09AM  13    EMAIL AND THE CONTEMPORANEOUS DOCUMENTS REFLECT.

10:09AM  14        BUT THAT IS NOT INFORMATION THAT CAME FROM MS. HOLMES OR

10:09AM  15    FROM ANYBODY THAT SHE DIRECTED TO PROVIDE THAT INFORMATION TO

10:09AM  16    HIM.

10:09AM  17        SO ONE ASSUMPTION THAT HE HAD WAS THIS TECHNOLOGY WAS VERY

10:09AM  18    GOOD, THE SAME ASSUMPTION THAT DR. ROBERTSON HAD AND THE SAME

10:09AM  19    ASSUMPTION THAT MS. HOLMES HAD.

10:09AM  20        HE ALSO MADE A BIG ASSUMPTION IN DECIDING TO INVEST, WHICH

10:10AM  21    WAS NOT UNCOMMON, HE ASSUMED THAT THERANOS WOULD BE THE NEXT

10:10AM  22    FACEBOOK OR THE NEXT TESLA OR THE NEXT GOOGLE.

10:10AM  23        THERANOS SAID, THIS IS HOW MUCH WE THINK WE'RE WORTH.  HE

10:10AM  24    VALUED THERANOS AT MANY TIMES WHAT THERANOS PERCEIVED ITSELF TO

10:10AM  25    BE WORTH.  AND THIS IS CLEARLY A BIG FACTOR AS YOU WILL RECALL

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9172

10:10AM  1    FROM HIS TESTIMONY.

10:10AM  2         HE ALSO, LIKE THE OTHER INVESTORS, FOCUSSED ON WALGREENS

10:10AM  3    AND THE WALGREENS RELATIONSHIP.

10:10AM  4         AND YOU KNOW THAT BECAUSE AS PART OF HIS INTERNAL

10:10AM  5    DISCUSSIONS WITH HIS HEDGE FUND, HE ENCOURAGED PARTNERS AND

10:10AM  6    FAMILY AND FRIENDS TO INVEST IN THERANOS, AND HE MADE THIS

10:10AM  7    PRESENTATION.

10:10AM  8         AND HOW THEY MADE THIS PRESENTATION TELLS YOU EVERYTHING

10:10AM  9    YOU NEED TO KNOW ABOUT WHAT WAS IMPORTANT TO PFM IN MAKING ITS

10:10AM 10    INVESTMENT.

10:10AM 11         HE DIDN'T TELL THE PEOPLE HE WAS ASKING TO INVEST ABOUT

10:10AM 12    WHAT THERANOS'S REVENUE WAS.  HE FOCUSSED ON WALGREENS AND THE

10:11AM 13    WALGREENS RELATIONSHIP.

10:11AM 14         AND HE TOLD THE INVESTORS THAT THERANOS WAS GOING TO ROLL

10:11AM 15    OUT IN WALGREENS STORES.

10:11AM 16         HE DIDN'T TELL THEM ABOUT THE NUMBER OF STORES THAT

10:11AM 17    THERANOS WAS IN, WHICH THERANOS HAD TOLD HIM.

10:11AM 18         HE DIDN'T TELL THEM ANYTHING ABOUT PFM'S INTERNAL DEBATE

10:11AM 19    REGARDING THE ACCURACY OF THE TECHNOLOGY.

10:11AM 20         AND HE DIDN'T MENTION ANYTHING ABOUT MILITARY PROGRAMS OR

10:11AM 21    PHARMACEUTICAL PROGRAMS AS A BASIS ON WHICH THEY SHOULD INVEST.

10:11AM 22         HE TOLD THEM ABOUT WALGREENS AND THE FACT THAT THERANOS

10:11AM 23    HAD A CONTRACT WITH WALGREENS BECAUSE THAT WAS WHAT MATTERED TO

10:11AM 24    HIM.

10:11AM 25         LET'S TALK NEXT ABOUT MR. MOSLEY WHO TESTIFIED.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9173

10:11AM  1        MR. MOSLEY, AS YOU'LL RECALL, WAS A LAWYER AT A LARGE

10:11AM  2    NEW YORK LAW FIRM WHO REPRESENTED MANY OTHERS WHO INVESTED IN

10:11AM  3    THERANOS, MANY OF THE WEALTHY FAMILIES OF THE COUNTRY:  THE

10:12AM  4    WALTON FAMILY, THE DEVOS FAMILY, ET CETERA.

10:12AM  5        HE WAS INTRODUCED TO THERANOS BY DR. KISSINGER, AND AFTER

10:12AM  6    HIMSELF BECOMING INTERESTED IN THERANOS, HE RECOMMENDED THAT

10:12AM  7    MANY OTHER PEOPLE INVEST IN THERANOS AS HIS TESTIMONY

10:12AM  8    DEMONSTRATED.

10:12AM  9        NOW, HOW DID THE GOVERNMENT PRESENT MR. MOSLEY'S DECISION

10:12AM  10   TO INVEST?

10:12AM  11       WELL, THEY SAID, IN ESSENCE, THAT MS. HOLMES SENT A SLIDE

10:12AM  12   DECK TO MR. MOSLEY, AND IN CONNECTION WITH THAT SLIDE DECK AND

10:12AM  13   THE PFIZER STUDY WHICH THEY SENT TO HIM AT THAT TIME, WHICH WAS

10:12AM  14   IN LATE AUGUST, EARLY SEPTEMBER, 60 DAYS LATER HE DECIDED TO

10:12AM  15   INVEST, AND THEY FOCUSSED DURING HIS DIRECT EXAMINATION ON

10:12AM  16   STATEMENTS AS PART OF THAT SLIDE DECK.

10:12AM  17       BUT WHAT REALLY HAPPENED WITH RESPECT TO MR. MOSLEY'S

10:12AM  18   INVESTMENT DECISION?

10:12AM  19       WELL, THERE WAS A HUGE AMOUNT OF ACTIVITY IN BETWEEN THE

10:13AM  20   DATE THAT MS. HOLMES SENT HIM THAT SLIDE DECK AND THE DATE THAT

10:13AM  21   HE ULTIMATELY DECIDED TO INVEST IN LATE OCTOBER.

10:13AM  22       HE TALKED TO MANY OF HIS CLIENTS WHO WERE ALSO INVESTING

10:13AM  23   IN THERANOS.  HE TALKED TO OTHERS WHO WERE KNOWLEDGEABLE ABOUT

10:13AM  24   THERANOS.  FOR EXAMPLE, HE TALKED TO DR. KISSINGER, HIS CLIENT.

10:13AM  25   HE TALKED TO THE LAWYER FOR THERANOS, MR. BOIES, WHO WAS HIS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

10:13AM  1    LONG-TIME FRIEND AND HIS FORMER LAW PARTNER.  HE TALKED TO HIS

10:13AM  2    CLIENTS FROM THE WALTON FAMILY WHO WERE ALSO EVALUATING WHETHER

10:13AM  3    TO INVEST AT THAT TIME.

10:13AM  4        HE LOOKED AT MANY ASPECTS OF THERANOS THAT HAD NOTHING TO

10:13AM  5    DO WITH THE POWERPOINT THAT THERANOS SENT TO HIM.

10:13AM  6        HE LOOKED AT THERANOS'S RELATIONSHIP WITH WALGREENS, OF

10:13AM  7    COURSE.

10:13AM  8        BUT HE ALSO LOOKED AT THE PATENT PORTFOLIO.

10:13AM  9        HE LOOKED AT THE JOHNS HOPKINS REPORT.

10:13AM 10        HE DID ALL KINDS OF DILIGENCE IN CONNECTION WITH HIS

10:13AM 11    DECISION TO INVEST.  HE WAS DOING MORE THAN LOOKING AT THE

10:13AM 12    POWERPOINT AND READING ARTICLES IN THE NEWSPAPER.

10:14AM 13        AND HE TESTIFIED WHEN HE CAME, LADIES AND GENTLEMEN, THAT

10:14AM 14    HE KNEW THERANOS WAS ONLY IN A FEW DOZEN WALGREENS STORES.  HE

10:14AM 15    KNEW THAT THERANOS USED COMMERCIAL DEVICES AS PART OF WHAT IT

10:14AM 16    DID.

10:14AM 17        HE KNEW THAT THERE WAS A TWO-PHASE MODEL.  HE KNEW THERE

10:14AM 18    WAS A PHASE I, PHASE II MODEL.

10:14AM 19        HE KNEW THAT THE PROJECTIONS WERE BASED ON SPECIFIC

10:14AM 20    ASSUMPTIONS AND THAT THEY MIGHT CHANGE.

10:14AM 21        AND HE KNEW THERE WAS NOT GOING TO BE PHARMACEUTICAL AND

10:14AM 22    MILITARY WORK.

10:14AM 23        HE KNEW EVERYTHING.

10:14AM 24        AND HE KNEW THAT AS A RESULT OF HIS INTERACTIONS WITH ALL

10:14AM 25    THESE OTHERS WHO WERE LOOKING TO INVEST IN THERANOS AT THE SAME

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                   9175

10:14AM   1    TIME.

10:14AM   2         AND BASED ON THAT KNOWLEDGE, HE WAS ENTHUSIASTIC ABOUT

10:14AM   3    THERANOS.

10:14AM   4         AND WHAT DID HE DO IN RESPONSE TO WHAT HE DID?  WELL, HE

10:14AM   5    DID WHAT HE REPORTED AT THE TIME.

10:14AM   6         AS YOU SAW IN THIS EMAIL, EXHIBIT 14135, HE SAID THAT HE

10:14AM   7    WAS RECOMMENDING THE INVESTMENT TO HIS CLIENTS.

10:15AM   8         AND A NUMBER OF THEM DID INVEST.  IN FACT, MR. MOSLEY MAY

10:15AM   9    HAVE BEEN THE MOST SIGNIFICANT FACTOR IN THE INVESTMENTS THAT

10:15AM   10   CONSTITUTED THE MOST AMOUNT OF MONEY THAT WERE INVESTED IN

10:15AM   11   THERANOS.  IF YOU WERE TO AGGREGATE THE CLIENTS OF MR. MOSLEY

10:15AM   12   THAT INVESTED IN THERANOS, THEIR TOTAL INVESTMENTS TOTALLED

10:15AM   13   MORE THAN $400 MILLION, AND YOU'LL RECALL FROM HIS TESTIMONY

10:15AM   14   HIS DISCUSSION OF HIS MANY INTERACTIONS WITH THOSE FAMILIES.

10:15AM   15        REMEMBER THAT THERANOS KNEW HE WAS THE LAWYER FOR THOSE

10:15AM   16   FAMILIES AND THEY SHARED WITH HIM ALL OF THE INFORMATION THAT I

10:15AM   17   JUST DESCRIBED TO YOU.

10:15AM   18        ASK YOURSELF IF ALL OF THESE INVESTORS KNEW THAT SAME

10:15AM   19   INFORMATION AND WHETHER THE INVESTMENT OF MR. MOSLEY OR OF

10:15AM   20   OTHERS WAS REALLY BASED, AS THE GOVERNMENT SUGGESTS, ON

10:15AM   21   ISOLATED STATEMENTS IN POWERPOINTS.

10:16AM   22        NOW, ANOTHER FEATURE OF MR. MOSLEY'S TESTIMONY AND, IN

10:16AM   23   FACT, OF THE NEXT INVESTOR I'LL DISCUSS, OR THE NEXT INDIVIDUAL

10:16AM   24   I'LL DISCUSS, MS. PETERSON, IS THAT THEY READ THE PARLOFF

10:16AM   25   ARTICLE.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9176

10:16AM   1        AND WE'VE TALKED ABOUT THE PARLOFF ARTICLE THUS FAR QUITE

10:16AM   2    A LOT, ABOUT MEDEVAC ISSUES, AND WE'VE TALKED ABOUT THE FACT

10:16AM   3    THAT MR. PARLOFF KNEW ABOUT THE PHASE I, PHASE II MODEL.  HE

10:16AM   4    KNEW ABOUT VENOUS TESTING.  HE KNEW THAT SMALL SAMPLES WERE

10:16AM   5    CURRENTLY BEING OFFERED, BUT THAT OTHER VENOUS TESTS WERE BEING

10:16AM   6    OFFERED IN THE CLIA LAB.  HE KNEW ALL OF THAT.

10:16AM   7        AND GIVEN ALL OF THOSE DISCLOSURES, IT'S HARD TO SAY THAT

10:16AM   8    MS. HOLMES WAS INTENDING TO DECEIVE MR. PARLOFF.  HE KNEW A LOT

10:16AM   9    ABOUT THERANOS'S BUSINESS.

10:16AM  10        BUT THE GOVERNMENT SAYS MS. HOLMES DID DECEIVE

10:16AM  11    MR. PARLOFF, AND THEY SUGGEST THIS BY FOCUSSING ON ONE SEGMENT

10:16AM  12    OF TAPE IN THE TEN HOURS OF TAPE THAT THERE ARE, WHICH WAS

10:17AM  13    PLAYED YESTERDAY BY MR. SCHENK.

10:17AM  14        AND THAT'S THE TAPE WHERE MR. PARLOFF AND MS. HOLMES HAVE

10:17AM  15    A CONVERSATION ABOUT WHAT THE LAP IS GOING TO LOOK LIKE IN

10:17AM  16    RESPONSE TO A REQUEST THAT HE MADE TO VISIT THE ARIZONA LAB.

10:17AM  17        WELL, I WANT TO TAKE A LOOK AT THAT BECAUSE THE

10:17AM  18    IMPLICATION OF THE GOVERNMENT IN CONNECTION WITH THE PARLOFF

10:17AM  19    TAPES IS THAT SHE DIDN'T TELL MR. PARLOFF THAT COMMERCIAL

10:17AM  20    DEVICES WERE BEING USED IN SOME CONTEXT IN CONNECTION WITH

10:17AM  21    THERANOS'S PROGRAM.

10:17AM  22        BUT SHE CLEARLY DID TELL HIM THAT BECAUSE WE SEE FROM THIS

10:17AM  23    SECTION OF TAPE THAT SHE SAYS TO HIM SOMETHING THAT I WILL

10:17AM  24    DECIPHER FOR YOU, WHICH SHE SAYS THAT THE LAB IN ARIZONA IS A

10:17AM  25    MODERATE, WILL BE A MODERATE COMPLEXITY LAB.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                        9177

10:17AM   1        A MODERATE COMPLEXITY LAB MEANS THAT IT DOESN'T USE THESE

10:18AM   2   PROPRIETARY DEVICES, OR THESE LDT'S.  IT NECESSARILY USES

10:18AM   3   DEVICES THAT COME FROM OTHER COMPANIES THAT ARE COMMERCIAL

10:18AM   4   DEVICES.

10:18AM   5        THAT DISCLOSURE TELLS MR. PARLOFF EVERYTHING THAT HE NEEDS

10:18AM   6   TO KNOW.

10:18AM   7        SO THIS DISCUSSION ABOUT VISITING THE LAB IN CALIFORNIA OR

10:18AM   8   ARIZONA, IF IT'S EVEN CLEAR WHAT THAT SNIPPET IS ABOUT, CLEARLY

10:18AM   9   ISN'T DESIGNED TO DECEIVE HIM ABOUT THE FACT THAT THERANOS WAS

10:18AM  10   USING COMMERCIAL MACHINES.

10:18AM  11        I ALSO SHOULD SAY THAT, YOU KNOW, ONE OF THE THEORIES THAT

10:18AM  12   I THINK THE GOVERNMENT HAS ABOUT THE PARLOFF ARTICLE IS THAT

10:18AM  13   MS. HOLMES HAD AN OBLIGATION TO TELL HIM EVERYTHING ABOUT THE

10:18AM  14   COMPANY SO THAT HE COULD WRITE A FULSOME DISCLOSURE OF ALL OF

10:18AM  15   THERANOS'S ACTIVITIES.

10:18AM  16        BUT HE TELLS READERS IN THE ARTICLE THAT THERE ARE THINGS

10:18AM  17   THAT THERANOS DID NOT DISCLOSE TO HIM.

10:19AM  18        AND WHEN THERANOS SENDS THAT ARTICLE AROUND, YOU'LL RECALL

10:19AM  19   THAT THE NOTE FROM THERANOS TO SHAREHOLDERS SAID THAT IT HAD

10:19AM  20   ONLY DISCLOSED A SELECTIVE AMOUNT OF INFORMATION TO HIM.

10:19AM  21        SO THIS IS NOT, THIS IS NOT A SITUATION WHERE THIS WAS

10:19AM  22   DESIGNED TO BE A FULSOME, FULSOME ARTICLE DESCRIBING ALL OF

10:19AM  23   THERANOS'S ACTIVITIES.

10:19AM  24        LET ME TALK ABOUT THE LAST INVESTOR, WHICH IS THE DEVOS

10:19AM  25   FAMILY.


                         UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                     9178

10:19AM  1        LISA PETERSON FROM THE DEVOS FAMILY TESTIFIED.  THE DEVOS

10:19AM  2   FAMILY INVESTED THROUGH THE RDV INVESTMENT, AND THE DEVOS

10:19AM  3   FAMILY MEMBERS ARE DESIGNATED IN THE SLIDE THAT I'M SHOWING

10:19AM  4   YOU, AND I'VE ASTERISKED THOSE MEMBERS OF THE INVESTMENT

10:19AM  5   COMMITTEE, THOSE MEMBERS OF THE FAMILY WHO ARE THE MEMBERS OF

10:19AM  6   THE INVESTMENT COMMITTEES, THAT IS DOUG DEVOS, DAN DEVOS,

10:20AM  7   DICK DEVOS, AND RICK DEVOS.

10:20AM  8        MR. MOSLEY WAS THE LAWYER FOR THE FAMILY AND TALKING TO

10:20AM  9   THEM ABOUT THE INVESTMENT AT THAT TIME.

10:20AM 10        BUT NO MEMBER OF THIS INVESTMENT COMMITTEE, NONE, CAME TO

10:20AM 11   THIS COURT AND TESTIFIED ABOUT WHY THE DEVOS FAMILY, THROUGH

10:20AM 12   ITS INVESTMENT VEHICLE, DECIDED TO MAKE THIS INVESTMENT,

10:20AM 13   WHETHER IT WAS BASED ON INFORMATION THAT THEY LEARNED FROM

10:20AM 14   THERANOS DIRECTLY, WHETHER IT WAS BASED ON INFORMATION THAT

10:20AM 15   THEY LEARNED FROM OTHERS.

10:20AM 16        BUT THE ONE THING THAT WE DO KNOW IS MS. PETERSON, WHO DID

10:20AM 17   COME AND TESTIFY, DID NOT PLAY A ROLE WITH REGARD TO THEIR

10:20AM 18   DECISION TO INVEST.

10:20AM 19        SHE DID WORK IN THE INVESTMENT GROUP, AND SHE DID REPORT

10:20AM 20   TO HER BOSS, JERRY TUBERGEN.  BUT SHE TESTIFIED THAT SHE DIDN'T

10:20AM 21   HAVE ANY AUTHORITY TO MAKE AN INVESTMENT DECISION.

10:20AM 22        SHE SAID SHE WAS NOT PART OF MR. TUBERGEN'S CONVERSATIONS

10:20AM 23   WITH THE INVESTMENT COMMITTEE OR PART OF CONVERSATIONS WITH

10:20AM 24   THEM AT ALL.

10:20AM 25        AND, IN FACT, WHAT THE RECORD REFLECTS IS THAT THE DEVOS

UNITED STATES COURT REPORTERS

9179

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

10:21AM  1    FAMILY -- YOU KNOW, HER CONTENTION DURING HER DIRECT TESTIMONY

10:21AM  2    WAS THAT SHE HAD WRITTEN A MEMO, AND THIS MEMO REFLECTED WHAT

10:21AM  3    WAS IMPORTANT TO THE DEVOS FAMILY'S DECISION TO INVEST.

10:21AM  4         BUT WE KNOW THAT THE DEVOS FAMILY HAD DECIDED TO INVEST

10:21AM  5    BEFORE THAT MEMO WAS EVER REVIEWED.

10:21AM  6         JUST TO REMIND YOU OF THE CHRONOLOGY, THERE WAS A HIGH

10:21AM  7    LEVEL MEETING AT THERANOS IN THE MIDDLE OF OCTOBER 2014 AND IT

10:21AM  8    WAS DESIGNED FOR THE DEVOS FAMILY MEMBERS TO UNDERSTAND

10:21AM  9    THERANOS.

10:21AM  10        AND AT THAT MEETING THE FAMILY SAID THAT THEY WOULD

10:21AM  11   COMMUNICATE -- THEY WOULD INVEST $100 MILLION ON THE SPOT AT

10:21AM  12   THAT MEETING BASED ON THAT MEETING.

10:21AM  13        AND YOU SAW DOCUMENTS WHICH REFLECTED THAT DECISION MIGHT

10:21AM  14   HAVE EVEN BEEN MADE A WEEK BEFORE THAT MEETING.

10:21AM  15        MS. PETERSON'S MEMO, WHICH WAS DRAFTED FOR THE INVESTMENT

10:21AM  16   COMMITTEE, WAS NOT DRAFTED, WE KNOW, UNTIL AFTER OCTOBER 20TH,

10:22AM  17   AT THE VERY LEAST.

10:22AM  18        AS YOU SEE IN THESE EMAILS, SHE SAID ON OCTOBER 20TH THAT

10:22AM  19   SHE'LL DOCUMENT SOMETHING FOR THE FILE.

10:22AM  20        AND THEN IN NOVEMBER SHE NOTES THAT SHE WON'T HAVE A

10:22AM  21   SIGNATURE ON THAT FOR A WHILE, EVEN THOUGH THE INVESTMENT

10:22AM  22   DECISION WAS MADE AT LEAST A FEW WEEKS BEFORE.

10:22AM  23        SO LET'S REVIEW THE INVESTORS AND WHY THEY INVESTED.  I

10:22AM  24   THINK THEY HAVE A FEW THINGS IN COMMON.

10:22AM  25        FIRST, AS I MENTIONED, THEY ALL SIGNED CONTRACTS WITH

10:22AM   1      THERANOS.  THEY WERE ALL INVOLVED WITH OTHERS WHO INVESTED.

10:22AM   2           THEY WERE ALL HEAVILY INFLUENCED BY THE WALGREENS

10:22AM   3      RELATIONSHIP.

10:22AM   4           THE LAST ISSUE WITH INVESTORS THAT I WANT TO TALK ABOUT IS

10:22AM   5      THIS ISSUE REGARDING REVENUE THAT MR. SCHENK MENTIONED

10:22AM   6      YESTERDAY AND MR. LEACH EXAMINED MS. HOLMES ABOUT YESTERDAY.

10:22AM   7           WHAT DOES THE GOVERNMENT ALLEGE?

10:23AM   8           THEY ALLEGE THAT MS. HOLMES REPRESENTED THAT THERANOS

10:23AM   9      WOULD GENERATE $100 MILLION IN REVENUES IN 2014 AND $990

10:23AM  10      MILLION IN 2015.

10:23AM  11           NOW, THE GOVERNMENT SAYS, WELL, THAT CAN'T HAVE BEEN MADE

10:23AM  12      IN GOOD FAITH BECAUSE THERANOS ONLY GENERATED VERY MODEST

10:23AM  13      REVENUES, ABOUT A FEW HUNDRED THOUSAND DOLLARS IN BOTH 2014 AND

10:23AM  14      2015.

10:23AM  15           WELL, THAT'S REALLY NOT AN ACCURATE PICTURE OF WHAT WAS

10:23AM  16      GOING ON INSIDE OF THERANOS OR ITS ACTIVITIES.

10:23AM  17           THERE'S NO QUESTION THAT THERANOS GENERATED HUNDREDS OF

10:23AM  18      MILLIONS OF DOLLARS IN CASH DURING THE PERIOD THAT WE'RE

10:23AM  19      CONCERNED ABOUT, AND IT CAME FROM CUSTOMERS.

10:23AM  20           IT WASN'T RECOGNIZED AS ACTUAL REVENUE, IT WAS DEFERRED

10:23AM  21      REVENUE.

10:23AM  22           AND YOU SEE HERE IN EXHIBIT 10685 THAT IT TOTALLED MORE

10:23AM  23      THAN $200 MILLION.

10:23AM  24           SO MONEY WAS COMING INTO THE COMPANY.  THE COMPANY WAS NOT

10:24AM  25      ONLY EARNING A FEW HUNDRED THOUSAND DOLLARS A YEAR.  IN FACT,

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9181

10:24AM  1    IT WAS EARNING AN ENORMOUS AMOUNT OF CASH DURING THIS PERIOD.

10:24AM  2        THE QUESTION THAT THE GOVERNMENT IS REALLY FOCUSSING YOU

10:24AM  3    ON, BUT I THINK IT'S REALLY NOT CENTRALLY WHAT IS GOING ON, IS,

10:24AM  4    WAS THAT REVENUE ACTUAL REVENUE OR WAS IT DEFERRED REVENUE?

10:24AM  5        WELL, WE KNOW WHAT THE INVESTORS KNEW ABOUT THAT BECAUSE

10:24AM  6    THEY WERE GIVEN BOTH THE BALANCE SHEET, WHICH REFLECTED THE

10:24AM  7    DEFERRED REVENUE, AND THEY WERE GIVEN THE REVENUE PROJECTIONS

10:24AM  8    FOR BOTH 2014 AND 2015.

10:24AM  9        IF YOU LOOK HERE, AS THE GOVERNMENT ALLEGES, THERANOS DID

10:24AM 10    PROJECT THEY WOULD HAVE $140 MILLION IN REVENUE IN 2014.  AND

10:24AM 11    THIS WAS PROVIDED TO MR. MOSLEY, FOR EXAMPLE, IN THE SUMMER OF

10:24AM 12    2014.

10:24AM 13        BUT WHAT WAS MR. MOSLEY TOLD AT THE SAME TIME?

10:25AM 14        THIS IS THE BALANCE SHEET.  AND HE WAS TOLD THAT THERANOS

10:25AM 15    HAD DEFERRED REVENUE OF ABOUT $168 MILLION AS OF THAT TIME.

10:25AM 16        SO THE QUESTION, IF YOU REALLY COMPARE THESE TWO

10:25AM 17    DOCUMENTS, IS WOULD THIS DEFERRED REVENUE BECOME ACTUAL REVENUE

10:25AM 18    BY THE END OF 2014?

