No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XLV of LVII | ER-12832 to ER-13129

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA  98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                              9251

01:13PM   1    INVESTMENTS.

01:13PM   2        THAT IS ABSOLUTELY PART OF THE MOTIVE IN THIS CASE, AND

01:13PM   3    ALTHOUGH YOU'RE NOT REQUIRED TO FIND MOTIVE, IT'S NOT AN

01:13PM   4    ELEMENT OF ANY OF THE CHARGED CRIMES, IT'S IMPORTANT TO

01:13PM   5    UNDERSTAND THAT THAT WAS CERTAINLY ON THE MINDS OF BOTH

01:13PM   6    DEFENDANT, HOLMES AND BALWANI, IN THIS CASE AS THEY DECIDED HOW

01:13PM   7    TO APPROACH THEIR DEALINGS WITH WALGREENS AND THE

01:13PM   8    MISREPRESENTATIONS THEY MADE THERE, AND THEIR APPROACH TO

01:13PM   9    INVESTORS AND THE MISREPRESENTATIONS THEY MADE TO THEM.

01:13PM  10        ALTHOUGH MS. HOLMES WAS REPRESENTING TO THE PUBLIC THAT

01:13PM  11    THE COMPANY'S TECHNOLOGY WAS BEING ACTIVELY USED BY THE

01:13PM  12    MILITARY, YOU KNOW THAT THAT'S NOT TRUE.

01:14PM  13        DURING CLOSING MR. DOWNEY MADE SOME REFERENCE TO SOME OF

01:14PM  14    THE LIMITED ENGAGEMENTS THAT THE COMPANY HAD WITH THE MILITARY.

01:14PM  15        LET ME JUST GO THROUGH THEM TO MAKE SURE THAT WE'RE ALL ON

01:14PM  16    THE SAME PAGE ABOUT THE CRITICAL FACT THAT NONE OF THESE

01:14PM  17    ENGAGEMENTS INVOLVED ACTUAL CLINICAL USE OF THE ANALYZER.  NONE

01:14PM  18    OF THESE WERE USE OF THE THERANOS TECHNOLOGY FOR ITS INTENDED

01:14PM  19    PURPOSE.

01:14PM  20        SO, FOR EXAMPLE, FOR SOCOM, THAT'S SPECIAL OPERATIONS

01:14PM  21    COMMAND, MR. EDLIN TESTIFIED THAT TWO DEVICES WERE SENT TO A

01:14PM  22    BASE IN KENTUCKY.  HE TESTIFIED THAT THOSE DEVICES WERE NOT

01:14PM  23    EVEN CAPABLE OF RUNNING A CBC, A BASIC COMPLETE BLOOD COUNT,

01:14PM  24    THAT THEY WOULD HAVE HAD TO BE REPLACED LATER IN ORDER FOR THAT

01:14PM  25    TEST TO BE POSSIBLE.  AND AS FAR AS HE KNOWS, THOSE DEVICES

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9252

01:14PM  1      WERE NEVER USED FOR ANYTHING.

01:14PM  2           AGAIN, TWO DEVICES, SENT TO KENTUCKY, NEVER USED, AND THAT

01:14PM  3      WAS THE EXTENT OF THE SOCOM DEALING.

01:14PM  4           FOR AFRICOM, MR. DOWNEY REFERENCED THIS ONE AS WELL.

01:15PM  5           EXHIBIT 12251 TELLS YOU WHAT THIS WAS ACTUALLY ABOUT.  IT

01:15PM  6      WAS NOT CLINICAL USE OF THE ANALYZER.  IT WAS NOT USE OF THE

01:15PM  7      ANALYZER TO TEST ANY PATIENT SAMPLES.

01:15PM  8           INSTEAD, THIS WAS A TEST TO SEE WHETHER THE DEVICE WOULD

01:15PM  9      FUNCTION, WHETHER IT WOULD SUCCESSFULLY START UP, POWER DOWN,

01:15PM 10      THINGS LIKE THAT, IN THE ENVIRONMENT.

01:15PM 11           HERE'S A QUOTE FROM THAT DOCUMENT.  IT SAYS, "ALL

01:15PM 12      LABORATORY RESULTS WILL BE ARTIFICIALLY CREATED.  NO ACTUAL

01:15PM 13      LABORATORY DATA WILL BE COLLECTED ON VOLUNTEERS."

01:15PM 14           YOU'LL RECALL FROM MR. EDLIN'S TESTIMONY THAT THIS WAS AN

01:15PM 15      EXPERIMENT WHERE THE RESULTS FOR THE TESTS THAT WERE GOING TO

01:15PM 16      BE RUN HAD BEEN PREDETERMINED.  THEY DIDN'T ACTUALLY RELATE TO

01:15PM 17      WHAT WAS HAPPENING IN PATIENTS' BODIES, AND NO TREATMENT

01:15PM 18      DECISIONS WOULD HAVE BEEN MADE BASED ON THOSE TESTS EITHER.

01:15PM 19           HOW ABOUT CENTCOM?

01:15PM 20           THIS IS THE COMPONENT OF THE MILITARY THAT GENERAL MATTIS

01:16PM 21      WAS IN CHARGE OF.  BOTH HE AND MR. EDLIN TESTIFIED THAT

01:16PM 22      ALTHOUGH CENTCOM CONSIDERED AND WAS INTERESTED IN SIDE BY SIDE

01:16PM 23      TESTING OF THERANOS TECHNOLOGY TO SEE WHETHER THERANOS

01:16PM 24      ANALYZERS COULD RELIABLY PERFORM AS WELL AS CONVENTIONAL

01:16PM 25      ANALYZERS, ALTHOUGH CENTCOM WAS INTERESTED IN THAT, THAT NEVER

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:16PM   1     HAPPENED.

01:16PM   2          AND EXHIBIT 10457 IS A PROTOCOL FOR AN LOE, THAT'S LIMITED

01:16PM   3     OBJECTIVE EXPERIMENT, THAT NEVER HAPPENED.  THAT WAS GOING TO

01:16PM   4     INVOLVE SHIPPING DEVICES TO AFGHANISTAN.  THAT PROTOCOL, THAT

01:16PM   5     STUDY, NEVER GOT OFF THE GROUND.

01:16PM   6          AND THEN FINALLY THERE WAS THE BURN STUDY.

01:16PM   7          THIS WAS NOT EXCLUSIVELY A MILITARY OPERATION AS YOU SAW

01:16PM   8     FROM EXHIBIT 7694.  THAT'S THE PUBLISHED ARTICLE WITH THE STUDY

01:16PM   9     DETAILS.

01:16PM   10          YOU'LL RECALL FROM THAT ARTICLE THAT THIS WAS A STUDY OF A

01:17PM   11     TREATMENT TECHNIQUE THAT HAD NOTHING TO DO WITH THERANOS.  NO

01:17PM   12     TREATMENT DECISIONS WERE BASED ON THE USE OF THE THERANOS TEST

01:17PM   13     RESULTS.

01:17PM   14          AND THIS TESTING ALSO OCCURRED EXCLUSIVELY WITHIN THE U.S.

01:17PM   15     IT WAS NOT IN THE BATTLEFIELD.  IT DID NOT EXCLUSIVELY INVOLVE

01:17PM   16     SOLDIERS.

01:17PM   17          SO THIS ALSO WAS NOT ANYTHING LIKE WHAT MS. HOLMES WAS

01:17PM   18     REPRESENTING WAS HAPPENING.

01:17PM   19          IT'S IMPORTANT TO REMEMBER THAT IN NONE OF THESE CASES WAS

01:17PM   20     THERE EVEN COMPARATIVE TESTING TO SEE WHETHER THE THERANOS

01:17PM   21     DEVICE COULD PERFORM WELL ENOUGH FOR ACTUAL USE.  THAT WOULD

01:17PM   22     HAVE BEEN THE FIRST STEP BEFORE ANY SOLDIERS WERE ACTUALLY

01:17PM   23     TREATED BASED ON THERANOS TEST RESULTS, AND THAT PRECONDITION,

01:17PM   24     THAT TEST OF THE THERANOS TECHNOLOGY NEVER EVEN OCCURRED.

01:17PM   25          SO THAT SHOULD GIVE YOU AN IDEA OF HOW FAR AWAY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:17PM  1    MS. HOLMES'S REPRESENTATIONS WERE FROM THE ACTUAL TRUTH ON THAT

01:17PM  2    TOPIC.

01:17PM  3        SO THAT WAS THE TRUTH AT THERANOS.

01:18PM  4        THE PEOPLE, THOUGH, AND THE ORGANIZATIONS THAT MS. HOLMES

01:18PM  5    WANTED TO DO BUSINESS WITH DIDN'T KNOW THOSE FACTS, AND THEY

01:18PM  6    COULD NOT BE ALLOWED TO KNOW THAT TRUTH.

01:18PM  7        IF INVESTORS HAD KNOWN THOSE FACTS, THEY NEVER WOULD HAVE

01:18PM  8    WRITTEN CHECKS TO THERANOS.  THEY NEVER WOULD HAVE INVESTED

01:18PM  9    THEIR MONEY.

01:18PM 10        IF WALGREENS HAD KNOWN THOSE FACTS, THEY WOULDN'T HAVE

01:18PM 11    PARTNERED WITH THERANOS AND AGREED TO PUT THERANOS'S TESTING

01:18PM 12    SERVICES IN WALGREENS STORES.

01:18PM 13        AND IF PATIENTS HAD KNOWN THOSE FACTS, THEY NEVER WOULD

01:18PM 14    HAVE TRUSTED THERANOS TO TELL THEM WHAT WAS HAPPENING WITH

01:18PM 15    THEIR HEALTH.

01:18PM 16        IN OTHER WORDS, THOSE FACTS, THE TRUTH, WERE FATAL TO

01:18PM 17    THERANOS, AND MS. HOLMES KNEW THAT.

01:18PM 18        SO, AS A RESULT, MS. HOLMES SET OUT TO MAKE SURE THAT THE

01:18PM 19    PEOPLE THAT SHE CARED ABOUT DOING BUSINESS WITH, THE PEOPLE

01:18PM 20    WHOSE MONEY SHE NEEDED, HAD A DISTORTED AND INACCURATE VIEW OF

01:19PM 21    THE COMPANY IN THEIR HEADS.

01:19PM 22        HER SCHEME TO DEFRAUD CAME TO ENCOMPASS INVESTORS IN THE

01:19PM 23    COMPANY AND PATIENTS WHO CAME TO THERANOS FOR BLOOD TESTS,

01:19PM 24    RESULTING IN THE CHARGES IN THIS CASE.

01:19PM 25        LET'S TALK NOW ABOUT SOME OF THE ARGUMENTS YOU'VE SEEN

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9255

01:19PM   1     FROM THE DEFENSE OVER THE COURSE OF TRIAL AND ESPECIALLY IN

01:19PM   2     CLOSING.

01:19PM   3          WE'LL LOOK AT THE MAIN THEMES THAT MS. HOLMES'S LAWYERS

01:19PM   4     HAVE OFFERED AND WALK THROUGH WHY NONE OF THEM GETS IN THE WAY

01:19PM   5     OF A CONVICTION ON ALL COUNTS IN THIS CASE.

01:19PM   6          FIRST, WE MENTIONED THIS BEFORE, THE DEFENSE HAS

01:19PM   7     HIGHLIGHTED THE HARD WORK THAT OCCURRED AT THERANOS, AND IN

01:19PM   8     PARTICULAR THE HARD WORK THAT THE DEFENDANT HERSELF DID.

01:19PM   9          AGAIN, THERE'S NO DISPUTE ON THAT FACT.  THE EVIDENCE

01:19PM  10     SHOWS THAT MS. HOLMES DEVOTED A LOT OF TIME AND ENERGY TO THIS

01:19PM  11     COMPANY.  THE COMPANY WAS VERY IMPORTANT TO HER.

01:19PM  12          THERE'S ALSO NO EVIDENCE THAT MS. HOLMES CREATED THE

01:19PM  13     COMPANY, THAT SHE ASSEMBLED THE BOARD, THAT SHE HIRED

01:20PM  14     SCIENTISTS FOR THE PURPOSE OF CONDUCTING A FRAUD.  THAT'S NOT

01:20PM  15     THE GOVERNMENT'S ALLEGATION.

01:20PM  16          FOR ONE THING, THE EVIDENCE SHOWS THAT SHE FOUNDED THE

01:20PM  17     COMPANY IN THE EARLY 2000'S, AND THE CHARGED CRIMES IN THIS

01:20PM  18     CASE DON'T START UNTIL 2010 ON THE INVESTOR SIDE AND 2013 FOR

01:20PM  19     THE PATIENT SIDE.

01:20PM  20          SO THE PARTIES AGREE THAT MS. HOLMES WORKED HARD, THAT SHE

01:20PM  21     WANTED THERANOS TO SUCCEED.  SHE WANTED HER COMPANY TO BE

01:20PM  22     SUCCESSFUL.

01:20PM  23          THE DEFENSE HOLDS THAT OUT AS A REASON TO DOUBT

01:20PM  24     MS. HOLMES'S INTENT TO DEFRAUD IN THIS CASE.

01:20PM  25          BUT, IN FACT, THAT WAS HER MOTIVE.  THAT WAS THE MOTIVE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:20PM  1    FOR THE SCHEME TO DEFRAUD.  SHE DID THIS ON BEHALF OF THE

01:20PM  2    COMPANY.  SHE COMMITTED THESE CRIMES BECAUSE SHE WAS DESPERATE

01:20PM  3    FOR THE COMPANY TO SUCCEED, AND WE'LL TALK ABOUT SOME OF THE

01:20PM  4    EVIDENCE THAT SHOWS THAT.

01:20PM  5        THE DEFENSE ALSO MENTIONED GOOD FAITH A COUPLE OF TIMES,

01:21PM  6    AND I WANT TO BE CLEAR ABOUT WHAT THE INSTRUCTIONS IN THIS CASE

01:21PM  7    WILL SHOW.

01:21PM  8        SO AFTER I'M FINISHED WITH MY OPPORTUNITY TO ADDRESS YOU,

01:21PM  9    THE COURT IS GOING TO INSTRUCT YOU ON THE RELEVANT LAW IN THIS

01:21PM  10   CASE, AND THAT WILL BE THE LAW THAT YOU SHOULD FOLLOW IN YOUR

01:21PM  11   DELIBERATIONS.

01:21PM  12       I EXPECT THAT THE COURT IS GOING TO INSTRUCT YOU

01:21PM  13   SPECIFICALLY ON GOOD FAITH.  I THINK THAT WILL BE JURY

01:21PM  14   INSTRUCTION NUMBER 22.

01:21PM  15       HERE'S THE IMPORTANT THING TO KNOW HERE IN CONNECTION WITH

01:21PM  16   THE DEFENSE ARGUMENT.  GOOD FAITH THAT WOULD PREVENT A

01:21PM  17   CONVICTION IS GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

01:21PM  18   MISREPRESENTATIONS ALLEGED.

01:21PM  19       I'LL SAY THAT AGAIN.  THE ONLY KIND OF GOOD FAITH THAT

01:21PM  20   PREVENTS A CONVICTION HERE IS GOOD FAITH BELIEF IN THE TRUTH OF

01:21PM  21   THE SPECIFIC MISREPRESENTATIONS ALLEGED.

01:21PM  22       THAT'S NOT THE SAME THING AS GENERAL GOOD FAITH BELIEF IN

01:21PM  23   THE COMPANY OVERALL.  IT'S NOT THE SAME THING AS A GENERAL GOOD

01:21PM  24   FAITH EFFORT TO MAKE THE COMPANY WORK.

01:22PM  25       IN ORDER TO FIND THAT GOOD FAITH PRECLUDES A CONVICTION

9257
REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:22PM  1      HERE, MS. HOLMES MUST HAVE BELIEVED IN THE FALSE THINGS THAT

01:22PM  2   SHE WAS SAYING.

01:22PM  3      IT'S IMPOSSIBLE TO CONCLUDE THAT, AND WE'LL TALK SOME MORE

01:22PM  4   ABOUT WHY.

01:22PM  5      MR. DOWNEY ALSO HAS HIGHLIGHTED THE THEME THAT THE FAILURE

01:22PM  6   OF A BUSINESS DOES NOT EQUAL A FRAUD.

01:22PM  7      AGAIN, THERE'S NO DISPUTE THERE.  THAT'S NOT THE NATURE OF

01:22PM  8   THE ALLEGATIONS IN THIS CASE.  THE ACHIEVEMENTS THAT NEVER

01:22PM  9   MATERIALIZED AT THERANOS ARE SOMETHING THAT WE DISCUSSED AND

01:22PM  10  SOMETHING THAT IS NOT CONTROVERSIAL.

01:22PM  11     BUT THEY'RE ALSO NOT A CRIME.  THAT DEGREE OF FAILURE AND

01:22PM  12  THE FACT THAT THOSE GOALS WERE NOT ACHIEVED DOES NOT BY ITSELF

01:22PM  13  MAKE A CRIME.

01:22PM  14     A VERSION OF MS. HOLMES THAT SET OUT TO ACHIEVE THE GOALS

01:22PM  15  THAT SHE SET OUT TO ACHIEVE AND WAS SUCCESSFUL WOULD HAVE BEEN

01:22PM  16  A HERO.

01:23PM  17     A VERSION WHO TRIED HER BEST AND FAILED, BUT WAS STILL

01:23PM  18  HONEST ABOUT IT, STILL WOULD HAVE BEEN SOMEONE DESERVING OF

01:23PM  19  RESPECT, EVEN ADMIRATION.

01:23PM  20     BUT THAT'S NOT THE VERSION THAT WE SEE IN THE EVIDENCE IN

01:23PM  21  THIS CASE.

01:23PM  22     INSTEAD, WE SEE A CEO OF A COMPANY WHO WAS SO DESPERATE

01:23PM  23  FOR THE COMPANY TO SUCCEED, SO AFRAID OF FAILURE, THAT SHE WAS

01:23PM  24  WILLING TO DO ANYTHING TO KEEP THAT COMPANY FROM FAILING, TO

01:23PM  25  BOLSTER THE REPRESENTATION OF THE COMPANY, AND TO ARTIFICIALLY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9258

01:23PM   1    CREATE SUCCESS OF THE COMPANY.

01:23PM   2         SO BY CONVICTING MS. HOLMES, BY FINDING THAT ALL OF THE

01:23PM   3    ELEMENTS ARE MET IN THIS CASE, YOU'RE NOT PUNISHING THE

01:23PM   4    DEFENDANT FOR BEING AMBITIOUS AND FAILING.  WE ADMIRE PEOPLE

01:23PM   5    WHO SET AMBITIOUS GOALS AND SET OUT TO ACHIEVE THEM.

01:23PM   6         THIS CASE WENT BAD FOR THERANOS AND MS. HOLMES WHEN SHE

01:23PM   7    MADE THE OTHER CHOICE, WHEN SHE REFUSED TO ACCEPT FAILURE AND

01:24PM   8    TURNS TO BREAKING THE LAW INSTEAD.

01:24PM   9         THE DEFENSE HAS ALSO HIGHLIGHTED MS. HOLMES'S YOUTH AND

01:24PM  10    RELATIVE INEXPERIENCE AS A POSSIBLE EXCUSE IN THIS CASE.

01:24PM  11         YOU SHOULDN'T BE DISTRACTED BY THAT.  ALTHOUGH THE DEFENSE

01:24PM  12    HIGHLIGHTS THE AGE MS. HOLMES WAS WHEN SHE FOUNDED THE COMPANY,

01:24PM  13    IT'S IMPORTANT TO REMEMBER THAT THE PERSON ON TRIAL IS 37 YEARS

01:24PM  14    OLD TODAY.

01:24PM  15         IN 2013 AND 2014 WHEN SHE WAS DECIDING TO OFFER FLAWED

01:24PM  16    BLOOD TESTS TO THE PUBLIC, SHE WAS 29 AND 30.

01:24PM  17         IN 2010 WHEN THE FRAUD ON INVESTORS BEGAN, SHE WAS 26.

01:24PM  18         THAT IS CERTAINLY OLD ENOUGH TO KNOW THE DIFFERENCE

01:24PM  19    BETWEEN RIGHT AND WRONG.  IT'S OLD ENOUGH TO KNOW THE

01:24PM  20    DIFFERENCE BETWEEN HONESTY AND DISHONESTY.

01:24PM  21         AND LEST YOU THINK THERE'S SOMETHING ABOUT THIS SPECIFIC

01:24PM  22    SETTING THAT MADE IT DIFFICULT TO TELL THE DIFFERENCE BETWEEN

01:24PM  23    RIGHT AND WRONG OR TO KNOW WHAT THE RIGHT THING WAS, ASK

01:24PM  24    ERIKA CHEUNG.  ASK ERIKA CHEUNG HOW YOUNG IS TOO YOUNG TO KNOW

01:25PM  25    THAT OFFERING INACCURATE BLOOD TESTS IS A BAD THING.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9259

01:25PM  1        YOU RECALL THAT MS. CHEUNG JOINED THERANOS JUST OUT OF

01:25PM  2    COLLEGE.  IT WAS HER FIRST JOB AFTER GRADUATING, AND IT ONLY

01:25PM  3    TOOK HER A HANDFUL OF MONTHS TO SEE THE PROBLEMS THAT WERE

01:25PM  4    OBVIOUS WITH THE THERANOS TECHNOLOGY AND TO DECIDE THAT SHE

01:25PM  5    DIDN'T WANT TO BE A PART OF IT.

01:25PM  6        BY THE WAY, SHE HAD NO IDEA ABOUT THE MISLEADING

01:25PM  7    STATEMENTS THAT MS. HOLMES WAS MAKING TO INVESTORS AND TO

01:25PM  8    OTHERS.  IMAGINE WHAT SHE WOULD HAVE DONE IF SHE HAD KNOWN

01:25PM  9    ABOUT THAT.

01:25PM 10        ANOTHER THEME THAT WE'VE SEEN IN MS. HOLMES'S LAWYERS'

01:25PM 11    ARGUMENTS IS THE THEME OF BLAMING OTHERS.  AND LET'S TALK FIRST

01:25PM 12    ABOUT THE BOARD OF DIRECTORS.

01:25PM 13        YOU'LL SEE THAT WITH A NUMBER OF THESE ARGUMENTS, THE

01:25PM 14    DEFENSE WOULD LIKE YOU TO BELIEVE THAT THERE WERE OTHER PEOPLE

01:25PM 15    AT THERANOS WHO SHOULD HAVE ADVISED HOLMES BETTER, PEOPLE WHO

01:26PM 16    SHOULD HAVE PREVENTED BAD THINGS FROM HAPPENING, PEOPLE WHO

01:26PM 17    WERE RESPONSIBLE FOR THE BAD THINGS, OR PEOPLE WHO GAVE

01:26PM 18    MS. HOLMES INACCURATE INFORMATION.

01:26PM 19        NONE OF THOSE ARGUMENTS HOLD WATER.

01:26PM 20        WHEN IT COMES TO THE BOARD, IT'S IMPOSSIBLE TO BLAME THE

01:26PM 21    BOARD OF DIRECTORS FOR WHAT HAPPENED HERE, MAINLY BECAUSE THE

01:26PM 22    BOARD WAS NOT GIVEN THE INFORMATION THAT IT NEEDED TO HELP THE

01:26PM 23    COMPANY NAVIGATE THE PROBLEMS THAT IT WAS FACING.

01:26PM 24        AND A GOOD EXAMPLE OF THAT IS MS. HOLMES'S DECISION NOT TO

01:26PM 25    SHARE WITH THE BOARD THE LIMITATIONS OF THE THERANOS ANALYZER.

UNITED STATES COURT REPORTERS

01:26PM   1        MR. DOWNEY TALKED ABOUT THIS.

01:26PM   2        LET'S CLEAR UP THE RECORD HERE.

01:26PM   3        THE EVIDENCE IN THE CASE SHOWS THAT THERANOS'S RELIANCE ON

01:26PM   4   THIRD PARTY DEVICES WAS ABSOLUTELY CONCEALED FROM ITS BOARD OF

01:26PM   5   DIRECTORS.

01:26PM   6        ON DIRECT GENERAL MATTIS, A MEMBER OF THE BOARD, WAS ASKED

01:27PM   7   WHETHER THERANOS'S USE OF THIRD PARTY DEVICES, WHETHER THE

01:27PM   8   RELIANCE ON THIRD PARTY DEVICES WOULD HAVE STOOD OUT IN HIS

01:27PM   9   MIND, FOR EXAMPLE, IF A MAJORITY OF THE TESTS RUN WERE RUN ON

01:27PM  10   THIRD PARTY DEVICES?

01:27PM  11        HE ANSWERED, "AT THIS POINT IT WOULD HAVE LEAPED OUT AT ME

01:27PM  12   BECAUSE MY WHOLE EFFORT AT CENTCOM HAD BEEN TO TRY TO GET IT

01:27PM  13   INTO THEATRE BECAUSE IT WAS DIFFERENT AND IT COULD DO THIS OFF

01:27PM  14   OF THIS ONE SMALL MACHINE."

01:27PM  15        SO THIS WAS SOMETHING THAT ALTHOUGH GENERAL MATTIS DIDN'T

01:27PM  16   HAVE A BACKGROUND IN, HE WAS NO EXPERT IN BLOOD TESTING OR

01:27PM  17   MEDICAL DEVICES, HIS INTEREST IN THERANOS AND HIS INTEREST IN

01:27PM  18   POSSIBLE MILITARY USE WAS PREDICATED ON THE ABILITY OF THE

01:27PM  19   MACHINE, THIS ONE MACHINE, THIS ONE SMALL MACHINE, TO RUN A

01:27PM  20   WIDE RANGE OF BLOOD TESTS WITHOUT RELIANCE ON THE LARGE

01:27PM  21   CONVENTIONAL ANALYZERS THAT OTHER LABS USED.

01:27PM  22        NOW, WHEN MS. HOLMES TOOK THE STAND, SHE CLAIMED THAT IN A

01:28PM  23   LATE 2013 BOARD MEETING SHE TOLD THE BOARD ABOUT THE COMPANY'S

01:28PM  24   USE OF CONVENTIONAL MODIFIED MACHINES.

01:28PM  25        AND THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:28PM 1      GENERAL MATTIS DIDN'T RECALL THAT DISCUSSION BECAUSE HE WAS

01:28PM 2      TIRED.

01:28PM 3           MR. DOWNEY IN CLOSING SUGGESTED THAT IT'S POSSIBLE THAT

01:28PM 4      GENERAL MATTIS WAS NOT PRESENT AT THAT MEETING.

01:28PM 5           THE MINUTES FOR THAT MEETING CAN BE FOUND AT EXHIBIT 4005,

01:28PM 6      THAT'S 4-0-0-5.  THEY DON'T SHOW THE SUGGESTION THAT HOLMES

01:28PM 7      CLAIMS TOOK PLACE THERE.

01:28PM 8           THOSE MINUTES SHOWED A GENERAL DISCUSSION OF TRADE

01:28PM 9      SECRETS, BUT THEY DON'T DISCUSS DISCLOSURE OF THE COMPANY'S USE

01:28PM 10     OF MODIFIED THIRD PARTY MACHINES.

01:28PM 11          AND MORE IMPORTANTLY, THEY DON'T DISCLOSE THE DISCUSSION

01:28PM 12     OF THE COMPANY'S RELIANCE ON THIRD PARTY MACHINES, AND THAT'S

01:29PM 13     AN IMPORTANT DISTINCTION HERE.

01:29PM 14          WHEN MS. HOLMES WAS UNDER CROSS-EXAMINATION, SHE WAS

01:29PM 15     ASKED, "AM I RIGHT IT'S YOUR TESTIMONY THAT YOU TOLD THE BOARD

01:29PM 16     OF DIRECTORS THERANOS WAS USING MODIFIED COMMERCIAL ANALYZERS

01:29PM 17     TO DO THE PHASE I TESTING?"

01:29PM 18          SHE DIDN'T ANSWER "YES."

01:29PM 19          HER ANSWER HERE WAS, "I TOLD THE BOARD OF DIRECTORS THAT

01:29PM 20     WE HAD AN INVENTION AROUND MODIFIED COMMERCIAL ANALYZERS."

01:29PM 21          THAT'S CRITICAL.  IF MS. HOLMES ONLY TOLD THE BOARD THAT

01:29PM 22     THE COMPANY HAD AN INVENTION THAT INVOLVED MODIFIED THIRD PARTY

01:29PM 23     DEVICES, THE MEMBERS OF THE BOARD WOULD HAVE NO REASON TO

01:29PM 24     SUSPECT THAT THE COMPANY WAS RELYING ON THAT INVENTION, WAS

01:29PM 25     DEPENDENT ON THAT INVENTION BECAUSE ITS OWN HOME BUILT ANALYZER

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9262

01:29PM   1    COULDN'T DO THE RANGE OF TESTS THAT IT CLAIMED IT COULD DO.

01:29PM   2        THAT'S THE MISSING PIECE OF INFORMATION THAT WAS WITHHELD

01:29PM   3    FROM THE BOARD.

01:29PM   4        AND THE FACT THAT -- OR THE CLAIM THAT MS. HOLMES TOLD THE

01:30PM   5    BOARD ABOUT THIS INVENTION, ABOUT THE ABILITY TO USE MODIFIED

01:30PM   6    COMMERCIAL ANALYZERS IS THE KIND OF HALF-TRUTH THAT THIS

01:30PM   7    DEFENDANT WAS ESPECIALLY FOND OF USING, SOMETHING THAT ARGUABLY

01:30PM   8    TECHNICALLY CORRECT, BUT STILL LEAVES THE LISTENER WITH AN

01:30PM   9    UNMISTAKABLE INCORRECT UNDERSTANDING ABOUT WHAT THE TRUTH IS.

01:30PM  10        IN FACT, NOT ONLY DID MS. HOLMES NOT TELL THE BOARD ABOUT

01:30PM  11    THE COMPANY'S RELIANCE ON THIRD PARTY DEVICES IN 2013, SHE

01:30PM  12    DIDN'T TELL THEM IN 2014 OR UNTIL LATE 2015 WHEN SHE HAD TO.

01:30PM  13        YOU'LL RECALL THAT AFTER THE OCTOBER 2015

01:30PM  14    "WALL STREET JOURNAL" ARTICLE WAS PUBLISHED, THERE WAS A SERIES

01:30PM  15    OF EMAILS BETWEEN MS. HOLMES AND THE MEMBERS OF THE BOARD OF

01:30PM  16    DIRECTORS WHERE THE MEMBERS OF THE BOARD WERE INTERROGATING

01:30PM  17    HER, WERE ASKING HER ABOUT THE CLAIMS IN THE ARTICLE, AND

01:31PM  18    SPECIFICALLY ABOUT THE COMPANY'S USE OF VEIN DRAWS AND

01:31PM  19    CONVENTIONAL ANALYZERS.

01:31PM  20        HERE'S AN EMAIL FROM THE DAY AFTER THE ARTICLE WAS

01:31PM  21    PUBLISHED.  THIS IS EXHIBIT 4553.  AND THIS IS FROM

01:31PM  22    MR. KOVACEVICH WHO, BY THE WAY, THE MINUTES WILL SHOW WAS

01:31PM  23    PRESENT AT THE OCTOBER 2013 MEETING WHERE HOLMES CLAIMED SHE

01:31PM  24    PROVIDED THIS INFORMATION TO THE BOARD ABOUT MODIFIED THIRD

01:31PM  25    PARTY DEVICES.

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:31PM 1          THE MINUTE ALSO SHOW THAT GENERAL MATTIS WAS PRESENT AT

01:31PM 2     THAT MEETING, BY THE WAY.

01:31PM 3          IN THIS EMAIL MR. KOVACEVICH ASKS, "SO WHEN BLOOD IS

01:31PM 4     WITHDRAWN IN VENOUS TUBES DO I UNDERSTAND CORRECTLY THAT THE

01:31PM 5     TESTS ARE THEN DONE ON LAB LIKE EQUIPMENT AND NOT EDISON?"

01:31PM 6          HE'S ASKING THIS QUESTION BECAUSE HE DIDN'T KNOW.  EVEN

01:31PM 7     AFTER BEING A MEMBER OF THE BOARD FOR TWO YEARS OR MORE,

01:31PM 8     MR. KOVACEVICH WAS NOT AWARE OF THE COMPANY'S RELIANCE ON, THE

01:32PM 9     COMPANY'S DEPENDENCE ON THIRD PARTY DEVICES INDEPENDENT OF ITS

01:32PM 10    OWN HOME GROWN MODIFIER OR ANALYZER.

01:32PM 11         A LITTLE WAYS UP IN THE SAME CHAIN, MR. KOVACEVICH HAS

01:32PM 12    RECEIVED SOME MORE INFORMATION, BUT HE SAID, "I AM STILL

01:32PM 13    CONFUSED, HOWEVER, REGARDING MY PREVIOUS EMAIL.  AT THIS

01:32PM 14    MOMENT, HOW MANY OF OUR CUSTOMER SUBMISSIONS ARE BEING TESTED

01:32PM 15    ON LAB EQUIPMENT VERSUS EDISON?"

01:32PM 16         MS. HOLMES'S ANSWER IS DECEPTIVE ON ITS FACE.  SHE SAYS,

01:32PM 17    "THAT'S CORRECT - WE ARE AT AN EXACT MOMENT IN TIME RIGHT NOW

01:32PM 18    WHERE WE'VE JUST TRANSITIONED FROM OPERATING UNDER THE

01:32PM 19    TRADITIONAL LABORATORY FRAMEWORK (GOVERNED BY A LAW CALLED

01:32PM 20    CLIA) TO THE FDA FRAMEWORK."

01:32PM 21         AND THEN IN THE PARAGRAPH BELOW SHE SAYS, "PART OF THIS

01:32PM 22    TRANSITION MEANS MOVING ALL OPERATIONS FROM THE CLIA QUALITY

01:32PM 23    SYSTEMS TO THE FDA QUALITY SYSTEMS."

01:32PM 24         SHE SAYS BELOW THAT, "WE VOLUNTARY DECIDED AND

01:33PM 25    COMMUNICATED TO THE FDA THAT WE WOULD TEMPORARILY NOT USE THE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:33PM  1    NANOTAINER" -- THAT WAS THE PROPRIETARY BLOOD COLLECTION DEVICE

01:33PM  2    USED WITH ITS OWN ANALYZERS -- "UNDER THE CLIA LAB FRAMEWORK

01:33PM  3    UNTIL WE RECEIVED CLEARANCE."

01:33PM  4        SHE GOES ON TO SAY, "WE DO NOT HAVE A GOOD PERCENTAGE

01:33PM  5    NUMBER RIGHT NOW OF HOW MANY TESTS WILL BE DONE ON OUR

01:33PM  6    EQUIPMENT DURING THIS TEMPORARY PERIOD."

01:33PM  7        GENERAL MATTIS TESTIFIED THAT, UNDERSTANDABLY, THIS ANSWER

01:33PM  8    LED HIM TO BELIEVE THAT THE COMPANY' RELIANCE ON THIRD PARTY

01:33PM  9    DEVICES WAS A TEMPORARY THING, SOMETHING THAT HAD STARTED

01:33PM  10   SHORTLY BEFORE THIS EMAIL, SOMETHING THAT WOULDN'T LAST VERY

01:33PM  11   LONG.

01:33PM  12       THAT WASN'T TRUE.  THE COMPANY HAD BEEN DEPENDENT ON THIRD

01:33PM  13   PARTY NON-THERANOS ANALYZERS SINCE THE DAY IT FIRST LAUNCHED

01:33PM  14   IT'S TESTS TO THE PUBLIC.

01:33PM  15       AND THAT'S BECAUSE THE THERANOS EDISON COULD NOT PERFORM

01:33PM  16   THE WIDE RANGE OF TESTS THAT THE DEFENDANT CLAIMED AND THAT

01:34PM  17   THERANOS OFFERED.

01:34PM  18       SO IF MS. HOLMES DIDN'T TELL THE BOARD OF DIRECTORS ABOUT

01:34PM  19   HOW THE THERANOS TECHNOLOGY WORKED, WHAT IT COULD DO AND WHAT

01:34PM  20   IT COULDN'T DO, WHAT WAS THE POINT OF THE THERANOS BOARD?

01:34PM  21       WELL, THE EVIDENCE SHOWED THAT UNLIKE THE TYPICAL BOARD OF

01:34PM  22   DIRECTORS, THIS WAS NOT A GROUP OF PEOPLE MEANT TO STEER THE

01:34PM  23   COMPANY, TO ADVISE THE CEO.

01:34PM  24       INSTEAD, THE BOARD AT THERANOS WAS JUST ANOTHER AUDIENCE.

01:34PM  25   IT WAS A GROUP OF ILLUSTRIOUS AND CONNECTED PEOPLE WHO HOLMES

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9265

01:34PM  1      WANTED TO IMPRESS SO THAT THEY COULD THEN GO ON TO CONNECT

01:34PM  2      HOLMES AND THE COMPANY TO OTHER PEOPLE WHO COULD BENEFIT THE

01:34PM  3      COMPANY.

01:34PM  4          AND YOU SAW THAT THAT PLAN WORKED.

01:34PM  5          HENRY KISSINGER, WHO WAS ON THE THERANOS BOARD, CONNECTED

01:34PM  6      MS. HOLMES TO MR. MOSLEY, WHO THEN WENT ON, AS MR. DOWNEY

01:34PM  7      HIGHLIGHTED FOR YOU, TO CONNECT HOLMES WITH MULTIPLE INVESTORS.

01:34PM  8          SO HAVING THIS BOARD OF PROMINENT AND RESPECTED

01:35PM  9      INDIVIDUALS CERTAINLY PAID OFF FOR THE DEFENDANT.  WE'LL TALK

01:35PM 10      ABOUT ANOTHER WAY SHORTLY.

01:35PM 11          BUT THE EVIDENCE SHOWS THAT THAT WAS THE POINT.  THAT WAS

01:35PM 12      THE MOTIVATION IN HAVING THIS GROUP OF PEOPLE.  THEY WERE NOT

01:35PM 13      THERE FOR THEIR CONTRIBUTIONS TO THE STEERING OF THE COMPANY

01:35PM 14      AND THE DECISION MAKING OF THE MANAGEMENT.

01:35PM 15          INSTEAD, THEY WERE THERE TO BE IMPRESSED AND TO BOLSTER

01:35PM 16      THE REPUTATION OF THE COMPANY.

01:35PM 17          ANOTHER THEME OF THE DEFENSE IS THAT MS. HOLMES WAS MISLED

01:35PM 18      OR LET DOWN BY THE SCIENTISTS AND ENGINEERS AT THE COMPANY.

01:35PM 19          THE EVIDENCE DOESN'T SHOW THAT, EITHER.

01:35PM 20          FIRST, MS. HOLMES CLAIMS THAT THE SCIENTISTS AND ENGINEERS

01:35PM 21      WHO WORKED AT THERANOS LED HER TO BELIEVE THAT THE TECHNOLOGY

01:35PM 22      WAS GREAT AND THAT HER REPRESENTATIONS WERE TRUE.

01:36PM 23          WE'LL TALK SOME MORE ABOUT THEM WHEN WE TALK ABOUT THE 4.0

01:36PM 24      SERIES DEVICE, WHICH IS AN IMPORTANT TOPIC.

01:36PM 25          FOR NOW, YOU SHOULD RECALL THAT DURING HER TESTIMONY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9266

01:36PM  1      MS. HOLMES, FOR EXAMPLE, MADE VAGUE REFERENCE TO SCIENTISTS AND

01:36PM  2   ENGINEERS IN THE COMPANY REVIEWING THE INVESTOR PRESENTATIONS

01:36PM  3   WHERE DRAMATIC CLAIMS WERE MADE ABOUT WHAT THE THERANOS

01:36PM  4   TECHNOLOGY COULD DO.

01:36PM  5      LET'S EXPLORE THAT A LITTLE BIT.

01:36PM  6      THROUGHOUT THE TRIAL, MS. HOLMES CLAIMS TO HAVE RELIED ON

01:36PM  7   ADVICE FROM DAN YOUNG, WHO WAS A SENIOR SCIENTIST AT THERANOS.

01:36PM  8      BUT THE EVIDENCE SHOWED CRITICALLY THAT HE WAS UNAWARE OF

01:36PM  9   THE CLAIMS THAT SHE WAS MAKING ABOUT THERANOS'S SUPERIOR

01:36PM 10   PERFORMANCE, OR SUPPOSEDLY SUPERIOR PERFORMANCE.

01:36PM 11      THIS IS EXHIBIT 7421, AND THIS IS AN EMAIL CHAIN RELATING

01:36PM 12   TO CONCERNS THAT TYLER SHULTZ HAD RAISED.

01:37PM 13      YOU SEE A FEW EMAIL CHAINS RELATING TO HIS LETTER WHERE HE

01:37PM 14   RAISED DIRECTLY TO MS. HOLMES A NUMBER OF SERIOUS CONCERNS

01:37PM 15   ABOUT PROBLEMS WITH THE COMPANY'S TECHNOLOGY.

01:37PM 16      IN THIS EMAIL RESPONDING TO PART OF THAT LETTER FROM

01:37PM 17   TYLER SHULTZ, MR. BALWANI WRITES TO DANIEL YOUNG AND

01:37PM 18   ELIZABETH HOLMES, "WHERE ARE WE CLAIMING THAT OUR TESTS ARE

01:37PM 19   BETTER ACROSS THE BOARD?"

01:37PM 20      NOW, THIS IS IN FEBRUARY OF 2014.  YOU KNOW THAT AT THIS

01:37PM 21   TIME MS. HOLMES KNEW EXACTLY WHERE THOSE CLAIMS WERE.  THEY

01:37PM 22   WERE IN THE ARTICLES FOR WHICH SHE HAD BEEN INTERVIEWED; THE

01:37PM 23   ARTICLES THAT SHE HAD APPROVED OR HAD AN OPPORTUNITY TO REVIEW

01:37PM 24   BEFORE THEY WERE PUBLISHED; THEY WERE IN THE INVESTOR

01:37PM 25   PRESENTATIONS THAT SHE HAD PERSONALLY GIVEN TO THE INVESTORS IN

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9267

01:37PM  1    THIS CASE AND THAT SHE HAD DISCUSSED WITH THEM.

01:37PM  2         AND SHE HAD ORALLY MADE THESE SAME REPRESENTATIONS TO

01:37PM  3    INVESTORS.  YOU'VE SEEN THAT NUMEROUS TIMES, THE CLAIM THAT

01:38PM  4    THERANOS TECHNOLOGY WAS BETTER, WAS MORE ACCURATE, HAD THE

01:38PM  5    HIGHEST LEVELS OF ACCURACY, AND THE LIKE.

01:38PM  6         DANIEL YOUNG, THOUGH, RESPONDS TO THAT EMAIL, "I DON'T

01:38PM  7    THINK WE MAKE SUCH A CLAIM.  NOT THAT I HAVE SEEN ON THE

01:38PM  8    WEBSITE AT LEAST."

01:38PM  9         NOW, YOU KNOW FROM MR. EDLIN'S TESTIMONY THAT SUCH CLAIMS

01:38PM  10   DID ACTUALLY APPEAR ON THE WEBSITE.

01:38PM  11        BUT THIS EMAIL FROM DANIEL YOUNG SUGGESTS THAT HE DIDN'T

01:38PM  12   KNOW ANYTHING ABOUT THE REPRESENTATIONS AND THE CLAIMS THAT

01:38PM  13   WERE BEING MADE TO INVESTORS.

01:38PM  14        THAT SAME EMAIL GOES ON WITH DANIEL YOUNG WRITING THAT

01:38PM  15   TYLER SHULTZ "SEEMED VERY SURPRISED THAT I ASKED HIM WHERE HE

01:38PM  16   THOUGHT WE CLAIMED SUPERIOR PERFORMANCE OVER OTHER TESTS."

01:38PM  17        HE MENTIONS THAT TYLER SHULTZ MENTIONS SOME ARTICLES, AND

01:38PM  18   DANIEL YOUNG SAYS, "I ASKED HIM TO FOLLOW-UP AND HIGHLIGHT

01:38PM  19   THESE SPECIFICALLY FOR ME."

01:39PM  20        AGAIN, DANIEL YOUNG TRYING TO TRACK DOWN MENTIONS OR

01:39PM  21   CLAIMS OF SUPERIOR PERFORMANCE, SUPERIOR ACCURACY ON THE PART

01:39PM  22   OF THERANOS.

01:39PM  23        UNBEKNOWNST TO HIM, HE WAS ON AN EMAIL CHAIN WITH THE VERY

01:39PM  24   PERSON WHO WAS PROPAGATING THOSE CLAIMS, THE SAME PERSON WHO

01:39PM  25   WAS SPREADING THOSE LIES.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                              9268

01:39PM   1         FOR THAT REASON YOU SHOULD VIEW WITH SERIOUS SKEPTICISM

01:39PM   2    ANY CLAIM THAT INDIVIDUALS LIKE DANIEL YOUNG WERE BEHIND THOSE

01:39PM   3    CLAIMS OR HAD BLESSED THEM OR APPROVED OF THEM IN ANY WAY.

01:39PM   4         YOU ALSO HEARD FROM SEVERAL OF THE COMPANY'S SCIENTISTS

01:39PM   5    WHO YOU KNOW FROM THEIR TESTIMONY WOULD NEVER HAVE SAID THOSE

01:39PM   6    POSITIVE SWEEPING THINGS ABOUT THERANOS'S TECHNOLOGY.

01:39PM   7         THE SCIENTISTS AT THE COMPANY WERE WELL AWARE OF THE

01:39PM   8    PROBLEMS WITH THE COMPANY'S TECHNOLOGY.  SEVERAL OF THEM, AS

01:40PM   9    YOU KNOW, RESIGNED BECAUSE OF THE SERIOUS PROBLEMS THAT THEY

01:40PM  10    SAW WITH THE THERANOS ANALYZER AND THE MODIFIED DEVICES.

01:40PM  11         SO THE IDEA THAT THOSE SAME INDIVIDUALS, THAT GROUP OF

01:40PM  12    PEOPLE WOULD HAVE BEEN SUPPORTING HOLMES'S CLAIMS OF SUPERIOR

01:40PM  13    ACCURACY OF UNPRECEDENTED QUALITY DOESN'T HOLD WATER, EITHER.

01:40PM  14         LAB DIRECTORS ARE AN ESPECIALLY IMPORTANT PART OF THIS

01:40PM  15    ANALYSIS, SO LET'S TALK ABOUT THEM A LITTLE BIT.

01:40PM  16         THE DEFENSE HAS GONE TO GREAT EFFORT IN THIS CASE TO PAINT

01:40PM  17    ADAM ROSENDORFF, THERANOS'S LAB DIRECTOR IN 2013 AND 2014, AS

01:40PM  18    BEING IN CHARGE OF ALL DECISIONS IN THE LAB.  THEY HAVE BLAMED

01:40PM  19    HIM FOR IMPROPER VALIDATION.  THEY HAVE ATTEMPTED TO SHOW THAT

01:40PM  20    HE WAS THE PERSON WHO WAS RESPONSIBLE FOR ALL OF THE ACCURACY

01:40PM  21    AND RELIABILITY PROBLEMS THAT HAPPENED AT THERANOS.

01:40PM  22         WHAT DOES THE EVIDENCE ACTUALLY SHOW ABOUT THAT THOUGH?

01:40PM  23         FIRST OF ALL, WHEN IT COMES TO VALIDATION, YOU WILL RECALL

01:41PM  24    THAT DR. ROSENDORFF TESTIFIED THAT THE VALIDATION PROCESS AT

01:41PM  25    THERANOS WAS VERY RUSHED, MORE RUSHED THAN HE WANTED IT TO BE.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:41PM  1          WHEN HE WAS ASKED WHO WAS SETTING THE SCHEDULE, WHO WAS

01:41PM  2     RESPONSIBLE FOR THAT PACE, HE TESTIFIED THAT THAT WAS COMING

01:41PM  3     FROM MANAGEMENT.  THAT WAS MS. HOLMES AND MR. BALWANI.

01:41PM  4          HE ALSO TESTIFIED THAT ALTHOUGH THE ASSAYS PERFORMED WELL

01:41PM  5     ENOUGH DURING THE VALIDATION PHASE, THEIR PERFORMANCE DEGRADED

01:41PM  6     SIGNIFICANTLY ONCE THEY ACTUALLY STARTED USING THEM FOR PATIENT

01:41PM  7     TESTING.

01:41PM  8          AND HE SAID THAT AS SOON AS THE ASSAYS STARTING BEING USED

01:41PM  9     IN THE CLINICAL LAB, HE STARTED SEEING PROBLEMS, AND HE

01:41PM 10     TESTIFIED ABOUT MAKING EFFORTS TO MAKE THOSE PROBLEMS KNOWN TO

01:41PM 11     THE COMPANY'S MANAGEMENT IN WAYS IN WHICH HE WAS REBUFFED AND

01:41PM 12     UNSUCCESSFUL IN DOING THE RIGHT THING AT THE COMPANY.

01:41PM 13          ONE IMPORTANT QUESTION FOR YOU TO ASK YOURSELVES IN

01:41PM 14     CONSIDERING THE ARGUMENT THAT DR. ROSENDORFF WAS REALLY IN

01:42PM 15     CHARGE OF EVERYTHING IN THE LAB, IF THAT WAS REALLY TRUE, THEN

01:42PM 16     WHY DID HE QUIT OUT OF CONCERN FOR THE WAY THAT THE TECHNOLOGY

01:42PM 17     WAS PERFORMING?  WHY DID HE QUIT IN PROTEST OF THE PRACTICES IN

01:42PM 18     THE THERANOS LAB IF IT WAS WITHIN HIS POWER TO CHANGE THINGS?

01:42PM 19          SO WHO WAS ULTIMATELY IN CONTROL OF THE LAB AT THERANOS?

01:42PM 20          WELL, ONE RELATED QUESTION IS, WHY DIDN'T DR. ROSENDORFF

01:42PM 21     STOP ALL TESTING ON THE EDISON?

01:42PM 22          HE WAS ASKED ABOUT THIS WHEN HE WAS ON THE STAND.  HE WAS

01:42PM 23     ASKED THE QUESTION, "DID YOU EVER ASK MS. HOLMES WHETHER

01:42PM 24     THERANOS WOULD CONSIDER CEASING USE OF THE EDISON ALTOGETHER?"

01:42PM 25          HE SAID, "NO."

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9270

01:42PM  1        WHEN ASKED, "WHY NOT," HE SAID, "THERE WAS TREMENDOUS

01:42PM  2   PRESSURE AT THE COMPANY TO SHOW THAT THIS TECHNOLOGY WAS

01:42PM  3   SUCCESSFUL.  IT CAME FROM THE TOP.  IT PERMEATED R&D."

01:42PM  4        HE THEN SAID THAT THAT DISSUADED HIM FROM MAKING THE

01:43PM  5   SUGGESTION TO STOP USING THE EDISON BECAUSE HE SAID, "AT

01:43PM  6   VARIOUS POINTS I THOUGHT I MIGHT BE FIRED IF I TOOK TOO STRONG

01:43PM  7   A POSITION ON IT."

01:43PM  8        OF COURSE THAT WOULD HAPPEN.

01:43PM  9        WHAT DO YOU THINK WOULD HAPPEN IF, BASED ON ALL OF THE

01:43PM 10   INFORMATION YOU KNOW ABOUT HOW THIS COMPANY WAS RUN, SOMEONE

01:43PM 11   CAME FORWARD TO THE MANAGERS OF THE COMPANY, THE FOUNDER AND

01:43PM 12   THE COO, AND ASKED THE COMPANY TO STOP USING ITS OWN

01:43PM 13   PROPRIETARY TECHNOLOGY?

01:43PM 14        THE WHOLE POINT OF THE COMPANY WAS TO DEVELOP AND USE THIS

01:43PM 15   TECHNOLOGY.  HE KNEW THAT IDEA WAS A NONSTARTER.  HE FELT THE

01:43PM 16   PRESSURE THAT WAS BEING IMPOSED FROM THE TOP TO KEEP USING THE

01:43PM 17   TECHNOLOGY, AND THAT'S WHY HE LIMITED HIS SUGGESTIONS TO THE

01:43PM 18   THINGS THAT HE THOUGHT WOULD ACTUALLY HAVE A CHANCE OF

01:43PM 19   SUCCEEDING.

01:43PM 20        YOU'LL RECALL IN CONNECTION WITH THIS THE SEQUENCE OF

01:43PM 21   EVENTS AROUND HCG IN MAY OF 2014.

01:43PM 22        MR. DOWNEY ALLUDED TO THIS DURING HIS CLOSING, AND YOU'LL

01:43PM 23   RECALL THAT ON MAY 30TH, 2014, DR. ROSENDORFF, IN RESPONSE TO

01:44PM 24   SERIOUS PROBLEMS THAT HE WAS SEEING WITH HCG, ORDERED THAT THE

01:44PM 25   HCG ASSAY BE TAKEN OFF OF THE THERANOS PROPRIETARY SYSTEM, THAT

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:44PM  1    IT BE RUN ONLY ON NON-THERANOS DEVICES THAT HE VIEWED AS MORE

01:44PM  2    RELIABLE.

01:44PM  3        WHAT HAPPENED NEXT?

01:44PM  4        MR. DOWNEY CITED A NUMBER OF EXHIBITS TO YOU, BUT STILL

01:44PM  5    ONLY PRESENTED PART OF THE STORY.

01:44PM  6        I'LL CITE SOME EXHIBITS FOR YOU:  5418 INCLUDES THE

01:44PM  7    MAY 30TH EMAIL WITH DR. ROSENDORFF TAKING HCG OFF OF EDISON.

01:44PM  8        BUT ON THAT SAME EMAIL, DAYS LATER IN AN EMAIL THAT DOES

01:44PM  9    NOT INCLUDE DR. ROSENDORFF, YOU'LL RECALL THAT DANIEL YOUNG

01:44PM 10    WRITES TO COMPANY MANAGEMENT SAYING IT'S NOT CLEAR THAT THAT

01:44PM 11    DECISION HAD BEEN MADE.

01:44PM 12        DR. ROSENDORFF'S EMAIL WAS IN ALL CAPS YOU'LL REMEMBER.

01:44PM 13    HE HAD MADE THAT DECISION AS LAB DIRECTOR TO TAKE HCG OFF OF

01:45PM 14    THE EDISON.

01:45PM 15        DAYS LATER DANIEL YOUNG IS REPORTING THAT IT'S NOT CLEAR

01:45PM 16    THAT THAT DECISION HAD BEEN MADE.

01:45PM 17        A COUPLE WEEKS LATER, IN EXHIBIT 13876 WE SEE

01:45PM 18    DR. ROSENDORFF ASKING FOR A STATUS UPDATE ON THE ASSAY, AND

01:45PM 19    HE'S INFORMED AT THAT TIME BY MR. BALWANI THAT HCG IS STILL ON

01:45PM 20    NANOTAINERS; IN OTHER WORDS, THAT IT'S STILL BEING RUN ON THE

01:45PM 21    EDISON, THAT IT'S BACK ON THE EDISON.

01:45PM 22        MR. DOWNEY JUST CITED THAT SAME EMAIL TO YOU SUPPOSEDLY AS

01:45PM 23    EVIDENCE THAT DR. ROSENDORFF KNEW AND APPROVED THE CONTINUED

01:45PM 24    USE OF HCG ON EDISON.

01:45PM 25        WHAT DOES IT ACTUALLY SHOW?  IT ACTUALLY SHOWS THAT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9272

01:45PM  1    DR. ROSENDORFF DIDN'T HAVE CONTROL OVER WHAT EQUIPMENT WAS USED

01:45PM  2    IN HIS OWN LAB.  HE WAS FORCED TO ASK QUESTIONS ABOUT HOW A

01:45PM  3    GIVEN ASSAY WAS BEING RUN BECAUSE IT WASN'T UP TO HIM.

01:45PM  4        IF IT HAD BEEN UP TO HIM AND IF HIS APPROVAL WOULD HAVE

01:46PM  5    BEEN REQUIRED, HE WOULDN'T HAVE TO ASK MR. BALWANI WHAT

01:46PM  6    DECISION HAD BEEN MADE AND WHAT PROCESS IS BEING USED.

01:46PM  7        HE ALSO TESTIFIED THAT DESPITE THE CONTINUED USE OF EDISON

01:46PM  8    FOR HCG, THAT THE PROBLEMS WITH THAT ASSAY WERE NEVER, EVER

01:46PM  9    SOLVED TO HIS SATISFACTION.

01:46PM 10        AND YOU CONTINUED TO SEE, WHEN DR. ROSENDORFF WAS ON THE

01:46PM 11    STAND, CONTINUED QUALITY CONTROL FAILURES AND OTHER PROBLEMS

01:46PM 12    RELATING TO THAT VERY, VERY IMPORTANT TEST.

01:46PM 13        NOW, WHEN DR. ROSENDORFF WAS ON THE STAND, THE DEFENSE

01:46PM 14    ATTACKED HIM.  YOU'LL RECALL THAT THE CROSS-EXAMINATION WAS

01:46PM 15    VERY LENGTHY AND SOMEWHAT HOSTILE.

01:46PM 16        DR. ROSENDORFF WAS ATTACKED FOR EVERYTHING FROM

01:46PM 17    COOPERATING WITH THE GOVERNMENT, THERE WERE QUESTIONS ABOUT HOW

01:46PM 18    MANY TIMES HE MET WITH THE GOVERNMENT AND WHO WAS PRESENT.

01:46PM 19        HE WAS ATTACKED FOR NOT BEING QUICK ENOUGH TO RESPOND TO

01:46PM 20    QUESTIONS FROM DOCTORS IN ONE OR TWO INSTANCES.

01:47PM 21        AND THE SUGGESTION WAS MADE THAT HE HAD BEEN ASLEEP AT THE

01:47PM 22    WHEEL AT THERANOS AND NOT DONE A GOOD ENOUGH JOB OF MONITORING

01:47PM 23    THE QUALITY OF TESTS, THAT THIS WAS HIS FAULT.

01:47PM 24        ASK YOURSELF WHETHER THAT IS ACTUALLY WHAT MS. HOLMES AND

01:47PM 25    MR. BALWANI BELIEVED ABOUT DR. ROSENDORFF IN 2014.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9273

01:47PM   1        YOU CAN DETERMINE THAT BY WHAT THEY DID AFTER

01:47PM   2   DR. ROSENDORFF LEFT THE COMPANY.

01:47PM   3        DR. ROSENDORFF LEFT IN NOVEMBER 2014, AND AFTER THAT

01:47PM   4   SUNNY BALWANI HIRED HIS DERMATOLOGIST TO RUN THE LAB.

01:47PM   5        MS. HOLMES KNEW THAT SUNIL DHAWAN WAS MR. BALWANI'S

01:47PM   6   DERMATOLOGIST.

01:47PM   7        THERE'S TESTIMONY THAT NEITHER MR. BALWANI -- I'M SORRY,

01:47PM   8   NEITHER DR. DHAWAN NOR DR. SAWYER WERE EVER REALLY PRESENT IN

01:47PM   9   THE LAB, THAT THEY DIDN'T DO ANY REAL WORK OVERSEEING THE

01:47PM  10   TESTS, ESPECIALLY THE THERANOS SPECIFIC TESTS RUN ON THE EDISON

01:47PM  11   AND THE MODIFIED THIRD PARTY DEVICES.

01:48PM  12        AND THEIR LACK OF PRESENCE AT THE LAB, THEIR LACK OF

01:48PM  13   OVERSIGHT ACTIVITY, WAS NOT A LACK OF DILIGENCE ON THEIR PART.

01:48PM  14   THAT WAS THE AGREEMENT THAT THEY HAD WITH THERANOS.  THEY WERE

01:48PM  15   WORKING AS INTENDED.  THAT'S WHAT MR. BALWANI AND MS. HOLMES

01:48PM  16   WANTED THEM TO DO.

01:48PM  17        AND THAT CHOICE, THE CHOICE TO HIRE ABSENTEE LAB DIRECTORS

01:48PM  18   WHO WERE NOT MORE ENGAGED REALLY SHOWS THAT THEIR COMPLAINTS

01:48PM  19   WITH DR. ROSENDORFF WAS NOT ABOUT INATTENTION AND A LACK OF

01:48PM  20   DILIGENCE.

01:48PM  21        INSTEAD, IT WAS THE FACT THAT HE KEPT RAISING THESE

01:48PM  22   ISSUES.  HE WAS A PAIN TO THEM.

01:48PM  23        THE FACT THAT HE KEPT SOUNDING THE ALARM ABOUT THESE

01:48PM  24   UNRELIABLE TESTS MADE IT INCONVENIENT, AND WHEN HE LEFT, THEY

01:48PM  25   REPLACED HIM WITH PEOPLE WHO WOULD NOT PRESENT THAT KIND OF

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9274

01:48PM   1    PROBLEM.

01:48PM   2         NOTABLY, WHEN MS. HOLMES HIRED DR. DAS, IT'S NOT DISPUTED

01:48PM   3    THAT THAT WAS IN RESPONSE TO AN INSPECTION THAT HAD GONE VERY

01:49PM   4    BADLY FOR THERANOS.

01:49PM   5         SO THAT WAS WHEN THE PREVIOUS APPROACH TO HIRING LAB

01:49PM   6    DIRECTORS HAD ALREADY BACKFIRED AT THE COMPANY, AND THE COMPANY

01:49PM   7    WAS DESPERATE FOR A CHANGE IN COURSE.

01:49PM   8         WE'LL ALSO DISCUSS IN A FEW MINUTES THE FACT THAT WE CAN'T

01:49PM   9    BLAME SCIENTISTS FOR THE FALSE STATEMENTS THAT MS. HOLMES MADE

01:49PM  10    AT THERANOS BECAUSE SHE CONFIRMED FOR YOU UNDER OATH WHEN SHE

01:49PM  11    WAS ON THE STAND THAT SHE KNEW THE KEY FACTS ABOUT WHAT THE

01:49PM  12    TECHNOLOGY COULD AND COULD NOT DO.  THAT CONFIRMS THAT SHE KNEW

01:49PM  13    THAT THE STATEMENTS SHE WAS MAKING WERE FALSE AT THE TIME SHE

01:49PM  14    MADE THEM.

01:49PM  15         LET'S TALK BRIEFLY ABOUT LAWYERS WHO WORKED FOR MS. HOLMES

01:49PM  16    AND THE COMPANY.

01:49PM  17         THERE'S BEEN SOME MENTION OF GUIDANCE THAT MS. HOLMES GOT

01:49PM  18    FROM LAWYERS AROUND TRADE SECRETS AND OTHER ISSUES.

01:49PM  19         YOU SHOULDN'T PUT TOO MUCH STOCK INTO THAT BECAUSE YOU

01:49PM  20    KNOW THAT MS. HOLMES IGNORED CAUTIONARY ADVICE FROM LAWYERS,

01:50PM  21    ESPECIALLY WHEN IT CAME TO THE HONESTY OF CLAIMS ABOUT THE

01:50PM  22    THERANOS TECHNOLOGY.

01:50PM  23         YOU'LL RECALL THIS EXHIBIT, 3981, WHERE A LAWYER EMAILS

01:50PM  24    HOLMES DIRECTLY AND ADVISES THAT A LOT OF CLAIMS ON THE WEBSITE

01:50PM  25    NEED TO BE REPLACED OR TONED DOWN, CLAIMS ABOUT HIGHEST

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

01:50PM  1    QUALITY, OR THE HIGHEST LEVEL OF ACCURACY.  THESE CLAIMS,

01:50PM  2    ACCORDING TO THE LAWYER, WERE PROBLEMATIC.

01:50PM  3        AND YET YOU KNOW FROM THE EVIDENCE AND THE TESTIMONY THAT

01:50PM  4    THESE CLAIMS REMAINED ON THE WEBSITE.  AND, EVEN MORE,

01:50PM  5    MS. HOLMES CONTINUED TO DISTRIBUTE INVESTOR BINDERS IN

01:50PM  6    PRESENTATIONS THAT WERE PEPPERED WITH THESE SAME CLAIMS,

01:50PM  7    IGNORING THIS CAUTIONARY ADVICE FROM COUNSEL.

01:50PM  8        BY THE WAY, ON THAT LAST TOPIC, YOU MAY RECALL THAT WHEN

01:51PM  9    "THE WALL STREET JOURNAL" ARTICLE WAS ABOUT TO BE PUBLISHED,

01:51PM 10    THE ARTICLE WRITTEN BY A JOURNALIST NAMED JOE RAGO, MS. HOLMES

01:51PM 11    AND OTHERS AT THE COMPANY HAD AN OPPORTUNITY TO REVIEW THE TEXT

01:51PM 12    OF THAT ARTICLE.

01:51PM 13        I'LL GIVE YOU AN EXHIBIT NUMBER, WHICH IS 1090.  THAT IS

01:51PM 14    AN EMAIL THAT YOU MIGHT REMEMBER WHERE AN EMPLOYEE NAMED

01:51PM 15    JEFF BLICKMAN SENT MS. HOLMES DIRECTLY A LIST OF CONCERNING

01:51PM 16    ISSUES THAT HE SAW IN THAT ARTICLE, AND THAT LIST INCLUDED

01:51PM 17    MENTION OF IMPROVED ACCURACY IN THE DRAFT ARTICLE.  THAT WAS

01:51PM 18    SOMETHING THAT MR. BLICKMAN WAS CALLING OUT TO MS. HOLMES AS

01:51PM 19    SOMETHING THAT MIGHT BE CONCERNING.

01:51PM 20        THIS, COMBINED WITH THE EMAIL OF THE LAWYER, SHOWS YOU

01:51PM 21    THERE WERE PEOPLE AT THERANOS WHO CARED ABOUT BEING ACCURATE

01:51PM 22    AND TRUTHFUL IN REPRESENTATIONS ABOUT WHAT THE COMPANY CAN DO.

01:51PM 23        THE PROBLEM IS THAT MS. HOLMES WAS NOT ONE OF THOSE

01:51PM 24    PEOPLE, AND SHE WAS IN CHARGE.  SHE WAS THE DECISION-MAKER.

01:51PM 25        THE DEFENSE HAS ALSO RELIED MULTIPLE TIMES ON THE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                9276

01:52PM   1    EXISTENCE OF FAVORABLE PATIENT REVIEWS EITHER AS EVIDENCE THAT

01:52PM   2    THE TECHNOLOGY DIDN'T HAVE PROBLEMS OR THAT MS. HOLMES BELIEVED

01:52PM   3    THAT THE TECHNOLOGY DIDN'T HAVE PROBLEMS.

01:52PM   4        THE DEFENSE ASKS YOU TO BELIEVE THAT THESE FAVORABLE

01:52PM   5    PATIENT REVIEWS WHERE PATIENTS, FOR EXAMPLE, ARE GIVING

01:52PM   6    THERANOS AND WALGREENS FOUR OR FIVE STARS FOR THEIR EXPERIENCE

01:52PM   7    GAVE MS. HOLMES REASON TO BELIEVE THAT THERE WERE NO PROBLEMS

01:52PM   8    WITH THE TECHNOLOGY AND THAT EVERYTHING WAS FINE.

01:52PM   9        ASK YOURSELF WHETHER THAT'S CONVINCING.  ASK YOURSELF

01:52PM  10    WHETHER THE CEO OF A TECHNOLOGY COMPANY, SOMEONE WHO IS NAMED

01:52PM  11    ON MULTIPLE PATENTS, SOMEONE WHO TOOK THE LEAD ON THE INVENTION

01:52PM  12    SIDE AND THE TECHNOLOGY SIDE WOULD REALLY BELIEVE THAT CUSTOMER

01:52PM  13    SATISFACTION RATINGS RELATED TO THE RELIABILITY OF A DEVICE OR

01:53PM  14    THE APPROPRIATENESS OF THAT DEVICE FOR PATIENT CARE.

01:53PM  15        A RESTAURANT WITH AN F RATING FROM THE HEALTH INSPECTOR

01:53PM  16    CAN STILL HAVE A FOUR STAR YELP REVIEW IF THE CUSTOMERS DON'T

01:53PM  17    KNOW ABOUT THE PROBLEMS IN THE KITCHEN.

01:53PM  18        AND THAT'S EXACTLY WHAT WAS HAPPENING AT THERANOS.

01:53PM  19        IT'S NOT SURPRISING AT ALL THAT CUSTOMERS WHO HAD THE

01:53PM  20    FINGERSTICK EXPERIENCE AT WALGREENS HAD A FAVORABLE EXPERIENCE

01:53PM  21    AND WERE HAPPY WITH THAT EXPERIENCE.

01:53PM  22        THERANOS PUT A LOT OF EFFORT INTO WHAT ITS FACILITIES AT

01:53PM  23    WALGREENS LOOKED LIKE, HOW PEOPLE WERE TREATED.

01:53PM  24        YOU KNOW FROM THE EVIDENCE THAT THE PRICES WERE LOW.

01:53PM  25    THESE THINGS MADE PEOPLE HAPPY.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9277

01:53PM  1          THAT HAS NOTHING TO DO WITH THE ACCURACY OR THE

01:53PM  2   RELIABILITY OF THE TESTS, AND YOU KNOW FROM THE OTHER EVIDENCE

01:53PM  3   IN THE CASE THAT THERE WERE SERIOUS PROBLEMS THERE.  AND

01:53PM  4   MS. HOLMES HAD ACCESS TO THAT SAME INFORMATION, SO SHE WAS

01:53PM  5   AWARE, TOO.

01:53PM  6          AND IN 2014 WALGREENS WAS STARTING TO SEE THESE PROBLEMS

01:53PM  7   AS WELL.  WALGREENS WAS STARTING TO UNDERSTAND THAT THERANOS

01:54PM  8   TECHNOLOGY COULDN'T DO EVERYTHING THAT IT HAD BEEN HELD OUT TO

01:54PM  9   DO AND FOR THOSE SAME REASONS THE WALGREENS RELATIONSHIP WAS IN

01:54PM  10  JEOPARDY.

01:54PM  11         SO YOU SHOULD NOT BELIEVE THAT MS. HOLMES WAS IGNORING

01:54PM  12  THOSE FACTS, WAS IGNORING THOSE OBVIOUS TRUTHS SIMPLY BECAUSE

01:54PM  13  PATIENTS WERE HAPPY WHEN THEY WERE WALKING OUT OF A WALGREENS

01:54PM  14  SERVICE CENTER.

01:54PM  15         YOU ALSO KNOW THAT THOSE CUSTOMER REVIEWS THAT WERE

01:54PM  16  FAVORABLE ARE ONLY PART OF THE PICTURE HERE.

01:54PM  17         YOU KNOW THAT IN MANY CASES PATIENTS OR DOCTORS CONTACTED

01:54PM  18  THERANOS TO TALK ABOUT PROBLEMATIC TEST RESULTS THAT THEY HAD

01:54PM  19  GOTTEN BACK, TEST RESULTS THAT WERE DEMONSTRABLY INACCURATE,

01:54PM  20  TEST RESULTS THAT WERE DIFFERENT FROM WHAT THEY HAD SEEN

01:54PM  21  BEFORE, TEST RESULTS THAT HAD GIVEN THEM CONCERNS ABOUT THE

01:54PM  22  RELIABILITY OF THE THERANOS TESTS.

01:54PM  23         LET'S TALK NEXT ABOUT THE WAY THE DEFENSE HAS RELIED ON

01:55PM  24  PATENTS IN THIS CASE.

01:55PM  25         AS YOU KNOW FROM THE TESTIMONY, SEVERAL PATENTS WERE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9278

01:55PM   1   AWARDED TO MS. HOLMES AND TO THERANOS AS A RESULT OF THE WORK

01:55PM   2   DEVELOPING THE INTELLECTUAL PROPERTY OF THE COMPANY.

01:55PM   3        THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT YOU SHOULD

01:55PM   4   CONCLUDE FROM THAT THAT THIS WAS REAL TECHNOLOGY, THAT THE

01:55PM   5   TECHNOLOGY MUST HAVE WORKED BECAUSE PATENTS WERE AWARDED

01:55PM   6   COVERING THAT TECHNOLOGY.

01:55PM   7        ALTERNATIVELY, YOU'RE ASKED TO BELIEVE THAT MS. HOLMES

01:55PM   8   UNDERSTOOD THAT THE TECHNOLOGY WORKED BECAUSE THESE PATENTS HAD

01:55PM   9   BEEN REWARDED, OR HAD BEEN AWARDED.

01:55PM  10        BUT YOU KNOW FROM MS. HOLMES'S TESTIMONY THAT THE PROCESS

01:55PM  11   FOR OBTAINING THESE PATENTS HAS NOTHING TO DO WITH THE

01:55PM  12   RELIABILITY OF THE TECHNOLOGY, WITH THE ACCURACY OF THE

01:55PM  13   ANALYZER.

01:55PM  14        YOU KNOW THAT FROM HER TESTIMONY, SHE APPLIED FOR HER

01:56PM  15   FIRST PATENT I THINK IT WAS A YEAR BEFORE SHE STARTED TO TRY TO

01:56PM  16   BUILD A PROTOTYPE OF THAT DEVICE.  THAT'S WHAT SHE TESTIFIED

01:56PM  17   TO.

01:56PM  18        EXHIBIT 9501 IS THAT FIRST PATENT.

01:56PM  19        SHE LATER STARTED WORKING ON A PROTOTYPE THAT COVERED PART

01:56PM  20   OF THAT PATENT, BUT IF YOU LOOK AT THAT EXHIBIT -- AGAIN,

01:56PM  21   THAT'S 9501 -- YOU'LL SEE THAT IT ALSO COVERS, BESIDES AN

01:56PM  22   ANALYZER, A PILL THAT COULD BE SWALLOWED AND WOULD CONDUCT

01:56PM  23   ANALYSIS WHILE IT WAS PASSING THROUGH THE SYSTEM.

01:56PM  24        IT ALSO COVERED A PATCH THAT COULD BE WORN AND WOULD

01:56PM  25   CONDUCT AN ANALYSIS WHEN IT WAS ATTACHED TO THE SKIN.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                              9279

01:56PM  1          THOSE PRODUCTS WERE NEVER DEVELOPED BY THERANOS.  THEY

01:56PM  2     WERE NEVER TAKEN TO THE PROTOTYPE STAGE.  THEY WERE NEVER

01:56PM  3     TURNED INTO REAL WORKING TECHNOLOGY BASED ON THE RECORD IN THIS

01:56PM  4     CASE.

01:56PM  5          THAT'S HOW YOU KNOW THAT THE PATENT PROCESS IS TOTALLY

01:56PM  6     DIVORCED FROM THE IDEA OF A REAL WORKING DEVICE.

01:57PM  7          SO THE FACT THAT MS. HOLMES OBTAINED PATENTS, THE FACT

01:57PM  8     THAT THESE PIECES OF PAPER WERE ISSUED GIVING HER LEGAL RIGHTS

01:57PM  9     OVER THIS INTELLECTUAL PROPERTY, SHE KNEW BETTER THAN ANYONE

01:57PM  10    THAT THAT DID NOT MEAN THAT THE TECHNOLOGY ITSELF WAS VALID,

01:57PM  11    AND THAT CERTAINLY WOULD NOT HAVE BEEN REASON FOR HER TO

01:57PM  12    DISMISS THE NEGATIVE INFORMATION THAT SHE WAS HEARING ABOUT THE

01:57PM  13    THERANOS TECHNOLOGY.

01:57PM  14         YOUR HONOR, I'M ABOUT TO MOVE TO A DIFFERENT TOPIC, BUT

01:57PM  15    THIS MIGHT BE A GOOD TIME FOR A BREAK.

01:57PM  16              THE COURT:  ALL RIGHT.  LET'S DO THAT.  WE'LL TAKE A

01:57PM  17    30 MINUTE BREAK HERE, LADIES AND GENTLEMEN, 30 MINUTES.

01:57PM  18         THANK YOU.

01:58PM  19         (RECESS FROM 1:58 P.M. UNTIL IS 2:34 P.M.)

02:34PM  20              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

02:34PM  21    SEATED.  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

02:34PM  22    MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:34PM  23         MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:35PM  24              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:35PM  25         MEMBERS OF THE JURY, WELCOME BACK.

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9280

02:35PM  1      LET'S TALK ABOUT NEXT GENERATION DEVICES AT THERANOS.

02:35PM  2      MUCH OF THE EVIDENCE IN THE CASE FOCUSSED ON THE ANALYZERS

02:35PM  3  THAT THERANOS WAS USING TO ACTUALLY CONDUCT ITS PATIENT TESTING

02:35PM  4  DURING THE RELEVANT YEARS, THE YEARS WHEN THE FRAUD WAS

02:35PM  5  ACTUALLY OCCURRING.

02:35PM  6      IN THE DEFENSE'S QUESTIONING AND IN THEIR CLOSING ARGUMENT

02:35PM  7  THEY'VE INTRODUCED A THEORY THAT DEPENDS ON BLURRING THE LINES

02:35PM  8  BETWEEN THE DEVICES THAT THERANOS WAS USING TO CONDUCT ITS

02:35PM  9  PATIENT TESTING AND THE NEXT GENERATION DEVICES THAT WERE IN

02:35PM 10  DEVELOPMENT, THE DEVICES THAT WERE ON THE HORIZON THAT WOULD

02:35PM 11  SOME DAY BE AVAILABLE.

02:35PM 12      JUROR:  WE DON'T HAVE SCREENS.

02:35PM 13      THE CLERK:  WHAT'S THE MATTER?  LET ME DO A RESET.

02:35PM 14  ONE MOMENT, PLEASE.

02:35PM 15  (PAUSE IN PROCEEDINGS.)

02:36PM 16      THE CLERK:  IS IT ON?

02:36PM 17      JUROR:  YES.

02:36PM 18      THE CLERK:  THANK YOU.

02:36PM 19      MR. BOSTIC:  WHAT DID THE EVIDENCE AT TRIAL SHOW

02:36PM 20  ABOUT THESE NEXT GENERATION DEVICES?

02:36PM 21      WELL, FOR ONE THING, YOU HEARD IN THE TESTIMONY AND SAW

02:36PM 22  FROM THE DOCUMENTS THE NEXT GENERATION DEVICES -- AND HERE

02:36PM 23  WE'RE TALKING ABOUT THE 4 SERIES, THE 4S, THE MINILAB, THE

02:36PM 24  MONOBAY -- THIS FAMILY OF NEXT GENERATION DEVICES WAS

02:36PM 25  PERPETUALLY NEXT GENERATION.  IT WAS ALWAYS IN THE FUTURE.  IT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9281

| | | |
|---|---|---|
| 02:36PM | 1 | WAS ALWAYS ON THE HORIZON.  IT NEVER BECAME THE CURRENT |
| 02:37PM | 2 | THERANOS TECHNOLOGY.  IT WAS NEVER USED FOR PATIENT TESTING. |
| 02:37PM | 3 | THAT IS NOT IN DISPUTE. |
| 02:37PM | 4 | AND THE 4.0 AND THE 4 SERIES WAS NEVER USED FOR PATIENT |
| 02:37PM | 5 | TESTING BECAUSE IT WAS NEVER READY FOR PATIENT TESTING. |
| 02:37PM | 6 | THERANOS, INSTEAD, WAS USING THE PREVIOUS VERSION OF THE |
| 02:37PM | 7 | EDISON, THE 3.5, IN ITS CLINICAL LAB. |
| 02:37PM | 8 | NOW, AFTER THE FACT, THE DEFENSE IS ASKING YOU TO BELIEVE |
| 02:37PM | 9 | THAT ALL OF THE FALSE CLAIMS MS. HOLMES MADE ABOUT THE |
| 02:37PM | 10 | TECHNOLOGY IN THIS CASE ALL OF THE TIMES THAT SHE SPOKE ABOUT |
| 02:37PM | 11 | WHAT THE THERANOS ANALYZER COULD DO, ALL OF THE TIMES SHE SPOKE |
| 02:37PM | 12 | ABOUT THE COMPANY'S ACHIEVEMENT AND ITS CAPABILITIES, THOSE |
| 02:37PM | 13 | WERE ACTUALLY REFERENCES TO A FUTURE DEVICE, NOT THE DEVICE |
| 02:37PM | 14 | THAT THE COMPANY WAS USING FOR ITS ONGOING CLINICAL TESTING. |
| 02:37PM | 15 | NOW, BEFORE YOU GIVE THIS VERSION OF EVENTS ANY CREDIT, |
| 02:37PM | 16 | ASK YOURSELVES WHY NOT A SINGLE LISTENER WALKED AWAY WITH THAT |
| 02:38PM | 17 | UNDERSTANDING. |
| 02:38PM | 18 | OF ALL OF THE PEOPLE THAT MS. HOLMES MADE THIS CLAIM TO, |
| 02:38PM | 19 | YOU HEARD FROM A VARIETY, PEOPLE WITH DIFFERENT BACKGROUNDS, |
| 02:38PM | 20 | PEOPLE WHO HEARD THESE CLAIMS IN DIFFERENT CONTEXTS. |
| 02:38PM | 21 | EACH OF THEM WALKED AWAY BELIEVING THAT MS. HOLMES WAS |
| 02:38PM | 22 | TALKING ABOUT THE COMPANY'S PRESENT DAY CAPABILITIES, THE |
| 02:38PM | 23 | ANALYZERS THAT THE COMPANY HAD DEVELOPED AND COMPLETED, THE |
| 02:38PM | 24 | ANALYZERS THAT THE COMPANY WAS USING FOR ITS ONGOING PATIENT |
| 02:38PM | 25 | TESTING. |

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                   9282

02:38PM   1        AND WHY WAS THAT?

02:38PM   2        WELL, THINK ABOUT THE EVIDENCE IN TERMS OF WHAT MS. HOLMES

02:38PM   3   WAS ACTUALLY SAYING TO THOSE PEOPLE, WHAT THE WRITTEN MATERIALS

02:38PM   4   SAID, WHAT YOU HEARD SHE SAID IN IN-PERSON CONVERSATIONS.

02:38PM   5        IN CASES WHERE MS. HOLMES WAS TALKING ABOUT WHAT THE

02:38PM   6   TECHNOLOGY COULD DO AND WHAT THERANOS WAS CAPABLE OF, HER

02:38PM   7   CLAIMS WERE PRESENT TENSE CLAIMS.  THEY WERE ALWAYS ABOUT THE

02:38PM   8   ATTRIBUTES OF THE TECHNOLOGY, THE ABILITIES OF THE TECHNOLOGY

02:38PM   9   WITH NO FORWARD LOOKING LANGUAGE.

02:38PM  10        CLAIMS ABOUT THERANOS HAVING THE HIGHEST LEVELS OF

02:39PM  11   ACCURACY, NOT SOME DAY HAVING THE HIGHEST LEVEL OF ACCURACY.

02:39PM  12        CLAIMS ABOUT THERANOS TECHNOLOGY BEING ABLE TO DO THE

02:39PM  13   ENTIRE RANGE OF TESTS, NOT HAVING THE GOAL TO SOME DAY

02:39PM  14   HOPEFULLY BE ABLE TO DO THE ENTIRE RANGE OF TESTS.

02:39PM  15        IT'S BECAUSE OF THE WAY MS. HOLMES CHOSE TO COMMUNICATE

02:39PM  16   ABOUT THERANOS TECHNOLOGY THAT LISTENERS WALKED AWAY BELIEVING

02:39PM  17   THAT THEY WERE HEARING ABOUT WHAT THE COMPANY COULD DO AS OF

02:39PM  18   THE DAY THAT THEY WERE HEARING THESE STATEMENTS.

02:39PM  19        IN PARTICULAR, THINK ABOUT THE INVESTOR PRESENTATIONS IN

02:39PM  20   THIS REGARD.  YOU'VE SEEN THOSE NUMEROUS TIMES IN THIS CASE.  I

02:39PM  21   WON'T SHOW YOU THEM NOW AGAIN.

02:39PM  22        BUT THINK ABOUT THE CLAIMS IN THOSE SLIDES THAT WERE

02:39PM  23   FRAMED IN THE PRESENT TENSE, THE CLAIMS THAT I JUST MENTIONED

02:39PM  24   ABOUT THE NUMBER OF TESTS THAT COULD BE DONE, LANGUAGE LIKE

02:39PM  25   THERANOS CONDUCTS ANY TEST AVAILABLE IN CENTRAL LABORATORIES

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9283

02:39PM   1    AND CAN PROCESS ALL SAMPLE TYPES.  THINK ABOUT LANGUAGE LIKE

02:40PM   2    THERANOS HAS THE HIGHEST LEVELS OF ACCURACY, AND THINK ABOUT

02:40PM   3    WHETHER THERE'S ANYTHING ABOUT THAT LANGUAGE THAT WOULD GIVE

02:40PM   4    EVEN A HINT TO SOMEONE THAT MS. HOLMES ACTUALLY WASN'T TALKING

02:40PM   5    ABOUT PRESENT DAY CAPABILITY, THAT SHE WAS TALKING ABOUT SOME

02:40PM   6    SPECULATIVE FUTURE EVENT THAT SHE HOPED WOULD OCCUR.

02:40PM   7         THOSE INVESTOR PRESENTATIONS -- AND YOU WILL RECALL THAT

02:40PM   8    THERE WERE DOZENS AND SOMETIMES HUNDREDS OF PAGES LONG -- DID

02:40PM   9    SOMETIMES INCLUDE SOME FORWARD LOOKING STATEMENTS ABOUT THE

02:40PM   10   EVENTUAL FOOTPRINT IN WALGREENS OR THE AMOUNT OF REVENUE THAT

02:40PM   11   THERANOS HOPED TO GENERATE AT A CERTAIN POINT.

02:40PM   12        NOW, THOSE FORWARD LOOKING STATEMENTS ARE IN A DIFFERENT

02:40PM   13   CATEGORY, AND THEY CAN STILL BE FRAUDULENT IF THEY'RE MADE WITH

02:40PM   14   THE INTENT TO DECEIVE.

02:40PM   15        BUT WE'RE NOT TALKING ABOUT THOSE NOW.  WE'RE TALKING

02:40PM   16   ABOUT PRESENT TENSE STATEMENTS THAT CLEARLY WERE MEANT TO

02:40PM   17   CONVEY THE REALITY AS OF THAT DAY.

02:40PM   18        THOSE INVESTOR PRESENTATIONS WOULD HAVE NEEDED TO BE

02:41PM   19   COMPLETELY REWRITTEN IN ORDER TO BE HONEST IN LIGHT OF THE

02:41PM   20   DEFENSE'S THEORY ABOUT THESE NEXT GENERATION DEVICES.

02:41PM   21        ALL OF THAT LANGUAGE THAT IS IN THE PRESENT TENSE WOULD

02:41PM   22   HAVE NEEDED TO BE CHANGED.

02:41PM   23        I SUPPOSE THEY COULD HAVE ADDED A NOTE AT THE BEGINNING OF

02:41PM   24   THOSE INVESTOR SLIDE PRESENTATIONS SAYING, WARNING, ALL OF THE

02:41PM   25   CLAIMS YOU'RE ABOUT TO SEE IN THIS PRESENTATION ARE NOT ABOUT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9284

02:41PM   1    THE COMPANY'S PRESENT DAY CAPABILITIES, BUT THEY'RE ABOUT A

02:41PM   2    FUTURE GENERATION THAT IS NOT YET FINALIZED.

02:41PM   3        THAT WOULD HAVE BEEN A WAY TO AVOID CONFUSION AND TO KEEP

02:41PM   4    FROM MISLEADING PEOPLE.

02:41PM   5        THAT WASN'T DONE.  THAT CRITICAL PIECE OF INFORMATION WAS

02:41PM   6    WITHHELD, AND AS A RESULT, EVERYONE LEFT THESE CONVERSATIONS,

02:41PM   7    THESE INTERACTIONS WITH MS. HOLMES, BELIEVING THAT THEY HAD

02:41PM   8    HEARD ABOUT WHAT THE COMPANY COULD DO THAT DAY.  WHY WOULD THEY

02:41PM   9    ASSUME ANYTHING ELSE?

02:41PM   10       MS. HOLMES ASKED YOU TO BELIEVE THAT REPORTS FROM THERANOS

02:41PM   11   EMPLOYEES SUPPORTED HER CLAIMS WITH RESPECT TO THE 4 SERIES AND

02:42PM   12   WHAT IT WAS GOING TO BE CAPABLE OF.

02:42PM   13       BUT WHAT WERE THOSE EMPLOYEES ACTUALLY TELLING HER?

02:42PM   14       IN HER TESTIMONY, SHE TOLD YOU, "BY 2009, 2010, WE HAD A

02:42PM   15   BREAKTHROUGH IN WHICH WE FIGURED OUT HOW TO APPLY THE FORMULA

02:42PM   16   NOT JUST TO ONE METHOD OF TESTS, BUT TO FOUR."

02:42PM   17       AND IN RESPONSE TO HER LAWYER'S QUESTION SHE SAID THAT

02:42PM   18   "THAT WORK THAT LED HER TO CONCLUDE THAT THE COMPANY WAS

02:42PM   19   CAPABLE OF PERFORMING ANY BLOOD TEST ESSENTIALLY."

02:42PM   20       LET'S LOOK AT AN IMPORTANT PIECE OF EVIDENCE THAT THAT

02:42PM   21   BELIEF WAS SUPPOSEDLY BASED ON.

02:42PM   22       THIS WAS INTRODUCED BY THE DEFENSE.  THIS IS EXHIBIT 7098.

02:42PM   23   THIS IS A PRESENTATION FROM FEBRUARY 2010 GIVEN BY A SCIENTIST

02:42PM   24   NAMED IAN GIBBONS AT THERANOS, AND MS. HOLMES SAYS THIS

02:42PM   25   INFORMATION WAS PART OF WHAT CONVINCED HER THAT SHE WAS NOW

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9285

02:42PM  1      CLEAR TO REPRESENT TO OTHERS THAT THERANOS TECHNOLOGY WAS

02:42PM  2      CAPABLE OF PERFORMING ANY TEST AND IN MAKING OTHER CLAIMS THAT

02:43PM  3      SHE MADE.

02:43PM  4           LET'S SEE WHAT THIS PRESENTATION ACTUALLY SAYS.

02:43PM  5           PAGE 2, RIGHT AFTER THE COVER PAGE, CONTAINS AN OVERVIEW.

02:43PM  6      AND NOTICE THAT IT REPEATEDLY USES FORWARD LOOKING LANGUAGE.

02:43PM  7      THIS IS WHAT THE SCIENTIST IS TELLING MS. HOLMES, "SYSTEM 4.0

02:43PM  8      WILL BE CAPABLE OF PERFORMING ANY MEASUREMENT REQUIRED," "IT IS

02:43PM  9      ENVISAGED THAT SEVERAL DISTINCT MEASUREMENT TECHNOLOGIES WILL

02:43PM  10     BE INCORPORATED," "THE SYSTEM WILL BE BROADLY BASED ON THE

02:43PM  11     EXISTING CARTRIDGE," "THE NUMBER OF TOTAL MEASUREMENTS PER

02:43PM  12     SAMPLE WILL BE INCREASED BY TWO TO THREE-FOLD."

02:43PM  13          THIS IS HOW YOU WRITE SENTENCES ABOUT WHAT HASN'T HAPPENED

02:43PM  14     YET.  EVERYBODY KNOWS THIS.

02:43PM  15          THIS WAS THE INFORMATION THAT MS. HOLMES WAS TAKING IN

02:43PM  16     ABOUT THE NEXT GENERATION TECHNOLOGY, AND IT'S ONLY WHEN IT

02:43PM  17     PASSED THROUGH KIND OF HER MIND AND WHEN SHE MADE A DECISION

02:43PM  18     ABOUT HOW TO EXPLAIN IT TO OTHERS THAT IT TOOK ON THIS PRESENT

02:43PM  19     TENSE CHARACTER, THAT IT BECAME AN EXAGGERATION IN THE FORM OF

02:44PM  20     CLAIMS ABOUT WHAT THE COMPANY'S CURRENT TECHNOLOGY COULD DO.

02:44PM  21          THAT'S NOT AN EXCEPTION IN THIS PRESENTATION.

02:44PM  22          IT GOES ON TO TALK ABOUT SYSTEM REQUIREMENTS.

02:44PM  23          NOTICE THAT SEVERAL KEY ASPECTS OF THE DEVICE ARE STILL

02:44PM  24     TBD, OR TO BE DECIDED, INCLUDING OTHER CAPABILITIES.

02:44PM  25          AND AT THE BOTTOM THERE, IT SAYS OTHER CAPABILITIES TO BE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9286

02:44PM  1    DECIDED, BUT NOT LESS THAN SYSTEM 3.0.

02:44PM  2        IN OTHER WORDS, THE PLAN FOR THE 4.0 WAS THAT IT WAS GOING

02:44PM  3    TO BE BETTER THAN THE 3.0.

02:44PM  4        DOES THAT SEEM CONCRETE ENOUGH TO YOU TO SUPPORT A GOOD

02:44PM  5    FAITH BELIEF THAT THE COMPANY HAS TECHNOLOGY THAT CAN DO

02:44PM  6    EVERYTHING THAT MS. HOLMES WAS CLAIMING?

02:44PM  7        AND IMPORTANTLY, THIS PRESENTATION ALSO IDENTIFIED SOME

02:44PM  8    PROBLEMS WITH THE 4 SERIES PLAN THAT THE COMPANY HAD APPARENTLY

02:44PM  9    NOT YET SOLVED, THINGS THAT WERE GOING TO MAKE THIS PROJECT

02:45PM 10    ESPECIALLY COMPLEX AND HURDLES THAT THE COMPANY WOULD NEED TO

02:45PM 11    OVERCOME IN ORDER TO GET THERE.

02:45PM 12        NOW, MS. HOLMES CONTINUED TO HEAR SOME POSITIVE REPORTS

02:45PM 13    FROM SCIENTISTS AND ENGINEERS ABOUT THE DEVELOPMENT PROCESS FOR

02:45PM 14    THE 4 SERIES, BUT AT NO POINT DID THEY TELL HER THAT THE 4

02:45PM 15    SERIES WAS READY FOR PATIENT TESTING.  AT NO POINT DID --

02:45PM 16    DURING THE RELEVANT TIME PERIOD DID THERANOS ACTUALLY USE THE 4

02:45PM 17    SERIES FOR PATIENT TESTING, ALTHOUGH OBVIOUSLY THERE WOULD HAVE

02:45PM 18    BEEN A DESIRE TO DO SO HAD THE SYSTEM BEEN READY.

02:45PM 19        SO THESE REPRESENTATIONS OR THE INFORMATION THAT

02:45PM 20    MS. HOLMES GOT FROM EMPLOYEES COULD NOT HAVE GIVEN HER A GOOD

02:45PM 21    FAITH BASIS TO CLAIM THAT THE TECHNOLOGY WAS CURRENTLY CAPABLE

02:45PM 22    OF DOING EVERYTHING.

02:45PM 23        IF ANYTHING, THEY MADE HER OPTIMISTIC THAT THE LIES THAT

02:45PM 24    SHE WAS TELLING COULD BE MADE TRUE BEFORE THEY HAD BEEN

02:45PM 25    DETECTED.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                9287

02:46PM  1        SO YOU'RE REASONABLE TO INFER THAT THIS INFORMATION FROM

02:46PM  2    SCIENTISTS AND ENGINEERS AT THERANOS GAVE MS. HOLMES SOME

02:46PM  3    COMFORT IN SPREADING FALSE INFORMATION ABOUT WHAT THERANOS

02:46PM  4    COULD DO AND WHERE THE TECHNOLOGY WAS AT BECAUSE SHE HOPED THAT

02:46PM  5    BY THE TIME THAT ANYONE BECAME THE WISER, THE TECHNOLOGY WOULD

02:46PM  6    HAVE CAUGHT UP TO HER REPRESENTATIONS, AND NO ONE WOULD EVER

02:46PM  7    FIND OUT.

02:46PM  8        AS IT TURNS OUT, THAT'S NOT WHAT HAPPENED.

02:46PM  9        BUT FOR PURPOSES OF THE CHARGED OFFENSE AND HER INTENT TO

02:46PM  10   DEFRAUD, A LIE IS A LIE AT THE MOMENT THAT IT IS MADE.  IT DOES

02:46PM  11   NOT MATTER WHETHER MS. HOLMES HAD THE INTENT TO MAKE THE LIE

02:46PM  12   TRUE OR TO AVOID BEING FOUND OUT.  THE PROBLEM IS IN MAKING THE

02:46PM  13   MISREPRESENTATION ON THE DAY IT'S MADE.

02:46PM  14       ALSO, REMEMBER IN THIS CONTEXT THE GOOD FAITH INSTRUCTION.

02:46PM  15   WHEN THE COURT INSTRUCTS YOU ABOUT GOOD FAITH, AGAIN, THE COURT

02:47PM  16   IS GOING TO TELL YOU THAT A GOOD FAITH THAT PREVENTS A

02:47PM  17   CONVICTION IS A GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

02:47PM  18   MISREPRESENTATION CHARGED.

02:47PM  19       HERE MS. HOLMES'S OWN TESTIMONY PRECLUDES THAT FINDING.

02:47PM  20   LET'S TAKE A LOOK AT THAT.

02:47PM  21       HER TESTIMONY TELLS YOU IN ADDITION TO ALL OF THE OTHER

02:47PM  22   EVIDENCE IN THE CASE, THAT SHE WAS AWARE DURING THE RELEVANT

02:47PM  23   TIME PERIOD OF WHAT THE ANALYZER COULD DO AND WHAT IT COULDN'T

02:47PM  24   DO.

02:47PM  25       FOR EXAMPLE, TOWARDS THE BEGINNING OF HER TESTIMONY,

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9288

02:47PM  1    MS. HOLMES WAS ASKED "HOW MANY SMALL SAMPLE ASSAYS DID THERANOS

02:47PM  2    OFFER IN ITS CLINICAL LAB?"

02:47PM  3        HER ANSWER WAS, "70 OR SO."

02:47PM  4        SHE WAS THEN ASKED, "HOW MANY OF THOSE ASSAYS WERE OFFERED

02:47PM  5    WHERE THE ANALYSIS WAS PERFORMED ON A MINIATURIZED THERANOS

02:47PM  6    DEVICE?"

02:47PM  7        SHE ANSWERED, "TWELVE."

02:47PM  8        SHE WAS ALSO ASKED WHETHER SHE UNDERSTOOD THAT THE MINILAB

02:47PM  9    WAS NEVER USED FOR PATIENT TESTING.

02:47PM  10       SHE SAID SHE DID.

02:47PM  11       SHE CONFIRMED ALSO THAT SHE WAS FAMILIAR WITH THE EDISON

02:48PM  12   3.5 DURING THE 2013 TIME PERIOD, AND IN 2014, AND IN 2015, AND

02:48PM  13   THAT SHE KNEW WHAT THE EDISON 3.5 COULD DO AND WHAT IT COULDN'T

02:48PM  14   DO.

02:48PM  15       SO WHAT DOES THAT MEAN?  THAT MEANS THAT WHENEVER

02:48PM  16   MS. HOLMES MADE A REPRESENTATION THAT WAS INCONSISTENT WITH

02:48PM  17   THIS, SHE'S ADMITTING THAT THAT WAS A KNOWING

02:48PM  18   MISREPRESENTATION.  SHE KNEW THE TRUTH.  SHE KNEW WHAT THE

02:48PM  19   MINILAB COULD DO.  SHE KNEW THE MINILAB WAS NEVER USED FOR

02:48PM  20   PATIENT TESTING, THAT NEXT GENERATION DEVICE.  SHE KNEW WHAT

02:48PM  21   THE 3.5 WAS CAPABLE OF AND WHAT IT WAS NOT CAPABLE OF.

02:48PM  22       SO WHEN SHE SAID THE THERANOS TECHNOLOGY CAN DO ANY TEST,

02:48PM  23   WHEN SHE BOASTED OF GREATER ACCURACY, WHEN SHE CAUSED PEOPLE TO

02:48PM  24   BELIEVE THAT THE EDISON WAS CAPABLE OF RUNNING THE ENTIRE RANGE

02:48PM  25   OF TESTS, HERE'S THE TESTIMONY THAT TELLS YOU THAT SHE KNEW

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                9289

02:48PM   1    BETTER.  SHE KNEW BETTER.

02:48PM   2        AND OF COURSE SHE DID.  SHE WAS THE FOUNDER OF THE

02:49PM   3    COMPANY.  SHE WAS NAMED ON MULTIPLE PATENTS.  SHE DEVOTED SO

02:49PM   4    MUCH ENERGY AND TIME TO THIS.  OF COURSE SHE KNEW WHAT THE

02:49PM   5    TRUTH WAS REGARDING THAT TECHNOLOGY.

02:49PM   6        SO THIS THEME BY THE DEFENSE, THIS ARGUMENT THAT

02:49PM   7    MS. HOLMES WAS ACTUALLY TALKING ABOUT A FUTURE DEVICE AND NOT

02:49PM   8    CURRENT TECHNOLOGY IS ACTUALLY A SIGNIFICANT ADMISSION BY THE

02:49PM   9    DEFENDANT.

02:49PM  10        IT MEANS THAT MS. HOLMES WAS INTENTIONALLY REPRESENTING AS

02:49PM  11    A PRESENT ACCOMPLISHMENT SOMETHING THAT HAD NOT HAPPENED YET,

02:49PM  12    AND THAT SHE KNEW THAT.

02:49PM  13        THE DEFENSE IS PRESENTING IT AS IF IT EXCUSES MS. HOLMES'S

02:49PM  14    CRIMINAL CONDUCT.  BUT, IN FACT, THIS IS JUST A DESCRIPTION OF

02:49PM  15    HOW THE FRAUD ACTUALLY WORKED.

02:49PM  16        YOU HEARD FROM THE VICTIMS WHO TESTIFIED THAT MS. HOLMES'S

02:49PM  17    APPARENT TECHNIQUE OF SPEAKING ABOUT NEXT GENERATION DEVICES AS

02:49PM  18    IF THEY WERE ALREADY HERE WAS EFFECTIVE IN DECEIVING INVESTORS,

02:49PM  19    IN DECEIVING OTHER PEOPLE WHO HAD CONTACT WITH THERANOS.

02:50PM  20        IF THIS THEORY, IF THIS ARGUMENT IS LESS PERSUASIVE TO

02:50PM  21    YOU, IT'S BECAUSE YOU HAVE ACCESS TO INFORMATION THAT THOSE

02:50PM  22    VICTIMS DID NOT HAVE.

02:50PM  23        UNLIKE THOSE VICTIMS, YOU'RE NOT RELIANT ON MS. HOLMES AS

02:50PM  24    YOUR SOLE SOURCE OF INFORMATION ABOUT THE COMPANY.  YOU SAT

02:50PM  25    THROUGH A TRIAL WHERE YOU HEARD FROM THERANOS INSIDERS AND

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

02:50PM 1    PEOPLE WHO COULD TELL YOU ABOUT THE DIFFERENCES BETWEEN THE 3

02:50PM 2    SERIES THAT WAS ACTUALLY A FINAL PRODUCT USED FOR PATIENT

02:50PM 3    TESTING AND THE NEXT GENERATION DEVICES THAT WERE ALWAYS

02:50PM 4    SPECULATIVE, ALWAYS HYPOTHETICAL, NEVER FINISHED.

02:50PM 5        BECAUSE YOU HAVE THAT UNDERSTANDING, YOU HAVE A CLEAR

02:50PM 6    FOCUS ABOUT WHETHER THIS DEFENSE IS ACTUALLY VIABLE AND YOU ARE

02:50PM 7    ABLE TO SEE THROUGH IT.

02:50PM 8        WHAT'S MORE, YOU KNEW THAT THERE WERE SERIOUS ACCURACY AND

02:50PM 9    RELIABILITY PROBLEMS WITH THE 3 SERIES ANALYZERS THAT THERANOS

02:51PM 10   APPARENTLY DID NOT KNOW HOW TO SOLVE.

02:51PM 11       THAT SHOULD MAKE YOU VERY SKEPTICAL THAT THE COMPANY WAS

02:51PM 12   ON ITS WAY TO DEVELOPING A 4 SERIES DEVICE THAT WAS MORE

02:51PM 13   COMPLICATED, MORE AMBITIOUS, THAT WAS GOING TO OVERCOME THESE

02:51PM 14   PROBLEMS, AND IT SHOULD MAKE YOU SKEPTICAL OF ANY CLAIM THAT

02:51PM 15   MS. HOLMES HAD A GOOD FAITH BELIEF IN THAT.

02:51PM 16       THE COMPANY COULDN'T SOLVE THE ACCURACY AND RELIABILITY

02:51PM 17   PROBLEMS PLAGUING THE MUCH SIMPLER 3 SERIES DEVICE.

02:51PM 18       ANOTHER THEME THAT THE DEFENSE HAS RAISED RELATES TO

02:51PM 19   INFORMATION THAT WAS SHARED WITH PEOPLE OTHER THAN VICTIMS IN

02:51PM 20   THIS CASE.

02:51PM 21       LET ME START BY REMINDING YOU THAT THIS CASE IS ABOUT

02:51PM 22   DECEPTION OF THE SPECIFIC VICTIMS WHO FELL UNDER THE SCHEMES TO

02:51PM 23   DEFRAUD INVESTORS AND PATIENTS.

02:51PM 24       WE'RE TALKING ABOUT SCHEMES RELATING TO MULTIPLE INVESTORS

02:51PM 25   AND MANY, IF NOT ALL, PATIENTS WHO PAID FOR THERANOS DEVICES OR

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9291

| | | |
|---|---|---|
| 02:51PM | 1 | PAID FOR THERANOS TESTS, AND THERE ARE SPECIFIC REPRESENTATIVES |
| 02:52PM | 2 | OF THOSE CLASSES WHO KIND OF UNDERLIE THE COUNTS THAT YOU'LL BE |
| 02:52PM | 3 | ASKED TO MAKE FINDINGS ABOUT. |
| 02:52PM | 4 | THAT'S WHAT THIS CASE IS ABOUT. |
| 02:52PM | 5 | THIS CASE IS NOT TURNING ON INFORMATION THAT WAS SHARED |
| 02:52PM | 6 | WITH PEOPLE OTHER THAN THE VICTIMS OF THOSE SCHEMES TO DEFRAUD. |
| 02:52PM | 7 | LET'S TALK FIRST ABOUT INFORMATION SHARED WITH REGULATORS. |
| 02:52PM | 8 | THE DEFENSE HAS REMINDED YOU MULTIPLE TIMES THAT THERANOS |
| 02:52PM | 9 | PROVIDED INFORMATION TO THE FDA AND TO INSPECTORS THAT IT DID |
| 02:52PM | 10 | NOT PROVIDE TO THE VICTIMS IN THIS CASE, AND IT WOULD LIKE YOU |
| 02:52PM | 11 | TO CONCLUDE THAT THERANOS'S WILLINGNESS TO PROVIDE THAT |
| 02:52PM | 12 | INFORMATION TO THE AUTHORITIES SHOULD INDICATE TO YOU THAT THE |
| 02:52PM | 13 | COMPANY WASN'T TRYING TO KEEP THAT INFORMATION SECRET AT ALL. |
| 02:52PM | 14 | FIRST OF ALL, ASK YOURSELVES IF THAT'S WHAT THE EVIDENCE |
| 02:53PM | 15 | SHOWS. |
| 02:53PM | 16 | DOES THE EVIDENCE SHOW THAT THERANOS AND MS. HOLMES WERE |
| 02:53PM | 17 | CONSISTENTLY HONEST WITH REGULATORS? |
| 02:53PM | 18 | RECALL EXHIBIT 4047.  THAT'S AN EMAIL FROM MS. HOLMES TO |
| 02:53PM | 19 | DANIEL YOUNG AND OTHERS ABOUT THE PATH THAT AN AUDITOR WAS |
| 02:53PM | 20 | GOING TO TAKE THROUGH THE THERANOS LAB DURING AN INSPECTION. |
| 02:53PM | 21 | SHORTLY AFTER THAT, IN CONNECTION WITH THAT SAME |
| 02:53PM | 22 | INSPECTION, ON EXHIBIT 4316 DANIEL YOUNG EMAILS ADAM ROSENDORFF |
| 02:53PM | 23 | AND TELLS HIM NOT TO REMIND THE INSPECTOR ABOUT THE DOWNSTAIRS |
| 02:53PM | 24 | LAB.  THAT'S THE LAB WHERE THE THERANOS-SPECIFIC DEVICES WERE |
| 02:53PM | 25 | KEPT. |

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                9292

02:53PM  1        AND IN THAT EMAIL DAN YOUNG SAYS THAT IT'S SIMPLER IF THE

02:53PM  2   INSPECTORS FOCUS ON THE UPSTAIRS LAB.

02:53PM  3        EXHIBIT 1295 IS AROUND THAT SAME TIME PERIOD IN CONNECTION

02:53PM  4   WITH THAT SAME INSPECTION, AND THAT'S AN EMAIL FROM

02:53PM  5   MR. BALWANI, THE CODEFENDANT HERE, TALKING ABOUT AN AREA IN THE

02:53PM  6   LAB THAT IS CORDONED OFF OR BLOCKED OFF DURING THIS INSPECTION.

02:54PM  7        AND HE PROVIDES SOME SCRIPTING FOR LAB PERSONNEL TO

02:54PM  8   RESPOND TO THE AUDITORS IF THEY'RE ASKED QUESTIONS ABOUT WHAT

02:54PM  9   IS BEHIND THAT BARRIER.

02:54PM 10        ONE IMPORTANT REASON WHY YOU SHOULD DISCOUNT THE FACT THAT

02:54PM 11   MS. HOLMES PROVIDED INFORMATION TO REGULATORS IS THAT THE

02:54PM 12   INCENTIVES ARE COMPLETELY DIFFERENT HERE.

02:54PM 13        OBVIOUSLY THE PURPOSE OF PROVIDING FALSE INFORMATION TO

02:54PM 14   INVESTORS WAS TO MAKE THE COMPANY SEEM SPECIAL AND UNIQUE AND

02:54PM 15   INNOVATIVE, TO ATTRACT THOSE INVESTORS AND MAKE THEM WANT TO

02:54PM 16   GET ON BOARD AND INVEST THEIR MONEY IN A NEW COMPANY.

02:54PM 17        WHEN IT COMES TO REGULATORS, HOWEVER, THE INCENTIVE IS THE

02:54PM 18   OPPOSITE.  SOMETHING NEW, SOMETHING INNOVATIVE, SOMETHING

02:54PM 19   DIFFERENT, IT'S REASONABLE TO INFER, WOULD CAUSE GREATER

02:54PM 20   SCRUTINY BY REGULATORS.

02:55PM 21        BECAUSE OF THAT, IT WAS ACTUALLY TO THERANOS'S ADVANTAGE

02:55PM 22   TO BE UP FRONT WITH THE REGULATORS ABOUT THE NORMAL SYSTEMS

02:55PM 23   THAT IT WAS USING, THE COMMERCIALLY AVAILABLE ANALYZERS, THE

02:55PM 24   FDA APPROVED PROCESSES, BY DISCLOSING THAT THERANOS WAS DOING

02:55PM 25   THE SAME THING THAT ANY LAB WOULD DO, THE SAME WAY THAT QUEST

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9293

02:55PM  1    WAS DOING IT, THE SAME WAY THAT LABCORP WAS DOING IT, THERANOS

02:55PM  2    COULD EXPECT THAT THE FDA WOULD BE COMFORTED BY THAT AND WOULD

02:55PM  3    NOT APPLY ADDITIONAL SCRUTINY.

02:55PM  4         THE OPPOSITE IS TRUE FOR INVESTORS.  INVESTORS WOULD HAVE

02:55PM  5    LITTLE INTEREST IN INVESTING IN A NEW LAB THAT WAS DOING THINGS

02:55PM  6    THE OLD WAY.

02:55PM  7         SO, AGAIN, YOU SHOULDN'T BE SURPRISED TO HEAR THAT

02:55PM  8    MS. HOLMES WAS MORE FORTHCOMING WITH THE FDA WHEN IT CAME TO

02:55PM  9    THINGS LIKE THE COMPANY'S USE OF THIRD PARTY DEVICES.

02:55PM 10         SHE DIDN'T LIE TO THE FDA BECAUSE SHE DIDN'T NEED TO, AND

02:55PM 11    ALSO BECAUSE HER CHANCES OF DECEIVING THEM WOULD HAVE BEEN

02:55PM 12    REDUCED.

02:55PM 13         RECALL FROM THE EVIDENCE DURING THE TRIAL THAT

02:55PM 14    ORGANIZATIONS LIKE FDA AND CMS CAN INSPECT LABORATORIES WITH OR

02:56PM 15    WITHOUT NOTICE, SO PROVIDING FALSE INFORMATION TO THEM ABOUT

02:56PM 16    WHAT WAS IN THE LAB WOULD CARRY A MUCH HIGHER RISK AS COMPARED

02:56PM 17    TO THE INVESTORS IN THIS CASE WHOSE ACCESS TO THE LAB WAS

02:56PM 18    CONTROLLED BY NONE OTHER THAN THE DEFENDANT.

02:56PM 19         LET'S TALK NEXT ABOUT SOME OF THE EVIDENCE IN THIS CASE

02:56PM 20    INVOLVING PHARMACEUTICAL REPORTS THAT WERE DOCTORED BY

02:56PM 21    MS. HOLMES AND SHARED BY WALGREENS AND OTHERS.

02:56PM 22         THE DEFENSE PRESENTED EVIDENCE THAT SOME OF THOSE REPORTS

02:56PM 23    WERE LATER SENT TO THE COMPANIES WHOSE LOGOS APPEARED AT THE

02:56PM 24    TOP, AND I THINK THE DEFENSE WANTS YOU TO CONCLUDE FROM THAT

02:56PM 25    THAT MS. HOLMES HAD NO INTENT TO DECEIVE ANYONE BECAUSE SHE

9294
REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

02:56PM  1    APPARENTLY WAS OKAY WITH CERTAIN INDIVIDUALS AT THOSE COMPANIES

02:57PM  2    KNOWING THAT THOSE LOGOS HAD BEEN PLACED THERE.

02:57PM  3         IT'S IMPORTANT TO KEEP IN MIND, THOUGH, THIS IS NOT A CASE

02:57PM  4    ABOUT THE MISUSE OF LOGOS.  THIS IS NOT A CASE ABOUT TRADEMARK

02:57PM  5    MISAPPROPRIATION WHERE THE VICTIM IS THE PHARMACEUTICAL

02:57PM  6    COMPANY.

02:57PM  7         THE WRONG THING THAT HAPPENED THERE IS THAT THE LOGOS WERE

02:57PM  8    USED TO DECEIVE A THIRD PARTY, WHETHER IT WAS A POTENTIAL

02:57PM  9    INVESTOR IN THERANOS, WHETHER IT WAS WALGREENS, A POTENTIAL

02:57PM 10    BUSINESS PARTNER.  THAT IS WHERE THOSE DOCUMENTS WERE USED AS

02:57PM 11    TOOLS.  THAT'S THE WRONGFUL CONDUCT THAT YOU SHOULD FOCUS ON.

02:57PM 12         SO SENDING REPORTS BACK TO THESE COMPANIES IS NOT THE SAME

02:57PM 13    THING AS REVEALING TO THE ACTUAL TARGETS OF THE DECEPTION,

02:57PM 14    WALGREENS OR INVESTORS, THAT THOSE REPORTS HAD BEEN CREATED BY

02:57PM 15    THERANOS AND THAT THE LOGOS HAD BEEN APPLIED BY MS. HOLMES

02:57PM 16    HERSELF.

02:57PM 17         AND SURE ENOUGH, WHEN MS. HOLMES WAS ASKED, "BEFORE GIVING

02:58PM 18    THE DOCUMENT TO WALGREENS," AND THIS IS RELATING TO THE PFIZER

02:58PM 19    REPORT, "YOU DID NOT TELL PFIZER YOU WERE ADDING ITS LOGO TO A

02:58PM 20    DOCUMENT THAT THERANOS PREPARED; AM I RIGHT?"

02:58PM 21         SHE SAYS, "I DON'T KNOW.  I DON'T REMEMBER THIS PROCESS."

02:58PM 22         THE FOLLOW-UP QUESTION IS, "AND YOU NEVER TOLD WALGREENS

02:58PM 23    THAT YOU PUT THE PFIZER LOGO ON THIS?"

02:58PM 24         "ANSWER:  I'M SURE WE DIDN'T."

02:58PM 25         LOOK AT THE CONTRAST BETWEEN THOSE TWO ANSWERS AND RECALL

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                9295

02:58PM   1    DURING MS. HOLMES'S TESTIMONY THERE WERE A LOT OF THINGS THAT

02:58PM   2    SHE DIDN'T REMEMBER, THAT SHE WASN'T SURE ABOUT, THAT SHE

02:58PM   3    DIDN'T KNOW.

02:58PM   4        HERE IS SOMETHING THAT SHE IS SURE ABOUT.  WHEN ASKED

02:58PM   5    WHETHER THEY TOLD WALGREENS THAT SHE PUT THE PFIZER LOGO ON

02:58PM   6    THAT DOCUMENT, SHE ANSWERED THAT SHE'S SURE SHE DIDN'T.

02:58PM   7        AND THE REASON SHE KNOWS SHE DIDN'T TELL WALGREENS THIS

02:58PM   8    FACT IS BECAUSE IT WOULD HAVE REVEALED THE TRUTH THAT SHE WAS

02:58PM   9    TRYING TO CONCEAL.

02:58PM  10        LET'S LOOK AT THE METHOD THAT SHE USED THERE.

02:59PM  11        THIS IS EXHIBIT 291, AN APRIL 14TH, 2010 EMAIL FROM

02:59PM  12    MS. HOLMES TO REPRESENTATIVES OF WALGREENS ATTACHING THAT

02:59PM  13    PFIZER REPORT AND TWO OTHERS.

02:59PM  14        AND LOOK AT HOW SHE DESCRIBES THEM.  SHE SAYS "DR. JAY,

02:59PM  15    ALEX,

02:59PM  16        "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:59PM  17    DILIGENCE REPORTS ON THERANOS SYSTEMS."  SHE SAYS THEY ARE FROM

02:59PM  18    GLAXOSMITHKLINE, PFIZER, AND SCHERING-PLOUGH.

02:59PM  19        WHEN SHE WAS ON THE STAND SHE ADMITTED THAT, IN FACT, OF

02:59PM  20    COURSE THESE REPORTS WERE NOT FROM THOSE COMPANIES.  THEY WERE

02:59PM  21    FROM THERANOS.

02:59PM  22        SHE MAINTAINED, HOWEVER, THAT THEY WERE INDEPENDENT IN

02:59PM  23    SOME SENSE.  IT'S UNCLEAR HOW DOCUMENTS THAT WERE PREPARED OR

02:59PM  24    ALTERED BY THERANOS, AND THEN DOCTORED TO APPEAR LIKE THEY WERE

02:59PM  25    COMING FROM SOMEONE ELSE, COULD BE FAIRLY VIEWED AS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                          9296

02:59PM   1    INDEPENDENT.

02:59PM   2         BUT I THINK YOU'RE IN A GOOD POSITION TO JUDGE WHETHER

02:59PM   3    THIS WAS AN HONEST EMAIL OR NOT AT THE TIME THAT MS. HOLMES

03:00PM   4    SENT IT, AND TO JUDGE HER INTENT IN MISCHARACTERIZING THESE

03:00PM   5    DOCUMENTS WHEN SHE SENT THEM TO WALGREENS.

03:00PM   6         THERE'S TRULY NO EXPLANATION HERE OTHER THAN AN INTENT TO

03:00PM   7    DECEIVE.  THERE'S NO REASON NOT TO BE UP FRONT ABOUT THE SOURCE

03:00PM   8    OF THESE DOCUMENTS.  THERE'S NO REASON TO SEND THEM IN THE

03:00PM   9    FIRST PLACE UNLESS YOUR INTENT IS FOR THE RECIPIENT TO BELIEVE

03:00PM  10    THAT THEY'RE READING THE OPINIONS OF THE COMPANIES' WHOSE LOGOS

03:00PM  11    YOU HAVE PLACED AT THE TOP OF THOSE DOCUMENTS.

03:00PM  12         LET'S TALK BRIEFLY ABOUT ANOTHER DEFENSE THEME, WHICH IS

03:00PM  13    BRINGING FOCUS ON THE ACTIONS OF THE VICTIMS IN THIS CASE,

03:00PM  14    SPECIFICALLY THE INVESTORS.

03:00PM  15         YOU'VE HEARD IN THIS CASE FROM A SAMPLING OF INVESTORS.

03:00PM  16    EACH OF THEM TOLD YOU ABOUT THE FALSE AND MISLEADING

03:00PM  17    INFORMATION THAT THEY RECEIVED FROM MS. HOLMES EITHER IN

03:00PM  18    WRITTEN MATERIALS THAT SHE GAVE THEM, IN-PERSON INTERACTIONS,

03:00PM  19    OR INDIRECTLY IN NEWS ARTICLES THAT MS. HOLMES HELPED SHAPE AND

03:00PM  20    APPROVE.

03:00PM  21         THE DEFENSE HAS FOCUSSED THROUGHOUT THE TRIAL ON THE DUE

03:01PM  22    DILIGENCE EFFORTS OF THOSE INVESTORS, SOMETIMES IMPLYING OR

03:01PM  23    INSINUATING THAT INVESTORS WEREN'T CAREFUL ENOUGH, THAT THEY

03:01PM  24    DIDN'T TAKE ENOUGH STEPS TO CONFIRM WHAT MS. HOLMES WAS SAYING,

03:01PM  25    THAT THEY WEREN'T SKEPTICAL ENOUGH.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

03:01PM 1      WHAT DOES THE LAW SAY ON THAT?

03:01PM 2      HERE'S WHAT I EXPECT THE COURT TO INSTRUCT YOU ON THIS

03:01PM 3  TOPIC.

03:01PM 4      THIS IS JURY INSTRUCTION NUMBER 26 THAT I EXPECT YOU'LL

03:01PM 5  RECEIVE.  NOTE THAT IT SAYS, "AN ALLEGED VICTIM'S NEGLIGENCE IS

03:01PM 6  NOT A DEFENSE TO WIRE FRAUD."

03:01PM 7      SO IN CASES WHERE YOU MIGHT FEEL THAT A GIVEN INVESTOR

03:01PM 8  WASN'T CAREFUL ENOUGH, WASN'T SKEPTICAL ENOUGH, SHOULD HAVE

03:01PM 9  TAKEN MORE STEPS, SHOULD HAVE DONE MORE INDEPENDENT

03:01PM 10  INVESTIGATION, KNOW THAT THAT HAS NOTHING TO DO WITH YOUR

03:01PM 11  VERDICT.  KNOW THAT THE FOCUS, AS THE COURT WILL INSTRUCT YOU,

03:01PM 12  IS ON THE DEFENDANT'S INTENT, AND A SCHEME TO DEFRAUD IS STILL

03:01PM 13  A SCHEME TO DEFRAUD EVEN IF IT WOULD ONLY ENSNARE SOMEONE WHO

03:02PM 14  IS LESS CAREFUL THAN THEY SHOULD BE.

03:02PM 15      IT'S ALSO NOTABLE THAT IN THE COURSE OF THE TRIAL YOU ALSO

03:02PM 16  HEARD FROM INVESTORS EVERYWHERE ON THE SPECTRUM OF CAREFULNESS

03:02PM 17  AND SOPHISTICATION AND DUE DILIGENCE.

03:02PM 18      ON THE ONE HAND YOU HAD CHRIS LUCAS WHO TESTIFIED THAT HE

03:02PM 19  TRUSTED MS. HOLMES.  HE TOOK HER WORDS AT FACE VALUE.  HE HAD A

03:02PM 20  HIGH LEVEL UNDERSTANDING OF WHAT THE COMPANY HAD DONE AND WHAT

03:02PM 21  THE TECHNOLOGY COULD DO BASED ON CONVERSATIONS WITH HER.  AND

03:02PM 22  HE, BASED ON THAT TRUST AND BASED ON HER REPRESENTATIONS, MADE

03:02PM 23  THE DECISION TO INVEST.

03:02PM 24      ON THE OTHER END OF THE SPECTRUM THERE'S PFM AND SOMEONE

03:02PM 25  LIKE BRIAN GROSSMAN, A VERY SOPHISTICATED INVESTOR WHO TOOK

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9298

03:02PM   1        MULTIPLE STEPS TO INVESTIGATE, TRY TO FIND CORROBORATION, HIRE

03:03PM   2        EXPERTS AND GO THROUGH A PROCESS TO GET AS COMFORTABLE AS

03:03PM   3        POSSIBLE WITH THE INVESTMENT IN THERANOS.

03:03PM   4             AND THEN IN HIS OWN CATEGORY IS MR. EISENMAN WHO YOU HEARD

03:03PM   5        MADE HIS BEST EFFORTS TO GET MORE INFORMATION ABOUT THE

03:03PM   6        COMPANY, BUT WAS SHUT OUT BY MS. HOLMES AND MR. BALWANI DURING

03:03PM   7        A CERTAIN TIME PERIOD.

03:03PM   8             WHAT EFFECT DID THAT HAVE?  THAT FORCED HIM TO RELY ON

03:03PM   9        WHAT MS. HOLMES HAD TOLD HIM PREVIOUSLY, CONVERSATIONS LEADING

03:03PM  10        UP TO AND THROUGH 2010, CLAIMS THAT SHE HAD MADE ABOUT THE

03:03PM  11        TECHNOLOGY, AND CONTENT THAT HE SAW IN MEDIA THAT MS. HOLMES

03:03PM  12        HAD APPROVED.

03:03PM  13             REGARDING HIS FOCUS OF CERTAIN STATEMENTS OF HERS, I

03:03PM  14        SUBMIT THAT THE BALANCE OF HIS TESTIMONY TELLS YOU THAT WHAT

03:03PM  15        SHE TOLD HIM DID MATTER TO HIM.  HE TESTIFIED ABOUT HOW HE TOOK

03:03PM  16        NOTES ABOUT HER CLAIMS.  YOU SAW FOLLOW-UP EMAILS ASKING HER

03:03PM  17        QUESTIONS ABOUT CARTRIDGE MANUFACTURING NUMBERS AND

03:04PM  18        PROJECTIONS.  OBVIOUSLY THOSE THINGS MATTERED TO HIM.

03:04PM  19             I SHOULD ALSO POINT OUT, THOUGH, THAT YOU SHOULDN'T BE

03:04PM  20        DISTRACTED BY DEFENSE ARGUMENTS ABOUT WHAT MATTERED TO A

03:04PM  21        CERTAIN INVESTOR AT A CERTAIN TIME.

03:04PM  22             WHEN YOU'RE INSTRUCTED ABOUT THE LAW, YOU'RE GOING TO HEAR

03:04PM  23        ABOUT A CONCEPT CALLED MATERIALITY, WHICH RELATES TO THE KIND

03:04PM  24        OF MISREPRESENTATION THAT CAN FORM THE BASIS FOR A WIRE FRAUD

03:04PM  25        CONVICTION.

9299
REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

03:04PM  1          AND YOU'RE GOING TO HEAR THAT MATERIALITY RELATES TO THE

03:04PM  2     CAPACITY OF A CERTAIN STATEMENT TO INDUCE SOMEONE TO PART WITH

03:04PM  3     MONEY.  AND I'LL ASK YOU TO RELY ON THE COURT'S INSTRUCTION FOR

03:04PM  4     THAT.

03:04PM  5          BUT YOU'LL SEE THAT IT HAS NOTHING TO DO WITH WHAT WAS

03:04PM  6     SUBJECTIVELY IN A VICTIM'S MIND AT A GIVEN TIME.  IT'S AN

03:04PM  7     OBJECTIVE STANDARD.  IT RELATES TO THE TYPE OF CLAIM, THE TYPE

03:04PM  8     OF STATEMENT, NOT TO THE SPECIFIC PERSON THAT IT WAS MADE TO.

03:04PM  9          SO WHAT YOU SAW IN THE EVIDENCE IS THAT THE LEVEL OF DUE

03:05PM  10    DILIGENCE DOESN'T MATTER.  IN THE END, THE INVESTORS WHO

03:05PM  11    TESTIFIED WERE ALL ULTIMATELY FORCED TO RELY ON THE TRUTH OF

03:05PM  12    THE REPRESENTATIONS THAT THEY HEARD FROM MS. HOLMES.

03:05PM  13         THAT'S WHY YOU SHOULD ALSO DISCOUNT THE LANGUAGE IN THE

03:05PM  14    CONTRACTS THAT TALKS ABOUT THE SPECULATIVE NATURE OF THE

03:05PM  15    INVESTMENT OR INFORMATION RIGHTS AND THE LIKE.

03:05PM  16         OF COURSE THESE WERE RISKY INVESTMENTS.  THE INVESTORS

03:05PM  17    KNEW THAT.

03:05PM  18         AND, OF COURSE, THEY KNEW THAT THERE WAS SOME INFORMATION

03:05PM  19    THAT MAYBE THEY WEREN'T GETTING FROM THE COMPANY.

03:05PM  20         BUT YOU WON'T FIND ANY LANGUAGE IN THOSE CONTRACTS THAT

03:05PM  21    EXCUSES THE COMPANY FOR KNOWINGLY PROVIDING FALSE INFORMATION.

03:05PM  22         NOTHING IN THOSE CONTRACTS GAVE MS. HOLMES THE RIGHT TO

03:05PM  23    KNOWINGLY MISLEAD THOSE INVESTORS.

03:05PM  24         AT THE END OF THE DAY, THOSE INVESTORS WERE RELYING ON

03:05PM  25    RECEIVING ACCURATE INFORMATION FROM MS. HOLMES AND NOT BEING

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

03:05PM  1    INTENTIONALLY MISLED, AND THAT'S EXACTLY WHAT HAPPENED HERE.

03:06PM  2        KEEP IN MIND ALSO ON THIS TOPIC THAT PATIENTS WERE REALLY

03:06PM  3    AT A DISADVANTAGE HERE.

03:06PM  4        IF YOU THINK THAT SOME INVESTORS WERE AT A DISADVANTAGE IN

03:06PM  5    BEING ABLE TO COLLECT INFORMATION OR DO INDEPENDENT

03:06PM  6    INVESTIGATION, KNOW AND REALIZE THAT PATIENTS WERE FAR WORSE

03:06PM  7    OFF IN THEIR ABILITY TO FACT CHECK REPRESENTATIONS BY THE

03:06PM  8    DEFENDANT OR DO ANYTHING OTHER THAN JUST RELY ON INFORMATION

03:06PM  9    PUT OUT BY THE COMPANY.

03:06PM  10       LET'S TALK NEXT ABOUT ANOTHER DEFENSE THEME RELATING TO

03:06PM  11   CLAIMS OF TRADE SECRET PROTECTION.

03:06PM  12       YOU'VE HEARD EVIDENCE IN THE TRIAL ABOUT SECRETIVE

03:06PM  13   PRACTICES AT THERANOS AND A LOT OF THE EVIDENCE AND TESTIMONY

03:06PM  14   FROM VICTIMS HAS RELATED TO INFORMATION THAT WAS WITHHELD FROM

03:06PM  15   THEM, FACTS THAT THEY DID NOT GET, THINGS THAT MS. HOLMES DID

03:06PM  16   NOT TELL THEM.

03:06PM  17       THE DEFENSE WOULD LIKE YOU TO BELIEVE THAT IN EVERY CASE,

03:06PM  18   EVERY TIME INFORMATION WAS WITHHELD FROM A VICTIM, IT WAS

03:07PM  19   SIMPLY A GOOD FAITH EFFORT TO PROTECT THE COMPANY'S TRADE

03:07PM  20   SECRETS.

03:07PM  21       THAT DEFENSE DOESN'T HOLD WATER, AND HERE'S WHY:

03:07PM  22       FIRST OF ALL, THE EVIDENCE SHOWS YOU SOME CONTRADICTORY OR

03:07PM  23   IRRATIONAL PRACTICES HERE.  YOU SAW THAT THERANOS WAS QUITE

03:07PM  24   AGGRESSIVE IN GETTING EMPLOYEES AND OTHERS TO SIGN CDA'S, OR

03:07PM  25   CONFIDENTIAL DISCLOSURE AGREEMENTS.  THAT WAS THE PRIMARY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9301

```
03:07PM   1    MECHANISM, OR A PRIMARY MECHANISM, THAT THE COMPANY USED TO

03:07PM   2    PROTECT ITS CONFIDENTIAL INFORMATION.

03:07PM   3        THE DRAFT POLICY THAT MS. HOLMES READ THAT WAS INTRODUCED

03:07PM   4    INTO EVIDENCE SPECIFICALLY HIGHLIGHTED THE USE OF CDA'S AND

03:07PM   5    NOTED THAT THAT WAS AN ACCEPTABLE APPROACH.

03:07PM   6        SO THERE WAS NO NEED TO DECEIVE INVESTORS OR ANYONE ELSE

03:07PM   7    WHEN SIMPLY HAVING THEM ENTER INTO THESE AGREEMENTS WOULD HAVE

03:07PM   8    BEEN ADEQUATE TO PROTECT THE COMPANY'S INTELLECTUAL PROPERTY.

03:07PM   9        YOU SAW IN THE EVIDENCE THAT CRITICAL EVIDENCE WAS

03:08PM  10    WITHHELD EVEN FROM THOSE UNDER CDA'S OR OTHER OBLIGATIONS TO

03:08PM  11    KEEP SECRETS.  FOR EXAMPLE, WALGREENS AND THE BOARD OF

03:08PM  12    DIRECTORS, WHO HAD A DUTY AND AN INCENTIVE TO KEEP THERANOS'S

03:08PM  13    SECRETS, STILL WERE NOT TOLD THE FULL EXTENT OF THE COMPANY'S

03:08PM  14    RELIANCE ON THIRD PARTY DEVICES.

03:08PM  15        THAT'S BECAUSE THIS WASN'T ABOUT PROTECTING TRADE SECRETS.

03:08PM  16        A TRADE SECRET, AS YOU'VE HEARD, IS ABOUT PROTECTING HOW A

03:08PM  17    BUSINESS DOES SOMETHING.  IT'S NOT ABOUT HIDING WHAT A BUSINESS

03:08PM  18    CANNOT DO.

03:08PM  19        YOU HEARD MS. HOLMES TALK ABOUT HEARING FROM SENATOR NUNN

03:08PM  20    ABOUT HIS EXPERIENCE ON THE BOARD OF COCA-COLA AND THE EFFORTS

03:08PM  21    THAT THAT COMPANY TOOK TO PROTECT THE SECRET FORMULA FOR COKE.

03:08PM  22        SO THE COKE FORMULA IS A CLASSIC EXAMPLE OF A TRADE

03:08PM  23    SECRET.  IT'S SOMETHING THAT A COMPANY CAN DO, KNOWLEDGE THAT

03:08PM  24    IT HAS THAT IT NEEDS TO PROTECT, OTHERWISE ITS COMPETITORS WILL

03:09PM  25    BE ABLE TO COPY IT.
```

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                9302

03:09PM   1          THERANOS, THOUGH, WAS NO COCA-COLA.

03:09PM   2          IF THERANOS WERE A SODA COMPANY, IT WOULD BE A COMPANY

03:09PM   3     THAT COULD ONLY MAKE A FEW FLAVORS, AND FOR THE REST REPACKAGED

03:09PM   4     SODA FROM ANOTHER COMPANY AND SOLD IT AS ITS OWN.

03:09PM   5          THAT PRACTICE, THE PRACTICE OF TAKING A PRODUCT BY ANOTHER

03:09PM   6     AND PASSING IT OFF AS SOMETHING THAT YOU COULD DO, IS NO TRADE

03:09PM   7     SECRET.  THAT'S NOT THE KIND OF THING THAT NEEDS TO BE

03:09PM   8     PROTECTED BECAUSE IF A COMPETITOR FINDS OUT ABOUT IT, THEY'LL

03:09PM   9     START DOING IT.

03:09PM   10         IT'S A SECRET THAT NEEDS TO BE PROTECTED BECAUSE IF IT

03:09PM   11    GETS OUT, IT WILL MAKE THE COMPANY LOOK BAD, IT WILL EXPOSE THE

03:09PM   12    COMPANY AS A FRAUD, IT WILL MAKE THE COMPANY APPEAR LESS

03:09PM   13    SPECIAL, AND THAT WAS WHAT MS. HOLMES WAS TRYING TO AVOID.

03:09PM   14         AND THAT BRINGS US TO PROBABLY THE BIGGEST PROBLEM WITH

03:09PM   15    THIS DEFENSE THEORY.

03:09PM   16         THE DEFENSE WANTS YOU TO FOCUS ON THE MODIFICATIONS THAT

03:09PM   17    WERE MADE TO THIRD PARTY DEVICES AND VIEW THOSE AS TRADE

03:10PM   18    SECRETS.

03:10PM   19         BUT DON'T FORGET THAT MS. HOLMES ALSO WITHHELD INFORMATION

03:10PM   20    ABOUT THE NONMODIFIED THIRD PARTY DEVICES THAT WERE IN USE AT

03:10PM   21    THERANOS.

03:10PM   22         THERE IS NO ARGUMENT, THERE CAN BE NO ARGUMENT THAT THE

03:10PM   23    USE OF NONMODIFIED THIRD PARTY DEVICES WAS A TRADE SECRET.

03:10PM   24    THAT'S SOMETHING THAT ANY LAB COULD DO.  IT'S SOMETHING THAT

03:10PM   25    YOU KNOW THAT QUEST AND LABCORP WERE DOING.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9303

03:10PM   1        THE PRACTICE OF BUYING A SIEMENS ANALYZER AND USING IT TO

03:10PM   2   ANALYZE BLOOD IS NOT A TRADE SECRET.  THAT'S WHAT EVERY LAB

03:10PM   3   DOES.

03:10PM   4        THE FACT THAT MS. HOLMES TOOK STEPS TO HIDE THAT, THE FACT

03:10PM   5   THAT SHE DID NOT WANT INVESTORS AND THE PUBLIC TO KNOW THAT THE

03:10PM   6   COMPANY WAS RELYING ON ANY NON-THERANOS DEVICES SHOWS THAT THIS

03:10PM   7   IS NOT JUST ABOUT PROTECTING THOSE MODIFICATIONS.  THIS IS

03:10PM   8   ABOUT BUILDING UP THE EDISON.  THIS IS ABOUT LEAVING PEOPLE

03:10PM   9   WITH THE FALSE IMPRESSION THAT THE EDISON IS A DO-IT-ALL

03:10PM  10   DEVICE, AND THAT NOTHING ELSE IS NEEDED TO RUN THE LAB.

03:10PM  11        YOU ALSO HAVEN'T HEARD ANY EVIDENCE THAT TRADE SECRETS

03:11PM  12   CREATE A LICENSE TO LIE OR TO DECEIVE PEOPLE.

03:11PM  13        TO THE EXTENT MS. HOLMES FELT THAT THERE WERE TRADE

03:11PM  14   SECRETS THAT SHE NEEDED TO PROTECT, THERE WERE OBVIOUS, SIMPLE

03:11PM  15   WAYS TO DO THAT THAT DIDN'T INVOLVE DECEPTION.

03:11PM  16        FOR EXAMPLE, IN ANY CONVERSATION IF SHE WAS ASKED A

03:11PM  17   QUESTION THAT SHE COULDN'T ANSWER IN HER MIND BECAUSE OF TRADE

03:11PM  18   SECRET RESTRICTIONS, SHE COULD HAVE SIMPLY SAID, "I'M SORRY, I

03:11PM  19   CAN'T GET INTO THAT BECAUSE OF TRADE SECRET PURPOSES."  OR "I'M

03:11PM  20   NOT WILLING TO TALK ABOUT" FILL IN THE BLANK.

03:11PM  21        THAT WOULD HAVE BEEN AN APPROACH THAT WOULD HAVE PRESERVED

03:11PM  22   ANY TRADE SECRETS THAT SHE FELT NEEDED TO BE PRESERVED, WHILE

03:11PM  23   AT THE SAME TIME AVOIDING THE PROBLEM OF CREATING A FALSE

03:11PM  24   IMPRESSION IN SOMEONE'S MIND.

03:11PM  25        THE REASON SHE DIDN'T TAKE THAT SIMPLE APPROACH IS BECAUSE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

03:11PM 1    CREATING THAT FALSE IMPRESSION WAS HER GOAL.  THAT'S WHAT SHE

03:11PM 2    WAS SETTING OUT TO DO.

03:12PM 3        MR. DOWNEY HIGHLIGHTED FOR YOU THE FACT THAT DURING THE

03:12PM 4    RELEVANT TIME PERIOD AND IN THE COURSE OF MS. HOLMES'S DEALINGS

03:12PM 5    WITH THERANOS, SHE NEVER SOLD ANY OF HER SHARES AND DIDN'T

03:12PM 6    OBTAIN ANY PERSONAL ENRICHMENT THAT WAY.

03:12PM 7        YOU ALSO HEARD THAT THERE WAS A REASON WHY SHE DIDN'T SELL

03:12PM 8    SHARES, AND IT RELATED TO HER CONTROL OF THE COMPANY.

03:12PM 9        WHEN SHE WAS ON THE STAND, SHE TESTIFIED THAT SHE OWNED

03:12PM 10   APPROXIMATELY 50 PERCENT OF THERANOS.  IT CAME OUT ON CROSS

03:12PM 11   THAT IT WAS SLIGHTLY MORE THAN 50 PERCENT, GIVING HER A

03:12PM 12   CONTROLLING SHARE OF THE COMPANY.

03:12PM 13       YOU HEARD ABOUT HOW THE NATURE OF THOSE SHARES GAVE HER

03:12PM 14   DISPROPORTIONATE VOTING POWER THAT ALLOWED HER TO DO WHAT SHE

03:12PM 15   WANTED ESSENTIALLY IN THE COMPANY, INCLUDING FIRING THE BOARD,

03:12PM 16   FIRING OTHERS, AND THAT POWER WAS DERIVED FROM THE SHARES THAT

03:12PM 17   SHE HELD.

03:12PM 18       SO IT IS REASONABLE FOR YOU TO INFER THAT ONE REASON WHY

03:13PM 19   SHE DIDN'T LET GO OF ANY OF THOSE SHARES IS THAT SHE NEEDED TO

03:13PM 20   HOLD ON TO THAT CONTROL OF THE COMPANY NOT ONLY SO THAT SHE

03:13PM 21   COULD RUN IT THE WAY SHE CHOSE, BUT ALSO SO THAT SHE COULD KEEP

03:13PM 22   CONTROL OF ACCESS TO INFORMATION THE WAY THAT THE EVIDENCE

03:13PM 23   SHOWS THAT SHE DID.

03:13PM 24       IN CONNECTION WITH THIS ARGUMENT, YOU SHOULD ALSO KEEP IN

03:13PM 25   MIND WHAT I EXPECT THE COURT WILL GIVE YOU AS JURY INSTRUCTION

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                            9305

03:13PM  1    NUMBER 27 THAT TELLS YOU IN CLEAR TERMS THAT IT IS NOT

03:13PM  2    NECESSARY THAT MS. HOLMES MADE A PROFIT OR THAT ANYONE ACTUALLY

03:13PM  3    SUFFERED A LOSS.

03:13PM  4         SO YOU ARE NOT REQUIRED TO FIND THAT MS. HOLMES ACTUALLY

03:13PM  5    MADE A FINANCIAL PROFIT FROM THIS FRAUD OR THAT IT WAS

03:13PM  6    SUCCESSFUL IN ORDER TO CONVICT.  THAT IS NOT AN ELEMENT THAT

03:13PM  7    THE GOVERNMENT HAS TO PROVE.

03:13PM  8         THERE WERE ALSO BENEFITS FLOWING TO MS. HOLMES OTHER THAN

03:14PM  9    MONEY.  SHE HAD A SUBSTANTIAL SALARY TO BE SURE.

03:14PM 10         BUT SHE ALSO BENEFITED FROM THE ATTENTION, THE ACCOLADES,

03:14PM 11    THE FAME AND THE PROMINENCE THAT BEING THE CEO OF THIS

03:14PM 12    SUCCESSFUL COMPANY BROUGHT HER.

03:14PM 13         AND THERE'S ANOTHER REASON WHY SHE DIDN'T CASH OUT, AND

03:14PM 14    THAT RELATES TO HER ULTIMATE VISION AND THE LEVEL OF WEALTH AND

03:14PM 15    SUCCESS THAT SHE WANTED TO ACHIEVE, AND WE CAN SEE THAT IN THIS

03:14PM 16    TEXT MESSAGE AT EXHIBIT 5387D, PAGE 19.

03:14PM 17         AND IN NOVEMBER OF 2013 SUNNY TEXTS MS. HOLMES, "THEN

03:14PM 18    LET'S BUILD THE TRUE AMERICAN EMPIRE.  A MONOPOLY.  OUR

03:14PM 19    OBLIGATION TO U.S.A."

03:14PM 20         AND MS. HOLMES RESPONDS, "THAT'S WHAT WE'RE DOING."

03:14PM 21         IT'S NOT DISPUTED.  MS. HOLMES APPARENTLY, EVIDENTLY, WAS

03:14PM 22    NOT IN THIS SIMPLY TO GET MONEY.

03:14PM 23         SHE WANTED TO BUILD THE TRUE AMERICAN EMPIRE.  SHE WANTED

03:14PM 24    HER COMPANY TO BE A MONOPOLY, AND THE SUCCESS OF THE COMPANY

03:15PM 25    TURNED OUT TO BE THE MOTIVE FOR THE CRIME THAT SHE COMMITTED,

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9306

```
03:15PM   1    AND THAT'S IMPORTANT FOR YOU TO REALIZE.

03:15PM   2         A FRAUD COMMITTED FOR THE SAKE OF A COMPANY'S SUCCESS IS

03:15PM   3    STILL A FRAUD.  IT DOES NOT NEED TO BE THE CASE THAT A

03:15PM   4    DEFENDANT IS MOTIVATED BY PERSONAL ENRICHMENT.  THAT'S NOT AN

03:15PM   5    ELEMENT.

03:15PM   6         AND WHAT'S MORE, YOU DON'T NEED TO MAKE ANY FINDINGS AS TO

03:15PM   7    MOTIVE IN THIS CASE.  WE TALK ABOUT MOTIVE BECAUSE IT'S HELPFUL

03:15PM   8    FOR YOU TO UNDERSTAND WHY CERTAIN DECISIONS WERE MADE BY THE

03:15PM   9    DEFENDANT, BUT YOU DON'T NEED TO MAKE ANY CONCLUSIONS ABOUT

03:15PM  10    MOTIVE, YOU DON'T NEED TO AGREE ON WHAT MS. HOLMES'S MOTIVE WAS

03:15PM  11    IN ORDER TO RENDER YOUR VERDICT.

03:15PM  12         LET'S TALK NOW ABOUT SUNNY BALWANI.

03:15PM  13         YOU HEARD IN MS. HOLMES'S TESTIMONY ABOUT HER EXPERIENCE

03:15PM  14    IN HER RELATIONSHIP WITH MR. BALWANI.

03:15PM  15         I WONDER IF ANY OF YOU FEEL LIKE THAT TESTIMONY MAKES YOUR

03:16PM  16    JOB MORE DIFFICULT OR MORE COMPLICATED?

03:16PM  17         IT'S UNDERSTANDABLE IF IT DOES FOR A COUPLE OF REASONS:

03:16PM  18         FIRST, WE KNOW THAT HEARING ABOUT SOMEONE HAVING GONE

03:16PM  19    THROUGH A PAINFUL EXPERIENCE IS DIFFICULT.  IT'S DIFFICULT FOR

03:16PM  20    US TO SIT AND LISTEN TO SOMEONE TALK ABOUT SOMETHING PAINFUL OR

03:16PM  21    HURTFUL THAT THEY HAVE BEEN THROUGH.  IT'S NATURAL TO HAVE A

03:16PM  22    REACTION TO HEARING SOMEONE TALK ABOUT SOMETHING LIKE THAT.

03:16PM  23    IT'S NATURAL TO HAVE A STRONG REACTION TO SOMETHING LIKE THAT.

03:16PM  24         SO THAT'S ONE WAY THAT HEARING THAT TESTIMONY MIGHT MAKE

03:16PM  25    YOUR JOB AS JURORS MORE DIFFICULT.
```

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC

03:16PM   1        THE SECOND WAY IT MIGHT MAKE YOU FEEL THAT IT MAKES YOUR

03:16PM   2    JOB MORE COMPLICATED IS THAT YOU MIGHT BE WONDERING HOW

03:16PM   3    MS. HOLMES'S CLAIMS OF ABUSE AFFECTS YOUR ANALYSIS OF THE FRAUD

03:16PM   4    IN THIS CASE, OR WHETHER IT AFFECTS THE ANALYSIS AT ALL.

03:17PM   5        A NATURAL STARTING POINT MIGHT BE TO TRY TO DETERMINE WHAT

03:17PM   6    THE ANSWER IS TO THE FACTUAL QUESTION OF WHAT REALLY HAPPENED

03:17PM   7    BETWEEN MS. HOLMES AND MR. BALWANI.

03:17PM   8        IN THAT RESPECT, I'LL DIRECT YOU TO TWO JURY INSTRUCTIONS.

03:17PM   9    THIS IS JURY INSTRUCTION NUMBER 4 THAT SAYS, "MS. HOLMES HAS

03:17PM  10    TESTIFIED."  AND IT DIRECTS YOU TO TREAT THIS TESTIMONY JUST AS

03:17PM  11    YOU WOULD THE TESTIMONY OF ANY OTHER WITNESS.

03:17PM  12        JURY INSTRUCTION NUMBER 9 MAKES IT CLEAR THAT YOUR JOB IS

03:17PM  13    TO JUDGE THE CREDIBILITY OF WITNESSES AND IT TELLS YOU THAT

03:17PM  14    "YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

03:17PM  15    NONE OF IT."

03:17PM  16        AND IT INSTRUCTS YOU TO CONSIDER THINGS LIKE "THE

03:17PM  17    WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, AND WHETHER

03:17PM  18    OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY."

03:17PM  19        IN CHOOSING WHETHER TO BELIEVE PART OR ALL OF MS. HOLMES'S

03:18PM  20    TESTIMONY, YOU SHOULD ADHERE TO THESE INSTRUCTIONS AND YOU

03:18PM  21    SHOULD TAKE INTO ACCOUNT EVERYTHING YOU KNOW ABOUT THE FACTS OF

03:18PM  22    THIS CASE.

03:18PM  23        THAT SAID, YOU NEED TO MAKE UP YOUR OWN MINDS ABOUT WHAT

03:18PM  24    HAPPENED HERE, AND WHEN ALL IS SAID AND DONE, YOU MAY END UP

03:18PM  25    FEELING LIKE YOU'RE NOT IN A POSITION TO MAKE CONCLUSIONS ABOUT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                              9308

03:18PM   1    EXACTLY WHAT HAPPENED BETWEEN THE DEFENDANT AND MR. BALWANI.

03:18PM   2         THERE IS EXTENSIVE EVIDENCE IN THE RECORD OF THE CHARGED

03:18PM   3    FRAUD IN THIS CASE.  THERE IS MUCH LESS EVIDENCE ABOUT WHAT

03:18PM   4    HAPPENED BETWEEN MS. HOLMES AND MR. BALWANI IN THEIR PERSONAL

03:18PM   5    RELATIONSHIP.

03:18PM   6         SO THIS IS A CRITICAL THING TO UNDERSTAND.  YOU DO NOT

03:18PM   7    NEED TO REACH A CONCLUSION REGARDING WHAT HAPPENED WITH

03:18PM   8    MS. HOLMES AND MR. BALWANI IN ORDER TO RENDER YOUR VERDICT IN

03:18PM   9    THIS CASE.

03:18PM  10         IT'S IMPORTANT TO NOTE THAT THERE'S NO EVIDENCE HERE

03:18PM  11    CONNECTING THOSE ALLEGATIONS OF ABUSE WITH THE ACTUAL CHARGED

03:18PM  12    CONDUCT.

03:19PM  13         EVEN MS. HOLMES HERSELF WHEN SHE WAS ON THE STAND DIDN'T

03:19PM  14    MAKE THAT CONNECTION FOR YOU.  THERE'S NO EVIDENCE REGARDING A

03:19PM  15    LINK BETWEEN WHAT MR. BALWANI AND MS. HOLMES'S RELATIONSHIP WAS

03:19PM  16    LIKE AND THE CONDUCT THAT SHE'S CHARGED WITH COMMITTING.

03:19PM  17         ON THE SCREEN YOU'LL SEE A PORTION OF MS. HOLMES'S

03:19PM  18    TESTIMONY WHERE SHE WAS ASKED, "ARE YOU SAYING THAT MR. BALWANI

03:19PM  19    FORCED YOU TO MAKE THE STATEMENTS TO INVESTORS THAT YOU MADE

03:19PM  20    DURING THE COURSE OF THIS CASE?"

03:19PM  21         AND SHE SAYS "NO."

03:19PM  22         THIS IS HER LAWYER QUESTIONING HER.

03:19PM  23         SHE'S ASKED, "ARE YOU SAYING THAT HE FORCED YOU TO MAKE

03:19PM  24    CERTAIN STATEMENTS TO JOURNALISTS THAT WE'VE HEARD ABOUT DURING

03:19PM  25    THE COURSE OF THIS CASE?"

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9309

03:19PM   1        SHE ANSWERS, "NO."

03:19PM   2        SHE ALSO DENIED THAT MR. BALWANI CONTROLLED HER

03:19PM   3   INTERACTIONS WITH, FOR EXAMPLE, WALGREENS AND SAFEWAY

03:19PM   4   EXECUTIVES.

03:19PM   5        AND FINALLY, SHE DENIES THAT MR. BALWANI CONTROLLED HER

03:19PM   6   INTERACTIONS WITH MEMBERS OF THE THERANOS BOARD IN THE RELEVANT

03:19PM   7   TIME PERIOD.

03:20PM   8        WHEN ASKED WHAT IMPACT HER PERSONAL RELATIONSHIP WITH

03:20PM   9   MR. BALWANI HAD ON HER WORK AT THE COMPANY, SHE SAID SHE DIDN'T

03:20PM   10  KNOW AND THAT SHE FULLY DIDN'T UNDERSTAND THE IMPACT.

03:20PM   11       THAT WILL LEAVE YOU WONDERING WHY MS. HOLMES TESTIFIED

03:20PM   12  ABOUT THOSE ALLEGATIONS WHEN SHE WAS ON THE STAND.  BUT IN THE

03:20PM   13  ABSENCE OF EVIDENCE, IN THE ABSENCE OF ANY EVIDENCE LINKING

03:20PM   14  THAT EXPERIENCE TO THE CHARGED CONDUCT, YOU SHOULD PUT IT OUT

03:20PM   15  OF YOUR MIND, AND I'LL SHOW YOU AN INSTRUCTION THAT IS RELEVANT

03:20PM   16  TO THAT IN A MOMENT.

03:20PM   17       SO THE IMPORTANT QUESTION THEN IS, WHAT WAS MR. BALWANI'S

03:20PM   18  ROLE IN THE CHARGED CONDUCT?  HOW DID HIS INVOLVEMENT RELATE TO

03:20PM   19  THE CRIME THAT IS AT ISSUE HERE?

03:20PM   20       FIRST OF ALL, IT'S IMPORTANT TO NOTE THAT THE WITNESSES IN

03:20PM   21  THIS CASE, FROM FORMER EMPLOYEES TO OUTSIDERS WHO DEALT WITH

03:20PM   22  THERANOS, CONSISTENTLY TESTIFIED THAT THEY UNDERSTOOD

03:21PM   23  MS. HOLMES WAS IN CHARGE OF THE COMPANY AND EVEN HAD AUTHORITY

03:21PM   24  OVER MR. BALWANI.

03:21PM   25       MS. HOLMES ADMITTED THAT IN HER TESTIMONY, THAT THERE WERE

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                9310

03:21PM   1      ASPECTS OF THE BUSINESS RELATIONSHIP WHERE MR. BALWANI DEFERRED

03:21PM   2      TO HER, AND SPECIFICALLY SHE CONFIRMED THAT MR. BALWANI

03:21PM   3      DEFERRED TO HER ON ASPECTS OF INVENTIONS AND DEVICES AT

03:21PM   4      THERANOS.

03:21PM   5           REMEMBER ESPECIALLY THAT THERE'S NO EVIDENCE IN THIS CASE

03:21PM   6      THAT MR. BALWANI EVER EXPRESSLY ORDERED MS. HOLMES TO BE

03:21PM   7      DISHONEST.

03:21PM   8           IN FACT, THERE ARE EXAMPLES CITED DURING THE GOVERNMENT'S

03:21PM   9      CLOSING OF INSTANCES WHERE MR. BALWANI EITHER CAUTIONED

03:21PM   10     MS. HOLMES AWAY FROM BEING DISHONEST ABOUT SOMETHING, OR

03:21PM   11     EXPRESSED CONCERN ABOUT AN UNTRUE STATEMENT THAT SHE HAD MADE.

03:21PM   12          NOW, NO ONE IS SAYING THAT MR. BALWANI WAS A GOOD

03:21PM   13     INFLUENCE IN THIS CASE.  HE'S THE COCONSPIRATOR.  HE WAS PART

03:22PM   14     OF THE SCHEME TO DEFRAUD.

03:22PM   15          BUT THE EVIDENCE SHOWED THAT MS. HOLMES DID NOT NEED

03:22PM   16     ENCOURAGEMENT FROM MR. BALWANI IN ORDER TO BE DISHONEST AND

03:22PM   17     DECEPTIVE.

03:22PM   18          THE EVIDENCE ALSO SHOWED THAT MR. BALWANI COMMUNICATED

03:22PM   19     COMPLAINTS TO MS. HOLMES ABOUT THERANOS PRACTICES AND

03:22PM   20     TECHNOLOGY.  FOR EXAMPLE, MR. BALWANI WAS EVEN CRITICAL OF

03:22PM   21     DAN YOUNG TO MS. HOLMES IN AUGUST 2014.  IN RESPONSE TO AN

03:22PM   22     EMAIL FROM DR. YOUNG ABOUT TRYING TO ADDRESS ANOTHER ONGOING

03:22PM   23     PROBLEM WITH THERANOS'S ACCURACY AND RELIABILITY, MR. BALWANI

03:22PM   24     REMARKS, "ALWAYS ANOTHER STUDY AFTER THE FACT."

03:22PM   25          THIS IS A COMMENT BY MR. BALWANI EXPRESSING SKEPTICISM AND

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9311

03:22PM   1    WEARINESS OF THE FACT THAT THEY KEEP HAVING THESE PROBLEMS AND

03:22PM   2    DR. YOUNG ALWAYS PROPOSES ANOTHER STUDY THAT PURPORTS TO ANSWER

03:23PM   3    IT.

03:23PM   4         THIS WAS A PATTERN THAT MS. HOLMES OBVIOUSLY SAW.  IT'S

03:23PM   5    SOMETHING THAT SHE SHOULD HAVE REALIZED MEANT THAT THERE WAS A

03:23PM   6    FUNDAMENTAL FLAW WITH THE TECHNOLOGY OF THE COMPANY.

03:23PM   7         CONSIDER ALSO THE REASON WHY MS. HOLMES AND MR. BALWANI

03:23PM   8    ULTIMATELY SEPARATED TIES.  THE REASON WAS BUSINESS RELATED.

03:23PM   9         WHEN MS. HOLMES REALIZED THAT MR. BALWANI WAS NOT THE

03:23PM   10   BUSINESS PERSON SHE THOUGHT, SHE ENDED THE RELATIONSHIP AND

03:23PM   11   THEY PARTED WAYS.

03:23PM   12        THE FACT THAT THAT RELATED TO SOMEBODY'S SKILLS AS A

03:23PM   13   BUSINESS PERSON AND THE EFFECT HE HAD ON THE COMPANY AGAIN JUST

03:23PM   14   SHOWS THAT MS. HOLMES WAS PRIORITIZING THERANOS.  THAT WAS THE

03:23PM   15   MOTIVE HERE FOR EVERYTHING SHE DID, INCLUDING THE FRAUD.

03:23PM   16        WHEN IT COMES TO MR. BALWANI'S ROLE AND THE THINGS THAT HE

03:24PM   17   DID, KEEP IN MIND THE FOLLOWING JURY INSTRUCTIONS:  NUMBERS 19,

03:24PM   18   24, AND 25.  THESE ALL RELATE TO WAYS THAT MS. HOLMES IS

03:24PM   19   ACCOUNTABLE UNDER CERTAIN CONDITIONS FOR ACTIONS TAKEN BY A

03:24PM   20   COCONSPIRATOR OR A PERSON WHO COMMIT THE CRIME AS A PRINCIPAL

03:24PM   21   OR A COSCHEMER.

03:24PM   22        SO AT THE END OF THE DAY, WHAT EFFECT SHOULD MS. HOLMES'S

03:24PM   23   TESTIMONY ABOUT THE RELATIONSHIP HAVE ON YOU?

03:24PM   24        WELL, AS I MENTIONED BEFORE, IT'S NATURAL IF, UPON HEARING

03:24PM   25   SOMETHING LIKE THAT, YOU FEEL SYMPATHY FOR MS. HOLMES.  IF YOU

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9312

03:25PM   1    BELIEVE THAT THAT'S WHAT HAPPENED, IT'S NATURAL AND MAYBE

03:25PM   2    UNAVOIDABLE FOR YOU TO FEEL THAT WAY.

03:25PM   3         THE MORE IMPORTANT QUESTION, THOUGH, IS WHAT DO YOU DO

03:25PM   4    WITH THAT SYMPATHY?  HOW SHOULD IT AFFECT YOUR DELIBERATIONS

03:25PM   5    AND YOUR EXAMINATION OF THIS CASE?

03:25PM   6         THE COURT'S INSTRUCTIONS HAVE AN ANSWER FOR YOU THERE.

03:25PM   7    JURY INSTRUCTION NUMBER 1 TELLS YOU THAT YOU SHOULD "NOT ALLOW

03:25PM   8    YOURSELF TO BE INFLUENCED BY PERSONAL LIKES OR DISLIKES,

03:25PM   9    SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION, OR BIASES, INCLUDING

03:25PM  10    UNCONSCIOUS BIASES."

03:25PM  11         SYMPATHY, ACCORDING TO THIS INSTRUCTION, HAS NO PART IN

03:25PM  12    YOUR DELIBERATIONS.

03:25PM  13         THE QUESTION FOR YOU IS A FACTUAL ONE OF WHETHER

03:25PM  14    MS. HOLMES COMMITTED THE CHARGED CRIMES, WHETHER THE ELEMENTS

03:25PM  15    ARE SATISFIED.  YOU SHOULD PUT ANYTHING BESIDES THAT ASIDE.

03:25PM  16         LET'S TALK ABOUT ONE MORE DEFENSE THEME, WHICH IS CONDUCT

03:25PM  17    THAT MS. HOLMES TOOK IN 2016 AND ONWARD.

03:26PM  18         THE DEFENSE WANTS TO POINT TO THIS CONDUCT AS EVIDENCE OF

03:26PM  19    MS. HOLMES'S MENTAL STATE DURING THE RELEVANT TIME PERIOD, WHEN

03:26PM  20    THE FRAUD WAS TAKING PLACE.  YOU SHOULD BE SKEPTICAL OF THAT.

03:26PM  21         THIS IS A TIME PERIOD AFTER "THE WALL STREET JOURNAL"

03:26PM  22    EXPOSED FALSE INFORMATION THAT THE COMPANY HAD PUT FORWARD.

03:26PM  23         EVERYTHING THAT MS. HOLMES AND THERANOS DID DURING THIS

03:26PM  24    TIME PERIOD WAS PR, ORCHESTRATED BY A MULTI-BILLION DOLLAR

03:26PM  25    COMPANY, IN CRISIS MODE.

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9313

03:26PM   1        THE COMPANY KNEW THAT EVERYONE WAS WATCHING AND THE

03:26PM   2   COMPANY WAS TAKING EFFORTS MOTIVATED BY THAT FACT WITH THE

03:26PM   3   AWARENESS THAT THE WORLD WAS WATCHING AND IT HAD TO TRY TO

03:26PM   4   REHABILITATE ITS REPUTATION AND GET ITSELF BACK ON TRACK.

03:26PM   5        OPTIONS WERE CERTAINLY NARROWED IN THAT 2016 TIME PERIOD.

03:26PM   6        BUT IF YOUR GOAL IS, AS IT SHOULD BE, TO JUDGE

03:26PM   7   MS. HOLMES'S INTENT, THE MOST INFORMATIVE EVIDENCE COMES FROM

03:26PM   8   THE RELEVANT TIME PERIOD BEFORE ALL OF THIS SCRUTINY WAS PLACED

03:27PM   9   ON THE COMPANY.  IT'S AXIOMATIC.  IT'S MOST TELLING WHAT A

03:27PM  10   PERSON DOES WHEN NOBODY IS WATCHING.

03:27PM  11        AFTER "THE WALL STREET JOURNAL" ARTICLE, ALL EYES WERE ON

03:27PM  12   THERANOS AND ACTIONS WERE TAKEN FOR APPEARANCES SAKE.

03:27PM  13        JUDGE MS. HOLMES'S INTENT INSTEAD BY WHAT SHE DID BEFORE

03:27PM  14   SHE KNEW THAT THAT SCRUTINY WAS COMING.

03:27PM  15        IN THIS CASE THE EVIDENCE IS STRONG THAT THE DECEPTION BY

03:27PM  16   MS. HOLMES WAS DELIBERATE.

03:27PM  17        IT'S HARD TO BELIEVE THAT THE FALSE STATEMENTS SHE MADE

03:27PM  18   WERE UNINTENTIONAL OR MISTAKEN WHEN IT HAPPENED AGAIN AND AGAIN

03:27PM  19   OVER YEARS AND WHEN THE RESULT WAS PUTTING HUNDREDS OF MILLIONS

03:27PM  20   OF DOLLARS IN THE ACCOUNT OF HER COMPANY.

03:27PM  21        YOU SAW AND HEARD THROUGHOUT TRIAL, LISTENING TO WITNESSES

03:27PM  22   WHO HAD DEALINGS WITH HER, AND WHEN SHE WAS ON THE STAND THAT

03:27PM  23   SHE IS AN INTELLIGENT, THOUGHTFUL, AND WELL SPOKEN PERSON.

03:28PM  24        AND INTELLIGENT PEOPLE UNDERSTAND THE DIFFERENCE BETWEEN

03:28PM  25   WHAT IS TRUE AND WHAT IS NOT, BETWEEN WHAT IS HAPPENING TODAY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9314

03:28PM  1    AND WHAT MIGHT HAPPEN IN THE FUTURE.  THOUGHTFUL PEOPLE LIKE

03:28PM  2    MS. HOLMES THINK CAREFULLY BEFORE THEY SAY SOMETHING, AND WELL

03:28PM  3    SPOKEN PEOPLE LIKE MS. HOLMES HAVE NO TROUBLE COMMUNICATING

03:28PM  4    EXACTLY WHAT THEY MEAN TO COMMUNICATE.

03:28PM  5         BASED ON THAT, YOU KNOW THAT WHEN MS. HOLMES AGAIN AND

03:28PM  6    AGAIN INTENTIONALLY TOLD PEOPLE THAT THERANOS COULD DO

03:28PM  7    SOMETHING THAT IT COULD NOT, THAT THAT WAS ON PURPOSE, AND THAT

03:28PM  8    HER INTENT WAS TO DECEIVE AND TO CHEAT.

03:28PM  9         YOU SAW TWO VARIETIES OF FALSE STATEMENTS IN THIS CASE.

03:28PM  10   SOME WERE SIMPLE LIES.  THE FACT THAT, OR THE CLAIM THAT THE

03:28PM  11   THERANOS ANALYZER HAD BEEN USED IN THE BATTLEFIELD OR SENT TO

03:28PM  12   AFGHANISTAN, THOSE THINGS SIMPLY WERE NOT TRUE.

03:28PM  13        THERE WERE ALMOST MORE COMPLICATED HALF-TRUTHS THAT YOU

03:29PM  14   SAW, AND WE'LL TALK ABOUT THOSE IN A MOMENT, BUT THOSE ARE

03:29PM  15   PROPERLY PART OF YOUR EXAMINATION AS WELL.

03:29PM  16        LET'S TALK BRIEFLY ABOUT THE WIRE FRAUD ELEMENTS.

03:29PM  17        AND NOTICE THE LANGUAGE AT THE BOTTOM OF THAT FIRST

03:29PM  18   PARAGRAPH THAT SAYS "DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

03:29PM  19   CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS."

03:29PM  20        THAT MEANS THAT WHEN MS. HOLMES SAYS SOMETHING THAT IS

03:29PM  21   ARGUABLY DEFENSIBLE AS TRUE, BUT STILL INTENDED TO GIVE A

03:29PM  22   MISLEADING OR FALSE IMPRESSION, THAT CAN STILL FORM THE BASIS

03:29PM  23   OF A WIRE FRAUD CONVICTION, AND YOU SAW MANY EXAMPLES OF THAT

03:29PM  24   IN THIS CASE.

03:29PM  25        NOTE ALSO THAT THE WIRE ITSELF, THE WIRE TRANSMITTAL NEED

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9315

03:29PM  1    NOT BE FALSE OR MISLEADING.  SO THE CONTENT OF THE WIRE NEED

03:29PM  2    NOT BE FALSE, IT ONLY NEEDS TO BE IN FURTHERANCE OF THE SCHEME

03:30PM  3    IN ORDER TO SATISFY THE ELEMENT.

03:30PM  4        SOME OF THE BEST EXAMPLES OF HALF-TRUTHS IN THIS CASE AND

03:30PM  5    INTENTIONALLY MISLEADING STATEMENTS WERE IN THE RECORDINGS THAT

03:30PM  6    ROGER PARLOFF MADE.  AND I'LL JUST REMIND YOU OF A COUPLE.

03:30PM  7        SPEAKING TO MR. PARLOFF ABOUT THE RANGE OF TESTS OFFERED

03:30PM  8    BY THERANOS, YOU'LL RECALL THAT IN ONE OF THE RECORDINGS

03:30PM  9    MR. PARLOFF TALKED ABOUT SEEING 600 TESTS AVAILABLE AT QUEST

03:30PM  10   AND HE ASKED MS. HOLMES WHETHER HER PLATFORM REPLACED ALL OF

03:30PM  11   THOSE, AND SHE SAID, "OUR PLATFORM CAN YIELD -- LET ME THINK OF

03:30PM  12   THE BEST WAY TO SAY THIS.  WE CAN DO ALL OF THOSE TESTS."

03:30PM  13       SHE LATER SAID, "THE REASON I DIDN'T SAY REPLACE IS JUST

03:30PM  14   BECAUSE OF THIS THEME OF -- WELL, YOU KNOW, WE ARE PROCESSING

03:30PM  15   THE SAMPLES A DIFFERENT WAY."

03:30PM  16       SHE'S SAYING THAT THERANOS HAS THE SAME CAPABILITIES AS

03:31PM  17   QUEST BUT THAT THEY'RE PROCESSING THE SAMPLES A DIFFERENT WAY.

03:31PM  18       THAT WAS NOT TRUE.

03:31PM  19       THE COMPANY'S OWN TECHNOLOGY COULD DO FAR LESS, FAR FEWER

03:31PM  20   THAN THE NUMBER OF TESTS THAT QUEST OFFERED, AND TO THE EXTENT

03:31PM  21   THAT IT COULD MATCH THAT QUEST RANGE OF TESTS, IT WAS USING THE

03:31PM  22   SAME METHODS, PROCESSING THE SAMPLES THE SAME WAY.

03:31PM  23       SHE MADE SIMILAR CLAIMS TO MR. PARLOFF SAYING THAT THE

03:31PM  24   COMPANY HAD THE ABILITY TO DO TESTS THAT ARE NOT ON THE

03:31PM  25   WEBSITE, EVEN BEYOND THE HUNDREDS OF TESTS THAT THE COMPANY

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9316

03:31PM  1    LISTED ON ITS WEBSITE, SHE CLAIMED THAT THERANOS COULD DO EVEN

03:31PM  2    MORE.

03:31PM  3         ONE OF THE BEST EXAMPLES OF FALSE STATEMENTS BY MS. HOLMES

03:31PM  4    WAS RELATED TO THE NEED FOR VENIPUNCTURE WHEN SHE WAS SPEAKING

03:31PM  5    TO MR. PARLOFF.  THIS IS IN EXHIBIT 5473B2, AND 5474AB2.

03:32PM  6         IN THAT RECORDING YOU HEARD MR. PARLOFF ASK WHY THERANOS

03:32PM  7    EVER DID VENIPUNCTURE?

03:32PM  8         AND MS. HOLMES REPEATEDLY ANSWERS SAMPLE VOLUME AND THE

03:32PM  9    NUMBER OF SAMPLES THAT THE COMPANY COULD PROCESS AT A GIVEN

03:32PM 10    TIME.

03:32PM 11         AT NO POINT DURING THAT CONVERSATION DID SHE TELL

03:32PM 12    MR. PARLOFF THAT THE REASON VENIPUNCTURE WAS NECESSARY WAS THAT

03:32PM 13    THE COMPANY'S OWN TECHNOLOGY COULD NOT DO THE RANGE OF TESTS

03:32PM 14    THAT SHE WAS OFFERING.

03:32PM 15         ONE EXAMPLE THAT YOU SAW DURING TRIAL RELATES TO THAT SAME

03:32PM 16    INTENT BY MS. HOLMES TO CONCEAL THE NEED FOR VENOUS DRAWS FROM

03:32PM 17    VIP'S.  AND THIS WAS IN OCTOBER OF 2014.  MS. HOLMES WAS SHOWN

03:32PM 18    THIS WHEN SHE WAS ON THE STAND.

03:32PM 19         THIS IS A SITUATION WHERE POTENTIAL INVESTORS WERE COMING

03:32PM 20    TO WALGREENS AND THERE WAS A CONVERSATION AT THERANOS,

03:33PM 21    INCLUDING MS. HOLMES, WHERE CHRISTIAN WRITES, "ASSUMPTIONS HERE

03:33PM 22    FROM EAH," MS. HOLMES, "ARE THAT WE MUST NOT DO VENOUS DRAW,

03:33PM 23    AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS IF IT

03:33PM 24    DOES."

03:33PM 25         THERE'S MORE DISCUSSION ABOUT THE PLAN TO MAKE SURE THAT

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9317

03:33PM  1     HAPPENS AND THAT THE NEED FOR VENOUS DRAW IS NOT DISCLOSED TO

03:33PM  2     THESE VIP'S.

03:33PM  3          AND NOTICE AT THE BOTTOM OF THE PAGE.  IT SAYS, "IF THEY

03:33PM  4     NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK THE WAG TECH

03:33PM  5     ABOUT IT."

03:33PM  6          AND IT SAYS, "CIARA WILL ALSO BE ABLE TO COME OUT OF THE

03:33PM  7     DRAW ROOM ONCE CHECK-IN IS COMPLETE AND WELCOME THEM INTO THE

03:33PM  8     ROOM AND DISTRACT FROM LOOKING AT THE RECEIPT."

03:33PM  9          THE EVIDENCE OF DECEPTION IN THIS EMAIL COULD NOT BE

03:33PM  10    CLEARER.  THIS IS OBVIOUSLY AN ATTEMPT BY MS. HOLMES AND OTHERS

03:33PM  11    AT THERANOS TO MAKE SURE THAT VIP'S DON'T FIND OUT ABOUT THE

03:33PM  12    COMPANY'S NEED TO DO VENOUS DRAWS.  THEY WANT THESE VIP'S TO

03:34PM  13    BELIEVE THAT THERANOS'S FINGERSTICK TECHNOLOGY CAN DO THE

03:34PM  14    ENTIRE RANGE OF TESTS, AND FOR THAT REASON THEY'RE READY TO

03:34PM  15    LAUNCH THIS ELABORATE SCHEME THAT INCLUDES A STAFF MEMBER

03:34PM  16    COMING OUT TO DISTRACT THEM FROM LOOKING AT THE RECORD THAT

03:34PM  17    WOULD REVEAL THE SECRET THAT THERANOS IS TRYING TO KEEP.

03:34PM  18          SHORTLY AFTER BEING SHOWN THIS DOCUMENT, MS. HOLMES WAS

03:34PM  19    ASKED BY HER LAWYER WHETHER SHE EVER TRIED TO CONCEAL VENOUS

03:34PM  20    DRAWS FROM VIP'S AND SHE ANSWERED IN THE NEGATIVE.

03:34PM  21          YOU SHOULD THINK STRONGLY ABOUT WHAT THAT ANSWER SAYS

03:34PM  22    ABOUT HER CREDIBILITY AND JUDGE HER STATEMENTS ON THAT BASIS.

03:34PM  23          WHY DID THIS FRAUD WORK?  HOW DID IT WORK?

03:34PM  24          A BIG PART OF IT WAS BORROWED CREDIBILITY.  YOU SAW THAT.

03:35PM  25          MS. HOLMES BORROWED THE CREDIBILITY OF PHARMACEUTICAL

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                               9318

03:35PM  1    COMPANIES, OF WALGREENS, OF THE BOARD AND THE ILLUSTRIOUS

03:35PM  2    MEMBERS OF THE BOARD, OF THE PRESS, AND NOTABLE PUBLICATIONS

03:35PM  3    LIKE "THE WALL STREET JOURNAL" AND "FORTUNE," AND THE MILITARY.

03:35PM  4        BY ATTACHING HERSELF TO THESE INDIVIDUALS AND

03:35PM  5    ORGANIZATIONS, SHE BOLSTERED THERANOS'S OWN CREDIBILITY, AND BY

03:35PM  6    EXAGGERATING THOSE CONTEXTS, SHE CAUSED OTHERS TO BELIEVE THAT

03:35PM  7    THERANOS MUST HAVE THE LEGITIMACY OF THESE OTHER ENTITIES.

03:35PM  8        JUST BRIEFLY TO RESPOND TO WHAT MR. DOWNEY SAID ABOUT SOME

03:35PM  9    OF THE CHARGED COUNTS IN THIS CASE.

03:35PM  10       MR. DOWNEY NOTED THAT COUNT TEN REGARDING ERIN TOMPKINS

03:35PM  11   INVOLVED A TEST THAT WAS NOT PERFORMED ON THERANOS TECHNOLOGY.

03:35PM  12   THIS WAS THE HIV TEST.

03:36PM  13       FIRST OF ALL, NOTE THAT THIS TEST, AS A REMINDER, DOES

03:36PM  14   STATE A REACTIVE RESULT FOR THE HIV ANTIBODY.

03:36PM  15       IN CONTRAST, YOU SAW THAT MS. TOMPKINS LATER HAD A TEST

03:36PM  16   THAT CAME BACK NEGATIVE FOR THE HIV ANTIBODY.

03:36PM  17       THERE'S NO WAY THAT THESE TWO RESULTS CAN BOTH BE CORRECT.

03:36PM  18       AND YOU HEARD MS. TOMPKINS TESTIFY THAT SHE'S NEVER BEEN

03:36PM  19   DIAGNOSED WITH HIV.  SHE'S NEVER BEEN TREATED FOR IT.  SO

03:36PM  20   THERE'S NO REASON THAT THE ANTIBODIES SHOULD BE PRESENT IN HER

03:36PM  21   SYSTEM.

03:36PM  22       THE THERANOS RESULT IS NOT ACCURATE.

03:36PM  23       I'LL REMIND YOU OF EXHIBIT 13333 WHICH RELATES

03:36PM  24   SPECIFICALLY TO PROBLEMS THAT THERANOS HAD WITH THE SECTION OF

03:36PM  25   THE LAB THAT WAS INVOLVED IN RUNNING THE HIV TEST.  SO THIS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9319

03:36PM   1    SHOULD REDUCE YOUR SURPRISE THAT MS. TOMPKINS RECEIVED AN

03:36PM   2    INACCURATE RESULT.

03:36PM   3        I'LL ALSO REMIND YOU THAT THIS SET OF TESTS FROM

03:37PM   4    MS. TOMPKINS ALSO INCLUDED TESTS OTHER THAN HIV, INCLUDING

03:37PM   5    GLUCOSE AS PART OF THE COMPREHENSIVE METABOLIC PANEL, AND THAT

03:37PM   6    PANEL, MS. CHEUNG TESTIFIED, WAS RUN ON THERANOS TECHNOLOGY.

03:37PM   7        SO ANY WIRE THAT THERANOS ENGAGED IN THAT RELATED TO A

03:37PM   8    TEST RUN ON THERANOS TECHNOLOGY WAS IN FURTHERANCE OF THE

03:37PM   9    GENERAL SCHEME TO DEFRAUD PATIENTS BASED ON MS. HOLMES'S

03:37PM   10   KNOWLEDGE THAT THERANOS TECHNOLOGY WAS NOT SUFFICIENTLY

03:37PM   11   ACCURATE AND RELIABLE FOR PATIENT TESTING.

03:37PM   12       SO THERE'S NO REASON WHY THIS IS NOT A VIABLE WIRE FRAUD

03:37PM   13   COUNT ON WHICH YOU SHOULD RETURN A VERDICT OF GUILTY.

03:37PM   14       THIS IS THE LAST INSTRUCTION THAT I'LL HIGHLIGHT WITH YOU.

03:37PM   15   THIS IS THE STANDARD FOR REASONABLE DOUBT.

03:37PM   16       THE DEFENSE SHOWED YOU A DIAGRAM OF AN ASCENDING

03:37PM   17   STAIRCASE.  I'LL JUST REMIND YOU THAT IT'S THE COURT'S JOB TO

03:38PM   18   INSTRUCT YOU ON THE LAW.  THIS IS WHAT I EXPECT THE COURT WILL

03:38PM   19   GIVE YOU BY WAY OF INSTRUCTION.

03:38PM   20       IT TELLS YOU THAT "REASONABLE DOUBT IS PROOF THAT LEAVES

03:38PM   21   YOU FIRMLY CONVINCED THAT MS. HOLMES IS GUILTY."  NOTE THAT "IT

03:38PM   22   IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL

03:38PM   23   POSSIBLE DOUBT."

03:38PM   24       IT ALSO SAYS THAT "A REASONABLE DOUBT IS A DOUBT BASED ON

03:38PM   25   REASON AND COMMON SENSE AND IS NOT BASED PURELY ON

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                    9320

03:38PM   1      SPECULATION."

03:38PM   2           ACCORDING TO THAT STANDARD, YOU SHOULD FIND THAT

03:38PM   3      MS. HOLMES COMMITTED THE CHARGED OFFENSES AND RETURN A VERDICT

03:38PM   4      OF GUILTY IN THIS CASE.

03:38PM   5           OVER THE YEARS OF THERANOS'S OPERATIONS, MS. HOLMES HAD

03:38PM   6      MULTIPLE CHANCES TO DO THE RIGHT THING.  BUT AT SO MANY OF THE

03:38PM   7      FORKS IN THE ROAD, SHE CHOSE THE DISHONEST PATH.

03:38PM   8           HOW WOULD THINGS HAVE BEEN DIFFERENT IF MS. HOLMES HAD NOT

03:38PM   9      HAD THE INTENT TO DECEIVE?

03:38PM  10           WELL, SHE WOULD HAVE TOLD INVESTORS, WALGREENS

03:38PM  11      REPRESENTATIVES, AND OTHER VIP VISITORS TO THERANOS THAT THE

03:38PM  12      DEVICES SHE WAS SHOWING THEM IN CONFERENCE ROOMS WEREN'T

03:39PM  13      ACTUALLY THE DEVICES THAT WERE GOING TO BE USED TO RUN THEIR

03:39PM  14      TESTS, THAT THEIR TESTS WOULD BE RUN ON THIRD PARTY DEVICES

03:39PM  15      FROM OTHER COMPANIES.

03:39PM  16           IN INTERVIEWS WITH JOURNALISTS, IN REVIEWING ARTICLES, AND

03:39PM  17      IN SENDING ARTICLES TO THIRD PARTIES LIKE INVESTORS, SHE WOULD

03:39PM  18      HAVE AVOIDED PASSING ALONG KNOWINGLY FALSE INFORMATION.

03:39PM  19           SHE WOULD HAVE GIVEN GOOD FAITH REALISTIC REVENUE

03:39PM  20      PROJECTIONS.

03:39PM  21           SHE WOULD HAVE LISTENED TO LAB DIRECTORS AND OTHER

03:39PM  22      EMPLOYEES ABOUT PROBLEMS WITH THERANOS TECHNOLOGY AND RESPONDED

03:39PM  23      ACCORDINGLY AND STOPPED MAKING REPRESENTATIONS ABOUT THERANOS

03:39PM  24      HAVING SUPERIOR ACCURACY OR THE HIGHEST LEVELS OF QUALITY.

03:39PM  25           SHE WOULD HAVE RESPONDED TO THE DEPARTURE OF

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                        9321

03:39PM   1    ADAM ROSENDORFF BY APPOINTING A COMPETENT AND ATTENTIVE LAB

03:39PM   2    DIRECTOR TO MAKE SURE THAT THOSE PROBLEMS IN THE LAB WERE

03:39PM   3    ADDRESSED.

03:39PM   4        SHE WOULD HAVE REACTED TO PATIENT AND DOCTOR INQUIRIES

03:39PM   5    ABOUT INACTION OR MISSING TEST RESULTS BY NOT WITHHOLDING

03:40PM   6    INFORMATION OR GIVING THEM SCRIPTED ANSWERS THAT AIMED ONLY TO

03:40PM   7    BOLSTER THE COMPANY'S REPUTATION, BUT BY BEING HONEST AND BY

03:40PM   8    DISCONTINUING TESTS WHEN THAT NEEDED TO HAPPEN, AND MUCH SOONER

03:40PM   9    THAT IT DID HAPPEN.

03:40PM  10        THE LIST GOES ON AND ON.

03:40PM  11        ON EACH OF THESE ISSUES MS. HOLMES HAD A CHOICE AND SHE

03:40PM  12    CONSISTENTLY PUT THE REPUTATION OF THE COMPANY OVER WHAT THE

03:40PM  13    LAW REQUIRES AND WHAT PATIENTS AND INVESTORS WERE ENTITLED TO.

03:40PM  14        YOU'VE HEARD HER SAY THAT SHE WISHES SHE HANDLED CERTAIN

03:40PM  15    ISSUES DIFFERENTLY DURING HER TIME AT THE COMPANY.

03:40PM  16        HOW SHOULD THAT AFFECT YOUR THINKING?

03:40PM  17        WELL, YOU SHOULD REALIZE THAT SOMEONE IN MS. HOLMES'S

03:40PM  18    POSITION NATURALLY MIGHT FEEL SOME REGRET ABOUT CHOICES THAT

03:40PM  19    SHE MADE.  IT WOULD BE STRANGE IF SHE DIDN'T GIVEN WHAT HAS

03:40PM  20    RESULTED FROM THOSE CHOICES.

03:40PM  21        BUT YOU SHOULD KEEP IN MIND THAT REGARDLESS OF HOW SHE

03:40PM  22    FEELS TODAY ABOUT HER PAST CHOICES, IT'S THOSE CHOICES

03:41PM  23    THEMSELVES THAT YOU NEED TO FOCUS ON IN DETERMINING WHETHER SHE

03:41PM  24    COMMITTED A CRIME BACK THEN.

03:41PM  25        BECAUSE MS. HOLMES MADE THE CHOICE TO DEFRAUD INVESTORS

UNITED STATES COURT REPORTERS

REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC                                    9322

03:41PM   1    AND PATIENTS, AND BECAUSE SHE CONSPIRED WITH SUNNY BALWANI TO

03:41PM   2    CARRY OUT THOSE SCHEMES, YOU SHOULD RETURN A VERDICT OF GUILTY

03:41PM   3    ON ALL COUNTS.  THAT'S THE ONLY VERDICT SUPPORTED BY THE

03:41PM   4    EVIDENCE IN THIS CASE.

03:41PM   5         THANK YOU.

03:41PM   6              THE COURT:  THANK YOU, MR. BOSTIC.

03:41PM   7         LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE

03:41PM   8    CASE.  THE ONLY THING REMAINING FOR YOU IS FOR THE COURT TO

03:41PM   9    INSTRUCT YOU, AND IT'S MY INTENT TO DO THAT NOW.

03:41PM   10        WE CAN TAKE A STANDING BREAK.

03:41PM   11        LET ME TELL YOU THAT I EXPECT AND ANTICIPATE THE

03:41PM   12   INSTRUCTIONS WILL REQUIRE PERHAPS 40, 45 MINUTES MAYBE TO

03:41PM   13   COMPLETE.

03:41PM   14        IF ANYONE ON THE JURY WOULD LIKE TO TAKE A BRIEF BREAK OF

03:41PM   15   FIVE TO SEVEN MINUTES, I'M HAPPY TO DO THAT.  IS THERE ANYONE

03:42PM   16   WHO WOULD LIKE TO DO THAT BEFORE I BEGIN?

03:42PM   17        LET'S DO THAT.  I SEE A HAND.  LET'S DO THAT.

03:42PM   18        WE'LL TAKE A BREAK OF ABOUT FIVE, SEVEN MINUTES, AND WE'LL

03:42PM   19   COME BACK.

03:42PM   20        CHELA, CAN YOU GET THIS, PLEASE?

03:42PM   21        AND WE'LL COME BACK AND I'LL INSTRUCT THE JURY.

03:45PM   22        (RECESS FROM 3:42 P.M. UNTIL 3:53 P.M.)

03:53PM   23              THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:53PM   24   SEATED.

03:53PM   25        WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

9323

03:53PM 1    ARE PRESENT ONCE AGAIN.  OUR JURY IS PRESENT.

03:53PM 2        LADIES AND GENTLEMEN, I'LL NOW READ THE FINAL

03:53PM 3    INSTRUCTIONS.

03:54PM 4        MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

03:54PM 5    EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

03:54PM 6    TO THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

03:54PM 7    IN THE JURY ROOM FOR YOU TO CONSULT.

03:54PM 8        IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

03:54PM 9    EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS, TO DECIDE

03:54PM 10   THE FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT

03:54PM 11   TO YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE

03:54PM 12   LAW OR NOT.

03:54PM 13       YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE

03:54PM 14   LAW.  DO NOT ALLOW PERSONAL LIKES OR DISLIKES, SYMPATHY,

03:54PM 15   PREJUDICE, FEAR, OR PUBLIC OPINION TO INFLUENCE YOU.

03:54PM 16       YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE,

03:54PM 17   COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL

03:55PM 18   ORIENTATION, GENDER IDENTITY, GENDER, PROFESSION, CELEBRITY,

03:55PM 19   ECONOMIC CIRCUMSTANCES, OR POSITION IN LIFE OR IN THE

03:55PM 20   COMMUNITY.

03:55PM 21       ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

03:55PM 22   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

03:55PM 23   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

03:55PM 24   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

03:55PM 25   CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

**ER-12905**

9324

03:55PM 1    AWARENESS, CONTROL, OR INTENTION.  YOU WILL RECALL THAT YOU

03:55PM 2    TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF THE CASE.

03:55PM 3        YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

03:55PM 4    OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.  PLEASE DO

03:55PM 5    NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE

03:56PM 6    DONE, SAID, OR ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD

03:56PM 7    RETURN -- THAT IS A MATTER ENTIRELY UP TO YOU.

03:56PM 8        THE INDICTMENT IS NOT EVIDENCE.  MS. HOLMES, THE

03:56PM 9    DEFENDANT, HAS PLEADED NOT GUILTY TO THE CHARGES.  MS. HOLMES

03:56PM 10   IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT

03:56PM 11   PROVES HER GUILTY BEYOND A REASONABLE DOUBT.

03:56PM 12       IN ADDITION, MS. HOLMES DOES NOT HAVE TO TESTIFY OR

03:56PM 13   PRESENT ANY EVIDENCE.  MS. HOLMES DOES NOT HAVE TO PROVE

03:56PM 14   INNOCENCE; THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

03:56PM 15   ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

03:56PM 16       FOR REASONS THAT DO NOT CONCERN YOU, THE CASE AGAINST

03:56PM 17   MS. HOLMES'S CODEFENDANT, MR. RAMESH "SUNNY" BALWANI, IS NOT

03:57PM 18   BEFORE YOU.  DO NOT SPECULATE WHY.  THIS FACT SHOULD NOT

03:57PM 19   INFLUENCE YOUR VERDICT WITH REFERENCE TO MS. HOLMES, AND YOU

03:57PM 20   MUST BASE YOUR VERDICT SOLELY ON THE EVIDENCE AGAINST

03:57PM 21   MS. HOLMES.

03:57PM 22       MS. HOLMES HAS TESTIFIED.  YOU SHOULD TREAT THIS TESTIMONY

03:57PM 23   JUST AS YOU WOULD THE TESTIMONY OF ANY OTHER WITNESS.

03:57PM 24       PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

03:57PM 25   FIRMLY CONVINCED MS. HOLMES IS GUILTY.  IT IS NOT REQUIRED THAT

03:57PM  1    THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

03:57PM  2         A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

03:57PM  3    SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT MAY ARISE

03:57PM  4    FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE

03:57PM  5    EVIDENCE, OR FROM LACK OF EVIDENCE.

03:57PM  6         IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

03:58PM  7    THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

03:58PM  8    THAT MS. HOLMES IS GUILTY, IT IS YOUR DUTY TO FIND MS. HOLMES

03:58PM  9    NOT GUILTY.

03:58PM  10        ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

03:58PM  11   CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE CONVINCED BEYOND

03:58PM  12   A REASONABLE DOUBT THAT MS. HOLMES IS GUILTY, IT IS YOUR DUTY

03:58PM  13   TO FIND MS. HOLMES GUILTY.

03:58PM  14        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

03:58PM  15   FACTS ARE CONSIST OF:

03:58PM  16        THE SWORN TESTIMONY OF ANY WITNESS; AND,

03:58PM  17        THE EXHIBITS THAT ARE RECEIVED IN EVIDENCE.

03:58PM  18        IN REACHING YOUR VERDICT YOU MAY CONSIDER ONLY THE

03:58PM  19   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

03:58PM  20   THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN

03:59PM  21   DECIDING WHAT THE FACTS ARE:

03:59PM  22        1.  QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY

03:59PM  23   THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESS.

03:59PM  24   ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

03:59PM  25   THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

**ER-12907**

03:59PM 1    EVIDENCE.

03:59PM 2         SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

03:59PM 3    STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

03:59PM 4    TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.

03:59PM 5         IF THE FACT AS YOU REMEMBER THEM DIFFER FROM THE WAY THE

03:59PM 6    LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

03:59PM 7         2.  ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR

03:59PM 8    INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME

03:59PM 9    EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I HAVE

04:00PM 10   INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY,

04:00PM 11   YOU MUST DO SO.

04:00PM 12        3.  ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS

04:00PM 13   NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

04:00PM 14   SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

04:00PM 15        EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

04:00PM 16   IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

04:00PM 17   WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

04:00PM 18        CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT

04:00PM 19   IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

04:00PM 20   FACT.

04:00PM 21        YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

04:00PM 22   EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.  THE LAW MAKES

04:01PM 23   NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

04:01PM 24   OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

04:01PM 25   WEIGHT TO GIVE TO ANY EVIDENCE.

9327

04:01PM   1        BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE

04:01PM   2   THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT

04:01PM   3   RAINED DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE, SUCH AS A

04:01PM   4   TURNED ON GARDEN HOSE, MAY PROVIDE AN EXPLANATION FOR THE WATER

04:01PM   5   ON THE SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS

04:01PM   6   BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL

04:01PM   7   OF THE EVIDENCE IN THE LIGHT OF REASON, EXPERIENCE, AND COMMON

04:01PM   8   SENSE.

04:01PM   9        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

04:01PM  10   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

04:02PM  11   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

04:02PM  12   NONE OF IT.

04:02PM  13        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

04:02PM  14   INTO ACCOUNT:

04:02PM  15        1.  THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR

04:02PM  16   OR KNOW THE THINGS TESTIFIED TO;

04:02PM  17        2.  THE WITNESS'S MEMORY;

04:02PM  18        3.  THE WITNESS'S MANNER WHILE TESTIFYING;

04:02PM  19        4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF

04:02PM  20   ANY;

04:02PM  21        5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

04:02PM  22        6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

04:02PM  23   TESTIMONY;

04:02PM  24        7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

04:02PM  25   OF ALL OF THE EVIDENCE; AND,

04:02PM 1        8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

04:02PM 2        SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

04:03PM 3  CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

04:03PM 4  DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

04:03PM 5  HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

04:03PM 6  THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT

04:03PM 7  REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

04:03PM 8  BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT

04:03PM 9  DIFFERS FROM OTHER TESTIMONY.

04:03PM 10      HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

04:03PM 11  TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

04:03PM 12  CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAYS.

04:03PM 13      ON THE OTHER HAND, IF YOU THINK THAT THE WITNESS TESTIFIED

04:03PM 14  UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS,

04:03PM 15  YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

04:04PM 16      THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

04:04PM 17  NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

04:04PM 18  IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND

04:04PM 19  HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

04:04PM 20      YOU ARE HERE ONLY TO DETERMINE WHETHER MS. HOLMES IS

04:04PM 21  GUILTY OR NOT GUILTY OF THE CHARGES IN THE INDICTMENT.

04:04PM 22  MS. HOLMES IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT

04:04PM 23  CHARGED IN THE INDICTMENT.

04:04PM 24      A SEPARATE CRIME IS CHARGED AGAINST MS. HOLMES IN EACH

04:04PM 25  COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT ON

9329

04:04PM   1    ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

04:05PM   2        THE INDICTMENT CHARGES THAT THE OFFENSES ALLEGED IN COUNTS

04:05PM   3    ONE THROUGH EIGHT AND TEN THROUGH TWELVE WERE COMMITTED "ON OR

04:05PM   4    ABOUT" A CERTAIN DATE.

04:05PM   5        ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO PROVE

04:05PM   6    BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED ON A

04:05PM   7    DATE REASONABLY NEAR THE DATE ALLEGED IN THE INDICTMENT, IT IS

04:05PM   8    NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE OFFENSES

04:05PM   9    WERE COMMITTED PRECISELY ON THE DATE CHARGED.

04:05PM  10        YOU HAVE HEARD TESTIMONY FROM DR. AUDRA ZACHMAN AND

04:05PM  11    DR. MARK BURNES, WHO TESTIFIED TO BOTH FACTS AND OPINIONS AND

04:05PM  12    THE REASONS FOR THEIR OPINIONS.

04:05PM  13        FACT TESTIMONY IS BASED ON WHAT THE WITNESS SAW, HEARD, OR

04:05PM  14    DID.

04:05PM  15        OPINION TESTIMONY IS BASED ON THE EDUCATION OR EXPERIENCE

04:05PM  16    OF THE WITNESS.

04:05PM  17        AS TO THE TESTIMONY ABOUT FACTS, IT IS YOUR JOB TO DECIDE

04:06PM  18    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

04:06PM  19    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

04:06PM  20    NONE OF IT.  YOU MAY TAKE INTO ACCOUNT THE FACTORS DISCUSSED

04:06PM  21    EARLIER IN THESE INSTRUCTIONS THAT WERE PROVIDED TO ASSIST YOU

04:06PM  22    IN WEIGHING THE CREDIBILITY OF WITNESSES.

04:06PM  23        AS TO THE TESTIMONY ABOUT THE WITNESS'S OPINIONS, THIS

04:06PM  24    OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR

04:06PM  25    EXPERIENCE OF THIS WITNESS.  OPINION TESTIMONY SHOULD BE JUDGED

04:06PM  1      LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT ALL OF IT, PART OF

04:06PM  2      IT, OR NONE OF IT.  YOU SHOULD GIVE IT AS MUCH WEIGHT AS YOU

04:06PM  3      THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND

04:06PM  4      EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE

04:06PM  5      OTHER EVIDENCE IN THE CASE.

04:07PM  6          DURING THE TRIAL CERTAIN CHARTS AND SUMMARIES WERE SHOWN

04:07PM  7      TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE.

04:07PM  8      THESE CHARTS AND SUMMARIES WERE NOT ADMITTED INTO EVIDENCE AND

04:07PM  9      WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY ARE NOT

04:07PM  10     THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.

04:07PM  11         IF THEY DO NOT CORRECTLY REFLECT THE FACTS OR FIGURES

04:07PM  12     SHOWN BY THE EVIDENCE IN THE CASE, YOU SHOULD DISREGARD THESE

04:07PM  13     CHARTS AND SUMMARIES AND DETERMINE THE FACTS FROM THE

04:07PM  14     UNDERLYING EVIDENCE.

04:07PM  15         CERTAIN CHARTS AND SUMMARIES HAVE BEEN ADMITTED INTO

04:07PM  16     EVIDENCE.  CHARTS AND SUMMARIES ARE ONLY AS GOOD AS THE

04:07PM  17     UNDERLYING SUPPORTING MATERIAL.  YOU SHOULD, THEREFORE, GIVE

04:07PM  18     THEM ONLY SUCH WEIGHT AS YOU THINK THE UNDERLYING MATERIAL

04:07PM  19     DESERVES.

04:08PM  20         MS. HOLMES IS CHARGED IN COUNTS ONE AND TWO OF THE

04:08PM  21     INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD IN VIOLATION OF

04:08PM  22     SECTION 1349 OF TITLE 18 OF THE UNITED STATES CODE.

04:08PM  23         MS. HOLMES IS CHARGED IN COUNT ONE OF THE INDICTMENT WITH

04:08PM  24     CONSPIRING TO COMMIT WIRE FRAUD AGAINST INVESTORS IN THERANOS

04:08PM  25     DURING THE PERIOD 2010 TO 2015.

9331

04:08PM  1          MS. HOLMES IS CHARGED IN COUNT TWO OF THE INDICTMENT WITH

04:08PM  2     CONSPIRING TO COMMIT WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

04:08PM  3     THERANOS'S BLOOD TESTING SERVICES DURING THE PERIOD 2013 TO

04:08PM  4     2016.

04:08PM  5          I WILL DEFINE WIRE FRAUD LATER IN THESE INSTRUCTIONS.

04:08PM  6          IN ORDER FOR MS. HOLMES TO BE FOUND GUILTY OF EITHER

04:09PM  7     COUNT, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO EACH

04:09PM  8     COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

04:09PM  9     ELEMENTS BEYOND A REASONABLE DOUBT:

04:09PM  10         FIRST, THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE

04:09PM  11    PERSONS TO COMMIT WIRE FRAUD AS CHARGED IN THE INDICTMENT; AND,

04:09PM  12         SECOND, THAT MS. HOLMES BECAME A MEMBER OF THE ALLEGED

04:09PM  13    CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING

04:09PM  14    TO HELP ACCOMPLISH IT.

04:09PM  15         A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP -- AN

04:09PM  16    AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES.

04:09PM  17    THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING

04:09PM  18    UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS

04:09PM  19    COMMITTED.

04:09PM  20         FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT

04:10PM  21    THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT THEY AGREED ON

04:10PM  22    EVERY DETAIL OF THE CONSPIRACY.

04:10PM  23         IT IS NOT ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED

04:10PM  24    MATTERS OF COMMON INTEREST, ACTED IN SIMILAR WAYS, OR PERHAPS

04:10PM  25    HELPED ONE ANOTHER.

04:10PM 1        NOR IS IT ENOUGH, STANDING ALONE, THAT THEY HAD A BUSINESS

04:10PM 2    OR ROMANTIC RELATIONSHIP.

04:10PM 3        YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT WIRE FRAUD

04:10PM 4    AS ALLEGED IN THE INDICTMENT AS AN OBJECT OF THE CONSPIRACY

04:10PM 5    WITH ALL OF YOU AGREEING AS TO THE PARTICULAR CRIME WHICH THE

04:10PM 6    CONSPIRATORS AGREED TO COMMIT.

04:10PM 7        ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY

04:10PM 8    PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE

04:10PM 9    OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN

04:11PM 10   THOUGH THE PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL OF THE

04:11PM 11   DETAILS OF THE CONSPIRACY.

04:11PM 12       FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING

04:11PM 13   CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS.

04:11PM 14       ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A

04:11PM 15   CONSPIRACY, BUT HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME

04:11PM 16   OBJECT OR PURPOSE OF THE CONSPIRACY, DOES NOT THEREBY BECOME A

04:11PM 17   CONSPIRATOR.

04:11PM 18       SIMILARLY, A PERSON DOES NOT BECOME A CONSPIRATOR MERELY

04:11PM 19   BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS,

04:11PM 20   NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

04:11PM 21       "WILLFULLY" MEANS TO ACT WITH KNOWLEDGE THAT ONE'S CONDUCT

04:12PM 22   IS UNLAWFUL AND WITH THE INTENT TO DO SOMETHING THE LAW

04:12PM 23   FORBIDS.

04:12PM 24       A CONSPIRACY MAY CONTINUE FOR A LONG PERIOD OF TIME AND

04:12PM 25   MAY INCLUDE THE PERFORMANCE OF MANY TRANSACTIONS.  IT IS NOT

9333

04:12PM 1     NECESSARY THAT ALL MEMBERS OF A CONSPIRACY JOIN IN IT AT THE

04:12PM 2     SAME TIME, AND ONE MAY BECOME A MEMBER OF A CONSPIRACY WITHOUT

04:12PM 3     FULL KNOWLEDGE OF ALL OF THE DETAILS OF THE UNLAWFUL SCHEME OR

04:12PM 4     THE NAMES, IDENTITIES, OR LOCATIONS OF ALL OF THE OTHER

04:12PM 5     MEMBERS.

04:12PM 6         EVEN IF MS. HOLMES DID NOT DIRECTLY CONSPIRE WITH OTHER

04:12PM 7     CONSPIRATORS IN THE OVERALL SCHEME, MS. HOLMES HAS, IN EFFECT,

04:12PM 8     AGREED TO PARTICIPATE IN AN ALLEGED CONSPIRACY IF THE

04:12PM 9     GOVERNMENT PROVES EACH OF THE FOLLOWING BEYOND A REASONABLE

04:12PM 10    DOUBT:

04:13PM 11        FIRST, THAT MS. HOLMES DIRECTLY CONSPIRED WITH ONE OR MORE

04:13PM 12    CONSPIRATORS TO CARRY OUT AT LEAST ONE OF THE OBJECTS OF THE

04:13PM 13    CONSPIRACY;

04:13PM 14        SECOND, THAT MS. HOLMES KNEW OR HAD REASON TO KNOW THAT

04:13PM 15    OTHER CONSPIRATORS WERE INVOLVED WITH THOSE WITH WHOM

04:13PM 16    MS. HOLMES DIRECTLY CONSPIRED; AND,

04:13PM 17        THIRD, THAT MS. HOLMES HAD REASON TO BELIEVE THAT WHATEVER

04:13PM 18    BENEFITS MS. HOLMES MIGHT GET FROM THE ALLEGED CONSPIRACY WERE

04:13PM 19    PROBABLY DEPENDENT UPON THE SUCCESS OF THE ENTIRE VENTURE.

04:13PM 20        IT IS NOT A DEFENSE THAT A PERSON'S PARTICIPATION IN A

04:13PM 21    CONSPIRACY WAS MINOR OR FOR A SHORT PERIOD OF TIME.

04:13PM 22        EACH MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE

04:13PM 23    REASONABLY FORESEEABLE ACTIONS OF THE OTHER CONSPIRATORS

04:14PM 24    PERFORMED DURING THE COURSE AND IN FURTHERANCE OF THE

04:14PM 25    CONSPIRACY.  IF ONE MEMBER OF A CONSPIRACY COMMITS A CRIME IN

04:14PM 1      FURTHERANCE OF A CONSPIRACY, THE OTHER MEMBERS HAVE ALSO, UNDER

04:14PM 2      THE LAW, COMMITTED THE CRIME.

04:14PM 3          THEREFORE, YOU MAY FIND MS. HOLMES GUILTY OF WIRE FRAUD

04:14PM 4      AGAINST INVESTORS IN THERANOS AS CHARGED IN COUNTS THREE

04:14PM 5      THROUGH EIGHT OF THE INDICTMENT IF THE GOVERNMENT HAS PROVED

04:14PM 6      EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:14PM 7          FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:14PM 8      AS ALLEGED IN THAT COUNT;

04:14PM 9          SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

04:14PM 10     CHARGED IN COUNT ONE OF THE INDICTMENT;

04:14PM 11         THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:14PM 12     IN FURTHERANCE OF THE CONSPIRACY;

04:15PM 13         FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:15PM 14     THE TIME THE OFFENSE CHARGED IN COUNTS THREE AND EIGHT WAS

04:15PM 15     COMMITTED BY THE COCONSPIRATOR; AND,

04:15PM 16         FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

04:15PM 17     AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MS. HOLMES

04:15PM 18     TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE UNLAWFUL

04:15PM 19     AGREEMENT.

04:15PM 20         YOU MAY FIND MS. HOLMES GUILTY OF WIRE FRAUD AGAINST

04:15PM 21     PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES AS

04:15PM 22     CHARGED IN COUNTS TEN THROUGH TWELVE OF THE INDICTMENT IF THE

04:15PM 23     GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A

04:15PM 24     REASONABLE DOUBT:

04:15PM 25         FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:15PM 1    AS ALLEGED IN THAT COUNT;

04:15PM 2        SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

04:16PM 3    CHARGED IN COUNT TWO OF THE INDICTMENT;

04:16PM 4        THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:16PM 5    IN FURTHERANCE OF THE CONSPIRACY;

04:16PM 6        FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:16PM 7    THE TIME THE OFFENSE CHARGED IN COUNTS TEN THROUGH TWELVE WAS

04:16PM 8    COMMITTED BY THE COCONSPIRATOR; AND,

04:16PM 9        FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

04:16PM 10   AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MS. HOLMES

04:16PM 11   TO BE A NECESSARY OR A NATURAL CONSEQUENCE OF THE UNLAWFUL

04:16PM 12   AGREEMENT.

04:16PM 13       MS. HOLMES IS CHARGED IN COUNTS THREE, FOUR, FIVE, SIX,

04:16PM 14   SEVEN, EIGHT, TEN, ELEVEN AND TWELVE OF THE INDICTMENT WITH

04:17PM 15   WIRE FRAUD IN VIOLATION OF SECTION 1343 OF TITLE 18 OF THE

04:17PM 16   UNITED STATES CODE.

04:17PM 17       MS. HOLMES IS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE

04:17PM 18   INDICTMENT WITH WIRE FRAUD AGAINST INVESTORS IN THERANOS.  IN

04:17PM 19   PARTICULAR:

04:17PM 20       MS. HOLMES IS CHARGED IN COUNT THREE WITH WIRE FRAUD IN

04:17PM 21   CONNECTION WITH A WIRE TRANSFER OF $999,990 ON OR ABOUT

04:17PM 22   DECEMBER 30, 2013.

04:17PM 23       MS. HOLMES IS CHARGED IN COUNT FOUR WITH WIRE FRAUD IN

04:17PM 24   CONNECTION WITH A WIRE TRANSFER OF $5,349,900 ON OR ABOUT

04:17PM 25   DECEMBER 31, 2013.

04:17PM   1        MS. HOLMES IS CHARGED IN COUNT FIVE WITH WIRE FRAUD IN

04:17PM   2    CONNECTION WITH A WIRE TRANSFER OF $4,875,000 ON OR ABOUT

04:18PM   3    DECEMBER 31, 2013.

04:18PM   4        MS. HOLMES IS CHARGED IN COUNT SIX WITH WIRE FRAUD IN

04:18PM   5    CONNECTION WITH A WIRE TRANSFER OF $38,336,632 ON OR ABOUT

04:18PM   6    FEBRUARY 6, 2014.

04:18PM   7        MS. HOLMES IS CHARGED IN COUNT SEVEN WITH WIRE FRAUD IN

04:18PM   8    CONNECTION WITH A WIRE TRANSFER OF $99,999,984 ON OR ABOUT

04:18PM   9    OCTOBER 31, 2014.

04:18PM  10        MS. HOLMES IS CHARGED IN COUNT EIGHT WITH WIRE FRAUD IN

04:18PM  11    CONNECTION WITH A WIRE TRANSFER OF $5,999,997 ON OR ABOUT

04:19PM  12    OCTOBER 31, 2014.

04:19PM  13        MS. HOLMES IS CHARGED IN COUNTS TEN THROUGH TWELVE OF THE

04:19PM  14    INDICTMENT WITH WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

04:19PM  15    THERANOS'S BLOOD TESTING SERVICES.  IN PARTICULAR:

04:19PM  16        MS. HOLMES IS CHARGED IN COUNT TEN WITH WIRE FRAUD IN

04:19PM  17    CONNECTION WITH A WIRE TRANSMISSION OF PATIENT E.T.'S

04:19PM  18    LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 11, 2015.

04:19PM  19        MS. HOLMES IS CHARGED IN COUNT ELEVEN WITH WIRE FRAUD IN

04:19PM  20    CONNECTION WITH A WIRE TRANSMISSION OF PATIENT M.E.'S

04:19PM  21    LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 16, 2015.

04:19PM  22        MS. HOLMES IS CHARGED IN COUNT TWELVE WITH WIRE FRAUD IN

04:19PM  23    CONNECTION WITH A WIRE TRANSFER OF $1,126,661 ON OR ABOUT

04:20PM  24    AUGUST 3, 2015.

04:20PM  25        IN ORDER FOR MS. HOLMES TO BE FOUND GUILTY OF EACH COUNT

9337

04:20PM 1    OF WIRE FRAUD, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO

04:20PM 2    EACH COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

04:20PM 3    ELEMENTS BEYOND A REASONABLE DOUBT:

04:20PM 4        FIRST, MS. HOLMES KNOWINGLY PARTICIPATED IN, DEVISED, OR

04:20PM 5    INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD, OR A SCHEME OR

04:20PM 6    PLAN FOR OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR

04:20PM 7    FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES.  A SCHEME

04:20PM 8    TO DEFRAUD IS A DECEPTIVE SCHEME TO DEPRIVE A PERSON OF MONEY

04:20PM 9    OR PROPERTY.  DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

04:21PM 10   CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

04:21PM 11       SECOND, THE STATEMENTS MADE AS PART OF THE SCHEME WERE

04:21PM 12   MATERIAL.  STATEMENTS ARE MATERIAL IF THEY HAD A NATURAL

04:21PM 13   TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A PERSON

04:21PM 14   TO PART WITH MONEY OR PROPERTY;

04:21PM 15       THIRD, MS. HOLMES ACTED WITH THE INTENT TO DEFRAUD, THAT

04:21PM 16   IS, THE INTENT TO DECEIVE AND CHEAT.  THE INTENT TO DECEIVE AND

04:21PM 17   CHEAT IS THE INTENT TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY

04:21PM 18   MEANS OF DECEPTION; AND,

04:21PM 19       FOURTH, MS. HOLMES USED, OR CAUSED TO BE USED, AN

04:21PM 20   INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY

04:21PM 21   OUT AN ESSENTIAL PART OF THE SCHEME.

04:21PM 22       THE WIRE ITSELF NEED NOT BE FALSE OR MISLEADING.

04:22PM 23       IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

04:22PM 24   CONSIDER NOT ONLY MS. HOLMES'S WORDS AND STATEMENTS, BUT ALSO

04:22PM 25   THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

**ER-12919**

9338

04:22PM  1          A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED

04:22PM  2     IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY

04:22PM  3     FORESEE SUCH USE.

04:22PM  4          IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO MS. HOLMES

04:22PM  5     THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN NATURE.

04:22PM  6     RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO MS. HOLMES

04:22PM  7     THAT SOME WIRE COMMUNICATION WOULD OCCUR IN FURTHERANCE OF THE

04:22PM  8     SCHEME, AND AN INTERSTATE WIRE COMMUNICATION MUST HAVE ACTUALLY

04:22PM  9     OCCURRED IN FURTHERANCE OF THE SCHEME.

04:23PM  10         AN INTENT TO DEFRAUD IS AN INTENT TO DECEIVE AND CHEAT,

04:23PM  11    THAT IS, TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY MEANS OF

04:23PM  12    DECEPTION.

04:23PM  13         YOU MAY CONSIDER WHETHER MS. HOLMES HAD AN HONEST, GOOD

04:23PM  14    FAITH BELIEF IN THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS

04:23PM  15    ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT SHE

04:23PM  16    ACTED WITH INTENT TO DEFRAUD.

04:23PM  17         AN ACT IS DONE KNOWINGLY IF MS. HOLMES IS AWARE OF THE ACT

04:23PM  18    AND DOES NOT ACT THROUGH IGNORANCE, MISTAKE, OR ACCIDENT.  THE

04:23PM  19    GOVERNMENT IS NOT REQUIRED TO PROVE THAT MS. HOLMES KNEW THAT

04:24PM  20    HER ACTS WERE UNLAWFUL.  YOU MAY CONSIDER EVIDENCE OF

04:24PM  21    MS. HOLMES'S WORDS, ACTS, OR OMISSIONS, ALONG WITH ALL THE

04:24PM  22    OTHER EVIDENCE, IN DECIDING WHETHER MS. HOLMES ACTED KNOWINGLY.

04:24PM  23         TO FIND THAT MS. HOLMES ACTED KNOWINGLY, YOU MUST FIND

04:24PM  24    THAT SHE HERSELF HAD KNOWLEDGE OF THE FACT AT ISSUE.

04:24PM  25         MS. HOLMES MAY BE FOUND GUILTY OF WIRE FRAUD AS CHARGED IN

**ER-12920**

04:24PM 1    COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE OF THE

04:24PM 2    INDICTMENT, EVEN IF MS. HOLMES PERSONALLY DID NOT COMMIT THE

04:24PM 3    ACT OR ACTS CONSTITUTING THE CRIME BUT AIDED AND ABETTED IN ITS

04:24PM 4    COMMISSION.

04:24PM 5        TO "AID AND ABET" MEANS INTENTIONALLY TO HELP SOMEONE ELSE

04:24PM 6    COMMIT A CRIME.

04:24PM 7        TO PROVE MS. HOLMES GUILTY OF WIRE FRAUD BY AIDING AND

04:25PM 8    ABETTING, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

04:25PM 9    BEYOND A REASONABLE DOUBT:

04:25PM 10       FIRST, SOMEONE ELSE COMMITTED THE CONDUCT CHARGED IN

04:25PM 11   COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE OF THE

04:25PM 12   INDICTMENT;

04:25PM 13       SECOND, MS. HOLMES AIDED, COUNSELLED, COMMANDED, INDUCED,

04:25PM 14   OR PROCURED THAT PERSON WITH RESPECT TO AT LEAST ONE ELEMENT OF

04:25PM 15   WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH EIGHT AND TEN

04:25PM 16   THROUGH TWELVE OF THE INDICTMENT;

04:25PM 17       THIRD, MS. HOLMES ACTED WITH THE INTENT TO FACILITATE WIRE

04:25PM 18   FRAUD AS CHARGED IN COUNTS THREE THROUGH EIGHT AND TEN THROUGH

04:25PM 19   TWELVE OF THE INDICTMENT; AND,

04:25PM 20       FOURTH, MS. HOLMES ACTED BEFORE THE CRIME WAS COMPLETED.

04:25PM 21       IT IS NOT ENOUGH THAT MS. HOLMES MERELY ASSOCIATED WITH

04:25PM 22   THE PERSON COMMITTING THE CRIME, OR UNKNOWINGLY OR

04:26PM 23   UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON, OR

04:26PM 24   WAS PRESENT AT THE SCENE OF THE CRIME.

04:26PM 25       THE EVIDENCE MUST SHOW BEYOND A REASONABLE DOUBT THAT

04:26PM  1     MS. HOLMES ACTED WITH THE KNOWLEDGE AND INTENTION OF HELPING

04:26PM  2     THAT PERSON COMMIT WIRE FRAUD AS CHARGED IN COUNTS THREE

04:26PM  3     THROUGH EIGHT AND TEN THROUGH TWELVE OF THE INDICTMENT.

04:26PM  4         A DEFENDANT ACTS WITH THE INTENTION TO FACILITATE THE

04:26PM  5     CRIME WHEN THE DEFENDANT ACTIVELY PARTICIPATES IN A CRIMINAL

04:26PM  6     VENTURE WITH ADVANCE KNOWLEDGE OF THE CRIME AND HAVING ACQUIRED

04:26PM  7     THAT KNOWLEDGE WHEN THE DEFENDANT STILL HAD A REALISTIC

04:26PM  8     OPPORTUNITY TO WITHDRAW FROM THE CRIME.

04:26PM  9         THE GOVERNMENT IS NOT REQUIRED TO PROVE PRECISELY WHICH

04:26PM 10     PERSON ACTUALLY COMMITTED THE CRIME AND WHICH PERSON AIDED AND

04:26PM 11     ABETTED.

04:27PM 12         IF YOU FIND THAT MS. HOLMES WAS A MEMBER OF THE SCHEME TO

04:27PM 13     DEFRAUD INVESTORS IN THERANOS CHARGED IN COUNTS THREE THROUGH

04:27PM 14     EIGHT AND THAT MS. HOLMES HAD THE INTENT TO DEFRAUD INVESTORS

04:27PM 15     IN THERANOS, MS. HOLMES MAY BE RESPONSIBLE FOR OTHER

04:27PM 16     COSCHEMER'S ACTIONS DURING THE COURSE OF AND IN FURTHERANCE OF

04:27PM 17     THE ALLEGED SCHEME, EVEN IF MS. HOLMES DID NOT KNOW WHAT THEY

04:27PM 18     SAID OR DID.

04:27PM 19         FOR MS. HOLMES TO BE GUILTY OF AN OFFENSE COMMITTED BY A

04:27PM 20     COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

04:27PM 21     PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:27PM 22         FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD

04:27PM 23     INVESTORS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE

04:27PM 24     INDICTMENT;

04:27PM 25         SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

9341

04:28PM 1      OF THE SCHEME TO DEFRAUD THERANOS INVESTORS;

04:28PM 2          THIRD, MS. HOLMES WAS A MEMBER OF THE SAME SCHEME TO

04:28PM 3      DEFRAUD, AND POSSESSED THE INTENT TO DEFRAUD THERANOS

04:28PM 4      INVESTORS; AND,

04:28PM 5          FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

04:28PM 6      THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MS. HOLMES

04:28PM 7      COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

04:28PM 8      OF THE SCHEME TO DEFRAUD.

04:28PM 9          IF YOU FIND THAT MS. HOLMES WAS A MEMBER OF THE SCHEME TO

04:28PM 10     DEFRAUD PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES

04:28PM 11     CHARGED IN COUNTS TEN THROUGH TWELVE, AND THAT MS. HOLMES HAD

04:28PM 12     THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS, MS. HOLMES MAY

04:28PM 13     BE RESPONSIBLE FOR OTHER COSCHEMERS' DURING THE COURSE OF AND

04:29PM 14     IN FURTHERANCE OF THE ALLEGED SCHEME, EVEN IF MS. HOLMES DID

04:29PM 15     NOT KNOW WHAT THEY SAID OR DID.

04:29PM 16         FOR MS. HOLMES TO BE GUILTY OF AN OFFENSE COMMITTED BY A

04:29PM 17     COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

04:29PM 18     PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:29PM 19         FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD

04:29PM 20     PATIENTS WHO PAID FOR THE THERANOS'S BLOOD TESTING SERVICES

04:29PM 21     CHARGED IN COUNTS 2010 THROUGH TWELVE OF THE INDICTMENT;

04:29PM 22         SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

04:29PM 23     OF THE SCHEME TO DEFRAUD THERANOS PAYING PATIENTS;

04:29PM 24         THIRD, MS. HOLMES WAS A MEMBER OF THE SCHEME TO DEFRAUD,

04:29PM 25     AND POSSESSED THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS;

04:29PM 1     AND,

04:29PM 2          FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

04:29PM 3     THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MS. HOLMES

04:30PM 4     COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

04:30PM 5     OF THE SCHEME TO DEFRAUD.

04:30PM 6          AN ALLEGED VICTIM'S NEGLIGENCE IS NOT A DEFENSE TO WIRE

04:30PM 7     FRAUD.  YOU HAVE HEARD EVIDENCE REGARDING INVESTORS' PROCESS

04:30PM 8     FOR DECIDING WHETHER TO INVEST MONEY IN THERANOS.

04:30PM 9          YOU ARE TO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT

04:30PM 10    HELPS YOU DETERMINE WHETHER MS. HOLMES MADE FALSE OR FRAUDULENT

04:30PM 11    PRETENSES, REPRESENTATIONS, OR PROMISES AS PART OF A SCHEME OR

04:30PM 12    PLAN TO DEFRAUD.  AND YOU MAY SEE THE PRIOR WIRE FRAUD

04:30PM 13    INSTRUCTION.

04:30PM 14         YOU MAY ALSO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT

04:30PM 15    HELPS YOU DETERMINE WHETHER THE STATEMENTS MADE AS PART OF THE

04:30PM 16    ALLEGED SCHEME WERE MATERIAL; THAT IS, WHETHER THEY HAD A

04:30PM 17    NATURAL TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A

04:31PM 18    PERSON TO PART WITH MONEY OR PROPERTY.  AND YOU MAY SEE THE

04:31PM 19    PRIOR WIRE FRAUD INSTRUCTION.

04:31PM 20         SUCCESS OF A SCHEME TO DEFRAUD IS NOT NECESSARY FOR

04:31PM 21    PURPOSES OF DETERMINING WHETHER WIRE FRAUD OCCURRED.  FOR

04:31PM 22    COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE, IT IS NOT

04:31PM 23    NECESSARY THAT MS. HOLMES MADE A PROFIT OR THAT ANYONE ACTUALLY

04:31PM 24    SUFFERED A LOSS.

04:31PM 25         YOU HAVE HEARD EVIDENCE REGARDING ALLEGED VIOLATIONS OF

| | | |
|---|---|---|
| 04:31PM | 1 | REGULATIONS AND INDUSTRY STANDARDS.  MS. HOLMES IS NOT LIABLE |
| 04:31PM | 2 | FOR ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY |
| 04:31PM | 3 | BECAUSE SHE OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE |
| 04:31PM | 4 | REGULATIONS OR BECAUSE MS. HOLMES OR THERANOS MAY HAVE ENGAGED |
| 04:32PM | 5 | IN NEGLIGENT PRACTICES OR VIOLATED INDUSTRY STANDARDS RELATED |
| 04:32PM | 6 | TO LABORATORY TESTING OR MEDICAL DEVICES. |
| 04:32PM | 7 | HOWEVER, YOU MAY CONSIDER SUCH EVIDENCE, ALONG WITH OTHER |
| 04:32PM | 8 | EVIDENCE, LIMITED TO ANY PURPOSES FOR WHICH SUCH EVIDENCE WAS |
| 04:32PM | 9 | ADMITTED, IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED EACH |
| 04:32PM | 10 | OF THE COUNTS CHARGED IN THE INDICTMENT. |
| 04:32PM | 11 | WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE |
| 04:32PM | 12 | JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER THE DELIBERATIONS |
| 04:32PM | 13 | AND SPEAK FOR YOU HERE IN COURT. |
| 04:32PM | 14 | YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO |
| 04:32PM | 15 | REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY |
| 04:32PM | 16 | OR NOT GUILTY, MUST BE UNANIMOUS. |
| 04:32PM | 17 | EACH OF YOU MUST DECIDE THE CASE BY YOURSELF -- FOR |
| 04:33PM | 18 | YOURSELF, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED |
| 04:33PM | 19 | ALL OF THE EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, |
| 04:33PM | 20 | AND LISTENED TO THE VIEWS OF YOUR FELLOW JURORS. |
| 04:33PM | 21 | DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION |
| 04:33PM | 22 | PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION |
| 04:33PM | 23 | SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT. |
| 04:33PM | 24 | IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS |
| 04:33PM | 25 | VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER |

04:33PM 1    HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

04:33PM 2    HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

04:33PM 3    SIMPLY TO REACH A VERDICT.

04:33PM 4        PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY.  DO NOT ALLOW

04:33PM 5    PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, OR

04:33PM 6    PUBLIC OPINION TO INFLUENCE YOU.  YOU SHOULD ALSO NOT BE

04:34PM 7    INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS,

04:34PM 8    NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER,

04:34PM 9    PROFESSION, CELEBRITY, ECONOMIC CIRCUMSTANCES, OR POSITION IN

04:34PM 10   LIFE OR IN THE COMMUNITY.

04:34PM 11       ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

04:34PM 12   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

04:34PM 13   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

04:34PM 14   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

04:34PM 15   CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

04:34PM 16   AWARENESS, CONTROL, OR INTENTION.

04:34PM 17       IT IS YOUR DUTY AS JURORS TO CONSULT WITH ONE ANOTHER AND

04:34PM 18   TO DELIBERATE WITH ONE ANOTHER WITH A VIEW TOWARDS REACHING AN

04:34PM 19   AGREEMENT IF YOU CAN DO SO.

04:34PM 20       DURING YOUR DELIBERATIONS, YOU SHOULD NOT HESITATE TO

04:35PM 21   REEXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINION IF YOU BECOME

04:35PM 22   PERSUADED THAT IT IS WRONG.

04:35PM 23       BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

04:35PM 24   RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

04:35PM 25   THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

04:35PM 1    CASE OR TO THE ISSUES IT INVOLVES.

04:35PM 2         EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS

04:35PM 3    DURING YOUR DELIBERATIONS:

04:35PM 4         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

04:35PM 5    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

04:35PM 6    THE CASE OR ANYTHING TO DO WITH IT.  THIS RESTRICTION INCLUDES

04:35PM 7    DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET,

04:35PM 8    COMPUTER, OR ANY OTHER MEANS, VIA EMAIL, TEXT MESSAGING, OR ANY

04:36PM 9    INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FORMS OF SOCIAL

04:36PM 10   MEDIA.

04:36PM 11        THIS RESTRICTION APPLIES TO COMMUNICATING WITH YOUR FAMILY

04:36PM 12   MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE

04:36PM 13   INVOLVED IN THE TRIAL.

04:36PM 14        IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

04:36PM 15   SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

04:36PM 16   HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

04:36PM 17   CONTACT TO THE COURT.

04:36PM 18        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

04:36PM 19   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

04:36PM 20   IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

04:36PM 21   SEARCHING THE INTERNET (THROUGH GOOGLE OR OTHERWISE) OR USING

04:36PM 22   OTHER REFERENCE MATERIALS; AND DO NOT MAKE ANY INVESTIGATION OR

04:36PM 23   IN ANY OTHER WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

04:36PM 24        THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

04:37PM 25   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

04:37PM  1    HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

04:37PM  2    RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND

04:37PM  3    A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

04:37PM  4    PROCESS TO START OVER.

04:37PM  5         IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

04:37PM  6    NOTIFY THE COURT IMMEDIATELY.

04:37PM  7         SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR

04:37PM  8    NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

04:37PM  9    WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

04:37PM 10    NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

04:37PM 11    JURORS.

04:37PM 12         THE PUNISHMENT PROVIDED BY LAW FOR THE ALLEGED OFFENSES IS

04:38PM 13    FOR THE COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN

04:38PM 14    DECIDING WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST

04:38PM 15    MS. HOLMES BEYOND A REASONABLE DOUBT.

04:38PM 16         A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

04:38PM 17    REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

04:38PM 18    SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR

04:38PM 19    DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU

04:38PM 20    ARE READY TO RETURN TO THE COURTROOM.

04:38PM 21         IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

04:38PM 22    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK,

04:38PM 23    SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD

04:38PM 24    EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

04:38PM 25    AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN

04:38PM   1    WRITING OR HERE IN OPEN COURT.

04:39PM   2        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

04:39PM   3    LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

04:39PM   4    CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

04:39PM   5    QUESTION.

04:39PM   6        REMEMBER THAT YOU ARE NOT TO TELL ANYONE -- INCLUDING

04:39PM   7    ME -- HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, ON ANY

04:39PM   8    QUESTION SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT

04:39PM   9    OF MS. HOLMES, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT

04:39PM  10    OR HAVE BEEN DISCHARGED.

04:39PM  11        THAT CONCLUDES THE COURT'S READING OF THE INSTRUCTIONS.

04:39PM  12        ANY OBJECTION TO THE READING OF THE INSTRUCTIONS?

04:39PM  13            MR. LEACH:  YOUR HONOR, ON PAGE 21 AT LINE 17, THE

04:40PM  14    COURT I BELIEVE READ "IN COUNT THREE AND EIGHT," AND THE WORD

04:40PM  15    IS "THROUGH."

04:40PM  16        I DON'T THINK THE COURT NEEDS TO REREAD THIS WHOLE

04:40PM  17    INSTRUCTION.  I THINK THAT CAN JUST BE EITHER NOTED NOW BY THE

04:40PM  18    COURT, AND THE JURY WILL SEE THAT IN THE WRITTEN INSTRUCTIONS.

04:40PM  19            THE COURT:  ALL RIGHT.  THANK YOU.

04:40PM  20        THE COURT REPORTER HAS HANDED ME A COPY THAT'S CIRCLED

04:40PM  21    THAT WORD.

04:40PM  22        MR. DOWNEY?

04:40PM  23            MR. DOWNEY:  I AGREE WITH MR. SCHENK.

04:40PM  24        SUBJECT TO OUR PRIOR CONVERSATIONS THAT WE'VE HAD IN

04:40PM  25    CHARGING CONVERSATIONS, ET CETERA, I HAVE NO FURTHER

04:40PM   1       CORRECTIONS.

04:40PM   2            I THINK THE COURT READ THE INSTRUCTIONS CORRECTLY.

04:40PM   3                 THE COURT:  ALL RIGHT.  THANK YOU.

04:40PM   4            LADIES AND GENTLEMEN, IT'S BEEN POINTED OUT TO ME THAT

04:40PM   5       INSTRUCTION NUMBER 19, WHICH IS ON PAGE 21 -- YOU'LL HAVE THESE

04:40PM   6       WITH YOU, EACH OF YOU WILL HAVE A COPY OF THESE -- AT LINE 17,

04:41PM   7       IT'S THE FOURTH ELEMENT, I'M JUST GOING TO READ THAT FOURTH

04:41PM   8       ELEMENT AGAIN.

04:41PM   9            AND THIS IS AGAIN, INSTRUCTION NUMBER 19.

04:41PM  10            YOU'LL SEE IT AT THE BEGINNING OF LINE 16.

04:41PM  11            FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:41PM  12       THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS

04:41PM  13       COMMITTED BY THE COCONSPIRATOR.

04:41PM  14            IS THAT CORRECTED?

04:41PM  15                 MR. SCHENK:  YES, THANK YOU.

04:41PM  16                 MR. DOWNEY:  YES, YOUR HONOR.

04:41PM  17                 THE COURT:  THANK YOU.  I APOLOGIZE FOR MISSPEAKING

04:41PM  18       ON THAT.  THAT CORRECTS THE READING.

04:41PM  19            ONE FURTHER THING, LADIES AND GENTLEMEN -- AND COUNSEL, I

04:41PM  20       THINK I TOUCHED ON THIS WITH YOU -- LADIES AND GENTLEMEN, VIDEO

04:41PM  21       AND AUDIOS WERE ADMITTED IN EVIDENCE.  SHOULD YOU WISH TO SEE

04:41PM  22       OR HEAR THESE EXHIBITS, PLEASE LET OUR COURTROOM DEPUTY,

04:41PM  23       MS. KRATZMANN, KNOW, AND THEY WILL BE PLAYED FOR YOU HERE IN

04:42PM  24       THE COURTROOM, WHICH IS TO SAY THAT THEY WILL NOT BE ON THE

04:42PM  25       THUMB DRIVE, OR WHATEVER MATERIAL YOU HAVE IN THE JURY ROOM.

04:42PM 1   THOSE WOULD HAVE TO BE PLAYED, AND WILL BE PLAYED, FOR YOU HERE

04:42PM 2   IN THE COURTROOM SHOULD YOU WISH TO EITHER SEE OR HEAR THOSE.

04:42PM 3        ANYTHING FURTHER ON THAT, COUNSEL?

04:42PM 4             MR. SCHENK:  NO, YOUR HONOR.

04:42PM 5             MR. DOWNEY:  NO, YOUR HONOR.

04:42PM 6             THE COURT:  THANK YOU.  WITH THAT THEN, I'LL ASK THE

04:42PM 7   JURY TO RETIRE TO BEGIN THEIR DELIBERATIONS.

04:42PM 8        DO WE HAVE SOMEONE TO TAKE CHARGE OF THE JURY?

04:42PM 9             THE CLERK:  YES, WE DO, YOUR HONOR.

04:42PM 10       PLEASE COME FORWARD.

04:42PM 11            **(THE COURT SECURITY OFFICER WAS GIVEN THE OATH.)**

04:43PM 12            COURT SECURITY OFFICER:  YES.

04:43PM 13            THE CLERK:  THANK YOU.

04:43PM 14            THE COURT:  THANK YOU.  YOU MAY TAKE THE JURY TO THE

04:43PM 15  DELIBERATION ROOM SUCH THAT THEY CAN BEGIN THEIR DELIBERATIONS.

04:43PM 16       ALTERNATES NUMBER 4 AND 5, IF YOU WOULD PLEASE STAY SEATED

04:43PM 17  FOR JUST A MOMENT.

04:43PM 18       DO THEY HAVE THINGS IN THE JURY ROOM?

04:43PM 19            THE CLERK:  THEY DO, YOUR HONOR.

04:43PM 20       (JURY OUT AT 4:43 P.M., ALTERNATE JURORS PRESENT.)

04:43PM 21            THE COURT:  THANK YOU.  THE RECORD SHOULD REFLECT

04:43PM 22  THAT OUR 12 SEATED MEMBERS OF THE JURY HAVE LEFT THE COURTROOM

04:43PM 23  ESCORTED BY THE CSO TO BEGIN THEIR DELIBERATION.

04:43PM 24       THAT LEAVES IN THE COURTROOM, OF COURSE, OUR TWO WONDERFUL

04:43PM 25  ALTERNATES, NUMBER 4 AND NUMBER 5, OUR LOU GEHRIGS AS I CALLED

04:44PM  1    YOU EARLIER.

04:44PM  2         I WANT TO TELL YOU WHAT IS GOING TO HAPPEN NEXT, OUR TWO

04:44PM  3    ALTERNATES.

04:44PM  4         YOU MAY LEAVE THE COURTROOM NOW.  HOWEVER, PLEASE RECALL

04:44PM  5    IN MY EARLIER CONVERSATION THAT YOU MAY BE CALLED UPON TO

04:44PM  6    REPLACE A SITTING JUROR.

04:44PM  7         SHOULD THAT HAPPEN, MS. KRATZMANN WILL CONTACT YOU AND

04:44PM  8    HAVE YOU RETURN TO COURT.

04:44PM  9         SHOULD THAT OCCUR, THE JURY DELIBERATIONS WILL BEGIN ANEW

04:44PM  10   WITH THAT, THAT IS, ALL OVER AGAIN AND START ANEW WITH THE NEW

04:44PM  11   JUROR SEATED TO REPLACE A SITTING JUROR.

04:44PM  12        SO YOU'RE STILL, STILL PART OF OUR CASE.

04:44PM  13        AND WHAT THAT MEANS TO YOU, EACH OF YOU, IS THAT THE

04:44PM  14   ADMONITION THAT I GIVE YOU EVERY DAY THAT YOU PROBABLY COULD

04:44PM  15   RECITE BACK TO ME IS STILL IN PLACE; THAT IS, YOU MAY NOT, YOU

04:44PM  16   MAY NOT CONSULT ANYONE, PLEASE DO NOT CONSULT, DISCUSS, DO ANY

04:44PM  17   INVESTIGATION OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT

04:45PM  18   THIS CASE.

04:45PM  19        WHAT WILL HAPPEN IS YOU WILL BE ON CALL THEN.

04:45PM  20        YOU'RE STILL PART OF THIS CASE, AND YOU WILL BE SO UNTIL

04:45PM  21   AND UNLESS OUR JURY RETURNS WITH A VERDICT, I RELEASE THE JURY

04:45PM  22   FROM THEIR DUTIES, AND THEN YOU WILL BE CONTACTED ALSO AS TO

04:45PM  23   YOU BEING RELEASED FROM THE CONSTRAINTS, FROM YOUR OBLIGATIONS

04:45PM  24   AS ALTERNATE JURORS IN THIS CASE.

04:45PM  25        I DON'T KNOW WHAT IS GOING TO HAPPEN HERE, THAT IS,

9351

| | | |
|---|---|---|
| 04:45PM | 1 | WHETHER OR NOT WE'LL HAVE YOU COME BACK TO COURT TO SIT AS A |
| 04:45PM | 2 | JUROR IN THIS CASE. |
| 04:45PM | 3 | IF THAT DOES NOT OCCUR, AND THAT IS, IF WE DON'T GET TO |
| 04:45PM | 4 | SEE YOU AGAIN, LET ME JUST, I DO WANT TO EXTEND MY GRATITUDE. |
| 04:45PM | 5 | WHAT A HERCULEAN TASK THAT YOU HAVE DONE.  YOU'VE SAT HERE |
| 04:45PM | 6 | SINCE SEPTEMBER 6TH, MAYBE A WEEK THEREAFTER.  YOU'VE LISTENED |
| 04:46PM | 7 | TO THE TRIAL.  I KNOW THAT.  I'VE WATCHED YOU.  EVERYONE HAS |
| 04:46PM | 8 | WATCHED YOU. |
| 04:46PM | 9 | IF WE DON'T SEE YOU AGAIN, ON BEHALF OF MY COLLEAGUE |
| 04:46PM | 10 | JUDGES IN THE NORTHERN DISTRICT OF CALIFORNIA, AND ON BEHALF OF |
| 04:46PM | 11 | ALL OF THESE GOOD LAWYERS HERE, WE EXPRESS OUR GRATITUDE AND |
| 04:46PM | 12 | THANKS TO YOU FOR YOUR SERVICE. |
| 04:46PM | 13 | NOW, AGAIN, LET ME BE CLEAR, I'M NOT RELEASING YOU FROM |
| 04:46PM | 14 | YOUR OBLIGATIONS.  IT MAY COME TO PASS THAT YOU WILL BE SEATED |
| 04:46PM | 15 | AS A JUROR IN THIS CASE, AND THE ADMONITION REMAINS, AND IT |
| 04:46PM | 16 | REMAINS WITH YOU UNTIL YOU'RE INFORMED TO THE CONTRARY, UNTIL |
| 04:46PM | 17 | YOU'RE FORMALLY RELEASED. |
| 04:46PM | 18 | MS. KRATZMANN MAY INFORM YOU OF THAT. |
| 04:46PM | 19 | IF YOU HAVE ANY QUESTION ABOUT YOUR SERVICE, ABOUT YOUR |
| 04:46PM | 20 | RETURNING TO COURT, ANY ISSUE ON THAT, WOULD YOU PLEASE CONTACT |
| 04:46PM | 21 | MS. KRATZMANN AND SHE CAN ANSWER THOSE QUESTIONS FOR YOU? |
| 04:46PM | 22 | WHAT SHE'S GOING TO DO NOW IS DELICATELY NEGOTIATE YOUR |
| 04:46PM | 23 | BELONGINGS FROM THE DELIBERATION ROOM AND GET THOSE BACK TO YOU |
| 04:46PM | 24 | SO YOU CAN TAKE THOSE WITH YOU. |
| 04:46PM | 25 | AND SHE'LL RETRIEVE THOSE FOR YOU AND GIVE THOSE TO YOU. |

**ER-12933**

```
04:46PM   1          ALL RIGHT.  CAN YOU DO THAT NOW?  I'LL ASK THESE
04:47PM   2     LAWYERS --
04:47PM   3               THE CLERK:  IF THEY CAN COME BACK THIS WAY AND EXIT
04:47PM   4     OUT THIS WAY.
04:47PM   5               THE COURT:  THAT'S FINE.  DO YOU WANT TO TAKE THEM
04:47PM   6     NOW?
04:47PM   7               THE CLERK:  YES.
04:47PM   8               THE COURT:  OKAY.  ALTERNATES NUMBER 4 AND 5, IF YOU
04:47PM   9     WANT TO FOLLOW MS. KRATZMANN NOW.
04:47PM  10          (ALTERNATE JURORS OUT AT 4:47 P.M.)
04:47PM  11               THE COURT:  THANK YOU.  PLEASE BE SEATED.
04:47PM  12          THE RECORD SHOULD REFLECT THAT OUR ALTERNATE JURORS HAVE
04:47PM  13     LEFT THE COURTROOM.
04:47PM  14          REMAINING ARE ALL COUNSEL AND MS. HOLMES.
04:47PM  15          COUNSEL, I JUST WANT TO INFORM YOU ABOUT TIMING IF THERE
04:47PM  16     ARE QUESTIONS OR IF THE JURY SENDS US A NOTE.
04:47PM  17          I HAVE INDICATED THROUGH MS. KRATZMANN THAT SHOULD WE GET
04:47PM  18     NOTICE THAT THE JURY HAS REACHED A VERDICT IN THIS CASE, WE'LL
04:48PM  19     POST THAT ON OUR ECF POSTING, AND I'VE INDICATED THAT IT WOULD
04:48PM  20     PROBABLY BE ABOUT 30 MINUTES BEFORE THE COURT WOULD READ THE
04:48PM  21     VERDICT WHEN IT COMES IN.
04:48PM  22          I TYPICALLY LIKE -- I ASK LAWYERS TO BE ABLE TO COME BACK
04:48PM  23     WITHIN 15 MINUTES IF WE HAVE A QUESTION, BUT IN THIS
04:48PM  24     CIRCUMSTANCE I THINK 20 MINUTES, 20 TO 25 MINUTES.
04:48PM  25          IF WE HAVE A QUESTION, MS. KRATZMANN WILL REACH OUT TO
```

04:48PM   1        YOU.  IF YOU COULD MAKE YOURSELVES AVAILABLE WITHIN THAT 25

04:48PM   2        MINUTE TIMEFRAME, THAT WOULD BE HELPFUL.

04:48PM   3             IS THAT GOING TO CREATE AN ISSUE FOR EITHER TEAM HERE?

04:48PM   4                  MR. SCHENK:  NO, YOUR HONOR.

04:48PM   5                  MR. DOWNEY:  NOT FOR US, YOUR HONOR.

04:48PM   6                  THE COURT:  ALL RIGHT.  THANK YOU.

04:48PM   7             ANYTHING FURTHER THEN BEFORE WE BREAK?

04:48PM   8                  MR. SCHENK:  NO, NOT FROM THE GOVERNMENT.

04:48PM   9                  MR. DOWNEY:  NO.  THANK YOU, YOUR HONOR.

04:48PM  10                  THE COURT:  AND MS. KRATZMANN WILL KEEP BOTH SIDES

04:48PM  11        INFORMED ABOUT WHAT THE JURY DECIDES TO DO VIS-A-VIS THEIR

04:48PM  12        SCHEDULE, AND THEY WILL TELL HER, AND THEN I'LL ASK HER TO

04:49PM  13        COMMUNICATE THAT WITH YOU.

04:49PM  14             ALL RIGHT.  THANK YOU.

04:49PM  15                  MR. SCHENK:  THANK YOU, YOUR HONOR.

04:49PM  16                  MR. DOWNEY:  THANK YOU.

04:49PM  17             (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY AT

04:49PM  18        4:49 P.M.)

         19

         20

         21

         22

         23

         24

         25

1

2

3                        CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16                        IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8076
17

18

19                        LEE-ANNE SHORTRIDGE, CSR, CRR
                          CERTIFICATE NUMBER 9595
20

21                        DATED:  DECEMBER 17, 2021

22

23

24

25

9354

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

```
UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
                               )
                 PLAINTIFF,    )  SAN JOSE, CALIFORNIA
                               )
          VS.                  )  VOLUME 48
                               )
ELIZABETH A. HOLMES,           )  DECEMBER 21, 2021
                               )
                 DEFENDANT.    )  PAGES 9354 - 9359
_____)
```

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER

**ER-12937**

9355

```
 1        A P P E A R A N C E S: (CONT'D)
 2

 3    FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                              BY:  KEVIN M. DOWNEY
 4                                 LANCE A. WADE
                                   KATHERINE TREFZ
 5                                 SEEMA ROPER
                                   AMY SAHARIA
 6                                 ANDREW LEMENS
                                   PATRICK LOOBY
 7                            725 TWELFTH STREET, N.W.
                              WASHINGTON, D.C. 20005
 8
                              LAW OFFICE OF JOHN D. CLINE
 9                            BY:  JOHN D. CLINE
                              ONE EMBARCADERO CENTER, SUITE 500
10                            SAN FRANCISCO, CALIFORNIA 94111

11
      ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
12                           BY:  ADELAIDA HERNANDEZ

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|   |   |
|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    DECEMBER 21, 2021 |
| | 2 |                  P R O C E E D I N G S |
| 03:17PM | 3 |      (COURT CONVENED AT 3:17 P.M.) |
| 03:17PM | 4 |      (JURY OUT AT 3:17 P.M.) |
| 03:17PM | 5 |           THE COURT:  WE ARE ON THE RECORD IN THE HOLMES |
| 03:17PM | 6 | MATTER.  ALL COUNSEL IS PRESENT.  MS. HOLMES IS PRESENT. |
| 03:17PM | 7 |      COUNSEL, I JUST WANTED TO LET YOU KNOW THAT WE RECEIVED A |
| 03:17PM | 8 | NOTE FROM THE JURY, AND THIS WAS RECEIVED AT 3:30 P.M. -- |
| 03:17PM | 9 | 3:30 P.M. |
| 03:17PM | 10 |      MS. KRATZMANN, IF YOU COULD MAKE PHOTOCOPIES OF THE NOTE. |
| 03:17PM | 11 | WE'LL DISTRIBUTE THE NOTE TO COUNSEL NOW. |
| 03:17PM | 12 |      (DISCUSSION OFF THE RECORD.) |
| 03:17PM | 13 |           THE COURT:  IT SAYS 3:30. |
| 03:18PM | 14 |      (LAUGHTER.) |
| 03:18PM | 15 |      (PAUSE IN PROCEEDINGS.) |
| 03:18PM | 16 |           THE COURT:  SO, COUNSEL, YOU HAVE THE NOTE.  IT'S |
| 03:18PM | 17 | NOTE NUMBER 1, AND I'LL READ THE JURY'S NOTE. |
| 03:18PM | 18 |      "THE JURY HAS THE FOLLOWING QUESTION: |
| 03:18PM | 19 |      "CAN THE JURY TAKE JURY INSTRUCTIONS HOME TO REVIEW THEM |
| 03:18PM | 20 | AT LENGTH." |
| 03:18PM | 21 |      IT'S SIGNED BY A JUROR, AND IT'S DATED 12-21.  IT HAS A |
| 03:18PM | 22 | TIME 3:30 P. |
| 03:18PM | 23 |      COUNSEL, THE COURT'S RESPONSE IS "NO." |
| 03:19PM | 24 |      I DON'T KNOW -- I'M HAPPY TO HEAR FROM YOU IF YOU WOULD |
| 03:19PM | 25 | LIKE TO ADD TO THAT RESPONSE. |

03:19PM 1     (DISCUSSION OFF THE RECORD.)

03:19PM 2          THE COURT:  LET ME JUST INDICATE THE COURT -- FIRST

03:19PM 3     OF ALL, THE JURORS MAY NOT TAKE THE INSTRUCTIONS HOME TO

03:19PM 4     REVIEW.  THE COURT VIEWS THAT AS ENGAGING IN DELIBERATIONS, AND

03:19PM 5     AS WE ALL KNOW, ALL DELIBERATIONS MUST TAKE PLACE ONLY IN THE

03:19PM 6     JURY DELIBERATION ROOM.

03:19PM 7       IF I WERE TO ADD ANYTHING TO THAT ANSWER "NO," I WOULD ADD

03:19PM 8     WHAT I JUST SAID.

03:19PM 9          MR. DOWNEY:  YOUR HONOR, WE DON'T DISAGREE WITH

03:19PM 10    THAT, AND I THINK IT MAY BE CONTRARY TO AN INSTRUCTION THAT

03:19PM 11    YOUR HONOR HAS ALREADY GIVEN.  WE DON'T DISAGREE THAT "NO" IS A

03:19PM 12    SUFFICIENT ANSWER.

03:19PM 13         THE COURT:  OKAY.

03:19PM 14         MR. SCHENK:  YOUR HONOR, WE ALSO AGREE WITH THAT

03:19PM 15    JURY INSTRUCTION NUMBER 1 INFORMS THE JURY THAT A COPY IS IN

03:20PM 16    THE JURY ROOM.  IF THE COURT WANTS TO ADD TO IT, IT COULD CITE

03:20PM 17    TO THAT INSTRUCTION AND FURTHER CLARIFY THAT THE INSTRUCTIONS

03:20PM 18    SHOULD NOT BE TAKEN OUT OF THE DELIBERATION ROOM.

03:20PM 19         THE COURT:  OKAY.  WOULD YOU LIKE TO CRAFT SOMETHING

03:20PM 20    NOW OR DO YOU -- LET ME TURN TO THE DEFENSE.

03:20PM 21       THIS IS AN OPPORTUNITY FOR US, IF YOU WOULD LIKE, TO PUT

03:20PM 22    TOGETHER, AND MS. KRATZMANN HAS HER DEVICE READY.  ANYTHING IN

03:20PM 23    ADDITION TO "NO"?  DO YOU WANT A MINUTE TO TALK AT YOUR TABLES?

03:20PM 24      (DISCUSSION OFF THE RECORD.)

03:21PM 25         MR. DOWNEY:  YOUR HONOR, JUST FOR PERFECT CLARITY

| | | |
|---|---|---|
| 03:21PM | 1 | FOR THE JURY, THE DEFENSE SUGGESTS THAT WE SAY, "ALL |
| 03:21PM | 2 | DELIBERATIONS MUST OCCUR IN THE JURY ROOM.  NO." |
| 03:21PM | 3 | MR. SCHENK:  THAT'S FINE WITH THE GOVERNMENT. |
| 03:21PM | 4 | THE COURT:  OKAY.  MS. KRATZMANN, COULD YOU PRINT |
| 03:21PM | 5 | OUT THREE COPIES OF THOSE AND DISTRIBUTE THEM TO COUNSEL AND |
| 03:21PM | 6 | THE COURT? |
| 03:21PM | 7 | THE CLERK:  YES, YOUR HONOR. |
| 03:21PM | 8 | (PAUSE IN PROCEEDINGS.) |
| 03:22PM | 9 | THE CLERK:  (HANDING.) |
| 03:22PM | 10 | THE COURT:  THANK YOU. |
| 03:22PM | 11 | THE CLERK:  YOU'RE WELCOME. |
| 03:22PM | 12 | THE COURT:  COUNSEL, DO YOU HAVE THE PROPOSED |
| 03:22PM | 13 | RESPONSE IN FRONT OF YOU? |
| 03:22PM | 14 | IT READS IN RESPONSE TO JURY NOTE NUMBER 1, "ALL |
| 03:22PM | 15 | DELIBERATIONS MUST OCCUR IN THE JURY ROOM.  NO." |
| 03:22PM | 16 | MR. SCHENK:  THAT'S FINE WITH THE GOVERNMENT, |
| 03:22PM | 17 | YOUR HONOR. |
| 03:22PM | 18 | MR. DOWNEY:  THAT'S FINE WITH THE DEFENSE. |
| 03:22PM | 19 | THE COURT:  ALL RIGHT.  THANK YOU.  SHOULD I PUT THE |
| 03:22PM | 20 | TIME DOWN 3:23 P.M.? |
| 03:23PM | 21 | MR. SCHENK:  YES, YOUR HONOR. |
| 03:23PM | 22 | THE COURT:  ALL RIGHT.  I'LL DO THAT.  I'LL SIGN IT, |
| 03:23PM | 23 | AND WE'LL SEND THIS BACK. |
| 03:23PM | 24 | MR. DOWNEY:  VERY WELL. |
| 03:23PM | 25 | THE COURT:  ALL RIGHT.  I'VE SIGNED THE NOTE AND THE |

03:23PM   1    RESPONSE.  WE'LL SEND IT BACK TO THE JURY AND AWAIT ANY FURTHER

03:23PM   2    WORD.

03:23PM   3              MR. DOWNEY:  THANK YOU, YOUR HONOR.

03:23PM   4              MR. SCHENK:  THANK YOU, YOUR HONOR.

03:23PM   5              THE COURT:  ANYTHING FURTHER?

03:23PM   6              MR. DOWNEY:  NO, YOUR HONOR.

03:23PM   7              THE COURT:  ALL RIGHT.  THANK YOU.

03:23PM   8              THE CLERK:  COURT IS ADJOURNED.

03:23PM   9        (RECESS TAKEN AT 3:23 PENDING THE DELIBERATIONS OF THE

03:23PM  10    JURY.)

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

UNITED STATES COURT REPORTERS

1

2

3                   CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR

17         CERTIFICATE NUMBER 8076

18         _____

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  DECEMBER 21, 2021

22

23

24

25

9360

```
 1

 2                      UNITED STATES DISTRICT COURT

 3                    NORTHERN DISTRICT OF CALIFORNIA

 4                          SAN JOSE DIVISION

 5

    UNITED STATES OF AMERICA,      )   CR-18-00258-EJD
 6                                 )
                       PLAINTIFF,  )   SAN JOSE, CALIFORNIA
 7                                 )
              VS.                  )   VOLUME 49
 8                                 )
    ELIZABETH A. HOLMES,           )   DECEMBER 23, 2021
 9                                 )
                       DEFENDANT.  )   PAGES 9360 - 9367
10    _____)

11                    TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13    A P P E A R A N C E S:

14
    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                        BY:  JOHN C. BOSTIC
                               JEFFREY B. SCHENK
16                        150 ALMADEN BOULEVARD, SUITE 900
                          SAN JOSE, CALIFORNIA 95113
17
                          BY:  ROBERT S. LEACH
18                             KELLY VOLKAR
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21
    OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER
```

ER-12944

9361

```
 1      A P P E A R A N C E S: (CONT'D)

 2

 3      FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                 BY:  KEVIN M. DOWNEY
 4                                    LANCE A. WADE
                                      KATHERINE TREFZ
 5                                    J.R. FLEURMONT
                                      SEEMA ROPER
 6                                    AMY SAHARIA
                                      ANDREW LEMENS
 7                                    PATRICK LOOBY
                                 725 TWELFTH STREET, N.W.
 8                               WASHINGTON, D.C. 20005

 9                               LAW OFFICE OF JOHN D. CLINE
                                 BY:  JOHN D. CLINE
10                               ONE EMBARCADERO CENTER, SUITE 500
                                 SAN FRANCISCO, CALIFORNIA 94111
11

12      ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                                 BY:  ADELAIDA HERNANDEZ
13
                                 OFFICE OF THE U.S. ATTORNEY
14                               BY:  MADDI WACHS, PARALEGAL

15

16

17

18

19

20

21

22

23

24

25
```

ER-12945

|   |   |   |
|---|---|---|
|  | 1 | SAN JOSE, CALIFORNIA                    DECEMBER 23, 2021 |
|  | 2 | P R O C E E D I N G S |
| 12:30PM | 3 | (COURT CONVENED AT 12:30 P.M.) |
| 12:30PM | 4 | (JURY OUT AT 12:30 P.M.) |
| 12:30PM | 5 | THE COURT:  WE'RE ON THE RECORD.  WE'RE OUTSIDE OF |
| 12:30PM | 6 | THE PRESENCE OF THE JURY.  ALL COUNSEL AND MS. HOLMES IS |
| 12:30PM | 7 | PRESENT. |
| 12:30PM | 8 | WE HAVE NOTE NUMBER 2 FROM THE JURY.  AND MS. HOLMES HAS |
| 12:30PM | 9 | PROVIDED THAT -- EXCUSE ME, MS. KRATZMANN HAS PROVIDED THAT TO |
| 12:30PM | 10 | EACH SIDE. |
| 12:30PM | 11 | I'LL READ THE NOTE.  IT'S DATED 12-23, 11:39.  IT'S NOTE |
| 12:30PM | 12 | NUMBER 2.  IT READS: |
| 12:30PM | 13 | "WE WOULD LIKE TO LISTEN TO EXHIBITS 1348 (CLIPS 1-7, AND |
| 12:30PM | 14 | F) AND 1349 (CLIP 1 AND A)." |
| 12:31PM | 15 | AS COUNSEL RECALL, I INFORMED THE JURY THAT IF THEY WISHED |
| 12:31PM | 16 | TO HEAR OR SEE ANY OF THE AUDIO VISUAL EXHIBITS, WE WOULD DO |
| 12:31PM | 17 | THAT IN THE COURTROOM. |
| 12:31PM | 18 | I UNDERSTAND THAT YOU HAVE LAPTOPS HERE THAT WILL BE ABLE |
| 12:31PM | 19 | TO CALL THESE UP.  I BELIEVE THESE ARE AUDIO CLIPS IF I'M NOT |
| 12:31PM | 20 | MISTAKEN. |
| 12:31PM | 21 | SO WHAT I WOULD LIKE TO DO IS WE WILL INFORM THE JURY THAT |
| 12:31PM | 22 | WE WILL PLAY THESE CLIPS IN THE COURTROOM, AND WE WILL INVITE |
| 12:31PM | 23 | THEM IN ONCE ALL OF THE I.T., OR WHATEVER, IS SET UP TO DO |
| 12:31PM | 24 | THAT. |
| 12:31PM | 25 | IN THE INTERIM, WHAT I WOULD LIKE COUNSEL TO DO IS TO |

| | | |
|---|---|---|
| 12:31PM | 1 | REACH AGREEMENT AS TO THE PORTIONS THAT YOU THINK SHOULD BE |
| 12:32PM | 2 | PLAYED BASED ON THIS QUESTION, AND WHICH OF YOUR LAPTOPS IS |
| 12:32PM | 3 | GOING TO PLAY IT, AND TEST RUN IT SO WE DON'T HAVE ANY HICCUPS. |
| 12:32PM | 4 | AND I'LL STEP OFF THE BENCH NOW TO ALLOW YOU TO WORK THAT |
| 12:32PM | 5 | OUT. |
| 12:32PM | 6 | BEFORE I DO THAT, LET ME ASK A QUESTION TO EITHER SIDE. |
| 12:32PM | 7 | DOES THE GOVERNMENT HAVE ANY COMMENT ON THIS? |
| 12:32PM | 8 | MR. SCHENK:  NO.  THANK YOU, YOUR HONOR. |
| 12:32PM | 9 | MR. DOWNEY:  NO, YOUR HONOR. |
| 12:32PM | 10 | THE COURT:  ALL RIGHT.  THANK YOU THEN.  I'LL STEP |
| 12:32PM | 11 | DOWN. |
| 12:32PM | 12 | WHAT I WILL DO IS WE'LL ANSWER THE NOTE SAYING, "WE WILL |
| 12:32PM | 13 | PLAY THESE CLIPS IN THE COURTROOM, AND WE WILL SUMMON THE JURY |
| 12:32PM | 14 | INTO THE COURTROOM WHEN THEY'RE READY TO BE PLAYED, WHEN THE |
| 12:32PM | 15 | CLIPS ARE READY TO BE PLAYED." |
| 12:32PM | 16 | PARDON ME. |
| 12:32PM | 17 | IS THAT SUFFICIENT? |
| 12:32PM | 18 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:32PM | 19 | MR. DOWNEY:  YES, YOUR HONOR. |
| 12:32PM | 20 | THE COURT:  MS. KRATZMANN, IF YOU COULD PROVIDE A |
| 12:33PM | 21 | COPY TO EACH SIDE. |
| 12:33PM | 22 | THE CLERK:  YES, YOUR HONOR. |
| 12:33PM | 23 | THE COURT:  THANK YOU. |
| 12:33PM | 24 | (PAUSE IN PROCEEDINGS.) |
| 12:33PM | 25 | THE CLERK:  (HANDING.) |

9364

| 12:33PM | 1 | THE COURT:  GREAT.  THANK YOU. |
| 12:33PM | 2 | DO YOU EACH HAVE A COPY OF WHAT MS. KRATZMANN TYPED?  IS |
| 12:33PM | 3 | THIS AN APPROPRIATE ANSWER? |
| 12:33PM | 4 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:33PM | 5 | MR. DOWNEY:  YES, YOUR HONOR. |
| 12:33PM | 6 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:33PM | 7 | I'LL SIGN THIS. |
| 12:34PM | 8 | MS. KRATZMANN, IF YOU CAN GIVE THAT TO THE JURY. |
| 12:34PM | 9 | SHOULD I STEP DOWN NOW AND ALLOW YOU TO WORK OUT THE |
| 12:34PM | 10 | LOGISTICS OF THIS? |
| 12:34PM | 11 | MR. SCHENK:  THAT WOULD BE FINE.  THANK YOU. |
| 12:34PM | 12 | THE COURT:  ALL RIGHT.  AND JUST SING OUT WHEN |
| 12:34PM | 13 | YOU'RE READY TO GO, AND WE'LL COME OUT, WE'LL BRING THE JURY |
| 12:34PM | 14 | OUT, AND WE'LL PLAY THOSE CLIPS. |
| 12:34PM | 15 | MR. DOWNEY:  THANK YOU. |
| 12:34PM | 16 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:34PM | 17 | THE CLERK:  COURT IS IN RECESS. |
| 12:34PM | 18 | (RECESS FROM 12:34 P.M. UNTIL 12:46 P.M.) |
| 12:46PM | 19 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 12:46PM | 20 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 12:46PM | 21 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 12:46PM | 22 | HAVE COUNSEL HAD AN OPPORTUNITY TO REVIEW THE REQUESTED |
| 12:46PM | 23 | CLIPS, AND HAVE YOU SET THOSE UP SOMEHOW SO THEY CAN BE PLAYED? |
| 12:46PM | 24 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:46PM | 25 | MR. DOWNEY:  WE HAVE, YOUR HONOR. |

| | | |
|---|---|---|
| 12:46PM | 1 | THE COURT:  AND BY THAT I MEAN YOU HAVE AGREEMENT ON |
| 12:46PM | 2 | WHAT IS GOING TO BE PLAYED AND WHICH SIDE IS GOING TO DO THIS? |
| 12:46PM | 3 | MR. DOWNEY:  YES.  THE GOVERNMENT IS GOING TO DO IT, |
| 12:46PM | 4 | YOUR HONOR, AND WE'LL PLAY THE CLIPS SEQUENTIALLY AS ASKED FOR. |
| 12:46PM | 5 | THE COURT:  OKAY.  TERRIFIC. |
| 12:46PM | 6 | IF THERE'S NOTHING ELSE, WE'LL SUMMON THE JURY IN THEN. |
| 12:48PM | 7 | (JURY IN AT 12:48 P.M.) |
| 12:48PM | 8 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 12:49PM | 9 | SEATED. |
| 12:49PM | 10 | WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL |
| 12:49PM | 11 | ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS NOW PRESENT. |
| 12:49PM | 12 | THANK YOU, LADIES AND GENTLEMEN.  I RECEIVED A NOTE FROM |
| 12:49PM | 13 | THE JURY, WHICH I HAVE SHARED WITH COUNSEL.  THE NOTE I'LL READ |
| 12:49PM | 14 | AT THIS TIME IS, "WE WOULD LIKE TO LISTEN TO EXHIBITS 1348 |
| 12:49PM | 15 | (CLIPS 1-7, AND F) AND 1349 (CLIP 1 AND A)." |
| 12:49PM | 16 | I RECEIVED THAT.  I HAVE TALKED TO COUNSEL ABOUT THIS, |
| 12:49PM | 17 | LADIES AND GENTLEMEN OF THE JURY, AND I BELIEVE COUNSEL HAVE |
| 12:49PM | 18 | AGREED ON THE PLAYING OF THIS, OF THIS CLIP.  AND PER THE NOTE |
| 12:49PM | 19 | OF THE JURY, I'LL ASK THAT WE BEGIN WITH EXHIBIT 1348, AND |
| 12:49PM | 20 | WE'LL PLAY CLIPS 1-7 AND F. |
| 12:50PM | 21 | CAN YOU DO THAT, MR. SCHENK? |
| 12:50PM | 22 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:50PM | 23 | THE COURT:  THANK YOU. |
| 12:50PM | 24 | (AN AUDIO TAPED PLAYED IN OPEN COURT OFF THE RECORD.) |
| 12:52PM | 25 | THE COURT:  DOES THAT CONCLUDE 1348, 1-7 AND F? |

| | | |
|---|---|---|
| 12:53PM | 1 | MR. SCHENK:  NO, YOUR HONOR.  THAT WAS 1348-1. |
| 12:53PM | 2 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:53PM | 3 | (AN AUDIOTAPE PLAYED IN OPEN COURT OFF THE RECORD.) |
| 01:14PM | 4 | THE COURT:  MR. SCHENK, DOES THAT CONCLUDE 1348? |
| 01:14PM | 5 | MR. SCHENK:  YES, YOUR HONOR. |
| 01:14PM | 6 | THE COURT:  CLIPS 1 THROUGH 7 AND F? |
| 01:14PM | 7 | MR. SCHENK:  YES. |
| 01:14PM | 8 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:15PM | 9 | AND NOW, IF YOU WOULD, WE WILL PLAY 1349, CLIP 1 AND A. |
| 12:53PM | 10 | (AN AUDIOTAPE PLAYED IN OPEN COURT OFF THE RECORD.) |
| 01:28PM | 11 | THE COURT:  DOES THAT CONCLUDE 1349, CLIP 1 AND A? |
| 01:28PM | 12 | MR. SCHENK:  YES, YOUR HONOR. |
| 01:28PM | 13 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 01:28PM | 14 | DOES THAT -- PAYING THOSE TWO CLIPS PER THE NOTE, DOES |
| 01:28PM | 15 | THAT SATISFY THE QUESTION OF THE JURY THAT WAS PRESENTED? |
| 01:28PM | 16 | ANY HANDS UP THAT SAY THAT IT DOESN'T? |
| 01:28PM | 17 | I SEE NO HANDS. |
| 01:28PM | 18 | THEN I'LL ASK THE JURY TO RETURN AND TO THEIR |
| 01:28PM | 19 | DELIBERATIONS.  THANK YOU VERY MUCH. |
| 01:29PM | 20 | (JURY OUT AT 1:29 P.M.) |
| 01:29PM | 21 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 01:29PM | 22 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE |
| 01:29PM | 23 | COURTROOM TO CONTINUE DELIBERATIONS.  ALL COUNSEL AND |
| 01:29PM | 24 | MS. HOLMES ARE STILL PRESENT. |
| 01:29PM | 25 | ANYTHING FURTHER, MR. SCHENK? |

9367

01:29PM   1                    MR. SCHENK:  NO.

01:29PM   2                    MR. DOWNEY:  NO, YOUR HONOR.

01:29PM   3                    THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL BE IN

01:29PM   4        RECESS UNTIL WE HEAR ANYTHING FURTHER.  THANK YOU.

01:29PM   5                    THE CLERK:  COURT IS IN RECESS.

01:29PM   6             (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY AT

01:29PM   7        1:29 P.M.)

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
17         CERTIFICATE NUMBER 8076

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  DECEMBER 23, 2021

22

23

24

25

9384

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4
    UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
5                                    )
                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
6                                    )
        VS.                          )  VOLUME 51
7                                    )
    ELIZABETH A. HOLMES,             )  JANUARY 3, 2022
8                                    )
                    DEFENDANT.       )  PAGES 9384 - 9439
9    _____ )  **PAGES 9409 - 9417 SEALED**

10

11            TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE EDWARD J. DAVILA
12             UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S :

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
15                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
16                         SAN JOSE, CALIFORNIA 95113

17                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
18                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
19
        (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20

21   OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                         CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
23                         CERTIFICATE NUMBER 9595

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
25

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:   WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
 4                                  LANCE A. WADE
                                    KATHERINE TREFZ
 5                                  J.R. FLEURMONT
                                    SEEMA ROPER
 6                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 7

 8     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                               BY:  ADELAIDA HERNANDEZ
 9
                               OFFICE OF THE U.S. ATTORNEY
10                             BY:  LAKISHA HOLLIMAN, PARALEGAL
                                    MADDI WACHS, PARALEGAL
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    SAN JOSE, CALIFORNIA                    JANUARY 3, 2022

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 10:47 A.M.)

 4         (JURY OUT AT 10:47 A.M.)

 5              THE COURT:  WE ARE ON THE RECORD IN THE HOLMES

 6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

 7         WE ARE OUTSIDE OF THE PRESENCE OF THE JURY.  THE JURY

 8    CONTINUES TO DELIBERATE.

 9         WE RECEIVED A NOTE FROM THE JURY.  THIS IS NOTE NUMBER 3.

10    IT WAS RECEIVED AT 9:55.  MS. KRATZMANN WILL PROVIDE COUNSEL

11    THE NOTE NOW.

12              THE CLERK:  (HANDING.)

13         COUNSEL, I'M GOING TO GIVE YOU A MOMENT TO DISCUSS AT YOUR

14    TABLES, AND THEN I'LL ASK FOR ANY COMMENTS THAT YOU MIGHT HAVE.

15         (PAUSE IN PROCEEDINGS.)

16              THE COURT:  COUNSEL, LET ME ASK THIS, WOULD YOU

17    BENEFIT FROM ME STEPPING DOWN AND HAVING -- GIVING YOU SOME

18    TIME?

19              MR. LEACH:  NOT FROM THE GOVERNMENT, YOUR HONOR.  WE

20    THINK WE HAVE A POSITION BASED ON THE NOTE.  WE'RE HAPPY TO

21    CONFER WITH THE DEFENSE.

22              THE COURT:  OKAY.  ALL RIGHT.

23              MR. DOWNEY:  YOUR HONOR, I THINK THAT -- LET US TAKE

24    AN OPPORTUNITY TO CONFER WITH THE GOVERNMENT, BUT I DON'T THINK

25    THAT WILL TAKE MORE THAN A FEW MOMENTS.  I DON'T KNOW IF
```

```
10:51AM   1    YOUR HONOR WANTS TO STEP DOWN.

10:51AM   2            THE COURT:  I'M HAPPY TO STAY HERE IF YOU'RE

10:51AM   3    COMFORTABLE WITH THAT.  THAT'S FINE.

10:51AM   4        (DISCUSSION AMONGST ALL COUNSEL OFF THE RECORD.)

10:53AM   5            MR. DOWNEY:  I THINK WE'RE READY, YOUR HONOR.

10:53AM   6            THE COURT:  ALL RIGHT.  THANK YOU.

10:53AM   7        I DO HAVE THE NOTE.  I'LL READ IT AT THIS TIME.  IT'S

10:53AM   8    DATED TODAY'S DATE.  IT IS TIME STAMPED 9:55.  IT IS NOTE

10:53AM   9    NUMBER 3.

10:53AM  10        AND THE NOTE READS AS FOLLOWS:  "WE ARE UNABLE TO COME TO

10:53AM  11    A UNANIMOUS VERDICT ON 3 OF THE COUNTS."

10:54AM  12        IT'S SIGNED BY A JUROR.

10:54AM  13        I WANTED TO DIRECT COUNSEL TO 7.7.  I THINK YOU'VE

10:54AM  14    REFERENCED THAT ALREADY PERHAPS.

10:54AM  15        AND I'M HAPPY TO HEAR FROM THE PARTIES.  HOW YOU WOULD

10:54AM  16    LIKE TO PROCEED.

10:54AM  17            MR. LEACH:  GOOD MORNING, YOUR HONOR.  THANK YOU.

10:54AM  18        MAY I REMOVE MY MASK?

10:54AM  19            THE COURT:  PLEASE.  YES, PLEASE.

10:54AM  20            MR. LEACH:  WE AGREE WITH THE COURT'S INCLINATION

10:54AM  21    THAT THE COURT SHOULD GIVE MODEL INSTRUCTION 7.7.  I WOULD

10:54AM  22    RECOMMEND IN THE FIRST SENTENCE RATHER THAN SAYING "IN THIS

10:54AM  23    CASE," AND REPLACE THAT WITH "ON THREE OF THE COUNTS," AS

10:54AM  24    REFLECTED IN THE NOTE.

10:54AM  25        AND OUR POSITION IS THAT THE COURT SHOULD GIVE INSTRUCTION
```

| | | |
|---|---|---|
| 10:54AM | 1 | 7.7 MODIFIED TO THE NUMBER OF COUNTS AND PROVIDE NO OTHER |
| 10:55AM | 2 | INSTRUCTIONS AT THIS POINT. |
| 10:55AM | 3 | MR. DOWNEY:  YOUR HONOR, IF YOU'RE TO GIVE 7.7, WE |
| 10:55AM | 4 | ASK THAT THE COURT GIVE THE INSTRUCTION AS TO BURDEN OF PROOF |
| 10:55AM | 5 | AS CONTEMPLATED UNDER UNITED STATES VERSUS QUINTERO-BARRAZA, |
| 10:55AM | 6 | 78 F.3D 1344 AT 1350, THAT'S THE NINTH CIRCUIT IN 1995, |
| 10:55AM | 7 | ALTHOUGH IT'S NOT MANDATORY.  THE NINTH CIRCUIT SUGGESTS IT'S |
| 10:55AM | 8 | HELPFUL TO COUNTERACT ANY COERCIVE EFFECT. |
| 10:55AM | 9 | AS TO GIVING 7.7 AT THIS STAGE, I THINK THE JURORS ARE |
| 10:55AM | 10 | DISTINGUISHING BETWEEN COUNTS. |
| 10:55AM | 11 | AS I READ THE NOTE, I THINK THEY'RE DISTINGUISHING BETWEEN |
| 10:55AM | 12 | COUNTS AS TO WHICH THEY CAN AND CANNOT REACH A VERDICT. |
| 10:55AM | 13 | I THINK 7.7 IS PROBABLY UNNECESSARY AND RUNS THE RISK OF |
| 10:56AM | 14 | BEING COERCIVE. |
| 10:56AM | 15 | SO I UNDERSTAND THAT 7.7 IS GIVEN IN CASES OF DEADLOCK, |
| 10:56AM | 16 | BUT GIVEN THE LENGTH OF DELIBERATIONS ALREADY AND THE LENGTH OF |
| 10:56AM | 17 | TRIAL, ET CETERA, WE WOULD OBJECT TO THE COURT GIVING 7.7. |
| 10:56AM | 18 | THE COURT:  OKAY.  THANK YOU. |
| 10:56AM | 19 | MR. LEACH:  YOUR HONOR, WE'VE RECEIVED TWO NOTES |
| 10:56AM | 20 | FROM THE JURY.  ONE WAS, I THINK, TO REPLAY CERTAIN TESTIMONY, |
| 10:56AM | 21 | AND I THINK THE OTHER ONE WAS NOT TERRIBLY SUBSTANTIVE. |
| 10:56AM | 22 | THIS IS ONLY THE THIRD TIME WE HAVE HEARD FROM THEM.  I |
| 10:56AM | 23 | THINK THE AMOUNT OF TIME THAT THEY HAVE BEEN WORKING HARD IS A |
| 10:56AM | 24 | REASON TO GIVE THE INSTRUCTION, NOT TO REFRAIN FROM GIVING THE |
| 10:56AM | 25 | INSTRUCTION.  I THINK THE NINTH CIRCUIT HAS PROPOSED LANGUAGE |

10:56AM 1    THAT IS NOT COERCIVE, AND GIVEN THE LENGTH OF THE TRIAL AND THE

10:56AM 2    ABSENCE OF ANY DISSENSION TO DATE, COUNSEL IS IN FAVOR OF

10:56AM 3    GIVING IT, AND WE WOULD URGE THE COURT TO DO SO.

10:56AM 4              THE COURT:  ALL RIGHT.  THANK YOU.

10:56AM 5         THE -- I HAVE 7.7 IN FRONT OF ME.  I THINK -- I HEARD YOU

10:57AM 6    INDICATE A QUOTE ON THE FIRST LINE, AND I'M NOT SURE -- PERHAPS

10:57AM 7    WE DON'T HAVE THE SAME COPY.

10:57AM 8              MR. LEACH:  I'M WORKING FROM THE ELECTRONIC VERSION

10:57AM 9    ON THE NINTH CIRCUIT'S WEBSITE, YOUR HONOR.

10:57AM 10        AND WHAT I'M LOOKING AT READS, "MEMBERS OF THE JURY,

10:57AM 11   YOU'VE REPORTED THAT YOU HAVE BEEN UNABLE TO REACH A UNANIMOUS

10:57AM 12   VERDICT IN THIS CASE."

10:57AM 13        I WOULD REPLACE THE WORDS "IN THIS CASE" WITH "ON THREE OF

10:57AM 14   THE COUNTS."

10:57AM 15             THE COURT:  ALL RIGHT.  THANK YOU.

10:57AM 16        MR. DOWNEY, WHAT ARE YOUR OBJECTIONS TO THE COURT GIVING

10:57AM 17   7.7 NOW?

10:57AM 18        AND WE'LL NOTE THAT I BELIEVE THIS IS DAY SEVEN OF THE

10:57AM 19   DELIBERATIONS.  OF COURSE THE FIRST DAY WAS ABOUT 30 MINUTES I

10:57AM 20   THINK, THAT FRIDAY THE 17TH, I THINK IT WAS ONLY ABOUT

10:58AM 21   30 MINUTES.

10:58AM 22        THE RECORD SHOULD REFLECT, AS I'VE SAID, THE QUESTION WAS

10:58AM 23   PROVIDED AT 9:55, AND I BELIEVE THE JURORS BEGAN THEIR

10:58AM 24   DELIBERATIONS TODAY ABOUT 8:30, MAYBE A LITTLE AFTER THAT, AND

10:58AM 25   THEY CONTINUE TO DELIBERATE NOW.

| | | |
|---|---|---|
| 10:58AM | 1 | BUT MR. DOWNEY? |
| 10:58AM | 2 | MR. DOWNEY:  WELL, YOUR HONOR, I THINK JUST TO FRAME |
| 10:58AM | 3 | THE TIMEFRAME CORRECTLY, I THINK THIS IS THE EIGHTH DAY IF WE |
| 10:58AM | 4 | COUNT THE TAIL END OF THE DAY WHERE THEY BEGAN DELIBERATING ON |
| 10:58AM | 5 | A FRIDAY AFTERNOON. |
| 10:58AM | 6 | I THINK THE NOTE REFLECTS THAT THEY ARE CAPABLE OF |
| 10:58AM | 7 | DISTINGUISHING BETWEEN COUNTS, AND IT'S NOT A NOTE THAT IS |
| 10:58AM | 8 | ISSUED, I THINK, TO US LIGHTLY.  THEY'VE BEEN AT IT OVER A VERY |
| 10:58AM | 9 | LONG PERIOD OF TIME, EVEN THOUGH IT'S -- THE COURT IS |
| 10:58AM | 10 | CHARACTERIZING IT AS ONLY THE EIGHTH DAY, THEY HAVE ACTUALLY |
| 10:59AM | 11 | BEEN DELIBERATING SINCE THE AFTERNOON OF THE 17TH.  EXHAUSTION |
| 10:59AM | 12 | IS ALWAYS A FACTOR THAT INCREASES THE RISK WITH RESPECT TO AN |
| 10:59AM | 13 | INSTRUCTION THAT CAN BE HEARD AS COERCIVE. |
| 10:59AM | 14 | SO I THINK I WOULD SAY THE LENGTH OF DELIBERATIONS, NOT |
| 10:59AM | 15 | ONLY IN TERMS OF NUMBER OF DAYS, BUT THE PERIOD OVER WHICH |
| 10:59AM | 16 | DELIBERATIONS HAVE TAKEN PLACE, RUNS THE RISK OF COERCION. |
| 10:59AM | 17 | BUT IF THE COURT IS INCLINED TO GIVE THE INSTRUCTION, I |
| 10:59AM | 18 | WOULD JUST URGE THE COURT, YOU KNOW, 18 DAYS OUT FROM HAVING |
| 10:59AM | 19 | GIVEN INSTRUCTIONS, THAT THE COURT REITERATE THE APPROPRIATE |
| 10:59AM | 20 | BURDEN OF PROOF IN THE INSTRUCTION. |
| 10:59AM | 21 | THE COURT:  THANK YOU.  WE DO NOTE THAT THIS JURY |
| 10:59AM | 22 | HAS AT LEAST THEIR INDICATIONS WHERE THEY TOOK LAST WEDNESDAY |
| 10:59AM | 23 | -- EXCUSE ME, LAST WEDNESDAY WAS THE LAST DAY THAT THEY |
| 10:59AM | 24 | DELIBERATED, I BELIEVE, AND THEY CHOSE TO TAKE THE THURSDAY |
| 10:59AM | 25 | BEFORE THE HOLIDAY OFF.  OF COURSE THEY WERE PERMITTED TO DO |

10:59AM  1    SO.  THEY SET THEIR OWN SCHEDULE.

10:59AM  2        SO THEY'RE NOW JUST BACK FROM THAT BREAK THAT THEY SET

11:00AM  3    THEMSELVES.

11:00AM  4        MR. DOWNEY, OF COURSE THE COURT MUST MAKE, AND I WILL

11:00AM  5    MAKE, SOME INQUIRY AS TO THIS NOTE.  THE QUESTION IS SHOULD THE

11:00AM  6    COURT GIVE 7.7 NOW OR SHOULD THE COURT MAKE INQUIRY RECOGNIZING

11:00AM  7    THE NOTE AND MAKE INQUIRY NOW AS TO -- FROM THE FOREPERSON AS

11:00AM  8    TO HIS FEELINGS ON THE DELIBERATION STATUS?

11:00AM  9        MR. DOWNEY:  WELL, YOUR HONOR, I THINK IF THE COURT

11:00AM 10    IS INCLINED TO GIVE 7.7, I THINK INQUIRY IS APPROPRIATE AND MAY

11:00AM 11    EVEN BE REQUIRED TO DETERMINE THE EXTENT OF DEADLOCK.

11:00AM 12        I'M INFERRING FROM THE CONTEXT SOMETHING ABOUT THE NOTE,

11:00AM 13    BUT I CERTAINLY THINK IF THE COURT THINKS IT DOESN'T CONVEY

11:00AM 14    WHAT I READ IT TO CONVEY, I THINK -- THE COURT IS, I THINK,

11:00AM 15    OBLIGATED UNDER NINTH CIRCUIT LAW TO MAKE SOME FORM OF INQUIRY.

11:00AM 16        THE COURT:  RIGHT.  I AGREE WITH YOU.  I THINK I DO

11:01AM 17    HAVE TO.  THE JURY HAS INDICATED IN THEIR NOTE THAT THERE ARE

11:01AM 18    THREE COUNTS THAT THEY'RE UNABLE TO REACH UNANIMOUS VERDICT ON.

11:01AM 19        NOW, I COULD GIVE THE ALLEN WITH THE PRESUMPTION OF

11:01AM 20    INNOCENCE INSTRUCTION.

11:01AM 21        AGAIN, MR. LEACH, DO YOU HAVE ANY THOUGHTS ON THAT?

11:01AM 22        MR. LEACH:  I DON'T THINK IT'S REQUIRED, YOUR HONOR,

11:01AM 23    BUT I CERTAINLY DON'T THINK IT WOULD BE ERROR TO REMIND THEM

11:01AM 24    THAT THEY MUST BE UNANIMOUS AND MUST FIND THE ELEMENTS BEYOND A

11:01AM 25    REASONABLE DOUBT.

11:01AM   1        I WOULD ALSO NOTE TO THE COURT THAT THERE IS A MODEL

11:01AM   2   INSTRUCTION 7.8 FOR A POST-ALLEN INQUIRY THAT SUGGESTS --

11:01AM   3             THE COURT:  RIGHT.

11:01AM   4             MR. LEACH:  -- QUESTIONS THAT, IF THE COURT IS GOING

11:01AM   5   TO VOIR DIRE NOW, MIGHT BE APPROPRIATE.

11:01AM   6             THE COURT:  WELL, THAT'S THE, THAT'S REALLY THE

11:01AM   7   QUESTION HERE THAT THE COURT HAS, AND I WANT TO GET YOUR

11:01AM   8   THOUGHTS ON THAT.

11:01AM   9        THE COURT COULD -- I KNOW 7.8 HAS THE POST-ALLEN

11:02AM  10   QUESTIONS.  OFTENTIMES THOSE QUESTIONS ARE USED AT THE FIRST

11:02AM  11   INSTANCE OF RECEIVING A NOTE LIKE THIS.

11:02AM  12             MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR.

11:02AM  13        AND I THINK, UNLESS I'M MISREADING THE MODEL INSTRUCTIONS,

11:02AM  14   I THINK THERE'S A MODEL RULE THAT CONTEMPLATES A PRE-ALLEN

11:02AM  15   INQUIRY IN 54(A).

11:02AM  16             THE COURT:  AND I COULD -- WHEN I LOOK AT THIS, I

11:02AM  17   UNDERSTAND THE COERCIVE CONSTRAINTS ABOUT GIVING ALLEN, AND

11:02AM  18   NONE OF US WANT TO IN ANY WAY SUGGEST TO THE JURY THAT --

11:02AM  19   ANYTHING COERCIVE TO THE JURY IN REGARDS TO THEIR

11:02AM  20   DELIBERATIONS.

11:02AM  21        WHEN I LOOK AT 7.8, IT DOES HAVE, AND I THINK WE'RE

11:02AM  22   LOOKING AT THE SAME PAGE, IT DOES HAVE THE COLLOQUY THAT I

11:02AM  23   THINK LOOKING AT THAT COLLOQUY IS -- IT CUTS TO THE CHASE, IF

11:03AM  24   YOU'LL PARDON ME FOR PUTTING IT THAT WAY, IT ASKS THE

11:03AM  25   FOREPERSON TO SPEAK TO THE STATUS AND STATE OF THE

11:03AM  1    DELIBERATIONS AT THIS TIME.

11:03AM  2        MR. LEACH?

11:03AM  3            MR. LEACH:  I DON'T THINK IT'S ERROR, YOUR HONOR.

11:03AM  4    I DO THINK THAT IT'S EARLY IN THE DAY.  THIS IS THE FIRST

11:03AM  5    NOTE THAT WE'VE GOTTEN INDICATING THAT THERE'S SOME DISSENSION

11:03AM  6    ON ANY COUNTS.

11:03AM  7        THIS WAS A LONG TRIAL.  BOTH SIDES HAVE AN INTEREST IN

11:03AM  8    RESOLUTION ONE WAY OR ANOTHER ON ALL OF THE COUNTS, AND I THINK

11:03AM  9    THE LANGUAGE IN 7.7 IS CAREFULLY TAILORED TO NOT BE COERCIVE.

11:03AM  10       AND SO I DON'T SEE ANY RISK OF COERCION WITHOUT THAT TYPE

11:03AM  11   OF INQUIRY, BUT IT CERTAINLY WOULDN'T -- IT CERTAINLY COULD AID

11:03AM  12   THE INQUIRY.  IT WOULDN'T BE ERROR FOR THE COURT TO ASK THE 7.8

11:03AM  13   QUESTIONS NOW RATHER THAN AFTER THE ALLEN CHARGE.

11:03AM  14           MR. DOWNEY:  YOUR HONOR, WE CERTAINLY DON'T OBJECT

11:03AM  15   TO THE INQUIRY.  I MIGHT NOTE THAT I THINK THE REQUIREMENT AS

11:04AM  16   WELL IS THAT THE JURY BE POLLED AS YOUR HONOR I THINK KNOWS.

11:04AM  17           THE COURT:  WELL, WHEN THEY -- YOU'RE TALKING ABOUT

11:04AM  18   WHEN A VERDICT IS RECEIVED OR INDIVIDUALLY?

11:04AM  19       MY INTENT WOULD BE TO ASK THEM THE 7.8 LANGUAGE AT SOME

11:04AM  20   POINT AND THEN TO ASK THE JURORS IF THEY'RE IN AGREEMENT WITH

11:04AM  21   WHATEVER THAT STATEMENT IS.

11:04AM  22           MR. DOWNEY:  THAT'S RIGHT, THAT'S RIGHT, YOUR HONOR.

11:04AM  23   THAT IS WHAT I'M CONVEYING.

11:04AM  24           THE COURT:  RIGHT.

11:04AM  25       THE SECOND QUESTION IS IF THE JURY, DEPENDING ON THEIR

11:04AM 1    ANSWER, THEY'LL GO BACK AND I'LL ASK THEM TO LET US KNOW WHEN

11:04AM 2    AND IF THEY'RE ABLE TO RETURN A VERDICT.

11:04AM 3        IF THERE IS -- IF IT REMAINS AS IT SEEMS IN THIS NOTE,

11:04AM 4    THEN THE QUESTION IS WHEN AND SHOULD THE COURT DECLARE A

11:04AM 5    MISTRIAL AS TO ANY COUNTS WHERE THERE'S A LACK OF UNANIMITY?

11:04AM 6        YOUR THOUGHTS?

11:04AM 7        MR. DOWNEY:  WELL, YOUR HONOR, I HAVE MADE MY

11:05AM 8    POSITION CLEAR AS TO RECHARGING THEM.  I THINK IF THEY COME

11:05AM 9    BACK IN RESPONSE TO THE INQUIRY AND INDICATE THAT THEY'RE WHERE

11:05AM 10   I THINK THEY ARE BASED ON MY READING OF THE NOTE, THEN I THINK

11:05AM 11   WE PROBABLY HAVE A MISTRIAL AS TO THOSE COUNTS.

11:05AM 12       MR. LEACH:  I DON'T HAVE AN IMMEDIATE REACTION,

11:05AM 13   YOUR HONOR, BUT I THINK IT WOULD BE APPROPRIATE TO TAKE THE

11:05AM 14   VERDICT AND CONFIRM THAT THEY'RE DEADLOCKED ON THOSE THREE

11:05AM 15   COUNTS.

11:05AM 16       THE COURT:  YES.

11:05AM 17       MR. LEACH:  BUT THAT'S SOMETHING THAT I HAVEN'T

11:05AM 18   CONSIDERED BEFORE COMING UP HERE.

11:05AM 19       THE COURT:  WELL, WE'LL SEE WHAT THE VERDICT FORM

11:05AM 20   SAYS OF COURSE, AND THEN THE COURT INTENDS TO POLL THE JURY AS

11:05AM 21   TO WHATEVER VERDICTS THEY HAVE REACHED DEPENDING ON HOW THE

11:05AM 22   FORM IS COMPLETED.

11:05AM 23       WELL, LET ME DO THIS, LET ME --

11:05AM 24       MR. DOWNEY, IF THE COURT READS 7.7, YOU'RE ASKING THAT THE

11:06AM 25   COURT ALSO READ JURY INSTRUCTION NUMBER 2?

11:06AM   1              MR. DOWNEY:  WOULD YOU GIVE ME A MOMENT, YOUR HONOR?

11:06AM   2    LET ME JUST CONSULT WITH --

11:06AM   3              THE COURT:  OF COURSE.

11:06AM   4          (DISCUSSION OFF THE RECORD.)

11:06AM   5              MR. DOWNEY:  THAT'S RIGHT, YOUR HONOR, ON PAGE 3.

11:06AM   6              MR. LEACH:  FORGIVE ME, YOUR HONOR.  WHAT NUMBER WAS

11:06AM   7    THAT?

11:06AM   8              THE COURT:  IT WAS JURY INSTRUCTION NUMBER 2, AND

11:06AM   9    IT'S FOUND ON PAGE 3 OF THE FINAL JURY INSTRUCTIONS.

11:06AM  10              MR. LEACH:  YES.  NO OBJECTION.

11:06AM  11              THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT,

11:06AM  12    MR. DOWNEY?

11:06AM  13              MR. DOWNEY:  NO, YOUR HONOR.  BUT I WOULDN'T OBJECT

11:06AM  14    TO 3.2 EITHER IN THE MODEL.

11:07AM  15              THE COURT:  I'M SORRY, 3.2 DID YOU SAY?

11:07AM  16              MR. DOWNEY:  AND I THINK WHAT WE HAVE DONE IS PRETTY

11:07AM  17    CLOSE TO THAT.  SO JURY INSTRUCTION 2 IS FINE FROM OUR

11:07AM  18    PERSPECTIVE.

11:07AM  19              THE COURT:  ALL RIGHT.  ALL RIGHT.  THANK YOU.

11:08AM  20        ALL RIGHT.  THANK YOU.  I WILL READ 7.7 WITH MR. LEACH'S

11:08AM  21    SUGGESTED MODIFICATIONS.  THE FIRST LINE WE WILL MODIFY "TO

11:08AM  22    REACH A UNANIMOUS VERDICT ON THREE OF THE COUNTS."

11:08AM  23        I'LL READ THE FOLLOWING PARAGRAPHS, AND THEN I'LL CONCLUDE

11:08AM  24    BY INFORMING THE JURY THAT I'M GOING TO READ JURY INSTRUCTION

11:08AM  25    NUMBER 2.

| | | |
|---|---|---|
| 11:08AM | 1 | AND THEN I'LL ASK THEM THEN TO RETURN TO THE JURY ROOM AND |
| 11:08AM | 2 | CONTINUE DELIBERATIONS, AND WE'LL AWAIT ANY FURTHER WORD FROM |
| 11:08AM | 3 | THE JURY. |
| 11:08AM | 4 | ALL RIGHT.  LET'S BRING THEM IN.  THANK YOU. |
| 11:08AM | 5 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 11:08AM | 6 | (PAUSE IN PROCEEDINGS.) |
| 11:11AM | 7 | (JURY IN AT 11:11 A.M.) |
| 11:11AM | 8 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 11:11AM | 9 | WE ARE ON THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL |
| 11:11AM | 10 | ARE PRESENT.  MS. HOLMES IS PRESENT.  THE JURY IS PRESENT. |
| 11:11AM | 11 | GOOD MORNING, LADIES AND GENTLEMEN. |
| 11:11AM | 12 | I JUST WANT TO CONFIRM THAT THE COURT DID RECEIVE NOTE |
| 11:11AM | 13 | NUMBER 3 FROM THE JURY.  THE NOTE READS:  "WE ARE UNABLE TO |
| 11:11AM | 14 | COME TO A UNANIMOUS VERDICT ON 3 OF THE COUNTS." |
| 11:11AM | 15 | LADIES AND GENTLEMEN, WHAT I WOULD LIKE TO DO IS TO READ |
| 11:11AM | 16 | TO YOU AN ADDITIONAL INSTRUCTION, ACTUALLY TWO, AND THEN I'M |
| 11:11AM | 17 | GOING TO ASK YOU TO CONTINUE DELIBERATIONS AFTER YOU HEAR |
| 11:11AM | 18 | THESE.  SO PLEASE DO LISTEN CLOSELY. |
| 11:11AM | 19 | MEMBERS OF THE JURY, YOU HAVE REPORTED THAT YOU HAVE BEEN |
| 11:12AM | 20 | UNABLE TO REACH A UNANIMOUS VERDICT ON THREE OF THE COUNTS.  I |
| 11:12AM | 21 | HAVE DECIDED TO SUGGEST A FEW ADDITIONAL THOUGHTS TO YOU. |
| 11:12AM | 22 | AS JURORS, YOU HAVE A DUTY TO DISCUSS THE CASE WITH ONE |
| 11:12AM | 23 | ANOTHER AND TO DELIBERATE IN AN EFFORT TO REACH A UNANIMOUS |
| 11:12AM | 24 | VERDICT IF EACH OF YOU CAN DO SO WITHOUT VIOLATING YOUR |
| 11:12AM | 25 | INDIVIDUAL JUDGMENT AND CONSCIENCE. |

11:12AM   1        EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT ONLY

11:12AM   2   AFTER YOU CONSIDER THE EVIDENCE IMPARTIALLY WITH YOUR FELLOW

11:12AM   3   JURORS.

11:12AM   4        DURING YOUR DELIBERATIONS, YOU SHOULD NOT HESITATE TO

11:12AM   5   REEXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINION IF YOU BECOME

11:13AM   6   PERSUADED THAT IT IS WRONG.

11:13AM   7        YOU SHOULD NOT, HOWEVER, CHANGE AN HONEST BELIEF AS TO THE

11:13AM   8   WEIGHT OR EFFECT OF THE EVIDENCE SOLELY BECAUSE OF THE OPINIONS

11:13AM   9   OF YOUR FELLOW JURORS OR FOR THE MERE PURPOSE OF RETURNING A

11:13AM  10   VERDICT.

11:13AM  11        I ALSO REMIND YOU THAT IN YOUR DELIBERATIONS YOU ARE

11:13AM  12   NOT -- YOU ARE -- EXCUSE ME.  LET ME READ THAT AGAIN.

11:13AM  13        I ALSO REMIND YOU THAT IN YOUR DELIBERATIONS YOU ARE TO

11:13AM  14   CONSIDER THE INSTRUCTIONS THAT I HAVE GIVEN YOU AS A WHOLE.

11:13AM  15        YOU SHOULD NOT SINGLE OUT ANY PART OF ANY INSTRUCTION,

11:13AM  16   INCLUDING THIS ONE, AND IGNORE OTHERS.  THEY ARE ALL EQUALLY

11:13AM  17   IMPORTANT.

11:13AM  18        NOW, WHAT I HAVE JUST SAID IS NOT MEANT TO RUSH YOU OR

11:14AM  19   PRESSURE YOU INTO AGREEING ON A VERDICT.  TAKE AS MUCH TIME AS

11:14AM  20   YOU NEED TO DISCUSS THINGS.  THERE IS NO HURRY.

11:14AM  21        I ALSO WANT TO READ TO YOU JURY INSTRUCTION NUMBER 2,

11:14AM  22   WHICH READS, THE INDICTMENT IS NOT EVIDENCE.  MS. HOLMES, THE

11:14AM  23   DEFENDANT, HAS PLEADED NOT GUILTY TO THE CHARGES.  MS. HOLMES

11:14AM  24   IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT

11:14AM  25   PROVES HER GUILTY BEYOND A REASONABLE DOUBT.

| | | |
|---|---|---|
| 11:14AM | 1 | IN ADDITION, MS. HOLMES DOES NOT HAVE TO TESTIFY OR |
| 11:14AM | 2 | PRESENT ANY EVIDENCE.  MS. HOLMES DOES NOT HAVE TO PROVE |
| 11:14AM | 3 | INNOCENCE.  THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY |
| 11:14AM | 4 | ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT. |
| 11:14AM | 5 | LADIES AND GENTLEMEN, I'LL NOW ASK YOU TO NOW RETURN TO |
| 11:14AM | 6 | THE JURY ROOM AND CONTINUE YOUR DELIBERATIONS WITH THESE |
| 11:15AM | 7 | ADDITIONAL COMMENTS IN MIND. |
| 11:15AM | 8 | YOU CAN NOTIFY THE COURT OF ANY ADDITIONAL QUESTIONS OR |
| 11:15AM | 9 | ANY OTHER POSITIONS YOU HAVE WHEN APPROPRIATE.  SO I'LL ASK YOU |
| 11:15AM | 10 | TO RETIRE NOW IF YOU WOULD, PLEASE. |
| 11:15AM | 11 | MS. KRATZMANN, IF YOU COULD. |
| 11:15AM | 12 | (JURY OUT AT 11:15 A.M.). |
| 11:15AM | 13 | THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK |
| 11:15AM | 14 | YOU. |
| 11:15AM | 15 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT. |
| 11:15AM | 16 | LET ME ASK THE PARTIES, THE GOVERNMENT, ANY OBJECTION TO |
| 11:15AM | 17 | THE COURT READING THE 7.7 AND THE JURY INSTRUCTION NUMBER 2? |
| 11:15AM | 18 | MR. LEACH:  NO, YOUR HONOR. |
| 11:15AM | 19 | THE COURT:  MR. DOWNEY? |
| 11:15AM | 20 | MR. DOWNEY:  YOUR HONOR, YOU'VE READ CONSISTENT WITH |
| 11:16AM | 21 | MODEL 7.7.  SO SUBJECT TO OUR PRIOR DISCUSSIONS, NOTHING |
| 11:16AM | 22 | FURTHER. |
| 11:16AM | 23 | THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT. |
| 11:16AM | 24 | WE'LL BE IN RECESS.  THANK YOU. |
| 11:16AM | 25 | THE CLERK:  COURT IS IN RECESS. |

11:16AM   1          (RECESS TAKEN AT 11:16 A.M. PENDING THE DELIBERATIONS OF

11:16AM   2      THE JURY.)

11:16AM   3

          4

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

| | | |
|---|---|---|
| 03:19PM | 1 | **AFTERNOON SESSION** |
| 03:19PM | 2 | (COURT CONVENED AT 3:19 P.M.) |
| 03:19PM | 3 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 03:19PM | 4 | WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT. |
| 03:19PM | 5 | MS. HOLMES IS PRESENT.  WE'RE OUTSIDE OF THE PRESENCE OF THE |
| 03:19PM | 6 | JURY. |
| 03:19PM | 7 | I DID RECEIVE NOTE NUMBER 4.  AND I'LL ASK OUR COURTROOM |
| 03:19PM | 8 | DEPUTY TO PROVIDE COPIES TO COUNSEL. |
| 03:19PM | 9 | THE CLERK:  YES, YOUR HONOR.  (HANDING.) |
| 03:19PM | 10 | THE COURT:  LET ME READ THE NOTE INTO THE RECORD. |
| 03:20PM | 11 | IT'S DATED 1/3.  IT'S 2:20.  IT'S NOTE NUMBER 4. |
| 03:20PM | 12 | AND THE NOTE READS AS FOLLOWS:  "AFTER CONSIDERING ALL |
| 03:20PM | 13 | EVIDENCE AND GIVEN INSTRUCTIONS, WE HAVE CONCLUDED THAT WE |
| 03:20PM | 14 | CANNOT REACH A UNANIMOUS VERDICT ON 3 CHARGES." |
| 03:20PM | 15 | IT'S SIGNED BY A JUROR. |
| 03:20PM | 16 | COUNSEL, MY THOUGHT IS TO BRING OUR JURY PANEL IN.  THE |
| 03:20PM | 17 | COURT, OF COURSE, HAS GIVEN THE ALLEN INSTRUCTION, MODIFIED |
| 03:20PM | 18 | ALLEN INSTRUCTION, NINTH CIRCUIT MODEL INSTRUCTION. |
| 03:20PM | 19 | MY INTENT WOULD BE TO HAVE THE JURY RETURN TO THE |
| 03:20PM | 20 | COURTROOM, AND I WOULD MAKE INQUIRY OF THE FOREPERSON.  I WOULD |
| 03:20PM | 21 | THEN IN SOME MANNER POLL THE REMAINING MEMBERS OF THE JURY TO |
| 03:21PM | 22 | DETERMINE WHETHER OR NOT THE QUESTION -- THEY AGREE WITH THE |
| 03:21PM | 23 | STATEMENT THAT IS LISTED IN THIS QUESTION. |
| 03:21PM | 24 | IF THEY DO, THEN IT WOULD BE MY INTENT TO ASK THEM, IF |
| 03:21PM | 25 | THEY DON'T HAVE THE VERDICT FORM WITH THEM, TO ASK THEM TO |

9401

03:21PM 1    RETURN TO THE JURY ROOM AND THEN LET US KNOW WHAT THEY HAVE

03:21PM 2    COMPLETED THE VERDICT FORM AND WE CAN THEN CALL THEM BACK FOR

03:21PM 3    ANY DECISION THAT THEY'VE MADE.

03:21PM 4         ANY COMMENT FROM THE GOVERNMENT?

03:21PM 5         FROM THE DEFENSE?

03:21PM 6         (DISCUSSION AMONGST COUNSEL OFF THE RECORD.)

03:21PM 7              THE COURT:  MR. DOWNEY?

03:21PM 8              MR. DOWNEY:  AS A PRACTICAL MATTER, I THINK THE

03:22PM 9    COURT'S APPROACH GENERALLY SOUNDS CORRECT TO US.  BUT WILL THE

03:22PM 10   COURT BE DECLARING A MISTRIAL AS TO THOSE THREE COUNTS AT THIS

03:22PM 11   TIME OR HOW DO -- OBVIOUSLY WE DON'T KNOW THE COUNTS, NOR DO WE

03:22PM 12   WISH TO INQUIRE --

03:22PM 13             THE COURT:  CORRECT.

03:22PM 14             MR. DOWNEY:  -- AND NOR DOES THE COURT WISH TO

03:22PM 15   INQUIRE INTO THAT.

03:22PM 16        SO I JUST WANTED TO INQUIRE AS TO HOW WE --

03:22PM 17             THE COURT:  NO.  FAIR QUESTION.

03:22PM 18        MY SENSE IS THAT WE WOULD, ASSUMING THE COLLOQUY GOES AS

03:22PM 19   I'VE SUGGESTED, AND I WOULD ASK THEM TO COMPLETE THE VERDICT

03:22PM 20   FORM AND RETURN, LET US KNOW WHEN THEY HAVE A COMPLETED VERDICT

03:22PM 21   FORM.

03:22PM 22        I WOULD HAVE THEM COME BACK.  I WOULD ASK MS. KRATZMANN TO

03:22PM 23   READ THE VERDICT FORM.  IF THERE ARE THREE COUNTS THAT ARE NOT

03:22PM 24   RESPONDED TO, THEN AT THAT POINT I WOULD RECORD THE VERDICTS IF

03:22PM 25   THERE ARE ANY AS TO THOSE COUNTS.

9402

03:22PM   1        THE REMAINING VERDICTS WOULD BE SUBJECT TO ANY FUTURE

03:23PM   2   MOTION FOR EITHER MISTRIAL OR ANY OTHER ACTION THAT WOULD BE

03:23PM   3   TAKEN.

03:23PM   4        MY SENSE IS THAT AFTER THE -- I THINK I'VE TOLD YOU THIS

03:23PM   5   PREVIOUSLY, AFTER THE VERDICTS ARE RECORDED AND I RELEASE THE

03:23PM   6   JURY, I WOULD, I WOULD INVITE THEM BACK TO PERSONALLY THANK

03:23PM   7   THEM AND TO ASK THEM IF THERE'S ANYTHING THE COURT -- IF THEY

03:23PM   8   HAVE SUGGESTIONS FOR THE COURT, FOR ANYTHING THAT THE COURT

03:23PM   9   COULD DO TO ENHANCE A JUROR EXPERIENCE.

03:23PM   10       I WOULD TAKE A BREAK AND COME BACK TO TALK WITH ALL OF US

03:23PM   11  ABOUT NEXT STEPS.

03:23PM   12       AND AT THAT POINT I'LL MAKE INQUIRY AS TO ANY REMAINING

03:23PM   13  COUNTS AS TO ANY MOTIONS AS TO THOSE COUNTS THAT EITHER PARTY

03:23PM   14  WISHES TO MAKE, AND THEN THE COURT WILL MAKE A DECISION AS TO

03:23PM   15  WHAT TO DO ABOUT ANY REMAINING COUNTS AND SET ANY NEW DATES AS

03:23PM   16  NEEDED.

03:23PM   17       ANY COMMENT ON THAT?

03:23PM   18       (DISCUSSION OFF THE RECORD.)

03:23PM   19            MR. DOWNEY:  IN THAT SENSE, YOUR HONOR --

03:23PM   20            THE COURT:  EXCUSE ME.

03:24PM   21            MR. DOWNEY:  -- WHEN WOULD YOUR HONOR INTEND TO

03:24PM   22  DISCHARGE THE JURY?

03:24PM   23            THE COURT:  WELL, IT WOULD BE AS SOON AS THE

03:24PM   24  VERDICTS ARE RECORDED.

03:24PM   25            MR. DOWNEY:  I THINK THERE WAS ONE MATTER WE WANTED

03:24PM   1    TO ADDRESS WITH THE JURY WHICH WE'VE RAISED WITH YOUR HONOR, SO

03:24PM   2    I WOULD REQUEST THAT THE JURY NOT BE DISCHARGED UNTIL AFTER

03:24PM   3    THAT MATTER IS ADDRESSED.

03:24PM   4         THE COURT:  WELL, I THINK WE SHOULD TALK ABOUT THAT.

03:24PM   5    I'M NOT SURE OF THE NECESSITY OF THAT GIVEN THE STATE OF RECENT

03:24PM   6    DEVELOPMENTS, LET ME PUT IT THAT WAY, AND I'M NOT -- I'M JUST

03:24PM   7    NOT CERTAIN THAT THAT IS SOMETHING, BECAUSE OF THE RECENT

03:24PM   8    DEVELOPMENTS, I'M NOT CERTAIN THAT THAT IS REQUIRED,

03:24PM   9    MR. DOWNEY.

03:24PM  10         MR. DOWNEY:  WELL, I THINK WHAT YOUR HONOR IS

03:24PM  11    REFERRING TO, WE DISCUSSED THAT POSSIBILITY PREVIOUSLY, AND AS

03:24PM  12    I SAID AT THAT TIME, I THINK THAT'S OBVIOUSLY A NECESSARY BUT

03:24PM  13    NOT SUFFICIENT STEP TO ADDRESS THE ISSUE WE'RE CONFRONTING.

03:24PM  14         THE COURT:  RIGHT.

03:24PM  15         MR. DOWNEY:  SO I WOULD JUST MAKE THE REQUEST THAT

03:25PM  16    THE JURY NOT BE DISCHARGED AND WE UNDERTAKE APPROPRIATE

03:25PM  17    PROCEDURES TO ADDRESS THE MATTER.

03:25PM  18         THE COURT:  OKAY.  THANK YOU.

03:25PM  19         MR. LEACH:  THANK YOU, YOUR HONOR.

03:25PM  20    THE GOVERNMENT HAS NO OBJECTION PROCEEDING IN THE WAY THAT

03:25PM  21    THE COURT HAS DESCRIBED.

03:25PM  22         THE COURT:  OKAY.  ALL RIGHT.

03:25PM  23    AND NOT THE WAY THAT MR. DOWNEY SUGGESTED?

03:25PM  24         MR. LEACH:  CORRECT.  WE'RE NOT SEEKING THAT, AND

03:25PM  25    AGREE WITH THE COURT'S PROPOSED COURSE OF ACTION.  SO, YES,

03:25PM  1    WE'RE FINE WITH THAT APPROACH.

03:25PM  2            THE COURT:  OKAY.  ALL RIGHT.

03:25PM  3        MR. DOWNEY, ANYTHING ELSE?

03:25PM  4            MR. DOWNEY:  YOUR HONOR, I JUST WANT TO MAKE CERTAIN

03:25PM  5    THAT I THINK THIS IS AN ASSUMPTION THAT WILL GUIDE THE COURT'S

03:25PM  6    INTERACTIONS WITH THE JURY, BUT I THINK IT'S FAIR TO SAY THAT

03:25PM  7    WE DON'T KNOW WHAT THE STATUS IS OF THE JURY'S DELIBERATION

03:25PM  8    WITH REGARD TO THE REMAINING EIGHT COUNTS.

03:26PM  9            THE COURT:  THAT'S RIGHT.

03:26PM  10           MR. DOWNEY:  AND SO IN THE SEQUENCE, WOULD THE

03:26PM  11   APPROPRIATE TIME TO ADDRESS THE INABILITY TO REACH A VERDICT

03:26PM  12   WITH THE KIND OF INQUIRY THAT THE COURT CONTEMPLATES, WHICH IS

03:26PM  13   IN THE MANUAL AND IS CALLED FOR UNDER NINTH CIRCUIT LAW, WOULD

03:26PM  14   THAT TAKE PLACE AFTER THE JURY HAS INDICATED IT HAS OTHERWISE

03:26PM  15   REACHED A VERDICT?

03:26PM  16           THE COURT:  CORRECT.  MY INTENT IS TO BRING THEM

03:26PM  17   OUT, REVIEW THE NOTE WITH THE FOREPERSON, AND THEN MOVE TO THE

03:26PM  18   COLLOQUY THAT IS SUGGESTED IN 7.8, MODEL INSTRUCTION 7.8.

03:26PM  19       AND I THINK YOU HAVE SEEN THAT.  WE'VE TALKED ABOUT THAT

03:26PM  20   THIS MORNING.  THE COURT WOULD MAKE INQUIRY OF THE BALANCE, IN

03:26PM  21   ESSENCE POLL FOR PURPOSES OF THE NOTE, POLL AS TO THAT NOTE

03:27PM  22   WHETHER OR NOT ALL OF THE JURORS AGREE WITH THE STATEMENT IN

03:27PM  23   THE NOTE.

03:27PM  24           MR. DOWNEY:  WELL, THE ONLY SUGGESTION I WOULD MAKE

03:27PM  25   TO YOUR HONOR IS THAT I WOULD THINK THE FIRST STEP WOULD BE

03:27PM   1    THAT WE DIRECT THEM TO DELIBERATE UNTIL THEY THINK THAT THEY

03:27PM   2    HAVE EITHER REACHED A VERDICT OR ARE UNABLE TO REACH A VERDICT

03:27PM   3    ON ALL COUNTS AND INDICATE THAT.

03:27PM   4        AND THEN I THINK THE STEPS THAT YOUR HONOR CONTEMPLATES,

03:27PM   5    OR THE APPROPRIATE STEPS IF THEY COME BACK AND INDICATE THAT

03:27PM   6    THEY ARE ABLE TO REACH A VERDICT AS TO SOME COUNTS AND SOME

03:27PM   7    REMAIN.

03:27PM   8        THE COURT:  I'M SORRY.  THAT'S WHAT I WAS SUGGESTING

03:27PM   9    WHEN I SAID THAT I'M GOING TO HAVE THEM RETURN TO THE JURY ROOM

03:27PM   10   AND THEN TO LET US KNOW WHEN AND IF THEY HAVE COMPLETED A

03:27PM   11   VERDICT FORM, OR THEY'RE READY TO COMPLETE A VERDICT FORM.

03:27PM   12        MR. DOWNEY:  FAIR ENOUGH, YOUR HONOR.

03:27PM   13       I JUST WANTED TO AVOID ANY SUGGESTION THAT IF THEY'RE NOT

03:27PM   14   AT THE POINT OF A VERDICT NOW, THAT IT'S AN APPROPRIATE TIME.

03:27PM   15   SO I THINK THE POLLING SHOULD AWAIT WHATEVER THEIR INDICATION

03:27PM   16   IS.

03:27PM   17        THE COURT:  RIGHT.

03:28PM   18       AND IF THEY CAN'T REACH A DECISION, AS THEY SAY IN THE

03:28PM   19   NOTE AS TO THREE COUNTS, THEN I COULD -- I'M NOT GOING TO GIVE

03:28PM   20   THEM ANOTHER ALLEN CHARGE, I'M NOT GOING TO DO THAT.  BUT I

03:28PM   21   WILL CONFIRM THAT THE NOTE IS ACCURATE AS TO EACH INDIVIDUAL

03:28PM   22   JUROR IF THAT'S WHAT THEIR STATE OF MIND IS.

03:28PM   23       AND IF THAT'S THE CASE, THEN I'LL ASK THEM TO GO BACK AND

03:28PM   24   COMPLETE THE VERDICT FORM AS BEST THAT THEY CAN, AND THEN WHEN

03:28PM   25   THEY'RE READY TO DO THAT, BRING THAT BACK AND INDICATE THAT

| | | |
|---|---|---|
| 03:28PM | 1 | THEY'RE READY TO DO THAT, BRING THAT BACK TO THE COURT, AND ASK |
| 03:28PM | 2 | THEM TO PROVIDE IT TO THE COURT, AND THEN I'LL HAVE |
| 03:28PM | 3 | MS. KRATZMANN READ WHATEVER VERDICTS, IF ANY, THEY HAVE REACHED |
| 03:28PM | 4 | AT THAT TIME. |
| 03:28PM | 5 | MR. DOWNEY:  FAIR ENOUGH. |
| 03:28PM | 6 | THE COURT:  DOES THAT MAKE SENSE? |
| 03:28PM | 7 | MR. DOWNEY:  I WASN'T CERTAIN.  I THOUGHT YOUR HONOR |
| 03:28PM | 8 | MIGHT BE PLANNING TO ENGAGE IN THAT FORM OF COLLOQUY WITH THE |
| 03:28PM | 9 | JURY AT THIS STAGE, AND I'M NOT SURE WE'RE QUITE THERE YET. |
| 03:28PM | 10 | THE COURT:  RIGHT.  OKAY. |
| 03:28PM | 11 | MR. LEACH? |
| 03:29PM | 12 | MR. LEACH:  THAT'S FINE WITH THE GOVERNMENT, |
| 03:29PM | 13 | YOUR HONOR. |
| 03:29PM | 14 | THE COURT:  OKAY.  ALL RIGHT.  WELL, LET'S BRING THE |
| 03:29PM | 15 | JURY IN THEN.  THANK YOU. |
| 03:31PM | 16 | (JURY IN AT 3:31 P.M.) |
| 03:31PM | 17 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 03:31PM | 18 | THE RECORD SHOULD REFLECT THAT WE'RE BACK ON THE RECORD |
| 03:31PM | 19 | AND ALL COUNSEL ARE PRESENT. |
| 03:31PM | 20 | MS. HOLMES IS PRESENT AND OUR JURY IS PRESENT. |
| 03:31PM | 21 | THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN.  I DID |
| 03:31PM | 22 | RECEIVE NOTE NUMBER 4, AND LET ME JUST READ THE NOTE. |
| 03:31PM | 23 | THIS IS NOTE NUMBER 4.  IT READS:  "AFTER CONSIDERING ALL |
| 03:31PM | 24 | EVIDENCE AND GIVEN INSTRUCTIONS WE HAVE CONCLUDED THAT WE |
| 03:32PM | 25 | CANNOT REACH A UNANIMOUS VERDICT ON 3 CHARGES." |

9407

| 03:32PM | 1 | LET ME ASK, WHO SPEAKS FOR THE JURY? |

03:32PM  1     LET ME ASK, WHO SPEAKS FOR THE JURY?

03:32PM  2     JUROR NUMBER 2, THANK YOU VERY MUCH.

03:32PM  3     JUROR NUMBER 2, LET ME ASK YOU SOME QUESTIONS, SIR.

03:32PM  4     THANK YOU.  YOU CAN BE SEATED.  THANK YOU.

03:32PM  5     JUROR NUMBER 2, IN YOUR OPINION, IS THE JURY UNABLE TO

03:32PM  6   AGREE ON A VERDICT AS TO ONE OR MORE COUNTS?

03:32PM  7          FOREPERSON:  YES.

03:32PM  8          THE COURT:  AND LET ME DIRECT THIS TO ALL OF THE

03:32PM  9   JURORS.  IF ANY OF YOU DISAGREE WITH THAT STATEMENT, PLEASE LET

03:32PM 10   ME KNOW NOW, THAT IS, RAISE YOUR HAND.

03:33PM 11     I SEE NO HANDS.

03:33PM 12     LET ME ASK THIS:  IS THERE A REASONABLE PROBABILITY THAT

03:33PM 13   THE JURY CAN REACH A UNANIMOUS VERDICT IF SENT BACK TO THE JURY

03:33PM 14   ROOM FOR FURTHER DELIBERATIONS?  IS THERE ANYONE WHO FEELS THAT

03:33PM 15   THAT IS A PROBABILITY?  IF SO, PLEASE RAISE YOUR HAND.

03:33PM 16     I SEE NO HANDS.

03:33PM 17     NOW, WITHOUT STATING WHERE ANY JUROR STANDS, I DON'T WANT

03:33PM 18   TO KNOW ANY OF THAT, DO ANY OF YOU BELIEVE THAT THERE IS A

03:33PM 19   REASONABLE PROBABILITY THAT THE JURY CAN REACH A UNANIMOUS

03:33PM 20   VERDICT IF YOU'RE SENT BACK TO THE JURY ROOM FOR FURTHER

03:33PM 21   DELIBERATIONS?  IF ANYONE FEELS THAT, PLEASE RAISE YOUR HAND.

03:33PM 22     I SEE NO HANDS.

03:33PM 23     ALL RIGHT.  THANK YOU.

03:33PM 24     JUROR NUMBER 2 IS THE FOREPERSON.  I'M NOW GOING TO ASK

03:34PM 25   YOU TO RETURN TO THE JURY DELIBERATION ROOM, AND TWO, IF YOU

9408

03:34PM   1    FEEL IT APPROPRIATE NOW, TO COMPLETE THE VERDICT FORM.  AND

03:34PM   2    PLEASE LET US KNOW, LET THE COURTROOM DEPUTY KNOW IF YOU HAVE

03:34PM   3    COMPLETED THE VERDICT FORM, AND WE'LL CALL YOU BACK SHOULD THAT

03:34PM   4    BE THE CASE.

03:34PM   5         ALL RIGHT?  THANK YOU.

03:34PM   6         (JURY OUT AT 3:34 P.M.)

03:34PM   7             THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:34PM   8    SEATED.

03:34PM   9         ALL RIGHT.  I'M INCLINED TO STEP DOWN AND JUST WAIT TO SEE

03:35PM   10   WHEN AND IF WE HEAR FROM THE JURY NEXT.

03:35PM   11        ANYTHING FURTHER BEFORE I DO THAT, MR. SCHENK?

03:35PM   12            MR. SCHENK:  YOUR HONOR, MAY WE COME BRIEFLY TO

03:35PM   13   SIDE-BAR TO DISCUSS ONE ISSUE?

03:35PM   14            THE COURT:  YES, OF COURSE.

03:35PM   15        WE'LL GO INTO THE JURY ROOM FOR A SIDE-BAR DISCUSSION.

03:35PM   16            MR. SCHENK:  THANK YOU.

03:35PM   17        (SIDE-BAR PROCEEDINGS HELD UNDER SEAL.)

          18

          19

          20

          21

          22

          23

          24

          25

| | | |
|---|---|---|
| 03:35PM | 1 | /// |
| 04:02PM | 2 | /// |
| 04:02PM | 3 | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD. |
| 04:02PM | 4 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 04:02PM | 5 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 04:02PM | 6 | DID YOU MAKE COPIES OF NOTE 5? |
| 04:02PM | 7 | THE CLERK:  I DID, YOUR HONOR. |
| 04:02PM | 8 | THE COURT:  IF YOU COULD PASS THAT OUT. |
| 04:02PM | 9 | THE CLERK:  (HANDING.) |
| 04:02PM | 10 | THE COURT:  WE DO HAVE NOTE 5 FROM THE JURY, AND |
| 04:02PM | 11 | MS. KRATZMANN CAN PASS THAT OUT NOW. |
| 04:02PM | 12 | THE NOTE READS:  "AS PER THE COURT'S INSTRUCTIONS WE'VE |
| 04:02PM | 13 | REACHED A UNANIMOUS VERDICT." |
| 04:03PM | 14 | IT'S SIGNED BY JUROR NUMBER 2, I BELIEVE, THE FOREPERSON. |
| 04:03PM | 15 | SO LET'S ASK OUR JURY TO RETURN TO THE COURTROOM. |
| 04:03PM | 16 | THE CLERK:  YES, YOUR HONOR. |
| 04:03PM | 17 | (JURY IN AT 4:03 P.M.) |
| 04:05PM | 18 | THE COURT:  THANK YOU.  PLEASE BE SEATED. |
| 04:05PM | 19 | WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 04:05PM | 20 | ARE PRESENT ONCE AGAIN.  ALL COUNSEL, MS. HOLMES IS PRESENT, |
| 04:05PM | 21 | OUR JURY IS PRESENT. |
| 04:05PM | 22 | AGAIN, THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN. |
| 04:05PM | 23 | I HAVE RECEIVED NOTE NUMBER 5, AND IT INDICATES AS |
| 04:05PM | 24 | FOLLOWS:  "AS PER THE COURT'S INSTRUCTIONS WE'VE REACHED A |
| 04:06PM | 25 | UNANIMOUS VERDICT." |

| | | |
|---|---|---|
| 04:06PM | 1 | LET ME ASK JUROR NUMBER 2, HAS THE JURY REACHED VERDICTS |
| 04:06PM | 2 | IN THIS CASE? |
| 04:06PM | 3 | FOREPERSON:  YES. |
| 04:06PM | 4 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 04:06PM | 5 | DO YOU HAVE THE VERDICT FORM? |
| 04:06PM | 6 | FOREPERSON:  YES (INDICATING). |
| 04:06PM | 7 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 04:06PM | 8 | I'LL ASK MS. KRATZMANN TO COLLECT THAT FROM YOU, PLEASE. |
| 04:07PM | 9 | (PAUSE IN PROCEEDINGS.) |
| 04:07PM | 10 | THE COURT:  I'M GOING TO RETURN THE VERDICT FORM. |
| 04:07PM | 11 | IT'S NOT DATED. |
| 04:07PM | 12 | DO WE HAVE A PEN? |
| 04:07PM | 13 | THE CLERK:  YES, WE DO.  (HANDING.) |
| 04:08PM | 14 | THANK YOU. |
| 04:09PM | 15 | (PAUSE IN PROCEEDINGS.) |
| 04:09PM | 16 | THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT. |
| 04:09PM | 17 | THANK YOU. |
| 04:09PM | 18 | I'M NOW GOING TO ASK MS. KRATZMANN, OUR COURTROOM DEPUTY, |
| 04:09PM | 19 | TO PUBLISH THE VERDICTS.  WHAT THAT MEANS, LADIES AND |
| 04:09PM | 20 | GENTLEMEN, IS I'M GOING TO ASK MS. KRATZMANN TO READ THE |
| 04:09PM | 21 | VERDICT FORM INTO THE RECORD. |
| 04:09PM | 22 | LADIES AND GENTLEMEN OF THE JURY, PLEASE LISTEN CLOSELY AS |
| 04:09PM | 23 | MS. KRATZMANN READS YOUR VERDICTS. |
| 04:09PM | 24 | WHEN SHE'S FINISHED, I'M GOING TO HAVE HER POLL THE JURY, |
| 04:09PM | 25 | THAT IS, SHE'S GOING TO ASK EACH OF YOU INDIVIDUALLY AS TO |

9420

04:09PM  1    WHETHER OR NOT THESE VERDICTS ARE YOUR TRUE AND CORRECT

04:09PM  2    VERDICTS.

04:09PM  3          MS. KRATZMANN.

04:09PM  4              THE CLERK:  YES, YOUR HONOR.

04:09PM  5          LADIES AND GENTLEMEN OF THE JURY, HEARKEN TO YOUR VERDICT

04:09PM  6    FOR IT WILL STAND RECORDED.

04:09PM  7          IN THE UNITED STATES DISTRICT COURT OF THE NORTHERN

04:10PM  8    DISTRICT OF CALIFORNIA FOR THE MATTER OF CASE NUMBER

04:10PM  9    18-CR-00258-EJD, UNITED STATES OF AMERICA VERSUS

04:10PM  10   ELIZABETH HOLMES.

04:10PM  11         WE, THE MEMBER OF THE JURY IN THE ABOVE-ENTITLED CASE,

04:10PM  12   UNANIMOUSLY FIND THE DEFENDANT, ELIZABETH HOLMES:

04:10PM  13         1.  GUILTY OF THE CHARGE OF CONSPIRACY TO COMMIT WIRE

04:10PM  14   FRAUD AGAINST THERANOS INVESTORS, IN VIOLATION OF 18 U.S.C.

04:10PM  15   SECTION 1349, AS CHARGED IN COUNT ONE OF THE INDICTMENT.

04:10PM  16         2.  NOT GUILTY OF THE CHARGE OF CONSPIRACY TO COMMIT WIRE

04:10PM  17   FRAUD AGAINST THERANOS PAYING PATIENTS, IN VIOLATION OF 18

04:10PM  18   U.S.C. SECTION 1349, AS CHARGED IN COUNT TWO OF THE INDICTMENT.

04:10PM  19         3.  NO VERDICT.

04:10PM  20         4.  NO VERDICT.

04:11PM  21         5.  NO VERDICT.

04:11PM  22         6.  GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST THERANOS

04:11PM  23   INVESTORS, IN VIOLATION OF 18 U.S.C. SECTION 1343, IN

04:11PM  24   CONNECTION WITH A WIRE TRANSFER OF $38,336,632 ON OR ABOUT

04:11PM  25   FEBRUARY 6TH, 2014, AS CHARGED IN COUNT SIX OF THE INDICTMENT.

04:11PM  1          7.  GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST THERANOS

04:11PM  2   INVESTORS, IN VIOLATION OF 18 U.S.C. SECTION 1343, IN

04:11PM  3   CONNECTION WITH A WIRE TRANSFER OF $99,999,984 ON OR ABOUT

04:11PM  4   OCTOBER 31ST, 2014, AS CHARGED IN COUNT SEVEN OF THE

04:11PM  5   INDICTMENT.

04:12PM  6          8.  GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST THERANOS

04:12PM  7   INVESTORS, IN VIOLATION OF 18 U.S.C. SECTION 1343, IN

04:12PM  8   CONNECTION WITH A WIRE TRANSFER OF $5,999,997 ON OR ABOUT

04:12PM  9   OCTOBER 31ST, 2014, AS CHARGED IN COUNT EIGHT OF THE

04:12PM 10   INDICTMENT.

04:12PM 11          10.  NOT GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST

04:12PM 12   THERANOS PAYING PATIENTS, IN VIOLATION OF 18 U.S.C. SECTION

04:12PM 13   1343, IN CONNECTION WITH A WIRE TRANSMISSION OF PATIENT E.T.'S

04:12PM 14   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 11TH, 2015, AS

04:12PM 15   CHARGED IN COUNT TEN OF THE INDICTMENT.

04:12PM 16          11.  NOT GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST

04:12PM 17   THERANOS PAYING PATIENTS, IN VIOLATION OF 18 U.S.C. SECTION

04:13PM 18   1343, IN CONNECTION WITH A WIRE TRANSMISSION OF PATIENT M.E.'S

04:13PM 19   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 16TH, 2015, AS

04:13PM 20   CHARGED IN COUNT ELEVEN OF THE INDICTMENT.

04:13PM 21          12.  NOT GUILTY OF THE CHARGE OF WIRE FRAUD AGAINST

04:13PM 22   THERANOS PAYING PATIENTS, IN VIOLATION OF 18 U.S.C. SECTION

04:13PM 23   1343, IN CONNECTION WITH A WIRE TRANSFER OF $1,126,661 ON OR

04:13PM 24   ABOUT AUGUST 3RD, 2015, AS CHARGED IN COUNT TWELVE OF THE

04:13PM 25   INDICTMENT.

9422

| | | |
|---|---|---|
| 04:13PM | 1 | THIS IS DATED JANUARY 3RD, 2022, BY THE JURY FOREPERSON. |
| 04:13PM | 2 | THE COURT:  THANK YOU. |
| 04:13PM | 3 | MADAM CLERK, IF YOU WOULD PLEASE POLL THE JURY. |
| 04:13PM | 4 | THE CLERK:  YES, YOUR HONOR. |
| 04:13PM | 5 | JUROR NUMBER 1, IS THAT YOUR VERDICT AS READ BY THE COURT? |
| 04:14PM | 6 | JUROR:  YES, THAT IS MY VERDICT. |
| 04:14PM | 7 | THE COURT:  DO WE HAVE A MICROPHONE? |
| 04:14PM | 8 | IF YOU COULD SPEAK LOUDER, JUROR NUMBER 1? |
| 04:14PM | 9 | JUROR:  THAT IS MY VERDICT. |
| 04:14PM | 10 | THE COURT:  THANK YOU. |
| 04:14PM | 11 | THE CLERK:  TEST, TEST. |
| 04:14PM | 12 | (HANDING.) |
| 04:14PM | 13 | THE CLERK:  JUROR NUMBER 2, IS THAT YOUR VERDICT AS |
| 04:14PM | 14 | READ BY THE COURT. |
| 04:14PM | 15 | FOREPERSON:  YES. |
| 04:14PM | 16 | THE CLERK:  JUROR NUMBER 3, IS THAT YOUR VERDICT AS |
| 04:14PM | 17 | READ BY THE COURT? |
| 04:14PM | 18 | JUROR:  YES. |
| 04:14PM | 19 | THE CLERK:  JUROR NUMBER 4, IS THAT YOUR VERDICT AS |
| 04:14PM | 20 | READ BY THE COURT? |
| 04:14PM | 21 | JUROR:  YES. |
| 04:15PM | 22 | THE CLERK:  JUROR NUMBER 5, IS THAT YOUR VERDICT AS |
| 04:15PM | 23 | READ BY THE COURT? |
| 04:15PM | 24 | JUROR:  YES. |
| 04:15PM | 25 | THE CLERK:  JUROR NUMBER 6, IS THAT YOUR VERDICT AS |

04:15PM  1    READ BY THE COURT?

04:15PM  2                   JUROR:  YES.

04:15PM  3                   THE CLERK:  JUROR NUMBER 7, IS THAT YOUR VERDICT AS

04:15PM  4    READ BY THE COURT?

04:15PM  5                   JUROR:  YES.

04:15PM  6                   THE CLERK:  JUROR NUMBER 8, IS THAT YOUR VERDICT AS

04:15PM  7    READ BY THE COURT?

04:15PM  8                   JUROR:  YES.

04:15PM  9                   THE CLERK:  JUROR NUMBER 9, IS THAT YOUR VERDICT AS

04:15PM 10    READ BY THE COURT?

04:15PM 11                   JUROR:  YES.

04:15PM 12                   THE CLERK:  JUROR NUMBER 10, IS THAT YOUR VERDICT AS

04:15PM 13    READ BY THE COURT?

04:15PM 14                   JUROR:  YES.

04:15PM 15                   THE CLERK:  JUROR NUMBER 11, IS THAT YOUR VERDICT AS

04:15PM 16    READ BY THE COURT?

04:15PM 17                   JUROR:  YES.

04:15PM 18                   THE CLERK:  AND JUROR NUMBER 12, IS THAT YOUR

04:15PM 19    VERDICT AS READ BY THE COURT?

04:15PM 20                   JUROR:  YES.

04:15PM 21                   THE COURT:  THANK YOU.

04:15PM 22        THE JURY HAVING BEEN POLLED AS TO THEIR VERDICTS, THE

04:15PM 23    COURT WILL NOW ASK THE CLERK TO RECORD THOSE VERDICTS THAT HAVE

04:15PM 24    BEEN REACHED.  I'LL ORDER THOSE RECORDED AT THIS TIME.

04:15PM 25        LADIES AND GENTLEMEN OF THE JURY, IT'S NOW MY OPPORTUNITY

04:16PM   1      TO THANK YOU, THANK YOU FOR YOUR SERVICE AS JURORS IN THIS

04:16PM   2      CASE.  IT'S BEEN A LONG CASE.  WE COLLECTIVELY HAVE BEEN

04:16PM   3      THROUGH MANY THINGS.  OUR CURRENT PANDEMIC SITUATION AFFECTED

04:16PM   4      US SUCH THAT YOU'RE SEATED IN THE WAY THAT YOU'RE SEATED.  I

04:16PM   5      HAD YOU MOVE AND ROTATE AROUND.  YOU ARRIVED EARLY

04:16PM   6      CONSISTENTLY.  MANY OF YOU DROVE MILES AND MILES TO GET TO THE

04:16PM   7      COURTHOUSE TO FULFILL YOUR OBLIGATIONS AS JURORS, AND I'M

04:16PM   8      GRATEFUL.

04:16PM   9          AND ON BEHALF OF ALL OF THE JUDGES AND MY COLLEAGUES OF

04:16PM  10      THE NORTHERN DISTRICT OF CALIFORNIA, I WANT TO EXTEND MY THANKS

04:16PM  11      AND GRATITUDE FOR YOUR SERVICE.

04:16PM  12          IT'S JUST AMAZING TO HAVE YOU COME FROM YOUR JOBS, FROM

04:16PM  13      YOUR FAMILIES, MAKE THOSE SACRIFICES TO COME AND BE A

04:16PM  14      PARTICIPANT IN YOUR JUSTICE SYSTEM, AND I HOPE YOU'RE PROUD OF

04:16PM  15      YOUR SERVICE HERE TODAY.

04:16PM  16          BEFORE, BEFORE I DO EXCUSE YOU, FORMALLY EXCUSE YOU, I DO

04:17PM  17      WANT TO TALK TO YOU ABOUT A COUPLE OF THINGS.

04:17PM  18          FIRST OF ALL, WHEN YOU ARE EXCUSED, YOU RECALL THE

04:17PM  19      ADMONITION THAT YOU PROBABLY COULD RECITE BY HEART THAT I READ

04:17PM  20      TO YOU EVERY MORNING AND EVERY EVENING WHEN WE LEFT.  THAT

04:17PM  21      ADMONITION WILL NOW LONGER BE IN PLACE, WHICH IS TO SAY YOU

04:17PM  22      MAY, IF YOU WISH, DISCUSS, TALK WITH ANYONE ABOUT THIS CASE.

04:17PM  23      THAT'S ENTIRELY UP TO YOU.

04:17PM  24          HOWEVER, IF YOU FEEL THAT SOMEONE IS INAPPROPRIATE IN

04:17PM  25      THEIR APPROACH OR THEIR CONTACT WITH YOU, OR IF THEY, FOR

04:17PM  1    EXAMPLE, THEY CONTINUE TO CONTACT YOU AFTER YOU'VE ASKED THEM

04:17PM  2    TO LEAVE YOU ALONE OR AFTER YOU'VE SAID NO, YOU'VE EXPRESSED

04:17PM  3    YOUR DESIRE NOT TO COMMUNICATE, THAT WOULD BE INAPPROPRIATE ON

04:17PM  4    THAT OTHER PARTY'S PART, AND YOU SHOULD NOTIFY THE COURT

04:18PM  5    IMMEDIATELY OF SUCH CONDUCT SO THAT THE COURT CAN TAKE WHATEVER

04:18PM  6    ACTION WOULD BE APPROPRIATE.

04:18PM  7         I DO WANT TO -- AND THIS IS SOMETHING THAT I DO WITH EVERY

04:18PM  8    JURY THAT I HAVE THE PRIVILEGE OF WORKING WITH, LADIES AND

04:18PM  9    GENTLEMEN, AND THAT IS, I EXTEND AN INVITATION TO THE JURY TO

04:18PM  10   COME BACK TO MY OFFICE JUST BEHIND THIS WALL HERE AND ALLOW ME

04:18PM  11   THE PRIVILEGE OF PERSONALLY THANKING EACH OF YOU FOR YOUR

04:18PM  12   SERVICE, AND ALSO THE OPPORTUNITY FOR ME TO INQUIRE OF YOU OF

04:18PM  13   WHAT WE, THE COURT, CAN DO TO ENHANCE YOUR EXPERIENCE AS

04:18PM  14   JURORS.

04:18PM  15        AND I'M SERIOUS ABOUT THAT.  I DO ASK JURORS WHAT CAN WE

04:18PM  16   DO TO MAKE THINGS BETTER, EASIER, MORE EFFICIENT, AND A PROCESS

04:18PM  17   THAT IS MORE COMFORTABLE FOR OUR JURORS.

04:18PM  18        I'M GOING TO EXTEND THAT INVITATION.

04:18PM  19        NOW, IT'S NOT AN ORDER.  I CAN'T ORDER YOU TO DO THAT.

04:18PM  20        BUT I WOULD HOPE THAT YOU WOULD SEE IT AS AN INVITATION

04:19PM  21   TO, AGAIN, ALLOW ME TO THANK YOU, EXPRESS MY GRATITUDE TO YOU

04:19PM  22   PERSONALLY.  I WON'T KEEP YOU LONG.  I PROMISE YOU THAT.

04:19PM  23        BUT I DO WELCOME THE OPPORTUNITY TO GIVE PERSONAL THANKS

04:19PM  24   TO THE JURORS AND THEN YOU CAN LEAVE.

04:19PM  25        I CAN'T ORDER YOU TO DO THAT.  IT'S ON YOUR OWN.  IF YOU

04:19PM  1      WOULD LIKE TO COME BACK AND SEE MY OFFICE, I WOULD BE HAPPY TO

04:19PM  2      SHARE THAT WITH YOU FOR JUST A MOMENT.

04:19PM  3          I DO WANT TO ASK YOU COLLECTIVELY ONE QUESTION, THOUGH,

04:19PM  4      AND I'M GOING TO ASK YOU TO PLEASE PAY ATTENTION TO THIS

04:19PM  5      QUESTION AND I'M GOING TO ASK YOU IF YOU HAVE RESPONSE TO THIS

04:19PM  6      QUESTION, PLEASE RAISE YOUR HAND SO I CAN KNOW YOUR RESPONSE.

04:19PM  7          IF YOU WISH TO SPEAK PRIVATELY ABOUT THIS QUESTION OR YOUR

04:19PM  8      RESPONSE TO THE QUESTION, PLEASE LET ME KNOW, AND I'D BE HAPPY

04:19PM  9      TO ACCOMMODATE THAT AS WELL.

04:19PM 10          AND HERE'S THE QUESTION, LADIES AND GENTLEMEN:  DURING

04:19PM 11      YOUR DELIBERATIONS, DID YOU OBSERVE ANYONE MONITORING OR

04:20PM 12      RECORDING THE DELIBERATIONS OR AT ANY TIME HAVE A BELIEF OR

04:20PM 13      SUSPICION THAT THE DELIBERATIONS WERE MONITORED OR RECORDED IN

04:20PM 14      ANY WAY?  DID ANY OF YOU HAVE THAT?

04:20PM 15          I'M GOING TO READ IT ONE MORE TIME.

04:20PM 16          DURING YOUR DELIBERATIONS, DID YOU OBSERVE ANYONE

04:20PM 17      MONITORING OR RECORDING THE DELIBERATIONS OR AT ANY TIME HAVE A

04:20PM 18      BELIEF OR SUSPICION THAT THE DELIBERATIONS WERE MONITORED OR

04:20PM 19      RECORDED IN ANY WAY?

04:20PM 20          ANYONE HAVE AN AFFIRMATIVE RESPONSE TO THAT QUESTION?  I

04:20PM 21      SEE HEADS MOVING LEFT TO RIGHT, WHICH IS THE UNIVERSAL SIGN OF

04:20PM 22      "NO" I BELIEVE.

04:20PM 23          IF ANYONE HAS AN AFFIRMATIVE, THAT IS, "YES" TO THAT

04:20PM 24      QUESTION, WOULD YOU RAISE YOUR HAND NOW.

04:20PM 25          I SEE NO HANDS.

9427

| | | |
|---|---|---|
| 04:20PM | 1 | THANK YOU. |
| 04:20PM | 2 | LET ME ASK COUNSEL, ANYTHING FURTHER BEFORE I DISCHARGE |
| 04:21PM | 3 | AND OTHERWISE EXCUSE THIS JURY? |
| 04:21PM | 4 | MR. SCHENK:  NO.  THANK YOU. |
| 04:21PM | 5 | MR. DOWNEY:  NO, YOUR HONOR. |
| 04:21PM | 6 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 04:21PM | 7 | LET ME ALSO SAY THIS ON BEHALF OF -- AND I HOPE YOU'LL |
| 04:21PM | 8 | PARDON MY PRESUMPTION -- BUT ON BEHALF OF BOTH COUNSEL, ALL |
| 04:21PM | 9 | COUNSEL HERE, BOTH TABLES, I DO WANT TO EXTEND THE GRATITUDE |
| 04:21PM | 10 | THROUGH ME, IF YOU'LL PARDON ME, COUNSEL, BUT I DO WANT TO |
| 04:21PM | 11 | EXTEND GRATITUDE FROM COUNSEL AS WELL.  THEY DON'T OFTEN GET A |
| 04:21PM | 12 | CHANCE TO SEE AND SPEAK WITH A JUROR, CERTAINLY NOT WHILE |
| 04:21PM | 13 | YOU'RE IN SESSION, THEY MAY NOT HAVE A CHANCE TO DO THAT, BUT I |
| 04:21PM | 14 | KNOW THAT THEY DO EXTEND THEIR GRATITUDE, BOTH SIDES, BOTH |
| 04:21PM | 15 | TEAMS DO TO YOU FOR YOUR SERVICE HERE TODAY. |
| 04:21PM | 16 | SO ANYTHING FURTHER, COUNSEL? |
| 04:21PM | 17 | WHAT I'D LIKE TO DO IS TO -- I WILL MEET WITH WHATEVER |
| 04:21PM | 18 | JURORS WOULD ACCEPT MY INVITATION TO MEET ME FOR JUST A COUPLE |
| 04:21PM | 19 | OF MINUTES.  THAT WILL TAKE A FEW MINUTES. |
| 04:21PM | 20 | AND THEN I'LL COME BACK, COUNSEL, AND WE CAN DISCUSS ANY |
| 04:21PM | 21 | FURTHER PROCEEDINGS AS TO THE STATUS OF THE CASE. |
| 04:22PM | 22 | ANYTHING FURTHER BEFORE I STEP DOWN? |
| 04:22PM | 23 | MR. SCHENK:  NO, YOUR HONOR. |
| 04:22PM | 24 | MR. DOWNEY:  NO, YOUR HONOR.  THAT'S FINE. |
| 04:22PM | 25 | THE COURT:  ALL RIGHT.  THANK YOU. |

04:22PM 1        SO, LADIES AND GENTLEMEN, I AM AT THIS TIME GOING TO

04:22PM 2   FORMALLY DISCHARGE YOU FROM YOUR SERVICES AS JURORS IN THIS

04:22PM 3   CASE, AND I'M GOING TO FORMALLY EXTEND AN INVITATION TO YOU TO

04:22PM 4   JUST MEET WITH ME, AS I SAID, JUST FOR A MINUTE IN MY CHAMBERS.

04:22PM 5   IT'S NOT AN ORDER.  I CAN'T ORDER YOU TO DO THAT.

04:22PM 6        YOU'VE HEARD ME TALK ABOUT THE MARSHALS DOING ALL OF THESE

04:22PM 7   WONDERFUL THINGS FOR US.  I CAN'T ASK THEM TO DRAG YOU INTO MY

04:22PM 8   OFFICE, BUT I HOPE YOU'LL DO THAT ON YOUR OWN VOLITION SO I

04:22PM 9   CAN, AS I SAID, EXTEND MY PERSONAL GRATITUDE TO YOU.

04:22PM 10       SO WE'LL BE IN RECESS.  THANK YOU.

04:22PM 11            THE CLERK:  COURT IS IN RECESS.

04:22PM 12       (RECESS FROM 4:22 P.M. UNTIL 4:52 P.M.)

04:52PM 13            THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

04:52PM 14   ALL COUNSEL ARE PRESENT AND MS. HOLMES IS PRESENT.

04:52PM 15       THE JURY IS DISCHARGED.

04:52PM 16       COUNSEL, ANY THOUGHTS ABOUT NEXT STEPS?

04:53PM 17            MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

04:53PM 18       A FEW ISSUES.

04:53PM 19       THE FIRST, I THINK IT WOULD MAKE SENSE TO SET A STATUS

04:53PM 20   HEARING REGARDING THE THREE HUNG COUNTS MAYBE A WEEK FROM NOW

04:53PM 21   TO HEAR FROM THE GOVERNMENT, THE GOVERNMENT'S PLAN WITH REGARD

04:53PM 22   TO THOSE COUNTS.  I THINK IT WOULD BE APPROPRIATE FOR THE COURT

04:53PM 23   TO FIND A MISTRIAL AS TO THOSE COUNTS, AND THEN THE GOVERNMENT

04:53PM 24   WILL -- CAN ADVISE THE COURT AT A NEXT HEARING WHAT IT PLANS TO

04:53PM 25   DO WITH REGARD TO THOSE COUNTS.

04:53PM 1        A FEW OTHER THINGS, BUT I CAN PAUSE ON THAT IF WE WANTED

04:53PM 2   TO DISCUSS THAT FOR A MOMENT.

04:53PM 3        THE COURT:  OKAY.  THANK YOU.

04:53PM 4        MR. DOWNEY:  YOUR HONOR, WE HAVE NO OBJECTION TO A

04:53PM 5   STATUS CONFERENCE IN A WEEK.

04:53PM 6        WE WOULD INTEND TO MAKE VARIOUS MOTIONS AND WOULD BE IN A

04:53PM 7   POSITION TO PROPOSE A SCHEDULE RELATED TO THOSE.

04:53PM 8        BUT IT SEEMS TO ME THAT GIVEN THE PENDENCY OF THE

04:53PM 9   GOVERNMENT'S POSITION ON THE THREE COUNTS, THAT MIGHT BEST BE

04:53PM 10  DONE AT THAT TIME RATHER THAN NOW.

04:53PM 11       THE COURT:  IS THERE ANY OBJECTION TO THE COURT

04:54PM 12  FINDING A MISTRIAL AS TO COUNTS THREE, FOUR, AND FIVE BASED ON

04:54PM 13  THE JURY'S VERDICT?

04:54PM 14       MR. SCHENK:  NOT FROM THE GOVERNMENT.

04:54PM 15       MR. DOWNEY:  WELL, YOUR HONOR, I HAVE NO POSITION ON

04:54PM 16  THAT.  I THINK IT'S ENTERED AS A NO VERDICT, SO I DON'T KNOW

04:54PM 17  THAT A MISTRIAL IS APPROPRIATE.

04:54PM 18       THE COURT:  WELL, THEY DID NOT REACH -- THE JURY DID

04:54PM 19  NOT REACH A VERDICT ON THOSE THREE COUNTS AND THE COURT WILL

04:54PM 20  FIND -- AND WE SAW THAT IN THE VERDICT FORM, AND WE SAW THAT AT

04:54PM 21  LEAST IN TWO OF THE NOTES THAT THE JURORS SENT OUT TO US.

04:54PM 22       SO I WILL FIND THAT IT'S APPROPRIATE TO FIND A MISTRIAL AS

04:54PM 23  TO COUNTS THREE, FOUR, AND FIVE OF THE THIRD SUPERSEDING

04:54PM 24  INDICTMENT.

04:54PM 25       AND I'M HAPPY TO SET THAT FOR STATUS CONFERENCE NEXT WEEK

04:54PM   1    IF YOU WOULD LIKE OR A DATE THAT'S CONVENIENT.

04:54PM   2             MR. DOWNEY:  SHOULD WE TALK ABOUT A PROPOSED DATE

04:55PM   3    AND SUBMIT IT BY -- AND SUBMIT IT TO THE COURT?

04:55PM   4             THE COURT:  THAT'S FINE IF YOU WOULD LIKE TO DO

04:55PM   5    THAT.

04:55PM   6             MR. SCHENK:  THAT'S FINE WITH THE GOVERNMENT.

04:55PM   7             THE COURT:  ALL RIGHT.  THANK YOU.

04:55PM   8             MR. DOWNEY:  DOES IT SUIT THE COURT TO LEAVE PENDING

04:55PM   9    AT THIS TIME SETTING ANY SCHEDULE WITH REGARD TO RULE 29 AND

04:55PM   10   RULE 33 MOTIONS BECAUSE WE -- OBVIOUSLY WE MAY HEAR SOMETHING

04:55PM   11   FROM THE GOVERNMENT THAT WOULD AFFECT WHETHER THOSE ARE

04:55PM   12   APPROPRIATE AT THIS TIME.

04:55PM   13            THE COURT:  WELL, YOU DID MAKE A RULE 29, A TIMELY

04:55PM   14   RULE 29 MOTION THAT PRESERVED THAT.

04:55PM   15        SHOULD WE DEFER ANY FURTHER DISCUSSION ON THAT FOR

04:55PM   16   SCHEDULING PURPOSES TO ALLOW YOU TO MEET AND CONFER?  IS THAT

04:55PM   17   WHAT YOU WOULD LIKE TO DO?

04:55PM   18            MR. DOWNEY:  I THINK SO, YOUR HONOR.  I MEAN, IT

04:55PM   19   WOULD BE OUR INTENTION TO RENEW UNDER RULE 29 AND TO MAKE

04:55PM   20   VARIOUS MOTIONS PURSUANT TO RULE 33, AND I KNOW THE GOVERNMENT

04:55PM   21   HAS, YOU KNOW, ANOTHER EVENT WITH SOME OVERLAPPING TEAM

04:56PM   22   MEMBERS, SO IT MIGHT MAKE SENSE FOR US TO CONFER ON WHAT IS

04:56PM   23   SENSIBLE IN LIGHT OF THOSE COMMITMENTS.

04:56PM   24            THE COURT:  ALL RIGHT.  THANK YOU.

04:56PM   25            MR. SCHENK:  THAT'S CERTAINLY FINE WITH THE

04:56PM  1    GOVERNMENT TO ADD THAT TO OUR MEET AND CONFER AND THEN WE COULD

04:56PM  2    COME UP WITH A SCHEDULE, MAYBE DISCUSS THAT AT OUR NEXT STATUS

04:56PM  3    HEARING.

04:56PM  4            THE COURT:  SURE.  THAT'S FINE.

04:56PM  5       AS TO A REFERRAL TO THE PROBATION DEPARTMENT, I'M NOT

04:56PM  6    INCLINED TO DO THAT TODAY, AND WE CAN DISCUSS THAT AT OUR

04:56PM  7    STATUS CONFERENCE AS WELL.

04:56PM  8       I HAD THOUGHT THAT IF THERE WAS GOING TO BE A REFERRAL IN

04:56PM  9    THIS MATTER, I MIGHT DEFER THAT UNTIL AFTER ANY OTHER

04:56PM  10   LITIGATION INVOLVING THE CODEFENDANT IS RESOLVED.  THAT'S MY

04:56PM  11   INITIAL THOUGHT ON THAT, AND WE COULD CONTINUE TO SET STATUS AS

04:56PM  12   TO REFERRAL AS NEEDED.  THAT WOULD BE MY THOUGHT ON THAT.

04:57PM  13      I DON'T KNOW WHAT THE PARTIES FEEL ABOUT THAT.

04:57PM  14           MR. SCHENK:  I THINK THAT THE COURT COULD SET A

04:57PM  15   SENTENCING DATE EVEN IF IT HASN'T REFERRED THE DEFENDANT TO

04:57PM  16   PROBATION FOR THE PREPARATION OF A PSR.  MY THOUGHT WAS TO

04:57PM  17   FIRST RESOLVE THE ISSUE WITH REGARD TO THE THREE COUNTS,

04:57PM  18   WHETHER THERE WOULD BE A RETRIAL OR NOT ON THOSE COUNTS, AND

04:57PM  19   NOT WORRY ABOUT SETTING A SENTENCING DATE.

04:57PM  20      SO I HAD LINKED THE REFERRAL TO PROBATION AND A SENTENCING

04:57PM  21   DATE MORE TO A RESOLUTION OF THE THREE COUNTS --

04:57PM  22           THE COURT:  SURE.

04:57PM  23           MR. SCHENK:  -- AS OPPOSED TO THE SEVERED TRIAL, THE

04:57PM  24   CASE WITH THE CODEFENDANT.

04:57PM  25      BUT OBVIOUSLY WE WOULD DEFER TO THE COURT FOR THAT

| | | |
|---|---|---|
| 04:57PM | 1 | SCHEDULE. |
| 04:57PM | 2 | THE COURT:  WELL, WE CAN -- I'M NOT GOING TO MAKE A |
| 04:57PM | 3 | REFERRAL TODAY.  MAYBE WE'LL CONTINUE OUR CONVERSATION ON THAT |
| 04:57PM | 4 | ON WHATEVER OUR STATUS DATE IS. |
| 04:57PM | 5 | AND DO YOU WANT TO JUST NOTIFY THE COURT AS TO -- MAKE |
| 04:58PM | 6 | INQUIRY AS TO WHAT TIME WE HAVE AVAILABLE ONCE YOU'VE BEEN ABLE |
| 04:58PM | 7 | TO DISCERN WHAT YOU NEED TO DO AND THE TIMING FOR THAT? |
| 04:58PM | 8 | MR. DOWNEY:  THAT SOUNDS FINE, YOUR HONOR. |
| 04:58PM | 9 | MR. SCHENK:  YES, YOUR HONOR. |
| 04:58PM | 10 | THE COURT:  OKAY.  ALL RIGHT. |
| 04:58PM | 11 | SO JUST AS A HOUSEKEEPING MATTER, MS. HOLMES WILL REMAIN |
| 04:58PM | 12 | AT LIBERTY AT HER CURRENT STATUS WITH ALL OF THE -- I'LL JUST |
| 04:58PM | 13 | INCORPORATE BY REFERENCE ALL OF THE OTHER OBLIGATIONS REGARDING |
| 04:58PM | 14 | THAT RELEASE.  THOSE WILL REMAIN IN PLACE.  I WON'T DISTURB ANY |
| 04:58PM | 15 | OF THOSE. |
| 04:58PM | 16 | MR. SCHENK:  YOUR HONOR, THE GOVERNMENT WOULD |
| 04:58PM | 17 | APPRECIATE BEING HEARD BRIEFLY ON THAT. |
| 04:58PM | 18 | THE COURT:  YES. |
| 04:58PM | 19 | MR. SCHENK:  WE DO NOT INTEND TO ASK THE COURT TO |
| 04:58PM | 20 | REMAND THE DEFENDANT TODAY, BUT WE DO THINK THAT IT IS |
| 04:58PM | 21 | APPROPRIATE TO MODIFY THE CURRENT CONDITIONS OF RELEASE. |
| 04:58PM | 22 | CURRENTLY MS. HOLMES IS OUT ON AN UNSECURED BOND, JUST A |
| 04:58PM | 23 | SIGNATURE BOND, AND WE THINK NOW IT IS APPROPRIATE TO CHANGE |
| 04:59PM | 24 | THAT TO A SECURED BOND. |
| 04:59PM | 25 | WE'VE BRIEFLY DISCUSSED THAT WITH COUNSEL. |

04:59PM  1      I THINK WE CAN GO ABOUT IT ONE OF TWO WAYS.  THE COURT

04:59PM  2   COULD CONTINUE TO HEAR ARGUMENTS, FOR INSTANCE, A BAIL REVIEW

04:59PM  3   HEARING BEFORE YOUR HONOR.

04:59PM  4      IF THE COURT WOULD PREFER, WE COULD BE REFERRED TO THE

04:59PM  5   MAGISTRATE AND CONTINUE OUR DISCUSSION THERE.  WE COULD HAVE A

04:59PM  6   REVISED PRETRIAL REPORT OR A REVISED BAIL REPORT TO GUIDE THAT

04:59PM  7   DISCUSSION, OR WE COULD JUST, AT OUR NEXT APPEARANCE IN FRONT

04:59PM  8   OF YOUR HONOR, HEAR ARGUMENT FROM THE GOVERNMENT AND THE COURT

04:59PM  9   COULD THEN MODIFY THE DEFENDANT'S BAIL TO WHAT THE GOVERNMENT

04:59PM  10  IS REQUESTING.

04:59PM  11     THE AMOUNT DOES NOT NEED TO CHANGE.  WE WOULD JUST REQUEST

04:59PM  12  THAT IT CHANGE TO A SECURED BOND.

04:59PM  13     AND IF GIVEN ADVANCED NOTICE, THAT PROBABLY COULD BE TAKEN

04:59PM  14  CARE OF AT A NEXT STATUS DATE.

04:59PM  15         THE COURT:  SO YOU'RE SUGGESTING EVEN A PROPERTY

04:59PM  16  BOND?

04:59PM  17         MR. SCHENK:  YES, YOUR HONOR.

05:00PM  18         MR. DOWNEY:  I WOULD SUGGEST THAT WE DISCUSS THE

05:00PM  19  DETAILS OF THAT WITH MR. SCHENK, THAT THE CURRENT CONDITIONS

05:00PM  20  REMAIN IN PLACE FOR THE NEXT WEEK OR SO UNTIL WE SET THE STATUS

05:00PM  21  CONFERENCE, AND WE CAN TAKE IT UP THEN.

05:00PM  22         THE COURT:  SUBJECT TO ANY MODIFICATION THAT THE

05:00PM  23  COURT -- AND I'LL KEEP IT.  IT'S IMPORTANT THAT THE TRIAL COURT

05:00PM  24  KEEP THAT FOR ANY FURTHER ACTION.

05:00PM  25         MR. SCHENK:  YES, YOUR HONOR.

05:00PM  1          THE COURT:  BUT AS OF TODAY, ALL OF THE ORIGINAL

05:00PM  2   CONDITIONS REMAIN IN PLACE AND ALL OF THE OBLIGATIONS IN THAT

05:00PM  3   ORDER REMAIN IN PLACE SUBJECT TO REVIEW.

05:00PM  4       AND I DON'T HAVE ANY DIFFICULTY REFERRING IT TO PRETRIAL

05:00PM  5   SERVICES JUST FOR AN UPDATE ON THINGS.  THAT MIGHT BE HELPFUL,

05:00PM  6   TOO.

05:00PM  7       I DON'T KNOW THE LAST TIME, WHEN WAS IT, 2018 WHEN IT WAS

05:00PM  8   THE LAST REPORT.  THINGS HAVE CHANGED.

05:00PM  9       SO LET ME REFER THIS TO PRETRIAL SERVICES JUST FOR AN

05:00PM  10  UPDATED REPORT TO ASSIST THE PARTIES IN OUR DISCUSSION AT THE

05:00PM  11  STATUS HEARING.

05:01PM  12      AND THAT MAY REQUIRE YOUR CLIENT BEING REINTERVIEWED,

05:01PM  13  WHATEVER THEY NEED.  I DON'T KNOW WHAT THEY'LL DO, BUT YOU'LL

05:01PM  14  GET A REPORT.

05:01PM  15      AND IF YOU COULD LOOP IN PRETRIAL SERVICES WITH SUFFICIENT

05:01PM  16  NOTICE SO THAT THEY GET THE WORK DONE PRIOR TO OUR STATUS.

05:01PM  17      IF WE MEET NEXT WEEK, THEY MIGHT NOT HAVE ENOUGH TIME TO

05:01PM  18  GET THAT DONE, SO JUST BEAR THAT IN MIND.

05:01PM  19      ANYTHING?

05:01PM  20          MR. SCHENK:  MAY I JUST HAVE ONE MOMENT?

05:01PM  21          THE COURT:  YES, PLEASE.

05:01PM  22      (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

05:01PM  23          MR. DOWNEY:  YOUR HONOR, WOULD THAT REQUEST BE

05:01PM  24  APPROPRIATE NOW OR SHOULD WE WAIT TO SEE WHAT THE GOVERNMENT IS

05:01PM  25  GOING TO DO WITH THE THREE REMAINING COUNTS?

9435

05:01PM   1          IT SEEMS TO ME IT MIGHT --

05:01PM   2                THE COURT:  FOR THE PRETRIAL SERVICES?

05:01PM   3                MR. DOWNEY:  YEAH.  I DON'T HAVE ANY, I DON'T HAVE

05:01PM   4    ANY PARTICULAR OBJECTION TO IT, BUT IT SEEMS TO ME THAT IF

05:01PM   5    THERE'S GOING TO BE FURTHER PROCEDURE IN THIS CASE AS TO A

05:01PM   6    VERDICT, THEN IT PROBABLY OUGHT TO WAIT.

05:01PM   7                THE COURT:  WELL, THAT'S TRUE, BUT I'D LIKE TO GET

05:01PM   8    IT STARTED, AT LEAST LET PRETRIAL SERVICES KNOW WHAT IS GOING

05:02PM   9    ON AND THEY CAN MARSHAL WHATEVER THEY DO.

05:02PM  10          AND IF IT CHANGES, THEY CAN CERTAINLY RECEIVE A PHONE CALL

05:02PM  11    INDICATING AS MUCH.

05:02PM  12          BUT JUST TO GET IT STARTED SO WE DON'T HAVE ANY OTHER

05:02PM  13    DELAYS I THINK WOULD BE APPROPRIATE, AND WE'LL SEE WHERE THAT

05:02PM  14    IS.

05:02PM  15          I'VE JUST BEEN HANDED A NOTE FROM OUR VERY EFFICIENT

05:02PM  16    PRETRIAL SERVICE OFFICER.  HE'S ON HIS WAY UP.  I THINK HE'S

05:02PM  17    GOING TO REQUEST THAT MS. HOLMES GO TO PRETRIAL SERVICES TODAY

05:02PM  18    WHILE SHE'S IN THE BUILDING.

05:02PM  19          MAYBE THEY CAN COLLECT WHATEVER INFORMATION THAT THEY

05:02PM  20    NEED, AND THAT WOULD BE MUCH MORE EFFICIENT.  LET'S WAIT UNTIL

05:02PM  21    HE ARRIVES.  LET'S SEE.

05:02PM  22          I'M NOT GOING TO TAKE ANY ACTION, OF COURSE, ON RELEASING

05:02PM  23    ANY EXHIBITS AT THIS POINT OR ANY OTHER MATTERS REGARDING

05:03PM  24    EVIDENCE.

05:03PM  25          ANYTHING FURTHER THAT WE SHOULD BE THINKING ABOUT?

9436

| | | |
|---|---|---|
| 05:03PM | 1 | MR. DOWNEY:  MAY I JUST TALK TO MY COLLEAGUES? |
| 05:03PM | 2 | THE COURT:  YES, PLEASE. |
| 05:03PM | 3 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 05:03PM | 4 | MR. DOWNEY:  NOTHING ON OUR SIDE, YOUR HONOR. |
| 05:03PM | 5 | THE COURT:  HE'S COMING UP, ADRIANA? |
| 05:03PM | 6 | THE CLERK:  HE DID INDICATE, YOUR HONOR, HE'S ON HIS |
| 05:03PM | 7 | WAY. |
| 05:03PM | 8 | THE COURT:  OKAY. |
| 05:03PM | 9 | (PAUSE IN PROCEEDINGS.) |
| 05:05PM | 10 | THE COURT:  IT LOOKS LIKE THE AFTERNOON OF MAYBE THE |
| 05:05PM | 11 | 12TH MIGHT BE -- |
| 05:05PM | 12 | THE CLERK:  ARE YOU GOING TO DO IT BY ZOOM OR IN |
| 05:05PM | 13 | PERSON? |
| 05:05PM | 14 | THE COURT:  WELL, I THINK IN PERSON. |
| 05:05PM | 15 | WILL COUNSEL BE ABLE TO MAKE AN IN PERSON ON THE 12TH, OR |
| 05:05PM | 16 | DID YOU HAVE THOUGHTS ON THAT? |
| 05:05PM | 17 | MR. DOWNEY:  WELL, MR. SCHENK JUST SUGGESTED MAYBE |
| 05:05PM | 18 | WE DO IT BY ZOOM, BUT -- AND -- |
| 05:05PM | 19 | THE COURT:  NO, NO. |
| 05:05PM | 20 | MR. DOWNEY:  BUT WE'LL MAKE OURSELVES AVAILABLE WHEN |
| 05:05PM | 21 | THE COURT SETS IT AND I THINK THE AFTERNOON OF THE 12TH WOULD |
| 05:05PM | 22 | BE FINE. |
| 05:05PM | 23 | THE COURT:  WELL, I'M HAPPY TO DO ZOOM IF THAT'S |
| 05:05PM | 24 | CONVENIENT FOR THE PARTIES FOR THAT PURPOSE. |
| 05:05PM | 25 | MR. SCHENK:  NO OBJECTION FROM THE GOVERNMENT. |

| 05:05PM | 1 | WHATEVER IS MOST CONVENIENT. |
| 05:05PM | 2 | THE COURT:  OKAY.  I SEE MR. RANGEL IS NOW PRESENT |
| 05:05PM | 3 | FROM PRETRIAL SERVICES.  THANK YOU FOR COMING UP. |
| 05:05PM | 4 | I HAVE REFERRED MS. HOLMES FOR AN UPDATE ON -- FOR A |
| 05:05PM | 5 | PRETRIAL SERVICES REPORT.  WE'RE GOING TO PROBABLY HAVE A |
| 05:06PM | 6 | HEARING NEXT WEEK REGARDING WHETHER OR NOT THERE WILL BE ANY |
| 05:06PM | 7 | CHANGE IN THE CONDITIONS OF HER RELEASE. |
| 05:06PM | 8 | THE GOVERNMENT IS REQUESTING THAT THERE BE SOME SECURED |
| 05:06PM | 9 | BOND IN PLACE NOW THAT THE JURY HAS REACHED DECISIONS ON SOME |
| 05:06PM | 10 | OF THE COUNTS.  SO THAT'S SOMETHING WE'LL EXPLORE. |
| 05:06PM | 11 | I DON'T KNOW IF THAT'S SOMETHING THAT YOU WANTED TO DO |
| 05:06PM | 12 | TODAY WITH AN INTERVIEW OR UPDATES. |
| 05:06PM | 13 | PRETRIAL OFFICER:  I CAN, YOUR HONOR, WHENEVER YOU |
| 05:06PM | 14 | WOULD LIKE US TO COMPLETE THE UPDATED -- |
| 05:06PM | 15 | THE COURT:  HOW LONG -- CAN YOU JUST TELL ME, I'M |
| 05:06PM | 16 | JUST CURIOUS, HOW LONG WOULD THAT BE IF MS. HOLMES WERE TO GO |
| 05:06PM | 17 | TO YOUR OFFICE NOW AND TALK WITH YOU, ANY IDEA OF A TIMELINE ON |
| 05:06PM | 18 | THAT? |
| 05:06PM | 19 | PRETRIAL OFFICER:  I'D SAY APPROXIMATELY NO MORE |
| 05:06PM | 20 | THAN ONE HOUR, YOUR HONOR.  WE WOULD PROBABLY TALK ABOUT |
| 05:06PM | 21 | FINANCIAL INFORMATION AND WHAT HER -- WHAT SHE IS PROPOSING, |
| 05:07PM | 22 | WHAT SHE IS PROPOSING FOR THE SECURED BOND, YOUR HONOR. |
| 05:07PM | 23 | THE COURT:  AND WOULD YOU TALK TO COUNSEL ABOUT THAT |
| 05:07PM | 24 | AS WELL? |
| 05:07PM | 25 | PRETRIAL OFFICER:  YES, YOUR HONOR, I WOULD TALK TO |

| | | |
|---|---|---|
| 05:07PM | 1 | HER COUNSEL. |
| 05:07PM | 2 | THE COURT:  OKAY.  WELL, MAYBE WE SHOULD -- MAYBE |
| 05:07PM | 3 | YOU SHOULD KNOW WHAT THE GOVERNMENT IS GOING TO ASK FOR. |
| 05:07PM | 4 | SO, MR. SCHENK, WHAT ARE YOUR THOUGHTS? |
| 05:07PM | 5 | MR. SCHENK:  I THINK THE GOVERNMENT'S REQUEST WOULD |
| 05:07PM | 6 | BE THAT WHAT IS CURRENTLY SECURED JUST BY MS. HOLMES'S |
| 05:07PM | 7 | SIGNATURE BE CONVERTED TO A SECURED BOND EITHER IN THE FORM OF |
| 05:07PM | 8 | PROPERTY OR CASH, IF THAT'S AVAILABLE. |
| 05:07PM | 9 | THE COURT:  OKAY.  SO THE POSSIBILITY OF AN EITHER |
| 05:07PM | 10 | CASH BOND OR PROPERTY BOND THAT REQUIRES PAPERWORK AND THOSE |
| 05:07PM | 11 | TYPES OF THINGS; RIGHT? |
| 05:07PM | 12 | MR. SCHENK:  YES, YOUR HONOR. |
| 05:07PM | 13 | THE COURT:  ALL RIGHT. |
| 05:07PM | 14 | ANYTHING, MR. DOWNEY? |
| 05:07PM | 15 | MR. DOWNEY:  NOT AT THIS TIME, YOUR HONOR. |
| 05:07PM | 16 | THE COURT:  DO YOU HAVE ANY QUESTIONS, MR. RANGEL? |
| 05:07PM | 17 | PRETRIAL OFFICER:  NOT AT THIS TIME. |
| 05:07PM | 18 | THE COURT:  WELL, I'M GOING TO STEP DOWN.  THEY'LL |
| 05:07PM | 19 | STILL BE HERE AND YOU CAN TALK WITH THEM IF YOU WOULD LIKE. |
| 05:08PM | 20 | IS YOUR CLIENT AVAILABLE TO MEET WITH PRETRIAL SERVICES |
| 05:08PM | 21 | JUST NOW? |
| 05:08PM | 22 | MR. DOWNEY:  YES, I THINK SO. |
| 05:08PM | 23 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 05:08PM | 24 | MR. DOWNEY:  YOUR HONOR, MR. WADE SUGGESTS PROBABLY |
| 05:08PM | 25 | A GOOD THOUGHT, WHICH IS MIGHT WE CONFER WITH MR. SCHENK WITH |

05:08PM  1    MORE PRECISION AS TO WHAT HE HAS IN MIND AND THEN SET UP AN

05:08PM  2    INTERVIEW WITH PRETRIAL SERVICES FOR WHICH MS. HOLMES COULD

05:08PM  3    EITHER COME DOWN OR WE COULD DO BY ZOOM RATHER THAN DO IT

05:08PM  4    TODAY?  WE COULD DO IT IN THE NEXT FEW DAYS.

05:08PM  5        BUT IT MIGHT GIVE US AN OPPORTUNITY TO REVIEW ASSETS AND

05:08PM  6    SO FORTH AND HAVE THAT DISCUSSION WITH MR. SCHENK.

05:08PM  7             MR. SCHENK:  THAT'S FINE WITH ME, YOUR HONOR.

05:08PM  8             PRETRIAL OFFICER:  YOUR HONOR, IS THERE ANY SPECIFIC

05:09PM  9    DATE THAT YOU WANT THIS COMPLETED BY?

05:09PM  10            THE COURT:  WELL, I'M AT THE MERCY OF COUNSEL HERE,

05:09PM  11   MR. RANGEL.  THEY ARE GOING TO TELL ME WHICH DATE IS GOOD.  I

05:09PM  12   SUGGESTED THE 12TH AND IT LOOKS LIKE IT'S GOOD FOR OUR

05:09PM  13   SCHEDULE.

05:09PM  14       SO ARE YOU AVAILABLE THEN?

05:09PM  15            PRETRIAL OFFICER:  YES, YOUR HONOR.  IT COULD BE

05:09PM  16   DONE ON THE AFTERNOON OF THE 12TH, YES, YOUR HONOR.

05:09PM  17            THE COURT:  ALL RIGHT.  LET'S USE THAT AS KIND OF A

05:09PM  18   TARGET DATE FOR OUR PURPOSES THEN.

05:09PM  19            MR. DOWNEY:  OKAY.  THANK YOU, YOUR HONOR.

05:09PM  20            MR. SCHENK:  THANK YOU, YOUR HONOR.

05:09PM  21            THE COURT:  ALL RIGHT.

05:09PM  22            MR. DOWNEY:  THANK YOU, YOUR HONOR.

05:09PM  23            THE COURT:  THANK YOU.  WE'LL BE IN RECESS.

05:09PM  24            THE CLERK:  COURT IS ADJOURNED.

05:09PM  25       (COURT CONCLUDED AT 5:09 P.M.)

```
 1
 2
 3                         CERTIFICATE OF REPORTERS
 4
 5
 6
 7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
 8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10    HEREBY CERTIFY:
11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13    ABOVE-ENTITLED MATTER.
14
15
16          _____
            IRENE RODRIGUEZ, CSR, CRR
17          CERTIFICATE NUMBER 8076
18          _____
19          LEE-ANNE SHORTRIDGE, CSR, CRR
            CERTIFICATE NUMBER 9595
20
21          DATED: JANUARY 3, 2022
22
23
24
25
```

**ER-13000**

**To:**     Elizabeth Holmes[eholmes@theranos.com]; Surekha Gangakhedkar[surekhag@theranos.com]; Ian Gibbons[igibbons@theranos.com]; Gary Frenzel[gfrenzel@theranos.com]
**From:**   Susan DiGiaimo
**Sent:**   Wed 6/11/2008 2:00:15 PM
**Subject:**   FW: Theranos Evaluation
Theranos Evaluation Summary 09_June_2008.doc

    See attached summary of GSK's evaluation of our systems.  I am following up with Rebecca Hodge as well as Derek and Bob Dobbins in regards to the upcoming AXOR study as well as additional opportunities.

---

  **From:** nelson.n.rhodes@gsk.com [mailto:nelson.n.rhodes@gsk.com]
**Sent:** Wednesday, June 11, 2008 9:38 AM
**To:** derek.j.nunez@gsk.com; rebecca.j.hodge@gsk.com; robert.l.dobbins@gsk.com
**Cc:** Susan DiGiaimo
**Subject:** Theranos Evaluation

    Please find the attached Metabolic Biomarker Lab summary of the Theranos Systems evaluation that took place May 27-28, 2008.


Best regards,
Nelson

FOIA Confidential Treatment Requested by Theranos         THER-2632558
Fed. R. Crim. P. 6(e) material

Trial Exh. 0112 Page 0001

**ER-13001**

**Background information:**
On May 27-28, 2008 the Theranos system was evaluated at GSK to profile active GLP-1 and C-peptide values and these data were compare to "gold standard" ELISAs using frozen human plasma from study AXO110461. The key project objectives (found in the attached statement of work) were:

[ EMBED Word.Document.8 \s ]

- To assess the performance of the Theranos System in measuring GLP-1 and c-peptide values (the "Cartridge Analytes") as compares to the current gold standard ELISA.
- To assess the functionality, specificity, reproducibility, accuracy, and precision of the Theranos System.
- Assess the Theranos data reporting and transfer functions

Thirty plasma samples (assayed in duplicate) were chosen based on historical GSK data for total GLP-1 levels from subjects given a mixed meal and two finger prick blood draws were performed. Five Theranos machines were used with active GLP-1 and C-peptide cartridges that required 20μL of plasma. MesoScale Discovery's (MSD) active and total GLP-1, Linco (Millipore) active GLP-1, and Linco (Millipore) C-peptide ELISAs were run as comparator assays.

**Data:**
Original data (attached):

[ EMBED Excel.Sheet.8 ]

The original calibration for the Theranos system was based on spikes into human blood and plasma and validated against the Linco ELISA kit. The baseline (background) signal for no spikes was higher than the RLUs seen for most of the samples in the GSK study.

Recalibrated data and correlations (attached):

[ EMBED Excel.Sheet.8 ] [ EMBED PowerPoint.Show.8 ]

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2632559

**GSK Metabolic Biomarker Lab comments:**

- Data show good correlation
  - $r^2 = 0.90$ for GLP-1 (MSD vs. Theranos)
  - $r^2 = 0.96$ for C-peptide (Linco vs. Theranos)
  - inter-instrument precision acceptable (RLU average %CV = 11)
- Machines worked well
- Touch-screen interface was easy to use
- Cartridges were pretty straight forward (easy to handle and load)
- Assays took approximately 1 hour and 15 minutes per cartridge
- Finger prick/blood draw procedure was difficult (needed larger lancet and better syringe system)

**Overall conclusions:**

- The Theranos system eliminates the need for a lab and provided quality data
- The Metabolic Biomarker Lab has a favorable impression of the technology/system and recommends GSK clinical groups to work with Theranos to identify the best use of this technology.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



**JOHNS HOPKINS**
M E D I C I N E

### Summary of Hopkins/Walgreens/Theranos Meeting
April 27th, 2010

**Johns Hopkins Medicine Participants:**

| | |
|---|---|
| Dr. Frederick Brancati | Professor of Medicine & Epidemiology, Director, Division of General Internal Medicine; Director, Diabetes Prevention & Control Core |
| Dr. Thomas Kicker | Professor of Medicine; Director of Hematology Laboratory |
| Dr. William Clark | Associate Professor of Pathology; Director of Clinical Pathology Laboratory |
| Mark Shaver | Head of Strategic Alliances, Johns Hopkins Medicine International |
| Bassam Sayad | Managing Director, Johns Hopkins Medicine International, Formerly Senior Staff, JH Clinical Pathology |

**Walgreens Participants:**

| | |
|---|---|
| Dr. Jay Rosan | Vice President, Health Innovation, Walgreens |

**Theranos Participants:**

| | |
|---|---|
| Elizabeth Holmes | President & CEO, Theranos |
| Sunny Balwani | Vice Chairman, Theranos |

**Innosight Participants:**

| | |
|---|---|
| Erika Johnson | Manager, Innosight |

**Meeting Objectives:**

- Hopkins team was asked to comment on validity and usefulness of Theranos product, specifically related to the science that supports the technology and the application of the technology in a variety of settings including hospital, clinic, laboratory and potentially within Walgreens as an add on to the clinical programs and retail pharmacy business that currently exists.

**Methodology:**

- The Hopkins Team reviewed proprietary data on test performance for routine tests (clinical pathology, hematology) and special tests (e.g. tumor markers)

- Theranos presented additional data on technology, test performance, and business vision— and demonstrated technology on site.

- Dr. Rosan commented on Walgreens preliminary strategy to explore expanding into the laboratory space, expanding its health services offerings to include lab and pathology testing within Walgreens retail space.

*Confidential Document*

CONFIDENTIAL TREATMENT REQUESTED BY JOHNS HOPKINS UNIVERSITY
AND JOHNS HOPKINS HEALTH SYSTEM CORP

JH_SEC_0000085

US-REPORTS-0000611

Trial Exh. 0302 Page 0001

ER-13004

**Key Findings**:  Based on this evaluation, the consensus of the Hopkins team was as follows:

- The technology is novel and sound.  It can accurately run a wide range of routine and special assays.

- The technology is simple enough to be used by non-specialists in the field.

- Special strengths of the technology include:
  - Accuracy
  - Miniaturization (small footprint, portable, usable in the field)
  - Flexibility (can be tailored to needs of variety of clinical venues)
  - Connectivity (connection to centralized control via wireless/web enhances QC and population-based analysis)
  - Adaptability for Research (can be tailored for repeated measures of new targets, e.g. drugs)
  - Cost per study was stated to be significantly lower than currently available on the commercial market

- The Hopkins team thought that the technology would be useful in the retail clinic setting, with the proviso that the throughput for an individual sample (30-45 min) would require multiple units per site and impose an upper limit for group throughput.

- The Hopkins team also thought it would be attractive to consider JHU-Theranos research collaboration around individualized medicine, especially around drug kinetics and response.

- One observation: "The Theranos Technology is not really 'point of care' technology—it's really a traditional lab assay approach, with the attendant accuracy and validity---highly miniaturized.  Essentially a 'mini-lab'."

- No major weaknesses were identified.

**Additional Information**:

- Dr. Clark indicated that over the past two years he has had numerous conversations with Theranos about utilizing their technology at Johns Hopkins for research activities.  The conversations continue to be favorable and both parties will continue to explore opportunities for collaboration.

**Disclaimer:**

This information is being provided solely for the benefit of Walgreens and shall be used by Walgreens for its internal purposes only.  In addition, the materials provided in no way signify an endorsement by Johns Hopkins Medicine to any product or service.

*Confidential Document*

CONFIDENTIAL TREATMENT REQUESTED BY JOHNS HOPKINS UNIVERSITY
AND JOHNS HOPKINS HEALTH SYSTEM CORP

JH_SEC_0000086

US-REPORTS-0000612

Trial Exh. 0302 Page 0002

ER-13005

# THERANOS MASTER PURCHASE AGREEMENT

This Master Purchase Agreement ("Agreement") dated July___30ᵗʰ___, 2010 ("Effective Date") is by and between:

**WALGREENS**

| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| --- | --- | --- | --- |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | |
| Company Phone Number | | Email | wade.miquelon@walgreens.com |
| Company Fax Number | | | |

**THERANOS**

| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| --- | --- | --- | --- |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A: Program Overview
Schedule B: Purchasing Terms and Conditions
Schedule C: Support and Maintenance Terms
Schedule D: Pricing
Schedule E: Definitions
Schedule F: Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Projections
Schedule J: Theranos Pharmaceutical Clinical Trials Infrastructure

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference. This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
| --- | --- |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE MIQUELON | |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| EXECUTIVE VICE PRESIDENT | |
| (Title) | (Title) |

Theranos and Walgreens Confidential and Proprietary

Trial Exh. 0372 Page 0002

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000006

# THERANOS MASTER PURCHASE AGREEMENT

This Master Purchase Agreement ("Agreement") dated July 30, 2010 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | |
| Company Phone Number | | Email | wade.miquelon@walgreens.com |
| Company Fax Number | | | |
| THERANOS | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A: Program Overview
Schedule B: Purchasing Terms and Conditions
Schedule C: Support and Maintenance Terms
Schedule D: Pricing
Schedule E: Definitions
Schedule F: Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Projections
Schedule J: Theranos Pharmaceutical Clinical Trials Infrastructure

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference. This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| | |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| | *Elizabeth Holmes* |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| | *President & CEO* |
| (Title) | (Title) |

Theranos and Walgreens Confidential and Proprietary

Trial Exh. 0372 Page 0003

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000007

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes. The terms and conditions governing this Schedule are set forth in Schedule B, attached. Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions. If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail. The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1. **Background.**

   Theranos has developed, and is developing, generations of "mini-lab" devices that can run any blood test in real-time for less than the traditional cost of central lab tests. The Theranos Systems will run routine laboratory tests and proprietary tests that detect the appearance of diseases, enabling early intervention and initiation of treatment long before complications emerge.

   In-store blood testing from a single finger-stick could transform the role of pharmacies in healthcare. It is estimated that 80% of physicians' diagnoses are a result of laboratory tests. By putting the right tools and information in the hands of clinicians at a pharmacy or other Walgreens clinical locations, Theranos could play a major role in realizing the true potential of pharmacies in improving patient health and reducing national healthcare costs. In addition to driving new traffic into stores and increasing ownership of the totality of health needs for store customers, pharmacies will fundamentally improve patient outcomes, be better predictors of the health of consumers, and reduce the costs of healthcare.

   In introducing Theranos Systems at Walgreens stores and through Walgreens' Employer Solutions Group, Walgreens could become the hub for early detection and treatment of critical ailments to prevent the complications that lead to extraordinary healthcare costs and, ultimately, fatalities.

   Equally, the Theranos infrastructure at Walgreens is a powerful clinical studies infrastructure for pharmaceutical drug development, post-marketing, and safety studies. Theranos' investment in clinical development over the past six years can be applied to making Walgreens a hub for pharmaceutical programs.

   Theranos Systems installed at Walgreens' pharmacies and Employer Solutions Group locations could bring cutting edge, personalized, and preventative healthcare into pharmacies without the need for complex infrastructure and the overhead associated with it. Walgreens will enable fast, efficient and scalable health services at the point-of-care; this service will quickly drive even more new, predictable and repeat customer traffic in stores.

   The ability to run blood tests from a finger-stick in less than an hour at Walgreens' pharmacies creates a new workflow and a new diagnostic paradigm for health care. Patients will be able to come to Walgreens for most of their health needs. The time saved will reduce visits to hospitals and paperwork prone to medical errors, while enabling more accurate and earlier treatment, improving the outcomes of the patients who get their care at Walgreens.

   Individual's biochemical profiles will link to targeted recommendations through "smart" software and self-learning software applications that facilitate behavior modification. Health information and nutritional recommendations provide insight into improvements in lifestyle, diet, and other resources available through Walgreens' stores. Walgreens' *Health Assistant* software will provide "smart" individualized support, links to prescriptions and health resources through mobile and online portals for a total customer lifestyle/health solution. Trusted health solutions could build customer loyalty and result in Walgreens becoming the center for continuity of care for store customers and members.

2. **Program Objectives.** The objectives of this Program include:

   a. Make blood testing faster and far more accessible, effective, and actionable by introducing a more cost-effective, real-time blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide.

Trial Exh. 0372 Page 0004

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000008

**ER-13008**

b.   Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices or through the web browser. This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

c.   Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

d.   Early intervention and reduced hospitalization through early detection of the onset of disease.

e.   Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

3.   **Program Managers.** Each party will assign a program manager to this Program. The responsibilities of each party's program manager include: (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party. The parties acknowledge that the Program Plan is subject to change as the Program progresses. Notwithstanding anything to the contrary in this Section 3, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

4.   **Reviews.** As needed, the appropriate Representatives from each party will meet on a regularly-scheduled basis to be determined, to review the status of the Program.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary                                                        -3-

Trial Exh. 0372 Page 0005

**Confidential Treatment Requested by Walgreen Co.**                                          WAG-TH-00000009

**SCHEDULE B**

**PURCHASING TERMS AND CONDITIONS**

1. **Scope.** The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment. To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2. **Best Price Guarantee.** Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to purchase Tests or Cartridges, defined as Available Cartridges, for a price lower than that available to Walgreens. Should Theranos provide Available Cartridges to United States retail pharmacies, grocers, mass merchants, or physician office(s) through an alternative delivery arrangement, Theranos agrees that the pricing for such arrangement shall not be lower than the reasonably equivalent Cartridge price charged to Walgreens. Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Best Price Guarantee, provided sales of such Tests or Cartridges below the Walgreens price are not material to Theranos for any given twelve (12) month period. For purposes of this Agreement Available Cartridges include First Generation Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows:

a. Version 1 ("V1") – All routine laboratory Tests specified on Schedule D;
b. Version 2 ("V2") – The following laboratory Tests including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests, (the parties agree that they will memorialize the CPT codes that are included in Version 2 as such codes become available);
c. Version 3 ("V3") – Predictive Tests (including, but not limited to, diabetes/pre-diabetes, congestive heart failure, women's cancer, men's cancer) and remaining esoteric Tests to be identified by description and/or CPT code by the parties at a later date.

3. **Exclusivity.**

a. **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to MedcoHealth Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager).

b. **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos will make the Theranos System available for sale as follows:

    i. For V1: Six (6) months after the successful completion of the Pilot;
    ii. For V2: Six (6) months after the date such Cartridges are available to Walgreens for sale; and
    iii. For V3: Twelve (12) months after the date that each new Cartridge is made available to Walgreens for sale. To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011. Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2012. Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.
    iv. For twelve (12) months after the date of completion of Walgreens' 12 month exclusivity period on each new V3 Cartridge, Theranos will grant Walgreens a 15-25% price advantage (as set forth below) over Walmart on all V3 tests for another twelve months. Under this arrangement, Theranos will guarantee that Walgreens will have at least a 15% price advantage over Walmart for tests that cost Walgreens $100 or greater and at least a 25% price advantage over Walmart for tests that cost Walgreens $30 or less. For all tests that cost Walgreens between $100 and $30, Theranos will linearly increase the % margin over Walmart from 15% to 25% at dollar increments. For instance, a test that costs Walgreens $100 will be sold to Walmart for at least $120. A test that costs Walgreens $30 will be sold for at least $40 to Walmart.

Confidential Treatment Requested by Walgreen Co.      WAG-TH-00000010

The parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the prices charged to Walgreens during such twelve (12) month period for V3 Cartridges shall be in accordance with this Section 3(b)iv. Should the results of such audit show that Walgreens was charged more than what is provided for in this Section, Theranos shall refund such additional charges to Walgreens within thirty (30) days of such certification. Said certification shall be made twice: Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new V3 Cartridge completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such V3 Cartridge completes.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of V2 and V3 cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b. Theranos shall promptly notify Walgreens in writing of the identity of such retail grocer and its related entities. During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

    **c.**   **Priority Capacity Allocation.** Upon ninety (90) calendar days' notice at any time, Walgreens can notify Theranos of its commitment to purchase specific quantities of Existing Cartridges and Theranos will dedicate its production capacity to fulfill those commitments from ninety (90) days of the date of notice until completion before using that production capacity to supply any other United States retail pharmacy, grocer, or mass merchant. Under this provision, Walgreens shall have the right to purchase Existing Cartridges for direct sale in the United States by Walgreens and Affiliates, but not for resale. Sales of cartridges under this provision are not cancellable or subject to reschedule and not subject to inclusion in the Excess Inventory provision below.

    **d.**   **Excess Inventory.** Walgreens, no more than once per calendar quarter, may elect to engage the Excess Inventory Return described as follows: if within sixty (60) calendar days preceding the expiration of the Warranty Period (see Schedule B, Section 17.a.) Walgreens determines that the Warranty Period for a number of the purchased Available Cartridges will expire prior to Walgreens' forecasted capacity to sell the Available Cartridges directly ("Excess Inventory"), Walgreens may notify Theranos in writing ("Excess Inventory Notification") of such Excess Inventory and Theranos will arrange to have such Cartridges returned to Theranos, with Walgreens responsible for the reasonable cost of the associated shipping, including shipment of the replacement Cartridge to Walgreens. Theranos will replace said Cartridge with a new Cartridge within 180 days of the Excess Inventory being shipped back to Theranos. The Excess Inventory Notification will include: (i) the type of Available Cartridge; (ii) the quantity of Available Cartridges; (iii) the location of each Available Cartridge; (iv) the purchase price paid (or owing) for each Available Cartridge; and (v) written confirmation that subject Available Cartridges were maintained in the standard shipping packaging and stored in environments consistent with Theranos' data sheets and/or storage recommendations. In the case of V1 Cartridges, Walgreens will pay to Theranos a fixed fee of $5.00 per Cartridge to restock and replace the Excess Inventory. In the case of V2 and V3 Cartridges, Walgreens will pay a restocking fee equal to 20% of the Cartridge price. Should said Cartridge be purchased through a Pre-Purchase commitment, then the remaining credit available to Walgreens after the restocking fee is paid would be split equally between a cash refund and to the credit balance for pre-purchases. As an example, if the restocking fee for a V2 Cartridge is 20% and the Cartridge was originally purchased for $10.00, with $5.00 paid in cash and $5.00 applied from the pre-purchase credit balance, Walgreens would receive $4.00 in cash and $4.00 would be credited to its pre-purchase credit balance.

    **e.**   **Notice of Cartridge Availability.** Theranos shall (a) deliver to Walgreens a written notice (the "Notice") stating the forecasted availability of the Available Cartridges, including the Cartridge type, the estimated shipment dates, and, subject to Schedule B, Section 10, below, the proposed price ("Offered Price"); and (b) offer to sell the Available Cartridges to Walgreens at the Offered Price and on the other terms set forth in this Agreement.

  **4.**   **First Announcement Rights.** Theranos will not authorize any other United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

  **5.**   ***Theranos Pharmaceutical Clinical Trials Infrastructure.*** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their laboratory tests performed at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions

Theranos and Walgreens Confidential and Proprietary             -5-

**Confidential Treatment Requested by Walgreen Co.**         WAG-TH-00000011

between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule J.

6. **Cartridge Pre-Purchase Commitments**.

(a)     Walgreens agrees to initially pre-purchase fifty million dollars ($50 million) of Cartridges ("Inventory") which includes use of Devices and provision of Services according to the following schedule:
   (i)     $30 million on the Effective Date of this Agreement
   (ii)    $20 million within five (5) days of receipt of official, written FDA approval and CLIA Waived Status for Theranos System including all Version 1 Tests
The first $30 million pre-purchase payment will be invoiced at the Effective Date of this Agreement. The second $20 million payment will be invoiced after Theranos obtains any and all official, written FDA approval, CLIA-waived status and any other federal regulatory approvals necessary in order for Walgreens to commence utilizing the Theranos System and Cartridges to perform Tests for its customers in accordance with the Pilot set forth in Schedule F (the "Approvals"). If Theranos fails to obtain the Approvals by December 31, 2010, such failure shall entitle Walgreens to terminate this Agreement in accordance with Schedule B, Section 23.c.

(b)     In the event the initial commitment detailed in Section 6(a) above is satisfied to Walgreens' satisfaction, Walgreens shall commit to two (2) additional $25 million purchase commitments, subject to the following terms:

   (i)     The existing commitment is exhausted;
   (ii)    Walgreens assumptions regarding cost and performance are being met; and
   (iii)   The prepaid amount is expected to be exhausted by Walgreens in a period not to exceed 180 days.

7. **Ordering**.

a. **Purchase Orders.** Walgreens will issue purchase orders to Theranos specifying the Theranos Deliverable that Walgreens requests Theranos to deliver. Each purchase order will reference this Agreement. If, and to the extent, a purchase order contains boilerplate or pre-printed terms, this Agreement supersedes any and all such boilerplate or preprinted terms. At a minimum, each purchase order shall specify (i) a complete list of the Deliverables covered by the purchase order, including the quantity, model number and description of each; (ii) the price of each Deliverable, and any applicable discounts; (iii) the billing address; (iv) the ship-to address; (v) the proposed requested ship date, which shall be no later than six (6) months from the date of the purchase order; and (vi) the signature of the employee or agent authorized to place the order.

b. **Order Acknowledgment.** Theranos will acknowledge Walgreens' purchase order in writing within ten (10) days after receipt. Theranos' acknowledgment will note any exceptions regarding matters such as the Deliverables ordered and pricing. In no event will any purchase order be binding on Theranos until Walgreens' purchase order and Theranos' acknowledgment are in agreement as to Deliverables ordered, quantity, pricing and scheduled shipping dates.

8. **Scheduling and Cancellation**. For all Cartridge purchase orders, cancellations shall be handled in the same manner as Excess Inventory returns as detailed in Section 3(d) above with the exception of those orders placed under Walgreens' Priority Capacity Allocation detailed in Section 3(c).

9. **Invoicing**. Theranos will issue invoices as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Cartridges | On shipment date and will specify number of Cartridges shipped by shipping destination; charge to be reflected on invoice for Services described below. |
| Devices | No invoice, as Walgreens will not be separately charged for Devices. Theranos, in its discretion, will determine the number of Devices to be placed in each location based on Cartridge consumption, provided that each location selected by Walgreens shall be able to process twelve (12) Tests at a time. |

Theranos and Walgreens Confidential and Proprietary                                                                    -6-

**Confidential Treatment Requested by Walgreen Co.**                                    WAG-TH-00000012

| Training (installation and use of Devices)*  *Theranos will train the trainer and will assist Walgreens in developing appropriate training materials, videos, and literature to operate devices and run the tests. Additionally, Theranos will provide periodic trainer updates as new versions of Devices and Tests require it. | No invoice, as Walgreens will not be separately charged for Training |
| --- | --- |
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing. The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10. **Payment**. Commencing with the Pilot Phase, Walgreens shall compensate Theranos for purchase of Cartridges, use of the Devices, and of Services, as follows: The parties will allocate the initial pre–purchase commitment of $30 million into an account on the Effective Date, with the remaining $20 million funded at the time of receipt of official, written FDA approval and CLIA Waived Status for Theranos System including all Version 1 Tests.

          i.      **Deduction from Pre-Purchase Account.**   Theranos will apply 50% of the invoiced amount to the first $50 million of Pre-Purchase until such time as the balance reaches zero, provided that if Walgreens exercises its rights under Section 20, Theranos will only apply 50% of the invoiced amount to the first $25 million of Pre-Purchase until such time as the balance reaches zero. The remaining 50% shall be paid in cash in accordance with subsection (ii). Once the balance reaches zero, payment to Theranos will be made in accordance with subsection (ii).Any adjustments to pre-purchase commitments resulting from paragraphs 3.d or 7 shall be made to the account for the related adjusting transaction.

          ii.      **Issuing Payment to Theranos.**     All payments are due within thirty calendar days from the date of Invoice. If, after ten (10) days written notice to Walgreens that a payment is overdue and such Invoice remains unpaid, late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

All fees payable to Theranos under this Agreement will be detailed, categorized and clearly stated on an invoice, in a form reasonably acceptable to Walgreens, in accordance with this Agreement. Theranos reserves the right to suspend providing any Deliverable if any payment obligation which has not been reasonably disputed by Walgreens is more than ten (10) days past due and that such suspension will not be deemed a breach or failure under this Agreement and will not trigger any remedies provided within this Agreement. Theranos agrees that it will provide written notice to Walgreens should any invoice be past due. Theranos will immediately resume providing Deliverables upon full and final payment of such past-due payment obligation. Walgreens will have the right to set off any damages or charges assessed by Walgreens under this Agreement, for which Walgreens has notified Theranos in writing and which have not been reasonably disputed by Theranos, against any undisputed amounts owed to Theranos under this Agreement. Walgreens shall have no obligation to pay any charges or expenses first invoiced more than 12 months after they accrue, except to the extent they are for taxes which Walgreens is obligated to pay pursuant to this Agreement and which are imposed after such period.

Theranos will also send a completed W9 to the following address:

Walgreen Co.
Danville Accounting Office
1901 E. Voorhees, MS 685
Danville, IL 61834

Trial Exh. 0372 Page 0009

Confidential Treatment Requested by Walgreen Co.        WAG-TH-00000013

11. **Purchase Price.** Prior to initiating the Pilot as described in Schedule F, the parties will negotiate and agree upon pricing for the newly Available Cartridges and related Services. In the event the parties fail to negotiate and agree upon pricing prior to the time of Pilot initiation as described in Schedule F, either party shall have the right to terminate this Agreement pursuant to Section 23.b. The agreed-upon pricing schedule will be reduced to writing and this Agreement will be amended by including the pricing in Schedule D. The price to be agreed upon by the parties will not include applicable taxes, or custom duties. If Theranos has the legal obligation to collect any taxes, duties or charges of any kind imposed by any country, federal, state, or local government entity, the appropriate amount shall be added to Walgreens' invoice and shall be paid by Walgreens unless Walgreens provides Theranos with a valid tax exemption certificate authorized by the appropriate taxing authority.

12. **Discounts.** The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions. Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein. The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

13. **Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

14. **Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

a. **Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System.

b. **Reports.**

    i. **Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

    ii. **Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. All Reports generated, including but not limited to all Results provided to clinicians, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens.

    iii. **Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the Ordering Practitioner, the technician that performed the Test, and, to the extent required by state law, any other individuals or entities of the Critical Value and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value.

    iv. **Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

    v. **Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will, on behalf of Walgreens, prepare and submit any and all Reports, or other information or forms that Walgreens may be required to disclose to a health department or other government agency as a result of performing certain Tests.

Theranos and Walgreens Confidential and Proprietary          -8-

**Confidential Treatment Requested by Walgreen Co.**          WAG-TH-00000014

vi. **Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports on behalf of and for the benefit of Walgreens.

vii. **Walgreens' Retention Right:** Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

c. **Billing.**

i. **Provider.** Theranos acknowledges and agrees that Walgreens will be the provider of the clinical laboratory services performed at Walgreen's locations utilizing the Theranos System. As the provider of service, all claims for payment submitted to patients and/or third-party payors will be submitted in the name of Walgreens and under a Walgreen's tax identification number. Theranos acknowledges and agrees that it will not submit any claims in its name or tax id number any claims for payment to any customers or third-party payors for Tests performed at Walgreens locations. Theranos shall look solely to Walgreens for payment of the items and services it provides to Walgreens pursuant to this Agreement.

ii. **Billing Software.** For the duration of the Pilot phase, Walgreens will utilize the TheranOS billing software to electronically bill payors for Tests performed at Walgreens stores. Walgreens will determine, and will notify Theranos in writing, within sixty (60) days after the conclusion of the Pilot if it subsequently wishes to use TheranOS billing software to electronically bill payors for Tests performed at Walgreens stores. Walgreen's use of the TheranOS billing software will be subject to the license specified in Section 19 of this Agreement.

iii. **Collections.** During the Pilot, Theranos will utilize the TheranOS software to submit initial electronic claims to third-party payors, and Theranos will be responsible for any subsequent follow-up or collection activities that may be required to resolve claim rejections, underpayments or other reimbursement issues. The process and subsequent execution of filing claims shall be subject to Walgreens' approval, with Walgreens having access to Theranos' billing system and process. Walgreens will determine, and will notify Theranos in writing, within sixty (60) days after the conclusion of the Pilot if it subsequently wishes to have Theranos to continue to manage the collection process.

iv. **Records.** In accordance with the requirements of Schedule G, Theranos will electronically maintain an archive of all transactions generated utilizing the TheranOS billing software including but not limited to claims submissions, remittance advice and claims history.

v. **Bank Account.** All reimbursement collected from patients and third-party payors for Tests performed at Walgreens locations and billed using the TheranOS software will be electronically directed or otherwise deposited into one or more bank accounts established and owned by Walgreens.

d. **HIPAA.** The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G.

15. **Delivery.** Delivery of Cartridges and any other Theranos Deliverables to which Walgreens will acquire title will be shipped F.O.B. (Domestic) to Walgreens' warehouse ("Delivery Point"). Walgreens will request a date for delivery of such Deliverables on the purchase order. Theranos will confirm that date, or some other date ("Delivery Date") which will be no later than 30 days after Theranos' receipt of the Purchase Order subject to reasonable availability of the requested volumes. Theranos shall confirm the Delivery Date in the Warehouse Ship to Arrive ("WSTA") in the Walgreens purchase order system. Theranos will use reasonable efforts to deliver the Deliverables on the Delivery Date. However, Theranos shall not be liable for any failure to meet such date. Title for the Deliverable, assuming title is transferring in accordance with this Agreement, excluding any Software, and risk of loss or damage to the Deliverable will pass to Walgreens upon Theranos' delivery of Deliverable to the Walgreens facility specified in the purchase order. If specified, Theranos will use commercially reasonable efforts to manage just-in-time inventory for Walgreens.

Confidential Treatment Requested by Walgreen Co.                                                               WAG-TH-00000015

**16. Shipment.** In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous. Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions. If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens. Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**17. Devices.**

**a.** Any Devices, Cartridges and other Deliverable provided by Theranos to Walgreens shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

**b.** Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

**c.** Theranos shall regularly calibrate the deployed Devices in a commercially reasonable manner to ensure timely and accurate Tests.

**d.** If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

**e.** Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**18. Warranty.**

**a.** At the time Theranos notifies Walgreens of Available Cartridges, Theranos shall also advise Walgreens of the expected shelf-life ("Warranty Period") of the Cartridges. Unless otherwise provided in the applicable procurement document, all Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Provided Walgreens maintains the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens, Theranos will warrant the shelf-life of the Cartridges. For Cartridges that Theranos confirms are non-conforming to this warranty, and provided Walgreens notifies Theranos in writing during the Warranty Period of the non-conformance, Theranos, at its expense, will replace the non-conforming Cartridges within thirty (30) calendar days of Walgreens' notification. The parties agree that replacement of cartridges, as noted in the previous sentence, shall be Theranos' sole obligation and Walgreens' exclusive remedy, provided that not more than 3% of the Cartridges used in any three (3) month period require replacement. Should more than 3% of the Cartridges used in any three (3) month period require replacement it will be deemed a material breach under this Agreement.. This warranty shall not apply to Cartridge subject to abuse, misuse, modification, repair, accident, or use other than pursuant to and in accordance with this Agreement.

**b.** Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

Trial Exh. 0372 Page 00012

Confidential Treatment Requested by Walgreen Co. WAG-TH-00000016

**ER-13016**

c. Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

d. **Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

19. Licenses.

a. **Theranos License Grant.** Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software installed on Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b. **Ownership.** Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information. Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use. Walgreens shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users, disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software. Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

c. **Walgreens License Grant.** Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d. **Property Ownership/Use.**

(i) Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii) Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens

Theranos and Walgreens Confidential and Proprietary

-11-

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000017

**ER-13017**

may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii) Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv) With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v) Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi) Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to payors, including the government who are paying for tests, provided that the use of these Results and Reports is restricted to treatment of the specific patient for whom such Results and Reports are provided. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(vii) Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii) Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers,

Theranos and Walgreens Confidential and Proprietary                                                                          -12-

**Confidential Treatment Requested by Walgreen Co.**                                         **WAG-TH-00000018**

**ER-13018**

including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

(ix)    To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)    As between Walgreens and Theranos: (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

    **e.  Confidentiality.**

        **i.  Use and Protection.** Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent. Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement. Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States. Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise. Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information. **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.** In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

        **ii.  Terms of Agreement.** Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary, (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party. In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from

  Theranos and Walgreens Confidential and Proprietary                       -13-

**Confidential Treatment Requested by Walgreen Co.**                   **WAG-TH-00000019**

making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

    **iii. Term of Confidentiality**.   The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives.   Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

**20.      Convertible Note.**      In partial consideration for Walgreens' commitments set forth in this Agreement, from the Effective Date until the six (6)-month anniversary of the successful completion of the Pilot, Walgreens shall have the right to purchase a convertible promissory note in the principal amount of $25 million in substantially the form set forth in Schedule H-1 (the "Convertible Note").   Payments made by Walgreens pursuant to its pre-purchase commitments described in Schedule B, Section 7 that have not been applied to Invoices may, at the election of Walgreens, be applied to pay all or a part of the purchase price of the Convertible Note.   The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note). The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note) and initially be convertible into 1,666,666 shares of Series C-1 based on a $15 Conversion Price of each Series C-1 preferred share. Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**21. Indemnification.**

    **21.1 Defense and Indemnification.**   (i)Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens's use of the Theranos System, Services or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.   Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction.  (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.   However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.  (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section

Trial Exh. 0372 Page 00016

**Confidential Treatment Requested by Walgreen Co.**      WAG-TH-00000020

21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

**21.2** **Infringement.** In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to: (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows: (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot and exhaustion of Walgreens $50 million pre-purchase commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After exhaustion of Walgreen's $50 million pre-purchase commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000. Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above. Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos. For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever. Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

21.3 **Procedures.** The indemnifying party has the right to control the defense and settlement of any Claim; provided, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed). Upon the indemnifying partys' request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation. Each party will provide prompt notification of any Claim; provided, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

21.4 **Independent Obligation.** The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

**22.** **Limitation of Liability.** In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party. In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. In no event shall Walgreen's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims: (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables. Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential

Theranos and Walgreens Confidential and Proprietary                                                                                  -15-

**Confidential Treatment Requested by Walgreen Co.**                                                    WAG-TH-00000021

**ER-13021**

Information.  Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.  The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

23.  **Term and Termination.**

a.  **Term.**  This Agreement will be in effect until three (3) years from the Effective Date or longer based on performance thresholds mutually agreed upon in writing by amending this Agreement after successful completion of the Pilot.  This Agreement will be automatically extended for three (3) year periods unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the renewal date.

b.  **Termination due to unsatisfactory Pilot.**  Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement, with Walgreens receiving a refund of all sums paid by Walgreens as further detailed in Section 23.d.

c.  **Termination for Cause.**  If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach.  In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default.  Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due.  Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately..

d.  **Obligations upon Termination.**
    i.  Theranos' Obligations to Walgreens:
        1.  In the event Walgreens terminates this Agreement pursuant to Sections 23.b or 23.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund all sums paid by Walgreens pursuant to Section 5 that were not applied by Walgreens towards payment of Invoices.
    ii.  Walgreens' Obligations to Theranos:
        1.  In the event this Agreement is terminated by Theranos pursuant to Section 23.c or Walgreens elects not to renew, Theranos will retain such sums as Walgreens may have paid under, and in accordance with, this Agreement. Within one hundred eighty (180) calendar days of the termination date, Theranos will provide Walgreens with, and Walgreens shall pay, an invoice setting forth any amounts owed, but not yet paid, prior to the termination date, including any additional expenses Theranos incurred with respect to non-cancellable commitments attributable to the termination of this Agreement.
    iii.  Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

e.  **Letter of Credit.**  Theranos agrees that until the Payment Refund Obligation Termination occurs, Theranos will maintain a letter of credit equal to the amount of pre-purchase commitments for the benefit of Walgreens.  The letter of credit shall be issued by a bank, and shall be on terms, reasonably acceptable to Walgreens.

f.  **Survival of Provisions**.  Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

24.  **Miscellaneous.**

Theranos and Walgreens Confidential and Proprietary                                                    -16-

**Confidential Treatment Requested by Walgreen Co.**                                        WAG-TH-00000022

**ER-13022**

e.   **Governing Law/Venue.** This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles.  The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

f.   **Independent Contractor.**  Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise.  Neither party has the authority to represent the other as to any matters.

g.   **Entire Agreement.**  The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

h.   **Force Majeure.**  Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party.  Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

i.   **Assignment.**  Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned.  Any such attempt to do so will be ineffective.  Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary.  Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

j.   **Notices.**  All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid.  All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

k.   **Prevailing Party.**  In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

l.   **Amendment; Waiver.**  No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

m.   **Severability.**  If any portion of this Agreement is held invalid, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

n.   **Publicity.**  Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent.  Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

Trial Exh. 0372 Page 00019

**Confidential Treatment Requested by Walgreen Co.**                                    WAG-TH-00000023

**ER-13023**

o.   **Export and Import Requirements**.  Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported.  Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

p.   **Compliance With Laws.**  Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations.  Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party,  whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

o.   **EEOC Compliance.**  In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), **unless exempted by said regulations**, particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1).  Theranos certifies, in accordance with the requirements of  41 CFR Section 60-1.8), that its facilities for employees are not segregated.  In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

p.   **Insurance.**  Theranos will maintain at its expense the following insurance during the term of this Agreement:

   (i)      Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

   (ii)     Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii)     Excess          liability insurance with minimum limits of $5,000,000 in the aggregate; and

   (iv)     Professional Liability (errors & omissions) with minimum limits of $2,000,000.

q.   **Policy Requirements.**  .  All policies will be primary and at Theranos' sole expense.  Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability.  All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens.  Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher.  The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations herein.  Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders.  If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r.   **Theranos Data Security Reviews.**  Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices.  If any such review or examination indicates  that the procedures have or are likely to fail, Theranos will promptly notify

Theranos and Walgreens Confidential and Proprietary                                                                    -18-

Confidential Treatment Requested by Walgreen Co.                                        WAG-TH-00000024

**ER-13024**

Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts. Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation. Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device. Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 24.r.

*[remainder of page intentionally left blank]*

Trial Exh. 0372 Page 00021

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000025

ER-13025

**SCHEDULE C**

**SUPPORT AND MAINTENANCE TERMS**

1.      **Support and Maintenance:  Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

**1.1      Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance.  Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems.  Theranos will designate a dedicated Client Solutions manager to Walgreens.  The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests.  Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online.  In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2      Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone.  Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted.  Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software.  Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours.  Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

3.      **Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

4.      **Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

Trial Exh. 0372 Page 00022

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000026

**ER-13026**

**SCHEDULE D**

**PRICING**

Final Pricing for the Deliverables shall be agreed upon prior to the commencement of the pilot phase of the project. At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted. Pricing will not be finalized unless and until it is reduced to writing, and signed by an authorized representative(s) of each party. Pursuant to Schedule B, paragraph 2, Theranos agrees that no United States retail pharmacy, grocer, or mass merchant will purchase Tests and Available Cartridges at lower prices than Walgreens.

**Routine Laboratory Tests (Version 1)**

List attached to end of Agreement

The parties acknowledge and agree that this list is subject to further additions. Theranos will provide notice to Walgreens of such changes by sending an email to: (i) renaat.VanDenHooff@walgreens.com; and (ii) jay.rosan@walgreens.com

**Exclusions.** The prices to be negotiated will not include costs and expenses Theranos will incur in performing the obligations outlined in this Agreement, which will be invoiced separately as incurred by Theranos. These costs are limited to Theranos personnel travel and lodging and meals (including, to the extent requested by Walgreens, travel to all of Walgreens' sites where training will be conducted and Devices installed), and any incidental expenses. Said travel costs shall be subject to Walgreens' Consultant Travel Policy, a copy of which has been provided to Theranos.

*[remainder of page intentionally left blank]*

Trial Exh. 0372 Page 00023

**Confidential Treatment Requested by Walgreen Co.**      WAG-TH-00000027

**ER-13027**

**SCHEDULE E**

**DEFINITIONS**

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1.  "**Affiliate**" means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2.  "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3.  "**Available Cartridges**" means First Generation Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows: Version 1 – all routine laboratory Tests; Version 2 – diagnostic (influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy) and all available esoteric Tests; Version 3 – predictive Tests, each a separate V3 Cartridge, (diabetes/pre-diabetes, congestive heart failure, women's cancer, men's cancer) and remaining esoteric Tests.

4.  "**Calibration**" means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

5.  "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

6.  "**Change of Control**" means (i) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

7.  "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

8.  "**Confidential Information**" means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement. Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential. "Confidential Information" does not include information which: (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary. Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

9.  "**Control, Controls** or **Controlled**" mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

10.  "**Device**" means Theranos' reader capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Theranos, communicating with authorized parties and providing analytical information.

11.  "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

Trial Exh. 0372 Page 00024

Confidential Treatment Requested by Walgreen Co.                                          WAG-TH-00000028

**ER-13028**

12. "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

13. "**Discloser**" means the party disclosing Confidential Information.

14. "**Documentation**" means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

15. "**Existing Cartridges**" means, at any time, all Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows that have previously been made available to Walgreens: Version 1 – all routine laboratory Tests; Version 2 – diagnostic (influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy) and all available esoteric Tests; Version 3 – predictive Tests (diabetes/pre-diabetes, congestive heart failure, breast cancer, ovarian cancer, prostate cancer, colorectal cancer) and remaining esoteric Tests.

16. "**First Generation**" means the first product version of any Cartridge.

17. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

18. "**Medication Compliance/Adherence**" means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

19. "**Medication Persistence**" means the duration of time from initiation to discontinuation of administration of medications.

20. "**MTM**" or "**Medication Therapy Management**" means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

21. "**Ordered Tests**" means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

22. "**Ordering Practitioner**" means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

23. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

24. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

25. "**Pilot**" means the pilot program as set forth in Schedule F.

26. "**Processed Data**" means information generated by Theranos utilizing Theranos IP such as predictive modeling.

27. "**Program**" means the project outlined in Schedule A.

28. "**Recipient**" means the party receiving Confidential Information from Discloser.

29. "**Report(s)**" means the collective V1 Reports, V2 Results and V3 Results provided to Walgreens.

30. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

31. "**Result(s)**" means the collective V1 Results, V2 Results, and V3 Results provided to Walgreens.

Theranos and Walgreens Confidential and Proprietary                                        -23-

Confidential Treatment Requested by Walgreen Co.                          WAG-TH-00000029

32. **"Services"** means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. **"Support and Maintenance Services(s)"** means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

35. **"Test"** means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of diagnostic or predictive tests: a Cartridge, software program, information system or any other product necessary to perform a diagnostic or predictive test that has been granted CLIA-waived status by FDA.

36. **"TheranOS"** means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

37. **"Theranos Intellectual Property"** means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

38. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

39. **"V1 Results"** means the numerical outcome (raw data points) of a V1 laboratory Test originated at a Walgreens' Location.

40. **"V1 Report"** means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location. A Report for a V1 test is made up of the following three (3) components: (i) a V1 Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling.

41. **"V2 Result" or V3 Result"** means the documentation provided to the ordering clinician and Walgreens for a V2 or V3 test originated at a Walgreens Location. A V2 or V3 Result is made up of analysis only.

42. **"Walgreens"** means Walgreen Co. and its wholly owned subsidiaries.

43. **"Walgreens Location"** means a clinical or retail location including employer sites and academic research centers.

Trial Exh. 0372 Page 00026

**Confidential Treatment Requested by Walgreen Co.**                                        **WAG-TH-00000030**

**SCHEDULE F**
**PILOT**

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms. The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Measuring potential demand for the services to evaluate the potential for national expansion of the services within Walgreens locations and so that Walgreens assures itself that it will be able to utilize the $50 million purchase commitment within 360 days of completing the Pilot.
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:

- The Pilot will include all Version 1 tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in up to 90 stores with 30 stores offering service at least between the hours of 6 AM and 9 PM.
- The Pilot for store locations will commence no sooner than January 15, 2011, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary FDA approvals and CLIA waived status for the Theranos System including all Version 1 Tests; (ii) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (iii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to produce the Device and Cartridges is adequate to support reaching the 15 patient average per store per day goal. While the Parties intend the Pilot to start no sooner than January 15, 2011, the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met. At such time as Theranos has satisfied the above three (3) requirements, Theranos shall provide written notice to Walgreens of the same. Walgreens, shall either: (i) Commence the Pilot within forty-five (45) days of such notice; or (ii) inform Theranos in writing as to why it can not yet commence the Pilot. Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after January 15, 2011, but no later than June 30, 2011.
- The services will be offered in at least two (2) Employer Solutions Group ("ESG") locations. The Pilot for ESG locations will commence on a mutually agreeable date once Theranos obtains all necessary FDA approvals and CLIA waived status for the Theranos System including all Version 1 Tests, and acceptable terms are reached with the employers regarding reimbursement.
- Should Theranos fail to meet its requirements under this Schedule F prior to June 30, 2011, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 23(c). Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 23(b) and 23(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- At the retail store level, Walgreens average gross profit per patient during the pilot timeframe shall exceed $10.00 per patient.
- At the retail store level for the last 30 days of the pilot, the average patients tested per store will exceed 15 patients.
- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.
- Theranos must demonstrate to Walgreens' reasonable satisfaction that it can produce devices to support 1,000 stores and 450,000 Cartridges per month within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide roll out of the program post Pilot.

(Signature Page Follows)

Theranos and Walgreens Confidential and Proprietary                                                    -25-

Trial Exh. 0372 Page 00027

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000031

**ER-13031**

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

Theranos and Walgreens Confidential and Proprietary

-26-

Trial Exh. 0372 Page 00028

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000032

**SCHEDULE H-1**
**CONVERTIBLE PROMISSORY NOTE**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

**THERANOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

$25,000,000                                                                                        [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to Walgreen Co. ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Twenty-Five Million Dollars ($25,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated [_____] (the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)   Interest. This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually. Accrued interest on this Note shall be payable on the Maturity Date.

(b)   The "Maturity Date" shall be the earlier of:

i.   the date of the Company's Initial Public Offering;

ii.   the effective date of a Change of Control;

iii.   one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

iv.   the date that is ten years after the date of the Note .

(c)   Voluntary Prepayment. Unless waived in writing by the Company, if the $100,000,000 purchase of Inventory is not fulfilled in accordance with Schedule B of the Agreement, or if the Company determines that the Pilot is not successful based upon the mutually agreed-upon success criteria in Schedule F of the Agreement, Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within one hundred eighty (180) calendar days from the date of Company's written request.

Theranos and Walgreens Confidential and Proprietary                                                      -27-

Trial Exh. 0372 Page 00029

Confidential Treatment Requested by Walgreen Co.                                        WAG-TH-00000033

**ER-13033**

2.    **Conversion.**

(a) Optional Conversion. At any time prior to repayment by the Company of the Note, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price. Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert. All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b) Notice of Company Events.    The Company shall give written notice to Investor of the anticipated occurrence of any Company Event. Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(b) Conversion Procedure.

   i.  Conversion Pursuant to Section 2(a). Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a). Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii). Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

   ii.  Fractional Shares; Interest; Effect of Conversion. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note. Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

3.    **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

Theranos and Walgreens Confidential and Proprietary                                           -28-

Confidential Treatment Requested by Walgreen Co.                          WAG-TH-00000034

ER-13034

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i) any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

Confidential Treatment Requested by Walgreen Co.      WAG-TH-00000035

4.     **Investor Representations.** Investor represents and warrant to the Company as follows:

(a)  Binding Obligation.  Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  Securities Law Compliance.  Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5.     **Miscellaneous.**

(a)  Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

   i.   Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

   ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor.  In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

   iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b)  Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c)  Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000036

(e)  Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)  Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WALGREEN CO.

By:_____
Name:_____
Its:_____

Theranos and Walgreens Confidential and Proprietary

-31-

Trial Exh. 0372 Page 00033

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000037

ER-13037

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

July 30, 2010

PURSUANT to Section 20 of that certain Master Purchase Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $25 million in substantially the form set forth in Schedule H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) until the six (6)-month anniversary of the successful completion of the Pilot (as defined in the Agreement), Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate below.

THERANOS, INC.

By: _____

Name: Elizabeth Holmes

Title: President & CEO

*THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:*

On this _____ day of _____, 201__, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WALGREEN CO.

By: _____

Name: _____

Title: _____

Theranos and Walgreens
Confidential and Proprietary

32

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000038

**ER-13038**

**SCHEDULE I**
**PROJECTIONS**

The parties agree and acknowledge that the information attached to this Schedule I is an estimation provided for informational purposes only. Nothing in this Schedule I shall be binding and the information contained herein is subject to change , without notice.

Theranos and Walgreens
Confidential and Proprietary

33

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000039

**SCHEDULE J**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**

Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement. At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

Theranos and Walgreens
Confidential and Proprietary

34

Trial Exh. 0372 Page 00036

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000040**

**ER-13040**



## Theranos Base Assay Library

| | | |
|---|---|---|
| 82947 | assay, glucose, blood quant | Glucose; quantitative, blood (except reagent strip) |
| 82565 | creatinine (egfr) | Creatinine; blood |
| 84520 | urea nitrogen | Urea nitrogen; quantitative |
| 84132 | serum potassium | Potassium; serum, plasma or whole blood |
| 84460 | alanine amino (alt) (sgpt) | Transferase; alanine amino (ALT) (SGPT) |
| 82310 | calcium | Calcium; total |
| 84295 | serum sodium | Sodium; serum, plasma or whole blood |
| 82435 | blood chloride | Chloride; blood; serum/plasma |
| 84450 | transferase (ast) (sgot) | Transferase; aspartate amino (AST) (SGOT) |
| 82374 | assay, blood carbon dioxide | Carbon dioxide (bicarbonate), serum/plasma |
| 82040 | serum albumin | Albumin; serum, plasma or whole blood |
| 82247 | bilirubin, total | Bilirubin; total |
| 84075 | alkaline phosphatase | Phosphatase, alkaline; |
| 84155 | protein, serum | Protein, total, except by refractometry; serum, plasma or whole blood |
| 85018 | hemoglobin | Blood count; hemoglobin (Hgb) |
| 90006 | mean cell volume | |
| 90007 | mean corpuscular hemoglobin | |
| 90008 | mean corpuscular hemoglobin per cell | |
| 90011 | red cell distribution width | |
| 85014 | hematocrit | Blood count; hematocrit (Hct) |
| 85041 | automated rbc count | Blood count; red blood cell (RBC), automated |
| 85045 | automated reticulocyte count | Blood count; reticulocyte, automated |

Trial Exh. 0372 Page 00037

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000041

ER-13041


*theranos* ™
redefining healthcare

| 85048 | automated leukocyte count | Blood count; leukocyte (WBC), automated |
|---|---|---|
| 90003 | basophils | |
| 90004 | eosinophils | |
| 90005 | lymphocytes | |
| 90009 | monocytes | |
| 90010 | neutrophils | |
| 85049 | automated platelet count | Blood count; platelet, automated |
| 83051 | plasma hemoglobin | Hemoglobin; plasma |
| 84478 | triglycerides | Triglycerides |
| 82465 | assay, bld/serum cholesterol | Cholesterol, serum or whole blood, total |
| 83718 | lipoprotein | Lipoprotein, direct measurement; high density cholesterol (HDL cholesterol) |
| 84443 | thyroid stim hormone | Thyroid stimulating hormone (TSH) |
| 84156 | protein, urine | Protein, total, except by refractometry; urine |
| 82340 | calcium in urine | Calcium; urine quantitative, timed specimen |
| 82042 | urine albumin | Albumin; urine or other source, quantitative, each specimen |
| 82436 | urine chloride | Chloride; urine |
| 83069 | urine hemoglobin | Hemoglobin; urine |
| 84578 | urine urobilinogen | Urobilinogen, urine; qualitative |
| 84583 | urine urobilinogen | Urobilinogen, urine; semiquantitative |
| 83036 | glycosylated hemoglobin | Hemoglobin; glycosylated (A1C) |
| 84153 | psa, total | Prostate specific antigen (PSA); total |
| 84439 | free thyroxine | Thyroxine; free |
| 82248 | bilirubin, direct | Bilirubin; direct |
| 85610 | prothrombin time | Prothrombin time; |
| 82306 | vitamin d, 25 hydroxy | Vitamin D; 25 hydroxy, includes fraction(s), if performed |

THERANOS CONFIDENTIAL

Trial Exh. 0372 Page 00038

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000042

ER-13042



| 85652 | rbc sed rate, automated | Sedimentation rate, erythrocyte; automated |
|---|---|---|
| 87491 | chylmd trach, dna, amp probe | Infectious agent detection by nucleic acid (DNA or RNA); Chlamydia trachomatis, amplified probe technique |
| 87591 | n.gonorrhoeae, dna, amp prob | Infectious agent detection by nucleic acid (DNA or RNA); Neisseria gonorrhoeae, amplified probe technique |
| 84436 | total thyroxine | Thyroxine; total |
| 80101 | drug screen, single | Drug screen, qualitative; single drug class method (eg, immunoassay, enzyme assay), each drug class |
| 85027 | complete cbc, automated | Blood count; complete (CBC), automated (Hgb, Hct, RBC, WBC and platelet count) |
| 84550 | blood/uric acid | Uric acid; blood |
| 82570 | urine creatinine | Creatinine; other source |
| 82043 | microalbumin, quantitative | Albumin; urine, microalbumin, quantitative |
| 83540 | iron | Iron |
| 87340 | hepatitis b surface ag, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; hepatitis B surface antigen (HBsAg) |
| 86592 | syphilis  non-trep qual | Syphilis test, non-treponemal antibody; qualitative (eg, VDRL, RPR, ART) |
| 86703 | hiv-1/hiv-2, single | Antibody; HIV-1 and HIV-2, single assay |
| 82607 | vitamin b-12 | Cyanocobalamin (Vitamin B-12); |
| 86140 | c-reactive protein | C-reactive protein; |
| 84479 | thyroid (t3 or t4) | Thyroid hormone (T3 or T4) uptake or thyroid hormone binding ratio (THBR) |
| 82728 | ferritin | Ferritin |
| 84403 | total testosterone | Testosterone; total |
| 86038 | antinuclear antibodies | Antinuclear antibodies (ANA); |
| 83550 | iron binding | Iron binding capacity |
| 84100 | phosphorus | Phosphorus inorganic (phosphate); |
| 86803 | hepatitis c ab | Hepatitis C antibody; |
| 82550 | ck (cpk) | Creatine kinase (CK), (CPK); total |
| 83001 | gonadotropin (fsh) | Gonadotropin; follicle stimulating hormone (FSH) |

THERANOS CONFIDENTIAL

Trial Exh. 0372 Page 00039

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000043



| 84702 | chorionic gonadotropin | Gonadotropin, chorionic (hCG); quantitative |
| 83615 | lactate dehydrogenase (ld) (ldh) enzyme | Lactate dehydrogenase (LD), (LDH); |
| 82784 | assay, iga/igd/igg/igm each | Gammaglobulin (immunoglobulin); IgA, IgD, IgG, IgM, each |
| 82746 | blood folic acid serum | Folic acid; serum |
| 82977 | ggt | Glutamyltransferase, gamma (GGT) |
| 86431 | rheumatoid factor, quant | Rheumatoid factor; quantitative |
| 84480 | assay, triiodothyronine (t3) | Triiodothyronine T3; total (TT-3) |
| 86235 | nuclear antigen antibody | Extractable nuclear antigen, antibody to, any method (eg, nRNP, SS-A, SS-B, Sm, RNP, Sc170, J01), each antibody |
| 84481 | free  (ft-3) | Triiodothyronine T3; free |
| 83735 | magnesium | Magnesium |
| 86901 | blood typing, rh (d) | Blood typing; Rh (D) |
| 86900 | blood typing, abo | Blood typing; ABO |
| 86762 | rubella antibody | Antibody; rubella |
| 86850 | rbc antibody screen | Antibody screen, RBC, each serum technique |
| 83002 | gonadotropin (lh) | Gonadotropin; luteinizing hormone (LH) |
| 82670 | estradiol | Estradiol |
| 85730 | thromboplastin time, partial | Thromboplastin time, partial (PTT); plasma or whole blood |
| 86677 | helicobacter pylori ab, iga | Antibody; Helicobacter pylori |
| 86705 | hep b core antibody, igm | Hepatitis B core antibody (HBcAb); IgM antibody |
| 84146 | prolactin | Prolactin |
| 86709 | hep a antibody, igm | Hepatitis A antibody (HAAb); IgM antibody |
| 84402 | testosterone | Testosterone; free |
| 84144 | progesterone | Progesterone |
| 82150 | amylase | Amylase |
| 83690 | lipase | Lipase |

THERANOS CONFIDENTIAL

Trial Exh. 0372 Page 00040

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000044

**ER-13044**


*theranos™*
redefining healthcare

| 82105 | alpha-fetoprotein, serum | Alpha-fetoprotein (AFP); serum |
|---|---|---|
| 86336 | inhibin A or B | Inhibin A |
| 86376 | microsomal antibody | Microsomal antibodies (eg, thyroid or liver-kidney), each |
| 83970 | parathormone | Parathormone (parathyroid hormone) |
| 86706 | hep b surface antibody | Hepatitis B surface antibody (HBsAb) |
| 86160 | complement, antigen | Complement; antigen, each component |
| 86665 | epstein-barr antibody | Antibody; Epstein-Barr (EB) virus, viral capsid (VCA) |
| 83525 | insulin | Insulin; total |
| 86696 | herpes simplex type 2 | Antibody; herpes simplex, type 2 |
| 86618 | lyme disease antibody | Antibody; Borrelia burgdorferi (Lyme disease) |
| 86617 | lyme disease antibody | Antibody; Borrelia burgdorferi (Lyme disease) confirmatory test (eg, Western Blot or immunoblot) |
| 86800 | thyroglobulin antibody | Thyroglobulin antibody |
| 82785 | ige | Gammaglobulin (immunoglobulin); IgE |
| 86695 | herpes simplex | Antibody; herpes simplex, type 1 |
| 87536 | hiv-1, dna, quant | Infectious agent detection by nucleic acid (DNA or RNA); HIV-1, quantification |
| 86304 | immunoassay, tumor, ca 125 | Immunoassay for tumor antigen, quantitative; CA 125 |
| 86300 | immunoassay, tumor, ca 15-3 | Immunoassay for tumor antigen, quantitative; CA 15-3 (27.29) |
| 82627 | dehydroepiandrosterone sulfate (dheas) | Dehydroepiandrosterone-sulfate (DHEA-S) |
| 83721 | blood lipoprotein | Lipoprotein, direct measurement; LDL cholesterol |
| 87480 | candida, dna, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Candida species, direct probe technique |
| 87510 | gardner vag, dna, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Gardnerella vaginalis, direct probe technique |
| 87660 | trichomonas vagin, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Trichomonas vaginalis, direct probe technique |
| 82533 | total cortisol | Cortisol; total |
| 86225 | dna antibody | Deoxyribonucleic acid (DNA) antibody; native or double stranded |
| 86200 | ccp antibody | Cyclic citrullinated peptide (CCP), antibody |

**Confidential Treatment Requested by Walgreen Co.**      WAG-TH-00000045

**ER-13045**



| | | |
|---|---|---|
| 86308 | **heterophile antibodies** | Heterophile antibodies; screening |
| 82272 | **occult bld feces, 1-3 tests** | Blood, occult, by peroxidase activity (eg, guaiac), qualitative, feces, 1-3 simultaneous determinations, performed for other than colorectal neoplasm screening |
| 83090 | **homocystine** | Homocysteine |
| 86787 | **varicella-zoster antibody** | Antibody; varicella-zoster |
| 86708 | **hep a antibody, total** | Hepatitis A antibody (HAAb); total |
| 82652 | **vit d 1, 25-dihydroxy** | Vitamin D; 1, 25 dihydroxy, includes fraction(s), if performed |
| 86704 | **hep b core antibody, total** | Hepatitis B core antibody (HBcAb); total |
| 82378 | **carcinoembryonic antigen** | Carcinoembryonic antigen (CEA) |
| 86360 | **t cell, absolute count/ratio** | T cells; absolute CD4 and CD8 count, including ratio |
| 87324 | **clostridium ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Clostridium difficile toxin(s) |
| 86147 | **cardiolipin antibody** | Cardiolipin (phospholipid) antibody, each Ig class |
| 82677 | **estriol** | Estriol |
| 86664 | **epstein-barr antibody** | Antibody; Epstein-Barr (EB) virus, nuclear antigen (EBNA) |
| 84270 | **sex hormone globul** | Sex hormone binding globulin (SHBG) |
| 87329 | **giardia ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; giardia |
| 83013 | **h pylori (c-13), breath** | Helicobacter pylori; breath test analysis for urease activity, non-radioactive isotope (eg, C-13) |
| 87400 | **influenza a/b, ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Influenza, A or B, each |
| 86021 | **wbc antibody identification** | Antibody identification; leukocyte antibodies |
| 87522 | **hepatitis c, rna, quant** | Infectious agent detection by nucleic acid (DNA or RNA); hepatitis C, quantification |
| 86694 | **herpes simplex** | Antibody; herpes simplex, non-specific type test |
| 80164 | **assay, dipropylacetic acid** | Dipropylacetic acid (valproic acid) |
| 83921 | **organic acid,  single, quant** | Organic acid, single, quantitative |
| 86039 | **antinuclear antibodies (ana)** | Antinuclear antibodies (ANA); titer |

Confidential Treatment Requested by Walgreen Co.      WAG-TH-00000046

**ER-13046**



| | | |
|---|---|---|
| 86361 | **t cell, absolute count** | T cells; absolute CD4 count |
| 82787 | **igg 1, 2, 3 or 4, each** | Gammaglobulin (immunoglobulin); immunoglobulin subclasses (eg, IgG1, 2, 3, or 4), each |
| 84482 | **t3 reverse** | Triiodothyronine T3; reverse |
| 87255 | **genet virus isolate, hsv** | Virus isolation; including identification by non-immunologic method, other than by cytopathic effect (eg, virus specific enzymatic activity) |
| 83880 | **natriuretic peptide** | Natriuretic peptide |
| 87427 | **shiga-like toxin ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Shiga-like toxin |
| 86359 | **t cells, total count** | T cells; total count |
| 80156 | **assay, carbamazepine, total** | Carbamazepine; total |
| 80185 | **phenytoin, total** | Phenytoin; total |
| 87350 | **hepatitis be ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; hepatitis Be antigen (HBeAg) |
| 89055 | **leukocyte assessment, fecal** | Leukocyte assessment, fecal, qualitative or semiquantitative |
| 86747 | **parvovirus antibody** | Antibody; parvovirus |
| 87517 | **hepatitis b, dna, quant** | Infectious agent detection by nucleic acid (DNA or RNA); hepatitis B virus, quantification |
| 80162 | **digoxin** | Digoxin |
| 82232 | **beta-2 protein** | Beta-2 microglobulin |
| 82390 | **ceruloplasmin** | Ceruloplasmin |
| 84681 | **c-peptide** | C-peptide |
| 86060 | **antistreptolysin o, titer** | Antistreptolysin 0; titer |
| 80178 | **lithium** | Lithium |
| 84154 | **psa, free** | Prostate specific antigen (PSA); free |
| 86631 | **chlamydia antibody** | Antibody; Chlamydia |
| 86707 | **hep be antibody** | Hepatitis Be antibody (HBeAb) |
| 80197 | **tacrolimus** | Tacrolimus |
| 85660 | **rbc sickle cell** | Sickling of RBC, reduction |

THERANOS CONFIDENTIAL

Trial Exh. 0372 Page 00043

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000047

ER-13047



| 85613 | russell viper venom, diluted | Russell viper venom time (includes venom); diluted |
| 86146 | glycoprotein antibody | Beta 2 Glycoprotein I antibody, each |
| 82085 | aldolase | Aldolase |
| 84305 | somatomedin | Somatomedin |
| 86663 | epstein-barr antibody | Antibody; Epstein-Barr (EB) virus, early antigen (EA) |
| 86765 | rubeola antibody | Antibody; rubeola |
| 82523 | collagen crosslinks | Collagen cross links, any method |
| 86735 | mumps antibody | Antibody; mumps |
| 87338 | hpylori, stool, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Helicobacter pylori, stool |
| 80158 | cyclosporine | Cyclosporine |
| 83010 | haptoglobin, quant | Haptoglobin; quantitative |
| 83925 | opiates | Opiate(s), drug and metabolites, each procedure |
| 84425 | vitamin b-1 | Thiamine (Vitamin B-1) |
| 86615 | bordetella antibody | Antibody; Bordetella |
| 86812 | hla typing, a, b, or c | HLA typing; A, B, or C (eg, A10, B7, B27), single antigen |
| 87902 | genotype, dna, hepatitis c | Infectious agent genotype analysis by nucleic acid (DNA or RNA); Hepatitis C virus |
| 82024 | acth | Adrenocorticotropic hormone (ACTH) |
| 82140 | ammonia | Ammonia |
| 84445 | tsi | Thyroid stimulating immune globulins (TSI) |
| 85306 | Clotting inhibitors or anticoagulants; protein S, free | Clotting inhibitors or anticoagulants; protein S, free |
| 86644 | cmv antibody | Antibody; cytomegalovirus (CMV) |
| 86671 | fungus antibody | Antibody; fungus, not elsewhere specified |
| 82164 | angiotensin i enzyme | Angiotensin I - converting enzyme (ACE) |
| 84432 | thyroglobulin | Thyroglobulin |

THERANOS CONFIDENTIAL

Trial Exh. 0372 Page 00044

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000048

Message

| | |
|---|---|
| **From**: | Rosan, Jay [jay.rosan@walgreens.com] |
| **Sent**: | 1/18/2012 10:14:18 PM |
| **To**: | Miquelon, Wade D. [wade.miquelon@walgreens.com]; Kunstman, Gregory T. [greg.kunstman@walgreens.com]; Doyle, Daniel F. [dan.doyle@walgreens.com]; Romanski, Kimberly A. [kim.romanski@walgreens.com]; Zimmerman, Heather M. [heather.zimmerman@walgreens.com] |
| **Subject**: | Here is the slide show that was presented to us by Sunny and Elizabeth |

Dr. Jay Rosan

Walgreens

VP Health Innovation

484-351-3020 office;            cell

jay.rosan@walgreens.com

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000184





# January 16, 2012

## Walgreens

## Project Normandy Briefing

This presentation and its contents are
Theranos proprietary and confidential under the
Theranos – Walgreens Common Interest Agreement.

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000185



*theranos*
*redefining healthcare*

# Walgreens Theranos Partnership Objectives

➢ Profitability

➢ New revenue base

➢ New, leading presence in critical healthcare space

➢ Further increase the value of WAG pharmacies and lead in establishing the pharmacy of the 21st century:
  ➢ MTM, services, counseling, specialty pharmacy, companion diagnostics

➢ Gain pull-through traffic for other services and products

➢ New growth driver for employer business
  ➢ Lowest cost, highest quality testing from a finger-stick

➢ Scalability

➢ Low-Manageable Risk

Theranos Confidential                                                                2

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000186

Trial Exh. 0503 Page 0003

ER-13051





# Theranos Updates

Theranos Confidential

3

Confidential Treatment Requested by Walgreen Co. WAG-TH-00000187



# Revenue Opportunity

- Market size: $60B in 2011 projected to grow to $100B+ by 2018

| 2011 Projected Revenue | |
| --- | --- |
| Quest Diagnostics | $7.6B |
| Lab Corp | $5.6B |
| Other regional Independent Labs, Physician Office Labs | $10B+ |
| Hospital-based Outpatient Lab Services (at 300%+ of Medicare) | $30B+ |
| TOTAL | $60B |

Confidential Treatment Requested by Walgreen Co.    WAG-TH-00000188

Trial Exh. 0503 Page 0005

ER-13053



# Revenue Opportunity

- ~90-95% test volume yields 70% revenue

- Bottom 5% is 30% of revenue and bulk of profits for current lab industry

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000189

Trial Exh. 0503 Page 0006

**ER-13054**


*theranos*
*redefining healthcare*

# What Will Drive Adoption the Fastest

- The 'payors' priority is savings
  - Cost
  - Cost
  - Cost
  - Improved quality of care
  - Longer term savings

- National Footprint

- Medicaid

- Medicare

### One breakthrough/disruption at a time

Confidential Treatment Requested by Walgreen Co.      WAG-TH-00000190

Trial Exh. 0503 Page 0007

**ER-13055**



## Project Normandy:
## The world's first finger-stick based CLIA-certified lab through retail RX

- 99.9% less blood

- State of the art result turnaround: 4-24 hours

- Nation's lowest cost and highest quality laboratory provider

Theranos



Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000191

Trial Exh. 0503 Page 0008

ER-13056



# Project Normandy: Process



| | PSC | CLIA Lab | Results Reporting |
|---|---|---|---|
| **Check-In** | • Patient checks in w/:<br>  • Lab order from clinician<br>  • Insurance card<br>  • Photo ID | • Refrigerated shipping vessel received at CLIA Lab<br>• Samples accessioned and queued for analysis on Theranos devices using Theranos LDTs in Theranos Lab<br>• Samples analyzed<br>• Results recorded in Theranos System | • Results reported directly to ordering clinician via fax, secure web portal or EMR |
| **Sample Collection** | • Technician verifies patient's ID<br>• Technician pricks patient's finger<br>• Technician collects sample in mini-tube<br>• Technician places mini-tube into refrigerated shipping vessel | | |
| **Shipping** | • Vessel is shipped to Theranos Lab | | |

Theranos Confidential

8

Confidential Treatment Requested by Walgreen Co.   WAG-TH-00000192

Trial Exh. 0503 Page 0009

 *theranos*
*redefining healthcare*

# Typical hours of operation for patient service centers

**Theranos patient service centers are open 100% longer than traditional lab providers today, providing:**

- **More convenient access to lab services for patients**
- **Significant reduction in lost patient work hours**



Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000193

Trial Exh. 0503 Page 0010

ER-13058


*theranos*
*redefining healthcare*

# Project Normandy:
# Faster Scalability at WAG

Scalability
- ➢ Smaller space requirements at retail
- ➢ Faster deployment
- ➢ Lower initial cost of deployment for WAG
- ➢ Lower Training requirements for technicians

- ➢ Stage 1 : Deploy CA, IL + select states
- ➢ Stage 2: Add 5 more states and 20-30 MSAs
- ➢ Stage 3: National Rollouts

- ➢ Distributed laboratories in all MSAs and States

Confidential Treatment Requested by Walgreen Co.                          WAG-TH-00000194

Trial Exh. 0503 Page 0011

**ER-13059**



# Theranos-Walgreens Opportunity

- Disrupting the Cost Paradigm

  - At 50% off of current Medicare reimbursement rates, Theranos-WAG will be less than ½ the cost of Quest and Lab Corp for Medicare, Medicaid and the majority of private payors.

  - We will be ¼ the cost of hospital-based outpatient labs for private payors.

Theranos Confidential                                                                                    11
Confidential Treatment Requested by Walgreen Co.                                      WAG-TH-00000195

Trial Exh. 0503 Page 0012

ER-13060



# Theranos-Walgreens Opportunity

At 50% of Medicare, Theranos-WAG Market Opportunity:

| Revenue Opportunity | |
|---|---|
| 2012 | $17B |
| 2013 | $18B |
| 2014 | $21B |
| 2015 | $22B |
| 2016 | $23B |
| 2017 | $24B |
| 2018 | $26B |

Theranos Confidential 12

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000196

Trial Exh. 0503 Page 0013



# Cost Savings Analysis Summary

**Medicare**

California Medicaid (Medi-Cal)

Illinois Medicaid

Pennsylvania Medicaid

13

Confidential Treatment Requested by Walgreen Co. WAG-TH-00000197

Trial Exh. 0503 Page 0014

ER-13062



# Medicare Cost Savings Analysis



Source: CMS National Health Expenditure Projections 2010-2020

Confidential Treatment Requested by Walgreen Co. WAG-TH-00000198

Trial Exh. 0503 Page 0015

ER-13063



# Theranos Impact on Lab-Testing Costs



Estimated <u>Direct Out-of-Pocket Cost Savings</u> for Medicare

10-year aggregate savings of $79 billion

Medicare will revise its national reimbursement fee schedule to align with Theranos' lower price points, generating additional savings to the healthcare system from reduced reimbursement to other labs

Theranos Confidential   15

Confidential Treatment Requested by Walgreen Co.   WAG-TH-00000199

Trial Exh. 0503 Page 0016



# Cost Savings Analysis Summary

Medicare

California Medicaid (Medi-Cal)

Illinois Medicaid

Pennsylvania Medicaid

Confidential Treatment Requested by Walgreen Co.
WAG-TH-00000200

**Trial Exh. 0503 Page 0017**

**ER-13065**



# Medi-Cal Cost Savings Analysis



**Est. Medi-Cal Enrollment**

**Est. Medi-Cal Total Expenditures**

Source: CMS.gov & Medi-Cal.ca.gov

Theranos Confidential

17

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000201

Trial Exh. 0503 Page 0018

ER-13066



# Theranos Impact on Lab-Testing Costs



Estimated <u>Direct Out-of-Pocket Cost Savings</u> for Medi-Cal

10-year aggregate savings of $6.8 billion

Theranos Confidential 18

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000202

Trial Exh. 0503 Page 0019



# Federal Government Direct Savings

*In addition to state level savings, the federal government will recognize significant cost savings on their increased share of new Medi-Cal costs after 2014*

### 2014-2019 State and Federal Medi-Cal Spending Increase over Baseline

| ($ in millions) | State | Federal | Total | % Federal |
|---|---|---|---|---|
| Standard Participation Scenario | $2,982 | $44,694 | $47,676 | 94% |
| **Savings from Theranos** | **$46** | **$684** | $730 | |
| Enhanced Outreach Scenario | $6,544 | $54,936 | $61,480 | 89% |
| **Savings from Theranos** | **$100** | **$841** | $941 | |

Baseline Scenario:           Assumes expenditures if reform had not been enacted
Standard Participation Scenario:   Assumes 57% participation among the newly eligible uninsured and lower participation
                        across other coverage groups
Enhanced Outreach Scenario:    Assumes 75% participation among the newly eligible that are currently uninsured and
                        higher participation among those currently eligible for coverage than in the standard
                        scenario

Source: Kaiser Commission on Medicaid and the Uninsured

Confidential Treatment Requested by Walgreen Co.                          WAG-TH-00000203

Trial Exh. 0503 Page 0020

ER-13068



# Cost Savings Analysis Summary

Medicare

California Medicaid (Medi-Cal)

Illinois Medicaid

Pennsylvania Medicaid

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000204

Trial Exh. 0503 Page 0021

ER-13069



# Illinois Medicaid Cost Savings Analysis





Source: Kaiser, CMS.gov and Theranos estimates

Confidential Treatment Requested by Walgreen Co.
WAG-TH-00000205

Trial Exh. 0503 Page 0022

ER-13070



# Theranos Impact on Lab-Testing Costs

**Estimated <u>Direct out-of-pocket Cost Savings</u> for Illinois Medicaid**



Theranos Confidential 22

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000206

Trial Exh. 0503 Page 0023

ER-13071



# Additional Federal Government Direct Savings

*In addition to state level savings, the federal government will recognize significant cost savings on their increased share of new Illinois Medicaid costs after 2014*

**2014-2019 Illinois State and Federal Medicaid Spending Increase over Baseline**

| ($ in millions) | IL State | Federal | Total | % Federal |
|---|---|---|---|---|
| **Standard Participation Scenario** | $1,202 | $19,259 | $20,461 | 94% |
| **Savings from Theranos** | **$29** | **$472** | **$501** | |
| **Enhanced Outreach Scenario** | $2,468 | $22,109 | $24,577 | 90% |
| **Savings from Theranos** | **$60** | **$542** | **$602** | |

Baseline Scenario:      Assumes expenditures if reform had not been enacted
Standard Participation Scenario:      Assumes 57% participation among the newly eligible uninsured and lower participation across other coverage groups
Enhanced Outreach Scenario:      Assumes 75% participation among the newly eligible that are currently uninsured and higher participation among those currently eligible for coverage than in the standard scenario

Source: Kaiser Commission on Medicaid and the Uninsured

Confidential Treatment Requested by Walgreen Co.      WAG-TH-00000207

Trial Exh. 0503 Page 0024

ER-13072


*theranos*
*redefining healthcare*

# Cost Savings Analysis Summary

Medicare

California Medicaid (Medi-Cal)

Illinois Medicaid

Pennsylvania Medicaid

Theranos Confidential

Confidential Treatment Requested by Walgreen Co.                                    WAG-TH-00000208



# Pennsylvania Medicaid Cost Savings Analysis



**Est. PA Medicaid Enrollment**



**Est. PA Medicaid Total Expenditures**

Source: CMS.gov and Theranos estimates

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000209

Trial Exh. 0503 Page 0026

ER-13074



# Theranos Impact on Lab-Testing Costs

**Estimated <u>Direct out-of-pocket Cost Savings</u> for PA Medicaid**



10-year aggregate savings of $6.8 billion

Theranos Confidential 26

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000210

Trial Exh. 0503 Page 0027

ER-13075



## Project Normandy:
## Theranos' finger-stick based laboratory

➢ Profitability

➢ No regulatory risk

➢ Massive new revenue base

➢ New, leading presence in critical healthcare space

➢ Further increase the value of WAG pharmacies and lead in establishing the pharmacy of the 21st century:
  ➢ MTM, services, counseling, specialty pharmacy, companion diagnostics
➢ Gain pull-through traffic for other services and products

➢ New growth driver for employer business
  ➢ Lowest cost, highest quality testing from a finger-stick

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000211

Trial Exh. 0503 Page 0028

ER-13076


*theranos*
*redefining healthcare*

## One Disruption at a time

- First Launch – 2012:
  - Project Normandy at WAG
  - First finger-stick based CLIA certified national lab at retail Rx

- Second Launch – Early to Mid 2013
  - Project D-Day
  - Results available in 30 minutes or less!
    - Ship Theranos Minilabs to WAG stores
      - 1600 24 hour locations nationally(?)

- Third Launch – 2014+
  - Theranos Minilabs in all WAG Stores (as appropriate)

Confidential Treatment Requested by Walgreen Co. · WAG-TH-00000212

Trial Exh. 0503 Page 0029

ER-13077

 *theranos*
*redefining healthcare*

# Moving Forward

Option A:
- Sign Agreement by end of March
- Initiate IT & systems integration by April 1
- Rapid pilot in ~30 stores in CA by June
- CA & IL deployment complete by end of Q3 2012: >95% of stores
- 30+ MSAs + 5+ select states by end of 2012
- Fully deployed nationally by H1 2013

- Terms similar to existing Agreement:
  - WAG exclusivity for 6 months
  - WAG-only retail RX Normandy launch and announcement
  - Best pricing guarantee
  - Announcement rights on tests
  - Theranos brings payor contracts
  - Upfront pre-purchase payment to Theranos

Other Options to be discussed

Confidential Treatment Requested by Walgreen Co.     WAG-TH-00000213

Trial Exh. 0503 Page 0030

**ER-13078**

## AMENDED AND RESTATED
## THERANOS MASTER SERVICES AGREEMENT

Whereas the parties entered into the Theranos Master Purchase Agreement ("Original Agreement") dated July 30, 2010;

Whereas the parties agree that because of certain changes in circumstances, it is necessary to terminate the Original Agreement and replace it with this Agreement (as defined below;

This Amended and Restated Master Services Agreement ("Agreement") dated June 5 , 2012 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | |
| Company Phone Number | | Email | wade.miquelon@walgreens.com |
| Company Fax Number | | | |
| THERANOS | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Service Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Walgreens Service Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G:  HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Theranos Pharmaceutical Clinical Trials Infrastructure
Schedule J: Test Menu

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

**Confidential Treatment Requested by Walgreen Co.**

WAG-TH-00000050

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| _____ | _____ |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| _____ | _____ |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| _____ | _____ |
| (Title) | (Title) |

Theranos and Walgreens Confidential and Proprietary

-2-

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000051**

**ER-13080**

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE D. MIQUELON | (Authorized Representative – Printed) |
| (Authorized Representative – Printed) | |
| CFO | (Title) |
| (Title) | |

ER-LAW

Theranos and Walgreens Confidential and Proprietary

-2-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000052

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes. The terms and conditions governing this Schedule are set forth in Schedule B, attached. Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions. If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail. The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1. **Intentionally Deleted.**

2. **Program Objectives.** The objectives of this Program include:

   a. Make testing less invasive, faster and far more accessible, effective, and actionable by introducing a more cost-effective, blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide (which, by example, include, but are not limited to infusion centers and CSG/ESG clinics). Other types of specimens collected will be nasal and throat swabs as well as urine samples.

   b. Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices, including any on-site interface provided by Theranos, or through the web browser. This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

   c. Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

   d. Early intervention and reduced hospitalization through early detection of the onset of disease.

   e. Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

3. **Phased Disruption.** As Theranos continues to develop disruptive technology, the parties agree to discuss terms by which such innovations can be made commercially available through Walgreens. Notwithstanding the previous, the parties acknowledge the mutual desire to bring Theranos' technology to market as quickly as is reasonably possible. With that in mind, at the commencement of this Agreement, it is the parties' intention for Walgreens to act as a patient service center and collect blood samples via finger-stick technology, small samples of urine, saliva, feces, or swabs, with laboratory testing to be performed by Theranos at a CLIA certified offsite laboratory ("PSC Phase"). At such point that the Theranos System is approved for use in a retail setting by appropriate regulatory bodies, the parties will determine which Walgreens locations, if any, should deploy the Theranos System, with Theranos acting as the CLIA certified laboratory at the retail and/or employer setting ("Onsite Phase").

4. **Program Managers.** Each party will assign a program manager to this Program. The responsibilities of each party's program manager include: (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party. The parties acknowledge that the Program Plan is subject to change as the Program progresses. Notwithstanding anything to the contrary in this Schedule A, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

5. **Reviews.** The appropriate Program Managers and Representatives from each party will meet on at least a bi-weekly basis at least until the Pilot commences, to develop the project and review the entire status of the Program.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary                                                                    -3-

**Confidential Treatment Requested by Walgreen Co.**                                                          **WAG-TH-00000053**

**SCHEDULE B**

**SERVICE TERMS AND CONDITIONS**

1.  **Scope.**  The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment.  To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2.  **Service Fee Guarantee.** During the PSC Phase, Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to procure the right to act as a PSC for Theranos or the right to obtain services from Theranos as they relate to the collection of specimens for service(s) for a compensation amount per Test that exceeds the compensation amount available to Walgreens for those services.  Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Service Fee Guarantee, provided service fees paid for such services below the Walgreens fee, are not material to Theranos for any given twelve (12) month period.

    With respect to Predictive Tests, the parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the service fee provided to Walgreens during the PSC Phase conforms with this Section 2.  Should the results of such audit show that Walgreens was paid a lesser service fee than what is provided for in this Section, Theranos shall supplement such service fee  within thirty (30) days of such certification.  Said certification shall be made twice:  Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new Predictive Test completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such Test completes.

3.  **Exclusivity.**

a.  **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use (through collection of blood samples, other specimens or otherwise) in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other non-hospital company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to Medco Health Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager). Notwithstanding the previous, the following exception shall apply: in geographic areas where Theranos has not yet launched through Walgreens stores, the above restriction around central lab companies shall not apply until Theranos launches through Walgreens stores in a given geography.

b.  **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos may provide testing services  as follows:

    i.   For Routine and Specialty Tests:  For the PSC Phase, six (6) months after successful completion of the Pilot, and, if Walgreens commits to proceed with the Onsite Phase within sixty (60) days of notice by Theranos, along with written evidence that the FDA has no objections to the commercial use of the Theranos System in a retail pharmacy setting, six (6) months from that date of initiation of the Onsite Phase. Assuming Walgreens decides to proceed to the Onsite Phase, the parties shall work together to plan scale, provided that the parties agree that the initiation of the Onsite Phase shall take place at the end of the sixty (60) day notice period;

    ii.  For Theranos Predictive Tests: Twelve (12) months after the date that each of the following new Tests are available:  diabetes/pre-diabetes, congestive heart failure, women's cancer and men's cancer.  For purposes of this Section, available shall mean the date upon which Theranos secures a major payor's reimbursement for such Test, provided that such Test is not available on a direct to consumer basis.  For purposes of this Agreement, the term "major payor" shall mean one of any of the following companies:  UnitedHealth Group, WellPoint, Inc., Kaiser Foundation Group, Aetna Group, Humana Group, HCSC, Coventry Corp., Highmark Group, Independence Blue Cross Group, and Blue Shield of CA Group.  To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011.  Walgreens' exclusivity right to

Theranos and Walgreens Confidential and Proprietary                                                                                            -4-

**Confidential Treatment Requested by Walgreen Co.**                                                                         **WAG-TH-00000054**

secure and offer said test would expire on 1/1/2012. Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of Specialty and Predictive Tests/Cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b. During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

   c. **Walgreens Exclusivity**      Provided that Theranos is able to perform all Routine and Specialty Tests and any other predictive test that are commercially available in a given jurisdiction with equivalent test quality, pricing and patient service as compared to existing laboratory service providers, Walgreens agrees that it shall not offer laboratory services in Walgreens stores. Notwithstanding the previous, the following exceptions shall apply: (i) To the extent Theranos is not able to offer Routine and Specialty Tests, and/or other commercially available predictive tests in a given jurisdiction, then Theranos shall have a period of three (3) months to secure necessary regulatory agency approvals to provide such Routine and Specialty Tests and/or predictive tests; (ii) sale of over the counter/point of care tests which are available without a clinician order, shall not be applicable to the exclusivity provided in this subsection (c). Should Theranos fail to obtain such regulatory agency approvals, Theranos shall contract with a local provider of laboratory services, such provider to have obtained all necessary regulatory approvals necessary to provide laboratory services, to provide such test(s) at Walgreens. Should Theranos not be able to reach an agreement with a local provider of laboratory services, Walgreens shall have the right to work with other providers of laboratory services for all tests in that jurisdiction. Notwithstanding the previous sentence, to the extent that Theranos can provide laboratory services in a given jurisdiction, Walgreens shall still rely on Theranos to provide laboratory services for the tests it is authorized to perform. At such time that Theranos obtains the ability to provide services in the jurisdiction at issue, at equivalent levels of quality, pricing and services as compared to the existing laboratory service providers and provides notice to Walgreens of the same, Walgreens agrees that it will not renew its contract with the alternate service provider and will transition its lab offerings back to Theranos in a period of not greater than ninety (90) days; and (iii) To the extent any of Walgreens' employer clients direct Walgreens to contract with another laboratory service provider, the above exclusive shall not apply to the patients that Walgreens serves under that contract. During the term, Walgreens agrees that it shall not operate as a laboratory. Except as otherwise provided for in this Agreement as it relates to over the counter/point of care tests available without a clinician order, or in instances in which Theranos cannot provide services, Walgreens agrees that it shall not direct patients of the Theranos laboratory to non-Theranos laboratory services.

   4. **First Announcement Rights.** Theranos will not authorize any other United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges and/or Tests before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

   5. **Theranos Pharmaceutical Clinical Trials Infrastructure.** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their specimens collected at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule I.

   6. **Innovation Fee.**

Theranos and Walgreens Confidential and Proprietary      -5-

(a) Walgreens agrees to pay to Theranos an Innovation Fee ("Innovation Fee") for up to $100 million dollars. The Innovation fee is being paid to Theranos in exchange for the following terms granted to Walgreens in this Agreement: (i) exclusivity; (ii) price protection; (iii) first announcement rights; infrastructure costs associated with building out the Theranos laboratory structure to support Walgreens' scale; and other good and valuable consideration. Distribution of the Innovation Fee shall be as follows:

    (i)      $25 million shall be distributed to Theranos within five (5) days of the due diligence items/visits detailed in 6(b) below, being completed;

    (ii)     $25 million shall be distributed to Theranos within five (5) days of reaching ten (10) patients per store per day on average during the pilot;

    (iii)    Upon successful Pilot completion and initiation of Program launch, Walgreens shall commit to a final distribution of $50 million.

(b) Within thirty (30) days of the Effective Date for items (i-iii and vi), and seventy-five (75) days for items (iv-v), Theranos shall make available or provide access to the following due diligence items for Walgreens' review. Upon receipt, and confirmation of these due diligence items, Walgreens will direct the escrow agent to release the initial $25 million distribution:

    (i)      <u>Covered Lives</u>-   Theranos shall provide written evidence of contracts with payors that provide coverage in the Pilot Market. Such written evidence shall demonstrate Theranos' ability to process claims, bill and reimburse Walgreens for its services within the Pilot Market;

    (ii)     <u>Test Menu</u>-   Theranos will provide Walgreens with a copy of the Test Menu (incorporated as Schedule J) and operations manual that the Theranos trained Walgreens technician will utilize during the PSC.

    (iii)    <u>Laboratory in Good Standing</u>-   Theranos shall provide to Walgreens copies of the CLIA inspection report and any interim exception reports, proficiency testing results for all tests on the Test Menu, and any correlation studies.

    (iv)    <u>PSC Expectations</u>-   Theranos shall provide Walgreens with a written copy of the standard operating procedures/protocol expectations for the PSC. Additionally, Theranos shall provide to Walgreens the front end IT requirements consisting of screen shots PSC personnel will use and/or required fields for patient data entry. After Walgreens' initial review of the materials, Walgreens shall provide its initial comments, and the parties shall work together to mutually revise the materials as is necessary.

    (v)     <u>Facilities Visit</u>-   Theranos shall permit Walgreens' staff to visit the following Theranos facilities: lab operations, call center, IT and billing. During the visit, Walgreens shall not have unfettered access to Theranos' facilities, but rather, the visit shall include opportunities for Walgreens to confirm for itself in a visual sense that Theranos has the capabilities to carry out its obligations under this Agreement. For purposes of clarity, such visit will not be for purposes of an audit, but rather to see the Theranos operations in action.

    (vi)    <u>Pricing/Fee/Collectability</u>-   The parties shall confirm the Pricing detailed in Section 11 below and the Innovation Fee are consistent with the fair market values for such Pricing and Innovation Fee. Walgreens will engage a third party consultant to determine the fair market value of the services provided by Walgreens to Theranos and the Innovation Fee provided to Theranos ("FMV Study"). Further, the parties shall agree upon the appropriate measure in order to measure collectability as it relates to the initial $25M payment.

(c) If Theranos realizes at least $1.75 billion in net revenue domestically from laboratory services it provides at all of its laboratory locations that utilize the Theranos System within twelve (12) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn $50 million of the Innovation Fee. If the final $50 million distribution is made and Theranos realizes at least $2.5 billion in net revenue from laboratory locations

**Confidential Treatment Requested by Walgreen Co.**    WAG-TH-00000056

that utilize the Theranos System within eighteen (18) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn the second $50 million of the Innovation Fee. If the aforementioned milestones are not realized, Theranos will refund the entire Innovation Fee dollar for dollar back to Walgreens on a per test consumed basis, with at least $50 million being credited in the first twelve (12) months after Program launch. For purposes of clarity, the refund per patient shall be the Theranos Fee divided by the number of patients actually served during the applicable time period

7. **Ordering.** All Theranos Tests will be ordered electronically using Theranos software and/or equipment in the stores or ESG location, and Theranos will be able to receive and process this electronic order. As soon as is reasonably possible, and to the extent possible, the Walgreens' systems and Theranos' systems will be integrated in order to provide a seamless patient experience and optimizing operations by reduce dual entry for laboratory services as well as other Walgreens services (e.g. pharmacy, Take Care Clinics, etc.).

8. **Scheduling and Cancellation.** Intentionally Deleted.

9. **Invoicing.** Walgreens will issue invoices to Theranos as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing. The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10. **Payment.** Commencing with the Pilot Phase through the first twelve (12) months post Pilot, Theranos shall compensate Walgreens Services as described in Section 15 of this Agreement, as follows: within seven (7) days of receipt of payment from the payor or patient. After the first twelve (12) months post Pilot, Theranos shall compensate Walgreens for Walgreens Services no later than forty-five (45) days after Walgreens has collected said specimen.

If after ten (10) days written notice to Theranos that a payment is overdue and such Invoice remains unpaid, late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

11. **Pricing.**
The parties agree that Walgreens shall receive, a fair market value fee for the Walgreens Services, which the parties estimate will fall within a range of $10.00-$16.00/per patient ("the Pricing"). The price to be agreed upon by the parties will not include applicable taxes, or custom duties. Based on the results of the FMV Study, Walgreens and Theranos shall amend this Agreement, upon terms to be mutually agreed upon, by including pricing based on the services provided by Walgreens in Schedule D, including a procedure to deal with any inability to realize pricing. Should the parties be unable to agree upon pricing, the parties shall engage in the process laid out in Section 24(b) of this Agreement.

12. **Discounts.** The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions. Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein. The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

**Confidential Treatment Requested by Walgreen Co.**                    **WAG-TH-00000057**

13. **Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

14. **Theranos Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

a. **Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System. At such time that direct to consumer testing is approved by the applicable regulatory body, Walgreens will collect samples ordered directly by patients and Theranos will provide laboratory services for such samples.

b. **Reports.**

    i. **Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

    ii. **Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. In accordance with the relevant provisions in this Agreement, all Results provided to clinicians from samples collected at Walgreens, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent and in compliance with HIPAA and all applicable federal and state regulations. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens. Theranos agrees that it will use commercially reasonable efforts to deliver Reports to authorized Ordering Practitioners within four (4) hours of the sample arriving at the laboratory.

    iii. **Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the appropriate personnel according to its obligations as a CLIA-certified lab under federal and state law and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value. Should direct to consumer testing be made available under this Agreement, Theranos shall notify the patient directly of any Result that is classified as a Critical Value.

    iv. **Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

    v. **Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will prepare and submit any and all Reports, or other information or forms that may be required to disclose to a health department or other government agency as a result of performing certain Tests.

    vi. **Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports.

    vii. **Walgreens' Retention Right:** Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

c. **Billing.** The following shall apply during the PSC Phase. Should the parties agree to provide laboratory services in the Onsite Phase, the parties will agree on mutually acceptable billing terms.

    i. **Provider.** The parties acknowledge and agree that Theranos will be the provider of clinical laboratory services under this Agreement. Theranos acknowledges and agrees that Walgreens will be the provider of the specimen collection services performed at Walgreen's locations. As the provider of laboratory services, all claims for payment submitted to patients and/or third-party payors will be submitted by Theranos. Walgreens acknowledges and agrees that it will not submit under its name or tax id number any claims for

**Confidential Treatment Requested by Walgreen Co.**      **WAG-TH-00000058**

payment to any customers or third-party payors for Tests. Walgreens shall look solely to Theranos for payment of the items and services it provides to patients pursuant to this Agreement.

**d. HIPAA.** The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G.

**15. Walgreens Services.** Walgreens will assign to Theranos specifically trained technicians ("Walgreen Technicians") utilizing a training and certification program provided by Theranos. These technicians will provide laboratory patient services, as directed by Theranos during such times that Walgreens is interacting with a patient in order to provide patient services. Walgreen Technicians will professionally handle the patients needing laboratory services. Walgreen Technicians will draw blood using the finger stick technique; Walgreen Technicians will collect the proper other specimens according to the directions provided by Theranos. Walgreen Technicians will also obtain the patient's demographic and insurance information, which will be entered into the system that is available. If applicable, the Walgreen Technician will collect any co-pay. In addition the Walgreen Technician will take the order that came from the practitioner and enter the information from that form into the system. The Walgreen Technician will then provide information to the patient about how the patient can obtain results of the testing. The Walgreen Technician will properly store and prepare the specimen for pick-up according to the directions provided by Theranos. At the completion of the patient interaction, the Walgreen Technician will prepare the area for the next patient.

    i. **Patient Service Centers.** Walgreens locations serving as Theranos Patient Service Centers will be patient service centers which provide for the collection and processing of human blood, urine, feces, or other matrices for analysis by Theranos' CLIA certified laboratory. The physical locations for Theranos Patient Service Centers must conform to Theranos standards, with the parties to agree upon any deviations on a site specific basis. The parties agree that they shall memorialize such standards in writing. Theranos laboratory supervisors or designated supervisory qualified staff will oversee the sites and make monthly on-site visits to each Theranos Patient Service Center. Theranos laboratory personnel will perform on-site inspections of all Theranos Patient Service Centers on an ongoing basis.

    ii. **Patient Service Center Personnel.** Walgreens technicians selected by Theranos and Walgreens will act as operators of the Theranos CLIA laboratory. Said technicians will be certified by the Theranos CLIA laboratory for the performance of sample collection and processing. All certifications must be complete prior to launch of the Theranos infrastructure in Walgreens Locations. All Theranos trained and certified technicians in Walgreens Locations will be trained in Theranos Procedure Manuals and Accession Records for specimen collection stations. Only certified Theranos technicians following approved Theranos protocols may collect samples and interact with patients in Theranos Patient Service Centers. The Theranos Patient Service Centers may not be used to collect samples for any non-Theranos laboratory tests. For purposes of clarity, the parties acknowledge that as of the date of this Agreement, Walgreens is conducting health testing screening. Such screening shall not violate this subsection, provided that the testing activities are performed in a matter such that the patient will not perceive the service to be a Theranos service.

The parties agree and acknowledge, that when required by law, clinicians working at Walgreens' ESG/CSG locations will give patients the option to have their laboratory services performed at a lab/PSC of their choosing.

**16. Delivery.** Theranos shall deliver sample tubes, lancets/blood collecting devices (finger stick devices), bandages and all other necessary supplies to Walgreens locations on an as needed basis. Walgreens will notify Theranos when it has 20% remaining stock of collection vessels/finger stick devices available for use. Theranos shall deliver replacement supplies within 1days of receipt of such notice.

**17. Shipment.** Theranos shall arrange for specimens to be picked up at least once per day, and in locations that collect at least 50 specimens per day before Noon local time, there shall be at least two pick-ups per day

With respect to the Onsite Phase, the following shall apply: In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous. Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions. If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens. Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required

**Confidential Treatment Requested by Walgreen Co.**      **WAG-TH-00000059**

**ER-13088**

under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**18. Devices.**

a. Any Devices, Cartridges and other Deliverable s provided by Theranos to Walgreens, including, but not limited to any finger stick collection devices, shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

b. Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). Prior to the commencement of the Onsite Phase, Theranos will provide Walgreens with a statement certifying the cost component value of the Device for Walgreens' insurance purposes. As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

c. If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

d. Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**19. Warranty.**

a. During the Onsite Phase the following shall apply: All Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Walgreens will maintain the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens.

b. Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

c. Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

d. **Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**20. Licenses.**

a. **Theranos License Grant.** Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software

Theranos and Walgreens Confidential and Proprietary                                                    -10-

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000060**

installed on Ordering Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b. **Ownership.** Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information. Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use. Walgreens shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users. disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software. Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

c. **Walgreens License Grant.** Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that where applicable under federal and state law, Theranos obtain patient consent to use such data and that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d. **Lab Certifications.** Prior to commencement of the Pilot, Theranos shall provide a copy of the full CLIA Inspection report and PT results to Walgreens for its review. Only, In the event the report is not made available to Walgreens, or should Walgreens, in its reasonable discretion, determine that such report contains information which calls into question any significant quality issues with the Theranos methodology, then Walgreens, at its cost, shall have the right to conduct an internal correlation study to verify the Theranos platform sensitivity and specificity with respect to the Test Menu offered by Theranos. A copy of the Test Menu is attached to this Agreement as Schedule J. Walgreens and Theranos will mutually agree upon the third party/research institution to assist Walgreens with this study if necessary. Prior to commencement of any work on Walgreens' behalf, such third party shall enter into a binding non-disclosure agreement with Theranos. Should Theranos receive notice of an inspection and/or the results of an inspection that could potentially impact Walgreens' ability to provide services under this Agreement, then Theranos agrees that it shall provide a copy of such inspection report and where relevant, PT results to Walgreens. If after written notice to Theranos, there exists any issue that impacts Walgreens' ability to provide services to Theranos under this Agreement, or that impacts the patient experience and such issue remains uncured after thirty days' written notice, then Walgreens shall have the right to visit the relevant portions of Theranos' facilities (including, but not limited to, laboratory facilities, call center, billing, logistics) in order to better understand the issue and the steps being taken to resolve such issue.

e. **Property Ownership/Use.**

(i)   Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii)  Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for

Theranos and Walgreens Confidential and Proprietary                                          -11-

**ER-13090**

approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii)     Subject to patient consent and with the exception of anonymous testing, Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv)     With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v)     Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi)     Intentionally Deleted.

(vii)     Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii)     Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers, including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000062**

**ER-13091**

(ix)　To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)　As between Walgreens and Theranos: (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

f.　**Confidentiality.**

i.　**Use and Protection.** Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent. Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement. Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States. Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise. Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information. **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.** In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

ii.　**Terms of Agreement.** Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary; (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party. In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

**Confidential Treatment Requested by Walgreen Co.**　　　　　　　　　　　　　　**WAG-TH-00000063**

    iii. **Term of Confidentiality.** The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives. Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

    iv. **Confidentiality Protocol.** Should Walgreens desire to communicate with any third parties in order to cultivate a larger customer base as it relates to the Theranos System and/or Tests offered by Theranos, Walgreens, prior to engaging in such discussions shall do the following: (i) Walgreens shall have the receiving party sign a Non-Disclosure Agreement (in a form to be approved by Theranos and Walgreens). Theranos' identity will not be revealed until the agreement has been executed by both Walgreens and the receiving party; (ii) Walgreens will submit the form to Theranos, along with notations of any deviations from the agreed upon form; (iii) Within ten (10) days of receiving the NDA, Theranos shall either provide Walgreens with a signed copy, or advise in writing as to why the NDA is unacceptable. The parties shall separately agree on a set of materials that can be provided to third parties upon execution of a mutually acceptable NDA.

**21. Convertible Note.** In partial consideration for Walgreens' commitments set forth in this Agreement, within fourteen days of the Effective Date, Walgreens shall have the right to purchase, or cause its affiliate WVC Investments, LLC to purchase, a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedule H-1 (the "Convertible Note"). The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note). The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note). Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**22. Indemnification.**

    **22.1 Defense and Indemnification.** (i) Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens's use of the Theranos System, Services, Devices or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement. Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction. (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement. However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of

**Confidential Treatment Requested by Walgreen Co.**    **WAG-TH-00000064**

competent jurisdiction. (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section 21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

22.2     **Infringement.** In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to: (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows: (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot, and as applicable, the refund of the payment of Walgreens first $50 million of the Innovation Fee commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After as applicable, the refund of the payment of Walgreen's second $50 million Innovation Fee, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000. Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above. Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos. For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever. Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

22.3     **Procedures.** The indemnifying party has the right to control the defense and settlement of any Claim; provided, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed). Upon the indemnifying party's request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation. Each party will provide prompt notification of any Claim; provided, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

22.4     **Independent Obligation.** The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

23.     **Limitation of Liability.** In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party. In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. In no event shall Walgreens's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims: (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including

Theranos and Walgreens Confidential and Proprietary         -15-

**Confidential Treatment Requested by Walgreen Co.**         **WAG-TH-00000065**

death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables. Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential Information. Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction. The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

24. **Term and Termination.**

    a.   **Term.** Assuming this Agreement is not terminated pursuant to Section 24(c) below, this Agreement will be in effect until three (3) years from successful completion of the Pilot. At the end each year of the Term, the Term of this Agreement shall automatically extend for one (1) additional year, unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the anniversary date of the day upon which the Pilot was completed. For purposes of clarity, assume the following example: The Pilot is successfully completed on January 1, 2013. The term would then run through and including December 31, 2016. Unless either party gives notice to the other 90 days prior to December 31, 2014, the Term would automatically extend to December 31, 2017.

    b.   **Termination due to unsatisfactory Pilot or inability to realize Pricing.** Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement. Should Theranos terminate the Agreement, Theranos shall , within fourteen days of providing notice of termination, refund the Innovation Fee, and Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement. Should Walgreens terminate the Agreement, Walgreens shall forgive $25 million of the Innovation Fee, and Theranos shall pay off the remaining balance as detailed below in 24(d)(i). Further, if Walgreens terminates the Agreement, Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement. In the event the parties fail to agree on either of the following issues: (i) failure to agree on the fair market fee to be paid to Walgreens within fourteen (14) days of receipt of the FMV Report; and (ii) failure to agree to agree on revisions to Pricing within ninety (90) days after one party notifies the other in writing of a need to revise Pricing due to a governmental action, including, but not limited to, an audit, investigation, inquiry, change of law, issuance of new guidance or interpretation of law, then either party shall have the right to terminate this Agreement.

    c.   **Termination for Cause.** If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach. In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default. Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due. Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately.

    d.   **Obligations upon Termination.**

        i.   Theranos' Obligations to Walgreens:

            1.   In the event Walgreens terminates this Agreement pursuant to Sections 24.b or 24.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund the Innovation Fee as detailed in subsections (b), as applicable, and (c).

        ii.   Walgreens' Obligations to Theranos:

            1.   In the event this Agreement is terminated by Theranos pursuant to Section 24.c Theranos shall retain the initial $25 million distribution of the Innovation Fee..

        iii.   Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

**Confidential Treatment Requested by Walgreen Co.**        WAG-TH-00000066

f.　　**Survival of Provisions.** Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

25.　　**Marketing/Sales.** The parties agree that during the term of the Agreement, Theranos shall be responsible for sales/marketing efforts with respect to physician sales. Walgreens shall bear responsibility for sales/marketing efforts within/to Walgreens' locations. The parties shall each be responsible for sales/marketing efforts with respect to consumer marketing. The parties agree that prior to the commencement of the Pilot a sales/marketing playbook shall be developed and agreed upon. Such playbook will lay out the framework by which each party will carry out its sales/marketing efforts and the messaging that will be used by each respective party. All Theranos locations will be branded with the Theranos name and meet Theranos service center standards.

26.　　**Miscellaneous.**

**Governing Law/Venue.** This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles. The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

a.　　**Independent Contractor.** Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise. Neither party has the authority to represent the other as to any matters.

b.　　**Entire Agreement.** The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

c.　　**Force Majeure.** Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party. Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

d.　　**Assignment.** Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned. Any such attempt to do so will be ineffective. Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary. Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

e.　　**Notices.** All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid. All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

f.　　**Prevailing Party.** In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

g.　　**Amendment; Waiver.** No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

**Confidential Treatment Requested by Walgreen Co.**　　　　　　　　**WAG-TH-00000067**

**ER-13096**

h.  **Severability.** If any portion of this Agreement is held invalid or to be out of compliance with federal or state law, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith if possible to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

i.  **Publicity.** Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent. Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

j.  **Export and Import Requirements.** Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported. Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

k.  **Compliance With Laws.** Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations. Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party, whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

   o.  **EEOC Compliance.** In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), **unless exempted by said regulations**, particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1). Theranos certifies, in accordance with the requirements of 41 CFR Section 60-1.8), that its facilities for employees are not segregated. In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

   p.  **Insurance.** Theranos will maintain at its expense the following insurance during the term of this Agreement:

   (i)  Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

   (ii)  Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii)  Excess liability insurance with minimum limits of $5,000,000 in the aggregate; and

   (iv)  Professional Liability (errors & omissions) with minimum limits of $2,000,000.

   q.  **Policy Requirements.** . All policies will be primary and at Theranos' sole expense. Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability. All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens. Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher. The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000068**

herein. Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders. If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r. **Theranos Data Security Reviews.** Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices. If any such review or examination indicates that the procedures have or are likely to fail, Theranos will promptly notify Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts. Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation. Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device. Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 26.r.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary

-19-

**ER-13098**

**SCHEDULE C**

**THERANOS SYSTEM SUPPORT AND MAINTENANCE TERMS**

1.       **Support and Maintenance: Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

1.1       **Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance.  Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems.  Theranos will designate a dedicated Client Solutions manager to Walgreens.  The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests.  Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online.  In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

1.2       **Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone.  Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted.  Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software.  Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours.  Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

3.       **Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

4.       **Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

Theranos and Walgreens Confidential and Proprietary                                                                        -20-

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000070**

**SCHEDULE D**

**WALGREENS SERVICE PRICING**

PRICING TO BE AGREED UPON

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary

-21-

**ER-13100**

**SCHEDULE E**

**DEFINITIONS**

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1. "**Affiliate**" means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2. "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3. "**Calibration**" means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

4. "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

5. "**Change of Control**" means (i) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

6. "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

7. "**Confidential Information**" means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement. Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential. "Confidential Information" does not include information which: (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary. Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

8. "**Control, Controls or Controlled**" mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

9. "**Device**" means Theranos' analyzer, the Theranos patient interface and sample collection tools.

10. "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

11. "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

12. "**Discloser**" means the party disclosing Confidential Information.

Theranos and Walgreens Confidential and Proprietary                                    -22-

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000072**

13. **"Documentation"** means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

14. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

15. **"Medication Compliance/Adherence"** means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

16. **"Medication Persistence"** means the duration of time from initiation to discontinuation of administration of medications.

17. **"MTM"** or **"Medication Therapy Management"** means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

18. **"Ordered Tests"** means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

19. **"Ordering Practitioner"** means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

20. **"Pilot"** means the pilot program as set forth in Schedule F.

21. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

22. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

23. "**Predictive Test**" means a test for diabetes/pre-diabetes, congestive heart failure, women's caner, men's cancer or other such Theranos proprietary test.

24. **"Processed Data"** means information generated by Theranos utilizing Theranos IP such as predictive modeling.

25. "**Program**" means the project outlined in Schedule A, but shall not include the Pilot for purposes of the Innovation Fee.

26. "**PSC**" means patient service center.

27. "**Recipient**" means the party receiving Confidential Information from Discloser.

28. **"Report(s)"** means the collective Routine Reports, Specialty Test Results and Predictive Results provided to Walgreens.

29. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

30. **"Result(s)"** means the collective Routine and/or Specialty Results, and Predictive Results provided to Walgreens.

31. "Routine **"Test"** means a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association.

**Confidential Treatment Requested by Walgreen Co.**                                          **WAG-TH-00000073**

32. "**Services**" means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term "**Software**" also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. "**Specialty Test**" means laboratory tests, including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests (the parties agree that they will memorialize the CPT codes that are include all Specialty Tests as such codes become available).

35. "**Support and Maintenance Services(s)**" means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

36. "**Test**" means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of Predictive tests: a Cartridge, software program, information system or any other product necessary to perform a Predictive test that has been granted CLIA-waived status by FDA.

37. "**TheranOS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

38. "**Theranos Intellectual Property**" means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

39. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

40. "**Routine Results**" means the numerical outcome (raw data points) of a Routine laboratory Test originated at a Walgreens' Location.

41. "**Routine Report**" means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location. A Report for a Routine test is made up of the following three (3) components: (i) a Routine Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling.

42. "**Specialty Result**" or **Predictive Result**" means the documentation provided to the ordering clinician and Walgreens for a Specialty Test or Predictive Test originated at a Walgreens Location. A Specialty or Predictive Result is made up of analysis only.

43. "**Walgreens**" means Walgreen Co. and its wholly owned subsidiaries.

44. "**Walgreens Location**" means a clinical or retail location including employer sites and academic research centers.

Theranos and Walgreens Confidential and Proprietary

-24-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000074

**SCHEDULE F**
**PILOT**

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms. The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:
- The Pilot will include all Routine and Specialty tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in all stores (including 24 hour stores) in the pilot market to be mutually agreed upon between the parties ("Pilot Market"). The services will be available during normal store hours.
- The Pilot for store locations will commence no sooner than September 15, 2012, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary approvals to provide laboratory services in the State of California; (i) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (ii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to process Tests is adequate to support reaching the 15 patient average per store per day goal. While the Parties intend the Pilot to start no sooner than September 15, 2012 the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met. At such time as Theranos has satisfied the above requirements, Theranos shall provide written notice to Walgreens of the same. Walgreens shall commence the Pilot within forty-five (45) days of such notice. In order for Pilot to commence, Theranos must accredit the PSC locations and staff and all such locations must meet Theranos Lab Standards as defined in this Agreement. Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after September 15, 2012, but no later than February 1, 2013.
- The services will be offered in at least one (1) Employer Solutions Group ("ESG") locations. The Pilot for the ESG location will commence on a mutually agreeable date.
- Should Theranos fail to meet its requirements under this Schedule F prior to April 1, 2013, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 24(c). Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 24(b) and 24(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- Walgreens Service Fee received during the pilot timeframe shall be at least $10.00 per patient, in accordance with the Pricing agreed upon per the terms of this Agreement.

- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.

National rollout criteria:
- Assuming adequate payor coverage, Theranos must demonstrate to Walgreens' reasonable satisfaction that it can support 100,000Tests per day within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot. In a subsequent amendment, the parties shall document terms regarding national roll-out schedule, expectations, etc.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide rollout of the program post Pilot.

Theranos and Walgreens Confidential and Proprietary                                                                    -25-

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000075**

Should the Pilot success criteria not be initially met within ninety (90) days of the Pilot commencement, the parties agree that they shall not terminate this Agreement, so long as at least three (3) patients per day have had laboratory services provided at Walgreens.  In good faith, the parties shall work together to identify the problems that prevented the Pilot from being successful.  If after twelve (12) months of continued efforts to address the issues identified in the Pilot, the parties are unable to resolve the Pilot issues, the parties will have the right to terminate this Agreement pursuant to Section 24(c) of this Agreement.

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000076

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000077**

**ER-13106**

SCHEDULE H-1
CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THERANOS, INC.

CONVERTIBLE PROMISSORY NOTE

$40,000,000                                                                                                     [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to WVC Investments, LLC ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Forty Million Dollars ($40,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance. All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof. This Note is issued pursuant to that certain Amended and Restated Theranos Master Services Agreement by and between the Company and Investor dated [ 6/5/12 ] (the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)   Interest. This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually. Accrued interest on this Note shall be payable on the Maturity Date.

(b)   The "Maturity Date" shall be the earlier of:

i.    the date of the Company's Initial Public Offering;

ii.   the effective date of a Change of Control;

iii.  one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

iv.   the date that is ten years after the date of the Note .

(c)   Prepayment. The Company shall not have the right to prepay any portion of principal or accrued interest under this Note except with the express written consent of Investor unless and only to the extent that the Company and/or the Investor have determined that the Pilot contemplated by the Agreement is unsuccessful.

2.      **Conversion.**

Theranos and Walgreens Confidential and Proprietary                                                               -28-

**Confidential Treatment Requested by Walgreen Co.**                                                    **WAG-TH-00000078**

(a) Optional Conversion. At any time prior to repayment by the Company of the Note, if services are being offered in at least 1,000 Investor locations (as contemplated in the Agreement), Investor may elect to convert all or any party of the outstanding principal amount up to $20,000,000 of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. At any time prior to repayment by the Company of the Note, if services are being offered in at least 2,500 locations (as contemplated in the Agreement) Investor may elect to convert all or any part of the remaining outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert. All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b) Notice of Company Events. The Company shall give written notice to Investor of the anticipated occurrence of any Company Event. Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(c) Conversion Procedure.

i. Conversion Pursuant to Section 2(a). Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a). Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii). Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

ii. Fractional Shares; Interest; Effect of Conversion. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note. Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

Confidential Treatment Requested by Walgreen Co.        WAG-TH-00000079

3. **Definitions**. As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i) any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

"Tranche 1" shall mean $10,000,000 of the principal amount of this Note.

"Tranche 2" shall mean $30,000,000 of the principal amount of this Note.

"Tranche 1 Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Tranche 2 Conversion Price" shall mean $75.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

**Confidential Treatment Requested by Walgreen Co.**                                    WAG-TH-00000080

4.    **Investor Representations.** Investor represents and warrant to the Company as follows:

(a)  Binding Obligation. Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  Securities Law Compliance. Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5.    **Miscellaneous.**

(a)  Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

    i.   Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

    ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor. In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

    iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b)  Waiver and Amendment. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c)  Notices. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  Payment. Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

Theranos and Walgreens Confidential and Proprietary

Confidential Treatment Requested by Walgreen Co.                              WAG-TH-00000081

(e)   Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)   Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By: _____
Name: _____
Its: _____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By: _____
Name: _____
Its: _____

-32-

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00000082

ER-13111

(e) Governing Law. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f) Counterparts. This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____
Name:_____ WAYNE A. MIQUELON - CFO
Its:_____

CR - LAW

Theranos and Walgreens Confidential and Proprietary

-32-

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000083**

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

June 5, 2012

PURSUANT to Section 21 of that certain Amended and Restated Theranos Master Services Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedules H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) to fourteen (14) days after the Effective Date with respect to Schedule H-1, Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate, for the applicable Convertible Note, below.

THERANOS, INC.

By: _____

Name: _Elizabeth Holmes_

Title: _CEO_

*THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:*

On this _____ day of _____, 201__, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WALGREEN CO.

By: _____

Name: _____

Title: _____

Confidential Treatment Requested by Walgreen Co.                    WAG-TH-00000084

**ER-13113**

**SCHEDULE I**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**

Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement. At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

**Confidential Treatment Requested by Walgreen Co.**                                    **WAG-TH-00000085**

**ER-13114**

**SCHEDULE J**
**TEST MENU**

**TO COME**

**Confidential Treatment Requested by Walgreen Co.**

**WAG-TH-00000086**

**ER-13115**

**To:** Hojvat, Sally A ███████████████████████████ Hobson, John (Peyton)
**From:** Elizabeth Holmes
**Sent:** Fri 9/6/2013 6:27:12 AM
**Importance:** Normal
**Subject:** FW: FDA Informational Meeting Request
**Received:** Fri 9/6/2013 6:27:00 AM
Theranos - FDA Informational Meeting Request.pdf

Dear Sally and Peyton:

In follow up to our conversation, we filed a formal Informational Meeting Request through the e-copy process, as discussed on our call, to further share within FDA our plans for business operations as we proceed with the filings we've discussed for turning our LDTs into FDA cleared assays.

We included a detailed overview of those business operations plans in the document we submitted; I wanted to email you a copy of what we sent in so that you could see it before we introduce this in the public domain.

We have figured out how to effectively video tape the inside of our devices executing nucleic acid amplification protocols and have been building a secure website to post that on for you to access. We will be sending this to you very shortly. This is of course highly confidential to Theranos and we appreciate your protection of it and access to it.

We have also updated our pre-submission to include both the nucleic acid amplification and immunochemistry influenza assays we discussed and will follow the video link with that pre-submission filing.

Thank you again for your time and guidance, and we look forward to the opportunity to meet with you again soon.

With my best regards,

Elizabeth

Elizabeth Holmes
CEO
Theranos, Inc.

Tel: 650.470.6111
Fax: 650.838.9804

===================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304
650-838-9292   www.theranos.com
===================================

Confidential

THPFM0000853528



1601 S. California Ave     P 650.838.9292     theranos.com
Palo Alto, CA 94304       F 650.838.9165

Attn: Sally Hojvat
U.S. Food and Drug Administration
Center for Devices and Radiological Health Pre-Sub Document Mail Center – WO66-G609
10903 New Hampshire Avenue
Silver Spring, MD 20993

September 5, 2013

Re: Informational Meeting Request

Dear Sally,

In follow up to our conversations, we wanted to formally share our plans with you for the coming months. In accordance with this, we have included a written summary of these plans in the letter in Attachment A and would like to request an Informational Meeting to provide you and the FDA with an in-person informational briefing on these plans. We anticipate that the meeting will take no more than 1 hour. Sunny Balwani, Theranos' COO and President, and I will attend. Our regulatory counsel may attend as well. We are available to meet at your convenience. When we last spoke, you had indicated we could work to coordinate this with a pre-submission meeting, which we will be filing the formal request for shortly, so that they could be conducted around the same time, and suggested late October, which would work for us. We are available to meet at your convenience; October 21, 25, and 28 are three potential dates on which we could meet at a time convenient for you. However, if there is another date that would work better for you, please let us know, and we would be happy to meet then. We would like to reserve a room that has a conference phone and an LCD projector.

Enclosed please find two (2) paper copies of this Informational Meeting request and one (1) eCopy. The eCopy is an exact duplicate of the paper copy.

We look forward to the opportunity to meet with you.

With my best regards,

Elizabeth Holmes
CEO
Theranos, Inc.
650-470-6111
eholmes@theranos.com

THERANOS CONFIDENTIAL



1601 S. California Ave    P 650.838.9292     theranos.com
Palo Alto, CA 94304    F 650.838.9165

Attachment A

Dear Sally,

In follow up to our conversations, we wanted to formally share our plans with you for the coming months before making any associated announcements.

As we've had the opportunity to discuss, Theranos would like to be the first lab to convert every LDT it has or brings up into an FDA-cleared assay, as appropriate.

We have very much appreciated your guidance in our meeting last year and on our recent call.

We have been configuring our devices to collect video of the inside of the devices while running to send to you, which you will receive in parallel with this letter, and are following with the pre-submission we discussed for the initial influenza nucleic acid amplification and immunochemistry assays. We request, in advance, that you treat the video and this letter as proprietary and confidential information of Theranos in the event the FDA receives a public records request. Theranos considers the content of the video highly confidential since it reveals trade secrets and other closely guarded information about the inner workings of Theranos' proprietary technology. This letter contains Theranos' confidential future business plans. We look forward to our coming meeting and to working with you to establish a framework for additional filings from there.

In line with our discussions and FDA's guidance in our meeting last year and the minutes that followed, until Theranos receives clearance from FDA, Theranos' devices will only be used in and by Theranos' high complexity CLIA certified lab in Palo Alto, CA.

In accordance with the registration of our devices, we are developing and manufacturing our devices under GMP and in accordance with all the relevant quality controls.

All samples will be physically transported to Theranos' lab to be run through Theranos' Laboratory Developed Tests, or where relevant, on FDA approved analyzers and tests in Theranos' CLIA laboratory.

Theranos' Laboratory Developed Tests and CLIA laboratory are undergoing and will continue to undergo ongoing Proficiency Testing in accordance with our CLIA certifications.

As discussed on our call, we will begin processing micro-samples and traditional phlebotomy draws collected by trained and certified phlebotomists qualified under the appropriate state laws and employed by Theranos in early September of 2013.

The collection of micro-samples will be done in capillary collection tubes and specimen transport containers that Theranos has registered with FDA or, as relevant, that are commercially available, and all samples will be physically couriered to our certified CLIA lab in Palo Alto for processing in that CLIA lab.

All tests will be routinely ordered clinical tests, and all will be physician ordered and directed. All results will be reported back to physicians.

Theranos will be paid for its laboratory tests on a per CPT code basis which it will bill at 50% of Medicare reimbursement thresholds. Theranos will not be selling or distributing any

THERANOS CONFIDENTIAL

Confidential

Trial Exh. 1095 Page 0003

THPFM0000853530

ER-13118



1601 S. California Ave    P 650.838.9292    theranos.com
Palo Alto, CA 94304    F 650.838.9165

devices – as per above, Theranos devices will only be used by Theranos' own CLIA laboratory.

For the collection of samples, Theranos will open retail Patient Service Centers, as mentioned on our last call.

Theranos will brand its laboratory's Patient Service Centers or Collection Sites as Theranos Wellness Centers. These Wellness Centers are being built out as dedicated areas inside select retail locations.

Each Patient Service Center is operated and overseen by our CLIA laboratory staff in accordance with CLIA.

Theranos has made significant investments to establish a new standard for convenience, cleanliness, and patient environment in its sample collection sites.

Theranos will open its first Patient Service Center inside a Walgreens pharmacy store, and has procured space inside Walgreens to be able to ultimately introduce its centers inside different stores across the country.

In the month of September, 1-3 locations are planned in Palo Alto in the Bay Area, including one at Theranos' headquarters in Palo Alto.

We look forward to the opportunity to build a long term relationship with the FDA and will continue briefing you on upcoming plans, as relevant and as they develop, and as we work to complete ongoing filings of our tests with you.

With my best regards,


Elizabeth


THERANOS CONFIDENTIAL

Confidential

THPFM0000853531


**ER-13119**

**Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service**

*With first location launching this month in Silicon Valley, consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours*

PALO ALTO, Calif., and DEERFIELD, Ill., Sept. 9, 2013 – Theranos, Inc. and Walgreens (NYSE: WAG) (Nasdaq: WAG) today announced a long-term partnership to bring access to Theranos' new lab testing service through Walgreens pharmacies nationwide. As the service becomes available through Theranos Wellness Centers inside Walgreens stores, consumers will be able to access less invasive and more affordable clinician-directed lab testing, from a blood sample as small as a few drops, or 1/1,000 the size of a typical blood draw. The samples are either taken from a tiny finger stick or a micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for most diagnostic lab testing.

Theranos and Walgreens are taking the first step in making this service available to consumers with the first Theranos Wellness Center location opening this month at Walgreens drugstore at 300 University Ave. in Palo Alto, Calif., in the heart of Silicon Valley. The companies plan to offer the service at Walgreens locations nationwide.

For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples.  Theranos' proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results. Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. Theranos tests are low cost – always 50 percent of Medicare reimbursement rates or less – and are reimbursed by major insurance carriers, Medicare, and Medicaid. Developed to be accessible to everyone, Theranos tests cost the same amount for everyone, regardless of insurance plan or whether they are uninsured.

Confidential

THPFM0001815817

"For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most. Clinicians can now see their patients having received lab results from fresh samples in a matter of hours," said Elizabeth Holmes, Chairman, CEO and Founder of Theranos. "This partnership will further our goal to bring high quality, affordable lab testing to people everywhere, with our new Wellness Centers in Walgreens retail locations closest to homes and workplaces."

By minimizing the volume of blood required from patient draws, Theranos helps clinicians provide a new standard of care across all specialties and treatment areas. Kind, minimally invasive collection has the potential to benefit everyone, including oncology, pediatric and geriatric patient populations that require frequent blood draws. Theranos seamlessly integrates with existing practice workflows and offers a full spectrum of laboratory tests, from the most common panels to highly specialized tests. Collection for Theranos tests will be performed in Theranos Wellness Centers by licensed phlebotomists or appropriately state certified personnel.

"Theranos' service offers affordable certified lab testing with quicker response times, and furthers our mission to provide a differentiated patient experience," said Kermit Crawford, Walgreens president of pharmacy, health and wellness. "This is the next step in Walgreens efforts to transform community pharmacy, giving our patients and customers convenient access to the comprehensive care they need, right in their communities."

As the nation's largest retail pharmacy chain with more than 8,100 neighborhood pharmacies, Walgreens has the infrastructure to help bring Theranos to consumers nationwide.

**About Theranos**

Headquartered in Palo Alto, Theranos, Inc. is working to shape the future of lab testing and the way health information is collected, analyzed, and communicated. Founded in 2003 by Elizabeth Holmes, Theranos is on a mission to make actionable health information accessible to people everywhere in the world at the time it matters, enabling early detection and intervention of

disease, and empowering individuals with information to live the lives they want to live. [
HYPERLINK "http://www.theranos.com/" ]

**About Walgreens**

As the nation's largest drugstore chain with fiscal 2012 sales of $72 billion, Walgreens ([
HYPERLINK
"http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.walgreens.com&esheet=50683078&
newsitemid=20130801006486&lan=en-
US&anchor=www.walgreens.com&index=2&md5=d76441c4070440ef81a7b8b24c794409" ]) vision is to
become America's first choice for health and daily living. Each day, Walgreens provides more
than 6 million customers the most convenient, multichannel access to consumer goods and
services and trusted, cost-effective pharmacy, health and wellness services and advice in
communities across America. Walgreens scope of pharmacy services includes retail, specialty,
infusion, medical facility and mail service, along with respiratory services. These services
improve health outcomes and lower costs for payers including employers, managed care
organizations, health systems, pharmacy benefit managers and the public sector. The company
operates 8,117 drugstores in all 50 states, the District of Columbia and Puerto Rico. Take Care
Health Systems is a Walgreens subsidiary that is the largest and most comprehensive manager of
worksite health and wellness centers and in-store convenient care clinics, with more than 700
locations throughout the country.

*Cautionary Note Regarding Forward-Looking Statements: Statements in this release that are not
historical are forward-looking statements made pursuant to the safe harbor provisions of the Private
Securities Litigation Reform Act of 1995. Words such as "expect," "likely," "outlook," "forecast,"
"would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "target," "continue,"
"sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible,"
"assume," and variations of such words and similar expressions are intended to identify such
forward-looking statements. These forward-looking statements are not guarantees of future
performance and involve risks, assumptions and uncertainties, including, but not limited to, those
relating to the speed, efficiency, cost, reliability and safety of lab testing services and results, the
introduction of Theranos services at Walgreens locations including the timing, scope and financial
ramifications thereof, and those described in Item 1A (Risk Factors) of our most recent Annual
Report on Form 10-K and Quarterly Report on Form 10-Q, each of which is incorporated herein by
reference, and in other documents that we file or furnish with the Securities and Exchange
Commission. Should one or more of these risks or uncertainties materialize, or should underlying
assumptions prove incorrect, actual results may vary materially from those indicated or anticipated
by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on*

THPFM0001815819

Trial Exh. 1113 Page 0003

*these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this report, whether as a result of new information, future events, changes in assumptions or otherwise.*

**Contact**

Theranos
Jeffrey Blickman,
[ HYPERLINK "mailto:pr@theranos.com" ]

or

Walgreens
Jim Cohn,

Confidential

THPFM0001815820

Trial Exh. 1113 Page 0004

**ER-13123**

**To:**      Hobson, John (Peyton) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Hojvat, Sally A

**From:**     Elizabeth Holmes
**Sent:**      Wed 10/16/2013 2:51:58 AM
**Importance:**      Normal
**Received:**      Wed 10/16/2013 2:51:00 AM
Theranos Workflow Diagrams_FDA_Confidential.pdf

Dear Peyton,

We've tried to compile comprehensive and simple workflow diagrams in follow up to our emails and as discussed on our last call.

Let me know if they make sense and if there are any questions or ambiguities and we can iterate them for you prior to circulation.

With my very best regards,

Elizabeth

===================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304
650-838-9292   www.theranos.com
===================================

Trial Exh. 1177 Page 0001

THPFM0000154268

**theranos**

## Overview of Sample Processing Workflow Prepared for FDA:

## Phase I and Phase II of Theranos Business Operations

This presentation and its contents are Theranos proprietary and confidential.

Confidential

THPFM0000154269

Trial Exh. 1177 Page 0002

ER-13125

# Phase I: Current

**Theranos PSC**
**(Theranos site operated by Theranos CLIA lab)**



Theranos Confidential

Confidential

THPFM0000154270

Trial Exh. 1177 Page 0003

# Phase II: Post-FDA Clearance



Theranos PSC
(Theranos site operated by
Theranos CLIA lab)

Theranos High-Complexity CLIA-Certified Lab in Palo Alto, CA

Theranos Confidential

Confidential

THPFM0000154271

Trial Exh. 1177 Page 0004

# TSPU & TLAS Description

(The TSPU and TLAS are designed and manufactured by Theranos with no third party involvement.
The TSPU and TLAS are also only used by Theranos and are not sold.)

**Theranos Sample Processing Unit (TSPU)**

Performs automated pre-analytic processing*:

- Sample separation (into plasma)
- Reagent addition/preparatory steps and associated signal generation
- Transmits raw signals (e.g. pixels or photon counts) to TLAS**
- Connected to and controlled by TLAS under the oversight of Theranos CLIA laboratory personnel

*No operator decision making or manual processing required
**NB – results cannot be generated on the TSPU (and thus of course could never be transmitted from or displayed on the TSPU)

Theranos Confidential

**Theranos Laboratory Automation System (TLAS)**

Performs automated analysis and post-analytic processing:

- Pathologist and CLIA lab personnel oversight of TSPU
- Result derivation:
  - Signal analyzed
  - Replicates analyzed
  - Outliers analyzed
  - Controls analyzed
  - Calibrators analyzed
  - Signal converted to concentration based on analysis
- Pathologist and CLIA lab personnel oversight of analysis, post-analytic processing, and results

theranos

Confidential

THPFM0000154272

Trial Exh. 1177 Page 0005

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023