No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. XLVI of LVII | ER-13130 to ER-13429

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

# Trial Exhibit 1348
# (Clips 1–7)

Audio recording produced in native format

# Trial Exhibit 1348
# (Clip F)

Audio recording produced in native format

# Trial Exhibit 1349
# (Clip 1)

Audio recording produced in native format

# Trial Exhibit 1349
# (Clip A)

Audio recording produced in native format

**To:**    Adam Rosendorff[arosendorff@theranos.com]; Sunny Balwani[sbalwani@theranos.com]; Mark Pandori[mpandori@theranos.com]
**From:**    Daniel Young
**Sent:**    Wed 2/19/2014 9:47:12 PM
**Importance:**    Normal
**Subject:**   RE: Low HDLs
**Received:**    Wed 2/19/2014 9:47:14 PM

Thanks. Just let me know when you have them and I can take a look.

---

**From:** Adam Rosendorff
**Sent:** Wednesday, February 19, 2014 1:39 PM
**To:** Daniel Young; Sunny Balwani; Mark Pandori
**Subject:** RE: Low HDLs

Daniel

I've asked David Ramos to pull all of the ADVIA p-protocol lipid values from the last 4 months- please let me know when you would like to review?

Thanks,

Adam

**From:** Daniel Young
**Sent:** Wednesday, February 19, 2014 1:24 PM
**To:** Sunny Balwani; Mark Pandori; Adam Rosendorff
**Subject:** RE: Low HDLs

Adam, in addition to Sunny's questions below, I'd also like to review the Oct-Dec 2013 QC that you were referring to. The QC data I've reviewed was from Jan 2, 2014 to yesterday.

Also, can you please pull all HDL lab results for the last four months? I'd like to see the distribution.

Thanks,

Daniel

**From:** Sunny Balwani
**Sent:** Wednesday, February 19, 2014 1:01 PM
**To:** Daniel Young
**Cc:** Mark Pandori; Adam Rosendorff
**Subject:** Re: Low HDLs

Specially if we have stored samples for these 5 patients, we she rerun them with new reagent.

Also, are these 5 consecutive samples that gave us low readings or were they random?

On Feb 20, 2014, at 2:20 AM, "Daniel Young" <dyoung@theranos.com> wrote:

> Regarding Westgard rules – I think there is some confusion. There are actually two rules that I think our QC data failed:

Confidential                                                                             THPFM0000283860

- 10x rule: failure is defined as 10 consecutive observations on the same side of the mean line. This occurred for all 3 QC levels weeks ago.

- 4 1S rule: failure is defined as 4 consecutive observations on the same side of the 1SD line. Do have a defined SD for this assay that you were using to evaluate this rule?

I'm looking into other potential causes for low HDL values, but moving to new reagents and rerunning calibration for HDL on Advia seems like the first step that needs to happen in CLIA.

-Daniel

**From:** Mark Pandori
**Sent:** Wednesday, February 19, 2014 10:34 AM
**To:** Adam Rosendorff; Sunny Balwani
**Cc:** Daniel Young
**Subject:** RE: Low HDLs

Adam,

I recently discussed this QC data issue with Hoda, and I did assign this task of Advia QC acquisition to two CLA and Hoda in the course of my "Task Sheets" project.

Mark

**From:** Adam Rosendorff
**Sent:** Wednesday, February 19, 2014 10:17 AM
**To:** Sunny Balwani
**Cc:** Mark Pandori; Daniel Young
**Subject:** RE: Low HDLs

Sunny

Langly and I reviewed all the QC data for Oct-Dec 2013 for all the ADVIAs in early January. Looking at the Levey-Jennings QC for January and February so far, indeed we would have failed Westgard based on the 10 1s rule for level 1 at least, (10 consecutive QC runs below 1SD) . However, all of the QC is still acceptable for daily runs, and I do not think the consistently low control recovery for both Siemens and Theranos methods, explains the extremely low patient values.

I have been asking the supervisors to collect the ADVIA QC data and present it to me monthly since our CLIA inspection. It seems this is not happening. I will impress upon them the importance of collecting monthly QC.

Thanks,

Adam

**From:** Sunny Balwani
**Sent:** Wednesday, February 19, 2014 7:57 AM
**To:** Adam Rosendorff
**Cc:** Mark Pandori; Daniel Young
**Subject:** FW: Low HDLs

Adam.

Confidential

THPFM0000283861

Please see below. This was my suspicion and I had team look into the raw data. This is also where we got dinged in the CLIA audit. This should have been caught during regular QC. Is anyone looking at QC for Advias?

**From:** Daniel Young
**Sent:** Wednesday, February 19, 2014 7:47 AM
**To:** Sunny Balwani
**Cc:** Elizabeth Holmes
**Subject:** RE: Low HDLs

Beloe is the summary. D-HDL is the Advia default protocol and P-HDL is the Theranos protocol (pre-diluted) run on Advia. The mean bias ranges from -13% to -16%, with little variance. There is little difference between the two protocols. The QC data should have been flagged as I mentioned, for being consistently biased. We have a released SOP in CLIA that was not follows ("Westgard and Levey-Jennings Quality Control Doc # CL SOP-00023").

| | | QC Data | | | | | Assigned | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mean | SD | CV | Min | Max | Avg | Min | Max | Mean Bias |
| D-HDL | Level 1 | 23.6 | 0.48 | 0.02 | 22.5 | 24.6 | 27 | 21.6 | 32.4 | 13% |
| P-HDL | Level 1 | 23.6 | 1.10 | 0.05 | 17.1 | 24.4 | 27 | 21.6 | 32.4 | 13% |
| D-HDL | Level 2 | 43.8 | 0.90 | 0.02 | 41.5 | 46 | 51.3 | 41.04 | 61.56 | 15% |
| P-HDL | Level 2 | 43.9 | 1.95 | 0.04 | 33.1 | 47.3 | 51.3 | 41.04 | 61.56 | 14% |
| D-HDL | Level 3 | 65.2 | 1.39 | 0.02 | 61.8 | 68.5 | 77.2 | 61.74 | 92.66 | 16% |
| P-HDL | Level 3 | 64.8 | 1.87 | 0.03 | 58.1 | 70.1 | 77.2 | 61.74 | 92.66 | 16% |

-Daniel

**From:** Daniel Young
**Sent:** Tuesday, February 18, 2014 6:22 PM
**To:** Sunny Balwani
**Cc:** Elizabeth Holmes
**Subject:** RE: Low HDLs

At first glance, the HDL QC data looks to be running consistently low (very roughly 10% low). These QC data should have raised an alarm flag several weeks ago. The QC results seem similar for both the default Siemens protocol, as well as for the Theranos diluted protocol.

CLIA should have a person who is reviewing the QC data on a periodic basis. This deficiency came up in the last CLIA audit – I am not sure if they are doing this on a regular basis now or not.

-Daniel

On Feb 19, 2014, at 5:04 AM, "Adam Rosendorff" <arosendorff@theranos.com> wrote:

Daniel and Sunny

We have been getting a spate of low HDL values:

████████ 28 mg/dL

████████ 35 mg/dL    2/17/2014

████████ 23.5 mg/dL    2/14/2014 → resulted and reported

Confidential
THPFM0000283862

Trial Exh. 1541 Page 0003

| | | |
|---|---|---|
| ████ 28.6 mg/dL | 2/18/2014 |
| ████ 34.8 mg/dL | 2/17/2014 |

These are all around the 5th percentile or less- I suspect our HDL assay has failed and I do not want to report out this result until we fix it.

Thanks,

Adam Rosendorff, MD, FASCP

Laboratory Director

Theranos, Inc

(650) 856-4412 (Office)

(650) 823-4953 (Mobile)

(650) 852-9594 (Fax)

arosendorff@theranos.com

**To:** Elizabeth Holmes[eholmes@theranos.com]; Daniel Young[dyoung@theranos.com]; Paul Patel[ppatel@theranos.com]
**From:** Sunny Balwani
**Sent:** Fri 2/21/2014 10:43:04 PM
**Importance:** Normal
**Subject:** FW: Emailing: PA01458_PA01420
**Received:** Fri 2/21/2014 10:43:06 PM
Feb17-20lipid_log.xlsx

Does this point to assay change in siemens assay ? we still need to run this on other Advias and see if this is a device issue which could be very much possible...

**From:** Nicholas Haase
**Sent:** Friday, February 21, 2014 1:14 PM
**To:** Adam Rosendorff; Sunny Balwani; Daniel Young
**Subject:** RE: Emailing: PA01458_PA01420

Attached are lipid panel results from patients run between February 17 and now (this date range is the easiest for me to access). Any HDL values below 35 mg/dL are in red. HDL is definitely the only one trending low; in a number of patients with low HDL their other lipid levels are trending high.

For an investigation update, Sam G. and I looked at the kinetic data on Advia 3 (the absorbance is recorded every time the cuvette passes by the light source). We could not see any signal issues for calibrators, patient samples, or multiquals, even for the predicate method. Two lots of reagents have been used, with low HDL levels coming from both lots. We also checked the calibrator and QC values in the Advia, all information is accurate. I spoke with the consumables team, and there have not been any new lots of pCTNs, Lihep, or gel used. The dilution protocol on the Tecan also has not changed.

We've now got the samples from this morning's internal draw and will be diluting those.

Nick H.

> **From:** Adam Rosendorff
> **Sent:** Friday, February 21, 2014 12:08 PM
> **To:** Sunny Balwani; Daniel Young; Nicholas Haase
> **Subject:** RE: Emailing: PA01458_PA01420
>
> I'll talk to her- the patient data in the lab report is correctly reported- only her email has incorrect information.

> **From:** Sunny Balwani
> **Sent:** Friday, February 21, 2014 12:07 PM
> **To:** Adam Rosendorff; Daniel Young; Nicholas Haase
> **Subject:** RE: Emailing: PA01458_PA01420
>
> Lets check to see how Malissa made this mistake and see if we can simplify the process so it doesn't happen. Thanks.

> **From:** Adam Rosendorff
> **Sent:** Friday, February 21, 2014 12:02 PM
> **To:** Daniel Young; Nicholas Haase; Sunny Balwani
> **Subject:** RE: Emailing: PA01458_PA01420
>
> 0000000000001458 =  [ ]  Visit Date 2/17/2014, WAG Palo Alto
>
> 0000000000001420 =  [ ]  Visit Date 2/17/2014, WAG Palo Alto

Confidential                                                    THPFM0001702831

Trial Exh. 1556 Page 0001

Yes- I was misinformed- turns out they are separate patients- this is reassuring.

Adam

**From:** Daniel Young
**Sent:** Friday, February 21, 2014 11:48 AM
**To:** Nicholas Haase; Sunny Balwani; Adam Rosendorff
**Subject:** RE Emailing: PA01458_PA01420

Thanks. I just told Adam that I suspected that these were not the same samples. That makes sense.

-Daniel

---

**From:** Nicholas Haase
**Sent:** 2/ 21/ 2014 11:44 AM
**To:** Sunny Balwani; Adam Rosendorff
**Cc:** Daniel Young
**Subject:** RE Emailing: PA01458_PA01420

Adam,

For patient 01458, with an HDL of 34.8 mg/dL, the sample was not re-run - Patient 01420 is a different patient. I looked at the sample shipping spreadsheet and saw entries for both. PA01420 got a lipid panel and ALT tested, while PA01458 had CMP and Lipid panel ordered.

With all re-runs I can see in the Advia log, the re-run is consistent with the original result.

Nick

-----Original Message-----
From: Sunny Balwani
Sent: Friday, February 21, 2014 11:40 AM
To: Adam Rosendorff; Nicholas Haase
Cc: Daniel Young
Subject: RE: Emailing: PA01458_PA01420

There are both for HDL?

-----Original Message-----
From: Adam Rosendorff
Sent: Friday, February 21, 2014 11:34 AM
To: Nicholas Haase
Cc: Daniel Young; Sunny Balwani
Subject: Emailing: PA01458_PA01420

Nick

This patient is of concern to me:

Your message is ready to be sent with the following file or link attachments:

PA01458_PA01420

34.8 mg/dL retested to 70.7 mg/dL (2/17/2014 12:16:59)

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments. Check

Confidential

Trial Exh. 1556 Page 0002

THPFM0001702832

your e-mail security settings to determine how attachments are handled.

Confidential

THPFM0001702833

Trial Exh. 1556 Page 0003

**ER-13141**



File Produced in Native Format

Confidential

Trial Exh. 1556 Page 0004

THPFM0001702834

Theranos Internal Only

| | HDL | LDL | HDL+LDL | T. Chol | Trig |
|---|---|---|---|---|---|
| 17-Feb | | | | | |
| 1458 | 34.8 | 128.8 | 163.6 | 170 | 81 |
| 1420 | 70.7 | 83.6 | 154.3 | 166 | 52 |
| 18-Feb | | | | | |
| 1394 | 28.6 | 91.4 | 120 | 144 | 93 |
| 55198 | 49.7 | 206.4 | 256.1 | 265 | 151 |
| 1363 | 36.1 | 121.1 | 157.2 | 165 | 71 |
| 55185 | 33.8 | 142 | 175.8 | 204 | 227 |
| 55129 | 39.3 | 139.8 | 179.1 | 177 | 69 |
| 19-Feb | | | | | |
| 55211 | 41.5 | 116.9 | 158.4 | 176 | 137 |
| 55091 | 67.4 | 185 | 252.4 | 258 | 121 |
| 55192 | 76.5 | 83.4 | 159.9 | 183 | 219 |
| 1420-rrun | 71.4 | | | | |
| 3342 | 38.4 | 147.5 | 185.9 | 195 | 99 |
| 3322 | 70.6 | 103.4 | 174 | 178 | 50 |
| 1394-rrun | 29.8 | | | | |
| 1363-rrun | 33.2 | | | | |
| 1395 | 50 | 139.3 | 189.3 | 205 | 178 |
| 55185-rrun | 34.4 | 140.4 | 174.8 | 200 | 199 |
| 20-Feb | | | | | |
| 55202 | 31.3 | 168 | 199.3 | 224 | 266 |
| 3321 | 39.9 | 142.9 | 182.8 | 195 | 135 |
| 3301 | 45.1 | 131.1 | 176.2 | 189 | 75 |
| 55202-rrun | 33.6 | | | | |

Theranos Internal Only

**ER-13143**

**To:**    Mark Pandori[mpandori@theranos.com]; Sunny Balwani[sbalwani@theranos.com]; Adam
Rosendorff[arosendorff@theranos.com]; Paul Patel[ppatel@theranos.com]
**Cc:**    Elizabeth Holmes[eholmes@theranos.com]
**From:**    Daniel Young
**Sent:**    Sat 2/22/2014 4:40:13 AM
**Importance:**    Normal
**Subject:**    RE: Morning HDL Study Tecan Dilution Results
**Received:**    Sat 2/22/2014 4:40:14 AM

Makes sense for now.

---

**From:** Mark Pandori
**Sent:** Friday, February 21, 2014 8:39 PM
**To:** Sunny Balwani; Daniel Young; Adam Rosendorff; Paul Patel
**Cc:** Elizabeth Holmes
**Subject:** RE: Morning HDL Study Tecan Dilution Results

Any patients pending or run on Advia three in the last twenty four hours could be rerun on Advia one, and resulted out.

This is my take on this.

Mark

---

**From:** Sunny Balwani
**Sent:** 2/21/2014 8:26 PM
**To:** Mark Pandori; Daniel Young; Adam Rosendorff; Paul Patel
**Cc:** Elizabeth Holmes
**Subject:** RE: Morning HDL Study Tecan Dilution Results

Agreed.

---

**From:** Mark Pandori
**Sent:** Friday, February 21, 2014 8:20 PM
**To:** Daniel Young; Sunny Balwani; Adam Rosendorff; Paul Patel
**Cc:** Elizabeth Holmes
**Subject:** RE: Morning HDL Study Tecan Dilution Results

Daniel,

All of the predicate / venous specimens are run on Advia 1, while all p protocols are run on Advia 3. So the QC data you analyzed on Wednesday included Advia 1 and Advia 3.

My take, is that we could move p protocol specimens to Advia 1 and resume testing.
Monitor closely.

Meanwhile we troubleshoot the bias seen for the test, overall.

Mark

---

**From:** Daniel Young
**Sent:** 2/21/2014 7:16 PM
**To:** Mark Pandori; Sunny Balwani; Adam Rosendorff; Paul Patel

Confidential            THPFM0000001202

Trial Exh. 1559 Page 0001

**Cc:**Elizabeth Holmes
**Subject:**RE: Morning HDL Study Tecan Dilution Results

Note that Advia 3 was calibrated just recently, while Advia 1 was calibrated Jan 30.

I have not seen the QC data for Advia 1 –how does it compare to the consistently low QC data on Advia 3?

While Advia 3 is on average 10% to 15% lower than Advia 1 as I noted below, at this point cannot say which is more accurate.

Given the tight precision of the HDL and the total allowable error of 30% from CLIA/CMS, I do suggest that we can test and report HDL on Advia 1 or 3.

Other major conclusion is that the Fingerstick samples, pCTN, and our Theranos protocols are good.

Thanks,

Daniel

---

**From:**Mark Pandori
**Sent:** Friday, February 21, 2014 7:05 PM
**To:** Daniel Young; Sunny Balwani; Adam Rosendorff; Paul Patel
**Subject:** RE: Morning HDL Study Tecan Dilution Results

Daniel,

I was looking at the uncharted data with Paul earlier.

It seems possible to me, that the relatively low reads we have been seeing lately could be based upon:

1. the fact that we are running the p-protocol HDL on Advia 3. Had we run the p-HDL on Advia 1, some of the problem would go away.

2. both Advia 1 and Advia 3 have been reading consistently low for some other reason, according to the look back at the QC data that you provided on Wednesday

--So there could be two factors leading to the rather low values that we have been seeing occasionally (for specimens tested on Advia 3).

Note that given this data, all venous would look better than p-HDL, simply because all venous are always run on Advia 1, as is CLIA practice.

Anyhow, we need to decide what to do about patient testing, as the Lipid panel tests are piling up here.

Adam?

Mark

---

**From:** Daniel Young
**Sent:** Friday, February 21, 2014 6:37 PM
**To:** Mark Pandori
**Subject:** FW: Morning HDL Study Tecan Dilution Results

FYI:

Confidential

THPFM0000001203

**From:** Daniel Young
**Sent:** Friday, February 21, 2014 6:32 PM
**To:** Nicholas Haase; Adam Rosendorff; Paul Patel; Rose Edmonds; Xinwei Sam Gong; Curtis Schneider; Nishit Doshi
**Subject:** RE: Morning HDL Study Tecan Dilution Results

See plots in the attached. My summary is:

1) p-HDL on fingerstick and Venous are very comparable

2) p-HDL on fingerstick compares very well to predicate on Venous (better for Advia 3 than on Advia 1)

3) p-HDL and predicate method both on Venous show some differences at the high HDL concentrations, but are well correlated (performance is worse on Advia 1)

4) Advia 1 is reading 10% to 15% higher than Advia 3 for all sample types and HDL protocols

5) We do not see a problem of abnormally low HDL results

6) There was one low result for one replicate; this may have been a Tecan related issue since it affected all the lipid assays similarly; Nick is checking into this

Please let me know if you have any comments.

Thanks,

Daniel

**From:** Nicholas Haase
**Sent:** Friday, February 21, 2014 5:03 PM
**To:** Daniel Young; Adam Rosendorff; Paul Patel; Rose Edmonds; Xinwei Sam Gong; Curtis Schneider; Nishit Doshi
**Subject:** Morning HDL Study Tecan Dilution Results

Everyone,

Attached are the tabulated results from the Tecan-diluted Fingerstick and Venous samples from this morning's study, as well as the predicate venous results.

The key is as follows: P-xxxx = P-protocol; A3-1 = Advia 3 rep 1 (and so on).

The last three subjects were not fasting, hence the coloration of their patient numbers. Only one sample returned an HDL result below 35 mg/dL, and that one was low for all analytes. This is due to over-dilution, from either the Tecan picking up gel or hitting some plasma on the sidewall of the pCTN.

Let me know if anyone would like calculations and/or plots of anything in particular.

Overall, we did not see any low HDL samples, omitting the aforementioned exception. Advia 3 tends to report lower values than Advia 1, but there are different reagent lots on the instruments.

Let me know if anything else is needed. We are currently doing manual sample dilutions.

Regards,

Nick H.

Confidential

THPFM0000001204

Message

| | |
|---|---|
| **From**: | Adam Rosendorff [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ADAM ROSENDORFD92] |
| **Sent**: | 2/23/2014 8:22:52 PM |
| **To**: | Mark Pandori [/o=theranos organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=mark pandori16d] |
| **Subject**: | RE: Morning HDL Study Tecan Dilution Results |

Thanks you too

Sent from my Windows Phone

---

**From:** Mark Pandori
**Sent:** 2/23/2014 12:09 PM
**To:** Adam Rosendorff
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Yes, ok.

I hope you are doing well, this weekend.

Mark

---

**From:** Adam Rosendorff
**Sent:** 2/23/2014 12:05 PM
**To:** Mark Pandori
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Yes but this relationship is preanalytic and these analytes are unlinked ex vivo

Sent from my Windows Phone

---

**From:** Mark Pandori
**Sent:** 2/23/2014 11:51 AM
**To:** Adam Rosendorff
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Yea, ok.

Seems correct though, in terms of patient profiles too. People whose hdl are really higher, might actually have lower ldl.

I mean, if you had to predict.?

Just talking here.

Mark

---

**From:** Adam Rosendorff
**Sent:** 2/23/2014 11:48 AM

Confidential                                                                                          THPFM0002147134

Trial Exh. 1562 Page 0001

**ER-13147**

**To:** <u>Mark Pandori</u>
**Subject:** RE: Morning HDL Study Tecan Dilution Results
LDL would go down and the rest would go up if we switched. We should look at the LDL QC data to see if ADVIA 3 QC is consistently above the mean?

Sent from my Windows Phone

---

**From:** <u>Mark Pandori</u>
**Sent:** 2/23/2014 11:45 AM
**To:** <u>Adam Rosendorff</u>
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Seems switching instruments would resolve virtually all of it.

QC bias remains a mystery, but that on top of instrument bias might explain phenomenon.

?

Mark

---

**From:** <u>Adam Rosendorff</u>
**Sent:** 2/23/2014 11:42 AM
**To:** <u>Mark Pandori</u>
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Hi Mark

For sure the instrument bias is exacerbated with the p-protocols.

I think the qc bias has been quite steady since at least 9/29

Adam

Sent from my Windows Phone

---

**From:** <u>Mark Pandori</u>
**Sent:** 2/23/2014 11:27 AM
**To:** <u>Adam Rosendorff</u>
**Subject:** RE: Morning HDL Study Tecan Dilution Results
Has the Qc data revealed more bias in Feb than December?

My sense is that instrument bias is the major cause, and that for some reason, p protocols are more susceptible to the problem.

Mark

---

**From:** <u>Adam Rosendorff</u>
**Sent:** 2/22/2014 9:55 PM

Confidential

THPFM0002147135

**To:** <u>Mark Pandori</u>
**Subject:** FW: Morning HDL Study Tecan Dilution Results

Hi Mark


Forgot to cc: you on this email.


Cheers,


Adam


**From:** Adam Rosendorff
**Sent:** Saturday, February 22, 2014 9:49 PM
**To:** Daniel Young; Nicholas Haase; Paul Patel; Rose Edmonds; Xinwei Sam Gong; Curtis Schneider; Nishit Doshi
**Subject:** RE: Morning HDL Study Tecan Dilution Results


Daniel


Thanks for your analysis.  I have gone ahead and calculated an instrument bias and a "method" bias. To eliminate instrument bias from confounding the method bias analysis, ADVIA 3 p-protocols (FS) were compared with paired data also from ADVIA 3 for both p-protocols (venous) and predicate protocols (venous.) So the Method Bias is all from the same instrument.


The data is summarized below:


Instrument Bias


|  | A3-A1 | %Bias (A3-A1/A3) |
|---|---|---|
| p-Chol FS | -15.3 | -8.1 |
| p-HDL FS | -9.3 | -16.4 |
| p-LDL FS | 8.3 | 6.5 |
| p-TRIG FS | -16.9 | -19.8 |
| p-Chol V | -11.5 | -6.1 |
| p-HDL V | -8.1 | -8.1 |
| p-LDL V | 11.6 | 8.7 |
| p-TRIG V | -16.1 | -20.7 |
| Chol V | -3.8 | -1.9 |


Confidential                                                                    THPFM0002147136

Trial Exh. 1562 Page 0003


**ER-13149**

| | | |
|---|---|---|
| HDL V | -6.3 | -10.9 |
| LDL V | -1.4 | -1.4 |
| TRIG V | -1.96 | -2.7 |

Method Bias

| | p-Chol V | Chol V | p-HDL V | HDL V | p-LDL V | LDL V | p-TRIG V | TRIG V |
|---|---|---|---|---|---|---|---|---|
| p-Chol FS | 0.4 | 2.9 | NA | NA | NA | NA | NA | NA |
| p-HDL FS | NA | NA | -2.3 | 1.1 | NA | NA | NA | NA |
| p-LDL FS | NA | NA | NA | NA | -0.1 | 17.5 | NA | NA |
| p-TRIG FS | NA | NA | NA | NA | NA | NA | 8.1 | 15.2 |

Conclusions:

(1) Instrument bias:

In general, instrument bias is greater than method bias. In terms of p-protocols (FS as well as venous) ADVIA 3 underreports Chol, HDL and Trig values and overreports LDL values. The differences between ADVIA 3 and ADVIA 1 diminish significantly when looking at predicate protocols for all four analytes. Thus simply moving from ADVIA 3 to ADVIA 1 may not be the answer as 3 assays would increase (Chol, HDL and Trig) and one would decrease (LDL). I'd like to understand more about why the p-protocols exaggerate instrument to instrument variability (at least shown by the current data). **Please note that all 3 HDL QC levels for ADVIA 3 (has been used exclusively for FS patient samples) and for ADVIA 1 (has been used exclusively for venous samples) have both been running on the low side, thus low QC cannot explain ADVIA 3 HDL underreporting versus ADVIA 1.**

(2) Method bias

The p-protocol values (FS and venous), for Cholesterol and HDL match *very* well with the predicate values. However, what is most interesting is that the p-protocol values (FS and venous) for Triglycerides and LDL show a significant positive bias relative to their respective predicate values. One can speculate on why this might be the case.

(3) Spate of HDL values in 20's and 30 in February

The recent spate of HDL values in the 20's and 30's, and the fact that the February p-HDL average is now 46.1 (excluding obviously reruns) as opposed to around 65 for December and January, could be the result of the following:

(1) Hemolysis (bilirubin quenches H202 that is measured in the Siemens HDL assay)- perhaps due to prenalalytic factors such as specimen collection or transportation.

(2) Statistical aberration (only 17 patients have been tested so far as opposed to ~30 for Dec and Jan)

(3) Subtle changes in Siemens HDL reagent that would not affect the predicate assay but would affect the p-protocols (eg surfactant concentration, azide concentration).

Thanks all for looking into this. Please let me know if you have other comments. I am attaching Daniel's spreadsheet together with my additional analysis.

Adam

**From:** Daniel Young
**Sent:** Friday, February 21, 2014 6:32 PM
**To:** Nicholas Haase; Adam Rosendorff; Paul Patel; Rose Edmonds; Xinwei Sam Gong; Curtis Schneider; Nishit Doshi
**Subject:** RE: Morning HDL Study Tecan Dilution Results

See plots in the attached. My summary is:

1) p-HDL on fingerstick and Venous are very comparable

2) p-HDL on fingerstick compares very well to predicate on Venous (better for Advia 3 than on Advia 1)

3) p-HDL and predicate method both on Venous show some differences at the high HDL concentrations, but are well correlated (performance is worse on Advia 1)

4) Advia 1 is reading 10% to 15% higher than Advia 3 for all sample types and HDL protocols

5) We do not see a problem of abnormally low HDL results

6) There was one low result for one replicate; this may have been a Tecan related issue since it affected all the lipid assays similarly; Nick is checking into this

Please let me know if you have any comments.

Thanks,

Daniel

**From:** Nicholas Haase
**Sent:** Friday, February 21, 2014 5:03 PM
**To:** Daniel Young; Adam Rosendorff; Paul Patel; Rose Edmonds; Xinwei Sam Gong; Curtis Schneider; Nishit Doshi
**Subject:** Morning HDL Study Tecan Dilution Results

Everyone,

Confidential

THPFM0002147138

Attached are the tabulated results from the Tecan-diluted Fingerstick and Venous samples from this morning's study, as well as the predicate venous results.

The key is as follows:  P-xxxx = P-protocol; A3-1 = Advia 3 rep 1 (and so on).

The last three subjects were not fasting, hence the coloration of their patient numbers.  Only one sample returned an HDL result below 35 mg/dL, and that one was low for all analytes.  This is due to over-dilution, from either the Tecan picking up gel or hitting some plasma on the sidewall of the pCTN.

Let me know if anyone would like calculations and/or plots of anything in particular.

Overall, we did not see any low HDL samples, omitting the aforementioned exception.  Advia 3 tends to report lower values than Advia 1, but there are different reagent lots on the instruments.

Let me know if anything else is needed.  We are currently doing manual sample dilutions.


Regards,


Nick H.

Confidential

THPFM0002147139

**ER-13152**

**To:**    Erika Cheung[echeung@theranos.com]; Mark Pandori[mpandori@theranos.com]; Adam
Rosendorff[arosendorff@theranos.com]
**Cc:**    Aurelie Souppe[asouppe@theranos.com]; Jamie Liu[jliu@theranos.com]; Romina Riener[rriener@theranos.com]
**From:**    Langly Gee
**Sent:**    Fri 3/28/2014 6:37:22 PM
**Importance:**    Normal
**Subject:**    RE: Failed QC
**Received:**    Fri 3/28/2014 6:37:24 PM

Erika:

Both

---

**From:** Erika Cheung
**Sent:** Friday, March 28, 2014 11:37 AM
**To:** Mark Pandori; Langly Gee; Adam Rosendorff
**Cc:** Aurelie Souppe; Jamie Liu; Romina Riener
**Subject:** RE: Failed QC

Is this for CAPSYS or Hand-filled cartridges or both?

Thanks,

Erika

---

**From:** Mark Pandori
**Sent:** Friday, March 28, 2014 11:09 AM
**To:** Langly Gee; Adam Rosendorff
**Cc:** Aurelie Souppe; Erika Cheung; Jamie Liu; Romina Riener
**Subject:** RE: Failed QC

Langly,

Exactly what I wanted. Thank you.

However now, I am tempted to ask for how many of these failures resulted in re-calibration?

From that, we could calculate how much time it takes to run the average Edison patient, with all failures inclusive to that calculation. Is this data readily obtainable?

I will include this in my Issues Reports.

Mark Pandori

---

**From:** Langly Gee
**Sent:** Friday, March 28, 2014 10:25 AM
**To:** Mark Pandori; Adam Rosendorff
**Cc:** Aurelie Souppe; Erika Cheung; Jamie Liu; Romina Riener
**Subject:** Failed QC

Mark:

The other day you asked for a number of failed QC ELISA runs. For March, 26% runs failed.

Confidential                THPFM0001362138

**March ELISA QC FAILURES**

| Assay | Failed Low Level | Failed High Level | Total Runs | % Failures |
|---|---|---|---|---|
| Vitamin D | 11 | 3 | 77 | 18.2 |
| TT4 | 6 | 5 | 47 | 23.4 |
| TT3 | 11 | 9 | 39 | 51.3 |
| fT4 | 4 | 4 | 40 | 20.0 |
| tPSA | 4 | 11 | 51 | 29.4 |
| TSH | 0 | 2 | 43 | 4.7 |
| TST | 4 | 10 | 31 | 45.2 |
| Total | 40 | 44 | 328 | 25.6 |

Confidential

THPFM0001362139

**ER-13154**

**To:** Crawford, Kermit[kermit.crawford@walgreens.com]; Gourlay, Alex[alex.gourlay@walgreens.com]; Fluegel, Bradley[Bradley.Fluegel@walgreens.com]; Dubinsky, Jason[jason.dubinsky@walgreens.com]; Wagner, Mark[mark.wagner@walgreens.com]; Brad Wasson[S.B.Wasson@walgreens.com]; Sunny Balwani[sbalwani@theranos.com]; Van Loveren, Sylvia[sylvia.vanloveren@walgreens.com]; Mills, Troy[troy.mills@walgreens.com]; Barber, David[david.barber@walgreens.com]; Venegas, Sal[sal.venegas@walgreens.com]; Pellegrini, Adam[adam.pellegrini@walgreens.com]; Sesto, Matthew[matt.sesto@walgreens.com]; Tisdell, Lorinda[lorinda.tisdell@walgreens.com]; Wold, Heidi[heidi.wold@walgreens.com]; Reutzel, Erich[erich.reutzel@walgreens.com]; Reilly, Matthew[matthew.reilly@walgreens.com]; Engstrom, Tim[tim.engstrom@walgreens.com]; Gormanous, Jeffrey[jeff.gormanous@walgreens.com]; Couffer, Shannon[shannon.couffer@walgreens.com]; Kunstman, Greg[greg.kunstman@walgreens.com]; Jhaveri, Nimesh[nimesh.jhaveri@walgreens.com]; Christian Holmes[cholmes@theranos.com]; Weeast, Jim[james.weeast@walgreens.com]; Miller, David[dave.miller@walgreens.com]; Jagannathan, Priya[priya.jagannathan@walgreens.com]; Savage, Lawanda[lawanda.henton@walgreens.com]; Kozlowski, Casey[casey.kozlowski@walgreens.com]; Raju, Mahesh[mahesh.raju@walgreens.com]; Shovlin Mooney, Ashley[ashley.shovlin@walgreens.com]; Montague, Beth[beth.montague@walgreens.com]; Nelson, Raeann[raeann.nelson@walgreens.com]; Heald, Susan[susan.heald@walgreens.com]; Miquelon, Wade[wade.miquelon@walgreens.com]; Elizabeth Holmes[eholmes@theranos.com]; Chini, Linda[linda.chini@walgreens.com]; Tompkins, Robert[robert.tompkins@walgreens.com]; Koziel, Jeff[jeffrey.koziel@walgreens.com]; Sesto, Matthew[matt.sesto@walgreens.com]; Leiter, Nicole[nicole.leiter@walgreens.com]; Rosan, Jay[jay.rosan@walgreens.com]; Reilly, Matthew[matthew.reilly@walgreens.com]; Cantlin, John[jack.cantlin@walgreens.com]; Lee, John[john.g.lee@walgreens.com]; Gourlay, Nicola[nicola.gourlay@walgreens.com]; Doyle, Daniel[dan.doyle@walgreens.com]; Kunicki, Jeremy[jeremy.kunicki@walgreens.com]
**From:** Jhaveri, Nimesh
**Sent:** Tue 4/15/2014 6:17:15 PM
**Importance:** High
**Subject:** Diagnostic Testing - Live in 10 stores in Phoenix!!
**Received:** Tue 4/15/2014 6:15:48 PM

Good Afternoon Folks,

In September 2013, Theranos and Walgreens announced a long-term partnership to bring Theranos' new lab testing service to Walgreens stores nationwide. The first Theranos Wellness Center opened that month at a Walgreens in Palo Alto, Calif., where Theranos is headquartered. We then opened two additional locations in the Phoenix metropolitan area on November 2013.

Today we celebrate the expansion of Theranos Wellness Centers in eight additional stores in the Phoenix metropolitan area. This marks the beginning of our expansion of Theranos Wellness Centers in Arizona. Our partner, Theranos, have supplied us with phlebotomists to support Walgreens technicians as they perform lab services. The success of this launch is attributed to the powerful collaboration between the Walgreens and Theranos teams – at corporate, stores, districts and markets for both organizations.

Theranos Wellness Centers are now located at the following Phoenix Walgreens stores, with plans to add additional locations on an ongoing basis:

- 3402 N CENTRAL AVE, PHOENIX
- 6501 E GREENWAY PKWY, SCOTTSDALE
- 5101 W INDIAN SCHOOL RD, PHOENIX *NEW LOCATION*
- 2000 S MILL AVE, TEMPE *NEW LOCATION*
- 3605 E THOMAS RD, PHOENIX *NEW LOCATION*
- 3960 E CHANDLER BLVD, PHOENIX *NEW LOCATION*
- 3420 N SCOTTSDALE RD, SCOTTSDALE *NEW LOCATION*
- 1130 W SOUTHERN AVE, MESA *NEW LOCATION*
- 2415 E UNION HILLS DR, PHOENIX *NEW LOCATION*
- 7011 E SHEA BLVD, SCOTTSDALE *NEW LOCATION*
- 3450 W DUNLAP AVE, PHOENIX *NEW LOCATION*

Here is a link to the press release that went out previously that speaks to the strength of the partnership we have together and how with Theranos we are on the front lines of truly revolutionizing healthcare: http://news.walgreens.com/article_display.cfm?article_id=5820

**What you can say:**

- 10 Theranos Wellness Centers are now open in Phoenix metropolitan area.
- Our Palo Alto, California location continues to service patients.

**What you can NOT say:**

Confidential

Trial Exh. 1673 Page 0001

THPFM0000797107

- Locations of any additional locations in Phoenix
- Future market expansions plans outside our Northern California or Phoenix market. Only mention our relationship and that the companies plan to offer the service at Walgreens locations nationwide.

We look forward to expanding in the Phoenix market over next few months and plan to expand in additional markets in the future.

Thank you all for your help and support.

Be Well,
Nimesh

Nimesh S. Jhaveri, R.Ph., MBA
Divisional Vice-President - Pharmacy Transformation
Health Innovations Group | Pharmacy Health & Wellness

Walgreen Co.
200 Wilmot Road MS #2102 | Deerfield, IL 60015
nimesh.jhaveri@walgreens.com
  Phone: (847) 315-5317
  Fax: (847) 315-3699
  Mobile:

*Every day I help people get, stay and live well.*

This message, including attachments, is the property of Walgreen Co. or its affiliates. It is intended solely for the individuals or entities to which it is addressed. This message may contain information that is proprietary, confidential and subject to attorney-client privilege. If you are not the intended recipient, please immediately notify the sender and delete this message from your system. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is strictly prohibited.

Theranos Confidential

**Projected Statement of Income**

*900 locations* (handwritten)

| | Period Ending | 12/31/2014 | 12/31/2015 | |
|---|---|---|---|---|
| **Revenue (US COMMERCIAL ONLY)** | | | | |
| Lab Services from US Retail Pharmacies | | $ 42,000,000 | $ 470,000,000 | 47% |
| Lab Services Revenue from Physicians Offices | | $ 11,000,000 | $ ~~161,000,000~~ 160,000 | |
| Lab Services Revenue from Hospitals | | $ 47,000,000 | $ 290,000,000 | |
| OnSite Services Revenue from Hospitals | | $ – | $ ~~11,000,000~~ 10,000 | |
| ? — Pharmaceuticals Services | | $ 40,000,000 | $ ~~62,000,000~~ 60,000 | |
| ? — DOD | | TBD | TBD | |
| | | | | *Order of magnitude! thru manufacturing thru house sides?* (handwritten) |
| **Total Revenue** | | **$ 140,000,000** | **$ 990,000,000** | |
| Cost of Revenue: | | | | |
| Retail Pharmacy | | $ (16,000,000) | $ (188,000,000) | 208K/location (handwritten) |
| Physicians Office (courier) | | $ (4,000,000) | $ (64,000,000) | |
| Hospital (courier) | | $ (14,000,000) | $ (87,000,000) | |
| Hospital (onsite) | | $ – | $ (3,000,000) | |
| Pharmaceutical Services | | $ (5,000,000) | $ (12,000,000) | |
| DOD | | TBD | TBD | |
| Total Cost of Revenue | | **$ (39,000,000)** | **$ (354,000,000)** | |
| **Gross Profit** | 72% | $ 101,000,000 | $ 636,000,000 | 64.2% |
| **Operating Expenses** | | | | |
| Research & Development (including software apps & support) | | $ (57,000,000) | $ (127,000,000) | 12.8% |
| CLIA Lab Operations Fixed overhead (validation, software, facilities,..) | | $ (10,000,000) | $ (76,000,000) | |
| Data Center | | $ (3,000,000) | $ (25,000,000) | |
| Sales, Marketing & Branding | | $ (11,000,000) | $ (76,000,000) | |
| G&A | | $ (21,000,000) | $ (95,000,000) | 40.3% |
| Total Operating Expenses | | **$ (102,000,000)** | **$ (399,000,000)** | |
| **EBITDA** | | **$ (1,000,000)** | **$ 237,000,000** | 23% |
| **Depreciation & Taxes** | | | | |
| Depreciation of Capital Assets | | $ (2,000,000) | $ (7,000,000) | |
| Taxes | | $ – | TBD | |
| **Net Income** | | **$ (3,000,000)** | **$ 230,000,000** | |

Theranos Confidential

ER-13157

Trial Exh. 1853 Page 0001

US-REPORTS-0017479

RDV012671

EXHIBIT NO. 12
Peterson
3.4.19
A. Wright

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 28 of 300

Theranos Confidential

**THERANOS, INC. AND SUBSIDIARY**
Period ended July 14, 2014

| | | July 14, 2014 $'000 |
|---|---|---|
| **Current assets** | | |
| Cash & investment | $ | 162,713 |
| Accounts Receivable | | 25,000 |
| Inventory | | 5,853 |
| Other current assets | | 2,950 |
| **Total current assets** | | 196,516 |
| | | |
| Note Receiable | | 26,969 |
| Plant & Equipment | | 21,534 |
| | | |
| **Total Assets** | $ | 245,019 |
| | | |
| **Current liabilities** | | |
| Accounts Payable | $ | 4,627 |
| Other current liabilities | | 4,188 |
| **Total current liabilities** | | 8,815 |
| | | |
| Deferred revenue & customers' deposits | | 168,808 |
| Repurchaseable shares | | 11,460 |
| Other long term liabilities | | 4,183 |
| **Total liabilities** | | 193,266 |
| | | |
| Common stock | | 25,823 |
| Preferred stock | | 331,717 |
| Accumulated deficit | | (305,787) |
| **Total stockholder' equity** | | 51,753 |
| | | |
| **Total liabilities and stockholders' equity** | $ | 245,019 |

*No Debt* (handwritten)

*Which Pharma?* (handwritten)

Theranos Confidential

Message

| | |
|---|---|
| **From**: | Haworth, Patty [patty.haworth@walgreens.com] |
| **Sent**: | 8/11/2014 7:58:31 PM |
| **To**: | Raju, Mahesh [mahesh.raju@walgreens.com]; Joe Ahdoot [jahdoot@theranos.com]; Christian Holmes [cholmes@theranos.com]; Sizemore, Brian [brian.sizemore@walgreens.com]; Kimberly Alfonso [kalfonso@theranos.com]; Sunny Balwani [sbalwani@theranos.com]; Sesto, Matthew [matt.sesto@walgreens.com]; Nicholas Menchel [nmenchel@theranos.com]; Kozlowski, Casey [casey.kozlowski@walgreens.com]; Tracy Masson [tmasson@theranos.com]; Max Fosque [mfosque@theranos.com]; Ryan Karpel [rkarpel@theranos.com]; 'Mike Lewis [mike.lewis@slalom.com]; Jhaveri, Nimesh [nimesh.jhaveri@walgreens.com]; Samoila, Ashley [ashley.samoila@walgreens.com]; Carroll, Patrick [patrick.carroll@walgreens.com] |
| **CC**: | Makris, Evie [Evie.Makris@walgreens.com]; Look, John [john.look@walgreens.com]; Montague, Beth [beth.montague@walgreens.com] |
| **Subject**: | REVISED 8/6 Walgreens-Theranos Partnership Meeting Minutes & Slide Deck |
| **Attachments**: | Partnership Meeting Minutes 08-06-2014.pdf; Partnership Meeting Minutes 08-06-2014.docx; Theranos Walgreens Partnership Meeting August 2014 final.pptx |

Please see attached for revised slide deck including SMART goals that were discussed during the meeting.

**From:** Haworth, Patty
**Sent:** Monday, August 11, 2014 11:05 AM
**To:** Raju, Mahesh; Joe Ahdoot (JAhdoot@theranos.com); Christian Holmes (cholmes@theranos.com); Sizemore, Brian; Kimberly Alfonso (kalfonso@theranos.com); Sunny Balwani (sbalwani@theranos.com); Sesto, Matt (matt.sesto@walgreens.com); Nick Menchel (nmenchel@theranos.com); Casey Kozlowski (casey.kozlowski@walgreens.com); Tracy Masson; Max Fosque (mfosque@theranos.com); 'Ryan Karpel (rkarpel@theranos.com)'; 'Mike Lewis (mike.lewis@slalom.com)'; Jhaveri, Nimesh; Ashley Samoila (ashley.shovlin@walgreens.com); Carroll, Patrick
**Subject:** 8/6 Walgreens-Theranos Partnership Meeting Minutes & Slide Deck

All,

Please see attached for 8/6 Walgreens-Theranos Partnership Meeting Minutes and slide deck. Let me know if you have any additions or corrections.

Please block your calendar for our next meeting in Deerfield on October 2.

**Be well,**

**Patty**

**Patty Haworth, MBA, PMP**

Program Manager

Pharmacy, Health and Wellness PMO

Walgreen Co.

Confidential                                                                                                          THPFM0001173385

200 Wilmot Rd., MS# 2102

Deerfield, IL 60015

p

m



Every day I help people **get, stay and live well.**

This message, including attachments, is the property of Walgreen Co. or its affiliates. It is intended solely for the individuals or entities to which it is addressed. This message may contain information that is proprietary, confidential and subject to attorney-client privilege. If you are not the intended recipient, please immediately notify the sender and delete this message from your system. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is strictly prohibited.

Confidential

THPFM0001173386

**ER-13160**



Every day I help people **get, stay and live well.**

This message, including attachments, is the property of Walgreen Co. or its affiliates. It is intended solely for the individuals or entities to which it is addressed. This message may contain information that is proprietary, confidential and subject to attorney-client privilege. If you are not the intended recipient, please immediately notify the sender and delete this message from your system. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is strictly prohibited.

Confidential

THPFM0001173387

# Partnership Meeting Minutes

*August 6 | 9AM-1PM | Walgreens District Office - 5330 E. Washington St., Ste. D-105, Phoenix, AZ 85034*

| | | |
|---|---|---|
| Meeting called by | Theranos/WAG Leadership | **Attendees:** Tracy Masson, Christian Holmes, Kimberly Alfonso, Sunny Balwani, Nimesh Jhaveri, Casey Kozlowski, Nick Menchel, Joe Ahdoot, Max Fosque, Ashley Samoila, Matt Sesto, Brian Sizemore, Ryan Karpel, Mahesh Raju, Mike Lewis, Pat Carroll, Patty Haworth |
| Type of meeting | Mid-wave Partnership Debrief | |

## Agenda Items

| Topic | Presenter | Time allotted |
|---|---|---|
| ☐ Kick-off/Introductions | Sunny/Nimesh | 9-9:10 am |
| ☐ Current Status | Sunny/Nimesh | 9:10-9:30 am |
| ☐ Discuss Anchored Values | Mike Lewis | 9:30-10:00 am |
| ☐ Discuss Program Measures of Success (SMART Goals) | Nimesh | 10:00-11:00 am |
| ☐ Plan for FY15 | Casey | 11:00-11:30 am |
| ☐ California Plans | Sunny/Nimesh | 11:30-11:45 am |
| ☐ STD Testing - review the new structure of quality reporting from the HealthCare Clinic | Pat Carroll | 11:45 am-12:00 pm |
| ☐ Lunch | All | 12:00-1:00 pm |

## Meeting Minutes

**Kickoff:**
- Sunny kicked off the meeting
- Momentum is building and patient uptick is occurring
- Met 3 times in a row (5/28, 7/10, 8/7); next meeting is 10/2 in Deerfield;
- Nim commented on a big day for Walgreens to focus us even harder for what is next to focus on initiatives to drive value to Walgreens, our partners, and US health system
- The project team is in the process of putting together a clearly articulated playbook, including people preparedness, marketing, operations, launch plans, etc.
- Success has been through sheer muscle; we need to make it a seamless operation; if everyone went on vacation at the same time, we need to make sure operations are running seamlessly;

*Page 1*

Confidential

THPFM0001173388

- Matt echoed Nim and mentioned the need for cost control; collaboration has improved significantly; we can be brutally honest with each other internally and have a united front; need to sell the Theranos/Walgreens value prop;

**Current Status:**
1. 30 stores currently live (AZ 29; CA 1)
2. wave 4 launch dates – Aug 19 and Aug 26 – stores TBD
3. total visits in July – 2637
4. 27 out of 30 stores on DSL; Wave 4 wiring complete
5. TIFT team performing 65% of oversight visits
6. mostly improved patient experience
7. median check in time = 5 min – decr 1 min
8. median wait time = 7 min – incr 1 min
9. median perform time = 5 min – decr 2 min
10. total visit time = 17 min – decr 2 min

- Medicare/Medicaid now considers Theranos a large lab with 40 locations
- Theranos will send computer next week for reporting portal
- Passed 50% threshold of services provided to customers without using coupons
- Theranos Experience Survey Summary results are off the charts; Nim asked for month to month trending reports; these are currently not available on the reporting dashboard; the data is collected real time and can be made available to Walgreens; Matt requested exception reporting, including where the extremes are; need to understand if the same techs are performing the service; Sunny offered raw data dump; Walgreens would love to have this info to slice and dice;
- Baseline info provided where customers typically get their prescriptions filled; this is patient acquisition info; need to identify synergies; per Nim, important to get segment of the 47% that don't use Walgreens to fill scripts;
- Theranos is going to start collecting how many lab visits that patients get per year;
- Shared several stories re: positive feedback from customers; moving patient experience from negative to positive; 30-40 positive comments per day; these comments can be tied back to the technician based on time of day;
- Tracy shared shortest visit times; kudos to getting directions to the field on how to handle flow of patients during flu season; will continue to monitor wait time; can we handle 25 patients per day during flu season? We need to plan for that;
- Nim and Suzanne Hansen are meeting with legal team on Wednesday to use clinic rooms agnostically for any service; will send out an update after the meeting;
- Longest visit times may be due to new store rollout; each store needs to learn how to manage their own patient flow; per Sunny, look at wait and perform time together;
- Nim experienced both a venous draw and finger stick and it went seamlessly, but waited for 16 minutes due to space allocation; need to get a handle on space allocation; Nim commented that patients abandon less services if health guide is in that location; Sunny looks forward to the day where lab services will be included in queue management; this is included in Phase 3 and needs to be expedited;
- Per Joe, out of store marketing will launch next week, how soon do we anticipate that will impact patient volume in stores; Per Casey, need to have lab order, but it will be top of mind the next time they get a lab order;
- Per Matt, do we need to re-visit getting the bot out of the room; Tracy has been following up to make sure that the door is open, not closed; Casey has not seen any doors closed, but every time they are sitting in the room; guidelines for bots are to walk around for 10 minutes out of every hour with tear sheets; Ops Managers will be in the stores constantly and will build relationships within the stores;

Page 2

Confidential

THPFM0001173389

- Per Sunny, post 40 store launch would like to have Theranos to be completely out of the stores; need to plan for this;
- Per Casey; phlebotomist/health guide position was posted on 7/31 for store #6241; all techs will be trained; store has a budget of 40 hours for techs; backfill with bots if required; TIFT team will prioritize off hours oversight training; low volume store = 100 scripts; person should be there start to end of pharmacy hours (9 am-5 pm); Tuesday – Saturday; trained tech to cover on Monday; hope to get learnings from this store for future plans;
- Opportunities:
    1. scalable strategy for check in (how to do check in at perform room or multiple terminals for check in at Pharmacy; nuance is that they will have to pay at the counter; mobile app could collect credit card payments; cash payments would go to Pharmacy; results could be held if payment doesn't happen; per Mahesh, 5 stores will pilot additional check in terminals; equipment will be tight in those spaces;)
    2. store by store – start with stores with 10+ patients per day
    3. must start in August - will be tested during flu season
    4. tight integration between HCC and Theranos check-in (per Mahesh, take a look at HCC check in process for additional integration opportunities; per Nick, 3464 and 3789 have HCC integration and will be turned on for remaining 20 stores asap;)
    5. call center knowledge of Theranos and communication to patients (combined FAQ document sent to Call Center folks and provided key taglines)
    6. assurance that 40% of stores will be dedicated space (contractual agreement; Sunny will discuss with Nim; per Casey, Well Experience has better labor and better outcomes, so recommend following Well Experience in the future; this will be a shared space, not dedicated; if we have 25 patients per day, the room will be in use all day; need to think ahead for 40 patients; Casey requested to take offline to solve considering real estate constraints we have today;)
    7. improved staffing in all stores – surprises with Theranos tech shortages need to be minimized
    8. need improvement in attentiveness of some stores
    9. cleaning
    10. attention to process – including opening and closing procedures
    11. managing flow of patients
- Per Matt Sesto, need to follow up on which stores have medical concierge.  May need to educate 1-2 people on directing patients to the right place.
- Per Matt Sesto, take Playbook we have with instructions for HCC and replace with Theranos to improve store walks.
- Per Casey, consider reducing hours on weekends where we are not seeing patients.  Per Sunny, could inch back 1 hour.  Would like to have learnings September –December before making changes.
- Per Tracy, working to get info to stores on when refrigerator logging is not taking place.  Some stores are stepping up and able to monitor close process.
- Per Mike, need to reinforce people readiness/ownership and accountability.  Working to establish store champions.
- Ops Managers will be people managers for bots and relationship managers for stores.
- Per Sunny, working to educate that we are operating a lab operation <u>and</u> a store operation.
- Per Ashley, CMS surveyors may arrive at any moment and could impose sanctions if applicable.
- Per Matt, there are discussions on Walgreens side re: shared vs. dedicated space.  Matt was not aware of 40% contractual agreement re: dedicated space.
- Per Tracy, there are discussions on Theranos side re: how supplies are set up.
- Per Mahesh, Walgreens owns the rooms and are on the hook to make sure it is clean.
- Per Joe, need to have a turnkey solution to maintain what has been launched.
- Certification Maintenance proposal:

Page 3

Confidential

THPFM0001173390

1. Criteria for removal of Certification
   - <80% finger stick proficiency (Bi-Monthly)
   - Acting against established procedures (As reported)
2. What happens next?
   - Technician becomes Check-In ONLY
   - Lead time to remove technician from live patient perform workflow (?)
3. Reinstate Certification
   - Assess trainee using original oversight standards
   - At least 2 consecutive successful end-to-end visits
4. Idle Technicians
   - Technicians who perform <5 finger sticks in a given timeframe are required to complete practice finger sticks

- Tracy discussed person who went on maternity leave that had to go through new hire training again. Tracy struggles if the person is shaking while they are performing the service.
- Nim asked how new employees are trained. Ongoing training schedules are now available. Per Mike, ideally 2-3 months after hired would be a good time to send them to Theranos training. Lab testing is part of the job description nation-wide. Training will be batched based on need and periodic scheduling. Per Casey, TIFT team will be needed. Leads can assist with training. Store champion can provide fingers for practice. Per Nim, need clearly articulate process flows for new hires, rehires, etc. Per Brian, need consistency across the company on how certification maintenance will be handled upfront.
- **Action Item:** work with Averill Gordon and HR Employee Relations to create a step approach process similar to how we handle prescription errors. Per Casey, when an event occurs, there needs to be an intervention. The first time an event occurs, the intervention may be a conversation. The second time an event occurs, appropriate steps will need to be taken.
- **Action Item:** need to work with Priya Jagannathan to outline process flow for how to handle employees that cannot participate in Theranos services and may need to be transferred.
- **Action Item:** per Nim, add Priya Jagannathan on the phone during Partnership meetings.

**Program Measures of Success (SMART Goals):**
- Per Brian, how do we make the most of patients who are walking through our door? Casey cautions against providing scripts to employees because it comes across as being not genuine. Per Nim, scripting is being done to cross sell patients on other services.
- All of the patient experience scores would be shared with stores via dashboard green/yellow/red model.
- We can do Survey Monkey at store level directly to technicians. Matt Sesto is willing to sponsor. Guidance is to keep it brief.
- Per Matt, would like to collaborate with Theranos re: Mercy Family Care sales discussions.

**STD Testing**
- Realigned with clinicians on HCC re: quality of testing;
  - Pat will lead small group including Monica Kohler and Kristen Hall to review any clinical issues.
  - Pat needs a point person from Theranos to provide expedited response to issues. Daniel Young was assigned by Sunny.
  - Angela Bankston and Dawn Benz have stepped down from this process.
  - Sunny would like to provide educational material to nurses in the field.
  - Call scheduled today to reengage the hearts and minds of HCC employees.
  - Results will always be different between two labs.
  - Need to address urban myth re: tests done on small number (20) of patients, not thousands of assays.

Page 4

- Proficiency testing will be done through CAP.
- Theranos is eager to detail NPs one-on-one.
- HCC is rolling out STI protocol based evaluation testing nation-wide and will use Theranos panel in Phoenix.
  - There was a high incidence of male UTIs that were being turned away that were actually STDs. Turning away 1 patient per day. Would like to see 1 patient bump per day. Need to make HCC's EBIT accretive.
  - Results would need to be provided faster than LabCorp and/or Quest.
  - Theranos can turnaround samples within 1hour after it reaches the lab.
  - Most tests would be done via urine collection.
  - Nurses are already trained on venous draws and could use pediatric tubes with butterfly needles.
  - We are well down the road with protocol. Johns Hopkins has already sprinkled the magic dust on the protocol.
  - Nim recommended that this also be offered to Johns Hopkins.
  - Dr. Connell's vision is $50 visit with NP and $35 test with Theranos. This gets around concerns with confidentiality and cost, for example the 20-21 year old will not go on their parent's insurance.
  - Per Sunny, dropping price of Chlamydia/Gonorrhea to $30 next week.
  - Would like to do for a month in Phoenix and then rollout nationally.
  - There could be a script involved. Holy grail.
  - HCC could be ready in September. Theranos is ready now. They are launching sales to physicians next week.
  - Dr. Connell would like an HCC to be within 2-3 miles of Arizona State University. This is an opportunity for us.
  - #11610 on Mill is the current store that is located close to ASU.
  - Per Ashley, could zpack be moved to Prescription Savings Club to make it more affordable?
  - Kim suggests adding a store near ASU at McClintock.
  - Per Matt, need to take offline Tucson value prop due to UofA out of network.
  - Per Nim, target 10/1 to launch Johns Hopkins. Per Sunny, could use Vacutainer on 9/1 and move to finger stick on 11/1.
  - IV drug users need the full STI panel. Protocol would have questions that would lead patients to full STD panel, if applicable.
  - Mayor Stanton is very passionate re: HIV. This is a press opportunity.
  - Next Steps:
    1. Pat will keep us updated re: protocol.
    2. Pat needs to follow up with Suzanne Hansen re: store 11610.
    3. Nim will follow up with Harry Leider re: Johns Hopkins opportunity.
    4. Patty to notify Marketing team that content needs to be updated. Include this in August launch.
    5. Pat will send protocol to Sunny for review.
    6. Theranos to simplify EMR.

**Plan for FY15**

- Next market is Northern CA (5 stores initially, then expand for a total of 40)
- Expansion beyond the 5 stores will require Theranos data to obtain store selection
- Next markets:
  - Priority 1 :
    - CA – blue (~90) – toughest regulations
    - AZ (~20)
    - NY, NJ, CT – blue (~90) – toughest audits
    - WY?

Page 5

Confidential

THPFM0001173392

Trial Exh. 1884 Page 0008

- o Priority 2:
  - IL - blue
  - TX - red
  - FL
- o Priority 3:
  - IN
  - NM - blue
  - MS - red
- o Excluded PA
- Plan for FY15 is to follow the Well Experience rollout as much as possible.
  - o Keeps build-out costs low
  - o WE personnel are often a good fit for Theranos services.
- Initial goal for FY15 (Sept-Aug) was 500 stores. Need to redefine this goal.
  - o Nation-wide = 2000-2500 stores and 25-30 MSAs
  - o Assumes launch in parallel markets
  - o Need to figure out "launch in a box" concept
  - o Plan to be in every HCC location

|  | 2015 | 2016 (outside US) | 2017 |
|---|---|---|---|
| Well Experience | 2000 | 2000 | 1500 |
| Theranos | 200 | 800 | 800 |
| STD Program at HCC | 430 existing + 50 new | +150 new | +300 new |

- Next Steps:
  1. Criteria alignment, e.g. clinic, WE, etc.
  2. Get list of 2,000 stores with PHRs
  3. Get list of WE stores within those states
  4. Need to follow up on WY due to 12 stores
  5. Review Field Webinar content
  6. Identify owners for CA leadership kickoff meeting

**Key Anchors Discussion (prioritized order)**
1. Patient Experience (scalable & standardized)
2. Partner Relationship
3. Pharmacy Transformation
- Add clinic leadership to key stakeholders, including Pat Carroll, Suzanne Hansen, and Chief Nurse Practitioner (to be named)
- Theranos, Well Experience, HSRx, and Clinics are to priorities for the company; 3 out of 4 are represented on the Theranos initiative;
- Next Steps:
  1. Conduct Do/Say/Own exercise with Nim & Sunny
  2. Execute Against Change Management Action Planning Exercise Results
  3. Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
  4. Socialize FY15 Change Strategy

**Future meeting schedule:**
- 10/2, 1 - 5 pm, Deerfield, IL;
- 10/24, 8:30 am - 12:30 pm, Phoenix, AZ;
- 11/18, 8 am – 12 pm, Palo Alto, CA;
- 12/16, 8 am – 12 pm, Palo Alto, CA;

Confidential

THPFM0001173393

Trial Exh. 1884 Page 0009

**ER-13167**

# Partnership Meeting Minutes

*August 6 | 9AM-1PM | Walgreens District Office - 5330 E. Washington St., Ste. D-105, Phoenix, AZ 85034*

| Meeting called by | Theranos/WAG Leadership | **Attendees:** Tracy Masson, Christian Holmes, Kimberly Alfonso, Sunny Balwani, Nimesh Jhaveri, Casey Kozlowski, Nick Menchel, Joe Ahdoot, Max Fosque, Ashley Samoila, Matt Sesto, Brian Sizemore, Ryan Karpel, Mahesh Raju, Mike Lewis, Pat Carroll, Patty Haworth |
|---|---|---|
| Type of meeting | Mid-wave Partnership Debrief | |

## Agenda Items

| Topic | | Presenter | Time allotted |
|---|---|---|---|
| ☐ | Kick-off/Introductions | Sunny/Nimesh | 9-9:10 am |
| ☐ | Current Status | Sunny/Nimesh | 9:10-9:30 am |
| ☐ | Discuss Anchored Values | Mike Lewis | 9:30-10:00 am |
| ☐ | Discuss Program Measures of Success (SMART Goals) | Nimesh | 10:00-11:00 am |
| ☐ | Plan for FY15 | Casey | 11:00-11:30 am |
| ☐ | California Plans | Sunny/Nimesh | 11:30-11:45 am |
| ☐ | STD Testing - review the new structure of quality reporting from the HealthCare Clinic | Pat Carroll | 11:45 am-12:00 pm |
| ☐ | Lunch | All | 12:00-1:00 pm |

## Meeting Minutes

**Kickoff:**
- Sunny kicked off the meeting
- Momentum is building and patient uptick is occurring
- Met 3 times in a row (5/28, 7/10, 8/7); next meeting is 10/2 in Deerfield;
- Nim commented on a big day for Walgreens to focus us even harder for what is next to focus on initiatives to drive value to Walgreens, our partners, and US health system
- The project team is in the process of putting together a clearly articulated playbook, including people preparedness, marketing, operations, launch plans, etc.
- Success has been through sheer muscle; we need to make it a seamless operation; if everyone went on vacation at the same time, we need to make sure operations are running seamlessly;
- Matt echoed Nim and mentioned the need for cost control; collaboration has improved significantly; we can be brutally honest with each other internally and have a united front; need to sell the Theranos/Walgreens value prop;

Page [ PAGE  \* MERGEFORMAT ]

Confidential

THPFM0001173394

**Current Status:**
1. 30 stores currently live (AZ 29; CA 1)
2. wave 4 launch dates – Aug 19 and Aug 26 – stores TBD
3. total visits in July – 2637
4. 27 out of 30 stores on DSL; Wave 4 wiring complete
5. TIFT team performing 65% of oversight visits
6. mostly improved patient experience
7. median check in time = 5 min – decr 1 min
8. median wait time = 7 min – incr 1 min
9. median perform time = 5 min – decr 2 min
10. total visit time = 17 min – decr 2 min

- Medicare/Medicaid now considers Theranos a large lab with 40 locations
- Theranos will send computer next week for reporting portal
- Passed 50% threshold of services provided to customers without using coupons
- Theranos Experience Survey Summary results are off the charts; Nim asked for month to month trending reports; these are currently not available on the reporting dashboard; the data is collected real time and can be made available to Walgreens; Matt requested exception reporting, including where the extremes are; need to understand if the same techs are performing the service; Sunny offered raw data dump; Walgreens would love to have this info to slice and dice;
- Baseline info provided where customers typically get their prescriptions filled; this is patient acquisition info; need to identify synergies; per Nim, important to get segment of the 47% that don't use Walgreens to fill scripts;
- Theranos is going to start collecting how many lab visits that patients get per year;
- Shared several stories re: positive feedback from customers; moving patient experience from negative to positive; 30-40 positive comments per day; these comments can be tied back to the technician based on time of day;
- Tracy shared shortest visit times; kudos to getting directions to the field on how to handle flow of patients during flu season; will continue to monitor wait time; can we handle 25 patients per day during flu season? We need to plan for that;
- Nim and Suzanne Hansen are meeting with legal team on Wednesday to use clinic rooms agnostically for any service; will send out an update after the meeting;
- Longest visit times may be due to new store rollout; each store needs to learn how to manage their own patient flow; per Sunny, look at wait and perform time together;
- Nim experienced both a venous draw and finger stick and it went seamlessly, but waited for 16 minutes due to space allocation; need to get a handle on space allocation; Nim commented that patients abandon less services if health guide is in that location; Sunny looks forward to the day where lab services will be included in queue management; this is included in Phase 3 and needs to be expedited;
- Per Joe, out of store marketing will launch next week, how soon do we anticipate that will impact patient volume in stores; Per Casey, need to have lab order, but it will be top of mind the next time they get a lab order;
- Per Matt, do we need to re-visit getting the bot out of the room; Tracy has been following up to make sure that the door is open, not closed; Casey has not seen any doors closed, but every time they are sitting in the room; guidelines for bots are to walk around for 10 minutes out of every hour with tear sheets; Ops Managers will be in the stores constantly and will build relationships within the stores;
- Per Sunny, post 40 store launch would like to have Theranos to be completely out of the stores; need to plan for this;
- Per Casey; phlebotomist/health guide position was posted on 7/31 for store #6241; all techs will be trained; store has a budget of 40 hours for techs; backfill with bots if required; TIFT team will prioritize off hours

Confidential

Trial Exh. 1884 Page 0011

THPFM0001173395

ER-13169

oversight training; low volume store = 100 scripts; person should be there start to end of pharmacy hours (9 am-5 pm); Tuesday – Saturday; trained tech to cover on Monday; hope to get learnings from this store for future plans;

- Opportunities:
  1. scalable strategy for check in (how to do check in at perform room or multiple terminals for check in at Pharmacy; nuance is that they will have to pay at the counter; mobile app could collect credit card payments; cash payments would go to Pharmacy; results could be held if payment doesn't happen; per Mahesh, 5 stores will pilot additional check in terminals; equipment will be tight in those spaces;)
  2. store by store – start with stores with 10+ patients per day
  3. must start in August - will be tested during flu season
  4. tight integration between HCC and Theranos check-in (per Mahesh, take a look at HCC check in process for additional integration opportunities; per Nick, 3464 and 3789 have HCC integration and will be turned on for remaining 20 stores asap;)
  5. call center knowledge of Theranos and communication to patients (combined FAQ document sent to Call Center folks and provided key taglines)
  6. assurance that 40% of stores will be dedicated space (contractual agreement; Sunny will discuss with Nim; per Casey, Well Experience has better labor and better outcomes, so recommend following Well Experience in the future; this will be a shared space, not dedicated; if we have 25 patients per day, the room will be in use all day; need to think ahead for 40 patients; Casey requested to take offline to solve considering real estate constraints we have today;)
  7. improved staffing in all stores – surprises with Theranos tech shortages need to be minimized
  8. need improvement in attentiveness of some stores
  9. cleaning
  10. attention to process – including opening and closing procedures
  11. managing flow of patients
- Per Matt Sesto, need to follow up on which stores have medical concierge. May need to educate 1-2 people on directing patients to the right place.
- Per Matt Sesto, take Playbook we have with instructions for HCC and replace with Theranos to improve store walks.
- Per Casey, consider reducing hours on weekends where we are not seeing patients. Per Sunny, could inch back 1 hour. Would like to have learnings September –December before making changes.
- Per Tracy, working to get info to stores on when refrigerator logging is not taking place. Some stores are stepping up and able to monitor close process.
- Per Mike, need to reinforce people readiness/ownership and accountability. Working to establish store champions.
- Ops Managers will be people managers for bots and relationship managers for stores.
- Per Sunny, working to educate that we are operating a lab operation and a store operation.
- Per Ashley, CMS surveyors may arrive at any moment and could impose sanctions if applicable.
- Per Matt, there are discussions on Walgreens side re: shared vs. dedicated space. Matt was not aware of 40% contractual agreement re: dedicated space.
- Per Tracy, there are discussions on Theranos side re: how supplies are set up.
- Per Mahesh, Walgreens owns the rooms and are on the hook to make sure it is clean.
- Per Joe, need to have a turnkey solution to maintain what has been launched.
- Certification Maintenance proposal:
  1. Criteria for removal of Certification
     - <80% finger stick proficiency (Bi-Monthly)
     - Acting against established procedures (As reported)
  2. What happens next?

Page [ PAGE   \* MERGEFORMAT ]

Confidential

- ▪ Technician becomes Check-In ONLY
- ▪ Lead time to remove technician from live patient perform workflow (?)
3. Reinstate Certification
    - ▪ Assess trainee using original oversight standards
    - ▪ At least 2 consecutive successful end-to-end visits
4. Idle Technicians
    - ▪ Technicians who perform <5 finger sticks in a given timeframe are required to complete practice finger sticks

- Tracy discussed person who went on maternity leave that had to go through new hire training again. Tracy struggles if the person is shaking while they are performing the service.
- Nim asked how new employees are trained. Ongoing training schedules are now available. Per Mike, ideally 2-3 months after hired would be a good time to send them to Theranos training. Lab testing is part of the job description nation-wide. Training will be batched based on need and periodic scheduling. Per Casey, TIFT team will be needed. Leads can assist with training. Store champion can provide fingers for practice. Per Nim, need clearly articulate process flows for new hires, rehires, etc. Per Brian, need consistency across the company on how certification maintenance will be handled upfront.
- **Action Item:** work with Averill Gordon and HR Employee Relations to create a step approach process similar to how we handle prescription errors. Per Casey, when an event occurs, there needs to be an intervention. The first time an event occurs, the intervention may be a conversation. The second time an event occurs, appropriate steps will need to be taken.
- **Action Item:** need to work with Priya Jagannathan to outline process flow for how to handle employees that cannot participate in Theranos services and may need to be transferred.
- **Action Item:** per Nim, add Priya Jagannathan on the phone during Partnership meetings.


**Program Measures of Success (SMART Goals):**
- Per Brian, how do we make the most of patients who are walking through our door? Casey cautions against providing scripts to employees because it comes across as being not genuine. Per Nim, scripting is being done to cross sell patients on other services.
- All of the patient experience scores would be shared with stores via dashboard green/yellow/red model.
- We can do Survey Monkey at store level directly to technicians. Matt Sesto is willing to sponsor. Guidance is to keep it brief.
- Per Matt, would like to collaborate with Theranos re: Mercy Family Care sales discussions.


**STD Testing**
- Realigned with clinicians on HCC re: quality of testing;
    - Pat will lead small group including Monica Kohler and Kristen Hall to review any clinical issues.
    - Pat needs a point person from Theranos to provide expedited response to issues. Daniel Young was assigned by Sunny.
    - Angela Bankston and Dawn Benz have stepped down from this process.
    - Sunny would like to provide educational material to nurses in the field.
    - Call scheduled today to reengage the hearts and minds of HCC employees.
    - Results will always be different between two labs.
    - Need to address urban myth re: tests done on small number (20) of patients, not thousands of assays.
    - Proficiency testing will be done through CAP.
    - Theranos is eager to detail NPs one-on-one.
- HCC is rolling out STI protocol based evaluation testing nation-wide and will use Theranos panel in Phoenix.

Confidential                                                                 THPFM0001173397

**Trial Exh. 1884 Page 0013**


**ER-13171**

- There was a high incidence of male UTIs that were being turned away that were actually STDs. Turning away 1 patient per day. Would like to see 1 patient bump per day. Need to make HCC's EBIT accretive.
- Results would need to be provided faster than LabCorp and/or Quest.
- Theranos can turnaround samples within 1hour after it reaches the lab.
- Most tests would be done via urine collection.
- Nurses are already trained on venous draws and could use pediatric tubes with butterfly needles.
- We are well down the road with protocol. Johns Hopkins has already sprinkled the magic dust on the protocol.
- Nim recommended that this also be offered to Johns Hopkins.
- Dr. Connell's vision is $50 visit with NP and $35 test with Theranos. This gets around concerns with confidentiality and cost, for example the 20-21 year old will not go on their parent's insurance.
- Per Sunny, dropping price of Chlamydia/Gonorrhea to $30 next week.
- Would like to do for a month in Phoenix and then rollout nationally.
- There could be a script involved. Holy grail.
- HCC could be ready in September. Theranos is ready now. They are launching sales to physicians next week.
- Dr. Connell would like an HCC to be within 2-3 miles of Arizona State University. This is an opportunity for us.
- #11610 on Mill is the current store that is located close to ASU.
- Per Ashley, could zpack be moved to Prescription Savings Club to make it more affordable?
- Kim suggests adding a store near ASU at McClintock.
- Per Matt, need to take offline Tucson value prop due to UofA out of network.
- Per Nim, target 10/1 to launch Johns Hopkins. Per Sunny, could use Vacutainer on 9/1 and move to finger stick on 11/1.
- IV drug users need the full STI panel. Protocol would have questions that would lead patients to full STD panel, if applicable.
- Mayor Stanton is very passionate re: HIV. This is a press opportunity.
- Next Steps:
    1. Pat will keep us updated re: protocol.
    2. Pat needs to follow up with Suzanne Hansen re: store 11610.
    3. Nim will follow up with Harry Leider re: Johns Hopkins opportunity.
    4. Patty to notify Marketing team that content needs to be updated. Include this in August launch.
    5. Pat will send protocol to Sunny for review.
    6. Theranos to simplify EMR.

**Plan for FY15**

- Next market is Northern CA (5 stores initially, then expand for a total of 40)
- Expansion beyond the 5 stores will require Theranos data to obtain store selection
- Next markets:
    - Priority 1 :
        - CA – blue (~90) – toughest regulations
        - AZ (~20)
        - NY, NJ, CT – blue (~90) – toughest audits
        - WY?
    - Priority 2:
        - IL - blue
        - TX - red

Confidential

THPFM0001173398

Trial Exh. 1884 Page 0014

ER-13172

- ▪ FL
  - o Priority 3:
    - ▪ IN
    - ▪ NM - blue
    - ▪ MS - red
  - o Excluded PA
- Plan for FY15 is to follow the Well Experience rollout as much as possible.
  - o Keeps build-out costs low
  - o WE personnel are often a good fit for Theranos services.
- Initial goal for FY15 (Sept-Aug) was 500 stores. Need to redefine this goal.
  - o Nation-wide = 2000-2500 stores and 25-30 MSAs
  - o Assumes launch in parallel markets
  - o Need to figure out "launch in a box" concept
  - o Plan to be in every HCC location

|  | 2015 | 2016 (outside US) | 2017 |
|---|---|---|---|
| Well Experience | 2000 | 2000 | 1500 |
| Theranos | 200 | 800 | 800 |
| STD Program at HCC | 430 existing + 50 new | +150 new | +300 new |

- Next Steps:
  1. Criteria alignment, e.g. clinic, WE, etc.
  2. Get list of 2,000 stores with PHRs
  3. Get list of WE stores within those states
  4. Need to follow up on WY due to 12 stores
  5. Review Field Webinar content
  6. Identify owners for CA leadership kickoff meeting

**Key Anchors Discussion (prioritized order)**
  1. Patient Experience (scalable & standardized)
  2. Partner Relationship
  3. Pharmacy Transformation
- Add clinic leadership to key stakeholders, including Pat Carroll, Suzanne Hansen, and Chief Nurse Practitioner (to be named)
- Theranos, Well Experience, HSRx, and Clinics are to priorities for the company; 3 out of 4 are represented on the Theranos initiative;
- Next Steps:
  1. Conduct Do/Say/Own exercise with Nim & Sunny
  2. Execute Against Change Management Action Planning Exercise Results
  3. Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
  4. Socialize FY15 Change Strategy

**Future meeting schedule:**
- 10/2, 1 - 5 pm, Deerfield, IL;
- 10/24, 8:30 am - 12:30 pm, Phoenix, AZ;
- 11/18, 8 am – 12 pm, Palo Alto, CA;
- 12/16, 8 am – 12 pm, Palo Alto, CA;

Confidential

THPFM0001173399

Trial Exh. 1884 Page 0015

ER-13173

File Produced in Native Format

Confidential

THPFM0001173400

ER-13175



partnership meeting

08.06.14

this presentation and its contents are theranos property and confidential.

1

# agenda

- kick-off/introductions
  Sunny/Nimesh
- current status
  Sunny/Nimesh
- discuss anchored values                                    Mike Lewis
- discuss program measures of success            Nimesh (SMART goals)
- plan for FY15                                                      Casey
- california plans
  Sunny/Nimesh
- std testing
  Sunny/Pat Carroll

theranos confidential

2



# current status
## *Sunny*

- 30 stores currently live (AZ 29; CA 1)
- wave 4 launch dates – Aug 19 and Aug 26 – stores TBD
- total visits in August – 2637
- 27 out of 30 stores on DSL; Wave 4 wiring complete
- TIFT team performing 65% of oversight visits
- mostly improved patient experience
  - median check in time = 5 min – decr 1 min
  - median wait time = 7 min – incr 1 min
  - median perform time = 5 min – decr 2 min
  - total visit time = 17 min – decr 2 min

ER-13177



# Theranos Experience Survey Summary

*for period July 2 – August 4, 2014*

## Unique Respondents

650

## Average Quality/Experience Scores

| | |
|---|---|
| Overall Experience: | 4.85 stars |
| Check In Process: | 4.61 stars |
| Locating Theranos: | 4.79 stars |
| Facilities: | 4.79 stars |
| Sample Collection Process: | 4.86 stars |
| Skill of Technician: | 4.90 stars |

ER-13178

Theranos Confidential



ER-13179

## Overall Experience



**Average: 4.85 stars**

## Check In Process



**Average: 4.61 stars**

## Locating Theranos



**Average: 4.79 stars**

## Facilities



**Average: 4.79 stars**

Theranos Confidential



## Sample Collection Process



**Average: 4.86 stars**

## Skill of Technician



**Average: 4.90 stars**

ER-13180

Theranos Confidential

*theranos*

# Where do you typically get your prescriptions filled?



- Walgreens
- CVS
- Walmart
- Costco
- Target
- Safeway
- Rite-Aid
- Other

theranos

Theranos Confidential

**ER-13181**

## Based on your recent visit, what is the likelihood that you will return to a Theranos Wellness Center?



- 🟩 Definitely coming back
- 🟦 Likely to return
- 🟨 Not sure if I will return

ER-13182

Theranos Confidential



# Here's what people are saying…

"Absolutely love the new technology Theranos has for blood tests. I will definitely let all my family and friends know about your company."

"Another fabulous experience! I didn't feel any pain, the procedure was so quick, and Tiffany was a delight! Thank you for making the process of giving blood so easy and pleasant."

"Best visit I have ever had. Amazing people they take really amazing care of people."

"For a person who has severe phobia of needles and blood this was a pleasant experience all around."

"This was the easiest lab test blood draw I've done in my life!"

"Fantastic experience! I couldn't even feel my skin being pierced; it was so easy. Thank you for inventing this to help people!"

"Easy and convenient! Can't beat the price."

"Great customer service was provided at the Walgreens location lab today!"

ER-13183

Theranos Confidential



# shortest visit times

**ER-13184**

| Name | Median Checkin Time (mins) |
|------|---------------------------|
| WAG11610 | 4 |
| WAG1272 | 4 |
| WAG3132 | 4 |
| WAG3177 | 4 |
| WAG3464 | 4 |
| WAG5668 | 4 |

| Name | Median Wait Time (mins) |
|------|-------------------------|
| WAG13596 | 5 |
| WAG3477 | 5 |
| WAG6582 | 5 |
| WAG11610 | 6 |
| WAG1272 | 6 |
| WAG3132 | 6 |
| WAG3657 | 6 |
| WAG4188 | 6 |
| WAG4508 | 6 |
| WAG6060 | 6 |

| Name | Median Perform Time (mins) |
|------|---------------------------|
| WAG13596 | 1 |
| WAG3008 | 2 |
| WAG3048 | 3 |
| WAG5453 | 4 |
| WAG2851 | 5 |
| WAG3049 | 5 |
| WAG3464 | 5 |



# longest visit times

| Name | Median Checkin Time (mins) |
|---|---|
| WAG2851 | 7 |
| WAG3008 | 7 |
| WAG4793 | 7 |
| WAG6060 | 7 |
| WAG6128 | 7 |
| WAG6697 | 7 |
| WAG1076 | 8 |
| WAG4188 | 8 |
| WAG4508 | 9 |
| WAG6582 | 9 |

| Name | Median Wait Time (mins) |
|---|---|
| WAG3048 | 8 |
| WAG3049 | 8 |
| WAG3177 | 8 |
| WAG3464 | 8 |
| WAG3912 | 8 |
| WAG6128 | 8 |
| WAG4793 | 9 |
| WAG3008 | 10 |
| WAG1076 | 12 |
| WAG6697 | 20 |

| Name | Median Perform Time (mins) |
|---|---|
| WAG6128 | 8 |
| WAG3912 | 9 |
| WAG5222 | 9 |
| WAG5504 | 9.5 |
| WAG4508 | 10 |
| WAG4793 | 10 |
| WAG6697 | 12 |

ER-13185



# opportunities
## *Sunny*

- scalable strategy for check in
  - store by store – start with stores with 10+ patients per day
  - must start in August - will be tested during flu season
- tight integration between HCC and Theranos check-in
- call center knowledge of Theranos and communication to patients
- assurance that 40% of stores will be dedicated space
- improved staffing in all stores – surprises with Theranos tech shortages
- need improvement in attentiveness of some stores
  - cleaning
  - attention to process – including opening and closing procedures
  - managing flow of patients

ER-13186



# Certification Maintenance

1. Criteria for removal of Certification
   - <80% fingerstick proficiency (Bi-Monthly)
   - Acting against established procedures (As reported)

2. What happens next?
   - Technician becomes Check-In ONLY
   - Lead time to remove technician from live patient perform workflow (?)

3. Reinstate Certification
   - Assess trainee using original oversight standards
   - At least 2 consecutive successful end-to-end visits

❖ Idle Technicians
   - Technicians who perform <5 finger sticks in a given timeframe are required to complete practice fingersticks

ER-13187





ER-13188

# Diagnostic Testing – Theranos Partnership Change Management Updates and Key Anchors Readout

- August 6, 2014

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



# Change Management Updates

- Change Management Updates
    - Action Planning Exercise Results
- Key Anchors Discussion
    - Readout from Discussion
- Next Steps
    - Execute Against Change Management Action Planning Exercise Results
    - Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
    - Socialize FY15 Change Strategy

ER-13189



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

15

# Change Management Updates

- **Change Management Updates**
  - **Action Planning Exercise Results**
- Key Anchors Discussion
  - Readout from Discussion
- Next Steps
  - Execute Against Change Management Action Planning Exercise Results
  - Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
  - Socialize FY15 Change Strategy

ER-13190



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

# We Started Here: Business & Change Considerations Matrix Based on Stakeholder Feedback

## Recommended Focus Areas

**Red = Short Term Recommended Actions**

**Purple = Both ST and LT Recommended Actions**

**Black = Long Term Recommended Actions**

**ER-13191**

| | Definition of Success | Culture | Role Clarity | Business Readiness |
|---|---|---|---|---|
| **Business Levers** — Business Operations & Governance | • Clearly document decision rights & governance approach for partnership<br>• Further define short and long term success criteria<br>• Align business metrics to key behaviors<br>• Identify potential incentive alignment opportunities | • Reset "Pilot" vs. ""Initial Launch Market" expectations<br>• Identify common values shared by Walgreens and Theranos that can be leveraged to define success criteria<br>• Develop day to day interaction model that better pairs individuals across the partnership | • Define/align on Field, Corporate, and Theranos roles and responsibilities in the partnership<br>• Redefine/clarify roles for Kickoff Market vs. scale<br>• Further align governing bodies to decision making rights and escalation process | • Develop holistic Store Readiness checklist<br>• Define Pharmacy Workflow to incorporate scripts, WE, Theranos, and immunization services<br>• Develop pre-defined non-emergency SOP and app update calendar<br>• Define leading indicators to predict Program success<br>• Define scalable business model |
| **Change Levers** — Stakeholder Engagement, Communications, Organizational Alignment, and Training | • Align on communications strategy, plan, and execution with Theranos and field leadership<br><br>• Develop and measure additional training success criteria beyond pass rate | • Reframe "Pilot" vs. ""Initial Launch Market" language<br><br>• Develop and rally group behind both strategic and operational-level shared vision for the partnership<br><br>• Continue to incorporate Walgreens training principles, feedback and talent pool into training | • Leverage communications strategy recommendations (TBD)/agree on senders by message type<br><br>• Identify and develop district and store champions in existing and target markets<br><br>• Better align market/district leadership roles to training goals and focused value-add training activities | • Further enable TIFT team to realize team goals<br>• Facilitate SOP release approach alignment<br>• Identify best training practices and lessons learned from Kickoff Market to apply to scale<br>• Communicate Pharmacy Workflow to incorporate scripts, WE, Theranos, and immunization services<br>• Refine "T-minus" comms, Field Leadership Toolkit, and scenario planning exercises to better prepare field<br>• Measure business readiness based on lagging and leading indicators; recommend corrective actions |



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

## We Discussed Each Consideration (and Agreed On An Action Plan for Each) Yesterday. Example for "Definition of Success" Considerations Action Plan:

**Business Levers**

| Recommended Action | Owner (of Next Steps) | Next Steps |
|---|---|---|
| Clearly document decision rights & governance approach for partnership | Patty, Mike, Casey Christian | 1) Discuss collaboration with Christian on 8/6 <br> 2) (Collaboratively) summarize Phoenix market approach, general partnership approach, and what future markets would look like |
| Further define short and long term success criteria | Tracy – to work at Store/Operational level Casey, Mahesh, Mike (facilitate) | 1) Follow up from 8/5 meeting key anchors discussion, 8/6 success criteria discussions <br> 2) Tracy to document Theranos store/operational success criteria |
| Align business metrics to key behaviors | Mahesh, Mike | Leverage draft success criteria to align key behaviors/actions by role |
| Identify potential incentive alignment opportunities | Casey (working with workstream leads) | Theranos: future plan (past start-up mode) <br> Walgreens: Discuss potential approaches, timing with Casey |

**Change Levers**

| Recommended Action | Owner (of Next Steps) | Next Steps |
|---|---|---|
| Align on communications strategy, plan, and execution with Theranos and field leadership | Mike, Patty (to assist) | Document next iteration |
| Develop and measure additional training success criteria beyond pass rate | Mike, Ardith, John Look (to assist on reporting) Joe, Ryan | Mike to set up brainstorming session with Joe, Ryan, Ardith, and John Look on possible success criteria |



CHANGE MANAGEMENT

©2014 Walgree

ER-13192

# Change Management Updates

- Change Management Updates
  - Action Planning Exercise Results
- **Key Anchors Discussion**
  - **Readout from Discussion**
- Next Steps
  - Execute Against Change Management Action Planning Exercise Results
  - Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
  - Socialize FY15 Change Strategy

ER-13193



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

19

# Action Plan Next Steps

- Mike to Provide Full Action Plan Results to Group, Individuals Identified As Owners (for All Four Focus Areas)
  - Will Be Provided By End of Week
- Owners to Act Against Focus Areas
- ***Group to Identify Approach to Update Team***

ER-13194



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

# Key Anchors Discussion

What could we ask a Pharmacy Technician to rally around, that is also meaningful to senior leaders and others in our diverse stakeholder audience?

The common themes we agreed upon:

ER-13195



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

# With These Anchors In Mind, We Discussed Some of the Behaviors and Actions We Need to Ask of Our Stakeholders That Will Help the Program Realize Its Vision

| Key Stakeholders like... | whose role is to... | ...the Vision at the... | Should do/say/own |
|---|---|---|---|
| Brad Wasson<br>Rick Gates<br>Jeff Koziel<br>Nimesh Jhaveri | Define | Company level | **Do:**<br>**Say:**<br>**Own:** |
| Nimesh Jhaveri<br>Casey Kozlowski<br>Mahesh Raju | Define | Program/ Partnership level | **Do:**<br>**Say:**<br>**Own:** |
| Matt Sesto<br>Brian Sizemore<br>Casey Kozlowski<br>Mahesh Raju | Translate and reinforce | Kickoff Market level | **Do:**<br>**Say:**<br>**Own:** |
| DMs<br>RXSs | Translate and reinforce | District level | **Do:**<br>**Say:**<br>**Own:** |
| CLs<br>TI/FT Team | Execute | Community level | **Do:**<br>**Say:**<br>**Own:** |
| MGRs<br>RXMs<br>Pharmacy Team | Execute | Store level | **Do:**<br>**Say:**<br>**Own:** |
| IT<br>Finance<br>Call Center<br>Marketing | Support | Company, Program, and Field levels | **Do:**<br>**Say:**<br>**Own:** |

Elizabeth Holmes / Sunny Balwani — Define — Company level

Sunny Balwani / Tracy Masson / Joe Ahdoot / Christian Holmes — Define — Program/ Partnership level

Tracy Masson / Kim Alfonso / Joe Ahdoot — Translate and reinforce — Kickoff Market level

Sonia Cendejas / Operations Mgrs / Theranos Sales — Translate and reinforce — District level

Sonia Cendejas / Operations Mgrs — Execute — Community level

Theranos Phlebotomists / Operations Mgrs — Execute — Store level

Theranos IT / Theranos Call Center — Support — Company, Program, and Field levels

MANAGEMEN I

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

22

An Example: **CLs,** whose role is to **execute** the vision of a Superior Patient Experience; support the Partnership Collaboration and drive Pharmacy Transformation at the **Community and Store Level**, should…

ER-13197

| Key Stakeholders like… | whose role is to… | …the Vision at the… | Should do/say/own |
|---|---|---|---|
| **CLs**<br>MGRs<br>RXMs<br>Pharmacy Team | Theranos Phlebotomists | Execute | Store level | **Do:**<br>**Say:**<br>**Own:** |

CLs, whose role in Theranos is to execute the vision of a Superior Patient Experience and support the Partnership Collaboration at the Community and Store Level, should…

**DO:**
- **Communicate about Theranos services** and their benefits in the stores where it is offered; ask team members what they think about the service *[Patient Experience, Partnership Collaboration]*
- **Ensure** all the stores in your community are **aware of Theranos services** and where they are offered *[Patient Experience, Partnership Collaboration]*
- **Regularly update and energize team members** - celebrate positive patient experience results in your community *[Patient Experience]*
- **Hold Store Managers in your community accountable** for their store-level responsibilities; understand those responsibilities and ask about them on your Store Walks *[Partnership Collaboration]*

**SAY:**
- Have you gotten your lipid profile through Theranos yet? What did you think of the service? *[Partnership Collaboration]*
- (When in non-Theranos stores) Did you see what we are doing over in Store 1234? We can do lab testing services through our Pharmacy there now. Check out this booklet about the service. *[Partnership Collaboration]*
- I just wanted to recognize the great patient experience Jane provided to one of our Theranos patients. Listen to this great patient feedback! Great job Jane. *[Patient Experience]*
- John, it looks like there may have been some challenges last week with the bathrooms and having enough Theranos techs during peak time. What do we need to plan for in the next few weeks on scheduling, with immunizations coming up? *[Patient Experience, Partnership Collaboration]*

**OWN:**
- Their store's and community's Theranos Patient Experience results
- Accountability of their store's Pharmacy Manager, and of their community's Store Managers (for pharmacy scheduling, training, store and pharmacy team member engagement and experience)
- Maintain/increase the excitement around the incredible patient experience



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

# Change Management Updates

- Change Management Updates
  - Action Planning Exercise Results
- Key Anchors Discussion
  - Readout from Discussion
- Next Steps
  - Execute Against Change Management Action Planning Exercise Results
  - Leveraging Key Anchors and Action Planning Exercise Results, Finalize FY15 Change Strategy Draft
  - Socialize FY15 Change Strategy

ER-13198



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.





# Diagnostic Testing – Theranos Partnership Program

## Measures of Success (SMART Goals)

August 6, 2014

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



ER-13200

## SMART Program Measures for Success

**SMART goals are defined as:**

*Specific:* target a specific area for improvement

*Measurable:* quantify or at least suggest an indicator of progress

*Achievable:* realistic and attainable

*Realistic:* state what results can realistically be achieved, given available resources

*Time-related:* specify when the result(s) can be achieved

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



**ER-13201**

# SMART Program Measures for Success

| Category | Goal | Success Criteria | Owner(s) |
|---|---|---|---|
| Operational | Achieve acceptable labor model | 20 stores with Walgreens employed phlebotomist/health guide by 3/31/15 | Casey Kozlowski |
| | Achieve and maintain a training pass rate of 90% by 8/31/15 | Training pass rate <=90% | |
| Patient Experience | Likelihood to come back by 8/31/15 | <=90% | |
| | Referral by friend or family member by 8/31/15 | <=20% | |
| | Capture rate of 47% benchmark | <=47% benchmark | |
| | Conversion of non-Walgreens patients to become Walgreens patients | 10% of the 47% benchmark | |

# SMART Program Measures for Success, cont'd

| Category | Goal | Success Criteria | Owner(s) |
|---|---|---|---|
| IT | Theranos PSC application uptime =>99%<br>Note: applicable to DSL connected stores only | | |
| Payor and Providers | Payor coverage of at least 66% | Payor coverage of at least 66% | |
| Financial | Achieve 15* patients/store/day for a store that has been open at least 3 months by 8/31/15 | Achieve 15 patients/store/day | |
| HCC | % of lab orders driven from HCC | This is not being driven due to steerage | Sunny Balwani/<br>Pat Carroll |

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

28

**ER-13202**

# Potential Measurable Success Metrics For Stores

| Category | Goal | Success Criteria | Owner(s) |
|---|---|---|---|
| Training | % of eligible team members certified to perform check in | 100% | |
| | % of eligible team members certified to perform finger sticks | 90%<br><br>• Must work more than 20 hours per week<br>• Must be able to perform service using both hands<br>• Religious reasons<br>• Medical reasons<br>• Position code is:<br>• Perform: RxM, HG, Rx Tech<br>• Check-In Only: SFL, ASMT, ASM, MGR<br>**Action Item:**<br>• Need to work with ER to define eligible reasons | |

ER-13203

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

## Potential Measurable Success Metrics For Stores, cntd.

| Category | Goal | Success Criteria | Owner(s) |
|---|---|---|---|
| Patient Experience | Patient check in time < X minutes | < 3 minutes | |
| | Patient wait + perform time < X minutes | < 7 minutes (between check in end and collection completion) | |
| | Survey scores > X | • Average star rating per store and by tech<br>• Average % 5 star ratings for 90% of Theranos services | |
| | Reduce people who will never come back | 95% = yes | |
| | Number of sticks needed vs. ideal | <80% | |

**ER-13204**

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

ER-13205

# Potential Measurable Success Metrics For Stores, cntd.

| Category | Goal | Success Criteria | Owner(s) |
|---|---|---|---|
| Patient (non-experience) | Patient volume | Measurement of here's where you're at and here's where you are trending | |
| | % Venous Draws | =>10% venous draws by 8/31/15 | Sunny Balwani |
| | Net New vs. Existing Patients | Note: Need patient name and zip code (confirm with analytics) | |





# Diagnostic Testing – Theranos Partnership

## Plan for FY15
## August 6, 2014

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



ER-13207

## Plan for FY15

- Next market is Northern CA (5 stores initially, then expand for a total of 40)
- Expansion beyond the 5 stores will require Theranos data to obtain store selection
- Next markets?
- IL? IN? TX? FL?
- Plan for FY15 is to follow the Well Experience rollout as much as possible.
- Keeps build-out costs low
- WE personnel are often a good fit for Theranos services.
- Initial goal for FY15 (Sept-Aug) was 500 stores. Need to redefine this goal.



# Diagnostic Testing – Theranos Partnership

California Plans

August 6, 2014



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.

# Theranos California Wave 1: T Minus Schedule

**ER-13209**

| Timing | Target Date | Training event |
|---|---|---|
| T-10 | 8/6 | • Finalize California Wave 1 store selection for 4 stores |
| T-9 | 8/11-8/22 | • Conduct Field Webinars |
| T-8 | 8/11-8/15 | • Assess store readiness and start construction process |
| | 8/11-9/12 | • Hire BoIs/HG |
| | 9/15-10/3 | • Complete BoI/HG Training |
| T-5 | 9/8-9/26 | • Conduct Check-in Training for existing WAG Techs |
| T-2 | 9/29-10/3 | • Store Manager and Pharmacy Manager expectations/reminder/"coming very soon" Compass communications to stores in the Wave |
| | 9/29-10/10 (with copy to DM and RXS) | • TIFT Checklist for Pre-Launch Activities |
| T-1 | 10/13-10/17 | • Reminder to DMs, RXSs, and CLs in districts/communities with stores going live in the wave: cascade or otherwise communicate to all stores in your area about new capability in additional stores coming online in one week.<br>• 5 Minute Meeting scripts to all stores in wave, with instructions on using on or near go-live. |
| T | 10/21 | • MVP recognition via email communications about latest wave of stores going live. Recognition of MGRS, RXMS, Pharmacists, Techs, and other field personnel involved in stores launching successfully. |
| (Go Live) | | • Theranos Go-Live in 4 stores |

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



# California Theranos Rollout Timeline

## 2014



**Go Live Oct 21**

Confidential – Dates Subject to Change

| | July | Aug | Sept | Oct |
|---|---|---|---|---|

**Store Selection**
- July 28: Align on 4 candidate stores
- Aug 6: Finalize 4 locations w/ Theranos & MP&R

*Site Selection*

**Construction**
- Aug 11
- Assess Store Readiness — Aug 15
- Aug 11: Finalize Design Elements on D1
- Aug 11 — Design Elements — Oct 3
- Aug 18 — Permits — Aug 29

**Perform Personnel**
- Sept 2 — Perform Construction — Sept 30
- Aug 11 — Hiring WAG Personnel — Sept 12
- Aug 11 — State Regulations (HG & BOP) — Sept 12

**Check-In Training**
- Aug 25 — WAG Rx Staff, DH, & MGR — Sept 26

**Perform Training**
- Sept 15 — WAG Bot/HG — Oct 3
- Sept 8 — Check-In & Collection Training — Sept 26

**Communications**
- Aug 12 Field Webinar
- Sept 23 Launch Readiness

36

©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



©2014 Walgreen Co. All rights reserved. Confidential and proprietary information. For internal use only.



**ER-13211**

# Assumptions

- Construction:
  - Private Health Room build out is required
  - Construction can be done in an expedited manner
  - Receive approval to extend DSL connectivity to 4 more stores
  - Expedited CIA process for D1s, furniture orders, etc.

- Personnel:
  - WAG Phlebotomists are hired
  - State and regulatory concerns are addressed for HG & BOP
  - Theranos can assist with training in Palo Alto HQ

# IT Phase Plan

* Phase 2 had been previously deemed unnecessary

↑ We are here

| | Phase 0 | Phase 1 | Phase 3* | Phase 4 |
|---|---|---|---|---|
| **Software** | • Theranos App via Internet | • Theranos App via Internet | • Theranos App via One Patient View search app | • Theranos App via Enterprise EHR |
| **Hardware** | • All Theranos HW | • All Theranos HW | • Theranos HW with Walgreens peripherals | • Walgreens HW and peripherals |
| **Connectivity** | • Cellular (WiFi) | • Walgreens LAN / or other internet option (DSL/Cable) | • Walgreens LAN / or other internet option (DSL/Cable) | • Walgreens LAN |
| **Functionality** | • Slow processing speed<br>• Redundant equipment at check-in | • Faster processing speed | • Reduced dual entry<br>• Easier application access<br>• Search functionality<br>• Quality Reporting | • Streamlined, secure data<br>• Eliminate redundant HW<br>• Integration with PARS |
| **Target Date** | • Current | • End of Q3 FY14 | • End of Q4 FY14 | • TBD |

Note: These phases and corresponding scope are subject to change based on open items

38





ER-13213

# Phase 3 Scope

- Capabilities prioritized based on criticality for expansion past 40 stores
- Priority 1 and 2 items are:
- Financial reconciliation (including migrating from v1 to V2 barcode)
- Sharing of Patient data (demographics and insurance) between Theranos/WAG
- Implement single sign on (SSO) capabilities between Walgreens and the Theranos application
- Integrate Theranos work queue with the IC+ Philomometer
- POS integration (allowing Theranos to invoke an API when the copay is $0)

| Message | |
| --- | --- |
| **From:** | Tubergen, Jerry [/O=RDV CORPORATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JERRYT] |
| **Sent:** | 9/18/2014 2:38:18 AM |
| **To:** | DeVos, Dick (Windquest) [/o=RDV Corporation/ou=First Administrative Group/cn=Recipients/cn=DDV]; Doug DeVos [dld@amway.com]; DeVos, Dan (DP Fox) [/o=RDV Corporation/ou=First Administrative Group/cn=Recipients/cn=DanDeVos]; DeVos, Cheri (Outlook) [/o=RDV Corporation/ou=First Administrative Group/cn=Recipients/cn=cherid] |
| **Subject:** | Adobe Reader user sent you a file |
| **Attachments:** | THERANOS.pdf |

All

This morning I had one of the most interesting meetings I can recall with the women profiled in the attached Fortune magazine article. If you get a chance to take a look at this article prior to tomorrow's FC meeting I would encourage you to do so. I would like to see if we could find 15 minutes tomorrow to share with you and discuss a very unique investment opportunity we may have with her company.
I know the schedule is very tight tomorrow, but I hope you will trust my recommendation that we carve out some time for this.
I look forward to seeing you all tomorrow.

Best
Jerry

Confidential                                                                                      RDV004726



1/1,000th
Theranos tests can be
performed on just a few
drops of blood, or about
1/100th to 1/1,000th of
the ordinary amount.

# New Blood

×ELIZABETH HOLMES FOUNDED HER
REVOLUTIONARY BLOOD DIAGNOSTICS
COMPANY, THERANOS, WHEN SHE WAS 19.
IT'S NOW WORTH MORE THAN $9 BILLION,
AND POISED TO CHANGE HEALTH CARE.
*by Roger Parloff*

IN THE FALL OF 2003, Elizabeth Holmes, a 19-year-old sophomore at Stanford, plopped
herself down in the office of her chemical engineering professor, Channing Robert-
son, and said, "Let's start a company." ¶ Robertson, who had seen thousands of
undergraduates over his 33-year teaching career, had known Holmes just
more than a year. "I knew she was different," Robertson told me in
an interview. "The novelty of how she would view a complex
technical problem—it was unique in my experience."

FORTUNE.COM
**64**

PHOTOGRAPH BY **JOE PUGLIESE**

| STORY CODE | STORY NAME | ISSUE DATE | |
| --- | --- | --- | --- |
| THF30 | Theranos | 6/30/2014 | Page **1** of **9** |
| Confidential | | | RDV004727 |

**ER-13215**





Founder and
CEO Holmes
undergoing
the blood test
she invented at
a public clinic
at Theranos's
headquarters
in Palo Alto

*Month 00, 2010* FORTUNE.COM
**65**

| THE.W.06.30.14.FINAL3.indd 2 | KAVULLA · EVILLA · NEI⊙ARRIS ·PARLOFF · SMITH | | 6/10/14 5:42PM |
|---|---|---|---|
| **STORY CODE** | **STORY NAME** | **ISSUE DATE** | |
| THE30 | Theranos | 6/30/2014 | Page **2** of **9** |

Confidential

RDV004728

Holmes had then just spent the summer working in a lab at the Genome Institute in Singapore, a post she had been able to fill thanks to having learned Mandarin in her spare hours as a Houston teenager. Upon returning to Palo Alto, she showed Robertson a patent application she had just written. As a freshman, Holmes had taken Robertson's seminar on advanced drug-delivery devices—things like patches, pills, and even a contact-lens-like film that secreted glaucoma medication—but now she had invented one the likes of which Robertson had never conceived. It was a wearable patch that, in addition to administering a drug, would monitor variables in the patient's blood to see if the therapy was having the desired effect, and adjust the dosage accordingly.

"I remember her saying, 'And we could put a cellphone chip on it, and it could telemeter out to the doctor or the patient what was going on,'" Robertson recounts. "And I kind of kicked myself. I'd consulted in this area for 30 years, but I'd never said, here we make all these gizmos that measure, and all these systems that deliver, but I never brought the two together."

Still, he balked at seeing her start a company before finishing her degree. "I said, 'Why do you want to do this?' And she said, 'Because systems like this could completely revolutionize how effective health care is delivered. And this is what I want to do. I don't want to make an incremental change in some technology in my life. I want to create a whole new technology, and one that is aimed at helping humanity at all levels regardless of geography or ethnicity or age or gender.'"

That clinched it for him. "When I finally connected with what Elizabeth fundamentally is," he says, "I realized that I could have just as well been looking into the eyes of a Steve Jobs or a Bill Gates."

With Robertson's blessing, Holmes started her company and, a semester later, dropped out to pursue it full-time. Now she's 30, and her private, Palo Alto–based corporation, called Theranos—the name is an amalgam of the words "therapy" and "diagnosis"—has 500 employees and has raised more than $400 million from equity sales to investors who have effectively valued the company at more than $9 billion. All these numbers, confirmed to me by an outside director, are being published here for the first time. Though Theranos is largely unknown even in Silicon Valley, that is about to change.

"This is about being able to do good," Holmes says to me about her company. "And it's about being able to change the health care system through what we believe this country does so well, which is innovation and creativity and the ability to conceive of technology that can help solve policy challenges."

At first glance it's hard to see the connection between the patch that wowed Robertson and what Theranos does now. But as we will see, to Holmes they are simply different "embodiments" of the same core insights.

Theranos today is a potentially highly disruptive upstart in America's $73 billion diagnostic-lab industry, which performs nearly 10 billion tests a year and is estimated to provide the basis for about 70% of doctors' medical decisions. Medicare and Medicaid each pay roughly $10 billion annually on reimbursements for these tests.

Theranos runs what's called a high-complexity laboratory, certified by the federal Centers for Medicare & Medicaid Services (CMS), and it is licensed to operate in nearly every state. It currently offers more than 200—and is ramping up to offer more than 1,000—of the most commonly ordered blood diagnostic tests, all without the need for a syringe.

Theranos's tests can be performed on just a few drops of blood, or about 1/100th to 1/1,000th of the amount that would ordinarily be required—an extraordinary potential boon to frequently tested hospital patients or cancer victims, the elderly, infants, children, the obese, those on anticoagulants, or simply anyone with an aversion to blood draws. Theranos phlebotomists—technicians licensed to take blood—draw it with a finger stick using a patented method that minimizes even the minor discomfort involved with that procedure. (To me, it felt more like a tap than a puncture.)

The company has performed as many as 70 different tests from a single draw of 25 to 50 microliters collected in a tiny vial the size of an electric fuse, which Holmes has dubbed a "nanotainer." Such a volley of tests with conventional techniques would require numerous tubes of blood, each containing 3,000- to 5,000-microliter samples.

The fact that Theranos's technology uses such microscopic amounts of blood should eventually allow physicians far greater latitude when ordering so-called reflex tests than they have previously enjoyed. With reflex testing, the physician specifies that if a certain test comes up abnormal, the lab should immediately perform follow-up tests on the same sample to pinpoint the cause of the abnormality. Reflex testing saves patients the time, inconvenience, cost, and pain of return doctor visits and additional blood draws.

The results of Theranos's tests are available within hours—often matching the speed of emergency "stat" labs today, though stat labs, which are highly inefficient, can usually perform only a limited menu of maybe 40 tests.

Most important, Theranos tests cost less. Its prices are often a half to a quarter of what independent labs charge, and a quarter to a 10th of what hospital labs bill, with still greater savings for expensive procedures. Such pricing represents a potential godsend for the uninsured, the insured with high deductibles, insurers, and taxpayers. The company's prices are set to never exceed half the Medicare reimbursement rate for each procedure, a fact that, with widespread adoption, could save the nation billions. The company also posts its prices online, a seemingly obvious service to consumers, but one

PHOTOGRAPH BY DREW KELLY

| THE W 05 30 14 FINAL3.indd 3 | KAVULLA · EVILLA · NEIL ⦿RRIS ·PARLOFF · SMITH | | 6/00/14 5:40 PM |
|---|---|---|---|
| STORY CODE<br>THE30 | STORY NAME<br>Theranos | ISSUE DATE<br>6/30/2014 | Page 3 of 9 |

Confidential

RDV004729





Theranos can run as many as 70 tests on a sample this size, obtained by pricking a finger.

# "THIS IS THE TRUE TRANSFORMATION OF HEALTH CARE, RIGHT HERE IN FRONT OF US."

*—Mark Laret, CEO, UCSF Medical Center*

that is revolutionary in the notoriously opaque, arbitrary, and disingenuous world of contemporary health care pricing.

**P**RECISELY HOW THERANOS accomplishes all these amazing feats is a trade secret. Holmes will only say—and this is more than she has ever said before—that her company uses "the same fundamental chemical methods" as existing labs do. Its advances relate to "optimizing the chemistry" and "leveraging software" to permit those conventional methods to work with tiny sample volumes.

The scale of Theranos's operations at the moment is modest. Its phlebotomists currently take physician-ordered blood draws (and saliva, urine, feces, and other samples) at collection centers the company operates at its headquarters in Palo Alto and at 21 Walgreens—one in Palo Alto and the rest in Phoenix. But these are only the advance guard in a gradual national rollout that Walgreens committed to last

September; it plans to establish Theranos outposts in a substantial percentage of its 8,200 drugstores in all 50 states. It is the first step in Holmes's audacious plan to place a Theranos center within five miles of almost every American and within one mile of every city dweller. Walgreens CEO Greg Wasson told me in an interview that he hopes to eventually put them in the pharmacies of the company's European partner chain, Alliance Boots, as well.

At least as significant, three hospital groups are now working closely with Theranos with the aim of deploying its lab services—UCSF Medical Center in San Francisco, Dignity Health's 17-state hospital group, and Intermountain Healthcare's 22-hospital system in Utah and Idaho.

"I just think this is so exciting," says Mark Laret, the CEO of UCSF Medical Center, about what he's seen so far. "I mean, here it is. This is the true transformation of health care, right here in front of us."

"The first time I heard about this, I thought it was snake

| THE.W.06.30.14.FINAL3.indd 4 | KAVULLA · EVILLA · NEI◉ARRIS ·PARLOFF · SMITH | | 8/10/14 5:4◉PM |
|---|---|---|---|
| STORY CODE<br>**THE30** | STORY NAME<br>**Theranos** | ISSUE DATE<br>**6/30/2014** | Page **4** of **9** |

Confidential

RDV004730

**ER-13218**





# A Singular Board

WITH THREE FORMER CABINET
SECRETARIES, TWO FORMER
SENATORS, AND RETIRED MILITARY
BRASS, IT'S A BOARD LIKE NO OTHER.



T HOUGH LITTLE KNOWN and privately held, Theranos has assembled what may be, in terms of public service, the most illustrious board in U.S. corporate history. It includes three former U.S. cabinet secretaries, two former U.S. senators, a retired Navy admiral and a retired Marine Corps general.

In 2011, explains company founder Elizabeth Holmes, she realized that changing the way health care is delivered in this country would require the help of great strategists.

That July she finagled an introduction to George Shultz (above), the former Secretary of State, Treasury, and Labor, at Stanford's Hoover Institution. Shultz had held four cabinet-level positions, counting his stint as director of the Office of Management and Budget, and had also been president of engineering giant Bechtel Group and a director at biopharmaceutical company Gilead Sciences.

Their scheduled 10-minute interview lasted 2½ hours. Shultz was captivated by what Holmes's technologies could mean for health care, but was struck also by her "purity of motivation," he says. He joined Theranos's board that same month.

"He and I have seen each other at least once a week since I first met him," Holmes says.

Three years later nearly all the other outside directors on Theranos's board are people who were introduced to the company through Shultz, now 93. They are former Secretary of Defense Bill Perry, former Secretary of State and National Security Adviser Henry Kissinger, former U.S. Senators Sam Nunn and Bill Frist (a heart-transplant surgeon), retired U.S. Navy Adm. Gary Roughead, retired U.S. Marine Corp Gen. James Mattis, former Wells Fargo CEO and chairman Dick Kovacevich, and former Bechtel Group CEO Riley Bechtel.

"My belief is," says Shultz, "that if you're making a contribution, you're living. If you're not making any kind of contribution, well—. That's my motivation, and it's very parallel to Elizabeth's."

oil and mirrors," says David Helfet, the chief of orthopedic trauma at the Hospital for Special Surgery in Manhattan. But after reviewing voluminous validation studies supplied to him by the company, he has become a believer and is urging his hospital to consider adoption.

"It's real data," he says. "It's not their interpretation." (Theranos has invited Helfet to join its medical advisory board, he says, but he has not yet decided whether to do so.)

Helfet sees an opportunity to enlist Theranos lab services in the identification of so-called hospital-acquired infections—a major scourge in health care today. Conventional methods of identifying germs and figuring out which antibiotics will combat them—growing bacteria on agar in petri dishes—can require three to five days, during which patients languish in hospital beds, take ineffective antibiotics, and incubate antibiotic-resistant bacteria. Using DNA profiling Theranos can, for less than the cost of the conventional tests, identify a bug and its resistance profile within four hours, says Helfet, according to the data he has seen.

"That would be huge," he says. "That would change the way we practice medicine." (Though Theranos did not invent DNA testing of this kind, Holmes says, it has found ways to make it cost-efficient.)

Importantly, it's not just the blood draws that are tiny. It's also the analytical systems Theranos uses to perform the tests. They take up a small fraction of the footprint required by a conventional lab today.

"It takes at least 10 times—and maybe 100 times—less space for doing the same thing," says Laret of UCSF Medical Center. That makes it possible to imagine one day placing Holmes's labs right by the operating rooms in hospitals or in military evacuation helicopters or on ships and submarines or in refugee camps or in tents in the African bush. (The analyzers look like large desktop computer towers. Holmes declines to explain how they work, or even allow them to be photographed, citing the need to protect trade secrets. The company manufactures them at an unmarked facility I toured in a research park across the South Bay from Palo Alto, in Newark, Calif.)

What do incumbent players in the blood-diagnostic space think about all of this? The most frequent criticism is that Theranos is using purportedly breakthrough technology to perform tests that are relied on for life-and-death decisions without having first published any validation studies in peer-review journals. "I don't know what they're measuring, how they're measuring it, and why they think they're measuring it," says Richard Bender, an oncologist who is also a medical affairs consultant for Quest Diagnostics, the largest independent diagnostic lab.

Holmes counters that because, as noted, her tests employ "the same fundamental chemical methods" as existing tests,

Confidential

peer-review publication of validation studies is both unnecessary and inappropriate.

The backdrop for this dispute is an unusual regulatory structure that does, in fact, confer upon some—though not all—conventional lab tests an extra layer of validation that Theranos's do not yet have. Most labs, like Quest and Laboratory Corp. of America, perform many of their routine tests using analyzers they buy from medical-device manufacturers, like Siemens, Olympus, and Beckman Coulter. Before those manufacturers can sell such equipment, they must obtain U.S. Food and Drug Administration approval for the tests those analyzers perform—a process that is in addition to, and more searching than, the audits and proficiency tests required to win CMS certification for the lab itself.

At the same time, for other procedures conventional labs will devise their own lab-developed tests, or LDTs, which they do not have cleared by the FDA. While the FDA takes the position that it could require approval for LDTs, for many years it has said it would forgo that right in the exercise of its "enforcement discretion."

Theranos, which does not buy any analyzers from third parties, is therefore in a unique position. While it would need FDA approval to sell its own analyzers to other labs, it doesn't do that. It uses its analyzers only in its own CMS-certified lab. All its tests are therefore LDTs, effectively exempt from FDA oversight.

Holmes sees no basis for criticizing Theranos for acting within this framework, since no other labs seek FDA approval of their own LDTs. "Existing labs use thousands of assays that are neither FDA approved nor peer reviewed," she says, referring to their LDTs. (In fact, the American Clinical Laboratory Association, the trade group for traditional diagnostic labs, adamantly opposes any effort by the FDA to start requiring approval of LDTs and even takes the position that the FDA lacks legal authority to do so.)

Moreover, Holmes stresses, Theranos is currently seeking FDA clearance for every one of its tests, even though it's under no legal obligation to do so. (She has submitted many hundreds of pages of validation data in this effort, and has shown much of that data to *Fortune*.) Theranos may, in fact, be the only lab to have ever sought FDA clearance for LDTs.

Beyond the validation disputes, skeptics also question Theranos's business model. They doubt its ability to scale up anytime soon to the levels necessary to become a serious competitor, especially since the business has so many unglamorous aspects unrelated to testing—billing, customer service, sorting, regulatory compliance, and the logistics of transporting samples from physicians to labs. Quest, for instance, employs 45,000 people; owns a fleet of 3,000 vehicles and 20 airplanes; and runs eight regional hub labs, 150 satellite labs, and 2,200 patient service centers.



The Theranos "wellness center" at the Walgreens drugstore in downtown Palo Alto. Theranos's prices for tests are often a half to a quarter of independent lab prices and a quarter to a 10th of hospital lab prices.

Critics are likewise puzzled by the cosmic vastness of Holmes's end-to-end business model. If Theranos is making breakthrough analyzers, they wonder, why doesn't it just sell them to existing labs? To these critics, for Theranos to compete in the lab business itself while making all its own analyzers sounds implausible, if not crazy—like FedEx trying to manufacture all its own airplanes and trucks.

Still, Holmes has convinced a lot of people that she's onto something. She has assembled what, in terms of public service at least, may be the single most accomplished board in U.S. corporate history (see box). It includes former U.S. Secretary of State, Treasury, and Labor George Shultz; former Secretary of Defense Bill Perry; former Secretary of State and National Security Adviser Henry Kissinger; and former U.S. Senators Sam Nunn and Bill Frist (who is also a heart transplant surgeon), among others.

As a bonus, board meetings are also attended by the company's de facto legal adviser at large, trial lawyer David Boies. At 73, Boies may be the most eminent living trial lawyer, when one tallies up such cases as his civil antitrust prosecution of Microsoft from 1998 to 2000, his role in the historic *Bush v. Gore* matter of 2000, and his fight to legalize same-sex marriage.

Because of his admiration for Holmes and what her company is trying to do, Boies says, he agreed to represent Theranos personally in its first challenge from patent holders claiming infringement—something of a coming-of-age ritual for tech startups. In a rare if not unprecedented rout this

| THE.W.06.30.14.FINAL3.indd 6 | KAVULLA · EVILLA · NEI⊙ARRIS · PARLOFF · SMITH | | 6/10/14 3:43PM |
|---|---|---|---|
| STORY CODE | STORY NAME | ISSUE DATE | |
| THE30 | Theranos | 6/30/2014 | Page 6 of 9 |

Confidential

RDV004732



**THERANOS**

past March, the patent holders unconditionally surrendered midtrial, stipulating to the invalidity of their own patent. As a kicker they agreed—though the presiding judge would have been powerless to order such a thing himself—to bring no additional patent suits against Theranos for five years.

Though Holmes faces enormous challenges, she seems to consistently attract the service of extraordinary people and to inspire extraordinary fealty in them.

"She really does want to make a dent in the universe—one that is positive," says retired U.S. Marine Corps Gen. James Mattis, explaining why he signed up last fall as another of Theranos's strikingly illustrious outside directors. Mattis had stepped down just months earlier as commander of the U.S. Central Command—the chief of U.S. military operations in the Middle East and Central Asia, including Afghanistan—a post he had taken over from David Petraeus in 2010.

"The strength of the leader's vision in the military is seen as the critical element in that unit's performance," Mattis says. "I wanted to be around something again that had that sort of leadership."

**I**N A CONFERENCE ROOM at her 140,000-square-foot, open-floor-plan headquarters at the Stanford Research Park—a former home to Facebook and, before that, to the iconic Palo Alto tech firm Hewlett-Packard—Holmes grips a plastic cup of unappetizing green juice. Her first of the day; it is made from spinach, parsley, wheatgrass, and celery. Later she'll switch to cucumber. A vegan, she long ago dropped coffee in favor of these juices, which, she finds, are better able to propel her through her 16-hour days and seven-day weeks.

She admits—laughing nervously at the eccentricity of it—that after a meal she sometimes examines a drop of her own or others' blood on a slide, and says she can observe the difference between when someone has eaten something healthy, like broccoli, and when he's splurged on a cheeseburger. When we dine one night at an Italian place downtown with 814 pastas, the manager knows what she'll have: a spartan, dressingless mixed salad and an oil-free spaghetti with tomatoes, prepared from whole-wheat noodles she has provided the restaurant in advance, since it doesn't stock them. No wine.

During my four days at Theranos, Holmes dressed identically every day: black jacket; black mock turtleneck; black slacks with a wide, pale pinstripe; and black low-heel shoes. Steve Jobs, because of his vision and perfectionism about "great products"—words Holmes punches out with precisely Jobs' brio—is obviously a hero to her. As an apparent memento mori, she hangs in her office a framed screenshot of his Apple Internet bio, printed out on Aug. 24, 2011, the day he stepped down as CEO because of pancreatic cancer.

From still photos of Holmes herself—young, blond, and

blue-eyed—cynics might be excused for thinking, "Oh, I get it. I see why all these geezers are gushing about her company."

And from small talk with her, one might still wonder what all the fuss was about. She is polite and soft-spoken. She listens. She laughs naturally at other people's jokes and doesn't try to trump them. Her voice is lower pitched than you might expect, but that's about all you notice at first. That, and her youth.

"She looks like 19," says board member Henry Kissinger, 91.

Asked to assess her as a leader—because he's seen a few—he responds, "I can't compare her to anyone else because I haven't seen anyone with her special attributes. She has iron will, strong determination. But nothing dramatic. There is no performance associated with her. I have seen no sign that financial gain is of any interest to her. She's like a monk. She isn't flashy. She wouldn't walk into a room and take it over. But she would once the subject gets to her field."

And she does, when she begins explaining to me the "mission."

"Consumerizing this health care experience is a huge element of our mission," Holmes says at our first meeting in April, "which is access to actionable information at the time it matters." In our conversations over the next two months, she comes back to that phrase frequently. It is the theme that unifies what had seemed to me, at first, a succession of diverse, disparate aspects of her vision.

"There's a lot of ways we've focused on access," she explains, including the use of the minimally invasive finger stick, the affordability, the convenience of a drugstore location. The Walgreens "wellness centers," as they are called, are open evenings and weekends so that people won't have to miss work to get their blood test done. Each center is, within its Walgreens, an oasis, playing calming music—vaguely Eastern recorder melodies when I was there—and displaying nature scenes over a high-def LCD monitor (an aquarium video, in my case). The phlebotomist envelops the patient's finger in a cozy, warming wrap, massages it with a soothing, milking motion, then pulls the trigger on an unusually shallow, narrow-gauge lancet.

"Anywhere from 40% to 60% of people, when they're given a requisition by a doctor to go get tested, don't," asserts Holmes, "because they're scared of needles or the locations are inconvenient or the cost is too high. And if you're not even getting tested, how is it possible that we're going to move toward an era of preventive medicine?"

Preventive medicine—and this relates to the "at the time it matters" portion of her mission statement—is crucial to the mission. She is making diagnostic testing so accessible in all these different ways precisely so that people can eventually do it more often, almost the way they might use a bathroom scale to watch their weight.

Today people might have their blood tested once a year,

| THE W 06 30 14 FINAL3 indd  7 | KAVULLA · EVILLA · NEIL ⬤RRIS · PARLOFF · SMITH | | 6/00/4  5 40 PM |
| --- | --- | --- | --- |
| STORY CODE | STORY NAME | ISSUE DATE | |
| **THE30** | **Theranos** | **6/30/2014** | Page **7**of **9** |

Confidential

RDV004733

ER-13221

she explains. They get a snapshot of certain key values and learn whether they are "in range"—that is, statistically normal—or "out of range." But if they were tested more often, they would begin to see a "movie" of what's going on inside them. Sudden, rapid changes in some protein concentration—even when technically still in range—could tip off the doctor that something was amiss, and do so before it was too late to address the problem. (Theranos plans soon to display results in a way that maps them against all previous results from tests it has performed for that patient.)

"The movie goal is absolutely core to what we're working to do," she says. "When you have that trend, it is a much more meaningful clinical data set for the physician to use."

She knows that, she says, "because we've seen it." She's referring to the fact that since 2005 Theranos has been doing work for major pharmaceutical companies, including Pfizer and GlaxoSmithKline, that are conducting clinical drug trials. Early on it was a way for the company, working under confidentiality agreements, to stealthily refine its technology while earning revenue needed to build out infrastructure. Theranos would test drug-trial subjects three times a week—which wouldn't have been feasible using venipuncture—and catch adverse drug effects quickly, before they became dangerous.

"We're building an early-detection system," she explains. "I genuinely don't believe anything else matters more than when you love someone so much and you have to say good-bye too soon. I deeply believe it has to be a basic human right for everybody to have access to the kind of testing infrastructure that can tell you about these conditions in time for you to do something about it. So that's what we're building."



**H**OLMES WAS BORN in February 1984 in Washington, D.C. Her father, Christian Holmes IV, has devoted most of his life to public-minded government service—disaster relief in Africa, international development projects in China, environmental work in this country—and is currently the global water coordinator for the U.S. Agency for International Development. He met Elizabeth's mother, Noel, on Capitol Hill, where she worked as a congressional committee staffer.

When she was young, Elizabeth read a biography of her great-great-grandfather, the first Christian Holmes, who was a decorated World War I veteran, engineer, inventor, and surgeon after whom a hospital at the University of Cincinnati Medical Center is named. When she was 8, her family took a trip there to see a display about him.

"He ultimately worked himself to death," Elizabeth tells me—he died at 62—"but he was so passionate in what he did. I wondered, Would I want to be a doctor?"

But she soon discovered she couldn't handle the sight of blood, even fainting when friends arranged an opportunity for her to watch some surgeries performed. Though her parents remember Elizabeth as a fearless child, the lone exceptions, they say, were getting shots and enduring blood draws.

"The concept of sticking a needle into you and sucking your blood out," Holmes says, has always been profoundly disturbing to her. As a child, she says, "when I knew I needed to get a test, I would really be focused on that for weeks in advance." As an adult, she refused to get them. In fact, the last time she endured a venipuncture was in 2007, she says, when her board demanded that she get key-man insurance.

When Elizabeth turned 9, her father took a private sector job with the industrial conglomerate Tenneco. He went to Houston to find a house for the family to move into. He remembers feeling guilty about forcing Elizabeth and her younger brother, Christian Holmes V, to uproot themselves from their happy lives in D.C. So he was profoundly touched when he got a letter from Elizabeth reassuring him that "I love adventures," that she was looking forward to having "new ones in Texas," especially since Texas was "big on science." But the most striking thing about his 9-year-old's "Dear Daddy" letter was its first sentence: "What I really want out of life is to discover something new, something mankind didn't know was possible to do," she wrote.

Elizabeth and her brother—who is now director of product management at Theranos—had both been intrigued by their father's work in China. So when Elizabeth was about 9, her parents found them both a tutor to teach them Mandarin on Saturdays. Elizabeth then supplemented those lessons with summer language programs at Stanford and, later, at two universities in Beijing. Captivated by computer programming in high school, she was struck by how the Chinese universities' information technology facilities lagged behind what she was used to. To rectify that situation, she started her first business while still in high school, selling C++ compilers to Chinese universities.

Whether it grew out of her father's experiences at Tenneco or family lore—they are descendants of a founder of the Fleischmann's Yeast company—Elizabeth grew up admiring private industry. "At a relatively early age I began to believe that building a business was perhaps the greatest opportunity for making an impact," she says, "because it's a tool for making a change in the world."

Holmes was admitted by early decision to Stanford. As she headed off to college, her father gave her a copy of *Meditations*, by the Roman emperor and Stoic philosopher Marcus Aurelius. "I wanted it to reinforce the message of a purposeful life," her father explained to me. "I think it really affected her."

Upon admission, Holmes was named one of an elite group of freshmen denominated "president's scholars," which meant that Stanford would spot them $3,000 each to use on a research project. While still a freshman, Holmes persuaded her chemical engineering professor, Robertson, to let her use

| THE W 06 00 1A FINAL1 indd 8 | KAVULLA · EVILLA · NEI◉ARRIS · PARLOFF · SMITH | | 6/00/14 5:4▢PM |
|---|---|---|---|
| STORY CODE | STORY NAME | ISSUE DATE | |
| **THE30** | **Theranos** | **6/30/2014** | Page **8** of **9** |

Confidential                                                                                                    RDV004734



the stipend for a research project in his lab, though it would mean working mainly alongside Ph.D. candidates.

That summer she departed for Singapore to work in the lab at the Genome Institute, which was developing novel systems to detect the SARS virus in blood or nasal swabs. "I had not had much formal biology training," Holmes recalls, so she had to bring herself up to speed in that respect on her own. At the same time, her engineering and technology background at Stanford led her to believe that "there were much better ways to do" the tests she saw being performed at the institute.

As soon as she got back to the U.S., Holmes started writing a patent application embodying the ideas set in motion by that experience. "I saw her sit down at the computer, and for five to six days she barely got up," recalls her mother, Noel. "I would bring her food occasionally, and she slept maybe one or two hours a night for five nights."

The day after Elizabeth finished the draft, Noel started driving her from Houston to Stanford, hoping to enjoy some mother-daughter quality time. But Elizabeth just slept for two days in the car.

Noel and Chris knew then that Elizabeth wanted to start a business, though they didn't understand the details. It therefore came as no shock the following semester when she told them she needed to suspend college to pursue the company full-time. They let her take the money they'd saved for her education and put it into her business.

"What do you want for your children?" says Noel. "You want them to do something they're passionate about. To follow their dream. To help people. To change the world. So we said, 'Of course. Go do this.'"

**I**N WHAT RESPECT, then, does Holmes's first patent application—the wearable patch that would radio the doctor what is going on in your blood in real time—lead to Theranos, a player in the $73 billion diagnostic lab business?

When one returns to her core mission—making actionable information accessible at the time it matters—one glimpses part of what she means. The patch permitted physicians and patients to see the "movie" of what was going on inside patients' blood. The original name for her company was Real-Time Cures, though she soon scratched that, after deciding that too many people had a "cynical" reaction to the word "cure."

"Elizabeth has had a very clear vision of where she wanted to take this since the time I met her," says Sunny Balwani, who met her in 2002 and has been Theranos's president since 2009. "The business strategy, the tactics of what to do first, what to offer when—that has changed, but the overall goal and direction has been linear." Balwani, who founded and sold his own e-commerce company in the 1990s, is an expert in building software products.

For 10 years Holmes patiently raised money and refined her technologies. As much as she needed money, she turned down many offers, she says, because so many investors wanted quick returns.

"Too often the question is, What's your exit strategy?" she recounts, "before you're really understanding what your entry strategy is." She is building a company, she explains, that "30, 40, even 50 years from now will be defining new standards in terms of the way in which people will be able to get access to actionable information."

Early investors included venture capitalists Draper Fisher Jurvetson (which has funded Tesla and SpaceX), ATA Ventures, Silicon Valley legend Don Lucas Sr. (Oracle, National Semiconductor, Macromedia), and Oracle's Larry Ellison. She will not identify later investors other than to say they include private equity funds and "strategic partners," by which she means "entities working with the company as we scale." Though she has now raised more than $400 million, she says she has retained control over more than 50% of the stock.

All the while, Holmes has continued to invent and to upgrade her earlier inventions. "As she likes to put it," says board member Shultz, "the best patent is making yourself obsolete. So the person who steals your patent steals yesterday's technology."

Today Holmes is a co-inventor on 82 U.S. and 189 foreign patent applications, of which 18 in the U.S. and 66 abroad have been granted. Those are in addition to another 186 applications Theranos has filed worldwide that don't list Holmes as an inventor, of which 18 have already been granted.

**A**LTHOUGH I BELIEVE Balwani when he says that Holmes's "overall goal and direction" for the company "has been linear," I don't believe that Walgreens wellness centers represent the ultimate target of that vector. There are pieces of the puzzle we haven't seen yet. In some cases she may be waiting for regulatory approval, while in others she may just be waiting, like Steve Jobs, to finish perfecting her next "great product" before unveiling it with a flourish.

As Holmes relentlessly pursues the next "embodiment" of her vision, her old chemical engineering professor, Robertson, sits about 20 yards from her office, helping her. After years of volunteer service to the company as a director, he became a paid consultant in 2009. Last June he signed up as an employee.

"I gave up two endowed chairs to do this," he says. "I think that's a statement."

Then he adds, "To me, I wish I wasn't 70 years old. I wish I was her age and could be in on this. Because this is going to be a long, exciting, fascinating, exhilarating ride." **∎**

FEEDBACK *roger_parloff@fortune.com*

| THE W 06 30 14 FINAL3 indd 9 | KAVULLA · EVILLA · NEIL ●RRIS ·PARLOFF· SMITH | | 6/00/14 5:40 PM |
|---|---|---|---|
| STORY CODE | STORY NAME | ISSUE DATE | |
| THE30 | Theranos | 6/30/2014 | Page 9 of 9 |

Confidential

RDV004735

**This document was produced natively**

Trial Exh. 2098 Page 0001

Message

| | |
|---|---|
| **From:** | Peterson, Lisa (RDV Corp - Investment Management) [/O=RDV CORPORATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=LISAP] |
| **Sent:** | 10/20/2014 3:46:42 PM |
| **To:** | LaCombe, Pat (RDV Corp - Investment Management) [/o=RDV Corporation/ou=First Administrative Group/cn=Recipients/cn=patl] |
| **Subject:** | FW: Thank You |

...didn't even mention my name. What a joke. That stings big time after pulling an all-nighter getting prepared. Why don't I ever learn.

*Lisa*

▇▇▇▇ (direct)

▇▇▇▇ (cell)

**From:** Peterson, Lisa (RDV Corp - Investment Management)
**Sent:** Monday, October 20, 2014 11:43 AM
**To:** Tubergen, Jerry
**Subject:** RE: Thank You

No worries. I'll document something for the file that you can sign as "approved". Let me know how I can be helpful going forward, would love to stay remotely connected on this one as it really fascinates me.

*Lisa*

▇▇▇▇ direct)

▇▇▇▇ (cell)

**From:** Tubergen, Jerry
**Sent:** Monday, October 20, 2014 11:29 AM
**To:** Peterson, Lisa (RDV Corp - Investment Management)
**Subject:** Re: Thank You

Confidential

RDV005495

Detail----I just reread the attached email chain, and noticed I omitted you in referencing our meeting. My apologies, an oversight on my part that was certainly not intentional. Good news is we are in and I'm very encouraged by this deal.

Thanks for your help on this Lisa.

Jerry

On Oct 20, 2014, at 7:51 AM, Tubergen, Jerry <jerryt@rdvcorp.com> wrote:

Hi Lisa

Sunny is to get in touch with me re next steps. I will keep you posted.

Jerry

Begin forwarded message:

**From:** Elizabeth Holmes <eholmes@theranos.com>
**Date:** October 19, 2014 at 9:32:27 PM PDT
**To:** Jerry Tubergen <jerryt@rdvcorp.com>, Sunny Balwani <sbalwani@theranos.com>
**Cc:** Doug DeVos
**Subject: RE: Thank You**

Dear Jerry:

Thank you for this note.

We too very much enjoyed our meeting, and very much identified with your values and commitments.

We cannot think of a better foundation for long term impact and long term value creation than building our company with a group of anchor shareholders who share these values.

We have reserved the $100M allocation for you and the family. Sunny will follow with a note tomorrow with the details from here.

We look forward to building this long term partnership on all fronts.

With my very best regards,
Elizabeth

 RDV005496

-----Original Message-----
From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
Sent: Sunday, October 19, 2014 7:47 AM
To: Elizabeth Holmes; Sunny Balwani
Cc: Doug DeVos
Subject: Re: Thank You

Elizabeth and Sunny

Thank you so very much for our meeting Tuesday, with Doug, Cheri, Rick and me. It was wonderfully informative, and in fact, extremely encouraging and exciting to learn more about Theranos, and the truly amazing opportunities and potential that lay ahead. We all enjoyed spending the time with you, getting to know you both and hearing more about your values and vision. To say we were impressed, is clearly an understatement. As we agreed concluding our meeting, it is clear we have much in common, which is the stuff of good partnership.

We would love to move forward and be a part of the new shareholder base you are assembling. As we discussed, an investment of $100M seems to fit, if that works for you and the company.

We are truly honored to have this opportunity, and look forward to a long, successful partnership. We stand ready to be more that a financial partner, and are committed to helping you and your team build out the Theranos platform to positively impact lives throughout the world for many years to come. As we said, we view this as a multigenerational commitment.

Please have whomever is appropriate follow up with me regarding next steps at their earliest convenience.

And thank you again for using your talent and efforts to create something that will be of benefit to so many. We are grateful to have thus opportunity to be a part of this and are extremely encouraged about the future.

All the very best

Jerry

On Sep 23, 2014, at 3:04 PM, "Elizabeth Holmes" <eholmes@theranos.com> wrote:

Jerry:

Thanks for this note and your comments below.

Confidential

RDV005497

It was wonderful to meet you.

We too are deeply interested in the potential long term relationship here; our conversation and discussion on values and long term value creation greatly resonated with us.

We very much look forward to welcoming you to California. The 14th of October works for our team here - we are definitely progressing toward closing some of these transactions but can plan to get materials to you exactly upon receipt of your confidentiality agreement and move expeditiously with you after the meeting so you don't have to fly out twice.

I am looking forward to this,

Elizabeth

-----Original Message-----

From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]

Sent: Thursday, September 18, 2014 11:54 AM

To: Elizabeth Holmes

Cc: 'dmosley@          Christian Holmes

Subject: Thank You

Dear Elizabeth,

What a great pleasure it was to meet you and Christian yesterday and get a sense of your values and vision for Theranos. You have created something truly amazing. It does seem we have much in common. I came away inspired and enthused.

Confidential                                          RDV005498

I was able to speak to several DeVos family members today about you, Theranos, and the potential for us to become a partner with you in this exciting undertaking. As I expected, there was an overwhelmingly enthusiastic response (from both 2nd and 3rd generation family members), and a strong desire to explore how that might happen.

Dan Mosley and I spoke earlier today as well, and he indicated he would send me a confidentiality agreement to execute and return to you, which I am happy to do. Once you receive that, would you please send me a copy of the offering memorandum for our review?

As to an on-sight visit, I would love to find a time that works for me, along with one or two family members. I otherwise need to be in California in mid-October, and it would work well to come out a day or so early to visit you, say October 14 or 15. If you'd prefer, I can certainly find a time to come out sooner. Happy to do whatever works best for you. We are very much looking forward to exploring a mutually beneficial partnership.

Thanks very much for your time yesterday and the opportunity to meet you.

All the best,

Jerry

Confidential

RDV005499

| To: | Jerry Tubergen[jerryt@rdvcorp.com] |
|---|---|
| Cc: | Doug DeVos[dld@amway.com]; Elizabeth Holmes[eholmes@theranos.com] |
| From: | Sunny Balwani |
| Sent: | Tue 10/21/2014 1:31:13 AM |
| Importance: | Normal |
| Subject: | RE: Thank You |
| Received: | Tue 10/21/2014 1:31:15 AM |

Investor Master Signature Page_Series C-2.pdf
New Investor.zip
Theranos bank wire instruction.pdf

Jerry.

Hope you are well.

Per Elizabeth's email, attached please find all the relevant documents for the investment:

- The file named "New investor.zip" is a folder that contains the soft copy of all the investment documents you already have in the investment binder
- The 2 additional documents attached to this email are the signature page and wiring instructions

Since we didn't know the name of the investment fund/entity you will use for this investment, we left that blank in the signature document. Please fill out the name of the entity/investment fund and the address of this entity in the signature block. Once executed, you can send the original of the executed document to my attention at the address below.

Please let me know if I can provide any assistance with any of these documents.

with my best regards,

Sunny Balwani
President & COO
Theranos Inc.
650-320-2777
1601 S. California Ave.
Palo Alto, CA 94304
sbalwani@theranos.com

====================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304
650-838-9292    www.theranos.com
====================================

-----Original Message-----
From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
Sent: Monday, October 20, 2014 10:23 AM
To: Elizabeth Holmes
Cc: Sunny Balwani; Doug DeVos
Subject: Re: Thank You

FOIA Confidential Treatment Requested by Theranos TS-0001469

Thanks very much Elizabeth.

JT

> On Oct 19, 2014, at 9:33 PM, Elizabeth Holmes <eholmes@theranos.com> wrote:
>
> Dear Jerry:
>
> Thank you for this note.
>
> We too very much enjoyed our meeting, and very much identified with your values and commitments.
>
> We cannot think of a better foundation for long term impact and long term value creation than building our company with a group of anchor shareholders who share these values.
>
> We have reserved the $100M allocation for you and the family. Sunny will follow with a note tomorrow with the details from here.
>
> We look forward to building this long term partnership on all fronts.
>
> With my very best regards,
> Elizabeth
>
> -----Original Message-----
> From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
> Sent: Sunday, October 19, 2014 7:47 AM
> To: Elizabeth Holmes; Sunny Balwani
> Cc: Doug DeVos
> Subject: Re: Thank You
>
> Elizabeth and Sunny
>
> Thank you so very much for our meeting Tuesday, with Doug, Cheri, Rick and me. It was wonderfully informative, and in fact, extremely encouraging and exciting to learn more about Theranos, and the truly amazing opportunities and potential that lay ahead. We all enjoyed spending the time with you, getting to know you both and hearing more about your values and vision. To say we were impressed, is clearly an understatement. As we agreed concluding our meeting, it is clear we have much in common, which is the stuff of good partnership.
>
> We would love to move forward and be a part of the new shareholder base you are assembling. As we discussed, an investment of $100M seems to fit, if that works for you and the company.
>
> We are truly honored to have this opportunity, and look forward to a long, successful partnership. We stand ready to be more that a financial partner, and are committed to helping you and your team build out the Theranos platform to positively impact lives throughout the world for many years to come. As we said, we view this as a multigenerational commitment.
>
> Please have whomever is appropriate follow up with me regarding next steps at their earliest convenience.
>
> And thank you again for using your talent and efforts to create something that will be of benefit to so many. We are grateful to have thus opportunity to be a part of this and are extremely encouraged about the future.
>
> All the very best
>
> Jerry
>
>
>
>
>
>> On Sep 23, 2014, at 3:04 PM, "Elizabeth Holmes" <eholmes@theranos.com> wrote:
>>
>> Jerry:

FOIA Confidential Treatment Requested by Theranos                    TS-0001470

>>
>> Thanks for this note and your comments below.
>>
>> It was wonderful to meet you.
>>
>> We too are deeply interested in the potential long term relationship here; our conversation and discussion on values and long term value creation greatly resonated with us.
>>
>> We very much look forward to welcoming you to California. The 14th of October works for our team here - we are definitely progressing toward closing some of these transactions but can plan to get materials to you exactly upon receipt of your confidentiality agreement and move expeditiously with you after the meeting so you don't have to fly out twice.
>>
>> I am looking forward to this,
>>
>> Elizabeth
>>
>> -----Original Message-----
>> From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
>> Sent: Thursday, September 18, 2014 11:54 AM
>> To: Elizabeth Holmes
>> Cc: 'dmosley@cravath.com'; Christian Holmes
>> Subject: Thank You
>>
>> Dear Elizabeth,
>>
>> What a great pleasure it was to meet you and Christian yesterday and get a sense of your values and vision for Theranos. You have created something truly amazing. It does seem we have much in common. I came away inspired and enthused.
>>
>> I was able to speak to several DeVos family members today about you, Theranos, and the potential for us to become a partner with you in this exciting undertaking. As I expected, there was an overwhelmingly enthusiastic response (from both 2nd and 3rd generation family members), and a strong desire to explore how that might happen.
>>
>> Dan Mosley and I spoke earlier today as well, and he indicated he would send me a confidentiality agreement to execute and return to you, which I am happy to do. Once you receive that, would you please send me a copy of the offering memorandum for our review?
>>
>> As to an on-sight visit, I would love to find a time that works for me, along with one or two family members. I otherwise need to be in California in mid-October, and it would work well to come out a day or so early to visit you, say October 14 or 15. If you'd prefer, I can certainly find a time to come out sooner. Happy to do whatever works best for you. We are very much looking forward to exploring a mutually beneficial partnership.
>>
>> Thanks very much for your time yesterday and the opportunity to meet you.
>>
>> All the best,
>>
>> Jerry
>>

FOIA Confidential Treatment Requested by Theranos                                     TS-0001471

**MASTER SIGNATURE PAGE**

**IN WITNESS WHEREOF**, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "***Company***"), as an "Investor," "Series C-2 Investor," "Prior Investor," "Holder," "Seller," "Extension Investor" and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.    Amended and Restated Investors' Rights Agreement, dated February 7, 2014 (the "***Rights Agreement***"), as a Series C-2 Investor listed on Exhibit B thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2.    Amended and Restated Voting Agreement, dated February 7, 2014, as a Series C-2 Investor listed on Exhibit B thereto.

3.    Series C-2 Preferred Stock Purchase Agreement, dated February 7, 2014, as amended (the "***Purchase Agreement***"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

4.    Amendment No. 2 to the Series C-2 Preferred Stock Purchase Agreement, dated on or around July 2014 ("***Amendment No. 2***"), as an Extension Investor.

5.    Stockholder Confidentiality Agreement, dated as of the date hereof, as Stockholder.

I acknowledge and agree that I am investing the aggregate dollar value of $99,999,984 in cash to purchase a total of

5,882,352 shares of the Company's Series C-2 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement

and Amendment No. 2.


**Entity:** _____


**By:** _____          **ADDRESS:**

**Name:** _____          _____

**Title:** _____          _____

**Dated:** _____          _____


FOIA Confidential Treatment Requested by Theranos                                                                                   TS-0001472

**THERANOS, INC.**

**AMENDED AND RESTATED**

**INVESTORS' RIGHTS AGREEMENT**

**February 7, 2014**

FOIA Confidential Treatment Requested by Theranos TS-0001473

**TABLE OF CONTENTS**

<u>Page</u>

Section 1 Definitions ................................................................................................................... 1
    1.1    *Certain Definitions* .......................................................................................... 1

Section 2 Registration Rights ..................................................................................................... 5
    2.1    *Company Registration* .................................................................................... 5
    2.2    *Registration on Form S-3* ............................................................................... 6
    2.3    *Expenses of Registration* ................................................................................ 8
    2.4    *Registration Procedures* ................................................................................. 9
    2.5    *Indemnification* ............................................................................................ 10
    2.6    *Information by Holder* .................................................................................. 12
    2.7    *Restrictions on Transfer* ............................................................................... 12
    2.8    *Rule 144 Reporting* ...................................................................................... 14
    2.9    *Market Stand-Off Agreement* ....................................................................... 14
    2.10   *Delay of Registration* ................................................................................... 15
    2.11   *Transfer or Assignment of Registration Rights* ........................................... 15
    2.12   *Limitations on Subsequent Registration Rights* ........................................... 15
    2.13   *Termination of Registration Rights* .............................................................. 15

Section 3 Covenants of the Company ........................................................................................ 16
    3.1    *Confidentiality* .............................................................................................. 16
    3.2    *Confidential Information and Invention Assignment Agreements* ............... 16
    3.3    *Key Person Life Insurance* ........................................................................... 16
    3.4    *Termination of Covenants* ............................................................................ 16

Section 4 Company Right of First Refusal, Secondary Right of Refusal, and Assignee Right
    of Refusal .......................................................................................................................... 16
    4.1    *Right of First Refusal* ................................................................................... 16

Section 5 Miscellaneous ............................................................................................................ 19
    5.1    *Amendment* ................................................................................................... 19
    5.2    *Notices* .......................................................................................................... 19
    5.3    *Governing Law* ............................................................................................. 20
    5.4    *Successors and Assigns* ................................................................................ 20
    5.5    *Entire Agreement* ......................................................................................... 20
    5.6    *Delays or Omissions* .................................................................................... 20
    5.7    *Severability* .................................................................................................. 20
    5.8    *Titles and Subtitles* ...................................................................................... 21
    5.9    *Counterparts* ................................................................................................. 21
    5.10   *Telecopy Execution and Delivery* ................................................................ 21
    5.11   *Jurisdiction; Venue* ...................................................................................... 21
    5.12   *Further Assurances* ....................................................................................... 21
    5.13   *Termination Upon Change of Control* .......................................................... 21
    5.14   *Quarterly Board Meetings* ............................................................................ 22
    5.15   *Conflict* ......................................................................................................... 22
    5.16   *Costs of Enforcement* ................................................................................... 22
    5.17   *Aggregation* .................................................................................................. 22

-i-

FOIA Confidential Treatment Requested by Theranos

5.18    *Prior Rights Agreement Superseded/Waiver* .............................................................. 22

-ii-

FOIA Confidential Treatment Requested by Theranos                                                      TS-0001475

**ER-13236**

**THERANOS, INC.**
**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

This Amended and Restated Investors' Rights Agreement (this "**Agreement**") is made as of February 7, 2014, by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities (each, a "**Series C-2 Investor**" and collectively, the "**Series C-2 Investors**") listed on Exhibit A hereto and the persons and entities (each, a "**Prior Investor**" and collectively, the "**Prior Investors**") listed on Exhibit B hereto, and Elizabeth Holmes. The Series C-2 Investors and the Prior Investors are referred to herein collectively as the "**Investors.**" Unless otherwise defined herein, capitalized terms used in this Agreement have the meanings ascribed to them in **Section 1**.

**RECITALS**

**WHEREAS,** the Company, the Prior Investors and Elizabeth Holmes are parties to that certain Amended and Restated Investors' Rights Agreement, dated as of January 14, 2014 (the "**Prior Agreement**").

**WHEREAS,** the Series C-2 Investors are parties to the Series C-2 Preferred Stock Purchase Agreement of even date herewith, among the Company and the Series C-2 Investors listed on the Schedule of Investors thereto (the "**Series C-2 Purchase Agreement**"), and it is a condition to the closing of the sale of the Series C-2 Preferred Stock to the Series C-2 Investors listed on such Schedule of Investors that the Series C-2 Investors and the Company execute and deliver this Agreement.

**WHEREAS,** the undersigned Company, certain of the Prior Investors and Elizabeth Holmes desire to amend and restate the Prior Agreement to add Series C-2 Investors as parties and amend and restate the terms of the Prior Agreement.

**NOW, THEREFORE:** In consideration of the mutual promises and covenants set forth herein, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

**Section 1**
**Definitions**

1.1 *Certain Definitions.* As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "**Certificate of Designation**" means the Certificate of Designation of Series C-2 Preferred Stock.

(b) "**Class A Common Stock**" means the Class A Common Stock of the Company.

-1-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos     TS-0001476

(c)     "**Class B Common Stock**" means the Class B Common Stock of the Company.

(d)     "**Commission**" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(e)     "**Common Stock**" means the Class A Common Stock and Class B Common Stock.

(f)     "**Conversion Stock**" shall mean shares of Class A Common Stock issued upon conversion of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series C-1 Preferred Stock and Series C-2 Preferred Stock held by the Investors.

(g)     "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(h)     "**Holder**" shall mean any Investor who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been duly and validly transferred in accordance with **Section 2.11** of this Agreement and, for the purposes of Section 2 only, Elizabeth Holmes for so long as she holds Registrable Securities.

(i)     "**Indemnified Party**" shall have the meaning set forth in **Section 2.5(c)** hereto.

(j)     "**Indemnifying Party**" shall have the meaning set forth in **Section 2.5(c)** hereto.

(k)     "**Initial Public Offering**" shall mean the closing of the Company's first firm commitment underwritten public offering of the Class A Common Stock registered under the Securities Act.

(l)     "**Joinder**" shall mean the joinder agreement in the form of Annex A.

(m)     "**Offered Price**" shall have the meaning set forth in **Section 4.1(b)**.

(n)     "**Offered Shares**" shall have the meaning set forth in **Section 4.1(b)**.

(o)     "**Other Selling Stockholders**" shall mean persons other than Holders who, by virtue of agreements with the Company, are entitled to include their Other Shares in certain registrations hereunder.

(p)     "**Other Shares**" shall mean shares of Class A Common Stock, other than Registrable Securities (as defined below), (including shares of Class A Common Stock issuable upon conversion of shares of any currently unissued series of Preferred Stock of the Company) with respect to which registration rights have been granted.

-2-

THERANOS, INC. CONFIDENTIAL

ER-13238

(q)    "**Proposed Transferee**" shall have the meaning set forth in **Section 4.1(b)**.

(r)    "**Registrable Securities**" shall mean (i) shares of Conversion Stock, (ii) any shares of Class A Common Stock held by Elizabeth Holmes (including upon conversion of Class B Common Stock) and any shares of Class A Common Stock issued upon conversion of Preferred Stock held by Elizabeth Holmes, and (iii) any shares of Class A Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, all such shares of Class A Common Stock described in clauses (i) and (ii) of this subsection (s); provided, however, that Registrable Securities shall not include any shares of Class A Common Stock described in clause (i), (ii), or (iii) above which have previously been registered or which have been sold to the public either pursuant to a registration statement or Rule 144, or which have been sold in a private transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with this Agreement.

(s)    The terms "**register**," "**registered**" and "**registration**" shall refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of the effectiveness of such registration statement.

(t)    "**Registration Expenses**" shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company and one special counsel for the Holders, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses, fees and disbursements of other counsel for the Holders and the compensation of regular employees of the Company, which shall be paid in any event by the Company.

(u)    "**Restricted Securities**" shall mean any Registrable Securities required to bear the first legend set forth in **Section 2.7(c)** hereof.

(v)    "**Rule 144**" shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(w)    "**Rule 145**" shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission

(x)    "**Securities Act**" shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(y)    "**Seller**" shall have the meaning set forth in **Section 4.1(a)**.

-3-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos TS-0001478

-

(z)      "**Seller Shares**" shall have the meaning set forth in **Section 4.1(a)**.

(aa)     "**Selling Expenses**" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of one special counsel to the Holders included in Registration Expenses).

(bb)     "**Series A Preferred Stock**" shall mean the shares of Series A Preferred Stock of the Company.

(cc)     "**Series B Preferred Stock**" shall mean the shares of Series B Preferred Stock of the Company.

(dd)     "**Series C Preferred Stock**" shall mean the shares of Series C Preferred Stock of the Company.

(ee)     "**Series C-1 Preferred Stock**" shall mean the shares of Series C-1 Preferred Stock of the Company.

(ff)     "**Series C-2 Preferred Stock**" shall mean the shares of Series C-2 Preferred Stock of the Company.

(gg)     "**Series C-2 Purchase Agreement**" shall have the meaning set forth in the Recitals hereto.

(hh)     "**Transfer**" or words of similar import, mean and include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including but not limited to transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or involuntary, directly or indirectly, <u>except</u>:

(i)      by operation of law; *provided*, that the recipient enters into the Joinder;

(ii)     any transfer to the Company pursuant to the terms of this Agreement;

(iii)    any repurchase of the Seller Shares by the Company pursuant to agreements under which the Company has the option to repurchase such Seller Shares upon the occurrence of certain events, such as termination of employment, or in connection with the exercise by the Company of any rights of first refusal; and

(iv)     any redemption pursuant to Article V, Section 7 of the Company's Amended and Restated Certificate of Incorporation.

(ii)     "**Transfer Notice**" shall have the meaning set forth in **Section 4.1(b)**.

-4-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                     TS-0001479

-

ER-13240

**Section 2**
**Registration Rights**

2.1    *Company Registration.*

(a)    <u>Company Registration</u>. If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders, other than a registration pursuant to **Section 2.2**, a registration relating solely to employee benefit plans, a registration relating to the offer and sale of debt securities, a registration relating to a corporate reorganization or other Rule 145 transaction, or a registration on any registration form that does not permit secondary sales, the Company will:

(i)    promptly give written notice of the proposed registration to all Holders; and

(ii)    use its commercially reasonable efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in **Section 2.1(b)** below, and in any underwriting involved therein, all of such Registrable Securities as are specified in a written request or requests made by any Holder or Holders received by the Company within ten (10) days after such written notice from the Company is mailed or delivered. Such written request may specify all or a part of a Holder's Registrable Securities.

(b)    <u>Underwriting</u>. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to **Section 2.1(a)(i)**. In such event, the right of any Holder to registration pursuant to this **Section 2.1** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the Other Selling Stockholders or other holders of securities of the Company with registration rights to participate therein distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this **Section 2.1**, if the underwriters advise the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the underwriters may (subject to the limitations set forth below) exclude all Registrable Securities from, in the case of an initial public offering, or limit the number of Registrable Securities to be included in the registration and underwriting to a minimum of 30% on a pro rata basis. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in any other registration and underwriting shall be allocated, as follows: (i) first, to the Company for securities being sold for its own account, (ii) second, to the Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion and (iii) third, to the Other Selling Stockholders requesting to include

-5-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0001480

Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall also be excluded therefrom by written notice from the Company or the underwriter. The Registrable Securities or other securities so excluded shall also be withdrawn from such registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares of Registrable Securities to be included in such registration was previously reduced as a result of marketing factors pursuant to this **Section 2.1(b)**, the Company shall then offer to all persons who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among the persons requesting additional inclusion, in the manner set forth above.

(c)    <u>Right to Terminate Registration</u>. The Company shall have the right to terminate or withdraw any registration initiated by it under this **Section 2.1** prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

2.2    *Registration on Form S-3*.

(a)    <u>Request for Form S-3 Registration</u>. After its initial public offering, the Company shall use its commercially reasonable efforts to qualify for registration on Form S-3 or any comparable or successor form or forms. After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this **Section 2** and subject to the conditions set forth in this **Section 2.2**, if the Company shall receive from a Holder or Holders of at least 10% of the Registrable Securities a written request that the Company effect any registration on Form S-3 or any similar short form registration statement with respect to all or part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Holder or Holders), the Company will

(i)    promptly give written notice of the proposed registration to all other Holders; and

(ii)    as soon as practicable, file and use its commercially reasonable efforts to effect such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and to permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within twenty (20) days after such written notice from the Company is mailed or delivered.

-6-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos    TS-0001481

(b)　　Limitations on Form S-3 Registration. The Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this **Section 2.2**:

(i)　　Prior to the earlier of (A) the five (5) year anniversary of the date of this Agreement or (B) one hundred eighty (180) days following the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public;

(ii)　　In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(iii)　　If the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) on Form S-3 at an aggregate price to the public of less than $2,000,000;

(iv)　　The Company has effected two (2) such registrations; or

(v)　　During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Company-initiated registration.

(c)　　Deferral. If (i) in the good faith judgment of the board of directors of the Company (the "***Board***"), the filing of a registration statement covering the Registrable Securities would be materially detrimental to the Company and the Board concludes, as a result, that it is in the best interests of the Company to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board, it would be materially detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, in the best interests of the Company to defer the filing of such registration statement, then (in addition to the limitations set forth above) the Company shall have the right to defer such filing.

(d)　　Underwriting. If the Holders of Registrable Securities requesting registration under this **Section 2.2** intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this **Section 2.2** and the Company shall include such information in the written notice given pursuant to **Section 2.2(a)(i)** . In such event, the right of any Holder to include all or any portion of its Registrable Securities in such registration pursuant to this **Section 2.2** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities to the extent provided herein. If the Company shall request inclusion in any registration pursuant to **Section 2.2** of securities being sold for its own account, or if other persons shall request inclusion in any registration pursuant to **Section 2.2**, the Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and such offer shall be conditioned upon the participation of the Company or such other persons in such underwriting and the inclusion of the

-7-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　TS-0001482

Company's and such person's other securities of the Company and their acceptance of the further applicable provisions of this **Section 2** (including **Section 2.9**). The Company shall (together with all Holders and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by a majority in interest of the Holders, which underwriters are reasonably acceptable to the Company.

Notwithstanding any other provision of this Section 2.2, if the underwriters advise the Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of Registrable Securities and Other Shares that may be so included shall be allocated as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion; (ii) second, to the Company, which the Company may allocate, at its discretion, for its own account, or for the account of other holders or employees of the Company; and (iii) third, to the Other Selling Stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the underwriter or the Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 2.2(d), then the Company shall then offer to all Holders and Other Selling Stockholders who have retained rights to include securities in the registration the right to include additional Registrable Securities or Other Shares in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders and other Selling Stockholders requesting additional inclusion, as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion; and (ii) second, to the Other Selling Stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

2.3     *Expenses of Registration.* All Registration Expenses incurred in connection with registrations pursuant to **Section 2.1** hereof shall be borne by the Company. All Registration Expenses incurred in connection with registrations pursuant to **Section 2.2** hereof, including all fees and expenses of one special counsel to the Investors, shall be borne by the Investors on a pro rata basis. All Selling Expenses relating to securities registered on behalf of the Holders shall be borne by the holders of securities included in such registration pro rata among each other on the basis of the number of Registrable Securities so registered.

-8-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                                                    TS-0001483

2.4 *Registration Procedures.* In the case of each registration effected by the Company pursuant to this **Section 2**, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, the Company will use its commercially reasonable efforts to:

(a) Keep such registration effective for a period ending on the earlier of the date which is sixty (60) days from the effective date of the registration statement or such time as the Holder or Holders have completed the distribution described in the registration statement relating thereto.

(b) Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the period set forth in subsection (a) above;

(c) Furnish such number of prospectuses, including any preliminary prospectuses, and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d) Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdiction as shall be reasonably requested by the Holders; provided, that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e) Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing, and following such notification promptly prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing;

(f) Use its commercially reasonable efforts to furnish, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and reasonably satisfactory to a majority in interest of the Holders requesting registration of Registrable Securities and (ii) a "comfort" letter dated as of such date, from the independent certified public accountants of the

-9-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                          TS-0001484

Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

(g)     Provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)     Otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months, but not more than eighteen months, beginning with the first month after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act; and

(i)     Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed.

2.5     *Indemnification*.

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this **Section 2**, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any prospectus, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation (or alleged violation) by the Company of the Securities Act or any other federal securities law, any state securities laws or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any offering covered by such registration, qualification, or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action; provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or action arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder, any of such Holder's officers, directors, partners, legal counsel or accountants, any person controlling such Holder, such underwriter or any person who controls any such underwriter and stated to be specifically for use therein; and provided, further that, the indemnity agreement contained in this **Section 2.5(a)** shall not apply to amounts paid in settlement of any such loss, claim,

-10-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                    TS-0001485

**ER-13246**

damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(b)     To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder, and each of their officers, directors, and partners, and each person controlling such Holder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any such registration statement, prospectus, offering circular, or other document, or (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and provided that in no event shall any indemnity under this **Section 2.5** exceed the gross proceeds from the offering received by such Holder.

(c)     Each party entitled to indemnification under this **Section 2.5** (the "**Indemnified Party**") shall give notice to the party required to provide indemnification (the "**Indemnifying Party**") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not be unreasonably withheld), and the Indemnified Party may participate in such defense at such party's expense; and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this **Section 2.5**, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

-11-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                      TS-0001486

(d)     If the indemnification provided for in this **Section 2.5** is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense awarded by a court of law in such proportion as is determined to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

2.6     *Information by Holder*. Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this **Section 2**.

2.7     *Restrictions on Transfer*.

(a)     The holder of each certificate representing Registrable Securities by acceptance thereof agrees to comply in all respects with the provisions of this **Section 2.7**. Each Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Restricted Securities, or any beneficial interest therein, unless and until the transferee has agreed in writing for the benefit of the Company to take and hold such Restricted Securities subject to, and to be bound by, the terms and conditions set forth in this Agreement, including, without limitation, this **Section 2.7, Section 2.9, Section 3.1 and Section 4**, and:

(i)     there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     such Holder shall have given prior written notice to the Company of such Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, and, such Holder shall have furnished the Company, at its expense, with (i) an opinion of counsel, reasonably satisfactory to the Company, to the effect that such disposition will not require registration of such Restricted Securities under the Securities Act or (ii) a "no action" letter from the Commission to the effect that the transfer of such securities without registration will not result in a recommendation by

-12-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0001487

the staff of the Commission that action be taken with respect thereto, whereupon the holder of such Restricted Securities shall be entitled to transfer such Restricted Securities in accordance with the terms of the notice delivered by the Holder to the Company.

(b)     Notwithstanding the provisions of **Section 2.7(a)**, no such registration statement, opinion of counsel or "no action letter" shall be necessary for (i) a transfer not involving a change in beneficial ownership, or (ii) in transactions involving the distribution without consideration of Restricted Securities by any Holder to (x) a parent, subsidiary or other affiliate of Holder that is a corporation, or (y) any of its partners, members or other equity owners, or retired partners, retired members or other equity owners, or to the estate of any of its partners, members or other equity owners or retired partners, retired members or other equity owners; <u>provided</u>, in each case, that the Holder thereof shall give written notice to the Company of such Holder's intention to effect such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition.

(c)     Each certificate representing Registrable Securities shall (unless otherwise permitted by the provisions of this Agreement) be stamped or otherwise imprinted with a legend substantially similar to the following (in addition to any legend required under applicable state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, A SECONDARY RIGHT OF REFUSAL AND ASSIGNEE RIGHT OF REFUSAL AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

-13-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                TS-0001488

The Holders consent to the Company making a notation on its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer established in this **Section 2.7**.

(d)     The first legend referring to federal and state securities laws identified in **Section 2.7(c)** hereof stamped on a certificate evidencing the Restricted Securities and the stock transfer instructions and record notations with respect to such Restricted Securities shall be removed and the Company shall issue a certificate without such legend to the holder of such Restricted Securities if (i) such securities are registered under the Securities Act, or (ii) such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a public sale or transfer of such securities may be made without registration under the Securities Act.

2.8     *Rule 144 Reporting*. With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to use its commercially reasonable efforts to:

(a)     Make and keep public information regarding the Company available as those terms are understood and defined in Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b)     File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(c)     So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

2.9     *Market Stand-Off Agreement.* Each Holder hereby agrees that, if requested by the managing underwriter, such Holder shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Initial Public Offering filed under the Securities Act (or such other period up to 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor

-14-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                    TS-0001489

**ER-13250**



From finding your nearest Theranos Wellness Center™ location, to seeing and

FOIA Confidential Treatment Requested by Theranos TS-000149

provisions or amendments thereto). The obligations described in this **Section 2.9** shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in **Section 2.7(c)** hereof with respect to the shares of the Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

2.10 *Delay of Registration*. No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this **Section 2**.

2.11 *Transfer or Assignment of Registration Rights*. The rights to cause the Company to register securities granted to a Holder by the Company under this **Section 2** may be transferred or assigned by a Holder only to a transferee or assignee of not less than 100,000 shares of Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like); provided that (i) such transfer or assignment of Registrable Securities is effected in accordance with the terms of **Section 2.7** hereof and applicable securities laws, (ii) the Company is given written notice prior to said transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are intended to be transferred or assigned and (iii) the transferee or assignee of such rights assumes in writing the obligations of such Holder under this Agreement, including without limitation the obligations set forth in **Section 2.9**.

2.12 *Limitations on Subsequent Registration Rights*. From and after the date of this Agreement, the Company shall not, without the prior written consent of holders of at least a majority of the combined voting power of the then outstanding shares of Conversion Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights.

2.13 *Termination of Registration Rights*. The right of any Holder to request registration or inclusion in any registration pursuant to **Section 2.1** or **2.2** shall terminate on the earlier of (i) such date on which all shares of Registrable Securities held or entitled to be held upon conversion by such Holder are eligible to be sold under Rule 144 during any ninety (90)-day period, or (ii) five (5) years after the closing of the Initial Public Offering.

-15-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                                TS-0001490

**Section 3**
**Covenants of the Company**

The Company hereby covenants and agrees, as follows:

3.1     *Confidentiality*.

(a)     Notwithstanding any applicable law or provision of the Company's Amended and Restated Certificate of Incorporation (as it may hereafter be amended), each Investor hereby agrees to waive its rights to inspect the books and records of the Company pursuant to the Delaware General Corporation Law and other applicable law.  In addition, the Company shall not be required to disclose or make available information it is contractually bound to protect under third party agreements or to disclose or make available information in situations involving a conflict of interest.

(b)     Notwithstanding and without limiting **Section 3.1(a)**, any information provided by the Company to any Investor or Holder shall be kept strictly confidential by such Investor or Holder, and such Investor or Holder will not use such information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than in such Investor's or Holder's capacity as an officer or employee of the Company, or dissemination of such information to such Investor's or Holder's attorneys or employees (to the extent such employees have a need to know the contents of such information), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally.

3.2     *Confidential Information and Invention Assignment Agreements*. The Company shall have entered into, or shall enter into, confidential information and invention assignment agreements with Elizabeth Holmes and any other employee or consultant with access to the Company's intellectual property, confidential information or trade secrets.

3.3     *Key Person Life Insurance*. The Company shall use its commercially reasonable efforts to obtain or maintain term life insurance, payable to the Company, on the life of Elizabeth Holmes in the amount of $5,000,000.

3.4     *Termination of Covenants*. The covenants set forth in this **Section 3** shall terminate and be of no further force and effect after the closing of the Initial Public Offering.

**Section 4**
**Company Right of First Refusal, Secondary Right of Refusal,**
**and Assignee Right of Refusal**

4.1     *Right of First Refusal*.

(a)     General. Without limiting and in addition to the restrictions in **Section 2.7**, before any party hereto (a "**Seller**") may Transfer any shares of capital stock of the Company,

-16-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                        TS-0001491

excluding the Class B Common Stock, that are not otherwise subject to a right of first refusal of the Company ("**Seller Shares**"), such Seller must comply with the provisions of this **Section 4** (the "**Right of First Refusal**") and each Proposed Transferee (as defined below) must enter into the Joinder.

(b)    Notice of Proposed Transfer. Prior to a Seller Transferring any of its Seller Shares, such Seller shall deliver to the Company and to the founder of the Company, Elizabeth Holmes (the "**Founder**") not later than one hundred twenty (120) days prior to the consummation of the proposed Transfer, a binding written notice (the "**Transfer Notice**") stating: (i) such Seller's bona fide intention to Transfer such Seller Shares; (ii) the name, address and phone number of each proposed purchaser or other transferee (each, a "**Proposed Transferee**"); (iii) the aggregate number of Seller Shares proposed to be Transferred to each Proposed Transferee (the "**Offered Shares**"); and (iv) the terms and conditions of each proposed Transfer, including, but not limited to, the bona fide cash price or, in reasonable detail, other consideration for which such party proposes to Transfer the Offered Shares (the "**Offered Price**"). The Seller shall offer the Offered Shares at the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith and upon the same terms (or terms as similar as reasonably possible) to the Company, the Founder and/or the Assignee (as set forth below).

(c)    Exercise of Right of First Refusal. To exercise its Right of First Refusal, at any time within sixty (60) days after receipt of the Transfer Notice, the Company must deliver a written notice to the Seller and the Founder ("**Company Purchase Notice**"), electing to purchase all or any portion of the Offered Shares at the purchase price determined in accordance with subsection (f) below.

(d)    Grant of Secondary Right of Refusal to Founder. If the Company does not exercise its Right of First Refusal to purchase all of the Offered Shares, the Founder shall have a secondary right of refusal to purchase all or any portion of the Offered Shares not purchased by the Company (the "**Secondary Right of Refusal**"). If the Company does not intend to exercise its Right of First Refusal with respect to all of the Offered Shares, the Company must deliver a written notice to the Seller and to the Founder to that effect no later than sixty (60) days after the Seller delivered the Transfer Notice to the Company (the "**Secondary Notice**"). To exercise her Secondary Right of Refusal, the Founder must deliver a notice (the "**Founder Notice**") to such Seller and the Company within twenty (20) days after the Company's delivery of the Secondary Notice of her intent to exercise or not to exercise her Secondary Right of Refusal hereunder.

(e)    Right of Assignee of the Company. If both the Company and the Founder do not fully exercise their Right of First Refusal or Secondary Right of Refusal, respectively, then the Company may assign the right to purchase all or any portion of the Offered Shares not purchased by the Company or the Founder on the terms and conditions set forth in this **Section 4** (the "**Assignee Right of Refusal**") to any person (the "**Assignee**") and shall deliver a notice (the "**Assignment Notice**") to such Seller of its intent to exercise or not exercise its right of assignment within five (5) days after delivery of the Founder Notice. To exercise its Assignee Right of Refusal, the Assignee must deliver a notice (the "**Assignee Notice**") to such Seller, the Company and the Founder within

-17-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                         TS-0001492

twenty (20) days after delivery of the Founder Notice of the Assignee's intent to exercise or not to exercise his, her or its Assignee Right of Refusal.

(f)     Purchase Price. The purchase price for the Offered Shares to be purchased by the Company, the Founder and/or the Assignee shall be the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith, which determination will be binding upon the Company, the Founder and/or the Assignee, if applicable, and the Seller, absent fraud or error.  If the Offered Shares are to be Transferred by gift, bequest, devise or descent, the fair market value of the Offered Shares shall be determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. Subject to compliance with applicable state and federal securities laws, the Company, the Founder and/or the Assignee shall effect the purchase of all or any portion of the Offered Shares, including the payment of the purchase price, at the option of the Company, the Founder and/or the Assignee (i) in cash (by check), (ii) by wire transfer, (iii) by cancellation of all or a portion of any outstanding indebtedness of the Seller to the Company (or, in the case of purchase by the Founder or the Assignee, to the Founder or the Assignee, respectively), or (iv) by any combination thereof.  The closing of the purchase of any Offered Shares by the Company pursuant to the Right of First Refusal shall take place, and all payments from the Company shall have been delivered to the Seller, by the later of (i) the date specified in the Transfer Notice as the intended date for the proposed Transfer or (ii) sixty (60) days after delivery of the Company Purchase Notice.  The closing of the purchase of any Offered Shares by the Founder pursuant to the Secondary Right of Refusal shall take place, and all payments from the Founder shall have been delivered to the Seller, by not later than forty (40) days after delivery of the Founder Notice.  The closing of the purchase of any Offered Shares by the Assignee pursuant to the Assignee Right of Refusal shall take place, and all payments from the Assignee shall have been delivered to the Seller, by not later than twenty (20) days after delivery of the Assignee Notice.

(g)     Seller's Right to Transfer.  If all of the Offered Shares to be Transferred are not purchased by the Company, the Founder and/or the Assignee as provided in this **Section 4**, then the Seller may Transfer such securities not purchased by the Company, the Founder and/or Assignee to that Proposed Transferee on the terms and conditions set forth in the Transfer Notice, provided that such Transfer is consummated within thirty (30) days after the later of (i) the earlier of (1) the delivery of the Founder Notice indicating an intent not to fully exercise the Secondary Right of Refusal and (2) eighty (80) days after the Seller delivered the Transfer Notice to the Company and (ii) the earlier of the delivery of (1) the Assignee Notice indicating an intent not to fully exercise the Assignee Right of Refusal, (2) an Assignment Notice indicating the Company's intent not to exercise its right of assignment and (3) one-hundred (100) days after the Seller delivered the Transfer Notice to the Company, and provided further that any such Transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee enters into the Joinder.  If any securities described in the Transfer Notice are not Transferred to the Proposed Transferee within such period, or if the Seller proposes to change the price or other terms to make

-18-

THERANOS, INC. CONFIDENTIAL

ER-13255

them more favorable to the Proposed Transferee, a new Transfer Notice shall be given to the Company, the Founder and the Assignee, and the Company, the Founder and the Assignee, if any, shall have a new Right of First Refusal, Secondary Right of Refusal, and Assignee Right of Refusal, respectively, before any Seller Shares may be Transferred.

(h)     Termination.  The provisions of this **Section 4** shall automatically terminate upon effectiveness of the Initial Public Offering.

(i)     Transfer Void.  Any Transfer of Seller Shares not made in compliance with the requirements of this **Section 4** shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company.

## Section 5
## Miscellaneous

5.1     *Amendment*.  Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Holders holding at least a majority of the combined voting power of the then outstanding shares of Registrable Securities (on an as-converted to Class A Common Stock basis) and Class B Common Stock, voting together as a single class; provided, however, that (i) Holders purchasing shares of Series C-2 Preferred Stock in a Closing after the Initial Closing (each as defined in the Series C-2 Purchase Agreement), (ii) holders of the Company's capital stock that sign the Joinder pursuant to the terms of this Agreement or the Company's bylaws, and (ii) holders of Class A Common Stock that receive such securities pursuant to an award granted under the Theranos, Inc. 2013 Stock Incentive Plan may become parties to this Agreement, by executing a counterpart of or joinder to this Agreement or the Joinder without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Holder; and provided, further, that the express rights of Elizabeth Holmes set forth in **Section 2** (or **Section 5.1**) of this Agreement may not be adversely amended or waived in a different manner than the express rights hereunder of other Holders without the written consent of Elizabeth Holmes.  Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Holder and each future holder of all such securities of Holder.  Each Holder acknowledges that by the operation of this paragraph, the holders of a majority of the combined voting power of the then outstanding shares of Registrable Securities (on an as-converted to Class A Common Stock basis) and Class B Common Stock, voting together as a single class, will have the right and power to diminish or eliminate all rights of such Holder under this Agreement.

5.2     *Notices*.  All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid' or otherwise delivered by hand or by messenger addressed:

(a)     if to an Investor, at the Investor's address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

-19-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                    TS-0001494

(b)    if to any Holder, at such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such shares for which the Company has contact information in its records;

(c)    if to the Company, one copy should be sent to each of Elizabeth Holmes and Valeska Pederson Hintz at Theranos, Inc., 1601 S. California, Palo Alto, CA 94304, or at such other address as the Company shall have furnished to the Investors, with copies to Katharine A. Martin, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or four days after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

5.3    *Governing Law*. This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

5.4    *Successors and Assigns*. This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

5.5    *Entire Agreement*. This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof.

5.6    *Delays or Omissions*. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law, shall be cumulative and not alternative.

5.7    *Severability*. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such

-20-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos    TS-0001495

court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

5.8    *Titles and Subtitles*. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

5.9    *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

5.10    *Telecopy Execution and Delivery*. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

5.11    *Jurisdiction; Venue*. Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 5.2 hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

5.12    *Further Assurances*. Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

5.13    *Termination Upon Change of Control*. Notwithstanding anything to the contrary herein, all rights represented under this Agreement (excluding any then-existing obligations) shall terminate upon (a) the acquisition of the Company by another entity by means of any transaction or

-21-

THERANOS, INC. CONFIDENTIAL

series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving or resulting entity or the entity that controls such surviving or resulting entity), as a result of shares in the Company held by such holders immediately prior to such transaction, at least a majority of the total voting power represented by the voting securities of the Company, such surviving or resulting entity or the entity that controls such surviving or resulting entity outstanding immediately after such transaction or series of transactions; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company (excluding any transaction or series of transactions between or among the Company and any wholly owned subsidiary or subsidiaries).

5.14 *Quarterly Board Meetings*. The Board shall meet at least quarterly, unless otherwise agreed by the Board.

5.15 *Conflict*. In the event of any conflict between the terms of this Agreement and the Company's certificate of incorporation (including the Certificate of Designation) or the Company's bylaws, the terms of the Company's certificate of incorporation (including the Certificate of Designation) or the Company's bylaws, as the case may be, will control.

5.16 *Costs of Enforcement*. If any party to this Agreement seeks to enforce its rights under, or in connection with this Agreement, or challenges the validity of this Agreement through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

5.17 *Aggregation*. All shares of Preferred Stock of the Company held or acquired by affiliated entities or persons of an Investor (including but not limited to: (i) a constituent partner or a retired partner of an Investor that is a partnership; (ii) a partner, subsidiary or other affiliate of an Investor that is a corporation; (iii) an immediate family member living in the same household, a descendant, or a trust therefor, in the case of an Investor who is an individual; or (iv) a member of an Investor that is a limited liability company) shall be aggregated together for the purpose of determining the availability of any rights under this Agreement which are triggered by the beneficial ownership of a threshold number of shares of the Company's capital stock.

5.18 *Prior Rights Agreement Superseded/Waiver*. Pursuant to Section 5.1 of the Prior Agreement, the undersigned parties who are parties to such Prior Agreement hereby amend and restate the Prior Agreement to read in its entirety as set forth in this Agreement, all with the intent and effect that the Prior Agreement shall be hereby terminated and entirely replaced and superseded by this Agreement.

[Remainder of Page Intentionally Left Blank]

-22-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos

TS-0001497

The parties have executed this Amended and Restated Investors' Rights Agreement as of the date stated in the introductory clause.

**COMPANY**

**Theranos, Inc.**
a Delaware corporation

By: _____
Elizabeth Holmes, Chief Executive Officer

**ELIZABETH HOLMES**

By: _____

[SIGNATURE PAGE TO AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT]

FOIA Confidential Treatment Requested by Theranos                                                      TS-0001498

The parties have executed this Amended and Restated Investors' Rights Agreement as of the date stated in the introductory clause.

**INVESTORS**

Master Signature Pages of the Series C-2 Investors listed on <u>Exhibit A</u> and the Prior Investors listed on <u>Exhibit B</u> have been intentionally withheld per confidentiality agreements with the Company.

**[SIGNATURE PAGE TO AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT]**

FOIA Confidential Treatment Requested by Theranos                                                                  TS-0001499

**ER-13261**

## EXHIBIT A

## SERIES C-2 INVESTORS

Series C-2 Investors not listed per confidentiality agreements with the Company.

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos TS-0001500

-

**ER-13262**

**<u>EXHIBIT B</u>**

**PRIOR INVESTORS**

Prior investors not listed per confidentiality agreements with the Company.

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                                                 TS-0001501

**ER-13263**

ANNEX A

**JOINDER AGREEMENT**

By executing this counterpart signature page, the undersigned hereby agrees to be bound by and subject to all terms and conditions that apply to (i) a Holder under Sections 2.7 and 2.9, an Investor under Section 3.1, a Seller under Section 4, and a party under Sections 5.11 and 5.16 of the Company's Amended and Restated Investors' Rights Agreement, dated February 7, 2014, as amended, by and among the Company and the persons and entities listed on Exhibits A and B thereto (the "**IRA**"), (ii) a Voting Party under Sections 1, 2, 3, and 7(i) and a party under Sections 7(d) and 7(e) under the Company's Amended and Restated Voting Agreement, dated February 7, 2014, as amended, by and among the Company and the persons and entities listed on Exhibits A, B and C thereto (the "**Voting Agreement**") and (iii) Article IX of the Company's amended and restated bylaws, as amended (the "**Bylaws**").

For all purposes under the IRA and the Voting Agreement, the execution and delivery of this Joinder Agreement by the undersigned shall constitute the execution and delivery of a counterpart signature page to the IRA and Voting Agreement, and the undersigned shall have the rights and be subject to the obligations to extent provided hereunder, effective as of the date hereof.

IN WITNESS WHEREOF, the Joinder Agreement to the IRA, Voting Agreement and Bylaws has been executed by the undersigned as of the date set forth below.

JOINING PARTY:

_____
Signature

_____
Print Name

_____
Date

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                    TS-0001502

-

ER-13264

**THERANOS, INC.**

**AMENDED AND RESTATED VOTING AGREEMENT**

This Amended and Restated Voting Agreement (this "**Agreement**") is made as of February 7, 2014 by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities listed on **Exhibit A** attached hereto (each a "**Series C-2 Investor**," and collectively the "**Series C-2 Investors**"), the persons and entities listed on **Exhibit B** attached hereto (each a "**Prior Investor**," and collectively the "**Prior Investors**"), and the person listed on **Exhibit C** hereto (the "**Founder**"). The Series C-2 Investors and the Prior Investors are referred to herein collectively as the "**Investors**." The Investors and the Founder are referred to herein collectively as the "**Voting Parties**."

WHEREAS, the Company, certain of the Prior Investors and the Founder are parties to that certain Amended and Restated Voting Agreement, dated as of January 14, 2014 (the "**Prior Agreement**");

WHEREAS, the Company proposes to sell shares of the Company's Series C-2 Preferred Stock to certain of the Series C-2 Investors pursuant to the Series C-2 Preferred Stock Purchase Agreement (the "**Series C-2 Purchase Agreement**") of even date herewith (the "**Financing**");

WHEREAS, the undersigned Company, Prior Investors and the Founder desire to amend and restate the Prior Agreement to add the Series C-2 Investors as parties and amend and restate the terms of the Prior Agreement.

WHEREAS, as a condition to the Financing, the Voting Parties have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1. **Shares**. During the term of this Agreement, the Voting Parties each agree to vote all shares of the Company's voting securities now or hereafter owned by them, excluding the Class B Common Stock (as defined in the Company's certificate of incorporation), whether beneficially or otherwise, or as to which they have voting power (the "**Shares**") in accordance with the provisions of this Agreement.

-1-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos TS-0001503

-

2.     *Board of Directors*

(a)     *Voting.* The Company does not currently intend to hold annual meetings of stockholders and instead intends to elect directors by written consent in lieu of an annual meeting of stockholders. During the term of this Agreement, each Voting Party agrees to vote all Shares or to have all Shares voted in such manner as may be necessary to elect (and maintain in office) as members of the Company's Board of Directors the following persons:

(i)     the Founder;

(ii)     when and as designated by the Founder, up to (5) five persons (collectively with the Founder, the "**At-Large Founder Designees**"), none of whom are currently designated; and

(iii)     the individuals designated by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (as defined in the Company's certificate of incorporation) (on an as-converted to Class A Common Stock (as defined in the Company's certificate of incorporation) basis), Class A Common Stock and Class B Common Stock, voting together as a single class (the "**Majority Designees**", and together with the Founder and the At-Large Founder Designees, the "**Designees**").

(b)     By signing this Agreement, each Voting Party hereby ratifies and confirms that the Company's Board of Directors is currently composed of the following members: Elizabeth Holmes, George Shultz, James N. Mattis, Gary Roughead, Richard Kovacevich, William Perry, Henry Kissinger, Samuel Nunn, and Sunny Balwani.

(c)     *Removal.* During the term of this Agreement, each Voting Party agrees to vote all Shares to ensure that no director elected pursuant to this Agreement may be removed from office other than for cause unless such removal is directed or approved in advance by the Founder. Upon the direction or approval of the Founder to remove any director in accordance with the preceding sentence, each Voting Party shall vote, or cause to be voted, all of its Shares in a manner to cause such director to be removed.

3.     **Waivers.** Subject to applicable law, in the event that holders of a majority of the voting power of the applicable class or classes or series of Company capital stock take action through a vote by written consent or at a meeting of stockholders, the Voting Parties hereby agree to waive and hereby do waive (with respect to such applicable class or classes or series of capital stock) rights to notice of such action taken under this Agreement or otherwise as to matters arising under the General Corporation Law of the State of Delaware.

4.     **Termination**. This Agreement shall terminate upon the earlier of (i) a Change of Control Transaction; or (ii) (A) the agreement of the Founder, and (B) a majority-in-interest of the Voting Parties, acting together as a single class. "**Change of Control Transaction**" means either (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition,

-2-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                       TS-0001504

reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving or resulting entity or the entity that controls such surviving or resulting entity), as a result of shares in the Company held by such holders immediately prior to such transaction, at least a majority of the total voting power represented by the voting securities of the Company, such surviving or resulting entity or the entity that controls such surviving or resulting entity outstanding immediately after such transaction or series of transactions; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company (excluding any transaction or series of transactions between or among the Company and any wholly owned subsidiary or subsidiaries).

5.    *Additional Shares*. In the event that subsequent to the date of this Agreement any shares or other securities (other than pursuant to a Change of Control Transaction) are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

6.    *Restrictive Legend*. Each certificate representing any of the Shares subject to this Agreement shall be marked by the Company with a legend reading as follows:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO AN AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT."

Neither failure to cause the certificates representing the Shares to be marked with this restrictive legend nor failure to supply a copy of this Agreement shall affect the validity or enforceability of this Agreement.

7.    *Miscellaneous*

(a)    *Certain Definitions*. Shares "**held**" by a Voting Party shall mean any Shares directly or indirectly owned (of record or beneficially) by such Voting Party or as to which such Voting Party has voting power. "**Vote**" shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law. A "**majority-in-interest**" of the Voting Parties shall mean a majority of the Company's common stock (determined on an as-converted basis) then held by the Voting Parties.

(b)    *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and mailed, or delivered to each

-3-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                    TS-0001505

ER-13267

party as follows: (i) if to a Voting Party, at such Voting Party's address set forth in the Company's records, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, to each of Elizabeth Holmes and Valeska Pederson Hintz at Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA 94304, Phone: (650) 838-9292, or at such other address as the Company shall have furnished to the Voting Parties in writing, with copies to Katharine A. Martin, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being deposited with an overnight courier service of recognized standing or (iv) four days after being deposited in the U.S. mail, first class with postage prepaid. In the event of any conflict between the Company's books and records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(c) *Successors and Assigns*. The provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. The Company shall not permit the transfer of any Shares on its books or issue a new certificate representing any Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person was a Voting Party hereunder.

(d) *Governing Law*. This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law. Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 7(b) hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(e) *Costs of Enforcement*. If any party to this Agreement seeks to enforce its rights under or in connection with this Agreement or challenges the validity of this Agreement through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

-4-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0001506

(f)     *Titles and Subtitles*. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(g)     *Further Assurances*. Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

(h)     *Entire Agreement*. This Agreement and the exhibits hereto constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof.

(i)     *Irrevocable Proxy and Power of Attorney*. Each Voting Party hereby constitutes and appoints, with full power of substitution and re-substitution, as his or her proxy and grants a power of attorney to the Founder with respect to the matters set forth herein, including, without limitation, election and removal of persons as members of the Company's Board of Directors in accordance with this Agreement, and hereby authorizes the Founder to represent and vote all of such Voting Party's Shares in favor of the election or removal of persons as members of the Company's Board of Directors pursuant to and in accordance with the terms and provisions of this Agreement. Each of the proxy and power of attorney granted in this paragraph is given in consideration of the agreements and covenants of the Company and each Voting Party in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and is irrevocable unless and until this Agreement terminates. Each Voting Party hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to the Shares, deposit the Shares into a voting trust, or enter into any agreement (other than this Agreement), arrangement, or understanding with any person, directly or indirectly, to vote, grant any proxy, or give instructions with respect to the voting of the Shares, in each case, with respect to any of the matters set forth herein.

(j)     *Voting Agreement, Not Voting Trust*. This Agreement is a voting agreement governed by Section 218(c) of the Delaware General Corporation Law, not a voting trust governed by Section 218(a)-(b) of the Delaware General Corporation Law, and should be interpreted accordingly.

(k)     *Specific Performance*. It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

-5-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                                 TS-0001507

(l)     *No Liability for Election of Designated Directors.* No Voting Party shall have any liability for designating a director, for any act or omission by a designated director, or for voting for or against the removal of a designated director in accordance with the provisions of this Agreement.

(m)     *Amendment.* Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by (i) the Company, (ii) the Founder and (iii) the holders of a majority of the aggregate voting power of the Voting Parties; *provided, however*, that (a) Series C-2 Investors purchasing Shares under the Series C-2 Purchase Agreement after the Initial Closing (as defined in the Series C-2 Purchase Agreement), (b) holders of the Company's capital stock that sign the Joinder pursuant to the terms of this Agreement or the Company's bylaws, and (c) holders of the Company's Class A Common Stock that receive such securities pursuant to an award granted under the Theranos, Inc. 2013 Stock Incentive Plan may become parties to this Agreement by executing a counterpart of or joinder to this Agreement or the Joinder without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Voting Party. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Voting Party that has entered into this voting agreement. Each Voting Party acknowledges that by the operation of this paragraph, the Founder and the holders of a majority of the aggregate voting power of the Voting Parties will have the right and power to diminish or eliminate all rights of such Voting Party under this Agreement.

(n)     *No Waiver.* The failure or delay by a party to enforce any provision of this Agreement will not in any way be construed as a waiver of any such provision or prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and will not constitute a waiver of either party's right to assert any other legal remedy available to it.

(o)     *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

(p)     *Counterparts.* This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

(q)     *Prior Agreement Superseded.* Pursuant to Section 7(m) of the Prior Agreement, the undersigned parties who are parties to such Prior Agreement hereby amend and restate the Prior Agreement to read in its entirety as set forth in this Agreement, all with the intent

-6-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                                    TS-0001508


and effect that the Prior Agreement shall be hereby be terminated and entirely replaced and superseded by this Agreement.

(*signature pages follow*)

-7-

THERANOS, INC. CONFIDENTIAL

**ER-13271**

The parties have executed this Amended and Restated Voting Agreement as of the date stated in the introductory clause.

**COMPANY**

**Theranos, Inc.**
a Delaware corporation

By: _____
Elizabeth Holmes, Chief Executive Officer

**FOUNDER**

By: _____
Elizabeth Holmes

[SIGNATURE PAGE TO AMENDED AND RESTATED VOTING AGREEMENT

FOIA Confidential Treatment Requested by Theranos

TS-0001510

The parties have executed this Amended and Restated Voting Agreement as of the date stated in the introductory clause.

**INVESTORS**

Master Signature Pages of the Series C-2 Investors listed on <u>Exhibit A</u> and the Prior Investors listed on <u>Exhibit B</u> have been intentionally withheld per confidentiality agreements with the Company.

[SIGNATURE PAGE TO AMENDED AND RESTATED VOTING AGREEMENT

FOIA Confidential Treatment Requested by Theranos                                                                TS-0001511

ER-13273

## EXHIBIT A

### SERIES C-2 INVESTORS

Series C-2 Investors not listed per confidentiality agreements with the Company.

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                      TS-0001512

**EXHIBIT B**

**PRIOR INVESTORS**

Prior Investors not listed per confidentiality agreements with the Company.

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                    TS-0001513

-

## **EXHIBIT C**

### **FOUNDER**

Elizabeth Holmes

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                            TS-0001514

**THERANOS, INC.**
**AMENDMENT NO. 2 TO THE SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT**

This Amendment No. 2 (this "*Amendment*") to the Series C-2 Preferred Stock Purchase Agreement, dated February 7, 2014, as amended (the "*Purchase Agreement*"), is dated as of July __, 2014 and entered into by and among Theranos, Inc., a Delaware corporation (the "*Company*"), Elizabeth Holmes (the "*Stockholder Representative*"), and the persons and entities listed on **Exhibit A** to the Purchase Agreement (each, an "*Investor*"), except that certain Investors may not be listed on Exhibit A to the Purchase Agreement pursuant to confidentiality agreements entered into between the Company and such Investors. The Company and the Investors are collectively referred to herein as the "*Parties*." All capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Purchase Agreement.

**RECITALS**

**WHEREAS**, the Parties entered into the Purchase Agreement in connection with the sale and issuance of up to 11,764,706 shares of the Company's Series C-2 Preferred Stock (the "*Shares*") at a per share purchase price of $17.00 (the "*Series C-2 Financing*");

**WHEREAS**, certain investors (the "*Extension Investors*") intend to make additional investments in Subsequent Closings of the Series C-2 Financing (the "*Series C-2 Extension*") to occur on or prior to December 31, 2014;

**WHEREAS**, in order to allow the Extension Investors to invest in the Series C-2 Extension, the Extension Investors require that the Company and the Stockholder Representative amend the Purchase Agreement to extend the deadline for the Subsequent Closing period beyond May 30, 2014;

**WHEREAS**, the Parties desire to extend the deadline for consummating the Subsequent Closings until December 31, 2014;

**WHEREAS**, Section 7.1 of the Purchase Agreement provides that any term of the Purchase Agreement may be amended with the written consent of the Company and the Stockholder Representative; and

**WHEREAS**, the Company and the Stockholder Representative constitute the parties necessary to amend the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Amendment, the parties hereto agree as follows:

**1.** Section 2.1(b) is hereby amended and restated in its entirety as follows:

"If less than all of the Shares are sold and issued at the Initial Closing, then, subject to the terms and conditions of this Agreement, the Company may sell and issue at one or more subsequent closings (each, a "**Subsequent Closing**"), held on or before December 31, 2014, up to the balance of the unissued Shares. Any such sale and issuance in a Subsequent Closing shall be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, the Amended and Restated Investors' Rights Agreement in substantially the form attached hereto as Exhibit C (the "**Rights Agreement**"), and the Amended and Restated Voting Agreement in substantially the form attached hereto as Exhibit D (the "**Voting Agreement**,"

FOIA Confidential Treatment Requested by Theranos     TS-0001515

and together with this Agreement and the Rights Agreement, the "**Agreements**"), without the need for an amendment to any of the Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Subsequent Closing. Each Subsequent Closing shall take place at such date, time and place as shall be approved by the Company and the Investors representing a majority of the Shares to be sold in such Subsequent Closing."

      **2.**       **Exhibit A**.   Exhibit A to the Purchase Agreement is hereby supplemented as set forth on each Master Signature Page executed by an Extension Investor.

      **3.**       **Representations and Warranties**.  Each Purchaser hereby represents and warrants that all of the representations and warranties of the Purchaser contained in Section 4 of the Purchase Agreement are true and correct on the date hereof.

      **4.**       **Definition of Purchase Agreement**.  The Parties hereby acknowledge and agree that the definition of the "Purchase Agreement" set forth in the Rights Agreement and the Voting Agreement and of the "Agreement" set forth in the Purchase Agreement shall mean the Purchase Agreement, as amended by this Amendment and as amended from time to time after the date hereof.

      **5.**       **No Other Amendments.**  Except as specifically provided in this Amendment, the terms and conditions of the Purchase Agreement shall be unmodified and shall remain in full force and effect.

      **6.**       **Miscellaneous**.  This Amendment (including all exhibits hereto) and the Purchase Agreement (including all exhibits thereto) constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.  This Amendment may be executed in any number of counterparts and by facsimile signature, each of which when so executed and delivered will be deemed an original and all of which together shall constitute one and the same instrument.

            *     *     *     *     *

FOIA Confidential Treatment Requested by Theranos           TS-0001516

The parties are signing this Amendment No. 2 to the Series C-2 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**COMPANY**

**THERANOS, INC.**
a Delaware corporation

By: _____
Elizabeth Holmes, Chief Executive Officer

**STOCKHOLDER REPRESENTATIVE**

By: _____
Elizabeth Holmes

[SIGNATURE PAGE TO AMENDMENT NO. 2 TO THE
SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT]

FOIA Confidential Treatment Requested by Theranos TS-0001517

-

The parties are signing this Amendment No. 2 to the Series C-2 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**INVESTORS**

Master Signature Pages of the Investors listed on the Schedule of Investors have been intentionally withheld per confidentiality agreements with the Company.

[SIGNATURE PAGE TO AMENDMENT NO. 2 TO THE
SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT]

FOIA Confidential Treatment Requested by Theranos                                                                    TS-0001518

**ER-13280**



*Delaware*                    PAGE   1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF DESIGNATION OF "THERANOS, INC.",
FILED IN THIS OFFICE ON THE SEVENTH DAY OF FEBRUARY, A.D. 2014,
AT 10 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE
NEW CASTLE COUNTY RECORDER OF DEEDS.

3789976  8100

140151226

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 1121154

DATE: 02-10-14

FOIA Confidential Treatment Requested by Theranos                                        TS-0001519

**ER-13281**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 09:20 PM 02/07/2014*
*FILED 10:00 PM 02/07/2014*
*SRV 140151226 - 3789976 FILE*

## THERANOS, INC.
## CERTIFICATE OF DESIGNATION OF
## SERIES C-2 PREFERRED STOCK

### (Pursuant to Delaware General Corporation Law, Section 151(g))

Theranos, Inc., a Delaware corporation (the "Corporation"), hereby certifies as follows:

The Executive Committee (the "Executive Committee") of the Board of Directors (the "Board") of the Corporation on February 7, 2014, in accordance with Sections 141(c)(2) and 151(g) of the Delaware General Corporation Law and the Amended and Restated Certificate of Incorporation of the Corporation (as it may be amended from time to time, the "Certificate"), and pursuant to the authority delegated by the Board to the Executive Committee, duly adopted the following resolutions establishing a series of eleven million seven hundred sixty-four thousand seven hundred six (11,764,706) shares of the Corporation's Preferred Stock, $0.0001 par value per share, to be designated as its Series C-2 Preferred Stock:

"RESOLVED, that the Executive Committee hereby establishes a series of Series C-2 Preferred Stock of the Corporation and hereby states the number of shares, and fixes the powers, designations, preferences and relative, participating, optional and other rights, and the qualifications, limitations and restrictions thereof, of such series of shares, as follows. Capitalized terms not defined herein shall have the meanings set forth in the Certificate.

    1.    Designations and Amounts.    Eleven million seven hundred sixty-four thousand seven hundred six (11,764,706) shares of the Preferred Stock of the Corporation, $0.0001 par value per share, shall constitute a series of Preferred Stock designated as "Series C-2 Preferred Stock" (the "Series C-2 Preferred Stock").

    2.    Liquidation Rights.  Subject to the right of the holders of any shares of any series of Additional Preferred Stock ranking on a parity with, or prior and superior to, the shares of Series C-2 Preferred Stock with respect to payments upon liquidation, in the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, after payment of the Liquidation Preference specified for any Additional Preferred Stock ranking senior to such series as to the liquidation, dissolution or winding up of the Corporation in the applicable Certificate of Designation or Certificate of Amendment for such series, the holders of the Series C-2 Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Series B Preferred Stock, Series A Preferred Stock, Class A Common Stock or Class B Common Stock by reason of their ownership of such stock, but *pari passu* with the holders of the Series C Preferred Stock and the Series C-1 Preferred Stock, an amount per share for each share of Series C-2 Preferred Stock held by them equal to the sum of (i) the Liquidation Preference specified for such share of Series C-2 Preferred Stock and (ii) all declared but unpaid dividends (if any) on such share of Series C-2 Preferred Stock. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Series C-2 Preferred Stock, Series C-1 Preferred Stock and the Series C Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this **Section 2**, then the entire assets of the Corporation legally available for distribution shall be distributed pro rata among the holders of the Series C-2 Preferred Stock, the Series C-1 Preferred Stock and the Series C Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this **Section 2** and Section 3(a)(i) of Article V of the Certificate. The Liquidation Preference shall be

-1-

FOIA Confidential Treatment Requested by Theranos    TS-0001520

$17.00 per share for the Series C-2 Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth in the Certificate).

3.     Conversion Price and Original Issue Price. The Conversion Price shall be $17.00 per share for the Series C-2 Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth in the Certificate). The Original Issue Price shall be $17.00 per share for the Series C-2 Preferred Stock (subject to adjustment from time to time for Recapitalizations as set forth in the Certificate).

4.     Remaining Assets. Subject to the right of the holders of any shares of any series of Additional Preferred Stock ranking on a parity with, or prior and superior to, the shares of Series C-2 Preferred Stock with respect to payments upon liquidation, the holders of Series C-2 Preferred Stock shall be entitled to any payments in respect of remaining assets, if any, as set forth and in accordance with Section 3(b) of Article V of the Certificate.

5.     Voting Rights. Except as required by law, the holders of Series C-2 Preferred Stock shall vote together with the holders of other series of Preferred Stock, the holders of the Class A Common Stock and the holders of the Class B Common Stock, and not as separate classes. Except as required by law, there shall be no series voting for holders of Series C-2 Preferred Stock. Each holder of Series C-2 Preferred Stock shall be entitled to the number of votes equal to the number of shares of Class A Common Stock into which the shares of Series C-2 Preferred Stock held by such holder could be converted as of the record date. Each holder of Series C-2 Preferred Stock shall be entitled to vote on all matters on which the holders of Class A Common Stock shall be entitled to vote.

6.     Mandatory Redemption.

(a)     The Corporation may, at any time and from time to time, at its option, redeem (for cash, property or rights, including securities of the Corporation or another entity) any or all of the shares of the Series C-2 Preferred Stock of the Corporation, out of funds legally available therefor, subject to the notice provisions provided in subsection (b) below and at a price per share as determined in good faith by the Board to be the fair market value of each share ("Mandatory Redemption"). For the avoidance of doubt, any redemption pursuant to this **Section 6** is not required to be conducted on a pro rata basis as among any classes, series or holders.

(b)     If the Corporation exercises its right to redeem shares of Series C-2 Preferred Stock of the Corporation pursuant to this **Section 6**, it shall fix a date for redemption, and it shall mail a notice of such redemption at least seven (7) days and not more than thirty (30) days prior to the date fixed for redemption to the holders of shares of Series C-2 Preferred Stock of the Corporation to be so redeemed at their last addresses as the same appear on the books and records of the Corporation. Failure to give such notice by mail or any defect in notice to the holder of any share of Series C-2 Preferred Stock of the Corporation designated for redemption shall not affect the validity of the proceedings for the redemption of any other share of stock of the Corporation. In addition to any information required by law, each notice of redemption shall specify the following: (i) the number of shares of Series C-2 Preferred Stock of the Corporation to be redeemed; (ii) the date fixed for redemption; and (iii) the redemption price at which such shares are to be redeemed. If notice of redemption has been given as above provided, on and after the date fixed for redemption (unless the Corporation shall default in the payment of the redemption price), such shares shall be deemed no longer outstanding and the holders thereof shall have no right in respect of such shares except the right to receive the redemption price thereof, without interest thereon.

-2-

FOIA Confidential Treatment Requested by Theranos                                          TS-0001521

(c)     All certificates evidencing any shares of Series C-2 Preferred Stock of the Corporation shall bear the following legend or one substantially similar (in addition to any legend otherwise required):

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MANDATORY REDEMPTION RIGHT IN FAVOR OF THE ISSUER AS SET FORTH IN THE ISSUER'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER."

7.     <u>Other Rights, Preferences, Privileges and Restrictions</u>. Except as set forth in this Certificate of Designation, and subject to the right of the holders of any shares of any series of Additional Preferred Stock ranking on a parity with, or prior and superior to, the shares of Series C-2 Preferred Stock with respect to any number of specified rights, the Series C-2 Preferred Stock shall have such other rights, preferences, privileges (including, without limitation, as to dividends and conversion rights) and restrictions conferred or imposed on the Series C-1 Preferred Stock by, and as set forth in, the Certificate, including, for the avoidance of doubt, in respect to the automatic conversion provisions of Section 4(b) of Article V of the Certificate.

RESOLVED FURTHER, that the officers of the Corporation be, and they hereby are, authorized and directed, for and in the name and on behalf of the Corporation, to prepare and file a Certificate of Designation of Series C-2 Preferred Stock in accordance with the foregoing resolution and the provisions of the Delaware General Corporation Law and to take such actions as they may deem necessary or appropriate to carry out the intent of the foregoing resolutions."

IN WITNESS WHEREOF, Theranos, Inc. has caused this Certificate of Designation to be executed by its duly authorized officer this 7th day of February, 2014.

Elizabeth Holmes
President and Chief Executive Officer

-3-

FOIA Confidential Treatment Requested by Theranos

TS-0001522

**ER-13284**

**THERANOS, INC.**

**SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT**

This Series C-2 Preferred Stock Purchase Agreement (this "**Agreement**") is made by and among Theranos, Inc. a Delaware corporation (the "**Company**"), Elizabeth Holmes (the "**Stockholder Representative**"), and the persons and entities (each, an "**Investor**" and collectively, the "**Investors**") listed on the Schedule of Investors attached hereto as <u>Exhibit A</u> (the "**Schedule of Investors**"), except that certain Investors may not be listed on the Schedule of Investors pursuant to confidentiality agreements entered into between the Company and such Investors, as of February 7, 2014, but are nonetheless parties to this Agreement and referred to herein as Investors.

A.  Pursuant to the Certificate of Designation of Series C-2 Preferred Stock, attached hereto as <u>Exhibit B</u>, (the "**Certificate of Designation**"), the Company is authorized to issue up to 11,764,706 shares of the Company's Series C-2 Preferred Stock (the "**Series C-2 Preferred**").

B.  The Company wishes to sell and the Investors wish to purchase shares of the Series C-2 Preferred.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**SECTION 1**

**Authorization, Sale and Issuance of Series C-2 Preferred Stock**

1.1  *Authorization.*  The Company has authorized (a) the sale and issuance of up to 11,764,706 shares of Series C-2 Preferred (the "**Shares**"), having the rights, privileges, preferences and restrictions set forth in the Certificate of Designation and (b) the reservation of shares of the Company's Class A Common Stock, $0.0001 par value per share (the "**Class A Common Stock**") for issuance upon conversion of the Shares (the "**Conversion Shares**").

1.2  *Sale and Issuance of Shares.*  Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell and issue to each Investor, the number of Shares set forth in the column designated "Number of Series C-2 Shares" opposite such Investor's name on the Schedule of Investors or as set forth on such Investor's master signature page, at a cash purchase price of at least $17.00 per share (as the case may be, the "**Purchase Price**"). The Company's agreement with each Investor is a separate agreement, and the sale and issuance of the Shares to each Investor is a separate sale and issuance.

-1-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                    TS-0001523

**SECTION 2**

**Closing Dates and Delivery**

2.1     *Closing.*

(a)     The purchase, sale and issuance of the Shares shall take place at one or more closings (each of which is referred to in this Agreement as a "**Closing**"). The initial Closing (the "**Initial Closing**") shall take place at the offices of Theranos, Inc., 1601 S. California Avenue, Palo Alto, California 94304 at 5:00 p.m. local time on Monday, February 7, 2014.

(b)     If less than all of the Shares are sold and issued at the Initial Closing, then, subject to the terms and conditions of this Agreement, the Company may sell and issue at one or more subsequent closings (each, a "**Subsequent Closing**"), held on or before February 28, 2014, up to the balance of the unissued Shares. Any such sale and issuance in a Subsequent Closing shall be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, the Amended and Restated Investors' Rights Agreement in substantially the form attached hereto as <u>Exhibit C</u> (the "**Rights Agreement**"), and the Amended and Restated Voting Agreement in substantially the form attached hereto as <u>Exhibit D</u> (the "**Voting Agreement**," and together with this Agreement and the Rights Agreement, the "**Agreements**"), without the need for an amendment to any of the Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Subsequent Closing. Each Subsequent Closing shall take place at such date, time and place as shall be approved by the Company and the Investors representing a majority of the Shares to be sold in such Subsequent Closing.

2.2     *Delivery.* At each Closing, the Company will deliver to each Investor in such Closing a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing in such Closing against payment of the purchase price therefor as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (i) check payable to the Company, (ii) wire transfer in accordance with the Company's instructions, (iii) cancellation of indebtedness or (iv) any combination of the foregoing. In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

**SECTION 3**

**Representations and Warranties of the Company**

The Company hereby represents and warrants to the Investors as follows:

3.1     *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power and authority to own and operate its properties and

-2-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                TS-0001524

assets, to carry on its business as presently conducted, to execute and deliver the Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements, the amended and restated certificate of incorporation of the Company (the "**Restated Certificate**") and the Certificate of Designation. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's business, assets (including intangible assets), liabilities, financial condition, properties or results of operations (a "**Material Adverse Effect**").

3.2     *Capitalization.* As of February 6, 2014, the authorized capital stock of the Company consisted of 725,000,000 shares of Class A Common Stock, of which approximately 51,344,390 shares were issued and outstanding, 250,658,055 shares of the Company's Class B Common Stock, $0.0001 par value per share (the "**Class B Common Stock**"), all of which were issued and outstanding, and 225,000,000 shares of Preferred Stock, 46,320,045 of which were designated Series A Preferred Stock, all of which were issued and outstanding pursuant to that certain Series A Preferred Stock Financing dated December 17, 2004, January 21, 2005 and February 7, 2005 (the "**Series A Preferred**"), 54,162,965 of which were designated Series B Preferred Stock, all of which were issued and outstanding pursuant to that certain Series B Preferred Stock Financing dated February 3, 2006 (the "**Series B Preferred**"), 58,896,105 of which were designated Series C Preferred Stock, all of which were issued and outstanding pursuant to that certain Series C Preferred Stock Financing dated October 13, 2006, November 3, 2006, November 15, 2006 and December 12, 2006 (the "**Series C Preferred**"), and 43,000,005 of which were designated Series C-1 Preferred, 23,008,367 of which were issued and outstanding pursuant to that certain Series C-1 Preferred Stock Financing dated July 1, 2010, March 28, 2013 and January 14, 2014 (the "**Series C-1 Preferred**"). Upon the effectiveness of the Certificate of Designation, an additional 11,764,706 shares of authorized Preferred Stock will be designated as Series C-2 Preferred, none of which will be issued and outstanding. The Class A Common Stock, the Class B Common Stock, the Series A Preferred, the Series B Preferred, the Series C Preferred, the Series C-1 Preferred and the Series C-2 Preferred shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate and/or the Certificate of Designation.

(b)     The outstanding shares have been duly authorized and validly issued in compliance with applicable laws (including applicable federal and state securities laws), and are fully paid and nonassessable.

(c)     The Company has reserved:

(i)     the Shares for issuance pursuant to this Agreement;

(ii)     up to 33,333,335 shares of Series C-1 Preferred Stock for issuance pursuant to the Amended and Restated Series C-1 Stock Purchase Agreement at a purchase price of $15 per share for sales and issuances at any subsequent closing held on or before January 14, 2014;

-3-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                         TS-0001525

(iii)     a sufficient number of shares of Class A Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate and the Certificate of Designation) for issuance upon conversion of the Shares;

(iv)     225,252,942 shares of Class A Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2004 Stock Plan, under which options to purchase approximately 10,906,747 shares of the Company's Class A Common Stock were issued and outstanding as of February 6, 2014;

(v)     15,000,000 shares of Class A Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2013 Stock Incentive Plan, under which no options to purchase shares of the Company's Class A Common Stock were issued and outstanding as of February 6, 2014;

(vi)     741,665 shares of Class A Common Stock for issuance upon exercise of warrants to purchase the Company's Class A Common Stock; and

(vii)     9,666,670 shares of Series C-1 Preferred Stock for issuance upon conversion of notes convertible into shares of Series C-1 Preferred Stock.

(d)     All issued and outstanding shares of the Company's Class A Common Stock and Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

(e)     The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate, the Certificate of Designation and applicable law, will be validly issued, fully paid and nonassessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investors; provided, however, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Rights Agreement and the Company's Bylaws and to certain redemption rights in favor of the Company as set forth in the Restated Certificate (including the Certificate of Designation) and Bylaws.

(f)     Except for the conversion privileges of the Series A Preferred, Series B Preferred, Series C Preferred, Series C-1 Preferred and Series C-2 Preferred, the rights provided pursuant to the Rights Agreement, the convertible promissory notes issued in conjunction with the Series C-1 Preferred, as otherwise described in this Agreement, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock.

3.3     *Authorization*. All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization and filing of the Restated Certificate and the Certificate of Designation, the authorization, execution and delivery of the Agreements by the

-4-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                            TS-0001526

-

Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Agreements has been taken or will be taken prior to the Initial Closing. The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity, and (iii) to the extent the indemnification provisions contained in the Rights Agreement may further be limited by applicable laws and principles of public policy.

3.4 *Intellectual Property.*

(a) Rights. To the knowledge of the Company's executive officers (the "**Company's Knowledge**"), the Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("**Intellectual Property**") necessary to the business of the Company as presently conducted. To the Company's Knowledge, the Company by operating its business as currently proposed to be conducted will not violate or infringe any patent or trademark rights of any other person that are necessary for conducting the business of the Company as presently contemplated.

(b) Proprietary Information and Invention Assignment. The Company's current practice is to require each current and former employee and consultant of the Company to execute a confidential information and invention assignment agreement. To the Company's Knowledge, no employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement other than certain intellectual property created by certain employees prior to joining the Company. To the Company's Knowledge, no current employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as currently conducted. To the Company's Knowledge, it is not presently nor will it be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company.

3.5 *Compliance with Other Instruments.* The Company is not in violation of any material term of its Restated Certificate (including the Certificate of Designation) or Bylaws, each as amended to date. To the Company's knowledge, the Company is not in violation of any material federal or state statute, rule or regulation applicable to the Company. The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares and the Conversion Shares, will not result in any violation of, or conflict with, or constitute a default under, the Restated Certificate (including the Certificate of Designation) or Bylaws, each as amended to date, nor, to the Company's knowledge, will it result in any material violation of, or materially conflict with, or constitute a material default

-5-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0001527

under any of its material agreements, nor, to the Company's knowledge, will it result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company.

3.6     *Governmental Consent.* No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) the filing of the Certificate of Designation with the office of the Secretary of State of the State of Delaware, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "**Securities Act**") and (iii) such filings as may be required under applicable state securities laws.

3.7     *Offering.* Subject to the accuracy of the Investors' representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and the registration and/or qualification requirements of all applicable state securities laws.

3.8     *Registration Rights.* Except as set forth in the Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued.

3.9     *Brokers or Finders.* The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.10    *Employees.* To the Company's knowledge, there are no strike, labor dispute or union organization activities pending or threatened between it and its employees. To the Company's knowledge, none of its employees belongs to any union or collective bargaining unit.

## SECTION 4

### Representations and Warranties of the Investors

Each Investor hereby, severally and not jointly, represents and warrants to the Company as follows:

4.1     *No Registration.* Such Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

-6-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                    TS-0001528

4.2     *Investment Intent.* Such Investor is acquiring the Shares and the Conversion Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

4.3     *Investment Experience.* Such Investor, or its purchaser representative, within the meaning of Regulation D, Rule 501(h), promulgated by the Securities and Exchange Commission (its "**Purchaser Representative**"), has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that such Investor or its Purchaser Representative can protect its own interests. Such Investor or its Purchaser Representative has such knowledge and experience in financial and business matters so that such Investor or its Purchaser Representative is capable of evaluating the merits and risks of its investment in the Company.

4.4     *Speculative Nature of Investment.* Such Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is highly speculative and involves substantial risks. Such Investor can bear the economic risk of such Investor's investment and is able, without impairing such Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of such Investor's investment.

4.5     *Access to Data.* Such Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction. Such Investor believes that it has received all the information such Investor considers necessary or appropriate for deciding whether to purchase the Shares and Conversion Shares. Such Investor understands that such discussions, as well as any information issued by the Company, were intended to describe certain aspects of the Company's business and prospects, but were not necessarily a thorough or exhaustive description. Such Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Such Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements. Nothing in this Section 4.5 shall be deemed to limit or modify the Company's representations in Section 3.

4.6     *Accredited Investor.* The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the

-7-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                       TS-0001529

Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

4.7     *Residency*. The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investors.

4.8     *Rule 144.* Such Investor acknowledges that the Shares and the Conversion Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Such Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares being sold during any three-month period not exceeding specified limitations. Such Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available. Such Investor acknowledges and understands that notwithstanding any obligation under the Rights Agreement, the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Shares or the Conversion Shares, and that, in such event, the Investor may be precluded from selling such securities under Rule 144, even if the other requirements of Rule 144 have been satisfied. Such Investor acknowledges that, in the event all of the requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Class A Common Stock. Such Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

4.9     *No Public Market*. Such Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.10     *Authorization.*

(a)     Such Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of the Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

-8-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0001530

-

(b)     The Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)     No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

4.11     *Brokers or Finders*. Such Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

4.12     *Tax Advisors*. Such Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the Agreements. With respect to such matters, such Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

4.13     *Legends*. Such Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Rights Agreement or under applicable state securities laws):

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

-9-

THERANOS, INC. CONFIDENTIAL

 TS-0001531

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MANDATORY REDEMPTION RIGHT IN FAVOR OF THE ISSUER AS SET FORTH IN THE ISSUER'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (INCLUDING THE CERTIFICATE OF DESIGNATION OF SERIES C-2 PREFERRED STOCK) AND BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER."

4.14    *Investment Representations, Warranties and Covenants by Non-U.S. Persons*. Each Investor who is a Non-U.S. person (as that term is defined in Section 4.14(c) of this Agreement) hereby represents and warrants to the Company as follows:

(a)    This Agreement is made by the Company with such Investor who is a Non-U.S. person in reliance upon such Non-U.S. person's representations, warranties and covenants made in this Section 4.14.

(b)    Such Non-U.S. person has been advised and acknowledges that:

(i)    the Shares and the Conversion Shares have not been, and when issued, will not be registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other country;

(ii)    in issuing and selling the Shares and the Conversion Shares to such Non-U.S. person pursuant hereto, the Company is relying upon the "safe harbor" provided by Regulation S and/or on Section 4(2) under the Securities Act;

(iii)    it is a condition to the availability of the Regulation S "safe harbor" that the Shares and the Conversion Shares not be offered or sold in the United States or to a U.S. person until the expiration of a period of one year following the Closing Date; and

(iv)    notwithstanding the foregoing, prior to the expiration of one year after the Closing (the "**Restricted Period**"), the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to

-10-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                    TS-0001532

an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person.

(c)     As used herein, the term "**United States**" means and includes the United States of America, its territories and possessions, any State of the United States, and the District of Columbia, and the term "**U.S. person**" (as defined in Regulation S) means:

(i)     a natural person resident in the United States;

(ii)     any partnership or corporation organized or incorporated under the laws of the United States;

(iii)     any estate of which any executor or administrator is a U.S. person;

(iv)     any trust of which any trustee is a U.S. person;

(v)     any agency or branch of a foreign entity located in the United States;

(vi)     any nondiscretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

(vii)     any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated and (if an individual) resident in the United States; and

(viii)     a corporation or partnership organized under the laws of any foreign jurisdiction and formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

As used herein, the term "**Non-U.S. person**" means any person who is not a U.S. person or is deemed not to be a U.S. person under Rule 902(k)(2) of the Securities Act.

(d)     Such Non-U.S. person agrees that with respect to the Shares and the Conversion Shares until the expiration of the Restricted Period:

(i)     such Non-U.S. person, its agents or its representatives have not and will not solicit offers to buy, offer for sale or sell any of the Shares and the Conversion Shares, or any beneficial interest therein in the United States or to or for the account of a U.S. person during the Restricted Period; and

(ii)     notwithstanding the foregoing, prior to the expiration of the Restricted Period, the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are

-11-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                            TS-0001533

defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person; and

(iii)     such Non-U.S. person shall not engage in hedging transactions with regard to the Shares and the Conversion Shares unless in compliance with the Securities Act.

The foregoing restrictions are binding upon subsequent transferees of the Shares and the Conversion Shares, except for transferees pursuant to an effective registration statement. Such Non-U.S. person agrees that after the Restricted Period, the Shares and the Conversion Shares may be offered or sold within the United States or to or for the account of a U.S. person only pursuant to applicable securities laws.

(e)     Such Non-U.S. person has not engaged, nor is it aware that any party has engaged, and such Non-U.S. person will not engage or cause any third party to engage, in any directed selling efforts (as such term is defined in Regulation S) in the United States with respect to the Shares and the Conversion Shares.

(f)     Such Non-U.S. person: (i) is domiciled and has its principal place of business outside the United States; (ii) certifies it is not a U.S. person and is not acquiring the Shares or the Conversion Shares for the account or benefit of any U.S. person; and (iii) at the time of the Closing Date, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith will be located outside the United States.

(g)     At the time of offering to such Non-U.S. person and communication of such Non-U.S. person's order to purchase the Shares or the Conversion Shares and at the time of such Non-U.S. Person's execution of this Agreement, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith were located outside the United States.

(h)     Such Non-U.S. person is not a "distributor" (as defined in Regulation S) or a "dealer" (as defined in the Securities Act).

(i)     Such Non-U.S. person acknowledges that the Company shall make a notation in its stock books regarding the restrictions on transfer set forth in this Section 4.14 and shall transfer such shares on the books of the Company only to the extent consistent therewith.

In particular, such Non-U.S. person acknowledges that the Company shall refuse to register any transfer of the Shares or the Conversion Shares not made in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

(j)     Such Investor understands and agrees that each certificate held by such Non-U.S. person representing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or any the Conversion Shares upon conversion thereof upon any stock split,

-12-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                             TS-0001534

stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by this Agreement, by Sections 417 and 418 of the California Corporations Code or under applicable state securities laws):

> THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION. HEDGING TRANSACTIONS INVOLVING THE SHARES REPRESENTED HEREBY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE, HYPOTHECATION OR ANY OTHER TRANSFER OF ANY INTEREST IN ANY OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

4.15 *Representations by Non-U.S. Persons*. If an Investor is not a U.S. person, such Investor hereby represents that such Investor is satisfied as to the full observance of the laws of such Investor's jurisdiction in connection with any invitation to subscribe for the Shares and the Conversion Shares or any use of the Agreements, including (i) the legal requirements within such Investor's jurisdiction for the purchase of Shares and the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of such securities. Such Investor's subscription and payment for, and such Investor's continued beneficial ownership of, the Shares and the Conversion Shares will not violate any applicable securities or other laws of such Investor's jurisdiction.

### SECTION 5

#### Conditions to Investors' Obligations to Close

Each Investor's obligation to purchase the Shares at a Closing is subject to the fulfillment on or before the Closing of each of the following conditions, unless waived in writing by the applicable Investor purchasing the Shares in such Closing:

5.1 *Representations and Warranties*. With respect to the Initial Closing and any Subsequent Closing, the representations and warranties made by the Company in Section 3 of this Agreement shall be true and correct in all material respects as of the date of such closing.

-13-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                                     TS-0001535

5.2     *Covenants*. All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Initial Closing shall have been performed or complied with by it on or before the Initial Closing.

5.3     *Blue Sky*. The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

5.4     *Certificate of Designation*. The Certificate of Designation shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

5.5     *Rights Agreement*. The Company and Holders of a majority of the combined voting power of the Registrable Securities (as defined in the Rights Agreement) (on an as-converted to Class A Common Stock basis) and Class B Common Stock, voting together as a single class, shall have executed and delivered the Rights Agreement.

5.6     *Voting Agreement*. The Company, the Founder, and holders of a majority of the aggregate voting power of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

5.7     *Proceedings and Documents*. All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investors, and the Investors shall have been furnished with such instruments and documents as they shall have reasonably requested.

5.8     *Consents and Waivers*. The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for the performance by the Company of its obligations pursuant to the Agreements.

## SECTION 6

### Conditions to Company's Obligation to Close

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived in writing by the Company:

6.1     *Representations and Warranties*. The representations and warranties made by the Investors in such Closing in Section 4 shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the date of such Closing.

6.2     *Covenants*. All covenants, agreements and conditions contained in the Agreements to be performed by Investors on or prior to the date of such Closing shall have been performed or complied with as of the date of such Closing.

-14-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                    TS-0001536

6.3     *Compliance with Securities Laws*. The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

6.4     *Certificate of Designation*. The Certificate of Designation shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

6.5     *Rights Agreement*. The Company and Holders of a majority of the combined voting power of the Registrable Securities (as defined in the Rights Agreement) (on an as-converted to Class A Common Stock basis) and Class B Common Stock, voting together as a single class, shall have executed and delivered the Rights Agreement.

6.6     *Voting Agreement*. The Company, the Founder, and holders of a majority of the aggregate voting power of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

6.7     *Proceedings and Documents*. All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Company, and the Company shall have been furnished with such instruments and documents as they shall have reasonably requested.

## SECTION 7

### Miscellaneous

7.1     *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Stockholder Representative; provided, however, that Investors purchasing shares in a Closing after the Initial Closing may become parties to this Agreement in accordance with **Section 2.1** without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Investor. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities. Each Investor acknowledges that by the operation of this paragraph, the Stockholder Representative will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

-15-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                    TS-0001537

-

**ER-13299**

7.2     *Notices*. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid or otherwise delivered by hand or by messenger addressed:

(a)     if to an Investor, at the Investor's address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)     if to any other holder of any Shares or Conversion Shares, at such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c)     if to the Company, one copy should be sent to each of Elizabeth Holmes and Valeska Pederson Hintz, Theranos, Inc. 1601 S. California Avenue, Palo Alto, CA 94304, or at such other address as the Company shall have furnished to the Investors, with copies to Katharine A. Martin, Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

7.3     *Governing Law*. This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

7.4     *Brokers or Finders*. The Company shall indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 3.16**, and each Investor agrees to indemnify and hold harmless the Company and each other Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company, any other Investor or any of their constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 4.11**.

7.5     *Expenses*. The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement.

7.6     *Survival*. The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby.

-16-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                TS-0001538

7.7     *Successors and Assigns*. This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

7.8     *Entire Agreement*. This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof.

7.9     *Delays or Omissions*. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

7.10     *California Corporate Securities Law*. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

7.11     *Severability*. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

7.12     *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

-17-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                    TS-0001539

7.13   *Telecopy Execution and Delivery.* A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

7.14   *Jurisdiction; Venue.* Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 7.2 hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

7.15   *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

7.16   *Attorney's Fees.* In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

7.17   *Waiver of Potential Conflicts of Interest.* Each of the Investors and the Company acknowledges that Wilson Sonsini Goodrich & Rosati, Professional Corporation ("WSGR") may have represented and may currently represent certain of the Investors. In the course of such representation, WSGR may have come into possession of confidential information relating to such Investors. Each of the Investors and the Company acknowledges that WSGR is representing only the Company in this transaction. Each of the Investors and the Company understands that an affiliate of WSGR may also be an Investor under this Agreement. Pursuant to Rule 3-310 of the Rules of Professional Conduct promulgated by the State Bar of California, an attorney must avoid representations in which the attorney has or had a relationship with another party interested in the representation without the informed written consent of all parties affected. By executing this Agreement, each of the Investors and the Company hereby waives any actual or potential conflict of

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                           TS-0001540

interest which may arise as a result of WSGR's representation of such persons and entities, WSGR's possession of such confidential information and the participation by WSGR's affiliate in the financing. Each of the Investors and the Company represents that it has had the opportunity to consult with independent counsel concerning the giving of this waiver.

**[SIGNATURE PAGES TO FOLLOW]**

-19-

THERANOS, INC. CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos                                                                    TS-0001541

The parties are signing this Series C-2 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**THERANOS, INC.**
**a Delaware corporation**

By: _____
Elizabeth Holmes, Chief Executive Officer

**SHAREHOLDER REPRESENTATIVE**

By: _____
Elizabeth Holmes

**[SIGNATURE PAGE TO SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT]**

FOIA Confidential Treatment Requested by Theranos

TS-0001542

The parties are signing this Series C-2 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**INVESTORS**

Master Signature Pages of the Investors listed on the Schedule of Investors have been intentionally withheld per confidentiality agreements with the Company.

**[SIGNATURE PAGE TO SERIES C-2 PREFERRED STOCK PURCHASE AGREEMENT]**

FOIA Confidential Treatment Requested by Theranos TS-0001543

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

Investors not listed per confidentiality agreements with the Company.

FOIA Confidential Treatment Requested by Theranos TS-0001544

-

**EXHIBIT B**

**CERTIFICATE OF DESIGNATION OF SERIES C-2 PREFERRED STOCK**

FOIA Confidential Treatment Requested by Theranos TS-0001545

**EXHIBIT C**

**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

FOIA Confidential Treatment Requested by Theranos                 TS-0001546

**EXHIBIT D**

**AMENDED AND RESTATED VOTING AGREEMENT**

FOIA Confidential Treatment Requested by Theranos          TS-0001547

## STOCKHOLDER CONFIDENTIALITY AGREEMENT

Ladies and Gentlemen:

In consideration for the sale by Theranos, Inc., a Delaware company (the "*Company*"), of shares of its Series C-2 Preferred Stock to the undersigned ("*Stockholder*") pursuant to the Series C-2 Preferred Stock Purchase Agreement, dated February 7, 2014 (the "*Purchase Agreement*"), the Company and Stockholder agree to the terms and obligations of this Stockholder Confidentiality Agreement, dated as of the date hereof. Terms used herein but not defined shall have the meanings assigned to them in the Purchase Agreement.

Stockholder acknowledges that Investors purchasing shares pursuant to the Purchase Agreement and other existing stockholders of the Company party to certain of the Agreements may wish to remain anonymous. Stockholder agrees that the Company has no obligation to provide Stockholder with certain exhibits to the Agreements, including the Schedule of Investors, in order to maintain the anonymity of Investors and other stockholders of the Company.

Stockholder further acknowledges that by entering into the Agreements, it agrees to be bound by the terms and obligations of such Agreements, notwithstanding the fact that Stockholder was not provided with all exhibits to the Agreements. The Company represents and warrants to Stockholder that the excluded exhibits to the Agreements do not contain any obligations by Stockholder.

Sincerely,

**THERANOS, INC.**

Elizabeth Holmes, Chief Executive Officer

theran⬤s

1601 S California Avenue,
Palo Alto, CA 94304

Tel (650) 838 9292
Fax (650) 838 9165

Wire Transfer Instruction

| Account Name: | Theranos, Inc |
|---|---|
| Bank: | Comerica Bank<br><br>226 Airport Parkway, Suite 100 San Jose, CA 95110 |
| Account Number: | 5137 |
| Routing Number: | 7522 |
| Swift code (for international wire): MNBDUS33 | |

,

FOIA Confidential Treatment Requested by Theranos
TS-0001549

**ER-13311**

**To:** Sunil Dhawan
**From:** Heather King
**Sent:** Sat 7/9/2016 2:16:05 AM
**Importance:** Normal
**Subject:** CMS Notice on Imposition of Sanctions
**Received:** Sat 7/9/2016 2:16:06 AM

Dr. Dhawan – Please see attached, and let me know if you want to discuss.

Sincerely,

Heather King

General Counsel

Theranos, Inc.

CTRL-DHAWAN-00013211

US-REPORTS-0008426

Trial Exh. 3217 Page 0001

ER-13312

**THERANOS, INC.**

**AMENDED AND RESTATED**

**SERIES C-1 PREFERRED STOCK PURCHASE AGREEMENT**

**Initial Closing Date: July 1, 2010**

Confidential

THPFM0001058386

**ER-13313**

# TABLE OF CONTENTS

**Page**

**SECTION 1** Authorization, Sale and Issuance of Series C-1 Preferred Stock .................................. 2

    1.1    *Authorization* .................................................................................................................. 2
    1.2    *Sale and Issuance of Shares* .......................................................................................... 2

**SECTION 2** Closing Dates and Delivery ...................................................................................... 2

    2.1    *Closing* ........................................................................................................................... 2
    2.2    *Delivery* ......................................................................................................................... 3

**SECTION 3** Representations and Warranties of the Company ....................................................... 3

    3.1    *Organization, Good Standing and Qualification* ........................................................... 3
    3.2    *Capitalization* ................................................................................................................ 3
    3.3    *Authorization* .................................................................................................................. 5
    3.4    *Intellectual Property* ...................................................................................................... 5
    3.5    *Compliance with Other Instruments* .............................................................................. 6
    3.6    *Governmental Consent* ................................................................................................... 6
    3.7    *Offering* ......................................................................................................................... 6
    3.8    *Registration Rights* ........................................................................................................ 7
    3.9    *Brokers or Finders* ........................................................................................................ 7
    3.10  *Employees* ...................................................................................................................... 7

**SECTION 4** Representations and Warranties of the Investors ....................................................... 7

    4.1    *No Registration* .............................................................................................................. 7
    4.2    *Investment Intent* ........................................................................................................... 7
    4.3    *Investment Experience* .................................................................................................... 7
    4.4    *Speculative Nature of Investment* ................................................................................... 7
    4.5    *Access to Data* ............................................................................................................... 8
    4.6    *Accredited Investor* ........................................................................................................ 8
    4.7    *Residency* ....................................................................................................................... 8
    4.8    *Rule 144* ........................................................................................................................ 8
    4.9    *No Public Market* ........................................................................................................... 9
    4.10  *Authorization* .................................................................................................................. 9
    4.11  *Brokers or Finders* ........................................................................................................ 9
    4.12  *Tax Advisors* .................................................................................................................. 9
    4.13  *Legends* ........................................................................................................................ 10
    4.14  *Investment Representations, Warranties and Covenants by Non-U.S. Persons* ........ 10
    4.15  *Representations by Non-U.S. Persons* ......................................................................... 14

**SECTION 5** Conditions to Investors' Obligations to Close ........................................................ 14

    5.1    *Representations and Warranties* .................................................................................. 14
    5.2    *Covenants* ..................................................................................................................... 14

-i-

THERANOS, INC. CONFIDENTIAL

Trial Exh. 3530 Page 0002

**ER-13314**

**TABLE OF CONTENTS**
**(continued)**

Page

5.3     *Blue Sky* ........................................................................................... 14
5.4     *Restated Certificate* .................................................................... 14
5.5     *Rights Agreement* ........................................................................ 14
5.6     *Voting Agreement* ........................................................................ 14
5.7     *Proceedings and Documents* .................................................... 15
5.8     *Consents and Waivers* ............................................................... 15

**SECTION 6** Conditions to Company's Obligation to Close ........................ 15

6.1     *Representations and Warranties* ............................................. 15
6.2     *Covenants* ..................................................................................... 15
6.3     *Compliance with Securities Laws* ........................................... 15
6.4     *Restated Certificate* .................................................................... 15
6.5     *Rights Agreement* ........................................................................ 15
6.6     *Voting Agreement* ........................................................................ 15
6.7     *Proceedings and Documents* .................................................... 15

**SECTION 7** Miscellaneous ............................................................................. 16

7.1     *Amendment* .................................................................................. 16
7.2     *Notices* .......................................................................................... 16
7.3     *Governing Law* ............................................................................ 17
7.4     *Brokers or Finders* ..................................................................... 17
7.5     *Expenses* ....................................................................................... 17
7.6     *Survival* ........................................................................................ 17
7.7     *Successors and Assigns* .............................................................. 17
7.8     *Entire Agreement* ....................................................................... 17
7.9     *Delays or Omissions* .................................................................. 17
7.10   *California Corporate Securities Law* ..................................... 18
7.11   *Severability* ................................................................................. 18
7.12   *Counterparts* ............................................................................... 18
7.13   *Telecopy Execution and Delivery* .......................................... 18
7.14   *Jurisdiction; Venue* .................................................................... 18
7.15   *Further Assurances* ................................................................... 19
7.16   *Attorney's Fees* .......................................................................... 19
7.17   *Waiver of Potential Conflicts of Interest* ............................. 19

-ii-

THERANOS, INC. CONFIDENTIAL

Trial Exh. 3530 Page 0003

THPFM0001058388

**ER-13315**

### EXHIBITS

A  Schedule of Investors
B  Amended and Restated Certificate of Incorporation
C  Amended and Restated Investor Rights Agreement
D  Amended and Restated Voting Agreement

-iii-

THERANOS, INC. CONFIDENTIAL

THPFM0001058389

Trial Exh. 3530 Page 0004

ER-13316

**THERANOS, INC.**

**AMENDED AND RESTATED SERIES C-1 PREFERRED STOCK PURCHASE
AGREEMENT**

This Amended and Restated Series C-1 Preferred Stock Purchase Agreement (this "**Agreement**") is made by and among Theranos, Inc. a Delaware corporation (the "**Company**"), and the persons and entities (each, an "**Investor**" and collectively, the "**Investors**") listed on the Schedule of Investors attached hereto as <u>Exhibit A</u>, except that certain Investors may not be listed on the Schedule of Investors pursuant to confidentiality agreements entered into between the Company and such Investors (the "**Schedule of Investors**"), as of January 14, 2014 (the "**Amendment Date**"), and amends, restates and supersedes in its entirety that certain Amended and Restated Series C-1 Preferred Stock Purchase Agreement, (the "**Prior Agreement**"), by and among the Company and the Investors listed on the Schedule of Investors attached thereto (the "**Prior Investors**"), as of the date set forth next to each Prior Investors' name on the Schedule of Investors.

A. The Series C-1 Preferred Stock Purchase Agreement, dated as of July 1, 2010 (the "**Original Agreement**"), pursuant to which the Company sold and issued, and the Investors listed on the Schedule of Investors attached thereto purchased, an aggregate of 3,977,667 of the Company's Series C-1 Preferred Stock (the "**Series C-1 Preferred**").

B. Section 2.1(b) of the Prior Agreement provides that if less than 33,333,335 shares of the Series C-1 Preferred authorized for sale and issuance pursuant to the Prior Agreement were sold in the Initial Closing (as defined below), the Company may sell and issue up to the balance of the unsold shares at one or more Subsequent Closings (as defined in the Prior Agreement), which must take place within 36 months of the Initial Closing, which was held on July 1, 2010.

C. Investors purchasing shares in a Subsequent Closing may become parties to the Prior Agreement in accordance with Section 2.1 of the Prior Agreement.

D. The Company wishes to amend the Prior Agreement to provide that one or more Subsequent Closings may be held on or before December 31, 2013, and make such other changes as set forth below.

E. Section 7.1 of the Prior Agreement provides that the Prior Agreement may be amended by a written instrument referencing the Prior Agreement and signed by the Company and the Investors holding a majority of the Company's common stock issued or issuable upon conversion of the Shares (as defined in the Prior Agreement) issued or issuable upon conversion of the Shares issued pursuant to the Prior Agreement.

F. Pursuant to the Restated Certificate (as defined below), the Company effected a forward stock split and reclassification, pursuant to which each share of the Company's common stock that was issued and outstanding as of the effective time of such forward stock split was converted and reclassified into five (5) shares of the Company's Class A Common Stock, $0.0001

-1-

THERANOS, INC. CONFIDENTIAL

par value per share (the "**Class A Common Stock**") and each share of the Company's preferred stock that was issued and outstanding as of the effective time of such stock split was converted into five (5) shares of the Company's preferred stock (the "**Forward Split and Reclassification**"). Unless specified otherwise, all share numbers set forth herein give effect to the Forward Split and Reclassification.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Prior Agreement is hereby amended and restated as follows:

## SECTION 1

### Authorization, Sale and Issuance of Series C-1 Preferred Stock

1.1     *Authorization.* The Company has authorized (a) the sale and issuance of up to 33,333,335 shares of Series C-1 Preferred (the "**Shares**"), having the rights, privileges, preferences and restrictions set forth in the Amended and Restated Certificate of Incorporation of the Company, attached hereto as <u>Exhibit B</u> (the "**Restated Certificate**") and (b) the reservation of shares of the Class A Common Stock for issuance upon conversion of the Shares (the "**Conversion Shares**").

1.2     *Sale and Issuance of Shares.* Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell and issue to each Investor, the number of Shares set forth in the column designated "Number of Series C-1 Shares" opposite such Investor's name on the Schedule of Investors, at a cash purchase price of at least $15.00 per share (as the case may be, the "**Purchase Price**"). The Company's agreement with each Investor is a separate agreement, and the sale and issuance of the Shares to each Investor is a separate sale and issuance.

## SECTION 2

### Closing Dates and Delivery

2.1     *Closing.*

(a)     The purchase, sale and issuance of the Shares shall take place at one or more closings (each of which is referred to in this Agreement as a "**Closing**"). The initial Closing (the "**Initial Closing**") took place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 650 Page Mill Road, Palo Alto, California 94304 at 10:00 a.m. local time on Friday, July 1, 2010.

(b)     If less than all of the Shares are sold and issued at the Initial Closing, then, subject to the terms and conditions of this Agreement, the Company may sell and issue at one or more subsequent closings (each, a "**Subsequent Closing**"), held on or before December 31, 2013, up to the balance of the unissued Shares to such persons or entities as may be approved by Board of

-2-

THERANOS, INC. CONFIDENTIAL

Confidential                                                                 THPFM0001058391

Trial Exh. 3530 Page 0006

Directors of the Company. Any such sale and issuance in a Subsequent Closing shall be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, the Amended and Restated Investors' Rights Agreement in substantially the form attached hereto as Exhibit C (the "**Rights Agreement**"), and the Amended and Restated Voting Agreement in substantially the form attached hereto as Exhibit D (the "**Voting Agreement**," and together with this Agreement and the Rights Agreement, the "**Agreements**"), without the need for an amendment to any of the Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Subsequent Closing. Each Subsequent Closing shall take place at such date, time and place as shall be approved by the Company and the Investors representing a majority of the Shares to be sold in such Subsequent Closing.

2.2    *Delivery.* At each Closing, the Company will deliver to each Investor in such Closing a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing in such Closing against payment of the purchase price therefor as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (i) check payable to the Company, (ii) wire transfer in accordance with the Company's instructions, (iii) cancellation of indebtedness or (iv) any combination of the foregoing. In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

## SECTION 3

### Representations and Warranties of the Company

The Company hereby represents and warrants to the Investors as follows:

3.1    *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted, to execute and deliver the Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements and the Restated Certificate. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's business, assets (including intangible assets), liabilities, financial condition, properties or results of operations (a "**Material Adverse Effect**").

3.2    *Capitalization.*

(a)    As of October 1, 2013 (after giving effect to the Forward Split and Reclassification as if it occurred on such date), the authorized capital stock of the Company consisted of 725,000,000 shares of Class A Common Stock, of which approximately 245,111,810 shares are issued and outstanding, 250,658,055 shares of the Company's Class B Common Stock,

-3-

THERANOS, INC. CONFIDENTIAL

Confidential

$0.0001 par value per share (the "**Class B Common Stock**"), of which no shares are issued and outstanding, and 217,539,750 shares of Preferred Stock, 46,320,045 of which are designated Series A Preferred Stock, substantially all of which are issued and outstanding pursuant to that certain Series A Preferred Stock Financing dated December 17, 2004, January 21, 2005 and February 7, 2005 (the "**Series A Preferred**"), 54,162,965 of which are designated Series B Preferred Stock, substantially all of which are issued and outstanding pursuant to that certain Series B Preferred Stock Financing dated February 3, 2006 (the "**Series B Preferred**"), 62,056,740 of which are designated Series C Preferred Stock, 58,896,105 of which are issued and outstanding pursuant to that certain Series C Preferred Stock Financing dated October 13, 2006, November 3, 2006, November 15, 2006 and December 12, 2006 (the "**Series C Preferred**"), 33,333,335 of which are designated Series C-1 Preferred, approximately 19,888,335 of which are issued and outstanding and reserved pursuant to that certain Series C-1 Preferred Stock Financing dated July 1, 2010, as amended to date (the "**Series C-1 Preferred**"). The Class A Common Stock, the Class B Common Stock, the Series A Preferred, the Series B Preferred, the Series C Preferred, and the Series C-1 Preferred shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

      (b)     The outstanding shares have been duly authorized and validly issued in compliance with applicable laws (including applicable federal and state securities laws), and are fully paid and nonassessable.

      (c)     The Company has reserved:

      (i)     the Shares for issuance pursuant to this Agreement;

      (ii)     a sufficient number of shares of Class A Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Shares;

      (iii)     226,319,890 shares of Class A Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2004 Stock Plan, under which options to purchase approximately 8,236,660 shares of the Company's common stock were issued and outstanding as of October 1, 2013;

      (iv)     15,000,000 shares of Class A Common Stock anticipated to be authorized for issuance to employees, consultants and directors pursuant to its 2013 Stock Incentive Plan, pending approval of the 2013 Stock Incentive Plan by the Company's board of directors and stockholders;

      (v)     250,658,055 shares of Class B Common Stock anticipated to be authorized for issuance to Elizabeth Holmes in exchange for 250,658,055 shares of Class A Common Stock held by Ms. Holmes (assuming exercise of options and rights to purchase 53,705,830 shares of Class A Common Stock held by Ms. Holmes);

      (vi)     741,665 shares of Class A Common Stock for issuance upon exercise of warrants to purchase the Company's common stock; and

-4-

THERANOS, INC. CONFIDENTIAL

THPFM0001058393

Trial Exh. 3530 Page 0008

ER-13320

(vii)    9,666,670 shares of Series C-1 Preferred Stock for issuance upon conversion of notes convertible into shares of Series C-1 Preferred Stock.

(d)    All issued and outstanding shares of the Company's Class A Common Stock and Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

(e)    The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate and applicable law, will be validly issued, fully paid and nonassessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investors; provided, however, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Rights Agreement and the Company's Bylaws and to certain redemption rights in favor of the Company as set forth in the Company's Certificate of Incorporation and Bylaws.

(f)    Except for the conversion privileges of the Series A Preferred, Series B Preferred, Series C Preferred, and Series C-1 Preferred, the rights provided pursuant to the Rights Agreement, the convertible promissory notes issued in conjunction with the Series C-1 or as otherwise described in this Agreement, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock.

3.3    *Authorization.* All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization and filing of the Restated Certificate, the authorization, execution and delivery of the Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Agreements has been taken or will be taken prior to the Initial Closing. The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity, and (iii) to the extent the indemnification provisions contained in the Rights Agreement may further be limited by applicable laws and principles of public policy.

3.4    *Intellectual Property.*

(a)    <u>Rights</u>. To the knowledge of the Company's executive officers (the "**Company's Knowledge**"), the Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("**Intellectual Property**") necessary to the business of the Company as presently conducted. To the Company's Knowledge, the Company by operating its business as currently

-5-

THERANOS, INC. CONFIDENTIAL

Trial Exh. 3530 Page 0009

proposed to be conducted will not violate or infringe any patent or trademark rights of any other person that are necessary for conducting the business of the Company as presently contemplated.

(b)     Proprietary Information and Invention Assignment. The Company's current practice is to require each current and former employee and consultant of the Company to execute a confidential information and invention assignment agreement. To the Company's Knowledge, no employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement other than certain intellectual property created by certain employees prior to joining the Company. To the Company's Knowledge, no current employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as currently conducted. To the Company's Knowledge, it is not presently nor will it be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company.

3.5     *Compliance with Other Instruments.* The Company is not in violation of any material term of its Certificate of Incorporation or Bylaws, each as amended to date. To the Company's knowledge, the Company is not in violation of any material federal or state statute, rule or regulation applicable to the Company. The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares and the Conversion Shares, will not result in any violation of, or conflict with, or constitute a default under, the Company's Certificate of Incorporation or Bylaws, each as amended to date, nor, to the Company's knowledge, will it result in any material violation of, or materially conflict with, or constitute a material default under any of its material agreements, nor, to the Company's knowledge, will it result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company.

3.6     *Governmental Consent.* No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Certificate with the office of the Secretary of State of the State of Delaware, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "**Securities Act**") and (iii) such filings as may be required under applicable state securities laws.

3.7     *Offering.* Subject to the accuracy of the Investors' representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and the registration and/or qualification requirements of all applicable state securities laws.

-6-

THERANOS, INC. CONFIDENTIAL

Trial Exh. 3530 Page 0010

**ER-13322**

3.8     *Registration Rights.* Except as set forth in the Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued.

3.9     *Brokers or Finders.* The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.10    *Employees.* To the Company's knowledge, there are no strike, labor dispute or union organization activities pending or threatened between it and its employees. To the Company's knowledge, none of its employees belongs to any union or collective bargaining unit.

## SECTION 4

### Representations and Warranties of the Investors

Each Investor hereby, severally and not jointly, represents and warrants to the Company as follows:

4.1     *No Registration.* Such Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

4.2     *Investment Intent.* Such Investor is acquiring the Shares and the Conversion Shares, for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

4.3     *Investment Experience.* Such Investor, or its purchaser representative, within the meaning of Regulation D, Rule 501(h), promulgated by the Securities and Exchange Commission (its "**Purchaser Representative**"), has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that such Investor or its Purchaser Representative can protect its own interests. Such Investor or its Purchaser Representative has such knowledge and experience in financial and business matters so that such Investor or its Purchaser Representative is capable of evaluating the merits and risks of its investment in the Company.

4.4     *Speculative Nature of Investment.* Such Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is

-7-

THERANOS, INC. CONFIDENTIAL

highly speculative and involves substantial risks. Such Investor can bear the economic risk of such Investor's investment and is able, without impairing such Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of such Investor's investment.

4.5 *Access to Data*. Such Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction. Such Investor believes that it has received all the information such Investor considers necessary or appropriate for deciding whether to purchase the Shares and Conversion Shares. Such Investor understands that such discussions, as well as any information issued by the Company, were intended to describe certain aspects of the Company's business and prospects, but were not necessarily a thorough or exhaustive description. Such Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Such Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements. Nothing in this Section 4.5 shall be deemed to limit or modify the Company's representations in Section 3.

4.6 *Accredited Investor*. The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

4.7 *Residency*. The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investors.

4.8 *Rule 144*. Such Investor acknowledges that the Shares and the Conversion Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Such Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares being sold during any three-month period not exceeding specified limitations. Such Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available. Such Investor acknowledges and understands that notwithstanding any

-8-

Confidential

obligation under the Rights Agreement, the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Shares or the Conversion Shares, and that, in such event, the Investor may be precluded from selling such securities under Rule 144, even if the other requirements of Rule 144 have been satisfied. Such Investor acknowledges that, in the event all of the requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Class A Common Stock. Such Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

4.9     *No Public Market.* Such Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.10    *Authorization.*

(a)     Such Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of the Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

(b)     The Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)     No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

4.11    *Brokers or Finders.* Such Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

4.12    *Tax Advisors.* Such Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the

-9-

THERANOS, INC. CONFIDENTIAL

Agreements. With respect to such matters, such Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

    4.13    *Legends.* Such Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares and Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Rights Agreement or under applicable state securities laws):

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.
>
> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.
>
> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MANDATORY REDEMPTION RIGHT IN FAVOR OF THE ISSUER AS SET FORTH IN THE ISSUER'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION AND BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER."

    4.14    *Investment Representations, Warranties and Covenants by Non-U.S. Persons.* Each Investor who is a Non-U.S. person (as that term is defined in Section 4.14(c) of this Agreement) hereby represents and warrants to the Company as follows:

-10-

THERANOS, INC. CONFIDENTIAL

Confidential

THPFM0001058399

(a)     This Agreement is made by the Company with such Investor who is a Non-U.S. person in reliance upon such Non-U.S. person's representations, warranties and covenants made in this Section 4.14.

(b)     Such Non-U.S. person has been advised and acknowledges that:

(i)     the Shares and the Conversion Shares have not been, and when issued, will not be registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other country;

(ii)     in issuing and selling the Shares and the Conversion Shares to such Non-U.S. person pursuant hereto, the Company is relying upon the "safe harbor" provided by Regulation S and/or on Section 4(2) under the Securities Act;

(iii)     it is a condition to the availability of the Regulation S "safe harbor" that the Shares and the Conversion Shares not be offered or sold in the United States or to a U.S. person until the expiration of a period of one year following the Closing Date; and

(iv)     notwithstanding the foregoing, prior to the expiration of one year after the Closing (the "**Restricted Period**"), the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person.

(c)     As used herein, the term "**United States**" means and includes the United States of America, its territories and possessions, any State of the United States, and the District of Columbia, and the term "**U.S. person**" (as defined in Regulation S) means:

(i)     a natural person resident in the United States;

(ii)     any partnership or corporation organized or incorporated under the laws of the United States;

(iii)     any estate of which any executor or administrator is a U.S. person;

(iv)     any trust of which any trustee is a U.S. person;

(v)     any agency or branch of a foreign entity located in the United States;

(vi)     any nondiscretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

-11-

THERANOS, INC. CONFIDENTIAL

THPFM0001058400

Trial Exh. 3530 Page 0015

**ER-13327**

      (vii)   any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated and (if an individual) resident in the United States; and

      (viii)   a corporation or partnership organized under the laws of any foreign jurisdiction and formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

As used herein, the term "**Non-U.S. person**" means any person who is not a U.S. person or is deemed not to be a U.S. person under Rule 902(k)(2) of the Securities Act.

      (d)   Such Non-U.S. person agrees that with respect to the Shares and the Conversion Shares until the expiration of the Restricted Period:

      (i)   such Non-U.S. person, its agents or its representatives have not and will not solicit offers to buy, offer for sale or sell any of the Shares and the Conversion Shares, or any beneficial interest therein in the United States or to or for the account of a U.S. person during the Restricted Period; and

      (ii)   notwithstanding the foregoing, prior to the expiration of the Restricted Period, the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person; and

      (iii)   such Non-U.S. person shall not engage in hedging transactions with regard to the Shares and the Conversion Shares unless in compliance with the Securities Act.

The foregoing restrictions are binding upon subsequent transferees of the Shares and the Conversion Shares, except for transferees pursuant to an effective registration statement. Such Non-U.S. person agrees that after the Restricted Period, the Shares and the Conversion Shares may be offered or sold within the United States or to or for the account of a U.S. person only pursuant to applicable securities laws.

      (e)   Such Non-U.S. person has not engaged, nor is it aware that any party has engaged, and such Non-U.S. person will not engage or cause any third party to engage, in any directed selling efforts (as such term is defined in Regulation S) in the United States with respect to the Shares and the Conversion Shares.

-12-

THERANOS, INC. CONFIDENTIAL

(f)     Such Non-U.S. person: (i) is domiciled and has its principal place of business outside the United States; (ii) certifies it is not a U.S. person and is not acquiring the Shares or the Conversion Shares for the account or benefit of any U.S. person; and (iii) at the time of the Closing Date, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith will be located outside the United States.

(g)     At the time of offering to such Non-U.S. person and communication of such Non-U.S. person's order to purchase the Shares or the Conversion Shares and at the time of such Non-U.S. Person's execution of this Agreement, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith were located outside the United States.

(h)     Such Non-U.S. person is not a "distributor" (as defined in Regulation S) or a "dealer" (as defined in the Securities Act).

(i)     Such Non-U.S. person acknowledges that the Company shall make a notation in its stock books regarding the restrictions on transfer set forth in this Section 4.14 and shall transfer such shares on the books of the Company only to the extent consistent therewith.

In particular, such Non-U.S. person acknowledges that the Company shall refuse to register any transfer of the Shares or the Conversion Shares not made in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

(j)     Such Investor understands and agrees that each certificate held by such Non-U.S. person representing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or any the Conversion Shares upon conversion thereof upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by this Agreement, by Sections 417 and 418 of the California Corporations Code or under applicable state securities laws):

> THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION. HEDGING TRANSACTIONS INVOLVING THE SHARES REPRESENTED HEREBY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE, HYPOTHECATION OR ANY OTHER TRANSFER

-13-

THERANOS, INC. CONFIDENTIAL

THPFM0001058402

OF ANY INTEREST IN ANY OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

4.15    *Representations by Non-U.S. Persons.* If an Investor is not a U.S. person, such Investor hereby represents that such Investor is satisfied as to the full observance of the laws of such Investor's jurisdiction in connection with any invitation to subscribe for the Shares and the Conversion Shares or any use of the Agreements, including (i) the legal requirements within such Investor's jurisdiction for the purchase of Shares and the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of such securities. Such Investor's subscription and payment for, and such Investor's continued beneficial ownership of, the Shares and the Conversion Shares will not violate any applicable securities or other laws of such Investor's jurisdiction.

## SECTION 5

### Conditions to Investors' Obligations to Close

Each Investor's obligation to purchase the Shares at a Closing is subject to the fulfillment on or before the Closing of each of the following conditions, unless waived in writing by the applicable Investor purchasing the Shares in such Closing:

5.1    *Representations and Warranties.* With respect to any Subsequent Closing, the representations and warranties made by the Company in Section 3 of this Agreement shall be true and correct in all material respects as of the date of any Subsequent Closing.

5.2    *Covenants.* All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Initial Closing shall have been performed or complied with by it on or before the Initial Closing.

5.3    *Blue Sky.* The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

5.4    *Restated Certificate.* The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

5.5    *Rights Agreement.* The Company, Elizabeth Holmes, and Holders of a majority of the Registrable Securities (each as defined in the Rights Agreement) shall have executed and delivered the Rights Agreement.

5.6    *Voting Agreement.* The Company, the Founder, and a majority-in-interest of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

-14-

Confidential

THPFM0001058403

Trial Exh. 3530 Page 0018

**ER-13330**

5.7    *Proceedings and Documents.* All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investors, and the Investors shall have been furnished with such instruments and documents as they shall have reasonably requested.

5.8    *Consents and Waivers.* The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for the performance by the Company of its obligations pursuant to the Agreements.

## SECTION 6

### Conditions to Company's Obligation to Close

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived in writing by the Company:

6.1    *Representations and Warranties.* The representations and warranties made by the Investors in such Closing in Section 4 shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the date of such Closing.

6.2    *Covenants.* All covenants, agreements and conditions contained in the Agreements to be performed by Investors on or prior to the date of such Closing shall have been performed or complied with as of the date of such Closing.

6.3    *Compliance with Securities Laws.* The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

6.4    *Restated Certificate.* The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

6.5    *Rights Agreement.* The Company, Elizabeth Holmes and the Holders of a majority of the Registrable Securities shall have executed and delivered the Rights Agreement.

6.6    *Voting Agreement.* The Company, the Founder, and a majority-in-interest of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

6.7    *Proceedings and Documents.* All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Company,

-15-

THERANOS, INC. CONFIDENTIAL

and the Company shall have been furnished with such instruments and documents as they shall have reasonably requested.

## SECTION 7

### Miscellaneous

7.1 *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Investors holding a majority of the Class A Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement (excluding any of such shares that have been sold to the public or pursuant to Rule 144); provided, however, that Investors purchasing shares in a Closing after the Initial Closing may become parties to this Agreement in accordance with **Section 2.1** without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Investor. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities. Each Investor acknowledges that by the operation of this paragraph, the holders of a majority of the Class A Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement (excluding any of such shares that have been sold to the public or pursuant to Rule 144) will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

7.2 *Notices*. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid or otherwise delivered by hand or by messenger addressed:

(a) if to an Investor, at the Investor's address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b) if to any other holder of any Shares or Conversion Shares, at such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c) if to the Company, one copy should be sent to each of Elizabeth Holmes and Valeska Pederson Hintz, Theranos, Inc. 1601 S. California Avenue, Palo Alto, CA 94304, or at such other address as the Company shall have furnished to the Investors, with copies to Katharine A. Martin, Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

-16-

THERANOS, INC. CONFIDENTIAL

7.3 *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

7.4 *Brokers or Finders.* The Company shall indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 3.16**, and each Investor agrees to indemnify and hold harmless the Company and each other Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company, any other Investor or any of their constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 4.11**.

7.5 *Expenses.* The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement.

7.6 *Survival.* The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby.

7.7 *Successors and Assigns.* This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

7.8 *Entire Agreement.* This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof, including, without limitation, the Prior Agreement, which is superseded hereby and of no further force or effect.

7.9 *Delays or Omissions.* Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part

-17-

THERANOS, INC. CONFIDENTIAL

THPFM0001058406

of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

7.10 *California Corporate Securities Law.* THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

7.11 *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

7.12 *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

7.13 *Telecopy Execution and Delivery.* A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

7.14 *Jurisdiction; Venue.* Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 7.2 hereof; provided, that nothing in this paragraph shall affect the right of any party to serve

-18-

THERANOS, INC. CONFIDENTIAL

**ER-13334**

process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

7.15    *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

7.16    *Attorney's Fees.* In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

7.17    *Waiver of Potential Conflicts of Interest.* Each of the Investors and the Company acknowledges that Wilson Sonsini Goodrich & Rosati, Professional Corporation ("WSGR") may have represented and may currently represent certain of the Investors. In the course of such representation, WSGR may have come into possession of confidential information relating to such Investors. Each of the Investors and the Company acknowledges that WSGR is representing only the Company in this transaction. Each of the Investors and the Company understands that an affiliate of WSGR may also be an Investor under this Agreement. Pursuant to Rule 3-310 of the Rules of Professional Conduct promulgated by the State Bar of California, an attorney must avoid representations in which the attorney has or had a relationship with another party interested in the representation without the informed written consent of all parties affected. By executing this Agreement, each of the Investors and the Company hereby waives any actual or potential conflict of interest which may arise as a result of WSGR's representation of such persons and entities, WSGR's possession of such confidential information and the participation by WSGR's affiliate in the financing. Each of the Investors and the Company represents that it has had the opportunity to consult with independent counsel concerning the giving of this waiver.

[Signature Page Follows]

-19-

THERANOS, INC. CONFIDENTIAL

Confidential                                                                                                       THPFM0001058408

The parties are signing this Amended and Restated Series C-1 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**COMPANY**

**THERANOS, INC.**
a Delaware corporation

By: _____
Elizabeth Holmes, Chief Executive Officer

**[SIGNATURE PAGE TO AMENDED AND RESTATED
SERIES C-1 PREFERRED STOCK PURCHASE AGREEMENT]**

Confidential

THPFM0001058409

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, We each hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the following aggregate dollar value of $5,349,900 to purchase a total of 356,660 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Black Diamond Ventures XII-B, LLC**          **ADDRESS:**

Signature: _____

Name: Christopher B. Lucas, Managing Director

Dated: December 31, 2013

**ACCEPTED, AGREED AND ACKNOWLEDGED:**

**Theranos, Inc.**

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058410

Trial Exh. 3530 Page 0025

**ER-13337**

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned hereby agrees to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

The undersigned acknowledges and agrees that it is investing the aggregate dollar value of $4,843,185.00 in lieu of compensation owed to it for legal services rendered on behalf of the Company pursuant to that certain engagement letter to purchase a total of 322,879 shares of the Company's Series C-1 Preferred Stock, to which it is subscribing pursuant to the Purchase Agreement.

BOIES, SCHILLER & FLEXNER LLP

Date: January 14, 2014

By: _Amy Habie_

Name: _Amy Habie_

Title: _CFO_

**ACCEPTED, AGREED AND ACKNOWLEDGED:**

Theranos, Inc.

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058411

Trial Exh. 3530 Page 0026

**ER-13338**

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.

2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.

3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as <u>Exhibit A</u>.

I acknowledge and agree that I am investing the following aggregate dollar value of $249,990 to purchase a total of 16,666 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____

Name: **Colin Carter**

Dated: _____

**ACCEPTED, AGREED AND ACKNOWLEDGED:**
**Theranos, Inc.**

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058412

Trial Exh. 3530 Page 0027

ER-13339

<u>MASTER SIGNATURE PAGE</u>

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.

2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.

3.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as <u>Exhibit A</u>.

I acknowledge and agree that I am investing the following aggregate dollar value of $75,000 to purchase a total of 5,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____

Name:  Daniel Carter

Dated:  1 - 7 - 2014

ACCEPTED, AGREED AND ACKNOWLEDGED:
Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058413

Trial Exh. 3530 Page 0028



## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, We each hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the following aggregate dollar value of $99,990 to purchase a total of 6,666 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _Alan Eisenma_
By:  Alan Eisenman

Dated: _12/30/13_

I acknowledge and agree that I am investing the following aggregate dollar value of $300,000 to purchase a total of 20,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Gordon Family Trust**                     ADDRESS:

Signature: _____              _____

Name: _____              _____

Dated: _____

I acknowledge and agree that I am investing the following aggregate dollar value of $300,000 to purchase a total of 20,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Crofton Capital GP**                     ADDRESS:

Signature: _____              _____

Name: _____              _____

Dated: _____

I acknowledge and agree that I am investing the following aggregate dollar value of $49,995 to purchase a total of 3,333 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____              ---
By:  Sherrie Eisenman

Dated: _12/30/13_              ---

**ACCEPTED, AGREED AND ACKNOWLEDGED:**
Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, We each hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.
2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.
3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as <u>Exhibit A</u>.

I acknowledge and agree that I am investing the following aggregate dollar value of $99,990 to purchase a total of 6,666 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____
By:    Alan Eisenman     _____

Dated: _____     _____

I acknowledge and agree that I am investing the following aggregate dollar value of $300,000 to purchase a total of 20,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Gordon Family Trust**     ADDRESS:

Signature: _____
Name:    _____
Dated:    12/30/13     _____

I acknowledge and agree that I am investing the following aggregate dollar value of $300,000 to purchase a total of 20,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Crofton Capital GP**     ADDRESS:

Signature: Robert A Gordon
Name:    Robert A. Gordon, managing Partner
Dated:    12/30/2013     _____

I acknowledge and agree that I am investing the following aggregate dollar value of $49,995 to purchase a total of 3,333 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____
By:    Sherrie Eisenman     _____

Dated: _____     _____

ACCEPTED, AGREED AND ACKNOWLEDGED:
Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

THPFM0001058415

Trial Exh. 3530 Page 0030

ER-13342

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, We each hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.
3.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the following aggregate dollar value of $75,000 to purchase a total of 5,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**ADDRESS:**

Signature: _Kendra Fadil_

Name:  **Kendra Fadil**

Dated:  _1/14/14_

**ACCEPTED, AGREED AND ACKNOWLEDGED:**
**Theranos, Inc.**

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058416

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.
2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on <u>Exhibit A</u> thereto.
3.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as <u>Exhibit A</u>.

I acknowledge and agree that I am investing the following aggregate dollar value of $4,875,000 to purchase a total of 325,000 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Hall Black Diamond II, LLC**

Signature: *BB Ulut*

Name: *BRYAN TOLBERT*

Dated: *12/31/2013*

**ADDRESS:**

*6801 GAYLORD PARKWAY, SUITE 100*

*FRISCO, TX 75034*

**ACCEPTED, AGREED AND ACKNOWLEDGED:**
**Theranos, Inc.**

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the aggregate dollar value of $ 4,149,990 ($150,000 in lieu of compensation owed to me for service on the Company's board of directors and $ 3,999,990 in the form of cash) to purchase a total of 276,666 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

ADDRESS:

Signature: _____
By:      Richard Kovacevich

Dated: _____


ACCEPTED, AGREED AND ACKNOWLEDGED.

Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058418

Trial Exh. 3530 Page 0033

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, Each of the undersigned hereby agrees to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.   Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2.   Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3.   Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

Each of the undersigned acknowledges and agrees that Lucas Venture Group XI, L.P. and Lucas Venture Group IV, L.P., respectively, are severally investing the aggregate dollar value of $7,069,995 and $500,010, respectively, in cash to purchase a total of 471,333 and 33,334 shares of the Company's Series C-1 Preferred Stock, respectively, to which each is subscribing pursuant to the Purchase Agreement.

**LUCAS VENTURE GROUP XI, L.P.**

By: _____

Name: DONALD A. LUCAS

Title: Founder

Dated: 1-14-14

ADDRESS:


**LUCAS VENTURE GROUP IV, L.P.**

By: _____

Name: DONALD Adocas

Title: Founder

Dated: 1-14-14

ADDRESS:


**ACCEPTED, AGREED AND ACKNOWLEDGED:**

**Theranos, Inc.**

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058419

Trial Exh. 3530 Page 0034

**ER-13346**

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned hereby agrees to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the aggregate dollar value of $1,312,500.00 to purchase a total of 87,500 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

**Mendenhall TF Partners**

ADDRESS:

Signature: _____

By: Patrick Mendenhall

Title: _____

Dated: January 14, 2014

**ACCEPTED, AGREED AND ACKNOWLEDGI**

**Theranos, Inc.**

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

*[Signature Page to Stockholder Consent]*

Confidential

THPFM0001058420

Trial Exh. 3530 Page 0035

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Holder," "Seller," "Voting Party" and "Stockholder," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3. Termination Certificate, dated on or around December 2013, as an Investor listed on a signature page thereto, for purposes of terminating that certain Amended and Restated Co-Sale Agreement, dated as of July 1, 2010.

4. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

5. Stockholder Acknowledgement and Agreement, dated on the date hereof, as Stockholder.

6. Amendment No. 1 to the Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013, as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

I acknowledge and agree that I am investing the aggregate dollar value of $17,549,925 in cash to purchase a total of 1,169,995 shares of the Company's Series C-1 Preferred Stock, to which I am subscribing pursuant to the Purchase Agreement.

PEER VENTURES GROUP IV L.P.
a Delaware limited partnership

By: _____
Jared Hutchings, Managing Member

Dated: _1 / 14 / 2014_____

ACCEPTED, AGREED AND ACKNOWLEDGED:

Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058421

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," "Voting Party" and "Stockholder," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1.  Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2.  Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3.  Termination Certificate, dated on or around December 2013, as an Investor listed on a signature page thereto, for purposes of terminating that certain Amended and Restated Co-Sale Agreement, dated as of July 1, 2010.

4.  Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

5.  Stockholder Acknowledgement and Agreement, dated on the date hereof, as Stockholder.

6.  Amendment No. 1 to the Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013, as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

**PEER VENTURES GROUP III. L.P.**
a Delaware limited partnership

By: _____
Mark Campbell, Managing Member

Dated: _1 / 14 / 2014_

By: _____
Jared Hutchings, Managing Member

Dated: _1 / 14 / 2014_

**ACCEPTED, AGREED AND ACKNOWLEDGED:**

**Theranos, Inc.**

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058422

Trial Exh. 3530 Page 0037

ER-13349

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Holder," "Seller," "Voting Party" and "Stockholder," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Prior Investor listed on Exhibit B thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Prior Investor listed on Exhibit B thereto.

3. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

4. Stockholder Acknowledgement and Agreement, dated on the date hereof, as Stockholder.

ADDRESS:

Signature: *George P. Shultz*

By:     George P. Shultz

Dated:   *12-16-2013*

**ACCEPTED, AGREED AND ACKNOWLEDGED:**

Theranos, Inc.

By: _____

Name: Elizabeth Holmes, Chief Executive Officer

Confidential

THPFM0001058423

**ER-13350**

## MASTER SIGNATURE PAGE

IN WITNESS WHEREOF, I hereby agree to be a party to each of the following agreements of Theranos, Inc., a Delaware corporation (the "*Company*"), as an "Investor," "Series C-1 Investor," "Prior Investor," "Holder," "Seller," and "Voting Party," as applicable, as of the date of such agreements. Any copy, facsimile or other reliable reproduction of this Master Signature Page may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used with respect to any and all of the following agreements.

1. Amended and Restated Investors' Rights Agreement, dated on or around December 2013 (the "*Rights Agreement*"), as a Series C-1 Investor listed on Exhibit A thereto and the Joinder Agreement, attached as Annex A to the Rights Agreement.

2. Amended and Restated Voting Agreement, dated on or around December 2013, as a Series C-1 Investor listed on Exhibit A thereto.

3. Termination Certificate, dated on or around December 2013, as an Investor listed on a signature page thereto, for purposes of terminating that certain Amended and Restated Co-Sale Agreement, dated as of July 1, 2010.

4. Amended and Restated Series C-1 Preferred Stock Purchase Agreement, dated on or around December 2013 (the "*Purchase Agreement*"), as an Investor listed on the Schedule of Investors attached thereto as Exhibit A.

Teton Capital Company

By: _____
Name: LARRY OSROE
Title: GENERAL PTNR
Date: 12/18/2013

ACCEPTED, AGREED AND ACKNOWLEDGED:

Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Chief Executive Officer

THPFM0001058424

Trial Exh. 3530 Page 0039

ER-13351

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

**July 1, 2010 Closing**

| Investor | Number of Pre-Split Series C-1 Shares | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|---|
| PEER Ventures Group III, L.P. | 3,000,000 | 15,000,000 | $45,000,000.00 |
| **Total** | **3,000,000** | **15,000,000** | **$45,000,000.00** |

**July 19, 2010 Closing**

| Investor | Number of Pre-Split Series C-1 Shares | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|---|
| Teton Capital Company | 35,000 | 175,000 | $525,000.00 |
| **July 19, 2010 Total** | **35,000** | **175,000** | **$525,000.00** |
| **Aggregate Total** | **3,035,000** | **15,175,000** | **$45,525,000.00** |

**July 30, 2010 Closing**

| Investor | Number of Pre-Split Series C-1 Shares | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|---|
| BLUECROSS BLUESHIELD VENTURE PARTNERS, L.P. | 566,667 | 2,833,335 | $8,500,005.00 |
| SANDBOX CO-INVESTMENT FUND I, LLC | 100,000 | 500,000 | $1,500,000.00 |

[SCHEDULE OF INVESTORS]

| | | | |
|---|---|---|---|
| **July 30, 2010 Total** | **666,667** | **3,333,335** | **$10,000,005.00** |
| **Aggregate Total** | **3,701,667** | **18,508,335** | **$55,525,005.00** |

**March 28, 2013 Closing**

| Investor | Number of Pre-Split Series C-1 Shares | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|---|
| George P. Shultz | 40,000 | 200,000 | $3,000,000.00 |
| **March 28, 2013 Total** | **40,000** | **200,000** | **$3,000,000.00** |
| **Aggregate Total** | **3,741,667** | **18,708,335** | **$58,525,005.00** |

**June 10, 2013 Closing**

| Investor | Number of Pre-Split Series C-1 Shares | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|---|
| PEER Ventures Group IV, L.P. | 236,000 | 1,180,000 | $17,700,000.00 |
| **June 10, 2013 Total** | **236,000** | **1,180,000** | **$17,700,000.00** |
| **Aggregate Total** | **3,977,667** | **19,888,335** | **$76,225,005.00** |

**January 14, 2014 Closing**

| Investor | Number of Post-Split Series C-1 Shares | Purchase Price |
|---|---|---|
| Black Diamond Ventures XII-B, LLC | 356,660 | $5,349,900.00 |
| BOIES, SCHILLER & FLEXNER LLP | 322,879 | $4,843,185.00* |
| Colin Carter | 16,666 | $249,990.00 |
| Daniel Carter | 5,000 | $75,000.00 |

[SCHEDULE OF INVESTORS]

Confidential

Trial Exh. 3530 Page 0041

THPFM0001058426

| | | |
|---|---|---|
| Crofton Capital GP | 20,000 | $300,000.00 |
| Alan Eisenman | 6,666 | $99,990.00 |
| Sherrie Eisenman | 3,333 | $49,995.00 |
| Kendra Fadil | 5,000 | $75,000.00 |
| Gordon Family Trust | 20,000 | $300,000.00 |
| Hall Black Diamond II, LLC | 325,000 | $4,875,000.00 |
| Richard Kovacevich | 276,666 | $4,149,990.00** |
| Lucas Venture Group IV, L.P. | 33,334 | $500,010.00 |
| Lucas Venture Group XI, L.P. | 471,333 | $7,069,995.00 |
| Mendenhall TF Partners | 87,500 | $1,312,500.00 |
| PEER Ventures Group IV, L.P. | 1,169,995 | $17,549,925.00 |
| **January 14, 2014 Total** | **3,120,032** | **$46,800,480.00** |
| **Aggregate Total** | **23,008,367** | **$123,025,485.00** |

\* $4,843,185.00 of the Purchase Price is in lieu of compensation owed to the Investor for legal services rendered on behalf of the Company pursuant to that certain engagement letter and $0 in the form of cash.

\*\* $150,000.00 of the Purchase Price is in lieu of compensation owed to the Investor for service on the Company's board of directors and $3,999,990 in the form of cash.

[SCHEDULE OF INVESTORS]

Confidential

Trial Exh. 3530 Page 0042

THPFM0001058427

**EXHIBIT B**

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**

Confidential

THPFM0001058428

**EXHIBIT C**

**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

Confidential

THPFM0001058429

**EXHIBIT D**

**AMENDED AND RESTATED VOTING AGREEMENT**

*Walgreens*


NaviGate

# Program Charter

| | | | |
|---|---|---|---|
| **Program Name:** | Diagnostic Testing | **Program Manager:** | Patty Haworth |
| **Executive Sponsor:** | Wade Miquelon, Kermit Crawford | **Business Owner:** | Nimesh Jhaveri, Brad Wasson |
| **Finance Officer:** | Shannon Fairfield | **Product Director:** | TBD |

Modifications to this template must be requested by submitting a NaviGate Document Change Request form to Walgreens PMO via email at [ HYPERLINK "mailto:pmo.methodology@walgreens.com" ]. The form can be found under the NaviGate tab of the Corporate PMO website, underneath the Contact Us link at [ HYPERLINK "http://pmo" ].

## Document Version Control

| Date | Version # | Revision Description | Author(s) |
|---|---|---|---|
| 12/17/2010 | 1.0 | Initial Version | Patty Haworth |
| 02/25/2011 | 2.0 | Incorporated feedback from Health Law, Marketing, Pharmacy Ops, Accounting, Store Ops, Market Planning and Research, IT, Sales Training and Development | Patty Haworth/Kim Romanski/Mike Rubin |
| 3/5/2014 | 3.0 | Updates made based on revised business and operating model | Patty Haworth/Kim Romanski/Shannon Fairfield |
| | | | |
| | | | |

## Approvals

| Date | Approver(s) | Notes |
|---|---|---|
| | Nimesh Jhaveri | |
| | Brad Wasson | |
| | | |
| | | |



---

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095220

WAG-AZ-LITIG-002293

Trial Exh. 3755 Page 0001

ER-13358

*Walgreens*



NaviGate

## Executive Summary:

Diagnostic Testing allows Walgreens to expand its scope of services to include clinical lab testing at the point of care. It transforms the role of pharmacy by offering disruptive innovation for laboratory services in a retail setting. This is a healthcare game changer with the combination of the Theranos science and Walgreens platform.
This service offering includes:
- More convenient locations and hours
- Better patient and clinician experience
- A science that is more accurate
- Disruptive model that leads to industry cost savings

The overall goal is to expand to 2500 stores nationwide by the end of FY16. The plan for FY14 is to roll out diagnostic testing services to 40 stores by 8/1/14.

A winning business case is predicated on the following:
- A variable labor model utilizing trained technicians
- A scalable training plan with Theranos services

The scope of this Program Charter is targeted at the Pilot phase, with an overview for what is currently known about scale plans.

## Business Need/Opportunity:

### Opportunity:
The Walgreens opportunity (based on $73 billion market forecasted size according to the U.S. Clinical Laboratory and Pathology Testing report for 2013-2015 (G2 Report)) is 633M requisitions.
The Walgreens revenue opportunity, at a capture rate of 100% of the market, is $6.3B based on current contract.
The re-negotiated contract at target state ($14 rev/requisition) is $8.8B.

The total market size is $73B Revenue or ~633M requisitions, up from 2 years ago $60B and 520M requisitions. Based on Revenue share, for the calculations depicted below, it would be $24.1B Theranos revenue opportunity, $6.3B WAG revenue opportunity and 633M requisitions.

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095221

WAG-AZ-LITIG-002294

Trial Exh. 3755 Page 0002

**ER-13359**

*Walgreens*



NaviGate

**Lab Industry**
**Summary**

WAG market opportunity is $6.3B-$8.8B with 633M requisitions

| | Opportunity _in billions_ | |
|---|---|---|
| | **Revenue** | **Requisition** |
| Theranos Opportunity | $24.1 | 0.631 |
| WAG Opportunity Range | $6.3  @ $10 Rev/Req | 0.631 |
| | $8.8  @ $14 Rev/Req | |

| Calculation support: | _in billions_ | | |
|---|---|---|---|
| | **Total Market Revenue** | **Total Market Requisitions** | **Opportunity Requisitions** |
| YR2012 | $60 | 1.52 | 0.520 |
| YR2014 | $73 | 1.85 | 0.633 |

| | **Rev Share** | **Req Share** |
|---|---|---|
| Hospital | 63% | 53% |
| Indep Lab | 33% | 34% |
| Other | 4% | 13% |

Logic
- For a $60B market – there are a total of a Billion requisitions or patients. Of that market – Walgreens has the opportunity to capture the outpatient clinical lab market. The lab market consists of pathology (tissues) and clinical (fluids). Walgreens market opportunity is not on the revenue for lab industry – it is on the patient count or also commonly called – requisition count. The opportunity is determined based on the approximate 1.85 billion requisitions and determining the number of clinical outpatient requisitions. The market opportunity was 520M requisitions in YR2012. If Theranos and Walgreens captured 100% of the 520M requisitions and Theranos paid Walgreens $10/requisition, then Walgreens will earn $5.2B of revenue in diagnostic testing.
- Using that same ratio/logic for the approximate $73B revenue market - $60B/520M=$72B/X.... this computes x= 633M requisitions or patients. If Theranos and Walgreens captured 100% of the market and Theranos paid Walgreens $10/patient, then Walgreens will earn $6.3B of revenue in diagnostic testing.
- The Theranos and Walgreens relationship in the US market does not have a revenue sharing model due to Health law. Rather it is a per patient model. Internationally the opportunity exists for a revenue share model in some countries. Ideally this would be structured as a licensing agreement with Theranos.

**Proposed Solution:**
Walgreens plans to offer laboratory services through our Retail stores. We plan on performing the majority of the same tests (see Theranos Test Menu in Appendix C of Program Charter Appendix) that the industry leaders do today (LabCorp and Quest). The fundamental difference will be that Walgreens, through our convenient locations, will offer greater ease and access than is currently found in the industry today. Walgreens will be entering the lab market with a disruptive

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095222

WAG-AZ-LITIG-002295

Trial Exh. 3755 Page 0003

**ER-13360**

*Walgreens*



NaviGate

technology advantage. Moreover, we have found an ideal partner, Theranos, which can offer less invasive, faster, and cost-effective results to the patients. The Theranos technology only requires a small sample in order to automatically process multiple tests from a menu of 300+ tests in less than 4 hours. Samples collected include blood, urine, feces, and sputum. Approximately 120 mL of blood is collected per finger stick, with approximately 2 blood collections per patient. A drop of blood is 5 mL.

**Theranos Background:**
Theranos is an ideal partner to deliver on the strategy and the closest known competitor is 2+ years behind.
- Leadership with a shared vision and collaborative in approach
- Technology capable of completing almost all outpatient tests and powering a vastly improved patient experience
- A company and technology that is not lab centric, but patient centric
- A scientific team that wants to change the boundaries of healthcare by developing new and innovative tests

Theranos has a world-class scientific team that has built the company from inception ten years ago to a position ready for rapid commercial growth today.
- Elizabeth Holmes is CEO of Theranos, which she founded in 2003. Elizabeth left Stanford University's School of Engineering to build Theranos around her patents and vision for healthcare.
- President and Chief Operating Officer, Sunny Balwani, is an entrepreneur and a computer scientist. Sunny joined Theranos after dropping out of the Computer Science program at Stanford University. He received his MBA at UC Berkeley and undergraduate degree from UT Austin. Sunny began his career at Lotus Development Corporation, after which he served at Microsoft in various roles, and later started his own company in the business-to-business ecommerce space which he sold to CommerceOne.
- Theranos' technology combines a diverse range of expertise including computing, biochemistry, statistics, robotics and machine learning.
- Comprehensively validated over the last ten years by ten of the fifteen largest pharmaceutical companies with hundreds of thousands of assays processed

## Goals and Objectives:

Strategic Intent and Vision
In the Phoenix market, Walgreens and Theranos will:
- Create an incredibly positive consumer healthcare experience that inspires people to become our ambassadors
- Strategically expand Theranos lab services in a phased rollout to become the premier provider in the Phoenix metropolitan market
- Instill pride and enthusiasm in Walgreens staff through education, engagement, and collective ownership
- Showcase our partnership to build excitement around future launches
- Establish the model framework for the national expansion of our partnership

Priorities
- People
- Access
- Quality
- Safety
- Innovation

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095223

WAG-AZ-LITIG-002296

Trial Exh. 3755 Page 0004

ER-13361

*Walgreens*



NaviGate

Financial Outlook

| Financial Recap - Current Contract (in thousands, except per patient data) | | |
|---|---|---|
| | FY14 | FY15 | Steady State (FY20) |
| Patients/Store/Day | 5 | 5 | 20 |
| # Stores | 40 | 1,502 | 2,500 |
| Revenue | $277 | $9,447 | $181,422 |
| Key Costs | | | |
| Labor | ($125) | ($4,251) | ($81,640) |
| Training | ($441) | ($26,777) | ($8,786) |
| Front End | ($30) | ($991) | ($4,843) |
| Capital Investment | ($5,720) | ($102,395) | $0 |
| EBIT | ($3,405) | ($44,560) | $69,295 |
| EBIT/Patient | ($122.82) | ($47.17) | $3.82 |
| IRR (10 YR) | 7.1% | | |

| Financial Recap - Target State (in thousands, except per patient data) | | |
|---|---|---|
| | FY14 | FY15 | Steady State (FY20) |
| Patients/Store/Day | 5 | 5 | 20 |
| # Stores | 40 | 1,502 | 2,500 |
| Revenue | $388 | $13,226 | $253,991 |
| Key Costs | | | |
| Labor | ($125) | ($4,251) | ($81,640) |
| Training | ($441) | ($26,777) | ($6,806) |
| Front End | ($30) | ($991) | ($4,843) |
| Capital Investment | ($6,639) | ($111,248) | ($670) |
| EBIT | ($3,867) | ($46,477) | $109,564 |
| EBIT/Patient | ($139.48) | ($49.20) | $6.04 |
| IRR (10 YR) | 13.6% | | |

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095224

WAG-AZ-LITIG-002297

Trial Exh. 3755 Page 0005

ER-13362

*Walgreens*



NaviGate

<u>Pilot Goals</u>
Our goal for the pilot to achieve the following targets:
- Stand up 40 stores in Arizona by 8/1/14
- 15 patients per store per day within 3 months of 40 stores going live
- Determine scalable labor model
- Work toward a scalable training plan

## Strategy/Program Alignment:

This fits in transforming health care strategy and ultimately transforming the role of the community pharmacy. We are not only elevating the role of community pharmacy, but we are doing so through offering the service through our pharmacy technicians, health guides, and pharmacists.



[ SHAPE \* MERGEFORMAT ]

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095225

WAG-AZ-LITIG-002298

*Walgreens*



## Program Measures for Success:

Pilot Success (see Scorecard measures below)

**Operational**
- Achieve acceptable labor model
- Achieve a training pass rate of 90% while still maintaining excellent customer experience

**Patient experience**
- Optimal Patient Experience
- Completing end to end patient processing in less than 15 minutes
- Minimal lost or invalid specimens
- Enhanced experience for other services (e.g. CSG)

**IT**
- IT system that enables operational efficiency
- Able to scale customer support system

**Payor and Providers**
- Payor coverage of at least 60%
- Clinical sales force in place to drive sufficient volume to WAG stores

**Financial**
- Achieve 15* patients/store/day during pilot period of 90 days

*Note that the pilot period will be extended for an additional 12 months if 3 patients/store/day is achieved

The enclosed material is proprietary to Walgreens.

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095226

WAG-AZ-LITIG-002299

Trial Exh. 3755 Page 0007

**ER-13364**

*Walgreens* 

NaviGate

## Scorecard (Example):



**Metric**

-Stand up 40 store pilot in Phoenix market by Q4

-Achieve 3 Theranos patients/store/day during pilot

**Commentary**

-40 stores to be rolled out in AZ by Q4

-Theranos is beginning Commercial Sales

**YTD Metric Health**

| (Dollars in thousands) | January-14 | | | YTD | | | Full Year |
|---|---|---|---|---|---|---|---|
| Diagnostic Testing | Actual | vs | Budget | Actual | vs | Budget | Goal |
| Sales | $       - | $ | - | $       - | $ | 2 | $       - |
| EBIT | (117) | | (117) | (681) | | (944) | (1,600) |
| | | | | | | | |
| Health Testing | | | | | | | |
| Sales | 380 | | 438 | 2,346 | | 1,727 | 5,986 |
| EBIT | (220) | | (2) | (530) | | (233) | 588 |
| | | | | | | | |
| HQ Expense | - | | - | - | | - | - |
| Project Expense | (115) | | (117) | (643) | | (944) | (1,600) |
| Project Capital | (7) | | - | (37) | | (200) | (200) |



(1) Diagnostic Testing Scorecard includes BETA program and Health Testing

(2) Health Testing financials include free blood pressure tests

(3) * Denotes that the data is not in thousands

(4) % Theranos patients is between 25%-40%

(5) Health Testing supplies of ~$360K were purchased in the month of January based on anticipated contracts.
These purchases are included in the expense, though have not sold through.

---

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [
NUMPAGES ]

CONFIDENTIAL

WG095227

WAG-AZ-LITIG-002300

Trial Exh. 3755 Page 0008

**ER-13365**

**Walgreens**



NaviGate

## Financial Case:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # of Stores - Average | | 18 | 612 | 2,348 | 2,939 | 2,640 | 2,100 | 2,600 | |
| # of Stores | | 48 | 1,593 | 2,600 | 2,640 | 2,599 | 2,600 | 2,600 | |
| # of Days | | 365 | 365 | 365 | 365 | 365 | 365 | 365 | |
| Patients / Store / Day | | 5 | 6 | 8 | 15 | 20 | 20 | 20 | |
| Total Req's | | 27,722 | 944,683 | 7,049,897 | 13,270,174 | 16,142,231 | 18,142,231 | 18,142,231 | |
| Average GP / Patient | $ | 10.00 | $ 10.00 | $ 10.00 | $ 10.00 | $ 10.00 | $ 10.00 | $ 10.00 | |
| Revenue | $ | 277 | $ 9,447 | $ 70,499 | $ 138,702 | $ 181,422 | $ 181,422 | $ 181,422 | |
| COGS | $ | - | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Gross Profit** | $ | 277 | $ 9,447 | $ 70,499 | $ 138,702 | $ 181,422 | $ 181,422 | $ 181,422 | |
| **SG&A:** | | | | | | | | | |
| **Employee Costs** | | | | | | | | | |
| Tech Labor | | 125 | 4,251 | 31,725 | 62,366 | 81,840 | 81,840 | 81,840 | |
| Tech Overrun Hours | | 125 | 4,251 | 31,725 | - | - | - | - | |
| Training - First-time Training - WAG Employees | | 301 | 13,930 | 22,270 | - | - | - | - | |
| Training - First-time Training - WAG Employees - Turnover | | 25 | 641 | 2,816 | 3,242 | 3,242 | 3,242 | 3,242 | |
| Trainer Cost | | 129 | 7,312 | 5,544 | 8,644 | 5,544 | 8,644 | 5,544 | |
| Hepatitis B Vaccinations | | 23 | 643 | 578 | - | - | - | - | |
| Hepatitis B Vaccinations - Turnover | | 5 | 119 | 109 | 433 | 433 | 433 | 433 | |
| **Store Costs** | | | | | | | | | |
| Remerchandising Costs | | 52 | 1,616 | - | - | - | - | - | |
| Front End Impact | | 50 | 353 | 4,355 | 4,645 | 4,548 | 4,645 | 4,645 | |
| **Corporate Costs** | | | | | | | | | |
| Marketing | | 60 | 1,422 | 600 | 600 | 600 | 600 | 600 | |
| Legal | | 315 | 315 | 140 | 50 | 50 | 50 | 50 | |
| Project Manager | | 175 | 175 | 175 | 175 | 175 | 175 | 175 | |
| Corporate Travel | | 455 | 835 | 303 | 51 | 51 | | | |
| Corporate Project Team | | 1,150 | 3,000 | 2,900 | 2,500 | 2,000 | 2,000 | 2,000 | |
| Depreciation and Amortization | | 118 | 9,368 | 14,892 | 14,000 | 14,000 | 13,800 | 13,800 | |
| **Total SG&A Expenses** | $ | 3,582 | $ 54,097 | $ 118,327 | $ 95,144 | $ 113,418 | $ 113,327 | $ 112,127 | |
| **Total EBIT, excluding Innovation Fee** | $ (1,000) | $ (3,405) | $ (44,560) | $ (47,828) | $ 44,558 | $ 68,004 | $ 68,095 | $ 69,295 | |
| Tax @ 37% | $ (370) | $ (1,260) | $ (16,487) | $ (17,696) | $ 16,486 | $ 25,162 | $ 25,195 | $ 25,639 | |
| **Net Income** | $ (630) | $ (2,145) | $ (28,073) | $ (30,132) | $ 28,072 | $ 42,843 | $ 42,900 | $ 43,656 | |
| Cash flow without innovation fees | | $ (7,728) | $ (124,566) | $ (88,692) | $ 37,396 | $ 52,167 | $ 52,224 | $ 52,224 | |
| Cash flow with innovation fees | $ (25,758) | $ (82,728) | $ (124,566) | $ (88,692) | $ 37,396 | $ 52,167 | $ 152,224 | $ 52,224 | |
| IRR with innovation fees (tax effected) | 7.1% | | | | | | | | |
| | EBIT / Patient | $ | (122.82) | (47.17) | (6.78) | 3.19 | 3.75 | 3.75 | 3.82 |
| | EBITDA/Patient | $ | (114.57) | (37.25) | (4.68) | 4.25 | 4.56 | 4.57 | 4.57 |
| **Innovation Fees** | $ 26,000 | $ 75,000 | | | | | | 100000 | |

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095228

WAG-AZ-LITIG-002301

Trial Exh. 3755 Page 0009

**ER-13366**

*Walgreens*



NaviGate

## Program Scope and Exclusions:

In the new business arrangement with Theranos, the bulk of the responsibility falls on Theranos for pilot and may be transferred to Walgreens for long-term. The transfer of responsibilities is predicated on an update to the contract and financial terms.

Theranos is the lab in the new business arrangement. Walgreens' role is to take care of the experience in the store based on Theranos' training.

| Theranos Responsibilities | Walgreens Responsibilities |
|---|---|
| Lab | Space for Providing Service |
| Phlebotomists | Training |
| Training Content & SOPs | Trained Team Members to Offer Theranos Services |
| IT Application | Point of Sale payment collection |
| Medical Billing | In-store Marketing |
| Computer Equipment | Field Support |
| Supplies | |
| Courier | |
| Clinical Sales | |
| Call Center | |
| Broad Marketing Campaigns | |
| Provide Operational Data to Walgreens | |
| Provide Patient Results to Walgreens | |

## Background

**Walgreens/Theranos relationship:**
The relationship between Walgreens and Theranos began in February 2010. For several years the two organizations worked to find a business relationship that also met regulatory requirements. As such, it was determined in early 2013 that the original conceived business arrangement was not a viable relationship that mitigated regulatory concerns. As such, a new business model was formed and agreed to. Within that new arrangement, Theranos is the laboratory, and Walgreens is then contracted by Theranos to provide services on Theranos' behalf. The mechanism by which Walgreens will provide those services will be to use the pharmacy team members in the stores to be able to do patient sample collection on Theranos' behalf. Moreover, the Theranos specimens are **not** processed in the Walgreens retail stores. Rather, the specimens are picked up and taken to a Theranos central laboratory for processing.

**Training**
Pharmacy team members as well as health guides will and are being trained to be able to perform both the check-in as well as the sample collection. Given that the tests are not resulted in the stores, and there is no consultation required. The primary team members for performing the activities assigned will be Technicians and Health Guides.

Currently, the training curriculum is designed to be high touch. The ratio of trainer to trainee is 3:1 in order to provide adequate oversight of the blood specimen draw. The specimen draws that occur are from the finger, but require manual dexterity in both hands. Moreover, there is a specific grip that Theranos has designed that enhances the ability to collect the appropriate amount of blood. The combination of the amount of blood needed, gripping technique, and the collection into a unique Theranos device (called a Capillary Theranos Nanotainer (CTN) (Formerly called a Blood Collection Device (BCD)), as well as a high propensity for 'perfection' on specimen draw the first time – has resulted in a lower than

---

CONFIDENTIAL

WG095229

WAG-AZ-LITIG-002302

Trial Exh. 3755 Page 0010

**ER-13367**

*Walgreens* 

NaviGate

anticipated pass rate from the initial rounds of training. Improvements have been made in the training plan that we believe will lend itself to a higher pass rate as we progress through training.

**In-store Experience**
All the tests that Theranos performs will require a Clinician order. While there are some states that allow for a patient to order their own tests, the organizations have agreed strategically that our go to market strategy will be to require a clinician order. Clinicians are a critical part of the care of patients, and Walgreens and Theranos do not want to disintermediate clinicians from the care of patients. Moreover, clinicians order a lot of prescriptions and Walgreens does not want to aggravate the physician communities.

For reference, below is a process flow that outlines the patient experience.

[ SHAPE \* MERGEFORMAT ]

**Health Testing:**
Currently, Walgreens offers patients select Health Tests upon patient request at CLIA-waived locations. Theranos Diagnostic Testing services provide physicians and patients a simple solution for laboratory services under a CLIA-certified laboratory.

Both parties must work together to clearly differentiate the patient and physician experience of Health Testing from Theranos services. The CLIA-Waived testing that is performed as part of Health Testing is very different than the high complexity testing that Theranos is able to provide.

**Difference between Health Testing and Diagnostic Testing Services with Theranos:**



**Pilot Plans:**
There has been a step wise approach with Walgreens and Theranos for entering into the market. With the level of disruption the partnership creates, measures were taken to ensure product readiness before the unveiling.
1. **Controlled Soft Launch with clinical trial patients** (March – June 2013): Walgreens and Theranos worked together to stand up 3 locations in Arizona with the intent of **not publicly announcing** the services. Rather, the technicians would be trained to perform the services, Theranos would provide the IT equipment and support needed, and clinical trial patients would be paid by Theranos to come in for finger sticks and possible urine draws. Through this time period the IT application was enhanced as well as SOPs to help streamline the process.
2. **CA Launch** (9/9/2013): The teams collaborated on adding the services to a store in Palo Alto within proximity of the Theranos HQ. Given the location and the intended purposes of being a showcase store for Theranos services, this location underwent remodeling to include a dedicated room for Theranos Services that met Theranos specifications. This location was not viewed as a scalable solution, but rather something that could be used for PR visits to show the best in class partnership and experience both parties have to offer. With the opening of this location the **public announcement** occurred and the services were open to the public for patients with clinician lab orders. *Note due to the regulatory requirements in CA for fingerstick certification. The*

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [
NUMPAGES ]

CONFIDENTIAL

WG095230

WAG-AZ-LITIG-002303

Trial Exh. 3755 Page 0011

**ER-13368**

*Walgreens*



NaviGate

*CA location is currently operating under a model in which the check-in is performed by the pharmacy team members and the specimen collection is performed by a trained Theranos phlebotomist. At the point that pharmacy team members in California go through the training to meet the state's requirements, then the Walgreens pharmacy team members will be able to provide both the check-in as well as the specimen collection.*

3. **AZ Launch** (11/11/2013): The teams worked to focus efforts on the Arizona market – the primary market and focus for the pilot. Beginning in June over 100 team members were trained to stand up 10 stores for a **ribbon cutting** ceremony on 11/11. Due to support and experience concerns raised by Theranos, the number of stores that went live on 11/11 was scaled back to 2 locations: 3464 and 5453. Since the go-live, there have been rapid iterations of the IT solution, collection devices, and also SOPs in order to garner improvements in services. As such, scaling back to 2 locations has made it more manageable for both parties.

4. **Expanded Arizona Rollout (40 stores by 8/1/2014):** The overall goal is to expand to a total of 40 locations in Arizona by 8/1 in order to provide adequate market coverage and also test scalability. (See list of stores and map in Appendix D of Program Charter Appendix). The rollout schedule below outlines the plan to get to 40 locations.

**Arizona Rollout schedule:**
- Wave 1 - April 15 – 8 stores
- Wave 2 - May 15 – 10 stores
- Wave 3 - June 16 – 10 stores
- Wave 4 - July 15 – 10 stores

**Scale Plans:**

Both parties are aligned to reach a goal of nationwide coverage with at least 2500 locations. If the market demand exists, we will expand to additional locations. Rapid expansion to additional locations will be dictated by:

- **Market Entry Parameters**
  - **Payor coverage** – Theranos needs to have payor coverage in a market, overarching goal is to have 60% of the covered lives contracted, with an ideal target of 80%.
  - **Regulatory** – State specific regulations may make it more difficult to enter certain states over others (e.g. in CA the state requires Limited Phlebotomy Technician licensure by an approved educator in the state, NY has strict facility requirements for Patient Service Centers.)
  - **Unions** – Union negotiations and contracting may be a rate limiting step for entering into certain markets quickly. (E.G. – City of San Francisco, Duane Reede stores in NY).

- **Operational Readiness**
  - **PSC Operations** – labor model is determined and is scalable. Current model assumes entire end to end process is less than 15 minutes. Pilot metrics will be used to assess readiness for scale.
  - **Training** – Scalable training plan is determined and enables (hand selected) technicians as trainers as well as a higher ratio of trainer/trainee than what is currently the standard in pilot (pilot standard is 3:1)
  - **Courier** – couriers are in place for transporting specimens from stores to Theranos Central lab. For Pilot, Theranos has elected to whole own the courier process. Consideration might need to be given to Theranos contracting with a courier organization.
  - **Clinician Sales Force** – Sales force is deployed to facilitate volume to the stores. For pilot, Theranos has elected to whole own the sales process. For rapid scale – Theranos may need to consider a contract sales organization such as Inventiv.
  - **Call Center** –For pilot, Theranos has elected to run their own call center. For scale planning, it may make sense for Theranos to outsource Level 1 calls.

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095231

WAG-AZ-LITIG-002304

Trial Exh. 3755 Page 0012

**ER-13369**

*Walgreens*



NaviGate

- o **Lab Operations** – The proximity of the central lab to the store locations will be a key consideration in the ability to meet turnaround time promises.
- o **Supply Chain** – For pilot, Theranos is managing the supplies needed for the stores to offer Theranos services. A scalable solution may include Walgreens management of supplies (excluding Theranos proprietary items like CTNs and Finger Warmers).

- **Contractual updates/obligations**
  - o As learnings occur from the pilot and both parties align on a scale plan, it is likely that both Theranos and Walgreens will update the contract to support scale.

### Store Selection Criteria

The Walgreens and Theranos teams collaborated on criteria for selection of stores in the market. The belief is that these selection criteria will also hold true for scale. However, pilot results or market specific dynamics may require some adjustments. Below were the selection criteria:

- **High Medicare/Medicaid population:** The majority of lab tests that are ordered in the US fall into this patient population.
- **24 hour Pharmacy:** Peak service times for laboratory testing occur in the early morning due to fasting requirements needed for many common lab tests. As such, 24 hour pharmacies offer a convenience to patients that is unmatched in the industry.
- **Healthcare Clinic:** Stores with Health Care clinics compliment the service offering of pharmacy as well as now the new Theranos service. Walgreens NPs can write lab orders for patients, and those lab orders can be fulfilled by Theranos in the same store.
- **Select high volume pharmacy stores for geographic coverage:** Access for patients is key, so if in the event a store is needed to provide adequate coverage, a high volume pharmacy was selected to offer services as well.

### Store Layouts and Design for Services

For many of the retail pharmacies, there may need to be facilities changes to add privacy panels with appropriate networking and power support for Theranos equipment. In addition, some bathrooms may need to be refreshed in order to support a positive patient experience for urine lab testing. We are exploring options to improve patient experience, e.g. better privacy panels, sound deadening, etc.

### Equipment and Space Requirements:

Estimated footprint needed for patient service center space will be 24-36 sq. ft. with electrical outlets for several pieces of equipment. Equipment used in the store is dependent on existing store layout:

#### Specimen collection equipment
- Electrical supply source near specimen collection point
- Chair for patient
- Chair/stool on wheels for technician
- Table for specimen collection
- Theranos refrigerator for sample storage
- Theranos mini-refrigerator for keeping glucose drinks cold
- Computer/printer/scanner/QR bar code reader
- Centrifuge
- Phone
- Supplies
- Bio-waste container

#### Check-in equipment

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095232

WAG-AZ-LITIG-002305

**ER-13370**

*Walgreens*


NaviGate

- Computer/printer/scanner/driver's license scanner/pad for taking signatures
- Phone
- Walgreens POS system
- Refrigerator for sample storage (in addition to the one in the specimen collection space)

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095233

WAG-AZ-LITIG-002306

Trial Exh. 3755 Page 0014

ER-13371

*Walgreens* 

NaviGate

**Multiple layouts will be used to offer the services**
- **Dedicated Theranos rooms:** Some locations will have rooms built for providing Theranos services only. Both parties will work together to align on the design aesthetic for the Theranos rooms. Below is an example of the layout for store 5453 in Arizona.

[ SHAPE \\* MERGEFORMAT ]

- **Consultation Nooks or rooms for health care services:** In some locations, the store will have an existing consultation nook or room where health care services are performed. This space is designed to be used by the pharmacy team members for providing services such as Immunizations, Consultations, Health Testing, and also Theranos testing.
- **Privacy Panel:** In some locations there will be privacy panels set up for performing health care services. This is not the preferred option, but may be needed based on store space constraints. Below is an example of store 1197 of a privacy panel space.

[ SHAPE \\* MERGEFORMAT ]

---

CONFIDENTIAL

WG095234

WAG-AZ-LITIG-002307

Trial Exh. 3755 Page 0015

**ER-13372**

*Walgreens* 

NaviGate

**IT Solution**

Theranos is the lab and therefore, Theranos owns the end to end process for the services they are providing –
including the IT solution. Theranos takes in clinician orders through their system, performs medical billing, and
also delivers results to clinicians. The approach for the pilot, to keep it simple, was for the Theranos IT solution
to not be integrated into Walgreens systems. This allowed for the ability to test out the business model and buy-
in, without having to worry about IT integration as a constraint to move forward with pilot. Further – the
Theranos IT solution for connectivity uses cellular cards, rather than a Walgreens LAN or DSL connection. This
enabled a faster pilot implementation.

The teams have worked together to outline a plan toward integration to enable faster check-in for patients and
also facilitate scale. It should be noted that there will still be portions of the application that will be managed by
Theranos, such as medical billing and performing eligibility checks. Those portions are owned by Theranos,
because Theranos knows which contracts they have with payors and should maintain that information. Below is
a graphical depiction of the phases that the IT solution will move through toward integration.

**[ SHAPE \* MERGEFORMAT ]**

**Marketing/Sales**

The dynamics of the relationship are such that the primary marketing and sales campaign are focused on Theranos
services and Theranos is dominant in the branding. Both teams have worked together to determine the marketing
signage for in-store. Theranos has developed the creative, and Walgreens then will work with the vendor to get the
marketing materials to the stores in a sign pack.

Clinician detailing is the responsibility of Theranos to garner buy-in for the services, and also the account set-up for the
services. It should be noted, that as a result of clinician detailing, many clinicians are trying the service themselves first
hand. As a result of this, it is extremely important that the patient experience be great, because that clinician isn't just
trying the service for themselves, but for all of their potential patients that they might send over for services.

The current sales model used by Theranos is to have their own captive sales force. There have been early discussions
with Inventiv, a contract sales organization, to see if there was a possible fit for pilot or scale. Those discussions, as we
get closer to scale may be revisited.

**Reimbursement**

Theranos is the laboratory and is responsible for medical billing, including submission of claims to payors and also the
collection of payment from patients.

Walgreens and Theranos have a B2B relationship. As such, Walgreens is reimbursed by Theranos on a per patient basis.
For more information on the fee arrangement, please refer to the Walgreens/Theranos Contract.

**Pilot Out-of-scope:**
- Health Testing Program – refer to Health Testing Project Charter authored by Judy Sommers-Hanson
- Test Types:
  - Consumer directed testing / Direct Access Testing (DAT)
  - Reflex testing
  - Nasal swabs
  - Throat swabs
  - Chain of custody drug testing

---

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095235

WAG-AZ-LITIG-002308

Trial Exh. 3755 Page 0016

**ER-13373**

*Walgreens*



NaviGate

## Long-Term Scope:
We anticipate there will be a transition in responsibilities for operational items from Theranos to Walgreens as noted below:
- IT application
- Computer equipment
- Supplies (excluding Theranos proprietary devices (CTNs)
- Call Center
- Broad marketing

Note: Transition in responsibilities requires contractual updates before proceeding.

The long-term goal is to roll-out lab services across all Retail Pharmacies and other channels (e.g. specialty/infusion). Future Service Offerings:
1. Companion Diagnostics
   - Increases likelihood of patient retention in instances where a lab test is required for as part of a prescription(e.g., impaired liver or kidney function)
2. Adherence Monitoring
   - Solves historic problem re: inadequacy of Medication Possession Ratio (MPR) as an adherence metric; can distinguish non-adherent to therapy vs. loyal to WAG
   - Test provides empirical data as to whether or not and to what extent someone is adherent to medications.
3. Healthcare Clinic
   - Complements movement from episodic to chronic care (e.g., HTN pilot), and keeps testing revenue in-house (currently outsourced)
4. Specialty/Infusion
   - Specialty and infusion nurses, as part of their scope of practice also perform blood draws for patients. In collaboration with Theranos there is an opportunity to offer Theranos lab draws as part of the offering. Note that this may require a modification to how the specimen is currently drawn by Theranos – through a finger. If a patient already has a line open for an infusion, it would be good to be able to use that same line for a specimen draw for Theranos labs.
5. Employer Solutions Group
   - Some employer sites also have clinical services where laboratory specimens are drawn. In the instance that Theranos offers a price competitive model, Theranos lab services could be incorporated into the ESG solution and offering for clients.

## International
There are global implications to launching laboratory services. The business model and relationship that Walgreens and Theranos have is outlined for the US market. Internationally, the business relationship can be structured differently based on the regulatory environment and the assets that both parties can bring to the table. Internationally, there may be an opportunity to have the Theranos testing devices in the stores – which would allow for faster processing time as well as mitigating risk for additional hand offs to couriers for shipping to a central laboratory. Attached below is the most recent report regarding the global market for laboratory testing.

[ EMBED AcroExch.Document.7 ]

## Current Pilot Metrics:
In the current model, the operational metrics that Walgreen has access to is the POS data. As such, the POS data can be used to find out patient volume by store and time of day. There has been a request from Walgreens for additional

---

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095236

WAG-AZ-LITIG-002309

*Walgreens*



NaviGate

operational metrics from the Theranos system to determine check-in times, specimen times, Turnaround Time (TAT) for results. The timing of when the operational metrics from Theranos will be available is TBD.

See below for a statistical summary report as of 3/1/2014.

| Store # | State | Open Date | Total # of Pts | Avg Pts / Str / Day | # of Patients | | | Avg # of Pts / Day / Qtr or Month | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Qtr 1 | Qtr 2 | March | Qtr 1 | Qtr 2 | March |
| 13596 | CA | 9/9/2013 | 308 | 1.74 | 143 | 154 | 6 | 1.72 | 1.71 | 6.00 |
| | | | | | | | | | | |
| 3464 | AZ | 11/13/2013 | 77 | 0.71 | 9 | 68 | 0 | 0.50 | 0.76 | 0.00 |
| 5453 | AZ | 11/13/2013 | 107 | 0.98 | 12 | 94 | 1 | 0.67 | 1.04 | 1.00 |
| AZ Total | | | 184 | 0.87 | 21 | 162 | 1 | 0.58 | 0.90 | 0.50 |
| Grand Total | | | 487 | | 164 | 316 | 7 | | 1.17 | 2.33 |

*Data is current up to and including 3/1/14. There may be up to a 48 hour delay due to batch schedules that upload this data to LDW.
**Large amount of patients seen, during this time, may be Theranos family/friends rather than commercial pathacts (CA-13596 store ONLY).

| Store # | State | Open Date | Total # of Draws | Total Venous | # of Draws Qtr 1 | # Venous Qtr 1 | % Venous Qtr 1 | # of Draws Qtr 2 | # Venous Qtr 2 | % Venous Qtr 2 | # of Draws March | # Venous March | % Venous March | # of UA | # of >1 CTN used |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3464 | AZ | 11/13/2013 | 77 | 16 | 9 | 3 | 33% | 68 | 13 | 19% | 0 | 0 | 0% | 4 | 27 |
| 5453 | AZ | 11/13/2013 | 107 | 46 | 12 | 6 | 50% | 94 | 41 | 44% | 1 | 0 | 0% | 5 | 32 |
| AZ Total | | | 184 | 62 | 21 | 9 | 43% | 162 | 54 | 33% | 1 | 0 | 0% | 9 | 59 |

*Venous numbers are reported by the field not derived from LDW. Numbers reported through 3/1/14. Number of draws requiring >1 CTN includes extra CTN use due to faulty CTNs.

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095237

WAG-AZ-LITIG-002310

Trial Exh. 3755 Page 0018

ER-13375

*Walgreens* 

NaviGate

## Program Roles and Responsibilities:

| Role | Name(s) | Responsibility |
|------|---------|----------------|
| Program Sponsors | Wade Miquelon, Kermit Crawford | • Acts as a "champion", providing ongoing visible support through communications and actions.<br>• Obtains funding and serves as approval authority for the program.<br>• Approves and authorizes major changes to the program scope.<br>• Requests and secures functional area and program team involvement.<br>• Identifies, resolves, and escalates major issues and risks. |
| Executive Steering Committee | Alex Gourlay, Kermit Crawford, Mark Wagner, Brad Fleugel, Jason Dubinsky, Nimesh Jhaveri, Brad Wasson, Sunny Balwani | • Provides direction and ongoing, visible support for the project/program.<br>• Approves and authorizes all program changes impacting scope.<br>• Identifies, resolves, and escalates issues and risks.<br>• Identifies alignment and synergies with other strategic programs. |
| Operating Committee | Sylvia Van Loveren, Troy Mills, Dave Miller, David Barber, Sal Venegas, Jim Weeast, Adam Pellegrini, Matt Sesto, Lorinda Tisdell, Heidi Wold, Trent Riley, Priya Jagannathan, Erich Reutzel, Matt Reilly, Tim Engstrom, Jeff Gormanous, Karoline Dygas, Shannon Couffer, Greg Kunstman, Nimesh Jhaveri, Christian Holmes | • An advocate for the successful outcome of the program.<br>• Informed about key program decisions.<br>• Provides program input, when applicable. |
| Business Owners | Nimesh Jhaveri, Brad Wasson | • Defines and approves high-level and detailed program requirements.<br>• Approves the Program Charter.<br>• Provides direction and ongoing, visible support for the program through communications and actions.<br>• Approves and authorizes significant changes to the program scope.<br>• Identifies, resolves, and escalates issues and risks. |
| Program Manager/Project Managers | Patty Haworth – Program Manager,<br>Joe Ahdoot – Theranos Program Manager,<br>Chris Lynn – Walgreens IT Director, Aziz Skiredj – Walgreens IT Project Manager | • Coordinates the management of related programs and/ or projects to achieve common objectives.<br>• Partners with Business Owner(s) to establish and develop a Program Roadmap.<br>• Monitors and drives program delivery.<br>• Identifies, resolves, and escalates issues and risks. |

The enclosed material is proprietary to Walgreens.

CONFIDENTIAL

WG095238

WAG-AZ-LITIG-002311

Trial Exh. 3755 Page 0019

**ER-13376**

*Walgreens*


NaviGate

## Program Resource Chart:



## Key Program Assumptions:

- Business partners, IT, Legal, Regulatory, and Contracting resources, with the correct level of skill set, will be available as subject matter experts
- A short-term IT approach for pilot will heavily leverage Theranos for virtually all systems support
- A long-term IT approach will be executing in parallel to establish more Walgreens control over lab services systems
- Implementation of projects such as Well Experience and Centralization on Demand in chosen retail stores should be coordinated to avoid negatively impacting the Pilot.

---

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

CONFIDENTIAL

WG095239

WAG-AZ-LITIG-002312

Trial Exh. 3755 Page 0020

ER-13377

*Walgreens* 

**NaviGate**

## Key Program Risks:

### [ SHAPE \* MERGEFORMAT ]

| Risk Description | Rating | Mitigation Strategy |
|---|---|---|
| 1) Theranos devices and tests obtain regulatory approvals | H | Heather Zimmerman and Mike Simko to review potential issues with requirements of State Boards of Clinical Laboratories, State Boards of Pharmacies, Medicare, and CLIA. |
| 2) Ability to secure favorable payor contracts | H | Process begun with payors: HCSC, United, and Wellpoint. |
| 3) Develop productive provider relationships | H | Create a provider outreach strategy and formalize with Marketing team with consultation by Health Law. |
| 4) Ensure our partner Theranos delivers what is needed, including IT systems for the pilot | H | Minimize by communicating external dependencies and due dates clearly to Theranos. Escalate to management for prioritization, if applicable. |
| 5) Drive patient traffic for lab services | H | Create marketing campaigns that will meet target audience needs with review by Health Law. Work with prescribers and payors to drive customer traffic where possible. |
| 6) Ability to leverage field sales force to focus on the Project Beta initiative | H | Confirm with IVRT and Specialty field sales teams that they plan to support this initiative and that there are sufficient resources in place to do so. Consider outsourcing provider sales to an organization that has expertise in this area. |

## Project Timeline:

CONFIDENTIAL

WG095240

WAG-AZ-LITIG-002313

Trial Exh. 3755 Page 0021

ER-13378

*Walgreens*



NaviGate



The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [
NUMPAGES ]

CONFIDENTIAL

WG095241

WAG-AZ-LITIG-002314

Trial Exh. 3755 Page 0022

ER-13379

*Walgreens* 

## Core Team Contact List:

| Phone | Name | Involvement |
|---|---|---|
| | Lane Fraley | Partner with Rx Ops to plan and facilitate change |
| | Priya Jagannathan | Develop/revise policies and procedures for future roles |
| | Lindsay Kay | Schedule team members for training |
| | Chris Lynn | Two distinct roles: 1) inform future state scenarios 2) Design and build |
| | Aziz Skiredj | Two distinct roles: 1) inform future state scenarios 2) Design and build |
| | Jay Meyer | Two distinct roles: 1) inform future state scenarios 2) Design and build |
| | Dimple Rao | Design and build digital patient touch points |
| | Sarah Davis (interim) | Design and build digital patient touch points |
| | David Miller | Store selection based on stated criteria |
| | Jason Burke | Store selection based on stated criteria |
| | Angela Bankston | Support Nurse Practitioner use of Theranos services - CSG |
| | Katherine White | Provide oversight to Theranos collateral and create marketing support programs |
| | Shannon Fairfield | Test/validate economics; lead monitoring and tracking; |
| | Dana Meyer | Develop Theranos footprint alternatives that align with/enhance future scenarios |
| | Chris Dunn | Facilities and construction updates to stores for Theranos services |
| | Ardith Cortes | Develop training for Theranos services |
| | Jim Cohn | External communication for Theranos services |
| | Maggy MacPherson | Internal communication for Theranos services |
| | Andrea Biernacki | Liaison for Accounting and invoicing for Theranos services |
| | Del Robertson | Liaison for Accounting and invoicing for Theranos services |
| | Terry Lyza | Open up cash lines for impacted stores |
| | Mark Wooley | Two distinct roles: 1) inform future state scenarios 2) Design and build |
| | Heather Zimmerman | Provide feedback on future scenarios regarding regulatory hurdles |
| | Al Carter | Serve as the point person with regulatory agencies approval |
| | Greg Kunstman | Design and develop Theranos contracts |
| | Dan Tardiff | Regulatory support for Theranos contracts |
| | Javion Hutchinson | Provide loss prevention oversight for Theranos services |
| | Michael Fleming | Identify and validate labor impact of future state scenarios |
| | Gwen Holtan | Be informed re: Theranos services for Sales communication |
| | Maureen Charbonnet | Be informed re: Theranos services for Sales communication |
| | Gwen Holtan (interim) | Be informed re: Theranos services for Sales communication |
| | Karoline Dygas | Analyze impact of future scenarios on packaging and other sourced materials |
| | Kim Lampariello-Feldman | Determine future state implementation for Theranos Services – ESG |
| | Sue Thoss | Two distinct roles: 1) inform future state scenarios 2) Design |

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL

WG095242

WAG-AZ-LITIG-002315

Trial Exh. 3755 Page 0023

**ER-13380**

*Walgreens*



NaviGate

| | and build |
|---|---|
| Mahesh Raju | Product Manager |
| Patty Haworth | Overall program management |
| Beth Montague | Senior Business Analyst, Healthcare Solutions Group |
| Sarah Carr | Business Analyst, Healthcare Solutions Group |
| Sunny Balwani | Theranos COO, responsible for Legal |
| Christian Holmes | Theranos Product Management Director Accounting, responsible for Clinical Sales and Legal |
| Tracy Masson | Theranos General Manager Operations |
| Kimberly Alfonso | Theranos Phoenix General Manager Commercial |
| Joe Ahdoot | Theranos Program Manager, responsible for Training and Theranos Field Communication |
| Nick Menchel | Theranos Product Manager, responsible for Facilities, Supply Management and Courier |
| Max Fosque | Theranos Product Manager, responsible for Reporting & Analytics and Call Center |
| Jeff Blickman | Theranos Product Manager, responsible for Marketing, IT and IT Field Management |

## Program Charter Review / Approval:

### A. Review / Approval Process:

The Diagnostic Testing Program will use a 3-step plan for reviewing and approving the program charter:
1) The Program Manager will route the Program Charter for review to the Business Owners. All feedback should be provided verbally or sent electronically to Program Manager for consideration within 3 business days
2) The Program Manager will review all feedback and determine if adjustments need to be made to the Program Charter. Feedback contributors may be invited to a meeting to describe the change requested. Approved changes will be incorporated into the document.
3) The final Program Charter will be routed to approvers for signoff allowing 5 business days to complete this process.

### B. Reviewing / Approving Parties:

| Name | Role | Review (R) Approve (A) |
|---|---|---|
| Wade Miquelon | Executive Sponsor | R |
| Kermit Crawford | Executive Sponsor | R |
| Nimesh Jhaveri | Business Owner, Pharmacy Transformation | A |
| Brad Wasson | Business Owner, Healthcare Solutions Group | A |
| TBD | Product Director | R |
| Mahesh Raju | Product Manager | R |
| Patty Haworth | Program Manager | R |
| Beth Montague | Sr Business Analyst | R |
| Sarah Carr | Business Analyst | R |
| TBD | Operations Director | R |
| TBD | Operations Manager | R |
| Raeann Nelson | Operations Business Analyst | R |
| Chris Lynn | IT Director | R |
| Aziz Skiredj | IT Project Manager | R |

The enclosed material is proprietary to Walgreens.

[ FILENAME ]                                                                 Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL                                                                WG095243

WAG-AZ-LITIG-002316

Trial Exh. 3755 Page 0024

**ER-13381**

*Walgreens*



NaviGate

| | | |
|---|---|---|
| Alex Gourlay | Executive Steering Committee | R |
| Kermit Crawford | Executive Steering Committee | R |
| Mark Wagner | Executive Steering Committee | R |
| Brad Fleugel | Executive Steering Committee | R |
| Jason Dubinski | Executive Steering Committee | R |
| Nimesh Jhaveri | Executive Steering Committee | R |
| Sunny Balwani | Executive Steering Committee | R |
| Sylvia Van Loveren | Operating Committee | R |
| Troy Mills | Operating Committee | R |
| Dave Miller | Operating Committee | R |
| David Barber | Operating Committee | R |
| Sal Venegas | Operating Committee | R |
| Jim Weeast | Operating Committee | R |
| Adam Pellegrini | Operating Committee | R |
| Matt Sesto | Operating Committee | R |
| Lorinda Tisdell | Operating Committee | R |
| Heidi Wold | Operating Committee | R |
| Trent Riley | Operating Committee | R |
| Priya Jagannathan | Operating Committee | R |
| Erich Reutzel | Operating Committee | R |
| Matt Reilly | Operating Committee | R |
| Tim Engstrom | Operating Committee | R |
| Jeff Gormanous | Operating Committee | R |
| Karoline Dygas | Operating Committee | R |
| Shannon Couffer | Operating Committee | R |
| Greg Kunstman | Operating Committee | R |
| Nimesh Jhaveri | Operating Committee | R |
| Christian Holmes | Operating Committee | R |

The enclosed material is proprietary to Walgreens.

[ FILENAME ]

CONFIDENTIAL

WG095244

WAG-AZ-LITIG-002317

Trial Exh. 3755 Page 0025

ER-13382

**Theranos and Walgreens Bring Groundbreaking Diagnostic Lab Testing to the Phoenix Metropolitan Area**

*Theranos[TM] Wellness Centers at two Walgreens stores provide consumers with less invasive, fast, affordable testing on samples as small as a few drops of blood*

PHOENIX, Ariz., Nov. 13, 2013 – Theranos, Inc. and Walgreens (NYSE: WAG) (Nasdaq: WAG) today will celebrate the opening of two new Theranos Wellness Centers located inside Walgreens stores across the Phoenix metropolitan area. This marks the first expansion of Theranos' laboratory services outside of California, as part of its national partnership with Walgreens. A ribbon cutting ceremony will take place at 11 a.m. today at the Walgreens store located at 6501 E. Greenway Parkway, Scottsdale.

The new Theranos Wellness Centers will provide Phoenix area consumers with access to less invasive and more affordable clinician-directed lab testing from a blood sample as small as a few drops – 1/1,000 the size of a typical blood draw. The micro-samples, collected by certified phlebotomists or trained Walgreens technicians, are taken from either a tiny finger stick or traditional methods, eliminating the need for large needles and numerous vials of blood typically required for diagnostic lab testing.

[Quote from Phoenix Mayor Stanton]

Theranos test results can be made available to physicians in a matter of hours, enabling fast diagnoses to help make informed treatment choices. And tests are low cost – typically 50 percent of Medicare reimbursement rates or less – and are reimbursed by major insurance carriers, Medicare and Medicaid.

In September 2013, Theranos and Walgreens announced a long-term partnership to bring Theranos' revolutionary new lab testing service to Walgreens stores nationwide. The first Theranos Wellness Center opened that month at a Walgreens in Palo Alto, Calif., where Theranos is headquartered.

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00002770

Trial Exh. 4036 Page 0001

New Theranos Wellness Centers are located at the following Walgreens stores, with plans to add additional locations in the months ahead:

- 3402 N. Central Ave., Phoenix
- 6501 E. Greenway Parkway, Scottsdale

 "As we work to bring lab testing services to more of our stores and communities nationwide, we're excited that Phoenix area residents will be among the first to have this service available in the communities where they live and work," said Kermit Crawford, Walgreens president of pharmacy, health and wellness.  "Working with Theranos, we're proud to offer a differentiated patient experience through this latest innovation in health care technology.   It's another way in which we're providing comprehensive care as part of our mission to transform community pharmacy."

[Quote from Elizabeth Holmes/Theranos]

As the nation's largest retail pharmacy chain with more than 8,100 neighborhood pharmacies – including 188 in the Phoenix area – Walgreens has the infrastructure to enable Theranos to bring its services to consumers nationwide.

**About Theranos**

Headquartered in Palo Alto, California, Theranos, Inc. is working to shape the future of lab testing and the way health information is collected, analyzed, and communicated. Founded in 2003 by Elizabeth Holmes, Theranos is on a mission to make actionable health information accessible to people everywhere in the world at the time it matters, enabling early detection and intervention of disease, and empowering individuals with information to live the lives they want to live. www.theranos.com

**About Walgreens**

Confidential Treatment Requested by Walgreen Co.

As the nation's largest drugstore chain with fiscal 2013 sales of $72 billion, Walgreens (www.walgreens.com) vision is to be the first choice for health and daily living for everyone in America, and beyond. Each day, Walgreens provides more than 6 million customers the most convenient, multichannel access to consumer goods and services and trusted, cost-effective pharmacy, health and wellness services and advice in communities across America. Walgreens scope of pharmacy services includes retail, specialty, infusion, medical facility and mail service, along with respiratory services. These services improve health outcomes and lower costs for payers including employers, managed care organizations, health systems, pharmacy benefit managers and the public sector. The company operates 8,131 drugstores in all 50 states, the District of Columbia and Puerto Rico. Take Care Health Systems is a Walgreens subsidiary that is the largest and most comprehensive manager of worksite health and wellness centers and in-store convenient care clinics, with more than 750 locations throughout the country.

*Cautionary Note Regarding Forward-Looking Statements: Statements in this release that are not historical are forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "expect," "likely," "outlook," "forecast," "would," "could," "should," "can," "will," "project," "intend," "plan," "goal," "target," "continue," "sustain," "synergy," "on track," "believe," "seek," "estimate," "anticipate," "may," "possible," "assume," and variations of such words and similar expressions are intended to identify such forward-looking statements. These forward-looking statements are not guarantees of future performance and involve risks, assumptions and uncertainties, including, but not limited to, those relating to the speed, efficiency, cost, reliability and safety of lab testing services and results, the introduction of Theranos services at Walgreens locations including the timing, scope and financial ramifications thereof, and those described in Item 1A (Risk Factors) of our most recent Annual Report on Form 10-K and Quarterly Report on Form 10-Q, each of which is incorporated herein by reference, and in other documents that we file or furnish with the Securities and Exchange Commission. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those indicated or anticipated by such forward-looking statements. Accordingly, you are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date they are made. Except to the extent required by law, Walgreens does not undertake, and expressly disclaims, any duty or obligation to update publicly any forward-looking statement after the date of this report, whether as a result of new information, future events, changes in assumptions or otherwise.*

**Contact**

Theranos
Jeffrey Blickman, (650) 470-0334
pr@theranos.com

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00002772

or

Walgreens
Jim Cohn, (847) 315-2950
jim.cohn@walgreens.com

Confidential Treatment Requested by Walgreen Co.

WAG-TH-00002773

Trial Exh. 4036 Page 0004

Message

| From: | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EHOLMES] |
|---|---|
| Sent: | 11/27/2013 12:44:56 AM |
| To: | Daniel Young [dyoung@theranos.com]; Adam Rosendorff [arosendorff@theranos.com]; Kerry Elenitoba-Johnson [kjohnson@theranos.com]; Li Ding-Chiang [lding-chiang@theranos.com] |
| CC: | Sunny Balwani [sbalwani@theranos.com] |
| Subject: | RE: |

(Kerry please delineate this based on what we did with the NY inspector recently and send that out)

**From:** Elizabeth Holmes
**Sent:** Tuesday, November 26, 2013 4:34 PM
**To:** Daniel Young; Adam Rosendorff; Kerry Elenitoba-Johnson; Li Ding-Chiang
**Cc:** Sunny Balwani
**Subject:**

Let me know if the path for walking the auditors in and downstairs has been cemented so we avoid areas that cannot be accessed, and what that path is.

==================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304
650-838-9292   www.theranos.com
==================================

ssage

| | |
|---|---|
| From: | Sunny Balwani [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SBALWANI] |
| Sent: | 1/17/2014 5:20:12 AM |
| To: | Brian Grossman [Brian@pfmlp.com] |
| Subject: | RE: |

***** Confidential ******

Brian,

Attached please find a pdf which is a very confidential slide deck of discussions we had. It also includes a very detailed section on Data which Alex had requested, including the Nucleic Acid Amplification assays. This slide deck does not include any reference to Safeway.

Please note you will need the following credentials to open this file:

Userid: pfmlp

Password: TheranosConfidential2014!

I am also attaching scanned copies of the NDAs you had requested.

We will mail you the projections/financial model shortly.

Let me know if you have any questions on any of this.

P.S.

• At the conference, the Intermountain Health Systems announced the strategic partnership with Theranos. As you may already know, IMH is one of the largest hospital networks in the US and, more importantly, one of the most respected organizations and key thought leaders. Intermountain additionally participated as an equity investor in Theranos in the recent 2013 close.

• I don't know if any of your team members got to attend the conference but if not, the following is a recap of Walgreens announcement/comments on Theranos by their CEO and CFO.

Greg (CEO) ~ In our history book this will be a crawl, walk, run. We have launched in one store in Palo Alto where Theranos is located and are beginning a roll out in Phoenix. Once we've done that successfully you will see a more rapid national roll out. They have incredible, incredible technology. We are not going to comment on guidance in terms of revenue. Once we have rolled out in other states we will be able to talk more about it.

Confidential

THPFM0003870572

PFM-DEPO-00013722

Trial Exh. 4077 Page 0001

Wade (CFO) ~ Responding to a question around how the economics work with Theranos. It's sort of a fee for service where we provide some of the process around getting that finger stick but they are the lab and Theranos closes the loop, they handle getting that information back to medical professional and payers.

They discussed their 2016 financial targets, for which their calculated CAGRs show them lagging to reach, but highlighted alliance boots and Theranos as things that may help them catch up so they are not changing guidance on that 2016 target.

During the main presentation Greg Wasson commented on the influence of lab testing on overall healthcare spend while he was on the Theranos slide.

**From:** Brian Grossman [mailto:Brian@pfmlp.com]
**Sent:** Friday, January 10, 2014 11:16 PM
**To:** Sunny Balwani
**Subject:**

Sunny

Thanks again for the time you spent with our team walking us through the Theranos story. It's amazing to see what you and Elizabeth and the rest of the Theranos team have accomplished over the last 10 years. We will likely need a few days to process everything we learned today. One thing that would be especially helpful to our due diligence process is having access to the financial model we reviewed with you today.

Regards,

Brian

Confidential

THPFM0003870573

PFM-DEPO-00013723

Trial Exh. 4077 Page 0002

THPFM000387O574-001

theran○s

This presentation and its contents are Theranos proprietary and confidential.

Confidential

PFM-DEPO-00013724

Trial Exh. 4077 Page 0003



goodbye, big bad needle.

theranos

Theranos Confidential

THPFM000387057-002

Confidential

PFM-DEPO-00013725

Trial Exh. 4077 Page 0004

ER-13392

Trial Exh. 4077 Page 0005

PFM-DEPO-00013726



the only thing you should feel is better.

the blood test, reinvented. **theran⊕s**

Theranos Confidential

**theran⊕s**

Confidential

THPFM0003870574-003



THPFM000387057-004

theranos

Theranos Confidential

Confidential

PFM-DEPO-00013727

Trial Exh. 4077 Page 0006

ER-13394

Trial Exh. 4077 Page 0007

PFM-DEPO-00013728

# the lab test, reinvented.



**same tests.**
**smaller sample.**

Theranos Confidential

**theran☉s**

Confidential

THPFM0003870574-005

Trial Exh. 4077 Page 0008

ER-13395

# Press

## THE WALL STREET JOURNAL

THE WEEKEND INTERVIEW | 

### Elizabeth Holmes: The Breakthrough of Instant Diagnosis

*A Stanford dropout is bidding to make tests more accurate, less painful—and at a fraction of the current price.*

By JOSEPH RAGO

*Palo Alto, Calif.*

"The reality within our health-care system today is that when someone you care about gets really sick, by the time you find that out it's most often too late to do anything about it. It's heartbreaking. Because in those moments, there's nothing you wouldn't do to change it, and too often you're helpless," says Elizabeth Holmes. "We're finding cancer when you have a tumor, or heart disease by virtue of the fact that you're having a heart attack."

She wants to change that.

Ms. Holmes, a 29-year-old chemical and electrical engineer and entrepreneur, dropped out of Stanford as an undergraduate after founding a life sciences company called Theranos in 2003. Her inventions, which she is discussing in detail here for the first time, could upend the industry of laboratory testing and might change the way we detect and treat disease.

Ten years ago, Ms. Holmes was working out of the basement of a group college house, a world away from her current headquarters at a rambling industrial building in a research park just off campus. The company's real estate was one of the few Theranos facts known to Silicon Valley, but one suggestive of the closely held business's potential. The space was once home to Facebook, and before that Hewlett-Packard.

The secret that hundreds of employees are now refining involves devices that automate and miniaturize more than 1,000 laboratory tests, from routine blood work to advanced genetic analyses. Theranos's processes are faster, cheaper and more accurate than the conventional methods and require only microscopic blood volumes, not vial after vial of the stuff. The experience will be revelatory to anyone familiar with current practices, which often seem like medicine by leam Stoker.



A Theranos technician first increases blood flow to your hand by applying a wrap similar to one of those sizing pocket warmers, then uses a fingerstick to draw a few droplets of blood from the capillaries at the end of your hand. The blood wicks into a tube in a cartridge that Ms. Holmes calls a "nanotainer," which holds microliters of a sample, or about the amount of a raindrop. The nanotainer is then run through the analyzers in a Theranos laboratory. Results are usually sent back to a physician, but a full blood work-up—metabolic and immune markers, cell count, etc.—was in my inbox by the time I walked out the door. (Phew: all clear.)

It's the kind of modern, painless service that consumers rarely receive in U.S. health care, though Ms. Holmes makes the point the other way around: "We're here in Silicon Valley inside the consumer technology world . . . and what we think we're building is the first consumer health-care technology company. Patients are empowered by having better access to their own health information, and then by owning their own data."

And a Theranos clinic may be coming soon to a pharmacy near you. On Monday the company is launching a partnership with Walgreens for in-store sample-collection centers, with the first one in Palo Alto and expanding throughout California and beyond. Ms. Holmes's long-term goal is to provide Theranos services "within five miles of virtually every American home."

Theranos Confidential

## theranos

PFM-DEPO-0001372 9

Confidential

THPFM0003870574-006

ER-13396

Trial Exh. 4077 Page 0009

PFM-DEPO-00013730

# Press

## THE WALL STREET JOURNAL.

U.S. EDITION | Monday, September 9, 2013 As of 9:45 AM EDT

The Wall Street Journal news department was not involved in the creation of this content.

**PRESS RELEASE** September 9, 2013, 9:00 a.m. ET

### Theranos Selects Walgreens as a Long-Term Partner Through Which to Offer Its New Clinical Laboratory Service

With first location launching this month in Silicon Valley, consumers can now complete any clinician-directed lab test with as little as a few drops of blood and results available in a matter of hours

PALO ALTO, Calif. & DEERFIELD, Ill.--(BUSINESS WIRE)--September 09, 2013--

Theranos, Inc. and Walgreens (NYSE: WAG) (Nasdaq: WAG) today announced a long-term partnership to bring access to Theranos' new lab testing service through Walgreens pharmacies nationwide. As the service becomes available through Theranos Wellness Centers inside Walgreens stores, consumers will be able to access less invasive and more affordable clinician-directed lab testing, from a blood sample as small as a few drops, or 1/1,000 the size of a typical blood draw. The samples are either taken from a tiny finger stick or a micro-sample taken from traditional methods, eliminating the need for larger needles and numerous vials of blood required for most diagnostic lab testing.

Theranos and Walgreens are taking the first step in making this service available to consumers with the first Theranos Wellness Center location opening this month at Walgreens drugstore at 300 University Ave. in Palo Alto, Calif., in the heart of Silicon Valley. The companies plan to offer the service at Walgreens locations nationwide.

For the first time, Theranos is introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples. Theranos' proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results. Test results are available to physicians in a matter of hours, enabling fast diagnoses to help informed treatment choices. Theranos tests are low cost -- always 50 percent of Medicare reimbursement rates or less -- and are reimbursed by major insurance carriers, Medicare, and Medicaid. Developed to be accessible to everyone, Theranos tests cost the same amount for everyone, regardless of insurance plan or whether they are uninsured.

"For the past 10 years, Theranos has worked relentlessly to reach a point at which we could help make actionable information accessible to physicians and patients at the time it matters most. Clinicians can now see their patients having received lab results from fresh samples in a matter of hours," said Elizabeth Holmes, Chairman,



Theranos Confidential

Confidential

THPFM0003870574-007

# Media

- Selective interviews and conferences

- Reporters

- Not disclosing:
  - Device
  - Work with hospitals and/or the DoD
  - Future innovations or expansion plans

Theranos Confidential

**theran⬤s**

Confidential

THPFM0003870574-008

Trial Exh. 4077 Page 0010

ER-13397

PFM-DEPO-0001373l

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 269 of 300

ER-13398

PFM-DEPO-00013732

# Theranos Wellness Centers



theranos is now in
*Walgreens*

Theranos™ Wellness Centers will soon be located within
Walgreens stores nationwide.

Theranos Confidential

theranos

Confidential

THPFM0003870574-009

Trial Exh. 4077 Page 0012

ER-13399

PFM-DEPO-0001 3733

# Accessibility and Patient Compliance

## Theranos Wellness Centers



Theranos is introducing groundbreaking new spaces that transform the way patients and clinicians think about lab tests.

Theranos Wellness Centers are designed to make the patient experience as easy and comfortable as possible.

By giving people an easier way to get their lab testing done, they are more likely to be compliant with clinician lab orders.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-010

theran⊙s

THPFM0003870574-011

## Theranos Wellness Centers





theran⊙s

Theranos Confidential

Confidential

PFM-DEPO-00013734

Trial Exh. 4077 Page 0013

THPFM0003870574-012

# Theranos Wellness Centers

theran●s





Theranos Confidential

Confidential

PFM-DEPO-00013735

Trial Exh. 4077 Page 0014



Theranos Wellness Centers

theran⊙s

THPFM000387057 4-013

Theranos Confidential

Confidential

Trial Exh. 4077 Page 0016

ER-13403

PFM-DEPO-00013737

# Theranos Patient Service Centers

*Walgreens* & other retail pharmacies

**Theranos' Footprint at retail:**

Theranos patient service centers are located within a smaller radius from the patient than currently available

Theranos has more patient service centers than any lab provider in CA

**Accessibility and convenience are offered at an unprecedented value**

|  | 1 mile | 3 miles | 5 miles |
|---|---|---|---|
| **theranos** | > 95% | | |
| Quest Diagnostics | 7% | 35% | 56% |
| LabCorp | 9% | 45% | 69% |

**theranos**

Confidential

THPFM0003870574-014

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 275 of 300

ER-13404

Trial Exh. 4077 Page 0017

PFM-DEPO-00013738

# Same Tests, A Whole New Approach

The actionable information you need,
1/1,000 the size of a typical blood draw.



No big needles.    Simple tiny draw.    A sensitive draw.    Our nanotainer™

Theranos runs any test available in central laboratories, and processes all sample types.

All tests match existing reimbursement codes.

Theranos provides the highest level of oversight, automation, and standardization in our pre-
and post-analytic processes, ensuring the highest levels of accuracy and precision.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-015

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 276 of 300

ER-13405

# Specialized for Every Specialty

Theranos is a new standard in lab testing that can help every practice. And
we offer even more specialized tools for patients with specific needs.







### Oncology

With Theranos, patients can test at the necessary frequency with less trauma. Our micro-sample size lowers the risk of anemia and other secondary effects of large-volume draws.

### Pediatrics

When you're caring for the littlest patients, even a simple blood draw can be the biggest obstacle. But since we only require tiny drops, our tests are less traumatic, giving you more smiles and fewer tears.

### Geriatrics

With Theranos, you can process samples from patients with collapsed veins without the discomfort they go through now. No more searching for veins. No more painful draws from the knuckle or back of the hand.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-016

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 277 of 300

Trial Exh. 4077 Page 0019

ER-13406

PFM-DEPO-000013740

# Faster results.  Faster answers.



TEST RESULTS AVERAGE

**4 HOURS** OR LESS

Theranos' micro-sample analysis is performed at amazing speeds, so we can report results faster than previously possible – in less than 4 hours.

Data reported in high quality and in real-time becomes actionable information for improved decision making.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-017

ER-13407

Trial Exh. 4077 Page 0020

PFM-DEPO-00013741

# Better Data from Fresher Samples

Theranos rapidly processes samples from our distributed PSC locations, allowing for analysis of key markers before their analyte decay rates affect result integrity.

Certain analytes decay rapidly in blood/serum, having half-lives of less than 12 hours. CRP for example has a half life of 7 hours.



Theranos Confidential

Confidential

THPFM0003870574-018

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 279 of 300

ER-13408

Trial Exh. 4077 Page 0021

PFM-DEPO-00013742

# A New Standard in Quality

## The highest levels of accuracy.



By systematically controlling and standardizing our processes, Theranos offers tests with the highest levels of accuracy.

Theranos automates pre- and post-analytic processes, drastically minimizing human processing – the cause of the majority of lab test errors.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-019

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 280 of 300

Trial Exh. 4077 Page 0022

ER-13409

PFM-DEPO-00013743

# A New Standard in Quality

## More precise trending.



Prostate-Specific Antigen (PSA)

4.6
ng/mL

By making it easier to precisely measure your body's information at the needed frequencies, we can help clinicians see small changes in test results as they emerge over time.

Theranos Systems are designed to help monitor chronic disease states, providing accuracy and precision over time through the standardization of our systems.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-020

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 281 of 300

Trial Exh. 4077 Page 0023

ER-13410

PFM-DEPO-000013744

# A Better Way to See Results



Results are conveniently accessed through theranos.md, our secure digital hub that organizes all your results, or accessed through traditional methods.

Results are reported in easy-to-read graphs, allowing for better visualization of test data in a new, informative way.

Theranos Confidential

**theran⊕s**

Confidential

THPFM0003870574-021

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 282 of 300

Trial Exh. 4077 Page 0024

ER-1341

PFM-DEPO-00013745

# Cost Savings

## The full range of tests.  A fraction of the costs.

THERANOS RATES ARE ALWAYS

**50%** OR LESS

THAN MEDICARE-COVERED RATES

Theranos is committed to making lab testing more accessible to everyone.  That means pricing our tests dramatically lower than currently available options.

We can bill all major insurance carriers as well as Medicare and Medicaid.

Uninsured patients are offered the same discounted prices.

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-022

ER-13412

Trial Exh. 4077 Page 0025

PFM-DEPO-000013746

# Comprehensive Testing Across Methodologies

## Auto-Reflex Testing



When clinicians order tests with Theranos, they can specify follow-on tests to run automatically on the same sample if certain tests are out of range.

This saves patients another trip to the lab, avoids prophylactic decision-making and unnecessary prescriptions, and helps clinicians properly diagnose conditions sooner than they would be able to with conventional processes.

Theranos Confidential

**theran⊙s**

Confidential

THPFM0003870574-023



THPFM0003870574-024

Theranos Confidential

Confidential

PFM-DEPO-00013747

Trial Exh. 4077 Page 0026

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 285 of 300

ER-13414

Trial Exh. 4077 Page 0027

PFM-DEPO-00013748

# Seamless Integration with Physician Practices



**Send samples to us.**

You can send us samples using your smallest vacutainers. Just sign up and we'll help you register and arrange courier/delivery options. Get started here.

**theranos**

**Send patients to us.**

Or download our lab order form and send your patients to our convenient Theranos Wellness Centers. Sign up today and we'll get you set up.

Choose between sending your patients to our convenient Theranos Wellness Centers, or drawing samples in your office or facility.

Theranos accepts all paper lab order forms in addition to offering our own form.

Theranos Confidential



Confidential

THPFM0003870574-025

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 286 of 300

ER-13415

Trial Exh. 4077 Page 0028

PFM-DEPO-00013749

# An Entirely New Lab Experience

Everything, right at your fingertips.



From lab orders, to processing, to results, every aspect of lab testing is connected through our secure network.

Clinicians are delivered data quickly and accurately, at the time when it's needed.

Theranos Confidential

**theran⊕s**

Confidential

THPFM0003870574-026

Trial Exh. 4077 Page 0029

ER-13416

PFM-DEPO-00013750

# An Entirely New Lab Experience

## Theranos Information Systems

Theranos Information Systems facilitate real-time eligibility, authorization, authentication, information transmission, and billing.

All data is transmitted to physicians through a secure customized portal, secure fax, and/or integration with EMR/LIS systems.



Theranos Confidential

**theran⊙s**

Confidential

THPFM0003870574-027

# Real Estate & Growth

Current:

- 1601 California Ave, Palo Alto, CA: 135,000 square feet *through 11/31/14
- 7333 Gateway Blvd, Newark, CA: ~219,000 square feet and ~60,000 square feet
- 1001 East Meadow Circle, Palo Alto, CA: 25,000 square feet
- Tempe, Arizona
- Scottsdale, Arizona

Under Construction:

- 1701 Page Mill Road, Palo Alto, CA: ~120,000 square feet

Theranos Confidential

**theranos**

Confidential

THPFM0003870574-028

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 288 of 300

ER-13417

PFM-DEPO-00013751



Theranos Facilities: Phoenix, AZ

THPFM0003870574-029

Theranos Confidential

Confidential

PFM-DEPO-00013752

Trial Exh. 4077 Page 0031



Theranos Facilities: Palo Alto, CA

THPFM0003870574-030

Theranos Confidential

Confidential

ER-13420

Trial Exh. 4077 Page 0033

PFM-DEPO-000013754

# Commercial

Key Deployments:
- Medicare/Medicaid
- Retail
- Emergency Rooms/Hospitals & Provider Offices
- International Healthcare Infrastructure
- Infectious Disease and Population Threats
- DoD
- Pharma

Building market share
- Post-launch threats/Marketing/PR
- Rapid Scale & Infrastructure Investments

Theranos Confidential

**theran⊙s**

Confidential

THPFM0003870574-031

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 292 of 300

Trial Exh. 4077 Page 0034

ER-13421

PFM-DEPO-000137755

# Theranos Infrastructure

National retail footprint and health plan partnerships throughout the United States for an unprecedented infrastructure which exceeds that of any commercial laboratory in today's market

Medicaid partnerships with states across the country regarding the exceptional impact on healthcare delivery and cost reduction

Medicare partnership at the federal level focusing on improvements in delivery of services and Medicare cost reduction

Theranos Confidential

theranos

Confidential

THPFM0003870574-032

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 293 of 300

ER-13422

PFM-DEPO-00013756

# Theranos infrastructure at Walgreens



Theranos Confidential

theran⊙s

Confidential

THPFM0003870574-033

ER-13423

Trial Exh. 4077 Page 0036

PFM-DEPO-0001375/



# 1,445 PSCs



Theranos Confidential

Confidential

THPFM0003870574-034

ER-13424

Trial Exh. 4077 Page 0037

# LabCorp  1,593 PSCs



Theranos Confidential

theranos

PFM-DEPO-00013758

Confidential

THPFM0003870574-035

Theranos Confidential

Trial Exh. 4077 Page 0038

ER-13425

PFM-DEPO-0001375

THPFM0003870574-036

Trial Exh. 4077 Page 0039

ER-13426

PFM-DEPO-0001376O

one tiny drop
will change the world.

Welcome to the blood test, reinvented. Ask your physician or visit theranos.com. **theranos**



Theranos Confidential

**theranos**

Confidential

THPFM0003870574-037

entrance poster

the blood test, reinvented.    theran⊙s

Now at *Walgreens*

Theranos Confidential

38

theran⊙s

Confidential

ER-13427

PFM-DEPO-00013761

THPFM0003870574-038

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-47, Page 299 of 300

Trial Exh. 4077 Page 0041

ER-13428

**a-frame / front door sign**



one tiny drop
changes
everything.

the blood test, reinvented.
theran⊙s
now near the pharmacy at *Walgreens*

theran⊙s

Theranos Confidential

PFM-DEPO-00013762

Confidential

THPFM0003870574-039

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023