No. 22-10312

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

## EXCERPTS OF RECORD
### VOL. XLIX of LVII | ER-14029 to ER-14328

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

| | Staphylococcus aureus | Astelin | DNAzap (1% v/v) |
| --- | --- | --- | --- |
| | Nleisseria meningitis | Anefrin Nasal Spray | RNaseOut (1% v/v) |
| | Corynebacterium diphtheria | NeoSynephrine | |
| | | Vicks VapoRub cough suppressant | |
| | | ZiCam Allergy Relief Nasal Gel | |
| | | UTM | |

*Acceptance Criteria:*

Mean time to detection of triplicates for positives without interfering substances shall not be different from mean time to detection of positives in the presence of interfering substances using the student's T-test.

### *Inclusivity/Exclusivity*

The following tables summarize the inclusivity and exclusivity pathogens to be evaluated for each of the Viral and Bacterial assays.

| **Staphylococcus aureus (MR)** | | |
| --- | --- | --- |
| **Inclusivity** | **Exclusivity** | **Cross-reactivity** |
| MRSA NYBK2464 | *S. aureus* Wood 46 | Enterobacter cloacae |
| MRSA HDE288 | *S. aureus* FDA 209 | Streptococcus agalactiae |
| MRSA HFH-30364 | *S. aureus* PCI 1158 | Streptococcus pneumoniae |

71

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536184

**ER-14030**

| MRSA M10/0148 | *S. aureus* TCH959 | Acinetobacter baumannii |
|---|---|---|
| MRSA Mu50 [NRS1] | *S. aureus* NCTC 8530 [S11] | Neisseria meningitidis |
| | *S. aureus* Rose | Pseudomonas aeruginosa |
| | | Escherichia coli |
| | | Klebsiella pneumoniae |
| | | Serratia marcescens |
| | | Klebsiella oxytoca |
| | | |

**Staphylococcus aureus (MS)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| S. aureus Wood 46 | MRSA NYBK2464 | Adenovirus 4 |
| S. aureus FDA 209 | MRSA HDE288 | Candida albicans |
| S. aureus PCI 1158 | MRSA HFH-30364 | Klebsiella pneumoniae |
| S. aureus TCH959 | MRSA M10/0148 | Escherichia coli |
| S. aureus NCTC 8530 [S11] | MRSA Mu50 [NRS1] | 5ng human genomic DNA |
| S. aureus Rose | | Bordetella pertussis |
| | | A/California/7/2009 (H1N1 novel) |
| | | Flu B/Mass/3/66 |
| | | Pseudomonas aeruginosa |
| | | |

**Klebsiella pneumoniae (Enterobacteriaceae spp)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| K. pneumoniae 1002565 | Klebsiella oxytoca | |
| K. pneumoniae 1100975 | | Enterobacter cloacae |

72

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                      TS-0536185

| K. pneumoniae ATCC BAA-1898 | | Streptococcus agalactiae |
| K. pneumoniae ATCC BAA-1899 | | Streptococcus pneumoniae |
| K. pneumoniae K6 [CCUG 45421, LMG 20218, MCV37] | | Acinetobacter baumannii |
| K. pneumoniae AIS 2007023 [6179] | | Neisseria meningitidis |
| K. pneumoniac ART 2008133 [D-05, 1338] | | Pseudomonas aeruginosa |
| K. pneumoniae ATCC BAA-1903 | | Escherichia coli |
| K. pneumoniae ATCC BAA-1905 | | Serratia marcescens |
| | | Klebsiella oxytoca |
| | | |

**Klebsiella pneumoniae carbapenemase (KPC)**

| Inclusivity | Exclusivity | Cross-reactivity |
| --- | --- | --- |
| K. pneumoniae ATCC BAA-1898 | K. pneumoniae 1002565 | Adenovirus 4 |
| K. pneumoniae ATCC BAA-1899 | K. pneumoniae 1100975 | Candida albicans |
| K. pneumoniae ART 2008133 [D-05, 1338] | K. pneumoniae K6 [CCUG 45421, LMG 20218, MCV37] | Escherichia coli |
| K. pneumoniae ATCC BAA-1903 | K. pneumoniae AIS 2007023 [6179] | 5ng human genomic DNA |
| K. pneumoniae ATCC BAA-1905 | | Bordetella pertussis |
| | | A/California/7/2009 (H1N1 novel) |
| | | Flu B/Mass/3/66 |
| | | Pseudomonas aeruginosa |
| | | Staphylococcus aureus MSSA (DmecA) |
| | | |

73

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536186

**Haemophilus influenzae (ampic R)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| *Haemophilus influenzae* (ROB-1+) T2494 | | *Enterobacter cloacae* |
| *E. coli* 1532 blaTEM+ 1532 | | *Streptococcus agalactiae* |
| *Serratia marcescens blaTEM+ 1532* | | *Streptococcus pneumoniae* |
| | | *Acinetobacter baumannii* |
| | | *Neisseria meningitidis* |
| | | *Pseudomonas aeruginosa* |
| | | *Escherichia coli* |
| | | *Klebsiella pneumoniae* |
| | | *Serratia marcescens* |
| | | *Klebsiella oxytoca* |
| | | *Enterobacter aerogenes* |
| | | |

**Haemophilus influenzae (ampic S)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| Haemophilus influenzae type a | Haemophilus parainfluenzae | Adenovirus 4 |
| Haemophilus influenzae type b (ampS) | Haemophilus haemolyticus | Candida albicans |
| Haemophilus influenzae type c | Aggregatibacter segnis (deposited as Haemophilus Segnis) | Klebsiella pneumoniae |
| Haemophilus influenzae type d | | Escherichia coli |
| Haemophilus influenzae type e | | 5ng human genomic DNA |
| Haemophilus influenzae type f | | Bordetella pertussis |

74

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536187

| | | |
|---|---|---|
| Haemophilus influenzae (ROB-1+) | | A/California/7/2009 (H1N1 novel) |
| Haemophilus influenzae (ROB-1+) | | Flu B/Mass/3/66 |
| | | Pseudomonas aeruginosa |
| | | Staphylococcus aureus MSSA (DmecA) |
| | | Enterobacter cloacae |
| | | Streptococcus agalactiae |
| | | Streptococcus pneumoniae |
| | | Acinetobacter baumannii |
| | | Neisseria meningitidis |
| | | Serratia marcescens |
| | | Klebsiella oxytoca |
| | | |

**Moraxella catarrhalis**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| Moraxella catarrhalis Bc-30 | Acinetobacter baumannii | Adenovirus 4 |
| Moraxella catarrhalis Ne 11 | Neisseria meningitidis | Candida albicans |
| Moraxella catarrhalis 20 | Kingella kingae | Klebsiella pneumoniae |
| Moraxella catarrhalis N9 | Haemophilus influenzae | Escherichia coli |
| Moraxella catarrhalis 1908 | Streptococcus pneumoniae | 5ng human genomic DNA |
| Moraxella catarrhalis mMS 116 | | Bordetella pertussis |
| Moraxella catarrhalis 57135 | | A/California/7/2009 (H1N1 novel) |
| Moraxella catarrhalis 59632 | | Flu B/Mass/3/66 |
| | | Pseudomonas aeruginosa |

75

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536188

| | | Staphylococcus aureus MSSA (DmecA) |
|---|---|---|
| | | |

| Haemophilus parainfluenzae | | |
|---|---|---|
| **Inclusivity** | **Exclusivity** | **Cross-reactivity** |
| Haemophilus parainfluenzae NCTC 7857 | Haemophilus parainfluenzae NCTC 7857 | Adenovirus 4 |
| Haemophilus parainfluenzae 655 | Haemophilus parainfluenzae 655 | Candida albicans |
| Haemophilus parainfluenzae P142 | Haemophilus parainfluenzae P142 | Klebsiella pneumoniae |
| Haemophilus parainfluenzae P110 | Haemophilus parainfluenzae P110 | Escherichia coli |
| Haemophilus parainfluenzae H30 | Haemophilus parainfluenzae H30 | 5ng human genomic DNA |
| | Haemophilus influenzae type b (ampS) | Bordetella pertussis |
| | Haemophilus influenzae (ROB-1+) | A/California/7/2009 (H1N1 novel) |
| | Haemophilus haemolyticus | Flu B/Mass/3/66 |
| | Aggregatibacter segnis (deposited as Haemophilus Segnis) | Pseudomonas aeruginosa |
| | | Staphylococcus aureus MSSA (DmecA) |
| | | |

| Enterobacter cloacae (Enterobacteriaceae spp) | | |
|---|---|---|
| **Inclusivity** | **Exclusivity** | **Cross-reactivity** |
| Enterobacter cloacae NCDC 279-56 | Enterobacter aerogenes | Adenovirus 4 |

76

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536189

**ER-14035**

| | | |
|---|---|---|
| Enterobacter cloacae 1101152 | | Candida albicans |
| Enterobacter cloacae 1101177 | | Klebsiella pneumoniae |
| Enterobacter cloacae 1000654 | | Escherichia coli |
| Enterobacter cloacae [ATCC BAA-2080] | | 5ng human genomic DNA |
| Enterobacter hormacchci | | Bordetclla pertussis |
| | | A/California/7/2009 (H1N1 novel) |
| | | Flu B/Mass/3/66 |
| | | Pseudomonas aeruginosa |
| | | Staphylococcus aurcus MSSA (DmecA) |
| | | Streptococcus agalactiae |
| | | Streptococcus pneumoniae |
| | | Acinetobacter baumannii |
| | | Neisseria meningitidis |
| | | Serratia marcescens |
| | | Klebsiella oxytoca |
| | | Enterobacter aerogenes |
| | | |

**Enterobacter aerogenes (Enterobacteriaceae spp)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| Enterobacter aerogenes NCDC 819-56 | Enterobacter cloacae | Adenovirus 4 |
| Enterobacter aerogenes IFO 12010 | Enterobacter hormaechei | Candida albicans |
| Enterobacter aerogenes 1101206 | | Klebsiella pneumoniae |

77

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536190

| | | |
|---|---|---|
| Enterobacter aerogenes AmMS 264 | | Escherichia coli |
| Enterobacter aerogenes 1101481 | | Bordetella pertussis |
| Enterobacter aerogenes MULB-250 | | Influenza A/California/7/2009 (H1N1 novel) |
| Enterobacter aerogenes CDC 120-75 | | Influenza B/Russia/69 |
| | | Pseudomonas aeruginosa |
| | | Staphylococcus aureus MSSA (DmecA) |
| | | Streptococcus pyogenes |
| | | Enterobacter cloacae |
| | | Streptococcus agalactiae |
| | | Streptococcus pneumoniae |
| | | Acinetobacter baumannii |
| | | Neisseria meningitidis |
| | | Serratia marcescens |
| | | Klebsiella oxytoca |
| | | |

**Serratia marcescens (Enterobacteriaceae spp)**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| Serratia marcescens ATCC 10759 | Enterobacter cloacae | Adenovirus 4 |
| Serratia marcescens CDC 4385-74 | Streptococcus agalactiae | *Candida albicans* |
| Serratia marcescens CDC 3100-71 | Streptococcus pneumoniae | *Escherichia coli* |
| Serratia marcescens CDC 4340-74 | Acinetobacter baumannii | 5ng human genomic DNA |
| Serratia marcescens CY918 | Neisseria meningitidis | *Bordetella pertussis* |
| Serratia marcescens CY429 | Pseudomonas aeruginosa | FluA (H1N1) |

78

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536191

**ER-14037**

|  | Escherichia coli | FluB |
|--|--|--|
|  | Klebsiella pneumoniae | *Pseudomonas aeruginosa* |
|  | Serratia marcescens | *Staphylococcus aureus* |
|  | Klebsiella oxytoca | *Enterobacter cloacae* |
|  | Enterobacter aerogenes | *Streptococcus agalactiae* |
|  |  | *Streptococcus pneumoniae* |
|  |  | *Acinetobacter baumannii* |
|  |  | *Neisseria meningitidis* |
|  |  | *Klebsiella pneumoniae* |
|  |  | *Klebsiella oxytoca* |
|  |  |  |

**Acinetobacter baumanii**

| Inclusivity | Exclusivity | Cross-reactivity |
|--|--|--|
| Acinetobacter baumanii CLIA strain | Acinetobacter lwoffiI | Adenovirus 4 |
| Acinetobacter baumanii  B5W71 | Acinetobacter johnsonii | Candida albicans |
| Acinetobacter baumanii 5377 | Acinetobacter ursingii | Klebsiella pneumoniae |
| Acinetobacter baumanii AYE | Acinetobacter schindleri | Escherichia coli |
| Acinetobacter baumanii 2208 | Acinetobacter calcaoaceticus | 5ng human genomic DNA |
| Acinetobacter baumanii BAA-1605 |  | Bordetella pertussis |
|  |  | A/California/7/2009 (H1N1 novel) |
|  |  | Flu B/Mass/3/66 |
|  |  | Pseudomonas aeruginosa |
|  |  | Staphylococcus aureus MSSA (DmecA) |

79

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536192

**ER-14038**

|  |  | Enterobacter cloacae |
|  |  | Streptococcus agalactiae |
|  |  | Streptococcus pneumoniae |
|  |  | Neisseria meningitidis |
|  |  | Serratia marcescens |
|  |  | Klebsiella oxytoca |
|  |  |  |

**Legionella spp**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| L. pneumo. subsp pneumo. (Philadelphia-1) | Legionella micdadei | Adenovirus 4 |
| L. pneumo. subsp pneumo. (Knoxville-1) | Legionella longbeachae | Candida albicans |
| L. pneumo. subsp pneumo. (Leiden 1) | Legionella israeliensis | Klebsiella pneumoniae |
| L. pneumo. subsp pneumo. (570-CO-H ) |  | Escherichia coli |
| L. pneumo. subsp pneumo. (1169-MN-H ) |  | 5ng human genomic DNA |
| L. pneumo. subsp pneumo. (Togus-1) |  | Bordetella pertussis |
| L. pneumo. subsp pneumo. (Bloomington-2) |  | A/California/7/2009 (H1N1 novel) |
| L. pneumo. subsp fraseri(Los Angeles-1 ) |  | Flu B/Mass/3/66 |
| L. pneumo. subsp pneumo. (Chicago 2) |  | Pseudomonas aeruginosa |
| L. pneumophila (Chicago 8) |  | Staphylococcus aureus MSSA (DmecA) |

80

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536193

**ER-14039**

| L. pneumo. subsp pneumo. (IN-23-G1-C2) | | |
| L. pneumo. subsp. pascullei (MICU B ) | | |
| | | |

**Burkholderia cepacia**

| Inclusivity | Exclusivity | Cross-reactivity |
|---|---|---|
| Burkholderia cepacia 249 [S-4-An] | N/A | Adenovirus 4 |
| Burkholderia cepacia UCB 717 | | *Candida albicans* |
| Burkholderia cepacia NCDC A977 | | Klebsiella pneumoniae |
| Burkholderia cepacia 105597 | | *Escherichia coli* |
| Burkholderia multivorans LMG 13010 | | 5ng human genomic DNA |
| Burkholderia cenocepacia LMG 16656 | | Bordetella pertussis |
| Burkholderia stabilis LMG 14294 | | A/California/7/2009 (H1N1 novel) |
| Burkholderia vietnamiensis IFF-8296C | | Flu B/Mass/3/66 |
| Burkholderia pyrrocinia 2327 | | *Pseudomonas aeruginosa* |
| Burkholderia glathei N15 | | *Staphylococcus aureus* MSSA (DmecA) |
| | | *Streptococcus pyogenes* |
| | | Enterobacter cloacae |
| | | Streptococcus agalactiae |
| | | Streptococcus pneumoniae |
| | | Acinetobacter baumannii |
| | | Neisseria meningitidis |

81

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536194

ER-14040

|  |  | Serratia marcescens |
|  |  | Klebsiella oxytoca |
|  |  | Enterobacter aerogenes |
|  |  |  |

**Mycobacterium abscessus**

| Inclusivity | Exclusivity | Cross-reactivity |
| --- | --- | --- |
| M. abscessus [TMC 1543] gDNA | Mycobacterium bovis | Adenovirus 4 |
| M. abscessus MC1549 [K.K.] | Mycobacterium gastri | *Candida albicans* |
| M. abscessus [SSC 210] | Mycobacterium tuberculosis | Klebsiella pneumoniae |
| M. abscessus [TMC 1543] | Mycobacterium avium | *Escherichia coli* |
| M. abscessus MC1549 [K.K.] |  | Bordetella pertussis |
| M. abscessus [SSC 210] |  | Influenza A/California/7/2009 (H1N1 novel) |
| M. abscessus [TMC 1543] |  | Influenza B/Russia/69 |
|  |  | *Pseudomonas aeruginosa* |
|  |  | *Staphylococcus aureus* MSSA (DmecA) |
|  |  | *Streptococcus pyogenes* |
|  |  | Enterobacter cloacae |
|  |  | Streptococcus agalactiae |
|  |  | Streptococcus pneumoniae |
|  |  | Acinetobacter baumannii |
|  |  | Neisseria meningitidis |
|  |  | Serratia marcescens |
|  |  | Klebsiella oxytoca |

82

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536195

**ER-14041**

|  |  |  |
|--|--|--|
|  |  |  |

**Staphylococcus aureus (Vancomycin-resistant) VRSA**

| Inclusivity | Exclusivity | Cross Reactivity |
|---|---|---|
| None currently available | *S. aureus* Wood 46 | Adenovirus 4 |
|  | *S. aureus* FDA 209 | *Candida albicans* |
|  | *S. aureus* PCI 1158 | Klebsiella pneumoniae |
|  | *S. aureus* TCH959 | *Escherichia coli* |
|  | *S. aureus* NCTC 8530 [S11] | Bordetella pertussis |
|  | *S. aureus* Rose | Influenza A/California/7/2009 (H1N1 novel) |
|  | MRSA NYBK2464 | Influenza B/Russia/69 |
|  | MRSA HDE288 | *Pseudomonas aeruginosa* |
|  | MRSA HFH-30364 | *Staphylococcus aureus* MSSA (DmecA) |
|  | MRSA M10/0148 | *Streptococcus pyogenes* |
|  | MRSA Mu50 [NRS1] | Enterobacter cloacae |
|  |  | Streptococcus agalactiae |
|  |  | Streptococcus pneumoniae |
|  |  | Acinetobacter baumannii |
|  |  | Neisseria meningitidis |
|  |  | Serratia marcescens |
|  |  | Klebsiella oxytoca |

83

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536196

**ER-14042**

- Mean time to detection of negatives shall be at minimum 10 minutes greater than the mean time to detection of positives.

- All 3 replicates obey the above criteria.

- Mean time to detection of negatives statistically different from mean time to positives using the students T-test.

*Acceptance Criteria: Inclusivity*

- For each pathogen specific assay test, a mean range of time to detection will be assessed across all inclusive strains and substrains, which shall not exceed 5 minutes.

- The %CV for time to detection of all positives and negatives shall be <15%.

### Determination of Assay Cutoffs

The isothermal amplification process generates fluorescence upon incorporation of the double-stranded-DNA intercalating dye, and the relative fluorescence units (RFUs) detected once per minute over a 30 minute reaction. An amplification signal is detected if a statistical changepoint is found, with two populations of measurements, the latter of which has a mean RFU at least 1.5 times greater than the population of earlier measurements. The changepoint, the measurement that divides the samples into two populations, is used then to interpolate the time at which the amplification curve of the observed RFUs exceed the mean of the first population of measurements.

Cut-off times for making positive/equivocal/negative calls will be determined for each target empirically. A set of experiments for each target, repeated over five days, will be conducted that included 8 replicates each of three dilutions (LoD, 10X LoD, and 100X LoD), as well as 8 NTCs, using the target primers for amplification. These data will be processed using a receiver-operator character (ROC) analysis as per CLSI guidance document MM3-A2 and EP24-A2. The best threshold detection time for distinguishing positives and negatives determined using the Youden test statistic as implemented by the R package, pROC.

### Reproducibility (Precision)

Precision: Mean Time to Detection (Cycles or Minutes)

- Evaluate relative time to detection ($\Delta T$) for each pathogen at 0, $1\mathrm{X}10^2$, $1\mathrm{X}10^4$ and $1\mathrm{X}10^6$ copies or 0 $TCID_{50}$, 10 $TCID_{50}$, 100 $TCID_{50}$, 1000 $TCID_{50.}$

- $\Delta T$ is defined as the time to detection of a zero template reaction minus the time to detection of a reaction containing target nucleic acid.

- Continue over 5 days to obtain 20 data points.

84

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

TS-0536197

**ER-14043**

- Calculate ΔT mean, SD and %CV.Δ

Acceptance criteria: ΔT CV<20%

Precision: % positive, equivocal and negative at 3 detection limits

Prepare nucleic acid from high negative (LOD/10), low-positive (LOD) and high positive (3X LOD)

- Perform the above 4 times and record positive, negative and equivocal results, as well as mean relative time to detection for each.

- Continue over 5 days to obtain 20 data points.

- Calculate ΔT mean, SD and %CV.

*Acceptance criteria:*

- LOD/10:        ΔT CV <20%

- LOD            ΔT CV <15%

- 3XLOD          ΔT CV <15%

### Method Comparison

Purpose: As there are no cleared comparators available for TNAA tests for the Lower Respiratory Assays in this Pre-Submission, two Theranos in-house PCR tests with bi-directional sequence confirmation will be used.   A predetermine algorithm will be used with these two analytically validated PCR tests. The comparator assays are designed to amplify a different sequence from that amplified from the respective TNAA test. "True" positives are considered as any sample that has at least one bi-directional sequencing data meeting pre-defined quality acceptance criteria. "True" negatives were considered as any sample that tested negative by both of the comparator PCR assays.  Any conflicting results will be further investigated by culture.

For each clinical sample, each test will be run in duplicate, except for the NTC, which will be run for each primer pair. A positive determination is made for a sample when amplified products are detected prior to the assay cutoff time in both templated replicates, if the later of the two is no more than 20% later. A run with no positive calls for any of the assays is only valid if both the RnaseP and spike-in controls are positive by these metrics.

The following will invalidate a run and could necessitate retesting:

1. Detection of product in any of the NTC wells when a positive call is made for that target

85

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

2. Negative results for any of the pathogens, along with negative results in the Rnase P and spike-in controls

3. A negative result in the spike-in control, regardless of other results (indicates lack of template, so observed products are likely non-templated)

A positive result for a pathogen along with a negative result for Rnase P is still valid, as a high level infection could overcome poor sample collection.

Run retrospective samples each day using TNAA and Theranos PCR methods over 20 days using retrospective samples from demographically diverse population covering gender and age:

| Target | Positive | Negative |
|---|---|---|
| Staphylococcus aureus (MR) | 50 | 100 |
| Staphylococcus aureus (RS) | 50 | 100 |
| Klebsiella pneumoniae (Enterobacteriaceae spp) | 50 | 100 |
| Klebsiella pneumoniae carbapenemase (KPC) | 50 | 100 |
| Haemophilus influenzae (ampic R) | 50 | 100 |
| Haemophilus influenzae (ampic S) | 50 | 100 |
| Moraxella catarrhalis | 50 | 100 |
| Haemophilus parainfluenzae | 50 | 100 |
| Enterobacter cloacae (Enterobacteriaceae spp) | 50 | 100 |
| Enterobacter aerogenes (Enterobacteriaceae spp) | 50 | 100 |
| Serratia marcescens (Enterobacteriaceae spp) | 50 | 100 |
| Acinetobacter baumanii | 50 | 100 |
| Legionella spp | 50 | 100 |
| Burkholderia cepacia | 50 | 100 |
| Mycobacterium abscessus | 50 | 100 |
| Staphylococcus aureus (Vancomycin-resistant) VRSA | 50 | 100 |

- Carefully document positives and negatives for each pathogen on each method.

- Calculate the percent concordance and percent discordance of TNAA versus comparator RT-PCR assays.

Acceptance Criteria: Concordance >95%, [Sensitivity >90%, Specificity >95%, PPV>80%, NPV>80%].

86

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

TS-0536199

*Anticipated Predicate Device*

As the Theranos System, including the TSPU and TLAS, will have been cleared for running the influenza TNAA assays pursuant to the 510(k) submission corresponding to the Pre-Submission Q131199, Theranos plans to use that Theranos System as the predicate for the Lower Respiratory Assays under this submission with the Theranos in-house PCR tests as comparators as described above.

*Comparison to the Subject Device*

See the "*Performance Testing / Product Development – Performance Testing*" Section for more information regarding comparisons to the predicate device.

*TNAA:*

| Similarities between TSPU for Theranos Lower Respriatory TNAA assays and the previously cleared TSPU for Theranos Influenza TNAA assays | | |
|---|---|---|
| Element | TSPU | Cleared TSPU |
| | | |
| Analyte | RNA or DNA | Same |
| Technological Principles | Nucleic acid amplification | Same |
| Technological Principles | Recombination based isothermal method (See the "*Device Description – Theranos Nucleic Acid Amplification (TNAA) Assay* | Same |
| Test to result | <45mins | Same |
| Sample Preparation Method | Sample processing is automated in Theranos TSPU | Same |
| Reagent Storage | Reagents stored at 4 °C | Same |
| User Complexity (for instrument) | Low | Same |
| | | |
| Test Interpretation | Automated test interpretation and report generation by TLAS. TSPU operator cannot access raw data. | Same |
| | | |

87

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**ER-14046**

**Differences between TSPU and FilmArray RP**

| Element | TSPU | Cleared TSPU |
|---|---|---|
| Organisms Detected | Staphylococcus aureus (MR) | Influenza |
| | Staphylococcus aureus (RS) | Influenza A/H1 |
| | Klebsiella pneumoniae (Enterobacteriaceae spp) | Influenza A/H3 |
| | Klebsiella pneumoniae carbapenemase (KPC) | Influenza A/H1-2009 |
| | | Influenza A/H5N1 |
| | Haemophilus influenzae (ampic R) | Influenza A/N7N9 |
| | Haemophilus influenzae (ampic S) | Influenza B |
| | Enterobacter cloacae (Enterobacteriaceae spp) | |
| | Serratia marcescens (Enterobacteriaceae spp) | |
| | Acinetobacter baumanii | |
| | Staphylococcus aureus (Vancomycin-resistant) VRSA | |
| | Moraxella catarrhalis | |
| | Haemophilus parainfluenzae | |
| | Enterobacter aerogenes (Enterobacteriaceae spp) | |
| | Legionella spp | |
| | Burkholderia cepacia | |
| | Mycobacterium abscessus | |
| Specimen Types | Throat swabs, Sputum | Nasopharyngeal swabs, aspirates and washes, and nasal swabs |

88

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536201

**General Chemistry Proposed Study Design(s), Predicate, and Analytical and Pre-Clinical Performance:**

**Specific Performance Characteristics**

The study design comprises the following:

**Pre-Clinical/Laboratory/In-vitro Studies**

### 1. Sensitivity and Limit of Detection (LOD)

The limit of detection (LoD) will be established with a minimum of sixty (60) measurements with both blank and low level samples. The LoD will be determined from both the measure limit of blank (LoB) and test replicates of the low level sample (CLSI EP17-A). The mean and standard deviation (SD) of the low concentration sample is then calculated according to

$$LoD = LoB + 1.645 \ (SD_{\text{Low concentration}}), \quad \text{where } LoB = \text{mean}_{\text{blank}} + 1.645 \ (SD_{\text{blank}})$$

### 2. Reproducibility (Precision)

A minimum of two control samples (low and high) spanning the measurable range and preferably close to a medical decision level will each be tested in duplicate in two runs a day for 20 days for a total of 80 data points (CLSI EP5-A2). With-in run, between-run, total, mean, SD & calculated CV's will be determined using standard statistical analysis.

### 3. Specificity/Interference

Endogenous Interferences such as hemolysis, lipemia and icterus will be evaluated at high levels to quantify interference. One to three levels of the test analyte will be tested at levels close to concentrations where medical decision are made in replicate of five (5). For control the test analyte will be tested (in replicates of 5) without the interferent (CLSI EP7-A2). Non-interference is defined as bias of less than or equal to 10% of the results from samples with interferent compared to the mean results of the control samples.

### 4. Linearity/Assay Reportable Range

In order to determine the assay reportable range, a low concentration sample (ideally near and within the lower limit) and high concentration sample (the highest concentration tested) will be used to generate a minimum of 5- 8 levels equally spaced and including appropriate medical decision limits using defined ratios of high and low samples (CLSI EP6-A). Each level will be

89

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536202

tested in triplicate. Criteria for allowable non-linearity (+/- 10%) and recovery (+/-10%) will be applied.

## 5. Method Comparison (venous)

A minimum of 40 clinical samples consisting of both clinical and spiked samples spanning the reportable assay range, including the medical decision levels will be tested and compared with a comparator method (CLSI EP09-A2). Duplicate measurement will be obtained for the comparator and the Theranos test methods. Standard statistical technique will be applied to determine method comparability including slope, intercept, range of values, correlation, estimation of standard error and bias. Based on the results of the data examined, either a simple linear regression or alternative procedure will be used to estimate expected (average) bias and the confidence interval of expected bias at the desired medical decision level (s) as per CLSI EP0A9-A2 guidance. The acceptable bias at each medical decision level will be determined based on the total allowable error (TEa) minus the measured precision at the level closest to that decision level for each assay. If the confidence interval for the predicted bias includes the defined acceptable bias or if the acceptable bias is greater than the higher limit of the confidence interval of the predicted bias, then the data do not show that the bias of the Theranos method is different from the acceptable bias or there is a high probability (97%) that the predicated bias is acceptable, respectively. Exclusion criteria for outliers will be applied if samples show mean absolute difference greater than 4 between the Theranos and comparator methods.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
TS-0536203

**ER-14049**

1. **Albumin Assay**

| Parameter | Theranos Albumin | Siemens Advia 1800 Albumin |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | The Theranos Albumin assay in plasma determines the amount of protein that is in the clear liquid portion of the blood. Plasma albumin quantitatively binds to bromocresol green (BCG) to form an albumin-BCG complex that is detected as an endpoint reaction spectrophotometrically. | Same |
| Intended Use | Quantitative determination of Albumin | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 620 nm | 596/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

91

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536204

2. **Total Bilirubin Assay**

| Parameter | Theranos Total Bilirubin | Siemens Advia 1800 Total Bilirubin |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Total (conjugated and unconjugated) bilirubin, in the presence of a solubilizing agent (here, dimetylsulfoxide), reacts with diazotized sulfanilic acid to produce azobilirubin, in the aqueous solution, a colored product. The intensity of this product is directly proportional to the amount of total bilirubin concentration present in the sample. | The bilirubin is oxidized by vanadate at about pH 2.9 to produce biliverdin. In the presence of the detergent and the vanadate, both conjugated (direct) and unconjugated bilirubin are oxidized. This oxidation reaction causes the decrease in the optical density of the yellow color, which is proportional to the total bilirubin concentration in the sample. |
| Intended Use | Quantitative determination of Bilirubin | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 560 nm | 451/545 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536205

**ER-14051**

3. **Direct Bilirubin Assay**

| Parameter | Theranos Direct Bilirubin | Siemens Advia 1800 Direct Bilirubin |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Bilirubin reacts with diazotized sulfanilic acid to produce azobilirubin. The intensity of the color produced is detected spectrophotometrically and is directly proportional to the amount of direct bilirubin concentration present in the sample. | The bilirubin is oxidized by vanadate at about pH 3 to produce biliverdin. In the presence of the detergent and the vanadate, both conjugated (direct) is oxidized. This oxidation reaction causes the decrease in the optical density of the yellow color, which is specific to bilirubin. The decrease in optical density is proportional to the total bilirubin concentration in the sample and detected as an endpoint reaction secrophotometrically. |
| Intended Use | Quantitative determination of Direct Bilirubin | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 560 nm | 451/545 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

93

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536206

**ER-14052**

4. **Calcium Assay**

| Parameter | Theranos Calcium | Siemens Advia 1800 Calcium |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Calcium reacts with cresolphthalein complexone in 8-hydroxyquinoline to form a colored complex (purple color) whose intensity is detected spectrophotometrically. The intensity of the color is proportional to the calcium concentration in the sample. Color intensifiers and a stabilizer are present to minimize interference by other metallic ions. | Calcium ions form a colored complex with Arsenazo III, which is detected spectrophotometrically. The amount of calcium present in the sample is directly proportional to the intensity of the colored complex formed. |
| Intended Use | Quantitative determination of Calcium | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 570 nm | 658/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

94

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536207

5. **Carbon Dioxide Assay**

| Parameter | Theranos Carbon Dioxide | Siemens Advia 1800 Carbon Dioxide |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | The NADH-Based Bicarbonate Assay uses two enzymatic reactions to convert HCO3 to malate and β-NADH to β-NAD+ which can be detected spectrophotometrically as a decrease in signal over time with a rate that is dependent on the original HCO3 concentration. | PEPC catalyzes the first reaction involving HCO3 from the sample which generates oxaloacetate. In the presence of MDH, the NADH analog is oxidized by oxaloacetate to NAD+ analog. The oxidation of NADH analogue is detected by the decreased absorbance spectrophotometrically, which is proportional to the amount of CO2 in the sample. |
| Intended Use | Quantitative determination of Carbon dioxide/bicarbonate | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Kinetic |
| Detection Wavelength | 340 nm | 410/478 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

95

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536208

**ER-14054**

6. **Chloride Assay**

| Parameter | Theranos Chloride | Siemens Advia 1800 Chloride |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Chloride from the sample replaces Hg from $Hg^{2+}$ $(TPTZ)_2$ complex using $Fe_2SO_4$ from the reagent. The color intensity of resulting complex $Fe^+$ $TPTZ^-$ is detected spectrophotometrically and is proportional to the chloride concentration in the sample. | The sample is mixed with ISE buffer, thereby providing a constant pH and a constant ionic strength solution. As the buffered sample is moved through the ISE, changes in the electrical potential take place. These electrical potential changes are detected against the potential of a reference electrode to derive the correct analog value for the sample. |
| Intended Use | Quantitative determination of Chloride | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Potentiometric |
| Detection Wavelength | 600 nm | N/A |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

96

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536209

7. **Total Cholesterol Assay**

| Parameter | Theranos Total Cholesterol | Siemens Advia 1800 Total Cholesterol |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | The cholesterol esters are hydrolyzed by cholesterol esterase to cholesterol and free fatty acids. The cholesterol is converted to choles-4-en-3-one by cholesterol oxidase in the presence of oxygen to form hydrogen peroxide. A colored complex is formed from hydrogen peroxide, 4-aminoantipyrine and phenol under the catalytic influence of peroxidase. The absorbance of the complex is detected as an endpoint reaction spectrophotometrically. | Same |
| Intended Use | Quantitative determination of Total Cholesterol | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 505/694 nm | 505/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

97

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

8. **Creatine Kinase Assay**

| Parameter | Theranos Creatine Kinase | Siemens Advia 1800 Creatine Kinase |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Creatine Kinase reacts with the creatine phosphate and ADP to form ATP which is coupled to the hexokinase-G6PD reaction, generating NADPH. The concentration of NADPH is detected spectrophotometrically. | Same |
| Intended Use | Quantitative determination of Creatine Kinase | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Kinetic |
| Detection Wavelength | 340 nm | 340/410 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

98

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0536211

9. **Creatinine Assay**

| Parameter | Theranos Creatinine | Siemens Advia 1800 Creatinine |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Creatinine is converted to creatine by the action of creatininase. The creatine formed is hydrolyzed by creatinase to produce sarcosine, which is decomposed by sarcosine oxidase to form glycine, formaldehyde, and hydrogen peroxide. In the presence of peroxidase, the hydrogen peroxide formed yields a blue pigment by quantitative oxidative condensation with HMMPS and 4-aminoantipyrine. The creatinine concentration is obtained by detecting the absorbance of the blue color spectrophotometrically. | Same |
| Intended Use | Quantitative determination of Creatinine | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Endpoint |
| Detection Wavelength | 561 nm | 596/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

99

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536212

10. **Glucose Assay**

| Parameter | Theranos Glucose | Siemens Advia 1800 Glucose |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | β-D-Glucose is oxidized by glucose oxidase to produce D-gluconic acid and hydrogen peroxide. The hydrogen peroxide is then oxidatively coupled with 4-aminoantipyrine and phenol substitute, pHBA, in the presence of peroxidase to yield a red quinoneimine dye. The amount of colored complex formed is proportional to glucose concentration and can be detected spectrophotometrically. | Glucose is phosphorylated by adenosine triphosphate (ATP) in the presence of hexokinase. The glucose-6-phosphate that forms is oxidized in the presence of glucose-6-phosphate dehydrogenase causing reduction of NAD to NADH. The absorbance of NADH is detected as an endpoint reaction spectrophotometrically. |
| Intended Use | Quantitative determination of Glucose | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 510 nm | 340/410 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

100

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos TS-0536213

**ER-14059**

11. **Gamma-glutamyl transpeptidase (GGT) Assay**

| Parameter | Theranos GGT | Siemens Advia 1800 GGT |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | In the reaction with the synthetic substrate (L-γ-glutamyl-p -nitroanilide), glycylglycine acts as an acceptor for the γ-glutamyl residue and p-nitroaniline is liberated. The color intensity of liberated product is detected spectrophotometrically. | Same |
| Intended Use | Quantitative determination of GGT | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Kinetic |
| Detection Wavelength | 405 nm | 410/478 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

101

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536214

ER-14060

12. **Iron (non-heme) Assay**

| Parameter | Theranos Iron | Siemens Advia 1800 Iron |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Iron in human plasma is released from its carrier protein, transferrin, in an acid medium and simultaneously reduced to the ferrous form by a reducing agent. The ferrous ions chelate with the Ferene-S, a sensitive iron indicator forming a stable blue complex whose absorbance, spectrophotometrically detected, is proportional to the iron content. | Ferric iron is dissociated from its carrier protein, transferrin, in an acid medium and simultaneously reduced to the ferrous form. The ferrous iron is complexed with ferrozine, a sensitive iron indicator, to produce a colored chromophore, whose absorbance is read spectrophotometrically. |
| Intended Use | Quantitative determination of Iron | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 590 nm | 571/658 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

102

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536215

13. **Low-density lipoprotein (LDL) Assay**

| Parameter | Theranos LDL | Siemens Advia 1800 LDL |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Cholesterol esterase and cholesterol oxidase eliminate cholesterol, other than from low density lipoprotein. The action of catalase removes the peroxide produced by the oxidase. Specific detection of LDL Cholesterol is made after its release by detergent. The intensity of the quinoneimine produced in the Trinder reaction is directly proportional to the cholesterol concentration when detected spectrophotometrically. | Same |
| Intended Use | Quantitative determination of LDL | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 561 / 694 nm | 596/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

103

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536216

ER-14062

14. **High-density lipoprotein (HDL) Assay**

| Parameter | Theranos HDL | Siemens Advia 1800 HDL |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Elimination of chylomicrons, VLDL-Cholesterol, and LDL-Cholesterol takes place by PEG-Cholesterol esterase and cholesterol oxidase. The peroxide produced by the oxidase is removed by catalase. Specific detection of HDL-Cholesterol is made after release of HDL-Cholesterol by surfactant. The intensity of the quinoneimine dye produced in the Trinder reaction is directly proportional to the HDL cholesterol concentration when detected spectrophotometrically. | Same |
| Intended Use | Quantitative determination of HDL | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | 2-Point Kinetic |
| Detection Wavelength | 561/ 694 nm | 596/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

104

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536217

15. **Magnesium Assay**

| Parameter | Theranos Magnesium | Siemens Advia 1800 Magnesium |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Under basic conditions, deprotonated Xylidyl Blue selectively complexes with $Mg^{2+}$, shifting the color of the chromophore from deep purple to bright pink. The concentration of Magnesium can be determined by detecting the absorbance of resulting color complex. | Magnesium ions react with Xylidyl blue in an alkaline medium to form a water-soluble purple-red complex. The increase in absorbance is proportional to the concentration of magnesium in the sample. |
| Intended Use | Quantitative determination of Magnesium | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 597 nm | 505/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

105

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536218

ER-14064

16. **Alkaline Phosphatase (ALP) Assay**

| Parameter | Theranos Alkaline Phosphatase | Siemens Advia 1800 Alkaline Phosphatase |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | This assay uses the enzyme activity of alkaline phosphatase to dephosphorylate the chemiluminescent alkaline phosphatase substrate present in the assay reagent into an unstable dioxetane anion which decomposes and emits light. Charge transfer from the phenolate to the dioxetane ring promotes cleavage of the cyclic peroxide, releasing about 100 kcal to chemically excite one of the resulting carbonyl fragments to a singlet electronic state. Light emission obtained from the AP-catalyzed dioxetane decomposition reaction is a steady-state glow, the intensity of which is detected using a photodiode-based luminometer. | Alkaline phosphatase hydrolyzes the p-nitrophenyl substrate to form p-nitrophenol. The reaction is followed by the colorimetric detection of the rate of formation of the p-nitrophenol, which is proportional to the alkaline phosphatase activity. |
| Intended Use | Quantitative determination of ALP | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Kinetic |
| Detection Wavelength | Chemiluminescence | 410/478 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

106

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536219

17. **Phosphorus Assay**

| Parameter | Theranos Phosphorus | Siemens Advia 1800 Phosphorus |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | The Theranos phosphorus assay utilizes an improved malachite green method that uses malachite green dye and molybdate, which forms a stable colored complex with inorganic phosphate. The resulting phosphate-molybdate-malachite green complex gives a color in the visible range, which can be detected spectrophotometrically. | Inorganic phosphorus reacts with ammonium molybdate in the presence of sulfuric acid to form an unreduced phosphomolybdate complex, which is detected spectrophotometrically as an endpoint reaction. |
| Intended Use | Quantitative determination of Phosphorus | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 630 nm | 340/658 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

107

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536220

**ER-14066**

18. **Potassium Assay**

| Parameter | Theranos Potassium | Siemens Advia 1800 Potassium |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | In this method the compound Sodium Tetraphenylborate reacts with potassium from plasma. $K^+$ replaces $Na^+$ from Sodium Tetraphenylborate (NaTPB) to form potassium tetraphenylborate, a white precipitate. The turbidity caused by the precipitate is detected spectrophotometrically. | The sample is mixed with ISE buffer, thereby providing a constant pH and a constant ionic strength solution. As the buffered sample is moved through the ion selective electrode, changes in the electrical potential are measured against the potential of a reference electrode to derive the correct analog value for that sample. |
| Intended Use | Quantitative determination of Potassium | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Potentiometric |
| Detection Wavelength | 450 nm | N/A |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

108

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536221

19. **Total Protein Assay**

| Parameter | Theranos Total Protein | Siemens Advia 1800 Total Protein |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Protein peptide bonds interact with the cupric ions to form a purple complex that is detected spectrophotometrically to quantitatively detect Total Protein in human plasma. | Protein peptide bonds interact with the cupric ions to form a purple complex that is detected spectrophotometrically to quantitatively detect Total Protein in human plasma. |
| Intended Use | Quantitative determination of Total Protein | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 540 nm | 545 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

109

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536222

20. **Sodium Assay**

| Parameter | Theranos Sodium | Siemens Advia 1800 Sodium |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | In the Theranos Sodium colorimetric assay, sodium is determined enzymatically using the sodium dependent enzyme β-galactosidase which cleaves the substrate o-nitrophenyl-β-D-galactopyranose, yielding the product o-nitrophenol, a dye of which color intensity is detected spectrophotometrically. | The sample is mixed with ISE buffer, thereby providing a constant pH and a constant ionic strength solution. As the buffered sample is moved through the ion selective electrode, changes in the electrical potential are measured against the potential of a reference electrode in order to derive the correct analog value for that sample. |
| Intended Use | Quantitative determination of Sodium | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Potentiometric |
| Detection Wavelength | 405/420 nm | N/A |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

110

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536223

21. **Aspartate amino transferase (AST/SGOT) Assay**

| Parameter | Theranos AST | Siemens Advia 1800 AST |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | In the presence of L-aspartate and α-ketoglutarate, AST generates L-glutamate and oxaloacetate. The latter is decarboxylated by malate dehydrogenase coupled with the oxidation of NADH. The Theranos aspartate amino transferase assay utilizes a kinetic colorimetric method. The rate of NADH consumption detected is proportional to the activity of AST in the sample. | Same |
| Intended Use | Quantitative determination of AST | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Kinetic |
| Detection Wavelength | 340 nm | 340/410 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

111

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536224

ER-14070

22. **Alanine amino transferase (ALT/SGPT) Assay**

| Parameter | Theranos ALT | Siemens Advia 1800 ALT |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | ALT catalyzes the transfer of an amino group between L-alanine and α-ketoglutarate (α-KG). The pyruvate formed in the first reaction is then phosphorylated by pyruvate oxidase (POPG) in the presence of oxygen and water, forming peroxide in the process. ALT activity is determined by detecting the absorbance of the color generated, at 561 nm when the perodide forms a quinoneimine dye in the presence of 4-aminoantipyrine (4-AA) and ALPS. | ALT catalyzes the transfer of an amino group between L-alanine and α-ketoglutarate (α-KG). The pyruvate formed in the first reaction converts NADH to NAD in presence of lactate dehydrogenase. Concentration of the NADH is detected spectrophotometrically as the rate of absorbance decrease which proportional to the alanine aminotransferase (ALT) activity. |
| Intended Use | Quantitative determination of ALT | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Kinetic (rate) |
| Detection Wavelength | 561nm | 340/410 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

112

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536225

23. **Triglycerides Assay**

| Parameter | Theranos Triglycerides | Siemens Advia 1800 Triglycerides |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | This assay uses an enzyme reaction cascade with results in the production of hydrogen peroxide ($H_2O_2$) which is used by Horse Radish Peroxidase (HRP) to produce a purple color product. The absorbance of the complex is detected as an endpoint reaction spectrophotometrically. | The triglycerides are converted to glycerol and free fatty acids by lipase. The glycerol is then converted to glycerol-3-phosphate by glycerol kinase followed by its conversion to glycerol-3-phosphate-oxidase to hydrogen peroxide. A colored complex is formed from hydrogen peroxide, 4-aminophenazone and 4-chlorophenol under the catalytic influence of peroxidase. The absorbance of the complex is detected as an endpoint reaction spectrophotometrically. |
| Intended Use | Quantitative determination of triglycerides | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Kinetic | Endpoint |
| Detection Wavelength | 561 nm | 505/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

113

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536226

ER-14072

24. **Urea Nitrogen (BUN) Assay**

| Parameter | Theranos BUN | Siemens Advia 1800 BUN |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | The Theranos blood urea nitrogen assay utilizes a colorimetric endpoint method. The colorimetric signal is a result of the urease-mediated conversion of urea to ammonia, and the subsequent oxidative formation of 2,2-dicarboxyindophenol. | Urea is hydrolyzed in the presence of water and urease to produce ammonia and carbon dioxide. The ammonia reacts with 2-oxoglutarate in the presence of glutamate dehydrogenase and NADH. The oxidation of NADH to NAD is detected as an inverse rate reaction. |
| Intended Use | Quantitative determination of BUN | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Kinetic (rate) |
| Detection Wavelength | 630 nm | 340/410 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

114

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536227

25. **Uric Acid**

| Parameter | Theranos Uric Acid | Siemens Advia 1800 Uric Acid |
|---|---|---|
| Specimen Type | Human plasma | Human serum and plasma |
| Test Principle | Theranos uric acid assay chemistry is based on the iron reduction method. For this method, ferric iron (iron III) is reduced to ferrous iron (iron II) which then reacts with TPTZ to form a colored product that can be detected spectrophotometrically. The level of the resulting complex is directly proportional to the uric acid level of the sample. | The Uric Acid is converted by uricase to allantoin and hydrogen peroxide. A colored complex is formed from hydrogen peroxide, 4-aminophenazone, and TOOS [N-ethyl-N-(2-hydroxy-3-sulfopropyl)-3-methylaniline] under catalytic influence of peroxidase. The absorbance of the complex is detected spectrophotometrically. The level of the resulting complex is directly proportional to the uric acid level of the sample. |
| Intended Use | Quantitative determination of Uric Acid | Same |
| Controls | Bio-Rad or other commercial controls | Bio-Rad or other commercial controls |
| Reagent Storage | Reagent stored at $4^0$ C | Reagent stored at $4^0$ C |
| Testing Environment | Clinical Lab | Clinical Lab |
| Reaction Type | Endpoint | Endpoint |
| Detection Wavelength | 590 nm | 545/694 nm |
| Calibrators | Theranos General Chemistry calibrators | Siemens calibrators |
| Instrumentation | TSPU and TLAS | Advia 1800 |
| User Complexity | Low | Moderate/Low |

115

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    TS-0536228

**ER-14074**

*Specimen Information*

*Specimen Information for TNAA:*

The TNAA assays are performed on samples collected in the form of throat swabs ("*TS*") or sputum samples from individuals suspected of suffering from a lower respiratory infection. To collect a sample from a throat swab that has been applied to a subject's throat passage, the throat swab is placed inside a Swab vessel embedded in the Cartridge which is pre-filled with a transfer medium. The swab handle may be broken-off, and the vessel capped to preserve sample integrity. Most of the sample on the swab is released on contact into the transfer medium. When processed, the sample is automatically mixed by several cycles of pipetting to ensure maximal sample release from the swab so no human processing is required. Sputum samples are collected in sputum collection vessels. The sputum collection vessel is inserted into the Cartridge for subsequent processing. Samples will typically be processed and analyzed within several hours of their acquisition; thus, fresh samples will typically be used.

*Specimen Information for General Chemistries*

General Chemistry assays will be performed on human plasma. Whole blood collected by fingerstick or venipuncture will be introduced to the TSPU in the cartridge for General Chemistry testing. The TSPU separates the plasma from the cells for subsequent assay testing. Samples will be processed and analyzed within several hours of their collection.

116

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos TS-0536229

**Clinical Performance and Study Design Elements**
**Prospective Clinical Study for the Lower Respiratory TNAA Assays**

*Background and Study Goals:*

The primary goal of this prospective study is to supplement existing clinical data to characterize the accuracy of the TNAA assays run on the Theranos SPU and TLAS for the diagnosis of lower respiratory tract infections in patients suspected of infection. The General Chemistry assays serve an important role in clinical assessment of these patients, as well as in the assessment of other patient types exhibiting other signs and symptoms. Enabling highly sensitive TNAA tests with concurrent General Chemistry testing will help aid in the rapid clinical assessment and diagnosis of these patients.

The traditional testing approaches for lower respiratory tract infection include culturing, followed in some cases by confirmatory/subtyping via PCR testing. However, such testing approaches are typically expensive with slow turnaround times, leading to delays in treatment and possibly inappropriate treatment due to delays in test reporting.

The Theranos SPU and TLAS enable more convenient and rapid testing for both highly sensitive and specific TNAA tests as well as General Chemistry, hematology, and serological testing. This comprehensive approach yields very high accuracy (sensitivity and specificity), overall physiologic conditions, and state of the immune response. This timely and rich information can facilitate medical care, such as the decision to treat with an antiviral medication or not. It can also facilitate assessment of infectivity. Simultaneous testing in two or more modalities, such as gene-based TNAA testing, general chemistry, hematology, and immune/serologic testing, provides orthogonal tests which should enhance overall performance and clinical decision making. For example, early infections may be detected by TNAA methods but not by serologic tests. Conversely, poor recovery of sputum or low viral loads in lower respiratory samples could result in false negative results by nucleic acid testing alone, while blood based testing may still reveal medical conditions that need urgent care.

The Theranos SPU and TLAS enable CLIA oversight of sample processing with subsequent analysis in and under the oversight of the Theranos CLIA laboratory. This approach has clear advantages compared to traditional error-prone practices that include manual sample preparation with minimal oversight and shipping of samples to laboratories for analysis.

Throat swabs or sputum specimens are commonly used for the detection of lower respiratory tract infections. The relative ease of such sample collection should enable increased patient participation and help improve overall healthcare response and surveillance.

*Study Plan:*
The clinical performance of the Theranos SPU will be evaluated in a prospective study. Throat swab and sputum samples will be collected from subjects exhibiting symptoms of lower respiratory tract infection at 3 or more U.S. sites. The samples will be collected by trained technicians and

117

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

**ER-14076**

processed using the Theranos SPU at Theranos' Patient Service Center ("*TPSC*"). Each site will have 4 Theranos SPU's. Analysis will be done through the TLAS.

Testing accuracy and performance will be determined by comparison to comparator methods, including traditional CLIA-certified laboratory processing and analysis. Clinical study sites are selected based on the desired geographic/demographic variation of the potential subject populations. Subjects will be selected from diverse demographic groups. Each site will enroll 500 patients, for a total of 1,500 subjects. Subjects will be screened for exhibiting signs and symptoms of lower respiratory infection including but not limited to shortness of breath, weakness, high fever, coughing and fatigue. The subjects may or may not have had lower respiratory tract infection testing ordered by a physician. Written informed consent will be obtained from each subject and/or their parent/guardian (if under 18) at the time of enrollment into the study. To de-identify specimens, each subject will be assigned a Volunteer Identification Number (VIN) to track the sample. At the time of enrollment the following information will be recorded on the Case Report Form (CRF): 1) age; 2) sex; 3) information about their suspected respiratory infection, *i.e.,* signs and symptoms, date of onset; and 3) current medications (self-reported and/or collected from medical records).

Technicians at the TPSC will be trained on both the sample collection process as well as the basic operations of the Theranos SPU according to the intended use and associated instructions for use.

Two sample types (throat swab or sputum samples) will be collected across 1500 of the subjects. When collected, two throat swabs will be collected from each subject. One swab will be used for testing on the Theranos System, and the second swab will be used for testing on the comparator method. As there are no cleared comparator methods available for these TNAA tests, two Theranos in-house PCR tests with bi-directional sequence confirmation will be used.   A predetermine algorithm will be used with these two analytically validated PCR tests. The comparator assays are designed to amplify a different sequence from that amplified from the respective TNAA test. "True" positives are considered as any sample that has at least one bi-directional sequencing data meeting pre-defined quality acceptance criteria. "True" negatives are considered as any sample that tested negative by both of the comparator PCR assays.  Any conflicting results will be further investigated by culture and sequencing.

**Statistical Analysis Plan for Clinical Performance Study**

The main outcome of this study will be the determination of the diagnostic accuracy of the TNAA lower respiratory tract tests. To this end, concordance, sensitivity, specificity, positive predictive value ("*PPV*"), and negative predictive values ("*NPV*") will be calculated including 95% confidence intervals (CLSI guidance document EP12-A2).

These performance metrics will be calculated across all sites for each diagnostic outcome.  The analytic cut-off values will be based on the pre-clinical study results. Performance metrics will be calculated as per CLSI guidance document I/LA18-A2, MM3-A2, and EP12-A2. Comparator outcomes will serve as the presumed truth. Each discrepant classification will be investigated and resolved (included by culture).

118

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

As described, a total of 1500 subjects are planned to be enrolled in the prospective study. This sample size will provide sufficient subjects for the more common pathogens yielding low margins of error with a 95% confidence level for each performance metric. Retrospective samples may be used to supplement the prospective study if insufficient samples are obtained for certain test outcomes. In general, if incidence rates are <3.5%, retrospectives and/or contrived samples will be included.

**Clinical Study for the General Chemistry Assays**

The predicate test system (the Advia 1800) and the corresponding cleared assays did not require clinical data according to the published Decision Summaries. In the course of developing its Laboratory Developed Tests (LDTs), including the General Chemistry assays, Theranos has generated data from its development, validation, and various Theranos clinical programs relating to these LDTs. Given that the similar type of data that were the basis for clearance for the proposed predicate device, Theranos is not planning any additional clinical study for its General Chemistry Assays.

119

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

TS-0536232

ER-14078

### Previous Discussions or Submissions

In October 2012, Elizabeth Holmes (Theranos' CEO) and Sunny Balwani (Theranos' President and COO) and the FDA held a meeting. A teleconference was also held in August 2013 between Ms. Holmes and Sally Hojvat and John Hobson from the FDA.

During these meetings, Ms. Holmes relayed that Theranos' initial goal was to convert all of its LDTs into FDA-cleared assays, as appropriate. She also discussed how Theranos sought to gain FDA-clearance for the TSPU. During these discussions, the FDA indicated it would be possible to submit Theranos' NAA assays and ELISA assays together in an initial filing for the TSPU and TLAS. Ms. Holmes expressed Theranos' intent to use its first submission to create a framework for FDA clearance for its other assays. She indicated that Theranos would be submitting formal pre-submission request(s) accordingly.

During the meetings, Ms. Holmes also indicated that, until Theranos received clearance from the FDA, its devices would only be used in and by Theranos' Palo Alto-based CLIA-certified Laboratory. She provided that all samples would be physically transported to Theranos' Palo Alto-based CLIA-certified Laboratory to be run through Theranos' Laboratory Developed Tests, or where relevant, on FDA approved analyzers and tests in Theranos' Palo Alto-based CLIA-certified Laboratory. Ms. Holmes provided that, accordingly, in September 2013, Theranos intended to begin processing micro-samples and traditional phlebotomy draws collected by trained and certified phlebotomists qualified under the appropriate state laws and employed by Theranos in its CLIA-certified laboratory.

On September 5, 2013, Theranos submitted formal Informational Meeting Request Q131148 and referenced that it would be additionally filing a formal request for a Pre-Submission Meeting. On September 13, 2013, John Hobson, on behalf of the FDA, confirmed that (i) administrative review of Theranos' submission requesting FDA feedback was complete and (ii) its submission included sufficient information to enable feedback in the manner requested. Mr. Hobson was referenced as the lead reviewer assigned to Informational Meeting Request Q131148.

In Informational Meeting Request Q131148, Theranos provided that it would be configuring its devices to collect video of the inside of the devices and would be following with the pre-submission for the initial influenza NAA and ELISA assays. Ms. Holmes followed with an email to Sally Hojvat and John Hobson indicating availability of the video for viewing at their convenience. Informational Meeting Request Q131148 also confirmed Theranos' plans as previously conveyed to the FDA in the prior meetings, and further described its plans for collecting micro-samples and branding Patient Service Centers or Collection Sites as Theranos Wellness Centers. Informational Meeting Request Q131148 referenced the launch of Theranos' first Patient Service Center inside a Walgreens pharmacy store and its plans for opening 1-3 locations in Palo Alto, including one at Theranos' headquarters, in the month of September.

On November 4, 2013, Elizabeth Holmes (Theranos' CEO), Sunny Balwani (Theranos' President and COO) and legal counsel for Theranos attended the Informational Meeting (Q131148) with

120

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    TS-0536233

FDA and two representatives of CMS. On November 21, 2013, Theranos submitted draft minutes to FDA from that meeting for review.

On November 4, 2013, Elizabeth Holmes (Theranos' CEO) and Sunny Balwani (Theranos' President and COO) and others from Theranos attended a Pre-Submission Meeting (Q131191) to obtain feedback from FDA on 510(k) submission(s) for the TSPU, the associated software for analysis, the TLAS, and its influenza NAA and ELISA assays. On November 18, 2013, Theranos submitted draft minutes of that Pre-Submission Meeting to FDA for review. FDA confirmed that these minutes are final.

On November 30, 2013, Theranos submitted a Pre-Submission Meeting Request (Q131542) for Viral Versus Bacterial TNAA Assays and Cytometry Assays. This meeting has not yet been scheduled.

121

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

**Specific Questions**

1. As discussed in our prior Pre-Submissions (Q131199 and Q131542), one of our primary objectives is to prepare ongoing 510(k) submissions for Laboratory Developed Tests (LDTs) that we develop or have developed which operate on our TSPU, TLAS system. We would like to get the FDA's advice as to whether the data we have already generated relating to these LDTs in our development, validation, and various Theranos clinical programs (representative data for the Lower Respiratory TNAA assays included in Appendix B) would likely be sufficient for successful 510(k) submissions.

2. We would like to get FDA's guidance as to whether analytical and pre-clinical data will be adequate to support a successful 510(k) submission for the Theranos General Chemistry assays without additional clinical trial of prospective or retrospective clinical samples given that the predicate test system (the Advia 1800) and the corresponding cleared assays did not require such clinical data according to the published Decision Summaries.

3. We would like to get FDA's guidance as to whether the proposed study in the "*Clinical Performance and Study Design Elements*" Section of this Pre-Submission adequately addresses the Intended Use objectives for the Lower Respiratory TNAA assays and FDA's requirements for successful and expeditious 510(k) clearance.

4. As pointed out in the section on the anticipated predicate device for the TNAA assays, the Theranos System, including the TSPU and TLAS, will have been cleared for running the influenza TNAA assays pursuant to the 510(k) submission corresponding to the Pre-Submission Q131199 and Theranos plans to use that Theranos System as the predicate for the Lower Respiratory Assays with the Theranos in-house PCR tests as comparators. We would like to confirm with FDA that this is the best approach for obtaining 510(k) clearance of the Theranos Lower Respiratory TNAA assays included in this Pre-Submission.

5. We anticipate that there will low prevalence for some of the Lower Respiratory pathogens for the TNAA assays in the prospective clinical study and are considering two options to supplement low prospective samples: 1) retrospective samples (as noted in the study plan) and 2) synthetic samples. We would like FDA's feedback on these two approaches.

6. We anticipate that for at least one of the Lower Respiratory pathogens for the TNAA assays (e.g., Vancomycin-resistant Staphylococcus aureus), there will likely be no prevalence in the prospective clinical study and would like FDA's feedback on the best approach clinical validation of the assay for such pathogens.

7. We've included a detailed description of the TSPU in the proposed application, including all modules of the TSPU, even though not all modules of the TSPU are required for the TNAA and General Chemistry assays described in the application. Is this the proper level of description of the TSPU for our 510(k) submission, or should we not describe modules of the TSPU which are not used in the TNAA and General Chemistry assays?

122

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

8. Does our proposed application content meet FDA's expectations to support an expeditious handling of our final 510(k) submission? For example, Appendix F to the Draft Guidance for Industry and FDA Staff, entitled "Medical Devices: The Pre-Submission Program and Meetings with FDA Staff" sets forth specific recommendations for IVD submissions. We would like the FDA's advice as to whether we are sufficiently addressing these topics.

123

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536236

**Mechanism for Feedback**

Theranos hereby requests an in-person Pre-Submission Meeting to solicit feedback on this Pre-Submission and the associated upcoming filing. Although we met in person with the Division of Microbiology Devices previously, we feel that in-person meeting would still be useful, especially given that the Division of Clinical Chemistry will be reviewing information related to the Theranos system and assays for the first time.

124

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos    TS-0536237

## References

Clinical Laboratory Standards Institute (CLSI), MM3-A2, Molecular Diagnostic Methods for Infectious Diseases; Approved Guideline; Second Edition

CLSI, EP24-A2, Assessment of the Diagnostic Accuracy of Laboratory Tests Using Receiver Operating Characteristic Curves; Approved Guideline; Second Edition

CLSI, EP09-A3E, Method Comparison and Bias Estimation Using Patient Samples; Approved Guideline; Third Edition

CLSI, EP12-A2, User Protocol for Evaluation of Qualitative Test Performance; Approved Guideline; Second Edition

CLSI, I/LA18-A2, Specifications for Immunological Testing for Infectious Diseases; Approved Guideline; Second Edition

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                         TS-0536238

Appendix A -- General Chemistry Assay Details

|   | A | B | C |
|---|---|---|---|
| 1 | **Assay** | **Dilution** | **Sample** |
| 2 | Albumin | 30 | Plasma* |
| 3 | Total Bilirubin | 15 | Plasma |
| 4 | Direct Bilirubin | 15 | Plasma |
| 5 | Calcium | 15 | Plasma |
| 6 | Carbon dioxide | 50 | Plasma |
| 7 | Chloride | 300 | Plasma |
| 8 | Cholesterol (Total) | 30 | Plasma |
| 9 | Creatine Kinase | 15 | Plasma |
| 10 | Creatinine | 3 | Plasma |
| 11 | Glucose | 30 | Plasma |
| 12 | GGT (Gamma Glutamyltranspeptidase) | 15 | Plasma |
| 13 | Total  Iron | 6 | Plasma |
| 14 | LDL-Cholesterol | 30 | Plasma |
| 15 | HDL-Cholesterol | 30 | Plasma |
| 16 | Magnesium | 15 | Plasma |
| 17 | ALP | 30 | Plasma |
| 18 | Phosphorus | 30 | Plasma |
| 19 | Potassium | 15 | Plasma |
| 20 | Total Protein | 30 | Plasma |
| 21 | Sodium | 15 | Plasma |
| 22 | AST | 15 | Plasma |
| 23 | ALT | 15 | Plasma |
| 24 | Triglycerides | 30 | Plasma |
| 25 | Urea Nitrogen | 100 | Plasma |
| 26 | Uric Acid | 30 | Plasma |
| 27 | | | |
| 28 | | | *Sample for the General Chemistry assays is plasma collected by a fingerstick as whole blood (processed in the TSPU into plasma) |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-1

FOIA Confidential Treatment Requested by Theranos                          TS-0536239

Appendix A -- General Chemistry Assay Details

|  | D | E | F |
|---|---|---|---|
| 1 | **Anticoagulant (plasma/whole blood)** | **Diluent** | **Type** |
| 2 | edta | water | endpoint |
| 3 | edta | water | endpoint |
| 4 | edta | water | endpoint |
| 5 | heparin | water | endpoint |
| 6 | heparin | water | kinetic |
| 7 | Heparin | water | endpoint |
| 8 | edta | 0.9% Saline | endpoint |
| 9 | Heparin | water | kinetic |
| 10 | edta | water | kinetic |
| 11 | heparin | water | endpoint |
| 12 | Heparin | water | kinetic |
| 13 | Serum | water | endpoint |
| 14 | edta | 0.9% Saline | endpoint |
| 15 | edta | 0.9% Saline | endpoint |
| 16 | Heparin | water | endpoint |
| 17 | heparin | water | endpoint |
| 18 | heparin | water | Endpoint |
| 19 | heparin | water | endpoint |
| 20 | edta | water | endpoint |
| 21 | Heparin | water | kinetic |
| 22 | Heparin | water | kinetic |
| 23 | edta | water | endpoint |
| 24 | Heparin | water | endpoint |
| 25 | edta | water | endpoint |
| 26 | Heparin | water | endpoint |
| 27 |  |  |  |
| 28 |  |  |  |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-2

FOIA Confidential Treatment Requested by Theranos

TS-0536240

Appendix A -- General Chemistry Assay Details

|  | G | H | I |
|---|---|---|---|
|  | Num_Reagents | Diluted Sample Volume | Reagent 1 Volume |
| 1 | Num_Reagents | Diluted Sample Volume | Reagent 1 Volume |
| 2 | 1 | 10 | 20 |
| 3 | 2 | 15 | 10 |
| 4 | 2 | 15 | 10 |
| 5 | 2 | 10 | 10 |
| 6 | 1 | 10 | 20 |
| 7 | 1 | 10 | 20 |
| 8 | 1 | 10 | 20 |
| 9 | 1 | 15 | 15 |
| 10 | 2 | 10 | 10 |
| 11 | 2 | 10 | 10 |
| 12 | 1 | 15 | 15 |
| 13 | 2 | 10 | 10 |
| 14 | 2 | 10 | 10 |
| 15 | 2 | 10 | 10 |
| 16 | 2 | 10 | 10 |
| 17 | 2 | 10 | 10 |
| 18 | 1 | 10 | 20 |
| 19 | 1 | 15 | 15 |
| 20 | 1 | 10 | 20 |
| 21 | 2 | 10 | 10 |
| 22 | 1 | 15 | 15 |
| 23 | 3 | 7.5 | 7.5 |
| 24 | 2 | 10 | 10 |
| 25 | 2 | 10 | 10 |
| 26 | 2 | 10 | 10 |
| 27 |  |  |  |
| 28 |  |  |  |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-3

FOIA Confidential Treatment Requested by Theranos                    TS-0536241

ER-14087

Appendix A -- General Chemistry Assay Details

| | J | K | L |
|---|---|---|---|
| | **Reagent 1 Mix** | **Reagent 2 Volume** | **Reagent 2 Mix** |
| 1 | **Reagent 1 Mix** | **Reagent 2 Volume** | **Reagent 2 Mix** |
| 2 | yes | NA | |
| 3 | yes | 5 | yes |
| 4 | yes | 5 | yes |
| 5 | yes | 10 | yes |
| 6 | yes | NA | |
| 7 | Yes | NA | |
| 8 | yes | NA | |
| 9 | Yes | NA | |
| 10 | yes | 10 | yes |
| 11 | no | 10 | yes |
| 12 | Yes | N/A | N/A |
| 13 | Yes | 10 | Yes |
| 14 | Yes | 10 | Yes |
| 15 | Yes | 10 | Yes |
| 16 | No | 10 | Yes |
| 17 | No | 10 | Yes |
| 18 | yes | NA | |
| 19 | yes | NA | |
| 20 | yes | NA | |
| 21 | no | 10 | yes |
| 22 | Yes | NA | |
| 23 | Yes | 7.5 | Yes |
| 24 | no | 10 | yes |
| 25 | No | 10 | Yes |
| 26 | no | 10 | yes |
| 27 | | | |
| 28 | | | |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-4

FOIA Confidential Treatment Requested by Theranos

TS-0536242

Appendix A -- General Chemistry Assay Details

|  | M | N | O |
|---|---|---|---|
| 1 | **Reagent 3 Volume** | **Reagent 3 Mix** | **Incubation 1** |
| 2 | NA |  | 10 |
| 3 | NA |  | 0 |
| 4 | NA |  | 0 |
| 5 | NA |  | 0 |
| 6 | NA |  | 0 |
| 7 | NA |  | 10 |
| 8 | NA |  | 10 |
| 9 | NA |  | 0 |
| 10 | NA |  | 5 |
| 11 | NA |  | 0 |
| 12 | N/A |  | 0 |
| 13 | N/A |  | 10 |
| 14 | NA |  | 5 |
| 15 | NA |  | 5 |
| 16 | NA |  | 0 |
| 17 | NA |  | 0 |
| 18 | NA |  | 20 |
| 19 | NA |  | 10 |
| 20 | NA |  | 10 |
| 21 | NA |  | 0 |
| 22 | NA |  | 0 |
| 23 | 7.5 | Yes | 10 |
| 24 | NA |  | 0 |
| 25 | NA |  | 5 |
| 26 | NA |  | 0 |
| 27 |  |  |  |
| 28 |  |  |  |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-5

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0536243

**ER-14089**

Appendix A -- General Chemistry Assay Details

| | P | Q | R |
|---|---|---|---|
| | **Incubation 2** | **Incubation 3** | **Kinetic Detection Interval** |
| 1 | | | |
| 2 | NA | NA | |
| 3 | 5 | NA | |
| 4 | 5 | NA | NA |
| 5 | 5 | NA | |
| 6 | NA | NA | 5 |
| 7 | NA | NA | |
| 8 | NA | NA | |
| 9 | NA | NA | 15 |
| 10 | 0 | NA | 15 |
| 11 | 10 | NA | |
| 12 | NA | NA | 5 |
| 13 | 10 | N/A | N/A |
| 14 | 5 | NA | |
| 15 | 10 | NA | |
| 16 | 1 | NA | |
| 17 | 10 | NA | |
| 18 | NA | NA | |
| 19 | NA | NA | |
| 20 | NA | NA | |
| 21 | 0 | NA | 9 |
| 22 | NA | NA | 10 |
| 23 | 5 | 0 | |
| 24 | 10 | NA | |
| 25 | 5 | NA | |
| 26 | 10 | NA | NA |
| 27 | | | |
| 28 | | | |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-6

FOIA Confidential Treatment Requested by Theranos                    TS-0536244

**ER-14090**

Appendix A -- General Chemistry Assay Details

|   | S | T | U |
|---|---|---|---|
| 1 | **Reagent addition scheme** | **Detector** | **Wavelength** |
| 2 | Add reagents one at a time | Detector 4 | 620 |
| 3 | (reag_1 + reag_2) | Detector 4 | 560 |
| 4 | (reag_1 + reag_2) | Detector 4 | 560 |
| 5 | Add reagents one at a time | Detector 4 | 570 |
| 6 | Add reagents one at a time | Detector 4 | 340 |
| 7 | Add reagents one at a time | Detector 4 | 600 |
| 8 | Add reagents one at a time | Detector 4 | 500-700 |
| 9 | Add reagents one at a time | Detector 4 | 340 |
| 10 | Add reagents one at a time | Detector 4 | 340 |
| 11 | Add reagents one at a time | Detector 4 | 510 |
| 12 | Add reagents one at a time | Detector 4 | 340 |
| 13 | Add reagents one at a time | Detector 4 | 590 |
| 14 | Add reagents one at a time | Detector 4 | 560-700 |
| 15 | Add reagents one at a time | Detector 4 | 560-700 |
| 16 | Add reagents one at a time | Detector 4 | 582 |
| 17 | Add reagents one at a time | Detector 1 | NA |
| 18 | Add reagents one at a time | Detector 4 | 630 |
| 19 | Add reagents one at a time | Detector 4 | 450 |
| 20 | Add reagents one at a time | Detector 4 | 540 |
| 21 | Add reagents one at a time | Detector 4 | 420 |
| 22 | Add reagents one at a time | Detector 4 | 340 |
| 23 | Add reagents one at a time | Detector 4 | 561 |
| 24 | Add reagents one at a time | Detector 4 | 560 |
| 25 | Add reagents one at a time | Detector 4 | 630 |
| 26 | Add reagents one at a time | Detector 4 | 590 |
| 27 | | | |
| 28 | | | |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
A-7

FOIA Confidential Treatment Requested by Theranos

TS-0536245

## Appendix B:  Representative Data for TNAA Assays

### Methicillin-resistant Staphylococcus aureus





B-1
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                          TS-0536246

**ER-14092**

## Appendix B: Representative Data for TNAA Assays





B-2
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

## Appendix B: Representative Data for TNAA Assays



## Staphylococcus aureus



B-3
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                                    TS-0536248

### Appendix B:  Representative Data for TNAA Assays





B-4
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536249

**ER-14095**

**Appendix B: Representative Data for TNAA Assays**



**Klebsiella pneumoniae**



B-5

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536250

## Appendix B: Representative Data for TNAA Assays





B-6
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536251

**ER-14097**

## Appendix B:  Representative Data for TNAA Assays





B-7
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536252

**ER-14098**

**Appendix B: Representative Data for TNAA Assays**



**Klebsiella pneumoniae carbapenemase (KPC)**



B-8
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536253

**ER-14099**

## Appendix B:  Representative Data for TNAA Assays





B-9
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536254

**ER-14100**

## Appendix B: Representative Data for TNAA Assays





B-10
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536255

**ER-14101**

## Appendix B:  Representative Data for TNAA Assays

### Haemophilus influenza (ampic S)





B-11
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536256

**ER-14102**

## Appendix B: Representative Data for TNAA Assays





B-12
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0536257

## Appendix B: Representative Data for TNAA Assays

### Moraxella catarrhalis





B-13

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos
TS-0536258

**Appendix B: Representative Data for TNAA Assays**





B-14
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536259

## Appendix B: Representative Data for TNAA Assays

### Haemophilus parainfluenza





B-15
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536260

**ER-14106**

## Appendix B: Representative Data for TNAA Assays





B-16
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

### Appendix B: Representative Data for TNAA Assays

**Enterobacter cloacae**





B-17
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536262

**ER-14108**

**Appendix B: Representative Data for TNAA Assays**





B-18
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos    TS-0536263

## Appendix B: Representative Data for TNAA Assays



B-19
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536264

**ER-14110**

## Appendix B:  Representative Data for TNAA Assays

**Enterobacter aerogenes**





B-20
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0536265

**ER-14111**

## Appendix B: Representative Data for TNAA Assays





B-21
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

**ER-14112**

## Appendix B: Representative Data for TNAA Assays



**Serratia marcescens**



B-22
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                            TS-0536267

### Appendix B: Representative Data for TNAA Assays





B-23
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536268

**ER-14114**

### Appendix B: Representative Data for TNAA Assays





B-24
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536269

**ER-14115**

## Appendix B: Representative Data for TNAA Assays

### Acinetobacter baumannii





B-25
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

## Appendix B: Representative Data for TNAA Assays





B-26
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0536271

## Appendix B: Representative Data for TNAA Assays

### Legionella pneumophila





B-27
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536272

**ER-14118**

## Appendix B: Representative Data for TNAA Assays





B-28
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0536273

**ER-14119**

## Appendix B:  Representative Data for TNAA Assays



TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0536274

**ER-14120**

### Appendix B: Representative Data for TNAA Assays

### Mycobacterium abcessus





B-30
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

TS-0536275

## Appendix B: Representative Data for TNAA Assays





B-31
TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM
DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

**ER-14122**

**DX 07471**

---

Message

---

**From**: Jhaveri, Nimesh [nimesh.jhaveri@walgreens.com]
**Sent**: 9/6/2014 1:46:35 AM
**To**: Elizabeth Holmes [eholmes@theranos.com]
**Subject**: Fwd: Disruptive Women to Watch

Hello Elizabeth -

Hope this email finds you well. We have not spoken in a while - as you know we are making great progress in our partnership. Just wanted to congratulate you on all of your success and the honor of being on the list for Disruptive Women to Watch.

Congratulations and hope to catch up soon.

Be Well,
Nimesh

Nimesh S. Jhaveri, RPh., MBA
Divisional Vice-President
Walgreens
200 Wilmot Road MS #2102
Deerfield, IL 60015
p: 847.315.5317
m:

Every day I help people **get, stay** and **live** well.

This email message, including attachments, may contain information that is proprietary, confidential, privileged and/or exempt from disclosure. Please hold it in confidence to protect privilege and confidentiality. If you are not the intended recipient, then please notify the sender and delete this message. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is prohibited and may constitute a violation of the Electronic Communications Privacy Act. Unintended transmission does not create an attorney-client relationship or constitute a waiver of any legal privilege.

Begin forwarded message:

**From:** Robin Strongin [mailto:RStrongin@amplifypublicaffairs.net]
**Sent:** Wednesday, September 03, 2014 10:40 AM
**To:** Rohn, Lydia
**Subject:** Disruptive Women to Watch

Confidential                                     THPFM0000884807

**ER-14123**

 <!--[if !vml]--><!--[endif]-->

**For Immediate Release**

**Contact:** Robin Strongin 202.263.2917
rstrongin@amplifypublicaffairs.net

**Ginsburg, Lane Fox Headline "Disruptive Women to Watch" List**

***Disruptive Women in Health Care Announces Selection of 15 Women***
***Sure to Have Significant Impact on Health and Wellness in 2015***

WASHINGTON, D.C. – *Disruptive Women in Health Care*, an award-winning digital platform spotlighting women whose achievements and provocative ideas are advancing health care progress, today announced its annual "Disruptive Women to Watch" list for 2015, a roster that includes U.S. Supreme Court Justice Ruth Bader Ginsburg, television personality and activist Maria Shriver and Baroness Martha Lane Fox, tech entrepreneur and Member, House of Lords, in addition to a dozen other remarkable women.

"This year's selections truly reflect the profound changes taking place in and around health care," said *Disruptive Women* founder Robin Strongin. "Traditionally, we have spotlighted women who have broken new ground in health practice, research, technology or entrepreneurship. The fact is, though, that 21st century health care is shaped, as well, by developments in the legal, environmental and financial spheres, and this year's selections reflect this evolution in health and wellness."

Strongin said the Disruptive Women to Watch for 2015 are "game changers in their respective fields. They aren't simply successful in their professions. They're changing the way we understand and think about our own well-being and what to expect from our health care system." In short, said Strongin, "It is their collective wisdom, guts, and estrogen that will drive the changes we so desperately need."

The honorees will be formally recognized at a gala reception at the Gaylord Conference Center at National Harbor on Tuesday, December 9 as part of this year's mHealth Summit.

The 15 Disruptive Women to Watch for 2015 are:

• Amy Berman, Senior Program Officer for the Hartford Foundation and author of "Living Life in My Own Way – and Dying That Way as Well"

• Molly Joel Coye, MD, MPH, Chief Innovation Officer of UCLA Health

• Susan Dentzer, Senior Health Policy Advisor for the Robert Wood Johnson Foundation

• Bettina Experton, MD, MPH, President and CEO of Humetrix, a company developing consumer-centered health information technology mobile applications

• Baroness Martha Lane Fox of SoHo, Member of the House of Lords and successful entrepreneur

• Honorable Ruth Bader Ginsburg, Supreme Court Justice

Confidential

THPFM0000884808

- Elizabeth Holmes, Founder, Chairman and CEO of Theranos, a company developing new patient-centered approaches to clinical laboratory testing

- Desert Horse-Grant, Director of Strategic Planning and Operations for Solid Tumor Transactional Research, Fred Hutchinson Cancer Center

- Lisa Jackson, Vice President of Environmental Initiatives for Apple and former Administrator of the Environmental Protection Agency

- Kym Martin, MBA, CNC, CFT Co-Chair, Patient Experience Council, an organization offering guidance to the healthcare industry on how to improve the consumer experience for patients and caregivers

- Marie Michnich, DrPH, Director of Health Policy Education Program and Fellowships, Institute of Medicine

- Maria Shriver, Peabody- and Emmy-winning journalist, producer of *The Shriver Report,* and an activist for individuals and families struggling with Alzheimer's Disease

- Lisa Suennen, Health Tech Investor; Author "Tech Tonics"

- Madeleine Will, MA, Former Chairperson, President's Committee for People with Intellectual Disabilities and Director of the National Down Syndrome Society National Policy Center

- Alicia Wilson, Executive Director, La Clinica Del Pueblo, a nonprofit health center serving Latino and immigrant populations in the Washington, D.C. area.

For More Information about **15 Disruptive Women to Watch in 2015**, please visit:
http://www.disruptivewomen.net/15-disruptive-women-to-watch-in-2015/

**About Disruptive Women in Health Care**
Disruptive Women in Health Care's mission is "to serve as a platform for provocative ideas, thoughts, and solutions in the health sphere." Now in its fifth year, it has not only achieved its stated mission, but exceeded it. Disruptive Women has become an online destination for innovative thinking and has become a thought leader and influencer in its own right, receiving numerous awards and accolades. To learn more about Disruptive Women in Health Care, please visit: www.disruptivewomen.net.

###

<!--[if !vml]--><!--[endif]-->



LEGAL NOTICE : DISCLAIMERS All contents of the Disruptive Women in Health Care site are for informational purposes only. This content is based on professional insights, published experience, and expert opinion, but is not intended to be a substitute for professional medical advice, diagnosis, or treatment. If you think you may have a medical emergency, call your doctor or 911 immediately. Disruptive Women in Health Care and Amplify Public Affairs do not recommend or endorse any specific tests,

THPFM0000884809

physicians, products, procedures, opinions, or other information that may be mentioned on the site. Reliance on any information provided by Disruptive Women in Health Care bloggers and contributors, Amplify Public Affairs employees, others appearing on the site at the invitation of Disruptive Women in Health Care or Amplify Public Affairs, or other visitors to the site is solely at your own risk. Any reference to a commercial or non-commercial product, process, service or company is not an endorsement or recommendation by Disruptive Women in Health Care or Amplify Public Affairs. Disruptive Women in Health Care and Amplify Public Affairs do not endorse or recommend products, services, or manufacturers. Disruptive Women in Health Care and Amplify Public Affairs assume no liability whatsoever for the use or contents of any product or service mentioned

COPYRIGHT INFORMATION All information on this site is the property of Disruptive Women in Health Care and Amplify Public Affairs, LLC. All rights reserved

**Click here to unsubscribe.**



nonprofit software

Confidential

THPFM0000884810

DX 07490

Message

| | |
|---|---|
| From: | Sunny Balwani [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SBALWANI] |
| Sent: | 10/27/2014 10:28:14 PM |
| To: | Adam Rosendorff [/o=theranos organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=adam rosendorfd92] |
| CC: | Elizabeth Holmes [/o=theranos organization/ou=first administrative group/cn=recipients/cn=eholmes] |
| Subject: | RE: Critical ISEs |

no one briefed me on this so I am following up with Tina, Nishit, Daniel etc on this. will respond tomorrow.

**From:** Adam Rosendorff
**Sent:** Monday, October 27, 2014 3:28 PM
**To:** Sunny Balwani
**Cc:** Elizabeth Holmes
**Subject:** RE: Critical ISEs

We had a meeting with Tina, Nishit and the CLIA leadership about 6 weeks ago to come up with a consistent practice.

**From:** Sunny Balwani
**Sent:** Monday, October 27, 2014 3:27 PM
**To:** Adam Rosendorff
**Cc:** Elizabeth Holmes
**Subject:** RE: Critical ISEs

let me touch base with team on this one and will get back to you.

when did we start this policy?

**From:** Adam Rosendorff
**Sent:** Monday, October 27, 2014 3:20 PM
**To:** Sunny Balwani
**Cc:** Elizabeth Holmes
**Subject:** FW: Critical ISEs

Hi

I wanted to bring this important issue to your attention. Right now, after much cooperative discussion between CLIA and R&D and thought, if the CTN sodium is below 120mM or above 160mM we end up voiding the result, because we have no way of knowing for sure whether the result is truly abnormal or artifactual to the assay, or related to a specimen integrity issue.

Confidential

THPFM0002133315

Unfortunately, there are 2 conditions: Diabetes Insipidus and SIADH, where patients can live quite happily with a "Critical" sodium of <120mM or >160mM.

The patient below has diabetes insipidus which normally results in high sodium, but is probably being treated with DDAVP, which lowers the sodium. Therefore accurate measurement of sodium is important for this patient. I am not sure of the clinical value of a sodium assay, in which the only time we can report it is when it is *not critical*, and the very situations that require accurate measurement and reporting of abnormal of sodium results are voided. All of us in CLIA share the same concerns. How is the 4S Sodium doing? Maybe we can use the 4S for ISEs?

Thanks,

Adam

**From:** Anam Khan
**Sent:** Monday, October 27, 2014 3:08 PM
**To:** Adam Rosendorff
**Subject:** Critical ISEs

Hi Adam,

█████████ physician called today asking why ISEs weren't included on her final report. Only Comp was ordered, but ISEs were voided, so I explained that the patient would need to come back in to be redrawn. The lady I spoke to mentioned that they really needed the Sodium result because the patient had low Sodium levels and that's what they were checking. I noticed the Sodium results were critical low so I assume that's why we voided it. Is it possible that that was the true value? If she comes in again and the value is still critical low, will it just be voided again?

Thanks,

Anam

Confidential

THPFM0002133316



from the clinic or center and the conditions for release of information.

(3) The patient's written consent is required for release of information not authorized to be released without such consent.

(c) *Retention of records.* The records are retained for at least 6 years from date of last entry, and longer if required by State statute.

(Secs. 1102, 1833 and 1902(a)(13), Social Security Act; 49 Stat. 647, 91 Stat. 1485 (42 U.S.C. 1302, 1395l and 1396a(a)(13)))

[43 FR 30529, July 14, 1978. Redesignated at 50 FR 33034, Aug. 16, 1985, as amended at 57 FR 24981, June 12, 1992]

### § 491.11  Program evaluation.

(a) The clinic or center carries out, or arranges for, an annual evaluation of its total program.

(b) The evaluation includes review of:

(1) The utilization of clinic or center services, including at least the number of patients served and the volume of services;

(2) A representative sample of both active and closed clinical records; and

(3) The clinic's or center's health care policies.

(c) The purpose of the evaluation is to determine whether:

(1) The utilization of services was appropriate;

(2) The established policies were followed; and

(3) Any changes are needed.

(d) The clinic or center staff considers the findings of the evaluation and takes corrective action if necessary.

[71 FR 55346, Sept. 22, 2006]

## PART 493—LABORATORY REQUIREMENTS

### Subpart A—General Provisions

Sec.
493.1   Basis and scope.
493.2   Definitions.
493.3   Applicability.
493.5   Categories of tests by complexity.
493.15  Laboratories performing waived tests.
493.17  Test categorization.
493.19  Provider-performed microscopy (PPM) procedures.
493.20  Laboratories performing tests of moderate complexity.
493.25  Laboratories performing tests of high complexity.

### Subpart B—Certificate of Waiver

493.35  Application for a certificate of waiver.
493.37  Requirements for a certificate of waiver.
493.39  Notification requirements for laboratories issued a certificate of waiver.

### Subpart C—Registration Certificate, Certificate for Provider-performed Microscopy Procedures, and Certificate of Compliance

493.43  Application for registration certificate, certificate for provider-performed microscopy (PPM) procedures, and certificate of compliance.
493.45  Requirements for a registration certificate.
493.47  Requirements for a certificate for provider-performed microscopy (PPM) procedures.
493.49  Requirements for a certificate of compliance.
493.51  Notification requirements for laboratories issued a certificate of compliance.
493.53  Notification requirements for laboratories issued a certificate for provider-performed microscopy (PPM) procedures.

### Subpart D—Certificate of Accreditation

493.55  Application for registration certificate and certificate of accreditation.
493.57  Requirements for a registration certificate.
493.61  Requirements for a certificate of accreditation.
493.63  Notification requirements for laboratories issued a certificate of accreditation.

### Subpart E—Accreditation by a Private, Nonprofit Accreditation Organization or Exemption Under an Approved State Laboratory Program

493.551  General requirements for laboratories.
493.553  Approval process (application and reapplication) for accreditation organizations and State licensure programs.
493.555  Federal review of laboratory requirements.
493.557  Additional submission requirements.
493.559  Publication of approval of deeming authority or CLIA exemption.
493.561  Denial of application or reapplication.
493.563  Validation inspections—Basis and focus.
493.565  Selection for validation inspection—laboratory responsibilities.

HOLMES000700

493.567 Refusal to cooperate with validation inspection.
493.569 Consequences of a finding of non-compliance as a result of a validation inspection.
493.571 Disclosure of accreditation, State and CMS validation inspection results.
493.573 Continuing Federal oversight of private nonprofit accreditation organizations and approved State licensure programs.
493.575 Removal of deeming authority or CLIA exemption and final determination review.

Subpart F—General Administration

493.602 Scope of subpart.
493.606 Applicability of subpart.
493.638 Certificate fees.
493.639 Fee for revised certificate.
493.643 Fee for determination of program compliance.
493.645 Additional fee(s) applicable to approved State laboratory programs and laboratories issued a certificate of accreditation, certificate of waiver, or certificate for PPM procedures.
493.646 Payment of fees.
493.649 Methodology for determining fee amount.

Subpart G [Reserved]

Subpart H—Participation in Proficiency Testing for Laboratories Performing Nonwaived Testing

493.801 Condition: Enrollment and testing of samples.
493.803 Condition: Successful participation.
493.807 Condition: Reinstatement of laboratories performing nonwaived testing.

PROFICIENCY TESTING BY SPECIALTY AND SUBSPECIALTY FOR LABORATORIES PERFORMING TESTS OF MODERATE COMPLEXITY (INCLUDING THE SUBCATEGORY), HIGH COMPLEXITY, OR ANY COMBINATION OF THESE TESTS

493.821 Condition: Microbiology.
493.823 Standard; Bacteriology.
493.825 Standard; Mycobacteriology.
493.827 Standard; Mycology.
493.829 Standard; Parasitology.
493.831 Standard; Virology.
493.833 Condition: Diagnostic immunology.
493.835 Standard; Syphilis serology.
493.837 Standard; General immunology.
493.839 Condition: Chemistry.
493.841 Standard; Routine chemistry.
493.843 Standard; Endocrinology.
493.845 Standard; Toxicology.
493.849 Condition: Hematology.
493.851 Standard; Hematology.
493.853 Condition: Pathology.
493.855 Standard; Cytology: gynecologic examinations.

493.857 Condition: Immunohematology.
493.859 Standard; ABO group and D (Rho) typing.
493.861 Standard; Unexpected antibody detection.
493.863 Standard; Compatibility testing.
493.865 Standard; Antibody identification.

Subpart I—Proficiency Testing Programs for Nonwaived Testing

493.901 Approval of proficiency testing programs.
493.903 Administrative responsibilities.
493.905 Nonapproved proficiency testing programs.

PROFICIENCY TESTING PROGRAMS BY SPECIALTY AND SUBSPECIALTY

493.909 Microbiology.
493.911 Bacteriology.
493.913 Mycobacteriology.
493.915 Mycology.
493.917 Parasitology.
493.919 Virology.
493.921 Diagnostic immunology.
493.923 Syphilis serology.
493.927 General immunology.
493.929 Chemistry.
493.931 Routine chemistry.
493.933 Endocrinology.
493.937 Toxicology.
493.941 Hematology (including routine hematology and coagulation).
493.945 Cytology; gynecologic examinations.
493.959 Immunohematology.

Subpart J—Facility Administration for Nonwaived Testing

493.1100 Condition: Facility administration.
493.1101 Standard: Facilities.
493.1103 Standard: Requirements for transfusion services.
493.1105 Standard: Retention requirements.

Subpart K—Quality System for Nonwaived Testing

493.1200 Introduction.
493.1201 Condition: Bacteriology.
493.1202 Condition: Mycobacteriology.
493.1203 Condition: Mycology.
493.1204 Condition: Parasitology.
493.1205 Condition: Virology.
493.1207 Condition: Syphilis serology.
493.1208 Condition: General immunology.
493.1210 Condition: Routine chemistry.
493.1211 Condition: Urinalysis.
493.1212 Condition: Endocrinology.
493.1213 Condition: Toxicology.
493.1215 Condition: Hematology.
493.1217 Condition: Immunohematology.
493.1219 Condition: Histopathology.
493.1220 Condition: Oral pathology.
493.1221 Condition: Cytology.
493.1225 Condition: Clinical cytogenetics.

HOLMES000701

**Centers for Medicare & Medicaid Services, HHS**      **Pt. 493**

493.1226 Condition: Radiobioassay.
493.1227 Condition: Histocompatibility.

GENERAL LABORATORY SYSTEMS

493.1230 Condition: General laboratory systems.
493.1231 Standard: Confidentiality of patient information.
493.1232 Standard: Specimen identification and integrity.
493.1233 Standard: Complaint investigations.
493.1234 Standard: Communications.
493.1235 Standard: Personnel competency assessment policies.
493.1236 Standard: Evaluation of proficiency testing performance.
493.1239 Standard: General laboratory systems quality assessment.

PREANALYTIC SYSTEMS

493.1240 Condition: Preanalytic systems.
493.1241 Standard: Test request.
493.1242 Standard: Specimen submission, handling, and referral.
493.1249 Standard: Preanalytic systems quality assessment.

ANALYTIC SYSTEMS

493.1250 Condition: Analytic systems.
493.1251 Standard: Procedure manual.
493.1252 Standard: Test systems, equipment, instruments, reagents, materials, and supplies.
493.1253 Standard: Establishment and verification of performance specifications.
493.1254 Standard: Maintenance and function checks.
493.1255 Standard: Calibration and calibration verification procedures.
493.1256 Standard: Control procedures.
493.1261 Standard: Bacteriology.
493.1262 Standard: Mycobacteriology.
493.1263 Standard: Mycology.
493.1264 Standard: Parasitology.
493.1265 Standard: Virology.
493.1267 Standard: Routine chemistry.
493.1269 Standard: Hematology.
493.1271 Standard: Immunohematology.
493.1273 Standard: Histopathology.
493.1274 Standard: Cytology.
493.1276 Standard: Clinical cytogenetics.
493.1278 Standard: Histocompatibility.
493.1281 Standard: Comparison of test results.
493.1282 Standard: Corrective actions.
493.1283 Standard: Test records.
493.1289 Standard: Analytic systems quality assessment.

POSTANALYTIC SYSTEMS

493.1290 Condition: Postanalytic systems.
493.1291 Standard: Test report.
493.1299 Standard: Postanalytic systems quality assessment.

Subpart L [Reserved]

Subpart M—Personnel for Nonwaived Testing

493.1351 General.

LABORATORIES PERFORMING PROVIDER-PERFORMED MICROSCOPY (PPM) PROCEDURES

493.1353 Scope.
493.1355 Condition: Laboratories performing PPM procedures; laboratory director.
493.1357 Standard; laboratory director qualifications.
493.1359 Standard; PPM laboratory director responsibilities.
493.1361 Condition: Laboratories performing PPM procedures; testing personnel.
493.1363 Standard; PPM testing personnel qualifications.
493.1365 Standard; PPM testing personnel responsibilities.

LABORATORIES PERFORMING MODERATE COMPLEXITY TESTING

493.1403 Condition: Laboratories performing moderate complexity testing; laboratory director.
493.1405 Standard; Laboratory director qualifications.
493.1406 Standard; Laboratory director qualifications on or before February 28, 1992.
493.1407 Standard; Laboratory director responsibilities.
493.1409 Condition: Laboratories performing moderate complexity testing; technical consultant.
493.1411 Standard; Technical consultant qualifications.
493.1413 Standard; Technical consultant responsibilities.
493.1415 Condition: Laboratories performing moderate complexity testing; clinical consultant.
493.1417 Standard; Clinical consultant qualifications.
493.1419 Standard; Clinical consultant responsibilities.
493.1421 Condition: Laboratories performing moderate complexity testing; testing personnel.
493.1423 Standard; Testing personnel qualifications.
493.1425 Standard; Testing personnel responsibilities.

LABORATORIES PERFORMING HIGH COMPLEXITY TESTING

493.1441 Condition: Laboratories performing high complexity testing; laboratory director.
493.1443 Standard; Laboratory director qualifications.
493.1445 Standard; Laboratory director responsibilities.

547

HOLMES000702

493.1447  Condition: Laboratories performing high complexity testing; technical supervisor.
493.1449  Standard: Technical supervisor qualifications.
493.1451  Standard: Technical supervisor responsibilities.
493.1453  Condition: Laboratories performing high complexity testing; clinical consultant.
493.1455  Standard: Clinical consultant qualifications.
493.1457  Standard: Clinical consultant responsibilities.
493.1459  Condition: Laboratories performing high complexity testing; general supervisor.
493.1461  Standard: General supervisor qualifications.
493.1462  General supervisor qualifications on or before February 28, 1992.
493.1463  Standard: General supervisor responsibilities.
493.1467  Condition: Laboratories performing high complexity testing; cytology general supervisor.
493.1469  Standard: Cytology general supervisor qualifications.
493.1471  Standard: Cytology general supervisor responsibilities.
493.1481  Condition: Laboratories performing high complexity testing; cytotechnologist.
493.1483  Standard: Cytotechnologist qualifications.
493.1485  Standard: Cytotechnologist responsibilities.
493.1487  Condition: Laboratories performing high complexity testing; testing personnel.
493.1489  Standard: Testing personnel qualifications.
493.1491  Technologist qualifications on or before February 28, 1992.
493.1495  Standard: Testing personnel responsibilities.

**Subparts N–P [Reserved]**

**Subpart Q—Inspection**

493.1771  Condition: Inspection requirements applicable to all CLIA-certified and CLIA-exempt laboratories.
493.1773  Standard: Basic inspection requirements for all laboratories issued a CLIA certificate and CLIA-exempt laboratories.
493.1775  Standard: Inspection of laboratories issued a certificate of waiver or a certificate for provider-performed microscopy procedures.
493.1777  Standard: Inspection of laboratories that have requested or have been issued a certificate of compliance.
493.1780  Standard: Inspection of CLIA-exempt laboratories or laboratories requesting or issued a certificate of accreditation.

**Subpart R—Enforcement Procedures**

493.1800  Basis and scope.
493.1804  General considerations.
493.1806  Available sanctions: All laboratories.
493.1807  Additional sanctions: Laboratories that participate in Medicare.
493.1808  Adverse action on any type of CLIA certificate: Effect on Medicare approval.
493.1809  Limitation on Medicaid payment.
493.1810  Imposition and lifting of alternative sanctions.
493.1812  Action when deficiencies pose immediate jeopardy.
493.1814  Action when deficiencies are at the condition level but do not pose immediate jeopardy.
493.1816  Action when deficiencies are not at the condition level.
493.1820  Ensuring timely correction of deficiencies.
493.1826  Suspension of part of Medicare payments.
493.1828  Suspension of all Medicare payments.
493.1832  Directed plan of correction and directed portion of a plan of correction.
493.1834  Civil money penalty.
493.1836  State onsite monitoring.
493.1838  Training and technical assistance for unsuccessful participation in proficiency testing.
493.1840  Suspension, limitation, or revocation of any type of CLIA certificate.
493.1842  Cancellation of Medicare approval.
493.1844  Appeals procedures.
493.1846  Civil action.
493.1850  Laboratory registry.

**Subpart S [Reserved]**

**Subpart T—Consultations**

493.2001  Establishment and function of the Clinical Laboratory Improvement Advisory Committee.

AUTHORITY: Sec. 353 of the Public Health Service Act, secs. 1102, 1861(e), the sentence following sections 1861(s)(11) through 1861(s)(16) of the Social Security Act (42 U.S.C. 263a, 1302, 1395x(e), the sentence following 1395x(s)(11) through 1395x(s)(16)), and the Pub. L. 112-202 amendments to 42 U.S.C. 263a.

SOURCE: 55 FR 9576, Mar. 14, 1990, unless otherwise noted.

## Subpart A—General Provisions

SOURCE: 57 FR 7139, Feb. 28, 1992, unless otherwise noted.

HOLMES000703

**§ 493.1 Basis and scope.**

This part sets forth the conditions that all laboratories must meet to be certified to perform testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA). It implements sections 1861(e) and (j), the sentence following section 1861(s)(13), and 1902(a)(9) of the Social Security Act, and section 353 of the Public Health Service Act, as amended by section 2 of the Taking Essential Steps for Testing Act of 2012. This part applies to all laboratories as defined under "laboratory" in §493.2 of this part. This part also applies to laboratories seeking payment under the Medicare and Medicaid programs. The requirements are the same for Medicare approval as for CLIA certification.

[57 FR 7139, Feb. 28, 1992, as amended at 79 FR 25480, May 2, 2014]

**§ 493.2 Definitions.**

As used in this part, unless the context indicates otherwise—

*Accredited institution* means a school or program which—

(a) Admits as regular student only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such certificate;

(b) Is legally authorized within the State to provide a program of education beyond secondary education;

(c) Provides an educational program for which it awards a bachelor's degree or provides not less than a 2-year program which is acceptable toward such a degree, or provides an educational program for which it awards a master's or doctoral degree;

(d) Is accredited by a nationally recognized accrediting agency or association.

This definition includes any foreign institution of higher education that HHS or its designee determines meets substantially equivalent requirements.

*Accredited laboratory* means a laboratory that has voluntarily applied for and been accredited by a private, nonprofit accreditation organization approved by CMS in accordance with this part;

*Adverse action* means the imposition of a principal or alternative sanction by CMS.

*ALJ* stands for Administrative Law Judge.

*Alternative sanctions* means sanctions that may be imposed in lieu of or in addition to principal sanctions. The term is synonymous with "intermediate sanctions" as used in section 1846 of the Act.

*Analyte* means a substance or constituent for which the laboratory conducts testing.

*Approved accreditation organization for laboratories* means a private, nonprofit accreditation organization that has formally applied for and received CMS's approval based on the organization's compliance with this part.

*Approved State laboratory program* means a licensure or other regulatory program for laboratories in a State, the requirements of which are imposed under State law, and the State laboratory program has received CMS approval based on the State's compliance with this part.

*Authorized person* means an individual authorized under State law to order tests or receive test results, or both.

*Calibration* means a process of testing and adjusting an instrument or test system to establish a correlation between the measurement response and the concentration or amount of the substance that is being measured by the test procedure.

*Calibration verification* means the assaying of materials of known concentration in the same manner as patient samples to substantiate the instrument or test system's calibration throughout the reportable range for patient test results.

*Challenge* means, for quantitative tests, an assessment of the amount of substance or analyte present or measured in a sample. For qualitative tests, a challenge means the determination of the presence or the absence of an analyte, organism, or substance in a sample.

*CLIA* means the Clinical Laboratory Improvement Amendments of 1988.

*CLIA certificate* means any of the following types of certificates issued by CMS or its agent:

549

HOLMES000704

(1) *Certificate of compliance* means a certificate issued to a laboratory after an inspection that finds the laboratory to be in compliance with all applicable condition level requirements, or reissued before the expiration date, pending an appeal, in accordance with § 493.49, when an inspection has found the laboratory to be out of compliance with one or more condition level requirements.

(2) *Certificate for provider-performed microscopy (PPM) procedures* means a certificate issued or reissued before the expiration date, pending an appeal, in accordance with § 493.47, to a laboratory in which a physician, midlevel practitioner or dentist performs no tests other than PPM procedures and, if desired, waived tests listed in § 493.15(c).

(3) *Certificate of accreditation* means a certificate issued on the basis of the laboratory's accreditation by an accreditation organization approved by CMS (indicating that the laboratory is deemed to meet applicable CLIA requirements) or reissued before the expiration date, pending an appeal, in accordance with § 493.61, when a validation or complaint survey has found the laboratory to be noncompliant with one or more CLIA conditions.

(4) *Certificate of registration or registration certificate* means a certificate issued or reissued before the expiration date, pending an appeal, in accordance with § 493.45, that enables the entity to conduct moderate or high complexity laboratory testing or both until the entity is determined to be in compliance through a survey by CMS or its agent; or in accordance with § 493.57 to an entity that is accredited by an approved accreditation organization.

(5) *Certificate of waiver* means a certificate issued or reissued before the expiration date, pending an appeal, in accordance with § 493.37, to a laboratory to perform only the waived tests listed at § 493.15(c).

*CLIA-exempt laboratory* means a laboratory that has been licensed or approved by a State where CMS has determined that the State has enacted laws relating to laboratory requirements that are equal to or more stringent than CLIA requirements and the State licensure program has been approved by CMS in accordance with subpart E of this part.

*Condition level deficiency* means noncompliance with one or more condition level requirements.

*Condition level requirements* means any of the requirements identified as "conditions" in subparts G through Q of this part.

*Confirmatory testing* means testing performed by a second analytical procedure that could be used to substantiate or bring into question the result of an initial laboratory test.

*Credible allegation of compliance* means a statement or documentation that—

(1) Is made by a representative of a laboratory that has a history of having maintained a commitment to compliance and of taking corrective action when required;

(2) Is realistic in terms of its being possible to accomplish the required corrective action between the date of the exit conference and the date of the allegation; and

(3) Indicates that the problem has been resolved.

*Dentist* means a doctor of dental medicine or doctor of dental surgery licensed by the State to practice dentistry within the State in which the laboratory is located.

*Distributive testing* means laboratory testing performed on the same specimen, or an aliquot of it, that requires sharing it between two or more laboratories to obtain all data required to complete an interpretation or calculation necessary to provide a final reportable result for the originally ordered test. When such testing occurs at multiple locations with different CLIA certificates, it is considered distributive testing.

*Equivalency* means that an accreditation organization's or a State laboratory program's requirements, taken as a whole, are equal to or more stringent than the CLIA requirements established by CMS, taken as whole. It is acceptable for an accreditation organization's or State laboratory program's requirements to be organized differently or otherwise vary from the CLIA requirements, as long as (1) all of the requirements taken as a whole

550

HOLMES000705

would provide at least the same protection as the CLIA requirements taken as a whole; and (2) a finding of noncompliance with respect to CLIA requirements taken as a whole would be matched by a finding of noncompliance with the accreditation or State requirements taken as a whole.

*CMS agent* means an entity with which CMS arranges to inspect laboratories and assess laboratory activities against CLIA requirements and may be a State survey agency, a private, nonprofit organization other than an approved accreditation organization, a component of HHS, or any other governmental component CMS approves for this purpose. In those instances where all of the laboratories in a State are exempt from CLIA requirements, based on the approval of a State's exemption request, the State survey agency is not the CMS agent.

*FDA-cleared or approved test system* means a test system cleared or approved by the FDA through the premarket notification (510(k)) or premarket approval (PMA) process for in-vitro diagnostic use. Unless otherwise stated, this includes test systems exempt from FDA premarket clearance or approval.

*HHS* means the Department of Health and Human Services, or its designee.

*Immediate jeopardy* means a situation in which immediate corrective action is necessary because the laboratory's noncompliance with one or more condition level requirements has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health or safety of the general public. This term is synonymous with imminent and serious risk to human health and significant hazard to the public health.

*Intentional violation* means knowing and willful noncompliance with any CLIA condition.

*Kit* means all components of a test that are packaged together.

*Laboratory* means a facility for the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of pro-

viding information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings. These examinations also include procedures to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body. Facilities only collecting or preparing specimens (or both) or only serving as a mailing service and not performing testing are not considered laboratories.

*Midlevel practitioner* means a nurse midwife, nurse practitioner, or physician assistant, licensed by the State within which the individual practices, if such licensing is required in the State in which the laboratory is located.

*Nonwaived test* means any test system, assay, or examination that has not been found to meet the statutory criteria specified at section 353(d)(3) of the Public Health Service Act.

*Operator* means the individual or group of individuals who oversee all facets of the operation of a laboratory and who bear primary responsibility for the safety and reliability of the results of all specimen testing performed in that laboratory. The term includes—

(1) A director of the laboratory if he or she meets the stated criteria; and

(2) The members of the board of directors and the officers of a laboratory that is a small corporation under subchapter S of the Internal Revenue Code.

*Owner* means any person who owns any interest in a laboratory except for an interest in a laboratory whose stock and/or securities are publicly traded. (That is e.g., the purchase of shares of stock or securities on the New York Stock Exchange in a corporation owning a laboratory would not make a person an owner for the purpose of this regulation.)

*Party* means a laboratory affected by any of the enforcement procedures set forth in this subpart, by CMS or the OIG, as appropriate.

*Performance characteristic* means a property of a test that is used to describe its quality, e.g., accuracy, precision, analytical sensitivity, analytical specificity, reportable range, reference range, etc.

551

HOLMES000706

*Performance specification* means a value or range of values for a performance characteristic, established or verified by the laboratory, that is used to describe the quality of patient test results.

*Physician* means an individual with a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine degree who is licensed by the State to practice medicine, osteopathy, or podiatry within the State in which the laboratory is located.

*Principal sanction* means the suspension, limitation, or revocation of any type of CLIA certificate or the cancellation of the laboratory's approval to receive Medicare payment for its services.

*Prospective laboratory* means a laboratory that is operating under a registration certificate or is seeking any of the three other types of CLIA certificates.

*Rate of disparity* means the percentage of sample validation inspections for a specific accreditation organization or State where CMS, the State survey agency or other CMS agent finds noncompliance with one or more condition level requirements but no comparable deficiencies were cited by the accreditation organization or the State, and it is reasonable to conclude that the deficiencies were present at the time of the most recent accreditation organization or State licensure inspection.

*Example:* Assume the State survey agency, CMS or other CMS agent performs 200 sample validation inspections for laboratories accredited by a single accreditation organization or licensed in an exempt State during a validation review period and finds that 60 of the 200 laboratories had one or more condition level requirements out of compliance. CMS reviews the validation and accreditation organization's or State's inspections of the validated laboratories and determines that the State or accreditation organization found comparable deficiencies in 22 of the 60 laboratories and it is reasonable to conclude that deficiencies were present in the remaining 38 laboratories at the time of the accreditation organization's or State's inspection. Thirty-eight divided by 200 equals a 19 percent rate of disparity.

*Referee laboratory* means a laboratory currently in compliance with applicable CLIA requirements, that has had a record of satisfactory proficiency testing performance for all testing events for at least one year for a specific test, analyte, subspecialty, or specialty and has been designated by an HHS approved proficiency testing program as a referee laboratory for analyzing proficiency testing specimens for the purpose of determining the correct response for the specimens in a testing event for that specific test, analyte, subspecialty, or specialty.

*Reference range* means the range of test values expected for a designated population of individuals, e.g., 95 percent of individuals that are presumed to be healthy (or normal).

*Reflex testing* means confirmatory or additional laboratory testing that is automatically requested by a laboratory under its standard operating procedures for patient specimens when the laboratory's findings indicate test results that are abnormal, are outside a predetermined range, or meet other pre-established criteria for additional testing.

*Repeat proficiency testing referral* means a second instance in which a proficiency testing sample, or a portion of a sample, is referred, for any reason, to another laboratory for analysis prior to the laboratory's proficiency testing program event cut-off date within the period of time encompassing the two prior survey cycles (including initial certification, recertification, or the equivalent for laboratories surveyed by an approved accreditation organization).

*Reportable range* means the span of test result values over which the laboratory can establish or verify the accuracy of the instrument or test system measurement response.

*Sample* in proficiency testing means the material contained in a vial, on a slide, or other unit that contains material to be tested by proficiency testing program participants. When possible, samples are of human origin.

*State* includes, for purposes of this part, each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands and a political subdivision of a State where the State, acting pursuant to State law, has expressly delegated powers to the political subdivision sufficient to authorize the political subdivision to

HOLMES000707

**Centers for Medicare & Medicaid Services, HHS**                    **§ 493.2**

act for the State in enforcing requirements equal to or more stringent than CLIA requirements.

*State licensure* means the issuance of a license to, or the approval of, a laboratory by a State laboratory program as meeting standards for licensing or approval established under State law.

*State licensure program* means a State laboratory licensure or approval program.

*State survey agency* means the State health agency or other appropriate State or local agency that has an agreement under section 1864 of the Social Security Act and is used by CMS to perform surveys and inspections.

*Substantial allegation of noncompliance* means a complaint from any of a variety of sources (including complaints submitted in person, by telephone, through written correspondence, or in newspaper or magazine articles) that, if substantiated, would have an impact on the health and safety of the general public or of individuals served by a laboratory and raises doubts as to a laboratory's compliance with any condition level requirement.

*Target value* for quantitative tests means either the mean of all participant responses after removal of outliers (those responses greater than 3 standard deviations from the original mean) or the mean established by definitive or reference methods acceptable for use in the National Reference System for the Clinical Laboratory (NRSCL) by the National Committee for the Clinical Laboratory Standards (NCCLS). In instances where definitive or reference methods are not available or a specific method's results demonstrate bias that is not observed with actual patient specimens, as determined by a defensible scientific protocol, a comparative method or a method group ("peer" group) may be used. If the method group is less than 10 participants, "target value" means the overall mean after outlier removal (as defined above) unless acceptable scientific reasons are available to indicate that such an evaluation is not appropriate.

*Test system* means the instructions and all of the instrumentation, equipment, reagents, and supplies needed to perform an assay or examination and generate test results.

*Unsatisfactory proficiency testing performance* means failure to attain the minimum satisfactory score for an analyte, test, subspecialty, or specialty for a testing event.

*Unsuccessful participation in proficiency testing* means any of the following:

(1) Unsatisfactory performance for the same analyte in two consecutive or two out of three testing events.

(2) Repeated unsatisfactory overall testing event scores for two consecutive or two out of three testing events for the same specialty or subspecialty.

(3) An unsatisfactory testing event score for those subspecialties not graded by analyte (that is, bacteriology, mycobacteriology, virology, parasitology, mycology, blood compatibility, immunohematology, or syphilis serology) for the same subspecialty for two consecutive or two out of three testing events.

(4) Failure of a laboratory performing gynecologic cytology to meet the standard at § 493.855.

*Unsuccessful proficiency testing performance* means a failure to attain the minimum satisfactory score for an analyte, test, subspecialty, or specialty for two consecutive or two of three consecutive testing events.

*Validation review period* means the one year time period during which CMS conducts validation inspections and evaluates the results of the most recent surveys performed by an accreditation organization or State laboratory program.

*Waived test* means a test system, assay, or examination that HHS has determined meets the CLIA statutory criteria as specified for waiver under section 353(d)(3) of the Public Health Service Act.

[57 FR 7139, Feb. 28, 1992, as amended at 57 FR 7236, Feb. 28, 1992; 57 FR 34013, July 31, 1992; 57 FR 35761, Aug. 11, 1992; 58 FR 5220, Jan. 19, 1993; 58 FR 48323, Sept. 15, 1993; 60 FR 20043, Apr. 24, 1995; 63 FR 26732, May 14, 1998; 68 FR 3702, Jan. 24, 2003; 68 FR 50723, Aug. 22, 2003; 79 FR 25480, May 2, 2014; 79 FR 27157, May 12, 2014]

553

HOLMES000708

## §493.3 Applicability.

(a) *Basic rule.* Except as specified in paragraph (b) of this section, a laboratory will be cited as out of compliance with section 353 of the Public Health Service Act unless it—

(1) Has a current, unrevoked or unsuspended certificate of waiver, registration certificate, certificate of compliance, certificate for PPM procedures, or certificate of accreditation issued by HHS applicable to the category of examinations or procedures performed by the laboratory; or

(2) Is CLIA-exempt.

(b) *Exception.* These rules do not apply to components or functions of—

(1) Any facility or component of a facility that only performs testing for forensic purposes;

(2) Research laboratories that test human specimens but do not report patient specific results for the diagnosis, prevention or treatment of any disease or impairment of, or the assessment of the health of individual patients; or

(3) Laboratories certified by the Substance Abuse and Mental Health Services Administration (SAMHSA), in which drug testing is performed which meets SAMHSA guidelines and regulations. However, all other testing conducted by a SAMHSA-certified laboratory is subject to this rule.

(c) *Federal laboratories.* Laboratories under the jurisdiction of an agency of the Federal Government are subject to the rules of this part, except that the Secretary may modify the application of such requirements as appropriate.

[57 FR 7139, Feb. 28, 1992, as amended at 58 FR 5221, Jan. 19, 1993; 60 FR 20043, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003]

## §493.5 Categories of tests by complexity.

(a) Laboratory tests are categorized as one of the following:

(1) Waived tests.

(2) Tests of moderate complexity, including the subcategory of PPM procedures.

(3) Tests of high complexity.

(b) A laboratory may perform only waived tests, only tests of moderate complexity, only PPM procedures, only tests of high complexity or any combination of these tests.

(c) Each laboratory must be either CLIA-exempt or possess one of the following CLIA certificates, as defined in §493.2:

(1) Certificate of registration or registration certificate.

(2) Certificate of waiver.

(3) Certificate for PPM procedures.

(4) Certificate of compliance.

(5) Certificate of accreditation.

[60 FR 20043, Apr. 24, 1995]

## §493.15 Laboratories performing waived tests.

(a) *Requirement.* Tests for certificate of waiver must meet the descriptive criteria specified in paragraph (b) of this section.

(b) *Criteria.* Test systems are simple laboratory examinations and procedures which—

(1) Are cleared by FDA for home use;

(2) Employ methodologies that are so simple and accurate as to render the likelihood of erroneous results negligible; or

(3) Pose no reasonable risk of harm to the patient if the test is performed incorrectly.

(c) *Certificate of waiver tests.* A laboratory may qualify for a certificate of waiver under section 353 of the PHS Act if it restricts the tests that it performs to one or more of the following tests or examinations (or additional tests added to this list as provided under paragraph (d) of this section) and no others:

(1) Dipstick or Tablet Reagent Urinalysis (non-automated) for the following:

(i) Bilirubin;

(ii) Glucose;

(iii) Hemoglobin;

(iv) Ketone;

(v) Leukocytes;

(vi) Nitrite;

(vii) pH;

(viii) Protein;

(ix) Specific gravity; and

(x) Urobilinogen.

(2) Fecal occult blood;

(3) Ovulation tests—visual color comparison tests for human luteinizing hormone;

(4) Urine pregnancy tests—visual color comparison tests;

(5) Erythrocyte sedimentation rate—non-automated;

HOLMES000709

(6) Hemoglobin—copper sulfate—non-automated;

(7) Blood glucose by glucose monitoring devices cleared by the FDA specifically for home use;

(8) Spun microhematocrit; and

(9) Hemoglobin by single analyte instruments with self-contained or component features to perform specimen/reagent interaction, providing direct measurement and readout.

(d) *Revisions to criteria for test categorization and the list of waived tests.* HHS will determine whether a laboratory test meets the criteria listed under paragraph (b) of this section for a waived test. Revisions to the list of waived tests approved by HHS will be published in the FEDERAL REGISTER in a notice with opportunity for comment.

(e) Laboratories eligible for a certificate of waiver must—

(1) Follow manufacturers' instructions for performing the test; and

(2) Meet the requirements in subpart B, Certificate of Waiver, of this part.

[57 FR 7139, Feb. 28, 1992, as amended at 58 FR 5221, Jan. 19, 1993]

§493.17 Test categorization.

(a) *Categorization by criteria.* Notices will be published in the FEDERAL REGISTER which list each specific test system, assay, and examination categorized by complexity. Using the seven criteria specified in this paragraph for categorizing tests of moderate or high complexity, each specific laboratory test system, assay, and examination will be graded for level of complexity by assigning scores of 1, 2, or 3 within each criteria. The score of "1" indicates the lowest level of complexity, and the score of "3" indicates the highest level. These scores will be totaled. Test systems, assays or examinations receiving scores of 12 or less will be categorized as moderate complexity, while those receiving scores above 12 will be categorized as high complexity.

NOTE: A score of "2" will be assigned to a criteria heading when the characteristics for a particular test are intermediate between the descriptions listed for scores of "1" and "3."

(1) *Knowledge*—(i) *Score 1.* (A) Minimal scientific and technical knowledge is required to perform the test; and

(B) Knowledge required to perform the test may be obtained through on-the-job instruction.

(ii) *Score 3.* Specialized scientific and technical knowledge is essential to perform preanalytic, analytic or postanalytic phases of the testing.

(2) *Training and experience*—(i) *Score 1.* (A) Minimal training is required for preanalytic, analytic and postanalytic phases of the testing process; and

(B) Limited experience is required to perform the test.

(ii) *Score 3.* (A) Specialized training is essential to perform the preanalytic, analytic or postanalytic testing process; or

(B) Substantial experience may be necessary for analytic test performance.

(3) *Reagents and materials preparation*—(i) *Score 1.* (A) Reagents and materials are generally stable and reliable; and

(B) Reagents and materials are prepackaged, or premeasured, or require no special handling, precautions or storage conditions.

(ii) *Score 3.* (A) Reagents and materials may be labile and may require special handling to assure reliability; or

(B) Reagents and materials preparation may include manual steps such as gravimetric or volumetric measurements.

(4) *Characteristics of operational steps*—(i) *Score 1.* Operational steps are either automatically executed (such as pipetting, temperature monitoring, or timing of steps), or are easily controlled.

(ii) *Score 3.* Operational steps in the testing process require close monitoring or control, and may require special specimen preparation, precise temperature control or timing of procedural steps, accurate pipetting, or extensive calculations.

(5) *Calibration, quality control, and proficiency testing materials*—(i) *Score 1.* (A) Calibration materials are stable and readily available;

(B) Quality control materials are stable and readily available; and

555

HOLMES000710

(C) External proficiency testing materials, when available, are stable.

(ii) *Score 3.* (A) Calibration materials, if available, may be labile;

(B) Quality control materials may be labile, or not available; or

(C) External proficiency testing materials, if available, may be labile.

(6) *Test system troubleshooting and equipment maintenance*—(i) *Score 1.* (A) Test system troubleshooting is automatic or self-correcting, or clearly described or requires minimal judgment; and

(B) Equipment maintenance is provided by the manufacturer, is seldom needed, or can easily be performed.

(ii) *Score 3.* (A) Troubleshooting is not automatic and requires decision-making and direct intervention to resolve most problems; or

(B) Maintenance requires special knowledge, skills, and abilities.

(7) *Interpretation and judgment*—(i) *Score 1.* (A) Minimal interpretation and judgment are required to perform preanalytic, analytic and postanalytic processes; and

(B) Resolution of problems requires limited independent interpretation and judgment; and

(ii) *Score 3.* (A) Extensive independent interpretation and judgment are required to perform the preanalytic, analytic or postanalytic processes; and

(B) Resolution of problems requires extensive interpretation and judgment.

(b) *Revisions to the criteria for categorization.* The Clinical Laboratory Improvement Advisory Committee, as defined in subpart T of this part, will conduct reviews upon request of HHS and recommend to HHS revisions to the criteria for categorization of tests.

(c) *Process for device/test categorization utilizing the scoring system under § 493.17(a).* (1)(i) For new commercial test systems, assays, or examinations, the manufacturer, as part of its 510(k) and PMA application to FDA, will submit supporting data for device/test categorization. FDA will determine the complexity category, notify the manufacturer directly, and will simultaneously inform both CMS and CDC of the device/test category. FDA will consult with CDC concerning test categorization in the following three situations:

(A) When categorizing previously uncategorized new technology;

(B) When FDA determines it to be necessary in cases involving a request for a change in categorization; and

(C) If a manufacturer requests review of a categorization decision by FDA in accordance with 21 CFR 10.75.

(ii) Test categorization will be effective as of the notification to the applicant.

(2) For test systems, assays, or examinations not commercially available, a laboratory or professional group may submit a written request for categorization to PHS. These requests will be forwarded to CDC for evaluation; CDC will determine complexity category and notify the applicant, CMS, and FDA of the categorization decision. In the case of request for a change of category or for previously uncategorized new technology, PHS will receive the request application and forward it to CDC for categorization.

(3) A request for recategorization will be accepted for review if it is based on new information not previously submitted in a request for categorization or recategorization by the same applicant and will not be considered more frequently than once per year.

(4) If a laboratory test system, assay or examination does not appear on the lists of tests in the FEDERAL REGISTER notices, it is considered to be a test of high complexity until PHS, upon request, reviews the matter and notifies the applicant of its decision. Test categorization is effective as of the notification to the applicant.

(5) PHS will publish revisions periodically to the list of moderate and high complexity tests in the FEDERAL REGISTER in a notice with opportunity for comment.

[57 FR 7139, Feb. 28, 1992, as amended at 58 FR 5222, Jan. 19, 1993]

§ 493.19   Provider-performed microscopy (PPM) procedures.

(a) *Requirement.* To be categorized as a PPM procedure, the procedure must meet the criteria specified in paragraph (b) of this section.

(b) *Criteria.* Procedures must meet the following specifications:

HOLMES000711

Centers for Medicare & Medicaid Services, HHS §493.20

(1) The examination must be personally performed by one of the following practitioners:

(i) A physician during the patient's visit on a specimen obtained from his or her own patient or from a patient of a group medical practice of which the physician is a member or an employee.

(ii) A midlevel practitioner, under the supervision of a physician or in independent practice only if authorized by the State, during the patient's visit on a specimen obtained from his or her own patient or from a patient of a clinic, group medical practice, or other health care provider of which the midlevel practitioner is a member or an employee.

(iii) A dentist during the patient's visit on a specimen obtained from his or her own patient or from a patient of a group dental practice of which the dentist is a member or an employee.

(2) The procedure must be categorized as moderately complex.

(3) The primary instrument for performing the test is the microscope, limited to bright-field or phase-contrast microscopy.

(4) The specimen is labile or delay in performing the test could compromise the accuracy of the test result.

(5) Control materials are not available to monitor the entire testing process.

(6) Limited specimen handling or processing is required.

(c) *Provider-performed microscopy (PPM) examinations.* A laboratory may qualify to perform tests under this section if it restricts PPM examinations to one or more of the following procedures (or additional procedures added to this list as provided under paragraph (d) of this section), waived tests and no others:

(1) All direct wet mount preparations for the presence or absence of bacteria, fungi, parasites, and human cellular elements.

(2) All potassium hydroxide (KOH) preparations.

(3) Pinworm examinations.

(4) Fern tests.

(5) Post-coital direct, qualitative examinations of vaginal or cervical mucous.

(6) Urine sediment examinations.

(7) Nasal smears for granulocytes.

(8) Fecal leukocyte examinations.

(9) Qualitative semen analysis (limited to the presence or absence of sperm and detection of motility).

(d) *Revisions to criteria and the list of PPM procedures.* (1) The CLIAC conducts reviews upon HHS' request and recommends to HHS revisions to the criteria for categorization of procedures.

(2) HHS determines whether a laboratory procedure meets the criteria listed under paragraph (b) of this section for a PPM procedure. Revisions to the list of PPM procedures proposed by HHS are published in the FEDERAL REGISTER as a notice with an opportunity for public comment.

(e) *Laboratory requirements.* Laboratories eligible to perform PPM examinations must—

(1) Meet the applicable requirements in subpart C or subpart D, and subparts F, H, J, K, and M of this part.

(2) Be subject to inspection as specified under subpart Q of this part.

[60 FR 20044, Apr. 24, 1995; 68 FR 50723, Aug. 22, 2003]

§493.20 **Laboratories performing tests of moderate complexity.**

(a) A laboratory may qualify for a certificate to perform tests of moderate complexity provided that it restricts its test performance to waived tests or examinations and one or more tests or examinations meeting criteria for tests of moderate complexity including the subcategory of PPM procedures.

(b) A laboratory that performs tests or examinations of moderate complexity must meet the applicable requirements in subpart C or subpart D, and subparts F, H, J, K, M, and Q of this part. Under a registration certificate or certificate of compliance, laboratories also performing PPM procedures must meet the inspection requirements of §§493.1773 and 493.1777.

(c) If the laboratory also performs waived tests, compliance with subparts H, J, K, and M of this part is not applicable to the waived tests. However, the

557

HOLMES000712

laboratory must comply with the requirements in §§ 493.15(e), 493.1773, and 493.1775.

[60 FR 20004, Apr. 24, 1995, as amended at 68 FR 3702, Jan. 24, 2003; 68 FR 50723, Aug. 22, 2003]

### § 493.25 Laboratories performing tests of high complexity.

(a) A laboratory must obtain a certificate for tests of high complexity if it performs one or more tests that meet the criteria for tests of high complexity as specified in § 493.17(a).

(b) A laboratory performing one or more tests of high complexity must meet the applicable requirements of subpart C or subpart D, and subparts F, H, J, K, M, and Q of this part.

(c) If the laboratory also performs tests of moderate complexity, the applicable requirements of subparts H, J, K, M, and Q of this part must be met. Under a registration certificate or certificate of compliance, PPM procedures must meet the inspection requirements at §§ 493.1773 and 493.1777.

(d) If the laboratory also performs waived tests, the requirements of subparts H, J, K, and M are not applicable to the waived tests. However, the laboratory must comply with the requirements in §§ 493.15(e), 493.1773, and 493.1775.

[57 FR 7139, Feb. 28, 1992, as amended at 60 FR 20004, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003; 68 FR 50723, Aug. 22, 2003]

## Subpart B—Certificate of Waiver

Source: 57 FR 7142, Feb. 28, 1992, unless otherwise noted.

### § 493.35 Application for a certificate of waiver.

(a) *Filing of application.* Except as specified in paragraph (b) of this section, a laboratory performing only one or more waived tests listed in § 493.15 must file a separate application for each laboratory location.

(b) *Exceptions.* (1) Laboratories that are not at a fixed location, that is, laboratories that move from testing site to testing site, such as mobile units providing laboratory testing, health screening fairs, or other temporary testing locations may be covered under the certificate of the designated primary site or home base, using its address.

(2) Not-for-profit or Federal, State, or local government laboratories that engage in limited (not more than a combination of 15 moderately complex or waived tests per certificate) public health testing may file a single application.

(3) Laboratories within a hospital that are located at contiguous buildings on the same campus and under common direction may file a single application or multiple applications for the laboratory sites within the same physical location or street address.

(c) *Application format and contents.* The application must—

(1) Be made to HHS or its designee on a form or forms prescribed by HHS;

(2) Be signed by an owner, or by an authorized representative of the laboratory who attests that the laboratory will be operated in accordance with requirements established by the Secretary under section 353 of the PHS Act; and

(3) Describe the characteristics of the laboratory operation and the examinations and other test procedures performed by the laboratory including—

(i) The name and the total number of test procedures and examinations performed annually (excluding tests the laboratory may run for quality control, quality assurance or proficiency testing purposes;

(ii) The methodologies for each laboratory test procedure or examination performed, or both; and

(iii) The qualifications (educational background, training, and experience) of the personnel directing and supervising the laboratory and performing the laboratory examinations and test procedures.

(d) *Access requirements.* Laboratories that perform one or more waived tests listed in § 493.15(c) and no other tests must meet the following conditions:

(1) Make records available and submit reports to HHS as HHS may reasonably require to determine compliance with this section and § 493.15(e);

(2) Agree to permit announced and unannounced inspections by HHS in accordance with subpart Q of this part under the following circumstances:

HOLMES000713

(i) When HHS has substantive reason to believe that the laboratory is being operated in a manner that constitutes an imminent and serious risk to human health.

(ii) To evaluate complaints from the public.

(iii) On a random basis to determine whether the laboratory is performing tests not listed in §493.15.

(iv) To collect information regarding the appropriateness of waiver of tests listed in §493.15.

(e) *Denial of application.* If HHS determines that the application for a certificate of waiver is to be denied. HHS will—

(1) Provide the laboratory with a written statement of the grounds on which the denial is based and an opportunity for appeal, in accordance with the procedures set forth in subpart R of this part;

(2) Notify a laboratory that has its application for a certificate of waiver denied that it cannot operate as a laboratory under the PHS Act unless the denial is overturned at the conclusion of the administrative appeals process provided by subpart R; and

(3) Notify the laboratory that it is not eligible for payment under the Medicare and Medicaid programs.

[57 FR 7142, Feb. 28, 1992, as amended at 58 FR 5222, Jan. 19, 1993; 60 FR 20044, Apr. 24, 1995]

§493.37  Requirements for a certificate of waiver.

(a) HHS will issue a certificate of waiver to a laboratory only if the laboratory meets the requirements of §493.35.

(b) Laboratories issued a certificate of waiver—

(1) Are subject to the requirements of this subpart and §493.15(e) of subpart A of this part; and

(2) Must permit announced or unannounced inspections by HHS in accordance with subpart Q of this part.

(c) Laboratories must remit the certificate of waiver fee specified in subpart F of this part.

(d) In accordance with subpart R of this part, HHS will suspend or revoke or limit a laboratory's certificate of waiver for failure to comply with the requirements of this subpart. In addi-

tion, failure to meet the requirements of this subpart will result in suspension or denial of payments under Medicare and Medicaid in accordance with subpart R of this part.

(e)(1) A certificate of waiver issued under this subpart is valid for no more than 2 years. In the event of a noncompliance determination resulting in HHS action to revoke, suspend, or limit the laboratory's certificate of waiver, HHS will provide the laboratory with a statement of grounds on which the determination of non-compliance is based and offer an opportunity for appeal as provided in subpart R of this part.

(2) If the laboratory requests a hearing within the time specified by HHS, it retains its certificate of waiver or reissued certificate of waiver until a decision is made by an administrative law judge, as specified in subpart R of this part, except when HHS finds that conditions at the laboratory pose an imminent and serious risk to human health.

(3) For laboratories receiving payment from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory of a non-compliance determination even if there has been no appeals decision issued.

(f) A laboratory seeking to renew its certificate of waiver must—

(1) Complete the renewal application prescribed by HHS and return it to HHS not less than 9 months nor more than 1 year before the expiration of the certificate; and

(2) Meet the requirements of §§493.35 and 493.37.

(g) A laboratory with a certificate of waiver that wishes to perform examinations or tests not listed in the waiver test category must meet the requirements set forth in subpart C or subpart D of this part, as applicable.

[57 FR 7142, Feb. 28, 1992, as amended at 58 FR 5222, Jan. 19, 1993; 60 FR 20045, Apr. 24, 1995]

559

HOLMES000714

§ 493.39                                        42 CFR Ch. IV (10–1–15 Edition)

**§ 493.39 Notification requirements for laboratories issued a certificate of waiver.**

Laboratories performing one or more tests listed in § 493.15 and no others must notify HHS or its designee—

(a) Before performing and reporting results for any test or examination that is not specified under § 493.15 for which the laboratory does not have the appropriate certificate as required in subpart C or subpart D of this part, as applicable; and

(b) Within 30 days of any change(s) in—

(1) Ownership;

(2) Name;

(3) Location; or

(4) Director.

[57 FR 7142, Feb. 28, 1992, as amended at 60 FR 20045, Apr. 24, 1995]

## Subpart C—Registration Certificate, Certificate for Provider-performed Microscopy Procedures, and Certificate of Compliance

SOURCE: 57 FR 7143, Feb. 28, 1992, unless otherwise noted.

**§ 493.43 Application for registration certificate, certificate for provider-performed microscopy (PPM) procedures, and certificate of compliance.**

(a) *Filing of application.* Except as specified in paragraph (b) of this section, all laboratories performing non-waived testing must file a separate application for each laboratory location.

(b) *Exceptions.* (1) Laboratories that are not at a fixed location, that is, laboratories that move from testing site to testing site, such as mobile units providing laboratory testing, health screening fairs, or other temporary testing locations may be covered under the certificate of the designated primary site or home base, using its address.

(2) Not-for-profit or Federal, State, or local government laboratories that engage in limited (not more than a combination of 15 moderately complex or waived tests per certificate) public health testing may file a single application.

(3) Laboratories within a hospital that are located at contiguous buildings on the same campus and under common direction may file a single application or multiple applications for the laboratory sites within the same physical location or street address.

(c) *Application format and contents.* The application must—(1) Be made to HHS or its designee on a form or forms prescribed by HHS;

(2) Be signed by an owner, or by an authorized representative of the laboratory who attests that the laboratory will be operated in accordance with the requirements established by the Secretary under section 353 of the Public Health Service Act; and

(3) Describe the characteristics of the laboratory operation and the examinations and other test procedures performed by the laboratory including—

(i) The name and total number of test procedures and examinations performed annually (excluding waived tests or tests for quality control, quality assurance or proficiency testing purposes);

(ii) The methodologies for each laboratory test procedure or examination performed, or both;

(iii) The qualifications (educational background, training, and experience) of the personnel directing and supervising the laboratory and performing the examinations and test procedures.

(d) *Access and reporting requirements.* All laboratories must make records available and submit reports to HHS as HHS may reasonably require to determine compliance with this section.

[57 FR 7143, Feb. 28, 1992, as amended at 58 FR 5222, Jan. 19, 1993; 58 FR 39155, July 22, 1993; 60 FR 20045, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003]

**§ 493.45 Requirements for a registration certificate.**

Laboratories performing only waived tests, PPM procedures, or any combination of these tests, are not required to obtain a registration certificate.

(a) A registration certificate is required—(1) Initially for all laboratories performing test procedures of moderate complexity (other than the subcategory of PPM procedures) or high complexity, or both; and

560

HOLMES000715

(2) For all laboratories that have been issued a certificate of waiver or certificate for PPM procedures that intend to perform tests of moderate or high complexity, or both, in addition to those tests listed in §493.15(c) or specified as PPM procedures.

(b) HHS will issue a registration certificate if the laboratory—

(1) Complies with the requirements of §493.43;

(2) Agrees to notify HHS or its designee within 30 days of any changes in ownership, name, location, director or technical supervisor (laboratories performing high complexity testing only);

(3) Agrees to treat proficiency testing samples in the same manner as it treats patient specimens; and

(4) Remits the fee for the registration certificate, as specified in subpart F of this part.

(c) Prior to the expiration of the registration certificate, a laboratory must—

(1) Remit the certificate fee specified in subpart F of this part;

(2) Be inspected by HHS as specified in subpart Q of this part; and

(3) Demonstrate compliance with the applicable requirements of this subpart and subparts H, J, K, M, and Q of this part.

(d) In accordance with subpart R of this part, HHS will initiate suspension or revocation of a laboratory's registration certificate and will deny the laboratory's application for a certificate of compliance for failure to comply with the requirements set forth in this subpart. HHS may also impose certain alternative sanctions. In addition, failure to meet the requirements of this subpart will result in suspension of payments under Medicare and Medicaid as specified in subpart R of this part.

(e) A registration certificate is—

(1) Valid for a period of no more than two years or until such time as an inspection to determine program compliance can be conducted, whichever is shorter; and

(2) Not renewable; however, the registration certificate may be reissued if compliance has not been determined by HHS prior to the expiration date of the registration certificate.

(f) In the event of a noncompliance determination resulting in an HHS de-

nial of a laboratory's certificate of compliance application, HHS will provide the laboratory with a statement of grounds on which the noncompliance determination is based and offer an opportunity for appeal as provided in subpart R.

(g) If the laboratory requests a hearing within the time specified by HHS, it retains its registration certificate or reissued registration certificate until a decision is made by an administrative law judge as provided in subpart R of this part, except when HHS finds that conditions at the laboratory pose an imminent and serious risk to human health.

(h) For laboratories receiving payment from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory of denial of the certificate application even if there has been no appeals decision issued.

[57 FR 7143, Feb. 28, 1992, as amended at 58 FR 5233, Jan. 19, 1993; 60 FR 20045, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003]

## §493.47 Requirements for a certificate for provider-performed microscopy (PPM) procedures.

(a) A certificate for PPM procedures is required—

(1) Initially for all laboratories performing test procedures specified as PPM procedures; and

(2) For all certificate of waiver laboratories that intend to perform only test procedures specified as PPM procedures in addition to those tests listed in §493.15(c).

(b) HHS will issue a certificate for PPM procedures if the laboratory—

(1) Complies with the requirements of §493.43; and

(2) Remits the fee for the certificate, as specified in subpart F of this part.

(c) Laboratories issued a certificate for PPM procedures are subject to—

(1) The notification requirements of §493.53;

(2) The applicable requirements of this subpart and subparts H, J, K, and M of this part; and

(3) Inspection only under the circumstances specified under §§493.1773 and 493.1775, but are not routinely inspected to determine compliance with

561

HOLMES000716

the requirements specified in paragraphs (c) (1) and (2) of this section.

(d) In accordance with subpart R of this part, HHS will initiate suspension, limitation, or revocation of a laboratory's certificate for PPM procedures for failure to comply with the applicable requirements set forth in this subpart. HHS may also impose certain alternative sanctions. In addition, failure to meet the requirements of this subpart may result in suspension of all or part of payments under Medicare and Medicaid, as specified in subpart R of this part.

(e) A certificate for PPM procedures is valid for a period of no more than 2 years.

[58 FR 5223, Jan. 19, 1993, as amended at 60 FR 20045, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003; 68 FR 50723, Aug. 22, 2003]

§ 493.49 Requirements for a certificate of compliance.

A certificate of compliance may include any combination of tests categorized as high complexity or moderate complexity or listed in § 493.15(c) as waived tests. Moderate complexity tests may include those specified as PPM procedures.

(a) HHS will issue a certificate of compliance to a laboratory only if the laboratory—

(1) Meets the requirements of §§ 493.43 and 493.45;

(2) Remits the certificate fee specified in subpart F of this part; and

(3) Meets the applicable requirements of this subpart and subparts H, J, K, M, and Q of this part.

(b) Laboratories issued a certificate of compliance—

(1) Are subject to the notification requirements of § 493.51; and

(2) Must permit announced or unannounced inspections by HHS in accordance with subpart Q of this part—

(i) To determine compliance with the applicable requirements of this part;

(ii) To evaluate complaints;

(iii) When HHS has substantive reason to believe that tests are being performed, or the laboratory is being operated in a manner that constitutes an imminent and serious risk to human health; and

(iv) To collect information regarding the appropriateness of tests listed in

§ 493.15 or tests categorized as moderate complexity (including the subcategory) or high complexity.

(c) Failure to comply with the requirements of this subpart will result in—

(1) Suspension, revocation or limitation of a laboratory's certificate of compliance in accordance with subpart R of this part; and

(2) Suspension or denial of payments under Medicare and Medicaid in accordance with subpart R of this part.

(d) A certificate of compliance issued under this subpart is valid for no more than 2 years.

(e) In the event of a noncompliance determination resulting in an HHS action to revoke, suspend or limit the laboratory's certificate of compliance, HHS will—

(1) Provide the laboratory with a statement of grounds on which the determination of noncompliance is based; and

(2) Offer an opportunity for appeal as provided in subpart R of this part. If the laboratory requests a hearing within 60 days of the notice of sanction, it retains its certificate of compliance or reissued certificate of compliance until a decision is made by an administrative law judge (ALJ) as provided in subpart R of this part, except when HHS finds that conditions at the laboratory pose an imminent and serious risk to human health or when the criteria at § 493.1840(a) (4) and (5) are met.

(f) For laboratories receiving payment from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory of a noncompliance determination even if there has been no appeals decision issued.

(g) A laboratory seeking to renew its certificate of compliance must—

(1) Complete and return the renewal application to HHS 9 to 12 months prior to the expiration of the certificate of compliance; and

(2) Meet the requirements of § 493.43 and paragraphs (a)(2) and (b)(2) of this section.

(h) If HHS determines that the application for the renewal of a certificate

562

HOLMES000717

**Centers for Medicare & Medicaid Services, HHS** §493.55

of compliance must be denied or limited, HHS will notify the laboratory in writing of the—

(1) Basis for denial of the application; and

(2) Opportunity for appeal as provided in subpart R of this part.

(i) If the laboratory requests a hearing within the time period specified by HHS, the laboratory retains its certificate of compliance or reissued certificate of compliance until a decision is made by an ALJ as provided in subpart R, except when HHS finds that conditions at the laboratory pose an imminent and serious risk to human health.

(j) For laboratories receiving payment from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory of nonrenewal of the certificate of compliance even if there has been no appeals decision issued.

[60 FR 20045, Apr. 24, 1995, as amended at 68 FR 3702, Jan. 24, 2003]

**§493.51 Notification requirements for laboratories issued a certificate of compliance.**

Laboratories issued a certificate of compliance must meet the following conditions:

(a) Notify HHS or its designee within 30 days of any change in—

(1) Ownership;

(2) Name;

(3) Location;

(4) Director; or

(5) Technical supervisor (laboratories performing high complexity only).

(b) Notify HHS no later than 6 months after performing any test or examination within a specialty or subspecialty area that is not included on the laboratory's certificate of compliance, so that compliance with requirements can be determined.

(c) Notify HHS no later than 6 months after any deletions or changes in test methodologies for any test or examination included in a specialty or subspecialty, or both, for which the laboratory has been issued a certificate of compliance.

[57 FR 7143, Feb. 28, 1992, as amended at 60 FR 20046, Apr. 24, 1995]

**§493.53 Notification requirements for laboratories issued a certificate for provider-performed microscopy (PPM) procedures.**

Laboratories issued a certificate for PPM procedures must notify HHS or its designee—

(a) Before performing and reporting results for any test of moderate or high complexity, or both, in addition to tests specified as PPM procedures or any test or examination that is not specified under §493.15(c), for which it does not have a registration certificate as required in subpart C or subpart D, as applicable, of this part; and

(b) Within 30 days of any change in—

(1) Ownership;

(2) Name;

(3) Location; or

(4) Director.

[58 FR 5224, Jan. 19, 1993, as amended at 60 FR 20046, Apr. 24, 1995]

## Subpart D—Certificate of Accreditation

SOURCE: 57 FR 7144, Feb. 28, 1992, unless otherwise noted.

**§493.55 Application for registration certificate and certificate of accreditation.**

(a) *Filing of application.* A laboratory may be issued a certificate of accreditation in lieu of the applicable certificate specified in subpart B or subpart C of this part provided the laboratory—

(1) Meets the standards of a private non-profit accreditation program approved by HHS in accordance with subpart E; and

(2) Files a separate application for each location, except as specified in paragraph (b) of this section.

(b) *Exceptions.* (1) Laboratories that are not at fixed locations, that is, laboratories that move from testing site to testing site, such as mobile units providing laboratory testing, health screening fairs, or other temporary testing locations may be covered under the certificate of the designated primary site or home base, using its address.

(2) Not-for-profit or Federal, State, or local government laboratories that engage in limited (not more than a combination of 15 moderately complex

563

HOLMES000718

or waived tests per certificate) public health testing may file a single application.

(3) Laboratories within a hospital that are located at contiguous buildings on the same campus and under common direction may file a single application or multiple applications for the laboratory sites within the same physical location or street address.

(c) *Application format and contents.* The application must—(1) Be made to HHS on a form or forms prescribed by HHS;

(2) Be signed by an owner or authorized representative of the laboratory who attests that the laboratory will be operated in accordance with the requirements established by the Secretary under section 353 of the Public Health Service Act; and

(3) Describe the characteristics of the laboratory operation and the examinations and other test procedures performed by the laboratory including—

(i) The name and total number of tests and examinations performed annually (excluding waived tests and tests for quality control, quality assurance or proficiency testing purposes);

(ii) The methodologies for each laboratory test procedure or examination performed, or both; and

(iii) The qualifications (educational background, training, and experience) of the personnel directing and supervising the laboratory and performing the laboratory examinations and test procedures.

(d) *Access and reporting requirements.* All laboratories must make records available and submit reports to HHS as HHS may reasonably require to determine compliance with this section.

[57 FR 7144, Feb. 28, 1992, as amended at 58 FR 5224, Jan. 19, 1993; 58 FR 39155, July 22, 1993; 60 FR 20046, Apr. 24, 1995]

### § 493.57 Requirements for a registration certificate.

A registration certificate is required for all laboratories seeking a certificate of accreditation, unless the laboratory holds a valid certificate of compliance issued by HHS.

(a) HHS will issue a registration certificate if the laboratory—

(1) Complies with the requirements of § 493.55;

(2) Agrees to notify HHS within 30 days of any changes in ownership, name, location, director, or supervisor (laboratories performing high complexity testing only);

(3) Agrees to treat proficiency testing samples in the same manner as it treats patient specimens; and

(4) Remits the fee for the registration certificate specified in subpart F of this part.

(b)(1) The laboratory must provide HHS with proof of accreditation by an approved accreditation program—

(i) Within 11 months of issuance of the registration certificate; or

(ii) Prior to the expiration of the certificate of compliance.

(2) If such proof of accreditation is not supplied within this timeframe, the laboratory must meet, or continue to meet, the requirements of § 493.49.

(c) In accordance with subpart R of this part, HHS will initiate suspension, revocation, or limitation of a laboratory's registration certificate and will deny the laboratory's application for a certificate of accreditation for failure to comply with the requirements set forth in this subpart. In addition, failure to meet the requirements of this subpart will result in suspension or denial of payments under Medicare and Medicaid as specified in subpart R of this part.

(d) A registration certificate is valid for a period of no more than 2 years. However, it may be reissued if the laboratory is subject to subpart C of this part, as specified in § 493.57(b)(2) and compliance has not been determined by HHS before the expiration date of the registration certificate.

(e) In the event that the laboratory does not meet the requirements of this subpart, HHS will—

(1) Deny a laboratory's request for certificate of accreditation;

(2) Notify the laboratory if it must meet the requirements for a certificate as defined in subpart C of this part;

(3) Provide the laboratory with a statement of grounds on which the application denial is based;

(4) Offer an opportunity for appeal on the application denial as provided in subpart R of this part. If the laboratory requests a hearing within the time specified by HHS, the laboratory will

HOLMES000719

**Centers for Medicare & Medicaid Services, HHS** §493.61

retain its registration certificate or re-issued registration certificate until a decision is made by an administrative law judge as provided in subpart R, unless HHS finds that conditions at the laboratory pose an imminent and serious risk to human health; and

(5) For those laboratories receiving payment from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory or denial of the request even if there has been no appeals decision issued.

[57 FR 7144, Feb. 28, 1992, as amended at 60 FR 20046, Apr. 24, 1995]

**§493.61 Requirements for a certificate of accreditation.**

(a) HHS will issue a certificate of accreditation to a laboratory if the laboratory—

(1) Meets the requirements of §493.57 or, if applicable, §493.49 of subpart C of this part; and

(2) Remits the certificate of accreditation fee specified in subpart F of this part.

(b) Laboratories issued a certificate of accreditation must—

(1) Treat proficiency testing samples in the same manner as patient samples;

(2) Meet the requirements of §493.63;

(3) Comply with the requirements of the approved accreditation program;

(4) Permit random sample validation and complaint inspections as required in subpart Q of this part;

(5) Permit HHS to monitor the correction of any deficiencies found through the inspections specified in paragraph (b)(4) of this section;

(6) Authorize the accreditation program to release to HHS the laboratory's inspection findings whenever HHS conducts random sample or complaint inspections; and

(7) Authorize its accreditation program to submit to HHS the results of the laboratory's proficiency testing.

(c) A laboratory failing to meet the requirements of this section—

(1) Will no longer meet the requirements of this part by virtue of its accreditation in an approved accreditation program;

(2) Will be subject to full determination of compliance by HHS;

(3) May be subject to suspension, revocation or limitation of the laboratory's certificate of accreditation or certain alternative sanctions; and

(4) May be subject to suspension of payments under Medicare and Medicaid as specified in subpart R.

(d) A certificate of accreditation issued under this subpart is valid for no more than 2 years. In the event of a non-compliance determination as a result of a random sample validation or complaint inspection, a laboratory will be subject to a full review by HHS in accordance with §488.11 of this chapter.

(e) Failure to meet the applicable requirements of part 493, will result in an action by HHS to suspend, revoke or limit the certificate of accreditation. HHS will—

(1) Provide the laboratory with a statement of grounds on which the determination of noncompliance is based;

(2) Notify the laboratory if it is eligible to apply for a certificate as defined in subpart C of this part; and

(3) Offer an opportunity for appeal as provided in subpart R of this part.

(f) If the laboratory requests a hearing within the time frame specified by HHS—

(1) It retains its certificate of accreditation or reissued certificate of accreditation until a decision is made by an administrative law judge as provided in subpart R of this part, unless HHS finds that conditions at the laboratory pose an imminent and serious risk to human health; and

(2) For those laboratories receiving payments from the Medicare or Medicaid program, such payments will be suspended on the effective date specified in the notice to the laboratory even if there has been no appeals decision issued.

(g) In the event the accreditation organization's approval is removed by HHS, the laboratory will be subject to the applicable requirements of subpart C of this part or §493.57.

(h) A laboratory seeking to renew its certificate of accreditation must—

(1) Complete and return the renewal application to HHS 9 to 12 months prior to the expiration of the certificate of accreditation;

(2) Meet the requirements of this subpart; and

565

HOLMES000720

(3) Submit the certificate of accreditation fee specified in subpart F of this part.

(i) If HHS determines that the renewal application for a certificate of accreditation is to be denied or limited, HHS will notify the laboratory in writing of—

(1) The basis for denial of the application;

(2) Whether the laboratory is eligible for a certificate as defined in subpart C of this part;

(3) The opportunity for appeal on HHS's action to deny the renewal application for certificate of accreditation as provided in subpart R of this part. If the laboratory requests a hearing within the time frame specified by HHS, it retains its certificate of accreditation or reissued certificate of accreditation until a decision is made by an administrative law judge as provided in subpart R of this part, unless HHS finds that conditions at the laboratory pose an imminent and serious risk to human health; and

(4) Suspension of payments under Medicare or Medicaid for those laboratories receiving payments under the Medicare or Medicaid programs.

[57 FR 7144, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993]

§ 493.63 Notification requirements for laboratories issued a certificate of accreditation.

Laboratories issued a certificate of accreditation must:

(a) Notify HHS and the approved accreditation program within 30 days of any changes in—

(1) Ownership;

(2) Name;

(3) Location; or

(4) Director.

(b) Notify the approved accreditation program no later than 6 months after performing any test or examination within a specialty or subspecialty area that is not included in the laboratory's accreditation, so that the accreditation organization can determine compliance and a new certificate of accreditation can be issued.

(c) Notify the accreditation program no later than 6 months after of any deletions or changes in test methodologies for any test or examination in-

cluded in a specialty or subspecialty, or both, for which the laboratory has been issued a certificate of accreditation.

## Subpart E—Accreditation by a Private, Nonprofit Accreditation Organization or Exemption Under an Approved State Laboratory Program

SOURCE: 63 FR 26732, May 14, 1998, unless otherwise noted.

§ 493.551 General requirements for laboratories.

(a) *Applicability.* CMS may deem a laboratory to meet all applicable CLIA program requirements through accreditation by a private nonprofit accreditation program (that is, grant deemed status), or may exempt from CLIA program requirements all State licensed or approved laboratories in a State that has a State licensure program established by law, if the following conditions are met:

(1) The requirements of the accreditation organization or State licensure program are equal to, or more stringent than, the CLIA condition-level requirements specified in this part, and the laboratory would meet the condition-level requirements if it were inspected against these requirements.

(2) The accreditation program or the State licensure program meets the requirements of this subpart and is approved by CMS.

(3) The laboratory authorizes the approved accreditation organization or State licensure program to release to CMS all records and information required and permits inspections as outlined in this part.

(b) *Meeting CLIA requirements by accreditation.* A laboratory seeking to meet CLIA requirements through accreditation by an approved accreditation organization must do the following:

(1) Obtain a certificate of accreditation as required in subpart D of this part.

(2) Pay the applicable fees as required in subpart F of this part.

(3) Meet the proficiency testing (PT) requirements in subpart H of this part.

HOLMES000721

(4) Authorize its PT organization to furnish to its accreditation organization the results of the laboratory's participation in an approved PT program for the purpose of monitoring the laboratory's PT and for making the annual PT results, along with explanatory information required to interpret the PT results, available on a reasonable basis, upon request of any person. A laboratory that refuses to authorize release of its PT results is no longer deemed to meet the condition-level requirements and is subject to a full review by CMS, in accordance with subpart Q of this part, and may be subject to the suspension or revocation of its certificate of accreditation under §493.1840.

(5) Authorize its accreditation organization to release to CMS or a CMS agent the laboratory's PT results that constitute unsuccessful participation in an approved PT program, in accordance with the definition of "unsuccessful participation in an approved PT program," as specified in §493.2 of this part, when the laboratory has failed to achieve successful participation in an approved PT program.

(6) Authorize its accreditation organization to release to CMS a notification of the actions taken by the organization as a result of the unsuccessful participation in a PT program within 30 days of the initiation of the action. Based on this notification, CMS may take an adverse action against a laboratory that fails to participate successfully in an approved PT program.

(c) *Withdrawal of laboratory accreditation.* After an accreditation organization has withdrawn or revoked its accreditation of a laboratory, the laboratory retains its certificate of accreditation for 45 days after the laboratory receives notice of the withdrawal or revocation of the accreditation, or the effective date of any action taken by CMS, whichever is earlier.

§493.553 **Approval process (application and reapplication) for accreditation organizations and State licensure programs.**

(a) *Information required.* An accreditation organization that applies or reapplies to CMS for deeming authority, or a State licensure program that ap-

plies or reapplies to CMS for exemption from CLIA program requirements of licensed or approved laboratories within the State, must provide the following information:

(1) A detailed comparison of the individual accreditation, or licensure or approval requirements with the comparable condition-level requirements; that is, a crosswalk.

(2) A detailed description of the inspection process, including the following:

(i) Frequency of inspections.

(ii) Copies of inspection forms.

(iii) Instructions and guidelines.

(iv) A description of the review and decision-making process of inspections.

(v) A statement concerning whether inspections are announced or unannounced.

(vi) A description of the steps taken to monitor the correction of deficiencies.

(3) A description of the process for monitoring PT performance, including action to be taken in response to unsuccessful participation in a CMS-approved PT program.

(4) Procedures for responding to and for the investigation of complaints against its laboratories.

(5) A list of all its current laboratories and the expiration date of their accreditation or licensure, as applicable.

(6) Procedures for making PT information available (under State confidentiality and disclosure requirements, if applicable) including explanatory information required to interpret PT results, on a reasonable basis, upon request of any person.

(b) *CMS action on an application or reapplication.* If CMS receives an application or reapplication from an accreditation organization, or State licensure program, CMS takes the following actions:

(1) CMS determines if additional information is necessary to make a determination for approval or denial of the application and notifies the accreditation organization or State to afford it an opportunity to provide the additional information.

(2) CMS may visit the accreditation organization or State licensure program offices to review and verify the

567

HOLMES000722

policies and procedures represented in its application and other information, including, but not limited to, review and examination of documents and interviews with staff.

(3) CMS notifies the accreditation organization or State licensure program indicating whether CMS approves or denies the request for deeming authority or exemption, respectively, and the rationale for any denial.

(c) *Duration of approval.* CMS approval may not exceed 6 years.

(d) *Withdrawal of application.* The accreditation organization or State licensure program may withdraw its application at any time before official notification, specified at § 493.553(b)(3).

### § 493.555 Federal review of laboratory requirements.

CMS's review of an accreditation organization or State licensure program includes, but is not limited to, an evaluation of the following:

(a) Whether the organization's or State's requirements for laboratories are equal to, or more stringent than, the condition-level requirements for laboratories.

(b) The organization's or State's inspection process to determine the comparability of the full inspection and complaint inspection procedures and requirements to those of CMS, including, but not limited to, inspection frequency and the ability to investigate and respond to complaints against its laboratories.

(c) The organization's or State's agreement with CMS that requires it to do the following:

(1) Notify CMS within 30 days of the action taken, of any laboratory that has—

(i) Had its accreditation or licensure suspended, withdrawn, revoked, or limited;

(ii) In any way been sanctioned; or

(iii) Had any adverse action taken against it.

(2) Notify CMS within 10 days of any deficiency identified in an accredited or CLIA-exempt laboratory if the deficiency poses an immediate jeopardy to the laboratory's patients or a hazard to the general public.

(3) Notify CMS, within 30 days, of all newly—

(i) Accredited laboratories (or laboratories whose areas of specialty/subspecialty testing have changed); or

(ii) Licensed laboratories, including the specialty/subspecialty areas of testing.

(4) Notify each accredited or licensed laboratory within 10 days of CMS's withdrawal of the organization's deeming authority or State's exemption.

(5) Provide CMS with inspection schedules, as requested, for validation purposes.

### § 493.557 Additional submission requirements.

(a) *Specific requirements for accreditation organizations.* In addition to the information specified in §§ 493.553 and 493.555, as part of the approval and review process, an accreditation organization applying or reapplying for deeming authority must also provide the following:

(1) The specialty or subspecialty areas for which the organization is requesting deeming authority and its mechanism for monitoring compliance with all requirements equivalent to condition-level requirements within the scope of the specialty or subspecialty areas.

(2) A description of the organization's data management and analysis system with respect to its inspection and accreditation decisions, including the kinds of routine reports and tables generated by the systems.

(3) Detailed information concerning the inspection process, including, but not limited to the following:

(i) The size and composition of individual accreditation inspection teams.

(ii) Qualifications, education, and experience requirements that inspectors must meet.

(iii) The content and frequency of training provided to inspection personnel, including the ability of the organization to provide continuing education and training to inspectors.

(4) Procedures for removal or withdrawal of accreditation status for laboratories that fail to meet the organization's standards.

(5) A proposed agreement between CMS and the accreditation organization with respect to the notification requirements specified in § 493.555(c).

568

HOLMES000723

**Centers for Medicare & Medicaid Services, HHS**  §493.557

(6) Procedures for monitoring laboratories found to be out of compliance with its requirements. (These monitoring procedures must be used only when the accreditation organization identifies noncompliance. If noncompliance is identified through validation inspections, CMS or a CMS agent monitors corrections, as authorized at §493.565(d)).

(7) A demonstration of its ability to provide CMS with electronic data and reports in compatible code, including the crosswalk specified in §493.553(a)(1), that are necessary for effective validation and assessment of the organization's inspection process.

(8) A demonstration of its ability to provide CMS with electronic data, in compatible code, related to the adverse actions resulting from PT results constituting unsuccessful participation in PT programs as well as data related to the PT failures, within 30 days of the initiation of adverse action.

(9) A demonstration of its ability to provide CMS with electronic data, in compatible code, for all accredited laboratories, including the area of specialty or subspecialty.

(10) Information defining the adequacy of numbers of staff and other resources.

(11) Information defining the organization's ability to provide adequate funding for performing required inspections.

(12) Any facility-specific data, upon request by CMS, which includes, but is not limited to, the following:

(i) PT results that constitute unsuccessful participation in a CMS-approved PT program.

(ii) Notification of the adverse actions or corrective actions imposed by the accreditation organization as a result of unsuccessful PT participation.

(13) An agreement to provide written notification to CMS at least 30 days in advance of the effective date of any proposed change in its requirements.

(14) An agreement to disclose any laboratory's PT results upon reasonable request by any person.

(b) *Specific requirements for a State licensure program.* In addition to requirements in §§493.553 and 493.555, as part of the approval and review process, when a State licensure program applies or reapplies for exemption from the CLIA program, the State must do the following:

(1) Demonstrate to CMS that it has enforcement authority and administrative structures and resources adequate to enforce its laboratory requirements.

(2) Permit CMS or a CMS agent to inspect laboratories in the State.

(3) Require laboratories in the State to submit to inspections by CMS or a CMS agent as a condition of licensure or approval.

(4) Agree to pay the cost of the validation program administered in that State as specified in §§493.645(a) and 493.646(b).

(5) Take appropriate enforcement action against laboratories found by CMS not to be in compliance with requirements equivalent to CLIA requirements.

(6) Submit for Medicare and Medicaid payment purposes, a list of the specialties and subspecialties of tests performed by each laboratory.

(7) Submit a written presentation that demonstrates the agency's ability to furnish CMS with electronic data in compatible code, including the crosswalk specified in §493.553(a)(1).

(8) Submit a statement acknowledging that the State will notify CMS through electronic transmission of the following:

(i) Any laboratory that has had its licensure or approval revoked or withdrawn or has been in any way sanctioned by the State within 30 days of taking the action.

(ii) Changes in licensure or inspection requirements.

(iii) Changes in specialties or subspecialties under which any licensed laboratory in the State performs testing.

(9) Provide information for the review of the State's enforcement procedures for laboratories found to be out of compliance with the State's requirements.

(10) Submit information that demonstrates the ability of the State to provide CMS with the following:

(i) Electronic data and reports in compatible code with the adverse or corrective actions resulting from PT results that constitute unsuccessful participation in PT programs.

569

HOLMES000724

(ii) Other data that CMS determines are necessary for validation and assessment of the State's inspection process requirements.

(11) Agree to provide CMS with written notification of any changes in its licensure/approval and inspection requirements.

(12) Agree to disclose any laboratory's PT results in accordance with a State's confidentiality requirements.

(13) Agree to take the appropriate enforcement action against laboratories found by CMS not to be in compliance with requirements comparable to condition-level requirements and report these enforcement actions to CMS.

(14) If approved, reapply to CMS every 2 years to renew its exempt status and to renew its agreement to pay the cost of the CMS-administered validation program in that State.

§ 493.559  Publication of approval of deeming authority or CLIA exemption.

(a) *Notice of deeming authority or exemption.* CMS publishes a notice in the FEDERAL REGISTER when it grants deeming authority to an accreditation organization or exemption to a State licensure program.

(b) *Contents of notice.* The notice includes the following:

(1) The name of the accreditation organization or State licensure program.

(2) For an accreditation organization:

(i) The specific specialty or subspecialty areas for which it is granted deeming authority.

(ii) A description of how the accreditation organization provides reasonable assurance to CMS that a laboratory accredited by the organization meets CLIA requirements equivalent to those in this part and would meet CLIA requirements if the laboratory had not been granted deemed status, but had been inspected against condition-level requirements.

(3) For a State licensure program, a description of how the laboratory requirements of the State are equal to, or more stringent than, those specified in this part.

(4) The basis for granting deeming authority or exemption.

(5) The term of approval, not to exceed 6 years.

§ 493.561  Denial of application or reapplication.

(a) *Reconsideration of denial.* (1) If CMS denies a request for approval, an accreditation organization or State licensure program may request, within 60 days of the notification of denial, that CMS reconsider its original application or application for renewal, in accordance with part 488, subpart D.

(2) If the accreditation organization or State licensure program requests a reconsideration of CMS's determination to deny its request for approval or reapproval, it may not submit a new application until CMS issues a final reconsideration determination.

(b) *Resubmittal of a request for approval—accreditation organization.* An accreditation organization may resubmit a request for approval if a final reconsideration determination is not pending and the accreditation program meets the following conditions:

(1) It has revised its accreditation program to address the rationale for denial of its previous request.

(2) It demonstrates that it can provide reasonable assurance that its accredited facilities meet condition-level requirements.

(3) It resubmits the application in its entirety.

(c) *Resubmittal of request for approval—State licensure program.* The State licensure program may resubmit a request for approval if a final reconsideration determination is not pending and it has taken the necessary action to address the rationale for any previous denial.

§ 493.563  Validation inspections—Basis and focus.

(a) *Basis for validation inspection*—(1) *Laboratory with a certificate of accreditation.* (i) CMS or a CMS agent may conduct an inspection of an accredited laboratory that has been issued a certificate of accreditation on a representative sample basis or in response to a substantial allegation of noncompliance.

(ii) CMS uses the results of these inspections to validate the accreditation organization's accreditation process.

(2) *Laboratory in a State with an approved State licensure program.* (i) CMS

570

HOLMES000725

**Centers for Medicare & Medicaid Services, HHS** §493.567

or a CMS agent may conduct an inspection of any laboratory in a State with an approved State licensure program on a representative sample basis or in response to a substantial allegation of noncompliance.

(ii) The results of these inspections are used to validate the appropriateness of the exemption of that State's licensed or approved laboratories from CLIA program requirements.

(b) *Validation inspection conducted on a representative sample basis.* (1) If CMS or a CMS agent conducts a validation inspection on a representative sample basis, the inspection is comprehensive, addressing all condition-level requirements, or it may be focused on a specific condition-level requirement.

(2) The number of laboratories sampled is sufficient to allow a reasonable estimate of the performance of the accreditation organization or State.

(c) *Validation inspection conducted in response to a substantial allegation of noncompliance.* (1) If CMS or a CMS agent conducts a validation inspection in response to a substantial allegation of noncompliance, the inspection focuses on any condition-level requirement that CMS determines to be related to the allegation.

(2) If CMS or a CMS agent substantiates a deficiency and determines that the laboratory is out of compliance with any condition-level requirement, CMS or a CMS agent conducts a full CLIA inspection.

(d) *Inspection of operations and offices.* As part of the validation review process, CMS may conduct an onsite inspection of the operations and offices to verify the following:

(1) The accreditation organization's representations and to assess the accreditation organization's compliance with its own policies and procedures.

(2) The State's representations and to assess the State's compliance with its own policies and procedures, including verification of State enforcement actions taken on the basis of validation inspections performed by CMS or a CMS agent.

(e) *Onsite inspection of an accreditation organization.* An onsite inspection of an accreditation organization may include, but is not limited to, the following:

(1) A review of documents.

(2) An audit of meetings concerning the accreditation process.

(3) Evaluation of accreditation inspection results and the accreditation decision-making process.

(4) Interviews with the accreditation organization's staff.

(f) *Onsite inspection of a State licensure program.* An onsite inspection of a State licensure program office may include, but is not limited to, the following:

(1) A review of documents.

(2) An audit of meetings concerning the licensure or approval process.

(3) Evaluation of State inspection results and the licensure or approval decision-making process.

(4) Interviews with State employees.

§493.565 **Selection for validation inspection—laboratory responsibilities.**

A laboratory selected for a validation inspection must do the following:

(a) Authorize its accreditation organization or State licensure program, as applicable, to release to CMS or a CMS agent, on a confidential basis, a copy of the laboratory's most recent full, and any subsequent partial inspection.

(b) Authorize CMS or a CMS agent to conduct a validation inspection.

(c) Provide CMS or a CMS agent with access to all facilities, equipment, materials, records, and information that CMS or a CMS agent determines have a bearing on whether the laboratory is being operated in accordance with the requirements of this part, and permit CMS or a CMS agent to copy material or require the laboratory to submit material.

(d) If the laboratory possesses a valid certificate of accreditation, authorize CMS or a CMS agent to monitor the correction of any deficiencies found through the validation inspection.

§493.567 **Refusal to cooperate with validation inspection.**

(a) *Laboratory with a certificate of accreditation.* (1) A laboratory with a certificate of accreditation that refuses to cooperate with a validation inspection by failing to comply with the requirements in §493.565—

571

HOLMES000726

(i) Is subject to full review by CMS or a CMS agent, in accordance with this part; and

(ii) May be subject to suspension, revocation, or limitation of its certificate of accreditation under this part.

(2) A laboratory with a certificate of accreditation is again deemed to meet the condition-level requirements by virtue of its accreditation when the following conditions exist:

(i) The laboratory withdraws any prior refusal to authorize its accreditation organization to release a copy of the laboratory's current accreditation inspection, PT results, or notification of any adverse actions resulting from PT failure.

(ii) The laboratory withdraws any prior refusal to allow a validation inspection.

(iii) CMS finds that the laboratory meets all the condition-level requirements.

(b) *CLIA-exempt laboratory.* If a CLIA-exempt laboratory fails to comply with the requirements specified in §493.565, CMS notifies the State of the laboratory's failure to meet the requirements.

### § 493.569 Consequences of a finding of noncompliance as a result of a validation inspection.

(a) *Laboratory with a certificate of accreditation.* If a validation inspection results in a finding that the accredited laboratory is out of compliance with one or more condition-level requirements, the laboratory is subject to—

(1) The same requirements and survey and enforcement processes applied to laboratories that are not accredited and that are found out of compliance following an inspection under this part; and

(2) Full review by CMS, in accordance with this part; that is, the laboratory is subject to the principal and alternative sanctions in §493.1806.

(b) *CLIA-exempt laboratory.* If a validation inspection results in a finding that a CLIA-exempt laboratory is out of compliance with one or more condition-level requirements, CMS directs the State to take appropriate enforcement action.

### § 493.571 Disclosure of accreditation, State and CMS validation inspection results.

(a) *Accreditation organization inspection results.* CMS may disclose accreditation organization inspection results to the public only if the results are related to an enforcement action taken by the Secretary.

(b) *State inspection results.* Disclosure of State inspection results is the responsibility of the approved State licensure program, in accordance with State law.

(c) *CMS validation inspection results.* CMS may disclose the results of all validation inspections conducted by CMS or its agent.

### § 493.573 Continuing Federal oversight of private nonprofit accreditation organizations and approved State licensure programs.

(a) *Comparability review.* In addition to the initial review for determining equivalency of specified organization or State requirements to the comparable condition-level requirements. CMS reviews the equivalency of requirements in the following cases:

(1) When CMS promulgates new condition-level requirements.

(2) When CMS identifies an accreditation organization or a State licensure program whose requirements are no longer equal to, or more stringent than, condition-level requirements.

(3) When an accreditation organization or State licensure program adopts new requirements.

(4) When an accreditation organization or State licensure program adopts changes to its inspection process, as required by §493.575(b)(1), as applicable.

(5) Every 6 years, or sooner if CMS determines an earlier review is required.

(b) *Validation review.* Following the end of a validation review period, CMS evaluates the validation inspection results for each approved accreditation organization and State licensure program.

(c) *Reapplication procedures.* (1) Every 6 years, or sooner, as determined by CMS, an approved accreditation organization must reapply for continued approval of deeming authority and a State licensure program must reapply

572

HOLMES000727

for continued approval of a CLIA exemption. CMS provides notice of the materials that must be submitted as part of the reapplication procedure.

(2) An accreditation organization or State licensure program that does not meet the requirements of this subpart, as determined through a comparability or validation review, must furnish CMS, upon request, with the reapplication materials CMS requests. CMS establishes a deadline by which the materials must be submitted.

(d) *Notice.* (1) CMS provides written notice, as appropriate, to the following:

(i) An accreditation organization indicating that its approval may be in jeopardy if a comparability or validation review reveals that it is not meeting the requirements of this subpart and CMS is initiating a review of the accreditation organization's deeming authority.

(ii) A State licensure program indicating that its CLIA exemption may be in jeopardy if a comparability or validation review reveals that it is not meeting the requirements of this subpart and that a review is being initiated of the CLIA exemption of the State's laboratories.

(2) The notice contains the following information:

(i) A statement of the discrepancies that were found as well as other related documentation.

(ii) An explanation of CMS's review process on which the final determination is based and a description of the possible actions, as specified in §493.575, that CMS may impose based on the findings from the comparability or validation review.

(iii) A description of the procedures available if the accreditation organization or State licensure program, as applicable, desires an opportunity to explain or justify the findings made during the comparability or validation review.

(iv) The reapplication materials that the accreditation organization or State licensure program must submit and the deadline for that submission.

**§493.575 Removal of deeming authority or CLIA exemption and final determination review.**

(a) *CMS review.* CMS conducts a review of the following:

(1) A deeming authority review of an accreditation organization's program if the comparability or validation review produces findings, as described at §493.573. CMS reviews, as appropriate, the criteria described in §§493.555 and 493.557(a) to reevaluate whether the accreditation organization continues to meet all these criteria.

(2) An exemption review of a State's licensure program if the comparability or validation review produces findings, as described at §493.573. CMS reviews, as appropriate, the criteria described in §§493.555 and 493.557(b) to reevaluate whether the licensure program continues to meet all these criteria.

(3) A review of an accreditation organization or State licensure program, at CMS's discretion, if validation review findings, irrespective of the rate of disparity, indicate widespread or systematic problems in the organization's accreditation or State's licensure process that provide evidence that the requirements, taken as a whole, are no longer equivalent to CLIA requirements, taken as a whole.

(4) A review of the accreditation organization or State licensure program whenever validation inspection results indicate a rate of disparity of 20 percent or more between the findings of the organization or State and those of CMS or a CMS agent for the following periods:

(i) One year for accreditation organizations.

(ii) Two years for State licensure programs.

(b) *CMS action after review.* Following the review, CMS may take the following action:

(1) If CMS determines that the accreditation organization or State has failed to adopt requirements equal to, or more stringent than, CLIA requirements, CMS may give a conditional approval for a probationary period of its deeming authority to an organization 30 days following the date of CMS's determination, or exempt status to a State within 30 days of CMS's determination, both not to exceed 1 year, to

573

HOLMES000728

afford the organization or State an opportunity to adopt equal or more stringent requirements.

(2) If CMS determines that there are widespread or systematic problems in the organization's or State's inspection process, CMS may give conditional approval during a probationary period, not to exceed 1 year, effective 30 days following the date of the determination.

(c) *Final determination.* CMS makes a final determination as to whether the organization or State continues to meet the criteria described in this subpart and issues a notice that includes the reasons for the determination to the organization or State within 60 days after the end of any probationary period. This determination is based on an evaluation of any of the following:

(1) The most recent validation inspection and review findings. To continue to be approved, the organization or State must meet the criteria of this subpart.

(2) Facility-specific data, as well as other related information.

(3) The organization's or State's inspection procedures, surveyors' qualifications, ongoing education, training, and composition of inspection teams.

(4) The organization's accreditation requirements, or the State's licensure or approval requirements.

(d) *Date of withdrawal of approval.* CMS may withdraw its approval of the accreditation organization or State licensure program, effective 30 days from the date of written notice to the organization or State of this proposed action, if improvements acceptable to CMS have not been made during the probationary period.

(e) *Continuation of validation inspections.* The existence of any validation review, probationary status, or any other action, such as a deeming authority review, by CMS does not affect or limit the conduct of any validation inspection.

(f) *Federal Register notice.* CMS publishes a notice in the FEDERAL REGISTER containing a justification for removing the deeming authority from an accreditation organization, or the CLIA-exempt status of a State licensure program.

(g) *Withdrawal of approval-effect on laboratory status*—(1) *Accredited laboratory.* After CMS withdraws approval of an accreditation organization's deeming authority, the certificate of accreditation of each affected laboratory continues in effect for 60 days after it receives notification of the withdrawal of approval.

(2) *CLIA-exempt laboratory.* After CMS withdraws approval of a State licensure program, the exempt status of each licensed or approved laboratory in the State continues in effect for 60 days after a laboratory receives notification from the State of the withdrawal of CMS's approval of the program.

(3) *Extension.* After CMS withdraws approval of an accreditation organization or State licensure program, CMS may extend the period for an additional 60 days for a laboratory if it determines that the laboratory submitted an application for accreditation to an approved accreditation organization or an application for the appropriate certificate to CMS or a CMS agent before the initial 60-day period ends.

(h) *Immediate jeopardy to patients.* (1) If at any time CMS determines that the continued approval of deeming authority of any accreditation organization poses immediate jeopardy to the patients of the laboratories accredited by the organization, or continued approval otherwise constitutes a significant hazard to the public health, CMS may immediately withdraw the approval of deeming authority for that accreditation organization.

(2) If at any time CMS determines that the continued approval of a State licensure program poses immediate jeopardy to the patients of the laboratories in that State, or continued approval otherwise constitutes a significant hazard to the public health, CMS may immediately withdraw the approval of that State licensure program.

(i) *Failure to pay fees.* CMS withdraws the approval of a State licensure program if the State fails to pay the applicable fees, as specified in §§ 493.645(a) and 493.646(b).

(j) *State refusal to take enforcement action.* (1) CMS may withdraw approval of a State licensure program if the State

574

HOLMES000729

**Centers for Medicare & Medicaid Services, HHS** §493.638

refuses to take enforcement action against a laboratory in that State when CMS determines it to be necessary.

(2) A laboratory that is in a State in which CMS has withdrawn program approval is subject to the same requirements and survey and enforcement processes that are applied to a laboratory that is not exempt from CLIA requirements.

(k) *Request for reconsideration.* Any accreditation organization or State that is dissatisfied with a determination to withdraw approval of its deeming authority or remove approval of its State licensure program, as applicable, may request that CMS reconsider the determination, in accordance with subpart D of part 488.

## Subpart F—General Administration

SOURCE: 57 FR 7138, 7213, Feb. 28, 1992, unless otherwise noted.

### §493.602  Scope of subpart.

This subpart sets forth the methodology for determining the amount of the fees for issuing the appropriate certificate, and for determining compliance with the applicable standards of the Public Health Service Act (the PHS Act) and the Federal validation of accredited laboratories and of CLIA-exempt laboratories.

[60 FR 20047, Apr. 24, 1995]

### §493.606  Applicability of subpart.

The rules of this subpart are applicable to those laboratories specified in §493.3.

[58 FR 5212, Jan. 19, 1993]

### §493.638  Certificate fees.

(a) *Basic rule.* Laboratories must pay a fee for the issuance of a registration certificate, certificate for PPM procedures, certificate of waiver, certificate of accreditation, or a certificate of compliance, as applicable. Laboratories must also pay a fee to reapply for a certificate for PPM procedures, certificate of waiver, certificate of accreditation, or a certificate of compliance. The total of fees collected by HHS under the laboratory program must be sufficient to cover the general costs of administering the laboratory certification program under section 353 of the PHS Act.

(1) For registration certificates and certificates of compliance, the costs include issuing the certificates, collecting the fees, evaluating and monitoring proficiency testing programs, evaluating which procedures, tests or examinations meet the criteria for inclusion in the appropriate complexity category, and implementing section 353 of the PHS Act.

(2) For a certificate of waiver, the costs include issuing the certificate, collecting the fees, determining if a certificate of waiver should be issued, evaluating which tests qualify for inclusion in the waived category, and other direct administrative costs.

(3) For a certificate for PPM procedures, the costs include issuing the certificate, collecting the fees, determining if a certificate for PPM procedures should be issued, evaluating which procedures meet the criteria for inclusion in the subcategory of PPM procedures, and other direct administrative costs.

(4) For a certificate of accreditation, the costs include issuing the certificate, collecting the fees, evaluating the programs of accrediting bodies, and other direct administrative costs.

(b) *Fee amount.* The fee amount is set annually by HHS on a calendar year basis and is based on the category of test complexity, or on the category of test complexity and schedules or ranges of annual laboratory test volume (excluding waived tests and tests performed for quality control, quality assurance, and proficiency testing purposes) and specialties tested, with the amounts of the fees in each schedule being a function of the costs for all aspects of general administration of CLIA as set forth in §493.649 (b) and (c). This fee is assessed and payable at least biennially. The methodology used to determine the amount of the fee is found in §493.649. The amount of the fee applicable to the issuance of the registration certificate or the issuance or renewal of the certificate for PPM procedures, certificate of waiver, certificate of accreditation, or certificate of compliance is the amount in effect at the time the application is received.

575

HOLMES000730

Upon receipt of an application for a certificate, HHS or its designee notifies the laboratory of the amount of the required fee for the requested certificate.

[60 FR 20047, Apr. 24, 1995]

### § 493.639   Fee for revised certificate.

(a) If, after a laboratory is issued a registration certificate, it changes its name or location, the laboratory must pay a fee to cover the cost of issuing a revised registration certificate. The fee for the revised registration certificate is based on the cost to issue the revised certificate to the laboratory.

(b) A laboratory must pay a fee to cover the cost of issuing a revised certificate in any of the following circumstances:

(1) The fee for issuing an appropriate revised certificate is based on the cost to issue the revised certificate to the laboratory as follows:

(i) If a laboratory with a certificate of waiver wishes to perform tests in addition to those listed in § 493.15(c) as waived tests, it must, as set forth in § 493.638, pay an additional fee for the appropriate certificate to cover the additional testing.

(ii) If a laboratory with a certificate for PPM procedures wishes to perform tests in addition to those specified as PPM procedures or listed in § 493.15(c) as waived tests, it must, as set forth in § 493.638, pay an additional fee for the appropriate certificate to cover the additional testing.

(2) A laboratory must pay a fee to cover the cost of issuing a revised certificate when—

(i) A laboratory changes its name, location, or its director; or

(ii) A laboratory deletes services or wishes to add services and requests that its certificate be changed. (An additional fee is also required under § 493.643(d) if it is necessary to determine compliance with additional requirements.)

[57 FR 7213, Feb. 28, 1992, as amended at 60 FR 20047, Apr. 24, 1995]

### § 493.643   Fee for determination of program compliance.

(a) *Fee requirement.* In addition to the fee required under § 493.638, a laboratory subject to routine inspections must pay a fee to cover the cost of determining program compliance. Laboratories issued a certificate for PPM procedures, certificate of waiver, or a certificate of accreditation are not subject to this fee for routine inspections.

(b) *Costs included in the fee.* Included in the fee for determining program compliance is the cost of evaluating qualifications of personnel; monitoring proficiency testing; conducting onsite inspections; documenting deficiencies; evaluating laboratories' plans to correct deficiencies; and necessary administrative costs. HHS sets the fee amounts annually on a calendar year basis. Laboratories are inspected biennially; therefore, fees are assessed and payable biennially. If additional expenses are incurred to conduct follow up visits to verify correction of deficiencies, to impose sanctions, and/or for surveyor preparation for and attendance at ALJ hearings, HHS assesses an additional fee to include these costs. The additional fee is based on the actual resources and time necessary to perform the activities.

(c) *Classification of laboratories that require inspection for purpose of determining amount of fee.* (1) There are ten classifications (schedules) of laboratories for the purpose of determining the fee amount a laboratory is assessed. Each laboratory is placed into one of the ten following schedules based on the laboratory's scope and volume of testing (excluding tests performed for quality control, quality assurance, and proficiency testing purposes).

(i) (A) *Schedule A Low Volume.* The laboratory performs not more than 2,000 laboratory tests annually.

(B) *Schedule A.* The laboratory performs tests in no more than 3 specialties of service with a total annual volume of more than 2,000 but not more than 10,000 laboratory tests.

(ii) *Schedule B.* The laboratory performs tests in at least 4 specialties of service with a total annual volume of not more than 10,000 laboratory tests.

(iii) *Schedule C.* The laboratory performs tests in no more 3 specialties of service with a total annual volume of more than 10,000 but not more than 25,000 laboratory tests.

HOLMES000731

**Centers for Medicare & Medicaid Services, HHS** § 493.643

(iv) *Schedule D.* The laboratory performs tests in at least 4 specialties with a total annual volume of more than 10,000 but not more than 25,000 laboratory tests.

(v) *Schedule E.* The laboratory performs more than 25,000 but not more than 50,000 laboratory tests annually.

(vi) *Schedule F.* The laboratory performs more than 50,000 but not more than 75,000 laboratory tests annually.

(vii) *Schedule G.* The laboratory performs more than 75,000 but not more than 100,000 laboratory tests annually.

(viii) *Schedule H.* The laboratory performs more than 100,000 but not more than 500,000 laboratory tests annually.

(ix) *Schedule I.* The laboratory performs more than 500,000 but not more than 1,000,000 laboratory tests annually.

(x) *Schedule J.* The laboratory performs more than 1,000,000 laboratory tests annually.

(2) For purposes of determining a laboratory's classification under this section, a test is a procedure or examination for a single analyte. (Tests performed for quality control, quality assurance, and proficiency testing are excluded from the laboratory's total annual volume). Each profile (that is, group of tests) is counted as the number of separate procedures or examinations; for example, a chemistry profile consisting of 18 tests is counted as 18 separate procedures or tests.

(3) For purposes of determining a laboratory's classification under this section, the specialties and subspecialties of service for inclusion are:

(i) The specialty of Microbiology, which includes one or more of the following subspecialties:

(A) Bacteriology.

(B) Mycobacteriology.

(C) Mycology.

(D) Parasitology.

(E) Virology.

(ii) The specialty of Serology, which includes one or more of the following subspecialties:

(A) Syphilis Serology.

(B) General Immunology.

(iii) The specialty of Chemistry, which includes one or more of the following subspecialties:

(A) Routine chemistry.

(B) Endocrinology.

(C) Toxicology.

(D) Urinalysis.

(iv) The specialty of Hematology.

(v) The specialty of Immunohematology, which includes one or more of the following subspecialties:

(A) ABO grouping and Rh typing.

(B) Unexpected antibody detection.

(C) Compatibility testing.

(D) Unexpected antibody identification.

(vi) The specialty of Pathology, which includes the following subspecialties:

(A) Cytology.

(B) Histopathology.

(C) Oral pathology.

(vii) The specialty of Radiobioassay.

(viii) The specialty of Histocompatibility.

(ix) The specialty of Clinical Cytogenetics.

(d) *Additional fees.* (1) If after a certificate of compliance is issued, a laboratory adds services and requests that its certificate be upgraded, the laboratory must pay an additional fee if, in order to determine compliance with additional requirements, it is necessary to conduct an inspection, evaluate personnel, or monitor proficiency testing performance. The additional fee is based on the actual resources and time necessary to perform the activities. HHS revokes the laboratory's certificate for failure to pay the compliance determination fee.

(2) If it is necessary to conduct a complaint investigation, impose sanctions, or conduct a hearing, HHS assesses the laboratory holding a certificate of compliance a fee to cover the cost of these activities. If a complaint investigation results in a complaint being unsubstantiated, or if an HHS adverse action is overturned at the conclusion of the administrative appeals process, the government's costs of these activities are not imposed upon the laboratory. Costs for these activities are based on the actual resources and time necessary to perform the activities and are not assessed until after the laboratory concedes the existence of deficiencies or an ALJ rules in favor of HHS. HHS revokes the laboratory's

577

HOLMES000732

certificate of compliance for failure to pay the assessed costs.

[57 FR 7138, 7213, Feb. 28, 1992, as amended at 60 FR 20047, Apr. 24, 1995; 68 FR 3702, Jan. 24, 2003]

### § 493.645  Additional fee(s) applicable to approved State laboratory programs and laboratories issued a certificate of accreditation, certificate of waiver, or certificate for PPM procedures.

(a) *Approved State laboratory programs.* State laboratory programs approved by HHS are assessed a fee for the following:

(1) Costs of Federal inspections of laboratories in that State (that is, CLIA-exempt laboratories) to verify that standards are being enforced in an appropriate manner.

(2) Costs incurred for investigations of complaints against the State's CLIA-exempt laboratories if the complaint is substantiated.

(3) Costs of the State's prorata share of general overhead to develop and implement CLIA.

(b) *Accredited laboratories.* (1) In addition to the certificate fee, a laboratory that is issued a certificate of accreditation is also assessed a fee to cover the cost of evaluating individual laboratories to determine overall whether an accreditation organization's standards and inspection policies are equivalent to the Federal program. All accredited laboratories share in the cost of these inspections. These costs are the same as those that are incurred when inspecting nonaccredited laboratories.

(2) If a laboratory issued a certificate of accreditation has been inspected and followup visits are necessary because of identified deficiencies, HHS assesses the laboratory a fee to cover the cost of these visits. The fee is based on the actual resources and time necessary to perform the followup visits. HHS revokes the laboratory's certificate of accreditation for failure to pay the assessed fee.

(c) If, in the case of a laboratory that has been issued a certificate of accreditation, certificate of waiver, or certificate for PPM procedures, it is necessary to conduct a complaint investigation, impose sanctions, or conduct a hearing, HHS assesses that laboratory a fee to cover the cost of these activities. Costs are based on the actual resources and time necessary to perform the activities and are not assessed until after the laboratory concedes the existence of deficiencies or an ALJ rules in favor of HHS. HHS revokes the laboratory's certificate for failure to pay the assessed costs. If a complaint investigation results in a complaint being unsubstantiated, or if an HHS adverse action is overturned at the conclusion of the administrative appeals process, the costs of these activities are not imposed upon the laboratory.

[60 FR 20047, Apr. 24, 1995]

### § 493.646  Payment of fees.

(a) Except for CLIA-exempt laboratories, all laboratories are notified in writing by HHS or its designee of the appropriate fee(s) and instructions for submitting the fee(s), including the due date for payment and where to make payment. The appropriate certificate is not issued until the applicable fees have been paid.

(b) For State-exempt laboratories, HHS estimates the cost of conducting validation surveys within the State for a 2-year period. HHS or its designee notifies the State by mail of the appropriate fees, including the due date for payment and the address of the United States Department of Treasury designated commercial bank to which payment must be made. In addition, if complaint investigations are conducted in laboratories within these States and are substantiated, HHS bills the State(s) the costs of the complaint investigations.

[57 FR 7138, 7213, Feb. 28, 1992, as amended at 60 FR 20048, Apr. 24, 1995]

### § 493.649  Methodology for determining fee amount.

(a) *General rule.* The amount of the fee in each schedule for compliance determination inspections is based on the average hourly rate (which includes the costs to perform the required activities and necessary administration costs) multiplied by the average number of hours required or, if activities are performed by more than one of the entities listed in paragraph (b) of this section, the sum of the products of the

578

HOLMES000733

applicable hourly rates multiplied by the average number of hours required by the entity to perform the activity. The fee for issuance of the registration certificate or certificate of compliance is based on the laboratory's scope and volume of testing.

(b) *Determining average hourly rates used in fee schedules.* Three different entities perform activities related to the issuance or reissuance of any certificate. HHS determines the average hourly rates for the activities of each of these entities.

(1) *State survey agencies.* The following costs are included in determining an average hourly rate for the activities performed by State survey agencies:

(i) The costs incurred by the State survey agencies in evaluating personnel qualifications and monitoring each laboratory's participation in an approved proficiency testing program. The cost of onsite inspections and monitoring activities is the hourly rate derived as a result of an annual budget negotiation process with each State. The hourly rate encompasses salary costs (as determined by each State's civil service pay scale) and fringe benefit costs to support the required number of State inspectors, management and direct support staff.

(ii) Travel costs necessary to comply with each State's administrative requirements and other direct costs such as equipment, printing, and supplies. These costs are established based on historical State requirements.

(iii) Indirect costs as negotiated by HHS.

(2) *Federal agencies.* The hourly rate for activities performed by Federal agencies is the most recent average hourly cost to HHS staff and support a full time equivalent employee. Included in this cost are salary and fringe benefit costs, necessary administrative costs, such as printing, training, postage, express mail, supplies, equipment, computer system and building service charges associated with support services provided by organizational components such as a computer center, and any other oversight activities necessary to support the program.

(3) *HHS contractors.* The hourly rate for activities performed by HHS contractors is the average hourly rate established for contractor assistance based on an independent government cost estimate for the required workload. This rate includes the cost of contractor support to provide proficiency testing programs to laboratories that do not participate in an approved proficiency testing program, provide specialized assistance in the evaluation of laboratory performance in an approved proficiency testing program, perform assessments of cytology testing laboratories, conduct special studies, bill and collect fees, issue certificates, establish accounting, monitoring and reporting systems, and assist with necessary surveyor training.

(c) *Determining number of hours.* The average number of hours used to determine the overall fee in each schedule is HHS's estimate, based on historical experience, of the average time needed by each entity to perform the activities for which it is responsible.

[57 FR 7138, 7213, Feb. 28, 1992, as amended at 60 FR 20048, Apr. 24, 1995]

## Subpart G [Reserved]

## Subpart H—Participation in Proficiency Testing for Laboratories Performing Nonwaived Testing

SOURCE: 57 FR 7146, Feb. 28, 1992, unless otherwise noted.

### § 493.801  Condition: Enrollment and testing of samples.

Each laboratory must enroll in a proficiency testing (PT) program that meets the criteria in subpart I of this part and is approved by HHS. The laboratory must enroll in an approved program or programs for each of the specialties and subspecialties for which it seeks certification. The laboratory must test the samples in the same manner as patients' specimens. For laboratories subject to 42 CFR part 493 published on March 14, 1990 (55 FR 9538) prior to September 1, 1992, the rules of this subpart are effective on September 1, 1992. For all other laboratories, the rules of this subpart are effective January 1, 1994.

HOLMES000734

(a) *Standard; Enrollment.* The laboratory director must—

(1) Notify HHS of the approved program or programs in which it chooses to participate to meet proficiency testing requirements of this subpart.

(2)(i) Designate the program(s) to be used for each specialty, subspecialty, and analyte or test to determine compliance with this subpart if the laboratory participates in more than one proficiency testing program approved by CMS; and

(ii) For those tests performed by the laboratory that are not included in subpart I of this part, a laboratory must establish and maintain the accuracy of its testing procedures, in accordance with § 493.1236(c)(1).

(3) For each specialty, subspecialty and analyte or test, participate in one approved proficiency testing program or programs, for one year before designating a different program and must notify CMS before any change in designation; and

(4) Authorize the proficiency testing program to release to HHS all data required to—

(i) Determine the laboratory's compliance with this subpart; and

(ii) Make PT results available to the public as required in section 353(f)(3)(F) of the Public Health Service Act.

(b) *Standard: Testing of proficiency testing samples.* The laboratory must examine or test, as applicable, the proficiency testing samples it receives from the proficiency testing program in the same manner as it tests patient specimens. This testing must be conducted in conformance with paragraph (b)(4) of this section. If the laboratory's patient specimen testing procedures would normally require reflex, distributive, or confirmatory testing at another laboratory, the laboratory should test the proficiency testing sample as it would a patient specimen up until the point it would refer a patient specimen to a second laboratory for any form of further testing.

(1) The samples must be examined or tested with the laboratory's regular patient workload by personnel who routinely perform the testing in the laboratory, using the laboratory's routine methods. The individual testing or examining the samples and the labora-

tory director must attest to the routine integration of the samples into the patient workload using the laboratory's routine methods.

(2) The laboratory must test samples the same number of times that it routinely tests patient samples.

(3) Laboratories that perform tests on proficiency testing samples must not engage in any inter-laboratory communications pertaining to the results of proficiency testing sample(s) until after the date by which the laboratory must report proficiency testing results to the program for the testing event in which the samples were sent. Laboratories with multiple testing sites or separate locations must not participate in any communications or discussions across sites/locations concerning proficiency testing sample results until after the date by which the laboratory must report proficiency testing results to the program.

(4) The laboratory must not send proficiency testing samples or portions of proficiency testing samples to another laboratory for any analysis for which it is certified to perform in its own laboratory. Any laboratory that CMS determines intentionally referred a proficiency testing sample to another laboratory for analysis may have its certification revoked for at least 1 year. If CMS determines that a proficiency testing sample was referred to another laboratory for analysis, but the requested testing was limited to reflex, distributive, or confirmatory testing that, if the sample were a patient specimen, would have been in full conformance with written, legally accurate and adequate standard operating procedures for the laboratory's testing of patient specimens, and if the proficiency testing referral is not a repeat proficiency testing referral, CMS will consider the referral to be improper and subject to alternative sanctions in accordance with § 493.1804(c), but not intentional. Any laboratory that receives a proficiency testing sample from another laboratory for testing must notify CMS of the receipt of that sample regardless of whether the referral was made for reflex or confirmatory testing, or any other reason.

(5) The laboratory must document the handling, preparation, processing,

HOLMES000735

**Centers for Medicare & Medicaid Services, HHS** §493.821

examination, and each step in the testing and reporting of results for all proficiency testing samples. The laboratory must maintain a copy of all records, including a copy of the proficiency testing program report forms used by the laboratory to record proficiency testing results including the attestation statement provided by the PT program, signed by the analyst and the laboratory director, documenting that proficiency testing samples were tested in the same manner as patient specimens, for a minimum of two years from the date of the proficiency testing event.

(6) PT is required for only the test system, assay, or examination used as the primary method for patient testing during the PT event.

[57 FR 7146, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003; 79 FR 27157, May 12, 2014]

§ 493.803  Condition: Successful participation.

(a) Each laboratory performing nonwaived testing must successfully participate in a proficiency testing program approved by CMS, if applicable, as described in subpart I of this part for each specialty, subspecialty, and analyte or test in which the laboratory is certified under CLIA.

(b) Except as specified in paragraph (c) of this section, if a laboratory fails to participate successfully in proficiency testing for a given specialty, subspecialty, analyte or test, as defined in this section, or fails to take remedial action when an individual fails gynecologic cytology, CMS imposes sanctions, as specified in subpart R of this part.

(c) If a laboratory fails to perform successfully in a CMS-approved proficiency testing program, for the initial unsuccessful performance, CMS may direct the laboratory to undertake training of its personnel or to obtain technical assistance, or both, rather than imposing alternative or principle sanctions except when one or more of the following conditions exists:

(1) There is immediate jeopardy to patient health and safety.

(2) The laboratory fails to provide CMS or a CMS agent with satisfactory evidence that it has taken steps to correct the problem identified by the unsuccessful proficiency testing performance.

(3) The laboratory has a poor compliance history.

[57 FR 7146, Feb. 28, 1992, as amended at 60 FR 20048, Apr. 24, 1995; 63 FR 26737, May 14, 1998; 68 FR 3702, Jan. 24, 2003]

§ 493.807  Condition: Reinstatement of laboratories performing nonwaived testing.

(a) If a laboratory's certificate is suspended or limited or its Medicare or Medicaid approval is cancelled or its Medicare or Medicaid payments are suspended because it fails to participate successfully in proficiency testing for one or more specialties, subspecialties, analyte or test, or voluntarily withdraws its certification under CLIA for the failed specialty, subspecialty, or analyte, the laboratory must then demonstrate sustained satisfactory performance on two consecutive proficiency testing events, one of which may be on site, before CMS will consider it for reinstatement for certification and Medicare or Medicaid approval in that specialty, subspecialty, analyte or test.

(b) The cancellation period for Medicare and Medicaid approval or period for suspension of Medicare or Medicaid payments or suspension or limitation of certification under CLIA for the failed specialty, subspecialty, or analyte or test is for a period of not less than six months from the date of cancellation, limitation or suspension of the CLIA certificate.

[58 FR 5228, Jan. 19, 1993, as amended at 60 FR 20048, Apr. 24, 1995]

Proficiency Testing by Specialty and Subspecialty for Laboratories Performing Tests of Moderate Complexity (Including the Subcategory), High Complexity, or Any Combination of These Tests

§ 493.821  Condition: Microbiology.

The specialty of microbiology includes, for purposes of proficiency testing, the subspecialties of bacteriology, mycobacteriology, mycology, parasitology and virology.

581

HOLMES000736

### § 493.823  Standard; Bacteriology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) Remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.825  Standard; Mycobacteriology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given

to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) Remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.827  Standard; Mycology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame

582

HOLMES000737

for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) Remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### §493.829  Standard; Parasitology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) Remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### §493.831  Standard; Virology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure

583

HOLMES000738

to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unsatisfactory testing events, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.833  Condition: Diagnostic immunology.

The specialty of diagnostic immunology includes for purposes of proficiency testing the subspecialties of syphilis serology and general immunology.

### § 493.835  Standard; Syphilis serology.

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure

to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.837  Standard; General immunology.

(a) Failure to attain a score of at least 80 percent of acceptable responses for each analyte in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory analyte or test performance or testing event

HOLMES000739

for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte or test in two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

(g) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

§493.839 Condition: Chemistry.

The specialty of chemistry includes for the purposes of proficiency testing the subspecialties of routine chemistry, endocrinology, and toxicology.

§493.841 Standard; Routine chemistry.

(a) Failure to attain a score of at least 80 percent of acceptable responses for each analyte in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte or test in two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

(g) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

§493.843 Standard; Endocrinology.

(a) Failure to attain a score of at least 80 percent of acceptable responses for each analyte in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame

585

HOLMES000740

for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte or test in two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

(g) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.845 Standard; Toxicology.

(a) Failure to attain a score of at least 80 percent of acceptable responses for each analyte in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte or test in two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

(g) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

### § 493.849 Condition: Hematology.

The specialty of hematology, for the purpose of proficiency testing, is not subdivided into subspecialties of testing.

### § 493.851 Standard; Hematology.

(a) Failure to attain a score of at least 80 percent of acceptable responses for each analyte in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

HOLMES000741

**Centers for Medicare & Medicaid Services, HHS** §493.855

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory analyte or test performance or testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte in two consecutive events or two out of three consecutive testing events is unsuccessful performance.

(g) Failure to achieve an overall testing event score of satisfactory performance for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

**§493.853  Condition: Pathology.**

The specialty of pathology includes, for purposes of proficiency testing, the subspecialty of cytology limited to gynecologic examinations.

**§493.855  Standard;  Cytology: gynecologic examinations.**

To participate successfully in a cytology proficiency testing program for gynecologic examinations (Pap smears), the laboratory must meet the requirements of paragraphs (a) through (c) of this section.

(a) The laboratory must ensure that each individual engaged in the examination of gynecologic preparations is enrolled in a proficiency testing program approved by CMS by January 1, 1995, if available in the State in which he or she is employed. The laboratory must ensure that each individual is tested at least once per year and obtains a passing score. To ensure this annual testing of individuals, an announced or unannounced testing event will be conducted on-site in each laboratory at least once each year. Laboratories will be notified of the time of each announced on-site testing event at least 30 days prior to each event. Additional testing events will be conducted as necessary in each State or region for the purpose of testing individuals who miss the on-site testing event and for retesting individuals as described in paragraph (b) of this section.

(b) The laboratory must ensure that each individual participates in an annual testing event that involves the examination of a 10-slide test set as described in §493.945. Individuals who fail this testing event are retested with another 10-slide test set as described in paragraphs (b)(1) and (b)(2) of this section. Individuals who fail this second test are subsequently retested with a 20-slide test set as described in paragraphs (b)(2) and (b)(3) of this section. Individuals are given not more than 2 hours to complete a 10-slide test and not more than 4 hours to complete a 20-slide test. Unexcused failure to appear by an individual for a retest will result in test failure with resulting remediation and limitations on slide examinations as specified in (b)(1), (b)(2), and (b)(3) of this section.

(1) An individual is determined to have failed the annual testing event if he or she scores less than 90 percent on a 10-slide test set. For an individual who fails an annual proficiency testing event, the laboratory must schedule a

587

HOLMES000742

retesting event which must take place not more than 45 days after receipt of the notification of failure.

(2) An individual is determined to have failed the second testing event if he or she scores less than 90 percent on a 10-slide test set. For an individual who fails a second testing event, the laboratory must provide him or her with documented, remedial training and education in the area of failure, and must assure that all gynecologic slides evaluated subsequent to the notice of failure are reexamined until the individual is again retested with a 20-slide test set and scores at least 90 percent. Reexamination of slides must be documented.

(3) An individual is determined to have failed the third testing event if he or she scores less than 90 percent on a 20-slide test set. An individual who fails the third testing event must cease examining gynecologic slide preparations immediately upon notification of test failure and may not resume examining gynecologic slides until the laboratory assures that the individual obtains at least 35 hours of documented, formally structured, continuing education in diagnostic cytopathology that focuses on the examination of gynecologic preparations, and until he or she is retested with a 20-slide test set and scores at least 90 percent.

(c) If a laboratory fails to ensure that individuals are tested or those who fail a testing event are retested, or fails to take required remedial actions as described in paragraphs (b)(1), (b)(2) or (b)(3) of this section, CMS will initiate intermediate sanctions or limit the laboratory's certificate to exclude gynecologic cytology testing under CLIA, and, if applicable, suspend the laboratory's Medicare and Medicaid payments for gynecologic cytology testing in accordance with subpart R of this part.

[57 FR 7146, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993; 59 FR 62609, Dec. 6, 1994]

§ 493.857  Condition: Immunohematology.

The specialty of immunohematology includes four subspecialties for the purposes of proficiency testing: ABO group and D (Rho) typing; unexpected anti-body detection; compatibility testing; and antibody identification.

§ 493.859  Standard; ABO group and D (Rho) typing.

(a) Failure to attain a score of at least 100 percent of acceptable responses for each analyte or test in each testing event is unsatisfactory analyte performance for the testing event.

(b) Failure to attain an overall testing event score of at least 100 percent is unsatisfactory performance.

(c) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(d) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(e)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unacceptable analyte or unsatisfactory testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(f) Failure to achieve satisfactory performance for the same analyte in two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

588

HOLMES000743

(g) Failure to achieve an overall testing event score of satisfactory for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

**§493.861 Standard; Unexpected antibody detection.**

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unsatisfactory testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

**§493.863 Standard; Compatibility testing.**

(a) Failure to attain an overall testing event score of at least 100 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unsatisfactory testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to achieve an overall testing event score of satisfactory for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

**§493.865 Standard; Antibody identification.**

(a) Failure to attain an overall testing event score of at least 80 percent is unsatisfactory performance.

(b) Failure to participate in a testing event is unsatisfactory performance

589

HOLMES000744

and results in a score of 0 for the testing event. Consideration may be given to those laboratories failing to participate in a testing event only if—

(1) Patient testing was suspended during the time frame allotted for testing and reporting proficiency testing results;

(2) The laboratory notifies the inspecting agency and the proficiency testing program within the time frame for submitting proficiency testing results of the suspension of patient testing and the circumstances associated with failure to perform tests on proficiency testing samples; and

(3) The laboratory participated in the previous two proficiency testing events.

(c) Failure to return proficiency testing results to the proficiency testing program within the time frame specified by the program is unsatisfactory performance and results in a score of 0 for the testing event.

(d)(1) For any unsatisfactory testing event for reasons other than a failure to participate, the laboratory must undertake appropriate training and employ the technical assistance necessary to correct problems associated with a proficiency testing failure.

(2) For any unsatisfactory testing event score, remedial action must be taken and documented, and the documentation must be maintained by the laboratory for two years from the date of participation in the proficiency testing event.

(e) Failure to identify the same antibody in two consecutive or two out of three consecutive testing events is unsuccessful performance.

(f) Failure to achieve an overall testing event score of satisfactory for two consecutive testing events or two out of three consecutive testing events is unsuccessful performance.

## Subpart I—Proficiency Testing Programs for Nonwaived Testing

SOURCE: 57 FR 7151, Feb. 28, 1992, unless otherwise noted.

### §493.901 Approval of proficiency testing programs.

In order for a proficiency testing program to receive HHS approval, the program must be offered by a private nonprofit organization or a Federal or State agency, or entity acting as a designated agent for the State. An organization, Federal, or State program seeking approval or reapproval for its program for the next calendar year must submit an application providing the required information by July 1 of the current year. The organization, Federal, or State program must provide technical assistance to laboratories seeking to qualify under the program, and must, for each specialty, subspecialty, and analyte or test for which it provides testing—

(a) Assure the quality of test samples, appropriately evaluate and score the testing results, and identify performance problems in a timely manner;

(b) Demonstrate to HHS that it has—

(1) The technical ability required to—

(i) Prepare or purchase samples from manufacturers who prepare the samples in conformance with the appropriate good manufacturing practices required in 21 CFR parts 606, 640, and 820; and

(ii) Distribute the samples, using rigorous quality control to assure that samples mimic actual patient specimens when possible and that samples are homogeneous, except for specific subspecialties such as cytology, and will be stable within the time frame for analysis by proficiency testing participants;

(2) A scientifically defensible process for determining the correct result for each challenge offered by the program;

(3) A program of sufficient annual challenge and with the frequency specified in §§493.909 through 493.959 to establish that a laboratory has met minimum performance requirements;

(4) The resources needed to provide Statewide or nationwide reports to regulatory agencies on individual's performance for gynecologic cytology and on individual laboratory performance on testing events, cumulative reports and scores for each laboratory or individual, and reports of specific laboratory failures using grading criteria acceptable to HHS. These reports must be provided to HHS on a timely basis when requested;

(5) Provisions to include on each proficiency testing program report form

590

HOLMES000745

used by the laboratory to record testing event results, an attestation statement that proficiency testing samples were tested in the same manner as patient specimens with a signature block to be completed by the individual performing the test as well as by the laboratory director;

(6) A mechanism for notifying participants of the PT shipping schedule and for participants to notify the proficiency testing program within three days of the expected date of receipt of the shipment that samples have not arrived or are unacceptable for testing. The program must have provisions for replacement of samples that are lost in transit or are received in a condition that is unacceptable for testing; and

(7) A process to resolve technical, administrative, and scientific problems about program operations;

(c) Meet the specific criteria for proficiency testing programs listed by specialty, subspecialty, and analyte or test contained in §§493.901 through 493.959 for initial approval and thereafter provide HHS, on an annual basis, with the information necessary to assure that the proficiency testing program meets the criteria required for approval; and

(d) Comply with all applicable packaging, shipment, and notification requirements of 42 CFR part 72.

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993]

§493.903 Administrative responsibilities.

The proficiency testing program must—

(a)(1) Provide HHS or its designees and participating laboratories with an electronic or a hard copy, or both, of reports of proficiency testing results and all scores for each laboratory's performance in a format as required by and approved by CMS for each CLIA-certified specialty, subspecialty, and analyte or test within 60 days after the date by which the laboratory must report proficiency testing results to the proficiency testing program.

(2) Provide HHS with reports of PT results and scores of individual performance in cytology and provide copies of reports to participating individuals, and to all laboratories that em-

ploy the individuals, within 15 working days of the testing event;

(b) Furnish to HHS cumulative reports on an individual laboratory's performance and aggregate data on CLIA-certified laboratories for the purpose of establishing a system to make the proficiency testing program's results available, on a reasonable basis, upon request of any person, and include such explanatory information as may be appropriate to assist in the interpretation of the proficiency testing program's results;

(c) Provide HHS with additional information and data upon request and submit such information necessary for HHS to conduct an annual evaluation to determine whether the proficiency testing program continues to meet the requirements of §§493.901 through 493.959;

(d) Maintain records of laboratories' performance for a period of five years or such time as may be necessary for any legal proceedings; and

(e) Provide HHS with an annual report and, if needed, an interim report which identifies any previously unrecognized sources of variability in kits, instruments, methods, or PT samples, which adversely affect the programs' ability to evaluate laboratory performance.

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993]

§493.905 Nonapproved proficiency testing programs.

If a proficiency testing program is determined by HHS to fail to meet any criteria contained in §§493.901 through 493.959 for approval of the proficiency testing program, CMS will notify the program and the program must notify all laboratories enrolled of the non-approval and the reasons for non-approval within 30 days of the notification.

PROFICIENCY TESTING PROGRAMS BY SPECIALTY AND SUBSPECIALTY

§493.909 Microbiology.

The subspecialties under the specialty of microbiology for which a program may offer proficiency testing are

591

HOLMES000746

bacteriology, mycobacteriology, mycology, parasitology and virology. Specific criteria for these subspecialties are found at §§ 493.911 through 493.919.

### § 493.911 Bacteriology.

(a) *Types of services offered by laboratories.* In bacteriology, for proficiency testing purposes, there are five types of laboratories:

(1) Those that interpret Gram stains or perform primary inoculation, or both; and refer cultures to another laboratory appropriately certified for the subspecialty of bacteriology for identification;

(2) Those that use direct antigen techniques to detect an organism and may also interpret Gram stains or perform primary inoculation, or perform any combination of these;

(3) Those that, in addition to interpreting Gram stains, performing primary inoculations, and using direct antigen tests, also isolate and identify aerobic bacteria from throat, urine, cervical, or urethral discharge specimens to the genus level and may also perform antimicrobial susceptibility tests on selected isolated microorganisms;

(4) Those that perform the services in paragraph (a)(3) of this section and also isolate and identify aerobic bacteria from any source to the species level and may also perform antimicrobial susceptibility tests; and

(5) Those that perform the services in paragraph (a)(4) of this section and also isolate and identify anaerobic bacteria from any source.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing for bacteriology, the annual program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The samples may be provided to the laboratory through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing. For the types of laboratories specified in paragraph (a) of this section, an annual program must include samples that contain organisms that are representative of the six major groups of bacteria: anaerobes, Enterobacteriaceae, gram-positive ba-

cilli, gram-positive cocci, gram-negative cocci, and miscellaneous gram-negative bacteria, as appropriate. The specific organisms included in the samples may vary from year to year. The annual program must include samples for bacterial antigen detection, bacterial isolation and identification, Gram stain, and antimicrobial susceptibility testing.

(1) An approved program must furnish HHS with a description of samples that it plans to include in its annual program no later than six months before each calendar year. At least 50 percent of the samples must be mixtures of the principal organism and appropriate normal flora. The program must include other important emerging pathogens (as determined by HHS) and either organisms commonly occurring in patient specimens or opportunistic pathogens. The program must include the following two types of samples; each type of sample must meet the 50 percent mixed culture criterion:

(i) Samples that require laboratories to report only organisms that the testing laboratory considers to be a principal pathogen that is clearly responsible for a described illness (excluding immuno-compromised patients. The program determines the reportable isolates, including antimicrobial susceptibility for any designated isolate; and

(ii) Samples that require laboratories to report all organisms present. Samples must contain multiple organisms frequently found in specimens such as urine, blood, abscesses, and aspirates where multiple isolates are clearly significant or where specimens are derived from immuno-compromised patients. The program determines the reportable isolates.

(2) An approved program may vary over time. For example, the types of organisms that might be included in an approved program over time are—

*Anaerobes:*
  *Bacteroides fragilis group*
  *Clostridium perfringens*
  *Peptostreptococcus anaerobius*
  *Enterobacteriaceae*
  *Citrobacter freundii*
  *Enterobacter aerogenes*
  *Escherichia coli*
  *Klebsiella pneumoniae*
  *Proteus mirabilis*
  *Salmonella typhimurium*

HOLMES000747

**Centers for Medicare & Medicaid Services, HHS** §493.911

*Serratia marcescens*
*Shigella sonnei*
*Yersinia enterocolitica*
*Gram-positive bacilli:*
 *Listeria monocytogenes*
 *Corynebacterium species CDC Group JK*
*Gram-positive cocci:*
 *Staphylococcus aureus*
 *Streptococcus Group A*
 *Streptococcus Group B*
 *Streptococcus Group D (S. bovis and*
  *enterococcus)*
 *Streptococcus pneumoniae*
*Gram-negative cocci:*
 *Branhamella catarrhalis*
 *Neisseria gonorrhoeae*
 *Neisseria meningitidis*
*Miscellaneous Gram-negative bacteria:*
 *Campylobacter jejuni*
 *Haemophilis influenza, Type B*
 *Pseudomonas aeruginosa*

(3) For antimicrobial susceptibility testing, the program must provide at least one sample per testing event that includes gram-positive or gram-negative strains that have a predetermined pattern of sensitivity or resistance to the common antimicrobial agents.

(c) *Evaluation of a laboratory's performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c) (1) through (7) of this section.

(1) The program determines staining characteristics to be interpreted by Gram stain. The program determines the reportable bacteria to be detected by direct antigen techniques or isolation. To determine the accuracy of a laboratory's response for Gram stain interpretation, direct antigen detection, identification, or antimicrobial susceptibility testing, the program must compare the laboratory's response for each sample with the response which reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories.

(2) To evaluate a laboratory's response for a particular sample, the program must determine a laboratory's type of service in accordance with paragraph (a) of this section. A laboratory must isolate and identify the organisms to the same extent it performs these procedures on patient specimens. A laboratory's performance will be evaluated on the basis of its final answer, for example, a laboratory speci-

fied in paragraph (a)(3) of this section will be evaluated on the basis of the average of its scores for paragraphs (c)(3) through (c)(6) as determined in paragraph (c)(7) of this section.

(3) Since laboratories may incorrectly report the presence of organisms in addition to the correctly identified principal organism(s), the grading system must provide a means of deducting credit for additional erroneous organisms that are reported. Therefore, the total number of correct responses for organism isolation and identification submitted by the laboratory divided by the number of organisms present plus the number of incorrect organisms reported by the laboratory must be multiplied by 100 to establish a score for each sample in each testing event. For example, if a sample contained one principal organism and the laboratory reported it correctly but reported the presence of an additional organism, which was not considered reportable, the sample grade would be $1/(1 + 1) \times 100 = 50$ percent.

(4) For antimicrobial susceptibility testing, a laboratory must indicate which drugs are routinely included in its test panel when testing patient samples. A laboratory's performance will be evaluated for only those antibiotics for which service is offered. A correct response for each antibiotic will be determined as described in §493.911(c) (1) using criteria such as the guidelines established by the National Committee for Clinical Laboratory Standards. Grading is based on the number of correct susceptibility responses reported by the laboratory divided by the actual number of correct susceptibility responses determined by the program, multiplied by 100. For example, if a laboratory offers susceptibility testing for *Enterobacteriaceae* using amikacin, cephalothin, and tobramycin, and the organism in the proficiency testing sample is an *Enterobacteriaceae*, and the laboratory reports correct responses for two of three antimicrobial agents, the laboratory's grade would be $2/3 \times 100 = 67$ percent.

(5) The performance criterion for qualitative antigen tests is the presence or absence of the bacterial antigen. The score for antigen tests is the

593

HOLMES000748

ER-14177

number of correct responses divided by the number of samples to be tested for the antigen, multiplied by 100.

(6) The performance criteria for Gram stain is staining reaction, i.e., gram positive or gram negative. The score for Gram stain is the number of correct responses divided by the number of challenges to be tested, multiplied by 100.

(7) The score for a testing event in bacteriology is the average of the scores determined under paragraphs (c)(3) through (c)(6) of this section kbased on the type of service offered by the laboratory.

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

§493.913  Mycobacteriology.

(a) *Types of services offered by laboratories.* In mycobacteriology, there are five types of laboratories for proficiency testing purposes:

(1) Those that interpret acid-fast stains and refer specimen to another laboratory appropriately certified in the subspecialty of mycobacteriology;

(2) Those that interpret acid-fast stains, perform primary inoculation, and refer cultures to another laboratory appropriately certified in the subspecialty of mycobacteriology for identification;

(3) Those that interpret acid-fast stains, isolate and perform identification and/or antimycobacterial susceptibility of *Mycobacterium tuberculosis,* but refer other mycobacteria species to another laboratory appropriately certified in the subspecialty of mycobacteriology for identification and/or susceptibility tests;

(4) Those that interpret acid-fast stains, isolate and identify all mycobacteria to the extent required for correct clinical diagnosis, but refer antimycobacterial susceptibility tests to another laboratory appropriately certified in the subspecialty of mycobacteriology; and

(5) Those that interpret acid-fast stains, isolate and identify all mycobacteria to the extent required for correct clinical diagnosis, and perform antimycobacterial susceptibility tests on the organisms isolated.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing for mycobacteriology, the annual program must provide a minimum of five samples per testing event. There must be at least two testing events per year. The samples may be provided through mailed shipments or, at HHS' option, provided to HHS or its designee for on-site testing events. For types of laboratories specified in paragraphs (a)(1) and (a) (3) through (5) of this section, an annual program must include samples that contain species that are representative of the 5 major groups (complexes) of mycobacteria encountered in human specimens. The specific mycobacteria included in the samples may vary from year to year.

(1) An approved program must furnish HHS and its agents with a description of samples that it plans to include in its annual program no later than six months before each calendar year. At least 50 percent of the samples must be mixtures of the principal mycobacteria and appropriate normal flora. The program must include mycobacteria commonly occurring in patient specimens and other important emerging mycobacteria (as determined by HHS). The program determins the reportable isolates and correct responses for antimycobacterial susceptibility for any designated isolate.

(2) An approved program may vary over time. For example, the types of mycobacteria that might be included in an approved program over time are—

TB
   *Mycobacterium tuberculosis*
   *Mycobacterium bovis*
Group I
   *Mycobacterium kansasii*
Group II
   *Mycobacterium szulgai*
Group III
   *Mycobacterium avium-intracellulare*
   *Mycobacterium terrae*
Group IV
   *Mycobacterium fortuitum*

(3) For antimycobacterial susceptibility testing, the program must provide at least one sample per testing event that includes mycobacterium tuberculosis that has a predetermined pattern of sensitivity or resistance to the common antimycobacterial agents.

594

HOLMES000749

**Centers for Medicare & Medicaid Services, HHS**    **§ 493.915**

(4) For laboratories specified in paragraphs (a)(1) and (a)(2), the program must provide at least five samples per testing event that includes challenges that are acid-fast and challenges which do not contain acid-fast organisms.

(c) *Evaluation of a laboratory's performance.* HHS approves only those programs that assess the accuracy of a laboratory's response in accordance with paragraphs (c)(1) through (6) of this section.

(1) The program determines the reportable mycobacteria to be detected by acid-fast stain, for isolation and identification, and for antimycobacterial susceptibility. To determine the accuracy of a laboratory's response, the program must compare the laboratory's response for each sample with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories.

(2) To evaluate a laboratory's response for a particular sample, the program must determine a laboratory's type of service in accordance with paragraph (a) of this section. A laboratory must interpret acid-fast stains and isolate and identify the organisms to the same extent it performs these procedures on patient specimens. A laboratory's performance will be evaluated on the basis of the average of its scores as determined in paragraph (c)(6) of this section.

(3) Since laboratories may incorrectly report the presence of organisms in addition to the correctly identified principal organism(s), the grading system must provide a means of deducting credit for additional erroneous organisms reported. Therefore, the total number of correct responses submitted by the laboratory divided by the number of organisms present plus the number of incorrect organisms reported by the laboratory must be multiplied by 100 to establish a score for each sample in each testing event. For example, if a sample contained one principal organism and the laboratory reported it correctly but reported the presence of an additional organism, which was not present, the sample grade would be

$1 / (1 + 1) \times 100 = 50$ percent

(4) For antimycobacterial susceptibility testing, a laboratory must indicate which drugs are routinely included in its test panel when testing patient samples. A laboratory's performance will be evaluated for only those antibiotics for which susceptibility testing is routinely performed on patient specimens. A correct response for each antibiotic will be determined as described in § 493.913(c)(1). Grading is based on the number of correct susceptibility responses reported by the laboratory divided by the actual number of correct susceptibility responses as determined by the program, multiplied by 100. For example, if a laboratory offers susceptibility testing using three antimycobacterial agents and the laboratory reports correct response for two of the three antimycobacterial agents, the laboratory's grade would be $\frac{2}{3} \times 100 = 67$ percent.

(5) The performance criterion for qualitative tests is the presence or absence of acid-fast organisms. The score for acid-fast organism detection is the number of correct responses divided by the number of samples to be tested, multiplied by 100.

(6) The score for a testing event in mycobacteriology is the average of the scores determined under paragraphs (c)(3) through (c)(5) of this section based on the type of service offered by the laboratory.

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

§ 493.915 **Mycology.**

(a) *Types of services offered by laboratories.* In mycology, there are four types of laboratories for proficiency testing purposes that may perform different levels of service for yeasts, dimorphic fungi, dermatophytes, and aerobic actinomycetes:

(1) Those that isolate and identify only yeasts and/or dermatophytes to the genus level;

(2) Those that isolate and identify yeasts and/or dermatophytes to the species level;

(3) Those that isolate and perform identification of all organisms to the genus level; and

595

HOLMES000750

(4) Those that isolate and perform identification of all organisms to the species level.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing for mycology, the annual program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing. An annual program must include samples that contain organisms that are representative of five major groups of fungi: Yeast or yeast-like fungi; dimorphic fungi; dematiaceous fungi; dermatophytes; and saprophytes, including opportunistic fungi. The specific fungi included in the samples may vary from year to year.

(1) An approved program must, before each calendar year, furnish HHS with a description of samples that it plans to include in its annual program no later than six months before each calendar year. At least 50 percent of the samples must be mixtures of the principal organism and appropriate normal background flora. Other important emerging pathogens (as determined by HHS) and organisms commonly occurring in patient specimens must be included periodically in the program.

(2) An approved program may vary over time. As an example, the types of organisms that might be included in an approved program over time are—

*Candida albicans*
*Candida* (other species)
*Cryptococcus neoformans*
*Sporothrix schenckii*
*Exophiala jeanselmei*
*Fonsecaea pedrosoi*
*Microsporum sp.*
*Acremonium sp.*
*Trichophyton sp.*
*Aspergillus fumigatus*
*Nocardia sp.*
*Blastomyces dermatitidis* [1]
*Zygomycetes sp.*
[1] NOTE: Provided as a nonviable sample.

(c) *Evaluation of a laboratory's performance.* HHS approves only those programs that assess the accuracy of a laboratory's response, in accordance with paragraphs (c)(1) through (5) of this section.

(1) The program determines the reportable organisms. To determine the accuracy of a laboratory's response, the program must compare the laboratory's response for each sample with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories.

(2) To evaluate a laboratory's response for a particular sample, the program must determine a laboratory's type of service in accordance with paragraph (a) of this section. A laboratory must isolate and identify the organisms to the same extent it performs these procedures on patient specimens.

(3) Since laboratories may incorrectly report the presence of organisms in addition to the correctly identified principal organism(s), the grading system must deduct credit for additional erroneous organisms reported. Therefore, the total number of correct responses submitted by the laboratory divided by the number of organisms present plus the number of incorrect organisms reported by the laboratory must be multiplied by 100 to establish a score for each sample in each shipment or testing event. For example, if a sample contained one principal organism and the laboratory reported it correctly but reported the presence of an additional organism, which was not present, the sample grade would be $1/(1 + 1) \times 100 = 50$ percent.

(4) The score for the antigen tests is the number of correct responses divided by the number of samples to be tested for the antigen, multiplied by 100.

(5) The score for a testing event is the average of the sample scores as determined under paragraph (c)(3) or (c)(4), or both, of this section.

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5228, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

§ 493.917  Parasitology.

(a) *Types of services offered by laboratories.* In parasitology there are two types of laboratories for proficiency testing purposes—

(1) Those that determine the presence or absence of parasites by direct observation (wet mount) and/or pinworm preparations and, if necessary, refer

596

HOLMES000751

**Centers for Medicare & Medicaid Services, HHS** §493.917

specimens to another laboratory appropriately certified in the subspecialty of parasitology for identification;

(2) Those that identify parasites using concentration preparations and/or permanent stains.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing in parasitology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The samples may be provided through mailed shipments or, at HHS's option, may be provided to HHS or its designee for on-site testing. An annual program must include samples that contain parasites that are commonly encountered in the United States as well as those recently introduced into the United States. Other important emerging pathogens (as determined by HHS) and parasites commonly occurring in patient specimens must be included periodically in the program.

(1) An approved program must, before each calendar year furnish HHS with a description of samples that it plans to include in its annual program no later than six months before each calendar year. Samples must include both formalinized specimens and PVA (polyvinyl alcohol) fixed specimens as well as blood smears, as appropriate for a particular parasite and stage of the parasite. The majority of samples must contain protozoa or helminths or a combination of parasites. Some samples must be devoid of parasites.

(2) An approved program may vary over time. As an example, the types of parasites that might be included in an approved program over time are—

*Enterobius vermicularis*
*Entamoeba histolytica*
*Entamoeba coli*
*Giardia lamblia*
*Endolimax nana*
*Dientamoeba fragilis*
*Iodamoeba butschli*
*Chilomastix mesnili*
Hookworm
*Ascaris lumbricoides*
*Strongyloides stercoralis*
*Trichuris trichiura*
*Diphyllobothrium latum*
*Cryptosporidium sp.*
*Plasmodium falciparum*

(3) For laboratories specified in paragraph (a)(1) of this section, the program must provide at least five samples per testing event that include challenges which contain parasites and challenges that are devoid of parasites.

(c) *Evaluation of a laboratory's performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c)(1) through (6) of this section.

(1) The program must determine the reportable parasites. It may elect to establish a minimum number of parasites to be identified in samples before they are reported. Parasites found in rare numbers by referee laboratories are not considered in scoring a laboratory's performance; such findings are neutral. To determine the accuracy of a laboratory's response, the program must compare the laboratory's response with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories.

(2) To evaluate a laboratory's response for a particular sample, the program must determine a laboratory's type of service in accordance with paragraph (a) of this section. A laboratory must determine the presence or absence of a parasite(s) or concentrate and identify the parasites to the same extent it performs these procedures on patient specimens.

(3) Since laboratories may incorrectly report the presence of parasites in addition to the correctly identified principal parasite(s), the grading system must deduct credit for these additional erroneous parasites reported and not found in rare numbers by the program's referencing process. Therefore, the total number of correct responses submitted by the laboratory divided by the number of parasites present plus the number of incorrect parasites reported by the laboratory must be multiplied by 100 to establish a score for each sample in each testing event. For example, if a sample contained one principal parasite and the laboratory reported it correctly but reported the presence of an additional parasite, which was not present, the sample grade would be

$1/(1 + 1) \times 100 = 50$ percent.

597

HOLMES000752

(4) The criterion for acceptable performance for qualitative parasitology examinations is presence or absence of a parasite(s).

(5) The score for parasitology is the number of correct responses divided by the number of samples to be tested, multiplied by 100.

(6) The score for a testing event is the average of the sample scores as determined under paragraphs (c)(3) through (c)(5) of this section.

[57 FR 7151, Feb. 28, 1992, as amended at 68 FR 3702, Jan. 24, 2003]

§ 493.919 Virology.

(a) *Types of services offered by laboratories.* In virology, there are two types of laboratories for proficiency testing purposes—

(1) Those that only perform tests that directly detect viral antigens or structures, either in cells derived from infected tissues or free in fluid specimens; and

(2) Those that are able to isolate and identify viruses and use direct antigen techniques.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing in virology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The samples may be provided to the laboratory through mailed shipments or, at HHS's option, may be provided to HHS or its designee for on-site testing. An annual program must include viral species that are the more commonly identified viruses. The specific organisms found in the samples may vary from year to year. The annual program must include samples for viral antigen detection and viral isolation and identification.

(1) An approved program must furnish HHS with a description of samples that it plans to include in its annual program no later than six months before each calendar year. The program must include other important emerging viruses (as determined by HHS) and viruses commonly occurring in patient specimens.

(2) An approved program may vary over time. For example, the types of viruses that might be included in an ap-

proved program over time are the more commonly identified viruses such as Herpes simplex, respiratory syncytial virus, adenoviruses, enteroviruses, and cytomegaloviruses.

(c) *Evaluation of laboratory's performance.* HHS approves only those programs that assess the accuracy of a laboratory's response in accordance with paragraphs (c)(1) through (5) of this section.

(1) The program determines the reportable viruses to be detected by direct antigen techniques or isolated by laboratories that perform viral isolation procedures. To determine the accuracy of a laboratory's response, the program must compare the laboratory's response for each sample with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories.

(2) To evaluate a laboratory's response for a particular sample, the program must determine a laboratory's type of service in accordance with paragraph (a) of this section. A laboratory must isolate and identify the viruses to the same extent it performs these procedures on patient specimens.

(3) Since laboratories may incorrectly report the presence of viruses in addition to the correctly identified principal virus, the grading system must provide a means of deducting credit for additional erroneous viruses reported. Therefore, the total number of correct responses determined by virus culture techniques submitted by the laboratory divided by the number of viruses present plus the number of incorrect viruses reported by the laboratory must be multiplied by 100 to establish a score for each sample in each testing event. For example, if a sample contained one principal virus and the laboratory reported it correctly but reported the presence of an additional virus, which was not present, the sample grade would be $1/(1 + 1) \times 100 = 50$ percent.

(4) The performance criterion for qualitative antigen tests is presence or absence of the viral antigen. The score for the antigen tests is the number of correct responses divided by the number of samples to be tested for the antigen, multiplied by 100.

HOLMES000753

(5) The score for a testing event is the average of the sample scores as determined under paragraph (c)(3) and (c)(4) of this section.

[57 FR 7151, Feb. 28, 1992, as amended at 68 FR 3702, Jan. 24, 2003]

### §493.921 Diagnostic immunology.

The subspecialties under the specialty of immunology for which a program may offer proficiency testing are syphilis serology and general immunology. Specific criteria for these subspecialties are found at §§493.923 and 493.927.

### §493.923 Syphilis serology.

(a) *Program content and frequency of challenge.* To be approved for proficiency testing in syphilis serology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing. An annual program must include samples that cover the full range of reactivity from highly reactive to non-reactive.

(b) *Evaluation of test performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (b)(1) through (4) of this section.

(1) To determine the accuracy of a laboratory's response for qualitative and quantitative syphilis tests, the program must compare the laboratory's response with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories. The proficiency testing program must indicate the minimum concentration, by method, that will be considered as indicating a positive response. The score for a sample in syphilis serology is the average of scores determined under paragraphs (b)(2) and (b)(3) of this section.

(2) For quantitative syphilis tests, the program must determine the correct response for each method by the distance of the response from the target value. After the target value has been established for each response, the appropriateness of the response must be determined by using fixed criteria. The criterion for acceptable performance for quantitative syphilis serology tests is the target value ±1 dilution.

(3) The criterion for acceptable performance for qualitative syphilis serology tests is reactive or nonreactive.

(4) To determine the overall testing event score, the number of correct responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

### §493.927 General immunology.

(a) *Program content and frequency of challenge.* To be approved for proficiency testing for immunology, the annual program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the full range of reactivity from highly reactive to nonreactive. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing.

(b) *Challenges per testing event.* The minimum number of challenges per testing event the program must provide for each analyte or test procedure is five. Analytes or tests for which laboratory performance is to be evaluated include:

*Analyte or Test Procedure*

Alpha-1 antitrypsin

599

HOLMES000754

§ 493.927           **42 CFR Ch. IV (10–1–15 Edition)**

Alpha-fetoprotein (tumor marker)
Antinuclear antibody
Antistreptolysin O
Anti-human immunodeficiency virus (HIV)
Complement C3
Complement C4
Hepatitis markers (HBsAg, anti-HBc, HBeAg)
IgA
IgG
IgE
IgM
Infectious mononucleosis
Rheumatoid factor
Rubella

(c) *Evaluation of a laboratory's analyte or test performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c)(1) through (5) of this section.

(1) To determine the accuracy of a laboratory's response for quantitative and qualitative immunology tests or analytes, the program must compare the laboratory's response for each analyte with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories. The proficiency testing program must indicate the minimum concentration that will be considered as indicating a positive response. The score for a sample in general immunology is either the score determined under paragraph (c)(2) or (3) of this section.

(2) For quantitative immunology analytes or tests, the program must determine the correct response for each analyte by the distance of the response from the target value. After the target value has been established for each response, the appropriateness of the response must be determined by using either fixed criteria or the number of standard deviations (SDs) the response differs from the target value.

*Criteria for Acceptable Performance*

The criteria for acceptable performance are—

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Alpha-1 antitrypsin | Target value ±3 SD. |
| Alpha-fetoprotein (tumor marker). | Target value ±3 SD. |
| Antinuclear antibody | Target value ±2 dilutions or positive or negative. |
| Antistreptolysin O | Target value ±2 dilution or positive or negative. |
| Anti-Human Immuno-deficiency virus. | Reactive or nonreactive. |
| Complement C3 | Target value ±3 SD. |
| Complement C4 | Target value ±3 SD. |
| Hepatitis (HBsAg, anti-HBc, HBeAg). | Reactive (positive) or non-reactive (negative). |
| IgA | Target value ±3 SD. |
| IgE | Target value ±3 SD. |
| IgG | Target value ±25%. |
| IgM | Target value ±3 SD. |
| Infectious mononucleosis | Target value ±2 dilutions or positive or negative. |
| Rheumatoid factor | Target value ±2 dilutions or positive or negative. |
| Rubella | Target value ±2 dilutions or immune or nonimmune or positive or negative. |

(3) The criterion for acceptable performance for qualitative general immunology tests is positive or negative.

(4) To determine the analyte testing event score, the number of acceptable analyte responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \frac{\text{Analyte score for}}{\text{the testing event}}$$

(5) To determine the overall testing event score, the number of correct responses for all analytes must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

600

HOLMES000755

Centers for Medicare & Medicaid Services, HHS §493.931

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

§493.929  Chemistry.

The subspecialties under the specialty of chemistry for which a proficiency testing program may offer proficiency testing are routine chemistry, endocrinology, and toxicology. Specific criteria for these subspecialties are listed in §§493.931 through 493.939.

§493.931  Routine chemistry.

(a) *Program content and frequency of challenge.* To be approved for proficiency testing for routine chemistry, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the clinically relevant range of values that would be expected in patient specimens. The specimens may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing.

(b) *Challenges per testing event.* The minimum number of challenges per testing event a program must provide for each analyte or test procedure listed below is five serum, plasma or blood samples.

*Analyte or Test Procedure*

Alanine aminotransferase (ALT/SGPT)
Albumin
Alkaline phosphatase
Amylase
Aspartate aminotransferase (AST/SGOT)
Bilirubin, total
Blood gas (pH, pO2, and pCO2)
Calcium, total
Chloride
Cholesterol, total
Cholesterol, high density lipoprotein
Creatine kinase
Creatine kinase, isoenzymes
Creatinine
Glucose (Excluding measurements on devices
    cleared by FDA for home use)
Iron, total
Lactate dehydrogenase (LDH)
LDH isoenzymes
Magnesium
Potassium
Sodium
Total Protein
Triglycerides
Urea Nitrogen

Uric Acid

(c) *Evaluation of a laboratory's analyte or test performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c)(1) through (5) of this section.

(1) To determine the accuracy of a laboratory's response for qualitative and quantitative chemistry tests or analytes, the program must compare the laboratory's response for each analyte with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories. The score for a sample in routine chemistry is either the score determined under paragraph (c)(2) or (3) of this section.

(2) For quantitative chemistry tests or analytes, the program must determine the correct response for each analyte by the distance of the response from the target value. After the target value has been established for each response, the appropriateness of the response must be determined by using either fixed criteria based on the percentage difference from the target value or the number of standard deviations (SDs) the response differs from the target value.

*Criteria for Acceptable Performance*

The criteria for acceptable performance are—

| Analyte or test | Criteria for acceptable performance |
| --- | --- |
| Alanine aminotransferase (ALT/SGPT). | Target value ±20%. |
| Albumin ...................... | Target value ±10%. |
| Alkaline phosphatase .......... | Target value ±30%. |
| Amylase ...................... | Target value ±30%. |
| Aspartate aminotransferase (AST/SGOT). | Target value ±20%. |
| Bilirubin, total .............. | Target value ±0.4 mg/dL or ±20% (greater). |
| Blood gas pO2 ............... | Target value ±3 SD. |
| pCO2 ........................ | Target value ±5 mm Hg or ±8% (greater). |
| pH ........................... | Target value ±0.04. |
| Calcium, total ............... | Target value ±1.0 mg/dL. |
| Chloride ..................... | Target value ±5%. |
| Cholesterol, total ........... | Target value ±10%. |
| Cholesterol, high density lipoprotein. | Target value ±30%. |
| Creatine kinase ............. | Target value ±30%. |
| Creatine kinase isoenzymes | MB elevated (presence or absence) or Target value ±3SD. |
| Creatinine .................. | Target value ±0.3 mg/dL or ±15% (greater). |

601

HOLMES000756

§ 493.933                                    42 CFR Ch. IV (10–1–15 Edition)

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Glucose (excluding glucose performed on monitoring devices cleared by FDA for home use. | Target value ±6 mg/dl or ±10% (greater). |
| Iron, total | Target value ±20%. |
| Lactate dehydrogenase (LDH). | Target value ±20%. |
| LDH isoenzymes | LDH1/LDH2 ( + or − ) or Target value ±30%. |
| Magnesium | Target value ±25%. |
| Potassium | Target value ±0.5 mmol/L. |
| Sodium | Target value ±4 mmol/L. |
| Total Protein | Target value ±10%. |
| Triglycerides | Target value ±25%. |

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Urea nitrogen | Target value ±2 mg/dL or ±9% (greater). |
| Uric acid | Target value ±17%. |

(3) The criterion for acceptable performance for qualitative routine chemistry tests is positive or negative.

(4) To determine the analyte testing event score, the number of acceptable analyte responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \text{Analyte score for the testing event}$$

(5) To determine the overall testing event score, the number of correct responses for all analytes must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

[57 FR 7151, Feb. 28, 1992, as amended at 68 FR 3702, Jan. 24, 2003]

§ 493.933  Endocrinology.

(a) *Program content and frequency of challenge.* To be approved for proficiency testing for endocrinology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the clinically relevant range of values that would be expected in patient specimens. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing.

(b) *Challenges per testing event.* The minimum number of challenges per testing event a program must provide for each analyte or test procedure is five serum, plasma, blood, or urine samples.

*Analyte or Test*

Cortisol
Free Thyroxine

Human Chorionic gonadotropin (excluding urine pregnancy tests done by visual color comparison categorized as waived tests)
T3 Uptake
Triiodothyronine
Thyroid-stimulating hormone
Thyroxine

(c) *Evaluation of a laboratory's analyte or test performance.* HHS approves only those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c)(1) through (5) of this section.

(1) To determine the accuracy of a laboratory's response for qualitative and quantitative endocrinology tests or analytes, a program must compare the laboratory's response for each analyte with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories. The score for a sample in endocrinology is either the score determined under paragraph (c)(2) or (c)(3) of this section.

602

HOLMES000757

**Centers for Medicare & Medicaid Services, HHS** §493.937

(2) For quantitative endocrinology tests or analytes, the program must determine the correct response for each analyte by the distance of the response from the target value. After the target value has been established for each response, the appropriateness of the response must be determined by using either fixed criteria based on the percentage difference from the target value or the number of standard deviations (SDs) the response differs from the target value.

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Cortisol ........................... | Target value ±25%. |
| Free Thyroxine .................. | Target value ±3 SD. |
| Human Chorionic Gonadotropin (excluding urine pregnancy tests done by visual color comparison categorized as waived tests). | Target value ±3 SD positive or negative. |
| T3 Uptake ........................ | Target value ±3 SD. |
| Triiodothyronine ............... | Target value ±3 SD. |
| Thyroid-stimulating hormone | Target value ±3 SD. |
| Thyroxine ......................... | Target value ±20% or 1.0 mcg/dL (greater). |

(3) The criterion for acceptable performance for qualitative endocrinology tests is positive or negative.

(4) To determine the analyte testing event score, the number of acceptable analyte responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \frac{\text{Analyte score for}}{\text{the testing event}}$$

*Criteria for Acceptable Performance*

The criteria for acceptable performance are—

(5) To determine the overall testing event score, the number of correct responses for all analytes must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

## §493.937  Toxicology.

(a) *Program content and frequency of challenge.* To be approved for proficiency testing for toxicology, the annual program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the clinically relevant range of values that would be expected in specimens of patients on drug therapy and that cover the level of clinical significance for the particular drug. The samples may be provided through mailed shipments or, at HHS' option,

may be provided to HHS or its designee for on-site testing.

(b) *Challenges per testing event.* The minimum number of challenges per testing event a program must provide for each analyte or test procedure is five serum, plasma, or blood samples.

*Analyte or Test Procedure*

Alcohol (blood)
Blood lead
Carbamazepine
Digoxin
Ethosuximide
Gentamicin
Lithium
Phenobarbital

Phenytoin
Primidone
Procainamide
 (and metabolite)
Quinidine
Theophylline
Tobramycin
Valproic Acid

(c) *Evaluation of a laboratory's analyte or test performance.* HHS approves only

603

HOLMES000758

those programs that assess the accuracy of a laboratory's responses in accordance with paragraphs (c)(1) through (4) of this section.

(1) To determine the accuracy of a laboratory's responses for quantitative toxicology tests or analytes, the program must compare the laboratory's response for each analyte with the response that reflects agreement of either 80 percent of ten or more referee laboratories or 80 percent or more of all participating laboratories. The score for a sample in toxicology is the score determined under paragraph (c)(2) of this section.

(2) For quantitative toxicology tests or analytes, the program must determine the correct response for each analyte by the distance of the response from the target value. After the target value has been established for each response, the appropriateness of the response must be determined by using fixed criteria based on the percentage difference from the target value

*Criteria for Acceptable Performance*

The criteria for acceptable performance are:

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Alcohol, blood | Target Value ±25%. |
| Blood lead | Target Value ±10% or 4 mcg/dL (greater). |
| Carbamazepine | Target Value ±25%. |
| Digoxin | Target Value ±20% or ±0.2 ng/mL (greater). |
| Ethosuximide | Target Value ±20%. |
| Gentamicin | Target Value ±25%. |
| Lithium | Target Value ±0.3 mmol/L or ±20% (greater). |
| Phenobarbital | Target Value ±20% |
| Phenytoin | Target Value ±25%. |
| Primidone | Target Value ±25%. |
| Procainamide (and metabolite). | Target Value ±25%. |
| Quinidine | Target Value ±25%. |
| Tobramycin | Target Value ±25%. |
| Theophylline | Target Value ±25%. |
| Valproic Acid | Target Value ±25%. |

(3) To determine the analyte testing event score, the number of acceptable analyte responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \begin{array}{c}\text{Analyte score for}\\\text{the testing event}\end{array}$$

(4) To determine the overall testing event score, the number of correct responses for all analytes must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

§ 493.941  Hematology (including routine hematology and coagulation).

(a) *Program content and frequency of challenge.* To be approved for proficiency testing for hematology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the full range of values

that would be expected in patient specimens. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS and or its designee for on-site testing.

(b) *Challenges per testing event.* The minimum number of challenges per testing event a program must provide for each analyte or test procedure is five.

*Analyte or Test Procedure*

Cell identification or white blood cell differential
Erythrocyte count

604

HOLMES000759

**Centers for Medicare & Medicaid Services, HHS**  §493.941

Hematocrit (excluding spun microhemato-
crit)
Hemoglobin
Leukocyte count
Platelet count
Fibrinogen
Partial thromboplastin time
Prothrombin time

(1) An approved program for cell
identification may vary over time. The
types of cells that might be included in
an approved program over time are—

Neutrophilic granulocytes
Eosinophilic granulocytes
Basophilic granulocytes
Lymphocytes
Monocytes
Major red and white blood cell abnormalities
Immature red and white blood cells

(2) White blood cell differentials
should be limited to the percentage
distribution of cellular elements listed
above.

(c) *Evaluation of a laboratory's analyte
or test performance.* HHS approves only
those programs that assess the accu-
racy of a laboratory's responses in ac-
cordance with paragraphs (c) (1)
through (5) of this section.

(1) To determine the accuracy of a
laboratory's responses for qualitative
and quantitative hematology tests or
analytes, the program must compare
the laboratory's response for each
analyte with the response that reflects
agreement of either 80 percent of ten or
more referee laboratories or 80 percent
or more of all participating labora-
tories. The score for a sample in hema-
tology is either the score determined
under paragraph (c) (2) or (3) of this
section.

(2) For quantitative hematology tests
or analytes, the program must deter-
mine the correct response for each
analyte by the distance of the response
from the target value. After the target
value has been established for each re-
sponse, the appropriateness of the re-
sponse is determined using either fixed
criteria based on the percentage dif-
ference from the target value or the
number of standard deviations (SDs)
the response differs from the target
value.

*Criteria for Acceptable Performance*

The criteria for acceptable perform-
ance are:

| Analyte or test | Criteria for acceptable performance |
|---|---|
| Cell identification | 90% or greater consensus on identification. |
| White blood cell differential | Target ±3SD based on the percentage of different types of white blood cells in the samples. |
| Erythrocyte count | Target ±6%. |
| Hematocrit (Excluding spun hematocrits). | Target ±6%. |
| Hemoglobin | Target ±7%. |
| Leukocyte count | Target ±15%. |
| Platelet count | Target ±25%. |
| Fibrinogen | Target ±20%. |
| Partial thromboplastin time | Target ±15%. |
| Prothrombin time | Target ±15%. |

(3) The criterion for acceptable per-
formance for the qualitative hema-
tology test is correct cell identifica-
tion.

(4) To determine the analyte testing
event score, the number of acceptable
analyte responses must be averaged
using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \frac{\text{Analyte score for the testing event}}{}$$

(5) To determine the overall testing
event score, the number of correct re-
sponses for all analytes must be aver-
aged using the following formula:

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

605

HOLMES000760

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

## § 493.945 Cytology; gynecologic examinations.

(a) *Program content and frequency of challenge.* (1) To be approved for proficiency testing for gynecologic examinations (Pap smears) in cytology, a program must provide test sets composed of 10- and 20-glass slides. Proficiency testing programs may obtain slides for test sets from cytology laboratories, provided the slides have been retained by the laboratory for the required period specified in §§ 493.1105(a)(7)(i)(A) and 493.1274(f)(2). If slide preparations are still subject to retention by the laboratory, they may be loaned to a proficiency testing program if the program provides the laboratory with documentation of the loan of the slides and ensures that slides loaned to it are retrievable upon request. Each test set must include at least one slide representing each of the response categories described in paragraph (b)(3)(ii)(A) of this section, and test sets should be comparable so that equitable testing is achieved within and between proficiency testing providers.

(2) To be approved for proficiency testing in gynecologic cytology, a program must provide announced and unannounced on-site testing for each individual at least once per year and must provide an initial retesting event for each individual within 45 days after notification of test failure and subsequent retesting events within 45 days after completion of remedial action described in § 493.855.

(b) *Evaluation of an individual's performance.* HHS approves only those programs that assess the accuracy of each individual's responses on both 10- and 20-slide test sets in which the slides have been referenced as specified in paragraph (b)(1) of this section.

(1) To determine the accuracy of an individual's response on a particular challenge (slide), the program must compare the individual's response for each slide preparation with the response that reflects the predetermined consensus agreement or confirmation on the diagnostic category, as described in the table in paragraph

(b)(3)(ii)(A) of this section. For all slide preparations, a 100% consensus agreement among a minimum of three physicians certified in anatomic pathology is required. In addition, for premalignant and malignant slide preparations, confirmation by tissue biopsy is required either by comparison of the reported biopsy results or reevaluation of biopsy slide material by a physician certified in anatomic pathology.

(2) An individual qualified as a technical supervisor under § 493.1449 (b) or (k) who routinely interprets gynecologic slide preparations only after they have been examined by a cytotechnologist can either be tested using a test set that has been screened by a cytotechnologist in the same laboratory or using a test set that has not been screened. A technical supervisor who screens and interprets slide preparations that have not been previously examined must be tested using a test set that has not been previously screened.

(3) The criteria for acceptable performance are determined by using the scoring system in paragraphs (b)(3) (i) and (ii) of this section.

(i) Each slide set must contain 10 or 20 slides with point values established for each slide preparation based on the significance of the relationship of the interpretation of the slide to a clinical condition and whether the participant in the testing event is a cytotechnologist qualified under § 493.1469 or § 493.1483 or functioning as a technical supervisor in cytology qualified under § 493.1449 (b) or (k) of this part.

(ii) The scoring system rewards or penalizes the participants in proportion to the distance of their answers from the correct response or target diagnosis and the penalty or reward is weighted in proportion to the severity of the lesion.

(A) The four response categories for reporting proficiency testing results and their descriptions are as follows:

| Category | Description |
| --- | --- |
| A ............... | Unsatisfactory for diagnosis due to: <br> (1) Scant cellularity. <br> (2) Air drying. |

HOLMES000761

**Centers for Medicare & Medicaid Services, HHS** §493.945

| Category | Description |
|---|---|
| B .............. | (3) Obscuring material (blood, inflammatory cells, or lubricant). Normal or Benign Changes—includes: (1) Normal, negative or within normal limits. (2) Infection other than Human Papillomavirus (HPV) (e.g., *Trichomonas vaginalis*, changes or morphology consistent with *Candida* spp., *Actinomyces* spp. or *Herpes simplex* virus). (3) Reactive and reparative changes (e.g., inflammation, effects of chemotherapy or radiation). |
| C .............. | Low Grade Squamous Intraepithelial Lesion—includes: (1) Cellular changes associated with HPV. (2) Mild dysplasia/CIN−1. |
| D .............. | High Grade Lesion and Carcinoma—includes: (1) High grade squamous intraepithelial lesions which include moderate dysplasia/CIN−2 and severe dysplasia/carcinoma in-situ/CIN−3. (2) Squamous cell carcinoma. (3) Adenocarcinoma and other malignant neoplasms. |

(B) In accordance with the criteria for the scoring system, the charts in paragraphs (b)(3)(ii)(C) and (D) of this section, for technical supervisors and cytotechnologists, respectively, provide a maximum of 10 points for a correct response and a maximum of minus five (−5) points for an incorrect response on a 10-slide test set. For example, if the correct response on a slide is "high grade squamous intraepithelial lesion" (category "D" on the scoring system chart) and an examinee calls it "normal or negative" (category "B" on the scoring system chart), then the examinee's point value on that slide is calculated as minus five (−5). Each slide is scored individually in the same manner. The individual's score for the testing event is determined by adding the point value achieved for each slide preparation, dividing by the total points for the testing event and multiplying by 100.

(C) Criteria for scoring system for a 10-slide test set. (See table at (b)(3)(ii)(A) of this section for a description of the response categories.) For technical supervisors qualified under §493.1449(b) or (k):

| Examinee's response: | A | B | C | D |
|---|---|---|---|---|
| Correct response category: | | | | |
| A ..................... | 10 | 0 | 0 | 0 |
| B ..................... | 5 | 10 | 0 | 0 |
| C ..................... | 5 | 0 | 10 | 5 |
| D ..................... | 0 | −5 | 5 | 10 |

(D) Criteria for scoring system for a 10-slide test set. (See table at paragraph (b)(3)(ii)(A) of this section for a description of the response categories.) For cytotechnologists qualified under §493.1469 or §493.1483:

| Examinee's response: | A | B | C | D |
|---|---|---|---|---|
| Correct response category: | | | | |
| A ..................... | 10 | 0 | 5 | 5 |
| B ..................... | 5 | 10 | 5 | 5 |
| C ..................... | 5 | 0 | 10 | 10 |
| D ..................... | 0 | −5 | 10 | 10 |

(E) In accordance with the criteria for the scoring system, the charts in paragraphs (b)(3)(ii)(F) and (G) of this section, for technical supervisors and cytotechnologists, respectively, provide maximums of 5 points for a correct response and minus ten (−10) points for an incorrect response on a 20-slide test set.

(F) Criteria for scoring system for a 20-slide test set. (See table at paragraph (b)(3)(ii)(A) of this section for a description of the response categories.) For technical supervisors qualified under §493.1449(b) or (k):

| Examinee's response: | A | B | C | D |
|---|---|---|---|---|
| Correct response category: | | | | |
| A ..................... | 5 | 0 | 0 | 0 |
| B ..................... | 2.5 | 5 | 0 | 0 |
| C ..................... | 2.5 | 0 | 5 | 2.5 |
| D ..................... | 0 | −10 | 2.5 | 5 |

(G) Criteria for scoring system for a 20-slide test set. (See table at (b)(3)(ii)(A) of this section for a description of the response categories.) For cytotechnologists qualified under §493.1469 or §493.1483:

| Examinee's response: | A | B | C | D |
|---|---|---|---|---|
| Correct response category: | | | | |
| A ..................... | 5 | 0 | 2.5 | 2.5 |
| B ..................... | 2.5 | 5 | 2.5 | 2.5 |
| C ..................... | 2.5 | 0 | 5 | 5 |
| D ..................... | 0 | −10 | 5 | 5 |

[57 FR 7151, Feb. 28, 1992, as amended at 58 FR 5229, Jan. 19, 1993; 68 FR 3702, Jan. 24, 2003]

HOLMES000762

**§ 493.959 Immunohematology.**

(a) *Types of services offered by laboratories.* In immunohematology, there are four types of laboratories for proficiency testing purposes—

(1) Those that perform ABO group and/or D (Rho) typing;

(2) Those that perform ABO group and/or D (Rho) typing, and unexpected antibody detection;

(3) Those that in addition to paragraph (a)(2) of this section perform compatibility testing; and

(4) Those that perform in addition to paragraph (a)(3) of this section antibody identification.

(b) *Program content and frequency of challenge.* To be approved for proficiency testing for immunohematology, a program must provide a minimum of five samples per testing event. There must be at least three testing events at approximately equal intervals per year. The annual program must provide samples that cover the full range of interpretation that would be expected in patient specimens. The samples may be provided through mailed shipments or, at HHS' option, may be provided to HHS or its designee for on-site testing.

(c) *Challenges per testing event.* The minimum number of challenges per testing event a program must provide for each analyte or test procedure is five.

*Analyte or Test Procedure*

ABO group (excluding subgroups)
D (Rho) typing
Unexpected antibody detection
Compatibility testing
Antibody identification

(d) *Evaluation of a laboratory's analyte or test performance.* HHS approves only those programs that assess the accuracy of a laboratory's response in accordance with paragraphs (d)(1) through (5) of this section.

(1) To determine the accuracy of a laboratory's response, a program must compare the laboratory's response for each analyte with the response that reflects agreement of either 100 percent of ten or more referee laboratories or 95 percent or more of all participating laboratories except for unexpected antibody detection and antibody identification. To determine the accuracy of a laboratory's response for unexpected antibody detection and antibody identification, a program must compare the laboratory's response for each analyte with the response that reflects agreement of either 95 percent of ten or more referee laboratories or 95 percent or more of all participating laboratories. The score for a sample in immunohematology is either the score determined under paragraph (d)(2) or (3) of this section.

(2) *Criteria for acceptable performance.* The criteria for acceptable performance are—

| Analyte or test | Criteria for acceptable performance |
|---|---|
| ABO group | 100% accuracy. |
| D (Rho) typing | 100% accuracy. |
| Unexpected antibody detection | 80% accuracy. |
| Compatibility testing | 100% accuracy. |
| Antibody identification | 80% accuracy. |

(3) The criterion for acceptable performance for qualitative immunohematology tests is positive or negative.

(4) To determine the analyte testing event score, the number of acceptable analyte responses must be averaged using the following formula:

$$\frac{\text{Number of acceptable responses for the analyte}}{\text{Total number of challenges for the analyte}} \times 100 = \text{Analyte score for the testing event}$$

(5) To determine the overall testing event score, the number of correct responses for all analytes must be averaged using the following formula:

608

HOLMES000763

$$\frac{\text{Number of acceptable responses for all challenges}}{\text{Total number of all challenges}} \times 100 = \text{Testing event score}$$

## Subpart J—Facility Administration for Nonwaived Testing

SOURCE: 68 FR 3703, Jan. 24, 2003, unless otherwise noted.

### §493.1100 Condition: Facility administration.

Each laboratory that performs nonwaived testing must meet the applicable requirements under §§493.1101 through 493.1105, unless HHS approves a procedure that provides equivalent quality testing as specified in Appendix C of the State Operations Manual (CMS Pub. 7).

### §493.1101 Standard: Facilities.

(a) The laboratory must be constructed, arranged, and maintained to ensure the following:

(1) The space, ventilation, and utilities necessary for conducting all phases of the testing process.

(2) Contamination of patient specimens, equipment, instruments, reagents, materials, and supplies is minimized.

(3) Molecular amplification procedures that are not contained in closed systems have a uni-directional workflow. This must include separate areas for specimen preparation, amplification and product detection, and, as applicable, reagent preparation.

(b) The laboratory must have appropriate and sufficient equipment, instruments, reagents, materials, and supplies for the type and volume of testing it performs.

(c) The laboratory must be in compliance with applicable Federal, State, and local laboratory requirements.

(d) Safety procedures must be established, accessible, and observed to ensure protection from physical, chemical, biochemical, and electrical hazards, and biohazardous materials.

(e) Records and, as applicable, slides, blocks, and tissues must be maintained and stored under conditions that ensure proper preservation.

### §493.1103 Standard: Requirements for transfusion services.

A facility that provides transfusion services must meet all of the requirements of this section and document all transfusion-related activities.

(a) *Arrangement for services.* The facility must have a transfusion service agreement reviewed and approved by the responsible party(ies) that govern the procurement, transfer, and availability of blood and blood products.

(b) *Provision of testing.* The facility must provide prompt ABO grouping, D(Rho) typing, unexpected antibody detection, compatibility testing, and laboratory investigation of transfusion reactions on a continuous basis through a CLIA-certified laboratory or a laboratory meeting equivalent requirements as determined by CMS.

(c) *Blood and blood products storage and distribution.* (1) If a facility stores or maintains blood or blood products for transfusion outside of a monitored refrigerator, the facility must ensure the storage conditions, including temperature, are appropriate to prevent deterioration of the blood or blood product.

(2) The facility must establish and follow policies to ensure positive identification of a blood or blood product beneficiary.

(d) *Investigation of transfusion reactions.* The facility must have procedures for preventing transfusion reactions and when necessary, promptly identify, investigate, and report blood and blood product transfusion reactions to the laboratory and, as appropriate, to Federal and State authorities.

### §493.1105 Standard: Retention requirements.

(a) The laboratory must retain its records and, as applicable, slides, blocks, and tissues as follows:

(1) *Test requisitions and authorizations.* Retain records of test requisitions and test authorizations, including the patient's chart or medical record if used

609

HOLMES000764

as the test requisition or authorization, for at least 2 years.

(2) *Test procedures.* Retain a copy of each test procedure for at least 2 years after a procedure has been discontinued. Each test procedure must include the dates of initial use and discontinuance.

(3) *Analytic systems records.* Retain quality control and patient test records (including instrument printouts, if applicable) and records documenting all analytic systems activities specified in §§ 493.1252 through 493.1289 for at least 2 years. In addition, retain the following:

(i) Records of test system performance specifications that the laboratory establishes or verifies under § 493.1253 for the period of time the laboratory uses the test system but no less than 2 years.

(ii) Immunohematology records, blood and blood product records, and transfusion records as specified in 21 CFR 606.160(b)(3)(ii), (b)(3)(iv), (b)(3)(v) and (d).

(4) *Proficiency testing records.* Retain all proficiency testing records for at least 2 years.

(5) *Quality system assessment records.* Retain all laboratory quality systems assessment records for at least 2 years.

(6) *Test reports.* Retain or be able to retrieve a copy of the original report (including final, preliminary, and corrected reports) at least 2 years after the date of reporting. In addition, retain the following:

(i) Immunohematology reports as specified in 21 CFR 606.160(d).

(ii) Pathology test reports for at least 10 years after the date of reporting.

(7) *Slide, block, and tissue retention*—(i) *Slides.* (A) Retain cytology slide preparations for at least 5 years from the date of examination (see § 493.1274(f) for proficiency testing exception).

(B) Retain histopathology slides for at least 10 years from the date of examination.

(ii) *Blocks.* Retain pathology specimen blocks for at least 2 years from the date of examination.

(iii) *Tissue.* Preserve remnants of tissue for pathology examination until a diagnosis is made on the specimen.

(b) If the laboratory ceases operation, the laboratory must make provisions to ensure that all records and, as applicable, slides, blocks, and tissue are retained and available for the time frames specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50723, Aug. 22, 2003]

## Subpart K—Quality System for Nonwaived Testing

SOURCE: 68 FR 3703, Jan. 24, 2003, unless otherwise noted.

### § 493.1200 Introduction.

(a) Each laboratory that performs nonwaived testing must establish and maintain written policies and procedures that implement and monitor a quality system for all phases of the total testing process (that is, preanalytic, analytic, and postanalytic) as well as general laboratory systems.

(b) The laboratory's quality systems must include a quality assessment component that ensures continuous improvement of the laboratory's performance and services through ongoing monitoring that identifies, evaluates and resolves problems.

(c) The various components of the laboratory's quality system are used to meet the requirements in this part and must be appropriate for the specialties and subspecialties of testing the laboratory performs, services it offers, and clients it serves.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

### § 493.1201 Condition: Bacteriology.

If the laboratory provides services in the subspecialty of Bacteriology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1261, and §§ 493.1281 through 493.1299.

### § 493.1202 Condition: Mycobacteriology.

If the laboratory provides services in the subspecialty of Mycobacteriology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1262, and §§ 493.1281 through 493.1299.

610

HOLMES000765

Centers for Medicare & Medicaid Services, HHS §493.1225

**§ 493.1203  Condition: Mycology.**

If the laboratory provides services in the subspecialty of Mycology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1263, and §§ 493.1281 through 493.1299.

**§ 493.1204  Condition: Parasitology.**

If the laboratory provides services in the subspecialty of Parasitology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1264, and §§ 493.1281 through 493.1299.

**§ 493.1205  Condition: Virology.**

If the laboratory provides services in the subspecialty of Virology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1265, and §§ 493.1281 through 493.1299.

**§ 493.1207  Condition: Syphilis serology.**

If the laboratory provides services in the subspecialty of Syphilis serology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

**§ 493.1208  Condition: General immunology.**

If the laboratory provides services in the subspecialty of General immunology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

**§ 493.1210  Condition: Routine chemistry.**

If the laboratory provides services in the subspecialty of Routine chemistry, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1267, and §§ 493.1281 through 493.1299.

**§ 493.1211  Condition: Urinalysis.**

If the laboratory provides services in the subspecialty of Urinalysis, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

**§ 493.1212  Condition: Endocrinology.**

If the laboratory provides services in the subspecialty of Endocrinology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

**§ 493.1213  Condition: Toxicology.**

If the laboratory provides services in the subspecialty of Toxicology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

**§ 493.1215  Condition: Hematology.**

If the laboratory provides services in the specialty of Hematology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1269, and §§ 493.1281 through 493.1299.

**§ 493.1217  Condition: Immunohematology.**

If the laboratory provides services in the specialty of Immunohematology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1271, and §§ 493.1281 through 493.1299.

**§ 493.1219  Condition: Histopathology.**

If the laboratory provides services in the subspecialty of Histopathology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1273, and §§ 493.1281 through 493.1299.

**§ 493.1220  Condition: Oral pathology.**

If the laboratory provides services in the subspecialty of Oral pathology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

**§ 493.1221  Condition: Cytology.**

If the laboratory provides services in the subspecialty of Cytology, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1274, and §§ 493.1281 through 493.1299.

**§ 493.1225  Condition: Clinical cytogenetics.**

If the laboratory provides services in the specialty of Clinical cytogenetics,

611

HOLMES000766

ER-14195

the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1276, and §§ 493.1281 through 493.1299.

### § 493.1226  Condition: Radiobioassay.

If the laboratory provides services in the specialty of Radiobioassay, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, and §§ 493.1281 through 493.1299.

### § 493.1227  Condition: Histocompatibility.

If the laboratory provides services in the specialty of Histocompatibility, the laboratory must meet the requirements specified in §§ 493.1230 through 493.1256, § 493.1278, and §§ 493.1281 through 493.1299.

GENERAL LABORATORY SYSTEMS

### § 493.1230  Condition: General laboratory systems.

Each laboratory that performs nonwaived testing must meet the applicable general laboratory systems requirements in §§ 493.1231 through 493.1236, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the general laboratory systems and correct identified problems as specified in § 493.1239 for each specialty and subspecialty of testing performed.

### § 493.1231  Standard: Confidentiality of patient information.

The laboratory must ensure confidentiality of patient information throughout all phases of the total testing process that are under the laboratory's control.

### § 493.1232  Standard: Specimen identification and integrity.

The laboratory must establish and follow written policies and procedures that ensure positive identification and optimum integrity of a patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting of results.

### § 493.1233  Standard: Complaint investigations.

The laboratory must have a system in place to ensure that it documents all complaints and problems reported to the laboratory. The laboratory must conduct investigations of complaints, when appropriate.

### § 493.1234  Standard: Communications.

The laboratory must have a system in place to identify and document problems that occur as a result of a breakdown in communication between the laboratory and an authorized person who orders or receives test results.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

### § 493.1235  Standard: Personnel competency assessment policies.

As specified in the personnel requirements in subpart M, the laboratory must establish and follow written policies and procedures to assess employee and, if applicable, consultant competency.

### § 493.1236  Standard: Evaluation of proficiency testing performance.

(a) The laboratory must review and evaluate the results obtained on proficiency testing performed as specified in subpart H of this part.

(b) The laboratory must verify the accuracy of the following:

(1) Any analyte or subspecialty without analytes listed in subpart I of this part that is not evaluated or scored by a CMS-approved proficiency testing program.

(2) Any analyte, specialty or subspecialty assigned a proficiency testing score that does not reflect laboratory test performance (that is, when the proficiency testing program does not obtain the agreement required for scoring as specified in subpart I of this part, or the laboratory receives a zero score for nonparticipation, or late return of results).

(c) At least twice annually, the laboratory must verify the accuracy of the following:

(1) Any test or procedure it performs that is not included in subpart I of this part.

612

HOLMES000767

**Centers for Medicare & Medicaid Services, HHS** §493.1242

(2) Any test or procedure listed in subpart I of this part for which compatible proficiency testing samples are not offered by a CMS-approved proficiency testing program.

(d) All proficiency testing evaluation and verification activities must be documented.

**§493.1239 Standard: General laboratory systems quality assessment.**

(a) The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and, when indicated, correct problems identified in the general laboratory systems requirements specified at §§493.1231 through 493.1236.

(b) The general laboratory systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of general laboratory systems quality assessment reviews with appropriate staff.

(c) The laboratory must document all general laboratory systems quality assessment activities.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

PREANALYTIC SYSTEMS

**§493.1240 Condition: Preanalytic systems.**

Each laboratory that performs nonwaived testing must meet the applicable preanalytic system(s) requirements in §§493.1241 and 493.1242, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the preanalytic systems and correct identified problems as specified in §493.1249 for each specialty and subspecialty of testing performed.

**§493.1241 Standard: Test request.**

(a) The laboratory must have a written or electronic request for patient testing from an authorized person.

(b) The laboratory may accept oral requests for laboratory tests if it solicits a written or electronic authorization within 30 days of the oral request

and maintains the authorization or documentation of its efforts to obtain the authorization.

(c) The laboratory must ensure the test requisition solicits the following information:

(1) The name and address or other suitable identifiers of the authorized person requesting the test and, if appropriate, the individual responsible for using the test results, or the name and address of the laboratory submitting the specimen, including, as applicable, a contact person to enable the reporting of imminently life threatening laboratory results or panic or alert values.

(2) The patient's name or unique patient identifier.

(3) The sex and age or date of birth of the patient.

(4) The test(s) to be performed.

(5) The source of the specimen, when appropriate.

(6) The date and, if appropriate, time of specimen collection.

(7) For Pap smears, the patient's last menstrual period, and indication of whether the patient had a previous abnormal report, treatment, or biopsy.

(8) Any additional information relevant and necessary for a specific test to ensure accurate and timely testing and reporting of results, including interpretation, if applicable.

(d) The patient's chart or medical record may be used as the test requisition or authorization but must be available to the laboratory at the time of testing and available to CMS or a CMS agent upon request.

(e) If the laboratory transcribes or enters test requisition or authorization information into a record system or a laboratory information system, the laboratory must ensure the information is transcribed or entered accurately.

**§493.1242 Standard: Specimen submission, handling, and referral.**

(a) The laboratory must establish and follow written policies and procedures for each of the following, if applicable:

(1) Patient preparation.

(2) Specimen collection.

(3) Specimen labeling, including patient name or unique patient identifier

613

HOLMES000768

and, when appropriate, specimen source.

(4) Specimen storage and preservation.

(5) Conditions for specimen transportation.

(6) Specimen processing.

(7) Specimen acceptability and rejection.

(8) Specimen referral.

(b) The laboratory must document the date and time it receives a specimen.

(c) The laboratory must refer a specimen for testing only to a CLIA-certified laboratory or a laboratory meeting equivalent requirements as determined by CMS.

(d) If the laboratory accepts a referral specimen, written instructions must be available to the laboratory's clients and must include, as appropriate, the information specified in paragraphs (a)(1) through (a)(7) of this section.

§ 493.1249 Standard: Preanalytic systems quality assessment.

(a) The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the preanalytic systems specified at §§ 493.1241 through 493.1242.

(b) The preanalytic systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of preanalytic systems quality assessment reviews with appropriate staff.

(c) The laboratory must document all preanalytic systems quality assessment activities.

[68 FR 3703, Jan. 24, 2003; 68 FR 3703, Aug. 22, 2003]

ANALYTIC SYSTEMS

§ 493.1250 Condition: Analytic systems.

Each laboratory that performs nonwaived testing must meet the applicable analytic systems requirements in §§ 493.1251 through 493.1283, unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the analytic systems and correct identified problems as specified in § 493.1289 for each specialty and subspecialty of testing performed.

§ 493.1251 Standard: Procedure manual.

(a) A written procedure manual for all tests, assays, and examinations performed by the laboratory must be available to, and followed by, laboratory personnel. Textbooks may supplement but not replace the laboratory's written procedures for testing or examining specimens.

(b) The procedure manual must include the following when applicable to the test procedure:

(1) Requirements for patient preparation; specimen collection, labeling, storage, preservation, transportation, processing, and referral; and criteria for specimen acceptability and rejection as described in § 493.1242.

(2) Microscopic examination, including the detection of inadequately prepared slides.

(3) Step-by-step performance of the procedure, including test calculations and interpretation of results.

(4) Preparation of slides, solutions, calibrators, controls, reagents, stains, and other materials used in testing.

(5) Calibration and calibration verification procedures.

(6) The reportable range for test results for the test system as established or verified in § 493.1253.

(7) Control procedures.

(8) Corrective action to take when calibration or control results fail to meet the laboratory's criteria for acceptability.

(9) Limitations in the test methodology, including interfering substances.

(10) Reference intervals (normal values).

(11) Imminently life-threatening test results, or panic or alert values.

(12) Pertinent literature references.

(13) The laboratory's system for entering results in the patient record and reporting patient results including, when appropriate, the protocol for reporting imminently life-threatening results, or panic, or alert values.

614

HOLMES000769

(14) Description of the course of action to take if a test system becomes inoperable.

(c) Manufacturer's test system instructions or operator manuals may be used, when applicable, to meet the requirements of paragraphs (b)(1) through (b)(12) of this section. Any of the items under paragraphs (b)(1) through (b)(12) of this section not provided by the manufacturer must be provided by the laboratory.

(d) Procedures and changes in procedures must be approved, signed, and dated by the current laboratory director before use.

(e) The laboratory must maintain a copy of each procedure with the dates of initial use and discontinuance as described in §493.1105(a)(2).

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

## §493.1252 Standard: Test systems, equipment, instruments, reagents, materials, and supplies.

(a) Test systems must be selected by the laboratory. The testing must be performed following the manufacturer's instructions and in a manner that provides test results within the laboratory's stated performance specifications for each test system as determined under §493.1253.

(b) The laboratory must define criteria for those conditions that are essential for proper storage of reagents and specimens, accurate and reliable test system operation, and test result reporting. The criteria must be consistent with the manufacturer's instructions, if provided. These conditions must be monitored and documented and, if applicable, include the following:

(1) Water quality.

(2) Temperature.

(3) Humidity.

(4) Protection of equipment and instruments from fluctuations and interruptions in electrical current that adversely affect patient test results and test reports.

(c) Reagents, solutions, culture media, control materials, calibration materials, and other supplies, as appropriate, must be labeled to indicate the following:

(1) Identity and when significant, titer, strength or concentration.

(2) Storage requirements.

(3) Preparation and expiration dates.

(4) Other pertinent information required for proper use.

(d) Reagents, solutions, culture media, control materials, calibration materials, and other supplies must not be used when they have exceeded their expiration date, have deteriorated, or are of substandard quality.

(e) Components of reagent kits of different lot numbers must not be interchanged unless otherwise specified by the manufacturer.

## §493.1253 Standard: Establishment and verification of performance specifications.

(a) *Applicability.* Laboratories are not required to verify or establish performance specifications for any test system used by the laboratory before April 24, 2003.

(b)(1) *Verification of performance specifications.* Each laboratory that introduces an unmodified, FDA-cleared or approved test system must do the following before reporting patient test results:

(i) Demonstrate that it can obtain performance specifications comparable to those established by the manufacturer for the following performance characteristics:

(A) Accuracy.

(B) Precision.

(C) Reportable range of test results for the test system.

(ii) Verify that the manufacturer's reference intervals (normal values) are appropriate for the laboratory's patient population.

(2) *Establishment of performance specifications.* Each laboratory that modifies an FDA-cleared or approved test system, or introduces a test system not subject to FDA clearance or approval (including methods developed in-house and standardized methods such as text book procedures), or uses a test system in which performance specifications are not provided by the manufacturer must, before reporting patient test results, establish for each test system the performance specifications for the following performance characteristics, as applicable:

615

HOLMES000770

(i) Accuracy.

(ii) Precision.

(iii) Analytical sensitivity.

(iv) Analytical specificity to include interfering substances.

(v) Reportable range of test results for the test system.

(vi) Reference intervals (normal values).

(vii) Any other performance characteristic required for test performance.

(3) *Determination of calibration and control procedures.* The laboratory must determine the test system's calibration procedures and control procedures based upon the performance specifications verified or established under paragraph (b)(1) or (b)(2) of this section.

(c) *Documentation.* The laboratory must document all activities specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

**§ 493.1254  Standard: Maintenance and function checks.**

(a) *Unmodified manufacturer's equipment, instruments, or test systems.* The laboratory must perform and document the following:

(1) Maintenance as defined by the manufacturer and with at least the frequency specified by the manufacturer.

(2) Function checks as defined by the manufacturer and with at least the frequency specified by the manufacturer. Function checks must be within the manufacturer's established limits before patient testing is conducted.

(b) *Equipment, instruments, or test systems developed in-house, commercially available and modified by the laboratory, or maintenance and function check protocols are not provided by the manufacturer.* The laboratory must do the following:

(1)(i) Establish a maintenance protocol that ensures equipment, instrument, and test system performance that is necessary for accurate and reliable test results and test result reporting.

(ii) Perform and document the maintenance activities specified in paragraph (b)(1)(i) of this section.

(2)(i) Define a function check protocol that ensures equipment, instru-

ment, and test system performance that is necessary for accurate and reliable test results and test result reporting.

(ii) Perform and document the function checks, including background or baseline checks, specified in paragraph (b)(2)(i) of this section. Function checks must be within the laboratory's established limits before patient testing is conducted.

**§ 493.1255  Standard: Calibration and calibration verification procedures.**

Calibration and calibration verification procedures are required to substantiate the continued accuracy of the test system throughout the laboratory's reportable range of test results for the test system. Unless otherwise specified in this subpart, for each applicable test system the laboratory must do the following:

(a) Perform and document calibration procedures—

(1) Following the manufacturer's test system instructions, using calibration materials provided or specified, and with at least the frequency recommended by the manufacturer;

(2) Using the criteria verified or established by the laboratory as specified in § 493.1253(b)(3)—

(i) Using calibration materials appropriate for the test system and, if possible, traceable to a reference method or reference material of known value; and

(ii) Including the number, type, and concentration of calibration materials, as well as acceptable limits for and the frequency of calibration; and

(3) Whenever calibration verification fails to meet the laboratory's acceptable limits for calibration verification.

(b) Perform and document calibration verification procedures—

(1) Following the manufacturer's calibration verification instructions;

(2) Using the criteria verified or established by the laboratory under § 493.1253(b)(3)—

(i) Including the number, type, and concentration of the materials, as well as acceptable limits for calibration verification; and

(ii) Including at least a minimal (or zero) value, a mid-point value, and a maximum value near the upper limit of

616

HOLMES000771

the range to verify the laboratory's reportable range of test results for the test system; and

(3) At least once every 6 months and whenever any of the following occur:

(i) A complete change of reagents for a procedure is introduced, unless the laboratory can demonstrate that changing reagent lot numbers does not affect the range used to report patient test results, and control values are not adversely affected by reagent lot number changes.

(ii) There is major preventive maintenance or replacement of critical parts that may influence test performance.

(iii) Control materials reflect an unusual trend or shift, or are outside of the laboratory's acceptable limits, and other means of assessing and correcting unacceptable control values fail to identify and correct the problem.

(iv) The laboratory's established schedule for verifying the reportable range for patient test results requires more frequent calibration verification.

§493.1256 Standard: Control procedures.

(a) For each test system, the laboratory is responsible for having control procedures that monitor the accuracy and precision of the complete analytic process.

(b) The laboratory must establish the number, type, and frequency of testing control materials using, if applicable, the performance specifications verified or established by the laboratory as specified in §493.1253(b)(3).

(c) The control procedures must—

(1) Detect immediate errors that occur due to test system failure, adverse environmental conditions, and operator performance.

(2) Monitor over time the accuracy and precision of test performance that may be influenced by changes in test system performance and environmental conditions, and variance in operator performance.

(d) Unless CMS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7), that provides equivalent quality testing, the laboratory must—

(1) Perform control procedures as defined in this section unless otherwise specified in the additional specialty and subspecialty requirements at §§493.1261 through 493.1278.

(2) For each test system, perform control procedures using the number and frequency specified by the manufacturer or established by the laboratory when they meet or exceed the requirements in paragraph (d)(3) of this section.

(3) At least once each day patient specimens are assayed or examined perform the following for—

(i) Each quantitative procedure, include two control materials of different concentrations;

(ii) Each qualitative procedure, include a negative and positive control material;

(iii) Test procedures producing graded or titered results, include a negative control material and a control material with graded or titered reactivity, respectively;

(iv) Each test system that has an extraction phase, include two control materials, including one that is capable of detecting errors in the extraction process; and

(v) Each molecular amplification procedure, include two control materials and, if reaction inhibition is a significant source of false negative results, a control material capable of detecting the inhibition.

(4) For thin layer chromatography—

(i) Spot each plate or card, as applicable, with a calibrator containing all known substances or drug groups, as appropriate, which are identified by thin layer chromatography and reported by the laboratory; and

(ii) Include at least one control material on each plate or card, as applicable, which must be processed through each step of patient testing, including extraction processes.

(5) For each electrophoretic procedure include, concurrent with patient specimens, at least one control material containing the substances being identified or measured.

(6) Perform control material testing as specified in this paragraph before resuming patient testing when a complete change of reagents is introduced;

617

HOLMES000772

major preventive maintenance is performed; or any critical part that may influence test performance is replaced.

(7) Over time, rotate control material testing among all operators who perform the test.

(8) Test control materials in the same manner as patient specimens.

(9) When using calibration material as a control material, use calibration material from a different lot number than that used to establish a cut-off value or to calibrate the test system.

(10) Establish or verify the criteria for acceptability of all control materials.

(i) When control materials providing quantitative results are used, statistical parameters (for example, mean and standard deviation) for each batch and lot number of control materials must be defined and available.

(ii) The laboratory may use the stated value of a commercially assayed control material provided the stated value is for the methodology and instrumentation employed by the laboratory and is verified by the laboratory.

(iii) Statistical parameters for unassayed control materials must be established over time by the laboratory through concurrent testing of control materials having previously determined statistical parameters.

(e) For reagent, media, and supply checks, the laboratory must do the following:

(1) Check each batch (prepared in-house), lot number (commercially prepared) and shipment of reagents, disks, stains, antisera, (except those specifically referenced in §493.1261(a)(3)) and identification systems (systems using two or more substrates or two or more reagents, or a combination) when prepared or opened for positive and negative reactivity, as well as graded reactivity, if applicable.

(2) Each day of use (unless otherwise specified in this subpart), test staining materials for intended reactivity to ensure predictable staining characteristics. Control materials for both positive and negative reactivity must be included, as appropriate.

(3) Check fluorescent and immunohistochemical stains for positive and negative reactivity each time of use.

(4) Before, or concurrent with the initial use—

(i) Check each batch of media for sterility if sterility is required for testing;

(ii) Check each batch of media for its ability to support growth and, as appropriate, select or inhibit specific organisms or produce a biochemical response; and

(iii) Document the physical characteristics of the media when compromised and report any deterioration in the media to the manufacturer.

(5) Follow the manufacturer's specifications for using reagents, media, and supplies and be responsible for results.

(f) Results of control materials must meet the laboratory's and, as applicable, the manufacturer's test system criteria for acceptability before reporting patient test results.

(g) The laboratory must document all control procedures performed.

(h) If control materials are not available, the laboratory must have an alternative mechanism to detect immediate errors and monitor test system performance over time. The performance of alternative control procedures must be documented.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

§493.1261  Standard: Bacteriology.

(a) The laboratory must check the following for positive and negative reactivity using control organisms:

(1) Each day of use for beta-lactamase methods other than Cefinase™.

(2) Each week of use for Gram stains.

(3) When each batch (prepared in-house), lot number (commercially prepared), and shipment of antisera is prepared or opened, and once every 6 months thereafter.

(b) For antimicrobial susceptibility tests, the laboratory must check each batch of media and each lot number and shipment of antimicrobial agent(s) before, or concurrent with, initial use, using approved control organisms.

(1) Each day tests are performed, the laboratory must use the appropriate control organism(s) to check the procedure.

(2) The laboratory's zone sizes or minimum inhibitory concentration for

618

HOLMES000773

control organisms must be within established limits before reporting patient results.

(c) The laboratory must document all control procedures performed, as specified in this section.

### §493.1262 Standard: Mycobacteriology.

(a) Each day of use, the laboratory must check all reagents or test procedures used for mycobacteria identification with at least one acid-fast organism that produces a positive reaction and an acid-fast organism that produces a negative reaction.

(b) For antimycobacterial susceptibility tests, the laboratory must check each batch of media and each lot number and shipment of antimycobacterial agent(s) before, or concurrent with, initial use, using an appropriate control organism(s).

(1) The laboratory must establish limits for acceptable control results.

(2) Each week tests are performed, the laboratory must use the appropriate control organism(s) to check the procedure.

(3) The results for the control organism(s) must be within established limits before reporting patient results.

(c) The laboratory must document all control procedures performed, as specified in this section.

### §493.1263 Standard: Mycology.

(a) The laboratory must check each batch (prepared in-house), lot number (commercially prepared), and shipment of lactophenol cotton blue when prepared or opened for intended reactivity with a control organism(s).

(b) For antifungal susceptibility tests, the laboratory must check each batch of media and each lot number and shipment of antifungal agent(s) before, or concurrent with, initial use, using an appropriate control organism(s).

(1) The laboratory must establish limits for acceptable control results.

(2) Each day tests are performed, the laboratory must use the appropriate control organism(s) to check the procedure.

(3) The results for the control organism(s) must be within established limits before reporting patient results.

(c) The laboratory must document all control procedures performed, as specified in this section.

### §493.1264 Standard: Parasitology.

(a) The laboratory must have available a reference collection of slides or photographs and, if available, gross specimens for identification of parasites and use these references in the laboratory for appropriate comparison with diagnostic specimens.

(b) The laboratory must calibrate and use the calibrated ocular micrometer for determining the size of ova and parasites, if size is a critical parameter.

(c) Each month of use, the laboratory must check permanent stains using a fecal sample control material that will demonstrate staining characteristics.

(d) The laboratory must document all control procedures performed, as specified in this section.

### §493.1265 Standard: Virology.

(a) When using cell culture to isolate or identify viruses, the laboratory must simultaneously incubate a cell substrate control or uninoculated cells as a negative control material.

(b) The laboratory must document all control procedures performed, as specified in this section.

### §493.1267 Standard: Routine chemistry.

For blood gas analyses, the laboratory must perform the following:

(a) Calibrate or verify calibration according to the manufacturer's specifications and with at least the frequency recommended by the manufacturer.

(b) Test one sample of control material each 8 hours of testing using a combination of control materials that include both low and high values on each day of testing.

(c) Test one sample of control material each time specimens are tested unless automated instrumentation internally verifies calibration at least every 30 minutes.

(d) Document all control procedures performed, as specified in this section.

619

HOLMES000774

### § 493.1269  Standard: Hematology.

(a) For manual cell counts performed using a hemocytometer—

(1) One control material must be tested each 8 hours of operation; and

(2) Patient specimens and control materials must be tested in duplicate.

(b) For all nonmanual coagulation test systems, the laboratory must include two levels of control material each 8 hours of operation and each time a reagent is changed.

(c) For manual coagulation tests—

(1) Each individual performing tests must test two levels of control materials before testing patient samples and each time a reagent is changed; and

(2) Patient specimens and control materials must be tested in duplicate.

(d) The laboratory must document all control procedures performed, as specified in this section.

### § 493.1271  Standard: Immunohematology.

(a) *Patient testing.* (1) The laboratory must perform ABO grouping, D(Rho) typing, unexpected antibody detection, antibody identification, and compatibility testing by following the manufacturer's instructions, if provided, and as applicable, 21 CFR 606.151(a) through (e).

(2) The laboratory must determine ABO group by concurrently testing unknown red cells with, at a minimum, anti-A and anti-B grouping reagents. For confirmation of ABO group, the unknown serum must be tested with known A1 and B red cells.

(3) The laboratory must determine the D(Rho) type by testing unknown red cells with anti-D (anti-Rho) blood typing reagent.

(b) *Immunohematological testing and distribution of blood and blood products.* Blood and blood product collection and distribution must comply with 21 CFR 606.100(b)(12); 606.160(b)(3)(ii) and (b)(3)(v); 610.40; 640.5(a), (b), (c), and (e); and 640.11(b).

(c) *Blood and blood products storage.* Blood and blood products must be stored under appropriate conditions that include an adequate temperature alarm system that is regularly inspected.

(1) An audible alarm system must monitor proper blood and blood prod-

uct storage temperature over a 24-hour period.

(2) Inspections of the alarm system must be documented.

(d) *Retention of samples of transfused blood.* According to the laboratory's established procedures, samples of each unit of transfused blood must be retained for further testing in the event of transfusion reactions. The laboratory must promptly dispose of blood not retained for further testing that has passed its expiration date.

(e) *Investigation of transfusion reactions.* (1) According to its established procedures, the laboratory that performs compatibility testing, or issues blood or blood products, must promptly investigate all transfusion reactions occurring in facilities for which it has investigational responsibility and make recommendations to the medical staff regarding improvements in transfusion procedures.

(2) The laboratory must document, as applicable, that all necessary remedial actions are taken to prevent recurrences of transfusion reactions and that all policies and procedures are reviewed to assure they are adequate to ensure the safety of individuals being transfused.

(f) *Documentation.* The laboratory must document all control procedures performed, as specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

### § 493.1273  Standard: Histopathology.

(a) As specified in § 493.1256(e)(3), fluorescent and immunohistochemical stains must be checked for positive and negative reactivity each time of use. For all other differential or special stains, a control slide of known reactivity must be stained with each patient slide or group of patient slides. Reaction(s) of the control slide with each special stain must be documented.

(b) The laboratory must retain stained slides, specimen blocks, and tissue remnants as specified in § 493.1105. The remnants of tissue specimens must be maintained in a manner that ensures proper preservation of the tissue specimens until the portions submitted for microscopic examination have been examined and a diagnosis

HOLMES000775

made by an individual qualified under §493.1449(b), (l), or (m).

(c) An individual who has successfully completed a training program in neuromuscular pathology approved by HHS may examine and provide reports for neuromuscular pathology.

(d) Tissue pathology reports must be signed by an individual qualified as specified in paragraph (b) or, as appropriate, paragraph (c) of this section. If a computer report is generated with an electronic signature, it must be authorized by the individual who performed the examination and made the diagnosis.

(e) The laboratory must use acceptable terminology of a recognized system of disease nomenclature in reporting results.

(f) The laboratory must document all control procedures performed, as specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

§493.1274  Standard: Cytology.

(a) *Cytology slide examination site.* All cytology slide preparations must be evaluated on the premises of a laboratory certified to conduct testing in the subspecialty of cytology.

(b) *Staining.* The laboratory must have available and follow written policies and procedures for each of the following, if applicable:

(1) All gynecologic slide preparations must be stained using a Papanicolaou or modified Papanicolaou staining method.

(2) Effective measures to prevent cross-contamination between gynecologic and nongynecologic specimens during the staining process must be used.

(3) Nongynecologic specimens that have a high potential for cross-contamination must be stained separately from other nongynecologic specimens, and the stains must be filtered or changed following staining.

(c) *Control procedures.* The laboratory must establish and follow written policies and procedures for a program designed to detect errors in the performance of cytologic examinations and the reporting of results. The program must include the following:

(1) A review of slides from at least 10 percent of the gynecologic cases interpreted by individuals qualified under §493.1469 or §493.1483, to be negative for epithelial cell abnormalities and other malignant neoplasms (as defined in paragraph (e)(1) of this section).

(i) The review must be performed by an individual who meets one of the following qualifications:

(A) A technical supervisor qualified under §493.1449(b) or (k).

(B) A cytology general supervisor qualified under §493.1469.

(C) A cytotechnologist qualified under §493.1483 who has the experience specified in §493.1469(b)(2).

(ii) Cases must be randomly selected from the total caseload and include negatives and those from patients or groups of patients that are identified as having a higher than average probability of developing cervical cancer based on available patient information.

(iii) The review of those cases selected must be completed before reporting patient results.

(2) Laboratory comparison of clinical information, when available, with cytology reports and comparison of all gynecologic cytology reports with a diagnosis of high-grade squamous intraepithelial lesion (HSIL), adenocarcinoma, or other malignant neoplasms with the histopathology report, if available in the laboratory (either onsite or in storage), and determination of the causes of any discrepancies.

(3) For each patient with a current HSIL, adenocarcinoma, or other malignant neoplasm, laboratory review of all normal or negative gynecologic specimens received within the previous 5 years, if available in the laboratory (either on-site or in storage). If significant discrepancies are found that will affect current patient care, the laboratory must notify the patient's physician and issue an amended report.

(4) Records of initial examinations and all rescreening results must be documented.

(5) An annual statistical laboratory evaluation of the number of—

(i) Cytology cases examined;

(ii) Specimens processed by specimen type;

(iii) Patient cases reported by diagnosis (including the number reported

621

HOLMES000776

as unsatisfactory for diagnostic interpretation);

(iv) Gynecologic cases with a diagnosis of HSIL, adenocarcinoma, or other malignant neoplasm for which histology results were available for comparison;

(v) Gynecologic cases where cytology and histology are discrepant; and

(vi) Gynecologic cases where any rescreen of a normal or negative specimen results in reclassification as low-grade squamous intraepithelial lesion (LSIL), HSIL, adenocarcinoma, or other malignant neoplasms.

(6) An evaluation of the case reviews of each individual examining slides against the laboratory's overall statistical values, documentation of any discrepancies, including reasons for the deviation and, if appropriate, corrective actions taken.

(d) *Workload limits.* The laboratory must establish and follow written policies and procedures that ensure the following:

(1) The technical supervisor establishes a maximum workload limit for each individual who performs primary screening.

(i) The workload limit is based on the individual's performance using evaluations of the following:

(A) Review of 10 percent of the cases interpreted as negative for the conditions defined in paragraph (c)(1) of this section.

(B) Comparison of the individual's interpretation with the technical supervisor's confirmation of patient smears specified in paragraphs (e)(1) and (e)(3) of this section.

(ii) Each individual's workload limit is reassessed at least every 6 months and adjusted when necessary.

(2) The maximum number of slides examined by an individual in each 24-hour period does not exceed 100 slides (one patient specimen per slide; gynecologic, nongynecologic, or both) irrespective of the site or laboratory. This limit represents an absolute maximum number of slides and must not be employed as an individual's performance target. In addition—

(i) The maximum number of 100 slides is examined in no less than an 8-hour workday:

(ii) For the purposes of establishing workload limits for individuals examining slides in less than an 8-hour workday (includes full-time employees with duties other than slide examination and part-time employees), a period of 8 hours is used to prorate the number of slides that may be examined. The formula—

$$\frac{\text{Number of hours examining slides} \times 100}{8}$$

is used to determine maximum slide volume to be examined;

(iii) Nongynecologic slide preparations made using liquid-based slide preparatory techniques that result in cell dispersion over one-half or less of the total available slide may be counted as one-half slide; and

(iv) Technical supervisors who perform primary screening are not required to include tissue pathology slides and previously examined cytology slides (gynecologic and nongynecologic) in the 100 slide workload limit.

(3) The laboratory must maintain records of the total number of slides examined by each individual during each 24-hour period and the number of hours spent examining slides in the 24-hour period irrespective of the site or laboratory.

(4) Records are available to document the workload limit for each individual.

(e) *Slide examination and reporting.* The laboratory must establish and follow written policies and procedures that ensure the following:

(1) A technical supervisor confirms each gynecologic slide preparation interpreted to exhibit reactive or reparative changes or any of the following epithelial cell abnormalities:

(i) Squamous cell.

(A) Atypical squamous cells of undetermined significance (ASC-US) or cannot exclude HSIL (ASC-H).

(B) LSIL-Human papillomavirus (HPV)/mild dysplasia/cervical intraepithelial neoplasia 1 (CIN 1).

(C) HSIL-moderate and severe dysplasia, carcinoma in situ (CIS)/CIN 2 and CIN 3 or with features suspicious for invasion.

(D) Squamous cell carcinoma.

(ii) Glandular cell.

HOLMES000777

Centers for Medicare & Medicaid Services, HHS §493.1278

(A) Atypical cells not otherwise specified (NOS) or specified in comments (endocervical, endometrial, or glandular).

(B) Atypical cells favor neoplastic (endocervical or glandular).

(C) Endocervical adenocarcinoma in situ.

(D) Adenocarcinoma endocervical, adenocarcinoma endometrial, adenocarcinoma extrauterine, and adenocarcinoma NOS.

(iii) Other malignant neoplasms.

(2) The report of gynecologic slide preparations with conditions specified in paragraph (e)(1) of this section must be signed to reflect the technical supervisory review or, if a computer report is generated with signature, it must reflect an electronic signature authorized by the technical supervisor who performed the review.

(3) All nongynecologic preparations are reviewed by a technical supervisor. The report must be signed to reflect technical supervisory review or, if a computer report is generated with signature, it must reflect an electronic signature authorized by the technical supervisor who performed the review.

(4) Unsatisfactory specimens or slide preparations are identified and reported as unsatisfactory.

(5) The report contains narrative descriptive nomenclature for all results.

(6) Corrected reports issued by the laboratory indicate the basis for correction.

(f) *Record and slide retention.* (1) The laboratory must retain all records and slide preparations as specified in §493.1105.

(2) Slides may be loaned to proficiency testing programs in lieu of maintaining them for the required time period, provided the laboratory receives written acknowledgment of the receipt of slides by the proficiency testing program and maintains the acknowledgment to document the loan of these slides.

(3) Documentation of slides loaned or referred for purposes other than proficiency testing must be maintained.

(4) All slides must be retrievable upon request.

(g) *Automated and semi-automated screening devices.* When performing evaluations using automated and semi-automated screening devices, the laboratory must follow manufacturer's instructions for preanalytic, analytic, and postanalytic phases of testing, as applicable, and meet the applicable requirements of this subpart K.

(h) *Documentation.* The laboratory must document all control procedures performed, as specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

§493.1276 Standard: Clinical cytogenetics.

(a) The laboratory must have policies and procedures for ensuring accurate and reliable patient specimen identification during the process of accessioning, cell preparation, photographing or other image reproduction technique, photographic printing, and reporting and storage of results, karyotypes, and photographs.

(b) The laboratory must have records that document the following:

(1) The media used, reactions observed, number of cells counted, number of cells karyotyped, number of chromosomes counted for each metaphase spread, and the quality of the banding.

(2) The resolution is appropriate for the type of tissue or specimen and the type of study required based on the clinical information provided to the laboratory.

(3) An adequate number of karyotypes are prepared for each patient.

(c) Determination of sex must be performed by full chromosome analysis.

(d) The laboratory report must include a summary and interpretation of the observations, number of cells counted and analyzed, and use the International System for Human Cytogenetic Nomenclature.

(e) The laboratory must document all control procedures performed, as specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

§493.1278 Standard: Histocompatibility.

(a) *General.* The laboratory must meet the following requirements:

623

HOLMES000778

(1) An audible alarm system must be used to monitor the storage temperature of specimens (donor and beneficiary) and reagents. The laboratory must have an emergency plan for alternate storage.

(2) All patient specimens must be easily retrievable.

(3) Reagent typing sera inventory prepared in-house must indicate source, bleeding date and identification number, reagent specificity, and volume remaining.

(4) If the laboratory uses immunologic reagents (for example, antibodies, antibody-coated particles, or complement) to facilitate or enhance the isolation of lymphocytes, or lymphocyte subsets, the efficacy of the methods must be monitored with appropriate quality control procedures.

(5) Participate in at least one national or regional cell exchange program, if available, or develop an exchange system with another laboratory in order to validate interlaboratory reproducibility.

(b) *HLA typing.* The laboratory must do the following:

(1) Use a technique(s) that is established to optimally define, as applicable, HLA Class I and II specificities.

(2) HLA type all potential transplant beneficiaries at a level appropriate to support clinical transplant protocol and donor selection.

(3) HLA type cells from organ donors referred to the laboratory.

(4) Use HLA antigen terminology that conforms to the latest report of the World Health Organization (W.H.O.) Committee on Nomenclature. Potential new antigens not yet approved by this committee must have a designation that cannot be confused with W.H.O. terminology.

(5) Have available and follow written criteria for the following:

(i) The preparation of cells or cellular extracts (for example, solubilized antigens and nucleic acids), as applicable to the HLA typing technique(s) performed.

(ii) Selecting typing reagents, whether prepared in-house or commercially.

(iii) Ensuring that reagents used for typing are adequate to define all HLA-A, B and DR specificities that are officially recognized by the most recent W.H.O. Committee on Nomenclature and for which reagents are readily available.

(iv) The assignment of HLA antigens.

(v) When antigen redefinition and retyping are required.

(6) Check each HLA typing by testing, at a minimum the following:

(i) A positive control material.

(ii) A negative control material in which, if applicable to the technique performed, cell viability at the end of incubation is sufficient to permit accurate interpretation of results. In assays in which cell viability is not required, the negative control result must be sufficiently different from the positive control result to permit accurate interpretation of results.

(iii) Positive control materials for specific cell types when applicable (that is, T cells, B cells, and monocytes).

(c) *Disease-associated studies.* The laboratory must check each typing for disease-associated HLA antigens using control materials to monitor the test components and each phase of the test system to ensure acceptable performance.

(d) *Antibody Screening.* The laboratory must do the following:

(1) Use a technique(s) that detects HLA-specific antibody with a specificity equivalent or superior to that of the basic complement-dependent microlymphocytotoxicity assay.

(2) Use a method that distinguishes antibodies to HLA Class II antigens from antibodies to Class I antigens to detect antibodies to HLA Class II antigens.

(3) Use a panel that contains all the major HLA specificities and common splits. If the laboratory does not use commercial panels, it must maintain a list of individuals for fresh panel bleeding.

(4) Make a reasonable attempt to have available monthly serum specimens for all potential transplant beneficiaries for periodic antibody screening and crossmatch.

(5) Have available and follow a written policy consistent with clinical transplant protocols for the frequency of screening potential transplant beneficiary sera for preformed HLA-specific antibodies.

624

HOLMES000779

(6) Check each antibody screening by testing, at a minimum the following:

(i) A positive control material containing antibodies of the appropriate isotype for the assay.

(ii) A negative control material.

(7) As applicable, have available and follow written criteria and procedures for antibody identification to the level appropriate to support clinical transplant protocol.

(e) *Crossmatching.* The laboratory must do the following:

(1) Use a technique(s) documented to have increased sensitivity in comparison with the basic complement-dependent microlymphocytotoxicity assay.

(2) Have available and follow written criteria for the following:

(i) Selecting appropriate patient serum samples for crossmatching.

(ii) The preparation of donor cells or cellular extracts (for example, solubilized antigens and nucleic acids), as applicable to the crossmatch technique(s) performed.

(3) Check each crossmatch and compatibility test for HLA Class II antigenic differences using control materials to monitor the test components and each phase of the test system to ensure acceptable performance.

(f) *Transplantation.* Laboratories performing histocompatibility testing for transfusion and transplantation purposes must do the following:

(1) Have available and follow written policies and protocols specifying the histocompatibility testing (that is, HLA typing, antibody screening, compatibility testing and crossmatching) to be performed for each type of cell, tissue or organ to be transfused or transplanted. The laboratory's policies must include, as applicable—

(i) Testing protocols for cadaver donor, living, living-related, and combined organ and tissue transplants;

(ii) Testing protocols for patients at high risk for allograft rejection; and

(iii) The level of testing required to support clinical transplant protocols (for example, antigen or allele level).

(2) For renal allotransplantation and combined organ and tissue transplants in which a kidney is to be transplanted, have available results of final crossmatches before the kidney is transplanted.

(3) For nonrenal transplantation, if HLA testing and final crossmatches were not performed prospectively because of an emergency situation, the laboratory must document the circumstances, if known, under which the emergency transplant was performed, and records of the transplant must reflect any information provided to the laboratory by the patient's physician.

(g) *Documentation.* The laboratory must document all control procedures performed, as specified in this section.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

**§ 493.1281 Standard: Comparison of test results.**

(a) If a laboratory performs the same test using different methodologies or instruments, or performs the same test at multiple testing sites, the laboratory must have a system that twice a year evaluates and defines the relationship between test results using the different methodologies, instruments, or testing sites.

(b) The laboratory must have a system to identify and assess patient test results that appear inconsistent with the following relevant criteria, when available:

(1) Patient age.

(2) Sex.

(3) Diagnosis or pertinent clinical data.

(4) Distribution of patient test results.

(5) Relationship with other test parameters.

(c) The laboratory must document all test result comparison activities.

**§ 493.1282 Standard: Corrective actions.**

(a) Corrective action policies and procedures must be available and followed as necessary to maintain the laboratory's operation for testing patient specimens in a manner that ensures accurate and reliable patient test results and reports.

(b) The laboratory must document all corrective actions taken, including actions taken when any of the following occur:

(1) Test systems do not meet the laboratory's verified or established performance specifications, as determined

625

HOLMES000780

in § 493.1253(b), which include but are not limited to—

(i) Equipment or methodologies that perform outside of established operating parameters or performance specifications;

(ii) Patient test values that are outside of the laboratory's reportable range of test results for the test system; and

(iii) When the laboratory determines that the reference intervals (normal values) for a test procedure are inappropriate for the laboratory's patient population.

(2) Results of control or calibration materials, or both, fail to meet the laboratory's established criteria for acceptability. All patient test results obtained in the unacceptable test run and since the last acceptable test run must be evaluated to determine if patient test results have been adversely affected. The laboratory must take the corrective action necessary to ensure the reporting of accurate and reliable patient test results.

(3) The criteria for proper storage of reagents and specimens, as specified under § 493.1252(b), are not met.

**§ 493.1283　Standard: Test records.**

(a) The laboratory must maintain an information or record system that includes the following:

(1) The positive identification of the specimen.

(2) The date and time of specimen receipt into the laboratory.

(3) The condition and disposition of specimens that do not meet the laboratory's criteria for specimen acceptability.

(4) The records and dates of all specimen testing, including the identity of the personnel who performed the test(s).

(b) Records of patient testing including, if applicable, instrument printouts, must be retained.

**§ 493.1289　Standard: Analytic systems quality assessment.**

(a) The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess, and when indicated, correct problems identified in the ana-

lytic systems specified in §§ 493.1251 through 493.1283.

(b) The analytic systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of analytic systems quality assessment reviews with appropriate staff.

(c) The laboratory must document all analytic systems quality assessment activities.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

POSTANALYTIC SYSTEMS

**§ 493.1290　Condition: Postanalytic systems.**

Each laboratory that performs nonwaived testing must meet the applicable postanalytic systems requirements in § 493.1291 unless HHS approves a procedure, specified in Appendix C of the State Operations Manual (CMS Pub. 7) that provides equivalent quality testing. The laboratory must monitor and evaluate the overall quality of the postanalytic systems and correct identified problems as specified in § 493.1299 for each specialty and subspecialty of testing performed.

**§ 493.1291　Standard: Test report.**

(a) The laboratory must have an adequate manual or electronic system(s) in place to ensure test results and other patient-specific data are accurately and reliably sent from the point of data entry (whether interfaced or entered manually) to final report destination, in a timely manner. This includes the following:

(1) Results reported from calculated data.

(2) Results and patient-specific data electronically reported to network or interfaced systems.

(3) Manually transcribed or electronically transmitted results and patient-specific information reported directly or upon receipt from outside referral laboratories, satellite or point-of-care testing locations.

(b) Test report information maintained as part of the patient's chart or

626

HOLMES000781

**Centers for Medicare & Medicaid Services, HHS** §493.1291

medical record must be readily available to the laboratory and to CMS or a CMS agent upon request.

(c) The test report must indicate the following:

(1) For positive patient identification, either the patient's name and identification number, or a unique patient identifier and identification number.

(2) The name and address of the laboratory location where the test was performed.

(3) The test report date.

(4) The test performed.

(5) Specimen source, when appropriate.

(6) The test result and, if applicable, the units of measurement or interpretation, or both.

(7) Any information regarding the condition and disposition of specimens that do not meet the laboratory's criteria for acceptability.

(d) Pertinent "reference intervals" or "normal" values, as determined by the laboratory performing the tests, must be available to the authorized person who ordered the tests and, if applicable, the individual responsible for using the test results.

(e) The laboratory must, upon request, make available to clients a list of test methods employed by the laboratory and, as applicable, the performance specifications established or verified as specified in §493.1253. In addition, information that may affect the interpretation of test results, for example test interferences, must be provided upon request. Pertinent updates on testing information must be provided to clients whenever changes occur that affect the test results or interpretation of test results.

(f) Except as provided in §493.1291(l), test results must be released only to authorized persons and, if applicable, the persons responsible for using the test results and the laboratory that initially requested the test.

(g) The laboratory must immediately alert the individual or entity requesting the test and, if applicable, the individual responsible for using the test results when any test result indicates an imminently life-threatening condition, or panic or alert values.

(h) When the laboratory cannot report patient test results within its established time frames, the laboratory must determine, based on the urgency of the patient test(s) requested, the need to notify the appropriate individual(s) of the delayed testing.

(i) If a laboratory refers patient specimens for testing—

(1) The referring laboratory must not revise results or information directly related to the interpretation of results provided by the testing laboratory;

(2) The referring laboratory may permit each testing laboratory to send the test result directly to the authorized person who initially requested the test. The referring laboratory must retain or be able to produce an exact duplicate of each testing laboratory's report; and

(3) The authorized person who orders a test must be notified by the referring laboratory of the name and address of each laboratory location where the test was performed.

(j) All test reports or records of the information on the test reports must be maintained by the laboratory in a manner that permits ready identification and timely accessibility.

(k) When errors in the reported patient test results are detected, the laboratory must do the following:

(1) Promptly notify the authorized person ordering the test and, if applicable, the individual using the test results of reporting errors.

(2) Issue corrected reports promptly to the authorized person ordering the test and, if applicable, the individual using the test results.

(3) Maintain duplicates of the original report, as well as the corrected report.

(l) Upon request by a patient (or the patient's personal representative), the laboratory may provide patients, their personal representatives, and those persons specified under 45 CFR 164.524(c)(3)(ii), as applicable, with access to completed test reports that, using the laboratory's authentication process, can be identified as belonging to that patient.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003, as amended at 79 FR 7316, Feb. 6, 2014]

627

HOLMES000782

**§ 493.1299 Standard: Postanalytic systems quality assessment.**

(a) The laboratory must establish and follow written policies and procedures for an ongoing mechanism to monitor, assess and, when indicated, correct problems identified in the postanalytic systems specified in § 493.1291.

(b) The postanalytic systems quality assessment must include a review of the effectiveness of corrective actions taken to resolve problems, revision of policies and procedures necessary to prevent recurrence of problems, and discussion of postanalytic systems quality assessment reviews with appropriate staff.

(c) The laboratory must document all postanalytic systems quality assessment activities.

[68 FR 3703, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

## Subpart L [Reserved]

## Subpart M—Personnel for Nonwaived Testing

SOURCE: 57 FR 7172, Feb. 28, 1992, unless otherwise noted.

**§ 493.1351 General.**

This subpart consists of the personnel requirements that must be met by laboratories performing moderate complexity testing, PPM procedures, high complexity testing, or any combination of these tests.

[60 FR 20049, Apr. 24, 1995]

LABORATORIES PERFORMING PROVIDER-PERFORMED MICROSCOPY (PPM) PROCEDURES

SOURCE: 60 FR 20049, Apr. 24, 1995, unless otherwise noted.

**§ 493.1353 Scope.**

In accordance with § 493.19(b), the moderate complexity procedures specified as PPM procedures are considered such only when personally performed by a health care provider during a patient visit in the context of a physical examination. PPM procedures are subject to the personnel requirements in §§ 493.1355 through 493.1365.

**§ 493.1355 Condition: Laboratories performing PPM procedures; laboratory director.**

The laboratory must have a director who meets the qualification requirements of § 493.1357 and provides overall management and direction in accordance with § 493.1359.

**§ 493.1357 Standard: laboratory director qualifications.**

The laboratory director must be qualified to manage and direct the laboratory personnel and the performance of PPM procedures as specified in § 493.19(c) and must be eligible to be an operator of a laboratory within the requirements of subpart R of this part.

(a) The laboratory director must possess a current license as a laboratory director issued by the State in which the laboratory is located, if the licensing is required.

(b) The laboratory director must meet one of the following requirements:

(1) Be a physician, as defined in § 493.2.

(2) Be a midlevel practitioner, as defined in § 493.2, authorized by a State to practice independently in the State in which the laboratory is located.

(3) Be a dentist, as defined in § 493.2.

**§ 493.1359 Standard: PPM laboratory director responsibilities.**

The laboratory director is responsible for the overall operation and administration of the laboratory, including the prompt, accurate, and proficient reporting of test results. The laboratory director must—

(a) Direct no more than five laboratories; and

(b) Ensure that any procedure listed under § 493.19(c)—

(1) Is personally performed by an individual who meets the qualification requirements in § 493.1363; and

(2) Is performed in accordance with applicable requirements in subparts H, J, K, and M of this part.

[57 FR 7172, Feb. 28, 1992, as amended at 68 FR 3713, Jan. 24, 2003; 68 FR 50724, Aug. 22, 2003]

628

HOLMES000783

**§493.1361 Condition: Laboratories performing PPM procedures; testing personnel.**

The laboratory must have a sufficient number of individuals who meet the qualification requirements of §493.1363 to perform the functions specified in §493.1365 for the volume and complexity of testing performed.

**§493.1363 Standard: PPM testing personnel qualifications.**

Each individual performing PPM procedures must—

(a) Possess a current license issued by the State in which the laboratory is located if the licensing is required; and

(b) Meet one of the following requirements:

(1) Be a physician, as defined in §493.2.

(2) Be a midlevel practitioner, as defined in §493.2, under the supervision of a physician or in independent practice if authorized by the State in which the laboratory is located.

(3) Be a dentist as defined in §493.2 of this part.

**§493.1365 Standard: PPM testing personnel responsibilities.**

The testing personnel are responsible for specimen processing, test performance, and for reporting test results. Any PPM procedure must be—

(a) Personally performed by one of the following practitioners:

(1) A physician during the patient's visit on a specimen obtained from his or her own patient or from a patient of a group medical practice of which the physician is a member or employee.

(2) A midlevel practitioner, under the supervision of a physician or in independent practice if authorized by the State in which the laboratory is located, during the patient's visit on a specimen obtained from his or her own patient or from the patient of a clinic, group medical practice, or other health care provider, in which the midlevel practitioner is a member or an employee.

(3) A dentist during the patient's visit on a specimen obtained from his or her own patient or from a patient of a group dental practice of which the dentist is a member or an employee; and

(b) Performed using a microscope limited to a brightfield or a phase/contrast microscope.

LABORATORIES PERFORMING MODERATE COMPLEXITY TESTING

**§493.1403 Condition: Laboratories performing moderate complexity testing; laboratory director.**

The laboratory must have a director who meets the qualification requirements of §493.1405 of this subpart and provides overall management and direction in accordance with §493.1407 of this subpart.

**§493.1405 Standard: Laboratory director qualifications.**

The laboratory director must be qualified to manage and direct the laboratory personnel and the performance of moderate complexity tests and must be eligible to be an operator of a laboratory within the requirements of subpart R of this part.

(a) The laboratory director must possess a current license as a laboratory director issued by the State in which the laboratory is located, if such licensing is required; and

(b) The laboratory director must—

(1) (i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in anatomic or clinical pathology, or both, by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have had laboratory training or experience consisting of:

(A) At least one year directing or supervising non-waived laboratory testing; or

(B) Beginning September 1, 1993, have at least 20 continuing medical education credit hours in laboratory practice commensurate with the director responsibilities defined in §493.1407; or

(C) Laboratory training equivalent to paragraph (b)(2)(ii)(B) of this section

629

HOLMES000784

obtained during medical residency. (For example, physicians certified either in hematology or hematology and medical oncology by the American Board of Internal Medicine); or

(3) Hold an earned doctoral degree in a chemical, physical, biological, or clinical laboratory science from an accredited institution; and

(i) Be certified by the American Board of Medical Microbiology, the American Board of Clinical Chemistry, the American Board of Bioanalysis, or the American Board of Medical Laboratory Immunology; or

(ii) Have had at least one year experience directing or supervising non-waived laboratory testing;

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution;

(ii) Have at least one year of laboratory training or experience, or both in non-waived testing; and

(iii) In addition, have at least one year of supervisory laboratory experience in non-waived testing; or

(5)(i) Have earned a bachelor's degree in a chemical, physical, or biological science or medical technology from an accredited institution;

(ii) Have at least 2 years of laboratory training or experience, or both in non-waived testing; and

(iii) In addition, have at least 2 years of supervisory laboratory experience in non-waived testing;

(6) Be serving as a laboratory director and must have previously qualified or could have qualified as a laboratory director under § 493.1406; or

(7) On or before February 28, 1992, qualified under State law to direct a laboratory in the State in which the laboratory is located.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5233, Jan. 19, 1993]

§ 493.1406  Standard; Laboratory director qualifications on or before February 28, 1992.

The laboratory director must be qualified to manage and direct the laboratory personnel and test performance.

(a) The laboratory director must possess a current license as a laboratory director issued by the State, if such licensing exists; and

(b) The laboratory director must:

(1) Be a physician certified in anatomical or clinical pathology (or both) by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification;

(2) Be a physician who:

(i) Is certified by the American Board of Pathology or the American Osteopathic Board of Pathology in at least one of the laboratory specialties; or

(ii) Is certified by the American Board of Medical Microbiology, the American Board of Clinical Chemistry, the American Board of Bioanalysis, or other national accrediting board in one of the laboratory specialties; or

(iii) Is certified by the American Society of Cytology to practice cytopathology or possesses qualifications that are equivalent to those required for such certification; or

(iv) Subsequent to graduation, has had 4 or more years of full-time general laboratory training and experience of which at least 2 years were spent acquiring proficiency in one of the laboratory specialties;

(3) For the subspecialty of oral pathology only, be certified by the American Board of Oral Pathology, American Board of Pathology or the American Osteopathic Board of Pathology or possesses qualifications that are equivalent to those required for certification;

(4) Hold an earned doctoral degree from an accredited institution with a chemical, physical, or biological science as a major subject and

(i) Is certified by the American Board of Medical Microbiology, the American Board of Clinical Chemistry, the American Board of Bioanalysis, or other national accrediting board acceptable to HHS in one of the laboratory specialties; or

(ii) Subsequent to graduation, has had 4 or more years of full-time general laboratory training and experience of which at least 2 years were spent acquiring proficiency in one of the laboratory specialties;

(5) With respect to individuals first qualifying before July 1, 1971, have

630

HOLMES000785

been responsible for the direction of a laboratory for 12 months between July 1, 1961, and January 1, 1968, and, in addition, either:

(i) Was a physician and subsequent to graduation had at least 4 years of pertinent full-time laboratory experience;

(ii) Held a master's degree from an accredited institution with a chemical, physical, or biological science as a major subject and subsequent to graduation had at least 4 years of pertinent full-time laboratory experience;

(iii) Held a bachelor's degree from an accredited institution with a chemical, physical, or biological science as a major subject and subsequent to graduation had at least 6 years of pertinent full-time laboratory experience; or

(iv) Achieved a satisfactory grade through an examination conducted by or under the sponsorship of the U.S. Public Health Service on or before July 1, 1970; or

(6) Qualify under State law to direct the laboratory in the State in which the laboratory is located.

NOTE: The January 1, 1968 date for meeting the 12 months' laboratory direction requirement in paragraph (b)(5) of this section may be extended 1 year for each year of full-time laboratory experience obtained before January 1, 1958 required by State law for a laboratory director license. An exception to the July 1, 1971 qualifying date in paragraph (b)(5) of this section was made provided that the individual requested qualification approval by October 21, 1975 and had been employed in a laboratory for at least 3 years of the 5 years preceding the date of submission of his qualifications.

[58 FR 5233, Jan. 19, 1993]

§493.1407 Standard; Laboratory director responsibilities.

The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, and record and report test results promptly, accurate, and proficiently and for assuring compliance with the applicable regulations.

(a) The laboratory director, if qualified, may perform the duties of the technical consultant, clinical consultant, and testing personnel, or delegate these responsibilities to personnel

meeting the qualifications of §§493.1409, 493.1415, and 493.1421, respectively.

(b) If the laboratory director reapportions performance of his or her responsibilities, he or she remains responsible for ensuring that all duties are properly performed.

(c) The laboratory director must be accessible to the laboratory to provide onsite, telephone or electronic consultation as needed.

(d) Each individual may direct no more than five laboratories.

(e) The laboratory director must—

(1) Ensure that testing systems developed and used for each of the tests performed in the laboratory provide quality laboratory services for all aspects of test performance, which includes the preanalytic, analytic, and postanalytic phases of testing;

(2) Ensure that the physical plant and environmental conditions of the laboratory are appropriate for the testing performed and provide a safe environment in which employees are protected from physical, chemical, and biological hazards;

(3) Ensure that—

(i) The test methodologies selected have the capability of providing the quality of results required for patient care;

(ii) Verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method; and

(iii) Laboratory personnel are performing the test methods as required for accurate and reliable results;

(4) Ensure that the laboratory is enrolled in an HHS approved proficiency testing program for the testing performed and that—

(i) The proficiency testing samples are tested as required under subpart H of this part;

(ii) The results are returned within the timeframes established by the proficiency testing program;

(iii) All proficiency testing reports received are reviewed by the appropriate staff to evaluate the laboratory's performance and to identify any problems that require corrective action; and

(iv) An approved corrective action plan is followed when any proficiency

HOLMES000786

testing results are found to be unacceptable or unsatisfactory;

(5) Ensure that the quality control and quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur;

(6) Ensure the establishment and maintenance of acceptable levels of analytical performance for each test system;

(7) Ensure that all necessary remedial actions are taken and documented whenever significant deviations from the laboratory's established performance specifications are identified, and that patient test results are reported only when the system is functioning properly;

(8) Ensure that reports of test results include pertinent information required for interpretation;

(9) Ensure that consultation is available to the laboratory's clients on matters relating to the quality of the test results reported and their interpretation concerning specific patient conditions;

(10) Employ a sufficient number of laboratory personnel with the appropriate education and either experience or training to provide appropriate consultation, properly supervise and accurately perform tests and report test results in accordance with the personnel responsibilities described in this subpart;

(11) Ensure that prior to testing patients' specimens, all personnel have the appropriate education and experience, receive the appropriate training for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results;

(12) Ensure that policies and procedures are established for monitoring individuals who conduct preanalytical, analytical, and postanalytical phases of testing to assure that they are competent and maintain their competency to process specimens, perform test procedures and report test results promptly and proficiently, and whenever necessary, identify needs for remedial training or continuing education to improve skills;

(13) Ensure that an approved procedure manual is available to all personnel responsible for any aspect of the testing process; and

(14) Specify, in writing, the responsibilities and duties of each consultant and each person, engaged in the performance of the preanalytic, analytic, and postanalytic phases of testing, that identifies which examinations and procedures each individual is authorized to perform, whether supervision is required for specimen processing, test performance or results reporting, and whether consultant or director review is required prior to reporting patient test results.

[57 FR 7172, Feb. 28, 1992, as amended at 68 FR 3713, Jan. 24, 2003]

§ 493.1409 Condition: Laboratories performing moderate complexity testing; technical consultant.

The laboratory must have a technical consultant who meets the qualification requirements of § 493.1411 of this subpart and provides technical oversight in accordance with § 493.1413 of this subpart.

§ 493.1411 Standard: Technical consultant qualifications.

The laboratory must employ one or more individuals who are qualified by education and either training or experience to provide technical consultation for each of the specialties and subspecialties of service in which the laboratory performs moderate complexity tests or procedures. The director of a laboratory performing moderate complexity testing may function as the technical consultant provided he or she meets the qualifications specified in this section.

(a) The technical consultant must possess a current license issued by the State in which the laboratory is located, if such licensing is required.

(b) The technical consultant must—

(1) (i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in anatomic or clinical pathology, or both, by the American Board of Pathology or the American Osteopathic Board of Pathology or

632

HOLMES000787

**Centers for Medicare & Medicaid Services, HHS**  §493.1413

possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least one year of laboratory training or experience, or both in non-waived testing, in the designated specialty or subspecialty areas of service for which the technical consultant is responsible (for example, physicians certified either in hematology or hematology and medical oncology by the American Board of Internal Medicine are qualified to serve as the technical consultant in hematology); or

(3)(i) Hold an earned doctoral or master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least one year of laboratory training or experience, or both in non-waived testing, in the designated specialty or subspecialty areas of service for which the technical consultant is responsible; or

(4)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both in non-waived testing, in the designated specialty or subspecialty areas of service for which the technical consultant is responsible.

Note: The technical consultant requirements for "laboratory training or experience, or both" in each specialty or subspecialty may be acquired concurrently in more than one of the specialties or specialties of service, excluding waived tests. For example, an individual who has a bachelor's degree in biology and additionally has documentation of 2 years of work experience performing tests of moderate complexity in all specialties and subspecialties of service, would be qualified as a technical consultant in a laboratory performing moderate complexity testing in all specialties and subspecialties of service.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993]

**§493.1413 Standard; Technical consultant responsibilities.**

The technical consultant is responsible for the technical and scientific oversight of the laboratory. The technical consultant is not required to be onsite at all times testing is performed; however, he or she must be available to the laboratory on an as needed basis to provide consultation, as specified in paragraph (a) of this section.

(a) The technical consultant must be accessible to the laboratory to provide on-site, telephone, or electronic consultation; and

(b) The technical consultant is responsible for—

(1) Selection of test methodology appropriate for the clinical use of the test results;

(2) Verification of the test procedures performed and the establishment of the laboratory's test performance characteristics, including the precision and accuracy of each test and test system;

(3) Enrollment and participation in an HHS approved proficiency testing program commensurate with the services offered;

(4) Establishing a quality control program appropriate for the testing performed and establishing the parameters for acceptable levels of analytic performance and ensuring that these levels are maintained throughout the entire testing process from the initial receipt of the specimen, through sample analysis and reporting of test results;

(5) Resolving technical problems and ensuring that remedial actions are taken whenever test systems deviate from the laboratory's established performance specifications;

(6) Ensuring that patient test results are not reported until all corrective actions have been taken and the test system is functioning properly;

(7) Identifying training needs and assuring that each individual performing tests receives regular in-service training and education appropriate for the type and complexity of the laboratory services performed;

(8) Evaluating the competency of all testing personnel and assuring that the staff maintain their competency to perform test procedures and report test

633

HOLMES000788

results promptly, accurately and proficiently. The procedures for evaluation of the competency of the staff must include, but are not limited to—

(i) Direct observations of routine patient test performance, including patient preparation, if applicable, specimen handling, processing and testing;

(ii) Monitoring the recording and reporting of test results;

(iii) Review of intermediate test results or worksheets, quality control records, proficiency testing results, and preventive maintenance records;

(iv) Direct observation of performance of instrument maintenance and function checks;

(v) Assessment of test performance through testing previously analyzed specimens, internal blind testing samples or external proficiency testing samples; and

(vi) Assessment of problem solving skills; and

(9) Evaluating and documenting the performance of individuals responsible for moderate complexity testing at least semiannually during the first year the individual tests patient specimens. Thereafter, evaluations must be performed at least annually unless test methodology or instrumentation changes, in which case, prior to reporting patient test results, the individual's performance must be reevaluated to include the use of the new test methodology or instrumentation.

### § 493.1415  Condition: Laboratories performing moderate complexity testing; clinical consultant.

The laboratory must have a clinical consultant who meets the qualification requirements of § 493.1417 of this part and provides clinical consultation in accordance with § 493.1419 of this part.

### § 493.1417  Standard; Clinical consultant qualifications.

The clinical consultant must be qualified to consult with and render opinions to the laboratory's clients concerning the diagnosis, treatment and management of patient care. The clinical consultant must—

(a) Be qualified as a laboratory director under § 493.1405(b) (1), (2), or (3)(i); or

(b) Be a doctor of medicine, doctor of osteopathy or doctor of podiatric medicine and possess a license to practice medicine, osteopathy or podiatry in the State in which the laboratory is located.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993]

### § 493.1419  Standard: Clinical consultant responsibilities.

The clinical consultant provides consultation regarding the appropriateness of the testing ordered and interpretation of test results. The clinical consultant must—

(a) Be available to provide clinical consultation to the laboratory's clients;

(b) Be available to assist the laboratory's clients in ensuring that appropriate tests are ordered to meet the clinical expectations;

(c) Ensure that reports of test results include pertinent information required for specific patient interpretation; and

(d) Ensure that consultation is available and communicated to the laboratory's clients on matters related to the quality of the test results reported and their interpretation concerning specific patient conditions.

### § 493.1421  Condition: Laboratories performing moderate complexity testing; testing personnel.

The laboratory must have a sufficient number of individuals who meet the qualification requirements of § 493.1423, to perform the functions specified in § 493.1425 for the volume and complexity of tests performed.

### § 493.1423  Standard; Testing personnel qualifications.

Each individual performing moderate complexity testing must—

(a) Possess a current license issued by the State in which the laboratory is located, if such licensing is required; and

(b) Meet one of the following requirements:

(1) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located or have earned a doctoral, master's, or bachelor's degree in a chemical, physical,

HOLMES000789

biological or clinical laboratory science, or medical technology from an accredited institution; or

(2) Have earned an associate degree in a chemical, physical or biological science or medical laboratory technology from an accredited institution; or

(3) Be a high school graduate or equivalent and have successfully completed an official military medical laboratory procedures course of at least 50 weeks duration and have held the military enlisted occupational specialty of Medical Laboratory Specialist (Laboratory Technician); or

(4)(i) Have earned a high school diploma or equivalent; and

(ii) Have documentation of training appropriate for the testing performed prior to analyzing patient specimens. Such training must ensure that the individual has—

(A) The skills required for proper specimen collection, including patient preparation, if applicable, labeling, handling, preservation or fixation, processing or preparation, transportation and storage of specimens;

(B) The skills required for implementing all standard laboratory procedures;

(C) The skills required for performing each test method and for proper instrument use;

(D) The skills required for performing preventive maintenance, troubleshooting and calibration procedures related to each test performed;

(E) A working knowledge of reagent stability and storage;

(F) The skills required to implement the quality control policies and procedures of the laboratory;

(G) An awareness of the factors that influence test results; and

(H) The skills required to assess and verify the validity of patient test results through the evaluation of quality control sample values prior to reporting patient test results.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993]

**§493.1425 Standard; Testing personnel responsibilities.**

The testing personnel are responsible for specimen processing, test performance, and for reporting test results.

(a) Each individual performs only those moderate complexity tests that are authorized by the laboratory director and require a degree of skill commensurate with the individual's education, training or experience, and technical abilities.

(b) Each individual performing moderate complexity testing must—

(1) Follow the laboratory's procedures for specimen handling and processing, test analyses, reporting and maintaining records of patient test results;

(2) Maintain records that demonstrate that proficiency testing samples are tested in the same manner as patient samples;

(3) Adhere to the laboratory's quality control policies, document all quality control activities, instrument and procedural calibrations and maintenance performed;

(4) Follow the laboratory's established corrective action policies and procedures whenever test systems are not within the laboratory's established acceptable levels of performance;

(5) Be capable of identifying problems that may adversely affect test performance or reporting of test results and either must correct the problems or immediately notify the technical consultant, clinical consultant or director; and

(6) Document all corrective actions taken when test systems deviate from the laboratory's established performance specifications.

LABORATORIES PERFORMING HIGH COMPLEXITY TESTING

**§493.1441 Condition: Laboratories performing high complexity testing; laboratory director.**

The laboratory must have a director who meets the qualification requirements of §493.1443 of this subpart and provides overall management and direction in accordance with §493.1445 of this subpart.

**§493.1443 Standard; Laboratory director qualifications.**

The laboratory director must be qualified to manage and direct the laboratory personnel and performance of

635

HOLMES000790

high complexity tests and must be eligible to be an operator of a laboratory within the requirements of subpart R.

(a) The laboratory director must possess a current license as a laboratory director issued by the State in which the laboratory is located, if such licensing is required; and

(b) The laboratory director must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in anatomic or clinical pathology, or both, by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2) Be a doctor of medicine, a doctor of osteopathy or doctor of podiatric medicine licensed to practice medicine, osteopathy or podiatry in the State in which the laboratory is located; and

(i) Have at least one year of laboratory training during medical residency (for example, physicians certified either in hematology or hematology and medical oncology by the American Board of Internal Medicine); or

(ii) Have at least 2 years of experience directing or supervising high complexity testing; or

(3) Hold an earned doctoral degree in a chemical, physical, biological, or clinical laboratory science from an accredited institution and—

(i) Be certified and continue to be certified by a board approved by HHS; or

(ii) Before February 24, 2003, must have served or be serving as a director of a laboratory performing high complexity testing and must have at least—

(A) Two years of laboratory training or experience, or both; and

(B) Two years of laboratory experience directing or supervising high complexity testing.

(4) Be serving as a laboratory director and must have previously qualified or could have qualified as a laboratory director under regulations at 42 CFR 493.1415, published March 14, 1990 at 55 FR 9538, on or before February 28, 1992; or

(5) On or before February 28, 1992, be qualified under State law to direct a laboratory in the State in which the laboratory is located; or

(6) For the subspecialty of oral pathology, be certified by the American Board of Oral Pathology, American Board of Pathology, the American Osteopathic Board of Pathology, or possess qualifications that are equivalent to those required for certification.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993; 59 FR 62609, Dec. 6, 1994; 62 FR 25858, May 12, 1997; 63 FR 55034, Oct. 14, 1998; 65 FR 82944, Dec. 29, 2000; 68 FR 3713, Jan. 24, 2003]

§ 493.1445 **Standard; Laboratory director responsibilities.**

The laboratory director is responsible for the overall operation and administration of the laboratory, including the employment of personnel who are competent to perform test procedures, record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable regulations.

(a) The laboratory director, if qualified, may perform the duties of the technical supervisor, clinical consultant, general supervisor, or testing personnel, or delegate these responsibilities to personnel meeting the qualifications under §§ 493.1447, 493.1453, 493.1459, and 493.1487, respectively.

(b) If the laboratory director reapportions performance of his or her responsibilities, he or she remains responsible for ensuring that all duties are properly performed.

(c) The laboratory director must be accessible to the laboratory to provide onsite, telephone or electronic consultation as needed.

(d) Each individual may direct no more than five laboratories.

(e) The laboratory director must—

(1) Ensure that testing systems developed and used for each of the tests performed in the laboratory provide quality laboratory services for all aspects of test performance, which includes the preanalytic, analytic, and postanalytic phases of testing;

(2) Ensure that the physical plant and environmental conditions of the

HOLMES000791

laboratory are appropriate for the testing performed and provide a safe environment in which employees are protected from physical, chemical, and biological hazards;

(3) Ensure that—

(i) The test methodologies selected have the capability of providing the quality of results required for patient care;

(ii) Verification procedures used are adequate to determine the accuracy, precision, and other pertinent performance characteristics of the method; and

(iii) Laboratory personnel are performing the test methods as required for accurate and reliable results;

(4) Ensure that the laboratory is enrolled in an HHS-approved proficiency testing program for the testing performed and that—

(i) The proficiency testing samples are tested as required under subpart H of this part;

(ii) The results are returned within the timeframes established by the proficiency testing program;

(iii) All proficiency testing reports received are reviewed by the appropriate staff to evaluate the laboratory's performance and to identify any problems that require corrective action; and

(iv) An approved corrective action plan is followed when any proficiency testing result is found to be unacceptable or unsatisfactory;

(5) Ensure that the quality control and quality assessment programs are established and maintained to assure the quality of laboratory services provided and to identify failures in quality as they occur;

(6) Ensure the establishment and maintenance of acceptable levels of analytical performance for each test system;

(7) Ensure that all necessary remedial actions are taken and documented whenever significant deviations from the laboratory's established performance characteristics are identified, and that patient test results are reported only when the system is functioning properly;

(8) Ensure that reports of test results include pertinent information required for interpretation;

(9) Ensure that consultation is available to the laboratory's clients on matters relating to the quality of the test results reported and their interpretation concerning specific patient conditions;

(10) Ensure that a general supervisor provides on-site supervision of high complexity test performance by testing personnel qualified under §493.1489(b)(4);

(11) Employ a sufficient number of laboratory personnel with the appropriate education and either experience or training to provide appropriate consultation, properly supervise and accurately perform tests and report test results in accordance with the personnel responsibilities described in this subpart;

(12) Ensure that prior to testing patients' specimens, all personnel have the appropriate education and experience, receive the appropriate training for the type and complexity of the services offered, and have demonstrated that they can perform all testing operations reliably to provide and report accurate results;

(13) Ensure that policies and procedures are established for monitoring individuals who conduct preanalytical, analytical, and postanalytical phases of testing to assure that they are competent and maintain their competency to process specimens, perform test procedures and report test results promptly and proficiently, and whenever necessary, identify needs for remedial training or continuing education to improve skills;

(14) Ensure that an approved procedure manual is available to all personnel responsible for any aspect of the testing process; and

(15) Specify, in writing, the responsibilities and duties of each consultant and each supervisor, as well as each person engaged in the performance of the preanalytic, analytic, and postanalytic phases of testing, that identifies which examinations and procedures each individual is authorized to perform, whether supervision is required for specimen processing, test performance or result reporting and whether supervisory or director review

HOLMES000792

§ 493.1447                                                          42 CFR Ch. IV (10–1–15 Edition)

is required prior to reporting patient test results.

[57 FR 7172, Feb. 28, 1992, as amended at 68 FR 3714, Jan. 24, 2003]

### § 493.1447 Condition: Laboratories performing high complexity testing; technical supervisor.

The laboratory must have a technical supervisor who meets the qualification requirements of § 493.1449 of this subpart and provides technical supervision in accordance with § 493.1451 of this subpart.

### § 493.1449 Standard; Technical supervisor qualifications.

The laboratory must employ one or more individuals who are qualified by education and either training or experience to provide technical supervision for each of the specialties and subspecialties of service in which the laboratory performs high complexity tests or procedures. The director of a laboratory performing high complexity testing may function as the technical supervisor provided he or she meets the qualifications specified in this section.

(a) The technical supervisor must possess a current license issued by the State in which the laboratory is located, if such licensing is required; and

(b) The laboratory may perform anatomic and clinical laboratory procedures and tests in all specialties and subspecialties of services except histocompatibility and clinical cytogenetics services provided the individual functioning as the technical supervisor—

(1) Is a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(2) Is certified in both anatomic and clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or Possesses qualifications that are equivalent to those required for such certification.

(c) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of bacteriology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical, or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of bacteriology.

(d) If the requirements of paragraph (b) of this section are not met and the

638

HOLMES000793

**Centers for Medicare & Medicaid Services, HHS** §493.1449

laboratory performs tests in the subspecialty of mycobacteriology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor or podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycobacteriology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high com-

plexity testing within the subspecialty of mycobacteriology.

(e) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of mycology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in

639

HOLMES000794

high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of mycology.

(f) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of parasitology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology;

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological

science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of parasitology.

(g) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of virology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum

HOLMES000795

of 6 months experience in high complexity testing within the subspecialty of virology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing within the specialty of microbiology with a minimum of 6 months experience in high complexity testing within the subspecialty of virology.

(h) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of diagnostic immunology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of diagnostic immunology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology; or

(5) (i) Have earned a bachelor's degree in a chemical, physical or biologi-

cal science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of diagnostic immunology.

(i) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of chemistry, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of chemistry; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of chemistry.

(j) If the requirements of paragraph (b) of this section are not met and the

641

HOLMES000796

laboratory performs tests in the specialty of hematology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing for the specialty of hematology (for example, physicians certified either in hematology or hematology and medical oncology by the American Board of Internal Medicine); or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of hematology; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of hematology; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of hematology.

(k)(1) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of cytology, the individual functioning as the technical supervisor must—

(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Meet one of the following requirements—

(A) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(B) Be certified by the American Society of Cytology to practice cytopathology or possess qualifications that are equivalent to those required for such certification;

(2) An individual qualified under §493.1449(b) or paragraph (k)(1) of this section may delegate some of the cytology technical supervisor responsibilities to an individual who is in the final year of full-time training leading to certification specified in paragraphs (b) or (k)(1)(ii)(A) of this section provided the technical supervisor qualified under §493.1449(b) or paragraph (k)(1) of this section remains ultimately responsible for ensuring that all of the responsibilities of the cytology technical supervisor are met.

(l) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of histopathology, the individual functioning as the technical supervisor must—

(1) Meet one of the following requirements:

(i) (A) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(B) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification;

(ii) An individual qualified under §493.1449(b) or paragraph (l)(1) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraph (b) or (l)(1)(i)(B) of this section, the responsibility for examination and interpretation of histopathology specimens.

642

HOLMES000797

Centers for Medicare & Medicaid Services, HHS §493.1449

(2) For tests in dermatopathology, meet one of the following requirements:

(i) (A) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located and—

(B) Meet one of the following requirements:

(*1*) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(*2*) Be certified in dermatopathology by the American Board of Dermatology and the American Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(*3*) Be certified in dermatology by the American Board of Dermatology or possess qualifications that are equivalent to those required for such certification; or

(ii) An individual qualified under §493.1449(b) or paragraph (l)(2)(i) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (l)(2)(i)(B) of this section, the responsibility for examination and interpretation of dermatopathology specimens.

(3) For tests in ophthalmic pathology, meet one of the following requirements:

(i)(A) Be a doctor of medicine or doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located and—

(B) Must meet one of the following requirements:

(*1*) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(*2*) Be certified by the American Board of Ophthalmology or possess qualifications that are equivalent to those required for such certification and have successfully completed at least 1 year of formal post-residency fellowship training in ophthalmic pathology; or

(ii) An individual qualified under §493.1449(b) or paragraph (l)(3)(i) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (l)(3)(i)(B) of this section, the responsibility for examination and interpretation of ophthalmic specimens; or

(m) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the subspecialty of oral pathology, the individual functioning as the technical supervisor must meet one of the following requirements:

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located and—

(ii) Be certified in anatomic pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2) Be certified in oral pathology by the American Board of Oral Pathology or possess qualifications for such certification; or

(3) An individual qualified under §493.1449(b) or paragraph (m) (1) or (2) of this section may delegate to an individual who is a resident in a training program leading to certification specified in paragraphs (b) or (m) (1) or (2) of this section, the responsibility for examination and interpretation of oral pathology specimens.

(n) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of radiobioassay, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric

643

HOLMES000798

medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing for the specialty of radiobioassay; or

(3)(i) Have an earned doctoral degree in a chemical, physical, biological or clinical laboratory science from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing within the specialty of radiobioassay; or

(4)(i) Have earned a master's degree in a chemical, physical, biological or clinical laboratory science or medical technology from an accredited institution; and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing for the specialty of radiobioassay; or

(5)(i) Have earned a bachelor's degree in a chemical, physical or biological science or medical technology from an accredited institution; and

(ii) Have at least 4 years of laboratory training or experience, or both, in high complexity testing for the specialty of radiobioassay.

(o) If the laboratory performs tests in the specialty of histocompatibility, the individual functioning as the technical supervisor must either—

(1)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have training or experience that meets one of the following requirements:

(A) Have 4 years of laboratory training or experience, or both, within the specialty of histocompatibility; or

(B)(1) Have 2 years of laboratory training or experience, or both, in the specialty of general immunology; and

(2) Have 2 years of laboratory training or experience, or both, in the specialty of histocompatibility; or

(2)(i) Have an earned doctoral degree in a biological or clinical laboratory science from an accredited institution; and

(ii) Have training or experience that meets one of the following requirements:

(A) Have 4 years of laboratory training or experience, or both, within the specialty of histocompatibility; or

(B)(1) Have 2 years of laboratory training or experience, or both, in the specialty of general immunology; and

(2) Have 2 years of laboratory training or experience, or both, in the specialty of histocompatibility.

(p) If the laboratory performs tests in the specialty of clinical cytogenetics, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have 4 years of training or experience, or both, in genetics, 2 of which have been in clinical cytogenetics; or

(2)(i) Hold an earned doctoral degree in a biological science, including biochemistry, or clinical laboratory science from an accredited institution; and

(ii) Have 4 years of training or experience, or both, in genetics, 2 of which have been in clinical cytogenetics.

(q) If the requirements of paragraph (b) of this section are not met and the laboratory performs tests in the specialty of immunohematology, the individual functioning as the technical supervisor must—

(1)(i) Be a doctor of medicine or a doctor of osteopathy licensed to practice medicine or osteopathy in the State in which the laboratory is located; and

(ii) Be certified in clinical pathology by the American Board of Pathology or the American Osteopathic Board of Pathology or possess qualifications that are equivalent to those required for such certification; or

(2)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located; and

(ii) Have at least one year of laboratory training or experience, or both, in high complexity testing for the specialty of immunohematology.

HOLMES000799

NOTE: The technical supervisor requirements for "laboratory training or experience, or both" in each specialty or subspecialty may be acquired concurrently in more than one of the specialties or subspecialties of service. For example, an individual, who has a doctoral degree in chemistry and additionally has documentation of 1 year of laboratory experience working concurrently in high complexity testing in the specialties of microbiology and chemistry and 6 months of that work experience included high complexity testing in bacteriology, mycology, and mycobacteriology, would qualify as the technical supervisor for the specialty of chemistry and the subspecialties of bacteriology, mycology, and mycobacteriology.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5234, Jan. 19, 1993]

### §493.1451 Standard: Technical supervisor responsibilities.

The technical supervisor is responsible for the technical and scientific oversight of the laboratory. The technical supervisor is not required to be on site at all times testing is performed; however, he or she must be available to the laboratory on an as needed basis to provide supervision as specified in (a) of this section.

(a) The technical supervisor must be accessible to the laboratory to provide on-site, telephone, or electronic consultation; and

(b) The technical supervisor is responsible for—

(1) Selection of the test methodology that is appropriate for the clinical use of the test results;

(2) Verification of the test procedures performed and establishment of the laboratory's test performance characteristics, including the precision and accuracy of each test and test system;

(3) Enrollment and participation in an HHS approved proficiency testing program commensurate with the services offered;

(4) Establishing a quality control program appropriate for the testing performed and establishing the parameters for acceptable levels of analytic performance and ensuring that these levels are maintained throughout the entire testing process from the initial receipt of the specimen, through sample analysis and reporting of test results;

(5) Resolving technical problems and ensuring that remedial actions are taken whenever test systems deviate from the laboratory's established performance specifications;

(6) Ensuring that patient test results are not reported until all corrective actions have been taken and the test system is functioning properly;

(7) Identifying training needs and assuring that each individual performing tests receives regular in-service training and education appropriate for the type and complexity of the laboratory services performed;

(8) Evaluating the competency of all testing personnel and assuring that the staff maintain their competency to perform test procedures and report test results promptly, accurately and proficiently. The procedures for evaluation of the competency of the staff must include, but are not limited to—

(i) Direct observations of routine patient test performance, including patient preparation, if applicable, specimen handling, processing and testing;

(ii) Monitoring the recording and reporting of test results;

(iii) Review of intermediate test results or worksheets, quality control records, proficiency testing results, and preventive maintenance records;

(iv) Direct observation of performance of instrument maintenance and function checks;

(v) Assessment of test performance through testing previously analyzed specimens, internal blind testing samples or external proficiency testing samples; and

(vi) Assessment of problem solving skills; and

(9) Evaluating and documenting the performance of individuals responsible for high complexity testing at least semiannually during the first year the individual tests patient specimens. Thereafter, evaluations must be performed at least annually unless test methodology or instrumentation changes, in which case, prior to reporting patient test results, the individual's performance must be reevaluated to include the use of the new test methodology or instrumentation.

(c) In cytology, the technical supervisor or the individual qualified under §493.1449(k)(2)—

645

HOLMES000800

(1) May perform the duties of the cytology general supervisor and the cytotechnologist, as specified in §§ 493.1471 and 493.1485, respectively;

(2) Must establish the workload limit for each individual examining slides;

(3) Must reassess the workload limit for each individual examining slides at least every 6 months and adjust as necessary;

(4) Must perform the functions specified in § 493.1274(d) and (e);

(5) Must ensure that each individual examining gynecologic preparations participates in an HHS approved cytology proficiency testing program, as specified in § 493.945 and achieves a passing score, as specified in § 493.855; and

(6) If responsible for screening cytology slide preparations, must document the number of cytology slides screened in 24 hours and the number of hours devoted during each 24-hour period to screening cytology slides.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5235, Jan. 19, 1993; 68 FR 3714, Jan. 24, 2003]

### § 493.1453 Condition: Laboratories performing high complexity testing; clinical consultant.

The laboratory must have a clinical consultant who meets the requirements of § 493.1455 of this subpart and provides clinical consultation in accordance with § 493.1457 of this subpart.

### § 493.1455 Standard: Clinical consultant qualifications.

The clinical consultant must be qualified to consult with and render opinions to the laboratory's clients concerning the diagnosis, treatment and management of patient care. The clinical consultant must—

(a) Be qualified as a laboratory director under § 493.1443(b)(1), (2), or (3)(i) or, for the subspecialty of oral pathology, § 493.1443(b)(6); or

(b) Be a doctor of medicine, doctor of osteopathy, doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5235, Jan. 19, 1993]

### § 493.1457 Standard: Clinical consultant responsibilities.

The clinical consultant provides consultation regarding the appropriateness of the testing ordered and interpretation of test results. The clinical consultant must—

(a) Be available to provide consultation to the laboratory's clients;

(b) Be available to assist the laboratory's clients in ensuring that appropriate tests are ordered to meet the clinical expectations;

(c) Ensure that reports of test results include pertinent information required for specific patient interpretation; and

(d) Ensure that consultation is available and communicated to the laboratory's clients on matters related to the quality of the test results reported and their interpretation concerning specific patient conditions.

### § 493.1459 Condition: Laboratories performing high complexity testing; general supervisor.

The laboratory must have one or more general supervisors who are qualified under § 493.1461 of this subpart to provide general supervision in accordance with § 493.1463 of this subpart.

### § 493.1461 Standard: General supervisor qualifications.

The laboratory must have one or more general supervisors who, under the direction of the laboratory director and supervision of the technical supervisor, provides day-to-day supervision of testing personnel and reporting of test results. In the absence of the director and technical supervisor, the general supervisor must be responsible for the proper performance of all laboratory procedures and reporting of test results.

(a) The general supervisor must possess a current license issued by the State in which the laboratory is located, if such licensing is required; and

(b) The general supervisor must be qualified as a—

(1) Laboratory director under § 493.1443; or

(2) Technical supervisor under § 493.1449.

(c) If the requirements of paragraph (b)(1) or paragraph (b)(2) of this section

HOLMES000801

**Centers for Medicare & Medicaid Services, HHS** §493.1462

are not met, the individual functioning as the general supervisor must—

(1)(i) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located or have earned a doctoral, master's, or bachelor's degree in a chemical, physical, biological or clinical laboratory science, or medical technology from an accredited institution; and

(ii) Have at least 1 year of laboratory training or experience, or both, in high complexity testing; or

(2)(i) Qualify as testing personnel under §493.1489(b)(2); and

(ii) Have at least 2 years of laboratory training or experience, or both, in high complexity testing; or

(3)(i) Except as specified in paragraph (3)(ii) of this section, have previously qualified as a general supervisor under §493.1462 on or before February 28, 1992.

(ii) *Exception.* An individual who achieved a satisfactory grade in a proficiency examination for technologist given by HHS between March 1, 1986 and December 31, 1987, qualifies as a general supervisor if he or she meets the requirements of §493.1462 on or before January 1, 1994.''

(4) On or before September 1, 1992, have served as a general supervisor of high complexity testing and as of April 24, 1995—

(i) Meet one of the following requirements:

(A) Have graduated from a medical laboratory or clinical laboratory training program approved or accredited by the Accrediting Bureau of Health Education Schools (ABHES), the Commission on Allied Health Education Accreditation (CAHEA), or other organization approved by HHS.

(B) Be a high school graduate or equivalent and have successfully completed an official U.S. military medical laboratory procedures course of at least 50 weeks duration and have held the military enlisted occupational specialty of Medical Laboratory Specialist (Laboratory Technician).

(ii) Have at least 2 years of clinical laboratory training, or experience, or both, in high complexity testing; or

(5) On or before September 1, 1992, have served as a general supervisor of high complexity testing and—

(i) Be a high school graduate or equivalent; and

(ii) Have had at least 10 years of laboratory training or experience, or both, in high complexity testing, including at least 6 years of supervisory experience between September 1, 1982 and September 1, 1992.

(d) For blood gas analysis, the individual providing general supervision must—

(1) Be qualified under §493.1461(b) (1) or (2), or §493.1461(c); or

(2)(i) Have earned a bachelor's degree in respiratory therapy or cardiovascular technology from an accredited institution; and

(ii) Have at least one year of laboratory training or experience, or both, in blood gas analysis; or

(3)(i) Have earned an associate degree related to pulmonary function from an accredited institution; and

(ii) Have at least two years of training or experience, or both in blood gas analysis.

(e) The general supervisor requirement is met in histopathology, oral pathology, dermatopathology, and ophthalmic pathology because all tests and examinations, must be performed:

(1) In histopathology, by an individual who is qualified as a technical supervisor under §493.1449(b) or §493.1449(l)(1);

(2) In dermatopathology, by an individual who is qualified as a technical supervisor under §493.1449(b) or §493.1449(l) or (2);

(3) In ophthalmic pathology, by an individual who is qualified as a technical supervisor under §493.1449(b) or §493.1449(l)(3); and

(4) In oral pathology, by an individual who is qualified as a technical supervisor under §493.1449(b) or §493.1449(m).

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5235, Jan. 19, 1993; 58 FR 39155, July 22, 1993; 60 FR 20049, Apr. 24, 1995]

**§493.1462  General supervisor qualifications on or before February 28, 1992.**

To qualify as a general supervisor under §493.1461(c)(3), an individual

647

HOLMES000802

must have met or could have met the following qualifications as they were in effect on or before February 28, 1992.

(a) Each supervisor possesses a current license as a laboratory supervisor issued by the State, if such licensing exists; and

(b) The laboratory supervisor—

(1) Who qualifies as a laboratory director under § 493.1406(b)(1), (2), (4), or (5) is also qualified as a general supervisor; therefore, depending upon the size and functions of the laboratory, the laboratory director may also serve as the laboratory supervisor; or

(2)(i) Is a physician or has earned a doctoral degree from an accredited institution with a major in one of the chemical, physical, or biological sciences; and

(ii) Subsequent to graduation, has had at least 2 years of experience in one of the laboratory specialties in a laboratory; or

(3)(i) Holds a master's degree from an accredited institution with a major in one of the chemical, physical, or biological sciences; and

(ii) Subsequent to graduation has had at least 4 years of pertinent full-time laboratory experience of which not less than 2 years have been spent working in the designated specialty in a laboratory; or

(4)(i) Is qualified as a laboratory technologist under § 493.1491; and

(ii) After qualifying as a laboratory technologist, has had at least 6 years of pertinent full-time laboratory experience of which not less than 2 years have been spent working in the designated laboratory specialty in a laboratory; or

(5) With respect to individuals first qualifying before July 1, 1971, has had at least 15 years of pertinent full-time laboratory experience before January 1, 1968; this required experience may be met by the substitution of education for experience.

[58 FR 39155, July 22, 1993]

### § 493.1463  Standard: General supervisor responsibilities.

The general supervisor is responsible for day-to-day supervision or oversight of the laboratory operation and personnel performing testing and reporting test results.

(a) The general supervisor—(1) Must be accessible to testing personnel at all times testing is performed to provide on-site, telephone or electronic consultation to resolve technical problems in accordance with policies and procedures established either by the laboratory director or technical supervisor;

(2) Is responsible for providing day-to-day supervision of high complexity test performance by a testing personnel qualified under § 493.1489;

(3) Except as specified in paragraph (c) of this section, must be onsite to provide direct supervision when high complexity testing is performed by any individuals qualified under § 493.1489(b)(5); and

(4) Is responsible for monitoring test analyses and specimen examinations to ensure that acceptable levels of analytic performance are maintained.

(b) The director or technical supervisor may delegate to the general supervisor the responsibility for—

(1) Assuring that all remedial actions are taken whenever test systems deviate from the laboratory's established performance specifications;

(2) Ensuring that patient test results are not reported until all corrective actions have been taken and the test system is properly functioning;

(3) Providing orientation to all testing personnel; and

(4) Annually evaluating and documenting the performance of all testing personnel.

(c) Exception. For individuals qualified under § 493.1489(b)(5), who were performing high complexity testing on or before January 19, 1993, the requirements of paragraph (a)(3) of this section are not effective, provided that all high complexity testing performed by the individual in the absence of a general supervisor is reviewed within 24 hours by a general supervisor qualified under § 493.1461.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5235, Jan. 19, 1993; 60 FR 20050, Apr. 24, 1995]

648

HOLMES000803

ER-14232

### §493.1467 Condition: Laboratories performing high complexity testing; cytology general supervisor.

For the subspecialty of cytology, the laboratory must have a general supervisor who meets the qualification requirements of §493.1469 of this subpart, and provides supervision in accordance with §493.1471 of this subpart.

### §493.1469 Standard: Cytology general supervisor qualifications.

The cytology general supervisor must be qualified to supervise cytology services. The general supervisor in cytology must possess a current license issued by the State in which the laboratory is located, if such licensing is required, and must—

(a) Be qualified as a technical supervisor under §493.1449 (b) or (k); or

(b)(1) Be qualified as a cytotechnologist under §493.1483; and

(2) Have at least 3 years of full-time (2,080 hours per year) experience as a cytotechnologist within the preceding 10 years.

### §493.1471 Standard: Cytology general supervisor responsibilities.

The technical supervisor of cytology may perform the duties of the cytology general supervisor or delegate the responsibilities to an individual qualified under §493.1469.

(a) The cytology general supervisor is responsible for the day-to-day supervision or oversight of the laboratory operation and personnel performing testing and reporting test results.

(b) The cytology general supervisor must—

(1) Be accessible to provide on-site, telephone, or electronic consultation to resolve technical problems in accordance with policies and procedures established by the technical supervisor of cytology;

(2) Document the slide interpretation results of each gynecologic and nongynecologic cytology case he or she examined or reviewed (as specified under §493.1274(c));

(3) For each 24-hour period, document the total number of slides he or she examined or reviewed in the laboratory as well as the total number of slides examined or reviewed in any other laboratory or for any other employer; and

(4) Document the number of hours spent examining slides in each 24-hour period.

[57 FR 7172, Feb. 28, 1992, as amended at 68 FR 3714, Jan. 24, 2003]

### §493.1481 Condition: Laboratories performing high complexity testing; cytotechnologist.

For the subspecialty of cytology, the laboratory must have a sufficient number of cytotechnologists who meet the qualifications specified in §493.1483 to perform the functions specified in §493.1485.

### §493.1483 Standard: Cytotechnologist qualifications.

Each person examining cytology slide preparations must meet the qualifications of §493.1449 (b) or (k), or—

(a) Possess a current license as a cytotechnologist issued by the State in which the laboratory is located, if such licensing is required; and

(b) Meet one of the following requirements:

(1) Have graduated from a school of cytotechnology accredited by the Committee on Allied Health Education and Accreditation or other organization approved by HHS; or

(2) Be certified in cytotechnology by a certifying agency approved by HHS;
or

(3) Before September 1, 1992—

(i) Have successfully completed 2 years in an accredited institution with at least 12 semester hours in science, 8 hours of which are in biology; and

(A) Have had 12 months of training in a school of cytotechnology accredited by an accrediting agency approved by HHS; or

(B) Have received 6 months of formal training in a school of cytotechnology accredited by an accrediting agency approved by HHS and 6 months of full-time experience in cytotechnology in a laboratory acceptable to the pathologist who directed the formal 6 months of training; or

(ii) Have achieved a satisfactory grade to qualify as a cytotechnologist in a proficiency examination approved by HHS and designed to qualify persons as cytotechnologists; or

(4) Before September 1, 1994, have full-time experience of at least 2 years

649

HOLMES000804

or equivalent within the preceding 5 years examining slide preparations under the supervision of a physician qualified under §493.1449(b) or (k)(1), and before January 1, 1969, must have—

(i) Graduated from high school;

(ii) Completed 6 months of training in cytotechnology in a laboratory directed by a pathologist or other physician providing cytology services; and

(iii) Completed 2 years of full-time supervised experience in cytotechnology; or

(5)(i) On or before September 1, 1994, have full-time experience of at least 2 years or equivalent examining cytology slide preparations within the preceding 5 years in the United States under the supervision of a physician qualified under §493.1449(b) or (k)(1); and

(ii) On or before September 1, 1995, have met the requirements in either paragraph (b)(1) or (2) of this section.

[57 FR 7172, Feb. 28, 1992, as amended at 59 FR 685, Jan. 6, 1994]

### § 493.1485 Standard; Cytotechnologist responsibilities.

The cytotechnologist is responsible for documenting—

(a) The slide interpretation results of each gynecologic and nongynecologic cytology case he or she examined or reviewed (as specified in §493.1274(c));

(b) For each 24-hour period, the total number of slides examined or reviewed in the laboratory as well as the total number of slides examined or reviewed in any other laboratory or for any other employer; and

(c) The number of hours spent examining slides in each 24-hour period.

[57 FR 7172, Feb. 28, 1992, as amended at 68 FR 3714, Jan. 24, 2003]

### § 493.1487 Condition: Laboratories performing high complexity testing; testing personnel.

The laboratory has a sufficient number of individuals who meet the qualification requirements of §493.1489 of this subpart to perform the functions specified in §493.1495 of this subpart for the volume and complexity of testing performed.

### § 493.1489 Standard; Testing personnel qualifications.

Each individual performing high complexity testing must—

(a) Possess a current license issued by the State in which the laboratory is located, if such licensing is required; and

(b) Meet one of the following requirements:

(1) Be a doctor of medicine, doctor of osteopathy, or doctor of podiatric medicine licensed to practice medicine, osteopathy, or podiatry in the State in which the laboratory is located or have earned a doctoral, master's or bachelor's degree in a chemical, physical, biological or clinical laboratory science, or medical technology from an accredited institution;

(2)(i) Have earned an associate degree in a laboratory science, or medical laboratory technology from an accredited institution or—

(ii) Have education and training equivalent to that specified in paragraph (b)(2)(i) of this section that includes—

(A) At least 60 semester hours, or equivalent, from an accredited institution that, at a minimum, include either—

(1) 24 semester hours of medical laboratory technology courses; or

(2) 24 semester hours of science courses that include—

(i) Six semester hours of chemistry;

(ii) Six semester hours of biology; and

(iii) Twelve semester hours of chemistry, biology, or medical laboratory technology in any combination; and

(B) Have laboratory training that includes either of the following:

(1) Completion of a clinical laboratory training program approved or accredited by the ABHES, the CAHEA, or other organization approved by HHS. (This training may be included in the 60 semester hours listed in paragraph (b)(2)(ii)(A) of this section.)

(2) At least 3 months documented laboratory training in each specialty in which the individual performs high complexity testing.

(3) Have previously qualified or could have qualified as a technologist under §493.1491 on or before February 28, 1992;

HOLMES000805

(4) On or before April 24, 1995 be a high school graduate or equivalent and have either—

(i) Graduated from a medical laboratory or clinical laboratory training program approved or accredited by ABHES, CAHEA, or other organization approved by HHS; or

(ii) Successfully completed an official U.S. military medical laboratory procedures training course of at least 50 weeks duration and have held the military enlisted occupational specialty of Medical Laboratory Specialist (Laboratory Technician);

(5)(i) Until September 1, 1997—

(A) Have earned a high school diploma or equivalent; and

(B) Have documentation of training appropriate for the testing performed before analyzing patient specimens. Such training must ensure that the individual has—

(1) The skills required for proper specimen collection, including patient preparation, if applicable, labeling, handling, preservation or fixation, processing or preparation, transportation and storage of specimens;

(2) The skills required for implementing all standard laboratory procedures;

(3) The skills required for performing each test method and for proper instrument use;

(4) The skills required for performing preventive maintenance, troubleshooting, and calibration procedures related to each test performed;

(5) A working knowledge of reagent stability and storage;

(6) The skills required to implement the quality control policies and procedures of the laboratory;

(7) An awareness of the factors that influence test results; and

(8) The skills required to assess and verify the validity of patient test results through the evaluation of quality control values before reporting patient test results; and

(ii) As of September 1, 1997, be qualified under §493.1489(b)(1), (b)(2), or (b)(4), except for those individuals qualified under paragraph (b)(5)(i) of this section who were performing high complexity testing on or before April 24, 1995;

(6) For blood gas analysis—

(i) Be qualified under §493.1489(b)(1), (b)(2), (b)(3), (b)(4), or (b)(5);

(ii) Have earned a bachelor's degree in respiratory therapy or cardiovascular technology from an accredited institution; or

(iii) Have earned an associate degree related to pulmonary function from an accredited institution; or

(7) For histopathology, meet the qualifications of §493.1449 (b) or (l) to perform tissue examinations.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5236, Jan. 19, 1993; 58 FR 39155, July 22, 1993; 60 FR 20050, Apr. 24, 1995]

§493.1491 Technologist qualifications on or before February 28, 1992.

In order to qualify as high complexity testing personnel under §493.1489(b)(3), the individual must have met or could have met the following qualifications for technologist as they were in effect on or before February 28, 1992. Each technologist must—

(a) Possess a current license as a laboratory technologist issued by the State, if such licensing exists; and

(b)(1) Have earned a bachelor's degree in medical technology from an accredited university; or

(2) Have successfully completed 3 years of academic study (a minimum of 90 semester hours or equivalent) in an accredited college or university, which met the specific requirements for entrance into a school of medical technology accredited by an accrediting agency approved by the Secretary, and has successfully completed a course of training of at least 12 months in such a school; or

(3) Have earned a bachelor's degree in one of the chemical, physical, or biological sciences and, in addition, has at least 1 year of pertinent full-time laboratory experience or training, or both, in the specialty or subspecialty in which the individual performs tests; or

(4)(i) Have successfully completed 3 years (90 semester hours or equivalent) in an accredited college or university with the following distribution of courses—

(A) *For those whose training was completed before September 15, 1963.* At least 24 semester hours in chemistry and biology courses of which—

651

HOLMES000806

(*1*) At least 6 semester hours were in inorganic chemistry and at least 3 semester hours were in other chemistry courses; and

(*2*) At least 12 semester hours in biology courses pertinent to the medical sciences; or

(B) *For those whose training was completed after September 14, 1963.* (*1*) 16 semester hours in chemistry courses that included at least 6 semester hours in inorganic chemistry and that are acceptable toward a major in chemistry;

(*2*) 16 semester hours in biology courses that are pertinent to the medical sciences and are acceptable toward a major in the biological sciences; and

(*3*) 3 semester hours of mathematics; and

(ii) Has experience, training, or both, covering several fields of medical laboratory work of at least 1 year and of such quality as to provide him or her with education and training in medical technology equivalent to that described in paragraphs (b)(1) and (2) of this section; or

(5) With respect to individuals first qualifying before July 1, 1971, the technologist—

(i) Was performing the duties of a laboratory technologist at any time between July 1, 1961, and January 1, 1968, and

(ii) Has had at least 10 years of pertinent laboratory experience prior to January 1, 1968. (This required experience may be met by the substitution of education for experience); or

(6) Achieves a satisfactory grade in a proficiency examination approved by HHS.

[58 FR 39155, July 22, 1993]

### § 493.1495 Standard; Testing personnel responsibilities.

The testing personnel are responsible for specimen processing, test performance and for reporting test results.

(a) Each individual performs only those high complexity tests that are authorized by the laboratory director and require a degree of skill commensurate with the individual's education, training or experience, and technical abilities.

(b) Each individual performing high complexity testing must—

(1) Follow the laboratory's procedures for specimen handling and processing, test analyses, reporting and maintaining records of patient test results;

(2) Maintain records that demonstrate that proficiency testing samples are tested in the same manner as patient specimens;

(3) Adhere to the laboratory's quality control policies, document all quality control activities, instrument and procedural calibrations and maintenance performed;

(4) Follow the laboratory's established policies and procedures whenever test systems are not within the laboratory's established acceptable levels of performance;

(5) Be capable of identifying problems that may adversely affect test performance or reporting of test results and either must correct the problems or immediately notify the general supervisor, technical supervisor, clinical consultant, or director;

(6) Document all corrective actions taken when test systems deviate from the laboratory's established performance specifications; and

(7) Except as specified in paragraph (c) of this section, if qualified under § 493.1489(b)(5), perform high complexity testing only under the onsite, direct supervision of a general supervisor qualified under § 493.1461.

(c) *Exception.* For individuals qualified under § 493.1489(b)(5), who were performing high complexity testing on or before January 19, 1993, the requirements of paragraph (b)(7) of this section are not effective, provided that all high complexity testing performed by the individual in the absence of a general supervisor is reviewed within 24 hours by a general supervisor qualified under § 493.1461.

[57 FR 7172, Feb. 28, 1992, as amended at 58 FR 5236, Jan. 19, 1993; 60 FR 20050, Apr. 24, 1995]

### Subparts N–P [Reserved]

### Subpart Q—Inspection

SOURCE: 57 FR 7184, Feb. 28, 1992, unless otherwise noted.

HOLMES000807

§493.1771 Condition: Inspection requirements applicable to all CLIA-certified and CLIA-exempt laboratories.

(a) Each laboratory issued a CLIA certificate must meet the requirements in §493.1773 and the specific requirements for its certificate type, as specified in §§493.1775 through 493.1780.

(b) All CLIA-exempt laboratories must comply with the inspection requirements in §§493.1773 and 493.1780, when applicable.

[63 FR 26737, May 14, 1998]

§493.1773 Standard: Basic inspection requirements for all laboratories issued a CLIA certificate and CLIA-exempt laboratories.

(a) A laboratory issued a certificate must permit CMS or a CMS agent to conduct an inspection to assess the laboratory's compliance with the requirements of this part. A CLIA-exempt laboratory and a laboratory that requests, or is issued a certificate of accreditation, must permit CMS or a CMS agent to conduct validation and complaint inspections.

(b) General requirements. As part of the inspection process, CMS or a CMS agent may require the laboratory to do the following:

(1) Test samples, including proficiency testing samples, or perform procedures.

(2) Permit interviews of all personnel concerning the laboratory's compliance with the applicable requirements of this part.

(3) Permit laboratory personnel to be observed performing all phases of the total testing process (preanalytic, analytic, and postanalytic).

(4) Permit CMS or a CMS agent access to all areas encompassed under the certificate including, but not limited to, the following:

(i) Specimen procurement and processing areas.

(ii) Storage facilities for specimens, reagents, supplies, records, and reports.

(iii) Testing and reporting areas.

(5) Provide CMS or a CMS agent with copies or exact duplicates of all records and data it requires.

(c) Accessible records and data. A laboratory must have all records and data accessible and retrievable within a reasonable time frame during the course of the inspection.

(d) Requirement to provide information and data. A laboratory must provide, upon request, all information and data needed by CMS or a CMS agent to make a determination of the laboratory's compliance with the applicable requirements of this part.

(e) Reinspection. CMS or a CMS agent may reinspect a laboratory at any time to evaluate the ability of the laboratory to provide accurate and reliable test results.

(f) Complaint inspection. CMS or a CMS agent may conduct an inspection when there are complaints alleging noncompliance with any of the requirements of this part.

(g) Failure to permit an inspection or reinspection. Failure to permit CMS or a CMS agent to conduct an inspection or reinspection results in the suspension or cancellation of the laboratory's participation in Medicare and Medicaid for payment, and suspension or limitation of, or action to revoke the laboratory's CLIA certificate, in accordance with subpart R of this part.

[63 FR 26737, May 14, 1998; 63 FR 32699, June 15, 1998]

§493.1775 Standard: Inspection of laboratories issued a certificate of waiver or a certificate for provider-performed microscopy procedures.

(a) A laboratory that has been issued a certificate of waiver or a certificate for provider-performed microscopy procedures is not subject to biennial inspections.

(b) If necessary, CMS or a CMS agent may conduct an inspection of a laboratory issued a certificate of waiver or a certificate for provider-performed microscopy procedures at any time during the laboratory's hours of operation to do the following:

(1) Determine if the laboratory is operated and testing is performed in a manner that does not constitute an imminent and serious risk to public health.

(2) Evaluate a complaint from the public.

(3) Determine whether the laboratory is performing tests beyond the scope of the certificate held by the laboratory.

653

HOLMES000808

(4) Collect information regarding the appropriateness of tests specified as waived tests or provider-performed microscopy procedures.

(c) The laboratory must comply with the basic inspection requirements of § 493.1773.

[63 FR 26737, May 14, 1998]

### § 493.1777 Standard: Inspection of laboratories that have requested or have been issued a certificate of compliance.

(a) *Initial inspection.* (1) A laboratory issued a registration certificate must permit an initial inspection to assess the laboratory's compliance with the requirements of this part before CMS issues a certificate of compliance.

(2) The inspection may occur at any time during the laboratory's hours of operation.

(b) *Subsequent inspections.* (1) CMS or a CMS agent may conduct subsequent inspections on a biennial basis or with such other frequency as CMS determines to be necessary to ensure compliance with the requirements of this part.

(2) CMS bases the nature of subsequent inspections on the laboratory's compliance history.

(c) *Provider-performed microscopy procedures.* The inspection sample for review may include testing in the subcategory of provider-performed microscopy procedures.

(d) *Compliance with basic inspection requirements.* The laboratory must comply with the basic inspection requirements of § 493.1773.

[63 FR 26738, May 14, 1998]

### § 493.1780 Standard: Inspection of CLIA-exempt laboratories or laboratories requesting or issued a certificate of accreditation.

(a) *Validation inspection.* CMS or a CMS agent may conduct a validation inspection of any accredited or CLIA-exempt laboratory at any time during its hours of operation.

(b) *Complaint inspection.* CMS or a CMS agent may conduct a complaint inspection of a CLIA-exempt laboratory or a laboratory requesting or issued a certificate of accreditation at any time during its hours of operation

upon receiving a complaint applicable to the requirements of this part.

(c) *Noncompliance determination.* If a validation or complaint inspection results in a finding that the laboratory is not in compliance with one or more condition-level requirements, the following actions occur:

(1) A laboratory issued a certificate of accreditation is subject to a full review by CMS, in accordance with subpart E of this part and § 488.11 of this chapter.

(2) A CLIA-exempt laboratory is subject to appropriate enforcement actions under the approved State licensure program.

(d) *Compliance with basic inspection requirements.* CLIA-exempt laboratories and laboratories requesting or issued a certificate of accreditation must comply with the basic inspection requirements in § 493.1773.

[63 FR 26738, May 14, 1998]

## Subpart R—Enforcement Procedures

SOURCE: 57 FR 7237, Feb. 28, 1992, unless otherwise noted.

### § 493.1800 Basis and scope.

(a) *Statutory basis.* (1) Section 1846 of the Act—

(i) Provides for intermediate sanctions that may be imposed on laboratories that perform clinical diagnostic tests on human specimens when those laboratories are found to be out of compliance with one or more of the conditions for Medicare coverage of their services; and

(ii) Requires the Secretary to develop and implement a range of such sanctions, including four that are specified in the statute.

(2) The Clinical Laboratory Improvement Act of 1967 (section 353 of the Public Health Service Act) as amended by CLIA 1988, as amended by section 2 of the Taking Essential Steps for Testing Act of 2012—

(i) Establishes requirements for all laboratories that perform clinical diagnostic tests on human specimens;

(ii) Requires a Federal certification scheme to be applied to all such laboratories; and

654

HOLMES000809

(iii) Grants the Secretary broad enforcement authority, including—

(A) Use of intermediate sanctions;

(B) Suspension, limitation, or revocation of the certificate of a laboratory that is out of compliance with one or more requirements for a certificate; and

(C) Civil suit to enjoin any laboratory activity that constitutes a significant hazard to the public health.

(3) Section 353 also—

(i) Provides for imprisonment or fine for any person convicted of intentional violation of CLIA requirements;

(ii) Specifies the administrative hearing and judicial review rights of a laboratory that is sanctioned under CLIA; and

(iii) Requires the Secretary to publish annually a list of all laboratories that have been sanctioned during the preceding year.

(b) *Scope and applicability.* This subpart sets forth—

(1) The policies and procedures that CMS follows to enforce the requirements applicable to laboratories under CLIA and under section 1846 of the Act; and

(2) The appeal rights of laboratories on which CMS imposes sanctions.

[57 FR 7237, Feb. 28, 1992, as amended at 79 FR 25480, May 2, 2014]

§493.1804  General considerations.

(a) *Purpose.* The enforcement mechanisms set forth in this subpart have the following purposes:

(1) To protect all individuals served by laboratories against substandard testing of specimens.

(2) To safeguard the general public against health and safety hazards that might result from laboratory activities.

(3) To motivate laboratories to comply with CLIA requirements so that they can provide accurate and reliable test results.

(b) *Basis for decision to impose sanctions.* (1) CMS's decision to impose sanctions is based on one or more of the following:

(i) Deficiencies found by CMS or its agents in the conduct of inspections to certify or validate compliance with Federal requirements, or through review of materials submitted by the laboratory (e.g., personnel qualifications).

(ii) Unsuccessful participation in proficiency testing.

(2) CMS imposes one or more of the alternative or principal sanctions specified in §§493.1806 and 493.1807 when CMS or CMS's agent finds that a laboratory has condition-level deficiencies.

(c) *Imposition of alternative sanctions.* (1) CMS may impose alternative sanctions in lieu of, or in addition to principal sanctions, (CMS does not impose alternative sanctions on laboratories that have certificates of waiver because those laboratories are not inspected for compliance with condition-level requirements.)

(2) CMS may impose alternative sanctions other than a civil money penalty after the laboratory has had an opportunity to respond, but before the hearing specified in §493.1844.

(d) *Choice of sanction: Factors considered.* CMS bases its choice of sanction or sanctions on consideration of one or more factors that include, but are not limited to, the following, as assessed by the State or by CMS, or its agents:

(1) Whether the deficiencies pose immediate jeopardy.

(2) The nature, incidence, severity, and duration of the deficiencies or noncompliance.

(3) Whether the same condition level deficiencies have been identified repeatedly.

(4) The accuracy and extent of laboratory records (e.g., of remedial action) in regard to the noncompliance, and their availability to the State, to other CMS agents, and to CMS.

(5) The relationship of one deficiency or group of deficiencies to other deficiencies.

(6) The overall compliance history of the laboratory including but not limited to any period of noncompliance that occurred between certifications of compliance.

(7) The corrective and long-term compliance outcomes that CMS hopes to achieve through application of the sanction.

(8) Whether the laboratory has made any progress toward improvement following a reasonable opportunity to correct deficiencies.

655

HOLMES000810

(9) Any recommendation by the State agency as to which sanction would be appropriate.

(e) *Number of alternative sanctions.* CMS may impose a separate sanction for each condition level deficiency or a single sanction for all condition level deficiencies that are interrelated and subject to correction by a single course of action.

(f) *Appeal rights.* The appeal rights of laboratories dissatisfied with the imposition of a sanction are set forth in § 493.1844.

[57 FR 7237, Feb. 28, 1992; 57 FR 35761, Aug. 11, 1992, as amended at 60 FR 20051, Apr. 24, 1995]

### § 493.1806   Available sanctions: All laboratories.

(a) *Applicability.* CMS may impose one or more of the sanctions specified in this section on a laboratory that is out of compliance with one or more CLIA conditions.

(b) *Principal sanction.* CMS may impose any of the three principal CLIA sanctions, which are suspension, limitation, or revocation of any type of CLIA certificate.

(c) *Alternative sanctions.* CMS may impose one or more of the following alternative sanctions in lieu of or in addition to imposing a principal sanction, except on a laboratory that has a certificate of waiver.

(1) Directed plan of correction, as set forth at § 493.1832.

(2) State onsite monitoring as set forth at § 493.1836.

(3) Civil money penalty, as set forth at § 493.1834.

(d) *Civil suit.* CMS may bring suit in the appropriate U.S. District Court to enjoin continuation of any activity of any laboratory (including a CLIA-exempt laboratory that has been found with deficiencies during a validation survey), if CMS has reason to believe that continuation of the activity would constitute a significant hazard to the public health.

(e) *Criminal sanctions.* Under section 353(l) of the PHS Act, an individual who is convicted of intentionally violating any CLIA requirement may be imprisoned or fined.

[57 FR 7237, Feb. 28, 1992, as amended at 58 FR 5237, Jan. 19, 1993]

### § 493.1807   Additional sanctions: Laboratories that participate in Medicare.

The following additional sanctions are available for laboratories that are out of compliance with one or more CLIA conditions and that have approval to receive Medicare payment for their services.

(a) *Principal sanction.* Cancellation of the laboratory's approval to receive Medicare payment for its services.

(b) *Alternative sanctions.* (1) Suspension of payment for tests in one or more specific specialties or subspecialties, performed on or after the effective date of sanction.

(2) Suspension of payment for all tests in all specialties and subspecialties performed on or after the effective date of sanction.

### § 493.1808   Adverse action on any type of CLIA certificate: Effect on Medicare approval.

(a) *Suspension or revocation of any type of CLIA certificate.* When CMS suspends or revokes any type of CLIA certificate, CMS concurrently cancels the laboratory's approval to receive Medicare payment for its services.

(b) *Limitation of any type of CLIA certificate.* When CMS limits any type of CLIA certificate, CMS concurrently limits Medicare approval to only those specialties or subspecialties that are authorized by the laboratory's limited certificate.

### § 493.1809   Limitation on Medicaid payment.

As provided in section 1902(a)(9)(C) of the Act, payment for laboratory services may be made under the State plan only if those services are furnished by a laboratory that has a CLIA certificate or is licensed by a State whose licensure program has been approved by the Secretary under this part.

[57 FR 7237, Feb. 28, 1992; 57 FR 35761, Aug. 11, 1992]

### § 493.1810   Imposition and lifting of alternative sanctions.

(a) *Notice of noncompliance and of proposed sanction: Content.* If CMS or its agency identifies condition level noncompliance in a laboratory, CMS or its

HOLMES000811

agent gives the laboratory written notice of the following:

(1) The condition level noncompliance that it has identified.

(2) The sanction or sanctions that CMS or its agent proposes to impose against the laboratory.

(3) The rationale for the proposed sanction or sanctions.

(4) The projected effective date and duration of the proposed sanction or sanctions.

(5) The authority for the proposed sanction or sanctions.

(6) The time allowed (at least 10 days) for the laboratory to respond to the notice.

(b) *Opportunity to respond.* During the period specified in paragraph (a)(6) of this section, the laboratory may submit to CMS or its agent written evidence or other information against the imposition of the proposed sanction or sanctions.

(c) *Notice of imposition of sanction*—(1) *Content.* CMS gives the laboratory written notice that acknowledges any evidence or information received from the laboratory and specifies the following:

(i) The sanction or sanctions to be imposed against the laboratory.

(ii) The authority and rationale for the imposing sanction or sanctions.

(iii) The effective date and duration of sanction.

(2) *Timing.* (i) If CMS or its agent determines that the deficiencies pose immediate jeopardy, CMS provides notice at least 5 days before the effective date of sanction.

(ii) If CMS or its agent determines that the deficiencies do not pose immediate jeopardy, CMS provides notice at least 15 days before the effective date of the sanction.

(d) *Duration of alternative sanctions.* An alternative sanction continues until the earlier of the following occurs:

(1) The laboratory corrects all condition level deficiencies.

(2) CMS's suspension, limitation, or revocation of the laboratory's CLIA certificate becomes effective.

(e) *Lifting of alternative sanctions*—(1) *General rule.* Alternative sanctions are not lifted until a laboratory's compliance with all condition level requirements is verified.

(2) *Credible allegation of compliance.* When a sanctioned laboratory submits a credible allegation of compliance, CMS's agent determines whether—

(i) It can certify compliance on the basis of the evidence presented by the laboratory in its allegation; or

(ii) It must revisit to verify whether the laboratory has, in fact, achieved compliance.

(3) *Compliance achieved before the date of revisit.* If during a revisit, the laboratory presents credible evidence (as determined by CMS or its agent) that it achieved compliance before the date of revisit, sanctions are lifted as of that earlier date.

**§493.1812 Action when deficiencies pose immediate jeopardy.**

If a laboratory's deficiencies pose immediate jeopardy, the following rules apply:

(a) CMS requires the laboratory to take immediate action to remove the jeopardy and may impose one or more alternative sanctions to help bring the laboratory into compliance.

(b) If the findings of a revisit indicate that a laboratory has not eliminated the jeopardy, CMS suspends or limits the laboratory's CLIA certificate no earlier than 5 days after the date of notice of suspension or limitation. CMS may later revoke the certificate.

(c) In addition, if CMS has reason to believe that the continuation of any activity by any laboratory (either the entire laboratory operation or any specialty or subspecialty of testing) would constitute a significant hazard to the public health, CMS may bring suit and seek a temporary injunction or restraining order against continuation of that activity by the laboratory, regardless of the type of CLIA certificate the laboratory has and of whether it is State-exempt.

**§493.1814 Action when deficiencies are at the condition level but do not pose immediate jeopardy.**

If a laboratory has condition level deficiencies that do not pose immediate jeopardy, the following rules apply:

HOLMES000812

(a) *Initial action.* (1) CMS may cancel the laboratory's approval to receive Medicare payment for its services.

(2) CMS may suspend, limit, or revoke the laboratory's CLIA certificate.

(3) If CMS does not impose a principal sanction under paragraph (a)(1) or (a)(2) of this section, it imposes one or more alternative sanctions. In the case of unsuccessful participation in proficiency testing, CMS may impose the training and technical assistance requirement set forth at § 493.1838 in lieu of, or in addition to, one or more alternative sanctions.

(b) *Failure to correct condition level deficiencies.* If CMS imposes alternative sanctions for condition level deficiencies that do not pose immediate jeopardy, and the laboratory does not correct the condition level deficiencies within 12 months after the last day of inspection, CMS—

(1) Cancels the laboratory's approval to receive Medicare payment for its services, and discontinues the Medicare payment sanctions as of the day cancellation is effective.

(2) Following a revisit which indicates that the laboratory has not corrected its condition level deficiencies, notifies the laboratory that it proposes to suspend, limit, or revoke the certificate, as specified in § 493.1816(b), and the laboratory's right to hearing; and

(3) May impose (or continue, if already imposed) any alternative sanctions that do not pertain to Medicare payments. (Sanctions imposed under the authority of section 353 of the PHS Act may continue for more than 12 months from the last date of inspection, while a hearing on the proposed suspension, limitation, or revocation of the certificate of compliance, registration certificate, certificate of accreditation, or certificate for PPM procedures is pending.)

(c) *Action after hearing.* If a hearing decision upholds a proposed suspension, limitation, or revocation of a laboratory's CLIA certificate, CMS discontinues any alternative sanctions as of the day it makes the suspension, limitation, or revocation effective.

[57 FR 7237, Feb. 28, 1992, as amended at 60 FR 20051, Apr. 24, 1995]

**§ 493.1816 Action when deficiencies are not at the condition level.**

If a laboratory has deficiencies, that are not at the condition level, the following rules apply:

(a) *Initial action.* The laboratory must submit a plan of correction that is acceptable to CMS in content and time frames.

(b) *Failure to correct deficiencies.* If, on revisit, it is found that the laboratory has not corrected the deficiencies within 12 months after the last day of inspection, the following rules apply:

(1) CMS cancels the laboratory's approval to receive Medicare payment for its services.

(2) CMS notifies the laboratory of its intent to suspend, limit, or revoke the laboratory's CLIA certificate and of the laboratory's right to a hearing.

**§ 493.1820 Ensuring timely correction of deficiencies.**

(a) *Timing of visits.* CMS, the State survey agency or other CMS agent may visit the laboratory at any time to evaluate progress, and at the end of the period to determine whether all corrections have been made.

(b) *Deficiencies corrected before a visit.* If during a visit, a laboratory produces credible evidence that it achieved compliance before the visit, the sanctions are lifted as of that earlier date.

(c) *Failure to correct deficiencies.* If during a visit it is found that the laboratory has not corrected its deficiencies, CMS may propose to suspend, limit, or revoke the laboratory's CLIA certificate.

(d) *Additional time for correcting lower level deficiencies* not at the condition level. If at the end of the plan of correction period all condition level deficiencies have been corrected, and there are deficiencies, that are not at the condition level, CMS may request a revised plan of correction. The revised plan may not extend beyond 12 months from the last day of the inspection that originally identified the cited deficiencies.

(e) *Persistence of deficiencies.* If at the end of the period covered by the plan of correction, the laboratory still has deficiencies, the rules of §§ 493.1814 and 493.1816 apply.

HOLMES000813

§493.1826 **Suspension of part of Medicare payments.**

(a) *Application.* (1) CMS may impose this sanction if a laboratory—

(i) Is found to have condition level deficiencies with respect to one or more specialties or subspecialties of tests; and

(ii) Agrees (in return for not having its Medicare approval cancelled immediately) not to charge Medicare beneficiaries or their private insurance carriers for the services for which Medicare payment is suspended.

(2) CMS suspends Medicare payment for those specialities or subspecialties of tests for which the laboratory is out of compliance with Federal requirements.

(b) *Procedures.* Before imposing this sanction, CMS provides notice of sanction and opportunity to respond in accordance with §493.1810.

(c) *Duration and effect of sanction.* This sanction continues until the laboratory corrects the condition level deficiencies or CMS cancels the laboratory's approval to receive Medicare payment for its services, but in no event longer than 12 months.

(d) If the laboratory corrects all condition level deficiencies, CMS resumes Medicare payment effective for all services furnished on or after the date the deficiencies are corrected.

(2) [Reserved]

[57 FR 7237, Feb. 28, 1992; 57 FR 35761, Aug. 11, 1992]

§493.1828 **Suspension of all Medicare payments.**

(a) *Application.* (1) CMS may suspend payment for all Medicare-approved laboratory services when the laboratory has condition level deficiencies.

(2) CMS suspends payment for all Medicare covered laboratory services when the following conditions are met:

(i) Either—

(A) The laboratory has not corrected its condition level deficiencies included in the plan of correction within 3 months from the last date of inspection; or

(B) The laboratory has been found to have the same condition level deficiencies during three consecutive inspections; and

(ii) The laboratory has chosen (in return for not having its Medicare approval immediately cancelled), to not charge Medicare beneficiaries or their private insurance carriers for services for which Medicare payment is suspended.

(3) CMS suspends payment for services furnished on and after the effective date of sanction.

(b) *Procedures.* Before imposing this sanction, CMS provides notice of sanction and opportunity to respond in accordance with §493.1810.

(c) *Duration and effect of sanction.* (1) Suspension of payment continues until all condition level deficiencies are corrected, but never beyond twelve months.

(2) If all the deficiencies are not corrected by the end of the 12 month period, CMS cancels the laboratory's approval to receive Medicare payment for its services.

§493.1832 **Directed plan of correction and directed portion of a plan of correction.**

(a) *Application.* CMS may impose a directed plan of correction as an alternative sanction for any laboratory that has condition level deficiencies. If CMS does not impose a directed plan of correction as an alternative sanction for a laboratory that has condition level deficiencies, it at least imposes a directed portion of a plan of correction when it imposes any of the following alternative sanctions:

(1) State onsite monitoring.

(2) Civil money penalty.

(3) Suspension of all or part of Medicare payments.

(b) *Procedures*—(1) *Directed plan of correction.* When imposing this sanction, CMS—

(i) Gives the laboratory prior notice of the sanction and opportunity to respond in accordance with §493.1810;

(ii) Directs the laboratory to take specific corrective action within specific time frames in order to achieve compliance; and

(iii) May direct the laboratory to submit the names of laboratory clients for notification purposes, as specified in paragraph (b)(3) of this section.

(2) *Directed portion of a plan of correction.* CMS may decide to notify clients

HOLMES000814

of a sanctioned laboratory, because of the seriousness of the noncompliance (e.g., the existence of immediate jeopardy) or for other reasons. When imposing this sanction, CMS takes the following steps—

(i) Directs the laboratory to submit to CMS, the State survey agency, or other CMS agent, within 10 calendar days after the notice of the alternative sanction, a list of names and addresses of all physicians, providers, suppliers, and other clients who have used some or all of the services of the laboratory since the last certification inspection or within any other timeframe specified by CMS.

(ii) Within 30 calendar days of receipt of the information, may send to each laboratory client, via the State survey agency, a notice containing the name and address of the laboratory, the nature of the laboratory's noncompliance, and the kind and effective date of the alternative sanction.

(iii) Sends to each laboratory client, via the State survey agency, notice of the recision of an adverse action within 30 days of the rescission.

(3) *Notice of imposition of a principal sanction following the imposition of an alternative sanction.* If CMS imposes a principal sanction following the imposition of an alternative sanction, and for which CMS has already obtained a list of laboratory clients, CMS may use that list to notify the clients of the imposition of the principal sanction.

(c) *Duration of a directed plan of correction.* If CMS imposes a directed plan of correction, and on revisit it is found that the laboratory has not corrected the deficiencies within 12 months from the last day of inspection, the following rules apply:

(1) CMS cancels the laboratory's approval for Medicare payment of its services, and notifies the laboratory of CMS's intent to suspend, limit, or revoke the laboratory's CLIA certificate.

(2) The directed plan of correction continues in effect until the day suspension, limitation, or revocation of the laboratory's CLIA certificate.

### § 493.1834  Civil money penalty.

(a) *Statutory basis.* Sections 1846 of the Act and 353(h)(2)(B) of the PHS Act authorize the Secretary to impose civil money penalties on laboratories. Section 1846(b)(3) of the Act specifically provides that incrementally more severe fines may be imposed for repeated or uncorrected deficiencies.

(b) *Scope.* This section sets forth the procedures that CMS follows to impose a civil money penalty in lieu of, or in addition to, suspending, limiting, or revoking the certificate of compliance, registration certificate, certificate of accreditation, or certificate for PPM procedures of a laboratory that is found to have condition level deficiencies.

(c) *Basis for imposing a civil money penalty.* CMS may impose a civil money penalty against any laboratory determined to have condition level deficiencies regardless of whether those deficiencies pose immediate jeopardy.

(d) *Amount of penalty*—(1) *Factors considered.* In determining the amount of the penalty, CMS takes into account the following factors:

(i) The nature, scope, severity, and duration of the noncompliance.

(ii) Whether the same condition level deficiencies have been identified during three consecutive inspections.

(iii) The laboratory's overall compliance history including but not limited to any period of noncompliance that occurred between certifications of compliance.

(iv) The laboratory's intent or reason for noncompliance.

(v) The accuracy and extent of laboratory records and their availability to CMS, the State survey agency, or other CMS agent.

(2) *Range of penalty amount.* (i) For a condition level deficiency that poses immediate jeopardy, the range is $3,050–$10,000 per day of noncompliance or per violation.

(ii) For a condition level deficiency that does not pose immediate jeopardy, the range is $50–$3,000 per day of noncompliance or per violation.

(3) *Decreased penalty amounts.* If the immediate jeopardy is removed, but the deficiency continues, CMS shifts the penalty amount to the lower range.

(4) *Increased penalty amounts.* CMS may, before the hearing, propose to increase the penalty amount for a laboratory that has deficiencies which, after imposition of a lower level penalty

HOLMES000815

amount, become sufficiently serious to pose immediate jeopardy.

(e) *Procedures for imposition of civil money penalty*—(1) *Notice of intent.* (i) CMS sends the laboratory written notice, of CMS's intent to impose a civil money penalty.

(ii) The notice includes the following information:

(A) The statutory basis for the penalty.

(B) The proposed daily or per violation amount of the penalty.

(C) The factors (as described in paragraph (d)(1) of this section) that CMS considered.

(D) The opportunity for responding to the notice in accordance with §493.1810(c).

(E) A specific statement regarding the laboratory's appeal rights.

(2) *Appeal rights.* (i) The laboratory has 60 days from the date of receipt of the notice of intent to impose a civil money penalty to request a hearing in accordance with §493.1844(g).

(ii) If the laboratory requests a hearing, all other pertinent provisions of §493.1844 apply.

(iii) If the laboratory does not request a hearing, CMS may reduce the proposed penalty amount by 35 percent.

(f) *Accrual and duration of penalty*—(1) *Accrual of penalty.* The civil money penalty begins accruing as follows:

(i) 5 days after notice of intent if there is immediate jeopardy.

(ii) 15 days after notice of intent if there is not immediate jeopardy.

(2) *Duration of penalty.* The civil money penalty continues to accrue until the earliest of the following occurs:

(i) The laboratory's compliance with condition level requirements is verified on the basis of the evidence presented by the laboratory in its credible allegation of compliance or at the time or revisit.

(ii) Based on credible evidence presented by the laboratory at the time of revisit, CMS determines that compliance was achieved before the revisit. (In this situation, the money penalty stops accruing as of the date of compliance.)

(iii) CMS suspends, limits, or revokes the laboratory's certificate of compliance, registration certificate, certifi-

cate of accreditation, or certificate for PPM procedures.

(g) *Computation and notice of total penalty amount*—(1) *Computation.* CMS computes the total penalty amount after the laboratory's compliance is verified or CMS suspends, limits, or revokes the laboratory's CLIA certificate but in no event before—

(i) The 60 day period for requesting a hearing has expired without a request or the laboratory has explicitly waived its right to a hearing; or

(ii) Following a hearing requested by the laboratory, the ALJ issues a decision that upholds imposition of the penalty.

(2) *Notice of penalty amount and due date of penalty.* The notice includes the following information:

(i) Daily or per violation penalty amount.

(ii) Number of days or violations for which the penalty is imposed.

(iii) Total penalty amount.

(iv) Due date for payment of the penalty.

(h) *Due date for payment of penalty.* (1) Payment of a civil money penalty is due 15 days from the date of the notice specified in paragraph (g)(2) of this section.

(2) CMS may approve a plan for a laboratory to pay a civil money penalty, plus interest, over a period of up to one year from the original due date.

(i) *Collection and settlement*—(1) *Collection of penalty amounts.* (i) The determined penalty amount may be deducted from any sums then or later owing by the United States to the laboratory subject to the penalty.

(ii) Interest accrues on the unpaid balance of the penalty, beginning on the due date. Interest is computed at the rate specified in §405.378(d) of this chapter.

(2) *Settlement.* CMS has authority to settle any case at any time before the ALJ issues a hearing decision.

[57 FR 7237, Feb. 28, 1992, as amended at 60 FR 20051, Apr. 24, 1995; 61 FR 63749, Dec. 2, 1996]

## §493.1836 State onsite monitoring.

(a) *Application.* (1) CMS may require continuous or intermittent monitoring of a plan of correction by the State

HOLMES000816

survey agency to ensure that the laboratory makes the improvements necessary to bring it into compliance with the condition level requirements. (The State monitor does not have management authority, that is, cannot hire or fire staff, obligate funds, or otherwise dictate how the laboratory operates. The monitor's responsibility is to oversee whether corrections are made.)

(2) The laboratory must pay the costs of onsite monitoring by the State survey agency.

(i) The costs are computed by multiplying the number of hours of onsite monitoring in the laboratory by the hourly rate negotiated by CMS and the State.

(ii) The hourly rate includes salary, fringe benefits, travel, and other direct and indirect costs approved by CMS.

(b) *Procedures.* Before imposing this sanction, CMS provides notice of sanction and opportunity to respond in accordance with § 493.1810.

(c) *Duration of sanction.* (1) If CMS imposes onsite monitoring, the sanction continues until CMS determines that the laboratory has the capability to ensure compliance with all condition level requirements.

(2) If the laboratory does not correct all deficiencies within 12 months, and a revisit indicates that deficiencies remain, CMS cancels the laboratory's approval for Medicare payment for its services and notifies the laboratory of its intent to suspend, limit, or revoke the laboratory's certificate of compliance, registration certificate, certificate of accreditation, or certificate for PPM procedures.

(3) If the laboratory still does not correct its deficiencies, the Medicare sanction continues until the suspension, limitation, or revocation of the laboratory's certificate of compliance, registration certificate, certificate of accreditation, or certificate for PPM procedures is effective.

[57 FR 7237, Feb. 28, 1992, as amended at 60 FR 20051, Apr. 24, 1995]

### § 493.1838  Training and technical assistance for unsuccessful participation in proficiency testing.

If a laboratory's participation in proficiency testing is unsuccessful, CMS may require the laboratory to undertake training of its personnel, or to obtain necessary technical assistance, or both, in order to meet the requirements of the proficiency testing program. This requirement is separate from the principal and alternative sanctions set forth in §§ 493.1806 and 493.1807.

### § 493.1840  Suspension, limitation, or revocation of any type of CLIA certificate.

(a) *Adverse action based on actions of the laboratory's owner, operator or employees.* CMS may initiate adverse action to suspend, limit or revoke any CLIA certificate if CMS finds that a laboratory's owner or operator or one of its employees has—

(1) Been guilty of misrepresentation in obtaining a CLIA certificate;

(2) Performed, or represented the laboratory as entitled to perform, a laboratory examination or other procedure that is not within a category of laboratory examinations or other procedures authorized by its CLIA certificate;

(3) Failed to comply with the certificate requirements and performance standards;

(4) Failed to comply with reasonable requests by CMS for any information or work on materials that CMS concludes is necessary to determine the laboratory's continued eligibility for its CLIA certificate or continued compliance with performance standards set by CMS;

(5) Refused a reasonable request by CMS or its agent for permission to inspect the laboratory and its operation and pertinent records during the hours that the laboratory is in operation;

(6) Violated or aided and abetted in the violation of any provisions of CLIA and its implementing regulations;

(7) Failed to comply with an alternative sanction imposed under this subpart; or

(8) Within the preceding two-year period, owned or operated a laboratory that had its CLIA certificate revoked. (This provision applies only to the owner or operator, not to all of the laboratory's employees.)

HOLMES000817

**Centers for Medicare & Medicaid Services, HHS** §493.1840

(b) *Adverse action based on improper referrals in proficiency testing.* If CMS determines that a laboratory has intentionally referred its proficiency testing samples to another laboratory for analysis, CMS does one of the following:

(1)(i) Revokes the laboratory's CLIA certificate for at least 1 year, prohibits the owner and operator from owning or operating a CLIA-certified laboratory for at least 1 year, and may impose a civil money penalty in accordance with §493.1834(d), if CMS determines that—

(A) A proficiency testing referral is a repeat proficiency testing referral as defined at §493.2; or

(B) On or before the proficiency testing event close date, a laboratory reported proficiency testing results obtained from another laboratory to the proficiency testing program.

(ii) Following the revocation of a CLIA certificate in accordance with paragraph (b)(1)(i) of this section, CMS may exempt a laboratory owner from the generally applicable prohibition on owning or operating a CLIA-certified laboratory under paragraph (a)(8) of this section on a laboratory-by-laboratory basis if CMS finds, after review of the relevant facts and circumstances, that there is no evidence that—

(A) Patients would be put at risk as a result of the owner being exempted from the ban on a laboratory-by-laboratory basis;

(B) The laboratory for which the owner is to be exempted from the general ownership ban participated in or was otherwise complicit in the PT referral of the laboratory that resulted in the revocation; and

(C) The laboratory for which the owner is to be exempted from the general ownership ban received a PT sample from another laboratory in the prior two survey cycles, and failed to immediately report such receipt to CMS or to the appropriate CMS-approved accrediting organization.

(2) Suspends or limits the CLIA certificate for less than 1 year based on the criteria in §493.1804(d) and imposes alternative sanctions as appropriate, in accordance with §§493.1804(c) and (d), 493.1806(c), 493.1807(b), 493.1809 and, in the case of civil money penalties, §493.1834(d), when CMS determines that paragraph (b)(1)(i)(A) or (B) of this sec-

tion does not apply but that the laboratory obtained test results for the proficiency testing samples from another laboratory on or before the proficiency testing event close date. Among other possibilities, alternative sanctions will always include a civil money penalty and a directed plan of correction that includes required training of staff.

(3) Imposes alternative sanctions in accordance with §§493.1804(c) and (d), 493.1806(c), 493.1807(b), 493.1809 and, in the case of civil money penalties, §493.1834(d), when CMS determines that paragraph (b)(1)(i) or (2) of this section do not apply, and a PT referral has occurred, but no test results are received prior to the event close date by the referring laboratory from the laboratory that received the referral. Among other possibilities, alternative sanctions will always include a civil money penalty and a directed plan of correction that includes required training of staff.

(c) *Adverse action based on exclusion from Medicare.* If the OIG excludes a laboratory from participation in Medicare, CMS suspends the laboratory's CLIA certificate for the period during which the laboratory is excluded.

(d) *Procedures for suspension or limitation*—(1) *Basic rule.* Except as provided in paragraph (d)(2) of this section, CMS does not suspend or limit a CLIA certificate until after an ALJ hearing decision (as provided in §493.1844) that upholds suspension or limitation.

(2) *Exceptions.* CMS may suspend or limit a CLIA certificate before the ALJ hearing in any of the following circumstances:

(i) The laboratory's deficiencies pose immediate jeopardy.

(ii) The laboratory has refused a reasonable request for information or work on materials.

(iii) The laboratory has refused permission for CMS or a CMS agent to inspect the laboratory or its operation.

(e) *Procedures for revocation.* (1) CMS does not revoke any type of CLIA certificate until after an ALJ hearing that upholds revocation.

(2) CMS may revoke a CLIA certificate after the hearing decision even if it had not previously suspended or limited that certificate.

663

HOLMES000818

(f) *Notice to the OIG.* CMS notifies the OIG of any violations under paragraphs (a)(1), (a)(2), (a)(6), and (b) of this section within 30 days of the determination of the violation.

[57 FR 7237, Feb. 28, 1992, as amended at 79 FR 25480, May 2, 2014]

§ 493.1842  Cancellation of Medicare approval.

(a) *Basis for cancellation.* (1) CMS always cancels a laboratory's approval to receive Medicare payment for its services if CMS suspends or revokes the laboratory's CLIA certificate.

(2) CMS may cancel the laboratory's approval under any of the following circumstances:

(i) The laboratory is out of compliance with a condition level requirement.

(ii) The laboratory fails to submit a plan of correction satisfactory to CMS.

(iii) The laboratory fails to correct all its deficiencies within the time frames specified in the plan of correction.

(b) *Notice and opportunity to respond.* Before canceling a laboratory's approval to receive Medicare payment for its services, CMS gives the laboratory—

(1) Written notice of the rationale for, effective date, and effect of, cancellation;

(2) Opportunity to submit written evidence or other information against cancellation of the laboratory's approval.

This sanction may be imposed before the hearing that may be requested by a laboratory, in accordance with the appeals procedures set forth in § 493.1844.

(c) *Effect of cancellation.* Cancellation of Medicare approval terminates any Medicare payment sanctions regardless of the time frames originally specified.

§ 493.1844  Appeals procedures.

(a) *General rules.* (1) The provisions of this section apply to all laboratories and prospective laboratories that are dissatisfied with any initial determination under paragraph (b) of this section.

(2) Hearings are conducted in accordance with procedures set forth in subpart D of part 498 of this chapter, except that the authority to conduct hearings and issue decisions may be exercised by ALJs assigned to, or detailed to, the Departmental Appeals Board.

(3) Any party dissatisfied with a hearing decision is entitled to request review of the decision as specified in subpart E of part 498 of this chapter, except that the authority to review the decision may be exercised by the Departmental Appeals Board.

(4) When more than one of the actions specified in paragraph (b) of this section are carried out concurrently, the laboratory has a right to only one hearing on all matters at issue.

(b) *Actions that are initial determinations.* The following actions are initial determinations and therefore are subject to appeal in accordance with this section:

(1) The suspension, limitation, or revocation of the laboratory's CLIA certificate by CMS because of noncompliance with CLIA requirements.

(2) The denial of a CLIA certificate.

(3) The imposition of alternative sanctions under this subpart (but not the determination as to which alternative sanction or sanctions to impose).

(4) The denial or cancellation of the laboratory's approval to receive Medicare payment for its services.

(c) *Actions that are not initial determinations.* Actions that are not listed in paragraph (b) of this section are not initial determinations and therefore are not subject to appeal under this section. They include, but are not necessarily limited to, the following:

(1) The finding that a laboratory accredited by a CMS-approved accreditation organization is no longer deemed to meet the conditions set forth in subparts H, J, K, M, and Q of this part. However, the suspension, limitation or revocation of a certificate of accreditation is an initial determination and is appealable.

(2) The finding that a laboratory determined to be in compliance with condition-level requirements but has deficiencies that are not at the condition level.

(3) The determination not to reinstate a suspended CLIA certificate because the reason for the suspension has

HOLMES000819

**Centers for Medicare & Medicaid Services, HHS** §493.1844

not been removed or there is insufficient assurance that the reason will not recur.

(4) The determination as to which alternative sanction or sanctions to impose, including the amount of a civil money penalty to impose per day or per violation.

(5) The denial of approval for Medicare payment for the services of a laboratory that does not have in effect a valid CLIA certificate.

(6) The determination that a laboratory's deficiencies pose immediate jeopardy.

(7) The amount of the civil money penalty assessed per day or for each violation of Federal requirements.

(d) *Effect of pending appeals*—(1) *Alternative sanctions.* The effective date of an alternative sanction (other than a civil money penalty) is not delayed because the laboratory has appealed and the hearing or the hearing decision is pending.

(2) *Suspension, limitation, or revocation of a laboratory's CLIA certificate*—(i) *General rule.* Except as provided in paragraph (d)(2)(ii) of this section, suspension, limitation, or revocation of a CLIA certificate is not effective until after a hearing decision by an ALJ is issued.

(ii) *Exceptions.* (A) If CMS determines that conditions at a laboratory pose immediate jeopardy, the effective date of the suspension or limitation of a CLIA certificate is not delayed because the laboratory has appealed and the hearing or the hearing decision is pending.

(B) CMS may suspend or limit a laboratory's CLIA certificate before an ALJ hearing or hearing decision if the laboratory has refused a reasonable request for information (including but not limited to billing information), or for work on materials, or has refused permission for CMS or a CMS agent to inspect the laboratory or its operation.

(3) *Cancellation of Medicare approval.* The effective date of the cancellation of a laboratory's approval to receive Medicare payment for its services is not delayed because the laboratory has appealed and the hearing or hearing decision is pending.

(4) *Effect of ALJ decision.* (i) An ALJ decision is final unless, as provided in

paragraph (a)(3) of this section, one of the parties requests review by the Departmental Appeals Board within 60 days, and the Board reviews the case and issues a revised decision.

(ii) If an ALJ decision upholds a suspension imposed because of immediate jeopardy, that suspension becomes a revocation.

(e) *Appeal rights for prospective laboratories*—(1) *Reconsideration.* Any prospective laboratory dissatisfied with a denial of a CLIA certificate, or of approval for Medicare payment for its services, may initiate the appeals process by requesting reconsideration in accordance with §§ 498.22 through 498.25 of this chapter.

(2) *Notice of reopening.* If CMS reopens an initial or reconsidered determination, CMS gives the prospective laboratory notice of the revised determination in accordance with § 498.32 of this chapter.

(3) *ALJ hearing.* Any prospective laboratory dissatisfied with a reconsidered determination under paragraph (e)(1) of this section or a revised reconsidered determination under § 498.30 of this chapter is entitled to a hearing before an ALJ, as specified in paragraph (a)(2) of this section.

(4) *Review of ALJ hearing decisions.* Any prospective laboratory that is dissatisfied with an ALJ's hearing decision or dismissal of a request for hearing may file a written request for review by the Departmental Appeals Board as provided in paragraph (a)(3) of this section.

(f) *Appeal rights of laboratories*—(1) *ALJ hearing.* Any laboratory dissatisfied with the suspension, limitation, or revocation of its CLIA certificate, with the imposition of an alternative sanction under this subpart, or with cancellation of the approval to receive Medicare payment for its services, is entitled to a hearing before an ALJ as specified in paragraph (a)(2) of this section and has 60 days from the notice of sanction to request a hearing.

(2) *Review of ALJ hearing decisions.* Any laboratory that is dissatisfied with an ALJ's hearing decision or dismissal of a request for hearing may file a written request for review by the Departmental Appeals Board, as provided in paragraph (a)(3) of this section.

HOLMES000820

(3) *Judicial review.* Any laboratory dissatisfied with the decision to impose a civil money penalty or to suspend, limit, or revoke its CLIA certificate may, within 60 days after the decision becomes final, file with the U.S. Court of Appeals of the circuit in which the laboratory has its principal place of business, a petition for judicial review.

(g) *Notice of adverse action.* (1) If CMS suspends, limits, or revokes a laboratory's CLIA certificate or cancels the approval to receive Medicare payment for its services, CMS gives notice to the laboratory, and may give notice to physicians, providers, suppliers, and other laboratory clients, according to the procedures set forth at §493.1832. In addition, CMS notifies the general public each time one of these principal sanctions is imposed.

(2) The notice to the laboratory—

(i) Sets forth the reasons for the adverse action, the effective date and effect of that action, and the appeal rights if any; and

(ii) When the certificate is limited, specifies the specialties or subspecialties of tests that the laboratory is no longer authorized to perform, and that are no longer covered under Medicare.

(3) The notice to other entities includes the same information except the information about the laboratory's appeal rights.

(h) *Effective date of adverse action.* (1) When the laboratory's deficiencies pose immediate jeopardy, the effective date of the adverse action is at least 5 days after the date of the notice.

(2) When CMS determines that the laboratory's deficiencies do not pose immediate jeopardy, the effective date of the adverse action is at least 15 days after the date of the notice.

[57 FR 7237, Feb. 28, 1992; 57 FR 35761, Aug. 11, 1992, as amended at 68 FR 3714, Jan. 24, 2003]

### §493.1846   Civil action.

If CMS has reason to believe that continuation of the activities of any laboratory, including a State-exempt laboratory, would constitute a significant hazard to the public health, CMS may bring suit in a U.S. District Court to enjoin continuation of the specific activity that is causing the hazard or to enjoin the continued operation of the laboratory if CMS deems it nec-

essary. Upon proper showing, the court shall issue a temporary injunction or restraining order without bond against continuation of the activity.

### §493.1850   Laboratory registry.

(a) Once a year CMS makes available to physicians and to the general public specific information (including information provided to CMS by the OIG) that is useful in evaluating the performance of laboratories, including the following:

(1) A list of laboratories that have been convicted, under Federal or State laws relating to fraud and abuse, false billing, or kickbacks.

(2) A list of laboratories that have had their CLIA certificates suspended, limited, or revoked, and the reason for the adverse actions.

(3) A list of persons who have been convicted of violating CLIA requirements, as specified in section 353(l) of the PHS Act, together with the circumstances of each case and the penalties imposed.

(4) A list of laboratories on which alternative sanctions have been imposed, showing—

(i) The effective date of the sanctions;

(ii) The reasons for imposing them;

(iii) Any corrective action taken by the laboratory; and

(iv) If the laboratory has achieved compliance, the verified date of compliance.

(5) A list of laboratories whose accreditation has been withdrawn or revoked and the reasons for the withdrawal or revocation.

(6) All appeals and hearing decisions.

(7) A list of laboratories against which CMS has brought suit under §493.1846 and the reasons for those actions.

(8) A list of laboratories that have been excluded from participation in Medicare or Medicaid and the reasons for the exclusion.

(b) The laboratory registry is compiled for the calendar year preceding the date the information is made available and includes appropriate explanatory information to aid in the interpretation of the data. It also contains corrections of any erroneous statements

HOLMES000821

Centers for Medicare & Medicaid Services, HHS                    § 494.1

or information that appeared in the previous registry.

## Subpart S [Reserved]

## Subpart T—Consultations

SOURCE: 57 FR 7185, Feb. 28, 1992, unless otherwise noted.

### § 493.2001 Establishment and function of the Clinical Laboratory Improvement Advisory Committee.

(a) HHS will establish a Clinical Laboratory Improvement Advisory Committee to advise and make recommendations on technical and scientific aspects of the provisions of this part 493.

(b) The Clinical Laboratory Improvement Advisory Committee will be comprised of individuals involved in the provision of laboratory services, utilization of laboratory services, development of laboratory testing or methodology, and others as approved by HHS.

(c) HHS will designate specialized subcommittees as necessary.

(d) The Clinical Laboratory Improvement Advisory Committee or any designated subcommittees will meet as needed, but not less than once each year.

(e) The Clinical Laboratory Improvement Advisory Committee or subcommittee, at the request of HHS, will review and make recommendations concerning:

(1) Criteria for categorizing nonwaived testing;

(2) Determination of waived tests;

(3) Personnel standards;

(4) Facility administration and quality systems standards.

(5) Proficiency testing standards;

(6) Applicability to the standards of new technology; and

(7) Other issues relevant to part 493, if requested by HHS.

(f) HHS will be responsible for providing the data and information, as necessary, to the members of the Clinical Laboratory Improvement Advisory Committee.

[57 FR 7185, Feb. 28, 1992, as amended at 58 FR 5237, Jan. 19, 1993; 60 FR 20051, Apr. 24, 1995; 68 FR 3714, Jan. 24, 2003]

## PART 494— CONDITIONS FOR COVERAGE FOR END-STAGE RENAL DISEASE FACILITIES

### Subpart A—General Provisions

Sec.
494.1   Basis and scope.
494.10  Definitions.
494.20  Condition: Compliance with Federal, State, and local laws and regulations.

### Subpart B—Patient Safety

494.30  Condition: Infection control.
494.40  Condition: Water and dialysate quality.
494.50  Condition: Reuse of hemodialyzers and bloodlines.
494.60  Condition: Physical environment.

### Subpart C—Patient Care

494.70  Condition: Patients' rights.
494.80  Condition: Patient assessment.
494.90  Condition: Patient plan of care.
494.100 Condition: Care at home.
494.110 Condition: Quality assessment and performance improvement.
494.120 Condition: Special purpose renal dialysis facilities.
494.130 Condition: Laboratory services.

### Subpart D—Administration

494.140 Condition: Personnel qualifications.
494.150 Condition: Responsibilities of the medical director.
494.160 [Reserved]
494.170 Condition: Medical records.
494.180 Condition: Governance.

AUTHORITY: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh).

SOURCE: 73 FR 20475, Apr. 15, 2008, unless otherwise noted.

## Subpart A—General Provisions

### § 494.1  Basis and scope.

(a) *Statutory basis.* This part is based on the following provisions:

(1) Section 2991 of the Social Security Amendments of 1972 (Pub. L. 92–603), which extended Medicare coverage to insured individuals, their spouses, and their dependent children with ESRD who require dialysis or transplantation.

(2) Section 1861(e)(9) of the Act, which requires hospitals to meet such other requirements as the Secretary finds necessary in the interest of health and safety of individuals who

667

HOLMES000822

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-50, Page 224 of 300

# Theranos Sample Processing Unit (miniLab)



Fluorescence-based Isothermal detector

Thermocycler*

Centrifuge

Cytometer*

Material Handling Robot

Camera

Spectrophotometer

Thermal System

Luminometer & Fluorometer

Sonicator

Cartridge

theranos

Images not to scale
* Optional component

**DX 07694**

Chung *et al. Critical Care* (2017) 21:289
DOI 10.1186/s13054-017-1878-8

Critical Care

**RESEARCH**

**Open Access**



# High-volume hemofiltration in adult burn patients with septic shock and acute kidney injury: a multicenter randomized controlled trial

Kevin K. Chung[1,2*], Elsa C. Coates[3], David J. Smith Jr[4], Rachel A. Karlnoski[4], William L. Hickerson[5],
Angela L. Arnold-Ross[5], Michael J. Mosier[6], Marcia Halerz[6], Amy M. Sprague[7], Robert F. Mullins[7], Daniel M. Caruso[8],
Marlene Albrecht[8], Brett D. Arnoldo[9], Agnes M. Burris[9], Sandra L. Taylor[10], Steven E. Wolf[9], for the Randomized
controlled Evaluation of high-volume hemofiltration in adult burn patients with Septic shoCk and acUte kidnEy
injury (RESCUE) Investigators

## Abstract

**Background:** Sepsis and septic shock occur commonly in severe burns. Acute kidney injury (AKI) is also common and often results as a consequence of sepsis. Mortality is unacceptably high in burn patients who develop AKI requiring renal replacement therapy and is presumed to be even higher when combined with septic shock. We hypothesized that high-volume hemofiltration (HVHF) as a blood purification technique would be beneficial in this population.

**Methods:** We conducted a multicenter, prospective, randomized, controlled clinical trial to evaluate the impact of HVHF on the hemodynamic profile of burn patients with septic shock and AKI involving seven burn centers in the United States. Subjects randomized to the HVHF were prescribed a dose of 70 ml/kg/hour for 48 hours while control subjects were managed in standard fashion in accordance with local practices.

**Results:** During a 4-year period, a total of nine subjects were enrolled for the intervention during the ramp-in phase and 28 subjects were randomized, 14 each into the control and HVHF arms respectively. The study was terminated due to slow enrollment. Ramp-in subjects were included along with those randomized in the final analysis. Our primary endpoint, the vasopressor dependency index, decreased significantly at 48 hours compared to baseline in the HVHF group ($p = 0.007$) while it remained no different in the control arm. At 14 days, the multiple organ dysfunction syndrome score decreased significantly in the HVHF group when compared to the day of treatment initiation ($p = 0.02$). No changes in inflammatory markers were detected during the 48-hour intervention period. No significant difference in survival was detected. No differences in adverse events were noted between the groups.

**Conclusions:** HVHF was effective in reversing shock and improving organ function in burn patients with septic shock and AKI, and appears safe. Whether reversal of shock in these patients can improve survival is yet to be determined.

**Trial registration:** Clinicaltrials.gov NCT01213914. Registered 30 September 2010.

**Keywords:** High-volume hemofiltration, Burns, Septic shock, Acute kidney injury, Randomized controlled trial, Multicenter

\* Correspondence: kevin.k.chung.mil@mail.mil
Presented as an oral presentation at the 49th American Burn Association
Annual Meeting in Boston MA, USA on 24 March 2017.
[1]Brooke Army Medical Center, Fort Sam Houston, TX, USA
[2]Uniformed Services University of the Health Sciences, Bethesda, MD, USA
Full list of author information is available at the end of the article



© The Author(s). 2017 **Open Access** This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

HOLMES000921

**ER-14253**

Chung *et al. Critical Care* (2017) 21:289

## Background

Severe infections resulting in septic shock occur frequently in burn patients and are associated with high mortality [1]. AKI is also a common complication in this population, with an associated mortality as high as 80% among those who need renal replacement therapy (RRT) [2]. Like other intensive care unit (ICU) populations, the cause of AKI in burns is often multifactorial. However, a major cause of AKI is the combined effect of inflammation and microcirculatory dysregulation secondary to sepsis [3, 4]. Despite advances in burn care over the past few decades, the mortality rate in burns with AKI has remained unacceptably high, especially when compared to other ICU populations [2, 5].

Recently, aggressive application of continuous venovenous hemofiltration (CVVH) was found to decrease mortality in adult patients with severe burns and AKI when compared to historical controls [6]. The greatest benefit appeared to be realized in those patients in shock at the time therapy was initiated [6]. Early data suggest that HVHF could be utilized to treat both the renal and extra-renal manifestations of AKI in the setting of septic shock [7–10]. HVHF has evolved from standard renal replacement therapies to primarily manage the metabolic consequences of AKI into one of many blood purification techniques designed to target the dysregulated immune response associated with septic shock [11–13]. Authors of a recent Cochrane meta-analysis evaluating HVHF in sepsis concluded that the data were insufficient to comment on outcomes [14]. They did, however, note no adverse effects of HVHF. The largest study included found that HVHF (70 ml/kg/hour) did not lead to a decrease in 28-day mortality or contribute to improvements in hemodynamics when compared to controls (CVVH at 35 ml/kg/hour) in a mixed ICU population [15]. No studies have included burns.

Severe burns are characterized by an augmented host response that is more pronounced than in other populations [16]. This is followed by significant catabolism with periods of major metabolic and inflammatory derangements during active infection [17]. Application of blood purification techniques in this setting may improve outcomes. We hypothesized that HVHF would improve hemodynamics in the setting of septic shock and AKI in critically ill burn patients when compared to standard care.

## Methods

After obtaining multilevel institutional review board approval, we conducted a multicenter randomized controlled trial to compare the impact of HVHF compared to controls in burn patients with septic shock and AKI. The trial was registered on ClinicalTrials.gov (NCT01213914) and was monitored by a Data Safety Monitoring Board (DSMB). Ten burn centers were selected based on the presence of an established continuous RRT capability and prior experience conducting clinical trials. The enrollment period was from February 2012 to February 2016. Centers were excluded if they were not able to enroll any study subjects within a 12-month ramp-in period.

### Subjects

We included all adults with burns who subsequently developed septic shock with AKI at least 2 days post burn. Patients with end-stage renal disease were excluded. Septic shock was defined by the American Burn Association (ABA) definition that has previously been described [18]. AKI was defined by oliguria (< 20 ml/hour) for > 24 hours or an increase in serum creatinine of > 2 mg/dl in males or > 1.5 mg/dl in females over a period of < 4 days, the same criteria utilized in a prior multicenter study [19]. Once subjects were identified as meeting the inclusion and exclusion criteria, their legally authorized representative was contacted for informed consent and enrollment within 24 hours. Once enrolled, subjects were randomized into paired groupings by age and burn size in coordination via telephone through Perry Point Cooperative Studies Center (Baltimore Research and Education Foundation, Baltimore, MD, USA).

### Intervention

Subjects randomized to the HVHF arm were initiated on CVVH at a prescribed dose of 70 ml/kg/hour for 48 hours using either the NxStage System One™ (NxStage Medical Inc., Lawrence, MA, USA) or the PRISMAFLEX System™ (Baxter Healthcare Corporation, Deerfield, IL, USA). The study dose was discontinued at 48 hours. Patients requiring RRT beyond the intervention period were prescribed the mode, dose, anticoagulation, and duration of therapy determined by the treatment team.

### Control group

Subjects randomized to the control arm underwent treatment based on local standards to include any mode of RRT, delivered at standard doses (20–35 ml/kg/hour), with the timing of treatment initiation left to be decided by the treatment team. Anticoagulation strategy was determined by the treatment team.

### Endpoints

The primary outcome measure was identified as the hemodynamics profile at 48 hours objectively measured by the vasopressor dependency index (VDI) as described previously [20] (see Additional file 1). Secondary measures included vasopressor-free days in the first 14 days, MODS score in the first 14 days [21], ICU days, and mortality. Adverse events were reported to the DSMB as directed.

HOLMES000922

Chung et al. Critical Care (2017) 21:289

### Plasma cytokine concentrations

All six cytokines (IL-6, IL-8, IL-10, IL-12, IFN-γ, and TNF-α) were measured by a sandwich ELISA method on the Theranos 3.0 device (Theranos Inc., Palo Alto, CA, USA) (see Additional file 1).

### Statistical analysis

The study was powered to detect a 4.8-unit difference in the drop of the primary endpoint from baseline at 90% power, with a type I error rate of 5% resulting in a required sample size of 120 subjects.

Continuous data are summarized as the median (25th, 75th quantile) while categorical data are summarized as proportions. Fisher's exact test, McNemar's test, and the Wilcoxon rank-sum test were used as appropriate. Hemodynamic parameters were compared between controls and HVHF at both hour 0 and hour 48. Median values within each group were then compared between hour 0 and hour 48 to assess the difference in the drop of the VDI from baseline. To control the type I error rate for each variable at 0.05 given four statistical tests, an alpha level of 0.0125 was used to determine significance.

Linear mixed-effect models were used to compare trends in cytokine values over the first 48 hours between the control and HVHF groups. A random intercept and slope term were included for each subject.

Data were analyzed following the intention-to-treat principle where appropriate. All tests were two-sided at a significance level of 0.05. Analyses were conducted using R Version 3.3.1 (R Core Team) or SAS/STAT software version 9.4 (SAS Institute, Inc.).

## Results

Across seven participating burn centers, 4086 subjects were screened for enrollment during a 4-year enrollment period. Of those who met the inclusion criteria, a total of nine subjects were enrolled during the ramp-in phase and 28 subjects were randomized, 14 each into the control and HVHF arms. The study was terminated due to slow enrollment. Ramp-in subjects were included along with those randomized in the final analysis. Four subjects withdrew from the study. The primary endpoint was analyzed only for the subjects who remained in the study and had complete data. We applied the intent-to-treat principle for all other analyses. Figure 1 depicts the flow diagram for the trial. Baseline demographic and physiologic characteristics are presented in Table 1. Among those in the control group, all of whom were initiated on RRT upon randomization, seven and three subjects were initiated on CVVH and continuous venovenous hemodiafiltration (CVVHDF) respectively at an average delivered dose of 33 ± 3 ml/kg/hour. Two patients in the control group received intermittent hemodialysis (IHD) with a delivered clearance of 1.2 (Kt/V). All subjects in the HVHF group received

CVVH at an average prescribed dose of 70 ± 1 ml/kg/hour and a delivered dose of 66 ± ml/kg/hour. In the HVHF group, 11 patients received trisodium citrate and seven patients received heparin for regional anticoagulation, while five patients received no anticoagulation. In the control group, two subjects received trisodium citrate and eight subjects received heparin for regional anticoagulation, while four subjects received no anticoagulation. Anticoagulation strategy was not found to be significantly different between the two groups ($p = 0.11$).

### Primary endpoint

At the time of treatment initiation, which was a median of 2 (1, 3) hours from the time of randomization and up to 24 hours from meeting the inclusion criteria, 69% of control subjects and 50% of HVHF subjects remained on vasopressors. Our primary endpoint results (VDI) expressed as medians and quartiles are presented in Table 2 along with other hemodynamic parameters (see Additional file 1: Table S1 for all comparisons). In the HVHF group, the VDI decreased significantly at 48 hours compared to baseline ($p = 0.007$) while it remained no different in the control arm ($p = 0.24$). We also evaluated the change in the proportion of patients on vasopressors at 48 hours compared to baseline. For the control group, the percentage of patients on vasopressors did not change significantly between hour 0 and hour 48 (69% vs 50%, $p = 0.617$); while for the HVHF group, the percentage decreased significantly at hour 48 (50% vs 15%, $p = 0.013$).

### Secondary endpoints

Vasopressor-free days in the first 14 days were also no different between the control and HVHF groups (3.0 (0.0, 10.3) vs 7.0 (1.0, 10.0), $p = 0.39$). At 14 days, the MODS score was no different in the control group when compared to the day of treatment initiation (10.0 (9.2, 10.5) vs 8.0 (7.0, 12.0), $p = 0.34$) while it decreased significantly in the HVHF group (10.0 (7.0, 13.5) vs 7.0 (5.0, 10.0), $p = 0.02$). Relevant end-of-study outcome measures are compared in Table 3. We did not detect any difference in ICU days or need for RRT upon hospital discharge among survivors. We also did not detect a difference in mortality at various time points.

### Plasma cytokines

Of the six cytokines (IL-6, IL-8, IL-10, IL-12, IFN-γ, and TNF-α) measured over the 48-hour intervention period, none significantly decreased over time (see Fig. 2). Additionally, no cytokines were different at each time point between the two groups.

### Adverse events

No differences in adverse events were noted between the groups (see Additional file 1).

HOLMES000923

Chung *et al. Critical Care* (2017) 21:289

Page 4 of 8



**Fig. 1** Patient flow diagram. *LAR* legally authorized representative, *HVHF* high-volume hemofiltration

## Discussion

To date, this is the first and only controlled trial evaluating HVHF in the burn population. Despite having to stop our study early due to slow enrollment with a resultant small sample size, we detected a significant

**Table 1** Baseline characteristics

| Variable | Control (*n* = 14) | HVHF (*n* = 23) | *p* value |
|---|---|---|---|
| Age | 47 (37, 62) | 50 (42, 60) | 0.83 |
| Gender (% male) | 75.6 | 73.9 | 1 |
| %TBSA | 45 (29, 58) | 45 (30, 60) | 0.98 |
| Inhalation (%) | 36 | 30 | 1 |
| ISS | 26 (25, 47) | 25 (21, 44) | 0.75 |
| ARDS (%) | 57 | 43 | 0.51 |
| MODS score | 10 (9, 12) | 10 (7, 14) | 0.94 |
| APACHE II score | 32 (24, 35) | 28 (25, 34) | 0.63 |
| MAP | 70 (66, 85) | 75 (64, 82) | 1.00 |
| HR | 115 (101, 120) | 102 (91, 116) | 0.18 |
| Hemoglobin | 7.7 (7.4, 8.4) | 8.2 (7.8, 9.7) | 0.084 |
| BUN | 37 (32, 80) | 43 (29, 50) | 0.38 |
| Creatinine | 1.3 (1.1, 3.3) | 2.5 (1.2, 3.1) | 0.62 |
| Lactate | 1.4 (1.2, 1.6) | 1.9 (1.4, 2.5) | 0.22 |
| pH | 7.31 (7.25, 7.39) | 7.32 (7.29, 7.38) | 0.69 |
| PFR | 265 (168, 308) | 211 (171, 353) | 0.97 |
| BD | −0.3 (−3.3, 1) | −2.1 (−4.3, 1.4) | 0.70 |

Data presented as median (25th, 75th quantile) or percentage

*p* values from Wilcoxon two-sample tests for continuous variables and Fisher's exact test for binary variables. All subjects included in summary tables via the intent-to-treat principle

*HVHF* high-volume hemofiltration, *TBSA* total body surface area, *ISS* Injury Severity Score, *ARDS* acute respiratory distress syndrome, *MODS* multiple organ dysfunction syndrome, *APACHE* Acute Physiology and Chronic Health Evaluation, *MAP* mean arterial pressure, *HR* heart rate, *BUN* blood urea nitrogen, *PFR* partial pressure of oxygen to fraction of inspired oxygen ratio, *BD* base deficit

decrease in the primary endpoint over 48 hours. Thus, our data suggest that intervention with HVHF in burn patients with septic shock and concomitant AKI results in significant clinical improvement when compared to standard care. This finding was a bit unexpected and suggests that the actual effect size was greater than that assumed for our power calculation. Additionally, HVHF improved overall organ function over a 2-week period as reflected by a significant improvement of the MODS score.

While the small sample size may be a reason for restrained enthusiasm, these findings add valuable information to the limited body of literature that exists in the field of blood purification. Our detection of improved hemodynamics with HVHF in our study corroborates similar findings from previous studies. In one single-center pilot study, HVHF at 65 ml/kg/hour significantly decreased vasopressor requirements in septic shock patients with AKI [22]. In a nested cohort of 115 patients from the RENAL study, high-intensity CVVHDF, at a dose of 40 ml/kg/hour, was associated with greater improvements in MAP and vasopressor requirements when compared to controls [23]. Interestingly, the IVOIRE study, the largest trial to date to evaluate HVHF in a mixed ICU population, failed to show a benefit in hemodynamics [15]. Perhaps the difference in patient population could explain this discrepancy in our findings compared to the IVOIRE study. Burn injury is widely known to be associated with a dysregulated host response that is significant greater in magnitude and duration than any other population [17]. Regardless, it is difficult to dismiss our primary findings as being due to chance alone given the multicenter, RCT design.

The benefit of accelerating the reversal of shock is not difficult to deduce in the burn population. Among the principles of burn care is the concept of optimizing the

HOLMES000924

Chung *et al. Critical Care* (2017) 21:289

**Table 2** Hemodynamic parameters

| Variable | Control | | HVHF | |
|---|---|---|---|---|
| | Hour 0 | Hour 48 | Hour 0 | Hour 48 |
| MAP (mmHg) | 70 (66, 85) | 80 (72, 86) | 75 (64, 82) | 72 (68, 86) |
| Heart rate | 115 (101, 120) | 104 (97, 117) | 102 (91, 116) | 105 (95, 114) |
| Norepinephrine (μg/kg/min) | 0 (0, 0.06) | 0 (0, 0.06) | 0 (0, 0.03) | 0 (0, 0) |
| Vasopressin (units/hour) | 0.03 (0, 0.04) | 0.02 (0, 0.04) | 0 (0, 0.04) | 0 (0, 0)* |
| Modified inotropic score | 4 (0, 10) | 2 (0, 9.5) | 1 (0, 7.13) | 0 (0, 0)* |
| VDI | 0.05 (0, 0.13) | 0.02 (0, 0.12) | 0.01 (0, 0.09) | 0 (0, 0)* |

Data presented as median (25th, 75th quantile)
*HVHF* high-volume hemofiltration, *MAP* mean arterial pressure, *VDI* vasopressor dependency index
*$p < 0.0125$ when comparing hour 48 to baseline (hour 0)

conditions of wound healing throughout the hospitalization. The notion that shock states which impair microcirculation at the level of the wound bed will significantly impact wound healing is well accepted [24]. The extent of injured and unhealed wound burden is the greatest contributor to mortality in burns [25, 26]. Hence, any process that inhibits wound healing or results in less than optimal graft take after definitive surgery can theoretically impact overall outcomes. The study was not powered or designed to detect a difference in mortality. Given the longitudinal nature of burn care and the multiple episodes of sepsis that can occur while awaiting definitive wound coverage, it is unrealistic to expect that reversal of shock during one episode of sepsis could have an impact on inhospital mortality. Repeat treatments to reverse each episode of shock during the course of a hospitalization are likely to impact outcomes. This is particularly true if the intervention is able to preserve organ function much like HVHF did during this study.

The mechanism by which HVHF may have resulted in hemodynamic improvement in our study is somewhat unclear. Nonspecific cytokine removal in the setting of a dysregulated immune-inflammatory state is the main mechanism postulated for the improvements observed for a variety of blood purification strategies [13]. In our study, cytokine levels measured at discreet intervals for the duration of the 48-hour intervention period did not change (see Fig. 2). A recent study reported similar findings. Hemodynamic improvement with HVHF was not associated with a decrease in cytokine levels [27]. Additionally, the acid–base status was not different between the two groups (Additional file 1: Table S2). Higher intensity CRRT has been shown to improve blood pressure without any difference in acid–base status [23]. Of the many variables assessed, only BUN was different between the two groups. This suggests the possibility of better metabolic control as a reason for improvement in hemodynamics. Alternatively, a mechanism not evaluated during the course of the study, such as alteration of the neurohormonal axis or improvement of the microcirculation, may explain our findings [27–29].

In their review, Clark et al. cautioned against the routine use of HVHF for septic AKI [30]. In addition to concluding that the evidence of benefit was weak, they pointed to several concerns such as the possibility of under-dosing antibiotics and electrolyte abnormalities. It is clear that drug clearance is augmented with HVHF. However, drug pharmacokinetics is very complex and involves the consideration of multiple variables to include protein binding, the volume of distribution, and the sieving coefficient [31]. Hence, dosing should be individualized and guided by drug levels when available. Recent investigations suggest sufficient levels can be achieved by dosing to normal renal function [32–34]. Concern for therapy-related electrolyte abnormalities can easily be overcome by a standardized replacement protocol. All study sites for our trial had such protocols in place with routine monitoring and aggressive replacement. As such, no significant electrolyte abnormalities were encountered in our study, a distinct departure from what has been reported previously [15, 19].

A variety of blood purification strategies currently exist for the treatment of septic shock and can be applied in burns [13]. These include Polymyxin B-immobilized fiber therapy, plasma exchange, and hemoadsorptive columns [35–37]. Clark et al. suggest that further trials should focus on these methods in lieu of HVHF due to the

**Table 3** Final outcome measures

| Variable | Control (n = 14) | HVHF (n = 23) | p value |
|---|---|---|---|
| ICU days among survivors | 57 (47, 81) | 67 (36, 95) | 1 |
| RRT at discharge among survivors (%) | 33 | 38 | 1 |
| 14-day mortality (%) | 21 | 17 | 1 |
| 28-day mortality (%) | 36 | 22 | 0.45 |
| Inhospital mortality (%) | 57 | 65 | 0.73 |

Data presented as median (25th, 75th quantile) or percentage
All subjects included in the mortality comparison via the intent-to-treat principle
*HVHF* high-volume hemofiltration, *ICU* intensive care unit, *RRT* renal replacement therapy

HOLMES000925

Chung et al. Critical Care (2017) 21:289



**Fig. 2** Comparison of inflammatory mediators during the 48-hour intervention. HVHF high-volume hemofiltration, IFN interferon, IL interleukin, TNF tumor necrosis factor

resource intensiveness of the therapy [30]. However, all of these therapies harbor the same issues of insufficient clinical evidence. The most promising of these in terms of efficacy and safety, Polymyxin B hemoperfusion, is not widely available. On the other hand, HVHF is immediately available in centers that have an established continuous RRT program and does not pose nearly the same theoretical concerns that repeat treatments with plasma exchange may bring [13].

A number of limitations exist with this study. First, the study was mired by slow enrollment which resulted in a small sample size. This is despite sufficient funding and much enthusiasm within the burn community. Despite our best efforts, we fell short of our enrollment goal. Still, our findings were significant for the primary outcome and these data contribute to the body of literature that is starved of clinical data. Second, the informed consent process allowed for up to 24 hours prior to study initiation, which allowed enough time for patients to improve clinically while awaiting randomization. All of these patients received standard care which included early initiation of antibiotics and source control during the screening process. This resulted in a number of patients coming off vasopressor and correcting their laboratory abnormalities. An optimal design for this type

of study would have been to alter the consent process such that subjects could be randomized as soon as they met the criteria. Our current clinical research regulatory landscape makes such study designs exceedingly difficult. This is among many key reasons why some have called for the abandonment of randomized controlled trials in the ICU [38]. Another limitation is the fact that the definition of AKI utilized for our entry criteria is now outdated. When this study design was conceived in 2009, current standardized criteria for AKI such as RIFLE (Risk, Injury, Failure, Loss, End stage), AKIN (Acute Kidney Injury Network), or KDIGO (Kidney Disease: Improving Global Outcomes) had yet to be widely adopted or their use published for burns [39]. Hence, we chose to use the AKI entry criteria utilized in the Veterans Affairs/National Institutes of Health (VA/NIH) Acute Renal Failure Trial Network paper [19]. Readers should consider this limitation when attempting to translate our findings. Finally, even within a homogeneous population such as burn patients, the phenotypic presentation of sepsis varies widely. Some patients were in profound circulatory shock with evidence of severe inflammatory dysregulation, while others had an indolent course with a low-grade level of shock. This variability makes it difficult to gauge the true impact of this therapy

HOLMES000926

Chung *et al. Critical Care* (2017) 21:289

and may explain the lack of benefit detected in prior studies such as the IVOIRE study. Individualizing extra-corporeal therapies based on the exact phenotypic presentation is the most rational approach to clinical care but is very difficult to study in large numbers. This design challenge of matching the right treatment strategy to the right patient is ongoing [40].

## Conclusion

HVHF was effective in reversing shock and improving organ function in critically ill burn patients with septic shock and AKI, and appears safe. This therapy can be considered in select patients when the right resources are available. Whether reversal of shock in these patients can improve survival is yet to be determined.

## Additional file

Additional file 1: Contains supplementary methods, **Table S1** presenting comparison of hemodynamic parameters between control and HVHF groups at baseline (hour 0) and hour 48 and comparison of change in hemodynamic parameters between baseline and hour 48 for each group, **Table S2** presenting physiologic and laboratory characteristics (mean ± SD) at hours 0, 24, and 48, **Table S3** presenting *p* values for comparisons of physiologic and laboratory characteristics of controls to HVHF subjects at 0, 24, and 48 hours, and lists IRBs. (DOCX 27 kb)

## Abbreviations

ABA: American Burn Association; AKI: Acute kidney injury; AKIN: Acute Kidney Injury Network; CVVH: Continuous venovenous hemofiltration; CVVHDF: Continuous venovenous hemodiafiltration; DSMB: Data Safety Monitoring Board; HVHF: High-volume hemofiltration; ICU: Intensive care unit; IHD: Intermittent hemodialysis; IVOIRE: high VOlume in Intensive care; KDIGO: Kidney Disease: Improving Global Outcomes; MODS: Multiple organ dysfunction syndrome; RESCUE: Randomized controlled Evaluation of high-volume hemofiltration in adult burn patients with Septic shoCk and acUte kidnEy injury; RIFLE: Risk, Injury, Failure, Loss, End stage; RRT: Renal replacement therapy; VA/NIH: Veterans Affairs/National Institutes of Health; VDI: Vasopressor dependency index

## Acknowledgements

The authors would like to specifically acknowledge tremendous work done by the research nurses and coordinators to facilitate the conduct of this of this trial: Erica A. Pamplin, Cathy A. Rauschendorfer, Sonya Charo-Griego, Victoria D. Hatem, Javance R. Tercero, and Linda S. Welker, United States Army Institute of Surgical Research; Thanh Tran, and Kristina R. Bolling, MPH, University of South Florida Tampa General Hospital; Peggie F. Conrad, Loyola University Medical Center; Farrah J. Parker, Doctors Hospital Joseph M. Still Burn Center; Karen J. Richey, Renee R. Schein, Wendy L. Murphy, Starre A. Haney, and Jessica Renteria, Arizona Burn Center Maricopa Integrated Health Systems; Victoria Jones and Christopher Tran, University of Texas Southwestern Medical Center; Doug Ross, Tracy McDonald, and Jennifer Parks, University of Kansas Medical Center. The following are all of the ABA RESCUE investigators, listed by clinical site: Booker T. King, MD, Julie A. Rizzo, MD, Jeremy C. Pamplin, MD, Ian R. Driscoll, MD, Evan M. Renz, MD, Jonathan B. Lundy, MD, and Leopoldo C. Cancio, MD, United States Army Institute of Surgical Research; Carl W. Cruse, MD, Christopher A. McFarren, MD, Kimberly S. Brown, ARNP, University of South Florida Tampa General Hospital; Arif Showkat, MD, Lekha George, MD, Aneel Kumar, MD, Barbara Birmingham, CRNP, David Hill, PharmD, and Mary E. Bruce, PA, University of Tennessee Firefighters' Regional Burn Center; Arthur P. Sanford, MD and David J. Leehey, MD, Loyola University Medical Center; Robert F. Mullins, MD, Zaheed Hassan, MD, Joseph R. Shaver, MD, and Bruce Friedman, MD, Doctors Hospital Joseph M. Still Burn Center; Kevin N. Foster, MD and Michael D. Peck, MD, Arizona Burn Center Maricopa Integrated Health Systems;

Herb A. Phelan, MD and Ramesh Saxena, MD, University of Texas Southwestern Medical Center; James Howard, MD, Dhaval Bhavsar, MD, Satish Pommuru, MD, Michelle DeSouza, MD, Sri G. Yarlagadda, MD, University of Kansas Medical Center. The authors acknowledge the extensive contributions from the DSMB: Steven A. Conrad, MD, PhD (chair), Professor of Medicine, Emergency Medicine, Pediatrics, Neurosurgery and Anesthesiology, Louisiana State University Health Sciences Center, Shreveport, LA; Sharmila Dissanaike, MD, Assistant Professor, Department of Surgery, Texas Tech University Health Sciences Center, Lubbock, TX; and Richard Holubkov, PhD, Professor of Pediatrics, Department of Pediatrics, Division of Critical Care, School of Medicine, University of Utah, UT. Additionally, the authors are appreciative of the continuous support from the ABA central office: Kimberly A. Hoarle, Janet Turner, Kitty Vineyard, and Susan Browning; ABA Multi-Center Trials Group: Jeffrey Saffle, MD, Salt Lake, UT and James H. Holmes, MD, Winston-Salem, NC: Data Coordinating Center University of California Davis Medical Center, Sacramento, CA: MaryBeth Lawless (Director), Silvia Hughes, Katrina Falwell, and Terese Curri; and Theranos® Incorporation: Elizabeth Holmes (Chief Executive Officer), Daniel Young, PhD, and Daniel Edlin. The opinions or assertions contained herein are the private views of the authors and are not to be construed as official or as reflecting the views of the Department of the Army, Air Force or the Department of Defense.

## Funding

This work was funded by the United States Army Medical Research and Materiel Command (Grant number: W81XWH-09-2-0194).

## Authors' contributions

All authors made substantial contributions to conception and design, and acquisition of data. KKC, DJS, WLH, MJM, AMS, RFM, DMC, BDA, and SEW made substantial contributions to analysis and interpretation of data. KKC, DJS, WLH, MJM, DMC, BDA, SLT, and SEW were involved in drafting the manuscript. KKC, ECC, DJS, WLH, MJM, AMS, RFM, DMC, BDA, SLT, and SEW were involved in revising the manuscript critically for important intellectual content. All authors gave final approval of the final manuscript to be published.

## Authors' information

Not applicable.

## Ethics approval and consent to participate

The study was approved in a multilevel institutional review process. The core protocol was initially reviewed by the United States Army Medical Research and Materiel Command (USAMRMC) Institutional Review Board (IRB) and reviewed again for final approval by the Army Human Research Protection Office (AHRPO). The core protocol was then submitted to each participating site's local IRB with site-specific addendums and approved again by AHRPO. All amendments to the core protocol required multilevel review with final approval by the AHRPO. A list of IRBs for each specific site is listed in Additional file 1. Informed consent was obtained from all participating subjects through their surrogates.

## Consent for publication

All authors gave final approval of the final manuscript to be published.

## Competing interests

The authors declare that they have no competing interests.

## Publisher's Note

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

## Author details

[1]Brooke Army Medical Center, Fort Sam Houston, TX, USA. [2]Uniformed Services University of the Health Sciences, Bethesda, MD, USA. [3]United States Army Institute of Surgical Research, Fort Sam Houston, TX, USA. [4]University of South Florida Tampa General Hospital, Tampa, FL, USA. [5]University of Tennessee Firefighters' Regional Burn Center, Memphis, TN, USA. [6]Loyola University Medical Center, Maywood, IL, USA. [7]Doctors Hospital Joseph M. Still Burn Center, Augusta, GA, USA. [8]Arizona Burn Center Maricopa Integrated Health Systems, Phoenix, AZ, USA. [9]University of Texas Southwestern Medical Center, Dallas, TX, USA. [10]University of California Davis, Sacramento, CA, USA.

HOLMES000927

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-50, Page 232 of 300

Chung *et al. Critical Care* (2017) 21:289

Page 8 of 8

Received: 12 August 2017 Accepted: 30 October 2017
Published online: 25 November 2017

## References

1. Fitzwater J, Purdue GF, Hunt JL, et al. The risk factors and time course of sepsis and organ dysfunction after burn trauma. J Trauma. 2003;54(5):959–66.
2. Brusselaers N, Monstrey S, Colpaert K, et al. Outcome of acute kidney injury in severe burns: a systematic review and meta-analysis. Intensive Care Med. 2010;36:915–25.
3. Stewart IJ, Tilley MA, Cotant CL, et al. Association of AKI with adverse outcomes in burned military casualties. Clin J Am Soc Nephrol. 2012;7(2):199–206.
4. Gomez H, Ince C, De Backer D, et al. A unified theory of sepsis-induced acute kidney injury: inflammation, microcirculatory dysfunction, bioenergetics, and the tubular cell adaptation to injury. Shock. 2014;41:3–11.
5. Uchino S, Kellum JA, Bellomo R, et al. Acute renal failure in critically ill patients: a multinational, multicenter study. JAMA. 2005;294:813–8.
6. Chung KK, Lundy JB, Matson JR, et al. Continuous venovenous hemofiltration in severely burned patients with acute kidney injury: a cohort study. Crit Care. 2009;13:R62.
7. Ronco C, Bellomo R, Homel P, et al. Effects of different doses in continuous veno-venous haemofiltration on outcomes of acute renal failure: a prospective randomised trial. Lancet. 2000;356(9223):26–30.
8. Honore PM, Jamez J, Wauthier M, et al. Prospective evaluation of short-term, high-volume isovolemic hemofiltration on the hemodynamic course and outcome in patients with intractable circulatory failure resulting from septic shock. Crit Care Med. 2000;28(11):3581–7.
9. Piccinni P, Dan M, Barbacini S, et al. Early isovolaemic haemofiltration in oliguric patients with septic shock. Intensive Care Med. 2006;32(1):80–6.
10. Ratanarat R, Brendolan A, Ricci Z, et al. Pulse high-volume hemofiltration in critically ill patients: a new approach for patients with septic shock. Semin Dial. 2006;19(1):69–74.
11. Cohen J. The immunopathogenesis of sepsis. Nature. 2002;420(6917):885–91.
12. Azevedo LCP, Park M, Schettino GPP. Novel potential therapies for septic shock. Shock. 2008;30 Suppl 1:60–6.
13. Linden K, Stewart IJ, Kreyer SF, et al. Extracorporeal blood purification in burns: a review. Burns. 2014;40(6):1071–8.
14. Borthwick EM, Hill CJ, Rabindranath KS, et al. High-volume haemofiltration for sepsis in adults. Cochrane Database Syst Rev. 2013;1:1–39.
15. Joannes-Boyau O, Honore PM, Perez P, et al. High-volume versus standard-volume haemofiltration for septic shock patients with acute kidney injury (IVOIRE study): a multicenter randomized controlled trial. Intensive Care Med. 2013;39:1535–46.
16. Jeschke MG, Chinkes DL, Finnerty CC, et al. Pathophysiologic response to severe burn injury. Ann Surg. 2008;248:387–401.
17. Seok J, Warren HS, Cuenca AG, et al. Genomic responses in mouse models poorly mimic human inflammatory diseases. Proc Natl Acad Sci U S A. 2013;110:3507–12.
18. Greenhalgh DG, Saffle JR, Holmes JH, et al. American Burn Association consensus conference to define sepsis and infection in burns. J Burn Care Res. 2007;28(6):776–90.
19. Palevsky PM, Zhang JH, O'Connor TZ, et al. VA/NIH Acute Renal Failure Trial Network. Intensity of renal support in critically ill patients with acute kidney injury. N Engl J Med. 2008;359(1):7–20.
20. Cruz DN, Antonelli M, Fumagalli R, et al. Early use of Polymyxin B Hemoperfusion in Abdominal Septic Shock: the EUPHAS Randomized Controlled Trial. JAMA. 2009;301:2445–52.
21. Marshall JC, Cook DJ, Christou NV, et al. Multiple organ dysfunction score: a reliable descriptor of a complex clinical outcome. Crit Care Med. 1995;23:1638–52.
22. Boussekey N, Chiche A, Faure K, et al. A pilot randomized study comparing high and low volume hemofiltration on vasopressor use in septic shock. Intensive Care Med. 2008;34(9):1646–53.
23. Bellomo R, Lipcsey M, Calzavacca P, et al. Early acid-base and blood pressure effects of continuous renal replacement therapy intensity in patients with metabolic acidosis. Intensive Care Med. 2013;39:429–36.
24. Rowan MP, Cancio LC, Elster EA, et al. Burn wound healing and treatment: review and advancements. Crit Care. 2015;19:243.
25. Nitzschke SL, Aden JK, Serio-Melvin ML, et al. Wound healing trajectories in burn patients and their impact on mortality. J Burn Care Res. 2014;35:474–9.
26. Kagan RJ, Peck MD, Ahrenholz DH, et al. Surgical management of the burn wound and the use of skin substitutes: an expert panel white paper. J Burn Care Res. 2013;34:e60–79.
27. Tamme K, Maddison L, Kruusat R, et al. Effects of high volume haemodiafiltration on inflammatory response profile and microcirculation in patients with septic shock. Biomed Res Int. 2015;2015:125615.
28. Khanna A, English SW, Wang XS, et al. Angiotensin II for the treatment of vasodilatory shock. N Engl J Med. 2017;377:419–30.
29. Ruiz C, Hernandez G, Godoy C, et al. Sublingual microcirculatory changes during high-volume hemofiltration in hyperdynamic septic shock patients. Crit Care. 2010;14:R170.
30. Clark E, Molnar A, Joannes-Boyau O, et al. High-volume hemofiltration for septic acute kidney injury: a systematic review and meta-analysis. Crit Care. 2014;18:R7.
31. Choi G, Gomersall CD, Tian Q, et al. Principles of antibacterial dosing in continuous renal replacement therapy. Crit Care Med. 2009;37:2268–82.
32. Bilgrami I, Roberts JA, Wallis SC, et al. Meropenem dosing in critically ill patients with sepsis receiving high-volume continuous venovenous hemofiltration. Antimicrob Agents Chemother. 2010;54:2974–8.
33. Akers KS, Rowan MP, Niece KL, et al. Colistin pharmacokinetics in burn patients during continuous venovenous hemofiltration. Antimicrob Agents Chemother. 2015;59:46–52.
34. Akers KS, Cota JM, Frei CR, et al. Once-daily amikacin dosing in burn patients treated with continuous venovenous hemofiltration. Antimicrob Agents Chemother. 2011;55:4639–42.
35. Terayama T, Yamakawa K, Umemura Y, et al. Polymyxin B hemoperfusion for sepsis and septic shock: a systematic review and meta-analysis. Surg Infect. 2017;18:225–33.
36. Rimmer E, Houston BL, Kumar A, et al. The efficacy and safety of plasma exchange in patients with sepsis and septic shock: a systematic review and meta-analysis. Crit Care. 2014;18:699.
37. Friesecke S, Stecher SS, Gross S, et al. Extracorporeal cytokine elimination as rescue therapy in refractory septic shock: a prospective single-center study. J Artif Organs. June 6 2017. Epub ahead of print.
38. Vincent JL. We should abandon randomized controlled trials in the intensive care unit. Crit Care Med. 2010;38:S534–8.
39. Kidney Disease: Improving Global Outcomes (KDIGO) Acute Kidney Injury Work Group. KDIGO Clinical Practice Guideline for Acute Kidney Injury. Kidney Inter. 2012;2:1–138.
40. Kellum JA, Gomez H, Gomez A, et al. Acute dialysis quality initiative (ADQI) XIV sepsis phenotypes and targets for blood purification in sepsis: the Bogota consensus. Shock. 2016;45:242–8.

### Submit your next manuscript to BioMed Central and we will help you at every step:

- We accept pre-submission inquiries
- Our selector tool helps you to find the most relevant journal
- We provide round the clock customer support
- Convenient online submission
- Thorough peer review
- Inclusion in PubMed and all major indexing services
- Maximum visibility for your research

Submit your manuscript at
www.biomedcentral.com/submit

 BioMed Central

HOLMES000928

ER-14260

**DX 07742**

Message

| | |
|---|---|
| **From:** | Stefan Hristu [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SHRISTU] |
| **Sent:** | 2/24/2009 6:48:08 PM |
| **To:** | Elizabeth Holmes [eholmes@theranos.com] |
| **CC:** | Carolyn Balkenhol [cbalkenhol@theranos.com] |
| **Subject:** | Theranos studies completed to date |

Novartis – Bone inflammation study
TNF-alpha, IL-6, CRP
Recent analysis yielded new information
GSK – metabolic retrospective study
Active GLP-1
Eliminated the need for a lab
BMS – metabolic retrospective study
Active GLP-1
Great feedback, Home run
Merck – metabolic retrospective study
Active GLP-1
Great correlation with Merck data
Mayo – metabolic live study
Active GLP-1
Whole blood time course in live subject
Stanford Study – inflammation study in AML patients
CRP, protein-C
Monitoring biomarkers for neutropenic fever in hospitalized chemotherapy patients
Great results, trends correlate with physical events, such as fever spikes, etc.
Pfizer – at TNONC SCRI – angiogenesis study
VEGF, VEGFR2, PLGF
Deployed instruments to fourth line cancer patients in poor and underdeveloped areas of TN
Celgene – Revlimid and tumor flare
Screening of 18 biomarkers and statistical analysis of results
Reduced the number of relevant biomarkers to only a few that can now be placed on cartridges for a future study
Novartis – RA inflammation in children
CRP
Study is currently wrapping up
AstraZeneca – Apoptosis in Healthy volunteers
M30, m65, nDNA
Follow-up whole blood reproducibility study
AstraZeneca / University of Manchester – Angiogenesis in cancer patients
VEGF, VEGFR2, PLGF
Retrospective plasma and "live" whole blood
Very promising results
Follow-up whole blood reproducibility study


Attached is in slide format already - slide 3. Let me know if this is what you were looking for. As far as I know, this is the complete list.

Stefan Hristu
Client Solutions Lead
Theranos, Inc.
Worldwide +1.650.644.5241

Confidential                                                                      THER-AZ-06111616

US Toll-Free 1.877.843.4180
Fax +1.650.838.0153

================================

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT : This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which it is addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.

================================

Confidential

THER-AZ-06111617



File Produced in Native Format

Confidential                                                                                                              THER-AZ-06111618

**ER-14263**



*theranos*
redefining healthcare

# Where in the world is Theranos™ ?

This presentation and its contents are Theranos proprietary and confidential.

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-50, Page 237 of 300



# Geography to Date



Theranos Confidential



theranos
redefining healthcare

# Completed Successes

**Novartis – Bone inflammation study**
- TNF-alpha, IL-6, CRP
- Recent analysis yielded new information

**GSK – metabolic retrospective study**
- Active GLP-1
- Eliminated the need for a lab

**BMS – metabolic retrospective study**
- Active GLP-1
- Great feedback, Home run

**Merck – metabolic retrospective study**
- Active GLP-1
- Great correlation with Merck data

**Mayo – metabolic live study**
- Active GLP-1
- Whole blood time course in live subject

**Stanford Study – inflammation study in AML patients**
- CRP, protein-C
- Monitoring biomarkers for neutropenic fever in hospitalized chemotherapy patients
- Great results, trends correlate with physical events, such as fever spikes, etc.

**Pfizer – at TNONC SCRI – angiogenesis study**
- VEGF, VEGFR2, PLGF
- Deployed instruments to fourth line cancer patients in poor and underdeveloped areas of TN

**Celgene – Revlimid and tumor flare**
- Screening of 18 biomarkers and statistical analysis of results
- Reduced the number of relevant biomarkers to only a few that can now be placed on cartridges for a future study

**Novartis – RA inflammation in children**
- CRP
- Study is currently wrapping up

**AstraZeneca – Apoptosis in Healthy volunteers**
- M30, m65, mDNA
- Follow-up whole blood reproducibility study

**AstraZeneca / University of Manchester – Angiogenesis in cancer patients**
- VEGF, VEGFR2, PLGF
- Retrospective plasma and "live" whole blood
- Very promising results
- Follow-up whole blood reproducibility study

Theranos Confidential

3



*theranos*
redefining healthcare

# Ongoing

## AZ programs

- Apoptosis
  - Healthy Volunteers
  - Investigating baseline of m30, m65, nDNA biomarkers
- Angiogenesis
  - In patients with solid tumors, working with Royal Marsden Hospital
  - In patients with cancer, working with University of Manchester, UK

## Mayo clinic

- Active and Total GLP-1
  - 300 patients
  - 2600 samples to be run in house
  - Will result in publication of Theranos™ System results

## Centocor

- Asthma (ENA-78, Rantes, Eotaxin, TARC, IgE, asthma drug)
  - Assay development for pK/pD
  - To be deployed after completion into Phase 1b FIH study

## Theranos 001-2009

- Sepsis in healthy population to support 510(k) submission
  - Protein-C, CRP
  - Currently undergoing IRB review and hoping for fast track approval

## Celgene

- Statistical model for Bone and Hematopoietic regulation based on
  historical data and literature

Theranos Confidential

4

ER-14267



*theranos*
redefining healthcare

# Future Fun - The beginning

**Centocor**
- Phase 1B FIH study using Theranos™

**Celgene**
- Revlimid method of action model development from field data gathered using Theranos™ Systems
- Validate Bone and Hematopoietic models using field data gathered using Theranos™ Systems: ACE-011 drug MOA

**Schering-Plough**
- TNF-alpha and IL-6 validation
  - Once completed, Theranos™ Systems will be deployed in studies for gathering field data

**Mayo clinic**
- Total and active GLP-1 system to be used for future projects to replace traditional lab methods

**Astra Zeneca**
- Angiogenesis and Apoptosis

**Royal Marsden**
- Angiogenesis on Theranos systems across entire organization

**Daiichi-Sankyo**
- TNF-alpha, IL-6 validations

**Merck**

TBI and PTSD with Gov, DoD, NIH, work with HMOs, POC monitoring, 510(k)

Theranos Confidential

5



**theranos**
redefining healthcare

# 2009 : Ox

prosperity through fortitude and hard work

*World-Class Organization*

*Quality*

*Products*

*Software*

*Sales and Service*

*Business Development*

*Intellectual Property*

Theranos Confidential

6

DX 07751

# theranos

# Overview of Sample Processing Workflow Prepared for FDA:

## Phase I and Phase II of Theranos Business Operations

This presentation and its contents are Theranos proprietary and confidential.

# Phase I: Current

Theranos PSC
(Theranos site operated by Theranos CLIA lab)

Theranos High-Complexity CLIA-Certified Lab in Palo Alto, CA

**Clinician Test Order is Received**

- Sample collection is performed in dedicated Theranos Patient Service Center

- Collection and processing performed by Theranos licensed phlebotomists/state-certified personnel trained and further certified by Theranos' CLIA lab

- Sample collected by venipuncture, finger stick, or urine collection

- Phlebotomist/state-certified personnel places sample in and operates centrifuge, performs relevant preparatory steps prior to sample transport (all industry standard procedures – not Theranos specific)

Theranos courier physically transports sample to lab for analysis

Samples are processed and results are generated via conventional analyzers

OR

**Theranos Sample Processing Unit (TSPU)** performs automated pre-analytic processing

TSPU transmits signals securely to TLAS for analysis

TLAS provides control and oversight of TSPU

**Theranos Laboratory Automation System (TLAS)** performs automated analysis and post-analytic processing

Data is sent back to ordering clinician from lab

theranos

Theranos Confidential

ER-14271

# Phase II: Post-FDA Clearance

Theranos PSC
(Theranos site operated by
Theranos CLIA lab)

Theranos High-Complexity CLIA-Certified Lab in Palo Alto, CA

**Clinician Test Order is Received**

- Sample collection is performed in dedicated Theranos Patient Service Center

- Collection and processing performed by Theranos licensed phlebotomists / state-certified personnel trained and further certified by Theranos' CLIA lab

- Sample collected by venipuncture, finger stick, or urine collection

- Phlebotomist/state-certified personnel places sample in TSPU

  **Theranos Sample Processing Unit (TSPU)** automatically performs pre-analytic processing

Theranos courier physically transports sample to lab for analysis

OR

TSPU transmits signals securely to TLAS for analysis

Samples are processed and results are generated via conventional analyzers

**Theranos Laboratory Automation System (TLAS)** performs automated analysis and post-analytic processing

TLAS provides control and oversight of TSPU

Data is sent back to ordering clinician from lab



Theranos Confidential

theran●s

# TSPU & TLAS Description

(The TSPU and TLAS are designed and manufactured by Theranos with no third party involvement.

The TSPU and TLAS are also only used by Theranos and are not sold.)

## Theranos Sample Processing Unit (TSPU)

Performs automated pre-analytic processing*:

- Sample separation (into plasma)
- Reagent addition/preparatory steps and associated signal generation
- Transmits raw signals (e.g. pixels or photon counts) to TLAS**
- Connected to and controlled by TLAS under the oversight of Theranos CLIA laboratory personnel

*No operator decision making or manual processing required

**NB – results cannot be generated on the TSPU (and thus of course could never be transmitted from or displayed on the TSPU)

## Theranos Laboratory Automation System (TLAS)

Performs automated analysis and post-analytic processing:

- Pathologist and CLIA lab personnel oversight of TSPU
- Result derivation:
  - Signal analyzed
  - Replicates analyzed
  - Outliers analyzed
  - Controls analyzed
  - Calibrators analyzed
  - Signal converted to concentration based on analysis
- Pathologist and CLIA lab personnel oversight of analysis, post-analytic processing, and results


theranos

**DX 07753**

Message

| | |
|---|---|
| **From**: | Danise Yam [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DYAM] |
| **Sent**: | 11/3/2016 12:40:01 AM |
| **To**: | Gellman, Jeanne [Jeanne.Gellman@wilmerhale.com] |
| **CC**: | David Taylor [dtaylor@theranos.com]; Mugmon, Michael [Michael.Mugmon@wilmerhale.com] |
| **Subject**: | RE: Pharmaceutical payments for milestones --Privileged & Confidential |

Hi Jeanne,

Attached are –

1.) List of receipts from Pharma

2.) A contract summary (brief description of the deliverables of each contract)

3.) All related contracts

Thanks,

Danise

**From:** Gellman, Jeanne [mailto:Jeanne.Gellman@wilmerhale.com]
**Sent:** Wednesday, November 02, 2016 11:53 AM
**To:** Danise Yam <dyam@theranos.com>
**Cc:** David Taylor <dtaylor@theranos.com>; Mugmon, Michael <Michael.Mugmon@wilmerhale.com>
**Subject:** Pharmaceutical payments for milestones --Privileged & Confidential

Privileged & Confidential

Attorney-Client Communication

Hi Danise,

We have recently learned that Statements of Works for pharmaceutical clients from around 2006 to 2011 included milestones that triggered payments to Theranos, and we think it would be very helpful to obtain any records of payments made in connection with the achievement of those milestones. Would it be possible for you to provide us with a list of any such payments? It would also be very helpful if you could send us copies of the SoWs related to any such payments.

Thanks,

Jeanne

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905721

**Jeanne Gellman | WilmerHale**
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071 USA
+1 213 443 5314 (t)
+1 213 443 5400 (f)
jeanne.gellman@wilmerhale.com

Please consider the environment before printing this email.

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905722

ER-14275

File Produced in Native Format

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905723

**MASTER SERVICE PROVIDER AGREEMENT**

**THIS MASTER SERVICE PROVIDER AGREEMENT** (this "Agreement") made as of the 27th day of June, 2008 (the "Effective Date") by and between Celgene Corporation, a Delaware corporation, having its principal offices at 86 Morris Avenue, Summit, NJ 07901 (together with its subsidiaries and affiliates hereinafter collectively referred to as "Celgene") and Theranos, Inc., a Delaware corporation, having its principal office at 3200 Hillview Ave., Palo Alto, CA 94304 (hereinafter called "Service Provider").

In consideration of the mutual promises contained herein, the parties hereby mutually agree as follows:

1.     Services

    1.1    Definitions

"Affiliate" means with respect to a party, any person, corporation or other entity which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party. As used in this definition, "control" shall mean: (a) to possess, directly or indirectly, the power to affirmatively direct the management and policies of such person, corporation or other entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, or (b) direct or indirect beneficial ownership of at least fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign corporation in a particular jurisdiction) of the voting securities in such person, corporation or other entity.

"CABS" means Service Provider's ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

"Cartridge" means Service Provider's analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

"Celgene Contractors" mean independent contractors which are bound by written agreements or other legally enforceable obligations to maintain Confidential Information of Service Provider as confidential to the same extent as the Company is obligated hereunder.

"Celgene Compound" means any chemical and/or biological compound, including, but not limited to, any form or formulation thereof, which is owned or controlled by Celgene or its Affiliates, or for which Celgene or its Affiliates have been granted a license, that is used in connection with a Project.

"Participants" mean patients who are the subjects of a Project and who use the Theranos System.

"Project" means the services, clinical trials, studies or other tests or surveys designated in a Statement of Work, excluding any continuations or extensions thereof or additions thereto unless specified in the Statement of Work.

"Reader" means Service Provider's device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Service Provider, communicating with authorized parties and providing analytical information.

"Software" means computer programs, object code and related materials, in machine readable or printed form, of Service Provider and its licensors, as further described in Section 1.3, provided under a Statement of Work, including any upgrades or updates thereto that Service Provider may provide from time to time.

"Theranos System" means, collectively, the system comprised of CABS, Reader(s), Cartridges and any other components developed by or for Service Provider facilitating the operation of any of the foregoing, alone or in any combination.

"Users" means individuals, other than Participants, who are designated by Celgene to have access to CABS and who are properly trained end users of the Theranos System.

In addition, each capitalized term used in this Agreement and not defined in this Section 1.1 shall have the meaning given to such term in the relevant section of the body of this Agreement.

    1.2    Appointment

Service Provider will perform the services (the "Services") described in the Statement of Work attached hereto as Exhibit A and made fully a part hereof, according to the timeframes and schedules, and fees listed in said Statement of Work. In the event that the



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905724

**ER-14277**

parties hereto shall reach agreement with respect to the provision of additional services hereunder, such services shall be set forth in writing and attached hereto as an additional Statement of Work, and shall be made fully a part hereof, and such services shall be deemed to be Services hereunder. No such additional Statement of Work shall be attached to this Agreement without first being executed by the parties hereto. Services provided hereunder shall be governed by the terms and conditions of this Agreement and the applicable Statement(s) of Work as may be, from time to time, in effect. In the event of a conflict between the terms of this Agreement and a Statement of Work, the terms of this Agreement shall govern. Each such Statement of Work is hereby incorporated herein by reference and made a part of this Agreement.

Service Provider shall advise Celgene of the names and provide Celgene with the resume(s) of personnel prior to assigning them to perform the Services, upon the request of Celgene. Celgene reserves the right, at its sole discretion, to reject any personnel.

As necessary, Celgene shall make available to Service Provider an appropriate quantity of drug substance, and other materials to be used by Service Provider solely for the purpose of performing the Services. Upon termination of any Services, all unused drug substance, and other materials that were furnished to Service Provider by or on behalf of Celgene, shall be promptly returned to Celgene or its designee, destroyed, or retained upon study specific instructions as provided by Celgene to Service Provider.

Service Provider shall provide the necessary personnel, facilities, equipment and supplies required to perform the Services, and shall use commercially reasonable efforts consistent with its expertise to successfully complete the Services in accordance with the current state of Service Provider abilities, industry standards, and the terms of this Agreement, as such may be revised from time to time. All applicable regulatory requirements, including but not limited to Good Laboratory Practices (GLP), as appropriate to the Services, shall be followed. Service Provider agrees not to materially change or deviate from the methodologies used by it to perform a Service without Celgene's prior written consent.

1.3    Access to Software and Use of CABS

In support of the Services, Service Provider may make available to Celgene certain Software as a part of CABS. Such Software may include, without limitation, (a) Software installed on Readers ("Firmware") and (b) online or offline software services or products related to CABS which may be accessed through the Readers or at a designated website or IP address, or other designated medium or location ("Client Accessible Software").

Service Provider hereby grants to Celgene a non-exclusive, non-transferable, non-sublicensable license to use Firmware as incorporated into, and solely for use in connection with, Readers by Participants, Celgene employees and Celgene Contractors and otherwise in accordance with the terms of this Agreement, and only for the term of the particular Project for which such Firmware is made available under the applicable Statement of Work.

Service Provider hereby grants to Celgene a non-exclusive, non-transferable, non-sublicenseable license to use the Client Accessible Software for the purpose for which it is made available to Celgene and otherwise in accordance with the terms of this Agreement, and only for the term of the particular Project for which such Client Accessible Software is made available under the applicable Statement of Work. Celgene shall not allow access to the Client Accessible Software by more than the number of concurrent Users indicated in such Statement of Work.

Service Provider and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of Service Provider. Celgene shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Service Provider promptly of any such unauthorized use. Celgene shall not: (a) disassemble, decompile or otherwise reverse engineer the Software, (b) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in a Statement of Work, (c) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis or (d) create Internet "links" to or from the Software, or "frame" or "mirror" any of Celgene's content which forms part of the Software. Service Provider reserves all rights in the Software not expressly granted herein.

1.4    Use of Devices

In connection with the Services, Service Provider may make available to Celgene certain equipment, including but not limited to Readers and Cartridges (collectively, the "Devices"). Each Device will be provided to Celgene upon the terms set forth in the applicable Statement of Work.

Devices shall only be permitted to be used by (a) Celgene employees and Celgene Contractors and (b) Participants. Celgene agrees to take reasonable steps to protect the Devices from theft or use contrary to the terms of this Agreement. Celgene agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Celgene is not authorized to

-2-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

sell, rent, transfer, license or distribute the Devices, except as specifically provided in this Agreement or a Statement of Work.

Unless the Devices are purchased by Celgene pursuant to a Statement of Work: (i) Service Provider shall at all times retain ownership of the Devices, (ii) Celgene shall keep the Devices free of all security interests, liens and other encumbrances, (iii) Celgene assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Celgene and shall pay the full cost of any Devices not returned in accordance with the next paragraph, and (iv) Celgene shall permit any authorized representative of Service Provider to inspect the Devices, at a time and place, reasonably determined by Celgene, prior to the return of such Devices in accordance with the next paragraph, which may include Celgene's facilities or any other location at which the particular Project is being conducted.

Unless the Devices are purchased by Celgene pursuant to a Statement of Work, no later than ten (10) days after the earlier of completion of the applicable Project or the date of termination of this Agreement, Celgene shall, at its own cost, return to Service Provider the applicable Readers and Cartridges (other than Cartridges which have previously been consumed and properly disposed of). Such Devices shall be returned in as good a condition as when they were shipped to Celgene, ordinary wear and tear excepted.

2.      Material Transfer

From time to time, Celgene may provide to Service Provider such quantities of Celgene Compounds and/or other materials as may be specified in an applicable Statement of Work to allow Service Provider to perform the relevant services (collectively, the "Celgene Materials"). Celgene shall arrange to transfer the Celgene Materials, at Celgene's cost, to Service Provider at 3200 Hillview Ave., Palo Alto, CA 94304. Together with the Celgene Materials, Celgene shall provide to Service Provider: (a) such data and information as may be necessary to apprise Service Provider of the stability of such Celgene Materials; and (b) complete and accurate instructions for the proper storage and safe handling requirements with respect to the Celgene Materials. "Celgene Materials" may include the following as specified in each Statement of Work:

♦  Structures of relevant products
♦  Quantities of relevant materials
♦  Concentration ranges of the drug and metabolites in blood
♦  Certificates of analysis for relevant haptens

♦  Other materials/information necessary to effectively perform the Services as requested by Service Provider

The Celgene Materials will be used solely for the purposes of conducting the services by: (a) Service Provider at Service Provider' facilities; or (b) Service Provider contractors or consultants performing activities in connection with the services at external facilities; provided that each such consultant or contractor has executed a written agreement with Service Provider containing terms consistent with the terms of this agreement ("Service Provider Consultants"). Service Provider agrees to retain control over the Celgene Materials and not to transfer the Celgene Materials to any third party, other than to Service Provider Consultants, without the prior written approval of Celgene.

Service Provider agrees to use, or authorize the use of, all Celgene Materials for the sole purpose of performing the Services and not for any other services or purpose, without the prior written consent of Celgene. Except as may be required in connection with the provision of the Services, Service Provider agrees not to undertake efforts to ascertain the structure of any Celgene Compounds, nor to authorize any such efforts to be undertaken. Any and all unused Celgene Materials shall be promptly returned to Celgene upon request, except that Service Provider may retain a reference sample of each Celgene Material provided to Service Provider under an applicable Statement of Work for use by Service Provider solely for quality control purposes or to provide additional services to Celgene.

Service Provider acknowledges that the Celgene Compounds are experimental in nature and may have unknown characteristics. Service Provider therefore agrees to use prudence and reasonable care in use of the Celgene Compounds. Service Provider shall not use, nor authorize use of, the Celgene Compounds in humans for any purpose under any circumstances.

3.      Compensation

In consideration for Service Provider's performance of the Services, Celgene shall pay Service Provider a fee in the amount and on the terms specified in the applicable Statement of Work attached hereto specifying such Services. In addition, Celgene shall reimburse Service Provider for reasonable travel, shipping costs, data transmission, and other reasonable out-of-pocket expenses incurred by Service Provider in providing the Services, as set forth in the applicable Statement of Work. In the event Celgene makes any material changes in scope to the Services, the parties

-3-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905726

will agree in writing to a change order (a "Change Order") specifying any increase or decrease in the fees and expenses with respect to such Services. No Change Order may be implemented without first receiving a written approval from both parties.

4.    Confidentiality

"Confidential Information" shall, for the purpose of this Agreement, mean all information in any form, tangible or intangible, which may be disclosed by a party (the "Disclosing Party") to the other party (the "Receiving Party") in writing, orally or by observation which is nonpublic, proprietary, a trade secret, or confidential in nature and all of the information obtained from Celgene or generated by Service Provider during the course of its work for Celgene. The Receiving Party agrees to hold in trust and confidence all Confidential Information of the Disclosing Party. The Receiving Party further agrees that it shall not disclose all or any part of such Confidential Information to any third party or make any use thereof, or publish or present any work which in whole or in part uses or includes such Confidential Information, without the prior written consent of the Disclosing Party. The Receiving Party agrees to restrict access to all Confidential Information of the Disclosing Party to only such limited group of its authorized employees who (i) require such information in connection with the performance of Services under this Agreement and (ii) have agreed in writing to be bound by the terms and conditions hereof as they apply to the Receiving Party pursuant to Article 12 herein. It is understood, however, that Confidential Information shall not be deemed to include information which (a) the Receiving Party can demonstrate by its contemporaneous written records was known to it prior to the time of disclosure hereunder, (b) was lawfully revealed to the Receiving Party by a third party which has the legal right to disclose such information, or (c) is or becomes part of the public domain through no fault of the Receiving Party. The Receiving Party shall return to the Disclosing Party or destroy all Confidential Information of the Disclosing Party in tangible form (including all copies, extracts or derivatives thereof in any medium) within thirty (30) days after the termination or expiration of this Agreement, or upon request from the Disclosing Party, whichever comes first, except that the Receiving Party may keep one file copy of such information solely for purposes of monitoring compliance with this Agreement.

Notwithstanding the foregoing, the Receiving Party may use and disclose Confidential Information of the Disclosing Party as follows: (a) under appropriate confidentiality provisions substantially equivalent to those in this Agreement in connection with the performance of the Receiving Party's obligations or exercise of the Receiving Party's rights granted under this Agreement; and (b) to the extent such disclosure is reasonably necessary in filing for, prosecuting or

maintaining patents, copyrights and trademarks (including applications therefor), obtaining regulatory approvals, prosecuting or defending litigation or complying with applicable governmental regulations or is otherwise required by applicable law, provided, however, that if the Receiving Party is required by law to make any such disclosure of the Disclosing Party's Confidential Information it will give reasonable advance notice to the Disclosing Party of such disclosure requirement and, except to the extent inapplicable in the case of patent applications, will use commercially reasonable efforts to secure confidential treatment of such Confidential Information required to be disclosed. Confidential Information shall remain the property of the Disclosing Party.

For clarity, the parties agree and acknowledge that Service Provider's Confidential Information includes without limitation information disclosed by Service Provider to Celgene relating to Service Provider's monitoring and bioinformatics systems and equipment, including the Theranos System or any part thereof.

Neither party shall disclose the terms of this Agreement or any Statement of Work to any third party without the other party's prior written approval, except to employees, advisors (including financial advisors, attorneys and accountants), potential and existing investors (except that Service Provider shall not disclose any scientific research plan forming part of a Statement of Work to any existing or potential investor), potential acquirers and others on a need to know basis, in each case under circumstances that reasonably protect the confidentiality thereof. Such obligation shall not apply to disclosures which either party is required by law to make, provided that the disclosing party shall notify the other party of any such disclosure prior to such disclosure and will use commercially reasonable efforts to secure confidential treatment of this Agreement or such terms required to be disclosed. Neither party shall use the name, logos, trademarks or service marks of the other party in any publicity, advertising or disseminated information without such other party's prior written approval, except that Service Provider may list Celgene as a client of Service Provider.

5.    Intellectual Property

    5.1    Celgene Property

As between Celgene and Service Provider and to the extent permitted by law, (a) all data regarding Participants in a Project ("Participant Data") and (b) all inventions, methods, discoveries and other proprietary information that are (i) generated using trade secrets or other Confidential Information of Celgene, (ii) directed to Celgene Compounds (including, the composition of matter, method of manufacture, dosing or use thereof) and generated in performance of the Services provided

-4-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905727

by Service Provider to Celgene hereunder or (iii) generated by Celgene under this Agreement, are and shall remain, the sole and exclusive property of Celgene (collectively, "Celgene Property") and shall be maintained as Confidential Information of Celgene, subject to the terms of this Agreement. For the sake of clarity, Celgene Property shall not include any profile or pattern extracted, derived or identified by CABS' analytical engine from any data generated by CABS (including, without limitation, Participant Data)

Celgene hereby grants to Service Provider a non-exclusive license under any intellectual property rights owned or controlled by Celgene that is necessary or useful in connection with Service Provider's performance of the Services in accordance with and during the term of this Agreement.

In addition, Celgene hereby grants to Service Provider the right to transmit Participant Data through Service Provider's proprietary algorithms contained within CABS for the purpose of performing the Services under this Agreement.

5.2     Service Provider Property

Subject to Section 5.1(ii), as between Celgene and Service Provider, all inventions, methods, discoveries and other proprietary information developed in connection with the Services during the term of this Agreement and thereafter, whether by Celgene or Service Provider, or by the parties jointly, directed to: (a) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the CABS analytical engine (and the algorithms therein) and any results thereof, as well as any Cartridges customized for use in connection with a Project or (b) the generation of assays using Service Provider's proprietary methods and/or protocols for use in conjunction with the Theranos System, shall be the sole and exclusive property of Service Provider (collectively, "Service Provider Property"). Celgene shall promptly disclose to Service Provider in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence, and Celgene hereby assigns to Service Provider any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information, including all intellectual property rights therein.

Upon full payment by Celgene of the fees due under an applicable Statement of Work, Service Provider shall grant to Celgene an exclusive, world-wide, royalty-free license to any assays for use on Cartridges, developed under Section 5.2(b), for Celgene Compound generated as a result of performance of the Services. This exclusive license shall be solely for the specific purpose of using Theranos Systems containing such assays on Cartridges for real-time PK(/PD) profiling at prices specified in the applicable Statement

of Work. Celgene shall be prohibited from providing Service Provider Property to any third party or Affiliate for the purpose of supplying or reproducing such Service Provider Property, except as may be permitted pursuant to an agreement signed by Celgene and Service Provider, which shall be negotiated by the parties in good faith.

Service Provider may request that Celgene provide to Service Provider any data regarding the use, functionality or operation of the Cartridges, Readers or any other aspect of the Theranos System generated in connection with this Agreement.     Notwithstanding anything to the contrary in this Agreement, and subject to Celgene's rights in the Celgene Property, Service Provider shall have the right to use and disclose any data described in the preceding sentence to further develop, use, make, have made, sell, market or otherwise exploit any aspect of the Theranos System during the term of this Agreement and thereafter, including, without limitation, in connection with any regulatory filing for the Theranos System or any component thereof.

6.     Term and Termination

This Agreement shall be effective commencing on the Effective Date and shall remain in full effect until June 28, 2018 and may be renewed by mutual consent of Service Provider and Celgene for such additional period as the parties may agree upon, provided, however, that either party may terminate this Agreement and/or the applicable Statement(s) of Work at any time upon sixty (60) days written notice to the other party. A party shall have the right to terminate this Agreement immediately upon the material breach of any of the terms herein by the other party. In the event of termination by Celgene for any reason other than Service Provider's material breach of the terms of this Agreement, Service Provider shall be reimbursed for costs incurred directly in the performance of the Services prior to the date of the notice of termination, and for all reasonable non-cancelable commitments incurred directly in the performance of the Services and outstanding as of that date, provided that Service Provider uses reasonable efforts to mitigate same.

No later than ten (10) days after any termination of this Agreement or any Statement(s) of Work, Celgene shall return to Service Provider all Service Provider property in its possession or control, including: (a) all Confidential Information of Service Provider; (b) all Devices and Client Accessible Software provided under this Agreement or the applicable Statement(s) of Work; and (c) all authorization codes providing Participants and/or Users with access to the Theranos System in connection with the applicable Statement(s) of Work, unless, in each case, otherwise provided in any applicable Statement of Work. In addition, Celgene shall ensure that all relevant

-5-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905728

ER-14281

Participants, Users and other Celgene employees and consultants cease using the Theranos System promptly following any such termination of this Agreement or the applicable Statement(s) of Work.

Articles 4, 5, 6, 9, 14, 16 and 18 and Sections 1.3 (the fourth paragraph only), 1.4 (excluding the first paragraph), 12.1, 12.3 and 15.3 shall survive expiration or termination of this Agreement for any reason. Except as otherwise provided in this Article 6, all rights and obligations of the parties under this Agreement shall terminate upon expiration or termination of this Agreement for any reason.

7.      Independent Contractor

The relationship of Service Provider to Celgene is that of an independent contractor and nothing herein shall be construed as creating any other such relationship. Service Provider may adopt such arrangements as it may desire with regard to the details of the Services performed hereunder, the hours during which the Services are to be provided, and the place or places where the Services are to be furnished, provided that such details, hours and places shall be consistent with the proper accomplishment of the Services, and provided further that the Services shall be performed in a manner reasonably designed to attain the most satisfactory results for Celgene.

8.      Safety Compliance

In the event Service Provider is to perform any of the Services on Celgene's premises, Service Provider agrees that it shall comply with the applicable safety rules and regulations of the particular location where the Services are to be performed, and Celgene agrees that said safety rules and regulations shall be made available to Service Provider before the commencement of performance of any such Service.

9.      Indemnification

9.1      By Service Provider

Service Provider shall indemnify, defend and hold harmless Celgene and its officers, directors, employees and agents from and against all claims, causes of action, suits, damages and costs (including, without limitation, reasonable attorneys' fees incurred in connection with the defense or settlement of any such matter) (collectively, "Claims") arising out of, resulting from or otherwise in respect of the negligent acts or omissions of Service Provider or its officers, directors, employees or agents pertaining to the activities to be carried out pursuant to Service Provider's obligations under this Agreement; provided, however, that the foregoing shall not apply with respect to Claims to the extent arising out of the negligence or willful misconduct

of Celgene or its officers, directors, employees or agents. Celgene shall notify Service Provider of any such Claim made against it within ten (10) days of the date on which Celgene first becomes aware of the Claim.

In addition, Service Provider shall (a) defend or, at its option, settle any claim or suit against Celgene on the basis that the Theranos System infringes any United States trademark, copyright, trade secret or patent of a third party ("Intellectual Property Rights") and (b) pay any final judgment entered against Celgene on such claim or suit or any settlement thereof, provided that: (i) Service Provider has sole control of the defense and/or settlement of such claim or suit, (ii) Celgene notifies Service Provider promptly in writing of each such claim or suit and gives Service Provider all information known to Celgene relating thereto, (iii) Celgene cooperates with Service Provider in the settlement and/or defense and (iv) Celgene may not settle or compromise such claim or suit except with the prior written consent of Service Provider. Celgene shall be reimbursed for all reasonable out-of-pocket expenses incurred in providing any cooperation requested by Service Provider. If all or any part of the Theranos System is, or in the opinion of Service Provider may become, the subject of any claim or suit for infringement of any Intellectual Property Rights, Service Provider may, at its option and expense: (A) procure for Celgene the right to continue use of the Theranos System or the affected part thereof, (B) replace the Theranos System or affected part thereof, (C) modify the Theranos System or affected part thereof to make it non-infringing or (D) if none of the foregoing remedies are commercially feasible, terminate this Agreement and refund the aggregate payments made by Celgene for the Theranos System or the affected part thereof. Service Provider shall have no obligation under this paragraph to the extent a claim is based upon (1) use of any version of the Software other than a current, unaltered version, if infringement would have been avoided by a current, unaltered version or (2) combination, operation or use of the Theranos System or the Software contained therein with other software and/or hardware not provided by Service Provider. This paragraph states the entire liability of Service Provider and the exclusive remedy of the Celgene with respect to any infringement or alleged infringement by the Theranos System or any part thereof.

9.2      By Celgene

Celgene shall indemnify, defend and hold harmless Service Provider and its officers, directors, employees and agents from and against all Claims arising out of, resulting from or otherwise in respect of the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of Celgene (including any personal

-6-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905729

injury or property damage related thereto), except where such Claims are the result of negligence or willful misconduct of Service Provider or its officers, directors, employees, or agents. Celgene shall have no obligation to indemnify, defend or hold harmless Service Provider against Claims arising from a failure of Service Provider or its staff or agent(s) to (i) comply with any applicable Food and Drug Administration or other governmental requirement or (ii) adhere to the terms and conditions of this Agreement. Service Provider shall notify Celgene of any such Claim made against it within ten (10) days of the date on which Service Provider first becomes aware of the Claim.

9.3    Indemnification Procedure

To be eligible to be indemnified under this Article 8, the indemnified party shall provide the indemnifying party with the exclusive ability to defend (with the reasonable cooperation of the indemnified party) or settle any such claim, provided, however, that the indemnifying party shall not enter into any settlement that admits fault, wrongdoing or damages without the indemnified party's prior written consent, which consent shall not to be unreasonably withheld or delayed. The indemnified party shall have the right to participate, at its own expense and with counsel of its choice, in the defense of any claim or suit that has been assumed by the indemnifying party.

10.    Equal Opportunity

Service Provider acknowledges that it understands that Celgene is an Equal Opportunity Employer and Service Provider warrants that Service Provider complies with the Fair Labor Standard Act of 1938, as amended. Service Provider agrees that, if this Agreement is construed to be a subcontract within the meaning of the Rules and Regulations approved by the United States Secretary of Labor pursuant to Executive Order 11246, as amended, the Vietnam Era Veterans Readjustment Act of 1974, as amended, or the Rehabilitation Act of 1973, as amended, or of the regulations issued pursuant to Executive Order 11625, the provisions of those regulations as well as the Equal Opportunity and Nondiscrimination provision of Section 202 of Executive Order 11246 shall be incorporated herein by reference and shall be binding upon Service Provider as part of this Agreement.

11.    Insurance

Commencing with the performance of Services hereunder, Service Provider shall during the term of Service Provider's obligations under Article 8 hereof maintain insurance of the type and minimum coverage indicated below. The term of coverage shall be evidenced by certificates of insurance to be furnished at Celgene's request.

| Type | Minimum Limits |
|---|---|
| Worker's Compensation | Statutory |
| Employer's Liability | $100,000 |
| General Liability | $1,000,000 (Combined single limit) |
| Automobile – any auto | $1,000,000 (Combined single limit) |

12.    Warranties; Regulatory Compliance; Waiver of Warranty

12.1    Warranties

Each party hereby represents and warrants to the other party that: (i) it has the legal authority to enter into this Agreement, (ii) it has no obligations to any third party which (a) will in any way limit or restrict its ability to perform its obligations hereunder or (b) conflict with this Agreement, and (iii) it shall not disclose to the other party, nor make any use of in the performance of this Agreement, any trade secrets or confidential or proprietary information of any third party without the consent of such third party.

Service Provider represents and warrants to Celgene that (i) it possesses the necessary expertise to perform the Services hereunder consistent with the highest standards of the industry, and (ii) Service Provider (including, to its knowledge, its employees, agents and subcontractors) has not been debarred or suspended by the FDA from providing services to a company that has a pending or approved drug product application.

Service Provider represents and warrants that the Services will be performed in conformity with current generally accepted standards for the type of services specified, it will follow any protocols, study plans and/or exhibits where applicable, and it is the responsibility of Service Provider management to establish appropriate quality assurance, quality controls and review procedures. Service Provider will maintain high standards of professional conduct in the performance of work done under this Agreement and in the preparation of reports, and warrants that it will comply with all federal, state, and local laws, rules and regulations applicable to the work performed by it hereunder.

Celgene represents and warrants that it has obtained, and shall continue during the term of each Project to obtain, all necessary consents to be able to provide to Service Provider and to permit Service Provider to use for all purposes specified in this Agreement Participant Data and other data provided by Celgene or otherwise furnished to Service Provider in connection with any Statement of Work.

12.2    Regulatory Compliance

-7-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905730

Service Provider and Celgene recognize that it is possible that a regulatory agency, acting within its scope of authority, may at some time take regulatory action against Service Provider. Service Provider agrees to inform Celgene promptly of any such regulatory action taken against Service Provider that is relevant to the Services and to provide a copy of any written correspondence received from a regulatory agency that may affect such Services; provided, however, that Service Provider shall be entitled to redact confidential information of Service Provider or its customers that is not relevant to an assessment of the effect that such regulatory action may have on such Services.

Service Provider shall notify Celgene of any request received by Service Provider from any applicable regulatory agency to inspect or otherwise gain access to the information, data or materials pertaining to the Services performed by Service Provider under this Agreement. Service Provider shall notify Celgene of such requests prior to permitting any third party access unless prior notice is not possible. Service Provider agrees to permit inspection of such information, data and materials by authorized representatives of such agencies as required by law. Service Provider will provide Celgene with copies of such notice(s) and related correspondence and permit Celgene representatives to attend such visits. At Celgene's request and expense, and at a mutually agreeable time, Service Provider will accompany Celgene to such agencies to discuss relevant aspects of the Services performed hereunder. Celgene agrees to compensate Service Provider, at its then current rates, for its employees time, for such services.

In the event that Service Provider becomes debarred by the FDA, this Agreement shall automatically terminate upon receipt of such notice without any further action or notice, subject to the provisions of Article 5.

Any termination of this Agreement under this Section 11.2 shall be deemed to be a termination by Celgene for default by Service Provider pursuant to Article 5.

12.3    Waiver of Warranty

All Celgene materials, including all unused compounds, drugs, devices, and other related materials furnished to Service Provider are provided by Celgene "AS IS." CELGENE MAKES NO REPRESENTATIONS AND EXTENDS NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE CELGENE MATERIALS AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE OR USE. CELGENE DISCLAIMS ALL WARRANTIES OF NON INFRINGEMENT WITH RESPECT TO ANY THIRD PARTY RIGHTS AND TITLE, INCLUDING PATENT RIGHTS, IN THE CELGENE MATERIALS.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY STATEMENT OF WORK, SERVICE PROVIDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR THE THERANOS SYSTEM (OR ANY PART THEREOF) OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER ANY STATEMENT OF WORK, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF SERVICE PROVIDER OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

IN NO EVENT (A) SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE TOTAL FEES PAID BY AND DUE FROM CELGENE HEREUNDER. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS ON LIABILITY AND DAMAGES IN THE PRECEDING SENTENCE SHALL NOT (1) APPLY TO LIABILITY OR DAMAGES TO THE EXTENT ARISING FROM A BREACH UNDER ARTICLES 3 OR 4 OR FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT; NOR (2) LIMIT THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER ARTICLE 8 WITH RESPECT TO AMOUNTS OWING TO THIRD PARTIES.

13.    Undertaking of Employees, Agents, Consultants and Subcontractors of Service Provider

Service Provider may not assign or subcontract any part of the Services to any third party unless Celgene has been specifically informed of the subcontractor, and has agreed in writing to such assignment or subcontract. Service Provider shall notify Celgene, prior to beginning any Services, of any portion of the Services that Service Provider is unable to perform directly.

-8-



FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905731

**ER-14284**

In the event any Services are to be conducted by a third party, Service Provider shall, at all times, remain liable for the performance of its subcontractors.

Each party acknowledges and agrees that it is a condition precedent to the other party's obligations under this Agreement that each employee, agent, consultant and/or subcontractor of such party who will receive Confidential Information of the other party and/or perform Services hereunder shall agree in writing to be bound by confidentiality and invention assignment obligations at least as protective as the corresponding terms and conditions hereof, as they apply to such party, prior to the earlier to occur of (i) any disclosure of any Confidential Information of the other party to such employee, agent, consultant or subcontractor or (ii) the commencement of any Services contemplated under this Agreement by such employee, agent, consultant or subcontractor.

14.     Tax Reporting and Payment

Any tax or other governmental charges that apply to this Agreement or to the compensation payable to Service Provider hereunder are conclusively presumed to be included in such compensation and accordingly, any such tax or governmental charge shall not be added to any invoice submitted by Service Provider. Celgene is not responsible for payment of any employment, self-employment, or similar taxes imposed as a result of the performance of Services under this Agreement, whether by Service Provider or its employees, agents, consultants or sub-contractors.

15.     Celgene Audit; Reports; Retention of Records, Data and Samples

15.1    Celgene Audit Rights

Service Provider agrees to allow Celgene authorized representatives to visit Service Provider's facilities upon reasonable prior written notice and at reasonable times to observe the progress of the Services, and, not more than once per year during the term of this Agreement, to inspect those facilities of Service Provider and records which are being utilized in performing the Services. In the event the security requirements of Service Provider's other clients conflict with the visits of Celgene representatives, a compatible visitation schedule will be negotiated between Celgene and Service Provider.

Celgene shall designate representatives to participate in meetings to review the performance of the Services by Service Provider and Celgene's designated representatives shall have access at reasonable times to observe the Services in progress or review any and all records generated as a result of performance of the Services, in accordance with the preceding paragraph.

15.2    Reports

Service Provider shall provide Celgene with oral and/or written progress reports as set forth in the applicable Statement of Work.

15.3    Retention of Records, Data and Samples

Service Provider will complete the Services as set forth in the Statement(s) of Work. All raw data in paper or electronic form, including but not limited to all laboratory notebooks, descriptions, methods, and procedures, produced in performance of the Services, will be retained by Service Provider in compliance with applicable regulatory requirements. It is further agreed that Service Provider shall hold the data for a period of at least two (2) years. Six (6) months prior to the termination of the two (2) year period, Service Provider will notify Celgene in writing and request direction from Celgene as to whether Service Provider can destroy the data, return the data to Celgene or Celgene's designee, at Celgene's expense, or continue to store the data for a fee. Samples shall be stored by Service Provider, as applicable, for the period set forth in the applicable Statement of Work.

16.     Notices

Any required notice under this Agreement, including, but not limited to, notices of breach, termination, amendment, force majeure and assignment, shall be in writing and shall be made by overnight courier or certified mail, return receipt requested, and will be deemed given as of the date it is received by the receiving party. Such required notice shall be given to the parties at the address listed below:

If to Service Provider:

Theranos, Inc.
3200 Hillview Ave.
Palo Alto, CA 94304
Attn: Elizabeth Holmes

If to Celgene:

Primary Contact of Project
Operations Manager, Early
Drug Development
Celgene Corporation
86 Morris Avenue
Summit, NJ 07901

Copy to Vice President, Legal and Chief Counsel at the same address
Fax: (908) 673-2771

-9-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905732

**ER-14285**

Any general communications regarding the Services shall be provided to the Celgene representative as set forth in the applicable Statement of Work.

17.    Delays

Service Provider shall use commercially reasonable efforts to successfully complete the Services in accordance with the timeline, if any, set forth in the applicable Statement of Work. Service Provider will require documents, data, records and cooperation by Celgene in order to properly perform the Services, and Service Provider is not responsible for errors, delays or other consequences arising from the failure of Celgene or its employees, agents or contractors to provide such documents, data, records or cooperation in a timely manner. Whenever Service Provider becomes aware that it will not be able to successfully complete any Service, it shall promptly notify Celgene in writing. Service Provider shall then propose, and the parties shall endeavor to agree upon, a mutually acceptable solution to bring the Services back in accordance with the applicable Statement of Work and/or take appropriate action to remedy the matter. In the event the Services fall behind schedule based upon factors within the reasonable control of Service Provider, Celgene will not be responsible for reimbursing Service Provider for any costs or expenses incurred by Service Provider to progress the Services to return back to the schedule in accordance with this Article 17 unless agreed to in accordance with the terms of Article 3 (Compensation).

18.    Miscellaneous Provisions

18.1    Assignability

Neither party shall have the right to assign this Agreement or any of the rights or obligations hereunder without the prior written consent of the other party. Any attempted assignment of this Agreement in violation of this Section 17.1 shall be void.

18.2    Relief

In the event of the actual or threatened breach by a party of any of the terms of Articles 3 or 4 hereof, the other party shall have the right to specific performance and injunctive relief. The rights granted by this Section 17.2 are in addition to all other remedies and rights available at law or in equity.

18.3    Complete Agreement

This Agreement, together with all Statement(s) of Work attached hereto, constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and there are no other agreements or understandings, written or oral, between

the parties relating to the subject matter of this Agreement.

18.4    Amendments

This Agreement may not be altered, changed or amended except by a writing signed by each of the parties hereto.

18.5    Severability

In the event that any provision of this Agreement is held illegal or invalid for any reason, such provision shall not affect the remaining parts of this Agreement, but this Agreement shall be construed and enforced as if that legal and invalid provision had never been inserted herein.

18.6    Captions and Headings

The captions and headings in this Agreement are for convenience and reference only, and they shall in no way be held to explain, modify, or construe the meaning of the terms of this Agreement.

18.7    Counterpart Originals

This Agreement may be executed in two counterparts, both of which together shall constitute one and the same document.

18.8    Governing Law; Jurisdiction

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to the choice of law principles thereof.

18.9    Force Majeure

Any events or other causes beyond the reasonable control of a party (and which do not arise out of a breach by a party of its obligations hereunder) which prevent a party from fulfilling its duties as set forth herein shall operate to suspend the obligations of such party during the period required to remove such cause. A party whose obligations are so suspended will notify the other promptly of the occurrence of any such event and will use commercially reasonable efforts to minimize the duration and disruption of any such event. If Celgene delays or suspends a Project for a significant period of time due to no fault of Service Provider, and Celgene requests that Service Provider staff continue to be assigned to the Project during the period of such delay or suspension, a monthly services fee will be charged, in an amount and schedule mutually agreed upon by Service Provider and Celgene and that is consistent with Service Provider's general practices for calculation of such monthly service fees. Such delay

-10-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905733

ER-14286

shall last no longer than three (3) months, after which
time Service Provider shall have the right to terminate or
amend this Agreement and/or the applicable Statement
of Work.


IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to sign this
Agreement effective as of the Effective Date.

THERANOS, INC.                                    CELGENE CORPORATION

By: _____                    By: _____
     Elizabeth Holmes                                  Thomas O. Daniel, M.D.

Title: President and Chief Executive Officer      Title: President, Research



Legal Department:



-11-

FOIA Confidential Treatment Requested by Theranos                                    THER-0905734
Fed. R. Crim. P. 6(e) material

ER-14287

shall last no longer than three (3) months, after which time Service Provider shall have the right to terminate or amend this Agreement and/or the applicable Statement of Work.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to sign this Agreement effective as of the Effective Date.

THERANOS, INC.

By: _____

Elizabeth Holmes

Title: President and Chief Executive Officer

CELGENE CORPORATION

By: _____

Thomas O. Daniel, M.D.

Title: President, Research

Legal Department:

-11-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

| PAYMENT REMITTANCE INFORMATION<br>(NOTE: W-9 MUST BE INCLUDED FOR PAYMENT) | |
|---|---|
| **Check Payable to:** | |
| Company Name: | Theranos, Inc |
| | (Medical Unit/Attn will not appear on the face of the check) |
| Address: | 3200 Hillview Ave |
| Address: | |
| City: | Palo Alto State: CA Zip Code: 94304 |
| | (Information must be accurate for IRS and FDA purposes) |

**Invoices** are to be sent to the attention of:

Celgene Corporation
P.O. Box 1007
Summit, N.J. 07902-1007
Attn: <u>Accounts Payable</u>

Celgene shall pay the amount of each invoice received from Service Provider within thirty (30) days of receipt by Celgene, provided, that Service Provider has completed and returned to Celgene, as necessary, a Form W-9 as attached and unless Celgene has notified Service Provider within such thirty (30) day period that it disputes any particular invoiced item(s), which dispute the parties shall attempt in good faith to resolve. Because of the difficulty in substantiating the validity of claims for payment increases with time, Celgene reserves the right to decline to pay on invoices more than one hundred eighty (180) days after an expenses has been incurred. In no event will Celgene pay on invoices submitted more than one hundred eight (180) days after an expense has been incurred.

**Institutions Accounts Receivable Contact Information:**

**Name: Danise Yam**

**Phone: 650 470 6204**

**Fax: 650 838 9165**

**Email: dyam@theranos.com**

**[W-9 FORM FOLLOWS]**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905736

| Form **W-9**<br>(Rev. October 2007)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | Give form to the<br>requester. Do not<br>send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)
Theranos, Inc

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor ☒ Corporation ☐ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ ........
☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
3200 Hillview Ave

Requester's name and address (optional)

City, state, and ZIP code
Palo Alto, CA 94304

List account number(s) here (optional)

*Print or type*
*See Specific Instructions on page 2.*

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number
20 : 1231826

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**  Signature of U.S. person ▶   Date ▶ 9/18/2008

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                                          Form **W-9** (Rev. 10-2007)

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905737


*theranos*
redefining healthcare

**STATEMENT OF WORK**     **Program ID: CELG-001**

**Theranos System & Revlimid in CLL: CELGENE**

**Theranos Systems enable users to extract actionable information from blood test results and data analyses to rapidly enhance the value of key therapies.**

Contact:

Dr. Marc Thibonnier
Theranos, Inc.

Phone: 650.470.6192
mthibonnier@theranos.com

**July, 2008**     www.theranos.com

Theranos, Inc. 3200 Hillview Avenue, Palo Alto, CA 94304

*p.* +1.650.838.9292     *f.* +1.650.838.9165     www.theranos.com

---

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0905738

ER-14291



**THERANOS, INC. – CELGENE**

**STATEMENT OF WORK**

This Statement of Work is entered into pursuant to the Master Service Agreement, effective as of July, 2008 (the "Service Agreement"), by and between Theranos, Inc. ("THERANOS") and Celgene Corporation ("COMPANY" or "CELGENE"). All defined terms used herein have the same meanings as set forth in the Service Agreement unless otherwise specifically defined herein..

Chronic lymphocytic leukemia is the most frequent form of all leukemias in adults. In the USA, more than 17,000 new cases are being reported every year. Revlimid, which is already approved for the treatment of multiple myeloma, may fill an unmet medical need in patients with CLL. Current projections estimate that the drug may gain regulatory approval in 2010 for that additional indication. Financial analysts estimate that Revlimid could generate up to $6.5 billion dollars annually when introduced as a therapy for CLL patients[1].

Fast-tracking approval of Revlimid in CLL and demonstrating the best possible risk/benefit profile for patients will result in significant patient benefit and great value creation for Celgene.

In the course of treating CLL patients with Revlimid, the phenomenon of tumor flare has been observed, but its underlying mechanisms remain to be elucidated. As such, the THERANOS System will be used to profile the tumor flare phenomenon to predict which CLL patients will develop tumor flares on Revlimid and when the flare will manifest clinically (the "Project") in order to optimize the risk/benefit profile for each patient on the therapy and to ultimately increase patient safety, physician comfort with the therapy, prescriptions, and reimbursement coverage.

THERANOS will furnish to COMPANY the Services as set forth herein:

**KEY PROJECT OBJECTIVES**

- Compare the results of the Theranos System running a multiplexed panel of cytokine assays on archived plasma samples to different reference tests
- Characterize the dynamics profile associated with the change in rate of protein panels in blood for use in comprehensively profiling the onset of tumor flare in future studies.
  - Characterize the mechanism(s) of tumor flares in CLL patients on Revlimid
  - Obtain preliminary insight into trends in the circulating proteins prior to clinical manifestations of the flare and correlate them with drug exposure, patient and tumor characteristics
  - Lay the foundation for determining the optimal dose-response profile to prevent secondary clinical complications in future studies

**PROJECT PARAMETERS**

| Project | Revlimid-CLL |
|---|---|
| Analytes | Reference methods: Multiplexes of TNF-$\alpha$, sIL-2r, IL-6, GMCSF, MCP, MIP1-$\beta$, IL-8, MDC, IFN-$\gamma$, m30, m65, nDNA, BCL-2, IL-10, IL-13, IL-4, IL-1$\alpha$, CRP |
| Assay Development | Customization of reference methods for screening samples |
| Sample Types | Plasma – ~ 2mL desired, 1 mL acceptable for 18 analytes |
| Sites (Number) – Location | 1 – Theranos |
| Total Number of Samples | Paired samples from 20 patients (one at baseline, another at one week of treatment) |

---

[1] Estimates for 100,000 patients at $65,000 treatment cost per year

---

Theranos, Inc. Confidential                                                page 2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905739



| | |
|---|---|
| Number of Time Points | Two (one at baseline, another at one week) |
| Number of Cartridges for Study | TBD |
| Number of Readers | TBD |
| Length of Participant Participation | N/A |
| Localization/Languages for Translation | English |
| Touch Screen Interface Questions/Customization | N/A |
| Data Infrastructure | Purchase and configure a unique CELGENE-specific server and database |
| Expected Start Date (Date when plasma samples will be shipped to Theranos) | September, 2008 |
| Expected End Date (Date when data on all analytes will be available from all samples) | ~ 1 month |
| Total Duration of Services | TBD |
| Investigator Meeting ("IM") Date and Location / Calibration/Validation Start | (N/A |

### Data Delivery & Transfer

- During the Project, Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via TheranOS.
  - Cumulative data transfers can be executed by CELGENE at any time via the Export Utility in the Data Delivery component of TheranOS.

## PROJECT BUDGET AND PAYMENT SCHEDULE

| Products and Services: CELG-001 | Fees USD |
|---|---|
| Services (as described above)<br><br>Data delivery, client infrastructure and 24x7 customer care support<br><br>Product Delivery and Clinical Use:<br>❖ Distribution, trial definition/project management, services configuration/software customization (TheranOS), analytics, and Company-specific secure back-end database and server infrastructure<br>❖ Set up and Infrastructure, Real-time and reference method analysis, 40+ samples, 18 analytes each at $100 per analyte | $106,500 |
| Goodwill Investment: Cost-based pricing | |

| Payment Schedule | Amount Due (USD) |
|---|---|
| | $106,500 |
| Upon Execution of SOW:<br>▪ Commitment of Theranos Resources<br>▪ Procurement of THERANOS Systems<br><br>Additional Samples on a Purchase Order basis | |

Please note that should the scope, duration or parameters of this Project (*e.g.*, requirements for configuration and/or support) change, associated fees may need to be revised and no Services will be provided for such new scope or parameters until the parties hereto amend this Statement of Work to reflect such changes.

---

Theranos, Inc. Confidential

page 3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905740



For internationally based trials contract denomination will be in U.S. currency. Payments made to THERANOS will be made in U.S. currency.

### Late Payments
- All invoices not paid in thirty (30) days shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

### Trial Delays
- If CELGENE delays or suspends the Project for more than thirty (30) days due to no fault of THERANOS, and CELGENE requests that THERANOS staff continue to be assigned to the Project during the period of such delay or suspension, (i) CELGENE will pay to THERANOS all amounts due and payable through the date of such delay or suspension and (ii)a monthly services fee will be charged, in an amount and schedule reasonably determined by THERANOS consistent with THERANOS' general practices for calculation of such monthly service fees. Such delay shall last no longer than three (3) months, after which time THERANOS shall have the right to terminate or amend this Statement of Work.

### Expense Disbursements and Pass-through Costs
- In addition to the Products and Services fees described above, THERANOS charges for third-party expense disbursements and other costs incurred in connection with the performance of the Services. These costs include, but are not limited to, THERANOS personnel travel and lodging (including travel to all IMs or IM sites and services related activities), telecommunications, printing, additional touch-screen customizations, and any incidental expenses incurred to provide or in support of the Services outlined in this Statement of Work. Such costs will be billed monthly and will be due and payable by COMPANY within fifteen (15) days of receipt of invoice.

### Shipping and Data Transfer Costs
- THERANOS will be responsible for shipping all hardware to COMPANY and establishing the data transmission infrastructure. Readers will be leased to COMPANY by THERANOS solely for the duration specified under "PROJECT PARAMETERS" above. THERANOS will bill COMPANY monthly for shipping and related transportation costs as well as data transmission costs from the readers and apply an administrative fee.

## TRIAL COMMUNICATIONS

All communications provided for in this Statement of Work shall be made by confirmed fax receipt, express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

### THERANOS Contacts

Project Matters
Dr. Marc Thibonnier
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6192
Fax (650) 838-9165

Billing Matters
Danise Yam
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6204
Fax (650) 838-9165

### CELGENE Contacts

Project Matters
[CELGENE to provide]
[Insert Address]

Bill Invoices To
[CELGENE to provide]
[Insert Address]

---

Theranos, Inc. Confidential

page 4

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905741



If applicable, please provide a PO # to expedite billing: _____

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

| THERANOS, INC. | COMPANY |
|---|---|
| Signature | Signature |
| ELIZABETH HOLMES | Name (please print) THOMAS DANIEL |
| PRESIDENT & CEO | Title PRES. RESEARCH |
| Date August 26, 2008. | Date August 22, 2008 |

**Please sign and date two (2) originals and send both to THERANOS for signature via traceable mail (e.g., UPS or FedEx). One executed original will be returned to COMPANY.**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905742

ER-14295



Celgene Corporation
86 Morris Avenue
Summit, NJ 07901
Tel 908-673-9000
Fax 908-673-9001

**CHANGE ORDER**

Change Order No.: ___1___ to Agreement dated: ___October 1, 2008___
Program ID: ___CELG-0002___

| Study Drug: ACE-011 | Protocol: N/A | Requester: Victor Sloan |
|---|---|---|
| Service Provider: Theranos | Service Provider Contact: Jodi L. Sutton | Date of Request: October 12, 2009 |

Original Specifications (if applicable):
- Service Provider provision of learning engine for Celgene which dynamically models bone/erythropoesis blood pressure and endocrine physiologies and pathophysiologies.

Change in Specifications/New Specifications:
- Service Provider will additionally develop and deliver to Celgene a complete report characterizing a dose modification scheme that accounts for hemoglobin measures (efficacy) and blood pressure requirements (safety) in the treatment and monitoring of ESKD patients. The report will include, but not be limited to: (1) a set of dose modification rules intended for codification and operationalization suitable for inclusion in an IND application and/or clinical study protocol, and (2) all supporting simulation results.

| Activity | Billing Unit | Unit Price | No. of Units | Costs | | |
|---|---|---|---|---|---|---|
| | | | | Professional Fees | Pass-Through | Total |
| Dose Modification Scheme | Report | $25,000 | 1 | $25,000 | $500 | $25,500 |
| | | | Total: | $25,000 | $500 | $25,500 |

| Total Change Order (Currency): **$25,500.00** | Total Contract and Change Orders (including this one) Cost (Currency): **$3,285,500.00** (Original contract: **$3,260,000.00**; CO#1: **$25,500.00**) |
|---|---|

Implementation of this change is expected to have the following effect on the Program timeline:
No effect on original timeline. Timeline for completion of additional services estimated at 3 weeks.

| Authorized signatures (Provider) | Date: 10 Nov 2009 |
|---|---|
| Authorized signatures (Celgene): Sol J. Barer, Ph.D., Chairman & CEO | Date: 11/5/09 |

Acceptance: The services and costs identified in this Change Order are hereby accepted. All work is to be performed under the same terms and conditions as specified in the applicable Statement of Work and Master Agreement unless otherwise stipulated.



Celgene_Theranos_Data Modeling SOW_CO#1_FINAL_19Oct2009
Confidential

Page 1 of 4
Celgene Contract ID #7814

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905743

**ER-14296**



**Celgene Corporation**
86 Morris Avenue
Summit, NJ 07901
Tel 908-673-9000
Fax 908-673-9001

## Exhibit A
## Cumulative Budget Build-Up

| Activity | Original Agreement | Change Order #1 | Total Cumulative Fees |
|---|---|---|---|
| Learning Engine, Model Development, and Exclusive Access | $1,750,000 | | $1,750,000 |
| TheranOS System Customization, mapping MOA compound | $1,500,000 | | $1,500,000 |
| Dose Modification Scheme | | $25,000 | $25,000 |
| Pass-through Fees | $10,000 | $500 | $10,500 |
| **Total** | $3,260,000 | $25,500 | $3,285,500 |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905744

**ER-14297**



Celgene Corporation
86 Morris Avenue
Summit, NJ 07901
Tel 908-673-9000
Fax 908-673-9001

**Exhibit B**

**Payment Schedule**

| Celgene Budget Category | Trigger | Invoice Amount |
|---|---|---|
| Dose Modification Scheme | Delivery of complete, final dose modification report, as confirmed by Celgene | $25,000 |
| | **Professional Fees Total:** | **$25,000** |
| Pass-through costs | Monthly | Actual costs |

Invoices must reference purchase order (PO) number **5001827** and are to be sent to the attention of:

> Celgene Corporation
> Attn: Accounts payable
> PO Box 1007
> Summit, NJ 07902-1007
> Referencing: Victor Sloan

Celgene shall pay the amount of each invoice received from the Service Provider within forty-five (45) days of receipt by Celgene, unless Celgene has notified Service Provider within such forty-five (45) day period that it disputes any particular invoiced item(s), which dispute the parties shall attempt in good faith to resolve.

Because of the difficulty in substantiating the validity of claims for payment increases with time, Celgene reserves the right to decline to pay for expenses that are invoices more than ninety (90) days after the expense has been incurred. In no event will Celgene pay on invoices submitted more thane one hundred eighty (180) days after an expense has been incurred.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905745

**ER-14298**



Celgene Corporation
86 Morris Avenue
Summit, NJ 07901
Tel 908-673-9000
Fax 908-673-9001

**Exhibit C**

**Communications**

All communications provided for in this Change Order may be made via email, express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

**Theranos Contacts**

Project Matters
Seth Michelson
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6192
Email: smichelson@theranos.com

Billing Matters
Danise Yam
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6204
Email: dyam@theranos.com

**Celgene Contacts**

Project Matters
Victor Sloan
106 Allen Road, Suite 402
Basking Ridge, NJ 07920
Ph. (908) 860-7478
Fax (908) 860-7510
Email: vsloan@celgene.com

Billing Matters
As noted above

Celgene_Theranos_Data Modeling SOW_CO#1_FINAL_19Oct2009
Confidential

Page 4 of 4
Celgene Contract ID #7814

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905746

## CHANGE ORDER NO. 2 to STATEMENT OF WORK: CELG-0002

### ANNUAL UPDATES & ANALYSES LICENSE AND SERVICES; STUDY REPORTS, FRACTURE-HEALING MODELING & ACE-011 STUDIES

THIS CHANGE ORDER ("Change Order") TO "STATEMENT OF WORK CELG-0002" ("Statement of Work") is effective as of Sept 14, 2009, and shall terminate as of date the Services specified herein are completed, by and between Celgene Corporation, a Delaware corporation, having its principle offices at 86 Morris Avenue, Summit, NJ 07901 (together with its subsidiaries and affiliates hereinafter collectively referred to as "Celgene") and Theranos, Inc., a Delaware corporation, having its principle offices at 3200 Hillview Avenue, Palo Alto, CA 94304 (hereinafter called "Service Provider"). The parties acknowledge that any work contemplated herein that was initiated prior to the execution of this SOW was done in good faith and with the understanding that said work shall be governed by the terms hereof.

The Statement of Work (CELG-0002) expressly stated that "*upgrades, new features and maintenance updates will not be provided until Maintenance and Upgrade Support is purchased.*" This Change Order (1) expands the scope of the Statement of Work by setting forth the terms and conditions under which Service Provider will provide to Celgene, and Celgene will purchase, the annual Updates & Analyses License and Services (collectively referred to as "Theranos Annual Services"); (2) sets forth a model that Service Provider will develop for fracture healing in connection with ACE-011; (3) sets forth an application, Biomarker Identification Application ("BIA"), which Service Provider will deploy to identify candidate biomarkers using the models that Service Provider has developed for ACE-011; (4) and sets forth the ACE-011 Clinical Studies Program. To the extent this Change Order contains terms (defined below) additional to the terms of the Master Service Provider Agreement effective June 27, 2008 (the "MSA") this Change Order shall prevail, and to the extent there are terms in conflict with the terms in the MSA, the terms of this Change Order will prevail for terms specifically related to the Services contemplated herein; for all other terms the MSA shall govern.

1.      **Annual Updates & Analyses License and Services.**

Provided Celgene is current in its payment obligations for Theranos Annual Services, Service Provider shall provide Celgene the Updates & Analyses License and Services set forth in Sections 1.1 through 1.9 and defined in Section 1.10, on a twelve-month annual cycle in accordance with the terms set forth in this Change Order. In the event Celgene elects not to purchase a twelve-month renewal cycle, A) Service Provider shall transfer to Celgene a copy of the **full source data (for the purposes of clarity "full source data" shall mean clinical data)** produced up to that point, and B) Celgene will have the ability to use the last licensed version of the Software to enable regulatory submission of data. At the beginning of each twelve-month renewal cycle, Service Provider will furnish to Celgene the specific prognostic enhancements and updates that Service Provider intends to provide during the following twelve-month support period. If and when the prognostic enhancements and updates are developed, Service Provider will make these available to Celgene. Service Provider will use commercially reasonable efforts to ensure that any prognostic enhancements and updates are backwards compatible with prior Software and the TheranOS releases and versions. The prognostic enhancements and updates that Service Provider intends to develop during the next twelve months (the first annual support period) are attached as Appendix 1 to this Change Order.

Prognostic Enhancements, Updates, and Model Upgrades include, amongst others:

1.1     **Data Infrastructure Updates.**
        • Additional hardware for faster processing times
        • New data integration and translation tools

1.2     **Ontology Updates.**
        • New ontologies
        • Updates to existing ontologies



CONFIDENTIAL
Celgene Contract ID#8919

Page 1
FINAL v25MAY2010

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905747

**ER-14300**

**1.3**     **Model Updates and Upgrades.**
- New multivariate clustering
- Expanded Model Functionality
  - Addition of bisphosphonate treatment to ESRD target patient populations
  - Addition of exogenous EPO treatment
    - Timing of rescue
    - Dosage and magnitude of response to rescue
  - Expanding simulation capabilities
- Methodology for optimizing to a particular patient

**1.4**     **New Data Updates.**
- Data that helps to characterize any of the relevant physiologies or pathophysiologies, which is generated through Theranos Systems in other programs, will be made available to Celgene for quarterly updates to existing and drug-specific models.

**1.5**     **Literature Updates.**
- Automatic literature updates to the models will be made on a quarterly basis.
- General references update from the literature
- Literature mining
- Automated literature link to web data search engines

**1.6**     **Visualization Updates.**
- Upgrades to analytical visualization system
- Visualization increments

**1.7**     **User Interface Updates.**
- New data and patient sorting tools
- New diagrams for visualization of pathways and patient 'responder' groups

**1.8**     **Application Updates.**
- New features in all applications

**1.9**     **Support and Maintenance: Hardware and Software.**

     **1.9.1**    **Client Services.**

       Service Provider will use commercially reasonable efforts to provide Celgene Users (Celgene shall have up to 20 Users and one *superuser* whose responsibilities shall be agreed upon by the parties) 24x7 hardware and Software support and maintenance. Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated prognostic enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the hardware or Software and resolution of verifiable problems. Service Provider will designate a dedicated Client Solutions manager to Celgene. The Client Solutions manager will be responsible for assisting in the management of Celgene's support and maintenance requests. Support and maintenance services will be available telephone, email, and via TheranOS Real-Time Support online. In responding to Celgene's support inquiries, Service Provider will use the guidelines set forth in Section 1.9.1.1.

       **1.9.1.1**    **Reactive Incident Management Guidelines.**

       Service Provider will use commercially reasonable efforts to respond to Celgene's inquiry on a same-day basis via email or phone. Each inquiry will be assigned a priority

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905748

ER-14301

level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the TheranOS System, as that term is defined in the Master Services Agreement, is severely impacted. Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Celgene until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Celgene experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software. Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours EST. Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Celgene via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

**1.10    License and Access:  Theranos Annual Services.**

- During each annual support cycle, provided Celgene is current in its payment obligations hereunder, and subject to the prohibitions set forth in the MSA, Service Provider will grant to Celgene a non-exclusive, non-transferable license, without the right to sublicense, to use, the Software and the TheranOS, in accordance with this Change Order, and solely for Celgene's internal business purposes, and will grant Celgene Users access to the TheranOS via Service Provider's web portal. Celgene will have access to major, minor and maintenance Software releases and the TheranOS, including the prognostic enhancements and updates.

**1.11**    In the first annual upgrades & Analyses period, Service Provider will automate the Interim Analyses and Study Reports service for Celgene such that all future analyses and study reports can be performed and accessed directly by Celgene through TheranOS.

**2.    Costs.**

**2.1    Annual Costs for Theranos Annual Services.**

In consideration for the Theranos Annual Services to be provided under this Change Order, Celgene shall pay an annual cost equal to a percentage of the cumulative TheranOS costs of the multiple projects as reflected in the Statement of Work and any and all subsequent Change Orders, plus applicable taxes, if any. Pricing, in general, and this formula, in particular, are subject to change on a prospective basis to be mutually agreed upon by the parties at the appropriate time, however any rate increases will not be greater than 2.5% of the preceding year's rate. As of the date of invoice under this Change Order, Celgene shall pay an annual cost of twenty-percent (20%) of $3.25M. Accordingly, the annual cost for the first year during which Service Provider will be providing Theranos Annual Services is $650,000.

**2.2    First Year Discount and Invoicing for Theranos Annual Services.**

As Theranos Annual Services cover all Celgene programs across all therapeutic areas, Service Provider anticipates that Celgene will be able to accurately quantify return on initial investment for this service within 18 months. As such, Service Provider will discount payment by providing 18 months of Theranos Annual Services for the 12-month annual cost of $650,000. For the first 18-month Support Service cycle, Service Provider will issue an invoice upon execution of this Change Order. Thereafter, Service Provider will use commercially reasonable efforts to issue an invoice for Theranos Annual Services sixty (60) calendar days prior to each annual renewal period.

FOIA Confidential Treatment Requested by Theranos                                    THER-0905749
Fed. R. Crim. P. 6(e) material

**2.3    Payment Terms.**

See Section 9, Payment Schedule.

**2.4    Break in Coverage of Services.**

If any Theranos Annual Services are suspended for non-payment, Celgene may reinstate Theranos Annual Services by payment of all unpaid costs accrued during the period of lapsed Services, plus the subsequent twelve-month period, which shall be calculated to begin upon the date the Theranos Annual Services are reinstated.   Renewal may be conditioned upon Celgene's execution of a new Updates & Analyses License and Services Agreement.

**3.    Term and Termination for Theranos Annual Services.**

**3.1    Initial Term.**

The initial term of the Theranos Annual Services shall commence upon execution of this Change Order and shall continue for eighteen consecutive months.

**3.2    Renewal Terms.**

The Theranos Annual Services will be renewed for successive one-year periods only with Celgene's explicit written approval, to be provided not less than thirty (30) days prior to the date current coverage expires.  Service Provider will provide Celgene with a renewal quote for the terms of the subsequent one-year renewal period at least ninety (90) days in advance of the date current coverage expires, including the intended prognostic enhancements and updates that will be provided in the subsequent annual term. With Celgene's explicit written approval to renew the Theranos Annual Services for the upcoming 12 month term, Service Provider may invoice for the Theranos Annual Services.

For budget planning purposes, three (3) terms of the Theranos Annual Services have been included in this Change Order.  If additional terms of the Theranos Annual Service are requested by Celgene, the costs will be reflected in a change order executed by both parties in advance of the expiration of the then-current term. Celgene, at its sole discretion, will decide whether or not to renew the Theranos Annual Services within the timeframes noted above.

**3.3    Termination for Late Payment.**

Service Provider may terminate Theranos Annual Services upon written notice to Celgene if any payment due Service Provider is more than sixty (60) days past due.

**3.4    Termination for Breach.**

Either party may terminate any Theranos Annual Services term immediately upon written notice (email being sufficient) in the event of a material breach by the other party (i) which remains uncured for thirty (30) calendar days after written notice is given; or (ii) which by its nature cannot be cured within thirty (30) calendar days.

**3.5    Termination upon Notice.**

Celgene shall have the right to terminate Theranos Annual Services at any time upon thirty (30) days' advanced written notice (email is sufficient).

**4.    Modeling Services:  Fracture Healing.**

FOIA Confidential Treatment Requested by Theranos                    THER-0905750
Fed. R. Crim. P. 6(e) material

ER-14303

In its sole discretion, Celgene may request that Service Provider perform the Modeling Services associated with fracture healing as described in Sections 5 and 6. Upon the parties' agreement that such Services shall be rendered, Service Provider will perform the modeling Services.

4.1     To develop and operationalize the fracture-healing component of the ACE-011 model, Service Provider will assign a Celgene-specific modeling team that will develop, launch and support the additional model learning engines throughout the program timeline. The steps in that model development is outlined as follows: Identify, characterize and develop disease-specific parameter sets that reproduce the physiologic and pathophysiological behaviors of specific patient populations (e.g., compound fracture, hairline fracture, etc.).

   4.1.1     Literature-based clinical data for key parameters and outcomes will be used to generalize and tune the model. Disease/healing processes will include but not be limited to:
   • An inflammatory response stage.
   • A reparative response stage.
   • A remodeling stage.
   • And any relevant influences that may affect the state of the fracture and the underlying hypothesis regarding the efficacy of the compound (see Fig 1).

   4.1.2.     Specific measures for known patient populations from Celgene's own clinical experience and stored samples will be used to refine the model and its parameter sets so as to reproduce the observed clinical experience with sufficient fidelity (as measured by standard goodness of fit criteria).



Figure 1

4.2     Models will then be customized for any and all Celgene-specified assets, based on hypothesized MOAs and any stored information/samples in Celgene's inventory. Biomarkers related to MOA and secondary tissue effects will be integrated and dynamically refined as the models evolve to address the target.

4.3     The real-time feedback system will then be activated, such that feedback and model refinement will proceed based upon new data and frequent sampling of the key manifest variables in the model.

4.4     Biomarkers related to the MOA and secondary tissue effects will be integrated and dynamically refined as the model evolves to address the target.

4.5     The predictive pathophysiology mapping engine will be customized accordingly.

5.     **Applications.**

FOIA Confidential Treatment Requested by Theranos                          THER-0905751
Fed. R. Crim. P. 6(e) material

**ER-14304**

**5.1    Biomarker Identification Application ("BIA").**

Service Provider, together with the Celgene team, will deploy BIA to identify candidate biomarkers, in this instance using the models that Service Provider has developed for ACE-011. The ACE-011 solution will capture, analyze, and integrate all pertinent data into a BIA that will be intimately tied to the sampling scheme and data acquisition technologies as well as the Probability Mapping Application.  BIA may be subsequently deployed to identify candidate biomarkers for other compounds in development.

Service Provider-recommended analytes feeding into the Theranos ACE-011 Solution ("TAS") may include, but may not be limited to:

| | | |
|---|---|---|
| FGF-23 | Hgb | Osteocalcin |
| P1NP | P1CP | BSAP |
| TRAP5b | CTX | PTH |
| VitD | FSH | LH |
| Testosterone | Dihydrotestosterone (DHT) | Estradiol |
| IGF-1 | EPO | Hepcidin |

**5.2**    Probability Mapping Application – Characterizes Responder Classes.

**5.3**    Virtual Study Application – Updates and enhancements for fracture healing and other model enhancements will simulate efficacy, safety, and comparison to key drugs.

**5.4**    Ontologies – Customized disease ontology, mapping relationship of disease, symptoms, disease processes, and biomarkers as a reference structure for visualizing collected data.

**5.5**    Predictive Signatures – Upon each observed event in the enabling trial, updates the models automatically, and dynamically recalculates the risk profiles for each of the predictive signatures in the system.

**6.    Interim Analyses and Study Reports.**

Service Provider will provide for Celgene an interim modeling and simulation service strategically integrated into the overall ACE-011 development plan (see Figure 2).  To achieve the most cost-effective and timely results for Celgene, Service Provider will assign a two-person team to deliver up to six study reports during the twelve-month period after this Change Order is executed.  Service Provider has a plan to run three main analyses.

The plan calls for a Phase IIA study consisting of a single dose (0.1 mg/kg) of ACE-011 administered to determine both a safety profile for the compound with respect to hypertension ("HTN") and any and all compound-specific PK in End Stage Renal Disease ("ESRD") patients undergoing hemodialysis.  After the initial dosing, each patient will be followed for one month, and during that interim, Service Provider will run a series of modeling and simulation studies to identify an optimal initial dose and dose modification (i.e., titration) scheme that optimizes the efficacy response (i.e., will return HgB levels to 10 – 12 g/dL) within a constraint of an upper bound on blood pressure excursions.  The dose levels identified in the modeling will be used by Celgene to operationalize the second part of the Phase IIA study, a multidose accumulation/efficacy trial for ACE-011.  The patients in this second part of the trial will undergo dynamic dose modifications based upon the scheme identified during the interim modeling and simulation portions of the design.  The parties will make good faith efforts to realize and generate these reports within sixty (60) days of last patient accrued in part one of Phase IIA.

A second modeling and simulation effort will aid in the design and execution of the Phase IIB trials, in which three parallel cohorts with differing dosing regimens (either initial starting values or different interdose intervals) will be compared for the optimal choice of regimen for the Phase III confirmatory trial. The data from the Phase IIA trial (described above) will be used to populate/refine this modeling exercise.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905752

ER-14305

A third modeling and simulation effort will aid in the design and execution of the confirmatory Phase III trial and will be based on the data derived from both the Phase IIA and Phase IIB trials outlined above.



**Figure 2**

**7.    Cartridges:  Celgene ACE-011 Clinical Studies ("ACE-011 Studies").**

**7.1    Key Program Objectives for ACE-011 Studies.**

- Reduce the cost of ACE-011 clinical trials.
- Increase the quality, safety, and probability of success of ACE-011 trials by:
  - More fully characterizing exposure response profiles and accounting for patient heterogeneity.
  - Reducing the volume of blood drawn from anemic patients.

These objectives will be achieved through the deployment of a fully-integrated point-of-care data acquisition and modeling solution in ACE-011 clinical trials.

**7.2    Program Deliverables and Structure.**

The Theranos ACE-011 Solution ("TAS") is an automated data capture and analysis solution for the new chemical entity (NCE) ACE-011.  TAS is comprised of Theranos Field Systems and Theranos Operating System ("TheranOS").

**7.2.1    TAS Field Systems.**

TAS Field Systems include devices and cartridges for real-time point-of-care PK/PD analysis from a small sample of fresh blood or other body fluid.  By longitudinally characterizing the PK and PD of the compound and its dynamic impact across different pathologies and then automatically integrating that information into mathematical/statistical models, TAS more accurately accounts for patient variability to minimize safety risks and characterizes predictive signatures that can support fast-tracked development.  In future programs, TAS can be employed by Celgene to facilitate adaptive clinical trials.

**7.2.2.    Project Parameters.**

| TAS Field Systems Customization | Description |
|---|---|
| Assay Development | Service Provider will develop and customize assays and multiplexed cartridges for the specified analytes. Assay development will be done according to FDA and ICH guidelines. |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0905753

| Cartridge Analytes | ACE-011 PK assay, Anti-ACE-011-Antibody, markers of response based on model findings (BSAP, CTX, Dihydrotestosterone (DHT), EPO, Estradiol, FGF-23, FSH, Hgb, IGF-1, LH, NTX, Osteocalcin, P1NP, P1CP, PTH, Testosterone, TRAP5b, VitD, hepcidin) |
| Required Sample Types | Whole blood, plasma, serum, urine (interchangeably) |
| Required Materials | Celgene to provide Service Provider with relevant supply of drug and other required materials, as requested. |
| Number of Cartridges for Development, Validation, Cross-Validation Internally, and Calibration to Preferred Reference Methods | 5,000 for each assay in the multiplexes |
| Number of Devices | estimated but not limited to 104 |
| Localization/Languages for Translation | None (English Only) |
| Device Customization (Touch Screen Interface Questions/Customization) | ACE-011-specific applications, with device touch screens customized for Clinics: Patient Surveys/CRFs capture symptoms and other relevant information each time patients test finger-sticks in the clinic. Customized with Celgene's pre-selected/standardized surveys or CRFs. TAS Assistant provide real-time access to results, alerts and notifications |

Service Provider will provide unlimited devices for use in clinical studies. This program provides for 65,120 tests based on the original Phase II protocols. As predictive signatures are identified, the number of different markers measured will be reduced. As such, Service Provider estimates this volume of tests should carry through all/part of the ACE-011 Phase III studies. Additional tests can be ordered under a separate SOW with a volume discount.

**The following activities are required by Service Provider for the program:**

**Services: Pre-Deployment, Service Provider will**

- Refine Program goals and specifications with Celgene.
- Assign Program Manager.
  - Lead the pre-implementation Kick-Off Meeting to discuss program specifics, respective roles and responsibilities of Celgene and Service Provider for the duration of the program.
  - Collaborate with Celgene to create a program plan to ensure that timelines are accurately communicated and monitored.
- Customization and Installation of TheranOS.
- Customization of TAS Field Systems.

**Services: Post-Activation (Deployment of TAS)**

- **Training:**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905754

ER-14307

- **Initial field system and interface training**: Service Provider will develop and deliver a customized one day training course to be provided onsite at Celgene in NJ to a group of users that will be designated by Celgene

- **Follow up training session for users**: Service Provider will host a one day follow up training course to be provided onsite at Service Provider location in Palo Alto, CA to a group of users that will be designated by Celgene

- **Site Support and Training**: Service Provider will attend the site initiation visits and/or the investigators' meeting and/or visit the sites to train site personnel on operating the TAS and thereafter Service Provider will provide technical support on any issues related to operating the TAS. All other study conduct issues shall be directed to study sponsor. Celgene shall all pay reasonable travel and out-of-pocket expenses in accordance with Section 3 of the MSA.

- **Study procedures manual**: Service Provider will provide requested technical and writing support to the Celgene study team to develop study procedures manuals for the planned clinical trials

  - **Support Services**. During the Program, upon payment as specified below, Service Provider will provide 24x7 support coverage for TAS. TAS Field Support is provided for all tests procured under this Agreement, so long as payment for those tests has been received in accordance with the payment schedule included herein.

### 7.2.3. Change Orders.

Should the scope, duration or parameters of this project change, costs may need to be revised, and no services will be provided for such new scope or parameters until the parties amend this Change Order to reflect such changes, which shall be captured in a new change order and signed by both parties.

## 8. Costs for ACE-011 Project.

### Budget Additions at Change Order #2:

| Description | Resource Estimate & Timeline | Price |
|---|---|---|
| Annual Updates & Analyses License | 18 month coverage provided at 12 month rate, initiating upon execution of this change order | $650,000 |
| Annual Updates & Analyses License | 12 month renewal term, 2 additional terms each provided upon Celgene's prior written approval | $1,300,000 |
| TheranOS Model Development & Activation: (upon mutual agreement of the parties)<br>• Fracture Healing<br><br>TheranOS Applications<br>• Biomarker Identification Application (BIA)<br>• Probability Mapping Application<br>• Virtual Study Application<br>• Ontologies<br>• Predictive Signature<br><br>Services[1] | 3 FTE for 3-4 months<br><br><br>8 FTE for duration of the program | $350,000 |
| Interim Analysis and Study Reports Including but not limited to: | 2 FTE for up to 12 months from date of SOW execution as follows and subject | $700,000 |

CONFIDENTIAL
Celgene Contract ID#8919

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905755

**ER-14308**

| Description | Resource Estimate & Timeline | Price |
|---|---|---|
| • Modeling designs and simulations of new trials<br>• Dosing and trial execution regimens | to annual renewal:<br><br>In Phase IIA: 2 FTE months<br><br>Between Phase IIA/IIB: 3 FTE months<br>After Phase IIB: 4 FTE months | |
| Misc Pass-Through Fees | To cover software escrow fees, travel costs, etc. Budget estimate only, actual amounts to be invoiced. | $50,000 |

[1] Service Provider personnel will be available to provide any services not specifically set forth in this Agreement as Consulting Services. Consulting Services are not included in this Change Order. These Services can be provided at a rate of $250 per hour following written Celgene approval, and must be reflected in a change order executed by both parties.

[2] Additional training beyond that specified in this Agreement can be provided at a rate of $150 per hour following written Celgene approval, and must be reflected in a change order executed by both parties.

| | TAS Customization & ACE-011 Phase II Deployment | PRICE |
|---|---|---|
| **2009** | **Customization/Installation/Deployment of TAS** | |
| | TAS Field Systems:<br><br>• Assay Development and Validation<br><br>            Anti-ACE-011-Antibody assay<br><br>            19 PD Markers<br><br>• Customization of Device<br>Deployment of TAS:<br>  • Training[2]<br>  • Consulting services (ongoing throughout program duration)[1] | No charge ($500k Theranos investment)<br><br>No charge ($6.7M Theranos investment)<br>No charge |
| **2010** | **Clinical Trial: ACE-011 Phase II & III** | |
| | Devices for use in dialysis centers<br>     Phase IIa Stage 1 – est. quantity: at least 8<br>     Phase IIa Stage 2 – est. quantity: at least 24<br>     Phase IIb – est. quantity: at least 72<br>     Phase IIIs - TBD | No charge |
| | Study Support, Theranos set-up materials, Field System training, delivery, and 24x7 TAS Support | No charge |
| | **Phase IIa, Stage 1 – ($30/analyte)\*** | |
| | Est. 8 patients – 21 analytes | $45,600 |
| | **Phase IIa, Stage 2 – ($30/analyte)\*** | |
| | Est. 24 patients – 21 analytes | $134,640 |
| | **Phase IIbs & IIIs – ($30/analyte)\*** | |
| | Est. at least 450 patients – 21 analytes | $2,205,000 |

\* $30/analyte pricing correlates with a volume commitment to use TAS throughout the ACE-011 studies.

CONFIDENTIAL<br>Celgene Contract ID#8919

FOIA Confidential Treatment Requested by Theranos<br>Fed. R. Crim. P. 6(e) material

THER-0905756

**Cumulative Budget Build-Up Including Original SOW, CO#1, and CO#2:**

| Activity/Service | Original SOW | Change Order #1 | Change Order #2 | Total Cumulative Fees |
|---|---|---|---|---|
| Learning Engine, Model Development, and Exclusive Access | $1,750,000 | | | $1,750,000 |
| TheranOS System Customization, mapping MOA compound | $1,500,000 | | | $1,500,000 |
| Dose Modification Scheme | | $25,000 | | $25,000 |
| Annual Updates & Analysis License – Initial 18 mos. | | | $650,000 | $650,000 |
| Annual Updates & Analysis License – 12 mo renewal #1 | | | $650,000 | $650,000 |
| Annual Updates & Analysis License – 12 mo renewal #2 | | | $650,000 | $650,000 |
| Model Development & Activation | | | $350,000 | $350,000 |
| Interim Analysis & Study Reports | | | $700,000 | $700,000 |
| Phase IIa, Stage 1 Analyte Analysis | | | $45,600 | $45,600 |
| Phase IIa, Stage 2 Analyte Analysis | | | $134,640 | $134,640 |
| Phase IIbs & IIIs Analyte Analysis | | | $2,205,000 | $2,205,000 |
| Pass-through Fees | $10,000 | $500 | $50,000 | $60,500 |
| **Total** | $3,260,000 | $25,500 | $5,435,240 | $8,720,740 |

**Professional Costs**

Total professional costs for the entire Project shall not exceed Eight Million Six Hundred Sixty Thousand Two Hundred Forty Dollars ($8,660,240.00).

**Expense Disbursements and Pass-through Costs**

Total pass-through costs for the entire Project shall not exceed Sixty Thousand Five Hundred Dollars ($60,500.00) unless otherwise agreed to by both parties and will be paid according to the Payment Schedule.

CONFIDENTIAL
Celgene Contract ID#8919

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905757

ER-14310

9.      **Payment Schedule.**

|  | % Payment | Amount Due |
|---|---|---|
| **TheranOS System** | | |
| Learning Engine, Model Development, and TheranOS System Customization | 100% | $3,250,000 (paid) |
| Dose Modification Scheme | 100% | $25,000 (paid) |
| **Phase IIa REN-001** | | |
| Interim Analysis and Study Reports – invoiced upon Change Order Execution | 50% | $350,000 |
| Phase IIa tests – invoiced upon Change Order Execution | 100% | $180,240 |
| Initial 18-month license/update fee – invoiced upon Change Order Execution | 100% | $650,000 |
| 12-month license/update renewal period fee – invoiced upon Celgene's written approval to renew | 100% | $650,000 |
| 12-month license/update renewal period fee – invoiced upon Celgene's written approval to renew | 100% | $650,000 |
| **Phase IIb and III tests** | | |
| Interim Analysis and Study Reports (back-end) – invoiced upon completion | 50% | $350,000 |
| Phase IIb and III tests – invoiced quarterly based on usage | as consumed | Est. $2,205,000 |
| **Proposed Pricing for Additional Study** | | |
| TheranOS Models and Applications – Contingent upon a decision for a fracture healing study, at Celgene's sole discretion | 100% | $350,000 |
| **Professional Fees Total:** | | $8,660,240 |
| **Miscellaneous** | | |
| Pass-through expenses | Monthly, as incurred | Actuals, as approved by Celgene |

As specified and in accordance with the Master Service Provider Agreement, in addition to costs described above, Service Provider charges for third-party expense disbursements and other costs incurred in connection with the performance of all Services. These costs include, but are not limited to, Service Provider personnel travel and lodging (including travel to all investigator meeting(s) and/or investigative sites and Services-related activities), telecommunications, printing, additional touch-screen customizations, any incidental expenses, and the associated administrative costs incurred to provide or in support of the Services outlined in this Change Order. All expense disbursements and pass-through costs for this Project will be invoiced to Celgene at-cost, and without markup.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905758

Invoices must reference purchase order (PO) No. **5001827** and are to be sent to the attention of:

> Celgene Corporation
> Attn: Accounts Payable
> P.O. Box 1007
> Summit, NJ 07902-1007
> Referencing: Steve Ritland as Manager

Payment shall be due forty-five (45) days from invoice. Accounts that are past due for longer than thirty (30) days after the initial forty-five (45) day invoice period will be subject to a monthly charge of one-half percent (0.5%) per month on the unpaid amount, or the maximum rate allowed by applicable law, whichever is less. If Celgene's account is more than seventy-five (75) days past due, Theranos Annual Services may be subject to suspension, including access to and use of the Software and the TheranOS for Celgene Users, until the account is current as set forth in Section 3.4.

**10.     Trial Communications.**

All communications provided for in this Change Order may be made via email, and confirmed by fax receipt, express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

**Service Provider Contacts**

Project Matters
Dr. Daniel Young
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6119
Fax (650) 838-9165

Billing Matters
Danise Yam
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6204
Fax (650) 838-9165

**Celgene Contacts**

All Matters
Steve Ritland
86 Morris Ave
Summit NJ 07901
Ph. (908) 860-7475
Fax (908) 860-7467

**11.     Miscellaneous.**

Except as otherwise provided in this Change Order, all other terms and conditions of the Statement of Work and the Master Service Provider Agreement will remain in full force an effect. This Change Order may be executed in two or more counterparts, each of which shall be deemed an original and all of which together constitute one and the same.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905759

**IN WITNESS WHEREOF,** the parties have caused their duly authorized representatives to sign this Change Order effective as of the Effective Date.

THERANOS, INC.                                 CELGENE CORPORATION

By: _____                 By: _____

Name: _Elizabeth Holmes_____                   Name: _Robert J. Hugin_____

Title: _President & CEO_____                  Title: _Chief Executive Officer_

Date: _21 July 2010_____                   Date: _July 20, 2010_____

CONFIDENTIAL
Celgene Contract ID#8919

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905760

ER-14313



ORIGINAL

**THERANOS, INC. – CELGENE**
**STATEMENT OF WORK**
**Program ID: CELG-0002**

Celgene Corporation and Theranos, Inc. have entered into a Master Service Provider Agreement dated June 27, 2008 (the "Agreement") which provides that a Statement of Work be entered into to set out with specificity the details of a particular Project and Services. The terms contained herein are pursuant to and governed by such Agreement. For the purpose of this Statement of Work, CABS is herein referred to as TheranOS.

This Statement of Work is effective as of the 1st of October, 2008, and shall terminate as of date the Services specified herein are completed, and is by and between Celgene Corporation (hereinafter, Celgene), located at 86 Morris Avenue, Summit, NJ 07901 and Theranos, Inc. (hereinafter, Theranos), located at 3200 Hillview Ave., Palo Alto, CA 94304. The parties acknowledge that any work contemplated herein that was initiated prior to the execution of this SOW was done in good faith and with the understanding that said work shall be governed by the terms hereof.

**KEY PROGRAM OBJECTIVE**
Create a learning engine and a Celgene-specific data infrastructure which models the bone/erythropoesis blood pressure and endocrine physiologies in a dynamic fashion specific to the mechanisms of action of Celgene compounds to dramatically expedite time-to-approval and ensure realization of each target product profile.

In this program, Theranos will build a learning engine for Celgene which dynamically models bone/erythropoesis blood pressure and endocrine physiologies and pathophysiologies (the "Project"). This data infrastructure will power studies to rapidly identify optimal dosing schedules and quantitatively characterize efficacy dynamics profiles to fast-track approval of Celgene compounds for multiple indications and sub-patient populations. The first mechanism of action modeled in this data system will be the compound ACE-011.

In facilitating the rapid optimization of these compounds, a primary goal of this program is to quantify and showcase the economic implications of this new data infrastructure, as follows:

Based on Theranos' previous experience, predictive modeling has resulted in the demonstration of meaningful dose-response and efficacy dynamics profiles in 6 month timeframes where the conventional infrastructure took two years and was still not able to generate hard correlations. An 18 month time-savings, not to mention the ability to gain insight into methods for optimization for label expansion, can conservatively be equated to hundreds of millions of dollars gained. With industry estimates at $1-3 million a day for the value of each day gained in time to market, even 6 months saved ranges between $180 million and $540 million in return on investment.

Equally, once the infrastructure has been implemented, future studies will enable 25% fewer patients, reducing the patient costs, number of sites required, and infrastructure costs for shipping and processing samples through ambulatory point-of-care monitoring. Overall savings on 6 month trials once the data infrastructure has been established have been 50% of the cost of running an equivalent trial using the conventional infrastructure, further saving millions of dollars and covering the cost of Theranos infrastructure and units many times over. As the learning engine evolves after the first 6 month study, costs are further reduced in each follow-on study.

Ultimately though, the greatest economic return on investment lies in the ability to expand percentage market ownership by capturing multiple indications through visibility into pathway dynamics that enables rapid optimization in ways previously not possible. This capability enables commercialization of 'targeted blockbusters' by redefining a company's historical success rate in realizing the target product profile of each drug once it hits the market.

CONFIDENTIAL
Celgene Contract ID# 6443

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905761

**ER-14314**

**THERANOS SERVICES: PRE-DEPLOYMENT**
Project Services

The following activities are required to ensure the Project Objectives are met in the most efficient manner:

- Refine program goals and specifications with Celgene. Consulting fees for in-depth advisory services are not included in this agreement, such as visits to sites to review marker selection, etc. These services can be provided at a rate of $250/hour following written Celgene approval, and must be reflected in a change order to this Statement of Work that is agreed by both parties.
- Assign Program Manager.
- Lead the pre-implementation kick-off Project Meeting to discuss Project specifics, respective roles and responsibilities of Celgene and Theranos for the duration of the Project.
- Collaborate with Celgene to create a Project plan to ensure that timelines are accurately communicated and met.
- Initial setup of accounts and secure access privileges for all parties who will be authorized to access TheranOS (collectively, "Users").
- Specify Project-related workflow.
- Set-up and secure Celgene-specific data infrastructure (as described below).

**THERANOS SERVICES: POST-DEPLOYMENT**
Client Infrastructure and Technical Support

- Develop and deliver customized training course, to include up to two (2) hours of training at two (2) Celgene locations by up to two (2) Theranos representatives. Additional training hours can be provided at the rate of $150 per hour following written Celgene approval, and must be reflected in a change order to this Statement of Work that is agreed by both parties.
- Provide relevant Theranos System set-up materials.
- Provide and manage the web portals to be used by Celgene in connection with the Services provided under this Statement of Work.
- Enable Cumulative data transfers that can be executed by Celgene at any time via the Export Utility in the Data Delivery component of TheranOS. Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via TheranOS.
- Set up, administer, monitor, and troubleshoot web and database servers.
- Create secure backup infrastructure.
- Provide second level technical support to the Project Support Center (described below).
- Reasonably assist Celgene with issues regarding network infrastructure setup related to the Theranos System.
- Troubleshoot firewall, computer system, and connectivity issues relating to TheranOS.

**Project Support Center**

- During all phases of the Project through completion of acceptance testing, provide telephone helpdesk support for Celgene regarding the use of the Theranos System.
- Live coverage 24 hours a day, 7 days a week through Theranos customer-care center through completion of acceptance testing.

**PROJECT BUDGET AND PAYMENT SCHEDULE: PRODUCTS AND SERVICES**
Pre-Deployment Services (as described above): These will be provided by Theranos at no cost to Celgene.

Post-Deployment Services (as described above): These will be provided by Theranos at no cost to Celgene.

Learning Engine, Model Development and Exclusive Access:

- TheranOS installation, set up of models, interfaces to internal and external applications, and predictive pathophysiology mapping engine: $1,750,000, detailed below as a percentage of total price

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905762

- o Set up for Project infrastructure – secure Celgene specific data infrastructure for integrated analytics profiling correlations to radiological, laboratory and clinical parameters: 10%
- o Database customization for use in data integration and compound optimization: 90%
  - Set-up of dynamic central data repository: 3.75%
  - Web portal for profiling and monitoring of patients and cohorts: 3.75%
  - Configuration of real-time data flow for real-time and dynamic decision making and adaptive dosing: 3.75%
  - Configuration of back-end to automatically extract data from other internal and external databases for dynamic integration into Celgene's model: 3.75%
  - Development of compound-specific PK/PD models for disease and markers: 33%
  - Build disease ontology mapping relationship of disease, symptoms, disease processes, and biomarkers as a reference structure for collected data: 10%
  - Map patient data to ontologies for reference and establishment of relationships between biomarkers, diseases and outcomes.: 10%
  - Link multiple diseases via the related markers and disease processes through relationships in the disease ontologies. 4.4%
  - Custom graphics and reports using Theranos derived outcome prediction capabilities 4.4%
  - Rule based workflow specification mechanism for defining to the system trial protocols, along with rules for determining inflection points in patient management. 4.4%
  - Custom user interfaces for enhanced patient compliance and communication 4.4%
  - Distribution and support infrastructure (installations, training and customer support) 4.4%
- ◆ TheranOS customization for use in mapping MOA of compound: $1,500,000, detailed below.
  - o Development and population of the base probability space with currently accessible data, relevant pathway parameters and maps depicting progression and compound efficacy and safety: 50%
  - o Surface modeling to support multiple indications and sub-patient population analysis in parallel: 50%

**Model integration:** This will be provided by Theranos at no cost to Celgene. Theranos will provide a Celgene-specific modeling team that will develop, iterate, launch and support the data infrastructure over the Project timeline)

- ◆ Initial model development will reproduce healthy erythropoesis, blood pressure and endocrine (FSH/ sex steroids) effects and homeostatic bone remodeling, wherein parameter sets for the model parameters will reproduce normal population behavior
- ◆ Disease specific parameter sets will be developed that reproduce the physiologic and pathophysiological behaviors of specific populations (e.g., cancer related bone loss in the context of multiple myeloma, bone metastases of solid tumors, cancer treatments on erythropoesis, alterations on FSH and effect on sex steroids, and changes in blood pressure, etc.)
  - Literature based clinical data for key parameters and measures will be used to generalize and tune the model
  - Specific measures on known patient populations from Celgene's own clinical experience and stored samples will be used to refine the model and it's parameter sets so as to reproduce the observed clinical experience with sufficient fidelity (as measured by standard goodness of fit criteria)
- ◆ Then, the model will be customized to ACE-011, based on its hypothesized MOA(s) and any stored information/samples. Biomarkers related to MOA and secondary tissue effects will be sampled and dynamically refined as the model evolves to address the target.
- ◆ The Real-time feedback system will then be activated such that feedback and model refinement will proceed based upon frequent sampling of the key manifest variables in the model, capturing the dynamic interaction between osteoclasts and osteoblasts, changes in erythropoesis, FSH / sex steroids and blood pressure.

CONFIDENTIAL
Celgene Contract ID# 6443

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905763

**ER-14316**

Total Payment for learning engine, model development, and TheranOS customization: $3,250,000

FTE Costs of $2,520,000 will be wholly assumed by Theranos and will be primarily incurred in 2009 for integration of ACE-011 data including PK, clinical pharmacology, and other relevant parameters, incorporation of iterative feedback from Celgene, and customization for the disease-specific target populations.

**ESTIMATED TIME TO COMPLETION**

Infrastructure, model development, and TheranOS installation and customization will occur between October 15 and December 31, 2008. Successful completion will be validated by the metrics in Appendix 1. Upon successful completion of the learning engine, model development, and TheranOS customization, Theranos will transfer to Celgene exclusive access to the Celgene Software and provide the System Specifications. At this time, Celgene can begin iterating as desired.

Upon receipt of ACE-011 data, User IDs will be given to all relevant Celgene personnel to access the System and begin running simulations. Celgene will then be able to further validate successful implementation under the metrics in Appendix 1.

Model development and integration will continue up through Project launch in 2009 (launch estimated between February and April) so that Celgene can iterate and enhance the System as desired.

**Acceptance Testing**

All deliverables to be provided in connection with the Services shall be subjected to acceptance testing ("Acceptance Testing") by Celgene to verify that the Services conform to the general objectives and specifications (collectively, the "Specifications") set forth in this Statement of Work and all attachments and appendices attached hereto. Testing of Software or Services shall be made by Celgene within thirty business (30) days following Celgene's access to Software by Theranos to be developed and provided and will include any appropriate tests including those described in the Specifications.

**Acceptance/Validation**

Celgene shall notify Theranos if the Software or any Services do not conform to the Specifications within said thirty (30) business day period (or such other period as the parties may agree to in writing) following written notification from Theranos to Celgene that Theranos has completed access to Software or Services. The parties will cooperate with each other in identifying in what respects the Software or Services has failed to so conform. Theranos shall, at no cost to Celgene, promptly correct any deficiencies which prevent the Software or Services to conform to the Specifications. Upon completion of the corrective action by Theranos, and at no additional cost to Celgene, the acceptance tests performed by Celgene will be repeated until the Software or Services have successfully conformed; provided, that if Theranos is unable to deliver the Software or Services within twenty (20) business days following a scheduled completion date that conforms in all material respects with the Specifications therefore, then without limitation on its remedies available at law or in equity, Celgene may, at its option, (i) immediately terminate this Statement of Work, cease to use and return the non-conforming Software or Services, have no further obligation or liability of any kind to Theranos with regard to the non-conforming Software or Services (including payment of any amount for such), and Theranos shall reimburse Celgene for any amounts paid in advance by Celgene for the development of such; or (ii) require Theranos to continue to attempt to correct the deficiencies at Theranos' expense, reserving the right to terminate as foresaid at any time. When the Software or Services have successfully conformed to or satisfied the Specifications, Celgene shall give Theranos written notice thereof ("Acceptance" or "Validation").

**Timeliness of Performance**

Theranos will use its reasonable best efforts to complete the Services and provide the Services in accordance with the time lines set forth in this Statement of Work.

CONFIDENTIAL
Celgene Contract ID# 6443

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905764

**Maintenance During Acceptance Testing**

Theranos agrees to provide maintenance services as set forth in this Statement of Work during all Acceptance Testing. Such services shall be provided at no expense to Celgene.

**Maintenance Following Acceptance Testing**

Theranos shall ensure the Software continues to operate as accepted in conformity with all descriptions and Specifications herein or as otherwise provided by Theranos. Issue reporting systems will be available after the completion of Acceptance Testing with no time guarantee on responses. Upgrades, new features and maintenance updates will not be provided until Maintenance & Upgrade Support is purchased.

**Maintenance of Source Code and Software Access**

Theranos will deposit the entire source code, user and technical documentation for Software in an escrow account (the "Escrow Account") pursuant to an agreement between an escrow agent (the "Escrow Agent") and Theranos. In addition, Theranos will deposit future updated source code, user and technical documentation as updates to the Software are made. Such Escrow Agent will be instructed in writing by Theranos to deliver the said source code to Celgene upon written notice thereof by Celgene promptly upon either of the following occurrences: (i) Theranos suspends or discontinues business or indicates its intention to suspend or discontinue business; or (ii) Theranos' filing for bankruptcy, making a general assignment for the benefit of its creditors, or the appointment of a receiver on account of the insolvency of Theranos. Upon the occurrence of any of the above, Celgene shall have the right to use such source code to modify or augment Software solely for the purpose of supporting and maintaining the Software for internal use consistent with this Statement of Work. The Escrow Agent will be identified for Celgene in writing and the aforementioned content will be deposited into the Escrow Account within 30 days from the execution of this Statement of Work.

Upon payment of professional costs as noted below, Theranos will provide Celgene with perpetual access to the Software, and will be given use of TheranOS for 10 Celgene Users, as defined in the MSA.

**PAYMENT SCHEDULE**
**Professional Costs**
Total professional costs for the entire Project shall not exceed Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) and will be paid according to the following schedule:
- Payment for learning engine, model development, and TheranOS customization in the amount of $3,250,000 will be invoiced upon Validation by Celgene, in its sole discretion, of the deliverables as described in Appendix 1.

Payment is tied to successful realization of deliverables and is fully refundable if the model is not successfully implemented accordingly to the metrics in Appendix 1.

Should the scope, duration or parameters of this Project (*e.g.*, requirements for configuration and/or support) change, associated fees may need to be revised and no Services will be provided for such new scope or parameters until the parties hereto amend this Statement of Work to reflect such changes, which shall be captured in a change order and signed by both parties.

**Expense Disbursements and Pass-through Costs**

Total pass-through costs for the entire Project shall not exceed Ten Thousand Dollars ($10,000) unless otherwise agreed to by both parties and will be paid as follows:

- As specified and in accordance with the Master Services Agreement, in addition to the Products and Services fees described above, Theranos charges for third-party expense

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905765

disbursements and other costs incurred in connection with the performance of the Services. These costs include, but are not limited to, Theranos personnel travel and lodging (including travel to all IMs or IM sites and services related activities), telecommunications, printing, additional touch-screen customizations, any incidental expenses, and the associated administrative fees incurred to provide or in support of the Services outlined in this Statement of Work. All expense disbursements and pass-through costs for this Project will be invoiced to Celgene at-cost, without markup, and are not anticipated to exceed $10,000.

♦ All expense disbursements not paid in forty-five (45) days shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

Invoices must reference the assigned purchase order (PO) No. and are to be sent to the attention of:

> Celgene Corporation
> Attn: Accounts Payable
> P.O. Box 1007
> Summit, NJ 07902-1007
> Referencing: Randall Stevens as Manager

Celgene shall pay the amount of each invoice received from Theranos within forty-five (45) days of receipt by Celgene, unless Celgene has notified Theranos within such forty-five (45) day period that it disputes any particular invoiced item(s), which dispute the parties shall attempt in good faith to resolve.

Because of the difficulty in substantiating the validity of claims for payment increases with time, Celgene reserves the right to decline to pay for expenses that are invoiced more than ninety (90) days after an expense has been incurred. In no event will Celgene pay on invoices submitted more than one hundred eighty (180) days after an expense has been incurred

## TRIAL COMMUNICATIONS

All communications provided for in this Statement of Work shall be made by confirmed fax receipt, express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

### Theranos Contacts

| Project Matters | Billing Matters |
| --- | --- |
| Marc Thibonnier | Danise Yam |
| Theranos, Inc. | Theranos, Inc. |
| 3200 Hillview Ave | 3200 Hillview Ave |
| Palo Alto, CA 94304 | Palo Alto, CA 94304 |
| Ph. (650) 470-6192 | Ph. (650) 470-6204 |
| Fax (650) 838-9165 | Fax (650) 838-9165 |

### Celgene Contacts

| Project Matters | Billing Matters |
| --- | --- |
| Randall Stevens | As noted above |
| 106 Allen Road, Suite 402 | |
| Basking Ridge, NJ 07920 | |
| Ph. (908) 860-7475 | |
| Fax (908) 860-7467 | |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905766

Sep 05 08 05:58p    Theranos              6508389804              P.8

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

THERANOS, INC.                                CELGENE

_____                       _please see attached_____
Signature                                      Signature

Elizabeth Holmes                              _____
Name (please print)                            Name (please print)

President & CEO                               _____
Title                                          Title

3 Feb 2009                                    _____
Date                                           Date

CONFIDENTIAL                                   Page 7
Celgene Contract ID# 6443                      FINAL v29Jan09

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                               THER-0905767

**ER-14320**

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

**THERANOS, INC.**

*Please see attached*
_____
Signature

_____
Name (please print)

_____
Title

_____
Date

**CELGENE**

_____
Signature

Sol J. Barer, PhD
_____
Name (please print)

Chairman & CEO
_____
Title

Feb. 3, 2009
_____
Date

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905768

ER-14321

**APPENDIX I**
**METRICS FOR VALIDATION OF DELIVERABLES**

Upon successful completion of the Learning Engine, Model Development, TheranOS customization and transfer of Exclusive Access to Celgene, Theranos will demonstrate success through:

- Successful reproduction of literature-based homeostatic bone remodeling dynamics integrated with homeostatic calcium maintenance, blood pressure, endocrine (FSH/ sex steroids) and erythropoiesis using clinical data
- Application of the learning engine to the same clinical data used in the bone model above and successful, automatic reproduction of that data set within acceptable goodness of fit criteria

Upon successful integration of ACE-011 data including PK, clinical pharmacology, etc., iterative feedback from Celgene, and designation of the disease-specific target populations:

The model development effort will yield 3 interim deliverables which can be used to validate the System: They are: (1) a model of normal homeostatic bone, erythropoesis, FSH (sex steroid) and blood pressure physiology, (2) a model of bone, erythropoesis, FSH (sex steroid) and blood pressure pathophysiology specifically defined at the Project Meeting customized to first address the primary indications (and from which additional indications will evolve). This model will be derived from the homeostatic model through perturbation of physiologically well defined pathways, and (3) a full model including the hypothesized Mechanisms of Action for Celgene's compounds. Each model is a learning engine.

(1) The homeostatic model will be built and parameterized so as to reproduce all extant data Celgene may have in their clinical archives. These data should have been derived from a normal, untreated population. The model will be fit so as to reproduce the dependent variable measures, e.g., BMD, hemoglobin, FSH/sex steroid and blood pressure over time, as well as, any pertinent blood sample information, e.g., circulating levels of osteocalcin or PTH, testosterone, estrogen,that Celgene may have available. The result of this effort will be an initial, or "seed", parameter set. Variation in the observed patient population will be reproduced by "children" parameters sets, derive from the "seed", so as to represent a reasonable sampling of that underlying distribution. All model outcomes will be compared to the observed data using standard goodness-of-fit statistics.

(2) The relevant bone, erythropoesis, FSH (sex steroid) and blood pressure pathophysiology will be induced in the model for the "seed" and each "child" parameter set by modeling an agreed upon disturbance in the underlying physiology. For example, a decrease in circulating estrogen levels will be modeled through modification of those particular pathways in the model. The model will then be re-fit to any observed data Celgene may have archived for an untreated control group from a prior trial. The "seed" trajectory and each "child" trajectory as calculated by the model will be compared to those observed in the actual patient population using the same goodness-of-fit statistics derived above.

(3) The bone, erythropoesis, FSH (sex steroid) and blood pressure pathophysiology model will then be customized to represent Celgene's novel compound by explicitly modeling the hypothesized MOA of a compound on the target pathways of the model. In this phase, the model must be able to reproduce any and all observed in vivo dynamics as derived from the animal models. This effort will provide the parameter sets that best estimate animal PD. Generalization to human PD will be made through appropriate modifications to these parameter sets.

Estimates for human PK and its variance will be derived from the appropriate preclinical studies already run by Celgene during the preclinical development phase of the program. They will be represented in the model as a "grandchild" parameter set. For each hypothesized concentration exposure curve, an estimated concentration-effect curve can be generated for a given "grandchild".

Historical human data will then be reproduced in each model. Successful validation will be demonstrated again by automatic reproduction of another "sample" data set within acceptable goodness of fit criteria as mutually agreed upon with Celgene clinical leads.

CONFIDENTIAL
Celgene Contract ID# 6443

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905769

If there are no human data to compare against, the model predictions will be retuned and refit after an initial cohort of patients has been measured in a Phase I study.

Once those data have been adequately reproduced in the model, it will be used to project forward in time a dose response surface for the compound in the patient population of interest.

If one also supplies a concentration-effect curve for a known off-target effect, e.g., hemoglobin levels, one can use the dose response surface derived above to "optimize within constraint" to estimate the next best dose to test.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905770

ER-14323

**THERANOS, INC. – CELGENE**

**STATEMENT OF WORK**

**(Non-Clinical Development)**

**Program ID: CELG-0004**

**Celgene Reference #: ACE-011-DMPK-001**

Celgene Corporation and Theranos, Inc. have entered into a Master Service Provider Agreement dated June 27, 2008 (the "Agreement") which provides that a Statement of Work be entered into to set out with specificity the details of a particular Project and Services. The terms contained herein are pursuant to and governed by such Agreement. If, and to the extent, this Statement of Work provides additional terms and/or conflicting terms to the Master Service Agreement, the terms of this Statement of Work will prevail.

This Statement of Work is effective as of November 18 2009, and is by and between Celgene Corporation ("Celgene"), located at 86 Morris Avenue, Summit, NJ 07901 and Theranos, Inc. ("Theranos"), located at 3200 Hillview Ave., Palo Alto, CA 94304. The parties acknowledge that any work contemplated herein that was initiated prior to the execution of this Statement of Work was done in good faith and with the understanding that said work shall be governed by the terms hereof.

**OBJECTIVES**

Celgene's objectives are to:

1. Reduce the cost of Celgene's ACE-011 clinical trials.

2. Increase the quality, safety, and probability of success of ACE-011 trials by:
   a. more fully characterizing exposure response profiles and accounting for patient heterogeneity
   b. reducing the volume of blood drawn from anemic patients

**PROGRAM DELIVERABLES AND STRUCTURE**

The Theranos ACE-011 Solution ("TAS") is an automated data capture and analysis solution for the new chemical entity (NCE) ACE-011. TAS is comprised of Theranos Field Systems and Theranos Operating System ("TheranOS").

**TAS Field Systems**

TAS Field Systems include devices and cartridges for real-time point-of-care PK/PD analysis from a small sample of fresh blood or other body fluid. By longitudinally characterizing the PK and PD of the compound and its dynamic impact across different pathologies and then automatically integrating that information into mathematical/statistical models, TAS more accurately accounts for patient variability to minimize safety risks and characterizes predictive signatures that can support fast-tracked development. In future programs, TAS can be employed by Celgene to facilitate adaptive clinical trials.

**Project Parameters**

| TAS Field Systems Customization | Description |
| --- | --- |
| Assay Development & Clinical Use | Theranos will develop and customize assays for ACE-011 and multiplexed cartridges for the specified analytes. Assay development will be done according to FDA ICH guidelines. Upon completion of development, Theranos will deploy cartridges in clinical studies. The |

CONFIDENTIAL
Celgene Contract ID#

Page 1

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905771

**ER-14324**

| | |
|---|---|
| | PK assay will initially be compared to QPS tests for additional cross validation. During the development period for the PK assay, Theranos can develop an assay to measure any possible antibody levels to the drug. The multiplexed PK-antibody measurements could be used for identification of possible safety/efficacy thresholds and the associated drug and antibody levels. |
| Required Sample Types | Whole blood, plasma, serum, (interchangeably) |
| Required Materials | Celgene to provide Theranos with relevant supply of drug and other required materials, as requested. |

**Change Order Procedure**

Should the scope, duration or parameters of this project change, costs may need to be revised, and no services will be provided for such new scope or parameters until the parties amend this Statement of Work to reflect such changes, which shall be captured in a change order and signed by both parties.

Celgene agrees to pay reasonable cost should the project be canceled after the project has been contracted. This amount will cover any cost already incurred in preparation for the conduct of the project.

**PROGRAM COST AND PAYMENT SCHEDULE for NON-CLINICAL DEVELOPMENT**

Theranos will perform the services and provide the deliverables set forth in this Statement of Work as follows:

| TAS Customization & ACE-01 Phase I Deployment | | PRICE |
|---|---|---|
| **2009** | **Customization/Installation/Deployment of TAS** | |
| | TAS Field Systems: | |
| | • Assay Development    Real-time PK assay | $500k |
| | • Customization of Device | No charge |

**Milestone Payments.**

| Success Milestone | % Payment | Amount Due |
|---|---|---|
| Statement of Work Execution | 50% of total Non-Clinical payment | $250,000 |
| PK Assay Validation Completion | 40% of Non-Clinical payment | $200,000 |
| Acceptance of Final Study Report for PK Assay Development | 10% of Non-Clinical payment | $50,000 |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905772

**Exclusions**

As specified and in accordance with the Master Services Agreement, in addition to fees described above, Theranos charges for third-party expense disbursements and other costs incurred in connection with the performance of the services. These costs include, but are not limited to, telecommunications, printing, additional touch-screen customizations, any incidental expenses, and the associated administrative fees incurred to provide or in support of the Services outlined in this Statement of Work. All expense disbursements and pass-through costs for this Project will be invoiced to Celgene at-cost, without markup, and are not anticipated to exceed thirty-five thousand dollars ($35,000), and will be processed following Change Order Procedure.

Invoices must reference the assigned purchase order (PO) No. and are to be sent to the attention of:

> Celgene Corporation
> Attn: Accounts Payable
> P.O. Box 1007
> Summit, NJ 07902-1007
> Referencing: Gondi Kumar as Manager

Celgene shall pay the amount of each invoice received from Theranos within forty-five (45) days of receipt by Celgene, unless Celgene has notified Theranos within such forty-five (45) day period that it disputes any particular invoiced item(s), which dispute the parties shall attempt in good faith to resolve.

Because of the difficulty in substantiating the validity of claims for payment increases with time, Celgene reserves the right to decline to pay for expenses that are invoiced more than ninety (90) days after an expense has been incurred. In no event will Celgene pay on invoices submitted more than one hundred eighty (180) days after an expense has been incurred

**TRIAL COMMUNICATIONS**

All communications provided for in this Statement of Work may be made via email, and confirmed by fax receipt, express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

**Theranos Contacts**

<u>Project Matters</u>
Marc Thibonnier
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6192
Fax (650) 838-9165

<u>Billing Matters</u>
Danise Yam
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6204
Fax (650) 838-9165

**Celgene Contacts**

<u>Project Matters</u>
Gondi Kumar
86 Morris Avenue
Summit, NJ 07901
Ph. (908) 673-9718
Fax (908) 673-2842

<u>Billing Matters</u>
Celgene Accounts Payable
(see above address)

CONFIDENTIAL
Celgene Contract ID#

Page 3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905773

**IN WITNESS WHEREOF**, the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

| THERANOS, INC. | CELGENE CORPORATION |
|---|---|
| Signature | Signature |
| Name (please print) | Name (please print) |
| Elizabeth Holmes | Rick Morrissey |
| Title | Title |
| President & Chief Executive Officer | Vice President, Nonclinical Development |
| Date 18 November 2009 | Date 30 NOV 2009 |

Approved As To Form
Initials

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905774

ER-14327

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023