No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. L of LVII | ER-14329 to ER-14623

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA  98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com


centocor
research & development inc

December 22, 2009

**VIA OVERNIGHT MAIL**

Elizabeth Holmes
President and CEO
Theranos, Inc.
3200 Hillview
Palo Alto, CA 94304
650.470.6111

Re:      Fully-executed original of First Amendment to Clinical Assay
        Development and Feasibility Project Agreement between
        Theranos, Inc. and Centocor Research & Development, Inc.

Dear Elizabeth:

Per recent correspondence, I am enclosing one fully-executed original of the
above-referenced document. The related Purchase Order (PO) number has
been written on the upper right corner of the first page. Please ensure that
Theranos references this PO number on any invoice(s) submitted for work
performed under this Amendment.

My thanks again to you and your colleagues for your help in bringing this
document to completion.

Best regards, and best wishes for a Happy Holiday,

David M. Soloway

encls.

Research & Development Inc.
200 Great Valley Parkway
Malvern, PA 19355
phone: 610.651.6000
fax:    610.651.6400

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905775

PO# 992428071

**First Amendment to Clinical Assay Development and Feasibility Project Agreement
between Theranos, Inc. and Centocor Research & Development, Inc.**

This First Amendment (the "First Amendment") is made effective as of December 1, 2009 (the "First Amendment Effective Date") by and between Theranos, Inc., having a business address at 3200 Hillview, Palo Alto, CA 94303 ("Theranos"), and Centocor Research & Development, Inc., having a business address at 200 Great Valley Parkway, Malvern PA 19355, and its Affiliates ("Centocor").

**WHEREAS**, Centocor and Theranos previously entered into the Clinical Assay Development and Feasibility Project Agreement dated September 1, 2008 (the "Agreement"); and

**WHEREAS,** Centocor and Theranos desire to amend the Agreement as of the First Amendment Effective Date in order to (i) extend the term of the Agreement, (ii) authorize the production and use of additional Cartridges for the performance of the Project, and (iii) provide for the payment of funds in support of such production and performance;

**NOW THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

I.   Capitalized terms set forth in this First Amendment that are not specifically defined herein shall have the meaning ascribed to them in the Agreement.

II.  The words "Expiration Date:   September 10, 2010" on the cover page of the Agreement are hereby deleted in their entirety and the words "Expiration Date:  February 28, 2011" are substituted therefor.

III. Section 3(a) of the Agreement is hereby deleted in its entirety and the following is substituted therefor:

"(a)    This Agreement shall be effective for a period that commences on the Effective Date and that ends of February 28, 2011, unless sooner terminated as provided herein or mutually extended in writing by both parties."

IV. The word "Company" is hereby deleted from Section 5(b) of the Agreement, and the word "Theranos" is substituted therefor.

First Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
First Amendment Effective Date: December 1, 2009

1

ICD 237565

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905776

V. Exhibit C of the Agreement is hereby amended by adding the following language to the end of Exhibit C:

"In addition to the foregoing (and subject to the invoicing provisions and other terms of the Agreement), Centocor shall also provide funding in the amount of up to Two Hundred Thousand United States Dollars ($200,000USD), in accordance with the following schedule:

(i)     Fifty Thousand United States Dollars ($50,000USD) upon execution of this First Amendment; and

(ii)    One Hundred Thousand United States Dollars ($100,000USD) upon commencement of the Project, except such payment shall not be due in any event prior to January 15, 2010; and

(iii)   Fifty Thousand United States Dollars ($50,000USD) upon completion of the Project and Centocor's receipt of all reports and other deliverables required under the Agreement.

Unless Centocor otherwise agrees in writing, such additional funds shall be used for the sole purpose of, and shall constitute full consideration for, the production of One Thousand One Hundred (1,100) Cartridges and the use of such Cartridges in the performance of the Project. For the avoidance of doubt, no monies (including without limitation any monies referenced in Section 5(c)) are owed or payable to Theranos other than the monies that are, or that become, payable under this Exhibit C."

VI. All other terms and provisions of the Agreement shall remain in full force and effect.

*Signatures begin on the next page.*

First Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
First Amendment Effective Date: December 1, 2009

ICD 237565

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905777

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed by their duly authorized representatives.

**CENTOCOR RESEARCH &
DEVELOPMENT, INC.**

Signature: _Jay Siegel_

Name: _Jay P. Siegel, M.D._

Title: _President_

Date: _16 Dec 09_

**THERANOS, INC.**

Signature: _Elizabeth Holmes_

Name: _Elizabeth Holmes, Ph.D._

Title: _President and CEO_

Date: _9 Dec 2009_

Signature: _Amy E. Wilson_

Name: _Amy Ellison_

Title: _Sr. Finance Director_

Date: _12/16/09_

3

First Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
First Amendment Effective Date: December 1, 2009

ICD 237565

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905778

PO#992428071

**Second Amendment to Clinical Assay Development and Feasibility Project Agreement between Theranos, Inc. and Centocor Research & Development, Inc.**

This Second Amendment (the "Second Amendment") is made effective as of January 1, 2010 (the "Second Amendment Effective Date") by and between Theranos, Inc., having a business address at 3200 Hillview, Palo Alto, CA 94303 ("Theranos"), and Centocor Research & Development, Inc., having a business address at 200 Great Valley Parkway, Malvern PA 19355, and its Affiliates ("Centocor").

**WHEREAS**, Centocor and Theranos previously entered into the Clinical Assay Development and Feasibility Project Agreement dated September 1, 2008 (as amended, the "Agreement"); and

**WHEREAS,** Centocor and Theranos desire to amend the Agreement as of the Second Amendment Effective Date in order to (i) authorize the performance of certain additional work as part of the Project, and (ii) provide for the payment of funds in support of such additional work;

**NOW THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

I.   Capitalized terms set forth in this Second Amendment that are not specifically defined herein shall have the meaning ascribed to them in the Agreement.

II.  Exhibit A of the Agreement is hereby amended by adding the following language to the end of Exhibit A:

"Theranos shall prepare and provide Centocor with a procedural manual (i) that explains step-by-step processes that the unit will need to follow, (ii) that contains any information regarding Troubleshooting, device and cartridge shipments, and any IT information that might be helpful, and (iii) that includes clear instructions regarding the TNSS questionnaire.

The Clinicians Guide, the TNSS Survey, and the Patient Guide will be (as applicable) prepared and revised in accordance with the specifications below:

Clinicians Guide:
-   The Clinicians Guide has some general information on data to enter and menu options. The Clinicians Guide shall be customized per Centocor's instructions.
-   The Clinicians Guide, Page 18, references the running of a plasma/serum/venous blood sample. Theranos will clarify the following to Centocor's satisfaction: is this something that is expected to be done? If not, why is it here, if yes, does the site know this?

1

Second Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
Second Amendment Effective Date: January 1, 2010

ICD 252290

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905779

ER-14334

- Since Centocor does not use food diary, activity log or therapy options, these options should be removed from the Clinicians Guide or the Clinicians Guide should state in one sentence that these options will not be used.
- The Clinicians Guide should provide more text regarding the exact diary, as in line with the protocol (TNSS diary used by Atopic cohort only, at all scheduled timepoints for device use per protocol), and this section must be linked to the presentation on the TNSS. The Clinicians Guide should indicate that this is a survey that the subject should take and, therefore, such Guide should ensure this is clear for the clinicians.
- The Clinicians Guide should indicate very clearly how the communication plan with Theranos is expected to be managed, either through Theranos, through GCO or directly from site to Theranos. The Clinicians Guide must refer for appropriate contact to the study contact list (external vendors) and must ensure that the right people from Theranos are listed (in addition to Chelsea, the Theranos IT representative should be listed).

TNSS Survey (the "Survey"):
- The TNSS Survey will (i) state where language is being selected when the Survey is started; and (ii) indicate how to make an appropriate correction in case of mistakes.
- The above may need to be added to the Clinicians guide or to the Subject Guide.

Patient Guide:
- Please refer this Guide as the 'Subject Guide, rather than the 'Patient Guide.'
- Delete the pipette reference in the consumables section.
- Update the installation instructions to indicate clearly that the setup is not something the subject is expected to do! All is wireless so no activity is expected from the subject. In case the device is not functioning, the subject should call the site staff who will help the subject (either by contacting the Theranos helpdesk, or Theranos' IT expert).
- Delete sections on internet and phone line.
- Indicate that the subject will be practicing a few times with the fingerstick running, while at the site, and under the supervision of the study nurse/lab technician.
- Include more information on the appropriate way to discard all materials after use, including the cartridge after it taken out of the device.
- Take out Food Diary, Activity log and therapy log. And add in much more information on the use of the TNSS survey, how to use in device, what to do when mistakes are made etc.
- Where does the subject enter their subject number, visitor, type of cartridge (A or B) in the device?
- Clarify whether there are steps to skip when the subject works the device from home only using 1 cartridge instead of 2 at the site.
- Include more guidance on how subjects should keep their cartridges in the refrigerator (fridge). Some home fridges are not very stable, more in the back placement might cause cartridges to freeze. Explain to subjects exactly how to go about avoiding any mishaps, and indicate also what to do if mishaps occur."
- Theranos will be responsible for the translation of the approved Subject Guide into Dutch

2

Second Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
Second Amendment Effective Date: January 1, 2010

ICD 252290

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905780

III. Exhibit C of the Agreement is hereby amended by adding the following language to the end of Exhibit C:

"In addition to the foregoing (and subject to the invoicing provisions and other terms of the Agreement), Centocor shall also provide funding in the amount of Five Thousand One Hundred Eighty United States Dollars ($5,180USD), upon execution of this Second Amendment.

Such $5,180 payment constitutes full consideration for the work specified in this Second Amendment."

IV. All other terms and provisions of the Agreement shall remain in full force and effect.

*Signatures begin on the next page.*

3

Second Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
Second Amendment Effective Date: January 1, 2010

ICD 252290

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905781

ER-14336

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be executed by their duly authorized representatives.

**CENTOCOR RESEARCH &**
**DEVELOPMENT, INC.**

**THERANOS, INC.**

Signature: _Susan B Dur_        Signature: _[signature]_

Name: _SUSAN B D.llon_        Name: Elizabeth Holmes

Title: _Global TA Head, Immunology_  Title: President and CEO

Date: _2/19/10_            Date: _5 February 2010_

4

Second Amendment to Clinical Assay Development and Feasibility Project Agreement
Centocor Research & Development, Inc.
Theranos, Inc.
Second Amendment Effective Date: January 1, 2010

ICD 252290

**ER-14337**

CLINICAL ASSAY DEVELOPMENT AND FEASABILITY PROJECT AGREEMENT

FOR

USE OF THERANOS SYSTEMS

BETWEEN

CENTOCOR RESEARCH AND DEVELOPMENT, INC.

AND

THERANOS, INC.

Effective Date:  September 1, 2008

Expiration Date:  September 1, 2010

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905783

This Clinical Assay Development and Feasibility Project Agreement (this "Agreement") is effective as of September 1, 2008 (the "Effective Date") by and between Centocor Research and Development, Inc., a Pennsylvania corporation with offices at 200 Great Valley Parkway, Malvern, PA 19355 and its Affiliates ("Centocor"), and Theranos, Inc., a Delaware corporation with offices at 3200 Hillview, Palo Alto, CA 94304 ("Theranos").

WHEREAS, Centocor would like Theranos to provide, and Theranos would like to provide, clinical assay development Project and support for developing a clinical assay system and feasibility clinical study project ("Project") for using the Theranos System (as defined herein) by Centocor to evaluate real-time PK/PD profiling in plasma samples obtained by Centocor for potential Phase I asthma studies of CNTO 5825, as further described in Exhibit A, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

**DEFINITIONS:**

The following terms shall have the meanings indicated when used in this Agreement or any amendment hereto:

(a)     "**Affiliate**" shall mean any company or entity that controls, is controlled by or is under common control with a given Party.

(b)     "**IAPP**" shall mean the Johnson & Johnson Worldwide Policies on Information Asset Protection, dated December 19, 2003, as revised from time to time and provided to Theranos.

(c)     "**Cartridge**" means Theranos provided devices comprising one or more analytical chips containing biological fluid processing assay technology and assays to measure, among other matters, the concentration of specific analytes, including therapeutic compounds, proteins and/or biomarkers in a biological fluid sample, said Cartridge owned or controlled by Theranos or its Affiliates for which Theranos has rights to license or sublicense to Centocor solely for use according to the terms of this Agreement.

(d)     "**Centocor Intellectual Property Rights**" shall mean all retained and transferable legal rights covering Centocor Compound and Centocor Know How, and use thereof covered by Centocor or Affiliate owned, controlled or licensed patents, copyrights, trade secrets, know how, trademarks, moral rights, and other intellectual property rights designated under the laws of jurisdictional governmental authority.

(e)     "**Centocor Know How**" shall mean all proprietary materials, reagents, protocols, and other information supplied by Centocor to Theranos for developing the Theranos System for use as a clinical assay system for evaluating the feasibility of using such a Theranos System for real-time PK/PD profiling in whole blood samples obtained by Centocor for Phase I asthma studies of CNTO 5825, as further described in Exhibit A.

(f)     "**Centocor Compound**" means the Centocor provided biological compound designated as CNTO5825, owned or controlled by Centocor or its Affiliates and for which Centocor has rights to license or sublicense to Theranos soley for uses according to the terms of this Agreement.

(g)     "**Centocor Confidential Information**" shall mean (i) all scientific, technical, trade or business information of Centocor which is provided by Centocor to Theranos and which is treated by Centocor as confidential or proprietary including, without limitation, compounds, materials, formulations, inventions, assay systems, formulae, procedures, data, methods, techniques, reports, know-how, and other proprietary ideas, whether or not protected under patent, trademark, copyright, or other legal principles of Centocor, (ii) the inventions, discoveries, methods, improvements and intellectual property owned by Centocor under Section 7 of this Agreement, regardless of the inventorship or source thereof, and (iii) any other confidential information about or belonging to Centocor's Affiliates, customers, potential customers or others.  Notwithstanding the foregoing, Centocor Confidential Information does not include information which (a) at the time of disclosure is published, known publicly or is otherwise in the public domain, (b) is at the time of disclosure or later becomes publicly known under circumstances involving no breach of this Agreement, (c) is lawfully and in good faith made available to Theranos by a third party who did not derive it, directly or indirectly, from Centocor, or (d) is independently developed by Theranos without the aid, use or application of Centocor Confidential Information received hereunder; or (e) is required to be disclosed by law, provided that Theranos gives Centocor sufficient advance written notice to permit Centocor to seek a protective order with respect to such Confidential Information and thereafter discloses only the minimum Confidential Information required to be disclosed in order to comply.

(h)     "**Centocor Materials**" shall mean collectively, Centocor Compound, Centocor Know How, and Centocor Confidential Information.

(i)     "**Participants**" mean patients whose tissue samples are evaluated or measured using the Theranos System.

1

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905784

**ER-14339**

(j)   "**Project**" means the feasibility project set forth in Exhibit A hereto, which includes Part One (Part 1) for Theranos to develop using the Theranos System and Centocor Materials (as defined in Section 1(a)) a clinical assay system for feasibility testing by Centocor; and Part Two (Part 2) an optional feasibility study by Centocor using patient plasma samples obtained by Centocor to evaluate real-time PK/PD profiling for a preliminary Phase I study of CNTO 5825 in asthma, as further described in Exhibit A, excluding any continuations or extensions thereof or additions thereto unless otherwise specified in this Agreement or amendments thereto.

(k)   "**Reader**" means Theranos's proprietary device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Theranos, communicating with authorized parties and providing analytical information, said Reader owned or controlled by Theranos or its Affiliates for which Theranos has rights to license or sublicense to Centocor soley for use according to the terms of this Agreement.

(l)   "**Software**" means computer programs, object code and related materials, in machine readable or printed form, of Theranos and its licensors, as further described in Section 8(a), provided under this Agreement, including any upgrades or updates thereto that Theranos may provide from time to time, said Software owned or controlled by Theranos or its Affiliates for which Theranos has rights to license or sublicense to Centocor soley for use according to the terms of this Agreement.

(m)   "**T.OS**" means Theranos's ambulatory bioinformatics communication system, database, analytical engine, algorithms, hardware and methodologies, and related statistical and other analysis methods, data repositories and technologies, said T.OS owned or controlled by Theranos or its Affiliates for which Theranos has rights to license or sublicense to Centocor solely for use according to the terms of this Agreement.

(n)   "**Theranos Confidential Information**" shall mean all scientific, technical, trade or business information of Theranos which is provided by Theranos to Centocor and which is treated by Theranos as confidential or proprietary including, without limitation, compounds, materials, formulations, inventions, assay systems, formulae, procedures, data, methods, techniques, reports, know-how, and other proprietary ideas, whether or not protected under patent, trademark, copyright, or other legal principles of Theranos and any other confidential information about or belonging to Theranos' Affiliates, customers, potential customers or others. Notwithstanding the foregoing, Theranos Confidential Information does not include information which (a) at the time of disclosure is published, known publicly or is otherwise in the public domain, (b) is at the time of disclosure or later becomes publicly known under circumstances involving no breach of this Agreement, (c) is lawfully and in good faith made available to Centocor by a third party who did not derive it, directly or indirectly, from Theranos, or (d) is independently developed by Centocor without the aid, use or application of Theranos Confidential Information received hereunder; or (e) is required to be disclosed by law, provided that Centocor gives Theranos sufficient advance written notice to permit Theranos to seek a protective order with respect to such Confidential Information and thereafter discloses only the minimum Confidential Information required to be disclosed in order to comply.

(o)   "**Theranos Intellectual Property Rights**" shall mean all retained and transferable legal rights covering any Theranos System or use thereof covered by Theranos or Affiliate owned, controlled or licensed patents, copyrights, trade secrets, know how, trademarks, moral rights, and other intellectual property rights designated under the laws of jurisdictional governmental authority.

(p)   "**Theranos System**" means, collectively, the clinical assay system developed for Centocor comprised of the T.OS, Reader(s), Cartridges, Software, related methods, training programs, Theranos monitoring and other Theranos support, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination, used by Centocor under the terms of this Agreement, said Theranos System owned or controlled by Theranos or its Affiliates for which Theranos has rights to license or sublicense to Centocor solely for use according to the terms of this Agreement.

(q)   "**Users**" means individuals, other than Participants, who are designated and authorized by Centocor to have access to and use the Theranos System and who are properly trained end users of the Theranos System according to the terms of this Agreement.

1.   **SUPPLY OF PROJECT**

(a)   During the first twelve months or less of the term of this Agreement, Theranos shall use Centocor Compound, Centocor Know How and Centocor Confidential Information (collectively, "Centocor Materials") to develop as a first part of the Project a Theranos System (as defined herein) for use by Centocor to conduct feasibility testing using spiked plasma or whole blood samples. Subsequent to the first part of this development and feasibility testing, Centocor will elect at its sole option whether to use the developed Theranos System in a second part of the Project to further test the Theranos System for real-time PK/PD profiling of the Centocor CNTO 5825 product in whole blood samples obtained by Centocor, in Phase I asthma studies, as more particularly set forth in Exhibit A, attached hereto and incorporated herein in accordance with this Agreement. Where Centocor provides Theranos with a purchase order number in association with the Project provided hereunder, Theranos shall include such purchase order number in all documents and correspondence associated

2

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905785

with the delivery of such Project (including without limitation all invoices, delivery notices, advice notices and certificates).

(b)     Theranos shall provide to Centocor monthly reports of the Project provided in the format reasonably requested by Centocor.

(c)     Centocor reserves the right to reject for any lawful reason whatsoever any of Theranos's personnel assigned by Theranos to work on Project in connection with this Agreement. Theranos shall as soon as possible thereafter provide a replacement reasonably satisfactory to Centocor. Theranos shall not, however, leave the position without staffing reasonably acceptable to Centocor during the replacement assessment period.

(d)     The parties agree that the relationship between Theranos and Centocor is not one of exclusivity.

(e)     Theranos will perform criminal background and credit checks on each of its employees assigned to perform duties in connection with the Project that require the handling of any form of money, including, without limitation, currency, money orders, bank notes and negotiable instruments, non-negotiable instruments, purchase orders, credit cards or other valuable property of Centocor or its Affiliates. Theranos will ensure that for any personnel assigned to perform duties in connection with the Project, the reports resulting from such checks will be reasonably satisfactory in accordance with Centocor's reasonable requirements as provided to Theranos from time to time.

(f)     Theranos will request and reasonably receive documents, data, records, and cooperation by Centocor in order to properly perform the Project, and Theranos is not responsible for errors, delays or other consequences arising from the failure of Centocor or its employees, agents or contractors to provide such documents, data, records or cooperation in a timely manner. Subject to the foregoing, in connection with the Project and to enable Theranos to perform the Project in as efficient a manner as possible, Centocor shall reasonably provide to Theranos such additional information and assistance as may be described herein and as may be reasonably requested by Theranos from time to time during the term of this Agreement, including, but not limited to, any additional information and assistance with respect to previous development activities performed by Centocor which may relate to the Project and which may provide guidance to Theranos in performing the Project.

**2.     TRANSFER OF CENTOCOR COMPOUND, CENTOCOR KNOW HOW AND CENTOCOR CONFIDENTIAL INFORMATION**

(a)     Centocor will supply, at no cost to Theranos, sufficient quantities of the Centocor Compound, Centocor Know How, and Centocor Confidential Information (collectively "Centocor Materials") sufficient to allow Theranos to perform the Project. The Centocor Materials are to be used in confidence by Theranos only in Theranos's laboratories solely for purposes of performing the Project. The Centocor Compound shall not be used by Theranos in any human subjects. Theranos shall use the Centocor Materials in accordance with all applicable laws, regulations, and government guidelines, including those set forth by the National Institutes of Health (NIH), U.S. Department of Agriculture (USDA) or other governmental agencies regarding the use of like materials. Notwithstanding anything to the contrary in this Agreement, Theranos agrees that any information that it discloses hereunder will not include any personally identifiable information or any "Protected Health Information" ("PHI") as defined in 45 C.F.R. Section 164.501. The Centocor Material shall not be used in research that is subject to consulting or license obligations with any party other than Centocor. Theranos will not transfer Centocor Material to any person outside of Theranos's laboratory where the Project is performed, and will limit access to the Centocor Material to those Theranos employees in such laboratory who have a need to use the Centocor Material for purposes of the Project. Centocor shall not sell or otherwise transfer Centocor Material to any third party.

(b)     No rights, express or implied, are granted to Theranos under any Centocor Intelletual Property Rights relating to the Centocor Material that are presently or hereafter owned or controlled by Centocor and/or its Affiliates, except as otherwise provided in Section 7(j) below. Theranos acknowledges and agrees that, except as otherwise expressly provided herein: the Centocor Material is proprietary to Centocor and its Affiliates; Centocor and its Affiliates shall retain all right, title and interest in and to the Centocor Materials and Centocor Intellectual Property Rights; and Centocor remains free to distribute and/or license the Centocor Material to others, at Centocor's discretion.

(c)     For the avoidance of doubt, the term "Centocor Materials" shall include, but is not limited to, any form or formulation of the Centocor Compound. Theranos will not make any derivative or modification of the Centocor Compound. Theranos will not attempt to determine the structure or properties of any Centocor Compound, or perform any experiments with any Centocor Compound, except as expressly required for performance of the Project. All data or information obtained by Theranos relating to the chemical or physical properties of Centocor

3

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905786

Compound shall be assigned to Centocor or its Affiliate and shall be treated as Centocor's Confidential Information by Theranos.

**3.     TERM; TERMINATION**

(a)     This Agreement shall be effective for a two (2) year term from the Effective Date through September 1, 2010, unless sooner terminated as provided herein or mutually extended by both parties.

(b)     Either party may terminate this Agreement at any time if the other party is in default of its material obligations hereunder and such default is not cured within thirty (30) days after the defaulting party receives written notice thereof from the party seeking to terminate this Agreement; provided however, there shall be no cure period for a material breach that (i) is the result of gross negligence or willful misconduct, (ii) cannot reasonably be cured, in the reasonable opinion of the party seeking termination of the breach, or (iii) results in irreparable or continuing harm to the party seeking to terminate this Agreement.  Notwithstanding any termination of this Agreement as a result of a breach by the other party, the terminating party shall be entitled, in accordance with applicable law and this Agreement, to recover all damages sustained by it as a result of the other party's breach, subject to Section 14 below.

(c)     Centocor may terminate this Agreement at any time with or without cause upon ninety (90) days written notice to Theranos.  In the event of such termination, (i) Theranos shall comply with any reasonable directions given by Centocor regarding the Centocor Materials or Confidential Information of Centocor in such notice and (ii) Centocor shall pay Theranos within thirty (30) days of the effective date of termination under this Section 3(c) (A) ten percent (10%) of the total amount due under this Agreement to compensate Theranos for its wind-down activities, and (B) any additional amounts owed, but not yet paid for work performed and expenses incurred prior to the effective date of termination, as well as any incidental or out-of-pocket costs incurred by Theranos in connection with the Project, including, without limitation, non-cancellable commitments attributable to the termination of this Agreement.

(d)     Within thirty (30) days from the effective date of any termination of this Agreement as provided herein, the parties shall cooperate with each other and use all commercially reasonable efforts to effect a smooth transition process.  Such cooperation shall include, but not be limited to Theranos providing to Centocor, in the format reasonably requested by Centocor, all Centocor Materials, including any work-in-progress, co-developed intellectual property and Confidential Information of Centocor, as defined in Section 7, prepared pursuant to this Agreement.  Such cooperation shall further include Centocor's returning to Theranos all Theranos property in its possession or control, including: (a) all Confidential Information of Theranos; (b) all Devices (as provided in Section 9(d) below) and Client Accessible Software (as defined below in Section 8(a)) provided to Centocor, Participants, and/or Users under this Agreement; and (c) all authorization codes providing Participants and/or Users with access to the Theranos System; unless, in each case, otherwise provided in writing.  In addition, Centocor shall ensure that all relevant Participants, Users and other Centocor employees and consultants cease using the Theranos System immediately following any such termination of this Agreement.

(e)     Any expiration or termination of this Agreement shall not release any party from any liability which at such time had already accrued or thereafter accrues from a breach or default prior to such expiration or termination nor affect the survival of any right, duty or obligation of any party that is expressly stated to survive termination or expiration of this Agreement.  The following Sections of this Agreement shall survive termination or expiration of this Agreement: 2, 3(b), 3(c), 3(d), 3(e), 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, and 26.

**4.     CHANGES TO PROJECT**

(a)     Theranos may introduce changes to the Project provided that Theranos obtains the written approval from Centocor for all such changes prior to implementing any such changes.

(b)     Theranos shall prepare a change order in the form substantially of that in Exhibit B attached hereto for any proposed changes to the Project and shall send such change order to Centocor for written approval prior to Theranos implementing any such changes.  The change order shall set forth in detail the effect (if any) of the changes on the Project with respect to quality, price, timing and function.

(c)     Centocor shall be entitled to introduce changes to the Project at any time by providing written notice of such changes to Theranos.  If such changes have an effect on quality, price or function, Theranos shall prepare a change order as stated in 4(b) above within thirty (30) business days of receipt of Centocor's change notice.

4

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905787

(d)     If a change order provided pursuant to Section 4(b) or 4(c) above reflects a change in quality, price, timing or function not reasonably satisfactory to Centocor, Centocor shall have the option to revert to the Project in effect at such time or seek any changes that are mutually acceptable to both parties.

(d)     Except as provided in this Section, no order, statement or conduct of Centocor shall be considered to be a change in the Project or entitle Theranos to any type of equitable adjustment.

5.     **PRICE AND PAYMENT**

(a)     The pricing for the Project and level of reimbursements Centocor shall make for approved expenses shall be as set forth in Exhibit C attached hereto.

(b)     Theranos shall invoice Centocor in accordance with the schedule set forth in Exhibit C attached hereto. Unless Centocor otherwise informs Theranos, Theranos shall include on all invoices a reference to the purchase order number associated with this Agreement, a description of the Project to which the invoice relates, and the correct price. Theranos shall provide Centocor with invoices in the manner instructed by Centocor. Theranos shall not issue, and Centocor shall not pay, any invoices prior to both parties executing this Agreement, Centocor issuing a purchase order to Theranos for the Project (which such purchase order shall be issued no later than fifteen (15) days following the execution of this Agreement), and Theranos meeting the applicable milestone(s) and providing the applicable deliverable(s) to Centocor. Centocor shall pay all undisputed invoices within forty-five (45) days after receipt of such appropriately submitted invoices. All invoices not paid in forty-five (45) days shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand. Invoices shall be sent to: Johnson & Johnson Shared Services, P.O. Box 16540, New Brunswick, NJ 08906-6540. Copies of all invoices shall be sent to Gary Toedter, Ph.D. at Centocor Research & Development, Inc., 145 King of Prussia Road, Radnor, PA 19087. All invoices must reference a valid Centocor Purchase Order Number (PO) number. Centocor reserves the right to return to Theranos unprocessed and unpaid any invoice that does not reference such a PO number. All payments to Company shall be made by check payable to "Theranos, Inc." Payments will be sent to the attention of President at the address referenced below. Notwithstanding the foregoing, Centocor may contest any invoice or portion thereof if it reasonably believes that the charges reflected therein are inappropriate or questionable (paying all charges that are appropriate) and, once the matter is resolved, Centocor shall pay the appropriate charges within fifteen (15) days thereafter. In addition, in the event of early termination of this Agreement, financial accounting of all costs incurred and all funds received by Company hereunder together with a check for the amount of any unexpended balance, if any, shall be submitted to Centocor upon request.

(c)     If Centocor delays or suspends the Project for more than thirty (30) days due to no fault of Theranos, and Centocor requests that Theranos staff continue to be assigned to the Project during the period of such delay or suspension, (i) Centocor will pay to Theranos all amounts due and payable through the date of such delay or suspension, and (ii) a monthly Project fee for personnel and other expenses incurred will be charged, in an amount and schedule reasonably determined by Theranos consistent with Theranos's general practices for calculation of such monthly service fees. Such delay shall last no longer than three (3) months, after which time Theranos shall have the right to terminate this Agreement or amend the pricing for the Project, upon written notice to Centocor.

(d)     Except for charges expressly set forth in Exhibit C attached hereto or specified in this Agreement, Centocor shall not be responsible for any other charges or expenses of Theranos or any mark-ups on any expenses of Theranos, unless expressly stated in an amendment to this Agreement signed by the parties or a result of a change order approved in accordance with Section 4 above.

6.     **WARRANTIES**

(a)     Theranos represents and warrants the following:

(i)     The Project shall be in accordance with and conform to the terms of this Agreement and any applicable industry standards and practices;

(ii)     The Project shall be provided by qualified personnel reasonably skilled and trained in the performance of the Project and in a workmanlike and professional manner, all in conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances to Theranos;

5

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905788

      (iii)     Theranos, in the performance of the Project, shall not intentionally infringe or misappropriate any party's Intellectual Property Rights and any party's Confidential Information as defined in Section 7 herein below;

      (iv)     Theranos shall comply in all material respects with, and the Project shall be in material compliance with, all federal, state and municipal statutes, laws, ordinances and regulations, including, without limitation, those relating to the environment, occupational safety and health administration, labor standards, and any permits, licenses and certifications Theranos is required to have, governing the Project and deliverables provided;

      (v)     The Project, including the deliverables produced under this Agreement and any ancillary activities related to the Project will comply with the IAPP, except as otherwise agreed to in writing by the parties. If Theranos fails to comply with any revisions to the IAPP within thirty (30) days of Theranos's receipt of same or provide other acceptable assurances of equivalent protection, in Centocor's sole discretion, Centocor may immediately terminate this Agreement by written notice to Theranos, and such termination shall be deemed a termination under Section 3(c); and

      (vi)     Theranos and its employees are not subject to exclusion or debarment by the U.S. Food and Drug Administration ("FDA") or any other federal or state law which would preclude Theranos or its employees from providing the Project or Theranos from contracting for the Project; and

      (vii)     Theranos shall comply with Centocor's policy of Employment of Young People as follows:

This policy applies to the employment by Theranos of persons under the age of 18 ("Young Persons") in the manufacture of any product, or any component of any product, or to any Project provided to Centocor or an Affiliate of Centocor worldwide.

1) Age, Health & Safety – No person under the age of 16 shall be employed. No person between the ages of 16 and 18 shall be employed unless such employment is in compliance with the health, safety and morals provisions of the International Labour Organization Convention 138 Concerning Minimum Age.
2) Hours – No Young Person shall be required to work more than 48 hours of regularly scheduled time and 12 hours of overtime per week, nor more than six days per week.
3) Law & Regulations – No Young Person shall be employed unless such employment is in compliance with all applicable laws and regulations concerning age, hours, compensation, health and safety.

    (b)     Without limiting any other rights Centocor may have, and subject to Centocor's compliance with Section 1(f) hereof, Centocor reserves the right to refuse any Project if Theranos does not, or the Project does not, conform to the foregoing. Acceptance of any part of the Project shall not bind Centocor to accept any non-conforming Project simultaneously provided by Theranos, nor deprive Centocor of the right to reject any previous or future non-conforming Project.

    (c)     Centocor represents, warrants and covenants that it has obtained, and shall continue during the term of this Agreement to obtain, all necessary consents to be able to provide Participant Data (as defined below in Section 7(i)) to Theranos and to permit Theranos to use such Participant Data for all purposes specified in this Agreement.

    (d)     EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THERANOS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE PROJECT OR THE THERANOS SYSTEM (OR ANY PART THEREOF) OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER THIS AGREEMENT, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF THERANOS OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

6

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905789

(e)     Centocor acknowledges that Theranos makes no representation or warranty that Centocor's pharmaceutical, biologic, or medical device products (including any Centocor Compound) tested in connection with the Project can, either during the term of this Agreement or thereafter, be successfully developed or, if so developed, will receive the required approval by the FDA or other applicable regulatory body.

7.     **CONFIDENTIAL INFORMATION; INTELLECTUAL PROPERTY**

Confidential Information

(a)     As used herein, "Confidential Information" shall include all information given to one party (the "Receiving Party") by the other party (the "Disclosing Party"), or otherwise acquired, or generated by the Receiving Party, in connection with this Agreement, relating to the Disclosing Party or any of its Affiliates or their respective businesses or employees, including, without limitation, (i) information regarding any of the products, costs, productivity or technological advances of the Disclosing Party or any of its Affiliates, (ii) information that identifies or could reasonably be used to identify an individual, and (iii) the terms of this agreement; except for the avoidance of doubt, each party shall be deemed the Receiving Party of all inventions, discoveries, methods, improvements, and intellectual property owned by the other party under this Section 7, regardless of the inventorship of source thereof.

(b)     Notwithstanding the foregoing, "Confidential Information" does not include the following information: (i) information that is or was independently developed by the Receiving Party outside the scope of any agreement between Theranos and Centocor or its Affiliates and without use of any other Confidential Information, (ii) information that is or was received from a third party that did not have, to the Receiving Party's knowledge, any confidentiality or other similar obligation to the Disclosing Party or its Affiliates with respect to such information; or (iii) information that is or becomes a part of the public domain through no fault of the Receiving Party, its employees, representatives or agents.

(c)     The Receiving Party shall not (i) use, reproduce, sell, assign, lease or otherwise dispose of Disclosing Party's Confidential Information for any purpose other than to the extent necessary and contemplated in connection with the performance of its obligations or the exercise of its rights under this Agreement, (ii) disclose or commercially exploit the Confidential Information to any third party, including Affiliates, without the prior written approval of the Disclosing Party, (iii) transfer, download or delete Confidential Information accessed on Disclosing Party's computer systems or (iv) allow employees or agents of Receiving Party having access to the Confidential Information to store such in their homes. Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information to the extent such information is required to be disclosed by law, including, without limitation, pursuant to a subpoena; provided the Receiving Party promptly (within 5 days of receipt) notifies the Disclosing Party in writing of such requirement prior to any disclosure to allow the Disclosing Party to seek a protective order or similar relief in the Disclosing Party's sole and absolute discretion.

(d)     The Receiving Party shall (i) establish and maintain technical and organizational measures to protect Disclosing Party's Confidential Information against accidental or unlawful destruction, loss or alteration, or unauthorized disclosure, transfer, collection, use, storage, deletion or access by meeting or exceeding the requirements of the IAPP or by providing equivalent protection as otherwise agreed to in writing by the parties, (ii) restrict disclosure of the Confidential Information to its employees, consultants, agents and representatives who have a need to know such information and shall take appropriate action by instruction, agreement or otherwise with such parties who are permitted access to the Confidential Information to notify them of the obligations hereunder and be responsible for any actions of such parties that would be in breach of this Agreement as if done by Receiving Party and (iii) return or destroy, as requested by the Disclosing Party, all Disclosing Party's Confidential Information (originals and copies) upon the Disclosing Party's request, but in any event no later than upon termination of this Agreement.

(e)     Receiving Party shall immediately notify Disclosing Party (i) upon learning of an accidental or intentional breach of security affecting, or any unlawful or unauthorized use or disclosure relating to, the Disclosing Party's Confidential Information and (ii) of any change that is made with respect to the organizational or technical measures taken to protect Disclosing Party's Confidential Information that could materially impact the controls and/or standards of protection previously specified or approved by Centocor per the IAPP or otherwise.

(f)     In the event Receiving Party sends a notification under Section 7(e)(i) above, Receiving Party shall also immediately investigate and remediate the effects of the breach or unlawful or unauthorized use or disclosure. In the event Receiving Party sends a notification under Section 7(e)(ii) above and if Disclosing Party reasonably determines that such change shall materially lower or lessen the existing protection of the Confidential

7

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905790

Information, Disclosing Party shall have the right to immediately terminate this Agreement by written notice to the Receiving Party.

(g)     Neither party shall disclose the terms of this Agreement to any third party without the other party's prior written approval, except to its employees, advisors (including financial advisors, attorneys and accountants), potential and existing investors, potential acquirers and others on a need to know basis, in each case under circumstances that reasonably protect the confidentiality thereof. Such obligation shall not apply to disclosures which either party is required by law to make, provided that the disclosing party shall notify the other party of any such disclosure prior to such disclosure and will use commercially reasonable efforts to secure confidential treatment of this Agreement or such terms required to be disclosed. Neither party shall use the name, logos, trademarks or service marks of the other party in any publicity, advertising or disseminated information without such other party's prior written approval, except that Theranos may list Centocor as a client of Theranos.

Intellectual Property

(h)     No right, title, interest or license to the Receiving Party is either granted or implied under any Intellectual Property Rights by the disclosure of the Confidential Information hereunder. The Receiving Party acknowledges that the Disclosing Party is the exclusive owner of and has all rights to its Confidential Information, including all Intellectual Property Rights therein.

(i)     As between Centocor and Theranos and to the extent permitted by law, (a) all data regarding Participants in a Project ("Participant Data"), (b) all inventions, methods, discoveries and other proprietary information directed to the Centocor Compound (including, the composition of matter, method of manufacture or use thereof) and their applications and (c) all inventions, methods, discoveries and other proprietary information directed to biomarkers correlated with the Centocor Compound or the indication for which such Centocor Compound is being administered in the applicable Project ("Centocor Biomarkers") are and shall remain the sole and exclusive property of Centocor and shall be maintained as Confidential Information of Centocor, subject to the terms of this Agreement.

(j)     Centocor hereby grants to Theranos a non-exclusive license under any intellectual property rights owned or controlled by Centocor relating to the Centocor Materials that may be necessary or useful in connection with Theranos's performance of the Project in accordance with and during the term of this Agreement.

(k)     Centocor hereby grants to Theranos a non-exclusive, worldwide, irrevocable license, with the right to grant and authorize sublicenses, to Centocor Biomarkers for use in the Theranos System and to make, have made, use, sell, offer to sell and import Cartridges containing assays for detecting and/or measuring such Centocor Biomarkers, individually or in combination with other biomarkers or analytes. In addition, for clarity, the parties agree and acknowledge that nothing in this Agreement shall be deemed to prevent or restrict the use by Theranos or its Affiliates, directly or in collaboration with any third party, of any analytes or biomarkers other than Centocor Biomarkers, and Theranos may during the term of this Agreement and thereafter use and disclose such analytes or biomarkers, individually or in combination, for any purpose, provided that such analytes or other biomarkers are not claimed in any patent or patent application owned by Centocor or its Affiliates.

(l)     As between Centocor and Theranos, all inventions, methods, discoveries, improvements and other proprietary information developed in connection with or as a result of the Project during the term of this Agreement and thereafter, whether by Centocor or Theranos, or by the parties jointly, directed to any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the T.OS analytical engine and the algorithms therein, as well as any Cartridges customized for use in connection with a Project subject to Centocor's right in and to Centocor Compounds or (b) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Centocor shall promptly disclose to Theranos in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence and/or in Section 6(m) below, and Centocor hereby assigns to Theranos any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information, including all intellectual property rights therein.

(m)     In addition, any and all inventions, discoveries and other proprietary information generated in the course of performance of the Project, or otherwise in the performance of activities under this Agreement, directed to: (a) any Assays generated in the course of the Project; (b) any Cartridges containing a Theranos Assay (as defined below) customized for use in connection with Centocor Compounds, subject to Centocor's right in and to Centocor Compounds; (c) processes and techniques for the development of Assays and/or assays for use in conjunction with the Theranos System and/or any improvements thereto (collectively, "Theranos Processes"); and/or (d) any analytes or other biomarkers first identified in the course of performance of the Project (other than

PAR-2008-0001825

8

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905791

any analytes or other biomarkers claimed in any patent or patent application filed prior to the effective date of this Agreement), shall be the sole and exclusive property of Theranos ("Additional Theranos Inventions") and shall be maintained as Confidential Information of Theranos. For purposes of this Agreement, "Theranos Assay" means the method for detecting an analyte or multiplexed set of analytes and/or measuring its or their concentration in a matrix, including, without limitation, human blood.

(n)     Upon full payment by Centocor of the fees due under this Agreement, Theranos shall grant to Centocor an exclusive license under the Additional Theranos Inventions directed to any Assays for Centocor Compound generated as a result of the performance of the Project. This exclusive license shall be solely for the specific purpose of using Theranos Systems containing such Assay on Cartridges for real-time PK(/PD) monitoring at the price specified in this Agreement. Centocor shall be prohibited from providing Theranos Processes or Theranos Assays to any third party or Affiliate for the purpose of supplying or reproducing such Assays, except as may be permitted pursuant to an agreement signed by Centocor and Theranos.

(o)     At Theranos's request, Centocor shall provide to Theranos any data regarding the use, functionality or operation of the Cartridges, Readers or any other aspect of the Theranos System generated in connection with this Agreement. Notwithstanding anything to the contrary in this Agreement, Theranos shall have the right to use and disclose any data described in the preceding sentence to further develop, use, make, have made, sell, market or otherwise exploit any aspect of the Theranos System during the term of this Agreement and thereafter, including, without limitation, in connection with any regulatory filing for the Theranos System or any component thereof.

(p)     Upon Centocor's request at any time, Theranos shall provide to Centocor all material, data and work-in-progress in connection with the Project. Centocor's use of such material and data shall be subject to the licenses granted hereunder.

(q)     The parties hereto stipulate and agree that a breach of any of the provisions of this Section 7 could have a material and adverse effect upon the other party, damages arising from such breach may be difficult to ascertain and, without limiting any other right or remedy, equitable relief, including injunctions and specific performance, shall be available without bond or other requirement.

8.     **ACCESS TO SOFTWARE AND USE OF THE T.OS**

(a)     In support of the Project, Theranos may make available to Centocor certain Software as a part of the T.OS. Such Software may include, without limitation, (a) Software installed on Readers ("Firmware") and (b) online or offline software Project or products related to the T.OS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

(b)     Theranos hereby grants to Centocor a non-exclusive, non-transferable, non-sub-licensable license to use Firmware as incorporated into, and solely for use in connection with, Readers by Participants and Centocor employees and otherwise in accordance with the terms of this Agreement, and only for the term of the Project for which such Firmware is made available.

(c)     Theranos hereby grants to Centocor a non-exclusive, non-transferable, non-sub-licensable license to use the Client Accessible Software for the purpose for which it is made available to Centocor and otherwise in accordance with the terms of this Agreement, and only for the term of the particular Project for which such Client Accessible Software is made available under the applicable Agreement. Centocor shall not allow access to the Client Accessible Software by more than the number of concurrent Users indicated in such Agreement.

(d)     Centocor hereby grants to Theranos the perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in the T.OS data provided under, related to or generated in connection with this Agreement for use in the T.OS analytical engine to the extent permitted by law, provided that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individual Participants or any information identifying Centocor or Centocor Compounds, except in connection with the provision of any Project to Centocor under this Agreement.

(e)     Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of Theranos. Centocor shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos

9

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905792

**ER-14347**

promptly of any such unauthorized use. Centocor shall not: (a) disassemble, decompile or otherwise reverse engineer the Software, (b) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in an Agreement, (c) use the Software to provide processing Project to third parties or otherwise use the Software on a "service bureau" basis or (d) create Internet "links" to or from the Software, or "frame" or "mirror" any of Centocor's content which forms part of the Software. Centocor shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

9.      **USE OF DEVICES**

(a)      In connection with the Project, Theranos may make available to Centocor certain equipment, including but not limited to Readers and Cartridges (collectively, the "Devices"). Each Device will be provided to Centocor upon the terms set forth in this Agreement.

(b)      Devices shall only be permitted to be used by (a) Centocor employees and Centocor Contractors and (b) Participants. Centocor agrees to take all reasonable steps to protect the Devices from theft or use contrary to the terms of this Agreement. Centocor agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Centocor is not authorized to sell, rent, transfer, license, or distribute the Devices, except as specifically provided in this Agreement.

(c)      Unless the Devices are purchased by Centocor pursuant to the agreement:  (i) Theranos shall at all times retain ownership of the Devices, (ii) Centocor shall keep the Devices free of all security interests, liens and other encumbrances, (iii) Centocor assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Centocor and during transportation from Centocor's premises (or other mutually agreed premises) and shall pay the full cost of any Devices not returned in accordance with Section 9(d), (iv) Centocor shall adequately insure the Devices against loss or damage while such Devices are in the possession or control of Centocor and (v) Centocor shall permit any authorized representative of Theranos to inspect the Devices, at any time prior to the return of such Devices in accordance with Section 9(d), at Centocor's facilities or any other location at which the particular Project is being conducted.

(d)      Unless the Devices are purchased by Centocor pursuant to an agreement, no later than ten (10) days after the earlier of completion of the applicable Project or the date of termination of this Agreement, Centocor shall, at its own cost, return to Theranos the applicable Readers and Cartridges (other than Cartridges which have previously been consumed and properly disposed of), and Centocor shall furnish Theranos with a certificate signed by an executive officer of Centocor verifying that the same has been done.

(e)      In the event of such completion or termination, as applicable, Theranos shall have the right to enter Centocor's premises for the purposes of repossessing such Devices, and Centocor hereby consents to such entry. Theranos shall be entitled to receive from Centocor all collection costs, including attorneys' fees, incurred in the enforcement of its rights under this Article 9. Such Devices shall be returned in as good a condition as when they were shipped to Centocor, ordinary wear and tear excepted. Unless otherwise provided in an Agreement, Centocor shall cause all Participants to sign an agreement indicating they will return all Devices at the end of their participation in the applicable Project.

10.      **CUSTOMER'S PREMISES**

(a)      While on the premises of Centocor or any of its Affiliates (the "Premises"), Theranos shall comply with all rules and regulations communicated in writing by Centocor to Theranos while on and applicable to the Premises. Theranos shall be responsible for its employees and agents while on the Premises whether or not any actions fall outside the scope and course of employment or engagement by Theranos. Theranos shall ensure that its employees and agents proceed directly to the site of the work and do not enter any other part of the Premises.

(b)      Theranos agrees that Centocor or its Affiliate, as the case may be, may reasonably search Theranos's employees and agents and their vehicles while on, leaving or entering the Premises. Centocor or its Affiliate, as the case may be, may also reasonably search any packages of Theranos's employees and agents at any time while on, leaving or entering the Premises.

PAR-2008-0001825

10

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905793

**ER-14348**

11.    **INDEMNIFICATION**

(a)     Each party (each, in such capacity, the "indemnifying party") shall defend, indemnify and hold harmless the other party, its Affiliates and its agents, and successors and permitted assigns thereof (each, in such capacity, the "indemnified parties"), against any and all liability, claims, demands, damages, losses and expenses, including reasonable attorneys fees, in connection with or arising out of a claim by a third party based on (i) a material breach of this Agreement, or (ii) the negligence or willful misconduct in connection with this Agreement by the indemnifying party or its consultants, agents or representatives.

(b)     Centocor (in such capacity, the "indemnifying party") shall defend, indemnify and hold harmless Theranos, its Affiliates, and their respective employees, officers, directors, independent contractors, stockholders and agents (each, in such capacity, the "indemnified parties") against any and all liability, claims, demands, damages, losses and expenses, including reasonable attorneys fees, in connection with or arising out of a claim by a third party based on (i) the conduct of a Project or the use by Centocor or its Affiliates of the results of a Project, or (ii) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service that relates to such results by or under the authority of Centocor (including any personal injury or property damage related thereto); except, Centocor shall have no obligation to defend any indemnified parties against any liability, claims, demands, damages, losses, and/or expenses arising from or in connection with the negligence or willful misconduct of any of the indemnified parties.

(c)     The indemnified parties shall give the indemnifying party prompt written notice of any matter upon which the indemnified parties intend to base a claim for indemnification (an "Indemnity Claim") under this Section 11 and the indemnified parties shall have the right to participate jointly with the indemnifying parties in the indemnified parties' defense, settlement or other disposition of any Indemnity Claim, provided that, except as set forth in the following sentence, any such disposition shall be subject to the ultimate control of the indemnified parties. With respect to any Indemnity Claim relating solely to the payment of money damages and which could not result in the indemnified parties becoming subject to injunctive or other equitable relief or otherwise adversely affect the business of the indemnified parties in any manner, and as to which the indemnifying parties shall have acknowledged in writing the obligation to indemnify the indemnified parties hereunder, the indemnifying parties shall have the sole right to defend, settle or otherwise dispose of such Indemnity Claim, on such terms as the indemnifying parties, in its sole discretion, shall deem appropriate, provided that the indemnifying parties shall provide reasonable evidence of its ability to pay any damages claimed and with respect to any such settlement shall have obtained the written release of the indemnified parties from the Indemnity Claim.

12.    **INSURANCE**

Theranos agrees to maintain in full force and effect during the term of this Agreement and for two years thereafter valid and collectible insurance policies in connection with its activities as contemplated hereby, which policies shall be in compliance with Exhibit D attached hereto.

13.    **GOVERNING LAW; DISPUTE RESOLUTION**

(a)     This Agreement and all matters arising out of or relating to it shall be governed by, and construed in accordance with, the laws of the State of Delaware.

(b)     Subject to sub-section 13(c) below, any dispute, controversy or claim arising out of or related to this Agreement, or the interpretation, application, breach, termination or validity thereof, including any claim of inducement by fraud or otherwise that might arise between Centocor and Theranos relating to or arising from this Agreement or the Project that is unable to be resolved by the parties in accordance with sub-section 13(c) below, shall be settled by binding arbitration in accordance with the then prevailing Commercial Arbitration Rules of the American Arbitration Association ("AAA"), except where those rules conflict with this provision, in which case this provision controls. Arbitration shall be conducted before a single arbitrator selected from the AAA's National Roster of Arbitrators. Each party shall have the right to meet and interview the potential arbitrator(s) for no more than one hour each prior to the selection of an arbitrator. The arbitration shall be held, and Centocor and Theranos irrevocably consent to arbitrate, in Wilmington, Delaware, unless they mutually agree upon an alternative location. The arbitration shall be conducted in English. In rendering the award the arbitrator must apply the substantive law of Delaware (except where that law conflicts with this clause); however, the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. The arbitrator shall render a written opinion setting forth findings of fact and conclusions of law with the reasons therefore stated. Under no circumstances shall the arbitrator award damages in excess of or inconsistent with the limitations contained in the "Limitation of Liability" set out in Section 14 of this Agreement. Any court with jurisdiction shall enforce this clause and enter judgment on any award. Theranos and Centocor will agree upon, within 45

PAR-2008-0001825

11

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905794

days after arbitration is initiated or, if the parties fail to agree, they will adhere to procedures designed by the AAA to insure that the arbitration will be concluded and the award rendered within no more than eight months from selection of the arbitrator.

(c)     Prior to initiation of arbitration, Centocor and Theranos shall first attempt to reach an amicable resolution.  If after reasonable attempts to reach an amicable resolution the parties do not agree to a resolution stated in writing, the parties must then attempt and immediately request non-binding mediation to mediate their dispute in accordance with the procedures in effect of the CPR Institute for Dispute Resolution (CPR), except where that procedure conflicts with these provisions, in which case these provisions control.  Within a period of 45 days after the request for mediation, the parties agree to convene with the mediator, mutually selected by the parties or absent such agreement selected in accordance with selection procedures administered by the AAA, for at least one session to attempt to resolve the matter.  Each party shall have the right to meet and interview the potential mediator(s) for no more than one hour each prior to the selection of a mediator.  The mediation shall be conducted in Wilmington, Delaware, and shall be attended by a senior executive from each party with authority to resolve the dispute.  In no event shall mediation delay commencement of arbitration for more than 45 days absent agreement of the parties or interfere with the availability of emergency relief.

(d)     The arbitration and mediation proceedings shall be confidential and neither party shall publicize the nature of any dispute or the outcome of any mediation or arbitration proceedings except to the extent required by law or to the extent such party is permitted to disclose the Confidential Information of the other party in accordance with the terms of this Agreement, provided in the case of disclosure required by law, the party required to make any such disclosure informs the other party of such requirement to allow the other party to seek a protective order.  The mediator or arbitrator, as the case may be, shall issue appropriate protective orders to safeguard each party's Confidential Information.

(e)     Centocor and Theranos each have the right before or during the mediation or arbitration to seek and obtain from the appropriate court provisional remedies such as attachment, an injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the mediation or arbitration.

### 14.     LIMITATION OF LIABILITY

NO PARTY TO THIS AGREEMENT SHALL BE RESPONSIBLE FOR (A) PUNITIVE, INCIDENTAL, SPECIAL, INDIRECT, EXEMPLARY, MULTIPLIED OR CONSEQUENTIAL DAMAGES OF THE OTHER PARTY, HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; (B) ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR PROJECT; (C) ANY ATTORNEYS' FEES AND COSTS OF THE OTHER PARTY; AND (D) ANY PREJUDGMENT INTEREST WITH RESPECT TO ANY DISPUTE BETWEEN THE PARTIES.  IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE TOTAL FEES PAID BY AND DUE FROM CUSTOMER HEREUNDER.  NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS ON LIABILITY AND DAMAGES IN THE PRECEDING SENTENCES SHALL NOT APPLY TO: (A) LIABILITY OR DAMAGES TO THE EXTENT ARISING FROM A BREACH OF CONFIDENTIALITY OR FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT; OR (2) LIMIT THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER SECTION 11 WITH RESPECT TO AMOUNTS OWING TO THIRD PARTIES.

### 15.     FORCE MAJEURE

If any party is prevented from performing any of its obligations hereunder due to any cause which is beyond the nonperforming party's reasonable control, including fire, explosion, flood, or other acts of God; acts, regulations, or laws of any government; war, terrorist acts or civil commotion; strike, lock-out or labor disturbances; or failure of public utilities or common carriers (a "Force Majeure Event"), such nonperforming party shall not be liable for breach of this Agreement to the extent due to such Force Majeure Event.  Such nonperformance will be excused for three months or as long as such event shall be continuing (whichever occurs sooner), provided that the nonperforming party gives immediate written notice to the other party (the "Non-Force Majeure Party") of the Force Majeure Event (including its best estimate of the likely extent and duration of the interference with its activities) and that such nonperforming party exercises all reasonable efforts to eliminate the Force Majeure Event to resume performance of its affected obligations as soon as practicable.

12

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905795

16. **RELATIONSHIP OF THE PARTIES**

The relationship of the parties established by this Agreement is that of independent contractors, and nothing contained herein shall be construed to (i) give either party any right or authority to create or assume any obligation of any kind on behalf of the other or (ii) constitute the parties as partners, joint ventures, co-owners or otherwise as participants in a joint or common undertaking.

17. **SUBCONTRACTORS**

(a)     Theranos (i) shall not subcontract any of its obligations hereunder, including to any Affiliate, without the prior written consent of Centocor and (ii) shall be responsible for ensuring that any permitted subcontractors comply with this Agreement and for all actions of such subcontractors in connection with this Agreement, including any actions that would be in breach of this Agreement if performed by Theranos. In addition, each such permitted subcontractor who performs work pursuant to this Agreement may be required to execute a copyright and invention ownership agreement in the form satisfactory to Centocor granting Centocor ownership rights as granted in this Agreement.

(b)     Pursuant to Public Law 95-507, the provisions at 48 Code of Federal Regulations 52.219-8 ("Utilization of Small Business Concerns") and 52.219-9 ("Small Business Subcontracting Plan") are incorporated into any agreement in excess of $500,000, where applicable. This clause is aimed at maximizing opportunities for small, disadvantaged and women-owned businesses where appropriate and is intended for suppliers who offer further subcontracting opportunities. When Theranos is authorized, pursuant to Section 17(a) above, to subcontract any of its obligations hereunder and all other conditions exist, Theranos agrees to use its best efforts to carry out this policy to the fullest extent consistent with its efficient performance of this Agreement.

18. **ASSIGNMENT**

Neither party may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the other party and any attempt to do so shall be void; except that either party may assign its rights and obligations hereunder , without the consent of the other party, to any of its Affiliates or to a third party that succeeds to all or substantially all of such party's business or assets relating to this Agreement whether by sale, merger, operation of law or otherwise. Subject to the foregoing sentence, this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

19. **AUDIT**

(a)     During the term of this Agreement, and for a period of four (4) years following any termination or expiration of this Agreement, Theranos agrees to make, keep and maintain, in accordance with generally accepted accounting principles and practices, consistently applied from year to year, complete books, invoices, records of payments, purchase orders, tax returns, and memoranda relating to this Agreement, the Project and deliverables provided hereunder, including, without limitation, the internal policies and procedures, practices, books, and records demonstrating compliance with all policies and requirements stated herein. Centocor shall have the right to audit and/or examine all such items and Theranos's information systems and privacy and security procedures, either directly or through its authorized representative or agents, during regular business hours and upon reasonable prior notice to determine Theranos's compliance with this Agreement. Theranos shall also, within ten (10) days of Centocor's written request, provide annual certifications of Theranos's compliance with the policies and obligations set forth in this Agreement.

(b)     If any audit or examination reveals that Theranos collected more from Centocor than it was entitled to collect under this Agreement, Theranos shall promptly reimburse Centocor for the amount of any overcharges. Theranos shall also pay Centocor interest at the rate of one percent (1%) per month on such amount, but in no event to exceed the highest lawful rate of interest, calculated from the date the amount was paid to the Theranos until the date of actual reimbursement to Centocor. In the event that any such audit or examination reveals that Theranos collected more than five percent (5%) than what it was entitled to collect under this Agreement, Theranos shall also reimburse Centocor for the reasonable cost of such audit in addition to the other amount owed pursuant to this Section.

20. **HEADINGS**

The headings used herein have been inserted for convenience only and shall not affect the interpretation of this Agreement.

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905796

21.   **WAIVER**

The failure of either party to enforce at any time for any period any provision hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce each such provision, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

22.   **SEVERABILITY**

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, to the extent the economic benefits conferred by such to both parties remain substantially unimpaired, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions or affecting the validity or enforceability of any of such terms or provisions in any other jurisdiction, if the essential provisions of this Agreement for each party remain valid, binding and enforceable.

23.   **THIRD PARTY BENEFICIARIES**

This Agreement is intended solely for the benefit of the parties hereto and their respective successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other party.

24.   **NOTICES**

To be effective, all notices and other communications shall be in writing and delivered personally or mailed by overnight U.S. mail, postage prepaid, or by certified or registered U.S. mail, return receipt requested, postage prepaid, or sent by Federal Express or another nationally recognized courier service (billed to sender), to the parties at the following addresses or to such other place as a party may designate by written notice to the other:

If to Theranos:

Theranos, Inc.
3200 Hillview
Palo Alto, CA 94304
Attn: Dr. Marc Thibonnier

If to Centocor:

V.P. Patent Law
Centocor Research & Development, Inc.
145 King of Prussia Road
Radnor, PA
Attn: Ken Dow

All notices shall be deemed delivered as of the date received by addressee, except for notices delivered via overnight courier for next business day delivery, which shall be deemed delivered on the next business day following deposit with such carrier.

25.   **ENTIRE AGREEMENT; AMENDMENT; CONFLICTS**

(a)      It is the mutual desire and intent of the parties to provide certainty as to their respective future rights and remedies against each other by defining the extent of their mutual undertakings as provided herein. Accordingly, this Agreement (i) supersedes all previous understandings, agreements and representations between the parties, written or oral and (ii) constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and incorporates all representations, warranties, covenants, commitments and understandings on which they have relied in entering into this Agreement, and, except as provided for herein, neither party makes any covenant or other commitment concerning its future action nor does either party make any promises, representations, conditions, provisions or terms related thereto.

(b)      No modification, change or amendment to this Agreement shall be effective unless in writing signed by the parties hereto that identifies itself as an amendment to this Agreement. No additional terms included in any invoice, estimate, confirmation, acceptance or any other similar document in connection with this Agreement shall be effective. To the extent of any conflict or inconsistency between this Agreement and any

PAR-2008-0001825

14

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905797

**ER-14352**

invoice, estimate, confirmation, acceptance or any other similar document in connection with this Agreement, the terms of this Agreement shall govern unless expressly stated otherwise in a writing signed by each of the parties and such writing includes the section number(s) of this Agreement that the parties agree no longer governs for the matter(s) covered thereby.

(c )  Except as otherwise set forth herein, Centocor acknowledges and agrees that the Project shall not include the supply or pricing to Centocor of any (additional) Readers, Cartridges, and/or Assays nor the provision to Centocor of access to T.OS or any other aspect of the Theranos System, which Project would be provided by Theranos under a separate agreement.

## 26.  MISCELLANEOUS

(a)  Any provisions, representations or agreements required by law to be included in this Agreement are hereby incorporated by reference, including, without limitation, those prohibiting discrimination against any employee or applicant for employment because of race, color, religion, sex or national origin, or physical or mental handicap and those providing for the employment of disabled veterans and veterans of the Vietnam era.

(b)  Subject to Sections 13 and 14, any remedies provided herein are cumulative and not exclusive of any remedies provided by law or equity.

(c)  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(d)  The Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

Centocor Research & Development, Inc.

By: _____
Name: Jay P. Siegel, M.D.
Title:  President

By: _____
Name: Amy Ellixson
Title:  Controller

Theranos, Inc.

By: _____
Name: Elizabeth Holmes, Ph.D.
Title:  President and CEO

15

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905798

**ER-14353**

**EXHIBIT A – PROJECT**

Theranos will provide the following Project and deliverables as follows as further provided according to the terms of this Agreement:

**Deliverables:**

PART 1: Up to 12 months from Effective Date, Theranos will develop a PD and PK combined clinical assay system included in Theranos System, using Centocor Materials (Centocor will provide only the materials required for the PK assay development. The PD materials will be obtained by Theranos), for Centocor feasibility testing of proposed Theranos System clinical assay of spiked plasma or whole blood samples using real-time PK/PD profiling of CNTO 5825, according to the terms of this Agreement, according to the payment terms provided in Exhibit C.

PART 2: Upon Centocor's decision at Centocor's sole discretion upon completion and analysis of feasibility testing of Theranos System developed in PART 1, Centocor will optionally use Theranos System for a PD and PK combined clinical assay for Centocor feasibility testing of plasma samples using real-time PK/PD profiling in Phase I clinical study of CNTO 5825 in asthma, according to the terms of this Agreement, according to the payment terms provided in Exhibit C.

Theranos System clinical assay developed by Theranos for Centocor will include all of the following characteristics:

- Characterize the PK of CNTO 5825 through longitudinal time-series measurements of compound concentrations in fresh whole blood.
- Identify the concentration-response profile for CNTO 5825 through real-time PK/PD profiling.
- Characterize the heterogeneity of the target population, mild-to-moderate asthma subjects, with respect to PK and patient response.
- Characterize the efficacy profile associated with the change in rate of protein panels in fresh whole blood, for use in generating rapid reads on pathway modulation in this and future asthma studies.
- Enhance the value of the study by integrating individual quantifiable measures of asthma with patient-centric measures as derived from questionnaires and queries.

**Acceptance Criteria Considered by Centocor for Deliverables for Part 1 and Part 2:** Assay performance equivalent or superior to demonstrable performance of Centocor's in-house 'gold-standard' methods for measuring the analyte(s). The Theranos PK assay will be compared directly with the Centocor PK assay, with equivalent or superior performance of the Theranos assay being required (see Exhibit E for the Acceptance Criteria for the CNTO5825 PK Assay).

For any milestone in which Theranos submits a document that is a deliverable ("Document Deliverable"), Centocor shall have the right to review such Document Deliverable and shall notify Theranos if there are any deficiencies. Theranos shall use its commercially reasonable efforts to promptly cure any such deficiencies, and after completing any such cure, Theranos shall resubmit the Document Deliverable for review as set forth above.

**Currently Estimated Part 2 Project Parameters**

| Project | CNTO-5825-Mild-to-Moderate Asthma |
|---|---|
| Cartridge Analytes | 1-2 Cartridges: PK assay for monoclonal antibody target, IgE, TARC(CCL17), Eotaxin(CCL11), RANTES(CCL5), ENA-78(CXCL5) |
| Sample Types | Finger-stick and venous whole-blood (interchangeably) |
| Sites (Number) – Location | TBD |
| Total Number of Participants | 32 Subjects (2 cohorts from each route of admin) |
| Number of Time Points | 15 time points per patient |
| Number of Cartridges | Maximum of 960 + 150 (calibration/validation) = 1,110 |
| Number of Readers | TBD |
| Length of Participant Participation | 28 Weeks |
| Localization/Languages for Translation | None (English Only) |
| Touch Screen Interface Questions/Customization | Standardized questionnaire or home grown survey |

16

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905799

| Data Infrastructure | Purchase and configure a unique CENTOCOR-specific server and database |
|---|---|
| Expected Start Date (First Participant In) | TBD |
| Expected End Date (Last Participant Out) | TBD |
| Total Duration of Project | 28 Weeks |
| Investigator Meeting ("IM") Date and Location / Calibration/Validation Start | TBD |

**Theranos Project Deliverables for Part 1 and Part 2 as applicable:**

**Pre-Deployment**

Project Project
The following activities are required to ensure the Project Objectives are met in the most efficient manner:

- Refine program specifications with Centocor.
- Assign Program Manager.
- Lead the pre-implementation kick-off meeting to discuss Project specifics, roles and responsibilities of Centocor and Theranos for the duration of the Project.
- Transfer blinded patient and clinician IDs for set-up in touch-screen and T.OSportals.
- Transfer to Theranos assay-specific information, materials, and other relevant data (collectively, "Assay Specifications").
- Transfer spiked plasma or whole blood samples to Theranos for calibration to whole-blood assays.
- Plan for pre-trial sample collection from Participants to obtain samples (venous blood run on Cartridges and at reference lab across the full clinically relevant dynamic range – approximately 20 samples total from 3-10 patients) for whole-blood calibration. These can be run while training clinical staff. If samples are not available prior to study start, whole-blood calibration can be run on samples taken from the first 3-10 subjects during the clinical trial.
- Collaborate with Centocor to create a Project plan to ensure that timelines are accurately communicated and met.
- Customize project planning and control applications within T.OS. Centocor will be able to view program schedule, progress, and updates through the secure Centocor-specific web portal once the Project plan has been cemented.
- Set touch-screen interface specifications as mutually agreed upon by Theranos and Centocor. [1]
- Plan for Theranos System training session (as described below).

Project Configuration & TheranOS Customization
- Design, develop, program, test and validate Centocor-specific T.OS portal to capture Participant Data and display program progress.
- Initial setup of accounts and secure access privileges for all parties who will be authorized to access T.OS (collectively, "Users").
- Specify Project-related workflow.
- Set-up and secure Centocor-specific database and server.
- Customize and validate Project-specific Cartridges to Assay Specifications.
- Customize and validate touch-screen interface.

Training[2]
- Develop and deliver customized training course.
  - In-person training of site staff and Centocor staff at the IM.

**Post-deployment**

Data Delivery & Transfer
- During the Project, Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via T.OS.

---

[1] Deployment of the default survey interface is included in the budget. Customization of the default interface will be billed to Centocor at the rate of $250/hour.
[2] The first two (2) hours of training at each clinical site by up to two (2) Theranos representatives are included in the budget. Each additional hour of training will be billed to Centocor at the rate of $150 per hour.

17

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905800

ER-14355

o   Cumulative data transfers can be executed by Centocor at any time via the Export Utility in the Data Delivery component of T.OS.

**Theranos Study Services: Centocor Infrastructure and Technical Support**

- Provide relevant Theranos System set-up material(s).
- Set up Readers on-site(s).
- Provide and manage the web portals to be used by Centocor in connection with the Project provided under this Agreement.
- Work with Centocor to customize systems for the appropriate international telecommunications infrastructure to successfully transmit Participant Data.
- Set up, administer, monitor, and troubleshoot web and database servers for duration of the Project.
- Create secure backup infrastructure.
- Provide second level technical support to the Project Support Center (described below).
- Reasonably assist Centocor with issues regarding network infrastructure setup related to the Theranos System.
- Troubleshoot firewall, computer system, and connectivity issues relating to T.OS.

**Project Support Center**

- During the Project, provide telephone helpdesk support for Centocor regarding the use of the Theranos System*.
- Live coverage 24x7 through Theranos customer-care center.

*Participants to call site coordinator directly about any non-Theranos System issues.

18

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905801

ER-14356

[EXHIBIT B – CHANGE ORDER FORM]

**Change Order**

This document is a Change Order to the CLINICAL ASSAY DEVELOPMENT AND FEASABILITY PROJECT AGREEMENT FOR USE OF THERANOS SYSTEMS between Theranos, Inc. and Centocor Research & Development, Inc. dated September 1, 2008. The term of the Change Order shall begin on _____ and shall end on or upon completion of work as described below.

**Change Order: [insert** Change Order Number]

**Date:**

**Purchase Order Number: [insert** purchase order number]

Optional Protocol Number:

**Centocor Project Contact:** [insert Name of Contact]

**Theranos Project Contact: [insert** Name of Contact]

**Description of Change**

**[insert,** as appropriate, a description of the changes to be performed by Theranos, the fixed or unit price or time and materials rates for the changes to be performed, the milestones when the changed work or identifiable portions of the changed work are to be completed, the identifiable changed work to be delivered, a date or milestone for the termination of change order, the requirements of each Party necessary for completion of the changes. Reference to appropriate attachments]

**Payment Schedule**

The total revised contract value shall not exceed [insert total revised cost of project amount and currency] without prior written consent of OPERATING COMPANY.

| Description | Original Project Costs | Changes to Original Project Costs | Total Revised Project Costs |
|---|---|---|---|
| Original Contract Value | [insert amount in figures with currency] | | [insert amount in figures with currency] |
| Change Order [insert change order number] | | [insert amount in figures with currency] | |
| Change Order [insert change order number] | | [insert amount in figures with currency] | |
| Total of Project Costs | | | [insert cumulative total of original project costs and sum of *all* change orders] |

The re-estimated pre-approved additional costs or expenses shall not exceed [insert amount and currency] without prior written consent of Centocor.

| Description | Original Pre-Approved Additional Costs | Changes to Original Additional Costs | Total Revised Pre-Approved Additional Costs |
|---|---|---|---|
| Original Contract Value | [insert amount in figures with currency] | | [insert amount in figures with currency] |
| Change Order [insert change order number] | | [insert amount in figures with currency] | |
| Change Order [insert change order number] | | [insert amount in figures with currency] | |
| Total of Pre-Approved Additional Costs | | | [insert cumulative total of original pre-approved additional costs and sum of *all* change orders] |

19

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905802

ER-14357

**Payment Terms**

The Project Cost payment schedule as stated in **[insert** exact title of Agreement**]**, dated **[insert** month, day, year**]**, is replaced in its entirety with the revised payment schedule. **[insert or attach revised payment schedule]**

All other terms and conditions of the Agreement shall remain in full force.

**IN WITNESS WHEREOF,** the undersigned agree to the terms and conditions of the Agreement and subsequent amendment(s).

Centocor Research & Development, Inc.

Signature:_____

Print Title:_____

Date:_____

Theranos, Inc.

Signature:_____

Print Title:_____

Date:_____

20

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905803

## EXHIBIT C – PRICING

Theranos shall charge Centocor for Project rendered and deliverables associated therewith as follows:

**Project Milestone Payments:** Theranos shall invoice Centocor upon delivery and acceptance of the project deliverables (per the criteria stated in Exhibit A and below) as follows:

| Payment Schedule | Amount Due (USD) |
|---|---|
| Upon Execution of Agreement:<br>• Commitment of Theranos Resources<br>• Procurement of Theranos Systems<br>• Monthly assay development progress reports<br>• Success criteria: Match performance of commercially available standards and internal reference method.<br>• Payment for any assay is fully refundable if success criteria is not met | $29,167 per month for 12 months per PD assay until completion of assay development as per Acceptance Criteria in EXHIBIT A..<br>If development is successfully completed prior to the 12 month milestone, remainder of the development funds are payable at that time.<br>No development monies will be charged for IgE. |
| Upon successful assay-system validation on archived samples<br><br>Systems Production for study:<br>Pre-Deployment Project (as described above)<br>❖ Training<br>Post-Deployment Project (as described above)<br>❖ Project Support<br>Data delivery, client infrastructure and 24x7 customer care for 28 weeks<br><br>Product Delivery and Clinical Use:<br>❖ Development/Validation/Calibration/Customization of readers, cartridges, & multiplexed point of care assays<br>❖ Distribution, trial definition/project management, Project configuration/software customization (TheranOS), patient and clinical records integration, set up of patient and physician portals, real-time reporting, analytics, and Centocor-specific back-end database and server infrastructure<br>❖ Asthma 'baseline' creation in Centocor-specific database for real-time profiling of efficacy dynamics<br>❖ Communications and data transmission infrastructure<br>❖ Real-time patient monitoring ~32 patients, home installations and training at site and at homes, up to 1,110 multiplexed tests (target single cartridge + calibration – if necessary use 2 cartridges each with the drug | $41,667 per month for 12 months per PK assay until completion of assay development as per Acceptance Criteria in EXHIBIT A. If development is successfully completed prior to the 12 month milestone, remainder of the development funds are payable at that time.<br><br>* If any assays do not meet acceptance criteria as per Acceptable Criteria in EXHIBIT A by completion of timeline for study start, payment for assay development is fully refundable / credited to another assay program at Centocor's option.<br><br>$580K for production and supply to Phase I study if Centocor decided, in its sole discretion, to proceed upon successful completion of multiplexed cartridge development as per Acceptance Criteria in EXHIBIT A. |

21

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905804

**ER-14359**

**Expense Disbursements and Pass-through Costs**

In addition to the Products and Project fees described above, Theranos charges reasonable and customary costs for expense disbursements and other costs incurred in connection with the performance of the Project. These costs include, but are not limited to, Theranos personnel travel and lodging (including travel to all IMs or IM sites and Project related activities), telecommunications, printing, additional touch-screen customizations, and any incidental expenses incurred to provide or in support of the Project outlined in this Agreement. Such costs will be billed monthly and will be due and payable by Centocor within forty five (45) days of receipt of invoice.

**Shipping and Data Transfer Costs**

Theranos will be responsible for shipping all hardware to Centocor and establishing the data transmission infrastructure. Readers will be leased to Centocor by Theranos solely for the duration specified under "PROJECT PARAMETERS" in Exhibit A above. Theranos will bill Centocor monthly for shipping and related transportation costs as well as data transmission costs from the readers and apply an administrative fee.

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905805

**ER-14360**

## EXHIBIT /D - INSURANCE REQUIREMENTS

Theranos shall maintain, at all times and at its own expense, the types of insurance(s) specified below during the term of the Agreement. For product liability/completed operations, Theranos will maintain insurance coverage in effect for at least five (5) years after termination of the Agreement.

1.      Commercial General Liability and Umbrella Liability

        Theranos shall maintain coverage on a Commercial General Liability Occurrence Coverage Form (or equivalent) including coverage for product liability/completed operations and contractual liability with limits of not less than $5,000,000 each occurrence. Theranos shall separately maintain Umbrella Liability including product liability coverage with a limit of liability no less than $5,000,000 each occurrence.

        Each of the above coverages shall include worldwide coverage including coverage for USA jurisdiction claims and occurrences. Theranos's policy shall include Centocor and its Affiliates, and their directors, officers and employees, as Additional Named Insureds.

2.      Workers' Compensation

        Theranos shall maintain coverage on a Workers' Compensation Form (or equivalent) in accordance with applicable law, covering all employees who are to provide service under this Agreement. Theranos shall also maintain Employers' Liability coverage with limits of not less than the following:

        Bodily Injury by Accident.................................$1,000,000 Each Accident
        Bodily Injury by Disease..................................$1,000,000 Each Employee
        Bodily Injury by Disease..................................$1,000,000 Policy Limit

3.      Professional Liability/Errors & Omissions

        Theranos shall maintain coverage on a Professional Liability Form and/or Errors & Omissions (or equivalent) in the amount of not less than $5,000,000 per occurrence.

4.      Miscellaneous

        (a)     Theranos's policies for each of the coverages set forth above shall specifically waive any rights of subrogation against Centocor and its Affiliates, and their directors, officers and employees.

        (b)     Theranos shall supply Centocor with the above proof of insurance and forms, including any endorsements, as required upon the signing of this Agreement, but Centocor's failure to demand such proof or forms shall not waive Centocor's and/or Centocor's Affiliates' rights to such coverage as specified herein.

        (c)     All insurance companies for each of the coverages set forth above must be rated A or better with a financial rating of VII or better in the most recent A. M. Best's Rating Guide.

        (d)     All insurance policies for each of the coverages set forth above shall provide for thirty days (30) days' prior written notice to Centocor of any cancellation, nonrenewal or material change of coverage.

23

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos                                        THER-0905806
Fed. R. Crim. P. 6(e) material

ER-14361

**EXHIBIT E: Acceptance Criteria for the CNTO5825 PK Assay**

**All raw and analyzed data must be provided to Centocor**

Serum from 10 individual healthy donors (5 male/5 female) will be provided by Centocor.

Serum will be pooled for Intra- and Inter-Instrument Accuracy and Precision.

Serum will run individually for Selectivity assessment at the low end of the calibration curve.

The material for spiking for the PK assay will be provided by Centocor and will be CNTO5825.

The material for spiking for the PD assays will be provided by Theranos and will be the reference standard used to develop the calibration curve for the assay.

1.) Intra- and Inter-Instrument Accuracy and Precision (PK and PD assays):

   Samples: 5 spiked controls which span the calibration curve at the limits and midpoint of the curve must be tested 5 times on the same instrument for intra-instrument accuracy and precision and for inter-instrument accuracy and precision the 5 controls will be run one time each on 5 separate instruments.

Acceptance:  Mean results for 5 of 5 controls must be within 20% of nominal
                 concentration for intra- and inter-instrument accuracy (25% at the top and
                 bottom of the curve)

                 Results for precision must be a %CV of less than 20% for intra-instrument
                 and inter-instrument results.

2.) Selectivity at low end of calibration curve (shows measurement at the lower limit in the presence of irrelevant, endogenous IgGs) (PK assay only)

Accuracy of individual serum (n=10) at a spike concentration at the lowest point of the calibration curve (Lower Limit of Quantification, LLOQ) and the same 10 individuals without drug added.

Acceptance:  Results for 8 of 10 must be within 25% of nominal concentration for LLOQ or <LLOQ for the unspiked samples

3.) Confirmation of PK assay acceptability:

   Following final completion and agreement on steps 1 and 2 above Centocor will provide Theranos with 3 blinded samples for the PK assay.  Theranos will provide data to Centocor for unblinding and verification of concentration.  Concentration must be reported within 20% of nominal for final acceptance of PK assay.

********************

24

PAR-2008-0001825

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905807

**ER-14362**

# theranos

*redefining healthcare*

| Invoice # | |
| Invoice date | January 19th, 2009 |
| Purchase Order # | 61039482 |
| Agreement Date | |

Theranos, Inc
3200 Hillview Avenue
Palo Alto, California 94304
Tel: (650) 838 9292
Fax: (650) 838 9165

Bill To:  Mayo Clinic
West 13th Street
Rochester, Minnesota 55905

Attn:    Dr. Adrian Vella

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 2600 | Cartridge #1: GLP-1 Active<br>Cartridge #2: GLP-1 Active and GLP-1 Total | | $60,000 |
| | Use of Theranos Systems is governed by<br>Theranos Terms of Service, attached to this<br>invoice. | | |

| | | |
|---|---|---|
| Subtotal | | $60,000 |
| Sales Tax | | 0.00 |
| Total | | $60,000 |
| Prepayment | | 0.00 |
| Balance Due | | $60,000 |

**PAYMENT DUE UPON RECEIPT.** Late
payments shall incur interest at the rate of
1.5% per month until paid in full. All such
interest shall be due and payable on demand.

All costs described herein are in U.S. currency.  Payments made to THERANOS will be made in U.S. currency.

1

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905808

## KEY PROJECT OBJECTIVE

Characterize response, efficacy and safety at the point of care and in real time by indexing data from Theranos cartridges against trends of disease progression stored on a web-portal to begin improving treatment and outcomes.

The Theranos web-portal retains patterns of response -- blood data profiled with all other available information so that clinicians can better visualize where a patient stands in the disease progression trajectory.

## PROJECT PARAMETERS

| Project | Mayo Clinic - 01 |
|---|---|
| Cartridge Analytes | Cartridge #1: GLP-1 Active |
| | Cartridge #2: GLP-1 Active and GLP-1 Total |
| Sample Types | Archived Samples- Frozen whole blood |
| Sites (Number) -- Location | Theranos, Inc. |
| Total Number of Samples | 300 |
| Number of Cartridges | 1st Cartridge: GLP-1 Active: 100 samples, 12 time points = 1200 |
| | 2nd Cartridge: GLP-1 Active, GLP-1 Total: 200 samples, 7 time points = 1400 |
| | TOTAL Cartridges = 2600 |
| Number of Readers | 10 |
| | For use with GLP-1 cartridges and multiplexed cartridges of GLP-1 Active and GLP-1 Total |
| Localization/Languages for Translation | None (English Only) |
| Touch Screen Interface Questions/Customization | None |
| Data Infrastructure | Configure a secure Mayo Clinic-specific data infrastructure |
| Expected Start Date | February 2008 |
| Expected Data delivery date | April 1, 2008 |
| Total Duration of Services | 2 Months (February, March) |

2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905809

ER-14364

## THERANOS, INC. TERMS OF SERVICE

This agreement is entered into by and between Theranos, Inc. ("THERANOS") and The Mayo Clinic ("COMPANY"), effective as of date of execution.

1.  **THERANOS SYSTEM.** THE "THERANOS SYSTEM" is the system comprising the T.OS, Reader(s), Cartridges, Assays (each as defined in this Article 1) and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination.  As used in this Invoice: (a) "Assay" means any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood (b) "Cartridge" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample; (c) "Reader" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information; and (d) "T.OS" means THERANOS proprietary ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

2.  **SERVICES**

2.1.   In purchasing the Systems and Services, COMPANY agrees to these Terms of Service.

2.2    Data delivery and transfer:
          During the Project, Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via TheranOS web portal.

3.  **PAYMENT TERMS**

3.1.   Payment is due upon receipt of this Invoice.

3.2.   Late Payments.  Late payments shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

3.3.   Expense Disbursements and Pass-through Costs.  THERANOS charges for third-party expense disbursements and other costs incurred in connection with the performance of the Services.  These costs include, but are not limited to, THERANOS personnel travel and lodging (including travel to all IMs or IM sites and services related activities), shipping, telecommunications, data transmission, printing, additional touch-screen customizations, any incidental expenses, and the associated administrative fees incurred to provide or in support of the Services outlined in this Invoice.

4.  **ACCESS TO SOFTWARE AND USE OF THE T.OS**

4.1.   THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sub licensable license to use, in accordance with, and solely for the purposes specified in, this Invoiced and only for the term of the Project: (a) Software installed on Readers, for use by COMPANY employees and COMPANY contractors who are obligated in writing by confidentiality obligation at least as protective of THERANOS and its Confidential Information as this Invoice ("COMPANY Contractors") and (b) Software related to the T.OS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").  "Software" means computer programs, object code and related materials, in machine readable or printed form, including any updates or upgrades thereto.

4.2.   THERANOS and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of THERANOS. COMPANY shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify THERANOS promptly of any such unauthorized use.  COMPANY

3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                          THER-0905810

shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users indicated in the Invoice, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Invoice, (d) use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of COMPANY's content which forms part of the Software. COMPANY shall at all times comply with terms and conditions applicable to third party software provided with the Software. THERANOS reserves all rights in the Software not expressly granted herein.

**5.    THERANOS PROPERTY.**

5.1    As between COMPANY and THERANOS, all Inventions and improvements developed in connection with or as a result of the Services, during the term of this Invoice and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to: (a) any part of the whole of the THERANOS System or any improvements thereto, including, without limitation, the T.OS analytical engine and the algorithms therein; or (b) the generation of assay (s) used in conjunction with the THERANOS System shall be the sole and exclusive property of THERANOS. COMPANY shall promptly disclose to THERANOS in writing any Inventions described in the preceding sentence, and COMPANY hereby assigns to THERANOS any right, title or interest it may have in such Inventions.

**6.    INDEMNIFICATION.**

COMPANY will indemnify and hold harmless THERANOS and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any third party claim arising out of or in connection with: (a) the conduct of a Project or the use of the results of a Project; (b) COMPANY's breach of this Invoice, negligence or intentional misconduct; or (c) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of COMPANY (including any personal injury or property damage related thereto). COMPANY shall be promptly notified of any such claim and THERANOS shall cooperate with COMPANY in the defense of such claim.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of this day and year.

**THERANOS, INC.**                          **MAYO CLINIC ("COMPANY")**

Signature                                    Signature

_Elizabeth Holmes_                           _Daniel Schmitz_
                                             Name (please print)

_President & CEO_                            _Finance Manager_
                                             Title

_27 Jan 2009_                                _1/26/09_
Date                                         Date

**Please sign and date two (2) originals and send both to THERANOS for signature via traceable mail (e.g., UPS or FedEx). One executed original will be returned to COMPANY.**

4

FOIA Confidential Treatment Requested by Theranos          THER-0905811
Fed. R. Crim. P. 6(e) material

**THERANOS Contacts**

Project Matters
Susan DiGiaimo
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (609) 978-0763
Fax (609) 978-0764

Billing Matters
Denise Yam
Theranos, Inc.
3200 Hillview Ave
Palo Alto, CA 94304
Ph. (650) 470-6204
Fax (650) 838-9165

**MAYO CLINIC Contacts**

Project Matters

Bill Invoices To

If applicable, please provide PO # to expedite billing:

5

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905812



Research Laboratories
P. O. Box 2000
Rahway, NJ 07065

September 30, 2008

Dr. Elizabeth Holmes
President and Chief Executive Officer
Theranos, Inc.
3200 Hillview Avenue
Palo Alto, CA 94304

Dear Elizabeth:

In your email of September 29, you accepted the Agreement PDF file as an 'original' for your records. Therefore, I am emailing to you the PDF file of the fully executed MTA between Merck & Co., Inc. and Theranos, Inc.

Please remember to add Merck's internal LKR # (LKR57457) to your invoice to expedite payment.

Kind regards,

Maria Luisa Rios Candelore
Associate Director
External Scientific Affairs New Technologies
Merck & Co
126 E. Lincoln Avenue
Ry 70-211
Rahway, NJ   07065
Tel: 732-594-7083
Fax: 732-594-3830
Email: mari_candelore@merck.com


LKR57457

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905813



**EVALUATION AGREEMENT**
Between
**Merck & Co., Inc.**
and
**Theranos, Inc**

This Agreement is made by and between Merck & Co., Inc., a New Jersey corporation, having a place of business at One Merck Drive, Whitehouse Station, NJ 08889-0100 ("Merck") and Theranos, Inc having a place of business at 3200 Hillview Avenue, Palo Alto, CA 94304 ("Theranos"), each a "Party" and collectively, the "Parties".

1.  Definitions.

"Affiliate" of Merck means any entity (i) in which fifty percent (50%) or more of the voting equity interests are now or hereafter owned or controlled, directly or indirectly, by Merck, (ii) which now or hereafter owns or controls, directly or indirectly, fifty percent (50%) or more of the voting equity interests of Merck, or (iii) in which fifty percent (50%) or more of the voting equity interests are now or hereafter owned or controlled, directly or indirectly, by an entity identified in the preceding clause (i) or (ii).

"Agreement" means this Evaluation Agreement between Merck and Theranos.

"Confidential Information" means any and all information and data, whether communicated in writing or orally or by any other method, that is provided by one Party hereto to another Party hereto pursuant to this Agreement.

"Effective Date" is defined in Paragraph 4.

"Evaluation" means the activities described in the Work Plan.

"Evaluation Results" means a complete written report of all of the results of the Evaluation.

"Inventions" shall mean any inventions or discoveries, whether or not patentable, that are made, conceived or reduced to practice in the course of performing the Evaluation by employees and/or agents of Theranos (either solely or jointly with employees and/or agents of Merck or Affiliates of Merck).

"Merck Material" means the samples provided by Merck under this Agreement, as further defined in the Work Plan.

"Merck Information" means all information, data, Merck Material and other items supplied by Merck or its Affiliates to Theranos hereunder. For the avoidance of doubt, all Merck Information is considered Confidential Information.

"Officials" is defined in Paragraph 11.

"Payment" is defined in Paragraph 11.

"Personal Data" is defined in Paragraph 12.

"Term" is defined in Paragraph 4.

"Theranos Analytical Platform" means the system comprising the T.OS, Reader(s), Cartridges, Assays (each as defined in this Article 1) and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination. As used in this Agreement: (a) "Assay"

Page 1 of 7

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905814

means any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood; (b) "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample; (c) "**Reader**" means Theranos' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Theranos, communicating with authorized parties and providing analytical information; and (d) "**T.OS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

"Theranos Analytical Platform Invention" is defined in Paragraph 8.

"Work Plan" means the activities to be performed by the Parties and made a part of this Agreement as Attachment A hereto.

2.  <u>Purpose</u>. The purpose of the Evaluation is to assess the sensitivity of Theranos' Analytical Platform using Merck Material.

3.  <u>Merck Material</u>. Merck shall supply, at its own cost, sufficient samples of the Merck Material to Theranos to carry out the Evaluation in accordance with this Agreement. The Merck Material shall not be used in humans. It is understood that the Merck Material is provided only for the performance of the Evaluation and shall not be used for any other purpose, nor shall the Merck Material or any derivatives, analogs, modifications or components thereof be transferred, delivered or disclosed to any third party without the advance written consent of Merck. Any unused Merck Material shall be returned or otherwise disposed of promptly upon completion of the Evaluation or as may be earlier required under Paragraph 14.

4.  <u>Term</u>. This Agreement shall be effective on the date of the last signature below (the "Effective Date"). The term of this Agreement shall expire on the six (6) month anniversary of the Effective Date, subject to early termination as provided in Paragraph 14 (the "Term").

5.  <u>Payment</u>. Merck shall pay Theranos twelve thousand dollars ($12,000) within forty-five (45) days of the Effective Date and an invoice from Theranos.

6.  <u>Confidentiality</u>. (a) For the Term of this Agreement and for seven (7) years thereafter, each Party shall maintain all Confidential Information disclosed to it by the other Party in trust and confidence and not disclose any such Confidential Information to any third party without the prior written consent of such other Party, except as provided in Paragraph 6(b) below. Furthermore, each Party covenants that it shall not use the Confidential Information of the other Party except to perform its obligations under this Agreement or as otherwise expressly authorized under this Agreement. The obligations of confidentiality and use shall not apply with respect to any portion of the Confidential Information that the receiving Party can show by competent written proof:

      (i) Is publicly disclosed by the disclosing Party, either before or after it becomes known to the receiving Party;

      (ii) Was known to the receiving Party, without obligation to keep it confidential, prior to when it was received from the disclosing Party;

      (iii) Is subsequently disclosed to the receiving Party by a third party lawfully in possession thereof without obligation to keep it confidential;

      (iv) Has been publicly disclosed other than by the disclosing Party and without breach of an obligation of confidentiality with respect thereto; or

      (v) Has been independently developed by the receiving Party without the aid, application or use of Confidential Information of the disclosing Party.

(b) Each Party may disclose Confidential Information belonging to the other Party to the extent such disclosure is reasonably necessary in the following instances:

Page 2 of 7

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905815

ER-14370

(i) prosecuting or defending litigation;

(ii) complying with applicable governmental regulations; or

(iii) disclosure to Affiliates, sublicensees, employees, consultants or agents who require such information for the performance of activities to be conducted under this Agreement, provided that such persons or entities agree to be bound by written terms of confidentiality and non-use at least equivalent in scope to those set forth in this Paragraph 6.

7. Reports; Evaluation Results. Theranos shall keep Merck informed of the progress of the Evaluation as provided in the Work Plan, and will provide the Evaluation Results to Merck at the end of the Evaluation. Notwithstanding Paragraph 6 Merck and its Affiliates shall have the unrestricted right to use and disclose all Evaluation Results and to use and disclose any information developed pursuant to this Agreement, for any and all purposes Merck and its Affiliates deem necessary or advisable in the ordinary course of business. At Merck's request, Theranos shall provide to Merck copies of all documentation and data relating to the Evaluation or shall permit Merck to inspect and copy such documentation and data. Likewise, Theranos shall have the right to disclose Evaluation Results for the purpose of marketing the Theranos Analytical Platform provided that such disclosures do not contain any Merck Confidential Information, and Theranos may list Merck as a client of Theranos.

8. Inventions.

(a) As between Company and Theranos, all Inventions and improvements developed in connection with or as a result of the Services, during the term of this Agreement and thereafter, whether by Company or Theranos, or by the parties jointly, directed to: (a) any part or the whole of the Theranos Analytical Platform or any improvements thereto, including, without limitation, the T.OS analytical engine and the algorithms therein; or (b) the generation of assays for use in conjunction with the Theranos Analytical Platform, shall be the sole and exclusive property of Theranos. Company shall promptly disclose to Theranos in writing any Inventions described in the preceding sentence, and Company hereby assigns to Theranos any right, title or interest it may have in such Inventions ("Theranos Analytical Platform Invention").

(b) All Merck Information and all Inventions other than Theranos Analytical Platform Inventions shall be the sole and exclusive property of Merck. Theranos will, upon request by Merck, promptly execute any and all patent applications, assignments, or other instruments that Merck deems necessary or useful for the protection of Inventions other than Theranos Platform Technology Inventions, which may be filed or prepared at Merck's cost and expense.

(c) Theranos represents and warrants that no governmental entity or other third party has or shall have any claim or right to the Evaluation Results or any Inventions.

9. Access to Software and use of the T.OS

(a) Theranos hereby grants to Merck a non-exclusive, non-transferable, non-sublicensable license to use, in accordance with, and solely for the purposes specified in, this Statement of Work and only for the term of the Project: (a) Software installed on Readers, for use by patients who are the subject of the Project ("Participants"), Merck employees and Merck contractors who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Statement of Work ("Merck Contractors") and (b) Software related to the T.OS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). In this Statement of Work, "Software" means computer programs, object code and related materials, in machine readable or printed form, including any updates or upgrades thereto.

(b) Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of Theranos. Merck shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use. Merck shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users indicated in the Statement of Work, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy, sell, rent, transfer, reproduce or distribute the

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905816

Software, except as specifically provided in the Statement of Work, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Merck's content which forms part of the Software. Merck shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

(e) Merck hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in the T.OS data provided under, related to or generated in connection with this Agreement for use in the T.OS' analytical engine to the extent permitted by law, provided that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individual Participants or any information identifying Merck or Merck Compounds, except in connection with the provision of any Services to Merck under this Agreement.

10. <u>Publication</u>. Theranos shall have no right hereunder to publish or present any of the Merck Information including, without limitation, the Evaluation Results.

11. <u>Compliance With Law and Ethical Business Practices</u>. (a) Theranos shall conduct the Evaluation in accordance with all applicable laws, rules and regulations, including, without limitation, all current governmental regulatory requirements concerning Good Laboratory Practices. Theranos will notify Merck in writing of any deviations from applicable regulatory or legal requirements.

(b) Theranos hereby certifies that it will not and has not employed or otherwise used in any capacity the services of any person debarred under Section 21 USC 335a in performing any services hereunder. Theranos shall notify Merck in writing immediately if any such debarment occurs or comes to its attention, and shall, with respect to any person or entity so debarred promptly remove such person or entity from performing any service, function or capacity related to the Evaluation. Merck shall have the right, in its sole discretion, to terminate this Agreement immediately in the event of any such debarment.

(c) The Parties agree that their respective business must be conducted within the letter and spirit of the law. By signing this Agreement, each Party agrees to conduct the Evaluation contemplated herein in a manner which is consistent with both law and good business ethics.

(i) Theranos shall not make any payment, either directly or indirectly, of money or other assets, including but not limited to the compensation Theranos derives from this Agreement (hereinafter collectively referred as **"Payment"**), to government or political party officials, officials of international public organizations, candidates for public office, or representatives of other businesses or persons acting on behalf of any of the foregoing (hereinafter collectively referred as **"Officials"**) where such Payment would constitute violation of any law. In addition regardless of legality, Theranos shall make no Payment either directly or indirectly to Officials if such Payment is for the purpose of influencing decisions or actions with respect to the subject matter of this Agreement.

(ii) Theranos acknowledges that no employee of Merck or its Affiliates shall have authority to give any direction, either written or oral, relating to the making of any commitment by Theranos or its agents to any third party in violation of terms of this or any other Paragraph of this Agreement.

(d) Theranos' failure to abide by the provisions of this Paragraph 11 shall be deemed a material breach of this Agreement. Merck may in such case and with immediate effect terminate this Agreement at its sole discretion upon written notice to Theranos and without prejudice to any other remedies that may be available to Merck.

12. <u>Use of Human Materials</u>. (a) Notwithstanding anything to the contrary in Paragraph 6, Theranos shall hold in confidence all data that identifies or could be used to identify an individual (**"Personal Data"**), except as required or permitted under this Agreement, or to the extent necessary to be disclosed to regulatory agencies as part of the review process. In addition, notwithstanding anything to the contrary in Paragraph 6, Theranos shall comply with all applicable laws and regulations, as amended from time to time, with respect to the collection, use, storage, and disclosure of any Personal Data including without limitation, the U.S. Health Insurance Portability and Accountability Act (HIPAA) and the regulations promulgated thereunder. Theranos agrees to ensure that all appropriate technical and organization measures are taken to protect Personal Data against loss, misuse, and any unauthorized, accidental, or

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905817

unlawful access, disclosure, alteration, or destruction, including without limitation, implementation and enforcement of administrative, technical, and physical security policies and procedures applicable to Personal Data.

13.  Disclaimer. Merck assumes no responsibility and shall have no liability for the nature, conduct or results of any testing or other work performed under this Evaluation. ALL MERCK MATERIAL IS SUPPLIED "AS IS" AND IS PROVIDED WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED.  EACH PARTY ACKNOWLEDGES THAT THE MERCK MATERIAL IS EXPERIMENTAL IN NATURE AND MAY HAVE UNKNOWN HAZARDOUS CHARACTERISTICS, THAT THEY ARE AWARE OF THE RISKS OF WORKING WITH EXPERIMENTAL MERCK MATERIALS AND THAT THEY WILL STRICTLY ADHERE TO PROPER LABORATORY PROCEDURES FOR HANDLING BIOLOGICAL SUBSTANCES WITH UNKNOWN HAZARDS. THE MERCK MATERIAL WILL NOT BE USED IN HUMANS.

14.  Termination. (a) Merck may terminate this Agreement at any time effective upon thirty (30) days' written notice to Theranos.

     (b) Upon termination of this Agreement, or at any other time upon request, each Party agrees to return all Confidential Information of the requesting Party, and all documents generated in connection with the Evaluation, except that each Party may retain one copy in a secure location solely for recordkeeping purposes.

15.  Survival. The provisions of Paragraphs 3 (other than Merck's obligation to supply Merck Material), 6 through and including 19 and Paragraph 21 and all definitions relating to the foregoing, shall survive termination or expiration of this Agreement.

16.  Notices. Any notices required or provided by the terms of this Agreement shall be in writing, addressed in accordance with this Paragraph, and shall be delivered personally or sent by certified or registered mail, return receipt requested, postage prepaid or by nationally-recognized express courier services providing evidence of delivery. The effective date of any notice shall be the date of first receipt by the receiving Party. Notices shall be sent to the address/addressee given below or to such other address/addressee as the Party to whom notice is to be given may have provided to the other Party in writing in accordance with this provision.

| If to Merck: | Vice President and Head, External Scientific Affairs<br>126 E Lincoln Avenue RY70-200<br>Rahway, New Jersey 07065 |
|---|---|
| With copy to: | Office of the Secretary<br>Merck & Co., Inc.<br>P.O. Box 100<br>One Merck Drive<br>Whitehouse Station, NJ 08889-0100 |
| If to Theranos: | Chief Financial Officer<br>3200 Hillview<br>Palo Alto, CA 94304 |
| Send invoice to: | Merck & Co., Inc.<br>PTP Shared Services<br>PO Box 1700<br>Whitehouse Station, NJ  08889 |

Page 5 of 7

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905818

Att: Accounts Payable
Phone: 908-423-3000
Reference: LKR 57457
**PO # will be supplied by Merck and must be referenced on the invoice along with**
the LKR#

With copy to:         Pauline Mandelos
                      Merck Frosst Canada
                      P.O. 1005
                      Point Claire-Dorval
                      Quebec H9R 4P8
                      Phone: 514-428-3047
                      Fax: 514-428-8541

17.   <u>Governing Law</u>.  This Agreement shall be construed in accordance with the laws of the State of New York, and the patent laws of the United States, without reference to provisions of conflicts of laws.

18.   <u>Entire Agreement</u>.  This Agreement, together with any Attachments attached hereto and specifically referenced herein, constitutes the entire agreement between the Parties with respect to the Evaluation and supersedes and replaces any and all previous arrangements and understandings, whether oral or written, between the Parties with respect to the Evaluation.  Any amendment or modification to this Agreement shall be of no effect unless made in writing signed by an authorized representative of each Party.

19.   <u>Publicity/Use of Names</u>.  No disclosure of the existence, or the terms, of this Agreement may be made by either Party, and no Party shall use the name, trademark, trade name or logo of the other Party or its employees in any publicity, promotion, news release or disclosure relating to this Agreement or its subject matter, without the prior express written permission of the other Party, except as may be required by law.

20.   <u>Assignment</u>. Theranos may not assign its rights or obligations under this Agreement without the prior written consent of Merck.  Any such purported assignment shall be void.

21.   <u>Severability</u>.  The provisions of this Agreement are severable, and if any provisions hereof shall be determined to be invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives, effective as of the Effective Date.

Merck & Co., Inc.                          Theranos, Inc.

BY: _____                      BY: _____
     Authorized representative                  Authorized representative

TITLE: _____                     TITLE: __PRESIDENT & CEO__

DATE: __09/29/08__                         DATE: __9/15/08__

Marvyn J. Turner, Ph.D.
Senior Vice-President, MRL

Page 6 of 7

FOIA Confidential Treatment Requested by Theranos                              THER-0905819
Fed. R. Crim. P. 6(e) material

**ATTACHMENT A**
**WorkPlan**

**Objective:**

To assess the sensitivity of Theranos' analytical platform. Specifically, we would to asses the sensitivity of their active Glucagon-like peptide 1 (GLP-1) assay in human EDTA plasma samples.

**Merck will provide the following materials to be shipped frozen:**

- N=8 peptide standards spiked at predefined values in buffer (Human cytokine buffer from Meso Scale Discovery) 10 frozen aliquots of each level ~ 50uL each
- N=20 human EDTA (with protease inhibitor DPPIV) plasma samples from a food effect study [n=4 subjects, n=5 time points per subject (0, 0.5, 1.0, 2.0 and 4 hours post meal)]. 100 uL each

**Theranos will:**

- Analyze samples for active GLP-1 in duplicates. Standards will be run in triplicate.
- Transmit all data back to Merck via a Merck-specific secure web-portal accessible through the Theranos website which will allow for downloads in MS excel format (*.xls file). Results for the duplicate measurements of each sample will be provided.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905820



# TEST AGREEMENT

This Test Agreement (this "**Agreement**") is made effective as of June 24, 2008 (the "**Effective Date**") between Novartis Pharma AG, a Swiss Corporation having its principal place of business at Lichtstr.35, CH-4056 Basel, Switzerland ("COMPANY"), and Theranos, Inc., a Delaware corporation having its principle place of business at 3200 Hillview, Palo Alto, CA 94301, USA ("THERANOS").

In consideration of the mutual terms and covenants set forth herein, THERANOS and COMPANY hereby agree as follows:

1. **DEFINITIONS.** As used herein, the following terms have the meanings set forth below:

1.1. "**Affiliate**" means with respect to a party, any person, corporation or other entity which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party. As used in this Section 1.1, "control" shall mean: (a) to possess, directly or indirectly, the power to affirmatively direct the management and policies of such person, corporation or other entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, or (b) direct or indirect beneficial ownership of at least fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign corporation in a particular jurisdiction) of the voting securities in such person, corporation or other entity.

1.2. "**CABS**" means THERANOS' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

1.3. "**Cartridge**" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

1.4. "**COMPANY Contractors**" mean independent contractors of COMPANY which are bound by written agreements or other legally enforceable obligations to maintain Confidential Information of THERANOS as confidential to the same extent as the Company is obligated hereunder.

1.5. "**COMPANY Compound**" means any compound (including therapeutic drugs and any kind of biomarkers) developed, under development, or owned by COMPANY or its Affiliates, or for which COMPANY or its Affiliates have been granted a license, that is used in the performance of a Project or otherwise is a subject of a Project..

1.6. "**Participants**" mean patients who are the subjects of a Project and who use the THERANOS System.

1.7. "**Project**" means the validation tests or surveys provided for in Article 22 hereof.

1.8. "**Reader**" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information.

1.9. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, of THERANOS and its licensors, as further described in Section 5.1, provided under this Agreement, including any upgrades or updates thereto that THERANOS may provide from time to time.

1.10. "**THERANOS System**" means, collectively, the system comprised of the 'Customised CABS' (definition of 'customised CABS' as specified in Article 22), Reader(s), Cartridges (version of the readers and cartridges as specified in Article 22) and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination, as provided by THERANOS to COMPANY.

1.11. "**Users**" means individuals, other than Participants, who are designated by COMPANY to have access to CABS and who are properly trained end users of the THERANOS System.

1.12. In addition, each capitalized term used in this Agreement and not defined in this Article 1 shall have the meaning given to such term in the relevant section of the body of this Agreement.

2. **SERVICES**

2.1. COMPANY hereby retains THERANOS commencing as of the Effective Date to provide certain bioanalytical services and products as provided for in Article 22 of this Agreement (the "**Services**"). Services provided hereunder shall be governed by the terms and conditions of this Agreement.

2.2. THERANOS shall not subcontract any Services without COMPANY's prior written approval.

2.3 COMPANY shall have the right to extend all its rights and obligations under this Agreement to its Affiliates. For the avoidance of doubt, all references to COMPANY's Contractors in this Agreement shall apply to Contractors of COMPANY's Affiliates. COMPANY warrants that its Affiliates and their Contractors will comply with COMPANY's obligations under this Agreement.

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905821



### 3. COMPENSATION AND EXPENSES

3.1. As compensation for Services hereunder, COMPANY shall pay THERANOS the amounts specified in Article 22. COMPANY will reimburse THERANOS, without mark-up, for all travel, shipping costs, and other reasonable out-of-pocket expenses incurred by THERANOS personnel in providing the Services. COMPANY shall be responsible for and pay all local, state, federal, or foreign sales, use, excise, personal property, value added, GST or other similar taxes or duties, other than taxes based on the net income of THERANOS.

3.2. THERANOS shall send its invoices to the following address:

Novartis Pharma AG
Lichtstrasse 35
Postfach
CH-4002 Basel, Switzerland
Attn: John Varaklis, Head of Operations & Innovations for TM

THERANOS shall indicate on its invoices the project to which the invoice relates, the amount payable, VAT rate and amount (if applicable), and the bank details of THERANOS.

3.3. COMPANY shall pay invoices within sixty (60) days of receipt.

### 4. PUBLICITY

Neither party shall disclose the terms or subject matter of this Agreement to any third party without the other party's prior written approval, except to company employees, consultants and advisors (including financial advisors, investors, attorneys and accountants) on a need to know basis, in each case under circumstances that reasonably protect the confidentiality thereof. Such obligation shall not apply to disclosures which either party is required by law to make, provided that the disclosing party shall notify the other party of any such disclosure prior to such disclosure and will use commercially reasonable efforts to secure confidential treatment of this Agreement or such terms required to be disclosed. Neither party shall use the name, logos, trademarks or service marks of the other party in any publicity, advertising or disseminated information without such other party's prior written approval, except that THERANOS may list COMPANY as a client of THERANOS, without any use of COMPANY's logo, and without providing any information about COMPANY.

### 5. ACCESS TO SOFTWARE AND USE OF CABS

5.1. In support of the Services, THERANOS may make available to COMPANY certain Software as a part of CABS. Such Software may include, without limitation, (a) Software installed on Readers ("**Firmware**") and (b) online or offline software services or products related to CABS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("**Client Accessible Software**").

5.2. THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicensable, royalty-free, fully paid-up license to use Firmware as incorporated into, and solely for use in connection with, Readers by Participants, COMPANY employees and COMPANY Contractors and otherwise in accordance with the terms of this Agreement, and only for the term of this Agreement.

5.3. THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicenseable license to use the Client Accessible Software for the purpose for which it is made available to COMPANY and otherwise in accordance with the terms of this Agreement, and only for the term of this Agreement. COMPANY shall not allow access to the Client Accessible Software by more than the number of concurrent Users indicated in Article 22.

5.4. THERANOS and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of THERANOS. COMPANY shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify THERANOS promptly of any such unauthorized use. COMPANY shall not: (a) disassemble, decompile or otherwise reverse engineer the Software, (b) modify, copy, sell, rent, transfer, reproduce or distribute the Software, (c) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (d) create internet "links" to or from the Software, or "frame" or "mirror" any of COMPANY's content which forms part of the Software. COMPANY shall only be bound by terms and conditions applicable to third party software provided with the Software if COMPANY has received written notice of such terms and conditions and, in the case of financial terms and conditions, has agreed to be bound by them in writing. THERANOS reserves all rights in the Software not expressly granted herein.

### 6. USE OF DEVICES

6.1. In connection with the Services, THERANOS may make available to COMPANY certain equipment, including but not limited to Readers and Cartridges (collectively, the "**Devices**"). Each Device will be provided to COMPANY upon the terms set forth in Article 22.

6.2. Devices shall only be permitted to be used by (a) COMPANY employees and COMPANY Contractors and (b) Participants. COMPANY agrees to take all reasonable steps to protect the Devices from theft or use contrary to the terms of this Agreement. COMPANY agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. COMPANY is not authorized to sell, rent, transfer, license, or distribute the Devices, except as specifically provided in this Agreement.

6.3. (i) THERANOS shall at all times retain ownership of the Devices, (ii) COMPANY shall keep the

2

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905822



Devices free of all security interests, liens and other encumbrances, (iii) COMPANY assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of COMPANY and during transportation to and from COMPANY's premises (or other mutually agreed premises) and shall pay the full cost of any Devices not returned in accordance with section 6.4, (iv) COMPANY shall adequately insure or self-insure the Devices against loss or damage while such Devices are in the possession or control of COMPANY and (v) COMPANY shall permit any authorized representative of THERANOS to inspect the Devices, at any time prior to the return of such Devices in accordance with Section 6.4, at COMPANY's facilities or any other location at which the Project is being conducted.

6.4. No later than ten (10) days after the earlier of completion of the Project or the date of termination of this Agreement, COMPANY shall, at its own cost, return to THERANOS the applicable Readers and Cartridges (other than Cartridges which have previously been consumed and properly disposed of), and COMPANY shall furnish THERANOS with a certificate signed by two (2) authorized representatives of COMPANY verifying that the same has been done. In the event of such completion or termination, as applicable, THERANOS shall have the right to enter COMPANY's premises or the clinic location at which the Project is being conducted, as applicable, for the purposes of repossessing such Devices, at a time to be mutually agreed by the parties in writing, and COMPANY hereby consents to such entry. THERANOS shall be entitled to receive from COMPANY all collection costs, including reasonable attorneys' fees, incurred in the enforcement of its rights under this Article 6. Such Devices shall be returned in as good a condition as when they were shipped to COMPANY, ordinary wear and tear excepted. COMPANY warrants that all Participants will return all Devices at the end of their participation in the Project.

7. **CONFIDENTIALITY**

7.1. Except to the extent expressly authorized by this Agreement, or otherwise agreed by the parties in writing, the parties agree that the receiving party (hereinafter called "**Recipient**") shall keep confidential and shall not publish or otherwise disclose (except to its Affiliates for the purpose of this Agreement) or use for any purpose other than as provided for in this Agreement any confidential or proprietary information or materials furnished to it by the other party or its Affiliates (hereinafter called "**Donor**") pursuant to this Agreement which if disclosed in writing or tangible form are marked as "Confidential" or "Proprietary" or with some similar designation at the time of disclosure and if disclosed orally are summarized and identified as confidential in a written notice to Recipient within thirty (30) days after the initial disclosure thereof (collectively, "**Confidential Information**"). Notwithstanding the foregoing, Confidential Information shall not be deemed to include information or materials to the extent that it can be established by written documentation by Recipient that such information or material:

7.1.1. was already known to or possessed by Recipient, other than under an obligation of confidentiality, at the time of disclosure;

7.1.2. was generally available to the public or otherwise part of the public domain at the time of its disclosure to Recipient;

7.1.3. became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Recipient in breach of this Agreement;

7.1.4. was independently developed by Recipient as demonstrated by documented evidence prepared contemporaneously with such independent development; or

7.1.5. was disclosed to Recipient, other than under an obligation of confidentiality, by a third party who had no obligation to Donor not to disclose such information to others.

7.2. Recipient may use and disclose Confidential Information of Donor only as follows: (a) under appropriate confidentiality provisions substantially equivalent to those in this Agreement in connection with the performance of Recipient's obligations or exercise of Recipient's rights granted under this Agreement; and (b) to the extent such disclosure is reasonably necessary in filing for, prosecuting or maintaining patents, copyrights and trademarks (including applications therefor), obtaining regulatory approvals, prosecuting or defending litigation or complying with applicable governmental regulations or is otherwise required by applicable law, provided, however, that if Recipient is required by law to make any such disclosure of Donor's Confidential Information it will give reasonable advance notice to Donor of such disclosure requirement and, except to the extent inappropriate in the case of patent applications, will use commercially reasonable efforts to secure confidential treatment of such Confidential Information required to be disclosed. Confidential Information shall remain the property of Donor.

7.3. For clarity, the parties agree and acknowledge that THERANOS' Confidential Information includes without limitation information disclosed by THERANOS to COMPANY relating to THERANOS' monitoring and bioinformatics systems and equipment, including the THERANOS System or any part thereof.

7.4. Upon Donor's request, Recipient shall immediately return or destroy any of Donor's Confidential Information in Recipient's possession or control, other than such Confidential Information as Donor is entitled to retain hereunder for use following expiration or any termination of this Agreement, provided, that Recipient shall be entitled to retain one (1) archival copy of such Confidential Information for the sole purpose of determining Recipient's obligations under this Article 7; provided, further, that nothing in this Section 7.4 be deemed to modify or otherwise limit COMPANY's obligations under Section 6.4.

3

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905823



### 8. INTELLECTUAL PROPERTY

Except as expressly set forth herein, each party shall retain ownership of its own intellectual property owned or licensed by each party prior to the execution of this Agreement or developed independently from performance of the Services, and no licenses on such intellectual property are granted under this Agreement.

### 9. COMPANY PROPERTY

9.1. As between COMPANY and THERANOS and to the extent permitted by law, all data regarding Participants in a Project ("**Participant Data**") are and shall remain the sole and exclusive property of COMPANY and shall be maintained as Confidential Information of COMPANY, except to the extent that any exceptions in Sections 7.1.1 – 7.1.5 apply.

9.2. As between COMPANY and THERANOS, and subject to Sections 10.2 and 10.3, all inventions, methods, discoveries and other proprietary information developed in connection with the Services both during the term of this Agreement and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to a COMPANY Compound, including, without limitation, therapeutic drugs, biomarkers, assays and targets, and any uses thereof, shall be the sole and exclusive property of COMPANY. THERANOS shall promptly disclose to COMPANY in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence, and THERANOS hereby assigns to COMPANY any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information under this Agreement, including all intellectual property rights therein.

9.3. COMPANY hereby grants to THERANOS a non-exclusive license under any intellectual property rights owned or controlled by COMPANY that may be necessary in connection with THERANOS' performance of the Services in accordance with and during the term of this Agreement, but not for any purpose other than to perform the Services.

9.4. COMPANY hereby grants to THERANOS the rights to integrate, use and disclose in CABS data provided under, related to or generated in connection with this Agreement for use in the 'customised CABS' (as specified in Article 22) analytical engine to the extent permitted by law, provided that THERANOS does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individual Participants or any information identifying COMPANY or any proprietary COMPANY compounds, but not for any purpose other than to perform the Services.

### 10. THERANOS PROPERTY

10.1. As between COMPANY and THERANOS, all inventions, methods, discoveries and other proprietary information developed in connection with the Services both during the term of this Agreement and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to the reader, the cartridge and/or the CABS of the THERANOS System (collectively the "Hardware"), including, without limitation, the CABS' analytical engine, shall be the sole and exclusive property of THERANOS. COMPANY shall promptly disclose to THERANOS in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence, and COMPANY hereby assigns to THERANOS any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information under this Agreement, including all intellectual property rights therein.

10.2. As between COMPANY and THERANOS, all inventions, methods, discoveries and other proprietary information developed in connection with the Services both during the term of this Agreement and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood, shall be the sole and exclusive property of THERANOS if any such inventions, methods, discoveries and other proprietary information will be solely applicable in connection with the THERANOS System. COMPANY shall promptly disclose to THERANOS in writing any inventions, methods, discoveries and other proprietary information as described in the preceding sentence, For the sake of clarity, any inventions, methods, discoveries and other proprietary information developed in connection with the Services both during the term of this Agreement and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to any novel biomarker as such or other novel analyte as such, or to any use in the field of translational / personalized medicine of a novel or known biomarker or other novel or known analyte, shall be the sole and exclusive property of COMPANY, and no rights therein are granted to THERANOS under this Agreement.

10.3. As between COMPANY and THERANOS, all inventions, methods, discoveries and other proprietary information developed in connection with the Services both during the term of this Agreement and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood, shall be the sole and exclusive property of COMPANY if any such inventions, methods, discoveries and other proprietary information will be applicable both in connection with the THERANOS System and additionally in connection with any other system. The parties shall promptly disclose to each other in writing any inventions, methods, discoveries and other proprietary information as described in the preceding sentence, Upon request, COMPANY shall grant to THERANOS a non-exclusive royalty-free, fully paid-up, transferable, perpetual, irrevocable, world-wide license (with the right to grant sub-licenses), for any exploitation solely in connection with the THERANOS System of any such inventions, methods, discoveries and other proprietary information directed to such methods as described in this Section 10.3..

4

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material



10.4. COMPANY shall provide to THERANOS any data regarding the use, functionality or operation of the Hardware of the THERANOS System generated in connection with this Agreement. THERANOS shall have the right to use and disclose any data described in the preceding sentence to further develop, use, make, have made, sell, market or otherwise exploit the Hardware of the THERANOS System during the term of this Agreement and thereafter, including, without limitation, in connection with any regulatory filing for the THERANOS System or any component thereof, provided that COMPANY's name and COMPANY's Confidential Information are not disclosed. COMPANY makes no warranties about the accuracy of the data provided to THERANOS and THERANOS shall use such data at its own risk.

10.5. At COMPANY's reasonable request, THERANOS shall provide to COMPANY all reasonably necessary data relating to the Project in THERANOS' possession regarding the internal validation and quality assurance of the Cartridges and Readers, which COMPANY may use solely in connection with the Project, subject to COMPANY'S confidentiality obligations under this Agreement, and subject to THERANOS' right to withhold its Confidential Information. THERANOS makes no warranties about the accuracy of the data provided to COMPANY and COMPANY shall use such data at its own risk.

**11. EXPORT RESTRICTIONS**

Each party shall comply with all United States and foreign export control laws or regulations applicable to its performance under this Agreement.

**12. [Reserved]**

**13. INDEMNIFICATION**

COMPANY agrees to defend, indemnify and hold harmless THERANOS and its respective employees, officers, directors, independent contractors, affiliates, stockholders and agents against and from any claims, proceedings or investigations arising out of or in connection with (a) the conduct of the Project (except to the extent solely arising from the THERANOS System) or the use of the results of the Project, (b) COMPANY's breach of this Agreement, negligence or intentional misconduct or (c) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of COMPANY (including any personal injury or property damage related thereto), including, without limitation, amounts paid in settlement of claims, proceedings or investigations, and COMPANY agrees to bear all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation as such costs and expenses are incurred in advance of judgment or settlement, except to the extent that such claim arises from any breach, negligence or wilful misconduct of THERANOS, provided that (i) COMPANY has sole control of the defense and/or settlement of such claim or suit, (ii) THERANOS notifies COMPANY promptly in writing of each such claim or suit and gives COMPANY or its legal representatives all information

known to THERANOS relating thereto, (iii) THERANOS reasonably cooperates with COMPANY in the settlement and/or defense and (iv) THERANOS may not settle or compromise such claim or suit except with the prior written consent of COMPANY, which may not be unreasonably withheld. THERANOS shall be reimbursed for all reasonable out-of-pocket expenses incurred in providing any such cooperation requested by COMPANY.

**14. INFRINGEMENT INDEMNITY**

THERANOS represents, to the best of its knowledge, that the THERANOS System and its use in the performance of Services in accordance with this Agreement will not infringe any valid Intellectual Property Rights of third parties. THERANOS shall (a) defend or, at its option, settle any claim or suit against COMPANY on the basis that the THERANOS System and its use in the performance of the Services infringes any trademark, copyright, trade secret or patent of a third party ("**Intellectual Property Rights**") in the United States of America, Switzerland, Italy, France, United Kingdom or The Netherlands and (b) pay any final judgment entered against COMPANY on such claim or suit or any settlement thereof, provided that: (i) THERANOS has sole control of the defense and/or settlement of such claim or suit, taking into account the reasonable interests of COMPANY, (ii) COMPANY notifies THERANOS promptly in writing of each such claim or suit and gives THERANOS all information known to COMPANY relating thereto, (iii) COMPANY cooperates with THERANOS in the settlement and/or defense and (iv) COMPANY may not settle or compromise such claim or suit except with the prior written consent of THERANOS, which may not be unreasonably withheld. COMPANY shall be reimbursed for all reasonable out-of-pocket expenses incurred in providing any cooperation requested by THERANOS. If all or any part of the THERANOS System is, or in the opinion of THERANOS may become, the subject of any claim or suit for infringement of any Intellectual Property Rights, THERANOS may, at its option and expense: (A) procure for COMPANY the right to continue use of the THERANOS System or the affected part thereof, (B) replace the THERANOS System or affected part thereof, (C) modify the THERANOS System or affected part thereof to make it non-infringing or (D) if none of the foregoing remedies are commercially feasible, terminate this Agreement and refund the aggregate payments made by COMPANY for the THERANOS System or the affected part thereof. THERANOS shall have no obligation under this Article 14 to the extent a claim is based upon (1) use of any version of the Software other than a current, unaltered version, if infringement would have been avoided by a current, unaltered version or (2) combination, operation or use of the THERANOS System or the Software contained therein with other software and/or hardware not provided by THERANOS. This Article 14 states the entire liability of THERANOS and the exclusive remedy of the COMPANY with respect to any infringement or alleged infringement by the THERANOS System or any part thereof.

**15. INDEPENDENT CONTRACTOR**

The parties agree that the relationship of THERANOS and COMPANY established by this Agreement is that of

5

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905825

**ER-14380**



independent contractors. Furthermore, the parties agree that this Agreement does not, is not intended to and shall not be construed to establish an employment, agency or any other relationship. Neither party shall have any right, power or authority, nor shall they represent themselves as having any authority, to assume, create or incur any expense, liability or obligation, express or implied, on behalf of the other party, or otherwise act as an agent for the other party for any purpose.

### 16.  DELAYS

THERANOS will require documents, data, records, and cooperation by COMPANY in order to properly perform the Services, and THERANOS is not responsible for errors, delays or other consequences arising from the failure of COMPANY or its employees, agents or contractors to provide such documents, data, records or cooperation in a timely manner. Neither party shall be liable to the other for failure or delay in the performance of any of its obligations under this Agreement for the time and to the extent such failure or delay is caused by earthquake, riot, civil commotion, war, terrorist acts, strike, flood or governmental acts or restriction, or other cause that is beyond the reasonable control of such party.  The party affected by such force majeure will provide the other party with full information thereof as soon as it becomes aware of the same (including its best estimate of the likely extent and duration of the interference with its activities), and will use commercially reasonable efforts to overcome the difficulties created thereby and to resume performance of its obligations as soon as practicable.  If COMPANY delays or suspends a Project for six (6) weeks or more, for reasons beyond COMPANY's reasonable control and due to no fault of THERANOS (a "**Significant Delay**"), and COMPANY requests in writing that THERANOS staff continue to be assigned to the Project during the period of such delay or suspension, the parties shall seek to agree in writing a monthly services fee (if any) to be paid. THERANOS shall have no obligation to continue to assign its staff to the Project unless and until the parties reach such written agreement, and shall not be responsible for any errors, delays or other consequences arising from not having staff assigned to the Project during the period of delay.  THERANOS shall not charge any service fee unless such fee has been agreed by the parties in writing. Such delay shall last no longer than three (3) months, after which time THERANOS shall have the right to terminate this Agreement by providing ten (10) days notice in writing. In the event that THERANOS terminates this Agreement under this provision, COMPANY shall have the obligations to make payment for Services performed and for non-cancelable obligations incurred which are specified in Section 17.2..

### 17.  TERM and TERMINATION

17.1.  This Agreement shall come into force on the Effective Date and shall remain in effect until completion of the Project unless earlier terminated in accordance with this Agreement.

17.1.1.  This Agreement may be terminated by either party upon default in performance of the other party, provided that any defaulting party shall be given not less than ten (10) days prior written notice of default and the opportunity to cure the default during such period.

17.1.2.  Either party may terminate this Agreement by providing notice in writing with immediate effect if the other party has gone into bankruptcy or liquidation otherwise than for the purpose of amalgamation or reconstruction; or has had a receiver or manager appointed in respect of any of its assets; or has entered into any composition with its creditors.

17.1.3.  Either party may terminate this Agreement without cause on forty-five (45) days notice.

17.2.  In connection with a termination of this Agreement by COMPANY pursuant to Section 17.1.3, or by THERANOS pursuant to Section 16, THERANOS shall submit to COMPANY a statement showing, in reasonable detail, the relevant fees due and costs and expenses incurred, and COMPANY shall, within sixty (60) days of receipt of such statement from THERANOS, make payment to THERANOS for:

(a)   all Services properly rendered prior to receipt of the termination notice and for which COMPANY has not yet paid; and

(b)   reasonable non-cancelable obligations properly incurred prior to receipt of the termination notice, in order to perform its obligations under this Agreement,

unless COMPANY reasonably objects to any charge, in which case the parties shall seek in good faith to resolve any such disagreement.

17.3.  No later than thirty (30) days after any termination of this Agreement, COMPANY shall return to THERANOS all THERANOS property in its possession or control, including:  (a) all Confidential Information of THERANOS in accordance with Section 7.4; (b) all Devices and Client Accessible Software provided under this Agreement; and (c) all authorization codes providing Participants and/or Users with access to the THERANOS System in connection with this Agreement. In addition, COMPANY shall ensure that all relevant Participants, Users and other COMPANY employees and consultants cease using the THERANOS System promptly following any such termination of this Agreement. No later than thirty (30) days after any termination of this Agreement, THERANOS shall return to COMPANY all Confidential Information of COMPANY in accordance with Section 7.4.

17.4.  Articles 1, 4, 7, 8, 9, 10, 13, 14, 17 (other than Section 17.1), 18, 19, 20, and 21 and Sections 5.4, 6.2, 6.3 and 6.4 shall survive expiration or termination of this Agreement for any reason. Except as otherwise provided in this Section 17.4, all rights and obligations of the parties under this Agreement shall terminate upon expiration or termination of this Agreement for any reason.

6

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905826

ER-14381



### 18. COMMUNICATIONS AND PAYMENTS

All notices, administrative communications and payments provided for in this Agreement shall be by express delivery service or first class mail, postage prepaid, or express courier addressed to the applicable party as follows:

To THERANOS:    Theranos, Inc.
3200 Hillview
Palo Alto, CA 94301
Attn: Controller

To COMPANY:    Novartis Pharma AG
Lichtstr.35
CH-4056 Basel, Switzerland
Attention: John Varaklis,
Head of Operations & Innovations for TM
With a copy to Head Pharma Legal

### 19. ASSIGNMENT

Neither party shall have the right to assign this Agreement or any of the rights or obligations hereunder without the prior written consent of the other party. Notwithstanding the foregoing, either party may, without such consent, assign this Agreement to a third party that succeeds to all or substantially all of such party's business or assets relating to this Agreement whether by sale, merger, operation of law or otherwise.

### 20. LIMITED WARRANTY

20.1. Each party represents and warrants that: (a) it has the legal authority to enter into this Agreement; and (b) the execution, delivery and performance of this Agreement by it and its obligations hereunder do not conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

20.2. Each party shall perform its obligations under this Agreement: (a) in a timely and professional manner; (b) in conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances; (c) in compliance in all material respects with all applicable laws and regulations and (d) in accordance with this Agreement. Without limiting the foregoing, COMPANY represents, warrants and covenants that it has obtained, and shall continue during the term of the Project to obtain, all necessary consents to be able to provide to THERANOS, and to permit THERANOS to use for all purposes specified in this Agreement, Participant Data and other data provided by COMPANY or otherwise furnished to THERANOS in connection with this Agreement.

20.3. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THERANOS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR THE THERANOS SYSTEM (OR ANY PART THEREOF) OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER THIS AGREEMENT, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF THERANOS OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES. COMPANY acknowledges that THERANOS makes no representation or warranty that the COMPANY's pharmaceutical, biologic, or medical device products (including any proprietary COMPANY compounds) tested in connection with the Services can, either during the term of this Agreement or thereafter, be successfully developed or, if so developed, will receive the required approval by the U.S. Food and Drug Administration ("**FDA**") or other applicable regulatory body.

20.4. IN NO EVENT (A) SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THREE MILLION FIVE HUNDRED THOUSAND U.S. DOLLARS (U.S.$3,500,000). NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS ON LIABILITY AND DAMAGES IN THE PRECEDING SENTENCE SHALL NOT APPLY TO: (A) LIABILITY OR DAMAGES TO THE EXTENT ARISING FROM A BREACH UNDER ARTICLES 7, 8, 9 OR 10 OR FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT; OR (2) LIMIT COMPANY'S INDEMNIFICATION OBLIGATIONS UNDER ARTICLE 13 WITH RESEPCT TO AMOUNTS OWING TO THIRD PARTIES.

### 21. GENERAL CONDITIONS

21.1. The headings in this Agreement are for convenience only and do not in any way limit or amplify the terms or conditions of this Agreement.

21.2. This Agreement and its exhibits constitute the entire agreement between the parties and supersede all prior contracts, agreements, proposals, letters, communications and understandings, whether written or oral, relating to the same subject matter between the parties; provided however that this Agreement shall not modify or otherwise affect the parties' obligations under any confidentiality or non-disclosure agreement executed prior to the Effective Date with respect to the disclosure of information under any such agreement that is not related to the subject matter of this Agreement. The parties intend this Agreement to be a complete statement of the terms of their agreement, and no change or modification of any of the provisions of this Agreement shall be effective unless it is in writing and signed by duly authorized officers of THERANOS and COMPANY.

21.3. This Agreement shall be governed by and construed in accordance with the laws of the state of New

7

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905827



York, USA, without regard to the conflict of laws provisions thereof.

21.4. THERANOS agrees to comply at all times with all provisions of the Generic Drug Enforcement Act of 1992 (the "**Act**") applicable to the Services. THERANOS further agrees to submit to COMPANY upon completion or termination of the Project a certification that neither THERANOS nor any of its employees has been debarred by the FDA under the provisions of the Act and that THERANOS did not use in any capacity in connection with this Agreement the services of any person (as defined in the Act) debarred under the provisions of the Act.

21.5. The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision hereof.

21.6. No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement.

### 22. Project Parameters and Budget

22.1 The Services provided for under this agreement shall constitute a technical performance evaluation of the THERANOS System through a direct comparison of assays for CRP at a broad range of known levels assayable by the current standard. As referenced in Section 1.1, the "**THERANOS System**" is the system comprising the CABS, Reader(s), Cartridges, Assays (for the purpose of this agreement the assay is CRP) and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination. As used above,: (a) "**Assay**" means any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood; (b) "**Cartridge**" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample; (c) "**Reader**" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information; and (d) "**CABS**" means THERANOS' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies (for the purpose of this agreement, CABS is customized to profile patients whose CRP data is generated in parallel by current gold-standards).

22.2 The project parameters are as follows:
- ❖ Project: ACZ885 -- Pediatric Study
- ❖ Cartridge Analytes: Single Cartridge: CRP
- ❖ Sample Types: Venous draw -- whole blood
- ❖ Sites (Number) -- Location: 4 - UK, France, Italy, Netherlands
- ❖ Total Number of Participants: Up to 26

- ❖ Number of Time Points: Up to 8 time-points / Participant / month
- ❖ Number of Cartridges: 120+
- ❖ Number of Readers: up to 8
- ❖ Maximum number of concurrent users on web-portal: Unlimited for Novartis or hospital employees
- ❖ Length of Participant Participation: TBD based on mutual agreement on the available reviewed results
- ❖ Localization/Languages for Translation: English
- ❖ Touch Screen and/or Web Interface Customization: NOVARTIS-specific Theranos Feedback Survey
- ❖ Data Infrastructure: Purchase and configure a unique Novartis-specific server and database
- ❖ Expected Start Date (First Participant In): June, 2008
- ❖ Expected End Date (Last Participant Out): Trial end date is currently planned for March 2009.
- ❖ Total Duration of Services: TBD based on mutual agreement on the available reviewed results
- ❖ Investigator Meeting ("IM") Date and Location / Calibration Start : TBD based on obtaining any required approvals from local ethics committees and/or appropriate agencies.

22.3 Theranos will provide the following services pre-deployment:
- ❖ Refine project specifications with NOVARTIS.
- ❖ Assign Project Manager(s).
- ❖ Transfer blinded patient and clinician IDs for set-up in touch-screen and CABS portals (where available).
- ❖ Transfer to THERANOS assay-specific information, materials, and other relevant data (collectively, "Assay Specifications").
- ❖ Collaborate with NOVARTIS to create a Project plan to ensure that timelines are accurately communicated and met.
- ❖ Plan for THERANOS System training session (as described below).
- ❖ Design, develop, program, test and validate NOVARTIS-specific CABS portal to capture Participant Data and display program progress and user feedback.
- ❖ Initial setup of accounts and secure access privileges for all parties who will be authorized to access CABS (collectively, "Users").
- ❖ Specify Project-related workflow.
- ❖ Set-up and secure NOVARTIS-specific database and server. Participant Data will be accessible and retained only for the duration of the Project as defined in project parameters above. Participant Data once the study is complete shall be purged from NOVARTIS-specific database and server.
- ❖ Customize and validate Project-specific Cartridges to Assay Specifications.
- ❖ Customize and validate touch-screen interface.

8

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905828

ER-14383



❖ Develop and deliver customized training[1] course.
❖ In-person training of site staff and COMPANY staff at the IM.

**22.4** THERANOS will provide the following services post-deployment:

❖ Data Delivery & Transfer
- During the Project, Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via CABS.
- Cumulative data transfers can be executed by NOVARTIS at any time via the Export Utility in the Data Delivery component of CABS.

❖ Client Infrastructure and Technical Support
- Provide relevant THERANOS System set-up material(s).
- Set up Readers on-site(s).
- Provide and manage the web portals to be used by COMPANY in connection with the Services provided under this Statement of Work.
- Work with COMPANY to customize systems for the appropriate international telecommunications infrastructure to successfully transmit Participant Data.
- Set up, administer, monitor, and troubleshoot web and database servers for duration of the Project.
- Create secure backup infrastructure.
- Provide second level technical support to the Project Support Center (described below).
- Reasonably assist COMPANY with issues regarding network infrastructure setup related to the THERANOS System.
- Troubleshoot firewall, computer system, and connectivity issues relating to CABS.

❖ Project Support Center
- During the Project, provide telephone helpdesk support for COMPANY regarding the use of the THERANOS System*.
- Live coverage 24x7 through THERANOS customer-care center.
  - Participants to call site coordinator directly about any non-THERANOS System issues.

**22.5** Project Budget and Payment Terms
❖ Services:
- Pre-Deployment Services (as described above)
  ▪ Training

- Post-Deployment Services (as described above)
  ▪ Project Support
  ▪ Data delivery, client infrastructure and technical support

❖ Product Delivery and Clinical Use:
- Development/Validation/Calibration/Customization of Readers, Cartridges, & multiplexed point of care assays
- Distribution, trial definition/project management, services configuration/software customization (CABS), set up of NOVARTIS and physician portals, real-time reporting, analytics, and Company-specific back-end database and server infrastructure
- International, multi-center, communications and data transmission infrastructure
- International, multi-center, real-time patient monitoring

❖ Total Invoiced: $65,000
- Total Costs: $500,000
- Goodwill Investment: Flat Fee Applied: - ($435,000)
- Payment Schedule: Due upon execution of Agreement
- All invoices not paid in sixty (60) days shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.
- Please note that should the scope, duration or parameters of this Project (e.g., requirements for configuration and/or support) change, associated fees may need to be revised and no Services will be provided for such new scope or parameters until the parties hereto amend this Statement of Work to reflect such changes.
- For internationally based trials contract denomination will be in U.S. currency. Payments made to THERANOS will be made in U.S. currency.

*(The remainder of this page is intentionally left blank.)*

---

[1] The first two (2) hours of training at each clinical site by up to two (2) THERANOS representatives are included in the budget. Each additional hour of training will be billed to COMPANY at the rate of $150 per hour.

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905829

**theranos**
*redefining healthcare*

Each party has caused this Agreement to be executed by its duly authorized representative as of the Effective Date.

**THERANOS, INC.**                                      **NOVARTIS PHARMA AG**

_Elizabeth Holmes (signature)_
Accepted by (signature)                                Accepted by (signature)

ELIZABETH HOLMES
Name                                                   Name

PRESIDENT & CEO
Title                                                  Title


                                                       Accepted by (signature)


                                                       Name


                                                       Title

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                THER-0905830

27-Jun-2008  19:07     NOVARTIS - ED, Tran    +41613248913                    1/10

**theranos**
redefining healthcare

Each party has caused this Agreement to be executed by its duly authorized representative as of the Effective Date.

THERANOS, INC.                              NOVARTIS PHARMA AG

Accepted by (signature)                     Accepted by (signature)

ELIZABETH HOLMES                            GERVAIS TOUGAS
Name                                        Name

PRESIDENT ; CEO                             Global Head TRANSLATIONAL MEDICINE
Title                                        Title

                                            Accepted by (signature)

                                            JOHN VARAKLIS
                                            Name

                                            HEAD OF OPERATIONS AND INNOVATION FOR TM
                                            Title

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905831

**SERVICES FRAME AGREEMENT**
Between
**Pfizer, Inc. and Theranos, Inc**
**December 15, 2006**

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905832

This Agreement is entered into as of November 22, 2006 by and between **Pfizer Inc.** a Delaware corporation with a business address of 235 East 42nd Street, New York, NY 10017 (together with its Affiliates "Pfizer"), and Theranos, Inc. with an office at 1430 O'Brien Drive, Suite C, Menlo Park, California, 94025, USA.

**Whereas**, Pfizer is a pharmaceutical company possessing proprietary and confidential information related to drug development and potential drug targets and biomarkers; and

**Whereas**, Theranos is a technology company possessing expertise in assay development and data collection;

**Whereas**, both parties wish to enter into an evaluation of Theranos technology to determine its application to Pfizer's drug development efforts;

**Now therefore**, in consideration of the foregoing and mutual promises contained herein and to set forth a clear understanding of the mutual rights and obligations relating to it, the parties agree as follows:

**1.     GENERAL SCOPE OF AGREEMENT**

1.1.    Theranos will perform studies for feasibility, assay and informatics development, assay validation and sample measurement and other agreed services set forth in the Study Plan attached as Exhibit 1. Theranos will provide all personnel and equipment reasonably necessary to perform the Services. Theranos will not perform any work for Pfizer beyond the Study Plan without the prior written approval of Pfizer.

1.2.    The parties shall regularly communicate about all relevant matters with regard to the Study Plan, in a form and manner as the parties shall mutually agree. Theranos shall promptly inform Pfizer about any material unforeseen results, problems or difficulties with regard to the Study Plan which are reasonably likely to result in a significant delay in any timetable set forth in Exhibit 1.

1.3.    Theranos warrants that its employees and permitted sub-contractors who are involved in performing the Study Plan will comply with the applicable obligations of Theranos hereunder.

**2.     TERM OF AGREEMENT**

2.1.    The Term of this Agreement will be until the conclusion of the Study Plan agreed in Exhibit 1, unless earlier terminated in accordance with Section 9 of this Agreement.

1

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**3.** **TEST SAMPLES**

3.1    Subject to the provisions in Exhibit 1, Pfizer shall, at its own cost, deliver to Theranos free of charge certain Pfizer materials (the "Test Samples"), as mutually agreed by the parties and specified in Exhibit 1. Pfizer shall deliver an amount of the Test Samples sufficient to enable Theranos to perform the Study Plan to which the Test Samples relate.

3.2    Prior to receipt by Theranos of the Test Samples, Pfizer shall provide Theranos with any and all procedures and warnings which are known to Pfizer and are necessary and/or desirable to help assure the safe handling and use of the Test Samples. Theranos, however, accepts the Test Samples with the understanding that their hazardous and toxicological properties may not have been completely investigated and therefore are unknown. Theranos will handle the Test Samples accordingly and will inform Pfizer in writing of any adverse affects experienced by persons handling the Test Samples.

3.3    Theranos will use the Test Samples solely for the purpose of performing the Study Plan in Exhibit 1. In addition, Theranos shall not modify the Test Samples (except as agreed by the parties) or administer it to any animals or humans or supply the Test Samples to any third party other than an Affiliate or permitted sub-contractor, without the consent of Pfizer. Affiliate for the purpose of this Agreement shall mean any corporation or other business entity that is Controlled by, Controlling or under common Control with a party. "Control" for the purpose of this definition shall mean direct or indirect beneficial ownership of fifty percent (50%) or more of the voting interest in an entity, or the power to direct the management and policies of such corporation or other business entity, or such other relationship that in fact constitutes actual control.

**4.** **PAYMENT TERMS**

**PAYMENT**: Pfizer will pay to Theranos the sum of nine hundred thousand dollars ($900,000.00) according to the following payment schedule:

(i)    Pfizer will pay to Theranos the sum of five hundred thousand dollars ($500,000.00) within thirty (30) days of the execution of this Agreement.

(ii)    Pfizer will pay to Theranos the sum of three hundred thousand dollars ($300,000.00) upon submission of an interim report of assay development completion.

(iii)    Pfizer will pay to Theranos the sum of one hundred thousand dollars ($100,000.00) upon receipt of a final report from Theranos.

2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905834

(iv)    After the execution of this Agreement, Pfizer will issue a purchase order number to Theranos. Theranos will invoice Pfizer for payment due to Theranos using the issued purchase order number. The purchase order number must appear on each invoice. Theranos will be responsible for invoicing Pfizer at the successful completion of each milestone listed above, including the first payment due upon execution of this agreement.

Invoices should be submitted to:

Strategic Alliances
Pfizer Inc
50 Pequot Avenue
MS 6025-C4120
New London, Ct. 06320
Attn: Head of Development and Commercial Strategic Alliances

## 5.    INTELLECTUAL PROPERTY

5.1.    All information, data and writings, inventions and other intellectual property provided to Theranos by and/or on behalf of Pfizer in connection with this Agreement, in any form whatsoever, both tangible and intangible, which were owned by or licensed to Pfizer prior to being provided to Theranos, shall remain the sole and exclusive property of Pfizer (the "Pfizer Data"). Theranos shall acquire no right, title or interest in the Pfizer Data as a result of its performance of the Study Plan except as expressly provided in this Agreement. Pfizer hereby grants to Theranos a non-exclusive, worldwide, royalty-free license (including the right to grant sublicenses in accordance with this Agreement) to use any Pfizer Data that may be necessary or reasonably useful in connection with the performance of any work under the Study Plan.

5.2.    All information, data, writings, inventions and other intellectual property, in any form whatsoever, both tangible and intangible, owned by or licensed to Theranos prior to the commencement of this Agreement, or following the commencement date of this Agreement but prior to the commencement date of the Study Plan shall remain the sole and exclusive property of Theranos ("Theranos Background Technology"). For clarity, Theranos Background Technology shall include all inventions and other intellectual property relating to the Cartridges, the Readers, the ABCS and Theranos System, as each such term is defined in Exhibit. 2 attached to this Agreement and dated as of the date hereof.

5.3    The ownership of any information, data, writings, inventions and other intellectual property developed by Theranos (or its employees and subcontractors) as a result of Theranos' performance of the Study Plan shall be determined in accordance with the provisions of the Study Plan.

3

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905835

5.3.  After completion of the Study Plan or the termination of this Agreement: (a) upon the request of Pfizer, Theranos shall return to Pfizer all Pfizer Data and any other items specified in Exhibit 1; provided that Theranos shall not be obligated to return any Pfizer Data or other intellectual property assigned to Theranos by Pfizer under the Study Plan; and (b) upon the request of Theranos, Pfizer shall return to Theranos all Theranos Background Technology and any other items specified in Exhibit 2.

5.4.  Theranos represents that, to its knowledge, it owns or has the right to use all copyright, trademark, patents, and other intellectual property rights included in Theranos Background Technology which, as of the date of commencement of this Agreement, it intends to use to perform its obligations under this Agreement.

5.5.  Theranos shall acquire no right, title or interest in any of the trademarks, service marks or copyrights belonging to Pfizer, nor shall it be deemed to have made any trademark usage of any trademarks by the performance of any Services for Pfizer hereunder, except as expressly provided in this Agreement.

**6.  CONFIDENTIAL INFORMATION/PUBLICATION**

6.1.  Each party ("receiving party") agrees to maintain in confidence and not to publish, disclose or use for any purpose other than this Agreement, any and all confidential information, in any form whatsoever, disclosed by the other party ("disclosing party") in connection with this Agreement (collectively for each disclosing party, "Information"). Information shall include without limitation all confidential information disclosed to a party by the other party's Affiliates. The obligations under this Section 6 of non-disclosure and non-use shall not apply to the extent that:

(a)  Information of a disclosing party at or after such time that it is or becomes publicly available through no fault of the receiving party;

(b)  Information that is already independently known to the receiving party as shown by written records existing at the time of such disclosure;

(c)  Information at or after such time that it is disclosed to the receiving party by a third party with the legal right to do so; or

(d)  Information required to be disclosed by the receiving party pursuant to judicial process, court order or request of any governmental body, provided that the receiving party shall so notify the disclosing party sufficiently prior to disclosing such Information so as to permit the disclosing party to seek a protective order or otherwise prevent or restrict such disclosure.

Notwithstanding the foregoing, a receiving party may disclose Information of the disclosing party to any of its Affiliates, employees, consultants, agents, or

4

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905836

any permitted subcontractors or sub-subcontractors retained to assist the receiving party in the performance of the Study Plan, on a need-to-know basis in accordance with the receiving party's exercise of its rights or performance of its obligations under this Agreement, provided that the receiving party has first obtained written agreement from any such persons to maintain the confidentiality of, and not to use, such Information pursuant to terms not less strict than those set forth in this Agreement.

6.2.   Theranos shall not make any publications relating solely to the Study Plan or containing any Information about Pfizer products ("Pfizer Materials") without Pfizer's written consent.

6.3.   Each party's obligations under this Section 6 shall survive the expiry or termination of this Agreement for 10 (ten) years.

### 7.   PUBLICITY

7.1.   Neither party shall disclose that Pfizer has entered into this Agreement with Theranos; provided however that Theranos may disclose that Pfizer has entered into this Agreement to: (a) Theranos's advisors, existing and potential investors and others on a need-to-know basis, in each case under obligations of confidentiality and non-use which are not less strict than those set forth in this Agreement

7.2.   Neither party will use, or authorise others to use, the name, symbols, or marks of the other party in any advertising or publicity material or make any form of representation or statement with regard to the Services which would knowingly constitute an express or implied endorsement by the other party of any commercial product or service without that other party's prior written approval.

### 8.   INDEMNIFICATION:   Pfizer shall defend, indemnify and hold harmless Theranos, its employees, directors, trustees and officers, from and against any and all liability which it may incur by reason of Pfizer's use of the results of the work; provided, however, that Theranos shall indemnify Pfizer, its employees, consultants, directors and officers for any claims for injuries to persons or damages which occur on Theranos's premises or premises under the control of Theranos while performing work.

### 9..   TERMINATION:   Pfizer may terminate this Agreement with or without cause by giving forty five (45) days notice to Theranos in writing.  If Pfizer terminates this Agreement, Pfizer's only obligation shall be to pay Theranos for the work performed up to the date of termination and any

5

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905837

costs incurred to close down the project

**10.     CONFORMANCE WITH LAW AND ACCEPTED PRACTICE**

10.1.   Theranos shall perform the Study Plan:

  (a)     In a timely and professional manner;

  (b)     In conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances; and

  (c)     In compliance in all material respects with all applicable laws, regulations and guidelines relating to the Study Plan.

10.2.   Theranos warrants that it presently has not, and shall not for the term of this Agreement and any mutually agreed extension thereof, grant to any third party rights in Theranos Background Technology that are inconsistent with the rights granted to Pfizer under this Agreement.

10.3    EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY WORK ORDER, THERANOS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THERANOS BACKGROUND TECHNOLOGY, OR THE SERVICES OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER ANY WORK ORDER, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF THERANOS OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

**11.     SUBCONTRACTORS**

Theranos shall not retain any sub-contractor to assist Theranos in performing the Study Plan without the prior written approval of Pfizer, such approval not to be unreasonably withheld. Any such approval shall not relieve Theranos of its obligations under this Agreement.

**12.     INDEPENDENT CONTRACTOR**

12.1.   Theranos shall perform the Study Plan as an independent contractor and, as such, neither Theranos nor its employees shall be entitled to any benefits applicable to employees of Pfizer.

6

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905838

12.2. Neither party is authorised or empowered to act as agent for the other for any purpose and shall not on behalf of the other enter into any contract, warranty or representation or commitment of any kind as to any matter, without the prior written approval of the other party.

**13.  ENTIRE AGREEMENT**

This Agreement, and the attached Exhibits 1 and 2 attached hereto, represent the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior discussions, agreements and writings in respect hereto. None of the terms of this agreement shall be amended except in writing signed by both parties.

**14.  SEVERABILITY**

The invalidity, illegality or unenforceability of any term or provision of this Agreement shall not affect the validity, legality or enforceability of any other term or provision hereof and such invalid, illegal or unenforceable provision shall be reformed to comply with applicable law or stricken if not so conformable.

**15.  ASSIGNMENT**

Neither party hereto may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party, which consent may not be unreasonably withheld; provided that, without such consent, either party may assign this Agreement in connection with the transfer or sale of all or substantially all of its assets or business to which this Agreement relates or its merger or consolidation with another company. Pfizer may assign this Agreement in whole or in part to any Affiliate without the consent of Theranos, and shall provide written notice to Theranos promptly following any such assignment. No assignment shall relieve either party of the performance of any accrued obligation which such party may then have under this Agreement. Any assignment or transfer of this Agreement, or any of a party's rights or obligations hereunder, in violation of this Section 15 shall be void.

**16.  WAIVER**

Any term of this Agreement may be waived only by a written instrument executed by a duly authorized representative of the party waiving compliance. No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement.

7

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905839

17. **FORCE MAJEURE**

Neither party shall be liable for non-fulfilment of its obligations hereunder if such non-fulfilment is due to strikes, riots, war, invasion, acts of God, fire, explosion, floods, acts of government agencies (other than such acts which are the result of an act or omission of the party seeking to rely upon this Section 17), judicial action, labour disturbance and/or any other event beyond that party's reasonable control.

18. **APPLICABLE LAW AND VENUE**

This Agreement shall be governed by, and construed in accordance with the laws of New York, except as they relate to the conflict of laws.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

**PFIZER, Inc.**

_(signature)_

B.J. Barmann
(name printed)

V.P., Strategic Alliances
(title)

December 11, 2006
(date)

**THERANOS, INC.**

_(signature)_

ELIZABETH HOLMES
(name printed)

PRESIDENT & CEO
(title)

DECEMBER 12, 2006.
(date)

8

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905840

This Page Intentionally Blank

9

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905841

## Exhibit 1—Study Plan for the Technical Assessment of Theranos System

Pfizer is sponsoring a technical assessment of the Theranos System by utilizing cartridges designed to run assays for VEGF and PLGF. The Theranos System will be incorporated into the study outlined below.

**Goals of Study:**
1. Generate preliminary data on VEGF and PLGF trends in cancer patients while assessing the use of the Theranos System in the hands of clinicians and patients.
2. Obtain feedback and recommendations from clinical staff.
3. Assess the use of the Theranos System in the hands of ambulatory patients at home.
4. Assess the Ambulatory Bioinformatics Communications System including the physician and patient web portals as well as the data reports generated.

The details of this proposed protocol follow:

1. **Oncology Center(s):** Up to 3 Sites

2. **Expected Start Date:** December, 2006

3. **Type of Study:** On-site/In-home; Open Label, data comparison; current standard laboratory measurements *vs* real-time measurements using the Theranos System. Blood is monitored at baseline and periodically during the study.

4. **Patient Profile:** 60 patients with confirmed solid-tumor cancers such as colorectal, renal, NSCLC, etc. Patients should represent the spectrum of patients from adjuvant through to stage 4. For this study, a minimum of 10 adjuvant patients should be recruited.

5. **Indication:** Cancer (Confirmed solid-tumor cancers including colorectal, renal cancer, GIST, NSCLC. Etc.)

6. **Inclusion/Exclusion Criteria:** TBD with Investigator(s)

7. **Estimated Duration:** 14 data points as per Table 1

8. **Number of Patients:** Total 60 (males and females)

9. **Number of Readers:** 72 (1 Reader per patient per site plus 12 extra for use in clinic

10. **Number of Cartridges:** Total of 1140 cartridges;
    a. 17 cartridges per patient protocol = 840 total
    b. 3 extra cartridges per patient = 210
    c. 2 extra cartridges per patient at clinic = 140

11. **Statistics:** a) Plot/Correlation between levels of soluble selected biomarkers using the Theranos System and the conventional laboratory (ELISA or other) method; b) integrated analysis of real time data, patient diary inputs, and static information in the patient record.

12. **Other Requirements:**
    a. Where available, results of patient PET scans will be collected within the ABCS system.
    b. Each patient involved in the pilot will be sent home with a Reader and individual cartridges. The clinical personnel will need to use the supplied bar code scanner to scan the individual bar

10

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905842

**ER-14397**

codes for each cartridge and link it with a patient ID which will be entered via a screen within ABCS. The patients will also be supplied with the appropriate number of lancets and alcohol wipes. A tote bag will be supplied for each patient to carry their cartridges and accessories home.

**Clinical Trial Design -** The following clinical trial design will be incorporated into an approved protocol.

**Prior to Study Initiation**

1. Clinical Site will recruit patients for participation in this clinical trial. Upon agreement to participate the patients will have a venous blood draw sent to the laboratory for conventional evaluation. The frozen sample, the raw data and analyte concentrations from the laboratory evaluation should be sent to Theranos prior to the initiation of the study for creation of calibration curves.

**Pilot Study**

1. On the first clinic visit clinical personnel will draw venous blood from the patient and send the blood to the laboratory for conventional evaluation.

2. The designated clinical personnel will then demonstrate to the patient how to use the Theranos System. Designated clinical personnel will oversee the patient as they use a lancet to draw blood through a finger prick, use the Cartridge to draw in the blood sample and insert the cartridge into the reader. While the reader runs the analysis on that cartridge, the patient will be provided a Patient User Manual and instructed on the other aspects of their clinical trial and their therapies. The patients will also be taken through how to access the web site and the patient diary and how to record required information. After going through the patient diary, patients will return to the reader, dispose of the Cartridge and then use a second the Cartridge by repeating the process of drawing a blood sample and inserting the cartridge into a reader. Each patient will then leave the clinic with a Theranos reader and eight Theranos cartridges. Results from the finger prick assays will be compared to results from the venous blood draw.

3. The patient will take all medications as prescribed, and will record the following information into the patient diary (Appendix A) each day:
   a. Medicines taken including time of day and dose
   b. Overall health assessment; how do they feel that day and are they experiencing any side effects
   c. The Patient Diary will be finalized with Pfizer prior to the initiation of the study.

4. On Day 4 each patient will utilize the Theranos System as trained in step #3. The cartridge will be used to draw in the blood sample and cartridge with blood will be inserted into the reader. After the reader performs the analysis, the patient will dispose the used cartridge.

5. On Day 7, 10, 13 and 16 the patient will repeat this process

6. On Day 19 each patient will return to the clinic where clinical personnel will do a venous blood draw for analysis in the lab and will oversee the patient taking a finger stick and inserting the cartridge into the Theranos Reader for comparison to the laboratory test.

7. On Day 37, the patient will return to the clinic for their final visit as part of this study. The patients will return with their reader and will utilize a finger stick for the Theranos System and patients will have a final venous blood draw.

The complete outline of the patients monitoring process is laid out in the following table.

11

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905843

**ER-14398**

**Table 1:** Data Points for Clinical Monitoring using Theranos System (TS) and Laboratory (ELISA)

| Data Point | Location | Assay |
|---|---|---|
| Day 1 | Clinic | 2 TS cartridges ELISA |
| Day 4 | Home | TS |
| Day 7 | Home | TS |
| Day 10 | Home | TS |
| Day 13 | Home | TS |
| Day 16 | Home | TS |
| Day 19 | Clinic | 1 TS cartridge ELISA |
| Day 22 | Home | TS |
| Day 25 | Home | TS |
| Day 28 | Home | TS |
| Day 31 | Home | TS |
| Day 34 | Home | TS |
| Day 37 | Clinic | 1 TS cartridge ELISA |

**Deliverables**

1. Theranos System Evaluation
   a. Investigators – Clinic participants in the assessment will be asked to complete an evaluation of the Theranos System upon completion of the study. A draft of this questionnaire will be developed and approved by Pfizer prior to the initiation of the study.
   b. Patients – Patients will be asked to complete an evaluation of the Theranos System upon completion of the study. A draft of this questionnaire is attached in Appendix B but will be finalized and approved by Pfizer prior to the initiation of the study.

2. Theranos will provide a study report at the conclusion of the assessment. This report will include:
   a. Complete review of the data generated in aggregate and by patient sub-types such as cancer type, sex, etc.
   b. Integrated patient information including time of day when monitoring was performed, other medications, overall health rating, etc.
   c. Assessment of the technical performance of the Theranos System including the following metrics:
      i. Wireless Transmission - % success, identification of problems and solutions
      ii. Overall, performance of the Theranos System determined by customer service log maintained during the assessment.
      iii. Patient Compliance versus protocol.
   d. Summary of patient and clinical team assessment of Theranos System.

12

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

## **Appendix A – Patient Diary**

**Initial Questionnaire – Completed by Clinic Staff**

1. Please fill in the following information:
   a. Patient Age _____
   b. Patient Height _____
   c. Patient Weight _____
   d. Demographics
      1. Caucasian
      2. Black
      3. Hispanic
      4. Asian
      5. Other

2. Which of the following best describes your smoking status?
   a. I smoke daily
   b. I smoke occasionally
   c. I don't smoke now, but I used to
   d. I have tried it a few times, but never smoke regularly
   e. I have never smoked

3. How often do you usually have an alcoholic drink of any kind? This includes wine, beer and spirits.
   a. Every day
   b. 4-6 times per week
   c. 1-3 times per week
   d. Monthly or less
   e. I don't drink alcohol at all

4. How often do you exercise:
   a. Every day
   b. 4-6 times a week
   c. 2-3 times a week
   d. Once a week
   e. Less than once a month
   f. Never

5. What is the primary diagnosis the patient is being treated for:
   a. Colorectal Cancer
      i. Adjuvant
      ii. Metastatic
         1. Stage? II, III. IV
   b. GIST
      i. Adjuvant
      ii. Metastatic
         1. Stage? II, III. IV
   c. Renal Cancer
      i. Adjuvant
      ii. Metastatic
         1. Stage? II, III. IV
   d. Breast Cancer
      i. Adjuvant
      ii. Metastatic
         1. Stage? II, III. IV
   e. NSCLC

13

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905845

ER-14400

      i. Adjuvant
     ii. Metastatic
        1. Stage? II, III. IV
   f. Other
      i. Adjuvant
     ii. Metastatic
       Metastatic
        1. Stage? II, III. IV

14

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905846

2. Please check all the medications the patient is currently being given:

| Chemotherapies | | |
|---|---|---|
| 5-FU | fluorouracil | |
| Camptosar | irinotecan/CPT-11 | |
| Eloxatin | oxaliplatin | |
| Gemzar | gemcitabine | |
| Hycamtin | Topotecan | |
| Paraplatin | carboplatin | |
| Xeloda | Capecitabine | |
| | leucovorin | |
| Other Chemotherapy | | |

| General Therapies | | |
|---|---|---|
| Anastrozole | arimidex | |
| Avastin | bevacizumab | |
| Bexxar | | |
| Erbitux | cetuximab | |
| Gleevec | | |
| Herceptin | Gemcitabine | |
| Iressa | Gefitinib | |
| Nexavar | sorafenib | |
| Revlimid | LENALIDOMIDE | |
| Sutent | sutinib malate | |
| Tarceva | Erlotinib | |
| Taxotere | Docetaxel | |
| Velcade | Bortezomib | |
| Other General Therapies | | |

| Supportive Care | | |
|---|---|---|
| Advil/other | ibuprofen | |
| Ambien/Lunesta/other sleep aids | | |
| Anzament | dolasetron | |
| Aranesp | Erythropoietin | |
| Aspirin | | |
| Epogen | Erythropoietin | |
| Kytril | granisetron | |
| Neulasta | pegfilgrastim | |
| Neupogen | Filgrastim | |
| Paxil/other antidepressants | | |
| Procrit | Erythropoietin | |
| Tylenol/other | acetaminophen | |
| Zofran | ondansetron | |
| Other Supportive Care | | |

15

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905847

**Daily Questions**

1. On a scale of 1 to 10, how do you feel today?

   Very Good   10   9   8   7   6   5   4   3   2   1   Poor

2. Please check if you have any of these complaints today:
   a. Headache
   b. Nausea
   c. Body Pain
   d. Dizziness
   e. Reaction at infusion site
   f. Fatigue
   g. Depressed
   h. Shortness of breath
   i. Decreased appetite

3. Thinking about your health today, which of the following statements best describe your usual activities such as work, family or leisure activities.
   j. I have no problems with performing my usual activities
   k. I have some problems performing my usual activities
   l. I am unable to perform my usual activities.

4. Did you exercise in the last 24 hours?
   m. No
   n. Yes
   1. What kind of exercise did you do?  Mark all that apply
      - Walk
      - Run/Jog
      - Bike
      - Swim
      - Weights
      - Yoga
      - Pilates
      - Golf
      - Tennis
      - Other
   2. How long did you exercise?
      - Less than 30 minutes
      - 30 minutes to 1 hour
      - Over 1 hour

16

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905848

5. Please indicate the medications you took/received today and the time you took each medication.

| Chemotheraphies | | Time |
|---|---|---|
| 5-FU | fluorouracil | |
| Camptosar | irinotecan/CPT-11 | |
| Eloxatin | oxaliplatin | |
| Gemzar | gemcitabine | |
| Hycamtin | Topotecan | |
| Paraplatin | carboplatin | |
| Xeloda | Capecitabine | |
| | leucovorin | |
| Other Chemotherapy | | |

| General Therapies | | |
|---|---|---|
| Anastrozole | arimidex | |
| Avastin | bevacizumab | |
| Bexxar | | |
| Erbitux | cetuximab | |
| Gleevec | | |
| Herceptin | Gemcitabine | |
| Iressa | Gefitinib | |
| Nexavar | sorafenib | |
| Revlimid | Lenalidomide | |
| Sutent | sutinib malate | |
| Tarceva | Erlotinib | |
| Taxotere | Docetaxel | |
| Velcade | Bortezomib | |
| Other General Therapies | | |

| Supportive Care | | |
|---|---|---|
| Advil/other | ibuprofen | |
| Ambien/Lunesta/other sleep aids | | |
| Anzament | dolasetron | |
| Aranesp | Erythropoietin | |
| Aspirin | | |
| Epogen | Erythropoietin | |
| Kytril | granisetron | |
| Neulasta | pegfligrastim | |
| Neupogen | Filgrastim | |
| Paxil/other antidepressants | | |
| Procrit | Erythropoietin | |
| Tylenol/other | acetaminophen | |
| Zofran | ondansetron | |
| Other Supportive Care | | |

17

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905849

### **Appendix B -- Patient Evaluation**

Thank you for participating in a study to evaluate the Theranos System. By utilizing the Theranos System you've been able to provide information to your physician that could support their decisions around your ongoing therapy.

We would like to ask you a few questions about your use of the Theranos System.

1. Overall, how easy was it to use the Theranos System?
   a. Very easy
   b. Somewhat easy
   c. Somewhat hard at first, but it got easier
   d. Very hard

2. How would you rate the Patient User Manual?
   a. Very informative, with clear directions
   b. Informative but some of the directions need to be clarified
   c. Not helpful at all
   d. Didn't read it
   e. Didn't get a patient user manual

3. How would you rate the training you received at the clinic prior to taking the System home?

   Very Good    10   9   8   7   6   5   4   3   2   1   Poor

4. How would you rate the Theranos System on the following attributes
   - Ease of use

     Very Easy        10   9   8   7   6   5   4   3   2   1    Hard

   - Time Required

     Very little time    10   9   8   7   6   5   4   3   2   1    Lots of time

   - Patient Diary

     Very easy to use    10   9   8   7   6   5   4   3   2   1    Hard to Use

   - Drawing Blood

     Painless        10   9   8   7   6   5   4   3   2   1    Painful

5. How well did the Theranos System work for you during the trial?
   a. Very Well
   b. Okay
   c. Had problems
      i. What problem(s) did you experience? Mark all that apply
         1. Drawing blood
         2. Filling the cartridge
         3. Loading the cartridge
         4. Getting a cellular signal
         5. Getting onto the website
         6. Filling out the patient diary
         7. Other (please explain)

18

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905850

**ER-14405**

ii. (For each problem) How were you able to resolve your problem on _____?
    1. Figured out solution on my own
    2. Called clinic and they helped me
    3. Called Theranos Customer Care Center
        a. How would you rate the support you received?
            i. Excellent
            ii. Very Good
            iii. Good
            iv. Fair
            v. Poor
        b. How was your problem resolved?
            i. Customer Care Center talked me through the problem
            ii. A replacement reader/cartridge was sent to me
            iii. Other (please explain)

6. Overall, on a scale of 1 to 10 which process would you prefer to provide monitoring information to your physician?

Prefer monitoring at home                    Prefer going to clinic
            10  9  8  7  6  5  4  3  2  1

19

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905851

ER-14406

Grant Number: 70647

## SERVICES AGREEMENT

This Services Agreement (this "Agreement"), dated as of the last date of signature hereof (the "Effective Date"), is made by and between Schering Corporation, acting through its Schering-Plough Research Institute division, having a business address of 2000 Galloping Hill Road, Kenilworth, New Jersey 07033 ("SPRI") and THERANOS having a business address of 3200 Hillview Avenue, Palo Alto, California 94304 ("Provider") for services to be performed by Provider.

In consideration of Provider's engagement hereunder, the parties hereto agree to the following terms and conditions:

1. Project. Provider will provide to SPRI services including but not limited to Comprehensive validation of the Theranos cytokine panel under FDA/ICH guidelines-Schering Plough 001 as further described in Attachment C (invoice)(the "Project") in accordance with the terms of this Agreement. Provider will perform the Project for SPRI during the Term (as defined below) of this Agreement at such times as are reasonably available to Provider and in response to SPRI's needs.

2. Term. The anticipated Project start shall be April 15, 2009 and the anticipated Project completion shall be May 1, 2009 ("Project Term"). The Agreement, unless earlier terminated in accordance with Section 4, shall terminate at the end of the Project Term. The Project Term may be extended or modified by written agreement between SPRI and Provider.

3. Termination. This Agreement or any Project services to be performed hereunder shall be immediately terminable at any time by SPRI upon ten (10) days' written notice to Provider. Upon the delivery of such notice by SPRI, Provider shall immediately cease work on the Project, deliver to SPRI all work in progress, and return all Confidential Information (as defined in Section 6) with respect thereto. Upon termination, SPRI's sole obligation to Provider shall be to pay any monies due and owing up to the time of termination for Project services properly performed and all reasonable expenses properly incurred. In the event that any up-front payments have been made, those payments will be prorated for actual work performed and the remaining amount will be refunded to SPRI.

4. Payment Terms. SPRI will pay Provider a one time payment of $279,000 USD for the Project. In addition, Provider shall be reimbursed for all pre-approved reasonable and customary travel expenses, if any, incurred in the performance of the Project for SPRI. Requests for payment for Project and any other approved reimbursements shall be submitted upon signature of contract on detailed invoices, with original supporting documentation attached. All reimbursements will be subject to SPRI's Reimbursement Policy (the "Reimbursement Policy"), which is set forth as Attachment A hereto. The total payment for Project services rendered and any other approved reimbursements shall not exceed two hundred seventy nine thousand U.S dollars ($279,000). All

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

undisputed and properly documented invoices will be paid by SPRI within forty-five (45) days of receipt.

5. Audits.

A. Provider shall prepare and maintain during the Project Term and for a reasonable time afterward complete, accurate written records, accounts, notes, reports and data relating to the Project. SPRI or its authorized representatives shall have the right to audit financial documentation relating to the Project to verify amounts billed under this Agreement. "Pass-through" costs (i.e., direct third party costs that may be billed to SPRI) shall not include any overhead or profit and must be supported by original invoices (not merely itemized or referenced in a billing). SPRI's representatives may visit Provider's facility at reasonable times and with reasonable frequency during normal business hours to observe the progress of the Project and the Project's compliance with the terms of this Agreement. Provider will assist SPRI in scheduling such visits. During these visits, SPRI's representatives may examine the reports containing the results of all quality assurance inspections performed by Provider with respect to the Project and to examine the controls and procedures used by Provider in the performance of such quality assurance inspections.

B. Provider agrees to notify SPRI within twenty-four (24) hours in the event that the FDA or any other regulatory authority notifies Provider of a pending inspection/audit that concerns the Project or Provider's ability to perform the type of services needed for the Project. In addition, Provider will forward to SPRI any written communication received as a result of the inspection/audit within twenty-four (24) hours of receipt of such communication and agrees to allow SPRI to assist in responding to any citations. Such responses shall be made within two (2) weeks of issuance of any citation or within any deadline set by the issuing regulatory authority. Provider shall also provide to SPRI copies of any documents provided to any inspector or auditor. In the event the FDA or other regulatory authority requests or requires any action to be taken to address any citations, Provider agrees, after consultation with SPRI, to take such reasonable action as necessary to address such citations, and agrees to reasonably cooperate with SPRI with respect to any such citation or action taken with respect thereto.

6. Confidential Information.

A. During and for a period of five (5) years after the term or early termination of this Agreement, Provider shall retain in confidence all proprietary data and/or information obtained from SPRI or generated pursuant to the Project and any other information or material disclosed under secrecy agreements previously entered into between the parties related to the Project ("SPRI Confidential Information").

B. During and for a period of five (5) years after the term or early termination of this Agreement, SPRI shall retain in confidence Provider's proprietary business information marked as "confidential" when provided in tangible form and when disclosed otherwise such disclosure being identified as confidential at the time of disclosure, confirmed in writing and marked "confidential" by Provider within thirty (30) days of disclosure ("Provider Confidential Information"). Provider shall endeavor to identify both verbal and tangible Provider Confidential Information provided to SPRI as "Confidential" given the understanding that failure to do so does not constitute a

– 2 –

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905853

designation of non-confidentiality if a reasonable person would consider such document or disclosed information to be confidential based on the nature of such information and circumstances of disclosure.

    C. The above restrictions in paragraphs 6A and 6B shall not apply to SPRI Confidential Information or Provider Confidential Information (collectively referred to as "Confidential Information"):

        (i)      which is or becomes public knowledge (through no fault of receiving party); or

        (ii)     which is lawfully made available to receiving party by an independent third party owing no obligation of confidentiality to transmitting party with regard thereto (and such lawful right can be properly demonstrated by receiving party); or

        (iii)    which is already in receiving party's possession at the time of receipt from transmitting party (and such prior possession can be properly demonstrated by receiving party); or

        (iv)    which is published in accordance with the express terms of this Agreement; or

        (v)     which is required by law, regulation, rule, act or order of any governmental authority or agency to be disclosed by receiving party.

    D. To permit transmitting party an opportunity to intervene by seeking a protective order or other similar order, in order to limit or prevent disclosures of Confidential Information, receiving party shall promptly notify transmitting party, in writing, if it is requested by a court order, a governmental agency, or any other entity to disclose Confidential Information in receiving party's possession and thereafter receiving party shall disclose only the minimum Confidential Information required to be disclosed in order to comply, whether or not a protective order or other similar order is obtained by transmitting party.

    E. Subject to applicable federal, state or local legal and regulatory requirements, receiving party agrees to promptly return to transmitting party, upon its request, all Confidential Information obtained from transmitting party or belonging to transmitting party pursuant to this Agreement; provided, however, that receiving party may retain one copy of Confidential Information in a secure location for purposes of identifying receiving party's obligations under these confidentiality provisions.

    F. Receiving party shall limit disclosure of Confidential Information received hereunder to only those of its (i) representatives, agents and officers bound by a written agreement with terms equivalent to or more stringent than this Agreement, and (ii) employees (collectively, "Agents")

– 3 –

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905854

who are directly involved with the Project and only on a need to know basis for use on the Project. Receiving party shall advise its Agents upon disclosure to them of any Confidential Information of the proprietary nature thereof and the terms and conditions of this Agreement and shall use all reasonable safeguards to prevent unauthorized use or disclosure by such Agents. Receiving Party shall be responsible for any breach of these confidentiality provisions by its Agents.

G. Receiving party acknowledges and expressly agrees that any disclosure of Confidential Information in violation of this Agreement will be detrimental to transmitting party's business and cause it irreparable harm and damage. In accordance with applicable law and in addition to any other rights and remedies provided herein, transmitting party is entitled to seek equitable relief by way of injunction or otherwise.

7.  Publication.  Provider agrees that it will not, without the prior written permission of SPRI, use information and data received by it or generated pursuant to the Project for any purpose other than in carrying out this Agreement. Provider further agrees not to submit for publication any paper containing information and data received by it or generated pursuant to the Project without the prior written permission of SPRI's legal department. Neither party may use the name of the other party in any publicity or advertising nor issue a press release or otherwise publicize or disclose any information related to the existence of this Agreement or the terms and conditions hereof, without the prior written consent of the other party.

8.  Representations and Warranties of Provider.  Provider warrants and represents that: (i) Provider has the authority to execute this Agreement; (ii) Provider is not a party to any oral or written contract or understanding with any third party that will in any way limit or conflict with its ability to fulfill the terms of this Agreement; (iii) Neither Provider nor its representatives or employees involved with the Project have been debarred pursuant to the Federal Food, Drug and Cosmetic Act, or excluded from a federal health care program; (iv) Provider has insurance sufficient to cover Provider's obligations and any liability assumed by Provider under this Agreement and shall produce proof of such insurance within thirty (30) days of SPRI's request. (v) Provider will not enter into any oral or written contract or understanding with any third party that will in any way limit or conflict with its ability to fulfill the terms of this Agreement; (vi) Provider will promptly inform SPRI in writing of any event or circumstance that could reasonably affect its ability to perform hereunder in the manner contemplated by SPRI; (vii) all Project services shall be performed in a professional and workmanlike manner and will be in compliance with applicable laws, rules, and regulations; (viii) Provider shall replace or reperform, any of the Project materials, items furnished or Project services that are found to be defective without additional cost to SPRI; (ix) Provider shall neither disclose to SPRI nor induce SPRI to use any secret or confidential information or material belonging to any third party; and (x) all Project work product created under this Agreement shall be original work of Provider or in the public domain and shall not infringe any copyright, trademark, trade secret, patent or other intellectual property right of any third party.

9.  Intellectual Property.
A.  All concepts, inventions, ideas, patent rights, data, reports, trademarks, copyrights and other intellectual property rights that are related to or arise out of or in connection with the Project,

~ 4 ~

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905855

**ER-14410**

Provider's work product, or any and all services performed by Provider pursuant to this Agreement (collectively, the "Project Intellectual Property") will be the exclusive property of, and all ownership rights shall vest in, SPRI or SPRI's designee. All Works Made for Hire as defined in the U.S. Copyright Act, as amended, and all other copyrightable works are deemed, upon their creation, to be assigned to SPRI. Provider warrants that it has the authority to assign or cause the assignment of all Project Intellectual Property to SPRI and further agrees to sign all necessary documents or take such other actions as SPRI may reasonably request in order to perfect any and all such rights.

B. Notwithstanding the foregoing, Provider shall retain sole and exclusive ownership of all right, title and interest to and in its proprietary information, templates, processes, methodologies, inventions, patents, know-how and software owned or licensed by it as of the Effective Date, and all derivative works based upon an improvement to any of the foregoing, provided that the derivative works or improvements (i) are of general application, (ii) do not contain any, or are not developed using any, SPRI Confidential Information or other specific information about or relating to SPRI or its products, processes, plans or finances, and (iii) were discovered, created or developed solely by Provider without assistance from SPRI during Provider's provision of services for the Project for SPRI (all of the foregoing, the "Provider Intellectual Property"). To the extent Provider Intellectual Property is necessary for the use of the Project or deliverables provided under this Agreement, Provider grants to SPRI for the benefit of SPRI and its affiliates, agents, successors, permitted assigns and contractors the irrevocable, perpetual, non-exclusive, worldwide, royalty-free, paid-up right and license to Provider Intellectual Property for SPRI's use of the Project or deliverables.

10. <u>No Employment Relationship</u>. Provider understands and agrees that in its relationship with SPRI hereunder, Provider is not an employee of SPRI but, instead, Provider is acting in the capacity of an independent contractor and has no authority to represent or act on behalf of SPRI. Provider understands and agrees that it is not entitled to participate in any of the employee benefit plans of SPRI or any of its affiliates, including but not limited to any group health insurance plans, retirement plans, 401(k) savings plans, or stock incentive plans. Provider further understands and agrees that, if it is found to be a common law or statutory employee by (i) the Internal Revenue Service; (ii) any other taxing authority; (iii) any regulatory authority; or (iv) a court of law, then Provider hereby waives any right of eligibility that might thereby accrue to Provider to participate in the aforesaid benefit plans of SPRI. Provider hereby acknowledges that Provider is solely responsible for the payment of any and all taxes, including any quarterly estimated payments, applicable to Provider's performance hereunder.

11. <u>Indemnification and Liability</u>.
A. <u>SPRI Indemnification of Provider</u>. SPRI agrees, at its own cost and expense (including its attorney's fees), to indemnify, defend and hold harmless Provider and its affiliates, and their respective officers, directors, and employees from and against all liabilities, losses, costs, expenses, and damages that are brought or instituted against Provider by any independent third party (collectively "Provider Claim") to the extent that such Claim is based on or arises out of Provider's performance of the Project except to the extent such Claim arises from or out of the

-5-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905856

negligence or willful misconduct of Provider or Provider's failure to comply with the terms of this Agreement.

B. Provider Indemnification of SPRI. Provider agrees, at its own cost and expense (including its attorney's fees), to indemnify, defend and hold harmless SPRI and its affiliates, and their respective officers, directors, and employees from and against all liabilities, losses, costs, expenses and damages that are brought or instituted against SPRI by any independent third party as a result of Provider's negligence, willful misconduct or Provider's failure to comply with the terms of this Agreement (collectively "SPRI Claim").

C. Conditions of Indemnification for a Provider Claim and a SPRI Claim (collectively "Claim"). As one of the conditions to indemnification under this Agreement, a party seeking indemnification agrees to notify the other party in writing within ten (10) days of becoming aware of any Claim made, brought or instituted against it; provided, however, that the failure to timely give such notification shall not preclude a party's right to indemnification if such failure to notify does not materially adversely affect the indemnifying party's ability to defend against such Claim. A party seeking indemnification shall cooperate fully in assisting the indemnifying party with respect to gathering information concerning the time, place, and circumstances of the Claim and in obtaining the names and addresses of the injured parties and all available witnesses. The party seeking indemnification agrees to cooperate with and to authorize the indemnifying party to carry out sole management and defense of the Claim, unless the party seeking indemnification waives all of the other party's indemnification obligations under this Agreement. An indemnified party shall not compromise or settle any Claim without the prior written approval of the other party and an indemnifying party shall not admit the fault of an indemnified party without that party's written consent.

D. Limitation of Liability. Under no circumstances will either party be responsible under this Agreement for any indirect, incidental, special, exemplary, or consequential damages resulting from either party's performance or failure to perform under this Agreement.

12. Governing Law and Jurisdiction. This Agreement shall be construed in accordance with New Jersey law without regard to its conflict of law principles. It is understood and agreed that both parties hereby submit to the exclusive jurisdiction of New Jersey state and federal courts.

13. Assignment. Provider shall not assign this Agreement to any person, firm, partnership, corporation or other entity (including by operation of law, judicial process or otherwise) without the prior written consent of SPRI, which consent may be withheld for any reason. SPRI shall be entitled to assign this Agreement to any of its subsidiaries or affiliates (including by operation of law, judicial process or otherwise) without the prior written consent of Provider.

14. Subcontracting. Provider shall not subcontract any services to be provided hereunder without the prior written consent of SPRI. Any permitted subcontractor shall be bound by a written

-6-

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905857

agreement with terms consistent with the terms of this Agreement. SPRI shall have the right to review and approve any such subcontract.

15. Survival. The terms and conditions of Sections 5, 6, 7, 8(vii), 8(viii), 8(x), 9, 11, 12, 15 and 17 shall survive the termination or expiration of this Agreement.

16. Waiver and Severability. If any term or condition of this Agreement, the deletion of which would not adversely affect the receipt of any material benefit by a party hereunder, shall be held illegal, invalid or unenforceable, the remaining terms and conditions of this Agreement shall not be affected thereby and such terms and conditions shall be valid and enforceable to the fullest extent permitted by law. Failure on the part of a party to exercise or enforce any right conferred upon it hereunder shall not be deemed to be a waiver of any such right nor operate to bar the exercise or enforcement thereof at any time or times thereafter.

17. Data Privacy and Security Requirements. If Provider Processes Personal Data (as such terms are defined in Attachment B) pursuant to the Project, Provider shall comply with the terms set forth in SPRI's Data Privacy and Security Requirements, attached hereto as Attachment B, whenever Provider Processes Personal Data. Provider agrees that it will, to the extent required by applicable law, obtain an appropriate consent from any individual for whom Provider will disclose Personal Data to SPRI for SPRI to use as needed for the Project and any related health authority or regulatory inspection or request.

18. Adverse Events. During the course of the performance of the Project, Provider shall report to SPRI immediately by telephone and subsequently in writing any observable adverse event ("AE") that occurs or is detected by Provider personnel during data or specimen evaluation. An AE is defined as any observation or event suggesting significant risk for human subjects, including but not limited to death, life threatening conditions, and serious end organ toxicity, including hematological, renal, hepatic, cardiovascular and central nervous system findings.

19. Notices. Whenever any notice is to be given hereunder, it shall be in writing to the appropriate party at the address indicated below, or at such other place or places as either party may designate in a written notice to the other. Such notice shall be made via (i) recognized commercial overnight carrier (return receipt requested), (ii) registered or certified first class United States mail, postage prepaid, return receipt requested or (iii) personal delivery and shall be deemed to have been received upon receipt.

To Provider:      THERANOS
3200 Hillview Avenue, Palo Alto, California, 94304

Attn.: Carolyn Balkenhol

To SPRI:      Schering-Plough Research Institute
2000 Galloping Hill Road
Kenilworth, New Jersey 07033

– 7 –

Attn.: James McLeod, MD

20. <u>Entire Understanding</u>. No term, condition or other provision of any attachment or addenda to this Agreement shall supersede any term, condition or other provision of this Agreement other than the Reimbursement Policy that is incorporated into this Agreement, and with respect to any inconsistency or ambiguity, this Agreement and the Reimbursement Policy shall control. This Agreement represents the entire understanding of the parties and hereby supersedes all prior understandings and agreements, whether oral or written, between the parties with respect to the services to be performed. This Agreement may only be amended by a written instrument signed by an authorized representative of both parties.

\* \* \* \* \*

~ 8 ~

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905859

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed, by duly authorized representatives, as of the last date written below.

THERANOS

SCHERING CORPORATION,
acting through its Schering-Plough Research
Institute division

By: _____

By: _____

Name: _Elizabeth Holmes_

Name: _James McLeod_

Title: _President & CEO_

Title: _VP, SCREM_

Date: _29 April 2009_

Date: _29 April 2009_

Version date: 12 DEC 2008

–9–

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905860

## ATTACHMENT A

## REIMBURSEMENT POLICY

In accordance with SPRI's standard policies and procedures, the following are types of expenses for which SPRI will not reimburse, unless expressly agreed to in a prior writing by the parties:

- Commuting expenses to and/or from your place of business or residence (excluding transportation costs to and/or from the airport for SPRI-requested business)

- Add-on costs with respect to outside services, including but not limited to mark-up for the work product of outside professionals, including but not limited to freelancers

- Meals (except during travel periods in connection with the services rendered to SPRI). For this exception, reasonableness shall be measured at US rates of $50 for dinner and $25 each for breakfast and lunch, tax and tip included in all cases

- Administrative and/or overhead percentages

- Agency presentations for new business

- Business-class air travel. Business-class air travel is only reimbursable if approved in writing in advance by the area Vice President

The following types of expenses are not reimbursable:

- First-class air travel

- Mark-up on any out-of-pocket expenses

- Gifts to SPRI's employees

- Entertainment of SPRI's employees

- Travel time

Note:       This list sets forth the major items for which SPRI will not reimburse you and is meant to be merely illustrative and not exhaustive. All your expenses shall be reviewed with respect to the reasonableness of such expenses.

*All domestic travel arrangements within the US (air, train, hotels, rental cars, etc.) must be made through SPRI's Travel Services.* Effective for all airline or train tickets issued the required documentation to be included in support of expense reimbursement will be the final emailed itinerary/invoice issued by Travel Services at the time of ticket issuance **and** the original used boarding pass(es). These documents must be attached to your request for reimbursement when submitted.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905861

## ATTACHMENT B

## DATA PRIVACY AND SECURITY REQUIREMENTS

### A. Definitions

1. "Personal Data" means any information Processed as a result of the services performed under this Agreement that can be used to identify, locate, or contact an individual, including, but not limited to: (a) first and last name; (b) home or other physical address; (d) telephone number; (c) email address or online identifier associated with an individual; (e) social security number or similar identifier; (f) personally identifiable employment, financial, or health information; or (g) any other information relating to an individual that is combined with any of the above.

2. "Processing" (including its cognate, "process") means any operation or set of operations that is performed upon Personal Data, whether or not by automatic means, including, but not limited to, collection, recording, organization, storage, access, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination, making available, alignment, combination, blocking, deleting, erasure, or destruction.

3. "Data Security Breach" means: (a) the loss or misuse (by any means) of Personal Data; (b) the inadvertent, unauthorized, and/or unlawful Processing, corruption, transfer, or sale or rental of Personal Data; or (c) any other act or omission that compromises the security, confidentiality, or integrity of Personal Data.

4. "Technical and Organizational Security Measures" means measures commensurate with the types of Personal Data being Processed aimed at preventing a Data Security Breach, including but not limited such breach resulting from or arising out of Provider's Processing or other transmission of Personal Data, whether between or among Provider's Affiliates, or any other person or entity acting on behalf of Provider.

5. "Company" means any Company entity or Affiliate on behalf of which Provider Processes Personal Data pursuant to this Agreement.

6. "Affiliate" means any entity which controls, is controlled by, or is under common control with a party to this Agreement. "Control" being the direct or indirect ownership of more than fifty percent (50%) of the stock, shares or interests entitled to vote for election of directors or other governing body of the entity or otherwise having the ability to direct the management and policies of such entity.

### B. Obligations

To the extent Provider Processes Personal Data as a result of the services performed under this Agreement, Provider agrees to comply with each of the following terms:

1. Protect all Personal Data from any use or transfer that is not authorized by Company.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905862

2. Use reasonable and appropriate Technical and Organizational Security Measures on such Personal Data including physical and electronic safeguards.

3. Use or transfer Personal Data only on the instruction of Company, in accordance with this Agreement and all applicable privacy and data protection laws and for no other purpose.

4. In the event of a Data Security Breach: (a) notify Company as soon as Provider becomes aware but no later than three (3) business days; (b) assist and cooperate with Company at Provider's cost and expense concerning any disclosures to affected individuals, government or regulatory bodies; (c) and undertake other appropriate remedial measures as reasonably requested by Company or as required under any privacy or data protection laws.

5. Return or destroy (at the election of Company), all Personal Data subject to this Agreement, upon the expiration or earlier termination of this Agreement, or when there is no longer any legitimate business need to retain such Personal Data, or otherwise on the instruction of Company, but in no event later than ten (10) days from the date of such expiration, earlier termination, expiration of the legitimate business need, or instruction.

6. Provider will not disclose Personal Data to any third party (including, but not limited to, Provider's Affiliates and any person or entity acting on behalf of Provider) unless with respect to each such disclosure: (a) the disclosure is necessary in order to carry out Provider's obligations under this Agreement; (b) such third party is bound by the same provisions and obligations set forth in this Agreement; (c) Provider has received Company's prior written consent (such consent is not required for disclosures to Affiliates); and (d) Provider shall remain responsible for any breach of the obligations set forth in this Agreement and any violation of any privacy or data protection law by such third party to the same extent as if Provider caused such breach or violation.

7. Not transfer Personal Data from any jurisdiction to any other jurisdiction (the EEA constituting a single jurisdiction for this purpose) unless Provider uses reasonable and appropriate Technical and Organizational Security Measures for such transfer and storage in the new location.

8. Allow for Company to conduct onsite inspections and/or audits (upon reasonable advance notice) of Provider's Technical and Organizational Security Measures, and Provider agrees to cooperate with Company regarding such inspections or audits.

Version Date: 19 NOV 2008

– 2 –

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905863


*theranos*™
redefining healthcare

| Invoice # | SP09001 |
|---|---|
| Invoice date | April 29, 2009 |

| Purchase Order # | |
|---|---|
| Agreement Date | |

Theranos, Inc
3200 Hillview Avenue
Palo Alto, California 94304
Tel: (650) 838-9292
Fax: (650) 838-9165

Bill To: Schering-Plough Research Institute
1011 Morris Avenue
Mail Location U-13-3000
Union, New Jersey 07083

*(handwritten)* Jo FW
James Mc Leod
VP received
30-April-2009

Attn: Jim McLeod
Early Clinical Research and Experimental Medicine

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| | Data delivery, client infrastructure and 24x7 customer care support | | Included |
| | Distribution, trial definition/project management, services configuration/software customization (TheranOS), analytics, and Schering-Plough-specific secure back-end database and server infrastructure | | Included |
| | Set up and infrastructure, Real-time and multiplexed analysis - 2,790 multiplexed cartridges (CRP, IL-6, TNF-α) at $100 per cartridge ($33 per analyte including time, technicians, readers, and other materials) | (Laboratory discount pricing) | $279,000 |
| | Use of Theranos Systems is governed by Theranos Terms of Service, attached to this invoice. | | |

| | | | |
|---|---|---|---|
| **PAYMENT DUE UPON RECEIPT. Late payments shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.** | Subtotal | | $279,000 |
| | Sales Tax | | 0.00 |
| | Total | | $279,000 |
| | Prepayment | | 0.00 |
| | Balance Due | | $279,000 |

**Wire Transfer Instruction**
Bank: Comerica Bank, 226 Airport Parkway, Suite 100 San Jose, CA 95110
Swift code: MNBDUS33   Routing Number: 121137522   Account Number: 1892535137

All costs described herein are in U.S. currency. Payments made to THERANOS will be made in U.S. currency.

These payment terms expire May 1, 2009, if this agreement is not executed in full by that date.

THERANOS CONFIDENTIAL

Page 1

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905864



*theranos*™
*redefining healthcare*

**KEY PROJECT OBJECTIVE**

Comprehensive validation of the Theranos cytokine panel under FDA/ICH guidelines, according to attached Full Validation Protocol. Project 'success' criteria include analysis of blinded samples provided by Schering-Plough.

**PROJECT PARAMETERS**

| | |
|---|---|
| Project | Schering-Plough - 001 |
| Cartridge Analytes | Multiplexed Cartridge: CRP, IL-6, TNF-α |
| Sample Types | Archived Samples – Plasma, whole blood |
| Sites (Number) – Location | (1) – Theranos |
| Number of Blinded Samples for Validation | 30 (minimum 5mL per blinded sample) |
| Number of Cartridges | 2,790 |
| Number of Readers | 10 |
| Localization/Languages for Translation | None (English Only) |
| Touch Screen Interface Questions/Customization | None |
| Data Infrastructure | Configure a secure Schering-Plough-specific data infrastructure |
| Expected Start Date | May 1, 2009 |
| Expected End Date | TBD |
| Total Duration of Services | TBD (the "Term") |

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905865


*theranos*™
*redefining healthcare*

## Theranos™ System Full Validation Protocol:
### (hs)CRP, IL-6, TNF-a multiplex

*References/Background*
- ICH Q2 (R1) "Validation of Analytical Procedures"
- FDA CDER "Bioanalytical Method Validation"
- Binodh DeSilva et al. Recommendations for the Bioanalytical Method Validation of Ligand-binding Assays to Support Pharmacokinetic Assessments of Macromolecules. J. *Pharmaceutical Research*, Vol. 20:1885-1900 (2003)
- Previous programs for development of diagnostic systems undergoing regulatory approval

*Generally recommended parameters for investigation*
1. Calibration Curve
2. Accuracy
3. Precision
4. Specificity
5. Quantitation limit
6. Linearity
7. Range
8. Stability

*Reference methods*
Proposed reference method for each assay --TNF-alpha, IL-6 and CRP (both high and low sensitivity) -- is R&D Systems kits. Performance specifications are included in the Cartridge Inserts in each Cartridge box.

*Proposed analysis*
Detailed analysis protocols will be sent prior to evaluation initiation.
The calibration curve (1) can be assessed using 8 points (one blank, one zero spike and 6 spikes at levels, including LOQ's) in triplicate on each instrument. This can be done over three days (not necessarily consecutive) to generate data on reliability.

For accuracy (2), precision (3), and specificity (4), we recommend using 10 instruments and 120 cartridges per instrument. 20 cartridges will be run at each of the LLOQ, medium range and ULOQ levels for each sample type (plasma & whole blood). This will yield a strong dataset for statistical analysis of accuracy, precision and specificity.

For quantitation limit (5) verification, one can run 6 levels of spiked plasma around the stated limits of quantitation. We propose testing three levels above and three below the LLOQ and ULOQ, respectively, in triplicate on each instrument.

For linearity (6), we recommend using plasma and spiked analytes and testing 5 levels in triplicate on each instrument.

For range (7), we recommend testing 6 points around the claimed LLOQ and ULOQ to gauge response at the boundaries of the assay(s). This will also be done in triplicate on all instruments.

For stability (8), we test under 2-6°C conditions, for time points 0, 1, 2, and 3 months and run tests in triplicate at each of the LLOQ, mid-range and ULOQ levels of the assay(s). We recommend using plasma for these experiments as it can be stored for the duration of testing.

**NOTE:** The aforementioned numbers assume statistical significance for three analytes as each cartridge is multiplexed. The processing requirement is for each sample tested to contain a mix of all three analytes to be measured, in known quantities. Such samples may include archived clinical samples, spiked samples, or may be purchased. Each cartridge requires ~20uL of sample.

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905866


*theranos*™
*redefining healthcare*

*Summary of runs per instrument to achieve statistical significance*

| Calibration Curve | Accuracy/Precision | | | | | |
|---|---|---|---|---|---|---|
| In plasma | In plasma | | | In whole blood | | |
| 8 point calibration | At Mid-range | At LLOQ | At ULOQ | At Mid-range | At LLOQ | At ULOQ |
| 72 | 20 | 20 | 20 | 20 | 20 | 20 |

| Linearity | Range around Limits | | Stability (3months) | | |
|---|---|---|---|---|---|
| In plasma | In plasma | | In plasma | | |
| | at LLOQ | at ULOQ | At Mid-range | At LLOQ | At ULOQ |
| 15 | 18 | 18 | 12 | 12 | 12 |

*Estimated schedule*
Standard Theranos instrument run-time will be accelerated for this program.
Total number of cartridges provided will be 2,790 of the TNF-alpha, IL-6, CRP multiplex. Up to 10 additional instruments will be shipped. The total expected runtime (not including sample load, reference testing and the stability duration) is around 1 month. The total human capital commitment will only be 5 days over the entire program duration as it only takes up to 10 minutes to prepare and load a sample on a single instrument, after which the instruments run on their own.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905867



## THERANOS, INC. TERMS OF SERVICE

This agreement is entered into by and between Theranos, Inc. ("THERANOS") and Schering-Plough ("COMPANY"), effective as of date of execution.

**1. THERANOS SYSTEM.** THE "THERANOS SYSTEM" is the system comprising the T.OS, Reader(s), Cartridges, Assays (each as defined in this Article 1) and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination. As used in this Invoice: (a) "Assay" means any method used for the detection of an analyte (e.g. a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, without limitation, human blood (b) "Cartridge" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample; (c) "Reader" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information; and (d) "T.OS" means THERANOS proprietary ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

**2. SERVICES**

2.1. In purchasing the Systems and Services, COMPANY agrees to these Terms of Service.

**3. PAYMENT TERMS**

3.1. Payment is due upon receipt of this Invoice.

3.2. The agreement and payment terms herein expire May 1, 2009 if not executed in full by that date.

3.3. Late Payments. Late payments shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

3.4. Expense Disbursements and Pass-through Costs. THERANOS charges for third-party expense disbursements and other costs incurred in connection with the performance of the Services. These costs include, but are not limited to, THERANOS personnel travel and lodging (including travel to all IMs or IM sites and services related activities), shipping, telecommunications, data transmission, printing, additional touch-screen customizations, any incidental expenses, and the associated administrative fees incurred to provide or in support of the Services outlined in this Invoice.

**4. ACCESS TO SOFTWARE AND USE OF THE T.OS**

4.1. THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sub licensable license to use, in accordance with, and solely for the purposes specified in, this Invoiced and only for the term of the Project: (a) Software installed on Readers, for use by COMPANY employees and COMPANY contractors who are obligated in writing by confidentiality obligation at least as protective of THERANOS and its Confidential Information as this Invoice ("COMPANY Contractors") and (b) Software related to the T.OS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). "Software" means computer programs, object code and related materials, in machine readable or printed form, including any updates or upgrades thereto.

4.2. THERANOS and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of THERANOS. COMPANY shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify THERANOS promptly of any such unauthorized use. COMPANY shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users indicated in the Invoice, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Invoice, (d) use the Software

THERANOS CONFIDENTIAL

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905868



to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of COMPANY's content which forms part of the Software. COMPANY shall at all times comply with terms and conditions applicable to third party software provided with the Software. THERANOS reserves all rights in the Software not expressly granted herein.

4.3. COMPANY hereby grants to THERANOS perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in the T.OS data provided under, related to or generated in connection with this Agreement for use in the T.OS' analytical engine to the extent permitted by law, provided that THERANOS does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individual Participants or any information identifying COMPANY or COMPANY Compounds, except in connection with the provision of any Services to COMPANY under this Agreement.

5. <u>THERANOS PROPERTY</u>

5.1. As between COMPANY and THERANOS, all inventions and improvements developed in connection with or as a result of the Services, during the term of this Invoice and thereafter, whether by COMPANY or THERANOS, or by the parties jointly, directed to: (a) any part or the whole of the THERANOS System or any improvements thereto, including, without limitation, the T.OS analytical engine and the algorithms therein; or (b) the generation of assay (s) used in conjunction with the THERANOS System, shall be the sole and exclusive property of THERANOS. COMPANY shall promptly disclose to THERANOS in writing any inventions described in the preceding sentence, and COMPANY hereby assigns to THERANOS any right, title or interest it may have in such inventions.

6. <u>INDEMNIFICATION</u>

COMPANY will indemnify and hold harmless THERANOS and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any third party claim arising out of or in connection with: (a) the conduct of a Project or the use of the results of a Project; (b) COMPANY's breach of this Invoice, negligence or intentional misconduct; or (c) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of COMPANY (including any personal injury or property damage related thereto). COMPANY shall be promptly notified of any such claim and THERANOS shall cooperate with COMPANY in the defense of such claim.

FOIA Confidential Treatment Requested by Theranos                                          THER-0905869
Fed. R. Crim. P. 6(e) material

ER-14424



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of this day and year.

THERANOS, INC.                                    SCHERING-PLOUGH ("COMPANY")

Signature                                          Signature

Elizabeth Holmes                                   James McLeay
                                                   Name (please print)

President & CEO                                    VP ECBEM
                                                   Title

29 April 2009                                      (see second image)
Date                                               Date

Please sign and date two (2) originals and send both to THERANOS for signature via traceable mail (e.g., UPS or FedEx). One executed original will be returned to COMPANY.

FOIA Confidential Treatment Requested by Theranos                  THER-0905870
Fed. R. Crim. P. 6(e) material

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905871



## SERVICES AGREEMENT

This Services Agreement (this "**Agreement**") is made effective as of 1st July 2008 (the "**Effective Date**") between AstraZeneca UK Limited, a Company incorporated in England under no. 3674842 whose registered office is at 15 Stanhope Gate, London, W1K 1LN, England ("**COMPANY**"), and Theranos, Inc., a Delaware corporation having its principle place of business at 3200 Hillview Ave.Palo Alto, CA 94304("**THERANOS**").

In consideration of the mutual terms and covenants set forth herein, THERANOS and COMPANY hereby agree as follows:

1.     **DEFINITIONS.** As used herein, the following terms have the meanings set forth below:

1.1.     "**Affiliate**" means with respect to a party, any person, corporation or other entity which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party. As used in this Section 1.1, "control" shall mean: (a) to possess, directly or indirectly, the power to affirmatively direct the management and policies of such person, corporation or other entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, or (b) direct or indirect beneficial ownership of at least fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign corporation in a particular jurisdiction) of the voting securities in such person, corporation or other entity.

1.2.     "TheranOS" (Theranos Operating System) means THERANOS' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

1.3.     "**Cartridge**" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

1.4.     "**COMPANY Contractors**" mean independent contractors which are bound by written agreements or other legally enforceable obligations to maintain Confidential Information of THERANOS as confidential to the same extent as the Company is obligated hereunder.

1.5.     "**Participants**" mean patients who are the subjects of the Project and who use the Theranos System.

1.6.     "**Project**" means the project related to the protocol titled [The Assessment of Diurnal Variation of Serological Biomarkers of Cell Death in Healthy Controls] in connection with which Theranos will carry out the tests, studies and other activities set forth in Schedule 1.

1.7.     "**Reader**" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information.

1.8.     "**Software**" means computer programs, object code and related materials, in machine readable or printed form, of THERANOS and its licensors, as further described in Section 5.1, provided under this Agreement, including any upgrades or updates thereto that THERANOS may provide from time to time.

1.9.     "**THERANOS System**" means, collectively, the system comprised of TheranOS, Reader(s), Cartridges and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination.

1.10.     "**Users**" means individuals, other than Participants, who are designated by COMPANY to have access to TheranOS and who are properly trained end users of the Theranos System.

1.11.     In addition, each capitalized term used in this Agreement and not defined in this Article 1 shall have the meaning given to such term in the relevant section of the body of this Agreement.

2.     **SERVICES**

COMPANY hereby retains THERANOS on a non-exclusive basis commencing as of the Effective Date to provide the services as are set out in Schedule 1 (the "**Services**") for the execution of the Project

3.     **COMPENSATION AND EXPENSES**

As compensation for Services hereunder, COMPANY shall pay THERANOS the amounts specified in Schedule 2. COMPANY will reimburse THERANOS for all travel, shipping costs, and other reasonable out-of-pocket expenses incurred by THERANOS personnel in providing the Services, subject to such guidelines or limitations as may be set forth in Schedule 2. COMPANY shall be responsible for and pay all local, state, federal, or foreign sales, use, excise, personal property, value added, GST or other similar taxes or duties, other than taxes based on the net income of THERANOS.

4.     **PUBLICITY**

Neither party shall disclose the terms of this Agreement or the Project to any third party without the other party's prior written approval, except to company employees, advisors

---

Theranos Service Assessment Apoptosis D1330C00015 Final       1 of 17        Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material        THER-0905872

(including financial advisors, attorneys and accountants), potential and existing investors, potential acquirers and others on a need to know basis, in each case under circumstances that reasonably protect the confidentiality thereof. Such obligation shall not apply to disclosures which either party is required by law to make, provided that the disclosing party shall notify the other party of any such disclosure prior to such disclosure and will use commercially reasonable efforts to secure confidential treatment of this Agreement or such terms required to be disclosed. Neither party shall use the name, logos, trademarks or service marks of the other party in any publicity, advertising or disseminated information without such other party's prior written approval, except that THERANOS may list COMPANY as a client of THERANOS.

### 5. ACCESS TO SOFTWARE AND USE OF TheranOS

5.1. In support of the Services, THERANOS may make available to COMPANY certain Software as a part of TheranOS. Such Software may include, without limitation, (a) Software installed on Readers ("**Firmware**") and (b) online or offline software services or products related to TheranOS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("**Client Accessible Software**").

5.2. THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicenseable license to use Firmware as incorporated into, and solely for use in connection with, Readers by Participants, COMPANY employees and COMPANY Contractors and otherwise in accordance with the terms of this Agreement, and only for the term of the Project for which such Firmware is made available under this Agreement.

5.3. THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicenseable license to use the Client Accessible Software for the purpose for which it is made available to COMPANY and otherwise in accordance with the terms of this Agreement, and only for the term of the Project for which such Client Accessible Software is made available under this Agreement, and only for the number of concurrent Users indicated for the Project as set out in Schedule 1.

5.4. THERANOS and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of THERANOS. COMPANY shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify THERANOS promptly of any such unauthorized use. COMPANY shall not: (a) disassemble, decompile or otherwise reverse engineer the Software, (b) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided for in Schedule 1, (c) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis or (d) create Internet "links" to or from the Software, or "frame" or "mirror" any of COMPANY's content which forms part of the Software. COMPANY shall at all times comply with terms and conditions applicable to third party software provided with the Software. THERANOS reserves all rights in the Software not expressly granted herein.

### 6. USE OF DEVICES

6.1. In connection with the Services, THERANOS may make available to COMPANY certain equipment, including but not limited to Readers and Cartridges (collectively, the "**Devices**"). Each Device will be provided to COMPANY upon the terms set forth in Schedule 1.

6.2. Devices shall only be permitted to be used by (a) COMPANY employees and COMPANY Contractors and (b) Participants. COMPANY agrees to take all reasonable steps to protect the Devices from theft or use contrary to the terms of this Agreement. COMPANY agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. COMPANY is not authorized to sell, rent, transfer, license, or distribute the Devices, except as specifically provided in this Agreement or Schedule 1.

6.3. Unless the Devices are purchased by COMPANY: (i) THERANOS shall at all times retain ownership of the Devices, (ii) COMPANY shall keep the Devices free of all security interests, liens and other encumbrances, (iii) COMPANY assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of COMPANY and during transportation to and from COMPANY's premises (or other mutually agreed premises) and shall pay the full cost of any Devices not returned in accordance with section 6.4, (iv) COMPANY shall adequately insure the Devices against loss or damage while such Devices are in the possession or control of COMPANY and (v) COMPANY shall permit any authorized representative of THERANOS to inspect the Devices, at any time prior to the return of such Devices in accordance with Section 6.4, at COMPANY's facilities or any other location at which the particular Project is being conducted.

6.4. Unless the Devices are purchased by COMPANY , no later than ten (10) days after the earlier of completion of the Project or the date of termination of this Agreement, COMPANY shall, at its own cost, return to THERANOS the applicable Readers and Cartridges (other than Cartridges which have previously been consumed and properly disposed of), and COMPANY shall furnish THERANOS with a certificate signed by an executive officer of COMPANY verifying that the same has been done. In the event of such completion or termination, as applicable, THERANOS shall have the right to enter COMPANY's premises for the purposes of repossessing such Devices, and COMPANY hereby consents to such entry. THERANOS shall be entitled to receive from COMPANY all collection costs, including attorneys' fees, incurred in the enforcement of its rights under this Article 6. Such Devices shall be returned in as good a condition as when they were shipped to COMPANY, ordinary wear and tear excepted. COMPANY shall cause all Participants to sign an agreement indicating they will return all Devices at the end of their participation in the Project.

### 7. CONFIDENTIALITY

7.1. Except to the extent expressly authorized by this Agreement, or otherwise agreed by the parties in writing, the parties agree that the receiving party (hereinafter called "**Recipient**") shall keep confidential and shall not publish or otherwise disclose or use for any purpose other than as provided for in this Agreement any confidential or proprietary information or materials furnished to it by the other party (hereinafter called "**Donor**") pursuant to this Agreement which

Theranos Service Assessment Apoptosis D1330C00015 Final      2 of 17      Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material      THER-0905873

if disclosed in writing or tangible form are marked as "Confidential" or "Proprietary" or with some similar designation at the time of disclosure and if disclosed orally are summarized and identified as confidential in a written notice to Recipient within thirty (30) days after the initial disclosure thereof (collectively, "**Confidential Information**") given the understanding that failure to do so does not constitute a designation of non-confidentiality, when the confidential nature is apparent from context and subject matter. Notwithstanding the foregoing, Confidential Information shall not be deemed to include information or materials to the extent that it can be established by written documentation by Recipient that such information or material:

7.1.1. was already known to or possessed by Recipient, other than under an obligation of confidentiality, at the time of disclosure;

7.1.2. was generally available to the public or otherwise part of the public domain at the time of its disclosure to Recipient;

7.1.3. became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Recipient in breach of this Agreement;

7.1.4. was independently developed by Recipient as demonstrated by documented evidence prepared contemporaneously with such independent development; or

7.1.5. was disclosed to Recipient, other than under an obligation of confidentiality, by a third party who had no obligation to Donor not to disclose such information to others.

7.2. Recipient may use and disclose Confidential Information of Donor as follows: (a) under appropriate confidentiality provisions substantially equivalent to those in this Agreement in connection with the performance of Recipient's obligations or exercise of Recipient's rights granted under this Agreement; and (b) to the extent such disclosure is reasonably necessary in filing for, prosecuting or maintaining patents, copyrights and trademarks (including applications thereof), obtaining regulatory approvals, prosecuting or defending litigation or complying with applicable governmental regulations or is otherwise required by applicable law, provided, however, that if Recipient is required by law to make any such disclosure of Donor's Confidential Information it will give reasonable advance notice to Donor of such disclosure requirement and, except to the extent inappropriate in the case of patent applications, will use commercially reasonable efforts to secure confidential treatment of such Confidential Information required to be disclosed. Confidential Information shall remain the property of Donor.

7.3. For clarity, the parties agree and acknowledge that THERANOS' Confidential Information includes without limitation information disclosed by THERANOS to COMPANY relating to THERANOS' monitoring and bioinformatics systems and equipment, including the THERANOS System or any part thereof.

7.4. Upon Donor's request, Recipient shall immediately return or destroy any of Donor's Confidential Information in Recipient's possession or control, other than such Confidential

information as Donor is entitled to retain hereunder for use following expiration or any termination of this Agreement, provided, that Recipient shall be entitled to retain one (1) archival copy of such Confidential Information for the sole purpose of determining Recipient's obligations under this Article 7; provided, further, that nothing in this Section 7.4 shall be deemed to modify or otherwise limit COMPANY's obligations under Section 6.4.

8. **COMPANY PROPERTY**

8.0 For the avoidance of doubt, all COMPANY background intellectual property and know-how existing as of the Effective Date and used in connection with the Project including that directed to COMPANY Compound shall remain the property of COMPANY. Except for the licenses granted to THERANOS pursuant to Sections 8.2 and 8.3, nothing in this Agreement shall transfer those rights to THERANOS.

8.1. As between COMPANY and THERANOS and to the extent permitted by law, (a) all data regarding Participants in the Project ("**Participant Data**"), and (b) all inventions, methods, discoveries and other proprietary information directed to COMPANY Compound (including, the composition of matter, method of manufacture or use thereof) and their applications are and shall be the sole and exclusive property of COMPANY and shall be maintained as Confidential Information of COMPANY, subject to the terms of this Agreement.

8.2. COMPANY hereby grants to THERANOS a non-exclusive license under any intellectual property rights owned or controlled by COMPANY relating to COMPANY Compound that may be necessary or useful in connection with THERANOS' performance of the Services solely for the purposes of performance of the Services in accordance with and during the term of the Project and for no other purpose whatsoever.

8.3. In addition, COMPANY hereby grants to THERANOS the rights to integrate, use and disclose Data (as defined below) in TheranOS, provided that THERANOS does not disclose, and any resulting analyses generated by TheranOS do not contain, any personally identifying information regarding individual Participants or any information identifying COMPANY or COMPANY Compound, except in connection with the provision of any Services to COMPANY under this Agreement. For the purposes of this Section 8.3, "Data" means any data generated by Theranos from or in connection with the biological fluid placed onto the Cartridges(s) by Participants or /and Users, and COMPANY CPU (Clinical Pharmacology Unit) staff and for the avoidance of doubt it is hereby confirmed that Data is included in Participant Data.

9. **THERANOS PROPERTY**

9.0 For the avoidance of doubt, all THERANOS background intellectual property and know-how existing as of the Effective Date and used in connection with the Project shall remain the property of THERANOS. Except for the licenses granted to COMPANY pursuant to Sections 5.2, 5.3 and 6, nothing in this Agreement shall transfer those rights to COMPANY.

9.1. As between COMPANY and THERANOS, all inventions, methods, discoveries and other proprietary information developed during the execution of the Services during the term of this Agreement and thereafter whether by

FOIA Confidential Treatment Requested by Theranos     THER-0905874
Fed. R. Crim. P. 6(e) material

COMPANY or THERANOS, or by the parties jointly, directed to: (a) any part or the whole of the THERANOS System or any improvements thereto, including, without limitation, the TheranOS' analytical engine and any results thereof, as well as any Cartridges customized for use in connection with the Project subject to COMPANY's rights in and to COMPANY Compound or (b) any combination of assays for use in conjunction with the THERANOS System subject to COMPANY's rights in and to COMPANY Compound, shall be the sole and exclusive property of THERANOS. COMPANY shall promptly disclose to THERANOS in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence, and COMPANY hereby assigns to THERANOS any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information, including all intellectual property rights therein. COMPANY will provide Theranos with all necessary documentation at Theranos cost to allow for the provision of Clause 9.1.

9.2.    At THERANOS' request, COMPANY shall provide to THERANOS any data regarding the use, functionality or operation of the Cartridges, Readers or any other aspect of the THERANOS System generated in connection with this Agreement. Notwithstanding anything to the contrary in this Agreement, THERANOS shall have the right to use and disclose any data described in the preceding sentence to further develop, use, make, have made, sell, market or otherwise exploit any aspect of the THERANOS System during the term of this Agreement and thereafter, including, without limitation, in connection with any regulatory filing for the THERANOS System or any component thereof.

**10.    EXPORT RESTRICTIONS**

Each party shall comply with all United States and foreign export control laws or regulations applicable to its performance under this Agreement.

**11.    INFRINGEMENT INDEMNITY**

THERANOS shall (a) defend or, at its option, settle any claim or suit against COMPANY on the basis that the THERANOS System infringes any United States or United Kingdom patent of a third party (**"Intellectual Property Rights"**) and (b) pay any final judgment entered against COMPANY on such claim or suit or any settlement thereof, provided that: (i) THERANOS has sole control of the defense and/or settlement of such claim or suit, (ii) COMPANY notifies THERANOS promptly in writing of each such claim or suit and gives THERANOS all information known to COMPANY relating thereto, (iii) COMPANY cooperates with THERANOS in the settlement and/or defense and (iv) COMPANY may not settle or compromise such claim or suit except with the prior written consent of THERANOS.  COMPANY shall be reimbursed for all reasonable out-of-pocket expenses incurred in providing any cooperation requested by THERANOS.  If all or any part of the THERANOS System is, or in the opinion of THERANOS may become, the subject of any claim or suit for infringement of any Intellectual Property Rights, THERANOS may, at its option and expense: (A) procure for COMPANY the right to continue use of the THERANOS System or the affected part thereof, (B) replace the THERANOS System or affected part thereof, (C) modify the THERANOS System or affected part thereof to make it non-infringing or (D) if none of the foregoing remedies are commercially feasible, terminate this Agreement and refund

the aggregate payments made by COMPANY for the THERANOS System or the affected part thereof. THERANOS shall have no obligation under this Article 11 to the extent a claim is based upon (1) use of any version of the Software other than a current, unaltered version, if infringement would have been avoided by a current, unaltered version or (2) combination, operation or use of the THERANOS System or the Software contained therein with other software and/or hardware not provided by THERANOS. This Article 11 states the entire liability of THERANOS and the exclusive remedy of the COMPANY with respect to any infringement or alleged infringement by the THERANOS System or any part thereof.

**12.    INDEMNIFICATION**

12.1.    COMPANY agrees to defend, indemnify and hold harmless THERANOS and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any claims, proceedings or investigations arising out of or in connection with (a) the conduct of a Project or the use of the results of a Project, (b) COMPANY's breach of this Agreement, negligence or intentional misconduct or (c) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of COMPANY (including any personal injury or property damage related thereto), including, without limitation, amounts paid in settlement of claims, proceedings or investigations, and agrees to bear all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation as such costs and expenses are incurred in advance of judgment or settlement.  COMPANY shall be promptly notified of any such claim and THERANOS shall cooperate with COMPANY in the defense of such claim.

12.2.    THERANOS agrees to defend, indemnify and hold harmless COMPANY and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any third-party claims, proceedings or investigations arising out of or in connection with (a) any personal injury or property damage directly related to the use of the THERANOS System during the conduct of a Project (except as a result of the negligence or intentional misuse of the THERANOS System in such Project by COMPANY or its Affiliates or their respective employees, consultants and/or agents or by the Participants), (b) the use by THERANOS of the results of a Project in TheranOS, or (c) THERANOS' material breach of this Agreement, negligence or intentional misconduct, including, without limitation, amounts paid in settlement of claims, proceedings or investigations, and agrees to bear all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation as such costs and expenses are incurred in advance of judgment or settlement.  THERANOS shall be promptly notified of any such claim and COMPANY shall cooperate with THERANOS in the defense of such claim.

**13.    INDEPENDENT CONTRACTOR**

The parties agree that the relationship of THERANOS and COMPANY established by this Agreement is that of independent contractors. Furthermore, the parties agree that this Agreement does not, is not intended to and shall not be construed to establish an employment, agency or any other relationship.  Neither party shall have any right, power or

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905875

authority, nor shall they represent themselves as having any authority, to assume, create or incur any expense, liability or obligation, express or implied, on behalf of the other party, or otherwise act as an agent for the other party for any purpose.

### 14. DELAYS

THERANOS will require documents, data, records, and cooperation by COMPANY in order to properly perform the Services, and THERANOS is not responsible for errors, delays or other consequences arising from the failure of COMPANY or its employees, agents or contractors to provide such documents, data, records or cooperation in a timely manner. Neither party shall be liable to the other for failure or delay in the performance of any of its obligations under this Agreement for the time and to the extent such failure or delay is caused by earthquake, riot, civil commotion, war, terrorist acts, strike, flood or governmental acts or restriction, or other cause that is beyond the reasonable control of the respective party. The party affected by such force majeure will provide the other party with full information thereof as soon as it becomes aware of the same (including its best estimate of the likely extent and duration of the interference with its activities), and will use commercially reasonable efforts to overcome the difficulties created thereby and to resume performance of its obligations as soon as practicable. If COMPANY delays or suspends the Project for a significant period of time due to no fault of THERANOS, and COMPANY requests that THERANOS staff continue to be assigned to the Project during the period of such delay or suspension, a monthly services fee will be charged, in an amount and schedule reasonably determined by THERANOS consistent with THERANOS' general practices for calculation of such monthly service fees. Such delay shall last no longer than three (3) months, after which time THERANOS shall have the right to terminate this Agreement.

### 15. TERMINATION

15.1. This Agreement may be terminated by either party upon default in performance of the other party, provided that any defaulting party shall be given not less than ninety (90) days prior written notice of default (or ten (10) days in the case of a payment default) and the opportunity to cure the default during such period. In the event this Agreement is terminated pursuant to this Article 15, THERANOS shall retain such sums as may have been paid to it by COMPANY under the terms of this Agreement to compensate THERANOS for work performed and expenses incurred in accordance with Schedule 1. COMPANY shall pay THERANOS any additional amounts owed, but not yet paid, for work performed and expenses incurred prior to termination, as well as any incidental costs associated with termination, within thirty (30) days after the effective date of termination.

15.2. COMPANY may terminate the Agreement without cause on ninety (90) days notice to THERANOS. In the event the Project is terminated pursuant to this Section 15.2, THERANOS shall retain such sums as may have been paid to it by COMPANY under the terms of this Agreement to compensate THERANOS for work performed and expenses incurred. In addition, COMPANY shall pay THERANOS within thirty (30) days of the effective date of termination under this Section 15.2 (i) an amount to compensate THERANOS for its wind-down activities , which shall be equal to ten percent (10%) of any amounts payable in consideration for the Services that have not been paid as of the effective date of such termination,

which the parties agree would be a reasonable estimation of THERANOS' costs incurred in connection with such wind-down activities; and (ii) any additional out-of-pocket costs incurred by THERANOS in connection with the Project, including, without limitation, non-cancellable commitments attributable to the termination of the Agreement.

15.3. No later than ten (10) days after any termination of this Agreement, COMPANY shall return to THERANOS all THERANOS property in its possession or control, including: (a) all Confidential Information of THERANOS; (b) all Devices and Client Accessible Software provided under this Agreement; and (c) all authorization codes providing Participants and/or Users with access to the THERANOS System in connection with the Project; unless otherwise provided in Schedule 1. In addition, COMPANY shall ensure that all relevant Participants, Users and other COMPANY employees and consultants cease using the THERANOS System promptly following any such termination of this Agreement.

15.4. Articles 1, 4, 7, 8, 9, 11, 12, 15 (other than the first sentence of each of Sections 15.1 and 15.2), 16, 17, 18, and 19 and Sections 5.4, 6.2, 6.3 and 6.4 shall survive expiration or termination of this Agreement for any reason. Except as otherwise provided in this Section 15.4, all rights and obligations of the parties under this Agreement shall terminate upon expiration or termination of this Agreement for any reason.

### 16. COMMUNICATIONS AND PAYMENTS

All notices, administrative communications and payments provided for in this Agreement shall be by express delivery service or first class mail, postage prepaid, addressed to the respective parties as follows:

To THERANOS:  Theranos, Inc.
3200 Hillview Ave.
Palo Alto, CA 94304

Attn: Controller

To COMPANY:  Dr.D.H.Bowen
AstraZeneca UK Limited
Parklands,
Alderley Park,
Macclesfield,
Cheshire SK10 4TG

### 17. ASSIGNMENT

Neither party shall have the right to assign this Agreement or any of the rights or obligations hereunder without the prior written consent of the other party. Notwithstanding the foregoing, either party may, without such consent, assign this Agreement to a third party that succeeds to all or substantially all of such party's business or assets relating to this Agreement whether by sale, merger, operation of law or otherwise.

### 18. LIMITED WARRANTY

18.1. Each party represents and warrants that: (a) it has the legal authority to enter into this Agreement; and (b) the execution, delivery and performance of this Agreement by it and its obligations hereunder do not conflict with any

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905876

**ER-14431**

agreement, instrument or understanding to which it is a party or by which it may be bound.

18.2. Each party shall perform its obligations under this Agreement: (a) in a timely and professional manner; (b) in conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances; and (c) in compliance in all material respects with all applicable laws. Without limiting the foregoing, COMPANY represents, warrants and covenants that it has obtained, and shall continue during the term of the Project to obtain, all necessary consents to be able to provide to THERANOS and to permit THERANOS to use for all purposes specified in this Agreement and subject to the terms of this Agreement Participant Data, Data (as defined in Section 8.3), and other data provided by COMPANY (with respect to such other data, at COMPANY's sole discretion) or otherwise furnished to THERANOS in connection with the Project or under this Agreement.

18.3. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THERANOS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR THE THERANOS SYSTEM (OR ANY PART THEREOF) OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER THIS AGREEMENT, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF THERANOS OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES. COMPANY acknowledges that THERANOS makes no representation or warranty that the COMPANY's pharmaceutical, biologic, or medical device products (including COMPANY Compound) tested in connection with the Services can, either during the term of this Agreement or thereafter, be successfully developed or, if so developed, will receive the required approval by the U.S. Food and Drug Administration ("FDA") or other applicable regulatory body.

18.4. IN NO EVENT (A) SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE TOTAL FEES PAID BY AND DUE FROM COMPANY HEREUNDER. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS ON LIABILITY AND DAMAGES IN THE PRECEDING SENTENCE SHALL NOT APPLY TO: (A) LIABILITY OR DAMAGES TO THE EXTENT ARISING FROM A BREACH UNDER ARTICLES 7, 8 OR 9 OR FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT; OR (2) LIMIT THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER ARTICLES 11 AND 12 WITH RESEPCT TO AMOUNTS OWING TO THIRD PARTIES.

19. **GENERAL CONDITIONS**

19.1. The headings in this Agreement are for convenience only and do not in any way limit or amplify the terms or conditions of this Agreement.

19.2. This Agreement, its exhibits and Schedules constitute the entire agreement between the parties and supersede all prior contracts, agreements, proposals, letters, communications and understandings, whether written or oral, relating to the same subject matter between the parties; provided however that this Agreement shall not modify or otherwise affect the parties' obligations under any confidentiality or non-disclosure agreement executed prior to the Effective Date with respect to the disclosure of information under any such agreement that is not related to the subject matter of this Agreement. The parties intend this Agreement to be a complete statement of the terms of their agreement, and no change or modification of any of the provisions of this Agreement shall be effective unless it is in writing and signed by duly authorized officers of THERANOS and COMPANY.

19.3. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, U.S.A.

19.4. In the event of a dispute arising out of this Agreement, the prevailing party shall be entitled to be paid all legal costs and expenses (including reasonable attorney fees) paid or incurred by it to bring or defend such dispute, including all costs of collection.

19.5. THERANOS agrees to comply at all times with all provisions of the Generic Drug Enforcement Act of 1992 (the "Act"). THERANOS further agrees to submit to COMPANY upon completion or termination of a Project a certification that neither THERANOS nor any of its employees has been debarred by the FDA under the provisions of the Act and that THERANOS did not use in any capacity in connection with this Agreement the services of any person (as defined in the Act) debarred under the provisions of the Act

*(The remainder of this page is intentionally left blank.)*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905877

**ER-14432**



Each party has caused this Agreement to be executed by its duly authorized representative as of the Effective Date.

THERANOS, INC.

Accepted by (signature)

Name       ELIZABETH HOLMES

Title       PRESIDENT AND CEO

ASTRAZENECA UK LIMITED

Accepted by (signature)

Name       ANITA LINDSAY

Title       Clinical Project Coordinator
           Director

---

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905878

ER-14433



## SCHEDULE 1 (to be attached)

**STATEMENT OF WORK**    **Program ID: AZ-0002**

Contact:

**Susan DiGiaimo**

**Theranos, Inc.**

Phone: (609) 978-0763

sdigiaimo@theranos.com

www.theranos.com

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905879

**ER-14434**

THERANOS, INC. – ASTRAZENECA UK LIMITED

STATEMENT OF WORK

This Statement of Work is entered into pursuant to the Service Agreement, effective as of June, 2008 (the "Service Agreement"), by and between Theranos, Inc. ("THERANOS") and AstraZeneca UK Limited ("ASTRAZENECA"). All defined terms used herein have the same meanings as set forth in the Service Agreement unless otherwise specifically defined herein.

The THERANOS System will be used in ASTRAZENECA's Diurnal Variation study (the "Project"). THERANOS will furnish to ASTRAZENECA the Services as set forth herein:

**KEY PROJECT OBJECTIVES**

- To generate a comprehensive and quantitative profile of pharmacodynamic response through trends and variations in M30, M65, and Nucleosomal DNA (the "Cartridge Analytes") in archived clinical samples.
- To assess the functionality, specificity, reproducibility, accuracy, and precision of the THERANOS System in a "real-world" setting
- To demonstrate heretofore unseen levels and changes in the Cartridge Analytes visible through real-time, fresh whole-blood, and more comprehensive longitudinal time-series measurements on a standardized platform.
- To demonstrate the correlation of changes in the Cartridge Analytes to physiological events.
- To compare the results and capabilities of the THERANOS System, including its integrated data infrastructure, to ASTRAZENECA's current 'gold-standard' laboratory testing infrastructure.

*Project Parameters*

| Project | AZ-0002; Apoptosis |
|---|---|
| Cartridge Analytes | Single cartridge: M30, M65, nDNA |
| Sample Types | Finger-stick and venous whole-blood (interchangeably) |
| Sites (Number) - Location | (1) – AZ CPU (AstraZeneca Clinical Pharmacology Unit), Alderley Edge, UK |
| Total Number of Participants | Maximum 36<br><br>12; Male<br><br>12; Pre-menopausal Females<br><br>12; Post-menopausal Females |
| Number of Time Points | 19 per male<br><br>19 per menopausal female |

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905880

ER-14435

| | 24 per pre-menopausal female<br><br>• Screening – 1 sample<br>• Day 1 – 0h,6h,12h,18h,24h<br>• Week 1 – 2X's<br>• Week 2 – 2X's<br>• Week 3 – 2X's<br>• Week 4 – 2X's<br>• Daily during menstruation<br>• Day 28 – 0h,6h,12h,18h,24h |
|---|---|
| Number of Cartridges | Maximum of 750 |
| Number of Readers | 10 at site based on enrollment |
| Length of Participant Participation | 28 Days |
| Localization/Languages for Translation | English |
| Touch Screen Interface Questions/Customization | Capture Diurnal Variations |
| Data Infrastructure | Purchase and configure a unique ASTRAZENECA-specific server and database |
| Expected Start Date (First Participant In) | TBD 2008 not confirmed to date |
| Expected End Date (Last Participant Out) | TBD 2008 not confirmed to date |
| Total Duration of Services | 1 Month |
| Investigator Meeting ("IM") Date and Location / Calibration/Validation Start | TBD, AZ CPU, Alderley Edge, UK |

*THERANOS Services: pre-deployment*

Project Services

The following activities are required to ensure the Project Objectives are met in the most efficient manner:

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material      THER-0905881

**ER-14436**

- Refine project specifications with ASTRAZENECA.

- Assign Project Manager.

- Lead the pre-implementation kick-off meeting to discuss Project specifics, roles and responsibilities of ASTRAZENECA and THERANOS for the duration of the Project.

- Transfer blinded patient and clinician IDs for set-up in touch-screen and TheranOS portals.

- Transfer to THERANOS assay-specific information, materials, and other relevant data (collectively, "Assay Specifications").

- Transfer relevant assay materials and archived plasma samples to THERANOS for whole-blood calibration.

- Plan for pre-trial sample collection from Participants -- obtain samples (venous blood run on Cartridges and at reference lab across the full clinically relevant dynamic range – approximately 20 samples total from 3-10 patients) for whole-blood calibration. These can be run while training clinical staff.

- Collaborate with ASTRAZENECA to create a Project plan to ensure that timelines are accurately communicated and met.

- Customize project and control applications within TheranOS. ASTRAZENECA will be able to view program schedule, progress, and updates through the secure ASTRAZENECA-specific web portal once the Project plan has been cemented.

- Set touch-screen interface specifications as mutually agreed upon by THERANOS and ASTRAZENECA.[1]

- Plan for THERANOS System training session (as described below).

Project Configuration & TheranOS Customization

- Design, develop, program, test and validate ASTRAZENECA-specific TheranOS portal to capture Participant Data and display program progress.

- Initial setup of accounts and secure access privileges for all parties who will be authorized to access TheranOS (collectively, "Users").

- Specify Project-related workflow.

- Set-up and secure ASTRAZENECA-specific database and server.

- Customize and validate Project-specific Cartridges to Assay Specifications.

- Customize and validate touch-screen interface.

---

[1] Deployment of the default survey interface is included in the budget. Customization of the default interface will be billed to ASTRAZENECA at the rate of $250/hour.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905882

Training[2]

- Develop and deliver customized training course.
  - o In-person training of site staff and ASTRAZENECA staff at the IM.

*THERANOS Services: post-deployment*

Data Delivery & Transfer

- During the Project, Users will have permission-based access to view all data, as well as on-demand ASCII/Excel (CSV) data transfer via TheranOS.
  - o Cumulative data transfers can be executed by ASTRAZENECA at any time via the Export Utility in the Data Delivery component of TheranOS.

Client Infrastructure and Technical Support

- Provide relevant THERANOS System set-up material(s).
- Set up Readers on-site(s).
- Provide and manage the web portals to be used by ASTRAZENECA in connection with the Services provided under this Statement of Work.
- Work with ASTRAZENECA to customize systems for the appropriate international telecommunications infrastructure to successfully transmit Participant Data.
- Set up, administer, monitor, and troubleshoot web and database servers for duration of the Project.
- Create secure backup infrastructure.
- Provide second level technical support to the Project Support Center (described below).
- Reasonably assist ASTRAZENECA with issues regarding network infrastructure setup related to the THERANOS System.
- Troubleshoot firewall, computer system, and connectivity issues relating to TheranOS.

Project Support Center

---

[2] The first two (2) hours of training at each clinical site by up to two (2) THERANOS representatives are included in the budget. Each additional hour of training will be billed to ASTRAZENECA at the rate of $150 per hour.

Theranos Service Assessment Apoptosis D1330C00015 Final          12 of 17          Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos          THER-0905883
Fed. R. Crim. P. 6(e) material

- During the Project, provide telephone helpdesk support for ASTRAZENECA regarding the use of the THERANOS System*.
- Live coverage 24x7 through THERANOS customer-care center.

*Participants to call site coordinator directly about any non-THERANOS System issues.

*PROJECT BUDGET AND PAYMENT SCHEDULE*

| Products and Services: Apoptosis Project | Fees USD |
|---|---|
| **Services:** | |
| • Assay Development (Single point-of-care Cartridge; M30, M65, nDNA) | $25,000 |
| Pre-Deployment Services (as described above) | |
| • Training | |
| Post-Deployment Services (as described above) | |
| • Project Support | |
| Data delivery, client infrastructure and technical support | |
| Product Delivery and Clinical Use: | |
| • Validation/Calibration/Customization of readers, cartridges, & multiplexed point of care assays | |
| • Distribution, trial definition/project management, services configuration/software customization (TheranOS), patient and clinical records integration, set up of patient and physician portals, real-time reporting, analytics, and ASTRAZENECA-specific back-end database and server infrastructure | |
| • Shipping, telecommunication costs, THERANOS travel expense to IM meeting and/or sponsor site | |
| • Apoptosis 'baseline' creation in ASTRAZENECA-specific database | |
| • International communications and data transmission infrastructure | |
| • Real-time patient monitoring – Readers, Information System, and up to 750 multiplexed cartridges | $200,000 |
| Good Will Investment ($2,000,000 assay development quote) | - ($1,975,000) |
| Good Will Investment ($400,000 original study quote) | - ($200,000) |
| **Total: Products and Services** | **$225,000** |

| Payment Schedule | Amount Due (USD) |
|---|---|

Theranos Service Assessment Apoptosis D1330C00015 Final          13 of 17                    Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                                                THER-0905884

**ER-14439**

Upon Execution of SOW:

- Commitment of Theranos Resources
- Procurement of THERANOS Systems                                      $25,000

Upon Assay Validation                                                          $200,000

Please note that should the scope, duration or parameters of this Project (*e.g.*, requirements for configuration and/or support) change, associated fees may need to be revised and no Services will be provided for such new scope or parameters until the parties hereto amend this Statement of Work to reflect such changes.

For internationally based trials contract denomination will be in U.S. currency. Payments made to THERANOS will be made in U.S. currency.

**Late Payments**

- All invoices not paid in thirty (30) days shall incur interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

**Trial Delays**

- If ASTRAZENECA delays or suspends the Project for more than thirty (30) days due to no fault of THERANOS, and ASTRAZENECA requests that THERANOS staff continue to be assigned to the Project during the period of such delay or suspension, (i) ASTRAZENECA will pay to THERANOS all amounts due and payable through the date of such delay or suspension and (ii) a monthly services fee will be charged, in an amount and schedule reasonably determined by THERANOS consistent with THERANOS' general practices for calculation of such monthly service fees. Such delay shall last no longer than three (3) months, after which time THERANOS shall have the right to terminate or amend this Statement of Work.

*Trial Communications*

All communications provided for in this Statement of Work shall be made by confirmed fax receipt, express

Theranos Service Assessment Apoptosis D1330C00015 Final          14 of 17                    Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905885

delivery service or mailed postage prepaid and addressed to the respective parties as follows:

**THERANOS Contacts**

| Project Matters | Billing Matters |
|---|---|
| Susan DiGiaimo | Danise Yam |
| Theranos, Inc. | Theranos, Inc. |
| 3200 Hillview Ave | 3200 Hillview Ave |
| Palo Alto, CA 94304 | Palo Alto, CA 94304 |
| Ph. (609) 978-0763 | Ph. (650) 470-6204 |
| Fax (609) 978-0764 | Fax (650) 644-3224 |

**ASTRAZENECA Contacts**

| Project Matters | Bill Invoices To |
|---|---|
| Dr. Alistair Greystoke CRUK AZ Research Fellow | **The Purchase2pay team** |
| 11S6 | AstraZeneca UK Limited |
| Mereside | P O BOX 30 |
| Alderley Park, | Charter Way |
| Macclesfield, | Silk Rd Business Park |
| Cheshire | Macclesfield |
| SK10 4TF | Cheshire |
| | SK10 2NA |
| | England |

Theranos Service Assessment Apoptosis D1330C00015 Final     15 of 17     Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905886

Email: P2PInvoice@AstraZeneca.com

Marked for the attention of Camille
Hambrook and containing the correct Purchase
Order Number

]

]                                ]

If available, please provide a PO # to expedite billing:  _____

Theranos Service Assessment Apoptosis D1330C00015 Final          16 of 17          Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos                                        THER-0905887
Fed. R. Crim. P. 6(e) material

ER-14442

**IN WITNESS WHEREOF,** the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

**THERANOS, INC.**

Signature

ELIZABETH HOLMES

PRESIDENT AND CEO

8/7/09

Date

**ASTRAZENECA UK LIMITED**

Signature
ANITA LINDSAY

Name (please print)
Clinical Project Coordinator
Title
Director

1/7/58

Date

Please sign and date two (2) originals and send both to THERANOS for signature via traceable mail (*e.g.*, UPS or FedEx). One executed original will be returned to ASTRAZENECA

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905888

ER-14443



30 September 2008

Susan DiGiaimo
Theranos, Inc
3200 Hillview Avenue,
Palo Alto,
California 94304

Our Ref: RECENTIN PA#1
Your Ref:

Dear Susan,

Please find enclosed duplicate copies of the Amendment #1 for the above referenced trial.

Could I request that you progress signature of both copies in the book-marked sections. Upon signature, please return one copy marked for my attention and keep the remaining copy for your files.

Should you have any queries please do not hesitate to contact me.

Yours sincerely

Huw Bowen
Clinical Outsourcing Manager

Parklands
Alderley Park
Macclesfield
Cheshire
SK10 4TG, UK

Email:huw.bowen@astrazeneca.com

---

**AstraZeneca**
Mereside
Alderley Park
Macclesfield
Cheshire SK10 4TG
England

**Tel** +44 (0)1625 582828
**Fax** +44 (0)1625 583074

AstraZeneca UK Limited
Registered in England No 3674842
Registered Office 15 Stanhope Gate
London W1K 1LN

AZ2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905889

ASTRAZENECA UK LIMITED

CHANGE ORDER

**Amendment Number: One**

**Date: 15th September 2008**

relating to the Services Agreement (dated 31st January 2008) by and between

**ASTRAZENECA UK LIMITED**, a company incorporated in England under no. 3674842, whose registered office is situated at 15 Stanhope Gate, London, W1K 1LN, England

(*AstraZeneca*)

and

**THERANOS INC**, with a place of business situated at 3200 Hillview Ave.Palo Alto, CA 94304

( "Theranos")

concerning the provision of analytical services

**Change Details:**

The original Services Agreement (including appendices) is hereby amended to incorporate the following change,

Existing status:

1.1 Schedule 2: Total Cost $25,000.00.

Requested change:
As per change order log September 2008:

Schedule 2: Revised COL #1 Cost $22,273.00
Pass Through (Logistics & Travel) $22,273.00

Revised Study Total Cost : $47,273.00

---

D1300C00003 Theranos PA#1 Final      1 of 2

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material      THER-0905890

COL September 2008:



"Theranos
D1330C000003 COL"

**All other terms and conditions of the original contract remain unchanged.**

SIGNED for and on behalf of                    SIGNED for and on behalf of
ASTRAZENECA UK LIMITED                         THERANOS INC

_____                        _____
Signature                                      Signature

Name: _ALINDSAY_____                         Name: _ELIZABETH HOLMES_

Title: _CLINICAL PROJECT___                     Title: _PRESIDENT & CEO__
       _COORDINATION Director_

Date: _30/9/05_____                        Date: _October 1, 2008._

D1300C00003 Theranos PA#1 Final                                    2 of 2

FOIA Confidential Treatment Requested by Theranos                THER-0905891
Fed. R. Crim. P. 6(e) material

THER-0905892

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

ER-14447

CHANGE ORDER LOG

**SMB CHANGE ORDER LOG**

| | | | | |
|---|---|---|---|---|
| ESP = | Theranos Inc | | | |
| Date = | 15-Sep-08 | | | |
| Study Number = | U1330C0G263 | | | |
| Currency = | EURO ☐ SEK ☐ GBP ☐ USD ☑ | | | |

| Change Item # | Description | Name of Initiator | PROPOSED COSTS | | | AGRED COSTS | | | Comments | AZ Technical Approval - Name/Date | AZ Financial Approval - Name/Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Est Fee for Services | Est Fee for Pass Through | Est Total | Est Fee for Services | Est Fee for Pass Through | Est Total | | | |
| **Original Contract Value:** | | | | | | 20,000.00 | 0.00 | 20,000.00 | | | |
| 1.1 | Pass thru travel & accomodation from USA for training | S Spratt | 0.00 | 3,273.00 | 3,273.00 | 0.00 | 3,273.00 | 3,273.00 | | Agreed e.mail S Spratt 23.08.08 | Agreed e.mail S Spratt 23.08.08 |
| 1.2 | Shipping costs for reorder and supplies | S Spratt | 0.00 | 19,000.00 | 19,000.00 | 0.00 | 19,000.00 | 19,000.00 | | Agreed e.mail S Spratt 23.08.08 | |
| 1.3 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| **Amendment #1 Subtotal:** | | | 0.00 | 22,273.00 | 22,273.00 | 0.00 | 22,273.00 | 22,273.00 | | | |
| 2.1 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 2.2 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 2.3 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| **Amendment #2 Subtotal:** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 3.1 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 3.2 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| 3.3 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| **Amendment #3 Subtotal:** | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | |
| **Revised Contract Value:** | | | | | | | 20,000.00 | 47,273.00 | | | |

**RECONCILIATION OF SERVICE FEES AND PASS THROUGHS**

Note: The following reconciliation of costs must be provided in February, May, July and November

| | Agreed Value (Total of All Contract and Change Order Fee and Pass Through Value) | Total of Invoiced and/or Accrued Value to date | Total Committed Value to date | Forecast Value (Difference between Agreed Value and Change Order Agreed/Accrued Plus any Anticipate Pass Through Spend) | Total Unforecasted Value (Difference between Agreed Value and Forecasted Value) |
|---|---|---|---|---|---|
| Service Fees | | 47,273.00 | | 0% | 47,273.00 |
| Pass Through Costs | | 20,000.00 | | 0% | 20,000.00 |



## SERVICES AGREEMENT

This Services Agreement (this "**Agreement**") is made effective as of January 31st, 2008 (the "**Effective Date**") between AstraZeneca UK Limited, a company incorporated in England under no. 3674542 whose registered office is at 15 Stanhope Gate, London, W1K 1LN, England ("**COMPANY**"), and Theranos, Inc., a Delaware corporation having its principle place of business at 3200 Hillview Ave.Palo Alto, CA 94304("**THERANOS**").

In consideration of the mutual terms and covenants set forth herein, THERANOS and COMPANY hereby agree as follows:

1. **DEFINITIONS.** As used herein, the following terms have the meanings set forth below:

1.1. "**Affiliate**" means with respect to a party, any person, corporation or other entity which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party. As used in this Section 1.1, "control" shall mean: (a) to possess, directly or indirectly, the power to affirmatively direct the management and policies of such person, corporation or other entity, whether through ownership of voting securities or by contract relating to voting rights or corporate governance, or (b) direct or indirect beneficial ownership of at least fifty percent (50%) (or such lesser percentage which is the maximum allowed to be owned by a foreign corporation in a particular jurisdiction) of the voting securities in such person, corporation or other entity.

1.2. "**CABS**" means THERANOS' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, and related statistical and other analysis methods, data repositories and technologies.

1.3. "**Cartridge**" means THERANOS' analytical chips containing biological fluid processing technology and assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

1.4. "**COMPANY Contractors**" mean independent contractors which are bound by written agreements or other legally enforceable obligations to maintain Confidential Information of THERANOS as confidential to the same extent as the Company is obligated hereunder.

1.5. "**COMPANY Compound**" means RECENTIN™ (also known as cediranib, AZD2171).

1.6. "**Participants**" mean patients who are the subjects of the Project and who use the Theranos System.

1.7. "**Project**" means the project related to the protocol titled [ An Exploratory Open-Label, Non-randomised, Single Centre Methodology Study to Compare Dynamic Contrast Enhanced CT and MRI as Markers of Changes in Vascular Activity Mediated by a Positive Control Agent [Cediranib (Recentin™; AZD2171), a Potent Inhibitor of VEGF-driven Angiogenesis] in Patients with Advanced Solid Tumours ] in connection with which Theranos will carry out the tests, studies and other activities set forth in Schedule 1.

1.8. "**Reader**" means THERANOS' device capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by THERANOS, communicating with authorized parties and providing analytical information.

1.9. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, of THERANOS and its licensors, as further described in Section 5.1, provided under this Agreement, including any upgrades or updates thereto that THERANOS may provide from time to time.

1.10. "**THERANOS System**" means, collectively, the system comprised of CABS, Reader(s), Cartridges and any other components developed by or for THERANOS facilitating the operation of any of the foregoing, alone or in any combination.

1.11. "**Users**" means individuals, other than Participants, who are designated by COMPANY to have access to CABS and who are properly trained end users of the Theranos System.

1.12. In addition, each capitalized term used in this Agreement and not defined in this Article 1 shall have the meaning given to such term in the relevant section of the body of this Agreement.

2. **SERVICES**

COMPANY hereby retains THERANOS on a non-exclusive basis commencing as of the Effective Date to provide the services as are set out in Schedule 1 (the "**Services**") for the execution of the Project

3. **COMPENSATION AND EXPENSES**

As compensation for Services hereunder, COMPANY shall pay THERANOS the amounts specified in Schedule 2 COMPANY will reimburse THERANOS for all travel, shipping costs, and other reasonable out-of-pocket expenses incurred by THERANOS personnel in providing the Services, subject to such guidelines or limitations as may be set forth in Schedule 2 COMPANY shall be responsible for and pay all local, state, federal, or foreign sales, use, excise, personal property, value added, GST or other similar taxes or duties, other than taxes based on the net income of THERANOS.

4. **PUBLICITY**

Neither party shall disclose the terms of this Agreement or the Project to any third party without the other party's prior written approval, except to company employees, advisors

Theranos Service Assessment Final                    1 of 20                    Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                              THER-0905893

(including financial advisors, attorneys and accountants), potential and existing investors, potential acquirers and others on a need to know basis, in each case under circumstances that reasonably protect the confidentiality thereof. Such obligation shall not apply to disclosures which either party is required by law to make, provided that the disclosing party shall notify the other party of any such disclosure prior to such disclosure and will use commercially reasonable efforts to secure confidential treatment of this Agreement or such terms required to be disclosed. Neither party shall use the name, logos, trademarks or service marks of the other party in any publicity, advertising or disseminated information without such other party's prior written approval, except that THERANOS may list COMPANY as a client of THERANOS.

### 5. ACCESS TO SOFTWARE AND USE OF CABS

5.1.    In support of the Services, THERANOS may make available to COMPANY certain Software as a part of CABS. Such Software may include, without limitation, (a) Software installed on Readers ("**Firmware**") and (b) online or offline software services or products related to CABS which may be accessed through the Readers or at a designated website or IP address, disc, programs or other designated location ("**Client Accessible Software**").

5.2.    THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicenseable license to use Firmware as incorporated into, and solely for use in connection with, Readers by Participants, COMPANY employees and COMPANY Contractors and otherwise in accordance with the terms of this Agreement, and only for the term of the Project for which such Firmware is made available under this Agreement.

5.3.    THERANOS hereby grants to COMPANY a non-exclusive, non-transferable, non-sublicenseable license to use the Client Accessible Software for the purpose for which it is made available to COMPANY and otherwise in accordance with the terms of this Agreement, and only for the term of the Project for which such Client Accessible Software is made available under this Agreement. COMPANY shall not allow access to the Client Accessible Software by more than the number of concurrent Users indicated for the Project as set out in Schedule 1.

5.4.    THERANOS and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Confidential Information of THERANOS. COMPANY shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify THERANOS promptly of any such unauthorized use. COMPANY shall not: (a) disassemble, decompile or otherwise reverse engineer the Software, (b) modify, copy, sell, rent, transfer, reproduce or distribute the Software, except as specifically provided for in Schedule 1, (c) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis or (d) create Internet "links" to or from the Software, or "frame" or "mirror" any of COMPANY's content which forms part of the Software. COMPANY shall at all times comply with terms and conditions applicable to third party software provided with Software. THERANOS reserves all rights in the Software not expressly granted herein.

### 6. USE OF DEVICES

6.1.    In connection with the Services, THERANOS may make available to COMPANY certain equipment, including but not limited to Readers and Cartridges (collectively, the "**Devices**"). Each Device will be provided to COMPANY upon the terms set forth in Schedule 1.

6.2.    Devices shall only be permitted to be used by (a) COMPANY employees and COMPANY Contractors and (b) Participants. COMPANY agrees to take all reasonable steps to protect the Devices from theft or use contrary to the terms of this Agreement. COMPANY agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. COMPANY is not authorized to sell, rent, transfer, license, or distribute the Devices, except as specifically provided in this Agreement or Schedule 1.

6.3.    Unless the Devices are purchased by COMPANY: (i) THERANOS shall at all times retain ownership of the Devices, (ii) COMPANY shall keep the Devices free of all security interests, liens and other encumbrances, (iii) COMPANY assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of COMPANY and during transportation to and from COMPANY's premises (or other mutually agreed premises) and shall pay the full cost of any Devices not returned in accordance with section 6.4, (iv) COMPANY shall adequately insure the Devices against loss or damage while such Devices are in the possession or control of COMPANY and (v) COMPANY shall permit any authorized representative of THERANOS to inspect the Devices, at any time prior to the return of such Devices in accordance with Section 6.4, at COMPANY's facilities or any other location at which the particular Project is being conducted.

6.4.    Unless the Devices are purchased by COMPANY , no later than ten (10) days after the earlier of completion of the Project or the date of termination of this Agreement, COMPANY shall, at its own cost, return to THERANOS the applicable Readers and Cartridges (other than Cartridges which have previously been consumed and properly disposed of), and COMPANY shall furnish THERANOS with a certificate signed by an executive officer of COMPANY verifying that the same has been done. In the event of such completion or termination, as applicable, THERANOS shall have the right to enter COMPANY's premises for the purposes of repossessing such Devices, and COMPANY hereby consents to such entry. THERANOS shall be entitled to receive from COMPANY all collection costs, including attorneys' fees, incurred in the enforcement of its rights under this Article 6. Such Devices shall be returned in as good a condition as when they were shipped to COMPANY, ordinary wear and tear excepted. COMPANY shall cause all Participants to sign an agreement indicating they will return all Devices at the end of their participation in the Project.

### 7. CONFIDENTIALITY

7.1.    Except to the extent expressly authorized by this Agreement, or otherwise agreed by the parties in writing, the parties agree that the receiving party (hereinafter called "**Recipient**") shall keep confidential and shall not publish or otherwise disclose or use for any purpose other than as provided for in this Agreement any confidential or proprietary information or materials furnished to it by the other party (hereinafter called "**Donor**") pursuant to this Agreement which

Theranos Service Assessment Final

2 of 20

Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905894

if disclosed in writing or tangible form are marked as "Confidential" or "Proprietary" or with some similar designation at the time of disclosure and if disclosed orally are summarized and identified as confidential in a written notice to Recipient within thirty (30) days after the initial disclosure thereof (collectively, "**Confidential Information**") given the understanding that failure to do so does not constitute a designation of non-confidentiality, when the confidential nature is apparent from context and subject matter. Notwithstanding the foregoing, Confidential Information shall not be deemed to include information or materials to the extent that it can be established by written documentation by Recipient that such information or material:

7.1.1.    was already known to or possessed by Recipient, other than under an obligation of confidentiality, at the time of disclosure;

7.1.2.    was generally available to the public or otherwise part of the public domain at the time of its disclosure to Recipient;

7.1.3.    became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Recipient in breach of this Agreement;

7.1.4.    was independently developed by Recipient as demonstrated by documented evidence prepared contemporaneously with such independent development; or

7.1.5.    was disclosed to Recipient, other than under an obligation of confidentiality, by a third party who had no obligation to Donor not to disclose such information to others.

7.2.    Recipient may use and disclose Confidential Information of Donor as follows: (a) under appropriate confidentiality provisions substantially equivalent to those in this Agreement in connection with the performance of Recipient's obligations or exercise of Recipient's rights granted under this Agreement; and (b) to the extent such disclosure is reasonably necessary in filing for, prosecuting or maintaining patents, copyrights and trademarks (including applications therefor), obtaining regulatory approvals, prosecuting or defending litigation or complying with applicable governmental regulations or is otherwise required by applicable law, provided, however, that if Recipient is required by law to make any such disclosure of Donor's Confidential Information it will give reasonable advance notice to Donor of such disclosure requirement and, except to the extent inappropriate in the case of patent applications, will use commercially reasonable efforts to secure confidential treatment of such Confidential Information required to be disclosed.  Confidential Information shall remain the property of Donor.

7.3.    For clarity, the parties agree and acknowledge that THERANOS' Confidential Information includes without limitation information disclosed by THERANOS to COMPANY relating to THERANOS' monitoring and bioinformatics systems and equipment, including the THERANOS System or any part thereof.

7.4.    Upon Donor's request, Recipient shall immediately return or destroy any of Donor's Confidential Information in Recipient's possession or control, other than such Confidential

Information as Donor is entitled to retain hereunder for use following expiration or any termination of this Agreement, provided, that Recipient shall be entitled to retain one (1) archival copy of such Confidential Information for the sole purpose of determining Recipient's obligations under this Article 7; provided, further, that nothing in this Section 7.4 shall be deemed to modify or otherwise limit COMPANY's obligations under Section 6.4.

### 8.    COMPANY PROPERTY

8.0    For the avoidance of doubt, all COMPANY background intellectual property and know-how existing as of the Effective Date and used in connection with the Project including that directed to COMPANY Compound shall remain the property of COMPANY.  Except for the licenses granted to THERANOS pursuant to Sections 8.2 and 8.3, nothing in this Agreement shall transfer those rights to THERANOS.

8.1.    As between COMPANY and THERANOS and to the extent permitted by law, (a) all data regarding Participants in the Project ("**Participant Data**"), and (b) all inventions, methods, discoveries and other proprietary information directed to COMPANY Compound (including, the composition of matter, method of manufacture or use thereof) and their applications are and shall be the sole and exclusive property of COMPANY and shall be maintained as Confidential Information of COMPANY, subject to the terms of this Agreement.

8.2.    COMPANY hereby grants to THERANOS a non-exclusive license under any intellectual property rights owned or controlled by COMPANY relating to COMPANY Compound that may be necessary or useful in connection with THERANOS' performance of the Services solely for the purposes of performance of the Services in accordance with and during the term of the Project and for no other purpose whatsoever.

8.3.    In addition, COMPANY hereby grants to THERANOS the rights to integrate, use and disclose Data (as defined below) in CABS, provided that THERANOS does not disclose, and any resulting analyses generated by CABS do not contain, any personally identifying information regarding individual Participants or any information identifying COMPANY or COMPANY Compound, except in connection with the provision of any Services to COMPANY under this Agreement.  For the purposes of this Section 8.3, "Data" means any data generated by Theranos from or in connection with the biological fluid placed onto the Cartridges(s) by Participants, and for the avoidance of doubt it is hereby confirmed that Data is included in Participant Data.

### 9.    THERANOS PROPERTY

9.0    For the avoidance of doubt, all THERANOS background intellectual property and know-how existing as of the Effective Date and used in connection with the Project shall remain the property of THERANOS.  Except for the licenses granted to COMPANY pursuant to Sections 5.2, 5.3 and 6, nothing in this Agreement shall transfer those rights to THERANOS.

9.1.    As between COMPANY and THERANOS, all inventions, methods, discoveries and other proprietary information developed during the execution of the Services during the term of this Agreement and thereafter whether by COMPANY or THERANOS, or by the parties jointly, directed to:

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material
THER-0905895

**ER-14450**

(a) any part or the whole of the THERANOS System or any improvements thereto, including, without limitation, the CABS' analytical engine and any results thereof, as well as any Cartridges customized for use in connection with the Project subject to COMPANY's rights in and to COMPANY Compound or (b) the generation of assays for use in conjunction with the THERANOS System subject to COMPANY's rights in and to COMPANY Compound, shall be the sole and exclusive property of THERANOS. COMPANY shall promptly disclose to THERANOS in writing any inventions, methods, discoveries and other proprietary information described in the preceding sentence, and COMPANY hereby assigns to THERANOS any right, title or interest it may have in such inventions, methods, discoveries and other proprietary information, including all intellectual property rights therein. COMPANY will provide Theranos with all necessary documentation at Theranos cost to allow for the provision of Clause 9.1.

9.2.   At THERANOS' request, COMPANY shall provide to THERANOS any data regarding the use, functionality or operation of the Cartridges, Readers or any other aspect of the THERANOS System generated in connection with this Agreement. Notwithstanding anything to the contrary in this Agreement, THERANOS shall have the right to use and disclose any data described in the preceding sentence to further develop, use, make, have made, sell, market or otherwise exploit any aspect of the THERANOS System during the term of this Agreement and thereafter, including, without limitation, in connection with any regulatory filing for the THERANOS System or any component thereof.

## 10.   EXPORT RESTRICTIONS

Each party shall comply with all United States and foreign export control laws or regulations applicable to its performance under this Agreement.

## 11.   INFRINGEMENT INDEMNITY

THERANOS shall (a) defend or, at its option, settle any claim or suit against COMPANY on the basis that the THERANOS System infringes any United States or United Kingdom patent of a third party ("**Intellectual Property Rights**") and (b) pay any final judgment entered against COMPANY on such claim or suit or any settlement thereof, provided that:  (i) THERANOS has sole control of the defense and/or settlement of such claim or suit, (ii) COMPANY notifies THERANOS promptly in writing of each such claim or suit and gives THERANOS all information known to COMPANY relating thereto, (iii) COMPANY cooperates with THERANOS in the settlement and/or defense and (iv) COMPANY may not settle or compromise such claim or suit except with the prior written consent of THERANOS.  COMPANY shall be reimbursed for all reasonable out-of-pocket expenses incurred in providing any cooperation requested by THERANOS.  If all or any part of the THERANOS System is, or in the opinion of THERANOS may become, the subject of any claim or suit for infringement of any Intellectual Property Rights, THERANOS may, at its option and expense:  (A) procure for COMPANY the right to continue use of the THERANOS System or the affected part thereof, (B) replace the THERANOS System or affected part thereof, (C) modify the THERANOS System or affected part thereof to make it non-infringing or (D) if none of the foregoing remedies are commercially feasible, terminate this Agreement and refund the aggregate payments made by COMPANY for the THERANOS System or the affected part thereof.  THERANOS

shall have no obligation under this Article 11 to the extent a claim is based upon (1) use of any version of the Software other than a current, unaltered version, if infringement would have been avoided by a current, unaltered version or (2) combination, operation or use of the THERANOS System or the Software contained therein with other software and/or hardware not provided by THERANOS.  This Article 11 states the entire liability of THERANOS and the exclusive remedy of the COMPANY with respect to any infringement or alleged infringement by the THERANOS System or any part thereof.

## 12.   INDEMNIFICATION

12.1.   COMPANY agrees to defend, indemnify and hold harmless THERANOS and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any claims, proceedings or investigations arising out of or in connection with (a) the conduct of a Project or the use of the results of a Project, (b) COMPANY's breach of this Agreement, negligence or intentional misconduct or (c) the development, manufacture, use, sale, offer for sale, marketing or testing of any product or service by or under the authority of COMPANY (including any personal injury or property damage related thereto), including, without limitation, amounts paid in settlement of claims, proceedings or investigations, and agrees to bear all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation as such costs and expenses are incurred in advance of judgment or settlement.  COMPANY shall be promptly notified of any such claim and THERANOS shall cooperate with COMPANY in the defense of such claim.

12.2.   THERANOS agrees to defend, indemnify and hold harmless COMPANY and its respective employees, officers, directors, independent contractors, stockholders and agents against and from any third-party claims, proceedings or investigations arising out of or in connection with (a) any personal injury or property damage directly related to the use of the THERANOS System during the conduct of a Project (except as a result of the negligence or intentional misuse of the THERANOS System in such Project by COMPANY or its Affiliates or their respective employees, consultants and/or agents or by the Participants), (b) the use by THERANOS of the results of a Project in CABS, or (c) THERANOS' material breach of this Agreement, negligence or intentional misconduct, including, without limitation, amounts paid in settlement of claims, proceedings or investigations, and agrees to bear all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation as such costs and expenses are incurred in advance of judgment or settlement.  THERANOS shall be promptly notified of any such claim and COMPANY shall cooperate with THERANOS in the defense of such claim.

## 13.   INDEPENDENT CONTRACTOR

The parties agree that the relationship of THERANOS and COMPANY established by this Agreement is that of independent contractors. Furthermore, the parties agree that this Agreement does not, is not intended to and shall not be construed to establish an employment, agency or any other relationship. Neither party shall have any right, power or authority, nor shall they represent themselves as having any authority, to assume, create or incur any expense, liability or

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905896

obligation, express or implied, on behalf of the other party, or otherwise act as an agent for the other party for any purpose.

### 14.  DELAYS

THERANOS will require documents, data, records, and cooperation by COMPANY in order to properly perform the Services, and THERANOS is not responsible for errors, delays or other consequences arising from the failure of COMPANY or its employees, agents or contractors to provide such documents, data, records or cooperation in a timely manner. Neither party shall be liable to the other for failure or delay in the performance of any of its obligations under this Agreement for the time and to the extent such failure or delay is caused by earthquake, riot, civil commotion, war, terrorist acts, strike, flood or governmental action or restriction, or other cause that is beyond the reasonable control of the respective party. The party affected by such force majeure will provide the other party with full information thereof as soon as it becomes aware of the same (including its best estimate of the likely extent and duration of the interference with its activities), and will use commercially reasonable efforts to overcome the difficulties created thereby and to resume performance of its obligations as soon as practicable. If COMPANY delays or suspends theProject for a significant period of time due to no fault of THERANOS, and COMPANY requests that THERANOS staff continue to be assigned to the Project during the period of such delay or suspension, a monthly services fee will be charged, in an amount and schedule reasonably determined by THERANOS consistent with THERANOS' general practices for calculation of such monthly service fees. Such delay shall last no longer than three (3) months, after which time THERANOS shall have the right to terminate this Agreement.

### 15.  TERMINATION

15.1.  This Agreement may be terminated by either party upon default in performance of the other party, provided that any defaulting party shall be given not less than ninety (90) days prior written notice of default for ten (10) days in the case of a payment default) and the opportunity to cure the default during such period. In the event this Agreement is terminated pursuant to this Article 15, THERANOS shall retain such sums as may have been paid to it by COMPANY under the terms of this Agreement to compensate THERANOS for work performed and expenses incurred in accordance with Schedule 1.. COMPANY shall pay THERANOS any additional amounts owed, but not yet paid, for work performed and expenses incurred prior to termination, as well as any incidental costs associated with termination, within thirty (30) days after the effective date of termination.

15.2.  COMPANY may terminate the Agreement without cause on ninety (90) days notice to THERANOS. In the event the Project is terminated pursuant to this Section 15.2, THERANOS shall retain such sums as may have been paid to it by COMPANY under the terms of this Agreement to compensate THERANOS for work performed and expenses incurred. In addition, COMPANY shall pay THERANOS within thirty (30) days of the effective date of termination under this Section 15.2 (i) an amount to compensate THERANOS for its wind-down activities, which shall be equal to ten percent (10%) of any amounts payable in consideration for the Servicesthat have not been paid as of the effective date of such termination, which amount the parties agree, for convenience, would be a reasonable estimation of THERANOS' costs incurred in

connection with such wind-down activities; and (ii) any additional out-of-pocket costs incurred by THERANOS in connection with the Project, including, without limitation, non-cancellable commitments attributable to the termination of the Agreementt.

15.3.  No later than ten (10) days after any termination of this Agreement, COMPANY shall return to THERANOS all THERANOS property in its possession or control, including: (a) all Confidential Information of THERANOS; (b) all Devices and Client Accessible Software provided under this Agreement; and (c) all authorization codes providing Participants and/or Users with access to the THERANOS System in connection with the ; unless otherwise provided in Schedule1. In addition, COMPANY shall ensure that all relevant Participants, Users and other COMPANY employees and consultants cease using the THERANOS System promptly following any such termination of this Agreement.

15.4.  Articles 1, 4, 7, 8, 9, 11, 12, 15 (other than the first sentence of each of Sections 15.1 and 15.2), 16, 17, 18, and 19 and Sections 5.4, 6.2, 6.3 and 6.4 shall survive expiration or termination of this Agreement for any reason. Except as otherwise provided in this Section 15.4, all rights and obligations of the parties under this Agreement shall terminate upon expiration or termination of this Agreement for any reason.

### 16.  COMMUNICATIONS AND PAYMENTS

All notices, administrative communications and payments provided for in this Agreement shall be by express delivery service or first class mail, postage prepaid, addressed to the respective parties as follows:

To THERANOS:  Theranos, Inc.
3200 Hillview Ave.
Palo Alto, CA 94304

Attn: Controller

To COMPANY:  Dr.D.H.Bowen
AstraZeneca UK Limited
Parklands,
Alderley Park,
Macclesfield,
Cheshire SK10 4TG

### 17.  ASSIGNMENT

Neither party shall have the right to assign this Agreement or any of the rights or obligations hereunder without the prior written consent of the other party. Notwithstanding the foregoing, either party may, without such consent, assign this Agreement to a third party that succeeds to all or substantially all of such party's business or assets relating to this Agreement whether by sale, merger, operation of law or otherwise.

### 18.  LIMITED WARRANTY

18.1.  Each party represents and warrants that: (a) it has the legal authority to enter into this Agreement; and (b) the execution, delivery and performance of this Agreement by it and its obligations hereunder do not conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905897

ER-14452

18.2. Each party shall perform its obligations under this Agreement: (a) in a timely and professional manner; (b) in conformance with that level of care and skill ordinarily exercised by other professional companies of a similar size and in similar circumstances; and (c) in compliance in all material respects with all applicable laws. Without limiting the foregoing, COMPANY represents, warrants and covenants that it has obtained, and shall continue during the term of the Project to obtain, all necessary consents to be able to provide to THERANOS and to permit THERANOS to use for all purposes specified in this Agreement and subject to the terms of this Agreement Participant Data, Data (as defined in Section 8.3), and other data provided by COMPANY (with respect to such other data, at COMPANY's sole discretion) or otherwise furnished to THERANOS in connection with the Project or under this Agreement.

18.3. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THERANOS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES OR THE THERANOS SYSTEM (OR ANY PART THEREOF) OR ANY ITEMS OR WORK PRODUCT PROVIDED UNDER THIS AGREEMENT, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OF ANY INTELLECTUAL PROPERTY OF THERANOS OR NONINFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES. COMPANY acknowledges that THERANOS makes no representation or warranty that the COMPANY's pharmaceutical, biologic, or medical device products (including COMPANY Compound) tested in connection with the Services can, either during the term of this Agreement or thereafter, be successfully developed or, if so developed, will receive the required approval by the U.S. Food and Drug Administration ("FDA") or other applicable regulatory body.

18.4. IN NO EVENT (A) SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF DATA, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE TOTAL FEES PAID BY AND DUE FROM COMPANY HEREUNDER. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS ON LIABILITY AND DAMAGES IN THE PRECEDING SENTENCE SHALL NOT APPLY TO: (A) LIABILITY OR DAMAGES TO THE EXTENT ARISING FROM A BREACH UNDER ARTICLES 7, 8 0R 9 OR FROM A PARTY'S GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT; OR (2) LIMIT THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER ARTICLES 11 AND 12 WITH RESECPT TO AMOUNTS OWING TO THIRD PARTIES.

## 19. GENERAL CONDITIONS

19.1. The headings in this Agreement are for convenience only and do not in any way limit or amplify the terms or conditions of this Agreement.

19.2. This Agreement, its exhibits and Schedules constitute the entire agreement between the parties and supersede all prior contracts, agreements, proposals, letters, communications and understandings, whether written or oral, relating to the same subject matter between the parties; provided however that this Agreement shall not modify or otherwise affect the parties' obligations under any confidentiality or non-disclosure agreement executed prior to the Effective Date with respect to the disclosure of information under any such agreement that is not related to the subject matter of this Agreement. The parties intend this Agreement to be a complete statement of the terms of their agreement, and no change or modification of any of the provisions of this Agreement shall be effective unless it is in writing and signed by duly authorized officers of THERANOS and COMPANY.

19.3. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, U.S.A.

19.4. In the event of a dispute arising out of this Agreement, the prevailing party shall be entitled to be paid all legal costs and expenses (including reasonable attorney fees) paid or incurred by it to bring or defend such dispute, including all costs of collection.

19.5. THERANOS agrees to comply at all times with all provisions of the Generic Drug Enforcement Act of 1992 (the "Act"). THERANOS further agrees to submit to COMPANY upon completion or termination of a Project a certification that neither THERANOS nor any of its employees has been debarred by the FDA under the provisions of the Act and that THERANOS did not use in any capacity in connection with this Agreement the services of any person (as defined in the Act) debarred under the provisions of the Act

*(The remainder of this page is intentionally left blank.)*

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905898

ER-14453



Each party has caused this Agreement to be executed by its duly authorized representative as of the Effective Date.

THERANOS, INC.

_Michael T. Esquivel_
Accepted by (signature)

Michael T. Esquivel
Name

General Counsel & Corporate Secretary
Title

ASTRAZENECA UK LIMITED

_Kirsty Mackay_
Accepted by (signature)

KIRSTY MACKAY
Name

DISCOVERY MEDICINE CLINICAL
TEAM LEADER
Title

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905899

ER-14454



# SCHEDULE 1

Contact:

Susan DiGiaimo

Corporate Account Manager

Theranos, Inc.

Phone: (609) 978-0763

sdigiaimo@theranos.com

www.theranos.com

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905900

Theranos, Inc. -- AstraZeneca

SCHEDULE 1

This Statement of Work is entered into pursuant to the Services Agreement, dated 31st January, 2008 (the "Service Agreement"), among AstraZeneca UK Limited ("COMPANY") and Theranos, Inc. ("THERANOS"). All defined terms used herein have the same meanings as set forth in the Services Agreement unless otherwise specifically defined herein.

COMPANY is planning the below described application that requires utilization of the Theranos System in a clinical trial (the "Project"). THERANOS will furnish the Services, as set forth herein, to COMPANY to facilitate collection and analysis of data for the Project using the Theranos System.

This document outlines the Services, terms for use and customization of the Theranos System for use solely by COMPANY in connection with the Project.

*DESCRIPTION OF IMPLEMENTATION*

Theranos has developed an angiogenesis cartridge as part of the Theranos System which can monitor angiogenesis markers including VEGF, PLGF and VEGFR2. COMPANY is interested in assessing and comparing the Theranos System with the current standard ELISA assays for these three markers.

The following study requirements are based on THERANOS' initial assessment and assumptions of the application specific information provided toward achieving the aforementioned objectives. Ongoing discussion with COMPANY's trial team is expected after receipt of the final protocols.

***The Theranos System is a fully integrated Healthcare Systems Solution. The implementation process includes:***

- Customized design if applicable

- Customized assay panels if applicable

- Development of antibodies where applicable

- Baseline development where applicable

- 24 X 7 Real-time data access to data and hosting

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material       THER-0905901

- Reporting, including compliance and transmission data by subject site.
- Comprehensive Theranos Systems training for the site (Users) and subjects (Participants). Additional training can be provided via WebEx and teleconference if needed
- Theranos System unique access code to authorized users
- Convenient Theranos System Koozie: insulated, carrying case for subject to take the needed accessories and components of System home and to site.
- 24 X 7 customer support provided by direct Theranos employees for the site and COMPANY.

**Project Objectives:** To assess and compare the Theranos System with the current standard ELISA assays for the measurement of VEGF, VEGFR2 and PlGF in patient blood samples..

The project covered by this Schedule 1 is an Exploratory objective of a Phase I Clinical Trial.

**CLINICAL TRIAL USE:**

- <u>Clinical Use AZD2171(Recentin™):</u> THERANOS will use the THERANOS proprietary angiogenesis cartridge. Measurement of the following analytes: VEGF, VEGFR2, and PlGF in blood samples from patients will be done.
- The system will demonstrate the use of these "baselines" for adaptive testing based on the integrated analysis results from these trials.
- Theranos testing infrastructure will allow for venous samples to be run with 1 mL of blood or less to enable more frequent venous testing as an alternative to a central laboratory

*THERANOS will provide the Readers, Cartridges, and TheranOS (Theranos Operating System) for use in the clinical trial. The data received from the Readers through THERANOS' proprietary TheranOS transmission will be profiled in a custom database for clinics/clinicians of AstraZeneca involved in the trial.*

<u>*Project Parameters: AZD2171(Recentin™) Clinical Trial*</u>

| Project Parameters | Project Detail |
|---|---|
| Project ID | AZD2171 |
| Assays | VEGF, PlGF, VEGFR2 |
| Number of sites | 1 Site, UK- Royal Marsden, London |
| Total number of patients to be monitored | 25 patients (up to a maximum of 35 patients)with advanced treatment refractory solid tumors; patients will receive Recentin 45mg OD |
| Number of Time points | 3 X's per week for 28 Days |

Theranos Service Assessment Final         10 of 20         Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905902

| | |
|---|---|
| Length of patient participation for Theranos assessments | Up to 28 days for each patient |
| Participating countries | United Kingdom |
| Languages for translation | None (English Only) |
| Number of unique questions on Diary | N/A |
| Customization of communications network and power | Customize control system for use in the UK |
| Expected start date | |
| | February 2008 |
| Expected end date | January 2010 |
| Total duration of Project | **2 years** |

| HARDWARE | READERS | CARTRIDGES | TheranOS (Months) |
|---|---|---|---|
| Maximum 36 ( 35 plus one extra per site<br>Minimum 26 (25 plus one extra at site | 36<br><br>26 | Minimum 25 subjects: 12 per month per subject=300<br>Maximum 35: 12 per month per subject= 420 | 24 Months |

AstraZeneca is validating the Theranos System by utilizing Cartridges designed to run multiplexed assays. These assays will measure VEGF, VEGFR2, and PIGF. The Theranos System will be incorporated into a clinical trial utilizing oncology subjects in the UK.


Goals of Study:

- Compare real-time data from Theranos System with that obtained from current gold standard ELISA laboratory procedures.
- To obtain real-time data from the Theranos System when used to compare data from venous blood draw using preferred laboratory measurements versus finger stick on the Theranos System.
- To compare the result time for obtaining real-time data from the Theranos system with the current preferred laboratory measurement method.
- To assess the Communication and Ambulatory Bioinformatics System (TheranOS) including the healthcare provider and patient portals as well as the data reports generated.
- To receive qualified input/feedback on the performance of the Theranos System from clinical personnel and patients associated with the clinical site.
- Generate data on the Theranos System that demonstrates the performance of the assay including inter/intra reader and assay variability and sensitivity of the assays.

FOIA Confidential Treatment Requested by Theranos<br>Fed. R. Crim. P. 6(e) material      THER-0905903

**ER-14458**

Total # of Cartridges as required by data points in Table 1 = 12 per patient (TOTAL = 300)

**TABLE I: Data Points for Clinical Monitoring using the Theranos System (TS) and Laboratory Assay (ELISA)**

| Data Point | Location | Assay |
|---|---|---|
| Day −1 | Clinic | 1 TS cartridges ELISA |
| Day 1 | Clinic | 1 TS cartridges ELISA |
| Day 3 | Home | TS |
| Day 5 | Home | TS |
| Day 7 | Clinic | 1 TS cartridge ELISA |
| Day 9 | Home | TS |
| Day 11 | Home | TS |
| Day 14 | Clinic | 1 TS cartridge ELISA |
| Day 17 | Home | TS |
| Day 19 | Home | TS |
| Day 21 | Clinic | 1 TS Cartridge ELISA |
| Day 23 | Home | TS |
| Day 25 | Home | TS |
| Day 28 | Clinic | 1 TS Cartridge ELISA |

*THERANOS Services: pre-deployment*

THERANOS delivers the following services with a standard trial implementation, including, Software customization, training and study support.

Project Management

Theranos Service Assessment Final      12 of 20      Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905904

*For the Project, a Strategic Account Manager is assigned for the implementation of the Project.*

- Lead the pre-implementation kick off meeting to discuss Project specifics, roles and responsibilities of COMPANY and THERANOS for the duration of the Project

- Define and transfer assay-specific criteria, materials and background information

- Create and monitor a plan to ensure timelines for the Services are accurately communicated and adhered to

- Customize Project planning and control applications within TheranOS*

- Develop TheranOS Requirements Specification document, which describes how patient data will be received and viewed via the web, as well as how data will be entered via the web using TheranOS, if applicable.

- Develop Data Transfer Specification document

- Provide Theranos System User Guide for all participants

- Plan for comprehensive training session

Services Configuration/Software Customization

*THERANOS will design, develop, program, test and validate a secure database to capture quality data generated in the course of the conduct of the Project. This is carried out in conjunction with COMPANY involvement.*

- Setup secure study specific Web access

- Initial setup of accounts and access privileges of all parties who will be authorized to access TheranOS

- Acquire, inventory, test Readers and Cartridges for specified study

Training

*THERANOS offers customized training services to COMPANY staff and Users*

- Develop and deliver customized training course, including comprehensive overview and Theranos System hands-on workshop

- THERANOS will provide a local nurse trained in the use of the Theranos System to assist subjects in setting up their systems in their homes and to provide additional support during the course of the trial as needed.

- In-person training of COMPANY staff and Users at investigator meeting and/or site

- THERANOS will send up to two (2) individuals to perform training**; THERANOS assumes the meeting will not extend beyond two (2) days

Theranos Service Assessment Final        13 of 20        Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905905

- THERANOS supplies the Theranos System for individual hands-on training

**\*\*NOTE:** THERANOS requires one (1) hour of training at the investigator meeting and/or site to adequately train COMPANY staff and Users in using the Theranos System.*

*THERANOS Services: post-deployment*

Data Delivery

During the trial, Users will have permission-based access to viewing all data, and on-demand ASCII/Excel (CSV) data transfer via TheranOS.

Subject Monitoring and Project Management Reports

The following reports and analytical tools will be available via the Internet using the data collected from the Theranos System:

**Optional for this study:** Upon request, custom data summaries can be provided.*

1:Tabular Data Listing

2:Cartridge Data Readout

3:Study Summary Report (contains enrollment by site and other high-level study status information)

**NOTE: THERANOS** will be responsible for monitoring TheranOS only to ensure that the THERANOS System is operating as intended. THERANOS will not be responsible for reviewing or acting upon the clinical data presented in the data reports, nor for ensuring the completeness of any such data.*

Data Transfer

Monthly, cumulative data transfers executed by THERANOS in SAS file format to Astrazeneca via email (password protected ZIP file). Formatting, mapping and quality assurance of design not to exceed 10 hours.

Project Support

Client Infrastructure and Technical Support

Theranos Service Assessment Final          14 of 20          Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                              THER-0905906

*THERANOS will provide and manage the data sites to be used by COMPANY in connection with the Services provided in this Schedule 1.*

- Work with COMPANY to ascertain whether the clinical have appropriate computer configuration to run TheranOS and if they have the appropriate telecommunications infrastructure to successfully transmit Participant Data.

- Create User profiles (adding a User to a Project and assigning their role for the Project)

- Administer, monitor and troubleshoot web and database servers for duration of the Project

- Create daily backups of Project data to tape, and store at offsite facility

- Provide second level technical support to the Project Support Center

- Assist COMPANY with issues regarding network infrastructure setup related to the THERANOS System

- Troubleshoot firewall, computer system and connectivity issues relating to TheranOS

Project Support Center

*During the Project, THERANOS will provide telephone support for COMPANY regarding the use of the Theranos System provided in this Schedule 1.*

- North America help desk support from THERANOS' Menlo Park, CA office:

  - Responding to telephone support needs for the duration of the Project

  - Live coverage from 09:00 to 9:00 East Coast Time

  - 24 x 7 beeper support

Shipping

*THERANOS will be responsible for shipping all hardware, whether purchased or leased, to COMPANY. Readers will be leased unless otherwise stated by COMPANY. COMPANY will provide a third party billing account number so that shipping charges will be billed directly to COMPANY. In the event that an account number is not provided, THERANOS will bill COMPANY monthly for shipping charges and apply a shipping administrative fee in the amount of 10% of the shipping costs.*

*Trial Communications*

All communications provided for in this Schedule 1 for the Project set forth herein shall be made by express delivery service or mailed postage prepaid and addressed to the respective parties as follows:

**THERANOS Contacts:**

Study Matters:                     Billing Matters

Susan DiGiaimo

Theranos Service Assessment Final               15 of 20               Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905907

Corporate Account Manager

Theranos, Inc.

1430 O'Brien Drive

Menlo Park, CA 94025

Ph.(609) 978-0763

Fax (609) 978-0764

sdigiaimo@theranos.com

Controller

Theranos, Inc.

1430 O'Brien Drive

Menlo Park, CA 94025

Ph. (650) 470-6177

Fax (650) 838-9165

**COMPANY Contacts:**

<u>Study Matters:</u>
Shirley Spratt (Senior SDOS)

<u>Bill Invoices To:</u>
Invoices need to be sent electronically to
UKAPinvoicesection@astrazeneca.com or if this is
not possible to the following address:

The purchase2pay team

AstraZeneca UK Ltd

PO Box 30

Silk Road Business Park

Macclesfield

SK10 2NA

If available, please provide a PO # to expedite billing: _____

Theranos Service Assessment Final                16 of 20                Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos                                THER-0905908
Fed. R. Crim. P. 6(e) material

IN WITNESS WHEREOF, the parties hereto have caused this Statement of Work to be executed by their respective duly authorized representatives as of this day and year.

THERANOS, Inc.                                    COMPANY

_Michael T. Esquivel_                             _Kirsty Mackay_
Signature                                         Signature
Michael T. Esquivel                               KIRSTY MACKAY
                                                  Name (please print)
General Counsel & Corporate Secretary             DISCOVERY MEDICINE CLINICAL
                                                  Title      TEAM LEADER
February 14, 2008                                 5 Feb 2008
Date                                              Date

Please sign and date two (2) originals and send both to THERANOS for signature via traceable mail (e.g. UPS or FedEx). One executed original will be returned to COMPANY.

FOIA Confidential Treatment Requested by Theranos                                    THER-0905909
Fed. R. Crim. P. 6(e) material

ER-14464

<u>Schedule 2</u>

Please note that should the scope or parameters of this Project (e.g. requirements for configuration and/or support) change, associated fees may need to be revised and no Services will be provided for such new scope or parameters until the parties her to amend this Statement of Work to reflect such changes.

| Services | Fees USD |
|---|---|
| Clinical Use: AZD2171 Study | |
|     •   **Pre-Deployment** | |
|     •   Development/Validation/Customization of readers, cartridges, & multiplexed point of care assays | |
|     •   Training, Distribution, , trial definition/project management, services configuration/software customization (TheranOS), set up of patient and physician portals, real-time reporting, analytics, and AstraZeneca-specific back-end infrastructure | |
|     •   International communications and data transmission infrastructure | |
|     •   **Post-Deployment** | |
|     •   Data delivery, Project support, client infrastructure and technical support | |
| International customer care support (24x7) | $25,000 |
| **Total Services** | |
| **Total Contract Value** | **$25,000** |

| PAYMENT SCHEDULE | | |
|---|---|---|
| Payment Schedule | Amount Due | Invoice Date no later than: |
| Upon Execution of SOW | | |

Theranos Service Assessment Final        18 of 20        Theranos, Inc. Confidential

FOIA Confidential Treatment Requested by Theranos        THER-0905910
Fed. R. Crim. P. 6(e) material

| | | |
|---|---|---|
| Commitment of Theranos Resources | | |
| Hardware Procurement | | |
| *Total Due at Contract Execution* | $25,000 | 100% |
| **Milestone Payments** | | |

**For internationally based trials contract denomination will be in US currency. Any significant changes in the US <currency> conversion rate will be reflected in this Schedule 2. Payments made to Theranos will be made in US currency.**

**Trial Extensions:**

Should COMPANY extend the study, the above milestones will still be due and payable on the schedule provided above.

**Late Payments:**

All invoices not paid in 45 days shall incrue interest at the rate of 1.5% per month until paid in full. All such interest shall be due and payable on demand.

**Trial Delays:**

All amounts are due and payable as set forth above provided that in the event of a delay in the commencement or implementation of the Project of over sixty (60) days, COMPANY may by written notice to THERANOS request that Services be suspended for a period of time or until the occurrence of a milestone (in either case, the "Suspension Period") specified in the notice (but in no event to exceed six months in duration) provided that COMPANY (i) pays to THERANOS all amounts due and payable through the date of delivery of said notice and (ii) COMPANY pays to THERANOS a fee (the "Suspension Fee") equal to $10,000. THERANOS shall not be obligated to provide any services during the Suspension Period. At the end of the Suspension Period, the Services and payments therefore shall resume as set forth in the Services Agreement and this Schedule 2. No more then one Suspension Period may be actuated during any twelve-month period.

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**Pass Through Costs:**

a) Actual costs incurred for items including but not limited to THERANOS travel and lodging (including travel to COMPANY site or CRO location (s), Investigator Meetings, telecommunications, printing, shipping and related transportation costs and other incidental expenses incurred to provide or in support of the Services outlined in this Schedule 2 will be billed monthly and will be due and payable by COMPANY within fifteen (15) days of receipt of invoice. These expenses will be charged to COMPANY at Theranos cost.

b) Certain charges including but not limited to VAT, duties, etc., if applicable will be paid directly to COMPANY

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-0905912

ER-14467

File Produced in Native Format

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material                                                                                    THER-0905913

| Customer | Contract description | Effective Date of SOW/agreement | Contract total | Deliverables | Revenue Recognition method |
|---|---|---|---|---|---|
| AstraZeneca | AZ62171 Heparin | 1/31/2008 | 25,000 | Service and support for 6 patient studies.<br><br>These service and support include material support such as readers and cartridges and technical support such as access to TheranOS system, infrastructure set up and other customer support during the duration of the studies. Completion of such service and support for each study can be evidenced by the data generated. | Revenue is recognized per completed study for each patient |
| AstraZeneca | Apoptosis | 7/1/2008 | 225,000 | Service and support for 48 patient studies (36 patient per contract plus 12 additional patient subsequently agreed).<br><br>These service and support include material support such as readers and cartridges and technical support such as access to TheranOS system, infrastructure set up and other customer support during the duration of the studies. Completion of such service and support for each study can be evidenced by the data generated. | Revenue is recognized per completed study for each patient |
| Celgene Corporation | Revlimid-CLL | Jul-08 | 106,550 | Report on analysis of samples provided by customer | Revenue is recognized in full when the analysis on all samples was completed and the report was submitted to customer |
| Novartis | Novaris - CRP | 6/24/2008 | 65,000 | Service and support for 26 patient studies.<br><br>These service and support include material support such as readers and cartridges and technical support such as access to TheranOS system, infrastructure set up and other customer support during the duration of the studies. Completion of such service and support for each study can be evidenced by the data generated. | Revenue is recognized per completed study for each patient |
| Mayo Clinic | GLP 1 Active and GLP 1 Total | 1/19/2009 | 60,000 | Report on analysis of samples provided by customer | Revenue is recognized in full when the analysis on all samples was completed and the report was submitted to customer |
| Celgene Corporation | Dose modification scheme - SOW2 CO1 | 11/10/2009 | 25,000 | Dosage scheme report | Revenue is recognized in full when the dosage scheme report is delivered |
| Schering-Plough Research Institute | Multiplexed Cartridge: CRP, IL-6, TNF-α | 4/30/2009 | 279,000 | Validation report | Revenue is recognized in full when the analysis on all samples was completed and the report was submitted to customer |
| Centocor Research & Develop PD/PK Assay System Development | | 9/12/2008 | $1,900,020<br><br>Optional $580,000 | There are two parts to the contract - assay development with monthly reports and an option for clinical trial supplies and support.<br><br>If the assays meet customer acceptance, the customer has the option for the production and supply of cartridges to the clinical trial for $580,000. This option was elected by a purchase order dated June 19 2009.<br><br>Part one is the development of 4 PD and 1 PK assays. There 12 monthly fees for each assay, $29,167 for the PD assays (4 x 12 x $29,167 = $1,400,016) and $41,667 for the PK assays (12 x $41,667 = $500,004). Total fee for part one is $1,900,020.<br><br>There are acceptance criteria for the assays. The assay fees are refundable or available for credit on other projects if the assays are not accepted. | |
| Celgene Corporation | TheranOS development and modeling - SOW2 | 2/3/2009 | 3,250,000 | Under the terms of the SOW 2, Theranos was engaged to build a learning engine and develop a model for Celgene. There are criteria for acceptance. Theranos does not transfer the developed software to Celgene and Celgene does not obtain a license to the software. Theranos does provide access during the project and is required to make access available for perpetual period after acceptance. Theranos provides maintenance and access after acceptance.<br><br>The model was developed with delivery and acceptance in November 2009. | Revenue will be recognized over 36 months |
| Celgene Corporation | SOW2 CO2 | 7/21/2010 | 4,085,240 | Annual maintenance fee plus development and shipment of cartridges to support their validation study | Revenue will be recognized based on the cartridges consumed by customer. This is evidenced by the data sent to our server. |
| Celgene Corporation | ACE-011 clinical trials (SOW 4) | 11/30/2009 | 500,000 | Validation report | Revenue is recognized in full when the analysis on all samples was completed and the report was submitted to customer |
| American Burn Association | Burn project | 5/10/2010 | 288,000 | 1,920 multiplexed cartridges ($25 per analyte) | revenue is recognized as cartridge is shipped |

Type: Contract

Sum of Amount

| Name | 2007/5 | 2008/9 | 2008/10 | 2008/11 | 2008/12 | 2009/1 | 2009/2 | 2009/3 | 2009/4 | 2009/5 | 2009/6 | 2009/12 | 2010/1 | 2010/2 | 2010/3 | 2010/5 | 2010/8 | 2010/12 | 2011/3 | 2011/6 | 2014/3 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Burn Association | | 25,000 | 125,000 | 100,000 | | | | | | | | | | | | | | | | | 38,000 | 288,000 |
| AstraZeneca UK Limited | | | 106,500 | | | | | | | | | 250,000 | | | | | | | | | | 250,000 |
| Colgene, Inc. | | | | | 475,005 | 158,335 | 158,335 | 158,335 | 158,335 | 625,007 | 746,868 | | | 50,000 | 100,000 | 250,000 | 1,180,240 | 50,000 | 200,000 | 50,000 | | 5,951,742 |
| Genocon R&D Inc | | | | | | | 3,250,000 | | | | | | | | | | | | | | | 2,880,000 |
| Mayo Clinic | | | | | | | 60,000 | | | | | | | | | | | | | | | 60,000 |
| Merck & Co, Inc | | | | 12,000 | | | | | | | | | | | | | | | | | | 12,000 |
| Novartis Pharma AG | | | 64,982 | | | | | | | | | | 20,000 | | | | | | | | | 84,982 |
| Pfizer, Inc. | 500,000 | | | 400,000 | | | | | | | | | | | | | | | | | | 900,000 |
| Schering Plough Research | | | | | | | | | | 279,000 | | | | | | | | | | | | 279,000 |
| Grand Total | 500,000 | 25,000 | 296,482 | 512,000 | 475,005 | 158,335 | 3,468,335 | 158,335 | 158,335 | 904,007 | 746,868 | 250,000 | 25,000 | 50,000 | 100,000 | 250,000 | 1,180,240 | 50,000 | 200,000 | 50,000 | 38,000 | 9,995,742 |

**DX 09002**

# VALIDATION REPORT

| | |
|---|---|
| Study Title | Determination of ACE-011 in Human Whole Blood using the Theranos Field System |
| Celgene Study Number | ACE-011-DMPK-001 |
| Principal Investigator | Surekha Gangakhedkar |
| Sponsor | Celgene Corporation<br>86 Morris Avenue<br>Summit, New Jersey 07901<br>USA |
| Test Site | Theranos, Inc<br>3200 Hillview Ave,<br>Palo Alto, CA 94304 |
| Test Site Study Number | CELG-004 |
| Study Initiation Date | December 13, 2010 |
| Experimental Completion Date | January 10, 2011 |
| Report Issued | January 10, 2011 |
| Total Pages | 72 |

Confidential and Proprietary                     1

Confidential

THPFM0005688139



# 1 TABLE OF CONTENTS

TITLE PAGE ................................................................................................................ 1
1    TABLE OF CONTENTS ........................................................................................ 2
2    LIST OF TABLES .................................................................................................. 4
3    LIST OF FIGURES ................................................................................................ 5
4    ABBREVIATIONS ................................................................................................. 6
5    GLP COMPLIANCE STATEMENT ..................................................................... 7
6    QUALITY ASSURANCE STATEMENT ............................................................. 8
7    RESPONSIBLE PERSONNEL ............................................................................. 9
8    ARCHIVE STATEMENT .................................................................................... 10
9    SIGNATURE PAGE ............................................................................................ 11
10   REPORT SUMMARY ......................................................................................... 12
     10.1  INTRODUCTION ................................................................................... 12
     10.2  METHODS ........................................................................................... 12
     10.3  RESULTS ............................................................................................ 12
     10.4  CONCLUSION ..................................................................................... 14
11   MATERIALS AND EQUIPMENT ...................................................................... 15
     11.1  CHEMICALS AND REAGENTS .............................................................. 15
     11.2  SAMPLE-PROCESSING EQUIPMENT ...................................................... 15
     11.3  ANALYTICAL EQUIPMENT .................................................................. 15
12   ANALYTE INFORMATION ............................................................................... 16
13   DEFINITIONS ..................................................................................................... 17
14   ACCEPTANCE CRITERIA ................................................................................. 18
     14.1  RUN ACCEPTANCE CRITERIA ............................................................. 18
     14.2  METHOD ACCEPTANCE ...................................................................... 18
15   METHODS ........................................................................................................... 20
     15.1  PRIMARY STOCK SOLUTION AND 10X CALIBRATORS .......................... 20
     15.2  PREPARATION OF WORKING STANDARDS IN HUMAN WHOLE BLOOD ........... 20
16   ANALYTICAL METHOD SUMMARY ............................................................. 21
17   RESULTS AND DISCUSSION ........................................................................... 22
     17.1  STANDARD CURVE AND REGRESSION ANALYSIS .................................. 22
     17.2  PRECISION AND ACCURACY ............................................................... 22
        17.2.1  Intra-Day Accuracy and Precision ............................................... 22
        17.2.2  Inter-Day Accuracy and Precision ............................................... 22
        17.2.3  Inter-Instrument Accuracy and Precision ..................................... 23

Confidential                                               THPFM0005688140

**ER-14472**


redefining healthcare

17.3    LOWER AND UPPER LIMIT OF QUANTIFICATION, SMIN AND SMAX ............................... 23
17.4    MATRIX SPECIFICITY AND SELECTIVITY IN HUMAN WHOLE BLOOD ............................. 23
17.5    STABILITY ................................................................................................................. 23
     17.5.1    Process Stability ................................................................................................ 23
     17.5.2    Cartridge Stability ............................................................................................ 24
17.6    HIGH DOSE HOOK EFFECT TEST ................................................................................. 24
17.7    INSTRUMENT CARRYOVER TEST .................................................................................. 24

18    CONCLUSION ................................................................................................................... 25

19    REFERENCE DOCUMENTS ............................................................................................. 26

20    TABLES ............................................................................................................................. 27

21    FIGURES ........................................................................................................................... 59

22    APPENDICES .................................................................................................................... 65

22.1    PROTOCOL ................................................................................................................. 65

Confidential

THPFM0005688141



## 2 LIST OF TABLES

Table 1: Validation Summary of ACE-011 in Human Whole Blood ........................................... 13
Table 2: Theranos ELISA Parameters ................................................................................. 21
Table 3: Expected Values for On-Board Controls, Signal (RLU) ............................................ 27
Table 4: Regression Analysis of Day 1 ACE-011 Calibration in Human Whole Blood ............. 27
Table 5: Regression Analysis of Day 2 ACE-011 Calibration in Human Whole Blood ............. 28
Table 6: Regression Analysis of Day 3 ACE-011 Calibration in Human Whole Blood ............. 29
Table 7: Regression Analysis of 3-Day ACE-011 Calibration in Human Whole Blood ............. 30
Table 8: ACE-011 Calibration in Human Whole Blood Day 1, Signal (RLU) ............................ 31
Table 9: ACE-011 Calibration in Human Whole Blood Day 2, Signal (RLU) ............................ 32
Table 10: ACE-011 Calibration in Human Whole Blood Day 3, Signal (RLU) .......................... 33
Table 11: Day 1, 2 and 3 Calibration, Back-Calculated Concentration (ng/mL) ...................... 34
Table 12: Intra-Day Precision, Day 1 Signal (RLU) ............................................................. 35
Table 13: Intra-Day Precision, Day 2 Signal (RLU) ............................................................. 36
Table 14: Intra-Day Precision, Day 3 Signal (RLU) ............................................................. 37
Table 15: Intra-Day Precision, Concentration (ng/mL) ......................................................... 38
Table 16: Inter-Day Precision, Signal (RLU) ....................................................................... 39
Table 17: Inter-Day Precision, Concentration (ng/mL) .......................................................... 39
Table 18: Inter-Instrument Precision at 500 ng/mL, Signal (RLU) .......................................... 40
Table 19: Inter-Instrument Precision at 500 ng/mL, Concentration (ng/mL) ............................. 41
Table 20: Selectivity in Human Whole Blood, Signal (RLU) ................................................... 42
Table 21: Selectivity in Human Whole Blood, Concentration (ng/mL) ..................................... 47
Table 22: Summary of Selectivity in Human Whole Blood, Concentration (ng/mL) .................. 51
Table 23: Process Stability, Signal (RLU) ........................................................................... 53
Table 24: Process Stability, Concentration (ng/mL) .............................................................. 53
Table 25: Cartridge Stability at 4℃, Signal (RLU) ............................................................... 54
Table 26: Cartridge Stability at Room Temperature, Signal (RLU) .......................................... 55
Table 27: Cartridge Stability at 4℃, Concentration (ng/mL) .................................................. 56
Table 28: Cartridge Stability at Room Temperature, Concentration (ng/mL) ............................ 56
Table 29: High Dose Hook Effect Test, Signal (RLU) ........................................................... 57
Table 30: High Dose Hook Effect Test, Concentration (ng/mL) .............................................. 57
Table 31: Instrument Carryover Test, Signal (RLU) .............................................................. 58
Table 32: Instrument Carryover Test, Concentration (ng/mL) ................................................ 58

Confidential                                                                 THPFM0005688142



## 3   LIST OF FIGURES

Figure 1: Standard Curve for Day 1 Calibration in Whole Blood .............................................. 59
Figure 2: Standard Curve for Day 2 Calibration in Whole Blood .............................................. 60
Figure 3: Standard Curve for Day 3 Calibration in Whole Blood .............................................. 61
Figure 4: Standard Curve for 3-Day Calibration in Whole Blood .............................................. 62
Figure 5: Process Stability, Signal (RLU) .............................................................................. 63
Figure 6: Process Stability, Concentration (ng/mL) ................................................................ 63
Figure 7: Cartridge Stability at 4°C, Signal (RLU) .................................................................. 64
Figure 8: Cartridge Stability at Room Temperature, Signal (RLU) ............................................ 64

Confidential                                                          THPFM0005688143

ER-14475



## 4   ABBREVIATIONS

This section provides abbreviations and definitions of terms and concepts that may be commonly used throughout this report.

| | |
|---|---|
| **COA** | Certificate of Analysis |
| **Conc.** | Concentration |
| **CV** | Coefficient of Variance |
| **DFE** | Difference from Expected |
| **ELISA** | Enzyme-linked Immunosorbent Assay |
| **LLOQ** | Lower Limit of Quantification |
| **N** | Number of cartridge replicates |
| **NA** | Not Applicable |
| **NC** | Not Calculated |
| **ng/mL** | Nanogram per milliliter |
| **NR** | Not Reportable |
| **OORH** | Out of Range High |
| **OORL** | Out of Range Low |
| **QC** | Quality Control |
| **$r^2$** | Coefficient of Determination |
| **RLU** | Relative Light Units |
| **RT** | Room Temperature |
| **S.D.** | Standard Deviation |
| **SOP** | Standard Operating Procedure |
| **μL** | Microliter(s) |
| **ULOQ** | Upper Limit of Quantitation |

Confidential                                                                                   THPFM0005688144

**ER-14476**



## 5  GLP COMPLIANCE STATEMENT

Study Title:    Determination of ACE-011 in Human Whole Blood using the Theranos Field System

This study was conducted in compliance with the Food and Drug Administration (FDA) Good Laboratory Practice Regulations (GLP) as set forth in Title 21 of the U.S. Code of Federal Regulations Part 58; and the FDA Guidance for Industry: Bioanalytical Method Validation, May 2001.


Surekha Gangakhedkar                          01/10/11
_____    _____

Surekha Gangakhedkar                          Date
Principal Investigator
Theranos, Inc

Confidential                                                 THPFM0005688145

ER-14477



## 6 QUALITY ASSURANCE STATEMENT

Study Title:    Determination of ACE-011 in Human Whole Blood using the Theranos Field System

Principal Investigator: Surekha Gangakhedkar

This bioanalytical method validation report has been audited by the Quality Assurance Unit of Theranos, Inc and has been found to accurately represent the method validated in this study. Within the scope of this audit and review, the reported results accurately reflect the raw data. The type of audit performed, the date the audit was performed, and the date the audit findings were reported to the principal investigator (study director) and management are summarized below.

| Audit Type | QA Auditor | Audit Dates | Date Audit Findings Reported to Theranos Principal Investigator and Management |
|---|---|---|---|
| Draft Protocol | Don Vu | 12/06/10 | 12/22/10 |
| Study Records | Javier Quinonez | 01/10/11 | 01/10/11 |
| Draft Report | Javier Quinonez | 01/10/11 | 01/10/11 |

Javier Quinonez                                    01/03/11

---

Quality Assurance
Theranos, Inc                                      Date

Confidential                                                                    THPFM0005688146

ER-14478



## 7 RESPONSIBLE PERSONNEL

| Surekha Gangakhedkar | Assay Systems Manager, Principal Investigator |
| Gary Frenzel | VP Assay Systems |
| Tina Noyes | Senior Scientist |
| Javier Quinonez | QA Auditor |

Confidential                                                                 THPFM0005688147

ER-14479



## 8   ARCHIVE STATEMENT

All raw data, this bioanalytical report, and required supporting information for this study will be held under the control of Theranos, Inc. 3200 Hillview Ave, Palo Alto, CA 94304, USA.

A copy of the final report will be sent to Celgene Corporation.

Confidential                                                                THPFM0005688148



## 9 SIGNATURE PAGE

Study Title:    Determination of ACE-011 in Human Whole Blood using the Theranos Field System

This report accurately describes the data obtained in the study.  I have reviewed the study and agree that the data supports the conclusions stated herein.

Surekha Gangakhedkar                          01/10/11

_____          _____

Surekha Gangakhedkar                          Date
Principal Investigator
Theranos, Inc

Gary Frenzel                                          01/10/11

_____          _____

Gary Frenzel                                          Date
VP Assay Systems
Theranos, Inc


SIGNATURE OF FINAL REPORT REVIEW, CELGENE CORPORATION


_____          _____

Peter D Bryan Ph.D.                              Date
Associate Director – DMPK
Celgene Corporation

Confidential                                                                 THPFM0005688149



## 10  REPORT SUMMARY

### 10.1 Introduction

The objective of the study is to validate an ELISA method to quantify ACE-011 using the Theranos Assay System in human whole blood.  The validated assay method will be used to determine ACE-011 in human whole blood samples generated during clinical studies.

### 10.2 Methods

A competitive ELISA will be validated for quantifying ACE-011 in human whole blood performed on a Theranos cartridge. In this assay, the capture surface consists of rabbit anti-goat antibody. The samples (including standards and QCs), alkaline-phosphatase labeled ACE-011 and the anti-ACE-011 antibody (goat anti-ACTRIIa) are added to the capture surface. After the removal of unbound reagents by multiple wash steps, a chemiluminescent substrate is added. The response (Relative Light Units) is inversely proportional to the amount of analyte present. Calibrations are analyzed using Theranos proprietary software.

Method validation will be performed to comply with the FDA 2001 Bioanalytical Method Validation Guidance.

### 10.3 Results

A summary of the data for ACE-011 test results for the 3 core runs in 3 different whole blood samples and additional experiments are provided in Table 1.

Confidential                                                                                              THPFM0005688150

ER-14482



**Table 1:** Validation Summary of ACE-011 in Human Whole Blood

| Report Title | Determination of ACE-011 in Human Whole Blood using the Theranos Field System |
|---|---|
| Report Number | Theranos Project Number: CELG-004<br>Celgene No. ACE-011-DMPK-001 |
| Analyte Name and Synonym | ACE-011 (ActRIIA-IgG1) |
| Sample Volume | 20 µL |
| Analytical Method Type | Competitive ELISA |
| Sample Processing Method | None |
| Calibration Range | 40.0 – 4000.0 ng/mL |
| Standard Curve Concentrations | 0, 20*, 40, 80, 125, 250, 500, 1000, 2000, 4000 and 8000* ng/mL. |
| Lower Limit Of Quantitation (LLOQ) | 40.0 ng/mL |
| Upper Limit Of Quantitation (ULOQ) | 4000.0 ng/mL |
| QC Concentrations | 40, 120, 400, 3000 and 4000 ng/mL. |

\* Anchor points

| Experiment | Result | Criteria Met |
|---|---|---|
| Inter-Instrument Precision N=24 Instruments (CV %) | 10.1% | Yes |
| Inter-Instrument Accuracy N=24 Instruments (% Recovery) | 93% | Yes |
| Intra-Day Precision at 5 QC Levels N=6 per level (CV%) | 5.9 to 19.8% | Yes |
| Intra-Day Accuracy at 5 QC Levels N=6 per level (% Recovery) | 81 to 110% | Yes |
| Inter-Day Precision at 5 QC Levels N=18 per level (CV%) | 10.2 to 16.4% | Yes |
| Inter-Day Accuracy at 5 QC Levels N=18 per level (% Recovery) | 82 to 105% | Yes |
| High Dose Hook Effect Test (12,000 ng/mL) N=5 | 100% OORH | Yes |
| Instrument Carryover Test (0 ng/mL run after 4000 ng/mL) N=9 | 100% OORL | Yes |
| Selectivity: Recovery at 1000 ng/mL (% Recovery) | 20 out of 20 samples were 100±25% | Yes |
| Selectivity: Recovery at 40 ng/mL (LLOQ) (% Recovery) | 17 out of 20 samples were 100±25% | Yes |
| Selectivity: Recovery at 0 ng/mL (un-spiked) (% Recovery) | 20 out of 20 samples were OORL | Yes |
| Process Stability: Precision at 500 ng/mL N = 15 (CV %) | 8.8 % | Yes |
| Process Stability: Accuracy at 500 ng/mL N = 15 (% Recovery) | 93 % | Yes |
| Cartridge Stability Week 1-4 at 4ºC: Precision (CV %) | 7.1 to 18.8% | Yes |
| Cartridge Stability Week 1-4 at 4ºC: Accuracy (% Recovery) | 82 to 119% | Yes |

Confidential      THPFM0005688151

**ER-14483**



## 10.4 Conclusion

An ELISA method (Celgene No. ACE-011-DMPK-001) has been validated for the quantification of ACE-011 in human whole blood from 40.0 to 4000.0 ng/mL.

The results indicate the method is sensitive, selective, accurate, and reproducible.

Confidential     THPFM0005688152

**ER-14484**



## 11  MATERIALS AND EQUIPMENT

### 11.1 Chemicals and Reagents

HPLC grade Water, Baker
Phosphate Buffered Saline (PBS), Sigma
Wash Buffer, Assay Designs
99% Pure BSA, Sigma
Heterophilic Blocking Reagent (HBR), Scantibodies
Rabbit anti-goat antibody, Southern Biotech
ACE-011, Provided by Sponsor
Anti-ACTRIIA Antibody, R&D Systems
Alkaline Phosphatase-SH Labeling Kit, Dojindo
PhosphoGlo Substrate, KPL
Pooled Human Serum, Bioreclamation (for cartridge stability)
Human Whole Blood, Stanford Blood Center (for all other experiments)

### 11.2 Sample-Processing Equipment

*Equivalent equipment may be substituted on an as-needed basis.*

Plastic tubes: 1.5 mL
Pipette Tips for single and Multichannel pipettes
Pipettes: Single channels: 1-10µL, 20-200 µL; Multichannel 20-300µL

### 11.3 Analytical Equipment

Theranos ACE-011 060 Cartridges and System

Confidential                                                                                 THPFM0005688153



## 12 ANALYTE INFORMATION

Name:                    ACE-011

Synonym                  ActRIIA-IgG1

Supplied Form            Pre-determined quantity 50 mg/mL

Lot Number:              09011-001

Storage Conditions:      -65°C or colder

Confidential
THPFM0005688154

**ER-14486**



## 13 DEFINITIONS

This section provides definitions of terms and concepts commonly used throughout this report.

**Percent Difference from Expected** $(\%DFE) = \dfrac{\text{Signal - Expected Signal}}{\text{Expected Signal}} \times 100$

**Precision** $= \%$ Coefficient of Variation $(\%CV) = \dfrac{\text{Standard Deviation}}{\text{Mean Concentration}} \times 100$

**Accuracy** $= \%$ Recovery $= \dfrac{\text{Determined Concentration}}{\text{Nominal Concentration}} \times 100$

Quality control samples at five concentration levels: 40.0, 120.0, 400.0, 3000.0 and 4000.0 ng/mL) were prepared. The 40.0 ng/mL concentration corresponds to the assay LLOQ and the 4000.0 ng/mL concentration corresponds to the assay ULOQ. The Low QC concentration was ≤3 times the concentration of the lowest calibration standard. Mid QC concentration was approximately in the middle (linear) of the calibration curve. High QC was approximately 75-80% of the highest calibration standard concentration.

Calibration standard and QC concentrations were determined based upon the actual concentrations of the stock solutions.

All statistics in the data tables are calculated by Microsoft® Excel according to the calibration rules and equation applied by the Theranos System.

Confidential

THPFM0005688155


*redefining healthcare*

## 14  ACCEPTANCE CRITERIA

The validation acceptance criteria and the statistical data will be determined at a minimum to this protocol.

### 14.1 Run Acceptance Criteria

Within each cartridge, the standards or samples will be automatically assayed in two replicates. The RLU from both replicates will be used to construct the calibration curve. A back-calculated concentration will be obtained for each replicate. The cartridge concentration will be reported as the mean of the replicate concentrations.

Cartridge acceptance criteria include:
(1) The % CV from the two sample replicates is ≤ 25%.
(2) The on-board controls satisfy acceptance criteria: the response from both the controls should be within ±25% of the defined mean response and at least one of them should within ±20% of the defined mean response.

If cartridge does not meet acceptance criteria, the result is reported as NR

### 14.2 Method Acceptance

<u>Calibration standards</u>

For each validation run to be acceptable, a minimum of 75% of the total number of calibration standards in the calibration range should be within 100+/-20% (100+/-25% at LLOQ and ULOQ standards) of their nominal values, and a minimum of six unique standard concentrations must be within the assay range.  The calibration curve must contain at least one calibration standard at both the LLOQ and ULOQ of the range.

<u>Intra-Day Accuracy and Precision</u>

For method acceptance, the mean of back-calculated concentrations of the six (or more) replicates at each QC level for each day should not deviate more than ±20% (±25% for the LLOQ and ULOQ) from its corresponding nominal concentration. In addition, at least half of all the individual back-calculated concentrations from the six (or more) replicates for each QC level for each day must be within 100±20% (100±25% at the LLOQ and ULOQ) of their corresponding nominal values. The precision at each QC level for each day must not exceed 20% (25% for LLOQ) when calculated as the %CV.  The concentrations will be calculated using the whole blood calibration curve, which does not include the High, Mid and Low QC levels. No more than one QC outlier (Dixon test) may be excluded from the statistical calculations for a given validation run, and a maximum of two QC outliers may be excluded for the combined three core runs.

Confidential                                                                          THPFM0005688156



<u>Inter-day Accuracy and Precision</u>

Inter-day accuracy and precision will be evaluated over a period of three days. On each day, the QC levels specified in Table 2 will be spiked into a single whole blood sample. At least six replicate cartridges will be used per QC level on each of the days. For method acceptance, the mean of back-calculated concentrations of all the replicates from all three days at each QC level should not deviate more than ±20% (±25% for the LLOQ and ULOQ) from its corresponding nominal concentration. The precision of all the replicates from all three days at each QC level must not exceed 20% (25% for LLOQ) when calculated as the %CV. The concentration will be back-calculated using the whole blood calibration curve. No more than one QC outlier (Dixon test) may be excluded from the statistical calculations for a given validation run, and a maximum of two QC outliers may be excluded for the combined three core runs.

<u>Selectivity</u>

For the spiked samples, 14 out of 20 of the back-calculated concentrations from the individual whole blood samples must be within 25% of the corresponding nominal concentration. For the un-spiked samples, 14 of 20 must have a back-calculated concentration less than the LLOQ. The concentration will be back-calculated using the whole blood calibration curve.

<u>Instrument Precision</u>

For acceptance, 24 cartridges (run on 24 difference instruments) with a mid-range concentration (500 ng/mL in a single whole blood sample) should be within 20% of the nominal concentration. The concentration will be back-calculated using the whole blood calibration curve.

<u>High Dose Hook Effect Test</u>

Evaluate response of assay at a concentration of 12,000 ng/mL in whole blood with 5 replicate cartridges. The back-calculated concentration for this analyte level for all five replicates should be greater than ULOQ.

<u>Instrument Carryover Test</u>

The response of un-spiked whole blood sample run immediately after a 4000 ng/mL spiked blood sample on the same instrument must be less than the LLOQ response to be considered acceptable.

<u>Stability Test in Pre-built Cartridge</u>

To establish acceptance, the mean back-calculated concentrations for each analyte level must be no more than ±20% from their Day 0 back-calculated concentration. In addition, the precision (%CV) of all the replicates within the reportable range must not exceed 20%. Data not available as of the report date will be presented as an appendix to the validation report at a later date.

Confidential                                                  THPFM0005688157



## 15 METHODS

### 15.1 Primary Stock Solution and 10X Calibrators

ACE-011 was provided at a concentration of 50 mg/mL. This stock solution was diluted serially in Assay Buffer (3% BSA in TBS with 0.05% Sodium Azide) to create a set of 10X calibrators and 10X QC standards as per the dilution series shown below. These standard solutions were aliquoted and stored at −80°C.

| Calibrator # | 1X ng/mL | 10x ng/mL | Volume (uL) Stock/Previous | Volume (uL) Diluent | Volume (uL) Total |
|---|---|---|---|---|---|
| 1 | 8,000 | 80,000 | 10.0 | 6240.0 | 6250 |
| 2 | 4000 | 40,000 | 3000.0 | 3000.0 | 6000 |
| 3 | 2000 | 20,000 | 2400.0 | 2400.0 | 4800 |
| 4 | 1000 | 10,000 | 2600.0 | 2600.0 | 5200 |
| 5 | 500 | 5,000 | 3100.0 | 3100.0 | 6200 |
| 6 | 250 | 2,500 | 2600.0 | 2600.0 | 5200 |
| 7 | 125 | 1,250 | 3200.0 | 3200.0 | 6400 |
| 8 | 80 | 800 | 2304.0 | 1296.0 | 3600 |
| 9 | 40 | 400 | 1500.0 | 1500.0 | 3000 |
| 10 | 20 | 200 | 1000.0 | 1000.0 | 2000 |
| 11 | 0 | 0 | 0.0 | 2000.0 | 2000 |

| Level | 1X ng/mL | 10x ng/mL | Volume (uL) Stock/Previous | Volume (uL) Diluent | Volume (uL) Total |
|---|---|---|---|---|---|
| QC High | 3,000 | 30,000 | 5.0 | 8295.0 | 8300 |
| QC Mid | 400 | 4,000 | 800.0 | 5200.0 | 6000 |
| QC Low | 120 | 1,200 | 1440.0 | 3360.0 | 4800 |

### 15.2 Preparation of Working Standards in Human Whole Blood

To prepare working standards and QC samples, 1 part of each 10X solution was combined with 9 parts whole blood for each data point. For example, 25µL of the 10X standard mixed with 225µL whole blood for a total of 250µL of spike whole blood. Spikes were mixed into whole blood by pipetting up and down gently 8 times.



## 16  ANALYTICAL METHOD SUMMARY

Typical ELISA parameters used in this method validation are listed in Table 2 below.

**Table 2:** Theranos ELISA Parameters

| Parameter | Value of Parameter |
|---|---|
| Analyte | ACE-011 |
| Matrix | Human whole blood |
| Calibration Standard Concentrations | 0, 20*, 40, 80, 125, 250, 500, 1000, 2000, 4000 and 8000* ng/mL |
| Quality Control Concentrations | 40.0, 120.0, 400.0, 3000.0 and 4000.0 ng/mL |
| Regression Type | 4-Parameter Logistic |
| Sample Volume | 20 µL whole blood |
| Extraction Procedure Summary | In this assay, the capture surface consists of rabbit anti-goat antibody. The samples (whole blood, serum or plasma), alkaline-phosphatase labeled ACE-011 and the anti-ACE-011 antibody (goat anti-ACTRIIa) are added to the capture surface. After the removal of unbound reagents by multiple wash steps, a chemiluminescent substrate is added. |

\* Anchor points

Confidential                                                                     THPFM0005688159

**ER-14491**



## 17  RESULTS AND DISCUSSION

A total of 3 complete validation runs in 3 different whole blood samples on 3 days were performed during the method validation.

### 17.1 Standard Curve and Regression Analysis

Calibration standard concentrations were prepared with a different individual whole blood sample for each of three day runs. Standard calibration curves were determined for each of the three days using 4-Parameter Logistic regression using Theranos proprietary software. In addition, a standard calibration curve was determined using data from all three days. Expected values for the on-board controls were calculated as the mean RLU using all the runs for three days.

Table 3 shows the expected values for the on-board controls. Tables 4-6 show the 4-Parameter Logistic Regression parameters for each of the three days. Table 7 shows the 4-Parameter Logistic Regression parameters using data from all 3 days. Tables 8-10 show the raw data for the calibration runs for the three days and Table 11 summarizes the back-calculated concentrations for the runs for the three days.

The acceptance criteria for the Calibration Standards is met each day with the percentage of individual cartridges showing recovery within 100±20% (100±25% at the LLOQ and ULOQ) of nominal as follows: Day 1; 83%, Day 2; 76%, Day 3; 75%

### 17.2 Precision and Accuracy

Precision and accuracy of the method were determined by analyzing QC samples at three different concentrations within the standard curve range in addition to the LLOQ and ULOQ for each whole blood sample/day to validate reproducibility.

#### 17.2.1 Intra-Day Accuracy and Precision

Intra-day accuracy and precision were evaluated for each of the three days. Six replicate cartridges were run per QC level on each of the days. The concentrations of the QC levels were calculated using the same day's whole blood calibration curve. Intra-day accuracy and precision raw data and calculated concentration results are shown in Tables 12 through 15. These results met the acceptance criteria.

#### 17.2.2 Inter-Day Accuracy and Precision

Inter-day accuracy and precision were evaluated over the three days using the QC levels and the LLOQ and ULOQ levels. Inter-day accuracy and precision raw data and calculated concentration results are shown in Tables 16 and 17. These results met the acceptance criteria.

Confidential                                                                 THPFM0005688160



### 17.2.3 Inter-Instrument Accuracy and Precision

Inter-instrument accuracy and precision were evaluated over 24 different instruments at a mid-range concentration of 500 ng/mL spiked into a whole blood sample. Intra-instrument accuracy and precision raw data and concentration results are shown in Table 18 and 19. These results met the acceptance criteria.

## 17.3 Lower and Upper Limit of Quantification, SMin and SMax

The lower limit of quantification (LLOQ) of the assay was 40.0 ng/mL and the upper limit of quantification (ULOQ) was 4000.0 ng/mL. The maximum and minimum signal (RLU) corresponding to the calibrated range was determined by the 4 Parameter Logistic fit as SMax and SMin respectively, and any results that fell above SMax were reported as "OORH" while results that fell below SMin were reported as "OORL".

## 17.4 Matrix Specificity and Selectivity in Human Whole Blood

Selectivity is the ability of an analytical method to differentiate and quantify the analyte in the presence of other components in the sample. The selectivity test was performed by analyzing twenty individual lots of normal human whole blood spiked with 1000 ng/mL, 40 ng/mL and without ACE-011. Table 20 shows the raw data and Table 21 shows the concentration results for the selectivity test, with a summary in Table 22. All of the 20 samples showed OORL (below LLOQ) results un-spiked, 17 of the 20 samples showed a recovery between 75-125% spiked at 40.0 ng/mL (LLOQ), and all 20 of the samples showed recovery between 75-125% spiked at 1000.0 ng/mL. These results met the acceptance criteria.

## 17.5 Stability

Stability tests were used to evaluate the stability of the analyte during situations likely to be encountered during sample handling and analysis.

### 17.5.1 Process Stability

Stability of ACE-011 in human whole blood at room temperature after addition to the Theranos Cartridge sample well was evaluated. A sample of whole blood was spiked at 500 ng/mL and loaded into a number of cartridges using a stepper pipette. The cartridges were left sitting on the bench-top at room temperature over a span of up to 14 minutes before loading the cartridge into the Theranos instruments. These cartridges were a subset of the cartridges used for the inter-instrument precision test. The raw data from the process stability test are shown in Table 23 and the concentration results are shown in Table 24. Figures 5 and 6 depict the data in graphical form. These results met the acceptance criteria.

Confidential                                                                 THPFM0005688161



### 17.5.2 Cartridge Stability

Stability tests are ongoing for manufactured cartridges stored at room temperature and 4°C (the recommended storage condition). This stability test encompasses all the components of the cartridge including the capture surface, conjugate, and the onboard liquid controls.

The cartridges were manufactured and packaged in individual sealed foil pouches and then stored at either 4°C in a glass-front refrigerator, or at room temperature on the bench top. The stability tests are performed with 3 analyte levels of 3000 ng/mL (QCH), 120 ng/mL (QCL) and 0 ng/mL spiked into pooled serum, aliquoted and stored at -80°C. Time points to be tested include 0, 1, 2, 4, 8, 12, 24 and 48 weeks with three replicates for each analyte level for each of the time points. All cartridges will include the on-board controls at 3000 ng/mL and 120 ng/mL in assay buffer.

Tables 25 through 28 show the raw data and calculated concentration results gathered as of this report. Figures 7 and 8 depict the stability data in graphical form. At 4°C, the recommended storage condition, the stability results meet the acceptance criteria through week 4. At room temperature, the stability results fail to meet the acceptance criteria at 2 weeks and beyond. The on-board controls also failed at and after 2 weeks at room temperature indicating that the on-board controls are a good indication of cartridge viability. It is recommended that the cartridges are not allowed to remain unrefrigerated for a significant length of time.

## 17.6 High Dose Hook Effect Test

The response of assay at very high concentrations was tested. A whole blood sample spiked with 12,000 ng/mL ACE-011 was tested with 5 replicate cartridges. The raw data are shown in Table 29 and the concentration results are shown in Table 30. The calculated concentrations for all 5 cartridges were OORH and the RLU were less than the SMin. These results met the acceptance criteria.

## 17.7 Instrument Carryover Test

To verify that instrument carryover is not a potential problem, an un-spiked whole blood sample was run on 9 different instruments immediately after a 4000 ng/mL spiked whole blood sample was run on the same instruments. The raw data are shown in Table 31 and the concentration results are shown in Table 32. The calculated concentrations for all 9 cartridges were OORL and the RLU were greater than the SMax. These results met the acceptance criteria.

Confidential                                                                    THPFM0005688162



## 18 CONCLUSION

An ELISA method (Celgene number ACE-011-DMPK-001) has been validated for the quantification of ACE-011 in Human Whole Blood from 40.0 - 4000.0 ng/mL. The results indicate the method is sensitive, selective, accurate, and reproducible. The cartridges are stable when stored at 4 degrees (current stability data available for 4 weeks; longer study is on-going). In addition, ACE-011 is stable in human whole blood for at least 10 minutes after loading the sample into the cartridge, before starting the run.

Confidential                                                                                 THPFM0005688163



## 19 REFERENCE DOCUMENTS

- ∞ Method Validation Protocol "Determination of ACE-011 in Human Whole Blood using the Theranos Field Systems" Theranos Project Number: CELG-004, Celgene Study Number: ACE-011-DMPK-001

- ∞ ACE-011 Assay Notebook

Confidential

THPFM0005688164



## 20 TABLES

**Table 3:** Expected Values for On-Board Controls, Signal (RLU)

| Parameter | Value |
|---|---|
| **120 ng/mL Onboard Control: Expected Value (RLU)** | 47267 |
| **3000 ng/mL Onboard Control: Expected Value (RLU)** | 4577 |

**Table 4:** Regression Analysis of Day 1 ACE-011 Calibration in Human Whole Blood

| Parameter | Value |
|---|---|
| **Min** | 1983.96712949276 |
| **Max** | 76417.8579939314 |
| **Slope** | 1.22759742248462 |
| **Ed50** | 65.2149302620573 |
| **LLOQ (ng/mL)** | 40.0 |
| **ULOQ (ng/mL)** | 4000.0 |
| **Equation** | RLU = Min+(Max-Min)/(1+(Conc/Ed50))^Slope |
| **SMax (Expected RLU at LLOQ)** | 54503 |
| **SMin (Expected RLU at ULOQ)** | 2382 |

Confidential                                                                              THPFM0005688165

**ER-14497**



**Table 5:** Regression Analysis of Day 2 ACE-011 Calibration in Human Whole Blood

| Parameter | Value |
|---|---|
| Min | 1945.12382586302 |
| Max | 75951.1087062286 |
| Slope | 1.25658397094462 |
| Ed50 | 63.9656971481931 |
| LLOQ (ng/mL) | 40.0 |
| ULOQ (ng/mL) | 4000.0 |
| Equation | RLU = Min+(Max-Min)/(1+(Conc/Ed50))^Slope |
| SMax (Expected RLU at LLOQ) | 54106 |
| SMin (Expected RLU at ULOQ) | 2287 |

Confidential     THPFM0005688166

ER-14498



**Table 6:** Regression Analysis of Day 3 ACE-011 Calibration in Human Whole Blood

| Parameter | Value |
|---|---|
| **Min** | 1990.38258329355 |
| **Max** | 68926.9009417742 |
| **Slope** | 1.29265551374546 |
| **Ed50** | 75.8393131455105 |
| **LLOQ (ng/mL)** | 40.0 |
| **ULOQ (ng/mL)** | 4000.0 |
| **Equation** | RLU = Min+(Max-Min)/(1+(Conc/Ed50))^Slope |
| **SMax (Expected RLU at LLOQ)** | 52403 |
| **SMin (Expected RLU at ULOQ)** | 2321 |

Confidential     THPFM0005688167

ER-14499



**Table 7:** Regression Analysis of 3-Day ACE-011 Calibration in Human Whole Blood

| Parameter | Value |
|---|---|
| Min | 2014.04465757502 |
| Max | 69872.237599832 |
| Slope | 1.30878573744094 |
| Ed50 | 75.1058097981751 |
| LLOQ (ng/mL) | 40.0 |
| ULOQ (ng/mL) | 4000.0 |
| Equation | RLU = Min+(Max-Min)/(1+(Conc/Ed50))^Slope |
| SMax (Expected RLU at LLOQ) | 53136 |
| SMin (Expected RLU at ULOQ) | 2324 |

Confidential

THPFM0005688168

**ER-14500**



**Table 8:** ACE-011 Calibration in Human Whole Blood Day 1, Signal (RLU)

| [ACE-011] ng/mL | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|
| 8000 | 2249 | 2217 | 2233 | 1 | 2091 | 6.5 | 49662 | 5 | 4506 | -1 |
|  | 1795 | 2131 | 1963 | 12 |  |  | 48203 | 2 | 4817 | 5 |
|  | 2204 | 1951 | 2077 | 9 |  |  | 51398 | 9 | 5064 | 11 |
| 4000 | 2403 | 2593 | 2498 | 5 | 2496 | 4.9 | 52549 | 11 | 4724 | 3 |
|  | 2623 | 2495 | 2559 | 4 |  |  | 56637 | 20 | 4870 | 7 |
|  | 3082 | 2319 | 2700 | 20 |  |  | 52880 | 12 | 4813 | 5 |
|  | 2315 | 2532 | 2424 | 6 |  |  | 49734 | 5 | 4791 | 5 |
|  | 2120 | 2579 | 2350 | 14 |  |  | 46719 | -1 | 4086 | -11 |
|  | 2352 | 2540 | 2446 | 5 |  |  | 46760 | -1 | 4304 | -6 |
| 2000 | 2755 | 3439 | 3097 | 16 | 3132 | 1.6 | 47847 | 1 | 5063 | 11 |
|  | 3068 | 3268 | 3168 | 4 |  |  | 41066 | -13 | 4349 | -5 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |
| 1000 | 3595 | 3563 | 3579 | 1 | 3865 | 6.9 | 47495 | 0 | 3996 | -13 |
|  | 4068 | 4138 | 4103 | 1 |  |  | 40499 | -14 | 4373 | -4 |
|  | 3762 | 4067 | 3914 | 5 |  |  | 41769 | -12 | 4189 | -8 |
| 500 | 7103 | 6978 | 7040 | 1 | 7459 | 5.0 | 40447 | -14 | 4557 | 0 |
|  | 7504 | 7689 | 7596 | 2 |  |  | 46245 | -2 | 5467 | 20 |
|  | 7646 | 7837 | 7741 | 2 |  |  | 53186 | 12 | 5047 | 10 |
| 250 | 18788 | 14624 | 16706 | 18 | 14728 | 12.8 | 48247 | 2 | 5709 | 25 |
|  | 15722 | 13343 | 14532 | 12 |  |  | 56775 | 20 | 5355 | 17 |
|  | 12513 | 13378 | 12945 | 5 |  |  | 41126 | -13 | 4656 | 2 |
| 125 | 23021 | 24507 | 23764 | 4 | 24503 | 13.7 | 47247 | 0 | 5382 | 18 |
|  | 20346 | 22832 | 21589 | 8 |  |  | 40769 | -14 | 4676 | 2 |
|  | 29208 | 27104 | 28156 | 5 |  |  | 46690 | -1 | 5190 | 14 |
| 80 | 31113 | 30363 | 30738 | 2 | 34137 | 8.8 | 41914 | -11 | 3895 | -15 |
|  | 34197 | 36255 | 35226 | 4 |  |  | 52316 | 11 | 5126 | 12 |
|  | 34228 | 38665 | 36446 | 9 |  |  | 53704 | 14 | 5354 | 17 |
| 40 | 47775 | 45604 | 46690 | 3 | 50141 | 5.8 | 48889 | 3 | 4029 | -12 |
|  | 47254 | 48326 | 47790 | 2 |  |  | 42102 | -11 | 4603 | 1 |
|  | 53686 | 54718 | 54202 | 1 |  |  | 44463 | -6 | 4684 | 2 |
|  | 48868 | 53889 | 51379 | 7 |  |  | 47394 | 0 | 4954 | 8 |
|  | 54716 | 42336 | 48526 | 18 |  |  | 39714 | -16 | 4231 | -7 |
|  | 47557 | 56957 | 52257 | 13 |  |  | 51034 | 8 | 4567 | 0 |
| 20 | 57089 | 66045 | 61567 | 10 | 58692 | 11.1 | 48576 | 3 | 4874 | 7 |
|  | 66928 | 59600 | 63264 | 8 |  |  | 46302 | -2 | 5353 | 17 |
|  | 49084 | 53406 | 51245 | 6 |  |  | 43317 | -8 | 4461 | -2 |
| 0 | 70841 | 77712 | 74277 | 7 | 74444 | 0.3 | 41781 | -12 | 4426 | -3 |
|  | 72171 | 77054 | 74612 | 5 |  |  | 50172 | 6 | 5130 | 12 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |

N = 3 cartridges for regular calibration points, N = 6 cartridges for LLOQ and ULOQ
NR = Not Reported, % DFE = Percentage Difference From Expected Value

Confidential

THPFM0005688169

**ER-14501**



**Table 9:** ACE-011 Calibration in Human Whole Blood Day 2, Signal (RLU)

| [ACE-011] ng/mL | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|
| 8000 | 2299 | 2197 | 2248 | 3 | 1990 | 11.5 | 43566 | -8 | 4848 | 6 |
|  | 1643 | 1975 | 1809 | 13 |  |  | 41324 | -13 | 4761 | 4 |
|  | 1848 | 1978 | 1913 | 5 |  |  | 38009 | -20 | 4299 | -6 |
| 4000 | 2111 | 2558 | 2335 | 14 | 2383 | 2.0 | 40924 | -13 | 4045 | -11 |
|  | 2222 | 2485 | 2354 | 8 |  |  | 49231 | 4 | 4972 | 9 |
|  | 2473 | 2332 | 2403 | 4 |  |  | 50926 | 8 | 4821 | 5 |
|  | 2337 | 2427 | 2382 | 3 |  |  | 59248 | 25 | 4515 | -1 |
|  | 2597 | 2337 | 2467 | 7 |  |  | 59220 | 25 | 4996 | 9 |
|  | 2238 | 2481 | 2360 | 7 |  |  | 57384 | 21 | 4301 | -6 |
| 2000 | 3308 | 3310 | 3309 | 0 | 3191 | 4.8 | 54294 | 15 | 4777 | 5 |
|  | 2926 | 3113 | 3020 | 4 |  |  | 49680 | 5 | 4892 | 7 |
|  | 2958 | 3531 | 3245 | 12 |  |  | 38592 | -18 | 4134 | -10 |
| 1000 | 4205 | 4728 | 4467 | 8 | 4074 | 9.0 | 41383 | -12 | 5185 | 13 |
|  | 3939 | 4090 | 4014 | 3 |  |  | 53626 | 13 | 4641 | 2 |
|  | 3781 | 3699 | 3740 | 2 |  |  | 38404 | -19 | 4820 | 5 |
| 500 | 8114 | 7175 | 7644 | 9 | 6985 | 9.1 | 42761 | -10 | 4107 | -10 |
|  | 6088 | 6655 | 6372 | 6 |  |  | 39260 | -17 | 4334 | -5 |
|  | 7315 | 6561 | 6938 | 8 |  |  | 50010 | 6 | 4202 | -8 |
| 250 | 12122 | 12145 | 12133 | 0 | 12255 | 1.7 | 52479 | 11 | 4400 | -4 |
|  | 11693 | 13297 | 12495 | 9 |  |  | 50797 | 7 | 5527 | 21 |
|  | 12282 | 11991 | 12136 | 2 |  |  | 49700 | 5 | 4912 | 7 |
| 125 | 18764 | 23428 | 21096 | 16 | 24464 | 15.6 | 54169 | 15 | 4290 | -6 |
|  | 28980 | 28274 | 28627 | 2 |  |  | 53011 | 12 | 4742 | 4 |
|  | 23391 | 23946 | 23669 | 2 |  |  | 44567 | -6 | 4304 | -6 |
| 80 | 42238 | 40066 | 41152 | 4 | 42173 | 3.4 | 58116 | 23 | 5149 | 13 |
|  | 40103 | 46287 | 43195 | 10 |  |  | 44074 | -7 | 5261 | 15 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |
| 40 | 41253 | 47407 | 44330 | 10 | 47946 | 7.4 | 42491 | -10 | 4443 | -3 |
|  | 41230 | 45206 | 43218 | 7 |  |  | 40768 | -14 | 4452 | -3 |
|  | 50914 | 50348 | 50631 | 1 |  |  | 52808 | 12 | 4912 | 7 |
|  | 50596 | 52882 | 51739 | 3 |  |  | 41551 | -12 | 3881 | -15 |
|  | 47124 | 53378 | 50251 | 9 |  |  | 41650 | -12 | 4152 | -9 |
|  | 46206 | 48804 | 47505 | 4 |  |  | 52610 | 11 | 3854 | -16 |
| 20 | 58475 | 58315 | 58395 | 0 | 60505 | 7.0 | 46134 | -2 | 4027 | -12 |
|  | 55193 | 60335 | 57764 | 6 |  |  | 41759 | -12 | 4825 | 6 |
|  | 68673 | 62039 | 65356 | 7 |  |  | 46445 | -2 | 4783 | 5 |
| 0 | 69169 | 67562 | 68366 | 2 | 68090 | 2.5 | 44854 | -5 | 4011 | -12 |
|  | 72089 | 60445 | 66267 | 12 |  |  | 46480 | -2 | 4720 | 3 |
|  | 74581 | 64696 | 69638 | 10 |  |  | 43365 | -8 | 4718 | 3 |

N = 3 cartridges for regular calibration points, N = 6 cartridges for LLOQ and ULOQ

NR = Not Reported, % DFE = Percentage Difference From Expected Value

Confidential

THPFM0005688170

ER-14502



**Table 10:** ACE-011 Calibration in Human Whole Blood Day 3, Signal (RLU)

| [ACE-011] ng/mL | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|
| 8000 | 2210 | 2238 | 2224 | 1 | 2063 | 8.9 | 45154 | -5 | 5267 | 15 |
|  | 1987 | 2216 | 2102 | 8 |  |  | 56674 | 20 | 4786 | 5 |
|  | 1849 | 1879 | 1864 | 1 |  |  | 50811 | 7 | 4378 | -4 |
| 4000 | 2433 | 2407 | 2420 | 1 | 2488 | 6.9 | 44285 | -6 | 4952 | 8 |
|  | 2248 | 2500 | 2374 | 7 |  |  | 44967 | -5 | 4287 | -6 |
|  | 2665 | 2803 | 2734 | 4 |  |  | 48375 | 2 | 4663 | 2 |
|  | 2427 | 2155 | 2291 | 8 |  |  | 50822 | 7 | 4650 | 2 |
|  | 2414 | 2489 | 2452 | 2 |  |  | 49930 | 6 | 4610 | 1 |
|  | 2710 | 2607 | 2658 | 3 |  |  | 46827 | -1 | 4288 | -6 |
| 2000 | 2617 | 2012 | 2315 | 18 | 2834 | 18.1 | 36822 | -22 | 4359 | -5 |
|  | 3756 | 2923 | 3339 | 18 |  |  | 51834 | 10 | 5286 | 16 |
|  | 2871 | 2826 | 2848 | 1 |  |  | 38257 | -19 | 4771 | 4 |
| 1000 | 4247 | 4813 | 4530 | 9 | 4663 | 4.0 | 47156 | 0 | 5191 | 14 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |
|  | 5126 | 4465 | 4795 | 10 |  |  | 42911 | -9 | 4132 | -10 |
| 500 | 7261 | 7234 | 7247 | 0 | 7073 | 15.3 | 52152 | 10 | 3614 | -21 |
|  | 7828 | 8283 | 8056 | 4 |  |  | 43250 | -9 | 3759 | -18 |
|  | 6188 | 5646 | 5917 | 6 |  |  | 51757 | 9 | 5110 | 12 |
| 250 | 14716 | 14444 | 14580 | 1 | 14929 | 15.2 | 48921 | 3 | 4567 | 0 |
|  | 18668 | 16044 | 17356 | 11 |  |  | 56113 | 19 | 4612 | 1 |
|  | 12553 | 13149 | 12851 | 3 |  |  | 50389 | 7 | 4783 | 5 |
| 125 | 22898 | 23011 | 22954 | 0 | 25374 | 8.9 | 42990 | -9 | 4393 | -4 |
|  | 24167 | 27331 | 25749 | 9 |  |  | 55890 | 18 | 4912 | 7 |
|  | 29215 | 25625 | 27420 | 9 |  |  | 50068 | 6 | 4753 | 4 |
| 80 | 25690 | 25270 | 25480 | 1 | 27684 | 11.3 | 42501 | -10 | 3742 | -18 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |
|  | 27764 | 32012 | 29888 | 10 |  |  | 42291 | -11 | 3559 | -22 |
| 40 | 55153 | 51339 | 53246 | 5 | 51218 | 2.4 | 48215 | 2 | 4152 | -9 |
|  | 51241 | 48919 | 50080 | 3 |  |  | 37887 | -20 | 5376 | 18 |
|  | 51876 | 51260 | 51568 | 1 |  |  | 45086 | -5 | 3932 | -14 |
|  | 53666 | 46016 | 49841 | 11 |  |  | 47894 | 1 | 4170 | -9 |
|  | 48955 | 53651 | 51303 | 6 |  |  | 43615 | -8 | 3834 | -16 |
|  | 48281 | 54254 | 51268 | 8 |  |  | 37158 | -21 | 3750 | -18 |
| 20 | 57032 | 69005 | 63018 | 13 | 57420 | 8.7 | 55679 | 18 | 4181 | -9 |
|  | 54016 | 52990 | 53503 | 1 |  |  | 48175 | 2 | 4255 | -7 |
|  | 58150 | 53330 | 55740 | 6 |  |  | 43827 | -7 | 4266 | -7 |
| 0 | 68818 | 64844 | 66831 | 4 | 68317 | 3.1 | 51469 | 9 | 4849 | 6 |
|  | NR | NR | NR | - |  |  | NR | - | NR | - |
|  | 72720 | 66887 | 69803 | 6 |  |  | 39374 | -17 | 3757 | -18 |

N = 3 cartridges for regular calibration points, N = 6 cartridges for LLOQ and ULOQ
NR = Not Reported, % DFE = Percentage Difference From Expected Value

Confidential                                                                                    THPFM0005688171

ER-14503



**Table 11:** Day 1, 2 and 3 Calibration, Back-Calculated Concentration (ng/mL)

| [ACE-011] ng/mL | Day 1 | | | | Day 2 | | | | Day 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Conc | Mean | CV % | % Rec. | Conc | Mean | CV % | % Rec. | Conc | Mean | CV % | % Rec. |
| 8000 | OORH | OORH | | | OORH | OORH | | | OORH | OORH | | |
| | OORH | | | | OORH | | | | OORH | | | |
| | OORH | | | | OORH | | | | OORH | | | |
| 4000 | 3828 | 3270 | 19.8 | 82 | 2883 | 3373 | 10.3 | 84 | 3753 | 3238 | 17.0 | 81 |
| | 3436 | | | | 3192 | | | | 3284 | | | |
| | 1998 | | | | 3707 | | | | 2457 | | | |
| | 3544 | | | | 3811 | | | | 3702 | | | |
| | 3311 | | | | 3436 | | | | 3562 | | | |
| | 3502 | | | | 3211 | | | | 2668 | | | |
| 2000 | 2129 | 2009 | 8.5 | 100 | 1513 | 1663 | 10.1 | 83 | 2794 | 2207 | 26.1 | 110 |
| | 1888 | | | | 1845 | | | | 1641 | | | |
| | NR | | | | 1632 | | | | 2186 | | | |
| 1000 | 1467 | 1293 | 12.2 | 129 | 923 | 1071 | 13.4 | 107 | 933 | 898 | 5.6 | 90 |
| | 1157 | | | | 1078 | | | | NR | | | |
| | 1256 | | | | 1211 | | | | 862 | | | |
| 500 | 551 | 515 | 6.1 | 103 | 464 | 519 | 10.6 | 104 | 510 | 538 | 19.1 | 108 |
| | 503 | | | | 575 | | | | 452 | | | |
| | 491 | | | | 519 | | | | 651 | | | |
| 250 | 208 | 241 | 13.6 | 96 | 275 | 273 | 1.6 | 109 | 235 | 233 | 16.2 | 93 |
| | 241 | | | | 268 | | | | 195 | | | |
| | 273 | | | | 275 | | | | 270 | | | |
| 125 | 134 | 131 | 16.8 | 105 | 150 | 126 | 19.4 | 101 | 139 | 124 | 11.4 | 99 |
| | 151 | | | | 101 | | | | 121 | | | |
| | 108 | | | | 129 | | | | 111 | | | |
| 80 | 95 | 82 | 13.7 | 103 | 58 | 56 | 5.8 | 70 | 122 | 111 | 14.8 | 138 |
| | 78 | | | | 54 | | | | NR | | | |
| | 74 | | | | NR | | | | 99 | | | |
| 40 | 47 | 43 | 17.9 | 108 | 51 | 44 | 16.5 | 109 | 34 | 38 | 11.8 | 96 |
| | 44 | | | | 53 | | | | 37 | | | |
| | 33 | | | | 38 | | | | 34 | | | |
| | 38 | | | | 36 | | | | 46 | | | |
| | 57 | | | | 39 | | | | 39 | | | |
| | 45 | | | | 44 | | | | 41 | | | |
| 20 | OORL | OORL | | | OORL | OORL | | | OORL | OORL | | |
| | OORL | | | | OORL | | | | OORL | | | |
| | 38 | | | | OORL | | | | OORL | | | |
| 0 | OORL | OORL | | | OORL | OORL | | | OORL | OORL | | |
| | OORL | | | | OORL | | | | NR | | | |
| | NR | | | | OORL | | | | OORL | | | |

% Rec. = Percentage Recovery

Confidential                                    THPFM0005688172



**Table 12:** Intra-Day Precision, Day 1 Signal (RLU)

| Level | [ACE-011] ng/mL | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|-------|-----------------|---------------------|---|----------------------|------|----------------------|------|-----------------------|-------|------------------------|-------|
| ULOQ | 4000 | 2403 | 2593 | 2498 | 5 | 2496 | 4.9 | 52549 | 11 | 4724 | 3 |
|      |      | 2623 | 2495 | 2559 | 4 |      |     | 56637 | 20 | 4870 | 7 |
|      |      | 3082 | 2319 | 2700 | 20 |     |     | 52880 | 12 | 4813 | 5 |
|      |      | 2315 | 2532 | 2424 | 6 |      |     | 49734 | 5  | 4791 | 5 |
|      |      | 2120 | 2579 | 2350 | 14 |     |     | 46719 | -1 | 4086 | -11 |
|      |      | 2352 | 2540 | 2446 | 5 |      |     | 46760 | -1 | 4304 | -6 |
| High | 3000 | 3004 | 2848 | 2926 | 4 | 2650 | 6.8 | 45336 | -4 | 3896 | -15 |
|      |      | 2768 | 2523 | 2645 | 7 |      |     | 43816 | -7 | 4825 | 6 |
|      |      | 2449 | 2944 | 2696 | 13 |     |     | 53951 | 14 | 4608 | 1 |
|      |      | 2628 | 2799 | 2713 | 4 |      |     | 42839 | -9 | 4547 | -1 |
|      |      | 2360 | 2446 | 2403 | 3 |      |     | 53090 | 12 | 4807 | 5 |
|      |      | 2471 | 2564 | 2518 | 3 |      |     | 50694 | 7  | 3787 | -17 |
| Mid | 400 | 7745 | 7183 | 7464 | 5 | 9351 | 12.9 | 50336 | 6 | 4651 | 2 |
|      |     | 9393 | 9711 | 9552 | 2 |      |      | 51873 | 10 | 4774 | 4 |
|      |     | 9770 | 11141 | 10456 | 9 |    |      | 44917 | -5 | 5521 | 21 |
|      |     | 9575 | 11921 | 10748 | 15 |   |      | 48583 | 3 | 5020 | 10 |
|      |     | 7744 | 9558 | 8651 | 15 |     |      | 49210 | 4 | 5112 | 12 |
|      |     | 8441 | 10028 | 9235 | 12 |    |      | 52912 | 12 | 4578 | 0 |
| Low | 120 | 30821 | 26724 | 28773 | 10 | 26006 | 7.8 | 48420 | 2 | 4519 | -1 |
|      |     | 28612 | 25002 | 26807 | 10 |    |     | 39484 | -16 | 4533 | -1 |
|      |     | 26392 | 25357 | 25874 | 3 |     |     | 41854 | -11 | 4233 | -7 |
|      |     | 20811 | 24689 | 22750 | 12 |    |     | 53167 | 12 | 4388 | -4 |
|      |     | 28134 | 25609 | 26871 | 7 |     |     | 44364 | -6 | 4122 | -10 |
|      |     | 28279 | 21639 | 24959 | 19 |    |     | 51263 | 8 | 4783 | 5 |
| LLOQ | 40 | 47775 | 45604 | 46690 | 3 | 50141 | 5.8 | 48889 | 3 | 4029 | -12 |
|      |    | 47254 | 48326 | 47790 | 2 |     |     | 42102 | -11 | 4603 | 1 |
|      |    | 53686 | 54718 | 54202 | 1 |     |     | 44463 | -6 | 4684 | 2 |
|      |    | 48868 | 53889 | 51379 | 7 |     |     | 47394 | 0 | 4954 | 8 |
|      |    | 54716 | 42336 | 48526 | 18 |    |     | 39714 | -16 | 4231 | -7 |
|      |    | 47557 | 56957 | 52257 | 13 |    |     | 51034 | 8 | 4567 | 0 |

N = 6 cartridges per level
% DFE = Percentage Difference From Expected Value

Confidential                                                                                    THPFM0005688173



**Table 13:** Intra-Day Precision, Day 2 Signal (RLU)

| Level | [ACE-011] ng/mL | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULOQ | 4000 | 2111 | 2558 | 2335 | 14 | 2383 | 2.0 | 40924 | -13 | 4045 | -11 |
|  |  | 2222 | 2485 | 2354 | 8 |  |  | 49231 | 4 | 4972 | 9 |
|  |  | 2473 | 2332 | 2403 | 4 |  |  | 50926 | 8 | 4821 | 5 |
|  |  | 2337 | 2427 | 2382 | 3 |  |  | 59248 | 25 | 4515 | -1 |
|  |  | 2597 | 2337 | 2467 | 7 |  |  | 59220 | 25 | 4996 | 9 |
|  |  | 2238 | 2481 | 2360 | 7 |  |  | 57384 | 21 | 4301 | -6 |
| High | 3000 | 2520 | 2572 | 2546 | 1 | 2567 | 7.0 | 44634 | -6 | 5291 | 16 |
|  |  | 3050 | 2321 | 2686 | 19 |  |  | 47306 | 0 | 4661 | 2 |
|  |  | 2421 | 2016 | 2219 | 13 |  |  | 48140 | 2 | 4092 | -10 |
|  |  | 2515 | 2796 | 2655 | 7 |  |  | 55105 | 17 | 5016 | 10 |
|  |  | 2804 | 2577 | 2691 | 6 |  |  | 46970 | -1 | 5119 | 12 |
|  |  | 2326 | 2891 | 2608 | 15 |  |  | 49117 | 4 | 4646 | 2 |
| Mid | 400 | 8043 | 8772 | 8407 | 6 | 8525 | 12.2 | 42959 | -9 | 4465 | -2 |
|  |  | 8177 | 7051 | 7614 | 10 |  |  | 50679 | 7 | 4239 | -7 |
|  |  | 7746 | 9241 | 8493 | 12 |  |  | 57450 | 22 | 5111 | 12 |
|  |  | 8345 | 9623 | 8984 | 10 |  |  | 48172 | 2 | 4745 | 4 |
|  |  | 10537 | 10007 | 10272 | 4 |  |  | 53681 | 14 | 3967 | -13 |
|  |  | 7474 | 7284 | 7379 | 2 |  |  | 39899 | -16 | 4206 | -8 |
| Low | 120 | 23829 | 24704 | 24267 | 3 | 24800 | 11.4 | 49519 | 5 | 3945 | -14 |
|  |  | 25951 | 23536 | 24744 | 7 |  |  | 50884 | 8 | 4114 | -10 |
|  |  | 21554 | 20931 | 21242 | 2 |  |  | 41001 | -13 | 5029 | 10 |
|  |  | 24556 | 28511 | 26534 | 11 |  |  | 45089 | -5 | 4284 | -6 |
|  |  | 26315 | 32235 | 29275 | 14 |  |  | 49986 | 6 | 5057 | 11 |
|  |  | 23102 | 22380 | 22741 | 2 |  |  | 39188 | -17 | 3813 | -17 |
| LLOQ | 40 | 41253 | 47407 | 44330 | 10 | 47946 | 7.4 | 42491 | -10 | 4443 | -3 |
|  |  | 41230 | 45206 | 43218 | 7 |  |  | 40768 | -14 | 4452 | -3 |
|  |  | 50914 | 50348 | 50631 | 1 |  |  | 52808 | 12 | 4912 | 7 |
|  |  | 50596 | 52882 | 51739 | 3 |  |  | 41551 | -12 | 3881 | -15 |
|  |  | 47124 | 53378 | 50251 | 9 |  |  | 41650 | -12 | 4152 | -9 |
|  |  | 46206 | 48804 | 47505 | 4 |  |  | 52610 | 11 | 3854 | -16 |

N = 6 cartridges per level

% DFE = Percentage Difference From Expected Value

Confidential                    THPFM0005688174

**ER-14506**



**Table 14:** Intra-Day Precision, Day 3 Signal (RLU)

| Level | [ACE-011] ng/mL | Sample Replicates 1 | Sample Replicates 2 | Intra-Cartridge Mean | Intra-Cartridge CV % | Inter-Cartridge Mean | Inter-Cartridge CV % | 120 ng/mL Control RLU | 120 ng/mL Control % DFE | 3000 ng/mL Control RLU | 3000 ng/mL Control % DFE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ULOQ | 4000 | 2433 | 2407 | 2420 | 0.8 | 2488 | 6.9 | 44285 | -6 | 4952 | 8 |
|  |  | 2248 | 2500 | 2374 | 7.5 |  |  | 44967 | -5 | 4287 | -6 |
|  |  | 2665 | 2803 | 2734 | 3.6 |  |  | 48375 | 2 | 4663 | 2 |
|  |  | 2427 | 2155 | 2291 | 8.4 |  |  | 50822 | 7 | 4650 | 2 |
|  |  | 2414 | 2489 | 2452 | 2.2 |  |  | 49930 | 6 | 4610 | 1 |
|  |  | 2710 | 2607 | 2658 | 2.7 |  |  | 46827 | -1 | 4288 | -6 |
| High | 3000 | 2642 | 2442 | 2542 | 5.6 | 2624 | 6.6 | 45899 | -3 | 4476 | -2 |
|  |  | 3122 | 2681 | 2901 | 10.7 |  |  | 54945 | 16 | 5013 | 10 |
|  |  | 2761 | 2754 | 2757 | 0.2 |  |  | 55856 | 18 | 3969 | -13 |
|  |  | 2607 | 2398 | 2502 | 5.9 |  |  | 54259 | 15 | 5159 | 13 |
|  |  | 2320 | 2577 | 2448 | 7.4 |  |  | 40684 | -14 | 4058 | -11 |
|  |  | 2758 | 2425 | 2591 | 9.1 |  |  | 39457 | -17 | 4134 | -10 |
| Mid | 400 | 10239 | 9687 | 9963 | 3.9 | 9188 | 9.3 | 47345 | 0 | 4308 | -6 |
|  |  | 8758 | 9486 | 9122 | 5.6 |  |  | 51841 | 10 | 5214 | 14 |
|  |  | 9862 | 9675 | 9769 | 1.4 |  |  | 50547 | 7 | 4926 | 8 |
|  |  | 9895 | 10012 | 9953 | 0.8 |  |  | 47281 | 0 | 5141 | 12 |
|  |  | 8312 | 8028 | 8170 | 2.5 |  |  | 50334 | 6 | 5352 | 17 |
|  |  | 8198 | 8105 | 8152 | 0.8 |  |  | 45567 | -4 | 5176 | 13 |
| Low | 120 | 24559 | 25649 | 25104 | 3.1 | 25114 | 10.6 | 42500 | -10 | 3741 | -18 |
|  |  | 22334 | 28579 | 25457 | 17.3 |  |  | 47783 | 1 | 4879 | 7 |
|  |  | 26186 | 25169 | 25677 | 2.8 |  |  | 47978 | 1 | 4225 | -8 |
|  |  | 19715 | 20441 | 20078 | 2.6 |  |  | 44983 | -5 | 3458 | -24 |
|  |  | 27888 | 27907 | 27898 | 0.0 |  |  | 41562 | -12 | 3602 | -21 |
|  |  | 27452 | 25485 | 26468 | 5.3 |  |  | 42861 | -9 | 4189 | -8 |
| LLOQ | 40 | 55153 | 51339 | 53246 | 5.1 | 51218 | 2.4 | 48215 | 2 | 4152 | -9 |
|  |  | 51241 | 48919 | 50080 | 3.3 |  |  | 37887 | -20 | 5376 | 18 |
|  |  | 51876 | 51260 | 51568 | 0.8 |  |  | 45086 | -5 | 3932 | -14 |
|  |  | 53666 | 46016 | 49841 | 10.9 |  |  | 47894 | 1 | 4170 | -9 |
|  |  | 48955 | 53651 | 51303 | 6.5 |  |  | 43615 | -8 | 3834 | -16 |
|  |  | 48281 | 54254 | 51268 | 8.2 |  |  | 37158 | -21 | 3750 | -18 |

N = 6 cartridges per level

% DFE = Percentage Difference From Expected Value

THERANOS CONFIDENTIAL

Confidential

THPFM0005688175

ER-14507



**Table 15:** Intra-Day Precision, Concentration (ng/mL)

| [ACE-011] ng/mL | Day 1 | | | | Day 2 | | | | Day 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Conc | Mean | CV % | % Rec | Conc | Mean | CV % | % Rec | Conc | Mean | CV % | % Rec |
| 4000 | 3828 | 3270 | 19.8 | 82 | 2883 | 3373 | 10.3 | 84 | 3753 | 3238 | 17.0 | 81 |
| | 3436 | | | | 3192 | | | | 3284 | | | |
| | 1998 | | | | 3707 | | | | 2457 | | | |
| | 3544 | | | | 3811 | | | | 3702 | | | |
| | 3311 | | | | 3436 | | | | 3562 | | | |
| | 3502 | | | | 3211 | | | | 2668 | | | |
| 3000 | 2280 | 3180 | 19.6 | 106 | 2934 | 2961 | 12.4 | 99 | 3159 | 2956 | 11.3 | 99 |
| | 3115 | | | | 3028 | | | | 2385 | | | |
| | 3144 | | | | 3531 | | | | 3369 | | | |
| | 2830 | | | | 2636 | | | | 2941 | | | |
| | 4072 | | | | 2505 | | | | 3050 | | | |
| | 3639 | | | | 3128 | | | | 2834 | | | |
| 400 | 514 | 405 | 15.8 | 101 | 415 | 416 | 13.1 | 104 | 357 | 394 | 10.7 | 98 |
| | 385 | | | | 467 | | | | 394 | | | |
| | 349 | | | | 413 | | | | 364 | | | |
| | 341 | | | | 387 | | | | 357 | | | |
| | 438 | | | | 331 | | | | 445 | | | |
| | 404 | | | | 481 | | | | 446 | | | |
| 120 | 105 | 121 | 10.8 | 101 | 125 | 123 | 13.5 | 103 | 124 | 118 | 5.9 | 98 |
| | 115 | | | | 122 | | | | 124 | | | |
| | 120 | | | | 147 | | | | 121 | | | |
| | 143 | | | | 112 | | | | 111 | | | |
| | 115 | | | | 99 | | | | 108 | | | |
| | 129 | | | | 135 | | | | 116 | | | |
| 40 | 47 | 44 | 18.4 | 110 | 51 | 44 | 16.5 | 109 | 34 | 38 | 11.8 | 96 |
| | 44 | | | | 53 | | | | 37 | | | |
| | 33 | | | | 38 | | | | 34 | | | |
| | 38 | | | | 36 | | | | 46 | | | |
| | 57 | | | | 39 | | | | 39 | | | |
| | 45 | | | | 44 | | | | 41 | | | |

N = 6 cartridges per level per day

% Rec. = Percentage Recovery

Confidential                                          THPFM0005688176

**ER-14508**



**Table 16:** Inter-Day Precision, Signal (RLU)

| [ACE-011] ng/mL | Mean RLU | CV % |
|---|---|---|
| 4000 | 2456 | 5.2 |
| 3000 | 2583 | 6.4 |
| 400 | 9021 | 11.6 |
| 120 | 25720 | 8.2 |
| 40 | 49768 | 5.9 |

N = 18 cartridges per level (6 cartridges per day per level)

**Table 17:** Inter-Day Precision, Concentration (ng/mL)

| [ACE-011] ng/mL | Mean Conc | CV % | % Recovery |
|---|---|---|---|
| 4000 | 3294 | 15.2 | 82 |
| 3000 | 3032 | 14.7 | 101 |
| 400 | 405 | 12.8 | 101 |
| 120 | 121 | 10.2 | 101 |
| 40 | 42 | 16.4 | 105 |

N = 18 cartridges per level (6 cartridges per day per level)

Confidential                                                      THPFM0005688177

ER-14509



**Table 18:** Inter-Instrument Precision at 500 ng/mL, Signal (RLU)

| Instrument | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean RLU | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8114 | 7175 | 7644 | 9 | 7830 | 8.3 | 42761 | -10 | 4107 | -10 |
| 2 | 7646 | 7837 | 7741 | 2 | | | 53186 | 12 | 5047 | 10 |
| 3 | 7828 | 8283 | 8056 | 4 | | | 43250 | -9 | 3759 | -18 |
| 4 | 8447 | 7965 | 8206 | 4 | | | 50906 | 8 | 3837 | -16 |
| 5 | 6882 | 7612 | 7247 | 7 | | | 52234 | 10 | 4530 | -1 |
| 6 | 9315 | 8148 | 8732 | 9 | | | 50905 | 8 | 4581 | 0 |
| 7 | 6254 | 7916 | 7085 | 17 | | | 56405 | 19 | 4304 | -6 |
| 8 | 7801 | 7586 | 7694 | 2 | | | 52148 | 10 | 3994 | -13 |
| 9 | 8607 | 8142 | 8375 | 4 | | | 52903 | 12 | 4307 | -6 |
| 10 | 7497 | 7164 | 7331 | 3 | | | 51062 | 8 | 4201 | -8 |
| 11 | 7449 | 8242 | 7846 | 7 | | | 49759 | 5 | 4324 | -5 |
| 12 | 6752 | 7667 | 7210 | 9 | | | 36124 | -24 | 4263 | -7 |
| 13 | 6615 | 6664 | 6640 | 1 | | | 52356 | 11 | 4174 | -9 |
| 14 | 8378 | 8628 | 8503 | 2 | | | 48152 | 2 | 3551 | -22 |
| 15 | 6176 | 6778 | 6477 | 7 | | | 51265 | 8 | 4220 | -8 |
| 16 | 7439 | 7512 | 7476 | 1 | | | 49027 | 4 | 3545 | -22 |
| 17 | 8052 | 8074 | 8063 | 0 | | | 51908 | 10 | 3838 | -16 |
| 18 | 7799 | 8153 | 7976 | 3 | | | 47989 | 1 | 4397 | -4 |
| 19 | 8254 | 6551 | 7403 | 16 | | | 56814 | 20 | 3786 | -17 |
| 20 | 8556 | 8559 | 8558 | 0 | | | 45939 | -3 | 4206 | -8 |
| 21 | 8051 | 8206 | 8129 | 1 | | | 49282 | 4 | 3942 | -14 |
| 22 | 7859 | 7820 | 7840 | 0 | | | 54004 | 14 | 3613 | -21 |
| 23 | 8452 | 9390 | 8921 | 7 | | | 54405 | 15 | 4757 | 4 |
| 24 | 8287 | 9249 | 8768 | 8 | | | 52854 | 12 | 4335 | -5 |

N = 24 cartridges, N = 24 instruments
% DFE = Percentage Difference From Expected Value

Confidential                                                                    THPFM0005688178



**Table 19:** Inter-Instrument Precision at 500 ng/mL, Concentration (ng/mL)

| Instrument | Conc | % Recovery | Inter-Instrument | | |
|:---:|:---:|:---:|:---:|:---:|:---:|
| | | | Mean Conc | CV % | % Recovery |
| 1 | 473 | 95 | 464 | 10 | 93 |
| 2 | 464 | 93 | | | |
| 3 | 444 | 89 | | | |
| 4 | 435 | 87 | | | |
| 5 | 502 | 100 | | | |
| 6 | 408 | 82 | | | |
| 7 | 524 | 105 | | | |
| 8 | 468 | 94 | | | |
| 9 | 426 | 85 | | | |
| 10 | 494 | 99 | | | |
| 11 | 459 | 92 | | | |
| 12 | 506 | 101 | | | |
| 13 | 554 | 111 | | | |
| 14 | 418 | 84 | | | |
| 15 | 572 | 114 | | | |
| 16 | 483 | 97 | | | |
| 17 | 444 | 89 | | | |
| 18 | 449 | 90 | | | |
| 19 | 497 | 99 | | | |
| 20 | 415 | 83 | | | |
| 21 | 440 | 88 | | | |
| 22 | 458 | 92 | | | |
| 23 | 398 | 80 | | | |
| 24 | 406 | 81 | | | |

N = 24 cartridges, N = 24 instruments

Confidential                                                                 THPFM0005688179



**Table 20:** Selectivity in Human Whole Blood, Signal (RLU)

| Sample | HC | Spike (ng/mL) | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F1 | 44 | 0 | 92081 | 87739 | 89910 | 3 | 69641 | 29 | 58244 | 23 | 4691 | 3 |
| | | | 71284 | 67996 | 69640 | 3 | | | 52816 | 12 | 3828 | -16 |
| | | | 50504 | 48240 | 49372 | 3 | | | 47328 | 0 | 4511 | -1 |
| | | 40 | 44779 | 49998 | 47388 | 8 | 46835 | 1 | 43248 | -9 | 5127 | 12 |
| | | | 40379 | 51852 | 46115 | 18 | | | 46693 | -1 | 3898 | -15 |
| | | | 42805 | 51197 | 47001 | 13 | | | 50693 | 7 | 4943 | 8 |
| | | 1000 | 3823 | 5009 | 4416 | 19 | 4227 | 11 | 51094 | 8 | 3580 | -22 |
| | | | 4103 | 5016 | 4560 | 14 | | | 47226 | 0 | 4422 | -3 |
| | | | 3541 | 3869 | 3705 | 6 | | | 43274 | -8 | 4059 | -11 |
| F2 | 39 | 0 | 77179 | 78665 | 77922 | 1 | 61914 | 24 | 47980 | 1 | 4051 | -11 |
| | | | 55303 | 62304 | 58804 | 8 | | | 44747 | -5 | 4451 | -3 |
| | | | NR | NR | NR | - | | | NR | - | NR | - |
| | | 40 | 45463 | 46414 | 45938 | 1 | 44961 | 5 | 47084 | 0 | 3802 | -17 |
| | | | 41888 | 43362 | 42625 | 2 | | | 44815 | -5 | 3519 | -23 |
| | | | 45769 | 46872 | 46320 | 2 | | | 42031 | -11 | 4783 | 5 |
| | | 1000 | 5571 | 5230 | 5400 | 4 | 4319 | 22 | 40132 | -15 | 4166 | -9 |
| | | | 4139 | 3153 | 3646 | 19 | | | 37638 | -20 | 3423 | -25 |
| | | | NR | NR | NR | - | | | NR | - | NR | - |
| F3 | 45 | 0 | 89184 | 64666 | 76925 | 23 | 72598 | 13 | 42221 | -11 | 4494 | -2 |
| | | | 79202 | 78967 | 79085 | 0 | | | 49570 | 5 | 4303 | -6 |
| | | | 59903 | 63667 | 61785 | 4 | | | 49340 | 4 | 4259 | -7 |
| | | 40 | 43443 | 46229 | 44836 | 4 | 46527 | 6 | 38432 | -19 | 3859 | -16 |
| | | | 45835 | 54196 | 50015 | 12 | | | 36974 | -22 | 3702 | -19 |
| | | | NR | NR | NR | - | | | NR | - | NR | - |
| | | 1000 | 4010 | 4073 | 4041 | 1 | 4488 | 12 | 53463 | 13 | 4212 | -8 |
| | | | 5012 | 5213 | 5113 | 3 | | | 46188 | -2 | 4386 | -4 |
| | | | 3679 | 4943 | 4311 | 21 | | | 59168 | 25 | 4893 | 7 |
| F4 | 47 | 0 | 89448 | 88218 | 88833 | 1 | 74921 | 17 | 49286 | 4 | 4103 | -10 |
| | | | 65695 | 61270 | 63482 | 5 | | | 46527 | -2 | 4297 | -6 |
| | | | 68620 | 76274 | 72447 | 7 | | | 45735 | -3 | 3631 | -21 |
| | | 40 | 45612 | 42511 | 44061 | 5 | 47224 | 11 | 50323 | 6 | 3953 | -14 |
| | | | 42032 | 46580 | 44306 | 7 | | | 35428 | -25 | 3773 | -17 |
| | | | 55545 | 51061 | 53303 | 6 | | | 54071 | 14 | 4029 | -12 |
| | | 1000 | 4463 | 4699 | 4581 | 4 | 5269 | 19 | 45371 | -4 | 4170 | -9 |
| | | | 6007 | 6828 | 6418 | 9 | | | 54422 | 15 | 4509 | -1 |
| | | | 5154 | 4461 | 4807 | 10 | | | 48794 | 3 | 4911 | 7 |

% DFE = Percentage Difference From Expected
NR = Not Reported

Confidential

THPFM0005688180

ER-14512



Selectivity in Human Whole Blood, Signal (RLU), *Continued*

| Sample | HC | Spike (ng/mL) | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F5 | 43 | 0 | 55028 | 60568 | 57798 | 7 | 63183 | 9 | 49876 | 5 | 4185 | -8 |
| | | | 67612 | 70072 | 68842 | 3 | | | 51900 | 10 | 4298 | -6 |
| | | | 57483 | 68335 | 62909 | 12 | | | 42299 | -11 | 4544 | -1 |
| | | 40 | 37123 | 40403 | 38763 | 6 | 40747 | 7 | 42582 | -10 | 4275 | -6 |
| | | | 38539 | 40810 | 39674 | 4 | | | 39098 | -17 | 3978 | -13 |
| | | | 41563 | 46042 | 43803 | 7 | | | 42258 | -11 | 3638 | -20 |
| | | 1000 | 4283 | 4416 | 4349 | 2 | 4719 | 7 | 48005 | 2 | 3480 | -24 |
| | | | 4982 | 5098 | 5040 | 2 | | | 45773 | -3 | 3532 | -23 |
| | | | 4964 | 4570 | 4767 | 6 | | | 54590 | 15 | 3975 | -13 |
| F6 | 49 | 0 | 63667 | 70176 | 66922 | 7 | 63430 | 7 | 44363 | -6 | 3639 | -20 |
| | | | 58147 | 58237 | 58192 | 0 | | | 44676 | -6 | 3703 | -19 |
| | | | 57329 | 73025 | 65177 | 17 | | | 38753 | -18 | 4207 | -8 |
| | | 40 | 40106 | 47799 | 43953 | 12 | 49363 | 10 | 42932 | -9 | 3464 | -24 |
| | | | 52170 | 53252 | 52711 | 1 | | | 43309 | -8 | 4096 | -10 |
| | | | 52122 | 50731 | 51427 | 2 | | | 50966 | 8 | 4420 | -3 |
| | | 1000 | 3530 | 3772 | 3651 | 5 | 4139 | 16 | 41913 | -11 | 3520 | -23 |
| | | | 3369 | 4427 | 3898 | 19 | | | 45218 | -4 | 3462 | -24 |
| | | | 4970 | 4764 | 4867 | 3 | | | 42774 | -10 | 3601 | -21 |
| F7 | 43 | 0 | 59894 | 60987 | 60440 | 1 | 68632 | 13 | 44719 | -5 | 3528 | -23 |
| | | | 78025 | 78050 | 78038 | 0 | | | 46532 | -2 | 3804 | -17 |
| | | | 68269 | 66569 | 67419 | 2 | | | 46637 | -1 | 4352 | -5 |
| | | 40 | NR | NR | NR | - | 45358 | 27 | NR | - | NR | - |
| | | | 68421 | 49714 | 59067 | 22 | | | 45632 | -3 | 4130 | -10 |
| | | | 42159 | 40993 | 41576 | 2 | | | 42391 | -10 | 4143 | -9 |
| | | 1000 | 3681 | 4960 | 4321 | 21 | 4099 | 7 | 43169 | -9 | 3964 | -13 |
| | | | 4113 | 3493 | 3803 | 12 | | | 48727 | 3 | 3839 | -16 |
| | | | 4129 | 4218 | 4173 | 2 | | | 40857 | -14 | 3455 | -24 |
| F8 | 46 | 0 | 73656 | 68221 | 70938 | 5 | 70795 | 4 | 50678 | 7 | 3781 | -17 |
| | | | 75567 | 72151 | 73859 | 3 | | | 49157 | 4 | 4748 | 4 |
| | | | 65483 | 69691 | 67587 | 4 | | | 43789 | -7 | 3630 | -21 |
| | | 40 | 42124 | 42829 | 42477 | 1 | 49830 | 17 | 47115 | 0 | 3848 | -16 |
| | | | 56041 | 62415 | 59228 | 8 | | | 41834 | -12 | 3740 | -18 |
| | | | 46575 | 48993 | 47784 | 4 | | | 44626 | -6 | 4337 | -5 |
| | | 1000 | 5452 | 5438 | 5445 | 0 | 5088 | 9 | 56833 | 20 | 5308 | 16 |
| | | | 5193 | 5339 | 5266 | 2 | | | 49768 | 5 | 4047 | -11 |
| | | | 4521 | 4583 | 4552 | 1 | | | 52987 | 12 | 3640 | -20 |

% DFE = Percentage Difference From Expected
NR = Not Reported

Confidential
THPFM0005688181



Selectivity in Human Whole Blood, Signal (RLU), *Continued*

| Sample | HC | Spike (ng/mL) | Sample Replicates 1 | 2 | Intra-Cartridge Mean | CV % | Inter-Cartridge Mean | CV % | 120 ng/mL Control RLU | % DFE | 3000 ng/mL Control RLU | % DFE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| F9 | 42 | 0 | 62370 | 66514 | 64442 | 5 | 66548 | 6 | 47349 | 0 | 4467 | -2 |
| | | | 64018 | 63780 | 63899 | 0 | | | 44127 | -7 | 4443 | -3 |
| | | | 69038 | 73566 | 71302 | 4 | | | 45383 | -4 | 3651 | -20 |
| | | 40 | 39729 | 41843 | 40786 | 4 | 45382 | 14 | 48781 | 3 | 4520 | -1 |
| | | | 44863 | 40683 | 42773 | 7 | | | 40835 | -14 | 3471 | -24 |
| | | | 53397 | 51774 | 52585 | 2 | | | 46953 | -1 | 4111 | -10 |
| | | 1000 | 3305 | 3862 | 3584 | 11 | 4243 | 16 | 35601 | -25 | 3857 | -16 |
| | | | 4870 | 5050 | 4960 | 3 | | | 48797 | 3 | 4059 | -11 |
| | | | 4694 | 3679 | 4186 | 17 | | | 48880 | 3 | 4711 | 3 |
| F10 | 51 | 0 | 62503 | 58722 | 60613 | 4 | 60390 | 10 | 44482 | -6 | 4177 | -9 |
| | | | NR | NR | NR | - | | | NR | - | NR | - |
| | | | 50430 | 57977 | 54203 | 10 | | | 37266 | -21 | 4075 | -11 |
| | | 40 | 49506 | 44987 | 47247 | 7 | 47428 | 2 | 43505 | -8 | 4087 | -11 |
| | | | 47391 | 45890 | 46640 | 2 | | | 46089 | -3 | 4603 | 1 |
| | | | 43354 | 53439 | 48397 | 15 | | | 40331 | -15 | 4269 | -7 |
| | | 1000 | 5089 | 4882 | 4986 | 3 | 4201 | 16 | 39395 | -17 | 3568 | -22 |
| | | | 3937 | 3812 | 3874 | 2 | | | 40977 | -13 | 4087 | -11 |
| | | | 3755 | 3732 | 3744 | 0 | | | 40888 | -14 | 3561 | -22 |
| M1 | 51 | 0 | 57728 | 55753 | 56741 | 2 | 82701 | 41 | 38234 | -19 | 3615 | -21 |
| | | | 62402 | 78222 | 70312 | 16 | | | 50214 | 6 | 4512 | -1 |
| | | | 120781 | 121321 | 121051 | 0 | | | 42283 | -11 | 4084 | -11 |
| | | 40 | 51882 | 53620 | 52751 | 2 | 53266 | 2 | 45457 | -4 | 4692 | 3 |
| | | | 46817 | 62705 | 54761 | 21 | | | 45279 | -4 | 4145 | -9 |
| | | | 52353 | 52220 | 52286 | 0 | | | 42092 | -11 | 3765 | -18 |
| | | 1000 | 3815 | 4659 | 4237 | 14 | 3962 | 9 | 51209 | 8 | 4449 | -3 |
| | | | 3966 | 4193 | 4079 | 4 | | | 43512 | -8 | 4456 | -3 |
| | | | 3272 | 3870 | 3571 | 12 | | | 42188 | -11 | 4303 | -6 |
| M2 | 49 | 0 | 51991 | 69872 | 60932 | 21 | 64904 | 15 | 39317 | -17 | 4083 | -11 |
| | | | 77488 | 74576 | 76032 | 3 | | | 52761 | 12 | 3957 | -13 |
| | | | 55091 | 60403 | 57747 | 7 | | | 39457 | -17 | 3586 | -22 |
| | | 40 | 44885 | 44464 | 44674 | 1 | 47906 | 6 | 42067 | -11 | 3698 | -19 |
| | | | 53075 | 48623 | 50849 | 6 | | | 46253 | -2 | 4184 | -8 |
| | | | 45613 | 50776 | 48195 | 8 | | | 42951 | -9 | 3970 | -13 |
| | | 1000 | 3636 | 3965 | 3801 | 6 | 4018 | 18 | 41609 | -12 | 4728 | 3 |
| | | | NR | NR | NR | - | | | NR | - | NR | - |
| | | | 4813 | 4878 | 4845 | 1 | | | 52714 | 11 | 4769 | 4 |

% DFE = Percentage Difference From Expected
NR = Not Reported

THERANOS CONFIDENTIAL

Confidential

THPFM0005688182

DX 09003



Theranos, Inc.

# Acetaminophen in Plasma Assay Development Report

Madeleine Flexer Harrison

[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694637



## Assay Development Report: Acetaminophen in Plasma
## 2012

Assay Specifications...................................................................................2

Analyte Background..................................................................................2

### Assay Development and Optimizations

Assay Chemistry.......................................................................................2

Protocols................................................................................................ 3

Reference Assay.......................................................................................3

Sample Dilution.......................................................................................4

Calibrator Verifications.............................................................................5

Reagent Titrations....................................................................................5

### Assay Performance

Dilution Linearity ....................................................................................7

Extended Range .......................................................................................8

Plasma Spike Recovery .............................................................................9

Precision ................................................................................................9

Kinetics .................................................................................................10

Clinical Sample .......................................................................................11

Interference ............................................................................................11

Stability..................................................................................................12

Conclusion .............................................................................................12

[ PAGE \* MERGEFORMAT ]

**ER-14516**



**Assay Specifications**

This assay is designed to measure acetaminophen in plasma across a range of 20 – 200 ug/ml. The assay uses a 1:15 dilution and is completed in 15 minutes.

**Analyte Background**

Acetaminophen is an anti-inflammatory pain reliever commonly known as Tylenol. It targets the cyclooxygenase 3 (COX-3). Acetaminophen is safe at a therapeutic dose (10-30 ug/ml) but at an overdose level (>200 ug/ml) it is hepatotoxic. One of its metabolic pathways in the liver involves cytochrome p450 which produces the toxic metabolite N-acetyl-p-benzoquinone (NAPQI). Under therapeutic conditions glutathione is able to reduce NAPQI and prevent oxidative damage. At overdose levels glutathione becomes depleted and is incapable to accommodate the excess NAPQI which is then free to covalently bind hepatic proteins and cause liver damage.

This assay is designed to measure acetaminophen levels in patients being treated for acetaminophen overdose. The purpose of measuring the serum levels of acetaminophen is to determine and monitor treatment with N-acetyl cysteine, which increases the levels of glutathione and prevents hepatic damage.

## Assay Development and Optimization

### Assay Chemistry

This assay measures the amount of acetaminophen present in plasma by first cleaving acetaminophen with the enzyme aryl acylamidase to produce p-aminophenol which can then react with O-Cresol and $CuSO_4$ to produce indophenol. Indophenol's presence can be measured at 615 nm as an endpoint reaction. This assay is performed as a 2 step, 2 reagent assay.

| Reagent A Component | Concentration |
|---|---|
| Aryl Acylamidase | 10 ug/ml |
| O-Cresol | 0.41% |
| DI $H_2O$ | N/A |

| Reagent B Component | Concentration |
|---|---|
| $CuSO_4$ | 0.566 mM |
| $NH_4OH$ | 118.34 mM |
| DI $H_2O$ | N/A |

[ PAGE \* MERGEFORMAT ]

Confidential

**ER-14517**



Working reagent A should be kept at 4 °C in an amber coloured bottle. Working reagent B can be kept at room temperature. Calibrators and samples are diluted in 100 mM Tris-HCl, pH 9.

**Protocols**

1. Dilute calibrators and samples 1:15 (20 ul sample in 280 ul buffer) in 100 mM Tris-HCl, pH 9. Mix by brief vortexing.
2. Add 20 ul of each diluted sample to 384 MTP in duplicate.
3. Under the hood ad 20 ul of Reagent A to each sample.
4. Incubate for 10 minutes at 37 °C.
5. Add 20 ul of Reagent B.
6. Incubate for 5 minutes at 37 °C.
7. Read absorbance as endpoint at 615 nm in spectrophotometer.

Data Analysis

The assay signal is converted to concentration of Acetaminophen by plotting the absorbance of each calibrator on the x-axis and the concentration of each calibrator on the y-axis. The resulting graph can fit a line y=mx+b. Using the slope (m) and the y-intercept (b) the concentration of Acetaminophen in each sample can be calculated by using the following equation:

$$[Acetaminophen] \; ug/ml = m(sample \; signal) + b$$

**Reference Assay**

In the development of this assay Sigma and Roche Acetaminophen Assays were used as references.

[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694640

ER-14518



### Sample Dilution

The best sample dilution; one with best signal and CVs was 1:15 and the best enzyme dilution was 10 ug/ml.



[ PAGE  \* MERGEFORMAT ]

Confidential

THPFM0005694641



## Calibrator Verification

The kit used to verify the calibrators was the Sekisui Diagnostics - Acetaminophen-SL Assay. For the calibrators to work on the kit they had to be diluted in DI water rather than 100 mM Tris-HCl pH 9.



## Reagent Titrations

The assay reagents were optimized by titrating different concentrations of O-Cresol and $CuSO_4$ in $NH_4OH$. Though there appears to be very little variation between 1/2x and 1x O-Cresol, the 2x O-Cresol does not produce any signal at all. This suggests that either the 2x O-Cresol inhibits the enzyme (aryl acylamidase) or the colour reaction with p-aminophenol has an upper limit. Titration of the $CuSO_4$ showed an increase in signal with an increase of reagent. While the 2x concentration had the best signal, the 1x $CuSO_4$ has an acceptable signal and if necessary or more cost effective could be used as the working reagent. This experiment showed that the concentration of $CuSO_4$ has the most influence in variation in signal of the reaction.

[ PAGE  \* MERGEFORMAT ]

Confidential

THPFM0005694642





[ PAGE  \* MERGEFORMAT ]

Confidential

THPFM0005694643

ER-14521



**Assay Performance**

**Dilution Linearity**

Dilution linearity was performed by mixing spiked (100 ug/ml Acetaminophen) and un-spiked plasma to create a series of samples with varying concentrations. The samples were then diluted 1:15 in 100 mM Tris-HCl, pH 9. Lithium-heparin plasma was used to avoid possible chelation issues that might occur with EDTA plasma. The assay shows good linearity with an $R^2$ 0.9976. The only issue is the high value seen for the y-int which could be calibrated out in the final assay procedure.

| [Acet] ug/ml Spiked | Mean Signal | Std Dev | Signal CV | Mean Value | Recovery |
|---|---|---|---|---|---|
| 0 | 0.103 | 0.005 | 5% | 9.4 | - |
| 30 | 0.162 | 0.000 | 0% | 37.6 | 125% |
| 50 | 0.204 | 0.004 | 2% | 58.2 | 116% |
| 60 | 0.226 | 0.003 | 1% | 68.4 | 114% |
| 70 | 0.253 | 0.003 | 1% | 81.6 | 117% |
| 80 | 0.271 | 0.001 | 0% | 89.9 | 112% |
| 90 | 0.300 | 0.008 | 3% | 104.0 | 116% |
| 100 | 0.315 | 0.007 | 2% | 111.2 | 111% |



[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694644



**Extended Range**

The linear range of this assay was tested by extending the calibration above the clinical range to 500 ug/ml. Additional calibrators were prepared from 100 mM Acetaminophen stock and diluted in 100 mM Tris-HCl, pH 9.



| [Acetaminophen] ug/ml | Mean Signal | Std Dev | %CV | Mean Value | Recovery |
|---|---|---|---|---|---|
| 500 | 1.060 | 0.054 | 5% | 522.903 | 105% |
| 400 | 0.743 | 0.067 | 9% | 361.969 | 90% |
| 300 | 0.624 | 0.004 | 1% | 301.514 | 101% |
| 250 | 0.570 | 0.016 | 3% | 273.942 | 110% |
| 200 | 0.377 | 0.013 | 4% | 175.623 | 88% |
| 100 | 0.193 | 0.000 | 0% | 82.335 | 82% |
| 50 | 0.134 | 0.001 | 1% | 52.222 | 104% |
| 25 | 0.084 | 0.001 | 1% | 26.937 | 108% |
| 12.5 | 0.070 | 0.002 | 3% | 19.517 | 156% |
| 6.25 | 0.057 | 0.000 | 0% | 12.986 | 208% |
| 3.125 | 0.051 | 0.001 | 1% | 10.267 | 329% |
| 0 | 0.044 | 0.001 | 1% | 6.658 | - |

The assay is linear to at least 500 ug/ml.

[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694645



Intra-Run Concentration CVs

## Plasma Spike Recovery

Charcoal stripped plasma (Sera Con II CD, 3x FT, Lot # 10E1406) was spiked with 4 different therapeutic levels of Acetaminophen using a 50 mM stock. The four resulting samples were subsequently spiked with low, med and high levels of Acetaminophen. Most recoveries are within 10 % of nominal.

| [Acetaminophen] Spiked ug/ml | Sample A | Sample B | Sample C | Sample D | Mean % Recovery |
|---|---|---|---|---|---|
| 0 | - | - | - | - | - |
| 25 | 96% | 112% | 89% | 99% | 99% |
| 75 | 86% | 92% | 91% | 88% | 89% |
| 150 | 90% | 91% | 91% | 93% | 91% |
| Sample Average | 91% | 98% | 90% | 93% | 93% |

## Precision

In the development of this assay, precision was tested by spiking one sample of EDTA plasma from Stanford blood bank to produce 5 samples of varying acetaminophen concentration. These samples as well as their calibrators were freshly diluted in 100 mM Tris-HCl, pH 9 each time they were run. The only issue with using EDTA plasma is that the reaction would not reach its end point for 30 min. The data below was collected  30 minutes after the final incubation was completed. This assay demonstrated good precision with average Inter-run CVs at 4% and average Intra-run CVs at 5%.

Reported Acetaminophen (ug/ml)

| Sample | Run 1 | Run 2 | Run 3 | Mean | Std. Dev. | CV |
|---|---|---|---|---|---|---|
| 1 | 102.60 | 99.07 | 95.45 | 99.04 | 3.58 | 4% |
| 2 | 70.24 | 68.70 | 67.45 | 68.80 | 1.40 | 2% |
| 3 | 58.17 | 55.57 | 55.79 | 56.51 | 1.44 | 3% |
| 4 | 52.83 | 46.89 | 46.84 | 48.85 | 3.45 | 7% |
| 5 | 34.56 | 32.12 | 31.24 | 32.64 | 1.72 | 5% |

Average Inter-run Concentration CV  =  4%

[ PAGE  \* MERGEFORMAT ]

Confidential



| Sample | Run 1 | Run 2 | Run 3 | Mean |
|--------|-------|-------|-------|------|
| 1 | 8% | 2% | 4% | 5% |
| 2 | 12% | 7% | 3% | 7% |
| 3 | 2% | 1% | 5% | 3% |
| 4 | - | 7% | 2% | 5% |
| 5 | 1% | 5% | 5% | 4% |
| Average Intra-run CV | | | = | 5% |

### Kinetics

To clarify the late endpoint of the samples in the precision experiment, a kinetic study was done to confirm the endpoint of the assay reaction. Calibrators, and spiked EDTA and Li-Heparin samples were run and their signals were read for 30 minutes after the final incubation step.

The results show that while the calibrators and Li-Heparin samples reach an endpoint immediately, the EDTA samples do not appear to reach their endpoint until 30 minutes after the final incubation step. The Theranos system requires samples to read within 15 minutes and so it is recommended that only Li-Heparin samples are run on the Acetaminophen Assay.

Calibrators



EDTA



[ PAGE  \* MERGEFORMAT ]

Confidential



EDTA at 100 ug/ml



Li-Heparin



## Clinical Samples

Clinical samples were prepared by spiking two levels of acetaminophen into Lithium-Heparin plasma from eight different patients. This produced a total of sixteen clinical samples which were then run on both the Theranos and Sekisui assay. The resulting data produces the correlation equation y = 0.9702x + 6.4211, R² = 0.9899 which is more than adequate to our standards



[ PAGE \* MERGEFORMAT ]

ER-14526



## Interference

Interference was tested by spiking hemolysed, icteric and lipemic plasma samples with different concentrations of Acetaminophen. For each sample spiked with 200 and 100 ug/ml of Acetaminophen recovery was within 10% of nominal but at 50 and 0 ug/ml both have over-recovery for each sample type. Interference is therefore only an issue at lower concentrations of Acetaminophen.

| Hemolysed | | | | | | | |
|---|---|---|---|---|---|---|---|
| [Acetaminophen] ug/ml | 1 | 2 | Mean Value | Std Dev | %CV | Mean Value | Recovery |
| 200 | 0.403 | 0.410 | 0.407 | 0.005 | 0.013 | 192.138 | 96% |
| 100 | 0.262 | 0.248 | 0.255 | 0.010 | 0.037 | 109.708 | 110% |
| 50 | 0.189 | 0.191 | 0.190 | 0.002 | 0.011 | 74.376 | 149% |
| 0 | 0.112 | 0.115 | 0.113 | 0.002 | 0.014 | 32.794 | - |

| Icteric | | | | | | | |
|---|---|---|---|---|---|---|---|
| [Acetaminophen] ug/ml | 1 | 2 | Mean Value | Std Dev | %CV | Mean Value | Recovery |
| 200 | 0.422 | 0.402 | 0.412 | 0.014 | 0.035 | 195.128 | 98% |
| 100 | 0.232 | 0.225 | 0.229 | 0.005 | 0.020 | 95.358 | 95% |
| 50 | 0.166 | 0.164 | 0.165 | 0.001 | 0.008 | 60.679 | 121% |
| 0 | 0.066 | 0.071 | 0.069 | 0.004 | 0.060 | 8.361 | - |

| Lipemic | | | | | | | |
|---|---|---|---|---|---|---|---|
| [Acetaminophen] ug/ml | 1 | 2 | Mean Value | Std Dev | %CV | Mean Value | Recovery |
| 200 | 0.464 | 0.459 | 0.461 | 0.003 | 0.007 | 221.898 | 111% |
| 100 | 0.256 | 0.221 | 0.238 | 0.024 | 0.103 | 100.603 | 101% |
| 50 | 0.209 | 0.187 | 0.198 | 0.015 | 0.077 | 78.779 | 158% |
| 0 | 0.122 | 0.121 | 0.121 | 0.000 | 0.004 | 37.142 | - |

[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694649



An acetaminophen overdose is treated with N-acetyl cysteine. The dosage of NAC is determined by measuring the amount of acetaminophen in plasma. Once treatment begins, acetaminophen levels are monitored to determine the patient's rate of recovery. It is therefore important that N-Acetyl Cysteine does not interfere with our acetaminophen assay.

To measure the interference of this drug a lithium-heparin plasma sample was spiked with 100 ug/ml acetaminophen. The sample was then split seven ways and each subsequent sample was spike with a different concentration of N-Acetyl Cysteine. The results show that from 500-200 ug/ml of NAC interference is just within 10% and anything below does not face any interference.

| [NAC] ug/ml | [Acetaminophen stock] ug/ml | 1 | 2 | Mean Value | Std Dev | %CV | Mean Value | Recovery |
|---|---|---|---|---|---|---|---|---|
| 500 | 100 | 0.255 | 0.256 | 0.255 | 0.001 | 0.003 | 89.610 | 90% |
| 400 | 100 | 0.257 | 0.252 | 0.254 | 0.003 | 0.014 | 89.007 | 89% |
| 300 | 100 | 0.257 | 0.258 | 0.258 | 0.001 | 0.003 | 90.817 | 91% |
| 200 | 100 | 0.258 | 0.255 | 0.256 | 0.002 | 0.010 | 90.214 | 90% |
| 100 | 100 | 0.282 | 0.268 | 0.275 | 0.010 | 0.037 | 99.842 | 100% |
| 50 | 100 | 0.274 | 0.271 | 0.273 | 0.002 | 0.009 | 98.688 | 99% |
| 0 | 100 | 0.278 | 0.268 | 0.273 | 0.007 | 0.025 | 98.924 | 99% |

### Stability

At this time, Reagent A is very unstable and left at room temperature degrades within 30 minutes. Reagent B has proved to be stable for the entirety of the development of this assay.

### Conclusion

The Theranos acetaminophen in plasma assay has completed pre-feasibility testing and met the necessary testing criteria, excluding stability which is pending. This assay can measure acetaminophen from 0 - 500 ug/ml at a 1:15 dilution in 15 minutes.

[ PAGE \* MERGEFORMAT ]

Confidential

THPFM0005694650

**DX 09158**

| theran⊙s | **Estradiol Validation Report** | Document Number:<br>Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Author(s):**

| Signature: | Date: 9/17/2014 |
|---|---|
| Name: Ran Hu, PhD | Title: Immunoassay Sr. Scientist |

**Reviewer(s)**

| Signature: Sharada Sivaraman | Date: 9/17/14 |
|---|---|
| Name: Sharada Sivaraman, PhD | Title: Immunoassay Team Leader |

| Signature: | Date: 9/17/14 |
|---|---|
| Name: Chinmay Pangarkar, Ph.D. | Title: Associate Director |

| Signature: | Date: 9/18/14 |
|---|---|
| Name: Daniel Young, Ph.D. | Title: Vice President |

**Approver(s):**

| Signature: | Date: 9/18/14 |
|---|---|
| Name: Adam Rosendorff, M.D | Title: Laboratory Director |

Sunil S. Dhawan M.D.    9/19/15

1

Confidential

ER-14529

| **theranos** | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Table of Content**

LIST OF TABLES ............................................................................. 3
LIST OF FIGURES............................................................................ 4
1    ASSAY BACKGROUND.......................................................... 5
2    REGULATION AND GUIDANCE.............................................. 6
3    CALIBRATION ..................................................................... 6
4    PRECISION.......................................................................... 8
5    ACCURACY/COMPARABILITY ............................................. 10
6    DILUTION LINEARITY......................................................... 19
7    REFERENCE RANGE ........................................................... 21
8    BLOOD COLLECTION DEVICE (BCD) COMPARISON ............. 22
9    ANALYTICAL SENSITIVITY ................................................. 25
10   ANTICOAGULANT COMPARISON ........................................ 30
11   INTERFERENCE.................................................................. 34
12   CROSSREACTIVITY............................................................ 35
13   ANALYTE STABILITY ......................................................... 36
14   REAGENT STABILITY IN CAPSYS CARTRIDGES.................... 38
15   REFERENCES .................................................................... 39

2

Confidential

THPFM0005699331

ER-14530

| theranos | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

### List of Tables

Table 1 Theranos Estradiol Assay Specification................................................................ 6
Table 2 Calibrator preparation ....................................................................................... 7
Table 3: Acceptable Performance ................................................................................... 8
Table 4: Precision summary ........................................................................................... 8
Table 5: Method comparison summary ........................................................................... 10
Table 6: Verification of Bias Correction ......................................................................... 18
Table 7: Dilution Linearity ............................................................................................. 19
Table 8: Dilution Linearity Summary .............................................................................. 19
Table 9 Summary of reference range verification ............................................................ 21
Table 10: Venous v. Fingerstick results ......................................................................... 23
Table 11: Verification of blank....................................................................................... 25
Table 12: Verification of LLOQ....................................................................................... 27
Table 13: ½ LLOQ Replicates ........................................................................................ 29
Table 14: Analytical Sensitivity Summary ...................................................................... 30
Table 15: EDTA Plasma ................................................................................................. 30
Table 16: Li Heparin Plasma .......................................................................................... 31
Table 17: Serum ........................................................................................................... 32
Table 18: Summary of EDTA v. Li Heparin v. Serum ....................................................... 33
Table 19: Results of Hemolyzed Samples – 250 mg/dL Hemoglobin ................................ 34
Table 20: Icteric Samples – 5 mg/dL Bilirubin ............................................................... 35
Table 21: Lipemic Samples – 250 mg/dL Triglycerides ................................................... 35
Table 22: Cross-reactive test......................................................................................... 35
Table 23: Analyte Stability Summary: 4C ....................................................................... 36
Table 24: Analyte Stability Summary: RT ....................................................................... 36
Table 25: Capsys cartridge stability ............................................................................... 38

3

| theranos | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

**List of Figures**

Figure 1 Calibrator re-assignment ............................................................................. 7
Figure 2: Precision Plots ........................................................................................... 9
Figure 3: Scatter Plot – CLSI Guideline EP09-A2-IR Section 4.2 ........................... 15
Figure 4: Difference Plot – CLSI Guideline EP09-A2-IR Section 4.2 ...................... 16
Figure 5: Verification of Bias Correction ................................................................. 17
Figure 6: Dilution Linearity ...................................................................................... 20
Figure 7: Comparison of fingerstick and venous blood samples ............................... 24
Figure 8: EDTA Plasma v Serum .............................................................................. 34
Figure 9: Analyte Stability at 4C .............................................................................. 37
Figure 10: Analyte Stability at Room Temperature ................................................... 37
Figure 11: Capture antibody working solution stability at 4C .................................. 38

4

Confidential

THPFM0005699333

| **theranos** | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 1   ASSAY BACKGROUND

17 Beta-Estradiol is a steroid hormone, the predominant sex steroid in human females, and also present in males. It is one of three estrogens including estrone (E1) estradiol (E2) and estriol (E3). Estriol levels are high only during pregnancy, while estrone levels are low during reproductive years and rise after menopause. In females of reproductive age with normal ovaries, estradiol production during the menstrual cycle peaks the 1-2 days before ovulation and then falls as LH levels peak.

In the blood, estradiol is bound with high affinity to Steroid Hormone Binding Globulin (SHBG) a homodimeric glycoprotein with an internal hydrophobic domain. Human SHBG binds testosterone and its metabolites with highest affinity, followed closely by affinity for estradiol. Human SHBG differs from many other mammalian SHBGs in the fact that it binds estradiol with such high affinity. Estradiol also associates with low affinity to other plasma proteins such as Human Serum Albumin (HSA).

Since most of the estradiol in blood is bound to these proteins, many antibodies raised against estradiol haptens are not able to bind to the appropriate epitope in a biological matrix. The potential unavailability of SHBG-bound estradiol presents a challenge for assay design, and two main approaches to the problem can be used. One approach is to attempt to displace the estradiol from SHBG using a steroid with higher binding affinity such as Dihydrotestosterone (DHT). However in multiplexing assays this presents many challenges and limitations on the combination of analytes to be measured. Another approach is to create an antibody that is able to bind to estradiol even in its SHBG-bound state, likely a polyclonal antibody.

In post menopausal women, a high estradiol concentration is predictive of preserved bone mass and reduced fracture rates. Estradiol reduces bone resorption by inducing apoptosis of osteoclasts and is therefore protective against osteoporosis. Estradiol may also assist in attenuating the progression of diabetic kidney disease primarily by acting on TGF-Beta-1.

### 1.1   Theranos System Specification

This assay is designed to detect Estradiol in human EDTA plasm and Serum. Li-heparin plasma is not recommended to be used as a sample for the Theranos Estradiol assay. The assay has a reportable range of 25 – 1200 pg/ml (calibrator lot specific: current lot 26.9 – 1293 pg/ml). The calibrator values are verified by reference method. No NIBSC WHO material is available for Estradiol. Samples are stable at 4C or RT for 72 hours. If samples are not analyzed within 72 hours of collection, samples should be stored at -20C or lower.

5

Confidential

THPFM0005699334

| theranos | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Table 1 Theranos Estradiol Assay Specification**

| Assay | Theranos Estradiol Assay |
|---|---|
| Reportable Range | Nominal value 25 - 1200 pg/ml (validation batch: 26.9 - 1293 pg/ml) |
| Accepted sample type | EDTA plasma and Serum |
| Sample Stability | Up to 72 hours at 4 degree Celsius or Room Temperature |

1.2    Reference Assay

The SIEMENS Immulite 2000 Estradiol test was used as a predicate method.  The reportable range is 20-2000 pg/ml.  Hemolysis (packed red blood cells in concentration up to 30 μl/ml), lipemia (up to 3000 mg/dL triglycerides), and icterus (up to 200 mg/L bilirubin), does not affect assay precision.

**2    REGULATION AND GUIDANCE**

The qualification/validation of the ELISA assays on the Theranos device will be in accordance with C.F.R. Ch IV, § 493.1253 "Standard; Establishment and verification of performance specifications" and outlined in CLSI guideline C28A3.

**3    CALIBRATION**

3.1    Guidelines

3.1.1    In 42 CFR Part 493.1255, it is required to perform calibration procedures with at least the frequency recommended by the manufacturer, or using criteria specified by the laboratory, or when calibration verification fails to meet acceptable limits.

3.1.2    For the purposes of this Validation Plan, calibration will be carried out for each new lot of reagent cartridges.

3.1.2.1    At each level 3 cartridge replicates were tested.  Any individual tip with a value less than 150RLU was considered a "Dark" tip.  Any dark tips and outliers were excluded from the mean, %CV and % Recovery calculations.

3.1.2.2    Acceptance criteria: For each run, a minimum of 75% points of calibration standards should be within 100 ± 20% (100 ± 25% at LLOQ and ULOQ standards) of their nominal values, and a minimum of six unique standard concentrations must be within the assay range.

6

Confidential                                                                     THPFM0005699335

**ER-14534**

| theran⊚s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

3.2    Calibrator preparation

Estradiol assay calibrators were prepared by series diluting Estradiol standard material into charcoal adsorbed steroid depleted serum. Each calibrator was analyzed by predicate method. A graph was plotted (Nominal vs CLIA values) and the reassigned value was calculated from the slope.

Reassigned Value (pg/mL) = Nominal Value * 1.0779

**Table 2 Calibrator preparation**

| Estradiol | nominal conc (pg/ml) | CLIA results (pg/ml) | Reassigned Value (pg/ml) |
|---|---|---|---|
| Calibrator 1 | 2400 | 2641 | 2587.0 |
| Calibrator 2 | 1200 | 1193 | 1293.5 |
| Calibrator 3 | 600 | 623 | 646.7 |
| Calibrator 4 | 300 | 344 | 323.4 |
| Calibrator 5 | 150 | 157 | 161.7 |
| Calibrator 6 | 75 | 77.3 | 80.8 |
| Calibrator 7 | 50 | 48.2 | 53.9 |
| Calibrator 8 | 25 | 23.8 | 26.9 |
| Calibrator 9 | 12.5 | <20 | 13.5 |
| Calibrator 10 | 0 | <20 | 0.0 |

**Figure 1 Calibrator re-assignment**



7

**ER-14535**

| theranos | Estradiol Validation Report | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System | | |

**Calibration (Edison 3.5) For All Validation Experiments**
Two sets of device were calibrated. Each set of device was calibrated by nozzle (tip). For both sets, precision and accuracy were within $100 \pm 25\%$ at LLOQ and ULOQ standards.

**4  PRECISION**

4.1  Precision was evaluated according to CLSI standard EP5-A2, Evaluation of Precision Performance of Quantitative Measurement Methods.

4.2  Precision study procedure

4.2.1  Precision was evaluated at three medical decision levels. A total of 45 runs at each decision level were performed.

4.2.2  Three devices were calibrated individually. Each level had 15 runs on each device. All three levels were run on each device.

4.3  Precision summary

**Table 3: Acceptable Performance**

| Decision Level | Acceptable performance | TAE(%) | Precision (%) | Allowable Bias (%) |
|---|---|---|---|---|
| 60 pg/ml | 25% | 25 | 21.1 | 3.9 |
| 450 pg/ml | 24% | 24 | 20.1 | 3.9 |

**Table 4: Precision summary**

| Level | Assigned value (pg/ml) | Mean Calculated Concentration (pg/ml) | %CV |
|---|---|---|---|
| 1 | 550 | 554 | 20.1% |
| 2 | 183.3 | 174.4 | 20.8% |
| 3 | 73.3 | 65.5 | 21.1% |

8

Confidential

THPFM0005699337

ER-14536

| theran⬤s | **Estradiol Validation Report** | Document Number:<br>Revision: CL-RPT-131221 |
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 2: Precision Plots**

The plot shows the profile of predicted concentrations from precision study done over multiple runs.



9

Confidential

THPFM0005699338

ER-14537

| theranos | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 5 ACCURACY/COMPARABILITY

5.1 To test the accuracy of the assay on the Theranos System, 145 unique patient samples were assayed using both the predicate method (Siemens Immulite) and the Theranos System. Of these samples 47 were within the medical decision range (150 - 500 pg/ml), 50 were below 150pg/ml, and 48 were higher than 500pg/ml. Based on the results of the data examination, either a simple linear regression or alternative procedures were used to estimate expected (average) bias and the confidence interval of expected bias at the desired medical decision level(s) as per CLSI guidance EP09-A2. StatisPro was used for bias calculations. These estimates were compared with internal criteria to judge the acceptability of the Theranos method.

5.2 Results: Weighted Deming fitting was chosen for Estradiol method comparison. Equation between Theranos results and Immulite results was determined as y=0.98x+19.34

**Table 5: Method comparison summary**

| Sample ID | CLIA value (pg/ml) | Theranos results (pg/ml) | Theranos Bias-corrected results (pg/ml) |
|---|---|---|---|
| Patient 1 | < 20.0 | OORL | OORL |
| Patient 2 | 27.7 | OORL | OORL |
| Patient 3 | < 20.0 | OORL | OORL |
| Patient 4 | < 20.0 | OORL | OORL |
| Patient 5 | < 20.0 | OORL | OORL |
| Patient 6 | 28.8 | OORL | OORL |
| Patient 7 | 57.3 | 56.8 | 38.3 |
| Patient 8 | 71.4 | 66.8 | 48.4 |
| Patient 9 | 30.9 | 22.2 | 3.0 |
| Patient 10 | 27.4 | OORL | OORL |
| Patient 11 | 51.7 | 93.8 | 76.0 |
| Patient 12 | < 20.0 | OORL | OORL |
| Patient 13 | < 20.0 | 33.8 | 14.8 |
| Patient 14 | < 20.0 | OORL | OORL |
| Patient 15 | 53.4 | 39.9 | 21.0 |
| Patient 16 | 47.5 | OORL | OORL |
| Patient 17 | 76.3 | 227.5 | 212.4 |
| Patient 18 | 27.1 | 497.3 | 487.7 |
| Patient 19 | 25.8 | 55.4 | 36.8 |

10

Confidential

THPFM0005699339

ER-14538

| theran⊕s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | |
|---|---|---|---|
| Patient 20 | 87.8 | 91.7 | 73.9 |
| Patient 21 | 38.5 | 69.8 | 51.5 |
| Patient 22 | 29.8 | 21.7 | 2.4 |
| Patient 23 | < 20.0 | OORL | OORL |
| Patient 24 | < 20.0 | 34.7 | OORL |
| Patient 25 | 42.5 | OORL | OORL |
| Patient 26 | 610 | 658 | 652 |
| Patient 27 | 1273 | 1233 | 1239 |
| Patient 28 | 576 | 562 | 554 |
| Patient 29 | 1805 | 2365 | 2394 |
| Patient 30 | 1101 | 988 | 989 |
| Patient 31 | 1910 | 1735 | 1751 |
| Patient 32 | 3261 | 2070 | 2093 |
| Patient 33 | 2503 | 1326 | 1334 |
| Patient 34 | 994 | 813 | 810 |
| Patient 35 | 1693 | 1050 | 1051 |
| Patient 36 | 456 | 669 | 663 |
| Patient 37 | 1431 | 1954 | 1974 |
| Patient 38 | 1941 | 823 | 820 |
| Patient 39 | 737 | 1192 | 1196 |
| Patient 40 | 981 | 1947 | 1967 |
| Patient 41 | 1627 | 2126 | 2149 |
| Patient 42 | 494 | 551 | 543 |
| Patient 43 | 1299 | 1243 | 1249 |
| Patient 44 | 1318 | 1178 | 1183 |
| Patient 45 | 1604 | 1130 | 1134 |
| Patient 46 | 2625 | 2095 | 2118 |
| Patient 47 | 520 | 538 | 529 |
| Patient 48 | 859 | 602 | 595 |
| Patient 49 | 1145 | 1014 | 1015 |
| Patient 50 | 418 | 255 | 240 |
| Patient 51 | >2000 | 2048 | 2070 |
| Patient 52 | 550 | 623 | 616 |
| Patient 53 | 1214 | 1512 | 1523 |
| Patient 54 | 1461 | 1362 | 1370 |
| Patient 55 | 1130 | 1469 | 1479 |

11

Confidential

ER-14539

| theranos | Estradiol Validation Report | Document Number:<br>Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

| Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System | | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Patient 56 | 1657 | 2435 | 2465 |
| Patient 57 | 1721 | 1592 | 1605 |
| Patient 58 | 1514 | 1514 | 1526 |
| Patient 59 | 1195 | 1169 | 1173 |
| Patient 60 | 1161 | 1539 | 1551 |
| Patient 61 | 961 | 594 | 586 |
| Patient 62 | >2000 | 2677 | 2712 |
| Patient 63 | 350 | 436 | 426 |
| Patient 64 | 850 | 709 | 704 |
| Patient 65 | 1325 | 1256 | 1262 |
| Patient 66 | 1024 | 1109 | 1112 |
| Patient 67 | 918 | 1163 | 1167 |
| Patient 68 | 1263 | 2764 | 2801 |
| Patient 69 | 1784 | 1431 | 1440 |
| Patient 70 | 2333 | 2451 | 2481 |
| Patient 71 | 1753 | 1835 | 1852 |
| Patient 72 | 1259 | 1237 | 1242 |
| Patient 73 | 609 | 394 | 382 |
| Patient 74 | 2401 | 1933 | 1953 |
| Patient 75 | 942 | 819 | 816 |
| Patient 76 | 39.8 | OORL | OORL |
| Patient 77 | 49.8 | 102 | 84.6 |
| Patient 78 | 32.4 | OORL | OORL |
| Patient 79 | 23.9 | OORL | OORL |
| Patient 80 | 20.9 | OORL | OORL |
| Patient 81 | 22.4 | OORL | OORL |
| Patient 82 | 56.2 | 63.1 | 44.7 |
| Patient 83 | 25 | OORL | OORL |
| Patient 84 | 45.9 | OORL | OORL |
| Patient 85 | 149 | 283 | 269 |
| Patient 86 | 176 | 161 | 145 |
| Patient 87 | 36.2 | OORL | OORL |
| Patient 88 | 32.1 | 56.1 | 37.5 |
| Patient 89 | 117 | 202 | 186 |
| Patient 90 | 37.5 | OORL | OORL |
| Patient 91 | 99.2 | 73.7 | 55.5 |

12

Confidential

THPFM0005699341

ER-14540

| theran○s | Estradiol Validation Report | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | |
|---|---|---|---|
| Patient 92 | 62.3 | 36.6 | 17.6 |
| Patient 93 | 87.7 | 55.4 | 36.8 |
| Patient 94 | 34.9 | 67.0 | 48.6 |
| Patient 95 | 38.6 | 34.3 | 15.3 |
| Patient 96 | 22.8 | OORL | OORL |
| Patient 97 | 121 | 219 | 204 |
| Patient 98 | 30.7 | OORL | OORL |
| Patient 99 | 159 | 51.5 | 32.8 |
| Patient 100 | 36.7 | 41.1 | 22.2 |
| Patient 101 | 199 | 195 | 179 |
| Patient 102 | 279 | 292 | 278 |
| Patient 103 | 223 | 336 | 323 |
| Patient 104 | 478 | 572 | 564 |
| Patient 105 | 386 | 572 | 564 |
| Patient 106 | 383 | 247 | 233 |
| Patient 107 | 372 | 461 | 451 |
| Patient 108 | 368 | 333 | 320 |
| Patient 109 | 152 | 232 | 217 |
| Patient 110 | 340 | 339 | 326 |
| Patient 111 | 249 | 196 | 181 |
| Patient 112 | 246 | 367 | 355 |
| Patient 113 | 266 | 247 | 233 |
| Patient 114 | 212 | 119 | 102 |
| Patient 115 | 176 | 104 | 86.3 |
| Patient 116 | 181 | 66.4 | 48.0 |
| Patient 117 | 432 | 349 | 336 |
| Patient 118 | 356 | 1093 | 1096 |
| Patient 119 | 187 | 120 | 103 |
| Patient 120 | 295 | 306 | 292 |
| Patient 121 | 272 | 255 | 240 |
| Patient 122 | 246 | 192 | 176 |
| Patient 123 | 223 | 325 | 312 |
| Patient 124 | 295 | 365 | 353 |
| Patient 125 | 351 | 349 | 337 |
| Patient 126 | 208 | 241 | 226 |
| Patient 127 | 333 | 598 | 590 |

13

Confidential

THPFM0005699342

ER-14541

| theran⊙s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** ||||

| Patient 128 | 182 | 127 | 110 |
|---|---|---|---|
| Patient 129 | 253 | 367 | 355 |
| Patient 130 | 292 | 185 | 169 |
| Patient 131 | 310 | 248 | 233 |
| Patient 132 | 406 | 600 | 592 |
| Patient 133 | 248 | 399 | 387 |
| Patient 134 | 206 | 212 | 197 |
| Patient 135 | 275 | 722 | 717 |
| Patient 136 | 184 | 338 | 325 |
| Patient 137 | 204 | 344 | 331 |
| Patient 138 | 224 | 200 | 184 |
| Patient 139 | 315 | 359 | 346 |
| Patient 140 | 176 | 147 | 131 |
| Patient 141 | 147 | 226 | 211 |
| Patient 142 | 149 | 115 | 97.3 |
| Patient 143 | 1910 | 1419 | 1429 |
| Patient 144 | 1472 | 1481 | 1491 |
| Patient 145 | 1973 | OORH | OORH |

14

Confidential

THPFM0005699343

| theran😐s | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 3: Scatter Plot – CLSI Guideline EP09-A2-IR Section 4.2**



Confidential

THPFM0005699344

| <div style="text-align:center">**theran⊚s**</div> | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |

### Figure 4: Difference Plot – CLSI Guideline EP09-A2-IR Section 4.2



### Adequate range test

CLSI guideline EP09-A2-IR section 4.5

$r$    0.938

$r < 0.975$ indicates that the error in X is not adequately compensated by the measuring range. CLSI recommends use of partitioned biases.



### Partitioned differences

CLSI guideline EP09-A2-IR section 6.2

| Partition | n | Mean difference | SD |
|---|---|---|---|
| < 208 | 36 | -0.92220938 | 62.09771284 |
| ≥ 208 and < 850 | 38 | 1.440454955 | 114.4950934 |
| ≥ 850 | 36 | -120.479578 | 348.1226843 |

16

THPFM0005699345

**ER-14544**

| **theranos** | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Comparability**

*CLSI guideline EP09-A2-IR section 7*

| Level ID | Value | Difference | SE | 95% CI | Allowable difference |
|---|---|---|---|---|---|
| 1 | 60.0000000 | -0.92220938 | 10.3496188 | 0.333052577 to 20.088 | 2.400000000 |
| 2 | 450.0000000 | 1.440454955 | 18.5735567 | 6.193145802 to 39.074 | 18.00000000 |

Difference is less than allowable bias: 4%.

5.3 **Validation of bias correction**: In order to validate the bias correction derived in section 5.2, an independent set of samples was analyzed on Theranos as well as the predicate method. The objective of this study was to apply the bias correction on Theranos measurments, and then compare the mean bias between the two methods with the total allowable bias.

```
Total allowable bias = Total allowable error - Avg Imprecision
                     = 24% - 20.2%
                     = 3.8%
```

As seen in figure, after correction, the mean bias is 0.9%, with a 95% confidence interval around it of [-16.5%, 18.3%]. This bias is within the total allowable bias, thus validating the bias correction.

**Figure 5: Verification of Bias Correction**




17

THPFM0005699346

**ER-14545**

| theran⊕s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Table 6: Verification of Bias Correction

| SampleID | Immulite | Theranos |
|---|---|---|
| Patient 1 | 88.5 | 122.1 |
| Patient 3 | 44.9 | 39.8 |
| Patient 6 | 91.3 | 39.3 |
| Patient 7 | 38.5 | 33.0 |
| Patient 8 | 63.7 | 64.2 |
| Patient 9 | 46.6 | 109.7 |
| Patient 10 | 100.7 | 165.5 |
| Patient 13 | 63.8 | 66.1 |
| Patient 14 | 96.4 | 56.4 |
| Patient 16 | 58.2 | 59.1 |
| Patient 17 | 342.0 | 279.0 |
| Patient 18 | 25.8 | 30.0 |
| Patient 20 | 75.9 | 102.8 |
| Patient 22 | 117.5 | 100.2 |
| Patient 23 | 164.0 | 101.2 |
| Patient 25 | 33.6 | 40.0 |
| Patient 26 | 70.4 | 59.2 |
| Patient 27 | 45.0 | 39.8 |
| Patient 28 | 187.5 | 168.8 |
| Patient 30 | 47.4 | 33.6 |
| Patient 31 | 46.2 | 29.3 |
| Patient 33 | 147.0 | 92.4 |
| Patient 35 | 23.7 | 34.2 |
| Patient 37 | 63.9 | 62.6 |

18

THPFM0005699347

| theran⊚s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 6  DILUTION LINEARITY

6.1  A high analyte clinical sample was selected and serially diluted with a low analyte clinical sample to a total of 8 points to test the linearity. The nominal values of each level were reported by the predicate method (Siemens Immulite).

6.2  Acceptance criteria: Each dilution level was tested on the Theranos System and compared to the nominal concentrations. For each dilution level, the recovery should be within $100 \pm 20\%$ of their nominal value, and when plotted, the $R^2$ value should be equal or greater than 0.95.

### Table 7: Dilution Linearity

| CLIA Conc (pg/ml) | SampleID | RLU | | | | | | Theranos measured concentration (pg/ml) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| 2333 | High Patient Sample | 3218 | 2348 | 2490 | 2083 | 2077 | 2633 | OORH | 1203.603 | OORH | OORH | OORH | OORH | OORH |
| 1092 | Dilution 1 | 3934 | 5263 | 3684 | 5354 | 4407 | 3911 | 992 | 638 | 1133 | 641 | 1044 | 1011 | 1051 |
| 531 | Dilution 2 | 6527 | 6196 | 5122 | 5369 | 5897 | 6765 | 380 | 514 | 679 | 636 | 683 | 454 | 553 |
| 266 | Dilution 3 | 8896 | 7133 | 7942 | 7906 | 9971 | 9484 | 289 | 425 | 362 | 280 | 270 | 266 | 250 |
| 132 | Dilution 4 | 11385 | 13748 | 14832 | 13766 | 13198 | 9683 | 137 | 124 | 119 | 111 | 143 | 256 | 110 |
| 69 | Dilution 5 | 16289 | 15541 | 15629 | dark | 14077 | 13242 | 90 | 90 | 104 | INVALID | 120 | 139 | 91 |
| 44.7 | Dilution 6 | 13636 | 18955 | 19937 | 16768 | 17053 | 14419 | 45 | 50 | 38 | 77 | 66 | 113 | 47 |
| 29.2 | Low Patient Sample | 22680 | 22851 | 22240 | 22052 | 21545 | 18262 | OORL | OORL | OORL | 40 | OORL | 51 | OORL |

### Table 8: Dilution Linearity Summary

| Sample ID | Nominal Value [pg/ml] | Theranos Result [pg/ml] | % Recovery |
|---|---|---|---|
| High Patient Sample | 2333 | OORH | — |
| 1:2 | 1092 | 1051 | 96% |
| 1:4 | 531 | 553 | 104% |
| 1:8 | 266 | 250 | 94% |
| 1:16 | 132 | 110 | 83% |
| 1:32 | 69 | 91 | 133% |
| 1:64 | 44.7 | 47 | 104% |
| Low Patient Sample | 29.2 | OORL | — |

19

Confidential

THPFM0005699348

**ER-14547**

| **theranos** | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |

**Figure 6: Dilution Linearity**



y = 0.966x + 6.887| R^2=0.99

Confidential

THPFM0005699349

**ER-14548**

| **theranos** | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |

## 7   REFERENCE RANGE

To verify the accuracy of the Theranos System, the reference range was tested and compared to the results from the predicate method. According to C.F.R. Ch IV, § 493.1253 "Standard: Establishment and verification of performance specifications" and outlined in CLSI guideline C28A3, laboratories developing test methods need to verify the measuring interval. Additionally, by verifying the measuring interval, clinical laboratories can ensure that the calibration of the measurement procedure is correctly applicable over the range in which they report patient results and that the measuring interval they are obtaining in their laboratory is comparable to the interval defined by the manufacturer in the product insert. A measuring interval consists of all numeric values between the lower and upper numeric values for which a method can produce quantitative results suitable for clinical use.

7.1   Calculated concentrations are based on the mean RLU of 3 cartridges tested.

7.2   Acceptance Criteria: In accordance to CLSI guideline C28-A3c,

7.2.1   95% of at least 20 samples tested must be within the reference interval.

The reference interval established from the predicate method is from ND (not detectable) to 400 pg/ml for female donors at different phases in ovulatory cycle.

To verify reference range in Theranos assay, 30 fingerstick samples were collected from 10 unique female donors on three different dates and analyzed by Theranos method. Serum samples from the same donors at the same collection were analyzed by reference method. 29 out of 30 samples had valid results except one sample had a non assay related issue. 28 out of 29 samples had Estradiol value less than 400pg/ml and were within reference range.

Overall, 96.6 % of the patients tested were within the reference range, and is acceptable for verification of the reference range.

**Table 9 Summary of reference range verification**

| Sample ID/Date of collection | | Reported Value [pg/mL] | Theranos value [pg/mL] |
| --- | --- | --- | --- |
| 8/18/2014 | FS 25 | 206 | 356 |
| | FS 26 | 68.8 | 59 |
| | FS 27 | 54.5 | INVALID |
| | FS 28 | 31.1 | 99 |
| | FS 29 | 152 | 182 |

21

Confidential                                                                 THPFM0005699350

| theran⦵s | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |

| | FS 30 | 473 | 489 |
| | FS 31 | 85.8 | 119 |
| | FS 32 | 30.8 | 257 |
| | FS 33 | 216 | 247 |
| | FS 34 | 67.1 | 97 |
| | FS 25 | 45.8 | 39 |
| | FS 26 | 29.1 | OORL |
| | FS 27 | 74.7 | 78 |
| | FS 28 | 35 | OORL |
| 8/22/2014 | FS 29 | 275 | 291 |
| | FS 30 | 434 | 304 |
| | FS 31 | 72.2 | 105 |
| | FS 32 | <20.0 | OORL |
| | FS 33 | 42 | 98 |
| | FS 34 | 38.3 | 98 |
| | FS 25 | 474 | 72 |
| | FS 26 | 29.5 | OORL |
| | FS 27 | 163 | 206 |
| | FS 28 | 23.1 | OORL |
| 8/25/2014 | FS 29 | 135 | 148 |
| | FS 30 | 626 | 357 |
| | FS 31 | 86.4 | 173 |
| | FS 32 | 24.5 | OORL |
| | FS 33 | 35.2 | 130 |
| | FS 34 | 83 | 144 |

## 8    BLOOD COLLECTION DEVICE (BCD) COMPARISON

To compare EDTA plasma collected from Theranos blood collection device and venipuncture, 40 unique patients each donated 2 venous tubes of blood and 2 fingerstick samples. EDTA plasma was collected from venous and fingerstick blood collection and was tested on Edison readers.

22

Confidential

ER-14550

| theranos | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |

Results of fingerstick samples correlated with results of venous samples very well. The slope is 0.93, the R2 of correlation is 0.9.

**Table 10: Venous v. Fingerstick results**

| Sample | Estradiol results (pg/ml) | |
| | Venous | Fingerstick |
| --- | --- | --- |
| Patient 1 | 34.9 | 38.6 |
| Patient 2 | 348.9 | 344.1 |
| Patient 3 | OORL | OORL |
| Patient 4 | OORL | OORL |
| Patient 5 | 76.0 | 148.2 |
| Patient 6 | 184.6 | 209.0 |
| Patient 7 | 149.6 | 100.0 |
| Patient 8 | 87.9 | 100.0 |
| Patient 9 | 84.3 | 65.1 |
| Patient 10 | 38.0 | 51.8 |
| Patient 11 | 211.3 | 188.9 |
| Patient 12 | 61.5 | 63.2 |
| Patient 13 | 122.6 | 139.1 |
| Patient 14 | 165.6 | 197.4 |
| Patient 15 | 51.6 | 52.1 |
| Patient 16 | 95.3 | 105.4 |
| Patient 17 | 89.4 | 72.3 |
| Patient 18 | 45.4 | 44.8 |
| Patient 19 | 143.0 | 122.1 |
| Patient 20 | 34.5 | 37.4 |
| Patient 21 | 78.0 | 103.1 |
| Patient 22 | OORL | OORL |
| Patient 23 | 58.9 | 58.4 |
| Patient 24 | 35.6 | 46.9 |
| Patient 25 | 228.1 | 244.2 |
| Patient 26 | 150.6 | 168.8 |
| Patient 27 | OORL | OORL |
| Patient 28 | 60.6 | 38.1 |

23

Confidential

THPFM0005699352

| theran⊕s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

| Patient 29 | 242.2 | 222.2 |
| Patient 30 | OORL | OORL |
| Patient 31 | 116.7 | 128.7 |
| Patient 32 | 86.6 | 138.1 |
| Patient 33 | 137.6 | 113.7 |
| Patient 34 | 32.9 | 47.1 |
| Patient 35 | 37.6 | 45.6 |
| Patient 36 | OORL | OORL |
| Patient 37 | OORL | OORL |
| Patient 38 | 45.6 | 39.3 |
| Patient 39 | 23.1 | 63.2 |
| Patient 40 | OORL | OORL |



**Figure 7: Comparison of fingerstick and venous blood samples**



24

Confidential

THPFM0005699353

| theran⊕s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 9   ANALYTICAL SENSITIVITY

9.1   Verification of Limit of Blank

9.1.1   60 replicates of blank were measured and calculated from calibration curve.

9.1.2   Results: One out of 60 replicates had quantifiable results.

9.2   Verification of Limit of Quantification

9.2.1   60 replicates of sample at LLOQ level were measured and calculated from calibration curve.

9.2.2   Results: 33 out of 60 replicates had quantifiable results.

9.3   Replicates of ½ LLOQ

9.3.1   The LLOQ sample was diluted 1:1 with blank and 20 replicates of the 1/2xLLOQ sample were tested.

9.3.2   Results: 4 out of 20 replicates had quantifiable results.

**Table 11: Verification of blank**

| | RCU | | | | | | Measured concentration (pg/ml) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SampleID | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| Blank | 46854 | 44070 | 49219 | 47630 | 43419 | 34935 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 51176 | 48766 | 45401 | 47327 | 46501 | 39375 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 51556 | 52052 | 52346 | 57281 | 37241 | 43930 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 38612 | 40868 | 40155 | 40462 | 38217 | 46424 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 54789 | 60286 | 60288 | 60209 | 62284 | 59548 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 32765 | 36691 | 37976 | 37711 | 40183 | 42687 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 34634 | 38406 | 35156 | 39085 | 41155 | 38701 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 36109 | 38889 | 38252 | 41256 | 42486 | 43474 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 41223 | 57945 | 47955 | 44846 | 50599 | 41999 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 44812 | 39709 | 36036 | 39516 | 38539 | 32079 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 57443 | 55749 | 57932 | 58998 | 60688 | 60821 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 34332 | 32454 | 31692 | 210 | 210 | 209 | OORL | OORL | OORL | OORH | OORH | OORH | OORL |
| Blank | 59210 | 55504 | 58449 | 31053 | 59325 | 52226 | OORL | OORL | OORL | 34.5 | OORL | OORL | OORL |
| Blank | 39533 | 42545 | 42164 | 46410 | dark | 45988 | OORL | OORL | OORL | OORL | INVALID | OORL | OORL |

· 25

THPFM0005699354

**ER-14553**

| **theranos** | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date: 8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

| Blank | 40684 | 36910 | 41386 | 44764 | 45904 | 39022 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blank | 48179 | 55326 | 55884 | 52024 | 51974 | 36140 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 48694 | 44626 | 48161 | 49928 | 47966 | 40681 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 47030 | 50460 | 44801 | 51895 | 41705 | 37299 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 38902 | 40429 | 43732 | 41453 | 42720 | 34564 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 36826 | 40536 | 42740 | 43509 | 40319 | 41147 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 50680 | 42427 | 41307 | 44452 | 48750 | 50878 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 52404 | 56518 | 51020 | 56250 | 63707 | 55135 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 40177 | 43764 | 42821 | 45793 | 36600 | 35639 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 48077 | 45758 | 36585 | 48186 | 42110 | 34284 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 45511 | 46489 | 48889 | 54374 | 57776 | 54300 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 42164 | 42381 | 39023 | 45445 | 42411 | 35516 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 25615 | 28388 | 35005 | 37237 | dark | 36895 | 35.8 | 31.0 | OORL | OORL | INVALID | OORL | OORL |
| Blank | 52671 | 49851 | 49182 | 47610 | 45724 | 39674 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 31417 | 30230 | 33776 | 38887 | 32712 | 30060 | 28.0 | 27.1 | OORL | OORL | OORL | OORL | OORL |
| Blank | 54071 | 54015 | 54298 | 52674 | 49264 | 39028 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 33688 | 34465 | 34157 | 34823 | 37427 | 33040 | OORL | OORL | OORL | 29.5 | OORL | OORL | OORL |
| Blank | 34025 | 37039 | 37076 | 40244 | 43331 | 42877 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 42067 | 42071 | 38221 | 45488 | 44818 | 37757 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 51595 | 49949 | 62279 | 59239 | 64080 | 62054 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 35854 | 30626 | 42742 | 36725 | 40115 | 40517 | OORL | OORL | OORL | 27.4 | OORL | OORL | OORL |
| Blank | 49766 | 47523 | 58681 | 60756 | 51446 | 43904 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 40759 | 44576 | 47383 | 48811 | 47237 | 43221 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 42020 | 38906 | 37845 | 45836 | 44786 | 40502 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 43060 | 44028 | 42088 | 48242 | 35749 | 32462 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 40040 | 36269 | 32853 | 40495 | 42249 | 46500 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 37594 | 38914 | 41616 | 36000 | 42213 | 41128 | OORL | OORL | OORL | 28.1 | OORL | OORL | OORL |
| Blank | 38713 | 45650 | 45264 | 44915 | 47475 | 41190 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 35397 | 32722 | dark | 33127 | 30860 | 31207 | OORL | OORL | INVALID | 31.6 | OORL | OORL | OORL |
| Blank | 41537 | 42542 | 41221 | 44128 | 47244 | 45076 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 50818 | 52009 | 52183 | 50212 | 49924 | 42227 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 48790 | 45248 | 39057 | 48962 | dark | 49012 | OORL | OORL | OORL | OORL | INVALID | OORL | OORL |
| Blank | 45795 | 45842 | 46942 | 49158 | 46048 | 40920 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 48911 | 47464 | 50214 | 48217 | 49156 | 34353 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 33179 | 24770 | dark | 32306 | 25900 | 20108 | OORL | 40.3 | INVALID | 32.7 | OORL | 56.3 | INVALID |
| Blank | 34975 | 32464 | 38312 | 38162 | 41636 | 40379 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |

26

Confidential

THPFM0005699355

| theran⊙s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |||

| Blank | 39238 | 40332 | 36866 | 46734 | 42028 | 43028 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Blank | 27027 | 30179 | 34453 | 32847 | 37435 | 39881 | 33.5 | 27.2 | OORL | 31.9 | OORL | OORL | OORL |
| Blank | 38385 | 40281 | 38152 | 41891 | 46964 | 45051 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 34991 | 45348 | 41397 | 36800 | 39794 | 32826 | OORL | OORL | OORL | 27.3 | OORL | OORL | OORL |
| Blank | 32927 | 35573 | 36493 | 36823 | 40515 | 40566 | OORL | OORL | OORL | 27.3 | OORL | OORL | OORL |
| Blank | 29966 | 33132 | 31124 | 36102 | 36989 | 37866 | 29.6 | OORL | OORL | 28.0 | OORL | OORL | OORL |
| Blank | 35168 | 34219 | 38975 | 37988 | 405 | 333 | OORL | OORL | OORL | OORL | OORH | OORH | OORL |
| Blank | 29369 | 26747 | dark | 25028 | 29184 | 19540 | 30.3 | 34.9 | INVALID | 46.6 | OORL | 60.1 | 43.0 |
| Blank | 42291 | 40906 | 40003 | 40447 | 39618 | 31097 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Blank | 34918 | 36604 | 31000 | 32274 | dark | 39801 | OORL | OORL | 27.11056 | 32.7146 | INVALID | OORL | OORL |

### Table 12: Verification of LLOQ

| | RLU |||||| Measured concentration (pg/ml) |||||||
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SampleID | Tip1 | Tlp2 | Tlp3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| LLOQ | 28231 | 36305 | 27523 | 28267 | 33482 | 37804 | 31.8 | OORL | 34.2 | 39.3 | OORL | OORL | OORL |
| LLOQ | 26866 | 30533 | 31152 | 18591 | 33262 | 36082 | 33.8 | OORL | OORL | 71.0 | OORL | OORL | OORL |
| LLOQ | 26277 | 29706 | 28194 | 31088 | dark | 23793 | 34.7 | 28.2 | 32.7 | 34.5 | INVALID | 36.3 | 33.3 |
| LLOQ | 22942 | 25531 | 24806 | 30589 | dark | 29865 | 41.1 | 38.1 | 41.4 | 35.2 | INVALID | OORL | 39.0 |
| LLOQ | 26318 | 28735 | 29594 | 30608 | 29355 | 24521 | 34.6 | 30.2 | 29.7 | 34.9 | OORL | 33.1 | 32.5 |
| LLOQ | 32809 | 27978 | 27881 | 29806 | 30983 | 33068 | OORL | 32.0 | 33.4 | 36.5 | OORL | OORL | OORL |
| LLOQ | 32445 | 33381 | 24403 | 29239 | 31446 | 24623 | 26.9 | OORL | 42.4 | 37.5 | OORL | 32.7 | 34.9 |
| LLOQ | 27883 | 27428 | dark | 26325 | 27121 | 25762 | 32.3 | 33.3 | INVALID | 43.4 | OORL | 28.0 | 34.2 |
| LLOQ | 33586 | 34595 | 34257 | 20475 | 39112 | 34584 | OORL | OORL | OORL | 61.9 | OORL | OORL | OORL |
| LLOQ | 18222 | 28842 | 20402 | 26365 | 24301 | 29440 | 55.6 | 30.0 | 58.4 | 43.3 | 34.0 | OORL | 44.3 |
| LLOQ | 16417 | 15641 | 16036 | 22209 | dark | 21029 | 64.2 | 83.3 | 87.0 | 55.1 | INVALID | 50.7 | 68.1 |
| LLOQ | 20828 | 26045 | 25322 | 26278 | 25374 | 27279 | 46.5 | 36.8 | 39.9 | 43.5 | OORL | OORL | 41.7 |
| LLOQ | 25881 | 33714 | 33903 | 34429 | 37932 | 35341 | 35.3 | OORL | OORL | 29.9 | OORL | OORL | OORL |
| LLOQ | 28743 | 26187 | dark | 17693 | 26020 | 22239 | 31.1 | 36.4 | INVALID | 76.3 | OORL | 43.9 | 46.9 |
| LLOQ | 28267 | 31839 | 35728 | 21989 | 28659 | 26698 | 31.7 | OORL | OORL | 55.9 | OORL | OORL | OORL |
| LLOQ | 24410 | 27062 | 33049 | 31724 | 32555 | 27342 | 38.0 | 34.1 | OORL | 33.5 | OORL | OORL | OORL |
| LLOQ | 28661 | 24940 | 32018 | 31023 | 35478 | 35904 | 31.2 | 39.8 | OORL | 34.6 | OORL | OORL | OORL |
| LLOQ | 25125 | 26568 | 23694 | 28676 | 28509 | 29212 | 36.6 | 35.4 | 45.0 | 38.5 | OORL | OORL | 38.9 |
| LLOQ | 31976 | 26627 | 29028 | 32846 | 33544 | 32578 | 27.4 | 35.2 | 30.9 | 31.9 | OORL | OORL | 31.4 |
| LLOQ | 30451 | 32170 | 27318 | 34697 | dark | 34732 | 29.0 | OORL | 34.7 | 29.6 | INVALID | OORL | INVALID |
| LLOQ | 20367 | 23691 | 22855 | 24851 | 26913 | 27527 | 47.9 | 43.6 | 48.0 | 47.1 | OORL | OORL | 46.6 |
| LLOQ | 16871 | 18843 | 21722 | 23774 | dark | 22209 | 61.8 | 63.2 | 52.4 | 50.1 | INVALID | 44.1 | 54.3 |

27

THPFM0005699356

ER-14555

| theran⊙s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
| --- | --- | --- |
| | Validation Document | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| LLOQ | 24493 | 30841 | 30790 | 28068 | 32418 | 29293 | 37.8 | OORL | 27.5 | 39.7 | OORL | OORL | OORL |
| LLOQ | 40494 | 40318 | 14123 | 43986 | 44290 | 33327 | OORL | OORL | 106.7 | OORL | OORL | OORL | OORL |
| LLOQ | 30872 | 29914 | 33496 | 33811 | 35181 | 35405 | 28.6 | 27.7 | OORL | 30.7 | OORL | OORL | OORL |
| LLOQ | 21718 | 32055 | 33441 | 34282 | 27767 | 27490 | 44.1 | OORL | OORL | 30.1 | OORL | OORL | OORL |
| LLOQ | 25686 | 27057 | dark | 27334 | 25670 | 30657 | 35.7 | 34.2 | INVALID | 41.2 | OORL | OORL | INVALID |
| LLOQ | 17696 | 21630 | 18702 | 25760 | dark | 24482 | 57.8 | 50.8 | 67.6 | 44.2 | INVALID | 33.3 | 50.9 |
| LLOQ | 33624 | 33638 | 37839 | 33245 | 26684 | 30130 | OORL | OORL | OORL | 33.4 | OORL | OORL | OORL |
| LLOQ | 42493 | 42966 | 44792 | 46416 | dark | 42258 | OORL | OORL | OORL | OORL | INVALID | OORL | OORL |
| LLOQ | 27200 | 33383 | 33675 | 32360 | 35918 | 32432 | 33.2 | OORL | OORL | 32.6 | OORL | OORL | OORL |
| LLOQ | 25075 | 28553 | 23545 | 27521 | 28673 | 22854 | 36.7 | 30.7 | 45.5 | 40.8 | OORL | 40.8 | 38.9 |
| LLOQ | 27649 | 32001 | 33694 | 25077 | 35458 | 32971 | 32.6 | OORL | OORL | 46.5 | OORL | OORL | OORL |
| LLOQ | 27736 | 33676 | 32156 | 26419 | 33744 | 27358 | 32.5 | OORL | OORL | 43.2 | OORL | OORL | OORL |
| LLOQ | 30973 | 29440 | dark | 27847 | 22806 | 17365 | 28.5 | 28.7 | INVALID | 40.1 | 48.8 | 77.0 | 44.6 |
| LLOQ | 27026 | 29265 | 29188 | 30734 | 33462 | 30651 | 33.5 | 29.1 | 30.5 | 35.0 | OORL | OORL | 32.0 |
| LLOQ | 27519 | 18769 | 30506 | 31159 | 29500 | 35374 | 32.8 | 63.6 | 28.0 | 34.3 | OORL | OORL | 39.7 |
| LLOQ | 28777 | 26831 | 25267 | 25583 | 23803 | 28188 | 31.1 | 34.7 | 40.1 | 45.2 | 39.2 | OORL | 38.0 |
| LLOQ | 22079 | 25221 | 28441 | 30656 | 33851 | 25230 | 43.1 | 39.0 | 33.1 | 35.1 | OORL | 30.1 | 35.9 |
| LLOQ | 31608 | 28515 | 10869 | 33271 | 30791 | 31478 | 27.8 | 30.7 | 101.3 | 31.4 | OORL | OORL | 62.8 |
| LLOQ | 30592 | 28711 | 35830 | 32018 | 35982 | 37523 | 28.9 | 30.3 | OORL | 33.1 | OORL | OORL | OORL |
| LLOQ | 20069 | 26808 | 28613 | 31915 | dark | 35085 | 48.8 | 34.8 | 31.7 | 33.2 | INVALID | OORL | 37.1 |
| LLOQ | 26415 | 18544 | dark | 25260 | 24409 | 20325 | 34.5 | 64.7 | INVALID | 46.0 | 32.9 | 55.0 | 46.6 |
| LLOQ | 26878 | 23312 | 25490 | 21258 | dark | 26061 | 33.7 | 45.2 | 39.4 | 58.6 | INVALID | OORL | 44.2 |
| LLOQ | 25369 | 29975 | 32992 | 25292 | dark | 15481 | 36.2 | 27.6 | 45.9 | INVALID | | 95.7 | 51.3 |
| LLOQ | 28697 | 30922 | 32079 | 27393 | 33552 | 36578 | 31.2 | OORL | OORL | 41.1 | OORL | OORL | OORL |
| LLOQ | 24342 | 30144 | 29499 | 31454 | 30240 | 27235 | 38.1 | 27.3 | 29.9 | 33.9 | OORL | OORL | 32.3 |
| LLOQ | 16360 | 29755 | 29887 | 33762 | dark | 28076 | 64.5 | 28.1 | 29.2 | 30.7 | INVALID | OORL | 38.1 |
| LLOQ | 25282 | 19480 | 24289 | 27767 | 29109 | 30783 | 36.4 | 60.0 | 43.1 | 40.3 | OORL | OORL | 44.9 |
| LLOQ | 27094 | 32190 | 28326 | 29833 | 33664 | 36270 | 33.4 | OORL | 32.4 | 36.5 | OORL | OORL | OORL |
| LLOQ | 28707 | 29171 | 32732 | 33932 | 33864 | 33271 | 31.1 | 29.3 | OORL | 30.5 | OORL | OORL | OORL |
| LLOQ | 24690 | 25370 | dark | 26351 | 25751 | 27273 | 37.5 | 38.6 | INVALID | 43.4 | OORL | OORL | INVALID |
| LLOQ | 28190 | 31653 | 31467 | 35307 | 36188 | 29591 | 31.8 | OORL | OORL | 28.9 | OORL | OORL | OORL |
| LLOQ | 25696 | 25975 | 22746 | 30498 | 32604 | 30909 | 35.6 | 36.9 | 48.4 | 35.4 | OORL | OORL | 39.1 |
| LLOQ | 26504 | 26704 | dark | 26832 | 23333 | 14721 | 34.3 | 35.0 | INVALID | 42.3 | 43.8 | 104.7 | 38.9 |
| LLOQ | 31021 | 28635 | 11744 | 35372 | 33391 | 36746 | 28.4 | 30.5 | 142.8 | 28.8 | OORL | OORL | 57.6 |
| LLOQ | 25137 | 16839 | 25970 | 24435 | 28695 | 21368 | 36.6 | 74.8 | 38.1 | 48.2 | OORL | 48.7 | 49.3 |
| LLOQ | 27786 | 32070 | 32022 | 32319 | 29285 | 30423 | 32.4 | OORL | OORL | 32.7 | OORL | OORL | OORL |

28

Confidential

THPFM0005699357

**ER-14556**

| theranos | Estradiol Validation Report | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

| LLOQ | 22812 | 20346 | dark | 25324 | 26246 | 23558 | 41.4 | 56.1 | INVALID | 45.8 | OORL | 37.4 | 45.2 |
| LLOQ | 25671 | 30784 | 28904 | 27580 | 31713 | dark | 35.7 | OORL | 31.1 | 40.7 | OORL | INVALID | INVALID |

### Table 13: ½ LLOQ Replicates

| SampleID | RLU | | | | | | Measured concentration (pg/ml) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| 1/2 LLOQ | 21901 | 15953 | 27851 | 25152 | dark | 32146 | 43.6 | 80.9 | 33.4 | 46.3 | INVALID | OORL | 51.0 |
| 1/2 LLOQ | 38663 | 41145 | 46695 | 48310 | 44504 | 44147 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 33502 | 26292 | 27782 | 32044 | 30343 | 33465 | OORL | 36.1 | 33.6 | 33.0 | OORL | OORL | OORL |
| 1/2 LLOQ | 35275 | 34778 | 32116 | 32665 | dark | 40598 | OORL | OORL | OORL | 32.2 | INVALID | OORL | OORL |
| 1/2 LLOQ | 44083 | 40341 | 46801 | 40502 | 39023 | 35949 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 30136 | 32525 | 37409 | 39892 | 40774 | 44526 | 29.4 | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 24946 | 25164 | dark | 27314 | 24751 | 23735 | 37.0 | 39.2 | INVALID | 41.2 | 29.1 | 36.6 | 36.6 |
| 1/2 LLOQ | 30581 | 29547 | 29622 | 37634 | 35307 | 30692 | 28.9 | 28.5 | 29.7 | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 38730 | 35427 | 39021 | 37833 | 39251 | 42587 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 36920 | 34778 | 29899 | 38555 | dark | 36079 | OORL | OORL | OORL | OORL | INVALID | OORL | OORL |
| 1/2 LLOQ | 39039 | 34582 | 40885 | 41988 | 40702 | 38342 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 36158 | 33618 | 27822 | 39459 | 34752 | 33434 | OORL | OORL | 33.5 | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 28387 | 20587 | 34078 | 32188 | dark | 36770 | 31.6 | 55.0 | OORL | 32.8 | INVALID | OORL | INVALID |
| 1/2 LLOQ | 22996 | 26206 | 24786 | 20725 | dark | 23654 | 41.8 | 36.3 | 41.5 | 60.8 | INVALID | 37.0 | 38.9 |
| 1/2 LLOQ | 44387 | 43905 | 33941 | 48187 | 47251 | 52478 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 24181 | 24198 | 28572 | 28470 | 26378 | 31977 | 38.4 | 42.0 | 31.8 | 38.9 | OORL | OORL | 37.8 |
| 1/2 LLOQ | 32153 | 36934 | 39877 | 41272 | 41350 | 41313 | 27.2 | OORL | OORL | OORL | OORL | OORL | OORL |
| 1/2 LLOQ | 34531 | 29162 | dark | 30400 | 29961 | 31694 | OORL | 29.3 | INVALID | 35.5 | OORL | OORL | OORL |
| 1/2 LLOQ | 32158 | 34930 | 32760 | 35565 | 36369 | 43286 | 27.2 | OORL | OORL | 28.6 | OORL | OORL | OORL |
| 1/2 LLOQ | 35655 | 36629 | 39343 | 40999 | dark | 33426 | OORL | OORL | OORL | OORL | INVALID | OORL | OORL |
| 1/2 LLOQ | 40526 | 40443 | 40067 | 45556 | 43205 | 47090 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |

29

Confidential                                                                    THPFM0005699358

**ER-14557**

| theranos | Estradiol Validation Report | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Table 14: Analytical Sensitivity Summary

| Statistic | Percentage |
|---|---|
| % of blanks that are OORL | 96.7 |
| % of LLOQ that are calculable | 55 |
| % of 1/2 LLOQ that are OORL | 76.2 |

## 10  ANTICOAGULANT COMPARISON

To test the effect of anticoagulants, 20 unique patients donated a total of 3 samples, one EDTA, one Li Heparin, and one Serum. The matched samples were tested in Theranos systems and the results were compared across three matrices. There was no significant difference between serum and EDTA plasma, but the correlation was poor between EDTA plasma and heparin plasma. Both EDTA plasma and serum are suitable for Theranos Estradiol assay. Li-heparin plasma is not recommended to be used as a sample for the Theranos Estradiol assay.

### Table 15: EDTA Plasma

| EDTA plasma | CLIA conc. (serum) | RLU | | | | | | Calculated conc (pg/ml) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SampleID | (pg/ml) | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| Patient 1 | 22.6 | 23601 | 27147 | 32212 | 28534 | 31433 | 31505 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 2 | 49.8 | 15162 | 13648 | 14537 | 14329 | 13160 | 14563 | 91.3 | 126.2 | 125.0 | 103.3 | 143.9 | 109.9 | 99.6 |
| Patient 3 | 21 | 39893 | 49750 | 46708 | 51354 | 48728 | 48243 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 4 | <20.0 | 35744 | 31153 | 70798 | 46604 | 32986 | 37624 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 5 | <20.0 | 36429 | 43271 | 39681 | 36589 | 41820 | 36722 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 6 | < 20.0 | 26423 | 27377 | 29769 | 29385 | 32787 | 24990 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 7 | 26.9 | 12204 | 14356 | 14199 | 15167 | 17570 | 16497 | 140.3 | 111.4 | 132.0 | 93.3 | 59.0 | 76.0 | 84.7 |
| Patient 8 | < 20.0 | 31243 | 28315 | 26432 | 25099 | 27274 | 22302 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 9 | 34.3 | 20088 | 22438 | 20177 | 23338 | 23479 | 26964 | 40.9 | OORL | 35.0 | 33.3 | OORL | OORL | OORL |
| Patient 10 | 144 | 4531 | 9713 | 6680 | 12906 | 11189 | 10783 | 737 | 258 | 464 | 124 | 212 | 211 | 186 |
| Patient 11 | 24 | 16440 | 8362 | 37591 | 37530 | 36068 | 36312 | 75.5 | | OORL | OORL | OORL | OORL | OORL |
| Patient 12 | 20.4 | 15117 | 17418 | 18210 | 18576 | 20943 | 20961 | 91.9 | 65.1 | 62.4 | 62.2 | OORL | OORL | 52.3 |
| Patient 13 | 27 | 15379 | 13717 | 15218 | 15110 | 16377 | 11535 | 88.4 | 124.7 | 111.6 | 93.9 | 75.9 | 185.8 | 81.5 |
| Patient 14 | 74.2 | 14484 | 15050 | 15085 | 14142 | 12817 | 11284 | 100.7 | 98.6 | 114.2 | 105.7 | 153.8 | 193.9 | 87.5 |
| Patient 15 | 50.9 | 10622 | 10687 | 9833 | 10873 | 11227 | 12164 | 178.6 | 215.4 | 261.4 | 164.2 | 210.1 | 166.9 | 184.5 |
| Patient 16 | 35.2 | 19316 | 18478 | 13449 | 19104 | 20068 | 21008 | 47.3 | 54.1 | 148.6 | 58.4 | 32.7 | OORL | 29.5 |
| Patient 17 | < 20.0 | 25004 | 33095 | 34293 | 38189 | 39896 | 39819 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |

30

Confidential

THPFM0005699359

| | **Estradiol Validation Report** | Document Number: |
|---|---|---|
| **theranos** | | Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

| Patient 18 | 111 | 9214 | 2288 | 10014 | 9880 | 9766 | 8048 | 226 | 1220 | 254 | 192 | 282 | 348 | 224 |
| Patient 19 | 24.9 | 21720 | 27226 | 27100 | 29489 | 27921 | 23907 | 28.5 | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 20 | 24 | 20405 | 22539 | 24333 | 22116 | 26355 | 25722 | 38.4 | OORL | OORL | 39.7 | OORL | OORL | OORL |

### Table 16: Li Heparin Plasma

| Li-Hep | CLIA conc. (serum) (pg/ml) | RLU | | | | | | Calculated conc (pg/ml) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SampleID | | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| Patient 1 | 22.6 | 22006 | 6589 | 25164 | 23742 | 24308 | 21685 | OORL | | OORL | 31.3 | OORL | OORL | OORL |
| Patient 2 | 49.8 | 13416 | 15495 | 13674 | 14389 | 13005 | 15095 | 118 | 91 | 143 | 103 | 148 | 100 | 100 |
| Patient 3 | 21 | 32418 | 39501 | 28006 | 31848 | 31863 | 15522 | OORL | OORL | OORL | OORL | OORL | 92.0421 | OORL |
| Patient 4 | < 20.0 | 34172 | 54992 | 54337 | 55858 | 49609 | 31335 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 5 | < 20.0 | 28223 | 24566 | 26110 | 28466 | 25135 | 25564 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 6 | < 20.0 | 31826 | 34269 | 32267 | 37630 | 42296 | 40198 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 7 | 26.9 | 15699 | 17921 | 20271 | 20171 | 19585 | 18772 | 84.4 | 59.7 | 83.7 | 51.2 | 37.3 | 44.6 | 33.3 |
| Patient 8 | < 20.0 | 29446 | 31747 | 26090 | 33808 | 34637 | 26802 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 9 | 34.3 | 6970 | 7231 | 36179 | 34441 | 32164 | 21706 | | | OORL | OORL | OORL | OORL | OORL |
| Patient 10 | 144 | 12400 | 10082 | 10914 | 11437 | 10187 | 8950 | 136 | 241 | 219 | 151 | 259 | 293 | 202 |
| Patient 11 | 24 | 22445 | 21828 | 25023 | 22906 | 23115 | 22208 | OORL | 30.0 | OORL | 35.5 | OORL | OORL | OORL |
| Patient 12 | 20.4 | 20255 | 19808 | 20636 | 21134 | 22513 | 20017 | 39.5 | 42.9 | 28.8 | 45.3 | OORL | 30.1 | 18.4 |
| Patient 13 | 27 | 17041 | 18172 | 21577 | 16611 | 18126 | 14948 | 68.9 | 57.1 | OORL | 78.5 | 52.2 | 102.5 | 53.8 |
| Patient 14 | 74.2 | 11970 | 12577 | 11428 | 13196 | 12831 | 10830 | 145 | 153 | 203 | 119 | 153 | 210 | 148 |
| Patient 15 | 50.9 | 13553 | 12449 | 11884 | 11709 | 9197 | 12884 | 115 | 156 | 189 | 145 | 317 | 148 | 135 |
| Patient 16 | 35.2 | 11970 | 12577 | 11428 | 13196 | 12831 | 10830 | 145 | 153 | 203 | 119 | 153 | 210 | 148 |
| Patient 17 | < 20.0 | 24705 | 23302 | 24852 | 23997 | 32912 | 20198 | OORL | OORL | OORL | 30.1 | OORL | 28.1 | OORL |
| Patient 18 | 111 | 9911 | 10265 | 11115 | 2487 | 12346 | 12471 | 200 | 233 | 213 | OORH | 169 | 158 | 180 |
| Patient 19 | 24.9 | 21096 | 24924 | 23337 | 25938 | 28356 | 24734 | 33.1 | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 20 | 24 | 17119 | 15192 | 16465 | 18893 | 22471 | 21189 | 68.1 | 96.1 | 89.5 | 59.9 | OORL | OORL | 60.5 |

31

THPFM0005699360

| | **Estradiol Validation Report** | | Document Number: |
| --- | --- | --- | --- |
| **theranos** | | | Revision: CL-RPT-131221 |
| | **Validation Document** | | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | |

**Table 17: Serum**

| Serum | CLIA conc. (serum) (pg/ml) | RLU | | | | | | Calculated conc (pg/ml) | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| SampleID | | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result |
| Patient 1 | 22.6 | 27146 | 35490 | 26897 | 38647 | 38632 | 37237 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 2 | 49.8 | 14284 | 13628 | 13957 | 15021 | 15596 | 14458 | 103.7 | 126.7 | 137.2 | 94.9 | 89.0 | 112.0 | 93.5 |
| Patient 3 | 21 | 35966 | 43020 | 41641 | 45259 | 52613 | 59189 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 4 | < 20.0 | 77362 | 77027 | 79238 | 80653 | 70494 | 69550 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 5 | < 20.0 | 26898 | 41341 | 29462 | 33186 | 29775 | 32044 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 6 | < 20.0 | 31727 | 34949 | 36655 | 36359 | 40536 | 42601 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 7 | 26.9 | 15983 | 16893 | 16434 | 18761 | 17122 | 19862 | 80.9 | 71.4 | 90.0 | 60.9 | 65.0 | 31.8 | 48.5 |
| Patient 8 | < 20.0 | 24853 | 28096 | 29287 | 30362 | 24160 | 18216 | OORL | OORL | OORL | OORL | OORL | 51.56281 | OORL |
| Patient 9 | 34.3 | 18822 | 6599 | 21988 | 24836 | 25951 | 19487 | 51.6 | | OORL | OORL | OORL | 36.1 | OORL |
| Patient 10 | 144 | 12005 | 12074 | 10624 | 11294 | 11655 | 13102 | 145 | 167 | 210 | 154 | 193 | 142 | 156 |
| Patient 11 | 24 | 29264 | 5407 | 33774 | 32705 | 31213 | 36730 | OORL | | OORL | OORL | OORL | OORL | OORL |
| Patient 12 | 20.4 | 13819 | 19789 | 21692 | 18485 | 16268 | 19470 | 110.9 | 43.8 | OORL | 62.9 | 77.6 | 36.3 | 47.9 |
| Patient 13 | 27 | 17720 | 21144 | 20928 | 23332 | 9440 | 18846 | 62.0 | 34.9 | OORL | 33.3 | 301.7 | 43.6 | 24.5 |
| Patient 14 | 74.2 | 14601 | 13177 | 15474 | 17396 | 16680 | 11020 | 99.0 | 137.2 | 106.9 | 71.6 | 71.3 | 202.9 | 97.8 |
| Patient 15 | 50.9 | 6143 | 11079 | 16853 | 24853 | 11298 | 12857 | 430.7 | 200.5 | 83.2 | OORL | 207.2 | 147.9 | 199.3 |
| Patient 16 | 35.2 | 18486 | 10721 | 17398 | 18546 | 18772 | 18887 | 54.6 | 214.1 | 74.6 | 62.5 | 45.0 | 43.1 | 37.5 |
| Patient 17 | < 20.0 | 24216 | 22486 | 25260 | 27023 | 25131 | 23485 | OORL | OORL | OORL | OORL | OORL | OORL | OORL |
| Patient 18 | 111 | 7287 | 8651 | 10334 | 10612 | 11354 | 12446 | 327 | 316 | 241 | 171 | 205 | 159 | 223 |
| Patient 19 | 24.9 | 28263 | 6127 | 28836 | 32160 | 32004 | 33852 | OORL | | OORL | OORL | OORL | OORL | OORL |
| Patient 20 | 24 | 18501 | 19486 | 20401 | 20933 | 17898 | 24016 | 54.5 | 45.4 | 32.0 | 46.5 | 54.9 | OORL | 28.0 |

32

Confidential

THPFM0005699361

| theranos | **Estradiol Validation Report** | Document Number: |
| | | Revision: CL-RPT-131221 |
| | **Validation Document** | Effective Date:8/29/2014 |

**Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System**

### Table 18: Summary of EDTA v. Li Heparin v. Serum

| | | Theranos results (pg/ml) | | |
| | CLIA conc. (serum) (pg/ml) | serum | EDTA plasma | Heparin plasma |
| SampleID | | conc. | conc. | conc. |
| Patient 1 | 22.6 | OORL | OORL | OORL |
| Patient 2 | 49.8 | 93.5 | 99.6 | 100 |
| Patient 3 | 21 | OORL | OORL | OORL |
| Patient 4 | < 20.0 | OORL | OORL | OORL |
| Patient 5 | < 20.0 | OORL | OORL | OORL |
| Patient 6 | < 20.0 | OORL | OORL | OORL |
| Patient 7 | 26.9 | 48.5 | 84.7 | 33.3 |
| Patient 8 | < 20.0 | OORL | OORL | OORL |
| Patient 9 | 34.3 | OORL | OORL | OORL |
| Patient 10 | 144 | 156 | 186 | 202 |
| Patient 11 | 24 | OORL | OORL | OORL |
| Patient 12 | 20.4 | 47.9 | 52.3 | 18.4 |
| Patient 13 | 27 | 24.5 | 81.5 | 53.8 |
| Patient 14 | 74.2 | 97.8 | 87.5 | 148 |
| Patient 15 | 50.9 | 199.3 | 184.5 | 135 |
| Patient 16 | 35.2 | 37.5 | 29.5 | 148 |
| Patient 17 | < 20.0 | OORL | OORL | OORL |
| Patient 18 | 111 | 223 | 224 | 180 |
| Patient 19 | 24.9 | OORL | OORL | OORL |
| Patient 20 | 24 | 28.0 | OORL | 60.5 |

33

Confidential

THPFM0005699362

| theran⬤s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 8: EDTA Plasma v Serum**



## 11 INTERFERENCE

Matrix interference was evaluated by preparing hemolyzed, icteric and lipemic matrix and spiking three concentration levels of analyte into prepared matrix respectively. The spiked serum samples were measured on the Theranos System and predicate. The recovery was calculated with measured values from Theranos system and from predicate method.

Icteric samples with Bilirubin at 5mg/dL and lipemic samples with Triglycerides at 250mg/dL didn't show significant difference on Estradiol results. Hemolyzed samples with 250mg/dL Hemoglobin had slightly low recovery so results of hemolyzed samples in Theranos system should be interpreted with caution for Estradiol assay.

**Table 19: Results of Hemolyzed Samples – 250 mg/dL Hemoglobin**

| Spiked sample | RLU | | | | | | Calculated conc. (pg/ml) | | | | | | | % recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (pg/ml) | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result | |
| 695 | 5240 | 5614 | 4513 | 6112 | 6694 | 6549 | 472.1 | 476.5 | 1070.3 | 413.6 | 431.2 | 399.3 | 429.5 | 61.8 |
| 267 | 10484 | dark | 11629 | 10983 | 10023 | 11833 | 169.5 | | 157.0 | 187.4 | 226.7 | 166.1 | 166.0 | 62.2 |

34

Confidential

THPFM0005699363

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **theran⊕s** | | | **Estradiol Validation Report** | | | | | Document Number: | | | | | | |
| | | | | | | | | Revision: CL-RPT-131221 | | | | | | |
| | | | **Validation Document** | | | | | Effective Date:8/29/2014 | | | | | | |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | 14842 | 14260 | 15115 | 18689 | 19514 | 19016 | 105.6 | 114.3 | 99.2 | 99.0 | 90.0 | 86.2 | 81.7 | 65.3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20.3 | 43969 | 42009 | 49651 | 40371 | 54293 | 52488 | OORL | OORL | OORL | OORL | OORL | OORL | OORL | -- |

### Table 20: Icteric Samples – 5 mg/dL Bilirubin

| Spiked sample | RLU | | | | | | Calculated conc. (pg/ml) | | | | | | | % recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (pg/ml) | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result | |
| 639 | 4465 | 5211 | 4559 | 5364 | 4870 | 6121 | 904.1 | 714.7 | 764.3 | 680.4 | 773.0 | 437.2 | 731.3 | 114.4 |
| 253 | 4589 | 8140 | 8759 | dark | 9444 | 9675 | 854.4 | 341.3 | 324.1 | | 261.2 | 243.9 | 280.0 | 110.7 |
| 117 | 12168 | 13530 | 15549 | 16326 | 12626 | 16989 | 175.0 | 174.1 | 144.5 | 132.6 | 176.1 | 120.7 | 137.8 | 117.8 |
| <20 | 36581 | 42861 | 42491 | 48414 | 46551 | 48001 | 31.8 | OORL | OORL | OORL | OORL | OORL | OORL | -- |

### Table 21: Lipemic Samples – 250 mg/dL Triglycerides

| Spiked sample | RLU | | | | | | Calculated conc. (pg/ml) | | | | | | | % recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (pg/ml) | Tip1 | Tip2 | Tip3 | Tip4 | Tip5 | Tip6 | conc1 | conc2 | conc3 | conc4 | conc5 | conc6 | result | |
| 535 | 4835 | 4915 | 5082 | 5107 | 4607 | 5358 | 426.5 | 497.8 | 488.3 | 511.2 | 664.9 | 557.0 | 517.3 | 96.7 |
| 189 | 8090 | 6908 | 8383 | 8096 | 8941 | 8504 | 199.9 | 291.0 | 243.9 | 254.7 | 230.1 | 267.8 | 234.2 | 123.9 |
| 79.1 | 12813 | 16555 | 15664 | 16348 | 14585 | 18647 | 108.9 | 82.5 | 111.4 | 90.8 | 119.1 | 84.6 | 82.2 | 103.9 |
| <20 | 33069 | 36837 | 40644 | 35615 | 39143 | 43260 | OORL | OORL | OORL | OORL | OORL | OORL | OORL | -- |

## 12  CROSSREACTIVITY

Crossreactivity test data were obtained from assay development report. The cross-reactants were prepared in buffer to avoid other interference in serum or plasma. The recovery was calculated to determine the effect of the substance. No significant cross reactivity showed in tested substances and the results are comparable to predicate method.

### Table 22: Cross-reactive test

| Test Substance | Tested Conc pg/mL | Recovered Conc pg/mL | % Cross Reactivity |
|---|---|---|---|
| Estrone | 5000 | 156 | 3.12 |
| Estriol | 40,000 | 20 | 0.05 |
| Progesterone | 70,000 | OORL | 0.00 |
| Cortisol (Hydrocortisone) | 2000 | OORL | 0.00 |

35

THPFM0005699364

**ER-14563**

| theran⊚s | **Estradiol Validation Report** | Document Number: Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |
|---|

### 13 ANALYTE STABILITY

The stability of analyte was evaluated at 4C and room temperature. Aliquots of calibrators made by spiking Estradiol in depleted serum were stored at -80C. Multiple sets of stability testing calibrators were then transferred to either room temperature or 4C at the 0hr time point and stored at these temperatures for the remainder of testing. At each time point, one set of calibrator was analyzed and back calculated from calibration curve obtained at 0hr time point.

Overall the analyte stability data indicates that the samples are stable up to 72 hours when stored at 4C and room temperature.

**Table 23: Analyte Stability Summary: 4C**

| | RLU | | | | | | Calculated Concentration (pg/ml) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Level (pg/ml) | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr |
| 1293.5 | 3877 | 3590 | 3290 | 3543 | 3714 | 3498 | OORH | OORH | OORH | OORH | OORH | OORH |
| 323.4 | 7221 | 7803 | 5788 | 6908 | 7027 | 8876 | 294.1 | 253.7 | 399.2 | 262.8 | 279.9 | 209.0 |
| 53.9 | 24852 | 24586 | 23861 | 16986 | 24326 | 21341 | 26.4 | 62.2 | 28.1 | 43.3 | 26.0 | 26.7 |

**Table 24: Analyte Stability Summary: RT**

| RT | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | RLU | | | | | | Calculated Concentration (pg/ml) | | | | | |
| Level (pg/ml) | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr |
| 1293.5 | 3877 | 4273 | 3936 | 4481 | 3491 | 3604 | OORH | 823.3 | OORH | 835.3 | OORH | OORH |
| 323.4 | 7221 | 6588 | 5761 | 7995 | 7799 | 7171 | 294.1 | 317.3 | 475.0 | 259.4 | 236.9 | 293.8 |
| 53.9 | 24852 | 24303 | 19621 | 25693 | 28964 | 26006 | 26.4 | 29.8 | 50.9 | 56.2 | OORL | 23.3 |

36

Confidential

THPFM0005699365

**ER-14564**

| **theranos** | **Estradiol Validation Report** | Document Number:<br>Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 9: Analyte Stability at 4C**



**Figure 10: Analyte Stability at Room Temperature**



37

Confidential

THPFM0005699366

**ER-14565**

| **theran⊕s** | **Estradiol Validation Report** | Document Number:<br>Revision: CL-RPT-131221 |
|---|---|---|
| | **Validation Document** | Effective Date:8/29/2014 |
| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### 14   Reagent Stability in Capsys Cartridges

Reagent stability was conducted with Capsys built cartridges. Cartridges with all reagents filled by Capsys were stored at 4C and the monitoring of assay performance is on-going. At each time point, a set of calibrators made by spiking Estradiol in depleted serum was analyzed using Capsys cartridges and back calculated from calibration curve obtained at 0 time point. Current data shows reagents in Capsys cartridges are stable after 5 weeks' storage.

**Table 25: Capsys cartridge stability**

| | Nominal conc (pg/ml) | Calculated conc (pg/ml) | | |
|---|---|---|---|---|
| | | Week0 | Week 2 | Week 5 |
| Level 1 | 646.7 | 585 | 622 | 939 |
| Level 2 | 161.7 | 187 | 162 | 165 |
| Level 3 | 53.9 | 62.0 | 44.3 | 58.3 |
| Level 4 | 0 | OORL | OORL | OORL |

**Figure 11: Capture antibody working solution stability at 4C**



38

Confidential                                                                                                      THPFM0005699367

| **theranos** | **Estradiol Validation Report** | Document Number:<br>Revision: CL-RPT-131221 |
|---|---|---|
| | Validation Document | Effective Date:8/29/2014 |

| **Estradiol ELISA Assay Validation Report on Edison 3.5 Theranos System** |
|---|

## 15 REFERENCES

15.1 Code of Federal Regulations, Title 42, Chapter IV, Subchapter G, Part 493, Subpart K, Sections 493.1217, 493.1253, and 493.1255.

15.2 DeSilva B, Smith W, Weiner R, et al. Recommendations for the bioanalytical method validation of ligand-binding assays to support pharmacokinetic assessments of macromolecules. Pharmaceutical Res. 2003; 20:1885-1900.

15.3 Guidance for Industry: bioanalytical method validation. U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, 2001.

15.4 R (version 2.13.1). The R Foundation for Statistical Computing, 07/08/2011.

15.5 StatisPro (version 1.13.00). Clinical and Laboratory and Standards Institute, Wayne, PA. 07/14/2011.

15.6 Dexter-Immunoassay (version1.0), Theranos, Inc., 2009.

15.7 EP10-A3, Preliminary Evaluation of Quantitative Clinical Laboratory Measurement Procedures; Approved Guideline—Third Edition, 2006, Clinical and Laboratory Standards Institute, Wayne, PA.

15.8 EP15-A2, User Verification of Performance for Precision and Trueness; Approved Guideline—Second Edition. 2005, Clinical and Laboratory Standards Institute, Wayne, PA.

15.9 EP09-A2-IR, Method Comparison and Bias Estimation Using Patient Samples; Approved Guideline—Second Edition (Interim Revision), 2010, Clinical and Laboratory Standards Institute, Wayne, PA.

15.10 EP05-A2, Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

15.11 EP06-A, Evaluation of the Linearity of Quantitative Measurement Procedures: A Statistical Approach; Approved Guideline, 2003, Clinical and Laboratory Standards Institute, Wayne, PA.

15.12 EP7-A2, Interference Testing in Clinical Chemistry; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

39

**DX 09196**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran🅞s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| hCG ELISA Assay Validation Report on Edison 3.5 Theranos System |
|---|

**Author(s):**

Signature: _[signature]_
Date: 20 Mar 2014
Name: Michelle Johnson
Title: Immunoassay Research Associate

**Reviewer(s)**

Signature: _[signature]_
Date: 3|19|14
Name: Sharada Sivaraman, PhD
Title: Immunoassay Team Leader

Signature: _[signature]_
Date: 3/19/2014
Name: Daniel Young, Ph.D.
Title: Vice President

**Approver(s):**

Signature: _[signature]_
Date: 3/19/2014
Name: Adam Rosendorff, M.D
Title: Laboratory Director

_[signature]_ 9/19/15

Sunil S. Dhawan M.D.

CONFIDENTIAL COM FEDOR          -ORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001392

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Table of Content**

LIST OF TABLES ................................................................. 3
LIST OF FIGURES .............................................................. 4
1   ASSAY BACKGROUND ................................................. 5
2   REGULATION AND GUIDANCE ...................................... 5
3   CALIBRATION .............................................................. 6
4   PRECISION ................................................................ 17
5   REFERENCE RANGE ................................................... 18
6   ACCURACY/COMPARABILITY ....................................... 20
7   DILUTION LINEARITY ................................................. 28
8   BLOOD COLLECTION DEVICE (BCD) COMPARISON ....... 31
9   ANALYTICAL SENSITIVITY ........................................... 3534
10  ANTICOAGULANT COMPARISON ................................... 4038
11  INTERFERENCE ......................................................... 5047
12  CROSSREACTIVITY ................................................... 5148
13  SAMPLE STABILITY ................................................... 5249
14  REAGENT STABILITY ................................................. 5350
15  REFERENCES ........................................................... 5451

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## List of Tables

Table 1: Calibration 1 Data (Edison 3.0) ...............................................................7
Table 2: Calibration 1 Summary .............................................................................7
Table 3: Calibration 2 Data (Edison 3.0) .............................................................10
Table 4: Calibration 2 Summary ...........................................................................10
Table 5: Calibration 3 Data (Edison 3.0) .............................................................13
Table 6: Calibration 3 Summary ...........................................................................13
Table 7: Calibration 4 Data (Edison 3.5) .............................................................15
Table 8: Calibration 4 Summary ...........................................................................16
Table 9: Precision Summary ..................................................................................17
Table 10: Normal Patient Sample ..........................................................................18
Table 11: Reference Range Summary .....................................................................20
Table 12: Bias Correction ......................................................................................21
Table 13: Method Comparison Summary ...............................................................24
Table 14: Dilution Linearity High-Level Patient Sample ......................................28
Table 15: Dilution Linearity Mid-Level Patient Sample .......................................28
Table 16: Dilution Linearity Summary ...................................................................30
Table 17: Venous v. Fingerstick .............................................................................31
Table 18: Venous v. Fingerstick Comparison Summary ........................................3433
Table 19: Blank .......................................................................................................3534
Table 20: LLOQ ......................................................................................................3736
Table 21: Analytical Sensitivity Summary .............................................................3938
Table 21: EDTA Plasma ..........................................................................................4039
Table 22: Li Heparin Plasma ...................................................................................4341
Table 23: Serum ......................................................................................................4643
Table 24: EDTA v. Li Heparin v. Serum .................................................................4844
Table 25: Hemolyzed Samples (Hemoglobin 300mg/dL) .......................................5047
Table 26: Icteric Samples (Bilirubin 20mg/dL) ......................................................5047
Table 27: Lipemic Samples (Triglycerides 500mg/dL) ..........................................5148
Table 28: Cross-reactive Samples ...........................................................................5148
Table 29: Analyte Stability Summary ......................................................................5249

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001394

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊛s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**List of Figures**

Figure 1: Calibration 1 .............................................................9
Figure 2: Calibration 2 .............................................................12
Figure 3: Calibration 3 .............................................................14
Figure 4: Calibration 4 .............................................................16
Figure 5: Theranos System v. Predicate method Results .............................24
Figure 6: Theranos Corrected v. Predicate Method Results ..........................25
Figure 7: Scatter Plot ..............................................................25
Figure 8: Difference Plot ...........................................................26
Figure 9: Adequate range test .......................................................26
Figure 10: Linear Fit ...............................................................27
Figure 11: Comparability ............................................................27
Figure 12: Dilution Linearity .......................................................30
Figure 11: EDTA v. Li Heparin Plasma ...........................................~~48~~45
Figure 12: EDTA Plasma v Serum .................................................~~49~~45
Figure 13: Analyte Stability at 4C .............................................~~52~~49
Figure 14: Analyte Stability at Room Temperature ...............................~~53~~50
Figure 15: Reagent Stability at 4C .............................................~~53~~50

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001395

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 1 ASSAY BACKGROUND

Human chorionic gonadotropin (hCG) is a glycoprotein hormone normally produced by the placenta during pregnancy. The hCG molecule consists of two combined, dissimilar subunits designated alpha and beta. The beta subunit, with a molecular weight of approximately 30,000 daltons, confers biological and immunological specificity to the entire hCG molecule by virtue of its unique amino acid sequence and content. The alpha subunit, with a molecular weight of approximately 18,000 daltons, is essentially identical to the alpha subunit of the pituitary glycoprotein hormones: luteinizing hormone (LH), follicle-stimulating hormone (FSH), and thyroid-stimulating hormone (TSH).

### 1.1 Theranos System Specification

The Theranos assay for hCG is a sandwich ELISA, specific to pure native human hCG protein.
The Theranos System reportable range is 9.44 mIU/mL to 4722 mIU/mL. The Theranos hCG assay can accept serum, EDTA plasma and Li-heparin plasma as samples. The assay has a lower limit of quantification (LLOQ) of 9.4 mIU/mL. Non-pregnant females test below the assay LLOQ of the Theranos hCG assay.

### 1.2 Reference Assay

The Siemens Immulite 2000 hCG test was used as a predicate method. The assay reportable range is 1 mIU/mL to 5000 mIU/mL where samples less than 30mIU/mL are considered negative for pregnancy. The presence of bilirubin (200mg/L), hemoglobin (384 mg/dL), and lipemia (3000ng/dL) have no effect on assay precision.

## 2 REGULATION AND GUIDANCE

The qualification/validation of the ELISA assays on the Theranos device will be in accordance with C.F.R. Ch IV, § 493.1253 "Standard: Establishment and verification of performance specifications" and outlined in CLSI guideline C28A3.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001396

| theran⊛s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 3 CALIBRATION

3.1 For the purposes of this Validation Plan, calibration will be carried out for each new lot of reagent cartridges.

3.1.1 At each level 3 cartridge replicates will be tested.

3.1.2 A calibration curve should consist of a blank or zero sample (matrix sample processed without internal standard or a buffer without internal standard) and six to eight non-zero samples covering the expected range, including calibration standards at the LLOQ and ULOQ of the range,

3.1.3 Acceptance criteria: For each run, a minimum of 75% of the back-calculated mean values of the total number of calibration standards in the calibration range should be within 100 ± 20% (100 ± 25% at LLOQ and ULOQ standards) of their nominal values and a minimum of six unique standard concentrations must be within the assay range.

3.1.4 Individual values less than 100RLU are considered dark counts. Dark counts and outliers are highlighted in red and are excluded from the mean, %CV, and % recovery calculations.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-001397

| **theran⊙s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

### Table 1: Calibration 1 Data (Edison 3.0)

These data were used to analyze Accuracy/Comparability (6), Blood Collection Device Comparison (8), Anticoagulant Comparison (10), Interference (11), and Analyte Stability (13).

| Assigned Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip1 | Tip2 | Mean | %CV |
| 4722 | 1255516 | 1114504 | 1255516 | 1114504 | 1185010 | 8% | 1244374 | 9% | 4383.65 | 3342.27 | 4287.92 | 13% |
| | 796908 | 831938 | | | | | | | | | | |
| | 1221222 | 1386252 | 1221222 | 1386252 | 1303737 | 9% | | | 4097.30 | OORH | | |
| 2361 | 861639 | 887239 | 861639 | 887239 | 874439 | 2% | 898443 | 11% | 2107.58 | 2207.26 | 2252.35 | 18% |
| | 1020706 | 21 | 1020706 | DARK | 1020706 | | | | 2810.86 | | | |
| | 764370 | 958263 | 764370 | 958263 | 861317 | 16% | | | 1766.34 | 2509.36 | | |
| 944.4 | 466088 | 442083 | 466088 | 442083 | 454086 | 4% | 467250 | 16% | 985.26 | 934.60 | 987.74 | 16% |
| | 569581 | 538441 | 569581 | 538441 | 554041 | 4% | | | 1221.00 | 1146.84 | | |
| | 407455 | 379852 | 407455 | 379852 | 393654 | 3% | | | 863.80 | 809.13 | | |
| 94.4 | 10851 | 11829 | 10851 | 11829 | 11340 | 6% | 13166 | 23% | 84.39 | 88.57 | 94.02 | 12% |
| | 15909 | 17759 | 15909 | 17759 | 16834 | 8% | | | 104.43 | 110.99 | | |
| | 12469 | 10178 | 12469 | 10178 | 11324 | 14% | | | 91.21 | 81.41 | | |
| 47.2 | 3840 | 3018 | 3840 | 3018 | 3429 | 17% | 4525 | 23% | 45.89 | 39.36 | 50.78 | 14% |
| | 5534 | 5665 | 5534 | 5665 | 5600 | 2% | | | 57.31 | 58.11 | | |
| | 4826 | 4265 | 4826 | 4265 | 4546 | 9% | | | 52.80 | 48.97 | | |
| 23.6 | 1366 | 1502 | 1366 | 1502 | 1434 | 7% | 1590 | 11% | 22.31 | 24.04 | 25.11 | 8% |
| | 1456 | 1747 | 1456 | 1747 | 1602 | 13% | | | 23.46 | 26.96 | | |
| | 1779 | 1689 | 1779 | 1689 | 1734 | 4% | | | 27.32 | 26.29 | | |
| 9.4 | 448 | 642 | 448 | 642 | 545 | 25% | 567 | 16% | OORL | 10.97 | 9.48 | 16% |
| | 574 | 691 | 574 | 691 | 633 | 13% | | | 9.62 | 11.90 | | |
| | 533 | 514 | 533 | 514 | 514 | 3% | | | 8.77 | 8.37 | | |
| 0 | 262 | 246 | 262 | 246 | 254 | 4% | 284 | 20% | OORL | OORL | OORL | OORL |
| | 309 | 382 | 309 | 382 | 346 | 15% | | | OORL | OORL | | |
| | 226 | 280 | 226 | 280 | 253 | 15% | | | OORL | OORL | | |

### Table 2: Calibration 1 Summary

| Calibrator Level | Assigned Value [mIU/mL] | Theranos Result [mIU/mL] | %CV | % Recovery |
|---|---|---|---|---|
| Calibrator 1 | 4722 | 4287.92 | 13% | 91% |
| Calibrator 2 | 2361 | 2252.35 | 18% | 95% |
| Calibrator 3 | 944.4 | 987.74 | 16% | 105% |
| Calibrator 4 | 94.4 | 94.02 | 12% | 100% |
| Calibrator 5 | 47.2 | 50.78 | 14% | 108% |
| Calibrator 6 | 23.6 | 25.11 | 8% | 106% |
| Calibrator 7 | 9.4 | 9.48 | 16% | 100% |
| Calibrator 8 | 0 | OORL | OORL | OORL |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001398

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |



Theranos Internal Only

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001399

| **theran⊛s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 1: Calibration 1**



Nominal Value vs Theranos Result

$y = 0.9121x + 32.377$
$R^2 = 0.9988$

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001400

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Table 3: Calibration 2 Data (Edison 3.0)

These data were used to analyze Reference Range (5), Dilution Linearity Set 1 (7), and Analytical Sensitivity (9).

| Nominal Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip1 | Tip2 | Mean | %CV |
| 4722.00 | 1344572 | 1376376 | 1344572 | 1376376 | 1360474 | 2% | 1410092 | 4% | 3902.52 | 4194.06 | 4538.92 | 8% |
| | 1504620 | 23 | 1504620 | DARK | 1504620 | | | | OORH | | | |
| | 1432739 | 1392151 | 1432739 | 1392151 | 1412445 | 2% | | | 3704.50 | 4350.47 | | |
| 2361.00 | 1032341 | 1024966 | 1032341 | 1024966 | 1028654 | 1% | 1094495 | 7% | 2093.49 | 2065.37 | 2349.66 | 15% |
| | 1099155 | 1090476 | 1099155 | 1090476 | 1094816 | 1% | | | 2370.36 | 2331.98 | | |
| | 1228554 | 1091479 | 1228554 | 1091479 | 1160017 | 8% | | | 3050.81 | 2336.37 | | |
| 944.40 | 518584 | 127693 | 518584 | | 518584 | | 633124 | 15% | 818.64 | | 1019.88 | 17% |
| | 708447 | 598983 | 708447 | 598983 | 653715 | 12% | | | 1170.82 | 956.67 | | |
| | 706480 | 16 | 706480 | DARK | 706480 | | | | 1166.65 | | | |
| 94.44 | 23288 | 146463 | 23288 | | 23288 | | 1961 | 12% | 101.20 | OORL | 91.80 | 6% |
| | 19066 | 19501 | 19066 | 19501 | 19284 | 2% | | | 90.33 | 91.50 | | |
| | 18117 | 18083 | 18117 | 18083 | 18100 | 0% | | | 87.74 | 87.64 | | |
| 47.22 | 4608 | 6405 | 4608 | 6405 | 5507 | 23% | 6562 | 16% | 37.45 | 46.82 | 47.56 | 11% |
| | 6678 | 7344 | 6678 | 7344 | 7011 | 7% | | | 48.11 | 51.13 | | |
| | 6881 | 7453 | 6881 | 7453 | 7167 | 6% | | | 49.04 | 51.61 | | |
| 23.61 | 3027 | 2856 | 3027 | 2856 | 2942 | 4% | 2539 | 14% | 27.31 | 26.04 | 23.58 | 12% |
| | 2334 | 2534 | 2334 | 2534 | 2434 | 6% | | | 21.89 | 23.54 | | |
| | 2378 | 2102 | 2378 | 2102 | 2240 | 9% | | | 22.26 | 19.88 | | |
| 9.44 | 1245 | 14 | 1245 | DARK | 1245 | | 1056 | 20% | 11.11 | | 8.76 | 1% |
| | 1235 | 52 | 1235 | DARK | 1235 | | | | 10.99 | | | |
| | 894 | 848 | 894 | 848 | 871 | 4% | | | OORL | OORL | | |
| 0.00 | 36 | 30 | DARK | DARK | | | 510 | 8% | OORL | OORL | OORL | OORL |
| | 458 | 512 | 458 | 512 | 485 | 8% | | | OORL | OORL | | |
| | 516 | 555 | 516 | 555 | 536 | 5% | | | OORL | OORL | | |

### Table 4: Calibration 2 Summary

| Calibrator Level | Nominal Value [mIU/mL] | Theranos Result [mIU/mL] | %CV | % Recovery |
|---|---|---|---|---|
| Calibrator 1 | 4722 | 4538.92 | 8% | 96% |
| Calibrator 2 | 2361 | 2349.66 | 15% | 100% |
| Calibrator 3 | 944.4 | 1019.88 | 17% | 108% |
| Calibrator 4 | 94.44 | 91.80 | 6% | 97% |
| Calibrator 5 | 47.22 | 47.56 | 11% | 101% |
| Calibrator 6 | 23.61 | 23.58 | 12% | 100% |
| Calibrator 7 | 9.444 | 8.76 | 1% | 93% |
| Calibrator 8 | 0 | OORL | OORL | OORL |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001401

| theranos | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001402

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran⊛s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 2: Calibration 2**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001403

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊚s | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 3: Calibration 3**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001404

ER-14580

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

### Table 5: Calibration 3 Data (Edison 3.0)

These data were used to analyze data from Dilution Linearity Set 2 (7), Cross Reactivity (12).

| Nominal Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip L | Tip 2 | Mean | %CV |
| 4722 | 1747284 | 1579753 | 1747284 | 1579753 | 1663519 | 7% | 1308112 | 22% | OORH | OORH | OORH | OORH |
| | 1169092 | 1005724 | 1169092 | 1005724 | 1087408 | 11% | | | OORH | 1937.63 | | |
| | 1213253 | 1133568 | 1213253 | 1133568 | 1173411 | 5% | | | OORH | 2622.11 | | |
| 2361 | 1093765 | 1166401 | 1093765 | 1166401 | 1130083 | 5% | 1079372 | 6% | 2376.08 | OORH | 2295.37 | 12% |
| | 1118037 | 1075785 | 1118037 | 1075785 | 1096911 | 3% | | | 2521.84 | 2275.88 | | |
| | 1042793 | 979451 | 1042793 | 979451 | 1011122 | 4% | | | 2107.10 | 1828.61 | | |
| 944.4 | 700061 | 23 | 700061 | DARK | 700061 | | 735335 | 10% | 1033.23 | | 1086.19 | 15% |
| | 809074 | 793282 | 809074 | 793282 | 801178 | 1% | | | 1283.06 | 1243.13 | | |
| | 687326 | 636931 | 687326 | 636931 | 662129 | 5% | | | 1007.53 | 911.70 | | |
| 94.44 | 14986 | 18576 | 14986 | 18576 | 16781 | 15% | 19946 | 24% | 65.55 | 74.90 | 78.21 | 14% |
| | 21419 | 17481 | 21419 | 17481 | 19450 | 14% | | | 81.65 | 72.16 | | |
| | 295 | 27268 | | 27268 | 27268 | | | | | 94.26 | | |
| 47.22 | 5967 | 7841 | 5967 | 7841 | 6904 | 19% | 8866 | 24% | 34.24 | 42.28 | 46.21 | 18% |
| | 10695 | 11191 | 10695 | 11191 | 10943 | 3% | | | 52.61 | 54.24 | | |
| | 8638 | 5 | 8638 | DARK | 8638 | | | | 45.35 | | | |
| 23.61 | 3278 | 3365 | 3278 | 3365 | 3322 | 2% | 3598 | 15% | 19.41 | 19.99 | 21.49 | 15% |
| | 2873 | 4417 | | 4417 | 4417 | | | | | 26.35 | | |
| | 3333 | 105 | 3333 | | 3333 | | | | 19.77 | | | |
| 9.444 | 1806 | 2190 | 1806 | 2190 | 1998 | 14% | 1946 | 19% | 7.75 | 11.22 | 9.06 | 25% |
| | 1408 | 1945 | 1408 | 1945 | 1677 | 23% | | | OORL | 9.05 | | |
| | 2379 | 2803 | 2379 | | 2379 | | | | 12.80 | | | |
| 0 | 961 | 1235 | 961 | 1235 | 1098 | 18% | 1097 | 41% | OORL | OORL | OORL | OORL |
| | 425 | 1216 | 425 | 1216 | 821 | 68% | | | OORL | OORL | | |
| | 1649 | 7 | 1649 | DARK | 1649 | | | | OORL | | | |

### Table 6: Calibration 3 Summary

| Calibrator Level | Nominal Value [mIU/mL] | Theranos Result [mIU/mL] | %CV | % Recovery |
| --- | --- | --- | --- | --- |
| Calibrator 1 | 4722 | OORH | OORH | OORH |
| Calibrator 2 | 2361 | 2295.37 | 12% | 97% |
| Calibrator 3 | 944.4 | 1086.19 | 15% | 115% |
| Calibrator 4 | 94.44 | 78.21 | 14% | 83% |
| Calibrator 5 | 47.22 | 46.21 | 18% | 98% |
| Calibrator 6 | 23.61 | 21.49 | 15% | 91% |
| Calibrator 7 | 9.444 | 9.06 | 25% | 96% |
| Calibrator 8 | 0 | OORL | OORL | OORL |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001405

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Table 7: Calibration 4 Data (Edison 3.5)

This calibration was used for all precision testing.

| Reported Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | %CV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | |
| 4722 | 1686891 | 1731572 | 1686891 | 1731572 | 1709232 | 2% | 1581126 | 8% | OORH | OORH | 4384.91 | 8% |
| | 1374036 | 1533489 | | 1533489 | 1533489 | | | | OORL | 3069.36 | | |
| | 1432269 | 1521407 | 1432269 | 1521407 | 1476838 | 4% | | | 3329.39 | 3909.59 | | |
| 2361 | 1195182 | 1115194 | 1195182 | 1115194 | 1155188 | 5% | 1247930 | 9% | 2263.82 | 2004.44 | 2344.87 | 18% |
| | 1126450 | 1392112 | 1126450 | 1392112 | 1259281 | 15% | | | 2038.73 | 3107.47 | | |
| | 1193869 | 1171001 | 1193869 | 1171001 | 1182435 | 1% | | | 2259.25 | 2181.39 | | |
| 2361 | 1429786 | 1399087 | | 1399087 | 1399087 | | | | OORL | 3144.51 | | |
| | 1160950 | 1207529 | 1160950 | 1207529 | 1184240 | 3% | | | 2148.20 | 2307.38 | | |
| 944.4 | 495942 | 501507 | 495942 | 501507 | 498725 | 1% | 603442 | 14% | 768.93 | 776.61 | 923.85 | 14% |
| | 637919 | 657270 | 637919 | 657270 | 647595 | 2% | | | 976.91 | 1007.52 | | |
| | 631727 | 696288 | 631727 | 696288 | 664008 | 7% | | | 967.25 | 1071.20 | | |
| 94.44 | 14805 | 14595 | 14805 | 14595 | 14700 | 1% | 15972 | 11% | 86.16 | 85.41 | 90.18 | 6% |
| | 16791 | 14923 | 16791 | 14923 | 15857 | 8% | | | 92.92 | 86.57 | | |
| | 15571 | 19144 | 15571 | 19144 | 17358 | 15% | | | 88.82 | 100.38 | | |
| 47.22 | 7939 | 6524 | 7939 | 6524 | 7232 | 14% | 7009 | 10% | 57.67 | 50.13 | 52.82 | 8% |
| | 5924 | 7230 | 5924 | 7230 | 6577 | 14% | | | 46.64 | 54.00 | | |
| | 6862 | 7576 | 6862 | 7576 | 7219 | 7% | | | 52.01 | 55.82 | | |
| 23.61 | 2433 | 2657 | 2433 | 2657 | 2545 | 6% | 2755 | 18% | 19.99 | 22.23 | 23.18 | 19% |
| | 2541 | 2605 | 2541 | 2605 | 2573 | 2% | | | 21.09 | 21.72 | | |
| | 3742 | 2552 | 3742 | 2552 | 3147 | 27% | | | 31.73 | 21.20 | | |
| 9.444 | 1434 | 1429 | 1434 | 1429 | 1432 | 0% | 1613 | 12% | 8.09 | 8.03 | 10.52 | 23% |
| | 1622 | 1564 | 1622 | 1564 | 1593 | 3% | | | 10.63 | 9.87 | | |
| | 1700 | 1930 | 1700 | 1930 | 1815 | 9% | | | 11.64 | 14.45 | | |
| 0 | 874 | 988 | 874 | 988 | 931 | 9% | 1036 | 14% | OORL | OORL | OORL | OORL |
| | 954 | 1088 | 954 | 1088 | 1021 | 9% | | | OORL | OORL | | |
| | 1299 | 1012 | 1299 | 1012 | 1156 | 18% | | | OORL | OORL | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001406

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

### Table 8: Calibration 4 Summary

| Calibrator Level | Reported Value [units] | Theranos Result [units] | %CV | % Recovery |
|---|---|---|---|---|
| Calibrator 1 | 4722.00 | 4384.91 | 8% | 93% |
| Calibrator 2 | 2361.00 | 2344.87 | 18% | 99% |
| Calibrator 3 | 944.40 | 923.85 | 14% | 98% |
| Calibrator 4 | 94.44 | 90.18 | 6% | 95% |
| Calibrator 5 | 47.22 | 52.82 | 8% | 112% |
| Calibrator 6 | 23.61 | 23.18 | 19% | 98% |
| Calibrator 7 | 9.44 | 10.52 | 23% | 111% |
| Calibrator 8 | 0 | OORL | OORL | OORL |

### Figure 4: Calibration 4



**Nominal v Theranos Result**

$y = 0.9367x + 21.095$
$R^2 = 0.9989$

(Y axis: Theranos Result [mIU/mL], X axis: Nominal Value [mIU/mL])

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001407

ER-14583

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran✪s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### 4 PRECISION

The precision of this assay was tested over 5 days in a morning and evening shift. One run consisted of 9 total replicates at each of 3 analyte levels. In each shift 2 runs were performed. The data show the precision of the assay on the Theranos System.

4.1 The report will include scatter plots, precision summary tables and conclusions about the performance claim(s) regarding within-run (repeatability), between-day, between-lot and within laboratory precision.

4.2 Acceptance criteria: The %CV of replicates at each concentration of the samples should not be more than 20% (25% at LLOQ and ULOQ) for ELISA assays.

**Table 9: Precision Summary**

| Level(mIU/mL) | Precision (%) | Total Error (%) | Allowable Bias (%) |
|---------------|---------------|-----------------|--------------------|
| 5000 | 8 | 20 | 12 |
| 1000 | 9 | 18 | 9 |
| 50 | 12 | 15 | 3 |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001408

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | hCG Report | Document Number: CL-RPT-13095<br>Revision: A |
|---|---|---|
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 5 REFERENCE RANGE

To verify the accuracy of the Theranos System, the reference range was tested and compared to the results from the predicate method. According to C.F.R. Ch IV, § 493.1253 "Standard: Establishment and verification of performance specifications" and outlined in CLSI guideline C28A3, laboratories developing test methods need to verify the measuring interval. Additionally, by verifying the measuring interval, clinical laboratories can ensure that the calibration of the measurement procedure is correctly applicable over the range in which they report patient results and that the measuring interval they are obtaining in their laboratory is comparable to the interval defined by the manufacturer in the product insert. A measuring interval consists of all numeric values between the lower and upper numeric values for which a method can produce quantitative results suitable for clinical use.

5.1    Calculated concentrations are based on the mean RLU of 3 cartridges tested.

5.2    Acceptance Criteria: In accordance to CLSI guideline C28-A3c, 95% of at least 20 samples tested must be within the reference interval.

The reference interval established for non-pregnant women is less that 10mIU/mL. These patients are considered not pregnant. Of 20 unique samples collected from reference donors, zero patients had hCG levels outside of the reference range. This sample was confirmed via the predicate method listed in section 1.2. Overall, 100% of the patients tested fell within the reference range, and is acceptable for verification of the reference range.

**Table 10: Normal Patient Sample**

| Reported Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip1 | Tip2 | Mean | %CV | %Recovery |
| < 1.00 | 161 | 193 | 161 | 193 | 177 | 13% | 185 | 13% | OORL | OORL | OORL | OORL | OORL |
| | 166 | 166 | 166 | 166 | 166 | 0% | | | OORL | OORL | | | |
| | 209 | 216 | 209 | 216 | 213 | 2% | | | OORL | OORL | | | |
| < 1.00 | 188 | 202 | 188 | 202 | 195 | 5% | 191 | 8% | OORL | OORL | OORL | OORL | OORL |
| | 183 | 168 | 183 | 168 | 176 | 6% | | | OORL | OORL | | | |
| | 215 | 192 | 215 | 192 | 204 | 8% | | | OORL | OORL | | | |
| < 1.00 | 176 | 153 | 176 | 153 | 165 | 10% | 185 | 15% | OORL | OORL | OORL | OORL | OORL |
| | 210 | 154 | 210 | 154 | 182 | 22% | | | OORL | OORL | | | |
| | 210 | 206 | 210 | 206 | 208 | 1% | | | OORL | OORL | | | |
| 3.33 | 222 | 5 | 222 | DARK | 222 | | 256 | 8% | OORL | | OORL | OORL | OORL |
| | 255 | 274 | 255 | 274 | 265 | 5% | | | OORL | OORL | | | |
| | 267 | 264 | 267 | 264 | 266 | 1% | | | OORL | OORL | | | |
| < 1.00 | 124 | 141 | 124 | 141 | 133 | 9% | 163 | 17% | OORL | OORL | OORL | OORL | OORL |
| | 194 | 163 | 194 | 163 | 179 | 12% | | | OORL | OORL | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001409

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | | hCG Report | | Document Number: CL-RPT-13095 |
|---|---|---|---|---|
| | | | | Revision: A |
| | | Validation Document | | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 166 | 192 | 166 | 192 | 179 | 10% | | | OORL | OORL | | | |
| | 219 | 168 | 219 | 168 | 194 | 19% | | | OORL | OORL | | | |
| < 1.00 | 277 | 173 | 277 | 173 | 225 | 33% | 247 | 52% | OORL | OORL | OORL | OORL | OORL |
| | 493 | 152 | 493 | 152 | 323 | 75% | | | OORL | OORL | | | |
| | 264 | 168 | 264 | 168 | 216 | 31% | | | OORL | OORL | | | |
| 2.49 | 314 | 213 | 314 | 213 | 264 | 27% | 243 | 21% | OORL | OORL | OORL | OORL | OORL |
| | 271 | 229 | 271 | 229 | 250 | 12% | | | OORL | OORL | | | |
| | 162 | 159 | 162 | 159 | 161 | 1% | | | OORL | OORL | | | |
| < 1.00 | 100 | 156 | 100 | 156 | 128 | 31% | 142 | 16% | OORL | OORL | OORL | OORL | OORL |
| | 137 | 140 | 137 | 140 | 139 | 2% | | | OORL | OORL | | | |
| | 178 | 109 | 178 | 109 | 144 | 34% | | | OORL | OORL | | | |
| < 1.00 | 141 | 131 | 141 | 131 | 136 | 5% | 146 | 17% | OORL | OORL | OORL | OORL | OORL |
| | 165 | 150 | 165 | 150 | 158 | 7% | | | OORL | OORL | | | |
| | 423 | 311 | 423 | 311 | 367 | 22% | | | OORL | OORL | | | |
| < 1.00 | 394 | 332 | 394 | 332 | 363 | 12% | 319 | 27% | OORL | OORL | OORL | OORL | OORL |
| | 256 | 195 | 256 | 195 | 226 | 19% | | | OORL | OORL | | | |
| | 191 | 224 | 191 | 224 | 208 | 11% | | | OORL | OORL | | | |
| < 1.00 | 78 | 172 | DARK | 172 | 172 | | 258 | 34% | | OORL | OORL | OORL | OORL |
| | 338 | 364 | 338 | | 351 | 5% | | | OORL | OORL | | | |
| | 456 | 6 | 456 | DARK | 456 | | | | OORL | | | | |
| < 1.00 | 219 | 173 | 219 | 173 | 196 | 17% | 339 | 30% | OORL | OORL | OORL | OORL | OORL |
| | 434 | 413 | 434 | 413 | 424 | 4% | | | OORL | OORL | | | |
| < 1.00 | 32016 | 206 | | 206 | 206 | | 156 | 29% | | OORL | OORL | OORL | OORL |
| | 122 | 139 | 122 | 139 | 131 | 9% | | | OORL | OORL | | | |
| | 251 | 231 | 251 | 231 | 241 | 6% | | | OORL | OORL | | | |
| < 1.00 | 255 | 222 | 255 | 222 | 239 | 10% | 211 | 22% | OORL | OORL | OORL | OORL | OORL |
| | 154 | 154 | 154 | 154 | 154 | 0% | | | OORL | OORL | | | |
| < 1.00 | 233 | 235 | 233 | 235 | 234 | 1% | 242 | 12% | OORL | OORL | OORL | OORL | OORL |
| | 283 | 216 | 283 | 216 | 250 | 19% | | | OORL | OORL | | | |
| | 252 | 238 | 252 | 238 | 245 | 4% | | | OORL | OORL | | | |
| < 1.00 | 238 | 213 | 238 | 213 | 226 | 8% | 265 | 20% | OORL | OORL | OORL | OORL | OORL |
| | 285 | 361 | 285 | 361 | 323 | 17% | | | OORL | OORL | | | |
| | 301 | 4 | 301 | DARK | 301 | | | | OORL | | | | |
| 2.01 | 282 | 249 | 282 | 249 | 266 | 9% | 277 | 9% | OORL | OORL | OORL | OORL | OORL |
| | 167 | 136 | 167 | 136 | 152 | 14% | | | OORL | OORL | | | |
| < 1.00 | 181 | 166 | 181 | 166 | 174 | 6% | 164 | 10% | OORL | OORL | OORL | OORL | OORL |
| | 176 | 176 | 176 | 160 | 168 | 7% | | | OORL | OORL | | | |
| | 206 | 184 | 206 | 184 | 195 | 8% | | | OORL | OORL | | | |
| < 1.00 | 1988 | 203 | | 203 | 203 | | 180 | 15% | | OORL | OORL | OORL | OORL |
| | 148 | 158 | 148 | 158 | 153 | 5% | | | OORL | OORL | | | |
| < 1.00 | 235 | 205 | 235 | 205 | 220 | 10% | 203 | 15% | OORL | OORL | OORL | OORL | OORL |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-001410

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊕s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 186 | 159 | 186 | 159 | 173 | 11% | | | OORL | OORL | |
| | 197 | 236 | 197 | 236 | 217 | 13% | | | OORL | OORL | |

**Table 11: Reference Range Summary**

| Sample ID | Reported Value [mIU/mL] | Theranos Result [mIU/mL] |
|---|---|---|
| Patient 1 | < 1.00 | OORL |
| Patient 2 | < 1.00 | OORL |
| Patient 3 | < 1.00 | OORL |
| Patient 4 | 3.33 | OORL |
| Patient 5 | < 1.00 | OORL |
| Patient 6 | < 1.00 | OORL |
| Patient 7 | 2.49 | OORL |
| Patient 8 | < 1.00 | OORL |
| Patient 9 | < 1.00 | OORL |
| Patient 10 | < 1.00 | OORL |
| Patient 11 | < 1.00 | OORL |
| Patient 12 | < 1.00 | OORL |
| Patient 13 | < 1.00 | OORL |
| Patient 14 | < 1.00 | OORL |
| Patient 15 | < 1.00 | OORL |
| Patient 16 | < 1.00 | OORL |
| Patient 17 | 2.01 | OORL |
| Patient 18 | < 1.00 | OORL |
| Patient 19 | < 1.00 | OORL |
| Patient 20 | < 1.00 | OORL |

# 6   ACCURACY/COMPARABILITY

To test the accuracy of the assay on the Theranos System, 100 unique patient samples were assayed using both the predicate method (Siemens Immulite) and the Theranos System. Of these samples 18 were within the reference range (<10mIU/mL), and 82 were higher than the reference range. Based on the results of the data examination, either a simple linear regression or alternative procedures were used to estimate expected (average) bias and the confidence interval of expected bias at the desired medical decision level(s) as per CLSI guidance EP09-A2. StatisPro was used for bias calculations. These estimates were compared with internal criteria to judge the acceptability of the Theranos method. Each sample was run in replicate on the predicate, and the average used for comparison to the Theranos method. Some samples were stored before analysis on both methods. If the confidence interval for the predicted bias includes the defined acceptable bias or if the acceptable bias is greater than the higher limit of the confidence interval of the predicted bias, then the data do not show that the bias of the Theranos method is different from the acceptable bias or there is a high probability (97%) that the predicated bias is acceptable, respectively. The acceptable bias at each medical decision level was determined based on the total allowable error

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001411

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 6: Theranos Corrected v. Predicate Method Results**



**Figure 7: Scatter Plot**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001412

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⦿s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

(TEa) minus the measured precision at the level closest to that decision level. Total allowable error (TEa) was taken from CLIA proficiency testing criteria for acceptable analytical performance, as printed in the Federal Register February 28, 1992;57(40):7002-186, when available.

Each sample was tested in replicates of three. Calculated concentrations are based on the average RLU of 3 cartridges excluding outliers and dark count tips.

6.1     The analysis in the report will contain the following elements:

6.1.1   Repeatability plots, difference plots, and/or scatter plots

6.1.2   The result of an adequate range test (linear fit with r-value) to ensure that the sample results span the measuring interval

6.1.3   The results of the calculations for the predicted bias (or difference) estimates and confidence intervals

6.1.4   Statement of performance claims

6.1.4.1   Default acceptance criteria for immunoassays are absolute mean bias (%RE) ≤ 20% (≤ 25% at LLOQ) and total error (sum of the %CV and absolute %RE) ≤ 30% (≤40% at the LLOQ)

**Table 12: Bias Correction**

| Sample ID | Predicate Value (mIU/mL) | Theranos Result (mIU/mL) | Theranos Corrected (mIU/mL) |
|---|---|---|---|
| Patient 1 | 2780 | 4051.00 | 3238.52 |
| Patient 2 | 2410 | 3916.54 | 3131.04 |
| Patient 3 | 2508 | 3731.48 | 2983.11 |
| Patient 4 | 2442 | 3447.15 | 2755.82 |
| Patient 5 | 2495 | 3374.64 | 2697.86 |
| Patient 6 | 3255 | 3298.78 | 2637.22 |
| Patient 7 | 2295 | 3166.20 | 2531.25 |
| Patient 8 | 2138 | 3135.88 | 2507.00 |
| Patient 9 | 2241 | 3039.68 | 2430.11 |
| Patient 10 | 2414 | 2984.69 | 2386.15 |
| Patient 11 | 2759 | 2960.35 | 2366.69 |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001413

ER-14589

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

| Patient 12 | 1905 | 2834.28 | 2265.91 |
| Patient 13 | 2605 | 2699.93 | 2158.52 |
| Patient 14 | 2390 | 2290.21 | 1831.01 |
| Patient 15 | 1824 | 2076.27 | 1659.99 |
| Patient 16 | 1071 | 2019.67 | 1614.75 |
| Patient 17 | 1417 | 1890.81 | 1511.75 |
| Patient 18 | 1230 | 1591.48 | 1272.47 |
| Patient 19 | 1379 | 1514.84 | 1211.21 |
| Patient 20 | 970 | 1360.31 | 1087.69 |
| Patient 21 | 1209 | 1323.05 | 1057.90 |
| Patient 22 | 844 | 1304.42 | 1043.01 |
| Patient 23 | 1164 | 1299.37 | 1038.97 |
| Patient 24 | 910 | 1117.23 | 893.38 |
| Patient 25 | 929 | 1067.00 | 853.22 |
| Patient 26 | 1894 | 968.96 | 774.85 |
| Patient 27 | 458 | 694.70 | 555.62 |
| Patient 28 | 560 | 593.23 | 474.51 |
| Patient 29 | 543 | 545.44 | 436.31 |
| Patient 30 | 345 | 492.85 | 394.27 |
| Patient 31 | 455 | 461.42 | 369.15 |
| Patient 32 | 500 | 434.67 | 347.77 |
| Patient 33 | 415 | 416.44 | 333.19 |
| Patient 34 | 393 | 412.84 | 330.32 |
| Patient 35 | 310 | 357.24 | 285.87 |
| Patient 36 | 212 | 287.08 | 229.78 |
| Patient 37 | 250 | 271.57 | 217.39 |
| Patient 38 | 224 | 261.78 | 209.56 |
| Patient 39 | 156 | 261.46 | 209.30 |
| Patient 40 | 179 | 225.29 | 180.39 |
| Patient 41 | 150 | 194.50 | 155.78 |
| Patient 42 | 128 | 165.27 | 132.42 |
| Patient 45 | 185 | 128.33 | 102.89 |
| Patient 46 | 66.1 | 116.30 | 93.28 |
| Patient 47 | 115 | 107.83 | 86.50 |
| Patient 48 | 103 | 100.02 | 80.26 |
| Patient 49 | 44 | 66.22 | 53.24 |
| Patient 50 | 21.6 | 61.16 | 49.19 |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001414

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran❍s | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| Patient 51 | 40 | 58.64 | 47.18 |
|---|---|---|---|
| Patient 52 | 22.8 | 46.17 | 37.21 |
| Patient 53 | 33.5 | 43.67 | 35.21 |
| Patient 55 | 51.2 | 43.17 | 34.82 |
| Patient 57 | 38 | 41.32 | 33.34 |
| Patient 58 | 26.9 | 41.30 | 33.32 |
| Patient 59 | 9.72 | 36.15 | 29.20 |
| Patient 60 | 16 | 36.04 | 29.11 |
| Patient 62 | 11.2 | 34.98 | 28.27 |
| Patient 63 | 21 | 34.02 | 27.50 |
| Patient 64 | 23 | 32.89 | 26.60 |
| Patient 65 | 27 | 30.82 | 24.94 |
| Patient 66 | 25.4 | 30.07 | 24.35 |
| Patient 67 | 27.9 | 29.94 | 24.24 |
| Patient 68 | 7.79 | 28.28 | 22.92 |
| Patient 69 | 13.3 | 26.59 | 21.56 |
| Patient 70 | 8.34 | 26.05 | 21.13 |
| Patient 72 | 18.8 | 26.05 | 21.13 |
| Patient 73 | 26.1 | 25.70 | 20.85 |
| Patient 76 | 9.59 | 23.37 | 18.98 |
| Patient 79 | 53 | 23.27 | 18.91 |
| Patient 80 | 7.22 | 23.23 | 18.87 |
| Patient 83 | 22.8 | 23.18 | 18.83 |
| Patient 85 | 19.7 | 22.84 | 18.56 |
| Patient 86 | 17.3 | 21.94 | 17.84 |
| Patient 87 | 23.3 | 19.44 | 15.85 |
| Patient 88 | 11 | 18.54 | 15.13 |
| Patient 89 | 10.9 | 16.80 | 13.73 |
| Patient 90 | 17.3 | 15.50 | 12.70 |
| Patient 91 | 17.3 | 13.70 | 11.25 |
| Patient 92 | 15.1 | 12.60 | 10.38 |
| Patient 93 | 14.4 | 11.38 | 9.40 |
| Patient 94 | 17.8 | 11.09 | 9.17 |
| Patient 95 | 11.7 | 9.70 | 8.06 |
| Patient 96 | 11.1 | 9.45 | 7.86 |
| Patient 97 | 10.6 | 9.43 | 7.84 |
| Patient 99 | 12.2 | 8.69 | 7.25 |

Theranos Internal Only

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001415

ER-14591

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran●s** | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

| Patient 100 | 13.7 | 7.83 | 6.57 |

**Table 13: Method Comparison Summary**

| Method Comparison | | | |
|---|---|---|---|
| Level(mIU/mL) | Precision(%) | Total Error(%) | Allowable Bias(%) |
| 5000 | 8 | 20  2.0 | 12 |
| 1000 | 9 | 18 | 9 |
| 50 | 12 | 15 | 3 |

**Figure 5: Theranos System v. Predicate method Results**



Theranos Internal
Theranos Only

Theranos Result
y = 1.251x - 0.3831
R² = 0.9438

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001416

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊛s | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |



**Figure 8: Difference Plot**

**Figure 9: Adequate range test**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001417

ER-14593

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Adequate range test

*CLSI guideline EP09-A2-IR section 4.5*

| r | 0.980 |
| --- | --- |

r ≥ 0.975 indicates that the error in X is adequately compensated by the measuring range. CLSI recommends use of a linear fit.

## Figure 10: Linear Fit



### Ordinary linear fit

*CLSI guideline EP09-A2-IR section 5.1*

| n | 85 |
| --- | --- |

| Parameter | Estimate | SE | 95% CI |
| --- | --- | --- | --- |
| Constant (Intercept) | 0.496709996 | 25.18898130 | 50.603160802 to 50.596 |
| Proportional (slope) | 1.020 | 0.0226 | 0.975 to 1.065 |

| Sy.x | 190.3879406 |
| --- | --- |

## Figure 11: Comparability



### Comparability

*CLSI guideline EP09-A2-IR section 7*

| Level ID | Value | Difference | SE | 95% CI | Allowable difference |
| --- | --- | --- | --- | --- | --- |
| 1 | 50.00000000 | 1.492568003 | 24.55840962 | 953121005 to 50.338 | 1.500000000 |
| 2 | 1000.000000 | 20.41387014 | 22.22372585 | 788226937 to 64.615 | 90.00000000 |
| 3 | 5000.000000 | 100.0925107 | 100.8952489 | 594071446 to 300.7 | 450.0000000 |

Difference is less than allowable bias: 3% upto 51mIU/mL then 9%.

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001418

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

## 7 DILUTION LINEARITY

A high analyte sample was selected and serially diluted using a low sample to a total of 8 points to test the linearity. The exercise was repeated with a mid-level patient sample in order to span the reportable range of the assay. The nominal values of each level were calculated based on the value of the high analyte sample as reported by the predicate method (Siemens Immulite). CLSI guideline EP06-A will be followed to establish the measuring interval by performing a linearity study.

7.1 Each dilution level was tested on the Theranos System and compared to the nominal concentrations. For each dilution level, the recovery should be within $100 \pm 20\%$ ($100 \pm 25\%$ at LLOQ and ULOQ standards) of their nominal value, and when plotted, the $R^2$ value should be greater than 0.95.

In both cases (dilution of the high and mid-level sample) the recoveries were within 20% of nominal and the $R^2$ was 0.99.

**Table 14: Dilution Linearity High-Level Patient Sample**

| Nominal Value [mIU/mL] | All Tips Tip1 | Tip2 | Dark Exclusion Tip1 | Tip2 | Mean | %CV | Inter-Cartridge Mean | %CV | Concentration Tip1 | Tip2 | Mean | %CV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3255 | 1156537 | 1192582 | 1156537 | 1192582 | 1174560 | 2% | 1162857 | 8% | 2645.05 | 2838.63 | 2677.73 | 20% |
| | 1325872 | 1134702 | 1325872 | 1134702 | 1230287 | 11% | | | 3744.48 | 2536.01 | | |
| | 1052671 | 1114780 | 1052671 | 1114780 | 1083726 | 4% | | | 2173.40 | 2441.45 | | |
| 1628 | 832002 | 785607 | 832002 | 785607 | 808805 | 4% | 846178 | 9% | 1460.60 | 1344.77 | 1497.90 | 14% |
| | 166408 | 789756 | | 789756 | 789756 | | | | | 1354.75 | | |
| | 966358 | 837167 | 966358 | 857167 | 911763 | 8% | | | 1856.79 | 1527.47 | | |
| 814 | 370877 | 388063 | 370877 | 388063 | 379470 | 3% | 411577 | 10% | 596.06 | 620.32 | 654.12 | 9% |
| | 404897 | 421212 | 404897 | 421212 | 413055 | 3% | | | 644.44 | 668.19 | | |
| | 483702 | 400711 | 483702 | 400711 | 442207 | 13% | | | 762.87 | 638.41 | | |
| 407 | 151454 | 194995 | 151454 | 194995 | 173225 | 18% | 165805 | 11% | 304.98 | 362.05 | 323.94 | 7% |
| | 144595 | 159632 | | 159632 | 159632 | | | | | 315.81 | | |
| | 171929 | 151013 | 171929 | 151013 | 161471 | 9% | | | 331.97 | 304.40 | | |
| 203 | 63651 | 60776 | 63651 | 60776 | 62214 | 3% | 72490 | 15% | 179.12 | 174.38 | 193.27 | 9% |
| | 86706 | 81308 | 86706 | 81308 | 84007 | 5% | | | 214.97 | 206.86 | | |
| | 47268 | 70010 | | 70010 | 70010 | | | | | 189.36 | | |
| 102 | 26534 | 24439 | 26534 | 24439 | 25487 | 6% | 22098 | 25% | 108.93 | 103.99 | 98.24 | 15% |
| | 27199 | 9916 | 27199 | | 27199 | | | | 110.47 | | | |
| | 17730 | 14588 | 17730 | 14588 | 16159 | 14% | | | 86.66 | 77.44 | | |

**Table 15: Dilution Linearity Mid-Level Patient Sample**

| Nominal Value | All Tips | Dark Exclusion | Inter-Cartridge | Intra-Cartridge | Concentration | %CV |
|---|---|---|---|---|---|---|

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001419

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| [mIU/mL] | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 468964 | 466239 | 468964 | 466239 | 467602 | 0% | | | 739.96 | 735.77 | | |
| 926 | 581780 | 620106 | 581780 | 620106 | 600943 | 5% | 539545 | 12% | 925.92 | 995.43 | 853.28 | 12% |
| | 531670 | 568513 | 531670 | 568513 | 550092 | 5% | | | 840.16 | 902.68 | | |
| | 233464 | 290778 | 233464 | 290778 | 262121 | 15% | | | 411.99 | 487.16 | | |
| 463 | 5 | 5 | DARK | DARK | | | 293645 | 15% | | | 490.90 | 12% |
| | 333804 | 316533 | 333804 | 316533 | | | | | 549.88 | 521.50 | | |
| | 117773 | 115925 | 117773 | 115925 | 116849 | 1% | | | 289.42 | 256.86 | | |
| 232 | 85039 | 109014 | 85039 | 109014 | 97027 | 17% | 106938 | 14% | 212.48 | 247.20 | 244.27 | 9% |
| | 3 | 5 | DARK | DARK | | | | | | | | |
| | 36687 | 40669 | 36687 | 40669 | 38678 | 7% | | | 130.76 | 138.60 | | |
| 116 | 13468 | 26713 | | 26713 | 26713 | | 32538 | 18% | OORL | 109.35 | 122.20 | 10% |
| | 29909 | 28714 | 29909 | 28714 | 29312 | 3% | | | 116.54 | 113.89 | | |
| | 7673 | 8740 | 7673 | 8740 | 8207 | 9% | | | 52.57 | 57.02 | | |
| 58 | 8005 | 7305 | 8005 | 7305 | 7655 | 6% | 8144 | 19% | 53.99 | 50.96 | 54.57 | 12% |
| | 6318 | 10820 | 6318 | 10820 | 8569 | 37% | | | 46.40 | 64.93 | | |
| | 2222 | 2608 | 2222 | 2608 | 2415 | 11% | | | 20.94 | 24.13 | | |
| 29 | 3085 | 17 | 3085 | DARK | 3085 | | 2598 | 12% | 27.73 | | 24.05 | 10% |
| | 2517 | 2557 | 2517 | 2557 | 2537 | 1% | | | 23.40 | 23.73 | | |
| | 1153 | 1207 | 1153 | 1207 | 1180 | 3% | | | 9.99 | 10.65 | | |
| 14 | 968 | 969 | 968 | 969 | 969 | 0% | 1008 | 14% | 7.60 | 7.61 | 8.14 | 20% |
| | 869 | 884 | 869 | 884 | 877 | 1% | | | OORL | OORL | | |
| | 448 | 396 | 448 | 396 | 422 | 9% | | | OORL | OORL | | |
| 7 | 347 | 585 | 347 | 585 | 466 | 36% | 442 | 23% | OORL | OORL | OORL | OORL |
| | 245 | 170 | 245 | 170 | 208 | 26% | | | OORL | OORL | | |
| 4 | 227 | 230 | 227 | 230 | 229 | 1% | 224 | 12% | OORL | OORL | OORL | OORL |
| | 238 | 231 | 238 | 231 | 235 | 2% | | | OORL | OORL | | |

TIME SENSITIVE - PRODUCED ONLY

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001420

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

### Table 16: Dilution Linearity Summary

| Sample ID | Nominal Value [mIU/ml] | Theranos Result [mIU/ml] | % Recovery |
|---|---|---|---|
| High-Patient Sample | 3255.00 | 2677.73 | 82% |
| 1/2 | 1627.50 | 1497.90 | 92% |
| 1/4 | 813.75 | 654.12 | 80% |
| 1/8 | 406.88 | 323.94 | 80% |
| 1/16 | 203.44 | 193.27 | 95% |
| 1/32 | 101.72 | 98.24 | 97% |
| 1/64 | 50.86 | 39.57 | 78% |
| Mid-Patient Sample | 926.00 | 858.28 | 92% |
| 1/2 | 463.00 | 490.90 | 106% |
| 1/4 | 231.50 | 244.27 | 106% |
| 1/8 | 115.75 | 122.20 | 106% |
| 1/16 | 57.88 | 54.57 | 94% |
| 1/32 | 28.94 | 24.05 | 83% |
| 1/64 | 14.47 | OORL | OORL |
| 1/128 | 7.23 | OORL | OORL |
| Negative | 3.62 | OORL | OORL |

### Figure 12: Dilution Linearity



**Dilution Linearity**

$y = 0.8342x + 13.276$
$R^2 = 0.9962$

$y = 0.9308x + 15.405$
$R^2 = 0.9936$

◇ Set 1
■ Set 2

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001421

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

## 8 BLOOD COLLECTION DEVICE (BCD) COMPARISON

Because the sample volume obtained from a fingerstick is sufficient only for testing on the Theranos System but not in the predicate method, a second verification of the reference range was performed using matched fingerstick blood and venous blood. The normal range for non-pregnant women is less than 10 mIU/mL.

20 unique patients donated 2 venous tubes of blood and 4 fingerstick samples. Out of these patient samples one tested outside of the reference range. Overall, 100% of the patient samples fell within the reference range

### Table 17: Venous v. Fingerstick

| Sample Type | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | | | Concentration | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean n | %CV | Mean n | %CV | Mean n | %CV | Tip 1 | Tip 2 | Mean | %CV |
| Venous Tube 1 | 160 | 169 | 160 | 169 | 165 | 4% | | | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 153 | 184 | 153 | 184 | 169 | 13% | 167 | 8% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 1 | 101 | 87 | 101 | 87 | 94 | 11% | | | | 34% | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 98 | 108 | 98 | 108 | 103 | 7% | 92 | 18% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 3 | 96 | 61 | 96 | 61 | 79 | 32% | | | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 1 | 83 | 83 | 83 | 83 | 83 | 0% | 130 | 42% | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 172 | 183 | 172 | 183 | 178 | 4% | | | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 1 | 58 | 49 | 58 | 49 | 54 | 12% | | | 153 | 67% | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 150 | 102 | 150 | 102 | 126 | 27% | 169 | 76% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 3 | 306 | 346 | 306 | 346 | 326 | 9% | | | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 1 | 127 | 108 | 127 | 108 | 118 | 11% | 152 | 27% | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 187 | 187 | 187 | 187 | 187 | 0% | | | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 1 | 132 | 82 | 132 | 82 | 107 | 33% | | | 127 | 29% | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 137 | 131 | 137 | 131 | 134 | 3% | 111 | 23% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 3 | 94 | 89 | 94 | 89 | 92 | 4% | | | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 1 | 249 | 197 | 249 | 197 | 223 | 16% | 311 | 34% | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 376 | 422 | 376 | 422 | 399 | 8% | | | 214 | 49% | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 1 | 158 | 174 | 158 | 174 | 166 | 7% | 150 | 19% | | | OOR L | OOR L | OOR L | OOR L |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001422

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | | | | | | | | OOR L | OOR L | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Fingerstick 2 | 174 | 144 | 174 | 144 | 159 | 13% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 96 | 152 | 96 | 152 | 124 | 32% | | | | OOR L | OOR L | | |
| Venous Tube 1 | 178 | 142 | 178 | 142 | 160 | 16% | 165 | 11% | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 161 | 180 | 161 | 180 | 171 | 8% | | | | OOR L | OOR L | | |
| Fingerstick 1 | 55 | 49 | 55 | 49 | 52 | 8% | 84 | 31% | 117 | 41% OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 99 | 111 | 99 | 111 | 105 | 8% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 104 | 86 | 104 | 86 | 95 | 13% | | | | OOR L | OOR L | | |
| Venous Tube 1 | 304 6 | 308 | | 308 | 308 | | 298 | 5% | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 287 | 610 | 287 | | 287 | | | | | OOR L | OOR L | | |
| Fingerstick 1 | 135 | 139 | 135 | 139 | 137 | 2% | 111 | 24% | 158 | 56% OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 81 | 127 | 81 | 127 | 104 | 31% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 81 | 105 | 81 | 105 | 93 | 18% | | | | OOR L | OOR L | | |
| Venous Tube 1 | 117 | 100 | 117 | 100 | 109 | 11% | 92 | 22% | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 77 | 73 | 77 | 78 | 75 | 4% | | | | OOR L | OOR L | | |
| Fingerstick 1 | 128 | 96 | 128 | 96 | 112 | 20% | 98 | 16% | 95 | 20% OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 112 | 89 | 112 | 89 | 101 | 16% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 78 | 84 | 78 | 84 | 81 | 5% | | | | OOR L | OOR L | | |
| Venous Tube 1 | 85 | 101 | 85 | 101 | 93 | 12% | 96 | 16% | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 81 | 115 | 81 | 115 | 98 | 25% | | | | OOR L | OOR L | | |
| Fingerstick 1 | 159 | 127 | 159 | 127 | 143 | 16% | 113 | 40% | 106 | 34% OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 87 | 92 | 87 | 92 | 90 | 4% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 49 | 166 | 49 | 166 | 108 | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 127 | 118 | 127 | 118 | 123 | 5% | 117 | 8% | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 105 | 119 | 105 | 119 | 112 | 9% | | | | OOR L | OOR L | | |
| Fingerstick 1 | 77 | 65 | 77 | 65 | 71 | 12% | 112 | 33% | 114 | 25% OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 148 | 160 | 148 | 160 | 154 | 6% | | | | OOR L | OOR L | | |
| Fingerstick 3 | 110 | 112 | 110 | 112 | 111 | 1% | | | | OOR L | OOR L | | |
| Venous Tube 1 | 124 | 123 | 124 | 123 | 124 | 1% | 119 | 18% | 101 | 27% OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 89 | 138 | 89 | 138 | 144 | 31% | | | | OOR L | OOR L | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001423

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |
|---|

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fingerstick 1 | 135 | 62 | 135 | 62 | 99 | 52% | 89 | 28% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 79 | 95 | 79 | 95 | 87 | 13% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | 81 | 83 | 81 | 83 | 82 | 2% | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 137 | 136 | 137 | 136 | 137 | 1% | 113 | 25% | 94 | 37% | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 79 | 101 | 79 | 101 | 90 | 17% | | | | | OOR L | OOR L | | |
| Fingerstick 1 | 70 | 120 | 70 | 120 | 95 | 37% | 74 | 42% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 52 | 55 | 52 | 55 | 54 | 4% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | 486 | 241 | | | | | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 127 | 137 | 127 | 137 | 132 | 5% | 88 | 60% | 82 | 60% | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 84 | 4 | 84 | 4 | 44 | 129% | | | | | OOR L | OOR L | | |
| Fingerstick 1 | 131 | 118 | 131 | 118 | 125 | 7% | 58 | 58% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 73 | 3 | 73 | 3 | 38 | 130% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | 81 | 63 | 81 | 63 | 72 | 18% | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 131 | 131 | 131 | 131 | 131 | 0% | 97 | 63% | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 119 | 6 | 119 | 6 | 63 | 128% | | | | | OOR L | OOR L | | |
| Fingerstick 1 | 92 | 224 | 92 | 224 | 158 | 59% | 108 | 54% | 104 | 54% | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 74 | 79 | 74 | 79 | 77 | 5% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | 76 | 104 | 76 | 104 | 90 | 22% | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 608 | 138 | 608 | 138 | 373 | | 222 | 117% | | | 10.30 | OOR L | OOR L | OOR L |
| Venous Tube 2 | 77 | 66 | 77 | 66 | 72 | 11% | | | 150 | 125% | OOR L | OOR L | | |
| Fingerstick 1 | 49 | 83 | 49 | 83 | 66 | 36% | 78 | 25% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 88 | 91 | 88 | 91 | 90 | 2% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | | | | | | | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 101 | 141 | 101 | 141 | 121 | 23% | 137 | 18% | | | OOR L | OOR L | OOR L | OOR L |
| Venous Tube 2 | 152 | 154 | 152 | 154 | 153 | 1% | | | 132 | 17% | OOR L | OOR L | | |
| Fingerstick 1 | 92 | 133 | 92 | 133 | 113 | 26% | 128 | 17% | | | OOR L | OOR L | OOR L | OOR L |
| Fingerstick 2 | 153 | 135 | 153 | 135 | 144 | 9% | | | | | OOR L | OOR L | | |
| Fingerstick 3 | 129 | 7599 | 129 | | 129 | | | | | | OOR L | OOR L | | |
| Venous Tube 1 | 163 | 189 | 163 | 189 | 176 | 10% | 157 | 22% | 115 | 33% | OOR L | OOR L | OOR L | OOR L |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001424

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | | hCG Report | | Document Number: CL-RPT-13095 |
|---|---|---|---|---|
| | | | | Revision: A |
| | | Validation Document | | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| Sample | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Venous Tube 2 | 120 | 110529 / 120 | 120 | | 120 | | | | | | OORL | OORL | | |
| Fingerstick 1 | 101 | 122 | 101 | 122 | 112 | 13% | 94 | 18% | | | OORL | OORL | OORL | OORL |
| Fingerstick 2 | 93 | 75 | 93 | 75 | 84 | 15% | | | | | OORL | OORL | | |
| Fingerstick 3 | 94 | 81 | 94 | 81 | 88 | 11% | | | | | OORL | OORL | | |
| Venous Tube 1 | 118 | 133 | 118 | 133 | 126 | 8% | 130 | 11% | | | OORL | OORL | OORL | OORL |
| Venous Tube 2 | 148 | 120 | 148 | 120 | 134 | 15% | | | | | OORL | OORL | | |
| Fingerstick 1 | 40 | 100 | 40 | 100 | 70 | 61% | 78 | 41% | | 97% | OORL | OORL | OORL | OORL |
| Fingerstick 2 | 56 | 54 | 56 | 54 | 55 | 3% | | | | | OORL | OORL | OORL | OORL |
| Fingerstick 3 | 97 | 118 | 97 | 118 | 108 | 14% | | | | | OORL | OORL | | |
| Venous Tube 1 | 179 | 119 | 179 | 119 | 149 | | 111 | 46% | | | OORL | OORL | OORL | OORL |
| Venous Tube 2 | 70 | 74 | 70 | 74 | 72 | 4% | | | | | OORL | OORL | | |
| Fingerstick 1 | 74 | 83 | 74 | 83 | 79 | | 76 | 27% | 90 | 42% | OORL | OORL | OORL | OORL |
| Fingerstick 2 | 63 | 54 | 63 | 54 | 59 | | | | | | OORL | OORL | OORL | OORL |
| Fingerstick 3 | 69 | 112 | 69 | 112 | | 34% | | | | | OORL | OORL | | |
| Venous Tube 1 | 129 | 106 | 129 | 106 | 118 | 14% | | | 90 | 29% | OORL | OORL | OORL | |
| Venous Tube 2 | 123 | 99 | 123 | 99 | 111 | 15% | | | | | OORL | OORL | OORL | |
| Fingerstick 1 | 84 | 98 | 84 | 98 | 91 | 11% | 74 | 25% | 90 | 29% | OORL | OORL | OORL | |
| Fingerstick 2 | 76 | 80 | 76 | 80 | 78 | 4% | | | | | OORL | OORL | OORL | |
| Fingerstick 3 | 52 | 51 | 52 | 51 | 52 | 1% | | | | | OORL | OORL | | |
| Venous Tube 1 | 105 | 236 | 105 | 236 | 171 | 54% | 127 | 58% | | | OORL | OORL | OORL | OORL |
| Venous Tube 2 | 73 | 94 | 73 | 94 | 84 | 18% | | | 108 | 50% | OORL | OORL | OORL | OORL |
| Fingerstick 1 | 83 | 74 | 83 | 74 | 79 | 8% | 95 | 39% | | | OORL | OORL | OORL | OORL |
| Fingerstick 2 | 40 | 103 | 40 | 103 | 72 | 62% | | | | | OORL | OORL | OORL | OORL |
| Fingerstick 3 | 127 | 141 | 127 | 141 | 134 | 7% | | | | | OORL | OORL | | |

**Table 18: Venous v. Fingerstick Comparison Summary**

| Sample ID | Theranos Result [mIU/mL] | |
|---|---|---|
| | Venous Tube | Fingerstick |
| Patient 1 | OORL | OORL |
| Patient 2 | OORL | OORL |
| Patient 3 | OORL | OORL |

Theranos Internal Only (watermark)

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | **hCG Report** | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

| | | |
| --- | --- | --- |
| Patient 4 | OORL | OORL |
| Patient 5 | OORL | OORL |
| Patient 6 | OORL | OORL |
| Patient 7 | OORL | OORL |
| Patient 8 | OORL | OORL |
| Patient 9 | OORL | OORL |
| Patient 10 | OORL | OORL |
| Patient 11 | OORL | OORL |
| Patient 12 | OORL | OORL |
| Patient 13 | OORL | OORL |
| Patient 14 | OORL | OORL |
| Patient 15 | OORL | OORL |
| Patient 16 | OORL | OORL |
| Patient 17 | OORL | OORL |
| Patient 18 | OORL | OORL |
| Patient 19 | OORL | OORL |
| Patient 20 | OORL | OORL |

## 9 ANALYTICAL SENSITIVITY

In accordance with CLSI guideline EP17-A2 for analytical sensitivity verification, 60 replicates of a blank sample and 60 replicates of the LLOQ were tested.

### 9.1 Verification of Limit of Blank

9.1.1 Acceptance Criteria: the percentage of 60 blank replicates that return OORL results should be greater than 90%, or the percentage of 20 blank replicates should be greater than 85%. When the results are calculated by cartridge, for a total of 60 replicates, 100% of replicates returned OORL results. By grouping the results into 20 replicates of 3 cartridges, 100% returned OORL results.

### 9.2 Verification of Limit of Detection

9.2.1 Acceptance Criteria: the percentage of 60 LLOQ replicates that return quantifiable results should be greater than 90%, or the percentage of 20 LLOQ replicates should be greater than 85%. When the results are calculated by cartridge, for a total of 57 replicates, 83% of replicates returned quantifiable results. By grouping the results into 19 replicates of 3 cartridges, 95% returned quantifiable results.

**Table 19: Blank**

| RLU | | | | Blank | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| All Tips | | Dark Exclusion | | Intra-Cartridge | | | Inter-Cartridge | | |
| Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Result | Mean | %CV | Result |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001426

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | | **hCG Report** | | Document Number: CL-RPT-13095 |
|---|---|---|---|---|
| | | | | Revision: A |
| | | Validation Document | | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 436 | 465 | 436 | 465 | 451 | 5% | OORL | | | |
| 517 | 641 | 517 | 641 | 579 | 15% | OORL | 512 | 14% | OORL |
| 478 | 532 | 478 | 532 | 505 | 8% | OORL | | | |
| 133 | 585 | DARK | 585 | 585 | | OORL | | | |
| 315 | 475 | 315 | 475 | 395 | 29% | OORL | 486 | 22% | |
| 492 | 562 | 492 | 562 | 527 | 9% | OORL | | | OORL |
| 485 | 493 | 485 | 493 | 489 | 1% | OORL | | | |
| 523 | 686 | 523 | 686 | 605 | 19% | OORL | | 14% | |
| 498 | 593 | 498 | 593 | 546 | 12% | OORL | | | OORL |
| 277 | 272 | 277 | 272 | 275 | 1% | OORL | | | |
| 334 | 583 | 334 | 583 | 459 | 38% | OORL | 418 | 33% | |
| 515 | 526 | 515 | 526 | 521 | 1% | OORL | | | OORL |
| 475 | 561 | 475 | 561 | 518 | 12% | OORL | | | |
| 502 | 592 | 502 | 592 | 547 | 12% | OORL | 589 | 16% | |
| 694 | 707 | 694 | 707 | 701 | 1% | OORL | | | OORL |
| 503 | 349 | 503 | 349 | 426 | 26% | OORL | | | |
| 152 | 408 | 152 | 408 | 280 | 65% | OORL | 437 | 44% | |
| 608 | 721 | 608 | 721 | 665 | 12% | OORL | | | OORL |
| 495 | 534 | 495 | 534 | 515 | 5% | OORL | | | |
| 641 | 736 | 641 | 736 | 689 | 10% | OORL | 594 | 20% | |
| 704 | 451 | 704 | 451 | 578 | 31% | OORL | | | |
| 617 | 1141 | 617 | 1141 | 879 | 42% | OORL | | | |
| 512 | 645 | 512 | 645 | 579 | 16% | OORL | 587 | 54% | |
| 413 | 194 | 413 | 194 | 304 | 51% | OORL | | | OORL |
| 621 | 657 | 621 | 657 | 639 | 4% | OORL | | | |
| 628 | 5 | 628 | DARK | 628 | | OORL | 558 | 26% | |
| 306 | 576 | 306 | 576 | 441 | 43% | OORL | | | OORL |
| 535 | 429 | 535 | 429 | 482 | 16% | OORL | | | |
| 479 | 541 | 479 | 541 | 510 | 9% | OORL | 503 | 27% | |
| 314 | 719 | 314 | 719 | 517 | 55% | OORL | | | OORL |
| 692 | 730 | 692 | 730 | 711 | 4% | OORL | | | |
| 597 | 691 | 597 | 691 | 644 | 10% | OORL | 781 | 22% | |
| 1042 | 936 | 1042 | 936 | 989 | 8% | OORL | | | OORL |
| 577 | 593 | 577 | 593 | 585 | 2% | OORL | 558 | 23% | |
| 608 | 723 | 608 | 723 | 666 | 12% | OORL | | | OORL |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001427

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⦿s | | hCG Report | | | | Document Number: CL-RPT-13095 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Revision: A | | |
| | | Validation Document | | | | Effective Date: 3/19/2014 | | |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| 516 | 332 | 516 | 332 | 424 | 31% | OORL | | | |
|---|---|---|---|---|---|---|---|---|---|
| 434 | 4 | 434 | DARK | 434 | | OORL | | | |
| 398 | 446 | 398 | 446 | 422 | 8% | OORL | 489 | 18% | |
| 596 | 573 | 596 | 573 | 585 | 3% | OORL | | | |
| 476 | 16 | 476 | DARK | 476 | | OORL | | | |
| 653 | 420 | 653 | 420 | 537 | 31% | OORL | 545 | 18% | |
| 547 | 628 | 547 | 628 | 588 | 10% | OORL | | | OORL |
| 594 | 663 | 594 | 663 | 629 | 8% | OORL | | | |
| 549 | 580 | 549 | 580 | 565 | 4% | OORL | 596 | 14% | |
| 709 | 478 | 709 | 478 | 594 | 28% | OORL | | | OORL |
| 360 | 1013 | 360 | 1013 | 687 | 67% | OORL | | | |
| 453 | 522 | 453 | 522 | 488 | 10% | OORL | 559 | 41% | |
| 525 | 482 | 525 | 482 | 504 | 6% | OORL | | | OORL |
| 463 | 523 | 463 | 523 | 493 | 9% | OORL | | | |
| 134 | 745 | DARK | 745 | 745 | | OORL | 667 | 23% | |
| 660 | 444 | 660 | 444 | 552 | 28% | OORL | | | OORL |
| 599 | 688 | 599 | 688 | 644 | 10% | OORL | | | |
| 595 | 637 | 595 | 637 | 616 | 5% | OORL | 617 | 6% | |
| 581 | 600 | 581 | 600 | 591 | 2% | OORL | | | OORL |
| 426 | 675 | 426 | 675 | 551 | 32% | OORL | | | |
| 491 | 540 | 491 | 540 | 516 | 7% | OORL | 582 | 19% | |
| 695 | 667 | 695 | 667 | 681 | 3% | OORL | | | OORL |
| 617 | 419 | 617 | 419 | 518 | 27% | OORL | | | |
| 778 | 665 | 778 | 665 | 722 | 11% | OORL | 552 | 29% | |
| 465 | 365 | 465 | 365 | 415 | 17% | OORL | | | OORL |

**Table 20: LLOQ**

| RLU | LLOQ |
|---|---|
| | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001428

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| hCG ELISA Assay Validation Report on Edison 3.5 Theranos System |
| --- |

| All Tips | | Dark Exclusion | | Intra-Cartridge | | | Inter-Cartridge | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Result | Mean | %CV | Result |
| 829 | 2200 | | 2200 | 2200 | | 11.30 | | | |
| 1242 | 2648 | 1242 | 2648 | 1945 | 51% | 9.05 | 2228 | 26% | |
| 2482 | 2569 | 2482 | 2569 | 2526 | 2% | 13.97 | | | 11.81 |
| 1718 | 2177 | 1718 | 2177 | 1948 | 17% | 9.07 | | | |
| 1798 | 2098 | 1798 | 2098 | 1948 | 11% | 9.08 | 1879 | 11% | |
| 1709 | 1776 | 1709 | 1776 | 1743 | 3% | OORL | | | 8.44 |
| 863 | 1925 | | 1925 | 1925 | | 8.87 | 2202 | 11% | |
| 56 | 44 | DARK | DARK | | | | | | 11.32 |
| 2292 | 2389 | 2292 | 2389 | 2341 | 3% | 12.48 | | | |
| 1681 | 2194 | 1681 | 2194 | 1938 | 19% | 8.98 | | | |
| 2268 | 2831 | 2268 | 2831 | 2550 | 16% | 14.15 | 2117 | 28% | |
| 1198 | 2530 | 1198 | 2530 | 1864 | 51% | 8.30 | | | 10.59 |
| 2109 | 2279 | 2109 | 2279 | 2194 | 5% | 11.25 | | | |
| 344 | 2152 | | 2152 | 2183 | | 10.89 | 2180 | 4% | |
| | | DARK | DARK | | | | | | 11.13 |
| 1546 | 1730 | 1546 | 1730 | 1638 | 8% | OORL | | | |
| 2034 | 2170 | 2034 | 2170 | 2102 | 3% | 10.46 | 1832 | 13% | |
| 1660 | 1853 | 1660 | 1853 | 1757 | 8% | OORL | | | 8.00 |
| 1493 | 1704 | 1493 | 1704 | 1599 | 9% | OORL | | | |
| 1337 | 1382 | 1337 | 1382 | 1360 | 2% | OORL | 1479 | 11% | |
| 4 | 5 | DARK | DARK | | | | | | OORL |
| 2517 | 2348 | 2517 | 2348 | 2433 | 5% | 13.23 | | | |
| 1836 | 1891 | 1836 | 1891 | 1864 | 2% | 8.29 | 1950 | 21% | |
| 1411 | 1694 | 1411 | 1694 | 1553 | 13% | OORL | | | 9.09 |
| 1775 | 1909 | 1775 | 1909 | 1842 | 5% | 8.09 | | | |
| 1018 | 2591 | 1018 | 2591 | 1805 | 62% | 7.73 | 1859 | 30% | |
| 221 | 2003 | | 2003 | 2003 | | 9.58 | | | 8.25 |
| 2170 | 6 | 2170 | DARK | 2170 | | 11.05 | | | |
| 2169 | 2660 | 2169 | 2660 | 2415 | 14% | 13.08 | 2311 | 9% | |
| 2247 | 2308 | 2247 | 2308 | 2278 | 2% | 11.96 | | | 12.24 |
| 4 | 5 | DARK | DARK | | | | | | |
| 53 | 47 | DARK | DARK | | | | | | |
| 415 | 1154 | | | | | | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001429

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran⊚s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

### hCG ELISA Assay Validation Report on Edison 3.5 Theranos System

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1625 | 1846 | 1625 | 1846 | 1736 | 9% | OORL | 1865 | 33% | |
| 1782 | 1299 | 1782 | 1299 | 1541 | 22% | OORL | | | 8.31 |
| 1593 | 3044 | 1593 | 3044 | 2319 | 44% | 12.30 | | | |
| 844 | 1957 | | 1957 | 1957 | | 9.16 | 1809 | 24% | |
| 2187 | 1910 | 2187 | 1910 | 2049 | 10% | 9.99 | | | 0.777 |
| 1180 | 686 | 1180 | | 1180 | | OORL | | | |
| 13 | 2115 | DARK | 2115 | 2115 | | 10.57 | 2075 | 16% | |
| 1695 | 1822 | 1695 | 1822 | 1759 | 5% | OORL | | | 10.22 |
| 2191 | 2550 | 2191 | 2550 | 2371 | 11% | 12.73 | | | |
| 2314 | 2411 | 2314 | 2411 | 2363 | 3% | 12.66 | 2028 | 16% | |
| 1713 | 1957 | 1713 | 1957 | 1835 | 9% | 8.03 | | | 9.80 |
| 1615 | 2155 | 1615 | 2155 | 1885 | 20% | 8.50 | | | |
| 2183 | 2513 | 2183 | 2513 | 2348 | 10% | 12.54 | 2122 | 11% | |
| 1885 | 2172 | 1885 | 2172 | 2029 | 10% | 9.81 | | | 10.63 |
| 1839 | 2140 | 1839 | 2140 | 1990 | 11% | 9.46 | | | |
| 51 | 53 | DARK | DARK | | | | 1978 | 6% | |
| 1857 | 1952 | 1857 | 1952 | 1905 | 4% | 8.68 | | | 9.35 |
| 1948 | 2156 | 1948 | 2156 | 2052 | 7% | 10.02 | | | |
| 1899 | 2017 | 1899 | 2017 | 1958 | 4% | 9.17 | 1812 | 10% | |
| 1812 | 1821 | 1812 | 1821 | 1817 | 0% | 7.85 | | | 7.81 |
| 1851 | 1474 | 1851 | 1474 | 1663 | 16% | OORL | | | |
| 1891 | 2325 | 1891 | 2325 | 2108 | 15% | 10.51 | 1854 | 17% | |
| 833 | 1846 | | 1846 | 1846 | | 8.13 | | | 8.20 |
| 1444 | 1762 | 1444 | 1762 | 1603 | 14% | OORL | | | |
| 2134 | 2371 | 2134 | 2371 | 2253 | 7% | 11.75 | 2260 | 17% | |
| 1767 | 1947 | 1767 | 1947 | 1857 | 7% | 8.23 | | | 11.81 |
| 2482 | 2861 | 2482 | 2861 | 2672 | 10% | 15.09 | | | |

### Table 21: Analytical Sensitivity Summary

| Blank Summary | N | RLUs | | Calculated From Mean | Result |
|---|---|---|---|---|---|
| | | Mean | %CV | | % OORL |
| Intra-Cartridge | 60 | 557 | 23% | OORL | 100% |
| Inter-Cartridge | 20 | 555 | 13% | OORL | 100% |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-001430

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | hCG Report | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| hCG ELISA Assay Validation Report on Edison 3.5 Theranos System |
|---|

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1367 | 1277 | 1367 | 1277 | 1322 | 5% | | | 22.32 | 21.12 | | | |
| | 957 | 876 | 957 | 876 | 917 | 6% | | | 16.45 | 15.14 | | | |
| 42.5 | 27 | 1539 DARK | 1539 | 1539 | | | | | | 24.49 | | | |
| | 1354 | 1263 | 1354 | 1263 | 1309 | 5% | 1506 | 19% | 22.15 | 20.93 | 24.09 | 14% | 57% |
| | 1991 | 1385 | 1991 | 1385 | 1688 | 25% | | | 29.65 | 22.55 | | | |
| 37.2 | 1432 | 1204 | 1432 | 1204 | 1318 | 12% | | | 23.11 | 20.12 | | | |
| | 1378 | 1391 | 1378 | 1391 | 1385 | 1% | 1469 | 17% | 22.63 | 22.63 | 23.63 | 13% | 64% |
| | 1962 | 1449 | 1962 | 1449 | 1706 | 21% | | | 25.34 | 23.37 | | | |
| 35.7 | 1096 | 1110 | 1096 | 1110 | 1103 | 1% | | | 18.57 | 18.77 | | | |
| | 1536 | 1105 | 1536 | 1105 | 1321 | 23% | 1934 | 19% | 24.46 | 18.70 | 21.88 | 16% | 61% |
| | 1661 | 1493 | 1661 | 1493 | 1577 | 8% | | | 25.96 | 23.93 | | | |
| 34 | 1412 | 1862 | 1412 | 1862 | 1637 | 19% | | | 22.90 | 28.25 | | | |
| | 1384 | 1395 | 1384 | 1395 | 1390 | 1% | 1554 | 15% | 22.68 | 22.68 | 24.68 | 9% | 73% |
| | 1699 | 1571 | 1699 | 1571 | 1635 | 6% | | | 26.40 | 24.88 | | | |
| 33.9 | 874 | 891 | 874 | 891 | 883 | 1% | | | 15.11 | 15.39 | | | |
| | 1006 | 1041 | 1006 | 1041 | 1024 | 2% | 1037 | 14% | 17.22 | 17.75 | 17.69 | 13% | 52% |
| | 1252 | 1160 | 1252 | 1160 | 1206 | 5% | | | 20.78 | 19.50 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001431

ER-14607

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran◉s | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

### Table 23: Li Heparin Plasma

| Reported Value Spiked (30 mIU/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | Mean (m/s) | %CV | %Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | | | |
| 46 | 47075 | 876 | | 876 | 876 | | 894 | 7% | OORL | 18.14 | 18.14 | 6% | 34% |
| | 31 | 29 | DARK | DARK | | | | | | | | | |
| | 844 | 961 | 844 | 961 | 903 | 9% | | | 19.61 | 18.52 | | | |
| 34.1 | 1199 | 1348 | 1199 | 1348 | 1274 | 8% | 1200 | 14% | 20.09 | 22.07 | 20.06 | 13% | 59% |
| | 1025 | 1039 | 1025 | 1039 | 1032 | 1% | | | 17.51 | 17.72 | | | |
| | 1482 | 1107 | 1482 | 1107 | 1295 | 20% | | | 23.79 | 18.73 | | | |
| 38.1 | 1014 | 959 | 1014 | 959 | 987 | 4% | 1180 | 21% | 17.34 | 16.48 | 19.79 | 17% | 52% |
| | 1296 | 309 | 1296 | | 1296 | | | | 21.38 | OORL | | | |
| | 1085 | 1548 | 1085 | 1548 | 1317 | 25% | | | 18.81 | 24.60 | | | |
| 41.2 | 1544 | 1427 | 1544 | 1427 | 1486 | 6% | 1554 | 8% | 24.86 | 23.09 | 24.67 | 6% | 60% |
| | 1468 | 1629 | 1468 | 1629 | 1549 | 7% | | | 23.61 | 25.58 | | | |
| | 1764 | 1489 | 1764 | 1489 | 1627 | 12% | | | 27.15 | 23.88 | | | |
| 35.6 | 898 | 770 | 898 | 770 | 834 | 11% | 904 | 19% | 15.51 | 13.33 | 15.60 | 18% | 44% |
| | 802 | 724 | 802 | 724 | 763 | 7% | | | 13.89 | 12.51 | | | |
| | 1103 | 1126 | 1103 | 1126 | 1115 | 1% | | | 19.08 | 19.01 | | | |
| 35 | 1114 | 1081 | 1114 | 1081 | 1098 | 2% | 1349 | 19% | 18.83 | 18.35 | 22.09 | 15% | 63% |
| | 1533 | 1349 | 1533 | 1349 | 1441 | 9% | | | 24.42 | 22.08 | | | |
| | 1669 | 5 | 1669 | DARK | 1669 | | | | 26.05 | | | | |
| 37.2 | 43 | 42 | DARK | DARK | | | 1205 | 2% | | | 20.13 | 2% | 54% |
| | 1224 | 4 | 1224 | DARK | 1224 | | | | 20.40 | | | | |
| | 1171 | 1220 | 1171 | 1220 | 1196 | 3% | | | 19.65 | 20.34 | | | |
| 35.6 | 1510 | 1564 | 1510 | 1564 | 1537 | 2% | 1305 | 22% | 24.14 | 24.80 | 21.49 | 19% | 60% |
| | 596 | 835 | | 835 | 835 | | | | OORL | 14.46 | | | |
| | 1353 | 1261 | 1353 | 1261 | 1307 | 5% | | | 22.14 | 20.91 | | | |
| 33.7 | 443 | 494 | | | | | 1545 | 6% | OORL | OORL | 24.56 | 4% | 73% |
| | 1435 | 1558 | 1435 | 1558 | 1497 | 6% | | | 23.20 | 24.73 | | | |
| | 1543 | 1643 | 1543 | 1643 | 1593 | 4% | | | 24.54 | 25.75 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001432

ER-14608

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊛s | | hCG Report | | Document Number: CL-RPT-13095 |
|---|---|---|---|---|
| | | | | Revision: A |
| | | Validation Document | | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | | | |
|---|---|---|---|---|---|

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **35.2** | 93 | 139 | DARK | DARK | | | 1375 | 9% | 24.09 | 20.06 | 22.2 | 8% | 64% |
| | 1506 | 1200 | 1506 | 1200 | 1353 | 16% | | | | | | | |
| | 1424 | 1368 | 1424 | 1368 | 1396 | 3% | | | 23.06 | 22.33 | | | |
| **33.7** | 437 | 134 | | DARK | | | 1489 | 12% | OOR L | | 23.8 | 9% | 71% |
| | 1439 | 1340 | 1439 | 1340 | 1390 | 5% | | | 23.25 | 21.97 | | | |
| | 246 | 1687 | | | 1687 | | | | OOR L | 26.26 | | | |
| **34.7** | 1949 | 2716 | 1949 | 2716 | 2333 | 23% | 1937 | 14% | 29.20 | 36.72 | 29.06 | 17% | 84% |
| | 2066 | 1922 | 2066 | 1922 | 1994 | 5% | | | 30.44 | 28.91 | | | |
| | 1473 | 1493 | 1473 | 1493 | 1483 | 1% | | | 23.68 | 23.93 | | | |
| **36** | 1433 | 1378 | 1433 | 1378 | 1406 | 3% | 1438 | 6% | 23.17 | 22.46 | 23.24 | 5% | 65% |
| | 1347 | 7 | 1347 | DARK | 1347 | | | | 22.06 | | | | |
| | 1584 | 1449 | 1584 | 1449 | 1317 | 6% | | | 25.04 | 23.37 | | | |
| **37.8** | 885 | 989 | 885 | 989 | 937 | 8% | 654 | 46% | 15.29 | 16.95 | 11.20 | 30% | 30% |
| | 246 | 392 | 246 | 392 | 319 | 32% | | | OOR L | OOR L | | | |
| | 856 | 554 | 856 | 554 | 705 | 30% | | | 14.81 | 9.21 | | | |
| **33.3** | 562 | 692 | | 692 | | | 1167 | 28% | OOR L | 11.92 | 19.60 | 25% | 59% |
| | 1460 | 1506 | 1460 | 1506 | 1483 | 2% | | | 23.51 | 24.09 | | | |
| | 1074 | 1104 | 1074 | 1104 | 1089 | 2% | | | 18.24 | 18.69 | | | |
| **42.5** | 1465 | 1453 | 1465 | 1453 | 1459 | 1% | 2112 | 38% | 23.58 | 23.42 | 30.91 | 25% | 73% |
| | 2004 | 2232 | 2004 | 2232 | 2118 | 8% | | | 29.79 | 32.13 | | | |
| | 3404 | 3 | 3404 | | 3404 | | | | 42.53 | OOR L | | | |
| **37.2** | 8 | 35 | DARK | DARK | | | 2142 | 17% | | | 31.22 | 12% | 84% |
| | 1780 | 2267 | 1780 | 2267 | 2024 | 17% | | | 27.33 | 32.48 | | | |
| | 2580 | 1940 | 2580 | 1940 | 2260 | 20% | | | 35.48 | 29.10 | | | |
| **35.7** | 1330 | 1463 | 1330 | 1463 | 1397 | 7% | 1478 | 7% | 21.83 | 23.55 | 23.73 | 5% | 66% |
| | 1566 | 1398 | 1566 | 1398 | 1482 | 8% | | | 24.82 | 22.72 | | | |
| | 1609 | 1499 | 1609 | 1499 | 1554 | 5% | | | 25.34 | 24.00 | | | |
| **34** | 1941 | 1915 | 1941 | 1915 | 1928 | 1% | 1874 | 8% | 29.11 | 28.83 | 28.38 | 6% | 83% |
| | 1645 | 4 | 1645 | DARK | 1645 | | | | 25.77 | | | | |
| | 2128 | 2263 | 2066 | 1801 | 1934 | 10% | | | 30.44 | 27.57 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001433

ER-14609

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

| | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 33.9 | 915 | 2877 | 915 | | 915 | | 1102 | 20% | 15.78 | OOR L | 18.66 | 17% | 55% |
| | 990 | 1096 | 990 | 1096 | 1043 | 7% | | | 16.97 | 18.57 | | | |
| | 302 | 1408 | | 1408 | 1408 | | | | OOR L | 22.85 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

### Table 24: Serum

| Reported Value Spiked (30 mIU/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | %Recovery |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | |
| 46 | 1364 | 1469 | 1364 | 1469 | 1417 | 5% | 1296 | 10% | 22.28 | 23.63 | 21.3 8 | 8% | 46% |
| | 1160 | 3 | 1160 | DARK | 1160 | | | | 19.50 | | | | |
| | 1190 | 1298 | 1190 | 1298 | 1244 | 6% | | | 16.92 | 21.41 | | | |
| 34.1 | 1347 | 1644 | 1347 | 1644 | 1496 | 14% | 1411 | 12% | 22.06 | 25.76 | 22.8 9 | 10% | 67% |
| | 1192 | 1511 | 1192 | 1511 | 1352 | 17% | | | 19.95 | 24.15 | | | |
| | 941 | 1360 | | | 1360 | | | | OOR L | 22.23 | | | |
| 38.1 | 1614 | 1368 | 1614 | 1368 | 1491 | 12% | 1473 | 17% | 25.40 | 22.33 | 23.6 8 | 14% | 62% |
| | 1375 | 1061 | 1375 | 1061 | 1218 | 18% | | | 22.42 | 18.05 | | | |
| | 1696 | 1724 | 1696 | 1724 | 1710 | 1% | | | 26.37 | 26.69 | | | |
| 41.2 | 1924 | 1720 | 1924 | 1720 | 1822 | 8% | 1892 | 20% | 28.92 | 26.65 | 27.5 8 | 22% | 67% |
| | 1180 | 1275 | 1180 | 1275 | 1228 | 5% | | | 19.78 | 21.10 | | | |
| | 2103 | 2611 | 2103 | 2611 | 2357 | 15% | | | 30.82 | 35.77 | | | |
| 35.6 | 1421 | 1298 | 1421 | 1298 | 1360 | 6% | 1630 | 16% | 23.02 | 21.41 | 25.5 9 | 13% | 72% |
| | 1937 | 1825 | 1937 | 1825 | 1881 | 4% | | | 29.07 | 27.84 | | | |
| | 1668 | DARK | 1668 | DARK | 1668 | | | | 26.04 | | | | |
| 35 | 1153 | 1183 | 1153 | 1183 | 1168 | 2% | 1080 | 10% | 19.40 | 19.82 | 18.3 4 | 9% | 52% |
| | 940 | 1045 | 940 | 1045 | 993 | 7% | | | 16.18 | 17.81 | | | |
| | 289 | 321 | | | | | | | OOR L | OOR L | | | |
| 37.2 | 1215 | 1298 | 1215 | 1298 | 1257 | 5% | 1438 | 11% | 20.27 | 21.41 | 23.2 3 | 9% | 62% |
| | 1585 | 1621 | 1585 | 1621 | 1603 | 2% | | | 25.05 | 25.49 | | | |
| | 1399 | 1510 | 1399 | 1510 | 1455 | 5% | | | 22.74 | 24.14 | | | |
| 35.6 | 1704 | 1538 | 1704 | 1538 | 1621 | 7% | 1625 | 20% | 26.46 | 24.48 | 25.5 4 | 15% | 72% |
| | 1437 | 1293 | 1437 | 1293 | 1365 | 7% | | | 23.22 | 21.34 | | | |
| | 80476 | 2155 | | 2155 | 2155 | | | | OOR L | 31.36 | | | |
| 33.7 | 2038 | 1903 | 2038 | 1903 | 1971 | 5% | 1673 | 18% | 30.14 | 28.70 | 26.1 0 | 13% | 77% |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001435

**ER-14611**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | hCG Report | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1630 | 55289 | 1630 | | 1630 | | | | 25.59 | OOR L | | |
| | 1358 | 1435 | 1358 | 1435 | 1397 | 4% | | | 22.20 | 23.20 | | |
| 35.2 | 1706 | 1830 | 1706 | 1830 | 1768 | 5% | 1702 | 8% | 26.48 | 27.89 | 26.41 | 6% | 75% |
| | 720 | 1570 | DARK | 1570 | 1570 | | | | | 24.67 | | | |
| | 438 | 432 | | | | | | | | | | |
| | 631 | 645 | | | | | | | | | | |
| 33.7 | 1894 | 1524 | 1894 | 1524 | 1709 | 15% | 1398 | 29% | 28.60 | 24.31 | 22.72 | 23% | 67% |
| | 976 | 1197 | 976 | 1197 | 1087 | 14% | | | 18.73 | 20.02 | | |
| 34.7 | 1679 | 1409 | 1679 | 1409 | 1544 | 12% | 1569 | 13% | 26.17 | 22.86 | 24.77 | 10% | 71% |
| | 1284 | 1502 | 1284 | 1502 | 1393 | 11% | | | 21.22 | 24.04 | | |
| | 1756 | 1740 | 1756 | 1740 | 1748 | 1% | | | 27.06 | 26.88 | | |
| 36 | 1623 | DARK | 1623 | | 1623 | | 1394 | 16% | 25.51 | | 22.62 | 12% | 63% |
| | 1370 | 1189 | 1370 | 1189 | 1280 | 10% | | | 22.36 | 19.91 | | |
| | 372 | 543 | | | | | | | OOR L | | | |
| 37.8 | 675 | 698 | 675 | 698 | 687 | 2% | 756 | 9% | 11.60 | 12.03 | 12.55 | 6% | 33% |
| | 765 | 771 | 765 | 771 | 768 | 1% | | | 13.25 | 13.35 | | |
| | 746 | 701 | 746 | 701 | 724 | 4% | | | 12.91 | 12.91 | | |
| 33.3 | 1643 | 1504 | 1643 | 1504 | 1574 | 6% | 1491 | 11% | 25.75 | 24.06 | 23.91 | 8% | 72% |
| | DARK | DARK | DARK | DARK | | | | | | | | |
| | 132 | 131 | 1327 | DARK | 1327 | | | | 21.79 | | | |
| 42.5 | 2141 | 550 | 2141 | | 2141 | | 2194 | 8% | 31.21 | OOR L | 31.75 | 6% | 75% |
| | 2392 | 2049 | 2392 | 2049 | 2221 | 11% | | | 33.71 | 30.26 | | |
| | 362 | 3 | | DARK | | | | | OOR L | | | |
| 37.2 | 1997 | 1641 | 1997 | 1641 | 1819 | 14% | 1566 | 18% | 29.71 | 25.72 | 24.82 | 14% | 67% |
| | 1156 | 1640 | 1156 | 1640 | 1398 | 24% | | | 19.44 | 25.71 | | |
| | 1398 | 1562 | 1398 | 1562 | 1480 | 8% | | | 22.72 | 24.78 | | |
| 35.7 | 1334 | 1454 | 1334 | 1454 | 1394 | 6% | 1583 | 23% | 21.89 | 23.44 | 25.03 | 16% | 70% |
| | 1475 | 2295 | 1475 | 2295 | 1885 | 31% | | | 23.70 | 32.76 | | |
| | 1596 | 1346 | 1596 | 1346 | 1471 | 12% | | | 25.19 | 22.04 | | |
| 34 | 2275 | 2598 | 2275 | 2598 | 2437 | 9% | 2365 | 7% | .32.56 | 35.65 | 33.44 | 5% | 98% |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001436

ER-14612

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊗s | | hCG Report | | | | Document Number: CL-RPT-13095 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Revision: A | | | | | |
| | | Validation Document | | | | Effective Date: 3/19/2014 | | | | | |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | | | | | | | | | | |

| | | 2344 | 2243 | 2294 | 3% | | | 33.24 OOR L | 32.24 OOR L | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2344 / 2561 | 2243 / 2010 | | | | | | | | | |
| 33.9 | 1652 / 1294 / 1518 | 1620 / 1162 / 1414 | 1652 | 1620 | 1636 | 1% | 1443 | 13% | 25.85 | 25.47 | 22.2 / 11% | 69% |
| | | 1294 | 1162 | 1228 | 8% | | | 21.35 | 19.53 | | |
| | | 1518 | 1414 | 1466 | 5% | | | 24.24 | 22.73 | | |

**Table 25: EDTA v. Li Heparin v. Serum**

| Sample ID | Theranos Result [mIU/mL] | | |
|---|---|---|---|
| | EDTA Plasma | Li Heparin Plasma | Serum |
| Patient 1 | 18.21 | 15.44 | 21.38 |
| Patient 2 | 24.14 | 20.06 | 22.89 |
| Patient 3 | 25.96 | 19.59 | 23.68 |
| Patient 4 | 29.95 | 24.67 | 28.58 |
| Patient 5 | 21.80 | 15.60 | 25.59 |
| Patient 6 | 25.26 | 22.09 | 18.96 |
| Patient 7 | 22.27 | 20.13 | 23.23 |
| Patient 8 | 26.05 | 21.49 | 25.54 |
| Patient 9 | 24.38 | 24.56 | 26.10 |
| Patient 10 | 23.50 | 22.42 | 26.44 |
| Patient 11 | 21.06 | 22.87 | 22.72 |
| Patient 12 | 28.59 | 29.06 | 24.77 |
| Patient 13 | 26.02 | 23.24 | 22.67 |
| Patient 14 | 12.77 | 11.20 | 12.55 |
| Patient 15 | 17.65 | 19.60 | 23.91 |
| Patient 16 | 24.09 | 30.91 | 31.75 |
| Patient 17 | 23.63 | 31.22 | 24.82 |
| Patient 18 | 21.88 | 23.73 | 25.03 |
| Patient 19 | 24.68 | 28.38 | 33.44 |
| Patient 20 | 17.69 | 18.66 | 23.30 |

**Figure 13: EDTA v. Li Heparin Plasma**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001437

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |



**Figure 14: EDTA Plasma v Serum**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001438

ER-14614

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊕s | hCG Report | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |
|---|

## 11 INTERFERENCE

The recovery of analyte spiked into hemolyzed (300mg/dL Hemoglobin), icteric (20mg/dL Bilirubin), and lipemic (500mg/dL Triglycerides) serum samples was evaluated on the Theranos System and compared to predicate method values.

11.1 Acceptance Criteria: For each run, a minimum of 75% of the back-calculated mean values of the total number of calibration standards in the calibration range should be within 100 ± 20% (100 ± 25% at LLOQ and ULOQ standards) of their nominal values, and intra-cartridge %CV must be less than 20% when outliers are excluded.

Hemolyzed samples with up to 300 mg/dL hemoglobin, icteric samples with up to 20mg/dL bilirubin, and lipemic samples with up to 500 mg/dL triglycerides do not affect assay precision.

### Table 26: Hemolyzed Samples (Hemoglobin 300mg/dL)

| Reported Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | %Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | |
| 1392 | 648584 | 757413 | 648584 | 757413 | 702999 | 1% | | | 1424 | 1744 | | | |
| | 733988 | 793372 | 733988 | 793372 | 763680 | 5% | 745429 | 7% | 1670 | 1862 | 1706 | 10% | 123% |
| | 794435 | 744781 | 794435 | 744781 | 769698 | 5% | | | 1866 | 1704 | | | |
| 176 | 46312 | 49532 | 46312 | 49532 | 47922 | 5% | | | 196 | 197 | | | |
| | 39604 | 47881 | 39604 | 47881 | 43743 | 13% | 45175 | 9% | 173 | 193 | 187 | 5% | 106% |
| | 47245 | 40486 | 47245 | 40486 | 43866 | 11% | | | 192 | 176 | | | |
| 51.7 | 6017 | 3 | 6017 | DARK | 6017 | | | | 60 | | | | |
| | 5859 | 5748 | 5859 | 5748 | 5804 | 1% | 5704 | 9% | 59 | 59 | 58 | 6% | 113% |
| | 4793 | 6105 | 4793 | 6105 | 5449 | 17% | | | 53 | 61 | | | |
| 11.5 | 470 | 523 | 470 | 523 | 497 | 8% | | | OORL | 9 | | | |
| | 788 | 834 | 788 | 834 | 811 | 4% | 642 | 22% | 14 | 14 | 11 | 22% | 95% |
| | 596 | 643 | 596 | 643 | 620 | 5% | | | 10 | 11 | | | |

### Table 27: Icteric Samples (Bilirubin 20mg/dL)

| Reported Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | %Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | |
| 1256 | 857308 | 856658 | 857308 | 856658 | 856983 | 0% | | | 2091 | 2089 | | | |
| | 391795 | 372636 | 391795 | 372636 | 382216 | 4% | 648158 | 34% | 833 | 795 | 1423 | 42% | 113% |
| | 782171 | 628382 | 782171 | 628382 | 705277 | 15% | | | 1825 | 1370 | | | |
| 160 | 35651 | 35106 | 35651 | 35106 | 35379 | 1% | | | 163 | 162 | | | |
| | 24310 | 30528 | 24310 | 30528 | 27419 | 16% | 33956 | 19% | 132 | 150 | 159 | 11% | 99% |
| | 34318 | 43824 | 34318 | 43824 | 39071 | 17% | | | 160 | 184 | | | |
| 53.2 | 5549 | 2644 | 5549 | 2644 | 4097 | 50% | | | 57 | 36 | | | |
| | 7206 | 6673 | 7206 | 6673 | 6940 | 5% | 5565 | 28% | 67 | 64 | 57 | 19% | 108% |
| | 5841 | 5478 | 5841 | 5478 | 5660 | 5% | | | 59 | 57 | | | |
| 8.32 | 784 | 788 | 784 | 788 | 786 | 0% | | | 14 | 14 | | | |
| | 619 | 5 | 619 | DARK | 619 | | 628 | 25% | 11 | | 11 | 24% | 129% |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001439

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⬡s | hCG Report | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

**hCG ELISA Assay Validation Report on Edison 3.5 Theranos System**

| 435 | 514 | 435 | 514 | 475 | 12% | | OORL | 8 | | | |

### Table 28: Lipemic Samples (Triglycerides 500mg/dL)

| Reported Value [mIU/mL] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | %Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | |
| 1383 | 814619 | 802562 | 814619 | 802562 | 808591 | 1% | 728455 | 12% | 1936 | 1894 | 1653 | 15% | 120% |
| | 607608 | 647571 | 607608 | 647571 | 627590 | 5% | | | 1346 | 1421 | | | |
| | 737230 | 761142 | 737230 | 761142 | 749186 | 2% | | | 1808 | 1756 | | | |
| 163 | 30832 | 31424 | 30832 | 31424 | 31128 | 1% | 33997 | 12% | 151 | 152 | 159 | 7% | 98% |
| | 74 | 63 | DARK | DARK | | | | | | | | | |
| | 39779 | 33952 | 39779 | 33952 | 36866 | 11% | | | 174 | 159 | | | |
| 38.8 | 2414 | 2137 | 2414 | 2137 | 2276 | 9% | 2427 | 16% | 34 | 31 | 34 | 11% | 88% |
| | 2278 | 2270 | 2278 | 2270 | 2274 | 0% | | | 33 | 33 | | | |
| | 3217 | 2247 | 3217 | 2247 | 2732 | 23% | | | 41 | 32 | | | |
| < 1.00 | 505 | 482 | 505 | 482 | 494 | 3% | 380 | 30% | 8 | 8 | OORL | | OORL |
| | 231 | 254 | 231 | 254 | 243 | 7% | | | OORL | OORL | | | |
| | 376 | 429 | 376 | 429 | 403 | 9% | | | OORL | OORL | | | |

## 12 CROSSREACTIVITY

12.1.1 FSH and LH show negligible cross reactivity.

### Table 29: Cross-reactive Samples

| Reported Value [mIU/ml] | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | %Cross-Reactivity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | |
| FSH (1080 mIU/mL) | 1310 | 1815 | 1310 | 1815 | 1562.5 | 23% | 1405.4 | 18% | OORL | 7.84 | OORL | OORL | OORL |
| | 1110 | 5 | 1110 | | 1110 | | | | OORL | OORL | | | |
| | 1368 | 1424 | 1368 | 1424 | 1396 | 3% | | | OORL | OORL | | | |
| LH (327mIU/mL) | 1552 | 1782 | 1552 | 1782 | 1667 | 10% | 1320 | 21% | OORL | OORL | OORL | OORL | OORL |
| | 1100 | 1116 | 1100 | 1116 | 1108 | 1% | | | OORL | OORL | | | |
| | 1177 | 1193 | 1177 | 1193 | 1185 | 1% | | | OORL | OORL | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001440

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

## 13  SAMPLE STABILITY

The stability of patient samples stored at 4C and room temperature were tested to mimic the conditions that clinical samples may be stored and handled.  Samples were transferred from -80C to either room temperature or 4C at the 0hr time point, and stored at those temperatures for the remainder of testing.  Overall the analyte stability data indicates that the samples can be processed up to 72h if stored at 4 degrees or room temperature.

**Table 30: Analyte Stability Summary**



| Sample Level | 4C | | | | | | Room Temperature | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr | 0hr | 1hr | 4hr | 12hr | 24hr | 72hr |
| Level 1 | 2235.81 | 3209.50 | 2832.86 | 4142.30 | 4182.53 | 3653.61 | 2235.81 | 3053.04 | 2383.09 | 3701.97 | 3442.23 | 3440.62 |
| Level 2 | 834.01 | 738.97 | 627.33 | 684.26 | 855.26 | 777.52 | 834.01 | 772.61 | 663.19 | 811.72 | 1034.64 | 513.95 |
| Level 3 | 61.19 | 68.17 | 63.75 | 80.30 | 65.31 | 78.62 | 61.19 | 56.78 | 48.63 | 69.50 | 72.59 | 62.08 |

**Figure 15: Analyte Stability at 4C**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001441

| **theran😊s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |

**Figure 16: Analyte Stability at Room Temperature**



## 14   Reagent Stability

When stored at 4C cartridge reagents are stable up to 12 weeks.

**Figure 17: Reagent Stability at 4C**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001442

| **theran⊚s** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |

## 15 REFERENCES

15.1 Code of Federal Regulations, Title 42, Chapter IV, Subchapter G, Part 493, Subpart K, Sections 493.1217, 493.1253, and 493.1255.

15.2 DeSilva B, Smith W, Weiner R, et al. Recommendations for the bioanalytical method validation of ligand-binding assays to support pharmacokinetic assessments of macromolecules. Pharmaceutical Res. 2003; 20:1885-1900.

15.3 Guidance for Industry: bioanalytical method validation, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, 2001.

15.4 R (version 2.13.1). The R Foundation for Statistical Computing, 07/08/2011.

15.5 StatisPro (version 1.13.00). Clinical and Laboratory and Standards Institute, Wayne, PA. 07/14/2011.

15.6 Dexter-Immunoassay (version 1.0), Theranos, Inc., 2009.

15.7 EP10-A3, Preliminary Evaluation of Quantitative Clinical Laboratory Measurement Procedures; Approved Guideline—Third Edition, 2006, Clinical and Laboratory Standards Institute, Wayne, PA.

15.8 EP15-A2, User Verification of Performance for Precision and Trueness; Approved Guideline—Second Edition. 2005, Clinical and Laboratory Standards Institute, Wayne, PA.

15.9 EP09-A2-IR, Method Comparison and Bias Estimation Using Patient Samples; Approved Guideline—Second Edition (Interim Revision), 2010, Clinical and Laboratory Standards Institute, Wayne, PA.

15.10 EP05-A2, Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

15.11 EP06-A, Evaluation of the Linearity of Quantitative Measurement Procedures: A Statistical Approach; Approved Guideline, 2003, Clinical and Laboratory Standards Institute, Wayne, PA.

15.12 EP7-A2, Interference Testing in Clinical Chemistry; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001443

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | hCG Report | Document Number: CL-RPT-13095 |
| --- | --- | --- |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |

| hCG ELISA Assay Validation Report on Edison 3.5 Theranos System | | |
| --- | --- | --- |

| LLOQ Summary | N | RLUs | | Calculated From Means | % OOR | Result | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Mean | %CV | | | Mean | %CV |
| Intra-Cartridge | 53 | 1987 | 15% | 9.43 | | 10.39 | 19% |
| Inter-Cartridge | 19 | 1992 | 10% | 9.37 | | 9.70 | 16% |

## 10 ANTICOAGULANT COMPARISON

To test the effect of anticoagulants, 20 unique patients donated a total of 3 tubes, one EDTA, one Li Heparin, and one Serum.

10.1 Acceptance Criteria: When plotted against EDTA plasma, Serum and Li Heparin plasma should have a slope between 0.9 and 1.1.

### Table 22: EDTA Plasma

| Reported Value | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | %CV | %Recovery |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Spiked (30 mIU/mL.) | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | | |
| 46 | 1270 | 846 | 1270 | 846 | 1058 | 28% | 1071 | 24% | 21.03 | 14.64 | 18.21 | 20% | 40% |
| | 901 | 893 | 901 | 893 | 897 | 1% | | | 15.55 | 15.42 | | | |
| | 1499 | 1019 | 1499 | 1019 | 1259 | 27% | | | 24.00 | 17.42 | | | |
| 34.1 | 1603 | 1520 | 1603 | 1520 | 1562 | 4% | 1510 | 5% | 25.27 | 24.26 | 24.14 | 4% | 71% |
| | 1579 | 1428 | 1579 | 1428 | 1504 | 7% | | | 24.98 | 23.11 | | | |
| | 1433 | 1498 | 1433 | 1498 | 1466 | 3% | | | 23.17 | 23.99 | | | |
| 38.1 | 1518 | 1787 | DARK | DARK | 1653 | 12% | 1661 | 7% | 24.24 | 27.41 | 25.96 | 6% | 68% |
| | 1731 | 1607 | 1731 | 1607 | 1669 | 5% | | | 26.77 | 25.32 | | | |
| 41.2 | 1709 | 1976 | 1709 | 1976 | 1843 | 10% | 2020 | 19% | 26.52 | 29.49 | 29.95 | 13% | 73% |
| | 1834 | 1637 | 1834 | 1637 | 1736 | 8% | | | 27.94 | 25.68 | | | |
| | 2517 | 2444 | 2517 | 2444 | 2481 | 2% | | | 34.89 | 34.20 | | | |
| 35.6 | 1444 | 1780 | 1444 | 1780 | 1612 | 15% | 1327 | 23% | 23.31 | 27.33 | 21.80 | 19% | 61% |
| | 935 | 1079 | 935 | 1079 | 1007 | 10% | | | 16.10 | 18.32 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001444

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran⊙s** | **hCG Report** | Document Number: CL-RPT-13095 |
|---|---|---|
| | | Revision: A |
| | **Validation Document** | Effective Date: 3/19/2014 |

| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** |
|---|

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1486 | 1240 | 1486 | 1240 | 1363 | 13% | | | 23.84 | 20.62 | | |
| **35** | 1578 | 2688 | 1578 | | 1578 | | 1602 | 19% | 24.97 | OOR L | | |
| | 1713 | 5 | 1713 | DARK | 1713 | | | | 26.56 | | 28.26 | 13% | 72% |
| | 1204 | 1912 | 1204 | 1912 | 1558 | 32% | | | 20.12 | 28.80 | | |
| **37.2** | 1254 | 1076 | 1254 | 1076 | 1165 | 11% | 1364 | 14% | 20.8 | 18.27 | | |
| | 1300 | 1411 | 1300 | 1411 | 1356 | 6% | | | 21.4 | 22.89 | 22.27 | 12% | 60% |
| | 1592 | 1548 | 1592 | 1548 | 1570 | 2% | | | 25.44 | 24.60 | | |
| **35.6** | 1298 | 1356 | 1298 | 1356 | 1327 | 3% | 1689 | 19% | 27.41 | 22.18 | | |
| | 1955 | 1974 | 1955 | 1974 | 1965 | 1% | | | 29.26 | 29.47 | 26.03 | 15% | 73% |
| | 1754 | DARK | 1754 | | 1754 | | | | 27.04 | | | |
| **33.7** | 1462 | 1642 | 1462 | 1642 | 1552 | 5% | 1531 | 8% | 23.54 | 25.73 | | |
| | 1531 | 1702 | 1531 | 1702 | 1617 | 7% | | | 24.00 | 26.44 | 24.39 | 6% | 72% |
| | 1357 | 1490 | 1357 | 1490 | 1424 | 7% | | | 22.21 | 23.89 | | |
| **35.2** | 1716 | 1378 | 1716 | 1378 | 1547 | 15% | 1459 | | 25.60 | 22.46 | | |
| | 1377 | 1381 | 1377 | 1381 | 1379 | 0% | | | 22.45 | 22.50 | 23.50 | 7% | 67% |
| | 1477 | 1425 | 1477 | 1425 | 1451 | 3% | | | 23.73 | 23.07 | | |
| **33.7** | 1123 | 1241 | 1123 | 1241 | 1182 | 7% | 1272 | 7% | 18.96 | 20.63 | | |
| | 1276 | 1273 | 1276 | 1273 | 1275 | 0% | | | 21.11 | 21.07 | 21.06 | 6% | 62% |
| | 1315 | 1405 | 1315 | 1405 | 1360 | 5% | | | 21.63 | 22.81 | | |
| **34.7** | 2121 | 2032 | 2121 | 2032 | 2077 | 3% | 1893 | 15% | 31.01 | 30.08 | | |
| | 1611 | 1445 | 1611 | 1445 | 1528 | 8% | | | 25.37 | 23.32 | 28.59 | 12% | 82% |
| | 2003 | 2148 | 2003 | 2148 | 2076 | 5% | | | 29.77 | 31.28 | | |
| **36** | 1786 | 1618 | 1786 | 1618 | 1702 | 7% | 1666 | 19% | 27.40 | 25.45 | | |
| | 1320 | 1343 | 1320 | 1343 | 1332 | 1% | | | 21.70 | 22.00 | 26.02 | 14% | 72% |
| | 2140 | 1789 | 2140 | 1789 | 1965 | 13% | | | 31.20 | 27.43 | | |
| **37.8** | 875 | 794 | 875 | 794 | 835 | 7% | 738 | 15% | 15.13 | 13.75 | | |
| | 837 | 640 | 837 | 640 | 739 | 19% | | | 14.49 | 10.93 | 12.77 | 16% | 34% |
| | 663 | 620 | 663 | 620 | 642 | 5% | | | 11.37 | 10.54 | | |
| **33.3** | 661 | 1067 | 661 | 1067 | 864 | 33% | 1034 | 25% | 11.34 | 18.14 | 17.65 | 23% | 53% |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001445

ER-14621

| **theranos** | **hCG Report** | Document Number: CL-RPT-13095 |
| | | Revision: A |
| | Validation Document | Effective Date: 3/19/2014 |
| **hCG ELISA Assay Validation Report on Edison 3.5 Theranos System** | | |



CONFIDENTIAL, COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001446

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div align="right">

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

</div>

April 17, 2023