No. 22-10312

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

---

## EXCERPTS OF RECORD
## VOL. LII of LVII | ER-14924 to ER-15223

---

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | **Validation Document** | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** | | | |

| In-House 13 | 18 | 26.59 | 148% |
| In-House 14 | 13.7 | 19.12 | 140% |
| In-House 17 | 24.9 | 31.02 | 125% |
| In-House 18 | 9.6 | OORL | NA |
| 8/31/2013 - 1 | 19.4 | OORL | NA |
| 8/31/2013 - 3 | 28.1 | 44.84 | 160% |
| 8/31/2013 - 4 | 24 | 28.47 | 119% |
| 8/31/2013 - 5 | 22.8 | 42.35 | 186% |
| 8/31/2013 - 6 | 16.8 | 17.90 | 107% |
| H2 | 79.9 | 104.57 | 131% |
| H6 | 145 | 136.36 | 94% |
| H8 | 148 | 133.80 | 90% |
| H9 | 119 | 125.51 | 105% |
| H10 | 128 | 119.49 | 93% |
| H11 | 128 | 112.43 | 89% |
| H12 | 88.1 | 92.39 | 105% |
| H13 | 125 | 138.81 | 111% |
| H14 | 128 | 141.29 | 110% |
| H15 | 76.4 | 97.15 | 127% |
| H16 | 106 | 102.61 | 97% |
| H17 | 100 | 118.31 | 118% |
| H18 | 87.9 | 101.15 | 115% |
| H19 | 68.1 | 83.89 | 123% |
| H20 | 93.5 | 93.25 | 100% |
| H21 | 89.6 | 74.52 | 83% |
| H22 | 83.1 | 75.79 | 91% |
| H23 | 83.6 | 76.57 | 92% |
| H24 | 80.8 | 75.59 | 94% |
| H25 | 49.5 | 43.12 | 87% |
| H26 | 76.3 | 77.14 | 101% |
| H27 | 77.5 | 79.62 | 103% |
| H28 | 76.7 | 79.24 | 103% |
| H29 | 71 | 57.83 | 81% |
| H30 | 88 | 77.76 | 88% |
| H34 | 104 | 92.17 | 89% |
| H36 | 104 | 32.88 | 32% |
| H49 | 140 | 133.94 | 96% |
| H50 | 145 | 157.71 | 109% |
| H51 | 143 | 164.66 | 115% |
| H53 | 137 | 131.62 | 96% |
| H54 | 134 | 155.33 | 116% |
| H55 | 131 | 143.42 | 109% |
| H56 | 129 | 149.20 | 116% |
| H57 | 124 | 124.69 | 101% |
| H58 | 129 | 159.86 | 124% |
| H59 | 143 | 184.84 | 129% |
| H60 | 133 | 137.71 | 104% |

22

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001324

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: Revision: A |
|---|---|---|
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

**Table 9: Bias Correction**

| | Reported Value [ng/mL] | | | Data-Used for Method Comparison | |
|---|---|---|---|---|---|
| Sample ID | Predicate Method | Theranos System | Theranos-Corrected | Predicate Method | Theranos-Corrected |
| 11.0 | 30.4 | 38.1 | 27.9 | 19.1 | 7.8 |
| 16.0 | 24.7 | 39.0 | 28.6 | 19.6 | 11.4 |
| 20.0 | 23.7 | 27.5 | 19.3 | 23.7 | 19.3 |
| 22.0 | 42.2 | 45.7 | 34.1 | 24.7 | 28.6 |
| 25.0 | 27.7 | 31.8 | 22.8 | 27.7 | 22.8 |
| 30.0 | 27.9 | 31.4 | 22.4 | 27.9 | 22.4 |
| 31.0 | 43.4 | 64.6 | 49.6 | 30.4 | 27.9 |
| 36.0 | 58.1 | 52.1 | 39.3 | 31.0 | 15.7 |
| 41.0 | 55.3 | 53.2 | 40.2 | 32.7 | 57.3 |
| 87.0 | 19.1 | 13.5 | 7.8 | 33.2 | 68.0 |
| 91.0 | 31.0 | 23.2 | 15.7 | 35.1 | 25.3 |
| 94.0 | 59.7 | 48.5 | 36.4 | 37.2 | 38.9 |
| 95.0 | 53.8 | 75.9 | 58.8 | 41.5 | 56.1 |
| 97.0 | 53.9 | 95.5 | 74.9 | 42.2 | 34.1 |
| 79.0 | 56.4 | 66.3 | 51.0 | 43.4 | 49.6 |
| 80.0 | 66.1 | 72.0 | 55.6 | 45.3 | 76.8 |
| 81.0 | 35.1 | 35.0 | 25.3 | 49.5 | 39.8 |
| 84.0 | 37.2 | 51.6 | 38.9 | 49.6 | 68.7 |
| 89.0 | 19.6 | 17.9 | 11.4 | 53.8 | 58.8 |
| 98.0 | 41.5 | 72.6 | 56.1 | 53.9 | 74.9 |
| 99.0 | 45.3 | 97.9 | 76.8 | 55.3 | 40.2 |
| 100.0 | 33.2 | 87.2 | 68.0 | 56.4 | 51.0 |
| 101.0 | 32.7 | 74.0 | 57.3 | 58.1 | 39.3 |
| 103.0 | 49.6 | 88.1 | 68.7 | 59.7 | 36.4 |
| H02 | 78.8 | 92.7 | 72.5 | 66.1 | 55.6 |
| H08 | 143.0 | 195.8 | 156.8 | 71.0 | 97.6 |
| H17 | 98.4 | 112.8 | 89.0 | 76.3 | 69.1 |
| H18 | 89.0 | 92.5 | 72.4 | 76.7 | 87.1 |
| H20 | 92.6 | 84.0 | 65.4 | 77.5 | 76.0 |
| H21 | 89.6 | 92.6 | 72.4 | 78.8 | 72.5 |
| H22 | 83.1 | 124.6 | 98.6 | 80.8 | 81.6 |
| H23 | 83.6 | 100.1 | 78.6 | 83.1 | 98.6 |
| H24 | 80.8 | 103.8 | 81.6 | 83.6 | 78.6 |
| H25 | 49.5 | 52.7 | 39.8 | 88.0 | 88.5 |
| H26 | 76.3 | 88.5 | 69.1 | 89.0 | 72.4 |
| H27 | 77.5 | 97.0 | 76.0 | 89.6 | 72.4 |
| H28 | 76.7 | 110.5 | 87.1 | 92.6 | 65.4 |
| H29 | 71.0 | 123.3 | 97.6 | 98.4 | 89.0 |
| H30 | 88.0 | 112.2 | 88.5 | 130.5 | 151.2 |
| H50 | 145.0 | 209.2 | 167.8 | 132.5 | 108.4 |
| H53 | 136.5 | 198.6 | 159.2 | 133.0 | 117.9 |
| H54 | 136.5 | 175.4 | 140.2 | 133.0 | 123.7 |
| H55 | 133.0 | 148.2 | 117.9 | 134.0 | 125.3 |
| H56 | 130.5 | 188.9 | 151.2 | 136.5 | 159.2 |
| H57 | 134.0 | 157.3 | 125.3 | 136.5 | 140.2 |
| H58 | 132.5 | 136.6 | 108.4 | 143.0 | 156.8 |
| H60 | 133.0 | 155.3 | 123.7 | 145.0 | 167.8 |

Theranos Internal Only

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

**Table 10: Method Comparison**

| Method Comparison | | | |
|---|---|---|---|
| Level (ng/mL) | Precision (%) | Total Error (%) | Allowable Bias (%) |
| 10 | 20 | 35 | 15 |
| 30 | 21 | 35 | 14 |
| 100 | 10 | 25 | 15 |

**Figure 9: Scatter Plot CLSI guideline EP09-A2-IR section 4.2**

**Scatter plot**
*CLSI guideline EP09-A2-IR section 4.2*

Theranos (ng/mL)
CLIA (ng/mL)
Partition
Partition
0
20
40
60
80
100
120
140
160
180

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | Validation Document | Effective Date: |
| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** | | |

**Figure 10: Difference Plot CLSI guideline EP09-A2-IR section 4.2**



**Figure 11: Adequate Range Test EP09-A2-IR section4.5 and Partitioned Differences CLSI guideline EP09-A2-IR section 6.2**

**Adequate range test**

CLSI guideline EP09-A2-IR section 4.5

| | r | 0.927 |

r < 0.975 indicates that the error in X is not adequately compensated by the measuring range. CLSI recommends use of partitioned biases.

**Partitioned differences**

CLSI guidelines EP09-A2-IR section 6.2

| Partition | n | Mean difference | SD |
|---|---|---|---|
| < 45.3 | 15 | 1.076296408 | 13.98798234 |
| ≥ 45.3 and < 83.6 | 17 | 1.904036590 | 16.32018060 |
| ≥ 83.6 | 15 | -3.22910001 | 16.68607968 |

25

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT.

CMS2-001327

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: |
| 25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System | | |

**Figure 12: Comparability CLSI guideline EP09-A2-IR section 7**

**Comparability**

*CLSI guideline EP09-A2-IR section 7*

| Level ID | Value | Difference | SE | 95% CI | Allowable difference |
|---|---|---|---|---|---|
| 10.00000000 | 1.076296408 | 3.611681512 | 5.869990020 to 8.82258 | 1.500000000 |
| 30.00000000 | 1.076296408 | 3.611681512 | 5.869990020 to 8.82258 | 4.500000000 |
| 100.00000000 | -3.22910001 | 4.308327252 | 12.469542944 to 6.0113 | 15.00000000 |

Difference is less than allowable bias: 15%.

## 7    DILUTION LINEARITY

The dilution linearity was tested in replicates of 2.  A clinical sample with high levels of 25OH Vitamin D was diluted with a low level sample to create a dilution set.  Nominal values were calculated using the reported value of the high patient sample.  Each dilution level was tested on the Theranos System and compared to the nominal concentrations.  For each dilution level, the recovery should be within $100 \pm 20\%$ ($100 \pm 25\%$ at LLOQ and ULOQ standards) of their nominal value, and when plotted, the $R^2$ value should be greater than 0.95.

Calculated concentrations are based on the average RLU of 2 cartridges excluding outliers and dark count tips.  When comparing the nominal values to the Theranos results, the linearity is acceptable.

### Table 11: Dilution Linearity

Outliers and "DARK" tips and obvious outliers (highlighted in red) were excluded from the mean, %CV and %Recovery calculations.

| Sample ID | Reported Value (ng/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Dexter Calculated Result | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Concentration | | | | |
| | | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | %Recovery |
| High Patient | 108.25 | 2537 | 2474 | 2537 | 2474 | 2506 | 2% | 2400 | 6% | 101.81 | 104.54 | 107.94 | 6% | 100% |
| | | 2351 | 2239 | 2351 | 2239 | 2295 | 3% | | | 110.35 | 116.29 | | | |
| 4/7 | 61.21 | 3966 | 3973 | 3966 | 3973 | 3970 | 0% | 3953 | 1% | 64.53 | 64.41 | 64.74 | 1% | 106% |
| | | 3921 | 752 | 3921 | | 3921 | | | | 65.27 | OORH | | | |
| 1/3 | 37.69 | 6886 | 7125 | 6886 | 7125 | 7006 | 2% | 6344 | 14% | 36.64 | 35.32 | 39.96 | 15% | 106% |
| | | 5217 | 6148 | 5217 | 6148 | 5683 | 12% | | | 48.92 | 41.30 | | | |
| 1/4 | 25.93 | 7350 | 8144 | 7350 | 8144 | 7747 | 7% | 8246 | 8% | 34.15 | 30.49 | 30.07 | 9% | 116% |
| | | 8771 | 8717 | 8771 | 8717 | 8744 | 0% | | | 28.02 | 28.22 | | | |
| 1/5 | 20.05 | 12037 | 12055 | 12037 | 12055 | 12046 | 0% | 11410 | 7% | 18.88 | 18.84 | 20.29 | 10% | 101% |
| | | 10315 | 11231 | 10315 | 11231 | 10773 | 6% | | | 23.08 | 20.71 | | | |
| 1/8 | 14.17 | 11746 | 15972 | 11746 | 15972 | 13859 | 22% | 14788 | 14% | 19.52 | 12.15 | 13.88 | 26% | 98% |
| | | 15492 | 15943 | 15492 | 15943 | 15718 | 2% | | | 12.83 | 12.19 | | | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001328

**ER-14929**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⚬s | 25OHVitD Total Report | Document Number: |
| | | Revision: A |
| | Validation Document | Effective Date: |
| 25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System | | |

**Figure 13: Dilution Linearity Nominal v. Theranos Result**



**8   BLOOD COLLECTION DEVICE (BCD) COMPARISON**

Because the sample volume obtained from a fingerstick is sufficient only for testing on the Theranos System but not in the predicate method, a second verification of the reference range was performed using matched fingerstick blood and venous blood.  The reference range for 25OH Vitamin D per the Diasorin manual is 9.3–47.9 ng/mL.  30 unique patients donated 2 venous tubes of blood and 3 fingerstick samples. Of the 30 samples tested 1 was above the reference range and 1 tested below the reference range.

**Table 12: Venous v. Fingerstick Dark Tip and Outlier Exclusion Data**

| Sample Type | All Tips Tip1 | All Tips Tip2 | Dark Exclusion Tip1 | Dark Exclusion Tip2 | Inter-Cartridge Mean | Inter-Cartridge %CV | Intra-Cartridge Mean | Intra-Cartridge %CV | Intra-Cartridge Mean | Intra-Cartridge %CV | Concentrati Tip 1 | Concentrati Tip 2 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Venous 1 | 31447 | 36649 | 31447 | 36649 | 34048 | 11% | 30875 | 14% | | | 40.58 | 31.45 | |
| Venous 2 | 26759 | 28645 | 26759 | 28645 | 27702 | 5% | | | | | 51. | | |
| Finger 1 | 25172 | 23769 | 25172 | 23769 | 24470 | 4% | 28248 | 13% | 29299 | 13% | 55. | | |
| Finger 2 | 29067 | 32710 | 29067 | 32710 | 30888 | 6% | | | | | 45.0 | | |
| Finger 3 | 32143 | 26629 | 32143 | 26629 | 29386 | 13% | | | | | 39.2 | | |
| Venous 1 | 37140 | 35776 | 37140 | 35776 | 36458 | 3% | 34751 | 9% | | | 30.70 | 32.83 | 34.77 |
| Venous 2 | 31338 | 7 | 31338 | DARK | 31338 | | | | | | 40.8 | | |
| Finger 1 | 8209 | 38626 | | 38626 | 38626 | | 30603 | 18% | 32159 | 15% | | | |
| Finger 2 | 23846 | 27911 | 23846 | 27911 | 25879 | 11% | | | | | 59.3 | | |
| Finger 3 | 30569 | 32064 | 30569 | 32064 | 31317 | 3% | | | | | 42.3 | | |
| Venous 1 | 37703 | 38040 | 37703 | 38040 | 37871 | 1% | 35514 | 8% | 32676 | 16% | 29.86 | 29.36 | 33.47 |
| Venous 2 | 32897 | 33416 | 32897 | 33416 | 33157 | 1% | | | | | 37.80 | 36.85 | |

*(handwritten annotations: "18% al", "26%")*

27

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001329

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Finger 1 | 27 | 31 | DARK | DARK | | | | | | | | | | 45.18 |
| Finger 2 | 26307 | 25380 | 26307 | 25380 | 25843 | 3% | 29838 | 19% | | | | 52.36 | 54.88 | |
| Finger 3 | 37673 | 29992 | 37673 | 29992 | 33832 | 16% | | | | | | 29.90 | 43.58 | |
| Venous 1 | 41160 | 39110 | 41160 | 39110 | 40135 | 4% | | | | | | 25.11 | | |
| Venous 2 | 22676 | 25341 | 22676 | 25341 | 24008 | 8% | 37369 | 22% | | 49% | | 63.14 | | |
| Venous 1 | 41307 | 43185 | 41307 | 43185 | 42246 | 3% | | | 36877 | 19% | | 24.92 | | |
| Venous 2 | 42847 | 43328 | 42847 | 43328 | 43088 | 1% | | | | | | 23.03 | 22.40 | |
| Finger 1 | | | DARK | DARK | | | | | | | | | | |
| Finger 2 | 35040 | 34348 | 35040 | 34348 | 34694 | 1% | 35892 | 7% | | | | 34.04 | 35.21 | 32.82 |
| Finger 3 | 34368 | 39811 | 34368 | 39811 | 37089 | 10% | | | | | | 38.18 | 26.88 | |
| Venous 1 | 43226 | 40670 | 43226 | 40670 | 41948 | 4% | | | | | | 22.58 | 25.74 | |
| Venous 2 | 31736 | 31961 | 31736 | 31961 | 31848 | 0% | 35739 | 13% | | | | 40.01 | 39.57 | 33.59 |
| Venous 1 | 35581 | 39247 | 35581 | 39247 | 37414 | 7% | | | 34250 | 12% | | 33.14 | 27.65 | |
| Venous 2 | 32234 | 31256 | 32234 | 31256 | 31745 | 2% | | | | | | 39.05 | 40.96 | |
| Finger 1 | 32574 | 35670 | 32574 | 35670 | 34122 | 6% | | | | | | 38.40 | 33.00 | 39.26 |
| Finger 2 | 32843 | 33972 | 32843 | 33972 | 33408 | 2% | 32266 | 8% | | | | 37.90 | 35.86 | |
| Finger 3 | 28576 | 29958 | 28576 | 29958 | 29267 | 3% | | | | | | 46.74 | 43.66 | |
| Venous 1 | 58686 | 68469 | 58686 | 68469 | 63578 | 11% | | | | | | 8.84 | OORL | |
| Venous 2 | 48071 | 58074 | 48071 | 58074 | 53073 | 13% | 58214 | 9% | | | | 17.40 | 9.25 | 10.34 |
| Venous 1 | 57550 | 58107 | 57550 | 58107 | 57829 | 1% | | | 52697 | 18% | | 9.60 | 9.22 | |
| Venous 2 | 58263 | 58495 | 58263 | 58495 | 58379 | 0% | | | | | | 9.12 | 8.96 | |
| Finger 1 | 6 | 78 | DARK | DARK | | | | | | | | 30.29 | 28.15 | 24.86 |
| Finger 2 | 37412 | 38885 | 37412 | 38885 | 38148 | 3% | 41663 | 11% | | | | 30.29 | 28.15 | |
| Finger 3 | 42719 | 47639 | 42719 | 47639 | 45179 | 8% | | | | | | 23.18 | 17.82 | |
| Venous 1 | 51090 | 53594 | 51090 | 53594 | 52342 | 3% | | | | | | 14.62 | 12.54 | |
| Venous 2 | 43854 | 39862 | 43854 | 39862 | 41858 | 7% | 45193 | 11% | | | | 21.85 | 26.81 | 20.76 |
| Venous 1 | 44438 | 42935 | 44438 | 42935 | 43687 | 2% | | | 44978 | 11% | | 21.19 | 22.92 | |
| Venous 2 | 44913 | 40859 | 44913 | 40859 | 42886 | 7% | | | | | | 20.67 | 25.48 | |
| Finger 1 | 41086 | 40755 | 41086 | 40755 | 40921 | 1% | | | | | | 25.20 | | |
| Finger 2 | 41249 | 42437 | 41249 | 42437 | 41843 | 2% | 44691 | 12% | | 25% | | 24.99 | | |
| Finger 3 | 51056 | 51563 | 51056 | 51563 | 51309 | 1% | | | | | | 14.65 | | |
| Venous 1 | 25080 | 28107 | 25080 | 28107 | 26594 | 8% | | | | | | 55.72 | 47.84 | |
| Venous 2 | 38518 | 37871 | 38518 | 37871 | 38195 | 1% | 34911 | 16% | | | | 28.67 | 29.61 | 35.56 |
| Venous 1 | 38703 | 37839 | 38703 | 37839 | 38271 | 2% | | | 31665 | 19% | | 28.41 | 29.65 | |
| Venous 2 | 10890 | 38258 | | 38258 | 38258 | | | | | | | | 29.04 | |
| Finger 1 | 26729 | 19 | 26729 | DARK | 26729 | | 27121 | 5% | | | | 51.25 | | 50.37 |
| Finger 2 | 25644 | 26445 | 25644 | 26445 | 26044 | 2% | | | | | | 54.15 | 51.99 | |
| Finger 3 | 27489 | 29299 | 27489 | 29299 | 28394 | 5% | | | | | | 49.34 | 45.10 | |
| Venous 1 | 26263 | 1 | 26263 | DARK | 26263 | | | | | | | 52.47 | | |
| Venous 2 | 37786 | 34503 | 37786 | 34503 | 36145 | 6% | 32212 | 11% | | | | 29.73 | 34.94 | 39.66 |
| Venous 1 | 33710 | 31280 | 33710 | 31280 | 32495 | 5% | | | 32033 | 9% | | 36.33 | 40.91 | |
| Venous 2 | 32244 | 29697 | 32244 | 29697 | 30971 | 6% | | | | | | 39.03 | 44.22 | |
| Finger 1 | 31949 | 33538 | 31949 | 33538 | 32744 | 3% | | | | | | 39.59 | 36.63 | 40.05 |
| Finger 2 | 32667 | 34531 | 32667 | 34531 | 33599 | 4% | 31825 | 7% | | | | 38.23 | 34.90 | |
| Finger 3 | 29288 | 28976 | 29288 | 28976 | 29132 | 1% | | | | | | 45.12 | 45.82 | |
| Venous 1 | 33269 | 35983 | 33269 | 35983 | 34626 | 6% | 31204 | 13% | | | | 37.12 | 32.50 | 41.71 |
| Venous 2 | 27756 | 27810 | 27756 | 27810 | 27783 | 0% | | | 29520 | 14% | | 48.69 | 48.56 | |
| Finger 1 | 34417 | 30940 | 34417 | 30940 | 32679 | 8% | 28397 | 14% | | | | 35.09 | 41.60 | 48.06 |

28

CMS2-001330

**ER-14931**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⬤s | 25OHVitD Total Report | Document Number: |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

| Label | | | | | | % | | % | | % | | % | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Finger 2 | 28173 | 28780 | 28173 | 28780 | 28477 | 2% | | | | | | | 47.6 | | |
| Finger 3 | 23278 | 24794 | 23278 | 24794 | 24036 | 4% | | | | | | | 61.1 | | |
| Venous 1 | 31698 | 34983 | 31698 | 34983 | 33341 | 7% | 29970 | 14% | | | | | 40.08 | 34.13 | 44.41 |
| Venous 2 | 27821 | 25379 | 27821 | 25379 | 26600 | 6% | | | | | | | 48.53 | 54.88 | |
| Finger 1 | 39286 | 40113 | 39286 | 40113 | 39700 | 1% | 34950 | 15% | 32958 | 16% | | | 27.59 | 26.47 | |
| Finger 2 | 36330 | 36641 | 36330 | 36641 | 36486 | 1% | | | | | | | 31.95 | 31.46 | 35.12 |
| Finger 3 | 27476 | 29857 | 27476 | 29857 | 28666 | 6% | | | | | | | 49.37 | 42.88 | |
| Venous 1 | 29552 | 31065 | 29552 | 31065 | 30308 | 4% | 32846 | 10% | | | | | 44.54 | 41.35 | 38.23 |
| Venous 2 | 34133 | 36636 | 34133 | 36636 | 35384 | 5% | | | | | | | 33.58 | 31.47 | |
| Finger 1 | 24115 | 25078 | 24115 | 25078 | 24597 | 3% | 27800 | 12% | 29819 | 14% | | | 38.56 | 55.73 | 49.21 |
| Finger 2 | 26108 | 33031 | 26108 | 33031 | 29570 | 17% | | | | | | | 52.89 | 37.55 | |
| Finger 3 | 29935 | 28536 | 29935 | 28536 | 29235 | 3% | | | | | | | 43.71 | 46.84 | |
| Venous 1 | 26903 | 31324 | | | | | | | | | | | | | |
| Venous 2 | 57423 | 52159 | 57423 | 52159 | 54791 | 7% | 55539 | 6% | | | | | 9.69 | 13.71 | 11.15 |
| Venous 1 | 56012 | 57621 | 56012 | 57621 | 56816 | 2% | | | | | | | 10.70 | 9.56 | |
| Venous 2 | 51251 | 58768 | 51251 | 58768 | 55009 | 6% | | | 49940 | 14% | | | 14.48 | 8.78 | |
| Finger 1 | 43548 | 43942 | 43548 | 43942 | 43745 | 1% | 44340 | 10% | | | | | 22.20 | 21.75 | 21.62 |
| Finger 2 | 39030 | 43045 | 39030 | 43045 | 41037 | 7% | | | | | | | 27.95 | 22.79 | |
| Finger 3 | 44412 | 52064 | 44412 | 52064 | 48238 | 11% | | | | | | | 21.22 | 13.79 | |
| Venous 1 | 33225 | 33950 | 33225 | 33950 | 33587 | 2% | 37046 | 9% | | | | | 37.20 | 35.90 | 31.15 |
| Venous 2 | 22927 | 23959 | | | | | | | | | | | | | |
| Venous 1 | 36451 | 42338 | 36451 | 42338 | 39394 | 11% | | | 34573 | 13% | | | 31.76 | 23.64 | |
| Venous 2 | 37649 | 38665 | 37649 | 38665 | 38157 | 2% | | | | | | | 29.93 | 28.4 | |
| Finger 1 | 16882 | 19901 | | | | | | | | | | | | | |
| Finger 2 | 33823 | 33488 | 33823 | 33488 | 33656 | 1% | 30864 | 11% | | | | | 3. | | .19 |
| Finger 3 | 27337 | 28807 | 27337 | 28807 | 28072 | 4% | | | | | | | | | |
| Venous 1 | 24962 | 4 | 24962 | DARK | 24962 | | | | | | | | | | |
| Venous 2 | 16047 | 17043 | | | | | | | | | | | | | |
| Venous 1 | 33501 | 34644 | 33501 | 34644 | 34072 | 2% | 33005 | 15% | | | | | | | |
| Venous 2 | 33220 | 38697 | 33220 | 38697 | 35959 | 11% | | | 29250 | 18% | | | | | |
| Finger 1 | 25261 | 28294 | 25261 | 28294 | 26778 | 8% | | | | | | | | | |
| Finger 2 | 21048 | 33505 | 21048 | 33505 | 22277 | 8% | 26122 | 13% | | | | | | | |
| Finger 3 | 28684 | 29938 | 28684 | 29938 | 29311 | 3% | | | | | | | 40. | | |
| Venous 1 | 30493 | 37550 | 30493 | 37550 | 34021 | 16% | 31468 | 14% | | | | | 42. | | |
| Venous 2 | 30602 | 27226 | 30602 | 27226 | 28914 | 8% | | | | | | | 42.30 | | |
| Finger 1 | 20214 | 22823 | | | 22823 | 22823 | | | 30427 | 15% | | | | | |
| Finger 2 | 26925 | 34386 | 26925 | 34386 | 30655 | 17% | 29594 | 16% | | | | | 50.75 | .4 | 45.65 |
| Finger 3 | 29883 | 33952 | 29883 | 33952 | 31918 | 9% | | | | | | | 43.82 | 35.90 | |
| Venous 1 | 32047 | 34963 | 32047 | 34963 | 33505 | 6% | | | | | | | 39.40 | 34.17 | |
| Venous 2 | 43067 | 46620 | 43067 | 46620 | 44844 | 6% | 38705 | 12% | | | | | 22.77 | 18.85 | 28.94 |
| Venous 1 | 37229 | 39206 | 37229 | 39206 | 38218 | 4% | | | | | | | 30.56 | 27.70 | |
| Venous 2 | 38082 | 38425 | 38082 | 38425 | 38254 | 1% | | | 39885 | 12% | | | 29.30 | 28.80 | |
| Finger 1 | 36342 | 39070 | 36342 | 39070 | 37706 | 5% | 41772 | 11% | | | | | 31.93 | 27.89 | |
| Finger 2 | 40740 | 6 | 40740 | DARK | 40740 | | | | | | | | 25.65 | | 24.78 |
| Finger 3 | 44314 | 48393 | 44314 | 48393 | 46354 | 6% | | | | | | | 21.33 | 17.09 | |

*[handwritten annotations: "20%" and "80%"]*

29

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001331

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊙s | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

| Sample | R1 | R2 | R3 | R4 | Mean | %CV | Agg1 | %CV | Agg2 | %CV | Conc A | Conc B | Conc Mean |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Venous 1 | 44355 | 46789 | 44355 | 46789 | 45572 | 4% | 44411 | 5% | 42674 | 12% | 21.28 | 18.68 | 21.31 |
| Venous 2 | 45082 | 41419 | 45082 | 41419 | 43251 | 6% | | | | | 20.48 | 24.78 | |
| Finger 1 | 4 | 58 | DARK | DARK | | | 40936 | 17% | | | | | |
| Finger 2 | 35341 | 34386 | 35341 | 34386 | 34863 | 2% | | | | | 33.54 | 35.14 | 26.40 |
| Finger 3 | 46269 | 47750 | 46269 | 47750 | 47009 | 2% | | | | | 19.22 | 17.71 | |
| Venous 1 | 34381 | 34942 | 34381 | 34942 | 34662 | 1% | 34531 | 1% | 35679 | 9% | 35.15 | 34.20 | 34.90 |
| Venous 2 | 26252 | 34269 | | 34269 | 34269 | | | | | | | 26.35 | |
| Finger 1 | 33526 | 35470 | 33526 | 35470 | 34498 | 4% | 36253 | 10% | | | 26.65 | 33.33 | 32.46 |
| Finger 2 | 39197 | 42221 | 39197 | 42221 | 40709 | 5% | | | | | 27.73 | 23.78 | |
| Finger 3 | 32530 | 34577 | 32530 | 34577 | 33554 | 4% | | | | | 38.48 | 34.82 | |
| Venous 1 | 46766 | 49661 | 46766 | 49661 | 48213 | 4% | | | | | 18.70 | 15.90 | 13.95 |
| Venous 2 | 59143 | 65710 | 59143 | 65710 | 62426 | 7% | 54027 | 13% | | | 8.54 | OORL | |
| Venous 1 | 56410 | 58762 | 56410 | 58762 | 57586 | 3% | | | | | 10.41 | 8.79 | |
| Venous 2 | 45713 | 50051 | 45713 | 50051 | 47882 | 6% | 49229 | 16% | | | 19.80 | 15.54 | |
| Finger 1 | 44867 | 42770 | 44867 | 42770 | 43819 | 3% | | | | | 20.72 | 23.12 | 23.11 |
| Finger 2 | 45029 | 42068 | 45029 | 42068 | 43549 | 5% | 42832 | 4% | | | 20.54 | 23.37 | |
| Finger 3 | 40724 | 41532 | 40724 | 41532 | 41128 | 1% | | | | | 25.67 | 24.64 | |
| Venous 1 | 59769 | 59483 | 59769 | 59483 | 59626 | 0% | 49802 | 23% | | | 8.13 | 8.32 | 15.77 |
| Venous 2 | 39153 | 40804 | 39153 | 40804 | 39978 | 3% | | | | | 27.78 | 25.57 | |
| Finger 1 | 47980 | 54446 | 47980 | 54446 | 51213 | 9% | 47257 | 21% | 44713 | 19% | 17.49 | 11.87 | 20.47 |
| Finger 2 | 91934 | 101333 | | | | | | | | | | | |
| Finger 3 | 42491 | 33935 | 42491 | 33935 | 38213 | 16% | | | | | 23.46 | 35.93 | |
| Venous 1 | 38767 | 35562 | 38767 | 35562 | 37164 | 6% | 31875 | 21% | | | 28.32 | 33.18 | 39.74 |
| Venous 2 | 24120 | 29053 | 24120 | 29053 | 26587 | 13% | | | | | 58.55 | 45.65 | |
| Finger 1 | 32222 | 32459 | 32222 | 32459 | 32341 | 1% | 37122 | 22% | | | 39.07 | 38.62 | |
| Finger 2 | 51059 | 46675 | 51059 | 46675 | 48867 | 6% | 40620 | 19% | | | 14.65 | 18.80 | 25.71 |
| Finger 3 | 42535 | 38773 | 42535 | 38773 | 40654 | 7% | | | | | 23.40 | 28.31 | |
| Venous 1 | 33952 | 6 | 33952 | DARK | 33952 | | | | | | 35.90 | | 31.68 |
| Venous 2 | 35623 | 40421 | 35623 | 40421 | 38022 | 9% | 36665 | 9% | | | 33.08 | 26.06 | |
| Finger 1 | 38516 | 32701 | 38516 | 32701 | 35608 | 12% | 33740 | 12% | | | 28.68 | 38.16 | |
| Finger 2 | 28117 | 29427 | 28117 | 29427 | 28772 | 3% | 32278 | 11% | | | 47.82 | 44.81 | 39.46 |
| Finger 3 | 31668 | 33238 | 31668 | 33238 | 32453 | 3% | | | | | 40.14 | 37.17 | |
| Venous 1 | 58500 | 63539 | 58500 | 63539 | 61020 | 6% | 56312 | 19% | | | 8.96 | OORL | 17.22 |
| Venous 2 | 62338 | 40869 | 62338 | 40869 | 51604 | 29% | | | | | OORL | 25.48 | |
| Finger 1 | 66051 | 59128 | 66051 | 59128 | 62590 | 8% | 63024 | 18% | | | OORL | 8.55 | |
| Finger 2 | 82318 | 78523 | 82318 | 78523 | 80421 | 3% | 67500 | 15% | | | OORL | OORL | 8.64 |
| Finger 3 | 60141 | 58836 | 60141 | 58836 | 59488 | 2% | | | | | OORL | 8.74 | |
| Venous 1 | 58101 | 62629 | 58101 | 62629 | 60365 | 5% | 59852 | 4% | | | 9.23 | OORL | 9.48 |
| Venous 2 | 57358 | 61321 | 57358 | 61321 | 59339 | 5% | | | | | 9.74 | OORL | |
| Finger 1 | 41883 | 42793 | 41883 | 42793 | 42338 | 2% | 51373 | 17% | | | 24.20 | 23.09 | |
| Finger 2 | 39354 | 44321 | 39354 | 44321 | 41838 | 8% | 45720 | 13% | | | 27.50 | 21.32 | 20.37 |
| Finger 3 | 51945 | 54025 | 51945 | 54025 | 52985 | 3% | | | | | 13.89 | 12.20 | |
| Venous 1 | 39820 | 51954 | 39820 | 51954 | 45887 | 19% | 44370 | 12% | | | 26.86 | 11.88 | 21.70 |
| Venous 2 | 43302 | 42402 | 43302 | 42402 | 42852 | 1% | | | | | 22.49 | 23.56 | |
| Finger 1 | 40738 | 39021 | 40738 | 39021 | 39880 | 3% | 45220 | 11% | | | 25.65 | 27.96 | |
| Finger 2 | 49865 | 4 | 49865 | DARK | 49865 | | 45901 | 12% | | | 15.71 | | 20.12 |
| Finger 3 | 50478 | 49401 | 50478 | 49401 | 49940 | 2% | | | | | 15.16 | 16.14 | |

30

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001332

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: |
| --- | --- | --- |
| | Validation Document | Revision: A |
| | | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

| | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Venous 1 | 26976 | 26951 | 26976 | 26951 | 26964 | 0% | 34379 | 25% | | | 50.62 | 50.69 | 37.50 |
| Venous 2 | 43132 | 40458 | 43132 | 40458 | 41795 | 5% | | | 34809 | 17% | 22.69 | 26.02 | |
| Finger 1 | 35918 | 37375 | 35918 | 37375 | 36647 | 3% | | | | | 32.60 | 30.34 | |
| Finger 2 | 37488 | 39880 | 37488 | 39880 | 38684 | 4% | 35096 | 12% | | | 30.17 | 26.79 | 34.54 |
| Finger 3 | 30249 | 29667 | 30249 | 29667 | 29958 | 1% | | | | | 43.04 | 44.29 | |
| Venous 1 | 28115 | 29633 | 28115 | 29633 | 28874 | 4% | 34196 | 18% | | | 47.82 | 44.36 | 36.68 |
| Venous 2 | 39513 | 39524 | 39513 | 39524 | 39518 | 0% | | | 31320 | 15% | 27.28 | 27.87 | |
| Finger 1 | 26703 | 29662 | 26703 | 26703 | 28183 | 7% | | | | | 51.32 | 44.30 | |
| Finger 2 | 27633 | 29437 | 27633 | 29437 | 28535 | 4% | 29403 | 8% | | | 48.99 | 44.79 | 45.15 |
| Finger 3 | 33768 | 29217 | 33768 | 29217 | 31492 | 10% | | | | | 36.22 | 45.28 | |
| Venous 1 | 4245 | 20322 | | 20322 | 20322 | | 20388 | 11% | | | 71.70 | | 71.94 |
| Venous 2 | 18211 | 22630 | 18211 | 22630 | 20420 | 15% | | | 18996 | 10% | 80.81 | 63.29 | |
| Finger 1 | 17082 | 16209 | 17082 | 16209 | 16645 | 4% | | | | | 86.39 | 91.11 | |
| Finger 2 | 20108 | 19371 | 20108 | 19371 | 19740 | 3% | 18301 | 8% | | | 72.55 | 75.61 | 80.74 |
| Finger 3 | 18627 | 18407 | 18627 | 18407 | 18517 | 1% | | | | | 78.89 | 79.90 | |
| Venous 1 | 5087 | 29153 | | 29153 | 29153 | | 31633 | 8% | | | | 45.43 | 40.42 |
| Venous 2 | 31656 | 34089 | 31656 | 34089 | 32873 | 5% | | | 29802 | 9% | 40.17 | 35.66 | |
| Finger 1 | 32357 | 31299 | 32357 | 31299 | 31828 | 2% | | | | | 38.81 | 40.87 | |
| Finger 2 | 26840 | 27879 | 26840 | 27879 | 27360 | 3% | 28886 | 8% | | | 50.97 | 48.39 | 46.32 |
| Finger 3 | 28320 | 26621 | 28320 | 26621 | 27471 | 4% | | | | | 47.34 | 51.53 | |

**Table 13: Fingerstick v. Venous Blood Summary**

| Sample ID | Sample Type | Theranos Result [ng/mL] | %CV | % difference |
| --- | --- | --- | --- | --- |
| Patient 1 | Venous 1 | 42.43 | 20% | 12% |
| | Finger 1 | 48.26 | 18% | |
| Patient 2 | Venous 1 | 34.77 | 15% | 20% |
| | Finger 1 | 43.59 | 26% | |
| Patient 3 | Venous 1 | 33.47 | 13% | 26% |
| | Finger 1 | 45.18 | 25% | |
| Patient 4 | Venous 1 | 24.33 | 8% | 26% |
| | Finger 1 | 32.82 | 12% | |
| Patient 5 | Venous 1 | 33.59 | 22% | 14% |
| | Finger 1 | 39.26 | 13% | |
| Patient 6 | Venous 1 | 10.34 | 30% | 58% |
| | Finger 1 | 24.86 | 22% | |
| Patient 7 | Venous 1 | 20.76 | 24% | 3% |
| | Finger 1 | 21.37 | 25% | |
| Patient 8 | Venous 1 | 35.56 | 32% | 29% |
| | Finger 1 | 50.37 | 7% | |
| Patient 9 | Venous 1 | 39.66 | 18% | 1% |
| | Finger 1 | 40.05 | 11% | |
| Patient 10 | Venous 1 | 41.71 | 20% | 13% |
| | Finger 1 | 48.06 | 20% | |
| Patient 11 | Venous 1 | 44.41 | 21% | -26% |
| | Finger 1 | 35.12 | 27% | |
| Patient 12 | Venous 1 | 38.23 | 15% | 22% |

31

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001333

ER-14934

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊕s | 25OHVitD Total Report | Document Number:<br>Revision: A |
|---|---|---|
| | Validation Document | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** |

| | | | | |
|---|---|---|---|---|
| | Finger 1 | 49.21 | 16% | |
| Patient 13 | Venous 1 | 11.15 | 21% | 48% |
| | Finger 1 | 21.62 | 21% | |
| Patient 14 | Venous 1 | 31.15 | 16% | 26% |
| | Finger 1 | 42.19 | 16% | |
| Patient 15 | Venous 1 | 38.62 | 27% | 28% |
| | Finger 1 | 53.69 | 18% | |
| Patient 16 | Venous 1 | 41.22 | 20% | 10% |
| | Finger 1 | 45.65 | 26% | |
| Patient 17 | Venous 1 | 28.94 | 22% | -17% |
| | Finger 1 | 24.78 | 33% | |
| Patient 18 | Venous 1 | 21.31 | 12% | 19% |
| | Finger 1 | 26.40 | 35% | |
| Patient 19 | Venous 1 | 34.90 | 2% | -8% |
| | Finger 1 | 32.46 | 17% | |
| Patient 20 | Venous 1 | 13.95 | 34% | 40% |
| | Finger 1 | 23.11 | 9% | |
| Patient 21 | Venous 1 | 17.45 | 61% | 21% |
| | Finger 1 | 22.19 | 46% | |
| Patient 22 | Venous 1 | 41.42 | 33% | -28% |
| | Finger 1 | 32.35 | 24% | |
| Patient 23 | Venous 1 | 31.68 | 16% | 20% |
| | Finger 1 | 39.46 | 17% | |
| Patient 24 | Venous 1 | 17.22 | 68% | -99% |
| | Finger 1 | 8.64 | 2% | |
| Patient 25 | Venous 1 | 9.48 | 4% | 53% |
| | Finger 1 | 20.37 | 30% | |
| Patient 26 | Venous 1 | 21.70 | 26% | -8% |
| | Finger 1 | 20.12 | 31% | |
| Patient 27 | Venous 1 | 37.50 | 41% | -9% |
| | Finger 1 | 34.54 | 21% | |
| Patient 28 | Venous 1 | 36.68 | 30% | 19% |
| | Finger 1 | 45.15 | 11% | |
| Patient 29 | Venous 1 | 71.94 | 12% | 11% |
| | Finger 1 | 80.74 | 9% | |
| Patient 30 | Venous 1 | 40.42 | 12% | 13% |
| | Finger 1 | 46.32 | 11% | |

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001334

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number:<br>Revision: A |
|---|---|---|
| | **Validation Document** | Effective Date: |
| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** | | |

### 9  ANTICOAGULANT COMPARISON

Data for the anticoagulant and serum testing was obtained from the development report.

To test for a matrix effect due to serum or plasma, matched blood samples were collected from 12 donors in lithium heparin tubes and in serum tubes and centrifuged to obtain plasma and serum respectively. The matched samples were tested in the Theranos System and the results compared, based on the assay buffer calibration curve. There was no significant difference between serum and plasma results, either matrix is suitable for the Theranos 25-Hydroxyvitamin D assay.

**Table 14: Li Heparin v. Serum**

| | | Plasma | | Serum | | % Recovery in |
|---|---|---|---|---|---|---|
| Sample # | Gender | Mean Conc | CV % | Mean Conc | CV % | Plasma vs Serum |
| 01 | M | 16.7 | 7.3 | 14.9 | 8.3 | 112 |
| 02 | F | 20.9 | 6.3 | 27.3 | 8.1 | 77 |
| 03 | M | 25.2 | 1.9 | 25.7 | 8.1 | 98 |
| 04 | M | 17.6 | 9.5 | 21.0 | 10.9 | 84 |
| 05 | M | 24.1 | 3.4 | 28.0 | 2.2 | 86 |
| 06 | M | 29.4 | 3.6 | 34.1 | 2.5 | 86 |
| 07 | F | 23.5 | 8.2 | 23.9 | 6.7 | 98 |
| 08 | M | 28.5 | 5.6 | 30.6 | 0.9 | 93 |
| 09 | M | 24.2 | 5.2 | 24.8 | 25.0 | 98 |
| 10 | M | 19.3 | 3.7 | 21.0 | 8.9 | 92 |
| 11 | F | 16.9 | 5.8 | 18.6 | 5.3 | 91 |
| 12 | M | 15.1 | 3.6 | 17.1 | 10.7 | 89 |

**Figure 14: Li Heparin v. Serum**



Plasma (LiHep) vs Serum Results

$y = 0.905x$
$R^2 = 0.8334$

Li-Hep Plasma Result, ng/mL (y-axis)
Serum Result, ng/mL (x-axis)

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001335

ER-14936

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⦿s | 25OHVitD Total Report | Document Number:<br>Revision: A |
|---|---|---|
| | Validation Document | Effective Date: |

| 25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System |
|---|

The Theranos System is capable of preparing plasma from blood treated with either EDTA or lithium heparin as an anticoagulant in the collection system. To test for a bias due to anticoagulant, matched samples were collected from 10 donors in EDTA and in lithium heparin tubes and centrifuged to prepare plasma to test on the Theranos System. There was no significant difference between the lithium heparin and EDTA results.

**Table 15: Li Heparin v. EDTA Plasma**

| Sample ID | Gender | EDTA Plasma | | Li-Hep Plasma | | % Recovery in EDTA vs Li-Hep |
|---|---|---|---|---|---|---|
| | | Mean Conc | CV % | Mean Conc | CV % | |
| 03 | M | 31.7 | 3.8 | 25.1 | 7.7 | 126 |
| 04 | M | 39.5 | 3.1 | 34.9 | 2.0 | 113 |
| 05 | F | 14.2 | 9.0 | 8.0 | 6.2 | 178 |
| 06 | F | 17.7 | 4.2 | 17.7 | 7.2 | 100 |
| 07 | F | 34.8 | 7.9 | 32.2 | 5.9 | 108 |
| 08 | F | 39.5 | 11.0 | 34.3 | 5.8 | 115 |
| 09 | M | 37.8 | 6.3 | 23.3 | 8.6 | 161 |
| 10 | M | 36.5 | 3.8 | 30.9 | 8.6 | 118 |

**Figure 15: Li Heparin v. EDTA**



34

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001336

ER-14937

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: Revision: A |
| | **Validation Document** | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** |

## 10 ANALYTICAL SENSITIVITY

To test the analytical sensitivity, 60 replicates of a blank sample and 60 replicates at the LLOQ were tested. To determine the lowest detectable dilution level, 20 replicates of LLOQ dilutions were tested. At ¼ LLOQ, all but one point was out of the assay range.

### Table 16: 1/2xLLOQ 1/4xLLOQ

| 1/2 LLOQ | | | | | |
|---|---|---|---|---|---|
| **RLUs** | | **Calculated From Mean** | | **Calculated** | |
| Mean | %CV | Mean | | Mean | %CV |
| 70653 | 38% | | OORL | 18.59 | 28% |
| All Tips | | Inter-Cartridge | | Conc. (ng/mL) | |
| System Error | | | | | |
| System Error | | | | | |
| System Error | | | | | |
| 49621 | 50845 | 50233 | 2% | 19.72 | 18.80 |
| 44827 | 44234 | 44531 | 1% | 23.70 | 24.24 |
| 43680 | 51083 | 47382 | 11% | 24.75 | 18.63 |
| 49033 | 51754 | 50394 | 4% | 20.18 | 18.14 |
| 58693 | 56637 | 57665 | 3% | 13.58 | 14.83 |
| 41213 | 48107 | 44660 | 11% | 27.10 | 20.91 |
| 103857 | 20 | 51939 | 141% | OORL | OORH |
| 62103 | 70806 | 66455 | 9% | 11.60 | OORL |
| System Error | | | | | |
| 77118 | 76666 | 76892 | 0% | OORL | OORL |
| 101658 | 100896 | 101277 | 1% | OORL | OORL |
| 87529 | 100274 | 93902 | 10% | OORL | OORL |
| 108889 | 94046 | 101468 | 10% | OORL | OORL |
| System Error | | | | | |
| 63557 | 61852 | 62705 | 2% | 10.79 | 11.74 |
| 115509 | 74422 | 94966 | 31% | OORL | OORL |
| 109232 | 106992 | 108112 | 1% | OORL | OORL |
| 74622 | 81134 | 77878 | 6% | OORL | OORL |

| 1/4 LLOQ | | | | | |
|---|---|---|---|---|---|
| **RLUs** | | **Calculated From Mean** | | **Calculated** | |
| Mean | %CV | Mean | | Mean | %CV |
| 92340 | 17% | | OORL | 71.30 | |
| All Tips | | Inter-Cartridge | | Conc. (ng/mL) | |
| Tip1 | Tip2 | Mean | %CV | Tip 1 | Tip 2 |
| System Error | | | | | |
| 93085 | 102348 | 97717 | 7% | OORL | OORL |
| 103869 | 111975 | 107921 | 5% | OORL | OORL |
| 19669 | 93134 | 56402 | 92% | OORL | 71.30 |
| 84897 | 87504 | 86201 | 2% | OORL | OORL |
| 97025 | 97021 | 97023 | 0% | OORL | OORL |
| 100874 | 94633 | 97754 | 5% | OORL | OORL |
| 87356 | 96663 | 92010 | 7% | OORL | OORL |
| 91569 | 92013 | 91791 | 0% | OORL | OORL |
| 82701 | 78811 | 80706 | 2% | OORL | OORL |
| 97534 | 107179 | 102357 | 7% | OORL | OORL |
| 98694 | 88707 | 93701 | 8% | OORL | OORL |
| 85028 | 96049 | 90536 | 9% | OORL | OORL |
| 103790 | 98369 | 101080 | 4% | OORL | OORL |
| 108630 | 96627 | 102629 | 8% | OORL | OORL |
| 72244 | 85686 | 78965 | 12% | OORL | OORL |
| 88713 | 86659 | 87686 | 2% | OORL | OORL |
| 107139 | 102862 | 105001 | 3% | OORL | OORL |
| 69663 | 78511 | 74087 | 8% | OORL | OORL |
| 111652 | 110160 | 110906 | 1% | OORL | OORL |

35

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001337

**ER-14938**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: |
| 25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System | | |

### Table 17: Blank and Lowest Detectable Sensitivity

**Blank**

| RLUs | | Calculated From Mean | Calculated | |
|---|---|---|---|---|
| Mean | %CV | Mean | Mean | %CV |
| 94922 | 30% | OORL | 66.74 | 100% |
| All Tips | | Inter-Cartridge | Conc. (ng/mL) | |
| Tip1 | Tip2 | Mean | %CV | Tip 1 | Tip 2 |

| Tip1 | Tip2 | Mean | %CV | Tip 1 | Tip 2 |
|---|---|---|---|---|---|
| 108722 | 104512 | 106617 | 3% | OORL | OORL |
| 84051 | 87185 | 85618 | 3% | OORL | OORL |
| 94925 | 99265 | 97095 | 3% | OORL | OORL |
| 116732 | 120449 | 118591 | 2% | OORL | OORL |
| 118037 | 102725 | 110381 | 10% | OORL | OORL |
| 12162 | 99432 | 55797 | 111% | 127.54 | OORL |
| 84134 | 92076 | 88105 | 6% | OORL | OORL |
| 10813 | 80617 | 45715 | 108% | 148.67 | OORL |
| 115663 | 120069 | 117866 | 3% | OORL | OORL |
| 84461 | 104125 | 94293 | 15% | OORL | OORL |
| 101087 | 94379 | 97733 | 5% | OORL | OORL |
| 107517 | 118571 | 113044 | 7% | OORL | OORL |
| 81021 | 103049 | 92035 | 17% | OORL | OORL |
| 94242 | 95708 | 94975 | 1% | OORL | OORL |
| 72625 | 98612 | 85619 | 21% | OORL | OORL |
| 31875 | 108445 | 70160 | 77% | 39.30 | OORL |
| 74344 | 83641 | 78993 | 8% | OORL | OORL |
| 118778 | 132822 | 125800 | 8% | OORL | OORL |
| 101964 | 112222 | 107093 | 7% | OORL | OORL |
| 87441 | 95328 | 91385 | 6% | OORL | OORL |
| 102121 | 110890 | 106505 | 6% | OORL | OORL |
| 94427 | 94448 | 94438 | 0% | OORL | OORL |
| 111368 | 113617 | 112493 | 1% | OORL | OORL |
| 101395 | 100290 | 100843 | 1% | OORL | OORL |
| 90172 | 90654 | 90413 | 0% | OORL | OORL |
| 104795 | 4 | 52400 | 141% | OORL | OORH |
| 94686 | 98882 | 96784 | 3% | OORL | OORL |
| 88584 | 92278 | 90431 | 3% | OORL | OORL |
| 107795 | 8 | 53902 | 141% | OORL | OORH |
| 93437 | 96886 | 95162 | 3% | OORL | OORL |
| 108112 | 108011 | 108062 | 0% | OORL | OORL |
| 104712 | 103381 | 104047 | 1% | OORL | OORL |
| 113548 | 89688 | 101618 | 17% | OORL | OORL |
| 49 | 57 | 53 | 11% | OORH | OORH |
| 162888 | 167569 | 165229 | 2% | OORL | OORL |
| 92888 | 79118 | 86003 | 11% | OORL | OORL |
| 82689 | 92393 | 87541 | 8% | OORL | OORL |
| 114127 | 114653 | 114390 | 0% | OORL | OORL |
| 119697 | 111631 | 115664 | 5% | OORL | OORL |
| 93464 | 88656 | 91060 | 4% | OORL | OORL |

**LLOQ (10ng/mL)**

| RLUs | | Calculated From Mean | Calculated | |
|---|---|---|---|---|
| Mean | %CV | Mean | Mean | %CV |
| 71704 | 31% | OORL | 16.53 | 77% |
| All Tips | | Inter-Cartridge | Conc. (ng/mL) | |
| Tip1 | Tip2 | Mean | %CV | Tip 1 | Tip 2 |

| Tip1 | Tip2 | Mean | %CV | Tip 1 | Tip 2 |
|---|---|---|---|---|---|
| 87059 | 86261 | 86660 | 1% | OORL | OORL |
| 82704 | 91093 | 86899 | 7% | OORL | OORL |
| 90657 | 95670 | 93164 | 4% | OORL | OORL |
| 71660 | 71311 | 71486 | 0% | OORL | OORL |
| 65141 | 79328 | 72233 | 14% | 9.93 | OORL |
| 74504 | 80315 | 77408 | 5% | OORL | OORL |
| 80691 | 87962 | 84327 | 6% | OORL | OORL |
| 63937 | 69325 | 66631 | 6% | 10.58 | OORL |
| 78268 | 80981 | 78125 | 5% | OORL | OORL |
| 50559 | 84065 | 67312 | 35% | 19.01 | OORL |
| 80285 | 77623 | 78954 | 2% | OORL | OORL |
| 70664 | 72019 | 71342 | 1% | OORL | OORL |
| 18227 | 73221 | 45724 | 85% | 78.02 | OORL |
| 88461 | 98317 | 93339 | 7% | OORL | OORL |
| 71194 | 71032 | 71113 | 0% | OORL | OORL |
| 87981 | 63517 | 76654 | 21% | OORL | 9.83 |
| 77986 | 66414 | 72190 | 11% | OORL | 9.25 |
| 43159 | 78248 | 60704 | 41% | 25.25 | OORL |
| 76217 | 75119 | 75668 | 1% | OORL | OORL |
| 97061 | 101253 | 99157 | 3% | OORL | OORL |
| 71564 | 75377 | 73471 | 4% | OORL | OORL |
| 108137 | 100656 | 104397 | 5% | OORL | OORL |
| 69260 | 70145 | 69703 | 1% | OORL | OORL |
| 84874 | 83639 | 84257 | 1% | OORL | OORL |
| 79778 | 23 | 39901 | 141% | OORL | OORH |
| 51804 | 52446 | 52125 | 1% | 18.10 | 17.65 |
| 55883 | 68832 | 62358 | 15% | 15.33 | OORL |
| 74373 | 75325 | 74849 | 1% | OORL | OORL |
| 91929 | 77670 | 84800 | 12% | OORL | OORL |
| 76801 | 62396 | 69599 | 15% | OORL | 11.43 |
| System Error | | | | | |
| 51721 | 52510 | 52116 | 1% | 18.16 | 17.60 |
| 65509 | 61439 | 63474 | 5% | 9.73 | 11.97 |
| 66536 | 64620 | 65578 | 2% | 9.19 | 10.21 |
| 70697 | 5 | 35351 | 141% | OORL | OORH |
| 41202 | 41658 | 41430 | 1% | 27.20 | 26.73 |
| 97260 | 5 | 48633 | 141% | OORL | OORH |
| 77604 | 84544 | 81074 | 6% | OORL | OORL |
| 75281 | 82478 | 78880 | 6% | OORL | OORL |
| 98164 | 101522 | 99843 | 2% | OORL | OORL |

36

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001338

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: Revision: A |
|---|---|---|
| | **Validation Document** | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 84463 | 79887 | 82175 | 4% | OORL | OORL | | 57154 | 57515 | 57335 | 0% | 14.53 | 14.30 |
| System Error | | | | | | | 83790 | 12 | 41901 | 141% | OORL | OORH |
| 79391 | 90246 | 84819 | 9% | OORL | OORL | | 85271 | 87502 | 86387 | 2% | OORL | OORL |
| 99817 | 107187 | 103502 | 5% | OORL | OORL | | 103839 | 102245 | 103042 | 1% | OORL | OORL |
| 96914 | 94066 | 95490 | 2% | OORL | OORL | | 48324 | 52931 | 50628 | 6% | 20.73 | 17.31 |
| 108455 | 109609 | 109032 | 1% | OORL | OORL | | 75743 | 80023 | 77883 | 4% | OORL | OORL |
| 106033 | 113262 | 109648 | 5% | OORL | OORL | | 76790 | 82234 | 79512 | 5% | OORL | OORL |
| 109883 | 117186 | 113535 | 5% | OORL | OORL | | 82341 | 84422 | 83382 | 2% | OORL | OORL |
| 115564 | 120635 | 118100 | 3% | OORL | OORL | | 88534 | 7 | 44271 | 141% | OORL | OORH |
| 108325 | 105004 | 106665 | 2% | OORL | OORL | | 80312 | 88564 | 84438 | 7% | OORL | OORL |
| 95813 | 100491 | 98152 | 3% | OORL | OORL | | 78767 | 79429 | 79098 | 1% | OORL | OORL |
| 86115 | 83919 | 85017 | 2% | OORL | OORL | | 70402 | 76297 | 73350 | 6% | OORL | OORL |
| 98109 | 106615 | 102362 | 6% | OORL | OORL | | 61367 | 66403 | 63886 | 6% | 12.01 | 9.26 |
| 93723 | 6 | 46865 | 141% | OORL | OORH | | 84478 | 86609 | 85543 | 2% | OORL | OORL |
| 98357 | 106492 | 102425 | 6% | OORL | OORL | | 65298 | 68598 | 66948 | 1% | 11.49 | 10.76 |
| 133550 | 117310 | 125430 | 9% | OORL | OORL | | 67705 | 1 | 33853 | 141% | OORL | OORL |
| 103547 | 104901 | 104224 | 1% | OORL | OORL | | 81695 | 65099 | 63397 | 4% | 11.83 | 9.95 |
| 67409 | 66043 | 66726 | 1% | 8.73 | 9.45 | | 91065 | 94673 | 92869 | 3% | OORL | OORL |
| 77313 | 86247 | 81780 | 8% | OORL | OORL | | 70262 | 73111 | 71687 | 3% | OORL | OORL |
| 117170 | 123835 | 120503 | 4% | OORL | OORL | | 87047 | 81377 | 84212 | 5% | OORL | OORL |

## 11  INTERFERENCE

The recovery of analyte spiked into hemolyzed (500mg/dL Hemoglobin), icteric (40mg/dL), and lipemic (1000mg/dL Triglycerides) serum samples was evaluated on the Theranos System and compared to the predicate method. Lipemic samples containing triglycerides at 1000 mg/dl had very low recovery and should not be used for testing on the Theranos System.

**Table 18: Interfering Substances**

| Hemolyzed sample (hemoglobin 500mg/dL) | | | | | | | | | Dexter Calculated Result | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nominal Value (ng/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Concentration | | | | |
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip I | Tip 2 | Mean | %CV | %Recovery |
| 100 | 18297 | 17848 | 18297 | 17848 | 18073 | 2% | 16607 | 10% | 80.41 | 82.54 | 88.91 | 10% | 89% |
| | 14339 | 16313 | 14339 | 16313 | 15326 | 9% | | | 102.69 | 90.53 | | | |
| | 15221 | 17624 | 15221 | 17624 | 16423 | 10% | | | 96.95 | 83.64 | | | |
| 75 | 20099 | 20095 | 20099 | 20095 | 20097 | 0% | 23732 | 18% | 72.59 | 72.61 | 59.74 | 22% | 80% |
| | 26191 | 28543 | 26191 | 28543 | 27367 | 6% | | | 52.66 | 46.82 | | | |
| | 4 | 224 | DARK | | | | | | | | | | |
| 50 | 20972 | 20921 | 20972 | 20921 | 20947 | 0% | 21541 | 4% | 69.19 | 69.38 | 67.09 | 4% | 134% |
| | 22298 | 21424 | 22298 | 21424 | 21861 | 3% | | | 64.42 | 67.51 | | | |
| | 20911 | 22718 | 20911 | 22718 | 21815 | 0% | | | 69.42 | 63.00 | | | |
| 0 | 39883 | 35186 | 39883 | 35186 | 37535 | 9% | 43546 | 25% | 26.78 | 33.79 | 22.21 | 56% | 56% |
| | 32763 | 46 | 32763 | DARK | 32763 | | | | 38.05 | | | | |
| | 58300 | 51598 | 58300 | 51598 | 54949 | 9% | | | 9.09 | 14.18 | | | |

37

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001339

**ER-14940**

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theran⊖s | 25OHVitD Total Report | Document Number: |
|---|---|---|
| | | Revision: A |
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

**Icteric sample (Bilirubin 40mg/dL)**

| Nominal Value (ng/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Dexter Calculated Result Concentration | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | %Recovery |
| 100 | 14045 | 16014 | 14045 | 16014 | 15030 | 9% | 15030 | 9% | 104.73 | 92.22 | 98.15 | 9% | 98% |
| | 14 | 14 | DARK | DARK | | | | | | | | | |
| | 185 | 5 | | DARK | | | | | | | | | |
| 75 | 22006 | 25445 | 22006 | 25445 | 23726 | 10% | 18945 | 29% | 65.43 | 54.70 | 77.36 | 34% | 103% |
| | 20680 | 13 | 20680 | DARK | 20680 | | | | 70.30 | | | | |
| | 12865 | 13728 | 12865 | 13728 | 13297 | 5% | | | 113.61 | 107.00 | | | |
| 50 | 20065 | 19930 | 20065 | 19930 | 19998 | 0% | 19747 | 23% | 72.73 | 73.28 | 74.03 | 26% | 148% |
| | 14762 | 15022 | 14762 | 15022 | 14892 | 1% | | | 99.87 | 98.20 | | | |
| | 26855 | 21849 | 26855 | 21849 | 24352 | 15% | | | 50.93 | 65.98 | | | |
| 0 | 27853 | 31788 | 27853 | 31788 | 29821 | 9% | 32177 | 8% | 48.45 | 39.91 | 39.15 | 17% | |
| | | | DARK | DARK | | | | | | | | | |
| | 33725 | 35341 | 33725 | 35341 | 34533 | 3% | | | 36.30 | 33.54 | | | |

**Lipemic sample (Triglycerides 1000mg/dL)**

| Nominal Value (ng/mL) | All Tips | | Dark Exclusion | | Inter-Cartridge | | Intra-Cartridge | | Dexter Calculated Result Concentration | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tip1 | Tip2 | Tip1 | Tip2 | Mean | %CV | Mean | %CV | Tip 1 | Tip 2 | Mean | %CV | %Recovery |
| 100 | 29682 | 32942 | 29682 | 32942 | 31312 | 7% | 30237 | 17% | 44.25 | 37.72 | 43.06 | 26% | 43% |
| | 23808 | 24944 | 23808 | 24944 | 24376 | 3% | | | 50.50 | 56.11 | | | |
| | 33943 | 36102 | 33943 | 36102 | 35023 | 4% | | | 35.91 | 32.31 | | | |
| 75 | 28990 | 33739 | 28990 | 33739 | 31305 | 11% | 31094 | 17% | 43.79 | 36.27 | 41.29 | 24% | 55% |
| | 38788 | 48906 | 38788 | | 38788 | | | | 28.29 | | | | |
| | 25981 | 27974 | 25981 | 27974 | 26978 | 5% | | | 53.23 | 48.16 | | | |
| 50 | 32645 | 34156 | 32645 | 34156 | 33401 | 3% | 36893 | 17% | 38.27 | 35.54 | 31.07 | 28% | 62% |
| | 32809 | 32449 | 32809 | 32449 | 32629 | 1% | | | 37.96 | 38.64 | | | |
| | 46800 | 42501 | 46800 | 42501 | 44651 | 7% | | | 18.67 | 23.44 | | | |
| 0 | 55411 | 10 | 55411 | DARK | 55411 | | 53233 | 8% | 11.14 | | 12.83 | 26% | |
| | 49310 | 58021 | 49310 | DARK | 49310 | | | | 16.22 | | | | |
| | 50190 | 58021 | 50190 | 58021 | 54106 | 10% | | | 15.42 | 9.28 | | | |

38

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001340

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number:<br>Revision: A |
|---|---|---|
| | **Validation Document** | Effective Date: |
| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** | | |

**Figure 16: Hemolyzed Sample**



**Figure 17: Icteric Sample**



39

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001341

ER-14942

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran⊙s** | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | **Validation Document** | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** |

**Figure 18: Lipemic Sample**



## 12  CROSSREACTIVITY

Information about cross-reacting analytes was obtained from the predicate method.

No cross reactivity was observed with Vitamin D3 (Cholecalciferol), Vitamin D2 (Ergocalciferol), or 24,25-DihydroxyVitamin D3. Cross reactivity was observed with 1α,25-DihydroxyVitamin D3, another hydroxylated metabolite of Vitamin D, however this is not a clinical concern because blood levels of 1α,25-Dihydroxy Vitamin D are in the order of 1000-fold lower than 25-Hydroxyvitamin D (in the pg/mL range). Cross reactivity with this metabolite is common in 25-Hydroxyvitamin D assays.

40

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001342

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| theranos | 25OHVitD Total Report | Document Number: Revision: A |
|---|---|---|
| | Validation Document | Effective Date: |

**25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System**

### Table 19: Cross-reactive Samples

| Sample ID | Nominal Value (ng/mL) | All Tips Tip1 | Tip2 | Inter-Cartridge Mean | %CV | Intra-Cartridge Mean | %CV | Concentration Tip 1 | Tip 2 | Mean | %CV | %Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Control (25-HydroxyVitaminD3) | 150 | 2286 | 2096 | 2191 | 6% | 2432 | 12% | 113.72 | 124.97 | 106.44 | 13% | 71% |
| | | 2671 | 2676 | 2674 | 0% | | | 96.48 | 96.29 | | | |
| | 100 | 2885 | 2997 | 2941 | 3% | 2941 | 3% | 89.09 | 85.67 | 87.34 | 3% | 87% |
| | | 8 | 10 | | | | | | | | | |
| | 50 | 4131 | 4252 | 4192 | 2% | 4044 | 5% | 61.94 | 60.16 | 63.28 | 5% | 127% |
| | | 3762 | 4030 | 3896 | 5% | | | 68.05 | 63.50 | | | |
| 1α,25-Dihydroxy Vitamin D3 | 150 | 2237 | 2305 | 2271 | 2% | 2352 | 4% | 116.40 | 112.71 | 110.33 | 5% | 74% |
| | | 2406 | 2458 | 2432 | 2% | | | 107.65 | 105.26 | | | |
| | 100 | 3767 | 3642 | 3705 | 2% | 3642 | 3% | 67.96 | 70.31 | 70.31 | 3% | 70% |
| | | 3503 | 3656 | 3580 | 3% | | | 73.12 | 70.04 | | | |
| | 50 | 6290 | 9663 | 7977 | 30% | 7804 | 18% | 40.32 | 25.00 | 31.97 | 20% | 64% |
| | | 7860 | 7402 | 7631 | 4% | | | 31.72 | 33.89 | | | |
| 24,25-Dihydroxy Vitamin D3 | 150 | 23056 | 20942 | 21999 | 7% | 22992 | 6% | 4.52 | 6.48 | 4.58 | 30% | 3% |
| | | 23922 | 24047 | 23985 | 0% | | | OORL | OORL | | | |
| | 100 | 24146 | 23576 | 23861 | 2% | 23735 | 2% | OORL | 4.06 | OORL | OORL | OORL |
| | | 23014 | 24203 | 23609 | 4% | | | 4.36 | OORL | | | |
| | 50 | 24434 | 26115 | 25275 | 5% | 25059 | 3% | OORL | OORL | OORL | OORL | OORL |
| | | 24405 | 25282 | 24844 | 2% | | | OORL | OORL | | | |
| Cholecalciferol | 150 | 29411 | 28965 | 29089 | 2% | 31607 | 0% | OORL | OORL | OORL | OORL | OORL |
| | | 32888 | 35361 | 34125 | 5% | | | OORL | OORL | | | |
| | 100 | 30851 | 36801 | 30329 | 0% | 30864 | 2% | OORL | OORL | OORL | OORL | OORL |
| | | 30878 | 31918 | 31398 | 2% | | | OORL | OORL | | | |
| | 50 | 29796 | 30788 | 30292 | 2% | 31046 | 4% | OORL | OORL | OORL | OORL | OORL |
| | | 31087 | 32512 | 31800 | 3% | | | OORL | OORL | | | |
| Ergocalciferol | 150 | 32691 | 30025 | 31358 | 6% | 30935 | 4% | OORL | OORL | OORL | OORL | OORL |
| | | 30116 | 30909 | 30513 | 2% | | | OORL | OORL | | | |
| | 100 | 27321 | 27068 | 27195 | 1% | 27040 | 1% | OORL | OORL | OORL | OORL | OORL |
| | | 26660 | 27111 | 26886 | 1% | | | OORL | OORL | | | |
| | 50 | 29402 | 28751 | 29077 | 2% | 30040 | 4% | OORL | OORL | OORL | OORL | OORL |
| | | 31297 | 30708 | 31003 | 1% | | | OORL | OORL | | | |

## 13  STABILITY

The stability of serum samples stored at 4C and room temperature were tested to mimic the conditions that clinical samples may be stored and handled. Samples were transferred from -80C to either room temperature or 4C at the 0hr time point, and stored at those temperatures for the remainder of testing. Overall the analyte stability data indicates that the samples need to be processed within 12h if stored at 4 degrees and room temperature.

41

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001343

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: |
|---|---|---|
| | | Revision: A |
| | **Validation Document** | Effective Date: |
| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** | | |

**Figure 19: Analyte Stability when stored at 4C**



**Figure 20: Analyte Stability when stored at Room Temperature**



CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001344

ER-14945

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theranos** | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | **Validation Document** | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** |

### 14 Reagent Stability

Data from the development report were used to test the stability of the reagents stored at 4C. Reagents were stored outside of the cartridges and added immediately before testing. The reagents are stable at 4C for up to 13 weeks.

**Figure 21: Stability of Reagents up to 13 weeks**



43

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001345

ER-14946

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

| **theran⊙s** | **25OHVitD Total Report** | Document Number: |
| | | Revision: A |
| | **Validation Document** | Effective Date: |

| **25OHVitD Total ELISA Assay Validation Report on Edison 3.X Theranos System** |

## 15 REFERENCES

15.1 Code of Federal Regulations, Title 42, Chapter IV, Subchapter G, Part 493, Subpart K, Sections 493.1217, 493.1253, and 493.1255.

15.2 DeSilva B, Smith W, Weiner R, et al. Recommendations for the bioanalytical method validation of ligand-binding assays to support pharmacokinetic assessments of macromolecules. Pharmaceutical Res. 2003; 20:1885-1900.

15.3 Guidance for Industry: bioanalytical method validation. U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, 2001.

15.4 R (version 2.13.1). The R Foundation for Statistical Computing, 07/08/2011.

15.5 StatisPro (version 1.13.00). Clinical and Laboratory Standards Institute, Wayne, PA. 07/14/2011.

15.6 Dexter-Immunoassay (version1.0), Theranos, Inc., 2009.

15.7 EP10-A3, Preliminary Evaluation of Quantitative Clinical Laboratory Measurement Procedures; Approved Guideline—Third Edition, 2006, Clinical and Laboratory Standards Institute, Wayne, PA.

15.8 EP15-A2, User Verification of Performance for Precision and Trueness; Approved Guideline—Second Edition. 2005, Clinical and Laboratory Standards Institute, Wayne, PA.

15.9 EP09-A2-IR, Method Comparison and Bias Estimation Using Patient Samples; Approved Guideline—Second Edition (Interim Revision), 2010, Clinical and Laboratory Standards Institute, Wayne, PA.

15.10 EP05-A2, Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

15.11 EP06-A, Evaluation of the Linearity of Quantitative Measurement Procedures: A Statistical Approach; Approved Guideline, 2003, Clinical and Laboratory Standards Institute, Wayne, PA.

15.12 EP7-A2, Interference Testing in Clinical Chemistry; Approved Guideline—Second Edition, 2004, Clinical and Laboratory Standards Institute, Wayne, PA.

44

CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

CMS2-001346

ER-14947

**DX 10444**

| Message | |
|---|---|
| **From:** | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
| **Sent:** | 4/28/2012 2:11:24 AM |
| **To:** | 'Melissa Givens' ██████████████ |
| **CC:** | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes]; melissa.givens@usafricom.mil |
| **Subject:** | RE: lab visit next week |

LTC Givens,


Thank you for your email. Please let us know if you will be able to meet at our offices on Tuesday, May 1st at 2:30pm. Our address is 3200 Hillview Avenue, Palo Alto, CA, 94304. Please let us know if you need any help with directions.


We look forward to briefing you and addressing the topics raised in your recent emails in person.


Best regards,

Dan


**Daniel P. Edlin**
*Senior Product Manager*
Theranos, Inc.
Office:  650.470.0322
Mobile:  ██████████

dedlin@theranos.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT -- This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc . 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292   www.theranos.com

FOIA Confidential Treatment Requested by Theranos                                              THER-2549158
Fed. R. Crim. P. 6(e) material

**ER-14948**

**From:** Melissa Givens ███████████████
**Sent:** Friday, April 27, 2012 4:01 AM
**To:** Daniel Edlin; Elizabeth Holmes; melissa.givens@usafricom.mil
**Subject:** lab visit next week

Dan,

Can we pin down a time to meet next week?  I am trying to build the rest of my schedule but the visit to Theranos is my first priorty.
Has there been any progress in configuring a system that we would be able to emply soon to Africa?

Right now I can operate with a basic system without any advanced security features for the cellular or satellite signal, so I am most interested in fielding the equipment and collecting data on how it can save patient movement.  I have several trips to Africa coming up in the next few months and really want to test the equipment/process and then move forward with fielding it for full time use if the test runs go well.

Can you please respond to both of my emails because I will be in/out of the office the next few days.


Regards,
Melissa Givens

LTC Melissa Givens MD, MPH
Command Surgeon, SOCAFRICA

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-2549159

**DX 10446**

Message

| | |
|---|---|
| **From:** | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
| **Sent:** | 7/28/2012 9:32:38 PM |
| **To:** | 'Givens, Melissa L. LTC' [Melissa.Givens@███████ mgiven███████ |
| **CC:** | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes]; Christian Holmes [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Christian Holmes] |
| **Subject:** | RE: SOCAFRICA update |

LTC Givens,

We are very happy to hear that the trip went well and that there were no issues with the travel and function of the device.  As soon as we receive the device we will work on compiling the performance data for you.

Please note that we have developed a family of next generation systems which include a much more dynamic and sensitive touch screen.  As we proceed we will work with you to get you these systems for our next deployment.

We look forward to seeing the report and pre-proposal and working towards our next deployment together.

Best regards,
Dan


-----Original Message-----
From: Givens, Melissa L. LTC [mailto:Melissa.Givens@████████
Sent: Thursday, July 26, 2012 6:55 AM
To: Daniel Edlin; mgivens███████
Cc: Elizabeth Holmes; Christian Holmes
Subject: SOCAFRICA update

Theranos team,

I made it back from 2 trips to Africa and managed to work through all the cases in the protocol.

The machine travelled well and functioned well.  My only complaint is the touch screen - very frustrating.

I will be preparing a full report and have several pictures of the machine being used in Cameroon, Uganda, and South Sudan.  It would be helpful to have some data back from you when you receive the machine in regards to internal quality control on the samples that were run.

We will be sending the machine back via FedEx either tomorrow or early next week.  I will let you know once I have a tracking number.


Because the machine seemed to function well in the environment, I am going to write a pre- proposal to submit to the USSOCOM BISC in hopes of gaining funding for a full proposal through the USSOCOM BAA for Extramural Biomedical Research and Development.

My goal will be to deploy 3-5 machines to Africa to use real time at locations where we have persistent presence and collect real laboratory data and compare it to the current standard of care.  I will be writing the pre-proposal this weekend and will send you a copy next week to see if you think you can support.  Funding would not be approved for several months so we have more lead time on this initiative.


Regards,
Missy

LTC Melissa L. Givens MD, MPH


Confidential                                                                                          THPFM0000692119

**ER-14950**

```
Command Surgeon
Special Operations Command AFRICA
DSN: 314.421.3339
Comm: 49(0)711.729.3339
Cell:
melissa.givens@
```

**To:** Elizabeth Holmes[eholmes@theranos.com]
**From:** Daniel Edlin
**Sent:** Mon 12/3/2012 11:50:17 PM
**Importance:** Normal
**Subject:** FW: Approved IRB Protocol for Theranos LOE
**Received:** Mon 12/3/2012 11:50:20 PM

Theranos LOE_Protocol Application for Existing Data and Specimens V 2 2 (2).doc
M-10278 Approval Memo.pdf
follstad_thern_AOstartLetter_6NOV12.pdf

Hi Elizabeth,

Attached is the CENTCOM LOE protocol for your records. Note that this is being adjusted to include Vancomycin, Pre-albumin, Random Cortisol, and Factor Xa.

I'll send this to Daniel as well.

Thanks,

Dan

---

**From:** Murphy, Christine L Maj MIL USAF USCENTCOM CCSG-AA [mailto:christine.l.murphy███████████]
**Sent:** Friday, November 16, 2012 12:45 PM
**To:** Daniel Edlin; Christian Holmes
**Subject:** Approved IRB Protocol for Theranos LOE

Sirs,

For your reference please find attached the Approved Version of the protocol. Lab tech Officer as mentioned will be Capt Blanco, she is the only authorized hands on at this time. We will be submitting shortly an addendum to include the bridging Sergeant and Capt Blanco's replacement once that name is available. This is a common occurrence if any updates as to who is participating or minor updates in procedure occur to submit an addendum. I have also attached the IRB approval memo and the Approval To Start Letter from the theater Approval Authority for your reference. If there are any questions, please let me know. Thanks.

V/R

Maj Christine Murphy, USAF, BSC

Director, Joint Theater Blood Program

Human Protections Administrator/HPA

Clinical Laboratory Consultant

HQ USCENTCOM/CCSG

████████████████

MacDill AFB   FL  33621

DSN ██████████

Comm ████████████

christine.l.murphy@███████████

christine.l.murphy@████████████

Confidential                                                          THPFM0000144536

Confidential

THPFM0000144537

# U S Army Medical Research and Materiel Command
## Office of Research Protections
### Institutional Review Board Office

## Initial Application for Research
## Involving Use of Existing Human Data and/or Specimens

| Study Title: | Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device |
|---|---|

Date of application: ___September 12, 2012_____

**PART A.**

**1. Study Contacts**

| Principal Investigator: | Other Study Contact (if applicable) |
|---|---|
| Name and Degree: Eric Follstad, DAFC | Name and Degree: Maj Christine Murphy/MS/SBB |
| Title: Chief, Transformation & Concept Development | Title: Director, CENTCOM Theater Joint Blood Program Officer |
| Mailing Address: : HQ USCENTCOM/CCSG<br>7115 South Boundary Blvd<br>MacDill AFB  FL  33621 | Mailing Address: HQ USCENTCOM/CCSG<br>7115 South Boundary Blvd<br>MacDill AFB  FL  33621 |
| Phone Number:            or ▮▮▮▮▮▮ | Phone Number:            or ▮▮▮▮▮ |
| Email Address: eric.a.follstad▮▮▮▮▮▮il | Email Address:  christine.l.murphy@c▮▮ |
| Fax Number:  N/A | Fax Number:  N/A |

**2. Key Study Personnel** (*if more space is needed attach additional pages to the end of the application*)

List all key personnel **including the Principal Investigator (PI) and Other Study Contacts**, along with a brief statement of their study role(s) and responsibilities.  If more space is needed, attach an additional page to the end of this application.  NOTE: Key personnel are persons who have contact with <u>identifiable</u> data or specimens.

| Key Personnel | Study Roles and Responsibilities |
|---|---|
| Name:  Eric Follstad<br>Affiliated Institute: CENTCOM HQ, CCJ8-ST | Study Role(s):  Principal Investigator/Chief, Transformation & Concept Development<br>Responsibilities:  Lead S&T SME and coordinator for Theranos Limited Objective Experiment.  Oversight of project coordination including LOE team alignment, development of protocol/test packet, device delivery, training, analysis, and final product . |
| Name:  Maj Christine Murphy, USAF<br>Affiliated Institute:  CENTCOM HQ, CCSG | Study Role(s):  CCSG Liaison/Other Study Contact<br>Responsibilities:  Lead CCSG Laboratory SME and direct liaison with Theranos for coordination of technical aspects of device and cartridges and delivery for Information Technology evaluation, theater delivery, and S&T LOE. |
| Name: Humberto Ibarra<br>Affiliated Institute: USCENTCOM CCJ8-ST | Study Role(s): Lead Analyst<br>Responsibilities: Develop LOE Test Plan and Final Report |

Confidential

| Name: Capt Katrina Blanco, USAF Officer in Charge of Laboratory Affiliated Institute: Combined Joint Theater Hospital, Bagram Air Base | Study Role(s): On-site Investigator Responsibilities: Theater liaison to CCJ8 Analysis Team and Theranos. Coordination for initial setup of device, training of laboratory personnel in provision of de-identified specimens and results for the LOE, running of all samples on Theranos device, data collection, and entry of results. |
|---|---|
| Name: Affiliated Institute: | Study Role(s): Responsibilities: |
| Name: Affiliated Institute: | Study Role(s): Responsibilities: |

**3. Study Facilities**

| List all locations where study procedures will be performed | Briefly Describe Facility |
|---|---|
| Combined Joint Theater Hospital, Bagram Air Force Base, Afghanistan | Role III Military Treatment Facility. Testing will be performed in the clinical laboratory portion of the facility. |
| | |
| | |

**4. Additional Approvals –** *(Copies of approval memoranda are required before final IRB approval will be granted)*

Check all that are required by your institution:

- ☐ Institutional BioSafety Committee ☐ Completed ☐ Review Pending
- ☐ Human Stem Cell Use Committee ☐ Completed ☐ Review Pending
- ☐ Radiation Safety Committee ☐ Completed ☐ Review Pending
- ☐ Data Use Agreement ☐ Completed ☐ Review Pending
- ☐ Material Transfer Agreement ☐ Completed ☐ Review Pending
- ☐ Other: _____ ☐ Completed ☐ Review Pending
- ☐ NA

**5. Funding Information**

- ☒ Internal Funding: __CENTCOM Research, Science, and Technology Development Funding through J8__
- ☐ External Funding *(List all sources that apply, including all Industry Sponsors; list award numbers. If more space is needed attach additional pages to the end of the application)*

| Agency / Sponsor | Award Number |
|---|---|
| | Award #: _____ |
| | Award #: _____ |

**6. Target Population(s):**

- ☐ Adults
- ☐ Children
- ☐ Pregnant Women
- ☐ Fetuses
- ☐ Active Duty Military
- ☐ Individuals Not Able to Provide Informed Consent
- ☐ Employees of the Performance Site
- ☐ Individuals/Legal Authorized Representative Not Able to Provide Advanced Informed Consent
- ☐ Prisoners
- ☒ Other: Pre-existing de-identified laboratory samples

Confidential

THPFM0000144539

7.  **Waiver of the Informed Consent Process**.  Ensure the protocol includes the supporting justification and/or information related to the waiver/alteration.

    ☐  **A.  Not applicable** > skip to #8 below

    ☒  **B.  Waiver of informed consent -** For the IRB to grant a waiver of informed consent, all of the following criteria must be addressed in the informed consent section of the protocol:

    a)  The research involves no more than minimal risk to the subject.
    b)  The waiver will not adversely affect the rights and welfare of the subjects.
    c)  The research could not be <u>practicably</u> carried out without the waiver of informed consent.
    d)  Subjects will be provided with additional pertinent information after participation, whenever appropriate.

8.  **Documents Submitted**

    ☒  Protocol
    ☒  Request for waiver of HIPAA Authorization
    ☐  Data collection forms/CRFs
    ☐  Data Use Agreement
    ☐  Material Transfer Agreement

Confidential                                        THPFM0000144540

**ER-14956**

**Part B.    RESPONSIBILITIES OF THE PRINCIPAL INVESTIGATOR IN HUMAN SUBJECTS RESEARCH**

**The Principal Investigator is the individual who is primarily responsible for the execution of the research. He/she is responsible for the conduct of the study, obtaining subjects' consent, providing necessary reports, and maintaining study documents. The Principal Investigator and Associate Investigators will be familiar with all applicable regulations governing human subjects research, and will adhere to all requirements outlined in his/her institution's DoD Assurance of Compliance with the Human Subjects Protection Regulations as granted by the DoD, and/or by the institution's Federalwide Assurance granted by the Office for Human Research Protections, Department of Health and Human Services.**

**A.  Initial Approval/Study Implementation**

Research activities involving human subjects, to include recruitment, screening and/or enrollment, may not commence until the study has been reviewed and approved by the HQ, USAMRMC IRB's (hereafter referred to as the IRB). All study-related materials including, but not limited to, the protocol, informed consent form(s), recruitment materials, case report forms, etc., must be reviewed and approved by the IRB.

I acknowledge that I am responsible for assuring the quality of each subject's informed consent in accordance with current federal, DoD and Army regulations. This responsibility includes ensuring that any designee who obtains consent on my behalf is completely conversant with the protocol and is qualified to perform this responsibility.

I acknowledge that I am responsible for ensuring that the protocol has adequate ongoing data and safety monitoring.

**B.  Modifications/Amendments to the Protocol**

I agree to submit all protocol amendments, changes, and/or modifications to the IRB for review and approval prior to implementation. Any changes in approved research, during the period for which IRB approval has already been given, may not be initiated without IRB review and approval except when necessary to eliminate apparent immediate hazards to subjects or others. If such protocol changes or modifications are required, I will notify the IRB immediately.

**C.  Reporting Requirements for Unanticipated Events, SAEs, Deaths, Other**

I agree that all unanticipated problems involving risk to subjects or others, all serious adverse events and all subject deaths related to participation will be promptly reported by phone (301-619-2165), by email (irboffice@amedd.army.mil), or by facsimile (301-619-4165) to the IRB. A complete written report will follow the initial notification. In addition to the methods above, the complete report can be sent to the U.S. Army Medical Research and Materiel Command, ATTN: MCMR-RP, 504 Scott Street, Fort Detrick, Maryland 21702-5012.

I will report immediately to the IRB the knowledge of a pending compliance inspection/visit by the FDA, OHRP, or other governmental agency concerning this DoD funded research; the issuance of Inspection Reports, FDA Form 483, warning letters or actions taken by any Regulatory Agencies (e.g. local, state, federal) including legal or medical actions; and any instance of serious or continuing noncompliance with the regulations or requirements.

Any significant findings that become known during the course of the research that might affect the willingness of subjects to enroll or to continue to take part, will be promptly reported to the IRB.

**D.  Deviations to the Protocol**

Any deviations to the protocol that may have an effect on the safety or rights of the subject and/or the integrity of the study will be reported to the IRB as soon as the deviation is identified. I agree to report all deviations to the protocol in the continuing review report for the study and the final study report to the IRB.

**E.  Continuing Review Reports**

A continuing review report for the research study will be submitted to the IRB. I will report progress of the approved research to the IRB as often as requested, but not less frequently than once per year. Should the protocol not receive approval of continuation by its expiration date, all study activity, including subject recruitment, screening, enrollment, data collection and/or data analysis must be discontinued except where necessary to protect the safety of participants.

Confidential                                                                                                                                    THPFM0000144541

**F. Final Study Report**

I will notify the IRB upon completion of the research study and submit a final study report.

**G. Records Maintenance**

I will maintain a Study File that must be kept for three years following completion of the study (if no IND/IDE used [32 CFR 219.115 (b)]). If IND products or IDE devices are used, the file must be kept for two years after Food and Drug Administration (FDA) approval of marketing application and can then be destroyed; or if no application is filed or approved, until 2 years after the study is discontinued and FDA notified [21 CFR 312.62 (c)]. This file may be inspected at any time by representatives of the IRB, the FDA (as applicable), and/or other regulatory agencies responsible for the oversight of research. Documents maintained in the Study File may include:

- The approved protocol, supporting materials (e.g., study instruments, case report forms, recruitment materials), all protocol amendments, and all continuing review reports.
- All approval memoranda from the IRB (e.g., granting approval to initiate the study, protocol amendments, approval to continue the study).
- Correspondence with the IRB, FDA and/or other pertinent agencies.
- Other applicable committee documentation (e.g., Radiation Safety Committee).
- Study tracking logs.
- Each informed consent/assent document signed by the subject.
- Reports of unanticipated problems, adverse events (initial, follow-up, medical monitor's report), deviations.
- Reports of any significant new findings found during the course of the study.
- All study documents generated from study data.
- Publications, abstracts, reprints resulting from study data.
- All information pertaining to an investigational drug or device (as per FDA regulations).
- Final study report and IRB closure acknowledgment.


*I have read and agree to comply with the statements above which outline my responsibilities as a Principal Investigator.*

*As the Principal Investigator of this study, I assume full responsibility for the execution of this protocol. I also assume full responsibility for the oversight of all research team members and their activities related to this study.*


**Principal Investigator Signature:**

_____

**Printed Name:   Eric A. Follstad**            **DATE: September 12, 2012**

Confidential      THPFM0000144542

**ER-14958**

**PART C.  PROTOCOL**

**1. PROTOCOL TITLE:** Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device

**2.  ABSTRACT**  This LOE will document the functionality of the Theranos Device in a field environment after deployment and transport from the United States.  The LOE will also determine the Information Technology compatibility of the Theranos Device with pre-existing DoD network communications hardware and network security configurations.  Also documented will be a direct comparison of user-friendly operability, turn-around-times, and lab results between the Theranos Devices and pre-existing laboratory instrumentation.

**3.  RESEARCH HYPOTHESES/OBJECTIVES.**  The objective of the LOE is to document the functionality of the Theranos in a deployed setting under field conditions and its operations on the DoD network.  The comparison will provide information on if the Theranos device has potential to be an improvement over pre-existing lab technology through an improved user-friendly interface, faster turn-around-times, and an all inclusive lab testing device.

**4.  BACKGROUND AND SIGNIFICANCE.** Current existing methodology utilized in theater provides many tests, but not all tests that are available in U.S. run laboratories.  Several testing instruments are needed to complete the array of tests that doctors order for sick and injured Service members.  Limitations on these instruments are based on the need for trained lab technicians who must troubleshoot, interpret results, quality control, and panic values, and manually enter results.  The current methodology utilizes macro-sized technology and therefore requires a large amount of specimen to be collected from a patient.  Depending on the test and if it needs to be sent to a referral laboratory, it may take hours to days before results are received so that doctors can treat their patients.

The Theranos Device is an instrument that utilizes micro-sampling and consists of nano-technology in a plug and play format depending on the customization of the user requirements and specifications.  The device not only tests and contains lab information, but has the capability to enter other patient unique information as well such as symptoms, diet, pharmacy, physician notes, as well as other applications such as capture of biometric data (BP, pulse).  The device can run one to six samples at a time depending on unit size and configuration and can run blood, urine, stool, tissue, swabs, washes, and potentially other samples as well.  Excess sample can be saved.  The device is validated to perform in a wide range of temperature, humidity, and atmospheric pressure conditions.

The cartridges contain all the required QC, calibrators, reagents, diluent that is required for the testing.  The Cartridge can contain up to 60 assays with multiple areas of testing that can be performed in one cartridge with discrete testing and no cross reactivity.  Test menus available includes drug testing, cytokine, hematology, chemistry, bacterial, viral testing, DNA technology as well as others.  Tests that have not been developed yet can be developed in a short amount of time.  Only actual tests run are charged for.  Reflex testing is also available.  Analysis run time can run from 10 to 40 minutes depending on the cartridge configuration, although faster run times may also be available.  Cartridge storage includes room temperature and refrigeration storage.

Results of testing can be forwarded to Theranos affiliated pathology for review, locally, or both.  The manufacturer noted that potentially a lab technician would not be needed to run the Device.  Results and information are communicated from the device to a "cloud" multiple–Server type storage that can be accessed via a website.  The information can also be sent to the local medical site information systems.  As per user configuration requirements, the instrument may also display the results of lab testing or other application information.

Suggested areas of use could potentially be at Role III, II facilities (lab/patient care areas), MEDEVAC platforms, SOF units, and mortuary affairs for remains identification.  The device has the potential to vastly improve the operations of the laboratory testing through user friendly operations, decreased need for trained lab techs, improving cost and turn-around-time, and enabling medical diagnoses with an all-inclusive device that can be used in multiple platforms on land, in the air, or at sea in a fixed or transportable mode including backpack configurations.

**5**.  **RESEARCH DESIGN AND METHODS.**
*   Limited Objective Experiment (Pilot Study)

*   Two Theranos Devices will be sent from the U.S. to the CJTH Bagram Laboratory.

*   Upon arrival, both Devices will be plugged into the existing DoD network as indicated by the pre-approved Interim Authority To Test (IATT).  Once connected the Device will be able to communicate to the Theranos CLIA certified laboratory via a Theranos website.

*   Capt Blanco will be provided training on the Devices by Theranos to the required level of expertise for independent operations and minor maintenance.  Sample runs will be made to ensure proper operation, connectivity, end-to-end operation, and training objectives were met.

*   For testing, Capt Blanco will start-up the Device.  The Device will go through Start-up checks and provide screen readings that all start-up actions passed.  During start-up the Theranos website will be accessed to determine that

Confidential                                                                                      THPFM0000144543

**ER-14959**

Internet connections are on-line. Start-up and internet connection success will be recorded as per Device feedback.

- Theater configured cartridges will be used for the testing in the Device.
- Capt Blanco will receive specimens that have been de-identified per the standard operating procedures (SOP) in attachment 3 to prepare testing samples and record testing results.
- The LOE team and Capt Blanco will determine which tests will be run on each sample based on pre-existing clinical results (see SOP for procedures to keep sample de-indentified) and the matrix at Attachment 1.
- The matrix at Attachment 1 will be completed to the fullest extent possible based on sample availability, laboratory testing availability, and Theranos test funding.
- Device will perform analysis of the sample and electronically send preliminary results to Theranos. Theranos will review and finalize results sending back final results via Theranos website to Capt Blanco and on screen of Theranos Device.
- Results of turn-around time and laboratory results will be recorded from Theranos Device and pre-existing lab instrumentation. Turn-around-times will be measured in minutes and lab results will be measured according to the specific test. Recording vehicle will be on the LOE Analysis Team spreadsheet.
- Results provided by Capt Blanco will be analyzed by the LOE Analysis Team and findings will be recorded in the USCENTCOM Final Report.
- Capt Blanco will complete the Theranos LOE Questionnaire (see Attachment 2). These data will support findings documented in the USCENTCOM Final Report.

**6. TARGET POPULATION.** Samples will be selected from pre-existing laboratory specimens drawn for diagnostic related laboratory testing. No additional samples will be drawn from the patient for this LOE.

**6.1 Sample Characteristics**

**Subjects.** Samples will be selected from pre-existing, leftover laboratory specimens of active duty US service members (18 years of age or older) that will be de-identified prior to testing. These will be selected from leftover samples from physician ordered laboratory tests that are collected during the execution of the protocol. The testing will occur over a 28 day period and will consist of approximately 100 specimens, but may vary depending on the original sample and the type of testing performed on it. Depending on the test run the specimen may be required to be whole blood, serum, or plasma. The device test cartridges are capable of multiple tests per cartridge, so one specimen may have several tests run on it in one cartridge. The maximum expected number of tests/assays run will be 400 per device for a total of 800 tests. The maximum expected number of tests on the pre-existing instrumentation is half the number on the Theranos devices combined at 400 tests. Each sample will be run on each Theranos device and on the pre-existing instrumentation.

Attachment 1 lists the types of tests to be performed and the number of tests to be performed by each device for each type of test (8 to 12 tests per device for each type of test). On average, 4 to 6 samples will be tested per day during the 28 day period. Once on site, the actual number of tests per sample will be adjusted by the LOE Analysis Team and Capt Blanco based on sample availability; some samples will have less number of tests, some will have more. The specific types of tests to be tested for each sample will be selected to ensure that each type of test is performed at least once during the test period in the event that CJTH operational tempo (OPTEMPO) restricts lab analyses. (For example, tests 2 through 4 listed in Attachment 1 could be run on Sample 1, tests 5 through 8 listed in Attachment 1 could be run on Sample 2, and so on.)

The LOE Analysis Team and Capt Blanco will minimize the effect on lab resources by using pre-existing, de-identified clinical results. Priority will be given to selecting tests with known results first. Overall priority will be to ensure that each type of test is performed at least once during the test period.

The Protocol meets all requirements in 4.a through 4.g of the Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable dated 26 April 2006. Specifically, the protocol:

a) Meets the IDE exemption criteria at 21 CFR 812.2(c) (3) since the samples will be selected from leftover samples from physician ordered laboratory tests that are collected during the execution of the protocol and therefore:
    (i) is noninvasive,

(ii) does not require an invasive sampling procedure that presents significant risk,
(iii) does not by design or intention introduce energy into a subject, and
(iv) is not used as a diagnostic procedure without confirmation of the diagnosis by another, medically established diagnostic product or procedure.

b) The study uses leftover specimens, that is, remnants of specimens collected for routine clinical care or analysis that would have been discarded.

c) The specimens are not individually identifiable, i.e., the identity of the subject is not known to and may not readily be ascertained by the investigator or any other individuals associated with the investigation, including the sponsor. The CJTH SOP for de-identifying specimens (Attachment 3) will ensure that neither the investigator(s) nor any other individuals associated with the investigation or the sponsor can link the specimen to the subject from whom the specimen was collected, either directly or indirectly through coding systems. The LOE final report resulting from this investigation will not contain any patient identifiable information.

d) The specimens after de-identification will be accompanied by results of physician-ordered clinical tests. These clinical results will only be included in the study if like tests are performed on the Theranos devices. Clinical results not used in the study will be destroyed and not included in the study.

e) The individuals caring for the patients will be different from and do not share information about the patient with those conducting the investigation. The assessment team will use a dedicated laboratory technician, Capt Blanco, to participate in the LOE, who will not be involved in direct care of the patients from whom the specimens were taken.

f) The CJTH SOP for de-identifying samples will ensure specimens are provided to Capt Blanco without identifiers. The CJTH has established policies and procedures to ensure compliance with HIPAA requirement to prevent the release of personal information.

g) The study will be reviewed by an IRB in accordance with 21 CFR Part 56, except as described in section 7 of this guidance document.

**6.2. Inclusion Criteria.** Specimens will be utilized that will be consistent with the requirements of the particular test. This may include whole blood, serum, or plasma. Amount needed for test will be considered although this technology utilizes micro-samples so should be a minimal restriction. Specimen patient age should be 18 or older.

**6.3. Exclusion Criteria.** Specimens that do not meet testing criteria should not be used (example: if test requires whole blood, serum should not be used and vice versa.) Clotted, hemolyzed, lipemic, or other factors that could interfere with the test should not be used. Specimen patient age under 18 should not be used.

**6.4. Informed Consent**.

We are requesting the IRB allow the samples to be used in this study without gaining informed consent, and affirm that we will abide by all the requirements in the FDA Guidance Document for use of leftover specimens whereby the FDA states they will utilize enforcement discretion regarding informed consent provided specific requirements are met.

**7.0. Data/Specimen Collection.**

**7.1 Collection Procedures**.
- Candidate specimens will be hand selected by laboratory technicians not associated with the investigation and separated out into appropriate collection tubes. Selection of specimens will be based on quantity of specimen, age of patient (18 or older), and sample type required for the assay (whole blood, serum, plasma). Specimen will also be examined for anything that would interfere with the test (clots, hemolysis, fibrin, etc.). The de-identified samples tested on the Theranos devices and existing equipment for this research will be destroyed once testing is completed in accordance with the SOP.

- Data Elements To Be Collected:

| Variable | Source | Operational Specification |
|---|---|---|
| IT Compatibility | Network Communications | N/A |
| User Friendly Operability | Direct Observation and User Surveys | N/A |
| Task Elapsed Times | Recorded Start/Stop Times | N/A |
| Lab Result Comparison | Device/Instrument Printout | N/A |

CJTH Protocol 26 September 2012                Page 8 of 25

Confidential                                                                                                   THPFM0000144545

| Size, weight and floor space metrics | Direct measurement recorded on data logs | N/A |
|---|---|---|

- 

The LOE members are civilian personnel operating under approved orders, travel documents, and theater clearances (as required). The LOE Analysis Team will be deployed for 28 days to the CJTH Bagram Laboratory to observe the tests on the devices. Laboratory staff not associated with the investigation will provide de-indentified specimens from to be used on the Theranos device IAW the SOP. Capt Blanco will provide input on user operability of Device. The LOE members will record the test results and turn-around times for the existing laboratory equipment and the Theranos device.

- LOE Analysis Team will not have direct access to the de-identified specimens for testing. LOE Analysis Team will only be observing Capt Blanco operate the device with specimens that were previously de-identified by laboratory staff not associated with the investigation.
- Data will be assembled into a final report that will be provided to the CDR, US Central Command, and the Office of the Secretary of Defense for Acquisition, Technology, and Logistics (OSD/AT&L).

**7.2 Data Management and Storage.**
- The data will be collected both electronically and by hard copy in the laboratory.
- Analyzer equipment data will be collected off data logs, if available, from the analyzer equipment. For analyzers which do not provide electronic data logs, the analysis team will record test results manually via a hard copy test results log (Attachment 4). Both electronic logs and hard copy test results will be transferred to spreadsheets on the analysis team laptops which will use PGP whole disc encryption" software on their laptops for data protection.
- All partial electronic data logs and hard copies will be deleted or destroyed once the data has been entered into the analysis team laptops.
- Capt Blanco and the LOE Analysis Team will have access to the study data. Due to the operational nature of the study and the rotating lab personnel, additional names and positions of these government personnel will be documented prior to the start of the study. Current names and organizations follow:
  - Capt Katrina R. Blanco (CJTH)
- The following LOE Analysis Team will have access to the study data:
  - Mr. Humberto Ibarra (AMERICAN SYSTEMS Analyst)
  - Mr. Kenneth Sanchez (AMERICAN SYSTEMS Analyst)
  - Mr. Jason Pagan (AMERICAN SYSTEMS Analyst)
- At the completion of this study, data will be stored using approved hard disk encryption software by the Principal Investigator at HQ, USCENTCOM
- Data will be stored for 90 days following submittal of the final report.
- Data will be assembled into a final report that will be provided to the CDR, US Central Command, and the Office of the Secretary of Defense for Acquisition, Technology, and Logistics (OSD/AT&L).

**7.3 Specimen Management and Storage.**
- Previously run specimens that are selected for the study will be aliquoted into separate tubes from the original specimen and labeled in a de-indentified manner. (Example: Sample 1, Sample 2, etc.). Samples will be stored in test tube racks or equivalent at temperatures in accordance with the type of sample and test that is required. For example, some specimens require room temperature storage and others require refrigerated. On-site lab technicians will maintain proper storage before testing is performed and following completion of testing. Once results are recorded, specimens are no longer required.
- Storage of specimens will occur within the Bagram CJTH Laboratory.
- De-identified specimens will be stored until time of testing on all Devices and pre-existing lab equipment is complete and recorded properly.
- Specimens will be disposed of in accordance with standard disposal processes once testing is completed and recorded information is determined to be complete.

**7.4 Confidentiality Protection.**
- All specimens and collected results run on either the Device or the pre-existing instruments will be de-identified prior to release to Capt Blanco.. There will be no coded identifiers to link specimen to patient.
- There will be no unique identifiers linking the sample to the patient from whom the specimen originated. Generic labeling (Sample 1, Sample 2) will be utilized so results will be connected to de-identified specimen only.
- The only master list will be the sample numbers to link the results of the de-identified specimens run on the existing laboratory equipment to the specimens run on the Theranos device.

**8.0 Statistical Analysis.** There are four categories of data to be collected for the LOE:

Confidential

THPFM0000144546

1. Analyzer results (existing lab equipment and Theranos analyzer): There will be no statistical analysis performed on these data. The report will list the tests performed and the results of the tests for the existing laboratory equipment and the Theranos analyzer for each specimen sample.
2. Timed events (e.g., sample preparation times, analyzer run times): Depending on the results, the data will be presented as mean values with standard deviations noted, or, if warranted, plotted to show distribution, identified learning curve, etc. Outliers will be identified during the testing and investigated to determine their cause.
3. Hard metrics (size and weight of the analyzers, floor space, etc.): Metrics will be recorded and findings included in the final report. No statistical analysis will be performed on these data.
4. Subjective data (user ratings on specific characteristics of the devices): Data will be captured by the use of questionnaires (see Attachment 2) using a Likert scale, requesting the users to rate the different aspects of the analyzers. Results will be presented as bar charts showing the distribution of responses. Outliers will be identified and investigated during the execution of the LOE and results presented in narrative format in the final report.

**8.1 Sample Size.**
Each test will be performed on pre-existing equipment and on each Theranos device. Approximately a maximum total of 400 tests will be performed on each set of equipment. Each specific test will be run approximately 8 to 12 times as per Attachment 1 matrix. At this small sample size, there will be no statistical analysis accomplished. This sample size was determined based on the planned availability of the existing laboratory equipment due to an expected OPTEMPO, duration of test (28 days), the expected number of tests/test specimens available, and budgetary considerations. The analyzer results will be a simple side-by-side data comparison. The report will list the tests performed and the results of the tests for the existing laboratory equipment and the Theranos analyzer for each specimen sample.

**9.0 Reporting Unexpected Problems to the IRB.**

Unanticipated problems involving risk to volunteers or others will be promptly reported by phone (301-619-2165), by e-mail (irboffice@amedd.army.mil), or by facsimile (301-619-4165) to the U.S. Army Medical Research and Materiel Command's Office of Research Protections, Institutional Review Board Office. A complete written report will follow the initial notification. In addition to the methods above, the complete report will be sent to the U.S. Army Medical Research and Materiel Command, ATTN: MCMR-RP, 504 Scott Street, Fort Detrick, Maryland 21702-5012.

**10.0  Risks/Benefits Assessment.**

**10.1  Risks.**
Utilization of pre-existing specimens can potentially have risks in relation to breaching privacy or confidentiality, and may apply to individuals or groups to which they belong. In order to minimize the potential risk, specimens will be selected and de-identified by laboratory staff before being introduced for LOE analysis. Samples will be labeled generically as Sample 1, Sample 2, etc. and carry no identifying data. Clinical results accompanying the de-identified sample will not carry no identifying data or coding.

Potential risk to laboratory staff who de-identify the laboratory specimens and Capt Blanco will be exposure to body fluid substances in the form of whole blood, serum, or plasma and exposure to reagents in the testing device or pre-existing instrumentation. The laboratory staff and Capt Blanco will follow appropriate Body Fluid Exposure and Safety measures to protect against these potential risks. The laboratory will have and the laboratory staff who de-identify and Capt Blanco will utilize personal protective equipment to protect against exposure, which will include lab coat, gloves, eye protection when appropriate to prevent splash, hood if transfer is needed, and any other PPE appropriate to the procedure. The laboratory will have a Material Safety Data Sheet (MSDS) book available for safety reference on applicable reagents and supplies.

Potential risk to the LOE Analysis Team will be exposure to body fluid substances in the form of whole blood, serum, or plasma and exposure to reagents in the testing Device or pre-existing instrumentation. This exposure is assessed to be minimal since the LOE Analysis Team will not be physically handling any samples. However, the laboratory will provide personal protective equipment to protect against exposure, which will include lab coat, gloves, eye protection when appropriate to prevent splash, hood if transfer is needed, and any other PPE appropriate to the procedure. Body Fluid Exposure and Safety measures will be maintained as required by functional laboratories. The laboratory MSDS will also be available for the LOE Analysis Team.

**10.2 Potential Benefits.** The potential benefits is the determination that this new class of device technology works and provides benefits of nano-technology, micro-sampling, and one stop rapid turn-around-time testing in the treatment of ill and wounded military personnel both in the U.S. and deployment theater arenas. This technology could substantially improve the care and time to treatment of patients. The ultimate goal is to improve the chances of recovery and prevent unnecessary death.

**11.0  REFERENCES.**
1.  Theranos Website – October 2011
2.  Theranos Site Visit and Briefing – October 2011
3.  Theranos Information Paper – Assembled by CENTCOM Surgeons Office – October 2011
4.  Theranos Quad Chart – Assembled by CENTCOM Surgeons Office – January 2012
5.  Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable - April 2006.

**12.0  TIME REQUIRED TO COMPLETE THE RESEARCH (INCLUDING DATA ANALYSIS).**  Ninety Days.

Confidential                                                                                                    THPFM0000144548

**ER-14964**

**Attachment 1**
**Proposed Types of Tests and the Number of Tests per Device**

| TEST TYPE | Specimen | Theranos Device 1 Test # | Theranos Device 2 Test # | Current Instrumentation |
|---|---|---|---|---|
| Theranos Suggested Test Numbers (Not Cartridges) | | | | |
| Test Breakdown | | | | |
| CBC | Whole Blood | 12 | 12 | 12 |
| Sodium | Plasma | 12 | 12 | 12 |
| Potassium | Plasma | 12 | 12 | 12 |
| Chloride | Plasma | 12 | 12 | 12 |
| Bicarb | Plasma | 12 | 12 | 12 |
| Blood Urea Nitrogen | Plasma | 12 | 12 | 12 |
| Creatinine | Plasma | 12 | 12 | 12 |
| Glucose | Plasma | 12 | 12 | 12 |
| Calcium | Plasma | 12 | 12 | 12 |
| Magnesium | Plasma | 12 | 12 | 12 |
| Phosphorus | Plasma | 12 | 12 | 12 |
| Anion Gap | Calculated | 8 | 8 | 8 |
| Total Protein | Plasma | 12 | 12 | 12 |
| Albumin | Plasma | 12 | 12 | 12 |
| Total Bilirubin | Plasma | 12 | 12 | 12 |
| Alkaline Phosphatase | Plasma | 12 | 12 | 12 |
| AST | Plasma | 12 | 12 | 12 |
| ALT | Plasma | 12 | 12 | 12 |
| Amylase | Plasma | 12 | 12 | 12 |
| Lipase | Plasma | 12 | 12 | 12 |
| PT | Whole Blood | 8 | 8 | 8 |
| PTT | Whole Blood | 8 | 8 | 8 |
| INR | Calculated | 8 | 8 | 8 |
| Creatinine Kinase | Plasma | 12 | 12 | 12 |
| Troponin I | Whole Blood | 12 | 12 | 12 |
| ABG | Whole Blood | 6 | 6 | 6 |
| Lactate | Plasma | 6 | 6 | 6 |
| Base Excess/Deficit | Whole Blood | 8 | 8 | 8 |
| ABO Blood Type | EDTA - RBC | 12 | 12 | 12 |
| Rh Blood Type | EDTA - RBC | 12 | 12 | 12 |
| Cholesterol | Plasma | 12 | 12 | 12 |
| Triglyceride | Plasma | 12 | 12 | 12 |
| HDL Chol | Plasma | 12 | 12 | 12 |
| LDL Chol | Plasma | 12 | 12 | 12 |
| VLDL Chol | Plasma | 12 | 12 | 12 |
| Chol/HDL Chol | Plasma | 12 | 12 | 12 |
| TOTAL for Current Instrumentation | | | | 400 |
| TOTAL per Theranos Device | | 400 | 400 | |
| TOTAL for Theranos Devices and Current Instrumentation | | 800 | | 400 |

Confidential

THPFM0000144549

**ER-14965**

**Attachment 2**
## Theranos LOE Questionnaire

*The information you provide will be on a __non-attribution__ basis. Therefore, full freedom of expression is encouraged being that others will not later attribute your statements to you. Your name will only be used by data collectors for follow-up interviews when additional information is needed.*

*Thank you for your participation.*

Respondent Name (Title, First, Last): _____ Date: _____

Job Position: _____ Years in this Position: _____

Telephone Contact: _____ Email: _____

Please **circle** the most appropriate response and provide comments to amplify the response. Comments are highly encouraged as they provide the distinctions to qualify the answer. Comments are especially encouraged for "Highly Agree" or "Highly Disagree" responses.

| 1.   The Theranos reporting file format was clear.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____
_____
_____
_____
_____

| 2.   The current laboratory systems reporting file format was clear.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____
_____
_____
_____
_____

| 3.   The Theranos reporting file format was clearer than the current laboratory systems reporting file format.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____
_____
_____
_____
_____

Confidential                    THPFM0000144550

**ER-14966**

| 4. The Theranos reporting delivery mode was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 5. The current laboratory systems reporting delivery mode was clear. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 6. The Theranos reporting delivery mode was clearer than the current laboratory systems reporting delivery mode. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 7. The Theranos screen menus were easy to read and understand. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

Confidential

THPFM0000144551

ER-14967

| 8.   It was easy to access the test results on the Theranos devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 9.   It was easy to access the test results from the current laboratory devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 10.  It was easier to access the test results on the Theranos devices than from the current laboratory devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 11.  It was easy to download results on the Theranos devices.  Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

ER-14968

| 12. It was easy to access past test results on the Theranos devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 13. It was easy to access past test results from the current laboratory devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 14. It was easier to access past test results on the Theranos devices than from the current laboratory devices. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 15. The Theranos device was easy to operate and program. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144553

**ER-14969**

| 16. It was easy to select the appropriate cartridge for each specific set of tests. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 17. The Theranos device was easier to operate than the current laboratory equipment. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 18. The Theranos device was easier to set-up than the current laboratory equipment. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 19. The Theranos device and procedures overall training was adequate. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144554

**ER-14970**

| 20. The Theranos device hands-on training was adequate. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 21. The design of the Theranos device is adequate to allow a certified laboratory technician to operate it after initial training. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 22. The Theranos device manuals were adequate to support set-up of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 23. The Theranos device manuals were adequate to support operation of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential THPFM0000144555

ER-14971

| 24. The Theranos device manuals were adequate to support trouble-shooting of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 25. The Theranos device manuals were adequate to support maintenance of the system. Why? | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 26. The Theranos device operated on the Internet without incident. Please provide any examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

| 27. The Theranos device **did not** interfere with other clinic equipment. Please provide examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144556

**ER-14972**

| 28.  The Theranos device **was not** interfered with by other clinic equipment.  Please provide examples. | Highly Agree | Agree | Disagree | Highly Disagree | N/A |
|---|---|---|---|---|---|

Comments:_____

_____

_____

_____

_____

Confidential

THPFM0000144557

**ER-14973**

**Attachment 3**

BY ORDER OF THE CHIEF, LABORATORY SERVICES        SGSAL 44-AD-140
TASKFORCE MED
24 Sept 2012
Bagram AB, Afghanistan

*Administration*
**LABORATORY DE-IDENTIFICATION SOP**

1. **PURPOSE:** This operating instruction outlines sample de-identification for Theranos research testing.

2. **SCOPE:** This OI applies to all TF Med laboratory staff members providing de-edentified specimens to Capt Blanco for the Theranos Limited Objective Experiment.

3. **PRINCIPLES:** Research projects conducted in CJTH are sometimes run in the laboratory. Samples (and their associated results) for research must be de-identified for research projects.

4. **MATERIALS NEEDED:** Patient samples and associated results.

5. **PROCEDURE:**

5.1. Samples previously run for patient care will be selected for de-identification. The selection of samples will be based on the types of tests to be performed for any particular day. Capt Blanco and the LOE team will select the tests to be performed from the tests listed in Attachment 1. The selected tests will determine the type of specimen required to perform the tests (e.g., whole blood or plasma). Based on the specimen type required, the laboratory staff will randomly select the samples from available patient samples that match the sample type requirements for the day. Active duty (age 18 or older) samples will be pulled from the existing sample storage areas for Theranos study.

5.2. The results from testing already run on the patient sample will be pulled up in TC2.

5.3. Results will have all patient identification removed from them prior to printing and labeled as described in 5.4. The results will be printed for research use.

5.4. The sample will be aliquoted into a plastic pour off tube and labeled as Sample #1, etc. and provided to Capt Blanco along with the results from previous testing until enough samples are run for the study.

5.5. The aliquoted sample will be run on current lab instrumentation if any testing required has not already been run.

5.6. The aliquoted sample will be run on both Theranos analyzers and the results printed off.

_____

**Supersedes:** N/A                           **Certified by:** Capt Blanco
**OPR:** TASKFORCE MED (Capt Blanco)          **Number of printed pages:** 3

Confidential                                              THPFM0000144558

**ER-14974**

SGSAL 44-AD-140                                                24 Sept 2012

5.7.    The results will be checked for completeness then the sample will be disposed of according to biohazard requirements.

5.8.    De-identified results from current lab techniques and lab results from both research analyzers will be provided to the LOE Analysis Team.

Confidential                                               THPFM0000144559

**ER-14975**

SGSAL 44-AD-140                                        24 Sept 2012

**Reviewed/Approved**

This instruction has undergone supervisory review and is approved for implementations

SHEILA M. HANLEY, MSgt, USAF

Flight Chief, Clinical Laboratory Services

**Annual Review**

Name & Title                    Signature                    Date

_____

_____

_____

_____

_____

_____

Confidential                                        THPFM0000144560

**ER-14976**

SGSAL 44-AD-140                                                    24 Sept 2012

**Document Control**

Number of Official Copies:

Location of Copies:  Z:\EMDSS\EMDSS_SGSL_(Laboratory)\Admin\Current OIs\Admin OIs

Date of Implementation:  _____

**Revision Documentation**:  The following revisions were made to the OI following implementation.
Training was accomplished prior to implementation of the revision.

| # | Date | Summary of Revision | Training Completed | Trainer | OIC | Med Dir |
|---|------|--------------------|--------------------|---------|-----|---------|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |

Initials/Date (column group header above Trainer, OIC, Med Dir)

Confidential                                                       THPFM0000144561

**ER-14977**

Attachment 4

Test Results Log

| Sample # | Type of Test Performed | Results Theranos Device #1 | Results Theranos Device #2 | Existing Laboratory Equipment Results | |
|---|---|---|---|---|---|
| | | | | Equipment Name | Results |
| Sample 1 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 2 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 3 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 4 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Sample 5 | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Samples 6-90 (Same as Sample 5) | | | | | |

Confidential

ER-14978



**DEPARTMENT OF THE ARMY**
US ARMY MEDICAL RESEARCH AND MATERIEL COMMAND
504 SCOTT STREET
FORT DETRICK, MD 21702-5012

MCMR-RPI                                                      2 November 2012

MEMORANDUM FOR THE RECORD

SUBJECT:  IRB Approval of the Protocol, "Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device," Principal Investigator:  Eric A. Follstad, MS, Headquarters, US Central Command (USCENTCOM), MacDill AFB, FL; Performance Site: Craig Joint Theater Hospital, Bagram Air Field, Afghanistan, IRB Office Log Number M-10278

1.  The Headquarters, US Army Medical Research and Materiel Command Institutional Review Board (HQ USAMRMC IRB) serves as the IRB for research conducted within the USCENTCOM Area of Operations.  The above-referenced protocol has been reviewed for compliance with applicable human subject protection regulations.  There are no outstanding human research protections issues to be resolved.

2.  In accordance with 21 CFR 56.110(a,b), the protocol may be approved by expedited review because it involves no more than minimal risk and is included in the categories of research listed in the 9 November 1998 Notice in the Federal Register (63 FR 60364-60367) that may be reviewed by the IRB through an expedited review procedure, specifically, research on medical devices for which (i) an investigational device exemption application (21 CFR Part 812) is not required (Category 1b); and research involving materials that have been collected, or will be collected solely for nonresearch purposes (Category 5).

3.  The protocol (V 2.2, 26 September 2012, received 22 October 2012) is approved for a one-year period, 2 November 2012 – 1 November 2013, pending approval of the USFOR-A Joint Operations Area Approving Official.

4.  This *in vitro* diagnostic device investigation is approved for the use of up to 100 leftover human specimens that are not individually identifiable.

5.  This protocol meets the criteria set forth in the April 25, 2006 "Guidance for Sponsors, Institutional Review Boards, Clinical Investigators and FDA Staff:  Guidance on Informed Consent for In Vitro Diagnostic Device Studies Using Leftover Human Specimens that are Not Individually Identifiable" for use of specimens in FDA-regulated *in vitro* device studies without informed consent.

6.  A waiver of the HIPAA Privacy Rule requirement to obtain authorization for the use of protected health information in research is approved as allowed under DOD 6025.18-R, C7.9.2.2.

Confidential                                                      THPFM0000144563

**ER-14979**

MCMR-RPI
SUBJECT:  IRB Approval of the Protocol, "Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device," Principal Investigator:  Eric A. Follstad, MS, Headquarters, US Central Command (USCENTCOM), MacDill AFB, FL; Performance Site: Craig Joint Theater Hospital, Bagram Air Field, Afghanistan, IRB Office Log Number M-10278

7.  The protocol must be reviewed for continuation.  A continuing review report with a copy of the current protocol and supporting documents must be submitted in sufficient time for review and approval before the expiration date of 1 November 2013.

8.  Any modifications (including, but not limited to, changes in the principal investigator, inclusion/exclusion criteria, number of specimens to be used, or procedures) must be submitted as a written amendment for the IRB's review and approval prior to implementation.

9.  Any deviation to the protocol that may affect the safety or rights of the patients whose leftover specimens were used, or the integrity of the study must be reported to the IRB as soon as the deviation is identified.

10.  Unanticipated problems involving risk to subjects or others must be promptly reported by telephone (DSN 312-343-6240), by e-mail (irboffice@amedd.army.mil), or by facsimile (DSN 312-343-4165) to the HQ USAMRMC IRB.  A complete written report is to follow the initial notification.

11.  A final report must be submitted to the HQ USAMRMC IRB.

12.  The IRB Office point of contact for this protocol is Andrea Kline, MS, CIP at DSN 312-343-7801 or Andrea.Kline1@us.army.mil.

PITTMAN·PHILLIP· RICHARD·111492.6 0₈ 2

Digitally signed by PITTMAN.PHILLIP.RICHARD.111492.0₈ 2
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=PITTMAN.PHILLIP.RICHARD.111492.0₈ 2
Date: 2012.11.02 1₆ :0₆:40 -04'00'

PHILLIP R. PITTMAN, MD, MPH
Chair
Headquarters, US Army Medical Research
    and Materiel Command
    Institutional Review Board

2

Confidential

THPFM0000144564



**DEPARTMENT OF THE ARMY**
TASK FORCE 44 MED
BAGRAM AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

TF44-MB-B                                                                                                    6 NOV 2012

MEMORANDUM FOR Eric Follstad (Research Site: Afghanistan)

SUBJECT:  Protocol, "Limited Objective Experiment (LOE) on the Theranos Point of Service Lab Device"
M-10278, PI: Eric Follstad

1.  Congratulations.  The U.S. Army Medical Research and Materiel Command's (MRMC) Office of
Research Protections, Institutional Review Board has reviewed the above protocol and determined that it
qualified for expedited review because it involves no more than minimal risk and is included in the
categories of research listed in the 9 November 1998 Notice in the Federal Register (63 FR 60364-60367)
that may be reviewed by the IRB through an expedited review procedure.  The protocol is approved for a
one-year period, 19 October 2012 – 18 October 2013.

2.  As the USFOR-A Approving Official, I approve this research to be conducted within the Afghanistan
Theater. You may begin work on the protocol.

3.  Please retain a copy of this memorandum in your study file.

Encl

JON C. ALLISON
COL, MC, USA
Approving Official
US Forces-Afghanistan

CF:
US Army MRMC Office of Research Protections
JC2RT Study File

Confidential                                                                 THPFM0000144565

**ER-14981**

**10532**

**To:** Christian Holmes[cholmes@theranos.com]
**From:** Jeffrey Blickman
**Sent:** Mon 8/12/2013 10:36:07 PM
**Importance:** Normal
**Subject:** FW: Vit. D range/CV + PSA confirmation
**Received:** Mon 8/12/2013 10:36:08 PM

---

**From:** Daniel Young
**Sent:** Wednesday, August 07, 2013 10:53 PM
**To:** Jeffrey Blickman
**Cc:** Daniel Edlin
**Subject:** RE: Vit. D range/CV + PSA confirmation

Vit D concentration is expressed in ng/mL. Assay range: 4.0 to 150 ng/mL.  In this case, the reference range may be different from the "recommended" levels.  Here is what we can say:

| Vitamin D status | 25 OH Vitamin D |
|---|---|
| Deficiency | < 20 ng/mL |
| Insufficiency | 20 - 29 ng/mL |
| Sufficiency | 30 – 80 ng/mL |
| Toxicity | > 150 ng/mL |

If you want a reference range: 9-48 ng/mL.

I would say that the variance is <10%.  Not sure where the +/- 3 came from.

The predicate we are using has a reported CV of about 10-15%.

For PSA, I would show it as increasing.  For the graph, show an upper limit cutoff of 4.5 ng/mL.   This cutoff is for men 60-69.

Let me know if you have further questions.

-Daniel

---

**From:** Jeffrey Blickman
**Sent:** Wednesday, August 07, 2013 8:47 PM
**To:** Daniel Young
**Cc:** Daniel Edlin
**Subject:** Vit. D range/CV + PSA confirmation

Daniel, couple points around Vitamin D and PSA that we need confirmation on as it relates to our marketing/.COM material, trying to finalize this by tomorrow, please see below. Thanks in advance for your help.

We're using Vitamin D on the website as an example test result and I wanted to confirm the reference range and CV (including how that is represented). Dan said we've used 30-100 ng/mL for females and 25-80 ng/mL for males on previous reports. Since this is intended to be a generic example and published publicly, looking for the best ref range to use. Researching online, I saw that the Endocrine Society defines vitamin D deficiency below 20 ng/mL and vitamin D insufficiency between 21–29 ng/mL which looks to line up well with our 30-100 female range.

Confidential                                                                THPFM0004872636

**ER-14982**



Secondly, we make a point around test variance for our Vitamin D test as +/- 3.0 (don't have units on there now, but assume that to be ng/mL). Can you confirm that this is the correct and substantiated variance, again, this will be published on website:



Lastly, we use PSA as test trending example, see below infographic. Is this a good way to show PSA trend (down, up, down) or is it typically a continual upward progression? Would we make this more powerful to show that upward trend? Also, Elizabeth made a comment that we can measure the sensitivity in 0.1 ng/mL increments, and could show that here as well, can you confirm this? Also, what should our Y-axis be here...since there is no reference range per se, and cutoff values depend upon age, not sure what to use here.



Confidential

THPFM0004872637

**10566**

**theranos**

17.. Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

CLF 341367

California Department of Public Health

Laboratory Field Services

ATT: Facilities Licensing

850 Marina Bay Parkway, Bldg P, 1st Floor

Richmond, California 94804-6403



November 29, 2014

Dear Sir or Madam:

Please find an executed copies of Form CMS-116 regarding the addition of a
Laboratory Director to Theranos Clinical Laboratory located at 7333 Gateway Blvd,
Newark, California.  For your reference, the California License number is CLF
00341367 and the CLIA certification number is 05D2025714.  Note that LSF Forms
193 and 183 have been sent to you under separate cover.

If you have any questions or need further information, please do not hesitate to
contact me as indicated below.

Best regards,

Brad Arington

Senior Regulatory Counsel

Theranos, Inc.

1701 Page Mill Road

Palo Alto, California

P 650.856.7304

barington@theranos.com

<u>0354</u>

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

*CNF 341367*

Form Approved
OMB No. 0938-0581

# CLINICAL LABORATORY IMPROVEMENT AMENDMENTS (CLIA)
## APPLICATION FOR CERTIFICATION

## I. GENERAL INFORMATION

☐ Initial Application   ☐ Survey

☐ Change in Certificate Type

☑ Closure/Other Changes (Specify) Director Change

Effective Date November 19, 2014

**CLIA IDENTIFICATION NUMBER**

05   D 2025714

*(If an initial application leave blank, a number will be assigned)*

| FACILITY NAME | FEDERAL TAX IDENTIFICATION NUMBER |
|---|---|
| Theranos, Inc. | ▉▉▉▉▉▉ |

| EMAIL ADDRESS | TELEPHONE NO. *(Include area code)* | FAX NO. *(Include area code)* |
|---|---|---|
| labsupport@theranos.com | 650-838-9292 | 650-838-9165 |

| FACILITY ADDRESS — *Physical Location of Laboratory (Building, Floor, Suite if applicable.) Fee Coupon/Certificate will be mailed to this Address unless mailing or corporate address is specified* | MAILING/BILLING ADDRESS *(If different from facility address) send Fee Coupon or certificate* |
|---|---|

| NUMBER, STREET *(No P.O. Boxes)* | NUMBER, STREET |
|---|---|
| 7333 Gateway Blvd. | 1701 Page Mill Road |

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| Newark | CA | 94560 | Palo Alto | CA | 94304 |

| SEND CERTIFICATE TO THIS ADDRESS | SEND FEE COUPON TO THIS ADDRESS | CORPORATE ADDRESS *(If different from facility) send Fee Coupon or certificate* |
|---|---|---|
| Physical ☐ | Physical ☐ | NUMBER, STREET |
| Mailing ☐ | Mailing ☐ | 1701 Page Mill Road |
| Corporate ☑ | Corporate ☑ | |

| NAME OF DIRECTOR *(Last, First, Middle Initial)* | CITY | STATE | ZIP CODE |
|---|---|---|---|
| Sunil Dhawan, M.D. | Palo Alto | CA | 94304 |

| CREDENTIALS | FOR OFFICE USE ONLY |
|---|---|
| M.D., California License and high complexity lab director (see enclosures) | Date Received _____ |

## II. TYPE OF CERTIFICATE REQUESTED *((Check only one) Please refer to the accompanying instructions for inspection and certificate testing requirements)*

☐ Certificate of Waiver *(Complete Sections I – VI and IX – X)*

☐ Certificate for Provider Performed Microscopy Procedures (PPM) *(Complete Sections I – X)*

☑ Certificate of Compliance *(Complete Sections I – X)*

☐ Certificate of Accreditation (Complete Sections I – X) and indicate which of the following organization(s) your laboratory is accredited by for CLIA purposes, or for which you have applied for accreditation for CLIA purposes.

☐ The Joint Commission   ☐ AOA   ☐ AABB

☐ CAP   ☐ COLA   ☐ ASHI

If you are applying for a Certificate of Accreditation, you must provide evidence of accreditation for your laboratory by an approved accreditation organization as listed above for CLIA purposes or evidence of application for such accreditation within 11 months after receipt of your Certificate of Registration.

**NOTE:** Laboratory directors performing non-waived testing (including PPM) must meet specific education, training and experience under subpart M of the CLIA regulations. Proof of these qualifications for the laboratory director must be submitted with this application.

*ORIGINAL CMS 116 SENT TO LA/CLIA FOR UPDATE*

0355

**ER-14985**

In the next three sections, indicate testing performed and annual test volume.

## VI. WAIVED TESTING

Identify the waived testing (to be) performed. Be as specific as possible. This includes each analyte test system or device used in the laboratory.
   e.g. (Rapid Strep, Acme Home Glucose Meter)

**Quidel h. pylori, BD Macro-vue RPR, leadcare II, Bio-rad Tox-see (urine drug screen)**

Indicate the **ESTIMATED TOTAL ANNUAL TEST** volume for all waived tests performed  778

☐ Check if no waived tests are performed

## VII. PPM TESTING

Identify the PPM testing (to be) performed. Be as specific as possible.
   e.g. (Potassium Hydroxide (KOH) Preps, Urine Sediment Examinations)

# NA

Indicate the **ESTIMATED TOTAL ANNUAL TEST** volume for all PPM tests performed  _____

For laboratories applying for certificate of compliance or certificate of accreditation, also include PPM test volume in the specialty/subspecialty category and the "total estimated annual test volume" in section VIII.

☐ Check if no PPM tests are performed

If additional space is needed, check here ☐ and attach additional information using the same format.

## VIII. NON-WAIVED TESTING *(Including PPM testing if applying for a Certificate of Compliance or Accreditation)*

If you perform testing other than or in addition to waived tests, complete the information below. If applying for one certificate for multiple sites, the total volume should include testing for ALL sites.

Place a check (✓) in the box preceding each specialty/subspecialty in which the laboratory performs testing. Enter the estimated annual test volume for each specialty. Do not include testing not subject to CLIA, waived tests, or tests run for quality control, calculations, quality assurance or proficiency testing when calculating test volume. (For additional guidance on counting test volume, see the instructions included with the application package.)

If applying for a Certificate of Accreditation, indicate the name of the Accreditation Organization beside the applicable specialty/subspecialty for which you are accredited for CLIA compliance. (The Joint Commission, AOA, AABB, CAP, COLA or ASHI)

| SPECIALTY / SUBSPECIALTY | ACCREDITING ORGANIZATION | ANNUAL TEST VOLUME | SPECIALTY / SUBSPECIALTY | ACCREDITING ORGANIZATION | ANNUAL TEST VOLUME |
|---|---|---|---|---|---|
| HISTOCOMPATIBILITY 010 | | | HEMATOLOGY 400 | | 18147 |
| ☐ Transplant | | | ☑ Hematology | | |
| ☐ Nontransplant | | | IMMUNOHEMATOLOGY | | 200 |
| MICROBIOLOGY | | 369 | ☑ ABO Group & Rh Group 510 | | |
| ☑ Bacteriology 110 | | | ☐ Antibody Detection (transfusion) 520 | | |
| ☐ Mycobacteriology 115 | | | ☐ Antibody Detection (nontransfusion) 530 | | |
| ☐ Mycology 120 | | | ☐ Antibody Identification 540 | | |
| ☐ Parasitology 130 | | | ☐ Compatibility Testing 550 | | |
| ☑ Virology 140 | | | PATHOLOGY | | |
| DIAGNOSTIC IMMUNOLOGY | | 400 | ☐ Histopathology 610 | | |
| ☑ Syphilis Serology 210 | | | ☐ Oral Pathology 620 | | |
| ☑ General Immunology 220 | | | ☐ Cytology 630 | | |
| CHEMISTRY | | 28102 | RADIOBIOASSAY 800 | | |
| ☑ Routine 310 | | | ☐ Radiobioassay | | |
| ☑ Urinalysis 320 | | | CLINICAL CYTOGENETICS 900 | | |
| ☑ Endocrinology 330 | | | ☐ Clinical Cytogenetics | | |
| ☑ Toxicology 340 | | | TOTAL ESTIMATED ANNUAL TEST VOLUME | | 0356 |

## IX. TYPE OF CONTROL (check the one most descriptive of ownership type)

| VOLUNTARY NONPROFIT | FOR PROFIT | GOVERNMENT |
|---|---|---|
| ☐ 01 Religious Affiliation | ☒ 04 Proprietary | ☐ 05 City |
| ☐ 02 Private Nonprofit | | ☐ 06 County |
| ☐ 03 Other Nonprofit | | ☐ 07 State |
| | | ☐ 08 Federal |
| | | ☐ 09 Other Government |
| _____ *(Specify)* | | _____ *(Specify)* |

## X. DIRECTOR AFFILIATION WITH OTHER LABORATORIES

If the director of this laboratory serves as director for additional laboratories that are separately certified, please complete the following:

| CLIA NUMBER | NAME OF LABORATORY |
|---|---|
| 05D0866311 | East Bay Dermatology Medical Group |
| | |
| | |
| | |
| | |

---

### ATTENTION: READ THE FOLLOWING CAREFULLY BEFORE SIGNING APPLICATION

Any person who intentionally violates any requirement of section 353 of the Public Health Service Act as amended or any regulation promulgated thereunder shall be imprisoned for not more than 1 year or fined under title 18, United States Code or both, except that if the conviction is for a second or subsequent violation of such a requirement such person shall be imprisoned for not more than 3 years or fined in accordance with title 18, United States Code or both.

Consent: The applicant hereby agrees that such laboratory identified herein will be operated in accordance with applicable standards found necessary by the Secretary of Health and Human Services to carry out the purposes of section 353 of the Public Health Service Act as amended. The applicant further agrees to permit the Secretary, or any Federal officer or employee duly designated by the Secretary, to inspect the laboratory and its operations and its pertinent records at any reasonable time and to furnish any requested information or materials necessary to determine the laboratory's eligibility or continued eligibility for its certificate or continued compliance with CLIA requirements.

| SIGNATURE OF OWNER/DIRECTOR OF LABORATORY *(Sign in ink)* | DATE |
|---|---|
| | |

NOTE: Completed 116 applications must be sent to your local State Agency.

SEE ATTACHED LIST OF STATE AGENCY CONTACT INFORMATION.

**http://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/Downloads/CLIASA.pdf**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0581. The time required to complete this information collection is estimated to average 30 minutes to 2 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, Attn: PRA Reports Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

0357

Form CMS-116 (01/14)                                                                                                    4

**ER-14987**

State of California—Health and Human Services Agency                                                California Department of Public Health

## DIRECTOR'S ATTESTATION

I attest that effective  November 19, 2014 _____, I am the laboratory director, or a co-director of:
                                                         (date)

Theranos, Inc. _____ clinical laboratory, located at
                                              (name of laboratory)

7333 Gateway Blvd, Newark, California 94560 _____
                                                         (street address)

**CLIA number:** 05D2025714 _____   **State ID number (if known):** CLF 00341367 _____

As the director or co-director, I assume all directorship responsibilities for CLIA and State of California purposes. I understand that as a director of this laboratory, I am responsible for the accuracy and reliability of all testing performed by the laboratory and for ensuring that the laboratory meets all applicable CLIA and state requirements as stipulated in both federal and California laws (Code of Federal Regulations [CFR], Title 42, Sections 493.1407, 493.1445; California Business and Professions Code [BPC], Section 1209).

I understand that I will be held jointly and severally responsible with the laboratory owner(s) for any violations of law by this clinical laboratory (BPC Section 1265(b)). If deficient or unlawful practices are found that occurred while I was serving as laboratory director or co-director, which the laboratory fails or is unable to correct, and which results in the revocation of the laboratory's CLIA certificate or state license or registration, I understand that pursuant to Title 42 of the United States Code (USC), Section 263a(i)(3), 42 CFR 493.1840(a)(8), and BPC Section 1324, I would be prohibited from owning, operating, or directing another clinical laboratory for a period of at least two years from the date of revocation. Such action may also be grounds for referral to the Medical Board of California or other licensing board for appropriate action.

I understand that any false statement or representation of material fact in obtaining or retaining CLIA certification or state licensure or registration may be grounds for revocation of the laboratory's CLIA certificate under 42 CFR 493.1840(a)(1), and state license or registration under BPC Section 1320(f).

I understand that I will be responsible, along with the laboratory owner(s), to notify the Department of Public Health in writing of any changes in the laboratory ownership, directorship, name or location within **thirty days** of the change, and that failure to provide such notification will result in automatic revocation of the state license or registration (BPC Section 1265(g)), and sanctions against the CLIA certificate (42 CFR 493.39(b), 493.45(b)(2), 493.51(a), 493.53(a), 493.57(a)(2), and 493.63(a)).

I understand that I will continue to be held responsible as a laboratory director of this laboratory until the day that the California Department of Public Health **receives** a signed statement from me notifying the Department of my resignation or termination.

I affirm under penalty of perjury, that all information I have given in this document is true.

| | |
|---|---|
| _Sunil S. Dhawan_ _____ | 11/20/14 _____ |
| Director's signature | Date |
| **Sunil S. Dhawan, MD** _____ | CLIA Director:  ☑ Yes  ☐ No |
| Print or type director's name and title | |
| ███████████████████████ | |
| Director's address (as recorded on personal professional license) | |
| ████████ | |
| Director's direct contact telephone number | _Or_  California Board license number: 53340 ____ |
| | California Director license number: _____ |

LAB 183 (7/07)                                                                                          0358

**ER-14988**

Case: 22-10312, 04/17/2023, ID: 12696875, DktEntry: 22-53, Page 66 of 300

ER-14989

0359

# UNIVERSITY OF SOUTHERN CALIFORNIA

The Trustees of the University by virtue of the authority vested
in them and on the recommendation of the faculty of

## THE SCHOOL OF MEDICINE

have conferred the degree of

## DOCTOR OF MEDICINE

on

## SUNIL DHAWAN

who has successfully completed the requirements

Given at Los Angeles, in the State of California, on the thirteenth day of May,
in the year of our Lord, one thousand nine hundred and eighty-three

*James H. Zumberge*
President of the University

*[signature]*
Chairman of the Board of Trustees



*Allan W. Meeting Jr.*
Date



**The Medical Board of California**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815

### PHYSICIAN AND SURGEON

CERTIFICATE NO.   G53340    EXPIRATION    04/30/2016

**SUNIL S DHAWAN**

ORIGINAL
ISSUANCE DATE    RECEIPT NO.
08/06/1984        40600071

<u>0360</u>

**ER-14990**

**THERANOS, INC.**

---

**ACTION BY UNANIMOUS WRITTEN CONSENT**

**OF THE BOARD OF DIRECTORS**

---

In accordance with Section 141(f) of the Delaware General Corporation Law and the Bylaws

of Theranos, Inc., a Delaware corporation (the "***Company***"), the undersigned, constituting all of the

members of the Company's Board of Directors (the "***Board***"), hereby adopt the following

resolutions, which shall be filed with the minutes of proceedings of this Board and shall be effective

as of the date this Action by Unanimous Written Consent has been executed by all directors of the

Company:

**AMENDMENT AND RESTATEMENT OF CERTIFICATE OF INCORPORATION**

**WHEREAS**, on January 14, 2013, the Board adopted the Company's sixth Amended and
Restated Certificate of Incorporation (the "***Prior Charter***"), which was subsequently approved
by the holders of a majority of the Company's common stock, $0.0001 par value per share (the
"***Common Stock***") and the Company's preferred stock, $0.0001 par value per share (the
"***Preferred Stock***") voting together as a class on an as converted to Common Stock basis and
filed with the Secretary of State of Delaware on March 28, 2013.

**WHEREAS**, the Board desires to replace the Prior Charter by filing a certificate of correction in
the form attached hereto as Exhibit A (the "***Certificate of Correction***") and subsequently filing
the Restated Certificate (as defined below).

**WHEREAS**, the Board authorized a special committee of the Board (the "***Special Committee***"),
consisting only of directors who are independent of the Company's management and the founder
of the Company, Elizabeth Holmes (the "***Founder***"), and who are disinterested and independent
with respect to the matters discussed herein, to consider and review potential changes to the
Company's certificate of incorporation going forward.

**WHEREAS**, after revoking the Prior Charter by the filing of the Certificate of Correction, the
Company's current charter will temporarily be its fifth Amended and Restated Certificate of
Incorporation (the "***Fifth Charter***"), which the Special Committee desires to amend and restate
in its entirety by adopting a sixth Amended and Restated Certificate of Incorporation in the form
attached hereto as Exhibit B and all of the terms of which are incorporated herein by reference

Confidential

THER-AZ-01126580

(the "***Restated Certificate***"), in order to re-implement certain of the changes contemplated in the Prior Charter as well as additional changes the Special Committee and the Board believe are in the best interests of the Company and its stockholders.

**WHEREAS**, the Restated Certificate would, among other things: (i) authorize 725,000,000 shares of a new class of capital stock of the Company, the Class A Common Stock, par value $0.0001 per share (the "***Class A Common Stock***"), and establish the rights and restrictions thereof, including, without limitation, that the holders of the Class A Common Stock shall be entitled to one (1) vote for each share thereof held; (ii) authorize 250,658,055 shares of a new class of capital stock of the Company, the Class B Common Stock, par value $0.0001 per share (the "***Class B Common Stock***"), and establish the rights and restrictions thereof, including, without limitation, that the holders of the Class B Common Stock shall be entitled to one hundred (100) votes for each share thereof held; (iii) reclassify all outstanding shares of the Common Stock into Class A Common Stock; (iv) increase the authorized number of shares of the Preferred Stock, to 225,000,000 shares; (v) adopt certain protective provisions, as set forth in the new Article V, Section 10(a) of the Restated Certificate, including, without limitation, that for so long as any shares of Class B Common Stock remain outstanding, to the extent not otherwise authorized by the Board (including the affirmative approval of a member of the Board that is also a holder of the Class B Common Stock), the prior written consent (or affirmative vote) of the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, shall be required to authorize the Company (or to authorize or permit any subsidiary of the Company) to: (a) acquire equity or assets of an entity or business or person, involving consideration in excess of $25.0 million (other than acquisitions of securities pursuant to portfolio investment decisions in the ordinary course of business), (b) sell, convey, transfer, lease, or otherwise dispose of any of the assets of the Company involving consideration in excess of $25.0 million (other than dispositions and transfers of securities pursuant to portfolio investment decisions in the ordinary course of business), (c) create, incur, assume, guarantee or otherwise be or become liable with respect to debt in excess of $25.0 million outstanding at any one time, (d) effect any material change in the nature of the Company's business, (e) create any subsidiary that is not wholly owned, directly or indirectly, by the Company, (f) issue any equity of the Company, except the issuance of shares of Class A Common Stock upon conversion of shares of Preferred Stock or Class B Common Stock pursuant to and in accordance with the provisions of the Restated Certificate or exercise of any warrants, options or other rights to acquire capital stock of the Company or grants of stock, warrants, options or other rights to purchase capital stock of the Company pursuant to a stock option plan approved by the Board, (g) by action of the Board, delegate any power or authority to a committee of the Board, (h) dissolve, liquidate, or wind up the Company or (i) file a certificate of designation, and provide that (A) in the event that any holder of Class B Common Stock is a member of the Board, at least one director that is also a holder of Class B Common Stock must be present at a meeting of the Board to establish a quorum, (B) in the event that any holder of Class B Common Stock is a member of the Board and has been appointed by the Board to a committee of the Board, the following shall be necessary to establish a quorum: (1) the presence of at least one director who is a member of such committee and also a holder of Class B

Common Stock and (2) a majority of the total number of the members of such committee and (C) except for (1) the issuance of Class B Common Stock pursuant to the Exchange Agreement (as defined below), (2) the payment of Class B Common Stock as dividends in accordance with the terms of the Restated Certificate or (3) the granting of Class B Common Stock through any split or subdivision of the Class B Common Stock, the Company shall not at any time issue any additional shares of Class B Common Stock, unless such issuance is approved by the affirmative vote of the holders of a majority of the then outstanding shares of Class B Common Stock, voting as a separate class; (vi) make explicit that the number of authorized shares of Preferred Stock, Class A Common Stock or Class B Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by an affirmative vote of the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class (without any separate class votes of the holders of the Preferred Stock, Class A Common Stock or Class B Common Stock); (vii) approve a forum selection clause establishing the Court of Chancery of the State of Delaware, to the fullest extent permitted by law, as the sole and exclusive forum for certain stockholder suits, derivative actions and for the resolution of certain other disputes; (viii) specify that the Board shall determine the manner by which the accounts and books of the Company, or any of them, shall be open to the inspection of the stockholders, and that no stockholder shall have any right to inspect any account, book, or document of the Company, unless otherwise required by law or approved by the Board; (ix) make the indemnification of the Company's officers and directors under the Restated Certificate mandatory instead of permissive; (x) make the Series A Preferred Stock participating with respect to the distribution of the assets remaining after payment of the preferred liquidation preferences in a liquidation event; and (xi) institute various other changes, including, without limitation, to (a) increase the authorized number of shares of the Company's Series C-1 Preferred Stock in order to reserve 9,666,670 shares (after giving effect to the Forward Split as defined below) for issuance pursuant to certain convertible promissory notes of the Company, (b) effect the forward stock split of the capital stock of the Company such that each outstanding share of the Common Stock is split (and will also be reclassified) into five (5) shares of Class A Common Stock and each outstanding share of the Preferred Stock is split into five (5) shares of Preferred Stock of the same series (the "***Forward Split***"), (c) make the Class A Common Stock and Preferred Stock subject to redemption, in whole or in part, by the Company at its option at a price or prices determined in good faith by the Board to be the fair market value of such Class A Common Stock or Preferred Stock, at such time or times, from such stockholder or stockholders, in such amounts, in whole or in part, and with such adjustments, as shall be determined by the Board in its sole discretion, (d) provide that the Board has sole discretion to declare a dividend or other distribution on the capital stock of the Company, at the rate or rates and on any such other terms as the Board determines in its sole discretion, including that dividends and distributions may be declared on any class or series of the Company's capital stock and not on others (except that in the event a dividend or distribution is paid in the form of capital stock of the Company (or rights to acquire capital stock of the Company), the holders of the Class A Common Stock and the holders of Class B Common Stock shall be entitled to share equally, identically and ratably, on a per share basis, in such dividends and other distributions of shares of capital stock of the Company (or rights to acquire capital stock of the Company);

*provided*, *however*, that in the event that such dividend or distribution is paid in the form of shares of Class A Common Stock or Class B Common Stock (or rights to acquire Class A Common Stock or Class B Common Stock), the holders of Class A Common Stock shall receive Class A Common Stock or rights to acquire Class A Common Stock, as the case may be, and the holders of Class B Common Stock shall receive Class B Common Stock or rights to acquire Class B Common Stock, as the case may be), (e) reflect, in applicable provisions, that there may be additional series of Preferred Stock designated by the Board, subject to certain of the proposed protective provisions approved herein, pursuant to which designation the Board may issue shares of additional series of Preferred Stock, establish from time to time the number of shares to be included in each such series, and fix the designation, powers, preferences, and rights of the shares of each such series and the qualifications, limitations or restrictions thereof, and (f) remove the requirement that the Company provide holders of the Preferred Stock with ten days prior written notice of a record date for certain Company dividends, distributions, reclassifications, recapitalizations, or the voluntary liquidation or dissolution of the Company.

**WHEREAS**, after careful consideration, the Special Committee determined that the terms and conditions of the Restated Certificate are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and adopt the Restated Certificate.

**WHEREAS**, the Board deems it to be in the best interests of the Company and its stockholders to approve and adopt the Restated Certificate.

**WHEREAS,** the Board wishes to authorize the Company to seek the approval of the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) each class and series of capital stock of the Company, (iii) with respect to the contents of the Restated Certificate, the capital stock of the Company held by stockholders who are independent of the Founder, and (iv) with respect to the contents of the Restated Certificate, the Common Stock held by stockholders who are independent of the Founder, to approve and adopt the Restated Certificate, and if that vote is not obtained, the Company should not file the Restated Certificate.

**NOW THEREFORE, BE IT RESOLVED**, that the Certificate of Correction is hereby approved, adopted, and confirmed and its advisability is hereby declared, with such Certificate of Correction to be filed immediately prior to the Restated Certificate.

**RESOLVED FURTHER,** that the Restated Certificate is hereby approved and its advisability is hereby declared.

**RESOLVED FURTHER**, that the Board hereby submits the Restated Certificate for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Restated Certificate.

**RESOLVED FURTHER,** that the officers of the Company are hereby authorized and directed to solicit and obtain the approval of the Restated Certificate by the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) each class and series of capital stock

of the Company, (iii) with respect to the contents of the Restated Certificate, the capital stock of the Company held by stockholders who are independent of the Founder, and (iv) with respect to the contents of the Restated Certificate, the Common Stock held by stockholders who are independent of the Founder, upon receipt of such approval, to execute the Restated Certificate and take all such action as such officers deem necessary or desirable to file the Restated Certificate with the Delaware Secretary of State and to cause the Restated Certificate to become effective, the taking of any such action to be conclusive evidence of such a determination by such officers.

**RESOLVED, FURTHER**, that the Board may abandon such proposed Certificate of Correction or Restated Certificate, as applicable, before or after stockholder approval thereof, without further action by stockholders at any time prior to the effectiveness of the Certificate of Correction or Restated Certificate, as applicable.

**RESOLVED, FURTHER**, that the Company's counsel and the officers of the Company be, and each of them hereby is, authorized to execute and file the Certificate of Correction.

**RESOLVED, FURTHER**, that upon receipt of stockholder approval of the Restated Certificate, the officers of the Company be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Company, to take any and all actions, to perform all such acts and things, to execute, file, deliver, or record in the name and on behalf of the Company, all such certificates, instruments, agreements, or other documents, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purpose and intent of the foregoing resolutions, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized to take such action as they may deem proper, necessary or desirable to otherwise carry out the intent of the foregoing resolutions, the taking of any such action to be conclusive evidence of such a determination by such officers.

**RESOLVED FURTHER**, that the Forward Split and the reclassification of the outstanding shares of Common Stock as Class A Common Stock will be effective upon the filing of the Restated Certificate with the Secretary of State of the State of Delaware (the "***Effective Time***").

**RESOLVED FURTHER**, that, as of the Effective Time, (x) the number of shares of Common Stock subject to outstanding awards and reserved for issuance under the Amended and Restated 2004 Stock Plan (the "***2004 Plan***") shall be proportionately adjusted pursuant to the terms of the Plan to reflect the Forward Split (and any fractional shares shall be rounded down to the nearest whole share), and the exercise or purchase price of each outstanding award thereunder shall be amended proportionately (and shall be rounded up to the nearest whole cent) and (y) the awards shall be reclassified as awards exercisable or issuable for shares of Class A Common Stock.

**RESOLVED FURTHER**, that, as of the Effective Time, the number of shares of the Company's capital stock subject to outstanding warrants or convertible notes shall be

proportionately adjusted pursuant to the terms of such instruments, the exercise price of such outstanding instruments shall be amended proportionately, and in the case of outstanding warrants or convertible notes to purchase shares of the Common Stock, shall be reclassified as warrants or convertible notes to purchase shares of Class A Common Stock.

### AMENDED AND RESTATED BYLAWS

**WHEREAS,** the Board is expressly authorized to make, alter, amend or repeal the Bylaws of the Company.

**WHEREAS**, the Board proposes to amend and restate the Amended and Restated Bylaws of the Company, in the form attached hereto as Exhibit C (the "***Amended Bylaws***"), to, among other things, (i) eliminate the right of stockholders holding shares in the aggregate entitled to cast not less than 40% of the votes at a meeting to call a special meeting of the stockholders, (ii) approve changes to the right of first refusal provision, including providing a secondary right of first refusal in favor of the Founder and a right of the Company to assign its right of first refusal to one or more designees and (iii) require all transferees of stock to enter into a joinder agreement binding them to certain provisions of the Amended Rights Agreement (defined below) and the Amended Voting Agreement (defined below).

**WHEREAS**, after careful consideration, each of the members of the Special Committee determined that the terms and conditions of the Amended Bylaws are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and adopt the Amended Bylaws.

**WHEREAS**, the Board desires to adopt and approve the Amended Bylaws.

**WHEREAS**, the Board deems it to be in the best interests of the Company to solicit stockholder approval of the Amended Bylaws from the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) each class and series of capital stock of the Company, (iii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iv) the Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the Amended Bylaws will not be so amended.

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms, and provisions of the Amended Bylaws are hereby adopted and approved in all respects.

**RESOLVED FURTHER**, that the Board hereby submits the Restated Bylaws for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Restated Bylaws.

**RESOLVED FURTHER,** that the officers of the Company be, and each of them hereby is, authorized and directed to solicit approval, ratification, and confirmation of the Amended Bylaws from the stockholders of the Company.

**RESOLVED FURTHER,** that upon approval, ratification and confirmation of the Amended Bylaws from the stockholders of the Company, the Secretary of the Company be authorized to sign the certificate of adoption of the Bylaws and take all such action as such officer deems necessary or desirable to cause the Bylaws to become effective, the taking of any such action to be conclusive evidence of such a determination by such officer.

### EXCHANGE AND ISSUANCE OF CLASS B COMMON STOCK

**WHEREAS**, the Board deems it to be in the best interests of the Company and its stockholders to provide additional incentives to the Founder in connection with her role as the Company's Chief Executive Officer and to empower the Founder to carry out her long-term vision for the Company.

**WHEREAS**, the Board has determined that exchanging all of the Founder's Class A Common Stock (including shares acquired upon exercise of options and rights) for shares of Class B Common Stock will provide the Founder with the incremental authority necessary to empower her to carry out her long-term vision for the Company, which will in turn provide significant benefits to the Company and its stockholders.

**WHEREAS**, pursuant to the Company's authorization of a new class of its capital stock, the Class B Common Stock, and subject to the effectiveness of the Restated Certificate, the Board desires to exchange all of the Founder's Class A Common Stock for shares of Class B Common Stock.

**WHEREAS**, the Board deems it to be in the best interests of the Company to enter into an exchange agreement with the Founder pursuant to which the Founder will exchange all of her shares of Class A Common Stock (including shares acquired upon exercise of options and rights) for shares of Class B Common Stock (the "*Exchange Agreement*") in the form attached hereto as Exhibit D.

**WHEREAS**, the Board deems it to be in the best interests of the Company to solicit stockholder approval of the Exchange Agreement from the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) each class and series of capital stock of the Company, (iii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iv) the Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the Class B Common Stock will not be issued pursuant to the Exchange Agreement.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board deems it to be in the best interests of the Company and its stockholders to enter into the Exchange Agreement, providing among other things that (i) the Company issue the Class B Common Stock to the Founder in exchange for the Founder's Class A Common Stock, the Founder's ongoing and future services to the Company, and an aggregate purchase price of not less than $100,000.00 (the "*Purchase Price*"), which will be satisfied by the Founder pursuant to continued service as the Company's chief executive officer for a period of one-year at a rate equal to $8,333.33 per month, provided that in the event that the

Confidential

ER-14997

THER-AZ-01126586

Founder's employment shall terminate for any reason prior to the payment in full of such amount, the balance of the Purchase Price shall be payable in cash on a monthly basis, and (ii) the Company will make a gross-up payment to the Founder to cover income taxes due by the Founder as a result of the transaction.

    **RESOLVED FURTHER**, that the Board hereby submits the Exchange Agreement for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Exchange Agreement.

    **RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to solicit and obtain the approval of the Company's stockholders of the Exchange Agreement and, upon receipt of such approval, to execute the Exchange Agreement and take all such action as such officers deem necessary or desirable to execute and deliver the Exchange Agreement, to make reasonable changes thereto as such officers may deem advisable with the advice of counsel, to execute and deliver such further certifications, agreements and assurances as may be required by virtue of the Exchange Agreement and to take such further actions as are deemed necessary and advisable to carry out the intent of these resolutions, the taking of any such action to be conclusive evidence of such a determination by such officers.

### AMENDMENTS TO THE AMENDED AND RESTATED SERIES C-1 PREFERRED STOCK PURCHASE AGREEMENT

    **WHEREAS**, pursuant to the Company's Series C-1 Preferred Stock Purchase Agreement (the "***Original Purchase Agreement***"), dated July 1, 2010, the Company sold an aggregate of 3,000,000 shares of the Company's Series C-1 Preferred Stock at a price of $15.00 per share (the "***Initial Closing***").

    **WHEREAS**, the Original Purchase Agreement provided that the Company may sell and issue up to 6,666,667 shares (which has been increased to 33,333,335 shares in connection with the Forward Split) of Series C-1 Preferred Stock, with the balance of any unsold shares being sold at one or more Subsequent Closings (as defined in the Original Purchase Agreement), to occur within 30 days of the Initial Closing, which was subsequently amended in an Amended and Restated Series C-1 Preferred Stock Purchase Agreement (the "***Prior Purchase Agreement***") to occur within 36 months after the Initial Closing.

    **WHEREAS**, since the Initial Closing, the Company has sold an aggregate of 3,977,667 shares (or 19,888,335 shares after giving effect to the Forward Split), and the balance of shares remaining unsold is 2,689,000 shares (or 13,445,000 shares after giving effect to the Forward Split) (the "***Balance***").

    **WHEREAS**, as part of previous agreements, the Company wishes to amend the Prior Purchase Agreement to enable the Company to sell up to the Balance in one or more Subsequent Closings to be held on or before December 31, 2013 and to make such other changes as set forth in the Amended and Restated Series C-1 Purchase Agreement, substantially in the form attached hereto as Exhibit E (the "***Amended and Restated Purchase Agreement***").

**NOW, THEREFORE, BE IT RESOLVED**, that the Board deems it to be in the best interests of the Company and its stockholders to amend the Prior Purchase Agreement, substantially in the manner set forth in the Amended and Restated Purchase Agreement.

**RESOLVED FURTHER**, that the Board hereby approves the sale and issuance of the Balance in one or more closings at a price of $15.00 per share (after giving effect to the Forward Split).

**RESOLVED FURTHER**, that the Board hereby submits the Amended and Restated Purchase Agreement for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Amended and Restated Purchase Agreement.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to solicit and obtain the approval of the Company's stockholders of the Amended and Restated Purchase Agreement and, upon receipt of such approval, to execute the Amended and Restated Purchase Agreement and take all such action as such officers deem necessary or desirable to execute and deliver the Amended and Restated Purchase Agreement, to execute and deliver such further certifications, agreements and assurances as may be required by virtue of the Amended and Restated Purchase Agreement and to take such further actions as are deemed necessary and advisable to carry out the intent of these resolutions, the taking of any such action to be conclusive evidence of such a determination by such officers.

### AMENDMENT AND RESTATEMENT OF INVESTORS' RIGHTS AGREEMENT

**WHEREAS**, on January 14, 2013, the Board approved certain amendments to its Amended and Restated Investors' Rights Agreement, dated July 1, 2010, by and among the Company and the parties thereto (the "*Prior Rights Agreement*"), which were subsequently approved by the holders of a majority of the Common Stock and Preferred Stock, voting together as a class on an as-converted to Common Stock basis.

**WHEREAS**, the Company wishes to amend and restate the Prior Rights Agreement, in substantially the form attached hereto as <u>Exhibit F</u> (the "*Amended Rights Agreement*"), which will, among other things, clarify or specify the following: (i) add a more explicit waiver of any rights to inspect the books and records of the Company by Investors (as defined in the Amended Rights Agreement), (ii) add a right of first refusal in favor of the Company in the event any party to the Amended Rights Agreement proposes to sell shares not otherwise subject to a right of first refusal in favor of the Company, a secondary right of first refusal in favor of the Founder and right of the Company to assign its right of first refusal to one or more designees, (iii) provide that the Company shall not, without the prior written consent of holders of at least a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights, (iv) provide that any amendment to the Amended Rights Agreement be approved by Holders (as defined in the Amended Rights Agreement) holding at least a majority of the aggregate voting power of the Registrable Securities (including assuming the conversion of all outstanding shares

of Class B Common Stock), (v) terminate the right of Initiating Holders (as defined in the Prior Rights Agreement) to demand registration of their shares prior to the Company's initial public offering, (vi) more explicitly remove the inspection rights provided under the Prior Rights Agreement for holders of more than four million shares of the Company's capital stock, and (vii) more explicitly remove the requirement to obtain the consent of Investors (as defined in the Amended Rights Agreement) to any amendment, waiver, discharge or termination of any provisions of the Amended Rights Agreement that would operate to treat any such Investor different from other Investors and materially and adversely affect such Investor's rights under the Amended Rights Agreement.

**WHEREAS**, after careful consideration, each of the members of the Special Committee determined that the terms and conditions of the Amended Rights Agreement are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and adopt the Amended Rights Agreement.

**WHEREAS**, the Board deems it to be in the best interests of the Company to solicit stockholder approval of the Amended Rights Agreement from the holders of a majority of (i) the outstanding shares of the capital stock of the Company held by stockholders who are independent of the Founder and (ii) the outstanding shares of Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the Rights Agreement will not be so amended.

**NOW, THEREFORE, BE IT RESOLVED**, that the Amended Rights Agreement is hereby adopted and approved and determined to be in the best interests of the Company and its stockholders.

**RESOLVED FURTHER**, that the Board hereby submits the Amended Rights Agreement for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Amended Rights Agreement.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to solicit and obtain the approval of the Company's stockholders of the Amended Rights Agreement and, upon receipt of such approval, to execute the Amended Rights Agreement and take all such action as such officers deem necessary or desirable to execute and deliver the Amended Rights Agreement, to make reasonable changes thereto as such officers may deem advisable with the advice of counsel, to execute and deliver such further certifications, agreements and assurances as may be required by virtue of the Amended Rights Agreement and to take such further actions as are deemed necessary and advisable to carry out the intent of these resolutions.

### AMENDMENT AND RESTATEMENT OF VOTING AGREEMENT

**WHEREAS**, on January 14, 2013, the Board approved certain amendments to its Amended and Restated Voting Agreement, dated July 1, 2010, by and among the Company and the parties thereto (the "*Prior Voting Agreement*"), which were subsequently approved by the holders of a

majority of the Common Stock and Preferred Stock, voting together as a class on an as-converted to Common Stock basis.

**WHEREAS**, the Company wishes to amend and restate the Prior Voting Agreement, in substantially the form attached hereto as <u>Exhibit G</u> (the "***Amended Voting Agreement***"), which will, among other things, provide that the Voting Parties (as defined in the Amended Voting Agreement) agree to vote all of the Company's voting securities now or hereafter owned by them, or to have all of such securities voted, to (i) explicitly waive with respect to each class of securities of the Company any rights to notice of actions taken by the stockholders of such applicable classes to any matters arising under the General Corporation Law of the State of Delaware, (ii) appoint the Founder as irrevocable proxy and grant a power of attorney to the Founder, with full power of substitution and re-substitution, to vote on behalf of each Voting Party with respect to the matters set forth in the Amended Voting Agreement, including, without limitation, election and removal of persons as members of the Board in accordance with the Amended Voting Agreement, (iii) enable certain members of the Board, initially up to five members, to be designated by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, (iv) enable the Founder to designate five members of the Board and (v) provide the Founder with the right to remove any member of the Board in her sole discretion.

**WHEREAS**, after careful consideration, each of the members of the Special Committee determined that the terms and conditions of the Amended Voting Agreement are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and adopt the Amended Voting Agreement.

**WHEREAS**, the Board deems it to be in the best interests of the Company to solicit stockholder approval of the Amended Voting Agreement from the holders of a majority of the outstanding shares of (i) the capital stock of the Company held by stockholders who are independent of the Founder and (ii) the Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the Voting Agreement will not be so amended.

**NOW, THEREFORE, BE IT RESOLVED**, that the Amended Voting Agreement is hereby approved and determined to be in the best interests of the Company and its stockholders.

**RESOLVED FURTHER**, that the Board hereby submits the Amended Voting Agreement for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Amended Voting Agreement.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to solicit and obtain the approval of the Company's stockholders of the Amended Voting Agreement and, upon receipt of such approval, to execute the Amended Voting Agreement and take all such action as such officers deem necessary or desirable to execute and deliver the Amended Voting Agreement, to make reasonable changes thereto as such officers may deem advisable with the advice of counsel, to execute and deliver such further certifications, agreements and assurances as may be

required by virtue of the Amended Voting Agreement and to take such further actions as are deemed necessary and advisable to carry out the intent of these resolutions.

### APPROVAL OF 409A VALUATION

**WHEREAS,** the Company engaged Aranca, Inc. (the "*Appraiser*") to perform an independent appraisal of the Company (after giving effect to the Forward Split but before giving effect to the reclassification of the Common Stock as Class A Common Stock) to determine the fair market value of the Common Stock for purposes of granting stock options in compliance with Section 409A of the Internal Revenue Code.

**WHEREAS,** the Appraiser has prepared a written valuation study of the Common Stock as of December 6, 2013, which study is attached to these minutes as Exhibit H and the valuation provided by the Appraiser determined the fair market value of the Common Stock as of September 30, 2013 (the "*Valuation Date*") to be $0.17 per share after giving effect to the Forward Split ($0.85 per share before giving effect to the Forward Split).

**WHEREAS,** the Board has determined that the Appraiser is independent of, and not affiliated with, the Company.

**NOW, THEREFORE, BE IT RESOLVED,** that the Board has reviewed and considered the valuation provided by the Appraiser, which valuation considered all relevant factors, including, but not limited to, the sale price of shares in recent financings, the liquidation preferences of the Preferred Stock, the volatility of publicly traded entities engaged in a substantially similar business, and discounts for lack of marketability. The Board also has considered the overall performance of the Company, including its losses, and based on all of these considerations, the Board has determined that the valuation uses a reasonable methodology and has a reasonable basis for the determination of the fair value of the Common Stock on the Valuation Date.

**RESOLVED FURTHER,** that the Board hereby accepts the Appraiser's valuation of the per share fair market value of the Common Stock as of the Valuation Date as $0.17 after giving effect to the Forward Split ($0.85) before giving effect to the Forward Split), determines that no material event has occurred subsequent to the Valuation Date that would cause the per share fair market value of the Common Stock as of the date of this meeting to be greater than $0.17 after giving effect to the Forward Split ($0.85) before giving effect to the Forward Split), and determines that such per share fair market value is $0.17 after giving effect to the Forward Split ($0.85) before giving effect to the Forward Split) as of the date hereof.

### AMENDMENTS OF THE 2004 STOCK PLAN

**WHEREAS,** the Board wishes to make awards of nonstatutory stock options under the 2004 Plan to individuals who hold more than 10% of the voting power of all classes of stock of the Company or any parent or subsidiary of the Company ("*10% Stockholders*").

**NOW, THEREFORE, BE IT RESOLVED**, that the 2004 Plan is hereby amended to provide that the exercise price of nonstatutory stock options to 10% Stockholders shall be at least 100% of the Fair Market Value (as defined in the 2004 Plan) of the underlying shares of the Common Stock on the date of grant.

**RESOLVED FURTHER,** that, effective upon and consistent with the reclassification of the shares of the Common Stock as shares of Class A Common Stock and pursuant to its authority under Section 13(a) of the 2004 Plan, the definition of "Common Stock" under the 2004 Plan is hereby amended to mean "the Class A Common Stock of the Company" and the shares subject to outstanding awards and reserved for issuance under the 2004 Plan shall become shares of the Class A Common Stock.

**RESOLVED FURTHER,** that the form of standard Stock Option Agreement under the 2004 Plan be amended and restated in its entirety in the form attached hereto as Exhibit I, and such form is hereby approved.

**RESOLVED FURTHER,** that the form of early-exercise Stock Option Agreement under the 2004 Plan be amended and restated in its entirety in the form attached hereto as Exhibit J, including that such form allow for the exercise of an option by tender of a full recourse promissory note, and such form is hereby approved.

**RESOLVED FURTHER,** that the officers of the Company be, and each individually is, hereby authorized and directed to do and perform any and all such acts, including the execution, delivery and filing of any and all instruments, documents and certificates, as such officers deem necessary or advisable, to carry out and perform the purposes and intent of the foregoing resolutions, the taking of any such action to be conclusive evidence of such a determination by such officer.

### APPROVAL OF 2004 PLAN OPTION GRANTS TO EXECUTIVE MANAGEMENT & DIRECTORS

**WHEREAS**, on January 14, 2013, the Board by unanimous written consent (the "*January Consent*") analyzed making option grants, intending for such option grants to be made upon the receipt of the next valuation report, to purchase shares of the Common Stock to certain members of the Company's executive management and pursuant to the terms and conditions set forth in such resolutions and on Exhibit I to the January Consent (the "*Intended Management Options*").

**WHEREAS**, as of the date hereof, the Intended Management Options have not been granted, and the Board now desires to approve the grants set forth on Exhibit K in lieu of the Intended Management Options and receipt of the valuation report.

**WHEREAS**, the Board deems it advisable and in the best interests of the Company and its stockholders to grant the options listed on Exhibit K under the 2004 Plan.

**NOW, THEREFORE, BE IT RESOLVED**, that each individual named in the executive management and director stock option grant summary attached hereto as Exhibit K (each a "*Management Optionee*"), is hereby granted the option set forth in such exhibit under the 2004 Plan

to purchase the number of shares of capital stock of the Company set forth opposite his or her name on Exhibit K (each a "**Management Option**," and collectively, the "**Management Options**"), effective as of the date hereof.

**RESOLVED FURTHER,** that the Board acknowledges, for purposes of clarity, that the number of shares subject to each Management Optionee's Management Option shall represent (i) until the time of the filing of the Certificate of Correction, options to purchase the number of "Post-Split Shares" of the Common Stock set forth opposite his or her name on Exhibit K, (ii) upon and after filing of the Certificate of Correction, options to purchase the number of "Pre-Split Shares" of the Common Stock set forth opposite his or her name on Exhibit K, and (iii) as of the Effective Time, options to purchase the number of "Post-Split Shares" of the Class A Common Stock set forth opposite his or her name on Exhibit K.

**RESOLVED FURTHER,** that, as specified in Exhibit K, the Management Options each be an incentive stock option (defined under Section 422 of the Internal Revenue Code, as amended) (an "**ISO**") to the maximum extent permitted by law, or a nonstatutory stock option (an "**NSO**"); provided, however, that the Management Option granted to Elizabeth Holmes (the "**Holmes Option**") shall be an NSO as specified in Exhibit K.

**RESOLVED FURTHER,** that, unless otherwise noted on Exhibit K, each Management Option shall vest as follows: one forty-eighth (1/48th) of the shares subject to the Management Option shall vest on the one (1) month anniversary of the Vesting Commencement Date set forth on Exhibit K, and one forty-eighth (1/48th) of the shares subject to the Management Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Management Optionee continuing to be a Service Provider (as defined in the 2004 Plan) through each such date.

**RESOLVED FURTHER,** that each Management Option shall have an exercise price of $0.17 per share after giving effect to the Forward Split ($0.85 per share before giving effect to the Forward Split), which the Board has determined in good faith to be equal to no less than the fair market value of the Common Stock as of the date hereof.

**RESOLVED FURTHER,** that the Management Options shall have a maximum term of ten (10) years (subject to earlier termination following the Management Optionee's ceasing to be a Service Provider (as defined in the 2004 Plan) or a Director (as defined in the 2004 Plan), as specified in Exhibit K, or as otherwise provided by the 2004 Plan).

**RESOLVED FURTHER,** that each Management Option shall be evidenced by and subject to the terms and conditions of the appropriate form of stock option agreement approved by the Board on the date hereof, including that the form of stock option agreement for Ms. Holmes that permits her Management Option to be exercised by tender of a full recourse promissory note and security agreement.

**RESOLVED FURTHER,** that the Board hereby approves the exercise of the Holmes Option by tender of a full recourse promissory note and security agreement, substantially in the form attached

hereto as <u>Exhibit L</u>, which is a modified version of the form previously approved by the Board in the January Consent (the "**_Note_**").

**RESOLVED FURTHER,** that the Board hereby authorizes any officer of the Company (other than Ms. Holmes) (i) to cause the stock option agreement for the Holmes Option to be executed and delivered in the form approved in the above resolutions, and, (ii) thereafter, to extend the Note to Ms. Holmes upon or following the execution of such option agreement, if Ms. Holmes chooses to exercise the Holmes Option by tender of a promissory note.

**RESOLVED FURTHER,** that the Note shall have a maximum term of five (5) years, shall be full recourse, shall be secured by the shares of the capital stock subject to the Holmes Option, and shall bear interest at a rate equal to no less than the applicable federal rate necessary to avoid imputed income to her that is in effect at the time the Note is entered into or, if higher, the rate sufficient to avoid the Company incurring additional adverse financial accounting compensation expense with respect to the Holmes Option, with such rate compounded semi-annually.

**RESOLVED FURTHER,** that the Board has determined that acceptance of the Note as a method of payment for the shares to be issued upon the exercise of the Holmes Option is reasonably expected to benefit the Company and constitutes sufficient consideration.

**RESOLVED FURTHER,** that the number of shares issuable pursuant to the 2004 Plan shall be correspondingly reduced by the number of shares issuable upon exercise of the above-described Management Options.

**RESOLVED FURTHER,** that the offer and sale of the Management Options and the capital stock issuable upon exercise thereof be made in reliance upon any applicable exemption from registration provided by the Securities Act of 1933, as amended, including, but not limited to, an exemption from registration under Section 4(2) or Rule 701, and any applicable exemption under state securities laws, and that the officers of the Company be, and each of them hereby is, in consultation with the Company's legal counsel, authorized, empowered and directed to prepare or cause to be prepared, executed and filed all applications, exhibits, fees, notices and other documents and amendments thereto as may be required by federal and state securities or other laws applicable to the transaction contemplated by these resolutions.

<u>APPROVAL OF 2004 PLAN OPTION GRANTS TO EMPLOYEES</u>

**WHEREAS**, pursuant to the January Consent, the Board analyzed making option grants, intending for such option grants to be made upon the receipt of the next valuation report, to purchase shares of the Common Stock to certain of the Company's employees and pursuant to the terms and conditions set forth in such resolutions and on <u>Exhibit K</u> to the January Consent (the "**_Intended Employee Options_**").

**WHEREAS**, as of the date hereof, the Intended Employee Options have not been granted, and the Board now desires to approve the grants set forth on <u>Exhibit K</u> in lieu of the Intended Employee Options and receipt of the valuation report.

**WHEREAS**, the Board deems it advisable and in the best interests of the Company and its stockholders to grant the options listed on <u>Exhibit K</u>, which includes the Intended Employee Options, under the 2004 Plan.

**NOW, THEREFORE, BE IT RESOLVED**, that each individual named in the stock option grant summary attached hereto as <u>Exhibit K</u> (each an "***Optionee***"), is hereby granted the option set forth in such exhibit pursuant to the 2004 Plan to purchase the number of "Post-Split Shares" of the capital stock set forth opposite his or her name on <u>Exhibit K</u> (each an "***Option***," and collectively, the "***Options***"), effective as of the date hereof.

**RESOLVED FURTHER,** that the Board acknowledges, for purposes of clarity, that the number of shares subject to each Optionee's Option shall represent (i) until the time of the filing of the Certificate of Correction, options to purchase the number of "Post-Split Shares" of the Common Stock set forth opposite his or her name on <u>Exhibit K</u>, (ii) upon and after filing of the Certificate of Correction, options to purchase the number of "Pre-Split Shares" of the Common Stock set forth opposite his or her name on <u>Exhibit K</u>, and (iii) as of the Effective Time, options to purchase the number of "Post-Split Shares" of the Class A Common Stock set forth opposite his or her name on <u>Exhibit K</u>.

**RESOLVED FURTHER,** that the Board acknowledges, for purposes of clarity, if (i) the Certificate of Correction is not filed and does not become effective, each Option will continue to represent an option to purchase the corresponding number of "Post-Split Shares" and (ii) the conditions for effecting the Forward Split pursuant to the Restated Certificate are not satisfied and the Forward Split does not become effective after the filing of the Certificate of Correction, each Option will continue to represent an option to purchase the corresponding number of "Pre-Split Shares."

**RESOLVED FURTHER,** that, as specified in <u>Exhibit K</u>, the Options each be an ISO to the maximum extent permitted by law, or a NSO.

**RESOLVED FURTHER,** that, unless otherwise noted on <u>Exhibit K</u>, the Options shall vest as follows: twenty-five percent (25%) of the shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date set forth on <u>Exhibit K</u>, and one forty-eighth (1/48th) of the shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be a Service Provider (as defined in the 2004 Plan) through each such date.

**RESOLVED FURTHER,** that each Option shall have an exercise price of $0.17 per share after giving effect to the Forward Split ($0.85 per share before giving effect to the Forward Split), which the Board has determined in good faith to be equal to no less than the fair market value of the Common Stock as of the date hereof.

THER-AZ-01126595

**RESOLVED FURTHER,** that the Options shall have a maximum term of ten (10) years, unless otherwise specified in <u>Exhibit K</u> (subject to earlier termination following the Optionee's ceasing to be a Service Provider (as defined in the 2004 Plan) or as otherwise provided by the 2004 Plan).

**RESOLVED FURTHER,** that the Options shall be evidenced by and subject to the terms and conditions of the appropriate form of stock option agreement previously or hereafter approved by the Board.

**RESOLVED FURTHER,** that the number of stock options issuable pursuant to the 2004 Plan shall be correspondingly reduced by the number of shares issuable upon exercise of the above-described Options.

**RESOLVED FURTHER,** that the offer and sale of each Option and the capital stock issuable upon exercise thereof be made in reliance upon any applicable exemption from registration provided by the Securities Act of 1933, as amended, including, but not limited to, an exemption from registration under Section 4(2) or Rule 701, and any applicable exemption under state securities laws, and that the officers of the Company be, and each of them hereby is, in consultation with the Company's legal counsel, authorized, empowered and directed to prepare or cause to be prepared, executed and filed all applications, exhibits, fees, notices and other documents and amendments thereto as may be required by federal and state securities or other laws applicable to the transaction contemplated by these resolutions.

### TERMINATION OF THE AMENDED AND RESTATED 2004 STOCK PLAN

**WHEREAS,** the Board desires to terminate the Amended and Restated 2004 Stock Plan (the "***2004 Plan***") after almost ten years in existence, effective as of the date of the approval of the Plan (as defined below) by the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iii) the Common Stock held by stockholders who are independent of the Founder.

**NOW, THEREFORE, BE IT RESOLVED**, that effective as of the date of the approval of the Plan by the holders of a majority of the outstanding shares of (i) the capital stock of the Company held by stockholders who are independent of the Founder and (ii) the Common Stock held by stockholders who are independent of the Founder, the Board hereby terminates the Company's 2004 Plan; provided, that the termination of such plan shall not effect outstanding awards previously issued thereunder or approved elsewhere herein.

**RESOLVED FURTHER,** that the officers of the Company are hereby authorized and directed to take such actions and execute such documents as may be necessary or advisable to carry out the intent and accomplish the purposes of these resolutions, and any such actions taken by the officers prior to this date are hereby ratified and approved.

### 2013 STOCK INCENTIVE PLAN APPROVAL

**WHEREAS**, there has been proposed the adoption of a new stock incentive plan for the Company's employees, directors and consultants that provides for the grant of stock options, stock appreciation rights, restricted stock and restricted stock units to employees, directors and consultants, to be granted from time to time as determined by the Board or its designees (the Theranos, Inc. 2013 Stock Incentive Plan, or the "***Plan***"), in the form attached hereto as Exhibit M.

**WHEREAS**, the forms of stock option exercise agreement under the Plan provide that the Founder is designated as the true and lawful proxy and attorney-in-fact for any Plan participant that exercises shares, with the Founder to exercise voting control over all shares held by each such Plan Participant.

**WHEREAS**, the forms of stock option agreement require that each Plan participant sign a joinder agreement making such Plan participant subject to the Amended Rights Agreement, including, without limitation, the right of first refusal in favor of the Company, secondary right of first refusal in favor of the Founder and right of the Company to assign its right of first refusal to one or more designees.

**WHEREAS**, after careful consideration, each of the members of the Special Committee determined that the terms and conditions of the Plan are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and adopt the Plan.

**WHEREAS**, the Board believes that it is in the best interests of the Company and its stockholders to adopt the Plan and to solicit stockholder approval of the Plan from the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iii) the Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the 2013 Plan will not be adopted.

**NOW, THEREFORE, BE IT RESOLVED**, that the Plan is hereby adopted and approved.

**RESOLVED FURTHER**, that the form of standard Stock Option Agreement, which includes the Redemption Right, in the form attached hereto as Exhibit N is hereby approved.

**RESOLVED FURTHER**, that the form of standard Stock Option Agreement – Early Exercise, which includes the Redemption Right, in the form attached hereto as Exhibit O, is hereby approved.

**RESOLVED FURTHER**, that an aggregate of 15,000,000 shares of the Class A Common Stock are reserved for issuance under the Plan.

THER-AZ-01126597

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to file the appropriate notices with the appropriate governmental agencies, including but not limited to the California Commissioner of Corporations, in connection with the adoption of the Plan.

**RESOLVED FURTHER**, that the Board hereby submits the Plan for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Plan.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized and directed to seek stockholder ratification of the Plan from the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iii) the Common Stock held by stockholders who are independent of the Founder, and if such approval is not obtained, the 2013 Plan will not be adopted.

**RESOLVED FURTHER**, that the officers of the Company be, and each individually is, hereby authorized and directed to do and perform any and all such acts as such officers deem necessary or advisable, to carry out and perform the purposes and intent of the foregoing resolutions approving the Plan, the taking of any such action to be conclusive evidence of such a determination by such officer.

**APPROVAL OF INTERESTED PARTY TRANSACTIONS**

**WHEREAS**, pursuant to Section 144 of the Delaware General Corporation Law, no contract or transaction between the Company and one or more officers or directors of the Company, or any other corporation, partnership, association or other organization in which one or more of the officers or directors of the Company is an officer or director of, or has a financial interest in (any such party is referred to herein individually as an "**Interested Party**," and any such contract or transaction is referred to herein as an "**Interested Party Transaction**"), shall be void or voidable solely for that reason, or solely because the director or officer is present at or participates in the meeting of the Board that authorized the Interested Party Transaction or solely because the vote of any such director is counted for such purpose, if (i) the material facts as to the director's or officer's relationship or interest and as to the contract are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum, (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders, or (iii) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified by the Board or the stockholders.

**WHEREAS**, it is hereby disclosed or made known to the Board that the Founder, who will benefit from certain of the matters approved by the Board in connection with the approvals of the Restated Certificate, Amended Bylaws, Amended Rights Agreement, Amended Voting Agreement, the Plan and the authorization, exchange and issuance of the Class B Common Stock to the Founder (the "**Founder Transactions**"), is an Interested Party, and the Founder Transactions are Interested Party Transactions.

**WHEREAS**, the members of the Board are aware of the material facts related to the Founder Transactions and have had an adequate opportunity to ask questions regarding, and investigate the nature, and the relationship and/or interests, of the Interested Party in connection with the Founder Transactions.

**WHEREAS**, after careful consideration, each of the members of the Special Committee determined that the terms and conditions of the proposed Founder Transactions are in the best interests of the Company and its stockholders and the Special Committee recommended that the Board approve and consent to the Founder Transactions.

**WHEREAS**, after careful consideration, the undersigned members of the Board have determined in good faith that the terms and conditions of the proposed Founder Transactions are in the best interests of the Company and its stockholders that it is in the best interests of the Company and its stockholders to enter into the Founder Transactions.

**WHEREAS**, the Board believes that it is in the best interests of the Company to solicit stockholder approval of the Founder Transactions from the holders of a majority of the outstanding shares of: (i) the capital stock of the Company, (ii) each class and series of capital stock of the Company, (iii) the capital stock of the Company held by stockholders who are independent of the Founder, and (iv) the Common Stock held by stockholders who are independent of the Founder, and if that vote is not obtained, the Company should not file the Restated Certificate or otherwise implement the Founder Transactions.

**NOW, THEREFORE, BE IT RESOLVED**, that each undersigned member of the Board in good faith hereby approves and consents to the Founder Transactions and deems it to be in the best interests of the Company and its stockholders.

**RESOLVED FURTHER**, that the Board hereby submits the Founder Transactions for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the Founder Transactions.

**TERMINATION OF THE AMENDED AND RESTATED CO-SALE AGREEMENT**

**WHEREAS**, in connection with the Original Purchase Agreement, the Company entered into the Amended and Restated Co-Sale Agreement (the "***Co-Sale Agreement***") on July 1, 2010.

**WHEREAS**, on January 14, 2013, the Board approved the termination of the Co-Sale Agreement, which was subsequently approved by the holders of a majority of the Common Stock and Preferred Stock, voting together as a class on an as converted to Common Stock basis.

**WHEREAS**, the Company wishes to terminate the Co-Sale Agreement and the Board previously approved such termination.

**WHEREAS**, the Board hereby authorizes the Company to obtain the consent of the stockholders to terminate the Co-Sale Agreement.

**NOW, THEREFORE, BE IT RESOLVED**, that the Board hereby deems it in the best interests of the Company and its stockholders that the Co-Sale Agreement be terminated.

**RESOLVED FURTHER**, that the Board hereby approves the termination of the Co-Sale Agreement and the Co-Sale Termination Agreement, substantially in the form attached hereto as Exhibit P.

**RESOLVED FURTHER**, that the Board hereby submits the termination of Co-Sale Agreement for approval and adoption by the Company's stockholders and recommends that such stockholders approve and adopt the termination of Co-Sale Agreement.

OMNIBUS RESOLUTIONS

**NOW, THEREFORE, BE IT RESOLVED**, that the officers of the Company be, and each individually is, hereby authorized and directed to do and perform any and all such acts, including the execution, delivery and filing of any and all instruments, documents and certificates, as such officers deem necessary or advisable, to carry out and perform the purposes and intent of the foregoing resolutions, the taking of any such action to be conclusive evidence of such a determination by such officer.

**RESOLVED FURTHER**, that any actions taken by such officers prior to the date of the foregoing resolutions adopted hereby that are within the authority conferred thereby are hereby ratified, confirmed and approved as the acts and deeds of the Company.

[*Signature Page Follows*]

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

11:30 PM

Date: 12/13/13

_____
**Elizabeth Holmes**

Date:_____

_____
**Sunny Balwani**

Date:_____

_____
**Henry A. Kissinger**

Date:_____

_____
**Samuel Nunn**

Date:_____

_____
**William J. Perry**

Date:_____

_____
**Gary Roughead**

Date:_____

_____
**George P. Shultz**

Date:_____

_____
**Richard M. Kovacevich**

Date:_____

_____
**James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126601

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____

**Elizabeth Holmes**

11:00 pm

Date: 12|13|13 .

**Sunny Balwani**

Date:_____

**Henry A. Kissinger**

Date:_____

**Samuel Nunn**

Date:_____

**William J. Perry**

Date:_____

**Gary Roughead**

Date:_____

**George P. Shultz**

Date:_____

**Richard M. Kovacevich**

Date:_____

**James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126602

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____     _____
                                 **Elizabeth Holmes**

Date:_____     _____
                                 **Sunny Balwani**

Date: 12/12/13                   _____
                                 **Henry A. Kissinger**

Date:_____     _____
                                 **Samuel Nunn**

Date:_____     _____
                                 **William J. Perry**

Date:_____     _____
                                 **Gary Roughead**

Date:_____     _____
                                 **George P. Shultz**

Date:_____     _____
                                 **Richard M. Kovacevich**

Date:_____     _____
                                 **James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

**ER-15014**

THER-AZ-01126603

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____    _____
                                   **Elizabeth Holmes**

Date:_____    _____
                                   **Sunny Balwani**

Date:_____    _____
                                   **Henry A. Kissinger**

Date: 12 / 12 / 2013 _____    _____
                                   **Samuel Nunn**

Date:_____    _____
                                   **William J. Perry**

Date:_____    _____
                                   **Gary Roughead**

Date:_____    _____
                                   **George P. Shultz**

Date:_____    _____
                                   **Richard M. Kovacevich**

Date:_____    _____
                                   **James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

**ER-15015**

THER-AZ-01126604



**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____

**Elizabeth Holmes**

Date:_____

**Sunny Balwani**

Date:_____

**Henry A. Kissinger**

Date:_____

**Samuel Nunn**

Date:___*12 Dec 13*___

**William J. Perry**

Date:_____

**Gary Roughead**

Date:_____

**George P. Shultz**

Date:_____

**Richard M. Kovacevich**

Date:_____

**James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126605

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____  _____

**Elizabeth Holmes**

Date:_____  _____

**Sunny Balwani**

Date:_____  _____

**Henry A. Kissinger**

Date:_____  _____

**Samuel Nunn**

Date:_____  _____

**William J. Perry**

Date: *12 DECEMBER 2013*  _____

**Gary Roughead**

Date:_____  _____

**George P. Shultz**

Date:_____  _____

**Richard M. Kovacevich**

Date:_____  _____

**James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126606

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____

**Elizabeth Holmes**

Date:_____

**Sunny Balwani**

Date:_____

**Henry A. Kissinger**

Date:_____

**Samuel Nunn**

Date:_____

**William J. Perry**

Date:_____

**Gary Roughead**

Date: _12-12-2013_

**George P. Shultz**

Date:_____

**Richard M. Kovacevich**

Date:_____

**James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126607



DEC. 12. 2013 11:25AM

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____      _____
                                  **Elizabeth Holmes**


Date:_____      _____
                                  **Sunny Balwani**


Date:_____      _____
                                  **Henry A. Kissinger**


Date:_____      _____
                                  **Samuel Nunn**


Date:_____      _____
                                  **William J. Perry**


Date:_____      _____
                                  **Gary Roughead**


Date:_____      _____
                                  **George P. Shultz**

Date: 12 / 12 / 2013 _____      _____
                                  **Richard M. Kovacevich**


Date:_____      _____
                                  **James N. Mattis**


*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

**IN WITNESS WHEREOF,** this Action by Unanimous Written Consent of the Board of Directors shall be effective as of the date of the last signature below. This action may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction be a complete reproduction of the entire original writing.

Date:_____    _____
                                   **Elizabeth Holmes**

Date:_____    _____
                                   **Sunny Balwani**

Date:_____    _____
                                   **Henry A. Kissinger**

Date:_____    _____
                                   **Samuel Nunn**

Date:_____    _____
                                   **William J. Perry**

Date:_____    _____
                                   **Gary Roughead**

Date:_____    _____
                                   **George P. Shultz**

Date:_____    _____
                                   **Richard M. Kovacevich**

Date: _DECEMBER 13, 2013_    _____
      _10:44 pm_                   **James N. Mattis**

*[SIGNATURE PAGE TO BOARD CONSENT APPROVING SPECIAL COMMITTEE RECOMMENDATIONS]*

Confidential

THER-AZ-01126609

**EXHIBIT A**
**Certificate of Correction**



Confidential

THER-AZ-01126610

**CERTIFICATE OF CORRECTION OF
AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF
THERANOS, INC.**

Theranos, Inc., a corporation organized and existing under the General Corporation Law of the State of Delaware (the "Company"), in accordance with the provisions of Section 103 thereof, DOES HEREBY CERTIFY:

1. The name of the Company is Theranos, Inc.

2. An Amended and Restated Certificate of Incorporation of the Company was filed with the Secretary of State of the State of Delaware (the "Secretary of State") on March 28, 2013 (the "March 28, 2013 Certificate") and such Certificate requires correction as permitted by subsection (f) of Section 103 of the General Corporation Law of the State of Delaware.

3. The inaccuracy to be corrected is that the March 28, 2013 Certificate was filed at such time as it did not satisfy all of the requirements for amendment and restatement of the Company's Certificate of Incorporation then in effect.

4. The March 28, 2013 Certificate is therefore withdrawn, null and void and of no force and effect.

IN WITNESS WHEREOF, the Company has caused this Certificate of Correction to be executed as of the __ day of December, 2013.

**THERANOS, INC.**

By: _____
Name: _____
Title: _____

RLF1 9419346v.1

Confidential

**ER-15022**

**EXHIBIT B**
**Restated Certificate**



Confidential

THER-AZ-01126612

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION OF**

**THERANOS, INC.**

Theranos, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Corporation*"), certifies that:

      A.     The name of the Corporation is Theranos, Inc. The Corporation was originally incorporated under the name RealTime Cures, Inc. The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on April 13, 2004.

      B.     The first Amended and Restated Certificate of Incorporation was duly adopted on June 24, 2004, the second Amended and Restated Certificate of Incorporation was duly adopted on December 15, 2004, the third Amended and Restated Certificate of Incorporation was duly adopted on February 2, 2006, the fourth Amended and Restated Certificate of Incorporation was duly adopted on October 12, 2006, and the fifth Amended and Restated Certificate of Incorporation was duly adopted on June 30, 2010 in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

      C.     This sixth Amended and Restated Certificate of Incorporation was duly adopted in accordance with Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware, and restates, integrates and further amends the provisions of the Corporation's Certificate of Incorporation.

      D.     The text of the Certificate of Incorporation is amended and restated to read as set forth in EXHIBIT A attached hereto.

      IN WITNESS WHEREOF, Theranos, Inc. has caused this Amended and Restated Certificate of Incorporation to be signed by Elizabeth Holmes, a duly authorized officer of the Corporation, on December ___, 2013.

 

                          _____
                          Elizabeth Holmes,
                          Chief Executive Officer

-1-

Confidential

THER-AZ-01126613

## EXHIBIT A

### ARTICLE I

The name of the Corporation is Theranos, Inc.

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

### ARTICLE III

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, City of Wilmington, County of New Castle, 19801.  The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE IV

The total number of shares of stock that the Corporation shall have authority to issue is one billion two hundred million six hundred fifty-eight thousand fifty-five (1,200,658,055), consisting of seven hundred twenty-five million (725,000,000) shares of Class A Common Stock, $0.0001 par value per share (the "*Class A Common Stock*"), two hundred fifty million six hundred fifty-eight thousand fifty-five (250,658,055) shares of Class B Common Stock, $0.0001 par value per share (the "*Class B Common Stock*"), and two hundred twenty-five million (225,000,000) shares of Preferred Stock, $0.0001 par value per share.  The first series of Preferred Stock shall be designated "*Series A Preferred Stock*" and shall consist of forty-six million three hundred twenty thousand forty-five (46,320,045) shares.  The second series of Preferred Stock shall be designated "*Series B Preferred Stock*" and shall consist of fifty-four million one hundred sixty-two thousand nine hundred sixty-five (54,162,965) shares.  The third series of Preferred Stock shall be designated "*Series C Preferred Stock*" and shall consist of fifty-eight million eight hundred ninety-six thousand one hundred five (58,896,105) shares.  The fourth series of Preferred Stock shall be designated "*Series C-1 Preferred Stock*" and shall consist of forty-three million five (43,000,005) shares.  Additional series of Preferred Stock may be designated from time to time in accordance with the provisions set forth in this Article IV (the "*Additional Preferred Stock*").

Effective immediately upon the filing of this Amended and Restated Certificate of Incorporation (the "*Filing Date*") and without any further action on the part of the Corporation or any stockholder, each one (1) share of Common Stock, $0.0001 par value per share of the Corporation ("*Common Stock*") that is issued and outstanding on the Filing Date shall be split and reclassified into five (5) shares of Class A Common Stock and each one (1) share of Preferred Stock that is issued and outstanding on the Filing Date shall be split into five (5) shares of Preferred Stock of the same series, without increasing or decreasing the amount of stated capital or paid-in surplus of the Corporation (the "*Forward Split and Reclassification*").  The Forward Split and Reclassification shall be effected on a certificate-by-certificate basis, and any fractional shares shall be rounded down

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-1-

to the nearest whole share. On the Filing Date, each record holder of a certificate shall be deemed to be the holder of record of the shares of Class A Common Stock or Preferred Stock as the case may be, converted and reclassified in the Forward Split and Reclassification, notwithstanding that the certificates representing shares of Common Stock or Preferred Stock, as the case may be, shall not have been surrendered at the office of the Corporation. The Corporation shall, upon request of each record holder of a certificate, issue and deliver to such holder in exchange for such certificate a new certificate representing the increased number of shares, and in the case of holders of Common Stock, the new Class A Common Stock. All references to numbers of shares and all per share amounts set forth in this Amended and Restated Certificate of Incorporation have been revised to reflect the Forward Split and Reclassification, and, accordingly, no further adjustment pursuant to the terms of this Amended and Restated Certificate of Incorporation shall be made as a result of the Forward Split and Reclassification.

The shares of Preferred Stock may be issued from time to time in one or more series. The Corporation's Board of Directors (the "*Board*") is authorized, by filing a certificate pursuant to the applicable law of the State of Delaware (each such certificate filed in accordance with the terms of this paragraph, as it may be amended from time to time, a "*Certificate of Designation*"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations or restrictions thereof, including but not limited to the fixing or alteration of the dividend rights, dividend rate, conversion rights, voting rights, rights and terms of redemption (including sinking fund provisions), the redemption price or prices, and the liquidation preferences of any wholly unissued series of shares of Preferred Stock, and to increase or decrease the number of shares of any series subsequent to the issue of shares of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series.

<div align="center">ARTICLE V</div>

The terms and provisions of the Class A Common Stock, Class B Common Stock and Preferred Stock are as follows:

1.  <u>Definitions</u>. For purposes of this ARTICLE V, the following definitions shall apply:

    (a) "*Conversion Price*" shall mean $0.15 per share for the Series A Preferred Stock, $0.184628 per share for the Series B Preferred Stock, $0.564 per share for the Series C Preferred Stock, $3.00 per share for the Series C-1 Preferred Stock and, with respect to any series of Additional Preferred Stock, the per share Conversion Price set forth in the Certificate of Designation or an amendment to the Certificate of Incorporation (the "*Certificate of Amendment*") for such series of Additional Preferred Stock (in each case of the foregoing, subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

    (b) "*Convertible Securities*" shall mean any evidences of indebtedness, shares or other securities convertible into or exchangeable for Class A Common Stock.

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX -2-

(c) "*Corporation*" shall mean Theranos, Inc.

(d) "*Distribution*" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Class A Common Stock payable in Class A Common Stock or dividends on Class B Common Stock payable in Class B Common Stock or the purchase or redemption of shares of the Corporation for cash or property other than: (i) repurchases of Class A Common Stock or Class B Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Class A Common Stock or Class B Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) any redemption pursuant to **Section 7** below, and (iv) any other repurchase or redemption of capital stock of the Corporation approved by the Board or by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class.

(e) "*Liquidation Preference*" shall mean $0.15 per share for the Series A Preferred Stock, $0.184628 per share for the Series B Preferred Stock, $0.564 per share for the Series C Preferred Stock, $3.00 per share for the Series C-1 Preferred Stock and, with respect to any series of Additional Preferred Stock, the per share Liquidation Preference for such series of Additional Preferred Stock set forth in the Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock (in each case, subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(f) "*Options*" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Class A Common Stock or Convertible Securities.

(g) "*Original Issue Price*" shall mean $0.15 per share for the Series A Preferred Stock, $0.184628 per share for the Series B Preferred Stock, $0.564 per share for the Series C Preferred Stock, $3.00 per share for the Series C-1 Preferred Stock and, with respect to any series of Additional Preferred Stock, the per share Original Issue Price set forth in the Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock (in each case, subject to adjustment from time to time for Recapitalizations as set forth elsewhere herein).

(h) "*Preferred Stock*" shall mean the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series C-1 Preferred Stock and the Additional Preferred Stock, if any.

(i) "*Recapitalization*" shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

2. Dividends. Except, with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock, the holders of the outstanding shares of the capital

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-3-

stock of the Corporation shall be entitled to receive dividends when, as and if declared by the Board out of any assets at the time legally available therefor:

(a) <u>Non-Cash Distributions</u>.  Whenever a Distribution provided for in this **Section 2** shall be payable in property other than cash, the value of such Distribution shall be deemed to be the fair market value of such property as determined in good faith by the Board.

(b) <u>Stock Dividends</u>.  In the event a dividend or distribution is paid in the form of capital stock of the Corporation (or rights to acquire capital stock of the Corporation), the holders of the Class A Common Stock and the holders of Class B Common Stock shall be entitled to share equally, identically and ratably, on a per share basis, in such dividends and other distributions of shares of capital stock of the Corporation (or rights to acquire capital stock of the Corporation) as may be declared by the Board from time to time; <u>provided, however,</u> that in the event that such dividend or distribution is paid in the form of shares of Class A Common Stock or Class B Common Stock (or rights to acquire Class A Common Stock or Class B Common Stock), the holders of Class A Common Stock shall receive Class A Common Stock or rights to acquire Class A Common Stock, as the case may be, and the holders of Class B Common Stock shall receive Class B Common Stock or rights to acquire Class B Common Stock, as the case may be.

(c) <u>Consent to Certain Distributions</u>.  If Section 500 of the California Corporations Code is applicable to a distribution made by the Corporation to holders of Class A Common Stock or Class B Common Stock, then such section shall not apply, without regard to the "preferential dividends arrears amount" or any "preferential rights amount" (as such terms may be defined in Section 500(b) of the California General Corporation Law), if such distribution constitutes a distribution made by the Corporation in connection with (i) repurchases of Class A Common Stock or Class B Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Class A Common Stock or Class B Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) any redemption pursuant to **Section 7** below, and (iv) any other repurchase or redemption of capital stock of the Corporation approved by the Board or by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting as a single class.

Confidential

**ER-15028**

THER-AZ-01126617

3. <u>Liquidation Rights</u>. Except, with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock:

 (a) <u>Liquidation Preference</u>. Subject to the right of the holders of any shares of any series of Additional Preferred Stock ranking on a parity with, or prior and superior to, the shares of any other series of Preferred Stock with respect to payments upon liquidation:

 (i) In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, after payment of the Liquidation Preference specified for any Additional Preferred Stock ranking senior to such series as to the liquidation, dissolution or winding up of the Corporation in the applicable Certificate of Designation or Certificate of Amendment for such series, the holders of the Series C-1 Preferred Stock and the Series C Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Series B Preferred Stock, Series A Preferred Stock, Class A Common Stock or Class B Common Stock by reason of their ownership of such stock, an amount per share for each share of Series C-1 Preferred Stock or Series C Preferred Stock held by them equal to the sum of (i) the Liquidation Preference specified for such share of Series C Preferred Stock or Series C-1 Preferred Stock, as applicable, and (ii) all declared but unpaid dividends (if any) on such share of Series C Preferred Stock or Series C-1 Preferred Stock, as applicable. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Series C-1 Preferred Stock and the Series C Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this **Section 3(a)(i)**, then the entire assets of the Corporation legally available for distribution shall be distributed pro rata among the holders of the Series C Preferred Stock and the holders of the Series C-1 Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this **Section 3(a)(i)**.

 (ii) After payment of the Liquidation Preference specified for the Series C Preferred Stock and Series C-1 Preferred Stock to the holders of the Series C Preferred Stock and Series C-1 Preferred Stock pursuant to **Section 3(a)(i)** and specified for any Additional Preferred Stock ranking senior to such series as to the liquidation, dissolution or winding up of the Corporation in the applicable Certificate of Designation or Certificate of Amendment for such series, the holders of the Series A Preferred Stock and Series B Preferred Stock shall be entitled to receive, and prior and in preference to any Distribution of any of the assets of the Corporation to the holders of Class A Common Stock and Class B Common Stock by reason of their ownership of such stock, an amount per share for each share of Series A Preferred Stock equal to the Liquidation Preference specified for such share of Series A Preferred Stock and for each share of Series B Preferred Stock the Liquidation Preference specified for such share of Series B Preferred Stock plus, in each case, all declared but unpaid dividends (if any) on such share of Series A Preferred Stock or Series B Preferred Stock. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Series A Preferred Stock and Series B Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this **Section 3(a)(ii)**, then the entire assets of the Corporation legally available for distribution shall be distributed first with equal priority and pro rata among the holders of the

Confidential

THER-AZ-01126618

Series B Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this **Section 3(a)(ii)**, and second (and only after and to the extent that payment in full of all amounts receivable by holders of the Series B Preferred Stock under this **Section 3(a)(ii)** has been made) with equal priority and pro rata among the holders of the Series A Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this **Section 3(a)(ii)**.

      (b)   <u>Remaining Assets</u>.  After the payment or setting aside for payment to the holders of Preferred Stock of the full amounts specified in **Section 3(a)** above and as may be specified in one or more Certificates of Designation or Certificate of Amendment with respect to one or more series of Additional Preferred Stock, the entire remaining assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among holders of the Preferred Stock, Class A Common Stock and Class B Common Stock in proportion to the total number of shares of Class A Common Stock and Class B Common Stock then held by them, with such shares of Preferred Stock being treated for this purpose as if they had been converted to shares of Class A Common Stock at the then applicable Conversion Rate (as defined below).

      (c)  <u>Reorganization</u>.  Unless waived in writing by the holders of at least sixty percent (60%) of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, for purposes of this **Section 3**, a liquidation, dissolution or winding up of the Corporation (a "***Reorganization***") shall be deemed to be occasioned by, or to include, (a) the acquisition of the Corporation by another entity by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving or resulting entity or the entity that controls such surviving or resulting entity), as a result of shares in the Corporation held by such holders immediately prior to such transaction, at least a majority of the total voting power represented by the voting securities of the Corporation, such surviving or resulting entity or the entity that controls such surviving or resulting entity outstanding immediately after such transaction or series of transactions; (b) a sale, lease or other conveyance of all or substantially all of the assets of the Corporation (excluding any transaction or series of transactions between or among the Corporation and any wholly owned subsidiary or subsidiaries); or (c) any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary.

      (d)  <u>Equal Treatment of Common Stock in a Reorganization</u>.  In connection with any Reorganization, shares of Class A Common Stock and Class B Common Stock shall be treated equally, identically and ratably, on a per share basis, with respect to any consideration into which such shares are converted or any consideration paid or otherwise distributed to stockholders of the Corporation, unless different treatment of the shares of each such series is approved by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an

Confidential

THER-AZ-01126619

as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class.

(e) Valuation of Non-Cash Consideration. If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board, except that any publicly-traded securities to be distributed to stockholders in a liquidation, dissolution, or winding up of the Corporation shall be valued as follows:

(i) If the securities are then traded on a national securities exchange (or a similar national quotation system), then the value of the securities shall be deemed to be the average of the closing prices of the securities on such exchange or system over the ten (10) trading day period ending five (5) trading days prior to the Distribution;

(ii) if the securities are actively traded over-the-counter, then the value of the securities shall be deemed to be the average of the closing bid prices of the securities over the ten (10) trading day period ending five (5) trading days prior to the Distribution.

In the event of a merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

For the purposes of this **subsection 3(e)**, "*trading day*" shall mean any day which the exchange or system on which the securities to be distributed are traded is open and "*closing prices*" or "*closing bid prices*" shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange or the Nasdaq Stock Market, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

4. Conversion. Except, with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock, the holders of the Preferred Stock and Class B Common Stock shall have conversion rights as follows (the "*Conversion Rights*"):

(a) Right to Convert. Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Preferred Stock, into that number of fully-paid, non-assessable shares of Class A Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series. (The number of shares of Class A Common Stock into which each share of Preferred Stock of a series may be converted is hereinafter referred to as the "*Conversion Rate*" for each such series.) Upon any decrease or increase in the Conversion

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-7-

Price for any series of Preferred Stock, as described in this **Section 4**, the Conversion Rate for such series shall be appropriately increased or decreased. Each share of Class B Common Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Class B Common Stock, into one (1) share of Class A Common Stock.

(b) <u>Automatic Conversion</u>. Each share of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series C-1 Preferred Stock shall automatically be converted into fully-paid, non-assessable shares of Class A Common Stock at the then effective Conversion Rate for such share (i) immediately prior to the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "***Securities Act***"), covering the offer and sale of the Corporation's Class A Common Stock, provided that the offering price per share is not less than $1.128 (as adjusted for Recapitalizations) (a "***Qualified IPO***") or (ii) upon the receipt by the Corporation of a written request for such conversion from the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, or, if later, the effective date for conversion specified in such requests (each of the events referred to in (i) and (ii) are referred to herein as an "***Automatic Preferred Conversion Event***"). Each share of Class B Common Stock shall automatically be converted into one (1) fully-paid, non-assessable share of Class A Common Stock upon the date specified by affirmative vote of the holders of at least 66 2/3% of the outstanding shares of Class B Common Stock, voting as a separate class (an "***Automatic Class B Conversion Event***").

(c) <u>Mechanics of Conversion</u>. No fractional shares of Class A Common Stock shall be issued upon conversion of Preferred Stock and/or Class B Common Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Class A Common Stock as determined by the Board. For such purpose, all shares of Preferred Stock and/or Class B Common Stock held by each holder of Preferred Stock and/or Class B Common Stock shall be aggregated, and any resulting fractional share of Class A Common Stock shall be paid in cash. Before any holder of Preferred Stock and/or Class B Common Stock shall be entitled to convert the same into full shares of Class A Common Stock, and to receive certificates therefor, he shall either (A) surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for the Preferred Stock or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same; <u>provided</u>, <u>however</u>, that (i) on the date of an Automatic Preferred Conversion Event, the outstanding shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series C-1 Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent and (ii) on the date of an Automatic Class B Conversion Event, the outstanding shares of Class B Common Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-8-

shares are surrendered to the Corporation or its transfer agent; provided further, however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Class A Common Stock issuable upon such Automatic Preferred Conversion Event or Automatic Class B Conversion Event unless either the certificates evidencing such shares of Preferred Stock or Class B Common Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates.  On the date of the occurrence of an Automatic Preferred Conversion Event, each holder of record of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series C-1 Preferred Stock, and on the date of the occurrence of an Automatic Class B Conversion Event, each holder of record of shares of Class B Common Stock, shall be deemed to be the holder of record of the Class A Common Stock issuable upon such conversion, notwithstanding that the certificates representing such shares of Preferred Stock or Class B Common Stock, as applicable, shall not have been surrendered at the office of the Corporation, that notice from the Corporation shall not have been received by any holder of record of shares of such Preferred Stock or Class B Common Stock, as applicable, or that the certificates evidencing such shares of Class A Common Stock shall not then be actually delivered to such holder.

The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Preferred Stock or Class B Common Stock, as applicable, a certificate or certificates for the number of shares of Class A Common Stock to which he shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Class A Common Stock, plus any declared and unpaid dividends on the converted Preferred Stock or Class B Common Stock, as applicable.  Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of such shares of Preferred Stock or Class B Common Stock, as applicable, to be converted, and the person or persons entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Class A Common Stock on such date; provided, however, that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Class A Common Stock issuable upon such conversion of the Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

Confidential

THER-AZ-01126622

(d) Adjustments to Conversion Price for Diluting Issues.

(i) Special Definition. For purposes of this paragraph 4(d), "***Additional Shares of Common***" shall mean all shares of Class A Common Stock issued (or, pursuant to paragraph 4(d)(iii), deemed to be issued) by the Corporation after the filing of this Amended and Restated Certificate of Incorporation, other than issuances or deemed issuances of:

(1) shares of Class A Common Stock upon the conversion of the Preferred Stock or Class B Common Stock;

(2) shares of Class A Common Stock issued or issuable to officers, directors and employees of, or consultants or advisors to, the Corporation or any subsidiary of the Corporation pursuant to stock grants, option plans, purchase plans, or other employee stock incentive programs or arrangements, in each case, approved by the Board, or upon exercise of options, warrants or other rights to purchase Class A Common Stock granted to such parties pursuant to any such plan or arrangement;

(3) shares of Class A Common Stock issued upon the exercise or conversion of Options or Convertible Securities outstanding as of the Filing Date;

(4) shares of Class A Common Stock issued or issuable as a dividend or distribution on Preferred Stock or pursuant to any event for which adjustment is made pursuant to **Section 4(e)**, **4(f)** or **4(g)** hereof;

(5) shares of Class A Common Stock issued in a Qualified IPO;

(6) shares of Class A Common Stock issued or issuable pursuant to the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Board;

(7) shares of Class A Common Stock issued or issuable to banks, equipment lessors, real property lessors, commercial financial institutions, other comparable persons engaged in the business of making loans pursuant to a debt financing, or service providers pursuant to a debt financing or commercial transaction approved by the Board;

(8) shares of Class A Common Stock issued or issuable in connection with any settlement of any action, suit, proceeding or litigation not primarily for purposes of raising capital and approved by the Board;

(9) shares of Class A Common Stock issued or issuable in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships not primarily for purposes of raising capital and approved by the Board;

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-10-

ER-15034

(10)     shares of Class A Common Stock issued or issuable to suppliers or service providers in connection with the provision of goods or services pursuant to transactions not primarily for purposes of raising capital and approved by the Board; and

(11)     shares of Class A Common Stock that are issued or issuable which are otherwise expressly excluded from the definition of "Additional Shares of Common" under this Amended and Restated Certificate of Incorporation by written consent of the holders of a majority of the outstanding shares of each series of Preferred Stock whose Conversion Price is higher than the price per share of such shares of Class A Common Stock being issued.

(ii)     <u>No Adjustment of Conversion Price</u>.  No adjustment in the Conversion Price of a particular series of Preferred Stock shall be made in respect of the issuance of Additional Shares of Common unless the consideration per share (as determined pursuant to paragraph 4(d)(v)) for an Additional Share of Common issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to such issue, for such series of Preferred Stock.

(iii)     <u>Deemed Issue of Additional Shares of Common</u>.  In the event the Corporation at any time or from time to time after the Filing Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Class A Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities or, in the case of Options for Convertible Securities, the exercise of such Options and the conversion or exchange of the underlying securities, shall be deemed to have been issued as of the time of such issue of the Options and/or Convertible Securities or, in case such a record date shall have been fixed, as of the close of business on such record date, provided that in any such case in which shares are deemed to be issued:

(1) no further adjustment in the Conversion Price of any series of Preferred Stock shall be made upon the subsequent issue of Convertible Securities or shares of Class A Common Stock in connection with the exercise of such Options or conversion or exchange of such Convertible Securities;

(2) if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or in the number of shares of Class A Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change pursuant to the anti-dilution provisions of such Options or Convertible Securities such as this **Section 4(d)** or pursuant to Recapitalization provisions of such Options or Convertible Securities such as **Sections 4(e), (f)** and **(g)** hereof), the Conversion Price of each series of Preferred Stock and any subsequent adjustments based thereon shall be recomputed to reflect such change as if such change had been in effect as of the original issue thereof (or upon the occurrence of the record date with respect thereto);

Confidential

THER-AZ-01126624

(3) no readjustment pursuant to clause (2) above shall have the effect of increasing the Conversion Price of a series of Preferred Stock to an amount above the Conversion Price that would have resulted from any other issuances of Additional Shares of Common and any other adjustments provided for herein between the original adjustment date and such readjustment date;

(4) upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price of each series of Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon such expiration, be recomputed as if:

(a) in the case of Convertible Securities or Options for Class A Common Stock, the only Additional Shares of Common issued were the shares of Class A Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Corporation for the issue of such exercised Options plus the consideration actually received by the Corporation upon such exercise or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Corporation upon such conversion or exchange, and

(b) in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the Corporation for the Additional Shares of Common deemed to have been then issued was the consideration actually received by the Corporation for the issue of such exercised Options, plus the consideration deemed to have been received by the Corporation (determined pursuant to **Section 4(d)(v)**) upon the issue of the Convertible Securities with respect to which such Options were actually exercised; and

(5) if such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price which became effective on such record date shall be canceled as of the close of business on such record date, and thereafter the Conversion Price shall be adjusted pursuant to this paragraph 4(d)(iii) as of the actual date of their issuance.

(iv) <u>Adjustment of Conversion Price Upon Issuance of Additional Shares of Common</u>. In the event that the Corporation shall issue Additional Shares of Common (including Additional Shares of Common deemed to be issued pursuant to paragraph 4(d)(iii)) without consideration or for a consideration per share less than the applicable Conversion Price of a series of Preferred Stock in effect on the date of and immediately prior to such issue, then, the Conversion Price of the affected series of Preferred Stock shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of shares of Class A Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common so issued would

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-12-

Confidential

THER-AZ-01126625

purchase at such Conversion Price, and the denominator of which shall be the number of shares of Class A Common Stock outstanding immediately prior to such issue plus the number of such Additional Shares of Common so issued. Notwithstanding the foregoing, the Conversion Price shall not be reduced at such time if the amount of such reduction would be less than $0.01, but any such amount shall be carried forward, and a reduction will be made with respect to such amount at the time of, and together with, any subsequent reduction which, together with such amount and any other amounts so carried forward, equal $0.01 or more in the aggregate. For the purposes of this **Subsection 4(d)(iv)**, all shares of Class A Common Stock issuable upon conversion of all outstanding shares of Preferred Stock and the exercise and/or conversion of any other outstanding Convertible Securities and all outstanding Options shall be deemed to be outstanding.

(v)   Determination of Consideration. For purposes of this **Section 4(d)**, the consideration received by the Corporation for the issue (or deemed issue) of any Additional Shares of Common shall be computed as follows:

(1) Cash and Property. Such consideration shall:

(a)   insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with such issuance;

(b)   insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as reasonably determined in good faith by the Board; and

(c)   in the event Additional Shares of Common are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (a) and (b) above, as reasonably determined in good faith by the Board.

(2) Options and Convertible Securities. The consideration per share received by the Corporation for Additional Shares of Common deemed to have been issued pursuant to paragraph 4(d)(iii) shall be determined by dividing

(x)   the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by

Confidential

THER-AZ-01126626

(y)    the maximum number of shares of Class A Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(e)    <u>Adjustments for Subdivisions or Combinations of Class A Common Stock</u>.  In the event the outstanding shares of Class A Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Class A Common Stock, (i) the Conversion Price of each series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased and (ii) unless otherwise approved by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, the outstanding shares of the Class B Common Stock will be subdivided in the same proportion and manner.  In the event the outstanding shares of Class A Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Class A Common Stock, (i) the Conversion Prices in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased and (ii) unless otherwise approved by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, the outstanding shares of the Class B Common Stock will be combined in the same proportion and manner.  If the Corporation in any manner subdivides or combines the outstanding shares of Class A Common Stock or Class B Common Stock, the outstanding shares of the other such series will be subdivided or combined in the same proportion and manner, unless different treatment of the shares of the other such series is approved by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class.

(f)    <u>Adjustments for Subdivisions or Combinations of Preferred Stock</u>.  In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Preferred Stock, the Conversion Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding shares of Preferred Stock or a series of Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Preferred Stock, the Original Issue Price and Liquidation Preference of the affected series of Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(g)    <u>Adjustments for Reclassification, Exchange and Substitution</u>.  Subject to **Section 3** above ("***Liquidation Rights***"), if the Class A Common Stock issuable upon conversion of the Preferred Stock and the Class B Common Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above),

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-14-

then, in any such event, in lieu of the number of shares of Class A Common Stock which the holders would otherwise have been entitled to receive, each holder of such Preferred Stock and each holder of Class B Common Stock shall have the right thereafter to convert such shares of Preferred Stock and Class B Common Stock, into a number of shares of such other class or classes of stock which a holder of the number of shares of Class A Common Stock deliverable upon conversion of such series of Preferred Stock or upon conversion of such Class B Common Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(h) Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this **Section 4**, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Class A Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

(i) Waiver of Adjustment of Conversion Price.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived by the consent or vote of the holders of the majority of the outstanding shares of such series, voting as a separate series, either before or after the issuance causing the adjustment.

(j) Reservation of Stock Issuable Upon Conversion.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock solely for the purpose of effecting the conversion of the shares of the Preferred Stock and Class B Common Stock, such number of its shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock and the Class B Common Stock; and if at any time the number of authorized but unissued shares of Class A Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock and the Class B Common Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Class A Common Stock to such number of shares as shall be sufficient for such purpose.

5.    Voting.  Except with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock:

(a) Restricted Class Voting.  Except as required by law, the holders of the Preferred Stock, the holders of the Class A Common Stock and the holders of the Class B Common Stock shall vote together and not as separate classes.

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-15-

      (b) <u>No Series Voting</u>.  Except as otherwise expressly provided herein or as required by law, there shall be no series voting.

      (c) <u>Preferred Stock</u>.  Each holder of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series C-1 Preferred Stock shall be entitled to the number of votes equal to the number of shares of Class A Common Stock into which the shares of Preferred Stock held by such holder could be converted as of the record date.  Each holder of any Additional Preferred Stock shall be entitled to the number of votes (if any) provided for in a Certificate of Designation or Certificate of Amendment authorizing such series of Additional Preferred Stock.  The holders of shares of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series C-1 Preferred Stock shall be entitled to vote on all matters on which the Class A Common Stock shall be entitled to vote.  Each holder of Additional Preferred Stock shall be entitled to vote on matters to the extent provided for in the Certificate of Designation or Certificate of Amendment authorizing such series of Additional Preferred Stock.  If the Certificate of Designation or Certificate of Amendment is silent, then such series of Additional Preferred Stock shall be entitled to vote on all matters on which the Class A Common Stock shall be entitled to vote.

      (d) <u>Class A Common Stock</u>.  As long as any shares of the Class A Common Stock remain outstanding, the holders of the shares of Class A Common Stock shall be entitled to one (1) vote for each share thereof held.

      (e) <u>Class B Common Stock</u>.  As long as any shares of the Class B Common Stock remain outstanding, the holders of the shares of Class B Common Stock shall be entitled to one hundred (100) votes for each share thereof held.

Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted), shall be disregarded.

      (f) <u>Election of Directors</u>.  Except as otherwise provided in the Amended and Restated Voting Agreement dated on or about the date hereof, as amended from time to time, the directors shall be elected by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class as of the record date.

      (g) <u>Increase or Decrease in Authorized Capital Stock</u>.  The number of authorized shares of Preferred Stock, Class A Common Stock or Class B Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by an affirmative vote of the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, irrespective of the provisions of Section 242(b)(2) of the Delaware General Corporation Law (or any successor provision thereto), without a separate vote of the holders of the class or classes or series the number of authorized shares of which are being increased or decreased.

Confidential

THER-AZ-01126629

6.     Reissuance of Preferred Stock.  Except, with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock, in the event that any shares of Preferred Stock shall be converted pursuant to **Section 4** or **Section 9(a)** or otherwise repurchased by the Corporation, the shares so converted, redeemed or repurchased shall be cancelled and shall not be issuable by the Corporation.

7.     Mandatory Redemption.

(a)  The Corporation may, at any time and from time to time, at its option, redeem (for cash, property or rights, including securities of the Corporation or another entity) any or all of the shares of Class A Common Stock, the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock and/or the Series C-1 Preferred Stock of the Corporation, out of funds legally available therefor, subject to the notice provisions provided in subsection (b) below and at a price per share as determined in good faith by the Board to be the fair market value of each share ("**Mandatory Redemption**").  For the avoidance of doubt, any redemption pursuant to this **Section 7** is not required to be conducted on a pro rata basis as among any classes, series or holders.  The Corporation may not redeem shares of the Class B Common Stock.

(b)  If the Corporation exercises its right to redeem shares of stock of the Corporation pursuant to this **Section 7**, it shall fix a date for redemption, and it shall mail a notice of such redemption at least seven (7) days and not more than thirty (30) days prior to the date fixed for redemption to the holders of shares of stock of the Corporation to be so redeemed at their last addresses as the same appear on the books and records of the Corporation.  Failure to give such notice by mail or any defect in notice to the holder of any share of stock of the Corporation designated for redemption shall not affect the validity of the proceedings for the redemption of any other share of stock of the Corporation.  In addition to any information required by law, each notice of redemption shall specify the following: (i) the number of shares of stock of the Corporation to be redeemed; (ii) the date fixed for redemption; and (iii) the redemption price at which such shares are to be redeemed.  If notice of redemption has been given as above provided, on and after the date fixed for redemption (unless the Corporation shall default in the payment of the redemption price), such shares shall be deemed no longer outstanding and the holders thereof shall have no right in respect of such shares except the right to receive the redemption price thereof, without interest thereon.

(c)  All certificates evidencing any securities of the Corporation, other than shares of Class B Common Stock, shall bear the following legend or one substantially similar (in addition to any legend otherwise required):

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MANDATORY REDEMPTION RIGHT IN FAVOR OF THE ISSUER AS SET FORTH IN THE ISSUER'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER."

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-17-

8. <u>Notices</u>. Except, with respect to any series of Additional Preferred Stock, as and to the extent otherwise expressly provided in a Certificate of Designation or Certificate of Amendment for such series of Additional Preferred Stock, any notice required by the provisions of this ARTICLE V to be given to the holders of Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

9. <u>Rights of Class B Common Stock</u>.

(a) Upon the death or permanent incapacity of a holder of shares of Class B Common Stock or upon any purported sale, pledge, transfer, assignment or disposition of shares of Class B Common Stock to any Person other than its original holder, each such share of Class B Common Stock shall be automatically converted into a share of Class A Common Stock effective immediately, unless (i) the purported sale, pledge, transfer, assignment or disposition of such shares was approved by the Board, (ii) the purported sale, pledge, transfer, assignment or disposition of such shares was made during the lifetime of the holder of such shares to an entity that is controlled by such holder, or (iii) upon the death or permanent incapacity of the holder of such shares, such shares were transferred as previously directed in a writing executed by the holder of such shares. A pledge of shares of Class B Common Stock, prior to default thereunder, which does not grant to the pledgee the power to vote or direct the vote of the pledged shares or the power to dispose or direct the disposition of the pledged shares prior to a default, without any foreclosure or transfer of ownership, shall not trigger the conversion of such shares of Class B Common Stock. The mechanics of such conversion shall be as provided in **Section 4(c)** of this **ARTICLE V**.

(b) Except for (i) the issuance of Class B Common Stock in exchange for outstanding shares of Class A Common Stock pursuant to that certain exchange agreement entered into by and between the Corporation and the counterparty thereto on the Filing Date, (ii) the payment of Class B Common Stock as dividends in accordance with the terms of this Amended and Restated Certificate of Incorporation or (iii) the granting of Class B Common Stock through any split or subdivision of the Class B Common Stock, the Corporation shall not at any time issue any additional shares of Class B Common Stock, unless such issuance is approved by the affirmative vote of the holders of a majority of the then outstanding shares of Class B Common Stock, voting as a separate class.

10. <u>Other Rights of Stockholders</u>.

(a) In addition to any other vote required by law or this Amended and Restated Certificate of Incorporation, or irrespective of whether any other stockholder vote is otherwise required, as long as any shares of Class B Common Stock remain outstanding and only to the extent not otherwise authorized by the Board (including the affirmative approval of a member of the Board that is also a holder of the Class B Common Stock), the prior written consent (or affirmative vote) of the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, shall be required to authorize the Corporation (or to authorize or permit any subsidiary of the Corporation) to:

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-18-

(i)        directly or indirectly acquire Stock, Stock Equivalents, or assets (including, without limitation, any business or operating unit) of any Person, in each case in a single transaction or series of related transactions, involving consideration (whether in cash, securities, assets, or otherwise, and including debt assumed by the Corporation) paid or delivered by the Corporation in excess of $25,000,000 (other than acquisitions of securities pursuant to portfolio investment decisions in the ordinary course of business);

(ii)        directly or indirectly sell, convey, transfer, lease, or otherwise dispose of any of the assets of the Corporation (including Stock and Stock Equivalents) or any interest therein to any Person, or permit or suffer any other Person to acquire any interest in any of the respective assets (including Stock and Stock Equivalents or through transactions involving hybrid securities), in each case in a single transaction or series of related transactions, involving consideration (whether in cash, securities, assets, or otherwise, and including debt assumed by any other Person and debt of any entity acquired by such other Person) paid to or received by the Corporation in excess of $25,000,000 (other than dispositions and transfers of securities pursuant to portfolio investment decisions in the ordinary course of business);

(iii)        directly or indirectly create, incur, assume, guarantee, or otherwise be or become liable with respect to debt (including debt of any entity acquired by the Corporation, whether or not such debt is expressly assumed or guaranteed by the Corporation) in excess of $25,000,000 outstanding at any one time;

(iv)        effect any material change in the nature of the Corporation's business;

(v)        create any subsidiary that is not wholly owned, directly or indirectly, by the Corporation;

(vi)        issue any Stock or any Stock Equivalents, except the (A) issuance of shares of Class A Common Stock upon (x) conversion of shares of Preferred Stock or Class B Common Stock pursuant to and in accordance with the provisions of this Amended and Restated Certificate of Incorporation or (y) exercise of any Stock Equivalents or (B) grant of Stock or Stock Equivalents pursuant to a stock option plan approved by the Board;

(vii)        by action of the Board, delegate any power or authority to a committee of the Board;

(viii)        dissolve, liquidate, or wind-up the business and affairs of the Corporation; or

(ix)        file a Certificate of Designations.

(b) For purposes of this **Section 10** of Article V:

(i)        "Person" means any individual, corporation, partnership, joint venture, limited liability company, association or other business entity and any trust, unincorporated organization or government or any agency or political subdivision thereof;

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-19-

(ii)  "Stock" means shares of capital stock (whether denominated as common stock or preferred stock), beneficial, partnership or membership interests, participants or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or business trust, whether voting or non-voting; and

(iii)  "Stock Equivalents" means all securities convertible into or exchange for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable, and all voting debt.

(c) Except as otherwise expressly provided herein, including, without limitation, with respect to dividends and distributions pursuant to **Section 2** above, subdivisions or combinations pursuant to **Section 4(e)** above, treatment in a Reorganization pursuant to **Section 3(d)** above or as otherwise required by applicable law, shares of Class A Common Stock and Class B Common Stock shall have the same rights, preferences and privileges and rank equally, share ratably and be identical in all respects as to all matters.

ARTICLE VI

The Corporation is to have perpetual existence.

ARTICLE VII

Elections of directors need not be by written ballot unless a stockholder demands election by written ballot at the meeting and before voting begins or unless the Bylaws shall so provide.

ARTICLE VIII

Unless otherwise set forth herein, the number of directors which constitute the Board shall be designated in the Bylaws.

ARTICLE IX

In furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, alter, amend or repeal the Bylaws. The fact that such power has been so conferred upon the Board shall not divest the stockholders of the Corporation of the power, nor limit the power of the stockholders to adopt, amend or repeal the Bylaws.  In the event of conflict between a decision by the majority of the outstanding stockholders and the Board, as long as any shares of the Class B Common Stock remain outstanding, the holders of a majority of the then outstanding shares of the Class B Common Stock, voting as a separate class, may stay the decision at hand for a period of up to thirty (30) days so as to reach a resolution.

ARTICLE X

1.  To the fullest extent permitted by the Delaware General Corporation Law as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director.

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-20-

2.      The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director or officer of the Corporation or any predecessor of the Corporation or serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.

3.      Neither any amendment nor repeal of this ARTICLE X, nor the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this ARTICLE X, shall eliminate or reduce the effect of this ARTICLE X, in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this ARTICLE X, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

ARTICLE XI

1.  Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide.  The books of the Corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws.

2.  At all meetings of the Board, all of the directors must be present to establish a quorum for the transaction of business; provided, however, that, so long as any holder of Class B Common Stock is a member of the Board, if at least one director that is also a holder of Class B Common Stock is present at a meeting of the Board, a majority of the total number of directors must be present to establish a quorum.  If any holder of Class B Common Stock is a member of the Board and has been appointed by the Board to a committee of the Board, the following shall be necessary to establish a quorum of such committee: (1) the presence of at least one director that is a member of such committee and also a holder of Class B Common Stock and (2) a majority of the total number of the members of such committee.

ARTICLE XII

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation arising pursuant to any provision of the Delaware General Corporation Law, or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XII.

Confidential

THER-AZ-01126634

## ARTICLE XIII

Except as conferred by statute or as authorized by resolution of the Board, the Board from time to time shall determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of the stockholders, and no stockholder shall have any right to inspect any account, book, or document of the Corporation.

## ARTICLE XIV

The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force or as may be added or inserted, in the manner now and hereafter prescribed by law; and all rights, preferences and privileges of any nature conferred upon stockholders, directors or any other persons by and pursuant to this Amended and Restated Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this Article XIV.

#6493603v16PALIB2 - Theranos - Amended and Restated Certificate of Incorporation (Dual Class).DOCX-22-

**EXHIBIT C**
**Amended and Restated Bylaws**



Confidential

THER-AZ-01126636

**AMENDED AND RESTATED BYLAWS OF**

**THERANOS, INC.**

(last amended as of December 2013)



-1-

## ARTICLE I — MEETINGS OF STOCKHOLDERS

1.1 *Place of Meetings*.   Meetings of stockholders of Theranos, Inc. (the "**Company**") shall be held at any place, within or outside the State of Delaware, designated by the Company's board of directors (the "**Board**").  The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law (the "**DGCL**").  In the absence of any such designation or determination, stockholders' meetings shall be held at the Company's principal executive office.

1.2 *Annual Meeting*.   An annual meeting of stockholders may be held for the election of directors at such date and time as may be designated by resolution of the Board of Directors from time to time.  Any other proper business may be transacted at the annual meeting.  The Company shall not be required to hold an annual meeting of stockholders provided that (i) the stockholders are permitted to act by written consent under the Company's certificate of incorporation and these bylaws, (ii) the stockholders take action by written consent to elect directors and (iii) the stockholders unanimously consent to such action or, if such consent is less than unanimous, all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

1.3 *Special Meeting*.  A special meeting of the stockholders may be called at any time by the Board, chairperson of the Board, chief executive officer or president (in the absence of a chief executive officer) and may not be called by any other person or persons.  No business may be transacted at such special meeting other than the business specified in a notice to stockholders entitled to vote at such meeting.

1.4 *Notice of Stockholders' Meetings*.  Except as otherwise required by law, all notices of meetings of stockholders shall be sent or otherwise given in accordance with either **Section 1.5** or **Section 7.1** of these bylaws not less than 10 or more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting.  The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

1.5 *Manner of Giving Notice; Affidavit of Notice*.  Notice of any meeting of stockholders shall be given:

        (i)      if mailed, when deposited in the United States mail, postage prepaid, directed to the stockholder at his or her address as it appears on the Company's records; or

        (ii)     if electronically transmitted as provided in **Section 7.1** of these bylaws.

An affidavit of the secretary or an assistant secretary of the Company or of the transfer agent or any other agent of the Company that the notice has been given by mail or by a form of electronic

-2-

THER-AZ-01126638

transmission, as applicable, shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

1.6 *Quorum*. Except as otherwise provided by law, the certificate of incorporation or these bylaws, at each meeting of stockholders the presence in person or by proxy of the holders of shares of stock having a majority of the combined voting power of the stock then issued and outstanding and entitled to vote at the meeting shall be necessary and sufficient to constitute a quorum. Except as otherwise provided by law, the certificate of incorporation or these bylaws, where a separate vote by a class or series or classes or series is required, a majority of the then outstanding voting power of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter. If, however, such quorum is not present or represented at any meeting of the stockholders, then either (i) the chairperson of the meeting, or (ii) the holders of a majority of the combined voting power of the shares present in person or represented by proxy at such meeting and entitled to vote thereon, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented.

1.7 *Adjourned Meeting; Notice*. Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of the adjourned meeting if the time, place if any thereof, and the means of remote communications if any by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the continuation of the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

1.8 *Conduct of Business*. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in his or her absence by the chief executive officer, or in his or her absence by the Vice Chairman of the Board, if any, or in his or her absence by the President, or in the absence of the foregoing persons by a chairperson designated by the Board of Directors, or in the absence of such designation by a chairperson chosen at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence the chairperson of the meeting may appoint any person to act as secretary of the meeting. The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of business.

1.9 *Voting*. The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of **Section 1.11** of these bylaws, subject to Section 217 (relating to voting rights of fiduciaries, pledgors and joint owners of stock) and Section 218 (relating to voting trusts and other voting agreements) of the DGCL.

Except as may be otherwise provided in the certificate of incorporation or these bylaws, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder. Voting at meetings of stockholders need not be by written ballot and, unless otherwise required by

-3-

law, need not be conducted by inspectors of election unless so determined by the holders of a majority of the combined voting power of the shares present in person or represented by proxy at such meeting and entitled to vote thereon. At all meetings of stockholders for the election of directors at which a quorum is present, a plurality of the voting power of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors shall be sufficient to elect. All other elections and questions shall, unless otherwise provided by law, the certificate of incorporation or these bylaws, be decided by the affirmative vote of a majority of the voting power of the shares present in person or represented by proxy at the meeting and entitled to vote thereon. Except as otherwise provided by law, the certificate of incorporation or these bylaws, where a separate vote by a class or series or classes or series is required, the affirmative vote of a majority of the voting power of the shares of such class or series or classes or series present in person or represented by proxy at the meeting shall be the act of such class or series or classes or series.

1.10    ***Stockholder Action by Written Consent Without a Meeting***. Unless otherwise provided in the certificate of incorporation, any action required by the DGCL to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Company as provided in Section 228 of the DGCL. In the event that the action which is consented to is such as would have required the filing of a certificate under any provision of the DGCL, if such action had been voted on by stockholders at a meeting thereof, the certificate filed under such provision shall state, in lieu of any statement required by such provision concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

1.11    ***Record Date for Stockholder Notice; Voting; Giving Consents***. In order that the Company may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and which record date:

-4-

(i) in the case of determination of stockholders entitled to notice of or to vote at any meeting of stockholders or adjournment thereof, shall, unless otherwise required by law, not be more than sixty nor less than ten days before the date of such meeting;

(ii) in the case of determination of stockholders entitled to express consent to corporate action in writing without a meeting, shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors; and

(iii) in the case of determination of stockholders for any other action, shall not be more than sixty days prior to such other action.

If no record date is fixed by the Board of Directors:

a. the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held;

b. the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting when no prior action of the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company in accordance with applicable law, or, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and

c. the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

1.12  *Proxies*.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by electronic transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL.

## ARTICLE II — DIRECTORS

2.1 *Powers*.  Subject to the provisions of the DGCL and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders or by the

-5-

outstanding shares, the business and affairs of the Company shall be managed and all corporate powers shall be exercised by or under the direction of the Board.

2.2 **Number of Directors**. The number of directors shall be determined from time to time by resolution of the Board, provided however, that the Board shall consist of at least one member and no more than 11 members. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

2.3 **Election, Qualification and Term of Office of Directors**. Except as provided in the Company's certificate of incorporation, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting in accordance with **Section 1.2**. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws. The certificate of incorporation or these bylaws may prescribe other qualifications for directors. Each director, including a director elected to fill a vacancy, shall hold office until such director's successor is elected and qualified or until such director's earlier death, resignation or removal.

2.4 **Place of Meetings; Meetings by Telephone**. The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

2.5 **Regular Meetings**. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

2.6 **Special Meetings; Notice**.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the chief executive officer, the president (in the absence of a chief executive officer), the secretary or any two directors.

Notice of the time and place of special meetings shall be:

(i)     delivered personally by hand, by courier or by telephone;

(ii)    sent by United States first-class mail, postage prepaid;

(iii)   sent by facsimile; or

(iv)    sent by electronic mail,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Company's records.

-6-

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least 24 hours before the time of the holding of the meeting. If the notice is sent by United States mail, it shall be deposited in the United States mail at least four days before the time of the holding of the meeting. Any oral notice may be communicated to the director. The notice need not specify the place of the meeting (if the meeting is to be held at the Company's principal executive office) nor the purpose of the meeting.

2.7 *Quorum*. At all meetings of the Board, all of the directors must be present to establish a quorum for the transaction of business; provided, however, that, so long as any holder of the Class B Common Stock is a member of the Board, if at least one director who is also a holder of the Class B Common Stock is present at a meeting of the Board, a majority of the total number of directors must be present to establish a quorum. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the certificate of incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. Minutes will be kept for all meetings of the Board in which actions are taken.

2.8 *Board Action by Written Consent Without a Meeting*. Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

2.9 *Fees and Compensation of Directors*. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board shall have the authority to fix the compensation of directors.

2.10 *Approval of Loans to Officers*. The Company may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Company or of its subsidiary, including any officer or employee who is a director of the Company or its subsidiary, whenever, in the judgment of the Board, such loan, guaranty or assistance may reasonably be expected to benefit the Company. The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board shall approve, including, without limitation, a pledge of shares of stock of the Company.

## ARTICLE III — COMMITTEES

3.1 *Committees of Directors*. The Board may designate one or more committees, each committee to consist of one or more of the directors of the Company. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a

-7-

**ER-15054**
THER-AZ-01126643

member of a committee, the full board may vote to appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in these bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the seal of the Company to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Company.

3.2 ***Committee Minutes***.  Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

3.3 ***Meetings and Action of Committees***.  Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)     **Section 2.4** (place of meetings and meetings by telephone);

(ii)    **Section 2.5** (regular meetings);

(iii)   **Section 2.6** (special meetings and notice);

(iv)   **Section 6.10** (waiver of notice); and

(v)    **Section 2.8** (action without a meeting)

with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members.  *However*:

a.  the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

b.  special meetings of committees may also be called by resolution of the Board; and

c.  notice of special meetings of committees shall also be given to all alternate members appointed by the Board, who shall have the right to attend all meetings of the committee. A majority of the total number of the members of a committee shall constitute a quorum; provided, however, that if any holder of the Class B Common Stock is a member of the Board and has been appointed by the Board to a committee of the Board, the following shall be necessary to establish a quorum: (1) the presence of at least one director who is a member of such committee and also a holder of the Class B Common Stock and (2) a majority of the total number of the members of such committee. The vote of a majority of the members of a committee at any meeting at which a quorum is present shall be the act of the committee. The Board may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

## ARTICLE IV — OFFICERS

-8-

4.1 *Officers*.  The officers of the Company shall be a chief executive officer, a president and a secretary.  The Company may also have, at the discretion of the Board, a chairperson of the Board, a vice chairperson of the Board, a chief financial officer or treasurer, one or more senior vice presidents, one or more assistant treasurers, one or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws.  Any number of offices may be held by the same person.

4.2 *Appointment of Officers*.  The Board shall appoint the officers of the Company, except such officers as may be appointed in accordance with the provisions of **Sections 4.3** and **4.5** of these bylaws, subject to the rights, if any, of an officer under any contract of employment.

4.3 *Subordinate Officers*.  The Board may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, the president, to appoint, such other officers and agents as the business of the Company may require.  Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board or the chief executive officer may from time to time determine.

4.4 *Removal and Resignation of Officers*.  Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the Company.  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice.  Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

4.5 *Vacancies in Offices*.  Any vacancy occurring in any office of the Company shall be filled by the Board or as provided in **Section 4.2**.

4.6 *Representation of Shares of Other Corporations*.  The chairperson of the Board, the chief executive officer, the president, the treasurer, the secretary or assistant secretary of the Company, or any other person authorized by the Board or the chief executive officer or president, is authorized to vote, represent, and exercise on behalf of the Company all rights incident to any and all shares of any other corporation or corporations standing in the name of the Company.  The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

4.7 *Authority and Duties of Officers*.  All officers of the Company shall respectively have such authority and perform such duties in the management of the business of the Company as may be designated from time to time by the Board, the stockholders or the chief executive officer and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board and the chief executive officer. Subject to the foregoing, the chief executive officer (or in

-9-

Confidential

THER-AZ-01126645

the absence of a chief executive officer, the president) of the Company shall have general supervision, direction, and control of the business and the officers of the Company. All officers of the Company shall report to the chief executive officer (or in the absence of a chief executive officer, the president) or his or her designee.

### ARTICLE V — RESERVED

### ARTICLE VI — GENERAL MATTERS

6.1 *Stock Certificates; Partly Paid Shares*. The shares of the Company shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Company. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the Company by the chairperson or vice-chairperson of the Board, or the president or vice-president, and by the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the Company representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

The Company may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, upon the books and records of the Company in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the Company shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

6.2 *Special Designation on Certificates*. If the Company is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Company shall issue to represent such class or series of stock; *provided, however*, that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the Company shall issue to represent such class or series of stock a statement that the Company will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special

-10-

Confidential

**ER-15057**

THER-AZ-01126646

rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.3 *Lost Certificates*.  Except as provided in this **Section 6.3**, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Company and cancelled at the same time.  The Company may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Company may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Company a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

6.4 *Construction; Definitions*.  Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

6.5 *Dividends*.  The Board, subject to any restrictions contained in (i) the DGCL, (ii) the certificate of incorporation, or (iii) other applicable law, may declare and pay dividends upon the shares of its capital stock.  Dividends may be paid in cash, in property, or in shares of the Company's capital stock.

The Board may set apart out of any of the funds of the Company available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Company, and meeting contingencies.

6.6 *Fiscal Year*.  The fiscal year of the Company shall be fixed by resolution of the Board and may be changed by the Board.

6.7 *Seal*.  The Company may adopt a corporate seal, which shall be adopted and which may be altered by the Board.  The Company may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

6.8 *Stock Transfer Agreements*.  The Company shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Company to restrict the transfer of shares of stock of the Company of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

6.9 *Registered Stockholders*. The Company:

(i)        shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

-11-

(ii)     shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)     shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

6.10     ***Waiver of Notice***.  Whenever notice is required to be given under any provision of the DGCL, the certificate of incorporation or these bylaws, a written waiver, signed by the person entitled to notice, including without limitation a waiver of notice through execution of a stockholder voting agreement through which rights to notice is so waived, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the certificate of incorporation or these bylaws.

## ARTICLE VII — NOTICE BY ELECTRONIC TRANSMISSION

7.1 ***Notice by Electronic Transmission***. Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the DGCL, the certificate of incorporation or these bylaws, any notice to stockholders given by the Company under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice to the Company.  Any such consent shall be deemed revoked if:

(i)     the Company is unable to deliver by electronic transmission two consecutive notices given by the Company in accordance with such consent; and

(ii)     such inability becomes known to the secretary or an assistant secretary of the Company or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

a.     if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

-12-

    b.  if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice;

    c.  if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

    d.  if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Company that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

7.2 **Definition of Electronic Transmission**. An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

7.3 **Inapplicability**. Notice by a form of electronic transmission shall not apply to Sections 164, 296, 311, 312 or 324 of the DGCL.

## ARTICLE VIII — INDEMNIFICATION

8.1 **Indemnification of Directors and Officers**. The Company shall indemnify and hold harmless, to the fullest extent permitted by the DGCL as it presently exists or may hereafter be amended, any director or officer of the Company who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Company or while serving as a director or officer of the Company is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding. The Company shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board.

8.2 **Indemnification of Others**. The Company shall have the power to indemnify and hold harmless, to the extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Company who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an employee or agent of the Company or while serving as an employee or agent of the Company is or was serving at the request of the Company as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all

-13-

liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

8.3 *Prepayment of Expenses*. The Company shall pay the expenses incurred by any officer or director of the Company, and may pay the expenses incurred by any employee or agent of the Company, in defending any Proceeding in advance of its final disposition; *provided, however*, that the payment of expenses incurred by a person in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the person to repay all amounts advanced if it should be ultimately determined that the person is not entitled to be indemnified under this **Article VIII** or otherwise.

8.4 *Determination; Claim*. If a claim for indemnification or payment of expenses under this **Article VIII** is not paid in full within sixty (60) days after a written claim therefor has been received by the Company the claimant may file suit to recover the unpaid amount of such claim. In any such action the Company shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

8.5 *Non-Exclusivity of Rights*. The rights conferred on any person by this **Article VIII** shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the certificate of incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

8.6 *Insurance*. The Company may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify him or her against such liability under the provisions of the DGCL.

8.7 *Other Indemnification*. The Company's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or non-profit entity shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

8.8 *Amendment Or Repeal*. Any repeal or modification of the foregoing provisions of this **Article VIII** shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

## ARTICLE IX — RIGHT OF FIRST REFUSAL, SECONDARY RIGHT OF REFUSAL, ASSIGNEE RIGHT OF REFUSAL AND REPURCHASE

9.1 *Right of first refusal*.

-14-

**ER-15061**

(i)     Before any stockholder of the Company (a "**Seller**") may Transfer (as defined below) any shares of the Company's capital stock ("**Seller Shares**"), excluding the Class B Common Stock, such Seller must comply with the provisions of this **Article IX** (the "**Right of First Refusal**") and each Proposed Transferee (as defined below) must enter into the Joinder.  For purposes of this **Article IX**, the word "**Transfer**," "**Transferred**," "**Transfers**" or words of similar import, shall mean and include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including but not limited to transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or involuntary, directly or indirectly, except (a) by operation or law, *provided*, that the recipient enters into a joinder agreement (the "**Joinder**") in the form of Annex A to the Company's amended and restated investors' rights agreement dated in November 2013, as it may be amended from time to time (the "**IRA**"); (b) any transfer to the Company pursuant to the terms of the IRA; (c) any repurchase of the Seller Shares by the Company pursuant to agreements under which the Company has the option to repurchase such Seller Shares upon the occurrence of certain events, such as termination of employment, or in connection with the exercise by the Company of any rights of first refusal; and (d) any redemption pursuant to Article V, Section 7 of the Company's certificate of incorporation.

(ii)     Notice of Proposed Transfer.  Prior to a Seller Transferring any of its Seller Shares, such Seller shall deliver to the Company and to the founder of the Company, Elizabeth Holmes (the "**Founder**") not later than one hundred twenty (120) days prior to the consummation of the proposed Transfer, a binding written notice (the "**Transfer Notice**") stating: (i) such Seller's bona fide intention to Transfer such Seller Shares; (ii) the name, address and phone number of each proposed purchaser or other transferee (each, a "**Proposed Transferee**"); (iii) the aggregate number of Seller Shares proposed to be Transferred to each Proposed Transferee (the "**Offered Shares**"); and (iv) the terms and conditions of each proposed Transfer, including, but not limited to, the bona fide cash price or, in reasonable detail, other consideration for which such party proposes to Transfer the Offered Shares (the "**Offered Price**").  The Seller shall offer the Offered Shares at a price equal to the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith and upon the same terms (or terms as similar as reasonably possible) to the Company, the Founder and/or the Assignee (as set forth below).

(iii)     Exercise of Right of First Refusal.  To exercise its Right of First Refusal, at any time within sixty (60) days after receipt of the Transfer Notice, the Company must deliver a written notice to the Seller and the Founder ("**Company Purchase Notice**"), electing to purchase all or any portion of the Offered Shares at the purchase price determined in accordance with subsection (vi) below.

(iv)     Grant of Secondary Right of Refusal to Founder.  If the Company does not exercise its Right of First Refusal to purchase all of the Offered Shares, the Founder shall have a secondary right of refusal to purchase all or any portion of the Offered Shares not purchased by the Company (the "**Secondary Right of Refusal**").  If the Company does not intend to exercise its Right of First Refusal with respect to all of the Offered Shares, the Company must deliver a written notice

-15-

THER-AZ-01126651

to the Seller and to the Founder to that effect no later than sixty (60) days after the Seller delivered the Transfer Notice to the Company (the "**Secondary Notice**"). To exercise her Secondary Right of Refusal, the Founder must deliver a notice (the "**Founder Notice**") to such Seller and the Company within twenty (20) days after the Company's delivery of the Secondary Notice of her intent to exercise or not to exercise her Secondary Right of Refusal hereunder.

        (v)    <u>Right of Assignee of the Company</u>. If both the Company and the Founder do not fully exercise their Right of First Refusal or Secondary Right of Refusal, respectively, then the Company may assign the right to purchase all or any portion of the Offered Shares not purchased by the Company or the Founder on the terms and conditions set forth in this **Article IX** (the "**Assignee Right of Refusal**") to any person (the "**Assignee**") and shall deliver a notice (the "**Assignment Notice**") to such Seller of its intent to exercise or not exercise its right of assignment within five (5) days after delivery of the Founder Notice. To exercise its Assignee Right of Refusal, the Assignee must deliver a notice (the "**Assignee Notice**") to such Seller, the Company and the Founder within twenty (20) days after delivery of the Founder Notice of the Assignee's intent to exercise or not to exercise his, her or its Assignee Right of Refusal.

        (vi)    <u>Purchase Price</u>. The purchase price for the Offered shares to be purchased by the Company, the Founder and/or the Assignee shall be the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. If the Offered Shares are to be Transferred by gift, bequest, devise or descent, the fair market value of the Offered Shares shall be determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. Subject to compliance with applicable state and federal securities laws, the Company, the Founder and/or the Assignee shall effect the purchase of all or any portion of the Offered Shares, including the payment of the purchase price, at the option of the Company, the Founder and/or the Assignee (i) in cash (by check), (ii) by wire transfer, (iii) by cancellation of all or a portion of any outstanding indebtedness of the Seller to the Company (or, in the case of purchase by the Founder or the Assignee, to the Founder or the Assignee, respectively), or (iv) by any combination thereof. The closing of the purchase of any Offered Shares by the Company pursuant to the Right of First Refusal shall take place, and all payments from the Company shall have been delivered to the Seller, by the later of (i) the date specified in the Transfer Notice as the intended date for the proposed Transfer or (ii) sixty (60) days after delivery of the Company Purchase Notice. The closing of the purchase of any Offered Shares by the Founder pursuant to the Secondary Right of Refusal shall take place, and all payments from the Founder shall have been delivered to the Seller, by not later than forty (40) days after delivery of the Founder Notice. The closing of the purchase of any Offered Shares by the Assignee pursuant to the Assignee Right of Refusal shall take place, and all payments from the Assignee shall have been delivered to the Seller, by not later than twenty (20) days after delivery of the Assignee Notice.

<div align="center">-16-</div>

Confidential

<div align="center">**ER-15063**</div>

THER-AZ-01126652

(vii)  Seller's Right to Transfer.  If all of the Offered Shares to be Transferred are not purchased by the Company, the Founder and/or the Assignee as provided in this **Article IX**, then the Seller may Transfer such securities not purchased by the Company, the Founder and/or Assignee to that Proposed Transferee on the terms and conditions set forth in the Transfer Notice and the Joinder, provided that such Transfer is consummated within thirty (30) days after the later of (a) the earlier of (1) the delivery of the Founder Notice indicating an intent not to fully exercise the Secondary Right of Refusal and (2) eighty (80) days after the Seller delivered the Transfer Notice to the Company and (b) the earlier of the delivery of (1) the Assignee Notice indicating an intent not to fully exercise the Assignee Right of Refusal, (2) an Assignment Notice indicating the Company's intent not to exercise its right of assignment and (3) one-hundred (100) days after the Seller delivered the Transfer Notice to the Company, and provided further that any such Transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee enters into the Joinder.  If any securities described in the Transfer Notice are not Transferred to the Proposed Transferee within such period, or if the Seller proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Transfer Notice shall be given to the Company, the Founder and the Assignee, and the Company, the Founder and the Assignee, if any, shall have a new Right of First Refusal, Secondary Right of Refusal, and Assignee Right of Refusal, respectively, before any Seller Shares may be Transferred.

(viii)  Termination.  The provisions of this **Article IX** shall automatically terminate upon effectiveness of the Company's initial public offering of its common stock pursuant to the Securities Act of 1933.

(vi)  Transfer Void.  Any Transfer of shares of the Company's capital stock, excluding the Class B Common Stock, not made in compliance with the requirements of this **Article IX** shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company.

(vii)  Legend.  All certificates evidencing securities of the Company, excluding the Class B Common Stock, shall bear the following legend or one substantially similar (in addition to any legend otherwise required):

THE SALE OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO, AND IN CERTAIN CASES PROHIBITED BY, THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL, SECONDARY RIGHT OF REFUSAL, AND ASSIGNEE RIGHT OF REFUSAL AS SET FORTH IN THE AMENDED AND RESTATED BYLAWS OF THE COMPANY.  COPIES OF SUCH AMENDED AND RESTATED BYLAWS MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

-17-

**ER-15064**

THER-AZ-01126653

## ARTICLE X — AMENDMENTS

10.1    ***Amendment.*** These bylaws may be adopted, amended or repealed by the stockholders entitled to vote.  However, the Company may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors.  The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal bylaws.

10.2    ***Resolution of conflicts.*** In the event of conflict between a decision by the majority of the outstanding stockholders and the Board of Directors, the holders of a majority of the then outstanding shares of the Company's Class B Common Stock, voting together as a single class, may stay the decision at hand for a period of up to thirty (30) days so as to reach a resolution.



-18-

Confidential

THER-AZ-01126654

# ANNEX A

## JOINDER AGREEMENT

By executing this counterpart signature page, the undersigned hereby agrees to be bound by and subject to all terms and conditions that apply to (i) a Holder under Sections 2.7 and 2.9, an Investor under Section 3.1, a Seller under Section 4, and a party under Sections 5.11 and 5.16 of the Company's Amended and Restated Investors' Rights Agreement, dated December ___, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A and B thereto (the "**IRA**"), (ii) a Voting Party under Sections 1, 2, 3, and 7(i) and a party under Sections 7(d) and 7(e) under the Company's Amended and Restated Voting Agreement, dated December __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A, B and C thereto (the "**Voting Agreement**") and (iii) Article IX of the Company's amended and restated bylaws, as amended (the "**Bylaws**").

For all purposes under the IRA and the Voting Agreement, the execution and delivery of this Joinder Agreement by the undersigned shall constitute the execution and delivery of a counterpart signature page to the IRA and Voting Agreement, and the undersigned shall have the rights and be subject to the obligations to extent provided hereunder, effective as of the date hereof.

IN WITNESS WHEREOF, the Joinder Agreement to the IRA, Voting Agreement and Bylaws has been executed by the undersigned as of the date set forth below.

JOINING PARTY:

_____
Signature

_____
Print Name

_____
Date

-19-

Confidential

**ER-15066**

THER-AZ-01126655

**THERANOS, INC.**

**CERTIFICATE OF ADOPTION OF BYLAWS**

The undersigned hereby certifies that he or she is the duly elected, qualified and acting Secretary or Assistant Secretary of Theranos, Inc., a Delaware corporation (the "**Company**"), and that the foregoing bylaws, comprising 16 pages, were adopted as the Company's bylaws on December __, 2013 by the Company's board of directors.

The undersigned has executed this Certificate as of December __, 2013.

_____

**EXHIBIT D**
**Exchange Agreement**



Confidential

THER-AZ-01126657

**EXCHANGE AGREEMENT**

THIS EXCHANGE AGREEMENT (this "**Agreement**") is made and entered into as of December __, 2013, by and between Theranos, Inc., a Delaware corporation (the "**Company**"), and Elizabeth Holmes ("**Purchaser**").

WHEREAS, the Company's board of directors (the "**Board**") has determined that it is in the best interest of the Company and its stockholders to provide additional incentives to the Purchaser in connection with her role as the Company's Chief Executive Officer and to empower the Purchaser to carry out her long-term vision for the Company;

WHEREAS, many of the Company's stockholders have expressed their desires for the Purchaser to be empowered to carry out her long-term vision for the Company;

WHEREAS, the Company has filed its sixth Amended and Restated Certificate of Incorporation with the Secretary of State of Delaware, which, among other things, creates two classes of Company common stock, Class A Common Stock, entitling holders to one (1) vote for each share thereof held, and Class B Common Stock, entitling holders to one hundred (100) votes for each share thereof held; and

WHEREAS, the Board has determined that exchanging all of the Purchaser's shares of Class A Common Stock, $0.0001 par value per share (the "**Class A Common Stock**"), including shares acquired upon exercise of options and rights as of the date hereof, for shares of Class B Common Stock, $0.0001 par value per share (the "**Class B Common Stock**"), will provide the Purchaser with the incremental authority necessary to empower her to carry out her long-term vision for the Company.

NOW, THEREFORE, the parties hereto agree as follows:

**ARTICLE I.**
**EXCHANGE AND ISSUANCE OF CLASS B COMMON STOCK**

1.1     Exchange of Class A Common Stock. Subject to the terms and conditions of this Agreement, Purchaser agrees to acquire from the Company and the Company agrees to issue to the Purchaser shares of Class B Common Stock (the "**Class B Shares**") in exchange for all shares of Class A Common Stock held by the Purchaser, including shares acquired upon exercise of options and rights as of the date hereof (the "**Class A Shares**"), at an exchange ratio of one share of Class A Common Stock for one share of Class B Common Stock, as listed on **Schedule A** hereto (the "**Exchange**").

1.2     Consideration.   On the terms and subject to the conditions set forth herein, as consideration for the Exchange, Purchaser hereby acquires, and the Company hereby issues to Purchaser, the Class B Shares in exchange for the Class A Shares, Purchaser's ongoing and future services to the Company, and the "**Purchase Price,**" which shall mean $100,000.00, which the Company agrees may be satisfied by Purchaser pursuant to continued service as the Company's chief executive officer for a period of one year at a rate equal to $8,333.33 per month, provided that in the event that Purchaser's employment shall terminate for any reason prior to the payment in full

Confidential                                       THER-AZ-01126658

of such amount, the balance of the Purchase Price shall be payable in cash to the Company by the Purchaser on a monthly basis.

1.3    Gross-Up Payment.  The Company hereby agrees to pay Purchaser $55,000.00, as reimbursement for income taxes anticipated to be incurred as a result of the transactions contemplated under this Agreement (the "**Estimated Gross-Up Payment**").  If the Estimated Gross-Up Payment is more than the amount later determined to have been due, the excess shall be repaid by Purchaser within thirty days after written demand, and if the Estimated Gross-Up Payment is less than the amount later determined to have been due, the Company shall make an additional gross-up payment in respect of such excess at the time that the amount of the excess is finally determined.

## ARTICLE II.
## REPRESENTATIONS AND WARRANTIES

Purchaser hereby represents and warrants to the Corporation, with respect to the transactions contemplated hereby, as follows:

2.1    Experience; Risk.  Purchaser has such knowledge and experience in financial and business matters and/or as the chief executive officer of the Company that she is capable of evaluating the merits of and risks associated with the Exchange and of protecting her interests in connection herewith.  Purchaser is able to fend for herself in the transactions contemplated by this Agreement and has the ability to bear the economic risk of an investment in the Class B Shares, including complete loss of the investment value of the Class B Shares.

2.2    Investment.  Purchaser is acquiring the Class B Shares for her own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof, and has no present intention of selling, granting any participation in, or otherwise distributing the same.  Purchaser understands that the Class B Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration and prospectus delivery requirements of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Purchaser's representations as set forth herein.

2.3    Restricted Securities; Rule 144.  Purchaser understands that the Class B Shares are characterized as "restricted securities" under the Securities Act because such shares are being acquired from the Company in a transaction not involving a public offering, and that under the Securities Act and the rules and regulations promulgated thereunder the Class B Shares may be resold without registration under the Securities Act only in certain limited circumstances, and subject to the restrictions under the Company's certificate of incorporation.  Purchaser understands and hereby acknowledges that the Class B Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is otherwise available.  Purchaser is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit limited resales of shares purchased in a transaction not involving a public offering, subject to the satisfaction of certain conditions.

Confidential                **ER-15070**                THER-AZ-01126659

2.4    No Public Market.  Purchaser understands that no public market now exists for any security issued by the Company and that there is no assurance that a public market will ever exist for the Class B Shares.

2.5    Legends.  It is understood that the certificate representing the Class B Shares and any securities issued in respect thereof or exchange therefor, shall bear legends in substantially the following form (in addition to any legend required under applicable state securities laws):

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING AUTOMATIC CONVERSIONS IN THE EVENT OF MOST PURPORTED TRANSFERS OR SALES, AS SET FORTH IN THE CERTIFICATE OF INCORPORATION, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY."

**ARTICLE III.**
**GENERAL PROVISIONS**

3.1    *Governing Law.*  This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law. Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth on the signature pages hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. PURCHASER WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Confidential

**ER-15071**

THER-AZ-01126660

3.2 <u>Successors and Assigns</u>. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

3.3 <u>Entire Agreement; Amendment</u>. Other than the rights, restrictions and preferences provided for the Class B Shares pursuant to the Company's certificate of incorporation, bylaws, amended and restated investors' rights agreement and amended and restated voting agreement, this Agreement, including the exhibits attached hereto, constitutes the full and entire understanding and agreement between the parties with respect to the subject matter hereof. Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by both Purchaser and the Company.

3.4 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*



#6564360v3PALIB2 - Theranos - Class B Common Stock Exchange Agreement.DOCX             -4-

IN WITNESS WHEREOF, the undersigned have executed this Agreement to be effective as of the date first above written.

THERANOS, INC.
**a Delaware corporation**
1601 S. California Avenue
Palo Alto, CA 94304

By: _____

Name: _____

Title: _____

ELIZABETH HOLMES
1601 S. California Avenue
Palo Alto, CA 94304

By: _____

*[Signature Page to Exchange Agreement]*

**SCHEDULE A**

| Exchange Stockholder Name and Address | Number of Shares of Class B Common Stock to be Issued | Number of Shares of Class A Common Stock Exchanged |
|---|---|---|
| Elizabeth Holmes 1601 S. California Avenue Palo Alto, CA 94304 | 250,658,055 | 250,658,055 |

**EXHIBIT E**
**Amended and Restated Purchase Agreement**



Confidential

THER-AZ-01126664

**THERANOS, INC.**

**AMENDED AND RESTATED**

**SERIES C-1 PREFERRED STOCK PURCHASE AGREEMENT**

**Initial Closing Date: July 1, 2010**



C:\NRPortbl\PALIB2\RRF\6489825_2.DOCX (49124)

Confidential

**ER-15077**

THER-AZ-01126666

## TABLE OF CONTENTS

**Page**

**SECTION 1** Authorization, Sale and Issuance of Series C-1 Preferred Stock ............................ 2

    1.1    *Authorization* ................................................................................. 2
    1.2    *Sale and Issuance of Shares* .......................................................... 2

**SECTION 2** Closing Dates and Delivery ................................................................... 2

    2.1    *Closing* ........................................................................................ 2
    2.2    *Delivery* ...................................................................................... 3

**SECTION 3** Representations and Warranties of the Company ...................................... 3

    3.1    *Organization, Good Standing and Qualification* ............................ 3
    3.2    *Capitalization* ............................................................................. 3
    3.3    *Authorization* .............................................................................. 5
    3.4    *Intellectual Property* ................................................................... 5
    3.5    *Compliance with Other Instruments* ............................................ 6
    3.6    *Governmental Consent* ................................................................ 6
    3.7    *Offering* ...................................................................................... 6
    3.8    *Registration Rights* ..................................................................... 7
    3.9    *Brokers or Finders* ...................................................................... 7
    3.10  *Employees* ................................................................................... 7

**SECTION 4** Representations and Warranties of the Investors ..................................... 7

    4.1    *No Registration* ........................................................................... 7
    4.2    *Investment Intent* ........................................................................ 7
    4.3    *Investment Experience* ................................................................. 7
    4.4    *Speculative Nature of Investment* ................................................ 7
    4.5    *Access to Data* ............................................................................ 8
    4.6    *Accredited Investor* ..................................................................... 8
    4.7    *Residency* .................................................................................... 8
    4.8    *Rule 144* ..................................................................................... 8
    4.9    *No Public Market* ........................................................................ 9
    4.10  *Authorization* .............................................................................. 9
    4.11  *Brokers or Finders* ...................................................................... 9
    4.12  *Tax Advisors* ............................................................................... 9
    4.13  *Legends* ...................................................................................... 10
    4.14  *Investment Representations, Warranties and Covenants by Non-U.S. Persons* ........ 10
    4.15  *Representations by Non-U.S. Persons* ......................................... 14

**SECTION 5** Conditions to Investors' Obligations to Close ....................................... 14

    5.1    *Representations and Warranties* ................................................. 14
    5.2    *Covenants* ................................................................................... 14

-i-

THERANOS, INC. CONFIDENTIAL

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| 5.3 | *Blue Sky* | 14 |
| 5.4 | *Restated Certificate* | 14 |
| 5.5 | *Rights Agreement* | 14 |
| 5.6 | *Voting Agreement* | 14 |
| 5.7 | *Proceedings and Documents* | 15 |
| 5.8 | *Consents and Waivers* | 15 |

**SECTION 6** Conditions to Company's Obligation to Close ........ 15

| | | |
|---|---|---|
| 6.1 | *Representations and Warranties* | 15 |
| 6.2 | *Covenants* | 15 |
| 6.3 | *Compliance with Securities Laws* | 15 |
| 6.4 | *Restated Certificate* | 15 |
| 6.5 | *Rights Agreement* | 15 |
| 6.6 | *Voting Agreement* | 15 |
| 6.7 | *Proceedings and Documents* | 15 |

**SECTION 7** Miscellaneous ........ 16

| | | |
|---|---|---|
| 7.1 | *Amendment* | 16 |
| 7.2 | *Notices* | 16 |
| 7.3 | *Governing Law* | 17 |
| 7.4 | *Brokers or Finders* | 17 |
| 7.5 | *Expenses* | 17 |
| 7.6 | *Survival* | 17 |
| 7.7 | *Successors and Assigns* | 17 |
| 7.8 | *Entire Agreement* | 17 |
| 7.9 | *Delays or Omissions* | 17 |
| 7.10 | *California Corporate Securities Law* | 18 |
| 7.11 | *Severability* | 18 |
| 7.12 | *Counterparts* | 18 |
| 7.13 | *Telecopy Execution and Delivery* | 18 |
| 7.14 | *Jurisdiction; Venue* | 18 |
| 7.15 | *Further Assurances* | 19 |
| 7.16 | *Attorney's Fees* | 19 |
| 7.17 | *Waiver of Potential Conflicts of Interest* | 19 |

THERANOS, INC. CONFIDENTIAL

Confidential

THER-AZ-01126668

**EXHIBITS**

A    Schedule of Investors
B    Amended and Restated Certificate of Incorporation
C    Amended and Restated Investor Rights Agreement
D    Amended and Restated Voting Agreement



-iii-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126669

**THERANOS, INC.**

**AMENDED AND RESTATED SERIES C-1 PREFERRED STOCK PURCHASE
AGREEMENT**

This Amended and Restated Series C-1 Preferred Stock Purchase Agreement (this "**Agreement**") is made by and among Theranos, Inc. a Delaware corporation (the "**Company**"), and the persons and entities (each, an "**Investor**" and collectively, the "**Investors**") listed on the Schedule of Investors attached hereto as Exhibit A, except that certain Investors may not be listed on the Schedule of Investors pursuant to confidentiality agreements entered into between the Company and such Investors (the "**Schedule of Investors**"), as of December __, 2013 (the "**Amendment Date**"), and amends, restates and supersedes in its entirety that certain Amended and Restated Series C-1 Preferred Stock Purchase Agreement, (the "**Prior Agreement**"), by and among the Company and the Investors listed on the Schedule of Investors attached thereto (the "**Prior Investors**"), as of the date set forth next to each Prior Investors' name on the Schedule of Investors.

A.     The Series C-1 Preferred Stock Purchase Agreement, dated as of July 1, 2010 (the "**Original Agreement**"), pursuant to which the Company sold and issued, and the Investors listed on the Schedule of Investors attached thereto purchased, an aggregate of 3,977,667 of the Company's Series C-1 Preferred Stock (the "**Series C-1 Preferred**").

B.     Section 2.1(b) of the Prior Agreement provides that if less than 33,333,335 shares of the Series C-1 Preferred authorized for sale and issuance pursuant to the Prior Agreement were sold in the Initial Closing (as defined below), the Company may sell and issue up to the balance of the unsold shares at one or more Subsequent Closings (as defined in the Prior Agreement), which must take place within 36 months of the Initial Closing, which was held on July 1, 2010.

C.     Investors purchasing shares in a Subsequent Closing may become parties to the Prior Agreement in accordance with Section 2.1 of the Prior Agreement.

D.     The Company wishes to amend the Prior Agreement to provide that one or more Subsequent Closings may be held on or before December 31, 2013, and make such other changes as set forth below.

E.     Section 7.1 of the Prior Agreement provides that the Prior Agreement may be amended by a written instrument referencing the Prior Agreement and signed by the Company and the Investors holding a majority of the Company's common stock issued or issuable upon conversion of the Shares (as defined in the Prior Agreement) issued or issuable upon conversion of the Shares issued pursuant to the Prior Agreement.

F.     Pursuant to the Restated Certificate (as defined below), the Company effected a forward stock split and reclassification, pursuant to which each share of the Company's common stock that was issued and outstanding as of the effective time of such forward stock split was converted and reclassified into five (5) shares of the Company's Class A Common Stock, $0.0001

-1-

THERANOS, INC. CONFIDENTIAL

par value per share (the "**Class A Common Stock**") and each share of the Company's preferred stock that was issued and outstanding as of the effective time of such stock split was converted into five (5) shares of the Company's preferred stock (the "**Forward Split and Reclassification**"). Unless specified otherwise, all share numbers set forth herein give effect to the Forward Split and Reclassification.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Prior Agreement is hereby amended and restated as follows:

## SECTION 1

### Authorization, Sale and Issuance of Series C-1 Preferred Stock

1.1 *Authorization.* The Company has authorized (a) the sale and issuance of up to 33,333,335 shares of Series C-1 Preferred (the "**Shares**"), having the rights, privileges, preferences and restrictions set forth in the Amended and Restated Certificate of Incorporation of the Company, attached hereto as <u>Exhibit B</u> (the "**Restated Certificate**") and (b) the reservation of shares of the Class A Common Stock for issuance upon conversion of the Shares (the "**Conversion Shares**").

1.2 *Sale and Issuance of Shares.* Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase, and the Company agrees to sell and issue to each Investor, the number of Shares set forth in the column designated "Number of Series C-1 Shares" opposite such Investor's name on the Schedule of Investors, at a cash purchase price of at least $15.00 per share (as the case may be, the "**Purchase Price**"). The Company's agreement with each Investor is a separate agreement, and the sale and issuance of the Shares to each Investor is a separate sale and issuance.

## SECTION 2

### Closing Dates and Delivery

2.1 *Closing.*

(a) The purchase, sale and issuance of the Shares shall take place at one or more closings (each of which is referred to in this Agreement as a "**Closing**"). The initial Closing (the "**Initial Closing**") took place at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 650 Page Mill Road, Palo Alto, California 94304 at 10:00 a.m. local time on Friday, July 1, 2010.

(b) If less than all of the Shares are sold and issued at the Initial Closing, then, subject to the terms and conditions of this Agreement, the Company may sell and issue at one or more subsequent closings (each, a "**Subsequent Closing**"), held on or before December 31, 2013, up to the balance of the unissued Shares to such persons or entities as may be approved by Board of

-2-

Directors of the Company. Any such sale and issuance in a Subsequent Closing shall be on the same terms and conditions as those contained herein, and such persons or entities shall, upon execution and delivery of the relevant signature pages, become parties to, and be bound by, this Agreement, the Amended and Restated Investors' Rights Agreement in substantially the form attached hereto as Exhibit C (the "**Rights Agreement**"), and the Amended and Restated Voting Agreement in substantially the form attached hereto as Exhibit D (the "**Voting Agreement**," and together with this Agreement and the Rights Agreement, the "**Agreements**"), without the need for an amendment to any of the Agreements, and shall have the rights and obligations hereunder and thereunder, in each case as of the date of the applicable Subsequent Closing. Each Subsequent Closing shall take place at such date, time and place as shall be approved by the Company and the Investors representing a majority of the Shares to be sold in such Subsequent Closing.

2.2    *Delivery.* At each Closing, the Company will deliver to each Investor in such Closing a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing in such Closing against payment of the purchase price therefor as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (i) check payable to the Company, (ii) wire transfer in accordance with the Company's instructions, (iii) cancellation of indebtedness or (iv) any combination of the foregoing. In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

### SECTION 3

### Representations and Warranties of the Company

The Company hereby represents and warrants to the Investors as follows:

3.1    *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted, to execute and deliver the Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements and the Restated Certificate. The Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's business, assets (including intangible assets), liabilities, financial condition, properties or results of operations (a "**Material Adverse Effect**").

3.2    *Capitalization.*

(a)    As of October 1, 2013 (after giving effect to the Forward Split and Reclassification as if it occurred on such date), the authorized capital stock of the Company consisted of 725,000,000 shares of Class A Common Stock, of which approximately 245,111,810 shares are issued and outstanding, 250,658,055 shares of the Company's Class B Common Stock,

-3-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126672

$0.0001 par value per share (the "**Class B Common Stock**"), of which no shares are issued and outstanding, and 217,539,750 shares of Preferred Stock, 46,320,045 of which are designated Series A Preferred Stock, substantially all of which are issued and outstanding pursuant to that certain Series A Preferred Stock Financing dated December 17, 2004, January 21, 2005 and February 7, 2005 (the "**Series A Preferred**"), 54,162,965 of which are designated Series B Preferred Stock, substantially all of which are issued and outstanding pursuant to that certain Series B Preferred Stock Financing dated February 3, 2006 (the "**Series B Preferred**"), 62,056,740 of which are designated Series C Preferred Stock, 58,896,105 of which are issued and outstanding pursuant to that certain Series C Preferred Stock Financing dated October 13, 2006, November 3, 2006, November 15, 2006 and December 12, 2006 (the "**Series C Preferred**"), 33,333,335 of which are designated Series C-1 Preferred, approximately 19,888,335 of which are issued and outstanding and reserved pursuant to that certain Series C-1 Preferred Stock Financing dated July 1, 2010, as amended to date (the "**Series C-1 Preferred**"). The Class A Common Stock, the Class B Common Stock, the Series A Preferred, the Series B Preferred, the Series C Preferred, and the Series C-1 Preferred shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

(b)     The outstanding shares have been duly authorized and validly issued in compliance with applicable laws (including applicable federal and state securities laws), and are fully paid and nonassessable.

(c)     The Company has reserved:

(i)     the Shares for issuance pursuant to this Agreement;

(ii)     a sufficient number of shares of Class A Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Shares;

(iii)     226,319,890 shares of Class A Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2004 Stock Plan, under which options to purchase approximately 8,236,660 shares of the Company's common stock were issued and outstanding as of October 1, 2013;

(iv)     15,000,000 shares of Class A Common Stock anticipated to be authorized for issuance to employees, consultants and directors pursuant to its 2013 Stock Incentive Plan, pending approval of the 2013 Stock Incentive Plan by the Company's board of directors and stockholders;

(v)     250,658,055 shares of Class B Common Stock anticipated to be authorized for issuance to Elizabeth Holmes in exchange for 250,658,055 shares of Class A Common Stock held by Ms. Holmes (assuming exercise of options and rights to purchase 53,705,830 shares of Class A Common Stock held by Ms. Holmes);

(vi)     741,665 shares of Class A Common Stock for issuance upon exercise of warrants to purchase the Company's common stock; and

-4-

THERANOS, INC. CONFIDENTIAL

Confidential

THER-AZ-01126673

(vii)     9,666,670 shares of Series C-1 Preferred Stock for issuance upon conversion of notes convertible into shares of Series C-1 Preferred Stock.

(d)     All issued and outstanding shares of the Company's Class A Common Stock and Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable and have been approved by all requisite stockholder action, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities.

(e)     The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate and applicable law, will be validly issued, fully paid and nonassessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investors; provided, however, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Rights Agreement and the Company's Bylaws and to certain redemption rights in favor of the Company as set forth in the Company's Certificate of Incorporation and Bylaws.

(f)     Except for the conversion privileges of the Series A Preferred, Series B Preferred, Series C Preferred, and Series C-1 Preferred, the rights provided pursuant to the Rights Agreement, the convertible promissory notes issued in conjunction with the Series C-1 or as otherwise described in this Agreement, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock.

3.3     *Authorization*.  All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization and filing of the Restated Certificate, the authorization, execution and delivery of the Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares, and the performance of all of the Company's obligations under the Agreements has been or will be taken prior to the Initial Closing. The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity, and (iii) to the extent the indemnification provisions contained in the Rights Agreement may further be limited by applicable laws and principles of public policy.

3.4     *Intellectual Property*.

(a)     Rights.  To the knowledge of the Company's executive officers (the "**Company's Knowledge**"), the Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and other proprietary rights ("**Intellectual Property**") necessary to the business of the Company as presently conducted. To the Company's Knowledge, the Company by operating its business as currently

-5-

THERANOS, INC. CONFIDENTIAL

proposed to be conducted will not violate or infringe any patent or trademark rights of any other person that are necessary for conducting the business of the Company as presently contemplated.

(b)     Proprietary Information and Invention Assignment. The Company's current practice is to require each current and former employee and consultant of the Company to execute a confidential information and invention assignment agreement. To the Company's Knowledge, no employee has excluded any inventions or intellectual property from assignment to the Company under such confidential information and invention assignment agreement other than certain intellectual property created by certain employees prior to joining the Company. To the Company's Knowledge, no current employee or consultant of the Company is obligated under any agreement (including licenses, covenants or commitments of any nature) or subject to any judgment, decree or order of any court or administrative agency, or any other restriction that would interfere with the use of his or her best efforts to carry out his or her duties for the Company or to promote the interests of the Company or that would conflict with the Company's business as currently conducted. To the Company's Knowledge, it is not presently nor will it be necessary to utilize any inventions of any existing employees of the Company made prior to their employment by the Company.

3.5     *Compliance with Other Instruments.* The Company is not in violation of any material term of its Certificate of Incorporation or Bylaws, each as amended to date. To the Company's knowledge, the Company is not in violation of any material federal or state statute, rule or regulation applicable to the Company. The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares and the Conversion Shares, will not result in any violation of, or conflict with, or constitute a default under, the Company's Certificate of Incorporation or Bylaws, each as amended to date, nor, to the Company's knowledge, will it result in any material violation of, or materially conflict with, or constitute a material default under any of its material agreements, nor, to the Company's knowledge, will it result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company.

3.6     *Governmental Consent.* No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Certificate with the office of the Secretary of State of the State of Delaware, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "**Securities Act**") and (iii) such filings as may be required under applicable state securities laws.

3.7     *Offering.* Subject to the accuracy of the Investors' representations and warranties in Section 4, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and the registration and/or qualification requirements of all applicable state securities laws.

-6-

THERANOS, INC. CONFIDENTIAL

3.8 *Registration Rights.* Except as set forth in the Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued.

3.9 *Brokers or Finders.* The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.10 *Employees.* To the Company's knowledge, there are no strike, labor dispute or union organization activities pending or threatened between it and its employees. To the Company's knowledge, none of its employees belongs to any union or collective bargaining unit.

## SECTION 4

## Representations and Warranties of the Investors

Each Investor hereby, severally and not jointly, represents and warrants to the Company as follows:

4.1 *No Registration.* Such Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

4.2 *Investment Intent.* Such Investor is acquiring the Shares and the Conversion Shares, for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

4.3 *Investment Experience.* Such Investor, or its purchaser representative, within the meaning of Regulation D, Rule 501(h), promulgated by the Securities and Exchange Commission (its "**Purchaser Representative**"), has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that such Investor or its Purchaser Representative can protect its own interests. Such Investor or its Purchaser Representative has such knowledge and experience in financial and business matters so that such Investor or its Purchaser Representative is capable of evaluating the merits and risks of its investment in the Company.

4.4 *Speculative Nature of Investment.* Such Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is

-7-

THERANOS, INC. CONFIDENTIAL

**ER-15087**

THER-AZ-01126676

highly speculative and involves substantial risks. Such Investor can bear the economic risk of such Investor's investment and is able, without impairing such Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of such Investor's investment.

4.5     *Access to Data.* Such Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction. Such Investor believes that it has received all the information such Investor considers necessary or appropriate for deciding whether to purchase the Shares and Conversion Shares. Such Investor understands that such discussions, as well as any information issued by the Company, were intended to describe certain aspects of the Company's business and prospects, but were not necessarily a thorough or exhaustive description. Such Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Such Investor also acknowledges that it is relying solely on its own counsel and not on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements. Nothing in this Section 4.5 shall be deemed to limit or modify the Company's representations in Section 3.

4.6     *Accredited Investor.* The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

4.7     *Residency.* The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investors.

4.8     *Rule 144.* Such Investor acknowledges that the Shares and the Conversion Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Such Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares being sold during any three-month period not exceeding specified limitations. Such Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available. Such Investor acknowledges and understands that notwithstanding any

-8-

THERANOS, INC. CONFIDENTIAL

obligation under the Rights Agreement, the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Shares or the Conversion Shares, and that, in such event, the Investor may be precluded from selling such securities under Rule 144, even if the other requirements of Rule 144 have been satisfied. Such Investor acknowledges that, in the event all of the requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Class A Common Stock. Such Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

4.9     *No Public Market.* Such Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.10     *Authorization.*

(a)     Such Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of the Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

(b)     The Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)     No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

4.11     *Brokers or Finders.* Such Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

4.12     *Tax Advisors.* Such Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the

-9-

THERANOS, INC. CONFIDENTIAL

Agreements. With respect to such matters, such Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

4.13   *Legends*. Such Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Rights Agreement or under applicable state securities laws):

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.
>
> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.
>
> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A MANDATORY REDEMPTION RIGHT IN FAVOR OF THE ISSUER AS SET FORTH IN THE ISSUER'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION AND BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER."

4.14   *Investment Representations, Warranties and Covenants by Non-U.S. Persons*. Each Investor who is a Non-U.S. person (as that term is defined in Section 4.14(c) of this Agreement) hereby represents and warrants to the Company as follows:

-10-

THERANOS, INC. CONFIDENTIAL

(a)    This Agreement is made by the Company with such Investor who is a Non-U.S. person in reliance upon such Non-U.S. person's representations, warranties and covenants made in this Section 4.14.

(b)    Such Non-U.S. person has been advised and acknowledges that:

(i)    the Shares and the Conversion Shares have not been, and when issued, will not be registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other country;

(ii)    in issuing and selling the Shares and the Conversion Shares to such Non-U.S. person pursuant hereto, the Company is relying upon the "safe harbor" provided by Regulation S and/or on Section 4(2) under the Securities Act;

(iii)    it is a condition to the availability of the Regulation S "safe harbor" that the Shares and the Conversion Shares not be offered or sold in the United States or to a U.S. person until the expiration of a period of one year following the Closing Date; and

(iv)    notwithstanding the foregoing, prior to the expiration of one year after the Closing (the "**Restricted Period**"), the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person.

(c)    As used herein, the term "**United States**" means and includes the United States of America, its territories and possessions, any State of the United States, and the District of Columbia, and the term "**U.S. person**" (as defined in Regulation S) means:

(i)    a natural person resident in the United States;

(ii)    any partnership or corporation organized or incorporated under the laws of the United States;

(iii)    any estate of which any executor or administrator is a U.S. person;

(iv)    any trust of which any trustee is a U.S. person;

(v)    any agency or branch of a foreign entity located in the United States;

(vi)    any nondiscretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

-11-

THERANOS, INC. CONFIDENTIAL

**ER-15091**

THER-AZ-01126680

(vii)     any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated and (if an individual) resident in the United States; and

(viii)     a corporation or partnership organized under the laws of any foreign jurisdiction and formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

As used herein, the term "**Non-U.S. person**" means any person who is not a U.S. person or is deemed not to be a U.S. person under Rule 902(k)(2) of the Securities Act.

(d)     Such Non-U.S. person agrees that with respect to the Shares and the Conversion Shares until the expiration of the Restricted Period:

(i)     such Non-U.S. person, its agents or its representatives have not and will not solicit offers to buy, offer for sale or sell any of the Shares and the Conversion Shares, or any beneficial interest therein in the United States or to or for the account of a U.S. person during the Restricted Period; and

(ii)     notwithstanding the foregoing, prior to the expiration of the Restricted Period, the Shares and the Conversion Shares may be offered and sold by the holder thereof only if such offer and sale is made in compliance with the terms of this Agreement and either: (A) if the offer or sale is within the United States or to or for the account of a U.S. person (as such terms are defined in Regulation S), the securities are offered and sold pursuant to an effective registration statement or pursuant to Rule 144 under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act; or (B) the offer and sale is outside the United States and to other than a U.S. person; and

(iii)     such Non-U.S. person shall not engage in hedging transactions with regard to the Shares and the Conversion Shares unless in compliance with the Securities Act.

The foregoing restrictions are binding upon subsequent transferees of the Shares and the Conversion Shares, except for transferees pursuant to an effective registration statement. Such Non-U.S. person agrees that after the Restricted Period, the Shares and the Conversion Shares may be offered or sold within the United States or to or for the account of a U.S. person only pursuant to applicable securities laws.

(e)     Such Non-U.S. person has not engaged, nor is it aware that any party has engaged, and such Non-U.S. person will not engage or cause any third party to engage, in any directed selling efforts (as such term is defined in Regulation S) in the United States with respect to the Shares and the Conversion Shares.

-12-

THERANOS, INC. CONFIDENTIAL

(f)    Such Non-U.S. person: (i) is domiciled and has its principal place of business outside the United States; (ii) certifies it is not a U.S. person and is not acquiring the Shares or the Conversion Shares for the account or benefit of any U.S. person; and (iii) at the time of the Closing Date, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith will be located outside the United States.

(g)    At the time of offering to such Non-U.S. person and communication of such Non-U.S. person's order to purchase the Shares or the Conversion Shares and at the time of such Non-U.S. Person's execution of this Agreement, the Non-U.S. person or persons acting on Non-U.S. person's behalf in connection therewith were located outside the United States.

(h)    Such Non-U.S. person is not a "distributor" (as defined in Regulation S) or a "dealer" (as defined in the Securities Act).

(i)    Such Non-U.S. person acknowledges that the Company shall make a notation in its stock books regarding the restrictions on transfer set forth in this Section 4.14 and shall transfer such shares on the books of the Company only to the extent consistent therewith.

In particular, such Non-U.S. person acknowledges that the Company shall refuse to register any transfer of the Shares or the Conversion Shares not made in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

(j)    Such Investor understands and agrees that each certificate held by such Non-U.S. person representing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or any the Conversion Shares upon conversion thereof upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by this Agreement, by Sections 417 and 418 of the California Corporations Code or under applicable state securities laws):

> THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION. HEDGING TRANSACTIONS INVOLVING THE SHARES REPRESENTED HEREBY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY AND ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE, HYPOTHECATION OR ANY OTHER TRANSFER

-13-

THERANOS, INC. CONFIDENTIAL

ER-15093

OF ANY INTEREST IN ANY OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

4.15    *Representations by Non-U.S. Persons.* If an Investor is not a U.S. person, such Investor hereby represents that such Investor is satisfied as to the full observance of the laws of such Investor's jurisdiction in connection with any invitation to subscribe for the Shares and the Conversion Shares or any use of the Agreements, including (i) the legal requirements within such Investor's jurisdiction for the purchase of Shares and the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of such securities. Such Investor's subscription and payment for, and such Investor's continued beneficial ownership of, the Shares and the Conversion Shares will not violate any applicable securities or other laws of such Investor's jurisdiction.

## SECTION 5

### Conditions to Investors' Obligations to Close

Each Investor's obligation to purchase the Shares at a Closing is subject to the fulfillment on or before the Closing of each of the following conditions, unless waived in writing by the applicable Investor purchasing the Shares in such Closing:

5.1    *Representations and Warranties.* With respect to any Subsequent Closing, the representations and warranties made by the Company in Section 3 of this Agreement shall be true and correct in all material respects as of the date of any Subsequent Closing.

5.2    *Covenants.* All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Initial Closing shall have been performed or complied with by it on or before the Initial Closing.

5.3    *Blue Sky.* The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

5.4    *Restated Certificate.* The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

5.5    *Rights Agreement.* The Company, Elizabeth Holmes, and Holders of a majority of the Registrable Securities (each as defined in the Rights Agreement) shall have executed and delivered the Rights Agreement.

5.6    *Voting Agreement.* The Company, the Founder, and a majority-in-interest of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

-14-

Confidential

THER-AZ-01126683

5.7     *Proceedings and Documents.* All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investors, and the Investors shall have been furnished with such instruments and documents as they shall have reasonably requested.

5.8     *Consents and Waivers.* The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for the performance by the Company of its obligations pursuant to the Agreements.

## SECTION 6

### Conditions to Company's Obligation to Close

The Company's obligation to sell and issue the Shares at each Closing is subject to the fulfillment on or before such Closing of the following conditions, unless waived in writing by the Company:

6.1     *Representations and Warranties.* The representations and warranties made by the Investors in such Closing in Section 4 shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the date of such Closing.

6.2     *Covenants.* All covenants, agreements and conditions contained in the Agreements to be performed by Investors on or prior to the date of such Closing shall have been performed or complied with as of the date of such Closing.

6.3     *Compliance with Securities Laws.* The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

6.4     *Restated Certificate.* The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

6.5     *Rights Agreement.* The Company, Elizabeth Holmes and the Holders of a majority of the Registrable Securities shall have executed and delivered the Rights Agreement.

6.6     *Voting Agreement.* The Company, the Founder, and a majority-in-interest of the Voting Parties (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

6.7     *Proceedings and Documents.* All corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Company,

-15-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126684

and the Company shall have been furnished with such instruments and documents as they shall have reasonably requested.

## SECTION 7

### Miscellaneous

7.1 *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Investors holding a majority of the Class A Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement (excluding any of such shares that have been sold to the public or pursuant to Rule 144); provided, however, that Investors purchasing shares in a Closing after the Initial Closing may become parties to this Agreement in accordance with **Section 2.1** without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Investor. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities. Each Investor acknowledges that by the operation of this paragraph, the holders of a majority of the Class A Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement (excluding any of such shares that have been sold to the public or pursuant to Rule 144) will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

7.2 *Notices*. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid or otherwise delivered by hand or by messenger addressed:

(a) if to an Investor, at the Investor's address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b) if to any other holder of any Shares or Conversion Shares, at such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c) if to the Company, one copy should be sent to each of Elizabeth Holmes and Valeska Pederson Hintz, Theranos, Inc. 1601 S. California Avenue, Palo Alto, CA 94304, or at such other address as the Company shall have furnished to the Investors, with copies to Katharine A. Martin, Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

-16-

THERANOS, INC. CONFIDENTIAL

7.3     *Governing Law*. This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

7.4     *Brokers or Finders*. The Company shall indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 3.16**, and each Investor agrees to indemnify and hold harmless the Company and each other Investor from any liability for any commission or compensation in the nature of a brokerage or finder's fee or agent's commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company, any other Investor or any of their constituent partners, members, officers, directors, employees or representatives is responsible to the extent such liability is attributable to any inaccuracy or breach of the representations and warranties contained in **Section 4.11**.

7.5     *Expenses*. The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement.

7.6     *Survival*. The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby.

7.7     *Successors and Assigns*. This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

7.8     *Entire Agreement*. This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof, including, without limitation, the Prior Agreement, which is superseded hereby and of no further force or effect.

7.9     *Delays or Omissions*. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part

-17-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126686

of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

7.10    *California Corporate Securities Law*. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO SUCH QUALIFICATION IS UNLAWFUL UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

7.11    *Severability*. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

7.12    *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

7.13    *Telecopy Execution and Delivery*. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

7.14    *Jurisdiction; Venue*. Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 7.2 hereof; provided, that nothing in this paragraph shall affect the right of any party to serve

-18-

Confidential

THER-AZ-01126687

process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

7.15 *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

7.16 *Attorney's Fees.* In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

7.17 *Waiver of Potential Conflicts of Interest.* Each of the Investors and the Company acknowledges that Wilson Sonsini Goodrich & Rosati, Professional Corporation ("WSGR") may have represented and may currently represent certain of the Investors. In the course of such representation, WSGR may have come into possession of confidential information relating to such Investors. Each of the Investors and the Company acknowledges that WSGR is representing only the Company in this transaction. Each of the Investors and the Company understands that an affiliate of WSGR may also be an Investor under this Agreement. Pursuant to Rule 3-310 of the Rules of Professional Conduct promulgated by the State Bar of California, an attorney must avoid representations in which the attorney has or had a relationship with another party interested in the representation without the informed written consent of all parties affected. By executing this Agreement, each of the Investors and the Company hereby waives any actual or potential conflict of interest which may arise as a result of WSGR's representation of such persons and entities, WSGR's possession of such confidential information and the participation by WSGR's affiliate in the financing. Each of the Investors and the Company represents that it has had the opportunity to consult with independent counsel concerning the giving of this waiver.

[Signature Page Follows]

-19-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126688

The parties are signing this Amended and Restated Series C-1 Preferred Stock Purchase Agreement as of the date stated in the introductory clause.

**THERANOS, INC.**
**a Delaware corporation**

By: _____

Name: _____

Title: _____

-1-

THER-AZ-01126689

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

| Investor | Date | Address | Number of Series C-1 Shares | Purchase Price |
|---|---|---|---|---|
| [    ] | | [    ] | [    ] | $\_\_\_\_\_. |

\* Prior investors not listed per confidentiality agreements with the Company.

-1-

THER-AZ-01126690

**EXHIBIT B**

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**



-1-

Confidential

THER-AZ-01126691

**EXHIBIT C**

**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**



Confidential

THER-AZ-01126692

**EXHIBIT D**

**AMENDED AND RESTATED VOTING AGREEMENT**



THERANOS, INC. CONFIDENTIAL
6489825_2.DOCX

**EXHIBIT F**
**Amended and Restated Investors' Rights Agreement**



**ER-15105**



**THERANOS, INC.**

**AMENDED AND RESTATED**

**INVESTORS' RIGHTS AGREEMENT**

**December __, 2013**

**ER-15106**

THER-AZ-01126695

## TABLE OF CONTENTS

**Page**

Section 1 Definitions ........................................................................................................ 1
    1.1    *Certain Definitions* .......................................................................... 1

Section 2 Registration Rights ......................................................................................... 5
    2.1    *Company Registration* .................................................................... 5
    2.2    *Registration on Form S-3* .............................................................. 6
    2.3    *Expenses of Registration* ............................................................... 8
    2.4    *Registration Procedures* ................................................................ 9
    2.5    *Indemnification* ............................................................................ 10
    2.6    *Information by Holder* .................................................................. 12
    2.7    *Restrictions on Transfer* .............................................................. 12
    2.8    *Rule 144 Reporting* ...................................................................... 14
    2.9    *Market Stand-Off Agreement* ....................................................... 14
    2.10    *Delay of Registration* ................................................................... 15
    2.11    *Transfer or Assignment of Registration Rights* ........................... 15
    2.12    *Limitations on Subsequent Registration Rights* .......................... 15
    2.13    *Termination of Registration Rights* .............................................. 15

Section 3 Covenants of the Company .............................................................................. 15
    3.1    *Confidentiality* ............................................................................. 15
    3.2    *Confidential Information and Invention Assignment Agreements* .. 16
    3.3    *Key Person Life Insurance* ........................................................... 16
    3.4    *Termination of Covenants* ............................................................ 16

Section 4 Company Right of First Refusal, Secondary Right of Refusal, and Assignee Right
of Refusal ....................................................................................................................... 16
    4.1    *Right of First Refusal* .................................................................. 16

Section 5 Miscellaneous ................................................................................................. 19
    5.1    *Amendment* .................................................................................. 19
    5.2    *Notices* ......................................................................................... 19
    5.3    *Governing Law* ............................................................................ 20
    5.4    *Successors and Assigns* ................................................................ 20
    5.5    *Entire Agreement* ........................................................................ 20
    5.6    *Delays or Omissions* .................................................................... 20
    5.7    *Severability* ................................................................................. 20
    5.8    *Titles and Subtitles* ..................................................................... 20
    5.9    *Counterparts* ............................................................................... 21
    5.10    *Telecopy Execution and Delivery* ................................................ 21
    5.11    *Jurisdiction; Venue* ...................................................................... 21
    5.12    *Further Assurances* ...................................................................... 21
    5.13    *Termination Upon Change of Control* .......................................... 21
    5.14    *Quarterly Board Meetings* ........................................................... 22
    5.15    *Conflict* ....................................................................................... 22
    5.16    *Costs of Enforcement* ................................................................... 22
    5.17    *Aggregation* ................................................................................. 22

-i-

Confidential

**ER-15107**

THER-AZ-01126696

5.18   *Prior Rights Agreement Superseded/Waiver* ............................................................ 22



-ii-

Confidential

THER-AZ-01126697

## THERANOS, INC.
## AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT

This Amended and Restated Investors' Rights Agreement (this "**Agreement**") is made as of December __ , 2013, by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities (each, a "**Series C-1 Investor**" and collectively, the "**Series C-1 Investors**") listed on Exhibit A hereto, the persons and entities (each, a "**Prior Investor**" and collectively, the "**Prior Investors**") listed on Exhibit B hereto, and Elizabeth Holmes. The Series C-1 Investors and the Prior Investors are referred to herein collectively as the "**Investors**." Unless otherwise defined herein, capitalized terms used in this Agreement have the meanings ascribed to them in **Section 1**.

### RECITALS

**WHEREAS,** the Company, certain of the Series C-1 Investors, the Prior Investors and Elizabeth Holmes are parties to that certain Amended and Restated Investors' Rights Agreement dated as of July 1, 2010 (the "**Prior Agreement**").

**WHEREAS,** the Series C-1 Investors are parties to the Amended and Restated Series C-1 Preferred Stock Purchase Agreement of even date herewith, among the Company and the Series C-1 Investors listed on the Schedule of Investors thereto (the "**Purchase Agreement**"), and it is a condition to the closing of the sale of the Series C-1 Preferred Stock to the Series C-1 Investors listed on such Schedule of Investors that the Investors and the Company execute and deliver this Agreement.

**WHEREAS,** the undersigned Company, certain of the Series C-1 Investors, the Prior Investors and Elizabeth Holmes desire to amend and restate the Prior Agreement to add additional Series C-1 Investors as parties and amend and restate the terms of the Prior Agreement.

**NOW, THEREFORE:** In consideration of the mutual promises and covenants set forth herein, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### Section 1
### Definitions

1.1 *Certain Definitions.* As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "**Class A Common Stock**" means the Class A Common Stock of the Company.

(b) "**Class B Common Stock**" means the Class B Common Stock of the Company.

-1-

THERANOS, INC. CONFIDENTIAL

(c)　　"**Commission**" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(d)　　"**Common Stock**" means the Class A Common Stock and Class B Common Stock.

(e)　　"**Conversion Stock**" shall mean shares of Class A Common Stock issued upon conversion of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series C-1 Preferred Stock held by the Investors.

(f)　　"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(g)　　"**Holder**" shall mean any Investor who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been duly and validly transferred in accordance with **Section 2.11** of this Agreement and, for the purposes of Section 2 only, Elizabeth Holmes for so long as she holds Registrable Securities.

(h)　　"**Indemnified Party**" shall have the meaning set forth in **Section 2.5(c)** hereto.

(i)　　"**Indemnifying Party**" shall have the meaning set forth in **Section 2.5(c)** hereto.

(j)　　"**Initial Closing**" shall mean the date of the initial sale of shares of the Company's Series C-1 Preferred Stock pursuant to the Purchase Agreement.

(k)　　"**Initial Public Offering**" shall mean the closing of the Company's first firm commitment underwritten public offering of the Class A Common Stock registered under the Securities Act.

(l)　　"**Joinder**" shall mean the joinder agreement in the form of Annex A.

(m)　　"**Offered Price**" shall have the meaning set forth in **Section 4.1(b)**.

(n)　　"**Offered Shares**" shall have the meaning set forth in **Section 4.1(b)**.

(o)　　"**Other Selling Stockholders**" shall mean persons other than Holders who, by virtue of agreements with the Company, are entitled to include their Other Shares in certain registrations hereunder.

(p)　　"**Other Shares**" shall mean shares of Class A Common Stock, other than Registrable Securities (as defined below), (including shares of Class A Common Stock issuable upon conversion of shares of any currently unissued series of Preferred Stock of the Company) with respect to which registration rights have been granted.

-2-

THERANOS, INC. CONFIDENTIAL

(q)     "**Proposed Transferee**" shall have the meaning set forth in **Section 4.1(b)**.

(r)     "**Purchase Agreement**" shall have the meaning set forth in the Recitals hereto.

(s)     "**Registrable Securities**" shall mean (i) shares of Conversion Stock, (ii) any shares of Class A Common Stock held by Elizabeth Holmes (including upon conversion of Class B Common Stock) and any shares of Class A Common Stock issued upon conversion of Preferred Stock held by Elizabeth Holmes, and (iii) any shares of Class A Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, all such shares of Class A Common Stock described in clauses (i) and (ii) of this subsection (s); provided, however, that Registrable Securities shall not include any shares of Class A Common Stock described in clause (i), (ii), or (iii) above which have previously been registered or which have been sold to the public either pursuant to a registration statement or Rule 144, or which have been sold in a private transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with this Agreement.

(t)     The terms "**register**," "**registered**" and "**registration**" shall refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of the effectiveness of such registration statement.

(u)     "**Registration Expenses**" shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company and one special counsel for the Holders, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses, fees and disbursements of other counsel for the Holders and the compensation of regular employees of the Company, which shall be paid in any event by the Company.

(v)     "**Restricted Securities**" shall mean any Registrable Securities required to bear the first legend set forth in **Section 2.7(c)** hereof.

(w)     "**Rule 144**" shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(x)     "**Rule 145**" shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission

(y)     "**Securities Act**" shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

-3-

THERANOS, INC. CONFIDENTIAL

(z) "**Seller**" shall have the meaning set forth in **Section 4.1(a)**.

(aa) "**Seller Shares**" shall have the meaning set forth in **Section 4.1(a)**.

(bb) "**Selling Expenses**" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of one special counsel to the Holders included in Registration Expenses).

(cc) "**Series A Preferred Stock**" shall mean the shares of Series A Preferred Stock of the Company.

(dd) "**Series B Preferred Stock**" shall mean the shares of Series B Preferred Stock of the Company.

(ee) "**Series C Preferred Stock**" shall mean the shares of Series C Preferred Stock of the Company.

(ff) "**Series C-1 Preferred Stock**" shall mean the shares of Series C-1 Preferred Stock of the Company.

(gg) "**Shares**" shall mean the Company's Series C-1 Preferred Stock.

(hh) "**Transfer**" or words of similar import, mean and include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by bequest, devise or descent, or other transfer or disposition of any kind, including but not limited to transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or involuntary, directly or indirectly, except:

(i) by operation of law; *provided*, that the recipient enters into the Joinder;

(ii) any transfer to the Company pursuant to the terms of this Agreement;

(iii) any repurchase of the Seller Shares by the Company pursuant to agreements under which the Company has the option to repurchase such Seller Shares upon the occurrence of certain events, such as termination of employment, or in connection with the exercise by the Company of any rights of first refusal; and

(iv) any redemption pursuant to Article V, Section 7 of the Company's Amended and Restated Certificate of Incorporation.

(ii) "**Transfer Notice**" shall have the meaning set forth in **Section 4.1(b)**.

-4-

THERANOS, INC. CONFIDENTIAL

**Section 2**
**Registration Rights**

2.1     *Company Registration.*

(a)     Company Registration. If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders, other than a registration pursuant to **Section 2.2**, a registration relating solely to employee benefit plans, a registration relating to the offer and sale of debt securities, a registration relating to a corporate reorganization or other Rule 145 transaction, or a registration on any registration form that does not permit secondary sales, the Company will:

(i)     promptly give written notice of the proposed registration to all Holders; and

(ii)     use its commercially reasonable efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in **Section 2.1(b)** below, and in any underwriting involved therein, all of such Registrable Securities as are specified in a written request or requests made by any Holder or Holders received by the Company within ten (10) days after such written notice from the Company is mailed or delivered. Such written request may specify all or a part of a Holder's Registrable Securities.

(b)     Underwriting. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to **Section 2.1(a)(i)**. In such event, the right of any Holder to registration pursuant to this **Section 2.1** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the Other Selling Stockholders or other holders of securities of the Company with registration rights to participate therein distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this **Section 2.1**, if the underwriters advise the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the underwriters may (subject to the limitations set forth below) exclude all Registrable Securities from, in the case of an initial public offering, or limit the number of Registrable Securities to be included in the registration and underwriting to a minimum of 30% on a pro rata basis. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in any other registration and underwriting shall be allocated, as follows: (i) first, to the Company for securities being sold for its own account, (ii) second, to the Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion and (iii) third, to the Other Selling Stockholders requesting to include

-5-

Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall also be excluded therefrom by written notice from the Company or the underwriter. The Registrable Securities or other securities so excluded shall also be withdrawn from such registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares of Registrable Securities to be included in such registration was previously reduced as a result of marketing factors pursuant to this **Section 2.1(b)**, the Company shall then offer to all persons who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among the persons requesting additional inclusion, in the manner set forth above.

(c)     Right to Terminate Registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this **Section 2.1** prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

2.2     *Registration on Form S-3.*

(a)     Request for Form S-3 Registration. After its initial public offering, the Company shall use its commercially reasonable efforts to qualify for registration on Form S-3 or any comparable or successor form or forms. After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this **Section 2** and subject to the conditions set forth in this **Section 2.2**, if the Company shall receive from a Holder or Holders of at least 10% of the Registrable Securities a written request that the Company effect any registration on Form S-3 or any similar short form registration statement with respect to all or part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Holder or Holders), the Company will

(i)     promptly give written notice of the proposed registration to all other Holders; and

(ii)     as soon as practicable, file and use its commercially reasonable efforts to effect such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and to permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within twenty (20) days after such written notice from the Company is mailed or delivered.

-6-

(b)  <u>Limitations on Form S-3 Registration</u>. The Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this **Section 2.2**:

(i)  Prior to the earlier of (A) the five (5) year anniversary of the date of this Agreement or (B) one hundred eighty (180) days following the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public;

(ii)  In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(iii)  If the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) on Form S-3 at an aggregate price to the public of less than $2,000,000;

(iv)  The Company has effected two (2) such registrations; or

(v)  During the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a Company-initiated registration.

(c)  <u>Deferral</u>. If (i) in the good faith judgment of the board of directors of the Company (the "***Board***"), the filing of a registration statement covering the Registrable Securities would be materially detrimental to the Company and the Board concludes, as a result, that it is in the best interests of the Company to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board, it would be materially detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, in the best interests of the Company to defer the filing of such registration statement, then (in addition to the limitations set forth above) the Company shall have the right to defer such filing.

(d)  <u>Underwriting</u>. If the Holders of Registrable Securities requesting registration under this **Section 2.2** intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this **Section 2.2** and the Company shall include such information in the written notice given pursuant to **Section 2.2(a)(i)**. In such event, the right of any Holder to include all or any portion of its Registrable Securities in such registration pursuant to this **Section 2.2** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities to the extent provided herein. If the Company shall request inclusion in any registration pursuant to **Section 2.2** of securities being sold for its own account, or if other persons shall request inclusion in any registration pursuant to **Section 2.2**, the Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and such offer shall be conditioned upon the participation of the Company or such other persons in such underwriting and the inclusion of the

-7-

Confidential

THER-AZ-01126704

Company's and such person's other securities of the Company and their acceptance of the further applicable provisions of this **Section 2** (including **Section 2.9)**. The Company shall (together with all Holders and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by a majority in interest of the Holders, which underwriters are reasonably acceptable to the Company.

Notwithstanding any other provision of this Section 2.2, if the underwriters advise the Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of Registrable Securities and Other Shares that may be so included shall be allocated as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion; (ii) second, to the Company, which the Company may allocate, at its discretion, for its own account, or for the account of other holders or employees of the Company; and (iii) third, to the Other Selling Stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the underwriter or the Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 2.2(d), then the Company shall then offer to all Holders and Other Selling Stockholders who have retained rights to include securities in the registration the right to include additional Registrable Securities or Other Shares in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders and other Selling Stockholders requesting additional inclusion, as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders, assuming conversion; and (ii) second, to the Other Selling Stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders, assuming conversion.

2.3     *Expenses of Registration*. All Registration Expenses incurred in connection with registrations pursuant to **Section 2.1** hereof shall be borne by the Company. All Registration Expenses incurred in connection with registrations pursuant to **Section 2.2** hereof, including all fees and expenses of one special counsel to the Investors, shall be borne by the Investors on a pro rata basis. All Selling Expenses relating to securities registered on behalf of the Holders shall be borne by the holders of securities included in such registration pro rata among each other on the basis of the number of Registrable Securities so registered.

-8-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126705

2.4    *Registration Procedures.* In the case of each registration effected by the Company pursuant to this **Section 2**, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, the Company will use its commercially reasonable efforts to:

(a)    Keep such registration effective for a period ending on the earlier of the date which is sixty (60) days from the effective date of the registration statement or such time as the Holder or Holders have completed the distribution described in the registration statement relating thereto.

(b)    Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the period set forth in subsection (a) above;

(c)    Furnish such number of prospectuses, including any preliminary prospectuses, and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d)    Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdiction as shall be reasonably requested by the Holders; provided, that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)    Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing, and following such notification promptly prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing;

(f)    Use its commercially reasonable efforts to furnish, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and reasonably satisfactory to a majority in interest of the Holders requesting registration of Registrable Securities and (ii) a "comfort" letter dated as of such date, from the independent certified public accountants of the

-9-

THERANOS, INC. CONFIDENTIAL

THER-AZ-01126706

Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

(g)     Provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)     Otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve months, but not more than eighteen months, beginning with the first month after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act; and

(i)     Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed.

2.5     *Indemnification.*

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this **Section 2**, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any prospectus, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation (or alleged violation) by the Company of the Securities Act or any other federal securities law, any state securities laws or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any offering covered by such registration, qualification, or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action; provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or action arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder, any of such Holder's officers, directors, partners, legal counsel or accountants, any person controlling such Holder, such underwriter or any person who controls any such underwriter and stated to be specifically for use therein; and provided, further that, the indemnity agreement contained in this **Section 2.5(a)** shall not apply to amounts paid in settlement of any such loss, claim,

-10-

THERANOS, INC. CONFIDENTIAL

damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(b) To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder, and each of their officers, directors, and partners, and each person controlling such Holder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any such registration statement, prospectus, offering circular, or other document, or (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and provided that in no event shall any indemnity under this **Section 2.5** exceed the gross proceeds from the offering received by such Holder.

(c) Each party entitled to indemnification under this **Section 2.5** (the "**Indemnified Party**") shall give notice to the party required to provide indemnification (the "**Indemnifying Party**") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not be unreasonably withheld), and the Indemnified Party may participate in such defense at such party's expense; and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this **Section 2.5**, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

-11-

THERANOS, INC. CONFIDENTIAL

Confidential

THER-AZ-01126708

(d)     If the indemnification provided for in this **Section 2.5** is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense awarded by a court of law in such proportion as is determined to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

2.6     *Information by Holder*. Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this **Section 2**.

2.7     *Restrictions on Transfer*.

(a)     The holder of each certificate representing Registrable Securities by acceptance thereof agrees to comply in all respects with the provisions of this **Section 2.7**. Each Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Restricted Securities, or any beneficial interest therein, unless and until the transferee has agreed in writing for the benefit of the Company to take and hold such Restricted Securities subject to, and to be bound by, the terms and conditions set forth in this Agreement, including, without limitation, this **Section 2.7, Section 2.9, Section 3.1 and Section 4**, and:

(i)     there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     such Holder shall have given prior written notice to the Company of such Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, and, such Holder shall have furnished the Company, at its expense, with (i) an opinion of counsel, reasonably satisfactory to the Company, to the effect that such disposition will not require registration of such Restricted Securities under the Securities Act or (ii) a "no action" letter from the Commission to the effect that the transfer of such securities without registration will not result in a recommendation by

-12-

THERANOS, INC. CONFIDENTIAL

the staff of the Commission that action be taken with respect thereto, whereupon the holder of such Restricted Securities shall be entitled to transfer such Restricted Securities in accordance with the terms of the notice delivered by the Holder to the Company.

(b)    Notwithstanding the provisions of **Section 2.7(a)**, no such registration statement, opinion of counsel or "no action letter" shall be necessary for (i) a transfer not involving a change in beneficial ownership, or (ii) in transactions involving the distribution without consideration of Restricted Securities by any Holder to (x) a parent, subsidiary or other affiliate of Holder that is a corporation, or (y) any of its partners, members or other equity owners, or retired partners, retired members or other equity owners, or to the estate of any of its partners, members or other equity owners or retired partners, retired members or other equity owners; provided, in each case, that the Holder thereof shall give written notice to the Company of such Holder's intention to effect such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition.

(c)    Each certificate representing Registrable Securities shall (unless otherwise permitted by the provisions of this Agreement) be stamped or otherwise imprinted with a legend substantially similar to the following (in addition to any legend required under applicable state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, A SECONDARY RIGHT OF REFUSAL AND ASSIGNEE RIGHT OF REFUSAL AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

-13-

THERANOS, INC. CONFIDENTIAL

The Holders consent to the Company making a notation on its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer established in this **Section 2.7**.

(d)     The first legend referring to federal and state securities laws identified in **Section 2.7(c)** hereof stamped on a certificate evidencing the Restricted Securities and the stock transfer instructions and record notations with respect to such Restricted Securities shall be removed and the Company shall issue a certificate without such legend to the holder of such Restricted Securities if (i) such securities are registered under the Securities Act, or (ii) such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a public sale or transfer of such securities may be made without registration under the Securities Act.

2.8     *Rule 144 Reporting*. With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to use its commercially reasonable efforts to:

(a)     Make and keep public information regarding the Company available as those terms are understood and defined in Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public;

(b)     File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(c)     So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration.

2.9     *Market Stand-Off Agreement*. Each Holder hereby agrees that, if requested by the managing underwriter, such Holder shall enter an agreement not to sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the Initial Public Offering filed under the Securities Act (or such other period up to 35 days as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor

-14-

THERANOS, INC. CONFIDENTIAL

Confidential

THER-AZ-01126711

provisions or amendments thereto). The obligations described in this **Section 2.9** shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in **Section 2.7(c)** hereof with respect to the shares of the Common Stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day period (subject to extension as noted above).

2.10    *Delay of Registration.* No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this **Section 2**.

2.11    *Transfer or Assignment of Registration Rights.* The rights to cause the Company to register securities granted to a Holder by the Company under this **Section 2** may be transferred or assigned by a Holder only to a transferee or assignee of not less than 100,000 shares of Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like); provided that (i) such transfer or assignment of Registrable Securities is effected in accordance with the terms of **Section 2.7** hereof and applicable securities laws, (ii) the Company is given written notice prior to said transfer or assignment, stating the name and address of the transferee or assignee and identifying the securities with respect to which such registration rights are intended to be transferred or assigned and (iii) the transferee or assignee of such rights assumes in writing the obligations of such Holder under this Agreement, including without limitation the obligations set forth in **Section 2.9**.

2.12    *Limitations on Subsequent Registration Rights.* From and after the date of this Agreement, the Company shall not, without the prior written consent of holders of at least a majority of the combined voting power of the then outstanding shares of Conversion Stock (on an as-converted to Class A Common Stock basis), Class A Common Stock and Class B Common Stock, voting together as a single class, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights.

2.13    *Termination of Registration Rights.* The right of any Holder to request registration or inclusion in any registration pursuant to **Section 2.1** or **2.2** shall terminate on the earlier of (i) such date on which all shares of Registrable Securities held or entitled to be held upon conversion by such Holder are eligible to be sold under Rule 144 during any ninety (90)-day period, or (ii) five (5) years after the closing of the Initial Public Offering.

**Section 3**
**Covenants of the Company**

The Company hereby covenants and agrees, as follows:

3.1    *Confidentiality.*

-15-

THERANOS, INC. CONFIDENTIAL

ER-15123

THER-AZ-01126712

(a)     Notwithstanding any applicable law or provision of the Company's Amended and Restated Certificate of Incorporation (as it may hereafter be amended), each Investor hereby agrees to waive its rights to inspect the books and records of the Company pursuant to the Delaware General Corporation Law and other applicable law.  In addition, the Company shall not be required to disclose or make available information it is contractually bound to protect under third party agreements or to disclose or make available information in situations involving a conflict of interest.

(b)     Notwithstanding and without limiting **Section 3.1(a)**, any information provided by the Company to any Investor or Holder shall be kept strictly confidential by such Investor or Holder, and such Investor or Holder will not use such information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than in such Investor's or Holder's capacity as an officer or employee of the Company, or dissemination of such information to such Investor's or Holder's attorneys or employees (to the extent such employees have a need to know the contents of such information), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally.

3.2     *Confidential Information and Invention Assignment Agreements*.  The Company shall have entered into, or shall enter into, confidential information and invention assignment agreements with Elizabeth Holmes and any other employee or consultant with access to the Company's intellectual property, confidential information or trade secrets.

3.3     *Key Person Life Insurance*.  The Company shall use its commercially reasonable efforts to obtain or maintain term life insurance, payable to the Company, on the life of Elizabeth Holmes in the amount of $5,000,000.

3.4     *Termination of Covenants*.  The covenants set forth in this **Section 3** shall terminate and be of no further force and effect after the closing of the Initial Public Offering.

### Section 4
### Company Right of First Refusal, Secondary Right of Refusal, and Assignee Right of Refusal

4.1     *Right of First Refusal*.

(a)     General.  Without limiting and in addition to the restrictions in **Section 2.7**, before any party hereto (a "**Seller**") may Transfer any shares of capital stock of the Company, excluding the Class B Common Stock, that are not otherwise subject to a right of first refusal of the Company ("**Seller Shares**"), such Seller must comply with the provisions of this **Section 4** (the "**Right of First Refusal**") and each Proposed Transferee (as defined below) must enter into the Joinder.

(b)     Notice of Proposed Transfer.  Prior to a Seller Transferring any of its Seller Shares, such Seller shall deliver to the Company and to the founder of the Company, Elizabeth Holmes (the "**Founder**") not later than one hundred twenty (120) days prior to the consummation of the proposed Transfer, a binding written notice (the "**Transfer Notice**") stating: (i) such Seller's

-16-

Confidential

THER-AZ-01126713

bona fide intention to Transfer such Seller Shares; (ii) the name, address and phone number of each proposed purchaser or other transferee (each, a "**Proposed Transferee**"); (iii) the aggregate number of Seller Shares proposed to be Transferred to each Proposed Transferee (the "**Offered Shares**"); and (iv) the terms and conditions of each proposed Transfer, including, but not limited to, the bona fide cash price or, in reasonable detail, other consideration for which such party proposes to Transfer the Offered Shares (the "**Offered Price**"). The Seller shall offer the Offered Shares at the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith and upon the same terms (or terms as similar as reasonably possible) to the Company, the Founder and/or the Assignee (as set forth below).

(c) <u>Exercise of Right of First Refusal</u>. To exercise its Right of First Refusal, at any time within sixty (60) days after receipt of the Transfer Notice, the Company must deliver a written notice to the Seller and the Founder ("**Company Purchase Notice**"), electing to purchase all or any portion of the Offered Shares at the purchase price determined in accordance with subsection (f) below.

(d) <u>Grant of Secondary Right of Refusal to Founder</u>. If the Company does not exercise its Right of First Refusal to purchase all of the Offered Shares, the Founder shall have a secondary right of refusal to purchase all or any portion of the Offered Shares not purchased by the Company (the "**Secondary Right of Refusal**"). If the Company does not intend to exercise its Right of First Refusal with respect to all of the Offered Shares, the Company must deliver a written notice to the Seller and to the Founder to that effect no later than sixty (60) days after the Seller delivered the Transfer Notice to the Company (the "**Secondary Notice**"). To exercise her Secondary Right of Refusal, the Founder must deliver a notice (the "**Founder Notice**") to such Seller and the Company within twenty (20) days after the Company's delivery of the Secondary Notice of her intent to exercise or not to exercise her Secondary Right of Refusal hereunder.

(e) <u>Right of Assignee of the Company</u>. If both the Company and the Founder do not fully exercise their Right of First Refusal or Secondary Right of Refusal, respectively, then the Company may assign the right to purchase all or any portion of the Offered Shares not purchased by the Company or the Founder on the terms and conditions set forth in this **Section 4** (the "**Assignee Right of Refusal**") to any person (the "**Assignee**") and shall deliver a notice (the "**Assignment Notice**") to such Seller of its intent to exercise or not exercise its right of assignment within five (5) days after delivery of the Founder Notice. To exercise its Assignee Right of Refusal, the Assignee must deliver a notice (the "**Assignee Notice**") to such Seller, the Company and the Founder within twenty (20) days after delivery of the Founder Notice of the Assignee's intent to exercise or not to exercise his, her or its Assignee Right of Refusal.

(f) <u>Purchase Price</u>. The purchase price for the Offered Shares to be purchased by the Company, the Founder and/or the Assignee shall be the lesser of the Offered Price and the fair market value of the Offered Shares as determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith, which determination will be binding

-17-

THERANOS, INC. CONFIDENTIAL

Confidential
THER-AZ-01126714

upon the Company, the Founder and/or the Assignee, if applicable, and the Seller, absent fraud or error. If the Offered Shares are to be Transferred by gift, bequest, devise or descent, the fair market value of the Offered Shares shall be determined by the Board in good faith, which will be binding upon the Company, the Founder, the Assignee, if applicable, and the Seller, absent fraud or error. Subject to compliance with applicable state and federal securities laws, the Company, the Founder and/or the Assignee shall effect the purchase of all or any portion of the Offered Shares, including the payment of the purchase price, at the option of the Company, the Founder and/or the Assignee (i) in cash (by check), (ii) by wire transfer, (iii) by cancellation of all or a portion of any outstanding indebtedness of the Seller to the Company (or, in the case of purchase by the Founder or the Assignee, to the Founder or the Assignee, respectively), or (iv) by any combination thereof. The closing of the purchase of any Offered Shares by the Company pursuant to the Right of First Refusal shall take place, and all payments from the Company shall have been delivered to the Seller, by the later of (i) the date specified in the Transfer Notice as the intended date for the proposed Transfer or (ii) sixty (60) days after delivery of the Company Purchase Notice. The closing of the purchase of any Offered Shares by the Founder pursuant to the Secondary Right of Refusal shall take place, and all payments from the Founder shall have been delivered to the Seller, by not later than forty (40) days after delivery of the Founder Notice. The closing of the purchase of any Offered Shares by the Assignee pursuant to the Assignee Right of Refusal shall take place, and all payments from the Assignee shall have been delivered to the Seller, by not later than twenty (20) days after delivery of the Assignee Notice.

(g)     Seller's Right to Transfer. If all of the Offered Shares to be Transferred are not purchased by the Company, the Founder and/or the Assignee as provided in this **Section 4**, then the Seller may Transfer such securities not purchased by the Company, the Founder and/or Assignee to that Proposed Transferee on the terms and conditions set forth in the Transfer Notice, provided that such Transfer is consummated within thirty (30) days after the later of (i) the earlier of (1) the delivery of the Founder Notice indicating an intent not to fully exercise the Secondary Right of Refusal and (2) eighty (80) days after the Seller delivered the Transfer Notice to the Company and (ii) the earlier of the delivery of (1) the Assignee Notice indicating an intent not to fully exercise the Assignee Right of Refusal, (2) an Assignment Notice indicating the Company's intent not to exercise its right of assignment and (3) one-hundred (100) days after the Seller delivered the Transfer Notice to the Company, and provided further that any such Transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee enters into the Joinder. If any securities described in the Transfer Notice are not Transferred to the Proposed Transferee within such period, or if the Seller proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Transfer Notice shall be given to the Company, the Founder and the Assignee, and the Company, the Founder and the Assignee, if any, shall have a new Right of First Refusal, Secondary Right of Refusal, and Assignee Right of Refusal, respectively, before any Seller Shares may be Transferred.

(h)     Termination. The provisions of this **Section 4** shall automatically terminate upon effectiveness of the Initial Public Offering.

-18-

THERANOS, INC. CONFIDENTIAL

**ER-15126**

THER-AZ-01126715

(i)    <u>Transfer Void</u>.  Any Transfer of Seller Shares not made in compliance with the requirements of this **Section 4** shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company.

**Section 5**
**Miscellaneous**

5.1    *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Holders holding at least a majority of the aggregate voting power of the Registrable Securities (for purposes of this **Section 5.1**, the voting power of the "Registrable Securities" shall be determined by assuming the conversion of all outstanding shares of Class B Common Stock); provided, however, that (i) Holders purchasing shares of Series C-1 Preferred Stock in a Closing after the Initial Closing (each as defined in the Purchase Agreement) and (ii) holders of Class A Common Stock that receive such securities pursuant to award granted under the Theranos, Inc. 2013 Stock Incentive Plan may become parties to this Agreement, by executing a counterpart of or joinder to this Agreement without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Holder; and provided, further, that the express rights of Elizabeth Holmes set forth in **Section 2** (or **Section 5.1**) of this Agreement may not be adversely amended or waived in a different manner than the express rights hereunder of other Holders without the written consent of Elizabeth Holmes. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Holder and each future holder of all such securities of Holder. Each Holder acknowledges that by the operation of this paragraph, the holders of a majority of the aggregate voting power of the Registrable Securities will have the right and power to diminish or eliminate all rights of such Holder under this Agreement.

5.2    *Notices*. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid' or otherwise delivered by hand or by messenger addressed:

(a)    if to an Investor, at the Investor's address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)    if to any Holder, at such address as shown in the Company's records, or, until any such holder so furnishes an address to the Company, then to and at the address of the last holder of such shares for which the Company has contact information in its records;

(c)    if to the Company, one copy should be sent to each of Elizabeth Holmes and Valeska Pederson Hintz at Theranos, Inc., 1601 S. California, Palo Alto, CA 94304, or at such other address as the Company shall have furnished to the Investors, with copies to Katharine A. Martin, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the

-19-

THERANOS, INC. CONFIDENTIAL

earlier of its receipt or four days after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

5.3 *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

5.4 *Successors and Assigns.* This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

5.5 *Entire Agreement.* This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof.

5.6 *Delays or Omissions.* Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law, shall be cumulative and not alternative.

5.7 *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

5.8 *Titles and Subtitles.* The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

-20-

THERANOS, INC. CONFIDENTIAL

5.9 *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

5.10 *Telecopy Execution and Delivery.* A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

5.11 *Jurisdiction; Venue.* Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 5.2 hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

5.12 *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

5.13 *Termination Upon Change of Control.* Notwithstanding anything to the contrary herein, all rights represented under this Agreement (excluding any then-existing obligations) shall terminate upon (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving or resulting entity or the entity that controls such surviving or resulting entity), as a result of shares in the Company held by such holders immediately prior to such transaction, at least a majority of the total voting power represented by the voting securities of the Company, such surviving or resulting entity or the entity that controls such surviving or resulting

-21-

THERANOS, INC. CONFIDENTIAL

entity outstanding immediately after such transaction or series of transactions; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company (excluding any transaction or series of transactions between or among the Company and any wholly owned subsidiary or subsidiaries).

5.14    *Quarterly Board Meetings.* The Board shall meet at least quarterly, unless otherwise agreed by the Board.

5.15    *Conflict.* In the event of any conflict between the terms of this Agreement and the Amended Charter or the Company's Bylaws, the terms of the Amended Charter or the Company's Bylaws, as the case may be, will control.

5.16    *Costs of Enforcement.* If any party to this Agreement seeks to enforce its rights under, or in connection with this Agreement, or challenges the validity of this Agreement through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

5.17    *Aggregation.* All shares of Preferred Stock of the Company held or acquired by affiliated entities or persons of an Investor (including but not limited to: (i) a constituent partner or a retired partner of an Investor that is a partnership; (ii) a partner, subsidiary or other affiliate of an Investor that is a corporation; (iii) an immediate family member living in the same household, a descendant, or a trust therefor, in the case of an Investor who is an individual; or (iv) a member of an Investor that is a limited liability company) shall be aggregated together for the purpose of determining the availability of any rights under this Agreement which are triggered by the beneficial ownership of a threshold number of shares of the Company's capital stock.

5.18    *Prior Rights Agreement Superseded/Waiver.* Pursuant to Section 4.1 of the Prior Agreement, the undersigned parties who are parties to such Prior Agreement hereby amend and restate the Prior Agreement to read in its entirety as set forth in this Agreement, all with the intent and effect that the Prior Agreement shall be hereby be terminated and entirely replaced and superseded by this Agreement.

[Remainder of Page Intentionally Left Blank]

-22-

THERANOS, INC. CONFIDENTIAL

**EXHIBIT A**

**SERIES C-1 INVESTORS**

**Investor**



THERANOS, INC. CONFIDENTIAL

**ER-15131**

**<u>EXHIBIT B</u>**

**PRIOR INVESTORS**


[Prior investors not listed per confidentiality agreements with the Company.]



THERANOS, INC. CONFIDENTIAL

## ANNEX A

### JOINDER AGREEMENT

By executing this counterpart signature page, the undersigned hereby agrees to be bound by and subject to all terms and conditions that apply to (i) a Holder under Sections 2.7 and 2.9, an Investor under Section 3.1, a Seller under Section 4, and a party under Sections 5.11 and 5.16 of the Company's Amended and Restated Investors' Rights Agreement, dated December __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A and B thereto (the "**IRA**"), (ii) a Voting Party under Sections 1, 2, 3, and 7(i) and a party under Sections 7(d) and 7(e) under the Company's Amended and Restated Voting Agreement, dated December __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A, B and C thereto (the "**Voting Agreement**") and (iii) Article IX of the Company's amended and restated bylaws, as amended (the "**Bylaws**").

For all purposes under the IRA and the Voting Agreement, the execution and delivery of this Joinder Agreement by the undersigned shall constitute the execution and delivery of a counterpart signature page to the IRA and Voting Agreement, and the undersigned shall have the rights and be subject to the obligations to extent provided hereunder, effective as of the date hereof.

IN WITNESS WHEREOF, the Joinder Agreement to the IRA, Voting Agreement and Bylaws has been executed by the undersigned as of the date set forth below.

JOINING PARTY:

_____
Signature

_____
Print Name

_____
Date

THERANOS, INC. CONFIDENTIAL
6489813_12.docx

**EXHIBIT G**
**Amended and Restated Voting Agreement**



Confidential

**ER-15134**

THER-AZ-01126723

**THERANOS, INC.**

**AMENDED AND RESTATED VOTING AGREEMENT**

This Amended and Restated Voting Agreement (this "**Agreement**") is made as of December __, 2013 by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities listed on **Exhibit A** attached hereto (each a "**Series C-1 Investor**," and collectively the "**Series C-1 Investors**"), the persons and entities listed on **Exhibit B** attached hereto (each a "**Prior Investor**," and collectively the "**Prior Investors**"), and the person listed on **Exhibit C** hereto (the "**Founder**"). The Series C-1 Investors and the Prior Investors are referred to herein collectively as the "**Investors**." The Investors and the Founder are referred to herein collectively as the "**Voting Parties**."

WHEREAS, the Company, certain of the Series C-1 Investors, the Prior Investors and the Founder are parties to that certain Amended and Restated Voting Agreement dated as of July 1, 2010 (the "**Prior Agreement**");

WHEREAS, the Company proposes to sell additional shares of the Company's Series C-1 Preferred Stock to certain of the Series C-1 Investors pursuant to the Amended and Restated Series C-1 Preferred Stock Purchase Agreement (the "**Purchase Agreement**") of even date herewith (the "**Financing**");

WHEREAS, the undersigned Company, Prior Investors and the Founder desire to amend and restate the Prior Agreement to add additional Series C-1 Investors as parties and amend and restate the terms of the Prior Agreement.

WHEREAS, as a condition to the Financing, the Voting Parties have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      ***Shares***. During the term of this Agreement, the Voting Parties each agree to vote all shares of the Company's voting securities now or hereafter owned by them, excluding the Class B Common Stock (as defined in the Company's certificate of incorporation), whether beneficially or otherwise, or as to which they have voting power (the "**Shares**") in accordance with the provisions of this Agreement.

2.      ***Board of Directors***

        (a)      *Voting*. The Company does not currently intend to hold annual meetings of stockholders and instead intends to elect directors by written consent in lieu of an annual meeting of stockholders. During the term of this Agreement, each Voting Party agrees to vote all Shares or to

-1-

Confidential

THER-AZ-01126724

have all Shares voted in such manner as may be necessary to elect (and maintain in office) as members of the Company's Board of Directors the following persons:

(i)     the Founder;

(ii)     when and as designated by the Founder, up to (5) five persons (collectively with the Founder, the "**At-Large Founder Designees**"), none of whom are currently designated; and

(iii)     the individuals designated by the holders of a majority of the combined voting power of the then outstanding shares of Preferred Stock (as defined in the Company's certificate of incorporation) (on an as-converted to Class A Common Stock (as defined in the Company's certificate of incorporation) basis), Class A Common Stock and Class B Common Stock, voting together as a single class (the "**Majority Designees**", and together with the Founder and the At-Large Founder Designees, the "**Designees**").

(b)     By signing this Agreement, each Voting Party hereby ratifies and confirms that the Company's Board of Directors is currently composed of the following members: Elizabeth Holmes, George Shultz, James N. Mattis, Gary Roughead, Richard Kovacevich, William Perry, Henry Kissinger, Samuel Nunn, and Sunny Balwani.

(c)     *Removal*. During the term of this Agreement, each Voting Party agrees to vote all Shares to ensure that no director elected pursuant to this Agreement may be removed from office other than for cause unless such removal is directed or approved in advance by the Founder. Upon the direction or approval of the Founder to remove any director in accordance with the preceding sentence, each Voting Party shall vote, or cause to be voted, all of its Shares in a manner to cause such director to be removed.

3.     *Waivers.* Subject to applicable law, in the event that holders of a majority of the voting power of the applicable class or classes or series of Company capital stock take action through a vote by written consent or at a meeting of stockholders, the Voting Parties hereby agree to waive and hereby do waive (with respect to such applicable class or classes or series of capital stock) rights to notice of such action taken under this Agreement or otherwise as to matters arising under the General Corporation Law of the State of Delaware.

4.     *Termination*. This Agreement shall terminate upon the earlier of (i) a Change of Control Transaction; or (ii) (A) the agreement of the Founder, and (B) a majority-in-interest of the Voting Parties, acting together as a single class. "**Change of Control Transaction**" means either (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities

-2-

THERANOS, INC. CONFIDENTIAL

Confidential

**ER-15136**

THER-AZ-01126725

of the surviving or resulting entity or the entity that controls such surviving or resulting entity), as a result of shares in the Company held by such holders immediately prior to such transaction, at least a majority of the total voting power represented by the voting securities of the Company, such surviving or resulting entity or the entity that controls such surviving or resulting entity outstanding immediately after such transaction or series of transactions; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company (excluding any transaction or series of transactions between or among the Company and any wholly owned subsidiary or subsidiaries).

5.    *Additional Shares*. In the event that subsequent to the date of this Agreement any shares or other securities (other than pursuant to a Change of Control Transaction) are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

6.    *Restrictive Legend*. Each certificate representing any of the Shares subject to this Agreement shall be marked by the Company with a legend reading as follows:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT."

Neither failure to cause the certificates representing the Shares to be marked with this restrictive legend nor failure to supply a copy of this Agreement shall affect the validity or enforceability of this Agreement.

7.    *Miscellaneous*

(a)    *Certain Definitions*. Shares "**held**" by a Voting Party shall mean any Shares directly or indirectly owned (of record or beneficially) by such Voting Party or as to which such Voting Party has voting power. "**Vote**" shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law. A "**majority-in-interest**" of the Voting Parties shall mean a majority of the Company's common stock (determined on an as-converted basis) then held by the Voting Parties.

(b)    *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and mailed, or delivered to each party as follows: (i) if to a Voting Party, at such Voting Party's address set forth in the Company's records, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, to each of Elizabeth Holmes and Valeska Pederson Hintz at Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA 94304, Phone: (650) 838-9292, or at such other address as

-3-

Confidential

ER-15137

THER-AZ-01126726

the Company shall have furnished to the Voting Parties in writing, with copies to Katharine A. Martin, Esq., Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304. All such notices and communications will be deemed effective given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being deposited with an overnight courier service of recognized standing or (iv) four days after being deposited in the U.S. mail, first class with postage prepaid. In the event of any conflict between the Company's books and records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(c)     *Successors and Assigns*.  The provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. The Company shall not permit the transfer of any Shares on its books or issue a new certificate representing any Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person was a Voting Party hereunder.

(d)     *Governing Law*.  This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law. Each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Agreement. Each of the parties to this Agreement waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Agreement agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Agreement agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth in Section 7(b) hereof; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS AGREEMENT OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(e)     *Costs of Enforcement*.  If any party to this Agreement seeks to enforce its rights under or in connection with this Agreement or challenges the validity of this Agreement through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

(f)     *Titles and Subtitles*.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

-4-

THERANOS, INC. CONFIDENTIAL

**ER-15138**

THER-AZ-01126727

(g)     *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

(h)     *Entire Agreement.* This Agreement and the exhibits hereto constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supersede any prior agreements or understandings with respect to the subject matter hereof.

(i)     *Irrevocable Proxy and Power of Attorney.* Each Voting Party hereby constitutes and appoints, with full power of substitution and re-substitution, as his or her proxy and grants a power of attorney to the Founder with respect to the matters set forth herein, including, without limitation, election and removal of persons as members of the Company's Board of Directors in accordance with this Agreement, and hereby authorizes the Founder to represent and vote all of such Voting Party's Shares in favor of the election or removal of persons as members of the Company's Board of Directors pursuant to and in accordance with the terms and provisions of this Agreement. Each of the proxy and power of attorney granted in this paragraph is given in consideration of the agreements and covenants of the Company and each Voting Party in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and is irrevocable unless and until this Agreement terminates. Each Voting Party hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to the Shares, deposit the Shares into a voting trust, or enter into any agreement (other than this Agreement), arrangement, or understanding with any person, directly or indirectly, to vote, grant any proxy, or give instructions with respect to the voting of the Shares, in each case, with respect to any of the matters set forth herein.

(j)     *Voting Agreement, Not Voting Trust.* This Agreement is a voting agreement governed by Section 218(c) of the Delaware General Corporation Law, not a voting trust governed by Section 218(a)-(b) of the Delaware General Corporation Law, and should be interpreted accordingly.

(k)     *Specific Performance.* It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

(l)     *No Liability for Election of Designated Directors.* No Voting Party shall have any liability for designating a director, for any act or omission by a designated director, or for voting for or against the removal of a designated director in accordance with the provisions of this Agreement.

-5-

THERANOS, INC. CONFIDENTIAL

(m)  *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by (i) the Company, (ii) the Founder and (iii) the holders of a majority of the aggregate voting power of the Voting Parties; *provided, however*, that (i) Series C-1 Investors purchasing Shares under the Purchase Agreement after the Initial Closing (as defined in the Purchase Agreement) and (ii) holders of the Company's Class A Common Stock that receive such securities pursuant to award granted under the Theranos, Inc. 2013 Stock Incentive Plan may become parties to this Agreement by executing a counterpart of or joinder to this Agreement without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Voting Party. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Voting Party that has entered into this voting agreement. Each Voting Party acknowledges that by the operation of this paragraph, the Founder and the holders of a majority of the aggregate voting power of the Voting Parties will have the right and power to diminish or eliminate all rights of such Voting Party under this Agreement.

(n)  *No Waiver*. The failure or delay by a party to enforce any provision of this Agreement will not in any way be construed as a waiver of any such provision or prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and will not constitute a waiver of either party's right to assert any other legal remedy available to it.

(o)  *Severability*. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

(p)  *Counterparts*. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

(q)  *Prior Agreement Superseded*. Pursuant to Section 7(k) of the Prior Agreement, the undersigned parties who are parties to such Prior Agreement hereby amend and restate the Prior Agreement to read in its entirety as set forth in this Agreement, all with the intent and effect that the Prior Agreement shall be hereby be terminated and entirely replaced and superseded by this Agreement.

*(signature page follows)*

-6-

**EXHIBIT A**

**SERIES C-1 INVESTORS**

**Investor**

THERANOS, INC. CONFIDENTIAL
6489811_1.DOCX

Confidential

THER-AZ-01126730

**EXHIBIT B**

**PRIOR INVESTORS**

[Prior investors not listed per confidentiality agreements with the Company.]

**<u>EXHIBIT C</u>**

**FOUNDER**

Elizabeth Holmes

THERANOS, INC. CONFIDENTIAL
6489811_1.DOCX

Confidential

THER-AZ-01126732

**EXHIBIT H**
**409A Report**





# Theranos, Inc.

FMV of common stock as of September 30, 2013

December 06, 2013

INVESTMENT RESEARCH · BUSINESS RESEARCH · PATENT RESEARCH · VALUATION & ADVISORY SERVICES

Confidential | © Aranca. All rights reserved | info@aranca.com | www.aranca.com



# Table of Contents

**ENGAGEMENT OVERVIEW** ........................................................................................ **4**

Background ........................................................................................................ 4

Engagement Objective and Scope .................................................................... 4

Standard of Value ............................................................................................. 5

Scope of Analysis ............................................................................................. 6

Declaration ....................................................................................................... 7

**COMPANY OVERVIEW** ............................................................................................ **8**

Brief Company Profile ...................................................................................... 8

Financing History and Capital Structure .......................................................... 8

Products & Technology Solutions ..................................................................... 9

Target market .................................................................................................. 9

Technology ....................................................................................................... 10

Market Overview .............................................................................................. 10

Competitive Landscape ..................................................................................... 11

Management Team ........................................................................................... 12

Risks ................................................................................................................. 13

Stage of Enterprise Development ..................................................................... 14

**INDUSTRY OVERVIEW** ............................................................................................ **15**

Medical Diagnostics Industry ........................................................................... 15

In Vitro Diagnostics Industry ............................................................................ 15

Market Players .................................................................................................. 16

Drivers and Trends ........................................................................................... 16

Challenges ........................................................................................................ 17

Outlook ............................................................................................................. 18

**ECONOMIC OVERVIEW** .......................................................................................... **19**

General Economic Conditions ........................................................................... 19

Gross Domestic Product .................................................................................... 20

Trade Deficit ..................................................................................................... 21

Consumer Spending .......................................................................................... 22

Unemployment ................................................................................................. 22

Interest Rates .................................................................................................... 23

Consumer Prices and Inflation Rates ............................................................... 23

Venture Capital Industry ................................................................................... 24

M&A and IPOs in VC Space .............................................................................. 25

Outlook ............................................................................................................. 26



Theranos, Inc.

**VALUATION ANALYSIS** ............................................................................................................ **27**

  General Principles ................................................................................................................ 27

  Equity (Enterprise) Valuation Methods .............................................................................. 28

  Equity Value Determination ................................................................................................ 29

  Discounted Cash Flow (Income approach) .......................................................................... 30

  Guideline Public Companies' Trading Multiples Method .................................................... 34

  Allocable Equity Value ........................................................................................................ 35

**EQUITY VALUE ALLOCATION** ................................................................................................... **36**

  Methods of Allocation of Equity Value among different classes of stockholders ............. 36

  Methods of allocation of Equity Value applied for Theranos ............................................ 36

  Application of OPM ............................................................................................................. 37

  Discount for Lack of Marketability ('DLOM') ..................................................................... 43

  Final Valuation ................................................................................................................... 44

**EXHIBITS** ................................................................................................................................. **45**

  Exhibit 1 – Valuation Summary ......................................................................................... 45

  Exhibit 2 – Historical Financials ........................................................................................ 46

  Exhibit 3 – Financial Projections ........................................................................................ 49

  Exhibit 4 – Guideline Public Companies' Description ........................................................ 53

  Exhibit 5 – Valuation Theory .............................................................................................. 55

  Exhibit 6 – DCF (Income Approach) ................................................................................... 58

  Exhibit 7 – Guideline Public Companies' Trading Multiples (Market Approach) ............... 61

  Exhibit 8 – Concluded Equity Value ................................................................................... 62

  Exhibit 9 – Capital Structure .............................................................................................. 63

  Exhibit 10 –Equity Value Allocation Theory ...................................................................... 64

  Exhibit 11 – Discount for lack of Marketability ................................................................. 66

  Exhibit 12 – Fair Market Value Conclusion ........................................................................ 67

  Exhibit 13. – Brief Profile of Appraisal Team ..................................................................... 68

  Exhibit 14 – General Assumptions and Limiting Conditions .............................................. 69



## ENGAGEMENT OVERVIEW

### Background

Aranca, Inc. ('Aranca') has been engaged by Theranos, Inc. ('Theranos' or the 'Company') to conduct valuation analysis of the Company and prepare a written report to express our opinion on the Fair Market Value (FMV) of its common stock, on a minority and non-marketable basis, as of September 30, 2013 (the 'Date of Valuation').

### Engagement Objective and Scope

- We understand this report and its conclusions ('Valuation' or the 'Opinion') would be used by the Company's Board of Directors (and authorized Board committees) solely in connection with determining the exercise price for granting options to its employees to comply with IRC§409A, and as an input for valuations pursuant to SFAS 123 (R) for financial reporting purposes.

- Internal Revenue Service ('IRS') introduced new regulations IRC§409A in October 2004. To avoid violation of IRC §409A and consequent tax liabilities, companies must issue stock options at or above their grant date Fair Market Value as defined in IRS Revenue Ruling 59–60. This requires privately held companies to establish the Fair Market Value of the underlying securities to set up the exercise price of stock options. This report is intended to satisfy the requirements of IRC§409A for an Independent Appraisal of privately held companies.

- SFAS 123 (R), issued in December 2004, requires the value of all share-based payments to be recognized in the income statement. The statement requires public and non-public companies to measure the cost of employee services received in exchange for equity instruments, based on the Fair Value of awards on the grant date.

- In preparing our analysis, Danise Yam, Corporate Controller (management), provided information regarding Theranos' business, products and services, operations, past performance and financial results, financial condition, developments, and budgets. Aranca assumes the information provided and representations made are accurate and reliable, and fairly represent the financial position and prospects of the Company as on the valuation date. The validity and accuracy of this appraisal report depend upon the reliability and accuracy of basic data provided by management.

- The contents of this appraisal report and opinion of value stated herein may not be used for any purpose other than stated, and Aranca makes no assurances as to the accuracy or suitability of this valuation for purposes other than stated without its written consent.

- The analysis, opinions, and conclusions reported herein are limited by the reported assumptions and limiting conditions. (Please refer **Exhibit 14** for 'General Assumptions and Limiting Conditions'.)

Confidential
THER-AZ-01126737

**ER-15148**



Theranos, Inc.

## Standard of Value

Aranca has determined the Fair Market Value of the Company's common stock based on appraisal standards, valuation methodologies and approaches in conformity with IRS guidelines to consider 'all relevant facts and circumstances' and appraisal guidelines endorsed by the AICPA in its Practice Aid[1] and other widely recognized valuation standards.

IRS Revenue Ruling 59–60, which outlines in general the approach, methods, and factors to be considered in valuing the shares of the capital stock of closely held corporations for estate and gift tax purposes, defines Fair Market Value, in effect, as:

*"The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."*

Court decisions frequently state, in addition, that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and be well informed about the property and the market for such property.

In other words, in application of Fair Market Value standard, Aranca assumes:

▪ As of the valuation date, cash equivalent is paid for the Company being appraised.

▪ The seller is not 'compelled' or 'motivated' to sell interest in the Company due to business distress.

▪ The buyer is rational, but not 'motivated', to acquire interest in the Company due to certain synergistic benefits, which may not be available to other market participants.

▪ In other words, the buyer is not an existing shareholder, creditor, related, or controlled entity, which could be anticipated to pay higher or lower value than the arms length 'financial buyer' due to reasons associated with those considerations.

▪ The seller and buyer have reasonable information and knowledge of relevant facts and events that are known or knowable as of the valuation date.

FAS 123(R) defines 'Fair Value'[2] as:

*"The amount at which an asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale."*

AICPA finds the definition of Fair Market Value in Revenue Ruling 59–60 consistent with the definition of Fair Value in Generally Accepted Accounting Principles (GAAP)[3].

---

1 AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation'

2 SFAS 123 (R), Glossary, Appendix E

3 AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page 7, Footnote 8.

Theranos, Inc.
Confidential
THER-AZ-01126738

**ER-15149**



## Scope of Analysis

During the course of our valuation analysis, we have conducted limited reviews, inquiries, interviews, discussions, and analyses, which, in our opinion, were deemed to be appropriate for this valuation analysis. Our review and analysis includes, but is not limited to, the following:

1. Discussions and interviews with members of Theranos' senior management concerning the addressable markets, assets, significant milestones in its business plan, financial and operating history, future plans, key value drivers, projected operations, and exit options and scenarios, among others.

2. Review of financial statements for financial years December 31, 2008, through December 31, 2012. Review of un-audited financial statements ending September 30, 2013.

3. Review of forecasted financial statements for financial years ending December 31, 2013, through December 31, 2017, as provided by the Company.

4. Review of capitalization summary and summary of outstanding options and warrants of the Company as on the valuation date.

5. Review of the latest amended and restated Certificate of Incorporation dated June 30, 2010.

6. High-level secondary research and analysis on Theranos' markets and the industry in which it operates. Analysis of the Company's operating history, products and services, and competitive position, among others.

7. Research and analysis of financial data available from public sources of certain public companies operating in the same or similar industries, which, in our opinion, are comparable to the Company.

8. Review and analysis of certain other available Company documents, industry statistics, forecasts, and studies.



## Declaration

I hereby certify to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no (or the specified) personal interest with respect to the parties involved.

I have performed following services for Theranos within the three-year period immediately preceding acceptance of the assignment, as an appraiser or in any other capacity:

▪   Valuation analysis of the Company and prepare a written report to express opinion on the 'Fair Market Value' of the Company's common stock, on a minority and non-marketable basis, as of July 1, 2011.

▪   Valuation analysis of the Company and prepare a written report to express opinion on the 'Fair Market Value' of the Company's common stock, on a minority and non-marketable basis, as of July 1, 2012.

I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment. My engagement in this assignment was not contingent upon developing or reporting predetermined results. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, amount of the value opinion, attainment of a stipulated result, or occurrence of a subsequent event directly related to the intended use of this appraisal.

My analysis, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) and the ASA BV Standards.

I was assisted by Bharat Ramnani and Manpreet Singh during this independent appraisal process. No person other than those identified has any significant professional input during this independent appraisal process.

### Summary of Findings

Based on our analysis and after considering all relevant factors described in the detailed report presented hereinafter, in our opinion, as of September 30, 2013, the minority and non-marketable basis Fair Market Value of its common stock, as a class, is $0.17 per share.

**Principal Appraiser**
Hemendra Aran
Head, Valuation Services
Date of Report: December 06, 2013

Confidential



## COMPANY OVERVIEW

### Brief Company Profile

Established in May 2004, Theranos, Inc. is a Delaware corporation headquartered in Palo Alto, California. Theranos, a biomedical systems company, aims to employ its unique technology to personalize medical treatment through electronic devices that can read, transmit, and profile data of any aspect of an individual's health status. Pharmaceutical companies and physicians can then analyze the data to realize target profiles of their drugs and better patient care. In 2008, the Company started shipping devices for validation contracts (developing partnerships with pharmaceutical companies to validate the technology for its introduction to large-scale clinical studies).

| Quick facts – Theranos, Inc. | |
|---|---|
| Established | May 2004 |
| Headquarters | Palo Alto, CA |
| Founders | Elizabeth Holmes |
| Product/Service Offering | Healthcare information systems |
| Total Funding | 126.39 million |
| Investors | Healthcare distributors |
| Revenues (as of Sep 13) | Just launched products |

Theranos monetized its technology by entering into deals with large biopharmaceutical companies. Management believes the technology would help these companies improve their key therapies by rapidly optimizing the risk-benefit profiles of drugs, and thereby, shorten the duration of clinical trials. The Company's devices could also facilitate cost-effective care for healthcare providers. Clinicians could obtain quantitative information on disease progression and the efficacy of key compounds during and after clinical studies. Theranos plans to enter into the direct-to-consumer market by promoting its products through pharmacies and boutique nutritional shops.

In 2010, the Company developed smaller versions of its devices. However, 2011 onward, Theranos did not pursue new contracts for commercial use of these products and focused on the development of robust versions of its product models in preparation for targeting the general consumer market. The Company had previously received funding from its pharmaceutical partners through pre-payments for contracts. In 2013, the Company's product development and manufacturing is on track and products are launched in the market Q3 of FY13. Theranos also entered into a long term partnership with Walgreens. The Walgreen pharmacies shall serve as in-store sample collection centres for the Company. Walgreen is the nation's largest pharmacy chain with more than 8100 pharmacies. With Walgreens nationwide reach, the Company's lab testing service shall become more accessible for the customers.

The Company will continue to depend on its partners for providing the desired funding the next year as well to ensure the sustainability of its business due to its high cash burn rate.

### Financing History and Capital Structure

As of the valuation date, Theranos had secured four rounds of financing of over $126 million. The Company's total diluted capital structure consists of preferred capital (36.33%), common stock (49.66%), and options and warrants (14.01%). Total preferred capital was divided among Series A, B, C, and C1 shareholders. Each Preferred shareholder shall have the right to obtain liquidation preference of 1x and convert into common shareholder in the ratio of 1:1 (refer **Exhibit 9).**

The rights/preferences of each class of shareholders are as follows:

| Class of Stock | No. of Shares | Issue Price | Invested Capital | Participation Cap | Conversion Ratio |
|---|---|---|---|---|---|
| Series A | 46,320,045 | $0.150 | $6,948,007 | NA | 1:1 |
| Series B | 54,162,965 | $0.185 | $10,000,000 | Unlimited | 1:1 |
| Series C | 58,896,105 | $0.564 | $33,217,403 | Unlimited | 1:1 |
| Series C-1 | 18,508,335 | $3.00 | $55,525,005 | Unlimited | 1:1 |
| Series C-1* | 1,380,000 | $15.00 | $20,700,000 | Unlimited | 1:1 |
| Common | 245,014,100 | - | - | - | - |
| **Total** | **424,281,100** | | **126,390,415** | | |

Confidential
THER-AZ-01126741



<u>Liquidation Preference:</u> In the event of any liquidation, dissolution, or winding up of Theranos, Series C and C-1 Preferred shareholders shall be entitled to receive, prior and in preference to Series B Preferred, Series A Preferred, and Common stakeholders, an amount per share equal to liquidation preference specified for such share of Series C and Series C-1 Preferred stocks, as applicable, plus any declared but unpaid dividend on such share of Series C or Series C-1 Preferred stocks, as applicable. After the payment of liquidation preference for Series C and Series C-1 Preferred stocks, if the Company's assets legally available for distribution to Series A and Series B Preferred stockholders are insufficient to permit the payment of liquidation preferences of such holders, plus all declared but unpaid dividends on such shares, the entire assets legally available for distribution shall be distributed among Series B Preferred stockholders on a pro rata basis in proportion to the liquidation preference they would be entitled to receive. After the payment of liquidation preference of Series B Preferred stock, Series A Preferred Shareholders would be entitled to receive an amount equal to the liquidation preference for such shares on a pro rata basis.

<u>Dividends:</u> Preferred stockholders shall be entitled to receive dividends, as and if declared by the Company's Board of Directors, prior and in preference to any declaration or payment of dividend to common stockholders. The right to receive dividends on shares of any series of preferred stock shall not be cumulative.

<u>Participation:</u> Subsequent to the payment of the full liquidation preference of preferred stock, the remaining assets, if any, shall be ratably distributed among common stockholders. Series B, C, and C-1 shareholders have unlimited participation in receiving the corresponding amount in proportion to their liquidation preferences upon the liquidation, winding, or dissolution of the Company.

<u>Conversion:</u> Preferred shareholders have the right to convert to common stock in the ratio of 1:1.

## Products & Technology Solutions

Theranos has introduced personalized information systems to medicine. These systems enable patients to monitor stimulated levels of targeted analytes (a substance or chemical constituent determined in an analytical procedure) throughout the course of treatment or disease progression. Theranos' systems simultaneously run high and low sensitivity assays (a procedure in molecular biology for testing or measuring the activity of a drug or biochemical in an organism) to detect changes in the levels of markers directly induced by a drug. The monitors wirelessly communicate the results to medical personnel through a bioinformatics server. These systems monitor profiles ranging from drug efficacy, patient safety, and risk of adverse reaction (of drugs such as Vioxx) to the presence of Sexually Transmitted Diseases (STD), fertility monitors, and indicators of disease progression.

Theranos' technology platform analyzes blood samples and wirelessly analyzes the data in real-time on a server accessible on an individual's PDA or computer. Thus, the Company's products could be a direct challenge to conventional blood testing and data analysis infrastructure. Conventional methods of blood testing and analysis are time-consuming and any adverse drug effect on patients or clinical condition cannot be measured instantly. This, in turn, delays remedial measures. The Theranos infrastructure, which is convenient and faster, would be preferable since it enables users to extract better information from healthcare tests. Clinicians could use these systems to comprehensively profile disease progression and accurately characterize disease states, patient health, and efficacy & safety of a treatment on an individual basis.

## Target market

Theranos is pursuing a focused strategy to introduce its technology pipeline in target markets. In line with this, the Company is sequencing product releases for each application to target end markets that can most quickly adopt and commercialize the systems. Once fairly established in the market, Theranos aims to expand its product applications to the direct-to-consumer applications to enable monitoring of anything, anytime in an automated manner. With its innovative technology, the Company is in the process of developing a product capable of screening, monitoring, and supporting therapeutic administration and disease detection encompassing various disorders from vitamin deficiencies to emotional depression, diabetes to cancer chemotherapy, and contraception to congestive heart failure.

Theranos' systems could be applicable in the following markets:
i)      Pharmaceutical clinical trials (focused on phase IV)
ii)     Prescription medicines
iii)    Physicians' office, clinics, and hospitals
iv)     Health Maintenance Organizations (HMOs), insurance agencies, and governments
v)      Direct-to-consumer (through pharmacies and other shops)
vi)     Livestock and niche applications

Confidential
THER-AZ-01126742

ER-15153



## Technology

Key features of the Theranos technology include:

- Blood chemistry system that is more sensitive than cutting-edge laboratory analytical tools
- Fully integrated finger-prick blood monitoring system that eliminates the need to draw venous blood
- An integrated blood sampling port, which samples and analyzes blood droplet automatically without an individual ever viewing the sample being withdrawn
- Telecommunications and video communications with clinic, peer groups, and other relevant parties
- Real-time bioinformatics analysis of data and profiling on an individual's cell phone or Personal Digital Assistant (PDA)
- Web interface for patient, physician, and pharmaceutical companies
- Enables testing of a patient at home rather than a clinic
- Synchronizes clinical data and each patient record with data generated at home, providing complete analysis or health status of an individual
- Generates biomarker data indicating drug efficacy or new targets for novel pharmaceutical compounds

These systems comprise three components:

- Device: It is capable of extracting assay data from disposable cartridges and transmitting it via a wireless link to a remote database posted by Theranos.
- Cartridge: It is a consumable containing reagents to measure the concentration of target drug as well as defined markers for efficacy and safety of that drug and disease state in a patient's blood sample..
- Ambulatory Bioinformatics Communication System (ABCS): It is a database and proprietary analytical communications software for retrieving, transmitting, and analyzing data from Theranos Cartridges and patients' records. ABCS is upgraded at scheduled intervals.

## Market Overview

The entire pharmaceutical and theranostics market is regulated by the Food and Drug Administration (FDA). All new drug developments have to follow the FDA's stringent norms. Adherence to these norms tends to escalate costs and time required in drug development. The theranostics industry aims to address this issue by providing quick and more accurate testing methodologies to improve the drug risk profile.

The market is fragmented with players of all sizes. However, small firms have been observed to usually commence operations as niche service providers to the pharmaceutical industry. Over a period, these firms are acquired by large pharmaceutical companies. Theranostics has attracted many small- to medium-sized companies despite the challenge of being a new industry. The market's leading participants are larger pharmaceutical and diagnostics companies such as Roche and Abbott.

ER-15154



Theranos, Inc.

## Competitive Landscape

The theranostics industry is characterized by several small startups that eventually seek collaboration with larger companies as a strategy to enhance their competitiveness. Some of the companies operating in the industry are as follows:

| Company | Business |
|---|---|
|  | **Theranostics Health:** Founded in 2006, the company is shaping and creating a new healthcare and disease management system, in which individual patients are provided the best customized treatments. Its core technology platform measures the activity of several biomarkers in disease pathways, thus enabling companies to accurately profile their drug candidates and facilitate efficient and effective drug development. The platform also enables physicians to offer optimized therapies to patients. |
|  | **Cholestech Corporation:** The company's Cholestech LDX system provides accurate and affordable diagnostic testing for cholesterol and related lipids, blood glucose, inflammation, and liver enzymes. The Cholestech LDX lipid profile and glucose test is appropriate for assisting identification of those at risk of metabolic syndrome, a precursor to coronary heart disease and Type 2 diabetes. Cholestech was acquired by Inverness Medical Innovations in September 2007. |
| SEQUENOM | **Sequenom:** The company develops innovative technology, products, and diagnostic tests that target and serve discovery and clinical research, and molecular diagnostics markets. Sequenom's proprietary system MassARRAY® is a high-performance DNA analysis platform that efficiently and precisely measures the amount of genetic target materials and variations therein. |
| CLINICAL DATA | **Clinical Data, Inc.:** It is a global biotechnology firm developing targeted therapeutics, and genetic and pharmacogenomic tests for detecting serious diseases and predicting drug safety, tolerability, and efficacy. Clinical Data's PGxHealth division is leveraging its biomarker discovery expertise to develop pharmacogenomic tests. The company uses Familion and PGxPredict tests for predicting drug response. |
|  | **Somanetics Corporation:** The company is the pioneer and leader of cerebral and somatic oximetry, providing US clinicians with the first adult cerebral oximeter, pediatric cerebral oximeter, and simultaneous brain & body oximeter. This noninvasive patient monitor continuously measures changes in blood oxygen levels in the brain and body of patients. Currently, the INVOS® system is used in more than 700 hospitals in the US, including 80% of the centers performing pediatric cardiac surgery, and over 1,200 installations internationally. |



Theranos, Inc.

## Management Team

**Elizabeth Holmes, Founder, CEO**

Elizabeth is President and CEO of Theranos since she founded the Company in 2003. She left Stanford University to build Theranos around her breakthrough patents and a vision of enabling individuals to take control of their health through real-time diagnosis and monitoring, and treating targeted ailments noninvasively. Elizabeth took the Company from concept to reality, driving a major transformation in healthcare and pharmaceutical industries.

**Gary Frenzel, VP, Assay Systems**

Gary received his BS in Biology from Texas A&M University and went on to distinguish himself as an expert protein chemist and laboratory manager in R&D. He has managed the production of antibody conjugates for clinical trials in Europe and developed reagents, clinical cell separation systems, and multiplex assays, among others. His experience includes perfecting purification and conjugation processes, developing analytical methods for testing reagent quality, and obtaining ISO certification at various research foundations and commercial laboratories. Prior to joining Theranos, Gary was at Surromed Corporation, where he designed and developed methods for detecting variables that differentiate the state of disease from that of health.

**Sunny Balwani, President, Chief Operating Officer**

Sunny is President and Chief Operating Officer of Theranos. He is an entrepreneur and a computer scientist. He began his professional career at Lotus Development Corporation, after which he worked at Microsoft in several roles. Later, Sunny started his own company in the B2B ecommerce sector, which was later sold to CommerceOne. He holds an MBA degree from UC Berkeley and an undergraduate degree from UT Austin.

Confidential

THER-AZ-01126745

**ER-15156**



## Risks

Theranos faces the following key risks:

- **Funding risk:** Guideline public companies are at an advanced stage of enterprise development. Being listed companies, they have better access to funding from capital markets and debt facilities. On the other hand, being a private company, Theranos has limited access to various funding options. Although its cash balance is $31 million as of the valuation date, the Company will continue to incur a high cash burn rate due to huge R&D expenses in the near future and will be able to sustain its business operations for the next one and a half years. Thereafter, the Company would again need to raise capital to fund its operations.

- **Market acceptance of products:** Theranos develops novel devices, which were just launched in the market. Market acceptance of the products depends on the willingness and ability of patients and healthcare companies to adopt new technologies, and their perception of safety, efficacy, and benefits of the new technology and services compared to other competing products. If patients and healthcare communities are unable to adopt the new technology due to issues on performance, pricing, or availability of other substitutes or factors, the Company's top line may be affected.

- **Rapidly changing diagnostics devices market:** Factors such as changes in federal and state regulations and cost reduction pressures have led to rapid and continuous changes in the diagnostics devices market. Predicting the market's future growth with certainty will be difficult. The success of the diagnostics business depends on several factors such as product differentiation, product acceptance as a replacement for or supplement to traditional product offerings, effectiveness of sales and marketing efforts with customers and employees, ability to bring out new and additional products and services beneficial to customers, as well as the ability to obtain, retain, and renew contracts with big customers along with favorable pricing as the competition increases. Failure to manage any of these changes in the market will adversely affect the revenues and results of operations of the diagnostics business.

- **Required clearances for commercialization of newly developed medical devices:** The future performance of Theranos is highly dependent on the timely receipt of necessary regulatory approvals from FDA through clearance of a Premarket Notification 510(k) or Premarket approval (PMA) for its newly developed medical devices. Regulatory approval can be a lengthy, expensive, and uncertain process, and regulatory processes are subject to change, which can lead to increased costs and unanticipated delays. Failure to obtain FDA clearance would hamper the commercialization of diagnostics medical devices in the US, which could affect the future results of operations.

- **Defending technological intellectual property (IP) rights**: Theranos' products would be unique and innovative as it would utilize proprietarily developed technology. Therefore, the Company must protect its technology from counterfeit through patents and IP rights in order to maintain its competitive position for a reasonably longer period. The competitive edge could be eroded if Theranos fails to defend its IP rights, thereby adversely affecting revenue growth.

- **Key employees**: The pharmaceutical industry rests on high-quality human capital; however, it faces a perpetual dearth of skilled personnel. Shortage of skilled personnel may force the Company to spend additional funds on recruiting and retaining talents. Also, limited financial resources may force Theranos to compromise on quality manpower or defer its expansion plans. Either option is less than ideal and may negatively impact top-line forecasts.

- **Product liabilities**: The testing, manufacturing, marketing, and sales of products can expose the Company to potential product liability claims. This, in turn, would consume significant financial and management resources, and result in judgments over and above the amount of liability insurance.

Confidential



Theranos, Inc.

## Stage of Enterprise Development

The AICPA describes six stages of enterprise development based on varied factors as depicted below:

| Stage | Description |
|---|---|
| One | Enterprise has no product revenue to date and limited expense history, and typically an incomplete management team with an idea, plan, and possibly some initial product development. Typically, seed capital or first-round financing is provided during this stage by friends and family, angels, or venture capital firms focusing on early-stage enterprises, and the securities issued to those investors are occasionally in form of common stock, but more commonly in form of preferred stock. |
| Two | Enterprise has no product revenue, but substantive expense history, as product development is under way and business challenges are thought to be understood. Typically, a second or third round of financing occurs during this stage. Typical investors are venture capital firms, which may provide additional management or board of directors' expertise. The typical securities issued to those investors are in the form of preferred stock. |
| Three | Enterprise has made significant progress in product development, key development milestones have been met (for example, hiring of a management team), and development is near complete (for example, alpha and beta testing), but there is no product revenue. Typically, later rounds of financing occur during this stage. Typical investors are venture capital firms and also strategic business partners. The typical securities issued to those investors are in form of preferred stock. |
| Four | Enterprise has met additional key development milestones (for example, first customer orders, first revenue shipments) and has some product revenue, but is still operating at a loss. Typically, mezzanine rounds of financing occur during this stage. Also, it is frequently in this stage that discussions would commence with investment banks for an IPO. |
| Five | Enterprise has product revenue and has recently achieved breakthrough measures of financial success such as operating profitability or breakeven or positive cash flows. A liquidity event of some sort, such as an IPO or a sale of the enterprise, could occur in this stage. The form of securities issued is typically all common stock, with any outstanding preferred converting to common upon an IPO (and perhaps also upon other liquidity events). |
| Six | Enterprise has an established financial history of profitable operations or generation of positive cash flows. An IPO could also occur during this stage. |

As of the valuation date, the following factors were considered to determine Theranos' stage of development:

| | |
|---|---|
| Management Team & Operational History | The Company has an experienced management in place comprising people from biomedical and therapeutics fields with several years of collective experience. |
| Product/Service Offering | Theranos has previously developed a product named Theranos System 1.0, which was targeted at pharmaceutical companies to facilitate clinical trials. It provides customized, individual-patient solutions in real-time for drug discovery and clinical medicine. In 2011, the Company changed its strategy of developing smaller versions of medical devices to target healthcare companies. In 2013, the development of smaller versions of medical devices was on track, and the Company launched the product in the market in Q3 of 2013. |
| Customers | Theranos is positioning its system for use by pharmaceutical and biotechnology companies with drugs in clinical trials. The Company is now dealing with big pharmaceutical companies for its clinical trials of drugs. |
| Funding | Since its inception, Theranos has raised preferred funding of about $126.39 million through Series A, B, C, and C-1. |
| Revenues & Profitability | Theranos generated revenues of $0.52 million in FY11. The Company is expected to garner revenues of $50 million in FY13. It is operating at a loss as of the valuation date, and is expected to start generating profits from FY16. |

Conclusion: Stage of enterprise development for Theranos: **Four**

Theranos, Inc.
Confidential
THER-AZ-01126747

**ER-15158**



## INDUSTRY OVERVIEW

Theranos is a healthcare systems company that manufactures devices for determining any adverse effect of a drug on a patient on medication. Theranos' system can be used by clinicians to examine specimens such as blood, urine, and tissue donations, derived from the human body, to diagnose diseases or infections. These tests can be conducted at a laboratory or at home for use by consumers. Hence, the Company is broadly categorized into Medical Diagnostics Industry and can be classified under the **In Vitro Diagnostics Industry**.

### Medical Diagnostics Industry

Medical diagnosis refers to both the process of attempting to determine or identify a possible disease or disorder and the opinion arrived at by this process. In the field of medicine, it means the investigation and identification of disease states.

The modern diagnostics industry generally falls into two broad categories:

- In vitro diagnostics (IVD): It involves removal of samples of tissue such as blood, saliva, and biopsy from living organisms. This industry includes sales of automated and high-throughput analyzers and readers that handle and analyze results.
- In vivo diagnostics: It involves testing and observing tissue and function in living organisms. It utilizes X-ray, magnetic resonance imaging, and computed tomography techniques, etc which come under medical imaging, as well as electrocardiography and electroencephalography that come under monitoring procedures.

### In Vitro Diagnostics Industry

The IVD industry manufactures reagents, analytical instruments, and accessory products used to perform diagnostic laboratory tests. The three put together are referred to as IVD systems.

**Reagents** are solutions of highly specific biological or chemical substances that are able to react with target substances in samples. This process yields a product that can be measured or seen.

**Analytical instruments** are machines and equipment that automate the process, and are used to bring samples and reagents together. These measure the result or other qualities and parameters in samples.

**Accessory products**, produced by the IVD industry, include software programs used to run the instrumentation and control solutions that check the performance of the systems.

Growth in the IVD industry in 2012 can be mapped as follows:



*Source: Enterprise Analysis Corporation, 2013*



## Market Players

Roche Diagnostics (Germany), Abbott Diagnostics (USA), Beckman Coulter (USA), BD Diagnostics (USA), and Siemens Diagnostics (Germany) are the major players in the IVD market.

## Drivers and Trends

Following factors majorly drive this growth:

* Aging demographics:

  The probability of disease incurrence increases in individuals above the age of 65. The 78 million baby boomers born during 1946–64 have started turning 65 from 2011. Old age and obesity are major risk factors for chronic diseases, which would require frequent testing. This coupled with the increasing patient awareness, preventive testing and self testing offer a substantial growth opportunity to the industry.

* High insurance density

  The percentage of people without health insurance decreased from 15.7% in 2011 to 15.4% in 2012 in the US as per the US Census Bureau. Moreover, after the passing of the Patient Protection and Affordable Care Act in 2010, the US IVD industry will have an increased market of 30 million newly insured Americans driving higher volumes of testing and other services.



IVD sales by Test Location in 2012

- Central Lab — 73%
- Point of Care — 11%
- OTC/Self-Test — 16%

*Source: Enterprise Analysis Corporation, 2013*

* Decentralized laboratory testing:

  Another term for Point-of-care testing, decentralized laboratory testing is gaining momentum due to its accessibility and minimum infrastructure needs. These tests can be performed in the physicians' office, emergency rooms, intensive care units, or even patients' homes.

  Near Patient diagnosis and monitoring can significantly improve outcomes, reduce costs and therefore profoundly change therapy decisions. Thus there is a lot of R&D focus on developments of these POC equipments. This can be reflected from the fact that the Point-of-care testing sales were $5.32 billion in 2012 and are forecasted to increase to $9.03 in 2019 at a CAGR of 7.9%. Also the lack of adequate infrastructure in developing countries is propelling the growth of POC testing.

* Genetic testing to see a high adoption rate:

  The genetic testing market is expected to grow at a CAGR of 10.3%. Personolized medicine, Direct to consumer genetic testing & increasing application of genetic testing in the diagnosis of infectious diseases will drive the adoption rate of genetic tests in the near future. Convenience, accessibility, and use of genetic tests in rapid diagnosis of respiratory & infectious diseases, especially STDs like HIV/AIDS is driving the market growth

* Technological advancements:

  Advances such as automation, biosensor technology, miniaturization, integration of workstations, and information technology (IT) optimizing laboratory workflow would drive growth of the overall IVD market. Technological advances have also made Point-of-care testing to be more effective. Integration of IT with Point-of-care testing devices has improved data management and connectivity.

* Emerging markets:

  Developing countries like india China & Brazil are gaining importance. While Brazil is receiving huge Government funding, Asia is forecasted to clock revenues of $17.20 billion by 2016. China is the fastest growing economy within Asia, forecasted to reach revenues on $1.24 billion by 2016. The Helath Reform in China made headway in increasing the insurance coverage to 94% along with the primary healthcare system. Huge untapped markets & growth potential due to low penetration, Government initiatives for healthcare awareness, increasing elderly population etc are the major growth drivers in developing countries. Pricing pressures & unfavorable reimbursement scenario for tests in developed countries is thus leading to increased healthcare spending in emerging countries.

Confidential

**ER-15160**





*Source: Enterprise Analysis Corporation, 2013*

## Challenges

- **Complex regulatory framework:**
  Compliance to country-specific regulations slows down the IVD market growth, for instance, the US FDA's Quality Systems Regulations (QSR) and Europe's IVD Directive, which require foreign and domestic manufacturers to have in place a quality system for the design and production of their devices that are to be commercially distributed.

- **Restrictive Healthcare Reforms:**
  Though the recent Patient Protection and Affordable Care Act (PPACA) increased the insurance coverage in US, it had certain adverse effects on the IVD industry. For instance, the PPACA imposes an additional 2.3 excise tax on import and resale of medical devices in US beginning 2013. There will also be a new reporting and disclosure requirement on device manufacturers for any "transfer of value" to healthcare providers, and any investment interests held by physicians. Failure to do so will result in penalties up to $150,000. Thus, the PPACA as well as other health care reform measures that may be adopted in the future could have a material adverse effect on the industry.

- **Competition:**
  Increasing competition from emerging economies is one of the major challenges faced by the developing countries. Though US still holds the biggest market share in the IVD market, the favorable market conditions in the developing countries are offering them a huge potential to grow at a faster pace than the developing nations. This imposes huge pricing pressures on the developed markets, forcing them to make R&D investments in developing and manufacturing new products & technologies that anticipate the customer need and help the companies maintain a competitive edge. Delay in launch, marketing and distribution of new products can adversely affect their brand & positioning in the market.

- **Negative impact of inclusion of developing countries:**
  The rising popularity of emerging markets has made them the new expansion target for the IVD industry. However the unavailability of proper infrastructure and the lack of strict Government regulations, lead to the quality of tests performed and accuracy of test results being questioned along with the adherence to regulatory guidelines.

- **Unfavorable Reimbursement structure:**
  Many customers rely on Government funding and reimbursements by Medicare in the US. The financial crisis led to deep cuts in the healthcare budgets leading to reduced reimbursements for the customers and unavailability of capital for Clinical diagnostics & Life Sciences companies for introduction of innovative products. This unfavorable reimbursement scenario might discourage future capital investments, which would also hamper growth of this market.

Confidential

**ER-15161**



## Outlook

**IVD industry Revenue CAGR 2012-2017**



*Source: Research and Markets, 2013*

Global recession coupled with reimbursement pressures have led to a muted IVD industry sales growth, lower than the 6% annual growth seen before the recession peaked in 2008. However, as per a report by Research and Markets by 2017 IVD sales will climb near the $70 billion mark.

In 2012, the Americas had accounted for the largest share of the global in vitro diagnostic market, followed by Europe. However, the BRIC countries represent the fastest-growing markets due to the economic growth, the rising number of chronic diseases, and an increasing awareness about the use of in vitro diagnostic tests to control the spread of diseases. Moreover, the economic slowdown, pricing pressures, and high competition in mature countries will compel companies to focus on emerging markets.

In order to counter rising costs and competitions, industry consolidation and long-term partnerships will have a significantly high impact in the coming years. In the near future, personalized medicine and customized solutions shall gain importance. The future envisions diagnostics and pharmaceutical companies working together with a shift noticed in priority towards better customer service and enhanced data management systems.



## ECONOMIC OVERVIEW

The value of a company or its assets cannot be determined in isolation of the overall economic trends in geographic regions in which the entity operates. The review of economic trends is imperative while valuing a company, as the performance of a business, to a large extent, depends on the economic environment in which the company operates or sells its products/services. The following section briefly discusses the economic conditions and outlook for the US economy, as the company under consideration generates most of its revenues from the domestic market.

### General Economic Conditions

The economy has continued to recover from the financial crisis and recession, but the pace of recovery has been slower than as anticipated by FOMC participants and many others. Since the recession trough in mid-2009, growth in real gross domestic product (GDP) has averaged only a little more than 2 percent per year.

Economic data indicates US' real GDP expanded at an average annualized rate of 1.8% during the first quarter of 2013 vis-à-vis 0.4% in the previous quarter. The growth was mainly due to the increase in the demand of Personal Consumption Expenditures (PCE), private inventory investment, and residential fixed investment. The annual GDP for 2012 was $15.68 trillion. It represents 25.30% of the world economy.

| Economic Indicators | Key Developments |
|---|---|
| Real GDP | According to Bureau of Economic Analysis, the annual GDP for 2012 was $13.59 trillion. The real GDP in the first quarter of 2013 increased 1.8% as compared to 0.4% in the previous quarter. It expanded at a CAGR of 1.06% during 2005-12 periods. |
| Trade Deficit | Total exports and imports in March 2013 were $184.3 billion and $223.1 billion respectively resulting to a trade deficit of $38.8 billion. Current Account deficit was $106.1 billion in the first quarter of 2013 as compared to $102.3 billion in the previous quarter. |
| Consumer Spending and Government Spending | Consumer spending increased 2.6% in the first quarter of 2013, after surging 1.8% annually in the previous quarter. Government spending on the other hand decreased by 4.8% in the first quarter of 2013 as compared with decrease of 7.0% in the previous quarter. |
| Unemployment | The unemployment rate fell to 7.7% in the first quarter of 2013 as compared to 7.8% in the previous quarter. |
| Interest Rates | The yield on 30-day T-bill decreased to 0.07% in first quarter of 2013 after increasing to 0.09% in fourth quarter of 2012. The 10-year yield increased to 1.95% in first quarter of 2013 after decreasing to 1.71% in fourth quarter of 2012. Yield on 20-year Treasury Inflation Protected Security (TIPS), with principal and interest payments adjusted for inflation, increase to 0.19% from 0.00% over the same period. |
| Consumer Prices and Inflation Rates | In March 2013, the Producer Price Index (PPI) increased by 1.1% on a seasonally adjusted basis after increasing by 1.3% in January. During the same period, the Consumer Price Index (CPI) increased by 1.5% on a seasonally adjusted basis after increasing to 1.6% in January. |

Confidential
THER-AZ-01126752

ER-15163



**Theranos, Inc.**

## Gross Domestic Product

### Real GDP growth rate* - Quarter-wise



- According to Bureau of Economic Analysis, the real GDP in the first quarter of 2013 increased at 1.8% as compared to 0.4% in the previous quarter. The growth was mainly due to the increase in the demand of Personal Consumption Expenditures (PCE), private inventory investment, and residential fixed investment.

- Real PCE increased 2.6% in the first quarter of 2013 after an increase of 1.8% in the previous quarter.

- The real private investment increased 0.57% in the first quarter of 2013 after decreasing to 1.52% in the previous quarter.

- Real residential fixed investment expanded 14.0% in the first quarter of 2013 after increase of 17.6% in the previous quarter.

### Real GDP growth rate* - Annual



- Real GDP (chained 2005) was $13.59 trillion during 2012 as against $13.30 trillion in 2011, an increase of 2.2% on year-over-year basis. Real GDP showed a Compounded Annual Growth Rate (CAGR) of 1.06% during 2005-12 periods.

- Real Personal Consumption Expenditure (PCE) decreased 1.8% in 2012 as compared to increased of 2.4% in 2011.

- Gross Private Domestic Investment decreased 1.2% in 2012 after an increase of 1.5% in 2011.

- Government consumption expenditures and gross investment decreased 1.8% in 2012 after increasing to 3.3% in 2011.

- Market value of the nation's output of goods and services (current dollar GDP) increased 4.0% or $609.1 billion in 2012 as against $576.8 billion in 2011.

### Real GDP components* - Q1 2013



- PCE comprises of Goods and Services. Goods are bifurcated into two parts, durable and non-durable; durable goods increased 7.6% and non-durable goods increased 2.8%. Services increased 1.7% in the first quarter of 2013.

- Gross Domestic Investment consists of residential and non residential fixed investment. Real residential fixed investment expanded 14.0% in the first quarter of 2013 and real non-residential fixed investment increased 0.4% in the first quarter of 2013.

- Government Consumption comprises of federal and state and local expenditure. Federal government's consumption expenditure and gross investment (a part of the government's consumption expenditure) decreased 8.7% in the first quarter of 2013. State and local government consumption expenditure and gross investment decreased 2.1% in first quarter of 2013.

Source: Bureau of Economic Analysis
*Seasonally adjusted annual rates, excluding net export of goods and services (negative values)

Confidential
Theranos, Inc.
THER-AZ-01126753

**ER-15164**



Theranos, Inc.



**Historical Real GDP Components**

## Trade Deficit

**External trade* (in $Billions)**



**Key Highlights**

- Trade gap fell for a second month in a row in March 2013. In March the total exports and imports were $184.3 billion and $223.1 billion respectively resulting into a trade deficit of $38.8 billion, a drop of 11.0% as compared to February 2013.

- In March 2013, exports decreased due to decrease in foods, feeds, and beverages ($1.1 billion); automotive vehicles, parts, and engines ($0.3 billion); industrial supplies and materials ($0.3 billion); capital goods ($0.3 billion); and consumer goods ($0.3 billion). However there was an increase in other goods ($0.2 billion).

- In March 2013, imports decreased due to decrease in consumer goods ($3.4 billion); capital goods ($1.5 billion); industrial supplies and materials ($1.4 billion); and automotive vehicles, parts, and engines ($0.8 billion). However there was an increase in other goods ($0.9 billion).

**Trade deficit***



**Key Highlights**

- In the first quarter of 2013, the trade deficit was $536.1 billion as compared to $530.2 billion in the previous quarter, an increase of 3.4% of GDP.

- The current account deficit increased to $106.1 billion in first quarter 2013 from $102.3 billion in the previous quarter.

- Trade deficit with China decreased to $17.89 billion in March 2013 from $26.06 billion in December 2012. Trade deficit with China reached a record high in 2012, totaling $315.1 billion vis-à-vis $295.4 billion in 2011.

- Trade deficit with European Union increased to $9.89 billion in March 2013 from $8.49 billion in December 2012.

Source: Bureau of Economic Analysis, $ in Billion
*figures are seasonally adjusted at annual rates

ER-15165



Theranos, Inc.

## Consumer Spending

**Consumer Spending & Government Spending***



— Personal Consumption      — Government Spending

- Consumer spending grew at a seasonally adjusted at annual rates (SAAR) of 2.6% in the first quarter of 2013, after surging 1.8% annually in the previous quarter. Government spending on the other hand decreased at SAAR by 4.8% in the first quarter of 2013 as against 7.0% decrease in the previous quarter.

- National defense expenditure decreased 12.0% in the first quarter of 2013 after 22.1% decline in previous quarter. Non-defense federal expenditure decreased 2.1% in the first quarter after an increase of 1.7% in the previous quarter.

- In real GDP, the durable goods segments spending on motor vehicles & parts, furnishings & durable household equipment and recreational goods and vehicles increased 23.0%, 8.0% and 20.0%, respectively, in the first quarter of 2013. In the non-durable goods segment, expenditure on Food and beverages purchased for off-premises, consumption gasoline & other energy goods and clothing & footwear increased by 11.0%, 12.0% and 5.0% respectively.

Source: Bureau of Economic Analysis
*figures are Seasonally Adjusted at annual rates

## Unemployment

**Unemployment rate***



- The unemployment rate fell to 7.7% in the first quarter of 2013 as compared to 7.8% in the previous quarter. The unemployment rate was 8.2% and 8.0% in the second and third quarters of 2012.

- There was a fall in the number of unemployed persons (11.74 million) and the unemployment rate of 7.6% in March 2013 as compared to December 2012 (12.21 million) and 7.8%.

- According to the US Bureau of Labor Statistics, monthly non-farm payroll employment increased merely by 88,000 in March 2013 as compared to a rise of 155,000 in December 2012.

- In March 2013, employment increased in the field of healthcare, professional and business services, but declined in the field of retail trade.

Source: Bureau of Labor Statistics
*figures are averaged quarterly and Seasonally Adjusted at annual rates



<div style="text-align: right;">**Theranos, Inc.**</div>

## Interest Rates

**Interest rates\***



10 year Treasury Bond · 30 days Treasury Bill

- The chart above illustrates that the yield on 30-day T-bill decreased to 0.07% in first quarter of 2013 after increasing to 0.09% in the fourth quarter of 2012. The 10-year yield increased to 1.95% in first quarter of 2013 after decreasing to 1.71% in fourth quarter of 2012. Yield on 20-year Treasury Inflation Protected Security (TIPS), with principal and interest payments adjusted for inflation, increase to 0.19% from 0.00% over the same period.
- Federal Open Market Committee (FOMC) has maintained federal funds rate at 0–0.25% since the last quarter of 2008. It expects to keep the federal fund rate at this level till the unemployment rate is above 6.5%.
- Given the economic uncertainty in the US, the committee may keep interest rates at low levels and continue to purchase $85 billion a month in debt securities, which includes mortgage-backed securities of $40 billion and long-term treasury security of $45 billion.

Source: The Federal Reserve Board endings
*Represents quarterly data

## Consumer Prices and Inflation Rates

**Consumer Price Index and Inflation Rates\***



Consumer Price Index · Producer Price Index

- In March 2013, the Producer Price Index (PPI) increased by 1.1% on a seasonally adjusted basis after increasing to 1.3% and 1.5% during January and February respectively.
- In March 2013, the Consumer Price Index (CPI) increased by 1.5% on a seasonally adjusted basis after increasing to 1.6% and 2.0% during January and February respectively.
- According to FOMC, the inflation rate between one and two years ahead is expected to be merely 0.5% more than the committee's expected 2.0% rate in the long-run goal.

Source: Bureau of Labor Statistics
*figures are Seasonally Adjusted at annual rates

**ER-15167**



| | Theranos, Inc. |
|---|---|

## Venture Capital Industry

### Total VC Investment by Stage of development*



*Total · Later Stage · Expansion · Early Stage · Startup*

Source: NVCA/PWC Money Tree Report, Q1 '13
*figures are seasonally adjusted at annual rates

- During the first quarter of 2013, VC investment across sectors was $5.9 billion as compared to $6.7 billion in the fourth quarter of 2012. The number of deals over the same period decreased to 863 from 1,013.

- Investments in seed stage companies increased by 11% to reach $178 million, on the other hand the number of deals were reduced by 22.0% to reach at 52 in the first quarter of 2013.

- Investments in companies across early stages decreased by 28.0% to reach $1.5 billion, the number of deals were reduced by 17.0% to reach at 393 in the first quarter of 2013.

- Investment in expansion stage companies decreased 13.0% to reach $2.0 billion, the number of deals was also reduced by 13.0% to reach 217 deals in the first quarter of 2013.

- In the first quarter of 2013, investments in later stage companies increased 2.0% to reach $2.2 billion, the number of deals was reduced by 9.0% to reach at 201 deals in the first quarter of 2013.

### Venture Capital Investment by Industry*

| | $5.4 bn | $5.6 bn | $6.7 bn | $8.1 bn | $7.3 bn | $7.2 bn | $6.2 bn | $7.3 bn | $6.5 bn | $6.7 bn | $5.9 bn |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Other | 26% | 18% | 23% | 22% | 20% | 20% | 19% | 17% | 20% | 19% | 21% |
| Media and Entertainment | 6% | 10% | 8% | 9% | 8% | 5% | 7% | 10% | 7% | 6% | 9% |
| IT Services | 9% | 7% | 9% | 9% | 6% | 7% | 8% | 8% | 8% | 6% | 4% |
| Medical Devices | 11% | 9% | 10% | 10% | 10% | 7% | 11% | 9% | 7% | 10% | 9% |
| Industrial/Energy | 6% | 15% | 15% | 9% | 10% | 19% | 13% | 13% | 8% | 8% | 15% |
| Biotechnology | 17% | 16% | 14% | 18% | 16% | 19% | 10% | 10% | 19% | 19% | |
| Software | 22% | 26% | 20% | 22% | 30% | 28% | 27% | 32% | 32% | 32% | 40% |

Q3'10  Q4'10  Q1'11  Q2'11  Q3'11  Q4'11  Q1'12  Q2'12  Q3'12  Q4'12  Q1'13

*Software  ■Biotechnology  ■Industrial/Energy  ■Medical Devices  ■IT Services  ■Media and Entertainment  ■Other*

- Approximately $2.3 billion was invested in the Software industry during the first quarter of 2013, up 8.0% from previous quarter. The industry also recorded the highest number of deals (329), however it decreased by 18.0% from the previous quarter.

- Investments in the Industrial Energy sector declined 63.0% to $0.19 billion in the first quarter of 2013. The number of deals for the same period was 59; a decrease of 12.0% over the previous quarter. The Medical Devices and Equipment sector had investments of $0.51 billion in the first quarter of 2013, a 20.0% decrease as compared to previous quarter. The number of deals also decreased by 10.1% in the first quarter of 2013, to reach at deal of 71.

- Investments in the Biotechnology industry declined 33.0% to $0.87 billion in the first quarter of 2013. The number of deals for the same period was 96, a decrease of 30.4% from the previous quarter. Investments in the Media and Entertainment sector totaled $0.50 billion, a 37.0% increase from the previous quarter. The number of deals for the same period was 86; a decrease of 7.5% from the previous quarter. Investment in IT Services was $0.24 billion in the first quarter of 2013, down 41.0% from the fourth quarter of 2012. On the other hand, the number of deals for the same period was 68, an increase of 3.0% from the previous quarter.

- Overall VC investments declined in the first quarter of 2013 as compared to the previous quarter, both in terms of dollar and deal terms. While investments in the software industry and Media and Entertainment sector increased, that in the biotechnology, Medical Devices and Equipment sector, Industrial Energy sector and IT Services declined.

Source: NVCA/ PWC Money Tree Report, Q1 '13     *figures are Seasonally Adjusted at annual rates



Theranos, Inc.

## M&A and IPOs in VC Space

An exit event is an important aspect of the VC investment strategy. Two of the most prominent strategies pursued by VCs to exit a venture are mergers and acquisitions (M&A) and initial public offerings (IPOs).

### Mergers and Acquisitions



- In the first quarter of 2013, the number of M&A deals declined to 77 from 117 in the previous quarter. The average disclosed deal value also decreased to $98.4 million from $127.9 million.

Source: NVCA/PWC Money Tree Report, 2013 Q1, $ in Million   *figures are seasonally adjusted at annual rates

### Initial Public Offerings



- 8 venture-backed IPOs (aggregating $0.672 billion) were executed during the first quarter of 2013. The number of IPO's was constant as compared to previous quarter, but the average IPO offer amount decreased by 52.3% from the previous quarter.

Source: NVCA/PWC Money Tree Report, 2013 Q1, $ in Million   *figures are Seasonally Adjusted at annual rates



Theranos, Inc.

## Outlook



**Economic Projections – Central Tendencies for Growth Forecasts**

Source: Economic Projections of Federal Reserve Board Members and Federal Reserve Bank Presidents, March2013

- According to BBVA Research Report, it expects to have a moderate growth during the first two quarters due to fiscal cliff such as increase in federal taxes and uncertainty lingers. However the economy would show a sign of recovery from second quarter once the fiscal measures are adaptable to the business and consumers. The report expects annual growth of GDP to be 1.8% during 2013 and increase to 2.7% by end of 2016.

- According to the report, the economy not only faces domestic issues but also volatility problems from Europe, mainly related to political developments in Spain and Italy. Apart from crisis in Europe, there are also other issues relating to uncertainty in exchange rate policies, decline in credit rating of the U.S. economy. In order to increase the U.S. economy by the end of 2013, the government has to stabilize the above condition and take control on the full sequester.

- According to BBVA report, it expects non-farm employment is expected to reduce from 1.7% in 2012 to 1.4% in 2013. Nominal Personal Income is expected to increase from 3.5% to 4.6% during the same period. The 10 year Treasury note is expected to be 2.3% during 2013 and further increase to 3.7% by the end of 2016.

- The Federal Reserve revised its GDP growth estimate for 2013 to 2.3–2.6%. The unemployment rate is expected to decrease marginally in 2013. Inflation, as measured by the annual change in the price index for personal consumption expenditure is estimated to be in around 0.8-1.2% during 2013 and expect it to remain constant at 2.0% during 2014-15 respectively.

**Conclusion:** On a whole the U.S. economy has been substantially improved as compared to 2012. CBO has also revised the U.S. budget by expecting higher revenues and lower expenses. In order to improve the U.S. economy, the government not only needs to moderate the revenue volatility, but need to poise between taxation and spending in a more cautious fiscal environment. Focusing on new budget norms and fiscal resiliency would be a better option rather than going back and working on the old norms.

Theranos, Inc.
Confidential
THER-AZ-01126759

ER-15170



## VALUATION ANALYSIS

### General Principles

Business valuation is guided by two fundamental economic principles:

- Principle of 'future benefits': A rational buyer will not buy an asset at a price that exceeds the cash flows the asset is expected to generate in the future, adjusted for risks associated with achieving those streams of cash flows and time value of money.

- Principle of 'substitution': A rational buyer will not buy an asset at a price that exceeds the cost to acquire or recreate a similar asset with similar or greater economic utility.

The company's value is determined on a 'going-concern value' or 'liquidation value' premise.

- _Going-concern value:_ This premise assumes that the company will continue to do business in the foreseeable future, in which case, the potential investor will evaluate expected returns and associated risks on a continuing basis. It assumes the highest use and best exploitation of all business inputs such as land, labor, and capital, brought together. The value thus generated is generally greater than the mere sum of the parts.

- _Liquidation value:_ This is the estimated amount shareholders expect to receive on immediate sale of the company after settlement of external liabilities and cost of liquidation, if it were to go out of business.

Broader-level approach followed for determining FMV of common stock



Confidential

THER-AZ-01126760

**ER-15171**



To arrive at the Fair Market Value of Theranos' common stock, we first determined the Equity Value of the entire Company at a 'non-controlling' level, using different valuation methods as explained in the sections below. The Equity Value derived was then allocated among different classes of shareholders based on the appropriate methodologies prescribed in the AICPA Practice Aid[4] for the allocation of Equity Value. Thereafter, the Equity Value allocated per share to common stock, as a class, was adjusted for Discount for Lack of Marketability (DLOM) to arrive at the Fair Market Value of the Company's common stock.

## Equity (Enterprise) Valuation Methods

According to guidelines prescribed by the AICPA Practice Aid[5], all valuation methodologies applied for the valuation of a privately held company can be broadly classified under three approaches:

1. The Market Approach
2. The Income Approach
3. The Cost or Asset Approach

AICPA Practice Aid further states that in performing a valuation, an appraiser should consider all three approaches and select the most appropriate approach or approaches. The selection should consider factors such as the history, nature, and stage of development of the company; the nature of its assets and liabilities; capital structure; and the availability of a reliable, comparable, and verifiable data that will be required to perform the analysis.

According to the Uniform Standards for Professional Appraisal Practice ('USPAP'), *"An appraiser must develop value opinion(s) and conclusion(s) by use of one or more approaches that are necessary for credible assignment results[6]"*.

(For detailed theory, please refer **Exhibit 5**.)

---

[4] AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation'
[5] AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 8, Para # 13
[6] USPAP, Rule 9-4 (a)

Confidential
Theranos, Inc.
THER-AZ-01126761



Theranos, Inc.

## Equity Value Determination

- In our understanding, a prospective investor would evaluate investment in a company such as Theranos considering the expected returns and associated risks on the basis of continued future operations. Accordingly, we valued the Company's Equity Value on a going-concern basis.

- In our analysis of Theranos, we considered Market and Income approaches. Under the Market approach, we applied the Guideline Public Companies' (GPCS) trading multiples approach. Under the Income approach, we applied the Discounted Cash Flow (DCF) analysis.

- We have not employed the Cost approach in our valuation analysis. Generally, this approach is suitable when liquidation of the company being valued is imminent. The Cost approach focuses on the value that each individual asset is expected to realize on liquidation near the valuation date. The approach may sometimes be suitable for valuations on a going-concern basis in cases where the company being valued has huge and significant investments in tangible assets or where earnings generated from operations are insignificant relative to the value of its operating assets (e.g., real estate companies and startups). Therefore, for the purposes of this analysis, the Cost approach is considered the weakest; hence, it was not applied.

- Applicability of different valuation methodologies was evaluated based on factors including, but not limited to, the Company's development stage, significant milestones in its business plan, operating history, industry in which it operates, availability and quality of relevant data for each approach, and discussions with management about expected exit scenarios.

- Factors such as reliability of financial forecasts, as well as magnitude and materiality of assumptions required to build them were analyzed while weighing DCF. Similarly, weight to market-based method was assigned considering the number of GPCS and the extent to which Theranos was comparable to the shortlisted guideline public companies. Parameters considered for comparison include business lines, revenue model, size of revenues and stage of development.

- In our opinion, future expectations of returns, growth, and inherent risks associated with investment in a company in the development stage similar to Theranos can be measured by both Income and Market approaches. Accordingly, we assigned equal weights to the Equity Values arrived through DCF and Guideline Public Companies' Trading Multiples Method.



## Discounted Cash Flow (Income approach)

Our DCF analysis is based on financial forecasts provided by management for 2011 through 2017. (Please refer **Exhibit 3** for financial projections.) We conducted a limited and high-level review on the reasonability of key assumptions used to develop financial projections provided by management. Based on discussions with management, these estimates were suitably adjusted to reflect the most likely view of Theranos' prospects prevailing at the valuation date.

### Equity Value

Under the DCF approach, we first forecasted free cash flows generated from the Company's operations, i.e., net profit assuming full taxation, adjusted for non-cash expenses, changes in working capital, and capital expenses. Thereafter, free cash flows were discounted to arrive at the present value as of the valuation date. To arrive at the Equity Value, the sum of the present values of all future cash flows and terminal value was taken into consideration. To this sum, we added the cash balances as of the valuation date and the sum of the present value of all future reasonably realizable tax benefits to arrive at the Equity Value.

### Cost of Equity or the Discount Rate (CoE)

Discount rate is the rate of return that a willing financial buyer, acting rationally, would expect to receive from an investment to compensate for the inherent risks and the time value of money. This rate of return should also be acceptable to a willing seller with the same knowledge of facts, as explained in the Fair Market Value definition. We applied the widely used Capital Asset Pricing Method (CAPM) to build up the Cost of Equity (CoE) for Theranos. The Cost of Equity under CAPM is generally calculated as:



Cost of Equity = $R_f + \beta * (R_m - R_f)$

- $R_f$ is the Risk-Free Rate
- $\beta$ is the Beta
- $R_m$ is the Market Return
- $(R_m - R_f)$ is the Market Risk Premium

### Size Premium

Since the CoE arrived at using the standard CAPM equation (as shown above) fails to capture the investment risks associated with the stocks of small or early-stage companies, Aranca added a Size Premium (SP) based on Ibbotson Associates' study[7].

### Company-Specific Risk Premium

Aranca added the Company-Specific Risk Premium (CSRP) to account for the additional return that a prospective investor would expect to compensate for the additional risks involved in investing in Theranos. Our determination of CSRP was based on the analysis of various risks that the Company is exposed to, as detailed in the Risks section. We also considered the rates of return expected by venture capitalists for companies in different stages of financing, as described in the two publications identified in the AICPA Practice Aid.

| Rates of Return | | |
|---|---|---|
| Stage of Development | Plummer[8] | Scherlis and Sahlman[9] |
| Start-Up | 50–70% | 50–70% |
| First Stage or 'Early Development' | 40–60% | 40–60% |
| Second Stage or 'Expansion' | 35–50% | 30–50% |
| Bridge/IPO | 25–35% | 20–35% |

---

[7] Ibbotson Associates
[8] Plummer, James L., QED Report on Venture Capital Financial Analysis, Palo Alto: QED Research, Inc., 1987.
[9] Scherlis, Daniel R. and William A. Sahlman, "A Method for Valuing High-Risk, Long-Term, Investments: The Venture Capital Method." Harvard Business School Teaching Note 9-288-006, Boston: Harvard Business School Publishing, 1989.



Theranos, Inc.

We studied the *Venture Economics* publication presented in the AICPA Practice Aid, illustrating the average rates of returns for various venture capital funds for the period ended December 31, 2002.

| Type of Fund | 5-Year Return | 10-Year Return | 20-Year Return |
|---|---|---|---|
| Early/Seed Stage[10] | 51.4% | 34.9% | 20.4% |
| Balanced[11] | 20.9% | 20.9% | 14.3% |
| Later Stage[12] | 10.6% | 21.6% | 15.3% |
| All Ventures | 28.3% | 26.3% | 16.6% |

We also observed the CSRP & SP of guideline public comparables estimated using the total beta approach. Total beta, which measures a stock's risk relative to the market (which has a Tβ equal to 1.0), captures total risk, including systematic as well as unsystematic risk (size and company-specific risk). Thus, it makes intuitive sense to use the total beta of publicly traded stocks to assist in benchmarking company-specific risk for a privately held firm. One can then use the following equation to derive the total beta to measure unsystematic or company-specific risks.

$T\beta = \beta / R = \phi s / \phi m$

Wherein Tβ is a stock's total beta, β is a stock's beta, R is the correlation coefficient between a stock and the market (S&P 500), φs is a stock's standard deviation, and φm is the market's standard deviation. The CSRP of guideline companies derived using the total beta approach ranged between 1.00% and 3.82%, with a mean and median of 4.10% and 3.41%, respectively.

To determine the appropriate discount rate for Theranos, we conducted a qualitative analysis of risk factors defined under the Risks section for Theranos and guideline public companies such as Alere, Inc, Medidata Solutions, Abaxis, Inc, Cerner Corp, Paraxel International Corp and OraSure Technologies. Each of the risk factors was arranged on significance basis and analyzed. The companies were then compared on each factor to determine the extent of company-specific risk that can be attributed to Theranos. The CSRP of comparable companies was taken as a benchmark to determine CSRP for the Company. Risk factors analyzed are as follows:

- **Less visibility in terms of achieving the revenue targets:** The Company has just launched its products; its products are yet to gain market acceptance. Although the product launch was on track, the uncertainty is high in terms of meeting the financial projections.

- **Funding risk:** Guideline public companies are at an advanced stage of enterprise development. Being listed companies, they have better access to funding from capital markets and debt facilities. On the other hand, being a private company, Theranos has limited access to various funding options. Although its cash balance is $31 million as of the valuation date, the Company will continue to incur a high cash burn rate due to huge R&D expenses in the near future and will be able to sustain its business operations for the next one and a half years. Thereafter, the Company would again need to raise capital to fund its operations.

Based on our review of specific risks involving Theranos and comparative analysis relative to guideline public companies, we allocated 7% as the appropriate CSRP measure for the Company.

We determined beta of 1.09 as appropriate for Theranos based on the third quartile beta of the guideline public companies estimated by un-levering beta of each company to their individual debt/equity ratios and re-levering to the trimmed average debt/equity ratio of the selected comparables.

Based on inputs of risk-free rate at 2.76% (Source: Bloomberg), Beta at 1.09, market risk premium at 6.11% (Source: 2013 Ibbotson study), and Size premium of 6.03% (Source: 2013 Ibbotson study), in addition to the 7% CSRP, we determined the discount rate of **22.43%** as the appropriate expected rate of return from investment in Theranos' Equity.

---

[10] Seed Stage is defined by Venture Economics as including investments in portfolio companies that have not yet fully established commercial operations and may involve continued research and development. Early Stage is defined by Venture Economics as including investments in portfolio companies for product development and initial marketing, manufacturing, and sales activity.

[11] Defined by Venture Economics as including investments in portfolio companies at a variety of stages of development (Seed Stage, Early Stage, Later Stage).

[12] Defined by Venture Economics as including financing for the expansion of a company that is producing, shipping, and increasing sales.

Confidential



| Cost of Equity | | Source |
|---|---|---|
| **Beta** | 1.09 | *Bloomberg* |
| **Market Risk Premium** | 6.11% | *Ibbotson 2013* |
| **Size Premium** | 6.03% | *Ibbotson 2013* |
| **Risk-free rate** | 2.76% | *Bloomberg* |
| **CSRP** | 7% | |
| **Cost of Equity** | **22.43%** | |

*Considering the adjoining inputs, Theranos' cost of equity stood at 24.08%.*

**Terminal Value**

To arrive at the terminal value, we considered applying the Gordon growth method as well as an exit multiple based on valuation metrics of guideline public companies.

The Gordon Growth Method of computing the terminal value assumes a constant growth in cash flows until perpetuity, which is more appropriate in the case of companies that have reached a highly mature level of operations. Since, the Company is not expected to reach a mature level of operations by FY17, it would not be appropriate to use the Gordon Growth Method. Considering Theranos is expecting revenue in the form of large deals from big pharmaceutical companies, its revenue stream could be volatile in the coming years and even in 2017 (in which exit multiple is applied). Furthermore, in our opinion, financial projections beyond FY17 would require one to make a number of assumptions, which cannot be supported objectively for a company such as Theranos with a smaller operating history and, thus, would make the analysis highly subjective and speculative. Consequently, we determined the Company's terminal value by applying an exit multiple in FY17 based on observable GPCs historical trading multiples.

We observed the range of Price/Earning, EV/Revenue, and EV/EBITDA multiples for guideline public companies prevailing at the date of valuation. Considering Theranos is likely to make profits by FY16, we concluded the P/E or EV/EBITDA multiple would be more appropriate for arriving at the terminal value. However, looking at the forecasts, the Company is not expected to face tax liabilities in FY16 despite being profitable as Theranos would be enjoying benefits from Net Operating Losses (NOLs). Hence, applying P/E multiple would not be appropriate since net profits would not be adjusted for taxes by then. Hence, applying the EV/EBITDA multiple would provide the most appropriate measure of terminal value.

We observed that guideline public companies have historically traded at EV/EBITDA multiples ranging from 7.9x to 29.9x during FY10-LTM, with a mean ranging between 13.6-18.5x and median 11.4-16.6x. As of the valuation date, the Company has successfully launched its product in the market and the management is confident of achieving its business plans. Theranos is expected to register a substantial growth in revenues, higher than most of the GPCS. However, the Company still faces significant risk as its achievability of forecasts is highly contingent on the market acceptance of its product and successful execution of the business plans in the future. Based on higher risk and better growth prospects than GPCS, we deemed it appropriate to apply a multiple of 14x (mean of median multiples of last three years), to the EBITDA estimate for 2017 to determine the terminal value of the Company's equity.





### Equity Value

The FCFE for both the explicit forecast period and terminal value were discounted to their present values as of the valuation date by applying the discount rate determined above. Thereafter, the current balance of cash and cash equivalents as of the valuation date was added to the resultant figure to derive Theranos' Equity Value [without considering the value due to benefits on account of Net Operating Losses (NOLs)].

The FCFE considered in the analysis is calculated by considering post-tax profits. However, since Theranos has unutilized NOLs, it would enjoy significant tax savings by setting it against the profits in certain future years, the value of which needs to be determined separately. Based on the financial forecasts, we estimated the tax savings that the Company would enjoy year-on-year. These were then discounted to their present values to arrive at the value of NOLs.

Finally, the value of NOLs was added to the present value of FCFE, terminal value, and current cash equivalents to arrive at Theranos' Equity Value of **$207.98** million using this method. (Please refer **Exhibit 6** for all the above calculations.) We assigned a weight of total **50%** to DCF method in the final determination of the Company's Equity Value.

Confidential
THER-AZ-01126766



## Guideline Public Companies' Trading Multiples Method

While applying the guideline trading multiples method for the valuation of privately held companies, selection of representative public companies is the most important step. Based on our research, discussions with management, and review of databases (such as Bloomberg and Reuters), we initially shortlisted **12** public companies listed on US exchanges mainly operating in the '**medical devices**' and the '**healthcare information systems**' industries.

Each of the initially shortlisted companies was analyzed for comparability to Theranos based on parameters such as business lines, market share, revenue model, size of operations, and development stage. Based on the analysis discussed above, we finally selected the **six** companies as listed below ('guideline public companies') for our valuation analysis. (Please refer **Exhibit 4** for detailed description.)

- OraSure Technologies, Inc. (OSUR)
- Alere, Inc. (ALR)
- Medidata Solutions, Inc. (MDSO)
- Abaxis, Inc. (ABAX)
- Cerner Corp. (CERN)
- PAREXEL International Corp. (PRXL)

Theranos is in early stage of development and is expected to achieve profitability only by FY16. Considering this, we found it appropriate to apply EV/Revenue multiple to estimate the Company's Equity Value. We applied the FY14E EV/Revenue multiple, as it captures future growth potential and is more reliable than that of later years.

Aranca conducted a comparable analysis on the selected guideline public companies individually and collectively in terms of their risk and reward profile against the Company. This is necessary before drawing any conclusions from the multiples derived from guideline public companies. Factors analyzed included quantitative and qualitative considerations, which have the potential to impact financial performance and results in the foreseeable future. Specifically, we analyzed guideline public companies' financial results and other quantifiable parameters such as revenue size, assets size, growth rates, and profitability metrics. Our key observations are:

- Theranos is in the early stage of development compared to guideline public companies. Guideline companies are mature, well diversified in terms of product features, and sizeable with better revenues and operational metrics, making them incomparable to the Company.
- As on the valuation date, Theranos had just started generating revenue. The Company forecasts to garner revenue of approximately $50 million in FY13. This is very small compared to the LTM revenues of guideline public companies, which range from $88 million to $2.9 billion.
- Theranos is likely to turn profitable by FY16, whereas all shortlisted public guideline companies are already profitable and have a history of profitable operations.
- The Company's total assets fell significantly short against those of guideline public comparables.

Theranos is small in size relative to GPCs. However, the Company is likely to register a very high revenue growth rate compared to GPCs with revenues expected to increase at a CAGR of 30% during FY13–FY17.

The EV/Revenue multiple of guideline public companies for FY14E ranged between 1.5x–7.2x, with a mean and median of 3.7x and 3.3x, respectively. Considering the inherent risk in the business due to smaller scale of operations, lack of product diversification, and better growth prospects, we applied a median EV/Revenue multiple of 3.3x on Theranos' revenue estimates of FY14 to arrive at the EV of $199.90 million. We assigned a weight of total **50%** to GPCs trading multiples method in the final determination of the Company's Equity Value. (Please refer **Exhibit 7** for valuation based on guideline public companies' trading multiples)

Confidential
THER-AZ-01126767



## Allocable Equity Value

The Equity Value derived from the various approaches mentioned above after assigning appropriate weight was $203.94 million. This value is available for allocation among existing preferred and common shareholders based on their rights and preferences (please refer **Exhibit 8**).

Confidential
THER-AZ-01126768

**ER-15179**



## EQUITY VALUE ALLOCATION

### Methods of Allocation of Equity Value among different classes of stockholders

For allocation of Equity Value to preferred and common stockholders, the AICPA Practice Aid primarily suggests the following three most commonly used methods:

| | | |
|---|---|---|
| **Method 1** | **Current Value Method (CVM)** | CVM assumes that the hypothetical liquidation event would occur on the valuation date instead of a certain date in the future as assumed under the other two methods of allocation. |
| **Method 2** | **Option Pricing Method (OPM)** | OPM is a forward-looking approach and is appropriate for use when the range of future possible outcomes is so difficult to predict that forecasts would be highly speculative. The method considers common stock as a call option on the Equity Value as the common stock receives value only if the firm's value exceeds the liquidation preference of the preferred series. |
| **Method 3** | **Probability-Weighted Expected Return Method (PWERM)** | This method entails a forward-looking analysis of possible future outcomes available to the enterprise, the estimation of a range of future and present values under each outcome, and application of the probability factor to each outcome as of the valuation date. The potential outcomes typically considered are in the form of exit events such as sale or merger, IPO, dissolution, or continued as private entity. |

Each of these methods of allocation takes into consideration the diverse rights and preferences of multiple classes of shareholders with regard to distribution of liquidation proceeds. Each of these allocation methods has its own strengths and limitations. Our selection of the most appropriate allocation method is based on discussions with management about potential exit strategies, the most likely time horizon for each exit outcome, analysis of the Company's development stage, reliability of financial forecasts, and other factors. (For detailed theory, please refer **Exhibit 10**.)

### Methods of allocation of Equity Value applied for Theranos

Based on our analysis of progress made by Theranos in its business plan, discussions with management regarding nature and timing of potential exit outcomes, and other relevant factors, we deemed it appropriate to apply OPM as the primary method for allocation of the Company's Equity Value. Theranos has made progress in its business plan in terms of bringing together an experienced management team, launch of its products and raising financing. However, the Company is currently operating under losses and is expected to achieve operating breakeven only by FY16. Furthermore, Theranos, which is yet to gain market traction, achievability of future revenue targets is currently contingent on successful market acceptance of its product. The Company is also exposed to risks related to profitability, funding risk, competition, and other operational risks. Thus, Theranos' Equity Value depends on how well it uses opportunities and addresses challenges while following an uncharted path. Accordingly, Aranca found it appropriate to apply OPM in the case of Theranos.

We did not consider the CVM for allocation of Theranos' Equity Value based on our review and analysis of milestones achieved in its business plan.

Based on i) our review of the Company's development stage in light of the current macroeconomic scenario; ii) our discussions with management; iii) availability and reliability of estimates regarding the nature and timing horizons for exit outcomes; and iv) number and materiality of assumptions required and availability of information, we deemed it would be appropriate not to consider PWERM in our valuation analysis at this stage.

Confidential
THER-AZ-01126769

**ER-15180**



**Theranos, Inc.**

## Application of OPM

Theranos' capital structure, including dilutive securities such as common stock options, is depicted in the following table:

| Existing Shareholders | # of Shares Outstanding | Original Issue | Conv. ratio | CSE | Ownership % O/S | Ownership % Fully |
|---|---|---|---|---|---|---|
| Series A | 46,320,045 | $0.150 | 1.0x | 46,320,045 | 10.91% | 9.39% |
| Series B | 54,162,965 | $0.185 | 1.0x | 54,162,965 | 12.76% | 10.98% |
| Series C | 58,896,105 | $0.564 | 1.0x | 58,896,105 | 13.88% | 11.94% |
| Series C-1 | 18,508,335 | $3.000 | 1.0x | 18,508,335 | 4.36% | 3.75% |
| Series C-1* | 1,380,000 | $3.000 | 1.0x | 1,380,000 | 0.33% | 0.28% |
| Common shares | 245,111,810 | | | 245,111,810 | 57.76% | 49.68% |
| **Sub total** | **424,379,260** | | | **424,379,260** | **100%** | **86.02%** |
| | | | | | | |
| **Options** | | | | | | |
| Options @ $0.015 | 350,000 | $0.015 | | 350,000 | | 0.07% |
| Options @ $0.03 | 1,264,625 | $0.03 | | 1,264,625 | | 0.26% |
| Options @ $0.066 | 682,500 | $0.066 | | 682,500 | | 0.14% |
| Options @ $0.072 | 4,841,855 | $0.072 | | 4,841,855 | | 0.98% |
| Options @ $0.094 | 312,500 | $0.094 | | 312,500 | | 0.06% |
| Options @ $0.17 to be issued | 60,000,000 | $0.17 | | 60,000,000 | | 12.16% |
| Options @ $0.206 | 785,180 | $0.206 | | 785,180 | | 0.16% |
| Common Stock Warrants @ $0.072 | 741,665 | $0.072 | | 741,665 | | 0.15% |
| **Sub total** | **68,978,325** | | | **68,978,325** | | **13.98%** |
| | | | | | | |
| **Total** | **493,357,585** | | | **493,357,585** | **100%** | **100%** |

Our application of the BSOP method was designed around the following broad steps:

- Step 1: Determining different levels of Equity Value (breakpoints)
- Step 2: Determining proportion of distributing the incremental Equity Value
- Step 3: Determining incremental Equity Value of each of the options
- Step 4: Incremental Equity Value distribution

**Step 1: Determining different levels of Equity Value (breakpoints)**

This step entails determining the different levels of Equity Value, called breakpoints (also widely known as 'waterfall' distribution). Each consecutive breakpoint represents an incremental claim on Theranos' Equity Value by a certain class of shareholders/option holders triggered by their respective liquidation, participation, and/or conversion rights.



| Event description | Participating Class | Participating shares | Strike Point |
|---|---|---|---|
| Equity value is nil | None | - | - |
| Liquidation preference of Series C, C-1 and C-1* | Series C, C-1 & C-1* | 78,784,440 | 92,882,408 |
| Liquidation preference of Series B | Series B | 54,162,965 | 102,882,408 |
| Liquidation preference of Series A | Series A | 46,320,045 | 109,830,415 |
| Options @ $0.015 exercised | Series B,C,C-1,C-1* & Common | 378,059,215 | 115,501,303 |
| Options @ $0.03 and  exercised | Series B,C,C-1,C-1*,Common and Options @ $0.015 | 378,409,215 | 121,177,441 |
| Options @ $0.066 exercised | Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03 | 379,673,840 | 134,845,700 |
| Options @ $0.072 and Common Stock Warrants @ $0.072 exercised | Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03,$0.066 | 380,356,340 | 137,127,838 |
| Options @ $0.094 exercised | Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03,$0.066,$0.072, Common Warrants @ $0.072 | 385,939,860 | 145,618,515 |
| Series A converts | Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03,$0.066,$0.072,$0.094, Common Warrants @ $0.072 | 386,252,360 | 167,248,647 |
| Options @ $0.17 to be issued get exercised | Series A, Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03,$0.066,$0.072,$0.094, Common Warrants @ $0.072 | 432,572,405 | 175,900,095 |
| Options @ $0.206 get exercised | Series A, Series B, C,C-1,C-1*, Common, Options @ $0.015,$0.03,$0.066,$0.072,$0.094, $0.19, Common Warrants @ $0.072 | 492,572,405 | 193,632,701 |
| Thereafter | All classes | 493,357,585 | |

**Step 2: Determining proportion of distributing the incremental Equity Value**

After calculating the breakpoints, the proportion in which the incremental Equity Value would be distributed between each two consecutive breakpoints is determined.

| Allocation Percentages | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 | Option 6 |
|---|---|---|---|---|---|---|
| Series A | 0% | 0% | 100% | 0% | 0% | 0% |
| Series B | 0% | 100% | 0% | 14% | 14% | 14% |
| Series C | 36% | 0% | 0% | 16% | 16% | 16% |
| Series C-1 | 60% | 0% | 0% | 5% | 5% | 5% |
| Series C-1* | 4% | 0% | 0% | 0% | 0% | 0% |
| Common shares | 0% | 0% | 0% | 65% | 65% | 65% |
| Options @ $0.015 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.03 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.066 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.072 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.094 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.17 to be issued | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.206 | 0% | 0% | 0% | 0% | 0% | 0% |
| Common Stock Warrants @ $0.072 | 0% | 0% | 0% | 0% | 0% | 0% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

Confidential
Theranos, Inc.
THER-AZ-01126771

**ER-15182**



Theranos, Inc.

| Allocation Percentages | Option 7 | Option 8 | Option 9 | Option 10 | Option 11 | Option 12 |
|---|---|---|---|---|---|---|
| Series A | 0% | 0% | 0% | 11% | 9% | 9% |
| Series B | 14% | 14% | 14% | 13% | 11% | 11% |
| Series C | 15% | 15% | 15% | 14% | 12% | 12% |
| Series C-1 | 5% | 5% | 5% | 4% | 4% | 4% |
| Series C-1* | 0% | 0% | 0% | 0% | 0% | 0% |
| Common shares | 64% | 64% | 63% | 57% | 50% | 50% |
| Options @ $0.015 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.03 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.066 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.072 | 0% | 1% | 1% | 1% | 1% | 1% |
| Options @ $0.094 | 0% | 0% | 0% | 0% | 0% | 0% |
| Options @ $0.17 to be issued | 0% | 0% | 0% | 0% | 12% | 12% |
| Options @ $0.206 | 0% | 0% | 0% | 0% | 0% | 0% |
| Common Stock Warrants @ $0.072 | 0% | 0% | 0% | 0% | 0% | 0% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

**Step 3:**

**Determining incremental Equity Value of each option**

Each consecutive breakpoint is considered a strike price in the call options on the Company's Equity Value. Using the BSOP model with other inputs as discussed above, the incremental value of each option is calculated.

| Valuation using BSOP's | Option 1 | Option 2 | Option 3 | Option 4 |
|---|---|---|---|---|
| Value of the underlying Asset ($) | 203,940,691 | 203,940,691 | 203,940,691 | 203,940,691 |
| Strike Price ($) | - | 92,882,408 | 102,882,408 | 109,830,415 |
| S.D of the Underlying preferred share | 39% | 39% | 39% | 39% |
| Dividend yield | 0% | 0% | 0% | 0% |
| Time of Expiration (years) | 3 | 3 | 3 | 3 |
| Riskless Rate corresponding to option life time | 0.64% | 0.64% | 0.64% | 0.64% |
| Value of the common stock as an option on EV | 203,940,691 | 117,708,744 | 110,002,024 | 104,905,721 |
| **Incremental value of options** | **86,231,947** | **7,706,720** | **5,096,303** | **4,002,281** |

| Valuation using BSOP's | Option 5 | Option 6 | Option 7 | Option 8 |
|---|---|---|---|---|
| Value of the underlying Asset ($) | 203,940,691 | 203,940,691 | 203,940,691 | 203,940,691 |
| Strike Price ($) | 115,501,303 | 121,177,441 | 134,845,700 | 137,127,838 |
| S.D of the Underlying preferred share | 39% | 39% | 39% | 39% |
| Dividend yield | 0% | 0% | 0% | 0% |
| Time of Expiration (years) | 3 | 3 | 3 | 3 |
| Riskless Rate corresponding to option life time | 0.64% | 0.64% | 0.64% | 0.64% |
| Value of the common stock as an option on EV | 100,903,440 | 97,038,062 | 88,296,514 | 86,913,201 |
| **Incremental value of options** | **3,865,379** | **8,741,548** | **1,383,313** | **4,961,078** |

Confidential

ER-15183

Theranos, Inc.
THER-AZ-01126772



| Theranos, Inc. |
| --- |

| Valuation using BSOP's | Option 9 | Option 10 | Option 11 | Option 12 |
| --- | --- | --- | --- | --- |
| Value of the underlying Asset ($) | 203,940,691 | 203,940,691 | 203,940,691 | 203,940,691 |
| Strike Price ($) | 145,618,515 | 167,248,647 | 175,900,095 | 193,632,701 |
| S.D of the Underlying preferred share | 39% | 39% | 39% | 39% |
| Dividend yield | 0% | 0% | 0% | 0% |
| Time of Expiration (years) | 3 | 3 | 3 | 3 |
| Riskless Rate corresponding to option life time | 0.64% | 0.64% | 0.64% | 0.64% |
| Value of the common stock as an option on EV | 81,952,122 | 70,568,305 | 66,485,053 | 58,875,997 |
| **Incremental value of options** | **11,383,817** | **4,083,252** | **7,609,056** | **58,875,997** |

Assumptions used in the BSOP model are stated below:

| Term | Description | Inputs used in Theranos' case |
| --- | --- | --- |
| Business Equity Value | Value that would be distributable to equity shareholders in case of an exit | In case of Theranos, we used the Equity Value derived using DCF and market analysis. |
| Time to Liquidity | Time of occurrence of liquidity event; this important assumption impacts the analysis | We discussed with management the potential exit outcomes and most likely timeframe for their occurrence in light of the current product development stage. Based on the discussion, we selected September 2016 (three years) as the appropriate time for a liquidity event. |
| Risk-free Rate | Rate of return on government securities with maturity equal to time to liquidity | We used 0.64% as the risk-free rate based on the yield on US government zero-coupon bond with a maturity period of approximately three years. |
| Dividend Yield | Yield on dividends | Theranos is an early-stage privately held company with no history of dividends. According to management, there is no reasonable expectation of such dividends being paid in the foreseeable future. Hence, dividend yield is assumed to be 0%. |
| Volatility | Based on volatilities of guideline companies | The OPM allocates enterprise value among the different classes of shares, such as common stock and preferred stock, based on their rights and preferences. To allocate value, it treats them as call options on the enterprise value, with exercise price based on the liquidation preference of preference stock. Since we value the call option with the underlying being enterprise value, we have taken asset volatility for three years, an input to BSOP, which measures volatility of the underlying enterprise value. The asset volatility has been calculated using Merton's formulation based on equity volatility of the GPCs. The asset volatilities were in the range of 15.9–50.3%, with a mean, median, quartile 1 and quartile 3 of 32.7%, 32.6%, 26.4 and 38.6%, respectively. Based on the comparative analysis of Theranos with GPCs, we determined the quartile 3 measure of 38.6% as the appropriate proxy for volatility applicable to the Company. |



Theranos, Inc.

**Step 4:**

**Incremental Equity Value distribution**

Incremental value of each call option is distributed among different classes of shareholders based on their respective distribution proportion as calculated in step 3.

| Value Allocated | Option 1 | Option 2 | Option 3 | Option 4 |
|---|---|---|---|---|
| Series A | - | - | 5,096,303 | - |
| Series B | - | 7,706,720 | - | 573,390 |
| Series C | 30,839,008 | - | - | 623,497 |
| Series C-1 | 51,549,366 | - | - | 195,936 |
| Series C-1* | 3,843,572 | - | - | 14,609 |
| Common shares | - | - | - | 2,594,848 |
| Options @ $0.015 | - | - | - | - |
| Options @ $0.03 | - | - | - | - |
| Options @ $0.066 | - | - | - | - |
| Options @ $0.072 | - | - | - | - |
| Options @ $0.094 | - | - | - | - |
| Options @ $0.17 to be issued | - | - | - | - |
| Options @ $0.206 | - | - | - | - |
| Common Stock Warrants @ $0.072 | - | - | - | - |
| **Total** | **86,231,947** | **7,706,720** | **5,096,303** | **4,002,281** |

| Value Allocated | Option 5 | Option 6 | Option 7 | Option 8 |
|---|---|---|---|---|
| Series A | - | - | - | - |
| Series B | 553,264 | 1,247,039 | 196,985 | 696,240 |
| Series C | 601,613 | 1,356,014 | 214,199 | 757,082 |
| Series C-1 | 189,059 | 426,133 | 67,313 | 237,916 |
| Series C-1* | 14,096 | 31,773 | 5,019 | 17,739 |
| Common shares | 2,503,771 | 5,643,414 | 891,444 | 3,150,799 |
| Options @ $0.015 | 3,575 | 8,058 | 1,273 | 4,499 |
| Options @ $0.03 | - | 29,117 | 4,599 | 16,256 |
| Options @ $0.066 | - | - | 2,482 | 8,773 |
| Options @ $0.072 | - | - | - | 62,240 |
| Options @ $0.094 | - | - | - | - |
| Options @ $0.17 to be issued | - | - | - | - |
| Options @ $0.206 | - | - | - | - |
| Common Stock Warrants @ $0.072 | - | - | - | 9,534 |
| **Total** | **3,865,379** | **8,741,548** | **1,383,313** | **4,961,078** |

Confidential
Theranos, Inc.

ER-15185

THER-AZ-01126774



Theranos, Inc.

| Value Allocated | Option 9 | Option 10 | Option 11 | Option 12 |
|---|---|---|---|---|
| Series A | - | 437,236 | 715,533 | 5,527,712 |
| Series B | 1,596,317 | 511,269 | 836,687 | 6,463,666 |
| Series C | 1,735,815 | 555,948 | 909,803 | 7,028,506 |
| Series C-1 | 545,487 | 174,709 | 285,909 | 2,208,736 |
| Series C-1* | 40,672 | 13,026 | 21,318 | 164,686 |
| Common shares | 7,224,054 | 2,313,725 | 3,786,386 | 29,250,999 |
| Options @ $0.015 | 10,315 | 3,304 | 5,407 | 41,768 |
| Options @ $0.03 | 37,272 | 11,937 | 19,535 | 150,917 |
| Options @ $0.066 | 20,115 | 6,442 | 10,543 | 81,448 |
| Options @ $0.072 | 142,702 | 45,705 | 74,795 | 577,814 |
| Options @ $0.094 | 9,210 | 2,950 | 4,827 | 37,293 |
| Options @ $0.17 to be issued | - | - | 926,855 | 7,160,242 |
| Options @ $0.206 | - | - | - | 93,701 |
| Common Stock Warrants @ $0.072 | 21,859 | 7,001 | 11,457 | 88,508 |
| **Total** | **11,383,817** | **4,083,252** | **7,609,056** | **58,875,997** |

| Classes | # of shares | Value | Per Share | % of EV |
|---|---|---|---|---|
| Series A | 46,320,045 | 11,776,785 | 0.25 | 5.8% |
| Series B | 54,162,965 | 20,381,578 | 0.38 | 10.0% |
| Series C | 58,896,105 | 44,621,484 | 0.76 | 21.9% |
| Series C-1 | 18,508,335 | 55,880,564 | 3.02 | 27.4% |
| Series C-1* | 1,380,000 | 4,166,511 | 3.02 | 2.0% |
| **Common shares** | **245,111,810** | **57,359,440** | **0.23** | **28.1%** |
| Options @ $0.015 | 350,000 | 78,199 | 0.22 | 0.0% |
| Options @ $0.03 | 1,264,625 | 269,633 | 0.21 | 0.1% |
| Options @ $0.066 | 682,500 | 129,804 | 0.19 | 0.1% |
| Options @ $0.072 | 4,841,855 | 903,255 | 0.19 | 0.4% |
| Options @ $0.094 | 312,500 | 54,280 | 0.17 | 0.0% |
| Options @ $0.17 to be issued | 60,000,000 | 8,087,098 | 0.13 | 4.0% |
| Options @ $0.206 | 785,180 | 93,701 | 0.12 | 0.0% |
| Common Stock Warrants @ $0.072 | 741,665 | 138,359 | 0.19 | 0.1% |
| **Total** | **493,357,585** | **203,940,691** | | **100%** |



Theranos, Inc.

## Discount for Lack of Marketability ('DLOM')

Since privately held stocks are not traded on a public market, the stocks of these companies are generally not as liquid or marketable as that of a public company. This lack of marketability increases the cost of transactions involving private company stocks and reduces the Fair Market Value of these stocks. Hence, DLOM is applied to the stocks of privately held companies to derive their Fair Market Value. There are multiple approaches to calculate the DLOM of a stock that is privately held. Of these, we have used two variants of the Protective Put Approach – the Chaffee and Finnerty model (incorporating the Ghaidarov Correction).

### Protective Put Approach (Chaffee Model)

In the Chaffee Model, the cost of a put option calculated at the money acts as an estimate for the discount for lack of marketability. The value of the put option was calculated using the Black-Scholes Option Pricing Model. A put option provides a buyer the right but not the obligation to sell the investment held by him at the strike price of the put option. By purchasing a put option, the buyer ensures the liquidity of his investment, as he now has the right to sell the investment at the strike price of the put option. This cost of the put option becomes the implied discount for an investor holding stock of a privately held firm, as this stock lacks marketability. Thus, by calculating the value of a put option at a strike price equal to the value of the underlying stock, we can basically estimate the discount for lack of marketability. This is then deducted from the value of the underlying stock to arrive at the FMV.

To value the hypothetical put option, we use the Black-Scholes Option Pricing Model. Inputs used in the model are:

**Stock Price** – It is the value of the common stock pre-DLOM.

**Strike Price** – It is the value of the common stock pre-DLOM.

**Volatility** – As mentioned above, in the Protective Put Approach we are valuing the put option which becomes the implied discount for an investor holding common stock of a privately-held firm. Since we are valuing the put option with the underlying being equity value (Common Stock) of the Company, we take equity volatility, an input BSOP, to measure the volatility of the underlying equity value.

**Time to Expiry** – It is the expected time from the date of valuation until the occurrence of liquidation events, such as sale, merger, IPO or dissolution.

**Risk-Free Rate** – It refers to the risk-free rate corresponding to the life of the put option.

For Theranos, a pre-DLOM value of common stock ($0.23) based on the OPM was used as the stock price and strike price in the put option. The time to expiry was set at three years. The equity volatility ranged between 36.14% and 85.19%, with a mean and median of 64.48% and 64.32%, respectively. Based on our comparative analysis of the Company relative to GPCs, we determined the median volatility of 64.32% as the appropriate proxy for volatility applicable to Theranos. The risk-free rate used was 0.64%, which is the yield on Treasury bonds. According to the BSOP model, the value of the put option is $0.10 or **40.9%** of the pre-DLOM value. Since a hypothetical put option on the Company's common stock would cost 40.9% of the pre-DLOM value, the discount for lack of marketability for Theranos' common stock could be **40.9%**.

### Protective Put Approach (Finnerty Model)

To allocate a suitable DLOM (illiquidity discount) for a privately held stock, we have used the Protective Put Approach – Finnerty Model, as well. According to this approach, an Asian put option is used to calculate the Marketability Discount. This model assumes that the investor is able to purchase an "average-strike" put option (an "Asian" put). The payout on an Asian put is based on the average value of the underlying share over a period of time, rather than the final value. It reflects the investor's inability to time the market by eliminating the ability to earn average trading profits. Using this approach, we have calculated a DLOM of **26.5%**.

### Concluded DLOM

The two protective put approaches, viz., Chaffee and Finnerty are based on the OPM which considers market-specific factors in the volatility and time to liquidation event. Keeping the DLOM arrived using the above approaches as a guideline and based on the analysis of Company-specific qualitative factors listed below, we opine that a low DLOM should be applied to Theranos. Thus, a DLOM of **26.5%** was considered as the appropriate proxy applicable to the Company (Please refer **Exhibit 11** for complete calculation).

Confidential
Theranos, Inc.
THER-AZ-01126776



| Theranos, Inc. |

### Final Valuation

After considering all relevant factors described above, we determined, as of the valuation date, the FMV of Theranos' common stock, as a class, is **$0.17** per share (please refer <u>Exhibit 12</u>).



## EXHIBITS

### Exhibit 1 – Valuation Summary



Confidential

THER-AZ-01126778

**ER-15189**



Theranos, Inc.

### Exhibit 2 – Historical Financials

| Summary Income Statement (in '000 $) | Dec-09 | Dec-10 | Dec-11 | Dec-12 | Sep-13 |
|---|---|---|---|---|---|
| | FY-A | FY-A | FY-A | FY-A | YTD-A |
| Revenues | 2,794 | 1,401 | 518 | - | - |
| *Growth (%)* | | *n/a* | *n/a* | *n/a* | *n/a* |
| Cost of Sales | - | 306 | 325 | 74 | - |
| Gross Profit | 2,794 | 1,095 | 193 | (74) | - |
| *Gross Margin (%)* | *100.0%* | *78.2%* | *37.3%* | *n/a* | *n/a* |
| | | | | | |
| Operating Costs | 13,659 | 16,460 | 26,868 | 56,925 | 62,147 |
| EBITDA | (10,865) | (15,365) | (26,675) | (56,999) | (62,147) |
| *EBITDA Margin (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |
| | | | | | |
| Depreciation | 565 | 805 | 1,064 | 2,993 | 3,219 |
| EBIT | (11,430) | (16,170) | (27,739) | (59,992) | (65,366) |
| *EBIT Margin (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |
| | | | | | |
| Income/ (Loss) - Investments & Affiliates | (37) | (46) | 144 | 331 | 179 |
| PBT | (11,467) | (16,216) | (27,595) | (59,661) | (65,193) |
| *PBT Margin (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |
| | | | | | |
| Income Tax | - | - | - | - | - |
| **PAT** | **(11,467)** | **(16,216)** | **(27,595)** | **(59,661)** | **(65,193)** |
| *PAT Margin (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |



Theranos, Inc.

| Summary Balance Sheet (in '000 $) | Dec-09 | Dec-10 | Dec-11 | Dec-12 | Sep-13 |
|---|---|---|---|---|---|
| | FY-A | FY-A | FY-A | FY-A | YTD-A |
| Cash & Cash Equivalents | 3,691 | 36,717 | 88,057 | 51,781 | 31,625 |
| | | | | | |
| Trade Receivables | 29 | 56 | - | 25,000 | - |
| Inventory | 581 | - | - | 7,573 | 11,038 |
| Other Current Assets | 193 | 826 | 665 | 1,833 | 2,835 |
| Current Assets | 803 | 882 | 665 | 34,406 | 13,873 |
| | | | | | |
| Other Operating Assets | - | - | 16,805 | 17,123 | 17,362 |
| Other Operating Assets | - | - | 16,805 | 17,123 | 17,362 |
| | | | | | |
| Fixed Assets (Gross) | 4,024 | 5,660 | 8,702 | - | - |
| (Accum. Depreciation) | 2,258 | 3,029 | 4,054 | - | - |
| Fixed Assets (Net) | 1,766 | 2,631 | 4,648 | 19,529 | 20,289 |
| | | | | | |
| **Total Assets** | **6,260** | **40,230** | **110,175** | **122,839** | **83,149** |
| | | | | | |
| Trade Payables | 560 | 440 | 1,238 | 7,669 | 5,460 |
| Other Current Liabilities | 967 | 1,298 | 2,839 | 4,583 | 4,510 |
| Deferred Revenue | 3,809 | 4,065 | 77,308 | 98,308 | 83,808 |
| Current Liabilities | 5,336 | 5,803 | 81,385 | 110,560 | 93,778 |
| | | | | | |
| Other Operating Liabilities | 1,530 | 2,606 | 23,464 | 15,987 | 11,959 |
| Total Other Operating Liabilities | 1,530 | 2,606 | 23,464 | 15,987 | 11,959 |
| | | | | | |
| Long Term Debt | 8,044 | 42 | 100 | 43,000 | 40,720 |
| Debt | 8,044 | 42 | 100 | 43,000 | 40,720 |
| | | | | | |
| Paid in Capital | 51,685 | 108,321 | 109,367 | 118,192 | 163,729 |
| Other Reserves | - | 9 | 5 | - | - |
| Retained Earnings | (60,335) | (76,551) | (104,146) | (164,900) | (227,038) |
| Shareholders' Equity | (8,650) | 31,779 | 5,226 | (46,708) | (63,309) |
| | | | | | |
| **Total Liabilities** | **6,260** | **40,230** | **110,175** | **122,839** | **83,149** |

Confidential
Theranos, Inc.
THER-AZ-01126780

ER-15191



Theranos, Inc.

| Cash Flow Statement (in '000 $) | Dec-10 | Dec-11 | Dec-12 | Sep-13 |
|---|---|---|---|---|
| | FY-A | FY-A | FY-A | YTD-A |
| Net Profit After Tax | (16,216) | (27,595) | (59,661) | (65,193) |
| Depreciation | 805 | 1,064 | 2,993 | 3,219 |
| Interest & Finance Costs | - | - | - | 6 |
| Adjusted Operating Cash Profit | (15,411) | (26,531) | (56,668) | (61,968) |
| | | | | |
| Trade Receivables | (27) | 56 | (25,000) | 25,000 |
| Inventory | 581 | - | (7,573) | (3,465) |
| Other Current Assets | (633) | 161 | (1,168) | (1,002) |
| Trade Payables | (120) | 798 | 6,431 | (2,209) |
| Other Current Liabilities | 331 | 1,541 | 1,744 | (73) |
| Deferred Revenue | 256 | 73,243 | 21,000 | (14,500) |
| Changes in Working Capital | 388 | 75,799 | (4,566) | 3,751 |
| | | | | |
| Change in Other Operating Liabilities | 1,076 | 20,858 | (7,477) | (4,028) |
| Change in Other Operating Assets | - | (16,805) | (318) | (239) |
| Net Change in Other Operating Assets/ Liabilities | 1,076 | 4,053 | (7,795) | (4,267) |
| | | | | |
| Cash Flow from Operations | (13,947) | 53,321 | (69,029) | (62,484) |
| | | | | |
| Net (Purchase) / Sale of Fixed Assets | (1,670) | (3,081) | (17,874) | (3,979) |
| Cash Flow from Investment Activities | (1,670) | (3,081) | (17,874) | (3,979) |
| | | | | |
| Net Debt Taken / (Repaid) | (8,002) | 58 | 42,900 | (2,280) |
| Interest & Finance Costs | - | - | - | (6) |
| Change in Share Capital & Reserves | 56,645 | 1,042 | 7,727 | 48,593 |
| Cash Flow from Financing Activities | 48,643 | 1,100 | 50,627 | 46,307 |
| | | | | |
| Change in Cash & Cash Equivalents | 33,026 | 51,340 | (36,276) | (20,156) |
| | | | | |
| Opening Cash & Cash Equivalents | 3,691 | 36,717 | 88,057 | 51,781 |
| | | | | |
| **Closing Cash & Cash Equivalents** | **36,717** | **88,057** | **51,781** | **31,625** |

Confidential

ER-15192



**Theranos, Inc.**

### Exhibit 3 – Financial Projections                                        <u>Back</u>

The financial projections provided by management for FY13–FY17 were reviewed by Aranca for reasonability and suitability of use, considering the objective of valuation.

**Revenues:**

Theranos expects to generate revenue from the new and robust models of its medical device, which comprises its unique technology platform and supporting hardware. Management believes the technology would help these companies improve their key therapies by rapidly optimizing the risk-benefit profiles of drugs, and thereby, shorten the duration of clinical trials. The Company's devices could also facilitate cost-effective care for healthcare providers. Clinicians could obtain quantitative information on disease progression and the efficacy of key compounds during and after clinical studies. The Company has entered into the direct-to-consumer market by promoting its products through pharmacies and boutique nutritional shops.



Projected Revenues (in $ million)

CAGR - 30.1%

| 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| 50.0 | 89.7 | 112.2 | 131.7 | 143.4 |

*"The Company's revenue is projected to expand at a CAGR of around 30.1% during 2013–17."*

**Expenses:** Theranos' expenses can be classified under costs of sales and operating expenses.

| Expenses | Description | Projections |
|----------|-------------|-------------|
| COS | Includes costs associated with validation and post-market contracts, mainly in maintaining the software and analyzing platform | COS are expected to increase to around 18% of revenue in FY17 from 20% in FY12. |
| General and Administrative | Comprises salaries of employees and contractors, other expenses such as lease rentals, and other corporate expenses | Expected to drop to about 14% of total revenues by FY17 from 31% in FY13. |
| Research and Development | Consists of salary expenses, facility-related costs, and materials used exclusively for R&D operations | Currently, R&D Cost is 110% of total revenues, it is expected to decline to 51% by FY17. |
| Depreciation Plant & Machinery | Includes depreciation expenses of plant and equipment | These expenses are projected to increase to around 10% of revenues in FY17 from 14% in FY13. |

**Working Capital and Capital Expenditure (Capex) Assumptions**

Confidential
THER-AZ-01126782

**ER-15193**



**Capex:** Theranos' capex primarily entails an outlay on Plant and Equipment and leased assets. The Company expects to incur capex of around $15 million in FY13, which is expected to increase to about 25 million in FY17. We used the straight line method to calculate depreciation. The remaining life of existing and new assets is estimated to be three and four years, respectively.

**Working Capital:** Some of the key assumptions for working capital are as follows:

| Classification | Range (over the forecast period) | Based on |
|---|---|---|
| Inventories | 56–80 days | COS |
| Other Current Assets | 6–14 days | Revenues |
| Account Payables | 42–49 days | COGS, Direct costs, and Operating expenses |
| Other Current Liabilities | 21–23 days | Operating Costs |

| Summary Income Statement (in '000 $) | Dec-13 | Dec-13 | Dec-14 | Dec-15 | Dec-16 | Dec-17 |
|---|---|---|---|---|---|---|
| | 3 Mth-F | FY-F | FY-F | FY-F | FY-F | FY-F |
| Revenues | 50,000 | 50,000 | 89,702 | 112,202 | 131,702 | 143,402 |
| *Growth (%)* | *n/a* | *0.0%* | *79.4%* | *25.1%* | *17.4%* | *8.9%* |
| Cost of Sales | 9,798 | 9,798 | 12,224 | 16,224 | 23,551 | 25,243 |
| Gross Profit | 40,202 | 40,202 | 77,478 | 95,978 | 108,151 | 118,159 |
| *Gross Margin (%)* | *80.4%* | *80.4%* | *86.4%* | *85.5%* | *82.1%* | *82.4%* |
| | | | | | | |
| Operating Costs | 1,743 | 63,890 | 68,651 | 73,412 | 76,301 | 79,366 |
| EBITDA | 38,459 | (23,688) | 8,827 | 22,566 | 31,850 | 38,793 |
| *EBITDA Margin (%)* | *76.9%* | *n/a* | *9.8%* | *20.1%* | *24.2%* | *27.1%* |
| | | | | | | |
| Depreciation | 8,796 | 12,015 | 19,324 | 23,102 | 21,996 | 24,610 |
| EBIT | 29,663 | (35,703) | (10,498) | (536) | 9,855 | 14,183 |
| *EBIT Margin (%)* | *59.3%* | *n/a* | *n/a* | *n/a* | *7.5%* | *9.9%* |
| | | | | | | |
| Interest & Finance Costs | 78 | 84 | 345 | 185 | 24 | 24 |
| Income/ (Loss) - Investments & Affiliates | 249 | 428 | 581 | 578 | 391 | 10 |
| PBT | 29,834 | (35,359) | (10,261) | (143) | 10,222 | 14,170 |
| *PBT Margin (%)* | *59.7%* | *n/a* | *n/a* | *n/a* | *7.8%* | *9.9%* |
| | | | | | | |
| Income Tax | - | - | - | - | - | - |
| **PAT** | **29,834** | **(35,359)** | **(10,261)** | **(143)** | **10,222** | **14,170** |
| *PAT Margin (%)* | *59.7%* | *n/a* | *n/a* | *n/a* | *7.8%* | *9.9%* |

Confidential
Theranos, Inc.
THER-AZ-01126783

**ER-15194**



| Theranos, Inc. |
|---|

| Summary Balance Sheet (in '000 $) | Dec-13 | Dec-14 | Dec-15 | Dec-16 | Dec-17 |
|---|---|---|---|---|---|
| | FY-F | FY-F | FY-F | FY-F | FY-F |
| Cash & Cash Equivalents | 45,720 | 8,020 | (10,035) | 370 | 71 |
| Trade Receivables | - | - | - | - | - |
| Inventory | 1,500 | 2,691 | 3,366 | 3,951 | 4,302 |
| Other Current Assets | 1,925 | 2,021 | 2,122 | 2,228 | 2,339 |
| Current Assets | 3,425 | 4,712 | 5,488 | 6,179 | 6,641 |
| Other Operating Assets | 29,664 | 30,228 | 30,802 | 15,819 | 16,120 |
| Other Operating Assets | 29,664 | 30,228 | 30,802 | 15,819 | 16,120 |
| Fixed Assets (Gross) | 34,565 | 57,936 | 77,028 | 96,479 | 121,854 |
| (Accum. Depreciation) | 13,754 | 32,064 | 54,728 | 76,757 | 102,571 |
| Fixed Assets (Net) | 20,811 | 25,872 | 22,301 | 19,723 | 19,282 |
| Total Assets | 99,620 | 68,832 | 48,555 | 42,090 | 42,114 |
| Trade Payables | 8,449 | 10,867 | 10,938 | 12,487 | 12,851 |
| Other Current Liabilities | 3,653 | 4,205 | 4,483 | 4,732 | 4,935 |
| Deferred Revenue | 58,808 | 44,106 | 29,404 | 14,702 | - |
| Current Liabilities | 70,910 | 59,178 | 44,825 | 31,921 | 17,786 |
| Other Operating Liabilities | 18,689 | 9,575 | 3,794 | 11 | - |
| Total Other Operating Liabilities | 18,689 | 9,575 | 3,794 | 11 | - |
| Long Term Debt | 43,490 | 43,810 | 3,000 | 3,000 | 3,000 |
| Debt | 43,490 | 43,810 | 3,000 | 3,000 | 3,000 |
| Paid in Capital | 163,729 | 163,729 | 204,539 | 204,539 | 204,539 |
| Other Reserves | 5 | 5 | 5 | 5 | 5 |
| Retained Earnings | (197,204) | (207,465) | (207,608) | (197,386) | (183,216) |
| Shareholders' Equity | (33,470) | (43,731) | (3,064) | 7,158 | 21,328 |
| Total Liabilities | 99,620 | 68,832 | 48,555 | 42,090 | 42,114 |

Confidential
THER-AZ-01126784

ER-15195



Theranos, Inc.

| Cash Flow Statement (in '000 $) | Dec-13 | Dec-14 | Dec-15 | Dec-16 | Dec-17 |
|---|---|---|---|---|---|
| | 3 Mth-F | FY-F | FY-F | FY-F | FY-F |
| Net Profit After Tax | 29,834 | (10,261) | (143) | 10,222 | 14,170 |
| Depreciation | 8,796 | 19,324 | 23,102 | 21,996 | 24,610 |
| Interest & Finance Costs | 78 | 345 | 185 | 24 | 24 |
| Adjusted Operating Cash Profit | 38,708 | 9,408 | 23,144 | 32,241 | 38,803 |
| | | | | | |
| Inventory | 9,538 | (1,191) | (675) | (585) | (351) |
| Other Current Assets | 910 | (96) | (101) | (106) | (111) |
| Trade Payables | 2,989 | 2,418 | 71 | 1,549 | 364 |
| Other Current Liabilities | (857) | 552 | 278 | 249 | 203 |
| Deferred Revenue | (25,000) | (14,702) | (14,702) | (14,702) | (14,702) |
| Changes in Working Capital | (12,420) | (13,019) | (15,129) | (13,595) | (14,597) |
| | | | | | |
| Change in Other Operating Liabilities | 6,730 | (9,114) | (5,781) | (3,783) | (11) |
| Change in Other Operating Assets | (12,303) | (564) | (574) | 14,983 | (301) |
| Net Change in Other Operating Assets/ Liabilities | (5,573) | (9,678) | (6,355) | 11,200 | (312) |
| | | | | | |
| Cash Flow from Operations | 20,715 | (13,289) | 1,660 | 29,846 | 23,894 |
| | | | | | |
| Net (Purchase) / Sale of Fixed Assets | (9,318) | (24,385) | (19,530) | (19,418) | (24,169) |
| Cash Flow from Investment Activities | (9,318) | (24,385) | (19,530) | (19,418) | (24,169) |
| | | | | | |
| Net Debt Taken / (Repaid) | 2,770 | 320 | (40,810) | - | - |
| Interest & Finance Costs | (78) | (345) | (185) | (24) | (24) |
| Change in Share Capital & Reserves | 5 | - | 40,810 | - | - |
| Cash Flow from Financing Activities | 2,698 | (25) | (185) | (24) | (24) |
| | | | | | |
| Change in Cash & Cash Equivalents | 14,095 | (37,700) | (18,056) | 10,405 | (299) |
| | | | | | |
| Opening Cash & Cash Equivalents | 31,625 | 45,720 | 8,020 | (10,035) | 370 |
| | | | | | |
| **Closing Cash & Cash Equivalents** | **45,720** | **8,020** | **(10,035)** | **370** | **71** |

Confidential

Theranos, Inc.

THER-AZ-01126785

ER-15196



Theranos, Inc.

## Exhibit 4 – Guideline Public Companies' Description          Back

| Company Name & Description | Ticker & Chart |
|---|---|

**OraSure Technologies, Inc.**

OraSure Technologies, Inc. is engaged in the development, manufacture, marketing, and sales of oral fluid diagnostic products and specimen collection devices using the company's oral fluid technologies, as well as other diagnostic products including immunoassays and other in vitro diagnostic tests used on other specimens. It also manufactures and sells medical devices used for the removal of benign skin lesions by cryosurgery or freezing. The company's diagnostic products include tests performed on a rapid basis at the point-of-care and tests that are processed in a laboratory. OraSure Technologies operates in two segments: OraSure business and DNAG. On August 17, 2011, the company completed the acquisition of DNA Genotek, Inc. (DNAG).

**OSUR.O**



**Alere, Inc.**

Alere, Inc. provides point-of-care diagnostics and services. The company's products and services help healthcare practitioners make treatment decisions and improve outcomes for individuals living with chronic disease. Its portfolio also includes a range of health information solutions that have access to critical health data, provide clinical decision support, and facilitate performance reporting and analysis. The company's segment includes professional diagnostics, health information solutions, and consumer diagnostics. Alere supplies professional diagnostic products to hospitals, reference laboratories, physician offices, and other point-of-care settings through worldwide distribution networks. In February 2013, the company acquired Epocal, Inc.

**ALR.N**



**Medidata Solutions, Inc.**

Medidata Solutions, Inc. (Medidata) is a global provider of software-as-a-service (SaaS) clinical technology solutions. The company offers Medidata Rave, a platform that integrates electronic data capture (EDC) with a clinical data management system (CDMS) in a solution that replaces traditional paper-based methods of capturing and managing clinical data. Medidata Rave enables sponsors to manage complex trials. Medidata's customers are pharmaceutical, biotechnology and medical device companies, academic institutions, contract research organizations (CROs), and other organizations engaged in clinical trials to bring medical products and treatments to market and explore indications for existing medical products. Medidata Rave's intuitive, user-friendly internet-based technology facilitates rapid adoption by investigators, sponsors and CROs. On July 1, 2011, the company acquired Clinical Force Limited (Clinical Force).

**MDSO.O**



*Source: Reuters Eikon*

**ER-15197**



Theranos, Inc.

| Company Name & Description | Ticker & Chart |
|---|---|

**Abaxis, Inc.**

ABAX.O

Abaxis, Inc. develops portable multi-test analyzer based on established principles of centrifugal analysis. Its products are capable of performing complete blood chemical constituent measurements instantly in the patient care setting.



**Cerner Corp.**

CERN.O

Cerner Corporation is a supplier of healthcare information technology solutions, services, devices, and hardware. Cerner's solutions optimize processes for healthcare organizations. These solutions are licensed by 9,300 facilities globally, including more than 2,650 hospitals; 3,750 physician practices; 40,000 physicians; 500 ambulatory facilities such as laboratories, ambulatory centers, cardiac facilities, radiology clinics, and surgery centers; 800 home health facilities; 40 employer sites and 1,600 retail pharmacies. It operates in two segments: domestic, which includes revenue contributions and expenditures associated with business activity in the US; and global, which includes revenue contributions and expenditure linked to business activity in Argentina, Aruba, Canada, Cayman Islands, Chile, Puerto Rico, Saudi Arabia, Singapore, Spain, and the UAE. Effective March 18, 2013, it acquired Labotix Automation, Inc.



**PAREXEL International Corp**

PRXL.O

PAREXEL International Corporation (PAREXEL) is a biopharmaceutical services company, providing a range of expertise in clinical research, medical communications, consulting, and advanced technology products & services to the global pharmaceutical, biotechnology, and medical device industries. It operates through three segments: Clinical Research Services (CRS), PAREXEL Consulting and Medical Communications Services (PCMS), and Perceptive Informatics, Inc. (Perceptive). The company's product and service offerings include clinical trial management, observational studies and patient/disease registries, data management, biostatistical analysis, epidemiology, health economics/outcomes research, pharmacovigilance, medical communications, clinical pharmacology, patient recruitment, and post-marketing surveillance. In May 2013, PAREXEL International Corp acquired the entire share capital of HERON Group Ltd.



*Source: Reuters Eikon*



## Exhibit 5 – Valuation Theory                                                    Back

### Market Approach

The market approach is based on the economic principle of competition (i.e., in a free market, forces of demand and supply will direct the values of businesses to a particular balance). Valuation under the market approach entails the application of appropriate market-based multiples selected from guideline public companies to parameters such as level of earnings, cash flow, revenues, invested capital or other financial factors (financial metrics) that represent the future financial performance of the subject company. This method is based on idea of determination of the price at which the company will be exchanged in the public market, and is particularly useful for valuing companies that are currently profitable and expected to continue making profits in the foreseeable future.

In some industries, certain industry-specific non-financial metrics are also used instead of financial metrics. One example of non-financial metrics would be 'price per million page views' in the online advertisement industry and 'price per subscriber' in the cable industry. The use of such non-financial metrics may be suitable for the valuation of companies in the very early stages of development with no profits and operating in industries where such metrics are generally accepted.

The multiples reflect the rate of return prospective investors will expect on their investment, which will commensurate the inherent risks associated with such investments. The multiples are believed to implicitly factor growth expectations and level of earnings that the company is expected to generate in perpetuity.

### Market Approach – Guideline Public Companies' Multiples

The most common method under the market multiples approach entails identifying suitable guideline public companies and selection of appropriate trading multiples (i.e., ratio of recently traded price to earnings, cash flows, revenues, invested capital).

Market multiples are generally expressed as a ratio of diverse variables such as:

- Net Profit (Price to Earnings – 'P/E'): P/E multiple, the most widely used multiple, measures the relationship between recently traded market share price of companies and their earnings per share. Earnings are calculated net of interest expense; this captures the impact of leverage (debt) during calculation of the Equity Value.

- Cash Flows (Price to Cash Flows – 'P/CF'): Cash flows under this multiple are calculated by adding back depreciation and other non-cash expenses. This multiple is suitable when the proportion of fixed assets and depreciation expenses is large relative to the company's total asset size, revenues, and net earnings. The multiple is particularly suitable since it offsets the differences caused by the dissimilar depreciation practices of guideline companies—these differences yield diverse P/E multiples.

- EBITDA (Enterprise Value to EBITDA- 'EV/EBITDA'): By using different depreciation methods, a company can inflate or deflate its earnings. Similarly, higher leverage enables a company to drive up Earnings per Share (EPS); however, this increase comes with higher risk (due to the increased leverage). Therefore, the earnings of companies with different depreciation policies and levels of leverage are not comparable. The EV/EBITDA multiple helps to overcome this shortcoming inherent in the PE multiple.

- Revenues (Price to Revenues - 'P/S' or Enterprise Value to Revenues - 'EV/S'): The EV/S multiple may be used for companies that exhibit negative earnings or where there is scope for manipulation of financial statements by a company's management, since it is easier to manipulate earnings than revenues. However, this multiple is more appropriate during comparison of the valuation of companies that have similar net profit margins.

- Net Book Value (Price to Net Book Value – 'P/NBV'): This multiple is useful for businesses such as banks and insurance companies that have significant tangible or financial assets relative to the total investment.

Market multiples are generally expressed either as current multiples (for example, Trailing Twelve Months 'TTM' multiple) or forward multiples (ratio of current price to earnings/cash flow/revenue for certain period in future (for example, 1-year forward multiple, 2-year forward multiple). The market value of a security is nothing but the amount that investors are ready to pay for benefits that are expected to flow to investors owning the security. Since the holder of the security is entitled to benefits after the date of purchase, forward trading multiples are generally considered more appropriate to value a security than current multiples, which compare the price of the security with the past performance of the company—this does not benefit an investor evaluating the investment.



However, the suitability of forward multiples is limited by the reliability and reasonableness of earnings/cash flow/revenue estimate for the selected future period, especially in the case of early stage privately-held companies due to their very limited performance history and inadequate market opinion about these estimates. Thus, in cases where future estimates are highly speculative, applying multiple on the trailing financial metrics could yield valuation results that are more reliable.

**Market Approach – Guideline Transaction Multiples**

Another variant of the market approach is the guideline transaction multiple method ('GTM'), wherein the ratio of total price paid for the public or private company to its earnings in recent mergers & acquisitions (M&A) transactions between unrelated parties is considered. This method is mostly used in combination with the income approach and other methods.

M&A transaction multiples, to some extent, include the strategic or synergistic value attributable to synergies available to the specific buyer, not available to most other market participants. To that extent, an M&A transaction may provide a better indication of the 'investment value' (i.e., value for that specific buyer) than the 'fair market value' (i.e., value to the hypothetical, rational financial buyer).

**Market Approach – Suitability in Valuation of Privately Held Company**

The market approach is theoretically preferable to other approaches because it uses direct comparisons with other companies and relies on data derived from actual market transactions. However, application of the market approach during the valuation of privately-held companies is fraught with challenges, especially during the early stages of development when financial information on the company being valued is inadequate.

▪ The foremost challenge to application of the market approach while valuing companies is the selection of 'true' guideline public companies or guideline transactions with reasonable effort and cost. Even if guideline public companies exist, the market approach may not be sufficiently reliable for valuation of companies in the early stages with no earnings or insignificant revenues, since financial forecasts may be highly speculative.

▪ Direct application of the performance indicators of public companies may be difficult, since public companies are typically in the much later stages of development relative to privately-held companies. In such cases, as per the AICPA Practice Aid guidelines, an appraiser may need to make certain adjustments to an initial valuation arrived at using guideline companies that are not comparable to the company being valued in one regard or the other.

AICPA Practice Aid further states: "In performing valuations of early stage enterprises under the market approach, not only is it assumed that the industry, size of enterprise, marketability of the products or services, and management teams are comparable but also that the enterprise's stage of development is comparable. This assumption often renders the market approach impractical for early stage companies because the pricing data for such companies are difficult, if not impossible, to find. Furthermore, even if pricing data can be found, until product or service feasibility is achieved, comparability among early stage companies is difficult to achieve[13]."

**Implied Post-Money Valuation at Latest Preferred Financing**

Although very limited in use, implied post-money valuation based on the latest preferred financing is another alternate method under the market approach for determining the Equity Value of company. This method is generally used to develop an indication of Equity Value along with other valuation methods and not as the primary method of valuation.

Value determination

| Amount raised in latest funding round | Divided By | Percentage of total equity stake given up | Equals | Equity Value under this method |

Approach suitable in following circumstances:

▪ When investors contributing to the latest preferred round are unrelated to the company

▪ Time lag between the financing date and the valuation date is not material

---

[13] AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 25, Para # 60, 61

Page 56 of 69      Theranos, Inc.
Confidential      THER-AZ-01126789
ER-15200



**Not suitable when:**

- Funds are contributed by investors who are existing shareholders in the company or are related to it in a manner that could materially impact their decision to invest

**Other Limitations**

The suitability of this method to derive the 'fair market value' of common stock may be very restricted due to following limitations:

- The method assumes all classes of equity (preferred and common stock) are equally valuable.

- Preferred shareholders generally have significantly superior economic as well as non-economic rights such as representation, preference, conversion, and other benefits that are difficult to quantify. Hence, the value associated with them cannot be isolated.

### Income Approach – Discounted Cash Flow Method

DCF is one of the widely used methods for valuing private companies and entails three broad steps:



*FCFE – Free Cash flows to Equity*

The free cash flows are discounted to arrive at the present value, as of the valuation date. To arrive at the Equity Value, the sum of the present value of all future cash flows and terminal value is taken into consideration. To this sum, cash balances and the sum of the present value of all future reasonably realizable tax benefits are added to arrive at the Equity Value.

### Cost Approach – Adjusted Book Value Method

- Estimating the value of the company under the adjusted book value method entails estimation of the fair value of each of its specific individual assets and liabilities.



**Suitability and features of cost approach**

- The cost approach is generally suitable when liquidation of the company being valued is imminent.

- The approach may sometimes be suitable for valuations under 'going-concern' basis in cases where the company being valued has huge and significant investments in tangible assets or where earnings generated from operations are insignificant relative to the value of its operating assets (for example, real estate holding companies and startups).

- While the income and market approaches focus on the cash flows likely to be generated through collective and continued exploitation of all assets, the cost approach focuses on the value that each individual asset is expected to realize on liquidation near the valuation date.

For the purposes of this analysis, therefore, the cost approach is considered the weakest and is generally applied as a secondary approach in conjunction with the income and/or market approaches.

Confidential

THER-AZ-01126790

**ER-15201**



| Theranos, Inc. |

### Exhibit 6 – DCF (Income Approach)                                                    Back

| Equity Value | (in '000 $) |
|---|---|
| PV of FCFE | (71,932) |
| Terminal Value | 540,103 |
| PV Factor | 0.42 |
| PV of Terminal Value | 228,470 |
| PV of Net Operating Losses | 19,814 |
| Equity Value | 176,352 |
| Current Cash & Cash Equivalents | 31,625 |
| **Total Equity Value** | **207,977** |

| Discounted Cash Flow Statement (in '000 $) | Dec-13 | Dec-14 | Dec-15 | Dec-16 | Dec-17 |
|---|---|---|---|---|---|
| | 3 Mth-F | FY-F | FY-F | FY-F | FY-F |
| Revenues | 50,000 | 89,702 | 112,202 | 131,702 | 143,402 |
| EBITDA | 38,459 | 8,827 | 22,566 | 31,850 | 38,793 |
| EBIT | 29,663 | (10,498) | (536) | 9,855 | 14,183 |
| Net Earnings (PAT) | 29,834 | (10,261) | (143) | 10,222 | 14,170 |
| | | | | | |
| Earnings Before Interest & Tax (EBIT) | 29,663 | (10,498) | (536) | 9,855 | 14,183 |
| Tax on EBIT | (11,865) | - | - | (3,942) | (5,673) |
| Earnings before Interest, but after Tax | 17,798 | (10,498) | (536) | 5,913 | 8,510 |
| *Growth (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *43.9%* |
| | | | | | |
| Depreciation & Amortization | 8,796 | 19,324 | 23,102 | 21,996 | 24,610 |
| Change in Working Capital | (12,420) | (13,019) | (15,129) | (13,595) | (14,597) |
| Net Change in Other Operating Assets/ Liabilities | (5,573) | (9,678) | (6,355) | 11,200 | (312) |
| Net Capital Expenditure | (9,318) | (24,385) | (19,530) | (19,418) | (24,169) |
| Free Cash Flow to Firm (FCFF) | (717) | (38,256) | (18,449) | 6,096 | (5,959) |
| *Growth (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |
| | | | | | |
| Net Debt Taken / (Repaid) | 2,770 | 320 | (40,810) | - | - |
| Interest & Finance Costs (Tax Adjusted) | (47) | (345) | (185) | (14) | (14) |
| Free Cash Flow to Equity (FCFE) | 2,007 | (38,281) | (59,444) | 6,082 | (5,973) |
| *Growth (%)* | *n/a* | *n/a* | *n/a* | *n/a* | *n/a* |
| | | | | | |
| Year Fraction | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 |
| Present Value Factor | 0.97 | 0.86 | 0.70 | 0.57 | 0.47 |
| | | | | | |
| **PV of FCFE** | **1,957** | **(32,877)** | **(41,701)** | **3,485** | **(2,796)** |

| Terminal Value Calculation | (in '000 $) |
|---|---|
| EBITDA FYE 31-Dec-17 | 38,793 |
| EV/EBITDA Multiple Exit Year | 14.00 |
| Terminal Value | 543,103 |
| Net Debt Exit Year | 3,000 |
| **Terminal Value of Equity** | **540,103** |

Confidential

ER-15202



| Theranos, Inc. |
| --- |

## Exit Multiple Assumption

| Company Name | Share Price [1] ($) | Mkt Cap ($ mn) | EV ($ mn) | EV/EBITDA | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 2009 | 2010 | 2011 | 2012 | LTM |
| OraSure Technologies Inc | 6.08 | 338 | 261 | n/a | n/a | n/a | n/a | n/a |
| Alere Inc | 30.90 | 2,527 | 6,692 | 12.7x | 12.4x | 10.0x | 9.3 x | 11.1x |
| Medidata Solutions Inc | 97.49 | 2,602 | 2,462 | 14.6x | 13.8x | 11.4x | 24.7x | |
| Abaxis Inc | 41.82 | 933 | 849 | 17.8x | 20.6x | 23.3x | 26.7x | 29.9x |
| Cerner Corp | 50.35 | 17,277 | 16,489 | 12.5x | 13.2x | 14.1x | 15.8x | 19.0x |
| PAREXEL International Corp | 49.90 | 2,805 | 2,976 | 6.2 x | 7.9 x | 9.1 x | 10.3x | 14.2x |
| **Count** | | | | 5 | 5 | 5 | 5 | 5 |
| **Mean** | | | | 12.8x | 13.6x | 13.6x | 17.4x | 18.5x |
| **Median** | | | | 12.7x | 13.2x | 11.4x | 15.8x | 16.6x |
| **Mulitple Selected** | | | | | | | | 14.0x |

*Source: Reuters Eikon*
[1] *Average Share Price for 30 days period ended on 09/30/2013*

| NOL (Net Operating Losses) Schedule | (in '000 $) | Dec-13 | Dec-14 | Dec-15 | Dec-16 |
| --- | --- | --- | --- | --- | --- |
| | | 3 Mth-F | FY-F | FY-F | FY-F |
| Net Profit/ (Loss)for the Year | | 29,834 | (10,261) | (143) | 10,222 |
| | | | | | |
| Opening Balance - NOLs | | 65,193 | 35,359 | 45,620 | 45,763 |
| NOLs adjusted against Profits | | 29,834 | - | - | 10,222 |
| Loss Accumulated | | - | 10,261 | 143 | - |
| Closing Balance - NOLs | | 35,359 | 45,620 | 45,763 | 35,541 |
| | | | | | |
| Tax Savings on NOLs | **40.00%** | 11,934 | - | - | 4,089 |
| | | | | | |
| Discount Factor | | 0.97 | 0.86 | 0.70 | 0.57 |
| | | | | | |
| PV of Tax Benefit on NOLs | | 11,633 | - | - | 2,343 |
| | | | | | |
| Sum of PV of Tax Benefits on NOLs | **19,814** | | | | |
| | | | | | |
| **Tax for the Period** | | - | - | - | - |

Theranos, Inc.

Confidential
THER-AZ-01126792

ER-15203



Theranos, Inc.

| NOL (Net Operating Losses) Schedule | (in '000 $) | Dec-17 | Dec-18 | Dec-19 |
|---|---|---|---|---|
| | | FY-F | FY-F | |
| Net Profit/ (Loss)for the Year | | 14,170 | 18,421 | 23,947 |
| | | | | |
| Opening Balance - NOLs | | 35,541 | 21,372 | 2,951 |
| NOLs adjusted against Profits | | 14,170 | 18,421 | 2,951 |
| Loss Accumulated | | - | - | - |
| Closing Balance - NOLs | | 21,372 | 2,951 | - |
| | | | | |
| Tax Savings on NOLs | 40.00% | 5,668 | 7,368 | 1,180 |
| | | | | |
| Discount Factor | | 0.47 | 0.38 | 0.31 |
| | | | | |
| PV of Tax Benefit on NOLs | | 2,653 | 2,817 | 369 |
| | | | | |
| Sum of PV of Tax Benefits on NOLs | 19,814 | | | |
| | | | | |
| Tax for the Period | | - | - | 8,398 |

## Cost of Equity Assumptions

| Company name | Re-levered Beta | R | Total Beta | Market Risk | Total Risk | Size Premium | CSRP |
|---|---|---|---|---|---|---|---|
| OraSure Technologies Inc | 1.47 | 0.61 | 2.39 | 11.72% | 17.37% | 2.70% | 2.95% |
| Alere Inc | 0.58 | 0.57 | 1.02 | 6.29% | 8.98% | 1.70% | 0.99% |
| Medidata Solutions Inc | 0.91 | 0.36 | 2.55 | 8.31% | 18.36% | 1.70% | 8.35% |
| Abaxis Inc | 1.11 | 0.55 | 2.03 | 9.54% | 15.14% | 1.73% | 3.87% |
| Cerner Corp | 0.93 | 0.61 | 1.51 | 8.42% | 12.01% | 0.76% | 2.83% |
| PAREXEL International Corp | 1.01 | 0.48 | 2.12 | 8.96% | 15.72% | 1.14% | 5.62% |
| **Mean** | **1.00** | | | | | | **4.10%** |
| **Median** | **0.97** | | | | | | **3.41%** |
| **Quartile 3** | **1.09** | | | | | | **5.19%** |

| Cost of Equity Calculations | Mean |
|---|---|
| Risk Free Rate | 2.76% |
| Beta | 1.09 |
| Equity Risk Premium | 6.11% |
| Size Premium | 6.03% |
| Company Specific Risk Premium | 7.00% |
| **Cost of Equity** | **22.43%** |

Confidential
Theranos, Inc.
THER-AZ-01126793

**ER-15204**



| Theranos, Inc. |

### Exhibit 7 – Guideline Public Companies' Trading Multiples (Market Approach)   Back

| Company Name | Share Price | Mkt Cap | EV | EV/Revenue 2014 |
|---|---|---|---|---|
| OraSure Technologies Inc | 6.08 | 338 | 261 | 2.5x |
| Alere Inc | 30.90 | 2,527 | 6,692 | 2.1x |
| Medidata Solutions Inc | 97.49 | 2,602 | 2,462 | 7.2x |
| Abaxis Inc | 41.82 | 933 | 849 | 4.1x |
| Cerner Corp | 50.35 | 17,277 | 16,489 | 5.1x |
| PAREXEL International Corp | 49.90 | 2,805 | 2,976 | 1.5x |
| **Median** | | | | **3.3x** |
| **Measure** | | | | **Median** |

*Source: Reuters Eikon*
*Notes: (1) Avg. Share Price for 7 days period ended on 09/30/2013*
*(2) All Multiples calculated for Calendar Year.*

| Equity Value Calculation (EV/Revenue) | 2014 |
|---|---|
| Selected Multiple | 3.3x |
| Measure | Median |
| Revenues (in '000 $) | 89,702 |
| Enterprise Value (in '000 $) | 292,807 |
| Add: Cash | 31,625 |
| Less:- Debt | (40,720) |
| Less:- Net Debt taken from Partners | (83,808) |
| Equity Value under different multiples, based on different time periods (in '000 $) | 199,904 |
| Weight considered for different multiples (in '000 $) | 100% |
| Weighted Equity Value (in '000 $) | **199,904** |

Confidential
Theranos, Inc.
THER-AZ-01126794

**ER-15205**



Theranos, Inc.

Exhibit 8 – Concluded Equity Value                                                 Back

| Concluded Equity Value | EV | Weight | Value |
|---|---|---|---|
| EV – Income Approach | 207,976,885 | 50% | 103,988,443 |
| EV – Market Approach | 199,904,496 | 50% | 99,952,248 |
| Concluded EV (Weighted Average) | | | 203,940,691 |

Confidential

ER-15206

THER-AZ-01126795



Theranos, Inc.

## Exhibit 9 – Capital Structure                                    Back

| Existing Shareholders | # of Shares Outstanding | Original Issue | Conv. ratio | CSE | Ownership % O/S | Ownership % Fully |
|---|---|---|---|---|---|---|
| Series A | 46,320,045 | $0.150 | 1.0x | 46,320,045 | 10.91% | 9.39% |
| Series B | 54,162,965 | $0.185 | 1.0x | 54,162,965 | 12.76% | 10.98% |
| Series C | 58,896,105 | $0.564 | 1.0x | 58,896,105 | 13.88% | 11.94% |
| Series C-1 | 18,508,335 | $3.000 | 1.0x | 18,508,335 | 4.36% | 3.75% |
| Series C-1* | 1,380,000 | $3.000 | 1.0x | 1,380,000 | 0.33% | 0.28% |
| Common shares | 245,111,810 | | | 245,111,810 | 57.76% | 49.68% |
| **Sub total** | **424,379,260** | | | **424,379,260** | **100%** | **86.02%** |
| | | | | | | |
| **Options** | | | | | | |
| Options @ $0.015 | 350,000 | 0.015 | | 350,000 | | 0.07% |
| Options @ $0.03 | 1,264,625 | 0.03 | | 1,264,625 | | 0.26% |
| Options @ $0.066 | 682,500 | 0.066 | | 682,500 | | 0.14% |
| Options @ $0.072 | 4,841,855 | 0.072 | | 4,841,855 | | 0.98% |
| Options @ $0.094 | 312,500 | 0.094 | | 312,500 | | 0.06% |
| Options @ $0.17 to be issued | 60,000,000 | 0.17 | | 60,000,000 | | 12.16% |
| Options @ $0.206 | 785,180 | 0.206 | | 785,180 | | 0.16% |
| Common Stock Warrants @ $0.072 | 741,665 | 0.072 | | 741,665 | | 0.15% |
| **Sub total** | **68,978,325** | | | **68,978,325** | | **13.98%** |
| | | | | | | |
| **Total** | **493,357,585** | | | **493,357,585** | **100%** | **100%** |

### Rights & Preferences of various classes of shareholders

| Existing Shareholders | # of Shares | Liquidation Preference per share | Total LP | Participation |
|---|---|---|---|---|
| Series A | 46,320,045 | $0.150 | 6,948,007 | n/a |
| Series B | 54,162,965 | $0.185 | 10,000,000 | Unlimited |
| Series C | 58,896,105 | $0.564 | 33,217,403 | Unlimited |
| Series C-1 | 18,508,335 | $3.000 | 55,525,005 | Unlimited |
| Series C-1* | 1,380,000 | $3.000 | 4,140,000 | Unlimited |
| Common Stock | 245,111,810 | | | |
| **Sub total** | **424,379,260** | | **109,830,415** | |

Theranos, Inc.
Confidential
THER-AZ-01126796

**ER-15207**



| | Theranos, Inc. |

## Exhibit 10 –Equity Value Allocation Theory

Back

### Current Value Method ('CVM')

The CVM assumes the hypothetical liquidation event would occur on the valuation date, instead of a certain date in the future as assumed under the other two methods of allocation.

The CVM entails two broad steps:

a) Determining the value of the company using equity valuation approaches discussed above;

b) Allocating that Equity Value among different classes of preferred stock based on their liquidation preferences or conversion values—whichever is greater.

CVM has the advantage of simplicity and objectiveness and is frequently used in the industry to deal with preferred stocks. However, as per the AICPA Practice Aid, the method is suitable only under the following limited circumstances[14]:

- When a liquidity event in the form of an acquisition or dissolution of the enterprise is imminent, and expectations about the future of the enterprise as going concern are virtually irrelevant.

- When an enterprise is at such an early stage of development that:

  - No material progress has been made on the enterprise's business plan.

  - No significant common Equity Value has been created in the business above the liquidation preference on preferred shares, and

  - There is no reasonable basis for estimating the amount and timing of such common Equity Value above the liquidation preference that might be created in the future.

The guidelines mentioned above suggest that the CVM is primarily suited for companies in very early stages of development and that as an enterprise progresses beyond that stage, the other allocation methods become more appropriate. The result obtained using this method is generally highly sensitive to changes in Equity Value. Furthermore, this is not forward-looking and fails to reflect the possibility that Theranos' Equity Value may increase or decrease between the valuation date and the date at which common stockholders will receive returns on their investments, if any[15].

We did not consider the CVM for allocation of Theranos' Equity Value based on our review and analysis of milestones achieved in its business plan.

### Option Pricing Method ('OPM')

The OPM is a forward-looking approach and is appropriate for use when the range of future possible outcomes is so difficult to predict that forecasts would be highly speculative. The method considers common stock as a call option on the Equity Value as the common stock only receives value if the firm's value exceeds the liquidation preference of preferred series.

#### Excerpt from AICPA Practice Aid[16]:

*"OPM is a forward-looking approach that considers common stock as a call option on Equity Value."*

"The option pricing method treats common stock and preferred stock as call options on the enterprise's value, with exercise prices based on the liquidation preference of the preferred stock. Under this method, the common stock has value only if the funds available for distribution to shareholders exceed the value of the liquidation preference at the time of a liquidity event (for example, merger or sale), assuming the enterprise has funds available to make a liquidation preference meaningful and collectible by shareholders. The common stock is modeled as a call option that gives its owner the right but not the obligation to buy the underlying enterprise value at a predetermined or exercise price. In the model, the exercise price is based on a comparison with the enterprise value rather than, as in the case of a 'regular' call option, a comparison with a per-share stock price. Thus, common stock is considered to be a call option with a claim on the enterprise at an exercise price equal to

---

[14] AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 63, Para # 154

[15] AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 63, Para # 153

16 AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 61, Para # 146, 147, 148

Theranos, Inc.

Confidential

THER-AZ-01126797

**ER-15208**



the remaining value immediately after the preferred stock is liquidated. The option pricing method has commonly used the Black–Scholes model to price the call option."

"The option pricing method considers various terms of the stockholder agreements, including the level of seniority among securities, dividend policy, conversion ratios, and cash allocations, upon liquidation of the enterprise. In addition, the method implicitly considers the effect of the liquidation preference as of the future liquidation date, and not as of the valuation date."

However, OPM has also certain limitations—prominent among these is the sensitivity to certain key assumptions like volatility, which, due to absence of any trading history, is very difficult to estimate for a privately held company. Generally, volatility for the company being valued is based on the observed volatilities of public comparables. While intraday volatility in publicly traded stocks may typically range between 1% and 10%, this cannot be imitated for a privately held company. When applied for valuation of privately held company equity securities, OPM measures the change in value over several months or years unlike options traded in public markets. This makes OPM analysis heavily dependent upon subjective assumption of volatility.

### Probability-Weighted Average Expected Return Method ('PWERM')

As outlined in the AICPA Practice Aid[17], "under a probability-weighted return method, the value of the common stock is estimated based upon an analysis of future values for the enterprise assuming various future outcomes. The share value is based on the probability-weighted present value of expected future investment returns, considering each of the possible future outcomes available to the enterprise, as well as rights of each share class."

*Under PWERM, the value of the common stock is estimated based upon an analysis of future values for the enterprise assuming various future outcomes*

This method entails a forward-looking analysis of possible future outcomes available to the enterprise, the estimation of a range of future and present values under each outcome, and application of the probability factor to each outcome as of the valuation date. The potential future outcomes that are typically considered are in the form of exit events like sale or merger, IPO, dissolution or continued as private entity.

The primary virtue of PWERM is its conceptual superiority since it explicitly captures the impact of various rights and terms attached to each class of shares under the shareholder agreements at the future date. Furthermore, PWERM is a forward-looking and dynamic method, since, instead of considering a single estimate of the Company's value at the valuation date, it reflects on the potential economic events and outcomes at certain dates in future while determining the value as of the valuation date.

On the flip side, PWERM is often complex to implement since it entails a number of assumptions about the timing of potential future events, the estimate of the probabilities that such events will occur, and a range of values under each of the potential events at future dates. These assumptions may be very difficult to estimate and support objectively. Furthermore, in certain cases, PWERM may require building complex probability models and depend heavily upon specific methodology followed and subjectivity of estimates made by the appraiser.

In our opinion, this method is generally more suitable for companies that have made significant progress in their business plan and expect one or more exit outcomes to occur in the foreseeable future. In other words, the planning horizon of the enterprise should be sufficiently long to reasonably estimate the information about the 'change in control events' such as IPO and sale.

---

17 AICPA Practice Aid Series 2004 – 'Valuation of Privately Held Company Equity Securities Issued as Compensation', Page # 59, Para # 141, 142, 143

Confidential



| Theranos, Inc. |

**Exhibit 11 – Discount for lack of Marketability**                                  Back

| Methodology | Weight | DLOM Arrived |
|---|---|---|
| Options Based Methods – Chaffee Model | 0% | 40.9% |
| Options Based Methods – Finnerty Model (Ghaidarov Correction) | 100% | 26.5% |
| **Concluded Discount for Lack of Marketability** | | **26.5%** |

| Protective Put Approach – Chaffee Model | |
|---|---|
| Stock Price | $0.234 |
| Strike Price | $0.234 |
| Volatility of the Underlying Asset | 64% |
| Dividend Yield | 0.00% |
| Time of Expiration (years) | 3.00 |
| Riskless Rate Corresponding to Option Life Time | 0.64% |
| Variance | 41% |
| Value of Put | 0.10 |
| **DLOM** | **40.90%** |

| Protective Put Approach – Finnerty Model | |
|---|---|
| Stock Price | $0.234 |
| Strike Price | $0.234 |
| Volatility of the Underlying Asset | 64% |
| Dividend Yield | 0.00% |
| Time of Expiration (years) | 3.00 |
| Riskless Rate Corresponding to Option Life Time | 0.64% |
| Variance | 41% |
| Value of Put | 0.06 |
| **DLOM** | **26.51%** |

**Equity Volatility Assumption**

| Company name | Equity Volatility |
|---|---|
| OraSure Technologies, Inc. | 50.28% |
| Alere, Inc. | 37.81% |
| Medidata Solutions, Inc. | 39.49% |
| Abaxis, Inc. | 36.05% |
| Cerner Corp | 25.77% |
| PAREXEL International Corp | 33.75% |
| **Mean** | 64.48% |
| **Median** | 64.32% |
| **Quartile 1** | 55.25% |
| **Quartile 3** | 72.08% |
| **High** | 85.19% |
| **Low** | 36.14% |
| **Trimmed Average** | 64.24% |
| **Selected** | **Median** |

Confidential

**ER-15210**



**Theranos, Inc.**

**Exhibit 12 – Fair Market Value Conclusion**                                                    Back

| Particulars | | Value |
|---|---|---|
| Common Stock Value (Before DLOM) | | $0.23 |
| Discount For Lack of Marketability (DLOM) | 26.5% | ($0.06) |
| **Fair Market Value of Common Stock (Post DLOM)** | | **$0.17** |



### Exhibit 13. – Brief Profile of Appraisal Team

**Hemendra Aran,**
*CEO and Head of Valuation Services*

Hemendra, Founder and CEO at Aranca, heads Valuation Services. Until date, he has overseen independent valuations of over 450 privately held firms as a principal appraiser. Hemendra has extensively interfaced with securities analysts, fund managers, financial consultants, M&A advisors, tax consultants, audit firms and members from regulatory bodies. He has written four books including one titled 'Global Financial Markets Revolution: The Future of Exchanges and Capital Markets', published by McMillan. Hemendra is a sought-after media speaker and has appeared on BBC and CNBC in addition to a host of business newspapers.

Before starting Aranca, Hemendra worked at Goldman Sachs and Infosys Technologies Limited. He is a member of the Institute of Business Appraisers, Plantation, Florida, US and subscribes to IBA's Code of Ethics. Hemendra holds an MBA from London Business School and Haas School of Business, University of California, Berkeley, and a BS from Indian Institute of Technology, Chennai.

**Bharat Ramnani, ASA, Chartered Accountant**
*Associate Vice-President, Valuation Services (Practice Lead)*

Bharat joined Aranca in 2006 and currently leads the firm's Valuations & Advisory Services practice. He has more than nine years of professional experience in corporate finance, equity research and business valuation. Bharat has executed independent business and independent valuation assignment for more than 300 US-based VC - funded privately held business across diverse industry sectors including semiconductor, software, online advertising, social media, Internet-based business and life sciences. He also manages Aranca's relationships with Private Equity clients across the globe, helping them in the valuation of their investment targets.

Prior to joining Aranca, Bharat worked with Finance team of R.A.K Ceramics in the Middle East. In this capacity, he was involved in a host of corporate finance activities including working capital, business reviews and new business evaluations. Bharat holds Accredited Senior Appraiser (ASA) designation conferred by the American Society of Appraisers and is a qualified Chartered Accountant (CPA Equivalent in India).

**Manpreet Singh, ASA**
*Manager, Valuation Services*

Manpreet joined Aranca in 2006 and is Manager in the firm's Valuations and Financial Advisory Services Groups. He has more than five years of experience in corporate finance, having assisted over 250 companies with their valuation requirements. In addition, Manpreet has been involved in providing financial advisory services on behalf of Aranca's clients based out of the Middle East.

Manpreet is an Accredited Senior Appraiser (ASA) designated in Business Valuation. He also holds Master of Business (Finance) from Victoria University, Australia, and a Bachelor in Commerce from the University of Delhi, India.

## Exhibit 14 – General Assumptions and Limiting Conditions

Back

This independent appraisal report is subject to the following assumptions and limiting conditions, to be understood in conjunction with the previously presented Certification section:

- All reported facts, comments, estimates, opinions and statistical information set forth in this report have been obtained from sources believed to be accurate, reliable and knowledgeable. No liability is assumed for the content or accuracy of the data furnished by others, including information and representations provided by management to Aranca.
- Aranca and the analyst have made no attempt to verify the accuracy, veracity, conformity and topical nature of the data gathered from such sources.
- Aranca and the analyst relied on historical financial data provided by the management, as well as, verbal representations made by the management regarding this data and subsequent adjustments made to this data.
- All financial statements and other data pertaining to the Company have been provided by management and accepted by Aranca without verification, including conformity or non-conformity with generally accepted accounting principles and/or other guidelines established by recognized regulatory and other governing bodies.
- The historical financial information and any adjustments thereto and any forecasts and projections presented in this report, including attached Exhibits, are included solely to assist in the development of the value estimate presented in this report.
- We do not provide assurance on the achievability of the results forecasted by the Company because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.
- The conclusions of value are based on the assumption that the current level of management expertise and effectiveness would continue to be maintained and that the character and the integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed
- Because of the limited purpose of this presentation, the information may be incomplete and contain departures from generally accepted accounting principles and/or other guidelines established by recognized regulatory and other governing bodies. We express no opinion or other assurances on the information presented and it should not be used for any other purpose other than to assist in this valuation.

**EXHIBIT I**
**Form of Stock Option Agreement (2004 Plan)**



## THERANOS, INC.

### 2004 STOCK PLAN

### STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the 2004 Stock Plan shall have the same defined meanings in this Stock Option Agreement.

**I.  NOTICE OF STOCK OPTION GRANT**

**Name:**

**Address:** _____

_____

The undersigned Optionee has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant:

Vesting Commencement Date:

[Pre-Split Exercise Price per Share*:]

[Post-Split] Exercise Price per Share*:

[Total Number of Pre-Split Shares Granted+]:

_____

\* [*The "Pre-Split Price" represents the exercise price per share before giving effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on March 28, 2013 (the "March Certificate"). The Company expects to file a certificate of correction with the Secretary of State of Delaware (the "Certificate of Correction") to replace the March Certificate upon the filing of the new certificate of incorporation setting forth a 5 to 1 forward stock split (the "New Certificate"). To the extent the 5 to 1 forward stock split contained in either the March Certificate or the New Certificate is effective, the "Post-Split Price" shall be the effective exercise price per share. At such times as the 5 to 1 forward split is not effective because neither the March Certificate nor the New Certificate are effective (including at such time as the Certificate of Correction has been filed but the New Certificate has not yet been filed), the "Pre-Split Price" shall be effective.*]

+ [*This "Pre-Split Shares" number represents the shares subject to the option before giving effect to the 5 to 1 forward stock split, which stock split is contained in the March Certificate. The Company expects to file the Certificate of Correction to replace the March Certificate upon the filing of the New Certificate. To the extent the 5 to 1 forward stock split contained in either the March Certificate or the New Certificate is effective, the "Post-Split Shares" number shall be the effective number of shares granted. At such times as the 5 to 1 forward split is not effective because neither the March Certificate nor the New Certificate are effective (including at such time as the Certificate of Correction has been filed but the New Certificate has not yet been filed), the "Pre-Split Shares" number shall be effective.*]

Confidential                                    **ER-15215**                          THER-AZ-01126804

Total Number of [Post-Split] Shares
Granted:[+]

Total Exercise Price:

Type of Option:                           Incentive Stock Option

                                          Nonstatutory Stock Option

Term/Expiration Date:                     [Maximum Term is 5 years for new hire and
                                          consulting grants and 10 years for
                                          performance grants]

Vesting Schedule:

This Option shall be exercisable in whole or in part, according to the following vesting
schedule:

**[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and 1/48 of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date, subject to Optionee continuing to be a Service Provider through each such date.]**

Termination Period:

This Option shall be exercisable for three (3) months after Optionee ceases to be a Service Provider. Upon Optionee's death or Disability, this Option shall be exercisable for one (1) year after Optionee ceases to be Service Provider. In no event may Optionee exercise this Option after the Term/Expiration Date as provided above.

**II.    AGREEMENT**

1.    Grant of Option. The Administrator of the Company hereby grants to the Optionee named in the Notice of Grant in Part I of this Agreement (the ***"Optionee"***), an option (the ***"Option"***) to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the ***"Exercise Price"***), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to **Section 15(c)** of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Grant as an Incentive Stock Option (***"ISO"***), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option (***"NSO"***).

2.    Exercise of Option. This Option shall be exercisable during its term in accordance with the provisions of **Section 10** of the Plan as follows:

Theranos _ Form SOA (2004 Plan Dec 2013 grants).docx          Page 2

(a)   <u>Right to Exercise</u>.   This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Grant and with the applicable provisions of the Plan and this Option Agreement.

(b)   <u>Method of Exercise</u>.   This Option shall be exercisable by delivery of an exercise notice in the form attached as **<u>Exhibit A</u>** (the **_"Exercise Notice"_**), which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company.  The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares.  This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws.  Assuming such compliance, for income tax purposes the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

3.   <u>Optionee's Representations</u>.   In the event the Shares have not been registered under the Securities Act of 1933, as amended, at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as **<u>Exhibit B</u>**.

4.   <u>Lock-Up Period</u>.   Optionee hereby agrees that Optionee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Optionee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

Optionee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.  In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Optionee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act.  The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future.  The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end

Confidential

THER-AZ-01126806

of said one hundred eighty (180) day period. Optionee agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section.

5. <u>Method of Payment</u>. Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a) cash;

(b) check;

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d) surrender of other Shares which, (i) in the case of Shares acquired from the Company, either directly or indirectly, have been owned by the Optionee, and not subject to a substantial risk of forfeiture, for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

6. <u>Restrictions on Exercise</u>. This Option may not be exercised until such time as the Plan has been approved by the shareholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7. <u>Non-Transferability of Option</u>. This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

8. <u>Term of Option</u>. This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

9. <u>Tax Obligations</u>.

(a) <u>Withholding Taxes</u>. Optionee agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise. Optionee acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b) <u>Notice of Disqualifying Disposition of ISO Shares</u>. If the Option granted to Optionee herein is an ISO, and if Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (1) the date two years after the Date of Grant, and (2) the date one year after the date of exercise, the Optionee shall immediately notify the Company in writing of such disposition. Optionee agrees that Optionee may be subject to income tax withholding by the Company on the compensation income recognized by the Optionee.

Confidential

**ER-15218**

THER-AZ-01126807

10.    Entire Agreement; Governing Law.   The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.  This Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

11.    No Guarantee of Continued Service.  OPTIONEE AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER).  OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

12.    Code Section 409A.   Under Code Section 409A, an option that vests after December 31, 2004 that was granted with a per share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the fair market value of a Share of Common Stock on the date of grant (a "discount option") may be considered "deferred compensation".  An option that is a "discount option" may result in (i) income recognition by the Optionee prior to the exercise of the option, (ii) an additional twenty percent (20%) tax, and (iii) potential penalty and interest charges.  Optionee acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per share exercise price of this Option equals or exceeds the fair market value of a Share of Common Stock on the date of grant in a later examination.  Optionee agrees that if the IRS determines that the Option was granted with a per share exercise price that was less than the fair market value of a Share of Common Stock on the date of grant, Optionee will be solely responsible for Optionee's costs related to such a determination.

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof.  Optionee further acknowledges that the Total Number of Shares Granted and the Exercise Price per Share in all cases, as set forth in the Notice of Grant in Part I of this Agreement, give effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on December __, 2013. [Optionee further acknowledges that the Total Number of Shares Granted and the Exercise Price per Share in all cases, as set forth in the Notice of Grant in Part I of this Agreement under "Pre-Split Exercise Per Share" and "Total Number of Pre-Split Shares Granted", do not give effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on March 28, 2013 (the "*March Certificate*").  The Company expects to file a certificate of correction with the Secretary of State of Delaware to replace the March Certificate upon the filing of the new certificate of incorporation, also setting forth a 5 to 1 forward stock split (the "*New Certificate*").  Optionee further acknowledges that pursuant to

Confidential

THER-AZ-01126808

Section 15(a) of the Plan, the Total Number of Shares Granted and the Exercise Price per Share shall be proportionately adjusted to the extent the 5 to 1 forward stock split, as indicated under "Post-Split Exercise Price Per Share" and "Total Number of Post-Split Shares Granted") contained in either the March Certificate or the New Certificate is effective.] Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

**OPTIONEE**                                    **THERANOS, INC.**

_____        _____
Signature                                       By

_____        _____
Print Name                                      Title

_____
_____
Residence Address

Confidential

**ER-15220**

THER-AZ-01126809

**EXHIBIT A**

**2004 STOCK PLAN**

**EXERCISE NOTICE**

**Theranos, Inc.**
**1601 S. California Avenue**
**Palo Alto, CA 94304**

Attention: _____

1.      Exercise of Option.  Effective as of today, _____, _____, the undersigned (*"Optionee"*) hereby elects to exercise Optionee's option to purchase _____ shares of the Common Stock (the *"Shares"*) of Theranos, Inc. (the *"Company"*) under and pursuant to the 2004 Stock Plan (the *"Plan"*) and the Stock Option Agreement dated _____, _____ (the *"Option Agreement"*).

2.      Delivery of Payment.  Optionee herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

3.      Representations of Optionee.  Optionee acknowledges that Optionee has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4.      Rights as Shareholder.  Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  The Shares shall be issued to the Optionee as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in **Section 13** of the Plan.

5.      Company's Right of First Refusal.  Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

        (a)      Notice of Proposed Transfer.  The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

Confidential                    **ER-15221**                    THER-AZ-01126810

(b)  Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)  Purchase Price.  The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)  Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)  Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)  Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section.  *"Immediate Family"* as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)  Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

6.  Tax Consultation.  Optionee understands that Optionee may suffer adverse tax consequences as a result of Optionee's purchase or disposition of the Shares.  Optionee represents that Optionee has consulted with any tax consultants Optionee deems advisable in connection with

Confidential

THER-AZ-01126811

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Amy Mason Saharia*
AMY MASON SAHARIA

April 17, 2023