No. 22-10312

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ELIZABETH A. HOLMES

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 5:18-CR-00258
Hon. Edward J. Davila

**EXCERPTS OF RECORD**
**VOL. LIII of LVII | ER-15224 to ER-15521**

JOHN D. CLINE
LAW OFFICE OF JOHN D. CLINE
  600 Stewart Street
  Suite 400
  Seattle, WA 98101
  (360) 320-6435

KEVIN M. DOWNEY
LANCE A. WADE
AMY MASON SAHARIA
KATHERINE A. TREFZ
WILLIAMS & CONNOLLY LLP
  680 Maine Ave. S.W.
  Washington, D.C. 200024
  (202) 434-5000
  asaharia@wc.com

the purchase or disposition of the Shares and that Optionee is not relying on the Company for any tax advice.

    7.   <u>Restrictive Legends and Stop-Transfer Orders.</u>

    (a)   <u>Legends</u>. Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY

    (b)   <u>Stop-Transfer Notices</u>. Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

    (c)   <u>Refusal to Transfer</u>. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

    8.   <u>Successors and Assigns</u>. The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of

Confidential       THER-AZ-01126812

the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

9.     Interpretation.  Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Optionee or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting.  The resolution of such a dispute by the Administrator shall be final and binding on all parties.

10.     Governing Law; Severability.   This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of Delaware.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice will continue in full force and effect.

11.     Entire Agreement.   The Plan and Option Agreement are incorporated herein by reference.  This Exercise Notice, the Plan, the Restricted Stock Purchase Agreement, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

Submitted by:                                           Accepted by:

OPTIONEE                                              THERANOS, INC.


_____          _____
Signature                                               By

_____          _____
Print Name                                             Its

Address:                                                 Address:
_____          1601 S. California Avenue
_____          Palo Alto, CA  94304
_____

                                                          _____
                                                          Date Received

Confidential                                                                    THER-AZ-01126813

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

OPTIONEE      :

COMPANY      :      THERANOS, INC.

SECURITY      :      COMMON STOCK

AMOUNT      :

DATE      :

In connection with the purchase of the above-listed Securities, the undersigned Optionee represents to the Company the following:

(a) Optionee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Optionee is acquiring these Securities for investment for Optionee's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the **"*Securities Act*"**).

(b) Optionee acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Optionee's investment intent as expressed herein. In this connection, Optionee understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Optionee's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, or for until an increase or decrease in the market price of the Securities, or for a period of one year or any other fixed period in the future. Optionee further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Optionee further acknowledges and understands that the Company is under no obligation to register the Securities. Optionee understands that the certificate evidencing the Securities will be imprinted with any legend required under applicable state securities laws.

(c) Optionee is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Optionee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such

C:\Users\rri\Desktop\Theranos _ Form SOA (2004 Plan Dec 2013 grants).docx)  -1-

longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which requires the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

(d) Optionee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Optionee understands that no assurances can be given that any such other registration exemption will be available in such event.

Signature of Optionee:

_____

Date:_____

Confidential

THER-AZ-01126815

**ER-15228**

**EXHIBIT J**
**Form of Stock Option Agreement – Early Exercise (2004 Plan)**



Confidential

**THERANOS, INC.**

**2004 STOCK PLAN**

**STOCK OPTION AGREEMENT — EARLY EXERCISE**

Unless otherwise defined herein, the terms defined in the 2004 Stock Plan shall have the same defined meanings in this Stock Option Agreement.

**I.    NOTICE OF STOCK OPTION GRANT**

**Name:**

**Address:**      _____

_____

The undersigned Optionee has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant:

Vesting Commencement Date:

[Pre-Split Exercise Price per Share[1]:]

[Post-Split] Exercise Price per Share[1]:

[Total Number of Pre-Split Shares Granted[2]]:

_____

[1] [*The "Pre-Split Price" represents the exercise price per share before giving effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on March 28, 2013 (the "March Certificate"). The Company expects to file a certificate of correction with the Secretary of State of Delaware (the "Certificate of Correction") to replace the March Certificate upon the filing of a new certificate of incorporation setting forth a 5 to 1 forward stock split (the "New Certificate"). To the extent the 5 to 1 forward stock split contained in either the March Certificate or the New Certificate is effective, the "Post-Split Price" shall be the effective exercise price per share. At such times as the 5 to 1 forward split is not effective because neither the March Certificate nor the New Certificate are effective (including at such time as the Certificate of Correction has been filed but the New Certificate has not yet been filed), the "Pre-Split Price" shall be effective.*]

[2] [*This "Pre-Split Shares" number represents the shares subject to the option before giving effect to the 5 to 1 forward stock split, which stock split is contained in the March Certificate. The Company expects to file the Certificate of Correction to replace the March Certificate upon the filing of the New Certificate. To the extent the 5 to 1 forward stock split contained in either the March Certificate or the New Certificate is effective, the "Post-Split Shares" number shall be the effective number of shares granted. At such times as the 5 to 1 forward split is not effective because neither the March Certificate nor the New Certificate are effective (including at such time as the Certificate of Correction has been filed but the New Certificate has not yet been filed), the "Pre-Split Shares" number shall be effective.*]

Confidential

THER-AZ-01126817

Total Number of [Post-Split] Shares Granted[2]:

Total Exercise Price:

Type of Option:                                    Incentive Stock Option

                                                        Nonstatutory Stock Option

Term/Expiration Date:                        [Maximum Term is 5 years for new hire and consulting grants and 10 years for performance grants]

<u>Vesting Schedule</u>:

This Option shall be exercisable in whole or in part, according to the following vesting schedule:

**[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and 1/48 of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date, subject to Optionee continuing to be a Service Provider through each such date.]**

<u>Termination Period</u>:

This Option shall be exercisable for three (3) months after Optionee ceases to be a Service Provider.  Upon Optionee's death or Disability, this Option shall be exercisable for one (1) year after Optionee ceases to be Service Provider.  In no event may Optionee exercise this Option after the Term/Expiration Date as provided above.

## II.  **AGREEMENT**

1.      <u>Grant of Option</u>.  The Administrator of the Company hereby grants to the Optionee named in the Notice of Grant in Part I of this Agreement (the **"*Optionee*"**), an option (the **"*Option*"**) to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the **"*Exercise Price*"**), and subject to the terms and conditions of the Plan, which is incorporated herein by reference.  Subject to **Section 15(c)** of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Grant as an Incentive Stock Option (**"*ISO*"**), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code.  Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option (**"*NSO*"**).

2.      <u>Exercise of Option</u>.  This Option shall be exercisable during its term in accordance with the provisions of **Section 10** of the Plan as follows:

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc          Page 2

Confidential                                                                                                                                    THER-AZ-01126818

       (a)    <u>Right to Exercise</u>.

        (i)    Subject to subsections 2(a)(ii) and 2(a)(iii) below, this Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. Alternatively, at the election of the Optionee, this Option may be exercised in whole or in part at any time as to Shares that have not yet vested. Vested Shares shall not be subject to the Company's repurchase right (as set forth in the Restricted Stock Purchase Agreement, attached hereto as **Exhibit C-1**).

        (ii)    As a condition to exercising this Option for unvested Shares, the Optionee shall execute the Restricted Stock Purchase Agreement.

        (iii)    This Option may not be exercised for a fraction of a Share.

       (b)    <u>Method of Exercise</u>. This Option shall be exercisable by delivery of an exercise notice in the form attached as **Exhibit A** (the **"Exercise Notice"**), which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

       No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

       3.    <u>Optionee's Representations</u>. In the event the Shares have not been registered under the Securities Act of 1933, as amended, at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as **Exhibit B**.

       4.    <u>Lock-Up Period</u>. Optionee hereby agrees that Optionee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Optionee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

       Optionee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Optionee

Confidential                  THER-AZ-01126819

shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period. Optionee agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section.

5.  <u>Method of Payment</u>.  Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)  cash;

(b)  check;

(c)  [tender of a promissory note on such terms and conditions as provided by the Company;]

(d)  consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(e)  surrender of other Shares which, (i) in the case of Shares acquired from the Company, either directly or indirectly, have been owned by the Optionee, and not subject to a substantial risk of forfeiture, for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

6.  <u>Restrictions on Exercise</u>.  This Option may not be exercised until such time as the Plan has been approved by the shareholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7.  <u>Non-Transferability of Option</u>.  This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

8.  <u>Term of Option</u>.  This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

9.  <u>Tax Obligations</u>.

(a)  <u>Withholding Taxes</u>.  Optionee agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all

Confidential

THER-AZ-01126820

Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise. Optionee acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b)     Notice of Disqualifying Disposition of ISO Shares.  If the Option granted to Optionee herein is an ISO, and if Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (1) the date two years after the Date of Grant, and (2) the date one year after the date of exercise, the Optionee shall immediately notify the Company in writing of such disposition.  Optionee agrees that Optionee may be subject to income tax withholding by the Company on the compensation income recognized by the Optionee.

10.     Entire Agreement; Governing Law.  The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.  This Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

11.     No Guarantee of Continued Service.  OPTIONEE AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER).  OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

12.     Code Section 409A.  Under Code Section 409A, an option that vests after December 31, 2004 that was granted with a per share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the fair market value of a Share of Common Stock on the date of grant (a "discount option") may be considered "deferred compensation".  An option that is a "discount option" may result in (i) income recognition by the Optionee prior to the exercise of the option, (ii) an additional twenty percent (20%) tax, and (iii) potential penalty and interest charges.  Optionee acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per share exercise price of this Option equals or exceeds the fair market value of a Share of Common Stock on the date of grant in a later examination.  Optionee agrees that if the IRS determines that the Option was granted with a per share exercise price that was less than the fair market value of a Share of Common Stock on the date of grant, Optionee will be solely responsible for Optionee's costs related to such a determination.

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and

Confidential

provisions thereof. Optionee further acknowledges that the Total Number of Shares Granted and the Exercise Price per Share in all cases, as set forth in the Notice of Grant in Part I of this Agreement, give effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on December __, 2013. [Optionee further acknowledges that the Total Number of Shares Granted and the Exercise Price per Share in all cases, as set forth in the Notice of Grant in Part I of this Agreement under "Pre-Split Exercise Per Share" and "Total Number of Pre-Split Shares Granted", do not give effect to the 5 to 1 forward stock split, which stock split is contained in the Company's certificate of incorporation filed with the Secretary of State of Delaware on March 28, 2013 (the "*March Certificate*"). The Company expects to file a certificate of correction with the Secretary of State of Delaware to replace the March Certificate upon the filing of a new certificate of incorporation, also setting forth a 5 to 1 forward stock split (the "*New Certificate*"). Optionee further acknowledges that pursuant to Section 15(a) of the Plan, the Total Number of Shares Granted and the Exercise Price per Share shall be proportionately adjusted to the extent the 5 to 1 forward stock split, as indicated under "Post-Split Exercise Price Per Share" and "Total Number of Post-Split Shares Granted") contained in either the March Certificate or the New Certificate is effective.] Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

**OPTIONEE**      **THERANOS, INC.**

_____  _____
Signature          By

_____  _____
Print Name         Title

_____
Residence Address

Confidential        THER-AZ-01126822

**EXHIBIT A**

**2004 STOCK PLAN**

**EXERCISE NOTICE**

**Theranos, Inc.**
**1601 S. California Avenue**
**Palo Alto, CA 94304**

Attention: _____

    1.    <u>Exercise of Option</u>.  Effective as of today, _____, _____, the undersigned (*"Optionee"*) hereby elects to exercise Optionee's option to purchase _____ shares of the Common Stock (the *"Shares"*) of Theranos, Inc. (the *"Company"*) under and pursuant to the 2004 Stock Plan (the *"Plan"*) and the Stock Option Agreement dated _____, _____ (the *"Option Agreement"*).

    2.    <u>Delivery of Payment</u>.  Optionee herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

    3.    <u>Representations of Optionee</u>.  Optionee acknowledges that Optionee has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

    4.    <u>Rights as Shareholder</u>.  Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  The Shares shall be issued to the Optionee as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in **Section 13** of the Plan.

    5.    <u>Company's Right of First Refusal</u>.  Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

    (a)    <u>Notice of Proposed Transfer</u>.  The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc       Page 1

Confidential        THER-AZ-01126823

(b)   Exercise of Right of First Refusal.   At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)   Purchase Price.   The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)   Payment.   Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)   Holder's Right to Transfer.   If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)   Exception for Certain Family Transfers.   Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)   Termination of Right of First Refusal.   The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

6.   Tax Consultation.   Optionee understands that Optionee may suffer adverse tax consequences as a result of Optionee's purchase or disposition of the Shares.  Optionee represents that Optionee has consulted with any tax consultants Optionee deems advisable in connection with

Confidential

THER-AZ-01126824

the purchase or disposition of the Shares and that Optionee is not relying on the Company for any tax advice.

7.    Restrictive Legends and Stop-Transfer Orders.

(a)    Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY

(b)    Stop-Transfer Notices.  Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

8.    Successors and Assigns.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of

Confidential

THER-AZ-01126825

the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

        9.    <u>Interpretation</u>. Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Optionee or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting. The resolution of such a dispute by the Administrator shall be final and binding on all parties.

        10.    <u>Governing Law; Severability</u>. This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of Delaware. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice will continue in full force and effect.

        11.    <u>Entire Agreement</u>. The Plan and Option Agreement are incorporated herein by reference. This Exercise Notice, the Plan, the Restricted Stock Purchase Agreement, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

Submitted by:                      Accepted by:

OPTIONEE                      THERANOS, INC.


_____        _____
Signature                      By

_____        _____
Print Name                   Its

<u>Address</u>:                        <u>Address</u>:
_____      1601 S. California Avenue
_____      Palo Alto, CA 94304
_____


                            _____
                            Date Received

Confidential                                THER-AZ-01126826

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

| | | |
|---|---|---|
| OPTIONEE | : | |
| COMPANY | : | THERANOS, INC. |
| SECURITY | : | COMMON STOCK |
| AMOUNT | : | |
| DATE | : | |

In connection with the purchase of the above-listed Securities, the undersigned Optionee represents to the Company the following:

(a)    Optionee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Optionee is acquiring these Securities for investment for Optionee's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the ***"Securities Act"***).

(b)    Optionee acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Optionee's investment intent as expressed herein. In this connection, Optionee understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Optionee's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, or for until an increase or decrease in the market price of the Securities, or for a period of one year or any other fixed period in the future. Optionee further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Optionee further acknowledges and understands that the Company is under no obligation to register the Securities. Optionee understands that the certificate evidencing the Securities will be imprinted with any legend required under applicable state securities laws.

(c)    Optionee is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Optionee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such

Confidential                                                                 THER-AZ-01126827

**ER-15240**

longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which requires the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

(d) Optionee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Optionee understands that no assurances can be given that any such other registration exemption will be available in such event.

Signature of Optionee:

_____

Date:_____

Confidential

THER-AZ-01126828

**EXHIBIT C-1**

**THERANOS, INC.**

**2004 STOCK PLAN**

**RESTRICTED STOCK PURCHASE AGREEMENT**

THIS AGREEMENT is made between _____ (the *"Purchaser"*) and **Theranos, Inc.** (the *"Company"*) or its assignees of rights hereunder as of _____, _____.

Unless otherwise defined herein, the terms defined in the 2004 Stock Plan shall have the same defined meanings in this Agreement.

<u>RECITALS</u>

A. Pursuant to the exercise of the option granted to Purchaser under the Plan and pursuant to the Option Agreement dated _____, _____ by and between the Company and Purchaser with respect to such grant (the *"Option"*), which Plan and Option Agreement are hereby incorporated by reference, Purchaser has elected to purchase _____ of those shares of Common Stock which have not become vested under the vesting schedule set forth in the Option Agreement (*"Unvested Shares"*). The Unvested Shares and the shares subject to the Option Agreement, which have become vested are sometimes collectively referred to herein as the *"Shares."*

B. As required by the Option Agreement, as a condition to Purchaser's election to exercise the option, Purchaser must execute this Agreement, which sets forth the rights and obligations of the parties with respect to Shares acquired upon exercise of the Option.

1. <u>Repurchase Option</u>.

(a) If Purchaser's status as a Service Provider is terminated for any reason, including for death and Disability, the Company shall have the right and option for ninety (90) days from such date to purchase from Purchaser, or Purchaser's personal representative, as the case may be, all of the Purchaser's Unvested Shares as of the date of such termination at the price paid by the Purchaser for such Shares (the *"Repurchase Option"*).

(b) Upon the occurrence of such termination, the Company may exercise its Repurchase Option by delivering personally or by registered mail, to Purchaser (or his transferee or legal representative, as the case may be) with a copy to the escrow agent described in Section 2 below, a notice in writing indicating the Company's intention to exercise the Repurchase Option AND, at the Company's option, (i) by delivering to the Purchaser (or the Purchaser's transferee or legal representative) a check in the amount of the aggregate repurchase price, or (ii) by the Company canceling an amount of the Purchaser's indebtedness to the Company equal to the aggregate repurchase price, or (iii) by a combination of (i) and (ii) so that the combined payment and cancellation of indebtedness equals such aggregate repurchase price. Upon delivery of such notice

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc        Page 1

Confidential                                                                                    THER-AZ-01126829

and payment of the aggregate repurchase price in any of the ways described above, the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and the rights and interests therein or relating thereto, and the Company shall have the right to retain and transfer to its own name the number of Unvested Shares being repurchased by the Company.

(c)     Whenever the Company shall have the right to repurchase Unvested Shares hereunder, the Company may designate and assign one or more employees, officers, directors or shareholders of the Company or other persons or organizations to exercise all or a part of the Company's Repurchase Option under this Agreement and purchase all or a part of such Unvested Shares.

(d)     If the Company does not elect to exercise the Repurchase Option conferred above by giving the requisite notice within ninety (90) days following the termination, the Repurchase Option shall terminate.

(e)     The Repurchase Option shall terminate in accordance with the vesting schedule contained in Purchaser's Option Agreement.

2.     <u>Transferability of the Shares; Escrow</u>.

(a)     Purchaser hereby authorizes and directs the Secretary of the Company, or such other person designated by the Company, to transfer the Unvested Shares as to which the Repurchase Option has been exercised from Purchaser to the Company.

(b)     To insure the availability for delivery of Purchaser's Unvested Shares upon repurchase by the Company pursuant to the Repurchase Option under Section 1, Purchaser hereby appoints the Secretary, or any other person designated by the Company as escrow agent (the **"Escrow Agent"**), as its attorney-in-fact to sell, assign and transfer unto the Company, such Unvested Shares, if any, repurchased by the Company pursuant to the Repurchase Option and shall, upon execution of this Agreement, deliver and deposit with the Escrow Agent, the share certificates representing the Unvested Shares, together with the stock assignment duly endorsed in blank, attached hereto as **Exhibit C-2**.  The Unvested Shares and stock assignment shall be held by the Escrow Agent in escrow, pursuant to the Joint Escrow Instructions of the Company and Purchaser attached as **Exhibit C-3** hereto, until the Company exercises its Repurchase Option, until such Unvested Shares are vested, or until such time as this Agreement no longer is in effect.  Upon vesting of the Unvested Shares, the Escrow Agent shall promptly deliver to the Purchaser the certificate or certificates representing such Shares in the Escrow Agent's possession belonging to the Purchaser, and the Escrow Agent shall be discharged of all further obligations hereunder; provided, however, that the Escrow Agent shall nevertheless retain such certificate or certificates as Escrow Agent if so required pursuant to other restrictions imposed pursuant to this Agreement.

(c)     The Company nor the Escrow Agent shall be liable for any act it may do or omit to do with respect to holding the Shares in escrow and while acting in good faith and in the exercise of its judgment.

(d)     Transfer or sale of the Shares is subject to restrictions on transfer imposed by any applicable state and federal securities laws.  Any transferee shall hold such Shares subject to all the provisions hereof and the Exercise Notice executed by the Purchaser with respect to any

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc          Page 2

Unvested Shares purchased by Purchaser and shall acknowledge the same by signing a copy of this Agreement.

3.    Ownership, Voting Rights, Duties.  This Agreement shall not affect in any way the ownership, voting rights or other rights or duties of Purchaser, except as specifically provided herein.

4.    Legends.  The share certificate evidencing the Shares issued hereunder shall be endorsed with the following legend (in addition to any legend required under applicable federal and state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AND RIGHTS OF REPURCHASE AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

5.    Adjustment for Stock Split.  All references to the number of Shares and the purchase price of the Shares in this Agreement shall be appropriately adjusted to reflect any stock split, stock dividend or other change in the Shares, which may be made by the Company pursuant to **Section 13** of the Plan after the date of this Agreement.

6.    Notices.  Notices required hereunder shall be given in person or by registered mail to the address of Purchaser shown on the records of the Company, and to the Company at their respective principal executive offices.

7.    Survival of Terms.  This Agreement shall apply to and bind Purchaser and the Company and their respective permitted assignees and transferees, heirs, legatees, executors, administrators and legal successors.

8.    Section 83(b) Election.  Purchaser hereby acknowledges that he or she has been informed that, with respect to the exercise of an Option for Unvested Shares, an election (the **"Election"**) may be filed by the Purchaser with the Internal Revenue Service, within thirty (30) days of the purchase of the exercised Shares, electing pursuant to Section 83(b) of the Code to be taxed currently on any difference between the purchase price of the exercised Shares and their Fair Market Value on the date of purchase.  In the case of a Nonstatutory Stock Option, this will result in a recognition of taxable income to the Purchaser on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the Option is exercised over the purchase price for the exercised Shares.  Absent such an Election, taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses.  In the case of an Incentive Stock Option, such an Election will result in a recognition of income to the Purchaser for alternative minimum tax purposes on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the option is exercised, over the purchase price for the exercised Shares.  Absent such an Election, alternative minimum taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses. Purchaser is strongly encouraged to seek the advice of his or her own tax consultants in connection with the purchase of the Shares and the advisability

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc        Page 3

Confidential        THER-AZ-01126831

of filing of the Election under Section 83(b) of the Code. A form of Election under Section 83(b) is attached hereto as **Exhibit C-4** for reference.

PURCHASER ACKNOWLEDGES THAT IT IS PURCHASER'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF PURCHASER REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON PURCHASER'S BEHALF.

9. <u>Representations</u>. Purchaser has reviewed with his own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement. Purchaser is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. Purchaser understands that he (and not the Company) shall be responsible for his own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

10. <u>Governing Law</u>. This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of Delaware.

Purchaser represents that he has read this Agreement and is familiar with its terms and provisions. Purchaser hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under this Agreement.

IN WITNESS WHEREOF, this Agreement is deemed made as of the date first set forth above.

OPTIONEE                                           THERANOS, INC.

_____        _____
Signature                                          By

_____        _____
Print Name                                         Title

_____
Residence Address

Dated: _____, _____

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc        Page 4

Confidential                                                                THER-AZ-01126832

**EXHIBIT C-2**

**ASSIGNMENT SEPARATE FROM CERTIFICATE**


FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto Theranos, Inc. _____ (_____) shares of the Common Stock of Theranos, Inc. standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said stock on the books of the within named corporation with full power of substitution in the premises.

This Stock Assignment may be used only in accordance with the Restricted Stock Purchase Agreement between Theranos, Inc. and the undersigned dated _____, _____ (the "*Agreement*").


Dated: _____,_____          Signature:_____


INSTRUCTIONS: Please do not fill in any blanks other than the signature line. The purpose of this assignment is to enable the Company to exercise its "repurchase option," as set forth in the Agreement, without requiring additional signatures on the part of the Purchaser.


Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc          Page 1

Confidential                                    THER-AZ-01126833

**EXHIBIT C-3**

**JOINT ESCROW INSTRUCTIONS**

_____, 20__

Theranos, Inc.
1601 S. California Avenue
Palo Alto, CA 94304
Attention: Secretary

Dear _____:

As Escrow Agent for both Theranos, Inc. (the **"Company"**), and the undersigned purchaser of stock of the Company (the **"Purchaser"**), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Restricted Stock Purchase Agreement (the **"Agreement"**) between the Company and the undersigned, in accordance with the following instructions:

1.      In the event the Company and/or any assignee of the Company (referred to collectively for convenience herein as the **"Company"**) exercises the Company's repurchase option set forth in the Agreement, the Company shall give to Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company.  Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2.      At the closing, you are directed (a) to date the stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver the stock assignments, together with the certificate evidencing the shares of stock to be transferred, to the Company or its assignee, against the simultaneous delivery to you of the purchase price (by cash, a check, or some combination thereof) for the number of shares of stock being purchased pursuant to the exercise of the Company's repurchase option.

3.      Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement.  Purchaser does hereby irrevocably constitute and appoint you as Purchaser's attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated, including but not limited to the filing with any applicable state blue sky authority of any required applications for consent to, or notice of transfer of, the securities. Subject to the provisions of this paragraph 3, Purchaser shall exercise all rights and privileges of a stockholder of the Company while the stock is held by you.

4.      Upon written request of the Purchaser, but no more than once per calendar year, unless the Company's repurchase option has been exercised, you will deliver to Purchaser a

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc        Page 1

Confidential                                                                THER-AZ-01126834

certificate or certificates representing so many shares of stock as are not then subject to the Company's repurchase option. Within 120 days after cessation of Purchaser's continuous employment by or services to the Company, or any parent or subsidiary of the Company, you will deliver to Purchaser a certificate or certificates representing the aggregate number of shares held or issued pursuant to the Agreement and not purchased by the Company or its assignees pursuant to exercise of the Company's repurchase option.

5.      If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to Purchaser, you shall deliver all of the same to Purchaser and shall be discharged of all further obligations hereunder.

6.      Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.      You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.      You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

9.      You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

10.     You shall not be liable for the outlawing of any rights under the Statute of Limitations with respect to these Joint Escrow Instructions or any documents deposited with you.

11.     You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

12.     Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be an officer or agent of the Company or if you shall resign by written notice to each party. In the event of any such termination, the Company shall appoint a successor Escrow Agent.

13.     If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

Confidential                                                                    THER-AZ-01126835

14.     It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

15.     Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties thereunto entitled at the following addresses or at such other addresses as a party may designate by ten days' advance written notice to each of the other parties hereto.

16.     By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

17.     This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

18.     These Joint Escrow Instructions shall be governed by the internal substantive laws, but not the choice of law rules, of Delaware.

PURCHASER                                    THERANOS, INC.

_____          _____
Signature                                    By

_____          _____
Print Name                                   Title

_____
Residence Address

ESCROW AGENT

_____
Corporate Secretary

Dated: _____,_____

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc          Page 3

Confidential                                    THER-AZ-01126836

**IF YOU WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF SUCH ELECTION IS <u>YOUR</u> RESPONSIBILITY.**

## *<u>THE FORM FOR MAKING THIS SECTION 83(B) ELECTION IS ATTACHED TO THIS AGREEMENT AS EXHIBIT C-4.</u>*

## *<u>YOU MUST FILE THIS FORM WITHIN 30 DAYS OF PURCHASING THE SHARES.</u>*

## *<u>YOU (AND NOT THE COMPANY OR ANY OF ITS AGENTS) SHALL BE SOLELY RESPONSIBLE FOR FILING SUCH FORM WITH THE IRS, EVEN IF YOU REQUEST THE COMPANY OR ITS AGENTS TO MAKE THIS FILING ON YOUR BEHALF AND EVEN IF THE COMPANY OR ITS AGENTS HAVE PREVIOUSLY MADE THIS FILING ON YOUR BEHALF.</u>*

*<u>The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See &lt;www.irs.gov&gt;</u>*

Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc     Page 1

Confidential

THER-AZ-01126837

**EXHIBIT C-4**

**ELECTION UNDER SECTION 83(b)**
**OF THE INTERNAL REVENUE CODE OF 1986**

The undersigned taxpayer hereby elects, pursuant to Sections 55 and 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income or alternative minimum taxable income, as the case may be, for the current taxable year the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below

1.     The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

   NAME:                    TAXPAYER:                    SPOUSE:

   ADDRESS:

   IDENTIFICATION NO.:      TAXPAYER:                    SPOUSE:

   TAXABLE YEAR:

2.     The property with respect to which the election is made is described as follows: _____ shares (the *"Shares"*) of the Common Stock of Theranos, Inc. (the *"Company"*).

3.     The date on which the property was transferred is:_____ ,_____.

4.     The property is subject to the following restrictions:

   The Shares may not be transferred and are subject to forfeiture under the terms of an agreement between the taxpayer and the Company.  These restrictions lapse upon the satisfaction of certain conditions contained in such agreement.

5.     The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is:  $_____.

6.     The amount (if any) paid for such property is:  $_____.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property.  The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated: _____, _____          _____
                                             Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated: _____, _____          _____
                                             Spouse of Taxpayer

C:\Users\rri\Desktop\Theranos _ Form Early Exercise SOA (2004 Plan Dec 2013 grants).doc  (43549)                    -1-

Confidential                                                                    THER-AZ-01126838

**ER-15251**

**EXHIBIT K**
**Stock Option Grants**

**Executive Management & Director Stock Option Grants**

| Name | Securities Exemption | Option Type | Pre-Split Shares | Post-Split Shares | Vesting Commencement Date | Vesting Schedule | Grant Reason | Jurisdiction |
|------|------|------|------|------|------|------|------|------|
| Sunny Balwani | 701 | ISO | 700,000 | 3,500,000 | 12/1/2012 | (1), (4), (5) | Performance | CA |
| Elizabeth Holmes | 4(2) | NSO | 10,741,166 | 53,705,830 | 12/1/2012 | (2), (4), (5) | Performance | CA |
| Gary Roughead | 701 | NSO* | 100,000 | 500,000 | 1/14/2013 | (3), (5) | New Director Grant | VA |
| William J. Perry | 701 | NSO* | 100,000 | 500,000 | 1/14/2013 | (3), (5) | New Director Grant | CA |
| Samuel Nunn | 701 | NSO* | 100,000 | 500,000 | 1/14/2013 | (3), (5) | New Director Grant | GA |
| Henry A. Kissinger | 701 | NSO* | 100,000 | 500,000 | 1/14/2013 | (3), (5) | New Director Grant | NY |
| James N. Mattis | 701 | NSO* | 100,000 | 500,000 | 7/29/2013 | (3), (5) | New Director Grant | CA |
| Richard Kovacevich | 701 | NSO* | 100,000 | 500,000 | 7/29/2013 | (3), (5) | New Director Grant | CA |
| *Total* | | | 12,041,166 | 60,205,830 | | | | |

\* This Management Option shall have a maximum term of ten (10) years (subject to earlier termination following the Management Optionee's ceasing to be a Director or as otherwise provided by the 2004 Plan). Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(1) Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be a Service Provider through

Confidential

THER-AZ-01126839

each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(2) One forty-eighth (1/48th) of the Shares subject to the Option shall vest on the one (1) month anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be a Service Provider through each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(3) One forty-eighth (1/48th) of the Shares subject to the Option shall vest on the one (1) month anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be a Director through each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(4) In the event of an Involuntary Termination (as defined below) of Optionee's employment with the Company within twelve (12) months following a Change of Control (as defined below), all of Optionee's outstanding unvested Shares subject to the Option shall become immediately vested and the Options shall become fully exercisable. "*Involuntary Termination*" shall mean (i) without Optionee's express written consent, the significant reduction of Optionee's duties, authority, or responsibilities relative to Optionee's duties, authority, and responsibilities as in effect immediately prior to such reduction or the assignment to Optionee of such reduced duties, authority, or responsibilities; (ii) without Optionee's express written consent, a material reduction by the Company in the base compensation of Optionee as in effect immediately prior to such reduction (other than an across-the-board reduction for all similar situated employees); (iii) without Optionee's express written consent, a reduction by the Company in the kind or level of employee benefits to which Optionee is entitled immediately prior to such reduction which is not applicable to all employees of the Company and which results in Optionee's overall benefits package being significantly reduced; or (iv) any purported termination by the Company of Optionee's status as an employee of the Company which is not effected for death, disability, or for Cause (as defined below). "*Cause*" shall mean (i) Optionee's repeated failure to perform his or her duties or responsibilities as an employee as directed or assigned by the Board (or its designee) from time to time, after written notice thereof from the Board (or its designee) to Optionee setting forth in reasonable detail the respects in which the Company believes Optionee has not performed such duties or responsibilities; (ii) Optionee's personally engaging in knowing and intentional illegal conduct which is seriously injurious to the Company or its affiliates; (iii) Optionee's being convicted of a felony, or committing an act of dishonesty or fraud against, or the misappropriation of property belonging to, the Company or its affiliates; or (iv) any breach by Optionee of any provision of any non-disclosure or invention assignment or similar agreement with the Company or any breach of any written code of conduct or policy of the Company. "*Change of Control*" shall mean the occurrence of any of the following events: (i) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (the "*Exchange Act*") becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities, except that, prior to the effectiveness of the Company's Form S-1 registration statement filed with the Securities and Exchange Commission in connection with the Company's initial public offering, any change in the beneficial ownership of the securities of the Company that is approved by the Board shall not be deemed to be a Change in Control unless the Board expressly provides otherwise; (ii) the consummation of the sale or disposition by the Company of all or substantially all of the Company's assets or (iii) the consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation. Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (i) its sole purpose is to change the state of the Company's

incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

(5)  This option is early exercisable.

## Employee Stock Option Grants

| Name | Securities Exemption | Option Type | Pre-Split Shares | Post-Split Shares | Vesting Commencement Date | Vesting Schedule | Grant Reason | Jurisdiction |
|---|---|---|---|---|---|---|---|---|
| Scott Marmer | 701 | ISO | 4,000 | 20,000 | 3/28/2012 | (1),(2) | Performance | CA |
| So Han Spivey | 701 | ISO | 3,000 | 15,000 | 3/29/2013 | (1) | Performance | CA |
| Scott Tabakman | 701 | ISO | 2,000 | 10,000 | 4/13/2013 | (1) | Performance | CA |
| Pranav Patel | 701 | ISO | 2,000 | 10,000 | 4/1/2013 | (1) | Performance | CA |
| Chinmay Pangarkar | 701 | ISO | 2,000 | 10,000 | 2/15/2013 | (1) | Performance | CA |
| Thomas Waggoner | 701 | ISO | 1,000 | 5,000 | 6/29/2013 | (1) | Performance | CA |
| Deborah Sloan | 701 | ISO | 2,000 | 10,000 | 4/1/2013 | (1) | Performance | CA |
| Martin Schoeller | 701 | NSO * | 13,333 | 66,667 | 9/8/2013 | (3) | Consulting Agreement | NY |
| Frederick Christians | 701 | ISO * | 1,000 | 5,000 | 2/8/2012 | (1) | New Hire | CA |
| Samartha Anekal | 701 | ISO | 4,500 | 22,500 | 3/12/2012 | (1) | Performance | CA |
| Sani Hadziahmetovic | 701 | ISO | 3,000 | 15,000 | 3/28/2012 | (1) | Performance | CA |
| Daniel Edlin | 701 | ISO | 3,000 | 15,000 | 3/28/2012 | (1) | Performance | CA |
| Nicholas Menchel | 701 | ISO | 3,000 | 15,000 | 3/28/2012 | (1) | Performance | CA |
| Jeffrey Blickman | 701 | ISO | 3,000 | 15,000 | 3/28/2012 | (1) | Performance | CA |
| Christian Holmes | 701 | ISO | 7,000 | 35,000 | 3/28/2012 | (1) | Performance | CA |

Confidential

THER-AZ-01126841

| Tim Smith | 701 | ISO | 2,000 | 10,000 | 4/23/2012 | (1) | Performance | CA |
|---|---|---|---|---|---|---|---|---|
| Hao Tung | 701 | ISO * | 2,000 | 10,000 | 4/30/2012 | (1) | New Hire | CA |
| Stephen Moyer | 701 | ISO * | 1,000 | 5,000 | 5/9/2012 | (1) | New Hire | CA |
| Mona Ramamurthy | 701 | ISO * | 2,000 | 10,000 | 7/2/2012 | (1) | New Hire | CA |
| Samartha Anekal | 701 | ISO | 9,000 | 45,000 | 10/10/2012 | (1) | Performance | CA |
| David Boies | 701 | NSO** | 100,000 | 500,000 | 10/8/2013 | (2), (4) | New engagement | NY |
| Brad Arington | 701 | ISO * | 1,200 | 6,000 | 10/14/2013 | (1) | New Hire | CA |
| Christian Holmes | 701 | ISO | 8,000 | 40,000 | 10/16/2013 | (1) | Performance | CA |
| Jeffrey Blickman | 701 | ISO | 5,000 | 25,000 | 10/16/2013 | (1) | Performance | CA |
| Nicholas Menchel | 701 | ISO | 5,000 | 25,000 | 10/16/2013 | (1) | Performance | CA |
| Sani Hadziahmetovic | 701 | ISO | 5,000 | 25,000 | 10/16/2013 | (1) | Performance | CA |
| Daniel Edlin | 701 | ISO | 5,000 | 25,000 | 10/16/2013 | (1) | Performance | CA |
| Max Fosque | 701 | ISO | 5,000 | 25,000 | 8/29/2013 | (1) | Performance | CA |
| *Total* | | | **204,033** | **1,020,167** | | | | |

\* This Option shall have a maximum term of five (5) years (subject to earlier termination following the Optionee's ceasing to be a Service Provider or as otherwise provided by the 2004 Plan). Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

\*\* This Option shall have a maximum term of five (5) years (subject to earlier termination following the Optionee's ceasing to be an advisory to the Board or as otherwise provided by the 2004 Plan). Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(1) Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be a Service Provider through each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(2) This Option is early exercisable.

Confidential

THER-AZ-01126842

(3) One forty-eighth (1/48th) of the Shares subject to the Option shall vest on the one (1) month anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to (i) termination of the Consulting Agreement, dated as of September 8, 2013, between the Company and Optionee (the "*Consulting Agreement*") and (ii) Optionee continuing to actively provide Services (as defined in the Consulting Agreement) to the Company, in each case through each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

(4) One forty-eighth (1/48th) of the Shares subject to the Option shall vest on the one (1) month anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Optionee continuing to be an advisor to the Board through each such date. Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings assigned to them in the 2004 Plan.

Confidential

THER-AZ-01126843

**EXHIBIT L**
**Promissory Note**



Confidential

THER-AZ-01126844

**PROMISSORY NOTE**

$9,129,991.10

Palo Alto, California
December [ ], 2013

Elizabeth Holmes ("**Maker**") hereby promises to pay to the order of Theranos, Inc., a Delaware corporation ("**Lender**"), its successors and assigns, in lawful money of the United States of America, Nine Million One Hundred Twenty-Nine Thousand Nine Hundred Ninety-One Dollars and Ten Cents ($9,129,991.10) or the principal balance outstanding under this Promissory Note, together with accrued and unpaid interest thereon, at the rate set forth below, on December [ ], 2018 (the "**Maturity Date**").

The unpaid principal amount of this Promissory Note shall accrue interest at a rate of 1.64%, compounded semi-annually, commencing on the date hereof. If any interest is determined to be in excess of the then legal maximum rate, then that portion of each interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of the obligations evidenced by this Promissory Note. Interest shall accrue on this Promissory Note, but shall not be paid until the Maturity Date.

This Promissory Note may be prepaid in whole or in part at any time, without premium or penalty.

Notwithstanding anything to the contrary in this Promissory Note (including the Maturity Date), the outstanding principal amount of this Promissory Note, plus all accrued and unpaid interest shall be due and payable upon the earlier of: (i) immediately prior to the closing of a Change in Control (as defined in Lender's Amended and Restated 2004 Stock Plan, as amended from time to time), (ii) two (2) business days prior to the date of Lender's filing a Registration Statement on Form S-1 (or similar form of the Securities and Exchange Commission then available) in connection with its initial public offering of its common stock, (iii) a bankruptcy or insolvency proceeding is instituted by or against Maker, or if a receiver is appointed for the property of Maker, or (iv) the date Lender determines, in its discretion, that any change in Lender's or Maker's status would cause the loan evidenced by this Promissory Note to be deemed to be a prohibited extension or maintenance of credit by Lender (or any successor entity) under Section 1402 of the Sarbanes-Oxley Act of 2002 or any other applicable law ("Acceleration Event(s)").

In addition, Maker shall be prohibited from making an assignment for the benefit of creditors. Any assignment shall be considered an Acceleration Event under this Promissory Note.

In the event that Maker shall fail to pay when due (whether at the Maturity Date or by reason of acceleration) any principal of or interest on this Promissory Note, then if such payment of principal or interest is not made within thirty (30) days of the due date, Lender may declare all obligations (including without limitation, outstanding principal and accrued and unpaid interest thereon) under this Promissory Note to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.

This Promissory Note is secured pursuant to that certain Stock Pledge Agreement, dated as of the date hereof, by and between Maker and Lender and attached hereto as Exhibit A. Without in any manner impairing the validity of this Promissory Note, the Stock Pledge Agreement or any security interest created

-1-

Confidential

THER-AZ-01126845

thereby, this Promissory Note is "full recourse" such that in the event of default under the terms of this Promissory Note, Lender will hold Maker personally liable for payment of the obligations evidenced by this Promissory Note.

MAKER ACKNOWLEDGES AND UNDERSTANDS THAT THE RULE 144 HOLDING PERIOD WILL NOT COMMENCE WITH RESPECT TO THE SHARES PURCHASED UNTIL THIS NOTE HAS BEEN PAID OR UNLESS THIS NOTE IS FULLY SECURED BY COLLATERAL OTHER THAN THE SHARES PURCHASED.

Maker hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other demands, protests and notices in connection with the execution, delivery, performance, collection and enforcement of this Promissory Note.

This Promissory Note is being delivered in, is intended to be performed in, shall be construed and interpreted in accordance with, and be governed by the internal laws of, the State of California, without regard to principles of conflict of laws.

This Promissory Note may only be amended, modified or terminated by an agreement in writing signed by the party to be charged. This Promissory Note shall be binding upon the heirs, executors, administrators, successors and assigns of the Maker and inure to the benefit of the Lender and its permitted successors, endorsees and assigns. This Promissory Note shall not be transferred without the express written consent of Lender, provided that if Lender consents to any such transfer or if notwithstanding the foregoing such a transfer occurs, then the provisions of this Promissory Note shall be binding upon any successor to Maker and shall inure to the benefit of and be extended to any holder thereof.



_____
Elizabeth Holmes

-2-

Confidential

THER-AZ-01126846

<u>Exhibit A</u>



-1-

Confidential

THER-AZ-01126847

## STOCK PLEDGE AGREEMENT

This **STOCK PLEDGE AGREEMENT**, dated as of December [\_\_], 2013 (this "**Pledge Agreement**"), is executed by **Elizabeth Holmes** ("**Debtor**") in favor of Theranos, Inc., a Delaware corporation ("**Secured Party**").

RECITALS

      A.     Debtor has executed a Promissory Note (the "**Note**") in favor of Secured Party.

      B.     In order to induce Secured Party to extend the credit evidenced by the Note, Debtor has agreed to enter into this Pledge Agreement and to pledge and grant to Secured Party the security interest in the collateral described below.

AGREEMENT

      NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtor hereby agrees with Secured Party as follows:

1.    Definitions and Interpretation. Unless otherwise defined herein, all other capitalized terms used herein and defined in the Note shall have the respective meanings given to those terms in the Note, and all terms defined in the California Uniform Commercial Code (the "**UCC**") shall have the respective meanings given to those terms in the UCC.

2.    The Pledge. To secure the Obligations as defined in Section 4 hereof, Debtor hereby pledges and assigns to Secured Party, and grants to Secured Party a security interest in, all of Debtor's right, title and interest, whether now existing or hereafter arising in all instruments, certificated and uncertificated securities, money and general intangibles of, relating to or arising from the following property (the "**Pledged Collateral**"):

    (a)    The securities of Secured Party described on Schedule A hereto (the "**Pledged Securities**");

    (b)    All dividends (including cash dividends), other distributions (including redemption proceeds), or other property, securities or instruments in respect of or in exchange for the Pledged Securities, whether by way of dividends, stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares or otherwise; and

    (c)    All proceeds of the foregoing ("**Proceeds**").

3.    Partial Release of Collateral. Upon the request of Debtor, Secured Party agrees to a partial release of the Pledged Securities on a pro rata basis equal to Debtor's payment on the Promissory Note.

4.    Security for Obligations. The obligations secured by this Pledge Agreement (the "**Obligations**") shall mean and include all obligations owed by Debtor to Secured Party pursuant to the terms of the Note, including all interest payable by Debtor thereunder.

-1-

Confidential

THER-AZ-01126848

**ER-15261**

5.    Delivery of Pledged Collateral; Financing Statements.  All certificates or instruments representing or evidencing the Pledged Collateral shall be promptly delivered to Secured Party and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party.  Concurrently with the execution of this Pledge Agreement, Debtor shall execute and deliver to Secured Party the UCC-1 financing statement provided by Secured Party.  Without limiting the generality of the foregoing, notwithstanding the fact that any of the Pledged Securities are subject to a lapsing right of repurchase in favor of Secured Party and an escrow arrangement in connection therewith (the "Unvested Shares"), Secured Party shall hold the stock certificates representing such shares in its possession and control pursuant to this Agreement, regardless of whether such repurchase right has lapsed or such escrow arrangement is in effect, until Debtor's obligations hereunder and under the Note have been satisfied; provided, further, that with respect to any agreements governing the Unvested Shares to which Secured Party is party, Secured Party hereby consents to Debtor's pledge of the Unvested Shares as Pledged Collateral hereunder to the extent such consent is necessary thereunder.

6.    Representations and Warranties.  Debtor hereby represents and warrants as follows:

(a)    Issuance of Pledged Securities, Etc.  The Pledged Securities are owned by Debtor free and clear of any and all liens, pledges, encumbrances (other than a lapsing right of repurchase in favor of Secured Party, if applicable) or charges, and Debtor has not optioned or otherwise agreed to sell, hypothecate, pledge, or otherwise encumber or dispose of the Pledged Securities.

(b)    Security Interest.  The pledge of the Pledged Collateral creates a valid security interest in the Pledged Collateral, securing the payment of the Obligations and the obligations hereunder.

(c)    Restatement of Representations and Warranties.  On and as of the date any property becomes Pledged Collateral, the foregoing representations and warranties shall be deemed restated with respect to such additional Pledged Collateral.

7.    Further Assurances.  Debtor agrees that at any time and from time to time, at Debtor's expense, Debtor will promptly execute and deliver all further instruments and documents, including without limitation all additional Pledged Securities, and take all further action, that may be necessary or desirable, or that Secured Party may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.

8.    Voting Rights; Dividends; Etc.

(a)    Rights Prior to an Event of Default.  So long as no Event of Default shall have occurred and be continuing:

(i)    Debtor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Securities or any part thereof for any purpose not inconsistent with the terms of this Pledge Agreement.

(ii)    Debtor shall be entitled to receive and retain free and clear of the security interest of Secured Party hereunder any and all dividends and interest paid in respect of the Pledged Securities.

-2-

Confidential                                                                                    THER-AZ-01126849

(b)     Rights Following an Event of Default.  Upon the occurrence and during the continuance of an Event of Default:

(i)     All rights of Debtor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 8(a)(i) and to receive the dividends and interest payments which it would otherwise be authorized to receive and retain pursuant to Section 8(a)(ii) shall cease and all such rights shall thereupon become vested in Secured Party which shall thereupon have the sole right, but not the obligation, to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends and interest payments.

(ii)     All dividends and interest payments which are received by Debtor contrary to the provisions of subparagraph (i) of this Section 8(b) shall be received in trust for the benefit of Secured Party, shall be segregated from other funds of Debtor and shall be forthwith delivered to Secured Party as Pledged Collateral in the same form as so received (with any necessary endorsement).

9.     Events of Default; Remedies.

(a)     Event of Default.  An "Event of Default" shall mean the occurrence of one or more of the following:

(i)     Debtor shall default in the payment of principal or interest on the Note when the same is due; or

(ii)     Debtor shall default in the performance of any material covenant, agreement or obligation contained in the Note or this Pledge Agreement, and Debtor shall fail to cure such default within thirty (30) days after receipt of written notice thereof from Secured Party.

(b)     Rights Under the UCC.  In addition to all other rights granted hereby, and otherwise by law, Secured Party shall have, with respect to the Pledged Collateral, the rights and obligations of a secured party under the UCC.

(c)     Sale of Pledged Collateral.  Debtor acknowledges and recognizes that Secured Party may be unable to effect a public sale of all or a part of the Pledged Securities and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire the Pledged Securities for their own account, for investment and not with a view to the distribution or resale thereof.  Debtor acknowledges that any such private sales may be at prices and on terms less favorable to Secured Party than those of public sales, and agrees that so long as such sales are made in good faith such private sales shall be deemed to have been made in a commercially reasonable manner and that Secured Party has no obligation to delay sale of any Pledged Securities to register such securities for public sale under the Securities Act of 1933, as amended, or under any state securities law.

(d)     Notice, Etc. In any case where notice of sale is required, thirty (30) days' prior written notice shall be deemed reasonable notice.  Secured Party may resort to the Pledged Collateral or any portion thereof with no requirement on the part of Secured Party to proceed first against any other Person or property.

(e)     Other Remedies.  Upon the occurrence and during the continuance of an Event of Default, (i) at the request of Secured Party, Debtor shall assemble and make available to Secured Party all records relating to the Pledged Securities at any place or places specified by Secured Party, together with such other

-3-

Confidential                                                                                            THER-AZ-01126850

information as Secured Party shall request concerning Debtor's ownership of the Pledged Securities; and (ii) Secured Party or its nominee shall have the right, but shall not be obligated, to vote or give consent with respect to the Pledged Securities or any part thereof.

10.  Secured Party Appointed Attorney-in-Fact.  Debtor hereby appoints Secured Party as Debtor's true and lawful proxy and attorney-in-fact, with full authority in the place and stead of Debtor, with full power of substitution and re-substitution, for and in the name, place and stead of Debtor or otherwise, from time to time in Secured Party's discretion and to the full extent permitted by law to take any action and to execute any instrument which Secured Party may deem reasonably necessary or advisable to accomplish the purposes of this Pledge Agreement in accordance with the terms and provisions hereof, including without limitation, to receive, endorse and collect all instruments made payable to Debtor representing any dividend, interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.  Debtor hereby ratifies all commercially reasonable actions that said attorney shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable and, notwithstanding anything in Section 212(b) of the Delaware General Corporation Code to the contrary, of indefinite duration, unless and until this proxy terminates pursuant to this Section 10.  This proxy and the power of attorney granted herein (i) is irrevocable (to the fullest extent permitted by applicable law) and (ii) is a durable power of attorney and shall survive the death, disability, incompetency, bankruptcy, insolvency or dissolution of Debtor and the transfer of all or any portion of the Pledged Securities and shall extend to the heirs, successors, assigns, transferees and personal representatives of the Debtor.  This proxy shall terminate and be of no further force or effect upon the termination of this Pledge Agreement.  The powers conferred on Secured Party hereunder are solely to protect its interests in the Pledged Collateral and shall not impose any duty upon Secured Party to exercise any such powers.  Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and in no event shall Secured Party or any of its officers, directors, employees or agents be responsible to Debtor for any act or failure to act, except for negligence or willful misconduct.

11.  Miscellaneous.

(a)  Notices.  Except as otherwise provided herein, all notices, requests, demands, consents, instructions or other communications to or upon Secured Party or Debtor under this Agreement or the Note shall be in writing and faxed, mailed or delivered to each party at the address or fax number last given to the other party.  All such notices and communications shall be effective (a) when received by Federal Express or other overnight service of recognized standing, on the business day following the deposit with such service; (b) when received by registered or certified mail, first class postage prepaid and addressed as aforesaid through the United States Postal Service, upon receipt; (c) when delivered by hand, upon delivery; and (d) when faxed, upon confirmation of receipt.

(b)  Nonwaiver.  No failure or delay on Secured Party's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

(c)  Amendments and Waivers.  This Pledge Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Debtor and Secured Party.  Each waiver or consent under any provision hereof shall be effective only in the specific instances for the purpose for which given.

-4-

Confidential

THER-AZ-01126851

(d)     <u>Assignments</u>.  This Pledge Agreement shall be binding upon and inure to the benefit of Secured Party and Debtor and their respective successors and assigns; provided, however, that Debtor may not assign its rights and duties hereunder without the prior written consent of Secured Party.

(e)     <u>Cumulative Rights, etc</u>.  The rights, powers and remedies of Secured Party under this Pledge Agreement shall be in addition to all rights, powers and remedies given to Secured Party by virtue of any applicable law, rule or regulation of any governmental authority, the Note or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Secured Party's rights hereunder.  Debtor waives any right to require Secured Party to proceed against any Person or to exhaust any collateral or to pursue any remedy in Secured Party's power.

(f)     <u>Payments Free of Taxes, Etc</u>. All payments made by Debtor under this Pledge Agreement shall be made by Debtor free and clear of and without deduction for any and all present and future taxes, levies, charges, deductions and withholdings.  In addition, Debtor shall pay upon demand any stamp or other taxes, levies or charges of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Pledge Agreement.  Upon request by Secured Party, Debtor shall furnish evidence satisfactory to Secured Party or such Secured Party that all requisite authorizations and approvals by, and notices to and filings with, governmental authorities and regulatory bodies have been obtained and made and that all requisite taxes, levies and charges have been paid.

(g)     <u>Partial Invalidity</u>.  If any time any provision of this Pledge Agreement is or becomes illegal, invalid or unenforceable in any respect under the law or any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Pledge Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(h)     <u>Governing Law</u>.  This Pledge Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to conflicts of law rules (except to the extent governed by the UCC).

(i)     <u>Termination</u>.  This Pledge Agreement shall terminate, and all liens securing the Pledged Collateral shall be automatically released and the Secured Party shall return all instruments held as collateral pursuant hereto upon payment in full of the Obligations.

*[Signature page follows]*

-5-

Confidential
THER-AZ-01126852

**ER-15265**

**IN WITNESS WHEREOF,** Debtor has caused this Pledge Agreement to be executed as of the day and year first above written.

_____
**Elizabeth Holmes**

**ACKNOWLEDGED AND AGREED:**

**Theranos, Inc.**

By:_____
Sunny Balwani
President & Chief Operating Officer

-6-

Confidential

THER-AZ-01126853

SCHEDULE A

TO PLEDGE AGREEMENT

SHARES

| Issuer | Certificate No.* | Certificate Date | No. of Shares | Registered Holder |
|--------|------------------|------------------|---------------|-------------------|
| Theranos, Inc. | | | 53,705,830 on a post-split basis (10,741,166 on a pre-split basis) | Elizabeth Holmes |
| | | | | |

*Each of Secured Party and Debtor acknowledges that some or all of the Pledged Securities may be subject to a lapsing right of repurchase in favor of Secured Party and held in escrow in connection therewith, and that such arrangements shall not adversely impact the rights and obligations of Secured Party or the Debtor hereunder.

-1-

Confidential

THER-AZ-01126854

**EXHIBIT M**
**2013 Stock Incentive Plan**



Confidential

**THERANOS, INC.**

**2013 STOCK INCENTIVE PLAN**

1.     <u>Purposes of the Plan</u>.  The purposes of this Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,

- to provide additional incentive to Employees, Directors and Consultants, and

- to promote the success of the Company's business.

The Plan permits the grant of Incentive Stock Options, Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock and Restricted Stock Units.

2.     <u>Definitions</u>.  As used herein, the following definitions will apply:

(a)     "<u>Administrator</u>" means the Board or any of its Committees as will be administering the Plan, in accordance with Section 4 of the Plan.

(b)     "<u>Applicable Laws</u>" means the requirements relating to the administration of equity-based awards under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws of any foreign country or jurisdiction where Awards are, or will be, granted under the Plan.

(c)     "<u>Award</u>" means, individually or collectively, a grant under the Plan of Options, Stock Appreciation Rights, Restricted Stock, or Restricted Stock Units.

(d)     "<u>Award Agreement</u>" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan.  The Award Agreement is subject to the terms and conditions of the Plan.

(e)     "<u>Board</u>" means the Board of Directors of the Company.

(f)     "<u>Cause</u>" means (i) a Participant's repeated failure to perform his or her duties or responsibilities as an employee as directed or assigned by the Board (or its designee) from time to time, after written notice thereof from the Board (or its designee) to a Participant setting forth in reasonable detail the respects in which the Company believes such Participant has not performed such duties or responsibilities; (ii) a Participant's personally engaging in knowing and intentional illegal conduct which is seriously injurious to the Company or its affiliates; (iii) a Participant being convicted of a felony, or committing an act of dishonesty or fraud against, or the misappropriation of property belonging to, the Company or its affiliates; or (iv) any breach by a Participant of any provision of any non-disclosure or invention assignment or similar agreement with the Company or any breach of any written code of conduct or policy of the Company.

#5836244v3PALIB1 - Theranos  2013 Stock Incentive Plan.DOC

Confidential                                                    THER-AZ-01126856

(g)     "<u>Change in Control</u>" means the occurrence of any of the following events:

(i)     <u>Change in Ownership of the Company</u>.  A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("Person"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than 50% of the total voting power of the stock of the Company, except that any change in the ownership of the stock of the Company as a result of a private financing of the Company that is approved by the Board will not be considered a Change in Control; or

(ii)     <u>Change in Effective Control of the Company</u>.  If the Company has a class of securities registered pursuant to Section 12 of the Exchange Act, a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For purposes of this clause (ii), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change in Control; or

(iii)     <u>Change in Ownership of a Substantial Portion of the Company's Assets</u>.  A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 50% of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions.  For purposes of this subsection (iii), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this Section 2(f), persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company.

Notwithstanding the foregoing, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time.

Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (i) its sole purpose is to change the jurisdiction of the Company's incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

Confidential                                                                    THER-AZ-01126857

(h)     "Code" means the Internal Revenue Code of 1986, as amended.   Any reference to a section of the Code herein will be a reference to any successor or amended section of the Code.

(i)     "Committee" means a committee of Directors or of other individuals satisfying Applicable Laws appointed by the Board, or by the compensation committee of the Board, in accordance with Section 4 hereof.

(j)     "Common Stock" means the Class A common stock of the Company.

(k)     "Company" means Theranos, Inc., a Delaware corporation, or any successor thereto.

(l)     "Consultant" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services to such entity.

(m)     "Director" means a member of the Board.

(n)     "Disability" means total and permanent disability as defined in Code Section 22(e)(3), provided that in the case of Awards other than Incentive Stock Options, the Administrator in its discretion may determine whether a permanent and total disability exists in accordance with uniform and non-discriminatory standards adopted by the Administrator from time to time.

(o)     "Employee" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary of the Company.   Neither service as a Director nor payment of a director's fee by the Company will be sufficient to constitute "employment" by the Company.

(p)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(q)     "Exchange Program" means a program under which (i) outstanding Awards are surrendered or cancelled in exchange for Awards of the same type (which may have higher or lower exercise prices and different terms), Awards of a different type, and/or cash, (ii) Participants would have the opportunity to transfer any outstanding Awards to a financial institution or other person or entity selected by the Administrator, and/or (iii) the exercise price of an outstanding Award is reduced or increased.   The Administrator will determine the terms and conditions of any Exchange Program in its sole discretion.

(r)     "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i)     If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market of The Nasdaq Stock Market, its Fair Market Value will be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

Confidential                                                                    THER-AZ-01126858

(ii)    If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share will be the mean between the high bid and low asked prices for the Common Stock on the day of determination (or, if no bids and asks were reported on that date, as applicable, on the last trading date such bids and asks were reported), as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(iii)    In the absence of an established market for the Common Stock, the Fair Market Value will be determined in good faith by the Administrator.

(s)    "Incentive Stock Option" means an Option that by its terms qualifies and is otherwise intended to qualify as an incentive stock option within the meaning of Code Section 422 and the regulations promulgated thereunder.

(t)    "Investors' Rights Agreement" means the Company's Amended and Restated Investors' Rights Agreement, dated as of October [_____], 2013, as the same may be amended and/or restated from time to time.

(u)    "Nonstatutory Stock Option" means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Stock Option.

(v)    "Option" means a stock option granted pursuant to the Plan.

(w)    "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Code Section 424(e).

(x)    "Participant" means the holder of an outstanding Award.

(y)    "Period of Restriction" means the period during which the transfer of Shares of Restricted Stock are subject to restrictions and therefore, the Shares are subject to a substantial risk of forfeiture.  Such restrictions may be based on the passage of time, the achievement of target levels of performance, or the occurrence of other events as determined by the Administrator.

(z)    "Plan" means this 2013 Stock Incentive Plan.

(aa)    "Restricted Stock" means Shares issued pursuant to an Award of Restricted Stock under Section 8 of the Plan, or issued pursuant to the early exercise of an Option.

(bb)    "Restricted Stock Unit" means a bookkeeping entry representing an amount equal to the Fair Market Value of one Share, granted pursuant to Section 9.  Each Restricted Stock Unit represents an unfunded and unsecured obligation of the Company.

(cc)    "Service Provider" means an Employee, Director or Consultant.

(dd)    "Share" means a share of the Common Stock, as adjusted in accordance with Section 13 of the Plan.

Confidential                                                                                                 THER-AZ-01126859

(ee)   "<u>Stock Appreciation Right</u>" means an Award, granted alone or in connection with an Option, that pursuant to Section 7 is designated as a Stock Appreciation Right.

(ff)   "<u>Subsidiary</u>" means a "subsidiary corporation," whether now or hereafter existing, as defined in Code Section 424(f).

3.   <u>Stock Subject to the Plan</u>.

(a)   <u>Stock Subject to the Plan</u>.  Subject to the provisions of Section 13 of the Plan, the maximum aggregate number of Shares that may be subject to Awards and sold under the Plan is 15,000,000 Shares.  The Shares may be authorized but unissued, or reacquired Common Stock.

(b)   <u>Lapsed Awards</u>.  If an Award expires or becomes unexercisable without having been exercised in full, is surrendered pursuant to an Exchange Program, or, with respect to Restricted Stock or Restricted Stock Units, is forfeited to or repurchased by the Company due to the failure to vest, the unpurchased Shares (or for Awards other than Options or Stock Appreciation Rights the forfeited or repurchased Shares) which were subject thereto will become available for future grant or sale under the Plan (unless the Plan has terminated).  With respect to Stock Appreciation Rights, only Shares actually issued pursuant to a Stock Appreciation Right will cease to be available under the Plan; all remaining Shares under Stock Appreciation Rights will remain available for future grant or sale under the Plan (unless the Plan has terminated).  Shares that have actually been issued under the Plan under any Award will not be returned to the Plan and will not become available for future distribution under the Plan; provided, however, that if Shares issued pursuant to Awards of Restricted Stock or Restricted Stock Units are repurchased by the Company or are forfeited to the Company due to the failure to vest, such Shares will become available for future grant under the Plan.  Shares used to pay the exercise price of an Award or to satisfy the tax withholding obligations related to an Award will become available for future grant or sale under the Plan.  To the extent an Award under the Plan is paid out in cash rather than Shares, such cash payment will not result in reducing the number of Shares available for issuance under the Plan.  Notwithstanding the foregoing and, subject to adjustment as provided in Section 13, the maximum number of Shares that may be issued upon the exercise of Incentive Stock Options will equal the aggregate Share number stated in Section 3(a), plus, to the extent allowable under Code Section 422 and the Treasury Regulations promulgated thereunder, any Shares that become available for issuance under the Plan pursuant to Section 3(b).

(c)   <u>Share Reserve</u>.  The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as will be sufficient to satisfy the requirements of the Plan.

4.   <u>Administration of the Plan</u>.

(a)   <u>Procedure</u>.

(i)   <u>Multiple Administrative Bodies</u>.  Different Committees with respect to different groups of Service Providers may administer the Plan.

Confidential                                                                              THER-AZ-01126860

(ii)    Other Administration.  Other than as provided above, the Plan will be administered by (A) the Board or (B) a Committee, which Committee will be constituted to satisfy Applicable Laws.

(b)    Powers of the Administrator.  Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator will have the authority, in its discretion:

(i)    to determine the Fair Market Value;

(ii)    to select the Service Providers to whom Awards may be granted hereunder;

(iii)    to determine the number of Shares to be covered by each Award granted hereunder;

(iv)    to approve forms of Award Agreements for use under the Plan;

(v)    to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder.  Such terms and conditions include, but are not limited to, the exercise price, the time or times when Awards may be exercised (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the Shares relating thereto, based in each case on such factors as the Administrator will determine;

(vi)    to institute and determine the terms and conditions of an Exchange Program;

(vii)    to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan;

(viii)    to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of satisfying applicable foreign laws or for qualifying for favorable tax treatment under applicable foreign laws;

(ix)    to modify or amend each Award (subject to Section 18(c) of the Plan), including but not limited to the discretionary authority to extend the post-termination exercisability period of Awards and to extend the maximum term of an Option (subject to Section 6(d));

(x)    to allow Participants to satisfy withholding tax obligations in a manner prescribed in Section 14;

(xi)    to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xii)    to allow a Participant to defer the receipt of the payment of cash or the delivery of Shares that otherwise would be due to such Participant under an Award; and

Confidential

THER-AZ-01126861

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) <u>Effect of Administrator's Decision</u>. The Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards.

5. <u>Eligibility</u>. Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock, and Restricted Stock Units may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. <u>Stock Options</u>.

(a) <u>Grant of Options</u>. Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Options in such amounts as the Administrator, in its sole discretion, will determine.

(b) <u>Option Agreement</u>. Each Award of an Option will be evidenced by an Award Agreement that will specify the exercise price, the term of the Option, the number of Shares subject to the Option, the exercise restrictions, if any, applicable to the Option, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(c) <u>Limitations</u>. Each Option will be designated in the Award Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. Notwithstanding such designation, however, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds one hundred thousand dollars ($100,000), such Options will be treated as Nonstatutory Stock Options. For purposes of this Section 6(c), Incentive Stock Options will be taken into account in the order in which they were granted, the Fair Market Value of the Shares will be determined as of the time the Option with respect to such Shares is granted, and calculation will be performed in accordance with Code Section 422 and Treasury Regulations promulgated thereunder.

(d) <u>Term of Option</u>. The term of each Option will be stated in the Award Agreement; provided, however, that the term will be no more than ten (10) years from the date of grant thereof. In the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option will be five (5) years from the date of grant or such shorter term as may be provided in the Award Agreement.

(e) <u>Option Exercise Price and Consideration</u>.

(i) <u>Exercise Price</u>. The per Share exercise price for the Shares to be issued pursuant to the exercise of an Option will be determined by the Administrator, but will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant. In addition, in the case of an Incentive Stock Option granted to an Employee who owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company

Confidential     THER-AZ-01126862

or any Parent or Subsidiary, the per Share exercise price will be no less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant. Notwithstanding the foregoing provisions of this Section 6(e)(i), Options may be granted with a per Share exercise price of less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant pursuant to a transaction described in, and in a manner consistent with, Code Section 424(a).

(ii) <u>Waiting Period and Exercise Dates</u>. At the time an Option is granted, the Administrator will fix the period within which the Option may be exercised and will determine any conditions that must be satisfied before the Option may be exercised.

(iii) <u>Form of Consideration</u>. The Administrator will determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator will determine the acceptable form of consideration at the time of grant. Such consideration may consist entirely of: (1) cash; (2) check; (3) promissory note, to the extent permitted by Applicable Laws, (4) other Shares, provided that such Shares have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which such Option will be exercised and provided further that accepting such Shares will not result in any adverse accounting consequences to the Company, as the Administrator determines in its sole discretion; (5) consideration received by the Company under cashless exercise program (whether through a broker or otherwise) implemented by the Company in connection with the Plan; (6) by net exercise, (7) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws, or (8) any combination of the foregoing methods of payment. In making its determination as to the type of consideration to accept, the Administrator will consider if acceptance of such consideration may be reasonably expected to benefit the Company.

(f) <u>Exercise of Option</u>.

(i) <u>Procedure for Exercise; Rights as a Stockholder</u>. Any Option granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement. An Option may not be exercised for a fraction of a Share.

An Option will be deemed exercised when the Company receives: (i) notice of exercise (in such form as the Administrator may specify from time to time) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised (together with applicable tax withholding). Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan. Shares issued upon exercise of an Option will be issued in the name of the Participant or, if requested by the Participant, in the name of the Participant and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to an Option, notwithstanding the exercise of the Option. The Company will issue (or cause to be issued) such Shares promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 13 of the Plan.

Confidential                                                                                    THER-AZ-01126863

Exercising an Option in any manner will decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(ii)     Termination of Relationship as a Service Provider.  If a Participant ceases to be a Service Provider, other than upon the Participant's termination as the result of the Participant's death or Disability or as a result of a termination for Cause, the Participant may exercise his or her Option within thirty (30) days of termination, or such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of termination.  Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan.  If after termination the Participant does not exercise his or her Option within the time specified by the Administrator, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iii)     Disability of Participant.  If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within six (6) months of termination, or such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent the Option is vested on the date of termination.  Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan.  If after termination the Participant does not exercise his or her Option within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iv)     Death of Participant.  If a Participant dies while a Service Provider, the Option may be exercised within six (6) months following the Participant's death, or within such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of death, by the Participant's designated beneficiary, provided such beneficiary has been designated prior to the Participant's death in a form acceptable to the Administrator.  If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution.  Unless otherwise provided by the Administrator, if at the time of death Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will immediately revert to the Plan.  If the Option is not so exercised within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(v)     Termination for Cause.  Notwithstanding any other provision of the Plan to the contrary, if the Participant's status as a Service Provider is terminated for Cause, the Option shall terminate and cease to be exercisable immediately upon such termination as a Service Provider.

#5836244v3PALIB1 - Theranos  2013 Stock Incentive Plan.DOC          -9-

Confidential                                                                    THER-AZ-01126864

7.    Stock Appreciation Rights.

(a)    Grant of Stock Appreciation Rights.  Subject to the terms and conditions of the Plan, a Stock Appreciation Right may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b)    Number of Shares.  The Administrator will have complete discretion to determine the number of Shares subject to any Award of Stock Appreciation Rights.

(c)    Exercise Price and Other Terms.  The per Share exercise price for the Shares that will determine the amount of the payment to be received upon exercise of a Stock Appreciation Right as set forth in Section 7(f) will be determined by the Administrator and will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.  Otherwise, the Administrator, subject to the provisions of the Plan, will have complete discretion to determine the terms and conditions of Stock Appreciation Rights granted under the Plan.

(d)    Stock Appreciation Right Agreement.  Each Stock Appreciation Right grant will be evidenced by an Award Agreement that will specify the exercise price, the term of the Stock Appreciation Right, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(e)    Expiration of Stock Appreciation Rights.  A Stock Appreciation Right granted under the Plan will expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement.  Notwithstanding the foregoing, the rules of Section 6(d) relating to the maximum term and Section 6(f) relating to exercise also will apply to Stock Appreciation Rights.

(f)    Payment of Stock Appreciation Right Amount.  Upon exercise of a Stock Appreciation Right, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

(i)    The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii)    The number of Shares with respect to which the Stock Appreciation Right is exercised.

At the discretion of the Administrator, the payment upon Stock Appreciation Right exercise may be in cash, in Shares of equivalent value, or in some combination thereof.

8.    Restricted Stock.

(a)    Grant of Restricted Stock.  Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Shares of Restricted Stock to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b)    Restricted Stock Agreement.  Each Award of Restricted Stock will be evidenced by an Award Agreement that will specify the Period of Restriction, the number of Shares

Confidential                                                      THER-AZ-01126865

**ER-15278**

granted, and such other terms and conditions as the Administrator, in its sole discretion, will determine. Unless the Administrator determines otherwise, the Company as escrow agent will hold Shares of Restricted Stock until the restrictions on such Shares have lapsed.

(c)   <u>Transferability</u>.  Except as provided in this Section 8 or as the Administrator determines, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated until the end of the applicable Period of Restriction.

(d)   <u>Other Restrictions</u>.  The Administrator, in its sole discretion, may impose such other restrictions on Shares of Restricted Stock as it may deem advisable or appropriate.

(e)   <u>Removal of Restrictions</u>.  Except as otherwise provided in this Section 8, Shares of Restricted Stock covered by each Restricted Stock grant made under the Plan will be released from escrow as soon as practicable after the last day of the Period of Restriction or at such other time as the Administrator may determine.  The Administrator, in its discretion, may accelerate the time at which any restrictions will lapse or be removed.

(f)   <u>Voting Rights</u>.  During the Period of Restriction, Service Providers holding Shares of Restricted Stock granted hereunder may exercise full voting rights with respect to those Shares, unless the Administrator determines otherwise.

(g)   <u>Dividends and Other Distributions</u>.  During the Period of Restriction, Service Providers holding Shares of Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares, unless the Administrator provides otherwise.  If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid.

(h)   <u>Return of Restricted Stock to Company</u>.  On the date set forth in the Award Agreement, the Restricted Stock for which restrictions have not lapsed will revert to the Company and again will become available for grant under the Plan.

9.   <u>Restricted Stock Units</u>.

(a)   <u>Grant</u>.  Restricted Stock Units may be granted at any time and from time to time as determined by the Administrator.  After the Administrator determines that it will grant Restricted Stock Units, it will advise the Participant in an Award Agreement of the terms, conditions, and restrictions related to the grant, including the number of Restricted Stock Units.

(b)   <u>Vesting Criteria and Other Terms</u>.  The Administrator will set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Restricted Stock Units that will be paid out to the Participant.  The Administrator may set vesting criteria based upon the achievement of Company-wide, business unit, or individual goals (including, but not limited to, continued employment or service), or any other basis determined by the Administrator in its discretion.

(c)   <u>Earning Restricted Stock Units</u>.  Upon meeting the applicable vesting criteria, the Participant will be entitled to receive a payout as determined by the Administrator.

Confidential                                                        THER-AZ-01126866

**ER-15279**

Notwithstanding the foregoing, at any time after the grant of Restricted Stock Units, the Administrator, in its sole discretion, may reduce or waive any vesting criteria that must be met to receive a payout.

(d)    <u>Form and Timing of Payment</u>.  Payment of earned Restricted Stock Units will be made as soon as practicable after the date(s) determined by the Administrator and set forth in the Award Agreement.  The Administrator, in its sole discretion, may settle earned Restricted Stock Units in cash, Shares, or a combination of both.

(e)    <u>Cancellation</u>.  On the date set forth in the Award Agreement, all unearned Restricted Stock Units will be forfeited to the Company.

10.    <u>Compliance With Code Section 409A</u>.  Awards will be designed and operated in such a manner that they are either exempt from the application of, or comply with, the requirements of Code Section 409A, except as otherwise determined in the sole discretion of the Administrator.  The Plan and each Award Agreement under the Plan is intended to meet the requirements of Code Section 409A and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Administrator.  To the extent that an Award or payment, or the settlement or deferral thereof, is subject to Code Section 409A the Award will be granted, paid, settled or deferred in a manner that will meet the requirements of Code Section 409A, such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Code Section 409A.

11.    <u>Leaves of Absence/Transfer Between Locations</u>.  Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence.  A Participant will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, or any Subsidiary.  For purposes of Incentive Stock Options, no such leave may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract.  If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1st) day of such leave, any Incentive Stock Option held by the Participant will cease to be treated as an Incentive Stock Option and will be treated for tax purposes as a Nonstatutory Stock Option.

12.    <u>Limited Transferability of Awards</u>.

(a)    Unless determined otherwise by the Administrator, Awards may not be sold, pledged, assigned, hypothecated, or otherwise transferred in any manner other than by will or by the laws of descent and distribution, and may be exercised, during the lifetime of the Participant, only by the Participant.  If the Administrator makes an Award transferable, such Award may only be transferred (i) by will, (ii) by the laws of descent and distribution, or (iii) as permitted by Rule 701 of the Securities Act of 1933, as amended (the "Securities Act").

(b)    Further, during the period the Company is relying upon the exemption from registration provided in Rule 12h-1(f)(1) promulgated under the Exchange Act (the "Rule 12h-1(f) Exemption") until the Company either (i) becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act  or (ii) is no longer relying upon the Rule 12h-1(f) Exemption, an

Confidential    THER-AZ-01126867

Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (x) persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (y) to an executor or guardian of the Participant upon the death or disability of the Participant, in each case, to the extent required for continued reliance on the Rule 12h-1(f) Exemption. Notwithstanding the foregoing sentence, the Administrator, in its sole discretion, may determine to permit transfers to the Company or in connection with a Change in Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f) or, if the Company is not relying on the Rule 12h-1(f) Exemption, to the extent permitted by the Plan.

13.    Adjustments; Dissolution or Liquidation; Merger or Change in Control.

(a)    Adjustments. In the event that any dividend or other distribution (whether in the form of cash, Shares, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Shares or other securities of the Company, or other change in the corporate structure of the Company affecting the Shares occurs, the Administrator, in order to prevent diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan, will adjust the number and class of shares of stock that may be delivered under the Plan and/or the number, class, and price of shares of stock covered by each outstanding Award; provided, however, that the Administrator will make such adjustments to an Award required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Award.

(b)    Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, the Administrator will notify each Participant as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised, an Award will terminate immediately prior to the consummation of such proposed action.

(c)    Merger or Change in Control. In the event of a merger of the Company with or into another corporation or other entity or a Change in Control, each outstanding Award will be treated as the Administrator determines (subject to the provisions of the following paragraph) without a Participant's consent, including, without limitation, that (i) Awards will be assumed, or substantially equivalent Awards will be substituted, by the acquiring or succeeding corporation (or an affiliate thereof) with appropriate adjustments as to the number and kind of shares and prices; (ii) upon written notice to a Participant, that the Participant's Awards will terminate upon or immediately prior to the consummation of such merger or Change in Control; (iii) outstanding Awards will vest and become exercisable, realizable, or payable, or restrictions applicable to an Award will lapse, in whole or in part prior to or upon consummation of such merger or Change in Control, and, to the extent the Administrator determines, terminate upon or immediately prior to the effectiveness of such merger or Change in Control; (iv) (A) the termination of an Award in exchange for an amount of cash and/or property, if any, equal to the amount that would have been attained upon the exercise of such Award or realization of the Participant's rights as of the date of the occurrence of the transaction (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction the Administrator determines in good faith that no amount would have been attained

Confidential                                                                                                    THER-AZ-01126868

upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment), or (B) the replacement of such Award with other rights or property selected by the Administrator in its sole discretion; or (v) any combination of the foregoing. In taking any of the actions permitted under this subsection 13(c), the Administrator will not be obligated to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly.

In the event that the successor corporation does not assume or substitute for the Award (or portion thereof), the Participant will fully vest in and have the right to exercise all of his or her outstanding Options and Stock Appreciation Rights, including Shares as to which such Awards would not otherwise be vested or exercisable, all restrictions on Restricted Stock and Restricted Stock Units will lapse, and, with respect to Awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at one hundred percent (100%) of target levels and all other terms and conditions met. In addition, if an Option or Stock Appreciation Right is not assumed or substituted in the event of a merger or Change in Control, the Administrator will notify the Participant in writing or electronically that the Option or Stock Appreciation Right will be exercisable for a period of time determined by the Administrator in its sole discretion, and the Option or Stock Appreciation Right will terminate upon the expiration of such period.

For the purposes of this subsection 13(c), an Award will be considered assumed if, following the merger or Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the merger or Change in Control, the consideration (whether stock, cash, or other securities or property) received in the merger or Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the merger or Change in Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of an Option or Stock Appreciation Right or upon the payout of a Restricted Stock Unit, for each Share subject to such Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or Change in Control.

Notwithstanding anything in this Section 13(c) to the contrary, an Award that vests, is earned or paid-out upon the satisfaction of one or more performance goals will not be considered assumed if the Company or its successor modifies any of such performance goals without the Participant's consent; provided, however, a modification to such performance goals only to reflect the successor corporation's post-Change in Control corporate structure will not be deemed to invalidate an otherwise valid Award assumption.

Notwithstanding anything in this Section 13(c) to the contrary, if a payment under an Award Agreement is subject to Code Section 409A and if the change in control definition contained in the Award Agreement does not comply with the definition of "change of control" for purposes of a distribution under Code Section 409A, then any payment of an amount that is otherwise accelerated under this Section will be delayed until the earliest time that such payment would be

Confidential                                                                        THER-AZ-01126869

permissible under Code Section 409A without triggering any penalties applicable under Code Section 409A.

    14.    <u>Tax Withholding</u>.

    (a)    <u>Withholding Requirements</u>.  Prior to the delivery of any Shares or cash pursuant to an Award (or exercise thereof), the Company will have the power and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, local, foreign or other taxes (including the Participant's FICA obligation) required to be withheld with respect to such Award (or exercise thereof).

    (b)    <u>Withholding Arrangements</u>.  The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit a Participant to satisfy such tax withholding obligation, in whole or in part by (without limitation) (i) paying cash, (ii) electing to have the Company withhold otherwise deliverable Shares having a Fair Market Value equal to the minimum statutory amount required to be withheld, (iii) delivering to the Company already-owned Shares having a Fair Market Value equal to the statutory amount required to be withheld, provided the delivery of such Shares will not result in any adverse accounting consequences, as the Administrator determines in its sole discretion, or (iv) selling a sufficient number of Shares otherwise deliverable to the Participant through such means as the Administrator may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld.  The amount of the withholding requirement will be deemed to include any amount which the Administrator agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax rates applicable to the Participant with respect to the Award on the date that the amount of tax to be withheld is to be determined.  The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

    15.    <u>No Effect on Employment or Service</u>.  Neither the Plan nor any Award will confer upon a Participant any right with respect to continuing the Participant's relationship as a Service Provider with the Company, nor will they interfere in any way with the Participant's right or the Company's right to terminate such relationship at any time, with or without cause, to the extent permitted by Applicable Laws.

    16.    <u>Date of Grant</u>.  The date of grant of an Award will be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator.  Notice of the determination will be provided to each Participant within a reasonable time after the date of such grant.

Confidential    THER-AZ-01126870

17.    Term of Plan.  Subject to Section 21 of the Plan, the Plan will become effective upon its adoption by the Board.  Unless sooner terminated under Section 18, it will continue in effect for a term of ten (10) years from the later of (a) the effective date of the Plan, or (b) the earlier of the most recent Board or stockholder approval of an increase in the number of Shares reserved for issuance under the Plan.

18.    Amendment and Termination of the Plan.

(a)    Amendment and Termination.  The Board may at any time amend, alter, suspend or terminate the Plan.

(b)    Stockholder Approval.  The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c)    Effect of Amendment or Termination.  No amendment, alteration, suspension or termination of the Plan will impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company.  Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

19.    Conditions Upon Issuance of Shares.

(a)    Legal Compliance.  Shares will not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

(b)    Investment Representations.  As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

20.    Inability to Obtain Authority.  The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

21.    Stockholder Approval.  The Plan will be subject to approval by the stockholders of the Company within twelve (12) months after the date the Plan is adopted by the Board.  Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

22.    Information to Participants.  If and as required (i) pursuant to Rule 701 of the Securities Act, if the Company is relying on the exemption from registration provided pursuant to Rule 701 of the Securities Act with respect to the applicable Award, and/or (ii) pursuant to Rule 12h-

Confidential                                                                THER-AZ-01126871

1(f) of the Exchange Act, to the extent the Company is relying on the Rule 12h-(1)(f) Exemption, then during the period of reliance on the applicable exemption and in each case of (i) and (ii)  until such time as the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company shall provide to each Participant the information described in paragraphs (e)(3), (4), and (5) of Rule 701 under the Securities Act not less frequently than every six (6) months with the financial statements being not more than 180 days old and with such information provided either by physical or electronic delivery to the Participants or by written notice to the Participants of the availability of the information on an Internet site that may be password-protected and of any password needed to access the information.  The Company may request that Participants agree to keep the information to be provided pursuant to this section confidential.  If a Participant does not agree to keep the information to be provided pursuant to this section confidential, then the Company will not be required to provide the information unless otherwise required pursuant to Rule 12h-1(f)(1) under the Exchange Act (if the Company is relying on the Rule 12h-1(f) Exemption) or Rule 701 of the Securities Act (if the Company is relying on the exemption pursuant to Rule 701 of the Securities Act).

Confidential                                                                                    THER-AZ-01126872

**EXHIBIT N**
**Form of Stock Option Agreement**



THER-AZ-01126873

**THERANOS, INC.**

**2013 STOCK INCENTIVE PLAN**

**STOCK OPTION AGREEMENT**

Unless otherwise defined herein, the terms defined in the 2013 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Stock Option Agreement (the "Option Agreement").

**I.    NOTICE OF STOCK OPTION GRANT**

**Name:**

**Address:**

The undersigned Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant: _____

Vesting Commencement Date: _____

Exercise Price per Share: $_____

Total Number of Shares Granted: _____

Total Exercise Price : $_____

Type of Option:            ____    Incentive Stock Option

            ____    Nonstatutory Stock Option

Term/Expiration Date: _____

Vesting Schedule:

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a Service Provider through each such date.]

#5836342v5PALIB1 - Theranos  Form of SOA (2013 Plan).DOCX            -1-

Confidential            THER-AZ-01126874

**ER-15287**

<u>Termination Period</u>:

This Option shall be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option shall be exercisable for twelve (12) months after Participant ceases to be a Service Provider[, or unless such termination is due to Cause, in which case, this Option shall terminate immediately]. Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 13 of the Plan.

**II.      AGREEMENT**

1.      <u>Grant of Option</u>.  The Administrator of the Company hereby grants to the Participant named in the Notice of Stock Option Grant in Part I of this Agreement ("Participant"), an option (the "Option") to purchase the number of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference.  Subject to Section 18 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Stock Option Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code.  Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO").  Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan.  In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2.      <u>Exercise of Option</u>.

(a)      <u>Right to Exercise</u>.  This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Stock Option Grant and with the applicable provisions of the Plan and this Option Agreement.

(b)      <u>Method of Exercise</u>.  This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding.  This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding.

Confidential                                                                                     THER-AZ-01126875

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Option is exercised with respect to such Shares.

3. <u>Participant's Representations</u>. In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, Participant shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as <u>Exhibit B</u> and an executed joinder agreement to the Stockholders Agreements (the "Joinder Agreement") in substantially the form attached hereto as <u>Exhibit C</u>.

4. <u>Lock-Up Period</u>. Participant hereby agrees that Participant shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Participant (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Participant agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Participant shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Participant agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section 4.

5. <u>Method of Payment</u>. Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Participant:

(a) cash;

Confidential        THER-AZ-01126876

(b)     check;

(c)     consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)     surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

6.     <u>Restrictions on Exercise</u>.  This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7.     <u>Non-Transferability of Option</u>.

(a)     This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant.  The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Participant.

(b)     Further, during the period the Company is relying upon the exemption from registration provided in Rule 12h-1(f)(1) promulgated under the Exchange Act (the "Rule 12h-1(f) Exemption") until the Company either (i) becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act  or (ii) is no longer relying upon the Rule 12h-1(f) Exemption, the Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (x) persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (y) to an executor or guardian of the Participant upon the death or disability of the Participant, in each case, to the extent required for continued reliance on the Rule 12h-1(f) Exemption.  Notwithstanding the foregoing sentence, the Administrator, in its sole discretion, may determine to permit transfers to the Company or in connection with a Change in Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f) or, if the Company is not relying on the Rule 12h-1(f) Exemption, to the extent permitted by the Plan.

8.     <u>Term of Option</u>.  This Option may be exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

9.     <u>Tax Obligations</u>.

(a)     <u>Tax Withholding</u>.  Participant agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Participant) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable

Confidential                                                                     THER-AZ-01126877

to the Option exercise. Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b) <u>Notice of Disqualifying Disposition of ISO Shares</u>. If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Participant shall immediately notify the Company in writing of such disposition. Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant.

(c) <u>Code Section 409A</u>. Under Code Section 409A, an Option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per Share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "discount option") may be considered "deferred compensation." An Option that is a "discount option" may result in (i) income recognition by Participant prior to the exercise of the Option, (ii) an additional twenty percent (20%) federal income tax, and (iii) potential penalty and interest charges. The "discount option" may also result in additional state income, penalty and interest tax to the Participant. Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the date of grant in a later examination. Participant agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant, Participant shall be solely responsible for Participant's costs related to such a determination.

10. <u>Entire Agreement; Governing Law</u>. The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant. This Option Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

11. <u>No Guarantee of Continued Service</u>. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR

Confidential                                              THER-AZ-01126878

RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

Participant acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Participant has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Participant further agrees to notify the Company upon any change in the residence address indicated below.

[SIGNATURE PAGE TO FOLLOW]

#5836342v5PALIB1 - Theranos  Form of SOA (2013 Plan).DOCX          -6-

Confidential                                                                                     THER-AZ-01126879

**ER-15292**

PARTICIPANT

THERANOS, INC.

_____
Signature

_____
By

_____
Print Name

_____
Print Name

_____
Residence Address

_____
Title

[SIGNATURE PAGE TO STOCK OPTION AGREEMENT]

Confidential

THER-AZ-01126880

ER-15293

**EXHIBIT A**

**2013 STOCK INCENTIVE PLAN**

**EXERCISE NOTICE**

Theranos, Inc.
1601 S. California Avenue
Palo Alto, CA 94304

Attention: _____

1. <u>Exercise of Option</u>.  Effective as of today, _____, _____, the undersigned ("Participant") hereby elects to exercise Participant's option (the "Option") to purchase _____ shares of the Common Stock (the "Shares") of Theranos, Inc. (the "Company") under and pursuant to the 2013 Stock Incentive Plan (the "Plan") and the Stock Option Agreement dated _____, _____ (the "Option Agreement").

2. <u>Delivery of Payment</u>.  Participant herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

3. <u>Representations of Participant</u>.  Participant acknowledges that Participant has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4. <u>Rights as Stockholder</u>.  Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Common Stock subject to an Award, notwithstanding the exercise of the Option.  The Shares shall be issued to Participant as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 13 of the Plan.

5. <u>Tax Consultation</u>.  Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares.  Participant represents that Participant has consulted with any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

6. <u>Restrictive Legends and Stop-Transfer Orders</u>.

(a) <u>Legends</u>.  Participant understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any

Confidential  THER-AZ-01126881

certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE INVESTORS' RIGHTS AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER). SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

> THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING PROXY (AS SET FORTH IN THE EXERCISE NOTICE) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING PROXY.

(b)    Stop-Transfer Notices.  Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of

Confidential

THER-AZ-01126882

this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

7.    Irrevocable Voting Proxy on Shares.

(a)    Participant hereby irrevocably designates and appoints Elizabeth Holmes (the "Proxy Holder") as Participant's true and lawful proxy and attorney-in-fact, with full power of substitution and re-substitution, for and in the name, place and stead of Participant, to represent him, her or it at all annual and special meetings of the stockholders and in connection with all written consents of the stockholders of the Company, with respect to all matters and to vote the Shares acquired hereunder (and any and all securities issued or issuable in respect thereof) at any meeting of the stockholders of the Company, however called, and at any adjournment or adjournments thereof, or in connection with any written consent of the stockholders of the Company, and to otherwise do all things which Participant might do if present and acting himself/herself/itself with respect to all matters.  Participant acknowledges that this proxy is coupled with an interest and shall be irrevocable and, notwithstanding anything in Section 212(b) of the Delaware General Corporation Code to the contrary, of indefinite duration, unless and until this proxy terminates pursuant to Section 7(e).

(b)    This proxy and the power of attorney granted herein (i) is irrevocable (to the fullest extent permitted by applicable law) and (ii) is a durable power of attorney and shall survive the death, disability, incompetency, bankruptcy, insolvency or dissolution of Participant and the transfer of all or any portion of the Shares and shall extend to the heirs, successors, assigns, transferees and personal representatives of the undersigned.  In the event that the Proxy Holder is unable to exercise the power and authority granted hereunder for any reason, Participant agrees to vote all the Shares held beneficially or of record by the undersigned in accordance with the Proxy Holder's instructions at any such meeting or adjournment thereof, or provide his, her or its written consent thereto.

(c)    Participant will, from time to time as requested by the Proxy Holder, execute and deliver such further instruments, ancillary agreements or other documents or take such other actions as may be necessary or advisable to give effect to, confirm, evidence or effectuate the purposes of the proxy granted hereby.  Participant hereby covenants and agrees that until this proxy is terminated in accordance with its terms, Participant will not, and will not agree to, directly or indirectly, grant any proxy or interest in or with respect to the Shares or deposit the Shares into a voting trust or enter into a voting agreement or arrangement with respect to the Shares.

(d)    This proxy shall be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of each of the Proxy Holder and the undersigned.  This proxy and the rights and obligations hereunder may not be assigned by Participant without the prior written consent of the Proxy Holder.

(e)    This proxy shall terminate and be of no further force or effect upon the earlier to occur of:  (i) the consummation of the Company's first firm commitment underwritten public offering of its common stock under the Securities Act or (ii) a Change in Control.

#5836342v5PALIB1 - Theranos  Form of SOA (2013 Plan).DOCX          -3-

Confidential                                                                   THER-AZ-01126883

8.    Successors and Assigns.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Participant and his or her heirs, executors, administrators, successors and assigns.

9.    Interpretation.  Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Participant or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting.  The resolution of such a dispute by the Administrator shall be final and binding on all parties.

10.    Governing Law; Severability.  Each of the parties to this Exercise Notice irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Exercise Notice. Each of the parties to this Exercise Notice waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Exercise Notice agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Exercise Notice agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth on the signature page hereto; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS EXERCISE NOTICE OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS EXERCISE NOTICE.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

11.    Costs of Enforcement.  If any party to this Exercise Notice seeks to enforce its rights under, or in connection with this Exercise Notice, or challenges the validity of this Exercise Notice through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

12.    Entire Agreement.  The Plan and Option Agreement are incorporated herein by reference.  This Exercise Notice, the Plan, the Option Agreement, the Investment Representation Statement, and the Joinder Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.

[SIGNATURE PAGE TO FOLLOW]

Confidential                                                                          THER-AZ-01126884

ER-15297

Submitted by:
PARTICIPANT

Accepted by:
THERANOS, INC.

_____

Signature

_____

Print Name

Address:

_____

_____

_____

By

_____

Print Name

_____

Title

Address:

_____

_____

_____

Date Received

**[SIGNATURE PAGE TO EXERCISE NOTICE]**

Confidential

THER-AZ-01126885

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

PARTICIPANT    :

COMPANY    :    THERANOS, INC.

SECURITY    :    COMMON STOCK

AMOUNT    :

DATE    :

In connection with the purchase of the above-listed Securities, the undersigned Participant represents to the Company the following:

(a)    Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Participant is acquiring these Securities for investment for Participant's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)    Participant acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c)    Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Participant, the exercise shall be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of

Confidential

THER-AZ-01126886

Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d)     Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.  Participant understands that no assurances can be given that any such other registration exemption shall be available in such event.

PARTICIPANT

_____
Signature

_____
Print Name

_____
Date

Confidential

THER-AZ-01126887

**EXHIBIT C**

**JOINDER AGREEMENT**

By executing this counterpart signature page, the undersigned hereby agrees to be bound by and subject to all terms and conditions that apply to (i) a Holder under Sections 2.7 and 2.9, an Investor under Section 3.1, a Seller under Section 4, and a party under Sections 5.11 and 5.16 of the Company's Amended and Restated Investors' Rights Agreement, dated October __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A and B thereto (the "**IRA**"), (ii) a Voting Party under Sections 1, 2, 3, and 7(i) and a party under Sections 7(d) and 7(e) under the Company's Amended and Restated Voting Agreement, dated October __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A, B and C thereto (the "**Voting Agreement**") and (iii) Article IX of the Company's amended and restated bylaws, as amended (the "**Bylaws**").

For all purposes under the IRA and the Voting Agreement, the execution and delivery of this Joinder Agreement by the undersigned shall constitute the execution and delivery of a counterpart signature page to the IRA and Voting Agreement, and the undersigned shall have the rights and be subject to the obligations to extent provided hereunder, effective as of the date hereof.

IN WITNESS WHEREOF, the Joinder Agreement to the IRA, Voting Agreement and Bylaws has been executed by the undersigned as of the date set forth below.

JOINING PARTY:

_____
Signature

_____
Print Name

_____
Date

Confidential
THER-AZ-01126888

**EXHIBIT O**
**Form of Stock Option Agreement – Early Exercise**



Confidential

THER-AZ-01126889

**THERANOS, INC.**

**2013 STOCK INCENTIVE PLAN**

**STOCK OPTION AGREEMENT — EARLY EXERCISE**

Unless otherwise defined herein, the terms defined in the 2013 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Stock Option Agreement – Early Exercise (the "Option Agreement").

**I.**　　**NOTICE OF STOCK OPTION GRANT**

　　　**Name:**

　　　**Address:**


The undersigned Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

| | |
|---|---|
| Date of Grant: | _____ |
| Vesting Commencement Date: | _____ |
| Exercise Price per Share: | $_____ |
| Total Number of Shares Granted: | _____ |
| Total Exercise Price: | $_____ |
| Type of Option: | ____ Incentive Stock Option |
| | ____ Nonstatutory Stock Option |
| Term/Expiration Date: | _____ |

Vesting Schedule:

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

[Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48th) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a Service Provider through each such date.]

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX

Confidential

THER-AZ-01126890

Termination Period:

This Option shall be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option shall be exercisable for twelve (12) months after Participant ceases to be a Service Provider[, or unless such termination is due to Cause, in which case, this Option shall terminate immediately]. Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 13 of the Plan.

## II. AGREEMENT

1.     Grant of Option.  The Administrator of the Company hereby grants to the Participant named in the Notice of Stock Option Grant in Part I of this Agreement ("Participant"), an option (the "Option") to purchase the number of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference.  Subject to Section 18 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Stock Option Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code.  Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO").  Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan.  In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2.     Exercise of Option.  This Option shall be exercisable during its term in accordance with the provisions of Section 6 of the Plan as follows:

(a)     Right to Exercise.

(i)     Subject to subsections 2(a)(ii) and 2(a)(iii) below, this Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Stock Option Grant.  Alternatively, at the election of Participant, this Option may be exercised in whole or in part at any time as to Shares that have not yet vested.  Vested Shares shall not be subject to the Company's repurchase right (as set forth in the Restricted Stock Purchase Agreement, attached hereto as Exhibit C-1).

(ii)     As a condition to exercising this Option for unvested Shares, Participant shall execute the Restricted Stock Purchase Agreement.

(iii)     This Option may not be exercised for a fraction of a Share.

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX-2-

Confidential                                                THER-AZ-01126891

(b)   <u>Method of Exercise</u>.  This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company.  The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding.  This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws.  Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Option is exercised with respect to such Shares.

3.    <u>Participant's Representations</u>.  In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, Participant shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as <u>Exhibit</u> B and an executed joinder agreement to the Investors' Rights Agreement (the "Joinder Agreement") in substantially the form attached hereto as <u>Exhibit D</u>.

4.    <u>Lock-Up Period</u>.  Participant hereby agrees that Participant shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Participant (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Participant agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.  In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Participant shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act.  The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that

#5841142v4PALIB1 - Theranos Form of Early Exercise SOA (2013 Plan).DOCX-3-

may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Participant agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section 4.

5.    Method of Payment. Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Participant:

(a)    cash;

(b)    check;

(c)    consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)    surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

6.    Restrictions on Exercise. This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7.    Non-Transferability of Option.

(a)    This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Participant.

(b)    Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "Reliance End Date"), Participant shall not transfer this Option or, prior to exercise, the Shares subject to this Option, in any manner other than (i) to persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of Participant upon the death or disability of Participant. Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to this Option, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

8.    Term of Option. This Option may be exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX-4-

Confidential                                                                                                  THER-AZ-01126893

9.      Tax Obligations.

(a)      Tax Withholding.  Participant agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Participant) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise.  Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b)      Notice of Disqualifying Disposition of ISO Shares.  If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Participant shall immediately notify the Company in writing of such disposition.  Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant.

(c)      Code Section 409A.  Under Code Section 409A, an Option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per Share exercise price that is determined by the Internal Revenue Service (the "IRS") to be less than the Fair Market Value of a Share on the date of grant (a "discount option") may be considered "deferred compensation."  An Option that is a "discount option" may result in (i) income recognition by Participant prior to the exercise of the Option, (ii) an additional twenty percent (20%) federal income tax, and (iii) potential penalty and interest charges.  The "discount option" may also result in additional state income, penalty and interest tax to the Participant.  Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the date of grant in a later examination.  Participant agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant, Participant shall be solely responsible for Participant's costs related to such a determination.

10.      Entire Agreement; Governing Law.  The Plan is incorporated herein by reference.  The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.  This Option Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

11.      No Guarantee of Continued Service.  PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER.  PARTICIPANT FURTHER ACK-NOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO

Confidential

THER-AZ-01126894

NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

Participant acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Participant has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Participant further agrees to notify the Company upon any change in the residence address indicated below.

[SIGNATURE PAGE FOLLOWS]

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX -6-

Confidential                                                    THER-AZ-01126895

PARTICIPANT                          THERANOS, INC.

_____      _____
Signature                            By

_____      _____
Print Name                           Print Name

_____      _____
                                     Title

_____
Residence Address

[SIGNATURE PAGE TO STOCK OPTION AGREEMENT – EARLY EXERCISE]

Confidential                                    THER-AZ-01126896

**ER-15309**

**EXHIBIT A**

**2013 STOCK INCENTIVE PLAN**

**EXERCISE NOTICE**

Theranos, Inc.
1601 S. California Avenue
Palo Alto, CA 94304

Attention: _____

1.      Exercise of Option.  Effective as of today, _____, ____, the undersigned ("Participant") hereby elects to exercise Participant's option (the "Option") to purchase _____ shares of the Common Stock (the "Shares") of Theranos, Inc. (the "Company") under and pursuant to the 2013 Stock Incentive Plan (the "Plan") and the Stock Option Agreement – Early Exercise dated _____, _____ (the "Option Agreement").

2.      Delivery of Payment.  Participant herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

3.      Representations of Participant.  Participant acknowledges that Participant has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4.      Rights as Stockholder.  Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Common Stock subject to an Award, notwithstanding the exercise of the Option.  The Shares shall be issued to Participant as soon as practicable after the Option is exercised in accordance with the Option Agreement.  No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 13 of the Plan.

5.      Tax Consultation.  Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares.  Participant represents that Participant has consulted with any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

6.      Restrictive Legends and Stop-Transfer Orders.

(a)      Legends.  Participant understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

Confidential

THER-AZ-01126897

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE INVESTORS' RIGHTS AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER). SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING PROXY (AS DESCRIBED IN THE EXERCISE NOTICE) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING PROXY.

(b)   Stop-Transfer Notices.  Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)   Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

7.    Irrevocable Voting Proxy on Shares.

#5841142v4PALIB1 - Theranos Form of Early Exercise SOA (2013 Plan).DOCX-2-

Confidential                                                                      THER-AZ-01126898

(a)     Participant hereby irrevocably designates and appoints Elizabeth Holmes (the "Proxy Holder") as Participant's true and lawful proxy and attorney-in-fact, with full power of substitution and re-substitution, for and in the name, place and stead of Participant, to represent him, her or it at all annual and special meetings of the stockholders and in connection with all written consents of the stockholders of the Company, with respect to all matters and to vote the Shares acquired hereunder (and any and all securities issued or issuable in respect thereof) at any meeting of the stockholders of the Company, however called, and at any adjournment or adjournments thereof, or in connection with any written consent of the stockholders of the Company, and to otherwise do all things which Participant might do if present and acting himself/herself/itself with respect to all matters.  Participant acknowledges that this proxy is coupled with an interest and shall be irrevocable and, notwithstanding anything in Section 212(b) of the Delaware General Corporation Code to the contrary, of indefinite duration, unless and until this proxy terminates pursuant to Section 7(e).

(b)     This proxy and the power of attorney granted herein (i) is irrevocable (to the fullest extent permitted by applicable law) and (ii) is a durable power of attorney and shall survive the death, disability, incompetency, bankruptcy, insolvency or dissolution of Participant and the transfer of all or any portion of the Shares and shall extend to the heirs, successors, assigns, transferees and personal representatives of the undersigned.  In the event that the Proxy Holder is unable to exercise the power and authority granted hereunder for any reason, Participant agrees to vote all the Shares held beneficially or of record by the undersigned in accordance with the Proxy Holder's instructions at any such meeting or adjournment thereof, or provide his, her or its written consent thereto.

(c)     Participant will, from time to time as requested by the Proxy Holder, execute and deliver such further instruments, ancillary agreements or other documents or take such other actions as may be necessary or advisable to give effect to, confirm, evidence or effectuate the purposes of the proxy granted hereby.  Participant hereby covenants and agrees that until this proxy is terminated in accordance with its terms, Participant will not, and will not agree to, directly or indirectly, grant any proxy or interest in or with respect to the Shares or deposit the Shares into a voting trust or enter into a voting agreement or arrangement with respect to the Shares.

(d)     This proxy shall be binding upon, inure to the benefit of, and be enforceable by the successors and permitted assigns of each of the Proxy Holder and the undersigned.  This proxy and the rights and obligations hereunder may not be assigned by Participant without the prior written consent of the Proxy Holder.

(e)     This proxy shall terminate and be of no further force or effect upon the earlier to occur of:  (i) the consummation of the Company's first firm commitment underwritten public offering of its common stock under the Securities Act or (ii) a Change in Control.

8.     <u>Successors and Assigns</u>.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Participant and his or her heirs, executors, administrators, successors and assigns.

Confidential                                                                THER-AZ-01126899

9.     Interpretation.  Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Participant or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting.  The resolution of such a dispute by the Administrator shall be final and binding on all parties.

10.     Governing Law; Severability.  Each of the parties to this Exercise Notice irrevocably submits to the exclusive jurisdiction of the Delaware Court of Chancery (and if the Delaware Court of Chancery is unavailable, any state or federal court sitting in Wilmington, Delaware), as well as to the jurisdiction of all courts to which an appeal may be taken therefrom, in any suit, action, or proceeding arising out of or relating to this Exercise Notice. Each of the parties to this Exercise Notice waives any defense of lack of personal jurisdiction or inconvenient forum to any suit, action, or proceeding brought in accordance with this paragraph. Each of the parties to this Exercise Notice agrees to waive any bond, surety, or other security that might be required of any other party with respect to any such suit, action, or proceeding, including any appeal thereof. Each of the parties to this Exercise Notice agrees to accept service of process by certified mail, return receipt requested, addressed to such party at the address set forth on the signature page hereto; provided, that nothing in this paragraph shall affect the right of any party to serve process in any other manner permitted by law. EACH OF THE PARTIES TO THIS EXERCISE NOTICE OTHER THAN THE COMPANY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS EXERCISE NOTICE.  In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

11.     Costs of Enforcement.  If any party to this Exercise Notice seeks to enforce its rights under, or in connection with this Exercise Notice, or challenges the validity of this Exercise Notice through legal proceedings, the non-prevailing party shall pay all reasonable costs and expenses (including attorneys' fees) incurred by the prevailing party.

12.     Entire Agreement.  The Plan and Option Agreement are incorporated herein by reference.  This Exercise Notice, the Plan, the Restricted Stock Purchase Agreement, the Option Agreement, the Investment Representation Statement, and the Joinder Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.

**[SIGNATURE PAGE FOLLOWS]**

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX -4-

Confidential                                                                                                    THER-AZ-01126900

Submitted by:                              Accepted by:
PARTICIPANT                                THERANOS, INC.


_____            _____
Signature                                  By

_____            _____
Print Name                                 Print Name

                                           _____
                                           Title

Address:                                   Address:

_____            _____

_____            _____

                                           _____
                                           Date Received


**[SIGNATURE PAGE TO EXERCISE NOTICE]**


Confidential                                          THER-AZ-01126901

**ER-15314**

[SIGNATURE PAGE TO EXERCISE NOTICE]

Confidential

THER-AZ-01126902

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

PARTICIPANT          :

COMPANY              :          THERANOS, INC.

SECURITY             :          COMMON STOCK

AMOUNT               :

DATE                 :

In connection with the purchase of the above-listed Securities, the undersigned Participant represents to the Company the following:

(a)     Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Participant is acquiring these Securities for investment for Participant's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)     Participant acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c)     Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Participant, the exercise shall be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such

                                                          THER-AZ-01126903

longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d)     Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.  Participant understands that no assurances can be given that any such other registration exemption shall be available in such event.

PARTICIPANT

_____
Signature

_____
Print Name

_____
Date

Confidential                                                    THER-AZ-01126904

**EXHIBIT C-1**

**THERANOS, INC.**

**2013 STOCK INCENTIVE PLAN**

**RESTRICTED STOCK PURCHASE AGREEMENT**

THIS RESTRICTED STOCK PURCHASE AGREEMENT (the "Agreement") is made between _____ (the "Purchaser") and Theranos, Inc. (the "Company") or its assignees of rights hereunder as of _____, _____.

Unless otherwise defined herein, the terms defined in the 2013 Stock Incentive Plan shall have the same defined meanings in this Agreement.

<u>RECITALS</u>

A.    Pursuant to the exercise of the option (grant number _____) granted to Purchaser under the Plan and pursuant to the Stock Option Agreement – Early Exercise (the "Option Agreement") dated _____, _____ by and between the Company and Purchaser with respect to such grant (the "Option"), which Plan and Option Agreement are hereby incorporated by reference, Purchaser has elected to purchase _____ of those shares of Common Stock which have not become vested under the vesting schedule set forth in the Option Agreement ("Unvested Shares"). The Unvested Shares and the shares subject to the Option Agreement, which have become vested are sometimes collectively referred to herein as the "Shares."

B.    As required by the Option Agreement, as a condition to Purchaser's election to exercise the option, Purchaser must execute this Agreement, which sets forth the rights and obligations of the parties with respect to Shares acquired upon exercise of the Option.

1.    <u>Repurchase Option</u>.

(a)    If Purchaser's status as a Service Provider is terminated for any reason, including for death and Disability, the Company shall have the right and option for ninety (90) days from such date to purchase from Purchaser, or Purchaser's personal representative, as the case may be, all of the Purchaser's Unvested Shares as of the date of such termination at the price paid by the Purchaser for such Shares (the "Repurchase Option").

(b)    Upon the occurrence of such termination, the Company may exercise its Repurchase Option by delivering personally or by registered mail, to Purchaser (or his or her transferee or legal representative, as the case may be) with a copy to the escrow agent described in Section 2 below, a notice in writing indicating the Company's intention to exercise the Repurchase Option AND, at the Company's option, (i) by delivering to the Purchaser (or the Purchaser's transferee or legal representative) a check in the amount of the aggregate repurchase price, or (ii) by the Company canceling an amount of the Purchaser's indebtedness to the Company equal to the aggregate repurchase price, or (iii) by a combination of (i) and (ii) so that the combined payment and

Confidential

THER-AZ-01126905

cancellation of indebtedness equals such aggregate repurchase price. Upon delivery of such notice and payment of the aggregate repurchase price in any of the ways described above, the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and the rights and interests therein or relating thereto, and the Company shall have the right to retain and transfer to its own name the number of Unvested Shares being repurchased by the Company.

(c)    Whenever the Company shall have the right to repurchase Unvested Shares hereunder, the Company may designate and assign one or more employees, officers, directors or stockholders of the Company or other persons or organizations to exercise all or a part of the Company's Repurchase Option under this Agreement and purchase all or a part of such Unvested Shares.

(d)    If the Company does not elect to exercise the Repurchase Option conferred above by giving the requisite notice within ninety (90) days following the termination, the Repurchase Option shall terminate.

(e)    The Repurchase Option shall terminate in accordance with the vesting schedule contained in Purchaser's Option Agreement.

2.    <u>Transferability of the Shares; Escrow</u>.

(a)    Purchaser hereby authorizes and directs the Secretary of the Company, or such other person designated by the Company, to transfer the Unvested Shares as to which the Repurchase Option has been exercised from Purchaser to the Company.

(b)    To insure the availability for delivery of Purchaser's Unvested Shares upon repurchase by the Company pursuant to the Repurchase Option under Section 1, Purchaser hereby appoints the Secretary, or any other person designated by the Company as escrow agent (the "Escrow Agent"), as its attorney-in-fact to sell, assign and transfer unto the Company, such Unvested Shares, if any, repurchased by the Company pursuant to the Repurchase Option and shall, upon execution of this Agreement, deliver and deposit with the Escrow Agent, the share certificates representing the Unvested Shares, together with the stock assignment duly endorsed in blank, attached hereto as <u>Exhibit C-2</u>. The Unvested Shares and stock assignment shall be held by the Escrow Agent in escrow, pursuant to the Joint Escrow Instructions of the Company and Purchaser attached as <u>Exhibit C-3</u> hereto, until the Company exercises its Repurchase Option, until such Unvested Shares are vested, or until such time as this Agreement no longer is in effect. Upon vesting of the Unvested Shares, the Escrow Agent shall promptly deliver to the Purchaser the certificate or certificates representing such Shares in the Escrow Agent's possession belonging to the Purchaser, and the Escrow Agent shall be discharged of all further obligations hereunder; provided, however, that the Escrow Agent shall nevertheless retain such certificate or certificates as Escrow Agent if so required pursuant to other restrictions imposed pursuant to this Agreement.

(c)    Neither the Company nor the Escrow Agent shall be liable for any act it may do or omit to do with respect to holding the Shares in escrow and while acting in good faith and in the exercise of its judgment.

(d)    Transfer or sale of the Shares is subject to restrictions on transfer imposed by any applicable state and federal securities laws. Any transferee shall hold such Shares subject to all

#5841142v4PALIB1 - Theranos Form of Early Exercise SOA (2013 Plan).DOCX-2-

the provisions hereof and the Exercise Notice executed by the Purchaser with respect to any Unvested Shares purchased by Purchaser and shall acknowledge the same by signing a copy of this Agreement.

3.    Ownership, Voting Rights, Duties.  This Agreement shall not affect in any way the ownership, voting rights or other rights or duties of Purchaser, except as specifically provided herein.

4.    Legends.  The share certificate evidencing the Shares issued hereunder shall be endorsed with the following legend (in addition to any legend required under applicable federal and state securities laws):

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AND RIGHTS OF REPURCHASE AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

5.    Adjustment for Stock Split.  All references to the number of Shares and the purchase price of the Shares in this Agreement shall be appropriately adjusted to reflect any stock split, stock dividend or other change in the Shares, which may be made by the Company pursuant to Section 13 of the Plan after the date of this Agreement.

6.    Notices.  Notices required hereunder shall be given in person or by registered mail to the address of Purchaser shown on the records of the Company, and to the Company at their respective principal executive offices.

7.    Survival of Terms.  This Agreement shall apply to and bind Purchaser and the Company and their respective permitted assignees and transferees, heirs, legatees, executors, administrators and legal successors.

8.    Section 83(b) Election.  Purchaser hereby acknowledges that he or she has been informed that, with respect to the exercise of an Option for Unvested Shares, an election (the "Election") may be filed by the Purchaser with the Internal Revenue Service, within thirty (30) days of the purchase of the exercised Shares, electing pursuant to Section 83(b) of the Code to be taxed currently on any difference between the purchase price of the exercised Shares and their Fair Market Value on the date of purchase.  In the case of a Nonstatutory Stock Option, this will result in the recognition of taxable income to the Purchaser on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the Option is exercised over the purchase price for the exercised Shares.  Absent such an Election, taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses.  In the case of an Incentive Stock Option, such an Election will result in a recognition of income to the Purchaser for alternative minimum tax purposes on the date of exercise, measured by the excess, if any, of the Fair Market Value of the exercised Shares, at the time the option is exercised, over the purchase price for the exercised Shares.  Absent such an Election, alternative minimum taxable income will be measured and recognized by Purchaser at the time or times on which the Company's Repurchase Option lapses.

Confidential

THER-AZ-01126907

This discussion is intended only as a summary of the general United States income tax laws that apply to exercising Options as to Shares that have not yet vested and is accurate only as of the date this form Agreement was approved by the Board. The federal, state and local tax consequences to any particular taxpayer will depend upon his or her individual circumstances. Purchaser is strongly encouraged to seek the advice of his or her own tax consultants in connection with the purchase of the Shares and the advisability of filing of the Election under Section 83(b) of the Code. A form of Election under Section 83(b) is attached hereto as Exhibit C-4 for reference.

PURCHASER ACKNOWLEDGES THAT IT IS PURCHASER'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF PURCHASER REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON PURCHASER'S BEHALF.

9.     Representations. Purchaser has reviewed with his or her own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement. Purchaser is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. Purchaser understands that he or she (and not the Company) shall be responsible for his or her own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

10.     Entire Agreement; Governing Law. The Plan and Option Agreement are incorporated herein by reference. The Plan, the Option Agreement, the Exercise Notice, this Agreement, the Investment Representation Statement, and the Joinder Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Purchaser with respect to the subject matter hereof, and may not be modified adversely to the Purchaser's interest except by means of a writing signed by the Company and Purchaser. This Agreement is governed by the internal substantive laws but not the choice of law rules of Delaware.

Purchaser represents that he or she has read this Agreement and is familiar with its terms and provisions. Purchaser hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under this Agreement.

[SIGNATURE PAGE FOLLOWS]

Confidential

THER-AZ-01126908

IN WITNESS WHEREOF, this Agreement is deemed made as of the date first set forth above.

PARTICIPANT                                    THERANOS, INC.


_____          _____
Signature                                          By

_____          _____
Print Name                                        Print Name

_____          _____
                                                     Title

_____
Residence Address


Dated:                                               _____,


Confidential                                      THER-AZ-01126909

**ER-15322**

[SIGNATURE PAGE TO RESTRICTED STOCK PURCHASE AGREEMENT]

Confidential

THER-AZ-01126910

**EXHIBIT C-2**

**ASSIGNMENT SEPARATE FROM CERTIFICATE**


      FOR VALUE RECEIVED I, _____, hereby sell, assign and transfer unto Theranos, Inc. _____ shares of the Common Stock of Theranos, Inc. standing in my name of the books of said corporation represented by Certificate No. _____ herewith and do hereby irrevocably constitute and appoint _____ to transfer the said stock on the books of the within named corporation with full power of substitution in the premises.

      This Stock Assignment may be used only in accordance with the Restricted Stock Purchase Agreement between Theranos, Inc. and the undersigned dated _____, _____ (the "Agreement").


Dated: _____, ____         Signature: _____


      INSTRUCTIONS: Please do not fill in any blanks other than the signature line. The purpose of this assignment is to enable the Company to exercise its "repurchase option," as set forth in the Agreement, without requiring additional signatures on the part of the Purchaser.


#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX

Confidential      THER-AZ-01126911

**EXHIBIT C-3**

**JOINT ESCROW INSTRUCTIONS**

_____, ____

Theranos, Inc.
1601 S. California Avenue
Palo Alto, CA 94304

Attention _____:

As Escrow Agent for both Theranos, Inc. (the "Company"), and the undersigned purchaser of stock of the Company (the "Purchaser"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Restricted Stock Purchase Agreement (the "Agreement") between the Company and the undersigned, in accordance with the following instructions:

1. In the event the Company and/or any assignee of the Company (referred to collectively for convenience herein as the "Company") exercises the Company's repurchase option set forth in the Agreement, the Company shall give to Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company. Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2. At the closing, you are directed (a) to date the stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver the stock assignments, together with the certificate evidencing the shares of stock to be transferred, to the Company or its assignee, against the simultaneous delivery to you of the purchase price (by cash, a check, or some combination thereof) for the number of shares of stock being purchased pursuant to the exercise of the Company's repurchase option.

3. Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement. Purchaser does hereby irrevocably constitute and appoint you as Purchaser's attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated, including but not limited to the filing with any applicable state blue sky authority of any required applications for consent to, or notice of transfer of, the securities. Subject to the provisions of this paragraph 3, Purchaser shall exercise all rights and privileges of a stockholder of the Company while the stock is held by you.

4. Upon written request of the Purchaser, but no more than once per calendar year, unless the Company's repurchase option has been exercised, you shall deliver to Purchaser a certificate or certificates representing so many shares of stock as are not then subject to the

Confidential

THER-AZ-01126912

Company's repurchase option. Within one hundred and twenty (120) days after cessation of Purchaser's continuous employment by or services to the Company, or any parent or subsidiary of the Company, you shall deliver to Purchaser a certificate or certificates representing the aggregate number of shares held or issued pursuant to the Agreement and not purchased by the Company or its assignees pursuant to exercise of the Company's repurchase option.

5.      If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to Purchaser, you shall deliver all of the same to Purchaser and shall be discharged of all further obligations hereunder.

6.      Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.

7.      You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for Purchaser while acting in good faith, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8.      You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

9.      You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

10.     You shall not be liable for the outlawing of any rights under the Statute of Limitations with respect to these Joint Escrow Instructions or any documents deposited with you.

11.     You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor.

12.     Your responsibilities as Escrow Agent hereunder shall terminate if you shall cease to be an officer or agent of the Company or if you shall resign by written notice to each party. In the event of any such termination, the Company shall appoint a successor Escrow Agent.

13.     If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX-2-

Confidential                                                                 THER-AZ-01126913

14.    It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

15.    Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid, addressed to each of the other parties thereunto entitled at the following addresses or at such other addresses as a party may designate by ten (10) days' advance written notice to each of the other parties hereto.

16.    By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

17.    This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

18.    These Joint Escrow Instructions shall be governed by the internal substantive laws, but not the choice of law rules, of Delaware.

PURCHASER                                    THERANOS, INC.


_____           _____
Signature                                    By

_____           _____
Print Name                                   Print Name

_____           _____
                                             Title

_____
Residence Address

ESCROW AGENT


_____
Corporate Secretary

Dated: _____


#5841142v4PALIB1 - Theranos  Form of Early Exercise SOA (2013 Plan).DOCX -3-

Confidential                                    THER-AZ-01126914

**EXHIBIT C-4**

**ELECTION UNDER SECTION 83(b)**
**OF THE INTERNAL REVENUE CODE OF 1986**

The undersigned taxpayer hereby elects, pursuant to Sections 55 and 83(b) of the Internal Revenue Code of 1986, as amended, to include in taxpayer's gross income or alternative minimum taxable income, as the case may be, for the current taxable year the amount of any compensation taxable to taxpayer in connection with taxpayer's receipt of the property described below.

1.    The name, address, taxpayer identification number and taxable year of the undersigned are as follows:

                      TAXPAYER              SPOUSE

NAME:           _____     _____

ADDRESS:      _____     _____

                              _____     _____

TAX ID NO.:     _____     _____

TAXABLE YEAR:    _____

2.    The property with respect to which the election is made is described as follows: _____ shares (the "Shares") of the Common Stock of Theranos, Inc. (the "Company").

3.    The date on which the property was transferred is:_____ ,_____.

4.    The property is subject to the following restrictions:

    The Shares may not be transferred and are subject to forfeiture under the terms of an agreement between the taxpayer and the Company. These restrictions lapse upon the satisfaction of certain conditions contained in such agreement.

5.    The Fair Market Value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms shall never lapse, of such property is: $_____.

6.    The amount (if any) paid for such property is: $_____.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understands that the foregoing election may not be revoked except with the consent of the Commissioner.

Dated: _____, _____    _____

                                                 Taxpayer

The undersigned spouse of taxpayer joins in this election.

Dated: _____, _____    _____

                                                 Spouse of Taxpayer

#5841142v4PALIB1 - Theranos Form of Early Exercise SOA (2013 Plan).DOCX

Confidential        THER-AZ-01126915

**EXHIBIT D**

**JOINDER AGREEMENT**

By executing this counterpart signature page, the undersigned hereby agrees to be bound by and subject to all terms and conditions that apply to (i) a Holder under Sections 2.7 and 2.9, an Investor under Section 3.1, a Seller under Section 4, and a party under Sections 5.11 and 5.16 of the Company's Amended and Restated Investors' Rights Agreement, dated October __, 2013, as amended, by and among the Company and the persons and entities listed on Exhibits A and B thereto (the "**IRA**"), (ii) a Voting Party under Sections 1, 2, 3, and 7(i) and a party under Sections 7(d) and 7(e) under the Company's Amended and Restated Voting Agreement, as amended, dated October __, 2013, by and among the Company and the persons and entities listed on Exhibits A, B and C thereto (the "**Voting Agreement**") and (iii) Article IX of the Company's amended and restated bylaws, as amended (the "**Bylaws**").

For all purposes under the IRA and the Voting Agreement, the execution and delivery of this Joinder Agreement by the undersigned shall constitute the execution and delivery of a counterpart signature page to the IRA and Voting Agreement, and the undersigned shall have the rights and be subject to the obligations to extent provided hereunder, effective as of the date hereof.

IN WITNESS WHEREOF, the Joinder Agreement to the IRA, Voting Agreement and Bylaws has been executed by the undersigned as of the date set forth below.

JOINING PARTY:

_____
Signature

_____
Print Name

_____
Date

C:\Users\rri\AppData\Local\Temp\dm009\#5841142v4PALIB1 - Theranos Form of Early Exercise SOA (2013 Plan).DOCX (47838)

Confidential                                                                    THER-AZ-01126916

**EXHIBIT P**
**Co-Sale Termination Agreement**



Confidential

THER-AZ-01126917

**THERANOS, INC.**

**TERMINATION CERTIFICATE**

December __, 2013

THIS TERMINATION CERTIFICATE (this "Termination Certificate") is executed as of the date set forth above, by Theranos, Inc., a Delaware corporation (the "Company"), Elizabeth Holmes (the "Founder") and the investors listed on the signature pages hereto (the "Investors").

WHEREAS:  The Company, the Founder and the Investors are party to that certain Amended and Restated Co-Sale Agreement dated as of July 1, 2010 (the "Co-Sale Agreement").

WHEREAS:  The Company, the Founder and the Investors desire to terminate the Co-Sale Agreement.

WHEREAS:  Section 6 of the Co-Sale Agreement provides in pertinent part that the Co-Sale Agreement may be terminated by a writing executed by holders of at least a majority of the shares of Preferred Stock then held by the Investors (as such terms are defined in the Co-Sale Agreement), on an as converted to common basis.

WHEREAS: the undersigned represent holders of at least a majority of the shares of Preferred Stock held by the Investors (as such terms are defined in the Co-Sale Agreement), on an as converted to common basis.

**NOW, THEREFORE,** effective as of the date first set forth above, the Co-Sale Agreement is hereby terminated in its entirety and is of no further force or effect, and no party thereto shall have any liability or obligation under the Co-Sale Agreement henceforth.

*[Signature Pages Follow]*

6494162_1.DOC

Confidential

THER-AZ-01126918

IN WITNESS WHEREOF, the undersigned have executed this Termination Certificate effective as of the date first set forth above. Any copy, facsimile or other reliable reproduction of this Termination Certificate may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.

**THERANOS, INC.**
a Delaware corporation

By: _____

Name: _____

Title: _____


_____
**ELIZABETH HOLMES**


**INVESTOR**

By: _____

Name: _____

Title: _____


*[Signature Page to Termination Certificate]*

Confidential

THER-AZ-01126919

# U.S. Issued Patents

- Number of U.S. issued patents: **149**

- Issue date of first patent: **November 6, 2007**

- Number of patents issued 2010-2016: **59**

- Number of issued patents with applications 2010-2016: **134**

HOLMES0019238



HOLMES0019239

## Entities That Invested in Theranos

| Round | Number of Investments |
|-------|----------------------|
| Series A | 49 |
| Series B | 71 |
| Series C | 109 |
| Series C-1 | 23 |
| Series C-2 | 23 |
| | Total: 275 |

HOLMES0019243

Message

| | |
|---|---|
| **From:** | Melissa Givens ▬▬▬▬▬▬▬▬ |
| **Sent:** | 5/15/2012 3:12:09 PM |
| **To:** | Daniel Edlin [/o=theranos organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=daniel edlin]; melissa.givens@usafricom.mil |
| **CC:** | Elizabeth Holmes [/o=theranos organization/ou=first administrative group/cn=recipients/cn=eholmes]; Christian Holmes [/o=theranos organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=christian holmes] |
| **Subject:** | RE: Theranos Demo Results |

Greetings all,

It has been an extremely busy week for me so I have not had much time to devote to protocol writing.
I figured I can send you a shell of the protocol and let you work on filling in pertinent details while I flesh out the remainder of the protocol.

File attached has some highlighted areas in red where I could use your input - please provide references.  I still have to generate the clinical scenarios and survey instruments.

How are things progressing in terms of customs clearance for shipping the cartridges?

I'm excited to get the initial concept down on paper.  Not a very sophisticated study but should at least be proof of concept to deploy further systems and collect more robust data.

Regards,
Missy Givens

---

From: dedlin@theranos.com
To: Melissa.Givens@usafricom.mil; mgivens▬▬▬▬▬▬▬▬
CC: eholmes@theranos.com; cholmes@theranos.com
Subject: Theranos Demo Results
Date: Wed, 2 May 2012 06:41:30 +0000

LTC Givens,

It was great meeting you this afternoon.  Attached to this note are the results from the blood sample we drew. We are happy to answer any questions you might have.
We will be in touch soon with follow up from our conversation today, and we very much look forward to advancing our partnership.

Best regards,
Dan

**Daniel P. Edlin**
*Senior Product Manager*
Theranos, Inc.
Office:  650.470.0322
Mobile: ▬▬▬▬▬▬▬
dedlin@theranos.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc.

Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292    www.theranos.com

FOIA Confidential Treatment Requested by Theranos

TS-0900828

**Protocol Name**: Utility of portable enhanced laboratory device to support SOF forces in austere environments on the African continent

**Research site(s):** multiple locations within the SOCAFRICA area of operations to include the trans-Sahara region and sub-Saharan east Africa. Research sites will be remote areas occupied by SOCAFRICA forces without endemic medical facilities that meet Western standards.

**Sponsor:** None

**Research Personnel:**

**Principle Investigator:**
LTC Melissa Givens, MD, MPH
SOCAFRICA Surgeon
Kelley Kasserne GEB 3304
Plienningerstr 289 70567
+█████████
[ HYPERLINK "mailto:Melissa.givens@

**Associate Investigator(s):** TBD

1. **Background**

    There is a paucity of Western standard medical facilities in Africa. Laboratories do not meet the certification standards of U.S. labs so it is difficult to know if results are reliable.
Service members deployed to Africa rely on host nation facilities for clinical laboratory evaluation. There is only one MTF on the African continent with clinical laboratory services in Djibouti. Obviously this lab cannot support service members deployed across the continent as the time, travel, and costs would be prohibitive. Currently most of the deployed members in Africa are in extremely austere locations and operate in small teams. The current deployable laboratory capabilities are designed to support much larger units with a significant footprint. Even the Special Operations Resuscitation team which is designed to provide stabilization and diagnostic support for SOF forces brings a significant footprint and logistical requirement that is not appropriate to support small teams.
    Because units in Africa have minimal medical support (most often a team medic) it is not unusual for a patient to be transported significant distances to undergo diagnostics tests and receive care. This movement exposes the patient and medical escort to the risks inherent to travel in Africa. It also results in loss of unit capability due to reduced manpower and can also be a significant strain on logistical resources. Unfortunately, even these long evacuations rarely bring the patient to a level of care that is commensurate with Western standards.
    Current DNBI data (SOCAFRICA DNBI 2011-12) reveals that host nation laboratory services are required about 3-4 times per week for every 100 service members in an operational environment. Host nation laboratories may or may not conform to regulatory guidelines for laboratory services and there is often not an option to seek out an accredited lab. Results from non-certified laboratories may be unreliable and laboratory error could result in increased morbidity among service members. A false positive test may lead to unnecessary treatment with possible side effects or unnecessary patient movement for further evaluation that exposes the SM to risk. False negatives may result in delayed treatment that can result in worsening of disease. In Africa, delays in care can be particularly devastating due to long evacuation times. Currently, SOCAFRICA practice is to evacuate personnel who require confirmatory laboratory testing when a certified host nation laboratory is not available. Review of 6 months of evacuation data for 100 personnel, revealed that 8 SMs were moved to the closest MTF solely for laboratory evaluation. At an aircraft fuel cost of $240/hr and an aircraft maintenance cost of $600/hr and an average 9 hour round trip flight, transportation costs alone for these 8 patients (using

FOIA Confidential Treatment Requested by Theranos

TS-0900829

**ER-15338**

SOCAFRICA managed air assets) is over $60,000. This cost does not include lost man hours and risks of travel. Once evacuated for further evaluation, the SM may not return to his unit for several days and often it takes over a week to arrange return transport. Forward positioned laboratory capability could decrease patient movement and reduce costs and lost man hours.

Africa is a unique operational environment with significant medical threats and SOCAFRICA forces are often living in working in the most unforgiving environments. The African continent harbors some of the most dangerous infectious disease processes in the world. Many of these diseases are difficult to diagnose without laboratory support as the symptoms are non-specific. Undifferentiated fever is just one example of a diagnostic dilemma that could represent something as simple as a minor upper respiratory illness or a life threatening diagnosis such as malaria or early manifestation of hemorrhagic fever. Because of the life threatening nature of many endemic diseases, it is often necessary to begin empiric therapy pending diagnosis to prevent morbidity and mortality. Unfortunately, empiric therapy can often complicate further diagnostic assessment or may clinically alter the disease progression such that further treatment decisions are compromised. Additionally, many of the pharmaceuticals used to treat high risk disease threat such as PEP for HIV exposure are very expensive. A single bottle of Combivir costs over $900. The ability to provide reliable laboratory testing at remote sites could help minimize the risks and costs of unnecessary medical treatment.

Theranos data pertinent to study: Cost of tests, deployability of system, QA controls, etc

The intent of this study is to establish operational functionality of Theranos laboratory systems and quantify impacts of utilizing these systems at forward deployed locations. If Theranos systems are shown to be operationally effective and have the capacity to improve patient care, reduce costs, and mitigate risks, service members throughout the organization will benefit by further deployment of these devices.

### 2. Objectives

The primary objective of this study is to deploy the Theranos system to austere locations on the African continent and demonstrate the ability to generate meaningful laboratory data without the physical presence of licensed medical providers to guide medical decisions made through remote consultation.

Secondary objectives include impact of Theranos systems on diagnostic certainty in austere environments, patient movement, patient care costs (to include traditional lab costs, cost of unnecessary treatment, and evacuation costs), treatment decisions, and man hours for lost duty due to patient movement.

Hypothesis: Theranos systems emplaced in austere troop locations on the African continent can effectively generate meaningful laboratory data that can improve diagnostic and treatment decisions, reduce unnecessary patient movement, reduce patient care costs and reduce lost man hours.

### 3. Study Design
    a. **Study design:** prospective observational study
    b. **Setting:** various austere locations throughout the SOCAFRICA area of operations
    c. **Interventions:**
        i. Conduct laboratory panel on volunteers to demonstrate operability of equipment in various locations/environments
            1. Standard physical exam tests on 5 volunteers
                a. CBC, chemistry, liver panel, UA, lipids
                b. Will gather survey data on ease of laboratory assessment (likert scale), pain (0-10 pain scale)
        ii. Conduct scenario based laboratory assessments using Theranos system on volunteers (see attached scenarios and assessment tools) and collect decision

tree data, treatment decisions, and evacuation decisions from on-site personnel and remote consulting medical provider.
1. Adult male with chest pain (1 volunteer)
2. Female with abdominal pain and vaginal bleeding (1 volunteer)
3. Walking blood bank scenario requiring donor screening (5 volunteers)

iii. Mock patient scenario requiring laboratory assessment with subsequent evacuation for confirmatory testing under current system. Scenario will be conducted simultaneously at two independent sites on 2 different volunteers performing the same scenario which would utilize the same laboratory testing facility, with the same level of provider. Data collected to include decision tree, further diagnostics, treatment decisions, and patient movement decisions. Volunteers will be assessed by provider and scenario will drive provider to take patient to host nation laboratory(control patient) or utilize Theranos system(intervention patient). Laboratory assessment will be conducted at host nation lab per provider orders. Photo documentation of encounter will be conducted by study personnel. Laboratory results will drive need for further confirmatory testing requiring patient evacuation for control patient. Medical evacuation processes according to SOCAFRICA SOP will be conducted and volunteer will be moved from assessment site to MTF in Djibouti. Once in Djibouti, laboratory assessment will be conducted appropriate to patient scenario and clinical disposition will be documented. Once laboratory assessment is complete, standard procedures for returning volunteer to duty will be undertaken according to SOCAFRICA SOP. For intervention patient, confirmatory testing will be performed on Theranos system on site and clinical decision tree will be documented. All pertinent timelines and costs will be collected as data points for duration of scenario until patient is returned to original duty station/status.

iv. All laboratory results will be artificially created to represent scenario results so no actual laboratory data will be collected on volunteers. All samples will be collected and run but actual results will not be utilized and destroyed upon reporting.

d. **Equipment/instruments:**
    i. See attached surveys used for data collection
    ii. Equipment: Theranos system
        1. Description
        2. Certifications
        3. Safety data

e. **Subjects**
    i. **Study population:** Study subjects will be active duty U.S. service members over 18 years of age deployed to Africa in support of SOCAFRICA. All study subjects will be volunteers and only enrolled after informed consent is obtained.
    ii. **Number of subjects:** The study will be conducted using a convenience sample of volunteers. Fourteen total volunteer encounter will be conducted but volunteers may participate in more than one scenario.
    iii. **Consent:** Written informed consent will be documented for all volunteers prior to participation in the study.
    iv. **Blinding:** volunteers to include those undergoing laboratory analysis and those making clinical decisions will be blinded to the scenarios with the exception of the 5 volunteers doing physical exam screening. The PI will not be blinded.
    v. **Compensation**: No direct compensation
    vi. **Risk to subjects:** The only risk to subjects is the discomfort associated with a fingerstick/venipuncture and the associated small risk of infection. No personally identifiable data will be collected other than demographic information to include age, gender, and location at time of enrollment. All clinical data will be notional

FOIA Confidential Treatment Requested by Theranos          TS-0900831

**ER-15340**

data, created as a scenario and will not represent any true condition of the research subject.

   **f. Data collection:**
        i. Data will be collected by PI through direct observation. PI will accompany volunteer throughout course of study enrollment to capture all data points.
        ii. See attached data collection sheet for each scenario

   **g. Data management:**
        i. Data will be de-identified. Volunteers will be given a study number to track all results.

   **h. Statistics:**

   **i. Budget:**
        **i.**

**DX 12479**

| Message | |
|---|---|
| From: | Kerry Elenitoba-Johnson [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KERRY ELENITOBA-JOHNSON8F8] |
| Sent: | 11/27/2013 12:56:53 AM |
| To: | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes]; Daniel Young [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=dyoung]; Adam Rosendorff [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=Recipients/CN=Adam Rosendorfd92]; Li Ding-Chiang [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Li Ding-Chiang6ae] |
| CC: | Sunny Balwani [/O=THERANOS ORGANIZATION/OU=First administrative group/cn=recipients/cn=sbalwani] |
| Subject: | RE: |

No problem,

The path for the NY inspection was from the conference room near the front lobby directly to the lab going past HR. All of the bulletin boards from the lobby to HR were covered with paper so the inspector could not view any of the drawings or items on the boards. David Do assisted with placing the paper on the white boards.

I would suggest that the path to the Normandy lab be the stairs by the back door and walk through the shipping area or use the elevator if anyone has a physical problem preventing them from using the stairs.

Thanks, Kerry

---

**From:** Elizabeth Holmes
**Sent:** Tuesday, November 26, 2013 4:45 PM
**To:** Daniel Young; Adam Rosendorff; Kerry Elenitoba-Johnson; Li Ding-Chiang
**Cc:** Sunny Balwani
**Subject:** RE:

(Kerry please delineate this based on what we did with the NY inspector recently and send that out)

---

**From:** Elizabeth Holmes
**Sent:** Tuesday, November 26, 2013 4:34 PM
**To:** Daniel Young; Adam Rosendorff; Kerry Elenitoba-Johnson; Li Ding-Chiang
**Cc:** Sunny Balwani
**Subject:**

Let me know if the path for walking the auditors in and downstairs has been cemented so we avoid areas that cannot be accessed, and what that path is.

====================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT -- This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304

650-838-9292    www.theranos.com
====================================

FOIA Confidential Treatment Requested by Theranos
TS-1031536

ER-15343

**DX 12587**

| Message | |
|---|---|
| **From:** | Adam Rosendorff [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ADAM ROSENDORFD92] |
| **Sent:** | 4/1/2014 8:36:17 PM |
| **To:** | Daniel Young [/o=theranos organization/ou=first administrative group/cn=recipients/cn=dyoung] |
| **CC:** | Sunny Balwani [/o=theranos organization/ou=first administrative group/cn=recipients/cn=sbalwani]; Mark Pandori [/o=theranos organization/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=mark pandori16d] |
| **Subject:** | RE: CO2 (Bicarbonate) issue |

Daniel

Please let us know when the bicarbonate correction is live in LIS.

Thanks,

Adam

---

**From:** Adam Rosendorff
**Sent:** Monday, March 31, 2014 8:52 PM
**To:** Daniel Young
**Cc:** Sunny Balwani; Mark Pandori
**Subject:** RE: CO2 (Bicarbonate) issue

Ok thanks- so I guess the 90% recovery is after bias correction- if this is the case then 20 normals most likely would all be within the predicate RR for HCO3?

We can discuss further tomorrow.

Best,

Adam

---

**From:** Daniel Young
**Sent:** Monday, March 31, 2014 8:47 PM
**To:** Adam Rosendorff
**Cc:** Sunny Balwani; Mark Pandori
**Subject:** RE: CO2 (Bicarbonate) issue

Thanks – I have been looking at the CO2 data you sent me today.

We are also evaluating the processing times in the lab (timing the processing steps), as this can have a big impact on CO2. The data from our in-house AAP dry runs (now 7 days of testing) looks ok overall – with an average of about 90% recovery. With a few more days of testing, I think we will have a good data set from which to make a decision.

Finally, moving forwards, we will apply a bias correction for CO2 fingerstick samples such that we report the results in the venous "equivalent" concentration. In this case, the reference range would not need to be changed.

Please let me know if you have any questions.

-Daniel

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-4053184

**From:** Adam Rosendorff
**Sent:** Monday, March 31, 2014 8:37 PM
**To:** Daniel Young
**Cc:** Sunny Balwani; Mark Pandori
**Subject:** RE: CO2 (Bicarbonate) issue

Pardon me I meant "bias observed between predicate and theranos methods."

**From:** Adam Rosendorff
**Sent:** Monday, March 31, 2014 8:36 PM
**To:** Daniel Young
**Cc:** Sunny Balwani; Mark Pandori
**Subject:** FW: CO2 (Bicarbonate) issue

Daniel

For March 2014 our central 95% for C02 was: 13.5-22.9mM (n=135)., compared to our reference range of 19-33mM as stated in the validation report. On the 135 data points, Zero (0) values were greater than 33mM and 81 values were less than 19. Using a parametric method, taking +/-2SD as the cutoff, the reference range would be 13.5-23.5mM. December only has 22 data points, and I am still waiting on January and February.

Based on this information, I suggest a new Bicarbonate reference range for our method of 13.5-22.9mM. The RR in the validation report was a transferred range based on the bias observed between V and FS methods. Is there any further transformation that is applied to the data before we see it in LIS?

Thanks,

Adam

**From:** Adam Rosendorff
**Sent:** Monday, March 31, 2014 12:51 PM
**To:** Sunny Balwani
**Cc:** Mark Pandori
**Subject:** RE: CO2 (Bicarbonate) issue

Thanks- I will review with Langley what our Levey-Jennings data looks like for both ADVIAs.

Adam

**From:** Sunny Balwani
**Sent:** Monday, March 31, 2014 12:49 PM
**To:** Adam Rosendorff
**Cc:** Mark Pandori
**Subject:** RE: CO2 (Bicarbonate) issue

We had generated tremendous amount of data on this and addresses this very point. I am meeting with the team to address this email and evaluate why we are seeing the 30% lower number and why if we have been seeing this for 6 days by R&D this didn't get flagged.

In the meantime, have we run this on both advias to make sure this is not an Advia issue?

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

THER-4053185

Thanks.

---

**From:** Adam Rosendorff
**Sent:** Monday, March 31, 2014 12:38 PM
**To:** Sunny Balwani
**Cc:** Mark Pandori
**Subject:** CO2 (Bicarbonate) issue
**Importance:** High

Hi Sunny

At least 2/3 of our patients are reading below the normal range for bicarbonate (19-33 mM for CTNs). I do not expect outpatients to have abnormal bicarb values. Curtis's study with 6 days of data (24 data points) also shows that Bicarb is reading ~30% lower than matched venous, even after correction of the value for bias. The current best explanation is that there is rapid loss of $CO_2$ from the CTNs during transport/processing. It is known that there is a loss of 6mM of bicarbonate for every hour a vacutainer is left open. Because of the small volumes we are dealing with, the rate of loss in our case is probably greater. ARUP specimen stability is 24hrs refrigerated. Our current validation report states that:

- Plasma samples for Bicarbonate analysis are stable sealed for 2 weeks at 2-8 °C.

However the ADVIA package insert says:

- Serum or lithium heparin plasma may be stored at 2-8°C for 7 days or at room temperature for up to 24 hours.

I wonder if Paul has any data on outgassing that we can use to decide on what our best course of action is.

CLSes have been asking me what we should do about Bicarb reporting. On the one hand, physicians are aware that if they want an accurate bicarb reading, they need to get the sample to the lab stat.

So far we have not had any phone calls regarding bicarb values- I think docs know that it's a highly context-dependant assay.

Your comments would be welcome.

Adam

**Adam Rosendorff, MD, FASCP**
**Laboratory Director**
**Theranos, Inc**
**(650) 856-4412 (Office)**
**(650) 823-4953 (Mobile)**
**(650) 852-9594 (Fax)**
arosendorff@theranos.com

FOIA Confidential Treatment Requested by Theranos                                                                THER-4053186
Fed. R. Crim. P. 6(e) material

**DX 12656**

Message
| | |
|---|---|
| **From**: | Adam Rosendorff [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ADAM ROSENDORFD92] |
| **Sent:** | 6/4/2014 1:11:19 AM |
| **To:** | Sunny Balwani [/o=theranos organization/ou=first administrative group/cn=recipients/cn=sbalwani] |
| **Subject:** | RE: HCG on Edisons |

Yes that makes sense-

THanks

---

**From:** Sunny Balwani
**Sent:** Tuesday, June 03, 2014 6:02 PM
**To:** Adam Rosendorff
**Subject:** FW: HCG on Edisons

FYI. I will continue to monitor this personally and make sure this become part of the culture.

One of the reaons I want to have separate siemens devices for R&D is so there is no mixing of work between R&D and CLIA and ofcourse moving CLIA to Newark solves all of these problems.

---

**From:** Daniel Young
**Sent:** Tuesday, June 03, 2014 5:55 PM
**To:** Sunny Balwani; Chinmay Pangarkar
**Subject:** RE: HCG on Edisons

Yes, sure.  I updated Adam over the weekend regarding our review of the past data for HCG data and what we were looking at moving forwards.  We'll update him on the latest efforts on this.

CLIA staff often reaches out for guidance, sometimes at the request of Adam, but they should be running all decisions by Adam, which was my understanding.

-Daniel

---

**From:** Sunny Balwani
**Sent:** Tuesday, June 03, 2014 5:37 PM
**To:** Daniel Young; Chinmay Pangarkar
**Subject:** HCG on Edisons
**Importance:** High

Adam came by my office EXTREMELY frustrated that as a lab director he is not being kept in the loop when we are asking CLIA members to run R&D experiments without him being involved or aware of these. He cited the example of HCG sample that was diluted and ran and Adam didn't know what it was, what it was diluted in and other details and now David came to him today – after Adam not being in the loop for days.

My understand is that this was an experimental run and not  something that was intended to be report to physician and I don't think it ever was reported to the physician. However, when experiments or instructions are sent to CLIA staff who don't know the difference and are not expected to know the difference, this causes chaos and confusion.

Confidential

THER-AZ-05843935

Moreover, Adam had also sent an email to the CLIA lab about not running any HCG samples on Edisons and he doesn't know if that was carried thru or if we later determined that the data on Edisons was correct and good and if that information was communicated to Adam. These information has to go through him.

We need to honor SOPs and processes in CLIA and if there are R&D experiments we want to run then they should be clearly labeled as such – even if they are with left over clinical samples– so no one in CLIA is confused. This is paramount in running a smooth CLIA operation.

Can you guys please touch base with Adam so he is in the loop on all HCG decisions on Edisons.

Thanks for the help.

Sunny.

Confidential

**DX 12764**

**To:**  Sunny Balwani[sbalwani@theranos.com]; Elizabeth Holmes[eholmes@theranos.com]; Nishit
Doshi[ndoshi@theranos.com]
**From:**  Daniel Young
**Sent:**  Tue 9/23/2014 8:12:10 PM
**Subject:**  RE: Customer Issue

I sent Adam the Co2 data last week and indicated that we can release these results normally now.  He
had a few questions for me that I discussing with him today.

-----Original Message-----
From: Sunny Balwani
Sent: Tuesday, September 23, 2014 1:08 PM
To: Daniel Young; Elizabeth Holmes; Nishit Doshi
Subject: RE: Customer Issue

did you communicate to CLIA to release all CO2 and also educate Adam on this. if not the ask Chinmay
and or Nishit to communicate this to Adam.

thanks

-----Original Message-----
From: Daniel Young
Sent: Tuesday, September 23, 2014 1:00 PM
To: Elizabeth Holmes; Sunny Balwani; Nishit Doshi
Subject: RE: Customer Issue

Calcium results are looking good and stable since recalibrations were performed last week.  (Other
protocols variations were tested, but not change was seen.)  This is still being monitor closely, and we
may have to impose tighter QC criteria and calibration criteria.

Potassium reference range study is ongoing this week in both Pheonix in Palo Alto.

CO2 has been looking good since we instituted time dependent bias corrections.

-Daniel

-----Original Message-----
From: Elizabeth Holmes
Sent: Tuesday, September 23, 2014 12:58 PM
To: Daniel Young; Sunny Balwani; Nishit Doshi
Subject: RE: Customer Issue

What's the latest on this

-----Original Message-----
From: Daniel Young
Sent: Thursday, September 11, 2014 7:02 PM
To: Sunny Balwani; Nishit Doshi
Cc: Elizabeth Holmes
Subject: RE: Customer Issue

We've processed and reviewed all the most recent data and crafted a resolution plan.  Unfortunately, the
pCTN FDA study and TEDMED pre-studies have been fully occupying the team, delaying the next steps
on this plan.  We have not been able to execute any new in-house studies either due to limited
phlebotomists related to both the FDA study and TEDMED (we've been working to resolve this with
temps etc).

FOIA Confidential Treatment Requested by Theranos                                    TS-1078150

The reference range study will commence next week, and next steps on Ca optimization/refinement will also be starting shortly.

-Daniel

-----Original Message-----
From: Sunny Balwani
Sent: Thursday, September 11, 2014 6:30 PM
To: Daniel Young; Nishit Doshi
Cc: Elizabeth Holmes
Subject: RE: Customer Issue

why haven't we already done this given the issues we have consistently having with these 2 assays along with CO2.

-----Original Message-----
From: Daniel Young
Sent: Thursday, September 11, 2014 6:20 PM
To: Sunny Balwani; Nishit Doshi
Subject: RE: Customer Issue

Yes, we discussed next steps on both of these matters.

For Ca, we believe we may need some fine tuning and/or additional criteria for the calibration.

For K, establishing a new reference range for FS (or equivalently translating this to the venous range) is going to be initiated.  We also will review our sample flagging process, as we know sample quality can impact K results.

Nishit and I will review the timeline for resolution on these and Nishit will track progress.

-Daniel

-----Original Message-----
From: Sunny Balwani
Sent: Thursday, September 11, 2014 5:49 PM
To: Daniel Young; Nishit Doshi
Subject: FW: Customer Issue

are you guys on top of the K and Ca. this has lost us a lot of doctors and we cant lose this one or any more.

Nishit this is genesis of my email about prioritizing. we need to get this 100% now.

thanks.

-----Original Message-----
From: Christian Holmes
Sent: Thursday, September 11, 2014 3:31 PM
To: Sunny Balwani
Subject: FW: Customer Issue

FYI - looking into this

-----Original Message-----

FOIA Confidential Treatment Requested by Theranos

TS-1078151

From: Kimberly Alfonso
Sent: Thursday, September 11, 2014 3:09 PM
To: Christian Holmes
Subject: Customer Issue

Please see below.

-----Original Message-----
From: Genna Hill
Sent: Thursday, September 11, 2014 10:50 AM
To: Kimberly Alfonso; Mike Phebus
Subject: Issue: high CA and K

Dr Shahvar's office has concerns about two patients reports coming back high. They have had several patients in the past have high Ca and K from us so they reran the same tests at Sonora and they have been coming back in the normal range:

1.) Patients initials: ▮▮▮
DOB: ▮▮▮▮
Theranos Results: K 5.5 and Ca 11.8 both flagged high.

Sonora results: 4.5 and 9.1 both flagged normal

2.) ▮▮▮▮▮▮▮▮  theranos 11.2 Ca (high) and same patient came back normal from Sonora


Sent from my iPhone

FOIA Confidential Treatment Requested by Theranos                              TS-1078152

**ER-15351**

**DX 12856**

This document was produced natively

SEC-USAO2-EPROD-000058918

Message

| | |
|---|---|
| **From**: | Tubergen, Jerry [/O=RDV CORPORATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JERRYT] |
| **Sent**: | 10/21/2014 1:28:24 AM |
| **To**: | Doug DeVos [████████████] |
| **Subject**: | Re: Thank You |

Thanks, Doug. Yup, we're there. And thanks for making the trip. I think we were already in, but that definitely sealed the deal.
This is, without a doubt, the most special opportunity we've seen, as it has so much potential to do so much, for so many!! Very cool.

JT a


> On Oct 20, 2014, at 6:24 PM, Doug DeVos <████████████> wrote:
>
> Jerry,
>
> Well done!! Looks like we're there!
>
> Exciting to be part of this tremendous effort to change the world for the better!
>
> Thanks,
>
> Doug
>
>> On Oct 20, 2014, at 13:23, Jerry Tubergen <jerryt@rdvcorp.com> wrote:
>>
>> Thanks very much Elizabeth.
>>
>> JT
>>
>>> On Oct 19, 2014, at 9:33 PM, Elizabeth Holmes <eholmes@theranos.com> wrote:
>>>
>>> Dear Jerry:
>>>
>>> Thank you for this note.
>>>
>>> We too very much enjoyed our meeting, and very much identified with your values and commitments.
>>>
>>> We cannot think of a better foundation for long term impact and long term value creation than building our company with a group of anchor shareholders who share these values.
>>>
>>> We have reserved the $100M allocation for you and the family. Sunny will follow with a note tomorrow with the details from here.
>>>
>>> We look forward to building this long term partnership on all fronts.
>>>
>>> With my very best regards,
>>> Elizabeth
>>>
>>> -----Original Message-----
>>> From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
>>> Sent: Sunday, October 19, 2014 7:47 AM
>>> To: Elizabeth Holmes; Sunny Balwani
>>> Cc: Doug DeVos
>>> Subject: Re: Thank You
>>>
>>> Elizabeth and Sunny
>>>
>>> Thank you so very much for our meeting Tuesday, with Doug, Cheri, Rick and me. It was wonderfully informative, and in fact, extremely encouraging and exciting to learn more about Theranos, and the truly amazing opportunities and potential that lay ahead. We all enjoyed spending the time with you, getting to know you both and hearing more about your values and vision. To say we were impressed, is clearly an understatement. As we agreed concluding our meeting, it is clear we have much in common, which is the stuff of good partnership.
>>>
>>> We would love to move forward and be a part of the new shareholder base you are assembling. As we discussed, an investment of $100M seems to fit, if that works for you and the company.

Confidential

RDV007493

>>>
>>> We are truly honored to have this opportunity, and look forward to a long, successful partnership. We
stand ready to be more that a financial partner, and are committed to helping you and your team build out
the Theranos platform to positively impact lives throughout the world for many years to come. As we said,
we view this as a multigenerational commitment.
>>>
>>> Please have whomever is appropriate follow up with me regarding next steps at their earliest
convenience.
>>>
>>> And thank you again for using your talent and efforts to create something that will be of benefit to
so many. We are grateful to have thus opportunity to be a part of this and are extremely encouraged about
the future.
>>>
>>> All the very best
>>>
>>> Jerry
>>>
>>>
>>>
>>>
>>>
>>>
>>>> On Sep 23, 2014, at 3:04 PM, "Elizabeth Holmes" <eholmes@theranos.com> wrote:
>>>>
>>>> Jerry:
>>>>
>>>> Thanks for this note and your comments below.
>>>>
>>>> It was wonderful to meet you.
>>>>
>>>> We too are deeply interested in the potential long term relationship here; our conversation and
discussion on values and long term value creation greatly resonated with us.
>>>>
>>>> We very much look forward to welcoming you to California. The 14th of October works for our team
here - we are definitely progressing toward closing some of these transactions but can plan to get
materials to you exactly upon receipt of your confidentiality agreement and move expeditiously with you
after the meeting so you don't have to fly out twice.
>>>>
>>>> I am looking forward to this,
>>>>
>>>> Elizabeth
>>>>
>>>> -----Original Message-----
>>>> From: Jerry Tubergen [mailto:jerryt@rdvcorp.com]
>>>> Sent: Thursday, September 18, 2014 11:54 AM
>>>> To: Elizabeth Holmes
>>>> Cc: 'dmosley@███████████'; Christian Holmes
>>>> Subject: Thank You
>>>>
>>>> Dear Elizabeth,
>>>>
>>>> What a great pleasure it was to meet you and Christian yesterday and get a sense of your values and
vision for Theranos. You have created something truly amazing. It does seem we have much in common. I
came away inspired and enthused.
>>>>
>>>> I was able to speak to several DeVos family members today about you, Theranos, and the potential for
us to become a partner with you in this exciting undertaking. As I expected, there was an overwhelmingly
enthusiastic response (from both 2nd and 3rd generation family members), and a strong desire to explore
how that might happen.
>>>>
>>>> Dan Mosley and I spoke earlier today as well, and he indicated he would send me a confidentiality
agreement to execute and return to you, which I am happy to do. Once you receive that, would you please
send me a copy of the offering memorandum for our review?
>>>>
>>>> As to an on-sight visit, I would love to find a time that works for me, along with one or two family
members. I otherwise need to be in California in mid-October, and it would work well to come out a day or
so early to visit you, say October 14 or 15. If you'd prefer, I can certainly find a time to come out
sooner. Happy to do whatever works best for you. We are very much looking forward to exploring a mutually
beneficial partnership.
>>>>
>>>> Thanks very much for your time yesterday and the opportunity to meet you.
>>>>
>>>> All the best,

Confidential

RDV007494

```
>>>>
>>>> Jerry
>>>>
```

Confidential                                                    RDV007495

**13288A**



**510(k) PREMARKET NOTIFICATION**

**FOR THE**

**THERANOS™ HERPES SIMPLEX VIRUS-1 IGG ASSAY**

**NOVEMBER 11, 2014**

**THERANOS, INC.**

**1701 PAGE MILL ROAD**

**PALO ALTO, CA 94304**

**U.S.A.**

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT**

FOIA Confidential Treatment Requested by Theranos                                   TS-0491680

**theranos**

1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

Attn: Sally Hojvat
U.S. Food and Drug Administration
Center for Devices and Radiological Health
Document Mail Center – WO66-G609
10903 New Hampshire Avenue
Silver Spring, MD 20993

November 11, 2014

**Re: Traditional 510(k) Premarket Notification for the Theranos™ Herpes Simplex Virus-1 IgG Assay**

Dear Sally:

Please find herewith a Traditional 510(k) Premarket Notification for Theranos Inc.'s anti-HSV-1 IgG assay for use with its automated sample processing and analysis system (the "***Theranos System***"), composed of Theranos' Sample Processing Units ("***TSPUs***") and Theranos' Laboratory Automation System ("***TLAS***").

Per FDA's August 12, 2005 guidance document titled, Guidance for Industry and Staff: Format for Traditional and Abbreviated 510(k)s regarding cover letters for 510(k) submissions, please note the following information:

1. Submission Date: November 12, 2014

2. Establishment Registration Numbers for Theranos, Inc.
   Palo Alto, California: 3010479366
   Newark, California: 3006231732

3. Common name of the device: Immunoassay for Herpes Simplex Virus -1 (HSV-1) IgG antibodies to the glycoprotein G (gG) 1 recombinant antigen

4. Trade Name: Theranos™ Herpes Simplex Virus-1 IgG Assay

5. Classification Name: Herpes simplex virus serological assays
   Regulation Number: 866.3305
   Product Code: MXJ – Enzyme linked immunosorbent assay, Herpes Simplex Virus, HSV-1

6. Reason for the 510(k): New device

7. Predicate: Focus HerpeSelect 1 and 2 Immunoblot IgG, from Focus Diagnostics, Inc. (4/14/2000)
   510(k) Number: K000238
   Regulation Number: 866.3305
   Product Code: LGC

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

8. Special Controls: Guidance for Industry and FDA Staff - Class II Special Controls
   Guidance Document: Herpes Simplex Virus Types 1 and 2 Serological Assays

Additionally, the principal factors about the design and use of the Theranos Herpes Simplex
Virus-1 IgG Assay are outlined in the following table.

| Question | YES | NO |
| --- | :---: | :---: |
| Is the device intended for prescription use (21 CFR§801 Subpart D)? | X | |
| Is the device intended for over-the-counter use (21 CFR§807 Subpart C)? | | X |
| Does the device contain components derived from a tissue or other biologic source? | X | |
| Is the device provided sterile? | | X |
| Is the device intended for single use? | | X* |
| Is the device a reprocessed single use device? | | X |
|     If yes, does this device type require reprocessed validation data? N/A | | |
| Does the device contain a drug? | | X |
| Does the device contain a biologic? | | X |
| Does the device use software? | X | |
| Does the submission include clinical information? | X | |
| Is the device implanted? | | X |

*Note that the HSV-1 Assay Cartridges used with the Theranos System are single-use only.

Enclosed please find one (1) paper copy of this Traditional 510(k) Premarket Submission and
one (1) eCopy. The eCopy is an exact duplicate of the paper copy.

*We request, in advance, that you treat this letter and our entire package as proprietary and
confidential information of Theranos in the event the FDA receives a public records request.
Theranos considers the content of these materials highly confidential as the materials reveal
trade secrets and other closely guarded information about the inner workings of Theranos'
proprietary technology.*

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

**theran⬤s**    1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

We again look forward to working with you on this filing and additional filings to come.

With my best regards,

Brad Arington
Senior Regulatory Counsel
Theranos, Inc.
650-856-7304
barington@theranos.com

cc:   Elizabeth Holmes, CEO and Founder
Daniel Young, Vice-President Theranos Systems

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER
THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos    TS-0491683

ER-15359

THERANOS, INC.          THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## Table of Contents

1.0    MEDICAL DEVICE USER FEE COVER SHEET (FORM FDA 3601) ................................ 1

2.0    CDRH PREMARKET REVIEW SUBMISSION COVER SHEET/CDRH 510(K) SCREENING CHECKLIST ........................................................................................................................ 3

3.0    INDICATIONS FOR USE STATEMENT ........................................................................ 11

4.0    510(K) SUMMARY .......................................................................................................... 12

5.0    TRUTHFUL AND ACCURACY STATEMENT ............................................................. 26

6.0    CLASS III SUMMARY AND CERTIFICATION ........................................................... 27

7.0    FINANCIAL CERTIFICATION OR DISCLOSURE STATEMENT ............................... 28

8.0    DECLARATIONS OF CONFORMITY AND SUMMARY REPORTS ............................ 29

9.0    EXECUTIVE SUMMARY ............................................................................................... 30

10.0    DEVICE DESCRIPTION ................................................................................................. 40

11.0    SUBSTANTIAL EQUIVALENCE DISCUSSION ......................................................... 70

12.0    PROPOSED LABELING .................................................................................................. 74

13.0    STERILIZATION AND SHELF-LIFE ........................................................................... 75

14.0    BIOCOMPATIBILITY ..................................................................................................... 76

15.0    SOFTWARE ...................................................................................................................... 77

16.0    ELECTROMAGNETIC COMPATIBILITY AND ELECTRICAL SAFETY ................... 86

17.0    PERFORMANCE TESTING – ANALYTICAL ............................................................... 88

18.0    PERFORMANCE TESTING – CLINICAL ...................................................................... 97

### APPENDICES

(Note that the Appendix Document Names reflect the file names of the corresponding documents in the eCopy for ease of reference. Excel and csv files are located in the Statistical Data folder. In the paper copy, they are indicated by the Appendix letters and numbers on the tabs.)

APPENDIX 8-A STANDARD DATA REPORT FOR IEC 60601-1-2:2007

APPENDIX 8-B STANDARD DATA REPORT FOR IEC 61010-1 ED. 3.0

APPENDIX 8-C STANDARD DATA REPORT FOR IEC 61010-2-020 ED. 2.0

APPENDIX 10-A HSV-1 CARTRIDGE LAYOUTS

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

THERANOS, INC.　　　　　　　THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

**APPENDIX 10-B WI-00033 WORK INSTRUCTIONS FOR SAMPLE COLLECTION, PROCESSING AND SHIPPING, THERANOS ANTI-HSV-1 IgG ASSAY**

**APPENDIX 10-C WI-00034 WORK INSTRUCTIONS FOR PROCESSING PATIENT SAMPLES ON A THERANOS SAMPLE PROCESSING UNIT BY THERANOS HIGH COMPLEXITY CLIA CERTIFIED LABORATORY STAFF**

**APPENDIX 10-D WI-00035 WORK INSTRUCTIONS FOR PROCESSING PATIENT SAMPLES ON A THERANOS SAMPLE PROCESSING UNIT BY FIELD TECHNICIANS**

**APPENDIX 10-E WI-00036 WORK INSTRUCTIONS FOR RETRIEVING RESULTS FROM ASSAYS RUN ON A THERANOS SAMPLE PROCESSING UNIT**

**APPENDIX 12-A LABEL CLIA CARTRIDGE OUTER BOX AND INNER BAG.**

**APPENDIX 12-B LABEL FIELD CARTRIDGE OUTER BOX AND INNER BAG.**

**APPENDIX 12-C PACKAGE INSERT - TSPU DEVICE.**

**APPENDIX 12-D TSPU LABEL.**

**APPENDIX 12-E PACKAGE INSERT - HSV-1 ASSAY.**

**APPENDIX 12-F PACKAGE INSERT FOR FOCUS HERPESELECT 1 AND 2 IMMUNOBLOT IgG**

**APPENDIX 15-A SYSTEM ARCHITECTURE DESIGN CHART**

**APPENDIX 15-B-1 SOFTWARE HAZARD ANALYSIS, THERANOS SYSTEM 4.**

**APPENDIX 15-B-2 SOP-00148_HAZARD_ANALYSIS**

**APPENDIX 15-C-1 REQ-00010_REQUIREMENTS, THERANOS SYSTEM 4, SOFTWARE, TLAS**

**APPENDIX 15-C-2 REQ-00011_REQUIREMENTS, THERANOS SYSTEM 4, SOFTWARE, TSPU**

**APPENDIX 15-D-1 SPC-00043_SPECIFICATION, THERANOS SYSTEM 4, SOFTWARE, TLAS**

**APPENDIX 15-D-2 SPC-00044_SPECIFICATIONS, THERANOS SYSTEM 4, SOFTWARE, TSPU**

**APPENDIX 15-E-1 TRACEABILITY MATRIX, THERANOS SYSTEM 4, TLAS.**

**APPENDIX 15-E-2 TRACEABILITY MATRIX, THERANOS SYSTEM 4, TSPU.**

**APPENDIX 15-F-1 TPR-00036_TEST PROTOCOL, THERANOS SYSTEM 4, SOFTWARE, TLAS.**

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

APPENDIX 15-F-2 TR-00044_TEST REPORT, THERANOS SYSTEM 4, SOFTWARE, TLAS.

APPENDIX 15-F-3 TPR-00037_TEST PROTOCOL, THERANOS SYSTEM 4, SOFTWARE, TSPU.

APPENDIX 15-F-4 TR-00045_TEST REPORT, THERANOS SYSTEM 4, SOFTWARE, TSPU.

APPENDIX 15-G SOFTWARE REVISION LEVEL HISTORY

APPENDIX 16-A-1 TR-00041 TEST REPORT, 4S2 DEVICE, EMC

APPENDIX 16-A-2 R969923

APPENDIX 16-A-3 R96624

APPENDIX 16-A-4 R96625

APPENDIX 16-B-1 TPR-00033_TEST PROTOCOL, TSPU 4S2, IEC61010-1_REVA

APPENDIX 16-B-2 TR-00039_TEST REPORT, TSPU 4S2, IEC 61010-1 AND DEVICE RESULTS

APPENDIX 16-C-1 TPR-00035_TEST PROTOCOL, TSPU CENTRIFUGE MODULE, IEC 61010-2-020_REVA

APPENDIX 16-C-2 TR-00036_TEST REPORT, TSPU 4S2 CENTRIFUGE MODULE, IEC 61010-2-020_REVA

APPENDIX 17-A-1-ANALYTICAL PRECISION

APPENDIX 17-A-2-ANALYTICAL PRECISION

APPENDIX 17-B-REAGENT STABILITY

APPENDIX 17-C-1-ANALYTE STABILITY

APPENDIX 17-C-2-1-ANALYTE STABILITY 2-8C

APPENDIX 17-C-2-2-ANALYTE STABILITY-FROZEN

APPENDIX 17-C-2-3-ANALYTE STABILITY-ROOM TEMPERATURE

APPENDIX 17-C-2-4-ANALYTE STABILITY-ONBOARD

APPENDIX 17-C-2-5-ANALYTE STABILITY-FREEZETHAW

APPENDIX 17-D-CROSS REACTIVITY

APPENDIX 17-E-1-INTERFERENCE STUDIES

APPENDIX 17-E-2-INTERFERENCE

APPENDIX 17-F-ASSAY CUT-OFF

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

APPENDIX 17-G-SAMPLE AND RUN LOG

APPENDIX 17-H TPR-00038 HSV1 IgG VALIDATION PROTOCOL

APPENDIX 18-A-1-MATRIX COMPARISON

APPENDIX 18-A-2-MATRIX COMPARISON

APPENDIX 18-B-1-PERFORMANCE IN HIGH RISK POPULATION

APPENDIX 18-B-2-PERFORMANCE IN HIGH RISK POPULATION

APPENDIX 18-C-1-PERFORMANCE IN PREGNANT WOMEN POPULATION

APPENDIX 18-C-2-PERFORMANCE IN PREGNANT WOMEN POPULATION

APPENDIX 18-D-1-PERFORMANCE IN LOW RISK POPULATION

APPENDIX 18-D-2-PERFORMANCE IN LOW RISK POPULATION

APPENDIX 18-E-1-PERFORMANCE ON CDC HSV PANEL

APPENDIX 18-E-2-PERFORMANCE ON CDC HSV PANEL

APPENDIX 18-F-1-CAPILLARY BLOOD TESTING IN CENTRAL LABORATORY-METHOD
        COMPARISON

APPENDIX 18-F-2-CAPILLARY BLOOD TESTING IN CENTRAL LABORATORY-METHOD
        COMPARISON

APPENDIX 18-G-1-CAPILLARY BLOOD TESTING IN CENTRAL LABORATORY-
        REPRODUCIBILITY

APPENDIX 18-G-2-CAPILLARY BLOOD TESTING IN CENTRAL LABORATORY-
        REPRODUCIBILITY

APPENDIX 18-H-1-CAPILLARY BLOOD TESTING IN PATIENT SERVICE CENTER-
        METHOD COMPARISON

APPENDIX 18-H-2-CAPILLARY BLOOD TESTING IN PATIENT SERVICE CENTER-
        METHOD COMPARISON

APPENDIX 18-I-1-CAPILLARY BLOOD TESTING IN PATIENT SERVICE CENTER-
        REPRODUCIBILITY

APPENDIX 18-I-2-CAPILLARY BLOOD TESTING IN PATIENT SERVICE CENTER-
        REPRODUCIBILITY

APPENDIX 18-J-INFORMATION ABOUT CLINICAL SAMPLES

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## 1.0  MEDICAL DEVICE USER FEE COVER SHEET (FORM FDA 3601)

Site: null  Page 1 of 2

Form Approved: OMB No. 0910-0511 Expiration Date: April 30, 2016. See Instructions for OMB Statement.

| DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION **MEDICAL DEVICE USER FEE COVER SHEET** | PAYMENT IDENTIFICATION NUMBER: **MD6078265** Write the Payment Identification number on your check. |
|---|---|

A completed cover sheet must accompany each original application or supplement subject to fees. If payment is made by U.S. mail or courier, please include a copy of this completed form with payment. Payment and mailing instructions can be found at: http://www.fda.gov/oc/mdufma/coversheet.html

| 1.  COMPANY NAME AND ADDRESS (include name, street address, city state, country, and post office code) THERANOS INC 1601 S California Ave Palo Alto CA 94304 US **1.1** EMPLOYER IDENTIFICATION NUMBER (EIN) *****1826 | 2.  CONTACT NAME Steven Arington **2.1** E-MAIL ADDRESS barington@theranos.com **2.2** TELEPHONE NUMBER (include Area code) 650-856-7304 **2.3** FACSIMILE (FAX) NUMBER (Include Area code) |
|---|---|

3.  TYPE OF PREMARKET APPLICATION (Select one of the following in each column; if you are unsure, please refer to the application descriptions at the following web site: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm345263.htm

| Select an application type: [X] Premarket notification(510(k)); except for third party [ ] 513(g) Request for Information [ ] Biologics License Application (BLA) [ ] Premarket Approval Application (PMA) [ ] Modular PMA [ ] Product Development Protocol (PDP) [ ] Premarket Report (PMR) [ ] 30-Day Notice | 3.1 Select a center [X] CDRH [ ] CBER 3.2  Select one of the types below [X] Original Application Supplement Types: [ ] Efficacy (BLA) [ ] Panel Track (PMA, PMR, PDP) [ ] Real-Time (PMA, PMR, PDP) [ ] 180-day (PMA, PMR, PDP) |
|---|---|

4.  ARE YOU A SMALL BUSINESS? (See the instructions for more information on determining this status)
[ ] YES, I meet the small business criteria and have submitted   [X] NO, I am not a small business the required qualifying documents to FDA
**4.1**  If Yes, please enter your Small Business Decision Number:

5. FDA WILL NOT ACCEPT YOUR SUBMISSION IF YOUR COMPANY HAS NOT PAID AN ESTABLISHMENT REGISTRATION FEE THAT IS DUE TO FDA. HAS YOUR COMPANY PAID ALL ESTABLISHMENT REGISTRATION FEES THAT ARE DUE TO FDA?
[X] YES (All of our establishments have registered and paid the fee, or this is our first device, and we will register and pay the fees within 30 days of FDA's approval/clearance of this device.)
[ ] NO (If "NO," FDA will not accept your submission until you have paid all fees due to FDA. This submission will not be processed; see http://www.fda.gov/cdrh/mdufma for additional information)

6.  IS THIS PREMARKET APPLICATION COVERED BY ANY OF THE FOLLOWING USER FEE EXCEPTIONS? IF SO, CHECK THE APPLICABLE EXCEPTION.

| [ ] This application is the first PMA submitted by a qualified small business, including any affiliates | [ ] The sole purpose of the application is to support conditions of use for a pediatric population |
|---|---|

https://userfees.fda.gov/OA_HTML/mdufmaCScdCfgItemsPopup.jsp?ordnum=6078265   10/29/2014

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 1 of **109**

FOIA Confidential Treatment Requested by Theranos  TS-0491688

THERANOS, INC.   THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

Site: null                                                    Page 2 of 2

| [ ] This biologics application is submitted under section 351 of the Public Health Service Act for a product licensed for further manufacturing use only | [ ] The application is submitted by a state or federal government entity for a device that is not to be distributed commercially |
|---|---|

7. IS THIS A SUPPLEMENT TO A PREMARKET APPLICATION FOR WHICH FEES WERE WAIVED DUE TO SOLE USE IN A PEDIATRIC POPULATION THAT NOW PROPOSES CONDITION OF USE FOR ANY ADULT POPULATION? (If so, the application is subject to the fee that applies for an original premarket approval application (PMA).
[ ] YES        [X] NO

PAPERWORK REDUCTION ACT STATEMENT
Public reporting burden for this collection of information is estimated to average 18 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the address below.

Department of Health and Human Services, Food and Drug Administration, Office of Chief Information Officer, 8455 Colesville Road, COLE-14-14253 Silver Spring, MD 20993-0002
[Please do NOT return this form to the above address, except as it pertains to comments on the burden estimate.]

8. USER FEE PAYMENT AMOUNT SUBMITTED FOR THIS PREMARKET APPLICATION
   $5,018.00                                                29-Oct-2014

"Close Window"  Print Cover sheet

https://userfees.fda.gov/OA_HTML/mdufmaCScdCfgItemsPopup.jsp?ordnum=6078265     10/29/2014

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **2** of **109**

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simplex Virus-1 Assay
Section 2.0

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

**CDRH PREMARKET REVIEW SUBMISSION COVER SHEET**

Form Approval
OMB No. 0910-0120
Expiration Date: December 31, 2013
See PRA Statement on page 5.

| Date of Submission | User Fee Payment ID Number | FDA Submission Document Number (if known) |
|---|---|---|
| 11/11/2014 | MD6078265 | |

## SECTION A — TYPE OF SUBMISSION

**PMA**
- ☐ Original Submission
- ☐ Premarket Report
- ☐ Modular Submission
- ☐ Amendment
- ☐ Report
- ☐ Report Amendment
- ☐ Licensing Agreement

**PMA & HDE Supplement**
- ☐ Regular (180 day)
- ☐ Special
- ☐ Panel Track (PMA Only)
- ☐ 30-day Supplement
- ☐ 30-day Notice
- ☐ 135-day Supplement
- ☐ Real-time Review
- ☐ Amendment to PMA & HDE Supplement
- ☐ Other

**PDP**
- ☐ Original PDP
- ☐ Notice of Completion
- ☐ Amendment to PDP

**510(k)**
- ☒ Original Submission:
- ☒ Traditional
- ☐ Special
- ☐ Abbreviated (Complete section I, Page 5)
- ☐ Additional Information
- ☐ Third Party

**Request for Feedback**
- ☐ Pre-Submission
- ☐ Informational Meeting
- ☐ Submission Issue Meeting
- ☐ Day 100 Meeting
- ☐ Agreement Meeting
- ☐ Determination Meeting
- ☐ Study Risk Determination
- ☐ Other (specify):

**IDE**
- ☐ Original Submission
- ☐ Amendment
- ☐ Supplement

**Humanitarian Device Exemption (HDE)**
- ☐ Original Submission
- ☐ Amendment
- ☐ Supplement
- ☐ Report
- ☐ Report Amendment

**Class II Exemption Petition**
- ☐ Original Submission
- ☐ Additional Information

**Evaluation of Automatic Class III Designation (De Novo)**
- ☐ Original Submission
- ☐ Additional Information

**Other Submission**
- ☐ 513(g)
- ☐ Other (describe submission)

Have you used or cited Standards in your submission? ☒ Yes ☐ No (If Yes, please complete Section I, Page 5)

## SECTION B — SUBMITTER, APPLICANT OR SPONSOR

| Company / Institution Name | Establishment Registration Number (if known) |
|---|---|
| Theranos, Inc. | Owner/Operator # 10041002 |

| Division Name (if applicable) | Phone Number (including area code) |
|---|---|
| | 650-856-7304 |

| Street Address | FAX Number (including area code) |
|---|---|
| 1701 Page Mill Road | |

| City | State / Province | ZIP/Postal Code | Country |
|---|---|---|---|
| Palo Alto | California | 94304 | USA |

| Contact Name |
|---|
| Brad Arington |

| Contact Title | Contact E-mail Address |
|---|---|
| Senior Regulatory Counsel | barington@theranos.com |

## SECTION C — APPLICATION CORRESPONDENT (e.g., consultant, if different from above)

| Company / Institution Name | |
|---|---|

| Division Name (if applicable) | Phone Number (including area code) |
|---|---|

| Street Address | FAX Number (including area code) |
|---|---|

| City | State / Province | ZIP Code | Country |
|---|---|---|---|

| Contact Name | |
|---|---|

| Contact Title | Contact E-mail Address |
|---|---|

FORM FDA 3514 (1/13)

Page 1 of 8 Pages

H&E Publishing Services (301) 443-4740 EF

Page 3 of 109

**ER-15366**

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simpliex Virus-1 Assay

| SECTION D1 | REASON FOR APPLICATION - PMA, PDP, OR HDE | |
|---|---|---|
| ☐ New Device<br>☐ Withdrawal<br>☐ Additional or Expanded Indications<br>☐ Request for Extension<br>☐ Post-approval Study Protocol<br>☐ Request for Applicant Hold<br>☐ Request for Removal of Applicant Hold<br>☐ Request to Remove or Add Manufacturing Site | ☐ Change in design, component, or specification:<br>  ☐ Software/Hardware<br>  ☐ Color Additive<br>  ☐ Material<br>  ☐ Specifications<br>  ☐ Other *(specify below)* | ☐ Location change:<br>  ☐ Manufacturer<br>  ☐ Sterilizer<br>  ☐ Packager |
| ☐ Process change:<br>  ☐ Manufacturing   ☐ Packaging<br>  ☐ Sterilization<br>  ☐ Other *(specify below)* | ☐ Labeling change:<br>  ☐ Indications<br>  ☐ Instructions<br>  ☐ Performance Characteristics<br>  ☐ Shelf Life<br>  ☐ Trade Name<br>  ☐ Other *(specify below)* | ☐ Report Submission:<br>  ☐ Annual or Periodic<br>  ☐ Post-approval Study<br>  ☐ Adverse Reaction<br>  ☐ Device Defect<br>  ☐ Amendment |
| ☐ Response to FDA correspondence: | | ☐ Change in Ownership<br>☐ Change in Correspondent<br>☐ Change of Applicant Address |
| ☐ Other Reason *(specify)*. | | |

| SECTION D2 | REASON FOR APPLICATION - IDE | |
|---|---|---|
| ☐ New Device<br>☐ New Indication<br>☐ Addition of Institution<br>☐ Expansion / Extension of Study<br>☐ IRB Certification<br>☐ Termination of Study<br>☐ Withdrawal of Application<br>☐ Unanticipated Adverse Effect<br>☐ Notification of Emergency Use<br>☐ Compassionate Use Request<br>☐ Treatment IDE<br>☐ Continued Access | ☐ Change in:<br>  ☐ Correspondent/Applicant<br>  ☐ Design/Device<br>  ☐ Informed Consent<br>  ☐ Manufacturer<br>  ☐ Manufacturing Process<br>  ☐ Protocol - Feasibility<br>  ☐ Protocol - Other<br>  ☐ Sponsor | ☐ Response to FDA Letter Concerning:<br>  ☐ Conditional Approval<br>  ☐ Deemed Approved<br>  ☐ Deficient Final Report<br>  ☐ Deficient Progress Report<br>  ☐ Deficient Investigator Report<br>  ☐ Disapproval<br>  ☐ Request Extension of Time to Respond to FDA<br>  ☐ Request Meeting<br>  ☐ Request Hearing |
| | ☐ Report submission:<br>  ☐ Current Investigator<br>  ☐ Annual Progress Report<br>  ☐ Site Waiver Report<br>  ☐ Final | |
| ☐ Other Reason *(specify)*: | | |

| SECTION D3 | REASON FOR SUBMISSION - 510(k) | |
|---|---|---|
| ☒ New Device | ☐ Additional or Expanded Indications | ☐ Change in Technology |
| ☐ Other Reason *(specify)*: | | |

FORM FDA 3514 (1/13)                                                    Page 2 of 6 Pages

Page 4 of 109

FOIA Confidential Treatment Requested by Theranos                    TS-0491691

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simplex Virus-1 Assay

| SECTION E | ADDITIONAL INFORMATION ON 510(K) SUBMISSIONS | | | | |
|---|---|---|---|---|---|
| Product codes of devices to which substantial equivalence is claimed | | | | | Summary of, or statement concerning, safety and effectiveness information |

| 1 LGC | 2 | 3 | 4 | ☐ 510 (k) summary attached |
|---|---|---|---|---|
| 5 | 6 | 7 | 8 | ☐ 510 (k) statement |

Information on devices to which substantial equivalence is claimed *(if known)*

| | 510(k) Number | | Trade or Proprietary or Model Name | | Manufacturer |
|---|---|---|---|---|---|
| 1 | K000238 | 1 | HSV-1 & HSV-2 Differentiation Immunoblot IgG | 1 | Focus Diagnostics |
| 2 | | 2 | | 2 | |
| 3 | | 3 | | 3 | |
| 4 | | 4 | | 4 | |
| 5 | | 5 | | 5 | |
| 6 | | 6 | | 6 | |

| SECTION F | PRODUCT INFORMATION - APPLICATION TO ALL APPLICATIONS |
|---|---|

Common or usual name or classification name

Immunoassay for Herpes Simplex Virus -1 (HSV-1) IgG antibodies to the glycoprotein G (gG) 1 recombinant antigen

| | Trade or Proprietary or Model Name for This Device | | Model Number |
|---|---|---|---|
| 1 | Theranos Herpes Simplex Virus-1 IgG Assay | 1 | TSPU Model No. 4S2 |
| 2 | | 2 | |
| 3 | | 3 | |
| 4 | | 4 | |
| 5 | | 5 | |

FDA document numbers of all prior related submissions *(regardless of outcome)*

| 1 Q140358 | 2 Q131148 | 3 Q131199 | 4 Q131542 | 5 Q131664 | 6 Q140553 |
|---|---|---|---|---|---|
| 7 Q140057 | 8 Q140818 | 9 K143099 | 10 | 11 | 12 |

Data Included in Submission

☐ Laboratory Testing    ☐ Animal Trials    ☒ Human Trials

| SECTION G | PRODUCT CLASSIFICATION - APPLICATION TO ALL APPLICATIONS | |
|---|---|---|
| Product Code | C.F.R. Section *(if applicable)* | Device Class |
| MXJ | 21 CFR 866.3305 | ☐ Class I    ☒ Class II |
| Classification Panel | | ☐ Class III    ☐ Unclassified |
| Microbiology | | |

Indications *(from labeling)*

The TheranosTM HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-1) in human serum from venous blood and K2-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-1 infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of this assay has not been established for use in a pediatric population, neonates and immunocompromised patients. The Theranos HSV-1 IgG assay is for use with the Theranos System.

FORM FDA 3514 (1/13)

Page 3 of 5 Pages

FOIA Confidential Treatment Requested by Theranos    TS-0491692

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simpliex Virus-1 Assay

| *Note:* Submission of the information entered in Section H does not affect the need to submit device establishment registration. | FDA Document Number *(if known)* |
|---|---|

**SECTION H** — MANUFACTURING / PACKAGING / STERILIZATION SITES RELATING TO A SUBMISSION

| ☒ Original ☐ Add ☐ Delete | Facility Establishment Identifier (FEI) Number 3006231732 | ☒ Manufacturer ☐ Contract Manufacturer | ☐ Contract Sterilizer ☐ Repackager / Relabeler |
|---|---|---|---|
| Company / Institution Name Theranos, Inc. | | Establishment Registration Number 3006231732 | |
| Division Name *(if applicable)* Newark Facility | | Phone Number *(including area code)* (650) 856-7304 | |
| Street Address 7333 Gateway Blvd. | | FAX Number *(including area code)* | |

| City Newark | State / Province CA | ZIP Code 94560 | Country USA |
|---|---|---|---|

| Contact Name Brad Arington | Contact Title Senior Regulatory Counsel | Contact E-mail Address barington@theranos.com |
|---|---|---|

| ☒ Original ☐ Add ☐ Delete | Facility Establishment Identifier (FEI) Number 3010479366 | ☐ Manufacturer ☐ Contract Manufacturer | ☐ Contract Sterilizer ☐ Repackager / Relabeler |
|---|---|---|---|
| Company / Institution Name Theranos, Inc. | | Establishment Registration Number 3010479366 | |
| Division Name *(if applicable)* Palo Alto Facility | | Phone Number *(including area code)* (650) 856-7304 | |
| Street Address 1701 Page Mill Road | | FAX Number *(including area code)* | |

| City Palo Alto | State / Province CA | ZIP Code 94304 | Country USA |
|---|---|---|---|

| Contact Name Brad Arington | Contact Title Senior Regulatory Counsel | Contact E-mail Address barington@theranos.com |
|---|---|---|

| ☐ Original ☐ Add ☐ Delete | Facility Establishment Identifier (FEI) Number | ☐ Manufacturer ☐ Contract Manufacturer | ☐ Contract Sterilizer ☐ Repackager / Relabeler |
|---|---|---|---|
| Company / Institution Name | | Establishment Registration Number | |
| Division Name *(if applicable)* | | Phone Number *(including area code)* | |
| Street Address | | FAX Number *(including area code)* | |

| City | State / Province | ZIP Code | Country |
|---|---|---|---|

| Contact Name | Contact Title | Contact E-mail Address |
|---|---|---|

FORM FDA 3514 (1/13)　　　　Add Continuation Page　　Page 4 of 6 Pages

Page 6 of 109

ER-15369

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simplex Virus-1 Assay

| | |
|---|---|
| *Note:* Submission of this information does not affect the need to submit a 2891 or 2891a Device Establishment Registration form. | FDA Document Number *(if known)* |

## SECTION H *(Continued)*

| Original | Facility Establishment Identifier (FEI) Number | ☐ Manufacturer | ☐ Contract Sterilizer |
|---|---|---|---|
| ☐ Original | | ☐ Manufacturer | ☐ Contract Sterilizer |
| ☐ Add ☐ Delete | | ☐ Contract Manufacturer | ☐ Repackager / Relabeler |

| Company / Institution Name | Establishment Registration Number |
|---|---|

| Division Name *(if applicable)* | Phone Number *(including area code)* |
|---|---|

| Street Address | FAX Number *(including area code)* |
|---|---|

| City | State / Province | ZIP Code | Country |
|---|---|---|---|

| Contact Name | Contact Title | Contact E-mail Address |
|---|---|---|

| ☐ Original | Facility Establishment Identifier (FEI) Number | ☐ Manufacturer | ☐ Contract Sterilizer |
|---|---|---|---|
| ☐ Add ☐ Delete | | ☐ Contract Manufacturer | ☐ Repackager / Relabeler |

| Company / Institution Name | Establishment Registration Number |
|---|---|

| Division Name *(if applicable)* | Phone Number *(including area code)* |
|---|---|

| Street Address | FAX Number *(including area code)* |
|---|---|

| City | State / Province | ZIP Code | Country |
|---|---|---|---|

| Contact Name | Contact Title | Contact E-mail Address |
|---|---|---|

| ☐ Original | Facility Establishment Identifier (FEI) Number | ☐ Manufacturer | ☐ Contract Sterilizer |
|---|---|---|---|
| ☐ Add ☐ Delete | | ☐ Contract Manufacturer | ☐ Repackager / Relabeler |

| Company / Institution Name | Establishment Registration Number |
|---|---|

| Division Name *(if applicable)* | Phone Number *(including area code)* |
|---|---|

| Street Address | FAX Number *(including area code)* |
|---|---|

| City | State / Province | ZIP Code | Country |
|---|---|---|---|

| Contact Name | Contact Title | Contact E-mail Address |
|---|---|---|

**FORM FDA 3514 (1/13)**      Add Continuation Page      Page 5 of 6 Pages

Page 7 of 109

FOIA Confidential Treatment Requested by Theranos      TS-0491694

**ER-15370**

Theranos, Inc. 510(k) Pre-Market Notification for Herpes Simpliex Virus-1 Assay

| SECTION I | | | UTILIZATION OF STANDARDS | | |
|---|---|---|---|---|---|
| **Note:** Complete this section if your application or submission cites standards or includes a *"Declaration of Conformity to a Recognized Standard"* statement. | | | | | |
| **1** | Standards No. 60601-1-2:2007 | Standards Organization International Electrotechnical Commission (IEC) | Standards Title Medical electrical equipment – Part 1-2: General requirements for basic safety and essential performance – Collateral standard: Electromagnetic compatibility – Requirements and tests | Version 3.0 | Date 09/28/2007 |
| **2** | Standards No. 61010-1 | Standards Organization IEC | Standards Title Safety requirements for electrical equipment for measurement, control, and laboratory use - Part 1. General requirements | Version 3.0 | Date 06/10/2010 |
| **3** | Standards No. 61010-2-020 | Standards Organization IEC | Standards Title Safety requirements for electrical equipment for measurement, control, and laboratory use - Part 2-020: Particular requirements for laboratory centrifuges. | Version 2.0 | Date 05/24/2006 |
| **4** | Standards No. | Standards Organization | Standards Title | Version | Date |
| **5** | Standards No. | Standards Organization | Standards Title | Version | Date |
| **6** | Standards No. | Standards Organization | Standards Title | Version | Date |
| **7** | Standards No. | Standards Organization | Standards Title | Version | Date |
| **Please include any additional standards to be cited on a separate page.** | | | | | - |

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 0.5 hour per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
1350 Piccard Drive, Room 400
Rockville, MD 20850

*An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.*

FORM FDA 3514 (1/13)                                                                                          Page 6 of 6 Pages

FOIA Confidential Treatment Requested by Theranos                                                              TS-0491695

**ER-15371**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

SCREENING CHECKLIST FOR PREMARKET NOTIFICATION 510(k) SUBMISSIONS

The following table is a reproduction of the Premarket Notification 510(k) Checklist for Acceptance Decision. For the reviewer's convenience, the location within the submission is noted, or if the item is omitted, a justification for the omission is provided.

| Device: | Herpes Simplex Virus-1 IgG Assay | K: | |
|---|---|---|---|
| Submitter: | Theranos, Inc. | | |

| TITLE | YES PRESENT / OMISSION JUSTIFIED | NO / INADEQUATE OMITTED | SUBMISSION LOCATION |
|---|---|---|---|
| A. MDUFMA Cover Sheet | X | | Section 1 |
| B. CDRH Premarket Review Submission Cover Sheet | X | | Section 2 |
| C. 510(k) Cover Letter | X | | Cover Letter |
| D. Indications for Use Statement | X | | Section 3 |
| E. 510(k) Summary or 510(k) Statement | X | | Section 4 |
| F. Truthful and Accuracy Statement | X | | Section 5 |
| G. Class III Summary and Certification | X | | Section 6 |
| H. Financial Certification or Disclosure Statement | X | | Section 7 |
| I. Declarations of Conformity and Summary Reports (Abbreviated 510(k)s) | X | | Section 8 |
| J. Executive Summary | X | | Section 9 |
| K. Device Description | X | | Section 10 |
| L. Substantial Equivalence Discussion | X | | Section 11 |
| M. Proposed Labeling | X | | Section 12 |
| N. Sterilization/Shelf Life | X | | Section 13 |
| O. Biocompatibility | X | | Section 14 |
| P. Software | X | | Section 15 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 9 of **109**

**ER-15372**

THERANOS, INC.　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| Q. Electromagnetic Compatibility/ Electrical Safety | X | | Section 16 |
|---|---|---|---|
| R. Performance Testing – Analytical | X | | Section 17 |
| S. Performance Testing – Clinical | X | | Section 18 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **10** of **109**

FOIA Confidential Treatment Requested by Theranos　　　　　TS-0491697

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

---

3.0    INDICATIONS FOR USE STATEMENT

The Theranos™ HSV-1 IgG assay is a chemiluminescent immunoassay intended for
the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-l) in
human serum from venous blood and K2-EDTA anticoagulated human plasma from
venous and capillary blood. The test is indicated for sexually active individuals and
expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The
predictive value of positive or negative results depends on the population's prevalence
and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or
plasma donors. The performance of this assay has not been established for use in a
pediatric population, neonates and immunocompromised patients. The Theranos HSV-
1 IgG assay is for use with the Theranos System.


Type of Use (Select one or both, as applicable)

___X___ Prescription Use (Part 21 CFR 801 Subpart D)

_____ Over-The-Counter Use (21 CFR 801 Subpart C)


TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **11** of **109**

---

FOIA Confidential Treatment Requested by Theranos

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                        510(k) PREMARKET NOTIFICATION

## 4.0    510(K) SUMMARY

### GENERAL INFORMATION

Applicant:
Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304
U.S.A.
Phone:  650-838-9292
Fax:  650-838-9165

Contact Person:
Brad Arington
Senior Regulatory Counsel
Theranos, Inc.
Phone:  650-856-7304
Fax:  650-838-9165

Date Prepared:
November 10, 2014

### DEVICE INFORMATION

Trade Name:
Theranos Herpes Simplex Virus-1 IgG Assay

Generic/Common Name:
Immunoassay for Herpes Simplex Virus-1 (HSV-1) IgG antibodies to the glycoprotein
G (gG) 1 recombinant antigen

Classification:
21 CFR 866.3305, Herpes simplex virus serological assays, Class II

Product Codes:
MXJ – Enzyme linked immunosorbent assay, Herpes Simplex Virus, HSV-1

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491699

**ER-15375**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                          510(k) PREMARKET NOTIFICATION

**PREDICATE DEVICE**

Focus HerpeSelect® 1 and 2 Immunoblot IgG, from Focus Diagnostics, Inc. (K000238)

**DEVICE DESCRIPTION**

The Theranos HSV-1 IgG assay is for use with the Theranos System. The Theranos System performs automated pre-analytical processing steps and analysis to produce the test results.

The Theranos anti-HSV-1 IgG immunoassay is a three-step sandwich immunoassay with HSV-1 (gG) recombinant antigen coated surface, an anti-human IgG detection reagent conjugated to alkaline phosphatase (AP) and chemiluminescent substrate. Capture reagent is coated on the reaction surface. Analyte in the calibrators, controls or sample binds to the capture reagent. Unbound entities are washed out and the capture surface is subsequently incubated with the detection reagent. This is followed by wash step to remove any nonspecific reactants. The capture-analyte-detection complex is then incubated with AP substrate to initiate the chemiluminescence reaction. The rate of the reaction generates light levels that are detected and analyzed by the Theranos System.

**INTENDED USE/INDICATIONS FOR USE**

The Theranos™ HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-l) in human serum from venous blood and K2-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of this assay has not been established for use in a pediatric population, neonates and immunocompromised patients. The Theranos HSV-1 IgG assay is for use with the Theranos System.

**SUBSTANTIAL EQUIVALENCE**

The Theranos HSV-1 IgG assay was compared to an assay commercially manufactured by Focus Diagnostics, the HerpeSelect 1 and 2 Immunoblot IgG assay (K000238). Test performance was compared to the Focus Diagnostics assay for HSV-1 only. These tests have the same Intended Use and Indications for Use. The Table 4-1 below provides a comparison of the characteristics of the subject Theranos and Focus Diagnostics assays.

Table 4-1: Comparison of Theranos Method and Predicate Method

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **13** of **109**

FOIA Confidential Treatment Requested by Theranos                    TS-0491700

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| Attribute | Theranos Method | Predicate Method |
|---|---|---|
| Intended Use | The Theranos HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-l) in human serum from venous blood and K₂-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of this assay has not been established for use in a pediatric population, neonates and immunocompromised patients.  The Theranos HSV-1 IgG assay is for use with the Theranos System. | Focus Diagnostics' HerpeSelect®1 and 2 Immunoblot IgG test is intended for qualitatively detecting the presence or absence of human IgG class antibodies to HSV-1 and HSV-2 in human sera. The test is indicated for testing sexually active adults or expectant mothers for aiding in the presumptive diagnosis of HSV-1 and HSV-2 infection. The predictive value of a positive or negative result depends on the population's prevalence and the pretest likelihood of HSV-1 and HSV-2 infection. The performance of this assay has not been established for use in a pediatric population, for neonatal screening, for testing of immunocompromised patients, for use by a point of care facility or for use with automated equipment. |
| Sample Volume | 10 uL | 20 uL |
| Controls | 2 (negative and positive) per assay | Same |
| Sample matrix | Venous serum, K2-EDTA plasma from venous and capillary blood | Venous Serum |
| Reagent storage | 2-8 °C in ready-to-use cartridges | 2-8 °C, on-board and refrigerator |
| Type of assay | Sandwich format immunoassay | Nitrocellulose Immunoblot |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **14** of **109**

**ER-15377**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                          510(k) PREMARKET NOTIFICATION

| Platform | Theranos System | Manual procedure |
|---|---|---|
| Capture reagent | HSV-1 recombinant antigen (gG1) | HSV-1/HSV-2 antigen immobilized on nitrocellulose membrane |
| Detection reagent | Mouse monoclonal antibody against human IgG, conjugated to alkaline phosphatase | Goat anti-human IgG conjugated to alkaline phosphatase, bromo-chloro-indodyl phosphate and nitroblue tetrazolium substrate |
| Sample handling and processing | Automated | Manual |
| Measurement system | Photodiode | Visual observation of bands on a strip |
| Unit of measure | Antibody index | Positive or negative reading from color of band |
| Total incubation | 10 min | 2 hr 20 mins |

From performance data detailed below, Theranos has concluded that the Theranos Herpes HSV-1 IgG immunoassay is substantially equivalent to the commercially available HerpeSelect 1 and 2 Immunoblot IgG assay manufactured by Focus Diagnostics for detection of HSV-1 IgG antibodies in the indicated populations.

**Expected Values**

The HSV-1 IgG immunoassay was used to evaluate the prevalence of HSV-1 IgG antibodies in expectant mothers and high risk adults for whom an HSV-1 IgG test was ordered by a physician. The study population for the HSV-1 IgG immunoassay consisted of 640 patients. Of these 640 subjects, 82 were low-risk individuals and 558 were high risk adults, with 298 individuals identified as a pregnant sub-cohort. The data for the intended use population (558 specimens) have been summarized according to age group in decades, gender, number of reactive results, and number of non-reactive results.

Table 4-2 Expected results for HSV-1 IgG immunoassay in High Risk Adult Subjects

| Age range | Gender | Reactive | | Non-reactive | | Total |
|---|---|---|---|---|---|---|
| | | N | Percent | N | Percent | |
| 16 to 19 | Male | 0 | 0 | 0 | 0.0 | 0 |
| 16 to 19 | Female | 1 | 25.0 | 3 | 75.0 | 4 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **15** of **109**

**ER-15378**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                        510(k) PREMARKET NOTIFICATION

| 20 to 29 | Male | 8 | 47.1 | 9 | 52.9 | 17 |
| 20 to 29 | Female | 29 | 39.7 | 44 | 60.3 | 73 |
| 30 to 39 | Male | 5 | 50.0 | 5 | 50.0 | 10 |
| 30 to 39 | Female | 33 | 53.2 | 29 | 46.8 | 62 |
| 40 to 49 | Male | 5 | 50.0 | 5 | 50.0 | 10 |
| 40 to 49 | Female | 16 | 59.3 | 11 | 40.7 | 27 |
| 50 to 59 | Male | 17 | 85.0 | 3 | 15.0 | 20 |
| 50 to 59 | Female | 9 | 81.8 | 2 | 18.2 | 11 |
| 60 to 69 | Male | 5 | 83.3 | 1 | 16.7 | 6 |
| 60 to 69 | Female | 5 | 55.6 | 4 | 44.4 | 9 |
| 70 to 79 | Male | 3 | 75.0 | 1 | 25.0 | 4 |
| 70 to 79 | Female | 1 | 33.3 | 2 | 66.7 | 3 |
| 80 to 89 | Male | 0 | 0.0 | 0 | 0.0 | 0 |
| 80 to 89 | Female | 1 | 100.0 | 0 | 0.0 | 1 |
| Total | | 138 | 54% | 119 | 46% | 257 |

\* 2 samples tested equivocal on Theranos assay. Age information was unavailable for one subject.

Table 4-3 Expected results for HSV-1 IgG immunoassay in Pregnant Subjects

| Age range | Gender | Reactive | | Non-reactive | | Total |
|---|---|---|---|---|---|---|
| | | N | Percent | N | Percent | |
| 18 to 19 | Female | 7 | 53.8 | 6 | 46.2 | 13 |
| 20 to 29 | Female | 118 | 66.7 | 59 | 33.3 | 177 |
| 30 to 39 | Female | 65 | 64.4 | 36 | 35.6 | 101 |
| 40 to 49 | Female | 3 | 50.0 | 3 | 50.0 | 6 |
| Total | | 193 | 64.98 | 104 | 35.0 | 297 |

The hypothetical positive and negative predictive values (PPV, NPV) for the two populations are shown in Table 4-4. The calculations are based on the specificity and sensitivity values for HSV-1 IgG immunoassay determined in the study above, namely:

1.   Specificity of 97.4% and sensitivity of 95.2% in high risk adults
2.   Specificity of 95.1% and sensitivity of 97.4% in pregnant women

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 16 of 109

ER-15379

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

Table 4-4 Hypothetical Predictive Values

| Prevalence | High Risk Adults | | Pregnant Women | |
|---|---|---|---|---|
| | PPV | NPV | PPV | NPV |
| 50 | 93.8 | 92.6 | 92.1 | 91.7 |
| 45 | 93.2 | 93.2 | 91.3 | 92.4 |
| 40 | 92.4 | 93.8 | 90.3 | 93.0 |
| 35 | 91.4 | 94.2 | 89.1 | 93.5 |
| 30 | 90.1 | 94.6 | 87.5 | 94.0 |
| 25 | 88.3 | 94.9 | 85.3 | 94.3 |
| 20 | 85.8 | 95.2 | 82.3 | 94.7 |
| 15 | 82.0 | 95.5 | 77.7 | 95.0 |
| 10 | 75.2 | 95.7 | 69.9 | 95.2 |
| 5 | 60.2 | 96.0 | 53.8 | 95.5 |

**Specific Performance Characteristics**

To characterize performance of the Theranos HSV-1 IgG immunoassay in the clinical setting, the following four studies were conducted:

1. Matrix comparison
2. Sensitivity and specificity assessment in target population
3. CDC panel testing
4. Processing of capillary samples in central laboratory
   a. Method comparison
   b. Reproducibility
5. Processing of capillary samples in field locations
   a. Method comparison
   b. Reproducibility

**1.  Matrix Comparison**:

The effect of anticoagulants on the detection of analyte in HSV-1 IgG immunoassay was determined by comparing values obtained from matched venous serum venous K2-EDTA plasma, and capillary K2-EDTA plasma samples drawn from the same donors. At least 40 serum/plasma pairs were tested for each of the anticoagulants. The

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 17 of 109

THERANOS, INC.　　　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

acceptance criterion was a recovery of positive plasma samples within ± 20% of the serum reference value (serum drawn into primary tubes without gel). For negative samples, the acceptance criteria was a difference of <= 0.02 COI from the corresponding serum value. All anticoagulant–treated plasma samples met this criterion. The results of this study are displayed in Table 4-5 below.

Table 4-5 Summary of matrix comparison studies for HSV-1 IgG

| | Number of specimens showing recovery to serum within various ranges | | | | |
|---|---|---|---|---|---|
| Negative samples | <=0.005 COI | <=0.01 COI | <=0.02COI | >0.02COI | Total |
| Fingerstick EDTA plasma | 7 | 8 | 2 | 1 | 18 |
| Venous EDTA plasma | 9 | 2 | 6 | 1 | 18 |
| Positive samples | <=5% | 5-10% | 10-20% | >20% | Total |
| Fingerstick EDTA plasma | 17 | 6 | 0 | 0 | 23 |
| Venous EDTA plasma | 10 | 10 | 4 | 0 | 24 |

| Negative samples | Mean Bias (COI) | Mean Bias 95% LCL (COI) | Mean Bias 95% UCL (COI) |
|---|---|---|---|
| Fingerstick EDTA plasma | 0.002 | -0.020 | 0.024 |
| Venous EDTA plasma | 0.002 | -0.019 | 0.022 |
| Positive samples | Mean Bias (%) | Mean Bias 95% LCL (%) | Mean Bias 95% UCL (%) |
| Fingerstick EDTA plasma | -1.6 | -9.8 | 6.6 |
| Venous EDTA plasma | -0.3 | -14.9 | 14.3 |

**2. Sensitivity and specificity in target population**:

A clinical study was conducted to characterize the performance of HSV-1 IgG immunoassay. Retrospective venous serum samples were used in the study. The primary objective of the study was to demonstrate the sensitivity and specificity of the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **18** of **109**

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　　　TS-0491705

THERANOS, INC.                     THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                                 510(k) PREMARKET NOTIFICATION

HSV-1 IgG immunoassay in the Theranos CLIA-certified Laboratory in comparison to the reference method. All collected samples were tested on the Theranos HSV-1 IgG assay and tested with the FOCUS HerpeSelect Immunoblot reference method.

The target population for HSV-1 IgG includes individuals with signs and symptoms of HSV-1 infection, pregnant women and sexually active adults at risk for sexually transmitted diseases.    To capture the target population for the HSV-1 IgG assay, samples were obtained from adults (18 years and older) who had a prescription for a HSV-1 IgG test.

Assessment of the tests performance in low prevalence populations was also tested to assist in determining the specificity of the test. Low prevalence populations are not a target population for HSV testing, as the public health benefit of screening for HSV in low prevalence populations has not been determined. To capture this low risk group, samples were obtained from adults (18 years and older) who were not sexually active (celibate) and without a recent or current sexually transmitted disease (Hepatitis, Syphilis, HIV, HPV, Trichomonas, Chlamydia, Gonorrhoeae).

All samples in this portion of the studies were shipped frozen to Theranos. Upon receipt, the samples were thawed, divided into aliquots and refrozen. All subsequent testing was performed on samples which had been frozen and thawed once.

Samples that repeatedly tested equivocal on the predicate device were resolved using a validated western blot reference test (University of Washington, Seattle) as per the instructions of the predicate device package insert.

Among the 640 samples, 543 (85%) were females and 97 (15%) were males. Ages ranged from 18 to 90 years. These populations included: high risk individuals (n = 558) and low risk population (n = 82). Out of the 558 samples collected from the high risk group, 298 samples were identified as pregnant women. For acceptance, the lower bound of the 95% confidence interval on sensitivity and specificity needed to be >89%.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0491706

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

Table 4-6 Summary of HSV-1 IgG test performance on high risk adult population.

|  |  | Reference method | | | |
|---|---|---|---|---|---|
|  |  | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 137 | 0 | 2 | 139 |
|  | Equivocal | 1 | 0 | 1 | 1 |
|  | Negative | 5 | 1 | 113 | 119 |
|  | Total | 143 | 1 | 119 | **260** |

| Agreement classification | Numerator/Denominator | Percent Agreement | 95% Confidence Interval |
|---|---|---|---|
| Specificity | 113/116 | 97.4 | 92.6-99.5 |
| Sensitivity | 137/144 | 95.1 | 90.2-98.0 |

Table 4-7 Summary of HSV-1 IgG test performance on pregnant women population.

|  |  | Reference method | | | |
|---|---|---|---|---|---|
|  |  | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 188 | 1 | 4 | 193 |
|  | Equivocal | 0 | 1 | 0 | 1 |
|  | Negative | 2 | 2 | 100 | 104 |
|  | Total | 190 | 4 | 104 | **298** |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **20** of **109**

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| Agreement classification | Numerator/Denominator | Percent Agreement | 95% Confidence Interval |
|---|---|---|---|
| Specificity | 100/105 | 95.2 | 89.2-98.4 |
| Sensitivity | 188/193 | 97.4 | 94.1-99.2 |

**Low Risk Population:**

Serum samples were collected from a low risk population: individuals who are not sexually active, without a recent or current sexually transmitted disease (Hepatitis, Syphilis, HIV, HPV, Trichomonas, Chlamydia, Gonorrhoeae) as determined in an interview. Performance of the assay on this population is summarized in Table 4-8.

Table 4-8 Summary of HSV-1 IgG test performance on low risk population

| | | Reference method | | | |
|---|---|---|---|---|---|
| | | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 32 | 0 | 0 | 32 |
| | Equivocal | 0 | 0 | 0 | 0 |
| | Negative | 0 | 1 | 49 | 50 |
| | Total | 32 | 1 | 49 | *82* |

| Agreement classification | Numerator/Denominator | Percent Agreement | 95% Confidence Interval |
|---|---|---|---|
| Specificity | 49/49 | 100.0 | 92.7-100.0 |
| Sensitivity | 32/33 | 97 | 84.2-99.9 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **21** of **109**

THERANOS, INC.
THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

**3.** <u>**CDC panel testing**</u>:

The objective of this study was to demonstrate agreement of the Theranos method with the CDC panel. A panel of serum samples (n=100) was obtained from the US Centers for Disease Control and Prevention (CDC) and tested for confirmatory purposes. The CDC sample panel was tested on the HSV-1 IgG immunoassay on the Theranos System and the results were sent to the CDC for evaluation. The panel consisted of 54 positives and 46 negatives. The Theranos HSV-1 IgG assay demonstrated 100% agreement with the results provided by the CDC.

**4.** <u>**Processing of capillary blood samples in central laboratory**</u>:

In order to demonstrate the validity of Theranos HSV-1 IgG for capillary blood samples collected in the field, three Theranos Patient Service centers (Palo Alto, CA, Newark, CA and Scottsdale, AZ) were selected. At each site, 1 Theranos Capillary Tubes and Nanotainer Tubes and a serum tube were drawn from 20 adult subjects. From 10 subjects, 4 Capillary Tubes and Nanotainer Tubes were drawn for a reproducibility study. Samples were collected following the Theranos standard blood collection protocol. Samples were shipped on ice to Theranos CLIA Laboratory in Palo Alto, CA. Upon receipt, samples were centrifuged at 1200g for 5 mins. Plasma was extracted and tested on the Theranos System. All samples were processed or frozen as plasma within 48 hours of draw. Paired serum samples were tested on the reference method.

The agreement between Theranos assay and the reference method was excellent—with positive percent agreement of 97%, and negative percent agreement of 100%. Cohen's Kappa test yielded a Z-value of 14.98 and a p-value $< 2e-16$.

Table 4-9 Summary of method comparison for samples collected at Theranos Patient Service Centers at three sites.

|                   |     | Reference Result | |
|-------------------|-----|------|------|
|                   |     | POS  | NEG  |
| Theranos Result   | POS | 32   | 0    |
|                   | NEG | 1    | 19   |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **22** of **109**

FOIA Confidential Treatment Requested by Theranos          TS-0491709

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                        510(k) PREMARKET NOTIFICATION

Table 4-10 Reproducibility of Theranos HSV-1 IgG measurement on capillary blood samples collected at Theranos PSC. For negative samples with mean COI < 0.5, the mean of deviation of each measurement from the average of quadruplicate measurements is tabulated. For samples with mean COI > 0.5, %CV of the 4 measurements is tabulated.

| SubjectID | Mean | <\|ΔCOI\|> | SubjectID | Mean | %CV |
|---|---|---|---|---|---|
| 10 | 0.011 | 0.002 | 7 | 0.8 | 12% |
| 11 | 0.015 | 0.004 | 26 | 1.6 | 13% |
| 12 | 0.015 | 0.004 | 21 | 8.3 | 10% |
| 3 | 0.019 | 0.005 | 5 | 9.2 | NA |
| 23 | 0.019 | 0.010 | 16 | 10.0 | 15% |
| 19 | 0.019 | 0.004 | 24 | 10.6 | 7% |
| 13 | 0.020 | 0.005 | 18 | 11.2 | 14% |
| 22 | 0.026 | 0.017 | 6 | 13.7 | 12% |
| 1 | 0.026 | 0.006 | 2 | 15.7 | 9% |
| 15 | 0.039 | 0.016 | 14 | 18.2 | 5% |
| 28 | 0.039 | 0.021 | 9 | 24.6 | 11% |
| 8 | 0.046 | 0.011 | 20 | 29.7 | 16% |
| 29 | 0.050 | 0.021 | 30 | 30.9 | 13% |
| 4 | 0.084 | 0.007 | 17 | 46.1 | 1% |
| 27 | 0.116 | 0.021 | 25 | 46.2 | 13% |

**5.  Processing of capillary samples in field locations**

In order to demonstrate the validity of Theranos HSV-1 IgG for capillary blood samples collected and processed in the field, three Theranos Patient Service centers (Palo Alto, CA, Newark, CA and Scottsdale, AZ) were selected. At each site, one (1) Theranos Capillary Tubes and Nanotainer Tubes and a serum tube was drawn from 20 subjects. From 10 subjects, 4 Capillary Tubes and Nanotainer Tubes were drawn for a reproducibility study. Samples were collected following the Theranos' standard blood collection protocol. Samples were processed on the Theranos System at the TPSC by Theranos staff. All samples were stored at 2-8°C and processed within 48 hours of

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491710

THERANOS, INC.　　　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

collection. Paired serum samples were shipped to Theranos Laboratory in Palo Alto, CA and tested on the reference method.

The agreement between Theranos assay and the reference method was excellent with positive percent agreement of 98% and negative percent agreement of 97%. Cohen's Kappa test yielded a Z-value of 8.45 and a p-value < 2e-16.

Table 4-11 Summary of method comparison for samples collected at Theranos Patient Service Centers at three sites.

|  |  | Reference Result | |
|---|---|---|---|
|  |  | POS | NEG |
| Theranos Result | POS | 47 | 1 |
|  | NEG | 1 | 34 |

Table 4-12 Reproducibility of Theranos HSV-1 IgG measurement on capillary blood samples collected and processed at the TPSC. For negative samples with mean COI < 0.5, the mean of deviation of each measurement from the average of quadruplicate measurements is tabulated. For samples with mean COI > 0.5, %CV of the 4 measurements is tabulated.

| SubjectID | Mean | <|ΔCOI|> | SubjectID | Mean | %CV |
|---|---|---|---|---|---|
| M32-PA | 0.043 | 0.006 | F10-PA | 30.7 | 6.6 |
| M26-NWK | 0.016 | 0.008 | F11-PA | 3.2 | 8.7 |
| F-525NWK | 0.020 | 0.006 | F15-PA | 41.9 | 4.4 |
| F17-NWK | 0.061 | 0.012 | F16-PA | 13.5 | 4.8 |
| M-20NWK | 0.218 | 0.010 | F20-PA | 34.5 | 9.3 |
| M18-NWK | 0.032 | 0.008 | F29-PA | 9.6 | 19.8 |
| F28-AZ | 0.022 | 0.005 | F30-PA | 56.6 | 10.7 |
| M29-AZ | 0.019 | 0.001 | F31-PA | 11.1 | 8.3 |
| M31-AZ | 0.021 | 0.009 | F8- PA | 4.2 | 3.1 |
| M34-AZ | 0.026 | 0.004 | M17-PA | 21.2 | 15.3 |
| M36-AZ | 0.072 | 0.013 | M27-PA | 12.1 | 10.4 |
|  |  |  | M28-PA | 17.4 | 5.4 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　　　　　　　TS-0491711

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

|  |  |  | M27-NWK | 26.9 | 9.8 |
|---|---|---|---|---|---|
|  |  |  | F-21NWK | 22.1 | 17.0 |
|  |  |  | M-24NWK | 2.2 | 9.4 |
|  |  |  | M15-NWK | 67.8 | 6.4 |
|  |  |  | M16-NWK | 1.5 | 6.3 |
|  |  |  | F30-AZ | 5.8 | 8.2 |
|  |  |  | F32-AZ | 13.6 | 3.6 |
|  |  |  | F33-AZ | 10.1 | 11.1 |
|  |  |  | F35-AZ | 1.7 | 11.9 |
|  |  |  | F42-AZ | 5.1 | 12.6 |
|  |  |  | M26-AZ | 14.0 | 6.3 |
|  |  |  | M27-AZ | 5.9 | 10.3 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **25** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IGG ASSAY
                                               510(k) PREMARKET NOTIFICATION

---

**5.0    TRUTHFUL AND ACCURACY STATEMENT**

I certify that, in my capacity as (the position held in company) of Theranos, Inc., I
believe to the best of my knowledge, that all data and information submitted in the
premarket notification are truthful and accurate and that no material fact has been
omitted.


Daniel Young, Ph.D.                          11/11/2014
Vice President of Theranos Systems                Date
Theranos, Inc.


Premarket Notification 510(k) Number: _____

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT
Page 26 of 109

FOIA Confidential Treatment Requested by Theranos                    TS-0491713

THERANOS, INC.                    THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                         510(k) PREMARKET NOTIFICATION

## 6.0    CLASS III SUMMARY AND CERTIFICATION

Because the Theranos HSV-1 Assay is not a Class III device and is not substantially equivalent to any Class III device, the Literature Search and Certification requirement of the Safe Medical Devices Amendments (SMDA) of 1990 is not applicable.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491714

ER-15390

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                       510(k) PREMARKET NOTIFICATION

7.0     FINANCIAL CERTIFICATION OR DISCLOSURE STATEMENT

Theranos did not engage any Clinical Investigators outside of the company to conduct any of the studies from which performance data was submitted for this 510(k) Pre-market Notification.

The studies conducted for the performance data submitted for this 510(k) Pre-Market Notification are not "applicable device trials" under Title VIII of FDAAA, Sec. 801(j).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491715

ER-15391

THERANOS, INC.                THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                              510(k) PREMARKET NOTIFICATION

**8.0    DECLARATIONS OF CONFORMITY AND SUMMARY REPORTS**

**Declaration of Conformity**

This section is not applicable for Traditional 510(k) premarket notifications.

**Summary Reports – Standard Data Reports**

Please find a complete list of standards used in the preparation of this premarket notification. The Standards Data Reports (Form FDA 3654) for each standard are provided in the following order. The complete reports for each of these standards are described and provided in Section 16.0.

- **IEC 60601-1-2:2007**, Medical electrical equipment – Part 1-2: General requirements for basic safety and essential performance – Collateral standard: Electromagnetic compatibility – Requirements and tests. The Standard Data Report is attached as **Appendix 8-A**.
- **IEC 61010-1 ed. 3.0**, Safety requirements for electrical equipment for measurement, control, and laboratory use - Part 1: General requirements. The Standard Data Report is attached as **Appendix 8-B**.
- **IEC 61010-2-020 ed. 2.0**, Safety requirements for electrical equipment for measurement, control, and laboratory use - Part 2-020: Particular requirements for laboratory centrifuges. The Standard Data Report is attached as **Appendix 8-C**.

Note that the full test reports and supporting documentation for conformance to these standards are provided in Section 16.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                TS-0491716

THERANOS, INC.                    THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IGG ASSAY
                                  510(k) PREMARKET NOTIFICATION

## 9.0    EXECUTIVE SUMMARY

### OVERVIEW

This 510(k) Pre-market Notification covers Theranos, Inc.'s Herpes Simplex Virus-1 IgG Assay run on its Clinical Laboratory Improvement Amendments ("CLIA")-certified laboratory's automated sample processing and analysis system (the "**Theranos System**"), composed of Theranos' Sample Processing Units ("**TSPUs**") and Theranos' Laboratory Automation System ("**TLAS**").

TSPUs provide automated, pre-analytic sample processing for the purpose of substantially reducing human error in sample preparation, extraction, and processing, and for reducing the associated variability and error in test results.

The TSPU and TLAS were designed to automate the exact processing steps and protocols associated with the most precise and accurate CLIA-certified test methods. The TSPUs under this 510(k) Pre-market Notification cover two use cases: use of the TSPU in Theranos' central CLIA-certified laboratory (the "**CLIA-Laboratory Model**") and use of the TSPU in locations where patient specimens are collected, including Theranos' Patient Service Centers ("**TPSCs**"), under the control and oversight of Theranos' Palo Alto-based CLIA-certified laboratory, for the purpose of providing the highest integrity clinical laboratory services (the "**Field Model**").

Because the sample required for use in the Theranos System is very small and commercially available blood collection tubes require human processing (e.g. manual mixing, human participation in filling) that can increase variability in test results, and additionally are sized for larger samples such that the collection into the larger capillary tubes can increase variability in test results (too much anticoagulant, too much air exposure, etc.), Theranos has designed and developed the Capillary Tubes and Nanotainer Tubes to collect, preserve, and transport very small samples for processing in the Theranos System. Theranos filed a 510(k) Pre-Market Notification (K143099) on October 28, 2014 for the Capillary Tubes and Nanotainer Tubes. In addition, testing of the Capillary Tubes and Nanotainer Tubes for collection of capillary samples by fingerstick has been included in this 510(k) Pre-Market Notification to demonstrate further the performance of these devices as part of the overall Theranos System, as discussed further below.

The rationale behind the development of the TSPU and TLAS was to build a certified laboratory infrastructure where the highest level of oversight could be combined with rapid processing of fresh samples by automation of the pre-analytic processing steps either in the central CLIA-certified laboratory or the field, while maintaining all the

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **30** of **109**

**ER-15393**

**THERANOS, INC.**　　　　　**THERANOS**<sup>TM</sup> **HERPES SIMPLEX VIRUS-1 IGG ASSAY**
　　　　　　　　　　　　　　　**510(k) PREMARKET NOTIFICATION**

performance, validated protocols, and infrastructure associated with processing and running tests in a CLIA-certified laboratory.

Leveraging Theranos' intellectual property in the use of secure server software to control medical devices and enable two-way communication to and from medical devices, we believe that automation of pre-analytic processing steps with CLIA-certified laboratory oversight in the Field Model at TPSCs will increase the quality of patient care by enabling a faster generation of lab results for physicians, minimizing errors associated with pre-analytic and human processing, the largest contributor of error in laboratory testing, enabling processing of fresh samples to minimize the impact of analyte decay rates and the associated clinical relevance of results reported back to clinicians, minimizing the impact of sample shipments, temperature, environment, and human related variability on result variability and sample chain-of-custody issues, facilitating Theranos micro-sample testing for better patient experience and compliance, and providing oversight of processing steps that have the potential to cause test variability or error. Signals generated by the TSPU during pre-analytic processing are transmitted to Theranos' Palo Alto CLIA-certified laboratory, which will then conduct the analytic and post-analytic steps of the testing process through the TLAS, which can convert the signals received from the device into test results and review replicate data, outliers, controls, and calibrator values in doing so.

The preanalytic specimen collection and preparation activities described in the CLIA regulations are closely tracked by the activities performed in the Field Model at the Theranos collection sites by the Theranos personnel and the TSPU. Specifically, Theranos personnel prepare the patient, collect the sample and then place the sample into the TSPU cartridge. The cartridge is placed into the TSPU. The cartridge/TSPU then, through automated processes, performs (1) specimen preanalytic processing; and (2) transmission of preanalytic specimen data to the Theranos CLIA laboratory for analytic testing and postanalytic processing. These automated processes conducted by the TSPU are analogous to the preanalytic sample preparation performed by a phlebotomist/lab technician in a service center, and include sample processing operations such as sample separation and addition of various reagents, as well as automated specimen acceptability and rejection processes (with multiple redundancies added in an automated manner). It is important to note that the automation of the preanalytic sample processing eliminates common human error in sample preparation and processing, a significant factor in laboratory test error rates.

The next operation performed by the TSPU is digital transmission of preanalytic specimen data to the Theranos CLIA-certified laboratory for analytic testing and postanalytic processing. Again, this operation is analogous to a patient specimen collection site in which the collected and preanalytic processed sample would be physically transported to a CLIA certified laboratory for analytic and postanalytic

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

Page **31** of **109**

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　　　　　　　TS-0491718

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                      510(k) PREMARKET NOTIFICATION

processing. However, in this case, rather than transporting the physical sample, the
TSPU transmits data on the specimen to the Theranos CLIA laboratory for analytic
testing and post-analytic processing via the TLAS. Again, the Theranos model
eliminates potential for sample degradation or damage by removing the need to
physically transport the processed sample to the CLIA-certified laboratory for testing
and analysis. Importantly, the TSPU is monitored and controlled by the TLAS at the
Theranos CLIA-certified laboratory, requiring minimal interaction with the collection
site phlebotomist/technician as reflected in the Instructions for Use in the Package
Insert (Appendix 12-E).

After analyzing the data through the TLAS, the Palo Alto CLIA-certified laboratory
personnel generate a test report, which is transmitted to the health care professional that
ordered a given test. As referenced above, the Theranos laboratory leverages Theranos'
intellectual property in secure two-way network connectivity to connect the TLAS to
the TSPUs, making it possible for those TSPUs to be placed, under the Field Model, at
sample collection sites, such as the TSPCs, while constantly remaining under the
control and oversight of the TLAS run at and by Theranos' CLIA-certified central
laboratory.


DEVICE DESCRIPTION

The Theranos HSV-1 IgG assay is for use with the Theranos System, including the
TSPU and TLAS. The TSPU is a modular processing unit and can perform automated
pre-analytical processing steps in a central CLIA-certified laboratory or a CLIA
laboratory's patient specimen collection center. The TLAS is an analytical system in
the Theranos CLIA-certified laboratory to produce the test results.

As discussed in the Overview above, there are two use cases for the TSPU. The TSPU
can be located and perform automated pre-analytical processing steps either in locations
where patient specimens are collected, such as the TPSCs, (Field Model) or Theranos
central CLIA-certified laboratory (CLIA-Laboratory Model).

In the Field Model, sample for the HSV-1 Assay is EDTA anti-coagulated plasma
(whole blood processed into plasma inside the TSPU) collected by a fingerstick with
the Theranos Capillary Tubes and Nanotainer Tubes. The samples collected into the
Nanotainer Tubes are placed into the Cartridge and processed by the TSPU at the field
location.

In the CLIA-Laboratory Model, sample for the HSV-1 Assay is EDTA anti-coagulated
(i) capillary EDTA-anti-coagulated whole blood centrifuged into plasma in the CLIA-
laboratory prior to processing with the TSPU, (ii) venous EDTA-anti-coagulated whole

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **32** of **109**

FOIA Confidential Treatment Requested by Theranos                    TS-0491719

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

blood centrifuged into plasma in the CLIA-laboratory prior to processing with the TSPU and (iii) venous serum samples.

The EDTA-anti-coagulated whole blood samples (capillary or venous ) are collected at an appropriate collection center, shipped back to the Theranos CLIA-certified laboratory, centrifuged to separate the plasma in the sample, and then introduced into a disposable Cartridge which is inserted into the TSPU for sample processing. Serum samples may also be obtained by venipuncture in commercially available collection tubes for serum separation. These serum samples may be shipped back to Theranos CLIA-certified laboratory where the samples are introduced into a disposable Cartridge which is inserted into the TSPU for sample processing.

The samples are summarized in the following Table 9-1.

| Sample Processing Location | EDTA plasma, capillary | EDTA plasma, venous | Serum, venous |
|---|---|---|---|
| CLIA Laboratory | Yes (whole blood collected with the Capillary Tubes and Nanotainer Tubes and centrifuged into plasma in the CLIA laboratory) | Yes (whole blood collected with a commercially available venous blood EDTA-anti-coagulated collection device and centrifuged into plasma in the CLIA laboratory) | Yes (whole blood collected with a commercially available venous serum collection device and centrifuged to separate into serum at the collection site prior to shipment) |
| Field Location | Yes (whole blood collected with the Capillary Tubes and Nanotainer Tubes and processed into plasma within the TSPU) | No | No |

The Theranos anti-HSV-1 IgG immunoassay is a three-step sandwich immunoassay with HSV-1 (gG) recombinant antigen coated surface, an anti-human IgG detection reagent conjugated to alkaline phosphatase (AP) and chemiluminescent substrate. Capture reagent is coated on the reaction surface. Analyte in the calibrators, controls or sample binds to the capture reagent. Unbound entities are washed out and the capture

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **33** of **109**

FOIA Confidential Treatment Requested by Theranos                TS-0491720

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                          510(k) PREMARKET NOTIFICATION

surface is subsequently incubated with the detection reagent. This is followed by wash step to remove any nonspecific reactants. The capture-analyte-detection complex is then incubated with AP substrate to initiate the chemiluminescence reaction. The rate of the chemiluminescence reaction (which is proportional to the AP concentration, and hence the anti-HSV antibody concentration), generates light levels in the Luminometer Module of the TSPU, which are transmitted to the TLAS to be analyzed.

All consumables for processing are single-use contained in the Cartridge (and are not built into the TSPU) and are placed back into the Cartridge at the completion of processing for disposal. Therefore, upon completion of sample processing, the disposable Cartridge contains all the leftover sample and products of further processing and reactants created inside the TSPU.

### INTENDED USE/INDICATIONS FOR USE

The Theranos™ HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-l) in human serum from venous blood and K2-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of this assay has not been established for use in a pediatric population, neonates and immunocompromised patients. The Theranos HSV-1 IgG assay is for use with the Theranos System.

### SUBSTANTIAL EQUIVALENCE

The Theranos HSV-1 IgG assay was compared to an assay commercially manufactured by Focus Diagnostics, the HerpeSelect 1 and 2 Immunoblot IgG assay (K000238). Test performance was compared to the Focus Diagnostics assay for HSV-1 only. These tests have the same Intended Use and Indications for Use. Table 9-2 below provides a comparison of the characteristics of the subject Theranos and Focus Diagnostics assays.

Table 9-2: Comparison of Theranos HSV-1 IgG Assay and Predicate Device

| Attribute | Theranos Method | Predicate Method |
|-----------|-----------------|------------------|
| Intended Use | The Theranos HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes | Focus Diagnostics' HerpeSelect®1 and 2 Immunoblot IgG test is intended for qualitatively detecting the presence or |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **34** of **109**

THERANOS, INC.　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

| | | |
|---|---|---|
| | simplex virus type 1 (HSV-l) in human serum from venous blood and K$_2$-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of this assay has not been established for use in a pediatric population, neonates and immunocompromised patients. The Theranos HSV-1 IgG assay is for use with the Theranos System. | absence of human IgG class antibodies to HSV-1 and HSV-2 in human sera. The test is indicated for testing sexually active adults or expectant mothers for aiding in the presumptive diagnosis of HSV-1 and HSV-2 infection. The predictive value of a positive or negative result depends on the population's prevalence and the pretest likelihood of HSV-1 and HSV-2 infection. The performance of this assay has not been established for use in a pediatric population, for neonatal screening, for testing of immunocompromised patients, for use by a point of care facility or for use with automated equipment. |
| Sample Volume | 10 uL | 20 uL |
| Controls | 2 (negative and positive) per assay | Same |
| Sample matrix | Venous serum, K2-EDTA plasma from venous and capillary blood | Venous Serum |
| Reagent storage | 2-8 °C in ready-to-use cartridges, | 2-8 °C, on-board and refrigerator |
| Type of assay | Sandwich format immunoassay | Nitrocellulose Immunoblot |
| Platform | Theranos System version 4 consisting of TSPU and TLAS | Manual procedure |
| Capture reagent | HSV-1 recombinant antigen (gG1) | HSV-1/HSV-2 antigen immobilized on nitrocellulose membrane |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　TS-0491722

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| Detection reagent | Mouse monoclonal antibody against human IgG, conjugated to alkaline phosphatase | Goat anti-human IgG conjugated to alkaline phosphatase, bromo-chloro-indodyl phosphate and nitroblue tetrazolium substrate |
|---|---|---|
| Sample handling and processing | Automated | Manual |
| Measurement system | Photodiode | Visual observation of bands on a strip |
| Unit of measure | Antibody index | Positive or negative reading from color of band |
| Total incubation | 10 min | 2 hr 20 mins |

Intended Use and Indications for Use:

The Theranos HSV-1 IgG Assay and the Predicate Device have essentially the same Intended Uses, except that the Focus HerpeSelect 1 and 2 Immunoblot IgG also tests for the presence of IgG antibodies to HSV-2, which will be covered in a separate 510(k) Pre-market Notification. As to Indications for Use, both the Theranos HSV-1 IgG Assay and the Predicate Device's HSV-1 IgG Assay are indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-1 infection. In addition, neither assay is specifically intended for use in a pediatric population, for neonatal screening, for testing of immunocompromised patients nor for screening blood or plasma donors.

Technological Characteristics:

The Theranos HSV-1 IgG assay is for use with the Theranos System, including the Theranos Sample Process Unit (TSPU) and Theranos Laboratory Automation System (TLAS). The TSPU can perform automated pre-analytical processing steps in a central CLIA-certified laboratory or a patient specimen collection center. The differences in technological characteristics between the Theranos HSV-1 IgG assay and the Predicate Device, including type of assay, platform, capture reagent, detection reagent, sample handling and processing, measurement system and incubation time have been outlined in the comparison Table 9-2 above.

In order to establish that the technological differences between the devices do not impact the relative safety and effectiveness of the devices, Theranos conducted studies comparing the clinical performance of the two methods. A clinical study was

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 36 of 109

THERANOS, INC.　　　　　THERANOS[TM] HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

conducted to characterize the performance of HSV-1 IgG immunoassay. The primary objective of the study was to demonstrate the sensitivity and specificity in the indicated populations of the HSV-1 IgG immunoassay in the Theranos CLIA-certified Laboratory in comparison to the FOCUS HerpeSelect Immunoblot. The results of this study are discussed and presented in Section 18.b.iii.1. The Theranos assay was shown to have sensitivity and specificity of 95.1% (95%C.I.: 90.2%-98.0%) and 97.4% (95%C.I.: 92.6%-99.5%) respectively in adult high risk subjects, and sensitivity and specificity of 97.4% (95%C.I.: 94.1%-99.2%) and 95.2% (95%C.I.: 89.2%-98.4%) respectively in pregnant subjects, establishing equivalency to the predicate method. The specificity of the Theranos test was also confirmed by testing performance in a low risk population.

In addition, a seroconversion panel consisting of well-characterized HSV-1 serum samples was obtained from the CDC and tested on the Theranos HSV-1 IgG assay. Tests results from the Theranos HSV-1 IgG assay showed 100% agreement to the CDC results, further establishing the performance of the Theranos HSV-1 IgG assay.

In addition, Theranos performed method comparison studies between the Theranos HSV-1 IgG assay and the Predicate Device for both of the use cases, including sample pre-analytical processing with the TSPU within the TPSC and within the Theranos central CLIA-laboratory, as discussed and described in Sections 18.b.iii.3 and 18.b.iii.4, respectively. Compared to serum samples run on the predicate method, results indicate that capillary samples collected in the field and processed either in the field or at the central laboratory on the TSPU, yield good concordance to the predicate method. Namely, for field processing with the TSPU, positive percent agreement of 98% and negative percent agreement of 97% were shown. For central lab processing with the TSPU, positive percent agreement of 97%, and negative percent agreement of 100% were shown. These results reflect no statistical difference of the performance of the Theranos HSV-1 IgG Assay between the two sample processing locations. These results further support equivalence of the candidate method with the predicate method including capillary samples processed either in the field or at the central laboratory.

Sample Matrix:

To establish that the performance of the Theranos HSV-1 IgG assay with sample matrices stated above (venous serum and K2-EDTA plasma from venous and capillary blood) do not raise questions concerning safety and efficacy, Theranos performed a matrix comparison study. In this study, discussed and described in Section 18.a.ii, the effect of anticoagulants on the detection of analyte with the HSV-1 IgG immunoassay was determined by comparing values obtained from matched venous serum, venous K2-EDTA plasma, and capillary K2-EDTA plasma samples drawn from the same

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **37** of **109**

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

donors. Results showed that for positive samples, recovery was within ±20% of the serum value, while for negative samples, all samples showed a difference of less than or equal to 0.02 COI relative to the serum results.

## PERFORMANCE TESTING AND STUDY DESIGN

The performance testing described and discussed in Section 17 and 18 of this 510(k) Pre-Market Notification included testing with samples collected with the Capillary Tubes and Nanotainer Tubes. Specifically, Theranos performed a matrix comparison showing equivalent performance of capillary samples collected with these devices and venous serum and plasma samples collected with commercially available devices. In addition, method comparison studies, including field studies with prospective capillary sample collection, demonstrated good sensitivity and specificity for capillary samples collected with these devices and tested with the Theranos System compared to venous serum samples tested with the Predicate Device. And reproducibility and analyte stability studies were conducted on capillary samples collected with these devices to further demonstrate the performance of the Theranos System as well as the Capillary Tubes and Nanotainer Tubes. In the Pre-Submission Meeting Q140358 and related correspondence, Theranos had discussed with FDA various approaches to using venous samples in the clinical study of the targeted populations, due to challenges in obtaining capillary samples. Theranos accordingly designed these studies to demonstrate equivalence performance in the matrix comparison study between capillary samples collected with its devices and venous plasma and serum samples collected with commercially available devices run on the Theranos System. As discussed above in this study, the capillary samples performed similarly to the venous plasma and serum samples. Given the good performance of the capillary samples compared to venous plasma and serum, Theranos designed the clinical studies for the target populations using left-over venous samples obtained from third-party sources. In designing the clinical studies, Theranos included high risk and pregnant populations with a physician's order for a HSV-1 IgG antibody test, in addition to testing in a low prevalence population, in accordance with the Pre-Submission Q140358 guidance and the FDA's Guidance for Industry and FDA Staff - Class II Special Controls Guidance Document: Herpes Simplex Virus Types 1 and 2 Serological Assays.

## CONCLUSION

From the results of these studies, Theranos has concluded that the Theranos Herpes HSV-1 IgG immunoassay is substantially equivalent to the commercially available

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **38** of **109**

**ER-15401**

THERANOS, INC.   THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

HerpeSelect 1 and 2 Immunoblot IgG test manufactured by Focus Diagnostics for detection of HSV-1 IgG antibodies in the indicated populations and use cases.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## 10.0   DEVICE DESCRIPTION

### 10.01   Overview

This 510(k) Pre-market Notification covers Theranos, Inc.'s Herpes Simplex Virus-1 IgG Assay run on its Clinical Laboratory Improvement Amendments ("CLIA")-certified laboratory's automated sample processing and analysis system (the "**Theranos System**"), composed of Theranos' Sample Processing Units ("**TSPUs**") and Theranos' Laboratory Automation System ("**TLAS**").

TSPUs provide automated, pre-analytic sample processing for the purpose of substantially reducing human error in sample preparation, extraction, and processing, and for reducing the associated variability and error in test results.

The TSPU and TLAS were designed to automate the exact processing steps and protocols associated with the most precise and accurate CLIA-certified test methods. The TSPUs under this 510(k) Pre-market Notification cover two use cases: use in Theranos' central CLIA-certified laboratory (the "**CLIA-Laboratory Model**") and use by Theranos in locations where patient specimens are collected, including in Theranos' Patient Service Centers ("**TPSCs**"), under the control and oversight of Theranos' Palo Alto-based CLIA-certified laboratory, for the purpose of providing the highest integrity clinical laboratory services (the "**Field Model**").

The rationale behind the development of the TSPU and TLAS was to build a certified laboratory infrastructure where the highest level of oversight could be combined with rapid processing of fresh samples by automation of the pre-analytic testing process either in the central CLIA-certified laboratory or the field, while maintaining all the performance, validated protocols, and infrastructure associated with processing and running tests in a CLIA-certified laboratory.

Signals generated by the TSPU during pre-analytic processing are transmitted to Theranos' central CLIA-certified laboratory, which will then conduct the analytic and post-analytic steps of the testing process through the TLAS, which can convert the signals received from the device into test results and review replicate data, outliers, and controls in doing so.

After analyzing the data through the TLAS, the Palo Alto CLIA-certified laboratory personnel generate a test report, which is transmitted to the health care professional that ordered a given test. As referenced above, the Theranos laboratory leverages Theranos' intellectual property in secure network connectivity to connect with TSPUs, making it possible for those TSPUs to be placed, under the field model, in the TPSCs or sample collection sites, while constantly remaining under the control of the TLAS run at and by Theranos' CLIA-certified central laboratory.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **40** of **109**

THERANOS, INC.    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## 10.02 The Theranos System

The system described in this document consists of the following components operating under oversight of the Theranos CLIA-certified laboratory: the TSPU and the centralized TLAS, which is run at and by the Theranos' CLIA-certified laboratory, running the Theranos HSV-1 IgG Assay.



Figure 10-1.  Outline of the Theranos system, depicting the pre-analytical (sample processing, performed by the TSPU as controlled by the TLAS), analytical (results generation, performed by the TLAS), and post-analytical by CLIA personnel.  For this submission, the TSPU is located and operated in either the field or in Theranos' CLIA-certified clinical laboratory.

In the Field Model, sample for the HSV-1 Assay is EDTA anti-coagulated plasma (whole blood processed into plasma inside the TSPU) collected by a fingerstick with the Theranos Capillary Tubes and Nanotainer Tubes.  The samples collected into the Nanotainer Tubes are placed into the Cartridge and processed by the TSPU at the field location.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 41 of 109

THERANOS, INC.　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

In the CLIA-Laboratory Model, sample for the HSV-1 Assay is EDTA anti-coagulated
(i) capillary EDTA-anti-coagulated whole blood centrifuged into plasma in the CLIA-
laboratory prior to processing with the TSPU, (ii) venous EDTA-anti-coagulated whole
blood centrifuged into plasma in the CLIA-laboratory prior to processing with the
TSPU and (iii) venous serum samples.

The EDTA-anti-coagulated whole blood samples (capillary or venous ) are collected at
an appropriate collection center, shipped back to the Theranos CLIA-certified
laboratory, centrifuged to separate the plasma in the sample, and then introduced into a
disposable Cartridge which is inserted into the TSPU for sample processing. Serum
samples may also be obtained by venipuncture in commercially available collection
tubes for serum separation. These serum samples may be shipped back to Theranos
CLIA-certified laboratory where the samples are introduced into a disposable Cartridge
which is inserted into the TSPU for sample processing.

The samples are summarized in the following Table 10-1.

| Sample Processing Location | EDTA plasma, capillary | EDTA plasma, venous | Serum, venous |
|---|---|---|---|
| CLIA Laboratory | Yes (whole blood collected with the Capillary Tubes and Nanotainer Tubes and centrifuged into plasma in the CLIA laboratory) | Yes (whole blood collected with a commercially available venous blood EDTA-anti-coagulated collection device and centrifuged into plasma in the CLIA laboratory) | Yes (whole blood collected with a commercially available venous serum collection device and centrifuged to separate into serum at the collection site prior to shipment) |
| Field Location | Yes (whole blood collected with the Capillary Tubes and Nanotainer Tubes and processed into plasma within the TSPU) | No | No |

The samples undergo processing and reaction steps, and are eventually introduced to a
detector to yield a set of signals. These signal sets are transferred to the TLAS where

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　TS-0491729

THERANOS, INC.           THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                          510(k) PREMARKET NOTIFICATION

the raw data are tested and oversight is provided, and the relevant reportables are generated.

Figure 10-1 shows a schematic diagram of the workflow of the Theranos system. Steps illustrated by boxes numbered from 1 to 4 represent pre-analytic steps. Pre-analytic steps include sample collection, sample processing, reagent addition, signal generation, and transmission. Steps illustrated by boxes numbered from 5 to 8 represent analytic steps. Analytic steps include analysis of data received from a device at a sample collection site, oversight, including analysis of controls, calibrations, replicates, outliers, device and sample identification and quality information, and generation of the reportable. Transmission of the report to the health care professional by the CLIA personnel represents a post-analytic step. Post-analytic steps include further review of the analysis of data, and review of report generation and of the report generated for a particular test prior to sign off by CLIA-laboratory personnel and transmission to the physician who ordered a given test.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **43** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                       510(k) PREMARKET NOTIFICATION

**10.03   Theranos Sample Processing Unit (TSPU) and Materials**

The TSPU is a modular hardware unit (Figure 10-2) utilized for performing the pre-



Figure 10-2.  Theranos Sample Processing Unit.

analytic functions described above.  The TSPU was designed to automatically replicate the processing systems used in the relevant traditional 'gold-standard' assay protocols. The TSPU is enclosed in a thermally insulated and light-tight sheet metal enclosure.  It consists of the following components:

1.   Liquid Handling Module

2.   Centrifuge Module

3.   Sonicator Module

4.   Magnet Tool

5.   Detector 1 – Luminometer Module

6.   Detector 2 – Fluorometer Module

7.   Detector 3 – Fluorometer/Turbidimeter Module

8.   Detector 4 - Spectrophotometer Module

9.   Detector 5 - Microscopy Module

10.   Thermal Control System

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491731

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

11. Machine Vision System and Materials

This 510(k) Premarket Notification covers the Theranos HSV-1 IgG Assay as described above. Modules 1, 2, 5, 10 and 11 are used in connection with this Theranos HSV-1 Assay.

Modules 3, 4, 6, 7, 8 and 9 have been included here and briefly described for completeness. These modules are not used for Theranos HSV-1 IgG Assay.

The TSPU is composed of purchased components, machined parts, and molded parts. Most of the machined parts are made of aluminum, with stainless steel used in parts where greater tensile strength is required.

The TSPU specifications are as follows:

| Size (in.) | 13 (W) x 16.1 (H) x 22 (L) |
|---|---|
| Clearance Required (in.) | 12 on either side<br><br>12 on front, back and top |
| Weight | 80 lbs. |
| Power Consumption | 1300 W max. (100-230 VAC, 50/60 Hz) |
| Power Cord | Theranos Part Number 45-01007<br>NEMA5-15/IEC, 2.5 meter, 15A<br>IP 40 acc. to IEC 60529<br>C19 acc. to IEC 60320<br><br>UL 498, CSA C22.2 no. 42 (for cold conditions) pin-temperature 70 °C, 16 A,<br><br>Protection Class I |
| Ethernet Cable | CAT6, 50 ft. max.<br><br>Compliant to EIA/TIA Cat6 TIA/EIA-568-B-2.1 draft 9 standards |
| Temperature | Operating, 20-25 °C |
| Humidity | 80% Maximum Relative Humidity |
| Altitude | 0-2,000 m elevation above sea level |

Table 10-2. TSPU Specifications.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 45 of 109

FOIA Confidential Treatment Requested by Theranos  TS-0491732

THERANOS, INC.                THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                              510(k) PREMARKET NOTIFICATION

**Component No. 1. Liquid Handling Module**



Figure 10-3.  Liquid Handling Module

The automated liquid handling and processing module (Figure 10-3) is an electromechanical pipette-based assembly that resides within the TSPU. The pipette assembly is mounted onto a controllable gantry. This gantry moves the pipette assembly horizontally throughout the TSPU, allowing it to access different modules. The pipette assembly has individual pipette cards, each of which is independently actuated in the vertical direction. Each pipette card is capable of individually aspirating and dispensing fluids (including samples and reagents). The pipette assembly is used for engaging with vessels, for moving and mixing sample using pipette tips and vessels, and for moving those tips and vessels within the TSPU.  One pipette card in the Liquid Handling Module is configured to actuate the Magnetic Tool for sample processing, including extraction and purification as described in the "*4. Magnet Tool*" section below.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                TS-0491733

**ER-15409**

THERANOS, INC.      THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
         510(k) PREMARKET NOTIFICATION

**Component No. 2. Centrifuge Module**



Figure 10-4.  Centrifuge Module

The on-board centrifuge (Figure 10-4) is a horizontal centrifuge used for separations in the TSPU.  The centrifuge can hold 4 centrifuge tubes, is powered by a DC motor with an optical encoder, and is capable of achieving speeds of up to 10,000 RPM (and thus providing up to 3300g of centrifugal acceleration).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos      TS-0491734

ER-15410

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                      510(k) PREMARKET NOTIFICATION

**Component No. 3.  Sonicator Module**



Figure 10-5.  Sonicator module

The sonicator (Figure 10-5) is used during sample preparation steps to lyse cells, freeing the DNA for further processing and data generation. The sonicator assembly consists of a commercially available 40kHz sonotrode, housing, and power supply electronics. During sample purification, the sample is placed in a polystyrene vessel. This vessel is moved to the sonicator, using the automated liquid handling system. The handling system establishes contact between the vessel and sonicator by pushing the vessel against the sonicator probe with a slight amount of force. Once contact has been firmly established, the sonicator is energized. This transmits mechanical energy into the vessel and sample, causing cavitation and eventual lysis within the sample. Sonication energy can be modulated in power and applied in a continuous or pulsed fashion. Once sonication is complete, the liquid handling system returns the sample vessel for further purification processing.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491735

**ER-15411**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                            510(k) PREMARKET NOTIFICATION

**Component No. 4.  Magnet Tool**



Figure 10-6.  Magnet Tool

One of the pipette cards in the Liquid Handling Module has a modified piston assembly and nozzle to interface with the Magnet Tool.  The Magnet Tool is a magnetized rod used for separation of magnetic beads during TNAA sample prep.  Figure 10-6 shows a side view of the Magnet Tool operation. Left: The Magnet Tool is picked up from its resting location in the device when the piston is extended out of the nozzle. The Magnet Tool secures its position onto the piston and is retracted back into the nozzle prior to pickup of the Magnet Tool Sleeve from a location on the Cartridge; Center: The Magnet Tool is shown extended out of the nozzle into the Magnet Tool Sleeve, positioned for capture of magnetic beads onto the exterior wall of the Magnet Tool Sleeve; Right: The Magnet Tool is shown retracted in the nozzle and clear of the Magnet Tool Sleeve, used in conjunction with vertical movement of the nozzle for magnetic bead release.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **49** of **109**

**ER-15412**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                              510(k) PREMARKET NOTIFICATION

**Component No. 5.  Detector 1 – Luminometer Module**



Figure 10-7.  Luminometer and Fluorometer Modules

The luminometer (Figure 10-7) is used for reading signals in the ELISA assays.  The luminometer consists of a high-gain photodiode, which has performance characteristics similar to photomultiplier tubes typically used in microtiter plate readers.  The Luminometer Module includes an opening at its top through which a tip is inserted, and a detector which detects light generated as part of a chemiluminescence reaction in the tip.  The luminometer can accurately detect emitted light intensity as low as ~100 photons/s.

**Component No. 6.  Detector 2 – Fluorometer Module**

The Fluorometer Module (Figure 10-7) is specifically used for measuring fluorescence at an excitation wavelength band between 420 and 450nm, with an emission band between 570nm and 600nm.  This is used for signal generation in determining the concentration of porphyrins in the TLAS (for example, Zinc Protoporphyrin (ZPP), an

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT**

FOIA Confidential Treatment Requested by Theranos                    TS-0491737

**ER-15413**

THERANOS, INC.           THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                            510(k) PREMARKET NOTIFICATION

analyte requested for measurement in military combat applications) in red blood cells. The Fluorometer Module includes a laser diode, excitation filters, and emission filters. The detector is a high-sensitivity photodiode, similar to the one in the Luminometer Module. The Fluorometer Module shares the same processor as the Luminometer Module in the TSPU.

**Component No. 7. Detector 3 – Fluorometer/Turbidimeter Module**



Figure 10-8. Fluorometer/Turbidimeter Module

Detector 3 (Figure 10-8) generates signals for assays using fluorescence and turbidity. The core functionality of the this module is the excitation and detection of emitted fluorescence from products from nucleic acid amplification reactions and the detection of light transmission through the sample for turbidity samples. The module is comprised of the following major segments: excitation signal emitter, emission signal detector, Thermal Control System, automated door, and local command printed circuit board. As part of the TSPU, the TSPU mechanically interacts with the module through the use of the pipette-based automated liquid handling system.

The circuitry and device architecture have been designed to process up to 64 discrete samples simultaneously, and to work with the automated Liquid Handling Module. 60 of the individual wells are used to process samples for fluorescence detection in the TSPU ("fluorescence wells"), while the remaining 4 wells are used to process samples

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos      TS-0491738

**ER-15414**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

for turbidity detection in the TSPU ("turbidity wells"). Raw data are transmitted to the TLAS for analysis. The same hardware is used with turbidity wells as is used with the fluorescence wells with the exception of omitting filters and changing the gain values on the detector. Instead of detecting fluorescence, the turbidity wells detect light transmission through the samples over time.

Reactions in the module are supported by a Thermal Control System that is local to the module. The Thermal Control System is comprised of a finned heat sink, DC Cartridge heaters, fan, temperature sensors, thermal block, and heat pipes. The discrete nucleic acid amplification samples are located in vessels that rest within the thermal block, which provides a means to maintain a desired temperature within the sample. The temperature of the thermal block is monitored via two digital temperature sensors.

The heat sink, heater, and fan system is located at the back of the device, remote to the heater block. The heat sink is connected to the heater block via water filled copper heat tubes as a means of transporting thermal energy to and away from the heater block. Air circulation is active only during cooling of the heat sink. The heat pipes allow for complete isolation of air between the thermal block where sample is present and the heat sink. This prevents contamination and aerosolization.

**Component No. 8. Detector 4 - Spectrophotometer Module**



Figure 10-9. Spectrophotometer Module

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **52** of **109**

THERANOS, INC.    THERANOS™ HERPES SIMPLEX VIRUS-1 IGG ASSAY
510(k) PREMARKET NOTIFICATION

The TSPU has spectrophotometric capabilities, which are provided by the Spectrophotometer Module (Figure 10-9), and may be used to detect absorbance of small volumes (30uL) of fluid samples. The spectrophotometer is a compact, CCD-based spectrophotometer which can capture the complete intensity spectrum (32-bit intensity resolution, spectral range 300-800nm, 6nm spectral resolution) in a single capture. The output data from this module is an intensity spectrum, which is transmitted to the TLAS, where the absorbance spectrum is calculated. Based on the assay, the appropriate spectral range is chosen to compute the absorbance value. The spectrophotometer is equipped with two light sources: a broad-spectrum, 2W pulsed Xenon lamp used for absorbance detection and a 90mW red laser diode used for fluorescence detection.

**Component No. 9.  Detector 5 - Microscopy Module**



Figure 10-10.  Microscopy Module

The TPSU has a microscopy module (Figure 10-10) for imaging cells and other cellular and non-cellular components in samples. This is an epi-fluorescence microscopy module that uses an apochromatic objective lens to image objects with more than 10x magnification on a high sensitivity CCD sensor. This optical design yields a field of view of roughly 0.2 sq mm. The module is fitted with three laser diode light sources

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

Page **53** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

(violet at 405nm, green at 532nm and red at 641nm wavelengths) which allow imaging of fluorescent samples in more than 5 independent spectral channels. In addition to this, there is a ringlight in the near infrared red wavelength region which enables imaging of light scattered by objects in the field of view. Sample is loaded on a cuvette by the automated liquid handling module. The cuvette is then placed onto the XY stage by the automated liquid handling module. The cuvette is translated across the objective lens by automated movement of the XY stage. At every location that is to be imaged, a mechanical actuator moves the objective lens relative to the sample in the Z direction to achieve best focus using a passive feedback mechanism. The cuvette dimensions allow for 64 fields of view to be imaged in each channel.

**Component No. 10. Thermal Control System and Air Filter**

The TSPU has precise temperature control to maintain the air temperature inside the TSPU at target temperature during preparatory and processing steps. The Thermal Control System consists of a forced-air convection heater and three temperature sensors which are placed in different parts of the TSPU. There is a closed-loop feedback controller which regulates the heater output based on temperature input from the sensors. The insulation around the TSPU ensures minimal thermal exchange with ambient air. The TSPU also has a localized heater used to bring the Cartridge up to operating temperature. The Cartridge (see section on consumables for a more detailed description) is stored at refrigerated temperature. The sample(s) are placed in the Cartridge, and the Cartridge is introduced into the TSPU. There are vents underneath the Cartridge which circulate hot air to bring the Cartridge up to the operating temperature (e.g. from refrigerated temperature to operating temperature). The heater is regulated by a closed-loop temperature controller, the input to which is a temperature sensor which is adjacent to the Cartridge.

The Cartridge heater and the ambient heater, along with the temperature sensors and the temperature controllers, ensure that the Cartridge (containing the sample, reagents, buffers, etc.) are rapidly brought up to operating temperature and maintained at that temperature. The temperature sensors frequently record temperature across the TSPU and transmit information back to the TLAS for monitoring. Such environmental information is used by the TLAS for accessing integrity of the operation and control of the device, maintaining quality control of the operation and control of the device, and for reducing variation or error in the data collection and sample processing performed by the device.

The air exhausted from the TSPU is cleaned by running it through a HEPA filter for removing particles, debris, etc. The air circulation is facilitated by an induced draft fan.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **54** of **109**

ER-15417

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

The induced draft fan also maintains a slight negative pressure inside the TSPU to contain the air inside the TSPU.

**Component No. 11.  Machine Vision System**

The TSPU is configured to include sensors within the enclosure for the TLAS to monitor device status and operation.  The TSPU has a camera in the enclosure for capturing whether there are bubbles, particles, fibers, particulates, debris, precipitates, or other anomalies associated with any tips or vessels being handled within the TSPU which may affect readouts.  The TSPU camera also captures images of components that can be used to determine whether the components are positioned properly, or where components are positioned.  Imaging can be used to allow the TLAS to assess if a volume of sample, reagent, or other material falls within a desired range, or whether a sample, reagent, or other material is located in a desired location.  This information is frequently communicated to the TLAS for error-checking, calibration, protocol execution, and quality control of the TSPU.  A second camera is used to image the barcode on the side of each cartridge.  This image is sent to the TLAS, where the barcode is decoded.

**10.04   Software, Touchscreen, and Process Work Flow**

The TSPU operates under the control of the TLAS.  The TSPU may be connected to the TLAS via a secure Internet or other data network connection, and the TSPU and TLAS are capable of two-way communication with each other.    For example, the TLAS can send various commands and protocols to the processor of the TSPU, for execution by the TSPU.  Similarly, the TSPU can send information obtained by the TSPU to the TLAS, such as data obtained from pre-analytic steps with a sample or information obtained from sensors within the TSPU (e.g. signal, image, temperature information).  Information sent by the TSPU to the TLAS may be in response to a specific request for information from the TLAS to the TSPU, or it may be part of a standardized protocol.  Upon completion of pre-analytic processing in the TSPU, the TLAS performs analysis and post-analytic processing.

There is a touch screen embedded in the TSPU for operation of the device. The touchscreen allows for detailed, user-oriented instructions, oversight, by ensuring a technician follows all appropriate steps before processing a sample, and two way communications.  Operation of the TSPU within Theranos' CLIA-certified clinical laboratory is performed by qualified CLIA-laboratory personnel. Operation of the TSPU within the Theranos patient service center is performed by Theranos staff. The TLAS allows the operation of the clinical laboratory process without operator intervention, including control of the TSPU through direct LAS interfacing, specimen

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page 55 of 109

FOIA Confidential Treatment Requested by Theranos

THERANOS, INC.   THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

manipulation, transportation of the specimen and related signals, result evaluation, repeat testing, reflex testing and quality assessment and results reporting.

The secure network infrastructure allows for CLIA-compliance for certified analysis and testing through the TLAS for determination of the presence or absence of various substances in the human body in Theranos' CLIA-certified laboratory while automating sample processing through the TSPU to minimize pre-analytic error and variability.

### 10.05   Consumables and Materials

The sample and products of further processing and reaction are contained in disposable consumables inside the disposable reagent tray or Cartridge. All consumables are discrete such that reagents and reactions for each assay reside and occur, respectively, in physically separate locations to prevent cross-reactivity. The consumables contain all liquids or reagents such that no sample or reagent ever directly interacts with the device. All consumables for processing are contained in the Cartridge (and are not built into the TSPU) and are placed back into the Cartridge at the completion of processing for disposal.

The consumables used for the HSV-1 IgG Assay include the following.  Note that a diagram of the cartridge layout has been provided in **Appendix 10-A** and that the components marked below with an asterisk are not used for the HSV-1 IgG Assay, but have been included here and briefly described for completeness.

> Round vessels – 60uL capacity polypropylene vessels for storing reagents, dilutions, mixing, and reactions.
>
> Wash vessels – 200uL capacity polypropylene vessels for storing wash buffers.
>
> Centrifuge vessel 1 – narrow diameter 100uL capacity polystyrene vessels for centrifuging blood and efficiently removing supernatant
>
> Centrifuge vessel 2* – 120uL capacity polypropylene vessels for centrifuging samples and efficiently mixing and transferring small volumes.
>
> Mini tips – 10uL capacity polypropylene tips for transporting fluids; with silica filters for preventing cross-contamination.
>
> Large tips – 40uL capacity polypropylene tips for transporting fluids; with silica filters for preventing cross-contamination.
>
> Coated Mini Tips – 10uL capacity Polystyrene tips, coated with the capture antigen used for the HSV-1 IgG assay.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 56 of 109

ER-15419

THERANOS, INC.　　　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

Harpoon tip – A tip assembly consisting of a polypropylene hub attached to a metal harpoon, used for removing caps from Nanotainer tubes inside the TSPU.

Sonicator vessel* – 350uL polystyrene vessel, used to contain sample during sonication.

Magnet Tool Sleeve* – disposable polypropylene sleeve separates magnet from consumable to prevent contamination.

Colorstrip* – multiwell strip made from PMAA; this part contains multiple optically clear cavities into which colorimetric reactions are placed. The absorbance of the samples is then detected in the spectrophotometer.

Cartridge – Houses all consumables listed above. Secured by a lid to hold all consumables in place and prevent user interaction.



Figure 10-11. Cartridge illustrations for HSV-1 IgG tests from blood samples. Left: Nanotainer Tubes being introduced into the Cartridge. Right: Closed Cartridge with Nanotainer Tubes.

The Cartridge comes with a closed lid (Figure 10-11, Left), under which are all pre-populated consumables required for HSV-1 IgG assay as required. Reagents and buffers required for the assays are pre-filled and sealed in Round vessels and Wash vessels. Similarly, consumables and reagents for other types of assays, such as cytometry and other general chemistry assays, may be included with these assays in the same Cartridge.

Only the sample entry port(s) on the Cartridge are exposed to the operator. Figure 10-11 Right shows a cartridge in which the blood sample in the Nanotainer Tubes is inserted into the Cartridge.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page 57 of 109

THERANOS, INC.　　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

To process a sample, the Cartridge is inserted into the TSPU, and the Cartridge is drawn in, the door to the TSPU is closed, and the lid is opened by means of a mechanism inside the TSPU. This exposes all consumables of the Cartridge inside the TSPU. Afterwards, the sample processing, reagent addition, and signal generation steps take place in the TSPU, as instructed by commands from TLAS.

After completion of the appropriate processing steps, a Cartridge is ejected with the lid closed, and can be appropriately disposed of in its entirety.

**10.06　Sample Collection, Handling and Processing**

Patient samples collected in TPSCs can be processed in one of two ways:

1. **Field model: Technicians at the TPSCs run samples on a TSPU that is located on-site.** Sample is collected using the Theranos Capillary Tubes and Nanotainer Tubes from patients at TPSCs as described in WI-00033 Work Instructions for Sample Collection, Processing and Shipping, Theranos anti-HSV-1 IgG Assay (**Appendix 10-B**). "HSV-1 IgG Assay, field locations" Cartridges are stored refrigerated on-site in single cartridge pouches. The Theranos Nanotainer Tubes barcode is recorded in the field sample log which is saved in a location that is accessible to licensed staff members of the Theranos CLIA-certified laboratory. The Theranos Nanotainer Tubes are inserted into the sample slot of the "HSV-1 IgG Assay, field locations" Cartridge, and the "HSV-1 IgG Assay, field locations" Cartridge barcode is recorded in the field sample log. The "HSV-1 IgG Assay, field locations" Cartridge is inserted into the TSPU, and the protocol, which is associated with the "HSV-1 IgG Assay, field locations" Cartridge barcode via the Theranos Laboratory Automated System server (TLAS), starts automatically. Data from the assay are transmitted by the TSPU to the TLAS server located at the Theranos CLIA-certified laboratory. The result is retrieved by licensed staff members of the Theranos CLIA-certified laboratory using the cartridge barcode recorded in the field sample log. Details for TSPU operation and data extraction can be found in WI-00035 Work Instructions for Processing Patient Samples on a Theranos Sample Processing Unit by Field Technicians (**Appendix 10-D**) and WI-00036 Work Instructions for Retrieving Results from Assays run on a Theranos Sample Processing Unit (**Appendix 10-E**), respectively.

2. **Central model: Technicians ship collected samples to the Theranos CLIA-certified laboratory where the samples are run by licensed staff members on TSPUs.** Sample is collected using the Theranos Capillary Tubes and Nanotainer Tubes from patients at TPSCs as described in WI-00033 Work Instructions for Sample Collection, Processing and Shipping, Theranos anti-

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **58** of **109**

THERANOS, INC.    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

HSV-1 IgG Assay (**Appendix 10-B**).    The Theranos barcode of NanotainerTubes is scanned into a tracking file, and then the samples are packaged and shipped to the Theranos CLIA-certified laboratory as described in WI-00033 Work Instructions for Sample Collection, Processing and Shipping, Theranos anti-HSV-1 IgG Assay (**Appendix 10-B**). "HSV-1 IgG Assay, CLIA lab location" cartridges are stored refrigerated at the Theranos CLIA-certified laboratory in single cartridge pouches. Upon receipt, samples are processed according to WI-00034 Work Instructions for Processing Patient Samples on a Theranos Sample Processing Unit by Theranos High Complexity CLIA Certified Laboratory Staff (**Appendix 10-C**). The processed sample is pipetted into the "HSV-1 IgG Assay, CLIA lab location" cartridge sample well, and the "HSV-1 IgG Assay, CLIA lab location" cartridge barcode and sample description are recorded in the central sample log. The"HSV-1 IgG Assay, CLIA lab location" cartridge is inserted into the TSPU and the protocol starts automatically. This is a different protocol from that used in the field model, but is likewise automatically associated with the "HSV-1 IgG Assay, CLIA lab location" cartridge barcode via the TLAS server. Data from the assay are transmitted to the TLAS server located at the Theranos CLIA-certified laboratory. The result is retrieved in the same manner as in the field model by licensed staff members of the Theranos CLIA-certified laboratory using the cartridge barcode recorded in the central sample log. Details for TSPU operation and data extraction can be found in WI-00034 Work Instructions for Processing Patient Samples on a Theranos Sample Processing Unit by Theranos High Complexity CLIA Certified Laboratory Staff (**Appendix 10-C**) and WI-00036 Work Instructions for Retrieving Results from Assays run on a Theranos Sample Processing Unit (**Appendix 10-E**),respectively.

**10.07   Scientific Basis**

The TSPU and TLAS were designed to automate the exact processing steps and protocols associated with the most precise and accurate CLIA-certified test methods. The TSPU is configured to automatically perform a wide range of standard laboratory sample processing steps, such as pipetting, sonicating, centrifuging, mixing, and heating. These steps may be automatically performed by the TSPU in accordance with a protocol executed by a processor on the TSPU that received commands from the TLAS. Automation of the laboratory sample processing steps permits the steps to be performed by the TSPU with very high accuracy and precision targeted to exceed that achieved by human technicians for the same sample processing steps. In addition, the TSPU is capable of performing customizable sample processing steps (e.g. variable pipetting volumes, sonication times, etc.), based on the specific instructions of a given protocol from the TLAS.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page 59 of 109

THERANOS, INC.　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

**10.07.1　　ELISA Principle for the HSV-1 IgG Assay**

The Theranos anti-HSV-1 IgG immunoassay is a three-step sandwich immunoassay with HSV-1 (gG) recombinant antigen coated polystyrene tips, an anti-human IgG detection reagent conjugated to alkaline phosphatase (AP) and chemiluminescent substrate.

The principal reagents used in Theranos anti-HSV-1 IgG assay are shown in the table below (Table 10-3). Capture reagent is coated on the inner surface of tips. Analyte in the sample binds to the capture reagent. Unbound entities in the sample are washed out and the capture surface is subsequently incubated with the detection reagent. Following conjugate incubation, nonspecific reactants are removed by washing. The capture-analyte-detection complex is incubated with AP substrate to initiate the chemiluminescence reaction. The rate of the chemiluminescence reaction (which is proportional to the AP concentration, and hence the anti-HSV antibody concentration), generates light levels in the Luminometer Module, which are transmitted to the TLAS for analysis. A description of all reagents used in the Theranos HSV-1 IgG Immunoassay is provided in Table 10-3 below.

The Theranos HSV-1 IgG assay uses a commercially available purified recombinant HSV1 gG1 glycoprotein as the antigen coated on the surface. The reason for the selection of this antigen is its lack of cross-reactivity with its counterpart in HSV-2, i.e., gG-2. Literature reports confirm the serological type-specificity of gG-1 (Lee et al., 1986; Sanchez-Martinez et al., 1991) and further support the choice of gG-1 as the antigen for HSV1 antibody detection in serum. (Ashley et al., 1998). Another report identified one immunodominant region on the gG1 glycoprotein, delimited by amino acids 112–127, that showed reactivity with several anti-gG1 antibodies. The lack of reactivity with the corresponding stretches of amino acids on the HSV2 counterpart, gG2, suggests that this domain may be of interest in the further development of HSV-1 type-specific seroassay (Tunback et al., 2000). The recombinant antigen used in the Theranos HSV1 assay is a construct that encompasses the above immunodominant region (Met1-ASP190) from the Patton strain fused with human superoxide dismutase SOD. It is expressed in *Saccharomyces cerevisiae*. The antigen is supplied in 20mM malonate, with 6M urea, pH 7.5.

Table 10-3: Assay and Principal Reagents

| Assay | Capture reagent | Detection reagent | Assay Principle |
|-------|-----------------|-------------------|-----------------|
| anti-HSV-1 IgG | Herpes Simplex Virus type 1 gG1M | Mouse Anti-hIgG clone 2C11 | Sandwich ELISA assay: Capture of IgG antibodies on solid phase, |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **60** of **109**

THERANOS, INC.                     THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                   510(k) PREMARKET NOTIFICATION

| | antigen | | followed by detection with a conjugated mouse anti-IgG reagent |
|---|---|---|---|

Table 10-3:  Description of reagents used in the Theranos HSV-1 IgG Immunoassay

| Capture surface | 6 Polystyrene minitips coated with HSV1 gG1 recombinant antigen, BSA, 0.05% sodium azide. 4 coated minitips are used for the sample and one minitip each is used for control reaction. |
|---|---|
| Detection reagent OR Conjugate (65 µL) | Mouse monoclonal antibody against human IgG, conjugated to alkaline phosphatase (AP), BSA, TBS buffer, 0.05% sodium azide. |
| Positive control (65 µL) | Liquid, human serum based, containing high levels of HSV1 IgG. |
| Negative control (65 µL) | Liquid, human serum based, containing high levels of HSV1 IgG. |
| Assay Diluent (160 µL) | Protein-free formulation, PBS buffer, 0.02% methylisothiazolone and 0.02% bromonitrodioxane |
| Wash Buffer (65 µL) | TBS buffer, Tween 20 , 0.05% sodium azide |
| Chemiluminescent AP substrate reagent (65 µL) | AMPPD (3-(2'-Spiroadamantane)-4-methoxy-4-(3"-phosphoryloxy) phenyl-1,2-dioxetane), Tris buffer, MgCl2 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                        TS-0491748

THERANOS, INC.

THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

**10.07.2    Protocol for the HSV-1 Assay (Central CLIA-Laboratory Model)**

The protocol for HSV-1 IgG assay is divided into three parts: sample collection that occurs in TPSC, sample processing that occurs on TSPU and data analysis which occurs on the TLAS in Theranos high-complexity CLIA-certified laboratory.

A.    Sample collection: Sample is collected from patients by one of the three methods detailed below:

1.    Capillary blood is collected using Theranos Capillary Tubes and Nanotainer Tubes which use K2-EDTA as the anti-coagulant in both capillaries. This device is designed to collect 80uL of whole blood in each of a pair of Nanotainer Tubes. The Nanotainer Tubes are shipped in a temperature controlled shipping box (2-8°C) to Theranos' high-complexity CLIA-certified laboratory.

2.    Venous blood is collected with a commercially available venous blood EDTA-anti-coagulated collection device. These tubes are transported to Theranos' high-complexity CLIA-certified laboratory in a temperature controlled shipping box (2-8°C).

2.    Venous blood is collected in a standard serum separator tube (SST). Upon collection, tubes are centrifuged according to the manufacturer's recommendation. These tubes are transported to Theranos' high-complexity CLIA-certified laboratory in a temperature controlled shipping box (2-8°C).

B.    Sample processing: The sample processing starts with either of the following types of samples:

Capillary Samples: K2-EDTA anti-coagulated capillary whole blood in a Theranos Nanotainer which is centrifuged at 1200g for 6 mins by Theranos state-certified CLIA laboratory staff. Subsequently, approximately 30uL of plasma is transferred via a manual pipette to a round vessel in the "Theranos HSV-1 IgG Assay, CLIA lab location" cartridge by Theranos CLIA-certified laboratory staff.

Venous Plasma Samples: EDTA-anticoagulated venous whole blood collected in a commercially available venous blood collection device is centrifuged according to the manufacturer's specifications. The plasma (~30uL) is transferred via a manual pipette into a round vessel in the "Theranos HSV-1 IgG Assay, CLIA lab location" cartridge by Theranos CLIA-certified laboratory staff.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                          TS-0491749

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

<u>Venous Serum Samples</u>:  Serum from venous blood (~30uL) is
transferred via a manual pipette into a round vessel in the "Theranos
HSV-1 IgG Assay, CLIA lab location" cartridge by Theranos CLIA-
certified laboratory staff.

After loading either the serum or plasma into the Cartridge as detailed
above, the cartridge is loaded into the device.   Then the TSPU
implements the following steps in sequence:

1.   A Large tip is picked up and used to transfer 36uL of sample
     diluent into each of 2 sealed empty round vessels.    Another
     Large tip is then picked up and used to transfer 90uL of sample
     diluent into a wash well.

2.   Two Mini tips are picked up and used to transfer 4uL of the
     control material (negative and positive controls) from sealed
     round vessels to the round vessels containing 36uL of sample
     diluent.  The 2 vessels containing the diluted control material are
     mixed.  This yields control samples diluted 10X.

3.   A Mini tip is picked up and used to premix the plasma/serum
     from the sample round vessel.  10uL is then transferred to the
     wash well containing 90uL of sample diluent.  A Large tip is
     picked up and used to mix the wash well containing the diluted
     plasma/serum.  This is followed by a 10 minute incubation.  This
     yields plasma/serum diluted 10X.

4.   Six Coated Mini tips with HSV-1 capture reagent each aspirate
     10uL of wash buffer from 6 sealed wash wells to prewash the
     tips.  The contents of each tip are dispensed into sealed empty
     wash wells.  The 6 HSV-1 Coated Mini tips are moved to the
     Luminometer Module where the chemiluminescence intensity of
     each of the 6 tips is recorded in a sequential manner.  This dark
     read is used as a blank subtraction during data analysis in the
     TLAS.

5.   A Large tip is picked up and used to further mix the wash well
     containing the diluted plasma/serum.

6.   The 6 HSV-1 Coated Mini tips each aspirate 9uL of the 10X
     diluted plasma/serum or 10X diluted control material as
     appropriate.  The mixture is allowed to incubate with the capture
     protein on the surface for 5 minutes.  The diluted plasma/serum
     and the control material is then dispensed into the original
     well/vessels.

7.   The 6 HSV-1 Coated Mini tips each aspirate 10uL of high-salt
     wash buffer from 6 sealed round vessels, followed by a 1 minute

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **63** of **109**

FOIA Confidential Treatment Requested by Theranos                                        TS-0491750

THERANOS, INC.   THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
<br>510(k) PREMARKET NOTIFICATION

incubation. The high-salt wash buffer is then discarded into wash wells. This is repeated a second time with a 1 minute incubation and repeated a third time with a 5 minute incubation.

8. The 6 HSV-1 Coated Mini tips each aspirate 9.5uL of detection reagent from 6 sealed round vessels, followed by a 5 minute incubation. The contents are dispensed into the original vessels.

9. The 6 HSV-1 Coated Mini tips each aspirate 10uL of wash buffer from 6 wash wells, followed by a 1 minute incubation. The wash buffer is then discarded into wash wells. This is repeated for a total of 6 post-detection wash cycles.

10. The 6 HSV-1 Coated Mini tips each aspirate 10uL of AP substrate from 6 sealed round vessels.

11. The 6 HSV-1 Coated Mini tips are moved to the Luminometer Module where the chemiluminescence intensity of each of the 6 tips is recorded in a sequential manner. The AP substrate is then discarded into wash wells.

12. The counts recorded in the luminometer are transmitted to TLAS for analysis.

C. <u>Data analysis</u>: The count values are analyzed in the TLAS, where a calibration function is applied, and analysis is performed on these values and associated controls.

1. <u>Positive controls</u>: calibration function consists of pass/fail limits for the positive control. If the control value lies outside the pass limit, the run is considered to be invalid.

2. <u>Negative controls</u>: calibration function consists of pass/fail limits for the negative control. If the control value lies outside the pass limit, the run is considered to be invalid.

3. <u>Sample runs</u>: There are 4 replicate measurements of the sample. These 4 replicates are averaged, after removing outliers, if any. Outliers are detected as points outside 10 median absolute deviations.

  a. The mean value is divided by the cut-off value from the calibration function to get the cut-off index (COI).

  b. If the COI is greater than or equal to 1.1, a "reactive" result is returned.

  c. If the COI is less than or equal to 0.9, a "non-reactive" result is returned.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos   TS-0491751

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                              510(k) PREMARKET NOTIFICATION

   d. If the COI is between 0.9-1.1, an "equivocal" result is
    returned.

**10.07.3   Protocol for the HSV-1 Assay (Field Model)**

The protocol for HSV-1 IgG assay is divided into three parts: sample collection that
occurs in TPSC, sample processing that occurs on TSPU and data analysis which
occurs on the TLAS in Theranos high-complexity CLIA-certified laboratory.

 A. Sample collection: Capillary blood sample is collected using Theranos
   Capillary Tubes and Nanotainer Tubes which use K2-EDTA as the anti-
   coagulant in both capillaries. This device is designed to collect 80uL of
   whole blood in each of a pair of Nanotainer Tubes.

 B. After loading the Nanotainer Tube pair with whole blood into the "HSV-
   1 IgG Assay, field locations" cartridge, the cartridge is loaded into the
   device by a Theranos-trained technician. On board the TSPU, the
   following steps are implemented in sequence:

   1. A harpoon tip is picked up and used to pierce and remove the
    rubber cap of the Nanotainer Tube. The harpoon tip with the
    rubber cap is then returned to its original position on the
    cartridge.

   2. A Large tip is picked up and used to transfer 60uL of whole
    blood to a centrifuge vessel.

   3. The centrifuge vessel is transferred to a centrifuge and spun for 3
    minutes at 6200 RPM. The centrifuge vessel is then returned to
    its original position on the cartridge.

   4. A Large tip is picked up and used to transfer 36uL of sample
    diluent into each of 2 sealed empty round vessels. Another
    Large tip is then picked up and used to transfer 90uL of sample
    diluent into a sealed wash well.

   5. Two Mini tips are picked up and used to transfer 4uL of the
    control material (negative and positive controls) from sealed
    round vessels to the round vessels containing 36uL of sample
    diluent. The 2 vessels containing the diluted control material are
    mixed. This yields control samples diluted 10X.

   6. A mini tip is picked up and used to transfer 10uL of plasma from
    the centrifuge vessel to the wash well containing 90uL of sample
    diluent. A Large tip is picked up and used to mix the wash well
    containing the diluted plasma. This is followed by a 10 minute
    incubation. This yields plasma diluted 10X.

   7. Six Coated Mini tips with HSV-1 capture reagent each aspirate
    10uL of wash buffer from 6 sealed wash wells to prewash the

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT**

Page 65 of 109

**ER-15428**

THERANOS, INC.    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

tips.  The contents of each tip are dispensed into sealed empty wash wells.  The 6 HSV-1 Mini tips are moved to the Luminometer Module where the chemiluminescence intensity of each of the 6 tips is recorded in a sequential manner.  This dark read is used as a blank subtraction during data analysis in the TLAS.

8.  A Large tip is picked up and used to further mix the wash well containing the diluted plasma.

9.  The 6 HSV-1 Coated Mini tips each aspirate 9uL of the 10X diluted plasma or 10X diluted control material as appropriate. The mixture is allowed to incubate with the capture protein on the surface for 5 minutes.  The diluted plasma and the control material is then dispensed into the original well/vessels.

10.  The 6 HSV-1 Coated Mini tips each aspirate 10uL of high-salt wash buffer from 6 sealed round vessels, followed by a 1 minute incubation.  The high-salt wash buffer is then discarded into wash wells.  This is repeated a second time with a 1 minute incubation and repeated a third time with a 5 minute incubation.

11.  The 6 HSV-1 Coated Mini tips each aspirate 9.5uL of detection reagent from 6 sealed round vessels, followed by a 5 minute incubation.  The contents are dispensed into the original vessels.

12.  The 6 HSV-1 Coated Mini tips each aspirate 10uL of wash buffer from 6 wash wells, followed by a 1 minute incubation.  The wash buffer is then discarded into wash wells.  This is repeated for a total of 6 post-detection wash cycles.

13.  The 6 HSV-1 Coated Mini tips each aspirate 10uL of AP substrate from 6 sealed round vessels.

14.  The 6 HSV-1 Coated Mini tips are moved to the Luminometer Module where the chemiluminescence intensity of each of the 6 tips is recorded in a sequential manner. The AP substrate is then discarded into wash wells.

15.  The counts recorded in the luminometer are transmitted to TLAS for analysis.

C.  Data analysis: The count values are analyzed in the TLAS, where a calibration function is applied, and analysis is performed on these values and associated controls.

1.  Positive controls: calibration function consists of pass/fail limits for the positive control. If the control value lies outside the pass limit, the run is considered to be invalid.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 66 of 109

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

2.  Negative controls: calibration function consists of pass/fail limits
    for the negative control. If the control value lies outside the pass
    limit, the run is considered to be invalid.

3.  Sample runs: There are 4 replicate measurements of the sample.
    These 4 replicates are averaged, after removing outliers, if any.
    Outliers are detected as points outside 10 median absolute
    deviations.

    a.  The mean value is divided by the cut-off value from the
        calibration function to get the cut-off index (COI).
    b.  If the COI is greater than or equal to 1.1, a "reactive"
        result is returned.
    c.  If the COI is less than or equal to 0.9, a "non-reactive"
        result is returned.
    d.  If the COI is between 0.9-1.1, an "equivocal" result is
        returned.

## 10.08  Theranos Laboratory Automation System

The TLAS comprises at least one server configured to communicate with and control
one or more TSPUs with an encrypted, certificate-based security system. The TLAS
provides a number of functions, including communicating test protocols to the TSPU
based on the desired tests to be run on the sample and for maintaining oversight over
the TSPUs. During processing, the TSPU and TLAS are communicating to validate the
quality and integrity of the consumables, based on lot information tracked in the TLAS,
execute the sample processing steps, and monitor and oversee the quality of the sample
processing. After controlling sample processing in the TSPU, signal sets from the
sample are transferred to the TLAS where the raw data is analyzed, the relevant
reportables are generated for a Laboratory Information System, and post-analytic
processing steps are performed.

The TLAS is run at and by Theranos' CLIA-certified laboratory, and provides oversight
and remote control of the TSPU. The consumables containing patient samples
(Theranos Nanotainer Tubes for blood sample) are placed in a Cartridge and introduced
into the TSPU. The TSPU scans a barcode on the Cartridge, and the barcode value is
communicated to the TLAS, which securely de-codes the barcode value, and
communicates a sample processing protocol to the processor in the TSPU. The
processor further distributes tasks received from the TLAS to various modules in the
TSPU. The TSPU constantly feeds information back to the TLAS to ensure constant
monitoring of the TSPU and its performance. The final steps of sample processing are
signal generation (chemiluminescence light), and signal detection by detectors

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 67 of 109

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

(Detector 1).  The raw signals are transmitted back to the TLAS, which performs
analysis on these raw data and yields clinically relevant analyte reportables for CLIA
laboratory staff to oversee and further analyze, as applicable.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491755

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

**10.09   Results Interpretation**

The Theranos HSV-1 IgG assay results are to be interpreted based on the following recommendations:

Table 10-4.  Results interpretation

| Result | Interpretation | Inference |
|--------|----------------|-----------|
| POSITIVE | HSV-1 Positive | Presumptive evidence of HSV-1 exposure |
| NEGATIVE | HSV-1 Negative | No evidence of HSV-1 exposure detected |
| EQUIVOCAL | HSV-1 Equivocal | These samples should be re-tested. If on re-test, the sample is still equivocal, then a second sample should be drawn in 4-6 weeks and tested. |
| INVALID | Invalid result | The test result should be discarded and the test should be re-run. |

Assay results should be interpreted only in the context of other laboratory findings and the overall clinical status of the individual.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491756

THERANOS, INC.     THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## 11.0    SUBSTANTIAL EQUIVALENCE DISCUSSION

**Predicate Device Name:**

The predicate device for anti-HSV-1 IgG is Focus HerpeSelect 1 and 2 Immunoblot IgG, from Focus Diagnostics, Inc. (4/14/2000).

**Predicate Device 510(k) Number:**

K000238

**Comparison with Predicate:**

Similarities and differences between the candidate device and the predicate device:

| Attribute | Theranos Method | Predicate Method |
|---|---|---|
| Intended Use | The Theranos HSV-1 IgG assay is a chemiluminescent immunoassay intended for the qualitative detection of IgG antibodies to herpes simplex virus type 1 (HSV-l) in human serum from venous blood and $K_2$-EDTA anticoagulated human plasma from venous and capillary blood. The test is indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-l infection. The predictive value of positive or negative results depends on the population's prevalence and the pretest likelihood of HSV-1. The test is not FDA cleared for screening blood or plasma donors. The performance of | Focus Diagnostics' HerpeSelect®1 and 2 Immunoblot IgG test is intended for qualitatively detecting the presence or absence of human IgG class antibodies to HSV-1 and HSV-2 in human sera. The test is indicated for testing sexually active adults or expectant mothers for aiding in the presumptive diagnosis of HSV-1 and HSV-2 infection. The predictive value of a positive or negative result depends on the population's prevalence and the pretest likelihood of HSV-1 and HSV-2 infection. The performance of this assay has not been established |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **70** of **109**

THERANOS, INC.　　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
　　　　　　　　　　　　　　510(k) PREMARKET NOTIFICATION

| | | |
|---|---|---|
| | this assay has not been established for use in a pediatric population, neonates and immunocompromised patients. The Theranos HSV-1 IgG assay is for use with the Theranos System. | for use in a pediatric population, for neonatal screening, for testing of immunocompromised patients, for use by a point of care facility or for use with automated equipment. |
| Sample Volume | 10 uL | 20 uL |
| Controls | 2 (negative and positive) per assay | Same |
| Sample matrix | Venous serum, K2-EDTA plasma from venous and capillary blood | Venous Serum |
| Reagent storage | 2-8 °C in ready-to-use cartridges, | 2-8 °C, on-board and refrigerator |
| Type of assay | Sandwich format immunoassay | Nitrocellulose Immunoblot |
| Platform | Theranos System | Manual procedure |
| Capture reagent | HSV-1 recombinant antigen (gG1) | HSV-1/HSV-2 antigen immobilized on nitrocellulose membrane |
| Detection reagent | Mouse monoclonal antibody against human IgG, conjugated to alkaline phosphatase | Goat anti-human IgG conjugated to alkaline phosphatase, bromo-chloro-indodyl phosphate and nitroblue tetrazolium substrate |
| Sample handling and processing | Automated | Manual |
| Measurement system | Photodiode | Visual observation of bands on a strip |
| Unit of measure | Antibody index | Positive or negative reading from color of band |
| Total incubation | 10 min | 2 hr 20 mins |
| Calibration | Factory calibrated | Not included |

**Substantial Equivalence Discussion:**

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　　　　　TS-0491758

THERANOS, INC.                    THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

Intended Use and Indications for Use:

The Theranos HSV-1 IgG Assay and the Predicate Device have essentially the same Intended Uses, except that the Focus HerpeSelect 1 and 2 Immunoblot IgG also tests for the presence of IgG antibodies to HSV-2, which will be covered in a separate 510(k) Pre-market Notification. As to Indications for Use, both the Theranos HSV-1 IgG Assay and the Predicate Device's HSV-1 IgG Assay are indicated for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-1 infection. In addition, neither assay is specifically intended for use in a pediatric population, for neonatal screening, for testing of immunocompromised patients nor for screening blood or plasma donors.

Technological Characteristics:

The Theranos HSV-1 IgG assay is for use with the Theranos System, including the Theranos Sample Process Unit (TSPU) and Theranos Laboratory Automation System (TLAS). The TSPU can perform automated pre-analytical processing steps in a central CLIA-certified laboratory or a patient specimen collection center. The differences in technological characteristics between the Theranos HSV-1 IgG assay and the Predicate Device, including type of assay, platform, capture reagent, detection reagent, sample handling and processing, measurement system and incubation time have been outlined in the comparison table above.

In order to establish that the technological differences between the devices do not impact the relative safety and effectiveness of the devices, Theranos conducted studies comparing the clinical performance of the two methods. A clinical study was conducted to characterize the performance of HSV-1 IgG immunoassay. The primary objective of the study was to demonstrate the sensitivity and specificity in the indicated populations of the HSV-1 IgG immunoassay in the Theranos CLIA-certified Laboratory in comparison to the FOCUS HerpeSelect Immunoblot. The results of this study are discussed and presented in Section 18.b.iii.1. The Theranos assay was shown to have sensitivity and specificity of 95.1% (95%C.I.: 90.2%-98.0%) and 97.4% (95%C.I.: 92.6%-99.5%) respectively in adult high risk subjects, and sensitivity and specificity of 97.4% (95%C.I.: 94.1%-99.2%) and 95.2% (95%C.I.: 89.2%-98.4%) respectively in pregnant subjects, establishing equivalency to the predicate method. The specificity of the Theranos test was also confirmed by testing performance in a low risk population.

In addition, a seroconversion panel consisting of well-characterized HSV-1 serum samples was obtained from the CDC and tested on the Theranos HSV-1 IgG assay.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                                    TS-0491759

THERANOS, INC.                THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                      510(k) PREMARKET NOTIFICATION

Tests results from the Theranos HSV-1 IgG assay showed 100% agreement to the CDC results, further establishing the performance of the Theranos HSV-1 IgG assay.

In addition, Theranos performed method comparison studies between the Theranos HSV-1 IgG assay and the Predicate Device for both of the use cases, including sample pre-analytical processing with the TSPU within the TPSC and within the Theranos central CLIA-laboratory, as discussed and described in Sections 18.b.iii.3 and 18.b.iii.4, respectively. Compared to serum samples run on the predicate method, results indicate that capillary samples collected in the field and processed either in the field or at the central laboratory on the TSPU, yield good concordance to the predicate method. Namely, for field processing with the TSPU, positive percent agreement of 98% and negative percent agreement of 97% were shown.  For central lab processing with the TSPU, positive percent agreement of 97%, and negative percent agreement of 100% were shown. These results reflect no statistical difference of the performance of the Theranos HSV-1 IgG Assay between the two sample processing locations.  These results further support equivalence of the candidate method with the predicate method including capillary samples processed either in the field or at the central laboratory.

Sample Matrix:

To establish that the performance of the Theranos HSV-1 IgG assay with sample matrices stated above, (venous serum and K2-EDTA plasma from venous and capillary blood) do not raise questions of safety and efficacy, Theranos performed a matrix comparison study.  In this study, discussed and described in Section 18.a.ii, the effect of anticoagulants on the detection of analyte with the HSV-1 IgG immunoassay was determined by comparing values obtained from matched venous serum, venous K2-EDTA plasma, and capillary K2-EDTA plasma samples drawn from the same donors. Results showed that for positive samples, recovery was within ±20% of the serum value, while for negative samples, all samples showed a difference of less than or equal to 0.02 COI relative to the serum results.

**Conclusion:**

From the results of these studies, Theranos has concluded that the Theranos Herpes HSV-1 IgG immunoassay is substantially equivalent to the commercially available HerpeSelect 1 and 2 Immunoblot IgG test manufactured by Focus Diagnostics for detection of HSV-1 IgG antibodies in the indicated populations and use cases.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491760

THERANOS, INC.

THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

### 12.0 PROPOSED LABELING

The Theranos Herpes Simplex Virus Type 1 Assay and TSPU will have the following proposed labeling pieces, which are provided in **Appendices 12-A** through **12-E** as listed in Table 12-1 below.

**Table 12-1: Theranos Labeling**

| Appendix Number | Document Title | Commercially Released or Proposed Draft |
|---|---|---|
| 12-A | Label for CLIA Cartridge Outer Box and Inner Bag | Proposed Draft |
| 12-B | Label for Field Cartridge Outer Box and Inner Bag | Proposed Draft |
| 12-C | Package Insert - TSPU Device | Proposed Draft |
| 12-D | TSPU Label | Proposed Draft |
| 12-E | Package Insert - HSV-1 Assay | Proposed Draft |

The Package Insert for the Predicate Device, the Focus HerpeSelect 1 and 2 Immunoblot IgG assay, is attached as **Appendix 12-F**.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **74** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

**13.0    STERILIZATION AND SHELF-LIFE**

The Cartridges and Theranos System for the HSV-1 IgG Assay are non-sterile.

The shelf-life of the HSV-1 IgG Assay Cartridge has been studied as described in the Stability Studies in Section 17.c(4)(a).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **75** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

**14.0   BIOCOMPATIBILITY**

This 510(k) Pre-Market Submission is for an *In Vitro* Diagnostic device and does not require Biocompatibility testing.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491763

ER-15439

THERANOS, INC.                  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                        510(k) PREMARKET NOTIFICATION

## 15.0   SOFTWARE

### LEVEL OF CONCERN DETERMINATION

According to FDA's Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices (May 11, 2005), the Level of Concern for software contained in a medical device is Moderate, where the Software Device could only lead to an erroneous diagnosis or a delay in delivery of appropriate medical care that would likely lead to Minor Injury.  Note that the Theranos HSV-1 IgG Assay is for *in vitro* diagnostic use and thus there is no direct adverse effect on patient health.

The Theranos HSV-1 IgG Assay is intended for sexually active individuals and expectant mothers as an aid for the presumptive diagnosis of HSV-1 infection. The tests will not be FDA cleared for screening blood or plasma donors and will not have been established for use specifically in a pediatric population, neonates and immunocompromised or immunosuppressed patients.

The HSV-1 Assay will not be used as the primary means of diagnosis and a false positive result in the absence of clinical presentation consistent with infection would not likely result in antiviral drug treatment or cesarean delivery.  In addition, in the scenario where a false negative result is at odds with the clinical presentation of the patient, testing by other methods (such as by nucleic acid amplification) or using other specimens (oral, dermal or genital lesion) is recommended.  Given the mitigating factors of subsequent testing and analysis where the serological results are contrary to the clinical presentation, the Software Level of Concern is Moderate.  Pursuant to Pre-Submission Q140358, FDA confirmed that the Level of Concern would be Moderate for this assay.

Due to the Moderate Level of Concern, the following software-related documentation is provided in this section:

- Software Description
- Device Hazard Analysis
- Software Requirements Specification (SRS)
- Architecture Design Chart
- Software Design Specification (SDS)
- Traceability Analysis
- Software Development Environment Description
- Verification and Validation Documentation
- Revision Level History
- Unresolved Anomalies (Bugs or Defects)

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 77 of 109

ER-15440

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

**SOFTWARE DESCRIPTION**

The Theranos System software is comprised of two components (the TSPU and TLAS) and is supported by a systems architecture that ensures a secure environment in which only the TSPU and TLAS are authenticated to communicate to one another.

**Theranos Sample Processing Unit (TSPU)**

The TSPU operates under the control of the TLAS. The TSPU may be connected to the TLAS via a secure Internet or other data network connection, and the TSPU and TLAS are capable of proprietary two-way communication with each other. For example, the TLAS can send various commands and protocols to the processor of the TSPU, for execution by the TSPU. Similarly, the TSPU can send information obtained by the TSPU to the TLAS, such as data obtained from pre-analytic steps with a sample or information obtained from sensors within the TSPU (e.g., signal, image, temperature information). Information sent by the TSPU to the TLAS may be in response to a specific request for information from the TLAS to the TSPU, or it may be part of a standardized protocol. Upon completion of pre-analytic processing in the TSPU, the TLAS performs analysis and post-analytic processing.

The TSPU software supports the physical interface between the technician/operator and the device. It enables the functions that allow an authorized technician to load a specialized cartridge into the device prior to sample processing. Via a touchscreen embedded in the TSPU device, the TSPU software presents a UI to the user that allows for detailed user-oriented instructions ensuring a technician follows all appropriate steps before sample processing can begin. In processing a sample onboard the device, the TSPU software has the responsibility for directing all operations of the hardware and logging the success of each operation. Should an error occur during sample processing, the TSPU software recognizes the type of error and based on this determination either continues with the sample processing or aborts the run, and logs the error that occurred. The TSPU exposes the status of the hardware to the user in real-time. After processing the sample, the TSPU transmits raw signals to TLAS for analysis.

After inserting a cartridge into the device for sample processing, the TSPU software scans the cartridge barcode in order to retrieve the sample processing protocol associated with that cartridge from TLAS. This protocol is used as the set of instructions for the TSPU software to execute in processing the sample. In designing the Theranos System software, careful consideration was taken to ensure only validated protocols are run on known hardware configurations in processing samples on board the TSPU. When launching the TSPU software, a controller service scans the hardware configuration and compares it to the known configuration stored in the TLAS. If the hardware signatures differ in any way, the TSPU software will prevent the device from

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos  TS-0491765

**THERANOS, INC.**                    **THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY**
                                      **510(k) PREMARKET NOTIFICATION**

being used. Furthermore, to facilitate development of protocols on a device, the system architecture for TSPU implements a service API which abstracts the hardware layer from the instructions that operate all of the mechanisms of the device, allowing for more intuitive and faster development of protocols for sample processing on board the device. Upon validation of a sample processing protocol, the protocol is released within Theranos' configuration management system and associated to the correct cartridge type in TLAS.

**Theranos Laboratory Automation System (TLAS)**

TLAS provides control and secure two-way communication with the TSPUs to enable CLIA-compliant control and oversight of sample processing devices, while being placed at the locations in which the sample processing can be done, minimizing the number of errors associated with transportation and manual human handling found in traditional laboratories. The secure information and control communicated between the TSPU and TLAS allows for control and oversight to be extended from the central TLAS to the remote TSPU. In this manner, the TSPU remains a core component of the Theranos CLIA-certified laboratory and a core part of realizing the quality standards of the Theranos CLIA-certified laboratory. The combination of reducing human error from pre-analytic processing while maintaining CLIA-compliant control and oversight of the TSPUs provide for higher quality results and repeatable test procedures.

The TLAS system accepts, manages and distributes raw signals obtained by the TSPU while processing samples within the TSPU device. Additionally it manages and provisions the Theranos devices associated with it, including the Cartridges that are used for processing the sample. TLAS is composed of six components (refer to the **Appendix 15-A System Architecture Design Chart**) each of which is briefly described below. When the TSPU presents a cartridge barcode, TLAS returns the sequence of instructions, called a protocol, to the TSPU device. After processing the sample, the TSPU transmits the raw signals to TLAS. The calibration component of TLAS then calls on calibration curves established for the set of reagents that exist on the cartridge and the protocol that was run to convert the raw signals into finished measurements. The Theranos Manufacturing organization interacts with the TLAS system to generate unique barcodes for each cartridge, ensuring that the set of reagents loaded onto a cartridge are appropriately mapped to each cartridge. Theranos R&D associates each validated protocol to the correct cartridge type within TLAS.

Calibration Management System

The Calibration Management System handles calibration and prediction procedures. These procedures are mapped onto the raw results to produce the final results. Cartridge Manufacturing is responsible for updating these procedures and calibration values to correspond to the lots of reagents used.

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT**

Page **79** of **109**

THERANOS, INC.                          THERANOS™ HERPES SIMPLEX VIRUS-1 IGG ASSAY
                                        510(k) PREMARKET NOTIFICATION

Cartridge Management System

The Cartridge Management System is responsible for maintaining the mapping between cartridge barcode serial numbers and the cartridge types. It manages whether a cartridge has been previously used and whether or not the cartridge or its reagents are expired.

Final Results Manager

The Final Results Manager is the access path for technicians in CLIA to retrieve the final results of cartridge runs.

Protocol Manager

The Protocol Manager provides the facilities for Theranos R&D to create, update, and delete procedures that tell the TSPU the steps required to process the sample for a particular assay.

Raw Signal Manager

The Raw Signal Manager accepts raw signals from a TSPU Device and persist the data in the TLAS database. It activates the Signal Processing System to process the raw results received.

Signal Processing System

The Signal Processing System takes raw signals from the TSPU device and with the correct Calibration data from the Calibration Management System produces a final result for the cartridge run. It stores the final result so that the Final Results Manager may access them.

**System Security**

TSPU security is built upon two core tenets based on three main aspects. The main OS and software image running on TLAS is digitally signed before installing on each device to make the software tamper-proof. The TSPU devices are always kept in a secure environment and they are authenticated to the TLAS server by way of an individual and certificate unique to each device. This certificate must be validated by TLAS at each request prior to permitting any communications to begin. All internal storage is kept encrypted by a FIPS 140 chip. Authentication for each cartridge inserted into the TSPU is provided by a cartridge serial number set which must match a corresponding number kept by the TLAS server. This mechanism carried out in the secure environment noted above provides proper authentication to the TLAS server. For system provisioning, the TSPU devices use the Microsoft SCCM system management system. This system is a robust and mature system specifically designed

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **80** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

to remotely and securely manage large numbers of distributed systems and configurations. The builds are signed.

Access to the TLAS is allowed only to the secured and authenticated TSPU device. No other system that was not digitally signed by the TLAS architecture has access to the security certificate on a given device and therefore is not authorized to access any of the TLAS services. TLAS application security is primarily supported and administered by the operating system that it runs on Microsoft Windows Server, and the database management system that is used, Microsoft SQL Server Database Management System. Both of these programs are quite mature and have all necessary features to implement a robust and secure environment. Theranos maintains SOPs for administering these systems and the users who have access to these systems. The systems are subject to receiving only validated and signed updates as necessary only for the improvement or repair of TLAS.

The secure network infrastructure allows for CLIA-compliance for certified analysis and testing through the TLAS for determination of the presence or absence of various substances in the human body in Theranos' CLIA-certified laboratory while automating sample processing through the TSPU to minimize pre-analytic error and variability

**IT System Infrastructure**

The system infrastructure that allows the TSPU and TLAS to communicate with each other is also responsible for protecting the TSPU devices and the TLAS system from external attack.

The Theranos System application system is protected by multiple levels of security hardware and software. Refer to **Appendix 15-A** for a figure depicting this system infrastructure design. The application servers sit behind a CISCO ASA firewall backed up by a Palo Alto Networks firewall in addition to a Snort based Intrusion Detection System (IDS). The active aspect of the system for intrusion detection, the ASA and PAN systems, provide asymmetric detection algorithms and patterns which increase the probability that an intrusion will be detected. Both systems issue alerts when they discover anomalous traffic. They additionally capture any suspicious packets. The response activities include an immediate human inspection of the issues. If the issue requires, the packet sequence is reconstructed and perused. If a host is confirmed to be communicating to an unknown external target, it is immediately blocked. At this point recovery steps are required. The potentially compromised server is taken offline and backup servers will handle the load. Unless the server is deemed safe with a 100% confidence level, it is destroyed and replaced by a new server.

**ARCHITECTURE DESIGN CHART**

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

Page **81** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

For the Architecture Design Chart, see **Appendix 15-A (System Architecture Design Chart)**.

### DEVICE HAZARD ANALYSIS

Device Hazard Analysis, see **Appendix 15-B-1 (Software Hazard Analysis)** and **Appendix 15-B-2 (SOP-000148 Hazard Analysis)**.

### SOFTWARE REQUIREMENTS SPECIFICATION (SRS).

For the Software Requirements Specification (SRS), see **Appendix 15-C-1 (REQ-00010 Requirements, Theranos System 4, Software TLAS)** and **Appendix 15-C-2 (REQ-00011 Requirements, Theranos System 4, Software TSPU)**.

### SOFTWARE DESIGN SPECIFICATIONS (SDS)

For the Software Design Specifications (SDS), see **Appendix 15-D-1 (SPC-00043 Specifications, Theranos System 4, Software TLAS)** and **Appendix 15-D-2 (REQ-00044 Specifications, Theranos System 4, Software TSPU)**.

### TRACEABILITY ANALYSIS

For the Traceability Analysis, see **Appendix 15-E-1 (Traceability Matrix, Theranos System 4, Software TLAS)** and **Appendix 15-E-2 (Traceability Matrix, Theranos System 4, Software TSPU)**.

### SOFTWARE DEVELOPMENT ENVIRONMENT

Software is developed in accordance with a Disciplined Agile Delivery process with a standard software life cycle procedure.

A software life cycle is the period of time that starts when a software product is conceived and ends when the product is no longer available for use. The development and maintenance of software is divided into three distinct phases which allow validation and verification to be conducted at appropriate points during the software life cycle. This builds quality and reliability into the software and provides a measure of the quality of the software product. The software life cycle for the TLAS and TSPU software includes the following phases:

- Inception phase

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          TS-0491769

THERANOS, INC.                  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                510(k) PREMARKET NOTIFICATION

- Construction phase
- Transition phase

In the Inception phase, the requirements, high level use cases, and informal requirements are refined and from them a preliminary architectural design is established along with a preliminary domain model. These become live documents, evolving during the cycles of the following phase. These initial use cases and requirements are rigorously reviewed for hazard mitigation and effective software implementation. Additionally, preliminary supporting documentation, and overall planning takes place. Formal documentation for the inception phase of the current TLAS and TSPU software build started on September 16, 2014. These phases are ongoing life cycles that = continue over the life cycle of the software. Building from the prototype code base for both TLAS and TSPU software, particular thoughtfulness and deliberation was given to defining high-level use cases from the stakeholder perspective, incorporating lessons learned from previous builds.

The Construction phase converts the outputs of the Inception phase to real code. As the Construction phase proceeds, the verification tests are conducted, keeping the code in line with the specifications from the Inception phase. As iterations of the Construction phase occur, validation begins. The architecture and components delineated in the Inception phase are implemented as the code which is later validated by the validation tests. This process includes design, implementation, test execution, and debug steps. Any unforeseen anomalies are evaluated through the risk management process. As applicable, this process was followed for both the TSPU and TLAS development efforts where documentation is the code itself.

The conclusion of each cycle of the Construction phase ends with a process improvement review, during which any requirement changes and additions are reviewed and integrated, updates are made to the high level requirements and release plan, and a plan on how to move forward in the next cycle is completed. If a software component is producible at a cycle's conclusion, it may be demonstrated and reviewed by stakeholders, out of which new and/or changed requirements may emerge. The next cycle begins again with work item re-prioritization, validation of requirement coverage for any test case changes, and the subsequent development activities. This cyclical development process is extremely tolerant of requirement changes and other real-world emergency requests and priority shifts.

Final validation test scripts on the end-to-end solution were defined for both the TLAS and TSPU software and are documented in **Appendices 15-F-1** and **15-F-2**, respectively. The results of this testing for TLAS and TSPU are documented in **Appendices 15-F-3** and **15-F-4**, respectively. As the product completes the verification and validation of all of its specifications and requirements, it moves into the Transition

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491770

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                        510(k) PREMARKET NOTIFICATION

phase where the plan to move into production is finalized. Additionally, deployment is communicated to stakeholder, and they are trained for its use. Lastly, the production support environment is established

After release, any defects which may be reported are resolved by cycling through the aforementioned phases and the software is revised, revalidated, and re-released as necessary. A software revision level control procedure ensures that the integrity and reliability of the software is retained over the life of the product, and that only validated and released versions of software are available for human use or commercial distribution.

### VERIFICATION AND VALIDATION DOCUMENTATION

For the Verification and Validation Documentation, see:

- For the TLAS, **Appendix 15-F-1 (TPR-00036 Test Protocol, Theranos System 4, Software, TLAS)** and **Appendix 15-F-2 TR-00044 (Test Report, Theranos System 4, Software, TLAS)**, and
- For the TSPU, **Appendix 15-F-3 (TPR-00037 Test Protocol, Theranos System 4, Software, TSPU)** and **Appendix 15-F-4 (TR-00045 Test Report, Theranos System 4, Software, TSPU)**.

### SOFTWARE REVISION LEVEL HISTORY

For the Software Revision Level History, see **Appendix 15-G (Software Revision Level History)**.

Since the start of the most recent Validation study on 10/14/14 some changes were made to the TSPU and TLAS code, however these changes were limited to interface refactoring, bug fixes and alterations, including adjusting message texts that display on the TSPU. Additionally, a bug fix was implemented to enable the proper saving of the sample ID and optional notes to TLAS. These changes do not have an effect on the performance of the Theranos System and do not negatively affect patient safety.

While the code changes were made during the course of performing the analytical and clinical studies, a deliberate decision was made to validate the latest release of code such that the software that was validated is consistent with the newest and final release for both TSPU and TLAS software.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          TS-0491771

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

UNRESOLVED ANOMALIES

There are no major bugs or anomalies that are known. Below is a list of the current bugs at the time of submission and they are limited to TLAS messages and runtime displays which do not have a bearing on the test results or patient safety. These anomalies will be resolved in future releases as part of the standard development process.

Table 15-1: Tracking number and descriptions:

| | |
|---|---|
| 5392 | Runtime display incorrect if assay start after a failure |
| 5393 | inconsistent error messages for the same failure |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos      TS-0491772

ER-15448

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                   510(k) PREMARKET NOTIFICATION

## 16.0    ELECTROMAGNETIC COMPATIBILITY AND ELECTRICAL SAFETY

The Theranos™ Sample Processing Unit (TSPU) was subjected to electrical safety and
electromagnetic compatibility conditions as described by the following standards:

- **IEC 60601-1-2:2007**, Medical electrical equipment – Part 1-2: General
  requirements for basic safety and essential performance – Collateral
  standard: Electromagnetic compatibility – Requirements and tests
- **IEC 61010-1 ed. 3.0**, Safety requirements for electrical equipment for
  measurement, control, and laboratory use - Part 1: General requirements
- **IEC 61010-2-020 ed. 2.0**, Safety requirements for electrical equipment for
  measurement, control, and laboratory use - Part 2-020: Particular
  requirements for laboratory centrifuges

The device test conditions for electrical safety and electromagnetic compatibility did
not deviate from the accepted standards.  All test conditions were performed as outlined
by the IEC standards.  The TSPU passed all of the test conditions without deviation
from the aforementioned standards.

The testing for the electromagnetic compatibility conditions described in IEC 60601-1-
2:2007 was conducted by NTS-Silicon Valley.  The following documents are provided
have been provided related to this testing:

- The Theranos Test Report is provided in **Appendix 16-A-1 (TR00041)**.
- NTS-Silicon Valley Test Certificate and Test Report for Electromagnetic
  Compatibility Medical Electrical Equipment per EN 60601-1-2:2007 and
  IEC 60601-1-2:2007 Specifications are provided in **Appendix 16-A-2**.
- NTS-Silicon Valley Test Certificate and Test Report for Electromagnetic
  Compatibility Information Technology Equipment per EN 61000-3-2:2006
  +A1:2009 +A2:2009 and EN 61000-3-3"2008 are provided in **Appendix
  16-A-3**.
- NTS-Silicon Valley Test Certificate and Test Report for Electromagnetic
  Compatibility Electrical Equipment for Measurement, Control and
  Laboratory Use per EN 61326-1:2013 as modified by EN 61324-2-6:2006
  and EN 61326-2-6:2013 are provided in **Appendix 16-A-4**.

The testing for the electrical safety conditions described in IEC 61010-1 ed. 3.0 was
conducted by Theranos.  The following documents are provided have been provided
related to this testing:

- The test protocol for the TSPU for compliance with IEC 61010-1 ed. 3.0 is
  provided in **Appendix 16-B-1 (TPR00033)**.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 86 of 109

ER-15449

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

- The test report for the TSPU for compliance with IEC 61010-1 ed. 3.0 is provided in **Appendix 16-B-2 (TR00039)**.

The testing for the electrical safety conditions described in IEC 61010-2-020 ed. 2.0 was conducted by Theranos.  The following documents are provided have been provided related to this testing:

- The test protocol for the TSPU for compliance with IEC 61010-2-020 ed. 2.0 is provided in **Appendix 16-C-1 (TPR00035)**.
- The test report for the TSPU for compliance with IEC 61010-2-020 ed. 2.0 is provided in **Appendix 16-C-2 (TR00036)**.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos  TS-0491774

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

## 17.0  PERFORMANCE TESTING – ANALYTICAL

**a.  Precision:**

A precision study was conducted at the internal Theranos site (Palo Alto, CA). The study was performed over 13 non-consecutive days, using a panel of 6 serum samples, contrived to span the analytical range with values near the cutoff, one low positive and one high negative sample. On day 0, each member of the panel was prepared in bulk, aliquoted into Theranos round vessels, foil sealed, and stored at -80°C.

The six-member panel was tested using 4 replicates per run in 21 runs overall, across 13 non-consecutive days, using three different reagent lots. Finished product cartridges from each lot were calibrated before use, following the procedure outlined in Section 17.c. Forty-three Theranos TSPUs were used during this study. Daily runs were performed by Theranos staff in teams of two, with more than 12 operators covering the entire study. The mean, standard deviation and coefficient of variation (%CV) of the results were computed for each of the tested specimens. The intra-and inter-run CVs are summarized below. The details of the study protocol are included in **Appendix 17-H**. The precision study was designed and performed in accordance with CLSI EP05-A2 (Evaluation of Precision Performance of Quantitative Measurement Methods; Approved Guideline).

Table 17-1: Precision results summary

| Levels | N | within run CV (%) | between run CV (%) | within day CV (%) | within device CV (%) | within lot CV (%) |
|---|---|---|---|---|---|---|
| HSV1Neg1 | 92 | 7.4 | 9.4 | 10.2 | 10.3 | 11.4 |
| HSV1NegCO | 90 | 9.3 | 10.7 | 12.5 | 11.8 | 13.0 |
| HSV1POS1 | 79 | 9.8 | 10.3 | 10.0 | 7.3 | 12.0 |
| HSV1POS4 | 80 | 9.1 | 12.2 | 13.4 | 11.9 | 13.4 |
| HSV1POS3 | 69 | 9.1 | 11.2 | 10.7 | 8.7 | 10.6 |
| HSV1POS7 | 69 | 7.0 | 8.0 | 10.0 | 7.8 | 10.0 |
| Levels | mean, lot1 (COI) | mean, lot2 (COI) | mean, lot3 (COI) | mean, overall (COI) | SD, overall (COI) | CV, overall (%) |
| HSV1Neg1 | 0.42 | 0.42 | 0.44 | 0.42 | 0.05 | 11.4 |
| HSV1NegCO | 0.61 | 0.65 | 0.68 | 0.65 | 0.09 | 13.4 |
| HSV1POS1 | 1.06 | 1.00 | 0.93 | 1.02 | 0.13 | 12.6 |
| HSV1POS4 | 1.71 | 1.78 | 1.69 | 1.73 | 0.23 | 13.4 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **88** of **109**

FOIA Confidential Treatment Requested by Theranos  TS-0491775

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| | | | | | | |
|---|---|---|---|---|---|---|
| HSV1POS3 | 3.81 | 4.00 | 3.72 | 3.84 | 0.43 | 11.3 |
| HSV1POS7 | 9.17 | 8.99 | 8.83 | 9.00 | 0.90 | 10.0 |

Table 17-2: Precision Runs Summary: Number of runs per reagent lot for each level tested

| Level | N, lot1 | N, lot2 | N, lot3 | Total | # Devices | # Days | # Operators | # Invalid Runs | % Negative | % Positive |
|---|---|---|---|---|---|---|---|---|---|---|
| HSV1Neg1 | 27 | 38 | 27 | 92 | 35 | 7 | 14 | 3 | 100 | 0 |
| HSV1Neg CO | 25 | 37 | 28 | 90 | 28 | 7 | 14 | 2 | 100 | 0 |
| HSV1POS 1 | 27 | 44 | 8 | 79 | 35 | 8 | 16 | 3 | 47 | 53 |
| HSV1POS 4 | 25 | 27 | 28 | 80 | 11 | 2 | 4 | 4 | 0 | 100 |
| HSV1POS 3 | 25 | 13 | 26 | 64 | 16 | 3 | 6 | 1 | 0 | 100 |
| HSV1POS 7 | 25 | 19 | 25 | 69 | 15 | 2 | 4 | 3 | 0 | 100 |

Plots and line-by-line data are tabulated in **Appendices 17-A-1** and **17-A-2**, respectively.

    **b.**    **Linearity/assay reportable range:**

        Not applicable.

    **c.**    **Traceability, Stability, Expected values (controls, calibrators, or methods):**

    (1) Traceability: There is no international standard available for measuring HSV-1 antibody in serum or plasma, therefore an internal Theranos HSV-1 reference standard was prepared from high positive serum.

    (2) Controls: The two on-board controls used in the test are commercially sourced from Bio-Rad Laboratories (Liquichek ToRCH Plus Control, Positive Cat# 239 and Negative, cat# 228). Acceptable limits for control measurements were established by averaging 813 runs. The acceptable limits for the positive and negative controls (0.125 and 99.75 percentiles) are as follows. Any control measurement outside this range invalidates the cartridge run.

Table 17-3: Summary of acceptability limits for positive and negative on-board controls

| Control | Lower limit (RLU) | Upper limit (RLU) |
|---|---|---|
| | | |

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

Page **89** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

| | | |
|---|---|---|
| Positive | 787 | 2840 |
| Negative | 0 | 8.7 |

(3) Calibrators:  Calibrators for factory calibration are sourced commercially from Bio-Rad Laboratories (Bioplex HSV-1 & HSV-2 IgG Cal Set, Cat#663-3300) and an in-house cut-off calibrator. Calibration of Theranos HSV-1 IgG assay is tied to particular lot of reagents, and particular lot of cartridges. In order to perform calibration, 15 cartridges are randomly sampled from a particular lot of finished product. Each calibrator level (COI of 0.6, 1.1 and 2.1) is analyzed in 5 replicates. The cut-off is set for the lot of cartridges based on the RLU value of the cut-off calibrator. The other calibrators are used to verify the modulation of the assay. The modulation between level 1 (COI=0.6) and level 2 (COI=1.1) should be $\geq 1.4$, and the modulation between level 2 and level 3 (COI=2.1) should be $\geq 1.6$. If these conditions are not satisfied, the lot is considered to not have sufficient modulation and is disqualified.

(4) Stability:

(a) Reagents: To assess the stability of reagents, cartridges were randomly selected from the finished product. The cartridges were stored at the recommended storage temperature of 2-8°C, in temperature controlled cabinets, for the duration of ongoing stability studies. Temperature in the storage cabinets was checked at regular intervals. The test measurement intervals started with the production date of the last cartridge and continued (will continue) at approximately 0 (baseline), 4, 8, 12, 15, 18, 24 and 30 week time intervals. The effect of ambient temperature on the cartridges was also evaluated by placing the carts at room temperature for 24 hours. Stability was evaluated at time points t=4 hour and t=24 hours. Key stability parameters monitored for Theranos HSV-1 IgG assay were: a) Signal (COI) at 3 calibrators (negative, cut-off and positive), each measured in duplicate, and b) Modulation, i.e. ratio of CO/negative and Positive/CO calibrators. Acceptance criteria were/are as follows:

1. Mean signal for each CO and positive calibrator should be within 80-120% of the baseline value. Mean signal for the negative calibrator should be within 0.02 COI of the baseline value.
2. Modulation values for each value pair should be within 30% of the modulation at baseline.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491777

**ER-15453**

THERANOS, INC.     THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
            510(k) PREMARKET NOTIFICATION

Table 17-4:  Summary of reagent (cartridge) stability

| Condition | Stability |
|---|---|
| At 2-8°C, unopened | Up to 4 weeks |
| At 20 ± 3°C, opened | Up to 6 hours |

The line-by-line data are tabulated in Appendix 17-B.

The reagent stability study was designed and performed in accordance with CLSI EP25-A (Evaluation of Stability of In Vitro Diagnostic Reagents; Approved Guideline).

(b) Samples:  Sample stability was determined using a minimum of 8 samples per sample type, per condition. EDTA-anticoagulated capillary and venous whole blood as well as serum from venous draws were collected from each of the 8 donors. Samples were run immediately (within 2 hrs of collection) for a time zero reference point measurement. Samples were stored under each of the conditions described in Table 17-5 for the corresponding time period, after which they were tested. Each analytical run was performed in duplicate. A recovery of 80-120% with respect to the reference point (t=0) was considered acceptable.  For negative samples, a mean difference of 0.02 COI was considered acceptable.

Table 17-5:  Summary of sample stability studies

| Condition | Serum | Venous K2-EDTA plasma | Capillary K2-EDTA plasma |
|---|---|---|---|
| Stored at 2-8°C as plasma | 48hr | 48hr | 48hr |
| Stored at room temperature (20-25 °C) as plasma | 6 hours | 6 hours | 6 hours |
| Stored at -20°C as plasma | 1 week | 1 week | 1 week |
| Freeze/thaw cycles, as plasma/serum | 3 | 3 | 3 |

Table 17-6: Summary of stability data.

For each condition and each matrix, the relative magnitude of COI measurements at two different points shown in Table 17-5 above is tabulated. For negative samples, the mean of the absolute difference is used. For positive samples, the mean recovery is used.

| Condition | Matrix | Mean |ΔCOI| for negative samples | Mean recovery of COI for positive samples |
|---|---|---|---|
| Frozen | Serum | 0.009 | 102% |

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT**

Page **91** of **109**

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| | | | |
|---|---|---|---|
| (-20°C)<br>(0, 1 week) | Capillary K2-EDTA plasma | 0.005 | 102% |
| | Venous K2-EDTA plasma | 0.002 | 103% |
| 2-8°C<br>(0, 48 hours) | Serum | 0.006 | 102% |
| | Capillary K2-EDTA plasma | 0.003 | 100% |
| | Venous K2-EDTA plasma | 0.007 | 101% |
| Freeze-thaw<br>(3 cycles) | Serum | 0.011 | 102% |
| | Capillary K2-EDTA plasma | 0.016 | 95% |
| | Venous K2-EDTA plasma | 0.021 | 102% |
| On-board<br>(0, 2 hours) | Serum | 0.005 | 95% |
| | Capillary K2-EDTA plasma | 0.017 | 101% |
| | Venous K2-EDTA plasma | 0.010 | 96% |
| Room temp.<br>(0, 6 hours) | Serum | 0.007 | 97% |
| | Capillary K2-EDTA plasma | 0.015 | 99% |
| | Venous K2-EDTA plasma | 0.013 | 105% |

Figures are plotted in **Appendix 17-C-1**. Line-by-line data are tabulated in **Appendices 17-C-2-1** through **17-C-2-5**.

**d.**      **Detection Limit:**

Not applicable.

**e.**      **Analytical specificity:**

(1) <u>Cross reactivity</u>: Cross reactivity studies for the HSV-1 type specific IgG assay were designed to evaluate potential interference directed against closely related members of the Herpes virus family (EBV) and other conditions that may mimic an HSV-1 infection. Serum samples positive for one or more of the conditions/pathogens in Table 17-7, and confirmed negative for HSV-1 using

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **92** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IGG ASSAY
                                  510(k) PREMARKET NOTIFICATION

the reference method were tested in this study. One sample which had a
measured Rheumatoid factor (RF) level of greater than 25I U/mL, tested
positive with a COI of 1.15. These results indicate that the HSV-1 IgG test does
not cross reactivity against antibodies for the indicated
organisms/conditions.  Line-by-line data are tabulated in **Appendix 17-D**.

Table 17-7: Summary of HSV-1 IgG cross reactivity studies

| Organism/Condition | N | Reference HSV-1 Assay | Theranos HSV-1 Positive | Theranos HSV-1 Negative | Theranos HSV-1 Equivocal |
|---|---|---|---|---|---|
| Epstein Barr Virus (IgG) | 1 | Negative | 0 | 1 | 0 |
| HPV (IgG) | 4 | Negative | 0 | 4 | 0 |
| Rubella (IgG) | 13 | Negative | 0 | 13 | 0 |
| HSV-2 (IgG) | 40 | Negative | 0 | 40 | 0 |
| HAMA samples | 4 | Negative | 0 | 4 | 0 |
| Treponema pallidum | 8 | Negative | 0 | 7 | 1 |
| Rheumatoid Factor (RF) | 8 | Negative | 1 | 7 | 0 |
| Anti-nuclear antibody (ANA) | 8 | Negative | 0 | 8 | 0 |
| Sjorgens Syndrome | 3 | Negative | 0 | 3 | 0 |

(2) Interference: The impact of endogenous interfering substances and commonly
used drugs on the Theranos anti-HSV-1 IgG immunoassay was evaluated. All
interferents were tested with three serum samples (negative, high negative and
low positive). The serum samples were contrived by using a high positive
sample and diluting it with pooled negative serum.  The negative sample had a
mean COI of 0.024, the high negative at 0.77 and the low positive at 1.52.
These levels were selected to capture the highest likelihood of interference
leading to change in the reported result of the test. Samples were spiked with the
interferent at levels shown in Table 17-8. Each serum pool was tested in
duplicate. The acceptance criteria were a mean recovery within +/- 20% of the
value of the unspiked sample (i.e., in the absence of the potential interferent or
drug) for the positive and the high negative pools. For the low negative pool, the
criterion was a deviation of less than 0.02 COI.

All positive and high negative samples showed a signal change of less than 15%
for all interfering substances. All positive samples remained positive and all
negative samples remained negative upon spiking of drug or other interferents.
All negative samples showed a mean deviation of ≤0.02 COI, except Intralipid.
Intralipid spikes did not show any effect on recovery for near cut-off and

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491780

THERANOS, INC.　　　　　THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

positive samples. These results suggest that the HSV-1 IgG assay does not exhibit interference to the tested substances which would impact performance. Figures are plotted in **Appendix 17-E-1** and line-by-line data are tabulated in **Appendix 17-E-2**. This study was designed and performed in accordance with CLSI EP07-A2 (Interference Testing in Clinical Chemistry, Approved Guideline).

Table 17-8: Summary of interfering substances studies: endogenous interferents and drug interferents

| Interferent | Level | Low negative pool | | High negative pool | | Low positive pool | |
|---|---|---|---|---|---|---|---|
| | | Mean COI | ΔCOI | Mean COI | % Recovery | Mean COI | % Recovery |
| Hemoglobin | 1000 mg/dL | 0.025 | 0.00 | 0.69 | 90 | 1.71 | 113 |
| Bilirubin | 20 mg/dL | 0.024 | 0.00 | 0.68 | 88 | 1.61 | 106 |
| Intralipid | 2000 mg/dL | 0.053 | 0.03 | 0.81 | 105 | 1.60 | 105 |
| Acetylcysteine | 150 mg/L | 0.019 | -0.004 | 0.68 | 88 | 1.40 | 92 |
| Ampicillin-Na | 1000 mg/L | 0.025 | 0.001 | 0.76 | 99 | 1.44 | 95 |
| Ascorbic acid | 300 mg/L | 0.027 | 0.003 | 0.75 | 97 | 1.67 | 110 |
| Ca-Dobesilate | 200 mg/L | 0.027 | 0.004 | 0.70 | 91 | 1.51 | 99 |
| Cyclosporine | 5 mg/L | 0.031 | 0.008 | 0.74 | 97 | 1.53 | 101 |
| Cefoxitin | 2500 mg/L | 0.027 | 0.003 | 0.74 | 97 | 1.52 | 100 |
| Heparin | 5000U | 0.020 | -0.003 | 0.80 | 103 | 1.52 | 100 |
| Levodopa | 20 mg/L | 0.030 | 0.006 | 0.68 | 88 | 1.42 | 94 |
| Methyldopa+1.5h20 | 20 mg/L | 0.024 | 0.000 | 0.74 | 97 | 1.37 | 90 |
| Metronidazole | 200 mg/L | 0.039 | 0.016 | 0.74 | 96 | 1.38 | 91 |
| Phenylbutazone | 400 mg/L | 0.021 | -0.002 | 0.74 | 96 | 1.42 | 94 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　TS-0491781

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                         510(k) PREMARKET NOTIFICATION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Doxycycline | 50 mg/L | 0.024 | 0.000 | 0.71 | 92 | 1.35 | 89 |
| Acetylsalicylic acid | 1000 mg/L | 0.026 | 0.002 | 0.75 | 97 | 1.37 | 90 |
| Rifampicin | 60 mg/L | 0.014 | -0.009 | 0.69 | 90 | 1.35 | 89 |
| Acetaminophen | 200 mg/L | 0.034 | 0.010 | 0.64 | 83 | 1.68 | 111 |
| Control | | 0.024 | 0.000 | 0.77 | 100 | 1.52 | 100 |

**f.    Assay cut-off:**

Assay cutoff was established initially by measuring 192 native human serum samples from high risk adults, a subset of which were pregnant women. These samples conformed to the inclusion criteria of the clinical study discussed below. Furthermore, these samples were selected to have a greater fraction of near cut-off values. These samples were tested on the Theranos assay as well as the reference assay. The cutoff was selected as shown by the vertical line in Figure 17-1 below (RLU at cutoff = 303.5) to maximize agreement. This cut-off gave no false positives, and 6 false negatives, thus giving a specificity of 100% and a sensitivity of 95%. This cutoff was subsequently challenged using a set of 24 near-cutoff samples. Upon challenge, the cut-off performed with 2 false negatives and 2 false positives, showing no bias with these near-cutoff samples. This gave negative and positive percent agreements of 80% and 83% respectively. Line-by-line data are tabulated in **Appendix 17-F**.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 95 of **109**

**ER-15458**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                          510(k) PREMARKET NOTIFICATION



Figure 17-1: Distributions of positive (violet) and negative (orange) samples in RLU space. The cut-off was determined based on this data set and is shown as a vertical line at log10(RLU) of 2.48.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos                    TS-0491783

ER-15459

THERANOS, INC.           THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                510(k) PREMARKET NOTIFICATION

## 18.0  PERFORMANCE TESTING – CLINICAL

### a.  Comparison Studies:

   i.  Method comparison with predicate device:

The performance of the HSV-1 IgG immunoassay was evaluated in a clinical study by comparing the candidate device against the selected reference method. When samples repeatedly tested equivocal in the reference method, a confirmatory method, the University of Washington Western Blot was used to resolve these results, as per the reference method instructions for use (**Appendix 12-F**). Any remaining equivocal or discordant results were counted against the Theranos HSV-1 IgG immunoassay in the performance analysis. The results of method comparison study are discussed in the clinical study section below.

   ii.  Matrix comparison:

The effect of anticoagulants on the detection of analyte in HSV-1 IgG immunoassay was determined by comparing values obtained from matched venous serum venous K2-EDTA plasma, and capillary K2-EDTA plasma samples drawn from the same donors. At least 40 serum/plasma pairs were tested for each of the anticoagulants. The acceptance criterion was a recovery of positive plasma samples within ± 20% of the serum reference value (serum drawn into primary tubes without gel). For negative samples, the acceptance criteria was a difference of <= 0.02 COI from the corresponding serum value. All anticoagulant–treated plasma samples met this criterion. The results of this study are displayed in Table 18-1 below.  Figures are plotted in **Appendix 18-A-1** and line-by-line data are tabulated in **Appendix 18-A-2**.

Table 18-1: Summary of matrix comparison studies for HSV-1 IgG

| | Number of specimens showing recovery to serum within various ranges | | | | |
|---|---|---|---|---|---|
| Negative samples | <=0.005 COI | <=0.01 COI | <=0.02 COI | >0.02 COI | Total |
| Fingerstick EDTA plasma | 7 | 8 | 2 | 1 | 18 |
| Venous EDTA plasma | 9 | 2 | 6 | 1 | 18 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos          TS-0491784

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

| Positive samples | <=5% | 5-10% | 10-20% | >20% | Total |
|---|---|---|---|---|---|
| Fingerstick EDTA plasma | 17 | 6 | 0 | 0 | 23 |
| Venous EDTA plasma | 10 | 10 | 4 | 0 | 24 |

| Negative samples | Mean Bias (COI) | Mean Bias 95% LCL (COI) | Mean Bias 95% UCL (COI) |
|---|---|---|---|
| Fingerstick EDTA plasma | 0.002 | -0.020 | 0.024 |
| Venous EDTA plasma | 0.002 | -0.019 | 0.022 |
| Positive samples | Mean Bias (%) | Mean Bias 95% LCL (%) | Mean Bias 95% UCL (%) |
| Fingerstick EDTA plasma | -1.6 | -9.80 | 6.6 |
| Venous EDTA plasma | -0.3 | -14.9 | 14.3 |

**b. Clinical Studies**

  i. Clinical Sensitivity:
     Not applicable

  ii. Clinical Specificity:
     Not applicable

  iii. Other clinical supportive data (i. and ii. are not applicable)

To characterize performance of the Theranos HSV-1 IgG immunoassay in the clinical setting, the following four studies were conducted:

  1. Sensitivity and specificity assessment in target population
  2. CDC panel testing
  3. Processing of capillary samples in central laboratory
     a. Method comparison

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **98** of **109**

FOIA Confidential Treatment Requested by Theranos

THERANOS, INC.  THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

    b. Reproducibility
  4. Processing of capillary samples in field locations
    a. Method comparison
    b. Reproducibility

The data analysis for these studies was conducted in accordance with the guidelines provided in CLSI EP12-A2 (User Protocol for Evaluation of Qualitative Test Performance; Approved Guideline).

**1. <u>Sensitivity and specificity in target population</u>:**

A clinical study was conducted to characterize the performance of HSV-1 IgG immunoassay. Retrospective venous serum samples were used in the study. The primary objective of the study was to demonstrate the sensitivity and specificity of the HSV-1 IgG immunoassay in the Theranos CLIA-certified Laboratory in comparison to the reference method. All collected samples were tested on the Theranos HSV-1 IgG assay and tested with the FOCUS HerpeSelect Immunoblot reference method.

The target population for HSV-1 IgG includes individuals with signs and symptoms of HSV-1 infection, pregnant women and sexually active adults at risk for sexually transmitted diseases. To capture the target population for the HSV-1 IgG assay, samples were obtained from adults (18 years and older) who had a prescription for a HSV-1 IgG test.

Assessment of the device's performance in low prevalence populations was also tested to assist in determining the specificity of the test. Low prevalence populations are not a target population for HSV testing, as the public health benefit of screening for HSV in low prevalence populations has not been determined. To capture this low risk group, samples were obtained from adults (18 years and older) who were not sexually active (celibate) and without a recent or current sexually transmitted disease (Hepatitis, Syphilis, HIV, HPV, Trichomonas, Chlamydia, Gonorrhoeae).

The leftover retrospective samples were obtained from multiple specimen sources in the United States and Mexico (details are included in **Appendix 18-J**).

All samples were shipped frozen to Theranos. Upon receipt, the samples were thawed, divided into aliquots and refrozen. All subsequent testing was performed on samples which had been frozen and thawed once.

Samples that repeatedly tested equivocal on the predicate device were resolved using a validated western blot reference test (University of Washington, Seattle) as per the instructions of the predicate device package insert (**Appendix 12-F**).

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 99 of 109

THERANOS, INC.        THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

Among the 640 samples, 543 (85%) were females and 97 (15%) were males. Ages ranged from 18 to 90 years. These populations included: high risk individuals (n = 558) and low risk population (n = 82). Out of the 558 samples collected from the high risk group, 298 samples were identified as pregnant women. For acceptance, the lower bound of the 95% confidence interval on sensitivity and specificity needed to be >89%.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos    TS-0491787

THERANOS, INC.           THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                 510(k) PREMARKET NOTIFICATION

<u>Table 18-2</u>: Summary of HSV-1 IgG test performance on high risk adult population.

|  |  | Reference method |  |  |  |
|---|---|---|---|---|---|
|  |  | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 137 | 0 | 2 | 139 |
|  | Equivocal | 1 | 0 | 1 | 1 |
|  | Negative | 5 | 1 | 113 | 119 |
|  | Total | 143 | 1 | 119 | **260** |

| Agreement classification | Numerator/Denominator | Percent Agreement | 95% Confidence Interval |
|---|---|---|---|
| Specificity | 113/116 | 97.4 | 92.6-99.5 |
| Sensitivity | 137/144 | 95.1 | 90.2-98.0 |

Figures are plotted in **Appendix 18-B-1** and line-by-line data are tabulated in **Appendix 18-B-2**.

<u>Table 18-3</u>: Summary of HSV-1 IgG test performance on pregnant women population.

|  |  | Reference method |  |  |  |
|---|---|---|---|---|---|
|  |  | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 188 | 1 | 4 | 193 |
|  | Equivocal | 0 | 1 | 0 | 1 |
|  | Negative | 2 | 2 | 100 | 104 |
|  | Total | 190 | 4 | 104 | **298** |

| Agreement | Numerator/Denominator | Percent | 95% Confidence |
|---|---|---|---|

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page **101** of **109**

THERANOS, INC.　　　　　　THERANOS<sup>TM</sup> HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

| classification | | Agreement | Interval |
|---|---|---|---|
| Specificity | 100/105 | 95.2 | 89.2-98.4 |
| Sensitivity | 188/193 | 97.4 | 94.1-99.2 |

Figures are plotted in **Appendix 18-C-1** and line-by-line data are tabulated in **Appendix 18-C-2**.

**Low Risk Population:**

Serum samples were collected from a low risk population: individuals who are not sexually active, without a recent or current sexually transmitted disease (Hepatitis, Syphilis, HIV, HPV, Trichomonas, Chlamydia, Gonorrhoeae) as determined in an interview. Performance of the assay on this population is summarized in Table 18-4.

Table 18-4: Summary of HSV-1 IgG test performance on low risk population

| | | Reference method | | | |
|---|---|---|---|---|---|
| | | Positive | Equivocal | Negative | Total |
| Theranos HSV-1 IgG assay | Positive | 32 | 0 | 0 | 32 |
| | Equivocal | 0 | 0 | 0 | 0 |
| | Negative | 0 | 1 | 49 | 50 |
| | Total | 32 | 1 | 49 | *82* |

| Agreement classification | Numerator/Denominator | Percent Agreement | 95% Confidence Interval |
|---|---|---|---|
| Specificity | 49/49 | 100.0 | 92.7-100.0 |
| Sensitivity | 32/33 | 97 | 84.2-99.9 |

Figures are plotted in **Appendix 18-D-1** and line-by-line data are tabulated in **Appendix 18-D-2**.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

FOIA Confidential Treatment Requested by Theranos　　　　　　TS-0491789

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

**2. CDC panel testing:**

The objective of this study was to demonstrate agreement of the Theranos method with the well-characterized CDC seroconversion panel. A panel of serum samples (n=100) was obtained from the US Centers for Disease Control and Prevention (CDC) and tested for confirmatory purposes. The CDC sample panel was tested on the HSV-1 IgG immunoassay on the Theranos TSPUs and the results were sent to the CDC for evaluation. The panel consisted of 54 positives and 46 negatives. The Theranos HSV-1 IgG assay demonstrated 100% agreement with the results provided by the CDC. Figures are plotted in **Appendix 18-E-1** and line-by-line data are tabulated in **Appendix 18-E-2**.

**3. Processing of capillary blood samples in central laboratory:**

In order to demonstrate the validity of Theranos HSV-1 IgG for capillary blood samples collected in the field, three Theranos Patient Service centers (Palo Alto, CA, Newark, CA and Scottsdale, AZ) were selected. At each site, 1 Theranos Capillary Tubes and Nanotainer Tubes and a serum tube were drawn from 20 adult subjects. From 10 subjects, 4 Capillary Tubes and Nanotainer Tubes were drawn for a reproducibility study. Samples were collected following the Theranos standard blood collection protocol. Samples were shipped on ice to Theranos CLIA Laboratory in Palo Alto, CA. Upon receipt, samples were centrifuged at 1200g for 5 mins. Plasma was extracted, tested on the Theranos assay. All samples were processed or frozen as plasma within 48 hours of draw. Paired serum samples were tested on the reference method.

The agreement between Theranos assay and the reference method was excellent—with positive percent agreement of 97%, and negative percent agreement of 100%. Cohen's Kappa test yielded a Z-value of 14.98 and a p-value < 2e-16. Figures are plotted in **Appendix 18-F-1** and **Appendix 18-G-1** for method comparison and reproducibility, respectively. Line-by-line data are tabulated in **Appendix 18-F-2** and **Appendix 18-G-2** for the two studies, respectively.

These results demonstrate that compared to serum samples run on the predicate method, capillary samples collected in the field and processed at the central laboratory on the TSPU yield good concordance to the predicate method.

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **103** of 109

THERANOS, INC.            THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
510(k) PREMARKET NOTIFICATION

Table 18-5: Summary of method comparison for samples collected at Theranos Patient Service Centers at three sites.

|  |  | Reference Result | |
|---|---|---|---|
|  |  | POS | NEG |
| Theranos Result | POS | 32 | 0 |
|  | NEG | 1 | 19 |

Table 18-6: Reproducibility of Theranos HSV-1 IgG measurement on capillary blood samples collected at Theranos PSC. For negative samples with mean COI < 0.5, the mean of deviation of each measurement from the average of quadruplicate measurements is tabulated. For samples with mean COI > 0.5, %CV of the 4 measurements is tabulated.

| SubjectID | Mean | <\|ΔCOI\|> | SubjectID | Mean | %CV |
|---|---|---|---|---|---|
| 10 | 0.011 | 0.002 | 7 | 0.8 | 12% |
| 11 | 0.015 | 0.004 | 26 | 1.6 | 13% |
| 12 | 0.015 | 0.004 | 21 | 8.3 | 10% |
| 3 | 0.019 | 0.005 | 5 | 9.2 | NA |
| 23 | 0.019 | 0.010 | 16 | 10.0 | 15% |
| 19 | 0.019 | 0.004 | 24 | 10.6 | 7% |
| 13 | 0.020 | 0.005 | 18 | 11.2 | 14% |
| 22 | 0.026 | 0.017 | 6 | 13.7 | 12% |
| 1 | 0.026 | 0.006 | 2 | 15.7 | 9% |
| 15 | 0.039 | 0.016 | 14 | 18.2 | 5% |
| 28 | 0.039 | 0.021 | 9 | 24.6 | 11% |
| 8 | 0.046 | 0.011 | 20 | 29.7 | 16% |
| 29 | 0.050 | 0.021 | 30 | 30.9 | 13% |
| 4 | 0.084 | 0.007 | 17 | 46.1 | 1% |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE UNDER THE FREEDOM OF INFORMATION ACT

Page 104 of 109

FOIA Confidential Treatment Requested by Theranos      TS-0491791

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

| 27 | 0.116 | 0.021 | 25 | 46.2 | 13% |
|----|-------|-------|----|----|-----|

## 4.  Processing of capillary samples in field locations

In order to demonstrate the validity of Theranos HSV-1 IgG for capillary blood samples collected and processed in the field, three Theranos Patient Service centers (Palo Alto, CA, Newark, CA and Scottsdale, AZ) were selected. At each site, one (1) Theranos Capillary Tubes and Nanotainer Tubes and a serum tube were drawn from 20 subjects. From 10 subjects, 4 Capillary Tubes and Nanotainer Tubes were drawn for a reproducibility study. Samples were collected following the Theranos' standard blood collection protocol. Samples were processed on the Theranos TSPU at the TPSC by Theranos staff. All samples were stored at 2-8°C and processed within 48 hours of collection. Paired serum samples were shipped to Theranos Laboratory in Palo Alto, CA and tested on the reference method.

The agreement between Theranos assay and the reference method was excellent with positive percent agreement of 98% and negative percent agreement of 97%. Cohen's Kappa test yielded a Z-value of 8.45 and a p-value < 2e-16. Figures are plotted in **Appendix 18-H-1** and **Appendix 18-I-1** for field study method comparison and reproducibility, respectively.  Line-by-line data are tabulated in **Appendix 18-H-2** and **Appendix 18-I-2** for the two studies, respectively.

These results demonstrate that compared to serum samples run on the predicate method, capillary samples collected in the field and processed in the field on the TSPU yield good concordance to the predicate method.

Table 18-7:  Summary of method comparison for samples collected at Theranos Patient Service Centers at three sites.

|              |     | Reference Result | |
|--------------|-----|-----|-----|
|              |     | POS | NEG |
| Theranos Result | POS | 47 | 1 |
|              | NEG | 1  | 34 |

Table 18-8:  Reproducibility of Theranos HSV-1 IgG measurement on capillary blood samples collected and processed at Theranos PSC. For negative samples with mean COI < 0.5, the mean of deviation of each measurement from the average of

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT**

Page **105** of 109

THERANOS, INC.          THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                        510(k) PREMARKET NOTIFICATION

quadruplicate measurements is tabulated. For samples with mean COI > 0.5, %CV of the 4 measurements is tabulated.

| SubjectID | Mean | <\|ΔCOI\|> | SubjectID | Mean | %CV |
|---|---|---|---|---|---|
| M32-PA | 0.043 | 0.006 | F10-PA | 30.7 | 6.6 |
| M26-NWK | 0.016 | 0.008 | F11-PA | 3.2 | 8.7 |
| F-525NWK | 0.020 | 0.006 | F15-PA | 41.9 | 4.4 |
| F17-NWK | 0.061 | 0.012 | F16-PA | 13.5 | 4.8 |
| M-20NWK | 0.218 | 0.010 | F20-PA | 34.5 | 9.3 |
| M18-NWK | 0.032 | 0.008 | F29-PA | 9.6 | 19.8 |
| F28-AZ | 0.022 | 0.005 | F30-PA | 56.6 | 10.7 |
| M29-AZ | 0.019 | 0.001 | F31-PA | 11.1 | 8.3 |
| M31-AZ | 0.021 | 0.009 | F8- PA | 4.2 | 3.1 |
| M34-AZ | 0.026 | 0.004 | M17-PA | 21.2 | 15.3 |
| M36-AZ | 0.072 | 0.013 | M27-PA | 12.1 | 10.4 |
| | | | M28-PA | 17.4 | 5.4 |
| | | | M27-NWK | 26.9 | 9.8 |
| | | | F-21NWK | 22.1 | 17.0 |
| | | | M-24NWK | 2.2 | 9.4 |
| | | | M15-NWK | 67.8 | 6.4 |
| | | | M16-NWK | 1.5 | 6.3 |
| | | | F30-AZ | 5.8 | 8.2 |
| | | | F32-AZ | 13.6 | 3.6 |
| | | | F33-AZ | 10.1 | 11.1 |
| | | | F35-AZ | 1.7 | 11.9 |
| | | | F42-AZ | 5.1 | 12.6 |
| | | | M26-AZ | 14.0 | 6.3 |
| | | | M27-AZ | 5.9 | 10.3 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **106** of **109**

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                       510(k) PREMARKET NOTIFICATION

c.  **Clinical Cut-off:**

Not applicable

d.  **Expected values/Reference Range:**

The HSV-1 IgG immunoassay was used to evaluate the prevalence of HSV-1 IgG antibodies in expectant mothers and high risk adults for whom an HSV-1 IgG test was ordered by a physician. The study population for the HSV-1 IgG immunoassay consisted of 640 patients as described in Section 18.b.iii.1. Of these 640 subjects, 82 were low-risk individuals and 558 were high risk adults, with 298 individuals identified as a pregnant sub-cohort. The data for the intended use population (558 specimens) have been summarized according to age group in decades, gender, number of reactive results, and number of non-reactive results.

Table 18-9:  Expected results for HSV-1 IgG immunoassay in High Risk Adult Subjects

| Age range | Gender | Reactive | | Non-reactive | | Total |
|---|---|---|---|---|---|---|
| | | N | Percent | N | Percent | |
| 18 to 19 | Male | 0 | 0 | 0 | 0.0 | 0 |
| 16 to 19 | Female | 1 | 25.0 | 3 | 75.0 | 4 |
| 20 to 29 | Male | 8 | 47.1 | 9 | 52.9 | 17 |
| 20 to 29 | Female | 29 | 39.7 | 44 | 60.3 | 73 |
| 30 to 39 | Male | 5 | 50.0 | 5 | 50.0 | 10 |
| 30 to 39 | Female | 33 | 53.2 | 29 | 46.8 | 62 |
| 40 to 49 | Male | 5 | 50.0 | 5 | 50.0 | 10 |
| 40 to 49 | Female | 16 | 59.3 | 11 | 40.7 | 27 |
| 50 to 59 | Male | 17 | 85.0 | 3 | 15.0 | 20 |
| 50 to 59 | Female | 9 | 81.8 | 2 | 18.2 | 11 |
| 60 to 69 | Male | 5 | 83.3 | 1 | 16.7 | 6 |
| 60 to 69 | Female | 5 | 55.6 | 4 | 44.4 | 9 |
| 70 to 79 | Male | 3 | 75.0 | 1 | 25.0 | 4 |
| 70 to 79 | Female | 1 | 33.3 | 2 | 66.7 | 3 |
| 80 to 89 | Male | 0 | 0.0 | 0 | 0.0 | 0 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page 107 of 109

THERANOS, INC.                    THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY
                                  510(k) PREMARKET NOTIFICATION

| | | | | | | |
|---|---|---|---|---|---|---|
| 80 to 89 | Female | 1 | 100.0 | 0 | 0.0 | 1 |
| Total | | 138 | 53% | 119 | 47% | 257* |

\* 2 samples tested equivocal on Theranos assay. Age information was unavailable for one subject.

Table 18-10: Expected results for HSV-1 IgG immunoassay in Pregnant Subjects

| Age range | Gender | Reactive | | Non-reactive | | Total |
|---|---|---|---|---|---|---|
| | | N | Percent | N | Percent | |
| 18 to 19 | Female | 7 | 53.8 | 6 | 46.2 | 13 |
| 20 to 29 | Female | 118 | 66.7 | 59 | 33.3 | 177 |
| 30 to 39 | Female | 65 | 64.4 | 36 | 35.6 | 101 |
| 40 to 49 | Female | 3 | 50.0 | 3 | 50.0 | 6 |
| Total | | 193 | 65 | 104 | 35 | 297* |

The hypothetical positive and negative predictive values (PPV, NPV) for the two populations are shown in Table 18-11. The calculations are based on the specificity and sensitivity values for HSV-1 IgG immunoassay determined in the study above, namely:

3. Specificity of 97.4% and sensitivity of 95.2% in high risk adults
4. Specificity of 95.1% and sensitivity of 97.4% in pregnant women

Table 18-11: Hypothetical Predictive Values

| Prevalence | High Risk Adults | | Pregnant Women | |
|---|---|---|---|---|
| | PPV | NPV | PPV | NPV |
| 50 | 93.8 | 92.6 | 92.1 | 91.7 |
| 45 | 93.2 | 93.2 | 91.3 | 92.4 |
| 40 | 92.4 | 93.8 | 90.3 | 93.0 |
| 35 | 91.4 | 94.2 | 89.1 | 93.5 |
| 30 | 90.1 | 94.6 | 87.5 | 94.0 |
| 25 | 88.3 | 94.9 | 85.3 | 94.3 |
| 20 | 85.8 | 95.2 | 82.3 | 94.7 |

TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE
UNDER THE FREEDOM OF INFORMATION ACT

Page **108** of 109

FOIA Confidential Treatment Requested by Theranos                                                  TS-0491795

ER-15471

**THERANOS, INC.**  **THERANOS™ HERPES SIMPLEX VIRUS-1 IgG ASSAY**
**510(k) PREMARKET NOTIFICATION**

| | | | | |
|---|---|---|---|---|
| 15 | 82.0 | 95.5 | 77.7 | 95.0 |
| 10 | 75.2 | 95.7 | 69.9 | 95.2 |
| 5 | 60.2 | 96.0 | 53.8 | 95.5 |

**TRADE SECRET/CONFIDENTIAL COMMERCIAL INFORMATION EXEMPT FROM DISCLOSURE**
**UNDER THE FREEDOM OF INFORMATION ACT**

Page **109** of **109**

**13862**

**May 29, 2014 Continued**
Thursday

4:00 PM - 4:20 PM          **Meet with Adam Rosendorff**

4:25 PM - 4:30 PM          **Meet with Daniel Young**
                           Topics discussed: HCG Patient Data

HOLMES0018415

**13863**

# May 29, 2014
Thursday

| May 2014 | June 2014 |
|---|---|
| SuMo TuWe Th Fr Sa | SuMo TuWe Th Fr Sa |
|          1  2  3 | 1  2  3  4  5  6  7 |
| 4  5  6  7  8  9 10 | 8  9 10 11 12 13 14 |
| 11 12 13 14 15 16 17 | 15 16 17 18 19 20 21 |
| 18 19 20 21 22 23 24 | 22 23 24 25 26 27 28 |
| 25 26 27 28 29 30 31 | 29 30 |

**THURSDAY**

**29**

| | | |
|---|---|---|
| ← From Dec 18, 13 | Misty Rodriguez (Maternity) - Leona Garriott | To Jun 19 → |
| ← From Feb 26 | Tiffany Zhou Maternity Leave - Season Flores | To Aug 1 → |
| ← From Apr 7 | Harwinder Singh (Paternity leave) - 2b9e7cca-f86f-40b4-9338-e8f90fcd6d45 | |
| ← From Apr 14 | Amanda Trent LOA - Season Flores | To Jun 16 → |
| ← From May 13 | Salina Abusali PTO - Season Flores | To May 30 → |
| ← From May 19 | Cindy Chung PTO - 2b9e7cca-f86f-40b4-9338-e8f90fcd6d45 | To May 30 → |
| ← From May 21 | Kwesi Mercurius PTO - Season Flores | To Jun 4 → |
| ← From May 22 | Rachel Whittaker PTO - Season Flores | To Jun 2 → |
| ← From May 23 | Elaine Than PTO - Season Flores | To May 30 → |
| ← From May 26 | Esther Chan PTO - 2b9e7cca-f86f-40b4-9338-e8f90fcd6d45 | To Jun 2 → |
| ← From May 26 | Corey Anderson PTO - Season Flores | To May 30 → |
| ← From May 27 | Phuong Tran PTO - Season Flores | To Jun 6 → |
| ← From May 27 | Jennifer Ptacek PTO - 2b9e7cca-f86f-40b4-9338-e8f90fcd6d45 | To May 30 → |

**7 AM**

**8**

**9**   **Call Intermountain CFO**
Elizabeth Holmes

**10**   **Call Leonard Tessler**
Season Flores

**11**

**12 PM**

**1**

**2**   **Digital PCR**
Elizabeth Holmes

**3**

**4**   **SIF OOO**
Season Flores
  **Meet with Adam Rosendorff**
Lisa Durkin
  **Meet with Daniel Young**
Lisa Durkin

**Meet with Brad Arington**
Lisa Durkin

**5**

**Meet with Patrick O'Neil**
Lisa Durkin

**6**

**7**   **CEO Conditional - Christopher Haverick - Laboratory Technician, Microbiology**
CONF.1601.2; Ally Mayer
  **CEO Conditional - Sonia Hora - Payroll Administrator**
CONF.1601.1776; Ally Mayer

**8**   **CEO Conditional - Tonja Alton - Laboratory Technical Supervisor**
CONF.1601.2; Ally Mayer

**9**

**10**

**11**

HOLMES0018419

**13864**

Message

| | |
|---|---|
| **From**: | Season Flores [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SEASON FLORES675] |
| **Sent**: | 5/30/2014 10:34:26 PM |
| **To**: | Adam Rosendorff [arosendorff@theranos.com] |
| **Subject**: | CLIA Meeting |
| **Importance**: | High |

Hi Adam,

Elizabeth has asked me to coordinate a CLIA meeting for this afternoon at 4pm. Can you give me a list of attendees for the session?

Thank you,

Season

**Season Flores**

Executive Assistant to Elizabeth Holmes

Theranos, Inc. | 1601 S. California Avenue | Palo Alto, CA 94304

Tel: (650) 470-6111 | www.theranos.com

=======================================

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.

Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304 650-838-9292     www.theranos.com

=======================================

TS-0478999

**ER-15475**

**13875**

**To:** Sunny Balwani[sbalwani@theranos.com]
**From:** Daniel Young
**Sent:** Thur 6/5/2014 1:42:25 AM
**Importance:** Normal
**Subject:** RE: hCG update
**Received:** Thur 6/5/2014 1:42:27 AM

Nothing special.

The issue us that this change won't show up at the PSC until we release it to production tomorrow night.  So tomorrow, if there are any HCG orders, a pCTN may be collected.

---

**From:** Sunny Balwani
**Sent:** Wednesday, June 04, 2014 6:30 PM
**To:** Daniel Young
**Subject:** RE: hCG update

Does hcG require special handling? We shouldn't have to send any special intrsuction because just changing in LIS should do it

---

**From:** Daniel Young
**Sent:** Wednesday, June 4, 2014 6:29 PM
**To:** Adam Rosendorff; Sunny Balwani
**Subject:** RE: hCG update

We also are repeating the IQP study today.  All these studies are planned to be complete today.

At this time, we will be ready to switch to Immulite tomorrow night.

If we need to collect vacutainers tomorrow, we would need to send special instruction to the PSCs.  Right now we are not planning on doing this.

-Daniel

---

**From:** Adam Rosendorff
**Sent:** Wednesday, June 04, 2014 5:16 PM
**To:** Sunny Balwani
**Cc:** Daniel Young
**Subject:** hCG update

Sunny

Daniel, Chinmay and I discussed the plan for hCG:

(1)  Determine an "invalid tip count" cutoff based on running patient samples with no hCG (eg males), and applying a cutoff of minus 2SD from the mean for invalid RLU.

(2)  Assume that the inconsistencies with Friday's patient hCG values was due to sample mishandling?

Going forward

(1)  Change hCG to vacutainer (SST or gold-top), and run on Immulite

(2)  Hold current CTN orders for hCG and call for redraw on vacutainer as needed.

Confidential                                                                        THER-AZ-06318371

(3)  Resume CTN HCG when we have resolved these issues.

@ Daniel, please correct me if I am misunderstanding our plan.

Thanks,

Adam

Adam Rosendorff, MD, FASCP

Laboratory Director

Theranos, Inc

(650) 856-4412 (Office)

(650) 823-4953 (Mobile)

(650) 852-9594 (Fax)

arosendorff@theranos.com

Confidential

**ER-15477**

THER-AZ-06318372

**13876**

Message

| | |
|---|---|
| **From**: | Sunny Balwani [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SBALWANI] |
| **Sent**: | 6/16/2014 5:49:57 PM |
| **To**: | Adam Rosendorff [arosendorff@theranos.com]; Suraj Saksena [ssaksena@theranos.com]; Chinmay Pangarkar [cpangarkar@theranos.com] |
| **Subject**: | RE: Status update on HCG |

No. it is on nanotainers per chinmay's email below.

---

**From:** Adam Rosendorff
**Sent:** Monday, June 16, 2014 10:40 AM
**To:** Suraj Saksena; Chinmay Pangarkar
**Cc:** Sunny Balwani
**Subject:** RE: Status update on HCG

So HCG is back on vacutainers?

---

**From:** Suraj Saksena
**Sent:** Monday, June 16, 2014 10:37 AM
**To:** Adam Rosendorff; Chinmay Pangarkar
**Cc:** Sunny Balwani
**Subject:** RE: Status update on HCG

Adam,

In parallel, a new build has also been planned and is on high priority.

Thanks,
Suraj

---

**From:** Adam Rosendorff
**Sent:** Monday, June 16, 2014 10:32 AM
**To:** Chinmay Pangarkar
**Cc:** Suraj Saksena; Sunny Balwani
**Subject:** RE: Status update on HCG

Great- thanks-

---

**From:** Chinmay Pangarkar
**Sent:** Monday, June 16, 2014 10:31 AM
**To:** Adam Rosendorff
**Cc:** Suraj Saksena; Sunny Balwani
**Subject:** RE: Status update on HCG

Based on reports since friday, we have been consistently passing QC--so we don't have a problem with the current build.

thanks
Chinmay

---

**From:** Adam Rosendorff
**Sent:** Monday, June 16, 2014 10:28 AM

Confidential

**ER-15478**

THER-AZ-05781354

**To:** Chinmay Pangarkar
**Cc:** Suraj Saksena; Sunny Balwani
**Subject:** Status update on HCG

Hi Chinmay and Suraj

Can you give me a status update on the HCG on the Edison?

Thanks,

Adam

**Adam Rosendorff, MD, FASCP**
**Laboratory Director**
**Theranos, Inc**
**(650) 856-4412 (Office)**
**(650) 823-4953 (Mobile)**
**(650) 852-9594 (Fax)**
<u>arosendorff@theranos.com</u>

Confidential

THER-AZ-05781355

**13877**

| Message | |
|---|---|
| **From**: | Max Fosque [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MAX FOSQUE394] |
| **Sent**: | 6/18/2014 2:18:55 AM |
| **To**: | Hoda Alamdar [halamdar@theranos.com]; Chinmay Pangarkar [cpangarkar@theranos.com]; Daniel Young [dyoung@theranos.com] |
| **CC**: | David Ramos [dramos@theranos.com]; Gurbir Sidhu [gsidhu@theranos.com]; Sunny Balwani [sbalwani@theranos.com]; Adam Rosendorff [arosendorff@theranos.com] |
| **Subject**: | RE: HCG Tests |

This patient ordered HCG, Pregnancy Screen, Blood Quant. That is an Edison test with Edison-specific reference ranges in LIS.

It looks like HCG, Blood Quant was run from venous upstairs for this patient, instead of Edison. The result value is <1. However, for the Edison test, the LLOQ is 9.4.

I would recommend a manual report for this patient, in order to update the RR and result-level notes on the final report. I can do this.

In LIS, I would recommend adding 1 as the result value and voiding the result. Then, making a visit note stating the HCG test was run on the Immulite and the value reported was "<1."

Including others here for input.

Thanks,

Max

**From:** Hoda Alamdar
**Sent:** Tuesday, June 17, 2014 6:59 PM
**To:** Max Fosque
**Cc:** David Ramos; Gurbir Sidhu
**Subject:** RE: HCG Tests

Thanks Max,

█████████

Confidential

THPFM0000970485

**From:** Max Fosque
**Sent:** Tuesday, June 17, 2014 6:58 PM
**To:** Hoda Alamdar
**Cc:** David Ramos; Gurbir Sidhu
**Subject:** HCG Tests

████████████ HCG Urine Qualitative, should be entered as Positive or Negative.

████████████ Did not have HCG ordered. Did you mean someone else?

Thanks,
Max

**Max Fosque**
*Product Manager*

Theranos, Inc.

Office:  650.470.6212 | Mobile:  650.704.2834

mfosque@theranos.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1601 S. California Avenue, Palo Alto, CA, 94304
650-838-9292    www.theranos.com

THPFM0000970486

**13878**

Message

| | |
|---|---|
| **From**: | Adam Rosendorff [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ADAM ROSENDORFD92] |
| **Sent**: | 7/23/2014 5:41:44 PM |
| **To**: | Chinmay Pangarkar [cpangarkar@theranos.com] |
| **CC**: | Daniel Young [dyoung@theranos.com] |
| **Subject**: | RE: HCG quantitation |

Chinmay

This is the first enquiry we have had so far. I believe our test is advertised as a serum qual tes.

Adam

---

**From:** Chinmay Pangarkar
**Sent:** Wednesday, July 23, 2014 10:40 AM
**To:** Adam Rosendorff
**Cc:** Daniel Young
**Subject:** RE: HCG quantitation

I think the other open issue here was the workflow in Normandy and whether we would have enough sample for performing a rerun with dilution.

@Adam: Can you tell us more about the scope of this inquiry? Is a few patients so that we can have a manual SOP? Or it this for hundreds of patients?

Thanks

Chinmay

**From:** Adam Rosendorff
**Sent:** Wednesday, July 23, 2014 10:23 AM
**To:** Chinmay Pangarkar
**Cc:** Daniel Young
**Subject:** HCG quantitation

All

A while back we had discussed doing further validation of our Edison HCG test, so that we can report values >4722. This would involve further method comparisons with patients with higher hCGs, as well as possibly extending the calibration range.

We have had an enquiry regarding the clinical use of our hCG test in tracking the progress of a pregnancy.

Confidential

THPFM0000642870

Thanks,

Adam

**13893**

**To:**    Adam Rosendorff[arosendorff@theranos.com]; Daniel Young[dyoung@theranos.com]
**Cc:**    Sunny Balwani[sbalwani@theranos.com]; Elizabeth Holmes[eholmes@theranos.com]
**From:**    Mona Ramamurthy[/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MONA RAMAMURTHYF7E]
**Sent:**    Sat 5/24/2014 8:32:05 PM (UTC)
**Subject:**    RE: RE:

Yes, congrats, Daniel.  Fantastic news.  I will send you an invite for us to discuss further.

---

**From:** Adam Rosendorff
**Sent:** 5/24/2014 12:26 PM
**To:** Daniel Young
**Cc:** Sunny Balwani; Elizabeth Holmes; Mona Ramamurthy
**Subject:** Re: RE:

Daniel

Congratulations on cracking this.

Regards,

Adam

Sent from my iPhone

On May 24, 2014, at 12:08 PM, "Daniel Young" <dyoung@theranos.com> wrote:

> Sounds good.  I'll get together with Mona and draft the strategy.
>
> -Daniel
>
> On May 24, 2014, at 12:03 PM, "Sunny Balwani" <sbalwani@theranos.com> wrote:
>
>> **** Attorney Client Privileged communication ****
>>
>> Daniel.
>>
>> This is truly great progress and a big competitive advantage for us.
>>
>> We need to keep this project, the code, calibration and everything we learned here as Theranos trade secret. Everyone who was working on this needs to understand this. This also should not be communicated to anyone in CLIA who doesn't need to know how we do this calibration and how we got where we are on this project.  Besides Adam no one in CLIA needs to know our secret sauce and if Adam thinks anyone else needs to know this then we need get them under same agreement around our trade secret.   There as no on the industry capable of doing what we have accomplished here because of massive learnings and trial and erros. We need to protect this.
>>
>> As such, lets meet with Mona early week to make sure whoever from biomath team working on this project protects the confidentiality of this effort. Moreover, the team in CLIA and R&D that ran the validation process also needs to sign our trade secret document.
>>
>> I will leave it upto Mona and you to draft a strategy around this so EAH and I can sign off and implement.
>>
>> Thanks.

HOLMES0018425

**From:** Daniel Young
**Sent:** Friday, May 23, 2014 9:49 PM
**To:** Elizabeth Holmes
**Cc:** Sunny Balwani
**Subject:** RE:

I wanted to update you on the ISE studies in preparation for switching back to the diluted ISE protocols on Tuesday:

∀ With our new approach, we have now shown that we can process and run ISE's with diluted venous samples with great accuracy and precision (shown now over 10 days and 48 subjects)

∀ This week we adapted this approach to samples from pCTN/capillary samples. Learnings this week were:

  ○ Our real-time calibrators need to be diluted on the Tecan along with the samples to capture all process-dependent factors that impact sample processing and assay results

  ○ With this refined approach, we have now shown that we can get on average very accurate results from pCTN samples for ISE's

  ○ Based on these results, we are ready to deploy this process on Tuesday (we are just finalizing software updates now and completing QA testing before we move it to production)

∀ Additional issues that I plan to have the team address next week while generating data to be added to our amended validation reports include:

  ○ We have seen that diluted venous samples have much better precision than diluted pCTN/capillary samples; I want to confirm why this is the case. My two hypotheses are:

    ℳ Tecan processing introduces variance

    ℳ Variance introduced by the capillary sample collection and/or variance from pCTN circuits

    ℳ These hypotheses will be tested next week, and could lead to further process improvements/refinements

  ○ We started this week measuring lithium in our pCTN/capillary samples to assess heparin concentrations. Initial data suggest a wide range of concentrations in our capillary samples, and possibly concentrations that are very high. We are exploring the impact of this in more detail next week in our studies. One side effect of high heparin may be clumping of cells and platelets, which could lead to these elements being caught in the gel/plasma. We are exploring how this may or may not impact ISE and other GC assay results. More to come on this topic.

Please let me know if you have any questions.

Thanks,
Daniel

HOLMES0018426

**13977**

| Message | |
|---|---|
| **From**: | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
| **Sent**: | 7/11/2013 4:47:26 AM |
| **To**: | 'Elder, Stephanie T CIV (US)' [stephanie.t.elder. ▮▮▮▮] |
| **CC**: | 'Luciano, J W (Jeff) CIV (US)' [jeffrey.w.luciano. ▮▮▮▮] |
| **Subject**: | RE: W911QY-12-P-0323 (UNCLASSIFIED) |

Hello Stephanie,

I hope this email finds you doing well.  I wanted to follow up once more on my emails below.  We will wait to hear from you at your convenience.

Thanks and best regards,
Dan

-----Original Message-----
From: Daniel Edlin
Sent: Thursday, May 23, 2013 10:42 AM
To: 'Elder, Stephanie T CIV (US)'
Cc: 'Luciano, J W (Jeff) CIV (US)'
Subject: RE: W911QY-12-P-0323 (UNCLASSIFIED)

Hello Stephanie,

Just circling back on the below.

Thanks very much, and we look forward to connecting with you.

Best regards,
Dan


-----Original Message-----
From: Daniel Edlin
Sent: Monday, April 29, 2013 9:11 AM
To: 'Elder, Stephanie T CIV (US)'
Cc: 'Luciano, J W (Jeff) CIV (US)'
Subject: RE: W911QY-12-P-0323 (UNCLASSIFIED)

Hello Stephanie,

I just wanted to make sure that you saw my email below.

Hope to hear from you soon.

Best regards,
Dan
-----Original Message-----
From: Daniel Edlin
Sent: Wednesday, April 24, 2013 11:00 PM
To: 'Elder, Stephanie T CIV (US)
Cc: Luciano, J W (Jeff) CIV (US)
Subject: RE: W911QY-12-P-0323 (UNCLASSIFIED)

Stephanie,

Thank you for your email; I hope you are doing well.  We have been preparing for this and I am hoping to connect with you, and potentially Nate Jordan if you think it would be of value, to discuss the plans for initiating our program.

Can you please let me know your availability for a phone call?

Thank you, and I look forward to our conversation.

Confidential

Best regards,
Dan

-----Original Message-----
From: Elder, Stephanie T CIV (US) [mailto:stephanie.t.elder ██████████]
Sent: Wednesday, April 24, 2013 6:19 AM
To: Daniel Edlin
Cc: Luciano, J W (Jeff) CIV (US)
Subject: RE: W911QY-12-P-0323 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Dan,

Can you please provide an update on where you are with the devices and the
anticipated delivery dates?

Thank you,
Stephanie

V/R,

Stephanie Elder
Deputy PM / APM - TCCC
PM SOF-SSES

US Army Natick Soldier RD&E Center
██████████
Natick, MA  01760

Phone: ██████████
DSN: ██████████

NIPR: stephanie.t.elder.████████
SIPR: stephanie.t.elder.████████

-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Tuesday, February 19, 2013 3:47 PM
To: Jordan, Nathan C CIV (US)
Cc: Elder, Stephanie T CIV (US); Mastovich, Martin CIV (US)
Subject: RE: W911QY-12-P-0323 (UNCLASSIFIED)

Thank you, Nate.

Best regards,
Dan

-----Original Message-----
From: Jordan, Nathan C CIV (US) [mailto:nathan.c.jordan.██████████]
Sent: Tuesday, February 19, 2013 5:24 AM
To: Daniel Edlin
Cc: Elder, Stephanie T CIV (US); Mastovich, Martin CIV (US)
Subject: W911QY-12-P-0323 (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Dan,

Attached is the counter signed modification for your records.  Thanks again,

Nate

NATHAN JORDAN
Contract Specialist
Army Contracting Command - Aberdeen Proving Ground Natick Contracting
Division
██████████
Milford, MA  01757

Confidential                                                        THPFM0000584554

```
Phone: ███████████
Fax:   ███████████

** Please note my new email address:

nathan.c.jordan.████████████

Please comment on our service at:

http://res-ac.apgea.army.mil/restricted/survey.html


Classification: UNCLASSIFIED
Caveats: NONE


Classification: UNCLASSIFIED
Caveats: NONE
```

Confidential

**To:**     Daniel Edlin[dedlin@theranos.com]; Christian Holmes[cholmes@theranos.com]     **13986**
**Cc:**     Elizabeth Holmes (eholmes@theranos.com)[eholmes@theranos.com]
**From:**     Daniel Young[/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DYOUNG]
**Sent:**     Thur 6/21/2012 3:59:40 AM (UTC)
**Subject:**     AFRICOM training

48 hours of continual testing of the reader at 110 deg F completed successfully tonight.  We ran 100 protocols sequentially – so I feel very good about reliability for this deployment.

After removing the device from the thermal testing chamber, the AFRICOM protocol was tested successfully – so it is good to go for your demo tomorrow.

Reader is #106 and is sitting the in QA test area.  The extra AFRICOM cartridges are sitting by Mike Chen's desk.

Please let me know if you have any questions.

Daniel Young, PhD
Vice President, Theranos Systems
Theranos, Inc
3200 Hillview Avenue
Palo Alto,  Ca  94304
650-470-6119 (office)
████████ (mobile)

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which it is addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292    www.theranos.com

**13988**

Message

| | |
|---|---|
| **From**: | Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EHOLMES] |
| **Sent**: | 7/2/2015 4:52:27 PM |
| **To**: | All Theranos Employees [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=AllTheranosEmployees] |

It is with incredible pride that I officially let you know we have received our first FDA clearance on our system, and the first Laboratory Developed Test we filed: HSV-1.

Join me in our meeting this afternoon to discuss and celebrate together. We will be live streaming with Arizona, Newark, and L.A..

Elizabeth

==================================
PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 1701 Page Mill Road, Palo Alto, CA, 94304
650-838-9292    www.theranos.com
==================================

FOIA Confidential Treatment Requested by Theranos
Fed. R. Crim. P. 6(e) material

**13993**

Message

| From: | Daniel Edlin [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL EDLIN] |
|---|---|
| Sent: | 6/8/2012 5:47:12 AM |
| To: | 'Givens, Melissa L. LTC' [███████████████████] |
| CC: | Christian Holmes [/O=THERANOS ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Christian Holmes]; Elizabeth Holmes [/O=THERANOS ORGANIZATION/OU=First Administrative Group/cn=Recipients/cn=eholmes] |
| Subject: | RE: Theranos Demo Results |
| Attachments: | Theranos Confidential Background_DoD.DOCX |

LTC Givens,

Please see attached the literature for the research protocol. Let us know if you would like to see Theranos' standard pricing schedule, or costs specific to this program. We can get those to you right away.

Best regards,
Dan


Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:  650.470.0322
Mobile:  ███████████
dedlin@theranos.com

PRIVILEGED AND CONFIDENTIAL COMMUNICATION
IMPORTANT - This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which they are addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292      www.theranos.com



-----Original Message-----
From: Givens, Melissa L. LTC [████████████████████████]
Sent: Tuesday, June 05, 2012 1:08 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,

Sounds good, right now I have some open time on my schedule on the 19, 20th and the afternoon of the 21st if you do make the Germany trip.

The equipment and cartridges will be flown commercial air with me on the 23rd and I will fly back to Germany on the 2nd of July (I can't give further detail on travel). They will be stored in a hotel room with AC but taken out to the training site during the day. The training site has an open air building with no AC and the temperature will be between 100-110 degrees F. I will be transporting/storing all in a hardened "pelican" case - equivalent of a hard suitcase. This is what we usually use when we deploy for most equipment.

Confidential

**ER-15491**

THPFM0000691517

The power source in Africa is 220V but we have voltage convertors to convert
to 110V.
I intend to plug the device in when we are in the hotel and we will also try
to plug into generator power at the training site. We use surge protectors
when using generator power. When we fly the equipment from Uganda it will be
on a non-pressurized aircraft at altitudes less than 10,000 ft.
Temperatures will range from 100 degrees Fahrenheit with high humidity to 60
degrees in flight.
My time in Uganda will be 7 days but I cannot give out exact dates.

Hope this helps,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: ███████████
Comm: ███████████
Cell: ███████████


-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Tuesday, June 05, 2012 8:42 AM
To: Givens, Melissa L. LTC; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,

Thank you for this. We will aim for a video conference, however due to the
specialized customization of this device we may need to come to Germany to
meet with you. As soon as we have more clarity around this we will let you
know.

Regarding the cartridges, it is likely that we will have one cartridge
configuration for each type (blood and urine), and we will confirm this
shortly as we operate to get the customization done in time. We are trying
to run as many tests as we can to gain experience with the testing
conditions while still managing our timelines to ensure that the device
customization meets your request for preloaded results. Having customized
this rapidly we also need to make sure that all of the necessary testing is
completed and that there are no issues.

I have been actively involved in gathering the literature for the research
protocol and calculating the test costs and will continue to do so going
forward. We will be able to have these materials to you in time to submit
the protocol this week, and you can continue to contact me with any issues.


Can you also please address the following questions as we work on preparing
the materials:
- How will the cartridges be stored in the field? We will need to prepare
the appropriate packaging.
- How long will the cartridges be stored in the field? You mentioned that
it would be "a little over a week" in Cameroon- do you have any addition
details? How long will you be in Uganda?
- How will the device be transported in the field? i.e., Do you plan on
keeping the device in its packaging in between use? What kind of conditions
might be on the medevac from Germany to Uganda?
- What kind of power outlets will be available when the device is being
used? When and for how long will the device be plugged into a compatible
outlet?

Thank you and best regards,
Dan


-----Original Message-----

Confidential

**ER-15492**

From: Givens, Melissa L. LTC [█████████████████████████]
Sent: Monday, June 04, 2012 5:00 AM
To: Daniel Edlin; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

Dan,

Anyone on the team is always welcome in Germany but it seems like a lot of jet
lag for training we can accomplish online.

Yes to UA on the 5 volunteers for the standard physical exam.  We will just
stick to the blood work on the others.  Sorry I probably confused you when I
added UA results in the scenarios.  Let's keep it simple and stick to just the
5 UA tests.

There will be 14 separate encounters so we will need that many cartridges.  It
may be a good idea to have 2-3 extra just in case so why don't you send 16.

Are all the cartridges going to be configured the same?  I know we will be
producing artificial results but I also know you wanted to test out the
equipment in the environment so if there are particular tests/cartridge
configurations that need to be tested in austere conditions we can do so.


Lastly,  I still have not received the literature to put into my background
discussion on the research protocol. It is an expedited protocol but I really
need to get it turned in by the end of this week.  Who is the best POC to help
me with this?


Regards,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: █████████████
Comm: ████████████████
Cell: █████████████████████████


-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Sunday, June 03, 2012 10:51 PM
To: Givens, Melissa L. LTC; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,

Thank you.  We think it would be productive to have a video call on Skype to
make sure that we can answer any questions you may have and ensure that you
are fully comfortable with the equipment and procedures.   Note that we
received approval to travel to Germany to meet with you as well, and would be
happy to do so if you think it would be helpful.

With regards to the protocol, can you please confirm whether you plan to run
UA tests on just the five volunteers for the standard physical exam, or if the
other volunteers will require a urine test as well.  Please also let us know

how many total cartridges you will need.  Note that the cartridges for blood

samples will all be identical, and there will be separate cartridges for the

UA tests.

Look forward to hearing from you.

Best regards,
Dan


-----Original Message-----
From: Givens, Melissa L. LTC ███████████████████████
Sent: Thursday, May 31, 2012 4:37 AM
To: Daniel Edlin; 'Melissa Givens'
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

Dan,

We should be able to do the training over the phone once I receive the
equipment.
If necessary we can do a video call on Skype but it seems pretty straight
forward.

Once you ship the equipment just let me know and we can then block a time on
the calendar to do the training.

Regards,
Missy

LTC Melissa L. Givens MD, MPH
Command Surgeon
Special Operations Command AFRICA
DSN: ███████████████████
Comm ███████████████████
Cell ███████████████████

-----Original Message-----
From: Daniel Edlin [mailto:dedlin@theranos.com]
Sent: Thursday, May 31, 2012 7:16 AM
To: 'Melissa Givens'; Givens, Melissa L. LTC; Givens, Melissa L. LTC
Cc: Christian Holmes
Subject: RE: Theranos Demo Results

LTC Givens,


Thank you for this information.  We will review this internally and let you
know if we need any additional information.


On another note, one aspect of our deployment we haven't touched on yet is
the "train the trainer" session to review the operating procedures for the
devices and cartridges.  As you will assume this role, we'd like to meet
with you before you depart for Africa.  Please let us know your thoughts on
the best approach for this.


Best regards,

Dan


Confidential

ER-15494

THPFM0000691520

Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:   650 470 0322
Mobile:   ██████████

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or
legally privileged information. This information is intended solely for the
use of the individual or entity to which they are addressed. Any disclosure,
retransmission, reproduction, dissemination or other use of the contents of
this information by persons or entities other than the intended recipient is
strictly prohibited. If you have received this email in error, please
contact us immediately and delete all copies. Please note that any views or
opinions presented in this email are solely those of the author and do not
necessarily represent those of Theranos, Inc. Finally, before opening or
using attachments the recipient should check this email and any attachments
for the presence of viruses. Theranos, Inc. accepts no liability for any
damage caused by any virus transmitted by this email. Our sole
responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292     www.theranos.com <http://www.theranos.com/>




From: Melissa Givens ██████████████████████
Sent: Wednesday, May 30, 2012 12:03 PM
To: Daniel Edlin
Cc: Christian Holmes
Subject: RE: Theranos Demo Results


Dan,


Attached is the updated protocol.  I have attached a study number to each
scenario and also included the lab results I would like to see reported for
each patient.


For the 5 patients who are just having physical exam tests - these can all
be normal results.

I specified values for the remaining patients.  Let me know if I need to
include units.


I am also attaching the CDC algorithm for malaria diagnosis and treatment to
be uploaded if time permits. No worries if not.


The mailing address for my office is:

USAG Stuttgart

Command Surgeon

Kelley Kaserne GEB 3304

Plieningerstr. 289

70567 Stuttgart

phone ████████████████

Let me know if you need anything else or if I need to add any more details
regarding study numbers and lab results.


regards,

Missy

_____

From: dedlin@theranos.com
To: ████████████████ Melissa.Givens ███████████
CC: cholmes@theranos.com
Subject: RE: Theranos Demo Results
Date: Wed, 30 May 2012 03:55:37 +0000

LTC Givens,


It was good catching up with you today.  I had the chance to debrief on our
conversation with some of my colleagues assisting in the deployment, and
wanted to let you know that we are working to secure the additional
resources needed to meet your anticipated deadlines.  As for immediate next
steps, I am finalizing the cost summary and expect to have this breakdown
over to you very shortly, as well as the expected run time for DNA samples.


In parallel, we look forward to understanding more from you on the "blinded"
configuration for results communication on the device touchscreen.


Talk to you shortly.


Best regards,

Dan




Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:  650.470.0322
Mobile:  ████████████

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or

legally privileged information. This information is intended solely for the
use of the individual or entity to which they are addressed. Any disclosure,
retransmission, reproduction, dissemination or other use of the contents of
this information by persons or entities other than the intended recipient is
strictly prohibited. If you have received this email in error, please
contact us immediately and delete all copies. Please note that any views or
opinions presented in this email are solely those of the author and do not
necessarily represent those of Theranos, Inc. Finally, before opening or
using attachments the recipient should check this email and any attachments
for the presence of viruses. Theranos, Inc. accepts no liability for any
damage caused by any virus transmitted by this email. Our sole
responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292      www.theranos.com <http://www.theranos.com/>

From: Melissa Givens █████████████████
Sent: Tuesday, May 29, 2012 10:24 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,

1:30 is fine with me. Thanks for letting me know.

Missy

_____

From: dedlin@theranos.com
To: █████████████████Melissa.Givens█████████
Subject: RE: Theranos Demo Results
Date: Tue, 29 May 2012 16:24:54 +0000

LTC Givens,


We just had a meeting come up this afternoon; would you be able to move this
call to 1:30pm PST today?

Please let me know.


Thank you,

Dan


From: Daniel Edlin
Sent: Monday, May 28, 2012 2:11 PM
To: Melissa Givens
Subject: RE: Theranos Demo Results


LTC Givens,

Thank you. 1pm PST will work for us. Please use the following dial in
number:
████████████
Passcode:██████

Hope you are having a nice Memorial Day.

Best regards,
Dan

Confidential

THPFM0000691523

---

From: Melissa Givens
Sent: 5/28/2012 5:26 AM
To: Daniel Edlin
Subject: RE: Theranos Demo Results

Dan,


Sorry for the slow reply.  I am available for a call anytime between 12-2pm
your time on Tuesday.

Just let me know if that will work for you.



regards,

Missy


---

From: dedlin@theranos.com
To: ▮▮▮▮▮▮▮▮▮▮▮ melissa.givens ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
CC: cholmes@theranos.com
Subject: RE: Theranos Demo Results
Date: Fri, 25 May 2012 02:20:11 +0000

LTC Givens,


Thanks for this information.  Would you be available for a phone call on
Tuesday, May 29 to address some other questions we have about the scenarios
and testing frequency?  Please let us know what time would work for you.



Best regards,

Dan




Daniel P. Edlin
Senior Product Manager
Theranos, Inc.
Office:  650.470.0322
Mobile: ▮▮▮▮▮▮▮▮▮

dedlin@theranos.com <mailto:dedlin@theranos.com>


PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
transmission, and any files transmitted with it are confidential and/or
legally privileged information. This information is intended solely for the
use of the individual or entity to which they are addressed. Any disclosure,
retransmission, reproduction, dissemination or other use of the contents of
this information by persons or entities other than the intended recipient is
strictly prohibited. If you have received this email in error, please

THPFM0000691524

contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292      www.theranos.com <http://www.theranos.com/>

From: Melissa Givens [███████████████████]
Sent: Wednesday, May 23, 2012 12:09 PM
To: Daniel Edlin; melissa.givens@usafricom.mil; melissa.givens@africom.mil
Subject: RE: Theranos Demo Results

Dan,

Please plan on shipping device and cartridges to me in Germany.  I can send you the office address from work tomorrow for Fed Ex or DHL.

I will be hand carrying everything with me to Cameroon for the first test.

I travel with my physician license and usually am able to clear customs going to Africa with medical supplies and devices pretty easily so hopefully this will not be too difficult.

If we run into problems I can put the cartridges on a military aircraft but prefer that as last resort because I wont have control over how the cartridges are handled.

Regards,

Missy

> From: dedlin@theranos.com
> To: Melissa.Givens██████████████████
> ███████████████████████████████████
> Subject: RE: Theranos Demo Results
> Date: Wed, 23 May 2012 15:54:13 +0000
>
> Resending this to include both your other email address:
>
> LTC Givens,
>
> Thank you. Can you also please clarify how you envision the shipping process for the device and the cartridges. Will we be sending them separately to different locations? If so, can you please let us know where they will be shipped? I recall your saying during our meeting that you would carry the device with you; does this mean that we would first ship the reader to you in Germany, and then ship the cartridges separately to the location in theater? This information will help ensure that we have all of the customs permits for shipping.
>
> Thanks again.
>
> Best regards,
> Dan
>
> -----Original Message-----

Confidential
THPFM0000691525

> From: Givens, Melissa L. LTC [█████████████████████
> <mailto:[████████████████████████████]>
> Sent: Wednesday, May 23, 2012 6:54 AM
> To: Daniel Edlin
> Subject: RE: Theranos Demo Results
>
> Sorry. Here it is
>
> -----Original Message-----
> From: Daniel Edlin [mailto:dedlin@theranos.com]
> Sent: Tuesday, May 22, 2012 6:23 PM
> To: Givens, Melissa L. LTC; 'Melissa Givens'
> Cc: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
> LTC Givens,
>
> Thank you for the update and your continued work on the protocol; we
> are working in parallel to get your requested information to you as well.
> Not sure if there was supposed to be an attachment with the testing
> scenarios you mentioned, but I did not see one come through in your email.
> We'd be interested in seeing what scenarios you had in mind as soon as
> you can provide the information.
> We likewise do not want to miss the opportunity to showcase our system
> with you, and we will be in touch asap with updates.
>
> Best regards,
> Dan
>
>
> -----Original Message-----
> From: Givens, Melissa L. LTC [█████████████████████
> <mailto:[████████████████████████]>
> Sent: Tuesday, May 22, 2012 8:16 AM
> To: Daniel Edlin; 'Melissa Givens'
> Cc: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
> Dan,
>
> I finally got around to writing the scenarios so you have the
> specifics on which tests we plan to run. They are now attached at the
> end of the protocol.
> I still have not had time to flesh out the remainder of the protocol
> but want to keep feeding you what you need to drive forward with
> getting a system deployed with me in June.
> I have identified the volunteers and we are ready to roll.
>
> We just had an incident in the command that highlighted the need for
> this technology and I don't want to miss the opportunity to show how
> Theranos is the solution we are looking for.
>
> Please let me know what I can do to help make this happen.
>
> Regards,
> Missy
>
> LTC Melissa L. Givens MD, MPH
> Command Surgeon
> Special Operations Command AFRICA
> DSN: [███████████████]
> Comm: ──────────────────
> Cell: [█████████████████████████]
>
>
>
> -----Original Message-----
> From: Daniel Edlin [mailto:dedlin@theranos.com]
> Sent: Wednesday, May 16, 2012 6:37 PM
> To: 'Melissa Givens'; Givens, Melissa L. LTC
> Cc: Elizabeth Holmes; Christian Holmes

Confidential

THPFM0000691526

> Subject: RE: Theranos Demo Results
>
> LTC Givens,
>
>
> Thank you for sending this. We have a meeting later today to discuss
> the details outlined in the protocol draft and will follow up on your
> email below shortly.
>
>
> Best regards,
>
> Dan
>
>
>
> From: Melissa Givens [█████████████████████████]
> Sent: Tuesday, May 15, 2012 8:12 AM
> To: Daniel Edlin; █████████████████████
> Cc: Elizabeth Holmes; Christian Holmes
> Subject: RE: Theranos Demo Results
>
>
> Greetings all,
>
> It has been an extremely busy week for me so I have not had much time
> to devote to protocol writing.
> I figured I can send you a shell of the protocol and let you work on
> filling
>
> in pertinent details while I flesh out the remainder of the protocol.
>
> File attached has some highlighted areas in red where I could use your
> input
> -
> please provide references. I still have to generate the clinical
> scenarios and survey instruments.
>
> How are things progressing in terms of customs clearance for shipping
> the cartridges?
>
> I'm excited to get the initial concept down on paper. Not a very
> sophisticated study but should at least be proof of concept to deploy
> further systems and collect more robust data.
>
> Regards,
> Missy Givens
>
>
> _____
>
> From: dedlin@theranos.com
> To: Melissa.Givens█████████████████████████
> CC: eholmes@theranos.com; cholmes@theranos.com
> <mailto:cholmes@theranos.com>  <mailto:cholmes@theranos.com>
> Subject: Theranos Demo Results
> Date: Wed, 2 May 2012 06:41:30 +0000
>
> LTC Givens,
>
>
> It was great meeting you this afternoon. Attached to this note are the
> results from the blood sample we drew. We are happy to answer any
> questions you might have.
>
> We will be in touch soon with follow up from our conversation today,
> and we very much look forward to advancing our partnership.
>
>
>

THPFM0000691527

```
>
> Best regards,
>
> Dan
>
>
>
>
>
>
>
>
>
> Daniel P. Edlin
> Senior Product Manager
> Theranos, Inc.
> Office: 650.470.0322
> Mobile: ███████████
>
> dedlin@theranos.com <mailto:dedlin@theranos.com>
>
>
>
> PRIVILEGED AND CONFIDENTIAL COMMUNICATION IMPORTANT - This electronic
> transmission, and any files transmitted with it are confidential
> and/or legally privileged information. This information is intended
> solely for the use of the individual or entity to which they are
> addressed. Any disclosure,
>
> retransmission, reproduction, dissemination or other use of the
> contents of this information by persons or entities other than the
> intended recipient is
>
> strictly prohibited. If you have received this email in error, please
> contact us immediately and delete all copies. Please note that any
> views or opinions
>
> presented in this email are solely those of the author and do not
> necessarily represent those of Theranos, Inc. Finally, before opening
> or using attachments the recipient should check this email and any
> attachments for the presence of viruses. Theranos, Inc. accepts no
> liability for any damage caused by any virus transmitted by this
> email. Our sole responsibility is limited to resupplying any affected
> attachments.
> Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
> 650-838-9292 www.theranos.com <http://www.theranos.com/>
>
>
>
```

Confidential

THPFM0000691528

13993A



# Theranos, Inc. Confidential Information for AFRICOM Protocol

**Background: Overview and Cost Savings.**

Theranos is a high-complexity CLIA-certified laboratory headquartered in Palo Alto, California. Theranos manufactures proprietary clinical analyzers, assay reagents, and laboratory developed tests for the complete range of tests reimbursed by the Centers for Medicare and Medicaid Services.

Theranos tests are all validated with micro-liter sample volumes of the relevant biological matrices. For blood based assays, the assays are validated on micro-liter samples of serum, plasma, venous and finger-stick blood.

Part of Theranos' mission is to offer tests of unprecedented quality at unprecedented low costs. Costs per tests on Theranos systems are fractions of retail test or hospital test costs and in volume, very significantly discounted from US Medicare reimbursement thresholds. Theranos is working to offer laboratory services to Medicare and Medicaid programs in the US at rates far lower than current reimbursement thresholds to materially reduce federal and state healthcare spending.

Theranos manufactures all of its technologies and systems within the United States.

**Design: Deployment.**

Theranos' point-of-service laboratory infrastructure generates real-time data from a finger-stick of blood or other micro-volumes of different sample types delivering higher quality data than previously possible. This technology is an industry first, with profound effects on the ability to triage and stabilize patients via quantitative reads from micro sample sizes in real-time in the field.

Each Theranos device can process the complete range of tests currently available through the traditional centralized or hospital laboratory infrastructure. Theranos' device can process multiple samples on a given cartridge. Sample types include blood, urine, feces, tissue and saliva, amongst others. The cartridge can automatically perform follow-up tests when protocol dictates those additional tests are necessary.

For this program, the Theranos 3.0 system and accompanying cartridges will be deployable to designated sites in theatre. Devices can transmit data and video via satellite, short and long-wave radio, Ethernet, Wi-Fi, and cellular broadband to allow instant communication of test results to the necessary recipients.

The system is portable and designed to be able to be used at the point of sample acquisition. Theranos systems are highly automated with all pre-analytical, analytical, and post-analytical steps capable of being run by the system so that untrained operators can fully operate the system.

THERANOS CONFIDENTIAL AND PROPRIETARY



Embedded decision support on the device touchscreen allows for medical expertise to be provided to untrained operators in field.

**Theranos Clinical Analyzers.**

Theranos' clinical analyzers are capable of running the full spectrum of laboratory tests ranging from hematology to clinical chemistry, immunoassays, microscopy, and molecular based diagnostic tests.

The Theranos 3.0™ is a small, compact and portable analyzer that processes a single sample at one time.

Theranos clinical analyzers are capable of performing comprehensive pre-analytical and sample preparation procedures as well as analysis. In the context of placement of an analyzer in a Theranos CLIA laboratory, the device can automatically perform the pre-analytic and analytic procedures. The analyzers can also be used for sample preparation procedures only and transfer data remotely for analysis. Automation of many of the manual pre-analytic procedures contributes to acceleration of the total turnaround time of test results from the time of sample collection to analysis. Pre-analytic processing automation and integration also contributes to low coefficients of variation in system wide performance data.

Theranos clinical analyzers have integrated connectivity modes ranging from cellular connectivity to wired connectivity to radio for the purpose of transmitting comprehensive performance, quality, sample prep, and analytical information to a secure analytical infrastructure or into an EMR system.

Theranos clinical analyzers include touch screens with applications for clinical data entry. Test results are displayed as each assay is processed either on the touch screen and/or in an EMR as specified. The touch screen can also run training, support, and other applications to assist in ease of use and in data interpretation.

Theranos clinical analyzers are factory calibrated. Standardization of analyzers across Theranos locations has contributed to higher integrity data generation in past deployments. The ability to rapidly process fresh whole blood samples has further contributed to the integrity of Theranos test results.

Unlike waived devices, Theranos analyzers and the associated Theranos laboratory analytical software was designed to operate in a CLIA-certified laboratory framework with minimal human intervention. The level of integrated controls and oversight was introduced with the intent of operating in remote, scantily staffed, and/or rural environments.

**Theranos Tests.**

Theranos reagents are Analyte Specific Reagents. Theranos reagents are enclosed in the disposable reagent tray or cartridge into which the sample is deposited for analysis. While multiple reagents are contained in a single tray, all reactions are discrete. Reagent trays contain

THERANOS CONFIDENTIAL AND PROPRIETARY

**ER-15504**



reagents for a range of assay types. The largest number of assays run simultaneously on a single tray to date is 72. Reagent trays are customizable. Each reagent tray can process a finger-stick sample of blood to perform any given set of tests. Reagent trays are also customized for the full range of clinical sample matrices. The reagent tray is traced throughout its lifecycle through a unique bar code which is used for quality control purposes and monitoring reagent interactions.

Total test time of Theranos assays ranges from <1 minute for tests like PTT to <30 minutes depending on the analytes measured. Theranos has customized assay run times for prior deployments based on field requirements. Sample volume requirements range from <1 uL for a given assay to <50 uL for a given panel.

Theranos cartridges contain controls and calibrators for each assay. Assays are generally run in triplicates. All assays are validated under CLIA guidelines. Novel assays have been rapidly developed and validated on the Theranos platform for prior deployments. Representative data is attached.

**Certifications, Quality Control, Safety and Related Infrastructure.**

Theranos is a high complexity CLIA certified laboratory. Internationally, Theranos' model of operation is ISO certification of all CLIA laboratory facilities.

In all deployments, Theranos trains and certifies technicians operating in its sample collection sites and laboratory locations. Staff for Theranos laboratories can be assigned or contracted via existing (hospital) laboratory personnel. Theranos has been building a large distribution and support infrastructure which includes logistical hubs through which devices are replaced and serviced. Deployments always include additional back up devices for further modularity and redundancy; replaced devices are generally serviced offsite by Theranos personnel. As a CLIA lab, Theranos has not sold devices for deployments but rather provides a reference laboratory service. Theranos manages just in time inventory of reagent trays in its locations. Reagents are designed with minimum twelve month stability targets under the most robust conditions possible for a given assay. Theranos clinical analyzers are Class I medical devices classified under FDA 21 CFR Part 862.2160. In addition to its CLIA lab quality system standards, Theranos is QSR compliant.

While Theranos analyzers can be used for sample processing in the field, Theranos has also developed proprietary nanotainer™ (tiny vaccutainer that collects blood through a small capillary) which allow for micro volumes of sample to be stabilized in the appropriate anticoagulant and shipped to or processed in a clinical laboratory. Theranos nanotainer™s are classified as Capillary Blood Collection Tubes under 21 CFR Part 864.6150.

Theranos systems are Non-Invasive, Non-Significant Risk Devices. Theranos validates each assay under FDA and ICH Guidelines and where applicable, under/to WHO guidelines and standards.

Confidential

THPFM0000691531



Theranos is GLP and GMP compliant. Theranos software is validated under 21 CFR part 11. Theranos clinical analyzers are Class I medical devices classified under FDA 21 CFR Part 862.2160. In addition to its CLIA lab quality system standards, Theranos is QSR compliant.

All controls, calibrators, replicates, and QC testing mechanisms are automatically run with each test that is processed on board the system.

As a CLIA-certified laboratory, Theranos is legally liable for the accuracy of every result that it reports. This means that in addition to the controls, standards, and practices (such as Good Manufacturing Practices) required by FDA for Class I devices, Theranos devices are also subject to the ongoing testing, oversight, and regulatory obligations under CLIA certification.

Theranos is HIPAA and 21 CFT Part 11 compliant, utilizes bank-level encryption, and operates in compliance with a broad range of security standards and accreditation programs.

Theranos systems have undergone EMC testing, Underwriter's Laboratory (UL) certification, passed loose cargo vibration and drop/shock tests and extensive environmental testing.

THERANOS CONFIDENTIAL AND PROPRIETARY

**14207**

https://web.archive.org/web/20141009122317/http://www.walgreens.com/pharmacy/lab-testing/home.jsp



INTERNET ARCHIVE WaybackMachine
http://www.walgreens.com/pharmacy/lab-testing/home.jsp Go
78 captures
30 Mar 2014 - 13 Sep 2021
AUG OCT NOV
2013 09 2015
2014
About this capture

All prescription refills ship **FREE** to your home. Refill now ›
Checkout

Walgreens AT THE CORNER OF HAPPY & HEALTHY®

Balance Rewards | Store Locator | Sign In or Register
Savings & Deals | Healthcare Clinic | Your Account
Weekly Ad & Coupons

Pharmacy
Prescription Refills | Health Info & Services | Contact Lenses | Shop Products | Photo
Enter keyword or item # Search

Home > Pharmacy & Health

theranos

## the blood tests that need just a tiny sample.

### Walgreens Partners with Theranos to Provide Lab Services.

Theranos is working to shape the future of lab testing. Now, for the first time, their high-complexity CLIA-certified laboratory can perform your tests quickly and accurately using tiny samples.[1]

Learn more at Theranos.com

Para informaciï¿½n en espaï¿½ol haga clic aquï¿½

## Theranos is easy to find.

Theranos™ Wellness Centers are located inside select Walgreens in the greater Phoenix, AZ area and Palo Alto, CA—with more locations opening soon. With extended hours, including nights and weekends it's easy to fit your tests into your busy schedule.

Find a center

## one tiny drop changes everything.

Theranos' CLIA-certified laboratory can analyze samples as small as 1/1,000 the size of the typical blood draw. Their lab can perform tests on any sample type, including blood, urine, and other samples. It's fast, easy, and the highest level of quality.

## covered and affordable.

Theranos is committed to making lab testing more accessible to everyone. That means pricing their tests at dramatically low rates. Theranos can accept major insurance carriers as well as Medicare and Medicaid. And if you're uninsured, they offer you the same discounted prices they offer everyone else. Because a test should cost the same, no matter who you are.

Test menu

### goodbye, big bad needle.

Instead of a huge needle, Theranos-trained technicians can use a tiny finger stick or collect a micro-sample from a venous draw.[2] It's practically painless and a lot less scary. Now the entire lab testing process is comfortable, accommodating, and less intimidating – for people big and small.





### fast results. fast answers.

Theranos performs their test analyses fast, so they can return results to your clinician faster than ever before.[3] That means a more timely diagnosis to support better, more informed treatment.

### It's easy to get started



**1.**
Get a lab order from your clinician.



**2.**
Visit your nearest Theranos™ Wellness Center inside Walgreens.



**3.**
Bring your lab order to the pharmacy.



**4.**
Our friendly technician will take your sample.

### Unrivaled convenience.

Back to top

Find a Theranos™ Wellness Center at select Walgreens. No more trekking to an out-of-the-way laboratory. No more dealing with your health on someone else's terms. With extended hours, including nights and weekends – it's easy to fit your tests into your busy schedule.

Find Theranos™ Wellness Centers at these locations, with more opening soon.

Theranos and the Theranos logo(s) are trademarks, service marks, registered trademarks, and/or registered service marks of Theranos, Inc. Any images and text from the Theranos website, or otherwise provided by Theranos, are copyrighted by Theranos and reproduced here with permission. All other rights reserved.

[1]Clinical laboratory services will be performed by Theranos, Inc., an independently owned CLIA-certified clinical laboratory that is not a subsidiary, agent or employee of Walgreen Co. or any of Walgreen Co.'s subsidiaries.

[2]Blood may be drawn by a finger stick or venous draw performed by a Theranos- trained technician for Theranos testing performed in their CLIA-certified laboratory.

[3]Theranos, Inc does not directly advise patients with respect to the interpretation of the tests results or any treatment or care of any condition that the test results may indicate. All tests are ordered by a licensed health care clinician. For tests ordered by a health care clinician, Theranos, Inc. will provide the results to the ordering health care clinician and patient, when requested by the patient. It is the patient's and ordering clinician's responsibility to review and interpret the results and determine an appropriate course of treatment.

   

Enter email address for weekly deals | Sign up

| Customer Service | Walgreens Stores | Company Information | Plan Member Services |
| --- | --- | --- | --- |
| Shipping | Store Locator | AARPï¿½ | Mail Service Pharmacy |
| Returns | Weekly Ad | Awards and Recognition | Infusion Services |
| Product Recalls | Sweepstakes & Promotions | Careers | Respiratory Services |
| Contact Us | Special Email Offers | Company Info | Specialty Pharmacy |
| Accessibility | Healthcare Clinic | Disability Inclusion | |

ER-15509

Site Map
Help

**Balance® Rewards**
Offers
Program Details
BR for healthy choices
FAQs
Terms and Conditions
Contact Us

Flu Shots
Photo Blog
Paperless Coupons

**Walgreens Mobile**
**Walgreens Rebates**

Diversity
Investor Relations
Newsroom
Walgreens Logos
Sell Your Pharmacy
Social Responsibility
California Transparency Act
Affiliate Program
Developers
Our Sites

**Business Solutions**

**Balance® Financial**

**Well Ventures™**

Notice of Privacy Practices :: Terms of Use :: Online Privacy & Security

© Copyright 2014 Walgreen Co. All rights reserved.

**View all products by:**
As Seen on TV | Baby, Kids & Toys | Beauty | Contact Lenses | Diet & Fitness
| Grocery | Health Shops | Home Medical Supplies & Equipment | Household |
Medicines & Treatments | Natural & Organic | Personal Care | Seasonal |
Sexual Wellness | Vitamins & Supplements | Walgreens Brand | Top
Walgreens Searches

**Top photo products:**
Photo Cards | Photo Collages | Photo Books | Photo Prints | Photo Gifts |
Photo Mugs | Photo Calendars | Shop All Photo Products

14208



http://web.archive.org/web/20140819132005/http://theranos.com/the-experience

INTERNET ARCHIVE
WayBackMachine
http://theranos.com/the-experience
Go
7 captures
11 Sep 2013 – 15 Mar 2015
JUN AUG FEB
◄ 19 ►
2013 2014 2015
About this capture

theran●s

OUR SOLUTION    OUR CENTERS    OUR COMPANY    |    FOR PROVIDERS

GET STARTED

OUR SOLUTION / **THE EXPERIENCE**

# same tests.
# smaller sample.

At Theranos, we're committed to making the whole lab-testing experience more comfortable and convenient. Because we believe that engaging with your health should be positive and empowering.

## **Finally,** a lab test that asks less of you.

No big needles.        Just a tiny sample.        Into our nanotainer™ tube.

### A totally new experience.

Over the next few months, we'll be introducing groundbreaking new spaces that transform the way you think about lab tests. Our Theranos Wellness Centers are designed to make your experience as easy and comfortable as possible. You can make an appointment or walk in at your leisure with your doctor's order form. Then enjoy our friendly new process. Everything is designed with your wellness in mind.

### The only thing we want you to feel is better.

Instead of a big, intimidating needle, our certified phlebotomists can use a tiny finger stick or a micro-sample from a venous draw. Occasionally, a venipuncture may be required based on the lab order, but this is uncommon, and our aim is to eliminate that scenario entirely.

Our experience is a friendlier, less invasive, and less painful one. No big vials to fill. No more searching for a good vein because so much blood is required. And no big, painful bruises. The only thing we want you to feel is well.

ER-15512



## Unrivaled convenience.

With Theranos, you can give your sample in your doctor's office, or bring your doctor's lab order to any of our convenient Theranos Wellness Centers. No more trekking to an out-of-the-way laboratory. No more dealing with your health on someone else's terms. With our extended hours – including nights and weekends – it's easy to fit your tests into your busy schedule.



| COMPANY | WELLNESS CENTERS | PROVIDERS | PARTNERS | CONTACT US |
|---|---|---|---|---|
| OUR MISSION | FIND A CENTER | PARTICIPATE | PARTNER LOG IN | 1601 S. CALIFORNIA AVE. |
| TECHNOLOGY | GET STARTED | EASY INTEGRATION | | PALO ALTO, CA 94304 |
| TEST MENU | | | | INFO@THERANOS.COM |
| PRESS | | | | |
| WE'RE HIRING! | | | | |

© 2008-2014 Theranos, Inc. All Rights Reserved.       WEBSITE PRIVACY POLICY       SECURITY POLICY       TERMS OF USE       f       ✆       Follow @theranosinc



**15002**

Hematology Reports 2014; volume 6:5466

# Intensive serial biomarker profiling for the prediction of neutropenic fever in patients with hematologic malignancies undergoing chemotherapy: a pilot study

Steven M. Chan,[1] John Chadwick,[2] Daniel L. Young,[3] Elizabeth Holmes,[3] Jason Gotlib[1]

[1]Division of Hematology, Department of Medicine, Stanford University School of Medicine/Stanford Cancer Institute, CA, USA; [2]North Western Deanery, Three Piccadilly Place, Manchester, UK; [3]Theranos Inc., Palo Alto, CA, USA

## Abstract

Neutropenic fever (NF) is a life-threatening complication of myelosuppressive chemotherapy in patients with hematologic malignancies and triggers the administration of broad-spectrum antimicrobials. The ability to accurately predict NF would permit initiation of antimicrobials earlier in the course of infection with the goal of decreasing morbid complications and progression to septic shock and death. Changes in the blood level of inflammatory biomarkers may precede the occurrence of NF. To identify potential biomarkers for the prediction of NF, we performed serial measurements of nine biomarkers [C-reactive protein (CRP), protein C, interleukin (IL)-6, IL-8, IL-10, IL-1β, tumor necrosis factor-α, monocyte chemotactic protein-1, and intercellular adhesion molecule-1] using a multiplex ELISA array platform every 6-8 hours in patients undergoing myelosuppressive chemotherapy for hematologic malignancies. We found that the blood levels of IL-6 and CRP increased significantly 24 to 48 hours prior to the onset of fever. In addition, we showed that frequent biomarker monitoring is feasible using a bedside micro sample test device. The results of this pilot study suggest that serial monitoring of IL-6 and CRP levels using a bedside device may be useful in the prediction of NF. Prospective studies involving a larger cohort of patients to validate this observation are warranted. This trial is registered at ClinicalTrials.gov (NCT01144793).

## Introduction

Patients undergoing induction chemotherapy for acute leukemias are at a particularly high risk of developing neutropenic fever (NF) due to the prolonged duration of severe neutropenia. In the majority of these cases, the rapid administration of broad spectrum antimicrobials decreases the risk of progression to septic shock and death. Despite advances in antimicrobial therapy and supportive care measures, infection-related complications frequently prolong the duration of hospitalization and continue to be the main causes of early mortality in patients undergoing chemotherapy for acute leukemias.[1,2] Strategies to further decrease these complications are needed to improve patient outcomes.

The initiation of broad-spectrum antimicrobials for NF generally occurs at the time of fever. Although most patients stabilize after starting treatment, a subgroup of patients deteriorates rapidly into septic shock despite prompt initiation of antimicrobials. A strategy to improve outcomes is the use of antibiotic prophylaxis which has been shown to reduce infection-related mortality, especially with the use of fluoroquinolones.[3] However, antibiotic resistance, fungal overgrowth, and antibiotic-related adverse effects (e.g. *Clostridium difficile* colitis and allergic responses) have limited the routine use of antibiotic prophylaxis. An alternative strategy is to initiate antimicrobial therapy just prior to the onset of fever. This strategy may reduce the incidence of infection-related complications by treating at an earlier time point when the pathogen burden is lower and the patient's condition is relatively more stable. To successfully implement this strategy, a practical method for the prediction of NF is required but no such method currently exists.

Pro-inflammatory cytokines such as interleukin (IL)-6, IL-1 family members, and tumor necrosis factor-alpha (TNF-α) substantially increase in response to systemic infections. When they reach the central nervous system, they are able to increase the temperature set point and cause fever through induction of central mediators such as prostaglandins.[4] Given that a threshold concentration of these cytokines is required before a fever response is initiated, we hypothesize that increases in their blood concentration should precede the onset of NF. Previous studies have focused mainly on the use of biomarkers measured at the time of NF for the prediction of adverse outcomes such as bacteremia or septic shock.[5] In contrast, only a small number of studies have investigated the utility of biomarkers for the prediction of NF.[6-13] A few of these studies reported an increase in IL-6 and IL-8 levels before the onset of fever.[6,11-13] A common limitation with all these studies is the low frequency of measurement, ranging from three times per week to at most once daily. This limitation may obscure the predictive potential of a biomarker if the change occurs temporally close to the onset of fever.

Correspondence: Jason Gotlib, Division of Hematology, Stanford University School of Medicine/Stanford Cancer Institute, 875 Blake Wilbur Drive, Room 2324, Stanford, CA 94305-5821, USA.
Tel.: +1.650.725.0744 - Fax: +1.650.724.5203.
E-mail: jason.gotlib@stanford.edu

Key words: neutropenic fever, interleukin-6, C-reactive protein, acute leukemia.

Acknowledgements: the authors would express gratitude to the Stanford Division of Hematology and Stanford University Hospital hematology-oncology nursing staff for their dedicated time and effort on this study. They also express gratitude to Dr. Stephen O'Brien for his mentoring of Dr. John Chadwick.

Contributions: SMC and JC are the first coauthors; SMC, JC and JG contributed to all aspects of the study including study design, biomarker measurements, data analysis, and preparation of the manuscript; DLY and EH were involved in the measurement of biomarkers using the Theranos micro sample test.

Conflict of interests: the authors have no potential conflict of interests to disclose. This pilot study was a collaboration between Stanford University School of Medicine/Stanford Cancer Institute and Theranos, Inc, and no funding was received from Theranos for its implementation or conduct.

Received for publication: 26 April 2014.
Revision received: 5 June 2014.
Accepted for publication: 9 June 2014.

This work is licensed under a Creative Commons Attribution NonCommercial 3.0 License (CC BY-NC 3.0).

©Copyright S.M. Chan et al., 2014
Licensee PAGEPress, Italy
Hematology Reports 2014; 6:5466
doi:10.4081/hr.2014.5466

We conducted a pilot study (ClinicalTrials.gov identifier NCT01144793) to assess the feasibility of frequent serial monitoring of blood biomarkers for the prediction of NF in hospitalized patients undergoing intensive chemotherapy for hematologic malignancies. We selected a panel of biomarkers that have previously been shown to be elevated in response to an infection and are thus most likely to rise prior to the onset of fever.[14-23] We also included protein C which in contrast to the other biomarkers, has been shown to be decreased in the setting of sepsis and therefore its level may drop prior to fever onset.[24] The study had two aims: i) to identify potential predictive biomarkers that are worthy of further study in a larger cohort to predict NF, and ii) to assess the feasibility of frequent monitoring of blood biomarkers for future implementation of a bedside device.

OPEN ACCESS

HOLMES002085

Article



## Materials and Methods

### Patients

Disease-specific eligibility criteria included adult patients (≥18 years) with acute myeloid or lymphoid leukemia who were evaluated in the Stanford outpatient infusion treatment area (ITA) or inpatient hematology service. Patients undergoing induction or consolidation chemotherapy from April to June in 2008 were enrolled in the study. In our study, we defined neutropenia as an absolute neutrophil count (ANC) $<0.5\times10^9$/L and fever as a single body temperature greater than 38°C. This definition was chosen because it would trigger the initiation of broad-spectrum antibiotics on our inpatient service. Enrolled patients were required to have an indwelling catheter in place before sampling could begin. Vitals signs were measured at least once every 8 hours and more frequently depending on the patients' clinical status. This study received approval from the Stanford Institutional Review Board (IRB) and the Stanford Cancer Institute Scientific Review Committee (SRC). A full written informed consent was obtained from all patients.

### Blood sampling and biomarker measurements

Whole blood collection from the patient's central venous access line was initiated promptly following informed consent. One milliliter of blood was collected into an EDTA tube for each time point. The protocol specified collection of samples every 8 hours before the onset of fever and within 2 hours after fever developed. Sample collection changed to every 6 hours while patients were febrile, and reverted to every 8 hours after patients defervesced and the ANC rose above $1.0\times10^9$/L. Blood was refrigerated at 4°C immediately upon collection and transported to an off-site central facility for further processing. The bulk of the sam-

ple was centrifuged and the plasma fraction was aliquoted into 250 µL barcoded vials. The plasma samples were then flash frozen in liquid nitrogen and stored at −80°C for subsequent measurement of the biomarkers using Searchlight Protein Arrays (Pierce Biotechnology, Woburn, MA, USA). The following nine biomarkers were measured: C-reactive protein (CRP), protein C, IL-6, IL-8, IL-10, IL-1β, TNF-α, monocyte chemotactic protein-1 (MCP-1), and intercellular adhesion molecule-1 (ICAM-1). A small volume of whole blood was saved for comparative analysis by a micro sample test (Theranos, Palo Alto, CA, USA). During this development and validation phase, analysis of samples using the micro sample test was performed at an off-site facility.

The micro sample processing and analytical system developed by Theranos consists of single-use consumables that require only a small volume of blood sample (25 µL) for analysis and instrumentation and software enabling serial multiplexed enzyme-linked immunosorbent assays of a wide spectrum of biomarkers. The sample preparation and assays are fully automated and analysis takes less than 1 hour to complete. In this study, CRP and protein C levels were measured using this system.

### Statistical analysis

The level of significance in the difference between fold-changes for each biomarker was determined using the Wilcoxon signed rank test. This test compares the difference between matched pairs (distal *vs* proximal value of an individual patient) and does not assume the fold-change values to be normally distributed. A P-value less than 0.05 was considered statistically significant. The Pearson's correlation coefficient was used to determine strength of correlation between CRP levels measured using the Searchlight assay and the Theranos micro sample test. The GraphPad Prism software (version 6, GraphPad Software, La Jolla, CA, USA) was used for all calculations.

## Results and Discussion

A total of seventeen patients were enrolled in this pilot study. The median age of the patients enrolled was 49 years (range: 22-70 years). Twelve patients (70%) were male. The underlying diagnoses were acute myeloid leukemia (n=12), acute B- or T-lymphoblastic leukemia (n=3), and chronic myeloid leukemia in either lymphoid or myeloid blast crisis (n=2). Two of the patients were monitored in the outpatient ITA for either all or part of the pre-fever portion of sampling. A total of 1302 samples were drawn over the study period representing 96.5% of the planned draws.

In order to determine the relative change in the level of a biomarker prior to the onset of fever, a baseline measurement from which all comparisons are made is required. The sample collected 5 to 7 days prior to the onset of first fever was used as the baseline in our study. The baseline measurement was not available in 5 patients and they were excluded for further analysis. One patient did not have a sample collected within 8 hours prior to onset of first fever and was also excluded. Logistical issues with blood sampling included the need for venous catheter line removal due to suspected line infections (n=2) and patient refusal of blood draws (n=1). For patients who were febrile at the time of enrollment, they were included if the fever resolved within 48 hours of enrollment and was followed by at least a 10-day afebrile interval before onset of the next fever. For this subgroup of patients, the second fever was used as the reference point for analysis. Four of the 17 patients did not meet this requirement and were excluded. An additional patient was excluded because he was not neutropenic at the time of fever. As a result, six of the seventeen patients (35%) were considered fully evaluable.

Of the six patients included for further analysis, five of them had acute myeloid leukemia and the remaining patient had B-cell acute lymphoblastic leukemia (Table 1). All the

**Table 1. Characteristics of the patients included for analysis.**

| ID | Age | Sex | Primary diagnosis | Chemotherapy regimen | Chemotherapy started on day | Day of fever | Source/site of infection |
|----|-----|-----|-------------------|----------------------|-----------------------------|--------------|--------------------------|
| 4 | 59 | M | B-ALL | CALGB 9511 | 0 | 6.8 | Bacteremia, *K. pneumoniae* |
| 9 | 39 | F | AML | High dose cytarabine consolidation | -4 | 8.7 | Right upper lobe pneumonia |
| 10 | 70 | M | Secondary AML | 3+7 | 2 | 10.6 | Unknown |
| 11 | 57 | M | AML | 3+7 | 2 | 14.1 | Unknown |
| 13 | 38 | F | AML | 3+4 | 3 | 11.8 | Bacteremia, *E. coli* |
| 15 | 52 | M | Secondary AML | 3+4 | 2 | 8.8 | Unknown |

AML, acute myeloid leukemia; B-ALL, B-cell acute lymphoblastic leukemia; CALGB, Cancer and Leukemia Group B.
For each patient, day 0 corresponds to the day of enrollment in this study. 3+7 refers to a standard AML induction regimen consisting of 3 days of anthracycline and 7 days of continuous infusion cytarabine (100 mg/m2/day). 3+4 is a similar regimen except cytarabine is given at high dose (3 gm/m2) twice daily for 4 days.



HOLMES002086

ER-15515

**pagepress**

patients received induction chemotherapy regimens except for patient #9 who received consolidation therapy for AML. The median duration between the start of chemotherapy and subsequent fever was 8.7 days (range: 6.8-12.7 days). The median interval between blood draws in the pre-febrile period was 9 hours (range: 2-45 hours) and dropped to 7 hours (range: 2-24 hours) in the 72-hour period following the onset of fever. A source or site of infection was identified in three of the six patients (Table 1). Notably, patient #4 developed septic shock requiring care in the intensive care unit as a result of a *Klebsiella pneumoniae* infection.

To identify candidate biomarkers with the potential to predict NF, we determined the fold-changes at two time points for each biomarker and patient. The first one, henceforth referred to as *proximal*, was the ratio of the measurement drawn just prior to the onset of fever to the baseline measurement collected 5 to 7 days prior to fever onset. The second one, henceforth referred to as *distal*, was the ratio of the measurement taken between 2.5 to 3.5 days prior to onset of fever to the day 5-7 baseline measurement. Since the concentration of a predictive biomarker should progressively increase over time prior to the onset of fever, the proximal fold-change should correspondingly be higher than the distal fold-change. Non-predictive biomarkers should not demonstrate a difference between the two values. Of the nine biomarkers measured, only IL-6 and CRP had a statistically significant (P<0.05) difference between the proximal and distal fold-changes (Figure 1). The mean proximal fold-changes for IL-6 and CRP were 24.7 (range: 6.5-91) and 38.2 (range: 0.179-135) and mean distal fold-changes were 1.6 (range: 1.03-1.99) and 0.78 (range: 0.19-2.06), respectively. All patients had a higher proximal than distal fold-change for IL-6. In contrast, 4 of the 6 patients showed the same trend for CRP.

We next determined the time at which IL-6 and CRP predicted the onset of fever. For each biomarker, the mean of the distal fold-changes plus two standard deviations was used as the cut-off value above which fever was predicted to occur. This method of determining the cut-



**Figure 1.** Scatter plots of the proximal and distal fold-changes for each biomarker. Each point represents data from an individual patient. The mean value (horizontal line) is shown. *P<0.05.



**Figure 2.** Time course of body temperature, interleukin (IL)-6 and C-reactive protein (CRP) levels. Data are shown starting from the time of baseline measurement (5-7 days prior to fever onset) to the time of fever. Day 0 corresponds to the day of study enrollment. Red arrow indicates the time of fever. Black arrow indicates the time when the fold-change cut-off is crossed. The number under the green line refers to the time difference in days between these two values. The dotted horizontal lines in the IL-6 and CRP graphs indicate the baseline Searchlight measurements prior to onset of fever. Refer to Results and Discussion for details.

OPEN ○ ACCESS

HOLMES002087

**ER-15516**

**Article**

pagepress

off assumes that the distal fold-changes reflected mainly physiologic variations in the concentration of the biomarker and were not a direct response to the inciting infection that eventually caused the fever. Using this approach, IL-6 levels crossed the cut-off value for all patients at a median of 1.3 (range: 0.4-2.3) days prior to the onset of fever. For CRP, the cut-off was crossed in 4 of the 6 patients at a median of 1.7 (range: 1.2-2.3) days before fever onset. A closer inspection of the fever curves of 4 of the study patients in conjunction with their IL-6 and CRP levels over time clearly demonstrates an upward trend of these biomarkers prior to the onset of fever (Figure 2). Taken together, our analysis provides evidence that IL-6 and CRP may be useful in predicting the onset of NF with a lead time of 1 to 2 days.

To demonstrate the feasibility of serial biomarker monitoring with the micro sample test system, we measured the level of CRP and protein C in parallel using the same patient samples. Because CRP proved to be a potentially useful predictive biomarker, we focused our analysis on this biomarker. CRP levels of the six fully evaluable patients measured using the micro sample test correlated highly with values obtained using the commercially available Searchlight Protein Arrays (Figure 3). The Pearson's correlation coefficient (r) between the Theranos and Searchlight measurements was 0.85. Measurements using the micro sample test also demonstrated a rise in CRP levels prior to the onset of fever (Figure 2). A larger study is required to determine if the micro sample test system can be used interchangeably with standard laboratory assays which would support its use to predict NF in the hospital setting.

Although several cytokines including IL-6, IL-1 family members, and TNF-α have been implicated in mediating the fever response,[4] IL-6 was the only pro-inflammatory cytokine in our array screen that demonstrated promise in the prediction of NF. This finding suggests that IL-6 is a predominant cytokine mediating the febrile response in neutropenic patients. CRP, which is an acute phase reactant induced by IL-6,[35] was correspondingly also predictive of NF in our study population. These results are in agreement with prior studies that examined changes in IL-6 and CRP levels. Engel *et al.* reported a significant increase in IL-6 levels 24 to 48 hours prior to onset of fever.[6] They reported a shorter lead time for CRP of less than 24 hours. Two other studies reported a similar upward trend 24 to 48 hours before onset of fever with IL-6.[11,13] As mentioned previously, the frequency of measurement in these prior studies was only three times a week which may be insufficient for the prediction of NF on an individual basis. An advantage of our study is the relatively high frequency of measurements which increases the temporal



Figure 3. Plot of C-reactive protein levels measured using the Searchlight assay versus the Theranos micro sample test. Each data point represents an individual blood sample collected from one of the six fully evaluable patients in this study. The Pearson's correlation coefficient (r) is shown.

resolution of biomarker trends and demonstrates the predictive power of IL-6 and CRP in individual patients. However, there were some challenges to the collection of blood samples at this high frequency including missed draws from nursing staff, the need for central line removal for suspected line infection, and infrequent patient refusal of blood draws. Improved communication with the nursing staff and patients as well as a more streamlined sample collection protocol should help overcome the challenges identified in this pilot study.

The ability to reliably predict the onset of NF may permit early implementation of broad-spectrum antibiotics in order to reduce the likelihood of infection-related morbidity and mortality. Although the number of fully evaluable patients in this pilot, hypothesis-forming study was small, our results point to further exploration of the biomarkers IL-6 and CRP for prediction of NF. Future prospective studies with a larger cohort of patients using the micro sample test system for real time measurements of these and additional biomarkers are needed to validate our results and determine the sensitivity and specificity of this approach.

## References

1. Creutzig U, Zimmermann M, Reinhardt D, et al. Early deaths and treatment-related mortality in children undergoing therapy for acute myeloid leukemia: analysis of the multicenter clinical trials AML-BFM 93 and AML-BFM 98. J Clin Oncol 2004;22:4384-93.
2. Slats AM, Egeler RM, van der Does-van den Berg A, et al. Causes of death-other than progressive leukemia-in childhood acute lymphoblastic (ALL) and myeloid leukemia (AML): the Dutch Childhood Oncology Group experience. Leukemia 2005;19:537-44.
3. Gafter-Gvili A, Fraser A, Paul M, et al. Antibiotic prophylaxis for bacterial infections in afebrile neutropenic patients following chemotherapy. Cochrane Database Syst Rev 2012;1:CD004386.
4. Conti B, Tabarean I, Andrei C, Bartfai T. Cytokines and fever. Front Biosci 2004;9: 1433-49.
5. Phillips RS, Wade R, Lehrnbecher T, et al. Systematic review and meta-analysis of

HOLMES002088

ER-15517



**Article**

the value of initial biomarkers in predicting adverse outcome in febrile neutropenic episodes in children and young people with cancer. BMC Med 2012;10:6.

6. Engel A, Mack E, Kern P, Kern WV. An analysis of interleukin-8, interleukin-6 and C-reactive protein serum concentrations to predict fever, gram-negative bacteremia and complicated infection in neutropenic cancer patients. Infection 1998;26:213-21.

7. Goetz M, Behre G, Heussel G, et al. Soluble tumor necrosis factor receptor type II in the early diagnosis of fever in neutropenia. Ann Hematol 2002;81:382-5.

8. Engel A, Steinbach G, Kern P, Kern WV. Diagnostic value of procalcitonin serum levels in neutropenic patients with fever: comparison with interleukin-8. Scand J Infect Dis 1999;31:185-9.

9. Buyukberber N, Buyukberber S, Sevinc A, Camci C. Cytokine concentrations are not predictive of bacteremia in febrile neutropenic patients. Med Oncol 2009;26:55-61.

10. Ribeiro AF, Nobre V, Neuenschwander LC, et al. Use of inflammatory molecules to predict the occurrence of fever in oncohematological patients with neutropenia. Braz J Med Biol Res 2013;46:200-6.

11. Steinmetz HT, Herbertz A, Bertram M, Diehl V. Increase in interleukin-6 serum level preceding fever in granulocytopenia and correlation with death from sepsis. J Infect Dis 1995;171:225-8.

12. Lindemann A, Tamm I, Tanodi K, Mertelsmann R. Interleukin-8 serum levels for early detection of infectious episodes in neutropenic patients. J Infect Dis 1995;172:610. P

13. Schonbohn H, Schuler M, Kolbe K, et al. Plasma levels of IL-1, TNF alpha, IL-6, IL-8, G-CSF, and IL1-RA during febrile neutropenia: results of a prospective study in patients undergoing chemotherapy for acute myelogenous leukemia. Ann Hematol 1995;71:161-8.

14. Netea MG, Kullberg BJ, Van der Meer JW. Circulating cytokines as mediators of fever. Clin Infect Dis 2000;31:S178-84.

15. Kruttgen A, Rose-John S. Interleukin-6 in sepsis and capillary leakage syndrome. J Interferon Cytokine Res 2012;32:60-5.

16. Kunkel SL, Lukacs NW, Strieter RM. The role of interleukin-8 in the infectious process. Ann N Y Acad Sci 1994;730:134-43.

17. Du Clos TW, Mold C. The role of C-reactive protein in the resolution of bacterial infection. Curr Opin Infecti Dis 2001;14:289-93.

18. Scumpia PO, Moldawer LL. Biology of interleukin-10 and its regulatory roles in sepsis syndromes. Crit Care Med 2005;33: S468-71.

19. Oberholzer A, Oberholzer C, Moldawer LL. Interleukin-10: a complex role in the pathogenesis of sepsis syndromes and its potential as an anti-inflammatory drug. Crit Care Med 2002;30:S58-63.

20. Pruitt JH, Copeland EM 3rd, Moldawer LL. Interleukin-1 and interleukin-1 antagonism in sepsis, systemic inflammatory response syndrome, and septic shock. Shock 1995;3:235-51.

21. Zentella A, Manogue K, Cerami A. The role of cachectin/TNF and other cytokines in sepsis. Prog Clin Biol Res 1991;367:9-24.

22. Gomes RN, Teixeira-Cunha MG, Figueiredo RT, et al. Bacterial clearance in septic mice is modulated by MCP-1/CCL2 and nitric oxide. Shock 2013;39:63-9.

23. Figueras-Aloy J, Gomez-Lopez L, Rodriguez-Miguelez JM, et al. Serum soluble ICAM-1, VCAM-1, L-selectin, and P-selectin levels as markers of infection and their relation to clinical severity in neonatal sepsis. Am J Perinatol 2007;24:331-8.

24. Fisher CJ Jr., Yan SB. Protein C levels as a prognostic indicator of outcome in sepsis and related diseases. Crit Care Med 2000;28:S49-56.

25. Eklund CM. Proinflammatory cytokines in CRP baseline regulation. Adv Clin Chem 2009;48:111-36.



HOLMES002089

**ER-15518**

**15004**

**To:**      Elizabeth Holmes[/o=theranos organization/ou=first administrative group/cn=recipients/cn=eholmes]; Surekha Gangakhedkar[/o=theranos organization/ou=first administrative group/cn=recipients/cn=surekhag]
**Cc:**      Daniel Young[/o=theranos organization/ou=first administrative group/cn=recipients/cn=dyoung]; Gary Frenzel[/o=theranos organization/ou=first administrative group/cn=recipients/cn=gfrenzel]; Sunny Balwani[/o=theranos organization/ou=first administrative group/cn=recipients/cn=sbalwani]
**From:**    Ian Gibbons[/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=IGIBBONS]
**Sent:**     Tue 10/19/2010 11:23:45 PM (UTC)
**Subject:**   Re: GSK

I think we have demonstrated capabilities fully equivalent to lab. methods in areas where we have done assay development. Our immunoassays match the best that can be done in clinical labs and work with small blood samples. Generally our assays are faster by a factor of three to ten than kits. Our dynamic range capability is more than 10^4 fold, better than any other system. Out sensitivity is state-of-the–art (pM or pg/mL).

We have also shown abilities to work in all assay areas (cytometry, nucleic acids, general chemistry and immunoassay).

In general chemistry, we match reference methods but, importantly, we can use small blood samples.

Cost savings will accrue from small sample size and no blood draw requirement.

Acceleration of studies: Tina just put a Rubella Antibody assay on our system in three days.

We have shown HAI feasibility in less than two months.

On 10/19/10 3:52 PM, "Elizabeth Holmes" <eholmes@theranos.com> wrote:

     Thanks all. I've just landed and will take a look as soon as the materials are circulated. Three points I will want to highlight and quantify as numerically as possible (by how much):
     - why and how our platform will be capable of the full range of assays and be at least as good as the CRO
     - why and how we'll achieve significant cost savings
     - why and how we'll accelerate studies significantly

     On Oct 19, 2010, at 2:51 PM, "Surekha Gangakhedkar" <surekhag@theranos.com> wrote:

         Daniel,

         I will send you the LAMP data in an hour.

         Thanks,
         Surekha

         **From:** Daniel Young
         **Sent:** Tuesday, October 19, 2010 2:25 PM
         **To:** Ian Gibbons; Elizabeth Holmes
         **Cc:** Gary Frenzel; Surekha Gangakhedkar; Sunny Balwani
         **Subject:** RE: GSK

HOLMES0018922

         We have integrated Ian's IP material into the large slide deck that we have been working on (integrated

from Hopkins and old GSK presentations).

Our efforts to update the 3.X Materials are almost done. We will be finalizing this another 2 hour or so, and then will send out this deck for review to this group.

Next on our plate are putting together the slides updating GSK assay progress:

- I will be working on HAI (I need to do some more analysis to calculate sensitivity/specificity).
- I will integrate in Tina's rubella work
- We are still waiting for LAMP data from Surekha/Gary, and then we will make the slides

We aim to send these additional GSK assay slides by 6pm tonight.

-Daniel

---

**From:** Ian Gibbons
**Sent:** Tuesday, October 19, 2010 2:18 PM
**To:** Elizabeth Holmes
**Cc:** Gary Frenzel; Surekha Gangakhedkar; Sunny Balwani; Daniel Young
**Subject:** GSK

I have put together a PPT for GSK including :

 IP
HAI
Rubella Ab assay
LDL separation

The materials are the 3.x folder on the server.
Some HAI materials are hyperlinked into the main PPT because when I tried to paste them into my PPT, the formatting went wrong. Gary and Surekha have been able to access the materials and to fix some problems.

Daniel has the IP files describing Image analysis and centrifugation which I think are in presentable form. The general chemistry data and presentation materials are also in the 3.x folder under Presentations (please use the most recent). Note that we used the term LAMP in that PPT and this reference should be removed.

Daniel also has images and some analysis of Kwesi's urinalysis work (it's not yet clear that we can get a presentable calibration, but there is a dose-response for some 10 analytes: very good news).

I am having some difficulty saving files on the server because:
The files are very large and my internet connection through Comcast may be unreliable. Ian and Nathan have been very helpful.

Please recognize the remarkable work Tina did in cranking out a Rubella antibody assay in a very short time. She went the extra mile for the company and then some.

I will be available by 'phone as needed tomorrow and Thursday. Paul has a heads-up that you may want him to participate if technical matters on the HAI assay need to be addressed.

HOLMES0018923

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 17, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amy Mason Saharia
AMY MASON SAHARIA

April 17, 2023