# EXHIBIT 5

1

2                      UNITED STATES DISTRICT COURT

3                     NORTHERN DISTRICT OF CALIFORNIA

4                           SAN JOSE DIVISION

5

        UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                        )
                        PLAINTIFF,       )   SAN JOSE, CALIFORNIA
7                                        )
                VS.                      )   VOLUME 47
8                                        )
        ELIZABETH A. HOLMES,             )   DECEMBER 17, 2021
9                                        )
                        DEFENDANT.       )   PAGES 9111 - 9353
10      _____ )

11

12                    TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

        A P P E A R A N C E S:
14

15      FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                               BY:  JOHN C. BOSTIC
16                                  JEFFREY B. SCHENK
                               150 ALMADEN BOULEVARD, SUITE 900
17                             SAN JOSE, CALIFORNIA 95113

18                             BY:  ROBERT S. LEACH
                                    KELLY VOLKAR
19                             1301 CLAY STREET, SUITE 340S
                               OAKLAND, CALIFORNIA 94612
20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

22      OFFICIAL COURT REPORTERS:
                               IRENE L. RODRIGUEZ, CSR, RMR, CRR
23                             CERTIFICATE NUMBER 8074
                               LEE-ANNE SHORTRIDGE, CSR, CRR
24                             CERTIFICATE NUMBER 9595

25                  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED WITH COMPUTER

```
 1         A P P E A R A N C E S: (CONT'D)
 2

 3    FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                               BY:   KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   SEEMA ROPER
                                     J.R. FLEURMONT
 6                                   AMY SAHARIA
                                     ANDREW LEMENS
 7                                   RICHARD CLEARY
                                     PATRICK LOOBY
 8                             725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
 9
                               LAW OFFICE OF JOHN D. CLINE
10                             BY:   JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
11                             SAN FRANCISCO, CALIFORNIA 94111

12
      ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
13                            BY:   ADELAIDA HERNANDEZ

14                            OFFICE OF THE U.S. ATTORNEY
                              BY:   LAKISHA HOLLIMAN, PARALEGAL
15                                  MADDI WACHS, PARALEGAL

16                            WILLIAMS & CONNOLLY
                              BY:   TIMIKA ADAMS-SHERMAN, PARALEGAL
17
                              TBC
18                            BY:   BRIAN BENNETT, TECHNICIAN

19

20

21

22

23

24

25
```

1

2                          INDEX OF PROCEEDINGS

3

4      CLOSING ARGUMENT BY MR. DOWNEY (RES.)          P. 9136

5      REBUTTAL CLOSING ARGUMENT BY MR. BOSTIC        P.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|  |  |  |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    DECEMBER 17, 2021 |
| 08:36AM | 2 | P R O C E E D I N G S |
| 08:36AM | 3 | (COURT CONVENED AT 8:36 A.M.) |
| 08:36AM | 4 | (JURY OUT AT 8:36 A.M.) |
| 08:36AM | 5 | THE COURT:  WE'RE ON THE RECORD IN THE HOLMES |
| 08:36AM | 6 | MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT. |
| 08:36AM | 7 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:36AM | 8 | BEFORE WE BRING THE JURY IN, I JUST WANTED TO TALK ABOUT A |
| 08:36AM | 9 | COUPLE OF THINGS THAT CAME TO MY ATTENTION YESTERDAY, AND I |
| 08:36AM | 10 | HAVE SOME QUESTIONS FOR COUNSEL. |
| 08:36AM | 11 | MR. DOWNEY, THIS INVOLVES YOUR ARGUMENT, SIR. |
| 08:36AM | 12 | I GUESS I NEED SOME HELP ON YOUR ARGUMENT.  IT APPEARS |
| 08:37AM | 13 | THAT DURING YOUR ARGUMENT YOU TALKED ABOUT TRADE SECRETS, AND |
| 08:37AM | 14 | PLEASE RECALL THAT DURING OUR DISCUSSION ABOUT JURY |
| 08:37AM | 15 | INSTRUCTIONS, YOU -- YOUR TEAM INFORMED US THAT, THE COURT AND |
| 08:37AM | 16 | YOUR COLLEAGUE OPPOSITE, THAT YOU'D LIKE TO WITHDRAW THE TRADE |
| 08:37AM | 17 | SECRET INSTRUCTION. |
| 08:37AM | 18 | MR. DOWNEY:  YES, YES. |
| 08:37AM | 19 | THE COURT:  WHICH WAS DONE.  I GRANTED THAT. |
| 08:37AM | 20 | NOW IT APPEARS THAT THE ISSUE OF TRADE SECRETS IS IN FRONT |
| 08:37AM | 21 | OF THE JURY THROUGH YOUR ARGUMENT.  NOT EVIDENCE, I RECOGNIZE |
| 08:37AM | 22 | THAT. |
| 08:37AM | 23 | CONCURRENT WITH THAT IS -- AND I'M CURIOUS ABOUT THERE'S A |
| 08:37AM | 24 | MIL, I THINK IT WAS NUMBER 5, THAT TALKED ABOUT ADVICE OF |
| 08:37AM | 25 | COUNSEL AND THE REQUIREMENTS FOR ADVICE OF COUNSEL. |

08:37AM 1          AND IT SEEMS LIKE WE'RE CLOSE TO THAT NOW FROM YOUR

08:37AM 2   ARGUMENT.

08:37AM 3          MR. DOWNEY:  YEAH.  YOUR HONOR, I THINK WHAT THE

08:38AM 4   ARGUMENT CONVEYED RELATES NOT TO EVEN THE ACCURACY OF THE VIEW

08:38AM 5   WHAT A TRADE SECRET IS, BUT RATHER JUST, WITHIN THE COMPANY,

08:38AM 6   WHAT THEY UNDERSTOOD UNDER THEIR POLICY WAS A TRADE SECRET.

08:38AM 7          AND SO IT'S AN ISSUE THAT REALLY GOES TO INTENT, NOT TO

08:38AM 8   THE ACCURACY OR TO THE FULLNESS OF ANY ADVICE.

08:38AM 9          WE WOULD REQUEST -- WOULDN'T REQUEST AN ADVICE OF COUNSEL

08:38AM 10  INSTRUCTION WITH THAT, NOR WOULD WE ASK FOR AN INSTRUCTION ON

08:38AM 11  THE ELEMENTS BECAUSE I THINK MS. HOLMES IS CONTAINED IN THE

08:38AM 12  POLICY MEMO AND WHICH I REFERENCED DURING ARGUMENT YESTERDAY.

08:38AM 13         THE COURT:  ARE YOU ADVANCING A TRADE SECRETS

08:38AM 14  DEFENSE?

08:38AM 15         MR. DOWNEY:  WELL, I'M ADVANCING IT AS AN INTENT

08:38AM 16  DEFENSE ONLY, WHICH IS TO EXPLAIN THE REASONS THAT THE

08:39AM 17  DEFENDANT ACTED AS SHE DID.

08:39AM 18         I DON'T THINK THERE'S PER SE A TRADE SECRET DEFENSE IN

08:39AM 19  THIS CONTEXT, BUT I'M NOT SEEKING THE COURT'S IMPRIMATUR THAT

08:39AM 20  THAT IS A -- THAT HER UNDERSTANDING WAS CORRECT OR INCORRECT.

08:39AM 21         I'M JUST INTRODUCING THE EVIDENCE AND ARGUING ABOUT THE

08:39AM 22  EVIDENCE THAT IS PART OF THE RECORD.

08:39AM 23         THE COURT:  THANK YOU.

08:39AM 24         MY CONCERN IS THAT THE JURY, THEY'VE HEARD US TALK ABOUT,

08:39AM 25  YOU TALK ABOUT TRADE SECRETS BOTH IN YOUR EXAMINATIONS AND

08:39AM 1     CROSS-EXAMINATIONS -- AND I'M GOING TO ASK THE GOVERNMENT'S

08:39AM 2     THOUGHTS ON THIS, TOO -- BUT IT OCCURRED TO ME THAT THIS JURY

08:39AM 3     HAS BEEN -- HAS HEARD THIS TERM "TRADE SECRETS" AS WITNESSES

08:39AM 4     HAVE DESCRIBED IT, AS THE LAWYERS HAVE DESCRIBED IT, BUT THEY

08:39AM 5     WILL NOT HAVE ANY INSTRUCTION FROM THE COURT AS TO WHAT A TRADE

08:39AM 6     SECRET IS SUCH THAT THAT COULD GUIDE THEIR DELIBERATIONS.

08:40AM 7         THAT'S THE CONCERN I HAVE AS THE JUDICIAL OFFICER MAKING

08:40AM 8     SURE THAT THE JUDGE HAS -- EXCUSE ME, THE JURY HAS SUFFICIENT

08:40AM 9     INFORMATION SUCH THAT THEY CAN DELIBERATE FULLY ON THE ISSUES

08:40AM 10     BEFORE THEM.

08:40AM 11         THE TRADE SECRETS INSTRUCTION THAT WAS OFFERED BY YOU

08:40AM 12     WOULD SUGGEST THAT THAT, AT LEAST INITIALLY, WAS AN ISSUE THAT

08:40AM 13     YOU FELT, YOUR TEAM FELT, THAT THE COURT SHOULD INSTRUCT ON

08:40AM 14     BECAUSE THAT WAS GOING TO BE OF SOME MOMENT IN THE CASE.

08:40AM 15         WHEN YOU WITHDREW THAT INSTRUCTION, I SUPPOSE A REASONABLE

08:40AM 16     INFERENCE COULD BE THAT THAT'S NO LONGER THE CASE, THAT THAT

08:40AM 17     WOULDN'T BE AT LEAST BECAUSE WE WOULDN'T NEED TO INSTRUCT THE

08:40AM 18     JURY AS TO TRADE SECRET ISSUES.

08:40AM 19         AND NOW AT THIS JUNCTURE, AND PLEASE RECALL THAT THE

08:40AM 20     EXHIBIT THAT WE'VE REFERENCED, WHAT IS IT, 105?  I WAS LOOKING

08:40AM 21     AND I WAITED ON MY COMMENTS BECAUSE I WANTED TO READ THE

08:40AM 22     TRANSCRIPT AGAIN LAST NIGHT.

08:40AM 23         MR. DOWNEY:  YES.

08:41AM 24         THE COURT:  I COULDN'T RECALL IF YOU HAD ACTUALLY

08:41AM 25     UTTERED THE PHRASE "ADVICE OF COUNSEL" OR NOT, AND YOU DIDN'T.

08:41AM 1                    MR. DOWNEY:  NO, I DIDN'T.

08:41AM 2                    THE COURT:  IT'S 15055.

08:41AM 3                    MR. DOWNEY:  YES.

08:41AM 4                    THE COURT:  AND WE HAD SOME DISCUSSION ABOUT THIS,

08:41AM 5       AND THE GOVERNMENT OBJECTED ON RULE 16 GROUNDS AND WE HAD SOME

08:41AM 6       DISCUSSION ABOUT THIS AND IT ULTIMATELY WAS ADMITTED.  AND

08:41AM 7       THAT'S THE FOCUS OF BACK TO THIS TRADE SECRET.

08:41AM 8            SO I'M JUST CURIOUS, NOW THIS JURY HAS HEARD TRADE

08:41AM 9       SECRETS, WHAT THEY KNOW FROM TRADE SECRETS IS FROM THAT

08:41AM 10      DOCUMENT, WHICH ADMITTEDLY IS A DRAFT, I UNDERSTAND THAT, BUT

08:41AM 11      WILL THERE BE JURY CONFUSION, JUROR CONFUSION REGARDING THE

08:41AM 12      ISSUE OF TRADE SECRETS AND WHETHER OR NOT THEY NEED TO BE

08:41AM 13      INFORMED, INSTRUCTED AS TO A TRADE SECRET AND HOW THAT COMES

08:41AM 14      INTO PLAY WITH ANY GOOD FAITH ARGUMENT, ET CETERA?

08:42AM 15           THAT'S THE QUESTION.

08:42AM 16                   MR. DOWNEY:  YEAH, I THINK THE DYNAMICS OF WHERE WE

08:42AM 17      ARE ON THIS, YOUR HONOR, IS THAT, AS MR. SCHENK SAID IN HIS

08:42AM 18      CLOSING YESTERDAY, THAT THE DISCUSSION AND EXPLANATION OF

08:42AM 19      CERTAIN CONDUCT AS BEING MOTIVATED BY A TRADE SECRET CONCERN

08:42AM 20      WAS A RETROSPECTIVE EXPLANATION.

08:42AM 21           I THINK THE EVIDENCE IS ONLY OFFERED TO SHOW THE STATE OF

08:42AM 22      MIND OF THE DEFENDANT.  IT'S NOT REALLY A QUESTION OF WHETHER

08:42AM 23      HER UNDERSTANDING IS CONSISTENT WITH ANY INSTRUCTION THE COURT

08:42AM 24      WOULD GIVE AS TO WHAT A TRADE SECRET IS OR IS NOT.

08:42AM 25           I DON'T THINK THE COURT -- I DON'T THINK THE JURY NEEDS TO

08:42AM 1    RESOLVE THAT QUESTION.

08:42AM 2        I THINK WHAT THE JURY NEEDS TO RESOLVE IS, IN LOOKING AT

08:42AM 3    THE EXHIBIT, DO THEY THINK THAT WAS SOMETHING WHICH INFORMED

08:42AM 4    HER INTENT OR DO THEY THINK IT WASN'T?

08:42AM 5        AND IF THEY THINK IT WAS SOMETHING, ARE HER ACTIONS

08:42AM 6    CONSISTENT WITH WHAT THE POLICY OF THE COMPANY WAS?

08:43AM 7        I THINK -- FOR EXAMPLE, I DON'T KNOW THAT THIS IS THE

08:43AM 8    SITUATION, BUT YOU COULD IMAGINE THE POLICY OF THE COMPANY

08:43AM 9    BEING INCONSISTENT WITH WHAT YOUR HONOR WOULD INSTRUCT, AND I

08:43AM 10   DON'T KNOW WHAT THE BENEFIT WOULD BE IN THAT CASE OF HAVING AN

08:43AM 11   INSTRUCTION ONE WAY OR THE OTHER.

08:43AM 12       SO IT SEEMS TO ME THAT THE COURT GIVING SUCH AN

08:43AM 13   INSTRUCTION DOESN'T ADDRESS A QUESTION THAT THE JURY REALLY

08:43AM 14   NEEDS TO RESOLVE.

08:43AM 15       I THINK WHAT THE JURY NEEDS TO RESOLVE IS BASED ON THE

08:43AM 16   FACTS OF THE CASE.

08:43AM 17           THE COURT:  DO I NEED TO TELL THE JURY THAT, LADIES

08:43AM 18   AND GENTLEMEN, TO REMIND THEM THAT THE COMMENTS OF COUNSEL ARE

08:43AM 19   NOT EVIDENCE, AND THAT THERE HAS BEEN NO LEGAL DEFENSE

08:43AM 20   PROFFERED REGARDING TRADE SECRETS?

08:43AM 21           MR. DOWNEY:  I CERTAINLY WOULD VIEW THAT AS CALLING

08:43AM 22   OUT ONE ISSUE FOR COMMENT.

08:43AM 23       I THINK THEY DON'T -- I THINK I HAVE NO ISSUE WITH THEM

08:43AM 24   BEING TOLD DURING INSTRUCTIONS THAT THERE IS NOT AN ISSUE FOR

08:43AM 25   THEM TO RESOLVE AS TO WHAT THE LAW OF TRADE SECRETS IS, THAT

08:44AM 1    EVIDENCE THAT HAS BEEN INTRODUCED ON THAT SUBJECT MERELY IS

08:44AM 2    EVIDENCE INTRODUCED RELEVANT TO THE DEFENDANT'S INTENT.

08:44AM 3         IT SEEMS TO ME THAT I DON'T KNOW THAT THAT IS NECESSARY,

08:44AM 4    BUT I DON'T KNOW WHAT -- I DON'T REALLY KNOW WHAT THE COURT

08:44AM 5    WOULD HOPE THE JURY TO RESOLVE AS A RESULT OF THAT INSTRUCTION

08:44AM 6    OTHER THAN COMPARING IT TO WHAT WAS SAID, WHICH I THINK DOES

08:44AM 7    HAVE THE DIFFICULTY OF RUNNING, POTENTIALLY OF RUNNING SOME

08:44AM 8    PREJUDICE TO THE DEFENDANT.

08:44AM 9              THE COURT:  WELL --

08:44AM 10             MR. DOWNEY:  AND I SAY THAT HYPOTHETICALLY,

08:44AM 11   YOUR HONOR.  I DON'T KNOW THAT THAT IS TRUE.  IT WOULD

08:44AM 12   OBVIOUSLY DEPEND ON THE CONTENT AND SO FORTH.

08:44AM 13             THE COURT:  SURE.  BUT LET ME FIRST SAY I'M NOT

08:44AM 14   TRYING TO INTERJECT MYSELF IN EITHER OF YOUR CASES HERE.

08:44AM 15             MR. DOWNEY:  YES.

08:44AM 16             THE COURT:  BUT, AGAIN, MY POSITION IS MAKING SURE

08:44AM 17   THE JURY IS FULLY INFORMED, THIS CROSSED MY MIND.  THERE WERE

08:44AM 18   TWO ISSUES, THE TRADE SECRETS.  YOU HAD ADVOCATED INITIALLY FOR

08:44AM 19   AN INSTRUCTION ON TRADE SECRETS.  WE HAD DISCUSSION.  I LOOKED

08:45AM 20   AT YOUR PROFFER AND YOUR PROFFER SUGGESTED THAT WE ASK THE JURY

08:45AM 21   TO DEFINE CALIFORNIA LAW.  YOU RECALL THAT.

08:45AM 22             MR. DOWNEY:  RIGHT, RIGHT.

08:45AM 23             THE COURT:  AND I SAID I DON'T THINK THAT'S FAIR.

08:45AM 24        AND YOUR TEAM WITHDREW THAT INSTRUCTION.

08:45AM 25             MR. DOWNEY:  THAT'S RIGHT.

08:45AM 1    I THINK YOUR HONOR WAS ALSO CONCERNED WHAT, WHAT RELEVANCE

08:45AM 2    DOES IT HAVE IF IT DOESN'T INFORM THE FACTS OF THE CASE

08:45AM 3    DIRECTLY.

08:45AM 4         THE COURT:  WELL, I'M CONCERNED ABOUT THAT, AND I'M

08:45AM 5    ALSO CONCERNED ABOUT SOMETHING BEING LEFT PREGNANT FOR THE JURY

08:45AM 6    FOR THEM TO DECIDE AN ISSUE BASED ON A LACK OF FULSOME

08:45AM 7    INSTRUCTION AS TO WHAT THEY SHOULD DO.

08:45AM 8         AGAIN, THE ADVICE OF COUNSEL ISSUE IS ONE OF CONCERN.  I

08:45AM 9    KNOW THE MIL ORDER SAID IT WAS PREMATURE.  THE GOVERNMENT ASKED

08:45AM 10   THAT I GRANT THEIR MOTION SAYING THAT THERE COULD BE NO ADVICE

08:45AM 11   OF COUNSEL DEFENSE.

08:45AM 12        I SAID, WELL, IT'S PREMATURE TO MAKE THAT DECISION NOW.

08:45AM 13   WE HAVEN'T STARTED THE EVIDENCE YET.

08:45AM 14        YOU KNOW WHAT THE FOUNDATIONS ARE BASED ON THE

08:45AM 15   NINTH CIRCUIT'S CASES, AND IF YOU DECIDE TO DO THAT, INTRODUCE

08:46AM 16   AN ADVICE OF COUNSEL DEFENSE, WHICH WOULD GO TO GOOD FAITH,

08:46AM 17   IT'S NOT AN ABSOLUTE DEFENSE, OF COURSE.  IT'S SOMETHING THAT

08:46AM 18   THE JURY CAN CONSIDER WHEN THEY CONSIDER INTENT.

08:46AM 19        YOU DIDN'T DO THAT IN YOUR CASE.  I DON'T RECALL THAT.

08:46AM 20        MR. DOWNEY:  NOR IS IT MY INTENT TO ASK FOR THAT

08:46AM 21   INSTRUCTION.

08:46AM 22        THE COURT:  RIGHT.  RIGHT.

08:46AM 23        BUT THERE'S A LITTLE BIT OF A -- ARE WE CLOSE TO THAT?

08:46AM 24   ARE WE IN THAT NEIGHBORHOOD NOW?  ARE WE IN THE NEIGHBORHOOD OF

08:46AM 25   TRADE SECRETS?  ARE WE IN THE NEIGHBORHOOD OF ADVICE OF COUNSEL

08:46AM 1    SUCH THAT WE NEED TO GIVE DIRECTION TO THE JURY?  THAT'S MY

08:46AM 2    CONCERN HERE.

08:46AM 3         LET ME CALL ON THE GOVERNMENT.  I DON'T KNOW IF THEY HAVE

08:46AM 4    A COMMENT.  MAYBE THEY'LL TELL ME I'M COUNTING TOO MANY ANGELS

08:46AM 5    ON PINHEADS.  I DON'T KNOW.

08:46AM 6              MR. LEACH:  CAN THE COURT HEAR ME?

08:46AM 7              THE COURT:  I PROBABLY COULD IF YOU SPEAK INTO THIS

08:46AM 8    ONE (INDICATING).

08:46AM 9              MR. LEACH:  I'M TOLD THIS MICROPHONE DOESN'T WORK

08:46AM 10   AND I NEED TO TURN THIS ON SOMEHOW.

08:46AM 11             MR. DOWNEY:  HERE.

08:46AM 12             MR. LEACH:  MR. DOWNEY HAS EXPERIENCE.

08:46AM 13             THE COURT:  HE'S GOT EXPERIENCE IN THIS.

08:46AM 14             MR. LEACH:  HOW ABOUT NOW?

08:47AM 15             THE COURT:  LOUD AND CLEAR.  THANK YOU.

08:47AM 16             MR. LEACH:  THANK YOU, YOUR HONOR.

08:47AM 17        I'LL ADDRESS THIS BECAUSE I WAS HANDLING THE JURY

08:47AM 18   INSTRUCTION ON THIS POINT.

08:47AM 19             THE COURT:  YES.

08:47AM 20             MR. LEACH:  OUR CONCERN WITH THE TRADE SECRET

08:47AM 21   INSTRUCTION AT THE TIME WAS, FIRST, IT WAS AN INCOMPLETE

08:47AM 22   STATEMENT OF THE LAW.  IT DIDN'T ADDRESS ASPECTS OF THE LAW

08:47AM 23   LIKE THE NOSAL CASE WHICH SAYS THAT YOU CAN PROTECT A TRADE

08:47AM 24   SECRET WITH A CONFIDENTIALITY AGREEMENT.

08:47AM 25        SO OUR OBJECTION WAS THAT IT WAS INCOMPLETE, AND IT ALSO

08:47AM  1    HIGHLIGHTED A PARTICULAR PIECE OF EVIDENCE IN WHAT WE THOUGHT

08:47AM  2    WAS A MISLEADING WAY.

08:47AM  3         OUR POSITION IS THAT THE DISCUSSION ABOUT TRADE SECRET IS

08:47AM  4    THE PRETEXT TO SIMPLY DISCLOSE INFORMATION THAT THEY --

08:47AM  5         (CELL PHONE RINGING.)

08:47AM  6              THE COURT:  DON'T LET HIM BACK IN.

08:47AM  7              MR. LEACH:  AT THE TIME THE ARGUMENT THAT WE CAN'T

08:47AM  8    DISCLOSE TO WALGREENS OR OTHERS WAS A PRETEXT, AND A CONVENIENT

08:47AM  9    REASON NOT TO DISCLOSE WHAT THEY DIDN'T WANT TO DISCLOSE.

08:47AM 10         AND THAT'S OUR ARGUMENT.  WE'RE GOING TO ARGUE THAT BASED

08:48AM 11    ON THE FACTS.

08:48AM 12         I DO THINK THAT THE COURT HAS TOUCHED ON AN ISSUE THAT

08:48AM 13    MIGHT BE APPROPRIATE IN TERMS OF ADVICE OF COUNSEL

08:48AM 14    DISASSOCIATED FROM NECESSARILY THE TRADE SECRET ISSUE.

08:48AM 15         THEY HAVEN'T PROFFERED AN ADVICE OF COUNSEL DEFENSE.

08:48AM 16    THERE ARE ELEMENTS FOR ESTABLISHING THE ADVICE OF COUNSEL

08:48AM 17    DEFENSE.

08:48AM 18         WHAT I HEARD FROM MR. DOWNEY RIGHT NOW IS THAT THEY'RE NOT

08:48AM 19    ASSERTING AN ADVICE OF COUNSEL DEFENSE.

08:48AM 20         SO I DO THINK IT MIGHT BE APPROPRIATE TO CRAFT SOMETHING

08:48AM 21    ALONG THE LINES OF WHAT YOUR HONOR WAS SUGGESTING,

08:48AM 22    DISASSOCIATED FROM THE TRADE SECRET ISSUE, BECAUSE I WORRY IF

08:48AM 23    THE COURT IS GOING TO WEIGH IN ON THAT TERM, IT, IT COULD BE

08:48AM 24    PUTTING A STAMP ON A FACTUAL ISSUE THAT I THINK COULD CUT

08:48AM 25    EITHER WAY FOR BOTH PARTIES.

08:48AM 1        THE COURT:  YES, I DON'T WANT TO DO THAT.  I DON'T

08:48AM 2   WANT TO INTERJECT MYSELF INTO YOUR CASES.

08:48AM 3        MR. DOWNEY:  AND LET ME SAY, I AGREE WITH THAT

08:48AM 4   CONCERN.

08:48AM 5      I THINK AT THIS POINT THE GOVERNMENT'S CASE-IN-CHIEF, JUST

08:48AM 6   TO BE PRACTICAL AND HAVE THIS DISCUSSION ALONG THE LINES THAT

08:48AM 7   MR. LEACH IS DISCUSSING, THEY RAISED THE SUGGESTION THAT A LOT

08:49AM 8   OF BEHAVIORS IN THE COMPANY WERE SECRETIVE AND CONCEALING AND

08:49AM 9   SO FORTH.

08:49AM 10      I'M CERTAINLY ENTITLED TO PRESENT AN UNDERSTANDING THAT

08:49AM 11  THE DEFENDANT HAD OF WHAT SHE UNDERSTOOD AS TO WHAT THE

08:49AM 12  REQUIREMENTS WERE AND SO FORTH WITHOUT REGARD TO ANY ADVICE OF

08:49AM 13  COUNSEL DEFENSE.

08:49AM 14      AND THE JURY HAS EVIDENCE IN FRONT OF IT WHERE IT CAN

08:49AM 15  EVALUATE WHETHER SHE ACTED CONSISTENT WITH THAT UNDERSTANDING

08:49AM 16  OR NOT.

08:49AM 17      I THINK TO INSTRUCT RUNS THE RISK THAT THERE IS, YOU

08:49AM 18  KNOW --

08:49AM 19        THE COURT:  WELL, WE'RE HERE IN THIS MORASS NOW

08:49AM 20  BECAUSE THAT'S WHERE THE EVIDENCE HAS TAKEN US.

08:49AM 21      LET ME GET BACK TO MR. LEACH.

08:49AM 22        MR. DOWNEY:  SORRY.

08:49AM 23        THE COURT:  NO, NO.

08:49AM 24        MR. LEACH:  THE GOVERNMENT WOULD BE FINE WITH SOME

08:49AM 25  FORM OF INSTRUCTION THAT MS. HOLMES IS NOT ASSERTING AN ADVICE

08:49AM 1    OF COUNSEL DEFENSE AND AN ADVICE OF COUNSEL DEFENSE REQUIRES --

08:49AM 2    I DON'T HAVE THE MODEL IN FRONT OF ME -- BUT THERE'S

08:49AM 3    ESSENTIALLY THREE ELEMENTS, A FULL DISCLOSURE OF THE FACTS OF

08:49AM 4    THE LAWYER FOLLOWING THE ADVICE AND NOT KNOWING SOME ADDITIONAL

08:50AM 5    INFORMATION.

08:50AM 6        I DON'T THINK THAT INSTRUCTING ON THE NUANCES OF TRADE

08:50AM 7    SECRET LAW WOULD AID THE JURY AT THIS POINT.  I THINK IT'S MORE

08:50AM 8    A FACTUAL MATTER.

08:50AM 9        BUT ADDING CLARITY THROUGH THE INSTRUCTIONS THAT THERE'S

08:50AM 10   NO ADVICE OF COUNSEL DEFENSE AT ISSUE I THINK COULD BE

08:50AM 11   BENEFICIAL.

08:50AM 12       (DISCUSSION OFF THE RECORD.)

08:50AM 13          THE COURT:  SO TODAY I WAS CURIOUS WHETHER WE HAD

08:50AM 14   THE CONVERSATION, I WANTED TO HAVE IT, I WAS CURIOUS,

08:50AM 15   MR. DOWNEY, WHETHER YOU WOULD SAY THERE HAS BEEN A FULSOME

08:50AM 16   MEETING OF THE NINTH CIRCUIT REQUIREMENTS IN THE CASE BECAUSE

08:50AM 17   BY THE FACT THAT ON DIRECT EXAMINATION MS. HOLMES INDICATED

08:50AM 18   THAT SHE SPOKE WITH COUNSEL, HOUSE COUNSEL.

08:50AM 19       YOU WOULD TELL ME THAT THAT ACTS AS A WAIVER OF THE

08:50AM 20   PRIVILEGE, WHICH IS ONE OF THE REQUIREMENTS, AND THAT SHE THEN

08:51AM 21   ACTED ON -- THERE MIGHT BE SOME FOUNDATIONAL REQUIREMENTS I

08:51AM 22   THINK THAT ARE MISSING FROM NINTH CIRCUIT CASE LAW ON WHAT THAT

08:51AM 23   IS.

08:51AM 24       I JUST AM CURIOUS WHETHER OR NOT THE JURY IS GOING TO

08:51AM 25   BE -- NOT HAVE ALL OF THE INFORMATION THAT THEY NEED.  I DON'T

08:51AM 1    WANT TO SAY MISLED, BUT I WILL SAY NOT HAVE ALL OF THE

08:51AM 2    INFORMATION THAT THEY NEED BASED ON THE ARGUMENT AND ON THE

08:51AM 3    STATE OF THE EVIDENCE.

08:51AM 4         MR. DOWNEY:  WELL, YOUR HONOR, I WOULD TAKE STRONG

08:51AM 5    EXCEPTION TO THAT.

08:51AM 6         I THINK WE HAD DISCUSSION OF WHETHER WE WOULD WANT TO

08:51AM 7    ASSERT AN ADVICE OF COUNSEL DEFENSE.  WE DON'T.

08:51AM 8         THE GOVERNMENT RAISED IN ITS CASE, WHICH IT'S PERFECTLY

08:51AM 9    ENTITLED TO DO, THE IMPLICATION THAT A LOT OF THE BEHAVIORS IN

08:51AM 10   THE COMPANY SUGGESTED CRIMINALITY BECAUSE THEY WERE SECRETIVE.

08:51AM 11        WE HAVE INTRODUCED EVIDENCE WHICH DEMONSTRATES THAT THE

08:51AM 12   UNDERSTOOD POLICIES OF THE COMPANY WERE WHAT THEY WERE IN

08:51AM 13   REGARD TO THOSE ISSUES, IN TERMS OF ACCESS AND DIGITAL THINGS,

08:52AM 14   ET CETERA.

08:52AM 15        I THINK THE SUGGESTION THAT WE IN ANY WAY MISLED THEM

08:52AM 16   IS -- HAS NO BASIS IN THE RECORD.

08:52AM 17        AND I APPRECIATE THE ISSUE THAT YOUR HONOR IS DISCUSSING,

08:52AM 18   BUT I WOULD TAKE STRONG EXCEPTION TO THE SENSE THAT THEY'VE

08:52AM 19   BEEN MISLED.

08:52AM 20        THE COURT:  WELL, I SAID I'M NOT USING THE WORD

08:52AM 21   "MISLED," BUT SOMETIMES BY SAYING IT, IT SUGGESTS SOMETHING,

08:52AM 22   DOESN'T IT?

08:52AM 23        AND THAT GOES FULL CIRCLE TO THE ARGUMENT HERE I THINK,

08:52AM 24   WHAT I DON'T WANT THE JURY TO HAVE.

08:52AM 25        I LOOKED AT THE TRANSCRIPT ON PAGE 9099 AT LINE 21,

08:52AM 1    "MS. HOLMES HAD RECEIVED GUIDANCE IN CONNECTION WITH THAT WHEN

08:52AM 2    SHE ASKED THAT A POLICY BE PREPARED FOR THE COMPANY."

08:52AM 3            MR. DOWNEY:  RIGHT.

08:52AM 4            THE COURT:  "AND THEN THE DRAFT POLICY WAS SENT TO

08:52AM 5    HER.  SHE GOT A BASIC OUTLINE OF WHAT THE COMPANY HAD TO DO TO

08:52AM 6    PREPARE TO PRESERVE ITS TRADE SECRETS."  THAT'S AT LINES 21

08:52AM 7    THROUGH 25.

08:52AM 8        AND ON PAGE 9100, YOU REFERENCED 15055, AND THEN YOU SAY

08:53AM 9    AT LINE 2, "HE WAS AN ATTORNEY AT THE COMPANY WHO WAS WORKING

08:53AM 10   ON THE POLICY AND REPORTED AS PART OF THE DRAFT," AND YOU SAY

08:53AM 11   IT'S A DRAFT, AND HE CHARACTERIZED WHY IS SOMETHING A TRADE

08:53AM 12   SECRET?

08:53AM 13           SO HIS DEFINITION OF THAT WAS INTERJECTED --

08:53AM 14           MR. DOWNEY:  RIGHT.

08:53AM 15           THE COURT:  -- AT LEAST ARGUED TO THE JURY.

08:53AM 16       AND THEN YOU TALK ABOUT THE MEMO DEFINING AGAIN TRADE

08:53AM 17   SECRETS.

08:53AM 18       I THINK LATER ON YOU SUGGEST THAT YOUR CLIENT RECEIVED IT,

08:53AM 19   MS. HOLMES RECEIVED IT, AND THAT THEN I SUPPOSE INFORMS THE --

08:53AM 20           MR. DOWNEY:  I THINK THAT'S REFLECTED ON THE

08:53AM 21   DOCUMENT, YES.

08:53AM 22           THE COURT:  RIGHT.  RIGHT.

08:53AM 23       SO THIS IS THE ISSUE THAT I WAS CONCERNED ABOUT.

08:53AM 24       BUT DO I NEED TO TELL THIS JURY WHAT ADVICE OF COUNSEL IS?

08:53AM 25   IF YOU'RE GOING TO ARGUE THAT SHE RELIED ON ADVICE OF COUNSEL,

08:54AM 1    SHE RELIED ON THE MEMO, IS THAT ADVICE OF COUNSEL?  AND IS THAT

08:54AM 2    SOMETHING THAT I NEED TO ADDRESS TO THE JURY AS TO WHETHER OR

08:54AM 3    NOT ADVICE OF COUNSEL HAS BEEN ACTUALLY MET HERE?

08:54AM 4         MR. DOWNEY:  I DON'T SEE A BASIS OR REASON TO DO

08:54AM 5    THAT.  I HAVEN'T REQUESTED IT.

08:54AM 6        I THINK THE DEFENSE GOES TO INTENT.

08:54AM 7        OBVIOUSLY THE COURT WILL GIVE AN INTENT INSTRUCTION IN ANY

08:54AM 8    EVENT, BUT I THINK IT'S AN UNNECESSARY INSTRUCTION IN THIS

08:54AM 9    CONTEXT.

08:54AM 10        THE COURT:  WELL, I'VE GIVEN YOUR TEAM, YOU KNOW,

08:54AM 11   YOUR REQUEST FOR GOOD FAITH OVER VEHEMENT --

08:54AM 12        MR. DOWNEY:  RIGHT.

08:54AM 13        THE COURT:  -- OBJECTIONS.

08:54AM 14        MR. DOWNEY:  APPROPRIATELY.

08:54AM 15        THE COURT:  YES.  AND I'VE GIVEN THE INSTRUCTIONS

08:54AM 16   YOU WANT ON WILLFULLY ALSO.

08:54AM 17        AND MR. LEACH WAS RED IN THE FACE WHEN HE WAS OBJECTING TO

08:54AM 18   BOTH OF THOSE.

08:54AM 19        MR. DOWNEY:  WE'LL KNOW BETTER IN THE FUTURE WHAT

08:54AM 20   THE LAW IS.

08:54AM 21        THE COURT:  HE'S GOT THOSE.

08:54AM 22        ANYWAY, MR. LEACH?

08:54AM 23        MR. LEACH:  I THINK AN INSTRUCTION THAT MS. HOLMES

08:55AM 24   IS NOT ASSERTING AN ADVICE OF COUNSEL DEFENSE, AND AN ADVICE OF

08:55AM 25   COUNSEL DEFENSE REQUIRES THE ELEMENTS SET FORTH IN THE MODEL

08:55AM 1    WOULD BE APPROPRIATE.

08:55AM 2        I DO THINK THE ARGUMENT COUNSEL MADE, IF NOT STATING, WAS

08:55AM 3    STRONGLY IMPLYING SHE RELIED ON THE ADVICE OF AN ATTORNEY.

08:55AM 4        I WOULD CAUTION AGAIN A REFERENCE TO TRADE SECRETS BECAUSE

08:55AM 5    IT MIGHT GIVE SOME VALIDITY TO THE DEFENSE THAT ANIMATED THE

08:55AM 6    GOVERNMENT'S CONCERN IN THE FIRST INSTANCE.

08:55AM 7        SO WE THINK AN INSTRUCTION THAT THAT IS NOT AN ISSUE IN

08:55AM 8    THE CASE MIGHT BE APPROPRIATE.

08:55AM 9            MR. DOWNEY:  YOUR HONOR, I THINK THE INSTRUCTIONS AS

08:55AM 10   WE HAVE THEM ARE FINE.  I THINK IF THEY'RE GOING TO BE ALTERED

08:55AM 11   IN ANY WAY, EITHER AROUND ADVICE OF COUNSEL OR TRADE SECRETS,

08:55AM 12   I'D WANT TO TALK TO MS. SAHARIA AND OTHERS ON OUR TEAM.

08:55AM 13           THE COURT:  SHE'S IN THE ROOM.

08:55AM 14           MR. DOWNEY:  BUT I THINK THAT -- I DON'T SEE THE

08:55AM 15   NEED FOR THEM WHEN WE'RE NOT ARGUING, AND I DON'T THINK IT'S

08:55AM 16   APPROPRIATE TO INFORM THE JURY OF DEFENSES WE'RE NOT ASSERTING.

08:56AM 17   THERE ARE MANY DEFENSES WE'RE NOT ASSERTING IN THIS CONTEXT.

08:56AM 18       AND I THINK TO SUGGEST A POLICY WHICH STATES WHAT THE

08:56AM 19   COMPANY'S POLICY IS AND INFORMS THE DEFENDANT'S INTENT

08:56AM 20   IMPLICATES THE ADVICE OF COUNSEL DEFENSE IS TO SUGGEST IT'S NOT

08:56AM 21   VALID FOR THE INTENT DEFENSE, WHICH I DON'T THINK THERE'S ANY

08:56AM 22   DISPUTE THAT IT IS.

08:56AM 23           THE COURT:  SO ARE YOU -- AM I HEARING YOU SAY,

08:56AM 24   "JUDGE, I'M GOING TO STAY AWAY, I'M NOT GOING TO SAY 'ADVICE OF

08:56AM 25   COUNSEL,' I'M NOT GOING TO SAY SHE RELIED ON HER ATTORNEY'S

08:56AM 1    ADVICE"?

08:56AM 2         MR. DOWNEY:  I WASN'T REALLY PLANNING TO RETURN TO

08:56AM 3    THAT SUBJECT.

08:56AM 4         THE COURT:  "I'M GOING TO AVOID THAT AND I'M NOT

08:56AM 5    GOING TO GO BACK TO THAT IN MY ARGUMENT.  MY ARGUMENT IS WELL

08:56AM 6    BEYOND THAT AND I HAVE OTHER THINGS TO TALK ABOUT IN THE TIME

08:56AM 7    REMAINING."

08:56AM 8         MR. DOWNEY:  YES.

08:56AM 9         THE COURT:  AND I WOULD EXPECT THAT AND I WOULD

08:56AM 10   OTHERWISE ENCOURAGE, IF THEY WISH, THE GOVERNMENT IN THEIR

08:56AM 11   REBUTTAL TO SPEAK TO THIS ISSUE IF THEY WISH AND TO SUGGEST

08:56AM 12   THAT THERE'S A DEFICIT IN THE EVIDENCE AS TO ADVICE OF COUNSEL

08:56AM 13   AND THEY MAY NOT CONSIDER IT AND IT'S ARGUMENT, AND IT'S NOT

08:57AM 14   EVIDENCE, BUT IT'S ARGUMENT, AND THAT WOULD SUFFICE TO INFORM

08:57AM 15   THE JURY AS TO ANY CONCERNS THAT THEY MIGHT HAVE ABOUT WHETHER

08:57AM 16   OR NOT THEY SHOULD RELY ON AN ADVICE OF COUNSEL?

08:57AM 17        MR. DOWNEY:  WELL, I DON'T HAVE ANY BURDEN WITH

08:57AM 18   REGARD TO THE INTENT DEFENSE, SO SOME OF THAT ARGUMENTATION I

08:57AM 19   WOULD THINK IS IMPROPER.

08:57AM 20        AND I DON'T THINK IT'S PROPER TO GIVE AN ADVICE OF COUNSEL

08:57AM 21   DEFENSE SO THE REFERENCE OF DEFICIT OF EVIDENCE ON THE PART OF

08:57AM 22   THE DEFENDANT, WHO HAS NO BURDEN, I THINK WOULD BE

08:57AM 23   INAPPROPRIATE.

08:57AM 24        I THINK -- THEY'RE CERTAINLY ENTITLED TO COMMENT ON THE

08:57AM 25   EVIDENCE IN THE RECORD AS TO WHETHER, YOU KNOW, I DON'T KNOW

08:57AM 1   WHAT, AS TO WHETHER OTHER EVIDENCE IN THE RECORD INFORMS HER

08:57AM 2   KNOWLEDGE OR INTENT WITH RESPECT TO THE ISSUE THAT I RAISED.

08:57AM 3       THE TRUTH IS THAT THEY RAISED THIS ISSUE AS TO SOME OF

08:57AM 4   THESE BEHAVIORS FIRST AND WE SIMPLY WERE REBUTTING IT IN THE

08:57AM 5   COURSE OF THE DEFENSE CASE.

08:57AM 6       I DON'T THINK THAT THAT ENTITLES -- IF THEY WANTED TO

08:57AM 7   DEMONSTRATE AS PART OF THEIR BURDEN OF PROOF THAT IT WAS NOT

08:58AM 8   TRADE SECRET, OR A TRADE SECRET CONCERN THAT ANIMATED THAT

08:58AM 9   ACTIVITY, THEY SHOULD HAVE PROVEN IT IN THEIR CASE, OR IN THEIR

08:58AM 10  REBUTTAL CASE FOR THAT MATTER.

08:58AM 11      THE COURT:  SO MY QUESTION WAS, SHOULD WE JUST RELY

08:58AM 12  ON THE GOVERNMENT TO -- THEY KNOW WHAT THIS ISSUE IS, AND IF

08:58AM 13  THEY WANT TO TALK ABOUT IT, THEY CAN ADDRESS IT IN THEIR

08:58AM 14  REBUTTAL.

08:58AM 15      MR. DOWNEY:  THEY'VE ADDUCED PLENTY OF EVIDENCE AND

08:58AM 16  THEY CAN ADDRESS IT WITH THAT EVIDENCE.

08:58AM 17      MR. LEACH:  IT CERTAINLY IS AN ISSUE THAT WE INTEND

08:58AM 18  TO ADDRESS ON REBUTTAL, YOUR HONOR, AND I CONTINUE TO ASSERT

08:58AM 19  THAT SOME FORM OF ADVICE OF COUNSEL IS NOT AN ISSUE IN THIS

08:58AM 20  CASE WOULD BE APPROPRIATE.

08:58AM 21      BUT WE'RE PREPARED TO ARGUE IT AS WELL.

08:58AM 22      THE COURT:  OKAY.  WELL, THANK YOU.

08:58AM 23      I RAISED THIS ISSUE, AS I SAID, BECAUSE I GET TO, I

08:58AM 24  SUPPOSE, BUT THERE ARE ISSUES THAT CAME UP AS I LISTENED

08:58AM 25  YESTERDAY AFTERNOON AND I HAD CONCERN THAT IT MIGHT CREATE AN

08:58AM  1    ISSUE IN THE TRIAL SUCH THAT I WANTED TO ADDRESS IT BEFORE,

08:59AM  2    BEFORE THE CLOSE OF YOUR ARGUMENTS.

08:59AM  3         I, I THINK YOU ALL KNOW AND YOU'RE PROBABLY IN AGREEMENT

08:59AM  4    THAT IT'S REALLY DISADVANTAGEOUS TO THE JURY, TO ALL OF US, TO

08:59AM  5    TRY TO CREATE AN INSTRUCTION AT LITERALLY THE ELEVENTH HOUR.

08:59AM  6         AND THE INSTRUCTIONS THAT WE HAVE MET THREE DAYS ON THEM,

08:59AM  7    EXCHANGED EMAILS ON THEM, THEY'RE A SET PACKAGE NOW, THEY'RE

08:59AM  8    NUMBERED, THEY'RE PAGINATED.  I THINK WE HAVE COPIES FOR THE

08:59AM  9    JURY.

08:59AM  10        I EXPECT THAT I'M GOING TO INSTRUCT ABOUT 2:00 O'CLOCK

08:59AM  11   THIS AFTERNOON IS WHAT I'M GUESSING.  IT'S JUST DISRUPTIVE TO

08:59AM  12   INTERRUPT THAT PROCESS.

08:59AM  13        BUT I WANTED TO MAKE SURE, AND I RAISE MY CONCERNS HERE

08:59AM  14   BECAUSE THEY'RE SERIOUS CONCERNS.

08:59AM  15        I WAS CONCERNED, MR. DOWNEY, A LITTLE BIT ABOUT, ARE YOU

08:59AM  16   GOING TOO FAR HERE?  ARE YOU ARGUING ADVICE OF COUNSEL WITHOUT

08:59AM  17   REALLY SAYING IT?  IS IT -- ARE YOU PLANTING THE SEED WITHOUT

08:59AM  18   SAYING SOMETHING?

09:00AM  19        AND I JUST LOOK AT THAT AND I WAS A LITTLE CONCERNED ABOUT

09:00AM  20   THE EQUITIES OF DOING THAT AND INVOLVING THAT IN FRONT OF THE

09:00AM  21   JURY.

09:00AM  22        THAT'S WHY I RAISED THIS.

09:00AM  23             MR. DOWNEY:  WELL, I DON'T HAVE ACCESS, YOUR HONOR,

09:00AM  24   TO THE EXTENT -- I DON'T HAVE ACCESS TO ANY INFORMATION ABOUT

09:00AM  25   THIS SUBJECT THAT THE GOVERNMENT DOESN'T.

9132

09:00AM 1    SO I DON'T SEE THAT IT IS SOME INEQUITY, BUT I TAKE

09:00AM 2  YOUR HONOR'S GENERAL POINT, BUT I DON'T SEE IT AS AN INEQUITY

09:00AM 3  IN THE CASE.

09:00AM 4        THE COURT:  WELL, IT'S NOT SO MUCH THE CASE.

09:00AM 5    I THINK IT'S THE ARGUMENT TO THE JURY.

09:00AM 6    LET ME BE FRANK.  DOES IT STATE TOO MUCH THAT'S NOT THERE?

09:00AM 7  THAT WAS MY CONCERN.  ARE WE TALKING --

09:00AM 8        MR. DOWNEY:  AND MY ONLY POINT, YOUR HONOR, WAS THAT

09:00AM 9  IF, IF THE -- I DON'T HAVE DIFFERENT EVIDENCE THAT SUGGESTS

09:00AM 10 WHAT THE DEFENDANT'S STATE OF MIND WAS ON THESE ISSUES THAT I'M

09:00AM 11 AWARE OF THAT WOULD DISPROVE THE ASSERTIONS THAT I MADE, SO I'M

09:01AM 12 NOT SITTING HERE PREVENTING THE DISCOVERY OF ANY INFORMATION

09:01AM 13 THAT IS, THAT IS CONTRARY TO WHAT I ARGUED, WHICH I THINK IS

09:01AM 14 THE SPIRIT IN SOME WAYS OF, OF CERTAIN REQUIREMENTS AROUND

09:01AM 15 ADVICE OF COUNSEL.

09:01AM 16    THAT'S MY ONLY POINT.

09:01AM 17        THE COURT:  WELL, THAT WAS MY POINT.  THAT'S WHAT

09:01AM 18 CAUSED MY CONCERN.

09:01AM 19        MR. DOWNEY:  YES.

09:01AM 20        THE COURT:  WE'RE DANCING AROUND IT.

09:01AM 21        MR. DOWNEY:  YEAH.

09:01AM 22        THE COURT:  WE KNOW THE MUSIC, AND IT SEEMS LIKE

09:01AM 23 YOU'RE DANCING, AND HOW CLOSE ARE YOU GETTING TO THE LINE?  ARE

09:01AM 24 YOU WITHIN THE MARGINS OR OUTSIDE OF THE MARGINS?

09:01AM 25        MR. DOWNEY:  NO.  I THINK THE DOCUMENTS THAT I KNOW

9133

| 09:01AM | 1 | ABOUT FROM THIS WERE PRODUCED BY THE GOVERNMENT AS FAR AS I |
| 09:01AM | 2 | KNOW. |
| 09:01AM | 3 | THE COURT:  NO, NO, NO, NO.  I UNDERSTAND. |
| 09:01AM | 4 | WE'RE TALKING ABOUT TWO DIFFERENT THINGS HERE, THOUGH. |
| 09:01AM | 5 | WE'RE TALKING ABOUT THE EVIDENCE HERE AND NOW WE'RE TALKING |
| 09:01AM | 6 | ABOUT WHAT IS OUR DESCRIPTION OF THE EVIDENCE FOR THE JURY'S |
| 09:01AM | 7 | BEHALF. |
| 09:01AM | 8 | MR. DOWNEY:  RIGHT. |
| 09:01AM | 9 | THE COURT:  AND THOSE ARE TWO -- I UNDERSTAND.  YOU |
| 09:01AM | 10 | KNOW, IT'S AN ADVERSARY POSITION.  YOU HAVE DIFFERENT OPINIONS |
| 09:01AM | 11 | ABOUT WHAT THE EVIDENCE IS. |
| 09:01AM | 12 | MR. DOWNEY:  YEAH. |
| 09:01AM | 13 | THE COURT:  BUT I'M NOT SAYING THAT YOU HAVE GREATER |
| 09:01AM | 14 | EVIDENCE THAN THEY DO OR THEY THAN YOU. |
| 09:01AM | 15 | I'M SAYING THE COMMENT, THE FAIR COMMENT ABOUT THE |
| 09:02AM | 16 | EVIDENCE FOR THE JURY'S INFORMATION IS WHAT I'M CONCERNED |
| 09:02AM | 17 | ABOUT. |
| 09:02AM | 18 | MR. DOWNEY:  YES.  UNDERSTOOD. |
| 09:02AM | 19 | THE COURT:  ABOUT WHETHER OR NOT IT'S APPROPRIATE |
| 09:02AM | 20 | TO -- WHETHER I HAVE TO TAKE ANY MEASURE. |
| 09:02AM | 21 | MR. DOWNEY:  YES. |
| 09:02AM | 22 | THE COURT:  THAT'S MY CONCERN NOW. |
| 09:02AM | 23 | BUT YOU'VE TOLD ME THAT YOU'VE MOVED WELL ON FROM ANY |
| 09:02AM | 24 | ADVICE OF COUNSEL. |
| 09:02AM | 25 | MR. DOWNEY:  I WON'T BE BACK TO THAT SUBJECT.  I |

9134

09:02AM 1       WON'T MENTION THE ISSUE.

09:02AM 2           BUT I WILL SAY, IN MY OWN REVIEW OF YESTERDAY'S

09:02AM 3       TRANSCRIPT, I DID REVIEW ON ONE ISSUE WHICH I WILL CORRECT, BUT

09:02AM 4       I'LL LET THE COURT AWAIT THAT RATHER THAN --

09:02AM 5               THE COURT:  OKAY.

09:02AM 6               MR. DOWNEY:  -- THERE WAS ONE ISSUE THAT I DID WANT

09:02AM 7       TO ADDRESS AND CORRECT BECAUSE I THINK I MISSPOKE ON AN ISSUE

09:02AM 8       AND IT COULD BE IMPORTANT AND I WANT TO CORRECT IT.

09:02AM 9               THE COURT:  ALL RIGHT.  THANK YOU.

09:02AM 10          ANYTHING FURTHER?

09:02AM 11              MR. LEACH:  NO, YOUR HONOR.  THANK YOU FOR RAISING

09:02AM 12      IT.

09:02AM 13              THE COURT:  THANK YOU FOR THE CONVERSATION THIS

09:02AM 14      MORNING.  AS I'VE SAID, I'VE TOLD YOU MY CONCERNS AND MY

09:02AM 15      OBSERVATIONS.  THAT'S WHY WE'RE MEETING OUTSIDE OF THE PRESENCE

09:02AM 16      OF THE JURY.  I WANTED YOUR INPUT --

09:02AM 17              MR. DOWNEY:  I APPRECIATE IT.

09:02AM 18              THE COURT:  -- TO INFORM ME ABOUT WHAT MY THOUGHTS

09:02AM 19      ARE.

09:02AM 20          SO LET'S GO BACK TO TIMING.

09:02AM 21              MR. DOWNEY:  YES.

09:02AM 22              THE COURT:  WE'LL BRING OUR JURY IN IN ABOUT TWO

09:03AM 23      MINUTES HERE.

09:03AM 24          YOU THINK YOU'LL PROBABLY, MR. DOWNEY, WRAP UP BY THE

09:03AM 25      FIRST BREAK.

09:03AM   1          MR. DOWNEY:  I WOULD THINK SO, YOUR HONOR, YEAH.

09:03AM   2          THE COURT:  AND OUR FIRST BREAK IS AT 11:30 AGAIN?

09:03AM   3          MR. DOWNEY:  YEAH.  IF I'M DONE BEFORE THEN, YOU MAY

09:03AM   4   DECIDE TO TAKE IT EARLIER.  WE'LL SEE.

09:03AM   5          THE COURT:  ALL RIGHT.  AND THEN WILL THE GOVERNMENT

09:03AM   6   HAVE ANY REBUTTAL?  YOU KNOW, MAYBE I'M BEING PRESUMPTUOUS.

09:03AM   7          MR. LEACH:  I'LL RELY ON MY COLLEAGUE, MR. BOSTIC,

09:03AM   8   BUT I ANTICIPATE HE HAS REBUTTAL SOMEWHERE IN THE NEIGHBORHOOD

09:03AM   9   OF AN HOUR TO AN HOUR AND A HALF.

09:03AM  10          THE COURT:  OKAY.  FAIR ENOUGH.  ALL RIGHT.

09:03AM  11          MR. DOWNEY:  I'LL JUST TAKE A MINUTE AFTER

09:03AM  12   YOUR HONOR STEPS DOWN TO GET MIKED UP AND THEN WE'LL BE READY.

09:03AM  13          THE COURT:  SHOW HIM HOW TO DO THAT.

09:03AM  14          MR. DOWNEY:  YES.

09:03AM  15       (DISCUSSION OFF THE RECORD.)

09:03AM  16          THE CLERK:  COURT IS IN RECESS.

09:03AM  17       (RECESS FROM 9:03 A.M. UNTIL 9:14 A.M.)

09:14AM  18       (JURY IN AT 9:14 A.M.)

09:14AM  19          THE COURT:  WE'RE BACK ON THE RECORD.  COUNSEL IS

09:14AM  20   PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

09:14AM  21       GOOD MORNING, LADIES AND GENTLEMEN.

09:14AM  22       BEFORE I ASK MR. DOWNEY TO CONTINUE WITH HIS ARGUMENTS,

09:14AM  23   LET ME ASK YOU, DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO

09:14AM  24   DISCUSS, READ, LEARN, LISTEN TO, OR IN ANY WAY COME ACROSS ANY

09:15AM  25   INFORMATION ABOUT THIS CASE?  IF SO, PLEASE RAISE YOUR HAND.

09:15AM  1          I SEE NO HANDS.

09:15AM  2          THANK YOU VERY MUCH.

09:15AM  3          MR. DOWNEY, WOULD YOU LIKE TO CONTINUE WITH YOUR ARGUMENT?

09:15AM  4              MR. DOWNEY:  THANK YOU, YOUR HONOR.

09:15AM  5          **(MR. DOWNEY RESUMED HIS CLOSING ARGUMENT ON BEHALF OF**

09:15AM  6   **MS. HOLMES.)**

09:15AM  7              MR. DOWNEY:  GOOD MORNING, LADIES AND GENTLEMEN.

09:15AM  8          I WANT TO PICK UP WHERE I LEFT OFF AND I WANT TO GO

09:15AM  9   THROUGH WITH YOU SOME OF THE PARTICULAR COUNTS THAT ARE IN THE

09:15AM  10  INDICTMENT AND THAT MS. HOLMES IS CHARGED WITH.

09:15AM  11         BEFORE I DO THAT, I WANT TO CLARIFY ONE THING THAT I SAID

09:15AM  12  TO YOU YESTERDAY WITH REGARD TO THE STANDARDS OF PROOF THAT YOU

09:15AM  13  SHOULD CONSIDER AS YOU RETURN TO DELIBERATE.

09:15AM  14         IF YOU REMEMBER YESTERDAY, I USED THIS ILLUSTRATION WITH

09:15AM  15  YOU OF THE STEPS THAT YOU SHOULD GO UP TO TRY TO MAKE A

09:16AM  16  DETERMINATION OF WHETHER A CRIME HAS BEEN PROVEN BEYOND A

09:16AM  17  REASONABLE DOUBT, AND I WANT TO MAKE SURE THAT I'M CLEAR AS TO

09:16AM  18  THE DIFFERENCE BETWEEN THE CLEAR AND CONVINCING STANDARD AND

09:16AM  19  THE HIGHER STANDARD, WHICH IS THE BEYOND A REASONABLE DOUBT

09:16AM  20  STANDARD.

09:16AM  21         LET ME SHOW YOU A SLIDE IN CONNECTION WITH THAT.  THE

09:16AM  22  CLEAR AND CONVINCING STANDARD REQUIRES A "FIRM BELIEF OR

09:16AM  23  CONVICTION THAT IT IS HIGHLY PROBABLE THAT FACTUAL CONTENTIONS

09:16AM  24  ARE TRUE."  A FIRM BELIEF THAT IT IS HIGHLY PROBABLE.

09:16AM  25         BEYOND A REASONABLE DOUBT MEANS THAT YOU ARE "FIRMLY

09:16AM 1   CONVINCED" THAT THE DEFENDANT IS GUILTY.  THOSE ARE THE

09:16AM 2   DIFFERENT STANDARDS.

09:16AM 3       SO IF THE DEFENDANT IN YOUR MIND IS IN A PLACE WHERE SHE

09:16AM 4   IS -- YOU HAVE A FIRM BELIEF THAT IT IS HIGHLY PROBABLE THAT

09:16AM 5   THE CONTENTIONS THAT THE GOVERNMENT MAKES HERE ARE TRUE, THAT

09:17AM 6   DOES NOT MEET THE BEYOND A REASONABLE DOUBT STANDARD, AND YOU

09:17AM 7   SEE THERE THE BEYOND A REASONABLE DOUBT STANDARD.

09:17AM 8       SO WITH THAT IN MIND, LET'S LOOK AT SOME OF THE PARTICULAR

09:17AM 9   COUNTS THAT ARE IN THE INDICTMENT AND SOME OF THE PARTICULAR

09:17AM 10  INVESTORS.

09:17AM 11      LET ME TALK ABOUT SOMETHING THAT THE GOVERNMENT REALLY

09:17AM 12  DIDN'T TALK ABOUT YESTERDAY, WHICH IS WHEN MS. HOLMES ENTERED

09:17AM 13  CONVERSATIONS WITH INVESTORS, WHAT WAS SHE THINKING ABOUT?

09:17AM 14  WHAT TYPES OF INVESTORS DID SHE WANT TO HAVE INVEST IN THE

09:17AM 15  COMPANY AND WHAT DID SHE THEREFORE FOCUS ON AS PART OF HER

09:17AM 16  CONVERSATIONS WITH THEM?

09:17AM 17      WELL, AS YOU REMEMBER, SHE TESTIFIED DURING THE COURSE OF

09:17AM 18  HER DIRECT EXAMINATION THAT SHE WAS LOOKING FOR PEOPLE WHO WERE

09:17AM 19  LONG-TERM INVESTORS, AND SO SHE WAS TALKING ABOUT WHAT THE

09:17AM 20  COMPANY WOULD LOOK LIKE IN FIVE OR TEN YEARS, OR A YEAR, NOT

09:18AM 21  REPORTING, AS ANOTHER COMPANY MIGHT, ON THE PRESENT PERFORMANCE

09:18AM 22  OF THE COMPANY.

09:18AM 23      THAT'S IMPORTANT, LADIES AND GENTLEMEN, BECAUSE IT REALLY

09:18AM 24  REFLECTS A FUNDAMENTAL DISCONNECT BETWEEN THE GOVERNMENT'S

09:18AM 25  UNDERSTANDING OF THE FACTS AND OUR UNDERSTANDING OF THE FACTS.

09:18AM  1      IN THE GOVERNMENT'S VIEW, THE CASE IS REALLY ABOUT WHAT

09:18AM  2   THE TEST MENU WAS IN THE CLIA LABORATORY DURING THIS PHASE I

09:18AM  3   PERIOD, WHICH MS. HOLMES TOLD YOU SHE BELIEVED WOULD BE A BRIEF

09:18AM  4   PERIOD.

09:18AM  5      THAT WAS AN OLD DEVICE THAT WAS BEING USED FOR A PERIOD IN

09:18AM  6   THAT LAB.  IT WAS NOT THE PRIMARY MODE OF ANALYSIS FOR

09:18AM  7   FINGERSTICK TESTS.  THE MODIFIED MACHINES WERE.

09:18AM  8      BUT THE GOVERNMENT MAKES MUCH OF THE FACT THAT THIS WAS A

09:18AM  9   LIMITED DEVICE.  THAT'S, IN ESSENCE, THE THEORY OF THEIR CASE.

09:18AM 10      IF YOU GO BACK AND READ THE MATERIALS THAT MS. HOLMES

09:18AM 11   SHARED WITH INVESTORS AND YOU RECONSIDER WHAT SHE SAID TO

09:19AM 12   INVESTORS, YOU'LL SEE THAT SHE WAS TALKING ABOUT THE SERIES 4

09:19AM 13   DEVICE, THE SERIES 4 BEING THE DEVICE THAT SHE HAD FOCUSSED ON

09:19AM 14   IN CONNECTION WITH HER EFFORTS TO GET APPROVAL FROM THE FDA.

09:19AM 15      AND SHE WAS TALKING ABOUT PHASE II, FOR THE MOST PART, OF

09:19AM 16   THERANOS'S OPERATIONS.

09:19AM 17      THAT'S THE DISCONNECT.  SHE WAS NOT CONCEALING THE NUMBER

09:19AM 18   OF TESTS THAT WERE DONE ON THE PARTICULAR METHOD OF THE 3.5

09:19AM 19   DEVICE IN THE LAB.  SHE WAS NOT EVEN DISCLOSING THE MODIFIED

09:19AM 20   DEVICES FOR REASONS THAT WE DISCUSSED YESTERDAY.

09:19AM 21      SO THAT IS REALLY THE FUNDAMENTAL DISCONNECT THAT I THINK

09:19AM 22   EXISTS IN THE CASE AS TO HOW THE EVIDENCE IS PRESENTED.

09:19AM 23      AND WHEN YOU GO BACK, YOU HAVE TO ASK YOURSELF, HAS THE

09:19AM 24   GOVERNMENT PROVEN BEYOND A REASONABLE DOUBT THAT MS. HOLMES WAS

09:19AM 25   REALLY ATTEMPTING TO DECEIVE PEOPLE IN THE WAY THAT SHE TALKED

09:19AM  1    ABOUT THERANOS'S TECHNOLOGY BY NOT ACKNOWLEDGING THE 3 DEVICE

09:19AM  2    AT THAT TIME.

09:19AM  3         LET ME TALK NOW GENERALLY ABOUT THE PEOPLE WHO INVESTED IN

09:20AM  4    THERANOS.

09:20AM  5         AS YOU KNOW, YOU HEARD FROM SIX PEOPLE WHO HAD SOME

09:20AM  6    INVOLVEMENT WITH AN INVESTMENT IN THERANOS.  FOUR WERE ACTUALLY

09:20AM  7    INVESTORS, AND TWO WERE PEOPLE WHO WERE IN SOME WAY AFFILIATED

09:20AM  8    WITH INVESTORS:  MR. TOLBERT AND MS. PETERSON.

09:20AM  9         THERE WERE ACTUALLY MANY PEOPLE WHO INVESTED IN THERANOS

09:20AM 10    OVER TIME.  BY THE END OF THE TIME THAT THERANOS WAS AN

09:20AM 11    OPERATING COMPANY, THERE HAD BEEN ABOUT 275 PEOPLE OR ENTITIES

09:20AM 12    THAT INVESTED IN THERANOS.

09:20AM 13         NOW, PEOPLE LOST MONEY.  I DON'T MINCE WORDS ABOUT THAT.

09:20AM 14    MS. HOLMES CERTAINLY DID NOT INTEND FOR PEOPLE TO LOSE MONEY.

09:20AM 15    THAT'S A BAD EVENT AND A FAILURE ON HER PART.

09:20AM 16         IT SHOULD NOT BE SOMETHING THAT YOU HEAR AS US EXCUSING

09:20AM 17    ANYTHING IN HER BEHAVIOR WITH REGARD TO THAT ISSUE.

09:20AM 18         BUT THAT'S NOT THE ISSUE THAT WE'RE CONCERNED WITH IN THIS

09:21AM 19    TRIAL.

09:21AM 20         THE ISSUE WE'RE CONCERNED WITH IS, DID SHE INTENTIONALLY

09:21AM 21    MAKE MISREPRESENTATIONS TO PEOPLE FOR THE PURPOSE OF INDUCING

09:21AM 22    THEM TO INVEST IN HER COMPANY?

09:21AM 23         AND AS WE REVIEW THE EVIDENCE, I THINK THE EVIDENCE IS

09:21AM 24    FAIRLY CLEAR THAT SHE DID NOT, MUCH LESS SATISFY YOU BEYOND A

09:21AM 25    REASONABLE DOUBT, THAT SHE WAS ENGAGED IN THAT TYPE OF

09:21AM  1      DECEPTION THAT THE GOVERNMENT CLAIMS.

09:21AM  2           SO LET'S LOOK AT THE PEOPLE THAT WE HEARD FROM IN

09:21AM  3      CONNECTION WITH THE CASE.

09:21AM  4           AS YOU RECALL, THERE WERE TWO INVESTMENTS, C1 INVESTORS:

09:21AM  5      MR. EISENMAN, MR. TOLBERT, AND MR. LUCAS; AND THE C2 INVESTORS

09:21AM  6      THAT INVESTED IN 2014:  MR. GROSSMAN, MR. MOSLEY, AND

09:21AM  7      MS. PETERSON.

09:21AM  8           LET ME -- I'LL TALK ABOUT EACH OF THEM AND TALK ABOUT EACH

09:21AM  9      OF THEIR INVESTMENTS IN A MOMENT, BUT I WANT TO REVIEW WITH YOU

09:21AM  10     SOME THINGS THAT THEY ALL HAD IN COMMON.

09:22AM  11          FIRST, AND I THINK MOST IMPORTANTLY, ALL OF THE

09:22AM  12     RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS WERE NOT

09:22AM  13     GOVERNED BY THE DISCUSSIONS THAT THE GOVERNMENT FOCUSES ON OR

09:22AM  14     NEWSPAPER ARTICLES.

09:22AM  15          THE RELATIONSHIPS BETWEEN THESE INVESTORS AND THERANOS

09:22AM  16     WERE GOVERNED BY A CONTRACT, THE STOCK PURCHASE AGREEMENT THAT

09:22AM  17     YOU SAW AS PART OF OUR CROSS-EXAMINATIONS OF EACH OF THE

09:22AM  18     INVESTOR WITNESSES.

09:22AM  19          AND THE STOCK PURCHASE AGREEMENT HAD A LOT OF PROVISIONS

09:22AM  20     THAT ARE RELEVANT TO THE CASE THAT THE GOVERNMENT PRESENTS

09:22AM  21     HERE.

09:22AM  22          WHAT WERE THOSE?

09:22AM  23          WELL, FIRST OF ALL, AS THE WITNESSES TESTIFIED, THIS IS

09:22AM  24     NOT LIKE AN INVESTMENT THAT WOULD BE MADE IN A STOCK IN A

09:22AM  25     PUBLIC COMPANY WHERE THE PUBLIC COMPANY IS ROUTINELY DISCLOSING

09:22AM   1      INFORMATION ABOUT ITS OPERATIONS.

09:22AM   2           THIS IS AN INVESTMENT IN A PRIVATE COMPANY WHERE THE

09:23AM   3      INFORMATION THAT IS PROVIDED IS LIMITED.  IT MAY BE

09:23AM   4      EPISODICALLY PROVIDED.  THERE MAY BE INFORMATION THAT THE

09:23AM   5      COMPANY KNOWS THAT IS NOT KNOWN TO THE INVESTORS IN THE

09:23AM   6      COMPANY.

09:23AM   7           SO WHAT DOES A COMPANY IN THAT CIRCUMSTANCE RELY ON TO

09:23AM   8      MAKE SURE THAT THE INVESTORS ARE CAPABLE OF MAKING THE

09:23AM   9      INVESTMENT?

09:23AM   10          WELL, THEY TELL THE INVESTORS THAT AND THEY SAY, WE WANT

09:23AM   11     YOU TO REPRESENT TO US THAT YOU ARE A SOPHISTICATED ENOUGH

09:23AM   12     INVESTOR AND YOU HAVE ENOUGH EXPERIENCE INVESTING IN THIS AREA

09:23AM   13     THAT YOU'RE CAPABLE OF EVALUATING THESE RISKS.

09:23AM   14          AND THERE WERE INVESTORS LIKE THAT IN CONNECTION WITH

09:23AM   15     THIS.  YOU SAW MR. LUCAS TESTIFY.  HE WAS NOT ONLY AN

09:23AM   16     EXPERIENCED TECHNOLOGY INVESTOR, BUT HE HAD INVESTED

09:23AM   17     SPECIFICALLY IN BIO MEDICAL DEVICES.

09:23AM   18          MANY OF THE INVESTOR WITNESSES WERE PEOPLE WHO WERE

09:23AM   19     PROFESSIONAL INVESTMENT ADVISORS, NOT THEMSELVES INVESTORS AT

09:23AM   20     ALL.

09:23AM   21          SEVERAL OF THE INVESTORS TESTIFIED TO CONCLUSIONS THAT

09:23AM   22     THEY DREW FROM MS. HOLMES'S TESTIMONY ABOUT THE STATE OF THE

09:24AM   23     TECHNOLOGY, HOW DEVELOPED IT WAS, WHAT CERTAIN EVENTS MEANT FOR

09:24AM   24     WHAT HAD BEEN PROVEN WITH REGARD TO THE TECHNOLOGY, AS IF THIS

09:24AM   25     CONTRACT DID NOT CONTAIN THE FOLLOWING PROVISION, WHICH IS

PROVISION 4.4, SPECULATIVE NATURE OF THE INVESTMENT.

IN EVERY STOCK PURCHASE AGREEMENT, THE INVESTORS WERE TOLD, THIS IS A COMPANY THAT HAS A VERY LIMITED AND FINANCIAL, OPERATING AND FINANCIAL HISTORY.  THAT WAS OBVIOUS TO THE INVESTORS ANYWAY.  THERANOS WAS BECOMING INVOLVED IN A RETAIL BUSINESS THAT WAS BRAND NEW.

AT THE TIME THE C1 INVESTORS MADE THEIR INVESTMENT, THERANOS HAD ONLY BEEN OPERATING IN THE RETAIL SECTOR FOR ONLY ABOUT A MONTH, AND LESS THAN A YEAR WHEN ALL OF THE INVESTORS INVESTED.  SO THEY KNEW THIS WAS A NEW VENTURE AND THEY KNEW IT WAS SPECULATIVE AND THEY KNEW IT INVOLVED SUBSTANTIAL RISK.

THEY ALSO DISCLAIMED ANY REPRESENTATIONS THAT THERANOS WAS MAKING AS THE BASIS FOR THEIR INVESTMENT.

IF YOU SEE SECTION 4.5, THE INVESTORS ACKNOWLEDGE THAT THEY UNDERSTOOD THAT THE INFORMATION INVESTED -- PROVIDED BY THE COMPANY WAS NOT INTENDED TO DESCRIBE EVERYTHING ABOUT THE COMPANY.  IT WAS DESCRIBING CERTAIN ASPECTS ABOUT WHAT THE COMPANY WAS DOING.

AND WHEN THEY TESTIFIED, YOU'LL RECALL THAT THE INVESTORS ACKNOWLEDGED THAT THEY KNEW THIS.

MR. GROSSMAN, WHO WAS ONE OF THE MORE RECENT INVESTORS TO TESTIFY, HE WAS ASKED, DID YOU KNOW THAT THERE WERE ASPECTS OF THEIR OPERATIONS THAT THEY WERE NOT DISCLOSING TO YOU?

AND HE SAID, YES, THEY TOLD ME THAT AND I KNEW THAT, IN ADDITION TO IT BEING A PROVISION OF THE CONTRACT.

09:25AM   1            THEY ALSO SPECIFICALLY, SPECIFICALLY WERE TOLD, WE ARE

09:26AM   2   TELLING YOU WHAT WE THINK AS THERANOS ABOUT THE BUSINESS, HOW

09:26AM   3   IT WILL PERFORM IN THE FUTURE, WHAT WE THINK WE WILL EARN, WHAT

09:26AM   4   BUSINESS LINES WE THINK WE WILL HAVE.  AND WE'RE TELLING THAT

09:26AM   5   TO YOU TO INFORM YOU.

09:26AM   6            BUT YOU SHOULD UNDERSTAND THAT BECAUSE WE'RE A NEW COMPANY

09:26AM   7   AND A SPECULATIVE COMPANY, BUSINESS PLANS MAY CHANGE.

09:26AM   8            AND THAT'S IN SECTION 4.5 OF EVERY STOCK PURCHASE

09:26AM   9   AGREEMENT WHERE EACH INVESTOR SAYS, I KNOW THAT THOSE BUSINESS

09:26AM  10   PLANS ARE SPECULATIVE, I KNOW THAT PROJECTIONS THAT YOU PROVIDE

09:26AM  11   ME MAY NOT MATERIALIZE, AND THAT WHAT I AM BEING TOLD AS TO

09:26AM  12   WHAT YOU PROJECT MAY ACTUALLY BE SIGNIFICANTLY DIFFERENT FROM

09:26AM  13   THE RESULTS THAT YOU'RE ACTUALLY ABLE TO GENERATE.

09:26AM  14            SO WHEN WE LOOK AT SOME OF THE ISSUES WITH SPECIFIC

09:26AM  15   INVESTORS AROUND FINANCIAL PROJECTIONS THEY RECEIVED AND

09:26AM  16   BUSINESSES THAT THERANOS THOUGHT IT WOULD BE ABLE TO DEVELOP,

09:26AM  17   BEAR THAT IN MIND.  THAT'S THE CONTRACT UNDER WHICH EVERY

09:27AM  18   INVESTOR MAKES THEIR INVESTMENT.

09:27AM  19            NOW, LET ME TALK ABOUT EACH INVESTOR INDIVIDUALLY JUST FOR

09:27AM  20   A FEW MOMENTS WITH EACH.

09:27AM  21            FIRST, YOU'LL RECALL THAT MR. EISENMAN, WHO TESTIFIED

09:27AM  22   ABOUT HIS INVESTMENT AS PART OF THE C1 ROUND OF INVESTMENTS.

09:27AM  23   MR. EISENMAN IS SOMEONE WHO HAS BEEN INVOLVED IN THE FINANCIAL

09:27AM  24   INDUSTRY AND MAKING INVESTMENTS ON BEHALF OF HIMSELF AND OTHERS

09:27AM  25   FOR ESSENTIALLY HIS WHOLE PROFESSIONAL CAREER, 35 YEARS OR SO.

09:27AM  1    HE WAS NOT ONLY INVOLVED IN ADVISING OTHERS, BUT HE WAS

09:27AM  2    SIGNIFICANTLY INVOLVED IN HIS WIFE'S FAMILY'S PRIVATE OFFICE

09:27AM  3    WHERE THEY MADE INVESTMENTS IN CONNECTION WITH PRIVATE

09:27AM  4    COMPANIES, MADE INVESTMENTS WITH COMPANIES LIKE THERANOS ALL OF

09:27AM  5    THE TIME, AND HE ACKNOWLEDGED THAT WHEN HE TESTIFIED.

09:27AM  6        HE ALSO ACKNOWLEDGED THAT HE WAS FAMILIAR WITH SPECULATIVE

09:27AM  7    INVESTMENTS AND THE RISKS THAT THEY BORE, AND FOR THAT REASON

09:27AM  8    HE SAID HE WOULD NEVER ADVISE ONE OF HIS OWN CLIENTS TO INVEST

09:28AM  9    IN A PRIVATE COMPANY LIKE THERANOS BECAUSE HE THOUGHT THE RISK

09:28AM 10    FOR THEM WOULD BE TOO HIGH.

09:28AM 11        SO IN MAKING THE INVESTMENT, HE UNDERSTOOD THE NATURE OF

09:28AM 12    THE COMPANY THAT THIS WAS.

09:28AM 13        NOW, WHAT DID HE TESTIFY ABOUT AND WHAT DID THE EVIDENCE

09:28AM 14    SHOW ABOUT HIS INVESTMENT IN THERANOS?

09:28AM 15        ALTHOUGH HE TESTIFIED ON DIRECT EXAMINATION FOR QUITE A

09:28AM 16    WHILE, THE EVIDENCE IS ACTUALLY FAIRLY CLEAR ABOUT HIS CONTACT

09:28AM 17    WITH MS. HOLMES IN CONNECTION WITH EACH INVESTMENT THAT HE

09:28AM 18    MADE.

09:28AM 19        YOU RECALL THAT HE INVESTED IN 2006, WHICH IS BEFORE THE

09:28AM 20    CONSPIRACY PERIOD, AND THEN HE INVESTED AGAIN IN 2013.  LET'S

09:28AM 21    LOOK AT EACH OF THOSE INDIVIDUAL INVESTMENTS.

09:28AM 22        IN CONNECTION WITH HIS 2006 INVESTMENT, AND YOU MAY RECALL

09:28AM 23    THIS EXCHANGE, HE INVESTED ON OCTOBER 13TH, 2006.  HE TESTIFIED

09:28AM 24    ABOUT A NUMBER OF CONVERSATIONS THAT HE RECALLED HAVING WITH

09:28AM 25    MS. HOLMES.

09:28AM 1          BUT, IN FACT, THE DOCUMENTS FROM THE TIME REFLECTED THAT

09:29AM 2    HE HAD ONLY SPOKEN TO HER ONCE.  HE HAD SPOKEN TO HER FOR ABOUT

09:29AM 3    FIVE MINUTES, AND THAT THE FOCUS OF THE CALL WAS A CHAT, AND

09:29AM 4    THAT HIS IMPRESSIONS WERE THAT SHE WAS A TERRIFIC PERSON, AND

09:29AM 5    THEY OBVIOUSLY CHATTED ABOUT THE FACT THAT THEY HAD A COMMON

09:29AM 6    BACKGROUND.

09:29AM 7          NOT MUCH WAS REFLECTED IN THE CONTEMPORANEOUS RECORD AS TO

09:29AM 8    WHAT HE WAS TOLD IN CONNECTION WITH HIS 2006 INVESTMENT BY

09:29AM 9    MS. HOLMES.

09:29AM 10         THEN THE INVESTMENT THAT IS THE SUBJECT OF OUR CHARGE HERE

09:29AM 11   IS THE INVESTMENT THAT HE MADE IN LATE DECEMBER OF 2013.  AND

09:29AM 12   MR. EISENMAN DID NOT SPEAK TO MS. HOLMES AT ALL IN CONNECTION

09:29AM 13   WITH THAT INVESTMENT.  HE TESTIFIED HE HAD NO CONTACT WITH HER

09:29AM 14   IN CONNECTION WITH THAT INVESTMENT.

09:29AM 15         AND, IN FACT, I THINK THE RECORD SHOWED HE HAD NOT HAD

09:29AM 16   CONTACT WITH HER PERSONALLY FOR A NUMBER OF YEARS BEFORE THAT

09:29AM 17   INVESTMENT.

09:29AM 18         HE ALSO TOLD YOU THAT HE HAD TALKED TO MS. HOLMES OVER A

09:30AM 19   NUMBER OF YEARS BETWEEN 2006 AND 2010, BUT THAT WHEN HE MADE

09:30AM 20   HIS INVESTMENT DECISION IN 2013, NONE OF THAT WAS RELEVANT TO

09:30AM 21   THE DECISION HE WAS MAKING.  HE TESTIFIED HE WAS RELYING ON THE

09:30AM 22   CURRENT INFORMATION THAT HE HAD.

09:30AM 23         SO MS. HOLMES AND ANY PERSONAL CONTACT BETWEEN HER AND

09:30AM 24   MR. EISENMAN WERE NOT PARTICULARLY RELEVANT TO HIS DECISION TO

09:30AM 25   INVEST.

| | | |
|---|---|---|
| 09:30AM | 1 | NOW, WHAT WAS -- WHY WAS HE INVESTING?  WHAT CONTACT DID |
| 09:30AM | 2 | HE HAVE? |
| 09:30AM | 3 | WELL, YOU'LL REMEMBER THAT HE HAD CONTACT WITH MR. BALWANI |
| 09:30AM | 4 | IN CONNECTION WITH MAKING HIS INVESTMENT IN 2013, AND HE |
| 09:30AM | 5 | TESTIFIED THAT THOSE INTERACTIONS WERE PLEASANT AND THAT |
| 09:30AM | 6 | MR. BALWANI WAS SOLICITOUS OF HIM AND MR. BALWANI HAD BEEN VERY |
| 09:30AM | 7 | UNFRIENDLY WITH HIM IN CONNECTION WITH OTHER DEALINGS THAT THEY |
| 09:30AM | 8 | HAD, AND I THINK THE RECORD WAS CERTAINLY CONSISTENT WITH THE |
| 09:31AM | 9 | FACT THAT MR. BALWANI HAD BEEN UNFRIENDLY WITH HIM IN |
| 09:31AM | 10 | CONNECTION WITH THEIR OTHER INTERACTIONS. |
| 09:31AM | 11 | BUT WHAT DOES THE RECORD OF WHAT HAPPENED AT THE TIME SHOW |
| 09:31AM | 12 | AS TO WHAT HAPPENED BETWEEN MR. BALWANI AND MR. EISENMAN? |
| 09:31AM | 13 | WELL, WE KNOW THAT MR. EISENMAN ASKED FOR INFORMATION FROM |
| 09:31AM | 14 | MR. BALWANI IN CONNECTION WITH HIS INVESTMENT, AND THAT IS HERE |
| 09:31AM | 15 | IN EXHIBIT 1371. |
| 09:31AM | 16 | AND THESE WERE HIS QUESTIONS: |
| 09:31AM | 17 | WHAT IS THE SIZE OF THIS ROUND? |
| 09:31AM | 18 | ARE DIRECTORS PARTICIPATING IN THIS ROUND? |
| 09:31AM | 19 | IN OTHER WORDS, WHILE I'M INVESTING, IS THE OTHER BOARD OF |
| 09:31AM | 20 | DIRECTORS INVESTING AT THE SAME TIME? |
| 09:31AM | 21 | AND AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF |
| 09:31AM | 22 | $200 MILLION IN JANUARY AT A HIGHER PRICE? |
| 09:31AM | 23 | WAS MR. BALWANI'S RESPONSE FRIENDLY AS MR. EISENMAN |
| 09:31AM | 24 | DESCRIBED? |
| 09:31AM | 25 | IT WAS NOT.  HE SAID, "WE CAN'T ANSWER YOUR QUESTIONS |

09:32AM   1      ABOUT DIRECTORS, OTHER INVESTORS, AND CERTAINLY NOT ABOUT ANY

09:32AM   2      FUTURE INVESTMENT ROUNDS AND SPECULATE ABOUT WHAT THOSE

09:32AM   3      VALUATIONS MAY BE."

09:32AM   4          NOW, THAT'S SIGNIFICANT IN PART BECAUSE IT SHOWS THAT

09:32AM   5      REALLY VERY FEW REPRESENTATIONS WERE MADE TO MR. EISENMAN IN

09:32AM   6      CONNECTION WITH HIS DECISION TO INVEST.

09:32AM   7          BUT MORE SIGNIFICANTLY, IT REALLY SUGGESTS TO YOU WHAT

09:32AM   8      MATTERED TO MR. EISENMAN IN CONNECTION WITH MAKING INVESTMENT

09:32AM   9      DECISIONS.

09:32AM  10          CONTRARY TO WHAT THE GOVERNMENT TRIED TO ELICIT FROM HIS

09:32AM  11      TESTIMONY NOW, WHAT MATTERED TO MR. EISENMAN, WHICH IS

09:32AM  12      PERFECTLY FAIR, IS, IS WHAT WERE OTHER SOPHISTICATED INVESTORS

09:32AM  13      DOING WITH RESPECT TO THIS ROUND OF INVESTMENT?

09:32AM  14          WERE DIRECTORS ALSO INVESTING?

09:32AM  15          WERE THERE OTHERS WHO WERE INTERESTED IN THE INVESTMENT

09:32AM  16      WHO WOULD INVEST AT A HIGHER PRICE SOON?

09:32AM  17          NOW, THE ANSWER TO THOSE QUESTIONS WERE KNOWN TO

09:33AM  18      MR. BALWANI, AND IT MIGHT HAVE BEEN FAVORABLE FOR HIM TO TELL

09:33AM  19      MR. EISENMAN.

09:33AM  20          WE KNOW THAT AFTER THE FIRST OF THE YEAR THERE WAS AN

09:33AM  21      ADDITIONAL ROUND, AND THAT WAS AT A HIGHER PRICE.

09:33AM  22          BUT HE DIDN'T PROVIDE THAT INFORMATION TO MR. EISENMAN

09:33AM  23      BECAUSE HE DIDN'T THINK IT WAS AN APPROPRIATE REQUEST ON

09:33AM  24      MR. EISENMAN'S PART, AND HE DIDN'T THINK THAT HE SHOULD PROVIDE

09:33AM  25      IT SIMPLY TO MR. EISENMAN AND NOT TO OTHER INVESTORS.

09:33AM 1      WHAT DOES THIS SHOW YOU?  IT SHOWS YOU THAT ALL OF THE

09:33AM 2   REPRESENTATIONS THAT THE GOVERNMENT HAS FOCUSSED ON WERE NOT ON

09:33AM 3   MR. EISENMAN'S MIND AT THE TIME.  HE WASN'T INTERESTED IN THE

09:33AM 4   TECHNOLOGY.  HE WASN'T INTERESTED IN THE RELATIONSHIP BETWEEN

09:33AM 5   THERANOS AND THE DEPARTMENT OF DEFENSE, HE WASN'T INTERESTED IN

09:33AM 6   THERANOS'S PHARMACEUTICAL COMPANY.

09:33AM 7      HE WAS INTERESTED IN KNOWING ABOUT THE FINANCIAL DETAILS

09:33AM 8   OF WHAT WAS HAPPENING AT THERANOS SO THAT HE COULD EVALUATE

09:33AM 9   WHETHER THIS IS A STOCK THAT HE COULD BUY AND POTENTIALLY

09:33AM 10  QUICKLY SELL.

09:33AM 11     THAT'S PERFECTLY FINE.  THAT'S A PERFECTLY FINE DECISION

09:34AM 12  AND A PERFECTLY FINE JUDGMENT ON HIS PART.

09:34AM 13     BUT IT DOESN'T RELATE TO WHAT IS CLAIMED BY THE GOVERNMENT

09:34AM 14  HERE, THAT HE WAS DEFRAUDED IN CONNECTION WITH REPRESENTATIONS

09:34AM 15  ON A NUMBER OF ISSUES THAT HE SHOWED NO INTEREST IN AT THE

09:34AM 16  TIME.

09:34AM 17     WHAT IS THE REAL GIST OF MR. EISENMAN'S CLAIM, AS WELL AS

09:34AM 18  THE ACCOUNT INVOLVING MR. EISENMAN, AS WELL AS MANY OF THE

09:34AM 19  OTHER INVESTORS?

09:34AM 20     WELL, IT'S REALLY THE EVIDENCE THAT I WENT OVER YESTERDAY.

09:34AM 21  HE SAYS HE READ "THE WALL STREET JOURNAL" ARTICLE, HE SAYS HE

09:34AM 22  LOOKED AT THE WEBSITE AND HE DREW CERTAIN INFORMATION FROM THAT

09:34AM 23  ABOUT WHERE THERANOS WAS.

09:34AM 24     AS I SHOWED YOU YESTERDAY, MANY OF THE THINGS THAT HE AND

09:34AM 25  OTHERS CLAIMED THAT THEY DIDN'T KNOW WAS KNOWN PUBLICLY.

09:34AM   1          MR. PARLOFF HAD BEEN TOLD, FOR EXAMPLE, ABOUT PHASE I AND

09:34AM   2     PHASE II AFTER MR. EISENMAN'S INVESTMENT, WHICH WAS THE SUBJECT

09:34AM   3     OF HIS QUESTION TO MR. BALWANI.

09:34AM   4          IT WAS PUBLICLY KNOWN THAT THERE WAS VENOUS TESTING, ET

09:34AM   5     CETERA, ET CETERA.

09:34AM   6          ALL OF THE ISSUES THAT WERE FREQUENTLY REHEARSED THROUGH

09:35AM   7     MEDIA ARTICLES WITH THE INVESTORS, THERE WAS OTHER INFORMATION

09:35AM   8     OUT THERE THAT WOULD HAVE PROVIDED MR. EISENMAN WITH WHAT HE

09:35AM   9     CLAIMED HE DIDN'T KNOW.

09:35AM  10          LET'S LOOK AT THE NEXT INVESTOR, MR. LUCAS.

09:35AM  11          MR. LUCAS WAS ALSO A PROFESSIONAL INVESTOR.  HE WAS A

09:35AM  12     VENTURE CAPITALIST WHO INVESTED FULL TIME IN TECHNOLOGY.

09:35AM  13          HE OPERATED HIS OWN VENTURE CAPITAL FIRM, BLACK DIAMOND

09:35AM  14     VENTURES, AND HE INVESTED IN TECHNOLOGY AND IN MEDICAL DEVICE

09:35AM  15     COMPANIES.

09:35AM  16          AND HE KNEW A LOT ABOUT THERANOS BECAUSE HE HAD BEEN

09:35AM  17     INVOLVED WITH THERANOS FOR A NUMBER OF YEARS, AND HIS UNCLE WAS

09:35AM  18     THE CHAIRMAN OF THE BOARD OF THERANOS.

09:35AM  19          BUT UNLIKE THE OTHER INVESTORS, LIKE MR. EISENMAN, FOR

09:35AM  20     EXAMPLE, HE WAS INTERESTED IN THERANOS'S TECHNOLOGY, AND HE DID

09:35AM  21     ASK QUESTIONS THAT WERE SPECIFIC TO THERANOS'S TECHNOLOGY.

09:36AM  22          AND WHAT DOES THE RECORD REFLECT?

09:36AM  23          WELL, THE RECORD REFLECTS WHEN HE ASKED THOSE QUESTIONS,

09:36AM  24     HE GOT ACCURATE ANSWERS THAT MATCH WHAT YOU KNOW ABOUT WHAT WAS

09:36AM  25     GOING ON AT THERANOS.

09:36AM  1        FIRST OF ALL, YEARS BEFORE HE MADE THIS 2013 INVESTMENT

09:36AM  2   THAT IS THE SUBJECT OF THE COUNT IN THE INDICTMENT, IT WAS

09:36AM  3   EXPLAINED TO HIM THAT THERE WOULD BE VARIOUS SERIES OF DEVICES

09:36AM  4   ON WHICH BLOOD TESTS WOULD BE RUN THAT THERANOS WAS INVENTING,

09:36AM  5   THAT THOSE WOULD GROW GRADUALLY MORE AND MORE SOPHISTICATED,

09:36AM  6   BUT THAT THIS WAS A PROCESS THAT WAS GOING TO DEVELOP OVER

09:36AM  7   TIME.

09:36AM  8        HE CERTAINLY WAS A SOPHISTICATED TECHNOLOGY INVESTOR.  HE

09:36AM  9   KNEW THAT.

09:36AM  10       HE ALSO TESTIFIED THAT HE KNEW ACCURATELY WHAT THE

09:36AM  11  GOVERNMENT CLAIMS NO ONE KNEW, WHICH IS HE WAS ASKED, DID YOU

09:36AM  12  KNOW HOW MANY FINGERSTICK SAMPLES THERANOS HAD ACTUALLY

09:36AM  13  DEVELOPED ASSAYS WITH?

09:36AM  14       AND HE SAID -- HIS ESTIMATE WAS THAT IT WAS DOZENS, AND AT

09:37AM  15  LEAST IT WOULD HAVE BEEN DOZENS OF TESTS BECAUSE IT COULD DO

09:37AM  16  THE MAJORITY OF THE MOST COMMON TESTS OUT THERE.

09:37AM  17       WELL, YOU KNEW WHAT THE DIALOGUE WAS INSIDE OF THERANOS

09:37AM  18  BECAUSE OF THE EVIDENCE THAT YOU HAVE SEEN.  THEY TRIED TO

09:37AM  19  FIGURE OUT, WHAT ARE THE 43 OR THE 60 OR THE 70 TESTS THAT

09:37AM  20  WOULD ALLOW US TO DO THE MOST COMMON BLOOD TESTS?  THAT'S WHAT

09:37AM  21  THEY DID, AND THAT'S WHAT THEY OFFERED OUT OF THEIR CLIA LAB,

09:37AM  22  AND THOSE DEVICES -- AND THOSE WERE ANALYZED EITHER ON THE

09:37AM  23  MODIFIED MACHINES OR ON THE DEVICES.

09:37AM  24       MR. LUCAS WAS CLEARLY TOLD, THAT'S THE AMOUNT OF

09:37AM  25  FINGERSTICK SAMPLES THAT WE HAVE.

09:37AM   1        SO FOR INVESTORS WHO EVIDENCED AN INTEREST IN THE

09:37AM   2   TECHNOLOGY, THEY GOT ACCURATE INFORMATION.

09:37AM   3        AND THAT WAS TRUE OF MR. LUCAS AND IT REFLECTS, I THINK,

09:37AM   4   WHAT THE INTENT OF MS. HOLMES AND OTHERS WAS WITH RESPECT TO

09:37AM   5   INTERACTING WITH INVESTORS ON THESE ISSUES.

09:37AM   6        I THINK MR. LUCAS ALSO TESTIFIED ABOUT OTHER ELEMENTS OF

09:37AM   7   THERANOS THAT WERE IMPORTANT TO HIM, AND ONE OF THEM I THINK IS

09:38AM   8   QUITE IMPORTANT.

09:38AM   9        AND HE TESTIFIED I THINK PARTICULARLY POINTEDLY ABOUT IT.

09:38AM  10   WHEN INVESTORS WERE INVESTING, THIS WAS NOT A QUESTION OF THE

09:38AM  11   PRESENT TEST MENU OR A QUESTION OF THE PRESENT CAPACITY ON THE

09:38AM  12   NUMBER OF FINGERSTICK SAMPLES.  THEY WERE LOOKING AT WHAT IS --

09:38AM  13   WHERE IS MS. HOLMES TAKING THIS COMPANY?  IS THIS SOMETHING

09:38AM  14   WORTH INVESTING IN?

09:38AM  15        AND I THINK MR. LUCAS DESCRIBED THAT TO YOU IN SOME

09:38AM  16   DETAIL.

09:38AM  17        HE DESCRIBE MS. HOLMES'S PASSION, THAT HER INTEREST WAS

09:38AM  18   NOT IN MAKING MONEY, AND THAT SHE HAD A MISSION TO BRING THIS

09:38AM  19   TECHNOLOGY TO THE WORLD, AND THAT WAS ATTRACTIVE TO HIM.  HE

09:38AM  20   WANTED TO BE PART OF THAT INVESTMENT BECAUSE HE BELIEVED IT

09:38AM  21   WOULD SUCCEED, AND IF IT SUCCEEDED, IT WOULD NOT ONLY BE A

09:38AM  22   PROFITABLE VENTURE, BUT A VENTURE WORTH INVESTING IN.

09:38AM  23        LET ME ALSO MENTION ONE OTHER THING WITH MR. LUCAS, AND I

09:38AM  24   WON'T SAY THIS WITH RESPECT TO EVERY INVESTOR, BUT I THINK IT'S

09:39AM  25   TRUE ACROSS THEM.

09:39AM    1           WHEN INVESTORS WERE INVESTING IN 2013 OR 2014, WHY DID

09:39AM    2   THEY INVEST?

09:39AM    3           THE PRINCIPAL REASON THEY INVESTED WAS NOT ABOUT ANY

09:39AM    4   PARTICULAR TECHNOLOGY OR ANY PARTICULAR NUMBER OF FINGERSTICK

09:39AM    5   TESTS.

09:39AM    6           THE REASON THAT THEY INVESTED WAS THEY KNEW THAT WALGREENS

09:39AM    7   HAD AGREED TO PUT THERANOS'S TECHNOLOGY IN THEIR STORES

09:39AM    8   EVENTUALLY AND TO OPERATE THERANOS SERVICE CENTERS.

09:39AM    9           THAT JUDGMENT WAS ALL THEY NEEDED TO KNOW BECAUSE THAT

09:39AM   10   MEANT TWO THINGS TO THEM.  ONE, IT MEANT THAT A BIG NATIONAL

09:39AM   11   COMPANY HAD EVALUATED THERANOS AND MADE A DECISION TO BECOME A

09:39AM   12   PARTNER WITH THERANOS IN BRINGING ITS TECHNOLOGY TO THE PUBLIC

09:39AM   13   MARKET.

09:39AM   14           THAT'S A BIG DEAL.  THAT'S A MUCH BIGGER DEAL THAN THE

09:39AM   15   NUMBER OF PARTICULAR TESTS AT ANY GIVEN MOMENT.  IT'S A

09:39AM   16   STATEMENT THAT THIS TECHNOLOGY COMPANY IS GOING TO BE ABLE TO

09:39AM   17   MAKE ITS TECHNOLOGY WIDELY AVAILABLE.

09:40AM   18           SECOND, WHAT DID THEY ASSUME, WHICH WAS AN ACCURATE

09:40AM   19   ASSUMPTION?  THEY ASSUMED THAT A COMPANY LIKE WALGREENS WOULD

09:40AM   20   HAVE LOOKED AT THERANOS AND ITS TECHNOLOGY IN GREAT DETAIL.

09:40AM   21           AND YOU KNOW THAT'S TRUE.  YOU KNOW THAT THERE WAS A LOT

09:40AM   22   OF TECHNICAL DUE DILIGENCE THROUGH THE JOHNS HOPKINS STUDY, THE

09:40AM   23   JOHNS HOPKINS DUE DILIGENCE AND THE OTHER LAB CONSULTANTS THAT

09:40AM   24   WALGREENS WORKED WITH AS PART OF ITS EVALUATION OF THERANOS.

09:40AM   25           THAT'S WHAT WAS REALLY DRIVING THESE INVESTMENTS.  AND

09:40AM 1    MR. LUCAS DURING HIS TESTIMONY ACKNOWLEDGED THAT.

09:40AM 2        WHAT DID IT MEAN FINANCIALLY FOR THEM THAT THERE WAS THIS

09:40AM 3    WALGREENS PARTNERSHIP?

09:40AM 4        WELL, THAT WAS TALKED ABOUT WITH RESPECT TO WHAT THE

09:40AM 5    PRICING WAS OF THEIR SHARES AND HOW MUCH THEY RECOGNIZED IT AS

09:40AM 6    OF THE TIME THAT THEY WERE BEING OFFERED THE OPPORTUNITY TO

09:40AM 7    INVEST AT $15.

09:40AM 8        REMEMBER THAT MR. LUCAS, MR. EISENMAN, AND MR. TOLBERT, OR

09:40AM 9    MR. HALL WHO MR. TOLBERT WORKED FOR, THEY WERE ALL INDIVIDUALS

09:41AM 10   WHO EITHER DIRECTLY OR INDIRECTLY HAD INVESTED IN THERANOS

09:41AM 11   YEARS BEFORE THESE 2013 INVESTMENTS.

09:41AM 12       AND BY THE TIME THEY WERE BEING OFFERED THIS SECOND

09:41AM 13   OPPORTUNITY TO INVEST, THEY KNEW THAT WALGREENS, OR SOME

09:41AM 14   STRATEGIC PARTNER OF THERANOS, WAS NOW WILLING TO INVEST AT $15

09:41AM 15   A SHARE, WHICH WAS ACTUALLY $75 A SHARE BECAUSE IT WAS A SPLIT

09:41AM 16   SHARE.

09:41AM 17       THEY HAD INVESTED AT NUMBERS LIKE 2.82 A SHARE, AND IN

09:41AM 18   MR. LUCAS'S CASE, $0.92 A SHARE.

09:41AM 19       SO THEY ASSUMED, AT THE TIME THAT THEY WERE MAKING THIS

09:41AM 20   INVESTMENT DECISION, THAT THEY HAD ALREADY -- THEY ASSUMED

09:41AM 21   ACCURATELY THAT THEY HAD ALREADY REALIZED A SUBSTANTIAL RETURN

09:41AM 22   ON THEIR INVESTMENT WITH THERANOS.

09:41AM 23       THIS WAS REALLY A DECISION AS TO WHETHER THEY WANTED TO

09:41AM 24   INVEST AS WELL AT THIS INCREASED PRICE.  THAT'S HOW THEY WERE

09:41AM 25   EVALUATING THIS.

09:41AM 1      THEY ALSO KNEW, AS YOU SAW, ALTHOUGH NOT TOLD BY

09:42AM 2   MR. BALWANI OR MS. HOLMES, THEY SUSPECTED THAT THERE WOULD BE

09:42AM 3   ANOTHER OFFERING IN THE NEW YEAR AND THE PRICE WOULD BE HIGHER.

09:42AM 4   THAT WAS, IN FACT, TRUE.  THE C2 ROUND WAS OFFERED AT $17 A

09:42AM 5   SHARE.

09:42AM 6      SO THEY WERE LOOKING AT AN OPPORTUNITY TO INVEST AT $15 A

09:42AM 7   SHARE, RECOGNIZING THAT THE PRICE OF THERANOS STOCK WAS LIKELY

09:42AM 8   TO GO TO $17 A SHARE, WHICH, IN FACT, NEW OFFERINGS WERE HELD

09:42AM 9   AT THAT PRICE.

09:42AM 10      AND THAT'S THE WAY THAT THEY WERE VIEWING THIS INVESTMENT.

09:42AM 11      THEY VIEWED THAT AS POSSIBLE BECAUSE OF THE WALGREENS

09:42AM 12   PARTNERSHIP, WHICH WAS ALSO ACCURATE.

09:42AM 13      THE ARGUMENT THAT THEY WERE REALLY LOOKING OR MAKING AN

09:42AM 14   INVESTMENT IN THERANOS BECAUSE THEY WERE RELYING ON WHAT WAS

09:42AM 15   SAID IN A NEWSPAPER ARTICLE WHEN, IN FACT, WE KNOW WHAT THE

09:42AM 16   RECORD REFLECTS THEY WERE LOOKING AT, WHICH IS THE EFFECT OF

09:42AM 17   OTHER INVESTMENTS, THE EFFECT OF FUTURE INVESTMENTS, THE EFFECT

09:42AM 18   OF THE WALGREENS PARTNERSHIP DOESN'T SUGGEST WHAT WAS, IN FACT,

09:43AM 19   MATERIAL TO THEM.

09:43AM 20      LET'S LOOK NOW AT MR. TOLBERT.

09:43AM 21      MR. TOLBERT WAS NOT HIMSELF AN INVESTOR.  AND MR. TOLBERT

09:43AM 22   WORKS FOR A GENTLEMAN NAMED CRAIG HALL, WHO IS A TEXAS REAL

09:43AM 23   ESTATE INVESTOR, AND MR. HALL DID NOT TESTIFY OR EXPLAIN THE

09:43AM 24   REASONS HIMSELF AS TO WHY HE WAS SUPPORTIVE OF MAKING AN

09:43AM 25   INVESTMENT IN THERANOS.

09:43AM   1          IN 2006 THEY HAD INVESTED WITH MR. LUCAS, NOT DIRECTLY IN

09:43AM   2   THERANOS, BUT THEY HAD INVESTED THROUGH MR. LUCAS IN THERANOS.

09:43AM   3          I THINK IT'S FAIR TO SAY THAT BECAUSE THEIR ORIGINAL

09:43AM   4   INVESTMENT WAS THROUGH MR. LUCAS, IT WOULD HAVE BEEN REASONABLE

09:43AM   5   FOR THERANOS GENERALLY, AND FOR MS. HOLMES IN PARTICULAR, TO

09:44AM   6   ASSUME THAT INFORMATION THAT WAS BEING PASSED TO MR. LUCAS

09:44AM   7   WOULD BE PASSED ON TO MR. TOLBERT AND ULTIMATELY ON TO

09:44AM   8   MR. HALL.

09:44AM   9          BUT WHEN YOU HEARD THE EVIDENCE, IF YOU COMPARE WHAT

09:44AM   10  MR. LUCAS KNEW ABOUT THERANOS, THINGS LIKE THEY WERE OFFERING

09:44AM   11  NOT EVERY TEST ON FINGERSTICK BUT SOME DOZENS OF TESTS ON

09:44AM   12  FINGERSTICK, AND WHEN YOU COMPARE THAT TO WHAT MR. TOLBERT

09:44AM   13  KNEW, THEY DON'T MATCH, AND I ACKNOWLEDGE THAT.

09:44AM   14         AND I DON'T KNOW WHETHER THAT'S BECAUSE THERE WAS A GAP IN

09:44AM   15  INFORMATION BETWEEN MR. LUCAS AND MR. TOLBERT, OR WHETHER

09:44AM   16  MR. TOLBERT'S RECOLLECTION OF WHAT MR. LUCAS TOLD HIM HAS JUST

09:44AM   17  LEFT HIS MEMORY WITH THE PASSAGE OF TIME.

09:44AM   18         BUT IN ANY EVENT, ESSENTIALLY WHAT WAS PASSED ON TO

09:44AM   19  MR. LUCAS BY MS. HOLMES AND OTHERS, I THINK SHE PRESUMED WOULD

09:44AM   20  HAVE BEEN KNOWN BY MR. HALL AND BY MR. TOLBERT AS WELL.

09:45AM   21         MR. TOLBERT HAD NO DIRECT CONVERSATIONS WITH MS. HOLMES AT

09:45AM   22  ALL AFTER THE HALL GROUP'S FIRST INVESTMENT THROUGH MR. LUCAS

09:45AM   23  IN 2006.  NONE.  HE HAD NO CONTACT WITH HER AT ALL BETWEEN 2006

09:45AM   24  AND 2013.

09:45AM   25         NOR IN CONNECTION WITH HIS INVESTMENT IN 2013 DID HE HAVE

09:45AM  1    A DIRECT CONVERSATION WITH MS. HOLMES.

09:45AM  2        SO WE'RE NOT REALLY FOCUSSED ON DIRECT INTERPERSONAL

09:45AM  3    DEALINGS BETWEEN THEM.

09:45AM  4        WHAT THE GOVERNMENT FOCUSES ON HERE IS THE TAPE RECORDING

09:45AM  5    THAT YOU HEARD OF THE DECEMBER 20TH CALL, WHICH IS A TELEPHONE

09:45AM  6    CALL THAT MR. TOLBERT PARTICIPATED IN.  AS YOU RECALL, HE

09:45AM  7    TESTIFIED THAT THERE WERE MANY PARTICIPANTS IN THE CALL, THAT

09:45AM  8    HE SECRETLY TAPE RECORDED THAT INFORMATION FOR THE BENEFIT OF

09:45AM  9    MR. HALL, AND NO ONE ELSE BUT HE KNEW THAT HE WAS TAPING THE

09:46AM 10    CALL.

09:46AM 11        THE MAIN FOCUS, I THINK, REALLY OF THIS CALL, AND THE MAIN

09:46AM 12    FOCUS OF THE GOVERNMENT'S PRESENTATION OF EVIDENCE HERE IS THE

09:46AM 13    STATEMENT THAT MS. HOLMES MADE DURING THAT TAPE RECORDING ABOUT

09:46AM 14    THERANOS'S RELATIONSHIPS WITH THE MILITARY AND WHAT THE USE OF

09:46AM 15    THERANOS DEVICES WAS IN CONNECTION WITH MEDEVACS, ET CETERA.

09:46AM 16        I WANT TO GO THROUGH THAT WITH YOU IN A MOMENT, BUT I WANT

09:46AM 17    TO ALSO REMIND YOU THAT THE CONVERSATION THAT IS HAD ON THAT

09:46AM 18    TAPE WHERE MS. HOLMES IS DISCUSSING THE RELATIONSHIP BETWEEN

09:46AM 19    THERANOS AND THE DEPARTMENT OF DEFENSE IS NOT SOMETHING THAT

09:46AM 20    MS. HOLMES BROUGHT UP OR INTRODUCED INTO THE CONVERSATION.

09:46AM 21        THE COMMENTS SHE MADE WERE IN QUESTION -- WERE IN RESPONSE

09:46AM 22    TO A QUESTION BY ANOTHER INVESTOR WHO ASKED HER, IS THERE A

09:47AM 23    MILITARY ASPECT THAT THERANOS IS GOING TO PURSUE?

09:47AM 24        AND MS. HOLMES SAYS AS PART OF HER ANSWER THAT, WELL, YOU

09:47AM 25    KNOW, THE COMPANY DOES HAVE ACTIVITIES IN THAT REGARD, BUT THAT

09:47AM  1    THE COMPANY'S FOCUS GOING FORWARD IS GOING TO BE ON THE RETAIL

09:47AM  2    MARKET WITH WALGREENS AND HOPEFULLY WITH OTHER RETAIL PARTNERS.

09:47AM  3        BUT I WANT TO LOOK AT WHAT MS. HOLMES ACTUALLY SAYS ON

09:47AM  4    THAT TAPE, WHICH YOU HEARD AS PART OF THE TAPE, AND OF COURSE

09:47AM  5    YOU CAN HEAR AGAIN AS PART OF YOUR DELIBERATIONS.

09:47AM  6        AND I WANT TO BREAK IT DOWN AND COMPARE IT TO WHAT WAS

09:47AM  7    ACTUALLY GOING ON WITH THERANOS'S MILITARY PROGRAMS SO THAT YOU

09:47AM  8    UNDERSTAND WHAT WAS BEING CONVEYED AS PART OF THIS

09:47AM  9    CONVERSATION.

09:47AM  10       LET'S LOOK AT WHAT MS. HOLMES ACTUALLY SAYS.  THERE REALLY

09:47AM  11   ARE TWO PARTS TO THIS.  THERE'S A PART WHERE THERE'S A

09:47AM  12   DISCUSSION OF THE WORK THAT THERANOS WAS DOING IN CONNECTION

09:48AM  13   WITH AFGHANISTAN, AND THEN THERE'S A SEPARATE DISCUSSION ABOUT

09:48AM  14   THERANOS'S WORK WITH SPECIAL OPERATIONS.

09:48AM  15       SO WHAT DOES MS. HOLMES SAY ON THAT TAPE IF YOU ACTUALLY

09:48AM  16   RECALL WHAT SHE SAID?  IT'S REALLY BROKEN DOWN INTO THREE

09:48AM  17   PARTS.

09:48AM  18       FIRST, SHE SAYS THAT ONE PIECE OF WORK THAT THEY WERE

09:48AM  19   DOING IS IN THE CONTEXT OF WORK IN THE MIDDLE EAST, AND

09:48AM  20   SPECIFICALLY IN AFGHANISTAN.

09:48AM  21       AND THEN SHE GOES ON TO DESCRIBE A SIGNIFICANT MEDICAL

09:48AM  22   PROBLEM THAT EXISTED WITH GETTING MEDICAL TREATMENT FOR

09:48AM  23   SOLDIERS ON A TIMELY BASIS.

09:48AM  24       SHE THEN GOES ON TO SAY, WELL, THE ABILITY TO PLACE AND

09:48AM  25   TAKE A TECHNOLOGY LIKE THIS AND PUT IT IN FLIGHT HAS THE

09:48AM 1    POTENTIAL TO CHANGE SURVIVAL RATES.

09:48AM 2        SO THERE'S A POTENTIAL PLACEMENT THAT COULD SAVE LIVES.

09:48AM 3        THIRD, SHE SAYS WE'VE BEEN DOING A LOT OF WORK THERE.

09:48AM 4        NOW, WHY WOULD SHE SAY THAT?

09:49AM 5        WELL, LET'S LOOK AT THE WORK THAT THERANOS WAS ACTUALLY

09:49AM 6    DOING IN CONNECTION WITH THE PROGRAM IN AFGHANISTAN AT THAT

09:49AM 7    TIME.

09:49AM 8        FIRST, WAS THERE WORK THAT THERANOS WAS DOING IN

09:49AM 9    CONNECTION WITH DEPLOYING ITS DEVICES IN AFGHANISTAN?  YOU KNOW

09:49AM 10   THAT THERE WAS.  THERANOS HAD ENTERED A CONTRACT ABOUT A YEAR

09:49AM 11   BEFORE THIS CALL WITH CENTCOM, AND THE IDEA WAS THAT THE

09:49AM 12   DEVICES WOULD BE EVALUATED AT BAGRAM AIR FORCE BASE IN

09:49AM 13   AFGHANISTAN.

09:49AM 14       WHAT I'M SHOWING YOU NOW AS PART OF EXHIBIT 10457 IS THE

09:49AM 15   DOCUMENT THAT REFLECTED THE WORK THAT WAS TO BE DONE.

09:49AM 16       THEN WAS THERE GOING TO BE, AS PART OF THIS PROGRAM,

09:49AM 17   POTENTIAL PLACEMENT ON MEDEVAC HELICOPTERS THAT COULD SAVE

09:49AM 18   LIVES?  YES.  IF YOU READ THE LANGUAGE, THERE'S A NUMBER OF

09:49AM 19   DIFFERENT USES OF THERANOS DEVICES IN THIS CONTEXT THAT WERE

09:49AM 20   CONSIDERED AND WERE DESCRIBED AS PART OF THE PROCESS.

09:49AM 21       AS YOU SEE HERE, THERE'S A SUGGESTED USES COULD INCLUDE

09:50AM 22   MEDEVAC, BUT IT COULD INCLUDE MULTIPLE PLATFORMS ON LAND, AIR,

09:50AM 23   SEA, ET CETERA.

09:50AM 24       NOW, WAS THERANOS DOING ANY WORK TOWARDS THIS GOAL OR WAS

09:50AM 25   THIS, AS I THINK THE GOVERNMENT SUGGESTS, JUST A FANTASY OF

09:50AM 1      MS. HOLMES?

09:50AM 2          WELL, THE TRUTH IS, AND YOU'VE HEARD TESTIMONY DURING THE

09:50AM 3      CASE, THERANOS WAS DOING A LOT OF WORK TOWARDS THIS GOAL.

09:50AM 4          THERANOS WAS DEVELOPING A SPECIFIC DEVICE FOR PURPOSES OF

09:50AM 5      DEPLOYMENT WITH THE MILITARY, NOT ONLY IN AFGHANISTAN, BUT IN

09:50AM 6      OTHER LOCATIONS, CALLED A 4S DEVICE, A PROGRAM ON WHICH

09:50AM 7      THERANOS SPENT TENS OF MILLIONS OF DOLLARS AND WHICH IS PART

09:50AM 8      OF -- PART OF WHICH IS THIS WORK THAT IS DESCRIBED IN THE

09:50AM 9      CONTRACT THAT IS 10547, AND YOU CAN LOOK AT THAT AS PART OF

09:50AM 10     YOUR DELIBERATIONS.

09:50AM 11         NOW, LET'S GO ON TO THE SECOND PART OF WHAT SHE SAYS,

09:50AM 12     WHICH IS IN CONNECTION WITH SPECIAL OPERATIONS COMMAND.  SHE

09:51AM 13     SAYS, SEPARATELY, WE'VE BEEN DOING A LOT OF WORK WITH SPECIAL

09:51AM 14     OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE AREAS.

09:51AM 15         SHE TALKS ABOUT THE PROBLEM OF THERE BEING AN ABSENCE OF

09:51AM 16     MEDICAL CARE AND PEOPLE BEING EVACUATED GENERALLY OUT OF

09:51AM 17     CONTINENT.

09:51AM 18         AND THEN SHE GOES ON TO SAY WE, AS THERANOS, CREATED A

09:51AM 19     DISTRIBUTED SYSTEM THAT CAN BE REMOVED -- THAT CAN BE USED IN

09:51AM 20     REMOTE AREAS.

09:51AM 21         WHAT IS SHE TALKING ABOUT HERE?

09:51AM 22         WELL, HERE SHE'S TALKING ABOUT THE CONTRACT -- TWO

09:51AM 23     DIFFERENT CONTRACTS.  ONE IS THE PROGRAM THAT HAD ALREADY BEEN

09:51AM 24     DONE WITH SPECIAL OPERATIONS FORCES IN AFRICA.  YOU'LL REMEMBER

09:51AM 25     THAT THERE WAS A PROGRAM UNDER WHICH DEVICES WERE TAKEN TO

09:51AM   1     REMOTE LOCATIONS IN AFRICA AND THEY WERE EVALUATED AS TO

09:51AM   2     WHETHER THEY COULD SUSTAIN THE CONDITIONS OF REMOTE AREAS.

09:51AM   3     THOSE LOCATIONS ARE IDENTIFIED HERE IN EXHIBIT 12251.

09:52AM   4          AGAIN, THE DESCRIPTION SHE GIVES OF CURRENTLY AVAILABLE

09:52AM   5     TECHNOLOGIES BEING UNSUITABLE ON THE CALL IS EXACTLY MATCHED BY

09:52AM   6     SOME OF THE LANGUAGE THAT'S IN THE CONTRACT THAT THERANOS HAD

09:52AM   7     WITH AFRICOM AT THIS TIME.

09:52AM   8          WHAT ABOUT SPECIAL OPERATIONS COMMAND IN PARTICULAR?

09:52AM   9          SIMILARLY THERE WAS AN ARRANGEMENT WITH SPECIAL OPERATIONS

09:52AM  10     COMMAND, WHICH I'LL TALK ABOUT IN A MOMENT.

09:52AM  11          NOW, YOU HEARD FROM MR. EDLIN ABOUT THE SUBSTANTIAL WORK

09:52AM  12     THAT THERANOS WAS DOING IN CONNECTION WITH DEPLOYING THESE

09:52AM  13     DEVICES.  YOU ALSO HEARD ABOUT IT FROM MS. HOLMES.

09:52AM  14          AND YOU KNOW THAT THERANOS HAD DESIGNED DEVICES THAT COULD

09:52AM  15     BE USED IN AN EXTREME ENVIRONMENT.

09:52AM  16          SO WHEN MS. HOLMES WAS TALKING ABOUT THIS ON THIS CALL,

09:52AM  17     THIS IS WHAT SHE WAS TALKING ABOUT, THOSE POINTS.

09:52AM  18          MR. TOLBERT WAS ASKED DURING HIS TESTIMONY, WHAT DID YOU

09:53AM  19     UNDERSTAND, WHAT DID YOU TAKE AWAY FROM THIS CONVERSATION THAT

09:53AM  20     MS. HOLMES WAS TELLING YOU?

09:53AM  21          WELL, LET'S RECALL HIS TESTIMONY WHERE HE WAS ASKED THAT

09:53AM  22     QUESTION.  AND HE SAID, WELL, HE UNDERSTOOD FIRST THAT THERE

09:53AM  23     WAS SIGNIFICANT WORK BEING DONE TO DEPLOY THE THERANOS SYSTEM

09:53AM  24     IN THEATRE.

09:53AM  25          THAT WAS ACCURATE.  AS I SAY, THERANOS WAS SPENDING TENS

09:53AM  1    OF MILLIONS OF DOLLARS AND HAD A HIGH NUMBER OF PEOPLE WORKING

09:53AM  2    ON THIS PROJECT.

09:53AM  3          HE THEN WAS ASKED, WHAT DID YOU TAKE HER STATEMENTS ABOUT

09:53AM  4    SPECIAL OPERATIONS COMMAND?

09:53AM  5          AND HE SAYS THE UNDERSTANDING WAS THAT THEY HAD BEEN

09:53AM  6    WORKING WITH SPECIAL OPERATIONS COMMAND, AND IT CERTAINLY

09:53AM  7    REPRESENTED A CAPABILITY AND A BUSINESS THAT THE COMPANY HAD

09:53AM  8    PURSUED.

09:53AM  9          THAT IS ALSO ACCURATE.  YOU KNOW THAT FROM THE TESTIMONY

09:53AM 10    OF MR. EDLIN AND FROM MS. HOLMES'S TESTIMONY, AND FROM THE MANY

09:53AM 11    DOCUMENTS THAT HAVE BEEN PRODUCED DURING THE COURSE OF THE

09:53AM 12    CASE.

09:53AM 13          NOW, THIS TAPE, WHICH THE GOVERNMENT INTRODUCED, IS THE

09:54AM 14    BEST EVIDENCE, ALONG WITH THE TAPES FROM MR. PARLOFF, ABOUT HOW

09:54AM 15    MS. HOLMES TALKED ABOUT THERANOS'S RELATIONSHIPS WITH THE

09:54AM 16    DEPARTMENT OF DEFENSE AND HOW IT TALKED ABOUT ITS ASPIRATIONS,

09:54AM 17    HOW IT TALKED ABOUT PROGRAMS THAT IT HAD WITH SPECIAL

09:54AM 18    OPERATIONS COMMAND, HOW IT TALKED ABOUT THE WORK THAT IT WAS

09:54AM 19    DOING IN AFGHANISTAN.

09:54AM 20          BUT THESE PROJECTS WERE REAL PROJECTS.  THERE WAS A LOT OF

09:54AM 21    INVESTMENT THAT THE COMPANY MADE IN THIS.  THE COMPANY DEALT

09:54AM 22    WITH NUMEROUS PEOPLE IN THE DEPARTMENT OF DEFENSE.  YOU SAW

09:54AM 23    THAT IN EMAILS THAT WERE INTRODUCED DURING MR. EDLIN'S

09:54AM 24    TESTIMONY.

09:54AM 25          THESE PROGRAMS WENT ON FOR YEARS.  THERANOS HAD BEEN

09:54AM  1    TALKING WITH THE DEPARTMENT OF DEFENSE ABOUT THESE DEPLOYMENTS

09:54AM  2    SINCE 2011.

09:54AM  3        YOU KNOW, AS A RESULT OF HIS TESTIMONY, THAT THERANOS TOOK

09:54AM  4    ITS 4 SERIES DEVICES TO MACDILL AIR FORCE BASE FOR EVALUATION

09:55AM  5    BY CENTCOM AND THEY WERE FURTHER MODIFIED IN RESPONSE TO THAT

09:55AM  6    MEETING.

09:55AM  7        YOU KNOW THAT THERANOS ACTUALLY DELIVERED SERIES 4 DEVICES

09:55AM  8    TO SPECIAL OPERATIONS COMMAND, WHICH SPECIAL OPERATIONS COMMAND

09:55AM  9    ULTIMATELY DECIDED NOT TO USE, BUT THEY WERE BUILT.

09:55AM  10       AND DURING DECEMBER OF 2013 WHEN THIS CALL WAS HAPPENING,

09:55AM  11   MS. HOLMES WAS VERY MUCH AWARE THAT THESE PROGRAMS WERE

09:55AM  12   MIDSTREAM.  THE SOCOM DEVICES WOULD BE DELIVERED TO SPECIAL

09:55AM  13   OPERATIONS COMMAND ABOUT FOUR OR FIVE MONTHS AFTER THIS CALL.

09:55AM  14       THERANOS HAD AGREED WITH CENTCOM THAT IT WOULD DELIVER

09:55AM  15   DEVICES IN AFGHANISTAN ABOUT EIGHT MONTHS -- SCHEDULED TO BE

09:55AM  16   DELIVERED ABOUT EIGHT MONTHS AFTER THIS CALL.

09:55AM  17       THESE ARE THE CONTACTS -- THIS IS THE CONTEXT IN WHICH

09:55AM  18   THESE STATEMENTS WERE BEING MADE.  THERANOS WAS, IN FACT,

09:55AM  19   REALLY DOING THE WORK WHICH MS. HOLMES DESCRIBED.

09:56AM  20       AS YOU SEE FROM THE TAPE, SHE DID NOT SAY THESE DEVICES

09:56AM  21   ARE IN FLIGHT FOR CLINICAL USE, WHICH IS HOW MANY OF THE

09:56AM  22   WITNESSES HAVE BEEN QUESTIONED.

09:56AM  23       SHE TALKS ABOUT THE WORK THAT THERANOS WAS DOING IN

09:56AM  24   CONNECTION WITH THESE PROGRAMS.

09:56AM  25       SHE ALSO SAYS, THIS IS NOT GOING TO BE OUR BUSINESS.

09:56AM  1      WE'LL DO A LITTLE BIT HERE, BUT THIS IS NOT GOING TO BE OUR

09:56AM  2      BUSINESS.

09:56AM  3          SO FROM THE PERSPECTIVE OF INVESTORS, THEY ARE BEING TOLD,

09:56AM  4      I THINK ACCURATELY, WHAT THE STATE OF THERANOS'S BUSINESS WAS.

09:56AM  5          LET'S LOOK AT THE CONTRACTS THAT THERANOS HAD WITH THE

09:56AM  6      MILITARY OVER TIME.

09:56AM  7          THERE'S THE CENTCOM CONTRACT, WHICH I MENTIONED, WHICH

09:56AM  8      WAS, AS I SAY, ACTIVE DURING THIS PERIOD.

09:56AM  9          THERE WAS THE SPECIAL OPERATIONS COMMAND CONTRACT, WHICH

09:56AM  10     WAS ENTERED IN 2012, MODIFIED IN 2013.

09:56AM  11         AND THERE WAS THE PROGRAM WITH AFRICOM WHICH YOU WILL

09:56AM  12     RECALL SEEING TESTIMONY ABOUT DURING THE COURSE OF MR. EDLIN'S

09:57AM  13     TESTIMONY.

09:57AM  14         AND I WANT TO SHOW YOU SOME OF THE INTERACTIONS THAT

09:57AM  15     THERANOS HAD AS PART OF THAT PROGRAM, WHICH YOU'LL REMEMBER.

09:57AM  16         IF WE LOOK AT SLIDE 33, AND THIS IS EXHIBIT 13986 --

09:57AM  17     SORRY, 34.  THIS IS A REPORT FROM THE COMMAND SURGEON OF

09:57AM  18     AFRICOM ABOUT THERANOS'S DEVICES AND THEIR DEPLOYMENT TO

09:57AM  19     AFRICOM.

09:57AM  20         SHE WRITES IN DECEMBER OF -- OR JULY OF 2012 TO MR. EDLIN,

09:57AM  21     COPYING MS. HOLMES, THAT SHE HAS BEEN TO AFRICA AND SHE HAS

09:57AM  22     TAKEN THE DEVICE TO AFRICA WHERE THE DEVICE TRAVELLED WELL AND

09:57AM  23     IT FUNCTIONED WELL.

09:57AM  24         SHE TALKED ABOUT DIFFICULTIES WITH THE FUNCTIONALITY OF

09:57AM  25     THE SCREEN, BUT SHE REPORTED THAT SHE HAD TAKEN THE DEVICE AND

09:57AM  1    USED IT IN CAMEROON AND IN UGANDA AND SOUTH SUDAN.

09:58AM  2         THIS WAS NOT A FICTION THAT MS. HOLMES WAS MAKING UP AND

09:58AM  3    SHE WAS NOT INTENDING TO EXAGGERATE WHAT WORK HAD BEEN DONE.

09:58AM  4    THIS WAS VERY MUCH A PART OF THE WORK THAT THERANOS WAS DOING.

09:58AM  5         I THINK MR. TOLBERT'S TESTIMONY SHOWS YOU WHAT WAS REALLY

09:58AM  6    UNDERSTOOD AS PART OF THESE CONVERSATIONS WITH PEOPLE WHO HEARD

09:58AM  7    HER TALK ABOUT THESE DEVICES.

09:58AM  8         NOW, I WANT TO TALK ALSO ABOUT WHAT THE GOVERNMENT DID NOT

09:58AM  9    DO IN CONNECTION WITH ITS CASE ON THIS SUBJECT.

09:58AM 10         THEY INTRODUCED, AS MR. SCHENK DETAILED YESTERDAY,

09:58AM 11    TESTIMONY FROM, I DON'T KNOW, FIVE, SIX, SEVEN PEOPLE WHO SAID,

09:58AM 12    SHE TOLD ME THAT THERE WAS A DEVICE AND IT WAS IN FLIGHT AND

09:58AM 13    BEING CLINICALLY USED IN THAT CONTEXT, ET CETERA.

09:58AM 14         BUT THE GOVERNMENT DIDN'T CALL A SINGLE PERSON FROM THE

09:58AM 15    DEPARTMENT OF DEFENSE WHO WORKED ON THESE CONTRACTS WHO WOULD

09:59AM 16    HAVE BEEN ABLE TO GIVE ACCURATE DESCRIPTIONS OF THE STATE OF

09:59AM 17    THOSE PROGRAMS, WHAT THEY WERE TRYING TO DO IN CONNECTION WITH

09:59AM 18    THOSE PROGRAMS.  NOTHING.

09:59AM 19         THEY ASKED GENERAL MATTIS WHEN HE TESTIFIED WHETHER HE

09:59AM 20    KNEW THAT THOSE PROGRAMS HAD SUCCEEDED.  OF COURSE HE WAS NOT

09:59AM 21    INVOLVED IN THOSE PROJECTS BECAUSE, AS HE TOLD YOU, AFTER HE

09:59AM 22    CAME TO THERANOS, HE RECUSED HIMSELF FROM ALL ACTIVITIES WITH

09:59AM 23    THE DEPARTMENT OF DEFENSE.

09:59AM 24         THAT'S NOT THE ONLY TIME THAT MS. HOLMES TALKED ABOUT THIS

09:59AM 25    MEDEVAC ISSUE AND IT WAS CAPTURED ON TAPE.

09:59AM 1        REMEMBER THAT MR. PARLOFF ALSO TALKED ABOUT THE MEDEVAC

09:59AM 2    ISSUE, AND THAT WAS CAPTURED ON A TAPE OF A CONVERSATION

09:59AM 3    BETWEEN MS. HOLMES AND MR. PARLOFF.

09:59AM 4        AND YOU CAN LOOK AT WHAT WAS SAID AS PART OF THAT

09:59AM 5    CONVERSATION.

09:59AM 6        MR. PARLOFF ASKED MS. HOLMES, ARE YOU DOING STUFF OVERSEAS

09:59AM 7    ALREADY?

09:59AM 8        AND MS. HOLMES SAID, WE HAVE DONE WORK OVERSEAS FOR

10:00AM 9    PHARMACEUTICAL COMPANIES AND A LITTLE BIT WITH FOREIGN

10:00AM 10   GOVERNMENTS IN THE PAST, BUT WE'VE GOT OUR WORK CUT OUT FOR US

10:00AM 11   HERE.

10:00AM 12       SHE DOESN'T MENTION WORK ABROAD IN CONNECTION WITH ANY

10:00AM 13   MILITARY PROGRAM.

10:00AM 14       BUT IN RESPONSE TO THEIR CONVERSATION AS IT CONTINUES,

10:00AM 15   TOWARDS THE END OF IT SHE DOES TALK ABOUT SOME POTENTIAL

10:00AM 16   APPLICATIONS WITH THE MILITARY.  AND REMEMBER, THIS IS IN 2014.

10:00AM 17       SHE SAYS TO HIM, THERE'S MILITARY-SPECIFIC APPLICATIONS,

10:00AM 18   TOO, THAT ARE QUITE PROMISING.  THAT ARE QUITE PROMISING.

10:00AM 19   SOMETHING THAT MIGHT HAPPEN IN THE FUTURE.

10:00AM 20       NOW, YOU SEE THAT THAT IS SORT OF SIMILAR LANGUAGE TO HOW

10:00AM 21   SHE TALKED ABOUT, YOU KNOW, THE POTENTIAL IMPLICATIONS, THERE

10:00AM 22   COULD BE SOME PROMISE IN THAT, ET CETERA.

10:00AM 23       BUT THEN SHE GOES ON TO TALK ABOUT IT MORE SPECIFICALLY.

10:00AM 24       COULD THERE BE A MILITARY USE FOR THIS?  COULD THERE BE A

10:01AM 25   MEDEVAC USE FOR IT, ET CETERA?

10:01AM   1        AND LET'S SEE WHAT SHE SAYS.  WELL, "I MEAN, AND -- AND

10:01AM   2   THAT -- THAT HAS IMPLICATIONS, BROADLY."  THIS IS 2014.  SHE'S

10:01AM   3   SAYING THAT THERE'S A POTENTIAL APPLICATION IN THE FUTURE WITH

10:01AM   4   THE MILITARY.

10:01AM   5        NOW, WE KNOW WHAT MR. PARLOFF UNDERSTOOD AS A RESULT OF

10:01AM   6   THIS CONVERSATION BECAUSE WE KNOW WHAT HE WROTE IN HIS ARTICLE,

10:01AM   7   WHICH IS IN EXHIBIT 1776.  AND HE SAYS, "THAT MAKES IT POSSIBLE

10:01AM   8   TO IMAGINE ONE DAY PLACING HOLMES'S LABS RIGHT BY THE OPERATING

10:01AM   9   ROOMS IN HOSPITALS OR IN MILITARY EVACUATION HELICOPTERS."

10:01AM  10        ONE DAY IN THE FUTURE.  THIS IS A CAPACITY THAT THERANOS

10:01AM  11   MIGHT BE CAPABLE OF ACHIEVING.

10:01AM  12        NOW, WHAT DID THE TESTIMONY IN THIS CASE LOOK LIKE

10:02AM  13   COMPARED TO THE TAPES?

10:02AM  14        WELL, IN BOTH OF THE TAPES YOU SEE SOME COMMONALITIES.

10:02AM  15   SHE NEVER SAYS THERANOS DEVICES ARE BEING CURRENTLY BEING USED.

10:02AM  16        SHE NEVER TALKS ABOUT THESE ACTUALLY BEING IN FLIGHT WITH

10:02AM  17   CLINICAL USE.

10:02AM  18        SHE TALKS ABOUT POTENTIAL APPLICATIONS.  SHE DESCRIBES

10:02AM  19   PROJECTS THAT YOU KNOW ARE REAL PROJECTS.

10:02AM  20        HER WORDS TRACK THE CONTRACT LANGUAGE VERY CLOSELY.  SHE

10:02AM  21   DESCRIBES USE IN REMOTE AREAS.  SHE DESCRIBES THE PROBLEMS THAT

10:02AM  22   THEY'RE TRYING TO SOLVE.

10:02AM  23        AND IN EVERY SITUATION SHE SAYS, THIS ISN'T OUR FOCUS.

10:02AM  24   OUR FOCUS IS ON WALGREENS AND OTHER ASPECTS OF THE RETAIL

10:02AM  25   MARKET.

10:02AM  1          NOW, YOU'LL RECALL THAT MR. PARLOFF TALKED ABOUT HAVING A

10:02AM  2     CONVERSATION WITH MS. HOLMES THAT WASN'T CAPTURED ON THE TAPE.

10:02AM  3     AND HE SAID IN CONNECTION WITH THAT CONVERSATION, WHICH WAS I

10:03AM  4     GUESS A THIRD CONVERSATION -- THE FIRST AND SECOND CONVERSATION

10:03AM  5     ARE REFLECTED ON TAPE AND YOU KNOW WHAT WAS SAID AS PART OF

10:03AM  6     THAT.

10:03AM  7          BUT HE TESTIFIED THAT HE WAS TOLD BY MS. HOLMES NOT ON

10:03AM  8     TAPE THAT A THERANOS DEVICE WAS BEING USED IN AFGHANISTAN.  HE

10:03AM  9     DIDN'T HAVE ANY NOTES OF THAT CONVERSATION THAT HE STILL

10:03AM 10     POSSESSED AT ALL.

10:03AM 11          NOW, THAT'S, THAT'S -- THAT WOULD BE ODD, HONESTLY,

10:03AM 12     BECAUSE HE INTERVIEWED HER, AS HE TESTIFIED, FOR ABOUT 13 HOURS

10:03AM 13     OVER 11 DAYS, HAD ABOUT 10 HOURS OF TAPED CONVERSATIONS WITH

10:03AM 14     HER, AND HE TAPED TWO CONVERSATIONS WITH HER THAT REFLECT

10:03AM 15     DISCUSSION OF THIS.

10:03AM 16          BUT HE SAYS IN A THIRD CONVERSATION SHE SAYS SOMETHING

10:03AM 17     DIFFERENT.

10:03AM 18          MR. SCHENK ON DIRECT EXAMINATION, AS HE QUOTED YESTERDAY,

10:03AM 19     ELICITED TESTIMONY FROM -- I'M SORRY, MR. BOSTIC DID, FROM

10:04AM 20     MR. PARLOFF WHERE HE SAID, NO, SHE TOLD ME THAT THIS IS IN USE

10:04AM 21     ON A MEDEVAC.

10:04AM 22          BUT THEN ON CROSS-EXAMINATION WHEN MR. CLINE ASKED HIM

10:04AM 23     ABOUT THAT, HE SAID, SHE NEVER ACTUALLY TOLD YOU THAT IT WAS --

10:04AM 24     THERE WAS USE IN AFGHANISTAN, DID SHE?

10:04AM 25          HE RESPONDED, "I THOUGHT SHE DID."

10:04AM 1    HE THEN WAS ASKED, "SO YOU THOUGHT YOU HAD MORE THAN JUST

10:04AM 2    THE IMPRESSION THAT YOU DESCRIBED TO THE GOVERNMENT IN THOSE

10:04AM 3    FIRST TWO MEETINGS?"

10:04AM 4    HE SAID, "WELL, IT IS SEVEN YEARS AGO.  IT MIGHT HAVE BEEN

10:04AM 5    A VERY STRONG IMPRESSION.  I, I -- I'M NOT CERTAIN."

10:04AM 6    NOW, I DON'T FAULT MR. PARLOFF FOR THAT.  THAT'S THE

10:04AM 7    EVOLUTION OF MEMORY IN THE CONTEXT OF EVERYTHING THAT HAS

10:04AM 8    HAPPENED.

10:04AM 9    BUT WE KNOW FROM THE CONTEMPORANEOUS RECORD WHAT WAS TOLD

10:04AM 10   ABOUT MEDEVACS.  WE KNOW THAT HE WAS TOLD THAT THESE WERE

10:04AM 11   APPLICATIONS THAT THERANOS WAS PURSUING AS A POTENTIAL IN THE

10:04AM 12   FUTURE.

10:04AM 13   AND I THINK THE COMMENTARY ON THIS SUBJECT, WITH THE

10:05AM 14   BENEFIT OF WHAT MS. HOLMES ACTUALLY SAID ON BOTH RECORDINGS,

10:05AM 15   YOU SHOULD HEAR ALL OF THAT, ALL OF THE TESTIMONY ABOUT THAT IN

10:05AM 16   CONNECTION WITH THAT THOUGHT.

10:05AM 17   IT SHOULD RAISE, I THINK IN YOUR MIND, SOME QUESTION ABOUT

10:05AM 18   TESTIMONY THAT WITNESSES HAVE OFFERED ON THIS MEDEVAC ISSUE.

10:05AM 19   IN ANY EVENT, YOU KNOW THAT IN EVERY ISSUE -- IN EVERY

10:05AM 20   CIRCUMSTANCE MS. HOLMES WAS SAYING TO INVESTORS, THIS SHOULDN'T

10:05AM 21   BE MATERIAL TO YOUR INVESTMENT DECISION.

10:05AM 22   SO THOSE ARE THE THREE INVESTORS IN THE C1 ROUND,

10:05AM 23   MR. EISENMAN, MR. LUCAS, AND MR. TOLBERT.

10:05AM 24   LET ME TALK NOW ABOUT THE C2 ROUND.

10:05AM 25   YOU HEARD FROM MR. GROSSMAN, WHO WAS ONE INVESTOR.  I

10:05AM  1      THINK THE POINTS WITH MR. GROSSMAN CAN BE SUMMARIZED FAIRLY

10:05AM  2      SUCCINCTLY.

10:05AM  3          FIRST, HE INVESTED WITH A LARGE TEAM OF PEOPLE.  THERE

10:05AM  4      WERE THREE PEOPLE WHO HAD A LOT OF EXPERIENCE IN THE AREAS THAT

10:06AM  5      HE WAS EVALUATING WITH THERANOS, INCLUDING DR. RABODZEY, WHO HE

10:06AM  6      TESTIFIED ABOUT WHO EVALUATED THERANOS'S TECHNOLOGY QUITE

10:06AM  7      CLOSELY.

10:06AM  8          MR. GROSSMAN'S INTERACTIONS WITH MS. HOLMES IN CONNECTION

10:06AM  9      WITH HIS INVESTMENT WERE, IN FACT, QUITE LIMITED.  HE HAD AN

10:06AM  10     HOUR INTRODUCTORY MEETING WITH MR. BALWANI AND MS. HOLMES IN

10:06AM  11     DECEMBER OF 2013.  HE TESTIFIED NOTHING REALLY CONFIDENTIAL WAS

10:06AM  12     DISCUSSED THERE BECAUSE HE HADN'T SIGNED A CONFIDENTIALITY

10:06AM  13     DISCLOSURE AGREEMENT.

10:06AM  14         HE HAD A MEETING ABOUT A MONTH LATER THAT LASTED ABOUT

10:06AM  15     90 MINUTES PERHAPS WITH MS. HOLMES, AND SHE LEFT.

10:06AM  16         AND THEN HE HAD A FOLLOW-ON MEETING WITH MR. BALWANI AND

10:06AM  17     OTHERS.

10:06AM  18         THOSE ARE THE ONLY TWO INTERACTIONS THAT MR. GROSSMAN HAD.

10:06AM  19         BUT IN THE PERIOD FOLLOWING THEREAFTER, MR. GROSSMAN'S

10:06AM  20     FIRM CONDUCTED NEARLY DAILY DUE DILIGENCE AND DAILY ANALYSIS AS

10:07AM  21     YOU WOULD EXPECT HIS BUSINESS, WHICH IS A HEDGE FUND, TO DO IN

10:07AM  22     CONNECTION WITH ITS INVESTMENT, AND THEN ULTIMATELY MADE THE

10:07AM  23     DECISION TO INVEST IN EARLY FEBRUARY OF 2014.

10:07AM  24         NOW, WHAT DID THEY LOOK AT IN THAT PERIOD AND WHAT DID

10:07AM  25     THEY KNOW ABOUT THERANOS?

10:07AM   1          WELL, THEY KNEW A LOT.  IN FACT, THEY REALLY KNEW ALMOST

10:07AM   2     EVERYTHING ABOUT THERANOS BEFORE THEY MADE A DECISION TO

10:07AM   3     INVEST.

10:07AM   4          YOU SAW THAT THEY LOOKED AT AND ANALYZED ALL OF THE

10:07AM   5     REGULATORY ISSUES, THEY LOOKED AT ALL OF THE ISSUES ABOUT THE

10:07AM   6     LAB INDUSTRY, THEY SPOKE TO MR. BALWANI ABOUT HOW MANUFACTURING

10:07AM   7     WOULD WORK, THEY TOURED THE CLIA LAB.

10:07AM   8          ALL OF THIS TOOK PLACE AFTER MS. HOLMES INTERACTED WITH

10:07AM   9     MR. GROSSMAN.  SHE DID NOT INTERACT WITH HIM AGAIN.  ALL OF

10:07AM  10     THAT KIND OF ANALYSIS.

10:07AM  11          AND THE OTHER THING THAT WE KNOW IS THAT DR. RABODZEY

10:07AM  12     ANALYZED THERANOS'S TECHNOLOGY.

10:08AM  13          HOW?  WITH THE INFORMATION THAT THERANOS GAVE HIM.  THEY

10:08AM  14     SAID, HERE IS OUR DATA IN CONNECTION WITH HOW OUR TESTS

10:08AM  15     PERFORM, AND HE LOOKED AT THAT AND DID THAT ANALYSIS IN DETAIL,

10:08AM  16     AND HE SAID, YOU KNOW, I THINK THIS DATA MAY NOT DEMONSTRATE AS

10:08AM  17     GOOD A PERFORMANCE AS YOU MIGHT EXPECT.

10:08AM  18          SO PFM, AS YOU RECALL, MR. GROSSMAN'S FIRM SAID, WELL,

10:08AM  19     WE'VE GOT TO FIND OUT MORE ABOUT THE TECHNOLOGY.

10:08AM  20          SO WITHOUT MS. HOLMES'S KNOWLEDGE, THEY REACHED OUT

10:08AM  21     THROUGH MR. GROSSMAN'S FATHER-IN-LAW TO TALK TO DR. ROBERTSON,

10:08AM  22     MS. HOLMES'S MENTOR FROM STANFORD WHO WAS A COLLEAGUE OF

10:08AM  23     MR. GROSSMAN'S FATHER-IN-LAW.

10:08AM  24          AND MR. GROSSMAN SPOKE WITH PROFESSOR ROBERTSON.  YOU SEE

10:08AM  25     HIM REPORTING HERE TO HIS COLLEAGUE THAT IN CONNECTION WITH

10:08AM  1    ASKING HIM ABOUT THE TECHNOLOGY, HE HAD A MIND BLOWING CALL

10:08AM  2    WITH ELIZABETH'S PROFESSOR WHO HELPED HER START THIS AND WHO

10:09AM  3    WAS AN ORIGINAL BOARD MEMBER.

10:09AM  4        AND THEN IF YOU LOOK AT THE NEXT SLIDE YOU SEE WHAT HE

10:09AM  5    REPORTS.

10:09AM  6        MR. ROBERTSON REPORTS THAT HE WAS TOLD -- I'M SORRY.

10:09AM  7        MR. GROSSMAN REPORTS THAT HE WAS TOLD BY DR. ROBERTSON

10:09AM  8    THAT THERE IS NO TECHNICAL RISK AT ALL IN THEIR CORE

10:09AM  9    TECHNOLOGY; THERE WERE ROUGHLY 300 DIFFERENT TYPES OF THINGS TO

10:09AM 10    MATCH A FULL MENU; THERE IS NOTHING THAT THE TECHNOLOGY CAN'T

10:09AM 11    DO.

10:09AM 12        MR. GROSSMAN OBVIOUSLY RELIED ON THAT INFORMATION AS HIS

10:09AM 13    EMAIL AND THE CONTEMPORANEOUS DOCUMENTS REFLECT.

10:09AM 14        BUT THAT IS NOT INFORMATION THAT CAME FROM MS. HOLMES OR

10:09AM 15    FROM ANYBODY THAT SHE DIRECTED TO PROVIDE THAT INFORMATION TO

10:09AM 16    HIM.

10:09AM 17        SO ONE ASSUMPTION THAT HE HAD WAS THIS TECHNOLOGY WAS VERY

10:09AM 18    GOOD, THE SAME ASSUMPTION THAT DR. ROBERTSON HAD AND THE SAME

10:09AM 19    ASSUMPTION THAT MS. HOLMES HAD.

10:09AM 20        HE ALSO MADE A BIG ASSUMPTION IN DECIDING TO INVEST, WHICH

10:10AM 21    WAS NOT UNCOMMON, HE ASSUMED THAT THERANOS WOULD BE THE NEXT

10:10AM 22    FACEBOOK OR THE NEXT TESLA OR THE NEXT GOOGLE.

10:10AM 23        THERANOS SAID, THIS IS HOW MUCH WE THINK WE'RE WORTH.  HE

10:10AM 24    VALUED THERANOS AT MANY TIMES WHAT THERANOS PERCEIVED ITSELF TO

10:10AM 25    BE WORTH.  AND THIS IS CLEARLY A BIG FACTOR AS YOU WILL RECALL

10:10AM 1    FROM HIS TESTIMONY.

10:10AM 2         HE ALSO, LIKE THE OTHER INVESTORS, FOCUSSED ON WALGREENS

10:10AM 3    AND THE WALGREENS RELATIONSHIP.

10:10AM 4         AND YOU KNOW THAT BECAUSE AS PART OF HIS INTERNAL

10:10AM 5    DISCUSSIONS WITH HIS HEDGE FUND, HE ENCOURAGED PARTNERS AND

10:10AM 6    FAMILY AND FRIENDS TO INVEST IN THERANOS, AND HE MADE THIS

10:10AM 7    PRESENTATION.

10:10AM 8         AND HOW THEY MADE THIS PRESENTATION TELLS YOU EVERYTHING

10:10AM 9    YOU NEED TO KNOW ABOUT WHAT WAS IMPORTANT TO PFM IN MAKING ITS

10:10AM 10   INVESTMENT.

10:10AM 11        HE DIDN'T TELL THE PEOPLE HE WAS ASKING TO INVEST ABOUT

10:10AM 12   WHAT THERANOS'S REVENUE WAS.  HE FOCUSSED ON WALGREENS AND THE

10:11AM 13   WALGREENS RELATIONSHIP.

10:11AM 14        AND HE TOLD THE INVESTORS THAT THERANOS WAS GOING TO ROLL

10:11AM 15   OUT IN WALGREENS STORES.

10:11AM 16        HE DIDN'T TELL THEM ABOUT THE NUMBER OF STORES THAT

10:11AM 17   THERANOS WAS IN, WHICH THERANOS HAD TOLD HIM.

10:11AM 18        HE DIDN'T TELL THEM ANYTHING ABOUT PFM'S INTERNAL DEBATE

10:11AM 19   REGARDING THE ACCURACY OF THE TECHNOLOGY.

10:11AM 20        AND HE DIDN'T MENTION ANYTHING ABOUT MILITARY PROGRAMS OR

10:11AM 21   PHARMACEUTICAL PROGRAMS AS A BASIS ON WHICH THEY SHOULD INVEST.

10:11AM 22        HE TOLD THEM ABOUT WALGREENS AND THE FACT THAT THERANOS

10:11AM 23   HAD A CONTRACT WITH WALGREENS BECAUSE THAT WAS WHAT MATTERED TO

10:11AM 24   HIM.

10:11AM 25        LET'S TALK NEXT ABOUT MR. MOSLEY WHO TESTIFIED.

10:11AM 1      MR. MOSLEY, AS YOU'LL RECALL, WAS A LAWYER AT A LARGE

10:11AM 2   NEW YORK LAW FIRM WHO REPRESENTED MANY OTHERS WHO INVESTED IN

10:11AM 3   THERANOS, MANY OF THE WEALTHY FAMILIES OF THE COUNTRY:  THE

10:12AM 4   WALTON FAMILY, THE DEVOS FAMILY, ET CETERA.

10:12AM 5      HE WAS INTRODUCED TO THERANOS BY DR. KISSINGER, AND AFTER

10:12AM 6   HIMSELF BECOMING INTERESTED IN THERANOS, HE RECOMMENDED THAT

10:12AM 7   MANY OTHER PEOPLE INVEST IN THERANOS AS HIS TESTIMONY

10:12AM 8   DEMONSTRATED.

10:12AM 9      NOW, HOW DID THE GOVERNMENT PRESENT MR. MOSLEY'S DECISION

10:12AM 10  TO INVEST?

10:12AM 11     WELL, THEY SAID, IN ESSENCE, THAT MS. HOLMES SENT A SLIDE

10:12AM 12  DECK TO MR. MOSLEY, AND IN CONNECTION WITH THAT SLIDE DECK AND

10:12AM 13  THE PFIZER STUDY WHICH THEY SENT TO HIM AT THAT TIME, WHICH WAS

10:12AM 14  IN LATE AUGUST, EARLY SEPTEMBER, 60 DAYS LATER HE DECIDED TO

10:12AM 15  INVEST, AND THEY FOCUSSED DURING HIS DIRECT EXAMINATION ON

10:12AM 16  STATEMENTS AS PART OF THAT SLIDE DECK.

10:12AM 17     BUT WHAT REALLY HAPPENED WITH RESPECT TO MR. MOSLEY'S

10:12AM 18  INVESTMENT DECISION?

10:12AM 19     WELL, THERE WAS A HUGE AMOUNT OF ACTIVITY IN BETWEEN THE

10:13AM 20  DATE THAT MS. HOLMES SENT HIM THAT SLIDE DECK AND THE DATE THAT

10:13AM 21  HE ULTIMATELY DECIDED TO INVEST IN LATE OCTOBER.

10:13AM 22     HE TALKED TO MANY OF HIS CLIENTS WHO WERE ALSO INVESTING

10:13AM 23  IN THERANOS.  HE TALKED TO OTHERS WHO WERE KNOWLEDGEABLE ABOUT

10:13AM 24  THERANOS.  FOR EXAMPLE, HE TALKED TO DR. KISSINGER, HIS CLIENT.

10:13AM 25  HE TALKED TO THE LAWYER FOR THERANOS, MR. BOIES, WHO WAS HIS

10:13AM 1   LONG-TIME FRIEND AND HIS FORMER LAW PARTNER.  HE TALKED TO HIS

10:13AM 2   CLIENTS FROM THE WALTON FAMILY WHO WERE ALSO EVALUATING WHETHER

10:13AM 3   TO INVEST AT THAT TIME.

10:13AM 4        HE LOOKED AT MANY ASPECTS OF THERANOS THAT HAD NOTHING TO

10:13AM 5   DO WITH THE POWERPOINT THAT THERANOS SENT TO HIM.

10:13AM 6        HE LOOKED AT THERANOS'S RELATIONSHIP WITH WALGREENS, OF

10:13AM 7   COURSE.

10:13AM 8        BUT HE ALSO LOOKED AT THE PATENT PORTFOLIO.

10:13AM 9        HE LOOKED AT THE JOHNS HOPKINS REPORT.

10:13AM 10       HE DID ALL KINDS OF DILIGENCE IN CONNECTION WITH HIS

10:13AM 11  DECISION TO INVEST.  HE WAS DOING MORE THAN LOOKING AT THE

10:13AM 12  POWERPOINT AND READING ARTICLES IN THE NEWSPAPER.

10:14AM 13       AND HE TESTIFIED WHEN HE CAME, LADIES AND GENTLEMEN, THAT

10:14AM 14  HE KNEW THERANOS WAS ONLY IN A FEW DOZEN WALGREENS STORES.  HE

10:14AM 15  KNEW THAT THERANOS USED COMMERCIAL DEVICES AS PART OF WHAT IT

10:14AM 16  DID.

10:14AM 17       HE KNEW THAT THERE WAS A TWO-PHASE MODEL.  HE KNEW THERE

10:14AM 18  WAS A PHASE I, PHASE II MODEL.

10:14AM 19       HE KNEW THAT THE PROJECTIONS WERE BASED ON SPECIFIC

10:14AM 20  ASSUMPTIONS AND THAT THEY MIGHT CHANGE.

10:14AM 21       AND HE KNEW THERE WAS NOT GOING TO BE PHARMACEUTICAL AND

10:14AM 22  MILITARY WORK.

10:14AM 23       HE KNEW EVERYTHING.

10:14AM 24       AND HE KNEW THAT AS A RESULT OF HIS INTERACTIONS WITH ALL

10:14AM 25  THESE OTHERS WHO WERE LOOKING TO INVEST IN THERANOS AT THE SAME

10:14AM  1    TIME.

10:14AM  2         AND BASED ON THAT KNOWLEDGE, HE WAS ENTHUSIASTIC ABOUT

10:14AM  3    THERANOS.

10:14AM  4         AND WHAT DID HE DO IN RESPONSE TO WHAT HE DID?  WELL, HE

10:14AM  5    DID WHAT HE REPORTED AT THE TIME.

10:14AM  6         AS YOU SAW IN THIS EMAIL, EXHIBIT 14135, HE SAID THAT HE

10:14AM  7    WAS RECOMMENDING THE INVESTMENT TO HIS CLIENTS.

10:15AM  8         AND A NUMBER OF THEM DID INVEST.  IN FACT, MR. MOSLEY MAY

10:15AM  9    HAVE BEEN THE MOST SIGNIFICANT FACTOR IN THE INVESTMENTS THAT

10:15AM  10   CONSTITUTED THE MOST AMOUNT OF MONEY THAT WERE INVESTED IN

10:15AM  11   THERANOS.  IF YOU WERE TO AGGREGATE THE CLIENTS OF MR. MOSLEY

10:15AM  12   THAT INVESTED IN THERANOS, THEIR TOTAL INVESTMENTS TOTALLED

10:15AM  13   MORE THAN $400 MILLION, AND YOU'LL RECALL FROM HIS TESTIMONY

10:15AM  14   HIS DISCUSSION OF HIS MANY INTERACTIONS WITH THOSE FAMILIES.

10:15AM  15        REMEMBER THAT THERANOS KNEW HE WAS THE LAWYER FOR THOSE

10:15AM  16   FAMILIES AND THEY SHARED WITH HIM ALL OF THE INFORMATION THAT I

10:15AM  17   JUST DESCRIBED TO YOU.

10:15AM  18        ASK YOURSELF IF ALL OF THESE INVESTORS KNEW THAT SAME

10:15AM  19   INFORMATION AND WHETHER THE INVESTMENT OF MR. MOSLEY OR OF

10:15AM  20   OTHERS WAS REALLY BASED, AS THE GOVERNMENT SUGGESTS, ON

10:15AM  21   ISOLATED STATEMENTS IN POWERPOINTS.

10:16AM  22        NOW, ANOTHER FEATURE OF MR. MOSLEY'S TESTIMONY AND, IN

10:16AM  23   FACT, OF THE NEXT INVESTOR I'LL DISCUSS, OR THE NEXT INDIVIDUAL

10:16AM  24   I'LL DISCUSS, MS. PETERSON, IS THAT THEY READ THE PARLOFF

10:16AM  25   ARTICLE.

10:16AM   1    AND WE'VE TALKED ABOUT THE PARLOFF ARTICLE THUS FAR QUITE

10:16AM   2    A LOT, ABOUT MEDEVAC ISSUES, AND WE'VE TALKED ABOUT THE FACT

10:16AM   3    THAT MR. PARLOFF KNEW ABOUT THE PHASE I, PHASE II MODEL.  HE

10:16AM   4    KNEW ABOUT VENOUS TESTING.  HE KNEW THAT SMALL SAMPLES WERE

10:16AM   5    CURRENTLY BEING OFFERED, BUT THAT OTHER VENOUS TESTS WERE BEING

10:16AM   6    OFFERED IN THE CLIA LAB.  HE KNEW ALL OF THAT.

10:16AM   7    AND GIVEN ALL OF THOSE DISCLOSURES, IT'S HARD TO SAY THAT

10:16AM   8    MS. HOLMES WAS INTENDING TO DECEIVE MR. PARLOFF.  HE KNEW A LOT

10:16AM   9    ABOUT THERANOS'S BUSINESS.

10:16AM  10    BUT THE GOVERNMENT SAYS MS. HOLMES DID DECEIVE

10:16AM  11    MR. PARLOFF, AND THEY SUGGEST THIS BY FOCUSSING ON ONE SEGMENT

10:16AM  12    OF TAPE IN THE TEN HOURS OF TAPE THAT THERE ARE, WHICH WAS

10:17AM  13    PLAYED YESTERDAY BY MR. SCHENK.

10:17AM  14    AND THAT'S THE TAPE WHERE MR. PARLOFF AND MS. HOLMES HAVE

10:17AM  15    A CONVERSATION ABOUT WHAT THE LAP IS GOING TO LOOK LIKE IN

10:17AM  16    RESPONSE TO A REQUEST THAT HE MADE TO VISIT THE ARIZONA LAB.

10:17AM  17    WELL, I WANT TO TAKE A LOOK AT THAT BECAUSE THE

10:17AM  18    IMPLICATION OF THE GOVERNMENT IN CONNECTION WITH THE PARLOFF

10:17AM  19    TAPES IS THAT SHE DIDN'T TELL MR. PARLOFF THAT COMMERCIAL

10:17AM  20    DEVICES WERE BEING USED IN SOME CONTEXT IN CONNECTION WITH

10:17AM  21    THERANOS'S PROGRAM.

10:17AM  22    BUT SHE CLEARLY DID TELL HIM THAT BECAUSE WE SEE FROM THIS

10:17AM  23    SECTION OF TAPE THAT SHE SAYS TO HIM SOMETHING THAT I WILL

10:17AM  24    DECIPHER FOR YOU, WHICH SHE SAYS THAT THE LAB IN ARIZONA IS A

10:17AM  25    MODERATE, WILL BE A MODERATE COMPLEXITY LAB.

10:17AM  1        A MODERATE COMPLEXITY LAB MEANS THAT IT DOESN'T USE THESE

10:18AM  2   PROPRIETARY DEVICES, OR THESE LDT'S.  IT NECESSARILY USES

10:18AM  3   DEVICES THAT COME FROM OTHER COMPANIES THAT ARE COMMERCIAL

10:18AM  4   DEVICES.

10:18AM  5        THAT DISCLOSURE TELLS MR. PARLOFF EVERYTHING THAT HE NEEDS

10:18AM  6   TO KNOW.

10:18AM  7        SO THIS DISCUSSION ABOUT VISITING THE LAB IN CALIFORNIA OR

10:18AM  8   ARIZONA, IF IT'S EVEN CLEAR WHAT THAT SNIPPET IS ABOUT, CLEARLY

10:18AM  9   ISN'T DESIGNED TO DECEIVE HIM ABOUT THE FACT THAT THERANOS WAS

10:18AM  10  USING COMMERCIAL MACHINES.

10:18AM  11       I ALSO SHOULD SAY THAT, YOU KNOW, ONE OF THE THEORIES THAT

10:18AM  12  I THINK THE GOVERNMENT HAS ABOUT THE PARLOFF ARTICLE IS THAT

10:18AM  13  MS. HOLMES HAD AN OBLIGATION TO TELL HIM EVERYTHING ABOUT THE

10:18AM  14  COMPANY SO THAT HE COULD WRITE A FULSOME DISCLOSURE OF ALL OF

10:18AM  15  THERANOS'S ACTIVITIES.

10:18AM  16       BUT HE TELLS READERS IN THE ARTICLE THAT THERE ARE THINGS

10:18AM  17  THAT THERANOS DID NOT DISCLOSE TO HIM.

10:19AM  18       AND WHEN THERANOS SENDS THAT ARTICLE AROUND, YOU'LL RECALL

10:19AM  19  THAT THE NOTE FROM THERANOS TO SHAREHOLDERS SAID THAT IT HAD

10:19AM  20  ONLY DISCLOSED A SELECTIVE AMOUNT OF INFORMATION TO HIM.

10:19AM  21       SO THIS IS NOT, THIS IS NOT A SITUATION WHERE THIS WAS

10:19AM  22  DESIGNED TO BE A FULSOME, FULSOME ARTICLE DESCRIBING ALL OF

10:19AM  23  THERANOS'S ACTIVITIES.

10:19AM  24       LET ME TALK ABOUT THE LAST INVESTOR, WHICH IS THE DEVOS

10:19AM  25  FAMILY.

10:19AM  1      LISA PETERSON FROM THE DEVOS FAMILY TESTIFIED.  THE DEVOS

10:19AM  2  FAMILY INVESTED THROUGH THE RDV INVESTMENT, AND THE DEVOS

10:19AM  3  FAMILY MEMBERS ARE DESIGNATED IN THE SLIDE THAT I'M SHOWING

10:19AM  4  YOU, AND I'VE ASTERISKED THOSE MEMBERS OF THE INVESTMENT

10:19AM  5  COMMITTEE, THOSE MEMBERS OF THE FAMILY WHO ARE THE MEMBERS OF

10:19AM  6  THE INVESTMENT COMMITTEES, THAT IS DOUG DEVOS, DAN DEVOS,

10:20AM  7  DICK DEVOS, AND RICK DEVOS.

10:20AM  8      MR. MOSLEY WAS THE LAWYER FOR THE FAMILY AND TALKING TO

10:20AM  9  THEM ABOUT THE INVESTMENT AT THAT TIME.

10:20AM 10      BUT NO MEMBER OF THIS INVESTMENT COMMITTEE, NONE, CAME TO

10:20AM 11  THIS COURT AND TESTIFIED ABOUT WHY THE DEVOS FAMILY, THROUGH

10:20AM 12  ITS INVESTMENT VEHICLE, DECIDED TO MAKE THIS INVESTMENT,

10:20AM 13  WHETHER IT WAS BASED ON INFORMATION THAT THEY LEARNED FROM

10:20AM 14  THERANOS DIRECTLY, WHETHER IT WAS BASED ON INFORMATION THAT

10:20AM 15  THEY LEARNED FROM OTHERS.

10:20AM 16      BUT THE ONE THING THAT WE DO KNOW IS MS. PETERSON, WHO DID

10:20AM 17  COME AND TESTIFY, DID NOT PLAY A ROLE WITH REGARD TO THEIR

10:20AM 18  DECISION TO INVEST.

10:20AM 19      SHE DID WORK IN THE INVESTMENT GROUP, AND SHE DID REPORT

10:20AM 20  TO HER BOSS, JERRY TUBERGEN.  BUT SHE TESTIFIED THAT SHE DIDN'T

10:20AM 21  HAVE ANY AUTHORITY TO MAKE AN INVESTMENT DECISION.

10:20AM 22      SHE SAID SHE WAS NOT PART OF MR. TUBERGEN'S CONVERSATIONS

10:20AM 23  WITH THE INVESTMENT COMMITTEE OR PART OF CONVERSATIONS WITH

10:20AM 24  THEM AT ALL.

10:20AM 25      AND, IN FACT, WHAT THE RECORD REFLECTS IS THAT THE DEVOS

10:21AM  1    FAMILY -- YOU KNOW, HER CONTENTION DURING HER DIRECT TESTIMONY

10:21AM  2    WAS THAT SHE HAD WRITTEN A MEMO, AND THIS MEMO REFLECTED WHAT

10:21AM  3    WAS IMPORTANT TO THE DEVOS FAMILY'S DECISION TO INVEST.

10:21AM  4         BUT WE KNOW THAT THE DEVOS FAMILY HAD DECIDED TO INVEST

10:21AM  5    BEFORE THAT MEMO WAS EVER REVIEWED.

10:21AM  6         JUST TO REMIND YOU OF THE CHRONOLOGY, THERE WAS A HIGH

10:21AM  7    LEVEL MEETING AT THERANOS IN THE MIDDLE OF OCTOBER 2014 AND IT

10:21AM  8    WAS DESIGNED FOR THE DEVOS FAMILY MEMBERS TO UNDERSTAND

10:21AM  9    THERANOS.

10:21AM 10         AND AT THAT MEETING THE FAMILY SAID THAT THEY WOULD

10:21AM 11    COMMUNICATE -- THEY WOULD INVEST $100 MILLION ON THE SPOT AT

10:21AM 12    THAT MEETING BASED ON THAT MEETING.

10:21AM 13         AND YOU SAW DOCUMENTS WHICH REFLECTED THAT DECISION MIGHT

10:21AM 14    HAVE EVEN BEEN MADE A WEEK BEFORE THAT MEETING.

10:21AM 15         MS. PETERSON'S MEMO, WHICH WAS DRAFTED FOR THE INVESTMENT

10:21AM 16    COMMITTEE, WAS NOT DRAFTED, WE KNOW, UNTIL AFTER OCTOBER 20TH,

10:22AM 17    AT THE VERY LEAST.

10:22AM 18         AS YOU SEE IN THESE EMAILS, SHE SAID ON OCTOBER 20TH THAT

10:22AM 19    SHE'LL DOCUMENT SOMETHING FOR THE FILE.

10:22AM 20         AND THEN IN NOVEMBER SHE NOTES THAT SHE WON'T HAVE A

10:22AM 21    SIGNATURE ON THAT FOR A WHILE, EVEN THOUGH THE INVESTMENT

10:22AM 22    DECISION WAS MADE AT LEAST A FEW WEEKS BEFORE.

10:22AM 23         SO LET'S REVIEW THE INVESTORS AND WHY THEY INVESTED.  I

10:22AM 24    THINK THEY HAVE A FEW THINGS IN COMMON.

10:22AM 25         FIRST, AS I MENTIONED, THEY ALL SIGNED CONTRACTS WITH

10:22AM  1    THERANOS.  THEY WERE ALL INVOLVED WITH OTHERS WHO INVESTED.

10:22AM  2        THEY WERE ALL HEAVILY INFLUENCED BY THE WALGREENS

10:22AM  3    RELATIONSHIP.

10:22AM  4        THE LAST ISSUE WITH INVESTORS THAT I WANT TO TALK ABOUT IS

10:22AM  5    THIS ISSUE REGARDING REVENUE THAT MR. SCHENK MENTIONED

10:22AM  6    YESTERDAY AND MR. LEACH EXAMINED MS. HOLMES ABOUT YESTERDAY.

10:22AM  7        WHAT DOES THE GOVERNMENT ALLEGE?

10:23AM  8        THEY ALLEGE THAT MS. HOLMES REPRESENTED THAT THERANOS

10:23AM  9    WOULD GENERATE $100 MILLION IN REVENUES IN 2014 AND $990

10:23AM 10    MILLION IN 2015.

10:23AM 11        NOW, THE GOVERNMENT SAYS, WELL, THAT CAN'T HAVE BEEN MADE

10:23AM 12    IN GOOD FAITH BECAUSE THERANOS ONLY GENERATED VERY MODEST

10:23AM 13    REVENUES, ABOUT A FEW HUNDRED THOUSAND DOLLARS IN BOTH 2014 AND

10:23AM 14    2015.

10:23AM 15        WELL, THAT'S REALLY NOT AN ACCURATE PICTURE OF WHAT WAS

10:23AM 16    GOING ON INSIDE OF THERANOS OR ITS ACTIVITIES.

10:23AM 17        THERE'S NO QUESTION THAT THERANOS GENERATED HUNDREDS OF

10:23AM 18    MILLIONS OF DOLLARS IN CASH DURING THE PERIOD THAT WE'RE

10:23AM 19    CONCERNED ABOUT, AND IT CAME FROM CUSTOMERS.

10:23AM 20        IT WASN'T RECOGNIZED AS ACTUAL REVENUE, IT WAS DEFERRED

10:23AM 21    REVENUE.

10:23AM 22        AND YOU SEE HERE IN EXHIBIT 10685 THAT IT TOTALLED MORE

10:23AM 23    THAN $200 MILLION.

10:23AM 24        SO MONEY WAS COMING INTO THE COMPANY.  THE COMPANY WAS NOT

10:24AM 25    ONLY EARNING A FEW HUNDRED THOUSAND DOLLARS A YEAR.  IN FACT,

10:24AM  1    IT WAS EARNING AN ENORMOUS AMOUNT OF CASH DURING THIS PERIOD.

10:24AM  2         THE QUESTION THAT THE GOVERNMENT IS REALLY FOCUSSING YOU

10:24AM  3    ON, BUT I THINK IT'S REALLY NOT CENTRALLY WHAT IS GOING ON, IS,

10:24AM  4    WAS THAT REVENUE ACTUAL REVENUE OR WAS IT DEFERRED REVENUE?

10:24AM  5         WELL, WE KNOW WHAT THE INVESTORS KNEW ABOUT THAT BECAUSE

10:24AM  6    THEY WERE GIVEN BOTH THE BALANCE SHEET, WHICH REFLECTED THE

10:24AM  7    DEFERRED REVENUE, AND THEY WERE GIVEN THE REVENUE PROJECTIONS

10:24AM  8    FOR BOTH 2014 AND 2015.

10:24AM  9         IF YOU LOOK HERE, AS THE GOVERNMENT ALLEGES, THERANOS DID

10:24AM 10    PROJECT THEY WOULD HAVE $140 MILLION IN REVENUE IN 2014.  AND

10:24AM 11    THIS WAS PROVIDED TO MR. MOSLEY, FOR EXAMPLE, IN THE SUMMER OF

10:24AM 12    2014.

10:24AM 13         BUT WHAT WAS MR. MOSLEY TOLD AT THE SAME TIME?

10:25AM 14         THIS IS THE BALANCE SHEET.  AND HE WAS TOLD THAT THERANOS

10:25AM 15    HAD DEFERRED REVENUE OF ABOUT $168 MILLION AS OF THAT TIME.

10:25AM 16         SO THE QUESTION, IF YOU REALLY COMPARE THESE TWO

10:25AM 17    DOCUMENTS, IS WOULD THIS DEFERRED REVENUE BECOME ACTUAL REVENUE

10:25AM 18    BY THE END OF 2014?

10:25AM 19         NOW, THAT DECISION IS A DECISION THAT MS. HOLMES WOULD NOT

10:25AM 20    MAKE, COULD NOT MAKE, DID NOT MAKE.

10:25AM 21         AS YOU RECALL, MS. SPIVEY TESTIFIED THIS WAS A VERY

10:25AM 22    COMPLEX ACCOUNTING JUDGMENT.  SHE WAS TALKING TO THE OUTSIDE

10:25AM 23    ACCOUNTANTS FOR THERANOS ABOUT WHETHER THERANOS COULD RECOGNIZE

10:25AM 24    THAT REVENUE DURING THE COURSE OF 2014.

10:25AM 25         BUT WE DO KNOW WHAT MS. HOLMES BELIEVED, BECAUSE AS LATE

10:25AM   1   AS DECEMBER OF 2014, MR. BALWANI TOLD MS. HOLMES THAT

10:25AM   2   $100 MILLION OF THAT AT LEAST WOULD BE -- $100 MILLION OF THIS

10:26AM   3   DEFERRED NUMBER WOULD BE RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM   4        NOW, IT WASN'T.  IT WASN'T FOR WHATEVER REASON, AND THE

10:26AM   5   RECORD IS NOT CLEAR ON THIS, THE ACCOUNTING JUDGMENT WAS MADE

10:26AM   6   THAT THIS CASH WHICH HAD COME INTO THE COMPANY IN TENS OF

10:26AM   7   MILLIONS OF DOLLARS SHOULD REMAIN DEFERRED REVENUE AND NOT BE

10:26AM   8   RECOGNIZED AS ACTUAL REVENUE IN 2014.

10:26AM   9        WE DON'T KNOW FROM THE RECORD WHY THAT IS.  WE DON'T KNOW

10:26AM  10   WHY MR. HOLMES -- OR WHY MR. BALWANI THOUGHT IT COULD BE

10:26AM  11   RECOGNIZED AS REVENUE IN 2014, AS LATE AS DECEMBER.

10:26AM  12        BUT WE DO KNOW THAT IT WAS NOT UNREASONABLE FOR

10:26AM  13   MS. HOLMES, WHEN SHE SAW THESE PROJECTIONS, TO BELIEVE THAT

10:26AM  14   THEY WERE AN ACCURATE STATEMENT OF WHAT WOULD HAPPEN IN 2014.

10:26AM  15        NOW, WHAT ABOUT THE 2015 NUMBER?

10:26AM  16        IN 2015 THE PROJECTION WAS THAT THE COMPANY WOULD MAKE

10:27AM  17   ABOUT $990 MILLION.

10:27AM  18        FIRST OF ALL, REMEMBER THE BACKDROP FOR THIS.  THE

10:27AM  19   BACKDROP FOR THIS IS THESE PROJECTIONS, WHICH WERE TALKING

10:27AM  20   ABOUT A FUTURE PERIOD, THE INVESTORS ARE TOLD THIS IS, THIS IS

10:27AM  21   SPECULATIVE, BUT WE'RE GIVING YOU AN ESTIMATE OF WHAT WE THINK

10:27AM  22   WOULD HAPPEN.  THAT WAS PART OF THE CONTRACT.

10:27AM  23        BUT AS WELL, THE INVESTORS WERE TOLD, HERE'S THE NUMBER OF

10:27AM  24   STORES WE'RE IN NOW, AND WE HAVE A BIG RISK, WHICH IS FOR THE

10:27AM  25   REVENUE NUMBERS TO BE ACHIEVED, WE'VE GOT TO EXPAND ACROSS

10:27AM  1    WALGREENS STORES ACROSS THE COUNTRY.  WE'RE ASSUMING THAT WE

10:27AM  2    WILL GET TO CERTAIN NUMBERS OF WALGREENS STORES.

10:27AM  3         NOW, MS. HOLMES INTERACTED WITH, FOR EXAMPLE, MS. PETERSON

10:27AM  4    ON A VERY LIMITED BASIS, BUT YOU COULD SEE FROM MS. PETERSON'S

10:27AM  5    OWN NOTES THAT MS. HOLMES IS SAYING TO HER, WE HAVE THESE

10:27AM  6    CONTRACTS TO BE IN WALGREENS STORES, BUT OUR RISK IS, CAN WE

10:28AM  7    EXECUTE ON THAT?

10:28AM  8         THERE WASN'T ANY SECRET ABOUT THAT AS PART OF THESE

10:28AM  9    CONVERSATIONS.  PEOPLE KNEW THAT.  AND THEY HAD TO EXPAND FROM

10:28AM 10    THE NUMBER OF STORES THAT THEY WERE IN CURRENTLY, WHICH WAS 30

10:28AM 11    OR SO, TO 900 STORES TO ACHIEVE THESE RESULTS.  THAT WAS ALL

10:28AM 12    KNOWN AND THEY KNEW THAT THERANOS WOULD HAVE TO EXECUTE TO DO

10:28AM 13    THAT.

10:28AM 14         TESTIMONY OF MR. MOSLEY ACKNOWLEDGED HE KNEW THAT,

10:28AM 15    MR. GROSSMAN ACKNOWLEDGED THAT HE KNEW THAT.  YOU KNOW, THERE

10:28AM 16    ARE A LOT OF FACTORS THAT GO INTO THIS.

10:28AM 17         BUT THE NUMBERS THAT WERE BEING GIVEN WERE BASED ON A

10:28AM 18    PROJECTION OF WHAT WOULD HAPPEN.  THOSE NUMBERS WERE BEING

10:28AM 19    PLACED IN A MODEL THAT MR. BALWANI PREPARED AND CONTROLLED.

10:28AM 20         IT'S VERY DIFFICULT TO SAY THAT MS. HOLMES HAD BAD INTENT

10:28AM 21    WITH REGARD TO THAT WHEN THE RISKS ASSOCIATED WITH IT ARE BEING

10:28AM 22    DISCLOSED.

10:28AM 23         AND WE ALSO KNOW THAT IN TERMS OF PREPARING THESE

10:29AM 24    FINANCIAL PROJECTIONS, THIS WAS NOT MS. HOLMES'S PROVINCE.

10:29AM 25    THIS WAS WORK THAT WAS DONE BY MR. BALWANI.

10:29AM  1        WE KNOW FROM CONTEMPORANEOUS EMAILS THAT WHEN THE COMPANY

10:29AM  2   NEEDED REVENUE PROJECTIONS, THAT MS. HOLMES GOT THEM FROM

10:29AM  3   MR. BALWANI, AND I THINK MR. SCHENK ACKNOWLEDGED THAT

10:29AM  4   YESTERDAY.

10:29AM  5        AND ONE LAST ISSUE, WHICH MR. LEACH ASKED MS. HOLMES ABOUT

10:29AM  6   ON CROSS-EXAMINATION, IS THERE WERE DIFFERENT REVENUES GIVEN IN

10:29AM  7   CONNECTION WITH A DIFFERENT ISSUE AT THERANOS, THE SO-CALLED

10:29AM  8   ARANCA ANALYSIS, WHICH THE REVENUE NUMBER WAS PROJECTED TO BE A

10:29AM  9   LOWER NUMBER.

10:29AM  10       THE GOVERNMENT MAY, IN ITS REBUTTAL TO ME, MAKE A BIG DEAL

10:29AM  11  ABOUT THAT.  I DON'T KNOW.

10:29AM  12       BUT I WOULD SAY TO YOU THAT MS. HOLMES TESTIFIED, AND THIS

10:29AM  13  WAS NOT EXPLORED WITH HER ON CROSS-EXAMINATION IN ANY DETAIL,

10:29AM  14  THAT THINGS WERE DONE FOR DIFFERENT PURPOSES.

10:29AM  15       THESE ANALYSES DID NOT HAVE THE SAME PURPOSES WITHIN THE

10:30AM  16  COMPANY, AND THAT THESE PROJECTIONS, BOTH PROJECTIONS AS TO

10:30AM  17  WHAT THE COMPANY WOULD EARN FOR THE NEXT YEAR, WHICH WERE

10:30AM  18  SHARED WITH THE BOARD, AS WAS THE OTHER NUMBER, AND SHE WAS

10:30AM  19  VERY TRANSPARENT WITH DIRECTORS ABOUT BOTH OF THOSE NUMBERS.

10:30AM  20       LET ME TALK LAST ON THE INVESTORS ABOUT THE ISSUE OF

10:30AM  21  DEMONSTRATIONS, AND I'LL REALLY ONLY TALK BRIEFLY ABOUT THIS

10:30AM  22  SUBJECT, AND I'LL ASK YOU TO KEEP A FEW THINGS IN MIND IN

10:30AM  23  CONNECTION WITH DEMONSTRATIONS.

10:30AM  24       OBVIOUSLY THERE WERE THOUSANDS OF DEMONSTRATIONS I THINK

10:30AM  25  MS. HOLMES TESTIFIED OVER TIME.

10:30AM  1      AND SOME OF THE MOST IMPORTANT CONCEPTS IN CONNECTION WITH

10:30AM  2   THOSE RELATE TO THE TESTIMONY OF MR. EDLIN AND MS. HOLMES'S OWN

10:30AM  3   TESTIMONY.

10:30AM  4      FIRST OF ALL, MR. EDLIN TESTIFIED THAT HE HAD COORDINATED

10:30AM  5   THE LOGISTICS; THAT ALL OF THE SCIENTIFIC WORK DONE IN

10:30AM  6   CONNECTION WITH DEMONSTRATIONS WAS DONE BY DR. YOUNG; THAT

10:31AM  7   MANY, MANY PEOPLE INSIDE OF THERANOS WERE INVOLVED IN THESE

10:31AM  8   DEMONSTRATIONS, WHICH ARE PORTRAYED AS BEING EFFORTS TO DECEIVE

10:31AM  9   PEOPLE.

10:31AM 10      MR. EDLIN THOUGHT OTHERWISE.  HE THOUGHT THE PURPOSE OF

10:31AM 11   THIS WAS TO SHOWCASE THERANOS'S TECHNOLOGY AND TO SHOW THIS IS

10:31AM 12   HOW THE DEVICE OR OTHER TECHNOLOGY AT THERANOS WORKS.

10:31AM 13      WHEN I, WHEN I ASKED HIM ON CROSS-EXAMINATION, WERE YOU

10:31AM 14   INVOLVED IN AN EFFORT TO DECEIVE PEOPLE?  HE SAID OF COURSE

10:31AM 15   NOT, THAT HE WAS -- AND HE DID NOT HAVE ANY IMPRESSION THAT

10:31AM 16   ANYBODY AT THERANOS WAS TRYING TO DECEIVE PEOPLE IN CONNECTION

10:31AM 17   WITH THESE DEMONSTRATIONS AND HOW THEY WERE CONDUCTED.

10:31AM 18      AND THERE REALLY WERE DIFFERENT KINDS OF DEMONSTRATIONS.

10:31AM 19   AS YOU KNOW, THERE WAS A PHASE I AND PHASE II AS PART OF

10:31AM 20   THERANOS'S RELATIONSHIP WITH WALGREENS.

10:31AM 21      SOME OF THE DEMONSTRATIONS SHOWED HOW PHASE I WORKED SO

10:32AM 22   THAT BLOOD WOULD BE DRAWN FROM THE PERSON GETTING THE

10:32AM 23   DEMONSTRATION.  IT WOULD BE PUT INTO A BOX AND TRANSPORTED BACK

10:32AM 24   TO THE CENTRAL LAB.

10:32AM 25      OTHER TIMES THE DEVICE WOULD BE PROCESSED -- THE SAMPLES

10:32AM 1    WOULD BE PROCESSED ON THE DEVICE IN THE ROOM.  SOMETIMES PEOPLE

10:32AM 2    WANTED TO GIVE THEIR BLOOD.  SOMETIMES PEOPLE DIDN'T.  THEY

10:32AM 3    JUST WANTED TO SEE HOW THE MACHINE WORKED.  THERE WERE ALL

10:32AM 4    SORTS OF PERMUTATIONS ABOUT THIS.

10:32AM 5        BUT YOU'VE SEEN FROM THE RECORD WHAT HAPPENED.

10:32AM 6        THERE'S BEEN TESTIMONY ABOUT MR. RAGO AND HIS

10:32AM 7    DEMONSTRATION.  IN CONNECTION WITH HIS DEMONSTRATION, HIS BLOOD

10:32AM 8    SAMPLE WAS TAKEN FROM HIM AND IT WAS TAKEN TO THE CENTRAL LAB.

10:32AM 9        THE GOVERNMENT IMPLIED THAT THAT WAS DECEPTIVE.  BUT, IN

10:32AM 10   FACT, HE REPORTED IN THE ARTICLE THAT BLOOD WAS ANALYZED AT

10:32AM 11   THERANOS IN A CENTRAL LAB.  HE DIDN'T WATCH IT BEING ANALYZED

10:32AM 12   ON THE DEVICE.

10:32AM 13       AND AS TO PEOPLE WHO DIDN'T WANT A BLOOD SAMPLE TAKEN FROM

10:32AM 14   THEM, WHICH HAPPENED, AND I THINK YOU SAW EVIDENCE ABOUT THAT,

10:33AM 15   A PROTOCOL WAS DEVELOPED SO THAT YOU COULD SEE HOW THE

10:33AM 16   TECHNOLOGY WORKED FROM THE BEGINNING TO THE END.

10:33AM 17       WHY?  BECAUSE IF YOU PUT A SAMPLE INTO THIS DEVICE AND IT

10:33AM 18   DIDN'T HAVE BLOOD IN IT, THE DEVICE FAILED AND THE PERSON

10:33AM 19   RECEIVING THE DEMONSTRATION WOULDN'T SEE HOW THE DEVICE WORKED.

10:33AM 20       SO WHY DID THERANOS DEVELOP A NULL PROTOCOL?  MR. EDLIN

10:33AM 21   TOLD YOU.  BECAUSE PEOPLE WANTED TO SEE A DEMONSTRATION WITHOUT

10:33AM 22   GIVING A BLOOD SAMPLE, AND THIS ALLOWED THE DEVICE TO FUNCTION

10:33AM 23   WITHOUT BLOOD BEING ACTUALLY DRAWN AND ANALYZED.

10:33AM 24       NOW, THE REPORTS THAT WERE DONE IN CONNECTION WITH

10:33AM 25   DEMONSTRATIONS, THEY MADE CLEAR THAT THEY WERE ONLY TECHNOLOGY

10:33AM  1    DEMONSTRATIONS.  THESE WEREN'T USED FOR CLINICAL TREATMENT OF

10:33AM  2    PATIENTS.  YOU SEE THAT ON EVERY FORM AT THE TOP WHERE THE

10:33AM  3    DEMONSTRATIONS WERE DESCRIBED AS TECHNOLOGY DEMONSTRATIONS.

10:33AM  4         SCIENTISTS WERE INVOLVED IN ALL OF THESE PROCESSES AND

10:34AM  5    THEY DETERMINED WHAT THE FINAL RESULTS WOULD BE.

10:34AM  6         YOU SAW EXTENSIVE TESTIMONY FROM MR. EDLIN AND FROM

10:34AM  7    MS. HOLMES ABOUT DR. YOUNG'S OVERSEEING THESE PROCESSES AND

10:34AM  8    MANAGING HOW THE RESULTS WERE REPORTED SO THAT THEY WOULD BE

10:34AM  9    CONSISTENT WITH ACCURATE VIEWS OF WHAT PATIENT'S BLOOD RESULTS

10:34AM  10   WERE.

10:34AM  11        ALL OF THAT, LADIES AND GENTLEMEN, IS THE CONTEXT AROUND

10:34AM  12   THESE DEMONSTRATIONS.  OBVIOUSLY THERE ARE THOUSANDS OF

10:34AM  13   DEMONSTRATIONS, BUT I WOULD ASK YOU TO BEAR IN MIND TESTIMONY

10:34AM  14   THAT NO ONE WAS TRYING TO DECEIVE PEOPLE, THAT THE PROCESS WAS

10:34AM  15   MANAGED BY SCIENTISTS, AND THAT THE DEMONSTRATIONS HAVE

10:34AM  16   DIFFERENT PURPOSES.

10:34AM  17        SO DON'T ASSUME THAT IF YOU SEE SOMETHING IN A

10:34AM  18   DEMONSTRATION WITH BLOOD BEING TAKEN OUT OF A ROOM, IT MEANS

10:34AM  19   THAT SOMETHING UNTOWARD IS HAPPENING.

10:34AM  20        NOW, I WANT TO MOVE FROM THERE TO TALKING ABOUT THE OTHER

10:34AM  21   CONSPIRACY THAT IS ALLEGED WHICH RELATES TO THERANOS PATIENTS.

10:35AM  22        AND THE ALLEGATIONS HERE, OF COURSE, AS YOU KNOW, IS THAT

10:35AM  23   THERANOS'S TECHNOLOGY WAS NOT CAPABLE OF CONSISTENTLY PRODUCING

10:35AM  24   ACCURATE AND RELIABLE RESULTS.

10:35AM  25        WELL, I WOULD ASK YOU, IN CONNECTION WITH THIS, TO JUST

10:35AM  1    BEAR IN MIND THAT THE LAB WAS MANAGED BY A LAB DIRECTOR, AND

10:35AM  2    THERE ARE PROCESSES THAT WERE ESTABLISHED IN THE LAB, AND THAT

10:35AM  3    THESE INFORM MS. HOLMES'S INTENT.

10:35AM  4         THE LENS THROUGH WHICH YOU REALLY WANT TO LOOK, I THINK,

10:35AM  5    AT THIS PATIENT CASE IS THAT THERE'S A PROCESS GOING ON IN THE

10:35AM  6    LAB.

10:35AM  7         AND ASK YOURSELF THE QUESTION, WAS MS. HOLMES'S INTENT

10:35AM  8    WITH RESPECT TO WHAT WAS GOING ON IN THE LAB, WAS IT IN GOOD

10:35AM  9    FAITH?  DID SHE BELIEVE THAT THE TESTS THAT WERE BEING OFFERED

10:35AM 10    WERE ACCURATE AND RELIABLE?

10:35AM 11         IF SHE DID, WHY DID SHE BELIEVE IT?

10:36AM 12         WELL, AS YOU COULD GLEAN FROM THE CROSS-EXAMINATION OF

10:36AM 13    DR. ROSENDORFF, SHE REALLY SAW SIX THINGS WHEN SHE LOOKED AT

10:36AM 14    THE LAB.

10:36AM 15         FIRST, SHE SAW THAT DR. ROSENDORFF WAS RESPONSIBLE FOR

10:36AM 16    DETERMINING WHAT TESTS AND WHAT METHODS WERE APPROPRIATE FOR

10:36AM 17    TESTING.

10:36AM 18         RECALL THAT DR. ROSENDORFF WAS THE LAB DIRECTOR AT

10:36AM 19    THERANOS FROM THE TIME THE LAB OPENED UNTIL ABOUT NOVEMBER OF

10:36AM 20    2014.  HE TESTIFIED LONGER THAN ANY OTHER WITNESS IN THE CASE

10:36AM 21    OTHER THAN MS. HOLMES.

10:36AM 22         HE WAS A HIGHLY QUALIFIED LAB DIRECTOR.  HE HAD BEEN IN A

10:36AM 23    SIMILAR POSITION AS PART OF THE CHILDREN'S HOSPITAL IN

10:36AM 24    PITTSBURGH, AND HE WAS A VERY IMPRESSIVE CANDIDATE.

10:37AM 25         THE FIRST THING HE DID WAS HE SAID WE, WE DETERMINED WHICH

10:37AM 1    TESTS WE SHOULD OFFER, WHETHER IT SHOULD BE ON A THERANOS

10:37AM 2    DEVICE OR SOME OTHER DEVICE.

10:37AM 3        THAT HAPPENED, IN FACT, AT THERANOS, AND IT WAS REQUIRED

10:37AM 4    BY LAW AS YOU SAW IN CONNECTION WITH SOME OF THE DOCUMENTS

10:37AM 5    INTRODUCED IN THE CASE.

10:37AM 6        THE LAB DIRECTOR DECIDES WHAT SYSTEMS ARE USED, WHAT TESTS

10:37AM 7    ARE USED IN CONNECTION.

10:37AM 8        HE TESTIFIED THAT THAT IS, IN FACT, WHAT HAPPENED.  IT WAS

10:37AM 9    NOT MS. HOLMES'S RESPONSIBILITY, IT WAS HIS RESPONSIBILITY.

10:37AM 10       SECOND, IN CONNECTION WITH EVERY TEST THAT WAS OFFERED IN

10:37AM 11   THE THERANOS LAB, IT WOULD NOT BE OFFERED, ACCORDING TO

10:37AM 12   DR. ROSENDORFF'S TESTIMONY, UNLESS HE SIGNED A VALIDATION

10:37AM 13   REPORT FOR IT.

10:37AM 14       AND WHAT DID THAT MEAN?  WELL, IT MEANT THAT HE WENT

10:37AM 15   THROUGH A PROCESS BEFORE THAT TEST WAS OFFERED OF DETERMINING

10:37AM 16   WHETHER THE TEST WAS ACCURATE AND RELIABLE FOR PURPOSES OF

10:37AM 17   PATIENT USE.  IT WAS A LONG PROCESS WITH MULTIPLE STEPS.  THE

10:38AM 18   REPORT WOULD BE SIGNED.  THERE WOULD BE PROCEDURES THAT WOULD

10:38AM 19   BE CREATED TO MAKE SURE THAT THE PROCESSES WERE BEING ADHERED

10:38AM 20   TO.  THERE WOULD BE TRAINING IN THE LAB, ET CETERA, THE THINGS

10:38AM 21   THAT YOU WOULD EXPECT.

10:38AM 22       DR. ROSENDORFF TESTIFIED THAT WITH REGARD TO EVERY TEST

10:38AM 23   OFFERED IN THE THERANOS LAB, HE SIGNED THESE VALIDATION

10:38AM 24   REPORTS.

10:38AM 25       YOU HEARD LENGTHY TESTIMONY ABOUT THAT AS PART OF BOTH OF

10:38AM  1    HIS EXAMINATIONS.

10:38AM  2         NOW, I WANT TO DIVERT FROM THIS DISCUSSION TO TALK ABOUT

10:38AM  3    ONE ISSUE, WHICH IS THAT SOME OF THE WITNESSES THAT THE

10:38AM  4    GOVERNMENT OFFERED, THEY TESTIFIED IN A MANNER THAT IN SOME

10:38AM  5    WAYS IS A LITTLE BIT IN TENSION WITH WHAT DR. ROSENDORFF

10:38AM  6    TESTIFIED, BECAUSE WHILE DR. ROSENDORFF TESTIFIED THAT HE

10:38AM  7    VALIDATED EVERY TEST THAT WAS OFFERED, YOU RECALL THAT

10:39AM  8    MS. GANGAKHEDKAR EARLIER IN THE CASE SAID THAT SHE HAD CONCERNS

10:39AM  9    ABOUT THE TESTS THAT WOULD BE OFFERED IN THERANOS'S CLINICAL

10:39AM 10    LAB, AND SHE LEFT IN RESPONSE TO THOSE.

10:39AM 11         SO I WANT TO GIVE YOU THE FULL PICTURE IN REGARD TO THAT

10:39AM 12    ISSUE.

10:39AM 13         MS. GANGAKHEDKAR LEFT THE COMPANY, AFTER WORKING THERE FOR

10:39AM 14    YEARS AND YEARS, IN SEPTEMBER OF 2013.  AND SHE SAID, YOU KNOW,

10:39AM 15    AT THE TIME I HAD CONCERNS ABOUT SOME OF THE ASSAYS.  SHE HAD

10:39AM 16    LED THE IMMUNOASSAY TEAM AND SHE WAS -- SHE TESTIFIED, I THINK,

10:39AM 17    AS WELL, AS YOU SAW ON CROSS-EXAMINATION, THAT SHE WAS PROUD OF

10:39AM 18    THE WORK, BUT SHE HAD SOME CONCERNS ABOUT THE ASSAY.

10:39AM 19         WELL, LET'S LOOK AT WHAT THE CONTEMPORANEOUS DOCUMENTS

10:39AM 20    REFLECT.

10:39AM 21         HER COMMUNICATIONS WITH MS. HOLMES WERE FRIENDLY.  SHE

10:39AM 22    WISHED THE COMPANY TREMENDOUS SUCCESS AS A RESULT OF HER

10:40AM 23    DEPARTURE AND SHE WAS PROUD OF THE WORK THAT SHE HAD DONE.

10:40AM 24         ALSO, WE KNOW THAT MS. HOLMES WAS TOLD THAT

10:40AM 25    MS. GANGAKHEDKAR WAS LEAVING BECAUSE OF HEALTH REASONS, FAMILY

10:40AM 1     REASONS, STRESS REASONS, ET CETERA.

10:40AM 2          SO THE CONTEMPORANEOUS RECORDS DIDN'T QUITE MATCH

10:40AM 3     MS. GANGAKHEDKAR'S TESTIMONY, BUT THAT REALLY IS A SIDE ISSUE

10:40AM 4     BECAUSE WHAT YOU SEE FROM MS. GANGAKHEDKAR'S REPORT IS ACTUALLY

10:40AM 5     MS. HOLMES'S GOOD FAITH.

10:40AM 6          MS. GANGAKHEDKAR TESTIFIED, I WENT TO MS. HOLMES AND SAID

10:40AM 7     I'M CONCERNED ABOUT ASSAYS BEING VALIDATED.  I'VE BEEN RAISING

10:40AM 8     THESE ISSUES TO MR. BALWANI.

10:40AM 9          YOU'LL RECALL THAT THERE WAS A VERY UNPLEASANT EXCHANGE

10:40AM 10    BETWEEN MR. BALWANI AND MS. GANGAKHEDKAR AS TO HER WORK ETHIC

10:40AM 11    WITH FAIRLY SERIOUS CRITICISM OF HER ON MR. BALWANI'S PART.

10:41AM 12    THAT WAS IN EXHIBIT 3961.

10:41AM 13         AND SHE WENT TO MS. HOLMES AND SAID, I'M CONCERNED, I'M

10:41AM 14    LEAVING THE COMPANY.

10:41AM 15         AND MS. HOLMES'S REACTION WAS NOT, IF YOU'RE EXPRESSING

10:41AM 16    CONCERNS, YOU'RE FIRED.  I HAVE A SIMILAR REACTION, I'M

10:41AM 17    CRITICAL OF YOU.

10:41AM 18         MS. HOLMES SAID, WELL, IF YOU'RE STRESSED AND IF YOU HAVE

10:41AM 19    HEALTH ISSUES, WHY DON'T YOU JUST TAKE A LEAVE OF ABSENCE?

10:41AM 20    DON'T LEAVE THE COMPANY.  TAKE TIME OFF UNTIL YOUR HEALTH

10:41AM 21    PROBLEMS HAVE BEEN RESOLVED AND THEN COME BACK WHEN YOU'RE

10:41AM 22    READY TO COME BACK.

10:41AM 23         WHAT DOES ALL OF THAT MEAN AS TO WHAT THE GOVERNMENT'S

10:41AM 24    EVIDENCE MEANS ON THAT?

10:41AM 25         WELL, FIRST OF ALL, IT MEANS THAT MS. HOLMES WAS NOT

```
10:41AM    1      TRYING TO SUPPRESS ANY CONCERNS THAT WERE BEING RAISED BY

10:41AM    2      MS. GANGAKHEDKAR.

10:41AM    3          MS. HOLMES WAS REACTING TO THAT IN A VERY HUMAN WAY AND

10:41AM    4      SAYING, COME BACK AND WORK WITH US.

10:41AM    5          BUT ALSO IN RESPONSE TO THE CONCERNS THAT MS. GANGAKHEDKAR

10:41AM    6      RAISED, WHAT WE KNOW IS THAT NO, NO ASSAY, NO TEST WAS EVER

10:42AM    7      OFFERED IN THE THERANOS CLIA LABORATORY IN 2013 AND 2014 THAT

10:42AM    8      DR. ROSENDORFF DIDN'T ULTIMATELY SIGN OFF ON.

10:42AM    9          THE EVIDENCE DURING HIS TESTIMONY SHOWED THAT THERE WERE

10:42AM   10      ASSAYS ON WHICH THERANOS DELAYED THE DECISION TO USE TESTS ON

10:42AM   11      EITHER THE EDISON OR ON THE MODIFIED MACHINES BECAUSE THERE

10:42AM   12      WERE CONCERNS.

10:42AM   13          BUT THE LAUNCH OF THOSE TESTS WAS DELAYED UNTIL AFTER

10:42AM   14      THOSE CONCERNS HAD BEEN RESOLVED TO DR. ROSENDORFF'S

10:42AM   15      SATISFACTION.

10:42AM   16          SO I'LL SAY TWO THINGS ABOUT MS. GANGAKHEDKAR'S TESTIMONY.

10:42AM   17          FIRST, NOTHING ABOUT IT SHOWS THAT MS. HOLMES WAS TRYING

10:42AM   18      TO EXPRESS CONCERNS OR DISMISS CONCERNS OR ANYTHING LIKE THAT.

10:42AM   19          BUT SECOND, ANY CONCERN SHE RAISED WAS, IN MS. HOLMES'S

10:43AM   20      MIND, RESOLVED BY DELAY OF ANY ASSAYS UNTIL THOSE CONCERNS

10:43AM   21      COULD BE EVALUATED AND RESOLVED BY DR. ROSENDORFF AND OTHERS

10:43AM   22      WORKING IN THE CLIA LAB.

10:43AM   23          NOW, THE IMPLICATION OF WHAT DR. ROSENDORFF ULTIMATELY

10:43AM   24      TESTIFIED TO WAS THAT HE WAS UNCOMFORTABLE WITH TESTS THAT WERE

10:43AM   25      BEING OFFERED BY THERANOS.
```

10:43AM  1    BUT HE ACTUALLY TESTIFIED TO JUST THE OPPOSITE.  HE SAID

10:43AM  2    THAT HE COULDN'T RECALL EVER PUTTING A SIGNATURE ON A

10:43AM  3    VALIDATION REPORT WHERE HE THOUGHT THAT ASSAY WASN'T

10:43AM  4    APPROPRIATE FOR PATIENT USE.

10:43AM  5        SO I THINK THAT, YOU KNOW, THE THIRD FOUNDATIONAL POINT

10:43AM  6    HERE IS THAT NOT ONLY DID HE APPROVE ALL OF THE TESTS THAT WERE

10:43AM  7    OFFERED, BUT HE WAS COMFORTABLE SIGNING THE APPROVALS FOR THOSE

10:43AM  8    TESTS TO BE OFFERED IN THE CLIA LAB.

10:43AM  9        NEXT I THINK, AND IMPORTANTLY, REMEMBER THAT HE

10:44AM 10    ACKNOWLEDGED THAT HE NEVER CAME TO A CONCLUSION THAT THE 3.5

10:44AM 11    DEVICE THAT REFLECTED -- WAS TESTING ASSAYS IN THE THERANOS LAB

10:44AM 12    WAS ITSELF UNRELIABLE.  HE NEVER CAME TO THAT CONCLUSION.  AND

10:44AM 13    HIS BEHAVIOR AT THE TIME REFLECTED THAT.

10:44AM 14        HE CONTINUED TO APPROVE THE USE OF THAT DEVICE TO TEST

10:44AM 15    PATIENTS IN THE CLIA LAB UP UNTIL ALMOST HIS DEPARTURE.

10:44AM 16        YOU SEE THAT HE'S APPROVING THEM AS LATE AS SEPTEMBER OF

10:44AM 17    2014.  HE LEFT THE COMPANY WITHIN ABOUT 60 DAYS OF THAT.

10:44AM 18        SO THE SUGGESTION THAT HE IN SOME SENSE WAS FUNDAMENTALLY

10:44AM 19    UNCOMFORTABLE WITH THE EDISON DEVICE OR WITH OTHER ELEMENTS OF

10:44AM 20    THERANOS'S TECHNOLOGY IS NOT SUPPORTED BY THE RECORD.

10:44AM 21        FIFTH, HE TESTIFIED THAT IN EVERY INSTANCE HE FOLLOWED THE

10:44AM 22    CLIA REGULATIONS.  THERE WERE NO DEVIATIONS FROM WHAT WAS

10:45AM 23    REQUIRED.  HE SAID THAT DIRECTLY UNDER OATH.

10:45AM 24        AND LAST, AND THIS REALLY ADDRESSES MOST OF THE

10:45AM 25    GOVERNMENT'S CASE, HE SAYS THAT, YES, ISSUES CAME UP IN THE

10:45AM 1    CLIA LAB.

10:45AM 2        WE SAW SOME OF THOSE INSTANCES YESTERDAY IN EMAILS THAT

10:45AM 3    MR. SCHENK SHOWED YOU.

10:45AM 4        BUT HE SAID IN RESPONSE TO THAT, THERANOS THOROUGHLY

10:45AM 5    INVESTIGATED THOSE ISSUES.

10:45AM 6        AND I WANT TO RUN THROUGH A FEW OF THOSE WITHOUT GETTING

10:45AM 7    INTO THE PARTICULARS, BUT JUST GIVING YOU SOME GUIDEPOSTS TO

10:45AM 8    LOOK AT THOSE ISSUES IF THEY'RE OF CONCERN TO YOU IN CONNECTION

10:45AM 9    WITH DELIBERATING.

10:45AM 10       LET ME TALK ABOUT SOME OF THE INDIVIDUALS WHO YOU SAW WHO

10:45AM 11   RAISED CONCERNS, AND THEN I'LL TALK ABOUT SOME OF THE TESTS

10:45AM 12   THAT MR. SCHENK MENTIONED YESTERDAY.

10:45AM 13       FIRST, YOU HEARD TESTIMONY FROM MS. CHEUNG, WHO TESTIFIED

10:45AM 14   EARLIER IN THE CASE, THAT SHE HAD SOME CONCERNS AS THE RESULT

10:45AM 15   OF A QUALITY CONTROL EXPERIMENT THAT WAS UNDERTAKEN IN THE CLIA

10:46AM 16   LAB.

10:46AM 17       WELL, THE EVIDENCE IN THE CASE ON THIS IS VERY CLEAR.

10:46AM 18   MS. HOLMES WAS NOT SOMEONE WHO INTERACTED WITH MS. CHEUNG WHILE

10:46AM 19   SHE WAS AT THERANOS, MS. CHEUNG DIDN'T RAISE THOSE CONCERNS

10:46AM 20   WITH MS. HOLMES, AND MS. HOLMES WAS NOT TOLD BY ANYONE ELSE

10:46AM 21   THAT MS. CHEUNG HAD THOSE CONCERNS AT THE TIME THAT MS. CHEUNG

10:46AM 22   WAS WORKING AT THERANOS.

10:46AM 23       WHAT WE DO KNOW IS THAT DR. ROSENDORFF KNEW OF THOSE

10:46AM 24   CONCERNS AND THAT HE REACTED TO THOSE CONCERNS.  THE GIST OF

10:46AM 25   MS. CHEUNG'S TESTIMONY WAS THAT THERE WAS A PROFICIENCY TESTING

10:46AM  1    EXPERIMENT IN FEBRUARY OF 2014 AND THE RESULTS WERE VERY POOR.

10:46AM  2    YOU'LL RECALL HER TESTIFYING ABOUT THAT.

10:46AM  3         AND DR. ROSENDORFF SAID I LOOKED AT THAT AT THE TIME, AND

10:46AM  4    HE LOOKED AT IT AGAIN WHILE HE WAS SITTING UP HERE ON THE

10:46AM  5    STAND.  AND HE SAID THE WAY THAT THAT EXPERIMENT WAS DONE WAS

10:47AM  6    FLAWED, AND THE REASON THOSE RESULTS WERE BAD IS THAT IT WASN'T

10:47AM  7    DONE ACCORDING TO THE APPROPRIATE POLICY.

10:47AM  8         SO AS A RESULT OF DR. ROSENDORFF'S CONCLUSIONS,

10:47AM  9    DR. YOUNG'S CONCLUSIONS, ET CETERA, WHEN THIS ISSUE CAME UP

10:47AM 10    LATER TO MS. HOLMES, SHE WAS PRESENTED WITH THE BELIEF THAT THE

10:47AM 11    CONCERNS THAT MS. CHEUNG HAD RAISED WERE NOT JUSTIFIED.

10:47AM 12         NOW, THAT ONLY MAKES SENSE THAT DR. ROSENDORFF WOULD LOOK

10:47AM 13    AT THAT ISSUE AND RESOLVE THAT ISSUE BECAUSE, AS A MATTER OF

10:47AM 14    LAW AND AS A MATTER OF FACT, THAT WAS HIS RESPONSIBILITY.

10:47AM 15         WHAT WAS, WHAT WAS DONE AFTER MS. CHEUNG'S CONCERNS WERE

10:47AM 16    RAISED?  WELL, THEY UPDATED THE POLICY FOR HOW EXPERIMENTS

10:47AM 17    SHOULD BE RUN ON QUALITY CONTROL BECAUSE DR. ROSENDORFF SAID

10:47AM 18    MS. CHEUNG DIDN'T -- MS. CHEUNG AND MANY OTHERS INSIDE OF THE

10:47AM 19    LAB WHO WERE INVOLVED WITH THAT EXPERIMENT DIDN'T UNDERSTAND

10:47AM 20    HOW THESE QUALITY CONTROL EXPERIMENTS SHOULD BE RUN.

10:48AM 21         YOU HEARD A LOT OF TESTIMONY.  SO THAT'S ONE INDIVIDUAL

10:48AM 22    RAISING CONCERNS.

10:48AM 23         THE SECOND INDIVIDUAL THAT WE HEARD ABOUT, BUT DID NOT

10:48AM 24    SEE, WAS TYLER SHULTZ.  I WON'T GO THROUGH HIS CONCERNS IN

10:48AM 25    DETAIL BECAUSE YOU SAW SOME OF THOSE DOCUMENTS WHEN MS. HOLMES

10:48AM 1    TESTIFIED.

10:48AM 2        BUT SUFFICE IT TO SAY THAT THE GIST OF THAT TESTIMONY IS

10:48AM 3    MR. SHULTZ RAISED CONCERNS, MS. HOLMES TOOK THOSE CONCERNS VERY

10:48AM 4    SERIOUSLY.

10:48AM 5        HE RAISED THEM THREE SEPARATE TIMES.  IN EACH INSTANCE

10:48AM 6    MS. HOLMES ALMOST IMMEDIATELY BROUGHT THE FACT THAT MR. SHULTZ

10:48AM 7    HAD THESE CONCERNS TO THE ATTENTION OF DR. YOUNG, EFFECTIVELY

10:48AM 8    THE CHIEF TECHNICAL OFFICER, ASKED HIM TO EVALUATE THOSE

10:48AM 9    CONCERNS, ASKED HIM TO MEET WITH MR. SHULTZ, ASKED HIM TO

10:48AM 10   UNDERSTAND WHETHER THOSE CONCERNS HAD MERIT.

10:48AM 11       IF THEY DIDN'T HAVE MERIT, TO EXPLAIN TO MR. SHULTZ WHY

10:48AM 12   THEY DID NOT HAVE MERIT.

10:49AM 13       AND ALL OF THAT IS REFLECTED IN DOCUMENTS THAT HAVE BEEN

10:49AM 14   INTRODUCED IN THE CASE.  SO I'LL GIVE YOU THOSE EXHIBIT

10:49AM 15   NUMBERS.  THEY'RE EXHIBIT 1667, EXHIBIT 7421, AND EXHIBIT 7434.

10:49AM 16       I THINK IF YOU'LL GO BACK AND LOOK AT THOSE, YOU'LL SEE

10:49AM 17   THAT THE RECORD FROM THE TIME IS CONSISTENT WITH THAT

10:49AM 18   DESCRIPTION.

10:49AM 19       NOW, MORE EXTENSIVELY YESTERDAY MR. SCHENK JUST WENT

10:49AM 20   THROUGH JUST A BLITZ OF EMAILS WHERE THERE WOULD BE AN ISSUE IN

10:49AM 21   CONNECTION WITH A PARTICULAR ASSAY THAT WOULD ARISE FOR ONE

10:49AM 22   REASON OR ANOTHER.

10:49AM 23       AND MR. SCHENK SUGGESTED TO YOU THAT THE EXISTENCE OF

10:49AM 24   THOSE EMAILS, FRANKLY WHETHER MS. HOLMES WAS ON ALL OF THEM OR

10:49AM 25   NOT, SUGGESTED THAT MS. HOLMES SHOULD HAVE KNOWN THAT THE CLIA

10:50AM 1    LAB WAS NOT OFFERING ACCURATE AND RELIABLE RESULTS.

10:50AM 2        WHAT DO WE KNOW ABOUT HOW THERANOS APPROACHED THOSE ISSUES

10:50AM 3    WHEN THEY AROSE?

10:50AM 4        WELL, FIRST OF ALL, WE KNOW THAT DR. ROSENDORFF HAD PUT IN

10:50AM 5    PLACE, AS HE SHOULD HAVE, A STANDARD OPERATING PROCEDURE THAT

10:50AM 6    SAID EVERY TIME AN ISSUE IS RAISED ABOUT AN ASSAY, WE HAVE TO

10:50AM 7    DO AN INTERNAL REVIEW OF THAT CONCERN, WE HAVE TO EVALUATE

10:50AM 8    WHETHER THAT CONCERN GOES TO THE INTEGRITY OF THE ASSAY THAT WE

10:50AM 9    ARE OFFERING.

10:50AM 10       AND, IN FACT, IN EACH INSTANCE, INCLUDING EACH INSTANCE

10:50AM 11   RAISED BY MR. SCHENK YESTERDAY, THAT IS WHAT WAS DONE.

10:50AM 12       HOW DID THAT WORK?

10:50AM 13       THERE WAS -- THE ISSUE WOULD BE FLAGGED, LAB PERSONNEL AND

10:50AM 14   SCIENTISTS WOULD LOOK AT THE DATABASE THAT STORED THE

10:50AM 15   INFORMATION THAT RELATED TO TESTS ON THAT ASSAY, THEY WOULD

10:51AM 16   LOOK AS TO SEE WHETHER THERE WERE COMMON ISSUES AMONGST WHEN

10:51AM 17   THAT TEST WAS OFFERED, WHERE THAT TEST WAS OFFERED, THE LAB

10:51AM 18   TECHNICIAN WHO PROCESSED IT, THE PARTICULAR PERSON WHO WAS

10:51AM 19   DRAWING THE SAMPLES.  IS THERE SOMETHING HAPPENING WITH RESPECT

10:51AM 20   TO THIS ASSAY THAT IS LEADING TO INACCURATE RESULTS?

10:51AM 21       AND THEY WOULD COME TO A CONCLUSION.  AND IF THE

10:51AM 22   CONCLUSION WAS THERE'S A PROBLEM FUNDAMENTALLY WITH THIS TEST

10:51AM 23   OR WITH THIS DEVICE, THEY WOULD EITHER STOP OFFERING IT

10:51AM 24   COMPLETELY AS AN ASSAY OR THEY WOULD STOP OFFERING IT AND

10:51AM 25   TRANSFER IT TO ANOTHER DEVICE WHERE IT COULD BE OFFERED.

10:51AM  1          THAT WAS WHAT THE POLICY MR. ROSENDORFF PUT IN PLACE,

10:51AM  2    DR. ROSENDORFF PUT IN PLACE REQUIRED, AND THE EVIDENCE IN THE

10:51AM  3    CASE SUGGESTS THAT THAT WOULD HAPPEN.

10:51AM  4          LET'S TAKE AN EXAMPLE, AND IT'S ONLY ONE EXAMPLE, BUT

10:52AM  5    MR. SCHENK WENT THROUGH IT YESTERDAY, THE EXAMPLE OF HCG.

10:52AM  6          AND YOU'LL RECALL THAT THIS WAS THE SUBJECT OF A LOT OF

10:52AM  7    TESTIMONY IN DR. ROSENDORFF'S CROSS-EXAMINATION.

10:52AM  8          THE GOVERNMENT YESTERDAY PUT UP A -- SUGGESTED A

10:52AM  9    CHRONOLOGY TO YOU THAT LOOKS SOMETHING LIKE THIS WITH REGARD TO

10:52AM  10   BEGINNING OF ISSUES ON HCG AND SUGGESTED THAT THERE HAD BEEN A

10:52AM  11   VALIDATION REPORT WHERE DR. ROSENDORFF HAD DETERMINED TO PUT

10:52AM  12   HCG ON AN EDISON DEVICE IN MARCH, THAT TESTING HAD BEGUN IN

10:52AM  13   MAY, AND THAT IN LATE MAY DR. ROSENDORFF HAD STOPPED THAT

10:52AM  14   TESTING, AND THAT THIS WAS PRESENTED AS THIS WAS THE RESULT OF

10:52AM  15   A CONCERN THAT HAD BEEN RAISED AND REFLECTED A CONCERN ON

10:53AM  16   DR. ROSENDORFF'S PART.

10:53AM  17          BUT WHAT ACTUALLY HAPPENED WITH RESPECT TO THIS ISSUE?

10:53AM  18          THERE'S ACTUALLY A MUCH LARGER SERIES OF EVENTS INVOLVING

10:53AM  19   A MUCH LARGER SERIES OF EXHIBITS THAT WERE INTRODUCED IN THE

10:53AM  20   CASE.  AND THIS SHOWS YOU WHAT HAPPENED.

10:53AM  21          AFTER MAY 9TH, THE HCG ASSAY WAS OFFERED ON AN EDISON

10:53AM  22   DEVICE.

10:53AM  23          AS EXHIBIT 4145 DEMONSTRATES, THE QUESTION CAME IN.

10:53AM  24   DR. ROSENDORFF AND DR. YOUNG DISCUSSED IT.

10:53AM  25          ALMOST IMMEDIATELY MS. HOLMES ASKED TO MEET WITH THEM AS

10:53AM   1    SOON AS SHE KNEW ABOUT THE ISSUE.  AND LATER THAT DAY, THE

10:53AM   2    PHYSICIAN WHO HAD TREATED THE PATIENT WHERE THERE WAS AN ISSUE

10:53AM   3    WAS CONTACTED AND THERE WAS A PLAN OF ACTION FOR REACTING TO

10:53AM   4    THE POTENTIALLY ERRANT ISSUE.

10:53AM   5        WE KNOW FROM THE RECORD THAT MS. HOLMES WROTE, PERHAPS

10:53AM   6    EARLY THE NEXT MORNING, THAT SHE HAD DONE MANY MEETINGS ON IT

10:54AM   7    TODAY, REFERRING TO THAT SAME DAY, THE 2TH.  SHE MET WITH THE

10:54AM   8    STAFF OF THE CLIA LAB, INCLUDING DR. ROSENDORFF, THE NEXT DAY.

10:54AM   9        AND THEN JUST SHORTLY AFTER THAT MEETING ENDED,

10:54AM  10    DR. ROSENDORFF STOPPED TESTING ON THE EDISON DEVICE FOR THIS

10:54AM  11    HCG ASSAY.

10:54AM  12        THE SUGGESTION THAT A CONCERN BEING RAISED WITH MS. HOLMES

10:54AM  13    GAVE HER NOTICE OF INACCURATE AND UNRELIABLE RESULTS AND THAT

10:54AM  14    WASN'T IMMEDIATELY CORRECTED IS INCONSISTENT WITH WHAT THE

10:54AM  15    RECORD SHOWED ON THIS ISSUE.

10:54AM  16        NOW, THERE WAS A SUBSEQUENT SERIES OF EMAILS THAT DISCUSS

10:54AM  17    AN INVESTIGATION INTO THIS ISSUE, AND DR. ROSENDORFF'S

10:54AM  18    TESTIMONY REFLECTED THAT HE WAS AWARE BY THE MIDDLE OF JUNE

10:54AM  19    THAT THOSE QUESTIONS HAD BEEN RESOLVED AND THAT THE HCG ASSAY

10:54AM  20    WAS AGAIN BEING OFFERED ON THE EDISON DEVICE, AND THAT THAT

10:54AM  21    WAS, AS IT WAS THE TRUTH WITH RESPECT TO ALL ASSAYS, SOMETHING

10:55AM  22    THAT HE HAD SIGNED OFF ON AND APPROVED.

10:55AM  23        SO WHAT DOES THIS JUST ONE SCENARIO OF ALL THE OF THE

10:55AM  24    SCENARIOS MENTIONED YESTERDAY BY MR. SCHENK DEMONSTRATE?

10:55AM  25        FIRST OF ALL, IT DEMONSTRATES THAT WHEN A PROBLEM WAS

10:55AM  1    RAISED, THERE WERE IMMEDIATE MEETINGS ABOUT IT.  IT WAS NOT

10:55AM  2    TREATED CAVALIERLY.

10:55AM  3         SECOND, THERE WAS A DISCUSSION WITH THE PATIENT'S

10:55AM  4    PHYSICIAN.  IF A PATIENT HAD BEEN POTENTIALLY AFFECTED, THEY

10:55AM  5    TALKED TO THAT PHYSICIAN.

10:55AM  6         THIRD, THEY STOPPED THE TESTING, AS I TOLD YOU A FEW

10:55AM  7    MOMENTS AGO.  THEY WOULD EITHER OFFER IT ON ANOTHER PLATFORM OR

10:55AM  8    THEY WOULDN'T OFFER IT AT ALL.

10:55AM  9         THEY TRIED TO FIGURE OUT WHAT HAPPENED.

10:55AM  10        AND THEN DR. ROSENDORFF WOULD MAKE A DECISION BASED ON THE

10:55AM  11   INVESTIGATION, WAS THIS ACTUALLY AN ISSUE RELATED TO THE ASSAY?

10:55AM  12   WAS IT RELATED TO THE DEVICE?

10:55AM  13        AND DEPENDING ON THE RESULTS OF THAT DETERMINATION, HE

10:55AM  14   WOULD ALLOW THE TEST TO START OR CEASE OFFERING THAT TEST.

10:56AM  15        NOW, ANOTHER EMAIL WAS BROUGHT UP BY MR. SCHENK YESTERDAY,

10:56AM  16   AND IT WAS ALMOST AS IF DR. ROSENDORFF'S CROSS-EXAMINATION DID

10:56AM  17   NOT HAPPEN.

10:56AM  18        THIS IS AN EMAIL THAT DR. ROSENDORFF WAS SHOWN ON HIS

10:56AM  19   DIRECT.  YOU WILL RECALL IT WAS FROM CHRISTIAN HOLMES,

10:56AM  20   MS. HOLMES'S BROTHER, TO HER TALKING ABOUT HCG.

10:56AM  21        AND THE TEXT OF THAT EMAIL SAID, HCG HAS SOME SERIOUS

10:56AM  22   ISSUES AND PATIENT COMPLAINTS, AND IT WAS IMPLIED ON DIRECT

10:56AM  23   EXAMINATION AND YESTERDAY THAT THIS WAS FURTHER NOTICE TO

10:56AM  24   MS. HOLMES OF INACCURACY WITH REGARD TO THIS VERY SENSITIVE

10:56AM  25   ASSAY.

10:56AM  1        BUT WHAT DID THE -- WHAT DOES THE BALANCE OF THAT EMAIL,

10:56AM  2   AS WELL AS OTHER EXHIBITS RELATED TO THIS, DEMONSTRATE?

10:56AM  3        FIRST OF ALL, THE ISSUE THAT CHRISTIAN HOLMES WAS TALKING

10:56AM  4   ABOUT HERE WAS NOT AT ALL ACCURACY OR RELIABILITY.

10:56AM  5        WHAT HE WAS TALKING ABOUT IS THAT THE NUMBER OF SAMPLES

10:57AM  6   THAT THE COMPANY WAS RECEIVING TO TEST HCG ON WAS BACKLOGGED

10:57AM  7   AND WOMEN WERE WAITING TO FIND OUT WHETHER THEY WERE PREGNANT

10:57AM  8   OR NOT, AND THAT'S OBVIOUSLY A SENSITIVE SITUATION.

10:57AM  9        WHY DID THAT HAPPEN?  BECAUSE THE REAGENTS HADN'T BEEN

10:57AM 10   ORDERED BY DR. ROSENDORFF OR THOSE WORKING FOR DR. ROSENDORFF

10:57AM 11   IN THE LAB.

10:57AM 12        THE EXCHANGE BETWEEN CHRISTIAN HOLMES AND HIS SISTER HERE

10:57AM 13   HAS NOTHING TO DO WITH ACCURACY OR RELIABILITY OF THE HCG TEST.

10:57AM 14        THAT'S A PATTERN THAT YOU SEE ACROSS THESE ASSAYS, EITHER

10:57AM 15   THE CONCERN IS NOT WHAT'S BEING RAISED WITH MS. HOLMES MAY LOOK

10:57AM 16   AMBIGUOUS BUT IT'S NOT A CONCERN ABOUT ACCURACY, IT'S A CONCERN

10:57AM 17   THAT WAS INVESTIGATED OR RESOLVED, OR IT'S A CONCERN THAT WAS

10:57AM 18   INVESTIGATED AND THEY CEASED OFFERING THE ASSAYS.

10:57AM 19        I'M NOT GOING TO GO THROUGH ALL OF THOSE, BUT FOR THE

10:57AM 20   RECORD I WILL SAY THAT WE HAVE DONE THAT WITH RESPECT TO HDL

10:58AM 21   MENTIONED YESTERDAY, EXHIBITS -- THE EXHIBITS OFFERED BY THE

10:58AM 22   GOVERNMENT, AND WE'LL PROVIDE YOU WITH THOSE FROM THE DEFENSE.

10:58AM 23        THE EXHIBITS WHICH GIVE FURTHER CONTEXT ON HDL FOR YOU TO

10:58AM 24   TAKE A LOOK AT ARE LISTED HERE.  THEY PROVIDE THE CONTEXT AS TO

10:58AM 25   WHAT REALLY HAPPENED WITH RESPECT TO THESE ASSAYS FOLLOWING THE

10:58AM  1     PATTERN THAT I'VE JUST DESCRIBED.

10:58AM  2          NOW, HOW DO YOU KNOW WHAT I'VE TOLD YOU IS JUST TRUE EVEN

10:58AM  3     WITHOUT DIGGING THROUGH ALL OF THE DOCUMENTS THAT I'VE LISTED

10:58AM  4     ON THIS SLIDE?

10:58AM  5          HOW DO YOU KNOW THAT THERANOS DID NOT BELIEVE, AND

10:58AM  6     THEREFORE MS. HOLMES DID NOT BELIEVE, THAT IT WAS OFFERING

10:58AM  7     INACCURATE OR UNRELIABLE TEST RESULTS?

10:58AM  8          WELL, RECALL DR. ROSENDORFF WAS ASKED SQUARELY ABOUT THIS.

10:58AM  9     HE SAID -- AFTER BEING SHOWN ALL OF THESE EMAILS AND AFTER

10:59AM 10     THESE ISSUES WERE DISCUSSED AT LENGTH WITH HIM, HE WAS ASKED

10:59AM 11     SQUARELY, "YOU NEVER OFFERED TESTS THAT YOU THOUGHT WERE

10:59AM 12     INACCURATE AND UNRELIABLE WHEN YOU WERE SERVING AS LAB DIRECTOR

10:59AM 13     AT THERANOS; CORRECT?

10:59AM 14          "CORRECT."

10:59AM 15          THE LAB DIRECTOR DID NOT BELIEVE THAT THE TESTS WERE

10:59AM 16     INACCURATE OR UNRELIABLE.

10:59AM 17          AND THEN HE WAS ASKED, "DID YOU EVER USE A TEST ON

10:59AM 18     PATIENTS THAT YOU BELIEVED WAS INACCURATE OR UNRELIABLE?"

10:59AM 19          AND HE SAID, "NO.  NO."

10:59AM 20          THE PERSON WHO WAS SUPPOSED TO MAKE THESE DETERMINATIONS

10:59AM 21     DID NOT BELIEVE THAT TESTS WERE INACCURATE OR UNRELIABLE.

10:59AM 22          WHAT THE GOVERNMENT HAS REALLY DONE WITH RESPECT TO THIS

10:59AM 23     ISSUE IS THAT THEY HAVE LOOKED AT ISSUES THAT ARE COMING UP AND

10:59AM 24     BEING INVESTIGATED AND RESOLVED AND CONFLATED THAT WITH THE

10:59AM 25     IDEA THAT MS. HOLMES SHOULD SOMEHOW STEP IN AND FILL IN FOR THE

10:59AM   1    LAB DIRECTOR AND REMOVE OR KNOW THINGS THAT THE LAB DIRECTOR

11:00AM   2    DOESN'T KNOW.

11:00AM   3         WELL, THAT WOULD BE ENTIRELY IMPROPER AS I THINK YOU HEARD

11:00AM   4    DR. ROSENDORFF TESTIFY.

11:00AM   5         AND HE SAID THAT NOT ONLY WITH REGARD TO THE TESTS THAT

11:00AM   6    WERE OFFERED, THE CLASSES OF TESTS, SAY HDL OR HCG.

11:00AM   7         HE SAID HE NEVER WAS AWARE OF A PATIENT GETTING A TEST

11:00AM   8    THAT AT THE TIME HE BELIEVED WAS INACCURATE OR UNRELIABLE AT

11:00AM   9    THE TIME THAT IT WAS OFFERED.  HE SAID THAT OVER AND OVER AND

11:00AM  10    OVER AGAIN.

11:00AM  11         HE SAID THAT HE NEVER ALLOWED FOR THE RELEASE OF

11:00AM  12    INACCURATE RESULTS, THAT HE NEVER DIRECTED, THAT MS. HOLMES

11:00AM  13    NEVER DIRECTED THAT A PARTICULAR MACHINE BE USED, THAT SHE

11:00AM  14    NEVER TOLD HIM TO RELEASE A RESULT THAT SHE THOUGHT HE

11:00AM  15    SHOULDN'T RELEASE.  THAT SHE NEVER DIRECTED HIM OR OVERRULED

11:00AM  16    HIM ON ANYTHING IN CONNECTION WITH THE LAB, NOTHING.

11:00AM  17         THE EMAIL THAT THE GOVERNMENT USES HERE TO SHOW INTENT, ET

11:00AM  18    CETERA, HAPPEN WITHIN THIS FRAMEWORK WHERE THERE'S A LAB

11:01AM  19    DIRECTOR FOR THE FIRST YEAR.

11:01AM  20         HE ALSO TOLD YOU, YOU KNOW, NO LAB IS PERFECT, THAT THERE

11:01AM  21    ARE POTENTIAL ISSUES IN EVERY LAB.

11:01AM  22         I THINK WE SHOWED YOU AN EMAIL WHICH REFLECTED HIM

11:01AM  23    ACTUALLY SAYING THAT AN ISSUE HAD COME UP AND BEEN RAISED BY A

11:01AM  24    DOCTOR AND THAT -- THIS WASN'T THE FAULT OF THE TEST OR OF

11:01AM  25    THERANOS; THAT THIS WAS A MISREADING OF THE SITUATION BY THE

11:01AM 1    DOCTOR.  HE ACKNOWLEDGED THAT THERE WERE LAB ERRORS IN EVERY

11:01AM 2    LAB.

11:01AM 3         I THINK IN THE INSTANCE WHERE HE TRIED TO CLAIM THAT THEY

11:01AM 4    WERE MORE FREQUENT THAT AT THERANOS THAN IN HIS PRIOR

11:01AM 5    EXPERIENCES, HE WAS THEN SHOWN AND ACKNOWLEDGED THAT HE HAD

11:01AM 6    TESTIFIED PREVIOUSLY TO THE OPPOSITE PROPOSITION.

11:01AM 7         NOW, LET'S TALK ABOUT HIS DEPARTURE FROM THERANOS BECAUSE

11:01AM 8    IT WAS PORTRAYED ON HIS DIRECT EXAMINATION AND AGAIN YESTERDAY

11:01AM 9    AS IF HIS DEPARTURE WAS MOTIVATED BY A CONCERN ON HIS PART THAT

11:02AM 10   SOMETHING UNTOWARD WAS HAPPENING AT THERANOS.

11:02AM 11        FIRST OF ALL, I WOULD JUST ASK YOU TO VIEW THIS THROUGH

11:02AM 12   THE LENS OF MS. HOLMES'S INTENT.

11:02AM 13        HE SENT AN EMAIL TO MS. HOLMES WHICH WAS A GRACIOUS EMAIL.

11:02AM 14   HE DID NOT IDENTIFY ANY OF THE CONCERNS THAT HE IS NOW

11:02AM 15   IDENTIFYING.

11:02AM 16        AS YOU'LL RECALL THIS STORY, WHAT HAPPENED WITH REGARD TO

11:02AM 17   DR. ROSENDORFF WAS THAT THERANOS WANTED HIM TO STAY FOR A

11:02AM 18   PERIOD OF 60 DAYS AFTER HIS DEPARTURE BECAUSE THEY WANTED TO

11:02AM 19   FIND A NEW LAB DIRECTOR TO REPLACE HIM BECAUSE HIS DEPARTURE

11:02AM 20   WAS UNEXPECTED.

11:02AM 21        AND SHORTLY AFTER THOSE DISCUSSIONS WITH DR. ROSENDORFF,

11:02AM 22   HE BEGAN TO SEND EMAILS WITH VARIOUS COMPLAINTS AND QUESTIONS

11:02AM 23   ABOUT THINGS AT THERANOS.

11:02AM 24        YOU'LL REMEMBER JUST RECENTLY DURING MS. HOLMES'S

11:03AM 25   TESTIMONY WE SAW AN EMAIL EXCHANGE WHERE HE HAD RAISED A

11:03AM 1    QUESTION ABOUT IS THERE EBOLA ON THE PREMISES OF WHERE THE CLIA

11:03AM 2    LAB IS?

11:03AM 3         AND, OF COURSE, THERE WAS NOT.  THE EVIDENCE SHOWED THAT

11:03AM 4    THERE WERE, IN CONNECTION WITH RESEARCH BEING DONE AT A

11:03AM 5    DIFFERENT FACILITY, EBOLA WAS BEING DISCUSSED.

11:03AM 6         BUT THE SAME WAS TRUE IN CONNECTION WITH CONCERNS ABOUT

11:03AM 7    THE CLIA LAB.  HE RAISED THIS EMAIL TO MS. HOLMES IN THE MIDDLE

11:03AM 8    OF NOVEMBER AND HE SAID THAT HE WAS UNCOMFORTABLE WITH WHAT WAS

11:03AM 9    HAPPENING IN THE COMPANY AND THAT HE WAS GETTING QUESTIONS THAT

11:03AM 10   HE DIDN'T WANT TO ANSWER, ET CETERA.

11:03AM 11        WELL, LET'S LOOK AT WHAT MS. HOLMES SAID IN RESPONSE TO

11:03AM 12   THAT EMAIL.

11:03AM 13        SHE SAID, OUTSIDE OF THE FACT THAT YOU'VE NEVER EMAILED ME

11:03AM 14   ON ANY CONCERNS, YOU KNOW FROM EVERY CONVERSATION HOW

11:04AM 15   FUNDAMENTAL IT IS FOR YOU NEVER TO DO ANYTHING YOU'RE NOT

11:04AM 16   COMPLETELY CONFIDENT IN.

11:04AM 17        SHE WAS SURPRISED ON THIS PRESENTATION FROM

11:04AM 18   DR. ROSENDORFF.

11:04AM 19        NOW, DR. ROSENDORFF TESTIFIED THAT HE HAD A NUMBER OF

11:04AM 20   CONCERNS ABOUT THE INTEGRITY OF ASSAYS THAT WERE BEING OFFERED,

11:04AM 21   BUT I'D ASK YOU TO KEEP THE FOLLOWING IN MIND IN CONNECTION

11:04AM 22   WITH THAT.

11:04AM 23        FIRST, HE'S GIVEN VERY UNRELIABLE AND INCONSISTENT

11:04AM 24   STATEMENTS OVER TIME.  AS YOU RECALL HE WAS SHOWN THOSE DURING

11:04AM 25   HIS EXAMINATION AND HE ACKNOWLEDGED MAKING PRIOR INCONSISTENT

11:04AM  1    STATEMENTS.

11:04AM  2         HE LEFT THERANOS BECAUSE HE HAD FOUND A NEW JOB AND HE

11:04AM  3    WANTED TO START THAT NEW JOB, AND HE DID NOT WANT TO STAY AT

11:04AM  4    THERANOS FOR THE 60 DAY PERIOD THAT THERANOS WAS TRYING TO GET

11:04AM  5    HIM TO STAY THERE.

11:04AM  6         IN THE MONTHS LEADING UP TO THIS, WE SHOWED YOU SEVERAL

11:04AM  7    EMAILS WHERE HE WAS ERRATIC AND UNRESPONSIVE.  YOU MAY RECALL

11:04AM  8    EMAILS FROM MS. HOLMES'S BROTHER IN WHICH THEY WERE TRYING TO

11:04AM  9    GET HIM TO RESPOND TO A DOCTOR'S CONCERN.

11:05AM  10        AND THEN WHILE HE'S BEEN UNDER INVESTIGATION IN CONNECTION

11:05AM  11   WITH HIS LAB LICENSE, HE'S GIVEN INCONSISTENT STATEMENTS ABOUT

11:05AM  12   THE REASONS THAT HE LEFT THERANOS.

11:05AM  13        SO I THINK WHEN YOU HEAR HIS ASSERTION ABOUT CONCERNS OF

11:05AM  14   THERANOS, YOU SHOULD VIEW THAT TESTIMONY THROUGH THAT LENS.

11:05AM  15        NOW, AFTER DR. ROSENDORFF LEFT, AS YOU KNOW, DR. DHAWAN

11:05AM  16   BECAME THE LAB DIRECTOR.  AND I THINK IT'S FAIR TO SHOW YOU

11:05AM  17   THAT THE GOVERNMENT SAID YESTERDAY, AS THEY'VE SAID THROUGHOUT

11:05AM  18   THE CASE, THAT MR. HOLMES AND MR. BALWANI CHOSE TO PICK

11:05AM  19   MR. BALWANI'S DERMATOLOGIST TO RUN THE LAB.  AND THEY SAID THAT

11:05AM  20   MS. HOLMES AND MR. BALWANI PUT DR. DHAWAN IN CHARGE.

11:05AM  21        THAT IS NOT A FAIR CHARACTERIZATION OF WHAT MS. HOLMES WAS

11:05AM  22   SEEING AT THE TIME.

11:05AM  23        LET'S LOOK AT WHAT MS. HOLMES WAS SEEING AT THE TIME AS TO

11:06AM  24   WHAT WAS HAPPENING AFTER DR. ROSENDORFF LEFT.

11:06AM  25        THIS IS THE GOVERNMENT'S PRESENTATION, WHICH IS THE

Case 5:18-cr-00258-EJD Document 1703, Filed 01/18/23, Page 97 of 244
Case 5:22-cr-00258-EJD Document 1702-6, Filed 01/13/23, Page 97 of 244
CLOSING ARGUMENT BY MR. DOWNEY (RES.)                              9207

11:06AM  1    DERMATOLOGIST WAS IN CHARGE AND THERE WERE NO OTHER

11:06AM  2    PROTECTIONS.

11:06AM  3         BUT FIRST, AS YOU KNOW, DR. SAWYER, WHO THE GOVERNMENT

11:06AM  4    DIDN'T ACKNOWLEDGE OR MENTION IN ITS OPENING UNTIL DR. DHAWAN

11:06AM  5    WAS EXAMINED ABOUT IT, SHE CAME AT THE SAME TIME AND SHE

11:06AM  6    PROVIDED ADDITIONAL SERVICE.

11:06AM  7         BUT MORE FUNDAMENTALLY, THERE WAS LAB PERSONNEL WHOM

11:06AM  8    MS. HOLMES TESTIFIED MR. BALWANI HAD IDENTIFIED AS THESE ARE

11:06AM  9    THE INTERNAL PERSONNEL WHO ARE WORKING IN LIEU OF HAVING A

11:06AM  10   FULL-TIME LAB DIRECTOR, AND HE IDENTIFIES DR. SURAJ SAKSENA AS

11:06AM  11   THE INTERNAL CANDIDATE WHO HE EXPECTED TO BECOME THE LAB

11:06AM  12   DIRECTOR.

11:06AM  13        AND HE SAID THAT HE HAD WORKED IN THE CLIA LAB FOR A LONG

11:06AM  14   TIME.  HE WAS FULLY QUALIFIED, IN FACT, BUT THERE WERE

11:07AM  15   REQUIREMENTS ON PAPER THAT HE HAD TO MEET, AND HE WAS GETTING

11:07AM  16   THOSE, AND MR. BALWANI EXPECTED HE WOULD BECOME THE NEXT LAB

11:07AM  17   DIRECTOR.

11:07AM  18        NOW, THAT'S THE PICTURE THAT MS. HOLMES SAW, NOT THAT

11:07AM  19   MR. BALWANI'S DERMATOLOGIST WAS IN CHARGE, BUT RATHER THAT

11:07AM  20   THERE WAS THIS GROUP OF QUALIFIED PEOPLE:  DR. SAKSENA, THERE

11:07AM  21   WAS THE OUTSIDE CONSULTANT; MR. HURST, WHO HAD SET UP THE CLIA

11:07AM  22   LAB, WHO AGAIN WAS ENGAGED, AND HE WAS WORKING IN CONNECTION

11:07AM  23   WITH IT; THERE WAS QUALITY CONTROL PERSONNEL LIKE MR. GEE WHO

11:07AM  24   HAD BEEN WORKING WITH THE COMPANY FOR OVER A YEAR; AND THERE

11:07AM  25   WERE PEOPLE IMMEDIATELY UNDER THE LAB DIRECTOR, MS. ALAMDAR,

11:07AM   1    SIDHU, GODFRED MASINDE, A HUGE STAFF WORKING IN THE CLIA LAB

11:07AM   2    WHO HAD SUBSTANTIAL QUALIFICATIONS.

11:07AM   3        BUT FUNDALLY, WHAT THE GOVERNMENT WANTS TO SAY HERE IS

11:08AM   4    THAT MS. HOLMES RECEIVED NOTICE FROM MR. BALWANI THAT THIS LAB

11:08AM   5    WAS BEING -- WAS IN BAD SHAPE, AND THAT THAT WAS NOTICE TO

11:08AM   6    MS. HOLMES THAT SHE SHOULD HAVE KNOWN THINGS.

11:08AM   7        AND THEY SHOWED YOU THIS TEXT YESTERDAY.  ACTUALLY, I

11:08AM   8    THINK I HAVE IT HERE ON THE SLIDE.  THEY SHOWED YOU THIS TEXT,

11:08AM   9    AND THIS IS THE NOTICE THAT THE GOVERNMENT HAS AS TO THE

11:08AM   10   PROBLEMS IN THE CLIA LAB.

11:08AM   11       BUT NOBODY SAYS HERE -- HE SAYS THAT HE'S GOING TO WORK ON

11:08AM   12   FIXING THIS, AND HE WILL TAKE THE LAB OVER.

11:08AM   13       AND YOU KNOW WHAT HIS REPRESENTATIONS OF THAT TO

11:08AM   14   MS. HOLMES SOUNDED LIKE BECAUSE WE SAW HIS DESCRIPTION OF HIS

11:08AM   15   SITUATION IN AN EMAIL DURING THE COURSE OF THE CASE FROM A FEW

11:08AM   16   MONTHS BEFORE THIS.  HE PRESENTED HIMSELF, IN TAKING THE CLIA

11:08AM   17   LAB OPERATIONS, AS SOMEBODY WHO WAS UNIQUELY GIFTED AT

11:09AM   18   ORGANIZATIONAL STRUCTURES AND OPERATIONS, AND HE ASSURED

11:09AM   19   MS. HOLMES THAT HE WAS NOW GOING OUT TO THE CLIA LAB, WHICH WAS

11:09AM   20   IN A DIFFERENT FACILITY, AND TAKING IT OVER.

11:09AM   21       AND WHAT DOES THE RECORD SHOW FROM THIS MOMENT IN NOVEMBER

11:09AM   22   OF 2014 UNTIL CMS AND DR. DHAWAN AT THE END OF 2015?  WHAT

11:09AM   23   PROBLEMS DID MS. HOLMES LEARN ABOUT IN THE CLIA LAB DURING THIS

11:09AM   24   PERIOD FROM NOVEMBER OF 2014 UNTIL THE FALL OF 2015?

11:09AM   25       DO YOU KNOW THE NUMBER OF ISSUES THAT ARE IN THE RECORD OF

| | |
|---|---|
| 11:09AM | 1 |

MS. HOLMES BEING TOLD ABOUT SOME ISSUE IN CONNECTION WITH AN
ASSAY DURING THAT PERIOD?  ONE, WHICH WAS PRESENTED AT THAT
TIME TO HER AS BEING RESOLVED.  THAT'S IT.  THAT IS WHAT THE
RECORD IN THIS MATTER SHOWS; THAT AFTER THE POINT AT WHICH
DR. ROSENDORFF DEPARTED, THIS LARGE STAFF OF INDIVIDUALS LED BY
MR. BALWANI, WITH SUPPLEMENTAL SUPPORT FROM QUALITY CONTROL
EXPERTS AND FROM OUTSIDE LAB DIRECTORS WITH THE CONSULTANT,
MR. HURST, THAT NO PROBLEMS WERE RESULTING IN THE CLIA LAB THAT
REQUIRED HER ATTENTION.  NONE.  NONE.

THE PRESENTATION OF THAT TO MS. HOLMES WAS THAT THE
PROBLEM IN THE CLIA LAB PRIOR TO DR. ROSENDORFF'S DEPARTURE,
WHAT WOULD BE REASONABLE TO INFER?  THAT IT WAS DR. ROSENDORFF.
THERE'S NO INDICATION THAT ANY ISSUE WAS RAISED THAT WAS NOT
ADDRESSED DURING THAT PERIOD.

WHEN IS THE FIRST TIME THAT MS. HOLMES STARTS TO HEAR
ABOUT THOSE ISSUES?  IN THE FALL OF 2015 AS SHE TESTIFIED
DURING HER DIRECT TESTIMONY.

NOW, WE KNOW THAT AFTER CMS CAME IN AND MADE THE FINDINGS
THAT IT MADE, DR. DAS WAS HIRED.  YOU KNOW THAT HE TESTIFIED
THAT HE WAS HIRED WITH A NUMBER OF OTHER LAB DIRECTORS; THAT HE
WAS GIVEN THE MISSION OF TURNING OVER ROCKS; THAT MS. HOLMES
WAS SUPPORTIVE OF THAT; AND THAT HE WAS PART OF A REFORM EFFORT
TO MAKE THE OPERATIONS OF THAT LAB PROFESSIONAL WITH
MS. HOLMES'S SUPPORT AND WITH THE FULL SUPPORT OF RESOURCES.

THAT SOUNDS LIKE A DEFENSE WITNESS.  SO WHY DID THE

1   GOVERNMENT OFFER DR. DAS'S TESTIMONY?

2       WELL, THEY OFFERED HIS TESTIMONY TO I THINK IMPLY THAT THE

3   TECHNOLOGY THAT WAS BEING USED IN THE LAB, THE EDISON DEVICE

4   THAT WAS BEING OFFERED WAS UNRELIABLE OR GENERATING INACCURATE

5   RESULTS OR WAS INHERENTLY DOOMED TO GENERATE INACCURATE AND

6   UNRELIABLE RESULTS.

7       WELL, FIRST OF ALL, I WOULD SAY TO YOU, LADIES AND

8   GENTLEMEN, ALL OF THAT, OF COURSE, IS AFTER THE CONSPIRACY

9   PERIOD HERE.  WE KNOW WHAT HAPPENED WHEN MS. HOLMES HEARD ABOUT

10  DR. DAS'S CONCERNS.

11      BUT SECOND AND MORE FUNDAMENTALLY, THE RECORD REFLECTS

12  THAT DR. DAS DID NOT THINK THAT THE CONCERNS THAT CMS HAD

13  RAISED WERE ABOUT FUNDAMENTALLY THE CAPABILITIES OF ANY OF

14  THERANOS'S TECHNOLOGY.

15      WE KNOW THAT HE WAS ASKED TO REVIEW A STATEMENT THAT

16  MS. BENNETT PROPOSED, THE GIST OF WHICH SAYS THAT THEY REFER TO

17  HOW TECHNOLOGIES WERE USED AND NOT TO THE FUNDAMENTAL INTEGRITY

18  OF THOSE TECHNOLOGIES.

19      HE WAS ASKED IF THAT WAS ACCURATE AND HE RESPONDED "IT'S

20  ACCURATE, IN MY OPINION."

21      NOW, WHAT DID DR. DAS IN FACT CONCLUDE?  HE CONCLUDED THAT

22  THE VALIDATION REPORTS THAT DR. ROSENDORFF HAD SIGNED HAD BEEN

23  DONE INCORRECTLY; THAT THERE WERE STANDARDS SET AS TO WHAT

24  SHOULD ALLOW THOSE TESTS TO BE OFFERED, AND THOSE STANDARDS

25  WERE ALL WRONG.

| | |
|---|---|
| 11:13AM 1 | THAT DR. ROSENDORFF IN EFFECT, AS THE GATEKEEPER FOR |
| 11:13AM 2 | ASSAYS COMING INTO THE LAB, ALLOWED TESTS TO BE OFFERED WITH |
| 11:13AM 3 | INCORRECT ASSESSMENT AND THAT THOSE VALIDATION REPORTS NEVER |
| 11:13AM 4 | SHOULD HAVE BEEN SIGNED BY DR. ROSENDORFF. |
| 11:13AM 5 | SO IN ESSENCE, DR. DAS'S TESTIMONY IS REALLY A CRITICISM |
| 11:13AM 6 | OF THE JOB THAT DR. ROSENDORFF DID AS LAB DIRECTOR. |
| 11:13AM 7 | BUT THAT DOESN'T MEAN THAT AT THE TIME MS. HOLMES'S |
| 11:13AM 8 | TESTIMONY OR MS. HOLMES'S STATE OF MIND WAS NOT EVERYTHING THAT |
| 11:13AM 9 | WAS HAPPENING WITHIN THE CLIA LAB WAS BEING DONE IN A |
| 11:14AM 10 | REASONABLE, A RELIABLE, AND IN AN ACCURATE MANNER. |
| 11:14AM 11 | NOW, YOUR HONOR, I WOULD SUGGEST THAT WE JUST TAKE OUR |
| 11:14AM 12 | BREAK MAYBE NOW.  I JUST HAVE A BRIEF AMOUNT OF ADDITIONAL TIME |
| 11:14AM 13 | AND WE'LL FINISH UP AFTER THAT, BUT I PROBABLY HAVE 20 MINUTES. |
| 11:14AM 14 | THE COURT:  WOULD YOU PREFER THAT AS OPPOSED TO |
| 11:14AM 15 | PRESSING ON FOR 20 MINUTES? |
| 11:14AM 16 | MR. DOWNEY:  I THINK PERHAPS, YES. |
| 11:14AM 17 | THE COURT:  OKAY.  LET'S DO THAT. |
| 11:14AM 18 | LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK NOW.  WE'LL |
| 11:14AM 19 | TAKE 30 MINUTES, PLEASE. |
| 11:14AM 20 | THE CLERK:  COURT IS IN RECESS. |
| 11:15AM 21 | (JURY OUT AT 11:15 A.M.) |
| 11:15AM 22 | THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK |
| 11:15AM 23 | YOU. |
| 11:15AM 24 | THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR OUR |
| 11:15AM 25 | BREAK. |

11:15AM 1    BEFORE WE DO BREAK, I WANT TO RAISE JUST ANOTHER COMMENT

11:15AM 2    JUST TO FOLLOW UP ON OUR CONVERSATION THIS MORNING, AND I THINK

11:15AM 3    IN THE COLLOQUY THAT I HAD WITH COUNSEL, PARTICULARLY WITH

11:15AM 4    MR. DOWNEY, I WAS ASKING QUESTIONS -- I'M TRYING TO FIND THE

11:15AM 5    TRANSCRIPT HERE -- BUT I THINK I WAS ASKING SOME QUESTIONS,

11:15AM 6    MR. DOWNEY, ABOUT WHAT A SOLUTION WOULD BE, OR IF A SOLUTION

11:15AM 7    WAS NEEDED IN REGARDS TO TRADE SECRETS AND IN REGARDS TO ADVICE

11:15AM 8    OF COUNSEL, AND I THINK YOU SAID I'M NOT GOING TO GO INTO THAT

11:15AM 9    ANY FURTHER.

11:15AM 10    AND THEN I MADE A COMMENT ABOUT, WELL, SHOULD I ENCOURAGE

11:15AM 11    THE GOVERNMENT TO, IN THEIR CLOSING, TO DO THIS AND DO THAT?

11:15AM 12    I JUST WANT TO BE CLEAR, THAT WAS A QUESTION. AND YOU

11:15AM 13    ANSWERED THE QUESTION AFTER I THINK A COUPLE OF TIMES AS I SAID

11:16AM 14    SHOULD I ASK, SHOULD I ENCOURAGE THE GOVERNMENT, ARE YOU SAYING

11:16AM 15    I SHOULD ENCOURAGE THE GOVERNMENT TO COMMENT AS XXX, AND YOU

11:16AM 16    SAID RIGHT AS I KEPT GOING, RIGHT.

11:16AM 17            MR. DOWNEY: RIGHT.

11:16AM 18            THE COURT: AND THEN I SAID AT THE END, IS THAT WHAT

11:16AM 19    YOU'RE SAYING OR IS THAT WHAT I SHOULD DO?

11:16AM 20    AND I THINK YOU ANSWERED THAT AS A QUESTION.

11:16AM 21    I WANT TO BE CLEAR. THAT WAS A QUESTION. THE COURT WAS

11:16AM 22    NOT DIRECTING IN ANY WAY THAT THE GOVERNMENT SHOULD PROCEED IN

11:16AM 23    ANY MANNER AND I JUST WANT TO CONFIRM THAT THAT WAS YOUR

11:16AM 24    UNDERSTANDING.

11:16AM 25            MR. DOWNEY: THAT IS MY UNDERSTANDING.

11:16AM  1        I THINK IT WAS -- NOR DID I MEAN TO ENCOURAGE IT BY THE

11:16AM  2    STATEMENT, RIGHT, RIGHT, YES.

11:16AM  3             THE COURT:  RIGHT.

11:16AM  4             MR. DOWNEY:  I DON'T RECALL THE SPECIFICS OF WHAT

11:16AM  5    YOUR HONOR SAID, BUT I DID NOT HEAR THAT AS ENCOURAGEMENT BY

11:16AM  6    THE COURT TO DO THAT.

11:16AM  7             THE COURT:  I JUST WANTED TO MAKE SURE THAT'S -- I

11:16AM  8    FOUND IT HERE.

11:17AM  9        (PAUSE IN PROCEEDINGS.)

11:17AM 10             THE COURT:  THAT'S RIGHT.  I DON'T HAVE A TIME

11:17AM 11    STAMP, I'M SORRY.

11:17AM 12        BUT MY COMMENT WAS, "SO ARE YOU -- AM I HEARING YOU SAY,

11:17AM 13    'JUDGE, I'M GOING TO STAY AWAY, I'M NOT GOING TO SAY "ADVICE OF

11:17AM 14    COUNSEL," I'M NOT GOING TO SAY THAT SHE RELIED ON HER

11:17AM 15    ATTORNEY'S ADVICE.'"

11:17AM 16        AND THEN YOU SAID, "I WASN'T REALLY PLANNING TO RETURN TO

11:17AM 17    THAT."

11:17AM 18        AND THEN I CONTINUED MY COLLOQUY.  "'I'M GOING TO AVOID

11:17AM 19    THAT AND I'M NOT GOING TO GO BACK TO THAT IN MY ARGUMENT.  MY

11:17AM 20    ARGUMENT IS WELL BEYOND THAT AND I HAVE OTHER THINGS TO TALK

11:17AM 21    ABOUT IN THE TIME REMAINING."

11:17AM 22        "YES."

11:17AM 23        "AND I WOULD EXPECT THAT AND I WOULD OTHERWISE ENCOURAGE,

11:17AM 24    IF THEY WISH, THE GOVERNMENT" -- AND WHEN I WAS SAYING "IF THEY

11:17AM 25    WISH," I WAS SPEAKING FOR YOU.

11:17AM  1        IN OTHER WORDS, SAYING, IS THIS WHAT YOU'RE TELLING ME TO

11:17AM  2   DO?

11:17AM  3        -- "THE GOVERNMENT IN THEIR REBUTTAL TO SPEAK TO THIS

11:17AM  4   ISSUE IF THEY WISH AND TO SUGGEST THAT THERE'S A DEFICIT IN THE

11:17AM  5   EVIDENCE AS TO ADVICE OF COUNSEL AND THEY MAY NOT CONSIDER IT

11:17AM  6   AND IT'S ARGUMENT, AND IT'S NOT EVIDENCE, BUT IT'S ARGUMENT,

11:17AM  7   AND THAT WOULD SUFFICE TO INFORM THE JURY AS TO ANY CONCERNS

11:18AM  8   THAT THEY MIGHT HAVE ABOUT WHETHER OR NOT THEY SHOULD RELY ON

11:18AM  9   AN ADVICE OF COUNSEL," QUESTION MARK.

11:18AM 10        AND THEN YOU SAID, "WELL, I DON'T HAVE ANY BURDEN WITH

11:18AM 11   REGARD TO THE INTENT DEFENSE."

11:18AM 12        I THINK YOU TALKED ABOUT THAT.  I THINK THAT WOULD BE

11:18AM 13   APPROPRIATE.

11:18AM 14        AND THEN I -- AT THE END OF YOUR COMMENT, THE COURT SAID,

11:18AM 15   "SO MY QUESTION WAS, SHOULD WE JUST RELY ON THE GOVERNMENT

11:18AM 16   TO -- THEY KNOW WHAT THE ISSUE IS, AND IF THEY WANT TO TALK

11:18AM 17   ABOUT IT, THEY CAN ADDRESS IT IN THEIR REBUTTAL."

11:18AM 18        AND THEN YOU WENT ON AND SUGGESTED THAT.

11:18AM 19        THAT WAS THE TRANSCRIPT.  I WAS THINKING ABOUT THIS AND I

11:18AM 20   DIDN'T WANT TO SUGGEST THAT THE COURT WAS IN ANY WAY

11:18AM 21   DIRECTING -- AS I SAID EARLIER IN MY COMMENTS, I'M NOT GETTING

11:18AM 22   INTO EITHER OF YOUR CASES, I'M STAYING AWAY FROM THAT.

11:18AM 23        I WAS CONCERNED ABOUT INSTRUCTIONS AND WHETHER THERE WAS A

11:18AM 24   DEFICIT IN INSTRUCTIONS GIVEN THE COMMENTS THAT THE COURT

11:18AM 25   SHOULD ADVISE ON.

11:18AM  1          WE HAD THAT COLLOQUY, BUT I JUST WANT TO BE CLEAR, I WAS

11:18AM  2     NOT ENCOURAGING, DIRECTLY ENCOURAGING THE GOVERNMENT TO TAKE

11:19AM  3     ANY OBJECTION ON THIS.

11:19AM  4          WHAT I COMMENTED THERE IS IN REGARDS TO A QUESTION,

11:19AM  5     HYPOTHETICAL IF YOU WILL, AND I THINK YOU ANSWERED.

11:19AM  6          IS THAT YOUR UNDERSTANDING OF HOW IT TRANSPIRED?

11:19AM  7              MR. DOWNEY:  WELL, I THINK IF IT WASN'T, IT'S CLEAR

11:19AM  8     NOW.

11:19AM  9              THE COURT:  DOES THE GOVERNMENT WISH TO COMMENT ON

11:19AM 10     THIS?

11:19AM 11              MR. BOSTIC:  YOUR HONOR, ONLY TO SAY THAT I PARSED

11:19AM 12     THE COMMENTS THE SAME WAY THE COURT DID AND I THINK THE SAME

11:19AM 13     WAY THE COURT INTENDED.

11:19AM 14          I DIDN'T TAKE THEM AS DIRECTION OR ENCOURAGEMENT TO THE

11:19AM 15     GOVERNMENT AS FAR AS THE CONTENT OF THE REBUTTAL.

11:19AM 16              THE COURT:  WELL, THANK YOU.  AND THAT -- BECAUSE

11:19AM 17     THAT WOULD BE INAPPROPRIATE FOR THE COURT TO ADVISE EITHER OF

11:19AM 18     YOU HOW TO ARGUE YOUR CASE, AND THAT'S --

11:19AM 19              MR. DOWNEY:  OF COURSE, YOUR HONOR.

11:19AM 20              THE COURT:  AND THAT WAS NOT MY INTENT.  I JUST WANT

11:19AM 21     TO BE CLEAR ON THAT.

11:19AM 22          I THOUGHT ABOUT THAT AND I THOUGHT, WELL, I BETTER --

11:19AM 23     SOMETIMES IN DISCOURSE WE SAY THINGS, AND I JUST DIDN'T WANT

11:19AM 24     THERE TO BE ANY LACK OF CLARITY ON THAT.

11:19AM 25          ALL RIGHT.  THANK YOU VERY MUCH.

11:19AM  1          MR. DOWNEY:  UNDERSTOOD.  I SHOULD SAY, YOUR HONOR,

11:19AM  2   THAT ON LACK OF CLARITY, I REALIZED ON REVIEW OF THE TRANSCRIPT

11:19AM  3   THAT I HAD MISSPOKEN ON THE ISSUE THAT I BEGAN WITH TODAY, SO

11:20AM  4   I'VE TRIED TO CORRECT THAT AS PART OF OUR DISCUSSION.

11:20AM  5          THE COURT:  THANK YOU.  AND THANK YOU FOR STEERING

11:20AM  6   AWAY FROM AGE AND FATIGUE.  THANK YOU.

11:20AM  7       ALL RIGHT.  WE'LL TAKE OUR BREAK.

11:20AM  8          THE CLERK:  COURT IS IN RECESS.

11:20AM  9       (RECESS FROM 11:20 A.M. UNTIL 11:56 A.M.)

11:56AM  10      (JURY IN AT 11:56 A.M.)

11:56AM  11         THE COURT:  THANK YOU.  PLEASE BE SEATED.

11:56AM  12      WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:56AM  13  ARE PRESENT AGAIN.  OUR JURY IS PRESENT.

11:56AM  14      MR. DOWNEY.

11:56AM  15         MR. DOWNEY:  I WANT TO SPEND JUST A FEW MINUTES

11:56AM  16  TALKING WITH YOU ABOUT THE PATIENT COUNTS OF THE INDICTMENT AND

11:56AM  17  GIVE YOU THE FRAMEWORK THAT I THINK WILL BE HELPFUL TO YOU IN

11:56AM  18  LOOKING AT THOSE COUNTS.

11:56AM  19      FIRST OF ALL, RECALL WHAT THE CHARGE IS IN CONNECTION WITH

11:56AM  20  THE SECOND CONSPIRACY, THE PATIENT CONSPIRACY, AND THE PATIENT

11:56AM  21  COUNTS.  IT'S NOT THAT ANY INDIVIDUAL PATIENT GOT AN ERRANT

11:57AM  22  TEST.  THAT'S OBVIOUSLY A RESULT THAT NO ONE WANTS AND IT'S

11:57AM  23  UNDERSTANDABLY FRUSTRATING AND UPSETTING FOR THEM AND WE SAW

11:57AM  24  SOME OF THAT DURING THE COURSE OF THIS CASE.

11:57AM  25      BUT THE QUESTION IS, DID MS. HOLMES KNOW, IN RUNNING

11:57AM  1    THERANOS, THAT THERANOS WAS NOT ABLE TO CONSISTENTLY PROVIDE

11:57AM  2    ACCURATE AND RELIABLE RESULTS?

11:57AM  3        SO I THINK THE PLACE TO START WITH RESPECT TO THIS

11:57AM  4    ANALYSIS IS, IS WHAT WE KNOW ABOUT THE NUMBER OF TESTS THAT

11:57AM  5    THERANOS OFFERED AND WHAT THE GOVERNMENT DID IN CONNECTION WITH

11:57AM  6    ITS CASE.

11:57AM  7        I WOULD HAVE TO SAY FIRST, LADIES AND GENTLEMEN, THE

11:57AM  8    GOVERNMENT DIDN'T OFFER YOU ANY OVERVIEW DURING ITS CASE OF

11:57AM  9    STATISTICAL EVIDENCE.

11:57AM  10       WE HAVE NO IDEA OTHER THAN BASED ON THE ANECDOTES THAT

11:57AM  11   WE'VE HEARD THROUGH EMAILS ON A FEW OCCASIONS AND THE

11:58AM  12   INDIVIDUAL CASES WE KNOW ABOUT FROM THE THREE PATIENTS WHO

11:58AM  13   TESTIFED OF ERRORS OR POTENTIAL ERRORS.

11:58AM  14       THERE WAS NO PRESENTATION OF EVIDENCE AS TO THE RATE THAT

11:58AM  15   THOSE ERRORS WERE OCCURRING.  THERE WAS NO SAMPLING OF DATA.

11:58AM  16   THERE WAS NO PRESENTATION AT ALL OF ANY KIND OF A STATISTICAL

11:58AM  17   ANALYSIS.

11:58AM  18       I WOULD SAY TO YOU, LADIES AND GENTLEMEN, THAT THAT ALONE

11:58AM  19   IS A BASIS ON WHICH TO DECIDE THAT THIS CHARGE DOES NOT HAVE

11:58AM  20   MERIT.

11:58AM  21       WHY?

11:58AM  22       WELL, WE KNOW FROM TESTIMONY DURING THE COURSE OF THE CASE

11:58AM  23   HOW MANY TESTS THERANOS OFFERED WHEN IT WAS RUNNING A CLINICAL

11:58AM  24   LAB, AND IT'S SOMEWHERE IN THE NEIGHBORHOOD AT LEAST OF 8

11:58AM  25   MILLION PATIENTS WHO GOT TESTS.  IT MAY HAVE BEEN MORE.  THERE

| 11:58AM | 1 | WERE SLIGHTLY DIFFERENT ESTIMATES AS TO THE NUMBER OF TESTS |
| 11:59AM | 2 | THAT WERE OFFERED. |
| 11:59AM | 3 | NOW, IN REALTIME, WHAT DID MS. HOLMES KNOW BETWEEN 2013 |
| 11:59AM | 4 | AND EARLY 2016?  WHAT DID MS. HOLMES KNOW ABOUT INACCURACY WITH |
| 11:59AM | 5 | RESPECT TO THOSE TESTS? |
| 11:59AM | 6 | SO WE'RE NOT TALKING ABOUT DR. DAS'S ANALYSIS, WHICH IS |
| 11:59AM | 7 | PERFORMED AFTER THESE EVENTS.  WE'RE TALKING ABOUT WHAT |
| 11:59AM | 8 | HAPPENED IN REALTIME THAT TOLD HER OF ERRANT RESULTS AMONGST |
| 11:59AM | 9 | THESE 8 MILLION TESTS? |
| 11:59AM | 10 | WELL, THE TRUTH IS THAT WE DON'T REALLY KNOW MUCH EXCEPT |
| 11:59AM | 11 | FOR THE PATIENTS WHO HAVE COME TO TESTIFY, AND THE GOVERNMENT |
| 11:59AM | 12 | IN THE COURSE OF ITS CASE WAS ABLE TO PRESENT TESTIMONY FROM |
| 11:59AM | 13 | THREE PATIENTS, AND THEY TESTIFIED THAT IN CONNECTION WITH |
| 11:59AM | 14 | THREE DIFFERENT ASSAYS THAT THERANOS OFFERED, THAT SEVEN OF THE |
| 12:00PM | 15 | RESULTS CONTAINED ERRORS OR SEEMED TO CONTAINED ERRORS. |
| 12:00PM | 16 | TWO OF THOSE DOCTORS FOR THOSE PATIENTS TESTIFIED, |
| 12:00PM | 17 | DR. ZACHMAN AND DR. BURNES. |
| 12:00PM | 18 | THERE WERE NO OTHER WITNESSES AND NO OTHER TESTIMONY FROM |
| 12:00PM | 19 | DOCTORS OR PATIENTS ABOUT ERRANT RESULTS. |
| 12:00PM | 20 | SO THAT'S OUT OF THE 8 MILLION TESTS THAT WE KNOW WERE |
| 12:00PM | 21 | OFFERED OVER TIME. |
| 12:00PM | 22 | AND THEN I DO WANT TO LOOK AT EACH OF THOSE COUNTS |
| 12:00PM | 23 | INDIVIDUALLY BECAUSE THEY'RE EACH IMPORTANT. |
| 12:00PM | 24 | BUT I THINK, AS YOU CONSIDER BOTH THE CONSPIRACY COUNT AND |
| 12:00PM | 25 | YOU CONSIDER EACH OF THESE INDIVIDUAL COUNTS, REMEMBER THAT THE |

12:00PM 1    CHARGE HERE IS THAT MS. HOLMES INTENTIONALLY DEFRAUDED PEOPLE

12:00PM 2    IN SUGGESTING THAT THERANOS'S TESTS WERE ACCURATE OR RELIABLE.

12:00PM 3        AND THE EVIDENCE THAT HAS BEEN SHOWN IS THAT SHE SHOULD

12:00PM 4    HAVE KNOWN THAT BASED ON THESE THREE RESULTS OUT OF 8 MILLION

12:01PM 5    TESTS, AND PERHAPS, EVEN IF ONE WERE TO ACCEPT THE GOVERNMENT'S

12:01PM 6    OFFERED IMPLICATIONS FROM EMAILS, MAYBE ANOTHER 20 EMAILS,

12:01PM 7    WHICH WE DON'T REALLY KNOW WHAT THE END OF THAT STORY WAS.

12:01PM 8        BUT LET ME DISCUSS EACH OF THE CASES BECAUSE I THINK EACH

12:01PM 9    OF THESE CASES IS ALSO INSTRUCTIVE STATISTICALLY.

12:01PM 10       YOU KNOW THAT MS. TOMPKINS TESTIFIED, AND SHE GOT AN HIV

12:01PM 11   RESULT WHICH SHE UNDERSTOOD TO BE AN HIV POSITIVE RESULT.

12:01PM 12       SHE WAS TREATED BY A PHYSICIAN NAMED DR. ASIN,

12:01PM 13   GERALD ASIN.

12:01PM 14       THE GOVERNMENT CHOSE NOT TO CALL DR. ASIN AS PART OF ITS

12:01PM 15   CASE-IN-CHIEF.

12:01PM 16       BUT WE KNOW WHAT DR. ASIN CONCLUDED WITH RESPECT TO

12:01PM 17   THERANOS'S TESTS OVER TIME BECAUSE WE INTRODUCED THROUGH OUR

12:01PM 18   SUMMARY WITNESS, MR. MIDDLETON, THE RESULTS OF THE STATISTICS

12:02PM 19   AS TO HOW MANY TESTS DR. ASIN ORDERED FROM THERANOS, AND IT'S

12:02PM 20   ABOUT 2,000 TESTS.

12:02PM 21       WE ONLY KNOW OF THE ONE ERRANT RESULT, EVEN FOR THAT ONE

12:02PM 22   PHYSICIAN WE KNOW HAD AN ERRANT TEST, WE KNOW HE ORDERED ABOUT

12:02PM 23   2,000 TESTS.

12:02PM 24       AND THEN WE HEARD FROM MR. ELLSWORTH WHO HAD THE ERRANT

12:02PM 25   PSA TEST, AND AS YOU RECALL, HE WAS DR. BURNES'S PATIENT AND HE

```
12:02PM   1    DID TESTIFY, AND HE ACTUALLY TESTIFIED THAT HE HAD BEEN USING

12:02PM   2    THERANOS SERVICES FOR A YEAR, AND THAT IN CONNECTION WITH ALL

12:02PM   3    OF THE TEST RESULTS THAT WERE GENERATED OVER THE COURSE OF THAT

12:02PM   4    YEAR BY PATIENTS OF HIS WHO WENT TO THERANOS, THE GOVERNMENT

12:02PM   5    ACTUALLY DIDN'T EVEN ASK TO SEE THE OTHER RESULTS TO EVALUATE

12:03PM   6    WHETHER THEY WERE CORRECT OR NOT.

12:03PM   7         SO, AGAIN, WITH ONE DOCTOR WHO USED THE SERVICE OVER A

12:03PM   8    LONG PERIOD OF TIME, THERE APPEARS TO HAVE BEEN ONE TESTING

12:03PM   9    ERROR THAT THE GOVERNMENT COULD IDENTIFY.

12:03PM  10         THEN WE ALSO HAD TESTIMONY EARLIER IN THE CASE FROM

12:03PM  11    MS. GOULD, WHICH WAS OBVIOUSLY A SITUATION FOR HER THAT WAS A

12:03PM  12    HORRIBLE SITUATION, AND WE KNOW FROM THE TESTIMONY THAT HER

12:03PM  13    NURSE PRACTITIONER WAS DR. ZACHMAN, AND DR. ZACHMAN WORKED FOR

12:03PM  14    A CLINIC, AND SHE HAD SEVERAL OTHER PHYSICIANS AND

12:03PM  15    PRACTITIONERS WHO WERE PART OF THAT CLINIC WITH HER.

12:03PM  16         AND SHE WAS ASKED BY THE GOVERNMENT AS PART OF THIS

12:03PM  17    INVESTIGATION TO LOOK THROUGH THE RECORDS OF THAT CLINIC AND TO

12:03PM  18    IDENTIFY OTHER PROBLEMATIC RESULTS ON THE HCG ASSAY, AND SHE --

12:04PM  19    WE INTRODUCED THE EVIDENCE WHEN DR. ZACHMAN TESTIFIED THAT SHE,

12:04PM  20    SHE WASN'T ABLE TO IDENTIFY OTHER INSTANCES OF ERROR FOR -- IN

12:04PM  21    THOSE CASES.

12:04PM  22         MY POINT, LADIES AND GENTLEMEN, IS SIMPLY THIS:

12:04PM  23    DR. ROSENDORFF TESTIFIED THAT IT WAS WELL-KNOWN THAT THERE WERE

12:04PM  24    ERRORS IN CONNECTION WITH LAB TESTING.  IT DOESN'T MATTER WHAT

12:04PM  25    THE LAB IS, IT'S -- THERE ARE ERRORS, AND NO ONE IS EXCUSING
```

12:04PM 1    THAT OR DEFENDING IT.

12:04PM 2        BUT THE QUESTION IS WHETHER THE ERRORS HERE PUT MS. HOLMES

12:04PM 3    ON NOTICE THAT THERE WAS A PROBLEM, AND STATISTICALLY THERE'S

12:04PM 4    NO EVIDENCE THAT -- NO SUGGESTION THAT THE EVIDENCE THAT THE

12:04PM 5    GOVERNMENT HAS ADDUCED THAT THESE ERRORS WERE HAPPENING AT A

12:04PM 6    LEVEL THAT SHOULD HAVE PUT HER ON NOTICE THAT THERANOS'S TESTS

12:05PM 7    WERE INACCURATE OR UNRELIABLE.

12:05PM 8        LET ME LOOK AT THE INDIVIDUAL CASES IN A BIT MORE DETAIL,

12:05PM 9    BECAUSE EVEN WITHIN THE CASES I THINK THEY'RE INSTRUCTIVE AS TO

12:05PM 10   THE DATA THAT HAS BEEN PRESENTED TO YOU.

12:05PM 11       COUNT TEN CONCERNS MS. TOMPKINS, THE PATIENT WHO GOT AN

12:05PM 12   HIV RESULT THAT SHE INTERPRETED AS AN HIV POSITIVE REPORT.

12:05PM 13       I SHOULD SAY, FIRST OF ALL, THAT THAT WAS NOT ON A

12:05PM 14   THERANOS DEVICE.  THE HIV POSITIVE TEST THAT SHE UNDERSTOOD SHE

12:05PM 15   GOT WAS ON AN FDA APPROVED DEVICE, A COMMERCIAL DEVICE, SO THE

12:05PM 16   TEST WAS NOT RUN WITH THERANOS TECHNOLOGY.

12:05PM 17       BUT BE THAT AS IT MAY, THE LAB RESULTS ON THEIR FACE

12:05PM 18   ACTUALLY WOULD BE DIFFICULT FOR A LAYPERSON TO INTERPRET

12:05PM 19   BECAUSE THEY INTRODUCE SOMEWHAT CONTRADICTORY THINGS.

12:06PM 20       YOU CAN LOOK AT THIS EXCERPT FROM THE LAB RESULTS OF

12:06PM 21   MS. TOMPKINS, AND AS YOU SEE, ALTHOUGH THERE WERE SOME

12:06PM 22   INDICATIONS OF POSITIVE FINDINGS IN CONNECTION WITH THIS TEST,

12:06PM 23   THERE WAS ALSO A STATEMENT THAT SAID "NO LABORATORY EVIDENCE OF

12:06PM 24   AN HIV-1 INFECTION."

12:06PM 25       NOW, THE GOVERNMENT DIDN'T SHOW YOU ANY EVIDENCE THAT THIS

12:06PM  1    RESULT -- WHAT SENSE WAS TO BE MADE OF THIS RESULT AND WHETHER

12:06PM  2    IT ACTUALLY CONVEYED THAT THIS PATIENT WAS POSITIVE FOR HIV.

12:06PM  3         AND, IN FACT, I DON'T THINK THE GOVERNMENT INTRODUCED ANY

12:06PM  4    TESTIMONY FROM AN EXPERT, OR EVEN ANY TESTIMONY FROM THE DOCTOR

12:06PM  5    WITH WHOM MS. TOMPKINS HAD DEALT, DR. ASIN.

12:06PM  6         BUT WE KNOW BECAUSE OF A DOCUMENT THAT WE ADMITTED LATE IN

12:06PM  7    THE CASE WHAT HAPPENED INSIDE OF THERANOS WITH REGARD TO

12:07PM  8    MS. TOMPKINS'S TESTS.

12:07PM  9         AND THIS IS NOT A DOCUMENT THAT YOU SAW DURING THE COURSE

12:07PM 10    OF THE CASE, BUT THIS IS EXHIBIT 14259.  AND I WOULD ENCOURAGE

12:07PM 11    YOU, IN EVALUATING COUNT TEN, TO LOOK AT IT.

12:07PM 12         THERE'S A REPORT INTERNALLY FROM PERSONNEL THAT

12:07PM 13    MS. TOMPKINS HAD BEEN SPOKEN TO, AND DR. ASIN HAD BEEN SPOKEN

12:07PM 14    TO TO RECONCILE THIS SOMEWHAT CONFUSING REPORT OF RESULTS.

12:07PM 15         AND THE RECOMMENDATION WAS THAT THIS DID NOT INDICATE THAT

12:07PM 16    SHE WAS HIV POSITIVE, BUT THAT SHE NEEDED TO PURSUE FURTHER

12:07PM 17    TESTING IN LIGHT OF THE RESULTS WHICH HAD AN INCONSISTENCY.

12:07PM 18         THIS EMAIL CONVEYS THAT THAT HAD BEEN CONVEYED TO

12:07PM 19    DR. ASIN; THAT DR. ASIN SAID THAT HE COMPLETELY UNDERSTOOD THE

12:07PM 20    TESTING PROTOCOL, AND HE DIDN'T HAVE ANY ISSUES WITH THESE

12:07PM 21    RESULTS OR WITH THE WAY THAT THE PROTOCOLS WERE EXPLAINED TO

12:08PM 22    HIM.

12:08PM 23         THEN THE THERANOS PERSON GOES ON TO EXPLAIN THAT THEY ALSO

12:08PM 24    TALKED TO MS. TOMPKINS.  THEY EXPLAINED WHAT THE CDC

12:08PM 25    RECOMMENDED IN THIS SITUATION FOR FURTHER TESTING.

12:08PM 1     MS. TOMPKINS WAS UNDERSTANDABLY FRUSTRATED BY THE

12:08PM 2  CONFUSION, AND SHE SAID -- BUT SHE WAS ADVISED THIS IS WHY, IN

12:08PM 3  CONNECTION WITH THIS CIRCUMSTANCE, INITIAL TEST RESULTS HAVE TO

12:08PM 4  BE EITHER CONFIRMED OR DISPROVED BY FOLLOW-UP TESTS.

12:08PM 5     THEN THE UNDERSTANDING WAS, WELL, THIS IS REALLY FOR A

12:08PM 6  CONVERSATION BETWEEN HER AND HER PHYSICIAN, DR. ASIN.

12:08PM 7     NOW, WE DON'T KNOW WHAT HAPPENED THERE BECAUSE DR. ASIN

12:08PM 8  WASN'T CALLED BY THE GOVERNMENT.

12:08PM 9     BUT THE SUGGESTION THAT MS. TOMPKINS WAS GIVEN AN

12:08PM 10 INDICATION THAT SHE WAS HIV POSITIVE AND THAT THERE WAS NO

12:08PM 11 COMMUNICATION WITH HER TO CLARIFY POTENTIAL ADDITIONAL TESTING,

12:08PM 12 AND THAT THERE WAS NO ADDITIONAL COMMUNICATION WITH HER

12:09PM 13 PHYSICIAN TO MAKE SURE THAT THE LAB AND THE DOCTOR WERE ALIGNED

12:09PM 14 AS TO HOW THE PATIENT SHOULD BE TREATED IS JUST NOT FAIR AND

12:09PM 15 NOT CONSISTENT WITH WHAT THE DOCUMENTS SHOW.

12:09PM 16     SO I WOULD PARTICULARLY ASK YOU TO LOOK AT THAT EXHIBIT,

12:09PM 17 14259, BECAUSE I THINK IT GIVES YOU A WINDOW ON THE

12:09PM 18 PRESENTATION OF SOME OF THIS EVIDENCE.

12:09PM 19     LET ME TALK ABOUT COUNT ELEVEN, WHICH RELATES TO

12:09PM 20 MR. ELLSWORTH WHO HAD THE PSA TESTS WHERE THERE WERE RESULTS

12:09PM 21 THAT I THINK IT WAS FAIRLY OBVIOUS CONTAINED ERRORS ACROSS THE

12:09PM 22 TESTS.

12:09PM 23     WHAT HAPPENED WITH REGARD TO THE ASSAY THAT MR. ELLSWORTH

12:09PM 24 RECEIVED HIS TESTS ON?

12:09PM 25     WELL, MS. HOLMES DIDN'T FIND OUT ABOUT THIS ERRANT TEST

12:09PM  1    RESULT UNTIL WEEKS AFTER IT HAPPENED.  THERE'S NO EVIDENCE THAT

12:10PM  2    SHE KNEW OF THIS PARTICULAR PATIENT SITUATION UNTIL WEEKS AFTER

12:10PM  3    IT HAPPENED.

12:10PM  4        AND BY THE TIME THAT MS. HOLMES WAS TOLD ABOUT IT, SHE WAS

12:10PM  5    TOLD THE ISSUE HAD BEEN RESOLVED BECAUSE THE PSA TEST WAS NO

12:10PM  6    LONGER BEING OFFERED ON THE EDISON DEVICE.

12:10PM  7        THAT'S CONVEYED IN DOCUMENTS THAT YOU SEE IN THE CASE WITH

12:10PM  8    THE LISTING OF DATES AFTER THE LAST DATE OF MR. ELLSWORTH'S

12:10PM  9    MAY 16TH DATE, AND BY THE END OF JUNE THAT TEST WAS NO LONGER

12:10PM 10    BEING OFFERED ON THE THERANOS DEVICE.

12:10PM 11        LET'S TALK ABOUT THE -- MS. GOULD, WHO HAD THE SITUATION

12:10PM 12    WITH THE HCG TEST.

12:10PM 13        ALL INDICATIONS FROM THE RECORD HERE AGAIN ARE NOT THAT

12:10PM 14    SHE DIDN'T RECEIVE ERRONEOUS RESULTS IN THIS INSTANCE.  I THINK

12:11PM 15    THE RECORD INDICATES THAT THEY WERE VIEWED AS ERRONEOUS

12:11PM 16    RESULTS, AND THAT THERANOS TOOK THEM AS ERRONEOUS RESULTS, AND

12:11PM 17    THAT IT RESPONDED BY SUGGESTING TO HER THAT THE COMPANY HAD

12:11PM 18    MADE AN ERROR AND THAT THE COMPANY APOLOGIZED FOR THAT ERROR,

12:11PM 19    AND THAT IT WANTED TO TAKE STEPS WITH RESPECT TO HER AND WITH

12:11PM 20    RESPECT TO HER TREATING PHYSICIANS TO BOTH ACKNOWLEDGE THAT AND

12:11PM 21    TO TAKE STEPS TO CORRECT THE EFFECTS OF ANY ERROR ON HER.

12:11PM 22        AGAIN, THE ALLEGATION HERE IS THAT MS. HOLMES KNEW THAT

12:11PM 23    THE COMPANY COULD NOT CONSISTENTLY PROVIDE ACCURATE AND

12:11PM 24    RELIABLE RESULTS.

12:11PM 25        WHEN YOU HAVE A POOL OF MILLIONS OF TESTS, IT'S HARD TO

12:11PM   1    SEE HOW THESE THREE INSTANCES PROVE THAT KIND OF KNOWLEDGE ON

12:12PM   2    HER BEHALF WHEN, IN FACT, SHE MAY NOT HAVE KNOWN UNTIL THEY

12:12PM   3    WERE RESOLVED OF TWO OF THEM, AND IN THE THIRD INSTANCE THE

12:12PM   4    RESPONSE WAS TO TRY TO ADDRESS THE SITUATION.

12:12PM   5        WHAT DID MS. HOLMES HEAR ABOUT PATIENT EXPERIENCES THAT

12:12PM   6    YOU DIDN'T HEAR AS PART OF THE GOVERNMENT'S CASE?

12:12PM   7        WELL, WE INTRODUCED SEVERAL EXHIBITS DURING THE COURSE OF

12:12PM   8    THE CASE WHICH I WOULD ENCOURAGE YOU TO LOOK AT IN WHICH SHE

12:12PM   9    WAS GETTING POSITIVE FEEDBACK ABOUT WHAT THE TECHNOLOGY WAS

12:12PM  10    DOING TO EVALUATE PEOPLE'S HEALTH, NOT ONLY BECAUSE THE TESTS

12:12PM  11    WERE CONSIDERED ACCURATE AND RELIABLE.  THERE ARE EXAMPLES OF

12:12PM  12    THOSE.

12:12PM  13        BUT ALSO BECAUSE CERTAIN POPULATIONS THAT DID NOT HAVE AS

12:12PM  14    MUCH ACCESS TO BLOOD TESTING HAD ACCESS BECAUSE THERANOS'S

12:12PM  15    METHOD OF DRAWING BLOOD WAS MORE COMFORTABLE, AS IN THIS

12:12PM  16    EXHIBIT, 7623.  I'M SORRY.  IT'S IN EXHIBIT 7514.

12:13PM  17        BUT IN EXHIBIT 7623, THIS REALLY IS A COMMENT ON ACCURACY

12:13PM  18    BECAUSE THERANOS'S TECHNOLOGY ALLOWED THIS PATIENT TO RECEIVE

12:13PM  19    HER TEST RESULTS VERY QUICKLY BECAUSE OF THE TRANSMISSION

12:13PM  20    THROUGH SOFTWARE.

12:13PM  21        AND SHE WAS ABLE TO DISCOVER AHEAD, AHEAD OF HER DOCTOR,

12:13PM  22    AND UNLIKE THE EXPERIENCE THAT SHE HAD HAD WITH OTHER

12:13PM  23    COMPANIES, SHE WAS ABLE TO UNDERSTAND THAT SHE HAD A SERIOUS,

12:13PM  24    SERIOUS MEDICAL ISSUE.

12:13PM  25        SHE WAS VERY GRATEFUL, WHICH SHE CONVEYED BACK TO THE

12:13PM   1        COMPANY.

12:13PM   2             YOU'LL REMEMBER THE STANFORD PHYSICIAN IN EXHIBIT 7586A,

12:13PM   3        WHO REPORTED HE WAS A PHYSICIAN AND THAT TESTS THAT HE HAD GOT

12:13PM   4        FROM THERANOS WERE $25.  THEY WOULD HAVE BEEN 750 ELSEWHERE.

12:13PM   5             AND THAT HE, AS A PHYSICIAN, COMPARED THE RESULTS THAT HE

12:14PM   6        WAS GETTING TO THE RESULTS THAT WERE BEING OFFERED BY OTHER

12:14PM   7        LABS, AND THAT THEY WERE CONGRUENT.

12:14PM   8             THAT'S -- THIS IS THE KIND OF INFORMATION THAT MS. HOLMES

12:14PM   9        WAS RECEIVING IN REALTIME.

12:14PM  10             AND SOME OF THAT FEEDBACK WAS EXTRAORDINARY.  I MEAN,

12:14PM  11        PEOPLE TESTIFYING ABOUT -- THROUGH EMAIL TESTIFYING ABOUT

12:14PM  12        TRAVELLING LONG DISTANCES TO COME TO THERANOS TO BE TESTED

12:14PM  13        BECAUSE THE PRICES MADE IT ACCESSIBLE, AND THAT VERY MUCH

12:14PM  14        INFORMED HER VIEW OF WHAT THERANOS SERVICES WERE DOING FOR

12:14PM  15        PEOPLE'S HEALTH.

12:14PM  16             I WANT YOU TO LOOK FOR A MOMENT AT EXHIBIT 2214 AND NOTE

12:14PM  17        THIS COMMENT ABOUT SOMEBODY COMING ALL OF THE WAY FROM SOUTHERN

12:14PM  18        CALIFORNIA TO GET THESE TESTS BECAUSE THEY WERE, THEY WERE

12:14PM  19        CHEAPER IN ARIZONA THAN THEY WERE IN CALIFORNIA.

12:14PM  20             AND THE COST HAD BEEN KILLING THIS PATIENT BECAUSE AS A

12:15PM  21        CANCER PATIENT, THEY HAD TO GET FREQUENT TESTING AND AFFORDING

12:15PM  22        IT WAS DIFFICULT.

12:15PM  23             THIS IS THE LONGITUDINAL ISSUE THAT I MENTIONED YESTERDAY

12:15PM  24        IN CONNECTION WITH MS. HOLMES'S STATE OF MIND.

12:15PM  25             PEOPLE COULD CONTINUE TO GET THEIR BLOOD TESTED MORE

12:15PM 1    FREQUENTLY SO THEY COULD GET MORE SNAPSHOTS OF THEIR HEALTH

12:15PM 2    WHICH WOULD GIVE THEM MORE ACCURATE INFORMATION ABOUT WHAT WAS

12:15PM 3    GOING ON WITH THEM.

12:15PM 4        THIS IS WHAT MS. HOLMES WAS SEEING IN REALTIME.

12:15PM 5        NOW, THERE'S ONE LAST COUNT IN CONNECTION WITH THE

12:15PM 6    INDICTMENT THAT I'LL JUST MENTION VERY BRIEFLY, AND THIS IS

12:15PM 7    COUNT 12 WHICH RELATED, IF YOU RECALL, TO MR. SCHENK'S

12:15PM 8    DISCUSSION YESTERDAY TO THE HORIZON ENTITY, WHICH WAS AN

12:15PM 9    ADVERTISING ENTITY.

12:15PM 10       MY COMMENTS ON THIS WILL BE VERY BRIEF BECAUSE YOU REALLY

12:16PM 11   HAVE NO EVIDENCE RELATING TO THIS COUNT.

12:16PM 12       WE DON'T KNOW -- WE DO KNOW THERE WAS A WIRE TRANSFER FROM

12:16PM 13   THERANOS TO HORIZON IN CONNECTION WITH THIS.  WE DON'T KNOW

12:16PM 14   WHETHER THAT WIRE WAS USED TO BUY ADVERTISEMENTS, WE DON'T KNOW

12:16PM 15   WHETHER ADVERTISEMENTS RAN, AND IF THEY DID, WHAT THEY SAID.

12:16PM 16       WE DON'T KNOW OF ANY RELATIONSHIP BETWEEN MS. HOLMES AND

12:16PM 17   THE CONTENT OF THOSE ADS.  SO THE GOVERNMENT HAS REALLY PROVED

12:16PM 18   NOTHING WITH RESPECT TO THIS OTHER THAN THAT THERE WAS A WIRE

12:16PM 19   TRANSFER.

12:16PM 20       THE OTHER WITNESS WHO TESTIFIED ABOUT THIS WAS MS. SPIVEY,

12:16PM 21   THE CONTROLLER, WHO SAID SHE DID IN FACT SEND THIS WIRE AND

12:16PM 22   THAT HORIZON WAS A MARKETING FIRM.

12:16PM 23       THE LAST SUBSTANTIVE ISSUE I WANT TO TALK TO YOU ABOUT,

12:16PM 24   LADIES AND GENTLEMEN, IS EACH SIDE'S VIEW OF WHAT MS. HOLMES'S

12:16PM 25   MOTIVES WERE.

12:17PM  1        YOU RECALL THAT MR. LEACH SAID TO YOU IN OPENING STATEMENT

12:17PM  2   THAT THE REASON HE WOULD DEMONSTRATE TO YOU THAT MS. HOLMES

12:17PM  3   COMMITTED CRIMES WAS BECAUSE SHE FOUND HERSELF, SHORTLY BEFORE

12:17PM  4   SHE RAISED MONEY FROM INVESTORS, OUT OF TIME AND OUT OF MONEY.

12:17PM  5        AND MR. SCHENK BEGAN HIS REMARKS WITH THAT SAME THEME

12:17PM  6   YESTERDAY.

12:17PM  7        I WANT TO LOOK FIRST AT THE EVIDENCE IN SOME DETAIL, AND

12:17PM  8   THEN I WANT TO COMMENT A LITTLE FURTHER ON IT.

12:17PM  9        FIRST, THE GOVERNMENT'S THEORY HERE IS THAT IN 2009

12:17PM 10   MS. HOLMES RAN OUT OF MONEY, EARLY 2009.  WE DON'T KNOW THE

12:17PM 11   PRECISE DATE.

12:17PM 12        MS. SPIVEY TESTIFIED IT WAS SOMETIME IN EARLY 2009 THAT

12:17PM 13   THE COMPANY WAS RUNNING LOW ON CASH.

12:18PM 14        MS. SPIVEY ALSO TESTIFIED THAT AT SOME TIME LATER IN 2009,

12:18PM 15   THERANOS WAS NO LONGER LOW ON CASH, THAT THEY SECURED A LOAN

12:18PM 16   FROM FIDELITY AND THAT THE COMPANY WAS FINANCIALLY STABLE.

12:18PM 17        THE GOVERNMENT'S THEORY IS THAT MS. HOLMES ENGAGED WITH

12:18PM 18   WALGREENS AND SAFEWAY BEGINNING IN MARCH 2010, A YEAR AFTER

12:18PM 19   THIS PERIOD WHERE THE COMPANY WAS SHORT ON CASH, BECAUSE IT HAD

12:18PM 20   BEEN SHORT ON CASH IN THE EARLY PART OF 2009.

12:18PM 21        THERE'S JUST NO EVIDENCE TO SUPPORT THE GOVERNMENT'S

12:18PM 22   THEORY THAT MS. HOLMES WAS OUT OF MONEY IN CONNECTION WITH

12:18PM 23   THIS.  THE AGREEMENT WITH WALGREENS WAS NOT SIGNED UNTIL JULY

12:18PM 24   OF 2010 AND PAYMENTS UNDER THAT AGREEMENT WEREN'T MADE UNTIL

12:18PM 25   LATER.

12:18PM 1       THAT'S LITERALLY AFTER, 15 MONTHS AFTER MR. LEACH AND

12:19PM 2    MR. SCHENK TELL YOU THE COMPANY WAS DESPERATE FOR MONEY AND HAD

12:19PM 3    TO GO OUT AND DECEIVE PEOPLE.

12:19PM 4       THERE'S NO EVIDENCE AT ALL, NONE AT ALL, WHICH LINKS

12:19PM 5    THERANOS'S EFFORTS TO ENTER INTO PARTNERSHIPS WITH WALGREENS

12:19PM 6    AND SAFEWAY TO ANY DESPERATION FOR MONEY, ANY CONCERN ABOUT

12:19PM 7    MONEY.

12:19PM 8       WHAT DOES THE RECORD SHOW ABOUT THE PERIOD WHERE THOSE

12:19PM 9    PARTNERSHIPS WERE DISCUSSED?

12:19PM 10      EXACTLY THE OPPOSITE.  THERANOS WENT OUT TO RAISE MONEY

12:19PM 11   DURING THE HEIGHT OF ITS ACHIEVEMENT.  REMEMBER THAT IT WAS IN

12:19PM 12   EARLY 2010 THAT THERANOS BEGAN TO BELIEVE THAT IT HAD ACHIEVED

12:19PM 13   THE TECHNOLOGICAL BREAKTHROUGH THAT IT WOULD BE ABLE TO OFFER

12:19PM 14   ANY TEST ON ITS SMALL DEVICE AND TO ANALYZE ANY TEST, AND THEY

12:19PM 15   WANTED TO BRING THAT TECHNOLOGY OUT TO THE PUBLIC, AND THEY

12:20PM 16   TALKED TO RETAIL STORES, INCLUDING WALGREENS AND SAFEWAY, ABOUT

12:20PM 17   THAT AND THEY DECIDED TO ENTER INTO THOSE PARTNERSHIPS.  THAT'S

12:20PM 18   THE STORY THAT WE'VE TOLD YOU.

12:20PM 19      THE STORY THAT THE GOVERNMENT HAS TOLD YOU IS THAT THOSE

12:20PM 20   PARTNERSHIPS WERE CREATED BECAUSE 15 MONTHS BEFORE THERE HAD

12:20PM 21   BEEN A DESPERATION FOR CASH.

12:20PM 22      YOU HAVE TO WEIGH WHICH OF THOSE MOTIVES SEEMS MORE

12:20PM 23   PLAUSIBLE TO YOU.

12:20PM 24      NOW, IN 2013 THE GOVERNMENT SAYS THE CONSPIRACY WAS AGAIN

12:20PM 25   REINFORCED.  OF COURSE IT WAS ONGOING IN THE GOVERNMENT'S VIEW

12:20PM  1    FROM 2010 TO 2013, BUT THERE WAS ADDITIONAL ACTIVITY BECAUSE

12:20PM  2    THE GOVERNMENT WAS ABLE TO LOCATE A POINT IN 2013 WHEN THERANOS

12:20PM  3    WAS LOW ON CASH AND INVESTMENTS WERE TAKEN IN THEREAFTER.

12:20PM  4        BUT YOU KNOW THAT THAT THEORY ALSO HAS NO MERIT BECAUSE

12:20PM  5    YOU KNOW WHAT ELSE WAS HAPPENING IN CONNECTION WITH THAT

12:21PM  6    TIMEFRAME, WHICH IS THAT THERANOS WAS ABOUT TO ENTER INTO THE

12:21PM  7    AGREEMENT WITH WALGREENS WHERE THE ROLLOUT PLAN FOR ALL OF THE

12:21PM  8    STORES THAT THERANOS AND WALGREENS WERE GOING TO OFFER BLOOD

12:21PM  9    TESTING SERVICES IN WAS ABOUT TO BE SIGNED.  THEY HAD BEEN

12:21PM 10    DISCUSSING THAT SINCE SEPTEMBER.

12:21PM 11        ULTIMATELY THE C1 INVESTMENT CLOSES AT THE END OF

12:21PM 12    DECEMBER 2013.  THE GOVERNMENT SAYS BECAUSE SOME OF THOSE

12:21PM 13    INVESTORS SENT MONEY EARLIER THAN THAT, THAT THEY WERE

12:21PM 14    SOLICITED BECAUSE OF A DESPERATION FOR CASH.

12:21PM 15        YOU HAVEN'T HEARD FROM ANY OF THOSE INVESTORS ON THAT

12:21PM 16    WITNESS STAND.  THE GOVERNMENT HAS NO IDEA.  THIS RECORD SHOWS

12:21PM 17    NOTHING TO YOU ABOUT WHY THOSE TRANSACTIONS WERE ENTERED.

12:21PM 18        AND WE KNOW THAT WITH REGARD TO THE WITNESSES THAT THEY

12:21PM 19    DID BRING, WITH MR. EISENMAN, WITH MR. LUCAS, AND MR. TOLBERT

12:21PM 20    WHO INVESTED IN THAT PERIOD, WE KNOW FROM THE RECORD THAT

12:22PM 21    THERANOS -- THAT WALGREENS HAD AGREED TO AND DID MAKE A

12:22PM 22    SUBSTANTIAL PAYMENT TO THERANOS AT THE SAME TIME AS THOSE

12:22PM 23    INVESTMENTS.

12:22PM 24        WHAT IS THE STORY AS TO WHY THERANOS SOUGHT INVESTMENTS

12:22PM 25    THEN?

12:22PM  1      BECAUSE THEY SIGNED THAT CONTRACT WITH WALGREENS.  THEY

12:22PM  2   NEEDED TO BUILD UP THE CAPACITY TO OFFER THEIR BLOOD TESTING

12:22PM  3   SERVICES IN 3,000 STORES, TO TRAIN ALL OF THE PERSONNEL, TO

12:22PM  4   BUILD MANUFACTURING FACILITIES, TO BUILD UNITS, TO CONTINUE

12:22PM  5   WITH RESEARCH AND DEVELOPMENT, ALL OF THOSE THINGS.  THAT'S

12:22PM  6   WHAT THAT FUND RAISING WAS ABOUT DURING THAT TIME.

12:22PM  7      YOU DECIDE WHICH OF THOSE MOTIVES MAKES MORE SENSE TO YOU

12:22PM  8   IN LIGHT OF THE OVERALL RECORD OFFERED IN THIS CASE.

12:22PM  9      I ALSO SUGGESTED TO YOU WHEN WE WERE LOOKING AT THE ISSUE

12:22PM 10   OF REVENUE BEFORE THAT REALLY UNDERLYING ALL OF THIS -- AND IF

12:22PM 11   YOU THINK BACK TO MR. LEACH'S OPENING, AND EVEN MR. SCHENK'S

12:23PM 12   REMARKS YESTERDAY, IS THE NOTION THAT THERANOS WASN'T MAKING

12:23PM 13   ANY MONEY.  THERE WAS NO CASH COMING IN SO THEY HAD TO

12:23PM 14   CONTINUALLY RECRUIT INVESTORS.

12:23PM 15      YOU KNOW FROM THE DOCUMENT THAT I SHOWED YOU EARLIER

12:23PM 16   THAT'S NOT TRUE.  FROM INSURERS, FROM HOSPITALS, FROM OTHER

12:23PM 17   PLACES, THERANOS WAS GETTING TENS OF MILLIONS OF DOLLARS DURING

12:23PM 18   THIS PERIOD BECAUSE ALL OF THOSE PARTNERS BELIEVED THAT

12:23PM 19   THERANOS WOULD OFFER THESE SERVICES AND THAT THEY WOULD BE

12:23PM 20   SUCCESSFUL IN TREATING PATIENTS.

12:23PM 21      SO THEY WERE EAGER FOR PARTNERSHIPS WITH THERANOS AND

12:23PM 22   THERANOS WAS TAKING A GOOD DEAL OF MONEY IN.

12:23PM 23      NOW, I WOULD ASK YOU TO LOOK AT REALLY THE TWO STORIES

12:23PM 24   THAT ARE TOLD HERE IN LIGHT OF THE DOCUMENTS THAT YOU HAVE IN

12:23PM 25   FRONT OF YOU.

12:23PM  1        OUR STORY IS THAT MS. HOLMES WAS VERY DEVOTED TO HER

12:23PM  2   MISSION, AND THAT SHE DID NOT, IN CONNECTION WITH HER WORK AT

12:24PM  3   THERANOS, SELL ANY STOCK.

12:24PM  4        THAT, LADIES AND GENTLEMEN, IS UNDISPUTED.  FROM THE TIME

12:24PM  5   SHE FOUNDED THIS COMPANY UNTIL THE TIME THAT THIS COMPANY

12:24PM  6   COLLAPSED, SHE DID NOT SELL A SINGLE SHARE OF STOCK DESPITE

12:24PM  7   REPEATED OPPORTUNITIES, ONE AFTER ANOTHER, TO SELL THAT STOCK.

12:24PM  8        WHAT IS THE GOVERNMENT'S THEORY AS TO WHY SHE DID NOT SELL

12:24PM  9   STOCK?

12:24PM  10        I THINK WE HEARD FOR THE FIRST TIME YESTERDAY, BUT NOT IN

12:24PM  11   THE EVIDENCE IN THE CASE, A THEORY, WHICH WAS THAT MS. HOLMES

12:24PM  12   HELD A FORM OF STOCK THAT SHE WOULD LOSE CONTROL OVER THE

12:24PM  13   COMPANY IF SHE SOLD STOCK.

12:24PM  14        THERE'S NO EVIDENCE IN THE RECORD TO THAT EFFECT.  NO

12:24PM  15   WITNESS TESTIFIED LIKE THAT.  THERE'S NO INDICATION TO YOU THAT

12:24PM  16   THAT'S, THAT THAT'S CORRECT, AND THERE'S CERTAINLY NO

12:24PM  17   INDICATION THAT SHE COULDN'T HAVE SOLD TENS OF MILLIONS OF

12:25PM  18   DOLLARS OF STOCK WHILE LOSING CONTROL OF THE COMPANY -- WITHOUT

12:25PM  19   LOSING CONTROL OF THE COMPANY.

12:25PM  20        JUST NO EVIDENCE THAT THAT'S A MOTIVE IN THE CASE.

12:25PM  21        AND YOU SHOULD CONSIDER, YOU SHOULD CONSIDER THE FACT THAT

12:25PM  22   THAT MOTIVE IS ARTICULATED FOR THE FIRST TIME IN THE

12:25PM  23   GOVERNMENT'S SUMMATION AS TO THE GOVERNMENT'S PERSUASIVENESS

12:25PM  24   WITH RESPECT TO ARTICULATING A MOTIVE FOR THESE CRIMES.

12:25PM  25        NOW, I HAVE TALKED TO YOU FOR HOURS, AND I'M SURE YOU'RE

12:25PM  1      READY TO BE RID OF ME, AND PROBABLY VERY FATIGUED AT THE END OF

12:25PM  2      ANOTHER WEEK OF TRIAL.

12:25PM  3           BUT I WANT TO SPEND ANOTHER MINUTE TALKING TO YOU ABOUT

12:25PM  4      SOME CONCEPTS THAT I THINK WILL BE IMPORTANT AND HELPFUL TO YOU

12:25PM  5      AS YOU UNDERTAKE YOUR DELIBERATIONS IN THIS CASE.

12:25PM  6           THE FIRST CONCEPT I WANT TO TALK TO YOU ABOUT IS THE

12:25PM  7      CONCEPT OF UNANIMITY.

12:25PM  8           WE TALKED ABOUT REASONABLE DOUBT YESTERDAY, AND I WANT YOU

12:26PM  9      TO BEAR THAT IN MIND.

12:26PM  10          BUT MOST THINGS THAT WE DO IN THIS COUNTRY, IMPORTANT

12:26PM  11     THINGS THAT WE DECIDE IN THE INSTITUTIONS THAT WE HAVE, WE DO

12:26PM  12     THOSE BY MAJORITY VOTE, AND WE ACCEPT THAT.  THE SUPREME COURT

12:26PM  13     DECIDES CASES FIVE TO FOUR.  CONGRESS PASSES OR DOESN'T PASS

12:26PM  14     LEGISLATION BY ONE VOTE SOMETIMES.  THE HEALTH CARE SYSTEM IN

12:26PM  15     THIS COUNTRY WAS CHANGED BY ONE VOTE.  THAT HAPPENS.

12:26PM  16          BUT YOU ARE IN A DIFFERENT INSTITUTION HERE.  YOU ARE IN

12:26PM  17     AN INSTITUTION WHERE, FOR MS. HOLMES TO BE CONVICTED OF A

12:26PM  18     FELONY OFFENSE, EVERY ONE OF YOU, EVERY ONE OF YOU HAS TO BE

12:26PM  19     PERSUADED BEYOND A REASONABLE DOUBT THAT SHE COMMITTED EVERY

12:26PM  20     ELEMENT OF THAT OFFENSE.

12:26PM  21          YOU'VE TAKEN THE OATH TO UPHOLD THAT DUTY, AND YOU'VE BEEN

12:27PM  22     AN INCREDIBLY ATTENTIVE JURY, AND I KNOW THAT EVERY ONE OF YOU

12:27PM  23     WILL UPHOLD THAT DUTY FOR YOURSELF AND IN YOUR DELIBERATIONS

12:27PM  24     WITH OTHERS.

12:27PM  25          AND I WOULD SAY TO YOU, AFTER ALL OF THE EVIDENCE THAT I

12:27PM 1    HAVE DISCUSSED, AFTER ALL OF THE EVIDENCE THAT MR. SCHENK HAS

12:27PM 2    DISCUSSED WITH YOU, WITH ALL OF WHAT MR. BOSTIC WILL DISCUSS

12:27PM 3    WITH YOU, AS IS APPROPRIATE, THAT YOU CAN LOOK THROUGH ALL OF

12:27PM 4    THAT EVIDENCE AND YOU CAN LOOK TO THE NARRATIVE THAT EACH SIDE

12:27PM 5    HAS TOLD YOU IN THIS CASE.

12:27PM 6         YOU KNOW WHAT MS. HOLMES DID IN HER LIFE.  YOU KNOW THAT

12:27PM 7    SHE LEFT SCHOOL.  SHE GAVE UP A COLLEGE EDUCATION THAT PEOPLE

12:27PM 8    WOULD GIVE THEIR RIGHT ARM FOR.  SHE GAVE UP HER YOUTH.  SHE

12:27PM 9    GAVE UP HER FRIENDS.  SHE GAVE UP HER CLOSE RELATIONSHIP WITH

12:27PM 10   HER FAMILY.

12:27PM 11        WHY?

12:27PM 12        BECAUSE SHE BELIEVED SHE WAS BUILDING A TECHNOLOGY THAT

12:27PM 13   WOULD CHANGE THE WORLD.  THAT'S OUR STORY.

12:28PM 14        WHAT IS THE GOVERNMENT'S STORY?

12:28PM 15        THE GOVERNMENT'S STORY IS THAT BEGINNING IN 2010 EVERY

12:28PM 16   DAY, EVERY DAY FROM 2010 TO 2016, SHE KNEW SHE WAS COMMITTING A

12:28PM 17   CRIME.  SHE WAS ROBBING INVESTORS AND THAT SHE -- IN 2013 SHE

12:28PM 18   BEGAN ROBBING PATIENTS.

12:28PM 19        AND THEN YOU KNOW WHAT HAPPENED?

12:28PM 20        ONE DAY IN MARCH OF 2016 DR. DAS WALKED INTO HER OFFICE.

12:28PM 21   AND YOU HEARD ABOUT THAT.  DR. DAS SAID TO HER, I THINK THAT

12:28PM 22   THERE ARE 60,000 RESULTS GENERATED ON YOUR PROPRIETARY DEVICE

12:28PM 23   THAT WE HAVE TO VOID.

12:28PM 24        THAT'S A TOUGH THING TO HEAR WHEN YOU'VE SPENT 11 YEARS

12:28PM 25   BUILDING A TECHNOLOGY.  YOU KNOW THAT.

12:28PM  1    NOW WE KNOW IN THE GOVERNMENT'S NARRATIVE WHO THIS WOMAN

12:29PM  2  WAS AND WHAT CRIMES SHE COMMITTED.  WE KNOW THAT WHEN SHE HEARD

12:29PM  3  THAT IN THE GOVERNMENT'S VIEW, SHE MUST HAVE THOUGHT THAT THERE

12:29PM  4  ARE A THOUSAND CRIMES HIDDEN UNDER THE ROCKS OF THIS COMPANY,

12:29PM  5  AND IT HAS NOW BEEN DISCOVERED AND I HAVE TO REACT

12:29PM  6  APPROPRIATELY.

12:29PM  7    YOU DON'T NEED TO KNOW WHAT AN ASSAY IS.  YOU DON'T NEED

12:29PM  8  TO KNOW WHAT CLIA IS.

12:29PM  9    YOU KNOW FROM YOUR OWN EXPERIENCE AND FROM YOUR OWN COMMON

12:29PM 10  SENSE HOW TO EVALUATE PEOPLE'S INTENT.  AND YOU KNOW THAT AT

12:29PM 11  THE FIRST SIGN OF TROUBLE, CROOKS CASH OUT, CRIMINALS COVER UP,

12:29PM 12  AND RATS LEAVE A FLEEING SHIP.

12:29PM 13    SHE DIDN'T DO ANY OF THOSE.  NONE.

12:29PM 14    DID SHE COVER UP?

12:29PM 15    WHAT DID SHE TELL DR. DAS?

12:29PM 16    TURN OVER EVERY ROCK, EVERY ROCK, UNDER WHICH THE

12:30PM 17  GOVERNMENT SAYS WAS HIDDEN A THOUSAND CRIMES.

12:30PM 18    DID SHE CASH OUT?  YOU KNOW THAT ALREADY.  SHE DIDN'T SELL

12:30PM 19  A SINGLE SHARE OF STOCK EVEN THOUGH SHE HAD THAT OPPORTUNITY

12:30PM 20  FOR SIX YEARS AND FOR TWO MORE YEARS THEREAFTER.  SHE DID NOT

12:30PM 21  SELL A SINGLE SHARE OF STOCK.  NOT A SINGLE ONE.

12:30PM 22    AND DID SHE LEAVE IN THE FACE OF THAT CRITICISM AND SAY,

12:30PM 23  YOU KNOW WHAT?  DR. BONANNI CAN RUN THIS.  SOMEBODY CAN RUN

12:30PM 24  THIS.  THEY CAN DO A BETTER JOB THAN I CAN.  LET ME JUST TAKE

12:30PM 25  MY MONEY AND I'LL GET OUT.

12:30PM  1          NO.  SHE STAYED.

12:30PM  2          WHY?  BECAUSE SHE BELIEVED IN THIS TECHNOLOGY.  SHE STAYED

12:30PM  3     THE WHOLE TIME, AND SHE WENT DOWN WITH THAT SHIP WHEN IT WENT

12:30PM  4     DOWN.

12:30PM  5          LADIES AND GENTLEMEN, THAT IS WHO THIS WOMAN IS, AND I AM

12:30PM  6     ASKING YOU TO ACQUIT HER ON ALL COUNTS IN THE INDICTMENT, AND

12:30PM  7     YOU DON'T NEED MORE FROM ME TO KNOW WHAT HER INTENT WAS.

12:31PM  8          THANK YOU, LADIES AND GENTLEMEN.

12:31PM  9              THE COURT:  THANK YOU, COUNSEL.

12:31PM  10         DOES THE GOVERNMENT HAVE A REBUTTAL?

12:31PM  11             MR. BOSTIC:  YES, YOUR HONOR.

12:31PM  12             THE COURT:  WOULD YOU LIKE A BREAK BEFORE WE BEGIN

12:31PM  13    THE REBUTTAL?

12:31PM  14             MR. BOSTIC:  JUST A BRIEF ONE, YOUR HONOR.

12:31PM  15             THE COURT:  LET'S DO THAT.  LET'S TAKE ABOUT

12:31PM  16    15 MINUTES.  LADIES AND GENTLEMEN, LET'S TAKE ABOUT 15 MINUTES,

12:31PM  17    AND THEN WE'LL COME BACK.

12:31PM  18             THE CLERK:  COURT IS IN RECESS.

12:31PM  19         (RECESS FROM 12:31 P.M. UNTIL 12:51 P.M.)

12:51PM  20         (JURY IN AT 12:51 P.M.)

12:52PM  21             THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

12:52PM  22    SEATED.

12:52PM  23         WE'RE BACK ON THE RECORD.  MS. HOLMES IS PRESENT.  OUR

12:52PM  24    JURY IS PRESENT.  THANK YOU.

12:52PM  25             MR. BOSTIC, YOU HAVE A REBUTTAL?

12:52PM  1        MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

12:52PM  2        THE COURT:  PLEASE PROCEED.  THANK YOU.

12:52PM  3        **(MR. BOSTIC GAVE HIS REBUTTAL CLOSING ARGUMENT ON BEHALF**

12:52PM  4   **OF THE GOVERNMENT.)**

12:52PM  5        MR. BOSTIC:  MEMBERS OF THE JURY, GOOD AFTERNOON.

12:52PM  6        OVER THE COURSE OF THIS TRIAL YOU'VE HEARD THE STORY OF

12:52PM  7   TWO DIFFERENT VERSION OF THE COMPANY CALLED "THERANOS."

12:52PM  8        THE FIRST VERSION OF THAT COMPANY IN APPROXIMATELY 2013

12:52PM  9   HAD INVENTED AND PERFECTED A NEW BLOOD TESTING TECHNOLOGY.  IT

12:52PM 10   WAS A NEW DEVICE THAT COULD RUN ANY BLOOD TEST ON A TINY SAMPLE

12:52PM 11   FROM A FINGERSTICK.  IT WAS UNLIKE ANYTHING THAT HAD COME

12:52PM 12   BEFORE.

12:52PM 13        EVEN BETTER, IT COULD PERFORM THE FULL RANGE OF BLOOD

12:52PM 14   TESTS, REPLACING LARGER DEVICES.

12:52PM 15        IT WAS FAR SMALLER THAN CONVENTIONAL ANALYZERS, AND THAT

12:52PM 16   MEANT IT COULD BE USED ANYWHERE.

12:52PM 17        THE TECHNOLOGY IN THIS DEVICE HAD BEEN VALIDATED AND

12:52PM 18   ENDORSED BY MAJOR PHARMACEUTICAL COMPANIES AND ACADEMIC

12:53PM 19   INSTITUTIONS.

12:53PM 20        THE MOST POWERFUL AND WELL EQUIPPED MILITARY FORCE IN THE

12:53PM 21   WORLD WAS EVEN USING THIS DEVICE, AND USING THIS TECHNOLOGY,

12:53PM 22   AND IT WAS SAVING THE LIVES OF SOLDIERS ON THE BATTLEFIELD.

12:53PM 23        THIS COMPANY HAD SIGNIFICANT REVENUES FROM EARLY ON, WHICH

12:53PM 24   MAY BE UNUSUAL FOR A COMPANY AT THAT STAGE, BUT IT WAS VERY

12:53PM 25   PROMISING AND IT WAS ON THE VERGE OF GOING NATIONAL AND

12:53PM  1    GENERATING HUNDREDS OF MILLIONS, IF NOT BILLIONS, OF DOLLARS.

12:53PM  2         THE VERSION OF THERANOS I JUST DESCRIBED WAS NEVER REAL.

12:53PM  3    IT NEVER EXISTED.

12:53PM  4         IT EXISTED ONLY IN THE WORDS OF THE DEFENDANT, MS. HOLMES,

12:53PM  5    AND HER COCONSPIRATOR, SUNNY BALWANI.  IT EXISTED IN THE

12:53PM  6    WRITTEN MATERIALS THAT SHE AND HER COCONSPIRATOR PROVIDED TO

12:53PM  7    INVESTORS AND TO OTHERS OUTSIDE OF THE COMPANY.

12:53PM  8         AND IT EXISTED IN THE MINDS OF THE PEOPLE WHO BELIEVED

12:53PM  9    HER, WHO BELIEVED THE CLAIMS THAT SHE WAS MAKING ABOUT WHAT THE

12:53PM 10    COMPANY HAD DONE, WHAT THE COMPANY WAS DOING, AND WHAT IT HAD

12:53PM 11    ACCOMPLISHED.  AND THOSE PEOPLE WERE, OF COURSE, THE INVESTORS

12:54PM 12    WHO THEN WENT ON TO RELY ON THOSE REPRESENTATIONS AND ENTRUST

12:54PM 13    THE COMPANY WITH THEIR MONEY OR, OF COURSE, WITH THE PATIENTS

12:54PM 14    WHO ENTRUSTED THE COMPANY TO TELL THEM WHAT WAS HAPPENING WITH

12:54PM 15    THEIR HEALTH.

12:54PM 16         THE REAL VERSION OF THERANOS WHERE THE DEFENDANT WENT TO

12:54PM 17    WORK EVERY DAY WAS DRAMATICALLY DIFFERENT FROM THE ROSY PICTURE

12:54PM 18    THAT SHE WAS PAINTING FOR OTHERS.

12:54PM 19         NOW, THE DEFENSE HAS EMPHASIZED THROUGHOUT TRIAL AND

12:54PM 20    DURING ITS CLOSING ARGUMENT THAT THERE WERE MANY PEOPLE AT

12:54PM 21    THERANOS WHO WERE WORKING HARD TO MAKE THE TECHNOLOGY WORK AND

12:54PM 22    TO DEVELOP THAT TECHNOLOGY AND THAT THEY HAD SOME SUCCESSES.

12:54PM 23         FOR THE MOST PART, THERE'S NO DISAGREEMENT THERE.  IT'S

12:54PM 24    NOT CLEAR THAT THE ACHIEVEMENTS THAT TOOK PLACE AT THERANOS

12:54PM 25    WERE THE MIRACULOUS BREAKTHROUGHS THAT THE DEFENSE DESCRIBES.

12:54PM  1          BUT I'M NOT HERE TO CRITICIZE THE EFFORTS OF THE EMPLOYEES

12:54PM  2    WHO WORKED HARD TO TRY TO MAKE THAT TECHNOLOGY WORK.

12:54PM  3          THE DISEASE THAT PLAGUED THERANOS WASN'T A LACK OF EFFORT,

12:55PM  4    IT WAS A LACK OF HONESTY, AND IT WASN'T AT THE BOTTOM OF THE

12:55PM  5    GROUND LEVEL OF THE COMPANY, IT WAS AT THE TOP AS THE EVIDENCE

12:55PM  6    HAS SHOWN.

12:55PM  7          THE REASON WE'RE HERE STEMS BACK TO THE WAY THAT THERANOS

12:55PM  8    AND ITS WORK WERE DESCRIBED BY ITS CEO, THE DEFENDANT, AND THE

12:55PM  9    FOUNDER OF THE COMPANY.

12:55PM  10          NOT, FOR THE MOST PART, THE EFFORTS THAT WERE TAKING PLACE

12:55PM  11    AT THE COMPANY BY THE SCIENTISTS, ENGINEERS, AND OTHERS.

12:55PM  12          SO WHAT WAS THE DARKER TRUTH AT THERANOS?

12:55PM  13          WELL, FOR ONE THING, THE EVIDENCE AT TRIAL HAS AMPLY

12:55PM  14    DEMONSTRATED THAT THERE WERE VERY SERIOUS PROBLEMS WITH

12:55PM  15    THERANOS'S TECHNOLOGY.

12:55PM  16          MS. HOLMES'S LAWYER SAID IN HIS OPENING STATEMENT THAT,

12:55PM  17    QUOTE, THERE WERE PROBLEMS WITH THERANOS'S CLINICAL LABORATORY.

12:55PM  18          WELL, AS YOU SAW, THAT TURNED OUT TO BE QUITE THE

12:55PM  19    UNDERSTATEMENT.

12:55PM  20          HE ALSO SAID SOME OF THE TESTS THAT THERANOS OFFERED IN

12:55PM  21    HINDSIGHT WERE NOT PERFORMING AS WELL AS EXPECTED.

12:55PM  22          WELL, THAT WAS REALLY ANOTHER UNDERSTATEMENT, WASN'T IT?

12:56PM  23          AND THE EVIDENCE SHOWED THAT IT DIDN'T TAKE HINDSIGHT, IN

12:56PM  24    FACT, TO SEE THOSE PROBLEMS.  THOSE PROBLEMS WERE APPARENT WHEN

12:56PM  25    THEY WERE TAKING PLACE, AND THE COMPANY WENT ON OFFERING

12:56PM  1      UNRELIABLE AND INACCURATE BLOOD TESTS DESPITE THAT EVIDENCE.

12:56PM  2          LET'S TALK ABOUT SOME OF THE THINGS THAT YOU SAW THAT SHOW

12:56PM  3      YOU THAT THERE WERE SERIOUS PROBLEMS WITH THE THERANOS

12:56PM  4      TECHNOLOGY.

12:56PM  5          FIRST, DO YOU REMEMBER TESTIMONY ABOUT HOW MANY THERANOS

12:56PM  6      ANALYZERS IT TOOK AT THE TIME OF LAUNCH TO RUN A SINGLE PATIENT

12:56PM  7      SAMPLE?

12:56PM  8          YOU MIGHT RECALL THAT WHEN THERANOS FIRST STARTED OFFERING

12:56PM  9      BLOOD TESTING SERVICES TO THE PUBLIC, THERANOS DIDN'T TRUST A

12:56PM 10      SINGLE EDISON ANALYZER TO RUN A BLOOD TEST SAMPLE ON ITS OWN.

12:56PM 11      IT NEEDED TO GROUP THOSE ANALYZERS IN GROUPS OF THREE, HAVE ALL

12:56PM 12      THREE RUN THE SAME TEST, AND THEN THEY HAD A PRACTICE OF

12:56PM 13      COMBINING WHAT TURNED OUT TO BE SIX RESULTS, REMOVING TWO

12:56PM 14      OUTLIERS IF THEY DIDN'T LIKE THAT DATA, AND THEN AVERAGING THE

12:56PM 15      OTHER FOUR.

12:56PM 16          YOU'LL RECALL THE FACT THAT IT TOOK THREE DEVICES TO RUN

12:57PM 17      EVERY TEST MEANT THAT WHEN A PATIENT CAME IN AND NEEDED MORE

12:57PM 18      THAN ONE ASSAY RUN, IT WOULD TAKE A FLEET OF EDISONS TO

12:57PM 19      ACTUALLY PERFORM THAT TESTING.

12:57PM 20          SO YOU HEARD THE TESTIMONY OF ERIKA CHEUNG, WHO ACTUALLY

12:57PM 21      RAN THESE SAMPLES, THAT IF SOMEONE CAME IN AND, SAY, NEEDED

12:57PM 22      THREE ASSAYS RUN ON EDISON, THREE DIFFERENT KINDS OF BLOOD

12:57PM 23      TESTS, PLUS A CBC AND A GENERAL CHEMISTRY, FOR EXAMPLE, IT

12:57PM 24      WOULD TAKE I THINK 11 DEVICES SHE TESTIFIED TO TO PERFORM THE

12:57PM 25      TESTING ON THAT ONE PATIENT SAMPLE.

12:57PM  1          AND SO AS SHE DESCRIBED, THE SAMPLE WOULD COME DOWN TO THE

12:57PM  2     LAB AND THEN TEAMS OF TECHS WOULD SPRING INTO ACTION, AND THEY

12:57PM  3     WOULD DIVIDE THE SAMPLE UP, AND THEN THEY WOULD GO TO THIS

12:57PM  4     FLEET OF DEVICES THAT WAS NECESSARY TO RUN THAT SIMPLE TEST ON

12:57PM  5     THAT SINGLE PATIENT SAMPLE.

12:57PM  6          CONTRAST THAT WITH WHAT YOU KNOW MS. HOLMES WAS SAYING TO

12:58PM  7     THE PUBLIC, TO INVESTORS, TO JOURNALISTS, AND TO OTHERS ABOUT

12:58PM  8     THE CAPABILITIES OF THAT DEVICE.

12:58PM  9          YOU KNOW THAT SHE WAS PRESENTING THIS AS A DEVICE THAT ON

12:58PM 10     ITS OWN COULD RUN ANY COMBINATION OF TESTS, COULD DO IT ALL AT

12:58PM 11     ONCE FROM A SINGLE SAMPLE.

12:58PM 12          HOW DIFFERENT THE REALITY WAS FROM HOW SHE WAS PRESENTING

12:58PM 13     IT.

12:58PM 14          YOU'LL ALSO RECALL THAT ERIKA CHEUNG WHO, AGAIN, HAD

12:58PM 15     EXPERIENCE WORKING WITH THE THERANOS EDISON ANALYZERS AND ALSO

12:58PM 16     THE THIRD PARTY ANALYZERS AT THERANOS, TALKED ABOUT THE LEVEL

12:58PM 17     OF AUTOMATION INVOLVED IN THOSE TWO DIFFERENT KINDS OF DEVICES,

12:58PM 18     AND SHE TALKED ABOUT ALL OF THE MANUAL STEPS THAT WERE REQUIRED

12:58PM 19     TO USE THE EDISON ANALYZER.

12:58PM 20          SHE TALKED ABOUT THE NEED FOR DILUTION OF SAMPLES AND

12:58PM 21     OTHER STEPS THAT HAD TO BE DONE OUTSIDE OF THE MACHINE BEFORE

12:58PM 22     THE SAMPLE WAS EVEN READY TO BE PROCESSED ON THE ANALYZER.

12:58PM 23          SHE TOLD YOU THAT THE THIRD PARTY DEVICES ACTUALLY HAD A

12:58PM 24     HIGHER LEVEL OF AUTOMATION AND WERE EASIER TO USE IN THAT WAY.

12:59PM 25          AGAIN, CONTRAST THAT WITH WHAT MS. HOLMES SAID OVER AND

12:59PM  1    OVER AGAIN, WHICH WAS THAT THE THERANOS ANALYZER HAD A SUPERIOR

12:59PM  2    LEVEL OF AUTOMATION, AND THAT THAT WAS A BIG PART OF THE

12:59PM  3    TECHNOLOGICAL BREAKTHROUGH, THAT THAT WAS ONE OF THE REASONS

12:59PM  4    WHY THE DEVICE WAS ABLE TO ACHIEVE SUCH SUPERIOR ACCURACY.

12:59PM  5        YOU KNOW FROM THE TESTIMONY OF THE SECOND WITNESS IN THE

12:59PM  6    CASE, ERIKA CHEUNG, THAT THAT WAS ALSO FALSE.

12:59PM  7        YOU ALSO SAW EVIDENCE AND HEARD TESTIMONY ABOUT QUALITY

12:59PM  8    CONTROL PROBLEMS WITH THE THERANOS ANALYZERS DURING TRIAL.

12:59PM  9        AND YOU'LL RECALL THAT QUALITY CONTROL WAS A STEP THAT HAD

12:59PM  10   TO BE TAKEN IN THE LAB TO CONFIRM THAT AN ANALYZER WAS WORKING

12:59PM  11   BEFORE IT COULD BE USED FOR PATIENT TESTING, AND HOW IT WORKED

12:59PM  12   WAS A KNOWN SAMPLE WOULD BE TESTED ON THE ANALYZER, AND IT WAS

12:59PM  13   REQUIRED TO RETURN THE RIGHT RESULT, THE RESULT THAT WAS KNOWN

12:59PM  14   TO BE CORRECT, IN ORDER FOR IT TO BE USED ON PATIENT SAMPLES

12:59PM  15   WHERE THE RESULT WOULD BE UNKNOWN.

01:00PM  16       YOU'VE HEARD AMPLE TESTIMONY THAT THE THERANOS ANALYZERS

01:00PM  17   PERFORMED VERY POORLY WHEN IT CAME TO THIS QC STEP.

01:00PM  18       WE TALKED A COUPLE MINUTES AGO ABOUT THE PRACTICE AT

01:00PM  19   THERANOS OF RUNNING EACH ASSAY SIX TIMES ESSENTIALLY AND THEN

01:00PM  20   DISCARDING TWO OUTLIERS.

01:00PM  21       WE'LL SEE THAT IN THIS EMAIL.  THIS IS EXHIBIT 1287.

01:00PM  22   YOU'LL RECALL THAT ON THIS OCCASION A COUPLE OF MONTHS AFTER

01:00PM  23   THERANOS HAD LAUNCHED ITS TESTING SERVICES, MS. CHEUNG SENT AN

01:00PM  24   EMAIL TO THIS NORMANDY 911 EMAIL ADDRESS.  THIS WAS THE EMAIL

01:00PM  25   ADDRESS THAT EXISTED TO HANDLE THE PROBLEMS IN THE NORMANDY

01:00PM  1    LAB, THE PROBLEMS WITH THERANOS TECHNOLOGY THAT YOU HEARD CAME

01:00PM  2    UP FREQUENTLY.

01:00PM  3         MS. CHEUNG TESTIFIED THAT IN THIS CASE BOTH QC CONTROLS

01:00PM  4    THAT SHE WAS RUNNING AT THIS TIME HAD FAILED; THAT SHE HAD RUN

01:00PM  5    QC CONTROLS USING UNOPENED REAGENTS AND A NEW PACKAGE OF

01:01PM  6    CARTRIDGES, BUT THOSE HAD FAILED AS WELL.

01:01PM  7         MS. HOLMES WAS INFORMED OF THIS PROBLEM.  SUNNY BALWANI

01:01PM  8    TOLD HER ON THAT SAME DAY ABOUT WHAT WAS HAPPENING AND REPORTED

01:01PM  9    TO HER, "THIS IS BEYOND UNACCEPTABLE PERFORMANCE."

01:01PM  10        MS. HOLMES THEN GOT INVOLVED AND RESPONDED, "DO WE HAVE

01:01PM  11   ENOUGH SAMPLE TO RUN THIS ONE ON TRADITIONAL METHODS?"

01:01PM  12        THIS SHOWS MS. HOLMES'S KNOWLEDGE EVEN RELATIVELY EARLY IN

01:01PM  13   THE COMMERCIAL LAUNCH OF THE THERANOS TESTING THAT THE

01:01PM  14   TRADITIONAL METHODS, THE NON-THERANOS TECHNOLOGY, WAS A MORE

01:01PM  15   RELIABLE METHOD THAN THE THERANOS SPECIFIC DEVICES.

01:01PM  16        WHEN THE THERANOS SPECIFIC METHOD FAILED, WHEN QC COULD

01:01PM  17   NOT BE PASSED, AS WAS FREQUENTLY THE CASE, MS. HOLMES ASKED,

01:01PM  18   CAN WE GO BACK TO THE SAFE STANDARD?  CAN WE GO BACK TO THE

01:01PM  19   RELIABLE DEVICES THAT WE ALSO HAVE?

01:01PM  20        ULTIMATELY THIS SITUATION WAS RESOLVED, AND I SHOULD PUT

01:02PM  21   RESOLVED IN QUOTES, BECAUSE YOU SEE THAT THE ANSWER, AS

01:02PM  22   MS. HOLMES WAS TOLD, WAS THAT "TWO OUTLIERS HAD TO BE MANUALLY

01:02PM  23   REMOVED IN ORDER TO PASS QC."

01:02PM  24        SO YOU RECALL MS. CHEUNG'S TESTIMONY AND DR. ROSENDORFF'S

01:02PM  25   TESTIMONY ABOUT THIS PRACTICE WHERE MULTIPLE TEST RESULTS WOULD

01:02PM  1    BE GENERATED AND THE COMPANY WOULD SIMPLY IGNORE RESULTS THAT

01:02PM  2    CAUSED THE DEVICE NOT TO PASS QC.

01:02PM  3          THIS APPROACH YOU HEARD WAS NOT TAKEN WITH THE COMMERCIAL

01:02PM  4    ANALYZERS.  THE NON-THERANOS ANALYZERS DID NOT NEED TO USE THIS

01:02PM  5    PROCESS.  THEY DIDN'T NEED TO RELY ON THE PROCESS OF DISCARDING

01:02PM  6    THE DATA IN ORDER TO APPEAR MORE RELIABLE THAN THEY WERE.  YOU

01:02PM  7    HEARD THAT FROM MS. CHEUNG.

01:02PM  8          HIGH QUALITY CONTROL FAILURE RATES WERE A PERVASIVE

01:02PM  9    PROBLEM AT THERANOS AS YOU'VE HEARD.  BOTH MS. CHEUNG AND

01:02PM 10    DR. ROSENDORFF TESTIFIED ABOUT THE OVERALL RATES OF QUALITY

01:03PM 11    CONTROL FAILURE, AND YOU HEARD FROM THEM THAT, FOR EXAMPLE, IN

01:03PM 12    THE MONTH OF MARCH 2014, APPROXIMATELY 26 PERCENT OF EDISON

01:03PM 13    QUALITY CONTROL RUNS FAILED.

01:03PM 14          AND IF YOU LOOK AT THIS ON AN ASSAY BY ASSAY BASIS, YOU

01:03PM 15    SEE THAT IN SOME CASES IT'S MUCH WORSE.  I'LL DRAW YOUR

01:03PM 16    ATTENTION TO THE COLUMN FOR THE TT3 TEST, WHICH INDICATES THAT

01:03PM 17    MORE THAN 50 PERCENT OF THE QUALITY CONTROL RUNS FAILED DURING

01:03PM 18    THAT MONTH.

01:03PM 19          YOU HEARD TESTIMONY THAT MARCH WAS NOT AN ESPECIALLY BAD

01:03PM 20    MONTH FOR THERANOS, THAT THIS WAS TYPICAL.  THIS WAS TYPICAL OF

01:03PM 21    THE PERFORMANCE OF THESE MACHINES.

01:03PM 22          THINK ABOUT WHAT THAT MEANS.  IF HALF OF THE QUALITY

01:03PM 23    CONTROL SAMPLES RUN ON THIS DEVICE WERE FAILING, THINK ABOUT

01:03PM 24    WHAT THAT MEANS FOR THE PATIENT SAMPLES THAT WERE BEING RUN.

01:03PM 25          IF A TEST OR A DEVICE IS ONLY ACCURATE HALF OF THE TIME,

01:03PM  1    HOW CAN ANYONE, REGARDLESS OF THEIR LEVEL OF EXPERTISE OR

01:03PM  2    EDUCATION, HOW CAN ANYONE BE COMFORTABLE USING THAT IN THE

01:04PM  3    CLINICAL SETTING AND TRUSTING PATIENT CARE TO THAT KIND OF

01:04PM  4    DEVICE?

01:04PM  5        YOU ALSO SAW THAT THERE WAS AN INSTANCE WHERE THE THERANOS

01:04PM  6    ANALYZER WAS COMPARED TO PREDICATE NON-THERANOS ANALYZERS IN

01:04PM  7    THE CONTEXT OF PROFICIENCY TESTING SAMPLES.

01:04PM  8        AND YOU'LL RECALL THAT YOU SAW THIS DATA YESTERDAY SHOWING

01:04PM  9    THAT FOR TPSA, FOR EXAMPLE, THE PREDICATE DEVICE, THE

01:04PM 10    NON-THERANOS DEVICE, RELIABLY RETURNED THE SAME DEVICE -- OR

01:04PM 11    THE SAME RESULT, EXCUSE ME, TWICE IN A ROW WHEN THE SAME SAMPLE

01:04PM 12    WAS RERUN.

01:04PM 13        WHEN THE SAME THING WAS ATTEMPTED ON THE THERANOS DEVICE,

01:04PM 14    IT CAME NOWHERE CLOSE TO THAT SAME KIND OF CONSISTENCY.

01:04PM 15        THIS WAS A HUGE RED FLAG AS RECOGNIZED BY THE TECHNICAL

01:04PM 16    PEOPLE AT THERANOS.

01:04PM 17        IT WAS DISMISSED BY SOME AT THE TIME AS BEING INCONSISTENT

01:04PM 18    WITH THE ALTERNATIVE ASSESSMENT AND PROFICIENCY PROTOCOLS THAT

01:05PM 19    THE COMPANY HAD AT THAT TIME OR WAS WORKING ON DEVELOPING.

01:05PM 20        BUT YOU HEARD FROM DR. ROSENDORFF THAT HE STILL VIEWED

01:05PM 21    THIS AS A VALID AND A USEFUL SPOT-CHECK OF THE RELIABILITY OF

01:05PM 22    THE THERANOS SYSTEMS, AND THE THERANOS SYSTEMS FAILED THIS

01:05PM 23    SPOT-CHECK ABYSMALLY.

01:05PM 24        YOU ALSO HEARD AND SAW EVIDENCE THAT THE PROBLEMS WITH

01:05PM 25    THERANOS'S TECHNOLOGY WEREN'T JUST LIMITED TO THE EDISON.

01:05PM  1       SO, FOR EXAMPLE, DR. ROSENDORFF REVIEWED EVIDENCE

01:05PM  2   REGARDING A STUDY THAT WAS CONDUCTED AT THERANOS, AND HE

01:05PM  3   TESTIFIED THAT WHEN LOOKING AT THE VARIATIONS OBSERVED IN THAT

01:05PM  4   STUDY, THE VARIATION COMPARING VENOUS TO FINGERSTICK WAS MUCH

01:05PM  5   MORE PRONOUNCED WHEN FINGERSTICK SAMPLES WERE ASSAYED.

01:05PM  6       AND YOU'LL RECALL THAT FINGERSTICK WAS THE TYPE OF SAMPLE

01:05PM  7   THAT THERANOS RAN ON ITS MODIFIED THIRD PARTY DEVICES ALSO.

01:05PM  8       HE WAS THEN ASKED THE QUESTION, DOES THAT MEAN THAT USING

01:05PM  9   THE THERANOS APPROACH ON THESE DEVICES ACTUALLY MADE THE

01:06PM 10   DEVICES PERFORM WORSE THAN THEY DID IN THEIR UNMODIFIED FORM?

01:06PM 11       HIS ANSWER WAS, YES, IT INCREASED THE DIFFERENCES IN

01:06PM 12   RESULTS BETWEEN INSTRUMENTS.

01:06PM 13       SO NOT ONLY HAD THERANOS BUILT ITS OWN ANALYZER THAT WAS

01:06PM 14   NOT UP TO PAR AND WAS NOT WORKING WELL, BUT THE CHANGES THAT

01:06PM 15   THE COMPANY HAD MADE TO THIRD PARTY DEVICES THAT IT HAD

01:06PM 16   PURCHASED DECREASED THE ACCURACY AND RELIABILITY OF THOSE THIRD

01:06PM 17   PARTY DEVICES.

01:06PM 18       NOW, THERE WAS SOME DISCUSSION DURING THE DEFENSE'S

01:06PM 19   CLOSING ABOUT STATISTICS IN THIS CASE AND WHETHER YOU NEED TO

01:06PM 20   SEE FAILURE RATES ACROSS A PATIENT POPULATION TO UNDERSTAND

01:06PM 21   THAT THESE DEVICES WERE OR WERE NOT WORKING.

01:06PM 22       BASED ON THIS EVIDENCE, THE EVIDENCE AVAILABLE AT THE TIME

01:06PM 23   AT THERANOS, YOU KNOW THAT THESE PROBLEMS WERE OBVIOUS AND THAT

01:06PM 24   THEY WERE SERIOUS.

01:06PM 25       YOU ALSO HEARD TESTIMONY ABOUT THE DIFFICULTY IN

01:07PM 1    IDENTIFYING INACCURATE PATIENT RESULTS.  WHEN DR. ROSENDORFF

01:07PM 2    WAS ON THE STAND, HE TALKED ABOUT HOW AN INACCURATE PATIENT

01:07PM 3    RESULT MIGHT NOT STAND OUT FROM THE REST.  IT CAN BE DIFFICULT

01:07PM 4    TO IDENTIFY.  YOU NEED TO HAVE OTHER INFORMATION TO COMPARE THE

01:07PM 5    RESULT TO, WHETHER IT'S CLINICAL INFORMATION ABOUT HOW A

01:07PM 6    PATIENT IS PRESENTING OR CONTEMPORANEOUS RESULTS FROM ANOTHER

01:07PM 7    LAB.  YOU NEED TO HAVE SOMETHING ELSE TO HOLD THOSE RESULTS UP

01:07PM 8    TO.

01:07PM 9        SO THE KIND OF STATISTICAL ANALYSIS THAT THE DEFENSE IS

01:07PM 10   SAYING YOU NEED, FOR ONE THING, IT'S NOT CLEAR THAT THAT

01:07PM 11   ANALYSIS WOULD EVEN BE POSSIBLE.

01:07PM 12       BUT MORE IMPORTANTLY, YOU DON'T NEED IT.  YOU DON'T NEED

01:07PM 13   IT TO REACH THE CONCLUSION THAT THESE DEVICES WERE NOT WORKING

01:07PM 14   AS WELL AS THEY SHOULD HAVE BEEN, THAT IT WAS OBVIOUS TO

01:07PM 15   EVERYONE IN THE COMPANY, INCLUDING MS. HOLMES.

01:07PM 16       MR. DOWNEY ALSO TALKED ABOUT THE NATURE OF THE EVIDENCE OF

01:07PM 17   FAILURE IN THIS CASE, AND HE HIGHLIGHTED ONE CATEGORY OF THAT

01:08PM 18   EVIDENCE, WHICH WAS EXAMPLES OF INSTANCES WHERE THE DEVICE

01:08PM 19   RETURNED AN INACCURATE RESULT.

01:08PM 20       BUT THAT IS ONLY PART OF THE EVIDENCE IN THIS CASE.

01:08PM 21   THAT'S ONLY PART OF THE EVIDENCE SHOWING THAT THE ANALYZER WAS

01:08PM 22   NOT WORKING.

01:08PM 23       YOU SHOULD NOT FOCUS SOLELY ON THAT, ESPECIALLY IN LIGHT

01:08PM 24   OF THE EVIDENCE THAT SHOWED MUCH HIGHER FAILURE RATES FOR

01:08PM 25   QUALITY CONTROL FOR THE THERANOS ANALYZER VERSUS THE

01:08PM  1    NON-THERANOS TECHNOLOGY ALSO AT THE COMPANY.

01:08PM  2         FINALLY, JUST TO CLEAR UP THE RECORD ON THAT TOPIC,

01:08PM  3    MR. DOWNEY A COUPLE OF TIMES REFERENCED DR. ROSENDORFF'S

01:08PM  4    TESTIMONY COMPARING FAILURE RATES OR ERROR RATES AT THERANOS TO

01:08PM  5    ERROR RATES AT OTHER LABS, AND HE HAD PREVIOUSLY TESTIFIED THAT

01:08PM  6    I THINK HE HAD SEEN THE SAME NUMBER APPROXIMATELY OF ERRONEOUS

01:09PM  7    RESULTS AT THERANOS VERSUS HIS PREVIOUS LAB.

01:09PM  8         LATER IN HIS TESTIMONY, THOUGH, HE CLARIFIED THAT THAT

01:09PM  9    ACTUALLY CAUSED HIM TO BE FAR MORE CONCERNED ABOUT THE

01:09PM  10   RELIABILITY OF THERANOS'S TESTS GIVEN THE DIFFERENCE IN VOLUME

01:09PM  11   BETWEEN THOSE TWO LABS.

01:09PM  12        AS HE TESTIFIED, THE KEY QUESTION FOR HIM WAS, HOW

01:09PM  13   FREQUENTLY ARE THESE ERRORS POPPING UP IN RELATION TO THE TOTAL

01:09PM  14   NUMBER OF TESTS THAT ARE BEING PERFORMED?

01:09PM  15        AND YOU'LL RECALL THAT SOME OF HIS TESTIMONY FOCUSSED ON

01:09PM  16   THE EARLY DAYS OF THE THERANOS LAUNCH WHEN, AS BOTH PARTIES

01:09PM  17   AGREE, THE TESTING VOLUME WAS QUITE LOW.

01:09PM  18        SO A HIGH ERROR RATE DURING THAT TIME, ALL OF THESE

01:09PM  19   PROBLEMS CROPPING UP SO EARLY WHEN THE TEST VOLUME WAS LOW MADE

01:09PM  20   THIS EVEN MORE OF A RED FLAG FOR EVERYONE AT THE COMPANY.

01:09PM  21        LET'S KEEP TALKING ABOUT WHAT WAS TRUE AT THERANOS AND HOW

01:09PM  22   THINGS REALLY WERE.

01:09PM  23        YOU ALSO KNOW FROM THE EVIDENCE IN THIS CASE THAT ALTHOUGH

01:10PM  24   DEFENDANT WAS REPRESENTING THAT THE COMPANY HAD A RICH ONGOING

01:10PM  25   RELATIONSHIP WITH PHARMACEUTICAL COMPANIES AND WAS GENERATING A

01:10PM  1    SIGNIFICANT AMOUNT OF REVENUE FROM THOSE RELATIONSHIPS, THAT

01:10PM  2    WASN'T TRUE.  THOSE RELATIONSHIPS WERE FAR MORE LIMITED.

01:10PM  3         FOR ONE THING, YOU'LL RECALL, OR YOU'LL NOTICE IF YOU LOOK

01:10PM  4    AT THE RELEVANT EXHIBITS THAT THE ASSAYS INVOLVED IN THE

01:10PM  5    CONTRACTS WITH THE PHARMACEUTICAL COMPANIES WERE SPECIALIZED

01:10PM  6    ASSAYS THAT WERE GENERALLY NOT THE SAME AS THE ASSAYS THAT WERE

01:10PM  7    CRITICAL FOR CLINICAL CARE.

01:10PM  8         IN OTHER WORDS, THE ASSAYS THAT THERANOS WAS RUNNING FOR

01:10PM  9    THE PHARMA COMPANIES WERE GENERALLY NOT THE SAME ASSAYS THAT

01:10PM 10    MATTERED FOR PATIENT CARE AND THE CLINICAL LAUNCH.

01:10PM 11         SO THE FACT THAT THERANOS HAD EXPERIENCE IN THAT AREA IS

01:10PM 12    REALLY OF LIMITED RELEVANCE.

01:10PM 13         YOU ALSO HEARD TESTIMONY FROM EMPLOYEES AT THOSE

01:10PM 14    PHARMACEUTICAL COMPANIES WHO TOLD YOU THAT THEY ACTUALLY HAD

01:11PM 15    NEGATIVE IMPRESSIONS OF THERANOS'S TECHNOLOGY.  THEY HAD

01:11PM 16    CONCERNS ABOUT ITS PERFORMANCE.

01:11PM 17         IN GENERAL, THEY WERE NOT INTERESTED IN USING THE

01:11PM 18    COMPANY'S TECHNOLOGY FURTHER.

01:11PM 19         THE UNDISPUTED EVIDENCE ALSO SHOWS THAT THERANOS COLLECTED

01:11PM 20    NO REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2009.  YOU CAN

01:11PM 21    FIND THAT IN EXHIBIT 7753, AND THAT WAS A CHART THAT WAS

01:11PM 22    COVERED BY MS. YAM WHEN SHE WAS ON THE STAND.

01:11PM 23         AGAIN, DESPITE THE DEFENDANT'S REPRESENTATIONS GOING INTO

01:11PM 24    2012, 2013 AND FORWARD, THE COMPANY HAD NOT COLLECTED A DOLLAR

01:11PM 25    OF REVENUE FROM PHARMACEUTICAL WORK AFTER 2009.

01:11PM  1        MR. DOWNEY RECENTLY DISCUSSED WHETHER THERANOS WAS IN NEED

01:11PM  2   OF MONEY OR NOT.

01:11PM  3        ALTHOUGH MS. HOLMES REPRESENTED TO INVESTORS AND OTHERS

01:12PM  4   THAT THE COMPANY WAS FINANCIALLY PERFORMING WELL AND IT WAS

01:12PM  5   GENERATING SIGNIFICANT REVENUES AND IT WAS ABOUT TO GENERATE

01:12PM  6   EVEN MORE, SHE KNEW, BECAUSE SHE WAS CEO OF THE COMPANY,

01:12PM  7   BECAUSE SHE MONITORED THE CASH POSITION, THAT THAT WAS NOT

01:12PM  8   TRUE.

01:12PM  9        AND IF YOU LOOK AT EXHIBIT 5172, I WON'T DISPLAY IT NOW,

01:12PM  10  BUT IT'S AN ACCOUNTING RECORD THAT SHOWS THAT IN SEPTEMBER THE

01:12PM  11  COMPANY'S CASH BALANCE WAS DOWN TO LESS THAN 10 MILLION IF YOU

01:12PM  12  DON'T COUNT THE LINE OF CREDIT THAT WOULD HAVE BEEN DIFFICULT

01:12PM  13  FOR THERANOS TO ACCESS.

01:12PM  14       WHAT DID THAT MEAN?  WHAT DID $10 MILLION MEAN AT THAT

01:12PM  15  TIME?

01:12PM  16       THAT SAME EXHIBIT, 5172, SHOWS THAT AT THAT TIME, AND THIS

01:12PM  17  IS IN SEPTEMBER 2013, AT THAT TIME THE COMPANY'S BURN RATE OR

01:12PM  18  ITS SPEND RATE WAS APPROXIMATELY $1- TO $2 MILLION PER WEEK.

01:12PM  19       SO THAT MEANT THAT THE COMPANY WAS LESS THAN TWO MONTHS

01:12PM  20  FROM RUNNING OUT OF MONEY AND HAVING TO CLOSE ITS DOORS.

01:13PM  21       THAT WAS AROUND THE TIME WHEN THE COMPANY WAS PURSUING ITS

01:13PM  22  LAUNCH WITH WALGREENS BECAUSE IT DESPERATELY NEEDED THE CAPITAL

01:13PM  23  UNDER THAT CONTRACT.

01:13PM  24       IT WAS ALSO AGGRESSIVELY PURSUING INVESTMENT FROM

01:13PM  25  INVESTORS BECAUSE IT DESPERATELY NEEDED THE CAPITAL FROM THOSE

01:13PM   1      INVESTMENTS.

01:13PM   2          THAT IS ABSOLUTELY PART OF THE MOTIVE IN THIS CASE, AND

01:13PM   3    ALTHOUGH YOU'RE NOT REQUIRED TO FIND MOTIVE, IT'S NOT AN

01:13PM   4    ELEMENT OF ANY OF THE CHARGED CRIMES, IT'S IMPORTANT TO

01:13PM   5    UNDERSTAND THAT THAT WAS CERTAINLY ON THE MINDS OF BOTH

01:13PM   6    DEFENDANT, HOLMES AND BALWANI, IN THIS CASE AS THEY DECIDED HOW

01:13PM   7    TO APPROACH THEIR DEALINGS WITH WALGREENS AND THE

01:13PM   8    MISREPRESENTATIONS THEY MADE THERE, AND THEIR APPROACH TO

01:13PM   9    INVESTORS AND THE MISREPRESENTATIONS THEY MADE TO THEM.

01:13PM  10          ALTHOUGH MS. HOLMES WAS REPRESENTING TO THE PUBLIC THAT

01:13PM  11    THE COMPANY'S TECHNOLOGY WAS BEING ACTIVELY USED BY THE

01:13PM  12    MILITARY, YOU KNOW THAT THAT'S NOT TRUE.

01:14PM  13          DURING CLOSING MR. DOWNEY MADE SOME REFERENCE TO SOME OF

01:14PM  14    THE LIMITED ENGAGEMENTS THAT THE COMPANY HAD WITH THE MILITARY.

01:14PM  15          LET ME JUST GO THROUGH THEM TO MAKE SURE THAT WE'RE ALL ON

01:14PM  16    THE SAME PAGE ABOUT THE CRITICAL FACT THAT NONE OF THESE

01:14PM  17    ENGAGEMENTS INVOLVED ACTUAL CLINICAL USE OF THE ANALYZER.  NONE

01:14PM  18    OF THESE WERE USE OF THE THERANOS TECHNOLOGY FOR ITS INTENDED

01:14PM  19    PURPOSE.

01:14PM  20          SO, FOR EXAMPLE, FOR SOCOM, THAT'S SPECIAL OPERATIONS

01:14PM  21    COMMAND, MR. EDLIN TESTIFIED THAT TWO DEVICES WERE SENT TO A

01:14PM  22    BASE IN KENTUCKY.  HE TESTIFIED THAT THOSE DEVICES WERE NOT

01:14PM  23    EVEN CAPABLE OF RUNNING A CBC, A BASIC COMPLETE BLOOD COUNT,

01:14PM  24    THAT THEY WOULD HAVE HAD TO BE REPLACED LATER IN ORDER FOR THAT

01:14PM  25    TEST TO BE POSSIBLE.  AND AS FAR AS HE KNOWS, THOSE DEVICES

01:14PM  1    WERE NEVER USED FOR ANYTHING.

01:14PM  2         AGAIN, TWO DEVICES, SENT TO KENTUCKY, NEVER USED, AND THAT

01:14PM  3    WAS THE EXTENT OF THE SOCOM DEALING.

01:14PM  4         FOR AFRICOM, MR. DOWNEY REFERENCED THIS ONE AS WELL.

01:15PM  5         EXHIBIT 12251 TELLS YOU WHAT THIS WAS ACTUALLY ABOUT.  IT

01:15PM  6    WAS NOT CLINICAL USE OF THE ANALYZER.  IT WAS NOT USE OF THE

01:15PM  7    ANALYZER TO TEST ANY PATIENT SAMPLES.

01:15PM  8         INSTEAD, THIS WAS A TEST TO SEE WHETHER THE DEVICE WOULD

01:15PM  9    FUNCTION, WHETHER IT WOULD SUCCESSFULLY START UP, POWER DOWN,

01:15PM 10    THINGS LIKE THAT, IN THE ENVIRONMENT.

01:15PM 11         HERE'S A QUOTE FROM THAT DOCUMENT.  IT SAYS, "ALL

01:15PM 12    LABORATORY RESULTS WILL BE ARTIFICIALLY CREATED.  NO ACTUAL

01:15PM 13    LABORATORY DATA WILL BE COLLECTED ON VOLUNTEERS."

01:15PM 14         YOU'LL RECALL FROM MR. EDLIN'S TESTIMONY THAT THIS WAS AN

01:15PM 15    EXPERIMENT WHERE THE RESULTS FOR THE TESTS THAT WERE GOING TO

01:15PM 16    BE RUN HAD BEEN PREDETERMINED.  THEY DIDN'T ACTUALLY RELATE TO

01:15PM 17    WHAT WAS HAPPENING IN PATIENTS' BODIES, AND NO TREATMENT

01:15PM 18    DECISIONS WOULD HAVE BEEN MADE BASED ON THOSE TESTS EITHER.

01:15PM 19         HOW ABOUT CENTCOM?

01:15PM 20         THIS IS THE COMPONENT OF THE MILITARY THAT GENERAL MATTIS

01:16PM 21    WAS IN CHARGE OF.  BOTH HE AND MR. EDLIN TESTIFIED THAT

01:16PM 22    ALTHOUGH CENTCOM CONSIDERED AND WAS INTERESTED IN SIDE BY SIDE

01:16PM 23    TESTING OF THERANOS TECHNOLOGY TO SEE WHETHER THERANOS

01:16PM 24    ANALYZERS COULD RELIABLY PERFORM AS WELL AS CONVENTIONAL

01:16PM 25    ANALYZERS, ALTHOUGH CENTCOM WAS INTERESTED IN THAT, THAT NEVER

01:16PM    1    HAPPENED.

01:16PM    2         AND EXHIBIT 10457 IS A PROTOCOL FOR AN LOE, THAT'S LIMITED

01:16PM    3    OBJECTIVE EXPERIMENT, THAT NEVER HAPPENED.  THAT WAS GOING TO

01:16PM    4    INVOLVE SHIPPING DEVICES TO AFGHANISTAN.  THAT PROTOCOL, THAT

01:16PM    5    STUDY, NEVER GOT OFF THE GROUND.

01:16PM    6         AND THEN FINALLY THERE WAS THE BURN STUDY.

01:16PM    7         THIS WAS NOT EXCLUSIVELY A MILITARY OPERATION AS YOU SAW

01:16PM    8    FROM EXHIBIT 7694.  THAT'S THE PUBLISHED ARTICLE WITH THE STUDY

01:16PM    9    DETAILS.

01:16PM   10         YOU'LL RECALL FROM THAT ARTICLE THAT THIS WAS A STUDY OF A

01:17PM   11    TREATMENT TECHNIQUE THAT HAD NOTHING TO DO WITH THERANOS.  NO

01:17PM   12    TREATMENT DECISIONS WERE BASED ON THE USE OF THE THERANOS TEST

01:17PM   13    RESULTS.

01:17PM   14         AND THIS TESTING ALSO OCCURRED EXCLUSIVELY WITHIN THE U.S.

01:17PM   15    IT WAS NOT IN THE BATTLEFIELD.  IT DID NOT EXCLUSIVELY INVOLVE

01:17PM   16    SOLDIERS.

01:17PM   17         SO THIS ALSO WAS NOT ANYTHING LIKE WHAT MS. HOLMES WAS

01:17PM   18    REPRESENTING WAS HAPPENING.

01:17PM   19         IT'S IMPORTANT TO REMEMBER THAT IN NONE OF THESE CASES WAS

01:17PM   20    THERE EVEN COMPARATIVE TESTING TO SEE WHETHER THE THERANOS

01:17PM   21    DEVICE COULD PERFORM WELL ENOUGH FOR ACTUAL USE.  THAT WOULD

01:17PM   22    HAVE BEEN THE FIRST STEP BEFORE ANY SOLDIERS WERE ACTUALLY

01:17PM   23    TREATED BASED ON THERANOS TEST RESULTS, AND THAT PRECONDITION,

01:17PM   24    THAT TEST OF THE THERANOS TECHNOLOGY NEVER EVEN OCCURRED.

01:17PM   25         SO THAT SHOULD GIVE YOU AN IDEA OF HOW FAR AWAY

01:17PM 1    MS. HOLMES'S REPRESENTATIONS WERE FROM THE ACTUAL TRUTH ON THAT

01:17PM 2    TOPIC.

01:17PM 3        SO THAT WAS THE TRUTH AT THERANOS.

01:18PM 4        THE PEOPLE, THOUGH, AND THE ORGANIZATIONS THAT MS. HOLMES

01:18PM 5    WANTED TO DO BUSINESS WITH DIDN'T KNOW THOSE FACTS, AND THEY

01:18PM 6    COULD NOT BE ALLOWED TO KNOW THAT TRUTH.

01:18PM 7        IF INVESTORS HAD KNOWN THOSE FACTS, THEY NEVER WOULD HAVE

01:18PM 8    WRITTEN CHECKS TO THERANOS.  THEY NEVER WOULD HAVE INVESTED

01:18PM 9    THEIR MONEY.

01:18PM 10       IF WALGREENS HAD KNOWN THOSE FACTS, THEY WOULDN'T HAVE

01:18PM 11   PARTNERED WITH THERANOS AND AGREED TO PUT THERANOS'S TESTING

01:18PM 12   SERVICES IN WALGREENS STORES.

01:18PM 13       AND IF PATIENTS HAD KNOWN THOSE FACTS, THEY NEVER WOULD

01:18PM 14   HAVE TRUSTED THERANOS TO TELL THEM WHAT WAS HAPPENING WITH

01:18PM 15   THEIR HEALTH.

01:18PM 16       IN OTHER WORDS, THOSE FACTS, THE TRUTH, WERE FATAL TO

01:18PM 17   THERANOS, AND MS. HOLMES KNEW THAT.

01:18PM 18       SO, AS A RESULT, MS. HOLMES SET OUT TO MAKE SURE THAT THE

01:18PM 19   PEOPLE THAT SHE CARED ABOUT DOING BUSINESS WITH, THE PEOPLE

01:18PM 20   WHOSE MONEY SHE NEEDED, HAD A DISTORTED AND INACCURATE VIEW OF

01:19PM 21   THE COMPANY IN THEIR HEADS.

01:19PM 22       HER SCHEME TO DEFRAUD CAME TO ENCOMPASS INVESTORS IN THE

01:19PM 23   COMPANY AND PATIENTS WHO CAME TO THERANOS FOR BLOOD TESTS,

01:19PM 24   RESULTING IN THE CHARGES IN THIS CASE.

01:19PM 25       LET'S TALK NOW ABOUT SOME OF THE ARGUMENTS YOU'VE SEEN

01:19PM 1    FROM THE DEFENSE OVER THE COURSE OF TRIAL AND ESPECIALLY IN

01:19PM 2    CLOSING.

01:19PM 3        WE'LL LOOK AT THE MAIN THEMES THAT MS. HOLMES'S LAWYERS

01:19PM 4    HAVE OFFERED AND WALK THROUGH WHY NONE OF THEM GETS IN THE WAY

01:19PM 5    OF A CONVICTION ON ALL COUNTS IN THIS CASE.

01:19PM 6        FIRST, WE MENTIONED THIS BEFORE, THE DEFENSE HAS

01:19PM 7    HIGHLIGHTED THE HARD WORK THAT OCCURRED AT THERANOS, AND IN

01:19PM 8    PARTICULAR THE HARD WORK THAT THE DEFENDANT HERSELF DID.

01:19PM 9        AGAIN, THERE'S NO DISPUTE ON THAT FACT.  THE EVIDENCE

01:19PM 10   SHOWS THAT MS. HOLMES DEVOTED A LOT OF TIME AND ENERGY TO THIS

01:19PM 11   COMPANY.  THE COMPANY WAS VERY IMPORTANT TO HER.

01:19PM 12       THERE'S ALSO NO EVIDENCE THAT MS. HOLMES CREATED THE

01:19PM 13   COMPANY, THAT SHE ASSEMBLED THE BOARD, THAT SHE HIRED

01:20PM 14   SCIENTISTS FOR THE PURPOSE OF CONDUCTING A FRAUD.  THAT'S NOT

01:20PM 15   THE GOVERNMENT'S ALLEGATION.

01:20PM 16       FOR ONE THING, THE EVIDENCE SHOWS THAT SHE FOUNDED THE

01:20PM 17   COMPANY IN THE EARLY 2000'S, AND THE CHARGED CRIMES IN THIS

01:20PM 18   CASE DON'T START UNTIL 2010 ON THE INVESTOR SIDE AND 2013 FOR

01:20PM 19   THE PATIENT SIDE.

01:20PM 20       SO THE PARTIES AGREE THAT MS. HOLMES WORKED HARD, THAT SHE

01:20PM 21   WANTED THERANOS TO SUCCEED.  SHE WANTED HER COMPANY TO BE

01:20PM 22   SUCCESSFUL.

01:20PM 23       THE DEFENSE HOLDS THAT OUT AS A REASON TO DOUBT

01:20PM 24   MS. HOLMES'S INTENT TO DEFRAUD IN THIS CASE.

01:20PM 25       BUT, IN FACT, THAT WAS HER MOTIVE.  THAT WAS THE MOTIVE

01:20PM 1    FOR THE SCHEME TO DEFRAUD.  SHE DID THIS ON BEHALF OF THE

01:20PM 2    COMPANY.  SHE COMMITTED THESE CRIMES BECAUSE SHE WAS DESPERATE

01:20PM 3    FOR THE COMPANY TO SUCCEED, AND WE'LL TALK ABOUT SOME OF THE

01:20PM 4    EVIDENCE THAT SHOWS THAT.

01:20PM 5        THE DEFENSE ALSO MENTIONED GOOD FAITH A COUPLE OF TIMES,

01:21PM 6    AND I WANT TO BE CLEAR ABOUT WHAT THE INSTRUCTIONS IN THIS CASE

01:21PM 7    WILL SHOW.

01:21PM 8        SO AFTER I'M FINISHED WITH MY OPPORTUNITY TO ADDRESS YOU,

01:21PM 9    THE COURT IS GOING TO INSTRUCT YOU ON THE RELEVANT LAW IN THIS

01:21PM 10   CASE, AND THAT WILL BE THE LAW THAT YOU SHOULD FOLLOW IN YOUR

01:21PM 11   DELIBERATIONS.

01:21PM 12       I EXPECT THAT THE COURT IS GOING TO INSTRUCT YOU

01:21PM 13   SPECIFICALLY ON GOOD FAITH.  I THINK THAT WILL BE JURY

01:21PM 14   INSTRUCTION NUMBER 22.

01:21PM 15       HERE'S THE IMPORTANT THING TO KNOW HERE IN CONNECTION WITH

01:21PM 16   THE DEFENSE ARGUMENT.  GOOD FAITH THAT WOULD PREVENT A

01:21PM 17   CONVICTION IS GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

01:21PM 18   MISREPRESENTATIONS ALLEGED.

01:21PM 19       I'LL SAY THAT AGAIN.  THE ONLY KIND OF GOOD FAITH THAT

01:21PM 20   PREVENTS A CONVICTION HERE IS GOOD FAITH BELIEF IN THE TRUTH OF

01:21PM 21   THE SPECIFIC MISREPRESENTATIONS ALLEGED.

01:21PM 22       THAT'S NOT THE SAME THING AS GENERAL GOOD FAITH BELIEF IN

01:21PM 23   THE COMPANY OVERALL.  IT'S NOT THE SAME THING AS A GENERAL GOOD

01:21PM 24   FAITH EFFORT TO MAKE THE COMPANY WORK.

01:22PM 25       IN ORDER TO FIND THAT GOOD FAITH PRECLUDES A CONVICTION

01:22PM  1    HERE, MS. HOLMES MUST HAVE BELIEVED IN THE FALSE THINGS THAT

01:22PM  2    SHE WAS SAYING.

01:22PM  3         IT'S IMPOSSIBLE TO CONCLUDE THAT, AND WE'LL TALK SOME MORE

01:22PM  4    ABOUT WHY.

01:22PM  5         MR. DOWNEY ALSO HAS HIGHLIGHTED THE THEME THAT THE FAILURE

01:22PM  6    OF A BUSINESS DOES NOT EQUAL A FRAUD.

01:22PM  7         AGAIN, THERE'S NO DISPUTE THERE.  THAT'S NOT THE NATURE OF

01:22PM  8    THE ALLEGATIONS IN THIS CASE.  THE ACHIEVEMENTS THAT NEVER

01:22PM  9    MATERIALIZED AT THERANOS ARE SOMETHING THAT WE DISCUSSED AND

01:22PM  10   SOMETHING THAT IS NOT CONTROVERSIAL.

01:22PM  11        BUT THEY'RE ALSO NOT A CRIME.  THAT DEGREE OF FAILURE AND

01:22PM  12   THE FACT THAT THOSE GOALS WERE NOT ACHIEVED DOES NOT BY ITSELF

01:22PM  13   MAKE A CRIME.

01:22PM  14        A VERSION OF MS. HOLMES THAT SET OUT TO ACHIEVE THE GOALS

01:22PM  15   THAT SHE SET OUT TO ACHIEVE AND WAS SUCCESSFUL WOULD HAVE BEEN

01:22PM  16   A HERO.

01:23PM  17        A VERSION WHO TRIED HER BEST AND FAILED, BUT WAS STILL

01:23PM  18   HONEST ABOUT IT, STILL WOULD HAVE BEEN SOMEONE DESERVING OF

01:23PM  19   RESPECT, EVEN ADMIRATION.

01:23PM  20        BUT THAT'S NOT THE VERSION THAT WE SEE IN THE EVIDENCE IN

01:23PM  21   THIS CASE.

01:23PM  22        INSTEAD, WE SEE A CEO OF A COMPANY WHO WAS SO DESPERATE

01:23PM  23   FOR THE COMPANY TO SUCCEED, SO AFRAID OF FAILURE, THAT SHE WAS

01:23PM  24   WILLING TO DO ANYTHING TO KEEP THAT COMPANY FROM FAILING, TO

01:23PM  25   BOLSTER THE REPRESENTATION OF THE COMPANY, AND TO ARTIFICIALLY

01:23PM 1    CREATE SUCCESS OF THE COMPANY.

01:23PM 2         SO BY CONVICTING MS. HOLMES, BY FINDING THAT ALL OF THE

01:23PM 3    ELEMENTS ARE MET IN THIS CASE, YOU'RE NOT PUNISHING THE

01:23PM 4    DEFENDANT FOR BEING AMBITIOUS AND FAILING.  WE ADMIRE PEOPLE

01:23PM 5    WHO SET AMBITIOUS GOALS AND SET OUT TO ACHIEVE THEM.

01:23PM 6         THIS CASE WENT BAD FOR THERANOS AND MS. HOLMES WHEN SHE

01:23PM 7    MADE THE OTHER CHOICE, WHEN SHE REFUSED TO ACCEPT FAILURE AND

01:24PM 8    TURNS TO BREAKING THE LAW INSTEAD.

01:24PM 9         THE DEFENSE HAS ALSO HIGHLIGHTED MS. HOLMES'S YOUTH AND

01:24PM 10   RELATIVE INEXPERIENCE AS A POSSIBLE EXCUSE IN THIS CASE.

01:24PM 11        YOU SHOULDN'T BE DISTRACTED BY THAT.  ALTHOUGH THE DEFENSE

01:24PM 12   HIGHLIGHTS THE AGE MS. HOLMES WAS WHEN SHE FOUNDED THE COMPANY,

01:24PM 13   IT'S IMPORTANT TO REMEMBER THAT THE PERSON ON TRIAL IS 37 YEARS

01:24PM 14   OLD TODAY.

01:24PM 15        IN 2013 AND 2014 WHEN SHE WAS DECIDING TO OFFER FLAWED

01:24PM 16   BLOOD TESTS TO THE PUBLIC, SHE WAS 29 AND 30.

01:24PM 17        IN 2010 WHEN THE FRAUD ON INVESTORS BEGAN, SHE WAS 26.

01:24PM 18        THAT IS CERTAINLY OLD ENOUGH TO KNOW THE DIFFERENCE

01:24PM 19   BETWEEN RIGHT AND WRONG.  IT'S OLD ENOUGH TO KNOW THE

01:24PM 20   DIFFERENCE BETWEEN HONESTY AND DISHONESTY.

01:24PM 21        AND LEST YOU THINK THERE'S SOMETHING ABOUT THIS SPECIFIC

01:24PM 22   SETTING THAT MADE IT DIFFICULT TO TELL THE DIFFERENCE BETWEEN

01:24PM 23   RIGHT AND WRONG OR TO KNOW WHAT THE RIGHT THING WAS, ASK

01:24PM 24   ERIKA CHEUNG.  ASK ERIKA CHEUNG HOW YOUNG IS TOO YOUNG TO KNOW

01:25PM 25   THAT OFFERING INACCURATE BLOOD TESTS IS A BAD THING.

01:25PM  1          YOU RECALL THAT MS. CHEUNG JOINED THERANOS JUST OUT OF

01:25PM  2   COLLEGE.  IT WAS HER FIRST JOB AFTER GRADUATING, AND IT ONLY

01:25PM  3   TOOK HER A HANDFUL OF MONTHS TO SEE THE PROBLEMS THAT WERE

01:25PM  4   OBVIOUS WITH THE THERANOS TECHNOLOGY AND TO DECIDE THAT SHE

01:25PM  5   DIDN'T WANT TO BE A PART OF IT.

01:25PM  6          BY THE WAY, SHE HAD NO IDEA ABOUT THE MISLEADING

01:25PM  7   STATEMENTS THAT MS. HOLMES WAS MAKING TO INVESTORS AND TO

01:25PM  8   OTHERS.  IMAGINE WHAT SHE WOULD HAVE DONE IF SHE HAD KNOWN

01:25PM  9   ABOUT THAT.

01:25PM 10          ANOTHER THEME THAT WE'VE SEEN IN MS. HOLMES'S LAWYERS'

01:25PM 11   ARGUMENTS IS THE THEME OF BLAMING OTHERS.  AND LET'S TALK FIRST

01:25PM 12   ABOUT THE BOARD OF DIRECTORS.

01:25PM 13          YOU'LL SEE THAT WITH A NUMBER OF THESE ARGUMENTS, THE

01:25PM 14   DEFENSE WOULD LIKE YOU TO BELIEVE THAT THERE WERE OTHER PEOPLE

01:25PM 15   AT THERANOS WHO SHOULD HAVE ADVISED HOLMES BETTER, PEOPLE WHO

01:26PM 16   SHOULD HAVE PREVENTED BAD THINGS FROM HAPPENING, PEOPLE WHO

01:26PM 17   WERE RESPONSIBLE FOR THE BAD THINGS, OR PEOPLE WHO GAVE

01:26PM 18   MS. HOLMES INACCURATE INFORMATION.

01:26PM 19          NONE OF THOSE ARGUMENTS HOLD WATER.

01:26PM 20          WHEN IT COMES TO THE BOARD, IT'S IMPOSSIBLE TO BLAME THE

01:26PM 21   BOARD OF DIRECTORS FOR WHAT HAPPENED HERE, MAINLY BECAUSE THE

01:26PM 22   BOARD WAS NOT GIVEN THE INFORMATION THAT IT NEEDED TO HELP THE

01:26PM 23   COMPANY NAVIGATE THE PROBLEMS THAT IT WAS FACING.

01:26PM 24          AND A GOOD EXAMPLE OF THAT IS MS. HOLMES'S DECISION NOT TO

01:26PM 25   SHARE WITH THE BOARD THE LIMITATIONS OF THE THERANOS ANALYZER.

01:26PM  1          MR. DOWNEY TALKED ABOUT THIS.

01:26PM  2          LET'S CLEAR UP THE RECORD HERE.

01:26PM  3          THE EVIDENCE IN THE CASE SHOWS THAT THERANOS'S RELIANCE ON

01:26PM  4   THIRD PARTY DEVICES WAS ABSOLUTELY CONCEALED FROM ITS BOARD OF

01:26PM  5   DIRECTORS.

01:26PM  6          ON DIRECT GENERAL MATTIS, A MEMBER OF THE BOARD, WAS ASKED

01:27PM  7   WHETHER THERANOS'S USE OF THIRD PARTY DEVICES, WHETHER THE

01:27PM  8   RELIANCE ON THIRD PARTY DEVICES WOULD HAVE STOOD OUT IN HIS

01:27PM  9   MIND, FOR EXAMPLE, IF A MAJORITY OF THE TESTS RUN WERE RUN ON

01:27PM  10  THIRD PARTY DEVICES?

01:27PM  11         HE ANSWERED, "AT THIS POINT IT WOULD HAVE LEAPED OUT AT ME

01:27PM  12  BECAUSE MY WHOLE EFFORT AT CENTCOM HAD BEEN TO TRY TO GET IT

01:27PM  13  INTO THEATRE BECAUSE IT WAS DIFFERENT AND IT COULD DO THIS OFF

01:27PM  14  OF THIS ONE SMALL MACHINE."

01:27PM  15         SO THIS WAS SOMETHING THAT ALTHOUGH GENERAL MATTIS DIDN'T

01:27PM  16  HAVE A BACKGROUND IN, HE WAS NO EXPERT IN BLOOD TESTING OR

01:27PM  17  MEDICAL DEVICES, HIS INTEREST IN THERANOS AND HIS INTEREST IN

01:27PM  18  POSSIBLE MILITARY USE WAS PREDICATED ON THE ABILITY OF THE

01:27PM  19  MACHINE, THIS ONE MACHINE, THIS ONE SMALL MACHINE, TO RUN A

01:27PM  20  WIDE RANGE OF BLOOD TESTS WITHOUT RELIANCE ON THE LARGE

01:27PM  21  CONVENTIONAL ANALYZERS THAT OTHER LABS USED.

01:27PM  22         NOW, WHEN MS. HOLMES TOOK THE STAND, SHE CLAIMED THAT IN A

01:28PM  23  LATE 2013 BOARD MEETING SHE TOLD THE BOARD ABOUT THE COMPANY'S

01:28PM  24  USE OF CONVENTIONAL MODIFIED MACHINES.

01:28PM  25         AND THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT

01:28PM  1    GENERAL MATTIS DIDN'T RECALL THAT DISCUSSION BECAUSE HE WAS

01:28PM  2    TIRED.

01:28PM  3         MR. DOWNEY IN CLOSING SUGGESTED THAT IT'S POSSIBLE THAT

01:28PM  4    GENERAL MATTIS WAS NOT PRESENT AT THAT MEETING.

01:28PM  5         THE MINUTES FOR THAT MEETING CAN BE FOUND AT EXHIBIT 4005,

01:28PM  6    THAT'S 4-0-0-5.  THEY DON'T SHOW THE SUGGESTION THAT HOLMES

01:28PM  7    CLAIMS TOOK PLACE THERE.

01:28PM  8         THOSE MINUTES SHOWED A GENERAL DISCUSSION OF TRADE

01:28PM  9    SECRETS, BUT THEY DON'T DISCUSS DISCLOSURE OF THE COMPANY'S USE

01:28PM 10    OF MODIFIED THIRD PARTY MACHINES.

01:28PM 11         AND MORE IMPORTANTLY, THEY DON'T DISCLOSE THE DISCUSSION

01:28PM 12    OF THE COMPANY'S RELIANCE ON THIRD PARTY MACHINES, AND THAT'S

01:29PM 13    AN IMPORTANT DISTINCTION HERE.

01:29PM 14         WHEN MS. HOLMES WAS UNDER CROSS-EXAMINATION, SHE WAS

01:29PM 15    ASKED, "AM I RIGHT IT'S YOUR TESTIMONY THAT YOU TOLD THE BOARD

01:29PM 16    OF DIRECTORS THERANOS WAS USING MODIFIED COMMERCIAL ANALYZERS

01:29PM 17    TO DO THE PHASE I TESTING?"

01:29PM 18         SHE DIDN'T ANSWER "YES."

01:29PM 19         HER ANSWER HERE WAS, "I TOLD THE BOARD OF DIRECTORS THAT

01:29PM 20    WE HAD AN INVENTION AROUND MODIFIED COMMERCIAL ANALYZERS."

01:29PM 21         THAT'S CRITICAL.  IF MS. HOLMES ONLY TOLD THE BOARD THAT

01:29PM 22    THE COMPANY HAD AN INVENTION THAT INVOLVED MODIFIED THIRD PARTY

01:29PM 23    DEVICES, THE MEMBERS OF THE BOARD WOULD HAVE NO REASON TO

01:29PM 24    SUSPECT THAT THE COMPANY WAS RELYING ON THAT INVENTION, WAS

01:29PM 25    DEPENDENT ON THAT INVENTION BECAUSE ITS OWN HOME BUILT ANALYZER

01:29PM   1    COULDN'T DO THE RANGE OF TESTS THAT IT CLAIMED IT COULD DO.

01:29PM   2         THAT'S THE MISSING PIECE OF INFORMATION THAT WAS WITHHELD

01:29PM   3    FROM THE BOARD.

01:29PM   4         AND THE FACT THAT -- OR THE CLAIM THAT MS. HOLMES TOLD THE

01:30PM   5    BOARD ABOUT THIS INVENTION, ABOUT THE ABILITY TO USE MODIFIED

01:30PM   6    COMMERCIAL ANALYZERS IS THE KIND OF HALF-TRUTH THAT THIS

01:30PM   7    DEFENDANT WAS ESPECIALLY FOND OF USING, SOMETHING THAT ARGUABLY

01:30PM   8    TECHNICALLY CORRECT, BUT STILL LEAVES THE LISTENER WITH AN

01:30PM   9    UNMISTAKABLE INCORRECT UNDERSTANDING ABOUT WHAT THE TRUTH IS.

01:30PM  10         IN FACT, NOT ONLY DID MS. HOLMES NOT TELL THE BOARD ABOUT

01:30PM  11    THE COMPANY'S RELIANCE ON THIRD PARTY DEVICES IN 2013, SHE

01:30PM  12    DIDN'T TELL THEM IN 2014 OR UNTIL LATE 2015 WHEN SHE HAD TO.

01:30PM  13         YOU'LL RECALL THAT AFTER THE OCTOBER 2015

01:30PM  14    "WALL STREET JOURNAL" ARTICLE WAS PUBLISHED, THERE WAS A SERIES

01:30PM  15    OF EMAILS BETWEEN MS. HOLMES AND THE MEMBERS OF THE BOARD OF

01:30PM  16    DIRECTORS WHERE THE MEMBERS OF THE BOARD WERE INTERROGATING

01:30PM  17    HER, WERE ASKING HER ABOUT THE CLAIMS IN THE ARTICLE, AND

01:31PM  18    SPECIFICALLY ABOUT THE COMPANY'S USE OF VEIN DRAWS AND

01:31PM  19    CONVENTIONAL ANALYZERS.

01:31PM  20         HERE'S AN EMAIL FROM THE DAY AFTER THE ARTICLE WAS

01:31PM  21    PUBLISHED.  THIS IS EXHIBIT 4553.  AND THIS IS FROM

01:31PM  22    MR. KOVACEVICH WHO, BY THE WAY, THE MINUTES WILL SHOW WAS

01:31PM  23    PRESENT AT THE OCTOBER 2013 MEETING WHERE HOLMES CLAIMED SHE

01:31PM  24    PROVIDED THIS INFORMATION TO THE BOARD ABOUT MODIFIED THIRD

01:31PM  25    PARTY DEVICES.

01:31PM   1          THE MINUTE ALSO SHOW THAT GENERAL MATTIS WAS PRESENT AT

01:31PM   2     THAT MEETING, BY THE WAY.

01:31PM   3          IN THIS EMAIL MR. KOVACEVICH ASKS, "SO WHEN BLOOD IS

01:31PM   4     WITHDRAWN IN VENOUS TUBES DO I UNDERSTAND CORRECTLY THAT THE

01:31PM   5     TESTS ARE THEN DONE ON LAB LIKE EQUIPMENT AND NOT EDISON?"

01:31PM   6          HE'S ASKING THIS QUESTION BECAUSE HE DIDN'T KNOW.  EVEN

01:31PM   7     AFTER BEING A MEMBER OF THE BOARD FOR TWO YEARS OR MORE,

01:31PM   8     MR. KOVACEVICH WAS NOT AWARE OF THE COMPANY'S RELIANCE ON, THE

01:32PM   9     COMPANY'S DEPENDENCE ON THIRD PARTY DEVICES INDEPENDENT OF ITS

01:32PM  10     OWN HOME GROWN MODIFIER OR ANALYZER.

01:32PM  11          A LITTLE WAYS UP IN THE SAME CHAIN, MR. KOVACEVICH HAS

01:32PM  12     RECEIVED SOME MORE INFORMATION, BUT HE SAID, "I AM STILL

01:32PM  13     CONFUSED, HOWEVER, REGARDING MY PREVIOUS EMAIL.  AT THIS

01:32PM  14     MOMENT, HOW MANY OF OUR CUSTOMER SUBMISSIONS ARE BEING TESTED

01:32PM  15     ON LAB EQUIPMENT VERSUS EDISON?"

01:32PM  16          MS. HOLMES'S ANSWER IS DECEPTIVE ON ITS FACE.  SHE SAYS,

01:32PM  17     "THAT'S CORRECT - WE ARE AT AN EXACT MOMENT IN TIME RIGHT NOW

01:32PM  18     WHERE WE'VE JUST TRANSITIONED FROM OPERATING UNDER THE

01:32PM  19     TRADITIONAL LABORATORY FRAMEWORK (GOVERNED BY A LAW CALLED

01:32PM  20     CLIA) TO THE FDA FRAMEWORK."

01:32PM  21          AND THEN IN THE PARAGRAPH BELOW SHE SAYS, "PART OF THIS

01:32PM  22     TRANSITION MEANS MOVING ALL OPERATIONS FROM THE CLIA QUALITY

01:32PM  23     SYSTEMS TO THE FDA QUALITY SYSTEMS."

01:32PM  24          SHE SAYS BELOW THAT, "WE VOLUNTARY DECIDED AND

01:33PM  25     COMMUNICATED TO THE FDA THAT WE WOULD TEMPORARILY NOT USE THE

01:33PM  1    NANOTAINER" -- THAT WAS THE PROPRIETARY BLOOD COLLECTION DEVICE

01:33PM  2    USED WITH ITS OWN ANALYZERS -- "UNDER THE CLIA LAB FRAMEWORK

01:33PM  3    UNTIL WE RECEIVED CLEARANCE."

01:33PM  4        SHE GOES ON TO SAY, "WE DO NOT HAVE A GOOD PERCENTAGE

01:33PM  5    NUMBER RIGHT NOW OF HOW MANY TESTS WILL BE DONE ON OUR

01:33PM  6    EQUIPMENT DURING THIS TEMPORARY PERIOD."

01:33PM  7        GENERAL MATTIS TESTIFIED THAT, UNDERSTANDABLY, THIS ANSWER

01:33PM  8    LED HIM TO BELIEVE THAT THE COMPANY' RELIANCE ON THIRD PARTY

01:33PM  9    DEVICES WAS A TEMPORARY THING, SOMETHING THAT HAD STARTED

01:33PM  10   SHORTLY BEFORE THIS EMAIL, SOMETHING THAT WOULDN'T LAST VERY

01:33PM  11   LONG.

01:33PM  12       THAT WASN'T TRUE.  THE COMPANY HAD BEEN DEPENDENT ON THIRD

01:33PM  13   PARTY NON-THERANOS ANALYZERS SINCE THE DAY IT FIRST LAUNCHED

01:33PM  14   IT'S TESTS TO THE PUBLIC.

01:33PM  15       AND THAT'S BECAUSE THE THERANOS EDISON COULD NOT PERFORM

01:33PM  16   THE WIDE RANGE OF TESTS THAT THE DEFENDANT CLAIMED AND THAT

01:34PM  17   THERANOS OFFERED.

01:34PM  18       SO IF MS. HOLMES DIDN'T TELL THE BOARD OF DIRECTORS ABOUT

01:34PM  19   HOW THE THERANOS TECHNOLOGY WORKED, WHAT IT COULD DO AND WHAT

01:34PM  20   IT COULDN'T DO, WHAT WAS THE POINT OF THE THERANOS BOARD?

01:34PM  21       WELL, THE EVIDENCE SHOWED THAT UNLIKE THE TYPICAL BOARD OF

01:34PM  22   DIRECTORS, THIS WAS NOT A GROUP OF PEOPLE MEANT TO STEER THE

01:34PM  23   COMPANY, TO ADVISE THE CEO.

01:34PM  24       INSTEAD, THE BOARD AT THERANOS WAS JUST ANOTHER AUDIENCE.

01:34PM  25   IT WAS A GROUP OF ILLUSTRIOUS AND CONNECTED PEOPLE WHO HOLMES

01:34PM 1    WANTED TO IMPRESS SO THAT THEY COULD THEN GO ON TO CONNECT

01:34PM 2    HOLMES AND THE COMPANY TO OTHER PEOPLE WHO COULD BENEFIT THE

01:34PM 3    COMPANY.

01:34PM 4         AND YOU SAW THAT THAT PLAN WORKED.

01:34PM 5         HENRY KISSINGER, WHO WAS ON THE THERANOS BOARD, CONNECTED

01:34PM 6    MS. HOLMES TO MR. MOSLEY, WHO THEN WENT ON, AS MR. DOWNEY

01:34PM 7    HIGHLIGHTED FOR YOU, TO CONNECT HOLMES WITH MULTIPLE INVESTORS.

01:34PM 8         SO HAVING THIS BOARD OF PROMINENT AND RESPECTED

01:35PM 9    INDIVIDUALS CERTAINLY PAID OFF FOR THE DEFENDANT.  WE'LL TALK

01:35PM 10   ABOUT ANOTHER WAY SHORTLY.

01:35PM 11        BUT THE EVIDENCE SHOWS THAT THAT WAS THE POINT.  THAT WAS

01:35PM 12   THE MOTIVATION IN HAVING THIS GROUP OF PEOPLE.  THEY WERE NOT

01:35PM 13   THERE FOR THEIR CONTRIBUTIONS TO THE STEERING OF THE COMPANY

01:35PM 14   AND THE DECISION MAKING OF THE MANAGEMENT.

01:35PM 15        INSTEAD, THEY WERE THERE TO BE IMPRESSED AND TO BOLSTER

01:35PM 16   THE REPUTATION OF THE COMPANY.

01:35PM 17        ANOTHER THEME OF THE DEFENSE IS THAT MS. HOLMES WAS MISLED

01:35PM 18   OR LET DOWN BY THE SCIENTISTS AND ENGINEERS AT THE COMPANY.

01:35PM 19        THE EVIDENCE DOESN'T SHOW THAT, EITHER.

01:35PM 20        FIRST, MS. HOLMES CLAIMS THAT THE SCIENTISTS AND ENGINEERS

01:35PM 21   WHO WORKED AT THERANOS LED HER TO BELIEVE THAT THE TECHNOLOGY

01:35PM 22   WAS GREAT AND THAT HER REPRESENTATIONS WERE TRUE.

01:36PM 23        WE'LL TALK SOME MORE ABOUT THEM WHEN WE TALK ABOUT THE 4.0

01:36PM 24   SERIES DEVICE, WHICH IS AN IMPORTANT TOPIC.

01:36PM 25        FOR NOW, YOU SHOULD RECALL THAT DURING HER TESTIMONY

01:36PM  1     MS. HOLMES, FOR EXAMPLE, MADE VAGUE REFERENCE TO SCIENTISTS AND

01:36PM  2     ENGINEERS IN THE COMPANY REVIEWING THE INVESTOR PRESENTATIONS

01:36PM  3     WHERE DRAMATIC CLAIMS WERE MADE ABOUT WHAT THE THERANOS

01:36PM  4     TECHNOLOGY COULD DO.

01:36PM  5         LET'S EXPLORE THAT A LITTLE BIT.

01:36PM  6         THROUGHOUT THE TRIAL, MS. HOLMES CLAIMS TO HAVE RELIED ON

01:36PM  7     ADVICE FROM DAN YOUNG, WHO WAS A SENIOR SCIENTIST AT THERANOS.

01:36PM  8         BUT THE EVIDENCE SHOWED CRITICALLY THAT HE WAS UNAWARE OF

01:36PM  9     THE CLAIMS THAT SHE WAS MAKING ABOUT THERANOS'S SUPERIOR

01:36PM 10     PERFORMANCE, OR SUPPOSEDLY SUPERIOR PERFORMANCE.

01:36PM 11         THIS IS EXHIBIT 7421, AND THIS IS AN EMAIL CHAIN RELATING

01:36PM 12     TO CONCERNS THAT TYLER SHULTZ HAD RAISED.

01:37PM 13         YOU SEE A FEW EMAIL CHAINS RELATING TO HIS LETTER WHERE HE

01:37PM 14     RAISED DIRECTLY TO MS. HOLMES A NUMBER OF SERIOUS CONCERNS

01:37PM 15     ABOUT PROBLEMS WITH THE COMPANY'S TECHNOLOGY.

01:37PM 16         IN THIS EMAIL RESPONDING TO PART OF THAT LETTER FROM

01:37PM 17     TYLER SHULTZ, MR. BALWANI WRITES TO DANIEL YOUNG AND

01:37PM 18     ELIZABETH HOLMES, "WHERE ARE WE CLAIMING THAT OUR TESTS ARE

01:37PM 19     BETTER ACROSS THE BOARD?"

01:37PM 20         NOW, THIS IS IN FEBRUARY OF 2014.  YOU KNOW THAT AT THIS

01:37PM 21     TIME MS. HOLMES KNEW EXACTLY WHERE THOSE CLAIMS WERE.  THEY

01:37PM 22     WERE IN THE ARTICLES FOR WHICH SHE HAD BEEN INTERVIEWED; THE

01:37PM 23     ARTICLES THAT SHE HAD APPROVED OR HAD AN OPPORTUNITY TO REVIEW

01:37PM 24     BEFORE THEY WERE PUBLISHED; THEY WERE IN THE INVESTOR

01:37PM 25     PRESENTATIONS THAT SHE HAD PERSONALLY GIVEN TO THE INVESTORS IN

01:37PM  1    THIS CASE AND THAT SHE HAD DISCUSSED WITH THEM.

01:37PM  2        AND SHE HAD ORALLY MADE THESE SAME REPRESENTATIONS TO

01:37PM  3    INVESTORS.  YOU'VE SEEN THAT NUMEROUS TIMES, THE CLAIM THAT

01:38PM  4    THERANOS TECHNOLOGY WAS BETTER, WAS MORE ACCURATE, HAD THE

01:38PM  5    HIGHEST LEVELS OF ACCURACY, AND THE LIKE.

01:38PM  6        DANIEL YOUNG, THOUGH, RESPONDS TO THAT EMAIL, "I DON'T

01:38PM  7    THINK WE MAKE SUCH A CLAIM.  NOT THAT I HAVE SEEN ON THE

01:38PM  8    WEBSITE AT LEAST."

01:38PM  9        NOW, YOU KNOW FROM MR. EDLIN'S TESTIMONY THAT SUCH CLAIMS

01:38PM 10    DID ACTUALLY APPEAR ON THE WEBSITE.

01:38PM 11        BUT THIS EMAIL FROM DANIEL YOUNG SUGGESTS THAT HE DIDN'T

01:38PM 12    KNOW ANYTHING ABOUT THE REPRESENTATIONS AND THE CLAIMS THAT

01:38PM 13    WERE BEING MADE TO INVESTORS.

01:38PM 14        THAT SAME EMAIL GOES ON WITH DANIEL YOUNG WRITING THAT

01:38PM 15    TYLER SHULTZ "SEEMED VERY SURPRISED THAT I ASKED HIM WHERE HE

01:38PM 16    THOUGHT WE CLAIMED SUPERIOR PERFORMANCE OVER OTHER TESTS."

01:38PM 17        HE MENTIONS THAT TYLER SHULTZ MENTIONS SOME ARTICLES, AND

01:38PM 18    DANIEL YOUNG SAYS, "I ASKED HIM TO FOLLOW-UP AND HIGHLIGHT

01:38PM 19    THESE SPECIFICALLY FOR ME."

01:39PM 20        AGAIN, DANIEL YOUNG TRYING TO TRACK DOWN MENTIONS OR

01:39PM 21    CLAIMS OF SUPERIOR PERFORMANCE, SUPERIOR ACCURACY ON THE PART

01:39PM 22    OF THERANOS.

01:39PM 23        UNBEKNOWNST TO HIM, HE WAS ON AN EMAIL CHAIN WITH THE VERY

01:39PM 24    PERSON WHO WAS PROPAGATING THOSE CLAIMS, THE SAME PERSON WHO

01:39PM 25    WAS SPREADING THOSE LIES.

01:39PM  1         FOR THAT REASON YOU SHOULD VIEW WITH SERIOUS SKEPTICISM

01:39PM  2    ANY CLAIM THAT INDIVIDUALS LIKE DANIEL YOUNG WERE BEHIND THOSE

01:39PM  3    CLAIMS OR HAD BLESSED THEM OR APPROVED OF THEM IN ANY WAY.

01:39PM  4         YOU ALSO HEARD FROM SEVERAL OF THE COMPANY'S SCIENTISTS

01:39PM  5    WHO YOU KNOW FROM THEIR TESTIMONY WOULD NEVER HAVE SAID THOSE

01:39PM  6    POSITIVE SWEEPING THINGS ABOUT THERANOS'S TECHNOLOGY.

01:39PM  7         THE SCIENTISTS AT THE COMPANY WERE WELL AWARE OF THE

01:39PM  8    PROBLEMS WITH THE COMPANY'S TECHNOLOGY.  SEVERAL OF THEM, AS

01:40PM  9    YOU KNOW, RESIGNED BECAUSE OF THE SERIOUS PROBLEMS THAT THEY

01:40PM 10    SAW WITH THE THERANOS ANALYZER AND THE MODIFIED DEVICES.

01:40PM 11         SO THE IDEA THAT THOSE SAME INDIVIDUALS, THAT GROUP OF

01:40PM 12    PEOPLE WOULD HAVE BEEN SUPPORTING HOLMES'S CLAIMS OF SUPERIOR

01:40PM 13    ACCURACY OF UNPRECEDENTED QUALITY DOESN'T HOLD WATER, EITHER.

01:40PM 14         LAB DIRECTORS ARE AN ESPECIALLY IMPORTANT PART OF THIS

01:40PM 15    ANALYSIS, SO LET'S TALK ABOUT THEM A LITTLE BIT.

01:40PM 16         THE DEFENSE HAS GONE TO GREAT EFFORT IN THIS CASE TO PAINT

01:40PM 17    ADAM ROSENDORFF, THERANOS'S LAB DIRECTOR IN 2013 AND 2014, AS

01:40PM 18    BEING IN CHARGE OF ALL DECISIONS IN THE LAB.  THEY HAVE BLAMED

01:40PM 19    HIM FOR IMPROPER VALIDATION.  THEY HAVE ATTEMPTED TO SHOW THAT

01:40PM 20    HE WAS THE PERSON WHO WAS RESPONSIBLE FOR ALL OF THE ACCURACY

01:40PM 21    AND RELIABILITY PROBLEMS THAT HAPPENED AT THERANOS.

01:40PM 22         WHAT DOES THE EVIDENCE ACTUALLY SHOW ABOUT THAT THOUGH?

01:40PM 23         FIRST OF ALL, WHEN IT COMES TO VALIDATION, YOU WILL RECALL

01:41PM 24    THAT DR. ROSENDORFF TESTIFIED THAT THE VALIDATION PROCESS AT

01:41PM 25    THERANOS WAS VERY RUSHED, MORE RUSHED THAN HE WANTED IT TO BE.

01:41PM  1      WHEN HE WAS ASKED WHO WAS SETTING THE SCHEDULE, WHO WAS

01:41PM  2  RESPONSIBLE FOR THAT PACE, HE TESTIFIED THAT THAT WAS COMING

01:41PM  3  FROM MANAGEMENT.  THAT WAS MS. HOLMES AND MR. BALWANI.

01:41PM  4      HE ALSO TESTIFIED THAT ALTHOUGH THE ASSAYS PERFORMED WELL

01:41PM  5  ENOUGH DURING THE VALIDATION PHASE, THEIR PERFORMANCE DEGRADED

01:41PM  6  SIGNIFICANTLY ONCE THEY ACTUALLY STARTED USING THEM FOR PATIENT

01:41PM  7  TESTING.

01:41PM  8      AND HE SAID THAT AS SOON AS THE ASSAYS STARTING BEING USED

01:41PM  9  IN THE CLINICAL LAB, HE STARTED SEEING PROBLEMS, AND HE

01:41PM 10  TESTIFIED ABOUT MAKING EFFORTS TO MAKE THOSE PROBLEMS KNOWN TO

01:41PM 11  THE COMPANY'S MANAGEMENT IN WAYS IN WHICH HE WAS REBUFFED AND

01:41PM 12  UNSUCCESSFUL IN DOING THE RIGHT THING AT THE COMPANY.

01:41PM 13      ONE IMPORTANT QUESTION FOR YOU TO ASK YOURSELVES IN

01:41PM 14  CONSIDERING THE ARGUMENT THAT DR. ROSENDORFF WAS REALLY IN

01:42PM 15  CHARGE OF EVERYTHING IN THE LAB, IF THAT WAS REALLY TRUE, THEN

01:42PM 16  WHY DID HE QUIT OUT OF CONCERN FOR THE WAY THAT THE TECHNOLOGY

01:42PM 17  WAS PERFORMING?  WHY DID HE QUIT IN PROTEST OF THE PRACTICES IN

01:42PM 18  THE THERANOS LAB IF IT WAS WITHIN HIS POWER TO CHANGE THINGS?

01:42PM 19      SO WHO WAS ULTIMATELY IN CONTROL OF THE LAB AT THERANOS?

01:42PM 20      WELL, ONE RELATED QUESTION IS, WHY DIDN'T DR. ROSENDORFF

01:42PM 21  STOP ALL TESTING ON THE EDISON?

01:42PM 22      HE WAS ASKED ABOUT THIS WHEN HE WAS ON THE STAND.  HE WAS

01:42PM 23  ASKED THE QUESTION, "DID YOU EVER ASK MS. HOLMES WHETHER

01:42PM 24  THERANOS WOULD CONSIDER CEASING USE OF THE EDISON ALTOGETHER?"

01:42PM 25      HE SAID, "NO."

01:42PM 1    WHEN ASKED, "WHY NOT," HE SAID, "THERE WAS TREMENDOUS

01:42PM 2  PRESSURE AT THE COMPANY TO SHOW THAT THIS TECHNOLOGY WAS

01:42PM 3  SUCCESSFUL.  IT CAME FROM THE TOP.  IT PERMEATED R&D."

01:42PM 4    HE THEN SAID THAT THAT DISSUADED HIM FROM MAKING THE

01:43PM 5  SUGGESTION TO STOP USING THE EDISON BECAUSE HE SAID, "AT

01:43PM 6  VARIOUS POINTS I THOUGHT I MIGHT BE FIRED IF I TOOK TOO STRONG

01:43PM 7  A POSITION ON IT."

01:43PM 8    OF COURSE THAT WOULD HAPPEN.

01:43PM 9    WHAT DO YOU THINK WOULD HAPPEN IF, BASED ON ALL OF THE

01:43PM 10  INFORMATION YOU KNOW ABOUT HOW THIS COMPANY WAS RUN, SOMEONE

01:43PM 11  CAME FORWARD TO THE MANAGERS OF THE COMPANY, THE FOUNDER AND

01:43PM 12  THE COO, AND ASKED THE COMPANY TO STOP USING ITS OWN

01:43PM 13  PROPRIETARY TECHNOLOGY?

01:43PM 14    THE WHOLE POINT OF THE COMPANY WAS TO DEVELOP AND USE THIS

01:43PM 15  TECHNOLOGY.  HE KNEW THAT IDEA WAS A NONSTARTER.  HE FELT THE

01:43PM 16  PRESSURE THAT WAS BEING IMPOSED FROM THE TOP TO KEEP USING THE

01:43PM 17  TECHNOLOGY, AND THAT'S WHY HE LIMITED HIS SUGGESTIONS TO THE

01:43PM 18  THINGS THAT HE THOUGHT WOULD ACTUALLY HAVE A CHANCE OF

01:43PM 19  SUCCEEDING.

01:43PM 20    YOU'LL RECALL IN CONNECTION WITH THIS THE SEQUENCE OF

01:43PM 21  EVENTS AROUND HCG IN MAY OF 2014.

01:43PM 22    MR. DOWNEY ALLUDED TO THIS DURING HIS CLOSING, AND YOU'LL

01:43PM 23  RECALL THAT ON MAY 30TH, 2014, DR. ROSENDORFF, IN RESPONSE TO

01:44PM 24  SERIOUS PROBLEMS THAT HE WAS SEEING WITH HCG, ORDERED THAT THE

01:44PM 25  HCG ASSAY BE TAKEN OFF OF THE THERANOS PROPRIETARY SYSTEM, THAT

01:44PM  1     IT BE RUN ONLY ON NON-THERANOS DEVICES THAT HE VIEWED AS MORE

01:44PM  2     RELIABLE.

01:44PM  3          WHAT HAPPENED NEXT?

01:44PM  4          MR. DOWNEY CITED A NUMBER OF EXHIBITS TO YOU, BUT STILL

01:44PM  5     ONLY PRESENTED PART OF THE STORY.

01:44PM  6          I'LL CITE SOME EXHIBITS FOR YOU:  5418 INCLUDES THE

01:44PM  7     MAY 30TH EMAIL WITH DR. ROSENDORFF TAKING HCG OFF OF EDISON.

01:44PM  8          BUT ON THAT SAME EMAIL, DAYS LATER IN AN EMAIL THAT DOES

01:44PM  9     NOT INCLUDE DR. ROSENDORFF, YOU'LL RECALL THAT DANIEL YOUNG

01:44PM 10     WRITES TO COMPANY MANAGEMENT SAYING IT'S NOT CLEAR THAT THAT

01:44PM 11     DECISION HAD BEEN MADE.

01:44PM 12          DR. ROSENDORFF'S EMAIL WAS IN ALL CAPS YOU'LL REMEMBER.

01:44PM 13     HE HAD MADE THAT DECISION AS LAB DIRECTOR TO TAKE HCG OFF OF

01:45PM 14     THE EDISON.

01:45PM 15          DAYS LATER DANIEL YOUNG IS REPORTING THAT IT'S NOT CLEAR

01:45PM 16     THAT THAT DECISION HAD BEEN MADE.

01:45PM 17          A COUPLE WEEKS LATER, IN EXHIBIT 13876 WE SEE

01:45PM 18     DR. ROSENDORFF ASKING FOR A STATUS UPDATE ON THE ASSAY, AND

01:45PM 19     HE'S INFORMED AT THAT TIME BY MR. BALWANI THAT HCG IS STILL ON

01:45PM 20     NANOTAINERS; IN OTHER WORDS, THAT IT'S STILL BEING RUN ON THE

01:45PM 21     EDISON, THAT IT'S BACK ON THE EDISON.

01:45PM 22          MR. DOWNEY JUST CITED THAT SAME EMAIL TO YOU SUPPOSEDLY AS

01:45PM 23     EVIDENCE THAT DR. ROSENDORFF KNEW AND APPROVED THE CONTINUED

01:45PM 24     USE OF HCG ON EDISON.

01:45PM 25          WHAT DOES IT ACTUALLY SHOW?  IT ACTUALLY SHOWS THAT

01:45PM   1   DR. ROSENDORFF DIDN'T HAVE CONTROL OVER WHAT EQUIPMENT WAS USED

01:45PM   2   IN HIS OWN LAB.  HE WAS FORCED TO ASK QUESTIONS ABOUT HOW A

01:45PM   3   GIVEN ASSAY WAS BEING RUN BECAUSE IT WASN'T UP TO HIM.

01:45PM   4       IF IT HAD BEEN UP TO HIM AND IF HIS APPROVAL WOULD HAVE

01:46PM   5   BEEN REQUIRED, HE WOULDN'T HAVE TO ASK MR. BALWANI WHAT

01:46PM   6   DECISION HAD BEEN MADE AND WHAT PROCESS IS BEING USED.

01:46PM   7       HE ALSO TESTIFIED THAT DESPITE THE CONTINUED USE OF EDISON

01:46PM   8   FOR HCG, THAT THE PROBLEMS WITH THAT ASSAY WERE NEVER, EVER

01:46PM   9   SOLVED TO HIS SATISFACTION.

01:46PM  10       AND YOU CONTINUED TO SEE, WHEN DR. ROSENDORFF WAS ON THE

01:46PM  11   STAND, CONTINUED QUALITY CONTROL FAILURES AND OTHER PROBLEMS

01:46PM  12   RELATING TO THAT VERY, VERY IMPORTANT TEST.

01:46PM  13       NOW, WHEN DR. ROSENDORFF WAS ON THE STAND, THE DEFENSE

01:46PM  14   ATTACKED HIM.  YOU'LL RECALL THAT THE CROSS-EXAMINATION WAS

01:46PM  15   VERY LENGTHY AND SOMEWHAT HOSTILE.

01:46PM  16       DR. ROSENDORFF WAS ATTACKED FOR EVERYTHING FROM

01:46PM  17   COOPERATING WITH THE GOVERNMENT, THERE WERE QUESTIONS ABOUT HOW

01:46PM  18   MANY TIMES HE MET WITH THE GOVERNMENT AND WHO WAS PRESENT.

01:46PM  19       HE WAS ATTACKED FOR NOT BEING QUICK ENOUGH TO RESPOND TO

01:46PM  20   QUESTIONS FROM DOCTORS IN ONE OR TWO INSTANCES.

01:47PM  21       AND THE SUGGESTION WAS MADE THAT HE HAD BEEN ASLEEP AT THE

01:47PM  22   WHEEL AT THERANOS AND NOT DONE A GOOD ENOUGH JOB OF MONITORING

01:47PM  23   THE QUALITY OF TESTS, THAT THIS WAS HIS FAULT.

01:47PM  24       ASK YOURSELF WHETHER THAT IS ACTUALLY WHAT MS. HOLMES AND

01:47PM  25   MR. BALWANI BELIEVED ABOUT DR. ROSENDORFF IN 2014.

01:47PM  1        YOU CAN DETERMINE THAT BY WHAT THEY DID AFTER

01:47PM  2   DR. ROSENDORFF LEFT THE COMPANY.

01:47PM  3        DR. ROSENDORFF LEFT IN NOVEMBER 2014, AND AFTER THAT

01:47PM  4   SUNNY BALWANI HIRED HIS DERMATOLOGIST TO RUN THE LAB.

01:47PM  5        MS. HOLMES KNEW THAT SUNIL DHAWAN WAS MR. BALWANI'S

01:47PM  6   DERMATOLOGIST.

01:47PM  7        THERE'S TESTIMONY THAT NEITHER MR. BALWANI -- I'M SORRY,

01:47PM  8   NEITHER DR. DHAWAN NOR DR. SAWYER WERE EVER REALLY PRESENT IN

01:47PM  9   THE LAB, THAT THEY DIDN'T DO ANY REAL WORK OVERSEEING THE

01:47PM  10  TESTS, ESPECIALLY THE THERANOS SPECIFIC TESTS RUN ON THE EDISON

01:47PM  11  AND THE MODIFIED THIRD PARTY DEVICES.

01:48PM  12       AND THEIR LACK OF PRESENCE AT THE LAB, THEIR LACK OF

01:48PM  13  OVERSIGHT ACTIVITY, WAS NOT A LACK OF DILIGENCE ON THEIR PART.

01:48PM  14  THAT WAS THE AGREEMENT THAT THEY HAD WITH THERANOS.  THEY WERE

01:48PM  15  WORKING AS INTENDED.  THAT'S WHAT MR. BALWANI AND MS. HOLMES

01:48PM  16  WANTED THEM TO DO.

01:48PM  17       AND THAT CHOICE, THE CHOICE TO HIRE ABSENTEE LAB DIRECTORS

01:48PM  18  WHO WERE NOT MORE ENGAGED REALLY SHOWS THAT THEIR COMPLAINTS

01:48PM  19  WITH DR. ROSENDORFF WAS NOT ABOUT INATTENTION AND A LACK OF

01:48PM  20  DILIGENCE.

01:48PM  21       INSTEAD, IT WAS THE FACT THAT HE KEPT RAISING THESE

01:48PM  22  ISSUES.  HE WAS A PAIN TO THEM.

01:48PM  23       THE FACT THAT HE KEPT SOUNDING THE ALARM ABOUT THESE

01:48PM  24  UNRELIABLE TESTS MADE IT INCONVENIENT, AND WHEN HE LEFT, THEY

01:48PM  25  REPLACED HIM WITH PEOPLE WHO WOULD NOT PRESENT THAT KIND OF

01:48PM   1    PROBLEM.

01:48PM   2         NOTABLY, WHEN MS. HOLMES HIRED DR. DAS, IT'S NOT DISPUTED

01:48PM   3    THAT THAT WAS IN RESPONSE TO AN INSPECTION THAT HAD GONE VERY

01:49PM   4    BADLY FOR THERANOS.

01:49PM   5         SO THAT WAS WHEN THE PREVIOUS APPROACH TO HIRING LAB

01:49PM   6    DIRECTORS HAD ALREADY BACKFIRED AT THE COMPANY, AND THE COMPANY

01:49PM   7    WAS DESPERATE FOR A CHANGE IN COURSE.

01:49PM   8         WE'LL ALSO DISCUSS IN A FEW MINUTES THE FACT THAT WE CAN'T

01:49PM   9    BLAME SCIENTISTS FOR THE FALSE STATEMENTS THAT MS. HOLMES MADE

01:49PM  10    AT THERANOS BECAUSE SHE CONFIRMED FOR YOU UNDER OATH WHEN SHE

01:49PM  11    WAS ON THE STAND THAT SHE KNEW THE KEY FACTS ABOUT WHAT THE

01:49PM  12    TECHNOLOGY COULD AND COULD NOT DO.  THAT CONFIRMS THAT SHE KNEW

01:49PM  13    THAT THE STATEMENTS SHE WAS MAKING WERE FALSE AT THE TIME SHE

01:49PM  14    MADE THEM.

01:49PM  15         LET'S TALK BRIEFLY ABOUT LAWYERS WHO WORKED FOR MS. HOLMES

01:49PM  16    AND THE COMPANY.

01:49PM  17         THERE'S BEEN SOME MENTION OF GUIDANCE THAT MS. HOLMES GOT

01:49PM  18    FROM LAWYERS AROUND TRADE SECRETS AND OTHER ISSUES.

01:49PM  19         YOU SHOULDN'T PUT TOO MUCH STOCK INTO THAT BECAUSE YOU

01:49PM  20    KNOW THAT MS. HOLMES IGNORED CAUTIONARY ADVICE FROM LAWYERS,

01:50PM  21    ESPECIALLY WHEN IT CAME TO THE HONESTY OF CLAIMS ABOUT THE

01:50PM  22    THERANOS TECHNOLOGY.

01:50PM  23         YOU'LL RECALL THIS EXHIBIT, 3981, WHERE A LAWYER EMAILS

01:50PM  24    HOLMES DIRECTLY AND ADVISES THAT A LOT OF CLAIMS ON THE WEBSITE

01:50PM  25    NEED TO BE REPLACED OR TONED DOWN, CLAIMS ABOUT HIGHEST

01:50PM 1     QUALITY, OR THE HIGHEST LEVEL OF ACCURACY.  THESE CLAIMS,

01:50PM 2     ACCORDING TO THE LAWYER, WERE PROBLEMATIC.

01:50PM 3         AND YET YOU KNOW FROM THE EVIDENCE AND THE TESTIMONY THAT

01:50PM 4     THESE CLAIMS REMAINED ON THE WEBSITE.  AND, EVEN MORE,

01:50PM 5     MS. HOLMES CONTINUED TO DISTRIBUTE INVESTOR BINDERS IN

01:50PM 6     PRESENTATIONS THAT WERE PEPPERED WITH THESE SAME CLAIMS,

01:50PM 7     IGNORING THIS CAUTIONARY ADVICE FROM COUNSEL.

01:50PM 8         BY THE WAY, ON THAT LAST TOPIC, YOU MAY RECALL THAT WHEN

01:51PM 9     "THE WALL STREET JOURNAL" ARTICLE WAS ABOUT TO BE PUBLISHED,

01:51PM 10    THE ARTICLE WRITTEN BY A JOURNALIST NAMED JOE RAGO, MS. HOLMES

01:51PM 11    AND OTHERS AT THE COMPANY HAD AN OPPORTUNITY TO REVIEW THE TEXT

01:51PM 12    OF THAT ARTICLE.

01:51PM 13        I'LL GIVE YOU AN EXHIBIT NUMBER, WHICH IS 1090.  THAT IS

01:51PM 14    AN EMAIL THAT YOU MIGHT REMEMBER WHERE AN EMPLOYEE NAMED

01:51PM 15    JEFF BLICKMAN SENT MS. HOLMES DIRECTLY A LIST OF CONCERNING

01:51PM 16    ISSUES THAT HE SAW IN THAT ARTICLE, AND THAT LIST INCLUDED

01:51PM 17    MENTION OF IMPROVED ACCURACY IN THE DRAFT ARTICLE.  THAT WAS

01:51PM 18    SOMETHING THAT MR. BLICKMAN WAS CALLING OUT TO MS. HOLMES AS

01:51PM 19    SOMETHING THAT MIGHT BE CONCERNING.

01:51PM 20        THIS, COMBINED WITH THE EMAIL OF THE LAWYER, SHOWS YOU

01:51PM 21    THERE WERE PEOPLE AT THERANOS WHO CARED ABOUT BEING ACCURATE

01:51PM 22    AND TRUTHFUL IN REPRESENTATIONS ABOUT WHAT THE COMPANY CAN DO.

01:51PM 23        THE PROBLEM IS THAT MS. HOLMES WAS NOT ONE OF THOSE

01:51PM 24    PEOPLE, AND SHE WAS IN CHARGE.  SHE WAS THE DECISION-MAKER.

01:51PM 25        THE DEFENSE HAS ALSO RELIED MULTIPLE TIMES ON THE

01:52PM  1    EXISTENCE OF FAVORABLE PATIENT REVIEWS EITHER AS EVIDENCE THAT

01:52PM  2    THE TECHNOLOGY DIDN'T HAVE PROBLEMS OR THAT MS. HOLMES BELIEVED

01:52PM  3    THAT THE TECHNOLOGY DIDN'T HAVE PROBLEMS.

01:52PM  4        THE DEFENSE ASKS YOU TO BELIEVE THAT THESE FAVORABLE

01:52PM  5    PATIENT REVIEWS WHERE PATIENTS, FOR EXAMPLE, ARE GIVING

01:52PM  6    THERANOS AND WALGREENS FOUR OR FIVE STARS FOR THEIR EXPERIENCE

01:52PM  7    GAVE MS. HOLMES REASON TO BELIEVE THAT THERE WERE NO PROBLEMS

01:52PM  8    WITH THE TECHNOLOGY AND THAT EVERYTHING WAS FINE.

01:52PM  9        ASK YOURSELF WHETHER THAT'S CONVINCING.  ASK YOURSELF

01:52PM 10    WHETHER THE CEO OF A TECHNOLOGY COMPANY, SOMEONE WHO IS NAMED

01:52PM 11    ON MULTIPLE PATENTS, SOMEONE WHO TOOK THE LEAD ON THE INVENTION

01:52PM 12    SIDE AND THE TECHNOLOGY SIDE WOULD REALLY BELIEVE THAT CUSTOMER

01:52PM 13    SATISFACTION RATINGS RELATED TO THE RELIABILITY OF A DEVICE OR

01:53PM 14    THE APPROPRIATENESS OF THAT DEVICE FOR PATIENT CARE.

01:53PM 15        A RESTAURANT WITH AN F RATING FROM THE HEALTH INSPECTOR

01:53PM 16    CAN STILL HAVE A FOUR STAR YELP REVIEW IF THE CUSTOMERS DON'T

01:53PM 17    KNOW ABOUT THE PROBLEMS IN THE KITCHEN.

01:53PM 18        AND THAT'S EXACTLY WHAT WAS HAPPENING AT THERANOS.

01:53PM 19        IT'S NOT SURPRISING AT ALL THAT CUSTOMERS WHO HAD THE

01:53PM 20    FINGERSTICK EXPERIENCE AT WALGREENS HAD A FAVORABLE EXPERIENCE

01:53PM 21    AND WERE HAPPY WITH THAT EXPERIENCE.

01:53PM 22        THERANOS PUT A LOT OF EFFORT INTO WHAT ITS FACILITIES AT

01:53PM 23    WALGREENS LOOKED LIKE, HOW PEOPLE WERE TREATED.

01:53PM 24        YOU KNOW FROM THE EVIDENCE THAT THE PRICES WERE LOW.

01:53PM 25    THESE THINGS MADE PEOPLE HAPPY.

01:53PM 1      THAT HAS NOTHING TO DO WITH THE ACCURACY OR THE

01:53PM 2   RELIABILITY OF THE TESTS, AND YOU KNOW FROM THE OTHER EVIDENCE

01:53PM 3   IN THE CASE THAT THERE WERE SERIOUS PROBLEMS THERE.  AND

01:53PM 4   MS. HOLMES HAD ACCESS TO THAT SAME INFORMATION, SO SHE WAS

01:53PM 5   AWARE, TOO.

01:53PM 6      AND IN 2014 WALGREENS WAS STARTING TO SEE THESE PROBLEMS

01:53PM 7   AS WELL.  WALGREENS WAS STARTING TO UNDERSTAND THAT THERANOS

01:54PM 8   TECHNOLOGY COULDN'T DO EVERYTHING THAT IT HAD BEEN HELD OUT TO

01:54PM 9   DO AND FOR THOSE SAME REASONS THE WALGREENS RELATIONSHIP WAS IN

01:54PM 10  JEOPARDY.

01:54PM 11     SO YOU SHOULD NOT BELIEVE THAT MS. HOLMES WAS IGNORING

01:54PM 12  THOSE FACTS, WAS IGNORING THOSE OBVIOUS TRUTHS SIMPLY BECAUSE

01:54PM 13  PATIENTS WERE HAPPY WHEN THEY WERE WALKING OUT OF A WALGREENS

01:54PM 14  SERVICE CENTER.

01:54PM 15     YOU ALSO KNOW THAT THOSE CUSTOMER REVIEWS THAT WERE

01:54PM 16  FAVORABLE ARE ONLY PART OF THE PICTURE HERE.

01:54PM 17     YOU KNOW THAT IN MANY CASES PATIENTS OR DOCTORS CONTACTED

01:54PM 18  THERANOS TO TALK ABOUT PROBLEMATIC TEST RESULTS THAT THEY HAD

01:54PM 19  GOTTEN BACK, TEST RESULTS THAT WERE DEMONSTRABLY INACCURATE,

01:54PM 20  TEST RESULTS THAT WERE DIFFERENT FROM WHAT THEY HAD SEEN

01:54PM 21  BEFORE, TEST RESULTS THAT HAD GIVEN THEM CONCERNS ABOUT THE

01:54PM 22  RELIABILITY OF THE THERANOS TESTS.

01:54PM 23     LET'S TALK NEXT ABOUT THE WAY THE DEFENSE HAS RELIED ON

01:55PM 24  PATENTS IN THIS CASE.

01:55PM 25     AS YOU KNOW FROM THE TESTIMONY, SEVERAL PATENTS WERE

01:55PM  1    AWARDED TO MS. HOLMES AND TO THERANOS AS A RESULT OF THE WORK

01:55PM  2    DEVELOPING THE INTELLECTUAL PROPERTY OF THE COMPANY.

01:55PM  3         THERE'S BEEN A SUGGESTION BY THE DEFENSE THAT YOU SHOULD

01:55PM  4    CONCLUDE FROM THAT THAT THIS WAS REAL TECHNOLOGY, THAT THE

01:55PM  5    TECHNOLOGY MUST HAVE WORKED BECAUSE PATENTS WERE AWARDED

01:55PM  6    COVERING THAT TECHNOLOGY.

01:55PM  7         ALTERNATIVELY, YOU'RE ASKED TO BELIEVE THAT MS. HOLMES

01:55PM  8    UNDERSTOOD THAT THE TECHNOLOGY WORKED BECAUSE THESE PATENTS HAD

01:55PM  9    BEEN REWARDED, OR HAD BEEN AWARDED.

01:55PM  10         BUT YOU KNOW FROM MS. HOLMES'S TESTIMONY THAT THE PROCESS

01:55PM  11    FOR OBTAINING THESE PATENTS HAS NOTHING TO DO WITH THE

01:55PM  12    RELIABILITY OF THE TECHNOLOGY, WITH THE ACCURACY OF THE

01:55PM  13    ANALYZER.

01:55PM  14         YOU KNOW THAT FROM HER TESTIMONY, SHE APPLIED FOR HER

01:56PM  15    FIRST PATENT I THINK IT WAS A YEAR BEFORE SHE STARTED TO TRY TO

01:56PM  16    BUILD A PROTOTYPE OF THAT DEVICE.  THAT'S WHAT SHE TESTIFIED

01:56PM  17    TO.

01:56PM  18         EXHIBIT 9501 IS THAT FIRST PATENT.

01:56PM  19         SHE LATER STARTED WORKING ON A PROTOTYPE THAT COVERED PART

01:56PM  20    OF THAT PATENT, BUT IF YOU LOOK AT THAT EXHIBIT -- AGAIN,

01:56PM  21    THAT'S 9501 -- YOU'LL SEE THAT IT ALSO COVERS, BESIDES AN

01:56PM  22    ANALYZER, A PILL THAT COULD BE SWALLOWED AND WOULD CONDUCT

01:56PM  23    ANALYSIS WHILE IT WAS PASSING THROUGH THE SYSTEM.

01:56PM  24         IT ALSO COVERED A PATCH THAT COULD BE WORN AND WOULD

01:56PM  25    CONDUCT AN ANALYSIS WHEN IT WAS ATTACHED TO THE SKIN.

01:56PM  1       THOSE PRODUCTS WERE NEVER DEVELOPED BY THERANOS.  THEY

01:56PM  2   WERE NEVER TAKEN TO THE PROTOTYPE STAGE.  THEY WERE NEVER

01:56PM  3   TURNED INTO REAL WORKING TECHNOLOGY BASED ON THE RECORD IN THIS

01:56PM  4   CASE.

01:56PM  5       THAT'S HOW YOU KNOW THAT THE PATENT PROCESS IS TOTALLY

01:56PM  6   DIVORCED FROM THE IDEA OF A REAL WORKING DEVICE.

01:57PM  7       SO THE FACT THAT MS. HOLMES OBTAINED PATENTS, THE FACT

01:57PM  8   THAT THESE PIECES OF PAPER WERE ISSUED GIVING HER LEGAL RIGHTS

01:57PM  9   OVER THIS INTELLECTUAL PROPERTY, SHE KNEW BETTER THAN ANYONE

01:57PM  10  THAT THAT DID NOT MEAN THAT THE TECHNOLOGY ITSELF WAS VALID,

01:57PM  11  AND THAT CERTAINLY WOULD NOT HAVE BEEN REASON FOR HER TO

01:57PM  12  DISMISS THE NEGATIVE INFORMATION THAT SHE WAS HEARING ABOUT THE

01:57PM  13  THERANOS TECHNOLOGY.

01:57PM  14      YOUR HONOR, I'M ABOUT TO MOVE TO A DIFFERENT TOPIC, BUT

01:57PM  15  THIS MIGHT BE A GOOD TIME FOR A BREAK.

01:57PM  16           THE COURT:  ALL RIGHT.  LET'S DO THAT.  WE'LL TAKE A

01:57PM  17  30 MINUTE BREAK HERE, LADIES AND GENTLEMEN, 30 MINUTES.

01:57PM  18      THANK YOU.

01:58PM  19      (RECESS FROM 1:58 P.M. UNTIL IS 2:34 P.M.)

02:34PM  20           THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

02:34PM  21  SEATED.  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

02:34PM  22  MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:34PM  23      MR. BOSTIC, YOU'D LIKE TO CONTINUE?

02:35PM  24           MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:35PM  25      MEMBERS OF THE JURY, WELCOME BACK.

02:35PM  1    LET'S TALK ABOUT NEXT GENERATION DEVICES AT THERANOS.

02:35PM  2    MUCH OF THE EVIDENCE IN THE CASE FOCUSSED ON THE ANALYZERS

02:35PM  3  THAT THERANOS WAS USING TO ACTUALLY CONDUCT ITS PATIENT TESTING

02:35PM  4  DURING THE RELEVANT YEARS, THE YEARS WHEN THE FRAUD WAS

02:35PM  5  ACTUALLY OCCURRING.

02:35PM  6    IN THE DEFENSE'S QUESTIONING AND IN THEIR CLOSING ARGUMENT

02:35PM  7  THEY'VE INTRODUCED A THEORY THAT DEPENDS ON BLURRING THE LINES

02:35PM  8  BETWEEN THE DEVICES THAT THERANOS WAS USING TO CONDUCT ITS

02:35PM  9  PATIENT TESTING AND THE NEXT GENERATION DEVICES THAT WERE IN

02:35PM  10  DEVELOPMENT, THE DEVICES THAT WERE ON THE HORIZON THAT WOULD

02:35PM  11  SOME DAY BE AVAILABLE.

02:35PM  12    JUROR:  WE DON'T HAVE SCREENS.

02:35PM  13    THE CLERK:  WHAT'S THE MATTER?  LET ME DO A RESET.

02:35PM  14  ONE MOMENT, PLEASE.

02:35PM  15    (PAUSE IN PROCEEDINGS.)

02:36PM  16    THE CLERK:  IS IT ON?

02:36PM  17    JUROR:  YES.

02:36PM  18    THE CLERK:  THANK YOU.

02:36PM  19    MR. BOSTIC:  WHAT DID THE EVIDENCE AT TRIAL SHOW

02:36PM  20  ABOUT THESE NEXT GENERATION DEVICES?

02:36PM  21    WELL, FOR ONE THING, YOU HEARD IN THE TESTIMONY AND SAW

02:36PM  22  FROM THE DOCUMENTS THE NEXT GENERATION DEVICES -- AND HERE

02:36PM  23  WE'RE TALKING ABOUT THE 4 SERIES, THE 4S, THE MINILAB, THE

02:36PM  24  MONOBAY -- THIS FAMILY OF NEXT GENERATION DEVICES WAS

02:36PM  25  PERPETUALLY NEXT GENERATION.  IT WAS ALWAYS IN THE FUTURE.  IT

02:36PM   1    WAS ALWAYS ON THE HORIZON.  IT NEVER BECAME THE CURRENT

02:37PM   2    THERANOS TECHNOLOGY.  IT WAS NEVER USED FOR PATIENT TESTING.

02:37PM   3         THAT IS NOT IN DISPUTE.

02:37PM   4         AND THE 4.0 AND THE 4 SERIES WAS NEVER USED FOR PATIENT

02:37PM   5    TESTING BECAUSE IT WAS NEVER READY FOR PATIENT TESTING.

02:37PM   6         THERANOS, INSTEAD, WAS USING THE PREVIOUS VERSION OF THE

02:37PM   7    EDISON, THE 3.5, IN ITS CLINICAL LAB.

02:37PM   8         NOW, AFTER THE FACT, THE DEFENSE IS ASKING YOU TO BELIEVE

02:37PM   9    THAT ALL OF THE FALSE CLAIMS MS. HOLMES MADE ABOUT THE

02:37PM  10    TECHNOLOGY IN THIS CASE ALL OF THE TIMES THAT SHE SPOKE ABOUT

02:37PM  11    WHAT THE THERANOS ANALYZER COULD DO, ALL OF THE TIMES SHE SPOKE

02:37PM  12    ABOUT THE COMPANY'S ACHIEVEMENT AND ITS CAPABILITIES, THOSE

02:37PM  13    WERE ACTUALLY REFERENCES TO A FUTURE DEVICE, NOT THE DEVICE

02:37PM  14    THAT THE COMPANY WAS USING FOR ITS ONGOING CLINICAL TESTING.

02:37PM  15         NOW, BEFORE YOU GIVE THIS VERSION OF EVENTS ANY CREDIT,

02:37PM  16    ASK YOURSELVES WHY NOT A SINGLE LISTENER WALKED AWAY WITH THAT

02:38PM  17    UNDERSTANDING.

02:38PM  18         OF ALL OF THE PEOPLE THAT MS. HOLMES MADE THIS CLAIM TO,

02:38PM  19    YOU HEARD FROM A VARIETY, PEOPLE WITH DIFFERENT BACKGROUNDS,

02:38PM  20    PEOPLE WHO HEARD THESE CLAIMS IN DIFFERENT CONTEXTS.

02:38PM  21         EACH OF THEM WALKED AWAY BELIEVING THAT MS. HOLMES WAS

02:38PM  22    TALKING ABOUT THE COMPANY'S PRESENT DAY CAPABILITIES, THE

02:38PM  23    ANALYZERS THAT THE COMPANY HAD DEVELOPED AND COMPLETED, THE

02:38PM  24    ANALYZERS THAT THE COMPANY WAS USING FOR ITS ONGOING PATIENT

02:38PM  25    TESTING.

02:38PM  1        AND WHY WAS THAT?

02:38PM  2        WELL, THINK ABOUT THE EVIDENCE IN TERMS OF WHAT MS. HOLMES

02:38PM  3   WAS ACTUALLY SAYING TO THOSE PEOPLE, WHAT THE WRITTEN MATERIALS

02:38PM  4   SAID, WHAT YOU HEARD SHE SAID IN IN-PERSON CONVERSATIONS.

02:38PM  5        IN CASES WHERE MS. HOLMES WAS TALKING ABOUT WHAT THE

02:38PM  6   TECHNOLOGY COULD DO AND WHAT THERANOS WAS CAPABLE OF, HER

02:38PM  7   CLAIMS WERE PRESENT TENSE CLAIMS.  THEY WERE ALWAYS ABOUT THE

02:38PM  8   ATTRIBUTES OF THE TECHNOLOGY, THE ABILITIES OF THE TECHNOLOGY

02:38PM  9   WITH NO FORWARD LOOKING LANGUAGE.

02:38PM  10       CLAIMS ABOUT THERANOS HAVING THE HIGHEST LEVELS OF

02:39PM  11  ACCURACY, NOT SOME DAY HAVING THE HIGHEST LEVEL OF ACCURACY.

02:39PM  12       CLAIMS ABOUT THERANOS TECHNOLOGY BEING ABLE TO DO THE

02:39PM  13  ENTIRE RANGE OF TESTS, NOT HAVING THE GOAL TO SOME DAY

02:39PM  14  HOPEFULLY BE ABLE TO DO THE ENTIRE RANGE OF TESTS.

02:39PM  15       IT'S BECAUSE OF THE WAY MS. HOLMES CHOSE TO COMMUNICATE

02:39PM  16  ABOUT THERANOS TECHNOLOGY THAT LISTENERS WALKED AWAY BELIEVING

02:39PM  17  THAT THEY WERE HEARING ABOUT WHAT THE COMPANY COULD DO AS OF

02:39PM  18  THE DAY THAT THEY WERE HEARING THESE STATEMENTS.

02:39PM  19       IN PARTICULAR, THINK ABOUT THE INVESTOR PRESENTATIONS IN

02:39PM  20  THIS REGARD.  YOU'VE SEEN THOSE NUMEROUS TIMES IN THIS CASE.  I

02:39PM  21  WON'T SHOW YOU THEM NOW AGAIN.

02:39PM  22       BUT THINK ABOUT THE CLAIMS IN THOSE SLIDES THAT WERE

02:39PM  23  FRAMED IN THE PRESENT TENSE, THE CLAIMS THAT I JUST MENTIONED

02:39PM  24  ABOUT THE NUMBER OF TESTS THAT COULD BE DONE, LANGUAGE LIKE

02:39PM  25  THERANOS CONDUCTS ANY TEST AVAILABLE IN CENTRAL LABORATORIES

02:39PM   1    AND CAN PROCESS ALL SAMPLE TYPES.  THINK ABOUT LANGUAGE LIKE

02:40PM   2    THERANOS HAS THE HIGHEST LEVELS OF ACCURACY, AND THINK ABOUT

02:40PM   3    WHETHER THERE'S ANYTHING ABOUT THAT LANGUAGE THAT WOULD GIVE

02:40PM   4    EVEN A HINT TO SOMEONE THAT MS. HOLMES ACTUALLY WASN'T TALKING

02:40PM   5    ABOUT PRESENT DAY CAPABILITY, THAT SHE WAS TALKING ABOUT SOME

02:40PM   6    SPECULATIVE FUTURE EVENT THAT SHE HOPED WOULD OCCUR.

02:40PM   7         THOSE INVESTOR PRESENTATIONS -- AND YOU WILL RECALL THAT

02:40PM   8    THERE WERE DOZENS AND SOMETIMES HUNDREDS OF PAGES LONG -- DID

02:40PM   9    SOMETIMES INCLUDE SOME FORWARD LOOKING STATEMENTS ABOUT THE

02:40PM  10    EVENTUAL FOOTPRINT IN WALGREENS OR THE AMOUNT OF REVENUE THAT

02:40PM  11    THERANOS HOPED TO GENERATE AT A CERTAIN POINT.

02:40PM  12         NOW, THOSE FORWARD LOOKING STATEMENTS ARE IN A DIFFERENT

02:40PM  13    CATEGORY, AND THEY CAN STILL BE FRAUDULENT IF THEY'RE MADE WITH

02:40PM  14    THE INTENT TO DECEIVE.

02:40PM  15         BUT WE'RE NOT TALKING ABOUT THOSE NOW.  WE'RE TALKING

02:40PM  16    ABOUT PRESENT TENSE STATEMENTS THAT CLEARLY WERE MEANT TO

02:40PM  17    CONVEY THE REALITY AS OF THAT DAY.

02:40PM  18         THOSE INVESTOR PRESENTATIONS WOULD HAVE NEEDED TO BE

02:41PM  19    COMPLETELY REWRITTEN IN ORDER TO BE HONEST IN LIGHT OF THE

02:41PM  20    DEFENSE'S THEORY ABOUT THESE NEXT GENERATION DEVICES.

02:41PM  21         ALL OF THAT LANGUAGE THAT IS IN THE PRESENT TENSE WOULD

02:41PM  22    HAVE NEEDED TO BE CHANGED.

02:41PM  23         I SUPPOSE THEY COULD HAVE ADDED A NOTE AT THE BEGINNING OF

02:41PM  24    THOSE INVESTOR SLIDE PRESENTATIONS SAYING, WARNING, ALL OF THE

02:41PM  25    CLAIMS YOU'RE ABOUT TO SEE IN THIS PRESENTATION ARE NOT ABOUT

02:41PM  1    THE COMPANY'S PRESENT DAY CAPABILITIES, BUT THEY'RE ABOUT A

02:41PM  2    FUTURE GENERATION THAT IS NOT YET FINALIZED.

02:41PM  3        THAT WOULD HAVE BEEN A WAY TO AVOID CONFUSION AND TO KEEP

02:41PM  4    FROM MISLEADING PEOPLE.

02:41PM  5        THAT WASN'T DONE.  THAT CRITICAL PIECE OF INFORMATION WAS

02:41PM  6    WITHHELD, AND AS A RESULT, EVERYONE LEFT THESE CONVERSATIONS,

02:41PM  7    THESE INTERACTIONS WITH MS. HOLMES, BELIEVING THAT THEY HAD

02:41PM  8    HEARD ABOUT WHAT THE COMPANY COULD DO THAT DAY.  WHY WOULD THEY

02:41PM  9    ASSUME ANYTHING ELSE?

02:41PM 10        MS. HOLMES ASKED YOU TO BELIEVE THAT REPORTS FROM THERANOS

02:41PM 11    EMPLOYEES SUPPORTED HER CLAIMS WITH RESPECT TO THE 4 SERIES AND

02:42PM 12    WHAT IT WAS GOING TO BE CAPABLE OF.

02:42PM 13        BUT WHAT WERE THOSE EMPLOYEES ACTUALLY TELLING HER?

02:42PM 14        IN HER TESTIMONY, SHE TOLD YOU, "BY 2009, 2010, WE HAD A

02:42PM 15    BREAKTHROUGH IN WHICH WE FIGURED OUT HOW TO APPLY THE FORMULA

02:42PM 16    NOT JUST TO ONE METHOD OF TESTS, BUT TO FOUR."

02:42PM 17        AND IN RESPONSE TO HER LAWYER'S QUESTION SHE SAID THAT

02:42PM 18    "THAT WORK THAT LED HER TO CONCLUDE THAT THE COMPANY WAS

02:42PM 19    CAPABLE OF PERFORMING ANY BLOOD TEST ESSENTIALLY."

02:42PM 20        LET'S LOOK AT AN IMPORTANT PIECE OF EVIDENCE THAT THAT

02:42PM 21    BELIEF WAS SUPPOSEDLY BASED ON.

02:42PM 22        THIS WAS INTRODUCED BY THE DEFENSE.  THIS IS EXHIBIT 7098.

02:42PM 23    THIS IS A PRESENTATION FROM FEBRUARY 2010 GIVEN BY A SCIENTIST

02:42PM 24    NAMED IAN GIBBONS AT THERANOS, AND MS. HOLMES SAYS THIS

02:42PM 25    INFORMATION WAS PART OF WHAT CONVINCED HER THAT SHE WAS NOW

02:42PM  1    CLEAR TO REPRESENT TO OTHERS THAT THERANOS TECHNOLOGY WAS

02:42PM  2    CAPABLE OF PERFORMING ANY TEST AND IN MAKING OTHER CLAIMS THAT

02:43PM  3    SHE MADE.

02:43PM  4         LET'S SEE WHAT THIS PRESENTATION ACTUALLY SAYS.

02:43PM  5         PAGE 2, RIGHT AFTER THE COVER PAGE, CONTAINS AN OVERVIEW.

02:43PM  6    AND NOTICE THAT IT REPEATEDLY USES FORWARD LOOKING LANGUAGE.

02:43PM  7    THIS IS WHAT THE SCIENTIST IS TELLING MS. HOLMES, "SYSTEM 4.0

02:43PM  8    WILL BE CAPABLE OF PERFORMING ANY MEASUREMENT REQUIRED," "IT IS

02:43PM  9    ENVISAGED THAT SEVERAL DISTINCT MEASUREMENT TECHNOLOGIES WILL

02:43PM  10   BE INCORPORATED," "THE SYSTEM WILL BE BROADLY BASED ON THE

02:43PM  11   EXISTING CARTRIDGE," "THE NUMBER OF TOTAL MEASUREMENTS PER

02:43PM  12   SAMPLE WILL BE INCREASED BY TWO TO THREE-FOLD."

02:43PM  13        THIS IS HOW YOU WRITE SENTENCES ABOUT WHAT HASN'T HAPPENED

02:43PM  14   YET.  EVERYBODY KNOWS THIS.

02:43PM  15        THIS WAS THE INFORMATION THAT MS. HOLMES WAS TAKING IN

02:43PM  16   ABOUT THE NEXT GENERATION TECHNOLOGY, AND IT'S ONLY WHEN IT

02:43PM  17   PASSED THROUGH KIND OF HER MIND AND WHEN SHE MADE A DECISION

02:43PM  18   ABOUT HOW TO EXPLAIN IT TO OTHERS THAT IT TOOK ON THIS PRESENT

02:43PM  19   TENSE CHARACTER, THAT IT BECAME AN EXAGGERATION IN THE FORM OF

02:44PM  20   CLAIMS ABOUT WHAT THE COMPANY'S CURRENT TECHNOLOGY COULD DO.

02:44PM  21        THAT'S NOT AN EXCEPTION IN THIS PRESENTATION.

02:44PM  22        IT GOES ON TO TALK ABOUT SYSTEM REQUIREMENTS.

02:44PM  23        NOTICE THAT SEVERAL KEY ASPECTS OF THE DEVICE ARE STILL

02:44PM  24   TBD, OR TO BE DECIDED, INCLUDING OTHER CAPABILITIES.

02:44PM  25        AND AT THE BOTTOM THERE, IT SAYS OTHER CAPABILITIES TO BE

02:44PM  1     DECIDED, BUT NOT LESS THAN SYSTEM 3.0.

02:44PM  2          IN OTHER WORDS, THE PLAN FOR THE 4.0 WAS THAT IT WAS GOING

02:44PM  3     TO BE BETTER THAN THE 3.0.

02:44PM  4          DOES THAT SEEM CONCRETE ENOUGH TO YOU TO SUPPORT A GOOD

02:44PM  5     FAITH BELIEF THAT THE COMPANY HAS TECHNOLOGY THAT CAN DO

02:44PM  6     EVERYTHING THAT MS. HOLMES WAS CLAIMING?

02:44PM  7          AND IMPORTANTLY, THIS PRESENTATION ALSO IDENTIFIED SOME

02:44PM  8     PROBLEMS WITH THE 4 SERIES PLAN THAT THE COMPANY HAD APPARENTLY

02:44PM  9     NOT YET SOLVED, THINGS THAT WERE GOING TO MAKE THIS PROJECT

02:45PM 10     ESPECIALLY COMPLEX AND HURDLES THAT THE COMPANY WOULD NEED TO

02:45PM 11     OVERCOME IN ORDER TO GET THERE.

02:45PM 12          NOW, MS. HOLMES CONTINUED TO HEAR SOME POSITIVE REPORTS

02:45PM 13     FROM SCIENTISTS AND ENGINEERS ABOUT THE DEVELOPMENT PROCESS FOR

02:45PM 14     THE 4 SERIES, BUT AT NO POINT DID THEY TELL HER THAT THE 4

02:45PM 15     SERIES WAS READY FOR PATIENT TESTING.  AT NO POINT DID --

02:45PM 16     DURING THE RELEVANT TIME PERIOD DID THERANOS ACTUALLY USE THE 4

02:45PM 17     SERIES FOR PATIENT TESTING, ALTHOUGH OBVIOUSLY THERE WOULD HAVE

02:45PM 18     BEEN A DESIRE TO DO SO HAD THE SYSTEM BEEN READY.

02:45PM 19          SO THESE REPRESENTATIONS OR THE INFORMATION THAT

02:45PM 20     MS. HOLMES GOT FROM EMPLOYEES COULD NOT HAVE GIVEN HER A GOOD

02:45PM 21     FAITH BASIS TO CLAIM THAT THE TECHNOLOGY WAS CURRENTLY CAPABLE

02:45PM 22     OF DOING EVERYTHING.

02:45PM 23          IF ANYTHING, THEY MADE HER OPTIMISTIC THAT THE LIES THAT

02:45PM 24     SHE WAS TELLING COULD BE MADE TRUE BEFORE THEY HAD BEEN

02:45PM 25     DETECTED.

02:46PM 1     SO YOU'RE REASONABLE TO INFER THAT THIS INFORMATION FROM

02:46PM 2  SCIENTISTS AND ENGINEERS AT THERANOS GAVE MS. HOLMES SOME

02:46PM 3  COMFORT IN SPREADING FALSE INFORMATION ABOUT WHAT THERANOS

02:46PM 4  COULD DO AND WHERE THE TECHNOLOGY WAS AT BECAUSE SHE HOPED THAT

02:46PM 5  BY THE TIME THAT ANYONE BECAME THE WISER, THE TECHNOLOGY WOULD

02:46PM 6  HAVE CAUGHT UP TO HER REPRESENTATIONS, AND NO ONE WOULD EVER

02:46PM 7  FIND OUT.

02:46PM 8     AS IT TURNS OUT, THAT'S NOT WHAT HAPPENED.

02:46PM 9     BUT FOR PURPOSES OF THE CHARGED OFFENSE AND HER INTENT TO

02:46PM 10 DEFRAUD, A LIE IS A LIE AT THE MOMENT THAT IT IS MADE.  IT DOES

02:46PM 11 NOT MATTER WHETHER MS. HOLMES HAD THE INTENT TO MAKE THE LIE

02:46PM 12 TRUE OR TO AVOID BEING FOUND OUT.  THE PROBLEM IS IN MAKING THE

02:46PM 13 MISREPRESENTATION ON THE DAY IT'S MADE.

02:46PM 14     ALSO, REMEMBER IN THIS CONTEXT THE GOOD FAITH INSTRUCTION.

02:46PM 15 WHEN THE COURT INSTRUCTS YOU ABOUT GOOD FAITH, AGAIN, THE COURT

02:47PM 16 IS GOING TO TELL YOU THAT A GOOD FAITH THAT PREVENTS A

02:47PM 17 CONVICTION IS A GOOD FAITH BELIEF IN THE TRUTH OF THE SPECIFIC

02:47PM 18 MISREPRESENTATION CHARGED.

02:47PM 19     HERE MS. HOLMES'S OWN TESTIMONY PRECLUDES THAT FINDING.

02:47PM 20 LET'S TAKE A LOOK AT THAT.

02:47PM 21     HER TESTIMONY TELLS YOU IN ADDITION TO ALL OF THE OTHER

02:47PM 22 EVIDENCE IN THE CASE, THAT SHE WAS AWARE DURING THE RELEVANT

02:47PM 23 TIME PERIOD OF WHAT THE ANALYZER COULD DO AND WHAT IT COULDN'T

02:47PM 24 DO.

02:47PM 25     FOR EXAMPLE, TOWARDS THE BEGINNING OF HER TESTIMONY,

02:47PM 1   MS. HOLMES WAS ASKED "HOW MANY SMALL SAMPLE ASSAYS DID THERANOS

02:47PM 2   OFFER IN ITS CLINICAL LAB?"

02:47PM 3       HER ANSWER WAS, "70 OR SO."

02:47PM 4       SHE WAS THEN ASKED, "HOW MANY OF THOSE ASSAYS WERE OFFERED

02:47PM 5   WHERE THE ANALYSIS WAS PERFORMED ON A MINIATURIZED THERANOS

02:47PM 6   DEVICE?"

02:47PM 7       SHE ANSWERED, "TWELVE."

02:47PM 8       SHE WAS ALSO ASKED WHETHER SHE UNDERSTOOD THAT THE MINILAB

02:47PM 9   WAS NEVER USED FOR PATIENT TESTING.

02:47PM 10      SHE SAID SHE DID.

02:47PM 11      SHE CONFIRMED ALSO THAT SHE WAS FAMILIAR WITH THE EDISON

02:48PM 12  3.5 DURING THE 2013 TIME PERIOD, AND IN 2014, AND IN 2015, AND

02:48PM 13  THAT SHE KNEW WHAT THE EDISON 3.5 COULD DO AND WHAT IT COULDN'T

02:48PM 14  DO.

02:48PM 15      SO WHAT DOES THAT MEAN?  THAT MEANS THAT WHENEVER

02:48PM 16  MS. HOLMES MADE A REPRESENTATION THAT WAS INCONSISTENT WITH

02:48PM 17  THIS, SHE'S ADMITTING THAT THAT WAS A KNOWING

02:48PM 18  MISREPRESENTATION.  SHE KNEW THE TRUTH.  SHE KNEW WHAT THE

02:48PM 19  MINILAB COULD DO.  SHE KNEW THE MINILAB WAS NEVER USED FOR

02:48PM 20  PATIENT TESTING, THAT NEXT GENERATION DEVICE.  SHE KNEW WHAT

02:48PM 21  THE 3.5 WAS CAPABLE OF AND WHAT IT WAS NOT CAPABLE OF.

02:48PM 22      SO WHEN SHE SAID THE THERANOS TECHNOLOGY CAN DO ANY TEST,

02:48PM 23  WHEN SHE BOASTED OF GREATER ACCURACY, WHEN SHE CAUSED PEOPLE TO

02:48PM 24  BELIEVE THAT THE EDISON WAS CAPABLE OF RUNNING THE ENTIRE RANGE

02:48PM 25  OF TESTS, HERE'S THE TESTIMONY THAT TELLS YOU THAT SHE KNEW

02:48PM  1    BETTER.  SHE KNEW BETTER.

02:48PM  2        AND OF COURSE SHE DID.  SHE WAS THE FOUNDER OF THE

02:49PM  3    COMPANY.  SHE WAS NAMED ON MULTIPLE PATENTS.  SHE DEVOTED SO

02:49PM  4    MUCH ENERGY AND TIME TO THIS.  OF COURSE SHE KNEW WHAT THE

02:49PM  5    TRUTH WAS REGARDING THAT TECHNOLOGY.

02:49PM  6        SO THIS THEME BY THE DEFENSE, THIS ARGUMENT THAT

02:49PM  7    MS. HOLMES WAS ACTUALLY TALKING ABOUT A FUTURE DEVICE AND NOT

02:49PM  8    CURRENT TECHNOLOGY IS ACTUALLY A SIGNIFICANT ADMISSION BY THE

02:49PM  9    DEFENDANT.

02:49PM 10        IT MEANS THAT MS. HOLMES WAS INTENTIONALLY REPRESENTING AS

02:49PM 11    A PRESENT ACCOMPLISHMENT SOMETHING THAT HAD NOT HAPPENED YET,

02:49PM 12    AND THAT SHE KNEW THAT.

02:49PM 13        THE DEFENSE IS PRESENTING IT AS IF IT EXCUSES MS. HOLMES'S

02:49PM 14    CRIMINAL CONDUCT.  BUT, IN FACT, THIS IS JUST A DESCRIPTION OF

02:49PM 15    HOW THE FRAUD ACTUALLY WORKED.

02:49PM 16        YOU HEARD FROM THE VICTIMS WHO TESTIFIED THAT MS. HOLMES'S

02:49PM 17    APPARENT TECHNIQUE OF SPEAKING ABOUT NEXT GENERATION DEVICES AS

02:49PM 18    IF THEY WERE ALREADY HERE WAS EFFECTIVE IN DECEIVING INVESTORS,

02:49PM 19    IN DECEIVING OTHER PEOPLE WHO HAD CONTACT WITH THERANOS.

02:50PM 20        IF THIS THEORY, IF THIS ARGUMENT IS LESS PERSUASIVE TO

02:50PM 21    YOU, IT'S BECAUSE YOU HAVE ACCESS TO INFORMATION THAT THOSE

02:50PM 22    VICTIMS DID NOT HAVE.

02:50PM 23        UNLIKE THOSE VICTIMS, YOU'RE NOT RELIANT ON MS. HOLMES

02:50PM 24    YOUR SOLE SOURCE OF INFORMATION ABOUT THE COMPANY.  YOU SAT

02:50PM 25    THROUGH A TRIAL WHERE YOU HEARD FROM THERANOS INSIDERS AND

02:50PM  1    PEOPLE WHO COULD TELL YOU ABOUT THE DIFFERENCES BETWEEN THE 3

02:50PM  2    SERIES THAT WAS ACTUALLY A FINAL PRODUCT USED FOR PATIENT

02:50PM  3    TESTING AND THE NEXT GENERATION DEVICES THAT WERE ALWAYS

02:50PM  4    SPECULATIVE, ALWAYS HYPOTHETICAL, NEVER FINISHED.

02:50PM  5         BECAUSE YOU HAVE THAT UNDERSTANDING, YOU HAVE A CLEAR

02:50PM  6    FOCUS ABOUT WHETHER THIS DEFENSE IS ACTUALLY VIABLE AND YOU ARE

02:50PM  7    ABLE TO SEE THROUGH IT.

02:50PM  8         WHAT'S MORE, YOU KNEW THAT THERE WERE SERIOUS ACCURACY AND

02:50PM  9    RELIABILITY PROBLEMS WITH THE 3 SERIES ANALYZERS THAT THERANOS

02:51PM 10    APPARENTLY DID NOT KNOW HOW TO SOLVE.

02:51PM 11         THAT SHOULD MAKE YOU VERY SKEPTICAL THAT THE COMPANY WAS

02:51PM 12    ON ITS WAY TO DEVELOPING A 4 SERIES DEVICE THAT WAS MORE

02:51PM 13    COMPLICATED, MORE AMBITIOUS, THAT WAS GOING TO OVERCOME THESE

02:51PM 14    PROBLEMS, AND IT SHOULD MAKE YOU SKEPTICAL OF ANY CLAIM THAT

02:51PM 15    MS. HOLMES HAD A GOOD FAITH BELIEF IN THAT.

02:51PM 16         THE COMPANY COULDN'T SOLVE THE ACCURACY AND RELIABILITY

02:51PM 17    PROBLEMS PLAGUING THE MUCH SIMPLER 3 SERIES DEVICE.

02:51PM 18         ANOTHER THEME THAT THE DEFENSE HAS RAISED RELATES TO

02:51PM 19    INFORMATION THAT WAS SHARED WITH PEOPLE OTHER THAN VICTIMS IN

02:51PM 20    THIS CASE.

02:51PM 21         LET ME START BY REMINDING YOU THAT THIS CASE IS ABOUT

02:51PM 22    DECEPTION OF THE SPECIFIC VICTIMS WHO FELL UNDER THE SCHEMES TO

02:51PM 23    DEFRAUD INVESTORS AND PATIENTS.

02:51PM 24         WE'RE TALKING ABOUT SCHEMES RELATING TO MULTIPLE INVESTORS

02:51PM 25    AND MANY, IF NOT ALL, PATIENTS WHO PAID FOR THERANOS DEVICES OR

02:51PM 1    PAID FOR THERANOS TESTS, AND THERE ARE SPECIFIC REPRESENTATIVES

02:52PM 2    OF THOSE CLASSES WHO KIND OF UNDERLIE THE COUNTS THAT YOU'LL BE

02:52PM 3    ASKED TO MAKE FINDINGS ABOUT.

02:52PM 4        THAT'S WHAT THIS CASE IS ABOUT.

02:52PM 5        THIS CASE IS NOT TURNING ON INFORMATION THAT WAS SHARED

02:52PM 6    WITH PEOPLE OTHER THAN THE VICTIMS OF THOSE SCHEMES TO DEFRAUD.

02:52PM 7        LET'S TALK FIRST ABOUT INFORMATION SHARED WITH REGULATORS.

02:52PM 8        THE DEFENSE HAS REMINDED YOU MULTIPLE TIMES THAT THERANOS

02:52PM 9    PROVIDED INFORMATION TO THE FDA AND TO INSPECTORS THAT IT DID

02:52PM 10   NOT PROVIDE TO THE VICTIMS IN THIS CASE, AND IT WOULD LIKE YOU

02:52PM 11   TO CONCLUDE THAT THERANOS'S WILLINGNESS TO PROVIDE THAT

02:52PM 12   INFORMATION TO THE AUTHORITIES SHOULD INDICATE TO YOU THAT THE

02:52PM 13   COMPANY WASN'T TRYING TO KEEP THAT INFORMATION SECRET AT ALL.

02:52PM 14       FIRST OF ALL, ASK YOURSELVES IF THAT'S WHAT THE EVIDENCE

02:53PM 15   SHOWS.

02:53PM 16       DOES THE EVIDENCE SHOW THAT THERANOS AND MS. HOLMES WERE

02:53PM 17   CONSISTENTLY HONEST WITH REGULATORS?

02:53PM 18       RECALL EXHIBIT 4047.  THAT'S AN EMAIL FROM MS. HOLMES TO

02:53PM 19   DANIEL YOUNG AND OTHERS ABOUT THE PATH THAT AN AUDITOR WAS

02:53PM 20   GOING TO TAKE THROUGH THE THERANOS LAB DURING AN INSPECTION.

02:53PM 21       SHORTLY AFTER THAT, IN CONNECTION WITH THAT SAME

02:53PM 22   INSPECTION, ON EXHIBIT 4316 DANIEL YOUNG EMAILS ADAM ROSENDORFF

02:53PM 23   AND TELLS HIM NOT TO REMIND THE INSPECTOR ABOUT THE DOWNSTAIRS

02:53PM 24   LAB.  THAT'S THE LAB WHERE THE THERANOS-SPECIFIC DEVICES WERE

02:53PM 25   KEPT.

02:53PM  1        AND IN THAT EMAIL DAN YOUNG SAYS THAT IT'S SIMPLER IF THE

02:53PM  2    INSPECTORS FOCUS ON THE UPSTAIRS LAB.

02:53PM  3        EXHIBIT 1295 IS AROUND THAT SAME TIME PERIOD IN CONNECTION

02:53PM  4    WITH THAT SAME INSPECTION, AND THAT'S AN EMAIL FROM

02:53PM  5    MR. BALWANI, THE CODEFENDANT HERE, TALKING ABOUT AN AREA IN THE

02:53PM  6    LAB THAT IS CORDONED OFF OR BLOCKED OFF DURING THIS INSPECTION.

02:54PM  7        AND HE PROVIDES SOME SCRIPTING FOR LAB PERSONNEL TO

02:54PM  8    RESPOND TO THE AUDITORS IF THEY'RE ASKED QUESTIONS ABOUT WHAT

02:54PM  9    IS BEHIND THAT BARRIER.

02:54PM 10        ONE IMPORTANT REASON WHY YOU SHOULD DISCOUNT THE FACT THAT

02:54PM 11    MS. HOLMES PROVIDED INFORMATION TO REGULATORS IS THAT THE

02:54PM 12    INCENTIVES ARE COMPLETELY DIFFERENT HERE.

02:54PM 13        OBVIOUSLY THE PURPOSE OF PROVIDING FALSE INFORMATION TO

02:54PM 14    INVESTORS WAS TO MAKE THE COMPANY SEEM SPECIAL AND UNIQUE AND

02:54PM 15    INNOVATIVE, TO ATTRACT THOSE INVESTORS AND MAKE THEM WANT TO

02:54PM 16    GET ON BOARD AND INVEST THEIR MONEY IN A NEW COMPANY.

02:54PM 17        WHEN IT COMES TO REGULATORS, HOWEVER, THE INCENTIVE IS THE

02:54PM 18    OPPOSITE.  SOMETHING NEW, SOMETHING INNOVATIVE, SOMETHING

02:54PM 19    DIFFERENT, IT'S REASONABLE TO INFER, WOULD CAUSE GREATER

02:54PM 20    SCRUTINY BY REGULATORS.

02:55PM 21        BECAUSE OF THAT, IT WAS ACTUALLY TO THERANOS'S ADVANTAGE

02:55PM 22    TO BE UP FRONT WITH THE REGULATORS ABOUT THE NORMAL SYSTEMS

02:55PM 23    THAT IT WAS USING, THE COMMERCIALLY AVAILABLE ANALYZERS, THE

02:55PM 24    FDA APPROVED PROCESSES, BY DISCLOSING THAT THERANOS WAS DOING

02:55PM 25    THE SAME THING THAT ANY LAB WOULD DO, THE SAME WAY THAT QUEST

02:55PM   1    WAS DOING IT, THE SAME WAY THAT LABCORP WAS DOING IT, THERANOS

02:55PM   2    COULD EXPECT THAT THE FDA WOULD BE COMFORTED BY THAT AND WOULD

02:55PM   3    NOT APPLY ADDITIONAL SCRUTINY.

02:55PM   4        THE OPPOSITE IS TRUE FOR INVESTORS.  INVESTORS WOULD HAVE

02:55PM   5    LITTLE INTEREST IN INVESTING IN A NEW LAB THAT WAS DOING THINGS

02:55PM   6    THE OLD WAY.

02:55PM   7        SO, AGAIN, YOU SHOULDN'T BE SURPRISED TO HEAR THAT

02:55PM   8    MS. HOLMES WAS MORE FORTHCOMING WITH THE FDA WHEN IT CAME TO

02:55PM   9    THINGS LIKE THE COMPANY'S USE OF THIRD PARTY DEVICES.

02:55PM  10        SHE DIDN'T LIE TO THE FDA BECAUSE SHE DIDN'T NEED TO, AND

02:55PM  11    ALSO BECAUSE HER CHANCES OF DECEIVING THEM WOULD HAVE BEEN

02:55PM  12    REDUCED.

02:55PM  13        RECALL FROM THE EVIDENCE DURING THE TRIAL THAT

02:55PM  14    ORGANIZATIONS LIKE FDA AND CMS CAN INSPECT LABORATORIES WITH OR

02:56PM  15    WITHOUT NOTICE, SO PROVIDING FALSE INFORMATION TO THEM ABOUT

02:56PM  16    WHAT WAS IN THE LAB WOULD CARRY A MUCH HIGHER RISK AS COMPARED

02:56PM  17    TO THE INVESTORS IN THIS CASE WHOSE ACCESS TO THE LAB WAS

02:56PM  18    CONTROLLED BY NONE OTHER THAN THE DEFENDANT.

02:56PM  19        LET'S TALK NEXT ABOUT SOME OF THE EVIDENCE IN THIS CASE

02:56PM  20    INVOLVING PHARMACEUTICAL REPORTS THAT WERE DOCTORED BY

02:56PM  21    MS. HOLMES AND SHARED BY WALGREENS AND OTHERS.

02:56PM  22        THE DEFENSE PRESENTED EVIDENCE THAT SOME OF THOSE REPORTS

02:56PM  23    WERE LATER SENT TO THE COMPANIES WHOSE LOGOS APPEARED AT THE

02:56PM  24    TOP, AND I THINK THE DEFENSE WANTS YOU TO CONCLUDE FROM THAT

02:56PM  25    THAT MS. HOLMES HAD NO INTENT TO DECEIVE ANYONE BECAUSE SHE

02:56PM  1    APPARENTLY WAS OKAY WITH CERTAIN INDIVIDUALS AT THOSE COMPANIES

02:57PM  2    KNOWING THAT THOSE LOGOS HAD BEEN PLACED THERE.

02:57PM  3        IT'S IMPORTANT TO KEEP IN MIND, THOUGH, THIS IS NOT A CASE

02:57PM  4    ABOUT THE MISUSE OF LOGOS.  THIS IS NOT A CASE ABOUT TRADEMARK

02:57PM  5    MISAPPROPRIATION WHERE THE VICTIM IS THE PHARMACEUTICAL

02:57PM  6    COMPANY.

02:57PM  7        THE WRONG THING THAT HAPPENED THERE IS THAT THE LOGOS WERE

02:57PM  8    USED TO DECEIVE A THIRD PARTY, WHETHER IT WAS A POTENTIAL

02:57PM  9    INVESTOR IN THERANOS, WHETHER IT WAS WALGREENS, A POTENTIAL

02:57PM  10   BUSINESS PARTNER.  THAT IS WHERE THOSE DOCUMENTS WERE USED AS

02:57PM  11   TOOLS.  THAT'S THE WRONGFUL CONDUCT THAT YOU SHOULD FOCUS ON.

02:57PM  12       SO SENDING REPORTS BACK TO THESE COMPANIES IS NOT THE SAME

02:57PM  13   THING AS REVEALING TO THE ACTUAL TARGETS OF THE DECEPTION,

02:57PM  14   WALGREENS OR INVESTORS, THAT THOSE REPORTS HAD BEEN CREATED BY

02:57PM  15   THERANOS AND THAT THE LOGOS HAD BEEN APPLIED BY MS. HOLMES

02:57PM  16   HERSELF.

02:57PM  17       AND SURE ENOUGH, WHEN MS. HOLMES WAS ASKED, "BEFORE GIVING

02:58PM  18   THE DOCUMENT TO WALGREENS," AND THIS IS RELATING TO THE PFIZER

02:58PM  19   REPORT, "YOU DID NOT TELL PFIZER YOU WERE ADDING ITS LOGO TO A

02:58PM  20   DOCUMENT THAT THERANOS PREPARED; AM I RIGHT?"

02:58PM  21       SHE SAYS, "I DON'T KNOW.  I DON'T REMEMBER THIS PROCESS."

02:58PM  22       THE FOLLOW-UP QUESTION IS, "AND YOU NEVER TOLD WALGREENS

02:58PM  23   THAT YOU PUT THE PFIZER LOGO ON THIS?"

02:58PM  24       "ANSWER:  I'M SURE WE DIDN'T."

02:58PM  25       LOOK AT THE CONTRAST BETWEEN THOSE TWO ANSWERS AND RECALL

02:58PM   1    DURING MS. HOLMES'S TESTIMONY THERE WERE A LOT OF THINGS THAT

02:58PM   2    SHE DIDN'T REMEMBER, THAT SHE WASN'T SURE ABOUT, THAT SHE

02:58PM   3    DIDN'T KNOW.

02:58PM   4         HERE IS SOMETHING THAT SHE IS SURE ABOUT.  WHEN ASKED

02:58PM   5    WHETHER THEY TOLD WALGREENS THAT SHE PUT THE PFIZER LOGO ON

02:58PM   6    THAT DOCUMENT, SHE ANSWERED THAT SHE'S SURE SHE DIDN'T.

02:58PM   7         AND THE REASON SHE KNOWS SHE DIDN'T TELL WALGREENS THIS

02:58PM   8    FACT IS BECAUSE IT WOULD HAVE REVEALED THE TRUTH THAT SHE WAS

02:58PM   9    TRYING TO CONCEAL.

02:58PM   10        LET'S LOOK AT THE METHOD THAT SHE USED THERE.

02:59PM   11        THIS IS EXHIBIT 291, AN APRIL 14TH, 2010 EMAIL FROM

02:59PM   12   MS. HOLMES TO REPRESENTATIVES OF WALGREENS ATTACHING THAT

02:59PM   13   PFIZER REPORT AND TWO OTHERS.

02:59PM   14        AND LOOK AT HOW SHE DESCRIBES THEM.  SHE SAYS "DR. JAY,

02:59PM   15   ALEX,

02:59PM   16        "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:59PM   17   DILIGENCE REPORTS ON THERANOS SYSTEMS."  SHE SAYS THEY ARE FROM

02:59PM   18   GLAXOSMITHKLINE, PFIZER, AND SCHERING-PLOUGH.

02:59PM   19        WHEN SHE WAS ON THE STAND SHE ADMITTED THAT, IN FACT, OF

02:59PM   20   COURSE THESE REPORTS WERE NOT FROM THOSE COMPANIES.  THEY WERE

02:59PM   21   FROM THERANOS.

02:59PM   22        SHE MAINTAINED, HOWEVER, THAT THEY WERE INDEPENDENT IN

02:59PM   23   SOME SENSE.  IT'S UNCLEAR HOW DOCUMENTS THAT WERE PREPARED OR

02:59PM   24   ALTERED BY THERANOS, AND THEN DOCTORED TO APPEAR LIKE THEY WERE

02:59PM   25   COMING FROM SOMEONE ELSE, COULD BE FAIRLY VIEWED AS

02:59PM 1      INDEPENDENT.

02:59PM 2           BUT I THINK YOU'RE IN A GOOD POSITION TO JUDGE WHETHER

02:59PM 3      THIS WAS AN HONEST EMAIL OR NOT AT THE TIME THAT MS. HOLMES

03:00PM 4      SENT IT, AND TO JUDGE HER INTENT IN MISCHARACTERIZING THESE

03:00PM 5      DOCUMENTS WHEN SHE SENT THEM TO WALGREENS.

03:00PM 6           THERE'S TRULY NO EXPLANATION HERE OTHER THAN AN INTENT TO

03:00PM 7      DECEIVE.  THERE'S NO REASON NOT TO BE UP FRONT ABOUT THE SOURCE

03:00PM 8      OF THESE DOCUMENTS.  THERE'S NO REASON TO SEND THEM IN THE

03:00PM 9      FIRST PLACE UNLESS YOUR INTENT IS FOR THE RECIPIENT TO BELIEVE

03:00PM 10     THAT THEY'RE READING THE OPINIONS OF THE COMPANIES' WHOSE LOGOS

03:00PM 11     YOU HAVE PLACED AT THE TOP OF THOSE DOCUMENTS.

03:00PM 12          LET'S TALK BRIEFLY ABOUT ANOTHER DEFENSE THEME, WHICH IS

03:00PM 13     BRINGING FOCUS ON THE ACTIONS OF THE VICTIMS IN THIS CASE,

03:00PM 14     SPECIFICALLY THE INVESTORS.

03:00PM 15          YOU'VE HEARD IN THIS CASE FROM A SAMPLING OF INVESTORS.

03:00PM 16     EACH OF THEM TOLD YOU ABOUT THE FALSE AND MISLEADING

03:00PM 17     INFORMATION THAT THEY RECEIVED FROM MS. HOLMES EITHER IN

03:00PM 18     WRITTEN MATERIALS THAT SHE GAVE THEM, IN-PERSON INTERACTIONS,

03:00PM 19     OR INDIRECTLY IN NEWS ARTICLES THAT MS. HOLMES HELPED SHAPE AND

03:00PM 20     APPROVE.

03:00PM 21          THE DEFENSE HAS FOCUSSED THROUGHOUT THE TRIAL ON THE DUE

03:01PM 22     DILIGENCE EFFORTS OF THOSE INVESTORS, SOMETIMES IMPLYING OR

03:01PM 23     INSINUATING THAT INVESTORS WEREN'T CAREFUL ENOUGH, THAT THEY

03:01PM 24     DIDN'T TAKE ENOUGH STEPS TO CONFIRM WHAT MS. HOLMES WAS SAYING,

03:01PM 25     THAT THEY WEREN'T SKEPTICAL ENOUGH.

03:01PM   1          WHAT DOES THE LAW SAY ON THAT?

03:01PM   2          HERE'S WHAT I EXPECT THE COURT TO INSTRUCT YOU ON THIS

03:01PM   3   TOPIC.

03:01PM   4          THIS IS JURY INSTRUCTION NUMBER 26 THAT I EXPECT YOU'LL

03:01PM   5   RECEIVE.  NOTE THAT IT SAYS, "AN ALLEGED VICTIM'S NEGLIGENCE IS

03:01PM   6   NOT A DEFENSE TO WIRE FRAUD."

03:01PM   7          SO IN CASES WHERE YOU MIGHT FEEL THAT A GIVEN INVESTOR

03:01PM   8   WASN'T CAREFUL ENOUGH, WASN'T SKEPTICAL ENOUGH, SHOULD HAVE

03:01PM   9   TAKEN MORE STEPS, SHOULD HAVE DONE MORE INDEPENDENT

03:01PM  10   INVESTIGATION, KNOW THAT THAT HAS NOTHING TO DO WITH YOUR

03:01PM  11   VERDICT.  KNOW THAT THE FOCUS, AS THE COURT WILL INSTRUCT YOU,

03:01PM  12   IS ON THE DEFENDANT'S INTENT, AND A SCHEME TO DEFRAUD IS STILL

03:01PM  13   A SCHEME TO DEFRAUD EVEN IF IT WOULD ONLY ENSNARE SOMEONE WHO

03:02PM  14   IS LESS CAREFUL THAN THEY SHOULD BE.

03:02PM  15          IT'S ALSO NOTABLE THAT IN THE COURSE OF THE TRIAL YOU ALSO

03:02PM  16   HEARD FROM INVESTORS EVERYWHERE ON THE SPECTRUM OF CAREFULNESS

03:02PM  17   AND SOPHISTICATION AND DUE DILIGENCE.

03:02PM  18          ON THE ONE HAND YOU HAD CHRIS LUCAS WHO TESTIFIED THAT HE

03:02PM  19   TRUSTED MS. HOLMES.  HE TOOK HER WORDS AT FACE VALUE.  HE HAD A

03:02PM  20   HIGH LEVEL UNDERSTANDING OF WHAT THE COMPANY HAD DONE AND WHAT

03:02PM  21   THE TECHNOLOGY COULD DO BASED ON CONVERSATIONS WITH HER.  AND

03:02PM  22   HE, BASED ON THAT TRUST AND BASED ON HER REPRESENTATIONS, MADE

03:02PM  23   THE DECISION TO INVEST.

03:02PM  24          ON THE OTHER END OF THE SPECTRUM THERE'S PFM AND SOMEONE

03:02PM  25   LIKE BRIAN GROSSMAN, A VERY SOPHISTICATED INVESTOR WHO TOOK

03:02PM  1    MULTIPLE STEPS TO INVESTIGATE, TRY TO FIND CORROBORATION, HIRE

03:03PM  2    EXPERTS AND GO THROUGH A PROCESS TO GET AS COMFORTABLE AS

03:03PM  3    POSSIBLE WITH THE INVESTMENT IN THERANOS.

03:03PM  4         AND THEN IN HIS OWN CATEGORY IS MR. EISENMAN WHO YOU HEARD

03:03PM  5    MADE HIS BEST EFFORTS TO GET MORE INFORMATION ABOUT THE

03:03PM  6    COMPANY, BUT WAS SHUT OUT BY MS. HOLMES AND MR. BALWANI DURING

03:03PM  7    A CERTAIN TIME PERIOD.

03:03PM  8         WHAT EFFECT DID THAT HAVE?  THAT FORCED HIM TO RELY ON

03:03PM  9    WHAT MS. HOLMES HAD TOLD HIM PREVIOUSLY, CONVERSATIONS LEADING

03:03PM 10    UP TO AND THROUGH 2010, CLAIMS THAT SHE HAD MADE ABOUT THE

03:03PM 11    TECHNOLOGY, AND CONTENT THAT HE SAW IN MEDIA THAT MS. HOLMES

03:03PM 12    HAD APPROVED.

03:03PM 13         REGARDING HIS FOCUS OF CERTAIN STATEMENTS OF HERS, I

03:03PM 14    SUBMIT THAT THE BALANCE OF HIS TESTIMONY TELLS YOU THAT WHAT

03:03PM 15    SHE TOLD HIM DID MATTER TO HIM.  HE TESTIFIED ABOUT HOW HE TOOK

03:03PM 16    NOTES ABOUT HER CLAIMS.  YOU SAW FOLLOW-UP EMAILS ASKING HER

03:03PM 17    QUESTIONS ABOUT CARTRIDGE MANUFACTURING NUMBERS AND

03:04PM 18    PROJECTIONS.  OBVIOUSLY THOSE THINGS MATTERED TO HIM.

03:04PM 19         I SHOULD ALSO POINT OUT, THOUGH, THAT YOU SHOULDN'T BE

03:04PM 20    DISTRACTED BY DEFENSE ARGUMENTS ABOUT WHAT MATTERED TO A

03:04PM 21    CERTAIN INVESTOR AT A CERTAIN TIME.

03:04PM 22         WHEN YOU'RE INSTRUCTED ABOUT THE LAW, YOU'RE GOING TO HEAR

03:04PM 23    ABOUT A CONCEPT CALLED MATERIALITY, WHICH RELATES TO THE KIND

03:04PM 24    OF MISREPRESENTATION THAT CAN FORM THE BASIS FOR A WIRE FRAUD

03:04PM 25    CONVICTION.

03:04PM   1        AND YOU'RE GOING TO HEAR THAT MATERIALITY RELATES TO THE

03:04PM   2   CAPACITY OF A CERTAIN STATEMENT TO INDUCE SOMEONE TO PART WITH

03:04PM   3   MONEY.  AND I'LL ASK YOU TO RELY ON THE COURT'S INSTRUCTION FOR

03:04PM   4   THAT.

03:04PM   5        BUT YOU'LL SEE THAT IT HAS NOTHING TO DO WITH WHAT WAS

03:04PM   6   SUBJECTIVELY IN A VICTIM'S MIND AT A GIVEN TIME.  IT'S AN

03:04PM   7   OBJECTIVE STANDARD.  IT RELATES TO THE TYPE OF CLAIM, THE TYPE

03:04PM   8   OF STATEMENT, NOT TO THE SPECIFIC PERSON THAT IT WAS MADE TO.

03:04PM   9        SO WHAT YOU SAW IN THE EVIDENCE IS THAT THE LEVEL OF DUE

03:05PM  10   DILIGENCE DOESN'T MATTER.  IN THE END, THE INVESTORS WHO

03:05PM  11   TESTIFIED WERE ALL ULTIMATELY FORCED TO RELY ON THE TRUTH OF

03:05PM  12   THE REPRESENTATIONS THAT THEY HEARD FROM MS. HOLMES.

03:05PM  13        THAT'S WHY YOU SHOULD ALSO DISCOUNT THE LANGUAGE IN THE

03:05PM  14   CONTRACTS THAT TALKS ABOUT THE SPECULATIVE NATURE OF THE

03:05PM  15   INVESTMENT OR INFORMATION RIGHTS AND THE LIKE.

03:05PM  16        OF COURSE THESE WERE RISKY INVESTMENTS.  THE INVESTORS

03:05PM  17   KNEW THAT.

03:05PM  18        AND, OF COURSE, THEY KNEW THAT THERE WAS SOME INFORMATION

03:05PM  19   THAT MAYBE THEY WEREN'T GETTING FROM THE COMPANY.

03:05PM  20        BUT YOU WON'T FIND ANY LANGUAGE IN THOSE CONTRACTS THAT

03:05PM  21   EXCUSES THE COMPANY FOR KNOWINGLY PROVIDING FALSE INFORMATION.

03:05PM  22        NOTHING IN THOSE CONTRACTS GAVE MS. HOLMES THE RIGHT TO

03:05PM  23   KNOWINGLY MISLEAD THOSE INVESTORS.

03:05PM  24        AT THE END OF THE DAY, THOSE INVESTORS WERE RELYING ON

03:05PM  25   RECEIVING ACCURATE INFORMATION FROM MS. HOLMES AND NOT BEING

03:05PM  1    INTENTIONALLY MISLED, AND THAT'S EXACTLY WHAT HAPPENED HERE.

03:06PM  2         KEEP IN MIND ALSO ON THIS TOPIC THAT PATIENTS WERE REALLY

03:06PM  3    AT A DISADVANTAGE HERE.

03:06PM  4         IF YOU THINK THAT SOME INVESTORS WERE AT A DISADVANTAGE IN

03:06PM  5    BEING ABLE TO COLLECT INFORMATION OR DO INDEPENDENT

03:06PM  6    INVESTIGATION, KNOW AND REALIZE THAT PATIENTS WERE FAR WORSE

03:06PM  7    OFF IN THEIR ABILITY TO FACT CHECK REPRESENTATIONS BY THE

03:06PM  8    DEFENDANT OR DO ANYTHING OTHER THAN JUST RELY ON INFORMATION

03:06PM  9    PUT OUT BY THE COMPANY.

03:06PM 10         LET'S TALK NEXT ABOUT ANOTHER DEFENSE THEME RELATING TO

03:06PM 11    CLAIMS OF TRADE SECRET PROTECTION.

03:06PM 12         YOU'VE HEARD EVIDENCE IN THE TRIAL ABOUT SECRETIVE

03:06PM 13    PRACTICES AT THERANOS AND A LOT OF THE EVIDENCE AND TESTIMONY

03:06PM 14    FROM VICTIMS HAS RELATED TO INFORMATION THAT WAS WITHHELD FROM

03:06PM 15    THEM, FACTS THAT THEY DID NOT GET, THINGS THAT MS. HOLMES DID

03:06PM 16    NOT TELL THEM.

03:06PM 17         THE DEFENSE WOULD LIKE YOU TO BELIEVE THAT IN EVERY CASE,

03:06PM 18    EVERY TIME INFORMATION WAS WITHHELD FROM A VICTIM, IT WAS

03:07PM 19    SIMPLY A GOOD FAITH EFFORT TO PROTECT THE COMPANY'S TRADE

03:07PM 20    SECRETS.

03:07PM 21         THAT DEFENSE DOESN'T HOLD WATER, AND HERE'S WHY:

03:07PM 22         FIRST OF ALL, THE EVIDENCE SHOWS YOU SOME CONTRADICTORY OR

03:07PM 23    IRRATIONAL PRACTICES HERE.  YOU SAW THAT THERANOS WAS QUITE

03:07PM 24    AGGRESSIVE IN GETTING EMPLOYEES AND OTHERS TO SIGN CDA'S, OR

03:07PM 25    CONFIDENTIAL DISCLOSURE AGREEMENTS.  THAT WAS THE PRIMARY

03:07PM  1    MECHANISM, OR A PRIMARY MECHANISM, THAT THE COMPANY USED TO

03:07PM  2    PROTECT ITS CONFIDENTIAL INFORMATION.

03:07PM  3         THE DRAFT POLICY THAT MS. HOLMES READ THAT WAS INTRODUCED

03:07PM  4    INTO EVIDENCE SPECIFICALLY HIGHLIGHTED THE USE OF CDA'S AND

03:07PM  5    NOTED THAT THAT WAS AN ACCEPTABLE APPROACH.

03:07PM  6         SO THERE WAS NO NEED TO DECEIVE INVESTORS OR ANYONE ELSE

03:07PM  7    WHEN SIMPLY HAVING THEM ENTER INTO THESE AGREEMENTS WOULD HAVE

03:07PM  8    BEEN ADEQUATE TO PROTECT THE COMPANY'S INTELLECTUAL PROPERTY.

03:07PM  9         YOU SAW IN THE EVIDENCE THAT CRITICAL EVIDENCE WAS

03:08PM 10    WITHHELD EVEN FROM THOSE UNDER CDA'S OR OTHER OBLIGATIONS TO

03:08PM 11    KEEP SECRETS.  FOR EXAMPLE, WALGREENS AND THE BOARD OF

03:08PM 12    DIRECTORS, WHO HAD A DUTY AND AN INCENTIVE TO KEEP THERANOS'S

03:08PM 13    SECRETS, STILL WERE NOT TOLD THE FULL EXTENT OF THE COMPANY'S

03:08PM 14    RELIANCE ON THIRD PARTY DEVICES.

03:08PM 15         THAT'S BECAUSE THIS WASN'T ABOUT PROTECTING TRADE SECRETS.

03:08PM 16         A TRADE SECRET, AS YOU'VE HEARD, IS ABOUT PROTECTING HOW A

03:08PM 17    BUSINESS DOES SOMETHING.  IT'S NOT ABOUT HIDING WHAT A BUSINESS

03:08PM 18    CANNOT DO.

03:08PM 19         YOU HEARD MS. HOLMES TALK ABOUT HEARING FROM SENATOR NUNN

03:08PM 20    ABOUT HIS EXPERIENCE ON THE BOARD OF COCA-COLA AND THE EFFORTS

03:08PM 21    THAT THAT COMPANY TOOK TO PROTECT THE SECRET FORMULA FOR COKE.

03:08PM 22         SO THE COKE FORMULA IS A CLASSIC EXAMPLE OF A TRADE

03:08PM 23    SECRET.  IT'S SOMETHING THAT A COMPANY CAN DO, KNOWLEDGE THAT

03:08PM 24    IT HAS THAT IT NEEDS TO PROTECT, OTHERWISE ITS COMPETITORS WILL

03:09PM 25    BE ABLE TO COPY IT.

03:09PM  1          THERANOS, THOUGH, WAS NO COCA-COLA.

03:09PM  2          IF THERANOS WERE A SODA COMPANY, IT WOULD BE A COMPANY

03:09PM  3   THAT COULD ONLY MAKE A FEW FLAVORS, AND FOR THE REST REPACKAGED

03:09PM  4   SODA FROM ANOTHER COMPANY AND SOLD IT AS ITS OWN.

03:09PM  5          THAT PRACTICE, THE PRACTICE OF TAKING A PRODUCT BY ANOTHER

03:09PM  6   AND PASSING IT OFF AS SOMETHING THAT YOU COULD DO, IS NO TRADE

03:09PM  7   SECRET.  THAT'S NOT THE KIND OF THING THAT NEEDS TO BE

03:09PM  8   PROTECTED BECAUSE IF A COMPETITOR FINDS OUT ABOUT IT, THEY'LL

03:09PM  9   START DOING IT.

03:09PM 10          IT'S A SECRET THAT NEEDS TO BE PROTECTED BECAUSE IF IT

03:09PM 11   GETS OUT, IT WILL MAKE THE COMPANY LOOK BAD, IT WILL EXPOSE THE

03:09PM 12   COMPANY AS A FRAUD, IT WILL MAKE THE COMPANY APPEAR LESS

03:09PM 13   SPECIAL, AND THAT WAS WHAT MS. HOLMES WAS TRYING TO AVOID.

03:09PM 14          AND THAT BRINGS US TO PROBABLY THE BIGGEST PROBLEM WITH

03:09PM 15   THIS DEFENSE THEORY.

03:09PM 16          THE DEFENSE WANTS YOU TO FOCUS ON THE MODIFICATIONS THAT

03:09PM 17   WERE MADE TO THIRD PARTY DEVICES AND VIEW THOSE AS TRADE

03:10PM 18   SECRETS.

03:10PM 19          BUT DON'T FORGET THAT MS. HOLMES ALSO WITHHELD INFORMATION

03:10PM 20   ABOUT THE NONMODIFIED THIRD PARTY DEVICES THAT WERE IN USE AT

03:10PM 21   THERANOS.

03:10PM 22          THERE IS NO ARGUMENT, THERE CAN BE NO ARGUMENT THAT THE

03:10PM 23   USE OF NONMODIFIED THIRD PARTY DEVICES WAS A TRADE SECRET.

03:10PM 24   THAT'S SOMETHING THAT ANY LAB COULD DO.  IT'S SOMETHING THAT

03:10PM 25   YOU KNOW THAT QUEST AND LABCORP WERE DOING.

03:10PM 1      THE PRACTICE OF BUYING A SIEMENS ANALYZER AND USING IT TO

03:10PM 2   ANALYZE BLOOD IS NOT A TRADE SECRET.  THAT'S WHAT EVERY LAB

03:10PM 3   DOES.

03:10PM 4      THE FACT THAT MS. HOLMES TOOK STEPS TO HIDE THAT, THE FACT

03:10PM 5   THAT SHE DID NOT WANT INVESTORS AND THE PUBLIC TO KNOW THAT THE

03:10PM 6   COMPANY WAS RELYING ON ANY NON-THERANOS DEVICES SHOWS THAT THIS

03:10PM 7   IS NOT JUST ABOUT PROTECTING THOSE MODIFICATIONS.  THIS IS

03:10PM 8   ABOUT BUILDING UP THE EDISON.  THIS IS ABOUT LEAVING PEOPLE

03:10PM 9   WITH THE FALSE IMPRESSION THAT THE EDISON IS A DO-IT-ALL

03:10PM 10  DEVICE, AND THAT NOTHING ELSE IS NEEDED TO RUN THE LAB.

03:10PM 11     YOU ALSO HAVEN'T HEARD ANY EVIDENCE THAT TRADE SECRETS

03:11PM 12  CREATE A LICENSE TO LIE OR TO DECEIVE PEOPLE.

03:11PM 13     TO THE EXTENT MS. HOLMES FELT THAT THERE WERE TRADE

03:11PM 14  SECRETS THAT SHE NEEDED TO PROTECT, THERE WERE OBVIOUS, SIMPLE

03:11PM 15  WAYS TO DO THAT THAT DIDN'T INVOLVE DECEPTION.

03:11PM 16     FOR EXAMPLE, IN ANY CONVERSATION IF SHE WAS ASKED A

03:11PM 17  QUESTION THAT SHE COULDN'T ANSWER IN HER MIND BECAUSE OF TRADE

03:11PM 18  SECRET RESTRICTIONS, SHE COULD HAVE SIMPLY SAID, "I'M SORRY, I

03:11PM 19  CAN'T GET INTO THAT BECAUSE OF TRADE SECRET PURPOSES."  OR "I'M

03:11PM 20  NOT WILLING TO TALK ABOUT" FILL IN THE BLANK.

03:11PM 21     THAT WOULD HAVE BEEN AN APPROACH THAT WOULD HAVE PRESERVED

03:11PM 22  ANY TRADE SECRETS THAT SHE FELT NEEDED TO BE PRESERVED, WHILE

03:11PM 23  AT THE SAME TIME AVOIDING THE PROBLEM OF CREATING A FALSE

03:11PM 24  IMPRESSION IN SOMEONE'S MIND.

03:11PM 25     THE REASON SHE DIDN'T TAKE THAT SIMPLE APPROACH IS BECAUSE

03:11PM 1    CREATING THAT FALSE IMPRESSION WAS HER GOAL.  THAT'S WHAT SHE

03:11PM 2    WAS SETTING OUT TO DO.

03:12PM 3          MR. DOWNEY HIGHLIGHTED FOR YOU THE FACT THAT DURING THE

03:12PM 4    RELEVANT TIME PERIOD AND IN THE COURSE OF MS. HOLMES'S DEALINGS

03:12PM 5    WITH THERANOS, SHE NEVER SOLD ANY OF HER SHARES AND DIDN'T

03:12PM 6    OBTAIN ANY PERSONAL ENRICHMENT THAT WAY.

03:12PM 7          YOU ALSO HEARD THAT THERE WAS A REASON WHY SHE DIDN'T SELL

03:12PM 8    SHARES, AND IT RELATED TO HER CONTROL OF THE COMPANY.

03:12PM 9          WHEN SHE WAS ON THE STAND, SHE TESTIFIED THAT SHE OWNED

03:12PM 10   APPROXIMATELY 50 PERCENT OF THERANOS.  IT CAME OUT ON CROSS

03:12PM 11   THAT IT WAS SLIGHTLY MORE THAN 50 PERCENT, GIVING HER A

03:12PM 12   CONTROLLING SHARE OF THE COMPANY.

03:12PM 13         YOU HEARD ABOUT HOW THE NATURE OF THOSE SHARES GAVE HER

03:12PM 14   DISPROPORTIONATE VOTING POWER THAT ALLOWED HER TO DO WHAT SHE

03:12PM 15   WANTED ESSENTIALLY IN THE COMPANY, INCLUDING FIRING THE BOARD,

03:12PM 16   FIRING OTHERS, AND THAT POWER WAS DERIVED FROM THE SHARES THAT

03:12PM 17   SHE HELD.

03:12PM 18         SO IT IS REASONABLE FOR YOU TO INFER THAT ONE REASON WHY

03:13PM 19   SHE DIDN'T LET GO OF ANY OF THOSE SHARES IS THAT SHE NEEDED TO

03:13PM 20   HOLD ON TO THAT CONTROL OF THE COMPANY NOT ONLY SO THAT SHE

03:13PM 21   COULD RUN IT THE WAY SHE CHOSE, BUT ALSO SO THAT SHE COULD KEEP

03:13PM 22   CONTROL OF ACCESS TO INFORMATION THE WAY THAT THE EVIDENCE

03:13PM 23   SHOWS THAT SHE DID.

03:13PM 24         IN CONNECTION WITH THIS ARGUMENT, YOU SHOULD ALSO KEEP IN

03:13PM 25   MIND WHAT I EXPECT THE COURT WILL GIVE YOU AS JURY INSTRUCTION

03:13PM   1    NUMBER 27 THAT TELLS YOU IN CLEAR TERMS THAT IT IS NOT

03:13PM   2    NECESSARY THAT MS. HOLMES MADE A PROFIT OR THAT ANYONE ACTUALLY

03:13PM   3    SUFFERED A LOSS.

03:13PM   4        SO YOU ARE NOT REQUIRED TO FIND THAT MS. HOLMES ACTUALLY

03:13PM   5    MADE A FINANCIAL PROFIT FROM THIS FRAUD OR THAT IT WAS

03:13PM   6    SUCCESSFUL IN ORDER TO CONVICT.  THAT IS NOT AN ELEMENT THAT

03:13PM   7    THE GOVERNMENT HAS TO PROVE.

03:13PM   8        THERE WERE ALSO BENEFITS FLOWING TO MS. HOLMES OTHER THAN

03:14PM   9    MONEY.  SHE HAD A SUBSTANTIAL SALARY TO BE SURE.

03:14PM  10        BUT SHE ALSO BENEFITED FROM THE ATTENTION, THE ACCOLADES,

03:14PM  11    THE FAME AND THE PROMINENCE THAT BEING THE CEO OF THIS

03:14PM  12    SUCCESSFUL COMPANY BROUGHT HER.

03:14PM  13        AND THERE'S ANOTHER REASON WHY SHE DIDN'T CASH OUT, AND

03:14PM  14    THAT RELATES TO HER ULTIMATE VISION AND THE LEVEL OF WEALTH AND

03:14PM  15    SUCCESS THAT SHE WANTED TO ACHIEVE, AND WE CAN SEE THAT IN THIS

03:14PM  16    TEXT MESSAGE AT EXHIBIT 5387D, PAGE 19.

03:14PM  17        AND IN NOVEMBER OF 2013 SUNNY TEXTS MS. HOLMES, "THEN

03:14PM  18    LET'S BUILD THE TRUE AMERICAN EMPIRE.  A MONOPOLY.  OUR

03:14PM  19    OBLIGATION TO U.S.A."

03:14PM  20        AND MS. HOLMES RESPONDS, "THAT'S WHAT WE'RE DOING."

03:14PM  21        IT'S NOT DISPUTED.  MS. HOLMES APPARENTLY, EVIDENTLY, WAS

03:14PM  22    NOT IN THIS SIMPLY TO GET MONEY.

03:14PM  23        SHE WANTED TO BUILD THE TRUE AMERICAN EMPIRE.  SHE WANTED

03:14PM  24    HER COMPANY TO BE A MONOPOLY, AND THE SUCCESS OF THE COMPANY

03:15PM  25    TURNED OUT TO BE THE MOTIVE FOR THE CRIME THAT SHE COMMITTED,

03:15PM   1    AND THAT'S IMPORTANT FOR YOU TO REALIZE.

03:15PM   2        A FRAUD COMMITTED FOR THE SAKE OF A COMPANY'S SUCCESS IS

03:15PM   3    STILL A FRAUD.  IT DOES NOT NEED TO BE THE CASE THAT A

03:15PM   4    DEFENDANT IS MOTIVATED BY PERSONAL ENRICHMENT.  THAT'S NOT AN

03:15PM   5    ELEMENT.

03:15PM   6        AND WHAT'S MORE, YOU DON'T NEED TO MAKE ANY FINDINGS AS TO

03:15PM   7    MOTIVE IN THIS CASE.  WE TALK ABOUT MOTIVE BECAUSE IT'S HELPFUL

03:15PM   8    FOR YOU TO UNDERSTAND WHY CERTAIN DECISIONS WERE MADE BY THE

03:15PM   9    DEFENDANT, BUT YOU DON'T NEED TO MAKE ANY CONCLUSIONS ABOUT

03:15PM  10    MOTIVE, YOU DON'T NEED TO AGREE ON WHAT MS. HOLMES'S MOTIVE WAS

03:15PM  11    IN ORDER TO RENDER YOUR VERDICT.

03:15PM  12        LET'S TALK NOW ABOUT SUNNY BALWANI.

03:15PM  13        YOU HEARD IN MS. HOLMES'S TESTIMONY ABOUT HER EXPERIENCE

03:15PM  14    IN HER RELATIONSHIP WITH MR. BALWANI.

03:15PM  15        I WONDER IF ANY OF YOU FEEL LIKE THAT TESTIMONY MAKES YOUR

03:16PM  16    JOB MORE DIFFICULT OR MORE COMPLICATED?

03:16PM  17        IT'S UNDERSTANDABLE IF IT DOES FOR A COUPLE OF REASONS:

03:16PM  18        FIRST, WE KNOW THAT HEARING ABOUT SOMEONE HAVING GONE

03:16PM  19    THROUGH A PAINFUL EXPERIENCE IS DIFFICULT.  IT'S DIFFICULT FOR

03:16PM  20    US TO SIT AND LISTEN TO SOMEONE TALK ABOUT SOMETHING PAINFUL OR

03:16PM  21    HURTFUL THAT THEY HAVE BEEN THROUGH.  IT'S NATURAL TO HAVE A

03:16PM  22    REACTION TO HEARING SOMEONE TALK ABOUT SOMETHING LIKE THAT.

03:16PM  23    IT'S NATURAL TO HAVE A STRONG REACTION TO SOMETHING LIKE THAT.

03:16PM  24        SO THAT'S ONE WAY THAT HEARING THAT TESTIMONY MIGHT MAKE

03:16PM  25    YOUR JOB AS JURORS MORE DIFFICULT.

03:16PM 1    THE SECOND WAY IT MIGHT MAKE YOU FEEL THAT IT MAKES YOUR

03:16PM 2    JOB MORE COMPLICATED IS THAT YOU MIGHT BE WONDERING HOW

03:16PM 3    MS. HOLMES'S CLAIMS OF ABUSE AFFECTS YOUR ANALYSIS OF THE FRAUD

03:16PM 4    IN THIS CASE, OR WHETHER IT AFFECTS THE ANALYSIS AT ALL.

03:17PM 5    A NATURAL STARTING POINT MIGHT BE TO TRY TO DETERMINE WHAT

03:17PM 6    THE ANSWER IS TO THE FACTUAL QUESTION OF WHAT REALLY HAPPENED

03:17PM 7    BETWEEN MS. HOLMES AND MR. BALWANI.

03:17PM 8    IN THAT RESPECT, I'LL DIRECT YOU TO TWO JURY INSTRUCTIONS.

03:17PM 9    THIS IS JURY INSTRUCTION NUMBER 4 THAT SAYS, "MS. HOLMES HAS

03:17PM 10    TESTIFIED."  AND IT DIRECTS YOU TO TREAT THIS TESTIMONY JUST AS

03:17PM 11    YOU WOULD THE TESTIMONY OF ANY OTHER WITNESS.

03:17PM 12    JURY INSTRUCTION NUMBER 9 MAKES IT CLEAR THAT YOUR JOB IS

03:17PM 13    TO JUDGE THE CREDIBILITY OF WITNESSES AND IT TELLS YOU THAT

03:17PM 14    "YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

03:17PM 15    NONE OF IT."

03:17PM 16    AND IT INSTRUCTS YOU TO CONSIDER THINGS LIKE "THE

03:17PM 17    WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, AND WHETHER

03:17PM 18    OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY."

03:17PM 19    IN CHOOSING WHETHER TO BELIEVE PART OR ALL OF MS. HOLMES'S

03:18PM 20    TESTIMONY, YOU SHOULD ADHERE TO THESE INSTRUCTIONS AND YOU

03:18PM 21    SHOULD TAKE INTO ACCOUNT EVERYTHING YOU KNOW ABOUT THE FACTS OF

03:18PM 22    THIS CASE.

03:18PM 23    THAT SAID, YOU NEED TO MAKE UP YOUR OWN MINDS ABOUT WHAT

03:18PM 24    HAPPENED HERE, AND WHEN ALL IS SAID AND DONE, YOU MAY END UP

03:18PM 25    FEELING LIKE YOU'RE NOT IN A POSITION TO MAKE CONCLUSIONS ABOUT

03:18PM 1    EXACTLY WHAT HAPPENED BETWEEN THE DEFENDANT AND MR. BALWANI.

03:18PM 2        THERE IS EXTENSIVE EVIDENCE IN THE RECORD OF THE CHARGED

03:18PM 3    FRAUD IN THIS CASE.  THERE IS MUCH LESS EVIDENCE ABOUT WHAT

03:18PM 4    HAPPENED BETWEEN MS. HOLMES AND MR. BALWANI IN THEIR PERSONAL

03:18PM 5    RELATIONSHIP.

03:18PM 6        SO THIS IS A CRITICAL THING TO UNDERSTAND.  YOU DO NOT

03:18PM 7    NEED TO REACH A CONCLUSION REGARDING WHAT HAPPENED WITH

03:18PM 8    MS. HOLMES AND MR. BALWANI IN ORDER TO RENDER YOUR VERDICT IN

03:18PM 9    THIS CASE.

03:18PM 10       IT'S IMPORTANT TO NOTE THAT THERE'S NO EVIDENCE HERE

03:18PM 11   CONNECTING THOSE ALLEGATIONS OF ABUSE WITH THE ACTUAL CHARGED

03:18PM 12   CONDUCT.

03:19PM 13       EVEN MS. HOLMES HERSELF WHEN SHE WAS ON THE STAND DIDN'T

03:19PM 14   MAKE THAT CONNECTION FOR YOU.  THERE'S NO EVIDENCE REGARDING A

03:19PM 15   LINK BETWEEN WHAT MR. BALWANI AND MS. HOLMES'S RELATIONSHIP WAS

03:19PM 16   LIKE AND THE CONDUCT THAT SHE'S CHARGED WITH COMMITTING.

03:19PM 17       ON THE SCREEN YOU'LL SEE A PORTION OF MS. HOLMES'S

03:19PM 18   TESTIMONY WHERE SHE WAS ASKED, "ARE YOU SAYING THAT MR. BALWANI

03:19PM 19   FORCED YOU TO MAKE THE STATEMENTS TO INVESTORS THAT YOU MADE

03:19PM 20   DURING THE COURSE OF THIS CASE?"

03:19PM 21       AND SHE SAYS "NO."

03:19PM 22       THIS IS HER LAWYER QUESTIONING HER.

03:19PM 23       SHE'S ASKED, "ARE YOU SAYING THAT HE FORCED YOU TO MAKE

03:19PM 24   CERTAIN STATEMENTS TO JOURNALISTS THAT WE'VE HEARD ABOUT DURING

03:19PM 25   THE COURSE OF THIS CASE?"

03:19PM   1        SHE ANSWERS, "NO."

03:19PM   2        SHE ALSO DENIED THAT MR. BALWANI CONTROLLED HER

03:19PM   3   INTERACTIONS WITH, FOR EXAMPLE, WALGREENS AND SAFEWAY

03:19PM   4   EXECUTIVES.

03:19PM   5        AND FINALLY, SHE DENIES THAT MR. BALWANI CONTROLLED HER

03:19PM   6   INTERACTIONS WITH MEMBERS OF THE THERANOS BOARD IN THE RELEVANT

03:19PM   7   TIME PERIOD.

03:20PM   8        WHEN ASKED WHAT IMPACT HER PERSONAL RELATIONSHIP WITH

03:20PM   9   MR. BALWANI HAD ON HER WORK AT THE COMPANY, SHE SAID SHE DIDN'T

03:20PM  10   KNOW AND THAT SHE FULLY DIDN'T UNDERSTAND THE IMPACT.

03:20PM  11        THAT WILL LEAVE YOU WONDERING WHY MS. HOLMES TESTIFIED

03:20PM  12   ABOUT THOSE ALLEGATIONS WHEN SHE WAS ON THE STAND.  BUT IN THE

03:20PM  13   ABSENCE OF EVIDENCE, IN THE ABSENCE OF ANY EVIDENCE LINKING

03:20PM  14   THAT EXPERIENCE TO THE CHARGED CONDUCT, YOU SHOULD PUT IT OUT

03:20PM  15   OF YOUR MIND, AND I'LL SHOW YOU AN INSTRUCTION THAT IS RELEVANT

03:20PM  16   TO THAT IN A MOMENT.

03:20PM  17        SO THE IMPORTANT QUESTION THEN IS, WHAT WAS MR. BALWANI'S

03:20PM  18   ROLE IN THE CHARGED CONDUCT?  HOW DID HIS INVOLVEMENT RELATE TO

03:20PM  19   THE CRIME THAT IS AT ISSUE HERE?

03:20PM  20        FIRST OF ALL, IT'S IMPORTANT TO NOTE THAT THE WITNESSES IN

03:20PM  21   THIS CASE, FROM FORMER EMPLOYEES TO OUTSIDERS WHO DEALT WITH

03:20PM  22   THERANOS, CONSISTENTLY TESTIFIED THAT THEY UNDERSTOOD

03:21PM  23   MS. HOLMES WAS IN CHARGE OF THE COMPANY AND EVEN HAD AUTHORITY

03:21PM  24   OVER MR. BALWANI.

03:21PM  25        MS. HOLMES ADMITTED THAT IN HER TESTIMONY, THAT THERE WERE

03:21PM   1    ASPECTS OF THE BUSINESS RELATIONSHIP WHERE MR. BALWANI DEFERRED

03:21PM   2    TO HER, AND SPECIFICALLY SHE CONFIRMED THAT MR. BALWANI

03:21PM   3    DEFERRED TO HER ON ASPECTS OF INVENTIONS AND DEVICES AT

03:21PM   4    THERANOS.

03:21PM   5         REMEMBER ESPECIALLY THAT THERE'S NO EVIDENCE IN THIS CASE

03:21PM   6    THAT MR. BALWANI EVER EXPRESSLY ORDERED MS. HOLMES TO BE

03:21PM   7    DISHONEST.

03:21PM   8         IN FACT, THERE ARE EXAMPLES CITED DURING THE GOVERNMENT'S

03:21PM   9    CLOSING OF INSTANCES WHERE MR. BALWANI EITHER CAUTIONED

03:21PM   10   MS. HOLMES AWAY FROM BEING DISHONEST ABOUT SOMETHING, OR

03:21PM   11   EXPRESSED CONCERN ABOUT AN UNTRUE STATEMENT THAT SHE HAD MADE.

03:21PM   12        NOW, NO ONE IS SAYING THAT MR. BALWANI WAS A GOOD

03:21PM   13   INFLUENCE IN THIS CASE.  HE'S THE COCONSPIRATOR.  HE WAS PART

03:22PM   14   OF THE SCHEME TO DEFRAUD.

03:22PM   15        BUT THE EVIDENCE SHOWED THAT MS. HOLMES DID NOT NEED

03:22PM   16   ENCOURAGEMENT FROM MR. BALWANI IN ORDER TO BE DISHONEST AND

03:22PM   17   DECEPTIVE.

03:22PM   18        THE EVIDENCE ALSO SHOWED THAT MR. BALWANI COMMUNICATED

03:22PM   19   COMPLAINTS TO MS. HOLMES ABOUT THERANOS PRACTICES AND

03:22PM   20   TECHNOLOGY.  FOR EXAMPLE, MR. BALWANI WAS EVEN CRITICAL OF

03:22PM   21   DAN YOUNG TO MS. HOLMES IN AUGUST 2014.  IN RESPONSE TO AN

03:22PM   22   EMAIL FROM DR. YOUNG ABOUT TRYING TO ADDRESS ANOTHER ONGOING

03:22PM   23   PROBLEM WITH THERANOS'S ACCURACY AND RELIABILITY, MR. BALWANI

03:22PM   24   REMARKS, "ALWAYS ANOTHER STUDY AFTER THE FACT."

03:22PM   25        THIS IS A COMMENT BY MR. BALWANI EXPRESSING SKEPTICISM AND

03:22PM  1    WEARINESS OF THE FACT THAT THEY KEEP HAVING THESE PROBLEMS AND

03:22PM  2    DR. YOUNG ALWAYS PROPOSES ANOTHER STUDY THAT PURPORTS TO ANSWER

03:23PM  3    IT.

03:23PM  4         THIS WAS A PATTERN THAT MS. HOLMES OBVIOUSLY SAW.  IT'S

03:23PM  5    SOMETHING THAT SHE SHOULD HAVE REALIZED MEANT THAT THERE WAS A

03:23PM  6    FUNDAMENTAL FLAW WITH THE TECHNOLOGY OF THE COMPANY.

03:23PM  7         CONSIDER ALSO THE REASON WHY MS. HOLMES AND MR. BALWANI

03:23PM  8    ULTIMATELY SEPARATED TIES.  THE REASON WAS BUSINESS RELATED.

03:23PM  9         WHEN MS. HOLMES REALIZED THAT MR. BALWANI WAS NOT THE

03:23PM  10   BUSINESS PERSON SHE THOUGHT, SHE ENDED THE RELATIONSHIP AND

03:23PM  11   THEY PARTED WAYS.

03:23PM  12        THE FACT THAT THAT RELATED TO SOMEBODY'S SKILLS AS A

03:23PM  13   BUSINESS PERSON AND THE EFFECT HE HAD ON THE COMPANY AGAIN JUST

03:23PM  14   SHOWS THAT MS. HOLMES WAS PRIORITIZING THERANOS.  THAT WAS THE

03:23PM  15   MOTIVE HERE FOR EVERYTHING SHE DID, INCLUDING THE FRAUD.

03:23PM  16        WHEN IT COMES TO MR. BALWANI'S ROLE AND THE THINGS THAT HE

03:24PM  17   DID, KEEP IN MIND THE FOLLOWING JURY INSTRUCTIONS:  NUMBERS 19,

03:24PM  18   24, AND 25.  THESE ALL RELATE TO WAYS THAT MS. HOLMES IS

03:24PM  19   ACCOUNTABLE UNDER CERTAIN CONDITIONS FOR ACTIONS TAKEN BY A

03:24PM  20   COCONSPIRATOR OR A PERSON WHO COMMIT THE CRIME AS A PRINCIPAL

03:24PM  21   OR A COSCHEMER.

03:24PM  22        SO AT THE END OF THE DAY, WHAT EFFECT SHOULD MS. HOLMES'S

03:24PM  23   TESTIMONY ABOUT THE RELATIONSHIP HAVE ON YOU?

03:24PM  24        WELL, AS I MENTIONED BEFORE, IT'S NATURAL IF, UPON HEARING

03:24PM  25   SOMETHING LIKE THAT, YOU FEEL SYMPATHY FOR MS. HOLMES.  IF YOU

03:25PM  1    BELIEVE THAT THAT'S WHAT HAPPENED, IT'S NATURAL AND MAYBE

03:25PM  2    UNAVOIDABLE FOR YOU TO FEEL THAT WAY.

03:25PM  3         THE MORE IMPORTANT QUESTION, THOUGH, IS WHAT DO YOU DO

03:25PM  4    WITH THAT SYMPATHY?  HOW SHOULD IT AFFECT YOUR DELIBERATIONS

03:25PM  5    AND YOUR EXAMINATION OF THIS CASE?

03:25PM  6         THE COURT'S INSTRUCTIONS HAVE AN ANSWER FOR YOU THERE.

03:25PM  7    JURY INSTRUCTION NUMBER 1 TELLS YOU THAT YOU SHOULD "NOT ALLOW

03:25PM  8    YOURSELF TO BE INFLUENCED BY PERSONAL LIKES OR DISLIKES,

03:25PM  9    SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION, OR BIASES, INCLUDING

03:25PM 10    UNCONSCIOUS BIASES."

03:25PM 11         SYMPATHY, ACCORDING TO THIS INSTRUCTION, HAS NO PART IN

03:25PM 12    YOUR DELIBERATIONS.

03:25PM 13         THE QUESTION FOR YOU IS A FACTUAL ONE OF WHETHER

03:25PM 14    MS. HOLMES COMMITTED THE CHARGED CRIMES, WHETHER THE ELEMENTS

03:25PM 15    ARE SATISFIED.  YOU SHOULD PUT ANYTHING BESIDES THAT ASIDE.

03:25PM 16         LET'S TALK ABOUT ONE MORE DEFENSE THEME, WHICH IS CONDUCT

03:25PM 17    THAT MS. HOLMES TOOK IN 2016 AND ONWARD.

03:26PM 18         THE DEFENSE WANTS TO POINT TO THIS CONDUCT AS EVIDENCE OF

03:26PM 19    MS. HOLMES'S MENTAL STATE DURING THE RELEVANT TIME PERIOD, WHEN

03:26PM 20    THE FRAUD WAS TAKING PLACE.  YOU SHOULD BE SKEPTICAL OF THAT.

03:26PM 21         THIS IS A TIME PERIOD AFTER "THE WALL STREET JOURNAL"

03:26PM 22    EXPOSED FALSE INFORMATION THAT THE COMPANY HAD PUT FORWARD.

03:26PM 23         EVERYTHING THAT MS. HOLMES AND THERANOS DID DURING THIS

03:26PM 24    TIME PERIOD WAS PR, ORCHESTRATED BY A MULTI-BILLION DOLLAR

03:26PM 25    COMPANY, IN CRISIS MODE.

03:26PM  1      THE COMPANY KNEW THAT EVERYONE WAS WATCHING AND THE

03:26PM  2  COMPANY WAS TAKING EFFORTS MOTIVATED BY THAT FACT WITH THE

03:26PM  3  AWARENESS THAT THE WORLD WAS WATCHING AND IT HAD TO TRY TO

03:26PM  4  REHABILITATE ITS REPUTATION AND GET ITSELF BACK ON TRACK.

03:26PM  5      OPTIONS WERE CERTAINLY NARROWED IN THAT 2016 TIME PERIOD.

03:26PM  6      BUT IF YOUR GOAL IS, AS IT SHOULD BE, TO JUDGE

03:26PM  7  MS. HOLMES'S INTENT, THE MOST INFORMATIVE EVIDENCE COMES FROM

03:26PM  8  THE RELEVANT TIME PERIOD BEFORE ALL OF THIS SCRUTINY WAS PLACED

03:27PM  9  ON THE COMPANY.  IT'S AXIOMATIC.  IT'S MOST TELLING WHAT A

03:27PM  10  PERSON DOES WHEN NOBODY IS WATCHING.

03:27PM  11      AFTER "THE WALL STREET JOURNAL" ARTICLE, ALL EYES WERE ON

03:27PM  12  THERANOS AND ACTIONS WERE TAKEN FOR APPEARANCES SAKE.

03:27PM  13      JUDGE MS. HOLMES'S INTENT INSTEAD BY WHAT SHE DID BEFORE

03:27PM  14  SHE KNEW THAT THAT SCRUTINY WAS COMING.

03:27PM  15      IN THIS CASE THE EVIDENCE IS STRONG THAT THE DECEPTION BY

03:27PM  16  MS. HOLMES WAS DELIBERATE.

03:27PM  17      IT'S HARD TO BELIEVE THAT THE FALSE STATEMENTS SHE MADE

03:27PM  18  WERE UNINTENTIONAL OR MISTAKEN WHEN IT HAPPENED AGAIN AND AGAIN

03:27PM  19  OVER YEARS AND WHEN THE RESULT WAS PUTTING HUNDREDS OF MILLIONS

03:27PM  20  OF DOLLARS IN THE ACCOUNT OF HER COMPANY.

03:27PM  21      YOU SAW AND HEARD THROUGHOUT TRIAL, LISTENING TO WITNESSES

03:27PM  22  WHO HAD DEALINGS WITH HER, AND WHEN SHE WAS ON THE STAND THAT

03:27PM  23  SHE IS AN INTELLIGENT, THOUGHTFUL, AND WELL SPOKEN PERSON.

03:28PM  24      AND INTELLIGENT PEOPLE UNDERSTAND THE DIFFERENCE BETWEEN

03:28PM  25  WHAT IS TRUE AND WHAT IS NOT, BETWEEN WHAT IS HAPPENING TODAY

03:28PM  1    AND WHAT MIGHT HAPPEN IN THE FUTURE.  THOUGHTFUL PEOPLE LIKE

03:28PM  2    MS. HOLMES THINK CAREFULLY BEFORE THEY SAY SOMETHING, AND WELL

03:28PM  3    SPOKEN PEOPLE LIKE MS. HOLMES HAVE NO TROUBLE COMMUNICATING

03:28PM  4    EXACTLY WHAT THEY MEAN TO COMMUNICATE.

03:28PM  5        BASED ON THAT, YOU KNOW THAT WHEN MS. HOLMES AGAIN AND

03:28PM  6    AGAIN INTENTIONALLY TOLD PEOPLE THAT THERANOS COULD DO

03:28PM  7    SOMETHING THAT IT COULD NOT, THAT THAT WAS ON PURPOSE, AND THAT

03:28PM  8    HER INTENT WAS TO DECEIVE AND TO CHEAT.

03:28PM  9        YOU SAW TWO VARIETIES OF FALSE STATEMENTS IN THIS CASE.

03:28PM  10   SOME WERE SIMPLE LIES.  THE FACT THAT, OR THE CLAIM THAT THE

03:28PM  11   THERANOS ANALYZER HAD BEEN USED IN THE BATTLEFIELD OR SENT TO

03:28PM  12   AFGHANISTAN, THOSE THINGS SIMPLY WERE NOT TRUE.

03:28PM  13       THERE WERE ALMOST MORE COMPLICATED HALF-TRUTHS THAT YOU

03:29PM  14   SAW, AND WE'LL TALK ABOUT THOSE IN A MOMENT, BUT THOSE ARE

03:29PM  15   PROPERLY PART OF YOUR EXAMINATION AS WELL.

03:29PM  16       LET'S TALK BRIEFLY ABOUT THE WIRE FRAUD ELEMENTS.

03:29PM  17       AND NOTICE THE LANGUAGE AT THE BOTTOM OF THAT FIRST

03:29PM  18   PARAGRAPH THAT SAYS "DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

03:29PM  19   CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS."

03:29PM  20       THAT MEANS THAT WHEN MS. HOLMES SAYS SOMETHING THAT IS

03:29PM  21   ARGUABLY DEFENSIBLE AS TRUE, BUT STILL INTENDED TO GIVE A

03:29PM  22   MISLEADING OR FALSE IMPRESSION, THAT CAN STILL FORM THE BASIS

03:29PM  23   OF A WIRE FRAUD CONVICTION, AND YOU SAW MANY EXAMPLES OF THAT

03:29PM  24   IN THIS CASE.

03:29PM  25       NOTE ALSO THAT THE WIRE ITSELF, THE WIRE TRANSMITTAL NEED

03:29PM  1    NOT BE FALSE OR MISLEADING.  SO THE CONTENT OF THE WIRE NEED

03:29PM  2    NOT BE FALSE, IT ONLY NEEDS TO BE IN FURTHERANCE OF THE SCHEME

03:30PM  3    IN ORDER TO SATISFY THE ELEMENT.

03:30PM  4        SOME OF THE BEST EXAMPLES OF HALF-TRUTHS IN THIS CASE AND

03:30PM  5    INTENTIONALLY MISLEADING STATEMENTS WERE IN THE RECORDINGS THAT

03:30PM  6    ROGER PARLOFF MADE.  AND I'LL JUST REMIND YOU OF A COUPLE.

03:30PM  7        SPEAKING TO MR. PARLOFF ABOUT THE RANGE OF TESTS OFFERED

03:30PM  8    BY THERANOS, YOU'LL RECALL THAT IN ONE OF THE RECORDINGS

03:30PM  9    MR. PARLOFF TALKED ABOUT SEEING 600 TESTS AVAILABLE AT QUEST

03:30PM 10    AND HE ASKED MS. HOLMES WHETHER HER PLATFORM REPLACED ALL OF

03:30PM 11    THOSE, AND SHE SAID, "OUR PLATFORM CAN YIELD -- LET ME THINK OF

03:30PM 12    THE BEST WAY TO SAY THIS.  WE CAN DO ALL OF THOSE TESTS."

03:30PM 13        SHE LATER SAID, "THE REASON I DIDN'T SAY REPLACE IS JUST

03:30PM 14    BECAUSE OF THIS THEME OF -- WELL, YOU KNOW, WE ARE PROCESSING

03:30PM 15    THE SAMPLES A DIFFERENT WAY."

03:30PM 16        SHE'S SAYING THAT THERANOS HAS THE SAME CAPABILITIES AS

03:31PM 17    QUEST BUT THAT THEY'RE PROCESSING THE SAMPLES A DIFFERENT WAY.

03:31PM 18        THAT WAS NOT TRUE.

03:31PM 19        THE COMPANY'S OWN TECHNOLOGY COULD DO FAR LESS, FAR FEWER

03:31PM 20    THAN THE NUMBER OF TESTS THAT QUEST OFFERED, AND TO THE EXTENT

03:31PM 21    THAT IT COULD MATCH THAT QUEST RANGE OF TESTS, IT WAS USING THE

03:31PM 22    SAME METHODS, PROCESSING THE SAMPLES THE SAME WAY.

03:31PM 23        SHE MADE SIMILAR CLAIMS TO MR. PARLOFF SAYING THAT THE

03:31PM 24    COMPANY HAD THE ABILITY TO DO TESTS THAT ARE NOT ON THE

03:31PM 25    WEBSITE, EVEN BEYOND THE HUNDREDS OF TESTS THAT THE COMPANY

03:31PM   1    LISTED ON ITS WEBSITE, SHE CLAIMED THAT THERANOS COULD DO EVEN

03:31PM   2    MORE.

03:31PM   3         ONE OF THE BEST EXAMPLES OF FALSE STATEMENTS BY MS. HOLMES

03:31PM   4    WAS RELATED TO THE NEED FOR VENIPUNCTURE WHEN SHE WAS SPEAKING

03:31PM   5    TO MR. PARLOFF.  THIS IS IN EXHIBIT 5473B2, AND 5474AB2.

03:32PM   6         IN THAT RECORDING YOU HEARD MR. PARLOFF ASK WHY THERANOS

03:32PM   7    EVER DID VENIPUNCTURE?

03:32PM   8         AND MS. HOLMES REPEATEDLY ANSWERS SAMPLE VOLUME AND THE

03:32PM   9    NUMBER OF SAMPLES THAT THE COMPANY COULD PROCESS AT A GIVEN

03:32PM  10    TIME.

03:32PM  11         AT NO POINT DURING THAT CONVERSATION DID SHE TELL

03:32PM  12    MR. PARLOFF THAT THE REASON VENIPUNCTURE WAS NECESSARY WAS THAT

03:32PM  13    THE COMPANY'S OWN TECHNOLOGY COULD NOT DO THE RANGE OF TESTS

03:32PM  14    THAT SHE WAS OFFERING.

03:32PM  15         ONE EXAMPLE THAT YOU SAW DURING TRIAL RELATES TO THAT SAME

03:32PM  16    INTENT BY MS. HOLMES TO CONCEAL THE NEED FOR VENOUS DRAWS FROM

03:32PM  17    VIP'S.  AND THIS WAS IN OCTOBER OF 2014.  MS. HOLMES WAS SHOWN

03:32PM  18    THIS WHEN SHE WAS ON THE STAND.

03:32PM  19         THIS IS A SITUATION WHERE POTENTIAL INVESTORS WERE COMING

03:32PM  20    TO WALGREENS AND THERE WAS A CONVERSATION AT THERANOS,

03:33PM  21    INCLUDING MS. HOLMES, WHERE CHRISTIAN WRITES, "ASSUMPTIONS HERE

03:33PM  22    FROM EAH," MS. HOLMES, "ARE THAT WE MUST NOT DO VENOUS DRAW,

03:33PM  23    AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS IF IT

03:33PM  24    DOES."

03:33PM  25         THERE'S MORE DISCUSSION ABOUT THE PLAN TO MAKE SURE THAT

03:33PM  1    HAPPENS AND THAT THE NEED FOR VENOUS DRAW IS NOT DISCLOSED TO

03:33PM  2    THESE VIP'S.

03:33PM  3        AND NOTICE AT THE BOTTOM OF THE PAGE.  IT SAYS, "IF THEY

03:33PM  4    NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK THE WAG TECH

03:33PM  5    ABOUT IT."

03:33PM  6        AND IT SAYS, "CIARA WILL ALSO BE ABLE TO COME OUT OF THE

03:33PM  7    DRAW ROOM ONCE CHECK-IN IS COMPLETE AND WELCOME THEM INTO THE

03:33PM  8    ROOM AND DISTRACT FROM LOOKING AT THE RECEIPT."

03:33PM  9        THE EVIDENCE OF DECEPTION IN THIS EMAIL COULD NOT BE

03:33PM  10   CLEARER.  THIS IS OBVIOUSLY AN ATTEMPT BY MS. HOLMES AND OTHERS

03:33PM  11   AT THERANOS TO MAKE SURE THAT VIP'S DON'T FIND OUT ABOUT THE

03:33PM  12   COMPANY'S NEED TO DO VENOUS DRAWS.  THEY WANT THESE VIP'S TO

03:34PM  13   BELIEVE THAT THERANOS'S FINGERSTICK TECHNOLOGY CAN DO THE

03:34PM  14   ENTIRE RANGE OF TESTS, AND FOR THAT REASON THEY'RE READY TO

03:34PM  15   LAUNCH THIS ELABORATE SCHEME THAT INCLUDES A STAFF MEMBER

03:34PM  16   COMING OUT TO DISTRACT THEM FROM LOOKING AT THE RECORD THAT

03:34PM  17   WOULD REVEAL THE SECRET THAT THERANOS IS TRYING TO KEEP.

03:34PM  18        SHORTLY AFTER BEING SHOWN THIS DOCUMENT, MS. HOLMES WAS

03:34PM  19   ASKED BY HER LAWYER WHETHER SHE EVER TRIED TO CONCEAL VENOUS

03:34PM  20   DRAWS FROM VIP'S AND SHE ANSWERED IN THE NEGATIVE.

03:34PM  21        YOU SHOULD THINK STRONGLY ABOUT WHAT THAT ANSWER SAYS

03:34PM  22   ABOUT HER CREDIBILITY AND JUDGE HER STATEMENTS ON THAT BASIS.

03:34PM  23        WHY DID THIS FRAUD WORK?  HOW DID IT WORK?

03:34PM  24        A BIG PART OF IT WAS BORROWED CREDIBILITY.  YOU SAW THAT.

03:35PM  25        MS. HOLMES BORROWED THE CREDIBILITY OF PHARMACEUTICAL

03:35PM 1     COMPANIES, OF WALGREENS, OF THE BOARD AND THE ILLUSTRIOUS

03:35PM 2     MEMBERS OF THE BOARD, OF THE PRESS, AND NOTABLE PUBLICATIONS

03:35PM 3     LIKE "THE WALL STREET JOURNAL" AND "FORTUNE," AND THE MILITARY.

03:35PM 4          BY ATTACHING HERSELF TO THESE INDIVIDUALS AND

03:35PM 5     ORGANIZATIONS, SHE BOLSTERED THERANOS'S OWN CREDIBILITY, AND BY

03:35PM 6     EXAGGERATING THOSE CONTEXTS, SHE CAUSED OTHERS TO BELIEVE THAT

03:35PM 7     THERANOS MUST HAVE THE LEGITIMACY OF THESE OTHER ENTITIES.

03:35PM 8          JUST BRIEFLY TO RESPOND TO WHAT MR. DOWNEY SAID ABOUT SOME

03:35PM 9     OF THE CHARGED COUNTS IN THIS CASE.

03:35PM 10         MR. DOWNEY NOTED THAT COUNT TEN REGARDING ERIN TOMPKINS

03:35PM 11    INVOLVED A TEST THAT WAS NOT PERFORMED ON THERANOS TECHNOLOGY.

03:35PM 12    THIS WAS THE HIV TEST.

03:36PM 13         FIRST OF ALL, NOTE THAT THIS TEST, AS A REMINDER, DOES

03:36PM 14    STATE A REACTIVE RESULT FOR THE HIV ANTIBODY.

03:36PM 15         IN CONTRAST, YOU SAW THAT MS. TOMPKINS LATER HAD A TEST

03:36PM 16    THAT CAME BACK NEGATIVE FOR THE HIV ANTIBODY.

03:36PM 17         THERE'S NO WAY THAT THESE TWO RESULTS CAN BOTH BE CORRECT.

03:36PM 18         AND YOU HEARD MS. TOMPKINS TESTIFY THAT SHE'S NEVER BEEN

03:36PM 19    DIAGNOSED WITH HIV.  SHE'S NEVER BEEN TREATED FOR IT.  SO

03:36PM 20    THERE'S NO REASON THAT THE ANTIBODIES SHOULD BE PRESENT IN HER

03:36PM 21    SYSTEM.

03:36PM 22         THE THERANOS RESULT IS NOT ACCURATE.

03:36PM 23         I'LL REMIND YOU OF EXHIBIT 13333 WHICH RELATES

03:36PM 24    SPECIFICALLY TO PROBLEMS THAT THERANOS HAD WITH THE SECTION OF

03:36PM 25    THE LAB THAT WAS INVOLVED IN RUNNING THE HIV TEST.  SO THIS

03:36PM   1    SHOULD REDUCE YOUR SURPRISE THAT MS. TOMPKINS RECEIVED AN

03:36PM   2    INACCURATE RESULT.

03:36PM   3        I'LL ALSO REMIND YOU THAT THIS SET OF TESTS FROM

03:37PM   4    MS. TOMPKINS ALSO INCLUDED TESTS OTHER THAN HIV, INCLUDING

03:37PM   5    GLUCOSE AS PART OF THE COMPREHENSIVE METABOLIC PANEL, AND THAT

03:37PM   6    PANEL, MS. CHEUNG TESTIFIED, WAS RUN ON THERANOS TECHNOLOGY.

03:37PM   7        SO ANY WIRE THAT THERANOS ENGAGED IN THAT RELATED TO A

03:37PM   8    TEST RUN ON THERANOS TECHNOLOGY WAS IN FURTHERANCE OF THE

03:37PM   9    GENERAL SCHEME TO DEFRAUD PATIENTS BASED ON MS. HOLMES'S

03:37PM  10    KNOWLEDGE THAT THERANOS TECHNOLOGY WAS NOT SUFFICIENTLY

03:37PM  11    ACCURATE AND RELIABLE FOR PATIENT TESTING.

03:37PM  12        SO THERE'S NO REASON WHY THIS IS NOT A VIABLE WIRE FRAUD

03:37PM  13    COUNT ON WHICH YOU SHOULD RETURN A VERDICT OF GUILTY.

03:37PM  14        THIS IS THE LAST INSTRUCTION THAT I'LL HIGHLIGHT WITH YOU.

03:37PM  15    THIS IS THE STANDARD FOR REASONABLE DOUBT.

03:37PM  16        THE DEFENSE SHOWED YOU A DIAGRAM OF AN ASCENDING

03:37PM  17    STAIRCASE.  I'LL JUST REMIND YOU THAT IT'S THE COURT'S JOB TO

03:38PM  18    INSTRUCT YOU ON THE LAW.  THIS IS WHAT I EXPECT THE COURT WILL

03:38PM  19    GIVE YOU BY WAY OF INSTRUCTION.

03:38PM  20        IT TELLS YOU THAT "REASONABLE DOUBT IS PROOF THAT LEAVES

03:38PM  21    YOU FIRMLY CONVINCED THAT MS. HOLMES IS GUILTY."  NOTE THAT "IT

03:38PM  22    IS NOT REQUIRED THAT THE GOVERNMENT PROVE GUILT BEYOND ALL

03:38PM  23    POSSIBLE DOUBT."

03:38PM  24        IT ALSO SAYS THAT "A REASONABLE DOUBT IS A DOUBT BASED ON

03:38PM  25    REASON AND COMMON SENSE AND IS NOT BASED PURELY ON

03:38PM 1    SPECULATION."

03:38PM 2        ACCORDING TO THAT STANDARD, YOU SHOULD FIND THAT

03:38PM 3    MS. HOLMES COMMITTED THE CHARGED OFFENSES AND RETURN A VERDICT

03:38PM 4    OF GUILTY IN THIS CASE.

03:38PM 5        OVER THE YEARS OF THERANOS'S OPERATIONS, MS. HOLMES HAD

03:38PM 6    MULTIPLE CHANCES TO DO THE RIGHT THING.  BUT AT SO MANY OF THE

03:38PM 7    FORKS IN THE ROAD, SHE CHOSE THE DISHONEST PATH.

03:38PM 8        HOW WOULD THINGS HAVE BEEN DIFFERENT IF MS. HOLMES HAD NOT

03:38PM 9    HAD THE INTENT TO DECEIVE?

03:38PM 10       WELL, SHE WOULD HAVE TOLD INVESTORS, WALGREENS

03:38PM 11   REPRESENTATIVES, AND OTHER VIP VISITORS TO THERANOS THAT THE

03:38PM 12   DEVICES SHE WAS SHOWING THEM IN CONFERENCE ROOMS WEREN'T

03:39PM 13   ACTUALLY THE DEVICES THAT WERE GOING TO BE USED TO RUN THEIR

03:39PM 14   TESTS, THAT THEIR TESTS WOULD BE RUN ON THIRD PARTY DEVICES

03:39PM 15   FROM OTHER COMPANIES.

03:39PM 16       IN INTERVIEWS WITH JOURNALISTS, IN REVIEWING ARTICLES, AND

03:39PM 17   IN SENDING ARTICLES TO THIRD PARTIES LIKE INVESTORS, SHE WOULD

03:39PM 18   HAVE AVOIDED PASSING ALONG KNOWINGLY FALSE INFORMATION.

03:39PM 19       SHE WOULD HAVE GIVEN GOOD FAITH REALISTIC REVENUE

03:39PM 20   PROJECTIONS.

03:39PM 21       SHE WOULD HAVE LISTENED TO LAB DIRECTORS AND OTHER

03:39PM 22   EMPLOYEES ABOUT PROBLEMS WITH THERANOS TECHNOLOGY AND RESPONDED

03:39PM 23   ACCORDINGLY AND STOPPED MAKING REPRESENTATIONS ABOUT THERANOS

03:39PM 24   HAVING SUPERIOR ACCURACY OR THE HIGHEST LEVELS OF QUALITY.

03:39PM 25       SHE WOULD HAVE RESPONDED TO THE DEPARTURE OF

03:39PM 1    ADAM ROSENDORFF BY APPOINTING A COMPETENT AND ATTENTIVE LAB

03:39PM 2    DIRECTOR TO MAKE SURE THAT THOSE PROBLEMS IN THE LAB WERE

03:39PM 3    ADDRESSED.

03:39PM 4        SHE WOULD HAVE REACTED TO PATIENT AND DOCTOR INQUIRIES

03:39PM 5    ABOUT INACTION OR MISSING TEST RESULTS BY NOT WITHHOLDING

03:40PM 6    INFORMATION OR GIVING THEM SCRIPTED ANSWERS THAT AIMED ONLY TO

03:40PM 7    BOLSTER THE COMPANY'S REPUTATION, BUT BY BEING HONEST AND BY

03:40PM 8    DISCONTINUING TESTS WHEN THAT NEEDED TO HAPPEN, AND MUCH SOONER

03:40PM 9    THAT IT DID HAPPEN.

03:40PM 10       THE LIST GOES ON AND ON.

03:40PM 11       ON EACH OF THESE ISSUES MS. HOLMES HAD A CHOICE AND SHE

03:40PM 12   CONSISTENTLY PUT THE REPUTATION OF THE COMPANY OVER WHAT THE

03:40PM 13   LAW REQUIRES AND WHAT PATIENTS AND INVESTORS WERE ENTITLED TO.

03:40PM 14       YOU'VE HEARD HER SAY THAT SHE WISHES SHE HANDLED CERTAIN

03:40PM 15   ISSUES DIFFERENTLY DURING HER TIME AT THE COMPANY.

03:40PM 16       HOW SHOULD THAT AFFECT YOUR THINKING?

03:40PM 17       WELL, YOU SHOULD REALIZE THAT SOMEONE IN MS. HOLMES'S

03:40PM 18   POSITION NATURALLY MIGHT FEEL SOME REGRET ABOUT CHOICES THAT

03:40PM 19   SHE MADE.  IT WOULD BE STRANGE IF SHE DIDN'T GIVEN WHAT HAS

03:40PM 20   RESULTED FROM THOSE CHOICES.

03:40PM 21       BUT YOU SHOULD KEEP IN MIND THAT REGARDLESS OF HOW SHE

03:40PM 22   FEELS TODAY ABOUT HER PAST CHOICES, IT'S THOSE CHOICES

03:41PM 23   THEMSELVES THAT YOU NEED TO FOCUS ON IN DETERMINING WHETHER SHE

03:41PM 24   COMMITTED A CRIME BACK THEN.

03:41PM 25       BECAUSE MS. HOLMES MADE THE CHOICE TO DEFRAUD INVESTORS

03:41PM  1    AND PATIENTS, AND BECAUSE SHE CONSPIRED WITH SUNNY BALWANI TO

03:41PM  2    CARRY OUT THOSE SCHEMES, YOU SHOULD RETURN A VERDICT OF GUILTY

03:41PM  3    ON ALL COUNTS.  THAT'S THE ONLY VERDICT SUPPORTED BY THE

03:41PM  4    EVIDENCE IN THIS CASE.

03:41PM  5        THANK YOU.

03:41PM  6            THE COURT:  THANK YOU, MR. BOSTIC.

03:41PM  7        LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE

03:41PM  8    CASE.  THE ONLY THING REMAINING FOR YOU IS FOR THE COURT TO

03:41PM  9    INSTRUCT YOU, AND IT'S MY INTENT TO DO THAT NOW.

03:41PM  10       WE CAN TAKE A STANDING BREAK.

03:41PM  11       LET ME TELL YOU THAT I EXPECT AND ANTICIPATE THE

03:41PM  12   INSTRUCTIONS WILL REQUIRE PERHAPS 40, 45 MINUTES MAYBE TO

03:41PM  13   COMPLETE.

03:41PM  14       IF ANYONE ON THE JURY WOULD LIKE TO TAKE A BRIEF BREAK OF

03:41PM  15   FIVE TO SEVEN MINUTES, I'M HAPPY TO DO THAT.  IS THERE ANYONE

03:42PM  16   WHO WOULD LIKE TO DO THAT BEFORE I BEGIN?

03:42PM  17       LET'S DO THAT.  I SEE A HAND.  LET'S DO THAT.

03:42PM  18       WE'LL TAKE A BREAK OF ABOUT FIVE, SEVEN MINUTES, AND WE'LL

03:42PM  19   COME BACK.

03:42PM  20       CHELA, CAN YOU GET THIS, PLEASE?

03:42PM  21       AND WE'LL COME BACK AND I'LL INSTRUCT THE JURY.

03:45PM  22       (RECESS FROM 3:42 P.M. UNTIL 3:53 P.M.)

03:53PM  23           THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

03:53PM  24   SEATED.

03:53PM  25       WE ARE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

03:53PM 1    ARE PRESENT ONCE AGAIN.  OUR JURY IS PRESENT.

03:53PM 2         LADIES AND GENTLEMEN, I'LL NOW READ THE FINAL

03:53PM 3    INSTRUCTIONS.

03:54PM 4         MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

03:54PM 5    EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

03:54PM 6    TO THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

03:54PM 7    IN THE JURY ROOM FOR YOU TO CONSULT.

03:54PM 8         IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

03:54PM 9    EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS, TO DECIDE

03:54PM 10   THE FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT

03:54PM 11   TO YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE

03:54PM 12   LAW OR NOT.

03:54PM 13        YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE AND THE

03:54PM 14   LAW.  DO NOT ALLOW PERSONAL LIKES OR DISLIKES, SYMPATHY,

03:54PM 15   PREJUDICE, FEAR, OR PUBLIC OPINION TO INFLUENCE YOU.

03:54PM 16        YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE,

03:54PM 17   COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL

03:55PM 18   ORIENTATION, GENDER IDENTITY, GENDER, PROFESSION, CELEBRITY,

03:55PM 19   ECONOMIC CIRCUMSTANCES, OR POSITION IN LIFE OR IN THE

03:55PM 20   COMMUNITY.

03:55PM 21        ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

03:55PM 22   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

03:55PM 23   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

03:55PM 24   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

03:55PM 25   CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

03:55PM 1    AWARENESS, CONTROL, OR INTENTION.  YOU WILL RECALL THAT YOU

03:55PM 2    TOOK AN OATH PROMISING TO DO SO AT THE BEGINNING OF THE CASE.

03:55PM 3        YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

03:55PM 4    OUT SOME AND IGNORE OTHERS; THEY ARE ALL IMPORTANT.  PLEASE DO

03:55PM 5    NOT READ INTO THESE INSTRUCTIONS OR INTO ANYTHING I MAY HAVE

03:56PM 6    DONE, SAID, OR ANY SUGGESTION AS TO WHAT VERDICT YOU SHOULD

03:56PM 7    RETURN -- THAT IS A MATTER ENTIRELY UP TO YOU.

03:56PM 8        THE INDICTMENT IS NOT EVIDENCE.  MS. HOLMES, THE

03:56PM 9    DEFENDANT, HAS PLEADED NOT GUILTY TO THE CHARGES.  MS. HOLMES

03:56PM 10   IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT

03:56PM 11   PROVES HER GUILTY BEYOND A REASONABLE DOUBT.

03:56PM 12       IN ADDITION, MS. HOLMES DOES NOT HAVE TO TESTIFY OR

03:56PM 13   PRESENT ANY EVIDENCE.  MS. HOLMES DOES NOT HAVE TO PROVE

03:56PM 14   INNOCENCE; THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

03:56PM 15   ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

03:56PM 16       FOR REASONS THAT DO NOT CONCERN YOU, THE CASE AGAINST

03:56PM 17   MS. HOLMES'S CODEFENDANT, MR. RAMESH "SUNNY" BALWANI, IS NOT

03:57PM 18   BEFORE YOU.  DO NOT SPECULATE WHY.  THIS FACT SHOULD NOT

03:57PM 19   INFLUENCE YOUR VERDICT WITH REFERENCE TO MS. HOLMES, AND YOU

03:57PM 20   MUST BASE YOUR VERDICT SOLELY ON THE EVIDENCE AGAINST

03:57PM 21   MS. HOLMES.

03:57PM 22       MS. HOLMES HAS TESTIFIED.  YOU SHOULD TREAT THIS TESTIMONY

03:57PM 23   JUST AS YOU WOULD THE TESTIMONY OF ANY OTHER WITNESS.

03:57PM 24       PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

03:57PM 25   FIRMLY CONVINCED MS. HOLMES IS GUILTY.  IT IS NOT REQUIRED THAT

03:57PM 1    THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

03:57PM 2         A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

03:57PM 3    SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT MAY ARISE

03:57PM 4    FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE

03:57PM 5    EVIDENCE, OR FROM LACK OF EVIDENCE.

03:57PM 6         IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

03:58PM 7    THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

03:58PM 8    THAT MS. HOLMES IS GUILTY, IT IS YOUR DUTY TO FIND MS. HOLMES

03:58PM 9    NOT GUILTY.

03:58PM 10        ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

03:58PM 11   CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE CONVINCED BEYOND

03:58PM 12   A REASONABLE DOUBT THAT MS. HOLMES IS GUILTY, IT IS YOUR DUTY

03:58PM 13   TO FIND MS. HOLMES GUILTY.

03:58PM 14        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

03:58PM 15   FACTS ARE CONSIST OF:

03:58PM 16        THE SWORN TESTIMONY OF ANY WITNESS; AND,

03:58PM 17        THE EXHIBITS THAT ARE RECEIVED IN EVIDENCE.

03:58PM 18        IN REACHING YOUR VERDICT YOU MAY CONSIDER ONLY THE

03:58PM 19   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

03:58PM 20   THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN

03:59PM 21   DECIDING WHAT THE FACTS ARE:

03:59PM 22        1.  QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY

03:59PM 23   THE LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESS.

03:59PM 24   ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

03:59PM 25   THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

EVIDENCE.

SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.

IF THE FACT AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS STATE THEM, YOUR MEMORY OF THEM CONTROLS.

2. ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE. IN ADDITION, SOME EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I HAVE INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY, YOU MUST DO SO.

3. ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS NOT IN SESSION IS NOT EVIDENCE. YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT THE TRIAL.

EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL. DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER FACT.

YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE. EITHER CAN BE USED TO PROVE ANY FACT. THE LAW MAKES NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE. IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY EVIDENCE.

04:01PM 1        BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND SEE

04:01PM 2   THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT IT

04:01PM 3   RAINED DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE, SUCH AS A

04:01PM 4   TURNED ON GARDEN HOSE, MAY PROVIDE AN EXPLANATION FOR THE WATER

04:01PM 5   ON THE SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS

04:01PM 6   BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL

04:01PM 7   OF THE EVIDENCE IN THE LIGHT OF REASON, EXPERIENCE, AND COMMON

04:01PM 8   SENSE.

04:01PM 9        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

04:01PM 10  WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

04:02PM 11  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

04:02PM 12  NONE OF IT.

04:02PM 13       IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

04:02PM 14  INTO ACCOUNT:

04:02PM 15       1.  THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR

04:02PM 16  OR KNOW THE THINGS TESTIFIED TO;

04:02PM 17       2.  THE WITNESS'S MEMORY;

04:02PM 18       3.  THE WITNESS'S MANNER WHILE TESTIFYING;

04:02PM 19       4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF

04:02PM 20  ANY;

04:02PM 21       5.  THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

04:02PM 22       6.  WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

04:02PM 23  TESTIMONY;

04:02PM 24       7.  THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

04:02PM 25  OF ALL OF THE EVIDENCE; AND,

8.  ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT
CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES
DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT
HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT
THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT BUT
REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,
BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT
DIFFERS FROM OTHER TESTIMONY.

HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY
TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY
CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAYS.

ON THE OTHER HAND, IF YOU THINK THAT THE WITNESS TESTIFIED
UNTRUTHFULLY ABOUT SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS,
YOU MAY ACCEPT THE PART YOU THINK IS TRUE AND IGNORE THE REST.

THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT
NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT
IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND
HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

YOU ARE HERE ONLY TO DETERMINE WHETHER MS. HOLMES IS
GUILTY OR NOT GUILTY OF THE CHARGES IN THE INDICTMENT.
MS. HOLMES IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT
CHARGED IN THE INDICTMENT.

A SEPARATE CRIME IS CHARGED AGAINST MS. HOLMES IN EACH
COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT ON

04:04PM 1    ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

04:05PM 2         THE INDICTMENT CHARGES THAT THE OFFENSES ALLEGED IN COUNTS

04:05PM 3    ONE THROUGH EIGHT AND TEN THROUGH TWELVE WERE COMMITTED "ON OR

04:05PM 4    ABOUT" A CERTAIN DATE.

04:05PM 5         ALTHOUGH IT IS NECESSARY FOR THE GOVERNMENT TO PROVE

04:05PM 6    BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED ON A

04:05PM 7    DATE REASONABLY NEAR THE DATE ALLEGED IN THE INDICTMENT, IT IS

04:05PM 8    NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE OFFENSES

04:05PM 9    WERE COMMITTED PRECISELY ON THE DATE CHARGED.

04:05PM 10        YOU HAVE HEARD TESTIMONY FROM DR. AUDRA ZACHMAN AND

04:05PM 11   DR. MARK BURNES, WHO TESTIFIED TO BOTH FACTS AND OPINIONS AND

04:05PM 12   THE REASONS FOR THEIR OPINIONS.

04:05PM 13        FACT TESTIMONY IS BASED ON WHAT THE WITNESS SAW, HEARD, OR

04:05PM 14   DID.

04:05PM 15        OPINION TESTIMONY IS BASED ON THE EDUCATION OR EXPERIENCE

04:05PM 16   OF THE WITNESS.

04:05PM 17        AS TO THE TESTIMONY ABOUT FACTS, IT IS YOUR JOB TO DECIDE

04:06PM 18   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

04:06PM 19   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

04:06PM 20   NONE OF IT.  YOU MAY TAKE INTO ACCOUNT THE FACTORS DISCUSSED

04:06PM 21   EARLIER IN THESE INSTRUCTIONS THAT WERE PROVIDED TO ASSIST YOU

04:06PM 22   IN WEIGHING THE CREDIBILITY OF WITNESSES.

04:06PM 23        AS TO THE TESTIMONY ABOUT THE WITNESS'S OPINIONS, THIS

04:06PM 24   OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR

04:06PM 25   EXPERIENCE OF THIS WITNESS.  OPINION TESTIMONY SHOULD BE JUDGED

04:06PM 1   LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT ALL OF IT, PART OF

04:06PM 2   IT, OR NONE OF IT.  YOU SHOULD GIVE IT AS MUCH WEIGHT AS YOU

04:06PM 3   THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND

04:06PM 4   EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE

04:06PM 5   OTHER EVIDENCE IN THE CASE.

04:07PM 6       DURING THE TRIAL CERTAIN CHARTS AND SUMMARIES WERE SHOWN

04:07PM 7   TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE.

04:07PM 8   THESE CHARTS AND SUMMARIES WERE NOT ADMITTED INTO EVIDENCE AND

04:07PM 9   WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY ARE NOT

04:07PM 10  THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.

04:07PM 11      IF THEY DO NOT CORRECTLY REFLECT THE FACTS OR FIGURES

04:07PM 12  SHOWN BY THE EVIDENCE IN THE CASE, YOU SHOULD DISREGARD THESE

04:07PM 13  CHARTS AND SUMMARIES AND DETERMINE THE FACTS FROM THE

04:07PM 14  UNDERLYING EVIDENCE.

04:07PM 15      CERTAIN CHARTS AND SUMMARIES HAVE BEEN ADMITTED INTO

04:07PM 16  EVIDENCE.  CHARTS AND SUMMARIES ARE ONLY AS GOOD AS THE

04:07PM 17  UNDERLYING SUPPORTING MATERIAL.  YOU SHOULD, THEREFORE, GIVE

04:07PM 18  THEM ONLY SUCH WEIGHT AS YOU THINK THE UNDERLYING MATERIAL

04:07PM 19  DESERVES.

04:08PM 20      MS. HOLMES IS CHARGED IN COUNTS ONE AND TWO OF THE

04:08PM 21  INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD IN VIOLATION OF

04:08PM 22  SECTION 1349 OF TITLE 18 OF THE UNITED STATES CODE.

04:08PM 23      MS. HOLMES IS CHARGED IN COUNT ONE OF THE INDICTMENT WITH

04:08PM 24  CONSPIRING TO COMMIT WIRE FRAUD AGAINST INVESTORS IN THERANOS

04:08PM 25  DURING THE PERIOD 2010 TO 2015.

04:08PM 1     MS. HOLMES IS CHARGED IN COUNT TWO OF THE INDICTMENT WITH

04:08PM 2  CONSPIRING TO COMMIT WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

04:08PM 3  THERANOS'S BLOOD TESTING SERVICES DURING THE PERIOD 2013 TO

04:08PM 4  2016.

04:08PM 5     I WILL DEFINE WIRE FRAUD LATER IN THESE INSTRUCTIONS.

04:08PM 6     IN ORDER FOR MS. HOLMES TO BE FOUND GUILTY OF EITHER

04:09PM 7  COUNT, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO EACH

04:09PM 8  COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

04:09PM 9  ELEMENTS BEYOND A REASONABLE DOUBT:

04:09PM 10     FIRST, THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE

04:09PM 11  PERSONS TO COMMIT WIRE FRAUD AS CHARGED IN THE INDICTMENT; AND,

04:09PM 12     SECOND, THAT MS. HOLMES BECAME A MEMBER OF THE ALLEGED

04:09PM 13  CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING

04:09PM 14  TO HELP ACCOMPLISH IT.

04:09PM 15     A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP -- AN

04:09PM 16  AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES.

04:09PM 17  THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING

04:09PM 18  UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS

04:09PM 19  COMMITTED.

04:09PM 20     FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT

04:10PM 21  THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT THEY AGREED ON

04:10PM 22  EVERY DETAIL OF THE CONSPIRACY.

04:10PM 23     IT IS NOT ENOUGH, HOWEVER, THAT THEY SIMPLY MET, DISCUSSED

04:10PM 24  MATTERS OF COMMON INTEREST, ACTED IN SIMILAR WAYS, OR PERHAPS

04:10PM 25  HELPED ONE ANOTHER.

04:10PM 1        NOR IS IT ENOUGH, STANDING ALONE, THAT THEY HAD A BUSINESS

04:10PM 2   OR ROMANTIC RELATIONSHIP.

04:10PM 3        YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT WIRE FRAUD

04:10PM 4   AS ALLEGED IN THE INDICTMENT AS AN OBJECT OF THE CONSPIRACY

04:10PM 5   WITH ALL OF YOU AGREEING AS TO THE PARTICULAR CRIME WHICH THE

04:10PM 6   CONSPIRATORS AGREED TO COMMIT.

04:10PM 7        ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY

04:10PM 8   PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE

04:10PM 9   OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN

04:11PM 10  THOUGH THE PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL OF THE

04:11PM 11  DETAILS OF THE CONSPIRACY.

04:11PM 12       FURTHERMORE, ONE WHO WILLFULLY JOINS AN EXISTING

04:11PM 13  CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE ORIGINATORS.

04:11PM 14       ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A

04:11PM 15  CONSPIRACY, BUT HAPPENS TO ACT IN A WAY WHICH FURTHERS SOME

04:11PM 16  OBJECT OR PURPOSE OF THE CONSPIRACY, DOES NOT THEREBY BECOME A

04:11PM 17  CONSPIRATOR.

04:11PM 18       SIMILARLY, A PERSON DOES NOT BECOME A CONSPIRATOR MERELY

04:11PM 19  BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS,

04:11PM 20  NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.

04:11PM 21       "WILLFULLY" MEANS TO ACT WITH KNOWLEDGE THAT ONE'S CONDUCT

04:12PM 22  IS UNLAWFUL AND WITH THE INTENT TO DO SOMETHING THE LAW

04:12PM 23  FORBIDS.

04:12PM 24       A CONSPIRACY MAY CONTINUE FOR A LONG PERIOD OF TIME AND

04:12PM 25  MAY INCLUDE THE PERFORMANCE OF MANY TRANSACTIONS.  IT IS NOT

NECESSARY THAT ALL MEMBERS OF A CONSPIRACY JOIN IN IT AT THE

SAME TIME, AND ONE MAY BECOME A MEMBER OF A CONSPIRACY WITHOUT

FULL KNOWLEDGE OF ALL OF THE DETAILS OF THE UNLAWFUL SCHEME OR

THE NAMES, IDENTITIES, OR LOCATIONS OF ALL OF THE OTHER

MEMBERS.

EVEN IF MS. HOLMES DID NOT DIRECTLY CONSPIRE WITH OTHER

CONSPIRATORS IN THE OVERALL SCHEME, MS. HOLMES HAS, IN EFFECT,

AGREED TO PARTICIPATE IN AN ALLEGED CONSPIRACY IF THE

GOVERNMENT PROVES EACH OF THE FOLLOWING BEYOND A REASONABLE

DOUBT:

FIRST, THAT MS. HOLMES DIRECTLY CONSPIRED WITH ONE OR MORE

CONSPIRATORS TO CARRY OUT AT LEAST ONE OF THE OBJECTS OF THE

CONSPIRACY;

SECOND, THAT MS. HOLMES KNEW OR HAD REASON TO KNOW THAT

OTHER CONSPIRATORS WERE INVOLVED WITH THOSE WITH WHOM

MS. HOLMES DIRECTLY CONSPIRED; AND,

THIRD, THAT MS. HOLMES HAD REASON TO BELIEVE THAT WHATEVER

BENEFITS MS. HOLMES MIGHT GET FROM THE ALLEGED CONSPIRACY WERE

PROBABLY DEPENDENT UPON THE SUCCESS OF THE ENTIRE VENTURE.

IT IS NOT A DEFENSE THAT A PERSON'S PARTICIPATION IN A

CONSPIRACY WAS MINOR OR FOR A SHORT PERIOD OF TIME.

EACH MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE

REASONABLY FORESEEABLE ACTIONS OF THE OTHER CONSPIRATORS

PERFORMED DURING THE COURSE AND IN FURTHERANCE OF THE

CONSPIRACY. IF ONE MEMBER OF A CONSPIRACY COMMITS A CRIME IN

04:14PM 1    FURTHERANCE OF A CONSPIRACY, THE OTHER MEMBERS HAVE ALSO, UNDER

04:14PM 2    THE LAW, COMMITTED THE CRIME.

04:14PM 3         THEREFORE, YOU MAY FIND MS. HOLMES GUILTY OF WIRE FRAUD

04:14PM 4    AGAINST INVESTORS IN THERANOS AS CHARGED IN COUNTS THREE

04:14PM 5    THROUGH EIGHT OF THE INDICTMENT IF THE GOVERNMENT HAS PROVED

04:14PM 6    EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:14PM 7         FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:14PM 8    AS ALLEGED IN THAT COUNT;

04:14PM 9         SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

04:14PM 10   CHARGED IN COUNT ONE OF THE INDICTMENT;

04:14PM 11        THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:14PM 12   IN FURTHERANCE OF THE CONSPIRACY;

04:15PM 13        FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:15PM 14   THE TIME THE OFFENSE CHARGED IN COUNTS THREE AND EIGHT WAS

04:15PM 15   COMMITTED BY THE COCONSPIRATOR; AND,

04:15PM 16        FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

04:15PM 17   AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MS. HOLMES

04:15PM 18   TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE UNLAWFUL

04:15PM 19   AGREEMENT.

04:15PM 20        YOU MAY FIND MS. HOLMES GUILTY OF WIRE FRAUD AGAINST

04:15PM 21   PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES AS

04:15PM 22   CHARGED IN COUNTS TEN THROUGH TWELVE OF THE INDICTMENT IF THE

04:15PM 23   GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A

04:15PM 24   REASONABLE DOUBT:

04:15PM 25        FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:15PM 1   AS ALLEGED IN THAT COUNT;

04:15PM 2       SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

04:16PM 3   CHARGED IN COUNT TWO OF THE INDICTMENT;

04:16PM 4       THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

04:16PM 5   IN FURTHERANCE OF THE CONSPIRACY;

04:16PM 6       FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:16PM 7   THE TIME THE OFFENSE CHARGED IN COUNTS TEN THROUGH TWELVE WAS

04:16PM 8   COMMITTED BY THE COCONSPIRATOR; AND,

04:16PM 9       FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

04:16PM 10  AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY MS. HOLMES

04:16PM 11  TO BE A NECESSARY OR A NATURAL CONSEQUENCE OF THE UNLAWFUL

04:16PM 12  AGREEMENT.

04:16PM 13      MS. HOLMES IS CHARGED IN COUNTS THREE, FOUR, FIVE, SIX,

04:16PM 14  SEVEN, EIGHT, TEN, ELEVEN AND TWELVE OF THE INDICTMENT WITH

04:17PM 15  WIRE FRAUD IN VIOLATION OF SECTION 1343 OF TITLE 18 OF THE

04:17PM 16  UNITED STATES CODE.

04:17PM 17      MS. HOLMES IS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE

04:17PM 18  INDICTMENT WITH WIRE FRAUD AGAINST INVESTORS IN THERANOS.  IN

04:17PM 19  PARTICULAR:

04:17PM 20      MS. HOLMES IS CHARGED IN COUNT THREE WITH WIRE FRAUD IN

04:17PM 21  CONNECTION WITH A WIRE TRANSFER OF $999,990 ON OR ABOUT

04:17PM 22  DECEMBER 30, 2013.

04:17PM 23      MS. HOLMES IS CHARGED IN COUNT FOUR WITH WIRE FRAUD IN

04:17PM 24  CONNECTION WITH A WIRE TRANSFER OF $5,349,900 ON OR ABOUT

04:17PM 25  DECEMBER 31, 2013.

04:17PM 1    MS. HOLMES IS CHARGED IN COUNT FIVE WITH WIRE FRAUD IN

04:17PM 2    CONNECTION WITH A WIRE TRANSFER OF $4,875,000 ON OR ABOUT

04:18PM 3    DECEMBER 31, 2013.

04:18PM 4    MS. HOLMES IS CHARGED IN COUNT SIX WITH WIRE FRAUD IN

04:18PM 5    CONNECTION WITH A WIRE TRANSFER OF $38,336,632 ON OR ABOUT

04:18PM 6    FEBRUARY 6, 2014.

04:18PM 7    MS. HOLMES IS CHARGED IN COUNT SEVEN WITH WIRE FRAUD IN

04:18PM 8    CONNECTION WITH A WIRE TRANSFER OF $99,999,984 ON OR ABOUT

04:18PM 9    OCTOBER 31, 2014.

04:18PM 10   MS. HOLMES IS CHARGED IN COUNT EIGHT WITH WIRE FRAUD IN

04:18PM 11   CONNECTION WITH A WIRE TRANSFER OF $5,999,997 ON OR ABOUT

04:19PM 12   OCTOBER 31, 2014.

04:19PM 13   MS. HOLMES IS CHARGED IN COUNTS TEN THROUGH TWELVE OF THE

04:19PM 14   INDICTMENT WITH WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

04:19PM 15   THERANOS'S BLOOD TESTING SERVICES.  IN PARTICULAR:

04:19PM 16   MS. HOLMES IS CHARGED IN COUNT TEN WITH WIRE FRAUD IN

04:19PM 17   CONNECTION WITH A WIRE TRANSMISSION OF PATIENT E.T.'S

04:19PM 18   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 11, 2015.

04:19PM 19   MS. HOLMES IS CHARGED IN COUNT ELEVEN WITH WIRE FRAUD IN

04:19PM 20   CONNECTION WITH A WIRE TRANSMISSION OF PATIENT M.E.'S

04:19PM 21   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 16, 2015.

04:19PM 22   MS. HOLMES IS CHARGED IN COUNT TWELVE WITH WIRE FRAUD IN

04:19PM 23   CONNECTION WITH A WIRE TRANSFER OF $1,126,661 ON OR ABOUT

04:20PM 24   AUGUST 3, 2015.

04:20PM 25   IN ORDER FOR MS. HOLMES TO BE FOUND GUILTY OF EACH COUNT

04:20PM 1   OF WIRE FRAUD, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO

04:20PM 2   EACH COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

04:20PM 3   ELEMENTS BEYOND A REASONABLE DOUBT:

04:20PM 4       FIRST, MS. HOLMES KNOWINGLY PARTICIPATED IN, DEVISED, OR

04:20PM 5   INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD, OR A SCHEME OR

04:20PM 6   PLAN FOR OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR

04:20PM 7   FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES.  A SCHEME

04:20PM 8   TO DEFRAUD IS A DECEPTIVE SCHEME TO DEPRIVE A PERSON OF MONEY

04:20PM 9   OR PROPERTY.  DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

04:21PM 10  CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

04:21PM 11      SECOND, THE STATEMENTS MADE AS PART OF THE SCHEME WERE

04:21PM 12  MATERIAL.  STATEMENTS ARE MATERIAL IF THEY HAD A NATURAL

04:21PM 13  TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A PERSON

04:21PM 14  TO PART WITH MONEY OR PROPERTY;

04:21PM 15      THIRD, MS. HOLMES ACTED WITH THE INTENT TO DEFRAUD, THAT

04:21PM 16  IS, THE INTENT TO DECEIVE AND CHEAT.  THE INTENT TO DECEIVE AND

04:21PM 17  CHEAT IS THE INTENT TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY

04:21PM 18  MEANS OF DECEPTION; AND,

04:21PM 19      FOURTH, MS. HOLMES USED, OR CAUSED TO BE USED, AN

04:21PM 20  INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY

04:21PM 21  OUT AN ESSENTIAL PART OF THE SCHEME.

04:21PM 22      THE WIRE ITSELF NEED NOT BE FALSE OR MISLEADING.

04:22PM 23      IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

04:22PM 24  CONSIDER NOT ONLY MS. HOLMES'S WORDS AND STATEMENTS, BUT ALSO

04:22PM 25  THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

04:22PM 1    A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED

04:22PM 2    IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY

04:22PM 3    FORESEE SUCH USE.

04:22PM 4        IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO MS. HOLMES

04:22PM 5    THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN NATURE.

04:22PM 6    RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO MS. HOLMES

04:22PM 7    THAT SOME WIRE COMMUNICATION WOULD OCCUR IN FURTHERANCE OF THE

04:22PM 8    SCHEME, AND AN INTERSTATE WIRE COMMUNICATION MUST HAVE ACTUALLY

04:22PM 9    OCCURRED IN FURTHERANCE OF THE SCHEME.

04:23PM 10        AN INTENT TO DEFRAUD IS AN INTENT TO DECEIVE AND CHEAT,

04:23PM 11    THAT IS, TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY MEANS OF

04:23PM 12    DECEPTION.

04:23PM 13        YOU MAY CONSIDER WHETHER MS. HOLMES HAD AN HONEST, GOOD

04:23PM 14    FAITH BELIEF IN THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS

04:23PM 15    ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT SHE

04:23PM 16    ACTED WITH INTENT TO DEFRAUD.

04:23PM 17        AN ACT IS DONE KNOWINGLY IF MS. HOLMES IS AWARE OF THE ACT

04:23PM 18    AND DOES NOT ACT THROUGH IGNORANCE, MISTAKE, OR ACCIDENT.  THE

04:23PM 19    GOVERNMENT IS NOT REQUIRED TO PROVE THAT MS. HOLMES KNEW THAT

04:24PM 20    HER ACTS WERE UNLAWFUL.  YOU MAY CONSIDER EVIDENCE OF

04:24PM 21    MS. HOLMES'S WORDS, ACTS, OR OMISSIONS, ALONG WITH ALL THE

04:24PM 22    OTHER EVIDENCE, IN DECIDING WHETHER MS. HOLMES ACTED KNOWINGLY.

04:24PM 23        TO FIND THAT MS. HOLMES ACTED KNOWINGLY, YOU MUST FIND

04:24PM 24    THAT SHE HERSELF HAD KNOWLEDGE OF THE FACT AT ISSUE.

04:24PM 25        MS. HOLMES MAY BE FOUND GUILTY OF WIRE FRAUD AS CHARGED IN

04:24PM 1    COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE OF THE

04:24PM 2    INDICTMENT, EVEN IF MS. HOLMES PERSONALLY DID NOT COMMIT THE

04:24PM 3    ACT OR ACTS CONSTITUTING THE CRIME BUT AIDED AND ABETTED IN ITS

04:24PM 4    COMMISSION.

04:24PM 5        TO "AID AND ABET" MEANS INTENTIONALLY TO HELP SOMEONE ELSE

04:24PM 6    COMMIT A CRIME.

04:24PM 7        TO PROVE MS. HOLMES GUILTY OF WIRE FRAUD BY AIDING AND

04:25PM 8    ABETTING, THE GOVERNMENT MUST PROVE EACH OF THE FOLLOWING

04:25PM 9    BEYOND A REASONABLE DOUBT:

04:25PM 10        FIRST, SOMEONE ELSE COMMITTED THE CONDUCT CHARGED IN

04:25PM 11    COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE OF THE

04:25PM 12    INDICTMENT;

04:25PM 13        SECOND, MS. HOLMES AIDED, COUNSELLED, COMMANDED, INDUCED,

04:25PM 14    OR PROCURED THAT PERSON WITH RESPECT TO AT LEAST ONE ELEMENT OF

04:25PM 15    WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH EIGHT AND TEN

04:25PM 16    THROUGH TWELVE OF THE INDICTMENT;

04:25PM 17        THIRD, MS. HOLMES ACTED WITH THE INTENT TO FACILITATE WIRE

04:25PM 18    FRAUD AS CHARGED IN COUNTS THREE THROUGH EIGHT AND TEN THROUGH

04:25PM 19    TWELVE OF THE INDICTMENT; AND,

04:25PM 20        FOURTH, MS. HOLMES ACTED BEFORE THE CRIME WAS COMPLETED.

04:25PM 21        IT IS NOT ENOUGH THAT MS. HOLMES MERELY ASSOCIATED WITH

04:25PM 22    THE PERSON COMMITTING THE CRIME, OR UNKNOWINGLY OR

04:26PM 23    UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON, OR

04:26PM 24    WAS PRESENT AT THE SCENE OF THE CRIME.

04:26PM 25        THE EVIDENCE MUST SHOW BEYOND A REASONABLE DOUBT THAT

04:26PM 1    MS. HOLMES ACTED WITH THE KNOWLEDGE AND INTENTION OF HELPING

04:26PM 2    THAT PERSON COMMIT WIRE FRAUD AS CHARGED IN COUNTS THREE

04:26PM 3    THROUGH EIGHT AND TEN THROUGH TWELVE OF THE INDICTMENT.

04:26PM 4        A DEFENDANT ACTS WITH THE INTENTION TO FACILITATE THE

04:26PM 5    CRIME WHEN THE DEFENDANT ACTIVELY PARTICIPATES IN A CRIMINAL

04:26PM 6    VENTURE WITH ADVANCE KNOWLEDGE OF THE CRIME AND HAVING ACQUIRED

04:26PM 7    THAT KNOWLEDGE WHEN THE DEFENDANT STILL HAD A REALISTIC

04:26PM 8    OPPORTUNITY TO WITHDRAW FROM THE CRIME.

04:26PM 9        THE GOVERNMENT IS NOT REQUIRED TO PROVE PRECISELY WHICH

04:26PM 10   PERSON ACTUALLY COMMITTED THE CRIME AND WHICH PERSON AIDED AND

04:26PM 11   ABETTED.

04:27PM 12       IF YOU FIND THAT MS. HOLMES WAS A MEMBER OF THE SCHEME TO

04:27PM 13   DEFRAUD INVESTORS IN THERANOS CHARGED IN COUNTS THREE THROUGH

04:27PM 14   EIGHT AND THAT MS. HOLMES HAD THE INTENT TO DEFRAUD INVESTORS

04:27PM 15   IN THERANOS, MS. HOLMES MAY BE RESPONSIBLE FOR OTHER

04:27PM 16   COSCHEMER'S ACTIONS DURING THE COURSE OF AND IN FURTHERANCE OF

04:27PM 17   THE ALLEGED SCHEME, EVEN IF MS. HOLMES DID NOT KNOW WHAT THEY

04:27PM 18   SAID OR DID.

04:27PM 19       FOR MS. HOLMES TO BE GUILTY OF AN OFFENSE COMMITTED BY A

04:27PM 20   COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

04:27PM 21   PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:27PM 22       FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD

04:27PM 23   INVESTORS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE

04:27PM 24   INDICTMENT;

04:27PM 25       SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

04:28PM 1 OF THE SCHEME TO DEFRAUD THERANOS INVESTORS;

04:28PM 2 THIRD, MS. HOLMES WAS A MEMBER OF THE SAME SCHEME TO

04:28PM 3 DEFRAUD, AND POSSESSED THE INTENT TO DEFRAUD THERANOS

04:28PM 4 INVESTORS; AND,

04:28PM 5 FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

04:28PM 6 THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MS. HOLMES

04:28PM 7 COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

04:28PM 8 OF THE SCHEME TO DEFRAUD.

04:28PM 9 IF YOU FIND THAT MS. HOLMES WAS A MEMBER OF THE SCHEME TO

04:28PM 10 DEFRAUD PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES

04:28PM 11 CHARGED IN COUNTS TEN THROUGH TWELVE, AND THAT MS. HOLMES HAD

04:28PM 12 THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS, MS. HOLMES MAY

04:28PM 13 BE RESPONSIBLE FOR OTHER COSCHEMERS' DURING THE COURSE OF AND

04:29PM 14 IN FURTHERANCE OF THE ALLEGED SCHEME, EVEN IF MS. HOLMES DID

04:29PM 15 NOT KNOW WHAT THEY SAID OR DID.

04:29PM 16 FOR MS. HOLMES TO BE GUILTY OF AN OFFENSE COMMITTED BY A

04:29PM 17 COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

04:29PM 18 PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

04:29PM 19 FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD

04:29PM 20 PATIENTS WHO PAID FOR THE THERANOS'S BLOOD TESTING SERVICES

04:29PM 21 CHARGED IN COUNTS 2010 THROUGH TWELVE OF THE INDICTMENT;

04:29PM 22 SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

04:29PM 23 OF THE SCHEME TO DEFRAUD THERANOS PAYING PATIENTS;

04:29PM 24 THIRD, MS. HOLMES WAS A MEMBER OF THE SCHEME TO DEFRAUD,

04:29PM 25 AND POSSESSED THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS;

04:29PM 1    AND,

04:29PM 2        FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

04:29PM 3    THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MS. HOLMES

04:30PM 4    COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

04:30PM 5    OF THE SCHEME TO DEFRAUD.

04:30PM 6        AN ALLEGED VICTIM'S NEGLIGENCE IS NOT A DEFENSE TO WIRE

04:30PM 7    FRAUD.  YOU HAVE HEARD EVIDENCE REGARDING INVESTORS' PROCESS

04:30PM 8    FOR DECIDING WHETHER TO INVEST MONEY IN THERANOS.

04:30PM 9        YOU ARE TO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT

04:30PM 10   HELPS YOU DETERMINE WHETHER MS. HOLMES MADE FALSE OR FRAUDULENT

04:30PM 11   PRETENSES, REPRESENTATIONS, OR PROMISES AS PART OF A SCHEME OR

04:30PM 12   PLAN TO DEFRAUD.  AND YOU MAY SEE THE PRIOR WIRE FRAUD

04:30PM 13   INSTRUCTION.

04:30PM 14       YOU MAY ALSO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT

04:30PM 15   HELPS YOU DETERMINE WHETHER THE STATEMENTS MADE AS PART OF THE

04:30PM 16   ALLEGED SCHEME WERE MATERIAL; THAT IS, WHETHER THEY HAD A

04:30PM 17   NATURAL TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A

04:31PM 18   PERSON TO PART WITH MONEY OR PROPERTY.  AND YOU MAY SEE THE

04:31PM 19   PRIOR WIRE FRAUD INSTRUCTION.

04:31PM 20       SUCCESS OF A SCHEME TO DEFRAUD IS NOT NECESSARY FOR

04:31PM 21   PURPOSES OF DETERMINING WHETHER WIRE FRAUD OCCURRED.  FOR

04:31PM 22   COUNTS THREE THROUGH EIGHT AND TEN THROUGH TWELVE, IT IS NOT

04:31PM 23   NECESSARY THAT MS. HOLMES MADE A PROFIT OR THAT ANYONE ACTUALLY

04:31PM 24   SUFFERED A LOSS.

04:31PM 25       YOU HAVE HEARD EVIDENCE REGARDING ALLEGED VIOLATIONS OF

04:31PM 1    REGULATIONS AND INDUSTRY STANDARDS.  MS. HOLMES IS NOT LIABLE

04:31PM 2    FOR ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY

04:31PM 3    BECAUSE SHE OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE

04:31PM 4    REGULATIONS OR BECAUSE MS. HOLMES OR THERANOS MAY HAVE ENGAGED

04:32PM 5    IN NEGLIGENT PRACTICES OR VIOLATED INDUSTRY STANDARDS RELATED

04:32PM 6    TO LABORATORY TESTING OR MEDICAL DEVICES.

04:32PM 7        HOWEVER, YOU MAY CONSIDER SUCH EVIDENCE, ALONG WITH OTHER

04:32PM 8    EVIDENCE, LIMITED TO ANY PURPOSES FOR WHICH SUCH EVIDENCE WAS

04:32PM 9    ADMITTED, IN ASSESSING WHETHER THE GOVERNMENT HAS PROVED EACH

04:32PM 10   OF THE COUNTS CHARGED IN THE INDICTMENT.

04:32PM 11       WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

04:32PM 12   JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER THE DELIBERATIONS

04:32PM 13   AND SPEAK FOR YOU HERE IN COURT.

04:32PM 14       YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

04:32PM 15   REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

04:32PM 16   OR NOT GUILTY, MUST BE UNANIMOUS.

04:32PM 17       EACH OF YOU MUST DECIDE THE CASE BY YOURSELF -- FOR

04:33PM 18   YOURSELF, BUT YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED

04:33PM 19   ALL OF THE EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS,

04:33PM 20   AND LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

04:33PM 21       DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

04:33PM 22   PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

04:33PM 23   SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

04:33PM 24       IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

04:33PM 25   VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

04:33PM 1    HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

04:33PM 2    HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

04:33PM 3    SIMPLY TO REACH A VERDICT.

04:33PM 4         PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY.  DO NOT ALLOW

04:33PM 5    PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, OR

04:33PM 6    PUBLIC OPINION TO INFLUENCE YOU.  YOU SHOULD ALSO NOT BE

04:34PM 7    INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS,

04:34PM 8    NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER,

04:34PM 9    PROFESSION, CELEBRITY, ECONOMIC CIRCUMSTANCES, OR POSITION IN

04:34PM 10   LIFE OR IN THE COMMUNITY.

04:34PM 11        ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

04:34PM 12   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

04:34PM 13   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

04:34PM 14   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

04:34PM 15   CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

04:34PM 16   AWARENESS, CONTROL, OR INTENTION.

04:34PM 17        IT IS YOUR DUTY AS JURORS TO CONSULT WITH ONE ANOTHER AND

04:34PM 18   TO DELIBERATE WITH ONE ANOTHER WITH A VIEW TOWARDS REACHING AN

04:34PM 19   AGREEMENT IF YOU CAN DO SO.

04:34PM 20        DURING YOUR DELIBERATIONS, YOU SHOULD NOT HESITATE TO

04:35PM 21   REEXAMINE YOUR OWN VIEWS AND CHANGE YOUR OPINION IF YOU BECOME

04:35PM 22   PERSUADED THAT IT IS WRONG.

04:35PM 23        BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

04:35PM 24   RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

04:35PM 25   THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

04:35PM 1    CASE OR TO THE ISSUES IT INVOLVES.

04:35PM 2         EXCEPT FOR DISCUSSING THE CASE WITH YOUR FELLOW JURORS

04:35PM 3    DURING YOUR DELIBERATIONS:

04:35PM 4         DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

04:35PM 5    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

04:35PM 6    THE CASE OR ANYTHING TO DO WITH IT.  THIS RESTRICTION INCLUDES

04:35PM 7    DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET,

04:35PM 8    COMPUTER, OR ANY OTHER MEANS, VIA EMAIL, TEXT MESSAGING, OR ANY

04:36PM 9    INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FORMS OF SOCIAL

04:36PM 10   MEDIA.

04:36PM 11        THIS RESTRICTION APPLIES TO COMMUNICATING WITH YOUR FAMILY

04:36PM 12   MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE PEOPLE

04:36PM 13   INVOLVED IN THE TRIAL.

04:36PM 14        IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

04:36PM 15   SERVICE OR ANYTHING ABOUT THIS CASE, YOU MUST RESPOND THAT YOU

04:36PM 16   HAVE BEEN ORDERED NOT TO DISCUSS THE MATTER AND TO REPORT THE

04:36PM 17   CONTACT TO THE COURT.

04:36PM 18        DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

04:36PM 19   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

04:36PM 20   IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

04:36PM 21   SEARCHING THE INTERNET (THROUGH GOOGLE OR OTHERWISE) OR USING

04:36PM 22   OTHER REFERENCE MATERIALS; AND DO NOT MAKE ANY INVESTIGATION OR

04:36PM 23   IN ANY OTHER WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

04:36PM 24        THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

04:37PM 25   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

9346

```
04:37PM   1    HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE
04:37PM   2    RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS AND
04:37PM   3    A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL
04:37PM   4    PROCESS TO START OVER.
04:37PM   5        IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE
04:37PM   6    NOTIFY THE COURT IMMEDIATELY.
04:37PM   7        SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR
04:37PM   8    NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT
04:37PM   9    WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD
04:37PM  10    NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW
04:37PM  11    JURORS.
04:37PM  12        THE PUNISHMENT PROVIDED BY LAW FOR THE ALLEGED OFFENSES IS
04:38PM  13    FOR THE COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN
04:38PM  14    DECIDING WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST
04:38PM  15    MS. HOLMES BEYOND A REASONABLE DOUBT.
04:38PM  16        A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE
04:38PM  17    REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON
04:38PM  18    SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR
04:38PM  19    DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU
04:38PM  20    ARE READY TO RETURN TO THE COURTROOM.
04:38PM  21        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO
04:38PM  22    COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK,
04:38PM  23    SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD
04:38PM  24    EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,
04:38PM  25    AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN
```

04:38PM 1    WRITING OR HERE IN OPEN COURT.

04:39PM 2        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

04:39PM 3    LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.  YOU MAY

04:39PM 4    CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

04:39PM 5    QUESTION.

04:39PM 6        REMEMBER THAT YOU ARE NOT TO TELL ANYONE -- INCLUDING

04:39PM 7    ME -- HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, ON ANY

04:39PM 8    QUESTION SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT

04:39PM 9    OF MS. HOLMES, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS VERDICT

04:39PM 10   OR HAVE BEEN DISCHARGED.

04:39PM 11       THAT CONCLUDES THE COURT'S READING OF THE INSTRUCTIONS.

04:39PM 12       ANY OBJECTION TO THE READING OF THE INSTRUCTIONS?

04:39PM 13           MR. LEACH:  YOUR HONOR, ON PAGE 21 AT LINE 17, THE

04:40PM 14   COURT I BELIEVE READ "IN COUNT THREE AND EIGHT," AND THE WORD

04:40PM 15   IS "THROUGH."

04:40PM 16       I DON'T THINK THE COURT NEEDS TO REREAD THIS WHOLE

04:40PM 17   INSTRUCTION.  I THINK THAT CAN JUST BE EITHER NOTED NOW BY THE

04:40PM 18   COURT, AND THE JURY WILL SEE THAT IN THE WRITTEN INSTRUCTIONS.

04:40PM 19           THE COURT:  ALL RIGHT.  THANK YOU.

04:40PM 20       THE COURT REPORTER HAS HANDED ME A COPY THAT'S CIRCLED

04:40PM 21   THAT WORD.

04:40PM 22       MR. DOWNEY?

04:40PM 23           MR. DOWNEY:  I AGREE WITH MR. SCHENK.

04:40PM 24       SUBJECT TO OUR PRIOR CONVERSATIONS THAT WE'VE HAD IN

04:40PM 25   CHARGING CONVERSATIONS, ET CETERA, I HAVE NO FURTHER

04:40PM 1     CORRECTIONS.

04:40PM 2          I THINK THE COURT READ THE INSTRUCTIONS CORRECTLY.

04:40PM 3               THE COURT:  ALL RIGHT.  THANK YOU.

04:40PM 4          LADIES AND GENTLEMEN, IT'S BEEN POINTED OUT TO ME THAT

04:40PM 5     INSTRUCTION NUMBER 19, WHICH IS ON PAGE 21 -- YOU'LL HAVE THESE

04:40PM 6     WITH YOU, EACH OF YOU WILL HAVE A COPY OF THESE -- AT LINE 17,

04:41PM 7     IT'S THE FOURTH ELEMENT, I'M JUST GOING TO READ THAT FOURTH

04:41PM 8     ELEMENT AGAIN.

04:41PM 9          AND THIS IS AGAIN, INSTRUCTION NUMBER 19.

04:41PM 10         YOU'LL SEE IT AT THE BEGINNING OF LINE 16.

04:41PM 11         FOURTH, MS. HOLMES WAS A MEMBER OF THE SAME CONSPIRACY AT

04:41PM 12    THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS

04:41PM 13    COMMITTED BY THE COCONSPIRATOR.

04:41PM 14         IS THAT CORRECTED?

04:41PM 15              MR. SCHENK:  YES, THANK YOU.

04:41PM 16              MR. DOWNEY:  YES, YOUR HONOR.

04:41PM 17              THE COURT:  THANK YOU.  I APOLOGIZE FOR MISSPEAKING

04:41PM 18    ON THAT.  THAT CORRECTS THE READING.

04:41PM 19         ONE FURTHER THING, LADIES AND GENTLEMEN -- AND COUNSEL, I

04:41PM 20    THINK I TOUCHED ON THIS WITH YOU -- LADIES AND GENTLEMEN, VIDEO

04:41PM 21    AND AUDIOS WERE ADMITTED IN EVIDENCE.  SHOULD YOU WISH TO SEE

04:41PM 22    OR HEAR THESE EXHIBITS, PLEASE LET OUR COURTROOM DEPUTY,

04:41PM 23    MS. KRATZMANN, KNOW, AND THEY WILL BE PLAYED FOR YOU HERE IN

04:42PM 24    THE COURTROOM, WHICH IS TO SAY THAT THEY WILL NOT BE ON THE

04:42PM 25    THUMB DRIVE, OR WHATEVER MATERIAL YOU HAVE IN THE JURY ROOM.

04:42PM 1    THOSE WOULD HAVE TO BE PLAYED, AND WILL BE PLAYED, FOR YOU HERE

04:42PM 2    IN THE COURTROOM SHOULD YOU WISH TO EITHER SEE OR HEAR THOSE.

04:42PM 3        ANYTHING FURTHER ON THAT, COUNSEL?

04:42PM 4            MR. SCHENK:  NO, YOUR HONOR.

04:42PM 5            MR. DOWNEY:  NO, YOUR HONOR.

04:42PM 6        THE COURT:  THANK YOU.  WITH THAT THEN, I'LL ASK THE

04:42PM 7    JURY TO RETIRE TO BEGIN THEIR DELIBERATIONS.

04:42PM 8        DO WE HAVE SOMEONE TO TAKE CHARGE OF THE JURY?

04:42PM 9            THE CLERK:  YES, WE DO, YOUR HONOR.

04:42PM 10       PLEASE COME FORWARD.

04:42PM 11           **(THE COURT SECURITY OFFICER WAS GIVEN THE OATH.)**

04:43PM 12           COURT SECURITY OFFICER:  YES.

04:43PM 13           THE CLERK:  THANK YOU.

04:43PM 14       THE COURT:  THANK YOU.  YOU MAY TAKE THE JURY TO THE

04:43PM 15   DELIBERATION ROOM SUCH THAT THEY CAN BEGIN THEIR DELIBERATIONS.

04:43PM 16       ALTERNATES NUMBER 4 AND 5, IF YOU WOULD PLEASE STAY SEATED

04:43PM 17   FOR JUST A MOMENT.

04:43PM 18       DO THEY HAVE THINGS IN THE JURY ROOM?

04:43PM 19           THE CLERK:  THEY DO, YOUR HONOR.

04:43PM 20       (JURY OUT AT 4:43 P.M., ALTERNATE JURORS PRESENT.)

04:43PM 21           THE COURT:  THANK YOU.  THE RECORD SHOULD REFLECT

04:43PM 22   THAT OUR 12 SEATED MEMBERS OF THE JURY HAVE LEFT THE COURTROOM

04:43PM 23   ESCORTED BY THE CSO TO BEGIN THEIR DELIBERATION.

04:43PM 24       THAT LEAVES IN THE COURTROOM, OF COURSE, OUR TWO WONDERFUL

04:43PM 25   ALTERNATES, NUMBER 4 AND NUMBER 5, OUR LOU GEHRIGS AS I CALLED

04:44PM 1    YOU EARLIER.

04:44PM 2        I WANT TO TELL YOU WHAT IS GOING TO HAPPEN NEXT, OUR TWO

04:44PM 3    ALTERNATES.

04:44PM 4        YOU MAY LEAVE THE COURTROOM NOW.  HOWEVER, PLEASE RECALL

04:44PM 5    IN MY EARLIER CONVERSATION THAT YOU MAY BE CALLED UPON TO

04:44PM 6    REPLACE A SITTING JUROR.

04:44PM 7        SHOULD THAT HAPPEN, MS. KRATZMANN WILL CONTACT YOU AND

04:44PM 8    HAVE YOU RETURN TO COURT.

04:44PM 9        SHOULD THAT OCCUR, THE JURY DELIBERATIONS WILL BEGIN ANEW

04:44PM 10   WITH THAT, THAT IS, ALL OVER AGAIN AND START ANEW WITH THE NEW

04:44PM 11   JUROR SEATED TO REPLACE A SITTING JUROR.

04:44PM 12       SO YOU'RE STILL, STILL PART OF OUR CASE.

04:44PM 13       AND WHAT THAT MEANS TO YOU, EACH OF YOU, IS THAT THE

04:44PM 14   ADMONITION THAT I GIVE YOU EVERY DAY THAT YOU PROBABLY COULD

04:44PM 15   RECITE BACK TO ME IS STILL IN PLACE; THAT IS, YOU MAY NOT, YOU

04:44PM 16   MAY NOT CONSULT ANYONE, PLEASE DO NOT CONSULT, DISCUSS, DO ANY

04:44PM 17   INVESTIGATION OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT

04:45PM 18   THIS CASE.

04:45PM 19       WHAT WILL HAPPEN IS YOU WILL BE ON CALL THEN.

04:45PM 20       YOU'RE STILL PART OF THIS CASE, AND YOU WILL BE SO UNTIL

04:45PM 21   AND UNLESS OUR JURY RETURNS WITH A VERDICT, I RELEASE THE JURY

04:45PM 22   FROM THEIR DUTIES, AND THEN YOU WILL BE CONTACTED ALSO AS TO

04:45PM 23   YOU BEING RELEASED FROM THE CONSTRAINTS, FROM YOUR OBLIGATIONS

04:45PM 24   AS ALTERNATE JURORS IN THIS CASE.

04:45PM 25       I DON'T KNOW WHAT IS GOING TO HAPPEN HERE, THAT IS,

04:45PM  1    WHETHER OR NOT WE'LL HAVE YOU COME BACK TO COURT TO SIT AS A

04:45PM  2    JUROR IN THIS CASE.

04:45PM  3         IF THAT DOES NOT OCCUR, AND THAT IS, IF WE DON'T GET TO

04:45PM  4    SEE YOU AGAIN, LET ME JUST, I DO WANT TO EXTEND MY GRATITUDE.

04:45PM  5    WHAT A HERCULEAN TASK THAT YOU HAVE DONE.  YOU'VE SAT HERE

04:45PM  6    SINCE SEPTEMBER 6TH, MAYBE A WEEK THEREAFTER.  YOU'VE LISTENED

04:46PM  7    TO THE TRIAL.  I KNOW THAT.  I'VE WATCHED YOU.  EVERYONE HAS

04:46PM  8    WATCHED YOU.

04:46PM  9         IF WE DON'T SEE YOU AGAIN, ON BEHALF OF MY COLLEAGUE

04:46PM 10    JUDGES IN THE NORTHERN DISTRICT OF CALIFORNIA, AND ON BEHALF OF

04:46PM 11    ALL OF THESE GOOD LAWYERS HERE, WE EXPRESS OUR GRATITUDE AND

04:46PM 12    THANKS TO YOU FOR YOUR SERVICE.

04:46PM 13         NOW, AGAIN, LET ME BE CLEAR, I'M NOT RELEASING YOU FROM

04:46PM 14    YOUR OBLIGATIONS.  IT MAY COME TO PASS THAT YOU WILL BE SEATED

04:46PM 15    AS A JUROR IN THIS CASE, AND THE ADMONITION REMAINS, AND IT

04:46PM 16    REMAINS WITH YOU UNTIL YOU'RE INFORMED TO THE CONTRARY, UNTIL

04:46PM 17    YOU'RE FORMALLY RELEASED.

04:46PM 18         MS. KRATZMANN MAY INFORM YOU OF THAT.

04:46PM 19         IF YOU HAVE ANY QUESTION ABOUT YOUR SERVICE, ABOUT YOUR

04:46PM 20    RETURNING TO COURT, ANY ISSUE ON THAT, WOULD YOU PLEASE CONTACT

04:46PM 21    MS. KRATZMANN AND SHE CAN ANSWER THOSE QUESTIONS FOR YOU?

04:46PM 22         WHAT SHE'S GOING TO DO NOW IS DELICATELY NEGOTIATE YOUR

04:46PM 23    BELONGINGS FROM THE DELIBERATION ROOM AND GET THOSE BACK TO YOU

04:46PM 24    SO YOU CAN TAKE THOSE WITH YOU.

04:46PM 25         AND SHE'LL RETRIEVE THOSE FOR YOU AND GIVE THOSE TO YOU.

04:46PM  1      ALL RIGHT.  CAN YOU DO THAT NOW?  I'LL ASK THESE

04:47PM  2  LAWYERS --

04:47PM  3          THE CLERK:  IF THEY CAN COME BACK THIS WAY AND EXIT

04:47PM  4  OUT THIS WAY.

04:47PM  5          THE COURT:  THAT'S FINE.  DO YOU WANT TO TAKE THEM

04:47PM  6  NOW?

04:47PM  7          THE CLERK:  YES.

04:47PM  8          THE COURT:  OKAY.  ALTERNATES NUMBER 4 AND 5, IF YOU

04:47PM  9  WANT TO FOLLOW MS. KRATZMANN NOW.

04:47PM 10      (ALTERNATE JURORS OUT AT 4:47 P.M.)

04:47PM 11          THE COURT:  THANK YOU.  PLEASE BE SEATED.

04:47PM 12      THE RECORD SHOULD REFLECT THAT OUR ALTERNATE JURORS HAVE

04:47PM 13  LEFT THE COURTROOM.

04:47PM 14      REMAINING ARE ALL COUNSEL AND MS. HOLMES.

04:47PM 15      COUNSEL, I JUST WANT TO INFORM YOU ABOUT TIMING IF THERE

04:47PM 16  ARE QUESTIONS OR IF THE JURY SENDS US A NOTE.

04:47PM 17      I HAVE INDICATED THROUGH MS. KRATZMANN THAT SHOULD WE GET

04:47PM 18  NOTICE THAT THE JURY HAS REACHED A VERDICT IN THIS CASE, WE'LL

04:48PM 19  POST THAT ON OUR ECF POSTING, AND I'VE INDICATED THAT IT WOULD

04:48PM 20  PROBABLY BE ABOUT 30 MINUTES BEFORE THE COURT WOULD READ THE

04:48PM 21  VERDICT WHEN IT COMES IN.

04:48PM 22      I TYPICALLY LIKE -- I ASK LAWYERS TO BE ABLE TO COME BACK

04:48PM 23  WITHIN 15 MINUTES IF WE HAVE A QUESTION, BUT IN THIS

04:48PM 24  CIRCUMSTANCE I THINK 20 MINUTES, 20 TO 25 MINUTES.

04:48PM 25      IF WE HAVE A QUESTION, MS. KRATZMANN WILL REACH OUT TO

04:48PM 1    YOU.  IF YOU COULD MAKE YOURSELVES AVAILABLE WITHIN THAT 25

04:48PM 2    MINUTE TIMEFRAME, THAT WOULD BE HELPFUL.

04:48PM 3         IS THAT GOING TO CREATE AN ISSUE FOR EITHER TEAM HERE?

04:48PM 4              MR. SCHENK:  NO, YOUR HONOR.

04:48PM 5              MR. DOWNEY:  NOT FOR US, YOUR HONOR.

04:48PM 6              THE COURT:  ALL RIGHT.  THANK YOU.

04:48PM 7         ANYTHING FURTHER THEN BEFORE WE BREAK?

04:48PM 8              MR. SCHENK:  NO, NOT FROM THE GOVERNMENT.

04:48PM 9              MR. DOWNEY:  NO.  THANK YOU, YOUR HONOR.

04:48PM 10             THE COURT:  AND MS. KRATZMANN WILL KEEP BOTH SIDES

04:48PM 11   INFORMED ABOUT WHAT THE JURY DECIDES TO DO VIS-A-VIS THEIR

04:48PM 12   SCHEDULE, AND THEY WILL TELL HER, AND THEN I'LL ASK HER TO

04:49PM 13   COMMUNICATE THAT WITH YOU.

04:49PM 14        ALL RIGHT.  THANK YOU.

04:49PM 15             MR. SCHENK:  THANK YOU, YOUR HONOR.

04:49PM 16             MR. DOWNEY:  THANK YOU.

04:49PM 17        (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY AT

04:49PM 18   4:49 P.M.)

19

20

21

22

23

24

25

```
 1

 2

 3                    CERTIFICATE OF REPORTERS

 4

 5

 6

 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
17   CERTIFICATE NUMBER 8076

18

19   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
20   CERTIFICATE NUMBER 9595

21        DATED:  DECEMBER 17, 2021

22

23

24

25
```