# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


UNITED STATES OF AMERICA,               )   CR-18-00258-EJD
                                        )
                    PLAINTIFF,          )   SAN JOSE, CALIFORNIA
                                        )
           VS.                          )   VOLUME 17
                                        )
ELIZABETH A. HOLMES,                    )   OCTOBER 12, 2021
                                        )
                    DEFENDANT.          )   PAGES 3001 - 3278
   _____     )   **PAGES 3203 - 3278 SEALED**


                  TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
                  UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                            KELLY VOLKAR
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

       (APPEARANCES CONTINUED ON THE NEXT PAGE.)


OFFICIAL COURT REPORTERS:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                            CERTIFICATE NUMBER 8074
                            LEE-ANNE SHORTRIDGE, CSR, CRR
                            CERTIFICATE NUMBER 9595

       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
1    A P P E A R A N C E S: (CONT'D)

2

3    FOR DEFENDANT HOLMES:     WILLIAMS & CONNOLLY LLP
                               BY:  KEVIN M. DOWNEY
4                                   LANCE A. WADE
                                    KATHERINE TREFZ
5                                   RICHARD CLEARY
                                    PATRICK LOOBY
6                              725 TWELFTH STREET, N.W.
                               WASHINGTON, D.C. 20005
7
                               LAW OFFICE OF JOHN D. CLINE
8                              BY:  JOHN D. CLINE
                               ONE EMBARCADERO CENTER, SUITE 500
9                              SAN FRANCISCO, CALIFORNIA 94111

10
     ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
11                            BY:  ADELAIDA HERNANDEZ

12                            OFFICE OF THE U.S. ATTORNEY
                              BY:  LAKISHA HOLLIMAN, PARALEGAL
13                                 MADDI WACHS, PARALEGAL

14                            WILLIAMS & CONNOLLY
                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL
15
                              TBC
16                            BY:  BRIAN BENNETT, TECHNICIAN

17

18

19

20

21

22

23

24

25
```

3003

```
1                        INDEX OF PROCEEDINGS
2
            GOVERNMENT'S:
3

4       STEVEN BURD
        DIRECT EXAM BY MR. LEACH (RES.)           P. 3021
5       CROSS-EXAM BY MR. DOWNEY                   P. 3048
        REDIRECT EXAM BY MR. LEACH                 P. 3145
6       RECROSS-EXAM BY MR. DOWNEY                 P. 3156

7       WADE MIQUELON
        DIRECT EXAM BY
8       CROSS-EXAM BY
        REDIRECT EXAM BY
9       RECROSS-EXAM BY

10      NIMESH JHAVERI
        DIRECT EXAM BY
11      CROSS-EXAM BY
        REDIRECT EXAM BY
12      RECROSS-EXAM BY

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          INDEX OF EXHIBITS

2
                                         IDENT.      EVIDENCE
3        GOVERNMENT'S:

4        375                                         3022
         670, PAGES 1 & 2                            3029
5        684                                         3032
         693                                         3035
6        699                                         3036
         701                                         3037
7        715                                         3039
         770                                         3042
8        813                                         3044
         820                                         3046
9        281                                         3058
         332                                         3083
10

11

12       DEFENDANT'S:

13       7190                                        3073
         7104                                        3091
14       10537                                       3119
         7196                                        3124
15       12283                                       3128
         10568 & 10569                               3136
16

17

18

19

20

21

22

23

24

25
```

|   |   |
|---|---|
| | 1 |

```
         1    SAN JOSE, CALIFORNIA                    OCTOBER 12, 2021

08:20AM  2                      P R O C E E D I N G S

08:35AM  3         (COURT CONVENED AT 8:35 A.M.)

08:35AM  4         (JURY OUT AT 8:35 A.M.)

08:35AM  5              THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:35AM  6    MATTER.  LET ME JUST CAPTURE THE APPEARANCES OF THE PARTIES,

08:36AM  7    PLEASE, ONCE AGAIN.

08:36AM  8         WHO APPEARS FOR THE GOVERNMENT?

08:36AM  9              MR. LEACH:  GOOD MORNING, YOUR HONOR.

08:36AM 10         ROBERT LEACH, JEFF SCHENK, JOHN BOSTIC, AND KELLY VOLKAR

08:36AM 11    FOR THE UNITED STATES.

08:36AM 12              THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM 13         AND FOR THE DEFENSE?

08:36AM 14              MR. DOWNEY:  GOOD MORNING, YOUR HONOR.

08:36AM 15         KEVIN DOWNEY, LANCE WADE, KATIE TREFZ, AND ANDREW LEMENS

08:36AM 16    FROM WILLIAMS & CONNOLLY FOR MS. HOLMES, AND OUR COCOUNSEL

08:36AM 17    JOHN CLINE IS PRESENT, AND SO IS MS. HOLMES.

08:36AM 18              THE COURT:  THANK YOU.  GOOD MORNING.

08:36AM 19         I WANTED TO TOUCH BASE ABOUT THIS WEEK'S PROCEEDINGS.  WE

08:36AM 20    HAVE ONE WITNESS ON THE STAND, AND IF I RECALL CORRECTLY ABOUT

08:36AM 21    THE TIME ESTIMATE, YOU HAVE ABOUT ANOTHER HOUR OR SO,

08:36AM 22    MR. LEACH?

08:36AM 23              MR. LEACH:  YES, THAT'S RIGHT.

08:36AM 24              THE COURT:  OKAY.  AND THEN YOUR CROSS?

08:36AM 25              MR. DOWNEY:  YOUR HONOR, I THOUGHT WE WOULD PROBABLY
```

08:36AM 1    BE TO SORT OF MID TO LATE AFTERNOON, SO I ADVISED MR. LEACH TO

08:36AM 2    HAVE ANOTHER WITNESS AVAILABLE.

08:36AM 3              THE COURT:  GREAT.  OKAY.  THANK YOU.

08:36AM 4         AS FAR AS SCHEDULING, I WOULD LIKE TO GO UNTIL 3:00 TODAY

08:37AM 5    IF WE COULD.  I'LL ASK THE JURY THAT, AND PERHAPS AS WELL

08:37AM 6    TOMORROW, MAYBE 4:00 O'CLOCK TOMORROW IF WE CAN.

08:37AM 7         FRIDAY WE'LL HAVE TO END AT 1:00 O'CLOCK, 1:00 O'CLOCK ON

08:37AM 8    FRIDAY.  SO I'LL INFORM OUR JURY OF THAT SCHEDULE.

08:37AM 9         ALSO, YOU RECALL THERE WAS AN ANCILLARY MOTION REGARDING

08:37AM 10   THE QUESTIONNAIRES THAT WE HAD TALKED ABOUT, AND I INDICATED

08:37AM 11   THAT I WOULD LIKE TO MEET WITH THE JURORS AND TALK WITH THEM IN

08:37AM 12   MY CHAMBERS.

08:37AM 13        YOU HAVE HAD THE WEEKEND TO THINK ABOUT THAT PROCESS.

08:37AM 14        LET ME ASK, MR. DOWNEY, WHAT IS YOUR POSITION ABOUT

08:37AM 15   WHETHER OR NOT YOU OR A MEMBER OF YOUR TEAM WOULD LIKE TO JOIN

08:37AM 16   IN NOT THE CONVERSATION, BUT JUST TO BE PRESENT?

08:37AM 17             MR. DOWNEY:  YOUR HONOR, AS I'VE SAID LAST WEEK, I

08:37AM 18   THINK WE WOULD LIKE TO BE PRESENT.  OUR VIEW IS THAT UNDER

08:38AM 19   RULE 43 AND INDEED UNDER THE DUE PROCESS CLAUSE, IT'S AN

08:38AM 20   ELEMENT OF TRIAL FOR WHICH DEFENSE COUNSEL SHOULD BE PRESENT.

08:38AM 21             THE COURT:  OKAY.

08:38AM 22             MR. SCHENK:  GOOD MORNING, YOUR HONOR.

08:38AM 23        I'VE LOOKED AT CASES BETWEEN OUR LAST CONVERSATION AND

08:38AM 24   THIS MORNING AND I WOULD BE HAPPY TO SEND THEM TO THE COURT OR

08:38AM 25   PROVIDE THEM TO THE DEFENSE.

08:38AM 1        MY UNDERSTANDING IS THAT THERE'S NOT A TON OF CASE LAW ON

08:38AM 2   THIS ISSUE.  THERE IS NO CONSTITUTIONAL RIGHT.  I THINK THE

08:38AM 3   CASE LAW IS PRETTY CLEAR ON THAT.

08:38AM 4        UNDER THE RULES OF PROCEDURE, THOUGH, I THINK THE QUESTION

08:38AM 5   IS A LITTLE BIT LESS CLEAR.

08:38AM 6        I THINK THAT WHEN THE JURY HAS NOT YET BEEN IMPANELED, THE

08:38AM 7   CASE LAW INSTRUCTS US THAT MS. HOLMES HAS A RIGHT TO BE

08:38AM 8   PRESENT.

08:38AM 9        I DON'T, THOUGH, THINK THAT THAT RIGHT IS THE SAME ONCE

08:38AM 10  THE JURY HAS BEEN SEATED, AND TO ENTERTAIN A MOTION OR A MATTER

08:39AM 11  LIKE THIS ONE, WHICH IS ANCILLARY TO THE SPECIFIC TRIAL

08:39AM 12  PROCEEDING.  IN FACT, THE COURT COULD CERTAINLY HAVE THIS

08:39AM 13  DIALOGUE AT THE END OF THE TRIAL WITH THE JURORS TO ASK THEM

08:39AM 14  HOW THEY FEEL ABOUT THE RELEASE OF CERTAIN INFORMATION IN THEIR

08:39AM 15  QUESTIONNAIRES, AND I DON'T THINK ANYBODY WOULD BE ARGUING TO

08:39AM 16  THE COURT THAT THE DEFENDANT HAS A RIGHT TO BE PRESENT AT THAT

08:39AM 17  STAGE.

08:39AM 18       AND I'M NOT SURE THAT THE ANALYSIS CHANGES ALL THAT MUCH,

08:39AM 19  BECAUSE THE CONVERSATION IS THE SAME.  THE COURT'S CONVERSATION

08:39AM 20  WITH THESE JURORS WOULD BE IDENTICAL IF IT HAD IT TODAY OR IF

08:39AM 21  IT HAD IT POST-TRIAL, AND I THINK IT WOULD BE FINE FOR THE

08:39AM 22  COURT TO HAVE THAT CONVERSATION WITH JURORS WITHOUT THE

08:39AM 23  PRESENCE OF THE DEFENDANT, THOUGH I WANT TO ANNOUNCE FOR THE

08:39AM 24  COURT, I THINK THE CASE LAW IS A LITTLE BIT UNCLEAR OR MAYBE

08:39AM 25  LESS THAN COMPLETELY DECIDED IN THE CIRCUIT.  AND, AGAIN, I'LL

08:39AM 1     BE HAPPY TO PROVIDE THE CASES THAT I'VE LOOKED AT TO COME TO

08:39AM 2     THAT CONCLUSION.

08:39AM 3            THE COURT:  WELL, THANK YOU.  THAT WAS MY INITIAL

08:40AM 4     ANALYSIS AS WELL, AND THAT'S WHAT I WAS TALKING ABOUT LAST

08:40AM 5     WEEK, MR. DOWNEY.

08:40AM 6       I KNOW YOU TALK ABOUT DUE PROCESS, AND I'M NOT CERTAIN

08:40AM 7     I'VE SEEN IT, AND MAYBE YOU CAN EDUCATE ME IN A WAY.  THE TRIAL

08:40AM 8     HAS BEGUN AND THE JURORS ARE HERE.  THIS IS TOUCHING ON NOT AN

08:40AM 9     EVIDENTIARY MATTER THAT THE JURY WOULD RECEIVE AND OTHERWISE

08:40AM 10     CONSIDER IN THEIR DELIBERATIONS, BUT IT'S MORE FUNCTIONALLY

08:40AM 11     WITH THE COURT AND PERSONAL TO THEM AS TO QUESTIONNAIRES AND

08:40AM 12     INFORMATION THAT MIGHT OR MIGHT NOT BE RELEASED PURSUANT TO THE

08:40AM 13     SECONDARY MOTION THAT IS NOT PART OF OUR TRIAL OTHER THAN IT'S

08:40AM 14     THE MEDIA COALITION, I THINK, DESIRE'S TO GAIN INFORMATION

08:40AM 15     ABOUT OUR JURY BASED ON THE ANSWER TO THE QUESTIONNAIRES.

08:40AM 16       SO, AGAIN, I, I AM NOT CERTAIN I SEE THE DUE PROCESS, IT

08:40AM 17     RISES TO A DUE PROCESS ISSUE.  I'M HAPPY TO RECEIVE SOMETHING

08:40AM 18     FROM YOU IF YOU WOULD LIKE TO PRESENT SOMETHING TO ME, ALTHOUGH

08:41AM 19     I THOUGHT WE SHOULD GET THE ISSUE RESOLVED SOMEHOW.

08:41AM 20       I EXPRESSED TO YOU LAST WEEK MY INITIAL RETICENCE ABOUT

08:41AM 21     HAVING COUNSEL PRESENT, AND IT'S NOT LIKE I DON'T WANT COUNSEL

08:41AM 22     PRESENT, I ENJOY COUNSEL, BUT FOR THIS PURPOSE I DIDN'T WANT TO

08:41AM 23     OTHERWISE OFFER ANY INTIMIDATION FOR OUR JURY IN THIS

08:41AM 24     QUESTIONNAIRE.

08:41AM 25       I'M TRYING TO THINK IF I HAD YOU OR A REPRESENTATIVE OF

08:41AM 1    YOUR TEAM, IT WOULD BE ONE FROM EACH TEAM BACK IN MY OFFICE.  I

08:41AM 2    SUPPOSE I CAN SEAT EACH OF YOU COMFORTABLY IN THE CORNER AND

08:41AM 3    HAVE THEIR BACKS TO YOU, AND I DON'T KNOW IF ANY OF YOU WOULD

08:41AM 4    OBJECT TO THAT.

08:41AM 5        AND I DON'T MEAN TO BE FLIP, I JUST DON'T WANT THE JURORS

08:41AM 6    TO BE OTHERWISE IN DISCOMFORT SUCH THAT THEIR RESPONSES TO MY

08:41AM 7    QUESTIONS WOULD BE LESS THAN CANDID AND THEY MIGHT OTHERWISE BE

08:41AM 8    INTIMIDATED FOR THE PURPOSE.

08:42AM 9        I ALSO DON'T WANT TO IN ANY WAY AFFECT THEIR JUDGMENT.

08:42AM 10       I SEE THEM AS TWO SEPARATE ISSUES.  THEY WILL SOON BE

08:42AM 11   DELIBERATING THIS CASE AND TO HAVE CONTACT WITH COUNSEL IN THE

08:42AM 12   INTIMACY OF THE JUDGE'S CHAMBERS WHILE THE CASE IS BEING TRIED

08:42AM 13   IS SOMETHING THAT CAUSES ME CONCERN AS WELL.

08:42AM 14       I KNOW YOU WON'T BE PARTICIPANTS OF THE CONVERSATION, THAT

08:42AM 15   IS, I'M NOT GOING TO PERMIT YOU TO SPEAK TO THE JURORS.  YOU'RE

08:42AM 16   THERE TO WITNESS.

08:42AM 17       BUT, AGAIN, I'M CONCERNED A LITTLE BIT ABOUT UNTOWARD

08:42AM 18   CONTACT WITH OUR JURORS IN THAT RESPECT ALSO.

08:42AM 19       THOSE ARE THE THINGS THAT I'M THINKING ABOUT FOR YOUR

08:42AM 20   BENEFIT.  I DON'T WANT THAT TO INFLUENCE THEIR DELIBERATIVE

08:42AM 21   PROCESS IN ANY WAY.

08:42AM 22       ANYTHING YOU WOULD LIKE TO SAY, MR. DOWNEY?

08:42AM 23           MR. DOWNEY:  NO, YOUR HONOR.  I THINK REALLY ONLY

08:42AM 24   TWO POINTS.

08:42AM 25       I THINK SOME OF THE CONCERNS THAT THE COURT HAS ARE THE

08:42AM 1     SAME CONCERNS THAT DEFENSE COUNSEL SHARES.

08:43AM 2           WE'RE CONCERNED ABOUT ADDRESSING THE JURORS ON THIS MATTER

08:43AM 3     PRIOR TO DELIBERATIONS AND, RESPECTFULLY, I THINK WE WOULD BE

08:43AM 4     CONCERNED ABOUT COUNSEL HAVING A COLLOQUY WITH THEM ON THIS

08:43AM 5     SUBJECT.

08:43AM 6           BUT WE'RE ALSO CONCERNED ABOUT THE COURT HAVING A DIALOGUE

08:43AM 7     WITH THEM, NOT BECAUSE THE COURT HAS ANY IMPROPER INTENT, BUT

08:43AM 8     JUST BECAUSE THAT TYPE OF A DIALOGUE, AS I SAID LAST WEEK, IS

08:43AM 9     UNPREDICTABLE AND CAN HAVE AN INFLUENCE ON THE DELIBERATIONS

08:43AM 10    LATER THAT NONE OF US CAN SEE.

08:43AM 11          SO I'M CONCERNED ABOUT THE PROCEDURE FOR THAT REASON,

08:43AM 12    WHICH IS ONE OF THE REASONS THAT ANIMATES OUR REQUEST TO BE

08:43AM 13    PRESENT.

08:43AM 14          SO I DON'T FUNDAMENTALLY DISAGREE ABOUT THE DYNAMIC AND

08:43AM 15    IT'S AWKWARDNESS, BUT IT'S JUST A QUESTION OF HOW WE CONDUCT IT

08:43AM 16    AND THE ABILITY TO PROTECT MS. HOLMES'S RIGHTS.

08:43AM 17          I THINK THE SECOND ISSUE ON WHICH I THINK WE HAD A

08:43AM 18    DISAGREEMENT LAST WEEK, AND I DISAGREE WITH MR. SCHENK FOR THE

08:44AM 19    SAME REASON, THE JURORS ARE ONLY HERE TO PARTICIPATE IN THIS

08:44AM 20    PROCEEDING.  THEY'RE NOT HERE IN AN ANCILLARY PROCEEDING.  THEY

08:44AM 21    WERE SUMMONED FOR THIS PROCEEDING.

08:44AM 22          THE MEDIA COALITION INTERVENED IN THIS PROCEEDING.  THIS

08:44AM 23    IS NOT A MATTER THAT IS ANCILLARY TO THE TRIAL.  THIS IS PART

08:44AM 24    OF THE TRIAL, AND I THINK HAVING A DIALOGUE WITH THEM ABOUT IT

08:44AM 25    PRIOR TO THE TIME THAT THEY DELIBERATE RUNS A LOT OF RISK.

08:44AM 1          THE COURT:  WELL, IT'S NOT PART OF THE TRIAL PROCESS

08:44AM 2     IN THE SENSE THAT IT'S EVIDENTIARY.  IT'S SEPARATE.  I SEE IT

08:44AM 3     AS A SEPARATE ISSUE.

08:44AM 4          IT RELATES TO THEM, THE JURORS PERSONALLY, AS TO THEIR

08:44AM 5     PERSONAL INFORMATION AND HOW MUCH, IF ANY, WILL BE RELEASED

08:44AM 6     PURSUANT TO THE MOTION OF THE MEDIA COALITION.

08:44AM 7          IT DOESN'T HAVE ANYTHING TO DO WITH THE EVIDENCE THAT IS

08:44AM 8     COMING IN IN THIS CASE OR ANYTHING ABOUT THEIR THOUGHT PROCESS

08:44AM 9     IN THAT REGARD.  IT RELATES TO THEM PERSONALLY AS I SAID WITH

08:44AM 10    THIS PERSONAL INFORMATION.

08:44AM 11         I SEE IT -- IT'S IN THE SAME TRIAL, BUT I DO THINK IT'S A

08:44AM 12    SEPARATE ISSUE IN AND OF ITSELF.

08:45AM 13         ALL RIGHT.  WELL, AND DO YOU HAVE A -- I DIDN'T ASK YOU TO

08:45AM 14    DO THIS, BUT LET ME ASK YOU, DO YOU HAVE THOUGHTS ABOUT --

08:45AM 15    YOU'RE CONCERNED ABOUT THE CONVERSATION THAT THE COURT HAS.

08:45AM 16         DO YOU WANT TO OFFER A SCRIPT?  DO YOU HAVE A SCRIPT TO

08:45AM 17    OFFER THE COURT FOR THIS PURPOSE?

08:45AM 18         MR. DOWNEY:  I DON'T.  I'M SURE YOUR HONOR HAS A

08:45AM 19    SCRIPT IN MIND.  I'D BE HAPPY TO RECEIVE IT FROM YOU AND TO

08:45AM 20    COMMENT AND, IF THERE'S ANY CONCERN ABOUT IT, TO LET THE COURT

08:45AM 21    KNOW THAT.

08:45AM 22         THE COURT:  WELL, I APPRECIATE THAT OFFER, BUT --

08:45AM 23         MR. DOWNEY:  I DON'T REALLY HAVE IN MIND PRECISELY

08:45AM 24    THE INFORMATION THAT THE COURT WOULD LIKE TO RECEIVE FROM THE

08:45AM 25    JURORS.

08:45AM 1        I RECOGNIZE THE AWKWARDNESS OF THE SITUATION NOT ONLY

08:45AM 2   BECAUSE OF THE DYNAMICS, BUT ALSO BECAUSE WE CONSENTED TO A

08:45AM 3   STATEMENT IN THE QUESTIONNAIRE THAT IT WOULD BE CONFIDENTIAL.

08:45AM 4   HOW THEY TOOK THAT, FRANKLY, I DON'T KNOW.

08:45AM 5        AND SO I'M RELUCTANT TO PRESCRIBE FOR THE COURT EXACTLY

08:46AM 6   HOW YOU CONDUCT THAT CONVERSATION.

08:46AM 7             THE COURT:  WELL, THANK YOU.

08:46AM 8        I THINK THIS IS APPROPRIATE.  IT WAS THE COURT'S

08:46AM 9   PROMISE -- LET ME SAY, WE HAD A HEARING ON THIS, IT WAS A

08:46AM 10  PUBLIC HEARING, AND I INDICATED TO THE MEDIA COALITION'S

08:46AM 11  LAWYERS, IT WAS THE COURT'S PROMISE THAT THIS WOULD BE

08:46AM 12  CONFIDENTIAL, AND NOW THE MEDIA COALITION HAS BROUGHT TO MY

08:46AM 13  ATTENTION THAT, JUDGE, YOU SHOULDN'T HAVE -- MR. ZANSBERG SAID

08:46AM 14  YOU SHOULDN'T HAVE PROMISED THAT BECAUSE, YOU KNOW, THERE'S

08:46AM 15  CERTAIN CASE LAW THAT SUGGESTS YOU SHOULDN'T HAVE DONE THAT.

08:46AM 16       SO IF ANYTHING, IT'S THE COURT TO FALL ON ITS SWORD, IF

08:46AM 17  YOU WILL, TO SAY, LADIES AND GENTLEMEN, PERHAPS I MISSPOKE, BUT

08:46AM 18  LET'S HAVE A CONVERSATION ABOUT THAT.

08:46AM 19       SO IT'S ON THE COURT TO HAVE THAT CONVERSATION, AND I'M

08:46AM 20  NOT GOING TO ASK COUNSEL TO OTHERWISE OPINE OR SPEAK TO THAT.

08:46AM 21       ALL RIGHT.  THANK YOU FOR THAT.

08:46AM 22       LET ME MOVE TO ANOTHER ISSUE, AND THIS IS THE ISSUE

08:46AM 23  THAT -- THIS INVOLVES MR. LEACH.

08:46AM 24       THANK YOU, MR. SCHENK.

08:46AM 25             MR. SCHENK:  THANK YOU.

08:46AM 1          THE COURT:  THIS IS THE QUESTION ABOUT WHETHER OR

08:46AM 2    NOT THE JURY SHOULD HEAR ABOUT MONETARY SUMS EXPENDED FOR THE

08:47AM 3    DEVELOPMENT OF SAFEWAY STORES IN ANTICIPATION OF THERANOS

08:47AM 4    MACHINES COMING IN.

08:47AM 5          WE TALKED ABOUT THIS.  I THINK THE NUMBER WAS 300 MILLION,

08:47AM 6    OR SOMETHING LIKE THAT.

08:47AM 7          MR. DOWNEY, YOU OBJECTED TO, I THINK, THE NUMBER

08:47AM 8    SPECIFICALLY, AND TALKED ABOUT ITS RELEVANCE TO THE CASE.  THIS

08:47AM 9    ISN'T PERHAPS, I THINK YOU SUGGEST, NOT THE APPROPRIATE FORUM

08:47AM 10   TO RAISE THAT NUMBER AT THIS TIME.

08:47AM 11         ANY MORE THOUGHTS -- I THINK YOU ASKED TO DISCUSS THIS IF

08:47AM 12   I'M NOT MISTAKEN, BUT MR. LEACH?

08:47AM 13         MR. LEACH:  WE DID DISCUSS IT, YOUR HONOR.  I DO

08:47AM 14   ANTICIPATE THAT IT WILL COME UP SHORTLY WITH MR. BURD.  THE

08:47AM 15   GOVERNMENT'S POSITION IS THAT THIS IS HIGHLY RELEVANT EVIDENCE

08:47AM 16   AND NOT UNDULY PREJUDICIAL.  IT'S EMBEDDED IN A NUMBER OF

08:47AM 17   EMAILS THAT MR. BURD SENDS TO MS. HOLMES.  IT SPEAKS TO THE

08:47AM 18   MATERIALITY OF THE STATEMENTS THAT WERE MADE TO MR. BURD.

08:48AM 19         IT SPEAKS TO MS. HOLMES'S STATE OF MIND TO SHOW HER

08:48AM 20   KNOWLEDGE THAT SAFEWAY WAS RELYING ON THE REPRESENTATIONS SHE

08:48AM 21   WAS MAKING.

08:48AM 22         THE NUMBER IS BIG.  IT'S AT 1.3 -- OVER 350 MILLION, AND

08:48AM 23   ANOTHER .400 MILLION.  BUT THERE ARE A LOT OF BIG NUMBERS IN

08:48AM 24   THIS CASE, AND IF THE RESPONSE TO IT IS SAFEWAY DIDN'T HAVE TO

08:48AM 25   DO THAT, THAT WAS GRATUITOUS AND THEY'VE GOT ANOTHER USE FOR

08:48AM  1    IT, THAT'S CERTAINLY INFORMATION THAT COULD BE DEVELOPED IN

08:48AM  2    CROSS-EXAMINATION.

08:48AM  3        BUT I DON'T SEE -- THIS IS HIGHLY RELEVANT.  I DON'T THINK

08:48AM  4    IT'S EXCLUDABLE UNDER 403 IN THE BALANCING, AND IT GOES TO HER

08:48AM  5    STATE OF MIND.  SO WE WOULD INTEND TO ELICIT IT.

08:48AM  6            THE COURT:  OKAY.  THANK YOU.

08:48AM  7            MR. DOWNEY:  YOUR HONOR, TO REMIND THE COURT,

08:48AM  8    YOUR HONOR IS RIGHT, WE'RE CONCERNED ABOUT THE NUMBER.  IT'S

08:48AM  9    ALSO AN ISSUE THAT REQUIRES A GREAT DEAL OF ADDITIONAL

08:48AM  10   EVIDENCE, AS I MENTIONED ON FRIDAY.

08:48AM  11       WE HAVE TO SHOW -- FIRST OF ALL, THERANOS INVESTED AN

08:49AM  12   ENORMOUS AMOUNT OF MONEY IN CUSTOMIZING ITS DEVICES TO BE

08:49AM  13   PLACED IN THAT SPACE.  SAFEWAY DEVELOPED THOSE SPACES KNOWING

08:49AM  14   THAT THEY HAD ALTERNATIVE USES, AND THEY USED THEM

08:49AM  15   ALTERNATIVELY TODAY.

08:49AM  16       IT'S NOT RELEVANT TO THE ISSUE, THE CENTRAL ISSUE, WHICH

08:49AM  17   IS, IS THAT MONEY OF WHICH THEY WERE DEFRAUDED?  IT'S CLEARLY

08:49AM  18   NOT.  IT'S A SIDE ISSUE UNDER WHICH BOTH PARTIES UNDERTOOK

08:49AM  19   SUBSTANTIAL EXPENSES AND SAFEWAY WAS ULTIMATELY NOT HARMED,

08:49AM  20   SOMETHING THIS WITNESS CAN'T TESTIFY TO BECAUSE THIS WITNESS

08:49AM  21   WASN'T AT SAFEWAY WHEN ALTERNATIVE USE WAS MADE OF THIS SPACE.

08:49AM  22           THE COURT:  IS IT RELEVANT TO SHOW, IF YOU WILL,

08:49AM  23   SUBSEQUENT CONDUCT OF SAFEWAY?  AND PUT ASIDE THE NUMBER FOR A

08:49AM  24   MOMENT, BUT I SUPPOSE IT SPEAKS TO A MATERIALITY, PERHAPS NOT

08:49AM  25   AS TO THE WIRE FRAUD MATERIALITY, BUT IT SEEMS TO HAVE SOME

08:50AM 1    RELEVANCE THAT SAFEWAY, THE FACT THAT THEY EXPENDED SOME

08:50AM 2    EFFORTS -- LET'S JUST CALL IT EFFORTS WITHOUT PUTTING A DOLLAR

08:50AM 3    SIGN ON IT -- THEY EXPENDED SOME EFFORTS AS A RESULT OF THE

08:50AM 4    CONTRACTUAL RELATIONSHIP THAT THEY HAD.

08:50AM 5        AND WITHOUT THAT, ISN'T IT MISLEADING TO THE JURY TO HEAR,

08:50AM 6    WELL, THEY INVESTED MONEY AND THEN THERE'S A WHOLE -- THERE'S A

08:50AM 7    VACUUM OF, WELL, OKAY, BUT WHAT DID THEY DO?  THEY DIDN'T DO

08:50AM 8    ANYTHING ABOUT IT, THEY JUST INVESTED THIS MONEY.

08:50AM 9        THAT DOESN'T TELL THE WHOLE STORY, IF YOU WILL, FOR A 403

08:50AM 10   ANALYSIS, NOT 404.  BUT THAT TYPE OF A STORY, I THINK, THE JURY

08:50AM 11   IS ENTITLED TO HEAR.

08:50AM 12       NOW, THE QUESTION IS, SHOULD THEY HEAR IT'S 380,

08:50AM 13   $400 MILLION?  AND, MR. LEACH, I TEND TO, I TEND TO AGREE THAT

08:50AM 14   UNDER A 403 ANALYSIS, THAT MIGHT BE MORE PREJUDICIAL THAN IT IS

08:50AM 15   PROBATIVE.  IT WOULD CAUSE THE JURY THEN TO THINK ABOUT --

08:51AM 16   THEY'LL FOCUS ON, JUST BECAUSE WE'RE HUMANS AND THAT'S WHAT WE

08:51AM 17   DO, THEY FOCUS ON THE BIGGER NUMBER.

08:51AM 18       THE 55 MILLION, WHICH IS THE INVESTMENT, AND WHICH IS THE

08:51AM 19   ALLEGATIONS OF THE FRAUD ITSELF I SUPPOSE, THAT'S THE NUMBER

08:51AM 20   SAFEWAY INVESTED, AT LEAST THAT'S WHAT WE HAVE HEARD SO FAR,

08:51AM 21   THAT WOULD BE DWARFED BY THE EXPENDITURE THAT THEY MADE ON ALL

08:51AM 22   OF THEIR STORES.

08:51AM 23       AND I HAVE SOME CONCERN THAT THE JURY, NOTWITHSTANDING THE

08:51AM 24   COURT'S INSTRUCTION OTHERWISE, THEY MIGHT FOCUS ON THAT IN SOME

08:51AM 25   UNTOWARD MANNER.

08:51AM 1      I'M WONDERING IF WE CAN FILTER, SANITIZE THE LANGUAGE.  I

08:51AM 2  THINK LAST WEEK I USED SUBSTANTIAL.  YOU CAN THINK OF ANY OTHER

08:51AM 3  ADJECTIVE YOU WANT I SUPPOSE.

08:51AM 4      MR. LEACH:  THERE'S TWO EXHIBITS, YOUR HONOR, WHERE

08:51AM 5  THE DOLLAR AMOUNT IS MENTIONED.  ONE OF THEM I CAN REFRAIN FROM

08:51AM 6  OFFERING.

08:51AM 7      THE SECOND ONE, I THINK IT'S EXHIBIT 770 FOR DEFENSE

08:52AM 8  COUNSEL, THERE'S A REFERENCE TO SAFEWAY IN TWO AND ONE HALF

08:52AM 9  YEARS INVESTED 400 MILLION AND MORE THAN 50,000 MAN HOURS.  I

08:52AM 10  CAN REDACT THE NUMBER BOTH FOR THE DOLLAR AMOUNT EXPENDED AND

08:52AM 11  THE NUMBER OF HOURS IF THAT'S THE COURT'S RULING.

08:52AM 12      THE COURT:  WELL, THANK YOU.

08:52AM 13      AS I SAID, IT DOES HAVE SOME RELEVANCE.  IT DOES.

08:52AM 14      I THINK, MR. DOWNEY, IF THE JURY IS NOT INFORMED THAT

08:52AM 15  SAFEWAY DID SOMETHING ABOUT IT, I THINK THAT'S NOT THE FULL

08:52AM 16  STORY BECAUSE CLEARLY SAFEWAY DID.

08:52AM 17      THE QUESTION ABOUT THE AMOUNT OF FUNDS THAT THEY EXPENDED

08:52AM 18  AND THE TENSION THAT I HAVE BETWEEN THAT AND THE ACTUAL CHARGE

08:52AM 19  IS SOMETHING THAT I'M CONCERNED ABOUT.

08:52AM 20      MR. DOWNEY:  I THINK AT THE END OF THE DAY,

08:52AM 21  YOUR HONOR, I THINK PRESENTED WITH THESE EXHIBITS WITH THAT

08:52AM 22  REDACTION, THAT'S FINE WITH US.

08:52AM 23      I DON'T WANT TO BE PUT IN THE POSITION CORRESPONDINGLY

08:53AM 24  WHERE WE HAVE A TRIAL WHERE WE SHOW ALL OF THE COSTS THAT WERE

08:53AM 25  UNDERTAKEN ON THE THERANOS SIDE WHICH DEMONSTRATES THEIR BELIEF

08:53AM 1  AND GOOD FAITH AS TO THE IMMINENCE OF THE PROJECT, HOW ANY

08:53AM 2  PURPORTED LOSS OF THOSE MONIES HAS BEEN MITIGATED AND WAS KNOWN

08:53AM 3  TO BE CAPABLE OF MITIGATION AT THE TIME THIS WAS UNDERTAKEN.

08:53AM 4      IF THE FACT IN EVIDENCE IS THAT THEY BELIEVED THAT THEY

08:53AM 5  WERE GOING TO HAVE A PARTNERSHIP WITH THERANOS AND THAT THERE

08:53AM 6  WERE GOING TO BE PATIENT SERVICE CENTERS IN THEIR STORES

08:53AM 7  WITHOUT TRYING TO QUANTIFY OR IMPLYING MORE ABOUT IT, THAT'S

08:53AM 8  FINE WITH US, YOUR HONOR.

08:53AM 9          THE COURT:  WELL, AND I DO THINK IT'S FAIR FOR THE

08:53AM 10  GOVERNMENT TO BE ABLE TO PROBE SUBSTANTIAL CHANGES TO THE

08:53AM 11  STORES.  IT SOUNDS LIKE THAT'S WHAT THEY DID.

08:53AM 12      IF THAT'S WHAT THE EVIDENCE IS, I THINK THEY'RE ENTITLED

08:53AM 13  TO, HE'S -- IF THIS WITNESS HAS KNOWLEDGE, HE WOULD BE ENTITLED

08:53AM 14  TO TESTIFY ABOUT WHAT THEY WERE GOING TO DO WITH THE ROLLOUT,

08:54AM 15  ET CETERA, ET CETERA.

08:54AM 16      I THINK HE TOLD US THEIR GAME PLAN WAS TO ALLOW FOR A

08:54AM 17  CUSTOMER TO COME IN AND DO FULL STOP SERVICE ON THEIR HEALTH

08:54AM 18  NEEDS WHILE THEY'RE SHOPPING, AND I THINK HE CAN DEVELOP THAT.

08:54AM 19          MR. DOWNEY:  YOUR HONOR, THAT'S NOT -- I DON'T HAVE

08:54AM 20  A CONCERN THAT THE PLAN AT LEAST AS OF THE TIME THAT THE

08:54AM 21  CONTRACT WAS SIGNED IN 2010 AND THEREAFTER WAS TO HAVE PATIENT

08:54AM 22  SERVICE CENTERS, THAT THE POTENTIAL THAT THOSE PATIENT SERVICE

08:54AM 23  CENTERS HAD A NUMBER OF IMPLICATIONS, THAT'S NOT SOMETHING TO

08:54AM 24  WHICH I OBJECT.

08:54AM 25          THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM 1      SO, MR. LEACH, JUST TO BE CLEAR, I'M GOING TO -- THE

08:54AM 2  NUMBER -- I'M NOT GOING TO ALLOW YOU TO GET THE NUMBER IN, THE

08:54AM 3  300, 400, THAT TYPE OF THING.

08:54AM 4      BUT I WILL ALLOW YOU TO EXAMINE THE WITNESS AS TO THE

08:54AM 5  TYPES OF CHANGES THEY MADE, ANTICIPATED THINGS THAT THEY DID,

08:54AM 6  IF IT'S SUBSTANTIAL, WHATEVER THEY HAD TO DO ACROSS I DON'T

08:54AM 7  KNOW HOW MANY STORES THEY DID IT, BUT THAT WOULD BE

08:55AM 8  APPROPRIATE.

08:55AM 9      AGAIN, WE HAVE TO BE CAREFUL ABOUT DOORS.  I JUST REMIND

08:55AM 10 EVERYBODY ABOUT THAT.  OKAY.

08:55AM 11     ANYTHING FURTHER?

08:55AM 12     MR. LEACH:  JUST TO BE CLEAR, YOUR HONOR, THE NUMBER

08:55AM 13 OF STORES THAT THEY MADE RENOVATIONS TO, I CAN EXPLORE THAT

08:55AM 14 NUMBER?

08:55AM 15     THE COURT:  YES.

08:55AM 16     MR. LEACH:  IT'S JUST NOT THE TOTAL DOLLAR AMOUNT?

08:55AM 17     THE COURT:  CORRECT.

08:55AM 18     MR. LEACH:  UNDERSTOOD.  THANK YOU.

08:55AM 19     THE COURT:  ANY COMMENT ABOUT THAT, MR. DOWNEY?

08:55AM 20     MR. DOWNEY:  NO, YOUR HONOR.

08:55AM 21     THE COURT:  OKAY.

08:55AM 22     MR. DOWNEY:  YOUR HONOR, JUST ONE QUESTION.

08:55AM 23     HOWEVER THE ISSUE IS RESOLVED AROUND THE COLLOQUY WITH THE

08:55AM 24 JURORS, JUST SO WE CAN HAVE A MEANINGFUL DIALOGUE BETWEEN US AS

08:55AM 25 TO WHEN THE GOVERNMENT NEEDS TO HAVE THEIR WITNESSES PRESENT,

```
08:55AM   1        DID YOU HAVE A TIME SLOT IN MIND?

08:55AM   2             THE COURT:  THANK YOU.  WHAT I WAS HOPING TO DO IS

08:55AM   3    TO -- I'M NOT GOING TO TELL THEM ABOUT THIS THIS MORNING BEFORE

08:55AM   4    WE START EVIDENCE.  I JUST DON'T WANT THEM TO FOCUS ON THAT

08:55AM   5    WHILE THEY'RE HEARING THIS TESTIMONY.

08:55AM   6        I MAY TELL THEM JUST BEFORE THE BREAK THAT WHAT I INTEND

08:55AM   7    TO DO IS TALK TO THEM ABOUT THE MEDIA COALITION MOTION,

08:56AM   8    ET CETERA.  I INTEND TO PROVIDE THEM WITH THEIR QUESTIONNAIRES

08:56AM   9    AT THE BREAK SO THEY CAN LOOK THOSE OVER IF THEY WISH.

08:56AM  10        IF ANY JUROR WOULD LIKE TO SPEAK WITH ME TODAY, I'M HAPPY

08:56AM  11    TO RECEIVE THAT AND WE CAN DO THAT.  THEY'LL -- AND WE'LL END

08:56AM  12    TODAY AT 3:00 HOPEFULLY, AND THEN THEY CAN STAY AFTER IF

08:56AM  13    THEY'RE WILLING TO.

08:56AM  14        IF NOT, THEN I WILL TELL THEM IF SOME OF THEM WANT TO TAKE

08:56AM  15    THE QUESTIONNAIRE HOME WITH THEM, WE'LL PROVIDE THEM AN

08:56AM  16    ENVELOPE THAT THEY CAN TAKE IT IN, AND THEN TOMORROW WE CAN

08:56AM  17    DISCUSS IT EITHER AT A BREAK OR AT SOME TIME IN THE MORNING.

08:56AM  18        WE'LL SEE WHO CHOOSES TO DO THAT, AND THEN WE'LL

08:56AM  19    INCORPORATE THAT INTO OUR TIMEFRAME.

08:56AM  20        I'D LIKE TO DO IT AT THE END OF THE DAY IF I CAN, BUT --

08:56AM  21    AND I EXPECT, I ANTICIPATE THAT PROCESS IS GOING TO TAKE

08:56AM  22    PROBABLY 90 MINUTES I'M THINKING, IF EACH JUROR WANTS TO DO

08:56AM  23    THAT, QUERY WHETHER THEY'LL WANT TO STICK AROUND FOR THAT LONG

08:57AM  24    ALL AT ONE TIME.

08:57AM  25        SO WE'LL JUST DO THE BEST THAT WE CAN.
```

08:57AM 1        MR. DOWNEY:  AND IS IT THE COURT'S PREMISE THAT SOME

08:57AM 2   OF THEIR ADDRESSES AND SO FORTH FOR THE JURORS, WOULD SOME OF

08:57AM 3   THE INFORMATION BE REDACTED IN ANY EVENT?

08:57AM 4        THE COURT:  THEIR ADDRESSES ARE NOT --

08:57AM 5        MR. DOWNEY:  OKAY.

08:57AM 6        THE COURT:  -- IN THE QUESTIONNAIRE.  GEOGRAPHIC

08:57AM 7   LOCATION IS, BUT NOT ADDRESSES.

08:57AM 8        MR. DOWNEY:  OKAY.

08:57AM 9        THE COURT:  YES.  AND I DON'T THINK THE COALITION --

08:57AM 10  I THINK THE COALITION'S LAWYER INDICATED, I DON'T THINK HIS

08:57AM 11  COALITION OR ANY OF THE MEMBERS WERE SEEKING ADDRESSES.  SO,

08:57AM 12  YES.

08:57AM 13       MR. DOWNEY:  THANK YOU, YOUR HONOR.

08:57AM 14       MR. LEACH:  THANK YOU, YOUR HONOR.

08:57AM 15       THE COURT:  ALL RIGHT.  THANK YOU.

08:57AM 16       THE CLERK:  COURT IS IN RECESS.

08:57AM 17    (RECESS FROM 8:57 A.M. UNTIL 9:09 A.M.)

09:09AM 18    (JURY IN AT 9:09 A.M.)

09:09AM 19       THE COURT:  GOOD MORNING EVERYONE.  WE'RE BACK ON

09:09AM 20  THE RECORD WITH OUR JURY AND ALTERNATES ARE PRESENT,

09:09AM 21  RECONSTITUTED IN THE SEATING.  THANK YOU.  GOOD MORNING,

09:09AM 22  EVERYONE.

09:09AM 23    ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

09:09AM 24    AND MR. BURD IS ON THE STAND AGAIN.

09:09AM 25    BEFORE WE RESUME EXAMINATION, LADIES AND GENTLEMEN, LET ME

09:09AM  1    ASK YOU MEMBERS OF THE JURY AND OUR ALTERNATES, DURING THE LONG

09:09AM  2    WEEKEND, WHICH I HOPE YOU ALL ENJOYED, DID ANY OF YOU HAVE

09:09AM  3    OCCASION OR CAUSE TO COME ACROSS ANY INFORMATION OR DISCUSS

09:09AM  4    WITH ANYONE ANYTHING ABOUT THIS CASE?  DID YOU READ, HEAR,

09:09AM  5    LISTEN OR SPEAK WITH ANYONE ABOUT ANYTHING THAT INVOLVES THIS

09:09AM  6    CASE?

09:09AM  7         IF SO, WOULD YOU PLEASE RAISE YOUR HAND?

09:09AM  8         I SEE NO HANDS.

09:10AM  9         THANK YOU.

09:10AM 10         LET'S SEE, DID YOU WANT TO CONTINUE WITH YOUR DIRECT

09:10AM 11    EXAMINATION?

09:10AM 12              MR. LEACH:  I DID, YOUR HONOR.  THANK YOU.

09:10AM 13              THE COURT:  PLEASE, LET'S PROCEED.

09:10AM 14         SIR, IF YOU COULD ONCE AGAIN STATE YOUR NAME FOR THE

09:10AM 15    RECORD.

09:10AM 16              THE WITNESS:  MY NAME IS STEVE BURD, SPELLED

09:10AM 17    B-U-R-D.

09:10AM 18              THE COURT:  THANK YOU, SIR.  AND I'LL REMIND YOU,

09:10AM 19    SIR, YOU ARE STILL UNDER OATH.

09:10AM 20         **(GOVERNMENT'S WITNESS, STEVEN BURD, WAS PREVIOUSLY SWORN.)**

09:10AM 21              **DIRECT EXAMINATION (RESUMED)**

09:10AM 22    BY MR. LEACH:

09:10AM 23    Q.   GOOD MORNING, MR. BURD.

09:10AM 24    A.   GOOD MORNING.

09:10AM 25    Q.   WHEN WE BROKE LAST WEEK WE WERE ON EXHIBIT 718 FROM

09:10AM  1    DECEMBER OF 2012, AND DO YOU RECALL TESTIFYING ABOUT STATEMENTS

09:10AM  2    THAT MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH

09:10AM  3    THE MILITARY?

09:10AM  4    A.   YES, I HAVE IT.

09:10AM  5    Q.   OKAY.  DO YOU RECALL TESTIFYING ABOUT STATEMENTS THAT

09:11AM  6    MS. HOLMES MADE TO YOU ABOUT THERANOS'S RELATIONSHIP WITH THE

09:11AM  7    MILITARY?

09:11AM  8    A.   YES, I DO.

09:11AM  9    Q.   AND THE DATE OF THIS EMAIL, EXHIBIT 718, IS IN OR AROUND

09:11AM  10   DECEMBER OF 2012; IS THAT CORRECT?

09:11AM  11   A.   CORRECT.

09:11AM  12   Q.   I'D LIKE TO MOVE A LITTLE BACKWARD IN TIME TO AUGUST OF

09:11AM  13   2012, AND IF I COULD PLEASE DRAW YOUR ATTENTION TO WHAT WE HAVE

09:11AM  14   MARKED AS EXHIBIT 375.

09:11AM  15   A.   I HAVE IT.

09:11AM  16   Q.   OKAY.  DOES THIS APPEAR TO BE AN EMAIL FROM

09:11AM  17   ELIZABETH HOLMES TO YOU ATTACHING A POWERPOINT IN ADVANCE OF A

09:11AM  18   SAFEWAY BOARD MEETING?

09:11AM  19   A.   YES.

09:11AM  20          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 375.

09:11AM  21          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:11AM  22          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:12AM  23       (GOVERNMENT'S EXHIBIT 375 WAS RECEIVED IN EVIDENCE.)

09:12AM  24          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE ZOOM IN

09:12AM  25   ON THE TOP PORTION OF THE EMAIL.

09:12AM  1    THANK YOU.

09:12AM  2    Q.   MR. BURD, DID MS. HOLMES PRESENT TO THE SAFEWAY BOARD ON

09:12AM  3    OCCASION?

09:12AM  4    A.   YES, I CAN RECALL AT LEAST TWICE WHEN SHE DID THAT.

09:12AM  5    Q.   OKAY.  AND LET ME DRAW YOUR -- ON OCCASION, DID SHE

09:12AM  6    PRESENT POWERPOINTS TO THE SAFEWAY BOARD OF DIRECTORS?

09:12AM  7    A.   ON ONE OCCASION FOR SURE.

09:12AM  8    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 2 OF THIS

09:12AM  9    EXHIBIT.

09:12AM  10    DO YOU SEE THE DATE AUGUST OF 2012?

09:12AM  11    A.   I DO.

09:12AM  12    Q.   OKAY.  AT A HIGH LEVEL, WHAT WAS YOUR LEVEL OF

09:13AM  13    SATISFACTION WITH THE PACE OF THE ROLLOUT IN SAFEWAY STORES FOR

09:13AM  14    THERANOS'S DEVICES AT THIS POINT IN TIME?

09:13AM  15    A.   I WOULD SAY I WAS DISAPPOINTED BECAUSE WE MET -- THE

09:13AM  16    ORIGINAL DEADLINE FOR A PILOT WAS GOING TO BE IN THE FIRST

09:13AM  17    QUARTER.  THAT DIDN'T HAPPEN.

09:13AM  18    AT THIS POINT WE'RE INTO THE THIRD QUARTER.  SO, YOU KNOW,

09:13AM  19    THE DATES JUST KEPT BEING PUSHED BACK.

09:13AM  20    Q.   AND WAS THIS A SENTIMENT SHARED BY THE SAFEWAY BOARD?

09:13AM  21    A.   I WOULD SAY ANY TIME YOU MISS A DEADLINE THEY'RE

09:13AM  22    CONCERNED, RIGHT.

09:13AM  23    BUT IT WASN'T THE BIGGEST ISSUE ON THE TABLE.

09:13AM  24    Q.   THE BIGGEST ISSUE IN TERMS OF SAFEWAY OVERALL?

09:13AM  25    A.   CORRECT.

09:13AM 1    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

09:13AM 2         DO YOU SEE THE HEADINGS OR THE BULLET:  SAFEWAY READINESS;

09:14AM 3    THERANOS READINESS; PACE OF ROLLOUT; AND FINANCIAL

09:14AM 4    IMPLICATIONS?

09:14AM 5    A.   YES.

09:14AM 6    Q.   AND WAS THIS A DOCUMENT THAT YOU AND MS. HOLMES WORKED ON

09:14AM 7    TOGETHER?

09:14AM 8    A.   WHEN YOU SAY "WORKED TOGETHER" THIS IS, ON THE THERANOS

09:14AM 9    PIECE, WHICH IS THIS LARGELY ABOUT.  IF I HAD DONE SOME SLIDES,

09:14AM 10   I WOULD HAVE SHOWN THEM TO HER, AND IF SHE HAD DONE SOME

09:14AM 11   SLIDES, SHE WOULD HAVE SHOWN THEM TO ME.

09:14AM 12   Q.   OKAY.  SO YOU WERE SPEAKING TO SAFEWAY'S READINESS AND SHE

09:14AM 13   WAS SPEAKING TO THERANOS'S READINESS; IS THAT FAIR?

09:14AM 14   A.   I CAN'T TELL UNTIL I GET TO THE SLIDES, BUT THE

09:14AM 15   INFORMATION ON THERANOS READINESS CAME FROM ELIZABETH.

09:14AM 16   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 4.

09:14AM 17        DO YOU SEE WHERE IT SAYS PREPARING SAFEWAY FOR LAUNCH?

09:14AM 18   A.   YES.

09:14AM 19   Q.   AND THE BULLETS ARE:  COMPLETE ALL CONSTRUCTION; HIRE AND

09:15AM 20   TRAIN NEW EMPLOYEES; CREATE PR BUZZ TO FACILITATE ADOPTION; AND

09:15AM 21   FINALIZE LOGISTICS.

09:15AM 22        DO YOU SEE THAT?

09:15AM 23   A.   I DO.

09:15AM 24   Q.   AND LET ME FOCUS ON THE "COMPLETED ALL CONSTRUCTION," AND

09:15AM 25   I DRAW YOUR ATTENTION TO PAGE 5.

09:15AM  1    A.   YES.

09:15AM  2    Q.   AND DO YOU SEE THE PHASE I CONSTRUCTION, 969 U.S. UNITS?

09:15AM  3    A.   I DO.

09:15AM  4    Q.   AND WHAT DOES THAT REFER TO?

09:15AM  5    A.   WE INTENDED TO PUT THE MINILAB IN 969 U.S. UNITS.

09:15AM  6    Q.   AND HAD SAFEWAY TAKEN EFFORTS TO MODIFY THOSE UNITS TO GET

09:15AM  7    THEM READY FOR THE THERANOS ROLLOUT?

09:15AM  8    A.   YES.  THE -- THIS IS JUST DEPICTING WHERE WE ARE IN THAT

09:15AM  9    PROCESS.

09:15AM  10   Q.   AND WHAT IS MEANT BY THE TWO COLUMNS PLANS COMPLETE AND

09:15AM  11   CONSTRUCTION COMPLETE?

09:15AM  12   A.   THE FIRST THING YOU HAVE TO DO IS DRAW PLANS, AND OFTEN

09:15AM  13   LOCAL APPROVALS ON THOSE.  ONCE THE PLANS ARE APPROVED AND A

09:16AM  14   PERMIT IS GRANTED, THEN YOU CAN BE IN CONSTRUCTION.

09:16AM  15   Q.   OKAY.  AND THAT WAS DONE FOR 100 PERCENT OF THE 969 U.S.

09:16AM  16   UNITS IN PHASE I?

09:16AM  17   A.   THAT'S CORRECT.

09:16AM  18   Q.   AND CONSTRUCTION WAS ACTUALLY COMPLETE AT THIS POINT IN

09:16AM  19   TIME FOR 98 PERCENT OF THE 969 U.S. UNITS?

09:16AM  20   A.   YES.

09:16AM  21   Q.   OKAY.  THERE'S A REFERENCE TO PHASE II CONSTRUCTION.  WHAT

09:16AM  22   IS THAT?

09:16AM  23   A.   WE DECIDED THAT THE VOLUME WOULD BE SUCH THAT WE SHOULD

09:16AM  24   REALLY HAVE TWO PLACES IN THE STORE, AND SO WE CREATED A SECOND

09:16AM  25   ROOM.  IT WAS 9 FEET DEEP, 5 FEET WIDE.  WE ALSO NEEDED THAT

09:16AM   1    BECAUSE SAFEWAY HAD A GROWING VACCINATION BUSINESS AND WE

09:16AM   2    NEEDED TO COEXIST WITH THE LAB IN THAT SPACE.

09:16AM   3    Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO PAGE 11.

09:17AM   4         DO YOU SEE THE HEADING LAUNCH WITH HEAVY PR EFFORT?

09:17AM   5    A.   I DO.

09:17AM   6    Q.   OKAY.  IS PR AN ACRONYM FOR PUBLIC RELATIONS?

09:17AM   7    A.   YES.

09:17AM   8    Q.   AND THE FIRST BULLET SAYS, "ELIZABETH WILL MEET WITH

09:17AM   9    EDITORIAL BOARDS OF ALL LOCAL NEWSPAPERS."

09:17AM  10         DO YOU SEE THAT?

09:17AM  11    A.   I DO.

09:17AM  12    Q.   AND WHERE DID THAT IDEA COME FROM?

09:17AM  13    A.   YOU KNOW, THE -- CREATING THE LAUNCH EFFORT AND THE

09:17AM  14    MARKETING, THAT WAS LARGELY IN THERANOS'S DOMAIN.  YOU KNOW, WE

09:17AM  15    PROVIDED SOME INPUT ON THAT, BUT THAT WAS LARGELY SOMETHING

09:17AM  16    THAT THEY WOULD DO.

09:17AM  17    Q.   "A WSJ ARTICLE WILL BE RELEASED THE DAY OF OUR LAUNCH."

09:17AM  18         DO YOU KNOW WHERE THAT IDEA CAME FROM?

09:17AM  19    A.   AGAIN, IT WOULD HAVE COME FROM THERANOS.

09:17AM  20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 12.

09:18AM  21         DO YOU SEE THE HEADING OPERATIONAL LOGISTICS?

09:18AM  22    A.   YES.

09:18AM  23    Q.   AND THEN IN THE FIRST BULLET IT SAYS, "ONE CARTRIDGE WILL

09:18AM  24    SATISFY 95 PERCENT OF ALL CPT CODES."

09:18AM  25         WHERE DID THAT INFORMATION COME FROM?

09:18AM  1    A.   THAT CAME FROM THERANOS.

09:18AM  2    Q.   DID IT COME FROM MS. HOLMES?

09:18AM  3    A.   IT DID.

09:18AM  4    Q.   AND WHAT DOES THAT MEAN, THAT ONE CARTRIDGE WILL SATISFY

09:18AM  5    95 PERCENT OF ALL CPT CODES?

09:18AM  6    A.   IT MEANS THAT THE CARTRIDGES WHICH GO INTO THE MACHINES,

09:18AM  7    THAT A SINGLE CARTRIDGE, A SINGLE CONFIGURATION WILL BE CAPABLE

09:18AM  8    OF DOING ALL CPT CODES, AND A CPT CODE IS A BILLING CODE AND IT

09:18AM  9    IDENTIFIES A SPECIFIC BLOOD TEST.

09:18AM 10    Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

09:18AM 11    A.   IT WAS GREAT NEWS.

09:18AM 12    Q.   AND WHY WAS IT GREAT NEWS?

09:18AM 13    A.   BECAUSE WE HAD TO INVENTORY THESE CARTRIDGES IN EACH OF

09:19AM 14    THOSE STORES, AND IT MEANT THAT WE COULD HAVE MOSTLY THIS ONE

09:19AM 15    CARTRIDGE THAT DID 95 PERCENT, AND THEN A FEW OTHER CARTRIDGES

09:19AM 16    THAT WOULD, YOU KNOW, GET SOME LEVEL OF VOLUME, AND THEN THE

09:19AM 17    MOST ESOTERIC OF BLOOD TESTS MIGHT GO OUTSIDE.

09:19AM 18    Q.   AND BASED ON STATEMENTS FROM MS. HOLMES, WAS IT YOUR

09:19AM 19    UNDERSTANDING THAT THIS WAS SOMETHING THAT THERANOS COULD DO IN

09:19AM 20    AUGUST OF 2012?

09:19AM 21    A.   YES.

09:19AM 22    Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT PAGE, PAGE 13.

09:19AM 23         DO YOU SEE WHERE IT SAID THERANOS READINESS ON KEY TASKS?

09:19AM 24    A.   YES.

09:19AM 25    Q.   AND THERE'S A REFERENCE TO:  ON-CAMPUS FACILITY; STATUS OF

09:19AM 1     ONLINE ADJUDICATION; PRODUCTION RATE OF PROCESSING PLATFORM;

09:19AM 2     PRODUCTION RATE OF CARTRIDGES.

09:19AM 3         DO YOU SEE THOSE BULLETS?

09:19AM 4     A.  I DO.

09:19AM 5     Q.  AND WHAT DID YOU UNDERSTAND PRODUCTION RATE OF PROCESSING

09:20AM 6     PLATFORM AND PRODUCTION OF RATE OF CARTRIDGES TO MEAN?

09:20AM 7     A.  IN ORDER TO DO THE MINILAB, YOU NEEDED BOTH A MACHINE AND

09:20AM 8     YOU NEEDED CARTRIDGES TO GO IN IT.

09:20AM 9         AND SO AS YOU BUILD UP FOR A LAUNCH, YOU NEED TO HAVE

09:20AM 10    AMPLE INVENTORY SO YOUR BUSINESS DOESN'T GET DISRUPTED.

09:20AM 11    Q.  AT ANY POINT IN TIME IN THIS BOARD MEETING OR THIS

09:20AM 12    AUGUST 2012 TIME PERIOD, DID MS. HOLMES RAISE WITH YOU ANY TYPE

09:20AM 13    OF TECHNOLOGICAL ISSUE WITH THE MINILAB DEVICE THAT WAS HOLDING

09:20AM 14    UP THE ROLLOUT?

09:20AM 15    A.  I DON'T RECALL THE TIMEFRAME, BUT THE ONLY TECHNICAL ISSUE

09:20AM 16    THAT I RECALL WAS THIS EXCESS HEAT GENERATED BY STACKING ONE

09:20AM 17    UNIT ON TOP OF THE OTHER.

09:20AM 18    Q.  THANK YOU.

09:20AM 19        YOU CAN PUT THAT -- I'D LIKE TO DRAW YOUR ATTENTION TO THE

09:20AM 20    NEXT DOCUMENT, MR. BURD, WHICH IS EXHIBIT 670.  I'M ONLY

09:21AM 21    FOCUSSED ON PAGES 2 AND 3 OF 670, MR. BURD.

09:21AM 22    A.  YES.

09:21AM 23    Q.  AND DOES IT APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:21AM 24    MS. HOLMES DATED SEPTEMBER 12TH, 2012?

09:21AM 25    A.  YES.

09:21AM   1          MR. LEACH:  YOUR HONOR, I OFFER PAGES 2 AND 3 OF

09:21AM   2   EXHIBIT 670.

09:21AM   3          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:21AM   4          THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

09:21AM   5   PUBLISHED.

09:21AM   6      (GOVERNMENT'S EXHIBIT 670, PAGES 2 AND 3 WAS RECEIVED IN

09:21AM   7   EVIDENCE.)

09:21AM   8          MR. LEACH:  MS. HOLLIMAN, IF WE CAN PLEASE FOCUS ON

09:21AM   9   THE BOTTOM EMAIL IN THE CHAIN ON THE FIRST PAGE.

09:22AM  10   Q.   DO YOU SEE YOUR EMAIL ADDRESS IN THE FROM LINE, MR. BURD?

09:22AM  11   A.   I DO.

09:22AM  12   Q.   AND THE SUBJECT OF THIS IS ON CAMPUS FACILITY PERFORMANCE?

09:22AM  13   A.   CORRECT.

09:22AM  14   Q.   AND WHAT WAS THE ON CAMPUS FACILITY?

09:22AM  15   A.   WE HAD A HEALTH CENTER ON OUR CAMPUS, YOU KNOW, FOUR OR

09:22AM  16   FIVE BUILDINGS, AND THAT SEEMED THE LOGICAL PLACE TO PUT THIS

09:22AM  17   LAB, SO WE PUT IT OVER THERE IN THAT BUILDING.  THAT ALSO

09:22AM  18   CONTAINED AN EXERCISE FACILITY.

09:22AM  19   Q.   AND WHEN YOU SAY "PUT THIS LAB," WHAT DO YOU MEAN?  WHAT

09:22AM  20   WAS --

09:22AM  21   A.   WELL, THE ORIGINAL EXPECTATION IS THAT WE WOULD PUT A

09:22AM  22   THERANOS UNIT IN THERE.  THAT WAS THE REASON FOR WANTING AN ON

09:22AM  23   CAMPUS LAB, AND SO WE WOULD GET SOME REAL EXPERIENCE BECAUSE I

09:22AM  24   WAS REQUIRING THAT ALL SAFEWAY EMPLOYEES AND FAMILIES THAT

09:22AM  25   LIVED IN A CERTAIN RADIUS, THAT'S THE LAB THAT THEY WERE TO

09:22AM  1    USE.  IF THEY USED THAT LAB, WE WOULD PAY FOR THEIR LAB COSTS.

09:23AM  2         AS IT TURNED OUT, WE DIDN'T GET -- WE DIDN'T GET A LAB

09:23AM  3    UNIT FROM THERANOS.  WE ENDED UP DRAWING BLOOD.  I BELIEVE IT

09:23AM  4    WAS MOSTLY VEIN DRAW, BUT SOME OF THAT WAS ALSO FINGERSTICK IF

09:23AM  5    THE PATIENT AGREED TO TWO DIFFERENT FORMS, AND THEN THEY LEFT

09:23AM  6    THE FACILITY TO BE, TO BE ANALYZED.

09:23AM  7    Q.   THE BLOOD WAS TAKEN FROM THE SAFEWAY FACILITY SOMEWHERE

09:23AM  8    ELSE; IS THAT RIGHT?

09:23AM  9    A.   CORRECT.

09:23AM  10   Q.   OKAY.  AND DID MS. HOLMES GIVE YOU AN EXPLANATION FOR WHY

09:23AM  11   THERE WERE VENOUS AND FINGERSTICK DRAWS?

09:23AM  12   A.   THE -- I THINK THE EXPLANATION WAS THAT THEY WANTED TO,

09:23AM  13   YOU KNOW, CONTINUE TO TEST AND CALIBRATE, YOU KNOW, THEIR

09:23AM  14   UNITS, AND YOU COULD GET BOTH THE FINGERSTICK AND YOU COULD GET

09:24AM  15   A REGULAR DRAW AND IN THEORY THOSE ALL TO TURN OUT REMARKABLY

09:24AM  16   THE SAME.

09:24AM  17   Q.   IN THIS EMAIL TO MS. HOLMES YOU WROTE, "I AM GENUINELY

09:24AM  18   CONCERNED THAT SAFEWAY'S LAB REPUTATION GETS WORSE BY THE DAY.

09:24AM  19   KEEP IN MIND, I HAVE NOW REQUIRED THAT OUR EMPLOYEES AND THEIR

09:24AM  20   NEARBY DEPENDENTS USE THIS LAB."

09:24AM  21        WHAT WERE YOU GETTING AT THERE?

09:24AM  22   A.   WELL, EVEN THOUGH IT WAS A LAB ON OUR FACILITY, I THINK

09:24AM  23   OUR EMPLOYEES KNEW THAT WE WERE NOT REALLY THE ONES OPERATING

09:24AM  24   IT, RIGHT, AND THAT THERE WAS A LAB INVOLVED.

09:24AM  25        AND I THINK WHENEVER YOU START SOMETHING NEW, YOU'RE GOING

09:24AM 1    TO HAVE SOME ROUGH SPOTS.  BUT WE CONTINUED TO HAVE ROUGH

09:24AM 2    SPOTS.  WE HAD SAMPLES WHERE TEMPERATURE WAS NOT PROPERLY

09:24AM 3    CONTROLLED, WE HAD SAMPLES THAT WERE LOST, WE HAD RESULTS THAT

09:24AM 4    DIDN'T MAKE ANY SENSE.  THOSE ARE THE KINDS OF THINGS THAT I

09:25AM 5    WAS REFERRING TO.

09:25AM 6    Q.   OKAY.  LATER ON IN THAT PARAGRAPH YOU WROTE, "THE SOONER

09:25AM 7    WE GET TO 'FINGERSTICK,' THE BETTER WE WILL BE."

09:25AM 8         WHAT DID YOU MEAN BY THAT?

09:25AM 9    A.   WELL, WHAT I MEANT WAS THAT I REALLY WANTED A FULL TEST,

09:25AM 10   AND THE REASON WE DIDN'T END UP WITH A THERANOS UNIT IN THE

09:25AM 11   BUILDING IS THAT AFTER THINKING ABOUT IT MORE, ELIZABETH

09:25AM 12   THOUGHT THERE WAS A LOT MORE RISK THAT THE TECHNOLOGY GET OUT,

09:25AM 13   YOU KNOW, PARTICULARLY TO OTHER COMPETITORS.  THERE WAS

09:25AM 14   ACTUALLY A QUEST LOCATED ABOUT 50 YARDS FROM THIS BUILDING, A

09:25AM 15   QUEST LAB.

09:25AM 16   Q.   BENEATH YOU SUGGEST SOME CHANGES IN PROCEDURES, AND THEN

09:25AM 17   IN THE PARAGRAPH AFTER 4, YOU WROTE, "WHILE MY STAFF TELLS ME

09:25AM 18   THAT THERANOS PERFORMANCE IS MUCH BETTER THAN THE FIRST THREE

09:25AM 19   MONTHS, IT IS NOWHERE CLOSE TO THAT OF QUEST.  AS YOU KNOW, THE

09:26AM 20   VAST MAJORITY OF THEIR RESULTS ARE DELIVERED THE NEXT DAY."

09:26AM 21        WHAT WERE YOU GETTING AT THERE?

09:26AM 22   A.   WELL, THE TURN TIME WASN'T VERY PREDICTABLE, AND IT

09:26AM 23   TYPICALLY WOULD RUN TWO TO FOUR DAYS, AND SOME EVEN LONGER THAN

09:26AM 24   THAT.  AND SO IT'S DIFFICULT TO COMPETE, YOU KNOW, WITH A LAB

09:26AM 25   THAT GIVES YOU RESULTS SUBSTANTIALLY FASTER.

| | | |
|---|---|---|
09:26AM 1    Q.   LET ME NEXT DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

09:26AM 2    EXHIBIT 684.

09:26AM 3         DOES THIS APPEAR TO BE ANOTHER EMAIL EXCHANGE BETWEEN YOU

09:26AM 4    AND MS. HOLMES DURING THIS SEPTEMBER 2012 TIME PERIOD?

09:26AM 5    A.   YES.

09:26AM 6              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 684.

09:26AM 7              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:26AM 8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:26AM 9         (GOVERNMENT'S EXHIBIT 684 WAS RECEIVED IN EVIDENCE.)

09:26AM 10             MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN ON THE

09:27AM 11   MIDDLE EMAIL, MS. HOLLIMAN, THE ONE FROM MR. BURD.  THAT'S IT.

09:27AM 12   ALL OF THE WAY DOWN IF WE COULD.  PERFECT.

09:27AM 13   Q.   DO YOU SEE YOUR NAME IN THE FROM LINE OF THIS EMAIL,

09:27AM 14   MR. BURD?

09:27AM 15   A.   I DO.

09:27AM 16   Q.   AND THIS IS TO ELIZABETH HOLMES?

09:27AM 17   A.   YES.

09:27AM 18   Q.   IN THE FIRST PARAGRAPH YOU WROTE, "I THOUGHT I WOULD SHARE

09:27AM 19   WITH YOU WHAT YOUR TEAM HAS COMMUNICATED TO BRIAN HILLE."

09:27AM 20        WHO IS BRIAN HILLE?

09:27AM 21   A.   BRIAN HILLE WAS THE HEAD OF OUR PHARMACY OPERATIONS.

09:27AM 22   Q.   YOU THEN WRITE, "IF THE SOFT LAUNCH IS LIKELY TO BE AS

09:27AM 23   LATE AS OCTOBER 29TH, I NEED TO KNOW THAT NOW SO I CAN SLOW

09:27AM 24   DOWN THE HIRING EFFORT."

09:27AM 25        WHAT WERE YOU GETTING AT THERE?

09:27AM  1     A.   THE EMPLOYEES IN THE STORE WHO WOULD BE RESPONSIBLE FOR

09:27AM  2     THE LAB WORK WOULD ACTUALLY BE EMPLOYEES OF SAFEWAY, SO WE WERE

09:28AM  3     IN THE PROCESS OF HIRING, YOU KNOW, A LOT OF FOLKS.  AND

09:28AM  4     SOMEWHERE ALONG THE LINE ELIZABETH THOUGHT IT BEST, I DIDN'T

09:28AM  5     DISAGREE, THAT WE ACTUALLY HIRE A PHLEBOTOMIST, BECAUSE THAT'S

09:28AM  6     WHAT PEOPLE WERE USED TO DEALING WITH WAS A PHLEBOTOMIST.

09:28AM  7     Q.   SO SAFEWAY WAS HIRING A NUMBER OF PHLEBOTOMISTS?

09:28AM  8     A.   WE HIRED AN OUTSIDE AGENCY TO DO THE HIRING, AND WE HIRED

09:28AM  9     BOTH PEOPLE WITH EXPERIENCE AND WE HIRED PEOPLE WITHOUT

09:28AM 10     EXPERIENCE, AND I RECALL AT ONE POINT WE HAD 26 PEOPLE HIRED

09:28AM 11     AND ANOTHER 400 POSSIBILITIES IN THE WAITING.

09:28AM 12     Q.   ALL IN ANTICIPATION OF THE LAUNCH WITH THERANOS IN SAFEWAY

09:28AM 13     STORES?

09:28AM 14     A.   CORRECT.

09:28AM 15     Q.   AND IN THE NEXT PARAGRAPH YOU WROTE, "IT ALSO LOOKS LIKE

09:28AM 16     YOUR LAB WORK IS BEING SENT TO UTAH, NOT UCSF, AND NOT BEING

09:28AM 17     DONE ON SITE.  IT IS THE ONLY WAY IT COULD POSSIBLY TAKE 3 TO

09:29AM 18     5 DAYS."

09:29AM 19          WHAT WERE YOU GETTING AT THERE?

09:29AM 20     A.   WELL, I THINK THE ORIGINAL INTENT WAS TO USE UCSF FOR SOME

09:29AM 21     OF THE ANALYSIS, YOU KNOW, PARTICULARLY THE RARER TESTS.  AND

09:29AM 22     THIS IS INFORMATION THAT I GOT UNDOUBTEDLY FROM BRIAN HILLE,

09:29AM 23     AND I DON'T KNOW HOW HE LEARNED THAT IT WAS BEING SENT TO UTAH,

09:29AM 24     BUT THAT'S WHAT HE TOLD ME.

09:29AM 25     Q.   WAS THAT SURPRISING TO YOU?

09:29AM  1    A.   YEAH, IT'S A LONG WAYS AWAY.

09:29AM  2    Q.   AND DID MS. HOLMES GIVE YOU ANY EXPLANATION FOR WHY

09:29AM  3    THERANOS WAS SENDING TESTS EITHER TO UTAH OR TO UCSF?

09:29AM  4    A.   I DON'T RECALL AN EXPLANATION.  I KNEW THEY WERE DOING

09:29AM  5    SOME WORK DOWN IN THEIR FACILITY.

09:29AM  6    Q.   DID YOU THINK IT WAS FOR THE MAJORITY OF TESTS?  FOR A

09:29AM  7    PORTION OF THE TESTS?  WHAT WAS IN YOUR MIND?

09:29AM  8    A.   I REALLY DIDN'T KNOW.

09:30AM  9    Q.   IN THE THIRD PARAGRAPH YOU WROTE, "I FIRMLY BELIEVE THERE

09:30AM 10    ARE THINGS THAT WE SHOULD BE DOING DIFFERENTLY EVEN IN THE

09:30AM 11    SHORT RUN.  I AM SURE I DON'T HAVE ALL OF THE INFORMATION YOU

09:30AM 12    HAVE, BUT GIVEN THE SMALL NUMBER OF PATIENTS, WE COULD CREATE A

09:30AM 13    MUCH BETTER SHORT TERM EXPERIENCE WITH LITTLE OR NO ADDITIONAL

09:30AM 14    EFFORT.  IT PAINS ME NOT TO DO SO."

09:30AM 15         WHAT WERE YOU GETTING AT THERE?

09:30AM 16    A.   JUST THAT THE EXECUTION WASN'T GOOD.  YOU KNOW, IN THE

09:30AM 17    SUPERMARKET BUSINESS, WHICH IS SUCH LOW MARGIN, I MEAN,

09:30AM 18    OPERATIONS REALLY HAVE TO CLICK OR YOU DON'T MAKE ANY MONEY AT

09:30AM 19    ALL.

09:30AM 20         SO WE WERE REALLY FOCUSSED ON THE OPERATING ASPECTS OF

09:30AM 21    THIS FACILITY.

09:30AM 22    Q.   FURTHER DOWN BELOW YOU WROTE, "I JUST KNOW WE CAN DO

09:30AM 23    BETTER.  PROCESS IS SOMETHING THAT WE ARE VERY GOOD AT.  SORRY

09:30AM 24    TO BURDEN YOU WITH THIS."

09:30AM 25         WHAT WERE YOU COMMUNICATING THERE?

09:30AM 1    A.   IF THERE WAS SOMETHING THAT WE COULD DO TO HELP IMPROVE

09:30AM 2    THE PROCESS, WE WERE READY TO DO IT.

09:31AM 3    Q.   DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:31AM 4    A.   NO.

09:31AM 5    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

09:31AM 6    EXHIBIT 693.

09:31AM 7         IS THIS AN EMAIL EXCHANGE -- DOES THIS APPEAR TO BE AN

09:31AM 8    EMAIL EXCHANGE BETWEEN YOU AND ELIZABETH HOLMES IN THE

09:31AM 9    OCTOBER 2012 TIME PERIOD?

09:31AM 10   A.   YES.

09:31AM 11             MR. LEACH:   YOUR HONOR, I OFFER EXHIBIT 693.

09:31AM 12             MR. DOWNEY:   NO OBJECTION, YOUR HONOR.

09:31AM 13             THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

09:31AM 14        (GOVERNMENT'S EXHIBIT 693 WAS RECEIVED IN EVIDENCE.)

09:31AM 15             MR. LEACH:   AND IF WE CAN PLEASE ZOOM IN ON THE TOP

09:31AM 16   HALF.

09:31AM 17        THANK YOU, MS. HOLLIMAN.

09:31AM 18   Q.   MR. BURD, THE SUBJECT OF THIS IS SIX STORE LAUNCH

09:31AM 19   SCHEDULE.

09:31AM 20        DO YOU SEE THAT?

09:31AM 21   A.   YES.

09:31AM 22   Q.   AND WHAT DOES THAT REFER TO?

09:31AM 23   A.   THAT REFERS TO TRYING TO GO FROM THE ON CAMPUS FACILITY TO

09:32AM 24   SIX STORES, AND IT'S A BIT OF A PILOT.

09:32AM 25   Q.   AND THIS WAS SOMETHING THAT YOU WERE ENDEAVORING TO DO IN

09:32AM 1   THE FOURTH QUARTER OF 2012?

09:32AM 2   A.   THAT'S WHAT IT LOOKS LIKE FROM THIS MEMO.

09:32AM 3   Q.   OKAY.  DID MS. HOLMES EVER SAY TO YOU THAT THERE WAS SOME

09:32AM 4   TYPE OF TECHNOLOGICAL ISSUE GETTING IN THE WAY OF THAT?

09:32AM 5   A.   NO.

09:32AM 6   Q.   YOU WROTE, "WHERE ARE WE ON THE SCHEDULE?  WE HAVE HIRED

09:32AM 7   26 PHLEBOTOMISTS AND HAVE SCREENED, INTERVIEWED, AND HAVE

09:32AM 8   IDENTIFIED 181 OTHERS THAT WE ARE PREPARED TO HIRE."

09:32AM 9        IS THAT A REFERENCE TO THE HIRING THAT SAFEWAY ENGAGED IN

09:32AM 10  DURING THIS TIME PERIOD?

09:32AM 11  A.   YES.

09:32AM 12  Q.   LET ME NOW DRAW YOUR ATTENTION TO EXHIBIT 699.

09:32AM 13       IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN NOVEMBER OF

09:32AM 14  2012?

09:32AM 15  A.   YES.

09:32AM 16            MR. LEACH:  I OFFER EXHIBIT 699, YOUR HONOR.

09:32AM 17            MR. DOWNEY:  NO OBJECTION.

09:32AM 18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM 19       (GOVERNMENT'S EXHIBIT 699 WAS RECEIVED IN EVIDENCE.)

09:33AM 20  BY MR. LEACH:

09:33AM 21  Q.   DO YOU SEE THE SUBJECT SIX STORE LAUNCH, MR. BURD?

09:33AM 22  A.   YES.

09:33AM 23  Q.   AND IS THAT A REFERENCE SIMILAR TO THE EMAIL THAT WE JUST

09:33AM 24  LOOKED AT?

09:33AM 25  A.   CORRECT.

09:33AM  1    Q.   OKAY.  YOU WROTE IN THE BOTTOM EMAIL, "IF WE DON'T PICK A

09:33AM  2    LAUNCH DATE SOON, WE CAN FORGET ABOUT LAUNCHING EVEN SIX STORES

09:33AM  3    IN 2012.  IF YOU HAVE ALREADY DECIDED IT IS NOT GOING TO HAPPEN

09:33AM  4    UNTIL NEXT YEAR, I WOULD LIKE TO KNOW.  WHILE IT WOULD BE VERY

09:33AM  5    UNFORTUNATE TO NOT LAUNCH IN Q4, BASED ON THE INFORMATION I

09:33AM  6    HAVE, IT LOOKS PRETTY REMOTE.  I FEEL LIKE A JOGGER RUNNING IN

09:33AM  7    PLACE WAITING FOR THE STOPLIGHT TO TURN GREEN."

09:33AM  8         WHAT DID YOU MEAN IN THAT LAST SENTENCE, THAT YOU FELT

09:33AM  9    LIKE A JOGGER RUNNING IN PLACE?

09:33AM  10   A.   WELL, WE WERE READY.  ON OUR END WE WERE COMPLETELY READY,

09:33AM  11   AND WE WERE JUST WAITING ON THERANOS WITH NO REAL EXPLANATION

09:33AM  12   AS TO WHY IT WAS BEING DELAYED.

09:34AM  13        SO THE JOGGER MAKES NO PROGRESS AT A STOPLIGHT.

09:34AM  14   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 701.

09:34AM  15        DOES THIS APPEAR TO BE ANOTHER EMAIL BETWEEN YOU AND

09:34AM  16   MS. HOLMES IN OR AROUND NOVEMBER OF 2012?

09:34AM  17   A.   YES.

09:34AM  18             MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 701 INTO

09:34AM  19   EVIDENCE.

09:34AM  20             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:34AM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:34AM  22        (GOVERNMENT'S EXHIBIT 701 WAS RECEIVED IN EVIDENCE.)

09:34AM  23   BY MR. LEACH:

09:34AM  24   Q.   MR. BURD, THE SUBJECT OF THIS EMAIL IS BECOMING

09:34AM  25   DISCOURAGED.

```
09:34AM   1          DO YOU SEE THAT LANGUAGE?

09:34AM   2     A.   I DO.

09:34AM   3     Q.   OKAY.  WERE YOU BECOMING DISCOURAGED AT THIS POINT IN

09:34AM   4     TIME?

09:34AM   5     A.   I WAS GETTING CLOSE.

09:34AM   6     Q.   YOU WROTE, "I CAN RECALL HAVING BEEN DISCOURAGED ONCE IN

09:34AM   7     THE LAST 62 YEARS.  THAT SAID, I AM GETTING CLOSE TO MY SECOND

09:35AM   8     EVENT."

09:35AM   9          WAS THAT TRUE AT THE TIME?

09:35AM  10     A.   YES.  I KNOW IT SOUNDS LIKE A BIT OF AN EXAGGERATION, BUT

09:35AM  11     I'M ONE OF THE MOST POSITIVE PEOPLE YOU'LL EVER MEET.  I DON'T

09:35AM  12     GET DISCOURAGED.

09:35AM  13     Q.   AND WHAT WAS DISCOURAGING YOU?

09:35AM  14     A.   WELL, DEADLINES WEREN'T MET, NO REAL EXPLANATION PROVIDED.

09:35AM  15     I FELT -- I FELT THAT THERE WERE OBSTACLES THAT WERE GETTING IN

09:35AM  16     THE WAY.  I DIDN'T THINK IT WAS THE BOX.  I THOUGHT THERE WERE

09:35AM  17     OTHER OBSTACLES.

09:35AM  18          AND WHEN YOU HAVE 185,000 EMPLOYEES, YOU'RE WILLING TO

09:35AM  19     DEVOTE SOME OF THOSE PEOPLE TO REMOVING THOSE OBSTACLES IF THAT

09:35AM  20     WOULD BE HELPFUL.

09:35AM  21     Q.   AND DID MS. HOLMES EVER TAKE YOU UP ON THAT?

09:35AM  22     A.   WE DID A COUPLE OF THINGS TOGETHER TO TRY TO GET THE

09:35AM  23     LOGISTICS RIGHT IN THE STORE, BUT THAT WAS A NATURAL THING.  IT

09:35AM  24     WAS GOING TO TAKE PLACE IN OUR STORES AND WE WORKED ON THAT

09:35AM  25     TOGETHER.
```

09:35AM  1          THERE WERE A NUMBER OF THINGS WE WORKED ON TOGETHER, BUT

09:35AM  2   WE DIDN'T REMOVE OBSTACLES TOGETHER.

09:35AM  3   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 715.

09:36AM  4          DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:36AM  5   MS. HOLMES IN THE DECEMBER 2012 TIME PERIOD?

09:36AM  6   A.   YES.

09:36AM  7          MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 715 INTO

09:36AM  8   EVIDENCE.

09:36AM  9          MR. DOWNEY:  NO OBJECTION.

09:36AM  10          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:36AM  11         (GOVERNMENT'S EXHIBIT 715 WAS RECEIVED IN EVIDENCE.)

09:36AM  12          MR. LEACH:  AND, MS. HOLLIMAN, IF WE COULD PLEASE

09:36AM  13   FOCUS ON THE BOTTOM EMAIL FROM MR. BURD.

09:36AM  14   Q.   LET ME DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH,

09:36AM  15   MR. BURD.

09:36AM  16         DO YOU SEE WHERE YOU WROTE, "I HAVE LOTS OF DATA POINTS

09:36AM  17   FROM YOUR TEAM THAT SUGGESTS THAT SAFEWAY AND THERANOS MAY NOT

09:36AM  18   HAVE ALWAYS BEEN ON THE SAME PAGE"?

09:36AM  19   A.   YES.

09:36AM  20   Q.   AND THEN YOU PROVIDE A PARTIAL LIST OF THAT?

09:37AM  21   A.   I DO.

09:37AM  22   Q.   IN NUMBER 1 YOU WROTE, "THE ON CAMPUS LAB HAS OPERATED FOR

09:37AM  23   ALMOST A YEAR WITH A POOR PATIENT EXPERIENCE.  (THIS HAS

09:37AM  24   NOTHING TO DO WITH THE FACT THAT WE ARE DOING VEIN DRAW.)"

09:37AM  25          WAS THAT YOUR VIEW AT THE TIME?

09:37AM 1      A.   YES.

09:37AM 2      Q.   AND WAS THAT A TOPIC THAT YOU HAD DISCUSSED WITH

09:37AM 3      MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 4      A.   YES, IT WAS.

09:37AM 5      Q.   AND NUMBER 2 YOU WROTE, "THERANOS HAS BEEN SLOW TO REACT

09:37AM 6      TO OUR CONCERNS ABOUT THE ON CAMPUS LAB AND UNWILLING TO ALLOW

09:37AM 7      US TO FIX THE PROCESS OURSELVES."

09:37AM 8           WAS THAT YOUR VIEW AT THE TIME?

09:37AM 9      A.   YES.

09:37AM 10     Q.   AND WAS THAT SOMETHING THAT YOU HAD DISCUSSED WITH

09:37AM 11     MS. HOLMES ON MORE THAN ONE OCCASION?

09:37AM 12     A.   YES.

09:37AM 13     Q.   IF WE CAN GO TO THE NEXT PAGE, MS. HOLLIMAN.

09:37AM 14          I DRAW YOUR ATTENTION TO NUMBER 4, MR. BURD.

09:37AM 15     A.   YES.

09:37AM 16     Q.   YOU WROTE, "MY REPEATED SUGGESTIONS THAT WE ENGAGE IN A

09:38AM 17     COLLABORATIVE REVIEW OF THE PATIENT EXPERIENCE HAVE YET TO

09:38AM 18     GENERATE A POSITIVE RESPONSE.  THE PATIENT EXPERIENCE HAS BEEN

09:38AM 19     DESIGNED ENTIRELY BY THERANOS.  THIS IS NOT MY ONLY EXPERIENCE,

09:38AM 20     THIS IS MY TEAM'S EXPERIENCE."

09:38AM 21          WHAT DID YOU MEAN BY THAT?

09:38AM 22     A.   THAT WE WERE NOT PART OF THAT DETAILED PROCESS.  THINK OF

09:38AM 23     IT AS THE LOGISTICS OF A PATIENT COMES IN, HOW THEY GET CHECKED

09:38AM 24     IN, WHERE THEY SIT, YOU KNOW, ALL OF THE INFORMATION BEHIND IT

09:38AM 25     SO THAT IT'S HIGHLY AUTOMATED.  YOU KNOW, OF THE TWO COMPANIES,

09:38AM  1    WE WERE THE COMPANY THAT HAD PROBABLY GIVEN MILLIONS OF

09:38AM  2    VACCINATIONS, SO WE HAD PATIENT EXPERIENCE, AND WE WANTED TO

09:38AM  3    LEND THAT EXPERIENCE TO THE PROCESS.

09:38AM  4    Q.   AND THEN DOWN AT THE BOTTOM YOU WROTE, "I AM SORRY IF THIS

09:38AM  5    SOUNDS A BIT BLUNT.  CHALK IT UP TO THE LIMITATIONS OF EMAIL."

09:39AM  6         DID YOU THINK YOU WERE BEING BLUNT HERE?

09:39AM  7    A.   I THOUGHT I WAS BEING BLUNT.

09:39AM  8    Q.   WHY WERE YOU BEING BLUNT?

09:39AM  9    A.   NOTHING ELSE HAD WORKED.

09:39AM  10   Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO JANUARY OF 2013.

09:39AM  11   I DRAW YOUR ATTENTION TO EXHIBIT 770.

09:39AM  12        MAY I HAVE ONE MOMENT, YOUR HONOR?

09:39AM  13            THE COURT:  YES.

09:39AM  14        (PAUSE IN PROCEEDINGS.)

09:39AM  15   BY MR. LEACH:

09:39AM  16   Q.   DOES THIS APPEAR TO BE AN EMAIL EXCHANGE BETWEEN YOU AND

09:40AM  17   MS. HOLMES ON OR ABOUT JANUARY 20TH OF 2013?

09:40AM  18   A.   YES.

09:40AM  19            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 770 INTO

09:40AM  20   EVIDENCE.

09:40AM  21            MR. DOWNEY:  SUBJECT TO THE REDACTIONS THAT COUNSEL

09:40AM  22   REPRESENTS WERE MADE, WE HAVE NO OBJECTION.

09:40AM  23            THE COURT:  ALL RIGHT.  YOU'VE MADE THOSE

09:40AM  24   REDACTIONS?

09:40AM  25            MR. LEACH:  WE HAVE, YOUR HONOR.

09:40AM 1     THE COURT:  THANK YOU.  IT IS ADMITTED AND IT MAY BE

09:40AM 2  PUBLISHED WITH THE REDACTIONS.

09:40AM 3     (GOVERNMENT'S EXHIBIT 770 WAS RECEIVED IN EVIDENCE.)

09:40AM 4  BY MR. LEACH:

09:40AM 5  Q.   LET ME DRAW YOUR ATTENTION, MR. BURD, TO THE BOTTOM

09:40AM 6  PORTION OF PAGE 1, THE EMAIL FROM YOU TO MS. HOLMES.

09:40AM 7     DO YOU SEE THE DATE OF JANUARY 19TH, 2013?

09:40AM 8  A.   I DO.

09:40AM 9  Q.   AND THE FIRST SENTENCE READS, "I CANNOT BEGIN TO TELL YOU

09:40AM 10 HOW DISAPPOINTED I AM THAT YOU REDESIGNED THE WORDMARK WITHOUT

09:40AM 11 EVER TELLING US YOU WERE DOING IT."

09:40AM 12    WHAT WERE YOU TALKING ABOUT THERE?

09:40AM 13 A.   WE HAD PREVIOUSLY DONE, IN COOPERATION WITH ELIZABETH,

09:40AM 14 SOME WORK ON THE LOGO, HOW THE WORDS WOULD APPEAR BOTH INSIDE

09:41AM 15 AND OUTSIDE OF THE STORE, HOW THEY MIGHT APPEAR ON A LETTERHEAD

09:41AM 16 AT A TIME WHEN SHE DID NOT HAVE A TEAM IN PLACE TO DO THIS, OR

09:41AM 17 OFTEN YOU WOULD DO SOMETHING LIKE THIS WITH OUTSIDE EXPERTS,

09:41AM 18 AND SO WE HAD DONE ALL OF THIS WORK.  WE ALL SEEMED TO LIKE IT.

09:41AM 19    AND REGARDLESS, IF I'M GOING TO PUT A BRAND INSIDE OF MY

09:41AM 20 STORES, I HAVE TO APPROVE THE LOOK OF THAT BRAND.  I HAVE TO

09:41AM 21 BE -- I HAVE TO APPROVE THE COLORS, I HAVE TO APPROVE

09:41AM 22 EVERYTHING ABOUT IT BECAUSE IT COULD AFFECT OUR BRAND.

09:41AM 23 Q.   AND IF WE COULD GO TO PAGE 2, AND I WANT TO FOCUS YOU ON

09:41AM 24 THE FIRST PARAGRAPH, MR. BURD, ROUGHLY IN THE MIDDLE OF THE --

09:41AM 25 IF WE CAN ZOOM IN ON THE TOP HALF THERE, MS. HOLLIMAN.

09:42AM  1        THANK YOU.

09:42AM  2        AND, MR. BURD, I WANT TO DRAW YOUR ATTENTION TO THE

09:42AM  3   LANGUAGE IN THE FIRST PARAGRAPH AT THE TOP WHERE YOU SAY, "I

09:42AM  4   DON'T MIND PASSING THE BATON TO EITHER THERANOS OR ANYONE

09:42AM  5   ELSE."

09:42AM  6   A.   CAN YOU TELL ME AGAIN WHAT YOU'RE CITING?

09:42AM  7   Q.   SURE.  WE'RE ON PAGE 2 OF EXHIBIT 770.

09:42AM  8   A.   YES.

09:42AM  9   Q.   AND I DRAW YOUR ATTENTION TO THE FIRST PARAGRAPH AT THE

09:42AM  10  TOP.

09:42AM  11  A.   YES.

09:42AM  12  Q.   AND ROUGHLY THE THIRD SENTENCE SAYS, "I DON'T MIND PASSING

09:42AM  13  THE BATON."

09:42AM  14  A.   CORRECT.

09:42AM  15  Q.   "AND WHAT I MIND IS HAVING IT RIPPED FROM MY HANDS.  I DO

09:42AM  16  NOT LIKE WASTING TIME.  THIS DOES NOT FEEL LIKE A PARTNERSHIP."

09:42AM  17       WHAT WERE YOU HAVE GETTING AT THERE?

09:42AM  18  A.   JUST AS MUCH AS THERE WERE A LOT OF EMAILS AND PHONE

09:42AM  19  CALLS, ON SOME OF THE BUSINESS ISSUES IT WASN'T AS

09:42AM  20  COLLABORATIVE AS I THOUGHT IT SHOULD BE.

09:42AM  21  Q.   AND HOW DOES THAT RELATE TO THE REDOING OF THE WORDMARK?

09:43AM  22  A.   I MEAN, IT'S THEIR BRAND AND THEY CAN DO WHAT THEY CHOOSE

09:43AM  23  AND I THOUGHT A COURTESY CALL AT A MINIMUM WOULD BE USEFUL.

09:43AM  24  Q.   AND LET ME DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH

09:43AM  25  WHERE YOU SAY "I BELIEVE IN YOU.  I BELIEVE IN YOUR COMPANY.

09:43AM 1     AND I SHARE YOUR VISION.  I WANT SO MUCH TO HELP YOU CHANGE THE

09:43AM 2     WORLD.  WE ARE SO GOOD TOGETHER WHEN WE COLLABORATE.  BUT I

09:43AM 3     HAVE NEVER BEEN MORE FRUSTRATED."

09:43AM 4         WAS IT TRUE YOU HAD NEVER BEEN MORE FRUSTRATED?

09:43AM 5     A.   IT'S TRUE.

09:43AM 6     Q.   AND WHY WAS THAT?

09:43AM 7     A.   WELL, ALL OF THE MISSED DEADLINES, THE LACK OF

09:43AM 8     COLLABORATION ON KEY ISSUES.  REMEMBER, IT'S NOW BEEN ALMOST

09:43AM 9     TWO YEARS SINCE WE HAD A LAUNCH DATE SCHEDULED.

09:43AM 10    Q.   AND BESIDES THE STACKING OF THE DEVICES AND THE HEAT THAT

09:43AM 11    YOU'VE TALKED ABOUT, DID MS. HOLMES EVER ATTRIBUTE THIS TO SOME

09:43AM 12    FORM OF TECHNOLOGICAL ISSUE?

09:43AM 13    A.   NO.

09:44AM 14    Q.   LET ME MOVE FORWARD IN TIME, MR. BURD, TO MARCH OF 2013

09:44AM 15    AND DRAW YOUR ATTENTION TO WHAT WE HAVE MARKED AS EXHIBIT 813.

09:44AM 16        DOES THIS APPEAR TO BE AN EMAIL FROM BOB GORDON TO

09:44AM 17    MS. HOLMES, WITH A COPY TO YOU, ON OR ABOUT MARCH 19TH, 2013?

09:44AM 18    A.   YES.

09:44AM 19            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 813.

09:44AM 20            MR. DOWNEY:  NO OBJECTION.

09:44AM 21            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:44AM 22        (GOVERNMENT'S EXHIBIT 813 WAS RECEIVED IN EVIDENCE.)

09:44AM 23    BY MR. LEACH:

09:44AM 24    Q.   MR. BURD, REMIND US, WHO IS BOB GORDON?

09:44AM 25    A.   BOB GORDON WAS THE GENERAL COUNSEL OF SAFEWAY.

09:44AM   1    Q.   SOMEONE YOU WORKED WITH CLOSELY?

09:44AM   2    A.   VERY CLOSELY.

09:44AM   3    Q.   AND THE SUBJECT IS THERANOS - INVOICE FOR INVENTORY

09:44AM   4    PRE-PURCHASE.

09:44AM   5         DO YOU SEE THAT?

09:44AM   6    A.   YES.

09:44AM   7    Q.   AND WHAT DOES THAT REFER TO?

09:44AM   8    A.   THERE WERE POINTS IN THE CONTRACT, POINTS OF PROGRESS, AND

09:45AM   9    WHEN THAT MILESTONE WAS REACHED, THERE WAS ADDITIONAL MONEY DUE

09:45AM  10    FROM US AND IT CAME IN THE FORM OF A PRE-PURCHASE OF INVENTORY.

09:45AM  11    Q.   SO SAFEWAY, UNDER THE CONTRACT, WAS OBLIGATED TO PAY

09:45AM  12    $25 MILLION TO PRE-PURCHASE SOME INVENTORY?

09:45AM  13    A.   YOU KNOW, IF CERTAIN CONDITIONS WERE MET.

09:45AM  14    Q.   AND WHAT WERE SOME OF THE CONDITIONS?

09:45AM  15    A.   THE CONDITIONS WOULD BE A PILOT THAT WE REGARDED AS A

09:45AM  16    SUCCESS, AND THE WAY -- WE SAID THAT WE ALONE WOULD DECIDE

09:45AM  17    WHETHER IT WAS SUCCESSFUL, AND THAT CONDITION HAD NOT BEEN MET.

09:45AM  18    Q.   AND HAD A PILOT TAKEN PLACE AT ALL AT THIS POINT?

09:45AM  19    A.   NO.

09:45AM  20    Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 820.

09:46AM  21         DOES THIS APPEAR TO BE ANOTHER EMAIL RELATING TO THE

09:46AM  22    INVOICE THAT THERANOS SENT FOR THE $25 MILLION?

09:46AM  23    A.   YES.

09:46AM  24              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 820.

09:46AM  25              MR. DOWNEY:  NO OBJECTION.

09:46AM 1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:46AM 2          (GOVERNMENT'S EXHIBIT 820 WAS RECEIVED IN EVIDENCE.)

09:46AM 3          MR. LEACH:  IF WE CAN ZOOM IN ON THE SUBSTANCE.

09:46AM 4    THANK YOU, MS. HOLLIMAN.

09:46AM 5    Q.   THE SUBJECT IS TRIGGER POINT FOR THE 25 MILLION.

09:46AM 6         WHAT IS MEANT BY TRIGGER POINT?

09:46AM 7    A.   IT'S THE CONDITION IN THE CONTRACT THAT SAYS WHEN IT IS

09:46AM 8    MET WE WOULD PAY $25 MILLION.

09:46AM 9    Q.   AND YOUR VIEW AT THE TIME WAS THAT IT HAD NOT BEEN MET?

09:46AM 10   A.   CORRECT.

09:46AM 11   Q.   YOU WROTE, "I HAD A LONG CHAT WITH BOB GORDON EARLIER

09:46AM 12   TODAY ABOUT THE TRIGGERING EVENT.  AS WE DISCUSSED, WE WOULD

09:46AM 13   LIKE TO SEE THE SPU IN ACTION."

09:46AM 14        DO YOU SEE THAT?

09:46AM 15   A.   YES.

09:46AM 16   Q.   AND WHAT DID YOU MEAN BY THE SPU?

09:46AM 17   A.   THAT'S THE UNIT ITSELF, THE ANALYZER.

09:47AM 18   Q.   AND DID THAT EVER HAPPEN?

09:47AM 19   A.   NO.

09:47AM 20   Q.   YOU LEAVE SAFEWAY IN MAY OF 2013.  IS THAT YOUR TESTIMONY?

09:47AM 21   A.   CORRECT.

09:47AM 22   Q.   TO YOUR KNOWLEDGE, DID THERANOS EVER PUT A MINILAB DEVICE

09:47AM 23   IN A SAFEWAY STORE?

09:47AM 24   A.   TO MY KNOWLEDGE, NO.

09:47AM 25   Q.   TO YOUR KNOWLEDGE, DID SAFEWAY EVER SUCCESSFULLY OFFER

09:47AM  1    THERANOS BLOOD TESTING SERVICES TO THE PUBLIC?

09:47AM  2    A.   NO.

09:47AM  3    Q.   OTHER THAN THE STACKING OF THE DEVICES AND THE HEAT ISSUES

09:47AM  4    THAT YOU'VE DESCRIBED, DID MS. HOLMES EVER ATTRIBUTE DELAYS OR

09:47AM  5    FAILURES TO DO THAT TO SOME TYPE OF TECHNOLOGICAL ISSUE?

09:47AM  6    A.   NO.  LET ME GO BACK TO THE PUBLIC.  I WANT TO MAKE SURE,

09:47AM  7    WHEN I SAY THE PUBLIC, I'M THINKING OF NONEMPLOYEES OF SAFEWAY

09:47AM  8    AND THEIR FAMILIES.

09:47AM  9    Q.   OTHER THAN THE ON CAMPUS FACILITY THAT WE'VE TALKED ABOUT?

09:48AM  10   A.   RIGHT.

09:48AM  11   Q.   DID MS. HOLMES EVER SUGGEST USING MODIFIED THIRD PARTY

09:48AM  12   MACHINES TO DO FINGERSTICK TESTING?

09:48AM  13   A.   NO.

09:48AM  14   Q.   WOULD THAT HAVE BEEN OF INTEREST TO YOU?

09:48AM  15   A.   NO.

09:48AM  16            MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

09:48AM  17            THE COURT:  YES.

09:48AM  18        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:48AM  19            MR. LEACH:  THANK YOU, MR. BURD.

09:48AM  20        I HAVE NO FURTHER QUESTIONS.

09:48AM  21        THANK YOU, YOUR HONOR.

09:48AM  22            THE COURT:  CROSS-EXAMINATION?

09:48AM  23            MR. DOWNEY:  YES, YOUR HONOR.

09:48AM  24        YOUR HONOR, MAY I HAVE A MOMENT?

09:49AM  25            THE COURT:  YES.

| | | |
|---|---|---|
| 09:49AM | 1 | (PAUSE IN PROCEEDINGS.) |
| 09:49AM | 2 | MR. DOWNEY:  YOUR HONOR, I HAVE A NOTEBOOK FOR THE |
| 09:49AM | 3 | COURT AND THE WITNESS.  MAY I PASS A COPY UP AND APPROACH THE |
| 09:49AM | 4 | WITNESS? |
| 09:49AM | 5 | THE COURT:  PLEASE. |
| 09:49AM | 6 | MR. DOWNEY:  (HANDING.) |
| 09:49AM | 7 | **CROSS-EXAMINATION** |
| 09:49AM | 8 | BY MR. DOWNEY: |
| 09:49AM | 9 | Q.   GOOD MORNING, MR. BURD. |
| 09:49AM | 10 | A.   GOOD MORNING. |
| 09:49AM | 11 | Q.   MY NAME IS KEVIN DOWNEY AND I REPRESENT MS. HOLMES. |
| 09:49AM | 12 | I'M GOING TO REMOVE MY MASK, TOO, SO WE CAN HAVE THIS |
| 09:50AM | 13 | CONVERSATION A LITTLE MORE COMPREHENSIBLY -- |
| 09:50AM | 14 | A.   GREAT. |
| 09:50AM | 15 | Q.   -- FOR THE JURY. |
| 09:50AM | 16 | AS I UNDERSTAND IT, YOU WERE THE CHIEF EXECUTIVE AT |
| 09:50AM | 17 | SAFEWAY FOR ABOUT 20 YEARS. |
| 09:50AM | 18 | A.   EXACTLY 20 YEARS. |
| 09:50AM | 19 | Q.   AND I THINK YOU TESTIFIED ON DIRECT THAT SAFEWAY IS A VERY |
| 09:50AM | 20 | LARGE, SUCCESSFUL ORGANIZATION; IS THAT RIGHT? |
| 09:50AM | 21 | A.   CORRECT. |
| 09:50AM | 22 | Q.   YOU MENTIONED $45 BILLION OR SO IN REVENUES AS OF 2010. |
| 09:50AM | 23 | HOW MUCH OF THAT WOULD CONSTITUTE THE PROFIT OF SAFEWAY AT |
| 09:50AM | 24 | THAT TIME? |
| 09:50AM | 25 | A.   YOU KNOW, I DIDN'T COMMIT THOSE TO MEMORY, BUT WE USUALLY |

09:50AM  1   HAD FREE CASH FLOW AFTER MEETING ALL EXPENSES AND AROUND A

09:50AM  2   BILLION THREE OR SOMETHING LIKE THAT.

09:50AM  3   Q.   AND PEOPLE THINK THAT BECAUSE YOU'RE THE CEO, YOU'RE THE

09:50AM  4   TOP GUY.  BUT, IN FACT, YOU HAD A BOARD OF DIRECTORS YOU HAD TO

09:50AM  5   REPORT TO; IS THAT CORRECT?

09:50AM  6   A.   THAT'S CORRECT.

09:50AM  7   Q.   AND IT WAS A VERY SOPHISTICATED BOARD?

09:50AM  8   A.   WE HAD PEOPLE WITH STRONG BUSINESS EXPERIENCE.  WE THINK

09:51AM  9   IT WAS A GOOD BOARD.

09:51AM  10  Q.   AND YOU HAD THE FORMER CHIEF EXECUTIVE OF WELLS FARGO;

09:51AM  11  CORRECT?

09:51AM  12  A.   CORRECT?

09:51AM  13  Q.   AND YOU HAD THE FORMER VICE CHAIR OF MACY'S; CORRECT?

09:51AM  14  A.   RIGHT.

09:51AM  15  Q.   AND YOU HAD THE FORMER CEO OF AT&T WIRELESS; CORRECT?

09:51AM  16  A.   CORRECT.

09:51AM  17  Q.   AND SO YOU HAD A LOT OF PEOPLE WHO HAD A LOT OF EXPERIENCE

09:51AM  18  IN BUSINESS?

09:51AM  19  A.   THAT'S CORRECT.

09:51AM  20  Q.   AND THEY WERE PEOPLE WHO WOULD ASK YOU QUESTIONS AND

09:51AM  21  COMMENT ON DECISIONS MANAGEMENT MADE IF THEY HAD AN ISSUE WITH

09:51AM  22  IT; CORRECT?

09:51AM  23  A.   CORRECT.

09:51AM  24  Q.   AND WITHIN THE COMPANY, OF COURSE YOU MENTIONED -- I THINK

09:51AM  25  YOU MENTIONED YOU HAD MORE THAN 175,000 EMPLOYEES AT THAT TIME;

09:51AM   1    CORRECT?

09:51AM   2    A.   CORRECT.

09:51AM   3    Q.   AND MANY OF THOSE ARE THE PEOPLE WE KNOW WHO WORK IN THE

09:51AM   4    STORES; CORRECT?

09:51AM   5    A.   MOST OF THEM WORK IN THE STORES.

09:51AM   6    Q.   OKAY.  BUT YOU ALSO HAVE A FUNCTION THAT YOU MIGHT CALL

09:51AM   7    THE CORPORATE FUNCTION, WHICH IS THE LAWYERS AND THE

09:51AM   8    ACCOUNTANTS AND SO FORTH?

09:51AM   9    A.   WE WOULD CALL THAT THE SUPPORT FUNCTION.

09:51AM  10    Q.   THE SUPPORT FUNCTION.

09:51AM  11         HOW MANY PEOPLE WORKED IN THE SUPPORT FUNCTION IN 2010?

09:51AM  12    A.   YOU KNOW, 2010 TO 2013 ARE KIND OF BLURRING, SO I'LL JUST

09:52AM  13    GIVE YOU ROUGH NUMBERS.

09:52AM  14    Q.   THAT'S FINE.

09:52AM  15    A.   ON CAMPUS WE HAD AROUND 3500 EMPLOYEES; AND THEN WE WERE

09:52AM  16    ORGANIZED DIVISIONALLY IN NINE DIVISIONS IN THE U.S. AND

09:52AM  17    CANADA, AND SO THEY HAD THEIR OWN SUPPORT FUNCTION.  IT MIGHT

09:52AM  18    BE ANYWHERE FROM 300 TO 700 PEOPLE.

09:52AM  19    Q.   AND YOU HAD, WORKING WITHIN THAT, A NUMBER OF PEOPLE WHO

09:52AM  20    REPORTED DIRECTLY TO YOU; CORRECT?

09:52AM  21    A.   CORRECT.

09:52AM  22    Q.   AND THAT WAS A STRONG EXECUTIVE TEAM IN YOUR VIEW?

09:52AM  23    A.   IT WAS.

09:52AM  24    Q.   OKAY.  YOU HAD A -- I THINK YOU MENTIONED YOU HAD A

09:52AM  25    GENERAL COUNSEL, MR. GORDON; CORRECT?

09:52AM  1      A.   CORRECT.

09:52AM  2      Q.   AND YOU HAD A CHIEF FINANCIAL OFFICER, ROBERT EDWARDS;

09:52AM  3   CORRECT?

09:52AM  4      A.   CORRECT.

09:52AM  5      Q.   AND YOU HAD A NUMBER OF OTHER SENIOR EXECUTIVE VICE

09:52AM  6   PRESIDENT TYPES; CORRECT?

09:52AM  7      A.   YES.

09:52AM  8      Q.   AND YOU HAD AN ENTIRE DIVISION THAT WAS DEVOTED TO HEALTH

09:52AM  9   ISSUES AT SAFEWAY; CORRECT?

09:53AM  10     A.   WE HAD A SMALL COMPANY, A STARTUP, PROBABLY NOT MORE THAN

09:53AM  11  FIVE EMPLOYEES.

09:53AM  12     Q.   AND THAT WAS CALLED SAFEWAY HEALTH?

09:53AM  13     A.   SAFEWAY HEALTH.

09:53AM  14     Q.   OKAY.  AND WHEN THE COMPANY HAD ISSUES ON WHICH IT DIDN'T

09:53AM  15  HAVE INTERNAL CAPACITY TO UNDERTAKE DECISIONS OR CONDUCT ITS

09:53AM  16  OPERATIONS, YOU WOULD GET OUTSIDE ADVISORS; CORRECT?

09:53AM  17     A.   WE WOULD.

09:53AM  18     Q.   AND SO IF YOU NEEDED LAWYERS, YOU MIGHT HIRE A LAW FIRM;

09:53AM  19  CORRECT?

09:53AM  20     A.   YES.

09:53AM  21     Q.   AND IF YOU NEEDED TO UNDERTAKE A TRANSACTION, YOU MIGHT

09:53AM  22  HIRE PEOPLE TO HELP YOU WITH THAT TRANSACTION; CORRECT?

09:53AM  23     A.   YES.

09:53AM  24     Q.   AND YOU MIGHT HIRE INVESTMENT BANKERS; CORRECT?

09:53AM  25     A.   YEAH, FOR LARGE TRANSACTIONS.  SMALL ONES WE DO OURSELVES.

09:53AM  1    Q.   AND ACQUISITION ADVISORS AND SO FORTH; CORRECT?

09:53AM  2    A.   CORRECT.

09:53AM  3    Q.   OKAY.  AND AT THIS POINT IN YOUR 17TH OR 18TH YEAR,

09:53AM  4    WHATEVER IT WAS, AS THE CHIEF EXECUTIVE, YOU HAD BECOME A

09:54AM  5    PRETTY SOPHISTICATED NEGOTIATOR; IS THAT RIGHT?

09:54AM  6    A.   I THINK I'M PRETTY GOOD AT IT.

09:54AM  7         ON THE OTHER HAND, WE HAD -- THIS WAS LARGELY A UNIONIZED

09:54AM  8    COMPANY, SO I HAD PEOPLE NEGOTIATE FOR ME.  BUT I SET THE

09:54AM  9    STRATEGY, THEY EXECUTED THE STRATEGY, AND I APPROVED THE

09:54AM 10    OUTCOME.

09:54AM 11    Q.   WELL, YOU MENTIONED EVEN BEFORE YOU CAME TO SAFEWAY YOU

09:54AM 12    HAD A BACKGROUND IN PRIVATE EQUITY; CORRECT?

09:54AM 13    A.   I WORKED FOR KOHLBERG, KRAVIS, ROBERTS & COMPANY NOT AS AN

09:54AM 14    EMPLOYEE BUT AS AN ADVISOR FOR ALMOST TEN YEARS.

09:54AM 15    Q.   AND THAT'S A LARGE PRIVATE EQUITY FIRM THAT MAKES

09:54AM 16    INVESTMENTS IN COMPANIES; CORRECT?

09:54AM 17    A.   IT IS.

09:54AM 18    Q.   AND YOUR AFFILIATION YOU SAY LASTED TEN YEARS?

09:54AM 19    A.   CLOSE TO TEN YEARS.

09:54AM 20    Q.   AND YOU WERE AROUND TRANSACTIONS IN CONNECTION WITH THEIR

09:54AM 21    WORK; CORRECT?

09:54AM 22    A.   I WAS.

09:54AM 23    Q.   AND AT SAFEWAY STORES, YOU'VE ALSO ENGAGED IN NEGOTIATIONS

09:54AM 24    RELATED TO A NUMBER OF ACQUISITIONS OF A NUMBER OF BUSINESSES;

09:54AM 25    CORRECT?

09:55AM  1    A.   YES.

09:55AM  2    Q.   AND YOU STARTED SOME BUSINESSES.  I THINK YOU MENTIONED

09:55AM  3    THAT.

09:55AM  4    A.   I STARTED SOME BUSINESSES.

09:55AM  5    Q.   AND THEN THOSE ARE THE GAS STATIONS AND SO FORTH?

09:55AM  6    A.   ACTUALLY, I HADN'T THOUGHT ABOUT THAT.  THAT WOULD BE

09:55AM  7    NUMBER SEVEN.  I STARTED SEVEN BUSINESSES.

09:55AM  8    Q.   SEVEN BUSINESSES?

09:55AM  9    A.   YES.

09:55AM  10   Q.   OKAY.  NOW, YOU FIRST LEARNED ABOUT THERANOS IN 2010 OR

09:55AM  11   LATE 2009?

09:55AM  12   A.   I REMEMBER THE MONTH.  THE YEAR IS SOMEWHERE IN THESE

09:55AM  13   BINDERS.  THE MONTH WAS MARCH.

09:55AM  14   Q.   OKAY.  AND BEFORE YOU MET WITH MS. HOLMES, I THINK YOU

09:55AM  15   MENTIONED THAT SOME OTHER EXECUTIVES OF THE COMPANY HAD MET

09:55AM  16   WITH MS. HOLMES; CORRECT?

09:55AM  17   A.   CORRECT.

09:55AM  18   Q.   AND DO YOU KNOW ON HOW MANY OCCASIONS THEY HAD MET WITH

09:55AM  19   MS. HOLMES?

09:55AM  20   A.   I BELIEVE IT WAS JUST ONE.

09:55AM  21   Q.   OKAY.  AND DO YOU RECALL WHETHER A BOARD MEMBER OF

09:55AM  22   THERANOS HAD HAD A DISCUSSION WITH A BOARD MEMBER OF SAFEWAY,

09:55AM  23   OR RATHER, WITH THE CHIEF FINANCIAL OFFICER OF SAFEWAY ABOUT

09:56AM  24   THERANOS?

09:56AM  25   A.   YES.

09:56AM  1     Q.   AND THE CHIEF FINANCIAL OFFICER, AS YOU SAID, WAS

09:56AM  2     MR. EDWARDS; CORRECT?

09:56AM  3     A.   CORRECT.

09:56AM  4     Q.   AND THE BOARD MEMBER FROM THERANOS WAS MR. DON LUCAS;

09:56AM  5     CORRECT?

09:56AM  6     A.   THAT IS CORRECT.  I BELIEVE THEY SERVED ON A BOARD

09:56AM  7     TOGETHER AND THAT'S HOW THEY KNEW ONE ANOTHER.

09:56AM  8     Q.   SO THEY HAD A PRIOR RELATIONSHIP?

09:56AM  9     A.   CORRECT.

09:56AM  10    Q.   AND DID YOU LEARN ABOUT THAT CONVERSATION BEFORE YOU

09:56AM  11    ENTERED INTO DISCUSSIONS WITH MS. HOLMES?

09:56AM  12    A.   I DID NOT KNOW ABOUT THAT CONVERSATION.  I THINK IT TOOK

09:56AM  13    PLACE AFTER I MET ELIZABETH AND HEARD THE THERANOS STORY.

09:56AM  14    Q.   AND WHEN YOU HEARD THAT MR. LUCAS WAS A BOARD MEMBER, DID

09:56AM  15    YOU RECOGNIZE WHO HE WAS?

09:56AM  16    A.   I DID.

09:56AM  17    Q.   YOU UNDERSTOOD THAT HE HAD BEEN A SUBSTANTIAL INVESTOR IN

09:56AM  18    TECHNOLOGY COMPANIES; IS THAT RIGHT?

09:56AM  19    A.   CORRECT.

09:56AM  20    Q.   AND YOU UNDERSTOOD THAT HE HAD BEEN AFFILIATED WITH SOME

09:56AM  21    OF THE SUCCESS STORIES IN TECHNOLOGY; IS THAT CORRECT?

09:57AM  22    A.   CORRECT.

09:57AM  23    Q.   ORACLE AND SO FORTH?

09:57AM  24    A.   CORRECT.

09:57AM  25    Q.   AND DID YOU LEARN DETAILS ABOUT THE BUSINESS FROM YOUR --

09:57AM  1    THE PEOPLE WHO WORKED FOR YOU PRIOR TO THE TIME THAT YOU MET

09:57AM  2    MS. HOLMES?

09:57AM  3    A.   NO.

09:57AM  4    Q.   THEY SIMPLY TOLD YOU THAT WE HAD A MEETING AND THEY WOULD

09:57AM  5    LIKE YOU TO HAVE A MEETING?

09:57AM  6    A.   WELL, THEY TOLD ME ABOUT THE MEETING.  I WOULDN'T SAY IT

09:57AM  7    WAS DETAILS.  I JUST HAD TO HEAR THAT IT WAS A MINILAB, RESULTS

09:57AM  8    IN 20, 30 MINUTES, AND I WAS IMMEDIATELY INTERESTED.

09:57AM  9    Q.   AND THEN YOU HAD THE MEETING I THINK YOU DESCRIBED ON

09:57AM 10    DIRECT; CORRECT?

09:57AM 11    A.   I'M SORRY.  SAY THAT AGAIN.

09:57AM 12    Q.   I'M SORRY.  YOU HAD THE MEETING WITH MS. HOLMES THAT YOU

09:57AM 13    DESCRIBED ON FRIDAY, WHICH I WON'T MAKE YOU REPEAT.

09:57AM 14    A.   YES.

09:57AM 15    Q.   BUT THIS WAS IN GENERAL TERMS.  THIS WAS THE MEETING WHERE

09:57AM 16    YOU WANTED TO GAIN AN IMPRESSION OF HER, LEARN ABOUT HER VISION

09:57AM 17    AND SO FORTH?

09:57AM 18    A.   CORRECT.

09:57AM 19    Q.   AND I THINK YOU TESTIFIED THAT YOU WERE IMPRESSED WITH HER

09:57AM 20    AS A RESULT OF THAT MEETING; CORRECT?

09:57AM 21    A.   YES.

09:58AM 22    Q.   YOU KNEW AT THE TIME THAT SHE WAS A VERY YOUNG

09:58AM 23    ENTREPRENEUR; CORRECT?

09:58AM 24    A.   YES.

09:58AM 25    Q.   YOU KNEW SHE WAS IN HER 20S OR SO?

09:58AM 1    A.   RIGHT.

09:58AM 2    Q.   AND OF COURSE YOU KNEW THE COMPANY WAS A STARTUP; CORRECT?

09:58AM 3    A.   I KNEW THAT.  I MEAN, IT WAS A, IT WAS -- IT HAD STILL

09:58AM 4    BEEN IN BUSINESS FOR A WHILE, BUT I WOULD CLASSIFY IT AS A

09:58AM 5    STARTUP.

09:58AM 6    Q.   IT WAS ABOUT FIVE AND A HALF YEARS OLD OR SO?

09:58AM 7    A.   YES, YES.

09:58AM 8    Q.   AND DID YOU KNOW HOW MANY EMPLOYEES THE COMPANY HAD?

09:58AM 9    A.   I DID NOT.

09:58AM 10   Q.   AND DID YOU KNOW WHETHER THE COMPANY HAD EVER BEEN PART OF

09:58AM 11   A RETAIL PARTNERSHIP BEFORE MS. HOLMES'S DISCUSSIONS WITH YOU

09:58AM 12   AND OTHERS AT SAFEWAY?

09:58AM 13   A.   YOU KNOW, SOMEWHERE ALONG THE LINE, NOT IN THAT FIRST

09:58AM 14   MEETING, I LEARNED THAT THEY HAD DISCUSSIONS WITH WALGREENS.

09:58AM 15   Q.   THAT AT THE SAME TIME THEY WERE JUST HAVING DISCUSSIONS

09:58AM 16   WITH SAFEWAY, THERANOS WAS ALSO DISCUSSING POTENTIAL RETAIL

09:58AM 17   PARTNERSHIPS WITH OTHER RETAIL COMPANIES; IS THAT WHAT YOU

09:59AM 18   MEAN?

09:59AM 19   A.   THAT'S WHAT I MEAN.

09:59AM 20   Q.   OKAY.  BUT AS OF THAT TIME, THEY HAD NOT YET RUN ANY

09:59AM 21   RETAIL OPERATIONS; CORRECT?

09:59AM 22   A.   CORRECT.

09:59AM 23   Q.   AND THEIR WORK, AS YOU UNDERSTOOD IT, HAD LARGELY BEEN IN

09:59AM 24   CONNECTION WITH WORK WITH THE PHARMACEUTICAL INDUSTRY; CORRECT?

09:59AM 25   A.   THAT'S INITIALLY WHO THEY SAID THEY HAD TESTED OUT THEIR

09:59AM 1    DEVICE WITH.

09:59AM 2    Q.   SO YOU UNDERSTOOD THAT SAFEWAY OR WALGREENS OR ONE OF THE

09:59AM 3    OTHER COMPANIES THAT THEY WERE TALKING TO, THIS WOULD BE THEIR

09:59AM 4    FIRST CONSUMER-BASED DEPLOYMENT OF TECHNOLOGY; CORRECT?

09:59AM 5    A.   CORRECT.

09:59AM 6    Q.   AND YOU UNDERSTOOD, OF COURSE, AS A RESULT THAT THEY NEVER

09:59AM 7    SCALED THIS TECHNOLOGY OR BUILT TECHNOLOGY ON A BROAD BASIS;

09:59AM 8    CORRECT?

09:59AM 9    A.   I KNEW THEY DIDN'T HAVE A LOT OF CUSTOMERS, OKAY, SO THEY

09:59AM 10   HADN'T GEARED UP FOR A LOT OF PRODUCTION.

09:59AM 11   Q.   OKAY.  BUT NEVERTHELESS, FOR THE REASONS THAT I THINK YOU

09:59AM 12   SAID ON FRIDAY, YOU WERE IMPRESSED WITH MS. HOLMES AND WITH THE

09:59AM 13   COMPANY BASED ON WHAT YOU HAD LEARNED; CORRECT?

10:00AM 14   A.   CORRECT.

10:00AM 15   Q.   AND I THINK YOU TESTIFIED THAT YOU ALMOST IMMEDIATELY WERE

10:00AM 16   INTERESTED IN PURSUING A POTENTIAL PARTNERSHIP WITH THERANOS;

10:00AM 17   CORRECT?

10:00AM 18   A.   CORRECT.

10:00AM 19   Q.   AND YOU MENTIONED THAT YOU, SHORTLY AFTER THE MEETING,

10:00AM 20   THAT YOU THOUGHT YOU SENT AN EMAIL TO MS. HOLMES.

10:00AM 21       DO YOU RECALL THAT?

10:00AM 22   A.   I BELIEVE I DID.

10:00AM 23   Q.   OKAY.  LET ME SHOW YOU IN THE BINDER THAT I'VE PLACED IN

10:00AM 24   FRONT OF YOU EXHIBIT 281.

10:00AM 25   A.   YES.

10:00AM  1    Q.   IS THAT A LETTER THAT YOU SENT TO MS. HOLMES IN 2010 AFTER

10:00AM  2    THE MEETING THAT YOU DESCRIBED ON DIRECT?

10:00AM  3    A.   CORRECT.

10:00AM  4          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:00AM  5    281.

10:01AM  6          MR. LEACH:  NO OBJECTION.

10:01AM  7          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:01AM  8       (GOVERNMENT'S EXHIBIT 281 WAS RECEIVED IN EVIDENCE.)

10:01AM  9    BY MR. DOWNEY:

10:01AM 10    Q.   NOW, AM I RIGHT THAT AFTER YOU HEARD ABOUT THERANOS, THAT

10:01AM 11    YOU UNDERSTOOD THAT THIS OPPORTUNITY MIGHT BE ONE THAT HAD A

10:01AM 12    LOT OF POTENTIAL FOR SAFEWAY?

10:01AM 13    A.   CORRECT.

10:01AM 14    Q.   AND I THINK YOU SAID ON DIRECT THAT ONE OF THE POTENTIALS

10:01AM 15    WAS THAT JUST BY HAVING A NEW BUSINESS, YOU WOULD DRAW MORE

10:01AM 16    PEOPLE INTO SAFEWAY STORES; CORRECT?

10:01AM 17    A.   YES.

10:01AM 18    Q.   AND ANOTHER POSSIBILITY WAS THAT WITH RESPECT TO TESTS

10:01AM 19    THAT WERE PERFORMED IN SAFEWAY STORES, YOU MIGHT REALIZE A

10:01AM 20    LITTLE BIT OF A PROFIT ON EACH TEST THAT WAS PERFORMED;

10:01AM 21    CORRECT?

10:01AM 22    A.   CORRECT.

10:01AM 23    Q.   AND SO THAT THERANOS MIGHT BE OFFERING A TEST IN YOUR

10:01AM 24    STORE AT, SAY, $12 AND YOU MIGHT BE ABLE TO RETAIN TWO OF THOSE

10:01AM 25    DOLLARS; CORRECT?

10:01AM 1    A.   YES.  YOUR EXAMPLE, THOUGH, IS A PRETTY LOW NUMBER.  A

10:01AM 2    TYPICAL TEST WOULD BE, YOU KNOW, OVER $30.

10:02AM 3    Q.   OKAY.  AND OUT OF THAT, HOW MUCH WOULD SAFEWAY PROJECT IT

10:02AM 4    MIGHT BE ABLE TO CAPTURE?

10:02AM 5    A.   WE HAD SOMETHING IN THE CONTRACT THAT SUGGESTED THAT --

10:02AM 6    WELL, IT DIDN'T SUGGEST, IT SAID THAT WE WANTED TO MAKE $10 PER

10:02AM 7    TEST.

10:02AM 8    Q.   OKAY.  AND YOU ALSO TALKED ABOUT -- HOW MANY TESTS --

10:02AM 9    A.   CAN I CLARIFY THAT AND MAKE SURE EVERYBODY UNDERSTANDS?

10:02AM 10   Q.   YEAH.

10:02AM 11   A.   WE WANTED $10 IN REVENUE FOR DOING A TEST.  WHEN SOMEONE

10:02AM 12   COMES IN FOR A BLOOD TEST, THEY TYPICALLY HAVE THREE AND A HALF

10:02AM 13   TESTS, SO THAT WOULD BE $35.  AND THE FACILITY'S ON OUR

10:02AM 14   PROPERTY WITH OUR LABOR, THAT'S NOT THE PROFIT YOU MAKE, IT'S

10:02AM 15   THE REVENUE THAT YOU MAKE.

10:02AM 16   Q.   SO IT WOULD BE YOUR GROSS REVENUE, AND THEN OUT OF THAT

10:02AM 17   YOU WOULD REALIZE A SMALLER NUMBER AS PROFIT; CORRECT?

10:02AM 18   A.   CORRECT.

10:02AM 19   Q.   BUT IN TERMS OF THE LARGER STORE AND SO FORTH, THAT WAS

10:02AM 20   ALREADY BUILT, CORRECT, SO THIS WAS POTENTIALLY A PROFITABLE

10:02AM 21   BUSINESS?

10:02AM 22   A.   AT THE NUMBERS THAT WE WERE LOOKING AT, YES.

10:02AM 23   Q.   AND YOU ALSO MENTIONED THAT YOU MIGHT FEATURE TO OTHER

10:02AM 24   STORES A NETWORK IN WHICH THERANOS SERVICES MIGHT BE OFFERED.

10:03AM 25        COULD YOU EXPLAIN THAT?

10:03AM 1     A.   SURE.  WE HAD BUILT A NETWORK OF RETAILERS TO SELL GIFT

10:03AM 2     CARDS THAT YOU'LL SEE IN MOST SUPERMARKETS IN THE UNITED STATES

10:03AM 3     CALLED AN END CAP.

10:03AM 4          SO WE HAD THESE PARTNERSHIPS THAT EXISTED, AND WE FELT WE

10:03AM 5     COULD DO THE SAME THING FOR THERANOS BECAUSE WE WERE ONLY 1500,

10:03AM 6     1800 STORES IN THAT TIMEFRAME AND WE THOUGHT WE COULD PUT

10:03AM 7     TOGETHER A NATIONWIDE NETWORK OF OTHER RETAILERS AND WE WOULD

10:03AM 8     GET A REALLY SMALL SLIVER OF INCOME FROM THAT.

10:03AM 9     Q.   AND WOULD THAT BE DONE BY A LICENSING AGREEMENT BETWEEN

10:03AM 10    YOU AND THE OTHER STORES, OR HOW WOULD IT WORK?

10:03AM 11    A.   IT WOULD BE -- YOU KNOW, I DON'T THINK WE GOT FAR IN THAT

10:03AM 12    BUT WE ENVISIONED THAT WE WOULD PUT THAT NETWORK TOGETHER,

10:03AM 13    THERANOS WOULD APPROVE THOSE RETAILERS, AND THEN I CAN'T

10:04AM 14    RECALL, I THINK IT WAS OUR REVENUE WOULD COME FROM THE RETAILER

10:04AM 15    ITSELF, THAT SMALL BIT OF PROFIT.

10:04AM 16    Q.   AND YOU MENTIONED ON, ON -- A MOMENT AGO THAT YOU LEARNED

10:04AM 17    AT SOME POINT DURING THE COURSE OF YOUR DISCUSSIONS WITH

10:04AM 18    THERANOS THAT THEY WERE ALSO TALKING TO OTHER RETAILERS;

10:04AM 19    CORRECT?

10:04AM 20    A.   THE ONLY RETAILER I KNEW THAT THEY WERE TALKING TO WAS

10:04AM 21    WALGREENS.  AT LEAST THAT'S MY MEMORY.

10:04AM 22         I HAD INTRODUCED ELIZABETH TO PEOPLE AT PUBLIX, HY-VEE,

10:04AM 23    AND I THINK OTHER RETAILERS AT AN ANNUAL FMI CONFERENCE.

10:04AM 24    Q.   OKAY.  BUT WHATEVER -- AT THIS EARLY STAGE WHERE YOU WERE

10:04AM 25    MEETING MS. HOLMES FOR THE FIRST TIME, YOU RECOGNIZED THAT

10:04AM 1    WHATEVER RETAILER MIGHT GET AN EXCLUSIVE CONTRACT WITH

10:04AM 2    THERANOS, THAT THAT COULD BE A UNIQUELY PROFITABLE OPPORTUNITY

10:04AM 3    FOR THAT RETAILER; CORRECT?

10:04AM 4    A.   SURE.  AND THAT WAS NOT DISCUSSED AT THAT MEETING.  THAT

10:05AM 5    WAS LAID OUT IN THIS LETTER.

10:05AM 6    Q.   OKAY.  WELL, LET'S LOOK AT EXHIBIT 281 AND LET'S LOOK AT

10:05AM 7    THE FIRST PARAGRAPH.

10:05AM 8        IN THIS PARAGRAPH, YOU LAY OUT A POTENTIAL ARRANGEMENT

10:05AM 9    WHERE SAFEWAY WOULD HELP TO LAUNCH THE THERANOS BLOOD ANALYZER;

10:05AM 10   CORRECT?

10:05AM 11   A.   CORRECT.

10:05AM 12   Q.   AND IN RETURN, SAFEWAY WOULD GET THE EXCLUSIVE RIGHTS IN

10:05AM 13   ALL RETAIL FOR SOME PERIOD OF TIME; CORRECT?

10:05AM 14   A.   IT WAS CONFINED TO THE RETAIL SUPERMARKETS.

10:05AM 15   Q.   WELL, AT THIS POINT IN TIME, WERE YOU SEEKING ACTUALLY

10:05AM 16   EXCLUSIVE RIGHTS ACROSS ALL FORMS OF RETAIL?

10:05AM 17   A.   I DON'T BELIEVE SO.  I CAN READ THIS THING AGAIN.

10:05AM 18   Q.   SURE.

10:05AM 19       (PAUSE IN PROCEEDINGS.)

10:06AM 20         THE WITNESS:  WE WERE THINKING, YOU KNOW, WHETHER IT

10:06AM 21   SAYS IT HERE OR NOT, WE WERE THINKING EXCLUSIVELY ABOUT A

10:06AM 22   SUPERMARKET NETWORK.

10:06AM 23   BY MR. DOWNEY:

10:06AM 24   Q.   OKAY, SO THAT WOULD PRECLUDE RETAILERS LIKE KROGER AND

10:06AM 25   OTHERS FROM OFFERING IT IF YOU WERE ABLE TO ACHIEVE THAT TYPE

10:06AM   1       OF EXCLUSIVITY?

10:06AM   2       A.   WE WOULD TRY TO BUILD IT INITIALLY SO IT WAS RETAILERS

10:06AM   3       THAT WE DIDN'T COMPETE WITH, BUT WE LEARNED FROM THE BLACK HAWK

10:06AM   4       NETWORK THAT WE PUT TOGETHER FOR GIFT CARDS THAT WE ULTIMATELY

10:06AM   5       SOLD THEM TO EVERYBODY, EVEN THOSE WE COMPETED WITH, AND IT WAS

10:06AM   6       PROFITABLE TO DO SO.  BUT WE WOULD START WITH NONCOMPETING

10:06AM   7       RETAILERS.

10:06AM   8       Q.   OKAY.  AND SO WOULD YOU BE ABLE TO PRECLUDE, IN YOUR VIEW,

10:07AM   9       FOOD RETAILERS LIKE WAL-MART?

10:07AM  10       A.   WE WOULDN'T HAVE PICKED THEM BECAUSE WE COMPETE WITH THEM

10:07AM  11       SO BROADLY.

10:07AM  12       Q.   OKAY.  SO THEY WOULD NOT HAVE BEEN PART OF THE NETWORK?

10:07AM  13       A.   CORRECT.

10:07AM  14       Q.   SO IF YOU GOT AN EXCLUSIVE DEAL, YOU COULD PRECLUDE

10:07AM  15       WAL-MART FOR A PERIOD OF TIME FROM HOSTING THERANOS DEVICES?

10:07AM  16       A.   CORRECT.

10:07AM  17       Q.   OKAY.  AND THAT WOULD BE TRUE ALSO OF ANY OTHER RETAILER

10:07AM  18       THAT IS PART OF THE FOOD RETAIL CHAIN?

10:07AM  19       A.   YES.

10:07AM  20       Q.   OKAY.  IF YOU LOOK AT THE FIRST PARAGRAPH AFTER YOUR

10:07AM  21       INTRODUCTORY PARAGRAPH, YOU INDICATE THAT YOU WILL ARRANGE A

10:07AM  22       MEETING BETWEEN MS. HOLMES AND UCSF SO THAT IT COULD VERIFY

10:07AM  23       THAT THE BLOOD ANALYZER COULD PERFORM 85 PERCENT OF BLOOD WORK

10:07AM  24       DONE BY A STANDARD RETAIL LAB; CORRECT?

10:07AM  25       A.   CORRECT.

10:07AM   1      Q.   DID YOU ARRANGE THAT MEETING?

10:08AM   2      A.   WE DID ARRANGE A MEETING WITH UCSF WHICH INCLUDED THE CEO,

10:08AM   3      THE CHIEF MEDICAL OFFICER, AND THE HEAD OF LABS, BUT THAT

10:08AM   4      WASN'T UNTIL 2011.

10:08AM   5      Q.   WELL, DO YOU RECALL AT THE TIME OF THIS DISCUSSION WITH

10:08AM   6      MS. HOLMES THAT YOU DID ARRANGE A MEETING BETWEEN MS. HOLMES

10:08AM   7      AND PHYSICIANS AT UCSF?

10:08AM   8      A.   I DON'T QUITE UNDERSTAND THE QUESTION.

10:08AM   9      Q.   WELL, I THINK YOU JUST DESCRIBED A MEETING --

10:08AM  10      A.   ARE YOU ASKING, DID I DO THAT BEFORE 2011?

10:08AM  11      Q.   YES.

10:08AM  12      A.   I'D HAVE TO GO LOOK AT A BUNCH OF EMAILS.  I CAN'T COMMIT

10:08AM  13      ONE WAY OR THE OTHER ON THAT.

10:08AM  14      Q.   WELL, LET ME SHOW YOU ONE EMAIL TO SEE IF IT REFRESHES

10:08AM  15      YOUR RECOLLECTION.

10:08AM  16      A.   SURE.

10:08AM  17      Q.   AND THIS IS NOT FOR DISPLAY, BUT EXHIBIT 7101.  AND YOU

10:09AM  18      CAN REVIEW AS MUCH OF THIS AS YOU WOULD LIKE TO REVIEW, BUT I'M

10:09AM  19      JUST REALLY INTERESTED IN THE FIRST PARAGRAPH.

10:09AM  20           FIRST OF ALL, LET ME JUST ASK, IS KEVIN SHACHMUT ONE OF

10:09AM  21      THE EXECUTIVES WHO YOU MENTIONED WHO WORKED WITHIN SAFEWAY

10:09AM  22      HEALTH AT THIS TIME?

10:09AM  23      A.   THAT'S CORRECT.

10:09AM  24      Q.   IS IT ACCURATE THAT YOU, AS OF 2010, HAD CONTACTS AT UCSF?

10:09AM  25      A.   I HAD A LONGSTANDING RELATIONSHIP AT UCSF.

10:09AM   1          I HAVE TO READ THE COMPLETE LETTER.  CAN I DO THAT?

10:09AM   2     Q.   SURE.  OF COURSE.

10:09AM   3     A.   OKAY.

10:10AM   4          (PAUSE IN PROCEEDINGS.)

10:10AM   5              THE WITNESS:  OKAY.

10:10AM   6     BY MR. DOWNEY:

10:10AM   7     Q.   ALL RIGHT.  I ASKED YOU ABOUT MR. SHACHMUT.

10:10AM   8          IS BRAD WOLFSEN ALSO ANOTHER SAFEWAY HEALTH EXECUTIVE?

10:10AM   9     A.   HE WAS AT THE TIME.

10:10AM  10     Q.   AND YOU -- AS YOU SAID, YOU HAVE A LONGSTANDING

10:10AM  11     RELATIONSHIP WITH UCSF; IS THAT CORRECT?

10:10AM  12     A.   CORRECT.

10:10AM  13     Q.   AND IS THAT IN PART BECAUSE SAFEWAY HAS BEEN A GENEROUS

10:10AM  14     DONOR TO UCSF?

10:10AM  15     A.   SAFEWAY HAS, YES.

10:10AM  16     Q.   AND YOU PERSONALLY HAVE?

10:10AM  17     A.   I PERSONALLY HAVE.

10:10AM  18     Q.   AND SO YOU HAVE HAD GOOD RELATIONSHIPS WITHIN UCSF; IS

10:10AM  19     THAT CORRECT?

10:10AM  20     A.   CORRECT.

10:10AM  21     Q.   AND DOES THIS REFRESH YOUR RECOLLECTION THAT YOU REACHED

10:10AM  22     OUT AROUND THE TIME OF YOUR INITIAL MEETING WITH MS. HOLMES TO

10:10AM  23     ASK UCSF TO EVALUATE THERANOS'S TECHNOLOGY AND WHAT CAPACITIES

10:10AM  24     IT HAD AT THAT TIME?

10:10AM  25     A.   IT DOESN'T.  THIS LETTER STATES THAT STEVE WILL BE

10:11AM  1    REACHING OUT TO HIS CONTACTS --

10:11AM  2    Q.   YOU DON'T HAVE TO READ IT.  I'M JUST --

10:11AM  3          THE COURT:  EXCUSE ME, COUNSEL.

10:11AM  4       THE LAST PORTION IS STRICKEN, LADIES AND GENTLEMEN.  THE

10:11AM  5    PORTION ABOUT READING THE LETTER IS JUST TO REFRESH THE

10:11AM  6    WITNESS'S RECOLLECTION.

10:11AM  7          THE WITNESS:  RIGHT.

10:11AM  8    BY MR. DOWNEY:

10:11AM  9    Q.   I'M JUST ASKING YOU IF, HAVING READ IT, YOU RECALL IT OR

10:11AM 10    NOT.

10:11AM 11    A.   I DON'T BELIEVE THAT -- BY THE 24TH I HAD NOT YET REACHED

10:11AM 12    OUT TO UCSF.

10:11AM 13    Q.   DO YOU KNOW DR. SUE DESMOND-HELLMANN?

10:11AM 14    A.   SHE'S MY ALAMO NEIGHBOR.  I LIVE IN ALAMO AND SHE LIVES

10:11AM 15    NEXT DOOR.

10:11AM 16    Q.   AND DO YOU KNOW SHE'S DONE MANY THINGS, BUT AMONGST THEM

10:11AM 17    SHE'S A VERY PROMINENT EPIDEMIOLOGIST?

10:11AM 18    A.   SHE'S ACTUALLY A CANCER DOCTOR.

10:11AM 19    Q.   RIGHT.  AND SHE FOCUSES ON BIOSTATISTICS AND CANCER

10:11AM 20    RESEARCH AND SO FORTH?

10:11AM 21    A.   SHE DID THAT AT GENENTECH, AND THEN SHE SERVED AS THE

10:11AM 22    CHANCELLOR AT UCSF.

10:11AM 23    Q.   AND THEN SHE HELPED TO DEVELOP SEVERAL WELL-KNOWN AND

10:12AM 24    CRITICALLY IMPORTANT CANCER DRUGS; CORRECT?

10:12AM 25    A.   CORRECT.

10:12AM 1    Q.   AND DO YOU RECALL REACHING OUT TO DR. DESMOND-HELLMANN IN

10:12AM 2    2010 TO ASK HER TO LOOK AT THERANOS'S TECHNOLOGY AND DATA?

10:12AM 3    A.   IT WOULDN'T BE UNUSUAL FOR ME TO CALL HER OR CONTACT HER

10:12AM 4    VIA EMAIL.

10:12AM 5    Q.   AND WOULD IT ALSO BE LOGICAL FOR YOU AT THAT TIME TO HAVE

10:12AM 6    ASKED UCSF TO BE THE INSTITUTION THAT EVALUATED THE TECHNOLOGY?

10:12AM 7    A.   I WAS INTERESTED IN WHAT THEY THOUGHT OF THE TECHNOLOGY,

10:12AM 8    YES.

10:12AM 9    Q.   DO YOU KNOW THAT AT THAT TIME MS. HOLMES BROUGHT THE

10:12AM 10   THERANOS BLOOD ANALYZER AND OTHER COMPONENTS OF THERANOS

10:12AM 11   TECHNOLOGY TO UCSF?

10:12AM 12   A.   I'M NOT AWARE THAT -- I HAVE A VIVID RECOLLECTION OF A

10:12AM 13   MEETING I HAD WITH THE INDIVIDUALS I MENTIONED EARLIER.

10:12AM 14   Q.   THAT WAS IN 2011?

10:12AM 15   A.   THAT WAS IN 2011.

10:13AM 16        I DON'T RECALL.  MAYBE YOU CAN SHOW ME AN EMAIL.  I DON'T

10:13AM 17   RECALL A 2010 MEETING.

10:13AM 18   Q.   SO IF SUCH A MEETING HAPPENED, IT IS NOT SOMETHING THAT

10:13AM 19   YOU WERE PRESENT IN; CORRECT?

10:13AM 20   A.   IF IT HAPPENED, I WASN'T PRESENT OR I DON'T RECALL IT.

10:13AM 21   Q.   AND NOT SOMETHING THAT YOU WERE AWARE OF?  YOU WERE NOT

10:13AM 22   AWARE OF IT?

10:13AM 23   A.   IF IT HAPPENED, I WASN'T AWARE OF IT.

10:13AM 24   Q.   OKAY.  NOW, DID YOU, AFTER THIS ORIGINAL MEETING, THIS

10:13AM 25   MEETING THAT YOU DESCRIBED ON DIRECT, DID YOU START TO WORK ON

10:13AM 1    THE POTENTIAL STRUCTURE OF A DEAL WITH THERANOS?

10:13AM 2    A.   WE DID.  WE ALSO WORKED ON OUR DUE DILIGENCE PATH AS WELL.

10:13AM 3    Q.   WELL, I THINK -- DO YOU RECALL THAT MR. LEACH SHOWED YOU

10:13AM 4    ON DIRECT EXAMINATION A PRESENTATION THAT YOU HAD MADE TO THE

10:13AM 5    BOARD OF DIRECTORS OF SAFEWAY; CORRECT?

10:13AM 6    A.   CORRECT.

10:13AM 7    Q.   AND THAT WAS 45 DAYS LATER OR SO FORTH OR SOMETHING LIKE

10:14AM 8    THAT?

10:14AM 9    A.   I THINK IT WAS IN MAY.

10:14AM 10   Q.   IN MAY.

10:14AM 11       AND YOU TOLD THE BOARD AT THAT TIME THAT YOU WERE

10:14AM 12   EVALUATING A POTENTIAL DEAL WITH THERANOS; CORRECT?

10:14AM 13   A.   CORRECT.

10:14AM 14   Q.   AND YOU TOLD THE BOARD THAT YOU WOULD PERFORM DUE

10:14AM 15   DILIGENCE IN CONNECTION WITH THAT DEAL?

10:14AM 16   A.   CORRECT.

10:14AM 17   Q.   AND WERE YOU ASKED IN THAT MEETING ABOUT YOUR EVALUATION

10:14AM 18   OF THE REPRESENTATIONS THAT MS. HOLMES HAD MADE TO YOU

10:14AM 19   CONCERNING THE TECHNOLOGY?

10:14AM 20   A.   CAN YOU REPEAT THE QUESTION?

10:14AM 21   Q.   SURE.  DID BOARD MEMBERS ASK YOU WHAT THE CAPACITY OF THE

10:14AM 22   TECHNOLOGY WAS DURING THAT MEETING?

10:14AM 23   A.   YOU KNOW, I MADE A PRESENTATION, I REPRESENTED WHAT

10:14AM 24   THERANOS HAD REPRESENTED TO ME.  THEY ASKED QUESTIONS.  I

10:14AM 25   CERTAINLY DON'T REMEMBER WHAT THE QUESTIONS WERE.

10:14AM  1    Q.   BUT THEY ASKED YOU TO UNDERTAKE DUE DILIGENCE IN

10:15AM  2    CONNECTION WITH THOSE REPRESENTATIONS; CORRECT?

10:15AM  3    A.   WE TOLD THEM THAT WE WERE GOING TO DO DUE DILIGENCE.

10:15AM  4    Q.   IN FACT, IF YOU'D LET ME SHOW YOU THE EXHIBIT THAT YOU

10:15AM  5    WERE LOOKING AT ON DIRECT, IF YOU GO BACK TO THE WHITE BINDER

10:15AM  6    THAT MR. LEACH WAS SHOWING YOU AND GO TO EXHIBIT 336, WHICH IS

10:15AM  7    ALREADY IN EVIDENCE, AND I'M GOING TO DIRECT YOU TO PAGE 7.

10:15AM  8    A.   PAGE 7?

10:15AM  9    Q.   YES, SIR.

10:15AM 10         ON PAGE 7 AT A VERY HIGH LEVEL YOU OUTLINE A POSSIBLE DEAL

10:15AM 11    WITH THERANOS, AND THE FIRST THING YOU SAY, OF COURSE, IS THAT

10:15AM 12    IT WILL BE SUBJECT TO DUE DILIGENCE; CORRECT?

10:15AM 13    A.   I SAID THAT IN AN EARLIER CHART, I BELIEVE.

10:16AM 14    Q.   OKAY.  AND THE DEAL POINTS THAT YOU COMMUNICATED ON

10:16AM 15    PAGE 7, THIS WAS NOT THE DEAL THAT WAS ACTUALLY ULTIMATELY

10:16AM 16    NEGOTIATED, IS IT?

10:16AM 17    A.   NO.  IT WAS DIFFERENT.

10:16AM 18    Q.   OKAY.  SO, FOR EXAMPLE, YOU DID NOT MAKE -- SAFEWAY DID

10:16AM 19    NOT MAKE AN EQUITY INVESTMENT IN THERANOS, DID IT?

10:16AM 20    A.   NO, IT DID NOT.

10:16AM 21    Q.   AND SAFEWAY DID NOT TAKE A BOARD SEAT AT THERANOS, DID IT?

10:16AM 22    A.   IT WAS IN THE CONTRACT THAT THEY WOULD MAKE EVERY EFFORT

10:16AM 23    TO GIVE SAFEWAY A BOARD SEAT.

10:16AM 24    Q.   BUT YOU DID NOT ULTIMATELY TAKE A BOARD SEAT?

10:16AM 25    A.   WE DID NOT.  WE DID NOT.

10:16AM 1    Q.   OKAY.  LET ME ASK YOU -- AND, OF COURSE, AT ANY TIME IF

10:16AM 2    YOU WANT TO LOOK AT OTHER PARTS OF THE DOCUMENT, DO.

10:16AM 3    A.   SURE.

10:16AM 4    Q.   BUT I WANT TO DIRECT YOUR ATTENTION TO PAGE 18 OF THE SAME

10:17AM 5    EXHIBIT, 331.

10:17AM 6         PAGE 18 IS LABELED BUSINESS RISKS.

10:17AM 7         IS THIS PART OF A PRESENTATION THAT YOU GAVE TO THE

10:17AM 8    SAFEWAY BOARD ABOUT RISKS THAT HAD TO BE EVALUATED IN

10:17AM 9    CONNECTION WITH THE POTENTIAL DEAL WITH THERANOS?

10:17AM 10   A.   YES.

10:17AM 11   Q.   AND THE FIRST RISK THAT YOU IDENTIFIED IS REGULATORY

10:17AM 12   APPROVAL; CORRECT?

10:17AM 13   A.   CORRECT.

10:17AM 14   Q.   AND YOU UNDERSTOOD THAT THERE WERE POTENTIAL REGULATORY

10:17AM 15   RISKS INVOLVING VARIOUS FEDERAL REGULATORS; CORRECT?

10:17AM 16   A.   YES.

10:17AM 17   Q.   ANOTHER RISK WAS THAT THERANOS WOULD HAVE TO OBTAIN

10:17AM 18   CERTAIN APPROVALS OR WAIVERS UNDER CLIA; CORRECT?

10:17AM 19   A.   CORRECT.

10:17AM 20   Q.   AND CLIA IS ADMINISTERED BY CMS; CORRECT?

10:18AM 21   A.   CMS, WHICH IS MEDICARE.

10:18AM 22   Q.   OKAY.  AND I THINK YOU ALSO IDENTIFIED POTENTIAL RISKS

10:18AM 23   AROUND WHETHER THIRD PARTIES WHO WERE NECESSARY TO THE DEAL

10:18AM 24   WOULD AGREE TO THE DEAL.

10:18AM 25        SO, FOR EXAMPLE, YOU RECOGNIZED INSURANCE COMPANIES WOULD

10:18AM 1   HAVE TO SUPPORT THERANOS; CORRECT?

10:18AM 2   A.   CORRECT.

10:18AM 3   Q.   AND SO A RISK WAS THAT THAT WOULD NOT HAPPEN, THERANOS

10:18AM 4   WOULD NOT BE ABLE TO PERSUADE INSURANCE COMPANIES TO REIMBURSE

10:18AM 5   PATIENTS FOR THEIR SERVICES; CORRECT?

10:18AM 6   A.   CORRECT.

10:18AM 7   Q.   AND THAT'S -- THESE RISKS EXISTED BECAUSE IT WAS ALL VERY

10:18AM 8   EARLY IN TERMS OF THE DEAL; CORRECT?

10:18AM 9   A.   THAT'S RIGHT.

10:18AM 10  Q.   AND YOU WENT ON -- IF YOU WOULD JUST FLIP TO THE NEXT

10:18AM 11  PAGE -- YOU TELL THE BOARD AT THE END OF THIS PRESENTATION THAT

10:18AM 12  YOU WILL COMPLETE DUE DILIGENCE; CORRECT?

10:18AM 13  A.   CORRECT.

10:18AM 14  Q.   AND SOME OF THE ITEMS THAT YOU IDENTIFIED ON THE PRIOR

10:19AM 15  SLIDE, OR ADDRESSED, THAT YOU WOULD REVIEW THE REGULATORY

10:19AM 16  STRATEGY AND CONFIRM THE EQUITY VALUE AND THINGS LIKE THAT;

10:19AM 17  CORRECT?

10:19AM 18  A.   CORRECT.

10:19AM 19  Q.   AND YOU ALSO INDICATED THAT YOU WOULD VALIDATE THE

10:19AM 20  TECHNOLOGY WITH A SCIENTIFIC PANEL, INCLUDING JOHNS HOPKINS AND

10:19AM 21  UCSF; CORRECT?

10:19AM 22  A.   CORRECT.

10:19AM 23  Q.   NOW, IN TERMS OF CARRYING OUT THE DUE DILIGENCE OF THE

10:19AM 24  COMPANY, IT WAS ULTIMATELY YOUR RESPONSIBILITY, BUT OBVIOUSLY

10:19AM 25  YOU DIDN'T DO EVERY ASPECT OF IT; CORRECT?

10:19AM  1   A.   THAT'S CORRECT.

10:19AM  2   Q.   YOU HAD THE ABILITY TO DECIDE WHAT GOT DONE AND WHAT

10:19AM  3   DIDN'T GET DONE, BUT YOU DIDN'T NECESSARILY CARRY ALL OF IT

10:19AM  4   OUT; CORRECT?

10:19AM  5   A.   NOT ALL OF IT PERSONALLY, NO.

10:19AM  6   Q.   AND SO, FOR EXAMPLE, WITH RESPECT TO REGULATORY ISSUES,

10:19AM  7   YOU WOULD HAVE ASSIGNED -- YOU DID ASSIGN THAT RESPONSIBILITY

10:19AM  8   TO MR. GORDON, THE GENERAL COUNSEL; CORRECT?

10:20AM  9   A.   CORRECT.

10:20AM  10  Q.   AND WITH REGARD TO ANY FINANCIAL ISSUES, YOU WOULD HAVE

10:20AM  11  ASSIGNED THAT DUE DILIGENCE TO MR. EDWARDS; CORRECT?

10:20AM  12  A.   IN ALL LIKELIHOOD.

10:20AM  13  Q.   BY THE WAY, WITH RESPECT TO FINANCIAL ISSUES, DID YOU ASK

10:20AM  14  MS. HOLMES AT ANY TIME WHEN YOU WERE DEALING WITH HER, HOW MUCH

10:20AM  15  MONEY HAVE YOU SPENT DEVELOPING THIS TECHNOLOGY?

10:20AM  16  A.   I DON'T RECALL.

10:20AM  17  Q.   DO YOU KNOW IF MR. EDWARDS MADE THAT EVALUATION AS PART OF

10:20AM  18  HIS DUE DILIGENCE?

10:20AM  19  A.   I DON'T, I DON'T KNOW.

10:20AM  20  Q.   OKAY.  BUT IN TERMS OF THE BUSINESS MODEL, YOU WOULD HAVE

10:20AM  21  HAD SOME INPUT; CORRECT?

10:20AM  22  A.   THE BUSINESS MODEL, ABSOLUTELY.

10:20AM  23  Q.   AND MAYBE EXECUTIVES.  DID EXECUTIVES FROM SAFEWAY HEALTH

10:20AM  24  ALSO WORK ON DESIGNING THAT?

10:20AM  25  A.   THEY WOULD HAVE HAD A PERIPHERAL INVOLVEMENT.

10:20AM  1    Q.   OKAY.  SO BY THE END OF THE DAY, THERE WOULD BE A FAIRLY

10:20AM  2    BIG TEAM WORKING ON EVALUATING THERANOS; CORRECT?

10:20AM  3    A.   A NUMBER OF DISCIPLINES.

10:21AM  4    Q.   AND AS WELL BECAUSE THE ISSUES WERE COMPLICATED WITH

10:21AM  5    REGULATORS, DID SAFEWAY ALSO ENGAGE OUTSIDE LAWYERS?

10:21AM  6    A.   ON THE REGULATORY ISSUE, YES.

10:21AM  7    Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE PROCESS OF

10:21AM  8    CONSIDERING WHETHER TO DO A DEAL, SAFEWAY DID HUNDREDS OF HOURS

10:21AM  9    OF DUE DILIGENCE?

10:21AM 10    A.   AT LEAST 100.

10:21AM 11    Q.   AND YOU WOULD HAVE COMMUNICATED, LET'S SAY, WITH THERANOS

10:21AM 12    DURING THAT PERIOD ALMOST DAILY ABOUT ONE ASPECT OR ANOTHER OF

10:21AM 13    THE DEAL; CORRECT?

10:21AM 14    A.   WE WERE ON A PARALLEL PATH TO DO THE DEAL AND DO THE DUE

10:21AM 15    DILIGENCE.

10:21AM 16    Q.   OKAY.  LOOK AT, IF YOU WOULD, EXHIBIT 7190.

10:21AM 17              THE COURT:  I JUST WANT TO CORRECT YOU.  I THINK YOU

10:22AM 18    INDICATED THE EXHIBIT YOU WERE JUST DISCUSSING WAS 331, AND I

10:22AM 19    THINK IT WAS 336.

10:22AM 20              MR. DOWNEY:  I BEG YOUR PARDON, YOUR HONOR.  I DID

10:22AM 21    MISIDENTIFY IT.

10:22AM 22              THE WITNESS:  WHICH BINDER ARE WE IN?

10:22AM 23              MR. DOWNEY:  YOU CAN RETURN TO THE BLACK BINDER.

10:22AM 24              THE WITNESS:  AND GIVE ME THE EXHIBIT AGAIN.

10:22AM 25    BY MR. DOWNEY:

Case 5:18-cr-00258-JD2 Document 702072, Filed 01/18/23, Page 74 of 204

10:22AM  1    Q.   THE EXHIBIT IS 7190.

10:22AM  2    A.   I HAVE IT.

10:22AM  3    Q.   I'LL GIVE YOU A MINUTE TO LOOK AT IT, BUT MY QUESTION AT

10:22AM  4    THIS POINT IS, IS THIS AN EMAIL FROM YOU TO RICK JURGENS OF

10:22AM  5    HY-VEE COPYING MS. HOLMES?

10:22AM  6    A.   CORRECT.

10:22AM  7    Q.   AND YOU SENT THIS IN OR AROUND JULY OF 2011; CORRECT?

10:22AM  8    A.   CORRECT.

10:22AM  9         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

10:22AM 10    EXHIBIT 7190.

10:23AM 11         MR. LEACH:  NO OBJECTION.

10:23AM 12         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:23AM 13         (DEFENDANT'S EXHIBIT 7190 WAS RECEIVED IN EVIDENCE.)

10:23AM 14    BY MR. DOWNEY:

10:23AM 15    Q.   I JUST WANT TO ASK YOU IF THE STATEMENT IN HERE IS AN

10:23AM 16    ACCURATE CHARACTERIZATION OF THE DUE DILIGENCE THAT SAFEWAY

10:23AM 17    PERFORMED WITH RESPECT TO THERANOS.

10:23AM 18         FIRST OF ALL, LET ME ASK YOU, RICK JURGENS IS THE CEO OF

10:23AM 19    ANOTHER FOOD RETAILER; CORRECT?

10:23AM 20    A.   HE WAS AT THE TIME.

10:23AM 21    Q.   AND HE WAS THE CEO OF HY-VEE?

10:23AM 22    A.   CORRECT.

10:23AM 23    Q.   AND HY-VEE WAS ONE OF THE COMPANIES THAT YOU CONSIDERED

10:23AM 24    BRINGING INTO THE NETWORK; CORRECT?

10:23AM 25    A.   THAT'S CORRECT.

10:23AM 1    Q.   AND SO YOU WERE HAVING DISCUSSIONS WITH HIM ABOUT WHETHER

10:23AM 2    HY-VEE WOULD BE INTERESTED IN SUCH A DEAL; CORRECT?

10:23AM 3    A.   I ACTUALLY INTRODUCED ELIZABETH TO THEM.

10:23AM 4    Q.   OKAY.  AND YOU WERE DISCUSSING IN THIS EMAIL WHAT DUE

10:23AM 5    DILIGENCE HY-VEE SHOULD DO IN TERMS OF EVALUATING A POTENTIAL

10:23AM 6    DEAL; CORRECT?

10:23AM 7    A.   WE TALKED ABOUT SOME ELEMENTS OF THAT, SURE.

10:24AM 8    Q.   SO IN THE FIRST NUMBERED PARAGRAPH, YOU INDICATE THAT YOU

10:24AM 9    TALKED TO -- YOU INDICATE TO MR. JURGENS, "YOU SHOULD FOCUS

10:24AM 10   YOUR QUESTIONS WITH ME (SAFEWAY HAS SPENT HUNDREDS OF HOURS ON

10:24AM 11   ITS OWN DUE DILIGENCE AND HAS COMMUNICATED ALMOST DAILY WITH

10:24AM 12   ELIZABETH AND THERANOS FOR MORE THAN ONE YEAR).  THIS GIVES

10:24AM 13   ELIZABETH MORE TIME TO CONCENTRATE ON ALL THAT SHE MUST GET

10:24AM 14   DONE BEFORE SAFEWAY'S LAUNCH."

10:24AM 15        AT THE TIME THAT WAS AN ACCURATE STATEMENT?

10:24AM 16   A.   IT WAS AN ACCURATE STATEMENT, BUT IT DESERVES A LITTLE

10:24AM 17   EXPLANATION.

10:24AM 18        BECAUSE I WAS SENSITIVE TO ELIZABETH'S TIME AND WE HAD

10:24AM 19   BEEN THROUGH A GOOD DEAL OF OUR OWN DUE DILIGENCE, THEY COULD

10:24AM 20   ASK ME THE QUESTIONS THAT I PROBABLY ASKED ALREADY AND I COULD

10:24AM 21   PROVIDE THE ANSWERS SO THEY DIDN'T HAVE TO GO TO ELIZABETH.

10:24AM 22   Q.   I UNDERSTAND.  SO YOU WERE INDICATING THAT YOU THOUGHT THE

10:24AM 23   GREATEST EFFICIENCY WOULD BE FOR SAFEWAY TO PROVIDE ANY -- BE

10:25AM 24   CONTACTED FIRST ABOUT ANY DILIGENCE QUESTIONS; CORRECT?

10:25AM 25   A.   CONTACTED FIRST, YES.

| | |
|---|---|
| 10:25AM | 1 |
| 10:25AM | 2 |
| 10:25AM | 3 |
| 10:25AM | 4 |

Q.  BUT IT'S AN ACCURATE STATEMENT THAT SAFEWAY HAD SPENT

HUNDREDS OF HOURS ON DUE DILIGENCE ON THERANOS?

A.  IF I SAID IT IN THIS LETTER, IT'S TRUE.

Q.  AND DO YOU RECALL THAT SAFEWAY ASKED THERANOS FOR A NUMBER

OF DOCUMENTS DURING AND IN CONNECTION WITH PERFORMING DUE

DILIGENCE?

A.  WE DO -- I DO RECALL THAT, BUT I DON'T RECALL ALL OF THE

DOCUMENTS.

Q.  LET ME SHOW YOU A DOCUMENT WHICH IS IN THE BLACK NOTEBOOK,

WHICH IS EXHIBIT 10536.

     NOW, THIS IS AN EMAIL THAT YOU ARE NOT A SENDER OR A

RECIPIENT.  I WANT TO ASK YOU IF THE DOCUMENTS LISTED ON HERE

ARE DOCUMENTS THAT YOU RECALL WERE PART OF THE DILIGENCE

PROCESS BETWEEN THERANOS AND SAFEWAY.

A.  IT LOOKS LIKE A NUMBER OF THEM WOULD HAVE BEEN PART OF

THAT PROCESS.

Q.  AND, FOR EXAMPLE, IT'S STANDARD AS PART OF DUE DILIGENCE,

ISN'T IT, FOR ONE COMPANY TO PROVIDE ITS CAPITALIZATION TABLE

TO THE OTHER COMPANY; CORRECT?

A.  TO ANY COMPANY LOOKING TO BUY OR INVEST IN THE COMPANY,

YES.

Q.  OKAY.  LET ME ASK YOU ABOUT A FEW ITEMS ON HERE.  DO YOU

RECALL WHETHER ANY ASSAY DEVELOPMENT REPORTS WERE SENT FROM

THERANOS TO SAFEWAY AS PART OF THE DILIGENCE PROCESS?

A.  I DON'T KNOW IF THIS IS A CORRECT DESCRIPTION, BUT WE WERE

10:27AM   1    PROVIDED WITH SOME INFORMATION REGARDING SOME WORK THAT

10:27AM   2    THERANOS HAD SAID THEY HAD DONE WITH SOME PHARMACEUTICAL

10:27AM   3    COMPANIES.

10:27AM   4    Q.   WELL, DO YOU REMEMBER RECEIVING A DEVELOPMENT REPORT ABOUT

10:27AM   5    HOW THEY HAD ACTUALLY GONE ABOUT DEVELOPING ASSAYS INTERNALLY

10:27AM   6    AT THERANOS?

10:27AM   7    A.   I DON'T RECALL.

10:27AM   8    Q.   OKAY.  BUT DO YOU RECALL RECEIVING PATENTS FROM THERANOS

10:27AM   9    THAT DETAILED THE INTELLECTUAL PROPERTY IT HAD OBTAINED?

10:27AM  10    A.   IT WOULD HAVE BEEN COMMON TO ASK FOR THEM, BUT THAT'S NOT

10:27AM  11    SOMETHING THAT I WOULD HAVE PERSONALLY REVIEWED.

10:27AM  12    Q.   WOULD THOSE ISSUES HAVE BEEN HANDLED BY MR. GORDON?

10:27AM  13    A.   THEY WOULD.

10:27AM  14    Q.   AND WITH REGARD TO ANY OF THE REPORTS THAT RELATED TO

10:28AM  15    SCIENTIFIC ISSUES, THE TECHNOLOGY OR THE DEVELOPMENT OF ASSAYS,

10:28AM  16    WHO WITHIN SAFEWAY WOULD HAVE EVALUATED THAT INFORMATION?

10:28AM  17    A.   I THINK THE FIRST LEVEL OF EVALUATION PROBABLY WOULD HAVE

10:28AM  18    BEEN KEN SHACHMUT AT SAFEWAY HEALTH; WE WOULD HAVE HAD OUR HEAD

10:28AM  19    OF PHARMACY LOOK AT THESE IN TERMS OF INTERNAL; I PERSONALLY

10:28AM  20    HAD CONVERSATIONS WITH THE LAB DIRECTORS AT JOHNS HOPKINS AND

10:28AM  21    THE LAB DIRECTOR AT UCSF.

10:28AM  22    Q.   OKAY.  LET'S TALK ABOUT -- WHO IS THE LAB DIRECTOR AT

10:28AM  23    JOHNS HOPKINS THAT YOU RECALL SPEAKING TO?

10:28AM  24    A.   YOU KNOW, WE'RE GOING BACK 11 YEARS, SO I DON'T RECALL.

10:28AM  25    I'M SURE WE CAN DO AN INTERNET SEARCH.

```
10:28AM   1    Q.   WELL, LET ME ASK YOU A FEW NAMES BECAUSE I DON'T KNOW

10:29AM   2    EXACTLY WHO YOU ARE REFERRING TO.

10:29AM   3    A.   YEAH.

10:29AM   4    Q.   LET ME ASK YOU, DO YOU RECALL CONTACTING A PHYSICIAN NAMED

10:29AM   5    DR. JONATHAN SIMONS?

10:29AM   6    A.   I RECALL TALKING TO JONATHAN.

10:29AM   7    Q.   OKAY.  AND DR. SIMONS WAS THE CEO OF THE PROSTATE CANCER?

10:29AM   8    A.   HE WAS AT THE TIME.

10:29AM   9    Q.   AND HE'S AN ONCOLOGIST?

10:29AM  10    A.   HE'S AN ONCOLOGIST.

10:29AM  11    Q.   AND HE'S SOMEONE FOR WHOM YOU HAVE HIGH REGARD?

10:29AM  12    A.   IN THE SCIENTIFIC COMMUNITY, YES.

10:29AM  13    Q.   AND YOU SPOKE TO HIM ABOUT THE COMPANY?

10:29AM  14    A.   I DID.

10:29AM  15    Q.   AND YOU WANTED TO GET HIS IMPRESSIONS AND HIS EVALUATION

10:29AM  16    OF THERANOS AND ITS TECHNOLOGY?

10:29AM  17    A.   I ACTUALLY HAD HIM MEET ELIZABETH AS WELL.

10:29AM  18    Q.   YOU HAD DR. SIMONS MEET WITH MS. HOLMES?

10:29AM  19    A.   AND I WAS IN THE ROOM.

10:29AM  20    Q.   AND DID THAT MEETING GIVE YOU ANY SENSE OF THE CAPACITIES

10:29AM  21    OF THERANOS'S TECHNOLOGY?

10:30AM  22    A.   YOU KNOW, OBVIOUSLY JONATHAN WAS IN NO POSITION AT A

10:30AM  23    DINNER MEETING TO EVALUATE THE TECHNOLOGY.  HE THOUGHT IF

10:30AM  24    THERANOS COULD DO THIS, THAT WOULD BE A BIT OF A GAME CHANGER.

10:30AM  25    Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 7164.
```

10:30AM   1   A.   I HAVE IT.

10:30AM   2   Q.   THIS WAS AN EMAIL THAT WAS SENT, APPEARS TO HAVE BEEN SENT

10:30AM   3   FROM DR. SIMONS TO MS. HOLMES AND YOURSELF; CORRECT?

10:30AM   4   A.   CORRECT.

10:30AM   5           MR. DOWNEY:  I MOVE THE ADMISSION, YOUR HONOR, OF

10:30AM   6   7164.

10:31AM   7           MR. LEACH:  HEARSAY, YOUR HONOR.

10:31AM   8           THE COURT:  THERE ARE TWO DOCUMENTS HERE,

10:31AM   9   MR. DOWNEY.

10:31AM  10           MR. DOWNEY:  YOUR HONOR, I THINK IF YOU SEE --

10:31AM  11           THE COURT:  IS IT BOTH OF THEM YOU'RE SEEKING

10:31AM  12   ADMISSION OF?  THE SECOND ITEM SEEMS TO BE A TWO-PAGE LETTER.

10:31AM  13           MR. DOWNEY:  YES, YOUR HONOR.

10:31AM  14       I THINK THE WAY THE DOCUMENT WORKS IS THAT THE FIRST PAGE

10:31AM  15   IS AN EMAIL AND THE EMAIL HAS AS AN ATTACHMENT A MEMO WHICH IS

10:31AM  16   REFERENCED IF YOU SEE THAT UNDER THE SUBJECT, AND THEN THERE'S

10:31AM  17   AN ATTACHMENT OF A PDF AND WITHIN THE PDF THERE'S A COVER

10:31AM  18   LETTER TO ANOTHER LETTER WHICH, IN TURN, FORWARDS THAT LETTER.

10:32AM  19   AND THIS WAS BEING SHARED, I THINK, WITH THE RECIPIENTS OF THIS

10:32AM  20   EMAIL.

10:32AM  21           THE COURT:  AND THE SECOND LETTER, ARE YOU ASKING

10:32AM  22   THAT THIS BE ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED?  I

10:32AM  23   THINK I WOULD SUSTAIN A HEARSAY OBJECTION TO THAT SECOND PAGE.

10:32AM  24           MR. DOWNEY:  WELL, AT THE VERY LEAST, YOUR HONOR,

10:32AM  25   I'M ASKING THAT IT BE ADMITTED TO THE DEFENDANT'S STATE OF

10:32AM 1    MIND.

10:32AM 2         BUT I ALSO THINK IT GOES TO THE MATERIALITY ISSUES OF --

10:32AM 3    THIS WITNESS HAS TESTIFIED ON DIRECT ABOUT THOSE ISSUES WHICH

10:32AM 4    WERE IMPORTANT TO HIM IN EVALUATING AND CONTINUING UNDER THE

10:32AM 5    DEAL.

10:32AM 6         I THINK HE'S JUST TESTIFIED ABOUT CONVERSATIONS WITH THIS

10:33AM 7    WITNESS AND HIS REQUEST.  I THINK THIS RETAINS -- CONTAINS A

10:33AM 8    CONTEMPORANEOUS REFLECTION OF WHAT THOSE REFLECTIONS WERE.

10:33AM 9         THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

10:33AM 10        MR. DOWNEY:  MAY I ASK, YOUR HONOR, IF ANY OF THE

10:33AM 11   COMPONENTS REFRESH THE RECOLLECTION OF THE WITNESS?

10:33AM 12        THE COURT:  YOU MAY, OF COURSE.  SURE.

10:33AM 13   BY MR. DOWNEY:

10:33AM 14   Q.   LET ME ASK YOU, MR. BURD, TO LOOK AT THE THIRD PAGE OF THE

10:33AM 15   EXHIBIT.  LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:33AM 16   A.   I DO.

10:33AM 17   Q.   AND LET ME ASK YOU TO LOOK AT THE -- THERE'S A SHORT

10:33AM 18   PARAGRAPH AND THEN THERE'S A QUESTION, AND UNDER THAT THERE'S

10:34AM 19   AN ANSWER.

10:34AM 20        IF YOU GO TO THE SECOND SENTENCE FROM THE BOTTOM, I WANT

10:34AM 21   TO ASK --

10:34AM 22   A.   ON THE FIRST PAGE OR THE SECOND PAGE?

10:34AM 23   Q.   ON THE FIRST PAGE.

10:34AM 24   A.   OKAY.

10:34AM 25   Q.   SO DO YOU SEE THAT THERE'S A QUESTION THAT BEGINS "WHAT DO

10:34AM 1    YOU KNOW"?

10:34AM 2    A.   I'M ON THE BOTTOM OF THE FIRST PAGE.

10:34AM 3    Q.   I'M ASKING YOU TO LOOK AT THE TOP OF THE THIRD PAGE OF THE

10:34AM 4    EXHIBIT, WHICH IS A LETTER, AND I THINK I CAN --

10:34AM 5    A.   OKAY.  ALL RIGHT.  SO I'M ON THAT PAGE.

10:34AM 6    Q.   ALL RIGHT.  SO I'M ASKING YOU TO LOOK AT THE FIRST

10:34AM 7    PARAGRAPH, THE PARAGRAPH UNDER THE FIRST QUESTION THAT IS POSED

10:34AM 8    THERE.

10:34AM 9    A.   YES.

10:34AM 10   Q.   AND THE SECOND TO THE LAST SENTENCE OF THAT ANSWER THAT

10:35AM 11   BEGINS "THERE ARE."

10:35AM 12   A.   CORRECT.

10:35AM 13   Q.   IS THAT -- IS THE STATEMENT CONTAINED THEREIN CONSISTENT

10:35AM 14   WITH WHAT DR. SIMONS CONVEYED TO YOU ABOUT THE STATE OF

10:35AM 15   THERANOS'S TECHNOLOGY?

10:35AM 16   A.   IT'S NOT SOMETHING THAT I RECALL.

10:35AM 17   Q.   OKAY.  DO YOU RECALL DR. SIMONS EVER SAYING TO YOU THERE

10:35AM 18   WERE OTHER EFFORTS THAT WERE BEING MADE WHICH WERE SIMILAR

10:35AM 19   EFFORTS TO THE EFFORT THAT THERANOS WAS UNDERTAKING TO GIVE

10:35AM 20   POINT OF CARE BLOOD TESTING?

10:35AM 21   A.   I DON'T RECALL THAT.

10:35AM 22   Q.   DO YOU RECALL HIM SAYING THAT THERANOS WAS IN A SUPERIOR

10:35AM 23   POSITION TO OTHER COMPANIES BASED ON ITS PATENTS?

10:35AM 24   A.   I DON'T RECALL THAT.

10:35AM 25   Q.   OKAY.  AND DO YOU RECALL LEARNING FROM HIM THAT RELATIVE

10:36AM  1    TO OTHER BIOTECH COMPANIES IN THE SAME SPACE, HE THOUGHT THAT

10:36AM  2    THERANOS WAS IN THE LEADING POSITION?

10:36AM  3    A.   I DON'T RECALL THAT.  HE DIDN'T EVALUATE THE TECHNOLOGY.

10:36AM  4    HE WAS ASKING OTHERS ABOUT WHAT THEY KNOW OF HER.

10:36AM  5    Q.   OKAY.  I JUST WANT TO ASK YOU A QUESTION THAT IS A LITTLE

10:36AM  6    BIT OFF TOPIC, BUT I'LL JUST ASK YOU TO GO BACK TO THE EMAIL --

10:36AM  7    A.   SURE.

10:36AM  8    Q.   -- FOR A MOMENT.

10:36AM  9    A.   YES.

10:36AM  10   Q.   AND I WANT TO JUST ASK YOU TO LOOK AT THE LAST PARAGRAPH

10:36AM  11   OF THE EMAIL THAT BEGINS "ELIZABETH."

10:36AM  12   A.   YES.

10:36AM  13   Q.   AND JUST TAKE A LOOK TO LOOK AT THAT.

10:36AM  14        MY QUESTION IS, DO YOU RECALL REFERENCES TO A 3.0 OR A 4.0

10:36AM  15   IN DISCUSSING THERANOS TECHNOLOGY?

10:36AM  16   A.   I DON'T.

10:36AM  17        WHAT I RECALL FROM THE DINNER MEETING IS THAT THERE WAS A

10:37AM  18   LOT OF DISCUSSION ABOUT CANCER BECAUSE HE WAS AN ONCOLOGIST,

10:37AM  19   AND THOSE WERE SOME VISIONS THAT ELIZABETH HAD THAT SHE MIGHT

10:37AM  20   BE ABLE TO DO WITH THE ANALYZER, AND JONATHAN WAS JUST

10:37AM  21   DESCRIBING A JAR OF JELLY BEANS AND THE DIFFERENT COLORS AND HE

10:37AM  22   WAS -- THAT'S WHEN HE STARTED TALKING ABOUT CYTOKINES, BUT THEY

10:37AM  23   WERE TALKING AT A LEVEL OF DETAIL THAT WAS A LITTLE ABOVE ME.

10:37AM  24   Q.   OKAY.  SO YOU DON'T REMEMBER HEARING AT THAT DINNER

10:37AM  25   REFERENCES TO DIFFERENT VERSIONS OF THERANOS TECHNOLOGY?

10:37AM  1    A.   I DON'T.

10:37AM  2    Q.   DO YOU RECALL LEARNING THAT AT ANY TIME?

10:37AM  3    A.   I WASN'T AWARE OF ANYBODY ELSE DOING IT.

10:37AM  4    Q.   WELL, DO YOU RECALL HEARING ABOUT DIFFERENT VERSIONS LIKE

10:37AM  5    A 2.0, A 3.0, A 4.0 OF THERANOS'S TECHNOLOGY?

10:37AM  6    A.   YES.  I THINK THAT, AS I SAID DURING MY DIRECT TESTIMONY,

10:37AM  7    THERE WERE -- THE BIO SENSOR, WHATEVER THE TERM IS, THE UNIT,

10:37AM  8    IT WENT THROUGH CONSTANT CHANGE, BOTH PHYSICAL AND I SUPPOSE IT

10:38AM  9    HAD NEW CAPABILITIES AND THEREFORE YOU'D HAVE A 1, 2, 3, JUST

10:38AM  10   AS MICROSOFT DOES.

10:38AM  11   Q.   AND AT THE TIME, NOT TODAY, BUT AT THE TIME --

10:38AM  12   A.   YES.

10:38AM  13   Q.   -- DID YOU HAVE AN UNDERSTANDING OF THE DIFFERENCES

10:38AM  14   BETWEEN THOSE VERSIONS?

10:38AM  15   A.   NO.

10:38AM  16   Q.   LET ME ASK YOU TO LOOK NOW AT EXHIBIT 332.

10:39AM  17   A.   ALL RIGHT.

10:39AM  18   Q.   IS THIS AN EMAIL THAT MS. HOLMES SENT TO DR. SIMONS

10:39AM  19   COPYING YOU IN 2010?

10:39AM  20   A.   IT IS.

10:39AM  21   Q.   AND IS THIS PART OF YOUR DISCUSSIONS WITH THERANOS ABOUT

10:39AM  22   ENTERING, POTENTIALLY ENTERING A DEAL?

10:39AM  23   A.   WAS IT PART OF THE THOUGHT PROCESS?  YES.

10:39AM  24        MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

10:39AM  25   OF 332.

10:39AM 1        MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:39AM 2        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM 3        (GOVERNMENT'S EXHIBIT 332 WAS RECEIVED IN EVIDENCE.)

10:39AM 4   BY MR. DOWNEY:

10:39AM 5   Q.   I'LL ASK YOU TO FOCUS ON THE SECOND FULL PARAGRAPH.  THE

10:39AM 6   PARAGRAPH ABOVE, I'M SORRY, THE PARAGRAPH THAT BEGINS "THERANOS

10:39AM 7   STARTED OUT."

10:40AM 8   A.   YES.

10:40AM 9   Q.   IN THAT PARAGRAPH, MS. HOLMES TOLD DR. SIMONS AND YOU THAT

10:40AM 10  THERANOS HAD BUILT A MINILAB SYSTEM THAT AUTOMATES THE PROCESS

10:40AM 11  OF RUNNING A BROAD RANGE OF ASSAYS ON ACCELERATED TIMELINES

10:40AM 12  WITH MUCH SMALLER VOLUMES OF SAMPLE; CORRECT?

10:40AM 13  A.   CORRECT.

10:40AM 14  Q.   AND IS THAT CONSISTENT WITH WHAT SHE TOLD YOU IN YOUR

10:40AM 15  MEETING IN MARCH OF 2010?

10:40AM 16  A.   CORRECT.

10:40AM 17  Q.   IN THE NEXT PARAGRAPH SHE GOES ON TO SAY, "WE HAVE HAD THE

10:40AM 18  OPPORTUNITY TO PRESENT THE VALIDATION DATA ON THE TECHNOLOGY

10:40AM 19  PLATFORM AND ON THE BROAD RANGE OF ASSAYS AT HOPKINS."

10:40AM 20       CORRECT?

10:40AM 21  A.   THAT'S WHAT IT SAYS.

10:40AM 22  Q.   AND HOPKINS YOU UNDERSTOOD TO BE A REFERENCE TO

10:41AM 23  JOHNS HOPKINS?

10:41AM 24  A.   CORRECT.

10:41AM 25  Q.   AND SHE THEN GOES ON TO IDENTIFY A VARIETY OF DOCTORS AT

10:41AM  1    HOPKINS WHO HAVE PARTICIPATED IN THAT EVALUATION; CORRECT?

10:41AM  2    A.   CORRECT.

10:41AM  3    Q.   IS THIS WHEN YOU LEARNED THAT HOPKINS HAD UNDERTAKEN AN

10:41AM  4    EVALUATION OF THERANOS'S TECHNOLOGY?

10:41AM  5    A.   I CAN'T BE CERTAIN BECAUSE I KNOW PEOPLE AT HOPKINS AND

10:41AM  6    BECAUSE ELIZABETH SAID ONE OF THEIR ANALYZERS WAS PHYSICALLY ON

10:41AM  7    THEIR PROPERTY FOR A WHILE.  SHE INVITED ME TO TALK TO SOMEONE

10:41AM  8    AT HOPKINS, AND THAT'S THE PERSON THAT I CALLED.

10:41AM  9    Q.   AND IS THAT THE LABORATORY DIRECTOR THAT YOU ARE

10:41AM 10    RECALLING?

10:41AM 11    A.   I RECALL THEM AS A LABORATORY DIRECTOR.  IT ALMOST HAD TO

10:42AM 12    BE THE LABORATORY DIRECTOR BECAUSE THAT'S WHOSE OPINION I

10:42AM 13    WANTED TO HEAR.

10:42AM 14    Q.   DID YOU TALK TO ANY OF THE INDIVIDUALS WHO ARE IDENTIFIED

10:42AM 15    IN THE EMAIL THAT IS EXHIBIT 332?

10:42AM 16    A.   I DON'T RECALL TALKING.  THE NAME KICKLER SOUNDS A LITTLE

10:42AM 17    BIT FAMILIAR BUT, YOU KNOW, I TALKED TO THE PERSON THAT SHE

10:42AM 18    DIRECTED ME TO AND ASKED HIM WHETHER THIS BOX COULD DO WHAT SHE

10:42AM 19    SAID.

10:42AM 20    Q.   AND WAS THAT THE CONVERSATION THAT YOU HAD IN 2010?

10:42AM 21    A.   THAT WOULD HAVE BEEN IN 2010, YES.

10:42AM 22    Q.   OKAY.  AND WHAT DID THAT INDIVIDUAL TELL YOU?

10:42AM 23    A.   WHAT THEY SAID WAS THAT WE DIDN'T HAVE THE BOX HERE LONG

10:42AM 24    ENOUGH TO VALIDATE IT THE WAY WE WOULD LIKE.  IN OTHER WORDS,

10:42AM 25    THE BOX WAS TAKEN BACK BY THERANOS.

10:43AM  1          AND THE LAB DIRECTOR SAID, LOOK, IF THEY CAN DO THIS, IT'S

10:43AM  2     A GAME CHANGER, BUT I CAN'T VALIDATE FOR YOU THAT THEY'VE DONE

10:43AM  3     IT.  I DIDN'T HAVE ENOUGH TIME WITH THE BOX.

10:43AM  4     Q.   SO YOU UNDERSTOOD THAT IN 2010?

10:43AM  5     A.   CORRECT.

10:43AM  6     Q.   DID YOU LEARN FROM THAT DIRECTOR WHETHER OR NOT ANY DATA

10:43AM  7     HAD BEEN SHARED BY THERANOS WITH HOPKINS?

10:43AM  8     A.   I DID NOT.

10:43AM  9     Q.   NOW, IF I MIGHT ASK YOU, HOW FAMILIAR WERE YOU WITH THE

10:43AM  10    BLOOD TESTING BUSINESS BEFORE YOU BEGAN TALKING TO THERANOS IN

10:43AM  11    2010?

10:43AM  12    A.   YOU KNOW, I WAS FAMILIAR WITH WHO THE MAJOR LAB PLAYERS

10:43AM  13    WERE OUT THERE, QUEST AND LAB CORP., AND I WAS FAMILIAR WITH

10:43AM  14    THE TESTS, CPT CODES.

10:44AM  15         I KNEW THAT THOSE TWO LABS WERE MUCH CHEAPER THAN

10:44AM  16    OUTPATIENT HOSPITAL AND OTHERS, AND I ALSO KNEW -- AND THIS

10:44AM  17    SURPRISED ME -- THAT MEDICARE, WHO OFTEN HAS THE LOWEST RATES,

10:44AM  18    HAD THE HIGHEST LAB RATES.

10:44AM  19    Q.   SO YOU KNEW A LOT ABOUT THE BUSINESS?

10:44AM  20    A.   I KNOW MORE TODAY THAN I KNEW THEN.

10:44AM  21    Q.   BUT DID YOU ACTUALLY KNOW HOW THE MEDICAL PROCESS OF BLOOD

10:44AM  22    TESTING WORKED?

10:44AM  23    A.   IF YOU MEAN HOW ONE GETS A BLOOD TEST?  YOU GET A

10:44AM  24    PRESCRIPTION FROM A DOCTOR, THEY IDENTIFY THE TEST, THE SCRIPT

10:44AM  25    IS TAKEN TO A LAB AND THEY FULFILL THE REQUEST.

10:44AM 1    Q.   I MEANT SOMETHING SLIGHTLY DIFFERENT.

10:44AM 2    A.   OKAY.

10:44AM 3    Q.   I MEANT, DID YOU UNDERSTAND THAT WHEN A LAB IS ANALYZING A

10:44AM 4    BLOOD SAMPLE WHAT THE DIFFERENT ELEMENTS OF THAT ARE?

10:45AM 5    A.   I'M NOT SURE WHAT YOU MEAN BY "ELEMENTS."

10:45AM 6    Q.   WELL, DID YOU KNOW, FOR EXAMPLE, THAT THERE ARE DIFFERENT

10:45AM 7    FORMS OF BLOOD TESTING MACHINES THAT PERFORM DIFFERENT KINDS OF

10:45AM 8    BLOOD TESTS?

10:45AM 9    A.   I WAS FAMILIAR WITH THE FACT THAT, THAT MOST FULL SCALE

10:45AM 10   LABS CAN DO MOST ANYTHING, AND THEN THERE WERE REFERENCE LABS

10:45AM 11   THAT COULD DO A BIT MORE.

10:45AM 12   Q.   OKAY.  AND YOU UNDERSTOOD THAT THOSE WERE LABS THAT

10:45AM 13   CONTAINED A SUBSTANTIAL AMOUNT OF HEAVY EQUIPMENT TO PERFORM

10:45AM 14   THAT TESTING?

10:45AM 15   A.   CORRECT.

10:45AM 16   Q.   DID YOU -- WERE YOU FAMILIAR WITH THE TERM "ASSAY" BEFORE

10:45AM 17   DISCUSSION OF THERANOS?

10:45AM 18   A.   I HADN'T HEARD THE TERM USED IN THIS WAY, BUT I UNDERSTOOD

10:45AM 19   THE TERM WHEN USED.

10:45AM 20   Q.   OKAY.  AND DID YOU COME TO LEARN THAT THERE WERE DIFFERENT

10:45AM 21   FORMS OF ASSAYS, DIFFERENT METHODS BY WHICH ASSAYS WORKED?

10:46AM 22   A.   I'M NOT SURE.

10:46AM 23        NOW, ARE YOU EQUATING AN ASSAY TO A SPECIFIC CPT CODE?

10:46AM 24   Q.   WELL, IT IS -- EFFECTIVELY I AM.

10:46AM 25   A.   OKAY.

10:46AM  1    Q.   WHAT I AM REFERRING TO AS AN ASSAY IS THE METHOD BY WHICH

10:46AM  2    A PARTICULAR LAB ANALYZES AN ANALYTE IN THE BLOOD, SO A GLUCOSE

10:46AM  3    TEST OR A SODIUM TEST, THAT THERE ARE DIFFERENT ASSAYS FOR

10:46AM  4    EACH.

10:46AM  5    A.   SURE.

10:46AM  6    Q.   AND DID YOU UNDERSTAND THAT THE METHODS BY WHICH THEY WERE

10:46AM  7    ANALYZED FELL INTO DIFFERENT CATEGORIES?  WAS THAT SOMETHING

10:46AM  8    THAT YOU --

10:46AM  9    A.   NO, IT'S NOT THE LEVEL OF DETAIL THAT I HAD.

10:46AM  10   Q.   YOU KNEW THAT SOME BLOOD TESTS WERE PRETTY COMMONLY

10:46AM  11   ORDERED; CORRECT?

10:46AM  12   A.   CORRECT.

10:46AM  13   Q.   AND ONE OF YOUR GOALS, I THINK, IN DESIGNING THIS

10:46AM  14   PARTNERSHIP WAS TO MAKE SURE THAT THERANOS COULD TEST THOSE,

10:47AM  15   PLUS OTHER TESTS?

10:47AM  16   A.   CORRECT.

10:47AM  17   Q.   IN FACT, IN STARTING THE PARTNERSHIP, IS IT TRUE THAT

10:47AM  18   SAFEWAY PROVIDED TO THERANOS ITS DATA ABOUT WHICH TESTS WERE

10:47AM  19   ORDERED WITHIN SAFEWAY AND HOW FREQUENTLY THEY WERE ORDERED?

10:47AM  20   A.   WELL, WE HAD CLAIMS DATA.  I DON'T RECALL GIVING THEM

10:47AM  21   CLAIMS DATA.

10:47AM  22        BUT WE HAD INFORMATION THAT COULD TELL US THE TOP 25

10:47AM  23   ASSAYS, AS YOU REFER TO THEM, THE TOP 50, THE TOP 100, WHAT

10:47AM  24   THOSE PRICE POINTS WERE, YOU KNOW, FOR DIFFERENT LABS.  WE MAY

10:47AM  25   HAVE PROVIDED THAT.

10:47AM  1    Q.   SO WHEN YOU SAY CLAIMS DATA -- YOU, OF COURSE, PROVIDE

10:47AM  2    INSURANCE TO A NUMBER OF SAFEWAY EMPLOYEES; CORRECT?

10:47AM  3    A.   FOR THE BENEFIT OF THE JURY, ALL LARGE COMPANIES ARE

10:47AM  4    SELF-INSURED AND SO THEY PAY ALL OF THE MEDICAL BILLS, AND AN

10:47AM  5    INSURANCE COMPANY LIKE AN AETNA OR A BLUE SHIELD JUST DOES THE

10:48AM  6    MECHANICS OF PROCESSING THE CLAIM.

10:48AM  7    Q.   OKAY.  AND SO YOU, YOU RECALL GENERALLY IN SOME FORM THAT

10:48AM  8    YOU WERE ABLE TO AGGREGATE INFORMATION FROM THAT DATA AND

10:48AM  9    PROVIDE IT TO THERANOS?

10:48AM  10   A.   WE DID THAT OFTEN FOR OUR OWN ANALYSIS TO LOWER COSTS.

10:48AM  11   Q.   DO YOU RECALL PROVIDING IT TO THERANOS?

10:48AM  12   A.   I DON'T.  BUT IF THEY HAD ASKED FOR IT, I WOULD HAVE

10:48AM  13   PROVIDED IT ON AN AGGREGATED BASIS.

10:48AM  14   Q.   OKAY.  DO YOU RECALL DISCUSSIONS BETWEEN THERANOS AND

10:48AM  15   SAFEWAY AS TO WHICH TESTS WERE THE MOST COMMONLY ORDERED TESTS?

10:48AM  16   A.   I DON'T RECALL.  BUT WE KNEW WHAT THEY WERE, AND IF WE

10:48AM  17   WERE ASKED, WE PROVIDED IT.

10:48AM  18   Q.   OKAY.  NOW, DID YOU UNDERSTAND AT THE TIME THAT YOU WERE

10:48AM  19   HAVING CONVERSATIONS WITH THERANOS THAT THERANOS HAD NOT YET

10:49AM  20   DEVELOPED AN ASSAY FOR EACH BLOOD TEST THAT CAN POTENTIALLY BE

10:49AM  21   OFFERED?

10:49AM  22   A.   WE THOUGHT THAT THERANOS HAD DEVELOPED ASSAYS FOR ALMOST

10:49AM  23   ALL.  AND IF YOU GET TO PROBABLY 200 ASSAYS, YOU WOULD BE

10:49AM  24   95 PERCENT OF ALL ASSAYS, AND MAYBE AT 100 YOU WOULD BE AT

10:49AM  25   LEAST AT 75 PERCENT.

10:49AM  1    Q.   SO AT SOME POINT SAFEWAY HAD THAT UNDERSTANDING OF WHAT

10:49AM  2    THERANOS HAD DONE?

10:49AM  3    A.   WELL, WE WERE RELYING ON THE FACT THAT THEY SAID THAT THEY

10:49AM  4    COULD DO VIRTUALLY ALL ASSAY TYPES.

10:49AM  5    Q.   AND DID YOU AUTHORIZE MR. WOLFSEN AND MR. SHACHMUT TO HAVE

10:49AM  6    CONVERSATIONS WITH MS. HOLMES ABOUT THAT?

10:49AM  7    A.   THEY MADE A TRIP DOWN TO THERANOS AND SPENT A FEW HOURS.

10:49AM  8    Q.   AND I THINK YOU INDICATED IN YOUR EMAIL TO MR. JURGENS

10:50AM  9    THAT SAFEWAY WAS COMMUNICATING ALMOST DAILY WITH THERANOS.

10:50AM  10   A.   IN ONE FORM OR ANOTHER.

10:50AM  11   Q.   AND DID MR. SHACHMUT AND MR. WOLFSEN COMMUNICATE WITH

10:50AM  12   REPRESENTATIVES OF THERANOS BY EMAIL ABOUT THE POTENTIAL DEAL?

10:50AM  13   A.   THEY WERE PART OF A DUE DILIGENCE TEAM, SO I DON'T THINK

10:50AM  14   THEY WOULD HAVE BEEN TALKING ABOUT A POTENTIAL DEAL.  BUT THEY

10:50AM  15   WOULD HAVE BEEN PURSUING DIFFERENT AVENUES OF DUE DILIGENCE.

10:50AM  16   Q.   AND THEY WOULD HAVE BEEN TRYING TO UNDERSTAND WHAT

10:50AM  17   THERANOS'S CAPACITIES WERE; CORRECT?

10:50AM  18   A.   CORRECT.

10:50AM  19   Q.   AND OTHER ASPECTS OF THERANOS?

10:50AM  20   A.   RIGHT.

10:50AM  21   Q.   AND THAT WAS TRUE BOTH BEFORE THE DEAL WAS AGREED TO AND

10:50AM  22   THEN AS TIME WENT ON AND PAYMENTS WERE REQUESTED BY THERANOS;

10:50AM  23   CORRECT?

10:50AM  24   A.   CORRECT.

10:50AM  25   Q.   AND IN DOING THAT, DID YOU UNDERSTAND THAT THEY AND OTHER

10:51AM  1    SAFEWAY EMPLOYEES COMMUNICATED WITH THERANOS EMPLOYEES AND

10:51AM  2    EXECUTIVES BY EMAIL?

10:51AM  3    A.   THERE WOULD BE SOME EMAILS EXCHANGED I THINK DURING THE

10:51AM  4    DUE DILIGENCE PROCESS, AND THEN ONCE WE GOT DOWN TO THE

10:51AM  5    LOGISTICS AT THE STORE LEVEL, THERE WAS A SMALL TEAM AT

10:51AM  6    THERANOS AND A SMALL TEAM AT SAFEWAY.

10:51AM  7         BUT THE VAST MAJORITY OF COMMUNICATION WAS BETWEEN EITHER

10:51AM  8    MYSELF AND BOB GORDON, ELIZABETH, AND SUNNY.

10:51AM  9    Q.   AND TO THE EXTENT THAT EMPLOYEES COMMUNICATED BY EMAIL,

10:51AM 10    WAS THERE A SYSTEM AT SAFEWAY BY WHICH THAT EMAIL WAS

10:51AM 11    PRESERVED?

10:51AM 12    A.   I CAN'T TELL YOU.

10:51AM 13    Q.   DID YOU EVER SEE A LIBRARY OF ASSAYS THAT THERANOS -- THAT

10:51AM 14    YOU UNDERSTOOD THAT THERANOS COULD PERFORM?

10:51AM 15    A.   IN ONE OF THE EXHIBITS THEY OFFERED UP ABOUT JUST AS AN

10:52AM 16    EXAMPLE OF THEIR PRICING, AND THOSE WERE SOME OF THE TOP ASSAYS

10:52AM 17    IN TERMS OF VOLUME.

10:52AM 18    Q.   AND DO YOU KNOW THAT MS. HOLMES TOLD MR. WOLFSEN BY EMAIL

10:52AM 19    THAT THERANOS WAS NOT PRESENTLY CAPABLE OF PERFORMING ALL OF

10:52AM 20    THOSE TESTS?

10:52AM 21    A.   I DON'T KNOW THAT.  I'D LIKE TO SEE THE EMAIL.

10:52AM 22    Q.   WELL, LET ME ASK YOU TO LOOK AT EXHIBIT 7104.

10:52AM 23         YOUR HONOR, 7104 IS NOT AN EMAIL ON WHICH THIS WITNESS IS

10:52AM 24    COPIED.  I DO THINK THAT THIS IS AN IMPORTANT COMMUNICATION FOR

10:53AM 25    PURPOSES OF REFLECTING THE INTENT OF MS. HOLMES BOTH IN TERMS

10:53AM 1    OF SENDING AND RECEIVING THE EMAIL.  SO I THINK IT COULD BE

10:53AM 2    ADMITTED ON THAT BASIS.

10:53AM 3         BUT ALTERNATIVELY I'LL HAVE TO CALL EITHER MR. WOLFSEN OR

10:53AM 4    MR. SHACHMUT.  SO I MOVE TO ADMIT IT.

10:53AM 5              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:53AM 6              THE COURT:  TO THE ADMISSION OF THIS EMAIL?

10:53AM 7              MR. LEACH:  CORRECT.

10:53AM 8              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:53AM 9         (DEFENDANT'S EXHIBIT 7104 WAS RECEIVED IN EVIDENCE.)

10:53AM 10   BY MR. DOWNEY:

10:53AM 11   Q.   IF YOU LOOK AT THE BOTTOM OF THE EMAIL THAT STARTS ON

10:53AM 12   PAGE 1, MR. WOLFSEN WRITES TO MS. HOLMES AND SAYS HE'S RECEIVED

10:54AM 13   A REQUEST FROM PRESUMABLY SAFEWAY'S LAWYERS TO SEND THE

10:54AM 14   SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY TO OUR OUTSIDE

10:54AM 15   COUNSEL WHO IS ASSISTING IN VARIOUS REGULATORY RESEARCH.

10:54AM 16        AND THEN HE GOES ON TO DISCUSS SOME REGULATORY ISSUES.

10:54AM 17        DO YOU SEE THAT AT THE BOTTOM OF THE FIRST PAGE?

10:54AM 18   A.   YES.

10:54AM 19   Q.   AND HE SENDS THAT EMAIL TO MS. HOLMES AND MR. SHACHMUT;

10:54AM 20   CORRECT?

10:54AM 21   A.   YES.

10:54AM 22   Q.   AND MS. HOLMES RESPONDS TO THAT AND SAYS THIS IS FINE, BUT

10:54AM 23   THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE WILL

10:54AM 24   ACTUALLY MAKE AVAILABLE IN THE STORES, THAT LIST IS THE LIBRARY

10:55AM 25   WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS' CLINICAL TRIALS.

10:55AM 1          DO YOU SEE THAT?

10:55AM 2     A.   I SEE THAT.

10:55AM 3     Q.   AND I THINK YOU MENTIONED YOU UNDERSTOOD THAT THERANOS,

10:55AM 4     PRIOR TO THE TIME THAT THEY ENTERED NEGOTIATIONS WITH SAFEWAY,

10:55AM 5     HAD BEEN PURSUING PARTNERSHIPS WITH PHARMACEUTICAL COMPANIES;

10:55AM 6     CORRECT?

10:55AM 7     A.   THAT'S WHAT WE WERE TOLD, RIGHT.

10:55AM 8     Q.   AND MS. HOLMES IS SAYING TO MR. WOLFSEN, THIS IS A LIBRARY

10:55AM 9     OF ASSAYS WE FEATURE AND CAN DEVELOP AND VALIDATE AS PART OF

10:55AM 10    OUR TRIAL WITH YOU; CORRECT?

10:55AM 11         MR. LEACH:  OBJECTION.  THAT MISSTATES WHAT THIS

10:55AM 12    SAYS, AND IT CALLS FOR SPECULATION.

10:55AM 13         MR. DOWNEY:  I'LL WITHDRAW IT, YOUR HONOR.

10:55AM 14         THE COURT:  THE QUESTION IS WITHDRAWN.

10:55AM 15    BY MR. DOWNEY:

10:55AM 16    Q.   IN ANY EVENT, MR. WOLFSEN RESPONDS TO MS. HOLMES AND SAYS,

10:55AM 17    THANK YOU FOR THE CLARIFICATION, I HAD FORGOTTEN THAT THE LIST

10:55AM 18    WAS A COMPOSITE OF CURRENT AND FUTURE TESTS.

10:56AM 19         DO YOU SEE THAT?

10:56AM 20    A.   I SEE THAT.

10:56AM 21    Q.   IS THIS AN EMAIL AND THE COMMUNICATIONS CONTAINED HEREIN,

10:56AM 22    DO YOU RECALL ANY CONVERSATION WITH MR. WOLFSEN OR MR. SHACHMUT

10:56AM 23    ABOUT THAT IN OR AROUND APRIL OF 2010?

10:56AM 24    A.   I DO NOT.

10:56AM 25         THEY WERE SENT DOWN TO DISCUSS THE WORK THAT HAD BEEN DONE

10:56AM  1    WITH PHARMACEUTICAL COMPANIES, AND THOSE PRESUMABLY WERE UNITS

10:56AM  2    IN PATIENT'S HOMES THAT WERE VALIDATING SOME VERY SPECIFIC

10:56AM  3    ASPECTS OF SOME DRUG THAT THEY WERE DEVELOPING.

10:56AM  4    Q.   AND APPARENTLY THEY WERE ALSO IN TOUCH WITH SAFEWAY'S

10:56AM  5    OUTSIDE LAWYERS; CORRECT?

10:56AM  6    A.   I THINK THAT BOB GORDON WOULD HAVE BEEN FOR SURE.

10:56AM  7         BUT, AGAIN, I THINK WE'RE TALKING ABOUT APPLES AND ORANGES

10:56AM  8    HERE.  THE KIND OF TESTS THAT WERE RUN FOR PHARMACEUTICAL TO MY

10:56AM  9    KNOWLEDGE WOULDN'T BE THE SAME KIND OF TESTS YOU WOULD RUN FOR

10:57AM  10   INDIVIDUALS, AND WE WERE REPEATEDLY TOLD THAT THEY COULD DO

10:57AM  11   VIRTUALLY ALL.

10:57AM  12   Q.   WELL, THAT REMAINS -- THAT DEPENDS ON THE EMAIL, I

10:57AM  13   SUPPOSE.

10:57AM  14        BUT I WANT TO ASK YOU WHAT YOUR UNDERSTANDING OF THE

10:57AM  15   PHARMACEUTICAL BUSINESS WAS.

10:57AM  16        DID YOU UNDERSTAND THAT THEY WOULD PARTNER WITH

10:57AM  17   PHARMACEUTICAL COMPANIES IN CONNECTION WITH PARTICULAR ASSAYS?

10:57AM  18   DID YOU UNDERSTAND THAT?

10:57AM  19   A.   I UNDERSTOOD THAT THEY WERE WORKING WITH PHARMACEUTICAL

10:57AM  20   COMPANIES AND, JUST AS I SAID, THEY WERE TRYING TO EVALUATE

10:57AM  21   REALTIME HOW THOSE DRUGS WERE AFFECTING MAYBE, YOU KNOW, PARTS

10:57AM  22   OF TRADITIONAL ASSAYS I DON'T KNOW.

10:57AM  23   Q.   BUT YOU UNDERSTOOD --

10:57AM  24   A.   IT'S A DIFFERENT APPLICATION.

10:57AM  25   Q.   BUT YOU UNDERSTOOD THAT THEY WERE WORKING WITH DIFFERENT

10:57AM  1    PHARMACEUTICAL COMPANIES; CORRECT?

10:57AM  2    A.   I UNDERSTOOD THAT THAT'S WHAT THEY SAID THEY WERE DOING.

10:57AM  3    I NEVER PERSONALLY VALIDATED THAT.

10:57AM  4    Q.   OKAY.  BUT DID YOU UNDERSTAND THAT THE NATURE OF THOSE

10:57AM  5    PARTNERSHIPS WAS THAT THEY WOULD INVOLVE ONE OR TWO ASSAYS?

10:58AM  6    A.   I KNEW THAT.

10:58AM  7    Q.   LET ME ASK YOU ABOUT SOME REGULATORY ISSUES THAT WE

10:58AM  8    TOUCHED ON BEFORE.

10:58AM  9         YOUR HONOR, I THOUGHT, BECAUSE WE WILL GO UNTIL 3:00, I

10:58AM  10   THOUGHT WE MIGHT GO UNTIL 11:15 TODAY IF THAT'S -- GO UNTIL

10:58AM  11   11:15 AND HAVE A LITTLE BIT OF A LONGER BREAK.  SO LET ME JUST

10:58AM  12   COVER THIS MATTER.

10:58AM  13              THE COURT:  YOU PREVIEWED ME ASKING THE JURY IF THEY

10:58AM  14   CAN GO UNTIL 3:00.

10:58AM  15              MR. DOWNEY:  I BEG YOUR PARDON.

10:58AM  16              THE COURT:  SO THANKS FOR THAT.

10:58AM  17              MR. DOWNEY:  I'M BREAKING IT TO THEM SOFTLY.

10:58AM  18   Q.   LET ME ASK YOU ABOUT SAFEWAY'S EVALUATION OF THE LEGAL AND

10:58AM  19   REGULATORY ISSUES.

10:58AM  20        WE MENTIONED BEFORE CMS, AND THAT WAS ONE REGULATOR YOU

10:58AM  21   KNEW WOULD BE RELEVANT HERE; CORRECT?

10:58AM  22   A.   CORRECT.

10:58AM  23   Q.   AND THE FDA WAS ANOTHER; CORRECT?

10:58AM  24   A.   MAYBE THE FDA, MAYBE NOT.

10:59AM  25   Q.   THAT WAS AN OPEN QUESTION; CORRECT?

10:59AM 1    A.   CORRECT.

10:59AM 2    Q.   BUT YOU -- AND WHEN YOU ULTIMATELY ENTERED INTO AN

10:59AM 3    AGREEMENT, YOU ULTIMATELY INCLUDED A PROVISION WHICH SAID IF

10:59AM 4    THE FDA OBJECTS, WE HAVE THE RIGHT TO TERMINATE THE AGREEMENT;

10:59AM 5    CORRECT?

10:59AM 6    A.   I DON'T RECALL THAT, BUT THE DOCUMENT'S IN THESE BINDERS.

10:59AM 7    Q.   OKAY.  YOU UNDERSTOOD OVER TIME THAT THERANOS WAS WORKING

10:59AM 8    WITH BOTH OF THOSE REGULATORS; CORRECT?

10:59AM 9    A.   THEY SAID THEY WERE WORKING WITH BOTH, AND I KNEW THEY

10:59AM 10   WERE WORKING WITH CLIA, CLIA WAIVERS, BECAUSE I RECALLED THE

10:59AM 11   TIME WHEN ELIZABETH CALLED ME AND SAID THAT THEY HAD JUST BEEN

10:59AM 12   CLIA APPROVED.

10:59AM 13   Q.   RIGHT.  AT SOME POINT DURING THE RELATIONSHIP, THEIR LAB

10:59AM 14   HAD GOTTEN A CERTIFICATION FROM CLIA TO OPERATE AS A LAB?

10:59AM 15   A.   CORRECT, CORRECT.

10:59AM 16   Q.   BUT DURING THE TIME THAT YOU WERE NEGOTIATING THE

10:59AM 17   AGREEMENT IN 2010, MS. HOLMES NEVER SAID WE HAVE A CLIA

10:59AM 18   CERTIFICATION; CORRECT?

10:59AM 19   A.   NO, SHE DID NOT.  BUT SHE WAS EXPECTING TO GET ONE, AND I

11:00AM 20   BELIEVE THEY ULTIMATELY DID.

11:00AM 21   Q.   AND, IN FACT, FOR THE AGREEMENT TO GO FORWARD, THEY HAD TO

11:00AM 22   GET THAT; CORRECT?

11:00AM 23   A.   CORRECT.

11:00AM 24   Q.   AND SIMILARLY, DID YOU KNOW THAT THERANOS WAS TALKING TO

11:00AM 25   THE FDA ABOUT VARIOUS APPROVALS?

11:00AM 1    A.   I DO RECALL ELIZABETH SAYING THAT THEY WOULD PREFER TO GET

11:00AM 2    I GUESS A BIGGER GOLD STAMP OF APPROVAL WHICH THEY REGARDED AS

11:00AM 3    THE FDA.

11:00AM 4    Q.   AND DID YOU TALK TO MS. HOLMES ABOUT FDA APPROVAL IN 2010?

11:00AM 5    A.   WE MAY HAVE HAD SOME DISCUSSION.  BUT, YOU KNOW, TO

11:00AM 6    OPERATE A LAB, ALL YOU NEED IS CLIA WAIVED.

11:00AM 7    Q.   BUT YOU DIDN'T UNDERSTAND IN 2010 -- SHE NEVER TOLD YOU IN

11:01AM 8    2010 THAT THEY HAD ANY APPROVALS FROM THE FDA, DID SHE?

11:01AM 9    A.   I DON'T RECALL HER SAYING THAT.

11:01AM 10   Q.   OKAY.  AND AT THE TIME, DID YOU PERSONALLY LOOK AT THOSE

11:01AM 11   ISSUES VERY CLOSELY?

11:01AM 12   A.   IN TERMS OF CLIA AND FDA, WE WOULD HAVE RELIED ON OUTSIDE

11:01AM 13   COUNSEL.

11:01AM 14   Q.   AND THAT WOULD BE LATHAM & WATKINS?

11:01AM 15   A.   CORRECT.

11:01AM 16   Q.   AND THOSE, IN FACT, ARE THE LAWYERS WHO ARE REPRESENTING

11:01AM 17   YOU IN CONNECTION WITH YOUR APPEARANCE HERE TODAY; CORRECT?

11:01AM 18   A.   CORRECT.

11:01AM 19   Q.   AND THAT'S A VERY REPUTABLE, WELL-KNOWN LAW FIRM; CORRECT?

11:01AM 20   A.   YES.

11:01AM 21   Q.   NOW, IS THERE ANY ASPECT OF REGULATORY APPROVAL THAT YOU

11:01AM 22   RECALL RECEIVING A REPRESENTATION FROM THERANOS ABOUT THAT YOU

11:01AM 23   LATER CAME TO BELIEVE WAS UNTRUE?  DID THEY TELL YOU SOMETHING

11:02AM 24   ABOUT HAVING A REGULATORY APPROVAL THAT YOU THINK WAS FALSE?

11:02AM 25   A.   THE ONLY ONE I RECALL ELIZABETH SAYING WAS THAT THEY HAD

11:02AM  1    BEEN CLIA APPROVED.

11:02AM  2    Q.   OKAY.  BUT THAT WAS TRUE; CORRECT?

11:02AM  3    A.   AND THAT WAS TRUE.

11:02AM  4    Q.   OKAY.  AND LET ME --

11:02AM  5         THIS NEXT SUBJECT IS A LITTLE LONG, YOUR HONOR, SO IT

11:02AM  6    MIGHT BE A LOGICAL TIME FOR A BREAK.

11:02AM  7              THE COURT:  TIME FOR A BREAK?  ALL RIGHT.  WE'LL

11:02AM  8    TAKE A BREAK NOW.

11:02AM  9         SIR, YOU CAN STAND DOWN NOW IF YOU WANT TO TAKE YOUR

11:02AM 10    BREAK.

11:02AM 11              THE WITNESS:  SURE.

11:02AM 12              THE COURT:  I NEED TO TALK TO THE JURY FOR A FEW

11:02AM 13    MINUTES.  WE'LL COME BACK IN ABOUT 30 MINUTES, I THINK, ABOUT

11:02AM 14    30 MINUTES WOULD BE GOOD.

11:02AM 15         MR. DOWNEY, YOU CAN HAVE A SEAT.

11:02AM 16         LADIES AND GENTLEMEN, AS YOU'VE HEARD, I'D LIKE TO GO

11:02AM 17    UNTIL 3:00 THIS AFTERNOON, IF WE MAY, AND TOMORROW I'D LIKE TO

11:02AM 18    SEE IF WE CAN GO UNTIL 4:00 P.M.  FRIDAY WE WILL NEED TO BREAK

11:03AM 19    AT 1:00 P.M., 1:00 P.M. IN THE AFTERNOON.

11:03AM 20         ALSO, LADIES AND GENTLEMEN, BEFORE WE TAKE OUR BREAK, I DO

11:03AM 21    WANT TO INFORM YOU OF AN ACTION THAT HAS OCCURRED THAT AFFECTS

11:03AM 22    THE JURY QUESTIONNAIRES THAT YOU COMPLETED IN THE JURY

11:03AM 23    SELECTION PROCESS OF THIS CASE.

11:03AM 24         AS YOU RECALL, EACH OF YOU COMPLETED A JURY QUESTIONNAIRE

11:03AM 25    PRIOR TO YOUR COMING TO COURT TO BE QUESTIONED AS POTENTIAL

11:03AM    1    JURORS FOR THIS CASE.

11:03AM    2         THE QUESTIONNAIRE HAD TWO PAGES OF INSTRUCTIONS, AND ON

11:03AM    3    THE SECOND PAGE ABOVE MY SIGNATURE WAS THE STATEMENT THAT YOUR

11:03AM    4    ANSWERS WOULD BE CONFIDENTIAL.  YOU WERE INFORMED THAT THE

11:03AM    5    COURT WAS SENSITIVE TO YOUR PRIVACY.  YOU WERE INFORMED THAT

11:03AM    6    THE QUESTIONNAIRES WOULD BE REVIEWED BY THE LAWYERS AND THE

11:03AM    7    COURT AND THAT THEY WOULD BE KEPT WITH THE CLERK OF THE COURT

11:03AM    8    UNDER SEAL AND WOULD BE DISCLOSED, IF AT ALL, WITH NAMES AND

11:04AM    9    OTHER IDENTIFYING INFORMATION REMOVED.

11:04AM   10         NOW, I NEED TO INFORM YOU THAT ABOUT TEN DAYS AGO THE

11:04AM   11    COURT RECEIVED A MOTION FROM AN ENTITY CALLED "MEDIA COALITION"

11:04AM   12    ASKING THAT THE COURT UNSEAL THE QUESTIONNAIRES SUCH THAT THEY

11:04AM   13    MIGHT HAVE ACCESS TO THEM.

11:04AM   14         THE MEDIATION COALITION IDENTIFIES THEMSELVES AS THE

11:04AM   15    FOLLOWING:  AMERICAN BROADCASTING COMPANY, INCORPORATED DOING

11:04AM   16    BUSINESS AS ABC NEWS; THE ASSOCIATED PRESS; BLOOMBERG LP; THE

11:04AM   17    DAILY MAIL; DOW JONES & COMPANY INCORPORATED; NBC UNIVERSAL

11:04AM   18    MEDIA LLC; THE NEW YORK TIMES COMPANY; PORTFOLIO MEDIA

11:05AM   19    INCORPORATED, PUBLISHER OF LAW 360; 3 UNCANNY 4 LLC; AND THE

11:05AM   20    WASHINGTON POST COMPANY.

11:05AM   21         NOW, LAST WEEK, A FEW DAYS AGO, I HAD A HEARING ON THIS

11:05AM   22    MOTION WITH THE MEDIA COALITION ATTORNEY WHO BROUGHT THE

11:05AM   23    MOTION.  ALSO PRESENT WERE ATTORNEYS INVOLVED IN THIS CASE, AN

11:05AM   24    ATTORNEY FOR MS. HOLMES, AND THE UNITED STATES ATTORNEY'S

11:05AM   25    OFFICE PROSECUTING THIS CASE.

11:05AM 1    WE DISCUSSED THE QUESTION OF CONFIDENTIALITY OF THE

11:05AM 2  QUESTIONNAIRES AND I TOLD THE PARTIES THAT PRIOR TO ME DECIDING

11:05AM 3  WHAT, IF ANYTHING, IS TO BE RELEASED, I WOULD SPEAK TO EACH ONE

11:05AM 4  OF YOU PRIVATELY TO HEAR YOUR COMMENTS, IF ANY, ON THIS ISSUE.

11:05AM 5    NOW, WHAT I'D LIKE TO DO TODAY, LADIES AND GENTLEMEN, IS

11:05AM 6  AT THE BREAK, MS. KRATZMANN IS GOING TO PROVIDE YOU WITH COPIES

11:06AM 7  OF YOUR QUESTIONNAIRES, THE QUESTIONNAIRES THAT YOU FILLED OUT,

11:06AM 8  COPIES OF THEM.

11:06AM 9    MY THOUGHT IS THAT YOU MIGHT LIKE TO REVIEW THESE

11:06AM 10 QUESTIONNAIRES AT OUR BREAK.  AFTER WE FINISH EVIDENCE TODAY,

11:06AM 11 WHICH I SUGGESTED WOULD BE ABOUT 3:00 P.M., I WILL ASK IF ANY

11:06AM 12 OF YOU WISH TO SPEAK TO ME TODAY ABOUT YOUR QUESTIONNAIRES AND

11:06AM 13 THESE ISSUES.

11:06AM 14   IF YOU DO, WE WILL SPEAK IN MY CHAMBERS.  IF YOU WISH TO

11:06AM 15 THINK ABOUT IT OVERNIGHT, YOU MAY DO THAT AND I'LL ASK TOMORROW

11:06AM 16 IF YOU WISH TO SPEAK WITH ME, WHICH IS TO SAY THAT I WILL

11:06AM 17 PERMIT YOU TO TAKE YOUR QUESTIONNAIRE HOME WITH YOU, A COPY OF

11:06AM 18 YOUR QUESTIONNAIRE.  WE'LL PROVIDE AN ENVELOPE FOR YOU SUCH

11:06AM 19 THAT IT CAN REMAIN CONVENIENT TO YOU KEEPING IT PRIVATE, AND

11:06AM 20 THEN TOMORROW I'LL ASK YOU IF YOU WISH TO SPEAK WITH ME ABOUT

11:06AM 21 THIS.

11:06AM 22   OUR CONVERSATION WILL BE BRIEF.

11:06AM 23   NOW, I'VE TALKED TO THE LAWYERS HERE.  WE'LL MEET IN MY

11:07AM 24 CHAMBERS, IN MY OFFICE.  I'LL DO THAT ONE AT A TIME WITH EACH

11:07AM 25 OF YOU.  IT WILL BE RECORDED, SO THERE WILL BE A COURT REPORTER

11:07AM  1    PRESENT.  THE LAWYERS WILL HAVE ONE LAWYER PRESENT.  THEY WILL

11:07AM  2    NOT PARTICIPATE IN THE CONVERSATION.  THEY WILL BE THERE TO

11:07AM  3    OBSERVE ONLY.  I MAY HAVE SOME OF MY STAFF PRESENT AS WELL.

11:07AM  4        I TELL YOU THIS IN ADVANCE TO TRY TO LET YOU KNOW WHAT THE

11:07AM  5    CIRCUMSTANCES WILL BE SUCH THAT YOU WON'T BE INTIMIDATED WHEN

11:07AM  6    YOU WALK IN A ROOM AND SEE PEOPLE THERE.

11:07AM  7        MY GOAL IS NOT TO MAKE THIS INTIMIDATING AT ALL, BECAUSE

11:07AM  8    IT SHOULDN'T BE.  IT'S GOING TO BE A CONVERSATION WITH YOU AND

11:07AM  9    WITH ME, AND I HAVE SOME PREPARED QUESTIONS THAT I'M GOING TO

11:07AM 10    ASK EACH OF YOU REGARDING THIS ISSUE AND REGARDING YOUR

11:07AM 11    QUESTIONNAIRES.

11:07AM 12        SO THAT'S THE SCHEDULE FOR TODAY.

11:07AM 13        AT THE BREAK MS. KRATZMANN WILL PROVIDE YOU, AS I SAID,

11:07AM 14    WITH COPIES OF YOUR QUESTIONNAIRES IF YOU WOULD LIKE TO REVIEW

11:08AM 15    THOSE.

11:08AM 16        AGAIN, IF YOU WOULD LIKE TO SPEAK WITH ME TODAY AFTER

11:08AM 17    3:00 O'CLOCK, I'M HAPPY TO DO THAT.  IF YOU WANT TO WAIT UNTIL

11:08AM 18    TOMORROW, OF COURSE WE CAN DO THAT AS WELL.

11:08AM 19        I WILL ASK YOU, IF YOU DO LEAVE WITH YOUR QUESTIONNAIRES,

11:08AM 20    PLEASE DO NOT SHARE THEM WITH ANYONE ELSE, AND PLEASE BRING

11:08AM 21    THEM, BRING THEM WITH YOU TOMORROW BACK TO COURT AND WE'LL

11:08AM 22    COLLECT THOSE AGAIN.

11:08AM 23        ALL RIGHT.  THANK YOU.

11:08AM 24        COUNSEL, ANYTHING FURTHER?

11:08AM 25            MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

BURD CROSS BY MR. DOWNEY                                                    3101

11:08AM   1                    MR. DOWNEY:  NO, YOUR HONOR.

11:08AM   2                    THE COURT:  ALL RIGHT.  WE'LL TAKE ABOUT A 30 MINUTE

11:08AM   3          BREAK.  THANK YOU.

11:08AM   4                  (LUNCH RECESS TAKEN AT 11:08 A.M.)

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

**AFTERNOON SESSION**

11:46AM  1

11:46AM  2          (JURY IN AT 11:46 A.M.)

11:46AM  3          THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

11:46AM  4   PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:46AM  5          MR. DOWNEY, YOU WANTED TO CONTINUE?

11:46AM  6          MR. DOWNEY:  YES, SIR.

11:46AM  7          THE COURT:  YES?

11:46AM  8          MR. DOWNEY:  YES.

11:46AM  9   Q.   MR. BURD, WE WERE TALKING A LITTLE BIT THIS MORNING ABOUT

11:46AM  10  THE PROCESS OF DUE DILIGENCE BEFORE YOU ENTERED INTO AN

11:46AM  11  AGREEMENT WITH THERANOS.

11:46AM  12         I WANT TO TALK NOW ABOUT THE AGREEMENT THAT YOU ULTIMATELY

11:46AM  13  ENTERED INTO, AND YOU MIGHT FIND IT HELPFUL TO HAVE IT IN FRONT

11:46AM  14  OF YOU.  IT'S EXHIBIT 387 IN THE WHITE BINDER.

11:47AM  15         THE CLERK:  THAT WAS PREVIOUSLY ADMITTED.

11:47AM  16         MR. DOWNEY:  IT WAS.

11:47AM  17  Q.   BEFORE WE GET INTO THIS DOCUMENT, YOU HAD MENTIONED THAT

11:47AM  18  WITH RESPECT TO THIS AGREEMENT, MS. HOLMES NEGOTIATED A LOT OF

11:47AM  19  THE TERMS OF THE AGREEMENT ON HER OWN; CORRECT?

11:47AM  20  A.   YES, MEANING SHE -- MEANING WE NEVER SAT WITH A LAWYER

11:47AM  21  FROM THERANOS, WHICH IS CUSTOMARY.

11:47AM  22  Q.   AND YOU UNDERSTOOD FROM THERANOS THAT THIS WAS A BIG DEAL?

11:47AM  23  A.   I THOUGHT IT WAS, SURE.

11:47AM  24  Q.   OKAY.  LET ME DIRECT YOUR ATTENTION IN THE EXHIBIT THAT IS

11:47AM  25  IN FRONT OF YOU TO PAGE 8, AND I'M GOING TO BE LOOKING AT THE

11:47AM  1    PART OF IT THAT IS THE CARRY-OVER SECTION IN 3B WHICH CARRIES

11:48AM  2    OVER BETWEEN PAGES 8 AND 9.

11:48AM  3         DO YOU SEE THAT?

11:48AM  4    A.   YES.

11:48AM  5    Q.   NOW, YOU HAD TALKED DURING YOUR DIRECT EXAMINATION ABOUT A

11:48AM  6    PILOT PROGRAM.

11:48AM  7         DO YOU RECALL THAT?

11:48AM  8    A.   I DO.

11:48AM  9    Q.   BUT, IN FACT, THE AGREEMENT SET UP A SYSTEM UNDER WHICH

11:48AM 10    THERE WOULD BE THREE PHASES IN THE AGREEMENT; CORRECT?  THERE

11:48AM 11    WOULD BE A PRE-PILOT, A PILOT, AND THEN THERE WOULD BE A

11:48AM 12    LAUNCH.

11:48AM 13         DO YOU RECALL THAT?

11:48AM 14    A.   YES.

11:48AM 15    Q.   AND IN PARAGRAPH 3B OF THE AGREEMENT, THE OBLIGATIONS OF

11:48AM 16    THE PARTIES WERE SET FORWARD; CORRECT?

11:48AM 17    A.   CORRECT.

11:48AM 18    Q.   AND THERANOS WAS OBLIGATED UNDER THIS SECTION OF THE

11:48AM 19    AGREEMENT TO OBTAIN APPROVALS BY CLIA; CORRECT?

11:49AM 20    A.   YES.

11:49AM 21    Q.   AND THEY WERE ALSO REQUIRED TO OBTAIN APPROVALS REQUIRED

11:49AM 22    BY ANY OTHER REGULATOR OR LEGAL AUTHORITY; CORRECT?

11:49AM 23    A.   YES.

11:49AM 24    Q.   AND BEFORE THEY LAUNCHED AT SAFEWAY, THEY WERE REQUIRED TO

11:49AM 25    TAKE THEIR TECHNOLOGY AND CUSTOMIZE IT TO SAFEWAY.

11:49AM 1        DO YOU RECALL THAT?

11:49AM 2   A.   THERE IS SOME LANGUAGE IN HERE TO THAT FACT.

11:49AM 3   Q.   WELL, IT WAS A REQUIREMENT OF THE AGREEMENT, WASN'T IT?

11:49AM 4   A.   I'M LOOKING AT SECTION 3B II.

11:49AM 5        LET ME JUST READ IT FOR A SECOND.

11:49AM 6   Q.   CERTAINLY.

11:49AM 7        (PAUSE IN PROCEEDINGS.)

11:49AM 8        THE WITNESS:  YEAH, I THINK CUSTOMIZATION REFERRED

11:50AM 9   TO SORT OF INTEGRATING IT WITH THE BALANCE OF SAFEWAY SYSTEMS.

11:50AM 10  BY MR. DOWNEY:

11:50AM 11  Q.   OKAY.  AND SO SOFTWARE WOULD HAVE TO BE CREATED THAT DID

11:50AM 12  THAT?

11:50AM 13  A.   CORRECT.

11:50AM 14  Q.   AND DO YOU RECALL SUBSEQUENTLY THAT YOU ALSO WANTED TO

11:50AM 15  CUSTOMIZE THE DEVICE IN TERMS OF HOW IT APPEARED IN SAFEWAY

11:50AM 16  STORES.

11:50AM 17       DO YOU REMEMBER THAT?

11:50AM 18  A.   YES.  THERANOS WAS, YOU KNOW, GOING THROUGH SOME CHANGES

11:50AM 19  ON THEIR OWN AND SO I OFFERED UP, YOU KNOW, WHAT WOULD LOOK

11:50AM 20  GOOD FOR US.

11:50AM 21  Q.   OKAY.  AND JUST FROM A RETAIL PERSPECTIVE YOU OFFERED

11:50AM 22  THOUGHTS.

11:50AM 23  A.   RIGHT.

11:50AM 24  Q.   SO, FOR EXAMPLE, DO YOU RECALL THAT YOU SUGGESTED THAT THE

11:50AM 25  SCREEN OF THE DEVICE BE SEPARATED OUT FROM THE DEVICE?  DO YOU

11:50AM  1    REMEMBER THAT?

11:50AM  2    A.   IF IT'S IN -- IF IT'S IN ONE OF THE EMAILS, I'M SURE I

11:50AM  3    DID.

11:50AM  4    Q.   WELL, LET'S GO BACK TO THE AGREEMENT.

11:50AM  5         SO IN ADDITION TO WHAT WE'VE ALREADY DISCUSSED, THE

11:50AM  6    OBLIGATION WAS IMPOSED ON THERANOS BY THIS AGREEMENT TO

11:50AM  7    NEGOTIATE WITH PAYORS WHO PAY FOR THE MEDICAL COSTS OF

11:51AM  8    PATIENTS; CORRECT?

11:51AM  9    A.   CORRECT.

11:51AM  10   Q.   AND THEY HAD TO GAIN ACCEPTANCE THAT WAS SATISFACTORY TO

11:51AM  11   SAFEWAY BEFORE THERE WAS A LAUNCH; CORRECT?

11:51AM  12   A.   CORRECT.

11:51AM  13   Q.   AND THAT'S TRUE SPECIFICALLY WITH REGARD TO INSURERS;

11:51AM  14   CORRECT?

11:51AM  15   A.   YES.

11:51AM  16   Q.   AND THOSE OBLIGATIONS ARE COVERED IN B III AND IV;

11:51AM  17   CORRECT?

11:51AM  18   A.   YES.

11:51AM  19   Q.   AND THEN THERE WAS ALSO AN OBLIGATION THAT THERANOS HAD TO

11:51AM  20   MEET SERVICE STANDARDS SET BY SAFEWAY, INCLUDING THAT THE

11:51AM  21   RESULTS OF TESTS BE AVAILABLE IN 30 MINUTES OR LESS; CORRECT?

11:51AM  22   A.   YES.

11:51AM  23   Q.   AND THEN THERE WERE SOME OTHER PROVISION ABOUT THERANOS

11:51AM  24   REPLACING DEVICES THAT MALFUNCTIONED.

11:52AM  25        AND THEN SAFEWAY OBTAINED -- STRIKE THAT.

11:52AM  1        SAFEWAY WAS OBLIGATED TO HELP THERANOS IN GAINING

11:52AM  2   GOVERNMENT APPROVAL; CORRECT?

11:52AM  3   A.   CORRECT.

11:52AM  4   Q.   AND IT WAS OBLIGATED TO ASSIST THERANOS IN CONNECTION WITH

11:52AM  5   A MARKETING STRATEGY; CORRECT?

11:52AM  6   A.   YES.

11:52AM  7   Q.   AND THEN REMODELING OF THE STORE WOULD BE SAFEWAY'S

11:52AM  8   OBLIGATION, NOT THERANOS'S; CORRECT?

11:52AM  9   A.   THAT'S CORRECT.

11:52AM 10   Q.   AND ALL OF THIS WAS BEFORE THE PILOT PROGRAM LAUNCHED;

11:52AM 11   CORRECT?

11:52AM 12   A.   CORRECT.

11:52AM 13   Q.   OKAY.  SO ALL OF THESE TASKS HAD TO BE COMPLETED TO EACH

11:52AM 14   PARTY'S SATISFACTION IF IT WAS AN OBLIGATION OF THE OTHER PARTY

11:52AM 15   BEFORE THERE COULD EVER BE A PILOT LAUNCH AT SAFEWAY; CORRECT?

11:52AM 16   A.   CORRECT.

11:52AM 17   Q.   AND IF IT WERE TO PASS THAT THERANOS DID NOT MEET ONE OF

11:52AM 18   THOSE OBLIGATIONS OR MORE THAN ONE OF THOSE OBLIGATIONS,

11:53AM 19   SAFEWAY HAD THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT?

11:53AM 20   A.   IT'S NOT SOMETHING THAT I RECALL, BUT I WOULD, I WOULD

11:53AM 21   HAVE BEEN DISAPPOINTED IF GENERAL COUNSEL DIDN'T HAVE IT IN

11:53AM 22   HERE.

11:53AM 23   Q.   OKAY.  AND AFTER THE PRE-PILOT PERIOD WAS COMPLETED TO THE

11:53AM 24   SATISFACTION OF SAFEWAY, A PILOT PROGRAM COULD ACTUALLY LAUNCH;

11:53AM 25   CORRECT?

11:53AM 1     A.   CORRECT.

11:53AM 2     Q.   AND THAT'S DETAILED IN PARAGRAPH C ON PAGE 9; CORRECT?

11:53AM 3     A.   YES.

11:53AM 4     Q.   AND THE EXPECTATION OF THE PARTIES WAS THAT THE PILOT

11:53AM 5     PROGRAM WOULD LAST ABOUT 90 DAYS; CORRECT?

11:53AM 6     A.   YES.

11:53AM 7     Q.   AND ALSO THAT THE PILOT PROGRAM WOULD RUN CONCURRENTLY

11:53AM 8     WITH THE PILOT PROGRAM THAT WALGREENS WOULD RUN; CORRECT?

11:53AM 9     A.   YES.

11:54AM 10    Q.   AND AGAIN, AS WITH THE PRE-PILOT PERIOD, THE PILOT PERIOD

11:54AM 11    HAD TO BE COMPLETED TO SAFEWAY'S SATISFACTION; CORRECT?

11:54AM 12    A.   CORRECT.

11:54AM 13    Q.   AND AGAIN, IF SAFEWAY DID NOT -- IF SAFEWAY WERE

11:54AM 14    UNSATISFIED WITH THERANOS'S PERFORMANCE, IT COULD TERMINATE THE

11:54AM 15    AGREEMENT; CORRECT?

11:54AM 16    A.   CORRECT.

11:54AM 17    Q.   AND IF THE AGREEMENT WAS TERMINATED, THERANOS WAS

11:54AM 18    OBLIGATED TO RETURN ANY MONIES PAID BY SAFEWAY TO DATE;

11:54AM 19    CORRECT?

11:54AM 20    A.   I'D HAVE TO -- I'D HAVE TO READ THIS AND GIVE YOU AN

11:54AM 21    ANSWER ON THAT.

11:54AM 22    Q.   OKAY.  BUT DO YOU RECALL GENERALLY TRYING TO NEGOTIATE AN

11:54AM 23    AGREEMENT --

11:54AM 24    A.   CORRECT.

11:54AM 25    Q.   -- THAT PROVIDED FINANCIAL PROTECTION FOR SAFEWAY?

11:54AM    1    A.   RIGHT.

11:54AM    2    Q.   AND YOU HAD MENTIONED THIS MORNING THAT YOU WERE CONCERNED

11:54AM    3    TO ACHIEVE EXCLUSIVITY IN CONNECTION WITH THE FOOD RETAIL

11:54AM    4    MARKET; CORRECT?

11:54AM    5    A.   YES.

11:55AM    6    Q.   AND DO YOU RECALL THAT YOU WERE SUCCESSFUL IN THAT REGARD

11:55AM    7    AND THAT YOU DID OBTAIN A COMMITMENT FROM THERANOS THAT YOU

11:55AM    8    COULD BE THE -- THAT SAFEWAY COULD BE THE EXCLUSIVE FOOD

11:55AM    9    RETAILER TO LAUNCH FOR A PERIOD?

11:55AM   10    A.   YES.

11:55AM   11    Q.   AND IF YOU LOOK AT PARAGRAPH 5 ON PAGE 11, DOES THAT

11:55AM   12    REFLECT THAT PROVISION?

11:55AM   13    A.   I THINK THAT 5 JUST REFERS TO HOW MUCH OF THE INSURANCE

11:55AM   14    MARKET SHE HAS TO HAVE PRICING ARRANGEMENT WITH BEFORE THE

11:55AM   15    PROGRAM WOULD LAUNCH.

11:55AM   16    Q.   I'M SORRY.  I MAY HAVE DIRECTED YOU TO THE WRONG PLACE.

11:55AM   17         I'M LOOKING AT PAGE 11, B 5.  I THINK THAT'S EXCERPTED ON

11:56AM   18    YOUR SCREEN IF THAT'S HELPFUL AS WELL.

11:56AM   19         MY QUESTION WAS, THIS PROVISION PROVIDED THAT SAFEWAY

11:56AM   20    WOULD HAVE THE EXCLUSIVE RIGHT TO DEPLOY THERANOS IN THE FOOD

11:56AM   21    RETAIL CHANNEL; CORRECT?

11:56AM   22    A.   LET ME JUST FINISH THIS.

11:56AM   23         (PAUSE IN PROCEEDINGS.)

11:56AM   24              THE WITNESS:  CORRECT.

11:56AM   25    BY MR. DOWNEY:

11:56AM  1    Q.   NOW, THERE WERE OTHER FOOD RETAILERS AT THAT TIME WHO WERE

11:56AM  2    LARGER FOOD RETAILERS; CORRECT?

11:56AM  3    A.   WAL-MART WAS LARGER, KROGER WAS LARGER.

11:56AM  4    Q.   SAFEWAY ABOUT A THIRD?

11:56AM  5    A.   A THIRD.

11:56AM  6    Q.   AND ALSO UNDER THE AGREEMENT, DID -- SO THEY WOULD BE

11:56AM  7    PRECLUDED UNDER THE AGREEMENT FROM LAUNCHING THERANOS SYSTEMS?

11:56AM  8    A.   WE GAVE THE LIST OF ONES WE CONSIDERED TO BE THE PLAYERS,

11:56AM  9    AND IT'S IN THE DOCUMENT SOMEWHERE, BUT WE WOULD NOT HAVE PUT

11:57AM 10    WAL-MART ON THE LIST AND WE WOULD PROBABLY EXCLUDE KROGER.

11:57AM 11    BUT, AGAIN, IT'S IN THE DOCUMENT.

11:57AM 12    Q.   OKAY.  AND WE'VE BEEN TALKING ALSO ABOUT YOUR RIGHT TO

11:57AM 13    TERMINATE, AND I JUST WANT TO GIVE YOU AN ABILITY TO LOOK AT

11:57AM 14    THAT PROVISION AS WELL.  THAT'S ON PAGE 19.

11:57AM 15    A.   YES.

11:57AM 16    Q.   SECTION 26B.

11:57AM 17    A.   I HAVE IT.

11:57AM 18    Q.   OKAY.  AND PARAGRAPH 26B PROVIDES "IN THE EVENT THAT

11:57AM 19    SAFEWAY DETERMINES IN ITS SOLE DISCRETION THAT THE PILOT OF THE

11:57AM 20    PROGRAM HAS BEEN UNSUCCESSFUL, SAFEWAY HAS THE RIGHT TO

11:57AM 21    TERMINATE THIS AGREEMENT WITHOUT CAUSE ON THIRTY (30) CALENDAR

11:57AM 22    DAYS' PRIOR WRITTEN NOTICE TO THERANOS.  UPON ANY SUCH

11:58AM 23    TERMINATION, THERANOS SHALL PROMPTLY RETURN ALL PREPAYMENT

11:58AM 24    AMOUNTS ATTRIBUTABLE TO UNDELIVERED INVENTORY UNDER SECTION 10

11:58AM 25    ABOVE."

11:58AM  1            DO YOU SEE THAT?

11:58AM  2       A.   YES.

11:58AM  3       Q.   AND THE REFERENCE TO INVENTORY REFERS TO THE FACT THAT

11:58AM  4   PAYMENTS UNDER THE CONTRACT WERE BEING MADE AS PAYMENTS TO

11:58AM  5   PREPAY FOR CARTRIDGES THAT WERE PART OF THE THERANOS SYSTEMS?

11:58AM  6       A.   CORRECT.

11:58AM  7       Q.   OKAY.  SO ANY PAYMENTS MADE FOR THAT, THERANOS WOULD HAVE

11:58AM  8   AN OBLIGATION TO PREPAY; CORRECT?

11:58AM  9       A.   CORRECT.

11:58AM 10       Q.   AND IT WAS ALSO THE CASE UNDER PARAGRAPH 2 THAT IF THE FDA

11:58AM 11   TOOK ADVERSE ACTION AGAINST THERANOS, THAT SAFEWAY WOULD HAVE

11:58AM 12   THE RIGHT TO TERMINATE THE AGREEMENT; CORRECT?

11:58AM 13       A.   CORRECT.

11:58AM 14       Q.   WAS THAT A RISK THAT YOU BECAME AWARE OF DURING YOUR

11:58AM 15   EVALUATION OF THE DEAL?

11:59AM 16       A.   MY UNDERSTANDING AT THE TIME WAS THAT CLIA APPROVAL WAS

11:59AM 17   SUFFICIENT AND THEY DIDN'T NECESSARILY NEED FDA APPROVAL.

11:59AM 18            ELIZABETH POSITIONED THAT AS MORE OF A BULLETPROOF TYPE OF

11:59AM 19   APPROVAL.

11:59AM 20       Q.   BUT THE AGREEMENT CONTEMPLATED THE POSSIBILITY THAT THE

11:59AM 21   FDA MIGHT TAKE THE OPPOSITE POSITION; CORRECT?

11:59AM 22       A.   SURE.

11:59AM 23       Q.   AND THE RIGHTS AS TO WHO WOULD HAVE THE ABILITY TO

11:59AM 24   TERMINATE THE AGREEMENT DID NOT LIE WITH THERANOS, DID THEY?

11:59AM 25   THEY LAID WITH SAFEWAY; CORRECT?

11:59AM 1    A.   YES.

11:59AM 2    Q.   AND INDEED, AS WE TALKED ABOUT THIS MORNING, THERANOS WAS

11:59AM 3    A RELATIVELY YOUNG COMPANY; CORRECT?

11:59AM 4    A.   CORRECT.

11:59AM 5    Q.   AND I ASSUME YOU HAD SOME UNCERTAINTY AS TO WHETHER THEY

11:59AM 6    WOULD HAVE THE ABILITY TO REPAY IF SAFEWAY UNDERTOOK TO

11:59AM 7    TERMINATE THE CONTRACT; CORRECT?

12:00PM 8    A.   WE INITIALLY GOT A LETTER OF CREDIT SUPPORTING THE MONEY

12:00PM 9    WE PUT UP AND THAT GAVE US SOME COMFORT.

12:00PM 10   Q.   SO IF THERE WAS A TERMINATION OF THE AGREEMENT THAT

12:00PM 11   THERANOS ITSELF WAS UNABLE TO PAY, SAFEWAY WOULD STILL BE

12:00PM 12   REPAID UNDER THAT LETTER OF CREDIT; CORRECT?

12:00PM 13   A.   RIGHT.

12:00PM 14   Q.   AND IN CONNECTION WITH THE EXECUTION OF THE SAFEWAY

12:00PM 15   AGREEMENT, SAFEWAY MADE A COMMITMENT TO BUY ABOUT $10 MILLION

12:00PM 16   WORTH OF CARTRIDGES; IS THAT RIGHT?

12:00PM 17   A.   I DON'T SEE 10 MILLION CARTRIDGES.  I SEE $10 MILLION.

12:00PM 18        BUT MAYBE YOU CAN REFER ME TO A SECTION.

12:00PM 19   Q.   YES.  IT'S PARAGRAPH 10.

12:01PM 20   A.   PARAGRAPH 10.

12:01PM 21   Q.   AND IT'S LABELLED AS INVENTORY PRE-PURCHASES.  PAGE 12.

12:01PM 22   A.   PAGE 12.

12:01PM 23   Q.   AND IT'S REFERRING TO INITIAL PRE-PURCHASE?

12:01PM 24   A.   AND THIS WAS SIGNED 11 YEARS AGO.

12:01PM 25   Q.   I UNDERSTAND.

12:01PM 1    A.   A.   OKAY.

12:01PM 2         SO IT WAS $10 MILLION FOR APPROXIMATELY 715,000 UNITS.

12:01PM 3    Q.   OKAY.  AND THAT WAS THE PAYMENT THAT WAS MADE IN

12:01PM 4    CONNECTION WITH THE AGREEMENT WHEN YOU SIGNED IT; CORRECT?

12:01PM 5    A.   CORRECT.

12:01PM 6    Q.   AND THE PROTECTIONS THAT SAFEWAY HAD WERE IF THE AGREEMENT

12:01PM 7    DIDN'T WORK OUT, IT COULD TERMINATE IT; CORRECT?

12:01PM 8    A.   CORRECT.

12:01PM 9    Q.   AND THERE WAS SOME SECURITY, THERANOS AGREED TO REPAY

12:01PM 10   THAT; CORRECT?

12:02PM 11   A.   RIGHT.

12:02PM 12   Q.   AND IF THERANOS DID NOT REPAY IT, THERE WAS FINANCING THAT

12:02PM 13   ENSURED THE PAYMENT WOULD BE MADE TO SAFEWAY?

12:02PM 14   A.   CORRECT.

12:02PM 15   Q.   AND IN EXCHANGE FOR THAT DEAL, SAFEWAY GOT THE EXCLUSIVITY

12:02PM 16   THAT YOU TALKED ABOUT AT THE OUTSET; CORRECT?

12:02PM 17   A.   YES.

12:02PM 18   Q.   AND IF THE DEAL WERE TO WORK OUT, THE VARIOUS PROFIT

12:02PM 19   ADVANTAGES THAT SAFEWAY MIGHT ACHIEVE WOULD FLOW TO IT DURING

12:02PM 20   THAT EXCLUSIVITY PERIOD; CORRECT?

12:02PM 21   A.   CORRECT.

12:02PM 22   Q.   AND THIS BEING DRAFTED BY LAWYERS, IT CONTAINED A CLAUSE

12:02PM 23   REFERRED TO AS AN INTEGRATION CLAUSE.

12:02PM 24        IS THAT A TERM THAT YOU'RE FAMILIAR WITH?

12:02PM 25   A.   NOT REFERRING TO IT AS A CLAUSE.  INTEGRATION CLAUSE IS AT

12:02PM 1      THE INTEGRATION OF THE SOFTWARE.

12:03PM 2      Q.   WELL, LET ME ASK YOU TO LOOK AT PARAGRAPH 22 OF THE

12:03PM 3      AGREEMENT.  I'M SORRY, PAGE 22 OF THE AGREEMENT.

12:03PM 4      A.   OKAY.

12:03PM 5      Q.   IT'S JUST PARAGRAPH I.  IT'S THE ONLY PARAGRAPH ON THAT

12:03PM 6      PAGE.

12:03PM 7           AND IT SPECIFIES THAT EACH PARTY AGREES THAT THIS

12:03PM 8      AGREEMENT, INCLUDING ITS SCHEDULES, EMBODIES THE ENTIRE

12:03PM 9      UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDES AND REPLACES

12:03PM 10     ANY AND ALL PRIOR UNDERSTANDINGS, ARRANGEMENTS, AND AGREEMENTS,

12:03PM 11     WHETHER ORAL OR IN WRITING RELATING TO IT.

12:03PM 12          YOU'VE SEEN PARAGRAPHS LIKE THAT BEFORE?

12:03PM 13     A.   I DON'T RECALL SEEING IT, AND SO I'M REALLY NOT FAMILIAR

12:03PM 14     WITH THE INTEGRATION CLAUSE.

12:03PM 15          I LIKE THE LANGUAGE OF THIS AGREEMENT, YOU KNOW, BUT IT'S

12:03PM 16     NOT A TERM THAT I HAVE USED BEFORE.

12:04PM 17     Q.   OKAY.  BUT FOR WHATEVER REASON, IT'S INCLUDED IN THE

12:04PM 18     AGREEMENT?

12:04PM 19     A.   SURE.

12:04PM 20     Q.   OKAY.  NOW, LET ME RETURN FOR JUST ONE MOMENT TO THE

12:04PM 21     SUBJECT OF THE REGULATORY RISKS AND THE PATH THAT WENT FORWARD

12:04PM 22     FROM THE SIGNING OF THE AGREEMENT UNTIL THE TIME PERIOD THAT

12:04PM 23     YOU TALKED ABOUT IN EARLY 2013.

12:04PM 24          FIRST OF ALL, LET ME SAY, YOU REPEATEDLY REFERRED TO

12:04PM 25     TALKING ABOUT A LAUNCH AT A SPECIFIED TIME, BUT THERE WERE NO

12:04PM 1    PARTICULAR DEADLINES IN THIS AGREEMENT, WERE THERE?

12:04PM 2    A.   NO.  THERE WAS -- I THINK WE MAY HAVE LISTED AN

12:04PM 3    EXPECTATION.  BUT, YOU KNOW, WE KNEW WE WERE DEALING WITH

12:04PM 4    TECHNOLOGY AND IT'S SOMETIMES DIFFICULT TO NAIL THAT DOWN.

12:04PM 5        IF WE WERE GOING TO OPEN A GROCERY STORE, WE WOULD GIVE

12:05PM 6    YOU A SPECIFIC DAY.

12:05PM 7    Q.   BECAUSE THAT'S SOMETHING THAT YOU'VE BEEN DOING FOR A LONG

12:05PM 8    TIME?

12:05PM 9    A.   CORRECT.

12:05PM 10   Q.   OKAY.  AND YOU UNDERSTOOD THAT THE DELAYS THAT OCCURRED IN

12:05PM 11   THE PARTIES' ABILITY TO LAUNCH WERE DELAYS IN THE DEVELOPMENT

12:05PM 12   OF THE TECHNOLOGY AT THE TIME?

12:05PM 13   A.   I DID NOT.

12:05PM 14   Q.   WELL, I THOUGHT I ASKED YOU WHY YOU DIDN'T INCLUDE

12:05PM 15   DEADLINES IN THE AGREEMENT AND YOU SAID IT WAS BECAUSE OF THE

12:05PM 16   TECHNOLOGY.

12:05PM 17   A.   JUST THE IDEA OF GETTING EVERY INSURANCE COMPANY IN THE

12:05PM 18   COUNTRY TO BUY INTO YOUR PRICE SCHEDULE, THAT'S A BIG EXERCISE

12:05PM 19   IN ITS OWN, AND THEN WRITE SOFTWARE TO INTEGRATE IT WITH

12:05PM 20   SAFEWAY, THAT'S A BIG EXERCISE, LAUNCHING, MARKETING, ALL OF

12:05PM 21   THAT STUFF.

12:05PM 22       I WAS NEVER TOLD THERE WAS A TECHNOLOGY PROBLEM WITH THE

12:05PM 23   BOX ITSELF.

12:05PM 24   Q.   BUT YOU UNDERSTOOD THAT THE TECHNOLOGY HAD NOT BEEN SCALED

12:05PM 25   TO A LARGE DEGREE?

12:05PM   1    A.   WHEN I THINK OF SCALE, I THINK OF THE ABILITY TO PRODUCE,

12:06PM   2    YOU KNOW, SAY A THOUSAND OF THESE BOXES PER DAY AND A

12:06PM   3    PRODUCTION PLAN, YOU KNOW, MAYBE HUNDREDS OF THOUSANDS OF

12:06PM   4    CARTRIDGES.

12:06PM   5         THEY DID BUY A PLANT IN FREMONT, AND I ASSUMED IT WAS FOR

12:06PM   6    THAT PURPOSE.

12:06PM   7    Q.   AND YOU TOURED AT SOME POINT THE MANUFACTURING FACILITY?

12:06PM   8    A.   I DID NOT TOUR.  I DID NOT GET TO SEE THE FREMONT

12:06PM   9    FACILITY.

12:06PM  10    Q.   BUT YOU TOURED THE RESEARCH LAB?

12:06PM  11    A.   I TOURED PART OF THE RESEARCH LAB AND THE OFFICE OF THE

12:06PM  12    COMPANY.

12:06PM  13    Q.   OKAY.  BUT TO RETURN TO THE AGREEMENT, IT DIDN'T SAY WE

12:06PM  14    HAVE TO LAUNCH BY A PARTICULAR DAY, DID IT?

12:06PM  15    A.   IT DIDN'T SAY THAT, BUT THE AGREEMENT SPELLED OUT THAT

12:06PM  16    THEY CAN DO ALMOST ALL, YOU KNOW, ASSAYS.

12:06PM  17    Q.   AND THERE WAS NO DEADLINE IN CONNECTION WITH THE AGREEMENT

12:06PM  18    IS MY QUESTION TO YOU.

12:06PM  19    A.   NO DEADLINE BECAUSE ALL OF THE OTHER PUZZLE PIECES NEEDED

12:06PM  20    TO GET DONE.

12:06PM  21    Q.   OKAY.  AND YOU, YOU -- SO THE PARTIES HAD AN EXPECTATION

12:06PM  22    THAT THERE MIGHT BE A LAUNCH AS EARLY AS 2011; CORRECT?

12:07PM  23    A.   I THINK THAT WAS SUPPOSED TO BE THE PILOT.

12:07PM  24    Q.   OKAY.  BUT DO YOU KNOW WHEN -- DO YOU RECALL WHEN THE

12:07PM  25    REGULATORY APPROVAL FROM CLIA WAS OBTAINED?

12:07PM 1    A.   I JUST RECALL WHERE I WAS WHEN I GOT THE CELL CALL.

12:07PM 2    Q.   BUT YOU DON'T RECALL THE DATE IN 2011?

12:07PM 3    A.   NO.

12:07PM 4    Q.   AND YOU DON'T RECALL THAT THE DATE WAS WELL AFTER THE DATE

12:07PM 5    THAT YOU HAD PROJECTED THE PILOT PERIOD TO BEGIN?

12:07PM 6    A.   IT WAS AFTER, AND I THINK IT'S JUST ONE OF THE

12:07PM 7    UNCERTAINTIES.

12:07PM 8    Q.   OKAY.   AND ALSO DO YOU KNOW WHEN THE NEGOTIATIONS WITH THE

12:07PM 9    INSURERS WERE CONCLUDED?

12:07PM 10    A.   I DON'T KNOW WHEN THEY WERE CONCLUDED.   I REMEMBER GETTING

12:07PM 11    A PROGRESS REPORT ALONG THE WAY, BUT I DON'T RECALL A MOMENT

12:07PM 12    WHERE SOMEONE SAID, WE'RE DONE.

12:07PM 13    Q.   OKAY.   NOW, WE SAW IN THE AGREEMENT THAT WALGREENS ALSO

12:08PM 14    HAD OBTAINED EXCLUSIVITY RIGHTS IN A DIFFERENT CHANNEL FROM THE

12:08PM 15    CHANNEL THAT SAFEWAY HAD OBTAINED; CORRECT?

12:08PM 16    A.   WELL, THE ONLY COMPANY THEY TALKED ABOUT WAS WALGREENS

12:08PM 17    AND, YOU KNOW, THEY'RE SMART ENOUGH TO ASK FOR AN EXCLUSIVE IN

12:08PM 18    THEIR CHANNEL.

12:08PM 19    Q.   AND YOU UNDERSTOOD THAT WALGREENS AND SAFEWAY WERE BOTH

12:08PM 20    WORKING WITH THERANOS AT THE SAME TIME?

12:08PM 21    A.   I DID.

12:08PM 22    Q.   AND I THINK WE TALKED ABOUT A MOMENT AGO YOU UNDERSTOOD

12:08PM 23    THAT THE LAUNCHES OF, OF THERANOS WOULD BE ANNOUNCED IN

12:08PM 24    CONNECTION WITH BOTH STORES AT THE SAME TIME; CORRECT?

12:08PM 25    A.   THAT WAS THE AGREEMENT.

12:08PM 1    Q.   NOW, DID THERE COME A TIME IN EARLY 2012 WHERE YOU LEARNED

12:08PM 2    FROM MS. HOLMES THAT WALGREENS WAS UNWILLING TO LAUNCH UNDER

12:08PM 3    THE MODEL WHERE DEVICES WOULD BE PLACED IN STORES?  IS THAT

12:08PM 4    SOMETHING THAT YOU LEARNED FROM HER?

12:09PM 5    A.   I DIDN'T LEARN IT IN CONNECTION WITH WAL-MART.

12:09PM 6         I LEARNED IT IN CONNECTION WITH CONVERSATIONS THAT I HAD

12:09PM 7    WITH ELIZABETH WHERE THEY WERE NOW SUGGESTING THAT THE

12:09PM 8    PROCESSING ITSELF WOULDN'T TAKE PLACE IN THE STORE.

12:09PM 9         WE TALKED ABOUT A COURIER NETWORK.  I OFFERED TO GIVE HER

12:09PM 10   SOME HELP ON HOW TO BUILD THAT.

12:09PM 11        BUT IT WAS DESCRIBED AS AN EFFICIENT WAY TO START AND, YOU

12:09PM 12   KNOW, UPON REFLECTION, IT WASN'T WHERE WE STARTED, BUT THEY

12:09PM 13   THOUGHT THAT THAT WAS WHAT THE CURRENT SITUATION CALLED FOR.

12:09PM 14   Q.   BUT DID YOU HAVE ANY VISIBILITY ON WHAT THE POSITION OF

12:09PM 15   WALGREENS WAS WITH RESPECT TO THAT?

12:09PM 16   A.   NO.

12:09PM 17   Q.   BUT YOU DID LEARN THAT THERANOS SAID TO INITIATE THE

12:09PM 18   PROGRAM WE ARE ACTUALLY GOING TO DEVELOP A LABORATORY AT OUR

12:09PM 19   MAIN HEADQUARTERS; RIGHT?

12:10PM 20   A.   THEY WOULD BE DOING THE PROCESSING THERE, CORRECT.

12:10PM 21   Q.   OKAY.  AND YOU REFERENCED A COURIER SERVICE.  BLOOD

12:10PM 22   SAMPLES WOULDN'T BE PROCESSED IN THE STORE, THEY WOULD COME

12:10PM 23   BACK TO THAT CENTRAL FACILITY; CORRECT?

12:10PM 24   A.   THAT'S CORRECT.

12:10PM 25   Q.   AND OF COURSE WHEN THAT WAS DONE, PRESUMABLY THERE HAD TO

12:10PM 1    BE CHANGES TO THE SOFTWARE AND OTHER CHANGES THAT WOULD

12:10PM 2    ACCOMMODATE THAT TYPE OF AN ALTERATION IN THE AGREEMENT?

12:10PM 3    A.   WELL, THERE WAS NEVER AN ALTERATION IN THE AGREEMENT.

12:10PM 4    BUT, YOU KNOW, YOU POINTED OUT THE INTEGRATION PARAGRAPH.  IT

12:10PM 5    SAYS WE HAVE TO PUT IT IN WRITING IF IT'S GOING TO BE TRUE.

12:10PM 6    Q.   YOU'RE SAYING THERE'S NO AMENDMENT TO THE --

12:10PM 7    A.   CORRECT.

12:10PM 8    Q.   ALL RIGHT.  BUT SAFEWAY HAD ITS TERMINATION RIGHTS THE

12:10PM 9    ENTIRE TIME?

12:10PM 10   A.   CORRECT.

12:10PM 11   Q.   AND IN RESPONSE TO ANY OF THIS INFORMATION COULD HAVE

12:10PM 12   TERMINATED THE AGREEMENT; CORRECT?

12:10PM 13   A.   CORRECT.

12:10PM 14   Q.   I WANT TO SHOW YOU AN EMAIL FROM 2012 IF I MIGHT.  IT'S

12:10PM 15   EXHIBIT 10537.

12:11PM 16   A.   IN THE WHITE BOOK OR THE BLACK?

12:11PM 17   Q.   NO, IT SHOULD BE IN THE BLACK.

12:11PM 18   A.   10357?

12:11PM 19   Q.   I BEG YOUR PARDON, 10537.

12:11PM 20        AND THIS WILL BE ON YOUR SCREEN AS WELL AS IN THE BOOK.

12:11PM 21            THE CLERK:  I DON'T BELIEVE THIS HAS BEEN ADMITTED

12:11PM 22   INTO EVIDENCE.

12:11PM 23            MR. DOWNEY:  I BEG YOUR PARDON.

12:11PM 24   Q.   LET ME ASK YOU IF THIS IS -- JUST TO LOOK INITIALLY AT THE

12:11PM 25   GENERAL NATURE OF THE EMAIL AND ASK YOU IF THIS IS AN EMAIL

12:11PM   1    EXCHANGE BETWEEN YOU AND MS. HOLMES IN 2012.

12:12PM   2    A.   IT SURE LOOKS THAT WAY.

12:12PM   3    Q.   AND THIS RELATES TO THE SAFEWAY-THERANOS RELATIONSHIP;

12:12PM   4    CORRECT?

12:12PM   5    A.   YES.

12:12PM   6             MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:12PM   7    10537.

12:12PM   8             MR. LEACH:  NO OBJECTION, YOUR HONOR.

12:12PM   9             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:12PM  10        (DEFENDANT'S EXHIBIT 10537 WAS RECEIVED IN EVIDENCE.)

12:12PM  11    BY MR. DOWNEY:

12:12PM  12    Q.   ON THE BOTTOM OF THE EMAIL YOU'LL SEE THAT THERE IS AN

12:12PM  13    EMAIL FROM YOU TO MS. HOLMES IN JANUARY 2012.

12:12PM  14        DO YOU SEE THAT?

12:12PM  15    A.   YES.

12:12PM  16    Q.   AND YOU INDICATE IN THE FIRST SENTENCE, "WHILE I AM

12:12PM  17    COMMITTED TO GETTING THE GROCERY NETWORK UNDER CONTRACT WITHIN

12:12PM  18    TWO AND A ONE HALF MONTHS OF SAFEWAY'S LAUNCH, I AM VERY

12:12PM  19    CONCERNED ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO

12:12PM  20    LAUNCH WITH A MERE FINGER STICK."

12:13PM  21        DO YOU SEE THAT?

12:13PM  22    A.   I DO.

12:13PM  23    Q.   AND IN YOUR COMMENTS ABOUT A GROCERY NETWORK THERE, YOU'RE

12:13PM  24    REFERRING TO GETTING PARTNERS WHO YOU HAD MADE PART OF A

12:13PM  25    GROCERY NETWORK, YOU WERE TALKING ABOUT THE TIMING OF THEIR

12:13PM  1    LAUNCH; CORRECT?

12:13PM  2    A.   CORRECT.

12:13PM  3    Q.   BUT YOU EXPRESSED THAT YOU WERE VERY CONCERNED ABOUT

12:13PM  4    EITHER THE PARTNERS OR ANYONE ELSE LAUNCHING WITH WHAT YOU

12:13PM  5    TERMED "A MERE FINGER STICK;" CORRECT?

12:13PM  6    A.   CORRECT.

12:13PM  7    Q.   AND "A MERE FINGER STICK" REFERS TO A MODEL UNDER WHICH

12:13PM  8    THE BLOOD WAS COLLECTED AT A RETAIL STORE AND THEN THE BLOOD

12:13PM  9    WAS SENT BACK TO THERANOS FOR ANALYSIS IN THEIR CENTRAL LAB;

12:13PM  10   CORRECT?

12:13PM  11   A.   CORRECT.

12:13PM  12   Q.   AND THAT'S THE PROCESS THAT WE WERE TALKING ABOUT A MOMENT

12:13PM  13   AGO; CORRECT?

12:13PM  14   A.   CORRECT.

12:13PM  15   Q.   AND YOU SUGGESTED THAT MODEL WOULD SEVERELY COMPROMISE AND

12:14PM  16   PERMANENTLY DAMAGE THE BRAND WE ARE TRYING TO CREATE; CORRECT?

12:14PM  17   A.   IT CERTAINLY WASN'T THE ORIGINAL BRAND THAT WE TALKED

12:14PM  18   ABOUT.

12:14PM  19   Q.   RIGHT.  THE ORIGINAL PLAN WAS THAT YOU WOULD PLACE THE

12:14PM  20   ANALYZERS IN THE STORE; CORRECT?

12:14PM  21   A.   CORRECT.

12:14PM  22   Q.   BUT MS. HOLMES HAD PROVIDED INFORMATION TO YOU IN JANUARY

12:14PM  23   OF 2012 THAT SAID THERANOS WAS NO LONGER IN A POSITION TO DO

12:14PM  24   THAT; CORRECT?

12:14PM  25   A.   THAT'S WHY WE -- THAT'S CORRECT.  THAT'S WHY SHE OFFERED

12:14PM 1    THE COURIER NETWORK, BUT I EXPECTED -- I ANTICIPATED THAT WOULD

12:14PM 2    BE SHORT TERM.

12:14PM 3    Q.   AND YOU, YOU HAD A VARIETY OF CONCERNS THAT YOU EXPRESSED

12:14PM 4    TO HER IN JANUARY OF 2012 ABOUT THAT MODEL; CORRECT?

12:14PM 5    A.   CORRECT.

12:14PM 6    Q.   AND FIRST AMONG THEM WAS THAT THE EXPERIENCE THAT PEOPLE

12:14PM 7    MIGHT HAVE BETWEEN LOCATIONS MIGHT BE VERY INCONSISTENT;

12:15PM 8    CORRECT?

12:15PM 9    A.   NO.  THAT, PLUS THE ORIGINAL PROMISE HAS GONE AWAY.

12:15PM 10   Q.   WELL, AND, IN FACT, YOU SAY IN NUMBER 2 THAT YOU WOULD NOT

12:15PM 11   BE ABLE TO HAVE A SCIENTIFIC STANDARD WHERE BLOOD WOULD BE

12:15PM 12   BEING ANALYZED AS FRESH BLOOD; CORRECT?

12:15PM 13   A.   CORRECT.

12:15PM 14   Q.   AND THAT WAS A CONCERN THAT YOU HAD.

12:15PM 15        AND YOU LAY OUT A VARIETY OF OTHER CONCERNS IN THIS

12:15PM 16   JANUARY 2012 AGREEMENT; CORRECT?

12:15PM 17   A.   CORRECT.

12:15PM 18   Q.   BUT MS. HOLMES TOLD YOU AT THIS POINT THAT THIS WAS THE

12:15PM 19   MODEL THAT THERANOS WAS GOING TO PURSUE WITH WALGREENS;

12:15PM 20   CORRECT?

12:15PM 21   A.   I DON'T RECALL IF SHE SAID WALGREENS, BUT SHE SAID WE'VE

12:15PM 22   DECIDED AT THERANOS THAT THIS IS THE BEST WAY FOR US TO START

12:15PM 23   THIS COMPANY.

12:15PM 24   Q.   DID YOU UNDERSTAND THAT THAT WAS MOTIVATED BY SAFEWAY --

12:15PM 25   BY WALGREENS' POSITION AS TO THE LEGAL REQUIREMENTS BEING

12:15PM 1    IMPOSED BY FDA?

12:15PM 2    A.   I DID NOT.

12:15PM 3    Q.   ALL RIGHT.  YOU MENTIONED THAT AT SOME LATER POINT THERE

12:16PM 4    WAS AN AGREEMENT, AND I DON'T MEAN THE AGREEMENT WAS AMENDED,

12:16PM 5    BUT THERE WAS AN INFORMAL AGREEMENT BETWEEN YOU AND MS. HOLMES

12:16PM 6    THAT THERE WOULD BE A TYPE OF PILOT RUN IN THE ON CAMPUS

12:16PM 7    FACILITY AT SAFEWAY; CORRECT?

12:16PM 8    A.   I'M NOT SURE WE USED THE WORD "PILOT," BUT THAT WE WOULD

12:16PM 9    PUT ONE OF THEIR ANALYZERS ON PROPERTY AND WE WOULD SUBMIT TO

12:16PM 10   DOING SOME VOLUME AND WE COULD TEST OUT VIRTUALLY EVERY ASPECT

12:16PM 11   OF THE OFFERING.

12:16PM 12   Q.   AND YOU TESTIFIED ON DIRECT EXAMINATION ABOUT A NUMBER OF

12:17PM 13   EMAILS THAT YOU EXCHANGED WITH MS. HOLMES ABOUT YOUR CRITICISMS

12:17PM 14   OF HOW THAT WAS RUNNING; CORRECT?

12:17PM 15   A.   CORRECT.

12:17PM 16   Q.   BUT YOU KNEW AT THE OUTSET OF THAT PROGRAM THAT THAT

12:17PM 17   PROGRAM WOULD RUN UNDER THIS MODEL WHERE BLOOD WOULD BE TAKEN

12:17PM 18   FROM A SAFEWAY LOCATION BACK TO THERANOS; CORRECT?  IS THAT

12:17PM 19   RIGHT OR NOT?

12:17PM 20   A.   NO.

12:17PM 21   Q.   YOU THOUGHT THE TESTING WOULD TAKE PLACE IN THE STORES?

12:17PM 22   A.   I CAN EXPLAIN.

12:17PM 23   Q.   LET ME ASK YOU, DID YOU KNOW THAT THE BLOOD WOULD BE TAKEN

12:17PM 24   FROM THE STORES TO A CENTRAL LAB AT THERANOS FOR ANALYSIS?  DID

12:17PM 25   YOU KNOW THAT?

12:17PM   1    A.   WHAT TIMEFRAME?

12:17PM   2    Q.   WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED BETWEEN YOU

12:17PM   3    AND MS. HOLMES.

12:17PM   4    A.   WHEN THE CAMPUS PROJECT WAS BEING DISCUSSED, WE WERE GOING

12:17PM   5    TO GET A BOX.

12:17PM   6         NOW, THE BOX NEVER ARRIVED AND WE STARTED WITH A CONCEPT

12:17PM   7    SIMILAR TO WHAT YOU DESCRIBED, BUT THE BLOOD WOULD BE DRAWN AND

12:18PM   8    THEN IT WOULD GO TO THERANOS.

12:18PM   9    Q.   OKAY.  AND YOU KNEW THAT'S HOW THE STORE WAS OPERATING;

12:18PM  10    CORRECT?

12:18PM  11    A.   HOW WHAT STORE?

12:18PM  12    Q.   HOW THE STORE WAS OPERATING AND THE CAMPUS?

12:18PM  13    A.   THE CAMPUS.  I KNEW ALMOST EVERYTHING ABOUT HOW IT WAS

12:18PM  14    OPERATING.

12:18PM  15    Q.   WE LOOKED IN THE AGREEMENT ABOUT THE OBLIGATION THAT

12:18PM  16    SAFEWAY HAD TO ASSIST THERANOS WITH MARKETING.

12:18PM  17         DO YOU RECALL THAT?

12:18PM  18    A.   I'M SURE THERE'S SOME OFFERING TO HELP THEM.

12:18PM  19    Q.   AND THAT'S AN AREA OF ISSUE.

12:18PM  20         YOU JUST RECALL HAVING DISCUSSIONS ABOUT MARKETING WITH

12:19PM  21    MS. HOLMES; CORRECT?

12:19PM  22    A.   CORRECT.

12:19PM  23    Q.   AND THAT WAS A CONVERSATION THAT YOU HAD WITH HER OVER A

12:19PM  24    LONG PERIOD OF TIME; CORRECT?

12:19PM  25    A.   YES.

12:19PM  1    Q.   I'M GOING TO SHOW YOU AN EMAIL FROM JULY OF 2011, WHICH IS

12:19PM  2    EXHIBIT 7196, AND MY QUESTION WOULD SIMPLY BE AT THE OUTSET IF

12:19PM  3    THIS IS AN EMAIL BETWEEN YOU AND MS. HOLMES IN THAT TIME

12:19PM  4    PERIOD?

12:19PM  5    A.   YES.

12:19PM  6    Q.   AND IF YOU LOOK AT YOUR EMAIL, WE CAN --

12:19PM  7         MAY WE DISPLAY THAT, YOUR HONOR?

12:19PM  8              THE CLERK:  IT'S NOT BEEN ADMITTED, COUNSEL.

12:19PM  9              MR. DOWNEY:  I'M SORRY.  I MOVE FOR ITS ADMISSION.

12:19PM 10              MR. LEACH:  NO OBJECTION.

12:19PM 11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:19PM 12         (DEFENDANT'S EXHIBIT 7196 WAS RECEIVED IN EVIDENCE.)

12:20PM 13    BY MR. DOWNEY:

12:20PM 14    Q.   I WANT TO FOCUS ON YOUR EMAIL AT THE BOTTOM, THE EMAIL

12:20PM 15    THAT YOU SENT AT 9:13 P.M.

12:20PM 16         YOUR ADDRESS IS AT THE BOTTOM, BUT I THINK THE EMAIL

12:20PM 17    ITSELF IS CONTAINED AT THE TOP OF THE NEXT PAGE.

12:20PM 18         DO YOU SEE THAT?

12:20PM 19    A.   THE DISCUSSION ABOUT PRE-LAUNCH?

12:20PM 20    Q.   RIGHT.

12:20PM 21         (PAUSE IN PROCEEDINGS.)

12:20PM 22    BY MR. DOWNEY:

12:20PM 23    Q.   AND YOU WERE PUSHING MS. HOLMES IN THIS EMAIL TO FOCUS ON

12:20PM 24    BRANDING AND MARKETING; CORRECT?

12:20PM 25    A.   CORRECT.

12:20PM 1    Q.   AND THE GIST OF THIS EMAIL WAS THAT YOU WERE SAYING THAT

12:20PM 2    THERE'S A LOT OF WORK TO GET DONE TO DO MARKETING AND YOU

12:21PM 3    HADN'T GOTTEN IT DONE; CORRECT?

12:21PM 4    A.   CORRECT.

12:21PM 5    Q.   OKAY.  LET'S LOOK AT HER EMAIL --

12:21PM 6    A.   LET ME RESTATE.  THERE'S A LOT OF MARKETING WORK TO BE

12:21PM 7    DONE.  WE WERE NOT SAYING IT WAS OUR RESPONSIBILITY AND WE DID

12:21PM 8    NOT GET IT DONE.

12:21PM 9         SO YOU USED THE TERM -- I THOUGHT YOU IMPLIED THAT SAFEWAY

12:21PM 10   FAILED IN ITS MISSION TO IMPROVE THE MARKETING.

12:21PM 11   Q.   NO, NO.  SAFEWAY WAS ONLY TO ASSIST THERANOS; CORRECT?

12:21PM 12   A.   CORRECT.

12:21PM 13   Q.   BUT YOU WERE SAYING TO MS. HOLMES THAT YOU, THERANOS, HAD

12:21PM 14   NOT GOTTEN DONE ALL OF THE WORK YOU NEEDED TO GET DONE TO

12:21PM 15   MARKET THE COMPANY; CORRECT?

12:21PM 16   A.   TO MARKET THE PRODUCT.

12:21PM 17   Q.   OKAY.  AND SHE RESPONDED TO THAT EMAIL IT LOOKS LIKE A

12:21PM 18   LITTLE BIT LATER, AND THAT'S IN THE MIDDLE OF THE PAGE, AND

12:21PM 19   THAT'S BLOWN UP ON THE SCREEN.

12:21PM 20        AND SHE SAYS YOU HAD SAID IN YOUR EMAIL THERE'S A LOT OF

12:21PM 21   MOUNTAINS TO MOVE.  SHE SAID, I APPRECIATE YOUR COMMENTS ON

12:22PM 22   MOVING MOUNTAINS.  AS YOU KNOW, WE ARE WORKING 24 HOURS A DAY,

12:22PM 23   7 DAYS A WEEK ON OUR END AS WELL TOWARD OUR COMMON GOALS.

12:22PM 24        AND HER SECOND PARAGRAPH SAID, "THE MOST IMPORTANT THING

12:22PM 25   FOR THERANOS TO SPEND TIME ON RIGHT NOW IS SCALING UP OUR

12:22PM  1    INFRASTRUCTURE TO ESTABLISH OUR FOOTPRINT AND GO LIVE

12:22PM  2    NATIONWIDE.  OUR PRIORITY AND OBLIGATION THROUGH LAUNCH IS THE

12:22PM  3    PRODUCT, OPERATIONS, SOFTWARE, PAYOR, PROVIDER IN PRACTICE

12:22PM  4    STRUCTURES, AND THE THOUSANDS OF ASSOCIATED DETAILS FUNDAMENTAL

12:22PM  5    TO BUILDING THIS COMPANY.  THAT'S NOT TO SAY THAT OUR MARKETING

12:22PM  6    PLAN IS ANY LESS IMPORTANT THAN ANY OF THESE, BUT WITH THE

12:22PM  7    LIMITED RESOURCES OF A GROWING COMPANY, WE CANNOT DO BOTH AT

12:22PM  8    THE SAME TIME UNTIL WE FREE UP RESOURCES TO GIVE THIS THE TIME

12:22PM  9    AND ATTENTION THAT IT IS DUE."

12:22PM  10        DO YOU SEE THAT --

12:22PM  11   A.   I DO.

12:22PM  12   Q.   -- IN HER EMAIL?

12:22PM  13        AND THEN SHE TALKED ABOUT GETTING TOGETHER TO TALK ABOUT

12:23PM  14   IT AND THE COSTS ASSOCIATED WITH IT AND GIVES SOME MORE DETAILS

12:23PM  15   AS TO WHEN YOU MIGHT HAVE A MEETING.

12:23PM  16        DO YOU SEE THAT?

12:23PM  17   A.   YES.

12:23PM  18   Q.   OKAY.  AND YOU RESPONDED TO THIS EMAIL.

12:23PM  19        YOU SAID "I COMPLETELY UNDERSTAND THE PRIORITIES."

12:23PM  20        AND THEN YOU WENT ON IN SEVERAL SENTENCES AND SAID YOU

12:23PM  21   COULD HELP WITH MARKETING IN ESSENCE?

12:23PM  22   A.   CORRECT.

12:23PM  23   Q.   ALL RIGHT.  YOU CAN TAKE THAT DOWN.

12:23PM  24        NOW, AS WE TALKED ABOUT IN CONNECTION WITH THE AGREEMENT,

12:23PM  25   THE AGREEMENT ITSELF CONTEMPLATED THAT THERE WOULD BE A

12:23PM   1    PRE-PILOT, A PILOT, AND THEN A LAUNCH; CORRECT?

12:24PM   2    A.   CORRECT.

12:24PM   3    Q.   BUT AT SOME POINT DURING THE PERIOD AFTER THE AGREEMENT

12:24PM   4    WAS SIGNED, YOU CAME UP WITH AN IDEA TO ALTER HOW THE LAUNCH

12:24PM   5    WOULD BE DONE, DIDN'T YOU?

12:24PM   6    A.   WE HAD DISCUSSIONS, BUT YOU HAVE TO GIVE ME MORE THAN

12:24PM   7    THAT.

12:24PM   8    Q.   WELL, DO YOU RECALL DEVELOPING A STRATEGY THAT YOU

12:24PM   9    REFERRED TO AS SHOCK AND AWE?

12:24PM  10    A.   THAT WAS ACTUALLY -- WE STILL WANTED THE PILOT, AND THAT

12:24PM  11    DIDN'T SAY YOU WOULDN'T DO A PILOT.  REMEMBER WE TALKED ABOUT

12:24PM  12    DOING A PILOT IN A REMOTE AREA.

12:24PM  13        VERY EARLY ON WE TALKED ABOUT KIND OF A SHOCK AND AWE.

12:24PM  14    THAT'S WHY WE PREPARED OVER 900 FACILITIES TO HAVE THIS SPACE

12:24PM  15    AVAILABLE FOR THERANOS.

12:24PM  16    Q.   AND YOU UNDERSTOOD THAT TO CHANGE THE TERMS OF THE

12:24PM  17    AGREEMENT TO HAVE THOUSANDS OF STORES -- HOW MANY STORES WOULD

12:24PM  18    LAUNCH IN A SHOCK AND AWE STRATEGY?

12:24PM  19    A.    IT COULD BE AS FEW AS A SINGLE DIVISION OR IT COULD BE 22

12:25PM  20    STATES.

12:25PM  21    Q.   AND HOW MANY WOULD BE IN 22 STATES?

12:25PM  22    A.   A LITTLE OVER 900.

12:25PM  23    Q.   AND THAT WAS NEVER DONE, WAS IT?

12:25PM  24    A.   NEVER.

12:25PM  25    Q.   AND THE AGREEMENT WAS NEVER AMENDED TO ENCOMPASS THAT?

12:25PM 1    A.   WELL, I DON'T THINK THE AGREEMENT NECESSARILY CALLED FOR

12:25PM 2    SHOCK AND AWE.

12:25PM 3    Q.   OKAY.  LET'S TALK A LITTLE BIT ABOUT THE TESTIMONY YOU

12:25PM 4    GAVE ON DIRECT, ABOUT THE EXPERIENCE THAT PATIENTS WERE HAVING

12:25PM 5    ON CAMPUS ON SAFEWAY WHEN THEY GOT THEIR BLOOD DRAWN.

12:25PM 6         AND I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 12283.

12:26PM 7    A.   ALL RIGHT.

12:26PM 8    Q.   IS THIS AN EMAIL EXCHANGE THAT YOU HAD WITH MS. HOLMES IN

12:26PM 9    SEPTEMBER OF 2012?

12:26PM 10   A.   IT APPEARS TO BE.

12:26PM 11   Q.   AND IS THIS A DISCUSSION OF PERFORMANCE AT THE LAB ON

12:26PM 12   CAMPUS AT SAFEWAY?

12:26PM 13   A.   YES.

12:26PM 14        MR. DOWNEY:  YOUR HONOR, I WOULD MOVE THE ADMISSION

12:26PM 15   OF 12283.

12:26PM 16        MR. LEACH:  NO OBJECTION, YOUR HONOR.  I THINK THIS

12:26PM 17   IS ALSO IN EVIDENCE AS EXHIBIT 670.

12:26PM 18        MR. DOWNEY:  THERE IS AT LEAST PART OF IT AS 670,

12:26PM 19   AND MAYBE ALL OF THIS.

12:27PM 20        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:27PM 21        (DEFENDANT'S EXHIBIT 12283 WAS RECEIVED IN EVIDENCE.)

12:27PM 22   BY MR. DOWNEY:

12:27PM 23   Q.   I WANT TO FOCUS ON MS. HOLMES'S RESPONSE TO -- WELL, DO

12:27PM 24   YOU RECALL AT THE BOTTOM OF THIS, IN THE EMAIL THAT YOU SENT TO

12:27PM 25   MS. HOLMES, YOU RAISED A NUMBER OF CONCERNS ABOUT PERFORMANCE;

12:27PM  1    CORRECT?

12:27PM  2    A.   YES.

12:27PM  3    Q.   IN HER RESPONSE SHE SAYS, "AS YOU KNOW, WE WERE NOT EAGER

12:27PM  4    TO START THE MANDATE FOR ALL EMPLOYEES FOR THIS REASON."

12:27PM  5         DO YOU SEE THAT IN THE FIRST PARAGRAPH?

12:27PM  6    A.   I SEE THAT.

12:27PM  7    Q.   AND SHE GOES ON TO SAY, "AS YOU KNOW, WE DO NOT HAVE ALL

12:27PM  8    TESTS RUN IN OUR LAB ONSITE," REFERRING TO THE THERANOS LAB;

12:27PM  9    CORRECT?

12:28PM  10   A.   NOT NECESSARILY.  IT COULD BE THE ESOTERIC AND THE SELDOM

12:28PM  11   USED, WHICH THEY WOULD USE SOMETHING ELSE.

12:28PM  12   Q.   THOSE TESTS MIGHT GO OUT TO UCSF OR UTAH?

12:28PM  13   A.   RIGHT.

12:28PM  14   Q.   AND THEN SHE GOES ON TO DESCRIBE THE DIFFICULTIES THAT

12:28PM  15   THEY ARE HAVING, AND SHE SAYS THEY GET A LOT OF PHONE CALLS

12:28PM  16   THAT IN ESSENCE ARE ASKING WHEN WILL WE -- WHEN CAN MY PATIENT

12:28PM  17   HAVE HER RESULTS OR HIS RESULTS?

12:28PM  18   A.   YES.

12:28PM  19   Q.   AND SHE COMPLAINS THAT PERSONNEL ARE COMMUNICATING TO

12:28PM  20   PATIENTS THAT THE TESTS WILL BE AVAILABLE ON A TIMEFRAME THAT

12:28PM  21   THERANOS CAN'T MAKE THEM AVAILABLE.

12:28PM  22        DO YOU SEE THAT?

12:28PM  23   A.   I SEE THAT.

12:28PM  24   Q.   AND SHE GOES ON TO SAY, "THIS PROCESS DOES NOT TRANSLATE

12:29PM  25   TO THE THERANOS TESTING PROCESS AS YOU KNOW."

12:29PM  1        DO YOU SEE THAT?

12:29PM  2   A.   I SEE THAT.

12:29PM  3   Q.   AND DID YOU SEE THAT THAT -- DO YOU UNDERSTAND THAT AT THE

12:29PM  4   TIME TO MEAN THAT THIS IS NOT THE PROCESS WHERE THERANOS WOULD

12:29PM  5   HAVE A DEVICE ON SITE IN A STORE OR ANOTHER LOCATION AND RUN

12:29PM  6   THE TESTS THERE?

12:29PM  7   A.   THAT'S TRUE.  BUT THAT'S NOT HOW THIS ON CAMPUS FACILITY

12:29PM  8   STARTED.  IT STARTED THAT WE WERE GOING TO GET A BOX, AND THEN

12:29PM  9   THAT, FOR SECRECY REASONS, NO, NOW WE'RE GOING TO DO IT AT THE

12:29PM  10  COMPANY.

12:29PM  11       MR. DOWNEY:  WELL, I MOVE TO STRIKE THAT,

12:29PM  12  YOUR HONOR.  I JUST MOVE TO STRIKE EVERYTHING AFTER "THAT'S

12:29PM  13  TRUE."

12:29PM  14       THE COURT:  I'LL LEAVE THAT IN.  YOU CAN ASK ANOTHER

12:29PM  15  QUESTION.

12:29PM  16  BY MR. DOWNEY:

12:29PM  17  Q.   WELL, MY QUESTION IS THAT THE SENTENCE IN THE EMAIL WHERE

12:29PM  18  SHE SAYS A PROCESS THAT WAS CURRENTLY HAPPENING WAS NOT THE

12:29PM  19  THERANOS PROCESS WHERE A DEVICE WOULD BE PLACED ON SITE;

12:29PM  20  CORRECT?

12:29PM  21  A.   I AGREE WITH THAT.

12:29PM  22  Q.   AND SHE SAID WE'RE DOING THIS PROCESS TO SERVE SAFEWAY

12:30PM  23  PATIENTS, BUT IT DOES NOT MAKE SENSE FOR US, MEANING THERANOS,

12:30PM  24  TO INVEST IN A FULL SERVICE DINOSAUR LAB.

12:30PM  25       DO YOU SEE THAT?

12:30PM 1    A.   I SEE IT.  THAT WASN'T OUR PURPOSE.

12:30PM 2    Q.   AND DID YOU UNDERSTAND HER TO BE REFERRING TO THE FACT

12:30PM 3    THAT SOME RESULTS ARE DELAYED BECAUSE THEY ACTUALLY HAVE TO

12:30PM 4    SEND THEM OUT TO ANOTHER LAB?

12:30PM 5    A.   I DID.

12:30PM 6    Q.   AND THEN SHE GOES ON TO INDICATE THAT SHE WILL SEND YOU

12:30PM 7    OTHER INFORMATION THAT YOU HAD REQUESTED.

12:30PM 8         BUT YOU CONTINUED TO, I THINK, HAVE SOME CONCERNS, AND WE

12:30PM 9    SAW THAT ON DIRECT, YOU CONTINUED TO RAISE ISSUES WITH THE ON

12:30PM 10   CAMPUS FACILITY; CORRECT?

12:30PM 11   A.   WELL, I FINALLY -- I THINK WE HAD A PHONE CALL AND I SAID

12:31PM 12   THAT EITHER WE FIX IT OR LET'S GET RID OF IT, AND WE DECIDED ON

12:31PM 13   THAT CALL TO GET RID OF IT.

12:31PM 14   Q.   BUT IN -- I WANT TO SHOW YOU AN EMAIL, I BELIEVE 715.

12:31PM 15        I BELIEVE THIS IS IN EVIDENCE.

12:31PM 16        MR. LEACH:  WHICH ONE?

12:31PM 17        MR. DOWNEY:  715.

12:31PM 18        THE COURT:  DO YOU SHOW IT IN EVIDENCE?

12:31PM 19        THE WITNESS:  IS IT IN THE BLACK BINDER?

12:31PM 20   BY MR. DOWNEY:

12:31PM 21   Q.   IT SHOULD BE IN THE WHITE BOOK.  I'M SORRY.

12:32PM 22   A.   ALL RIGHT.  I HAVE IT.

12:32PM 23   Q.   AND YOU SEE AT THE BOTTOM OF THAT EMAIL YOU TALK ABOUT

12:32PM 24   SOME OF THE CONCERNS ABOUT PATIENT EXPERIENCE; CORRECT?

12:32PM 25   A.   CORRECT.

12:32PM  1    Q.   AND THEN SHE RESPONDS SAYING THAT THERANOS'S FOCUS ON

12:32PM  2    PATIENT EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL

12:32PM  3    PRODUCT; CORRECT?

12:32PM  4    A.   CAN YOU REPEAT THAT?

12:32PM  5    Q.   YEAH.  SHE RESPONDS TO YOUR COMPLAINTS ABOUT PATIENT

12:32PM  6    EXPERIENCE BY SAYING, "AS DISCUSSED, OUR FOCUS ON PATIENT

12:32PM  7    EXPERIENCE HAS BEEN IN THE CONTEXT OF OUR ACTUAL PRODUCT."

12:33PM  8         DO YOU SEE THAT IN THE FIRST SENTENCE OF HER RESPONSE?

12:33PM  9    A.   I DO.

12:33PM  10   Q.   AND SHE GOES ON TO SAY, "WHAT WE HAVE RUNNING AT THE

12:33PM  11   HEALTH CENTER IS NOT THAT."

12:33PM  12        AND THEN SHE GOES ON TO TALK ABOUT AN INDIVIDUAL FROM

12:33PM  13   THERANOS WHO WAS PART OF A CALL AND HE WAS REALLY NOT AN EXPERT

12:33PM  14   IN PATIENT EXPERIENCE.

12:33PM  15        DO YOU SEE THAT?

12:33PM  16   A.   I DO.

12:33PM  17   Q.   AND THEN YOU GO ON TO SAY YOU WANT TO COME TO AN AGREEMENT

12:33PM  18   AS TO HOW THE ON CAMPUS FACILITY SHOULD BE RUN; RIGHT?

12:33PM  19   A.   RIGHT.

12:33PM  20   Q.   AND WAS IT AS A RESULT OF THIS EXCHANGE THAT YOU AGREED TO

12:33PM  21   SHUT DOWN THE ON CAMPUS FACILITY?

12:33PM  22   A.   I DON'T KNOW IF IT WAS THIS EXCHANGE, BUT THERE WAS AN

12:33PM  23   EXCHANGE WHERE WE HAD THIS CONVERSATION, AND I SAID IF WE CAN'T

12:33PM  24   GET IT RIGHT, LET'S SHUT IT DOWN, AND SHE AGREED.

12:33PM  25   Q.   NOW, I THINK YOU TESTIFIED ON DIRECT THAT YOU LEFT SAFEWAY



12:34PM  1    IN MAY OF 2013; IS THAT RIGHT?

12:34PM  2    A.   CORRECT.

12:34PM  3    Q.   AND YOU ANNOUNCED THAT YOU WOULD BE LEAVING IN EARLY

12:34PM  4    JANUARY OF 2013; CORRECT?

12:34PM  5    A.   I CAN'T SAY IT WAS EARLY JANUARY.  I ACTUALLY THOUGHT IT

12:34PM  6    WAS SOMETIME IN LATE DECEMBER.

12:34PM  7    Q.   DECEMBER OF 2012?

12:34PM  8    A.   CORRECT.

12:34PM  9    Q.   BUT AT SOME POINT FIVE OR SO MONTHS BEFORE THE ANNUAL

12:34PM 10    MEETING?

12:34PM 11    A.   CORRECT.

12:34PM 12    Q.   AND YOU HAD BEEN THE PERSON AT SAFEWAY WHO HAD REALLY

12:34PM 13    CHAMPIONED THE THERANOS PROJECT; CORRECT?

12:34PM 14    A.   I WAS THE -- I WAS THE WHAT YOU WOULD CALL THE SPONSOR

12:35PM 15    CHAMPION, SURE.

12:35PM 16    Q.   AND TELL US WHAT THAT MEANS.

12:35PM 17    A.   WELL, IT MEANS THAT I HOLD MYSELF PERSONALLY RESPONSIBLE

12:35PM 18    FOR GETTING THIS DEAL DONE AND EXECUTED.

12:35PM 19    Q.   NOW, IN 2012, IS IT FAIR TO SAY THAT THE STOCK PERFORMANCE

12:35PM 20    OF SAFEWAY WAS, WAS LESS SUCCESSFUL THAN IT HAD BEEN IN PRIOR

12:35PM 21    YEARS?

12:35PM 22    A.   I'D HAVE TO LOOK AT THE -- AND IT'S HARD TO DO TODAY

12:35PM 23    BECAUSE WE'RE NO LONGER A PUBLIC COMPANY, SO I CAN'T CONFIRM

12:35PM 24    THAT.

12:35PM 25    Q.   WELL, DO YOU RECALL THAT THERE WAS A SIGNIFICANT DROP IN

12:35PM  1    THE SAFEWAY STOCK PRICE IN 2012?

12:35PM  2    A.  IN 20 YEARS, THAT HAPPENED FREQUENTLY.

12:35PM  3    Q.  WELL, LET ME SHOW YOU AN EXHIBIT WHERE WE CAN JUST FOCUS

12:36PM  4    ON 2012.  IT'S EXHIBIT 10568.

12:36PM  5    A.  WHITE BOOK?

12:36PM  6    Q.  BLACK BOOK.

12:36PM  7    A.  BLACK BOOK.

12:36PM  8        OKAY.

12:36PM  9    Q.  AND I'LL ALSO GIVE YOU AND ASK YOU TO LOOK AT

12:36PM  10   EXHIBIT 10569 JUST SO YOU CAN HAVE THOSE AVAILABLE FOR -- TO

12:36PM  11   REVIEW BECAUSE THEY'RE RELATED AS I THINK YOU'LL SEE.

12:36PM  12   A.  SO THE FIRST ONE IS JUST TAKING A DAILY READ ON THE STOCK

12:37PM  13   PRICE.

12:37PM  14   Q.  WELL, LET ME HAVE A CONVERSATION WITH THE JUDGE BEFORE YOU

12:37PM  15   DESCRIBE IT.

12:37PM  16           THE WITNESS:  OKAY.

12:37PM  17           MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM  18   10568 AND -69.

12:37PM  19           MR. LEACH:  THERE'S NOT YET A FOUNDATION LAID FOR IT

12:37PM  20   YET, YOUR HONOR.  THERE MIGHT BE.

12:37PM  21           MR. DOWNEY:  WELL, I THINK --

12:37PM  22           THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR

12:37PM  23   THIS?

12:37PM  24   BY MR. DOWNEY:

12:37PM  25   Q.  DO YOU RECALL THIS AS BLOOMBERG CHARTS TRACKING THE DAILY

12:37PM 1    PERFORMANCE OF SAFEWAY STOCK IN 2000 -- THE PERIOD BETWEEN 2010

12:37PM 2    AND 2013?

12:37PM 3    A.   IT SAYS IT'S BLOOMBERG.  IT'S NOT THE WAY THAT WE TRACK

12:37PM 4    THE STOCK.

12:37PM 5    Q.   BUT YOU RECOGNIZE THAT THAT'S WHAT THIS IS?

12:37PM 6    A.   I RECOGNIZE IT AS A DAILY KIND OF THE OPEN HIGH, LOW, AND

12:37PM 7    CLOSE.

12:37PM 8          MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:37PM 9    10568 AND -69.

12:37PM 10          THE COURT:  WELL, DID YOU COMMENT?  I DON'T THINK

12:37PM 11   THIS WITNESS HAS COMMENTED ON -69 YET.

12:37PM 12          THE WITNESS:  I HAVE NOT.

12:37PM 13   BY MR. DOWNEY:

12:37PM 14   Q.   WELL, DO YOU RECOGNIZE 10569?

12:38PM 15   A.   WELL, WHAT IT IS PRESUMABLY DESCRIBING -- I'M NOT

12:38PM 16   DISPUTING THAT THESE ARE THE NUMBERS.  IT'S JUST THAT I HAVE

12:38PM 17   NOT SEEN THIS EXHIBIT.

12:38PM 18          BUT AS I SAID EARLIER, YOU HAD YOUR UPS AND DOWNS OVER THE

12:38PM 19   COURSE OF, YOU KNOW, 20 YEARS.

12:38PM 20   Q.   FOR NOW I'M JUST FOCUSSED ON THE DOCUMENT.

12:38PM 21          DO YOU SEE AT THE BOTTOM OF 10568 THERE'S AN INTERNET

12:38PM 22   ADDRESS?

12:38PM 23   A.   HANG ON A SECOND.

12:38PM 24          ON THE BOTTOM OF THE VERY FIRST PAGE?

12:38PM 25   Q.   AT THE BOTTOM OF THE VERY FIRST PAGE, YES.

12:38PM   1    A.   SURE, SURE.

12:38PM   2    Q.   AND DO YOU SEE THE SAME ON THE BOTTOM OF 10569?

12:38PM   3    A.   I DO.

12:38PM   4         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:38PM   5    10568 AND 10569.

12:39PM   6         THE COURT:  SIR, DO YOU HAVE ANY DOUBT ABOUT THE

12:39PM   7    RELIABILITY OF EITHER OF THESE DOCUMENTS?

12:39PM   8         THE WITNESS:  I DON'T HAVE ANY DOUBT.  IT'S JUST

12:39PM   9    THAT IT'S NOT THE WAY THAT WE RECOVERED THE INFORMATION.  IT

12:39PM  10    WAS ALWAYS AN ONLINE SOURCE, YOU KNOW, NOT OFTEN PRINTED.  BUT

12:39PM  11    IF IT COMES FROM BLOOMBERG, IT SHOULD BE ACCURATE.

12:39PM  12         THE COURT:  I'LL ADMIT IT AND IT MAY BE PUBLISHED.

12:39PM  13         (DEFENDANT'S EXHIBITS 10569 AND 10569 WERE RECEIVED IN

12:39PM  14    EVIDENCE.)

12:39PM  15         THE COURT:  THANK YOU, SIR.

12:39PM  16         THE WITNESS:  SURE.

12:39PM  17    BY MR. DOWNEY:

12:39PM  18    Q.   LET ME FOCUS ON THE PERIOD THAT STARTS IN 2012 ON 10569.

12:39PM  19    A.   I'M SORRY.  CAN YOU GIVE ME THE PAGE NUMBER?

12:40PM  20    Q.   I'M SORRY.  I'M ON 10569, WHICH IS JUST THE GRAPH.

12:40PM  21    A.   OH, OKAY.

12:40PM  22    Q.   AND FOR NOW I'M JUST LOOKING AT THE PICTURE.

12:40PM  23         AND DO YOU SEE EARLY, IF YOU LOOK AT THE BOTTOM AXIS, YOU

12:40PM  24    CAN SEE THAT THAT REFLECTS TIMES AND VARIOUS DATES IN 2010 ALL

12:40PM  25    OF THE WAY THROUGH 2013?

12:40PM   1    A.   YES.

12:40PM   2    Q.   AND IF YOU SEE ON THE GRAPH ON THE LEFT SIDE THAT IS

12:40PM   3    VERTICAL, THAT REFLECTS THE PRICE OF SAFEWAY STOCK.

12:40PM   4         DO YOU SEE THAT?

12:40PM   5    A.   I DO.

12:40PM   6    Q.   AND DO YOU SEE, IF YOU LOOK AT THE PRICE POINT FOR

12:40PM   7    JANUARY 1, 2012, YOU SEE IT APPEARS THAT THE STOCK APPEARS TO

12:40PM   8    HAVE BEEN RISING AROUND THAT DATE?  DO YOU SEE THAT?

12:40PM   9    A.   YES.

12:40PM  10    Q.   AND THEN IN A PERIOD A LITTLE BIT THEREAFTER, DO YOU SEE

12:41PM  11    THAT A VERY PRECIPITOUS DECLINE IN THE PRICE OF SAFEWAY STOCK

12:41PM  12    BEGINS?

12:41PM  13    A.   YES.

12:41PM  14    Q.   SO THAT BY MID-YEAR, THE STOCK PRICE IS CONSIDERABLY LOWER

12:41PM  15    THAN IT HAD BEEN AT THE BEGINNING OF THE YEAR; CORRECT?

12:41PM  16    A.   CORRECT.

12:41PM  17    Q.   AND IF YOU LOOK AT THE DAILY CHART, THE DAILY PRICING

12:41PM  18    TABLE THAT IS CONTAINED IN 10568, YOU WILL SEE THAT THE PRICE

12:41PM  19    OF SAFEWAY STOCK DROPPED FROM ABOUT $19 A SHARE TO ABOUT $14

12:41PM  20    PER SHARE.

12:41PM  21         DO YOU SEE THAT?  BETWEEN JANUARY 1ST AND JULY 1ST?

12:41PM  22    A.   OF 2012?

12:41PM  23    Q.   YES, SIR.

12:42PM  24    A.   I MEAN, IT CERTAINLY REFLECTS THAT ON THE GRAPH.  I'M

12:42PM  25    STILL NOT FINDING JANUARY ON THE TABLES.

| | | |
|---|---|---|
| 12:42PM | 1 | Q. LET ME SEE IF I CAN GIVE YOU A HAND. |
| 12:42PM | 2 | IF YOU LOOK AT -- |
| 12:42PM | 3 | A. IF YOU'RE LOOKING AT 1/1/12. |
| 12:42PM | 4 | Q. DO YOU HAVE IT ON PAGE 10 OF 10568? |
| 12:42PM | 5 | A. OKAY. AND WHAT IS THE DATE THAT YOU'RE LOOKING FOR? |
| 12:42PM | 6 | Q. AND YOU COMPARE THAT TO -- LOOK AT JANUARY 3RD, 2012. |
| 12:42PM | 7 | A. JANUARY 3RD. YES. |
| 12:42PM | 8 | Q. DO YOU SEE THE CLOSE ON THAT DAY IS ABOUT 19.2? |
| 12:43PM | 9 | A. CORRECT. |
| 12:43PM | 10 | Q. AND THEN IF YOU FORWARD FROM THERE TO JULY 1ST, YOU WILL |
| 12:43PM | 11 | SEE THAT IT WASN'T TRADED ON JULY 1ST, BUT AS OF JULY 2ND, IT'S |
| 12:43PM | 12 | ABOUT 16.2, 16.3. |
| 12:43PM | 13 | A. YES. |
| 12:43PM | 14 | Q. AND THEN BY JULY 17TH, IT HAD DROPPED DOWN TO ABOUT 14 AND |
| 12:43PM | 15 | A QUARTER? CLOSER TO 14 AND A HALF AT THE CLOSE? |
| 12:43PM | 16 | A. ARE YOU SAYING JULY 13TH? |
| 12:43PM | 17 | Q. JULY 17TH? |
| 12:43PM | 18 | A. 17TH. YES. 14.6. |
| 12:43PM | 19 | Q. AND THEN IT BEGAN TO DROP AGAIN. |
| 12:43PM | 20 | AND DO YOU SEE BY AUGUST 6TH THE STOCK HAD DROPPED ALL OF |
| 12:44PM | 21 | THE WAY TO WHERE IT CLOSED AROUND 14.1, WHICH WAS JUST SLIGHTLY |
| 12:44PM | 22 | UP FROM 13.8, AND THEN IT STABILIZED AROUND THAT POINT. |
| 12:44PM | 23 | DO YOU SEE IT? |
| 12:44PM | 24 | A. IT STABILIZED FOR AWHILE. |
| 12:44PM | 25 | Q. SO BETWEEN 14 AND, OVER THE NEXT PERIOD, SOMEWHERE BETWEEN |

12:44PM  1    14 AND 14 AND A HALF THROUGH OCTOBER.

12:44PM  2        DO YOU SEE THAT?

12:44PM  3    A.   I SEE THAT.

12:44PM  4    Q.   AND DID YOU BELIEVE THAT THE RELATIONSHIP BETWEEN THERANOS

12:44PM  5    AND SAFEWAY HAD ANY RELATIONSHIP TO THE DROP IN THE VALUE OF

12:44PM  6    SAFEWAY STOCK?

12:44PM  7    A.   I CAN'T IMAGINE THAT I DID BECAUSE I DON'T THINK I EVER

12:45PM  8    THOUGHT THAT.

12:45PM  9    Q.   CAN I ASK YOU TO LOOK IN THE BLACK NOTEBOOK AT

12:45PM  10   EXHIBIT 13947.

12:45PM  11       YOUR HONOR, THIS IS RATHER A RECORD OF A COMMUNICATION

12:45PM  12   THAT WOULD CONTAIN A MOBILE PHONE NUMBER WHICH WE HAVE REDACTED

12:45PM  13   FOR PURPOSES OF DISPLAYING PUBLICLY OR ADMITTING AS AN EXHIBIT.

12:45PM  14   A.   DID YOU SAY 13, 13 --

12:45PM  15   Q.   -947?

12:45PM  16   A.   -- 947.

12:45PM  17            THE COURT:  13947?

12:46PM  18            MR. DOWNEY:  YES, SIR.

12:46PM  19            THE WITNESS:  I DON'T HAVE 13947.  MY LAST ONE IN

12:46PM  20   THE BINDER IS 12293 IN THE BLACK.

12:46PM  21   BY MR. DOWNEY:

12:46PM  22   Q.   ALL RIGHT.  BEAR WITH ME FOR A MOMENT.

12:46PM  23       THAT'S BECAUSE I HAVE ALL OF THE COPIES.

12:46PM  24   A.   THAT EXPLAINS IT.

12:46PM  25            MR. DOWNEY:  YOUR HONOR, IS THAT ALSO MISSING FROM

12:46PM  1    YOUR NOTEBOOK?

12:46PM  2            THE COURT:  IT IS.

12:47PM  3            MR. DOWNEY:  (HANDING.)

12:47PM  4        MAY I APPROACH THE WITNESS, YOUR HONOR?

12:47PM  5            THE COURT:  YOU MAY.

12:47PM  6            MR. DOWNEY:  (HANDING.)

12:47PM  7    Q.   MY QUESTION IS, JUST BEFORE ANYTHING ELSE, IS THIS A TEXT

12:47PM  8    MESSAGE THAT WAS EXCHANGED -- A SERIES OF TEXT MESSAGES THAT

12:47PM  9    WERE EXCHANGED BETWEEN YOU AND MS. HOLMES IN JULY OF 2012?

12:48PM  10   A.   I CAN'T SAY FOR CERTAIN BECAUSE I DON'T KNOW HOW THESE

12:48PM  11   MESSAGES WERE CAPTURED.

12:48PM  12   Q.   DO YOU KNOW IF YOU TEXTED MS. HOLMES IN 2000 -- JULY OF

12:48PM  13   2012 TO THE EFFECT THAT THE SHARE PRICE OF SAFEWAY WOULD

12:48PM  14   IMPROVE SIGNIFICANTLY IF WE LAUNCHED, CALL ME WHEN YOU CAN?

12:48PM  15           MR. LEACH:  OBJECTION, YOUR HONOR.

12:48PM  16           THE COURT:  SUSTAINED.  I'M NOT SURE THAT WAS A

12:48PM  17   QUESTION.

12:48PM  18       WHY DON'T YOU REPHRASE YOUR QUESTION?

12:48PM  19   BY MR. DOWNEY:

12:48PM  20   Q.   WELL, DID YOU COMMUNICATE WITH MS. HOLMES, BY TEXT OR

12:48PM  21   OTHERWISE, AND TELL HER THAT YOU THOUGHT THE STOCK PRICE OF

12:48PM  22   SAFEWAY WOULD IMPROVE IF YOU COULD ANNOUNCE A LAUNCH OF

12:48PM  23   THERANOS PRODUCT IN SAFEWAY STORES?

12:48PM  24   A.   I CAN'T SAY FOR CERTAIN.

12:48PM  25       I WOULD TELL YOU, SITTING HERE TODAY, THAT I THINK IT

12:49PM 1    WOULD HAVE MOVED THE STOCK PRICE UP HAD WE LAUNCHED.

12:49PM 2    Q.   BUT AS TO WHETHER IT HAPPENED OR NOT YOU JUST DON'T --

12:49PM 3    A.   DON'T KNOW.

12:49PM 4    Q.   -- RECALL?

12:49PM 5         LET ME ASK YOU ABOUT A FEW OF THE AREAS BRIEFLY THAT YOU

12:49PM 6    TOUCHED ON DURING THE COURSE OF YOUR DIRECT TESTIMONY.

12:49PM 7         YOU TALKED BRIEFLY ABOUT THE FACT THAT RENOVATIONS WERE

12:49PM 8    MADE IN SAFEWAY STORES TO ACCOMMODATE THERANOS BEING IN THE

12:49PM 9    STORES; CORRECT?

12:49PM 10   A.   CORRECT.

12:49PM 11   Q.   AND IF YOU WALK INTO A SAFEWAY TODAY, DO YOU KNOW WHAT IS

12:50PM 12   IN MANY OF THOSE LOCATIONS?

12:50PM 13   A.   YEAH.  I DON'T KNOW THE COUNT, BUT ONE OF THE STORES THAT

12:50PM 14   I GET PHARMACY PRESCRIPTIONS FROM HAS A QUEST LAB IN IT.

12:50PM 15   Q.   SO IN THE SPACES THAT WERE INTENDED FOR THERANOS, PERHAPS

12:50PM 16   WITH SOME MODIFICATION, THERE'S AN OPERATOR OF ONE OF ITS

12:50PM 17   COMPETITORS; CORRECT?

12:50PM 18   A.   CORRECT.

12:50PM 19   Q.   AND DO YOU KNOW HOW BLOOD IS DRAWN FROM THE PATIENTS AT

12:50PM 20   THOSE LOCATIONS?

12:50PM 21   A.   I DO.

12:50PM 22   Q.   AND HOW IS IT DRAWN?

12:50PM 23   A.   IT'S DRAWN THROUGH, TYPICALLY FOR ADULTS AT LEAST, A VEIN

12:50PM 24   IN THE ARM.

12:51PM 25             MR. DOWNEY:  YOUR HONOR, WILL YOU BEAR WITH ME FOR

12:51PM 1     ONE MOMENT?

12:51PM 2              THE COURT:  OF COURSE.

12:51PM 3         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:51PM 4     BY MR. DOWNEY:

12:51PM 5     Q.   ONE LAST QUESTION, MR. BURD.  I WANT TO ASK YOU ABOUT THE

12:51PM 6     AGREEMENTS BETWEEN THERANOS AND OTHER PARTIES, NOT ITS

12:51PM 7     AGREEMENT WITH SAFEWAY.

12:51PM 8         WE'VE TALKED ABOUT THE AGREEMENT THAT THERANOS HAD REACHED

12:51PM 9     WITH WALGREENS AT SOME POINT; CORRECT?

12:51PM 10    A.   YES.

12:51PM 11    Q.   DO YOU RECALL THAT?

12:51PM 12        AND DO YOU ALSO RECALL HEARING AT SOME POINT FROM

12:52PM 13    MS. HOLMES ABOUT THE DEPARTMENT OF DEFENSE AND THERANOS HAVING

12:52PM 14    A RELATIONSHIP WITH THE DEPARTMENT OF DEFENSE AND YOU TESTIFIED

12:52PM 15    ABOUT MEDEVAC AND SO FORTH?

12:52PM 16    A.   YES.

12:52PM 17    Q.   DID MS. HOLMES TELL YOU AS PART OF ANY CONVERSATION THAT

12:52PM 18    THERANOS HAD ENTERED INTO A CONTRACT WITH THE DEPARTMENT OF

12:52PM 19    DEFENSE IN LATE 2012 TO TEST ITS DEVICES BY CENTRAL COMMAND IN

12:52PM 20    AFGHANISTAN?

12:52PM 21    A.   NO.

12:52PM 22    Q.   I WANT TO JUST SHOW YOU A DOCUMENT WHICH YOU MAY OR MAY

12:52PM 23    NOT HAVE SEEN BEFORE, SO MY QUESTION IS SIMPLY -- WILL SIMPLY

12:52PM 24    BE WHETHER YOU'VE EVER HAD OCCASION TO SEE THE DOCUMENT, AND

12:53PM 25    IT'S 10547 IN THE BLACK NOTEBOOK.

12:53PM 1        IF YOU WOULD LOOK AT THE -- WELL, LET ME ASK YOU, DO YOU

12:53PM 2   RECALL EVER SEEING THIS DOCUMENT BEFORE?

12:53PM 3   A.   NO.

12:53PM 4   Q.   DID YOU KNOW DANIEL EDLIN AT THERANOS?

12:53PM 5   A.   NO.

12:53PM 6   Q.   OTHER THAN MS. HOLMES, DID YOU KNOW ANY OF THE OTHER

12:53PM 7   SENDERS OR RECIPIENTS OF THESE EMAILS, CHRISTIAN HOLMES,

12:53PM 8   DANIEL EDLIN?

12:53PM 9   A.   CHRISTIAN I MET.

12:53PM 10  Q.   AND YOU DON'T RECALL HER TELLING YOU IN DECEMBER OF 2012

12:54PM 11  THAT AN AGREEMENT HAD BEEN EXECUTED APPROVING A PROTOCOL FOR

12:54PM 12  THERANOS WITH THE DEPARTMENT OF DEFENSE?  THAT'S JUST A

12:54PM 13  QUESTION --

12:54PM 14  A.   YEAH.

12:54PM 15  Q.   THAT'S THE SPECIFIC QUESTION.

12:54PM 16  A.   I CAN TELL YOU WHAT I DO RECALL IF YOU WANT.

12:54PM 17  Q.   I'M JUST ASKING YOU ABOUT THE AGREEMENT BETWEEN THERANOS

12:54PM 18  AND THE DEPARTMENT OF DEFENSE.

12:54PM 19      YOU DON'T RECALL TALKING ABOUT ANY CONTRACT?

12:54PM 20  A.   NO.

12:54PM 21  Q.   OKAY.  AND YOU ALSO TESTIFIED THAT THE BUSINESS MADE SENSE

12:54PM 22  TO YOU BECAUSE THERE WERE, I THINK YOU SAID, ADMIRALS AND

12:54PM 23  GENERALS ON THE BOARD; CORRECT?

12:54PM 24  A.   CORRECT.

12:54PM 25  Q.   AND IS THAT A REFERENCE TO GENERAL MATTIS?

12:55PM  1    A.   THERE WERE -- THAT WAS JUST MY IMPRESSION.  IT HAD

12:55PM  2    CREDIBILITY, AND SHE SAID SHE HAD THESE BECAUSE OF THE

12:55PM  3    COMPOSITION OF HER BOARD.  THERE WERE NO NAMES MENTIONED.

12:55PM  4    Q.   I JUST WANT TO BE CERTAIN THAT I UNDERSTAND YOUR TESTIMONY

12:55PM  5    ON ONE LAST SUBJECT, WHICH IS EXHIBIT 370 WHICH YOU WERE SHOWN

12:55PM  6    AND WHICH WAS ADMITTED ON DIRECT.

12:56PM  7    A.   370?

12:56PM  8    Q.   YES, SIR.  THAT'S IN THE WHITE NOTEBOOK.

12:56PM  9    A.   I THOUGHT I HAD THE WHITE NOTEBOOK.

12:56PM 10         I HAVE IT.

12:56PM 11    Q.   OKAY.  AND I THINK YOU TESTIFIED THAT THE ITEM IN HERE

12:56PM 12    WHICH SAYS REVENUE FROM SAFEWAY NETWORK IS A PROJECTION ABOUT

12:56PM 13    REVENUE THAT SAFEWAY MIGHT RECEIVE FROM OTHER PARTNERS; IS THAT

12:56PM 14    RIGHT?

12:56PM 15    A.   I ACTUALLY SAID I WASN'T SURE IF ALL OTHER REVENUE --

12:56PM 16    REVENUE FROM SAFEWAY NETWORK, THAT WOULD CLEARLY BE THE NETWORK

12:56PM 17    THAT WE WERE GOING TO BUILD.

12:56PM 18         ALL OTHER REVENUE, WITHOUT SEEING SOME OTHER DOCUMENTS,

12:57PM 19    EITHER REFERS TO THE DIRECT WORK THAT WE DID AT OUR STORES WITH

12:57PM 20    THESE LABS, OR IT REFERS TO ALL REVENUE, ALL OTHER REVENUE THAT

12:57PM 21    THERANOS HAS.

12:57PM 22    Q.   BUT WITHOUT SEEING MORE DOCUMENTATION, YOU DON'T KNOW?

12:57PM 23    A.   CORRECT.

12:57PM 24    Q.   OKAY.

12:57PM 25         THAT'S ALL I HAVE OF THIS WITNESS ON CROSS-EXAMINATION.

| | | |
|---|---|---|
| 12:57PM | 1 | THE COURT: OKAY. |
| 12:57PM | 2 | REDIRECT? |
| 12:57PM | 3 | MR. LEACH: BRIEFLY, YOUR HONOR, YES. |
| 12:57PM | 4 | THE COURT: FOLKS, FEEL FREE TO STAND AND STRETCH |
| 12:57PM | 5 | FOR A MOMENT IF YOU WOULD LIKE. |
| 12:57PM | 6 | YOU MAY AS WELL, SIR, WHILE WE DO A TRANSITION. |
| 12:57PM | 7 | (STRETCHING.) |
| 12:58PM | 8 | THE COURT: MR. LEACH. |
| 12:58PM | 9 | MR. LEACH: THANK YOU, YOUR HONOR. |
| 12:58PM | 10 | **REDIRECT EXAMINATION** |
| 12:58PM | 11 | BY MR. LEACH: |
| 12:58PM | 12 | Q.  MR. BURD, I'D LIKE TO DRAW YOUR ATTENTION TO EXHIBIT 332, |
| 12:58PM | 13 | WHICH IS IN THE WHITE BINDER. |
| 12:58PM | 14 | A.  YES. |
| 12:58PM | 15 | Q.  AND I BELIEVE IT'S IN EVIDENCE. |
| 12:58PM | 16 | MR. BURD, DO YOU HAVE THE PRINT COPY OF 332 IN FRONT OF |
| 12:59PM | 17 | YOU? |
| 12:59PM | 18 | A.  I DO. |
| 12:59PM | 19 | Q.  AND DO YOU SEE THE SECOND LINE OF THE -- OR THE FIRST LINE |
| 12:59PM | 20 | OF THE SECOND PARAGRAPH, THERANOS STARTED OUT OF STANFORD |
| 12:59PM | 21 | UNIVERSITY IN 2003. |
| 12:59PM | 22 | DO YOU SEE THAT LANGUAGE? |
| 12:59PM | 23 | A.  I DO. |
| 12:59PM | 24 | Q.  AND YOU WERE ASKED A NUMBER OF QUESTIONS ON |
| 12:59PM | 25 | CROSS-EXAMINATION BY MR. DOWNEY ABOUT WHETHER THERANOS WAS A |

12:59PM 1    STARTUP OR WHAT YOUR UNDERSTANDING WAS.

12:59PM 2        DO YOU RECALL THOSE QUESTIONS?

12:59PM 3    A.   I DO.

12:59PM 4    Q.   AND YOU UNDERSTOOD IN 2010 THAT THERANOS HAD BEEN IN

12:59PM 5    BUSINESS FOR ROUGHLY SEVEN YEARS?

12:59PM 6    A.   CORRECT.

12:59PM 7    Q.   AND YOU UNDERSTOOD IN 2013 THAT IT HAD BEEN IN BUSINESS

12:59PM 8    FOR ABOUT TEN YEARS BY THAT PERIOD OF TIME?

12:59PM 9    A.   YES.

12:59PM 10   Q.   AND YOU ALSO TESTIFIED THAT MS. HOLMES TOLD YOU THERANOS

12:59PM 11   WAS CASH FLOW NEUTRAL.

12:59PM 12       DO YOU RECALL THAT TESTIMONY?

12:59PM 13   A.   CORRECT.

12:59PM 14   Q.   AND WAS THAT RELEVANT TO YOU?

12:59PM 15   A.   YES.

12:59PM 16   Q.   HOW SO?

12:59PM 17   A.   IT MADE US FEEL BETTER ABOUT THE COMPANY, THAT THEY WERE

12:59PM 18   NOT JUST, YOU KNOW, LOOKING FORWARD NUMBERS, THEY ACTUALLY HAD

12:59PM 19   ACHIEVED A LEVEL OF PERFORMANCE WHICH MADE THEM CASH FLOW

01:00PM 20   NEUTRAL, MEANING REVENUE AND EXPENSES WERE MATCHING.

01:00PM 21   Q.   AND DO YOU DIFFERENTIATE A BUSINESS THAT IS SEVEN TO TEN

01:00PM 22   YEARS OLD FROM A STARTUP THAT IS OPENING UP OUT OF A GARAGE ON

01:00PM 23   DAY ONE?

01:00PM 24   A.   YES.

01:00PM 25   Q.   EXPLAIN THAT FOR US, PLEASE.

01:00PM   1    A.   WELL, I THINK -- I MEAN, THERE'S NO MAGIC LINE HERE WHEN

01:00PM   2    ONE SHIFTS FROM A STARTUP TO A SMALL COMPANY, BUT IF YOU HAVE

01:00PM   3    VERY FEW REVENUE DOLLARS, I THINK YOU WOULD CONSIDER A STARTUP.

01:00PM   4         IF YOU'RE HITTING SOME STRONG REVENUE DOLLARS RELATIVE TO

01:00PM   5    YOUR SIZE AND YOU'RE MAKING MONEY, I WOULD SAY, YOU KNOW, YOU

01:00PM   6    WERE ON YOUR WAY.

01:00PM   7         SO I WOULD ALWAYS ARGUE THAT WITH THE CEO OF BLACK HAWK

01:00PM   8    NETWORK THAT HE WAS NO LONGER A STARTUP, YOU KNOW, HE WAS

01:00PM   9    GENERATING A HUNDRED MILLION IN PROFITS.

01:00PM  10         SO THIS WAS A STARTUP FOR AT LEAST SEVEN YEARS.

01:01PM  11    Q.   LET ME DRAW YOUR ATTENTION -- THANK YOU FOR THAT.

01:01PM  12         LET ME DRAW YOUR ATTENTION TO ANOTHER DOCUMENT THAT YOU

01:01PM  13    WERE EXAMINED ABOUT, AND THAT IS EXHIBIT 7104.  IT SHOULD BE IN

01:01PM  14    YOUR BLACK BINDER.

01:01PM  15    A.   I HAVE IT.

01:01PM  16    Q.   MS. KRATZMANN, MAY I USE THE ELMO.

01:01PM  17         MR. BURD, DO YOU RECALL QUESTIONS ABOUT THIS EXHIBIT

01:01PM  18    DURING YOUR CROSS-EXAMINATION?

01:01PM  19    A.   I DO.

01:01PM  20    Q.   AND YOU'RE NOT ON THIS EMAIL, RIGHT?  THIS IS NOT

01:01PM  21    SOMETHING THAT YOU SAW AT THE TIME?

01:02PM  22    A.   THAT'S CORRECT.

01:02PM  23    Q.   OKAY.  I WANTED TO DRAW YOUR ATTENTION TO THE ENTIRETY OR

01:02PM  24    THE FIRST PART OF THE EMAIL CHAIN WHERE BRAD WOLFSEN IS WRITING

01:02PM  25    TO ELIZABETH HOLMES AND KEN SHACHMUT WITH A REQUEST TO SHARE

01:02PM  1      INFORMATION WITH OUTSIDE COUNSEL.

01:02PM  2          DO YOU SEE THAT?

01:02PM  3      A.   YES.

01:02PM  4      Q.   AND REMIND US, WHO IS KEN SHACHMUT?

01:02PM  5      A.   KEN SHACHMUT WAS THE CHIEF FINANCIAL OFFICER OF SAFEWAY

01:02PM  6      HEALTH.

01:02PM  7      Q.   AND BRAD WOLFSEN, WHO WAS HE?

01:02PM  8      A.   BRAD WORKED FOR SAFEWAY HEALTH.  I DON'T RECALL HIS EXACT

01:02PM  9      RESPONSIBILITIES.

01:02PM  10     Q.   OKAY.  AND MR. WOLFSEN IS WRITING, "ELIZABETH,

01:02PM  11         "I'VE RECEIVED A REQUEST FROM OUR LAWYERS TO SEND THE

01:02PM  12     'SELECTED ASSAYS FROM THE THERANOS ASSAY LIBRARY' TO OUR

01:03PM  13     OUTSIDE COUNSEL WHO IS ASSISTING WITH THE CLIA AND STATE

01:03PM  14     REGULATIONS RESEARCH."

01:03PM  15         DO YOU SEE THAT LANGUAGE?

01:03PM  16     A.   I DO.

01:03PM  17     Q.   AND DO YOU SEE MS. HOLMES'S RESPONSE, "BRAD, THIS IS FINE,

01:03PM  18     BUT THAT LIST IS NOT AN ACCURATE REFLECTION OF THE TESTS WE

01:03PM  19     WILL ACTUALLY MAKE AVAILABLE IN THE STORES - THAT LIST IS THE

01:03PM  20     LIBRARY WE PROVIDE FOR OUR PHARMACEUTICAL CLIENTS CLINICAL

01:03PM  21     TRIALS."

01:03PM  22         DO YOU SEE THAT?

01:03PM  23     A.   YES.

01:03PM  24     Q.   AND SITTING HERE TODAY, DO YOU UNDERSTAND THAT TO MEAN THE

01:03PM  25     PHARMACEUTICAL LIST IS ACTUALLY NARROWER THAN WHAT IS GOING TO

01:03PM  1    BE OFFERED ON THE THERANOS DEVICE?

01:03PM  2    A.   YES, I BELIEVE IT'S NARROWER.

01:03PM  3    Q.   OKAY.  IF WE CAN GO NOW PLEASE TO EXHIBIT 375, PAGE 12.

01:03PM  4    A.   IN THE WHITE BINDER?

01:03PM  5    Q.   IN THE WHITE BINDER.

01:04PM  6         DO YOU RECALL THIS PORTION OF THE AUGUST 2012 BOARD

01:04PM  7    PRESENTATION -- LET ME ASK A BETTER QUESTION.

01:04PM  8         DO YOU RECALL THIS AS A PORTION OF THE POWERPOINT THAT WAS

01:04PM  9    PREPARED IN CONNECTION WITH THE AUGUST 2012 SAFEWAY BOARD

01:04PM  10   MEETING?

01:04PM  11   A.   YES.

01:04PM  12   Q.   OKAY.  AND THAT'S A BOARD MEETING THAT MS. HOLMES

01:04PM  13   ATTENDED, AT LEAST IN PART?

01:04PM  14   A.   YES, SHE DID IN PART.

01:04PM  15   Q.   AND I DRAW YOUR ATTENTION TO THE PORTION "ONE CARTRIDGE

01:04PM  16   WILL SATISFY 95 PERCENT OF ALL CPT CODES."

01:04PM  17        DO YOU SEE THAT?

01:04PM  18   A.   WHAT PAGE?

01:04PM  19   Q.   PAGE 11.  OR PAGE 12, EXCUSE ME.

01:04PM  20   A.   SORRY FOR BEING SO CASUAL.

01:04PM  21        OKAY.  YES.

01:04PM  22   Q.   AND IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES?

01:04PM  23   A.   YES, IT IS.

01:04PM  24   Q.   AND WAS THAT YOUR UNDERSTANDING OF WHAT THE THERANOS

01:05PM  25   DEVICE AND CARTRIDGE COULD DO AT THIS TIME PERIOD IN AUGUST OF

01:05PM  1    2012?

01:05PM  2    A.   YES.

01:05PM  3    Q.   YOU ALSO TESTIFIED ABOUT RECEIVING A CALL FROM MS. HOLMES

01:05PM  4    ABOUT CLIA CERTIFICATION OR CLIA APPROVAL.

01:05PM  5         DO YOU RECALL THAT?

01:05PM  6    A.   I DO.

01:05PM  7    Q.   AND THAT WAS GOOD NEWS TO YOU, WASN'T IT?

01:05PM  8    A.   IT WAS GREAT NEWS.

01:05PM  9    Q.   AND WHY WAS IT GREAT NEWS?

01:05PM  10   A.   I THOUGHT AT THE TIME IT MEANT THAT THE REGULATORY BODY

01:05PM  11   HERE WAS ACTUALLY BUYING INTO ALL OF THE ASSAYS.  I LEARNED

01:05PM  12   LATER THAT'S NOT THE CASE, BUT THAT'S WHAT I THOUGHT.

01:05PM  13   Q.   SO AT THE TIME YOU THOUGHT IT REFLECTED APPROVAL OF THE

01:05PM  14   DEVICE IN SOME FORM?

01:05PM  15   A.   CORRECT.

01:05PM  16   Q.   APPROVAL OF THE ASSAYS THAT WERE GOING TO BE RUN ON THE

01:05PM  17   DEVICE?

01:05PM  18   A.   CORRECT.

01:05PM  19   Q.   AND YOU HAVE A DIFFERENT UNDERSTANDING SITTING HERE TODAY?

01:05PM  20   A.   I DO JUST BECAUSE OF WHAT I HAVE LEARNED.

01:06PM  21   Q.   BUT AT THE TIME YOU VIEWED THAT AS GOOD NEWS?

01:06PM  22   A.   YES.

01:06PM  23   Q.   AND CMS VALIDATION OF THE DEVICE?

01:06PM  24   A.   IT WAS AN IMPORTANT MILESTONE.  BUT I, OF COURSE, THOUGHT

01:06PM  25   IT MEANT ALL OF THE CPT CODES.

01:06PM  1    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO THE MASTER SERVICES

01:06PM  2    AGREEMENT, EXHIBIT 387.  YOU WERE ASKED SOME QUESTIONS ABOUT

01:06PM  3    THAT ON CROSS-EXAMINATION.

01:06PM  4    A.   ALL RIGHT.

01:06PM  5    Q.   AND IF WE COULD GO TO PAGE 9.

01:06PM  6    A.   YES.

01:06PM  7    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT THE TIMING OF THE

01:06PM  8    SAFEWAY PRE-PILOT, THE SAFEWAY PRE-PILOT AND THE SAFEWAY LAUNCH

01:06PM  9    VIS-A-VIS WALGREENS.

01:06PM 10         DO YOU RECALL THOSE QUESTIONS?

01:06PM 11    A.   YES.

01:06PM 12    Q.   OKAY.  IN PARAGRAPH C IT SAYS, I DRAW YOUR ATTENTION TO

01:07PM 13    THE LANGUAGE, "THE PARTIES' EXPECTATION IS THAT THE PILOT WILL

01:07PM 14    LAST FOR APPROXIMATELY 90 CALENDAR DAYS, AND THAT THE PILOT OF

01:07PM 15    THE PROGRAM AT SAFEWAY WILL RUN CONCURRENTLY WITH ANY PILOT OF

01:07PM 16    THE PROGRAM CONDUCTED BY WALGREENS."

01:07PM 17         DO YOU SEE THAT LANGUAGE?

01:07PM 18    A.   YES.

01:07PM 19    Q.   AND DID YOU VIEW THAT AS AN OBLIGATION TO HAVE THEM RUN

01:07PM 20    CONCURRENTLY OR AN EXPECTATION?

01:07PM 21    A.   AN EXPECTATION.

01:07PM 22    Q.   SO IF YOU HAD SAID TO MS. HOLMES, WALGREENS SEEMS LIKE

01:07PM 23    THEY'RE WAY BEHIND US, I WANT TO GO FORWARD WITH THE PILOT, IS

01:07PM 24    THAT SOMETHING THAT YOU FELT FREE TO DO?

01:07PM 25    A.   REPEAT THAT, PLEASE.

01:07PM   1      Q.   SO IF YOU BELIEVED WALGREENS WAS TAKING TOO MUCH TIME,

01:07PM   2      THAT THEY WERE WAY BEHIND YOU, DID YOU FEEL FREE TO GO TO

01:07PM   3      MS. HOLMES AND SAY, I'D LIKE TO GO FORWARD WITH THE PILOT NOW?

01:07PM   4      A.   I THOUGHT THAT MIGHT BE A PROBLEM, THAT WE WOULD HAVE TO

01:08PM   5      GO TOGETHER.

01:08PM   6      Q.   LET ME DRAW YOUR ATTENTION TO WHERE IT SAYS "THE LAUNCH OF

01:08PM   7      THE PROGRAM WILL NOT OCCUR AT WALGREENS STORES PRIOR TO THE

01:08PM   8      LAUNCH OF THE PROGRAM AT SAFEWAY STORES."

01:08PM   9           WHAT DID THAT MEAN?

01:08PM  10      A.   NOW WE'RE BEYOND THE PILOT AND NOW IT'S LAUNCHED, AND IT

01:08PM  11      SAID IT WOULD LAUNCH SIMULTANEOUSLY.

01:08PM  12      Q.   DID IT SAY SIMULTANEOUSLY OR THAT WALGREENS WON'T GO

01:08PM  13      FIRST?

01:08PM  14      A.   IT SAYS THAT WALGREENS WON'T GO FIRST, BUT MY EXPECTATION

01:08PM  15      IS THAT IT WOULD GO AROUND THE SAME TIME.

01:08PM  16      Q.   OKAY.  YOU WANTED THEM TO GO AT THE SAME TIME?

01:08PM  17      A.   CORRECT.

01:08PM  18      Q.   AND WHY WAS THAT?

01:08PM  19      A.   WELL, WE DIDN'T WANT, YOU KNOW, WALGREENS TO HAVE AN EDGE

01:08PM  20      ON US, AND MY GUESS IS THAT THEY FELT THE SAME WAY.

01:09PM  21           SO RATHER THAN BARGAIN FROM THEM INSISTING THAT WE GO

01:09PM  22      FIRST, WE WERE CONTENT THAT WE WOULD GO AT THE SAME TIME.

01:09PM  23      Q.   IN THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES EVER

01:09PM  24      ATTRIBUTE DELAYS OF THE LAUNCH TO WALGREENS?

01:09PM  25      A.   NO.

01:09PM  1    Q.    DID SHE EVER ATTRIBUTE THE DELAYS TO SOME ISSUE WITH THE

01:09PM  2    MAIN LAB OR THE DEVICE THAT YOU'D BEEN SHOWN?

01:09PM  3    A.    NO.

01:09PM  4    Q.    LET ME PLEASE DRAW YOUR ATTENTION TO WHAT IS IN EVIDENCE

01:09PM  5    AS EXHIBIT 10537.

01:09PM  6    A.    WHICH BOOK?

01:09PM  7    Q.    THE BLACK BOOK PLEASE.

01:10PM  8    A.    I HAVE IT.

01:10PM  9    Q.    AND DO YOU RECALL BEING ASKED QUESTIONS ABOUT YOUR EMAIL

01:10PM  10   WHERE YOU WROTE IN THE FIRST PARAGRAPH, "I'M VERY CONCERNED

01:10PM  11   ABOUT ALLOWING NETWORK PARTNERS OR ANYONE ELSE TO LAUNCH WITH A

01:10PM  12   MERE FINGER STICK."

01:10PM  13         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

01:10PM  14   A.    YES.

01:10PM  15   Q.    AND FURTHER DOWN IN THE EMAIL YOU WROTE, "I ALSO

01:10PM  16   UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP MEASURE.'"

01:10PM  17         DO YOU SEE THAT LANGUAGE?

01:10PM  18   A.    I DON'T.  HELP ME OUT A LITTLE BIT.

01:10PM  19   Q.    SECOND TO THE LAST PARAGRAPH ON THE BOTTOM, YOU WROTE, "I

01:10PM  20   REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:10PM  21   CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY LAUNCH.

01:10PM  22   I ALSO UNDERSTAND THAT THIS IS INTENDED AS ONLY A 'STOP GAP

01:10PM  23   MEASURE.'"

01:10PM  24         DO YOU SEE THAT?

01:10PM  25   A.    I DO.

01:10PM  1    Q.   AND WHAT DID YOU MEAN BY "STOP GAP MEASURE"?

01:10PM  2    A.   I WOULD HAVE TO READ THE WHOLE MEMO, BUT I KNEW WE DIDN'T

01:10PM  3    DO FINGERSTICK EXCLUSIVELY, YOU KNOW, IN THE ON CAMPUS LAB AND

01:11PM  4    WE WERE ANTICIPATING THAT WHEN YOU LAUNCH, YOU WOULD BE DOING

01:11PM  5    FINGERSTICK.

01:11PM  6    Q.   AND THIS EMAIL IS FROM JANUARY OF 2012?

01:11PM  7    A.   CORRECT.

01:11PM  8    Q.   BY THE DECEMBER 2012 TIME PERIOD, DID MS. HOLMES INDICATE

01:11PM  9    TO YOU THAT THERE WAS ANY ISSUE WITH PUTTING THE DEVICE IN

01:11PM 10    SAFEWAY STORES?

01:11PM 11    A.   NO.

01:11PM 12         WELL, LET ME BACK UP ONE SECOND.

01:11PM 13    Q.   PLEASE.

01:11PM 14    A.   I DON'T RECALL WHEN THIS COURIER MODEL WAS DONE, BUT THAT

01:11PM 15    WAS CONSIDERED TO BE TEMPORARY, AND THE INTENT ALL ALONG HAS

01:11PM 16    BEEN DEVICES IN THE STORES.  OTHERWISE YOU CAN'T ACCOMPLISH 20

01:11PM 17    TO 30 MINUTES.

01:11PM 18    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 7196, WHICH

01:12PM 19    SHOULD BE IN YOUR BLACK BINDER.

01:12PM 20    A.   I HAVE IT.

01:12PM 21         MR. LEACH:  YOUR HONOR, WITH THE COURT'S PERMISSION,

01:12PM 22    I'D LIKE TO INQUIRE ABOUT -- THIS IS IN EVIDENCE, BUT THERE'S A

01:12PM 23    MATTER THAT I WOULD LIKE TO INQUIRE ABOUT, THE TOP EMAIL.

01:12PM 24         THE COURT:  THIS WAS -- THE DEFENSE PUT THIS IN

01:12PM 25    EVIDENCE.

01:12PM 1          MR. DOWNEY:  YES.

01:12PM 2          THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM 3          MR. LEACH:  OKAY.  THANK YOU, YOUR HONOR.

01:12PM 4          MR. DOWNEY:  YOUR HONOR, I HAD INTENDED TO REDACT

01:12PM 5  THAT AND I WONDER, CONSISTENT WITH THE PRIOR DISCUSSION --

01:12PM 6          THE COURT:  NO.  IT WAS MOVED INTO EVIDENCE BY YOU

01:12PM 7  WITHOUT OBJECTION.

01:12PM 8          MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

01:12PM 9          THE COURT:  SO --

01:12PM 10         MR. LEACH:  THERE WERE ALSO NEVER QUESTIONS ABOUT

01:12PM 11 THE REASONS FOR THE TERMINATION.

01:12PM 12         THE COURT:  YOU CAN ASK YOUR QUESTION.

01:12PM 13         MR. DOWNEY:  YOUR HONOR, THE REASON THAT I DID NOT

01:13PM 14 PRESENT THE REDACTED FORM IN EITHER THE WITNESS'S NOTEBOOK AND

01:13PM 15 THE WITNESS'S AND YOURS AND THE ONE ON THE SCREEN IS BECAUSE WE

01:13PM 16 DIDN'T HAVE A RULING WHEN WE PREPARED THIS.  BUT I UNDERSTAND

01:13PM 17 THE COURT'S RULING.

01:13PM 18         THE COURT:  WELL, I'M LEFT IN A BIT OF A QUANDARY

01:13PM 19 HERE.  IT WAS ADMITTED AND OFFERED BY YOU WITHOUT ANY

01:13PM 20 REDACTIONS AS I RECALL.

01:13PM 21         MR. DOWNEY:  I UNDERSTAND.

01:13PM 22         THE COURT:  IT WAS ADMITTED WITHOUT OBJECTION.

01:13PM 23     SO IN ANY EVENT, YOU CAN ASK A QUESTION IF YOU HAVE ONE.

01:13PM 24         MR. LEACH:  OKAY.

01:13PM 25 Q.  MR. BURD, MY ONLY QUESTION WAS THERE'S A REFERENCE IN --

01:13PM   1    DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS EMAIL REGARDING

01:13PM   2    THE PLAN LAUNCH IN CONNECTION WITH MARKETING?

01:13PM   3    A.   YES.

01:13PM   4    Q.   AND THERE'S A LINE IN YOUR RESPONSE WHERE YOU QUOTE, "I

01:13PM   5    ALSO WANT TO MAXIMIZE MY RETURN ON MY $275 MILLION REMODEL

01:13PM   6    INVESTMENT."

01:13PM   7         DO YOU SEE THAT LANGUAGE?

01:13PM   8    A.   YES.

01:13PM   9    Q.   AND WHAT IS THAT A REFERENCE TO?

01:13PM  10    A.   WELL, WE MADE THE INVESTMENT AND WE NEEDED TO LAUNCH.  IF

01:14PM  11    THE BOX WORKS AS WE THOUGHT IT DOES, THEN WE WOULD GENERATE A

01:14PM  12    REVENUE STREAM AND GENERATE PROFITS.

01:14PM  13    Q.   AND THE REMODEL INVESTMENT, WHAT DO YOU MEAN BY THAT?  IS

01:14PM  14    THAT MONEY THAT YOU GAVE TO THERANOS OR MONEY THAT YOU --

01:14PM  15    A.   NO.  THIS WAS MONEY THAT WE USED TO REMODEL THE STORES.

01:14PM  16    Q.   I HAVE NO FURTHER QUESTIONS.

01:14PM  17         THANK YOU, MR. BURD.

01:14PM  18             THE COURT:  MR. DOWNEY.

01:14PM  19                     **RECROSS-EXAMINATION**

01:14PM  20    BY MR. DOWNEY

01:15PM  21    Q.   VERY BRIEFLY, MR. BURD.

01:15PM  22         YOU WERE JUST ASKED A QUESTION ABOUT A REFERENCE IN A

01:15PM  23    DOCUMENT TO A REMODEL INVESTMENT.

01:15PM  24         DO YOU RECALL THAT?

01:15PM  25    A.   YES.

01:15PM 1    Q.   AND DO YOU RECALL TESTIFYING ON DIRECT EXAMINATION THAT

01:15PM 2    QUEST STORES NOW SIT IN MANY OF THOSE LOCATIONS?

01:15PM 3    A.   I DON'T KNOW HOW MANY, BUT I WOULD BET THAT IT'S -- THEY

01:15PM 4    STARTED IN ARIZONA, BUT I DON'T KNOW HOW MANY.

01:15PM 5    Q.   OKAY.  BUT LOCATIONS OF THE STORES YOU'RE FAMILIAR WITH,

01:15PM 6    ARE THOSE THE SAME LOCATIONS?

01:15PM 7    A.   CORRECT.

01:15PM 8    Q.   I WANT TO ASK YOU ABOUT YOUR EXCHANGE WITH MS. HOLMES IN

01:15PM 9    EARLY 2012 WHEN YOU WERE TALKING ABOUT YOUR DISAPPOINTMENT WITH

01:15PM 10   GOING TO A FINGERSTICK ONLY MODEL.

01:15PM 11        DO YOU RECALL THAT?

01:15PM 12   A.   ARE YOU TALKING ON CAMPUS?

01:15PM 13   Q.   WELL, I DON'T KNOW IF THE CAMPUS PROJECT HAD BEEN

01:16PM 14   INITIATED OR NOT.

01:16PM 15        BUT YOU SENT HER AN EMAIL IN JANUARY OF 2010 EXPRESSING A

01:16PM 16   CONCERN ABOUT EITHER ANY NETWORK PARTNER OR ANY OTHER PARTNER

01:16PM 17   OR ANY OTHER -- ANYONE ELSE LAUNCHING UNDER WHAT YOU TERMED A

01:16PM 18   FINGERSTICK ONLY MODEL.

01:16PM 19        DO YOU RECALL THAT?

01:16PM 20   A.   SURE, THAT RINGS A BELL.

01:16PM 21   Q.   AND AM I RIGHT TO SAY THAT YOU SAY YOU DID NOT UNDERSTAND

01:16PM 22   THAT THAT WAS HAPPENING BECAUSE OF A REQUEST FROM WALGREENS?

01:16PM 23   A.   CORRECT.

01:16PM 24   Q.   AND YOU DID NOT UNDERSTAND IT TO BE HAPPENING BECAUSE OF A

01:16PM 25   REGULATORY REQUIREMENT?

01:16PM  1    A.   CORRECT.

01:16PM  2    Q.   WHAT DID YOU UNDERSTAND WAS THE REASON AS TO WHY THERE WAS

01:16PM  3    NOT A LAUNCH WITHOUT -- UNDER THE MODEL THAT HAD ORIGINALLY

01:16PM  4    BEEN CONTEMPLATED?

01:16PM  5    A.   SO THE ORIGINAL MODEL WAS FINGERSTICK RESULTS IN STORE.

01:16PM  6         WE KNOW THAT THERE WAS A TEMPORARY MODEL THAT WAS VEIN

01:17PM  7    DRAW PROCESSED ELSEWHERE.

01:17PM  8         SO I DIDN'T WANT, I DIDN'T WANT OTHER NETWORK PLAYERS TO

01:17PM  9    LAUNCH FINGERSTICK WHILE WE WERE DOING SOMETHING DIFFERENT.

01:17PM 10    Q.   I UNDERSTAND THAT.  MY QUESTION TO YOU IS, WHAT WAS YOUR

01:17PM 11    UNDERSTANDING AS TO WHY THERANOS WAS PROPOSING LAUNCHING A

01:17PM 12    FINGERSTICK ONLY PROCESS WITH THOSE --

01:17PM 13    A.   CAN YOU DIRECT ME TO THE EMAIL?

01:17PM 14    Q.   SURE.

01:17PM 15         PULL IT UP FOR ONE MOMENT.

01:18PM 16         (PAUSE IN PROCEEDINGS.)

01:18PM 17    BY MR. DOWNEY:

01:18PM 18    Q.   THE DOCUMENT I WAS REFERRING TO, MR. BURD, IS 10537 IN THE

01:19PM 19    WHITE NOTEBOOK.

01:19PM 20    A.   IN THE WHITE?

01:19PM 21    Q.   BUT I DON'T MEAN TO CONFINE YOU TO THAT.  THERE ARE OTHER

01:19PM 22    DOCUMENTS THAT REFERENCE FINGERSTICK ONLY AS WELL.

01:19PM 23    A.   YEAH.  YOU SAID 10357 WHAT?

01:19PM 24    Q.   10537.

01:19PM 25    A.   10537.  YOU SAID WHITE?

01:19PM   1    Q.   I'M SORRY, I BEG YOUR PARDON.  BLACK.

01:19PM   2    A.   OKAY.  GIVE ME A MOMENT AND I'LL READ THE EMAIL FROM THE

01:19PM   3    TOP DOWN.

01:19PM   4    Q.   I THINK IT ACTUALLY GOES FROM THE BOTTOM UP.

01:20PM   5    A.   YEAH, OKAY.  BUT I'LL START WITH THE -- IT'S MY EMAIL THAT

01:20PM   6    YOU'RE REFERRING TO; RIGHT?

01:20PM   7    Q.   THAT'S RIGHT.  AND I'M JUST REFERRING TO YOUR REFERENCE TO

01:20PM   8    FINGERSTICK ONLY.

01:20PM   9    A.   SURE.

01:20PM   10        (PAUSE IN PROCEEDINGS.)

01:20PM   11             THE WITNESS:  OKAY.  I DON'T HAVE THE CONTEXT.

01:20PM   12   BY MR. DOWNEY:

01:20PM   13   Q.   IF YOU SEE THE SECOND TO THE LAST PARAGRAPH, YOU SAY, "I

01:20PM   14   REALIZE THAT YOU HAVE INFORMATION THAT I DON'T HAVE THAT IS

01:20PM   15   CAUSING YOU TO THINK ABOUT A POSSIBLE FINGER STICK ONLY

01:21PM   16   LAUNCH."

01:21PM   17        DO YOU SEE THAT?

01:21PM   18   A.   I DO.

01:21PM   19   Q.   AND DOES THAT -- DID YOU HAVE A CONVERSATION BEFORE YOU

01:21PM   20   WROTE THIS EMAIL WHERE YOU LEARNED SHE WAS CONTEMPLATING THAT?

01:21PM   21   A.   WE MUST HAVE.

01:21PM   22        SO WHAT I NOW UNDERSTAND FINGERSTICK TO MEAN WHEN IT SAYS

01:21PM   23   "FINGER STICK ONLY," I DIDN'T LIKE THE IDEA OF LAUNCHING WITH A

01:21PM   24   FINGERSTICK AND THEN HAVE EVERYTHING PROCESS OFF THE STORE

01:21PM   25   PROPERTY.

01:21PM  1    Q.   OKAY.  SO, IN OTHER WORDS, THE SAMPLE WOULD BE SENT BACK

01:21PM  2    TO A LAB AT THERANOS?

01:21PM  3    A.   YES, YES.

01:21PM  4    Q.   AND MS. HOLMES TOLD YOU AT SOME POINT PRIOR TO

01:21PM  5    JANUARY 12TH THAT THERANOS WAS CONSIDERING THAT MODEL WITH SOME

01:21PM  6    PARTNER?

01:21PM  7              THE COURT:  MR. BURD, WHY DON'T YOU SPEAK IN THE

01:21PM  8    MICROPHONE THERE?  THANK YOU.

01:21PM  9              THE WITNESS:  NO, NO, I DON'T RECALL THAT.

01:22PM  10   BY MR. DOWNEY:

01:22PM  11   Q.   OKAY.  WHAT PROMPTED YOU TO WRITE THIS EMAIL?

01:22PM  12   A.   WELL, WE MUST HAVE HAD A CONVERSATION ABOUT LAUNCHING PURE

01:22PM  13   FINGERSTICK, WHICH IS DISTINGUISHING PURE FINGERSTICK FROM YOU

01:22PM  14   DRAW THE BLOOD THAT WAY, AND IN THIS CASE YOU PICK IT UP WITH A

01:22PM  15   COURIER AND YOU TAKE IT TO A CENTRAL LOCATION.

01:22PM  16        WHAT WE WANTED WAS THE ORIGINAL DESIGN AT LAUNCH, WHICH

01:22PM  17   GAVE US RESULTS IN 20, 30 MINUTES, WHICH COULD ONLY HAPPEN IF

01:22PM  18   DONE IN THE STORE.

01:22PM  19   Q.   YOU SAY IN THE SECOND SENTENCE OF THIS EMAIL, "I AM VERY

01:22PM  20   CONCERNED ABOUT ALLOWING NETWORK PARTNERS FOR ANYONE ELSE TO

01:22PM  21   LAUNCH WITH A MERE FINGER STICK."

01:22PM  22        DO YOU SEE THAT?

01:22PM  23   A.   I SEE THAT, AND, YOU KNOW, REMEMBER, I'M NOW TRYING TO

01:22PM  24   RECALL, YOU KNOW, EIGHT, NINE YEARS AGO.  BUT, YOU KNOW, IN

01:22PM  25   BUILDING THE NETWORK, WE WERE MAKING THE SAME PROMISE, YOU

01:23PM  1      KNOW, TO THE -- TO OTHER SUPERMARKETS THAT HAD BEEN MADE TO US,

01:23PM  2      AND I THINK THAT'S WHAT THIS REFERS TO, THAT THEY WOULDN'T GET

01:23PM  3      THAT PROMISE, AND IT DIDN'T LOOK LIKE WE WERE GOING TO GET THAT

01:23PM  4      EITHER.

01:23PM  5      Q.   AND IS IT FAIR TO SAY THAT IN TERMS OF WHATEVER THE

01:23PM  6      CONVERSATION THAT YOU HAD WITH MS. HOLMES THAT PROMPTED THIS

01:23PM  7      EMAIL, TODAY YOU DON'T REMEMBER IT?

01:23PM  8      A.   CORRECT.

01:23PM  9      Q.   THANK YOU, MR. BURD.

01:23PM  10               THE COURT:  MR. LEACH?

01:23PM  11               MR. LEACH:  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

01:23PM  12               THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:23PM  13               MR. LEACH:  HE MAY, YES.

01:23PM  14               MR. DOWNEY:  YES.

01:23PM  15               THE COURT:  SIR, YOU'RE EXCUSED.  THANK YOU.

01:23PM  16               THE WITNESS:  THANK YOU.

01:23PM  17               THE COURT:  YOU'RE WELCOME.

01:23PM  18               THE WITNESS:  I'M JUST GOING TO LEAVE THE BOOKS

01:23PM  19      THERE.

01:23PM  20               THE COURT:  JUST LEAVE IT THERE.  THEY'LL CLEAN IT

01:23PM  21      UP.

01:23PM  22               THE WITNESS:  OKAY.

01:23PM  23               THE COURT:  WE WILL TAKE OUR AFTERNOON BREAK NOW,

01:23PM  24      LADIES AND GENTLEMEN.  IS 20 MINUTES ABOUT RIGHT?  WHY DON'T WE

01:23PM  25      TAKE 30 MINUTES?  LET'S TAKE A 30 MINUTE BREAK, PLEASE.  WE'LL

| | | |
|---|---|---|
| 01:24PM | 1 | COME BACK -- THE GOVERNMENT WILL HAVE A WITNESS, I THINK? |
| 01:24PM | 2 | MR. SCHENK: YES, YOUR HONOR. |
| 01:24PM | 3 | THE COURT: ALL RIGHT. WE'LL TAKE OUR RECESS. |
| 01:24PM | 4 | THANK YOU. |
| 01:24PM | 5 | THE CLERK: COURT IS IN RECESS. |
| 01:24PM | 6 | (RECESS FROM 1:24 P.M. UNTIL 2:11 P.M.) |
| 02:11PM | 7 | THE COURT: THANK YOU. WE'RE BACK ON THE RECORD. |
| 02:11PM | 8 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN. OUR JURY AND |
| 02:11PM | 9 | ALTERNATES ARE PRESENT. |
| 02:11PM | 10 | THANK YOU FOR YOUR PATIENTS. |
| 02:11PM | 11 | IN THE SPIRIT OF FULL DISCLOSURE, WE WERE GETTING MY |
| 02:12PM | 12 | OFFICE READY AND THAT MEANT MOVING BOXES. I'LL LEAVE IT AT |
| 02:12PM | 13 | THAT. |
| 02:12PM | 14 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS? |
| 02:12PM | 15 | MR. SCHENK: YES, YOUR HONOR. |
| 02:12PM | 16 | THE GOVERNMENT CALLS WADE MIQUELON. |
| 02:12PM | 17 | THE COURT: IF YOU WOULD STAND AND FACE OUR |
| 02:12PM | 18 | COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A |
| 02:12PM | 19 | QUESTION FOR YOU. |
| 02:12PM | 20 | **(GOVERNMENT'S WITNESS, WADE MIQUELON, WAS SWORN.)** |
| 02:12PM | 21 | THE WITNESS: YES. |
| 02:12PM | 22 | THE COURT: THANK YOU. |
| 02:12PM | 23 | PLEASE HAVE A SEAT HERE, SIR, AND MAKE YOURSELF |
| 02:12PM | 24 | COMFORTABLE. |
| 02:12PM | 25 | FEEL FREE TO ADJUST THAT CHAIR AND MICROPHONE. I'LL |

| | | |
|---|---|---|
| 02:12PM | 1 | ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 02:13PM | 2 | THE LAWYER WILL HAVE A QUESTION FOR YOU ABOUT YOUR MASK IN |
| 02:13PM | 3 | JUST A MOMENT. BUT, FIRST OF ALL, IF YOU COULD PLEASE STATE |
| 02:13PM | 4 | YOUR NAME AND THEN SPELL IT, PLEASE. |
| 02:13PM | 5 | THE WITNESS: YES, YOUR HONOR. MY NAME IS WADE |
| 02:13PM | 6 | MIQUELON. W-A-D-E, M-I-Q-U-E-L-O-N. |
| 02:13PM | 7 | THE COURT: THANK YOU. |
| 02:13PM | 8 | COUNSEL. |
| 02:13PM | 9 | **DIRECT EXAMINATION** |
| 02:13PM | 10 | BY MR. SCHENK: |
| 02:13PM | 11 | Q. GOOD AFTERNOON, MR. MIQUELON. I SEE YOU'VE TAKEN OFF YOUR |
| 02:13PM | 12 | MASK. WITH THE COURT'S PERMISSION AND IF YOU'RE FULLY |
| 02:13PM | 13 | VACCINATED, YOU CAN REMOVE YOUR MASK AND I'LL DO THE SAME. |
| 02:13PM | 14 | A. THANK YOU. |
| 02:13PM | 15 | THE COURT: THANK YOU, COUNSEL. |
| 02:13PM | 16 | MR. SCHENK: THANK YOU, YOUR HONOR. |
| 02:13PM | 17 | Q. MR. MIQUELON, WERE YOU THE CFO AT WALGREENS? |
| 02:13PM | 18 | A. YES, I WAS. |
| 02:13PM | 19 | Q. AND WHEN WERE YOU THE CFO AT WALGREENS? |
| 02:13PM | 20 | A. FROM JUNE 2016 TO AUGUST 3RD OR 4TH 2014. |
| 02:13PM | 21 | Q. DO YOU MIND PULLING THE MICROPHONE A LITTLE BIT CLOSER TO |
| 02:13PM | 22 | YOUR MOUTH? |
| 02:13PM | 23 | A. FROM JUNE -- JUNE 2008 -- I APOLOGIZE -- TO AUGUST 4TH, |
| 02:14PM | 24 | 2014. |
| 02:14PM | 25 | Q. SO 2008 UNTIL 2014? |

02:14PM 1    A.   THAT'S CORRECT.

02:14PM 2    Q.   AND WE'LL COME BACK TO THAT IN A MOMENT.

02:14PM 3         LET'S START WITH YOUR EDUCATIONAL BACKGROUND.  WHERE DID

02:14PM 4    YOU GO TO UNDERGRAD, AND IF YOU HAVE GRADUATE DEGREES?

02:14PM 5    A.   I WENT TO UNDERGRADUATE SCHOOL AT PURDUE UNIVERSITY AND I

02:14PM 6    WAS AN ENGINEER, AND I WENT TO GRADUATE SCHOOL AT WASHINGTON

02:14PM 7    UNIVERSITY AT ST. LOUIS FOR MY MBA.

02:14PM 8    Q.   FOR YOUR?

02:14PM 9    A.   MBA.

02:14PM 10   Q.   THANK YOU.  HOW ABOUT YOUR WORK HISTORY BEFORE YOU BECAME

02:14PM 11   CFO AT WALGREENS?

02:14PM 12   A.   AFTER GRADUATE SCHOOL, I SPENT 17 YEARS AT

02:14PM 13   PROCTOR & GAMBLE, THE FIRST MORE OR LESS FIVE YEARS IN

02:14PM 14   CINCINNATI, AND THE NEXT 12 YEARS I SPENT IN ASIA AND EUROPE.

02:14PM 15        AND FROM THERE I WENT TO TYSON FOODS WHERE I BECAME THE

02:14PM 16   CHIEF FINANCIAL OFFICER FOR TWO YEARS, AND AFTER TYSON FOODS I

02:14PM 17   WENT TO WALGREENS WHERE I WAS THEIR CHIEF FINANCIAL OFFICER FOR

02:15PM 18   MORE OR LESS SIX YEARS.

02:15PM 19   Q.   AND AFTER WALGREENS, HAVE YOU REMAINED EMPLOYED SINCE YOU

02:15PM 20   LEFT WALGREENS?

02:15PM 21   A.   YES.

02:15PM 22   Q.   AND WHAT HAVE YOU DONE SINCE THEN?

02:15PM 23   A.   I WAS THE CHIEF FINANCIAL OFFICER FOR THE LARGE ARTS AND

02:15PM 24   CRAFTS RETAILER, JOANN, AND I'M CURRENTLY THE CEO OF THE SAME

02:15PM 25   COMPANY.

02:15PM 1    Q.   YOU'RE CURRENTLY THE CHIEF EXECUTIVE OFFICER?

02:15PM 2    A.   YES.

02:15PM 3    Q.   OKAY.  WHILE YOU WERE THE CFO AT WALGREENS, WOULD YOU

02:15PM 4    DESCRIBE FOR THE JURY SOME OF YOUR RESPONSIBILITIES AS CFO?

02:15PM 5    A.   GENERAL OVERSIGHT FOR ALL FINANCIAL AND ACCOUNTING MATTERS

02:15PM 6    TYPICAL OF A TYPICAL CFO ROLE, FROM THE GOVERNMENT ASPECTS OF

02:15PM 7    ACCOUNTING THROUGH FINANCIAL ANALYSIS ASPECTS OF THE BUSINESS,

02:15PM 8    AS WELL AS I HAD OVERSIGHT FOR MERGERS AND ACQUISITION, WHAT WE

02:15PM 9    CALL M & A, NEW BUSINESS DEVELOPMENT, AND FOR A PERIOD OF TIME

02:15PM 10   I ALSO HAD OVERSIGHT FOR THE INTERNATIONAL EXPANSION OF THE

02:15PM 11   COMPANY.

02:15PM 12   Q.   WAS WALGREENS A PUBLICLY TRADED COMPANY WHILE YOU WERE

02:15PM 13   CFO?

02:16PM 14   A.   YES.

02:16PM 15   Q.   AND DO YOU RECALL WHAT THE TICKER SIMPLE OR THE TRADING

02:16PM 16   SYMBOL WAS?

02:16PM 17   A.   IT WAS -- AT THE TIME WHEN I JOINED IT WAS W-A-G, BUT THE

02:16PM 18   TICKER SYMBOL IS DIFFERENT NOW.

02:16PM 19   Q.   OKAY.  AND WHAT IS IT NOW, IF YOU KNOW?

02:16PM 20   A.   W-P-A.

02:16PM 21   Q.   OKAY.  THANK YOU.

02:16PM 22        HAVE YOU HEARD OF A COMPANY CALLED THERANOS?

02:16PM 23   A.   YES.

02:16PM 24   Q.   WHEN DID YOU BECOME FIRST FAMILIAR WITH THAT COMPANY?

02:16PM 25   A.   I BELIEVE IT WAS IN THE EARLY SPRING OF 2010, AROUND

02:16PM  1     MARCH.

02:16PM  2     Q.   AROUND MARCH OF 2010?

02:16PM  3     A.   CORRECT.

02:16PM  4     Q.   AND DO YOU REMEMBER THE CIRCUMSTANCES?  DID SOMEONE BRING

02:16PM  5     THE COMPANY TO YOUR ATTENTION?

02:16PM  6     A.   YES.  WE WERE LOOKING AT A LOT OF DIFFERENT LAY OUT

02:16PM  7     TECHNOLOGY COMPANIES AT WALGREENS TRYING TO SEE IF POTENTIAL

02:16PM  8     COMPANIES COULD BE A GOOD PARTNER FOR WHAT WE WANTED TO DO IN

02:16PM  9     TERMS OF EXPANDING CLINICAL OFFERINGS THROUGH LAB, AND I RECALL

02:16PM  10    DR. JAY ROSAN HAD COME TO ME WHILE WE WERE SEARCHING VARIOUS

02:16PM  11    COMPANIES AND HE WAS VERY EXCITED ABOUT THE COMPANY THAT HE

02:17PM  12    HEARD ABOUT CALLED THERANOS.

02:17PM  13    Q.   AND DR. ROSAN WAS ANOTHER EMPLOYEE AT WALGREENS?

02:17PM  14    A.   YES.  HE WAS MORE OR LESS THE MEDICAL EXPERT FOR THE NEW

02:17PM  15    BUSINESS DEVELOPMENT DIVISION OF THE COMPANY.

02:17PM  16    Q.   AND YOU DESCRIBED WALGREENS HAVING SOME INTEREST IN LABS.

02:17PM  17    COULD YOU DESCRIBE THAT FOR US?

02:17PM  18    A.   CORRECT.  EVEN THOUGH WALGREENS HAS BEEN A TRADITIONAL

02:17PM  19    PHARMACY, OVER TIME THEY'VE WORKED TO FIND OTHER HEALTH CARE

02:17PM  20    OFFERINGS THAT CAN MORE OR LESS PUSH THE HEALTH CARE CLOSER AND

02:17PM  21    CLOSER TO THE INDIVIDUAL IN THE COMMUNITY.

02:17PM  22         ONE EXAMPLE WOULD BE VACCINATIONS WHERE THEY'RE A VERY

02:17PM  23    LARGE PLAYER, AS WELL AS OTHER CLINICS AND THERE'S PRACTITIONER

02:17PM  24    SERVICES.  LAB WAS ANOTHER ADJACENCY THAT THAT WE WERE VERY

02:17PM  25    EXCITED ABOUT.

02:17PM 1    Q.   AND HOW DID THERANOS FIT INTO THIS INTEREST OF WALGREENS?

02:17PM 2    A.   THERANOS AT THE TIME -- AND THERE WAS A LOT OF, A LOT OF

02:17PM 3    COMPANIES THAT WERE LOOKING TO REALLY CHANGE THE WAY THAT

02:18PM 4    TRADITIONAL LAB HAD BEEN DONE THROUGH VARIOUS PLATFORMS, AND

02:18PM 5    THERE WAS A FAIR AMOUNT OF WORK TO TRY TO UNDERSTAND WHO THE

02:18PM 6    LEADER IN THAT SPACE MIGHT BE.

02:18PM 7         BUT AS WE GOT TO KNOW THERANOS, WE FELT THAT THEY WERE

02:18PM 8    PERHAPS THE FARTHEST ALONG AND THE MOST RELEVANT FOR WHAT THE

02:18PM 9    COMPANY WAS LOOKING TO ACHIEVE.

02:18PM 10   Q.   AND WHEN, IN THE EARLY DAYS IN 2010, YOU BEGAN TO LEARN

02:18PM 11   ABOUT THERANOS, WHAT KINDS OF THINGS DID YOU DO TO LEARN MORE

02:18PM 12   ABOUT THERANOS?

02:18PM 13   A.   AS A STARTING POINT I WAS ABLE TO GO OUT WITH

02:18PM 14   DR. JAY ROSAN AND SPEND SOME TIME AT THERANOS JUST TO LEARN

02:18PM 15   FROM ELIZABETH AND SUNNY WHAT THEY WERE DOING, WHAT THEY HAD

02:18PM 16   BEEN DOING, AND THAT WAS PROBABLY THE STARTING POINT OF THE

02:18PM 17   JOURNEY OF LEARNING.

02:18PM 18   Q.   YOU SAID GO OUT TO THERANOS.  WHAT DO YOU MEAN BY THAT?

02:18PM 19   WHERE WERE YOU AND WHERE DID YOU GO TO?

02:18PM 20   A.   I WAS BASED IN DEERFIELD, ILLINOIS, AND WE WENT TO THEIR

02:18PM 21   HEADQUARTERS AT THE TIME IN PALO ALTO.

02:18PM 22   Q.   IS THAT -- IS ILLINOIS WHERE WALGREENS IS HEADQUARTERED?

02:19PM 23   A.   CORRECT.

02:19PM 24   Q.   I THINK I PLACED A BINDER ON THE DESK IN FRONT OF YOU.  IF

02:19PM 25   YOU COULD OPEN IT UP TO TAB 278.

02:19PM 1      AT EXHIBIT 278, DO YOU RECOGNIZE THE DOCUMENTS THERE?

02:19PM 2   A.   YES.

02:19PM 3   Q.   WHAT ARE THE FIRST TWO PAGES, JUST GENERALLY?

02:19PM 4   A.   AN EMAIL MESSAGE.

02:19PM 5   Q.   DOES IT BEGIN AN EMAIL MESSAGE FROM MS. HOLMES TO YOU AND

02:19PM 6   DR. ROSAN, AN INDIVIDUAL YOU JUST REFERENCED?

02:19PM 7   A.   THAT'S CORRECT.

02:19PM 8   Q.   AND THEN IS THERE ANOTHER MESSAGE FROM YOU, AND THEN

02:19PM 9   ANOTHER MESSAGE WITHIN WALGREENS?

02:20PM 10  A.   THAT'S CORRECT.

02:20PM 11  Q.   AND HOW ABOUT THE ATTACHMENT?  DO YOU RECOGNIZE THE

02:20PM 12  ATTACHMENT?

02:20PM 13  A.   YES, I DO.

02:20PM 14  Q.   AND WHAT IS THE ATTACHMENT GENERALLY?

02:20PM 15  A.   IT WAS A PRESENTATION THAT HAD BEEN MADE TO US WHEN WE

02:20PM 16  VISITED AND SUBSEQUENTLY FORWARDED TO ME VIA EMAIL AND WHICH I

02:20PM 17  WAS SHARING WITH SOME EXECUTIVES IN THE COMPANY.

02:20PM 18  Q.   AND A PRESENTATION MADE TO YOU BY WHOM?

02:20PM 19  A.   BY THERANOS, BY MS. HOLMES AND MR. BALWANI.

02:20PM 20  Q.   THANK YOU.

02:20PM 21      YOUR HONOR, THE GOVERNMENT OFFERS 278.

02:20PM 22          MR. DOWNEY:  NO OBJECTION.

02:20PM 23          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:20PM 24      (GOVERNMENT'S EXHIBIT 278 WAS RECEIVED IN EVIDENCE.)

02:20PM 25          MR. SCHENK:  MS. HOLLIMAN, IF WE COULD START WITH

02:20PM  1    THE EMAIL AT THE BOTTOM OF THE PAGE, PICK UP WITH THE FROM AND

02:20PM  2    TO LINES.

02:20PM  3    Q.   MR. MIQUELON, YOU CAN START ON YOUR SCREEN, WE SEE AN

02:20PM  4    EMAIL FROM MS. HOLMES TO YOU IN MARCH OF 2010.

02:20PM  5         DO YOU SEE THAT?

02:20PM  6    A.   YES.

02:20PM  7    Q.   AND IF WE COULD CARRY OVER TO THE NEXT PAGE, THE SECOND

02:20PM  8    PAGE OF THIS EXHIBIT TO CAPTURE THE TEXT OF THE EMAIL,

02:21PM  9    MS. HOLMES WRITES, "WADE.

02:21PM  10        "IT WAS GREAT TO MEET YOU.

02:21PM  11        "AS PROMISED, PLEASE FIND THE PRESENTATION WE PRESENTED

02:21PM  12   TODAY."

02:21PM  13        DO YOU SEE THAT?

02:21PM  14   A.   YES.

02:21PM  15   Q.   AND WAS THIS THE PRESENTATION THAT YOU TRAVELLED TO

02:21PM  16   PALO ALTO TO ATTEND IN PERSON?

02:21PM  17   A.   YES.

02:21PM  18   Q.   AND NOW IF WE COULD LOOK ONE EMAIL UP BACK ON THE FIRST

02:21PM  19   PAGE, THE EMAIL IN THE MIDDLE, THE EMAIL FROM YOU, IF WE COULD

02:21PM  20   CAPTURE THAT EMAIL TO THE JURY.

02:21PM  21        YOU WROTE THAT EMAIL TO AN INDIVIDUAL NAMED GREG WASSON.

02:21PM  22        DO YOU SEE THAT?

02:21PM  23   A.   YES.

02:21PM  24   Q.   AND WHO WAS MR. WASSON?

02:21PM  25   A.   MR. WASSON WAS THE CHIEF EXECUTIVE OFFICER OF WALGREENS

02:21PM 1     AND HE WAS MY BOSS AT THE TIME.

02:21PM 2     Q.   IN THE EMAIL YOU DESCRIBE TO HIM YOUR BEGINNING EFFORTS AT

02:21PM 3     DUE DILIGENCE REGARDING THERANOS; IS THAT RIGHT?

02:21PM 4     A.   YES, THAT'S CORRECT.

02:21PM 5     Q.   AND WHAT WERE YOU TRYING TO COMMUNICATE TO THE CEO AT THIS

02:21PM 6     TIME?

02:21PM 7     A.   I THINK JUST THAT A LOT OF ENTHUSIASM ABOUT THE

02:22PM 8     POSSIBILITY OF WORKING WITH THEM AND THE FACT THAT IT WAS VERY

02:22PM 9     EXCITING AND IT SEEMED TO BE THEY WERE PRETTY MUCH OUT FRONT

02:22PM 10    FOR WHAT WE WERE LOOKING FOR.

02:22PM 11    Q.   I'D LIKE TO SHOW YOU SOME SLIDES FROM THE PRESENTATION,

02:22PM 12    BUT BEFORE WE DO THAT, DESCRIBE THE SETTING.  WHERE DID YOU GO

02:22PM 13    WHEN YOU WERE IN PALO ALTO, AND I'M WONDERING WHO WAS PRESENT

02:22PM 14    IN THE ROOM?

02:22PM 15    A.   WE WENT TO THEIR HEADQUARTERS AND WE WERE IN A SMALL

02:22PM 16    CONFERENCE ROOM RIGHT OFF OF THE RECEPTION AREA, WHICH WAS THE

02:22PM 17    FOUR OF US.

02:22PM 18    Q.   AND WHO WERE THE FOUR THAT WERE PRESENT?

02:22PM 19    A.   MYSELF, DR. ROSAN, MS. HOLMES, AND MR. BALWANI.

02:22PM 20    Q.   AND WHAT WAS IN THE ROOM IF YOU REMEMBER?  WAS THERE A

02:22PM 21    SCREEN OR A LAPTOP?  WAS THERE A DEVICE?

02:22PM 22    A.   I DON'T REMEMBER IF THE PRESENTATION WAS ON A LAPTOP OR IF

02:22PM 23    THERE WERE HANDOUTS AS WELL.

02:22PM 24    Q.   OKAY.  HOW ABOUT A THERANOS DEVICE OR DEVICES?  DID YOU

02:22PM 25    SEE ANYTHING?

02:22PM  1   A.   I SAW A THERANOS DEVICE LATER, BUT MY RECOLLECTION IS THAT

02:22PM  2   IT WAS OUTSIDE OF THE ROOM AND SLIGHTLY AROUND THE CORNER.

02:23PM  3   Q.   AND WHEN YOU SAY "LATER," DO YOU MEAN LATER THAT SAME DAY?

02:23PM  4   A.   LATER THAT SAME DAY.

02:23PM  5   Q.   OKAY.  IF WE COULD NOW TURN TO THE FIRST PAGE OF THE

02:23PM  6   PRESENTATION, THAT'S THE THIRD PAGE OF THE EXHIBIT.

02:23PM  7        IS THIS THE PRESENTATION THAT MS. HOLMES AND MR. BALWANI

02:23PM  8   PRESENTED TO YOU AND DR. ROSAN THAT DAY?

02:23PM  9   A.   YES.

02:23PM  10  Q.   AND IF YOU COULD TURN TO PAGE 5 OF THE EXHIBIT.  THERE'S A

02:23PM  11  SLIDE THAT BEGINS THERANOS INCORPORATED, AND I'D LIKE TO ASK

02:23PM  12  YOU SOME QUESTIONS ABOUT A FEW OF THE BULLETS.

02:23PM  13       IT BEGINS, "THERANOS IS A SILICON VALLEY-BASED HEALTH CARE

02:23PM  14  TECHNOLOGY COMPANY FOUNDED IN 2003."

02:23PM  15       DID MS. HOLMES SAY THAT TO YOU?  DID SHE DESCRIBE TO YOU

02:23PM  16  THAT THERANOS WAS A TECHNOLOGY COMPANY THAT WAS FOUNDED IN

02:23PM  17  2003?

02:23PM  18  A.   I DON'T KNOW IF THOSE WERE THE EXACT WORDS, BUT MORE OR

02:23PM  19  LESS SHE GAVE SOME PERSPECTIVE ON THE STARTUP AND THE COMPANY

02:23PM  20  HAD BEEN AROUND FOR, YOU KNOW, EFFECTIVELY SEVEN YEARS.

02:24PM  21  Q.   AND DID THAT SORT OF DESCRIBE THE WAY THE MEETING WENT?

02:24PM  22  WERE SLIDES SHOWN AND EITHER MS. HOLMES OR MR. BALWANI TALKED

02:24PM  23  ABOUT THE SLIDES WHILE THEY WERE BEING DISPLAYED?

02:24PM  24  A.   THAT'S CORRECT.

02:24PM  25  Q.   THE FIRST BULLET READS, "THERANOS'S PROPRIETARY, PATENTED

02:24PM 1    TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK IN

02:24PM 2    REAL-TIME AT THE POINT OF CARE, OUTSIDE OF TRADITIONAL LAB

02:24PM 3    SETTINGS."

02:24PM 4         IS THAT CONSISTENT WITH THE WAY THAT MS. HOLMES DESCRIBED

02:24PM 5    THE TECHNOLOGY TO YOU WHEN YOU WERE IN PALO ALTO?

02:24PM 6    A.   YES.

02:24PM 7    Q.   WHAT DID YOU UNDERSTAND "RUNS COMPREHENSIVE BLOOD TESTS,"

02:24PM 8    TO MEAN?

02:24PM 9    A.   MY UNDERSTANDING WAS A PRETTY BROAD RANGE OF IMMUNOASSAY

02:24PM 10   TESTS, YOU KNOW, BLOOD TESTS, THAT EXACTLY.

02:24PM 11   Q.   OKAY.  WHEN THIS CONCEPT WAS BEING DISCUSSED, DO YOU

02:24PM 12   REMEMBER IF MS. HOLMES OR MR. BALWANI OR BOTH OF THEM WERE

02:25PM 13   TALKING ABOUT IT?  DO YOU HAVE A RECOLLECTION OF WHO DID THE

02:25PM 14   SPEAKING?

02:25PM 15   A.   I THINK IT WAS VERY INTERACTIVE, SO I WOULD SAY THAT IT

02:25PM 16   WAS INTERACTIVE.

02:25PM 17   Q.   WHAT DO YOU MEAN BY "INTERACTIVE"?

02:25PM 18   A.   I MEAN WE WOULD TALK ABOUT DIFFERENT POINTS AND WE WOULD

02:25PM 19   ASK QUESTIONS AND BOTH WOULD CHIME IN.  BUT IT WOULD BE HARD TO

02:25PM 20   SAY ANYONE SAID ONE SPECIFIC LINE OR ANY ONE LINE.

02:25PM 21   Q.   OKAY.  THE BULLET CONTINUES, "FROM A FINGERSTICK IN

02:25PM 22   REAL-TIME AT THE POINT OF CARE."

02:25PM 23        WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:25PM 24   A.   WELL, JUST PART OF THE VALUE PROPOSITION, WHICH OBVIOUSLY

02:25PM 25   ONE DROP OF BLOOD WOULD HAVE BENEFITS, YOU KNOW, VERSUS AN

02:25PM 1    ENTIRE VIAL.

02:25PM 2        BUT BEING ABLE TO HAVE, AGAIN, THAT DECENTRALIZED LAB, I

02:25PM 3    THINK, AKIN MOVING FROM A MAINFRAME TO A LAPTOP, BEING ABLE TO

02:25PM 4    HAVE EFFECTIVELY A DEVICE THAT COULD AT THAT POINT OF CARE BE

02:25PM 5    ABLE TO TAKE THE BLOOD AND GATHER THE RESULTS HAD A LOT OF

02:25PM 6    ADDITIONAL BENEFITS AS WELL.

02:25PM 7    Q.   AND THEN IT CONTINUES, "OUTSIDE OF TRADITIONAL LAB

02:26PM 8    SETTINGS."

02:26PM 9        WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:26PM 10   A.   YOU KNOW, A TRADITIONAL LAB SETTING WOULD HAVE LARGE

02:26PM 11   MACHINES CAPABLE OF DOING SOME TESTS.  TYPICALLY YOU'RE WITH

02:26PM 12   LOOKING AT KIND OF VENA PUNCTURE, BEING ABLE TO DO THAT, THE

02:26PM 13   PATIENT MAY HAVE TO GO TO INDUSTRIAL COURT TO GET THEIR BLOOD

02:26PM 14   DRAWN, BUT THIS WOULD BE ABLE TO TAKE THE LAB TESTING AND

02:26PM 15   MOVING IT INTO THE PHARMACY WHERE IT WAS VERY CLOSE TO LOTS AND

02:26PM 16   LOTS OF PATIENTS.

02:26PM 17   Q.   SO THIS FIRST BULLET THAT WE JUST TALKED ABOUT, WAS THIS

02:26PM 18   ATTRACTIVE TO YOU AND TO WALGREENS?

02:26PM 19   A.   CERTAINLY.

02:26PM 20   Q.   WHY?

02:26PM 21   A.   AGAIN, WHEN YOU THINK ABOUT -- I THINK THE DATA SAYS 70 TO

02:26PM 22   80 PERCENT OF HEALTH CARE DECISIONS BY THE DOCTOR REQUIRES SOME

02:26PM 23   FORM OF LAB.  YOU KNOW, LAB IN MANY WAYS IS A GATEWAY TO GOOD

02:26PM 24   HEALTH.  BEING ABLE TO TEST ACCURATELY, FREQUENTLY, MAKING IT

02:26PM 25   ACCESSIBLE FOR PEOPLE, ALL OF THAT IS A WONDERFUL EXTENSION OF

02:26PM  1      HEALTH CARE.

02:26PM  2      Q.   THE THIRD BULLET ON THE SCREEN IN FRONT OF YOU READS, "OUR

02:27PM  3      CURRENT AND PAST CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR

02:27PM  4      PHARMACEUTICAL COMPANIES, MID SIZED BIO-PHARMAS, PROMINENT

02:27PM  5      RESEARCH INSTITUTIONS, AND U.S. AND FOREIGN GOVERNMENT HEALTH

02:27PM  6      AND MILITARY ORGANIZATIONS."

02:27PM  7           DID YOU HEAR MS. HOLMES OR MR. BALWANI DISCUSS THIS TOPIC

02:27PM  8      WHEN YOU WERE IN PALO ALTO?

02:27PM  9      A.   YES, WE DID.

02:27PM  10     Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:27PM  11     A.   WHAT I RECALL WAS REALLY 10 OF THE 15 PHARMACEUTICAL

02:27PM  12     COMPANIES, AS WELL AS SOME DISCUSSION ON THE WORK WITH THE

02:27PM  13     MILITARY.

02:27PM  14     Q.   AND WHAT DID YOU UNDERSTAND THAT THE PHARMACEUTICAL

02:27PM  15     COMPANIES DID FOR THERANOS?

02:27PM  16     A.   MY UNDERSTANDING WAS SOMEWHAT LIMITED BECAUSE THEY SAID

02:27PM  17     THAT THEY WERE UNDER NDA AND COULDN'T SHARE A LOT.

02:27PM  18          WHAT THEY HAD SAID IS THAT THEY WERE DOING WORK FOR, AND

02:27PM  19     IN VARIOUS DEGREES, SOME CLINICAL TRIAL WORK.

02:28PM  20          EARLY ON WHEN THEY STARTED WORKING WITH THE PHARMA

02:28PM  21     COMPANIES IT WAS -- YOU KNOW, A LOT OF THE REVENUE WAS DERIVED

02:28PM  22     FROM CREATING ALGORITHMS FOR THEM.

02:28PM  23          BUT THEY HAD BEEN MORPHING INTO BEING ABLE TO DO TESTING

02:28PM  24     FOR CLINICAL WORK AND HOPED TO TAKE THAT FURTHER OVER TIME.

02:28PM  25     Q.   DID THERE COME A TIME LATER ON IN YOUR INTERACTIONS WITH

02:28PM 1    THERANOS WHEN YOU GAINED MORE INFORMATION ABOUT WHAT MS. HOLMES

02:28PM 2    SAID THE THERANOS PHARMACEUTICAL WORK INVOLVED?

02:28PM 3    A.   YES.

02:28PM 4    Q.   AND WOULD YOU DESCRIBE THAT FOR US?

02:28PM 5    A.   I BELIEVE THERE WERE THREE PAPERS THAT WERE PRODUCED FOR

02:28PM 6    US TO SEE FROM THREE DIFFERENT PHARMA COMPANIES THAT HAD

02:28PM 7    BASICALLY OUTLINED SOME OF THE WORK THAT THEY HAD DONE

02:28PM 8    TOGETHER, AS WELL AS THE FINDINGS OF THE PHARMA COMPANIES.

02:28PM 9    Q.   OKAY.  THANK YOU.  WE'LL COME BACK TO THAT IN A MOMENT.

02:28PM 10       THE FINAL BULLET ON THE SCREEN READS, "THERANOS IS

02:28PM 11   LAUNCHING THERANOS SYSTEMS TO CONSUMERS IN 2010."

02:28PM 12   A.   CORRECT.

02:28PM 13   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:28PM 14   A.   I DON'T KNOW THAT WE TALKED ABOUT THAT IN DETAIL.

02:29PM 15       I DO BELIEVE AT THAT TIME THERE WAS SOME DISCUSSION OF

02:29PM 16   SOME WORK THAT THEY WERE DOING WITH ANOTHER LARGE RETAILER, AND

02:29PM 17   I BELIEVE OVER THE NEXT FEW MONTHS THERE WAS A LITTLE BIT OF

02:29PM 18   LIGHT SHED ON SOME OF THAT WORK AND SOME OF THE TESTING OF

02:29PM 19   THOSE EMPLOYEES.

02:29PM 20       BUT, AGAIN, I THINK THAT -- MY UNDERSTANDING WAS THAT THAT

02:29PM 21   WAS ALLUDING TO THAT OTHER RETAILER.

02:29PM 22   Q.   AND WHICH RETAILER WAS THAT?  DO YOU REMEMBER?

02:29PM 23   A.   TO MY BELIEF, IT'S SAFEWAY.  I'M NOT SURE THAT THAT WAS

02:29PM 24   EXPLICIT, BUT THAT IS WHAT I BELIEVED TO BE TRUE.

02:29PM 25   Q.   THANK YOU.

02:29PM   1        COULD WE TURN NOW TO PAGE 7.

02:29PM   2        THIS SLIDE IS ENTITLED OVERVIEW:  THERANOS SYSTEMS, AND

02:29PM   3   UNDER THE THERANOS SYSTEMS THERE ARE THREE PICTURES.

02:29PM   4        DO YOU SEE THOSE IMAGES?

02:29PM   5   A.   YES.

02:29PM   6   Q.   AND THE FIRST IMAGE IS LABELED DEVICES.

02:29PM   7        DO YOU RECOGNIZE THAT IMAGE?

02:29PM   8   A.   YES.

02:29PM   9   Q.   AND WHAT IS THAT?

02:29PM  10   A.   THAT WAS -- I DON'T KNOW AT THAT TIME WHAT IT WAS CALLED,

02:29PM  11   BUT IT BECAME EFFECTIVELY KNOWN AS THE EDISON MACHINE.

02:30PM  12   Q.   AND WHEN YOU WERE IN PALO ALTO, DID YOU SEE THE PHOTO OR

02:30PM  13   DID YOU SEE AN ACTUAL MACHINE?

02:30PM  14   A.   I SAW AN ACTUAL MACHINE.

02:30PM  15   Q.   AND WHERE WAS THAT MACHINE LOCATED?

02:30PM  16   A.   AGAIN, I BELIEVE THAT WAS RIGHT OUTSIDE OF THE CONFERENCE

02:30PM  17   ROOM IN A SMALL, YOU KNOW, CONCLAVE OFF TO THE RIGHT.

02:30PM  18   Q.   AND THE NEXT PHOTO IS LABELLED CARTRIDGES.

02:30PM  19        DID MS. HOLMES OR MR. BALWANI EXPLAIN TO YOU HOW

02:30PM  20   CARTRIDGES PLAYED A ROLE IN THE THERANOS SYSTEMS?

02:30PM  21   A.   CORRECT.

02:30PM  22   Q.   AND WHAT DID YOU LEARN?

02:30PM  23   A.   SO IT WAS -- MY UNDERSTANDING WAS ALWAYS THAT WHAT

02:30PM  24   THERANOS WAS ACTUALLY DOING WAS, AGAIN, KIND OF AKIN TO

02:30PM  25   MAINFRAMES MOVING TO LAPTOP.  IT WASN'T CHANGING HOW LAB HAD

02:30PM 1    BEEN DONE FOR IMMUNOASSAY.  IT WAS MAKING IT MUCH MORE

02:30PM 2    EFFECTIVE.

02:30PM 3         SO ESSENTIALLY YOU WOULD HAVE A CARTRIDGE WHICH HAD

02:30PM 4    VARIOUS CHAMBERS, YOU KNOW, LET'S SAY 8 BY 8 OR 64 POTENTIAL

02:30PM 5    CHAMBERS, AND EACH ONE CAN HOLD A SPECIFIC ANTIGEN, AND IF YOU

02:30PM 6    HAD A DROP OF BLOOD THAT WAS THEN MOVED INTO THE CHAMBERS, YOU

02:31PM 7    COULD HAVE A REACTION AND IT COULD BE READ THROUGH THE OPTICS

02:31PM 8    SIMILAR TO WHAT WOULD HAPPEN ON A, YOU KNOW, VERY BIG

02:31PM 9    EXPENSIVE, YOU KNOW, INDUSTRIAL MACHINE.  BUT IT WOULD HAPPEN,

02:31PM 10   YOU KNOW, MUCH MORE EFFICIENTLY AT THE POINT OF CARE THERE.

02:31PM 11        SO THE ESSENTIAL KEY OVER TIME WOULD BE TO CREATE

02:31PM 12   CARTRIDGES THAT WERE RELEVANT TO WHAT YOU WANTED TO TEST.  SO

02:31PM 13   IF YOU WERE DOING GENERAL CHEMISTRY, YOU WOULD HAVE TO HAVE A

02:31PM 14   CARTRIDGE THAT HAS THE VARIOUS ANTIGENS OF THE VARIOUS

02:31PM 15   CHEMISTRY THAT YOU'RE TRYING TO DO.

02:31PM 16   Q.   AND DID YOU HAVE AN UNDERSTANDING OF THE RELATIONSHIP

02:31PM 17   BETWEEN THE CARTRIDGE AND THE DEVICE?

02:31PM 18   A.   CORRECT.  I GUESS I ALWAYS THOUGHT OF IT REALLY AS A

02:31PM 19   PLATFORM, THE WAY THIS TECHNOLOGY WAS DEVELOPED, AND WHAT WAS

02:31PM 20   PRETTY EXCITING I THINK IS THAT THAT DEVICE IS REALLY A

02:31PM 21   PLATFORM TO TEST EFFECTIVELY ALMOST ANYTHING AS LONG AS YOU

02:31PM 22   HAVE THE PROPER CARTRIDGE FOR THE PROPER SPECIFIC TEST.

02:31PM 23   Q.   AND DID YOU SEE THE CARTRIDGE BEING PLACED INTO THE

02:31PM 24   DEVICE?

02:31PM 25   A.   I DON'T KNOW IF I SAW IT ON THAT DAY.  I DID LATER ON, BUT

02:32PM  1    I'M NOT SURE ON THAT PARTICULAR DAY THAT I DID.

02:32PM  2    Q.   YOU CAN'T RECALL IF IT WAS THAT DAY IN 2010, BUT AT SOME

02:32PM  3    POINT?

02:32PM  4    A.   AT SOME POINT I DID, YEAH.

02:32PM  5    Q.   AND THE THIRD IMAGE ON THE TOP IS CALLED MOBILE

02:32PM  6    APPLICATIONS.

02:32PM  7         DID YOU GAIN AN UNDERSTANDING OF WHAT THAT MEANT DURING

02:32PM  8    THE MEETING?

02:32PM  9    A.   YEAH, I THINK ANOTHER EXCITING THING THAT THEY WERE DOING

02:32PM  10   REALLY WAS THE I.T. AROUND THE ENTIRE VALUE PROPOSITION.

02:32PM  11        SO TO THE EXTENT THAT YOU COULD TEST REALTIME AT THE POINT

02:32PM  12   OF CARE WITH THE DEVICE AND THE CARTRIDGE, THE DATA, THE

02:32PM  13   RESULTS, IF YOU WILL, WILL BE FED INTO THE CLOUD AND GO INTO

02:32PM  14   THEIR CENTRAL LAB IN PALO ALTO FOR, YOU KNOW, PATHOLOGISTS TO

02:32PM  15   REVIEW OR AN ALGORITHM TO REVIEW.

02:32PM  16        BUT YOU WERE EFFECTIVELY PUTTING THIS INFORMATION ON THE

02:32PM  17   WEB AND PUTTING IT OUT MORE OR LESS REALTIME.

02:32PM  18   Q.   OKAY.  AND WAS THAT ATTRACTIVE TO WALGREENS?

02:32PM  19   A.   I THINK IT'S AN ATTRACTIVE PART OF THE PROPOSITION BECAUSE

02:32PM  20   YOU DON'T HAVE TO HAVE, YOU KNOW, AN EXPERT OR A PATHOLOGIST OR

02:32PM  21   A DOCTOR WHERE THE MACHINE IS.  YOU ONLY HAVE TO HAVE IT IN A

02:33PM  22   CENTRAL LOCATION WHERE THE DATA CAN BE ANALYZED PROPERLY.

02:33PM  23   Q.   IF YOU WOULD NOW TURN TO PAGE 8.

02:33PM  24        WE SEE ANOTHER PHOTO UNDER THERANOS SYSTEMS DEVICES.

02:33PM  25        IS THIS PHOTO ALSO SIMILAR TO THE DEVICE THAT YOU SAW IN

02:33PM   1     PALO ALTO?

02:33PM   2     A.   VERY SIMILAR.

02:33PM   3     Q.   DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT THERANOS

02:33PM   4     TESTED BLOOD ON NON-THERANOS DEVICES, ON SOME OTHER DEVICE?

02:33PM   5     A.   NOT TO MY RECOLLECTION, EXCEPT TO THE EXTENT THAT I KNOW

02:33PM   6     THAT THEY HAD DONE A LOT OF WORK TO CORRELATE THE THERANOS

02:33PM   7     EDISON DEVICE WITH CONVENTIONAL TESTING.

02:33PM   8          SO I GUESS MY UNDERSTANDING WAS THAT THEY MUST BE DOING,

02:33PM   9     YOU KNOW, THAT TESTING ON CONVENTIONAL LAB EQUIPMENT, WHETHER

02:33PM   10    IT BE IN HOUSE OR OUTSOURCED, BUT THAT THOSE CORRELATIONS WOULD

02:33PM   11    HAVE TO BE, YOU KNOW, DONE SOMEHOW.

02:33PM   12    Q.   SO DO I UNDERSTAND WHAT YOU'RE SAYING IS THAT THEY WOULD

02:34PM   13    TEST ON THE EDISON DEVICE, AND ALSO ON CONVENTIONAL DEVICES,

02:34PM   14    BUT FOR THE PURPOSES OF COMPARING THE RESULTS?

02:34PM   15    A.   RIGHT.  FOR PURPOSES OF DRAWING CORRELATIONS THAT WOULD,

02:34PM   16    YOU KNOW, DEMONSTRATE IT TO BE AS GOOD AS.

02:34PM   17    Q.   AND HOW ABOUT FOR THE WALGREENS BUSINESS PROPOSITION?  IF

02:34PM   18    WALGREENS WAS GOING TO PARTNER WITH THERANOS, DID YOU HAVE AN

02:34PM   19    UNDERSTANDING THAT THERANOS WOULD TEST BLOOD ON CONVENTIONAL

02:34PM   20    DEVICES?

02:34PM   21    A.   YES.

02:34PM   22    Q.   AND DESCRIBE THAT TO US.

02:34PM   23    A.   THE VALUE PROPOSITION WAS TO HAVE, YOU KNOW, 90,

02:34PM   24    95 PERCENT OF ALL TESTS THAT COULD BE DONE IN A CONVENTIONAL

02:34PM   25    LAB DONE ON A THERANOS DEVICE.

02:34PM  1          THERE WERE SOME DISCUSSIONS AT SOME TIME THAT IF WE HAD A

02:34PM  2     FULL LAB OFFERING AND THERE WERE OTHER, YOU KNOW, MORE OBSCURE

02:34PM  3     TESTS OR TESTS THAT WEREN'T RELEVANT TECHNOLOGY, THAT THOSE

02:34PM  4     MIGHT BE DONE THROUGH A LAB SETTING.  BUT THAT WAS, YOU KNOW,

02:34PM  5     IT WOULD BE A VERY SMALL MINORITY OF THE TOTAL.

02:34PM  6     Q.   SO THE MAJORITY WERE ON THE THERANOS DEVICE, AND AS YOU

02:34PM  7     SAID, SOME OBSCURE TESTS WOULD BE TESTED ON CONVENTIONAL

02:35PM  8     DEVICES?

02:35PM  9     A.   RIGHT.

02:35PM  10    Q.   WOULD YOU TURN TO PAGE 9.  THIS SLIDE IS ENTITLED

02:35PM  11    VALIDATION OF THERANOS SYSTEMS.  THE FIRST PARAGRAPH READS,

02:35PM  12    "THERANOS SYSTEMS HAVE BEEN COMPREHENSIVELY VALIDATED OVER THE

02:35PM  13    COURSE OF THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST

02:35PM  14    PHARMACEUTICAL COMPANIES."

02:35PM  15         DID MS. HOLMES OR MR. BALWANI EXPLAIN THAT TO YOU WHEN YOU

02:35PM  16    WERE IN PALO ALTO?

02:35PM  17    A.   AGAIN, IT WAS THE ATTESTATIONS THAT THEY HAD BEEN DOING

02:35PM  18    WORK FOR 10 OF THE 15 PHARMACEUTICAL COMPANIES.  WE GOT A

02:35PM  19    LITTLE MORE INFORMATION ON THREE OF THOSE COMPANIES.  BUT WE

02:35PM  20    DISCUSSED THAT.  AND THERE WAS A POINT IN WHICH, AGAIN, BECAUSE

02:35PM  21    THEY WERE UNDER NDA, THE LEVEL OF INFORMATION WAS DIMINISHED.

02:35PM  22    Q.   SO AT SOME POINT LATER YOU ACTUALLY RECEIVED SOME OF THESE

02:35PM  23    REPORTS; IS THAT RIGHT?

02:35PM  24    A.   I BELIEVE WE RECEIVED THREE DIFFERENT REPORTS.

02:35PM  25    Q.   OKAY.  COULD WE NOW TURN TO PAGE 17.  THIS SLIDE IS TITLED

```
02:36PM   1    THERANOS GENERAL CHEMISTRY TESTS.  THE FIRST BULLET READS,

02:36PM   2    "REAL-TIME, FINGER-STICK-BASED TESTS. "

02:36PM   3         WHEN YOU WERE AT THE THERANOS HEADQUARTERS, DID MS. HOLMES

02:36PM   4    OR MR. BALWANI EXPLAIN TO YOU THAT THERANOS TESTS WERE DONE BY

02:36PM   5    DRAWING BLOOD FROM A FINGERSTICK?

02:36PM   6    A.   THAT WAS MY UNDERSTANDING.

02:36PM   7    Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

02:36PM   8    A.   FROM THE DISCUSSIONS THAT I HAD WITH MR. BALWANI AND

02:36PM   9    MS. HOLMES.

02:36PM   10   Q.   OKAY.  AND THEY USED THE WORD REAL-TIME.

02:36PM   11        DID YOU HAVE AN UNDERSTANDING OF WHAT THAT MEANT?

02:36PM   12   A.   AGAIN, IT'S JUST THE FACT THAT YOU COULD TAKE BLOOD AND

02:36PM   13   ENTER IT INTO A DEVICE AND IDEALLY IN 15 MINUTES THE DEVICE

02:36PM   14   WOULD HAVE DONE THE ANALYSIS, VERSUS IF YOU WERE IN A LAB

02:36PM   15   SETTING, YOU MIGHT HAVE MULTIPLE HANDOFFS OF BLOOD VIALS

02:36PM   16   ULTIMATELY GOING TO A LAB AND THEN WAITING TO BE PROCESSED.

02:37PM   17   Q.   THE SECOND BULLET SAYS THAT "AT LESS THAN 70 PERCENT OF

02:37PM   18   THE COST OF CURRENT LAB TESTS."

02:37PM   19        WAS THERE SOME DISCUSSION ABOUT SOME COST ADVANTAGES TO

02:37PM   20   THE THERANOS SYSTEM?

02:37PM   21   A.   THERE WAS.  WE FELT THIS COULD BE MUCH MORE COST EFFECTIVE

02:37PM   22   THAN A TRADITIONAL LAB FOR A VARIETY OF REASONS.

02:37PM   23   Q.   WAS THAT ATTRACTIVE TO WALGREENS, THE COST ASPECT?

02:37PM   24   A.   I THINK ATTRACTIVE TO EVERYONE.

02:37PM   25   Q.   WHY?
```

02:37PM 1    A.   I THINK, YOU KNOW, THE THING THAT EXCITED ME FOR SURE SO

02:37PM 2    MUCH WAS THAT THERANOS HELD THE PROMISE OF BEING ABLE TO DO LAB

02:37PM 3    TESTING BETTER, FASTER, AND CHEAPER, ALL OF WHICH LEAD TO

02:37PM 4    BETTER OUTCOMES FOR PATIENTS.

02:37PM 5    Q.   IF YOU'LL NOW TURN PLEASE TO PAGE 27.

02:37PM 6         THIS SLIDE IS TITLED REAL-TIME FINGER-STICK-BASED TESTS

02:38PM 7    FOR LAUNCH AT WALGREENS IN 2010.

02:38PM 8         THEN THERE'S A NUMBERS 1, 2, AND 3, GENERAL CHEMISTRY

02:38PM 9    PANELS AND STANDARD BLOOD TESTS, THE SECOND IS INFLUENZA, THE

02:38PM 10   THIRD IS FERTILITY, AND THE SLIDE TALKS ABOUT LAUNCH AT

02:38PM 11   WALGREENS IN 2010.

02:38PM 12        WAS THERE DISCUSSION ABOUT LAUNCHING WITH

02:38PM 13   FINGERSTICK-BASED TESTS AT WALGREENS THAT YEAR IN 2010?

02:38PM 14   A.   THERE WERE DISCUSSIONS.  EVERYBODY WAS EXCITED ABOUT THE

02:38PM 15   PROPOSITION AND WONDERING, YOU KNOW, HOW LONG IT WOULD TAKE TO

02:38PM 16   BRING THIS TO REALITY, BUT THERE WERE SOME EARLIER DISCUSSIONS

02:38PM 17   FOR SURE.

02:38PM 18   Q.   AND WHEN YOU WERE HAVING THOSE DISCUSSIONS, DID MS. HOLMES

02:38PM 19   DRAW A DISTINCTION BETWEEN THE TESTS, THE BLOOD TESTS THAT WERE

02:38PM 20   READY IN 2010 VERSUS BLOOD TESTS THAT WOULD BE READY LATER OR

02:38PM 21   SOMETIME IN THE FUTURE?

02:38PM 22   A.   I DON'T BELIEVE SO.

02:38PM 23   Q.   WHAT DO YOU MEAN?

02:38PM 24   A.   THE -- YOU KNOW, AGAIN, EITHER ON THIS DAY OR IN THE NEXT

02:38PM 25   FEW MONTHS, THERE WAS A LOT OF DISCUSSION THAT THE COMPANY WAS

02:38PM  1    VERY ADEPT AT DOING KIND OF THE STANDARD TESTING.

02:39PM  2         BUT WE BUCKETED OVER TIME, YOU KNOW, THREE DIFFERENT

02:39PM  3    VERSIONS.  I THINK MORE OR LESS WE HAD THE TESTS THAT ARE THE

02:39PM  4    OVERWHELMING, YOU KNOW, STANDARD TESTS DONE; THERE WERE

02:39PM  5    SPECIALTY TESTS WHICH WERE A BIT MORE DIFFICULT; AND THEN WE

02:39PM  6    TALKED ABOUT SOMETHING CALLED V3, YOU KNOW, WHICH WERE TESTS

02:39PM  7    ULTIMATELY WHICH WOULD BE PREDICTIVE AND NEW TO THE WORLD, BUT

02:39PM  8    THAT DIDN'T REALLY EXIST YET.

02:39PM  9    Q.   AND WHEN YOU SAY V3, DO YOU MEAN VERSION?

02:39PM  10   A.   VERSION 3.

02:39PM  11   Q.   DID YOU HAVE AN UNDERSTANDING FROM MS. HOLMES WHAT THE

02:39PM  12   FIRST BUCKET, AS YOU DESCRIBED IT, WHAT WAS INVOLVED, OR WHAT

02:39PM  13   TYPES OF TESTS WERE INVOLVED IN THAT FIRST BUCKET?

02:39PM  14   A.   YOU KNOW, AGAIN, IT'S PRIMARY, YOU KNOW, BLOOD TESTS DONE

02:39PM  15   THROUGH IMMUNOASSAY, THE, THE ANTIGEN TESTS, WHICH NUMBER IN

02:39PM  16   THE HUNDREDS, BUT THOSE TESTS WERE EITHER READY TO GO OR WOULD

02:39PM  17   BE SHORTLY.

02:39PM  18   Q.   DID YOU LEAVE THE MEETING WITH AN UNDERSTANDING THAT THERE

02:39PM  19   WERE A NUMBER OF TESTS THAT WERE AVAILABLE IN 2010?

02:40PM  20   A.   YES, AND I DON'T KNOW HOW MANY SPECIFICALLY.  AGAIN, I

02:40PM  21   DON'T KNOW IF WE HAD A NUMBER.

02:40PM  22        WE, WE FELT THAT THEY WERE DOING A FAIRLY BROAD RANGE OF

02:40PM  23   TESTS WITH THE PHARMA COMPANIES, AS WELL AS OUR UNDERSTANDING

02:40PM  24   WAS THAT THEY WERE ALREADY DOING SOME WORK WITH THE OTHER

02:40PM  25   RETAILER IN THAT REGARD.

02:40PM 1    Q.   OKAY.  WOULD YOU NOW TURN TO PAGE 30.  THIS IS TITLED

02:40PM 2    REAL-TIME FINGER-STICK-BASED TESTS FOR LAUNCH AT WALGREENS IN

02:40PM 3    2011, AND IT INCLUDES WOMEN'S AND MEN'S HEALTH.

02:40PM 4         DURING THE MEETING, DID MS. HOLMES MAKE A DISTINCTION

02:40PM 5    BETWEEN THE TESTS THAT WOULD BE READY IN 2010 VERSUS THE TESTS

02:40PM 6    IN 2011?

02:40PM 7    A.   I RECALL SOME DIALOGUE.  I DON'T KNOW IF IT WAS THAT

02:40PM 8    MEETING OR NOT, WHETHER WE WOULD WANT TO TAKE A COUPLE OF

02:40PM 9    SPECIFIC TESTS TO GET SOME PILOT LEARNINGS, THESE TYPES OF

02:40PM 10   TESTS; OR WHETHER WE WOULD, YOU KNOW, WAIT AND DO KIND OF THE

02:41PM 11   BROADER GENERAL CHEMISTRY.

02:41PM 12        AGAIN, THIS WAS VERY EARLY DISCUSSIONS, BUT IT WAS JUST,

02:41PM 13   AGAIN, A DIALOGUE ON WHAT MIGHT BE THE NEXT BEST STEP TO BE

02:41PM 14   ABLE TO PILOT AND GET MORE INFORMATION.

02:41PM 15   Q.   DURING THE MEETING, DID YOU GET AN IMPRESSION ABOUT

02:41PM 16   MS. HOLMES'S ABILITY TO DESCRIBE TO YOU PRESENT CAPABILITIES AS

02:41PM 17   OPPOSED TO FUTURE CAPABILITIES?

02:41PM 18   A.   I DON'T KNOW IF I COULD SAY IN THAT VERY FIRST MEETING OR

02:41PM 19   NOT.  I THINK BOTH OF US WERE UNDER THE IMPRESSION, DR. ROSAN

02:41PM 20   AND I, THAT CERTAINLY THIS TECHNOLOGY WOULD WORK FOR, YOU KNOW,

02:41PM 21   A NUMBER OF TESTS AND THAT EXPANDING TESTS WAS JUST, AGAIN, A

02:41PM 22   MATTER OF JUST PERFECTING THE REAGENTS AND OTHER THINGS.  WE

02:41PM 23   CERTAINLY HAD AN UNDERSTANDING IT WORKED FOR MANY TESTS.  I

02:41PM 24   CAN'T SPECIFY HOW MANY.

02:41PM 25   Q.   YOU DIDN'T KNOW THE CURRENT NUMBER, BUT YOU UNDERSTOOD

02:42PM 1     THAT IT WAS PRESENTLY CAPABLE OF WORKING FOR SOME?

02:42PM 2     A.   RIGHT.  AND I WAS TOLD THAT ANY BLOOD, ANY BLOOD, URINE,

02:42PM 3     OTHER FLUID SAMPLE SHOULD BE ABLE TO BE WORKABLE UPON THAT

02:42PM 4     TECHNOLOGY.

02:42PM 5     Q.   I'M SORRY?

02:42PM 6     A.   ANY BLOOD, SALIVA, OR URINE, ALMOST ANY TEST SHOULD BE

02:42PM 7     ABLE TO WORK ON THAT PLATFORM.

02:42PM 8     Q.   IF YOU'LL TURN ONE PAGE NOW TO PAGE 31.

02:42PM 9          THIS SLIDE IS TITLED LAUNCH OF THERANOS SYSTEMS AT

02:42PM 10    WALGREENS AND IT READS, "THERANOS WOULD LIKE TO CEMENT A

02:42PM 11    PARTNERSHIP WITH WALGREENS BY END OF APRIL 2010 TO LAUNCH THE

02:42PM 12    GENERAL CHEMISTRY, INFLUENZA, AND FERTILITY TESTS IN Q4 2010."

02:42PM 13         DO YOU REMEMBER A DISCUSSION AROUND THIS TOPIC?

02:42PM 14    A.   VAGUELY, BUT YES.

02:42PM 15    Q.   AND THE MEETING WAS OCCURRING IN MARCH OF 2010; IS THAT

02:42PM 16    RIGHT?

02:42PM 17    A.   CORRECT.

02:43PM 18    Q.   AND SO WAS THERANOS SUGGESTING THAT YOU COULD BEGIN THE

02:43PM 19    PARTNERSHIP NEXT MONTH IN APRIL OF 2010?

02:43PM 20    A.   I THINK ON A SMALL SCALE, YES, THAT'S WHAT THEY'RE

02:43PM 21    SUGGESTING.

02:43PM 22    Q.   AND YOU SAID ON A SMALL SCALE.  IT DESCRIBES A LAUNCH WITH

02:43PM 23    CERTAIN TESTS, GENERAL CHEMISTRY, INFLUENZA AND FERTILITY.  DO

02:43PM 24    YOU REMEMBER THOSE BEING DISCUSSED?

02:43PM 25    A.   YES.

02:43PM  1   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:43PM  2   A.   AGAIN, THAT THESE MIGHT BE SOME LOW HANGING FRUIT, SO TO

02:43PM  3   SPEAK, IN ORDER TO BE ABLE TO GET IN THE MARKET AND START TO

02:43PM  4   UNDERSTAND THINGS LIKE CONSUMER ACCEPTANCE OF LAB IN A DRUG

02:43PM  5   STORE AND OTHER LEARNINGS.

02:43PM  6   Q.   OKAY.  WOULD YOU NOW TURN TO EXHIBIT 291 IN YOUR BINDER.

02:43PM  7        THE FIRST PAGE HAS A COUPLE OF EMAILS ON IT, AND THEN

02:43PM  8   THERE ARE SOME ATTACHMENTS.  WOULD YOU JUST SPEND A MINUTE AND

02:43PM  9   FLIP THROUGH THAT AND I'M GOING TO ASK YOU IF YOU RECOGNIZE THE

02:44PM 10   ATTACHMENTS.

02:44PM 11   A.   OKAY.

02:44PM 12   Q.   DO YOU RECOGNIZE THE ATTACHMENTS?

02:44PM 13   A.   I DO.

02:44PM 14   Q.   AND WHAT ARE THE ATTACHMENTS?

02:44PM 15   A.   THESE ARE EXCERPTS FROM THE THREE PHARMA COMPANIES,

02:44PM 16   DOCUMENTS THAT WERE SHARED WITH US MORE OR LESS VALIDATING THE

02:44PM 17   WORK THAT THEY HAD DONE WITH THEM.

02:44PM 18   Q.   SO EARLIER WHEN YOU TALKED ABOUT SEEING SOME VALIDATION

02:44PM 19   REPORTS FROM PHARMACEUTICAL COMPANIES, ARE THESE THOSE REPORTS?

02:44PM 20   A.   YES.

02:44PM 21   Q.   AND THEN THE EMAIL ON THE TOP OF THE FIRST PAGE FROM

02:44PM 22   MS. HOLMES TO TWO EMPLOYEES, INCLUDING DR. ROSAN ON THIS EMAIL,

02:44PM 23   YOU'RE NOT ON THIS EMAIL; IS THAT RIGHT?

02:44PM 24   A.   I'M NOT.

02:44PM 25   Q.   BUT YOU STILL SAW THESE ATTACHMENTS AT SOME POINT?

02:45PM 1    A.   YEAH.  I RECALL DR. ROSAN SHARING THOSE WITH ME.

02:45PM 2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS THE

02:45PM 3    FIRST EMAIL ON THE FIRST PAGE, THE ONE FROM MS. HOLMES AND THE

02:45PM 4    ATTACHMENTS.

02:45PM 5              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:45PM 6              THE COURT:  THOSE ARE ADMITTED, AND THEY MAY BE

02:45PM 7    PUBLISHED.

02:45PM 8         (GOVERNMENT'S EXHIBIT 291 WAS RECEIVED IN EVIDENCE.)

02:45PM 9    BY MR. SCHENK:

02:45PM 10   Q.   LET'S START FIRST WITH AN EMAIL FROM MS. HOLMES ON

02:45PM 11   APRIL 2010.

02:45PM 12        DO YOU SEE THAT EMAIL?

02:45PM 13   A.   YES.

02:45PM 14   Q.   AND IT READS "DR. JAY, ALEX.

02:45PM 15        "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

02:45PM 16   DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

02:45PM 17   THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

02:45PM 18   SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

02:46PM 19   EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD.  PLEASE NOTE

02:46PM 20   THAT THESE DOCUMENTS ARE STRICTLY CONFIDENTIAL UNDER OUR CDA."

02:46PM 21        IN THE EMAIL, SHE WRITES "INDEPENDENT DUE DILIGENCE

02:46PM 22   REPORTS."  IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

02:46PM 23   THESE REPORTS WERE?

02:46PM 24   A.   YES.

02:46PM 25   Q.   AND SHE ALSO WRITES THAT GLAXO, PFIZER, AND

02:46PM 1    SCHERING-PLOUGH DID THIS AFTER THEIR, QUOTE, "OWN TECHNICAL

02:46PM 2    VALIDATION."

02:46PM 3         DID YOU ALSO UNDERSTAND THAT THE PHARMA COMPANIES DID

02:46PM 4    THEIR OWN TECHNICAL VALIDATIONS AND PREPARED THESE REPORTS?

02:46PM 5    A.   YES.

02:46PM 6    Q.   LET'S NOW TURN TO THE REPORTS.  I'D LIKE TO FIRST SHOW YOU

02:46PM 7    PAGE 2.

02:46PM 8         THIS ONE IS FROM GSK.  WHEN YOU WERE CFO AT WALGREENS, YOU

02:46PM 9    SAID THAT DR. JAY SHARED THESE REPORTS WITH YOU.

02:46PM 10        DO YOU RECALL THAT?

02:46PM 11   A.   YES.

02:46PM 12   Q.   AND DO YOU REMEMBER WHAT YOU MADE OF THEM WHEN YOU

02:46PM 13   RECEIVED THE REPORTS?

02:47PM 14   A.   I THOUGHT IT WAS AT LEAST A TERRIFIC PIECE OF INFORMATION

02:47PM 15   ABOUT THE VALIDITY OF WHAT THEY WERE WORKING ON TO BE ABLE TO

02:47PM 16   HAVE THREE PHARMA COMPANIES USE IT, AND MOST OF THESE COMPANIES

02:47PM 17   HAVE VERY BIG LABS AND VERY BIG R&D BUDGETS FOR LABS, AND TO BE

02:47PM 18   ABLE TO VALIDATE SOME COMPONENTS OF WHAT THEY WERE DOING.

02:47PM 19   Q.   AND DID THAT PIECE OF VALIDATION MATTER TO YOU OR MATTER

02:47PM 20   TO WALGREENS AS YOU'RE DECIDING WHETHER TO CREATE A PARTNERSHIP

02:47PM 21   WITH THERANOS?

02:47PM 22   A.   CERTAINLY AN IMPORTANT PIECE.

02:47PM 23   Q.   WHY?

02:47PM 24   A.   AGAIN, THE PHARMACY COMPANIES IN GENERAL ARE MUCH MORE

02:47PM 25   ADEPT AT THE LAB WORK THAT THEY DO BOTH FOR THE CLINICAL WORK

02:47PM 1     FOR THEIR DRUG DEVELOPMENT, AS WELL AS MANY CASES FOR THEIR LAB

02:47PM 2     WORK OUTRIGHT.

02:47PM 3         SO BEING ABLE TO HAVE, AGAIN, THEIR VALIDATION, THEIR

02:47PM 4     ANALYSIS, JUST BEING ABLE TO KNOW THAT 10 OF THE TOP 15 WERE

02:47PM 5     ACTIVELY WORKING AND THREE WOULD BE WORKING TO VALIDATE AND

02:48PM 6     PUBLISH OR AT LEAST TO CREATE A PARTNER WE THOUGHT WAS VERY

02:48PM 7     IMPORTANT.

02:48PM 8     Q.   AND IF YOU WOULD NOW TURN TO PAGE 8 IN THE DOCUMENT.  WE

02:48PM 9     SEE THE VALIDATION REPORT FROM PFIZER.

02:48PM 10        DO YOU SEE THAT?

02:48PM 11    A.   I DO.

02:48PM 12    Q.   AND DID YOU NOTICE THAT PFIZER'S LOGO WAS ON THE DOCUMENT

02:48PM 13    WHEN YOU LOOKED AT THIS INITIALLY?

02:48PM 14    A.   YES.

02:48PM 15    Q.   AND WHAT DID YOU MAKE OF THAT FACT?

02:48PM 16    A.   MY ASSUMPTION WAS JUST THAT THIS WAS EITHER WRITTEN BY

02:48PM 17    PFIZER WITH THE APPROVAL OF THERANOS TO SHARE, OR IT WAS

02:48PM 18    WRITTEN BY THERANOS WITH PFIZER'S APPROVAL THAT THEY AGREED TO

02:48PM 19    WHAT WAS WRITTEN.

02:48PM 20    Q.   I'D NOW LIKE TO DRAW YOUR ATTENTION TO PAGE 34 IN THE

02:48PM 21    DOCUMENT.

02:48PM 22        NOW WE'RE LOOKING AT THE VALIDATION REPORT FROM SCHERING

02:49PM 23    CORPORATION, SCHERING-PLOUGH.

02:49PM 24        DO YOU NOTICE THAT THE SCHERING-PLOUGH LOGO WAS ON THIS

02:49PM 25    DOCUMENT ALSO?

02:49PM 1    A.   YES.

02:49PM 2    Q.   AND IN THE SECOND LINE, IS THE WORD "INSTITUTE"

02:49PM 3    MISSPELLED?

02:49PM 4    A.   YES.

02:49PM 5    Q.   AND DID YOU NOTICE THAT AT THE TIME?

02:49PM 6    A.   NO.

02:49PM 7    Q.   COULD WE NOW TURN TO EXHIBIT 300 IN YOUR BINDER.

02:49PM 8         AFTER YOU LEFT THE THERANOS HEADQUARTERS AND WENT BACK TO

02:49PM 9    ILLINOIS, DID YOU CONTINUE TO HAVE FURTHER MEETINGS WITH

02:49PM 10   THERANOS?

02:49PM 11   A.   YES.

02:49PM 12   Q.   FOR WHAT PURPOSE?  WHAT WERE YOU -- WHAT WAS WALGREENS

02:49PM 13   CONSIDERING?

02:49PM 14   A.   LIKE I SAID BEFORE, I THINK WE THOUGHT THAT THIS WAS ONE

02:50PM 15   OF THE MOST EXCITING COMPANIES THAT WE HAD SEEN, MAYBE NOT JUST

02:50PM 16   IN LAB BUT IN GENERAL; THAT WHAT THEY WERE DOING WAS VERY

02:50PM 17   DISRUPTIVE AND COULD BE BETTER, FASTER, CHEAPER THAN WHAT HAD

02:50PM 18   BEEN DONE BEFORE; THAT IT COULD REALLY CHANGE THE GAME IN TERMS

02:50PM 19   OF PROVIDING MORE ACCESSIBLE LAB AND BETTER OUTCOMES FOR

02:50PM 20   PATIENTS, AND SO WE WERE VERY EXCITED ABOUT FORMING A

02:50PM 21   PARTNERSHIP.

02:50PM 22   Q.   AND WAS ONE OF THE NEXT STEPS YOU TOOK TO HAVE ANOTHER

02:50PM 23   MEETING, THIS TIME IN ILLINOIS, WITH MS. HOLMES AND

02:50PM 24   MR. BALWANI?

02:50PM 25   A.   YES.

02:50PM  1    Q.   AND IS EXHIBIT 300 AN EMAIL FROM YOU TO OTHER FOLKS AT

02:50PM  2    WALGREENS IN ADVANCE OF THAT MEETING?

02:50PM  3    A.   YES.

02:50PM  4         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

02:50PM  5    EXHIBIT 300.

02:50PM  6         MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

02:50PM  7         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:50PM  8    (GOVERNMENT'S EXHIBIT 300 WAS RECEIVED IN EVIDENCE.)

02:50PM  9    BY MR. SCHENK:

02:50PM 10    Q.   IF WE CAN START WITH YOUR EMAIL THAT BEGINS ON THE MIDDLE

02:50PM 11    OF THE PAGE AND CAPTURE THE REST OF THE SCREEN ALL OF THE WAY

02:50PM 12    DOWN.

02:51PM 13         YOU WROTE THIS APRIL 26TH, 2010, SO ABOUT A MONTH AFTER

02:51PM 14    YOUR TRIP TO THERANOS HEADQUARTERS; IS THAT RIGHT?

02:51PM 15    A.   CORRECT.

02:51PM 16    Q.   AND YOU WROTE TO SEVERAL INDIVIDUALS FROM WALGREENS.  SORT

02:51PM 17    OF GENERALLY, WHO WERE THESE INDIVIDUALS?

02:51PM 18    A.   THIS WOULD BE A COMPILATION OF, YOU KNOW, EIGHT, NINE OF

02:51PM 19    THE TOP OFFICERS IN THE COMPANY, AS WELL AS EXECUTIVES WHO

02:51PM 20    OVERSAW NEW BUSINESS DEVELOPMENT, AS WELL AS EXECUTIVES WHO

02:51PM 21    WERE FROM A HEALTH CARE BACKGROUND.

02:51PM 22    Q.   AND THE FIRST NAME WE SEE IS GREG WASSON.  WAS HE THE CEO

02:51PM 23    AT THE TIME?

02:51PM 24    A.   YES, HE WAS.

02:51PM 25    Q.   IN THE EMAIL YOU WRITE, "AS YOU KNOW, PROVIDING DIAGNOSTIC

02:51PM 1    SERVICES IN THE STORES, RETAIL CLINICS, WORK SITE HEALTH

02:51PM 2    CENTERS, HOME CARE, ET CETERA, IS IN OUR STRATEGIC DOCUMENT AND

02:51PM 3    HAS BEEN PART OF OUR BOARD DISCUSSIONS."

02:51PM 4        WHAT DID YOU MEAN BY THAT, IN OUR STRATEGIC DOCUMENT AND

02:51PM 5    HAS BEEN PART OF OUR BOARD DISCUSSIONS?

02:52PM 6    A.   WELL, LIKE ANY COMPANY, WALGREENS HAS A STRATEGY OF BOTH

02:52PM 7    OVERARCHING THEMES, AS WELL AS SPECIFIC INITIATIVES, AND WE

02:52PM 8    WERE WORKING TO KEEP MOVING AGAIN INTO ADDITIONAL SPACES IN

02:52PM 9    HEALTH CARE THAT WE THOUGHT MADE SENSE FOR THE COMPANY.

02:52PM 10       AGAIN, ONE OF THE ONES MOST PEOPLE WOULD BE FAMILIAR WITH

02:52PM 11   WOULD BE VACCINATIONS, BUT THAT MOVING INTO THE LAB SPACE AND

02:52PM 12   PROVIDING MORE ACCESSIBLE LAB FOR PATIENTS WAS ANOTHER VERY

02:52PM 13   INTERESTING OPPORTUNITY.

02:52PM 14   Q.   A SENTENCE DOWN, OR TWO SENTENCES DOWN, YOU WRITE, "ON

02:52PM 15   FRIDAY NEXT WEEK WE HAVE ASKED A COMPANY, THERANOS, WHO HAS A

02:52PM 16   NEW TECHNOLOGY (AND WE BELIEVE TO POTENTIALLY BE THE LEADER IN

02:52PM 17   THE SPACE) TO PRESENT TO OUR SENIOR TEAM."

02:52PM 18       IS THAT TRUE, DID YOU ASK THERANOS TO COME AND PRESENT?

02:52PM 19   A.   YES.

02:52PM 20   Q.   AND THEN YOU WRITE, "THE REASONS WHY WE ARE SO ENCOURAGED

02:52PM 21   ARE," AND THEN I'D LIKE TO GO THROUGH SOME OF THESE REASONS

02:52PM 22   WITH YOU.

02:52PM 23       BUT FIRST, WHERE DID YOU GET THE INFORMATION THAT YOU

02:52PM 24   WROTE IN THIS LIST?  WHERE DID THAT COME FROM?

02:53PM 25   A.   THIS LIST WAS A MIX OF THE PRESENTATION THAT I SAW, AS

02:53PM 1    WELL AS THE DISCUSSION, THE Q & A AND THE DIALOGUE THAT WE HAD

02:53PM 2    AT THE PRIOR MEETING.

02:53PM 3    Q.   SO THE PRESENTATION THAT WE LOOKED AT, THE POWERPOINT

02:53PM 4    SLIDES?

02:53PM 5    A.   CORRECT.

02:53PM 6    Q.   AND THEN THE QUESTIONS AND ANSWERS THAT YOU RECEIVED WHEN

02:53PM 7    YOU WERE AT HEADQUARTERS FOR THERANOS?

02:53PM 8    A.   CORRECT, JUST MY PERSONAL NOTES THAT I WOULD HAVE TAKEN

02:53PM 9    FROM THE MEETING.

02:53PM 10   Q.   NUMBER 1 IS "50 TO 70 PERCENT CHEAPER THAN TESTS DONE AT

02:53PM 11   NORMAL LABS WHILE ALLOWING US TO EARN A ROBUST GROSS/NET

02:53PM 12   PROFIT.

02:53PM 13       "A.   DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE

02:53PM 14   OF A CLINICAL LAB, NO COURIERS, NO EXPENSIVE TESTING EQUIPMENT,

02:53PM 15   NO TEAMS OF TRAINED LAB TECHS, NO BIG BUILDINGS, PHARM TECH

02:53PM 16   LEVEL PERSON CAN RUN DEVICE?"

02:53PM 17       SO HELP ME TO UNDERSTAND WHAT YOU MEANT WHEN YOU WROTE

02:53PM 18   "DISRUPTIVE TECHNOLOGY THAT CUTS ENTIRE INFRASTRUCTURE OF A

02:54PM 19   CLINICAL LAB."

02:54PM 20   A.   I THINK THIS REALLY GOES TO PART OF THE VALUE PROPOSITION

02:54PM 21   OF, YOU KNOW, 50 TO 70 PERCENT LESS EXPENSIVE.

02:54PM 22       AGAIN, WHEN YOU THINK OF CONVENTIONAL LABS WHERE YOU HAVE

02:54PM 23   VERY EXPENSIVE MACHINES, WHERE YOU HAVE, AGAIN, REAL ESTATE TO

02:54PM 24   HOUSE THAT, WHERE YOU MIGHT HAVE RELATIONSHIPS WITH OFFICE

02:54PM 25   SPACE AND INDUSTRIAL PARKS TO COLLECT SAMPLES, WHERE YOU HAVE

02:54PM  1    COURIERS THAT HAVE TO, YOU KNOW, COURIER YOUR SAMPLES, YOU CAN

02:54PM  2    ARGUE THERE'S A LOT OF ROOM FOR EFFICIENCY AND OPPORTUNITY, AND

02:54PM  3    WE BELIEVED AT SCALE, AS I DO BELIEVE THAT SUNNY AND ELIZABETH

02:54PM  4    DID, THAT THERE WAS AN TREMENDOUS OPPORTUNITY TO REDUCE THAT

02:54PM  5    WASTE AND TO GIVE VALUE TO CUSTOMERS.

02:54PM  6    Q.   YOU THEN WROTE, "NO COURIERS."  DID YOU UNDERSTAND THAT

02:54PM  7    BLOOD TESTING THROUGH THERANOS WOULD NOT REQUIRE COURIERS TO

02:54PM  8    TRANSPORT BLOOD?

02:54PM  9    A.   CORRECT.  AND, AGAIN, I THINK TO THE EXTENT THAT YOU HAVE

02:54PM 10    AN EDISON IN FRONT OF YOU, THAT'S CORRECT.

02:55PM 11         AGAIN, TO THE EXTENT THAT YOU'RE GOING TO TAKE BLOOD

02:55PM 12    SAMPLES AND THEN SEND THEM TO AN EDISON, YOU'D HAVE SOME

02:55PM 13    COURIER PROCESS.

02:55PM 14    Q.   SURE.  AND THEN YOU WRITE "NO EXPENSIVE TESTING

02:55PM 15    EQUIPMENT."

02:55PM 16         WHAT DID YOU MEAN BY THAT?

02:55PM 17    A.   AGAIN, IT MIGHT BE SOMEWHAT ILLUSTRATIVE, BUT MY

02:55PM 18    UNDERSTANDING IS THAT CONVENTIONAL LAB WILL HAVE VERY EXPENSIVE

02:55PM 19    MACHINES, VERY LARGE MACHINES THAT HAVEN'T CHANGED MUCH IN MANY

02:55PM 20    YEARS, HUNDREDS OF THOUSANDS OF DOLLARS, IF NOT MILLIONS, AND

02:55PM 21    THAT YOU NEED SEVERAL OF THOSE TO BE ABLE TO DO A BROAD MENU OF

02:55PM 22    TESTS.

02:55PM 23         SO BEING ABLE, AGAIN, TO MOVE IT FROM MORE OF THAT

02:55PM 24    MAINFRAME TO A LAPTOP TO WHERE YOU'RE CREATING LOTS OF EDISONS

02:55PM 25    THAT ARE MORE CLOSER TO THE CUSTOMER VERSUS, AGAIN, INVESTING

```
02:55PM   1    IN THOSE VERY EXPENSIVE TRADITIONAL LAB TESTING MACHINES.
02:55PM   2    Q.   SO IN YOUR MIND, WAS ONE OF THE BENEFITS TO THERANOS THAT
02:55PM   3    THEY DID NOT USE THIS EXPENSIVE TRADITIONAL LAB TESTING
02:56PM   4    EQUIPMENT?
02:56PM   5    A.   CORRECT.
02:56PM   6    Q.   AND IF, IN FACT, THERANOS DID USE THIS EXPENSIVE
02:56PM   7    TRADITIONAL LAB TESTING EQUIPMENT, YOU WOULD LOSE THAT BENEFIT
02:56PM   8    THAT YOU JUST DESCRIBED TO US?
02:56PM   9    A.   CORRECT.
02:56PM  10    Q.   YOU WROTE, "NO TEAMS OF TRAINED LAB TECHS, NO BIG
02:56PM  11    BUILDINGS, AND THAT THE PHARM TECH LEVEL PERSON CAN RUN THE
02:56PM  12    DEVICE."
02:56PM  13         WHAT DID YOU MEAN BY THAT?
02:56PM  14    A.   AGAIN, IT'S -- IF YOU LOOK AT HOW A LAB IS DONE TODAY,
02:56PM  15    IT'S -- SOME OF THE LARGE LAB PLAYERS, THEY'RE NOT ONLY
02:56PM  16    INVESTING IN INFRASTRUCTURE OF LAB MACHINES, THEY'RE ALSO
02:56PM  17    INVESTING IN INFRASTRUCTURE OF COLLECTION POINTS.  AGAIN, IT
02:56PM  18    MIGHT BE AN OFFICE BUILDING, REAL ESTATE.  IT MIGHT BE IN AN
02:56PM  19    INDUSTRIAL PARK.
02:56PM  20         AND, AGAIN, WITH THE SINGLE BLOOD DROP AND THE NANOTAINER
02:56PM  21    BEING ABLE TO DO THAT AT THE POINT OF CARE, AND PERHAPS WITH
02:56PM  22    SOMEBODY WHO IS NOT A PHLEBOTOMIST WAS ALSO A BENEFIT.
02:56PM  23    Q.   AND DID YOU UNDERSTAND THAT WHEN USING THE EDISON DEVICE,
02:56PM  24    YOU DID NOT NEED A PHLEBOTOMIST TO DRAW BLOOD?
02:57PM  25    A.   CORRECT.
```

02:57PM 1   Q.   AND WHAT WAS A PHARMA TECH LEVEL PERSON?

02:57PM 2   A.   A PHARMA TECH WOULD BE SOMEBODY WHO IS NOT A PHARMACIST,

02:57PM 3   BUT WHO HAS HAD A FAIR AMOUNT OF TRAINING IN PHARMACY AND TO

02:57PM 4   BECOME A CERTIFIED TECHNICIAN.

02:57PM 5   Q.   BUT NOT A PHLEBOTOMIST?

02:57PM 6   A.   BUT NOT A PHLEBOTOMIST.

02:57PM 7   Q.   SO IF, IN FACT, THERANOS DREW BLOOD THROUGH A VEIN THAT

02:57PM 8   REQUIRED A PHLEBOTOMIST, YOU WOULD LOSE THAT ADVANTAGE; IS THAT

02:57PM 9   RIGHT?

02:57PM 10  A.   THAT WOULD BE TRUE.

02:57PM 11  Q.   IN NUMBER 2 YOU WRITE, "96 PERCENT OF TESTS DONE AT BIG

02:57PM 12  LABS ($52 BILLION MARKET) WILL BE ABLE TO BE DONE ON THESE

02:57PM 13  DEVICES."

02:57PM 14       WHAT DID YOU MEAN BY THAT?

02:57PM 15  A.   AGAIN, THAT WAS MY UNDERSTANDING OF THE PERCENT OF TESTS

02:57PM 16  THAT COULD BE DONE VIA WHETHER BLOOD, SALIVA, URINE, VIA THAT

02:57PM 17  IMMUNOASSAY TECHNOLOGY OF HAVING AN ANTIGEN REACT AND HAVING A,

02:58PM 18  YOU KNOW, A PROTEIN MARKER AND AN OPTIC READER BE ABLE TO

02:58PM 19  DECIDE.  SO IT WAS AN AMOUNT OF TESTING IN THEORY TO BE DONE ON

02:58PM 20  AN EDISON PLATFORM.

02:58PM 21  Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

02:58PM 22  A.   THAT WAS WITH MY DISCUSSION WITH SUNNY AND ELIZABETH.

02:58PM 23  Q.   NUMBER 3, YOU WRITE, "CONSUMER BENEFITS, A IS FINGERSTICK

02:58PM 24  VERSUS BLOOD DRAW."

02:58PM 25       WHAT DID YOU MEAN BY THAT?

02:58PM 1    A.   WELL, THERE'S A LOT OF BENEFITS FOR ONE DROP OF BLOOD

02:58PM 2    VERSUS PHLEBOTOMY FOR A LOT OF PEOPLE.  SOME PEOPLE DON'T LIKE

02:58PM 3    BLOOD, BUT THERE ARE PEOPLE WHO HAVE CHILDREN WITH SMALL VEINS

02:58PM 4    AND THERE ARE PEOPLE WITH SMALL VEINS, AND THERE MIGHT BE

02:58PM 5    PEOPLE WHO HAVE CANCER TREATMENT OR WHERE THEY HAVE HAD A LOT

02:58PM 6    OF VENA PUNCTURE DONE.

02:58PM 7         AND SO THERE'S A LOT OF LEGITIMATE REASONS FOR LESS BLOOD

02:58PM 8    TO BE VIABLE OR BETTER.

02:58PM 9    Q.   OKAY.  AND FROM YOUR DISCUSSIONS WITH MS. HOLMES, DID YOU

02:58PM 10   UNDERSTAND THAT THE THERANOS TECHNOLOGY TESTED BLOOD DRAWN FROM

02:59PM 11   A FINGERSTICK?

02:59PM 12   A.   YES.

02:59PM 13   Q.   B IS "RESULTS IN 30 MINUTES INSTEAD OF TOMORROW."

02:59PM 14        WHAT WERE YOU COMMUNICATING THERE?

02:59PM 15   A.   MY UNDERSTANDING WAS THAT ONCE YOU DREW THE BLOOD AND PUT

02:59PM 16   THE BLOOD IN THE MACHINE AND THE CARTRIDGE IN THE MACHINE, THAT

02:59PM 17   IT WOULD TAKE ABOUT 15 OR 20 MINUTES FOR THE EDISON MACHINE TO

02:59PM 18   BE ABLE TO INTERPRET THE RESULTS AND THEN THOSE RESULTS WOULD,

02:59PM 19   AGAIN, GET FED INTO THE CLOUD SOMEWHERE FOR A PATHOLOGIST OR AN

02:59PM 20   ALGORITHM OR WHATEVER TO BE ABLE TO DECIPHER THE FINAL OUTCOME.

02:59PM 21   Q.   AND DID YOU UNDERSTAND THAT THAT WAS FASTER THAN

02:59PM 22   TRADITIONAL TESTING?  YOU WROTE "INSTEAD OF TOMORROW"?

02:59PM 23   A.   YES.  IF YOU HAVE GO INTO AN INDUSTRIAL PARK AND THEY TAKE

02:59PM 24   A VIAL OF YOUR BLOOD, YOU'RE GOING TO HAVE TO, YOU KNOW, WAIT

02:59PM 25   FOR THAT VIAL TO BE SHIPPED TO A CONVENTIONAL LAB AND WAIT FOR

03:00PM  1    THAT TO BE RUN ON A TEST IN A CONVENTIONAL LAB, AND SO

03:00PM  2    EFFECTIVELY YOU'RE CUTTING OUT A LOT OF THAT TIME.

03:00PM  3    Q.   WAS THIS ASPECT OF SPEED IMPORTANT TO WALGREENS?

03:00PM  4    A.   I THINK BEING ABLE TO GIVE DOCTORS AND THEIR PATIENTS THE

03:00PM  5    DIAGNOSTIC RESULTS FASTER IS ALWAYS BETTER ON AN APPLES TO

03:00PM  6    APPLES BASIS.

03:00PM  7    Q.   AND IF IN FACT THERANOS WAS TESTING BLOOD ON CONVENTIONAL

03:00PM  8    DEVICES THAT TOOK THE LONGER TURNAROUND TIME, WOULD YOU LOSE

03:00PM  9    THE ADVANTAGE THAT YOU JUST DESCRIBED?

03:00PM  10   A.   YOU WOULD LOSE THE ADVANTAGE.

03:00PM  11   Q.   NUMBER 4 YOU WRITE, "7 YEARS IN DEVELOPMENT LED BY FUNDING

03:00PM  12   OF SILICON VALLEY EXPERTS SUCH AS LARRY ELLISON WITH STRONG

03:00PM  13   EXPERIENCED MANAGEMENT TEAM (VERY WELL FUNDED COMPANY)."

03:00PM  14        WHAT DID YOU MEAN BY THAT?

03:00PM  15   A.   JUST WHAT IT SAYS, WHICH IS OUR UNDERSTANDING IS THAT THEY

03:00PM  16   HAD HAD MR. ELLISON AND PERHAPS SOME VERY OTHER INFLUENTIAL

03:00PM  17   OTHER PEOPLE INVEST, AND I THINK THAT'S ALWAYS A GOOD SIGN WHEN

03:01PM  18   YOU HAVE PEOPLE WHO ARE IN THIS COMMUNITY OF TECHNOLOGY AND

03:01PM  19   WANT TO INVEST THEIR OWN MONEY, IT SPEAKS HIGHLY FOR THAT

03:01PM  20   COMPANY.

03:01PM  21   Q.   AND HOW ABOUT THAT THE COMPANY HAD BEEN AROUND FOR

03:01PM  22   SEVEN YEARS AT THAT TIME, DID THAT MATTER TO YOU?

03:01PM  23   A.   I DON'T KNOW IF THAT MATTERED.  IT SEEMED LIKE THEY HAD

03:01PM  24   ACCOMPLISHED A LOT IN THAT PERIOD, BUT I GUESS THE FACT THAT IT

03:01PM  25   HADN'T JUST STARTED THE DAY BEFORE IS PROBABLY IMPORTANT TO

03:01PM  1    GIVE SOME LEGITIMACY.

03:01PM  2    Q.   YOU SAY IT SEEMED LIKE THEY HAD ACCOMPLISHED A LOT DURING

03:01PM  3    THAT PERIOD OF TIME.

03:01PM  4         WHERE DID YOU GET THAT IMPRESSION?

03:01PM  5    A.   WELL, I MEAN, I WOULD SAY IF AFTER SEVEN YEARS YOU'RE

03:01PM  6    DOING CLINICAL WORK WITH 10 OF THE TOP 15 PHARMA COMPANIES,

03:01PM  7    THAT'S PRETTY IMPRESSIVE.

03:01PM  8    Q.   AND DID MS. HOLMES TELL YOU THAT?

03:01PM  9    A.   MS. HOLMES AND MR. BALWANI, YEAH.

03:01PM  10   Q.   THE LAST ITEM ON THIS PAGE IS NUMBER 1 AND IT READS, "DOES

03:01PM  11   NOT EVEN VALUE NEW TESTS SUCH AS BREAST CANCER AND PROSTATE

03:01PM  12   CANCER TESTS THEY ARE DEVELOPING."

03:02PM  13        WHAT DID YOU MEAN BY THAT?

03:02PM  14   A.   THIS WAS MORE OF THE KIND OF FUTURISTIC THINGS THAT THEY

03:02PM  15   WERE WORKING ON.  I THINK WE CALLED IT, YOU KNOW, VERSION 3.

03:02PM  16   SO IT WASN'T ANYTHING THAT THEY HAD -- SO THEY HAD ALREADY

03:02PM  17   DONE.  IT WAS MORE, AGAIN, WHEN YOU -- YOU KNOW, IF I JUST

03:02PM  18   PARSE, YOU KNOW, IF YOU THINK ABOUT A PSA TEST, GETTING A PSA

03:02PM  19   TEST FREQUENTLY AND HAVING IT VERY ACCURATE IS A BENEFIT.

03:02PM  20        IF YOU HAVE A PSA TEST DONE INFREQUENTLY AND IT'S DONE ON

03:02PM  21   TWO DIFFERENT MACHINES, THEY COULD BE CALIBRATED DIFFERENTLY

03:02PM  22   AND THE RESULT MAY NOT BE MEANINGFUL.

03:02PM  23        ON THE BREAST CANCER SIDE, THEY WERE LOOKING AT I THINK A

03:02PM  24   FEW SPECIFIC CANCERS WHERE THERE HAD BEEN NO BIOMARKER THAT HAD

03:02PM  25   BEEN EVER DISCOVERED, AND MAYBE THERE WON'T BE, BUT BY BEING

03:02PM 1    ABLE TO TEST FREQUENTLY AND ACCURATELY ACROSS MANY DIFFERENT

03:02PM 2    FACETS AND THEN RUNNING ALGORITHMS, YOU MIGHT SEE SEVERAL

03:03PM 3    MARKERS CHANGE WHICH WOULD BE PERHAPS AN INDICATION OF

03:03PM 4    PREDICTIVENESS OF FUTURE BREAST CANCER.

03:03PM 5    Q.   AND YOU WROTE "DOES NOT EVEN VALUE NEW TESTS."

03:03PM 6         WHAT DOES THAT MEAN?  DID YOU UNDERSTAND THAT NEW TESTS

03:03PM 7    WERE COMING IN THE FUTURE AS OPPOSED TO CURRENT CAPABILITIES?

03:03PM 8    A.   RIGHT.  THOSE FUTURE BASED TESTS, THOSE VERSION 3 I WOULD

03:03PM 9    SAY, AGAIN, I THINK THOSE WERE ALWAYS PRESENTED AS A

03:03PM 10   POSSIBILITY DOWN THE ROAD.  SO THAT WASN'T THE BASIS FOR OUR

03:03PM 11   PARTNERSHIP.

03:03PM 12        THE OTHER COMPONENT OF THIS IS JUST WHEN YOU LOOK AT THE

03:03PM 13   LAB SPACES, YOU KNOW, 50-, $60 BILLION OF LAB SALES AT THE TIME

03:03PM 14   I BELIEVE WAS ABOUT A BILLION TESTS DONE AT ABOUT $60 ON

03:03PM 15   AVERAGE, ALTHOUGH IT VARIES.

03:03PM 16        THERE WAS A BELIEF THAT IF YOU COULD DO THIS TYPE OF

03:03PM 17   TESTING WITH A DROP OF BLOOD ACCURATELY, YOU KNOW, CLOSER TO

03:03PM 18   THE CUSTOMER, THAT YOU WOULD ACTUALLY SEE A LOT MORE TESTING

03:03PM 19   INCUR.

03:03PM 20             MR. SCHENK:  THANK YOU, YOUR HONOR.

03:04PM 21        YOUR HONOR, I WAS GOING TO MOVE TO ANOTHER DOCUMENT.  I'M

03:04PM 22   CONSCIOUS OF THE TIME.

03:04PM 23             THE COURT:  THANK YOU.  LET'S TAKE OUR EVENING BREAK

03:04PM 24   NOW, SIR.  WE'LL BEGIN TOMORROW AT 9:00 O'CLOCK.  WE'LL BEGIN

03:04PM 25   AT 9:00 O'CLOCK, PLEASE.

03:04PM  1          LADIES AND GENTLEMEN, WE'LL TAKE OUR EVENING BREAK.  I

03:04PM  2     KNOW SOME OF YOU ARE GOING TO STAY AND SPEAK WITH ME, BUT LET

03:04PM  3     ME TELL ALL OF YOU, PLEASE, AGAIN, I'D LIKE TO ADMONISH YOU

03:04PM  4     THAT YOU DO NOT DO ANY INVESTIGATION ON YOUR OWN ABOUT ANYTHING

03:04PM  5     ABOUT THIS CASE OR ANYONE INVOLVED IN IT.

03:04PM  6          PLEASE AVOID ANY MEDIA, SOCIAL MEDIA, NEWS, NEWSPAPERS,

03:04PM  7     PERIODICALS, OR ANY OTHER NEWS ABOUT THIS CASE.

03:04PM  8          SHOULD YOU COME ACROSS THAT INADVERTENTLY, I'M GOING TO

03:04PM  9     ASK YOU TO PLEASE TURN IT OFF, CLOSE THE BOOK, TURN DOWN THE

03:04PM 10     VOLUME, AND I'LL ASK YOU TOMORROW MORNING AGAIN WHETHER OR NOT

03:04PM 11     THIS HAS HAPPENED TO ANYONE.

03:04PM 12          PLEASE HAVE A GOOD EVENING.

03:04PM 13          TOMORROW WE'LL BEGIN AT 9:00 A.M.

03:04PM 14          THOSE WHO ARE GOING TO REMAIN, MS. KRATZMANN WILL TAKE YOU

03:04PM 15     BACK TO THE JURY ROOM AND I'LL CALL YOU IN ONE AT A TIME FOR

03:04PM 16     OUR CONVERSATION.

03:04PM 17          THANK YOU VERY MUCH.

03:04PM 18          ANYTHING FURTHER BEFORE WE RECESS?

03:05PM 19               MR. SCHENK:  NO.  THANK YOU.

03:05PM 20               MR. DOWNEY:  NOTHING FURTHER.

03:05PM 21          THE COURT:  ALL RIGHT.  THANK YOU.

03:05PM 22     THANK YOU, SIR.  YOU MAY STAND DOWN.  THANK YOU.

03:05PM 23     (JURY OUT AT 3:05 P.M.)

03:05PM 24          THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:05PM 25     COUNSEL, YOU'LL IDENTIFY ONE OF YOU WHO WILL COME BACK TO

03:05PM 1    CHAMBERS AND THEN JUST LET MS. KRATZMANN KNOW AND WE'LL LET YOU

03:05PM 2    KNOW WHEN WE HAVE THINGS SET UP.

03:05PM 3              MR. SCHENK:  THANK YOU.

03:06PM 4         (RECESS FROM 3:06 P.M. UNTIL 3:20 P.M.)

03:06PM 5         (SEALED PROCEEDINGS IN CHAMBERS.)

03:06PM 6    ///

03:06PM 7    ///

03:06PM 8

03:20PM 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7         WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
          CERTIFICATE NUMBER 8076
17

18        _____

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  OCTOBER 12, 2021

22

23

24

25