10:25AM 19        NOW, THAT DECISION IS A DECISION THAT MS. HOLMES WOULD NOT

10:25AM 20    MAKE, COULD NOT MAKE, DID NOT MAKE.

10:25AM 21        AS YOU RECALL, MS. SPIVEY TESTIFIED THIS WAS A VERY

10:25AM 22    COMPLEX ACCOUNTING JUDGMENT.  SHE WAS TALKING TO THE OUTSIDE

10:25AM 23    ACCOUNTANTS FOR THERANOS ABOUT WHETHER THERANOS COULD RECOGNIZE

10:25AM 24    THAT REVENUE DURING THE COURSE OF 2014.

10:25AM 25        BUT WE DO KNOW WHAT MS. HOLMES BELIEVED, BECAUSE AS LATE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9182

10:25AM  1    AS DECEMBER OF 2014, MR. BALWANI TOLD MS. HOLMES THAT

10:25AM  2    $100 MILLION OF THAT AT LEAST WOULD BE -- $100 MILLION OF THIS

10:26AM  3    DEFERRED NUMBER WOULD BE RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM  4        NOW, IT WASN'T.  IT WASN'T FOR WHATEVER REASON, AND THE

10:26AM  5    RECORD IS NOT CLEAR ON THIS, THE ACCOUNTING JUDGMENT WAS MADE

10:26AM  6    THAT THIS CASH WHICH HAD COME INTO THE COMPANY IN TENS OF

10:26AM  7    MILLIONS OF DOLLARS SHOULD REMAIN DEFERRED REVENUE AND NOT BE

10:26AM  8    RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM  9        WE DON'T KNOW FROM THE RECORD WHY THAT IS.  WE DON'T KNOW

10:26AM 10    WHY MR. HOLMES -- OR WHY MR. BALWANI THOUGHT IT COULD BE

10:26AM 11    RECOGNIZED AS REVENUE IN 2014, AS LATE AS DECEMBER.

10:26AM 12        BUT WE DO KNOW THAT IT WAS NOT UNREASONABLE FOR

10:26AM 13    MS. HOLMES, WHEN SHE SAW THESE PROJECTIONS, TO BELIEVE THAT

10:26AM 14    THEY WERE AN ACCURATE STATEMENT OF WHAT WOULD HAPPEN IN 2014.

10:26AM 15        NOW, WHAT ABOUT THE 2015 NUMBER?

10:26AM 16        IN 2015 THE PROJECTION WAS THAT THE COMPANY WOULD MAKE

10:27AM 17    ABOUT $990 MILLION.

10:27AM 18        FIRST OF ALL, REMEMBER THE BACKDROP FOR THIS.  THE

10:27AM 19    BACKDROP FOR THIS IS THESE PROJECTIONS, WHICH WERE TALKING

10:27AM 20    ABOUT A FUTURE PERIOD, THE INVESTORS ARE TOLD THIS IS, THIS IS

10:27AM 21    SPECULATIVE, BUT WE'RE GIVING YOU AN ESTIMATE OF WHAT WE THINK

10:27AM 22    WOULD HAPPEN.  THAT WAS PART OF THE CONTRACT.

10:27AM 23        BUT AS WELL, THE INVESTORS WERE TOLD, HERE'S THE NUMBER OF

10:27AM 24    STORES WE'RE IN NOW, AND WE HAVE A BIG RISK, WHICH IS FOR THE

10:27AM 25    REVENUE NUMBERS TO BE ACHIEVED, WE'VE GOT TO EXPAND ACROSS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

10:27AM  1    WALGREENS STORES ACROSS THE COUNTRY.  WE'RE ASSUMING THAT WE

10:27AM  2    WILL GET TO CERTAIN NUMBERS OF WALGREENS STORES.

10:27AM  3        NOW, MS. HOLMES INTERACTED WITH, FOR EXAMPLE, MS. PETERSON

10:27AM  4    ON A VERY LIMITED BASIS, BUT YOU COULD SEE FROM MS. PETERSON'S

10:27AM  5    OWN NOTES THAT MS. HOLMES IS SAYING TO HER, WE HAVE THESE

10:27AM  6    CONTRACTS TO BE IN WALGREENS STORES, BUT OUR RISK IS, CAN WE

10:28AM  7    EXECUTE ON THAT?

10:28AM  8        THERE WASN'T ANY SECRET ABOUT THAT AS PART OF THESE

10:28AM  9    CONVERSATIONS.  PEOPLE KNEW THAT.  AND THEY HAD TO EXPAND FROM

10:28AM  10   THE NUMBER OF STORES THAT THEY WERE IN CURRENTLY, WHICH WAS 30

10:28AM  11   OR SO, TO 900 STORES TO ACHIEVE THESE RESULTS.  THAT WAS ALL

10:28AM  12   KNOWN AND THEY KNEW THAT THERANOS WOULD HAVE TO EXECUTE TO DO

10:28AM  13   THAT.

10:28AM  14       TESTIMONY OF MR. MOSLEY ACKNOWLEDGED HE KNEW THAT,

10:28AM  15   MR. GROSSMAN ACKNOWLEDGED THAT HE KNEW THAT.  YOU KNOW, THERE

10:28AM  16   ARE A LOT OF FACTORS THAT GO INTO THIS.

10:28AM  17       BUT THE NUMBERS THAT WERE BEING GIVEN WERE BASED ON A

10:28AM  18   PROJECTION OF WHAT WOULD HAPPEN.  THOSE NUMBERS WERE BEING

10:28AM  19   PLACED IN A MODEL THAT MR. BALWANI PREPARED AND CONTROLLED.

10:28AM  20       IT'S VERY DIFFICULT TO SAY THAT MS. HOLMES HAD BAD INTENT

10:28AM  21   WITH REGARD TO THAT WHEN THE RISKS ASSOCIATED WITH IT ARE BEING

10:28AM  22   DISCLOSED.

10:28AM  23       AND WE ALSO KNOW THAT IN TERMS OF PREPARING THESE

10:29AM  24   FINANCIAL PROJECTIONS, THIS WAS NOT MS. HOLMES'S PROVINCE.

10:29AM  25   THIS WAS WORK THAT WAS DONE BY MR. BALWANI.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9184

10:29AM   1        WE KNOW FROM CONTEMPORANEOUS EMAILS THAT WHEN THE COMPANY

10:29AM   2   NEEDED REVENUE PROJECTIONS, THAT MS. HOLMES GOT THEM FROM

10:29AM   3   MR. BALWANI, AND I THINK MR. SCHENK ACKNOWLEDGED THAT

10:29AM   4   YESTERDAY.

10:29AM   5        AND ONE LAST ISSUE, WHICH MR. LEACH ASKED MS. HOLMES ABOUT

10:29AM   6   ON CROSS-EXAMINATION, IS THERE WERE DIFFERENT REVENUES GIVEN IN

10:29AM   7   CONNECTION WITH A DIFFERENT ISSUE AT THERANOS, THE SO-CALLED

10:29AM   8   ARANCA ANALYSIS, WHICH THE REVENUE NUMBER WAS PROJECTED TO BE A

10:29AM   9   LOWER NUMBER.

10:29AM  10        THE GOVERNMENT MAY, IN ITS REBUTTAL TO ME, MAKE A BIG DEAL

10:29AM  11   ABOUT THAT.  I DON'T KNOW.

10:29AM  12        BUT I WOULD SAY TO YOU THAT MS. HOLMES TESTIFIED, AND THIS

10:29AM  13   WAS NOT EXPLORED WITH HER ON CROSS-EXAMINATION IN ANY DETAIL,

10:29AM  14   THAT THINGS WERE DONE FOR DIFFERENT PURPOSES.

10:29AM  15        THESE ANALYSES DID NOT HAVE THE SAME PURPOSES WITHIN THE

10:30AM  16   COMPANY, AND THAT THESE PROJECTIONS, BOTH PROJECTIONS AS TO

10:30AM  17   WHAT THE COMPANY WOULD EARN FOR THE NEXT YEAR, WHICH WERE

10:30AM  18   SHARED WITH THE BOARD, AS WAS THE OTHER NUMBER, AND SHE WAS

10:30AM  19   VERY TRANSPARENT WITH DIRECTORS ABOUT BOTH OF THOSE NUMBERS.

10:30AM  20        LET ME TALK LAST ON THE INVESTORS ABOUT THE ISSUE OF

10:30AM  21   DEMONSTRATIONS, AND I'LL REALLY ONLY TALK BRIEFLY ABOUT THIS

10:30AM  22   SUBJECT, AND I'LL ASK YOU TO KEEP A FEW THINGS IN MIND IN

10:30AM  23   CONNECTION WITH DEMONSTRATIONS.

10:30AM  24        OBVIOUSLY THERE WERE THOUSANDS OF DEMONSTRATIONS I THINK

10:30AM  25   MS. HOLMES TESTIFIED OVER TIME.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9185

10:30AM  1      AND SOME OF THE MOST IMPORTANT CONCEPTS IN CONNECTION WITH

10:30AM  2   THOSE RELATE TO THE TESTIMONY OF MR. EDLIN AND MS. HOLMES'S OWN

10:30AM  3   TESTIMONY.

10:30AM  4      FIRST OF ALL, MR. EDLIN TESTIFIED THAT HE HAD COORDINATED

10:30AM  5   THE LOGISTICS; THAT ALL OF THE SCIENTIFIC WORK DONE IN

10:30AM  6   CONNECTION WITH DEMONSTRATIONS WAS DONE BY DR. YOUNG; THAT

10:31AM  7   MANY, MANY PEOPLE INSIDE OF THERANOS WERE INVOLVED IN THESE

10:31AM  8   DEMONSTRATIONS, WHICH ARE PORTRAYED AS BEING EFFORTS TO DECEIVE

10:31AM  9   PEOPLE.

10:31AM  10      MR. EDLIN THOUGHT OTHERWISE.  HE THOUGHT THE PURPOSE OF

10:31AM  11  THIS WAS TO SHOWCASE THERANOS'S TECHNOLOGY AND TO SHOW THIS IS

10:31AM  12  HOW THE DEVICE OR OTHER TECHNOLOGY AT THERANOS WORKS.

10:31AM  13      WHEN I, WHEN I ASKED HIM ON CROSS-EXAMINATION, WERE YOU

10:31AM  14  INVOLVED IN AN EFFORT TO DECEIVE PEOPLE?  HE SAID OF COURSE

10:31AM  15  NOT, THAT HE WAS -- AND HE DID NOT HAVE ANY IMPRESSION THAT

10:31AM  16  ANYBODY AT THERANOS WAS TRYING TO DECEIVE PEOPLE IN CONNECTION

10:31AM  17  WITH THESE DEMONSTRATIONS AND HOW THEY WERE CONDUCTED.

10:31AM  18      AND THERE REALLY WERE DIFFERENT KINDS OF DEMONSTRATIONS.

10:31AM  19  AS YOU KNOW, THERE WAS A PHASE I AND PHASE II AS PART OF

10:31AM  20  THERANOS'S RELATIONSHIP WITH WALGREENS.

10:31AM  21      SOME OF THE DEMONSTRATIONS SHOWED HOW PHASE I WORKED SO

10:32AM  22  THAT BLOOD WOULD BE DRAWN FROM THE PERSON GETTING THE

10:32AM  23  DEMONSTRATION.  IT WOULD BE PUT INTO A BOX AND TRANSPORTED BACK

10:32AM  24  TO THE CENTRAL LAB.

10:32AM  25      OTHER TIMES THE DEVICE WOULD BE PROCESSED -- THE SAMPLES

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9186

10:32AM   1    WOULD BE PROCESSED ON THE DEVICE IN THE ROOM.  SOMETIMES PEOPLE

10:32AM   2    WANTED TO GIVE THEIR BLOOD.  SOMETIMES PEOPLE DIDN'T.  THEY

10:32AM   3    JUST WANTED TO SEE HOW THE MACHINE WORKED.  THERE WERE ALL

10:32AM   4    SORTS OF PERMUTATIONS ABOUT THIS.

10:32AM   5         BUT YOU'VE SEEN FROM THE RECORD WHAT HAPPENED.

10:32AM   6         THERE'S BEEN TESTIMONY ABOUT MR. RAGO AND HIS

10:32AM   7    DEMONSTRATION.  IN CONNECTION WITH HIS DEMONSTRATION, HIS BLOOD

10:32AM   8    SAMPLE WAS TAKEN FROM HIM AND IT WAS TAKEN TO THE CENTRAL LAB.

10:32AM   9         THE GOVERNMENT IMPLIED THAT THAT WAS DECEPTIVE.  BUT, IN

10:32AM  10    FACT, HE REPORTED IN THE ARTICLE THAT BLOOD WAS ANALYZED AT

10:32AM  11    THERANOS IN A CENTRAL LAB.  HE DIDN'T WATCH IT BEING ANALYZED

10:32AM  12    ON THE DEVICE.

10:32AM  13         AND AS TO PEOPLE WHO DIDN'T WANT A BLOOD SAMPLE TAKEN FROM

10:32AM  14    THEM, WHICH HAPPENED, AND I THINK YOU SAW EVIDENCE ABOUT THAT,

10:33AM  15    A PROTOCOL WAS DEVELOPED SO THAT YOU COULD SEE HOW THE

10:33AM  16    TECHNOLOGY WORKED FROM THE BEGINNING TO THE END.

10:33AM  17         WHY?  BECAUSE IF YOU PUT A SAMPLE INTO THIS DEVICE AND IT

10:33AM  18    DIDN'T HAVE BLOOD IN IT, THE DEVICE FAILED AND THE PERSON

10:33AM  19    RECEIVING THE DEMONSTRATION WOULDN'T SEE HOW THE DEVICE WORKED.

10:33AM  20         SO WHY DID THERANOS DEVELOP A NULL PROTOCOL?  MR. EDLIN

10:33AM  21    TOLD YOU.  BECAUSE PEOPLE WANTED TO SEE A DEMONSTRATION WITHOUT

10:33AM  22    GIVING A BLOOD SAMPLE, AND THIS ALLOWED THE DEVICE TO FUNCTION

10:33AM  23    WITHOUT BLOOD BEING ACTUALLY DRAWN AND ANALYZED.

10:33AM  24         NOW, THE REPORTS THAT WERE DONE IN CONNECTION WITH

10:33AM  25    DEMONSTRATIONS, THEY MADE CLEAR THAT THEY WERE ONLY TECHNOLOGY

UNITED STATES COURT REPORTERS

**ER-12766**

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9187

10:33AM   1   DEMONSTRATIONS.  THESE WEREN'T USED FOR CLINICAL TREATMENT OF

10:33AM   2   PATIENTS.  YOU SEE THAT ON EVERY FORM AT THE TOP WHERE THE

10:33AM   3   DEMONSTRATIONS WERE DESCRIBED AS TECHNOLOGY DEMONSTRATIONS.

10:33AM   4       SCIENTISTS WERE INVOLVED IN ALL OF THESE PROCESSES AND

10:34AM   5   THEY DETERMINED WHAT THE FINAL RESULTS WOULD BE.

10:34AM   6       YOU SAW EXTENSIVE TESTIMONY FROM MR. EDLIN AND FROM

10:34AM   7   MS. HOLMES ABOUT DR. YOUNG'S OVERSEEING THESE PROCESSES AND

10:34AM   8   MANAGING HOW THE RESULTS WERE REPORTED SO THAT THEY WOULD BE

10:34AM   9   CONSISTENT WITH ACCURATE VIEWS OF WHAT PATIENT'S BLOOD RESULTS

10:34AM  10   WERE.

10:34AM  11       ALL OF THAT, LADIES AND GENTLEMEN, IS THE CONTEXT AROUND

10:34AM  12   THESE DEMONSTRATIONS.  OBVIOUSLY THERE ARE THOUSANDS OF

10:34AM  13   DEMONSTRATIONS, BUT I WOULD ASK YOU TO BEAR IN MIND TESTIMONY

10:34AM  14   THAT NO ONE WAS TRYING TO DECEIVE PEOPLE, THAT THE PROCESS WAS

10:34AM  15   MANAGED BY SCIENTISTS, AND THAT THE DEMONSTRATIONS HAVE

10:34AM  16   DIFFERENT PURPOSES.

10:34AM  17       SO DON'T ASSUME THAT IF YOU SEE SOMETHING IN A

10:34AM  18   DEMONSTRATION WITH BLOOD BEING TAKEN OUT OF A ROOM, IT MEANS

10:34AM  19   THAT SOMETHING UNTOWARD IS HAPPENING.

10:34AM  20       NOW, I WANT TO MOVE FROM THERE TO TALKING ABOUT THE OTHER

10:34AM  21   CONSPIRACY THAT IS ALLEGED WHICH RELATES TO THERANOS PATIENTS.

10:35AM  22       AND THE ALLEGATIONS HERE, OF COURSE, AS YOU KNOW, IS THAT

10:35AM  23   THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING

10:35AM  24   ACCURATE AND RELIABLE RESULTS.

10:35AM  25       WELL, I WOULD ASK YOU, IN CONNECTION WITH THIS, TO JUST

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9188

10:35AM   1      BEAR IN MIND THAT THE LAB WAS MANAGED BY A LAB DIRECTOR, AND

10:35AM   2      THERE ARE PROCESSES THAT WERE ESTABLISHED IN THE LAB, AND THAT

10:35AM   3      THESE INFORM MS. HOLMES'S INTENT.

10:35AM   4           THE LENS THROUGH WHICH YOU REALLY WANT TO LOOK, I THINK,

10:35AM   5      AT THIS PATIENT CASE IS THAT THERE'S A PROCESS GOING ON IN THE

10:35AM   6      LAB.

10:35AM   7           AND ASK YOURSELF THE QUESTION, WAS MS. HOLMES'S INTENT

10:35AM   8      WITH RESPECT TO WHAT WAS GOING ON IN THE LAB, WAS IT IN GOOD

10:35AM   9      FAITH?  DID SHE BELIEVE THAT THE TESTS THAT WERE BEING OFFERED

10:35AM   10     WERE ACCURATE AND RELIABLE?

10:35AM   11          IF SHE DID, WHY DID SHE BELIEVE IT?

10:36AM   12          WELL, AS YOU COULD GLEAN FROM THE CROSS-EXAMINATION OF

10:36AM   13     DR. ROSENDORFF, SHE REALLY SAW SIX THINGS WHEN SHE LOOKED AT

10:36AM   14     THE LAB.

10:36AM   15          FIRST, SHE SAW THAT DR. ROSENDORFF WAS RESPONSIBLE FOR

10:36AM   16     DETERMINING WHAT TESTS AND WHAT METHODS WERE APPROPRIATE FOR

10:36AM   17     TESTING.

10:36AM   18          RECALL THAT DR. ROSENDORFF WAS THE LAB DIRECTOR AT

10:36AM   19     THERANOS FROM THE TIME THE LAB OPENED UNTIL ABOUT NOVEMBER OF

10:36AM   20     2014.  HE TESTIFIED LONGER THAN ANY OTHER WITNESS IN THE CASE

10:36AM   21     OTHER THAN MS. HOLMES.

10:36AM   22          HE WAS A HIGHLY QUALIFIED LAB DIRECTOR.  HE HAD BEEN IN A

10:36AM   23     SIMILAR POSITION AS PART OF THE CHILDREN'S HOSPITAL IN

10:36AM   24     PITTSBURGH, AND HE WAS A VERY IMPRESSIVE CANDIDATE.

10:37AM   25          THE FIRST THING HE DID WAS HE SAID WE, WE DETERMINED WHICH

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9189

10:37AM   1    TESTS WE SHOULD OFFER, WHETHER IT SHOULD BE ON A THERANOS

10:37AM   2    DEVICE OR SOME OTHER DEVICE.

10:37AM   3         THAT HAPPENED, IN FACT, AT THERANOS, AND IT WAS REQUIRED

10:37AM   4    BY LAW AS YOU SAW IN CONNECTION WITH SOME OF THE DOCUMENTS

10:37AM   5    INTRODUCED IN THE CASE.

10:37AM   6         THE LAB DIRECTOR DECIDES WHAT SYSTEMS ARE USED, WHAT TESTS

10:37AM   7    ARE USED IN CONNECTION.

10:37AM   8         HE TESTIFIED THAT THAT IS, IN FACT, WHAT HAPPENED.  IT WAS

10:37AM   9    NOT MS. HOLMES'S RESPONSIBILITY, IT WAS HIS RESPONSIBILITY.

10:37AM   10        SECOND, IN CONNECTION WITH EVERY TEST THAT WAS OFFERED IN

10:37AM   11   THE THERANOS LAB, IT WOULD NOT BE OFFERED, ACCORDING TO

10:37AM   12   DR. ROSENDORFF'S TESTIMONY, UNLESS HE SIGNED A VALIDATION

10:37AM   13   REPORT FOR IT.

10:37AM   14        AND WHAT DID THAT MEAN?  WELL, IT MEANT THAT HE WENT

10:37AM   15   THROUGH A PROCESS BEFORE THAT TEST WAS OFFERED OF DETERMINING

10:37AM   16   WHETHER THE TEST WAS ACCURATE AND RELIABLE FOR PURPOSES OF

10:37AM   17   PATIENT USE.  IT WAS A LONG PROCESS WITH MULTIPLE STEPS.  THE

10:38AM   18   REPORT WOULD BE SIGNED.  THERE WOULD BE PROCEDURES THAT WOULD

10:38AM   19   BE CREATED TO MAKE SURE THAT THE PROCESSES WERE BEING ADHERED

10:38AM   20   TO.  THERE WOULD BE TRAINING IN THE LAB, ET CETERA, THE THINGS

10:38AM   21   THAT YOU WOULD EXPECT.

10:38AM   22        DR. ROSENDORFF TESTIFIED THAT WITH REGARD TO EVERY TEST

10:38AM   23   OFFERED IN THE THERANOS LAB, HE SIGNED THESE VALIDATION

10:38AM   24   REPORTS.

10:38AM   25        YOU HEARD LENGTHY TESTIMONY ABOUT THAT AS PART OF BOTH OF

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9190

10:38AM   1    HIS EXAMINATIONS.

10:38AM   2         NOW, I WANT TO DIVERT FROM THIS DISCUSSION TO TALK ABOUT

10:38AM   3    ONE ISSUE, WHICH IS THAT SOME OF THE WITNESSES THAT THE

10:38AM   4    GOVERNMENT OFFERED, THEY TESTIFIED IN A MANNER THAT IN SOME

10:38AM   5    WAYS IS A LITTLE BIT IN TENSION WITH WHAT DR. ROSENDORFF

10:38AM   6    TESTIFIED, BECAUSE WHILE DR. ROSENDORFF TESTIFIED THAT HE

10:38AM   7    VALIDATED EVERY TEST THAT WAS OFFERED, YOU RECALL THAT

10:39AM   8    MS. GANGAKHEDKAR EARLIER IN THE CASE SAID THAT SHE HAD CONCERNS

10:39AM   9    ABOUT THE TESTS THAT WOULD BE OFFERED IN THERANOS'S CLINICAL

10:39AM  10    LAB, AND SHE LEFT IN RESPONSE TO THOSE.

10:39AM  11         SO I WANT TO GIVE YOU THE FULL PICTURE IN REGARD TO THAT

10:39AM  12    ISSUE.

10:39AM  13         MS. GANGAKHEDKAR LEFT THE COMPANY, AFTER WORKING THERE FOR

10:39AM  14    YEARS AND YEARS, IN SEPTEMBER OF 2013.  AND SHE SAID, YOU KNOW,

10:39AM  15    AT THE TIME I HAD CONCERNS ABOUT SOME OF THE ASSAYS.  SHE HAD

10:39AM  16    LED THE IMMUNOASSAY TEAM AND SHE WAS -- SHE TESTIFIED, I THINK,

10:39AM  17    AS WELL, AS YOU SAW ON CROSS-EXAMINATION, THAT SHE WAS PROUD OF

10:39AM  18    THE WORK, BUT SHE HAD SOME CONCERNS ABOUT THE ASSAY.

10:39AM  19         WELL, LET'S LOOK AT WHAT THE CONTEMPORANEOUS DOCUMENTS

10:39AM  20    REFLECT.

10:39AM  21         HER COMMUNICATIONS WITH MS. HOLMES WERE FRIENDLY.  SHE

10:39AM  22    WISHED THE COMPANY TREMENDOUS SUCCESS AS A RESULT OF HER

10:40AM  23    DEPARTURE AND SHE WAS PROUD OF THE WORK THAT SHE HAD DONE.

10:40AM  24         ALSO, WE KNOW THAT MS. HOLMES WAS TOLD THAT

10:40AM  25    MS. GANGAKHEDKAR WAS LEAVING BECAUSE OF HEALTH REASONS, FAMILY

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                       9191

10:40AM   1      REASONS, STRESS REASONS, ET CETERA.

10:40AM   2          SO THE CONTEMPORANEOUS RECORDS DIDN'T QUITE MATCH

10:40AM   3      MS. GANGAKHEDKAR'S TESTIMONY, BUT THAT REALLY IS A SIDE ISSUE

10:40AM   4      BECAUSE WHAT YOU SEE FROM MS. GANGAKHEDKAR'S REPORT IS ACTUALLY

10:40AM   5      MS. HOLMES'S GOOD FAITH.

10:40AM   6          MS. GANGAKHEDKAR TESTIFIED, I WENT TO MS. HOLMES AND SAID

10:40AM   7      I'M CONCERNED ABOUT ASSAYS BEING VALIDATED.  I'VE BEEN RAISING

10:40AM   8      THESE ISSUES TO MR. BALWANI.

10:40AM   9          YOU'LL RECALL THAT THERE WAS A VERY UNPLEASANT EXCHANGE

10:40AM  10      BETWEEN MR. BALWANI AND MS. GANGAKHEDKAR AS TO HER WORK ETHIC

10:40AM  11      WITH FAIRLY SERIOUS CRITICISM OF HER ON MR. BALWANI'S PART.

10:41AM  12      THAT WAS IN EXHIBIT 3961.

10:41AM  13          AND SHE WENT TO MS. HOLMES AND SAID, I'M CONCERNED, I'M

10:41AM  14      LEAVING THE COMPANY.

10:41AM  15          AND MS. HOLMES'S REACTION WAS NOT, IF YOU'RE EXPRESSING

10:41AM  16      CONCERNS, YOU'RE FIRED.  I HAVE A SIMILAR REACTION, I'M

10:41AM  17      CRITICAL OF YOU.

10:41AM  18          MS. HOLMES SAID, WELL, IF YOU'RE STRESSED AND IF YOU HAVE

10:41AM  19      HEALTH ISSUES, WHY DON'T YOU JUST TAKE A LEAVE OF ABSENCE?

10:41AM  20      DON'T LEAVE THE COMPANY.  TAKE TIME OFF UNTIL YOUR HEALTH

10:41AM  21      PROBLEMS HAVE BEEN RESOLVED AND THEN COME BACK WHEN YOU'RE

10:41AM  22      READY TO COME BACK.

10:41AM  23          WHAT DOES ALL OF THAT MEAN AS TO WHAT THE GOVERNMENT'S

10:41AM  24      EVIDENCE MEANS ON THAT?

10:41AM  25          WELL, FIRST OF ALL, IT MEANS THAT MS. HOLMES WAS NOT

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9192

10:41AM   1    TRYING TO SUPPRESS ANY CONCERNS THAT WERE BEING RAISED BY

10:41AM   2    MS. GANGAKHEDKAR.

10:41AM   3        MS. HOLMES WAS REACTING TO THAT IN A VERY HUMAN WAY AND

10:41AM   4    SAYING, COME BACK AND WORK WITH US.

10:41AM   5        BUT ALSO IN RESPONSE TO THE CONCERNS THAT MS. GANGAKHEDKAR

10:41AM   6    RAISED, WHAT WE KNOW IS THAT NO, NO ASSAY, NO TEST WAS EVER

10:42AM   7    OFFERED IN THE THERANOS CLIA LABORATORY IN 2013 AND 2014 THAT

10:42AM   8    DR. ROSENDORFF DIDN'T ULTIMATELY SIGN OFF ON.

10:42AM   9        THE EVIDENCE DURING HIS TESTIMONY SHOWED THAT THERE WERE

10:42AM  10    ASSAYS ON WHICH THERANOS DELAYED THE DECISION TO USE TESTS ON

10:42AM  11    EITHER THE EDISON OR ON THE MODIFIED MACHINES BECAUSE THERE

10:42AM  12    WERE CONCERNS.

10:42AM  13        BUT THE LAUNCH OF THOSE TESTS WAS DELAYED UNTIL AFTER

10:42AM  14    THOSE CONCERNS HAD BEEN RESOLVED TO DR. ROSENDORFF'S

10:42AM  15    SATISFACTION.

10:42AM  16        SO I'LL SAY TWO THINGS ABOUT MS. GANGAKHEDKAR'S TESTIMONY.

10:42AM  17        FIRST, NOTHING ABOUT IT SHOWS THAT MS. HOLMES WAS TRYING

10:42AM  18    TO EXPRESS CONCERNS OR DISMISS CONCERNS OR ANYTHING LIKE THAT.

10:42AM  19        BUT SECOND, ANY CONCERN SHE RAISED WAS, IN MS. HOLMES'S

10:43AM  20    MIND, RESOLVED BY DELAY OF ANY ASSAYS UNTIL THOSE CONCERNS

10:43AM  21    COULD BE EVALUATED AND RESOLVED BY DR. ROSENDORFF AND OTHERS

10:43AM  22    WORKING IN THE CLIA LAB.

10:43AM  23        NOW, THE IMPLICATION OF WHAT DR. ROSENDORFF ULTIMATELY

10:43AM  24    TESTIFIED TO WAS THAT HE WAS UNCOMFORTABLE WITH TESTS THAT WERE

10:43AM  25    BEING OFFERED BY THERANOS.

UNITED STATES COURT REPORTERS

**ER-12772**

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                     9193

10:43AM   1        BUT HE ACTUALLY TESTIFIED TO JUST THE OPPOSITE.  HE SAID

10:43AM   2   THAT HE COULDN'T RECALL EVER PUTTING A SIGNATURE ON A

10:43AM   3   VALIDATION REPORT WHERE HE THOUGHT THAT ASSAY WASN'T

10:43AM   4   APPROPRIATE FOR PATIENT USE.

10:43AM   5        SO I THINK THAT, YOU KNOW, THE THIRD FOUNDATIONAL POINT

10:43AM   6   HERE IS THAT NOT ONLY DID HE APPROVE ALL OF THE TESTS THAT WERE

10:43AM   7   OFFERED, BUT HE WAS COMFORTABLE SIGNING THE APPROVALS FOR THOSE

10:43AM   8   TESTS TO BE OFFERED IN THE CLIA LAB.

10:43AM   9        NEXT I THINK, AND IMPORTANTLY, REMEMBER THAT HE

10:44AM  10   ACKNOWLEDGED THAT HE NEVER CAME TO A CONCLUSION THAT THE 3.5

10:44AM  11   DEVICE THAT REFLECTED -- WAS TESTING ASSAYS IN THE THERANOS LAB

10:44AM  12   WAS ITSELF UNRELIABLE.  HE NEVER CAME TO THAT CONCLUSION.  AND

10:44AM  13   HIS BEHAVIOR AT THE TIME REFLECTED THAT.

10:44AM  14        HE CONTINUED TO APPROVE THE USE OF THAT DEVICE TO TEST

10:44AM  15   PATIENTS IN THE CLIA LAB UP UNTIL ALMOST HIS DEPARTURE.

10:44AM  16        YOU SEE THAT HE'S APPROVING THEM AS LATE AS SEPTEMBER OF

10:44AM  17   2014.  HE LEFT THE COMPANY WITHIN ABOUT 60 DAYS OF THAT.

10:44AM  18        SO THE SUGGESTION THAT HE IN SOME SENSE WAS FUNDAMENTALLY

10:44AM  19   UNCOMFORTABLE WITH THE EDISON DEVICE OR WITH OTHER ELEMENTS OF

10:44AM  20   THERANOS'S TECHNOLOGY IS NOT SUPPORTED BY THE RECORD.

10:44AM  21        FIFTH, HE TESTIFIED THAT IN EVERY INSTANCE HE FOLLOWED THE

10:44AM  22   CLIA REGULATIONS.  THERE WERE NO DEVIATIONS FROM WHAT WAS

10:45AM  23   REQUIRED.  HE SAID THAT DIRECTLY UNDER OATH.

10:45AM  24        AND LAST, AND THIS REALLY ADDRESSES MOST OF THE

10:45AM  25   GOVERNMENT'S CASE, HE SAYS THAT, YES, ISSUES CAME UP IN THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9194

10:45AM   1     CLIA LAB.

10:45AM   2           WE SAW SOME OF THOSE INSTANCES YESTERDAY IN EMAILS THAT

10:45AM   3     MR. SCHENK SHOWED YOU.

10:45AM   4           BUT HE SAID IN RESPONSE TO THAT, THERANOS THOROUGHLY

10:45AM   5     INVESTIGATED THOSE ISSUES.

10:45AM   6           AND I WANT TO RUN THROUGH A FEW OF THOSE WITHOUT GETTING

10:45AM   7     INTO THE PARTICULARS, BUT JUST GIVING YOU SOME GUIDEPOSTS TO

10:45AM   8     LOOK AT THOSE ISSUES IF THEY'RE OF CONCERN TO YOU IN CONNECTION

10:45AM   9     WITH DELIBERATING.

10:45AM  10           LET ME TALK ABOUT SOME OF THE INDIVIDUALS WHO YOU SAW WHO

10:45AM  11     RAISED CONCERNS, AND THEN I'LL TALK ABOUT SOME OF THE TESTS

10:45AM  12     THAT MR. SCHENK MENTIONED YESTERDAY.

10:45AM  13           FIRST, YOU HEARD TESTIMONY FROM MS. CHEUNG, WHO TESTIFIED

10:45AM  14     EARLIER IN THE CASE, THAT SHE HAD SOME CONCERNS AS THE RESULT

10:45AM  15     OF A QUALITY CONTROL EXPERIMENT THAT WAS UNDERTAKEN IN THE CLIA

10:46AM  16     LAB.

10:46AM  17           WELL, THE EVIDENCE IN THE CASE ON THIS IS VERY CLEAR.

10:46AM  18     MS. HOLMES WAS NOT SOMEONE WHO INTERACTED WITH MS. CHEUNG WHILE

10:46AM  19     SHE WAS AT THERANOS, MS. CHEUNG DIDN'T RAISE THOSE CONCERNS

10:46AM  20     WITH MS. HOLMES, AND MS. HOLMES WAS NOT TOLD BY ANYONE ELSE

10:46AM  21     THAT MS. CHEUNG HAD THOSE CONCERNS AT THE TIME THAT MS. CHEUNG

10:46AM  22     WAS WORKING AT THERANOS.

10:46AM  23           WHAT WE DO KNOW IS THAT DR. ROSENDORFF KNEW OF THOSE

10:46AM  24     CONCERNS AND THAT HE REACTED TO THOSE CONCERNS.  THE GIST OF

10:46AM  25     MS. CHEUNG'S TESTIMONY WAS THAT THERE WAS A PROFICIENCY TESTING

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9195

10:46AM   1    EXPERIMENT IN FEBRUARY OF 2014 AND THE RESULTS WERE VERY POOR.

10:46AM   2    YOU'LL RECALL HER TESTIFYING ABOUT THAT.

10:46AM   3        AND DR. ROSENDORFF SAID I LOOKED AT THAT AT THE TIME, AND

10:46AM   4    HE LOOKED AT IT AGAIN WHILE HE WAS SITTING UP HERE ON THE

10:46AM   5    STAND.  AND HE SAID THE WAY THAT THAT EXPERIMENT WAS DONE WAS

10:47AM   6    FLAWED, AND THE REASON THOSE RESULTS WERE BAD IS THAT IT WASN'T

10:47AM   7    DONE ACCORDING TO THE APPROPRIATE POLICY.

10:47AM   8        SO AS A RESULT OF DR. ROSENDORFF'S CONCLUSIONS,

10:47AM   9    DR. YOUNG'S CONCLUSIONS, ET CETERA, WHEN THIS ISSUE CAME UP

10:47AM  10    LATER TO MS. HOLMES, SHE WAS PRESENTED WITH THE BELIEF THAT THE

10:47AM  11    CONCERNS THAT MS. CHEUNG HAD RAISED WERE NOT JUSTIFIED.

10:47AM  12        NOW, THAT ONLY MAKES SENSE THAT DR. ROSENDORFF WOULD LOOK

10:47AM  13    AT THAT ISSUE AND RESOLVE THAT ISSUE BECAUSE, AS A MATTER OF

10:47AM  14    LAW AND AS A MATTER OF FACT, THAT WAS HIS RESPONSIBILITY.

10:47AM  15        WHAT WAS, WHAT WAS DONE AFTER MS. CHEUNG'S CONCERNS WERE

10:47AM  16    RAISED?  WELL, THEY UPDATED THE POLICY FOR HOW EXPERIMENTS

10:47AM  17    SHOULD BE RUN ON QUALITY CONTROL BECAUSE DR. ROSENDORFF SAID

10:47AM  18    MS. CHEUNG DIDN'T -- MS. CHEUNG AND MANY OTHERS INSIDE OF THE

10:47AM  19    LAB WHO WERE INVOLVED WITH THAT EXPERIMENT DIDN'T UNDERSTAND

10:47AM  20    HOW THESE QUALITY CONTROL EXPERIMENTS SHOULD BE RUN.

10:48AM  21        YOU HEARD A LOT OF TESTIMONY.  SO THAT'S ONE INDIVIDUAL

10:48AM  22    RAISING CONCERNS.

10:48AM  23        THE SECOND INDIVIDUAL THAT WE HEARD ABOUT, BUT DID NOT

10:48AM  24    SEE, WAS TYLER SHULTZ.  I WON'T GO THROUGH HIS CONCERNS IN

10:48AM  25    DETAIL BECAUSE YOU SAW SOME OF THOSE DOCUMENTS WHEN MS. HOLMES

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                    9196

10:48AM  1      TESTIFIED.

10:48AM  2          BUT SUFFICE IT TO SAY THAT THE GIST OF THAT TESTIMONY IS

10:48AM  3      MR. SHULTZ RAISED CONCERNS, MS. HOLMES TOOK THOSE CONCERNS VERY

10:48AM  4      SERIOUSLY.

10:48AM  5          HE RAISED THEM THREE SEPARATE TIMES.  IN EACH INSTANCE

10:48AM  6      MS. HOLMES ALMOST IMMEDIATELY BROUGHT THE FACT THAT MR. SHULTZ

10:48AM  7      HAD THESE CONCERNS TO THE ATTENTION OF DR. YOUNG, EFFECTIVELY

10:48AM  8      THE CHIEF TECHNICAL OFFICER, ASKED HIM TO EVALUATE THOSE

10:48AM  9      CONCERNS, ASKED HIM TO MEET WITH MR. SHULTZ, ASKED HIM TO

10:48AM 10      UNDERSTAND WHETHER THOSE CONCERNS HAD MERIT.

10:48AM 11          IF THEY DIDN'T HAVE MERIT, TO EXPLAIN TO MR. SHULTZ WHY

10:48AM 12      THEY DID NOT HAVE MERIT.

10:49AM 13          AND ALL OF THAT IS REFLECTED IN DOCUMENTS THAT HAVE BEEN

10:49AM 14      INTRODUCED IN THE CASE.  SO I'LL GIVE YOU THOSE EXHIBIT

10:49AM 15      NUMBERS.  THEY'RE EXHIBIT 1667, EXHIBIT 7421, AND EXHIBIT 7434.

10:49AM 16          I THINK IF YOU'LL GO BACK AND LOOK AT THOSE, YOU'LL SEE

10:49AM 17      THAT THE RECORD FROM THE TIME IS CONSISTENT WITH THAT

10:49AM 18      DESCRIPTION.

10:49AM 19          NOW, MORE EXTENSIVELY YESTERDAY MR. SCHENK JUST WENT

10:49AM 20      THROUGH JUST A BLITZ OF EMAILS WHERE THERE WOULD BE AN ISSUE IN

10:49AM 21      CONNECTION WITH A PARTICULAR ASSAY THAT WOULD ARISE FOR ONE

10:49AM 22      REASON OR ANOTHER.

10:49AM 23          AND MR. SCHENK SUGGESTED TO YOU THAT THE EXISTENCE OF

10:49AM 24      THOSE EMAILS, FRANKLY WHETHER MS. HOLMES WAS ON ALL OF THEM OR

10:49AM 25      NOT, SUGGESTED THAT MS. HOLMES SHOULD HAVE KNOWN THAT THE CLIA

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9197

10:50AM   1    LAB WAS NOT OFFERING ACCURATE AND RELIABLE RESULTS.

10:50AM   2         WHAT DO WE KNOW ABOUT HOW THERANOS APPROACHED THOSE ISSUES

10:50AM   3    WHEN THEY AROSE?

10:50AM   4         WELL, FIRST OF ALL, WE KNOW THAT DR. ROSENDORFF HAD PUT IN

10:50AM   5    PLACE, AS HE SHOULD HAVE, A STANDARD OPERATING PROCEDURE THAT

10:50AM   6    SAID EVERY TIME AN ISSUE IS RAISED ABOUT AN ASSAY, WE HAVE TO

10:50AM   7    DO AN INTERNAL REVIEW OF THAT CONCERN, WE HAVE TO EVALUATE

10:50AM   8    WHETHER THAT CONCERN GOES TO THE INTEGRITY OF THE ASSAY THAT WE

10:50AM   9    ARE OFFERING.

10:50AM  10         AND, IN FACT, IN EACH INSTANCE, INCLUDING EACH INSTANCE

10:50AM  11    RAISED BY MR. SCHENK YESTERDAY, THAT IS WHAT WAS DONE.

10:50AM  12         HOW DID THAT WORK?

10:50AM  13         THERE WAS -- THE ISSUE WOULD BE FLAGGED, LAB PERSONNEL AND

10:50AM  14    SCIENTISTS WOULD LOOK AT THE DATABASE THAT STORED THE

10:50AM  15    INFORMATION THAT RELATED TO TESTS ON THAT ASSAY, THEY WOULD

10:51AM  16    LOOK AS TO SEE WHETHER THERE WERE COMMON ISSUES AMONGST WHEN

10:51AM  17    THAT TEST WAS OFFERED, WHERE THAT TEST WAS OFFERED, THE LAB

10:51AM  18    TECHNICIAN WHO PROCESSED IT, THE PARTICULAR PERSON WHO WAS

10:51AM  19    DRAWING THE SAMPLES.  IS THERE SOMETHING HAPPENING WITH RESPECT

10:51AM  20    TO THIS ASSAY THAT IS LEADING TO INACCURATE RESULTS?

10:51AM  21         AND THEY WOULD COME TO A CONCLUSION.  AND IF THE

10:51AM  22    CONCLUSION WAS THERE'S A PROBLEM FUNDAMENTALLY WITH THIS TEST

10:51AM  23    OR WITH THIS DEVICE, THEY WOULD EITHER STOP OFFERING IT

10:51AM  24    COMPLETELY AS AN ASSAY OR THEY WOULD STOP OFFERING IT AND

10:51AM  25    TRANSFER IT TO ANOTHER DEVICE WHERE IT COULD BE OFFERED.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9198

10:51AM   1          THAT WAS WHAT THE POLICY MR. ROSENDORFF PUT IN PLACE,

10:51AM   2   DR. ROSENDORFF PUT IN PLACE REQUIRED, AND THE EVIDENCE IN THE

10:51AM   3   CASE SUGGESTS THAT THAT WOULD HAPPEN.

10:51AM   4          LET'S TAKE AN EXAMPLE, AND IT'S ONLY ONE EXAMPLE, BUT

10:52AM   5   MR. SCHENK WENT THROUGH IT YESTERDAY, THE EXAMPLE OF HCG.

10:52AM   6          AND YOU'LL RECALL THAT THIS WAS THE SUBJECT OF A LOT OF

10:52AM   7   TESTIMONY IN DR. ROSENDORFF'S CROSS-EXAMINATION.

10:52AM   8          THE GOVERNMENT YESTERDAY PUT UP A -- SUGGESTED A

10:52AM   9   CHRONOLOGY TO YOU THAT LOOKS SOMETHING LIKE THIS WITH REGARD TO

10:52AM  10   BEGINNING OF ISSUES ON HCG AND SUGGESTED THAT THERE HAD BEEN A

10:52AM  11   VALIDATION REPORT WHERE DR. ROSENDORFF HAD DETERMINED TO PUT

10:52AM  12   HCG ON AN EDISON DEVICE IN MARCH, THAT TESTING HAD BEGUN IN

10:52AM  13   MAY, AND THAT IN LATE MAY DR. ROSENDORFF HAD STOPPED THAT

10:52AM  14   TESTING, AND THAT THIS WAS PRESENTED AS THIS WAS THE RESULT OF

10:52AM  15   A CONCERN THAT HAD BEEN RAISED AND REFLECTED A CONCERN ON

10:53AM  16   DR. ROSENDORFF'S PART.

10:53AM  17          BUT WHAT ACTUALLY HAPPENED WITH RESPECT TO THIS ISSUE?

10:53AM  18          THERE'S ACTUALLY A MUCH LARGER SERIES OF EVENTS INVOLVING

10:53AM  19   A MUCH LARGER SERIES OF EXHIBITS THAT WERE INTRODUCED IN THE

10:53AM  20   CASE.  AND THIS SHOWS YOU WHAT HAPPENED.

10:53AM  21          AFTER MAY 9TH, THE HCG ASSAY WAS OFFERED ON AN EDISON

10:53AM  22   DEVICE.

10:53AM  23          AS EXHIBIT 4145 DEMONSTRATES, THE QUESTION CAME IN.

10:53AM  24   DR. ROSENDORFF AND DR. YOUNG DISCUSSED IT.

10:53AM  25          ALMOST IMMEDIATELY MS. HOLMES ASKED TO MEET WITH THEM AS

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9199

10:53AM   1      SOON AS SHE KNEW ABOUT THE ISSUE.  AND LATER THAT DAY, THE

10:53AM   2      PHYSICIAN WHO HAD TREATED THE PATIENT WHERE THERE WAS AN ISSUE

10:53AM   3      WAS CONTACTED AND THERE WAS A PLAN OF ACTION FOR REACTING TO

10:53AM   4      THE POTENTIALLY ERRANT ISSUE.

10:53AM   5          WE KNOW FROM THE RECORD THAT MS. HOLMES WROTE, PERHAPS

10:53AM   6      EARLY THE NEXT MORNING, THAT SHE HAD DONE MANY MEETINGS ON IT

10:54AM   7      TODAY, REFERRING TO THAT SAME DAY, THE 2TH.  SHE MET WITH THE

10:54AM   8      STAFF OF THE CLIA LAB, INCLUDING DR. ROSENDORFF, THE NEXT DAY.

10:54AM   9          AND THEN JUST SHORTLY AFTER THAT MEETING ENDED,

10:54AM  10      DR. ROSENDORFF STOPPED TESTING ON THE EDISON DEVICE FOR THIS

10:54AM  11      HCG ASSAY.

10:54AM  12          THE SUGGESTION THAT A CONCERN BEING RAISED WITH MS. HOLMES

10:54AM  13      GAVE HER NOTICE OF INACCURATE AND UNRELIABLE RESULTS AND THAT

10:54AM  14      WASN'T IMMEDIATELY CORRECTED IS INCONSISTENT WITH WHAT THE

10:54AM  15      RECORD SHOWED ON THIS ISSUE.

10:54AM  16          NOW, THERE WAS A SUBSEQUENT SERIES OF EMAILS THAT DISCUSS

10:54AM  17      AN INVESTIGATION INTO THIS ISSUE, AND DR. ROSENDORFF'S

10:54AM  18      TESTIMONY REFLECTED THAT HE WAS AWARE BY THE MIDDLE OF JUNE

10:54AM  19      THAT THOSE QUESTIONS HAD BEEN RESOLVED AND THAT THE HCG ASSAY

10:54AM  20      WAS AGAIN BEING OFFERED ON THE EDISON DEVICE, AND THAT THAT

10:54AM  21      WAS, AS IT WAS THE TRUTH WITH RESPECT TO ALL ASSAYS, SOMETHING

10:55AM  22      THAT HE HAD SIGNED OFF ON AND APPROVED.

10:55AM  23          SO WHAT DOES THIS JUST ONE SCENARIO OF ALL THE OF THE

10:55AM  24      SCENARIOS MENTIONED YESTERDAY BY MR. SCHENK DEMONSTRATE?

10:55AM  25          FIRST OF ALL, IT DEMONSTRATES THAT WHEN A PROBLEM WAS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

10:55AM 1    RAISED, THERE WERE IMMEDIATE MEETINGS ABOUT IT.  IT WAS NOT

10:55AM 2    TREATED CAVALIERLY.

10:55AM 3        SECOND, THERE WAS A DISCUSSION WITH THE PATIENT'S

10:55AM 4    PHYSICIAN.  IF A PATIENT HAD BEEN POTENTIALLY AFFECTED, THEY

10:55AM 5    TALKED TO THAT PHYSICIAN.

10:55AM 6        THIRD, THEY STOPPED THE TESTING, AS I TOLD YOU A FEW

10:55AM 7    MOMENTS AGO.  THEY WOULD EITHER OFFER IT ON ANOTHER PLATFORM OR

10:55AM 8    THEY WOULDN'T OFFER IT AT ALL.

10:55AM 9        THEY TRIED TO FIGURE OUT WHAT HAPPENED.

10:55AM 10       AND THEN DR. ROSENDORFF WOULD MAKE A DECISION BASED ON THE

10:55AM 11   INVESTIGATION, WAS THIS ACTUALLY AN ISSUE RELATED TO THE ASSAY?

10:55AM 12   WAS IT RELATED TO THE DEVICE?

10:55AM 13       AND DEPENDING ON THE RESULTS OF THAT DETERMINATION, HE

10:55AM 14   WOULD ALLOW THE TEST TO START OR CEASE OFFERING THAT TEST.

10:56AM 15       NOW, ANOTHER EMAIL WAS BROUGHT UP BY MR. SCHENK YESTERDAY,

10:56AM 16   AND IT WAS ALMOST AS IF DR. ROSENDORFF'S CROSS-EXAMINATION DID

10:56AM 17   NOT HAPPEN.

10:56AM 18       THIS IS AN EMAIL THAT DR. ROSENDORFF WAS SHOWN ON HIS

10:56AM 19   DIRECT.  YOU WILL RECALL IT WAS FROM CHRISTIAN HOLMES,

10:56AM 20   MS. HOLMES'S BROTHER, TO HER TALKING ABOUT HCG.

10:56AM 21       AND THE TEXT OF THAT EMAIL SAID, HCG HAS SOME SERIOUS

10:56AM 22   ISSUES AND PATIENT COMPLAINTS, AND IT WAS IMPLIED ON DIRECT

10:56AM 23   EXAMINATION AND YESTERDAY THAT THIS WAS FURTHER NOTICE TO

10:56AM 24   MS. HOLMES OF INACCURACY WITH REGARD TO THIS VERY SENSITIVE

10:56AM 25   ASSAY.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                      9201

10:56AM  1        BUT WHAT DID THE -- WHAT DOES THE BALANCE OF THAT EMAIL,

10:56AM  2   AS WELL AS OTHER EXHIBITS RELATED TO THIS, DEMONSTRATE?

10:56AM  3        FIRST OF ALL, THE ISSUE THAT CHRISTIAN HOLMES WAS TALKING

10:56AM  4   ABOUT HERE WAS NOT AT ALL ACCURACY OR RELIABILITY.

10:56AM  5        WHAT HE WAS TALKING ABOUT IS THAT THE NUMBER OF SAMPLES

10:57AM  6   THAT THE COMPANY WAS RECEIVING TO TEST HCG ON WAS BACKLOGGED

10:57AM  7   AND WOMEN WERE WAITING TO FIND OUT WHETHER THEY WERE PREGNANT

10:57AM  8   OR NOT, AND THAT'S OBVIOUSLY A SENSITIVE SITUATION.

10:57AM  9        WHY DID THAT HAPPEN?  BECAUSE THE REAGENTS HADN'T BEEN

10:57AM 10   ORDERED BY DR. ROSENDORFF OR THOSE WORKING FOR DR. ROSENDORFF

10:57AM 11   IN THE LAB.

10:57AM 12        THE EXCHANGE BETWEEN CHRISTIAN HOLMES AND HIS SISTER HERE

10:57AM 13   HAS NOTHING TO DO WITH ACCURACY OR RELIABILITY OF THE HCG TEST.

10:57AM 14        THAT'S A PATTERN THAT YOU SEE ACROSS THESE ASSAYS, EITHER

10:57AM 15   THE CONCERN IS NOT WHAT'S BEING RAISED WITH MS. HOLMES MAY LOOK

10:57AM 16   AMBIGUOUS BUT IT'S NOT A CONCERN ABOUT ACCURACY, IT'S A CONCERN

10:57AM 17   THAT WAS INVESTIGATED OR RESOLVED, OR IT'S A CONCERN THAT WAS

10:57AM 18   INVESTIGATED AND THEY CEASED OFFERING THE ASSAYS.

10:57AM 19        I'M NOT GOING TO GO THROUGH ALL OF THOSE, BUT FOR THE

10:57AM 20   RECORD I WILL SAY THAT WE HAVE DONE THAT WITH RESPECT TO HDL

10:58AM 21   MENTIONED YESTERDAY, EXHIBITS -- THE EXHIBITS OFFERED BY THE

10:58AM 22   GOVERNMENT, AND WE'LL PROVIDE YOU WITH THOSE FROM THE DEFENSE.

10:58AM 23        THE EXHIBITS WHICH GIVE FURTHER CONTEXT ON HDL FOR YOU TO

10:58AM 24   TAKE A LOOK AT ARE LISTED HERE.  THEY PROVIDE THE CONTEXT AS TO

10:58AM 25   WHAT REALLY HAPPENED WITH RESPECT TO THESE ASSAYS FOLLOWING THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                           9202

10:58AM  1      PATTERN THAT I'VE JUST DESCRIBED.

10:58AM  2          NOW, HOW DO YOU KNOW WHAT I'VE TOLD YOU IS JUST TRUE EVEN

10:58AM  3      WITHOUT DIGGING THROUGH ALL OF THE DOCUMENTS THAT I'VE LISTED

10:58AM  4      ON THIS SLIDE?

10:58AM  5          HOW DO YOU KNOW THAT THERANOS DID NOT BELIEVE, AND

10:58AM  6      THEREFORE MS. HOLMES DID NOT BELIEVE, THAT IT WAS OFFERING

10:58AM  7      INACCURATE OR UNRELIABLE TEST RESULTS?

10:58AM  8          WELL, RECALL DR. ROSENDORFF WAS ASKED SQUARELY ABOUT THIS.

10:58AM  9      HE SAID -- AFTER BEING SHOWN ALL OF THESE EMAILS AND AFTER

10:59AM 10      THESE ISSUES WERE DISCUSSED AT LENGTH WITH HIM, HE WAS ASKED

10:59AM 11      SQUARELY, "YOU NEVER OFFERED TESTS THAT YOU THOUGHT WERE

10:59AM 12      INACCURATE AND UNRELIABLE WHEN YOU WERE SERVING AS LAB DIRECTOR

10:59AM 13      AT THERANOS; CORRECT?

10:59AM 14          "CORRECT."

10:59AM 15          THE LAB DIRECTOR DID NOT BELIEVE THAT THE TESTS WERE

10:59AM 16      INACCURATE OR UNRELIABLE.

10:59AM 17          AND THEN HE WAS ASKED, "DID YOU EVER USE A TEST ON

10:59AM 18      PATIENTS THAT YOU BELIEVED WAS INACCURATE OR UNRELIABLE?"

10:59AM 19          AND HE SAID, "NO.  NO."

10:59AM 20          THE PERSON WHO WAS SUPPOSED TO MAKE THESE DETERMINATIONS

10:59AM 21      DID NOT BELIEVE THAT TESTS WERE INACCURATE OR UNRELIABLE.

10:59AM 22          WHAT THE GOVERNMENT HAS REALLY DONE WITH RESPECT TO THIS

10:59AM 23      ISSUE IS THAT THEY HAVE LOOKED AT ISSUES THAT ARE COMING UP AND

10:59AM 24      BEING INVESTIGATED AND RESOLVED AND CONFLATED THAT WITH THE

10:59AM 25      IDEA THAT MS. HOLMES SHOULD SOMEHOW STEP IN AND FILL IN FOR THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9203

10:59AM   1     LAB DIRECTOR AND REMOVE OR KNOW THINGS THAT THE LAB DIRECTOR

11:00AM   2     DOESN'T KNOW.

11:00AM   3          WELL, THAT WOULD BE ENTIRELY IMPROPER AS I THINK YOU HEARD

11:00AM   4     DR. ROSENDORFF TESTIFY.

11:00AM   5          AND HE SAID THAT NOT ONLY WITH REGARD TO THE TESTS THAT

11:00AM   6     WERE OFFERED, THE CLASSES OF TESTS, SAY HDL OR HCG.

11:00AM   7          HE SAID HE NEVER WAS AWARE OF A PATIENT GETTING A TEST

11:00AM   8     THAT AT THE TIME HE BELIEVED WAS INACCURATE OR UNRELIABLE AT

11:00AM   9     THE TIME THAT IT WAS OFFERED.  HE SAID THAT OVER AND OVER AND

11:00AM   10    OVER AGAIN.

11:00AM   11         HE SAID THAT HE NEVER ALLOWED FOR THE RELEASE OF

11:00AM   12    INACCURATE RESULTS, THAT HE NEVER DIRECTED, THAT MS. HOLMES

11:00AM   13    NEVER DIRECTED THAT A PARTICULAR MACHINE BE USED, THAT SHE

11:00AM   14    NEVER TOLD HIM TO RELEASE A RESULT THAT SHE THOUGHT HE

11:00AM   15    SHOULDN'T RELEASE.  THAT SHE NEVER DIRECTED HIM OR OVERRULED

11:00AM   16    HIM ON ANYTHING IN CONNECTION WITH THE LAB, NOTHING.

11:00AM   17         THE EMAIL THAT THE GOVERNMENT USES HERE TO SHOW INTENT, ET

11:00AM   18    CETERA, HAPPEN WITHIN THIS FRAMEWORK WHERE THERE'S A LAB

11:01AM   19    DIRECTOR FOR THE FIRST YEAR.

11:01AM   20         HE ALSO TOLD YOU, YOU KNOW, NO LAB IS PERFECT, THAT THERE

11:01AM   21    ARE POTENTIAL ISSUES IN EVERY LAB.

11:01AM   22         I THINK WE SHOWED YOU AN EMAIL WHICH REFLECTED HIM

11:01AM   23    ACTUALLY SAYING THAT AN ISSUE HAD COME UP AND BEEN RAISED BY A

11:01AM   24    DOCTOR AND THAT -- THIS WASN'T THE FAULT OF THE TEST OR OF

11:01AM   25    THERANOS; THAT THIS WAS A MISREADING OF THE SITUATION BY THE

9204

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

11:01AM 1    DOCTOR.  HE ACKNOWLEDGED THAT THERE WERE LAB ERRORS IN EVERY

11:01AM 2    LAB.

11:01AM 3        I THINK IN THE INSTANCE WHERE HE TRIED TO CLAIM THAT THEY

11:01AM 4    WERE MORE FREQUENT THAT AT THERANOS THAN IN HIS PRIOR

11:01AM 5    EXPERIENCES, HE WAS THEN SHOWN AND ACKNOWLEDGED THAT HE HAD

11:01AM 6    TESTIFIED PREVIOUSLY TO THE OPPOSITE PROPOSITION.

11:01AM 7        NOW, LET'S TALK ABOUT HIS DEPARTURE FROM THERANOS BECAUSE

11:01AM 8    IT WAS PORTRAYED ON HIS DIRECT EXAMINATION AND AGAIN YESTERDAY

11:01AM 9    AS IF HIS DEPARTURE WAS MOTIVATED BY A CONCERN ON HIS PART THAT

11:02AM 10   SOMETHING UNTOWARD WAS HAPPENING AT THERANOS.

11:02AM 11       FIRST OF ALL, I WOULD JUST ASK YOU TO VIEW THIS THROUGH

11:02AM 12   THE LENS OF MS. HOLMES'S INTENT.

11:02AM 13       HE SENT AN EMAIL TO MS. HOLMES WHICH WAS A GRACIOUS EMAIL.

11:02AM 14   HE DID NOT IDENTIFY ANY OF THE CONCERNS THAT HE IS NOW

11:02AM 15   IDENTIFYING.

11:02AM 16       AS YOU'LL RECALL THIS STORY, WHAT HAPPENED WITH REGARD TO

11:02AM 17   DR. ROSENDORFF WAS THAT THERANOS WANTED HIM TO STAY FOR A

11:02AM 18   PERIOD OF 60 DAYS AFTER HIS DEPARTURE BECAUSE THEY WANTED TO

11:02AM 19   FIND A NEW LAB DIRECTOR TO REPLACE HIM BECAUSE HIS DEPARTURE

11:02AM 20   WAS UNEXPECTED.

11:02AM 21       AND SHORTLY AFTER THOSE DISCUSSIONS WITH DR. ROSENDORFF,

11:02AM 22   HE BEGAN TO SEND EMAILS WITH VARIOUS COMPLAINTS AND QUESTIONS

11:02AM 23   ABOUT THINGS AT THERANOS.

11:02AM 24       YOU'LL REMEMBER JUST RECENTLY DURING MS. HOLMES'S

11:03AM 25   TESTIMONY WE SAW AN EMAIL EXCHANGE WHERE HE HAD RAISED A

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                9205

11:03AM  1     QUESTION ABOUT IS THERE EBOLA ON THE PREMISES OF WHERE THE CLIA

11:03AM  2     LAB IS?

11:03AM  3         AND, OF COURSE, THERE WAS NOT.  THE EVIDENCE SHOWED THAT

11:03AM  4     THERE WERE, IN CONNECTION WITH RESEARCH BEING DONE AT A

11:03AM  5     DIFFERENT FACILITY, EBOLA WAS BEING DISCUSSED.

11:03AM  6         BUT THE SAME WAS TRUE IN CONNECTION WITH CONCERNS ABOUT

11:03AM  7     THE CLIA LAB.  HE RAISED THIS EMAIL TO MS. HOLMES IN THE MIDDLE

11:03AM  8     OF NOVEMBER AND HE SAID THAT HE WAS UNCOMFORTABLE WITH WHAT WAS

11:03AM  9     HAPPENING IN THE COMPANY AND THAT HE WAS GETTING QUESTIONS THAT

11:03AM 10     HE DIDN'T WANT TO ANSWER, ET CETERA.

11:03AM 11         WELL, LET'S LOOK AT WHAT MS. HOLMES SAID IN RESPONSE TO

11:03AM 12     THAT EMAIL.

11:03AM 13         SHE SAID, OUTSIDE OF THE FACT THAT YOU'VE NEVER EMAILED ME

11:03AM 14     ON ANY CONCERNS, YOU KNOW FROM EVERY CONVERSATION HOW

11:04AM 15     FUNDAMENTAL IT IS FOR YOU NEVER TO DO ANYTHING YOU'RE NOT

11:04AM 16     COMPLETELY CONFIDENT IN.

11:04AM 17         SHE WAS SURPRISED ON THIS PRESENTATION FROM

11:04AM 18     DR. ROSENDORFF.

11:04AM 19         NOW, DR. ROSENDORFF TESTIFIED THAT HE HAD A NUMBER OF

11:04AM 20     CONCERNS ABOUT THE INTEGRITY OF ASSAYS THAT WERE BEING OFFERED,

11:04AM 21     BUT I'D ASK YOU TO KEEP THE FOLLOWING IN MIND IN CONNECTION

11:04AM 22     WITH THAT.

11:04AM 23         FIRST, HE'S GIVEN VERY UNRELIABLE AND INCONSISTENT

11:04AM 24     STATEMENTS OVER TIME.  AS YOU RECALL HE WAS SHOWN THOSE DURING

11:04AM 25     HIS EXAMINATION AND HE ACKNOWLEDGED MAKING PRIOR INCONSISTENT

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9206

11:04AM    1    STATEMENTS.

11:04AM    2         HE LEFT THERANOS BECAUSE HE HAD FOUND A NEW JOB AND HE

11:04AM    3    WANTED TO START THAT NEW JOB, AND HE DID NOT WANT TO STAY AT

11:04AM    4    THERANOS FOR THE 60 DAY PERIOD THAT THERANOS WAS TRYING TO GET

11:04AM    5    HIM TO STAY THERE.

11:04AM    6         IN THE MONTHS LEADING UP TO THIS, WE SHOWED YOU SEVERAL

11:04AM    7    EMAILS WHERE HE WAS ERRATIC AND UNRESPONSIVE.  YOU MAY RECALL

11:04AM    8    EMAILS FROM MS. HOLMES'S BROTHER IN WHICH THEY WERE TRYING TO

11:04AM    9    GET HIM TO RESPOND TO A DOCTOR'S CONCERN.

11:05AM   10         AND THEN WHILE HE'S BEEN UNDER INVESTIGATION IN CONNECTION

11:05AM   11    WITH HIS LAB LICENSE, HE'S GIVEN INCONSISTENT STATEMENTS ABOUT

11:05AM   12    THE REASONS THAT HE LEFT THERANOS.

11:05AM   13         SO I THINK WHEN YOU HEAR HIS ASSERTION ABOUT CONCERNS OF

11:05AM   14    THERANOS, YOU SHOULD VIEW THAT TESTIMONY THROUGH THAT LENS.

11:05AM   15         NOW, AFTER DR. ROSENDORFF LEFT, AS YOU KNOW, DR. DHAWAN

11:05AM   16    BECAME THE LAB DIRECTOR.  AND I THINK IT'S FAIR TO SHOW YOU

11:05AM   17    THAT THE GOVERNMENT SAID YESTERDAY, AS THEY'VE SAID THROUGHOUT

11:05AM   18    THE CASE, THAT MR. HOLMES AND MR. BALWANI CHOSE TO PICK

11:05AM   19    MR. BALWANI'S DERMATOLOGIST TO RUN THE LAB.  AND THEY SAID THAT

11:05AM   20    MS. HOLMES AND MR. BALWANI PUT DR. DHAWAN IN CHARGE.

11:05AM   21         THAT IS NOT A FAIR CHARACTERIZATION OF WHAT MS. HOLMES WAS

11:05AM   22    SEEING AT THE TIME.

11:05AM   23         LET'S LOOK AT WHAT MS. HOLMES WAS SEEING AT THE TIME AS TO

11:06AM   24    WHAT WAS HAPPENING AFTER DR. ROSENDORFF LEFT.

11:06AM   25         THIS IS THE GOVERNMENT'S PRESENTATION, WHICH IS THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9207

11:06AM   1    DERMATOLOGIST WAS IN CHARGE AND THERE WERE NO OTHER

11:06AM   2    PROTECTIONS.

11:06AM   3        BUT FIRST, AS YOU KNOW, DR. SAWYER, WHO THE GOVERNMENT

11:06AM   4    DIDN'T ACKNOWLEDGE OR MENTION IN ITS OPENING UNTIL DR. DHAWAN

11:06AM   5    WAS EXAMINED ABOUT IT, SHE CAME AT THE SAME TIME AND SHE

11:06AM   6    PROVIDED ADDITIONAL SERVICE.

11:06AM   7        BUT MORE FUNDAMENTALLY, THERE WAS LAB PERSONNEL WHOM

11:06AM   8    MS. HOLMES TESTIFIED MR. BALWANI HAD IDENTIFIED AS THESE ARE

11:06AM   9    THE INTERNAL PERSONNEL WHO ARE WORKING IN LIEU OF HAVING A

11:06AM  10    FULL-TIME LAB DIRECTOR, AND HE IDENTIFIES DR. SURAJ SAKSENA AS

11:06AM  11    THE INTERNAL CANDIDATE WHO HE EXPECTED TO BECOME THE LAB

11:06AM  12    DIRECTOR.

11:06AM  13        AND HE SAID THAT HE HAD WORKED IN THE CLIA LAB FOR A LONG

11:06AM  14    TIME.  HE WAS FULLY QUALIFIED, IN FACT, BUT THERE WERE

11:07AM  15    REQUIREMENTS ON PAPER THAT HE HAD TO MEET, AND HE WAS GETTING

11:07AM  16    THOSE, AND MR. BALWANI EXPECTED HE WOULD BECOME THE NEXT LAB

11:07AM  17    DIRECTOR.

11:07AM  18        NOW, THAT'S THE PICTURE THAT MS. HOLMES SAW, NOT THAT

11:07AM  19    MR. BALWANI'S DERMATOLOGIST WAS IN CHARGE, BUT RATHER THAT

11:07AM  20    THERE WAS THIS GROUP OF QUALIFIED PEOPLE:  DR. SAKSENA, THERE

11:07AM  21    WAS THE OUTSIDE CONSULTANT; MR. HURST, WHO HAD SET UP THE CLIA

11:07AM  22    LAB, WHO AGAIN WAS ENGAGED, AND HE WAS WORKING IN CONNECTION

11:07AM  23    WITH IT; THERE WAS QUALITY CONTROL PERSONNEL LIKE MR. GEE WHO

11:07AM  24    HAD BEEN WORKING WITH THE COMPANY FOR OVER A YEAR; AND THERE

11:07AM  25    WERE PEOPLE IMMEDIATELY UNDER THE LAB DIRECTOR, MS. ALAMDAR,

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                    9208

11:07AM   1    SIDHU, GODFRED MASINDE, A HUGE STAFF WORKING IN THE CLIA LAB

11:07AM   2    WHO HAD SUBSTANTIAL QUALIFICATIONS.

11:07AM   3         BUT FUNDALLY, WHAT THE GOVERNMENT WANTS TO SAY HERE IS

11:08AM   4    THAT MS. HOLMES RECEIVED NOTICE FROM MR. BALWANI THAT THIS LAB

11:08AM   5    WAS BEING -- WAS IN BAD SHAPE, AND THAT THAT WAS NOTICE TO

11:08AM   6    MS. HOLMES THAT SHE SHOULD HAVE KNOWN THINGS.

11:08AM   7         AND THEY SHOWED YOU THIS TEXT YESTERDAY.  ACTUALLY, I

11:08AM   8    THINK I HAVE IT HERE ON THE SLIDE.  THEY SHOWED YOU THIS TEXT,

11:08AM   9    AND THIS IS THE NOTICE THAT THE GOVERNMENT HAS AS TO THE

11:08AM  10    PROBLEMS IN THE CLIA LAB.

11:08AM  11         BUT NOBODY SAYS HERE -- HE SAYS THAT HE'S GOING TO WORK ON

11:08AM  12    FIXING THIS, AND HE WILL TAKE THE LAB OVER.

11:08AM  13         AND YOU KNOW WHAT HIS REPRESENTATIONS OF THAT TO

11:08AM  14    MS. HOLMES SOUNDED LIKE BECAUSE WE SAW HIS DESCRIPTION OF HIS

11:08AM  15    SITUATION IN AN EMAIL DURING THE COURSE OF THE CASE FROM A FEW

11:08AM  16    MONTHS BEFORE THIS.  HE PRESENTED HIMSELF, IN TAKING THE CLIA

11:08AM  17    LAB OPERATIONS, AS SOMEBODY WHO WAS UNIQUELY GIFTED AT

11:09AM  18    ORGANIZATIONAL STRUCTURES AND OPERATIONS, AND HE ASSURED

11:09AM  19    MS. HOLMES THAT HE WAS NOW GOING OUT TO THE CLIA LAB, WHICH WAS

11:09AM  20    IN A DIFFERENT FACILITY, AND TAKING IT OVER.

11:09AM  21         AND WHAT DOES THE RECORD SHOW FROM THIS MOMENT IN NOVEMBER

11:09AM  22    OF 2014 UNTIL CMS AND DR. DHAWAN AT THE END OF 2015?  WHAT

11:09AM  23    PROBLEMS DID MS. HOLMES LEARN ABOUT IN THE CLIA LAB DURING THIS

11:09AM  24    PERIOD FROM NOVEMBER OF 2014 UNTIL THE FALL OF 2015?

11:09AM  25         DO YOU KNOW THE NUMBER OF ISSUES THAT ARE IN THE RECORD OF

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9209

11:09AM  1    MS. HOLMES BEING TOLD ABOUT SOME ISSUE IN CONNECTION WITH AN

11:09AM  2    ASSAY DURING THAT PERIOD?  ONE, WHICH WAS PRESENTED AT THAT

11:09AM  3    TIME TO HER AS BEING RESOLVED.  THAT'S IT.  THAT IS WHAT THE

11:09AM  4    RECORD IN THIS MATTER SHOWS; THAT AFTER THE POINT AT WHICH

11:09AM  5    DR. ROSENDORFF DEPARTED, THIS LARGE STAFF OF INDIVIDUALS LED BY

11:10AM  6    MR. BALWANI, WITH SUPPLEMENTAL SUPPORT FROM QUALITY CONTROL

11:10AM  7    EXPERTS AND FROM OUTSIDE LAB DIRECTORS WITH THE CONSULTANT,

11:10AM  8    MR. HURST, THAT NO PROBLEMS WERE RESULTING IN THE CLIA LAB THAT

11:10AM  9    REQUIRED HER ATTENTION.  NONE.  NONE.

11:10AM  10        THE PRESENTATION OF THAT TO MS. HOLMES WAS THAT THE

11:10AM  11   PROBLEM IN THE CLIA LAB PRIOR TO DR. ROSENDORFF'S DEPARTURE,

11:10AM  12   WHAT WOULD BE REASONABLE TO INFER?  THAT IT WAS DR. ROSENDORFF.

11:10AM  13   THERE'S NO INDICATION THAT ANY ISSUE WAS RAISED THAT WAS NOT

11:10AM  14   ADDRESSED DURING THAT PERIOD.

11:10AM  15        WHEN IS THE FIRST TIME THAT MS. HOLMES STARTS TO HEAR

11:10AM  16   ABOUT THOSE ISSUES?  IN THE FALL OF 2015 AS SHE TESTIFIED

11:10AM  17   DURING HER DIRECT TESTIMONY.

11:10AM  18        NOW, WE KNOW THAT AFTER CMS CAME IN AND MADE THE FINDINGS

11:10AM  19   THAT IT MADE, DR. DAS WAS HIRED.  YOU KNOW THAT HE TESTIFIED

11:11AM  20   THAT HE WAS HIRED WITH A NUMBER OF OTHER LAB DIRECTORS; THAT HE

11:11AM  21   WAS GIVEN THE MISSION OF TURNING OVER ROCKS; THAT MS. HOLMES

11:11AM  22   WAS SUPPORTIVE OF THAT; AND THAT HE WAS PART OF A REFORM EFFORT

11:11AM  23   TO MAKE THE OPERATIONS OF THAT LAB PROFESSIONAL WITH

11:11AM  24   MS. HOLMES'S SUPPORT AND WITH THE FULL SUPPORT OF RESOURCES.

11:11AM  25        THAT SOUNDS LIKE A DEFENSE WITNESS.  SO WHY DID THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9210

11:11AM  1    GOVERNMENT OFFER DR. DAS'S TESTIMONY?

11:11AM  2        WELL, THEY OFFERED HIS TESTIMONY TO I THINK IMPLY THAT THE

11:11AM  3    TECHNOLOGY THAT WAS BEING USED IN THE LAB, THE EDISON DEVICE

11:11AM  4    THAT WAS BEING OFFERED WAS UNRELIABLE OR GENERATING INACCURATE

11:11AM  5    RESULTS OR WAS INHERENTLY DOOMED TO GENERATE INACCURATE AND

11:11AM  6    UNRELIABLE RESULTS.

11:12AM  7        WELL, FIRST OF ALL, I WOULD SAY TO YOU, LADIES AND

11:12AM  8    GENTLEMEN, ALL OF THAT, OF COURSE, IS AFTER THE CONSPIRACY

11:12AM  9    PERIOD HERE.  WE KNOW WHAT HAPPENED WHEN MS. HOLMES HEARD ABOUT

11:12AM 10    DR. DAS'S CONCERNS.

11:12AM 11        BUT SECOND AND MORE FUNDAMENTALLY, THE RECORD REFLECTS

11:12AM 12    THAT DR. DAS DID NOT THINK THAT THE CONCERNS THAT CMS HAD

11:12AM 13    RAISED WERE ABOUT FUNDAMENTALLY THE CAPABILITIES OF ANY OF

11:12AM 14    THERANOS'S TECHNOLOGY.

11:12AM 15        WE KNOW THAT HE WAS ASKED TO REVIEW A STATEMENT THAT

11:12AM 16    MS. BENNETT PROPOSED, THE GIST OF WHICH SAYS THAT THEY REFER TO

11:12AM 17    HOW TECHNOLOGIES WERE USED AND NOT TO THE FUNDAMENTAL INTEGRITY

11:12AM 18    OF THOSE TECHNOLOGIES.

11:12AM 19        HE WAS ASKED IF THAT WAS ACCURATE AND HE RESPONDED "IT'S

11:12AM 20    ACCURATE, IN MY OPINION."

11:12AM 21        NOW, WHAT DID DR. DAS IN FACT CONCLUDE?  HE CONCLUDED THAT

11:13AM 22    THE VALIDATION REPORTS THAT DR. ROSENDORFF HAD SIGNED HAD BEEN

11:13AM 23    DONE INCORRECTLY; THAT THERE WERE STANDARDS SET AS TO WHAT

11:13AM 24    SHOULD ALLOW THOSE TESTS TO BE OFFERED, AND THOSE STANDARDS

11:13AM 25    WERE ALL WRONG.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9211

11:13AM  1      THAT DR. ROSENDORFF IN EFFECT, AS THE GATEKEEPER FOR

11:13AM  2   ASSAYS COMING INTO THE LAB, ALLOWED TESTS TO BE OFFERED WITH

11:13AM  3   INCORRECT ASSESSMENT AND THAT THOSE VALIDATION REPORTS NEVER

11:13AM  4   SHOULD HAVE BEEN SIGNED BY DR. ROSENDORFF.

11:13AM  5      SO IN ESSENCE, DR. DAS'S TESTIMONY IS REALLY A CRITICISM

11:13AM  6   OF THE JOB THAT DR. ROSENDORFF DID AS LAB DIRECTOR.

11:13AM  7      BUT THAT DOESN'T MEAN THAT AT THE TIME MS. HOLMES'S

11:13AM  8   TESTIMONY OR MS. HOLMES'S STATE OF MIND WAS NOT EVERYTHING THAT

11:13AM  9   WAS HAPPENING WITHIN THE CLIA LAB WAS BEING DONE IN A

11:14AM 10   REASONABLE, A RELIABLE, AND IN AN ACCURATE MANNER.

11:14AM 11      NOW, YOUR HONOR, I WOULD SUGGEST THAT WE JUST TAKE OUR

11:14AM 12   BREAK MAYBE NOW.  I JUST HAVE A BRIEF AMOUNT OF ADDITIONAL TIME

11:14AM 13   AND WE'LL FINISH UP AFTER THAT, BUT I PROBABLY HAVE 20 MINUTES.

11:14AM 14          THE COURT:  WOULD YOU PREFER THAT AS OPPOSED TO

11:14AM 15   PRESSING ON FOR 20 MINUTES?

11:14AM 16          MR. DOWNEY:  I THINK PERHAPS, YES.

11:14AM 17          THE COURT:  OKAY.  LET'S DO THAT.

11:14AM 18      LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK NOW.  WE'LL

11:14AM 19   TAKE 30 MINUTES, PLEASE.

11:14AM 20          THE CLERK:  COURT IS IN RECESS.

11:15AM 21      (JURY OUT AT 11:15 A.M.)

11:15AM 22          THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11:15AM 23   YOU.

11:15AM 24      THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR

11:15AM 25   BREAK.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                           9212

11:15AM   1       BEFORE WE DO BREAK, I WANT TO RAISE JUST ANOTHER COMMENT

11:15AM   2   JUST TO FOLLOW UP ON OUR CONVERSATION THIS MORNING, AND I THINK

11:15AM   3   IN THE COLLOQUY THAT I HAD WITH COUNSEL, PARTICULARLY WITH

11:15AM   4   MR. DOWNEY, I WAS ASKING QUESTIONS -- I'M TRYING TO FIND THE

11:15AM   5   TRANSCRIPT HERE -- BUT I THINK I WAS ASKING SOME QUESTIONS,

11:15AM   6   MR. DOWNEY, ABOUT WHAT A SOLUTION WOULD BE, OR IF A SOLUTION

11:15AM   7   WAS NEEDED IN REGARDS TO TRADE SECRETS AND IN REGARDS TO ADVICE

11:15AM   8   OF COUNSEL, AND I THINK YOU SAID I'M NOT GOING TO GO INTO THAT

11:15AM   9   ANY FURTHER.

11:15AM  10       AND THEN I MADE A COMMENT ABOUT, WELL, SHOULD I ENCOURAGE

11:15AM  11   THE GOVERNMENT TO, IN THEIR CLOSING, TO DO THIS AND DO THAT?

11:15AM  12       I JUST WANT TO BE CLEAR, THAT WAS A QUESTION.  AND YOU

11:15AM  13   ANSWERED THE QUESTION AFTER I THINK A COUPLE OF TIMES AS I SAID

11:16AM  14   SHOULD I ASK, SHOULD I ENCOURAGE THE GOVERNMENT, ARE YOU SAYING

11:16AM  15   I SHOULD ENCOURAGE THE GOVERNMENT TO COMMENT AS XXX, AND YOU

11:16AM  16   SAID RIGHT AS I KEPT GOING, RIGHT.

11:16AM  17            MR. DOWNEY:  RIGHT.

11:16AM  18            THE COURT:  AND THEN I SAID AT THE END, IS THAT WHAT

11:16AM  19   YOU'RE SAYING OR IS THAT WHAT I SHOULD DO?

11:16AM  20       AND I THINK YOU ANSWERED THAT AS A QUESTION.

11:16AM  21       I WANT TO BE CLEAR.  THAT WAS A QUESTION.  THE COURT WAS

11:16AM  22   NOT DIRECTING IN ANY WAY THAT THE GOVERNMENT SHOULD PROCEED IN

11:16AM  23   ANY MANNER AND I JUST WANT TO CONFIRM THAT THAT WAS YOUR

11:16AM  24   UNDERSTANDING.

11:16AM  25            MR. DOWNEY:  THAT IS MY UNDERSTANDING.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9213

11:16AM  1        I THINK IT WAS -- NOR DID I MEAN TO ENCOURAGE IT BY THE

11:16AM  2    STATEMENT, RIGHT, RIGHT, YES.

11:16AM  3              THE COURT:  RIGHT.

11:16AM  4              MR. DOWNEY:  I DON'T RECALL THE SPECIFICS OF WHAT

11:16AM  5    YOUR HONOR SAID, BUT I DID NOT HEAR THAT AS ENCOURAGEMENT BY

11:16AM  6    THE COURT TO DO THAT.

11:16AM  7              THE COURT:  I JUST WANTED TO MAKE SURE THAT'S -- I

11:16AM  8    FOUND IT HERE.

11:17AM  9        (PAUSE IN PROCEEDINGS.)

11:17AM 10              THE COURT:  THAT'S RIGHT.  I DON'T HAVE A TIME

11:17AM 11    STAMP, I'M SORRY.

11:17AM 12        BUT MY COMMENT WAS, "SO ARE YOU -- AM I HEARING YOU SAY,

11:17AM 13    'JUDGE, I'M GOING TO STAY AWAY, I'M NOT GOING TO SAY "ADVICE OF

11:17AM 14    COUNSEL," I'M NOT GOING TO SAY THAT SHE RELIED ON HER

11:17AM 15    ATTORNEY'S ADVICE.'"

11:17AM 16        AND THEN YOU SAID, "I WASN'T REALLY PLANNING TO RETURN TO

11:17AM 17    THAT."

11:17AM 18        AND THEN I CONTINUED MY COLLOQUY.  "'I'M GOING TO AVOID

11:17AM 19    THAT AND I'M NOT GOING TO GO BACK TO THAT IN MY ARGUMENT.  MY

11:17AM 20    ARGUMENT IS WELL BEYOND THAT AND I HAVE OTHER THINGS TO TALK

11:17AM 21    ABOUT IN THE TIME REMAINING."

11:17AM 22        "YES."

11:17AM 23        "AND I WOULD EXPECT THAT AND I WOULD OTHERWISE ENCOURAGE,

11:17AM 24    IF THEY WISH, THE GOVERNMENT" -- AND WHEN I WAS SAYING "IF THEY

11:17AM 25    WISH," I WAS SPEAKING FOR YOU.

UNITED STATES COURT REPORTERS

**ER-12793**

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                               9214

11:17AM  1          IN OTHER WORDS, SAYING, IS THIS WHAT YOU'RE TELLING ME TO

11:17AM  2     DO?

11:17AM  3          -- "THE GOVERNMENT IN THEIR REBUTTAL TO SPEAK TO THIS

11:17AM  4     ISSUE IF THEY WISH AND TO SUGGEST THAT THERE'S A DEFICIT IN THE

11:17AM  5     EVIDENCE AS TO ADVICE OF COUNSEL AND THEY MAY NOT CONSIDER IT

11:17AM  6     AND IT'S ARGUMENT, AND IT'S NOT EVIDENCE, BUT IT'S ARGUMENT,

11:17AM  7     AND THAT WOULD SUFFICE TO INFORM THE JURY AS TO ANY CONCERNS

11:18AM  8     THAT THEY MIGHT HAVE ABOUT WHETHER OR NOT THEY SHOULD RELY ON

11:18AM  9     AN ADVICE OF COUNSEL," QUESTION MARK.

11:18AM 10          AND THEN YOU SAID, "WELL, I DON'T HAVE ANY BURDEN WITH

11:18AM 11     REGARD TO THE INTENT DEFENSE."

11:18AM 12          I THINK YOU TALKED ABOUT THAT.  I THINK THAT WOULD BE

11:18AM 13     APPROPRIATE.

11:18AM 14          AND THEN I -- AT THE END OF YOUR COMMENT, THE COURT SAID,

11:18AM 15     "SO MY QUESTION WAS, SHOULD WE JUST RELY ON THE GOVERNMENT

11:18AM 16     TO -- THEY KNOW WHAT THE ISSUE IS, AND IF THEY WANT TO TALK

11:18AM 17     ABOUT IT, THEY CAN ADDRESS IT IN THEIR REBUTTAL."

11:18AM 18          AND THEN YOU WENT ON AND SUGGESTED THAT.

11:18AM 19          THAT WAS THE TRANSCRIPT.  I WAS THINKING ABOUT THIS AND I

11:18AM 20     DIDN'T WANT TO SUGGEST THAT THE COURT WAS IN ANY WAY

11:18AM 21     DIRECTING -- AS I SAID EARLIER IN MY COMMENTS, I'M NOT GETTING

11:18AM 22     INTO EITHER OF YOUR CASES, I'M STAYING AWAY FROM THAT.

11:18AM 23          I WAS CONCERNED ABOUT INSTRUCTIONS AND WHETHER THERE WAS A

11:18AM 24     DEFICIT IN INSTRUCTIONS GIVEN THE COMMENTS THAT THE COURT

11:18AM 25     SHOULD ADVISE ON.

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9215

11:18AM  1        WE HAD THAT COLLOQUY, BUT I JUST WANT TO BE CLEAR, I WAS

11:18AM  2   NOT ENCOURAGING, DIRECTLY ENCOURAGING THE GOVERNMENT TO TAKE

11:19AM  3   ANY OBJECTION ON THIS.

11:19AM  4        WHAT I COMMENTED THERE IS IN REGARDS TO A QUESTION,

11:19AM  5   HYPOTHETICAL IF YOU WILL, AND I THINK YOU ANSWERED.

11:19AM  6        IS THAT YOUR UNDERSTANDING OF HOW IT TRANSPIRED?

11:19AM  7             MR. DOWNEY:  WELL, I THINK IF IT WASN'T, IT'S CLEAR

11:19AM  8   NOW.

11:19AM  9             THE COURT:  DOES THE GOVERNMENT WISH TO COMMENT ON

11:19AM 10   THIS?

11:19AM 11             MR. BOSTIC:  YOUR HONOR, ONLY TO SAY THAT I PARSED

11:19AM 12   THE COMMENTS THE SAME WAY THE COURT DID AND I THINK THE SAME

11:19AM 13   WAY THE COURT INTENDED.

11:19AM 14        I DIDN'T TAKE THEM AS DIRECTION OR ENCOURAGEMENT TO THE

11:19AM 15   GOVERNMENT AS FAR AS THE CONTENT OF THE REBUTTAL.

11:19AM 16             THE COURT:  WELL, THANK YOU.  AND THAT -- BECAUSE

11:19AM 17   THAT WOULD BE INAPPROPRIATE FOR THE COURT TO ADVISE EITHER OF

11:19AM 18   YOU HOW TO ARGUE YOUR CASE, AND THAT'S --

11:19AM 19             MR. DOWNEY:  OF COURSE, YOUR HONOR.

11:19AM 20             THE COURT:  AND THAT WAS NOT MY INTENT.  I JUST WANT

11:19AM 21   TO BE CLEAR ON THAT.

11:19AM 22        I THOUGHT ABOUT THAT AND I THOUGHT, WELL, I BETTER --

11:19AM 23   SOMETIMES IN DISCOURSE WE SAY THINGS, AND I JUST DIDN'T WANT

11:19AM 24   THERE TO BE ANY LACK OF CLARITY ON THAT.

11:19AM 25        ALL RIGHT.  THANK YOU VERY MUCH.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                     9216

11:19AM   1          MR. DOWNEY:  UNDERSTOOD.  I SHOULD SAY, YOUR HONOR,

11:19AM   2   THAT ON LACK OF CLARITY, I REALIZED ON REVIEW OF THE TRANSCRIPT

11:19AM   3   THAT I HAD MISSPOKEN ON THE ISSUE THAT I BEGAN WITH TODAY, SO

11:20AM   4   I'VE TRIED TO CORRECT THAT AS PART OF OUR DISCUSSION.

11:20AM   5          THE COURT:  THANK YOU.  AND THANK YOU FOR STEERING

11:20AM   6   AWAY FROM AGE AND FATIGUE.  THANK YOU.

11:20AM   7       ALL RIGHT.  WE'LL TAKE OUR BREAK.

11:20AM   8          THE CLERK:  COURT IS IN RECESS.

11:20AM   9       (RECESS FROM 11:20 A.M. UNTIL 11:56 A.M.)

11:56AM  10       (JURY IN AT 11:56 A.M.)

11:56AM  11          THE COURT:  THANK YOU.  PLEASE BE SEATED.

11:56AM  12       WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:56AM  13   ARE PRESENT AGAIN.  OUR JURY IS PRESENT.

11:56AM  14       MR. DOWNEY.

11:56AM  15          MR. DOWNEY:  I WANT TO SPEND JUST A FEW MINUTES

11:56AM  16   TALKING WITH YOU ABOUT THE PATIENT COUNTS OF THE INDICTMENT AND

11:56AM  17   GIVE YOU THE FRAMEWORK THAT I THINK WILL BE HELPFUL TO YOU IN

11:56AM  18   LOOKING AT THOSE COUNTS.

11:56AM  19       FIRST OF ALL, RECALL WHAT THE CHARGE IS IN CONNECTION WITH

11:56AM  20   THE SECOND CONSPIRACY, THE PATIENT CONSPIRACY, AND THE PATIENT

11:56AM  21   COUNTS.  IT'S NOT THAT ANY INDIVIDUAL PATIENT GOT AN ERRANT

11:57AM  22   TEST.  THAT'S OBVIOUSLY A RESULT THAT NO ONE WANTS AND IT'S

11:57AM  23   UNDERSTANDABLY FRUSTRATING AND UPSETTING FOR THEM AND WE SAW

11:57AM  24   SOME OF THAT DURING THE COURSE OF THIS CASE.

11:57AM  25       BUT THE QUESTION IS, DID MS. HOLMES KNOW, IN RUNNING

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9217

11:57AM   1    THERANOS, THAT THERANOS WAS NOT ABLE TO CONSISTENTLY PROVIDE

11:57AM   2    ACCURATE AND RELIABLE RESULTS?

11:57AM   3        SO I THINK THE PLACE TO START WITH RESPECT TO THIS

11:57AM   4    ANALYSIS IS, IS WHAT WE KNOW ABOUT THE NUMBER OF TESTS THAT

11:57AM   5    THERANOS OFFERED AND WHAT THE GOVERNMENT DID IN CONNECTION WITH

11:57AM   6    ITS CASE.

11:57AM   7        I WOULD HAVE TO SAY FIRST, LADIES AND GENTLEMEN, THE

11:57AM   8    GOVERNMENT DIDN'T OFFER YOU ANY OVERVIEW DURING ITS CASE OF

11:57AM   9    STATISTICAL EVIDENCE.

11:57AM  10        WE HAVE NO IDEA OTHER THAN BASED ON THE ANECDOTES THAT

11:57AM  11    WE'VE HEARD THROUGH EMAILS ON A FEW OCCASIONS AND THE

11:58AM  12    INDIVIDUAL CASES WE KNOW ABOUT FROM THE THREE PATIENTS WHO

11:58AM  13    TESTIFIED OF ERRORS OR POTENTIAL ERRORS.

11:58AM  14        THERE WAS NO PRESENTATION OF EVIDENCE AS TO THE RATE THAT

11:58AM  15    THOSE ERRORS WERE OCCURRING.  THERE WAS NO SAMPLING OF DATA.

11:58AM  16    THERE WAS NO PRESENTATION AT ALL OF ANY KIND OF A STATISTICAL

11:58AM  17    ANALYSIS.

11:58AM  18        I WOULD SAY TO YOU, LADIES AND GENTLEMEN, THAT THAT ALONE

11:58AM  19    IS A BASIS ON WHICH TO DECIDE THAT THIS CHARGE DOES NOT HAVE

11:58AM  20    MERIT.

11:58AM  21        WHY?

11:58AM  22        WELL, WE KNOW FROM TESTIMONY DURING THE COURSE OF THE CASE

11:58AM  23    HOW MANY TESTS THERANOS OFFERED WHEN IT WAS RUNNING A CLINICAL

11:58AM  24    LAB, AND IT'S SOMEWHERE IN THE NEIGHBORHOOD AT LEAST OF 8

11:58AM  25    MILLION PATIENTS WHO GOT TESTS.  IT MAY HAVE BEEN MORE.  THERE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                    9218

11:58AM   1    WERE SLIGHTLY DIFFERENT ESTIMATES AS TO THE NUMBER OF TESTS

11:59AM   2    THAT WERE OFFERED.

11:59AM   3         NOW, IN REALTIME, WHAT DID MS. HOLMES KNOW BETWEEN 2013

11:59AM   4    AND EARLY 2016?  WHAT DID MS. HOLMES KNOW ABOUT INACCURACY WITH

11:59AM   5    RESPECT TO THOSE TESTS?

11:59AM   6         SO WE'RE NOT TALKING ABOUT DR. DAS'S ANALYSIS, WHICH IS

11:59AM   7    PERFORMED AFTER THESE EVENTS.  WE'RE TALKING ABOUT WHAT

11:59AM   8    HAPPENED IN REALTIME THAT TOLD HER OF ERRANT RESULTS AMONGST

11:59AM   9    THESE 8 MILLION TESTS?

11:59AM   10        WELL, THE TRUTH IS THAT WE DON'T REALLY KNOW MUCH EXCEPT

11:59AM   11   FOR THE PATIENTS WHO HAVE COME TO TESTIFY, AND THE GOVERNMENT

11:59AM   12   IN THE COURSE OF ITS CASE WAS ABLE TO PRESENT TESTIMONY FROM

11:59AM   13   THREE PATIENTS, AND THEY TESTIFIED THAT IN CONNECTION WITH

11:59AM   14   THREE DIFFERENT ASSAYS THAT THERANOS OFFERED, THAT SEVEN OF THE

12:00PM   15   RESULTS CONTAINED ERRORS OR SEEMED TO CONTAINED ERRORS.

12:00PM   16        TWO OF THOSE DOCTORS FOR THOSE PATIENTS TESTIFIED,

12:00PM   17   DR. ZACHMAN AND DR. BURNES.

12:00PM   18        THERE WERE NO OTHER WITNESSES AND NO OTHER TESTIMONY FROM

12:00PM   19   DOCTORS OR PATIENTS ABOUT ERRANT RESULTS.

12:00PM   20        SO THAT'S OUT OF THE 8 MILLION TESTS THAT WE KNOW WERE

12:00PM   21   OFFERED OVER TIME.

12:00PM   22        AND THEN I DO WANT TO LOOK AT EACH OF THOSE COUNTS

12:00PM   23   INDIVIDUALLY BECAUSE THEY'RE EACH IMPORTANT.

12:00PM   24        BUT I THINK, AS YOU CONSIDER BOTH THE CONSPIRACY COUNT AND

12:00PM   25   YOU CONSIDER EACH OF THESE INDIVIDUAL COUNTS, REMEMBER THAT THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                           9219

12:00PM   1     CHARGE HERE IS THAT MS. HOLMES INTENTIONALLY DEFRAUDED PEOPLE

12:00PM   2     IN SUGGESTING THAT THERANOS'S TESTS WERE ACCURATE OR RELIABLE.

12:00PM   3         AND THE EVIDENCE THAT HAS BEEN SHOWN IS THAT SHE SHOULD

12:00PM   4     HAVE KNOWN THAT BASED ON THESE THREE RESULTS OUT OF 8 MILLION

12:01PM   5     TESTS, AND PERHAPS, EVEN IF ONE WERE TO ACCEPT THE GOVERNMENT'S

12:01PM   6     OFFERED IMPLICATIONS FROM EMAILS, MAYBE ANOTHER 20 EMAILS,

12:01PM   7     WHICH WE DON'T REALLY KNOW WHAT THE END OF THAT STORY WAS.

12:01PM   8         BUT LET ME DISCUSS EACH OF THE CASES BECAUSE I THINK EACH

12:01PM   9     OF THESE CASES IS ALSO INSTRUCTIVE STATISTICALLY.

12:01PM   10        YOU KNOW THAT MS. TOMPKINS TESTIFIED, AND SHE GOT AN HIV

12:01PM   11    RESULT WHICH SHE UNDERSTOOD TO BE AN HIV POSITIVE RESULT.

12:01PM   12        SHE WAS TREATED BY A PHYSICIAN NAMED DR. ASIN,

12:01PM   13    GERALD ASIN.

12:01PM   14        THE GOVERNMENT CHOSE NOT TO CALL DR. ASIN AS PART OF ITS

12:01PM   15    CASE-IN-CHIEF.

12:01PM   16        BUT WE KNOW WHAT DR. ASIN CONCLUDED WITH RESPECT TO

12:01PM   17    THERANOS'S TESTS OVER TIME BECAUSE WE INTRODUCED THROUGH OUR

12:01PM   18    SUMMARY WITNESS, MR. MIDDLETON, THE RESULTS OF THE STATISTICS

12:02PM   19    AS TO HOW MANY TESTS DR. ASIN ORDERED FROM THERANOS, AND IT'S

12:02PM   20    ABOUT 2,000 TESTS.

12:02PM   21        WE ONLY KNOW OF THE ONE ERRANT RESULT, EVEN FOR THAT ONE

12:02PM   22    PHYSICIAN WE KNOW HAD AN ERRANT TEST, WE KNOW HE ORDERED ABOUT

12:02PM   23    2,000 TESTS.

12:02PM   24        AND THEN WE HEARD FROM MR. ELLSWORTH WHO HAD THE ERRANT

12:02PM   25    PSA TEST, AND AS YOU RECALL, HE WAS DR. BURNES'S PATIENT AND HE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9220

12:02PM  1    DID TESTIFY, AND HE ACTUALLY TESTIFIED THAT HE HAD BEEN USING

12:02PM  2    THERANOS SERVICES FOR A YEAR, AND THAT IN CONNECTION WITH ALL

12:02PM  3    OF THE TEST RESULTS THAT WERE GENERATED OVER THE COURSE OF THAT

12:02PM  4    YEAR BY PATIENTS OF HIS WHO WENT TO THERANOS, THE GOVERNMENT

12:02PM  5    ACTUALLY DIDN'T EVEN ASK TO SEE THE OTHER RESULTS TO EVALUATE

12:03PM  6    WHETHER THEY WERE CORRECT OR NOT.

12:03PM  7         SO, AGAIN, WITH ONE DOCTOR WHO USED THE SERVICE OVER A

12:03PM  8    LONG PERIOD OF TIME, THERE APPEARS TO HAVE BEEN ONE TESTING

12:03PM  9    ERROR THAT THE GOVERNMENT COULD IDENTIFY.

12:03PM  10         THEN WE ALSO HAD TESTIMONY EARLIER IN THE CASE FROM

12:03PM  11   MS. GOULD, WHICH WAS OBVIOUSLY A SITUATION FOR HER THAT WAS A

12:03PM  12   HORRIBLE SITUATION, AND WE KNOW FROM THE TESTIMONY THAT HER

12:03PM  13   NURSE PRACTITIONER WAS DR. ZACHMAN, AND DR. ZACHMAN WORKED FOR

12:03PM  14   A CLINIC, AND SHE HAD SEVERAL OTHER PHYSICIANS AND

12:03PM  15   PRACTITIONERS WHO WERE PART OF THAT CLINIC WITH HER.

12:03PM  16         AND SHE WAS ASKED BY THE GOVERNMENT AS PART OF THIS

12:03PM  17   INVESTIGATION TO LOOK THROUGH THE RECORDS OF THAT CLINIC AND TO

12:03PM  18   IDENTIFY OTHER PROBLEMATIC RESULTS ON THE HCG ASSAY, AND SHE --

12:04PM  19   WE INTRODUCED THE EVIDENCE WHEN DR. ZACHMAN TESTIFIED THAT SHE,

12:04PM  20   SHE WASN'T ABLE TO IDENTIFY OTHER INSTANCES OF ERROR FOR -- IN

12:04PM  21   THOSE CASES.

12:04PM  22         MY POINT, LADIES AND GENTLEMEN, IS SIMPLY THIS:

12:04PM  23   DR. ROSENDORFF TESTIFIED THAT IT WAS WELL-KNOWN THAT THERE WERE

12:04PM  24   ERRORS IN CONNECTION WITH LAB TESTING.  IT DOESN'T MATTER WHAT

12:04PM  25   THE LAB IS, IT'S -- THERE ARE ERRORS, AND NO ONE IS EXCUSING

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9221

12:04PM   1      THAT OR DEFENDING IT.

12:04PM   2          BUT THE QUESTION IS WHETHER THE ERRORS HERE PUT MS. HOLMES

12:04PM   3      ON NOTICE THAT THERE WAS A PROBLEM, AND STATISTICALLY THERE'S

12:04PM   4      NO EVIDENCE THAT -- NO SUGGESTION THAT THE EVIDENCE THAT THE

12:04PM   5      GOVERNMENT HAS ADDUCED THAT THESE ERRORS WERE HAPPENING AT A

12:04PM   6      LEVEL THAT SHOULD HAVE PUT HER ON NOTICE THAT THERANOS'S TESTS

12:05PM   7      WERE INACCURATE OR UNRELIABLE.

12:05PM   8          LET ME LOOK AT THE INDIVIDUAL CASES IN A BIT MORE DETAIL,

12:05PM   9      BECAUSE EVEN WITHIN THE CASES I THINK THEY'RE INSTRUCTIVE AS TO

12:05PM  10      THE DATA THAT HAS BEEN PRESENTED TO YOU.

12:05PM  11          COUNT TEN CONCERNS MS. TOMPKINS, THE PATIENT WHO GOT AN

12:05PM  12      HIV RESULT THAT SHE INTERPRETED AS AN HIV POSITIVE REPORT.

12:05PM  13          I SHOULD SAY, FIRST OF ALL, THAT THAT WAS NOT ON A

12:05PM  14      THERANOS DEVICE.  THE HIV POSITIVE TEST THAT SHE UNDERSTOOD SHE

12:05PM  15      GOT WAS ON AN FDA APPROVED DEVICE, A COMMERCIAL DEVICE, SO THE

12:05PM  16      TEST WAS NOT RUN WITH THERANOS TECHNOLOGY.

12:05PM  17          BUT BE THAT AS IT MAY, THE LAB RESULTS ON THEIR FACE

12:05PM  18      ACTUALLY WOULD BE DIFFICULT FOR A LAYPERSON TO INTERPRET

12:05PM  19      BECAUSE THEY INTRODUCE SOMEWHAT CONTRADICTORY THINGS.

12:06PM  20          YOU CAN LOOK AT THIS EXCERPT FROM THE LAB RESULTS OF

12:06PM  21      MS. TOMPKINS, AND AS YOU SEE, ALTHOUGH THERE WERE SOME

12:06PM  22      INDICATIONS OF POSITIVE FINDINGS IN CONNECTION WITH THIS TEST,

12:06PM  23      THERE WAS ALSO A STATEMENT THAT SAID "NO LABORATORY EVIDENCE OF

12:06PM  24      AN HIV-1 INFECTION."

12:06PM  25          NOW, THE GOVERNMENT DIDN'T SHOW YOU ANY EVIDENCE THAT THIS

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                        9222

12:06PM   1    RESULT -- WHAT SENSE WAS TO BE MADE OF THIS RESULT AND WHETHER

12:06PM   2    IT ACTUALLY CONVEYED THAT THIS PATIENT WAS POSITIVE FOR HIV.

12:06PM   3        AND, IN FACT, I DON'T THINK THE GOVERNMENT INTRODUCED ANY

12:06PM   4    TESTIMONY FROM AN EXPERT, OR EVEN ANY TESTIMONY FROM THE DOCTOR

12:06PM   5    WITH WHOM MS. TOMPKINS HAD DEALT, DR. ASIN.

12:06PM   6        BUT WE KNOW BECAUSE OF A DOCUMENT THAT WE ADMITTED LATE IN

12:06PM   7    THE CASE WHAT HAPPENED INSIDE OF THERANOS WITH REGARD TO

12:07PM   8    MS. TOMPKINS'S TESTS.

12:07PM   9        AND THIS IS NOT A DOCUMENT THAT YOU SAW DURING THE COURSE

12:07PM  10    OF THE CASE, BUT THIS IS EXHIBIT 14259.  AND I WOULD ENCOURAGE

12:07PM  11    YOU, IN EVALUATING COUNT TEN, TO LOOK AT IT.

12:07PM  12        THERE'S A REPORT INTERNALLY FROM PERSONNEL THAT

12:07PM  13    MS. TOMPKINS HAD BEEN SPOKEN TO, AND DR. ASIN HAD BEEN SPOKEN

12:07PM  14    TO TO RECONCILE THIS SOMEWHAT CONFUSING REPORT OF RESULTS.

12:07PM  15        AND THE RECOMMENDATION WAS THAT THIS DID NOT INDICATE THAT

12:07PM  16    SHE WAS HIV POSITIVE, BUT THAT SHE NEEDED TO PURSUE FURTHER

12:07PM  17    TESTING IN LIGHT OF THE RESULTS WHICH HAD AN INCONSISTENCY.

12:07PM  18        THIS EMAIL CONVEYS THAT THAT HAD BEEN CONVEYED TO

12:07PM  19    DR. ASIN; THAT DR. ASIN SAID THAT HE COMPLETELY UNDERSTOOD THE

12:07PM  20    TESTING PROTOCOL, AND HE DIDN'T HAVE ANY ISSUES WITH THESE

12:07PM  21    RESULTS OR WITH THE WAY THAT THE PROTOCOLS WERE EXPLAINED TO

12:08PM  22    HIM.

12:08PM  23        THEN THE THERANOS PERSON GOES ON TO EXPLAIN THAT THEY ALSO

12:08PM  24    TALKED TO MS. TOMPKINS.  THEY EXPLAINED WHAT THE CDC

12:08PM  25    RECOMMENDED IN THIS SITUATION FOR FURTHER TESTING.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                9223

12:08PM  1        MS. TOMPKINS WAS UNDERSTANDABLY FRUSTRATED BY THE

12:08PM  2   CONFUSION, AND SHE SAID -- BUT SHE WAS ADVISED THIS IS WHY, IN

12:08PM  3   CONNECTION WITH THIS CIRCUMSTANCE, INITIAL TEST RESULTS HAVE TO

12:08PM  4   BE EITHER CONFIRMED OR DISPROVED BY FOLLOW-UP TESTS.

12:08PM  5        THEN THE UNDERSTANDING WAS, WELL, THIS IS REALLY FOR A

12:08PM  6   CONVERSATION BETWEEN HER AND HER PHYSICIAN, DR. ASIN.

12:08PM  7        NOW, WE DON'T KNOW WHAT HAPPENED THERE BECAUSE DR. ASIN

12:08PM  8   WASN'T CALLED BY THE GOVERNMENT.

12:08PM  9        BUT THE SUGGESTION THAT MS. TOMPKINS WAS GIVEN AN

12:08PM  10  INDICATION THAT SHE WAS HIV POSITIVE AND THAT THERE WAS NO

12:08PM  11  COMMUNICATION WITH HER TO CLARIFY POTENTIAL ADDITIONAL TESTING,

12:08PM  12  AND THAT THERE WAS NO ADDITIONAL COMMUNICATION WITH HER

12:09PM  13  PHYSICIAN TO MAKE SURE THAT THE LAB AND THE DOCTOR WERE ALIGNED

12:09PM  14  AS TO HOW THE PATIENT SHOULD BE TREATED IS JUST NOT FAIR AND

12:09PM  15  NOT CONSISTENT WITH WHAT THE DOCUMENTS SHOW.

12:09PM  16        SO I WOULD PARTICULARLY ASK YOU TO LOOK AT THAT EXHIBIT,

12:09PM  17  14259, BECAUSE I THINK IT GIVES YOU A WINDOW ON THE

12:09PM  18  PRESENTATION OF SOME OF THIS EVIDENCE.

12:09PM  19        LET ME TALK ABOUT COUNT ELEVEN, WHICH RELATES TO

12:09PM  20  MR. ELLSWORTH WHO HAD THE PSA TESTS WHERE THERE WERE RESULTS

12:09PM  21  THAT I THINK IT WAS FAIRLY OBVIOUS CONTAINED ERRORS ACROSS THE

12:09PM  22  TESTS.

12:09PM  23        WHAT HAPPENED WITH REGARD TO THE ASSAY THAT MR. ELLSWORTH

12:09PM  24  RECEIVED HIS TESTS ON?

12:09PM  25        WELL, MS. HOLMES DIDN'T FIND OUT ABOUT THIS ERRANT TEST

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                                    9224

12:09PM 1    RESULT UNTIL WEEKS AFTER IT HAPPENED.  THERE'S NO EVIDENCE THAT

12:10PM 2    SHE KNEW OF THIS PARTICULAR PATIENT SITUATION UNTIL WEEKS AFTER

12:10PM 3    IT HAPPENED.

12:10PM 4         AND BY THE TIME THAT MS. HOLMES WAS TOLD ABOUT IT, SHE WAS

12:10PM 5    TOLD THE ISSUE HAD BEEN RESOLVED BECAUSE THE PSA TEST WAS NO

12:10PM 6    LONGER BEING OFFERED ON THE EDISON DEVICE.

12:10PM 7         THAT'S CONVEYED IN DOCUMENTS THAT YOU SEE IN THE CASE WITH

12:10PM 8    THE LISTING OF DATES AFTER THE LAST DATE OF MR. ELLSWORTH'S

12:10PM 9    MAY 16TH DATE, AND BY THE END OF JUNE THAT TEST WAS NO LONGER

12:10PM 10   BEING OFFERED ON THE THERANOS DEVICE.

12:10PM 11        LET'S TALK ABOUT THE -- MS. GOULD, WHO HAD THE SITUATION

12:10PM 12   WITH THE HCG TEST.

12:10PM 13        ALL INDICATIONS FROM THE RECORD HERE AGAIN ARE NOT THAT

12:10PM 14   SHE DIDN'T RECEIVE ERRONEOUS RESULTS IN THIS INSTANCE.  I THINK

12:11PM 15   THE RECORD INDICATES THAT THEY WERE VIEWED AS ERRONEOUS

12:11PM 16   RESULTS, AND THAT THERANOS TOOK THEM AS ERRONEOUS RESULTS, AND

12:11PM 17   THAT IT RESPONDED BY SUGGESTING TO HER THAT THE COMPANY HAD

12:11PM 18   MADE AN ERROR AND THAT THE COMPANY APOLOGIZED FOR THAT ERROR,

12:11PM 19   AND THAT IT WANTED TO TAKE STEPS WITH RESPECT TO HER AND WITH

12:11PM 20   RESPECT TO HER TREATING PHYSICIANS TO BOTH ACKNOWLEDGE THAT AND

12:11PM 21   TO TAKE STEPS TO CORRECT THE EFFECTS OF ANY ERROR ON HER.

12:11PM 22        AGAIN, THE ALLEGATION HERE IS THAT MS. HOLMES KNEW THAT

12:11PM 23   THE COMPANY COULD NOT CONSISTENTLY PROVIDE ACCURATE AND

12:11PM 24   RELIABLE RESULTS.

12:11PM 25        WHEN YOU HAVE A POOL OF MILLIONS OF TESTS, IT'S HARD TO

9225
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

12:11PM  1    SEE HOW THESE THREE INSTANCES PROVE THAT KIND OF KNOWLEDGE ON

12:12PM  2    HER BEHALF WHEN, IN FACT, SHE MAY NOT HAVE KNOWN UNTIL THEY

12:12PM  3    WERE RESOLVED OF TWO OF THEM, AND IN THE THIRD INSTANCE THE

12:12PM  4    RESPONSE WAS TO TRY TO ADDRESS THE SITUATION.

12:12PM  5        WHAT DID MS. HOLMES HEAR ABOUT PATIENT EXPERIENCES THAT

12:12PM  6    YOU DIDN'T HEAR AS PART OF THE GOVERNMENT'S CASE?

12:12PM  7        WELL, WE INTRODUCED SEVERAL EXHIBITS DURING THE COURSE OF

12:12PM  8    THE CASE WHICH I WOULD ENCOURAGE YOU TO LOOK AT IN WHICH SHE

12:12PM  9    WAS GETTING POSITIVE FEEDBACK ABOUT WHAT THE TECHNOLOGY WAS

12:12PM 10    DOING TO EVALUATE PEOPLE'S HEALTH, NOT ONLY BECAUSE THE TESTS

12:12PM 11    WERE CONSIDERED ACCURATE AND RELIABLE.  THERE ARE EXAMPLES OF

12:12PM 12    THOSE.

12:12PM 13        BUT ALSO BECAUSE CERTAIN POPULATIONS THAT DID NOT HAVE AS

12:12PM 14    MUCH ACCESS TO BLOOD TESTING HAD ACCESS BECAUSE THERANOS'S

12:12PM 15    METHOD OF DRAWING BLOOD WAS MORE COMFORTABLE, AS IN THIS

12:12PM 16    EXHIBIT, 7623.  I'M SORRY.  IT'S IN EXHIBIT 7514.

12:13PM 17        BUT IN EXHIBIT 7623, THIS REALLY IS A COMMENT ON ACCURACY

12:13PM 18    BECAUSE THERANOS'S TECHNOLOGY ALLOWED THIS PATIENT TO RECEIVE

12:13PM 19    HER TEST RESULTS VERY QUICKLY BECAUSE OF THE TRANSMISSION

12:13PM 20    THROUGH SOFTWARE.

12:13PM 21        AND SHE WAS ABLE TO DISCOVER AHEAD, AHEAD OF HER DOCTOR,

12:13PM 22    AND UNLIKE THE EXPERIENCE THAT SHE HAD HAD WITH OTHER

12:13PM 23    COMPANIES, SHE WAS ABLE TO UNDERSTAND THAT SHE HAD A SERIOUS,

12:13PM 24    SERIOUS MEDICAL ISSUE.

12:13PM 25        SHE WAS VERY GRATEFUL, WHICH SHE CONVEYED BACK TO THE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                         9226

12:13PM  1    COMPANY.

12:13PM  2         YOU'LL REMEMBER THE STANFORD PHYSICIAN IN EXHIBIT 7586A,

12:13PM  3    WHO REPORTED HE WAS A PHYSICIAN AND THAT TESTS THAT HE HAD GOT

12:13PM  4    FROM THERANOS WERE $25.  THEY WOULD HAVE BEEN 750 ELSEWHERE.

12:13PM  5         AND THAT HE, AS A PHYSICIAN, COMPARED THE RESULTS THAT HE

12:14PM  6    WAS GETTING TO THE RESULTS THAT WERE BEING OFFERED BY OTHER

12:14PM  7    LABS, AND THAT THEY WERE CONGRUENT.

12:14PM  8         THAT'S -- THIS IS THE KIND OF INFORMATION THAT MS. HOLMES

12:14PM  9    WAS RECEIVING IN REALTIME.

12:14PM 10         AND SOME OF THAT FEEDBACK WAS EXTRAORDINARY.  I MEAN,

12:14PM 11    PEOPLE TESTIFYING ABOUT -- THROUGH EMAIL TESTIFYING ABOUT

12:14PM 12    TRAVELLING LONG DISTANCES TO COME TO THERANOS TO BE TESTED

12:14PM 13    BECAUSE THE PRICES MADE IT ACCESSIBLE, AND THAT VERY MUCH

12:14PM 14    INFORMED HER VIEW OF WHAT THERANOS SERVICES WERE DOING FOR

12:14PM 15    PEOPLE'S HEALTH.

12:14PM 16         I WANT YOU TO LOOK FOR A MOMENT AT EXHIBIT 2214 AND NOTE

12:14PM 17    THIS COMMENT ABOUT SOMEBODY COMING ALL OF THE WAY FROM SOUTHERN

12:14PM 18    CALIFORNIA TO GET THESE TESTS BECAUSE THEY WERE, THEY WERE

12:14PM 19    CHEAPER IN ARIZONA THAN THEY WERE IN CALIFORNIA.

12:14PM 20         AND THE COST HAD BEEN KILLING THIS PATIENT BECAUSE AS A

12:15PM 21    CANCER PATIENT, THEY HAD TO GET FREQUENT TESTING AND AFFORDING

12:15PM 22    IT WAS DIFFICULT.

12:15PM 23         THIS IS THE LONGITUDINAL ISSUE THAT I MENTIONED YESTERDAY

12:15PM 24    IN CONNECTION WITH MS. HOLMES'S STATE OF MIND.

12:15PM 25         PEOPLE COULD CONTINUE TO GET THEIR BLOOD TESTED MORE

UNITED STATES COURT REPORTERS

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9227

12:15PM   1    FREQUENTLY SO THEY COULD GET MORE SNAPSHOTS OF THEIR HEALTH

12:15PM   2    WHICH WOULD GIVE THEM MORE ACCURATE INFORMATION ABOUT WHAT WAS

12:15PM   3    GOING ON WITH THEM.

12:15PM   4        THIS IS WHAT MS. HOLMES WAS SEEING IN REALTIME.

12:15PM   5        NOW, THERE'S ONE LAST COUNT IN CONNECTION WITH THE

12:15PM   6    INDICTMENT THAT I'LL JUST MENTION VERY BRIEFLY, AND THIS IS

12:15PM   7    COUNT 12 WHICH RELATED, IF YOU RECALL, TO MR. SCHENK'S

12:15PM   8    DISCUSSION YESTERDAY TO THE HORIZON ENTITY, WHICH WAS AN

12:15PM   9    ADVERTISING ENTITY.

12:15PM  10        MY COMMENTS ON THIS WILL BE VERY BRIEF BECAUSE YOU REALLY

12:16PM  11    HAVE NO EVIDENCE RELATING TO THIS COUNT.

12:16PM  12        WE DON'T KNOW -- WE DO KNOW THERE WAS A WIRE TRANSFER FROM

12:16PM  13    THERANOS TO HORIZON IN CONNECTION WITH THIS.  WE DON'T KNOW

12:16PM  14    WHETHER THAT WIRE WAS USED TO BUY ADVERTISEMENTS, WE DON'T KNOW

12:16PM  15    WHETHER ADVERTISEMENTS RAN, AND IF THEY DID, WHAT THEY SAID.

12:16PM  16        WE DON'T KNOW OF ANY RELATIONSHIP BETWEEN MS. HOLMES AND

12:16PM  17    THE CONTENT OF THOSE ADS.  SO THE GOVERNMENT HAS REALLY PROVED

12:16PM  18    NOTHING WITH RESPECT TO THIS OTHER THAN THAT THERE WAS A WIRE

12:16PM  19    TRANSFER.

12:16PM  20        THE OTHER WITNESS WHO TESTIFIED ABOUT THIS WAS MS. SPIVEY,

12:16PM  21    THE CONTROLLER, WHO SAID SHE DID IN FACT SEND THIS WIRE AND

12:16PM  22    THAT HORIZON WAS A MARKETING FIRM.

12:16PM  23        THE LAST SUBSTANTIVE ISSUE I WANT TO TALK TO YOU ABOUT,

12:16PM  24    LADIES AND GENTLEMEN, IS EACH SIDE'S VIEW OF WHAT MS. HOLMES'S

12:16PM  25    MOTIVES WERE.

9228
CLOSING ARGUMENT BY MR. DOWNEY (RES.)

12:17PM  1      YOU RECALL THAT MR. LEACH SAID TO YOU IN OPENING STATEMENT

12:17PM  2  THAT THE REASON HE WOULD DEMONSTRATE TO YOU THAT MS. HOLMES

12:17PM  3  COMMITTED CRIMES WAS BECAUSE SHE FOUND HERSELF, SHORTLY BEFORE

12:17PM  4  SHE RAISED MONEY FROM INVESTORS, OUT OF TIME AND OUT OF MONEY.

12:17PM  5      AND MR. SCHENK BEGAN HIS REMARKS WITH THAT SAME THEME

12:17PM  6  YESTERDAY.

12:17PM  7      I WANT TO LOOK FIRST AT THE EVIDENCE IN SOME DETAIL, AND

12:17PM  8  THEN I WANT TO COMMENT A LITTLE FURTHER ON IT.

12:17PM  9      FIRST, THE GOVERNMENT'S THEORY HERE IS THAT IN 2009

12:17PM  10  MS. HOLMES RAN OUT OF MONEY, EARLY 2009.  WE DON'T KNOW THE

12:17PM  11  PRECISE DATE.

12:17PM  12      MS. SPIVEY TESTIFIED IT WAS SOMETIME IN EARLY 2009 THAT

12:17PM  13  THE COMPANY WAS RUNNING LOW ON CASH.

12:18PM  14      MS. SPIVEY ALSO TESTIFIED THAT AT SOME TIME LATER IN 2009,

12:18PM  15  THERANOS WAS NO LONGER LOW ON CASH, THAT THEY SECURED A LOAN

12:18PM  16  FROM FIDELITY AND THAT THE COMPANY WAS FINANCIALLY STABLE.

12:18PM  17      THE GOVERNMENT'S THEORY IS THAT MS. HOLMES ENGAGED WITH

12:18PM  18  WALGREENS AND SAFEWAY BEGINNING IN MARCH 2010, A YEAR AFTER

12:18PM  19  THIS PERIOD WHERE THE COMPANY WAS SHORT ON CASH, BECAUSE IT HAD

12:18PM  20  BEEN SHORT ON CASH IN THE EARLY PART OF 2009.

12:18PM  21      THERE'S JUST NO EVIDENCE TO SUPPORT THE GOVERNMENT'S

12:18PM  22  THEORY THAT MS. HOLMES WAS OUT OF MONEY IN CONNECTION WITH

12:18PM  23  THIS.  THE AGREEMENT WITH WALGREENS WAS NOT SIGNED UNTIL JULY

12:18PM  24  OF 2010 AND PAYMENTS UNDER THAT AGREEMENT WEREN'T MADE UNTIL

12:18PM  25  LATER.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9229

12:18PM   1          THAT'S LITERALLY AFTER, 15 MONTHS AFTER MR. LEACH AND

12:19PM   2     MR. SCHENK TELL YOU THE COMPANY WAS DESPERATE FOR MONEY AND HAD

12:19PM   3     TO GO OUT AND DECEIVE PEOPLE.

12:19PM   4          THERE'S NO EVIDENCE AT ALL, NONE AT ALL, WHICH LINKS

12:19PM   5     THERANOS'S EFFORTS TO ENTER INTO PARTNERSHIPS WITH WALGREENS

12:19PM   6     AND SAFEWAY TO ANY DESPERATION FOR MONEY, ANY CONCERN ABOUT

12:19PM   7     MONEY.

12:19PM   8          WHAT DOES THE RECORD SHOW ABOUT THE PERIOD WHERE THOSE

12:19PM   9     PARTNERSHIPS WERE DISCUSSED?

12:19PM  10          EXACTLY THE OPPOSITE.  THERANOS WENT OUT TO RAISE MONEY

12:19PM  11     DURING THE HEIGHT OF ITS ACHIEVEMENT.  REMEMBER THAT IT WAS IN

12:19PM  12     EARLY 2010 THAT THERANOS BEGAN TO BELIEVE THAT IT HAD ACHIEVED

12:19PM  13     THE TECHNOLOGICAL BREAKTHROUGH THAT IT WOULD BE ABLE TO OFFER

12:19PM  14     ANY TEST ON ITS SMALL DEVICE AND TO ANALYZE ANY TEST, AND THEY

12:19PM  15     WANTED TO BRING THAT TECHNOLOGY OUT TO THE PUBLIC, AND THEY

12:20PM  16     TALKED TO RETAIL STORES, INCLUDING WALGREENS AND SAFEWAY, ABOUT

12:20PM  17     THAT AND THEY DECIDED TO ENTER INTO THOSE PARTNERSHIPS.  THAT'S

12:20PM  18     THE STORY THAT WE'VE TOLD YOU.

12:20PM  19          THE STORY THAT THE GOVERNMENT HAS TOLD YOU IS THAT THOSE

12:20PM  20     PARTNERSHIPS WERE CREATED BECAUSE 15 MONTHS BEFORE THERE HAD

12:20PM  21     BEEN A DESPERATION FOR CASH.

12:20PM  22          YOU HAVE TO WEIGH WHICH OF THOSE MOTIVES SEEMS MORE

12:20PM  23     PLAUSIBLE TO YOU.

12:20PM  24          NOW, IN 2013 THE GOVERNMENT SAYS THE CONSPIRACY WAS AGAIN

12:20PM  25     REINFORCED.  OF COURSE IT WAS ONGOING IN THE GOVERNMENT'S VIEW

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9230

12:20PM   1    FROM 2010 TO 2013, BUT THERE WAS ADDITIONAL ACTIVITY BECAUSE

12:20PM   2    THE GOVERNMENT WAS ABLE TO LOCATE A POINT IN 2013 WHEN THERANOS

12:20PM   3    WAS LOW ON CASH AND INVESTMENTS WERE TAKEN IN THEREAFTER.

12:20PM   4        BUT YOU KNOW THAT THAT THEORY ALSO HAS NO MERIT BECAUSE

12:20PM   5    YOU KNOW WHAT ELSE WAS HAPPENING IN CONNECTION WITH THAT

12:21PM   6    TIMEFRAME, WHICH IS THAT THERANOS WAS ABOUT TO ENTER INTO THE

12:21PM   7    AGREEMENT WITH WALGREENS WHERE THE ROLLOUT PLAN FOR ALL OF THE

12:21PM   8    STORES THAT THERANOS AND WALGREENS WERE GOING TO OFFER BLOOD

12:21PM   9    TESTING SERVICES IN WAS ABOUT TO BE SIGNED.  THEY HAD BEEN

12:21PM  10    DISCUSSING THAT SINCE SEPTEMBER.

12:21PM  11        ULTIMATELY THE C1 INVESTMENT CLOSES AT THE END OF

12:21PM  12    DECEMBER 2013.  THE GOVERNMENT SAYS BECAUSE SOME OF THOSE

12:21PM  13    INVESTORS SENT MONEY EARLIER THAN THAT, THAT THEY WERE

12:21PM  14    SOLICITED BECAUSE OF A DESPERATION FOR CASH.

12:21PM  15        YOU HAVEN'T HEARD FROM ANY OF THOSE INVESTORS ON THAT

12:21PM  16    WITNESS STAND.  THE GOVERNMENT HAS NO IDEA.  THIS RECORD SHOWS

12:21PM  17    NOTHING TO YOU ABOUT WHY THOSE TRANSACTIONS WERE ENTERED.

12:21PM  18        AND WE KNOW THAT WITH REGARD TO THE WITNESSES THAT THEY

12:21PM  19    DID BRING, WITH MR. EISENMAN, WITH MR. LUCAS, AND MR. TOLBERT

12:21PM  20    WHO INVESTED IN THAT PERIOD, WE KNOW FROM THE RECORD THAT

12:22PM  21    THERANOS -- THAT WALGREENS HAD AGREED TO AND DID MAKE A

12:22PM  22    SUBSTANTIAL PAYMENT TO THERANOS AT THE SAME TIME AS THOSE

12:22PM  23    INVESTMENTS.

12:22PM  24        WHAT IS THE STORY AS TO WHY THERANOS SOUGHT INVESTMENTS

12:22PM  25    THEN?

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9231

12:22PM   1        BECAUSE THEY SIGNED THAT CONTRACT WITH WALGREENS.  THEY

12:22PM   2   NEEDED TO BUILD UP THE CAPACITY TO OFFER THEIR BLOOD TESTING

12:22PM   3   SERVICES IN 3,000 STORES, TO TRAIN ALL OF THE PERSONNEL, TO

12:22PM   4   BUILD MANUFACTURING FACILITIES, TO BUILD UNITS, TO CONTINUE

12:22PM   5   WITH RESEARCH AND DEVELOPMENT, ALL OF THOSE THINGS.  THAT'S

12:22PM   6   WHAT THAT FUND RAISING WAS ABOUT DURING THAT TIME.

12:22PM   7        YOU DECIDE WHICH OF THOSE MOTIVES MAKES MORE SENSE TO YOU

12:22PM   8   IN LIGHT OF THE OVERALL RECORD OFFERED IN THIS CASE.

12:22PM   9        I ALSO SUGGESTED TO YOU WHEN WE WERE LOOKING AT THE ISSUE

12:22PM  10   OF REVENUE BEFORE THAT REALLY UNDERLYING ALL OF THIS -- AND IF

12:22PM  11   YOU THINK BACK TO MR. LEACH'S OPENING, AND EVEN MR. SCHENK'S

12:23PM  12   REMARKS YESTERDAY, IS THE NOTION THAT THERANOS WASN'T MAKING

12:23PM  13   ANY MONEY.  THERE WAS NO CASH COMING IN SO THEY HAD TO

12:23PM  14   CONTINUALLY RECRUIT INVESTORS.

12:23PM  15        YOU KNOW FROM THE DOCUMENT THAT I SHOWED YOU EARLIER

12:23PM  16   THAT'S NOT TRUE.  FROM INSURERS, FROM HOSPITALS, FROM OTHER

12:23PM  17   PLACES, THERANOS WAS GETTING TENS OF MILLIONS OF DOLLARS DURING

12:23PM  18   THIS PERIOD BECAUSE ALL OF THOSE PARTNERS BELIEVED THAT

12:23PM  19   THERANOS WOULD OFFER THESE SERVICES AND THAT THEY WOULD BE

12:23PM  20   SUCCESSFUL IN TREATING PATIENTS.

12:23PM  21        SO THEY WERE EAGER FOR PARTNERSHIPS WITH THERANOS AND

12:23PM  22   THERANOS WAS TAKING A GOOD DEAL OF MONEY IN.

12:23PM  23        NOW, I WOULD ASK YOU TO LOOK AT REALLY THE TWO STORIES

12:23PM  24   THAT ARE TOLD HERE IN LIGHT OF THE DOCUMENTS THAT YOU HAVE IN

12:23PM  25   FRONT OF YOU.

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                          9232

12:23PM   1        OUR STORY IS THAT MS. HOLMES WAS VERY DEVOTED TO HER

12:23PM   2    MISSION, AND THAT SHE DID NOT, IN CONNECTION WITH HER WORK AT

12:24PM   3    THERANOS, SELL ANY STOCK.

12:24PM   4        THAT, LADIES AND GENTLEMEN, IS UNDISPUTED.  FROM THE TIME

12:24PM   5    SHE FOUNDED THIS COMPANY UNTIL THE TIME THAT THIS COMPANY

12:24PM   6    COLLAPSED, SHE DID NOT SELL A SINGLE SHARE OF STOCK DESPITE

12:24PM   7    REPEATED OPPORTUNITIES, ONE AFTER ANOTHER, TO SELL THAT STOCK.

12:24PM   8        WHAT IS THE GOVERNMENT'S THEORY AS TO WHY SHE DID NOT SELL

12:24PM   9    STOCK?

12:24PM   10       I THINK WE HEARD FOR THE FIRST TIME YESTERDAY, BUT NOT IN

12:24PM   11   THE EVIDENCE IN THE CASE, A THEORY, WHICH WAS THAT MS. HOLMES

12:24PM   12   HELD A FORM OF STOCK THAT SHE WOULD LOSE CONTROL OVER THE

12:24PM   13   COMPANY IF SHE SOLD STOCK.

12:24PM   14       THERE'S NO EVIDENCE IN THE RECORD TO THAT EFFECT.  NO

12:24PM   15   WITNESS TESTIFIED LIKE THAT.  THERE'S NO INDICATION TO YOU THAT

12:24PM   16   THAT'S, THAT THAT'S CORRECT, AND THERE'S CERTAINLY NO

12:24PM   17   INDICATION THAT SHE COULDN'T HAVE SOLD TENS OF MILLIONS OF

12:25PM   18   DOLLARS OF STOCK WHILE LOSING CONTROL OF THE COMPANY -- WITHOUT

12:25PM   19   LOSING CONTROL OF THE COMPANY.

12:25PM   20       JUST NO EVIDENCE THAT THAT'S A MOTIVE IN THE CASE.

12:25PM   21       AND YOU SHOULD CONSIDER, YOU SHOULD CONSIDER THE FACT THAT

12:25PM   22   THAT MOTIVE IS ARTICULATED FOR THE FIRST TIME IN THE

12:25PM   23   GOVERNMENT'S SUMMATION AS TO THE GOVERNMENT'S PERSUASIVENESS

12:25PM   24   WITH RESPECT TO ARTICULATING A MOTIVE FOR THESE CRIMES.

12:25PM   25       NOW, I HAVE TALKED TO YOU FOR HOURS, AND I'M SURE YOU'RE

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                           9233

12:25PM   1     READY TO BE RID OF ME, AND PROBABLY VERY FATIGUED AT THE END OF

12:25PM   2     ANOTHER WEEK OF TRIAL.

12:25PM   3          BUT I WANT TO SPEND ANOTHER MINUTE TALKING TO YOU ABOUT

12:25PM   4     SOME CONCEPTS THAT I THINK WILL BE IMPORTANT AND HELPFUL TO YOU

12:25PM   5     AS YOU UNDERTAKE YOUR DELIBERATIONS IN THIS CASE.

12:25PM   6          THE FIRST CONCEPT I WANT TO TALK TO YOU ABOUT IS THE

12:25PM   7     CONCEPT OF UNANIMITY.

12:25PM   8          WE TALKED ABOUT REASONABLE DOUBT YESTERDAY, AND I WANT YOU

12:26PM   9     TO BEAR THAT IN MIND.

12:26PM  10          BUT MOST THINGS THAT WE DO IN THIS COUNTRY, IMPORTANT

12:26PM  11     THINGS THAT WE DECIDE IN THE INSTITUTIONS THAT WE HAVE, WE DO

12:26PM  12     THOSE BY MAJORITY VOTE, AND WE ACCEPT THAT.  THE SUPREME COURT

12:26PM  13     DECIDES CASES FIVE TO FOUR.  CONGRESS PASSES OR DOESN'T PASS

12:26PM  14     LEGISLATION BY ONE VOTE SOMETIMES.  THE HEALTH CARE SYSTEM IN

12:26PM  15     THIS COUNTRY WAS CHANGED BY ONE VOTE.  THAT HAPPENS.

12:26PM  16          BUT YOU ARE IN A DIFFERENT INSTITUTION HERE.  YOU ARE IN

12:26PM  17     AN INSTITUTION WHERE, FOR MS. HOLMES TO BE CONVICTED OF A

12:26PM  18     FELONY OFFENSE, EVERY ONE OF YOU, EVERY ONE OF YOU HAS TO BE

12:26PM  19     PERSUADED BEYOND A REASONABLE DOUBT THAT SHE COMMITTED EVERY

12:26PM  20     ELEMENT OF THAT OFFENSE.

12:26PM  21          YOU'VE TAKEN THE OATH TO UPHOLD THAT DUTY, AND YOU'VE BEEN

12:27PM  22     AN INCREDIBLY ATTENTIVE JURY, AND I KNOW THAT EVERY ONE OF YOU

12:27PM  23     WILL UPHOLD THAT DUTY FOR YOURSELF AND IN YOUR DELIBERATIONS

12:27PM  24     WITH OTHERS.

12:27PM  25          AND I WOULD SAY TO YOU, AFTER ALL OF THE EVIDENCE THAT I

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

12:27PM 1    HAVE DISCUSSED, AFTER ALL OF THE EVIDENCE THAT MR. SCHENK HAS

12:27PM 2    DISCUSSED WITH YOU, WITH ALL OF WHAT MR. BOSTIC WILL DISCUSS

12:27PM 3    WITH YOU, AS IS APPROPRIATE, THAT YOU CAN LOOK THROUGH ALL OF

12:27PM 4    THAT EVIDENCE AND YOU CAN LOOK TO THE NARRATIVE THAT EACH SIDE

12:27PM 5    HAS TOLD YOU IN THIS CASE.

12:27PM 6        YOU KNOW WHAT MS. HOLMES DID IN HER LIFE.  YOU KNOW THAT

12:27PM 7    SHE LEFT SCHOOL.  SHE GAVE UP A COLLEGE EDUCATION THAT PEOPLE

12:27PM 8    WOULD GIVE THEIR RIGHT ARM FOR.  SHE GAVE UP HER YOUTH.  SHE

12:27PM 9    GAVE UP HER FRIENDS.  SHE GAVE UP HER CLOSE RELATIONSHIP WITH

12:27PM 10   HER FAMILY.

12:27PM 11       WHY?

12:27PM 12       BECAUSE SHE BELIEVED SHE WAS BUILDING A TECHNOLOGY THAT

12:27PM 13   WOULD CHANGE THE WORLD.  THAT'S OUR STORY.

12:28PM 14       WHAT IS THE GOVERNMENT'S STORY?

12:28PM 15       THE GOVERNMENT'S STORY IS THAT BEGINNING IN 2010 EVERY

12:28PM 16   DAY, EVERY DAY FROM 2010 TO 2016, SHE KNEW SHE WAS COMMITTING A

12:28PM 17   CRIME.  SHE WAS ROBBING INVESTORS AND THAT SHE -- IN 2013 SHE

12:28PM 18   BEGAN ROBBING PATIENTS.

12:28PM 19       AND THEN YOU KNOW WHAT HAPPENED?

12:28PM 20       ONE DAY IN MARCH OF 2016 DR. DAS WALKED INTO HER OFFICE.

12:28PM 21   AND YOU HEARD ABOUT THAT.  DR. DAS SAID TO HER, I THINK THAT

12:28PM 22   THERE ARE 60,000 RESULTS GENERATED ON YOUR PROPRIETARY DEVICE

12:28PM 23   THAT WE HAVE TO VOID.

12:28PM 24       THAT'S A TOUGH THING TO HEAR WHEN YOU'VE SPENT 11 YEARS

12:28PM 25   BUILDING A TECHNOLOGY.  YOU KNOW THAT.

9235

CLOSING ARGUMENT BY MR. DOWNEY (RES.)

```
12:28PM   1        NOW WE KNOW IN THE GOVERNMENT'S NARRATIVE WHO THIS WOMAN

12:29PM   2   WAS AND WHAT CRIMES SHE COMMITTED.  WE KNOW THAT WHEN SHE HEARD

12:29PM   3   THAT IN THE GOVERNMENT'S VIEW, SHE MUST HAVE THOUGHT THAT THERE

12:29PM   4   ARE A THOUSAND CRIMES HIDDEN UNDER THE ROCKS OF THIS COMPANY,

12:29PM   5   AND IT HAS NOW BEEN DISCOVERED AND I HAVE TO REACT

12:29PM   6   APPROPRIATELY.

12:29PM   7        YOU DON'T NEED TO KNOW WHAT AN ASSAY IS.  YOU DON'T NEED

12:29PM   8   TO KNOW WHAT CLIA IS.

12:29PM   9        YOU KNOW FROM YOUR OWN EXPERIENCE AND FROM YOUR OWN COMMON

12:29PM  10   SENSE HOW TO EVALUATE PEOPLE'S INTENT.  AND YOU KNOW THAT AT

12:29PM  11   THE FIRST SIGN OF TROUBLE, CROOKS CASH OUT, CRIMINALS COVER UP,

12:29PM  12   AND RATS LEAVE A FLEEING SHIP.

12:29PM  13        SHE DIDN'T DO ANY OF THOSE.  NONE.

12:29PM  14        DID SHE COVER UP?

12:29PM  15        WHAT DID SHE TELL DR. DAS?

12:29PM  16        TURN OVER EVERY ROCK, EVERY ROCK, UNDER WHICH THE

12:30PM  17   GOVERNMENT SAYS WAS HIDDEN A THOUSAND CRIMES.

12:30PM  18        DID SHE CASH OUT?  YOU KNOW THAT ALREADY.  SHE DIDN'T SELL

12:30PM  19   A SINGLE SHARE OF STOCK EVEN THOUGH SHE HAD THAT OPPORTUNITY

12:30PM  20   FOR SIX YEARS AND FOR TWO MORE YEARS THEREAFTER.  SHE DID NOT

12:30PM  21   SELL A SINGLE SHARE OF STOCK.  NOT A SINGLE ONE.

12:30PM  22        AND DID SHE LEAVE IN THE FACE OF THAT CRITICISM AND SAY,

12:30PM  23   YOU KNOW WHAT?  DR. BONANNI CAN RUN THIS.  SOMEBODY CAN RUN

12:30PM  24   THIS.  THEY CAN DO A BETTER JOB THAN I CAN.  LET ME JUST TAKE

12:30PM  25   MY MONEY AND I'LL GET OUT.
```

CLOSING ARGUMENT BY MR. DOWNEY (RES.)                    9236

12:30PM    1         NO.  SHE STAYED.

12:30PM    2         WHY?  BECAUSE SHE BELIEVED IN THIS TECHNOLOGY.  SHE STAYED

12:30PM    3    THE WHOLE TIME, AND SHE WENT DOWN WITH THAT SHIP WHEN IT WENT

12:30PM    4    DOWN.

12:30PM    5         LADIES AND GENTLEMEN, THAT IS WHO THIS WOMAN IS, AND I AM

12:30PM    6    ASKING YOU TO ACQUIT HER ON ALL COUNTS IN THE INDICTMENT, AND

12:30PM    7    YOU DON'T NEED MORE FROM ME TO KNOW WHAT HER INTENT WAS.

12:31PM    8         THANK YOU, LADIES AND GENTLEMEN.

12:31PM    9              THE COURT:  THANK YOU, COUNSEL.

12:31PM   10         DOES THE GOVERNMENT HAVE A REBUTTAL?

12:31PM   11              MR. BOSTIC:  YES, YOUR HONOR.

12:31PM   12              THE COURT:  WOULD YOU LIKE A BREAK BEFORE WE BEGIN

12:31PM   13    THE REBUTTAL?

12:31PM   14              MR. BOSTIC:  JUST A BRIEF ONE, YOUR HONOR.

12:31PM   15              THE COURT:  LET'S DO THAT.  LET'S TAKE ABOUT

12:31PM   16    15 MINUTES.  LADIES AND GENTLEMEN, LET'S TAKE ABOUT 15 MINUTES,

12:31PM   17    AND THEN WE'LL COME BACK.

12:31PM   18              THE CLERK:  COURT IS IN RECESS.

12:31PM   19         (RECESS FROM 12:31 P.M. UNTIL 12:51 P.M.)

12:51PM   20         (JURY IN AT 12:51 P.M.)

12:52PM   21              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

12:52PM   22    SEATED.

12:52PM   23         WE'RE BACK ON THE RECORD.  MS. HOLMES IS PRESENT.  OUR

12:52PM   24    JURY IS PRESENT.  THANK YOU.

12:52PM   25         MR. BOSTIC, YOU HAVE A REBUTTAL?

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9237

12:52PM   1              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

12:52PM   2              THE COURT:  PLEASE PROCEED.  THANK YOU.

12:52PM   3          **(MR. BOSTIC GAVE HIS REBUTTAL CLOSING ARGUMENT ON BEHALF**

12:52PM   4      **OF THE GOVERNMENT.)**

12:52PM   5              MR. BOSTIC:  MEMBERS OF THE JURY, GOOD AFTERNOON.

12:52PM   6          OVER THE COURSE OF THIS TRIAL YOU'VE HEARD THE STORY OF

12:52PM   7      TWO DIFFERENT VERSION OF THE COMPANY CALLED "THERANOS."

12:52PM   8          THE FIRST VERSION OF THAT COMPANY IN APPROXIMATELY 2013

12:52PM   9      HAD INVENTED AND PERFECTED A NEW BLOOD TESTING TECHNOLOGY.  IT

12:52PM  10      WAS A NEW DEVICE THAT COULD RUN ANY BLOOD TEST ON A TINY SAMPLE

12:52PM  11      FROM A FINGERSTICK.  IT WAS UNLIKE ANYTHING THAT HAD COME

12:52PM  12      BEFORE.

12:52PM  13          EVEN BETTER, IT COULD PERFORM THE FULL RANGE OF BLOOD

12:52PM  14      TESTS, REPLACING LARGER DEVICES.

12:52PM  15          IT WAS FAR SMALLER THAN CONVENTIONAL ANALYZERS, AND THAT

12:52PM  16      MEANT IT COULD BE USED ANYWHERE.

12:52PM  17          THE TECHNOLOGY IN THIS DEVICE HAD BEEN VALIDATED AND

12:52PM  18      ENDORSED BY MAJOR PHARMACEUTICAL COMPANIES AND ACADEMIC

12:53PM  19      INSTITUTIONS.

12:53PM  20          THE MOST POWERFUL AND WELL EQUIPPED MILITARY FORCE IN THE

12:53PM  21      WORLD WAS EVEN USING THIS DEVICE, AND USING THIS TECHNOLOGY,

12:53PM  22      AND IT WAS SAVING THE LIVES OF SOLDIERS ON THE BATTLEFIELD.

12:53PM  23          THIS COMPANY HAD SIGNIFICANT REVENUES FROM EARLY ON, WHICH

12:53PM  24      MAY BE UNUSUAL FOR A COMPANY AT THAT STAGE, BUT IT WAS VERY

12:53PM  25      PROMISING AND IT WAS ON THE VERGE OF GOING NATIONAL AND

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9238

12:53PM  1    GENERATING HUNDREDS OF MILLIONS, IF NOT BILLIONS, OF DOLLARS.

12:53PM  2         THE VERSION OF THERANOS I JUST DESCRIBED WAS NEVER REAL.

12:53PM  3    IT NEVER EXISTED.

12:53PM  4         IT EXISTED ONLY IN THE WORDS OF THE DEFENDANT, MS. HOLMES,

12:53PM  5    AND HER COCONSPIRATOR, SUNNY BALWANI.  IT EXISTED IN THE

12:53PM  6    WRITTEN MATERIALS THAT SHE AND HER COCONSPIRATOR PROVIDED TO

12:53PM  7    INVESTORS AND TO OTHERS OUTSIDE OF THE COMPANY.

12:53PM  8         AND IT EXISTED IN THE MINDS OF THE PEOPLE WHO BELIEVED

12:53PM  9    HER, WHO BELIEVED THE CLAIMS THAT SHE WAS MAKING ABOUT WHAT THE

12:53PM 10    COMPANY HAD DONE, WHAT THE COMPANY WAS DOING, AND WHAT IT HAD

12:53PM 11    ACCOMPLISHED.  AND THOSE PEOPLE WERE, OF COURSE, THE INVESTORS

12:54PM 12    WHO THEN WENT ON TO RELY ON THOSE REPRESENTATIONS AND ENTRUST

12:54PM 13    THE COMPANY WITH THEIR MONEY OR, OF COURSE, WITH THE PATIENTS

12:54PM 14    WHO ENTRUSTED THE COMPANY TO TELL THEM WHAT WAS HAPPENING WITH

12:54PM 15    THEIR HEALTH.

12:54PM 16         THE REAL VERSION OF THERANOS WHERE THE DEFENDANT WENT TO

12:54PM 17    WORK EVERY DAY WAS DRAMATICALLY DIFFERENT FROM THE ROSY PICTURE

12:54PM 18    THAT SHE WAS PAINTING FOR OTHERS.

12:54PM 19         NOW, THE DEFENSE HAS EMPHASIZED THROUGHOUT TRIAL AND

12:54PM 20    DURING ITS CLOSING ARGUMENT THAT THERE WERE MANY PEOPLE AT

12:54PM 21    THERANOS WHO WERE WORKING HARD TO MAKE THE TECHNOLOGY WORK AND

12:54PM 22    TO DEVELOP THAT TECHNOLOGY AND THAT THEY HAD SOME SUCCESSES.

12:54PM 23         FOR THE MOST PART, THERE'S NO DISAGREEMENT THERE.  IT'S

12:54PM 24    NOT CLEAR THAT THE ACHIEVEMENTS THAT TOOK PLACE AT THERANOS

12:54PM 25    WERE THE MIRACULOUS BREAKTHROUGHS THAT THE DEFENSE DESCRIBES.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9239

| | | |
|---|---|---|
| 12:54PM | 1 | BUT I'M NOT HERE TO CRITICIZE THE EFFORTS OF THE EMPLOYEES |
| 12:54PM | 2 | WHO WORKED HARD TO TRY TO MAKE THAT TECHNOLOGY WORK. |
| 12:54PM | 3 | THE DISEASE THAT PLAGUED THERANOS WASN'T A LACK OF EFFORT, |
| 12:55PM | 4 | IT WAS A LACK OF HONESTY, AND IT WASN'T AT THE BOTTOM OF THE |
| 12:55PM | 5 | GROUND LEVEL OF THE COMPANY, IT WAS AT THE TOP AS THE EVIDENCE |
| 12:55PM | 6 | HAS SHOWN. |
| 12:55PM | 7 | THE REASON WE'RE HERE STEMS BACK TO THE WAY THAT THERANOS |
| 12:55PM | 8 | AND ITS WORK WERE DESCRIBED BY ITS CEO, THE DEFENDANT, AND THE |
| 12:55PM | 9 | FOUNDER OF THE COMPANY. |
| 12:55PM | 10 | NOT, FOR THE MOST PART, THE EFFORTS THAT WERE TAKING PLACE |
| 12:55PM | 11 | AT THE COMPANY BY THE SCIENTISTS, ENGINEERS, AND OTHERS. |
| 12:55PM | 12 | SO WHAT WAS THE DARKER TRUTH AT THERANOS? |
| 12:55PM | 13 | WELL, FOR ONE THING, THE EVIDENCE AT TRIAL HAS AMPLY |
| 12:55PM | 14 | DEMONSTRATED THAT THERE WERE VERY SERIOUS PROBLEMS WITH |
| 12:55PM | 15 | THERANOS'S TECHNOLOGY. |
| 12:55PM | 16 | MS. HOLMES'S LAWYER SAID IN HIS OPENING STATEMENT THAT, |
| 12:55PM | 17 | QUOTE, THERE WERE PROBLEMS WITH THERANOS'S CLINICAL LABORATORY. |
| 12:55PM | 18 | WELL, AS YOU SAW, THAT TURNED OUT TO BE QUITE THE |
| 12:55PM | 19 | UNDERSTATEMENT. |
| 12:55PM | 20 | HE ALSO SAID SOME OF THE TESTS THAT THERANOS OFFERED IN |
| 12:55PM | 21 | HINDSIGHT WERE NOT PERFORMING AS WELL AS EXPECTED. |
| 12:55PM | 22 | WELL, THAT WAS REALLY ANOTHER UNDERSTATEMENT, WASN'T IT? |
| 12:56PM | 23 | AND THE EVIDENCE SHOWED THAT IT DIDN'T TAKE HINDSIGHT, IN |
| 12:56PM | 24 | FACT, TO SEE THOSE PROBLEMS.  THOSE PROBLEMS WERE APPARENT WHEN |
| 12:56PM | 25 | THEY WERE TAKING PLACE, AND THE COMPANY WENT ON OFFERING |

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                      9240

12:56PM 1    UNRELIABLE AND INACCURATE BLOOD TESTS DESPITE THAT EVIDENCE.

12:56PM 2        LET'S TALK ABOUT SOME OF THE THINGS THAT YOU SAW THAT SHOW

12:56PM 3    YOU THAT THERE WERE SERIOUS PROBLEMS WITH THE THERANOS

12:56PM 4    TECHNOLOGY.

12:56PM 5        FIRST, DO YOU REMEMBER TESTIMONY ABOUT HOW MANY THERANOS

12:56PM 6    ANALYZERS IT TOOK AT THE TIME OF LAUNCH TO RUN A SINGLE PATIENT

12:56PM 7    SAMPLE?

12:56PM 8        YOU MIGHT RECALL THAT WHEN THERANOS FIRST STARTED OFFERING

12:56PM 9    BLOOD TESTING SERVICES TO THE PUBLIC, THERANOS DIDN'T TRUST A

12:56PM 10   SINGLE EDISON ANALYZER TO RUN A BLOOD TEST SAMPLE ON ITS OWN.

12:56PM 11   IT NEEDED TO GROUP THOSE ANALYZERS IN GROUPS OF THREE, HAVE ALL

12:56PM 12   THREE RUN THE SAME TEST, AND THEN THEY HAD A PRACTICE OF

12:56PM 13   COMBINING WHAT TURNED OUT TO BE SIX RESULTS, REMOVING TWO

12:56PM 14   OUTLIERS IF THEY DIDN'T LIKE THAT DATA, AND THEN AVERAGING THE

12:56PM 15   OTHER FOUR.

12:56PM 16       YOU'LL RECALL THE FACT THAT IT TOOK THREE DEVICES TO RUN

12:57PM 17   EVERY TEST MEANT THAT WHEN A PATIENT CAME IN AND NEEDED MORE

12:57PM 18   THAN ONE ASSAY RUN, IT WOULD TAKE A FLEET OF EDISONS TO

12:57PM 19   ACTUALLY PERFORM THAT TESTING.

12:57PM 20       SO YOU HEARD THE TESTIMONY OF ERIKA CHEUNG, WHO ACTUALLY

12:57PM 21   RAN THESE SAMPLES, THAT IF SOMEONE CAME IN AND, SAY, NEEDED

12:57PM 22   THREE ASSAYS RUN ON EDISON, THREE DIFFERENT KINDS OF BLOOD

12:57PM 23   TESTS, PLUS A CBC AND A GENERAL CHEMISTRY, FOR EXAMPLE, IT

12:57PM 24   WOULD TAKE I THINK 11 DEVICES SHE TESTIFIED TO TO PERFORM THE

12:57PM 25   TESTING ON THAT ONE PATIENT SAMPLE.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9241

12:57PM  1        AND SO AS SHE DESCRIBED, THE SAMPLE WOULD COME DOWN TO THE

12:57PM  2   LAB AND THEN TEAMS OF TECHS WOULD SPRING INTO ACTION, AND THEY

12:57PM  3   WOULD DIVIDE THE SAMPLE UP, AND THEN THEY WOULD GO TO THIS

12:57PM  4   FLEET OF DEVICES THAT WAS NECESSARY TO RUN THAT SIMPLE TEST ON

12:57PM  5   THAT SINGLE PATIENT SAMPLE.

12:57PM  6        CONTRAST THAT WITH WHAT YOU KNOW MS. HOLMES WAS SAYING TO

12:58PM  7   THE PUBLIC, TO INVESTORS, TO JOURNALISTS, AND TO OTHERS ABOUT

12:58PM  8   THE CAPABILITIES OF THAT DEVICE.

12:58PM  9        YOU KNOW THAT SHE WAS PRESENTING THIS AS A DEVICE THAT ON

12:58PM 10   ITS OWN COULD RUN ANY COMBINATION OF TESTS, COULD DO IT ALL AT

12:58PM 11   ONCE FROM A SINGLE SAMPLE.

12:58PM 12        HOW DIFFERENT THE REALITY WAS FROM HOW SHE WAS PRESENTING

12:58PM 13   IT.

12:58PM 14        YOU'LL ALSO RECALL THAT ERIKA CHEUNG WHO, AGAIN, HAD

12:58PM 15   EXPERIENCE WORKING WITH THE THERANOS EDISON ANALYZERS AND ALSO

12:58PM 16   THE THIRD PARTY ANALYZERS AT THERANOS, TALKED ABOUT THE LEVEL

12:58PM 17   OF AUTOMATION INVOLVED IN THOSE TWO DIFFERENT KINDS OF DEVICES,

12:58PM 18   AND SHE TALKED ABOUT ALL OF THE MANUAL STEPS THAT WERE REQUIRED

12:58PM 19   TO USE THE EDISON ANALYZER.

12:58PM 20        SHE TALKED ABOUT THE NEED FOR DILUTION OF SAMPLES AND

12:58PM 21   OTHER STEPS THAT HAD TO BE DONE OUTSIDE OF THE MACHINE BEFORE

12:58PM 22   THE SAMPLE WAS EVEN READY TO BE PROCESSED ON THE ANALYZER.

12:58PM 23        SHE TOLD YOU THAT THE THIRD PARTY DEVICES ACTUALLY HAD A

12:58PM 24   HIGHER LEVEL OF AUTOMATION AND WERE EASIER TO USE IN THAT WAY.

12:59PM 25        AGAIN, CONTRAST THAT WITH WHAT MS. HOLMES SAID OVER AND

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9242

```
12:59PM   1    OVER AGAIN, WHICH WAS THAT THE THERANOS ANALYZER HAD A SUPERIOR

12:59PM   2    LEVEL OF AUTOMATION, AND THAT THAT WAS A BIG PART OF THE

12:59PM   3    TECHNOLOGICAL BREAKTHROUGH, THAT THAT WAS ONE OF THE REASONS

12:59PM   4    WHY THE DEVICE WAS ABLE TO ACHIEVE SUCH SUPERIOR ACCURACY.

12:59PM   5         YOU KNOW FROM THE TESTIMONY OF THE SECOND WITNESS IN THE

12:59PM   6    CASE, ERIKA CHEUNG, THAT THAT WAS ALSO FALSE.

12:59PM   7         YOU ALSO SAW EVIDENCE AND HEARD TESTIMONY ABOUT QUALITY

12:59PM   8    CONTROL PROBLEMS WITH THE THERANOS ANALYZERS DURING TRIAL.

12:59PM   9         AND YOU'LL RECALL THAT QUALITY CONTROL WAS A STEP THAT HAD

12:59PM  10    TO BE TAKEN IN THE LAB TO CONFIRM THAT AN ANALYZER WAS WORKING

12:59PM  11    BEFORE IT COULD BE USED FOR PATIENT TESTING, AND HOW IT WORKED

12:59PM  12    WAS A KNOWN SAMPLE WOULD BE TESTED ON THE ANALYZER, AND IT WAS

12:59PM  13    REQUIRED TO RETURN THE RIGHT RESULT, THE RESULT THAT WAS KNOWN

12:59PM  14    TO BE CORRECT, IN ORDER FOR IT TO BE USED ON PATIENT SAMPLES

12:59PM  15    WHERE THE RESULT WOULD BE UNKNOWN.

01:00PM  16         YOU'VE HEARD AMPLE TESTIMONY THAT THE THERANOS ANALYZERS

01:00PM  17    PERFORMED VERY POORLY WHEN IT CAME TO THIS QC STEP.

01:00PM  18         WE TALKED A COUPLE MINUTES AGO ABOUT THE PRACTICE AT

01:00PM  19    THERANOS OF RUNNING EACH ASSAY SIX TIMES ESSENTIALLY AND THEN

01:00PM  20    DISCARDING TWO OUTLIERS.

01:00PM  21         WE'LL SEE THAT IN THIS EMAIL.  THIS IS EXHIBIT 1287.

01:00PM  22    YOU'LL RECALL THAT ON THIS OCCASION A COUPLE OF MONTHS AFTER

01:00PM  23    THERANOS HAD LAUNCHED ITS TESTING SERVICES, MS. CHEUNG SENT AN

01:00PM  24    EMAIL TO THIS NORMANDY 911 EMAIL ADDRESS.  THIS WAS THE EMAIL

01:00PM  25    ADDRESS THAT EXISTED TO HANDLE THE PROBLEMS IN THE NORMANDY
```

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:00PM  1   LAB, THE PROBLEMS WITH THERANOS TECHNOLOGY THAT YOU HEARD CAME

01:00PM  2   UP FREQUENTLY.

01:00PM  3        MS. CHEUNG TESTIFIED THAT IN THIS CASE BOTH QC CONTROLS

01:00PM  4   THAT SHE WAS RUNNING AT THIS TIME HAD FAILED; THAT SHE HAD RUN

01:00PM  5   QC CONTROLS USING UNOPENED REAGENTS AND A NEW PACKAGE OF

01:01PM  6   CARTRIDGES, BUT THOSE HAD FAILED AS WELL.

01:01PM  7        MS. HOLMES WAS INFORMED OF THIS PROBLEM.  SUNNY BALWANI

01:01PM  8   TOLD HER ON THAT SAME DAY ABOUT WHAT WAS HAPPENING AND REPORTED

01:01PM  9   TO HER, "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

01:01PM 10        MS. HOLMES THEN GOT INVOLVED AND RESPONDED, "DO WE HAVE

01:01PM 11   ENOUGH SAMPLE TO RUN THIS ONE ON TRADITIONAL METHODS?"

01:01PM 12        THIS SHOWS MS. HOLMES'S KNOWLEDGE EVEN RELATIVELY EARLY IN

01:01PM 13   THE COMMERCIAL LAUNCH OF THE THERANOS TESTING THAT THE

01:01PM 14   TRADITIONAL METHODS, THE NON-THERANOS TECHNOLOGY, WAS A MORE

01:01PM 15   RELIABLE METHOD THAN THE THERANOS SPECIFIC DEVICES.

01:01PM 16        WHEN THE THERANOS SPECIFIC METHOD FAILED, WHEN QC COULD

01:01PM 17   NOT BE PASSED, AS WAS FREQUENTLY THE CASE, MS. HOLMES ASKED,

01:01PM 18   CAN WE GO BACK TO THE SAFE STANDARD?  CAN WE GO BACK TO THE

01:01PM 19   RELIABLE DEVICES THAT WE ALSO HAVE?

01:01PM 20        ULTIMATELY THIS SITUATION WAS RESOLVED, AND I SHOULD PUT

01:02PM 21   RESOLVED IN QUOTES, BECAUSE YOU SEE THAT THE ANSWER, AS

01:02PM 22   MS. HOLMES WAS TOLD, WAS THAT "TWO OUTLIERS HAD TO BE MANUALLY

01:02PM 23   REMOVED IN ORDER TO PASS QC."

01:02PM 24        SO YOU RECALL MS. CHEUNG'S TESTIMONY AND DR. ROSENDORFF'S

01:02PM 25   TESTIMONY ABOUT THIS PRACTICE WHERE MULTIPLE TEST RESULTS WOULD

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9244

01:02PM   1    BE GENERATED AND THE COMPANY WOULD SIMPLY IGNORE RESULTS THAT

01:02PM   2    CAUSED THE DEVICE NOT TO PASS QC.

01:02PM   3         THIS APPROACH YOU HEARD WAS NOT TAKEN WITH THE COMMERCIAL

01:02PM   4    ANALYZERS.  THE NON-THERANOS ANALYZERS DID NOT NEED TO USE THIS

01:02PM   5    PROCESS.  THEY DIDN'T NEED TO RELY ON THE PROCESS OF DISCARDING

01:02PM   6    THE DATA IN ORDER TO APPEAR MORE RELIABLE THAN THEY WERE.  YOU

01:02PM   7    HEARD THAT FROM MS. CHEUNG.

01:02PM   8         HIGH QUALITY CONTROL FAILURE RATES WERE A PERVASIVE

01:02PM   9    PROBLEM AT THERANOS AS YOU'VE HEARD.  BOTH MS. CHEUNG AND

01:02PM  10    DR. ROSENDORFF TESTIFIED ABOUT THE OVERALL RATES OF QUALITY

01:03PM  11    CONTROL FAILURE, AND YOU HEARD FROM THEM THAT, FOR EXAMPLE, IN

01:03PM  12    THE MONTH OF MARCH 2014, APPROXIMATELY 26 PERCENT OF EDISON

01:03PM  13    QUALITY CONTROL RUNS FAILED.

01:03PM  14         AND IF YOU LOOK AT THIS ON AN ASSAY BY ASSAY BASIS, YOU

01:03PM  15    SEE THAT IN SOME CASES IT'S MUCH WORSE.  I'LL DRAW YOUR

01:03PM  16    ATTENTION TO THE COLUMN FOR THE TT3 TEST, WHICH INDICATES THAT

01:03PM  17    MORE THAN 50 PERCENT OF THE QUALITY CONTROL RUNS FAILED DURING

01:03PM  18    THAT MONTH.

01:03PM  19         YOU HEARD TESTIMONY THAT MARCH WAS NOT AN ESPECIALLY BAD

01:03PM  20    MONTH FOR THERANOS, THAT THIS WAS TYPICAL.  THIS WAS TYPICAL OF

01:03PM  21    THE PERFORMANCE OF THESE MACHINES.

01:03PM  22         THINK ABOUT WHAT THAT MEANS.  IF HALF OF THE QUALITY

01:03PM  23    CONTROL SAMPLES RUN ON THIS DEVICE WERE FAILING, THINK ABOUT

01:03PM  24    WHAT THAT MEANS FOR THE PATIENT SAMPLES THAT WERE BEING RUN.

01:03PM  25         IF A TEST OR A DEVICE IS ONLY ACCURATE HALF OF THE TIME,

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9245

```
01:03PM   1      HOW CAN ANYONE, REGARDLESS OF THEIR LEVEL OF EXPERTISE OR

01:03PM   2      EDUCATION, HOW CAN ANYONE BE COMFORTABLE USING THAT IN THE

01:04PM   3      CLINICAL SETTING AND TRUSTING PATIENT CARE TO THAT KIND OF

01:04PM   4      DEVICE?

01:04PM   5          YOU ALSO SAW THAT THERE WAS AN INSTANCE WHERE THE THERANOS

01:04PM   6      ANALYZER WAS COMPARED TO PREDICATE NON-THERANOS ANALYZERS IN

01:04PM   7      THE CONTEXT OF PROFICIENCY TESTING SAMPLES.

01:04PM   8          AND YOU'LL RECALL THAT YOU SAW THIS DATA YESTERDAY SHOWING

01:04PM   9      THAT FOR TPSA, FOR EXAMPLE, THE PREDICATE DEVICE, THE

01:04PM  10      NON-THERANOS DEVICE, RELIABLY RETURNED THE SAME DEVICE -- OR

01:04PM  11      THE SAME RESULT, EXCUSE ME, TWICE IN A ROW WHEN THE SAME SAMPLE

01:04PM  12      WAS RERUN.

01:04PM  13          WHEN THE SAME THING WAS ATTEMPTED ON THE THERANOS DEVICE,

01:04PM  14      IT CAME NOWHERE CLOSE TO THAT SAME KIND OF CONSISTENCY.

01:04PM  15          THIS WAS A HUGE RED FLAG AS RECOGNIZED BY THE TECHNICAL

01:04PM  16      PEOPLE AT THERANOS.

01:04PM  17          IT WAS DISMISSED BY SOME AT THE TIME AS BEING INCONSISTENT

01:04PM  18      WITH THE ALTERNATIVE ASSESSMENT AND PROFICIENCY PROTOCOLS THAT

01:05PM  19      THE COMPANY HAD AT THAT TIME OR WAS WORKING ON DEVELOPING.

01:05PM  20          BUT YOU HEARD FROM DR. ROSENDORFF THAT HE STILL VIEWED

01:05PM  21      THIS AS A VALID AND A USEFUL SPOT-CHECK OF THE RELIABILITY OF

01:05PM  22      THE THERANOS SYSTEMS, AND THE THERANOS SYSTEMS FAILED THIS

01:05PM  23      SPOT-CHECK ABYSMALLY.

01:05PM  24          YOU ALSO HEARD AND SAW EVIDENCE THAT THE PROBLEMS WITH

01:05PM  25      THERANOS'S TECHNOLOGY WEREN'T JUST LIMITED TO THE EDISON.
```

UNITED STATES COURT REPORTERS

**ER-12825**

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9246

01:05PM   1          SO, FOR EXAMPLE, DR. ROSENDORFF REVIEWED EVIDENCE

01:05PM   2    REGARDING A STUDY THAT WAS CONDUCTED AT THERANOS, AND HE

01:05PM   3    TESTIFIED THAT WHEN LOOKING AT THE VARIATIONS OBSERVED IN THAT

01:05PM   4    STUDY, THE VARIATION COMPARING VENOUS TO FINGERSTICK WAS MUCH

01:05PM   5    MORE PRONOUNCED WHEN FINGERSTICK SAMPLES WERE ASSAYED.

01:05PM   6          AND YOU'LL RECALL THAT FINGERSTICK WAS THE TYPE OF SAMPLE

01:05PM   7    THAT THERANOS RAN ON ITS MODIFIED THIRD PARTY DEVICES ALSO.

01:05PM   8          HE WAS THEN ASKED THE QUESTION, DOES THAT MEAN THAT USING

01:05PM   9    THE THERANOS APPROACH ON THESE DEVICES ACTUALLY MADE THE

01:06PM  10    DEVICES PERFORM WORSE THAN THEY DID IN THEIR UNMODIFIED FORM?

01:06PM  11          HIS ANSWER WAS, YES, IT INCREASED THE DIFFERENCES IN

01:06PM  12    RESULTS BETWEEN INSTRUMENTS.

01:06PM  13          SO NOT ONLY HAD THERANOS BUILT ITS OWN ANALYZER THAT WAS

01:06PM  14    NOT UP TO PAR AND WAS NOT WORKING WELL, BUT THE CHANGES THAT

01:06PM  15    THE COMPANY HAD MADE TO THIRD PARTY DEVICES THAT IT HAD

01:06PM  16    PURCHASED DECREASED THE ACCURACY AND RELIABILITY OF THOSE THIRD

01:06PM  17    PARTY DEVICES.

01:06PM  18          NOW, THERE WAS SOME DISCUSSION DURING THE DEFENSE'S

01:06PM  19    CLOSING ABOUT STATISTICS IN THIS CASE AND WHETHER YOU NEED TO

01:06PM  20    SEE FAILURE RATES ACROSS A PATIENT POPULATION TO UNDERSTAND

01:06PM  21    THAT THESE DEVICES WERE OR WERE NOT WORKING.

01:06PM  22          BASED ON THIS EVIDENCE, THE EVIDENCE AVAILABLE AT THE TIME

01:06PM  23    AT THERANOS, YOU KNOW THAT THESE PROBLEMS WERE OBVIOUS AND THAT

01:06PM  24    THEY WERE SERIOUS.

01:06PM  25          YOU ALSO HEARD TESTIMONY ABOUT THE DIFFICULTY IN


                        UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                              9247

01:07PM   1    IDENTIFYING INACCURATE PATIENT RESULTS.  WHEN DR. ROSENDORFF

01:07PM   2    WAS ON THE STAND, HE TALKED ABOUT HOW AN INACCURATE PATIENT

01:07PM   3    RESULT MIGHT NOT STAND OUT FROM THE REST.  IT CAN BE DIFFICULT

01:07PM   4    TO IDENTIFY.  YOU NEED TO HAVE OTHER INFORMATION TO COMPARE THE

01:07PM   5    RESULT TO, WHETHER IT'S CLINICAL INFORMATION ABOUT HOW A

01:07PM   6    PATIENT IS PRESENTING OR CONTEMPORANEOUS RESULTS FROM ANOTHER

01:07PM   7    LAB.  YOU NEED TO HAVE SOMETHING ELSE TO HOLD THOSE RESULTS UP

01:07PM   8    TO.

01:07PM   9        SO THE KIND OF STATISTICAL ANALYSIS THAT THE DEFENSE IS

01:07PM   10   SAYING YOU NEED, FOR ONE THING, IT'S NOT CLEAR THAT THAT

01:07PM   11   ANALYSIS WOULD EVEN BE POSSIBLE.

01:07PM   12       BUT MORE IMPORTANTLY, YOU DON'T NEED IT.  YOU DON'T NEED

01:07PM   13   IT TO REACH THE CONCLUSION THAT THESE DEVICES WERE NOT WORKING

01:07PM   14   AS WELL AS THEY SHOULD HAVE BEEN, THAT IT WAS OBVIOUS TO

01:07PM   15   EVERYONE IN THE COMPANY, INCLUDING MS. HOLMES.

01:07PM   16       MR. DOWNEY ALSO TALKED ABOUT THE NATURE OF THE EVIDENCE OF

01:07PM   17   FAILURE IN THIS CASE, AND HE HIGHLIGHTED ONE CATEGORY OF THAT

01:08PM   18   EVIDENCE, WHICH WAS EXAMPLES OF INSTANCES WHERE THE DEVICE

01:08PM   19   RETURNED AN INACCURATE RESULT.

01:08PM   20       BUT THAT IS ONLY PART OF THE EVIDENCE IN THIS CASE.

01:08PM   21   THAT'S ONLY PART OF THE EVIDENCE SHOWING THAT THE ANALYZER WAS

01:08PM   22   NOT WORKING.

01:08PM   23       YOU SHOULD NOT FOCUS SOLELY ON THAT, ESPECIALLY IN LIGHT

01:08PM   24   OF THE EVIDENCE THAT SHOWED MUCH HIGHER FAILURE RATES FOR

01:08PM   25   QUALITY CONTROL FOR THE THERANOS ANALYZER VERSUS THE

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9248

01:08PM   1    NON-THERANOS TECHNOLOGY ALSO AT THE COMPANY.

01:08PM   2        FINALLY, JUST TO CLEAR UP THE RECORD ON THAT TOPIC,

01:08PM   3    MR. DOWNEY A COUPLE OF TIMES REFERENCED DR. ROSENDORFF'S

01:08PM   4    TESTIMONY COMPARING FAILURE RATES OR ERROR RATES AT THERANOS TO

01:08PM   5    ERROR RATES AT OTHER LABS, AND HE HAD PREVIOUSLY TESTIFIED THAT

01:08PM   6    I THINK HE HAD SEEN THE SAME NUMBER APPROXIMATELY OF ERRONEOUS

01:09PM   7    RESULTS AT THERANOS VERSUS HIS PREVIOUS LAB.

01:09PM   8        LATER IN HIS TESTIMONY, THOUGH, HE CLARIFIED THAT THAT

01:09PM   9    ACTUALLY CAUSED HIM TO BE FAR MORE CONCERNED ABOUT THE

01:09PM   10   RELIABILITY OF THERANOS'S TESTS GIVEN THE DIFFERENCE IN VOLUME

01:09PM   11   BETWEEN THOSE TWO LABS.

01:09PM   12       AS HE TESTIFIED, THE KEY QUESTION FOR HIM WAS, HOW

01:09PM   13   FREQUENTLY ARE THESE ERRORS POPPING UP IN RELATION TO THE TOTAL

01:09PM   14   NUMBER OF TESTS THAT ARE BEING PERFORMED?

01:09PM   15       AND YOU'LL RECALL THAT SOME OF HIS TESTIMONY FOCUSSED ON

01:09PM   16   THE EARLY DAYS OF THE THERANOS LAUNCH WHEN, AS BOTH PARTIES

01:09PM   17   AGREE, THE TESTING VOLUME WAS QUITE LOW.

01:09PM   18       SO A HIGH ERROR RATE DURING THAT TIME, ALL OF THESE

01:09PM   19   PROBLEMS CROPPING UP SO EARLY WHEN THE TEST VOLUME WAS LOW MADE

01:09PM   20   THIS EVEN MORE OF A RED FLAG FOR EVERYONE AT THE COMPANY.

01:09PM   21       LET'S KEEP TALKING ABOUT WHAT WAS TRUE AT THERANOS AND HOW

01:09PM   22   THINGS REALLY WERE.

01:09PM   23       YOU ALSO KNOW FROM THE EVIDENCE IN THIS CASE THAT ALTHOUGH

01:10PM   24   DEFENDANT WAS REPRESENTING THAT THE COMPANY HAD A RICH ONGOING

01:10PM   25   RELATIONSHIP WITH PHARMACEUTICAL COMPANIES AND WAS GENERATING A

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9249

01:10PM   1    SIGNIFICANT AMOUNT OF REVENUE FROM THOSE RELATIONSHIPS, THAT

01:10PM   2    WASN'T TRUE.  THOSE RELATIONSHIPS WERE FAR MORE LIMITED.

01:10PM   3        FOR ONE THING, YOU'LL RECALL, OR YOU'LL NOTICE IF YOU LOOK

01:10PM   4    AT THE RELEVANT EXHIBITS THAT THE ASSAYS INVOLVED IN THE

01:10PM   5    CONTRACTS WITH THE PHARMACEUTICAL COMPANIES WERE SPECIALIZED

01:10PM   6    ASSAYS THAT WERE GENERALLY NOT THE SAME AS THE ASSAYS THAT WERE

01:10PM   7    CRITICAL FOR CLINICAL CARE.

01:10PM   8        IN OTHER WORDS, THE ASSAYS THAT THERANOS WAS RUNNING FOR

01:10PM   9    THE PHARMA COMPANIES WERE GENERALLY NOT THE SAME ASSAYS THAT

01:10PM  10    MATTERED FOR PATIENT CARE AND THE CLINICAL LAUNCH.

01:10PM  11        SO THE FACT THAT THERANOS HAD EXPERIENCE IN THAT AREA IS

01:10PM  12    REALLY OF LIMITED RELEVANCE.

01:10PM  13        YOU ALSO HEARD TESTIMONY FROM EMPLOYEES AT THOSE

01:10PM  14    PHARMACEUTICAL COMPANIES WHO TOLD YOU THAT THEY ACTUALLY HAD

01:11PM  15    NEGATIVE IMPRESSIONS OF THERANOS'S TECHNOLOGY.  THEY HAD

01:11PM  16    CONCERNS ABOUT ITS PERFORMANCE.

01:11PM  17        IN GENERAL, THEY WERE NOT INTERESTED IN USING THE

01:11PM  18    COMPANY'S TECHNOLOGY FURTHER.

01:11PM  19        THE UNDISPUTED EVIDENCE ALSO SHOWS THAT THERANOS COLLECTED

01:11PM  20    NO REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2009.  YOU CAN

01:11PM  21    FIND THAT IN EXHIBIT 7753, AND THAT WAS A CHART THAT WAS

01:11PM  22    COVERED BY MS. YAM WHEN SHE WAS ON THE STAND.

01:11PM  23        AGAIN, DESPITE THE DEFENDANT'S REPRESENTATIONS GOING INTO

01:11PM  24    2012, 2013 AND FORWARD, THE COMPANY HAD NOT COLLECTED A DOLLAR

01:11PM  25    OF REVENUE FROM PHARMACEUTICAL WORK AFTER 2009.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                            9250

01:11PM   1          MR. DOWNEY RECENTLY DISCUSSED WHETHER THERANOS WAS IN NEED

01:11PM   2     OF MONEY OR NOT.

01:11PM   3          ALTHOUGH MS. HOLMES REPRESENTED TO INVESTORS AND OTHERS

01:12PM   4     THAT THE COMPANY WAS FINANCIALLY PERFORMING WELL AND IT WAS

01:12PM   5     GENERATING SIGNIFICANT REVENUES AND IT WAS ABOUT TO GENERATE

01:12PM   6     EVEN MORE, SHE KNEW, BECAUSE SHE WAS CEO OF THE COMPANY,

01:12PM   7     BECAUSE SHE MONITORED THE CASH POSITION, THAT THAT WAS NOT

01:12PM   8     TRUE.

01:12PM   9          AND IF YOU LOOK AT EXHIBIT 5172, I WON'T DISPLAY IT NOW,

01:12PM  10     BUT IT'S AN ACCOUNTING RECORD THAT SHOWS THAT IN SEPTEMBER THE

01:12PM  11     COMPANY'S CASH BALANCE WAS DOWN TO LESS THAN 10 MILLION IF YOU

01:12PM  12     DON'T COUNT THE LINE OF CREDIT THAT WOULD HAVE BEEN DIFFICULT

01:12PM  13     FOR THERANOS TO ACCESS.

01:12PM  14          WHAT DID THAT MEAN?  WHAT DID $10 MILLION MEAN AT THAT

01:12PM  15     TIME?

01:12PM  16          THAT SAME EXHIBIT, 5172, SHOWS THAT AT THAT TIME, AND THIS

01:12PM  17     IS IN SEPTEMBER 2013, AT THAT TIME THE COMPANY'S BURN RATE OR

01:12PM  18     ITS SPEND RATE WAS APPROXIMATELY $1- TO $2 MILLION PER WEEK.

01:12PM  19          SO THAT MEANT THAT THE COMPANY WAS LESS THAN TWO MONTHS

01:12PM  20     FROM RUNNING OUT OF MONEY AND HAVING TO CLOSE ITS DOORS.

01:13PM  21          THAT WAS AROUND THE TIME WHEN THE COMPANY WAS PURSUING ITS

01:13PM  22     LAUNCH WITH WALGREENS BECAUSE IT DESPERATELY NEEDED THE CAPITAL

01:13PM  23     UNDER THAT CONTRACT.

01:13PM  24          IT WAS ALSO AGGRESSIVELY PURSUING INVESTMENT FROM

01:13PM  25     INVESTORS BECAUSE IT DESPERATELY NEEDED THE CAPITAL FROM THOSE

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023