# EXHIBIT 14

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                       SAN JOSE DIVISION


    UNITED STATES OF AMERICA,       )   CR-18-00258-EJD
                                    )
                    PLAINTIFF,      )   SAN JOSE, CALIFORNIA
                                    )
          VS.                       )   VOLUME 19
                                    )
    ELIZABETH A. HOLMES,            )   OCTOBER 14, 2021
                                    )
                    DEFENDANT.      )   PAGES 3538 - 3757
    _____)


                 TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
                 UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:

    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113

                           BY:  ROBERT S. LEACH
                                KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612

         (APPEARANCES CONTINUED ON THE NEXT PAGE.)


    OFFICIAL COURT REPORTERS:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
                           LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595

         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S: (CONT'D)

 2

 3     FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                BY:  KEVIN M. DOWNEY
 4                                   LANCE A. WADE
                                     KATHERINE TREFZ
 5                                   PATRICK LOOBY
                                     RICHARD CLEARY
 6                                   ANDREW LEMENS
                                725 TWELFTH STREET, N.W.
 7                              WASHINGTON, D.C. 20005

 8                              LAW OFFICE OF JOHN D. CLINE
                                BY:  JOHN D. CLINE
 9                              ONE EMBARCADERO CENTER, SUITE 500
                                SAN FRANCISCO, CALIFORNIA 94111
10

11     ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                BY:  ADELAIDA HERNANDEZ
12
                                OFFICE OF THE U.S. ATTORNEY
13                              BY:  LAKISHA HOLLIMAN, PARALEGAL
                                     MADDI WACHS, PARALEGAL
14
                                WILLIAMS & CONNOLLY
15                              BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                              TBC
                                BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**ROBERTO AMENTA**
DIRECT EXAM BY MR. BOSTIC (RES.)        P. 3561
CROSS-EXAM BY MS. TREFZ                 P. 3570


**NIMESH JHAVERI**
DIRECT EXAM BY MR. SCHENK               P. 3572
CROSS-EXAM BY MR. DOWNEY                P. 3639
REDIRECT EXAM BY MR. SCHENK             P. 3694
RECROSS-EXAM BY MR. DOWNEY              P. 3705

**SUNIL DHAWAN**
DIRECT EXAM BY MR. SCHENK               P. 3709
CROSS-EXAM BY MR. WADE                  P. 3745

```
 1                          INDEX OF EXHIBITS

 2
                                        IDENT.        EVIDENCE
 3          GOVERNMENT'S:

 4          5428                                      3568
            1711                                      3583
 5          1755                                      3601
            1884                                      3605
 6          1896                                      3610
            1909                                      3615
 7          1906, PROVISIONALLY ADMITTED              3617
            1906, FULLY ADMITTED                      3618
 8          2214                                      3621
            2275                                      3623
 9          5387C                                     3627
            3755                                      3651
10          1673                                      3664
            2394                                      3673
11          2219                                      3713
            2248                                      3716
12          2663                                      3723
            2760                                      3725
13          2772                                      3727
            3041                                      3732
14          2791                                      3733
            2548                                      3739
15          2972                                      3741
            3217, PAGE 1                              3742
16          2553                                      3753

17
            DEFENDANT'S:
18
            7454                                      3690
19          7471                                      3691
            13961                                     3750
20          10531                                     3754

21

22

23

24

25
```

```
 1        SAN JOSE, CALIFORNIA                OCTOBER 14, 2021
 2                      P R O C E E D I N G S
 3            (COURT CONVENED AT 8:35 A.M.)
 4            (JURY OUT AT 8:35 A.M.)
 5                THE COURT:  THANK YOU FOR YOUR COURTESY.  WE'RE ON
 6        THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT AND
 7        MS. HOLMES IS PRESENT.
 8            WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.
 9            AND I THINK COUNSEL WANTED TO TALK ABOUT A FILING, A
10        DEFENSE FILING LAST NIGHT I THINK IT WAS, IT'S DOCUMENT 1086.
11            YES, MR. LOOBY, YOU'RE RISING TO SPEAK TO THIS?
12                MR. LOOBY:  I AM, YOUR HONOR.
13                THE COURT:  FIRST, LET'S GET A THRESHOLD QUESTION
14        ANSWERED.
15            IS THE GOVERNMENT INTENDING TO DO SOMETHING WITH
16        EXHIBIT 3217?
17                MR. SCHENK:  GOOD MORNING, YOUR HONOR.
18            YES, WE ARE.  THE EXHIBIT, IF THE COURT HAS A COPY IN
19        FRONT OF IT, HAS SORT OF TWO PARTS TO IT.  THE FIRST IS AN
20        EMAIL SENT FROM HEATHER KING TO DR. DHAWAN ATTACHING THE
21        DOCUMENT AND IT HAS SOME TEXT IN THE SUBJECT LINE, AND THEN THE
22        FOLLOWING PAGES ARE THE DOCUMENT FROM CMS.
23                THE COURT:  OKAY.  I THINK I HAVE IT -- I'M SORRY,
24        GO AHEAD.
25                MR. SCHENK:  IT IS THE GOVERNMENT'S INTENTION TO
```

08:36AM 1     ADMIT BOTH THE EMAIL AND THE ATTACHMENT AND TODAY TO ASK

08:36AM 2     DR. DHAWAN, OR WHEN DR. DHAWAN TESTIFIES, TO ASK DR. DHAWAN IF

08:36AM 3     MS. KING SENT HIM THE ATTACHMENT, IF THAT WAS THE FIRST TIME

08:36AM 4     THAT HE HAD HEARD ABOUT CMS'S FINDINGS, IF HE REVIEWED THE

08:37AM 5     INFORMATION IN IT, AND TO ASK THE COURT TO PROVISIONALLY ADMIT

08:37AM 6     THE ATTACHMENT TODAY.

08:37AM 7          I DO NOT INTEND TO PUBLISH THE ATTACHMENT WITH DR. DHAWAN.

08:37AM 8     IT CONTAINS SOME FINDINGS OF CMS, INCLUDING COMMENTS REGARDING

08:37AM 9     THE PRACTICE OF VOIDING TESTS AT THERANOS.

08:37AM 10          YOUR HONOR RULED AT THE MOTION IN LIMINE STAGE SORT OF TWO

08:37AM 11     THINGS THAT ARE RELEVANT FOR THIS DISCUSSION.  FIRST, THAT THE

08:37AM 12     CMS FINDINGS ARE RELEVANT, BUT THAT THE PRACTICE OF VOIDING

08:37AM 13     TESTS REQUIRED SOME FOUNDATION BEFORE THE GOVERNMENT COULD

08:37AM 14     ADMIT IT, THE QUESTION OF VOLUNTARINESS AND ALSO THE RELEVANCE

08:37AM 15     OF THAT TIMEFRAME WHEN THE TESTS WERE VOIDED.

08:37AM 16          DR. DHAWAN IS NOT THE WITNESS TO LAY THAT FOUNDATION.

08:37AM 17     THAT'S WHY I DON'T INTEND TO PUBLISH THE UNDERLYING CONTENT OF

08:37AM 18     THE CMS REPORT AT THIS POINT.

08:37AM 19          BUT I DON'T THINK THAT IT'S EXCLUDABLE.  I THINK IT IS

08:37AM 20     PROPERLY ADMITTED EVIDENCE UNDER THE COURT'S RULING, AND I CAN

08:37AM 21     PROVIDE SOME ADDITIONAL ARGUMENTS ON THAT, BUT I DON'T WANT TO

08:38AM 22     HIJACK THE CONVERSATION IF THE COURT NOW WANTS TO TURN TO THE

08:38AM 23     DEFENSE.

08:38AM 24          THE COURT:  RIGHT.  THANK YOU.  I JUST WANTED TO

08:38AM 25     DETERMINE WHETHER OR NOT YOU WERE SEEKING TO ADMIT IT, THE

08:38AM  1    PURPOSE FOR ADMISSION.

08:38AM  2         LET ME ASK ALSO, IS IT ANTICIPATED THIS WITNESS WILL

08:38AM  3    TESTIFY TODAY?

08:38AM  4              MR. SCHENK:  YES, YOUR HONOR.

08:38AM  5         I BELIEVE THAT WE WILL FINISH MR. JHAVERI TODAY, AND THE

08:38AM  6    COURT SUGGESTED WE WILL GO UNTIL 3:00 TODAY.

08:38AM  7              THE COURT:  CORRECT.

08:38AM  8              MR. SCHENK:  AND I ANTICIPATE THERE WILL BE TIME

08:38AM  9    AFTER MR. JHAVERI FOR DR. DHAWAN TO TAKE THE STAND AND MAYBE

08:38AM 10    BEGIN OR FINISH THE DIRECT DEPENDING ON WHEN WE START.

08:38AM 11         I ALSO HAD A THOUGHT I WANTED TO SHARE ON THE 1:30

08:38AM 12    APPEARANCE BEFORE JUDGE COUSINS, BUT WE CAN TURN TO THAT AFTER.

08:38AM 13              THE COURT:  WELL, WHY DON'T WE TALK ABOUT THAT NOW,

08:38AM 14    RIGHT, IF YOU DON'T MIND?

08:38AM 15         I SAID I WOULD BREAK TO ALLOW COUNSEL TO PARTICIPATE IN

08:38AM 16    THAT.

08:38AM 17         WHAT ARE YOUR THOUGHTS?

08:38AM 18              MR. SCHENK:  WE TALKED ABOUT IT, AND I THINK FROM

08:39AM 19    THE GOVERNMENT'S PERSPECTIVE, IF THE COURT ALLOWED SOME PEOPLE,

08:39AM 20    MS. VOLKAR AND MR. BOSTIC, TO ATTEND THAT HEARING REMOTELY, BUT

08:39AM 21    TO LEAVE THE COURTROOM FOR IT.

08:39AM 22         AND I UNDERSTAND THAT MR. CLINE ALSO INTENDS TO LEAVE THE

08:39AM 23    COURTROOM FOR IT.

08:39AM 24         BUT TO CONTINUE THE TESTIMONY HERE IN TRIAL.  WE HAVE THE

08:39AM 25    JURY AND WE HAVE TRANSCRIPT TIME AVAILABLE.

08:39AM 1   I THINK, THOUGH, IT WOULD BE THE GOVERNMENT'S REQUEST THAT

08:39AM 2   MAYBE THE COURT SAY TO THE JURY THAT THERE'S ANOTHER HEARING

08:39AM 3   GOING ON OR SOMETHING LIKE THAT SO THE JURY DOESN'T WONDER WHY

08:39AM 4   THERE ARE COUNSEL WHO HAVE BEEN PRESENT EVERY DAY WHO ARE NOW

08:39AM 5   ABSENT.

08:39AM 6       BUT I THINK THAT WOULD BE THE WAY TO MAXIMIZE OUR TIME.

08:39AM 7       MR. CLINE:  WE'RE FINE WITH THAT.

08:39AM 8       THE COURT:  THANK YOU.

08:39AM 9   MR. CLINE?

08:39AM 10      MR. CLINE:  WE'RE FINE WITH THAT APPROACH.  I'LL

08:39AM 11  STEP OUT AT THE APPROPRIATE TIME, AND IF THE COURT WANTS TO

08:39AM 12  TELL THE JURY WHAT IS GOING ON, THAT'S FINE.

08:39AM 13      THE COURT:  AND THAT'S A 1:30 HEARING?

08:40AM 14      MR. SCHENK:  YES, YOUR HONOR.

08:40AM 15      THE COURT:  OKAY.  I DON'T KNOW WHERE THAT COMPORTS

08:40AM 16  WITH OUR SCHEDULE AND BREAKS AS WELL, AND WE'LL SEE WHERE THAT

08:40AM 17  MEASURES.

08:40AM 18      MR. CLINE:  BUT THE HEARING INVOLVES TWO MOTIONS AND

08:40AM 19  IT MAY TAKE A WHILE, SO IF THE COURT WERE TO BREAK FOR THAT, I

08:40AM 20  THINK IT WOULD SERIOUSLY INTERRUPT THE PROCEEDINGS.

08:40AM 21      WE'RE FINE WITH MR. SCHENK'S PROPOSAL.

08:40AM 22      THE COURT:  OKAY.  ALL RIGHT.

08:40AM 23      I WAS TALKING ABOUT THE NATURAL BREAK WHEN YOU LEAVE THE

08:40AM 24  COURTROOM, BUT WE'LL SEE HOW THAT PANS OUT.

08:40AM 25      ALL RIGHT.  THANK YOU FOR THE HEADS UP ON THAT.  THANK

08:40AM 1    YOU.

08:40AM 2         OKAY.  WITH THAT FOUNDATION, DO YOU CONCEDE THE MOTION?

08:40AM 3              MR. LOOBY:  NO, YOUR HONOR.

08:40AM 4    IT SOUNDS LIKE THE GOVERNMENT DOESN'T REALLY NEED TO MOVE

08:40AM 5    THE ADMISSION OF THIS EXHIBIT WITH THIS WITNESS IF THEY'RE NOT

08:40AM 6    INTENDING TO PUBLISH IT OR ASK HIM KIND OF QUESTIONS ABOUT THE

08:40AM 7    PARTICULARS IN IT.  SO THAT'S ONE OF THE REASONS WHY WE COULD

08:40AM 8    DEFER PERHAPS THE ADMISSIBILITY OF IT.

08:40AM 9         WE DISAGREE THAT IT'S ADMISSIBLE WHOLESALE.

08:40AM 10        AS WE EXPLAINED IN LAST NIGHT'S PLEADING, THERE'S A COUPLE

08:40AM 11   OF OBSTACLES TO THAT.  THERE'S THE HEARSAY ISSUES AND THEN THE

08:41AM 12   401, 403 BALANCING TEST, AND THEN THE THIRD ISSUE OF THE

08:41AM 13   VOIDING TESTS AS WELL THE GOVERNMENT HAS YET TO LAY A

08:41AM 14   FOUNDATION UNDER THE COURT'S IN LIMINE ORDER.

08:41AM 15             THE COURT:  SO -- THANK YOU.

08:41AM 16        SO, MR. SCHENK, IS IT YOUR INTENT THEN TO INTRODUCE THE

08:41AM 17   ENTIRETY OF THE DOCUMENT AND ALL OF ITS CONTENTS WITH SOME

08:41AM 18   REDACTIONS?

08:41AM 19             MR. SCHENK:  I INTEND TO OFFER IT AND ONLY PUBLISH

08:41AM 20   THE FIRST PAGE, TO NOT INSERT REDACTIONS ON THE CONTENT OF THE

08:41AM 21   LETTER.

08:41AM 22        THERE ARE SEVERAL REFERENCES TO VOIDED TESTS IN THERE, AND

08:41AM 23   I THINK THE BETTER PRACTICE WOULD BE FOR ME TO NOT PUBLISH IT,

08:41AM 24   NOT ASK ANY QUESTIONS ABOUT THE CONTENT OF THE LETTER TO

08:41AM 25   DR. DHAWAN, TO ASK HIM QUESTIONS ONLY ABOUT THE EMAIL THAT HAS

08:41AM 1    VERY LITTLE CONTENT IN IT, AND THEN TO SAVE THE QUESTION ABOUT

08:41AM 2    THE DOCUMENT COMING IN, EITHER THE ATTACHMENT -- THE ATTACHMENT

08:41AM 3    EITHER COMING IN WHOLESALE OR LATER WITH REDACTIONS, DEPENDING

08:42AM 4    ON HOW THE COURT INTERPRETS THE FOUNDATION THAT THE GOVERNMENT

08:42AM 5    LAYS IN THE FUTURE.

08:42AM 6            THE COURT:  WITH ANOTHER WITNESS?

08:42AM 7            MR. SCHENK:  WITH A DIFFERENT WITNESS.

08:42AM 8            THE COURT:  WITH A DIFFERENT WITNESS.  I SEE.

08:42AM 9            MR. LOOBY:  RIGHT.  I GUESS WITHOUT KNOWING WHAT

08:42AM 10   TYPE OF FOUNDATION THEY WOULD LAY WITH A DIFFERENT WITNESS,

08:42AM 11   IT'S HARD TO SAY WHETHER OR NOT THEY'RE OFFERING THIS FOR THE

08:42AM 12   TRUTH OF THE MATTER, WHICH I THINK, YOU KNOW, SOME OTHER

08:42AM 13   WITNESS COULD MAYBE SPEAK TO.  I MEAN, DR. DHAWAN PROBABLY

08:42AM 14   WOULDN'T.

08:42AM 15       BUT REGARDLESS OF THAT, I THINK IT POSES PRETTY BIG

08:42AM 16   HEARSAY ISSUES, AND I THINK COMPARING IT TO THE JANUARY 2016

08:42AM 17   REPORT IS INSTRUCTIVE ON THAT FRONT.  YOUR HONOR HAS HELD THAT

08:42AM 18   THAT REPORT IS ADMISSIBLE UNDER RULE 803(8)(A)(2) AS A MATTER

08:42AM 19   OBSERVED WHILE UNDER A DUTY TO REPORT.

08:42AM 20       THE LETTER IS NOT THAT.  THE LETTER IS THE CULMINATION OF

08:42AM 21   A ROUND OF COMMISSIONS AND CORRESPONDENCE BETWEEN CMS AND

08:42AM 22   THERANOS, AND IT'S A NOTICE OF IMPOSITION OF SANCTIONS, THE

08:43AM 23   FACT OF WHICH IS RELEVANT AND ADMISSIBLE UNDER THE COURT'S

08:43AM 24   ORDER.

08:43AM 25       BUT THE HEARSAY STATEMENT FROM CMS, HEARSAY STATEMENTS

08:43AM 1    FROM CMS WITNESS KAREN FULLER, WHO IS THE SIGNATORY OF THE

08:43AM 2    LETTER, I THINK ARE NOT COVERED BY THE COURT'S PRIOR ORDERS.

08:43AM 3         IT'S REALLY, I THINK, INSTRUCTIVE OR A USEFUL WAY TO THINK

08:43AM 4    ABOUT IT AS MORE OF AN ADJUDICATION OF THE AGENCY AND THE

08:43AM 5    STRUCTURE.

08:43AM 6              THE COURT:  IT SEEMS LIKE -- PARDON ME FOR

08:43AM 7    INTERRUPTING YOU.

08:43AM 8              MR. LOOBY:  YES.

08:43AM 9              THE COURT:  IT SEEMS THAT, AND I'LL POINT THIS OUT

08:43AM 10   AND RAISE IT, IT SOUNDS LIKE WE'RE GOING TO GET TO THE REAL

08:43AM 11   ISSUES OF ADMISSIONS AT SOME TIME LATER.

08:43AM 12             MR. LOOBY:  YEAH.

08:43AM 13             THE COURT:  AND SO IT WILL BE DEFERRED -- SO I GUESS

08:43AM 14   THE OVERARCHING QUESTION IS, DO WE EVEN NEED TO ADMIT IT TODAY

08:43AM 15   CONDITIONALLY AND CAN WE DEFER THAT WHOLE RULING UNTIL LATER?

08:43AM 16   AND IF IT'S PROVISIONALLY ADMITTED, BUT NOT PUBLISHED, AND

08:43AM 17   EVERYONE RESERVES THEIR RIGHTS TO CHALLENGE ANY PUBLICATION, WE

08:44AM 18   CAN DO IT THAT WAY AS WELL.

08:44AM 19        BUT I LOOK AT -- A COUPLE OF THINGS JUMP OUT AT ME WHEN I

08:44AM 20   LOOK AT THIS -- AND I'M LOOKING AT MR. SCHENK HERE -- IT DOES

08:44AM 21   SEEM THAT THERE'S A LOT OF THE USE OF THE WORD CREDIBLE, NOT

08:44AM 22   CREDIBLE, NOT CREDIBLE.

08:44AM 23        JUST FOR OUR FUTURE CONVERSATION, THAT SEEMS TO BE MORE OF

08:44AM 24   A SUMMATION, ANALYSIS OF AN OPINION AS OPPOSED TO JUST THE

08:44AM 25   FINDING.  SO THAT'S ONE OF THE CONCERNS I HAD, AND IT'S A 403

08:44AM  1    CONCERN I SUPPOSE, AND THERE'S CONSISTENT USE OF THAT

08:44AM  2    THROUGHOUT THE DOCUMENT.

08:44AM  3          AND I THINK THAT'S WHAT YOU'RE SPEAKING TO, ONE OF THE

08:44AM  4    THINGS YOU'RE SPEAKING TO.

08:44AM  5              MR. LOOBY:  YEAH.  IN PARTICULAR UNDER RULE 403, WE

08:44AM  6    THINK THAT POSES AN ACUTE RISK OF UNFAIR PREJUDICE.

08:44AM  7          OBVIOUSLY THE WORD "CREDIBILITY" IS PART OF THE ANALYSIS

08:44AM  8    THAT CMS DOES WHEN IT EVALUATES A COMPANY'S RESPONSE.

08:44AM  9          BUT IN THE CONTEXT OF A CRIMINAL TRIAL, REPEATED, YOU

08:45AM 10    KNOW, ADMONITIONS OR STATEMENTS THAT THE AGENCY FOUND THERANOS

08:45AM 11    NOT CREDIBLE COULD EASILY BE TAKEN OUT OF CONTEXT AND PREJUDICE

08:45AM 12    MS. HOLMES.

08:45AM 13          AND THEN I WILL ALSO ADD, YOUR HONOR, THAT THE -- AT LEAST

08:45AM 14    FOR KIND OF WHICH FINDINGS WITHIN THE CMS REPORT THE GOVERNMENT

08:45AM 15    INTENDS TO EVEN PUT AT ISSUE IN THE CASE, IT WAS IN --

08:45AM 16    YOUR HONOR'S PRETRIAL RULING HAD INSTRUCTED THE GOVERNMENT TO

08:45AM 17    PROVIDE THE DEFENSE WITH NOTICE OF WHICH DEFICIENCIES ARE IN OR

08:45AM 18    ARE OUT, AND WE CAN REVISIT THE ADMISSIBILITY OF THE CMS REPORT

08:45AM 19    ITSELF IN THAT CONTEXT, AND THEY HAVE NOT DONE SO.

08:45AM 20          AND THIS LETTER KIND OF GOES, YOU KNOW, FROM TOP TO BOTTOM

08:45AM 21    THROUGH A LOT OF DEFICIENCIES THAT MAY NOT BE RELEVANT AT ALL

08:45AM 22    IN THE CASE, AND SO THAT'S ANOTHER 403 CONCERN THAT WE HAVE,

08:45AM 23    INCLUDING THAT THEY RELATE TO TESTS NOT AT ISSUE IN THE

08:45AM 24    INDICTMENT, INCLUDING THAT THEY RELATE TO ISSUES THAT THE

08:45AM 25    GOVERNMENT HAS NOT EVEN PROFFERED ARE RELEVANT UNDER ITS THEORY

08:45AM 1    OF ADMISSIBILITY FOR THE CMS SANCTIONS AND FINDINGS TO BEGIN

08:46AM 2    WITH.

08:46AM 3        SO I THINK IT'S VERY PREMATURE TO ADMIT THIS CONDITIONALLY

08:46AM 4    AND WE SUBMIT THAT IT SHOULDN'T BE ADMITTED AND WE DON'T THINK

08:46AM 5    THAT THEY WILL BE ABLE TO LAY THE PROPER FOUNDATION FOR IT NOW

08:46AM 6    OR LATER GIVEN THE HEARSAY AND RULE 403 CONCERNS, BUT CERTAINLY

08:46AM 7    NOT TODAY WITH THIS WITNESS WHO IT SOUNDS LIKE IS NOT GOING TO

08:46AM 8    BE SPEAKING TO THE CONTENT OF THE LETTER MUCH AT ALL.

08:46AM 9        THE COURT:  THANK YOU.

08:46AM 10    YOU DON'T PART COMPANY WITH MR. SCHENK ASKING THE WITNESS

08:46AM 11    ABOUT THE EMAIL, THE FIRST PAGE?

08:46AM 12        MR. LOOBY:  NO, YOUR HONOR.  THE EMAIL ITSELF WE

08:46AM 13    WOULDN'T OBJECT TO.  IT'S THE ATTACHMENT.

08:46AM 14        THE COURT:  AND THE WITNESS TESTIFYING THAT THE

08:46AM 15    WITNESS DID RECEIVE THE DOCUMENT, WHATEVER IT IS, BUT RECEIVED

08:46AM 16    SOMETHING?

08:46AM 17        MR. LOOBY:  CORRECT.  AND --

08:46AM 18        THE COURT:  I THINK THAT'S WHAT MR. SCHENK WANTS TO

08:46AM 19    DO, AT LEAST TODAY, AT A MINIMUM.

08:46AM 20        MR. SCHENK:  YES, YOUR HONOR.

08:46AM 21        THE COURT:  RIGHT.

08:46AM 22        MR. LOOBY:  RIGHT.  I THINK WE WOULDN'T OBJECT TO

08:46AM 23    THAT.

08:46AM 24        THERE ARE PERHAPS SOME FOLLOW-ON QUESTIONS ABOUT KIND OF

08:47AM 25    THE REPERCUSSIONS TO DR. DHAWAN OF THE IMPOSITION OF SANCTIONS

08:47AM 1   AND THE EFFECTS ON HIS, LIKE, PROFESSIONAL OBLIGATIONS AND

08:47AM 2   REPUTATION THAT WE MIGHT OBJECT TO IF THE GOVERNMENT GOES INTO

08:47AM 3   IT.

08:47AM 4        BUT AS TO KIND OF, YOU RECEIVED THE EMAIL, THIS IS WHAT

08:47AM 5   THE EMAIL CONVEYED, THIS IS HOW YOU FOUND OUT ABOUT THE RESULTS

08:47AM 6   OF THE INSPECTION, WE WOULDN'T OBJECT TO THAT.

08:47AM 7             THE COURT:  OKAY.

08:47AM 8        MR. SCHENK?

08:47AM 9             MR. SCHENK:  YOUR HONOR, THE DEFENSE IS ARGUING AND

08:47AM 10  THE COURT ASKED QUESTIONS ABOUT THE USE OF THE WORD "CREDIBLE"

08:47AM 11  OR CREDIBILITY FINDINGS IN THE LETTER AND WHETHER IT'S

08:47AM 12  DIFFERENT THAN AT THE MOTION IN LIMINE STAGE WHEN THE COURT

08:47AM 13  FOUND CMS FINDINGS UNDER THE 403 BALANCING TO BE MORE

08:47AM 14  PROBATIVE.  THE COURT WONDERS AND THE DEFENSE ARGUES IF THAT

08:47AM 15  HAS SHIFTED NOW, AND IF, IN PARTICULAR, THE USE OF THE WORD

08:47AM 16  "CREDIBLE" HAS AFFECTED THAT BALANCING.

08:47AM 17       WE WOULD ARGUE TO THE COURT IT HASN'T BECAUSE OF

08:47AM 18  DEVELOPMENTS DURING THE TRIAL.

08:47AM 19       THE COURT RULED PRETRIAL THAT THE FINDINGS OF CMS ARE

08:48AM 20  ADMISSIBLE AND THEY COME IN FOR PURPOSES BECAUSE THE GOVERNMENT

08:48AM 21  IS NOT ARGUING TO THE JURY, CONVICT MS. HOLMES BECAUSE SHE

08:48AM 22  VIOLATED CIVIL REGULATIONS.  AND WHEN THE GOVERNMENT IS NOT

08:48AM 23  ADMITTING IT FOR THAT PURPOSE, BUT RATHER FOR PURPOSES LIKE

08:48AM 24  KNOWLEDGE AND INTENT, THE COURT OUTLINED IN ITS MOTION IN

08:48AM 25  LIMINE IT IS RELEVANT.

08:48AM 1     THE DEFENSE HAD THE BENEFIT OF THAT PRETRIAL ORDER AS

08:48AM 2 WELL.  THEY KNEW THE WAY THAT THE GOVERNMENT WAS ALLOWED TO

08:48AM 3 LITIGATE THE CASE.

08:48AM 4     THEY THEN INTRODUCED CMS REGULATIONS IN THIS TRIAL, THE

08:48AM 5 ACTUAL REGULATIONS, AND WENT THROUGH THEM WITH DR. ROSENDORFF

08:48AM 6 AND ASKED IF HE COMPLIED WITH CERTAIN REGULATIONS.

08:48AM 7     SO TO NOW EXCLUDE THE COMMENTS THAT CMS MADE ABOUT WHETHER

08:48AM 8 THAT WAS ACTUALLY TRUE, WHETHER THERE WAS A SUFFICIENT BASIS IN

08:48AM 9 FACT TO BELIEVE THAT COMPLIANCE WITH THE REGULATIONS HAD BEEN

08:49AM 10 ACHIEVED, TO NOW DENY THE GOVERNMENT THE ABILITY TO PUT THAT IN

08:49AM 11 GIVES THE DEFENSE THE BENEFIT OF THE COURT'S PRETRIAL RULING TO

08:49AM 12 ARGUE ABOUT THE RELEVANCE OF THESE REGULATIONS.  FOR INSTANCE,

08:49AM 13 IF THE COURT HAD GONE THE OTHER WAY ON CMS, IT WOULD HAVE BEEN

08:49AM 14 MUCH HARDER TO ARGUE THAT THE REGULATIONS ARE RELEVANT.

08:49AM 15     SO NOW THE DEFENSE HAS PUT THOSE REGULATIONS IN, AND TO

08:49AM 16 SUGGEST THAT THE GOVERNMENT CAN'T NOW FOLLOW UP EVEN WITH THESE

08:49AM 17 CREDIBILITY FINDINGS IS TO LEAVE THE JURY WITH A MISIMPRESSION.

08:49AM 18     THERE ACTUALLY NOW HAS BEEN DIALOGUE BACK AND FORTH

08:49AM 19 BETWEEN THERANOS AND THE REGULATOR THAT IS SUMMARIZED IN THE

08:49AM 20 ATTACHMENT TO THIS EXHIBIT THAT SUGGESTS THE TYPE OF ARGUMENT

08:49AM 21 THAT THE DEFENSE WAS TRYING TO SUGGEST THROUGH ITS CROSS OF

08:49AM 22 DR. ROSENDORFF ISN'T TRUE, IS NOT SUPPORTED BY THE EVIDENCE.

08:49AM 23     AND IT IS BECAUSE OF THAT, IT IS BECAUSE OF THE CROSS THAT

08:49AM 24 THE DEFENSE HAS ELICITED THAT THE 403 BALANCING SHIFTS A LITTLE

08:50AM 25 BIT.

08:50AM 1      AND THE COURT MIGHT BE RIGHT, IF THE DEFENSE HAD NOT

08:50AM 2   ARGUED THE CMS REGS IN THE WAY THAT THEY HAVE, THE BALANCING

08:50AM 3   UNDER 403 FOR THIS DOCUMENT WOULD BE DIFFERENT.

08:50AM 4      BUT THAT ISN'T WHERE WE FIND OURSELVES.

08:50AM 5      WHERE WE FIND OURSELVES IS THAT THE DEFENSE TOOK ADVANTAGE

08:50AM 6   OF THE COURT'S RULING AT THE MOTIONS IN LIMINE STAGE TO OFFER

08:50AM 7   CMS REGS AND TO MAKE ARGUMENTS TO THE JURY ON ITS CROSS BASED

08:50AM 8   UPON THEM, AND THE GOVERNMENT SHOULD HAVE THAT SAME RIGHT.

08:50AM 9         THE COURT:  THANK YOU.  FAIR POINT, AND I'LL ASK

08:50AM 10  MR. LOOBY'S THOUGHT ABOUT THAT.

08:50AM 11     BUT DO YOU -- DOES THE LETTER, THE DOCUMENT THAT YOU'RE

08:50AM 12  SEEKING TO INTRODUCE, DOES IT TOUCH ON EACH OF THE AREAS THAT

08:50AM 13  WERE OPINED OF THE WITNESS FROM THE DEFENSE, AND DO WE NEED TO

08:50AM 14  LOOK AT THAT SO AS NOT TO BE TOO OVERBROAD?  IN OTHER WORDS,

08:50AM 15  ARE THERE SPECIFIC INSTANCES OF INQUIRY ON CROSS THAT RELATE TO

08:50AM 16  THE DOCUMENT YOU SEEK TO INTRODUCE, AND PERHAPS THAT'S A

08:50AM 17  NARROWER FIELD THAN THE ENTIRETY OF THE DOCUMENT?

08:51AM 18         MR. SCHENK:  YOUR HONOR, I HAVE NOT DONE THAT

08:51AM 19  ONE-FOR-ONE MATCHING TO SEE IF THE FINDINGS IN THE LETTER

08:51AM 20  RELATE, AS THE COURT SUGGESTS, ONE FOR ONE TO THE QUESTIONS

08:51AM 21  THAT WERE ASKED OF DR. ROSENDORFF.

08:51AM 22     THERE WERE FINDINGS IN THE LETTER REGARDING WHEN QC WAS

08:51AM 23  DONE AND THE QC RECORDKEEPING.

08:51AM 24         THE COURT:  RIGHT.

08:51AM 25         MR. SCHENK:  AND QA AND OTHER TOPICS THAT CERTAINLY

08:51AM 1    WERE COVERED WITH DR. ROSENDORFF.

08:51AM 2        BUT I CANNOT TELL THE COURT THAT THE LETTER ONLY INCLUDES

08:51AM 3    QUESTIONS THAT WERE COVERED WITH DR. ROSENDORFF.

08:51AM 4            THE COURT:  RIGHT.  THAT MIGHT MAKE A DIFFERENCE,

08:51AM 5    MR. LOOBY.

08:51AM 6            MR. LOOBY:  I THINK IT DOES.

08:51AM 7        BUT I THINK BEFORE ADDRESSING THAT, I THINK THE PRIMARY, I

08:51AM 8    THINK, ISSUE WITH THAT ARGUMENT IS THAT THIS LETTER, THIS

08:51AM 9    JULY 2016 LETTER DOESN'T REFLECT THE FINDINGS OF THE CMS

08:51AM 10   INSPECTION.  IT REFLECTS CMS'S EVALUATION OF SUBSEQUENT EVENTS

08:51AM 11   AND CORRESPONDENCE OF THERANOS'S ALLEGATIONS OF COMPLIANCE AND

08:51AM 12   CORRECTION OF ISSUES THAT WERE IDENTIFIED IN THE INSPECTION.

08:52AM 13       AND SO A LOT OF MR. SCHENK'S ARGUMENT GOES TO THE

08:52AM 14   ADMISSIBILITY OF THE FINDINGS THEMSELVES, YOU KNOW, EVEN -- AND

08:52AM 15   I DON'T BELIEVE THAT WE KIND OF OPENED THE DOOR AND WIDENED THE

08:52AM 16   BERTH OF, LIKE, WHAT WAS ALREADY AT ISSUE IN THIS CASE GIVEN,

08:52AM 17   YOU KNOW, THE FACT THAT THE CLIA REGULATIONS ARE PART OF THE

08:52AM 18   CASE.  SO I DON'T THINK THE ANALYSIS HAS SHIFTED.

08:52AM 19       BUT REGARDLESS, IF WHAT THEY WANT TO SHOW IS THAT THERE

08:52AM 20   WERE REGULATORY VIOLATIONS, THAT WOULD BE IN THE CMS REPORT

08:52AM 21   THAT THE COURT HAS ALREADY HELD IS ADMISSIBLE IN PART, OR IN

08:52AM 22   LARGE PART.

08:52AM 23       AND THIS SUBSEQUENT EXCHANGE WITH THE CREDIBILITY

08:52AM 24   DETERMINATIONS IS EVALUATING THERANOS'S SUBSEQUENT RESPONSES

08:52AM 25   AND IT'S ESSENTIALLY A BACK AND FORTH BETWEEN THE COMPANY AND

08:52AM 1    THE AGENCY THAT FUNCTIONS LIKE PLEADINGS IN AN ADMINISTRATIVE

08:52AM 2    PROCEEDING.

08:52AM 3        AND, IN FACT, THIS JULY LETTER IS THE IMPOSITION OF

08:52AM 4    SANCTIONS LETTER THAT GAVE THERANOS APPEAL RIGHTS, AND THEY DID

08:52AM 5    NOTICE AN APPEAL FROM THIS DETERMINATION THAT WAS LATER

08:53AM 6    SETTLED.

08:53AM 7        AND SO I THINK THIS IS PRETTY FAR AFIELD FROM THE ACTUAL

08:53AM 8    FINDINGS.

08:53AM 9        NOW, IT DOES COPY AND PASTE AND PARAPHRASE SOME OF THE

08:53AM 10   ISSUES THAT ARE IDENTIFIED IN THE CMS REPORT, BUT THE COURT HAS

08:53AM 11   ALREADY HELD THAT THE REPORT OR PORTIONS OF IT ARE LIKELY TO BE

08:53AM 12   ADMITTED AT TRIAL, AND WE DON'T THINK THAT THIS LETTER IS THE

08:53AM 13   FINDINGS OF THE AGENCY.

08:53AM 14       THE COURT:  OKAY.

08:53AM 15   MR. SCHENK, ANYTHING IN RESPONSE?

08:53AM 16       MR. SCHENK:  I THINK THE WAY WE CAN HANDLE IT TODAY

08:53AM 17   IS THAT THE GOVERNMENT CAN OFFER THE EXHIBIT, THE COURT CAN

08:53AM 18   ADMIT THE EMAIL AND GIVE THE GOVERNMENT PERMISSION TO PUBLISH

08:53AM 19   THE EMAIL, AND IF THE COURT WANTS TO DEFER RULING ON THE

08:53AM 20   ADMISSIBILITY OF THE ATTACHMENT, WE'RE FINE WITH THAT FOR

08:53AM 21   TODAY'S PURPOSES.

08:53AM 22       THE COURT CERTAINLY SHOULDN'T GRANT THE MOTION THE DEFENSE

08:53AM 23   FILED, OR THE NOTICE THAT THE DEFENSE FILED LAST NIGHT.

08:53AM 24       AND I THINK IF THE QUESTION IS, WHAT DO WE DO WITH THE

08:53AM 25   DOCUMENT TODAY, THE COURT DEFERRING RULING ON THE DOCUMENT

08:54AM 1    TODAY WOULD BE FINE WITH THE GOVERNMENT.

08:54AM 2         AGAIN, WE INTEND TO PUBLISH.

08:54AM 3              THE COURT:  WELL, THANK YOU.

08:54AM 4         THAT WAS ONE OF THE THOUGHTS THAT I HAD JUST BASED ON

08:54AM 5    MR. LOOBY'S CONVERSATION IS THAT I DON'T NEED TO PROVISIONALLY

08:54AM 6    ADMIT IT TODAY.  IF YOU WANT TO ADMIT IT, I'LL DEFER ADMISSION.

08:54AM 7    IF YOU WANT ME TO STATE THAT ON THE RECORD, OR IF YOU JUST WANT

08:54AM 8    TO WAIT UNTIL ANOTHER PERIOD OF TIME, WHATEVER YOU WOULD LIKE

08:54AM 9    TO DO ON THAT, BUT IT WON'T BE ADMITTED TODAY, LET ME JUST SAY

08:54AM 10   THAT.

08:54AM 11        THE EMAIL WILL, AND THE REPRESENTATION THAT THERE WAS A

08:54AM 12   DOCUMENT ATTACHED TO THE EMAIL, THAT IS ADMISSIBLE.

08:54AM 13        BUT WHETHER OR NOT TODAY THE DOCUMENT COMES IN, THAT WON'T

08:54AM 14   BE TOUCHED ON.

08:54AM 15        AND THEN WE CAN LOOK AT THESE OTHER ISSUES AT SOME POINT

08:54AM 16   IN TIME WHEN YOU HAVE ANOTHER WITNESS, FOUNDATIONAL WITNESS

08:54AM 17   THAT YOU THINK IS APPROPRIATE, AND WE CAN ALL LOOK AT THESE

08:54AM 18   OTHER, INCLUDING THE ONE-FOR-ONE ANALYSIS.

08:54AM 19        AND, MR. LOOBY, YOUR COMMENTS THAT EVEN IF THIS IS ONE FOR

08:54AM 20   ONE, IT'S NOT REALLY A MATCH BECAUSE IT'S A DIFFERENT PURPOSE

08:55AM 21   AT A DIFFERENT TIME.

08:55AM 22             MR. LOOBY:  RIGHT.  IT'S A LITTLE DOWNSTREAM FROM

08:55AM 23   THE ACTUAL FINDINGS IN THE REPORT.

08:55AM 24             THE COURT:  RIGHT.

08:55AM 25             MR. LOOBY:  SO I'M AVAILABLE TO ANSWER ANY OF THE

08:55AM 1    COURT'S QUESTIONS IF AND WHEN THE ISSUE DOES RIPEN DOWN THE

08:55AM 2    ROAD.

08:55AM 3         THE COURT:  OKAY.  WE'LL TAKE A LOOK AT IT THEN.

08:55AM 4    OKAY?

08:55AM 5         MR. LOOBY:  THANK YOU, YOUR HONOR.

08:55AM 6         THE COURT:  GREAT.

08:55AM 7         MR. LOOBY:  ACTUALLY, ONE LAST ISSUE THAT IS

08:55AM 8    SOMEWHAT RELATED TO THIS IS THAT DR. DHAWAN IN HIS INTERVIEWS

08:55AM 9    WITH THE GOVERNMENT HAS SUGGESTED THAT HE BELIEVES THAT

08:55AM 10   THERANOS MAY HAVE USED HIS NAME IN THE LAB TO PUT PEOPLE IN

08:55AM 11   DANGER.

08:55AM 12        WE'VE CONFERRED WITH THE GOVERNMENT ABOUT WHETHER OR NOT

08:55AM 13   THEY INTEND TO ELICIT THAT TYPE OF TESTIMONY, AND I UNDERSTAND

08:55AM 14   THAT THEY DO NOT, BUT THEY HAVE NOT ADMONISHED THE WITNESS TO

08:55AM 15   AVOID THAT TYPE OF TESTIMONY.

08:55AM 16        AND WE THINK THAT'S INADMISSIBLE TESTIMONY ON VARIOUS

08:55AM 17   GROUNDS, 403 UNDER THE COURT'S IN LIMINE RULING ON IMPACT AND

08:55AM 18   THE ISSUE OF, YOU KNOW, PATIENT HARM, AND 602 BECAUSE HE

08:56AM 19   DOESN'T REALLY HAVE A BASIS IN HIS OWN PERSONAL KNOWLEDGE FOR

08:56AM 20   THAT.

08:56AM 21        MR. SCHENK:  DR. DHAWAN IN AN INTERVIEW SAID THAT HE

08:56AM 22   WAS CONCERNED ABOUT WHETHER THE -- WHAT HE'S NOW LEARNED

08:56AM 23   SUGGESTS THAT THERE WAS THE POSSIBILITY FOR PATIENT HARM OR

08:56AM 24   WHETHER INDIVIDUALS WHO USED THE TESTING SERVICE WERE PUT IN

08:56AM 25   DANGER AND THAT CAUSES HIM CONCERN.

08:56AM 1      I THINK THAT IS OF THE SAME TYPE OF EVIDENCE AS MS. CHEUNG

08:56AM 2   OR DR. ROSENDORFF OR MS. GANGAKHEDKAR WHO ALL SAID THEY HAD

08:56AM 3   CONCERNS ABOUT THE TESTING, OF THERANOS ENTERING THE BLOOD

08:56AM 4   TESTING MARKET CREATING A RISK TO PATIENTS.  I THINK IT'S THE

08:56AM 5   SAME TYPE OF EVIDENCE AS THAT EVIDENCE IS, AND THAT EVIDENCE

08:56AM 6   HAS COME IN, AND IT'S CERTAINLY RELEVANT AND ADMISSIBLE, AND I

08:56AM 7   JUST DON'T KNOW THAT DR. DHAWAN'S IS OF A DIFFERENT TYPE SO I

08:56AM 8   HAVE INSTRUCTED HIM NOT TO SAY THAT DURING TRIAL.

08:56AM 9      THE COURT:  I THOUGHT YOU WERE REFERENCING PERSONAL

08:56AM 10  CONCERN OR JEOPARDY TO HIM PERSONALLY, EMPLOYMENT OR OTHERWISE.

08:57AM 11     MR. LOOBY:  THAT'S A SEPARATE ISSUE THAT WE HAVE NOT

08:57AM 12  CONFERRED WITH THE GOVERNMENT YET.  I WAS JUST FLAGGING WE MAY

08:57AM 13  OBJECT IF QUESTIONING GOES INTO THAT.

08:57AM 14    THIS IS A SEPARATE ISSUE ABOUT PATIENT HARM.

08:57AM 15     THE COURT:  OH.

08:57AM 16     MR. LOOBY:  IN THE CONTEXT OF THE INTERVIEW IT SEEMS

08:57AM 17  LIKE IT'S BASED OFF OF WHAT HE HAS SUBSEQUENTLY LEARNED.

08:57AM 18    WHAT HE SUBSEQUENTLY LEARNED MIGHT BE FROM CONSUMING NEWS

08:57AM 19  MEDIA, IT MIGHT BE FROM IT, YOU KNOW, REVIEWING DOCUMENTS THAT

08:57AM 20  HE WASN'T SHOWN IN REALTIME.

08:57AM 21    I THINK IT PUTS HIM IN A DIFFERENT CLASS FROM THE OTHER

08:57AM 22  WITNESSES WHO ARE TESTIFYING ABOUT WHAT THEY UNDERSTOOD ABOUT

08:57AM 23  EVENTS THAT THEY EXPERIENCED IN REAL TIME AND THIS TO ME FEELS

08:57AM 24  MORE --

08:57AM 25     THE COURT:  WELL, THAT'S A DISTINCTION.  I DON'T

```
08:57AM   1    KNOW WHAT HIS -- WHEN HIS EPIPHANY OCCURRED, BUT YOU CAN

08:57AM   2    CERTAINLY INQUIRE ON THAT, AND YOU CAN DETERMINE WHEN IT WAS.

08:57AM   3              MR. SCHENK:  YES.  THANK YOU.

08:57AM   4              THE COURT:  WE'LL SEE.

08:57AM   5              MR. LOOBY:  YES.

08:57AM   6              THE COURT:  STAY TUNED I THINK AS THEY SAY.

08:58AM   7              MR. LOOBY:  THANK YOU, YOUR HONOR.

08:58AM   8              THE COURT:  OKAY.  ANYTHING ELSE FOR THIS MORNING?

08:58AM   9              MR. LOOBY:  NONE FROM US.

08:58AM  10              MR. SCHENK:  NO, YOUR HONOR.

08:58AM  11              THE COURT:  OKAY.  THANK YOU.

08:58AM  12         SO WE'LL START AND WE'LL SEE WHAT WE CAN GET THROUGH.  I

08:58AM  13    THINK THIS WITNESS WHO IS CURRENTLY ON THE STAND IS A BRIEF

08:58AM  14    WITNESS?

08:58AM  15              MR. SCHENK:  YES.

08:58AM  16              THE COURT:  AND THEN WE MOVE INTO IS IT MR. JHAVERI?

08:58AM  17              MR. SCHENK:  JHAVERI.

08:58AM  18              THE COURT:  JHAVERI.  THANK YOU.

08:58AM  19         WE'LL SEE HOW FAR WE GO.  YOU'LL LET ME KNOW ABOUT BREAKS

08:58AM  20    AND THINGS, AND THEN WE'LL COORDINATE THE ALLOWANCE OF YOU AND

08:58AM  21    YOUR TEAMS TO PARTICIPATE IN THE OTHER HEARING.

08:58AM  22         GREAT.

08:58AM  23              MR. SCHENK:  THANK YOU.

08:58AM  24              MR. LOOBY:  THANK YOU.

08:58AM  25         (RECESS FROM 8:58 A.M. UNTIL 9:18 A.M.)
```

| | | |
|---|---|---|
| 09:18AM | 1 | (JURY IN AT 9:18 A.M.) |
| 09:18AM | 2 | THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON |
| 09:18AM | 3 | THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT. |
| 09:18AM | 4 | MS. HOLMES IS PRESENT. |
| 09:18AM | 5 | OUR JURY IS PRESENT.  OUR WITNESS IS ON THE STAND. |
| 09:18AM | 6 | GOOD MORNING, SIR. |
| 09:18AM | 7 | THE WITNESS:  GOOD MORNING. |
| 09:18AM | 8 | THE COURT:  GOOD MORNING AGAIN. |
| 09:18AM | 9 | LET ME ASK MY QUESTION AGAIN OF YOU.  DID ANY OF YOU HAVE |
| 09:18AM | 10 | ANY OCCASION TO DISCUSS THIS CASE WITH ANYONE, COME ACROSS ANY |
| 09:19AM | 11 | MEDIA, SOCIAL OR OTHERWISE, SUCH THAT YOU WOULD LIKE TO INFORM |
| 09:19AM | 12 | ME NOW ABOUT THAT CONTACT? |
| 09:19AM | 13 | IF SO, PLEASE RAISE YOUR HAND. |
| 09:19AM | 14 | I SEE NO HANDS. |
| 09:19AM | 15 | THANK YOU. |
| 09:19AM | 16 | A COUPLE OF OTHER JUST HOUSEKEEPING MATTERS.  FIRST OF |
| 09:19AM | 17 | ALL, WE HAD DISCUSSION, AS YOU KNOW, EACH OF YOU HAD DISCUSSION |
| 09:19AM | 18 | WITH ME IN MY CHAMBERS ABOUT THE QUESTIONNAIRES, AND I BELIEVE |
| 09:19AM | 19 | MS. KRATZMANN INFORMED YOU THAT WERE YOU NOT TO DISCUSS |
| 09:19AM | 20 | ANYTHING ABOUT THAT CONVERSATION WITH YOUR COLLEAGUES. |
| 09:19AM | 21 | THAT'S THE SAME ADMONITION ABOUT NOT DISCUSSING ANYTHING |
| 09:19AM | 22 | ABOUT THE CASE WITH EACH OTHER, THAT IS, ANY OF THE EVIDENCE, |
| 09:19AM | 23 | ANYTHING AT ALL.  YOU MAY ONLY DO THAT ONCE THE CASE HAS BEEN |
| 09:19AM | 24 | SUBMITTED TO YOU FOR YOUR DELIBERATIONS. |
| 09:19AM | 25 | THE SAME APPLIES, I JUST WANT TO RATIFY MS. KRATZMANN'S |

09:19AM 1    COMMENT TO YOU, YOU'RE NOT TO DISCUSS ANYTHING THAT WE

09:20AM 2    DISCUSSED IN OUR CONVERSATIONS ABOUT THE QUESTIONNAIRES WITH

09:20AM 3    EACH OTHER AS WELL.

09:20AM 4        THE OTHER HOUSEKEEPING MATTER IS THAT THIS AFTERNOON, I

09:20AM 5    THINK ABOUT 1:00 O'CLOCK, CLOSER TO 1:30, THAT SOME OF THESE

09:20AM 6    LAWYERS NEED TO ATTEND.  IT INVOLVES AN EVIDENTIARY MATTER.

09:20AM 7        BUT THEY NEED TO ATTEND TO THAT, AND THEY MAY GET UP AND

09:20AM 8    LEAVE THE COURTROOM.  I HAVE GIVEN THEM PERMISSION TO DO SO.

09:20AM 9        SO IF YOU SEE THEM LEAVE, THAT'S THE REASON WHY.  THEY

09:20AM 10   HAVE ANOTHER COURT APPEARANCE TO ATTEND TO, AND THEY WILL TRY

09:20AM 11   TO MAKE THAT -- AND THEY WILL TRY TO MAKE THEIR DEPARTURE AS

09:20AM 12   QUIET AS POSSIBLE.

09:20AM 13       BUT THAT'S WHAT IS HAPPENING.  I JUST WANTED TO LET YOU

09:20AM 14   KNOW THAT.  THANK YOU FOR THAT.

09:20AM 15       ANYTHING, COUNSEL, BEFORE WE BEGIN?

09:20AM 16           MR. SCHENK:  NO, YOUR HONOR.

09:20AM 17           THE COURT:  ALL RIGHT.  THANK YOU.

09:20AM 18       MR. BOSTIC, YOU WOULD LIKE TO CONTINUE?

09:20AM 19           MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:21AM 20       **(GOVERNMENT'S WITNESS, ROBERTO AMENTA, WAS PREVIOUSLY**

09:21AM 21   **SWORN.)**

09:21AM 22                   **DIRECT EXAMINATION (RESUMED)**

09:21AM 23   BY MR. BOSTIC:

09:21AM 24   Q.  WELCOME BACK, MR. AMENTA.

09:21AM 25   A.  THANK YOU.

09:21AM  1    Q.   WOULD YOU STATE YOUR NAME FOR THE RECORD?

09:21AM  2    A.   SURE.  IT'S ROBERTO, LAST NAME AMENTA, A-M-E-N-T-A.

09:21AM  3    Q.   AND DO YOU KNOW YOU'RE STILL UNDER OATH?

09:21AM  4    A.   YES.

09:21AM  5    Q.   WHEN WE LEFT OFF YESTERDAY, WE WERE TALKING ABOUT

09:21AM  6    EXHIBIT 4845, WHICH IS IN EVIDENCE.

09:21AM  7         IF WE CAN CALL THAT UP AND GO TO PAGE 18.

09:21AM  8         MR. AMENTA, GENERALLY SPEAKING, YOU'VE REVIEWED PAGES 18

09:21AM  9    THROUGH 24 OF EXHIBIT 4845 IN THE PAST?

09:21AM  10   A.   I HAVE.

09:21AM  11   Q.   AND WE'LL GET INTO SOME OF THE DETAILS OF WHAT IS ON THESE

09:21AM  12   PAGES, BUT GENERALLY SPEAKING, WHAT IS ON EACH PAGE OF THIS

09:21AM  13   DOCUMENT?

09:21AM  14   A.   A FEDWIRE FUNDS TRANSFER.

09:21AM  15   Q.   AND EACH PAGE IS A DIFFERENT FEDWIRE FUNDS TRANSFER?

09:21AM  16   A.   CORRECT.  THERE'S A REFERENCE TO AN IMAD AND AN OMAD,

09:22AM  17   I-M-A-D, O-M-A-D.  THAT IS AN INCOMING MESSAGE ACCOUNTABILITY

09:22AM  18   DATA, AND OUTGOING MESSAGE ACCOUNTABILITY DATA, AND THAT'S

09:22AM  19   UNIQUE TO FEDWIRE.

09:22AM  20   Q.   AND WE'RE LOOKING ON THE SCREEN AT PAGE 18 OF

09:22AM  21   EXHIBIT 4845.

09:22AM  22        DO YOU SEE THE OMAD AND IMAD NUMBERS REFERENCED ON THIS

09:22AM  23   PAGE?

09:22AM  24   A.   I DO.

09:22AM  25   Q.   AND HOW DOES FEDWIRE USE THOSE NUMBERS?

09:22AM  1    A.   SO IT'S -- THE IMAD FOR THE SENDING BANK, IT'S THE YEAR,

09:22AM  2    MONTH, DAY OF THE TRANSACTION, AND THEN IT IS THE END POINT OF

09:22AM  3    THE FINANCIAL INSTITUTION, OR IN POINT OF THE FINANCIAL

09:22AM  4    INSTITUTION, AND THEN WHAT MESSAGE IT IS FOR THAT DAY AND FOR

09:22AM  5    THAT INSTITUTION.

09:22AM  6         SO THAT'S THE IMAD.

09:22AM  7         AND FOR THE OMAD, IT'S THE YEAR, MONTH, DAY, SO IT'S THE

09:22AM  8    BANK'S END POINT.  IT IS WHAT MESSAGE IT IS FOR THAT DAY.  IT'S

09:22AM  9    THE DATE, AND THEN IT'S THE TIME 13:58.

09:23AM  10         AND THEN REFERENCE TO FT03 IS THE DALLAS.

09:23AM  11   Q.   THANK YOU.

09:23AM  12        I SHOULD HAVE MENTIONED, IF YOU'RE COMFORTABLE WITH

09:23AM  13   TESTIFYING WITHOUT A MASK, YOU CAN REMOVE IT.

09:23AM  14   A.   THANK YOU.

09:23AM  15   Q.   THE OMAD AND IMAD NUMBERS, DOES FEDWIRE EVER REUSE THOSE

09:23AM  16   NUMBERS?  IN OTHER WORDS, COULD TWO DIFFERENT TRANSACTIONS EVER

09:23AM  17   HAVE THE SAME OMAD OR IMAD NUMBER?

09:23AM  18   A.   THEY'RE UNIQUE FOR THE TRANSACTION.

09:23AM  19   Q.   LOOKING AT PAGE 18 HERE, FOR THIS TRANSACTION WE ARE

09:23AM  20   LOOKING AT, WHAT WAS THE DATE OF THIS WIRE TRANSFER?

09:23AM  21   A.   SO IT'S DECEMBER 30TH OF 2013.

09:23AM  22   Q.   AND IS THERE A PORTION OF THE OMAD AND IMAD THAT GIVES YOU

09:23AM  23   THAT INFORMATION?

09:23AM  24   A.   YES.

09:23AM  25   Q.   AND WHAT WAS THE AMOUNT OF THIS WIRE TRANSFER?

09:23AM  1    A.   THE AMOUNT IS FIELD TAG 2000, AND IT'S $99,990.

09:23AM  2    Q.   AND FROM THIS INFORMATION, WHO SENT THIS WIRE TRANSFER OF

09:23AM  3    $99,990?

09:24AM  4    A.   SURE.  SO IT'S THE SENDING BANK -- THE SENDING BANK, THE

09:24AM  5    3100 FIELD IS WELLS FARGO, AND THEY DID IT ON BEHALF OF

09:24AM  6    ALAN JAY EISENMAN AND CHARLES SCHWAB.

09:24AM  7    Q.   AND FINALLY, WHO WAS THIS TRANSFERRED TO ON THIS DATE?

09:24AM  8    A.   THE RECEIVING BANK IS COMERICA, AND IT WAS ON BEHALF OF

09:24AM  9    THERANOS.

09:24AM 10    Q.   THANK YOU.  LET'S GO TO THE NEXT PAGE, THAT'S EXHIBIT 19

09:24AM 11    OF 4845.  IF WE CAN ZOOM IN ON THE CONTENT.

09:24AM 12         MR. AMENTA, DO YOU SEE ANOTHER DOCUMENT RELATED TO ANOTHER

09:24AM 13    FEDWIRE TRANSFER?

09:24AM 14    A.   YES.

09:24AM 15    Q.   AND WHAT WAS THE DATE OF THIS TRANSFER?

09:24AM 16    A.   DECEMBER 31ST, 2013.

09:24AM 17    Q.   AND WHAT IS THE AMOUNT OF THIS TRANSFER?

09:24AM 18    A.   THE AMOUNT IS $5,349,900.

09:24AM 19    Q.   AND WHO SENT THIS WIRE TRANSFER IN THE AMOUNT OF

09:24AM 20    APPROXIMATELY $5.3 MILLION?

09:25AM 21    A.   SO THE SENDING BANK, WHILE IT'S NOT IN ITS SHORT FORM

09:25AM 22    NAME, IT'S THE ABA NUMBER, ROUTING NUMBER FOR PACIFIC WESTERN,

09:25AM 23    SO THAT'S THE SENDER, ABA (3100) ON BEHALF OF BLACK DIAMOND

09:25AM 24    VENTURES.

09:25AM 25    Q.   AND HOW ABOUT THE RECIPIENT?

09:25AM 1    A.   AGAIN, THAT ABA ROUTING FOR THE RECEIVER IS COMERICA ON

09:25AM 2    BEHALF OF THERANOS.

09:25AM 3    Q.   THANK YOU.

09:25AM 4         LET'S TURN TO THE NEXT PAGE, WHICH IS PAGE 20.  IF WE CAN

09:25AM 5    ZOOM IN ON THE CONTENT HERE.

09:25AM 6         MR. AMENTA, IS THIS INFORMATION RELATING TO A SEPARATE

09:25AM 7    WIRE TRANSFER?

09:25AM 8    A.   IT IS.  THIS IS ALSO DATED DECEMBER 31ST, 2013.

09:25AM 9    Q.   OKAY.  AND IN WHAT AMOUNT WAS THIS WIRE TRANSFER?

09:25AM 10   A.   THE AMOUNT FOR THIS TRANSACTION IS $4,875,000.

09:25AM 11   Q.   AND WHO SENT THIS APPROXIMATELY $4.9 MILLION TRANSACTION

09:26AM 12   ON THAT DATE?

09:26AM 13   A.   TEXAS CAPITAL BANK ON BEHALF OF HALL PHOENIX/INWOOD LDT.

09:26AM 14   Q.   AND THE RECIPIENT?

09:26AM 15   A.   THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS.

09:26AM 16   Q.   THANK YOU.  LET'S TURN NOW TO THE NEXT PAGE, PAGE 21.  IF

09:26AM 17   WE CAN ZOOM IN.

09:26AM 18        ON PAGE 21, DO YOU SEE DETAILS FOR ANOTHER FEDWIRE

09:26AM 19   TRANSMITTAL?

09:26AM 20   A.   YES.  THE DATE FOR THIS ONE IS FEBRUARY 6TH, 2014.

09:26AM 21   Q.   AND WHAT WAS THE AMOUNT OF THIS WIRE TRANSFER?

09:26AM 22   A.   THE AMOUNT IS $38,336,632.

09:26AM 23   Q.   OKAY.  AND WHO SENT THIS $38.3 MILLION TRANSFER ON THAT

09:26AM 24   DATE?

09:26AM 25   A.   CITIBANK ON BEHALF OF GOLDMAN SACHS AND PFM HEALTH CARE.

09:26AM  1    Q.   AND FINALLY, THE RECIPIENT FOR THIS ONE?

09:27AM  2    A.   THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS.

09:27AM  3    Q.   OKAY.  THANK YOU.  LET'S GO TO PAGE 22.

09:27AM  4         IF WE CAN ZOOM IN ON THIS CONTENT.

09:27AM  5         MR. AMENTA, FOR THE WIRE TRANSFER ON PAGE 22, WHAT WAS THE

09:27AM  6    DATE?

09:27AM  7    A.   OCTOBER 31ST OF 2014.

09:27AM  8    Q.   AND THE AMOUNT OF THIS WIRE TRANSFER?

09:27AM  9    A.   $99,999,984.

09:27AM 10    Q.   AND FINALLY, WHO WERE THE SENDER AND RECIPIENT FOR THIS

09:27AM 11    WIRE TRANSFER?

09:27AM 12    A.   SO NORTHERN CHICAGO ON BEHALF LAKESHORE CAPITOL MANAGEMENT

09:27AM 13    AND DYNASTY FINANCIAL.

09:27AM 14    Q.   AND WHO IS THE RECIPIENT?

09:27AM 15    A.   AND THE RECIPIENT IS COMERICA ON BEHALF OF THERANOS.

09:27AM 16    Q.   AND THE FINAL PAGE IS 23.  LET'S LOOK AT THAT.

09:28AM 17         MR. AMENTA, IF YOU COULD WALK US THROUGH THIS ONE.  WHAT

09:28AM 18    ARE THE RELEVANT DETAILS OF THIS WIRE TRANSFER?

09:28AM 19    A.   THE DATE IS OCTOBER 31ST OF 2014.

09:28AM 20         THE AMOUNT IS $5,999,997.

09:28AM 21         THE SENDING AND THE ORIGINATOR IS JP MORGAN CHASE, AND THE

09:28AM 22    MOSLEY FAMILY HOLDINGS, AND THE BENEFICIARY IS COMERICA BANK

09:28AM 23    FOR THERANOS.

09:28AM 24    Q.   AND WE JUST LOOKED AT DETAILS FOR SIX SEPARATE WIRE

09:28AM 25    TRANSFERS; IS THAT CORRECT?

09:28AM  1     A.   CORRECT.

09:28AM  2     Q.   AND EACH OF THOSE SIX WIRE TRANSFERS USED THE FEDWIRE

09:28AM  3     SYSTEM; IS THAT CORRECT?

09:28AM  4     A.   CORRECT.

09:28AM  5     Q.   YOU TESTIFIED EARLIER ABOUT THE SEQUENCE OF EVENTS AND THE

09:28AM  6     PROCESS NEEDED TO EXECUTE A FEDWIRE WIRE TRANSFER IN 2013,

09:28AM  7     2014.

09:28AM  8          DO YOU RECALL THAT TESTIMONY?

09:28AM  9     A.   I DO.

09:28AM  10    Q.   IS IT POSSIBLE FOR -- OR WAS IT POSSIBLE FOR A FEDWIRE

09:28AM  11    MONEY TRANSFER DURING THAT TIME PERIOD TO OCCUR WITHOUT AN

09:29AM  12    INTERSTATE WIRE COMMUNICATION?

09:29AM  13    A.   NO.

09:29AM  14    Q.   DID EACH OF THESE SIX WIRE TRANSFERS THEN NECESSARILY

09:29AM  15    INVOLVE A WIRE COMMUNICATION ACROSS STATE LINES?

09:29AM  16    A.   IT DID BETWEEN TEXAS AND NEW JERSEY.

09:29AM  17    Q.   BETWEEN THOSE TWO FEDWIRE FACILITIES?

09:29AM  18    A.   CORRECT.

09:29AM  19    Q.   IN FRONT OF YOU, DO YOU STILL HAVE A FEW EXHIBITS?  IF SO,

09:29AM  20    I'LL ASK YOU TO LOOK AT EXHIBIT NUMBER 5428.

09:29AM  21    A.   YES.

09:29AM  22    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:29AM  23    A.   YES.

09:29AM  24    Q.   AND GENERALLY SPEAKING, WITHOUT GETTING INTO THE CONTENT,

09:29AM  25    WHAT IS EXHIBIT 5428?

09:29AM 1      A.   IT'S A FEDWIRE FUNDS MESSAGE.

09:29AM 2      Q.   AND HAVE YOU REVIEWED 5428 BEFORE?

09:29AM 3      A.   I HAVE.

09:29AM 4           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT MOVES TO

09:29AM 5      ADMIT 5428.

09:29AM 6           MS. TREFZ:  NO OBJECTION.

09:29AM 7           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:29AM 8           (GOVERNMENT'S EXHIBIT 5428 WAS RECEIVED IN EVIDENCE.)

09:30AM 9      BY MR. BOSTIC:

09:30AM 10     Q.   MR. AMENTA, DO YOU SEE ON YOUR SCREEN NOW THE DETAILS OF

09:30AM 11     THAT WIRE TRANSFER IN EXHIBIT 5428?

09:30AM 12     A.   I DO.

09:30AM 13     Q.   ON WHAT DATE WAS THIS WIRE TRANSMITTAL SENT?

09:30AM 14     A.   AUGUST 3RD OF 2015.  IT'S IN THE AMOUNT OF $1,126,661.

09:30AM 15          THE SENDING SIDE, THE SENDER FINANCIAL INSTITUTION WAS

09:30AM 16     WELLS FARGO ON BEHALF OF THERANOS, AND THE RECEIVING

09:30AM 17     INSTITUTION WAS JP MORGAN CHASE ON BEHALF OF HORIZON MEDIA,

09:30AM 18     INC.

09:30AM 19     Q.   SO UNLIKE THE PREVIOUS TRANSACTIONS WE LOOKED AT, THIS ONE

09:30AM 20     IS GOING FROM THERANOS TO A THIRD PARTY?

09:30AM 21     A.   THEY'RE THE ORIGINATOR INSTEAD OF THE BENEFICIARY,

09:30AM 22     CORRECT.

09:30AM 23     Q.   AND YOU PREVIOUSLY TOLD US ABOUT THE FEDWIRE TRANSFERS IN

09:30AM 24     2013 AND 2014.  THIS TRANSFER WAS IN 2015.  WAS THE PROCESS

09:30AM 25     DIFFERENT AT THAT TIME?

09:30AM 1    A.   IT STILL REQUIRED THE SAME TWO PROCESSING CENTERS.

09:31AM 2         WHAT CHANGED IN NOVEMBER 10TH OF 2014 WAS THAT THE PRIMARY

09:31AM 3    SITE ALTERNATED, SO IT WOULD EITHER BE NEW JERSEY OR DALLAS

09:31AM 4    THAT WOULD BE THE PRIMARY SITE.

09:31AM 5         THE SECOND PART THAT CHANGED WAS THE PROCESS FOR IT WOULD

09:31AM 6    CHANGE.  SO IN THE EARLIER TIME PERIOD, APRIL 27TH, '09,

09:31AM 7    PRE-DECEMBER 2014, THE DALLAS WOULD SEND IT TO THE NEW JERSEY

09:31AM 8    FACILITY FOR PROCESSING.

09:31AM 9         POST THAT NOVEMBER 2014 DATE, THE PROCESSING WOULD BE THE

09:31AM 10   PRIMARY SITE WOULD SEND IT TO THE SECONDARY SITE FOR

09:31AM 11   ACKNOWLEDGEMENT, AND THEN THE PRIMARY SITE WOULD THEN, AFTER

09:31AM 12   RECEIVING ACKNOWLEDGEMENT, DO THE DEBITING AND CREDITING AND

09:31AM 13   SENDING THE ADVICES TO THE FINANCIAL INSTITUTIONS.

09:31AM 14   Q.   AND WHEN YOU'RE TALKING ABOUT THOSE TWO FEDWIRE FACILITIES

09:31AM 15   COMMUNICATING WITH EACH OTHER IN THE 2015 TIMEFRAME, ARE THOSE

09:31AM 16   AUTOMATED WIRE COMMUNICATIONS?

09:31AM 17   A.   CORRECT.

09:31AM 18   Q.   IN THE 2015 TIMEFRAME THEN, AND SPECIFICALLY IN AUGUST OF

09:32AM 19   2015, WOULD IT BE POSSIBLE FOR THIS WIRE TRANSFER TO OCCUR

09:32AM 20   WITHOUT AN INTERSTATE WIRE COMMUNICATION?

09:32AM 21   A.   NO.

09:32AM 22   Q.   AND THE TRANSFER THAT IS DEPICTED IN EXHIBIT 5428, WAS

09:32AM 23   THAT A WIRE TRANSFER THAT USED THE FEDWIRE SYSTEM?

09:32AM 24   A.   IT WAS.

09:32AM 25         MR. BOSTIC:  A MOMENT, YOUR HONOR?

09:32AM  1          THE COURT:  YES.

09:32AM  2          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

09:32AM  3          MR. BOSTIC:  NO FURTHER QUESTIONS, YOUR HONOR.

09:32AM  4      THANK YOU, MR. AMENTA.

09:32AM  5          THE WITNESS:  THANK YOU.

09:32AM  6          THE COURT:  MS. TREFZ.

09:32AM  7                    **CROSS-EXAMINATION**

09:32AM  8  BY MS. TREFZ:

09:32AM  9  Q.   HI, MR. AMENTA.  MY NAME IS KATIE TREFZ.  I REPRESENT

09:32AM 10  MS. HOLMES.

09:32AM 11  A.   GOOD MORNING.

09:32AM 12  Q.   I ONLY HAVE A COUPLE OF QUICK QUESTIONS FOR YOU.

09:32AM 13  A.   SURE.

09:32AM 14  Q.   ONE IS, ASIDE FROM HAVING PULLED THOSE RECORDS, YOU DON'T

09:33AM 15  HAVE ANY PERSONAL KNOWLEDGE ABOUT THE REASONS WHY THE WIRES

09:33AM 16  WERE SENT; CORRECT?

09:33AM 17  A.   CORRECT.

09:33AM 18  Q.   OR WHO WITHIN AN ORGANIZATION AUTHORIZED THEM; CORRECT?

09:33AM 19  A.   THAT'S CORRECT.

09:33AM 20  Q.   OR FOR WHAT PURPOSE THEY WERE SENT; CORRECT?

09:33AM 21  A.   THAT'S CORRECT.

09:33AM 22          MS. TREFZ:  THAT'S ALL.

09:33AM 23      THANK YOU.

09:33AM 24          THE WITNESS:  THANK YOU.

09:33AM 25          MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

09:33AM  1           THE COURT:  MAY THIS WITNESS BE EXCUSED?

09:33AM  2           MR. BOSTIC:  YES.

09:33AM  3           THE COURT:  MS. TREFZ?

09:33AM  4           MS. TREFZ:  YES.

09:33AM  5           THE COURT:  MR. AMENTA, YOU'RE EXCUSED.  THANK YOU.

09:33AM  6           MR. SCHENK:  YOUR HONOR, THE UNITED STATES CALLS

09:33AM  7     NIMESH JHAVERI.

09:34AM  8       (PAUSE IN PROCEEDINGS.)

09:34AM  9           THE COURT:  GOOD MORNING, SIR.  IF YOU WOULD COME

09:34AM  10    FORWARD, PLEASE, AND FACE OUR COURTROOM DEPUTY RIGHT HERE.

09:34AM  11       IF YOU WOULD RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR

09:34AM  12    YOU.

09:34AM  13       **(GOVERNMENT'S WITNESS, NIMESH JHAVERI, WAS SWORN.)**

09:34AM  14           THE WITNESS:  YES.

09:34AM  15           THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE

09:34AM  16    YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THE CHAIR AND

09:34AM  17    MICROPHONE AS YOU NEED.

09:34AM  18       I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

09:34AM  19       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:34AM  20    AND THEN SPELL IT, PLEASE.

09:34AM  21           THE WITNESS:  NIMESH JHAVERI.  FIRST NAME NIMESH,

09:34AM  22    N-I-M-E-S-H.  LAST NAME JHAVERI, J-H-A-V-E-R-I.

09:34AM  23           THE COURT:  THANK YOU.

09:34AM  24       COUNSEL.

09:35AM  25           MR. SCHENK:  THANK YOU, YOUR HONOR.

09:35AM  1              **DIRECT EXAMINATION**

09:35AM  2   BY MR. SCHENK:

09:35AM  3   Q.   GOOD MORNING, MR. JHAVERI.

09:35AM  4   A.   GOOD MORNING.

09:35AM  5   Q.   IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S

09:35AM  6   PERMISSION, YOU MAY REMOVE YOUR MASK TO TESTIFY IF YOU WOULD

09:35AM  7   LIKE.

09:35AM  8   A.   THANK YOU.

09:35AM  9   Q.   AND I ALSO WILL REMOVE MY MASK.

09:35AM 10        MR. JHAVERI, DID YOU WORK AT WALGREENS?

09:35AM 11   A.   I DID.

09:35AM 12   Q.   FOR HOW LONG?

09:35AM 13   A.   TWENTY-NINE YEARS.

09:35AM 14   Q.   LET'S COME BACK TO THAT IN A MOMENT.

09:35AM 15        I WONDER IF YOU CAN EXPLAIN TO THE JURY YOUR EDUCATIONAL

09:35AM 16   BACKGROUND?

09:35AM 17   A.   SURE.  I'M A REGISTERED PHARMACIST.  I HAVE A DEGREE IN

09:35AM 18   PHARMACY, AS WELL AS I HAVE MY MBA IN ORGANIZATIONAL BEHAVIOR.

09:35AM 19   Q.   AND WHERE DID YOU GET YOUR MBA?

09:35AM 20   A.   I GOT MY MBA AT LAKE FORREST GRADUATE SCHOOL OF MANAGEMENT

09:35AM 21   IN LAKE FORREST, ILLINOIS.

09:35AM 22   Q.   AND AFTER GRADUATING FROM BUSINESS SCHOOL, WHERE DID YOU

09:35AM 23   GO TO WORK?

09:35AM 24   A.   I ACTUALLY WENT TO WORK, AFTER PHARMACY SCHOOL, AT

09:35AM 25   WALGREENS.

09:35AM  1    Q.   OKAY.  AND DID YOU GET THE MBA WHILE YOU WERE WORKING?

09:36AM  2    A.   I DID.

09:36AM  3    Q.   AND DESCRIBE YOUR WORK HISTORY AT WALGREENS.  YOU SAID YOU

09:36AM  4    WERE THERE FOR 29 YEARS.  DID YOU HAVE THE SAME JOB THE WHOLE

09:36AM  5    TIME?

09:36AM  6    A.   NO.  I ACTUALLY STARTED AT WALGREENS IN 1989 AS A PHARMACY

09:36AM  7    TECHNICIAN AND STORE CLERK WHILE GOING THROUGH SCHOOL, AND THEN

09:36AM  8    BECAME A PHARMACIST, AND THEN WORKED IN VARIOUS POSITIONS OVER

09:36AM  9    THE YEARS UNTIL OCTOBER OF 2018.

09:36AM  10   Q.   AND YOU LEFT WALGREENS IN 2018?

09:36AM  11   A.   I DID.

09:36AM  12   Q.   WHILE YOU WERE WORKING AT WALGREENS, DID YOU BECOME

09:36AM  13   FAMILIAR WITH A COMPANY NAMED THERANOS?

09:36AM  14   A.   I DID.

09:36AM  15   Q.   DO YOU REMEMBER WHEN YOU FIRST BECAME FAMILIAR WITH

09:36AM  16   THERANOS?

09:36AM  17   A.   SOMETIME IN 2010, '11, APPROXIMATELY AT THAT TIME.

09:36AM  18   Q.   OKAY.  AND IF YOU WOULD PLEASE DESCRIBE THAT EXPOSURE TO

09:36AM  19   THE JURY.  WHAT HAPPENED IN 2010 OR 2011?

09:36AM  20   A.   SURE.  I WAS ACTUALLY WORKING AND LEADING A PROJECT TO

09:36AM  21   REDESIGN ALL OF OUR PHARMACIES TO BE MORE CUSTOMER CENTRIC AND

09:37AM  22   PATIENT CENTRIC AND REDESIGNING ALL OF THE PHARMACY AREAS TO

09:37AM  23   INCLUDE CERTAIN SPACES TO DELIVER CERTAIN HEALTH CARE SERVICES

09:37AM  24   SO PATIENTS COULD HAVE SIMPLY MORE THAN THEIR PHARMACY.

09:37AM  25        SO I RECEIVED A CALL FROM DR. JAY ROSAN, WHO WAS ALSO AT

09:37AM  1    WALGREENS, AND THEY HAD BEEN MEETING WITH THE THERANOS TEAM,

09:37AM  2    THE LEADERSHIP TEAM, AND ASKED ME IF I WOULD BE WILLING TO GIVE

09:37AM  3    THEM A TOUR OF THE NEW SPACE.

09:37AM  4         WE HAD A PILOT STORE IN WHEELING, ILLINOIS, AND I WAS MORE

09:37AM  5    THAN HAPPY TO DO THAT, AND THAT'S WHEN I WAS EXPOSED TO

09:37AM  6    THERANOS MORE AND MR. BALWANI AND MS. HOLMES.

09:37AM  7    Q.   DID YOU MEET EMPLOYEES FROM THERANOS THAT DAY?

09:37AM  8    A.   I MET BOTH OF THEM AT THE STORE, YES.

09:37AM  9    Q.   AND BY "BOTH OF THEM," YOU MEAN MS. HOLMES AND

09:37AM  10   MR. BALWANI?

09:37AM  11   A.   THAT'S CORRECT.

09:37AM  12   Q.   AND THEN WHAT DID YOU DO WITH THEM THAT DAY?

09:37AM  13   A.   IT WAS A SHORT VISIT.  I PROVIDED THEM A TOUR OF THE

09:37AM  14   STORE, PROVIDED A TOUR OF THE SPACE WHERE WE CAN USE TO DELIVER

09:38AM  15   DIFFERENT SERVICES FROM DIABETES EDUCATION SESSIONS TO LAB

09:38AM  16   SESSIONS OR LAB SERVICES.

09:38AM  17        IT WAS A FLEXIBLE SPACE, AND WE REALLY JUST GAVE THEM A

09:38AM  18   TOUR OF THAT, THE WAITING AREA, AND THEN THE NEW PHARMACY WITH

09:38AM  19   THE PHARMACIST SITTING OUTSIDE OF THE PHARMACY.

09:38AM  20        IT WAS A VERY SHORT VISIT.  AFTER THAT THEY THANKED ME

09:38AM  21   AND, YOU KNOW, THAT WAS THE END OF THE VISIT.

09:38AM  22   Q.   DO YOU RECALL IF, DURING THIS SHORT VISIT, YOU DISCUSSED

09:38AM  23   THE THERANOS TECHNOLOGY OR WHAT THE BUSINESS MODEL AT THERANOS

09:38AM  24   WAS?

09:38AM  25   A.   NO.  OF COURSE IT WAS INSIDE OF THE STORE, SO IT WAS IN A

09:38AM  1    PUBLIC SETTING, SO THERE WAS NO REALLY DETAILED DISCUSSION.  IT

09:38AM  2    WAS REALLY THE IDEA OF DELIVERING LAB SERVICES IN THAT SPACE.

09:38AM  3    Q.   OKAY.  ABOUT HOW LONG WAS THIS VISIT, DO YOU KNOW?

09:38AM  4    A.   ABOUT 15, 20 MINUTES.  IT WASN'T THAT LONG.

09:38AM  5    Q.   AND THEN AFTER THIS OCCASION, DID YOU HAVE ANOTHER

09:38AM  6    OPPORTUNITY TO REENGAGE IN THE THERANOS PROJECT?

09:38AM  7    A.   YES.  PROBABLY A COUPLE YEARS LATER WHEN WALGREENS OPENED

09:39AM  8    THE FIRST COUPLE OF STORES, I DID REENGAGE WITH THE THERANOS

09:39AM  9    TEAM, AS WELL AS UNDERSTANDING WHAT THE STORES LOOKED LIKE.

09:39AM 10    BUT THAT WAS THE NEXT TIME.

09:39AM 11    Q.   OKAY.  AND WOULD THAT HAVE BEEN IN 2013?

09:39AM 12    A.   THAT'S RIGHT.  I THINK IT WAS SOMETIME IN NOVEMBER, OR END

09:39AM 13    OF 2013.

09:39AM 14    Q.   OKAY.  AND DESCRIBE FOR THE JURY WHAT YOUR ROLE WAS AT

09:39AM 15    THAT POINT WHEN YOU REENGAGED IN THE LATTER PART OF 2013.

09:39AM 16    A.   YEAH.  MY ROLE HAD NOT CHANGED AT THAT TIME.  WE WERE

09:39AM 17    STILL DEVELOPING THE NEW LAYOUT, THE NEW EXPERIENCE, THE NEW

09:39AM 18    DESIGN OF OUR PHARMACIES IN STORES, AND WE CONTINUED TO DO

09:39AM 19    THAT.

09:39AM 20         SO I WAS STILL LEADING THAT AND TESTING THOSE STORES.  WE

09:39AM 21    HAD A HANDFUL OF STORES AT THAT TIME THAT WE WERE TESTING, AND

09:39AM 22    MY ROLE WAS TO UNDERSTAND THAT IF WE EXPANDED OR DELIVERED THIS

09:39AM 23    TYPE OF A SERVICE, IN THIS CASE LAB SERVICES WITH THERANOS, HOW

09:40AM 24    WOULD IT FIT INTO THE DESIGN OF THE STORE?  HOW WOULD IT FIT

09:40AM 25    INTO THE EXPERIENCE OF THE STORE?

09:40AM  1          IT'S QUITE DIFFICULT TO DO CONSTRUCTION IN A STORE AT A

09:40AM  2   MINUTE'S NOTICE.  WE WANT TO, YOU KNOW, NOT DISRUPT OUR TEAM

09:40AM  3   MEMBERS.  WE DON'T WANT TO DISRUPT OUR CUSTOMERS.  SO IT DOES

09:40AM  4   REQUIRE QUITE A BIT OF PLANNING.

09:40AM  5          SO THIS WAS MY ROLE WAS TO UNDERSTAND WHAT THE NEEDS ARE,

09:40AM  6   WHAT THE EXPECTATIONS ARE, AND HOW DOES IT FIT INTO OUR

09:40AM  7   PLANNING.

09:40AM  8   Q.   I SEE.  AND THEN IN THE EARLY PART OF 2014, DID YOU

09:40AM  9   RECEIVE A PROMOTION AT WALGREENS?

09:40AM 10   A.   I DID.

09:40AM 11   Q.   AND DESCRIBE THAT PROMOTION, PLEASE.

09:40AM 12   A.   SURE.  SO I DID RECEIVE A PROMOTION TO DIVISIONAL VICE

09:40AM 13   PRESIDENT OF HEALTH CARE SERVICES AND HEALTH CARE SERVICES

09:40AM 14   DEVELOPMENT, AND MY ROLE WAS A COMBINATION OF THE ROLE THAT I

09:40AM 15   HAD BEFORE, OVERSEEING A CONCEPT, THE REDESIGNING OF THE

09:40AM 16   STORES, WHICH WAS CALLED WELL EXPERIENCE, AS WELL AS SOME OF

09:40AM 17   THE OTHER INNOVATIONS THAT THE COMPANY WAS THINKING ABOUT AND

09:40AM 18   HOW DO WE OPERATIONALIZE AND EXECUTE ON THEM.

09:41AM 19          SO THE THERANOS PARTNERSHIP WAS NOW PART OF MY

09:41AM 20   RESPONSIBILITIES.

09:41AM 21   Q.   YOU USED A TERM JUST NOW, WELL EXPERIENCE.  IS THAT WHAT

09:41AM 22   YOU WERE DESCRIBING TO US EARLIER, THE PATIENT CENTERED FOCUS

09:41AM 23   OF WALGREENS STORES?

09:41AM 24   A.   THAT'S EXACTLY CORRECT.  THAT WAS THE INTERNAL TERM FOR

09:41AM 25   THE PROJECT WELL EXPERIENCE.  WE WERE TRYING TO CREATE THAT,

09:41AM 1    QUOTE-UNQUOTE, WELL EXPERIENCE FOR OUR CUSTOMERS AND PATIENTS

09:41AM 2    AS THEY WALKED IN AND GIVE THEM ACCESS TO SERVICES.

09:41AM 3    Q.   WHEN YOU RECEIVED THIS PROMOTION, DID YOUR ENGAGEMENT IN

09:41AM 4    THE THERANOS PROJECT CHANGE, OR YOUR RESPONSIBILITIES VIS-A-VIS

09:41AM 5    THE THERANOS PROJECT?

09:41AM 6    A.   YES, IT DID.

09:41AM 7         ONCE I TOOK ON THE NEW ROLE MY RESPONSIBILITIES, I HAD A

09:41AM 8    TEAM THAT ACTUALLY REPORTED TO ME THAT WAS NOW RESPONSIBLE FOR

09:41AM 9    THE PARTNERSHIP AND REALLY OPERATIONALIZING THIS PARTNERSHIP

09:41AM 10   THAT WE HAD HAD WITH THERANOS, OPEN MORE STORES SO WE CAN TEST

09:41AM 11   AND LEARN AND CONTINUE TO REFINE.

09:41AM 12   Q.   YOU JUST USED A TERM, OPERATIONALIZE.

09:41AM 13        WHAT DO YOU MEAN BY THAT?

09:42AM 14   A.   YEAH.  OPERATIONALIZE IS A BROAD TERM, AND IT'S REALLY

09:42AM 15   TAKING AN IDEA AND BRINGING IT TO MARKET, HELPING IT BECOME A

09:42AM 16   REALITY.

09:42AM 17        IN THIS CASE THERE WAS ABOUT THREE STORES, IF I REMEMBER

09:42AM 18   CORRECTLY, THAT WERE OPEN WITH THERANOS WELLNESS SERVICES

09:42AM 19   INSIDE OF THEM, AND THE IDEA WAS, HOW DO WE EXPAND THAT

09:42AM 20   FURTHER?

09:42AM 21        AND THAT REQUIRED -- OPERATIONALIZING SOMETHING REQUIRES,

09:42AM 22   IN THE RETAIL SETTING, CONSTRUCTION, DESIGN, LAYOUT, HOW DO WE

09:42AM 23   TRAIN OUR EMPLOYEES AND TEAM MEMBERS TO ACTUALLY EXECUTE ON THE

09:42AM 24   SERVICE?  WHAT DOES THE CUSTOMER EXPERIENCE LOOK LIKE?  YOU

09:42AM 25   KNOW, WHEN A PATIENT COMES IN AND WHEN A CUSTOMER WALKS IN,

09:42AM  1    WHAT HAPPENS?

09:42AM  2         ALL OF THOSE THOUGHTS AND IDEAS IS REALLY TO BRING IT INTO

09:42AM  3    AN EXECUTABLE WAY INSIDE OF A STORE, AND SO THAT'S WHAT I MEAN

09:42AM  4    BY OPERATIONALIZING.

09:42AM  5    Q.   THANK YOU.

09:42AM  6         WHEN YOU WERE DOING THIS WORK TO OPERATIONALIZE THE

09:43AM  7    THERANOS VENTURE, WERE YOU EVALUATING THE SUCCESS OF THE

09:43AM  8    THERANOS PROJECT?  YOU DESCRIBED THAT THERE WERE THREE STORES

09:43AM  9    OPENED.  WHERE WERE THOSE -- FIRST, WHERE WERE THOSE STORES?

09:43AM  10   A.   THE THREE STORES, ONE WAS IN CALIFORNIA IN PALO ALTO, AND

09:43AM  11   THE OTHER TWO WERE IN ARIZONA.

09:43AM  12   Q.   AND WERE YOU LOOKING AT CERTAIN METRICS OR JUST PAYING

09:43AM  13   ATTENTION TO HOW THE EXPERIENCE WAS GOING FOR CUSTOMERS TO

09:43AM  14   DETERMINE FURTHER EXPANSION?

09:43AM  15   A.   ABSOLUTELY.  WE HAD A SET OF METRICS THAT WE HAD DECIDED

09:43AM  16   WITH THE THERANOS TEAM, EVERYTHING FROM PATIENT WAIT TIME TO

09:43AM  17   HOW LONG IT TAKES TO CHECK YOU IN, TO MEASURES LIKE HOW MANY

09:43AM  18   MEMBERS WE'VE TRAINED, WHAT THE EXPERIENCE LEVELS LOOK LIKE.

09:43AM  19        AND THEN WE HAD SOME LAB RELATED MEASURES THAT WE ALSO

09:43AM  20   HAD, THE PERCENTAGE OF VENOUS VERSUS FINGERSTICK, BECAUSE THAT

09:43AM  21   WAS PART OF THE THERANOS VALUE PROPOSITION.

09:43AM  22        SO WE HAD SEVERAL OF THOSE MEASURES THAT WE LOOKED AT AND

09:44AM  23   MONITORED TO SEE, ARE WE SUCCEEDING?  ARE WE HITTING THE GOALS

09:44AM  24   THAT WE WANT TO HIT?  ARE WE ACHIEVING THE HYPOTHESIS THAT WE

09:44AM  25   SET OUT TO DO?

Case 5:18-cr-00258-EJD Document 1274 Filed 01/18/25 Page 43 of 222

09:44AM 1     Q.   WHEN A PATIENT WOULD COME INTO A WALGREENS THAT HAD A

09:44AM 2     THERANOS, WHAT SERVICES COULD THAT INDIVIDUAL RECEIVE FROM

09:44AM 3     THERANOS?

09:44AM 4     A.   WELL, THEY WERE ABLE TO RECEIVE THEIR TRADITIONAL LAB WORK

09:44AM 5     WHERE THEY OTHERWISE WOULD GO TO WITH A PROVIDER'S ORDER OR

09:44AM 6     PHYSICIAN'S ORDER, THEY COULD GO TO A LAB.

09:44AM 7          BUT IN THIS CASE THEY COULD GO TO WALGREENS PHARMACY AND

09:44AM 8     ACTUALLY RECEIVE A FINGERSTICK OR VENOUS DRAW AND HAVE THEIR

09:44AM 9     LABS DONE AND THOSE RESULTS WERE SENT TO THEIR PROVIDER WHO

09:44AM 10    ORDERED THOSE TESTS.

09:44AM 11    Q.   YOU SAID AT THIS STAGE ONE OF THE THINGS THAT YOU WERE

09:44AM 12    PAYING ATTENTION TO WAS THE PERCENT OF VENOUS DRAWS OR

09:45AM 13    FINGERSTICK DRAWS.  EXPLAIN THAT TO ME.  WHAT DO YOU MEAN?

09:45AM 14    A.   ABSOLUTELY.  SO IN A TRADITIONAL SETTING WHEN YOU WANT TO

09:45AM 15    GET YOUR LAB WORK DONE AND YOUR DOCTOR ORDERS LAB WORK AND YOU

09:45AM 16    NEED TO GET YOUR CHOLESTEROL CHECKED OR WHATEVER, YOUR BLOOD

09:45AM 17    COUNT, YOU'LL GO TO THE LAB AND THEY'LL TAKE SOME BLOOD OUT

09:45AM 18    FROM YOUR VENOUS, RIGHT BY YOUR ELBOW, OF SEVERAL TEST TUBES.

09:45AM 19          IN THE CASE OF THERANOS SERVICES, THE UNIQUE PART OF IT

09:45AM 20    WAS THAT YOU CAN DO THAT SAME TEST, THOSE SAME TESTS ON A SMALL

09:45AM 21    AMOUNT OF BLOOD THROUGH A FINGERSTICK, WHICH WAS EXTRAORDINARY,

09:45AM 22    AND THAT'S THE DIFFERENCE.

09:45AM 23          AND SO THE REAL AMAZING EXPERIENCE FOR PATIENTS WAS TO

09:45AM 24    COME IN, GET THOSE LABS THAT THEY TRADITIONALLY HAD THREE TEST

09:45AM 25    TUBES THAT THEY WERE TAKING OUT, BEING ABLE TO BE DONE WITH A

09:45AM  1     FEW DROPS OF BLOOD AND THROUGH A FINGERSTICK.

09:45AM  2          SO IT WAS LESS PAINFUL, IT WAS MORE EFFICIENT, IT WAS

09:45AM  3     FASTER, AND THAT REALLY IS THE DIFFERENCE BETWEEN THE TWO.

09:46AM  4     Q.   AND WAS THE NUMBER OF FINGERSTICK DRAWS OR THE PERCENT,

09:46AM  5     WAS THAT IMPORTANT TO WALGREENS?  WAS THAT A STATISTIC THAT

09:46AM  6     WALGREENS PAID ATTENTION TO?

09:46AM  7     A.   IT WAS VERY IMPORTANT.  IT WAS VERY IMPORTANT BECAUSE

09:46AM  8     THAT'S -- THAT WAS THE THERANOS TECHNOLOGY THAT WE HAD SIGNED A

09:46AM  9     PARTNERSHIP ON.  IT WAS CHANGING THE LAB ENVIRONMENT, THE

09:46AM 10     ABILITY FOR A PATIENT TO GET THEIR LAB WORK DONE IN A LESS

09:46AM 11     PAINFUL WAY, AND LESS BLOOD REQUIRED WAS THE ACTUAL MAGIC THAT,

09:46AM 12     YOU KNOW, THAT WAS SO INTRIGUING TO US AS WALGREENS.

09:46AM 13     Q.   DURING THIS PERIOD OF TIME, DID YOU HAVE PERIODIC MEETINGS

09:46AM 14     WITH INDIVIDUALS FROM THERANOS TO DISCUSS THIS TOPIC, THE

09:46AM 15     PERCENT OF VENOUS DRAWS?

09:46AM 16     A.   YES, SIR.

09:46AM 17     Q.   DID YOU HAVE ONE MAJOR POINT OF CONTACT AT THERANOS, OR

09:46AM 18     MANY?

09:46AM 19     A.   MY MAJOR CONTACT OR DAY-TO-DAY CONTACT WAS MR. BALWANI.

09:46AM 20     HE WAS THE CHIEF OPERATING OFFICER.

09:46AM 21     Q.   SO WHEN YOU HAD THESE PERIODIC MEETINGS TO DISCUSS HOW THE

09:47AM 22     ROLLOUT WAS GOING, WERE YOU HAVING THOSE DISCUSSIONS QUITE

09:47AM 23     OFTEN WITH MR. BALWANI HIMSELF?

09:47AM 24     A.   YES.

09:47AM 25          MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

09:47AM  1            THE COURT:  YES.

09:47AM  2            MR. SCHENK:  (HANDING.)

09:47AM  3   Q.   MR. JHAVERI, I'VE HANDED YOU A BINDER.  I WOULD ASK YOU TO

09:47AM  4   OPEN IT AND TURN TO TAB 1711.

09:47AM  5   A.   OKAY.

09:47AM  6   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

09:47AM  7   A.   I DO.

09:47AM  8   Q.   IS THIS AN EMAIL FROM AN INDIVIDUAL AT WALGREENS TO A

09:47AM  9   GROUP OF INDIVIDUALS, INCLUDING YOURSELF AND MR. BALWANI, IN

09:48AM 10   MAY OF 2014?

09:48AM 11   A.   YES.

09:48AM 12   Q.   AND DOES IT ALSO INCLUDE AS AN ATTACHMENT SOME SLIDES?

09:48AM 13   A.   YES, IT DOES.

09:48AM 14            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1711.

09:48AM 15            MR. DOWNEY:  YOUR HONOR, NO OBJECTION TO THE EMAIL.

09:48AM 16        I THINK THE ATTACHMENT HAS 801 PROBLEMS WITHIN 801

09:48AM 17   PROBLEMS.

09:48AM 18            THE COURT:  MR. SCHENK?

09:48AM 19            MR. SCHENK:  I'M NOT SURE WHICH SLIDES HE'S

09:48AM 20   REFERRING TO OR WHAT THE SPECIFIC 801 OBJECTION IS.

09:48AM 21            MR. DOWNEY:  WELL, YOUR HONOR, THERE ARE JUST

09:48AM 22   VARIOUS STATEMENTS ON VIRTUALLY EVERY SLIDE FROM PAGE 10 TO

09:48AM 23   REALLY FOLLOWING THEREAFTER WHICH ARE STATEMENTS BEING OFFERED

09:48AM 24   TO STATE WHAT THE STATE OF THE PROGRAM WAS.

09:49AM 25            THE COURT:  WHY DON'T YOU TRY TO LAY A FOUNDATION

09:49AM   1    AND LET'S GO FORWARD.

09:49AM   2              MR. SCHENK:  YES.  THANK YOU.

09:49AM   3    Q.   MR. JHAVERI, WOULD YOU LOOK AT THE SLIDES FOR A MOMENT?

09:49AM   4    THE SLIDES BEGIN ON PAGE 4 AND CONTINUE THROUGH THE REST OF THE

09:49AM   5    EXHIBIT THROUGH PAGE 17.

09:49AM   6    A.   IF I COULD JUST TAKE ONE MINUTE?

09:49AM   7    Q.   PLEASE.

09:49AM   8         (PAUSE IN PROCEEDINGS.)

09:49AM   9              THE WITNESS:  YES.

09:49AM  10    BY MR. SCHENK:

09:49AM  11    Q.   WERE THESE THE TYPES OF SLIDES PREPARED IN THE ORDINARY

09:49AM  12    COURSE OF BUSINESS FOR THE MEETINGS THAT WE JUST TALKED ABOUT?

09:49AM  13    A.   YES, THIS WAS IN PREPARATION FOR A STEERING COMMITTEE

09:49AM  14    MEETING IN MAY OF 2014, AND THESE SLIDES REFLECT THE

09:50AM  15    INFORMATION THAT WE SHARED WITH THE STEERING COMMITTEE.

09:50AM  16    Q.   AND WHEN THE SLIDES WERE PREPARED, DID YOU STRIVE TO

09:50AM  17    INCLUDE ACCURATE CONTENT WITHIN THE SLIDES?

09:50AM  18    A.   ABSOLUTELY.  YOU KNOW, IT WAS A PARTNERSHIP, SO THE

09:50AM  19    THERANOS TEAM AND THE WALGREENS TEAM, YOU KNOW, CREATED THESE

09:50AM  20    SLIDES TOGETHER SO WE CAN TELL THE STATUS OF THE PROGRAM

09:50AM  21    TOGETHER.

09:50AM  22    Q.   AND WERE THESE SLIDES PRESERVED SO THAT IF, AFTER THE

09:50AM  23    MEETING, YOU HAD A QUESTION ABOUT THE CONTENT OF A SLIDE OR

09:50AM  24    SOMETHING THAT WAS DISCUSSED, YOU COULD GO BACK TO THE SLIDES

09:50AM  25    AND LOOK AT THEM?

09:50AM  1    A.   YES.

09:50AM  2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1711.

09:50AM  3              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

09:50AM  4              THE COURT:  IT'S ADMITTED.  THE EMAIL AND THE SLIDES

09:50AM  5    ARE ADMITTED.  THEY MAY BE PUBLISHED.

09:50AM  6              MR. SCHENK:  THANK YOU, YOUR HONOR.

09:50AM  7         (GOVERNMENT'S EXHIBIT 1711 WAS RECEIVED IN EVIDENCE.)

09:50AM  8    BY MR. SCHENK:

09:50AM  9    Q.   MR. JHAVERI, LET'S START WITH THE TOP PORTION OF THE EMAIL

09:50AM 10    FROM THE SENDER AND IT'S FROM A PATTY HAWORTH.

09:50AM 11         DO YOU SEE THAT?

09:50AM 12    A.   I DO.

09:50AM 13    Q.   AND WHO WAS MS. HAWORTH?

09:50AM 14    A.   PATTY HAWORTH WAS A PROJECT MANAGER WHO WAS LEADING ALL OF

09:51AM 15    THE PROJECT MANAGEMENT FUNDAMENTALS FOR THE PROJECT ITSELF.

09:51AM 16    Q.   AND WITHIN THE TO LINE, THE FIRST NAME IS YOU; IS THAT

09:51AM 17    RIGHT?  YOU RECEIVED THIS?

09:51AM 18    A.   THAT'S CORRECT.

09:51AM 19    Q.   AND THEN ABOUT THE FOURTH LINE OF THE RECIPIENTS, DO YOU

09:51AM 20    SEE S. BALWANI?

09:51AM 21    A.   I DO.

09:51AM 22    Q.   AND WAS THAT MR. BALWANI'S EMAIL ADDRESS?

09:51AM 23    A.   YES, SIR.

09:51AM 24    Q.   AND THE SUBJECT IS DIAGNOSTIC TESTING EXECUTIVE STEERING

09:51AM 25    COMMITTEE SLIDE DECK.

09:51AM  1        WHAT WAS THE EXECUTIVE STEERING COMMITTEE?

09:51AM  2    A.   THE EXECUTIVE STEERING COMMITTEE WAS A COMMITTEE THAT WE

09:51AM  3    HAD FORMED AT THE EXECUTIVE LEVEL AT BOTH COMPANIES, AND IT WAS

09:51AM  4    DONE PERIODICALLY TO JUST KEEP ALL OF THE EXECUTIVES ABREAST OF

09:51AM  5    WHAT IS GOING ON IN THE PROGRESSION OF THE PROJECT ITSELF.

09:51AM  6    Q.   AND THE CONTENT SUGGESTS THAT THE SLIDE DECK IS ATTACHED

09:51AM  7    FOR A MEETING TODAY.

09:51AM  8        DO YOU SEE THAT?

09:51AM  9    A.   I DO.

09:51AM 10    Q.   YOU DESCRIBED A MOMENT AGO THESE PERIODIC MEETINGS.  WAS

09:52AM 11    THIS IN ADVANCE OF A MEETING THAT OCCURRED IN MAY OF 2014?

09:52AM 12    A.   YES.  THIS SLIDE DECK WAS FOR THAT MEETING FOR THAT

09:52AM 13    PARTICULAR DAY.

09:52AM 14    Q.   THANK YOU.  AND I'D LIKE NOW TO HAVE YOU TURN TO PAGE 7 OF

09:52AM 15    THE EXHIBIT.

09:52AM 16        IF WE CAN JUST ZOOM IN ON THE TOP BOX.

09:52AM 17        THE MEMBERS OF THE EXECUTIVE STEERING COMMITTEE APPEAR TO

09:52AM 18    BE LISTED HERE.

09:52AM 19        DO YOU SEE YOUR NAME?

09:52AM 20    A.   I DO, SIR.

09:52AM 21    Q.   AND ALSO MR. BALWANI AS COO FROM THERANOS?

09:52AM 22    A.   YES, SIR.

09:52AM 23    Q.   AND THERE ARE SOME OTHER INDIVIDUALS FROM WALGREENS LISTED

09:52AM 24    WITH YOUR NAME.  I WONDER IF YOU'LL TELL US WHO THEY ARE?

09:52AM 25    A.   SURE.  THE FIRST NAME IS KERMIT CRAWFORD.  KERMIT WAS THE

09:52AM   1   PRESIDENT OF PHARMACY SERVICES FOR WALGREENS AT THE TIME.

09:52AM   2       JASON DUBINSKY.  MR. DUBINSKY WAS THE FINANCIAL OFFICER.

09:53AM   3       BRAD FLEUGEL.  MR. FLEUGEL WAS THE CHIEF STRATEGY OFFICER

09:53AM   4   AT THE TIME.

09:53AM   5       ALEX GOURLAY.  ALEX WAS THE HEAD OF OUR FRONT STORE

09:53AM   6   OPERATIONS AT THAT TIME.  DAILY LIVING IS WHAT IT WAS CALLED.

09:53AM   7       AND THEN MYSELF.

09:53AM   8       MARK WAGNER WAS THE HEAD OF OUR STORE OPERATIONS.

09:53AM   9       AND THEN BRAD WASSON, WHO WAS MY BOSS, WAS THE HEAD OF THE

09:53AM  10   INNOVATIONS GROUP.

09:53AM  11   Q.  GREAT.  THANK YOU VERY MUCH.

09:53AM  12       IF YOU'LL NOW TURN TO PAGE 9.  IF YOU CAN ZOOM IN ON THIS

09:53AM  13   SLIDE, THE CONTENT.

09:53AM  14       IT'S ENTITLED CURRENT OPERATIONS METRICS.  WHAT DOES THAT

09:53AM  15   MEAN?  WHAT WERE THE CURRENT OPERATIONS METRICS?

09:53AM  16   A.  WELL, AS I REFERRED TO EARLIER, WE HAD DETERMINED -- "WE"

09:53AM  17   MEANING BOTH THE THERANOS TEAM AS WELL AS THE WALGREENS TEAM --

09:53AM  18   WHAT SHOULD WE BE MEASURING TO CONSTITUTE SUCCESS?  ARE WE

09:53AM  19   ACHIEVING THE SUCCESS FOR THIS PARTICULAR PROJECT AND HOW DO WE

09:54AM  20   MEASURE THAT?

09:54AM  21       AND SO THESE METRICS ARE IN REFERENCE TO THAT.  THESE WERE

09:54AM  22   THE ONES THAT WE DECIDED WOULD HAVE THE BIGGEST IMPACT ON THE

09:54AM  23   SUCCESS OF THE PROJECT, AND SO THAT'S WHAT WE WERE MEASURING.

09:54AM  24   Q.  GREAT.  AND THERE ARE -- THE TWO COLUMNS ON THE RIGHT EACH

09:54AM  25   HAVE DATES, FEBRUARY OF 2014 AND MAY OF 2014.

09:54AM 1          DID THERANOS AND WALGREENS NOT JUST TRACK PROGRESS AT A

09:54AM 2     PARTICULAR MOMENT, BUT OVER TIME?

09:54AM 3     A.   WE DID.

09:54AM 4     Q.   LET'S START WITH THE FIRST LINE.  THE FIRST ROW IS NUMBER

09:54AM 5     OF STORES LAUNCHED.

09:54AM 6          DO YOU SEE THAT?

09:54AM 7     A.   I DO.

09:54AM 8     Q.   AND WHAT WAS THE NUMBER FOR FEBRUARY AND THEN MAY OF 2014?

09:54AM 9     A.   FEBRUARY WAS THREE STORES LAUNCHED.

09:54AM 10    Q.   AND THEN BY MAY?

09:54AM 11    A.   ELEVEN STORES LAUNCHED.

09:54AM 12    Q.   AND THE NEXT LINE IS AVERAGE PATIENTS PER STORE PER DAY.

09:54AM 13    WOULD YOU READ THOSE NUMBERS TO THE JURY?

09:54AM 14    A.   SURE.  ON FEBRUARY 7TH, 2014, IT WAS .8; AND IN MAY OF

09:55AM 15    2014, IT WAS 3.1.

09:55AM 16    Q.   WERE WALGREENS AND THERANOS TRACKING OR PAYING ATTENTION

09:55AM 17    TO THE AVERAGE NUMBER OF PATIENTS PER STORE PER DAY?

09:55AM 18    A.   YES, WE WERE.

09:55AM 19    Q.   AND WAS THAT NUMBER IMPORTANT IN DETERMINING WHETHER THE

09:55AM 20    PILOT WAS SUCCESSFUL?

09:55AM 21    A.   IT IS VERY IMPORTANT.  IT'S -- IT SHOWS A COUPLE OF

09:55AM 22    DIFFERENT THINGS.  NUMBER ONE, IT SHOWS ADOPTION OF THIS

09:55AM 23    SERVICE BY PATIENTS.  IT SHOWS, ARE WE GROWING NOT ONLY IN

09:55AM 24    STORE COUNT, BUT IN THE NUMBER OF PATIENTS PER STORE?

09:55AM 25          SO IT WAS VERY, VERY IMPORTANT.

| | | |
|---|---|---|
| 09:55AM | 1 | AND IT ALSO ALLOWED US TO DETERMINE IF THERE WAS A RETURN |
| 09:55AM | 2 | ON THE INVESTMENT THAT BOTH THERANOS AND WALGREENS IS MAKING. |
| 09:55AM | 3 | Q.   THE NEXT LINE IS AVERAGE CHECK-IN, 10 TO 11 MINUTES IN |
| 09:55AM | 4 | FEBRUARY, DOWN TO 8 MINUTES IN MAY. |
| 09:55AM | 5 | WAS AVERAGE CHECK-IN SOMETHING THAT THERANOS AND WALGREENS |
| 09:55AM | 6 | ALSO TRACKED? |
| 09:55AM | 7 | A.   ABSOLUTELY. |
| 09:55AM | 8 | Q.   WHY? |
| 09:55AM | 9 | A.   THIS IS PART OF THE PATIENT EXPERIENCE.  AGAIN, THE ENTIRE |
| 09:55AM | 10 | SERVICE WAS TO CREATE A NEW PATIENT EXPERIENCE, ONE THAT IS |
| 09:56AM | 11 | EFFICIENT, ONE THAT IS LESS PAINFUL, ONE THAT IS LESS COST. |
| 09:56AM | 12 | AND SO WHEN A PATIENT CAME IN TO CHECK IN FOR THIS |
| 09:56AM | 13 | SERVICE, WE WANTED TO MAKE SURE THAT IT WAS GREAT FOR THEM, AND |
| 09:56AM | 14 | IT WAS SHORT, AND SO THAT'S WHY WE MEASURED IT FOR EVERY |
| 09:56AM | 15 | PATIENT. |
| 09:56AM | 16 | Q.   THE NEXT ROW IS AVERAGE PERFORM, 95 PERCENT RANGE. |
| 09:56AM | 17 | WHAT IS THAT? |
| 09:56AM | 18 | A.   YEAH.  SO WHAT WE DID HERE WAS HOW MANY OF THOSE PATIENTS |
| 09:56AM | 19 | WE ENDED UP THEN DID THE FULL, THEY RECEIVED THE FULL SERVICE, |
| 09:56AM | 20 | AND HOW LONG IT TOOK FOR -- FROM WHEN THEY WENT INTO THE ROOM |
| 09:56AM | 21 | TO GET THEIR LAB TESTS DONE, HOW LONG DID IT TAKE? |
| 09:56AM | 22 | AND AGAIN, THAT WAS PART OF THE ENTIRE SERVICE.  SO AS WE |
| 09:56AM | 23 | LOOK AT THESE NUMBERS, IT WAS SOMEWHERE BETWEEN 19 AND |
| 09:56AM | 24 | 20 MINUTES IN FEBRUARY, THE WHOLE EXPERIENCE; AND WE HAD THEN |
| 09:56AM | 25 | REDUCED IT DOWN FROM 13 TO 17 MINUTES. |

09:57AM 1        AND SO THAT WAS PART OF THE FULL EXPERIENCE.

09:57AM 2   Q.   I SEE.

09:57AM 3        AND THEN THE NEXT ROW, VENOUS DRAWS.  IN FEBRUARY OF 2014

09:57AM 4   THEY WERE AT 43 PERCENT; AND IN MAY OF 2014 THEY ARE AT

09:57AM 5   39 PERCENT.

09:57AM 6        WAS THAT SOMETHING THAT THERANOS AND WALGREENS TRACKED?

09:57AM 7   A.   YES.

09:57AM 8   Q.   WHY?

09:57AM 9   A.   AGAIN, AS I EXPLAINED EARLIER, THERE WERE TWO METHODS OF

09:57AM 10  HOW TO DRAW BLOOD.  ONE WAS THROUGH A FINGERSTICK, AND THE

09:57AM 11  OTHER WAS THROUGH YOUR TRADITIONAL VENOUS DRAW.

09:57AM 12       SO, AGAIN, THE THERANOS SERVICE, THAT WAS TO DO IT THROUGH

09:57AM 13  A FINGERSTICK, AND SO WE WANTED TO MEASURE THAT WHEN PATIENTS

09:57AM 14  CAME IN, WERE THEY ACTUALLY RECEIVING A FINGERSTICK FOR THEIR

09:57AM 15  BLOOD DRAW OR WERE THEY ACTUALLY RECEIVING A VENOUS DRAW FOR

09:57AM 16  THEIR BLOOD DRAW?

09:57AM 17       AND SO THAT'S WHY WE MEASURED THIS.  THIS WAS A BIG PART

09:57AM 18  OF THE EXPERIENCE.

09:57AM 19  Q.   AND WHICH DIRECTION DID WALGREENS DESIRE TO SEE THAT

09:58AM 20  NUMBER GO, VENOUS DRAWS INCREASE OR DECREASE?

09:58AM 21  A.   DECREASE.

09:58AM 22  Q.   AND WHY WAS THAT?

09:58AM 23  A.   ULTIMATELY THAT WAS THE EXPERIENCE.  IF WE WERE DOING

09:58AM 24  VENOUS DRAWS, IF THE PATIENTS WERE RECEIVING A VENOUS DRAW WHEN

09:58AM 25  THEY WALKED INTO A THERANOS WELLNESS CENTER INSIDE OF A

09:58AM 1    WALGREENS, THE EXPERIENCE IS NO DIFFERENT THAN GOING TO A LAB,

09:58AM 2    YOUR TRADITIONAL LAB.

09:58AM 3         SO WHAT WE WERE TRYING TO DO WAS TO MAKE SURE THAT THAT

09:58AM 4    NUMBER GETS TO ZERO, OR AS CLOSE AS POSSIBLE TO ZERO OVER TIME.

09:58AM 5    Q.   WHEN WALGREENS WAS EVALUATING WHETHER TO EXPAND THERANOS

09:58AM 6    SERVICES WITHIN WALGREENS STORES, WAS THIS NUMBER, VENOUS DRAW

09:58AM 7    PERCENT, RELEVANT TO THAT DETERMINATION?

09:58AM 8    A.   IT WAS.

09:58AM 9    Q.   WHY?

09:58AM 10   A.   AGAIN, IT'S PART OF THE EXPERIENCE AND IT'S PART OF THE

09:58AM 11   OFFERING.  YOU KNOW, IT'S, IT'S -- THIS WAS WHAT WAS BEING

09:58AM 12   TOUTED AS THE NEW TECHNOLOGY, THE NEW EXPERIENCE, AND SO IF

09:58AM 13   THIS NUMBER WAS IN THE 40 PERCENT OR HIGHER, OR NOT TO THE

09:59AM 14   POINT WHERE IT WAS CLOSE TO ZERO PERCENT, THE PATIENTS WERE NOT

09:59AM 15   RECEIVING THE SERVICE THAT THEY WERE PROMISED.

09:59AM 16   Q.   DID YOU DISCUSS THE IMPORTANCE OF VENOUS DRAW PERCENT WITH

09:59AM 17   MR. BALWANI?

09:59AM 18   A.   YES.

09:59AM 19   Q.   AND WOULD YOU TURN TO PAGE 10, THE NEXT PAGE.

09:59AM 20        THIS SLIDE IS CALLED VENOUS DRAWS.  AND THE FIRST LINE

09:59AM 21   READS, "ORIGINALLY ESTIMATED THAT BY END OF FEBRUARY 2014 WOULD

09:59AM 22   BE BELOW 20 PERCENT OF TOTAL DRAWS AND BELOW 10 PERCENT BY THE

09:59AM 23   END OF AUGUST."

09:59AM 24        DO YOU SEE THAT?

09:59AM 25   A.   I DO.

09:59AM   1   Q.   AND THERE'S A REFERENCE TO BELOW 10 PERCENT BY END OF

09:59AM   2   2014.  AND THE SLIDE WE JUST LOOKED AT SHOWED THAT IT WAS

09:59AM   3   43 PERCENT; IS THAT RIGHT?

09:59AM   4   A.   THAT'S RIGHT.

09:59AM   5   Q.   AND THE NEXT SECTION ON THIS SLIDE UNDER CURRENT

09:59AM   6   PROJECTIONS HAS SOME PROJECTIONS INCLUDED.

10:00AM   7        FIRST, WHERE DID THESE PROJECTIONS COME FROM?

10:00AM   8   A.   THIS CAME FROM THE THERANOS TEAM.  MR. BALWANI PROVIDED

10:00AM   9   THAT.  WE ASKED HIM -- OBVIOUSLY WALGREENS IS NOT THE LAB.

10:00AM  10   WE'RE NOT THE DEVELOPER OF THIS TECHNOLOGY.

10:00AM  11        AND SO THIS CONTENT, THIS SLIDE WAS PROVIDED TO US BY

10:00AM  12   MR. BALWANI.

10:00AM  13   Q.   THE FIRST DASH READS, "BELOW 20 PERCENT BY END OF AUGUST

10:00AM  14   AT A 90 PERCENT CONFIDENCE LEVEL."

10:00AM  15        WHAT DOES THAT MEAN?

10:00AM  16   A.   SO HE WAS VERY CONFIDENT, 90 PERCENT, THAT WE WOULD GET TO

10:00AM  17   UNDER 20 PERCENT BY THE END OF AUGUST IN TERMS OF VENOUS DRAWS.

10:00AM  18   SO 80 PERCENT -- TO MAKE IT VERY SIMPLE, 80 PERCENT OF THE

10:00AM  19   PATIENTS COMING IN WOULD GET A FINGERSTICK.

10:00AM  20   Q.   I SEE.  AND BY THE END OF AUGUST 2014, WAS THAT ACHIEVED?

10:00AM  21   A.   NO, SIR.

10:00AM  22   Q.   IT THE NEXT DASH READS, "BELOW 10 PERCENT BY END OF

10:00AM  23   OCTOBER, WITH A GREATER THAN 95 PERCENT CONFIDENCE LEVEL."

10:01AM  24        FIRST, DID THIS ALSO COME FROM MR. BALWANI?

10:01AM  25   A.   YES, SIR.

10:01AM 1    Q.   DID IT COME TO PASS THAT BELOW 10 PERCENT OF THE PATIENTS

10:01AM 2    RECEIVED A VENOUS DRAW BY THE END OF OCTOBER?

10:01AM 3    A.   NO, IT DID NOT COME TO PASS.

10:01AM 4    Q.   THE NEXT DASH READS, "BELOW 5 PERCENT BY THE END OF 2014

10:01AM 5    AT A 90 PERCENT CONFIDENCE LEVEL."

10:01AM 6         DID MR. BALWANI PROVIDE THAT INFORMATION?

10:01AM 7    A.   YES, SIR.

10:01AM 8    Q.   AND DID THAT COME TO PASS?  DID LESS THAN 5 PERCENT OF THE

10:01AM 9    PATIENTS RECEIVE VENOUS DRAWS?

10:01AM 10   A.   NO, IT DID NOT COME TO PASS.

10:01AM 11   Q.   IT THEN CONTINUES, "AT WHICH POINT MOVE VENOUS DRAWS ONLY

10:01AM 12   TO DESIGNATED/24-HOUR STORES."

10:01AM 13        WHAT DOES THAT MEAN?

10:01AM 14   A.   SO THE IDEA HERE IS THAT THE FINGERSTICK CAN BE DONE BY A

10:01AM 15   PHARMACY TECHNICIAN THAT IS TRAINED TO DO A FINGERSTICK.

10:01AM 16        A VENOUS DRAW REQUIRES A PHLEBOTOMIST, A LICENSED

10:01AM 17   PHLEBOTOMIST THAT IS TRAINED.

10:01AM 18        AND SO WHEN WE DID RECEIVE A CERTAIN PERCENTAGE, LIKE

10:02AM 19   BELOW 5 PERCENT, WE WOULD THEN BE ABLE TO MOVE THE PHLEBOTOMIST

10:02AM 20   TO ONLY 24-HOUR LOCATIONS WHERE THE VENOUS DRAW WAS REQUIRED

10:02AM 21   STILL FOR CERTAIN TESTS.  AND SO THAT WAS THE IDEA.

10:02AM 22        AGAIN, TO PUT PHLEBOTOMISTS IN EVERY STORE WAS FINANCIALLY

10:02AM 23   NOT ACHIEVABLE OR NOT SUSTAINABLE; AND THEN, SECONDLY, AT THE

10:02AM 24   SAME TIME WE WERE NOT ACHIEVING THE EXPERIENCE THAT WE WANTED

10:02AM 25   TO ACHIEVE.

10:02AM  1          SO THE IDEA HERE WAS TO GET THE PERCENTAGE DOWN TO A BELOW

10:02AM  2   5 PERCENT, AND SO 95 PERCENT OF THE PATIENTS WOULD GET A

10:02AM  3   FINGERSTICK, AND THOSE 5 PERCENT THAT STILL REQUIRED A VENOUS

10:02AM  4   DRAW, WE WOULD THEN DIRECT THOSE PATIENTS TO A 24-HOUR LOCATION

10:02AM  5   WHERE A PHLEBOTOMIST WOULD BE ON STAFF TO CONDUCT THE VENOUS

10:02AM  6   DRAW.

10:02AM  7   Q.   FROM AN ECONOMICS PERSPECTIVE, WHY IS IT BENEFICIAL TO

10:02AM  8   ONLY HAVE PHLEBOTOMISTS IN 24-HOUR LOCATIONS?

10:03AM  9   A.   WELL, NUMBER ONE, PHLEBOTOMISTS ARE TOUGH TO FIND, SO

10:03AM 10   STAFFING IS A CONCERN.

10:03AM 11          SECOND IS ALSO THERE IS AN ADDITIONAL SALARY NOW THAT HAS

10:03AM 12   TO BE PAID FOR.

10:03AM 13          WHAT WE WERE TRYING TO DO WITH THERANOS PARTNERSHIP IS TO

10:03AM 14   TRAIN SOME OF OUR TEAM MEMBERS, OUR PHARMACY TECHNICIANS WHO

10:03AM 15   WERE ALSO CERTIFIED IN PHARMACY, AND WE WERE TRAINING THEM TO

10:03AM 16   BECOME TECHNICIANS THAT THEY CAN DO FINGERSTICKS FOR SO WE

10:03AM 17   DON'T HAVE TO ADD AN ADDITIONAL INDIVIDUAL INSIDE OF A STORE.

10:03AM 18          SO IT KEPT THE COST PROFILE LOW, IT MADE THE EXPERIENCE

10:03AM 19   MORE SEAMLESS, AND IT MADE THE EXPERIENCE MORE EFFICIENT, AND

10:03AM 20   SO THAT'S WHY THIS WAS IMPORTANT FOR US.

10:03AM 21   Q.   DOES THE NEXT DASH BELOW THAT READS, "HOWEVER, THERE ARE

10:03AM 22   FEW TESTS THAT WE (WALGREENS AND THERANOS) MAY AGREE TO OFFER

10:03AM 23   FROM VENIPUNCTURE FOR SPECIALTY PHARMACY."

10:03AM 24          WHAT DOES THAT MEAN?  WHAT IS SPECIALTY PHARMACY?

10:04AM 25   A.   YEAH.  THERANOS WAS WORKING ON SOME MORE COMPLEX TESTS

10:04AM  1    THAT WOULD REQUIRE MORE BLOOD FOR THE TESTING, AND SO THIS

10:04AM  2    POINT WAS TO MAKE THAT IN THOSE 24-HOUR LOCATIONS WE WOULD

10:04AM  3    TRANSFER SOME OF THOSE MORE COMPLEX TESTS THAT DID REQUIRE MORE

10:04AM  4    BLOOD TO THOSE STORES.

10:04AM  5        AND SO THAT'S WHAT WE'RE REFERRING TO HERE, THAT THERE

10:04AM  6    MIGHT BE ALWAYS SOME TESTS THAT REQUIRE A FULL BLOOD DRAW.

10:04AM  7    Q.   AND WERE THESE MORE COMPLEX TESTS LESS COMMONLY ORDERED?

10:04AM  8    A.   THEY WERE LESS COMMONLY ORDERED, YES.

10:04AM  9    Q.   SO DID YOU UNDERSTAND THAT THERANOS COULD DO THE MORE

10:04AM  10   COMMONLY ORDERED TESTS BY FINGERSTICK, THAT THERE WOULD BE SOME

10:04AM  11   OF THESE LESS FREQUENTLY OR LESS COMMONLY ORDERED TESTS THAT

10:04AM  12   WOULD CONTINUE TO BE PERFORMED WITH A VEIN DRAW?

10:04AM  13   A.   THAT'S CORRECT.

10:04AM  14   Q.   AND THEN FINALLY IT READS, "WHY HIGHER NUMBER OF VENOUS

10:04AM  15   DRAWS SO FAR."

10:04AM  16       AND THEN IT GIVES A COUPLE OF REASONS.

10:04AM  17       WHO PROVIDED THESE REASONS?

10:04AM  18   A.   MR. BALWANI DID.

10:04AM  19   Q.   THE FIRST REASON IS "LEARNING PROCESS AROUND ORDERING

10:05AM  20   PATTERNS FOR ARIZONA."

10:05AM  21       DO YOU KNOW WHAT THAT MEANS?

10:05AM  22   A.   YES.  SO PART OF THE DISCUSSION THAT MR. BALWANI AND I

10:05AM  23   ALWAYS HAD IS HOW -- WHAT ARE YOU DOING -- "YOU" BEING

10:05AM  24   THERANOS -- TO CONTINUE TO REDUCE THE NUMBER OF VENOUS DRAWS?

10:05AM  25       AND THE REASONS THAT HE PROVIDED TO US WAS, ONE, THAT THEY

10:05AM  1    WERE STILL LEARNING THE PATTERNS, THE ORDERING PATTERNS FROM

10:05AM  2    THE PHYSICIANS IN EACH OF THESE AREAS, AND SO AS THEY LEARN,

10:05AM  3    THEY CAN MAKE SURE THEIR NANOTAINERS AND THEIR TECHNOLOGY IS

10:05AM  4    PREPARED AND READY FOR A FINGERSTICK TYPE OF A DRAW.

10:05AM  5         AND SO THAT'S WHAT THIS IS REFERRING TO.

10:05AM  6    Q.   AND THEN THE NEXT DASH READS, "ORDERING PATTERNS ARE

10:05AM  7    DIFFERENT THAN ANTICIPATED AND THERANOS IS ADDING NEW

10:05AM  8    CARTRIDGES RAPIDLY TO ADDRESS THESE PATTERNS."

10:05AM  9         WHAT DOES THAT MEAN?

10:05AM  10   A.   THAT'S EXACTLY A LITTLE BIT MORE EXPANSION OF MY POINT

10:05AM  11   EARLIER IS AS THERANOS UNDERSTOOD WHAT THE PHYSICIANS WERE

10:06AM  12   ORDERING IN THOSE PARTICULAR AREAS, THEY CAN BETTER PREPARE

10:06AM  13   THEIR CARTRIDGES, THEIR NANOTAINERS, AND THEIR TECHNOLOGY TO BE

10:06AM  14   ABLE TO DO THESE TESTS ON A FINGERSTICK.

10:06AM  15   Q.   DID MR. BALWANI EXPLAIN TO YOU THAT ONE OF THE REASONS WHY

10:06AM  16   THERE WERE HIGH VENOUS DRAW NUMBERS WAS BECAUSE OF

10:06AM  17   TECHNOLOGICAL PROBLEMS WITH THE THERANOS TECHNOLOGY?

10:06AM  18   A.   NO.  HE ALWAYS EXPLAINED IT AS THEY WERE LEARNING FROM

10:06AM  19   WHAT WAS BEING ORDERED, AND AS THEY LEARNED, THEY WOULD MAKE

10:06AM  20   SURE THAT THEIR TECHNOLOGY WAS READY TO GO FOR -- WITH THE

10:06AM  21   CARTRIDGES TO BE ABLE TO DO A FINGERSTICK.

10:06AM  22   Q.   AND WHEN THERANOS DID A FINGERSTICK DRAW, WHERE DID YOU OR

10:06AM  23   WALGREENS THINK THAT THAT BLOOD WAS BEING TESTED, ON A THERANOS

10:06AM  24   DEVICE OR ON A DIFFERENT DEVICE?

10:06AM  25   A.   ON A THERANOS DEVICE.

```
10:06AM   1   Q.   DID YOU KNOW WHETHER THERANOS WAS MODIFYING THIRD PARTY
10:06AM   2   DEVICES, CHANGING DEVICES THAT HAD BEEN MANUFACTURED BY SOMEONE
10:06AM   3   OTHER THAN THERANOS TO TEST FINGERSTICK DRAWS?
10:07AM   4   A.   NO.
10:07AM   5   Q.   WOULD YOU NOW TURN TO THE 12TH PAGE.  AND THE SLIDE IS
10:07AM   6   CALLED MARKETING RESEARCH OVERVIEW, AND IT'S THE LAST ONE ON
10:07AM   7   THE RIGHT THAT I'D LIKE TO BLOW UP.
10:07AM   8        AND UNDER THE WORD "MARKETING," DO YOU SEE THAT?
10:07AM   9   A.   YES, SIR.
10:07AM  10   Q.   IT LOOKS LIKE THERE'S SOME DISCUSSION OF EXTERNAL
10:07AM  11   ADVERTISING TO GENERATE AWARENESS OF SERVICE AND PERCEPTION OF
10:07AM  12   WALGREENS AS A HEALTH CARE INNOVATOR.
10:07AM  13        WHAT DOES THAT MEAN?
10:07AM  14   A.   THE ENTIRE SENTENCE OR --
10:07AM  15   Q.   FAIR QUESTION.
10:07AM  16        WHAT WAS THE USE OF ADVERTISING -- FOR WHAT PURPOSE WAS
10:07AM  17   ADVERTISING BEING DISCUSSED IN THESE MEETINGS?
10:07AM  18   A.   YEAH.  SO THIS WAS A BRAND NEW SERVICE FOR WALGREENS, AND
10:07AM  19   CERTAINLY THERANOS WAS A BRAND NEW COMPANY THAT WAS DEVELOPING
10:08AM  20   THIS NEW SERVICE, AND WE WANTED TO MAKE SURE THAT PEOPLE KNEW
10:08AM  21   THAT THE SERVICE WAS AVAILABLE.
10:08AM  22        SO WHETHER IT WAS SIGNAGE ON A STORE OR SIGNAGE BY THE
10:08AM  23   PHARMACY, OR BILLBOARDS, WHATEVER IT TAKES TO LET FOLKS KNOW
10:08AM  24   THAT THIS NEW SERVICE IS AVAILABLE.
10:08AM  25        AND THAT'S WHAT WE WERE TALKING ABOUT HERE IS, HOW DO WE
```

10:08AM  1    LET THE PUBLIC KNOW THAT THESE PARTICULAR STORES HAD THESE NEW

10:08AM  2    SERVICE THAT THEY CAN NOW LET THEIR PHYSICIANS KNOW ABOUT?

10:08AM  3        WALGREENS, AS A HEALTH CARE INNOVATOR, CERTAINLY WE WERE

10:08AM  4    TRYING TO EXPAND THE SERVICES BEYOND SIMPLY YOUR FRONT OF STORE

10:08AM  5    ITEMS, SHAMPOO, THINGS OF THAT NATURE, AND YOUR TRADITIONAL

10:08AM  6    PHARMACY.

10:08AM  7        SO WHAT THIS IS REFERRING TO IS THAT IT ALSO CONTINUES TO

10:08AM  8    PUSH FORWARD WALGREENS'S REPUTATION AS BEING AN INNOVATOR IN

10:08AM  9    THE HEALTH CARE SPACE.

10:08AM 10    Q.   SO DID THERANOS AND WALGREENS DISCUSS USING ADVERTISING TO

10:09AM 11    ENCOURAGE PATIENTS TO USE THE THERANOS BLOOD TESTING SERVICE?

10:09AM 12    A.   YES.   AND I WANT TO BE VERY CLEAR.   PATIENTS CAN'T WALK IN

10:09AM 13    AND GET THEIR LAB WORK DONE.

10:09AM 14        JUST LIKE TODAY, YOU CAN'T SIMPLY WALK INTO THE LAB AND

10:09AM 15    ASK FOR LABS, YOUR COMPLETE BLOOD PANEL OR THINGS OF THAT

10:09AM 16    NATURE TO BE DONE.

10:09AM 17        SO THE IDEA WAS THAT FOR PATIENTS TO KNOW ABOUT THIS

10:09AM 18    SERVICE AND THEN TO GO TO THEIR PROVIDER AND SAY, HEY, I NEED

10:09AM 19    LABS DONE, CAN I USE THAT NEW SERVICE?   THAT REQUIRES LESS

10:09AM 20    BLOOD AND IT'S LESS PAINFUL AND IT'S CONVENIENT AND IT'S AT MY

10:09AM 21    WALGREENS STORE.

10:09AM 22        THAT WAS THE IDEA HERE.

10:09AM 23        SO WE WERE TRYING TO LET THE PUBLIC KNOW THAT THIS NEW

10:09AM 24    INNOVATIVE SERVICE IS NOW AVAILABLE.

10:09AM 25    Q.   THROUGH ADVERTISING?

10:09AM 1    A.   THROUGH ADVERTISING, YES.

10:09AM 2    Q.   AND YOU DESCRIBED THE INABILITY OF A PATIENT TO COME IN

10:09AM 3    AND GET THEIR OWN BLOOD TEST ORDERS.

10:09AM 4         DID THAT CHANGE AT SOME POINT IN ARIZONA, DO YOU KNOW?

10:09AM 5    A.   YEAH.  WHAT I REMEMBER IS AT SOME POINT ARIZONA DID ALLOW

10:10AM 6    PATIENTS TO DO SELF-DIRECTED LABS, AND THAT DID CHANGE AT A

10:10AM 7    CERTAIN POINT THEN, AND WE WERE MEASURING THAT AS WELL.

10:10AM 8    Q.   WOULD YOU TURN TO THE NEXT PAGE.  IT'S PAGE 13.  THIS

10:10AM 9    SLIDE INCLUDES MARKETING CONCEPTS.

10:10AM 10        DO YOU SEE THAT?

10:10AM 11   A.   YES, SIR.

10:10AM 12   Q.   WERE THESE PROPOSED OR DISCUSSED WAYS TO ADVERTISE THE

10:10AM 13   THERANOS BLOOD TESTING SERVICE?

10:10AM 14   A.   YES.

10:10AM 15   Q.   AND SO ONE OF THEM READS "THE SMALLER BLOOD TEST IS HERE."

10:10AM 16        DO YOU SEE THAT ONE?

10:10AM 17   A.   I DO.

10:10AM 18   Q.   AND THE ONE BELOW THAT READS, "THE SMALLER, SMARTER BLOOD

10:10AM 19   TEST."

10:10AM 20        DO YOU SEE THAT ONE?

10:10AM 21   A.   I DO.

10:10AM 22   Q.   AND IN EACH OF THOSE SLIDES THERE'S SOME IMAGES.  WHAT IS

10:10AM 23   THE IMAGE ON THE RIGHT OF EACH OF THOSE SLIDES?  DO YOU

10:10AM 24   RECOGNIZE IT?

10:10AM 25   A.   I DO.  THAT WAS THE IMAGE OF THE NANOTAINER THAT THEY WERE

10:10AM 1     USING, AND THE BLOOD THAT IS INSIDE OF IT, THE PICTURE OF THE

10:11AM 2     BLOOD IS TO INDICATE THE SMALL AMOUNT OF BLOOD THAT IS REQUIRED

10:11AM 3     FOR THIS TEST.

10:11AM 4     Q.   AND SO WHEN THE BLOOD TESTING SERVICE WAS ADVERTISED TO

10:11AM 5     THE PUBLIC, DID YOU, IN THE ADS, HIGHLIGHT THE FINGERSTICK

10:11AM 6     NATURE OR THE SMALL BLEW DRAW NATURE OF THE TEST?

10:11AM 7     A.   WE DID.  WE DID.

10:11AM 8     Q.   AND WHY DID YOU HIGHLIGHT THAT PART OF THE SERVICE IN

10:11AM 9     PARTICULAR?

10:11AM 10     A.   AGAIN, AS I MENTIONED EARLIER, THE INNOVATION HERE WAS

10:11AM 11     THAT YOU CAN GET YOUR LABS DONE IN A FEW DROPS OF BLOOD WITH A

10:11AM 12     FINGERSTICK.  THAT WAS THE INNOVATION.

10:11AM 13         AND SO THAT'S WHAT WE WANTED TO TELL PATIENTS AND

10:11AM 14     CUSTOMERS ABOUT.

10:11AM 15         IF IT WAS SIMPLY ANOTHER, YOU KNOW, THREE TEST TUBES OF

10:11AM 16     BLOOD AT YOUR LOCAL LAB, WELL, THERE WASN'T ANYTHING INNOVATIVE

10:11AM 17     THERE.

10:11AM 18         WE WERE TRYING TO TELL, QUITE HONESTLY, ALL OF THE FOLKS

10:11AM 19     AROUND THE STORES THAT THIS NEW INNOVATION NOW EXISTS, AND IT

10:11AM 20     CAN BE AVAILABLE AT YOUR WALGREENS STORE.

10:11AM 21     Q.   THANK YOU.

10:12AM 22         WOULD YOU TURN NOW TO PAGE 15.

10:12AM 23         THIS SLIDE IS CALLED DIAGNOSTIC TESTING TIMELINE.

10:12AM 24         DO YOU SEE THAT?

10:12AM 25     A.   YES, SIR.

10:12AM   1    Q.   AND THERE ARE A COUPLE OF STARS ON THERE, AND THEN ON THE

10:12AM   2    RIGHT THERE'S A LEGEND OR A KEY.

10:12AM   3         DO YOU SEE THAT?

10:12AM   4    A.   YES, I DO.

10:12AM   5    Q.   AND IT LOOKS LIKE -- MY COPY IS A LITTLE BLURRY, BUT IT

10:12AM   6    LOOKS LIKE IT SAYS DECISION TO SCALE BASED ON OPERATING MODEL.

10:12AM   7    A.   CORRECT.

10:12AM   8    Q.   AND WHAT DOES THAT MEAN?

10:12AM   9    A.   WELL, AS I MENTIONED EARLIER, THE OPERATING MODEL IS

10:12AM  10    EVERYTHING THAT IT TAKES TO LAUNCH A STORE AND TO CONTINUE TO

10:12AM  11    LAUNCH MORE STORES.

10:12AM  12         AND PART OF WHAT WE WERE DOING HERE, AND WHAT YOU SAW FROM

10:12AM  13    3 STORES TO 11 STORES, IS TO CONTINUE TO EXPAND OUR PILOT.

10:12AM  14         IT'S NOT EASY TO WAKE UP ONE DAY AND SAY WE'RE GOING TO

10:13AM  15    OPEN, YOU KNOW, HUNDREDS OF STORES.  AS I MENTIONED EARLIER, IT

10:13AM  16    REQUIRES TRAINING OF OUR STAFF, IT REQUIRES CONSTRUCTION, IT

10:13AM  17    REQUIRES PLANNING OF HOW WE DO CONSTRUCTION, WHAT THE

10:13AM  18    EXPERIENCE WILL LOOK LIKE, WHAT THE CUSTOMER SERVICE WILL LOOK

10:13AM  19    LIKE, HOW DO WE KEEP THE DUST OFF OF PRODUCTS AND PEOPLE, WHAT

10:13AM  20    DOES THE MARKETING AND THE I.T. LOOK LIKE?

10:13AM  21         AND SO WE HAVE TO PLAN FOR THAT, AND SOMETIMES IT TAKES

10:13AM  22    MONTHS AND, IN SOME CASE DEPENDING ON ZONING LAWS, YEARS.

10:13AM  23         SO AS WE PLAN FOR ANY PROJECT, LET ALONE THE THERANOS

10:13AM  24    PARTNERSHIP, WE DO A PROOF OF CONCEPT AND THEN A PILOT AND WE

10:13AM  25    EXTEND THAT PILOT.  AND AS WE LEARN MORE, WE CONTINUE TO

10:13AM  1    EXPAND.  AND IF WE'RE HITTING THE TARGETS FOR ANY PROJECT, THEN

10:13AM  2    WE CONTINUE TO EXPAND.

10:13AM  3         SO WHAT THIS IS SHOWING IS WHEN IT WOULD BE TIME FOR US TO

10:13AM  4    MAKE THE DECISION FOR THE NEXT SET OF STORES AND WHAT WOULD

10:13AM  5    DETERMINE THAT, AND SO THAT'S WHAT THIS TIMELINE SHOWS.

10:13AM  6    Q.   AND WHEN THIS SLIDE WAS BEING DISCUSSED, DID YOU EXPLAIN

10:14AM  7    TO MR. BALWANI THAT FURTHER EXPANSION, MORE WALGREENS STORES

10:14AM  8    WITH THERANOS'S SERVICES WAS DEPENDENT UPON SUCCESS IN THE

10:14AM  9    PILOT?

10:14AM  10   A.   ABSOLUTELY.  MR. BALWANI AND I SPOKE ABOUT ALL OF THIS ON

10:14AM  11   A REGULAR BASIS ON WHAT CONSTITUTES SUCCESS, HOW TO EXPAND

10:14AM  12   FURTHER, WHAT WILL BE REQUIRED, WHAT DOES THE DESIGN LOOK LIKE

10:14AM  13   OF THE STORE TO, YOU KNOW, HOW FAST CAN WE GO?

10:14AM  14        SO, YES, MR. BALWANI WAS FULLY AWARE OF ALL OF THIS.

10:14AM  15   Q.   AND DID YOU EVER TELL MR. BALWANI THAT FURTHER EXPANSION

10:14AM  16   OR NATIONWIDE EXPANSION WITH WALGREENS WAS GUARANTEED?

10:14AM  17   A.   NO.

10:14AM  18   Q.   WOULD YOU TURN TO PAGE 17.  THIS SLIDE IS ENTITLED THE

10:14AM  19   PATH FORWARD.

10:14AM  20        AND THE FIRST BULLET READS, "OPERATIONS IMPROVEMENT."

10:15AM  21        WHAT IS THE FIRST BULLET UNDER THAT?

10:15AM  22   A.   "FOCUS ON VENOUS DRAWS REDUCTION."

10:15AM  23   Q.   WHAT DOES THAT MEAN?

10:15AM  24   A.   IT'S REDUCING THE PERCENTAGE OF DRAWS THAT ARE FROM THE

10:15AM  25   VENOUS VERSUS FINGERSTICK.

10:15AM  1    Q.   AND WAS THAT VERY IMPORTANT TO WALGREENS?

10:15AM  2    A.   IT WAS.

10:15AM  3    Q.   IF YOU'LL NOW GO DOWN TWO BULLETS WHICH BEING "ACHIEVE,"

10:15AM  4    "ACHIEVE 15 PATIENTS PER DAY PER STORE."

10:15AM  5         WHAT DOES THAT MEAN?

10:15AM  6    A.   AS I MENTIONED EARLIER, WE WERE MEASURING THE NUMBER OF

10:15AM  7    PATIENTS THAT COME TO THE THERANOS WELLNESS SERVICES PER STORE

10:15AM  8    PER DAY.

10:15AM  9         AND WE WERE, IF YOU REMEMBER, AT 3.1 IN MAY.  WHAT WE WERE

10:15AM  10   TRYING TO HIT IS THE 15 PATIENTS PER DAY AS OUR GOAL.

10:15AM  11   Q.   THANK YOU.

10:15AM  12        WOULD YOU NOW TURN TO EXHIBIT 1755.

10:15AM  13        DO YOU RECOGNIZE THIS DOCUMENT?

10:15AM  14   A.   I DO.

10:16AM  15   Q.   IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO INDIVIDUALS AT

10:16AM  16   THERANOS AND WALGREENS, INCLUDING MR. BALWANI AND YOURSELF, AND

10:16AM  17   ATTACHING SOME MEETING MINUTES?

10:16AM  18   A.   YES.

10:16AM  19             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1755.

10:16AM  20             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:16AM  21             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:16AM  22        (GOVERNMENT'S EXHIBIT 1755 WAS RECEIVED IN EVIDENCE.)

10:16AM  23             MR. SCHENK:  THANK YOU.

10:16AM  24   Q.   THIS EMAIL WAS SENT IN JUNE OF 2014, AND IT LOOKS LIKE THE

10:16AM  25   SUBJECT SUGGESTS THAT IT'S MEETING MINUTES FROM A MEETING THAT

10:16AM  1   HAPPENED AT THE END OF MAY OF THE SAME YEAR, OF 2014; IS THAT

10:16AM  2   RIGHT?

10:16AM  3   A.   THAT'S CORRECT.

10:16AM  4   Q.   AND SO WERE THESE PARTNERSHIP MEETINGS WHERE YOU AND

10:16AM  5   MR. BALWANI AND OTHERS ATTENDED, WERE THEY ROUGHLY MONTHLY?

10:16AM  6   A.   YEAH, APPROXIMATELY MONTHLY.

10:16AM  7   Q.   AND WERE THERE SOMETIMES POWERPOINT SLIDES PRESENTED LIKE

10:16AM  8   THE ONES WE JUST TALKED ABOUT?

10:16AM  9   A.   YES, THERE WOULD BE.

10:16AM  10  Q.   AND ON OTHER OCCASIONS WERE THERE MEETING MINUTES FROM THE

10:16AM  11  MEETING?

10:16AM  12  A.   YES, THERE WERE.

10:16AM  13  Q.   AND IF YOU WOULD TURN TO PAGE 6.  THIS LOOKS LIKE THE

10:17AM  14  FIRST PAGE OF THE MEETING MINUTES, AND I WANT TO ASK YOU ABOUT,

10:17AM  15  WITHIN THE CONTENT OF MEETING MINUTES, THE SECOND PARAGRAPH,

10:17AM  16  THE ONE THAT BEGINS WITH YOUR NAME.

10:17AM  17      DO YOU SEE THAT?

10:17AM  18  A.   I DO.

10:17AM  19  Q.   AND IT READS, "NIMESH REMINDED US OF HOW FAR WE HAVE COME

10:17AM  20  SINCE JANUARY.  WE ARE AT 21 STORES NOW."

10:17AM  21      AGAIN, THIS IS THE END OF MAY; IS THAT RIGHT?

10:17AM  22  A.   THAT'S CORRECT.

10:17AM  23  Q.   2014.

10:17AM  24      "A PILOT SHOULD NOT BE PERFECT.  IT SHOULD BE SO THAT WE

10:17AM  25  CAN LEARN EVERYTHING WE NEED TO SCALE.  THE LEARNINGS THAT ARE

10:17AM 1    COMING OUT OF THE FIRST 21 STORES ARE PRETTY GOOD.  WE MAY NOT

10:17AM 2    LIKE THEM, BUT WE ARE LEARNING."

10:17AM 3        WHAT DID YOU MEAN BY THAT, "WE MAY NOT LIKE THEM," THE

10:17AM 4    LEARNINGS, "BUT WE ARE LEARNING"?  WHAT DOES THAT MEAN?

10:17AM 5    A.  WE WERE IN THE THROES OF NOW EXPANDING, SO MORE PATIENTS

10:17AM 6    COME THROUGH THE STORES, AND WE UNDERSTAND EXACTLY WHAT IS

10:18AM 7    GOING ON, EVERYTHING FROM PATIENT WAIT TIME TO WHAT PERCENTAGE

10:18AM 8    OF VENOUS DRAWS, AND SOME THINGS WERE MOVING IN THE RIGHT

10:18AM 9    DIRECTION, AND SOME THINGS WERE NOT.

10:18AM 10       SO MY POINT HERE WAS THAT WE ARE STILL LEARNING.  WE ARE

10:18AM 11   CONTINUING TO LEARN.  YOU KNOW, IT'S DIFFICULT.  WE MAY NOT

10:18AM 12   LIKE ALL OF THE RESULTS.

10:18AM 13       BUT THAT'S WHAT PILOTS ARE FOR.  IT'S TO LEARN SO WE CAN

10:18AM 14   PERFECT THOSE THINGS THAT ARE NOT PERFECTED OR IMPROVE THAT ARE

10:18AM 15   NOT IMPROVED BEFORE WE SCALE.

10:18AM 16       SO THIS WAS MY MESSAGE TO BOTH THE THERANOS TEAM AS WELL

10:18AM 17   AS THE WALGREENS TEAM.

10:18AM 18   Q.  EVEN NEWS THAT YOU DIDN'T, YOU DIDN'T LIKE TO HEAR WAS

10:18AM 19   HELPFUL AT THIS POINT?  IS THAT WHAT YOU MEAN?  WE CAN BUILD

10:18AM 20   UPON AND GAIN FROM THAT KNOWLEDGE?

10:18AM 21   A.  ABSOLUTELY.  FOR EVERY TYPE OF PROJECT, YOU NEED TO HAVE A

10:18AM 22   BALANCED VIEW.  YOU JUST CAN'T HAVE ROSE COLORED GLASSES.  SO

10:18AM 23   THAT'S WHAT I'M TRYING TO SAY HERE.

10:18AM 24   Q.  DID YOU WANT TO SEE THIS PROJECT BE SUCCESSFUL?  DID YOU

10:18AM 25   WANT TO SEE THERANOS EXPAND IN WALGREENS STORES?

10:19AM 1    A.   ABSOLUTELY.

10:19AM 2    Q.   DID YOU AT THIS TIME STILL THINK THAT THERANOS WAS TESTING

10:19AM 3    THE FINGERSTICK BLOOD DRAWS ON THE THERANOS DEVICE?

10:19AM 4    A.   YES.

10:19AM 5    Q.   DID YOU HEAR OF THE DEVICE CALLED AN EDISON?  DOES THAT

10:19AM 6    TERM SOUND FAMILIAR TO YOU?

10:19AM 7    A.   I HAVE HEARD OF THAT.

10:19AM 8    Q.   AND SO DID YOU THINK THAT THE BLOOD TESTING WAS DONE ON AN

10:19AM 9    EDISON DEVICE?

10:19AM 10   A.   WHAT I KNEW WAS THAT WHETHER IT WAS EDISON OR ANOTHER

10:19AM 11   THERANOS DEVICE, IT WAS DONE ON A THERANOS DEVICE.

10:19AM 12   Q.   AND AT THIS TIME WHEN THE LEARNINGS AREN'T ALWAYS GOOD BUT

10:19AM 13   WE BENEFIT FROM THEM, DID YOU KNOW WHETHER THERANOS WAS TESTING

10:19AM 14   PATIENT'S BLOOD ON MODIFIED THIRD PARTY DEVICES?

10:19AM 15   A.   NO.

10:19AM 16   Q.   HOW ABOUT THE VENOUS DRAW PERCENT?  WERE YOU SATISFIED

10:19AM 17   WITH WHERE THAT NUMBER WAS AT THIS POINT?

10:19AM 18   A.   NO.  NO ONE WAS SATISFIED WITH THE HIGH PERCENTAGE.

10:19AM 19   Q.   WHEN YOU SAID NO ONE, DO YOU MEAN ALSO MR. BALWANI?

10:19AM 20   A.   ABSOLUTELY.

10:19AM 21   Q.   AND WHY DO YOU SAY THAT?

10:19AM 22   A.   BECAUSE, YOU KNOW, WE SPOKE ON A REGULAR BASIS ON WHAT

10:20AM 23   WILL CONSTITUTE SUCCESS, AND AS YOU SAW IN OUR PREVIOUS SLIDE,

10:20AM 24   HE WANTED TO REDUCE THEM AS WELL BECAUSE, AGAIN, THAT WAS THE

10:20AM 25   EXPERIENCE, THAT WAS THE INNOVATION, AND WE BOTH, AND OUR

10:20AM   1    TEAMS, WANTED THOSE PERCENTAGES TO GO DOWN.

10:20AM   2    Q.   NOW, IF YOU'LL TURN, PLEASE, TO 1884.

10:20AM   3         IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO A GROUP AT

10:20AM   4    WALGREENS AND THERANOS, INCLUDING MR. BALWANI AND YOU, NOW IN

10:20AM   5    AUGUST OF 2014?

10:20AM   6    A.   YES.

10:20AM   7    Q.   AND DOES IT ALSO INCLUDE SOME MEETING MINUTES?

10:20AM   8    A.   IT DOES.

10:20AM   9    Q.   AND A SLIDE DECK AS WELL?

10:21AM  10    A.   YES, IT DOES.

10:21AM  11              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1884.

10:21AM  12              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:21AM  13              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:21AM  14         (GOVERNMENT'S EXHIBIT 1884 WAS RECEIVED IN EVIDENCE.)

10:21AM  15              MR. SCHENK:  THANK YOU.

10:21AM  16    Q.   LET'S START AGAIN AT THE TOP.  IS THIS WHAT WE HAVE SEEN A

10:21AM  17    COUPLE TIMES ALREADY, MS. HAWORTH SENDING A SLIDE DECK AROUND

10:21AM  18    THE TIME OF ONE OF THESE PARTNERSHIP MEETINGS?

10:21AM  19    A.   YES.

10:21AM  20    Q.   AND IS THIS ONE FOR AN AUGUST 2014 MEETING?

10:21AM  21    A.   YES.

10:21AM  22    Q.   IF YOU'LL TURN TO PAGE 5.  WITHIN THE MEETING MINUTES

10:21AM  23    THERE'S A SECTION LABELLED CURRENT STATUS.

10:21AM  24         DO YOU SEE THAT?

10:21AM  25    A.   I DO.

10:21AM 1   Q.   AND THE FIRST ITEM IS 30 STORES CURRENTLY LIVE, (ARIZONA

10:21AM 2   29; CALIFORNIA 1.)

10:22AM 3        IS THAT RIGHT?

10:22AM 4   A.   YES.

10:22AM 5   Q.   AND SO WE'RE SEEING THE NUMBER OF STORES INCREASE.  IS

10:22AM 6   THAT STILL DURING THE PILOT PHASE?

10:22AM 7   A.   IT IS.

10:22AM 8   Q.   AND WERE YOU STILL PAYING ATTENTION TO THE METRICS WE

10:22AM 9   TALKED ABOUT TOWARDS THE BEGINNING OF YOUR TESTIMONY TO SEE

10:22AM 10  WHERE THE PILOT IS GOING?

10:22AM 11  A.   YES.

10:22AM 12  Q.   WOULD YOU TURN NOW TO PAGE 8.

10:22AM 13       AT THE BOTTOM THERE'S A SECTION CALLED PLAN FOR FISCAL

10:22AM 14  YEAR 2015.

10:22AM 15       THE FIRST BULLET IS, "NEXT MARKET IS NORTHERN CALIFORNIA

10:22AM 16  (5 STORES INITIALLY, THEN EXPAND FOR A TOTAL OF 40)."

10:22AM 17       AND THE SECOND BULLET IS, "EXPANSION BEYOND THE 5 STORES

10:22AM 18  WILL REQUIRE THERANOS DATA TO OBTAIN STORE SELECTION."

10:22AM 19       WHAT IS THAT REFERRING TO?

10:22AM 20  A.   WHAT WE WERE DOING WAS STARTING TO PLAN FOR POTENTIALLY

10:22AM 21  MORE MARKETS.  AS WE CONTINUED TO EXPAND THIS PILOT AND LEARN

10:22AM 22  MORE, WE WERE STARTING TO PLAN TO SAY, OKAY, WHERE DO WE GO

10:23AM 23  NEXT?

10:23AM 24       AND IN THIS PARTICULAR CASE WE WERE DISCUSSING NORTHERN

10:23AM 25  CALIFORNIA.  AND WHERE WE PUT THESE LOCATIONS WAS VERY, VERY

10:23AM 1    IMPORTANT.  YOU KNOW, IT HAD TO BE NEAR SPECIFIC AREAS WHERE

10:23AM 2    THERE WAS A NEED FOR THIS SERVICE, WHERE THERE WERE PHYSICIANS

10:23AM 3    AND PROVIDERS THAT NEEDED THIS SERVICE.

10:23AM 4        AND SO THEY WOULD PROVIDE US WITH DATA THAT WOULD GIVE US

10:23AM 5    INPUT, INSIGHT INTO WHERE WE WOULD PUT THESE LOCATIONS, AND SO

10:23AM 6    THAT'S WHAT WE WERE ASKING FOR.

10:23AM 7    Q.   OKAY.  WAS THE THERANOS SERVICE EVER EXPANDED IN NORTHERN

10:23AM 8    CALIFORNIA?

10:23AM 9    A.   NOT BEYOND THE ONE STORE.

10:23AM 10   Q.   WOULD YOU HAD NOW TURN TO THE NEXT PAGE, PAGE 9.  UNDER

10:23AM 11   THE SECOND BULLET, THE SECOND SHADED BULLET, "INITIAL GOAL FOR

10:23AM 12   FISCAL YEAR 15."

10:24AM 13       IT CONTINUES SEPTEMBER THROUGH AUGUST.  WAS THAT THE

10:24AM 14   WALGREENS FISCAL YEAR, SEPTEMBER TO AUGUST?

10:24AM 15   A.   YES.

10:24AM 16   Q.   "WAS 500 STORES.  NEED TO REDEFINE THIS GOAL."

10:24AM 17       AND IN THE CHART UNDER THERANOS, 2015 IS DOWN TO 200.

10:24AM 18       DO YOU SEE THAT?

10:24AM 19   A.   I DO.

10:24AM 20   Q.   AND SO WHAT IS HAPPENING HERE?  CAN YOU EXPLAIN THAT TO

10:24AM 21   ME?

10:24AM 22   A.   YES.  SO, AGAIN, AS I MENTIONED EARLIER, SOME OF THE

10:24AM 23   RESULTS OF THE PILOT WERE GOOD, SOME OF THE RESULTS WERE NOT

10:24AM 24   GOOD.

10:24AM 25       FOR ALL OF THOSE REASONS, WE RESET THE NUMBER OF STORES

10:24AM 1   THAT WE WANTED TO LAUNCH FROM 500 TO 200. IT MADE MORE SENSE.

10:24AM 2   IT WAS MORE MANAGEABLE. AND WE COULD CONTINUE TO DO A CRAWL,

10:24AM 3   WALK, RUN APPROACH.

10:24AM 4       WHAT YOU SEE HERE IS WELL EXPERIENCE, IS THE MODEL I SPOKE

10:24AM 5   ABOUT EARLIER, WHICH IS TO REDESIGN THE SPACE AND REDESIGN THE

10:24AM 6   PHARMACY TO BE MORE PATIENT AND CONSUMER CENTRIC.

10:25AM 7       SO WE WERE PLANNING FOR THOSE 2000 STORES, AND WHAT WE

10:25AM 8   WANTED TO DO WAS TO UNDERSTAND HOW MANY OF THOSE STORES WOULD

10:25AM 9   BECOME THERANOS WELLNESS CENTERS BECAUSE, AGAIN, WE WANTED TO

10:25AM 10  GO INTO A STORE AND CONSTRUCT ONCE, DISRUPT THE STORE ONCE,

10:25AM 11  DISRUPT CUSTOMERS AND PATIENTS ONCE. SO THAT'S WHY WE ARE

10:25AM 12  PLANNING BOTH OF THEM AT THE SAME TIME.

10:25AM 13  Q.   I SEE. WAS EVEN THIS 200 STORE NUMBER, WAS THAT EVER

10:25AM 14  GUARANTEED?

10:25AM 15  A.   NO. AS YOU SAW WITH THE 500, IT WASN'T GUARANTEED. WE

10:25AM 16  REDUCED THAT TO 200.

10:25AM 17  Q.   SO WHY IN 2014 ARE YOU TALKING ABOUT THE NUMBER OF 200

10:25AM 18  STORES?

10:25AM 19  A.   AGAIN, IT WAS ALL ABOUT PLANNING. IF THE PILOT WAS GOING

10:25AM 20  WELL AND WE WANTED TO THEN QUICKLY EXPAND, YOU CAN'T JUST

10:25AM 21  QUICKLY EXPAND. YOU HAVE TO PLAN FOR IT.

10:25AM 22      SO WHETHER IT WAS 5 STORES, 10 STORES, 200 STORES, OR 500

10:25AM 23  STORES, YOU STILL HAVE TO DO THE PLANNING BEHIND IT, AND THAT'S

10:26AM 24  WHAT WE WERE TRYING TO DO.

10:26AM 25      AND THAT PLANNING INCLUDED NOT ONLY THE WALGREENS, BUT THE

10:26AM 1     THERANOS TEAM TO MAKE SURE THAT THEY WERE READY.

10:26AM 2          AND SO THAT'S WHAT WE WERE DOING HERE.

10:26AM 3     Q.   DID YOU COMMUNICATE THIS IDEA TO MR. BALWANI?  AND BY

10:26AM 4     "THIS IDEA," I MEAN THE NUMBER OF STORES NEEDED TO BE REDUCED

10:26AM 5     FROM 500 TO 200, AND ALSO THAT THE 200 WASN'T GUARANTEED?

10:26AM 6     A.   YEAH, NOT ONLY WAS IT COMMUNICATED, THIS WAS DECIDED

10:26AM 7     TOGETHER.  IT WAS A PARTNERSHIP.  SO THESE DECISIONS WERE MADE

10:26AM 8     TOGETHER.  IT WAS NOT DONE IN A VACUUM BY WALGREENS OR BY

10:26AM 9     THERANOS.

10:26AM 10    Q.   WAS THE VENOUS DRAW PERCENT, THE NUMBER OF VENOUS DRAWS

10:26AM 11    THAT WERE HAPPENING, WAS THAT PART OF THE REASON TO REDUCE THE

10:26AM 12    NUMBER OF STORES?

10:26AM 13    A.   ONE OF THE REASONS, YES.

10:26AM 14    Q.   OKAY.  WERE THERE OTHERS THAT YOU RECALL?

10:26AM 15    A.   THE COST OF THE BUILDOUT WAS EXTREMELY HIGH AT THIS POINT.

10:26AM 16    WE HAD NOT PERFECTED THE MODEL OR THE DESIGN.  WE WERE STILL

10:26AM 17    CHANGING DESIGNS.  WHERE WE PUT IT INSIDE OF THE STORE ALSO

10:26AM 18    ADDED TO THE COST.

10:27AM 19         AND SO COST WAS AN OBSTACLE.  TRAINING OF OUR TEAM MEMBERS

10:27AM 20    WAS AN OBSTACLE.

10:27AM 21         AS I MENTIONED EARLIER, IF WE REQUIRED PHLEBOTOMISTS,

10:27AM 22    HIRING OF THOSE PHLEBOTOMISTS WAS AN OBSTACLE.

10:27AM 23         SO AGAIN, THE ENTIRE OPERATING MODEL WAS NOT PERFECTED,

10:27AM 24    AND SO THAT'S WHY WE DECIDED TO REDUCE THAT NUMBER DOWN.

10:27AM 25    Q.   OKAY.  AND I JUST WANTED TO REMIND YOU, THE EMAIL THAT

10:27AM 1    THIS IS ATTACHED TO, IT'S DATED AUGUST 11, 2014; IS THAT RIGHT?

10:27AM 2    A.    THAT'S RIGHT.

10:27AM 3    Q.    NOW IF YOU'LL TURN TO 1896.

10:27AM 4          IS THIS AN EMAIL FROM YOU TO MR. BALWANI ON AUGUST 15TH,

10:27AM 5    2014?

10:27AM 6    A.    YES.

10:27AM 7    Q.    ABOUT THE THERANOS-WALGREENS PARTNERSHIP?

10:27AM 8    A.    YES.

10:27AM 9          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1896.

10:27AM 10         MR. DOWNEY:  NO OBJECTION.

10:27AM 11         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM 12    (GOVERNMENT'S EXHIBIT 1896 WAS RECEIVED IN EVIDENCE.)

10:27AM 13   BY MR. SCHENK:

10:27AM 14   Q.    SO ABOUT FOUR DAYS AFTER THE DOCUMENT THAT WE WERE JUST

10:28AM 15   LOOKING AT, YOU SENT MR. BALWANI THIS EMAIL; IS THAT RIGHT?

10:28AM 16   A.    YES, SIR.

10:28AM 17   Q.    AND ALSO SOMEONE NAMED CASEY KOZLOWSKI.

10:28AM 18         DO YOU SEE THAT?

10:28AM 19   A.    I DO.

10:28AM 20   Q.    AND WHO WAS THIS INDIVIDUAL?

10:28AM 21   A.    CASEY KOZLOWSKI WAS THE DIRECTOR OF DIAGNOSTIC SERVICES

10:28AM 22   WHO REPORTED TO ME AND WAS DAY-TO-DAY ON THIS PARTICULAR

10:28AM 23   PROJECT.

10:28AM 24   Q.    OKAY.  IN THE FIRST SENTENCE YOU WRITE, "THERE HAS BEEN A

10:28AM 25   LOT OF DISCUSSION WITH THE NEW LEADERSHIP ON EVERYTHING OUR

10:28AM 1    COMPANY IS DOING TO DRIVE HEALTH CARE AND OUR COMPANY.  AS YOU

10:28AM 2    CAN IMAGINE, OUR PARTNERSHIP IS AT THE CORE."

10:28AM 3         WHAT DID YOU MEAN, "NEW LEADERSHIP"?

10:28AM 4    A.   WE WERE AT THIS POINT -- "WE" AS WALGREENS -- WAS IN THE

10:28AM 5    PROCESS OF MERGING WITH BOOTS ALLIANCE IN THE UK AND IT HAD NOT

10:28AM 6    BEEN COMPLETED YET AT THIS TIME.

10:28AM 7         BUT AS WE WERE MERGING THE LEADERSHIP AND THEY WERE

10:28AM 8    UNDERSTANDING WHAT EACH OF THE COMPANIES WERE DOING, WE WANTED

10:29AM 9    TO MAKE SURE THAT THEY UNDERSTOOD OUR PARTNERSHIP WITH

10:29AM 10   THERANOS.

10:29AM 11        AND AS I SAID, THE PARTNERSHIP WAS AT THE CORE OF US,

10:29AM 12   WALGREENS, BECOMING A HEALTH CARE SERVICE PROVIDER.

10:29AM 13   Q.   AND YOU WRITE THAT "OUR PARTNERSHIP."  IS THAT THE

10:29AM 14   THERANOS-WALGREENS PARTNERSHIP IS AT THE CORE?

10:29AM 15   A.   THAT'S CORRECT.

10:29AM 16   Q.   AND WHAT DID YOU MEAN BY THAT?

10:29AM 17   A.   WHAT I HAD MEANT BY THAT IS THAT THE LAB SERVICES THAT

10:29AM 18   WILL BE DELIVERED THROUGH THERANOS AND WALGREENS, AND THAT

10:29AM 19   PARTNERSHIP WAS ONE OF THE FIRST SERVICES THAT WE WERE GOING TO

10:29AM 20   LAUNCH.

10:29AM 21   Q.   I SEE.

10:29AM 22   A.   AND THAT WAS THE CORE.

10:29AM 23   Q.   AND WAS THAT SOMETHING THAT THE BOOTS ALLIANCE FOLKS WERE

10:29AM 24   PAYING ATTENTION TO?

10:29AM 25   A.   YES.

10:29AM 1    Q.   THE NEXT SENTENCE READS, "WE HAVE MADE UNBELIEVABLE

10:29AM 2    PROGRESS IN THE SHORT 5 MONTHS - I HAVE RECEIVED EMAILS FROM

10:29AM 3    SEVERAL LEADERS TELLING ME THIS."

10:29AM 4        DID YOU THINK THAT THAT WAS TRUE, THAT WALGREENS AND

10:29AM 5    THERANOS HAD MADE PROGRESS IN THE LAST FOUR OR FIVE MONTHS?

10:30AM 6    A.   WE DID.

10:30AM 7    Q.   AND DID YOU STILL THINK THAT THERANOS WAS TESTING THE

10:30AM 8    FINGERSTICK BLOOD ON THE EDISON DEVICE DEVICES?

10:30AM 9    A.   ON ONE OF THE DEVICES.

10:30AM 10   Q.   FORGIVE ME.  YOU DIDN'T KNOW WHAT IT WAS CALLED?

10:30AM 11   A.   THAT'S CORRECT.

10:30AM 12   Q.   I SEE.  DID YOU STILL NOT KNOW WHETHER THERANOS WAS

10:30AM 13   TESTING ON MODIFIED THIRD PARTY DEVICES?

10:30AM 14   A.   I DID NOT KNOW THAT.

10:30AM 15   Q.   THE NEXT SENTENCE READS, "HOWEVER, IT WILL BE IMPORTANT

10:30AM 16   THAT WE DRIVE WITH A SINGLE FOCUS TOGETHER.  THE 2 AREAS WHICH

10:30AM 17   MUST BE FOCUSSED ON ARE:"

10:30AM 18       AND THEN THE FIRST IS "PATIENTS PER DAY WITH A 4 PLUS

10:30AM 19   EXPERIENCE."

10:30AM 20       WOULD YOU EXPLAIN THAT TO THE JURY?

10:30AM 21   A.   SURE.  AT THE END OF EACH BLOOD DRAW FOR EVERY PATIENT, WE

10:30AM 22   WOULD HAND THEM AN IPAD, AND THAT IPAD WAS A SIMPLE

10:30AM 23   QUESTIONNAIRE OF HOW DID YOUR SERVICE GO, WERE YOU SATISFIED,

10:30AM 24   AND THERE WAS A FEW QUESTIONS, AND THEN IT WAS RATED 1 THROUGH

10:31AM 25   5.

10:31AM  1          AND SO IF A PATIENT GAVE US A 5 EXPERIENCE, THAT WAS THE

10:31AM  2   BEST.  A 1 WOULD BE THE LOWEST.

10:31AM  3          SO WHAT I WAS ASKING FOR IS AS WE CONTINUED TO GROW AND AS

10:31AM  4   WE CONTINUED TO EXPAND, LET'S MAKE SURE THAT NOT ONLY OUR

10:31AM  5   PATIENTS PER DAY CONTINUES TO GROW, BUT WE'RE DELIVERING A

10:31AM  6   GREAT EXPERIENCE, A 4 PLUS EXPERIENCE.  THAT'S WHAT I'M

10:31AM  7   REFERRING TO HERE.

10:31AM  8   Q.   I SEE.  AND THEN THE NEXT ONE IS, "VENOUS PERCENT IN THE

10:31AM  9   10 PERCENT RANGE."

10:31AM  10         WHAT DOES THAT MEAN?

10:31AM  11  A.   AGAIN, IT'S THE VENOUS DRAW, THE TOTAL VENOUS DRAW

10:31AM  12  PERCENTAGE TO BE BELOW 10 PERCENT.  IT WAS HOVERING AROUND

10:31AM  13  40 PERCENT AT THIS TIME.  SO, AGAIN, A SINGULAR FOCUS ON

10:31AM  14  GETTING THAT PERCENTAGE DOWN BELOW 10 PERCENT.

10:31AM  15  Q.   AND ONE OF THE FIRST DOCUMENTS I SHOWED YOU HAD THE CHART

10:31AM  16  WHERE THE VENOUS DRAW IN FEBRUARY WAS AROUND 43 PERCENT, AND

10:31AM  17  WE'RE NOW IN AUGUST.

10:31AM  18         HAD, AT ANY POINT, THE VENOUS DRAW GOTTEN AROUND THIS

10:31AM  19  10 PERCENT RANGE THAT YOU WERE LOOKING FOR?

10:32AM  20  A.   NO, SIR.

10:32AM  21  Q.   HOW ABOUT AT ANY POINT DURING THE ENTIRE

10:32AM  22  THERANOS-WALGREENS RELATIONSHIP?  DID THE VENOUS DRAW PERCENT

10:32AM  23  EVER GET AROUND 10 PERCENT?

10:32AM  24  A.   NO, SIR.

10:32AM  25  Q.   THE NEXT IS, "WE NEED TO HAVE A DOCUMENTED DETAILED PLAN

10:32AM 1    ON BOTH OR IT WILL BE DIFFICULT FOR ME TO CONVINCE EXPANSION

10:32AM 2    BEYOND ARIZONA."

10:32AM 3        WHAT DID YOU MEAN BY THAT?

10:32AM 4    A.   WHAT I WAS REFERRING TO IS THESE WERE THE -- THESE THREE

10:32AM 5    METRICS RIGHT HERE WERE AT THE CORE OF THE SUCCESS THAT WE

10:32AM 6    NEEDED TO ACHIEVE, AND IF WE'RE GOING TO ACHIEVE THEM, LET'S

10:32AM 7    MAKE SURE THAT WE HAVE A PLAN.  HOW DO WE DO IT?  WHAT ARE THE

10:32AM 8    THINGS THAT WE NEED TO DO?  WHAT ARE THE PUTS AND TICKS THAT WE

10:32AM 9    HAVE TO HAVE?  AND HOW ARE WE GOING TO GET THERE?

10:32AM 10       AND IF WE DON'T GET THERE, IT'S HARD FOR ME TO CONVINCE

10:32AM 11   MYSELF, OR ANY LEADERSHIP AT WALGREENS, TO SAY WE SHOULD GO

10:32AM 12   FURTHER BECAUSE WE JUST WEREN'T HITTING THE METRICS THAT WE SET

10:32AM 13   OUT TO DO.

10:32AM 14   Q.   SO WAS THE PERCENT OF VENOUS DRAWS AN IMPORTANT FACTOR IN

10:32AM 15   DETERMINING EXPANSION BEYOND ARIZONA?

10:32AM 16   A.   YES, IT WAS.

10:33AM 17   Q.   AND FOUR DAYS EARLIER YOU HAD A MEETING WHERE YOU TALKED

10:33AM 18   ABOUT THE NEED TO REDUCE THE NUMBER OF STORES FROM 500 TO 200.

10:33AM 19       DO YOU RECALL THAT?

10:33AM 20   A.   I DO.

10:33AM 21   Q.   AND FOUR DAYS AFTER THAT MEETING YOU SEND AN EMAIL TO

10:33AM 22   MR. BALWANI, AND ARE YOU INFORMING HIM THAT EVEN EXPANSION

10:33AM 23   BEYOND ARIZONA IS IN QUESTION IF WE CAN'T GET THE VENOUS DRAWS

10:33AM 24   BELOW 10 PERCENT?

10:33AM 25   A.   YEAH, THE VENOUS DRAWS, THE PATIENTS PER DAY, AND THE

10:33AM  1    EXPERIENCE ALL TOGETHER, WE NEED TO FOCUS IN ON THIS BEFORE WE

10:33AM  2    CAN GO BEYOND ARIZONA.

10:33AM  3    Q.    THANK YOU.  WOULD YOU NOW TURN TO 1909.

10:33AM  4          IS 1909 TWO EMAILS, ONE FROM YOU TO MR. BALWANI, AND THEN

10:33AM  5    A RESPONSE FROM MR. BALWANI TO YOU A FEW DAYS LATER,

10:33AM  6    AUGUST 21ST, 2014?

10:33AM  7    A.    YES.

10:34AM  8    Q.    AND IS THE SUBJECT MATTER THE THERANOS-WALGREENS

10:34AM  9    PARTNERSHIP?

10:34AM  10   A.    IT IS.

10:34AM  11            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

10:34AM  12   EXHIBIT 1909.

10:34AM  13            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:34AM  14            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:34AM  15        (GOVERNMENT'S EXHIBIT 1909 WAS RECEIVED IN EVIDENCE.)

10:34AM  16   BY MR. SCHENK:

10:34AM  17   Q.    LET'S START WITH THE EMAIL ON THE BOTTOM FROM YOU TO

10:34AM  18   MR. BALWANI.  YOU ARE LISTING SOME TOPICS FOR DISCUSSION.

10:34AM  19         AND THE SECOND BULLET UP FROM THE BOTTOM READS, "VENOUS

10:34AM  20   DRAW PERCENTAGE PROGRESS."

10:34AM  21         DO YOU SEE THAT?

10:34AM  22   A.    I DO.

10:34AM  23   Q.    AND WERE YOU ANXIOUS TO DISCUSS THE VENOUS DRAW NUMBERS

10:34AM  24   WITH MR. BALWANI?

10:34AM  25   A.    YES, I WAS.

10:34AM 1   Q.   MR. BALWANI RESPONDS THEN IN THE EMAIL AT THE TOP OF THIS

10:34AM 2   PAGE, AND IT'S THE FOURTH BULLET DOWN THAT I WANT TO DISCUSS

10:34AM 3   WITH YOU.  MR. BALWANI WRITES, "DISCUSS FURTHER YOUR COMMENT

10:34AM 4   ABOUT HAVING TO CONVINCE THE NEW MANAGEMENT FOR EXPANSION

10:34AM 5   BEYOND 40 STORES."

10:34AM 6        WERE THE 40 STORES A REFERENCE TO THE STORES IN ARIZONA?

10:34AM 7   A.   THAT'S CORRECT.

10:34AM 8   Q.   "IF THERE ARE ISSUES HERE, THEN WE NEED TO DISCUSS THIS

10:35AM 9   SOONER THAN LATER AS WE CAN'T SLOW DOWN OUR GROWTH FOR OBVIOUS

10:35AM 10  REASONS.  WOULD LIKE TO LEARN MORE HERE."

10:35AM 11       DO YOU KNOW WHAT HE WAS REFERRING TO?

10:35AM 12  A.   YES.  WE HAD A DISCUSSION ON THIS.  USUALLY WE HAD A

10:35AM 13  REGULARLY SCHEDULED MEETING TO DISCUSS TOPICS ON THE PROJECT

10:35AM 14  AND I WOULD PUT TOGETHER A FEW AGENDA ITEMS AND SO WOULD

10:35AM 15  MR. BALWANI, AND THEN WE WOULD DISCUSS THEM AND MAKE SURE WE

10:35AM 16  HAVE A PLAN FOR THEM.

10:35AM 17       SO THIS WAS A TOPIC THAT HE WANTED TO DISCUSS, AND I

10:35AM 18  EXPLAINED TO HIM EXACTLY WHAT I SAID EARLIER, THAT WE HAVE TO

10:35AM 19  HIT THE METRICS, WE HAVE TO MAKE SURE THAT THE MODEL IS

10:35AM 20  CORRECT, AND WE HAVE TO BE ABLE TO CREATE THE EXPERIENCE THAT

10:35AM 21  WE SET OUT TO DO.

10:35AM 22       IF WE DON'T, IT'S DIFFICULT TO EXPAND BEYOND THIS.

10:35AM 23  Q.   AND DID YOU HAVE A FOLLOW-UP CONVERSATION WITH MR. BALWANI

10:35AM 24  LIKE YOU HAD SUGGESTED?

10:35AM 25  A.   I DID.

10:35AM  1    Q.   WOULD YOU NOW TURN TO 1906.

10:36AM  2         IS 1906 A CALENDAR INVITE FOR THAT DISCUSSION?

10:36AM  3    A.   YES, SIR.

10:36AM  4    Q.   AND DOES IT ALSO INCLUDE YOUR NOTES FROM THE PHONE

10:36AM  5    CONVERSATION?

10:36AM  6    A.   YES.

10:36AM  7              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1906.

10:36AM  8              MR. DOWNEY:  YOUR HONOR, I DON'T KNOW IF THE NOTES

10:36AM  9    ARE ADMISSIBLE.  THEY CAN CERTAINLY BE USED TO REFRESH THE

10:36AM  10   WITNESS.

10:36AM  11        (PAUSE IN PROCEEDINGS.)

10:36AM  12             THE COURT:  MR. SCHENK, I'LL ADMIT THE TOP PORTION,

10:36AM  13   AND THEN YOU CAN LAY A FOUNDATION FOR THE NOTES IF YOU CAN.

10:36AM  14             MR. SCHENK:  THANK YOU.

10:37AM  15        (GOVERNMENT'S EXHIBIT 1906 WAS PROVISIONALLY RECEIVED IN

10:37AM  16   EVIDENCE.)

10:37AM  17   BY MR. SCHENK:

10:37AM  18   Q.   MR. JHAVERI, WHAT WAS YOUR PRACTICE WITH REGARD TO TAKING

10:37AM  19   NOTES DURING A MEETING SUCH AS THIS ONE?

10:37AM  20   A.   NOT NECESSARILY WITH MR. BALWANI, BUT IT WAS JUST MY

10:37AM  21   PRACTICE WHENEVER I HAVE A MEETING, I WILL TAKE THE NOTES DOWN

10:37AM  22   IN THE MEETING ITSELF SO I HAVE A RECORD OF IT.  AND SO THIS IS

10:37AM  23   A COPY OF THAT.

10:37AM  24   Q.   AND SO THERE ARE SOME BULLETS.  WERE THOSE JUST A CUT AND

10:37AM  25   PASTE OF 1909, THE TOPICS THAT YOU WANTED TO DISCUSS?

10:37AM 1      A.   EXACTLY.

10:37AM 2      Q.   AND THEN THE NOTES BELOW THE WORD "NOTES," WERE THOSE YOU

10:37AM 3      TAKING CONTEMPORANEOUS NOTES DURING THE MEETING?

10:37AM 4      A.   YES, AS WE WERE DISCUSSING EACH ITEM AND WHAT WE EITHER

10:37AM 5      DECIDED OR WHAT THE NEXT STEPS WERE, I WOULD NOTE THEM DOWN.

10:37AM 6      Q.   AND YOU SAID THIS WAS YOUR PRACTICE NOT JUST WITH

10:37AM 7      MR. BALWANI, BUT HOW YOU HANDLED NOTE TAKING DURING MEETINGS?

10:37AM 8      A.   CORRECT.

10:37AM 9      Q.   YOU GENERALLY TYPE THEM INTO THE CALENDAR INVITE ITSELF?

10:38AM 10     A.   THAT'S CORRECT.

10:38AM 11          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT MOVES TO

10:38AM 12     ADMIT 1906.

10:38AM 13          MR. DOWNEY:  SAME OBJECTION.

10:38AM 14          THE COURT:  I'LL ALLOW IT.  THIS IS CONTEMPORANEOUS

10:38AM 15     WITH THE MEETING, SO THE OBJECTION IS OVERRULED.

10:38AM 16          MR. SCHENK:  THANK YOU, YOUR HONOR.  AND PERMISSION

10:38AM 17     TO PUBLISH.

10:38AM 18          THE COURT:  YES.

10:38AM 19      (GOVERNMENT'S EXHIBIT 1906 WAS RECEIVED IN EVIDENCE.)

10:38AM 20     BY MR. SCHENK:

10:38AM 21     Q.   FIRST IN THE BULLETS, WE AGAIN SEE REPEATED THE FOURTH

10:38AM 22     BULLET, VENOUS DRAW PERCENTAGE PROGRESS.

10:38AM 23      DO YOU SEE THAT?

10:38AM 24     A.   I DO.

10:38AM 25     Q.   AND THEN THE FINAL BULLET, IT LOOKS LIKE YOU JUST CUT AND

10:38AM 1    PAST WHAT MR. BALWANI WROTE TO YOU THAT WE READ A MOMENT AGO

10:38AM 2    ABOUT WANTING TO DISCUSS YOUR POINT ABOUT HAVING TO CONVINCE

10:38AM 3    MANAGEMENT ABOUT EXPANSION; IS THAT RIGHT?

10:38AM 4    A.   YES.  AGAIN, WE COCREATED THE AGENDA ITEMS AND SO, YOU

10:38AM 5    KNOW, I JUST LISTED THEM OF THE TOPICS THAT WE NEEDED TO

10:38AM 6    DISCUSS.

10:38AM 7    Q.   OKAY.  UNDER NOTES AND THEN THE "EXPANSION" WORD, THE

10:38AM 8    FIRST BULLET IS "TEN PATIENTS PER DAY WITH EXTREMELY HIGH

10:39AM 9    CONFIDENCE BY END OF NOVEMBER, WE SHOULD BE HIGH CONFIDENCE

10:39AM 10   (THIS WEEK THE AVERAGE WAS 5.5)."

10:39AM 11        WHAT WERE YOU DISCUSSING WITH MR. BALWANI?

10:39AM 12   A.   THAT FIRST BULLET POINT REFERS TO THE PROGRESS, WHAT WERE

10:39AM 13   WE SEEING IN THE NUMBER OF PATIENTS THAT WERE USING THE

10:39AM 14   SERVICE, AND SO THE INFORMATION THAT WE DISCUSSED WAS BY THE

10:39AM 15   END OF NOVEMBER, MR. BALWANI FELT VERY STRONGLY THAT WE'LL HIT

10:39AM 16   THAT TEN PATIENTS PER DAY.

10:39AM 17        AND WE WERE ALREADY AT 5.5, AND SO THAT WAS THE POINT

10:39AM 18   HERE.

10:39AM 19   Q.   AND THEN THE SECOND BULLET HE'S TALKING ABOUT "GOING

10:39AM 20   AGAINST 2 DEEPLY ENTRENCHED COMPANIES."

10:39AM 21        DO YOU REMEMBER WHAT WAS BEING DISCUSSED AT THIS POINT?

10:39AM 22   A.   YES.  WE WERE -- THE TWO INCUMBENT PLAYERS IN THE LAB

10:39AM 23   SPACE WAS QUEST DIAGNOSTICS AND LAB CORP.

10:39AM 24        SO WHAT WE WERE DISCUSSING HERE IS THAT IT'S HIGHLY

10:39AM 25   COMPETITIVE, AND THE POINT WAS THAT WE WERE GOING AGAINST THEM

10:39AM   1    IN TERMS OF CAPTURING PATIENTS.

10:40AM   2         AND SO THAT IS SOMETHING THAT WAS, YOU KNOW, SOMETHING TO

10:40AM   3    WATCH OUT FOR.

10:40AM   4    Q.   OKAY.  AND THEN THE THIRD ONE DOWN, "VENOUS DRAW

10:40AM   5    PERCENT -- HOW DO WE BALANCE -- BY END OF CALENDAR YEAR 2014 --

10:40AM   6    LESS THAN 10 PERCENT."

10:40AM   7         WHAT WAS DISCUSS HERE?

10:40AM   8    A.   THE DISCUSSION HERE WAS ABOUT HOW AND WHEN WILL THIS

10:40AM   9    PERCENTAGE GO DOWN AND WHAT WILL BE REQUIRED TO DO THAT.

10:40AM  10         SO THAT WAS THE DISCUSSION HERE.

10:40AM  11    Q.   WHEN THE DESIRE TO HAVE THE VENOUS DRAW PERCENT REDUCED OR

10:40AM  12    GO DOWN, DID MR. BALWANI EVER EXPLAIN TO YOU TECHNOLOGICAL

10:40AM  13    OBSTACLES TO ACHIEVING A VENOUS DRAW REDUCTION?

10:40AM  14    A.   NO.  THE REASONS THAT HE PROVIDED WERE THE TWO REASONS

10:40AM  15    THAT I MENTIONED EARLIER ABOUT THE PATTERNS, ORDERING PATTERNS

10:40AM  16    FROM PHYSICIANS AND MAKING SURE THAT THE CARTRIDGES WERE READY.

10:40AM  17         HE ALSO EXPLAINED TO ME THAT AT TIMES THERE ARE PHYSICIANS

10:40AM  18    WHO ARE ORDERING BOTH TESTS, ONE WITH A VENOUS DRAW AND ONE

10:41AM  19    WITH FINGERSTICKS, TO ENSURE THAT THEY'RE SEEING THE SAME

10:41AM  20    RESULTS.

10:41AM  21         SO THOSE WERE THE REASONS THAT HE PROVIDED.

10:41AM  22    Q.   SO MR. BALWANI SUGGESTED TO YOU THAT THE CAUSE OF THE

10:41AM  23    VENOUS DRAW NUMBERS WERE THE REQUESTS OR THE ACTIONS OF THE

10:41AM  24    PHYSICIANS, THE ORDERING PATTERNS OF PHYSICIANS, OR THE DESIRE

10:41AM  25    TO HAVE FINGERSTICK AND A VEIN DRAW ON THE SAME PATIENT AT THE

10:41AM 1      SAME TIME?

10:41AM 2      A.   YES.

10:41AM 3      Q.   WOULD YOU TURN TO 2214.

10:41AM 4           IS THIS ANOTHER EMAIL FROM MS. HAWORTH TO THE GROUP FROM

10:41AM 5      THERANOS AND WALGREENS, INCLUDING YOURSELF AND MR. BALWANI,

10:41AM 6      FOLLOWING A NOVEMBER 2014 PARTNERSHIP MEETING WITH A SLIDE

10:41AM 7      DECK?

10:41AM 8      A.   YES.

10:41AM 9           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2214.

10:41AM 10          MR. DOWNEY:  NO OBJECTION.

10:41AM 11          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:41AM 12     (GOVERNMENT'S EXHIBIT 2214 WAS RECEIVED IN EVIDENCE.)

10:41AM 13     BY MR. SCHENK:

10:41AM 14     Q.   IF YOU WOULD TURN TO PAGE 6.

10:42AM 15          SO NOW IN NOVEMBER OF 2014 DURING THIS MEETING, THIS SLIDE

10:42AM 16     IS LABELED "CURRENT STATUS," AND THEN THERE ARE SOME NAMES?  DO

10:42AM 17     YOU SEE THAT, TRACY/ KIMBERLY?

10:42AM 18     A.   YES.

10:42AM 19     Q.   AND WHAT IS THAT A REFERENCE TO, TRACY/KIMBERLY, IF YOU

10:42AM 20     KNOW?

10:42AM 21     A.   YEAH, TRACY AND KIMBERLY WERE TEAM MEMBERS OF THERANOS.

10:42AM 22          TRACY, IF I REMEMBER CORRECTLY, WAS IN CHARGE OF

10:42AM 23     OPERATIONS FOR ARIZONA, AND KIMBERLY WAS IN CHARGE OF THE SALES

10:42AM 24     TEAMS, AND SO THEY WERE GIVING THE STATUS.

10:42AM 25     Q.   I SEE.  THE FIRST BULLET IS "41 STORES CURRENTLY LIVE

10:42AM 1      (ARIZONA 40; CALIFORNIA 1)."

10:42AM 2           IS THAT THE MAXIMUM NUMBER OF STORES THAT THERANOS BECAME

10:42AM 3      AVAILABLE WITHIN WALGREENS?

10:42AM 4      A.   YES.

10:42AM 5      Q.   THE SECOND BULLET READS, "VENOUS DRAWS PERFORMED DURING

10:42AM 6      40 PERCENT OF VISIT (2014-YEAR TO DATE)."

10:42AM 7           IS THAT RIGHT?

10:43AM 8      A.   THAT'S CORRECT.

10:43AM 9      Q.   AND WE SAW DURING YOUR TESTIMONY EARLIER THIS MORNING THAT

10:43AM 10     IN FEBRUARY OF 2014 THE VENOUS DRAWS WERE AT 43 PERCENT.

10:43AM 11          DO YOU RECALL THAT?

10:43AM 12     A.   I DO.

10:43AM 13     Q.   AND NOW IN NOVEMBER VENOUS DRAWS ARE STILL AT 40 PERCENT;

10:43AM 14     IS THAT RIGHT?

10:43AM 15     A.   YES.

10:43AM 16     Q.   AND DID THE VENOUS DRAWS EVER GET TO A POINT THAT YOU OR

10:43AM 17     WALGREENS WERE SATISFIED?

10:43AM 18     A.   NO.

10:43AM 19     Q.   WOULD YOU TURN NOW TO 2275.

10:43AM 20          IS 2275 AN EMAIL FROM YOU TO MR. BALWANI THE NEXT MONTH?

10:43AM 21     NOW WE'RE IN DECEMBER OF 2014?

10:43AM 22     A.   YES.

10:43AM 23     Q.   AND DOES THIS ALSO DISCUSS ISSUES RELATED TO THE

10:43AM 24     THERANOS-WALGREENS PARTNERSHIP?

10:43AM 25     A.   YES, IT DOES.

10:43AM  1          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2275.

10:43AM  2          MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

10:44AM  3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM  4      (GOVERNMENT'S EXHIBIT 2275 WAS RECEIVED IN EVIDENCE.)

10:44AM  5          MR. SCHENK:  THANK YOU.

10:44AM  6  Q.   THE TOPIC IS CONTRACT AND OTHER TOPICS.

10:44AM  7       DO YOU SEE THAT?

10:44AM  8  A.   I DO.

10:44AM  9  Q.   AND UNDER CONTRACT THERE'S A BULLET THAT BEGINS, "IN

10:44AM 10  ADDITION."

10:44AM 11       DO YOU SEE THAT?

10:44AM 12  A.   YES, I DO.

10:44AM 13  Q.   SO YOU WROTE TO MR. BALWANI, "IN ADDITION TO THE CONTRACT

10:44AM 14  TERMS ATTACHED, WE ARE ASKING FOR TRANSPARENCY ON THE

10:44AM 15  FOLLOWING:  FINANCIAL CONDITION OF THE COMPANY (NEED IT FOR OUR

10:44AM 16  AUDITORS), TECHNOLOGY/PROCESS DATA POINTS SO WE CAN REPRESENT

10:44AM 17  THERANOS IN A MORE COMPREHENSIVE MANNER."

10:44AM 18       WHAT DID YOU MEAN BY THAT?

10:44AM 19  A.   YEAH.  THERE ARE TWO POINTS HERE.  I HAD JUST RECEIVED A

10:44AM 20  CALL FROM OUR INVESTOR RELATIONS LEADERSHIP AND WE WERE

10:44AM 21  RECEIVING QUESTIONS NOT ONLY INTERNALLY BUT EXTERNALLY ON THE

10:44AM 22  PARTNERSHIP ITSELF.

10:44AM 23       AND INTERNALLY PART OF THE AUDIT OF ALL OF THE INVESTMENTS

10:45AM 24  THAT WALGREENS HAD MADE REQUIRED THAT WE HAD AN UNDERSTANDING

10:45AM 25  OF THE FINANCIAL CONDITION OF THE COMPANY THAT WE WERE

10:45AM  1    INVESTING IN.

10:45AM  2          AND SO THAT WAS MY ASK HERE ON THE FIRST POINT.

10:45AM  3          AND THEN THE SECOND IS UNDERSTANDING A LITTLE BIT MORE

10:45AM  4    ABOUT WHAT IS GOING ON WITH THE TECHNOLOGY, SOME OF THE DATA

10:45AM  5    POINTS THAT THEY'RE SEEING.

10:45AM  6          SO WHEN WE RECEIVED QUESTIONS ON THERANOS, THAT WE CAN

10:45AM  7    ANSWER THEM IN A MORE COMPREHENSIVE, INTELLIGENT MANNER RATHER

10:45AM  8    THAN SIMPLY REFERRING THEM TO THERANOS THEMSELVES.

10:45AM  9    Q.   I SEE.  AND THEN NUMBER 4 ON THE EMAIL READS, "HOW LONG

10:45AM  10   WILL WE HAVE PHLEBOTOMISTS IN ARIZONA?  WHAT IS ACCEPTABLE

10:45AM  11   PERCENT OF VENOUS DRAWS TO DEPLOY HUB AND SPOKE MODEL?"

10:45AM  12         WHAT IS THAT A REFERENCE TO?

10:45AM  13   A.   THAT IS IN REFERENCE TO THE DISCUSSION THAT WE HAD

10:45AM  14   EARLIER.  SO AS I MENTIONED, VENOUS DRAWS REQUIRE A

10:46AM  15   PHLEBOTOMIST, A LICENSED PHLEBOTOMIST TO CONDUCT, AND SO IN THE

10:46AM  16   ARIZONA STORES WE HAD PHLEBOTOMISTS IN ALL OF THE STORES TO DO

10:46AM  17   THOSE VENOUS DRAWS, AND WHAT I AM ASKING IS SIMPLY AS THE

10:46AM  18   PERCENTAGE OF VENOUS DRAWS TEND TO GO DOWN, THEN WE CAN MOVE

10:46AM  19   THE PHLEBOTOMISTS, AND THEN MOVE THEM INTO THOSE 24-HOUR

10:46AM  20   LOCATIONS THAT WE DISCUSSED EARLIER.

10:46AM  21         SO THE HUB AND SPOKE MODEL IS IN REFERENCE TO THAT, WHERE

10:46AM  22   THE MAJORITY, THE SPOKES, ARE THE STORES THAT ARE DOING PURE

10:46AM  23   THERANOS FINGERSTICK SERVICES, AND THE HUB WOULD BE THE 24-HOUR

10:46AM  24   LOCATION WHERE WE WOULD BE ABLE TO DO NOT ONLY THE FINGERSTICK

10:46AM  25   SERVICES BUT ALSO, IF REQUIRED, THE VENOUS DRAW WITH A

10:46AM  1   PHLEBOTOMIST.

10:46AM  2   Q.   I SEE.  SO THIS WAS IN DECEMBER OF 2014.  LET'S TALK

10:46AM  3   BRIEFLY JUST ABOUT THE FIRST TEN MONTHS OF 2015, JANUARY TO

10:46AM  4   ABOUT OCTOBER.

10:46AM  5        DID THE VENOUS DRAW NUMBER EVER GO DOWN TO A LEVEL AT

10:46AM  6   WHICH EXPANSION BEYOND THE 40 STORES IN ARIZONA OCCURRED?

10:47AM  7   A.   NO.

10:47AM  8   Q.   AND WAS THAT SOMETHING THAT YOU AND MR. BALWANI CONTINUED

10:47AM  9   TO TRACK?

10:47AM  10  A.   WE DID.

10:47AM  11  Q.   AND DID YOU CONTINUE TO DISCUSS THE REASONS WHY THE VENOUS

10:47AM  12  DRAW NUMBERS WERE WHERE THEY WERE?

10:47AM  13  A.   ABSOLUTELY.

10:47AM  14  Q.   AND DID THE REASONS THAT MR. BALWANI PROVIDED FOR YOU EVER

10:47AM  15  CHANGE, OR WERE THEY SIMILAR TO THE ONES THAT YOU ALREADY

10:47AM  16  TESTIFIED ABOUT?

10:47AM  17  A.   NO, THEY WERE SIMILAR.

10:47AM  18  Q.   IN OCTOBER -- AROUND OCTOBER OF 2015 DID YOU READ AN

10:47AM  19  ARTICLE ABOUT THERANOS?

10:47AM  20  A.   I DID.

10:47AM  21  Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE NEGATIVE?

10:47AM  22  A.   IT WAS.

10:47AM  23  Q.   AFTER THE ARTICLE, DID YOUR ROLE IN THE OPERATIONALIZING

10:47AM  24  OF THE THERANOS RELATIONSHIP CHANGE?  YOUR ROLE IN IT, DID THAT

10:47AM  25  CHANGE?

10:47AM  1    A.   YES, MY ROLE DID CHANGE.  OBVIOUSLY WE WERE NOT EXPANDING

10:47AM  2    BEYOND THE 41 STORES THAT WE ALREADY HAD.

10:47AM  3        AND BECAUSE OF THE ARTICLE, YOU KNOW, I TOOK A STEP BACK

10:47AM  4    AS WE WERE NOT EXPANDING ANYMORE, WE WERE JUST SIMPLY

10:47AM  5    MONITORING, AND OTHERS AT THE COMPANY TOOK LEAD.

10:48AM  6    Q.   AT SOME POINT, DID WALGREENS STOP OFFERING THERANOS BLOOD

10:48AM  7    TESTING SERVICES?  CAN YOU STILL GO TO WALGREENS AND GET

10:48AM  8    THERANOS BLOOD TESTING SERVICES?

10:48AM  9    A.   YES, WE DID STOP AT ONE POINT.

10:48AM  10   Q.   YOU DID STOP.  SORRY, I ASKED YOU TWO QUESTIONS.

10:48AM  11       DO YOU RECALL ROUGHLY WHEN YOU STOPPED?

10:48AM  12   A.   WE STOPPED ONE OF THE SERVICES IN JANUARY OF 2016 IN ONE

10:48AM  13   OF THE STORES.

10:48AM  14       AND THEN THE REST OF THE STORES WERE TURNED OFF SOMEWHERE

10:48AM  15   IN JUNE OF THAT YEAR, 2016.

10:48AM  16   Q.   THANK YOU.

10:48AM  17       YOUR HONOR, MAY I APPROACH?

10:48AM  18           THE COURT:  YES.

10:49AM  19           MR. SCHENK:  (HANDING.)

10:49AM  20   Q.   MR. BALWANI, I'VE HANDED YOU WHAT I'VE MARKED AS

10:49AM  21   EXHIBIT 5387C, AND THIS DOCUMENT IS 16 PAGES AND CONTAINS SOME

10:49AM  22   TEXT MESSAGES.

10:49AM  23       YOUR HONOR, I BELIEVE THE PARTIES ARE AGREEING TO ADMIT

10:49AM  24   THIS BASED ON A STIPULATION.

10:49AM  25           MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

10:49AM  1          THE COURT:  ALL RIGHT.  THIS IS -- I'M SORRY, IS

10:49AM  2   THIS 5387C DID YOU SAY?

10:49AM  3          MR. SCHENK:  YES, YOUR HONOR.

10:49AM  4          THE COURT:  THAT'S ADMITTED, AND WITHOUT OBJECTION

10:49AM  5   IT MAY BE PUBLISHED.

10:49AM  6          MR. SCHENK:  THANK YOU.

10:49AM  7      (GOVERNMENT'S EXHIBIT 5387C WAS RECEIVED IN EVIDENCE.)

10:49AM  8   BY MR. SCHENK:

10:49AM  9   Q.   MR. JHAVERI, I'D LIKE TO READ NOW SOME TEXT MESSAGES WITH

10:49AM 10   YOU.  I'LL HAVE YOU START, AND THEN IF YOU'LL FOLLOW ALONG WITH

10:49AM 11   ME, I JUST WANT TO IDENTIFY THE COLUMNS FOR YOU.

10:50AM 12      FIRST, THESE ARE NOT YOUR TEXT MESSAGES; IS THAT RIGHT?

10:50AM 13   A.   NO, THESE ARE NOT MY TEXT MESSAGES.

10:50AM 14   Q.   ARE THESE TEXT MESSAGES SENT BETWEEN MR. BALWANI AND

10:50AM 15   MS. HOLMES?

10:50AM 16   A.   YES, IT APPEARS TO BE.

10:50AM 17   Q.   SO THERE'S A COLUMN WITH A DATE THAT IS THE THIRD COLUMN,

10:50AM 18   DO YOU SEE THAT, AND THEY BEGIN MARCH OF 2010?

10:50AM 19   A.   YES, SIR.

10:50AM 20   Q.   AND THE NEXT COLUMN IS THE CONTENT.

10:50AM 21      DO YOU SEE THAT?

10:50AM 22   A.   YES.

10:50AM 23   Q.   AND THEN THE NEXT TWO COLUMNS ARE SENDER AND RECIPIENT.

10:50AM 24   SO THE FIRST NAME IS WHO SENT THE MESSAGE, AND THE SECOND IS

10:50AM 25   WHO RECEIVED IT; IS THAT RIGHT?

10:50AM  1    A.   THAT'S CORRECT.

10:50AM  2    Q.   OKAY.  I'D LIKE TO READ THEM WITH YOU.  IF YOU WOULD, WHY

10:50AM  3    DON'T YOU PLEASE START?

10:50AM  4    A.   SURE.

10:50AM  5         "WE HAVE AN OPPORTUNITY TO PUT TELEMEDICINE IN OUR

10:50AM  6    CONTRACT WITH WAG."

10:50AM  7    Q.   AND IS THAT A MESSAGE THAT MR. BALWANI SENT?

10:50AM  8    A.   YES.

10:50AM  9    Q.   AND THEN IT LOOKS LIKE MS. HOLMES RESPONDS, "WE SHOULD

10:50AM 10    NAIL THAT."

10:51AM 11         "AND ACTUALLY KICK IT OFF IN OUR MEETING WITH MAYO."

10:51AM 12         "AND POSSIBLY CLEVELAND."

10:51AM 13         "AND THEN BUILD THE TEAM HERE AS WE HIRE."

10:51AM 14         "THEY WON'T BE READY OVERNIGHT ANYWAY."

10:51AM 15    A.   "CLEVELAND CLINIC."

10:51AM 16    Q.   "YES."

10:51AM 17         MR. JHAVERI, I THINK THE NEXT ONE IS YOU.

10:51AM 18    A.   YES.

10:51AM 19         "WE WILL TALK, WE WILL BRING THIS UP AND NEGOTIATE AS LAST

10:51AM 20    THING ONCE ALL ELSE IS DONE."

10:51AM 21    Q.   "YES."

10:51AM 22    A.   "I OPENED THE DOOR."

10:51AM 23    Q.   "GREAT."

10:51AM 24    A.   "WILL TELL U MORE IN PERSON."

10:51AM 25    Q.   "K."

10:51AM   1      A.   "THEY WERE DROOLING OVER CLEVELAND CLINIC ANNOUNCEMENT."

10:51AM   2           "WE DID TESTER."

10:51AM   3           "YESTERDAY."

10:51AM   4      Q.   "EVERYONE IS."

10:51AM   5           "HOPEFULLY THEY'RE OFF PEER REVIEW."

10:51AM   6      A.   "WHICH IS WHY WE NEED TO DO GOOD-BYE CLEVELAND CLINIC."

10:52AM   7      Q.   "EXACTLY."

10:52AM   8           "ON CLEVELAND CLINIC."

10:52AM   9           AND THEN IF WE CAN TURN TO PAGE 2 AT THE TOP.

10:52AM  10      A.   "GOING THRU CVS CONTRACT.  WE CAN'T WORK WITH WAG OR CVS.

10:52AM  11      BOTH ARE SAME."

10:52AM  12           "AND SWY."

10:52AM  13      Q.   "CAN'T FORGET THAT."

10:52AM  14      A.   "WE NEED TO THINK THRU OUR DISCUSSION ON THIS TOPIC."

10:52AM  15      Q.   "MEANING TOMORROW'S?"

10:52AM  16      A.   "NO.  OUR OWN STORES."

10:52AM  17      Q.   "EXACTLY."

10:52AM  18      A.   "I AM THINKING.  IT WILL DEPEND ON DISCUSSION TOMORROW

10:52AM  19      WITH WAG."

10:52AM  20      Q.   AND NOW WE'RE TURNING TO THE THIRD PAGE.

10:52AM  21      A.   "IF CONTRACT TERMS AND WE DON'T HAVE 1000 STORES.  WHAT

10:53AM  22      HAPPENS TO 50M REMAINING INNOVATION PAYMENT."

10:53AM  23      Q.   "DEPENDS ON WHY TERMS."

10:53AM  24           "SCALE NOW IF NEED."

10:53AM  25      A.   "SO FORCE BUILD 1000 STORES?  I DON'T THINK THAT'S

10:53AM   1        INTELLIGENT."

10:53AM   2            "WITH CONTRACT EXPIRING IN AUGUST OF 2017 MEANS BUILDING

10:53AM   3    OUT 1000 BY FEBRUARY 2016.  NOT GOOD FOR US."

10:53AM   4            "THERE ARE EQUAL NUMBER OF CVS AND WAG IN NEW YORK STATE

10:53AM   5    BTW."

10:53AM   6    Q.  AND NOW WE'RE TURNING TO PAGE 4.

10:53AM   7    A.  "WHEN WE LAUNCH IN NEW YORK WE CAN LAUNCH WITH CVS AND

10:53AM   8    GIVE THEM ONCE WE HAVE 50 E DONE, WE WILL BE INVINCIBLE.

10:53AM   9    Q.  "AGREE."

10:53AM  10            "IF TERMS BECAUSE WE TERM THEN WE RETURN.  THEY TERM AND

10:54AM  11    WE DON'T WANT TO WE KEEP."

10:54AM  12    A.  "WE DON'T WANT 1000 STORES WITH ASSHOLES."

10:54AM  13            "200 WILL BE ENOUGH TO PROVE OUR POINT."

10:54AM  14    Q.  "I KNOW."

10:54AM  15    A.  "I WILL SAY WE KEEP 25 NO MATTER WHAT."

10:54AM  16    Q.  "BUT THEN DEPENDING ON WHO TERMS SHOULD WORK."

10:54AM  17            "AGREE."

10:54AM  18    A.  "YES."

10:54AM  19            "BUT IF NATURAL TERMS THEN WE RETURN 25."

10:54AM  20            "IF THEY DON'T BUILD 500 WE KEEP 25."

10:54AM  21            "CORRECT."

10:54AM  22    Q.  "YES.

10:54AM  23            "NATURAL MEANING WE BOTH DECIDE NOT TO REVIEW?  ALSO IF WE

10:54AM  24    WANT TO RENEW BUT THEY DON'T."

10:54AM  25    A.  "I WOULD LIKE TO KEEP SIMPLE.  IF THEY BUILD MINIMUM 500

| | | |
|---|---|---|
| 10:54AM | 1 | THEY GET ALL 50.  IF THEY DON'T WE KEEP MINIMUM 25.  I CAN ALSO |
| 10:55AM | 2 | SAY IF THEY DON'T BUILD 500 WE KEEP ALL 50 SINCE WE BANKED ON |
| 10:55AM | 3 | THEM." |
| 10:55AM | 4 | "GOING TO WAG MEETING." |
| 10:55AM | 5 | "DONE.  CALL WHEN U HAVE 30 MINUTES." |
| 10:55AM | 6 | Q.   "AGREE WITH ABOVE." |
| 10:55AM | 7 | "WILL CALL SOON." |
| 10:55AM | 8 | A.   "MOSTLY TERRIBLE MEETING BUT NET NET IS WHAT WE WANT." |
| 10:55AM | 9 | "LOVE YOU TOO." |
| 10:55AM | 10 | Q.   THE -- I'M SORRY.  THAT'S YOU. |
| 10:55AM | 11 | A.   "THE POINT ABOUT NARROWING DOWN MENU TO HIT HIGH FS |
| 10:55AM | 12 | PERCENTAGE CAME TO ME LIKE GIFT OF GOD." |
| 10:55AM | 13 | Q.   AND NOW WE'RE TURNING TO PAGE 5. |
| 10:55AM | 14 | A.   "I WAS MEDITATING ON THIS MEETING ALL NIGHT AND ALL DAY." |
| 10:55AM | 15 | Q.   "YOU NAILED IT." |
| 10:55AM | 16 | A.   "WE MUST HIT OUR VOLUME GOALS NOW." |
| 10:56AM | 17 | "WE NEED TO MAKE IT A MATTER OF LIFE AND DEATH." |
| 10:56AM | 18 | "SURVIVAL.  WE MUST NOT LOSE." |
| 10:56AM | 19 | Q.   NOW WE'RE TURNING TO PAGE 6. |
| 10:56AM | 20 | A.   "BTW I SENT CVS DOCUMENT TO HEATHER AND CHRIS ON SATURDAY |
| 10:56AM | 21 | AND HAVEN'T RECEIVED ANY FEEDBACK FROM THEM." |
| 10:56AM | 22 | Q.   "OK I WILL BE THERE (LANDING IN 2 HOURS AND 10 MINUTES) |
| 10:56AM | 23 | AND CAN MEET WITH ANY CANDIDATES WE THINK MAKES SENSE.  NOTHING |
| 10:56AM | 24 | IS ON MY CALENDAR.  DO YOU WANT ME TO EMAIL HEATHER AND CHRIS |
| 10:56AM | 25 | ON TURNING THE CVS DOCUMENT?" |

10:56AM 1    A.    "NO."

10:56AM 2    Q.    "ARE THEY HELPING YOU ON WAG CONTRACT?"

10:56AM 3    A.    "NO ONE ON WAG CONTRACT BEING WANT ANYONE ON WAG CONTRACT.

10:56AM 4    THIS U AND I NEED CLOSE OUR CHESTS."

10:56AM 5          "DON'T WANT."

10:56AM 6    Q.    NOW WE'RE TURNING TO PAGE 7.

10:57AM 7    A.    "I PRESENTED CA BUY ASKED ME WHY WE WOULDN'T DO CA WITH

10:57AM 8    WAG 'OUT OF CURIOSITY.'"

10:57AM 9          "I TOLD HIM CVS HAS BETTER FOOTPRINT IN SOCAL BUT

10:57AM 10   WALGREENS IS NOT TOO FAR BEHIND."

10:57AM 11   Q.    NOW ON TO PAGE 8.

10:57AM 12   A.    "CVS WON'T HAPPEN FOR ANOTHER YEAR."

10:57AM 13         "SO IF THEY WANT WE WILL MOVE WITHOUT THEM."

10:57AM 14         "WE WILL TALK ABOUT WAG WHEN U R BACK N."

10:57AM 15         "I SENT U CONTRACT AND COVER NOTE.  PLEASE SPEND TIME ON

10:57AM 16   THAT SO I CAN SEND OUT."

10:57AM 17   Q.    "HMM."

10:58AM 18         "YEAH."

10:58AM 19         "K."

10:58AM 20         "WHAT'S YOUR SENSE ON WHY 12 MO FOR SERVICE?"

10:58AM 21         "WHERE DID U LEAVE IT WITH HIM?"

10:58AM 22   A.    "THEY DON'T KNOW THE UPSIDE OR DOWNSIDE OF NOT HAVING

10:58AM 23   THIS."

10:58AM 24   Q.    "YEAH."

10:58AM 25         "WAS HE UPSET ABOUT MISSING PA?"

10:58AM  1    A.  "AND THE FACT THAT WE ARE NOT GROWING WITH WAG IS

10:58AM  2    SOMETHING THAT THEY ARE TRYING TO UNDERSTAND."

10:58AM  3         "THEY ARE ALL LEMMINGS.  THEY ONLY WANT IT IF OTHERS WANT

10:58AM  4    IT."

10:58AM  5    Q.  "THINKING."

10:58AM  6    A.  "THE MINUTE I SAID CALIFORNIA HIS QUESTION WAS WHY CVS,

10:58AM  7    WHY NOT WALGREENS?"

10:58AM  8    Q.  "I KNOW."

10:58AM  9    A.  "INSTEAD IF THERANOS WAS STRATEGIC TO THEM HE WOULD HAVE

10:58AM  10   JUMPED ON IT."

10:58AM  11   Q.  "SEEING OUR LOCATIONS IN PA WILL BE THE SAME REACTION."

10:58AM  12   A.  "THEY DON'T THINK OF US AS STRATEGIC.  EVERY CONVERSATION

10:58AM  13   I HAVE WITH HIM HE SPEND AT LEAST HALF OF IT IN WHEN WE CAN PUT

10:58AM  14   DEVICES IN MINUTE CLINICS."

10:59AM  15        "JUST LIKE 3 YEARS AGO."

10:59AM  16   Q.  NOW ON TO PAGE 9.

10:59AM  17        MS. HOLLIMAN, I THINK THAT'S PAGE 16.  DO WE HAVE 9 NEXT?

10:59AM  18   THAT'S IT.

10:59AM  19   A.  "HIGHEST VOLUME DAY TODAY .547 IN WAG."

10:59AM  20   Q.  AND NOW ON TO PAGE 10.

10:59AM  21   A.  "JC ARTICLE IS OUT."

10:59AM  22   Q.  PAGE 11?

11:00AM  23   A.  "I AM OK WITH LESS BLOOD AND DISCOMFORT IN HOLDING

11:00AM  24   STATEMENT."

11:00AM  25   Q.  "ALMOST ODD IF NOT THERE."

11:00AM  1        AND NOW PAGE 12.

11:00AM  2    A.   "OK."

11:00AM  3         "JUST WORRIED ABOUT FDA AND CMS."

11:00AM  4         "BUT OK."

11:00AM  5         "HAVE TO TAKE THIS RISK."

11:00AM  6    Q.   "WE MADE SUCH BIG DEAL WHEN THEY WERE HERE ABOUT

11:00AM  7    VENIPUNCTURE BEING LESS BLOOD I AM COMFORTABLE WITH IT."

11:00AM  8         "CRAMER WANTS EXCLUSIVE."

11:00AM  9         "NO OTHER T.V."

11:00AM  10   A.   "WAIT FOR DAVID."

11:01AM  11   Q.   NOW ON TO PAGE 13.

11:01AM  12        "SENDING DRAFT RUPERT EMAIL.  THE LANGUAGE ABOUT WHAT JC

11:01AM  13   SAID IS DAVID'S LANGUAGE DYING."

11:01AM  14        "FYI."

11:01AM  15   A.   "OK."

11:01AM  16        "WHICH PART IS DAVID LANGUAGE."

11:01AM  17   Q.   "THE PART ABOUT WHY I DIDN'T WANT TO TALK TO JC (HIS

11:01AM  18   ACCUSATIONS) AS WELL AS THE OTHER PARAGRAPHS THAT WEREN'T THERE

11:01AM  19   BEFORE.  EVERYTHING NEW EXCEPT THE ONE SENTENCE I ADDED ON THE

11:01AM  20   NEW ARTICLE."

11:01AM  21        "I AM COMFORTABLE WITH SAYING THE DEATH AND SEX THING TO

11:01AM  22   RUPERT BC IT MAKES THE POINT."

11:01AM  23   A.   "DON'T."

11:01AM  24   Q.   "DON'T WHAT?"

11:01AM  25   A.   "DON'T MAKE THE DEATH AND SEX POINT.  NOT OK."

11:01AM  1    Q.   "CHALLENGE IS YOU SAW HOW EVERYONE REACTED IN PRESS TO ME

11:01AM  2    NOT MEETING WITH HIM."

11:01AM  3         "THEY DIDN'T THINK HIM CHALLENGING ME ON PATENTS WAS

11:02AM  4    REMOTELY A GOOD REASON NOT TO MEET WITH HIM."

11:02AM  5    A.   "BUT WE HAVE ENUFF POINTS TO SAY I DIDN'T MEET WITH HIM

11:02AM  6    BECAUSE OF HIS FALSE ACCUSATIONS AND DIDN'T HAVE TO MEET WITH

11:02AM  7    SOMEONE WHO WAS ATTACKING ME WITHOUT EVEN MEETING WITH ME.  FOR

11:02AM  8    EXAMPLE PATENTS."

11:02AM  9         "I WOULDN'T OPEN UP USE PERSONAL LIFE OR MURDER BECAUSE

11:02AM  10   ENOUGH PEOPLE ON TWITTER WILL ASSUME THAT THERE IS SOMETHING

11:02AM  11   THERE.

11:02AM  12        "IT'S FILTH."

11:02AM  13        "AND WE NEED TO GET OUT OF FLIRTY."

11:02AM  14        "FILTH."

11:02AM  15   Q.   "AGREE FOR SURE ON OUTSIDE WORLD.  EVEN WHEN RUPERT TO

11:02AM  16   MAKE POINT."

11:02AM  17   A.   "IF U FEEL STRONGLY ABOUT MURDER.  BUT NOT PERSONAL LIFE."

11:02AM  18        "I THINK IT IS IMPORTANT TO SEND THIS EMAIL BUT DOESN'T

11:03AM  19   HELP WITH PUBLIC BEATING.  ALL OUR PARTNERS ARE BAILING ONE AT

11:03AM  20   A TIME AND SAME WITH OUR INVESTORS."

11:03AM  21   Q.   AND NOW ON TO PAGE 14.

11:03AM  22   A.   "DIGNITY WAG EVERYONE IS POSTURING TO WALK AWAY.  WE R

11:03AM  23   LOSING LEVERAGE FAST."

11:03AM  24   Q.   "HAVE YOU TALKED TO WAG?"

11:03AM  25   A.   "THEY ARE NOT TALKING FOR NOW UNTIL THEIR LAWYERS SAY SO."

11:03AM  1    Q.   "TO US?"

11:03AM  2    A.   "YES."

11:03AM  3         "AT C LEVEL."

11:03AM  4    Q.   "THEIR LAWYERS TOLD THEM NOT TO TALK TO US?"

11:03AM  5    A.   "YES."

11:03AM  6    Q.   "WOW."

11:03AM  7    A.   "IN SO MANY WORDS."

11:03AM  8         "NOT EXACTLY BUT THEY WILL BRING ALL OF THIS UP ABOUT

11:03AM  9    FINGERSTICK, ET CETERA, IN CONTRACT NEGOTIATIONS."

11:03AM 10         "IT IS GOING TO BE A VERY DIFFICULT 12 MONTHS."

11:04AM 11         "OUR CLIA LAB FAILED MPV PT AT ALL 5 LEVELS.  JUST FOUND

11:04AM 12    OUT.  DEALING WITH IT."

11:04AM 13    Q.   NOW ON TO PAGE 15.

11:04AM 14    A.   "MISS OLD DAYS.  THESE DAYS ARE NOT WORTH WHATEVER WE R

11:04AM 15    TRYING TO DO HERE."

11:04AM 16         "NIM JUST TEXTED ME.  WANTS TO TALK URGENTLY."

11:04AM 17    Q.   "U CALLING HIM?"

11:04AM 18    A.   "HE WILL CALL ME WHEN READY."

11:04AM 19    Q.   "LET ME KNOW HOW IT GOES.  THE FACTS ARE ON OUR SIDE."

11:04AM 20    A.   "I KNOW.  I AM STRONG ON FACTS.  THEY ALWAYS REACT TO

11:04AM 21    ANYTHING BUT I WILL BE STRONG."

11:04AM 22    Q.   AND FINALLY PAGE 16.

11:04AM 23    A.   "OK.  WAG FREAKING OUT.  LACK OF TRANSPARENCY."

11:05AM 24         "WHY THEY FOUND THIS ALL OUT THRU MEDIA AND NOT THRU US."

11:05AM 25    Q.   "K.  THAT'S WHAT WE'LL DO."

11:05AM  1        "HOW WAS NIM?

11:05AM  2    A.   "WHY WE DIDN'T TELL THEM ABOUT TURNING OFF NANOTAINER A."

11:05AM  3    Q.   "DID YOU TELL HIM IT LITERALLY JUST HAPPENED?"

11:05AM  4    A.   "YES."

11:05AM  5    Q.   "AND WE HADN'T FINALIZED PLAN W FDA YET AND STILL

11:05AM  6    HAVEN'T."

11:05AM  7    A.   "I TOLD HIM WE WERE SURPRISED BY THE ARTICLE AS MUCH AS

11:05AM  8    THEY R."

11:05AM  9        "YES."

11:05AM  10       "BUT IT WAS MATTER OF COMMUNICATION.  I HAD ACTUALLY

11:05AM  11   THOUGHT ABOUT IT BUT GOT TOO BUSY TO CHAT WITH U."

11:05AM  12   Q.   "THEN LET'S SHOW THEM THAT THIS LITERALLY IS STILL UP IN

11:05AM  13   AIR."

11:05AM  14       "SO WE LITERALLY JUST DECIDED SINCE THE DISCUSSION IS

11:05AM  15   GETTING AIRED OUT IN PRESS?"

11:05AM  16   A.   "OK."

11:05AM  17       "HOWEVER ISSUE IS WE DIDN'T TELL THEM IN ADVANCE ABOUT

11:05AM  18   SWITCHING."

11:05AM  19   Q.   "WE'LL HAVE TO PRESENT WELL THAT WE HADN'T DECIDED TO."

11:06AM  20   A.   "BAD IDEA.  AT THIS POINT THEY KNOW.  SO NEED TO BE

11:06AM  21   TRANSPARENT."

11:06AM  22   Q.   "HOW LONG HAS IT BEEN THAT WE DIDN'T TELL THEM?"

11:06AM  23   A.   "3-4 WEEKS."

11:06AM  24   Q.   "I'M TRYING TO REMEMBER WHAT OUR THINKING WAS ON THAT."

11:06AM  25   A.   "NONE.  WE JUST DIDN'T TELL THEM THINKING UNDER NEW MODEL

| | | |
|---|---|---|
| 11:06AM | 1 | THIS DOESN'T MATTER." |
| 11:06AM | 2 | "BUT ATTACKS LIKE THIS SCARE THEM AS THEY SCARE EVERYONE." |
| 11:06AM | 3 | Q.   "YEAH." |
| 11:06AM | 4 | MR. JHAVERI, WE JUST READ TEXT MESSAGES BETWEEN MARCH OF |
| 11:06AM | 5 | 2015 AND OCTOBER OF 2015. |
| 11:06AM | 6 | DURING THIS PERIOD, WERE YOU WORKING DILIGENTLY TO |
| 11:06AM | 7 | OPERATIONALIZE THERANOS BLOOD TESTING SERVICES INSIDE OF |
| 11:06AM | 8 | WALGREENS STORES? |
| 11:06AM | 9 | A.   YES. |
| 11:06AM | 10 | MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT? |
| 11:06AM | 11 | THE COURT:  YES. |
| 11:07AM | 12 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 11:07AM | 13 | MR. SCHENK:  NO FURTHER QUESTIONS.  THANK YOU. |
| 11:07AM | 14 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:07AM | 15 | DO YOU HAVE CROSS-EXAMINATION? |
| 11:07AM | 16 | MR. DOWNEY:  I WILL, YOUR HONOR. |
| 11:07AM | 17 | THE COURT:  LET'S TAKE OUR MORNING RECESS NOW, |
| 11:07AM | 18 | LADIES AND GENTLEMEN. |
| 11:07AM | 19 | SHOULD WE TAKE 25 MINUTES?  LET'S DO THAT.  25 MINUTES. |
| 11:07AM | 20 | 25 MINUTES. |
| 11:07AM | 21 | YOU MAY STAND DOWN, SIR.  YOU CAN STAND DOWN AND WE'LL |
| 11:07AM | 22 | TAKE 25 MINUTES. |
| 11:07AM | 23 | MR. SCHENK:  THANK YOU. |
| 11:07AM | 24 | (RECESS FROM 11:07 A.M. UNTIL 11:45 A.M.) |
| 11:45AM | 25 | THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON |

11:45AM 1    THE RECORD.

11:45AM 2         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:45AM 3    OUR JURY IS PRESENT, AND OUR WITNESS IS ON THE STAND.

11:46AM 4         MR. DOWNEY, YOU HAVE CROSS?

11:46AM 5              MR. DOWNEY:  I DO, YOUR HONOR.

11:46AM 6         YOUR HONOR, DURING THE BREAK I ASKED MS. KRATZMANN TO PASS

11:46AM 7    UP A COPY OF THE EXHIBITS FOR YOU AND PLACE ONE ON THE WITNESS

11:46AM 8    STAND FOR MR. JHAVERI.

11:46AM 9              THE COURT:  THANK YOU.

11:46AM 10                   **CROSS-EXAMINATION**

11:46AM 11   BY MR. DOWNEY:

11:46AM 12   Q.  GOOD LATE MORNING TO YOU, MR. JHAVERI.  MY NAME IS

11:46AM 13   KEVIN DOWNEY AND I REPRESENT MS. HOLMES.

11:46AM 14        I'M GOING TO REMOVE MY MASK AS WELL SO WE CAN HEAR EACH

11:46AM 15   OTHER DURING THIS CONVERSATION.

11:46AM 16   A.  SURE.

11:46AM 17   Q.  YOU'VE WORKED IN AND AROUND RETAIL OPERATIONS FOR DECADES

11:46AM 18   AT THIS POINT; RIGHT?

11:46AM 19   A.  THAT'S CORRECT.

11:46AM 20   Q.  AND IT'S A HARD THING TO OPEN A RETAIL STORE, ISN'T IT?

11:46AM 21   A.  IT IS.

11:46AM 22   Q.  AND IT IS A HARD THING TO EVEN OPEN A DEPARTMENT WITHIN A

11:46AM 23   RETAIL STORE?

11:46AM 24   A.  IT IS.

11:46AM 25   Q.  AND IT'S A HARD THING TO MANAGE A STORE; CORRECT?

11:46AM  1    A.   IT IS VERY DIFFICULT TO MANAGE A STORE.

11:46AM  2    Q.   AND EVEN TO MANAGE A DEPARTMENT WITHIN A STORE; CORRECT?

11:46AM  3    A.   CORRECT.

11:46AM  4    Q.   THERE'S A LOT TO IT?

11:47AM  5    A.   THERE'S MANY THINGS THAT ARE REQUIRED.

11:47AM  6    Q.   OKAY.  AND IF THE JOB THAT IS ASKED OF YOU IS TO OPEN 1500

11:47AM  7    STORES IN A YEAR, THAT'S A VERY HARD JOB; CORRECT?

11:47AM  8    A.   THAT IS VERY DIFFICULT, YES.

11:47AM  9    Q.   BUT IF THE SENIOR MANAGEMENT OF YOUR COMPANY ASKS YOU TO

11:47AM  10   DO THAT, THAT'S SOMETHING THAT YOU HAVE TO TRY TO ACCOMPLISH;

11:47AM  11   CORRECT?

11:47AM  12   A.   IF THEY ASK ME TO DO SOMETHING, YES, I WILL DO IT IN THE

11:47AM  13   BEST WAY THAT I CAN.

11:47AM  14   Q.   OKAY.  LET'S TALK ABOUT THE SITUATION THAT WAS IN PLACE

11:47AM  15   WHEN YOU REALLY STARTED WORKING ON THE RELATIONSHIP BETWEEN

11:47AM  16   THERANOS AND WALGREENS JUST SO I'M CLEAR ON THIS.

11:47AM  17        YOU WERE NOT INVOLVED IN THE NEGOTIATION OF ANY OF THE

11:47AM  18   AGREEMENTS BETWEEN WALGREENS AND THERANOS; CORRECT?

11:47AM  19   A.   NO, SIR.

11:47AM  20   Q.   AND THERE WERE OTHER EXECUTIVES AT THERANOS WHO DID

11:47AM  21   THOSE -- OR AT WALGREENS WHO DID THAT?

11:48AM  22   A.   THAT'S CORRECT.

11:48AM  23   Q.   THAT INCLUDED, FOR EXAMPLE, MR. WASSON, WHO WAS THE CEO,

11:48AM  24   AND MR. MIQUELON, WHO WAS THE CFO?

11:48AM  25   A.   I DON'T KNOW WHO WERE INVOLVED, BUT I WAS NOT INVOLVED IN

JHAVERI CROSS BY MR. DOWNEY                                          3641

11:48AM  1     THAT.

11:48AM  2     Q.   BUT YOU DO KNOW THAT ONE OF THE PRINCIPAL PLAYERS IN THE

11:48AM  3     RELATIONSHIP BETWEEN WALGREENS AND THERANOS WAS DR. JAY ROSAN;

11:48AM  4     CORRECT?

11:48AM  5     A.   THAT'S CORRECT.

11:48AM  6     Q.   AND DR. ROSAN WAS A SENIOR EXECUTIVE AT WALGREENS;

11:48AM  7     CORRECT?

11:48AM  8     A.   THAT'S CORRECT.

11:48AM  9     Q.   AND WHEN YOU TOOK OVER THE RELATIONSHIP WITH MR. BALWANI,

11:48AM  10    YOU UNDERSTOOD THAT DR. ROSAN HAD BEEN INVOLVED FOR MANY YEARS

11:48AM  11    IN THAT RELATIONSHIP; CORRECT?

11:48AM  12    A.   YES, I UNDERSTOOD THAT.

11:48AM  13    Q.   NOW, WHEN YOU STARTED WORKING TO -- I'LL USE THE WORD YOU

11:48AM  14    USED.  WHEN YOU STARTED WORKING TO OPERATIONALIZE THE PLAN THAT

11:48AM  15    WAS IN PLACE TO OPEN A NUMBER OF THERANOS CENTERS IN WALGREENS

11:48AM  16    STORES, DID SOMEONE BRIEF YOU ON THE SITUATION?

11:49AM  17    A.   WELL, IF I CAN STEP BACK A LITTLE BIT.  THERE WAS NO PLAN

11:49AM  18    TO OPERATIONALIZE THE SERVICES.  THEY HAD THREE STORES OPENED

11:49AM  19    WHEN I HAD TAKEN OVER ON THE OPERATIONAL PIECE.

11:49AM  20         SO WE WERE DEVELOPING A FULL PLAN TO GET THIS DONE, AND

11:49AM  21    THAT'S PART OF MY RESPONSIBILITY, AS WELL AS MY TEAM'S

11:49AM  22    RESPONSIBILITY.

11:49AM  23    Q.   OKAY.  AND JUST SO THAT I'M CLEAR, YOU HAD NOT PLAYED A

11:49AM  24    ROLE IN ANY KIND OF EVALUATION OF THE TECHNOLOGY OF THERANOS

11:49AM  25    PRIOR TO THE TIME ANY AGREEMENTS WERE SIGNED; IS THAT RIGHT?

11:49AM  1      A.   THAT'S CORRECT, SIR.

11:49AM  2      Q.   AND THAT WAS DONE BY OTHERS AT WALGREENS AND OUTSIDE

11:49AM  3      CONSULTANTS ADVISING THEM; CORRECT?

11:49AM  4      A.   THAT IS CORRECT.

11:49AM  5      Q.   AND AS FAR AS YOU KNOW, ADEQUATE DUE DILIGENCE WAS DONE IN

11:49AM  6      THAT REGARD; CORRECT?

11:49AM  7      A.   THAT IS CORRECT.

11:49AM  8      Q.   AND YOU ALSO WERE NOT INVOLVED IN CONTACT WITH MS. HOLMES;

11:49AM  9      IS THAT CORRECT?

11:49AM  10     A.   NO.  I HAD VERY LITTLE CONTACT WITH MS. HOLMES.

11:49AM  11     Q.   OKAY.  AND THAT WAS TRUE THROUGHOUT THE TIME THAT YOU WERE

11:50AM  12     INVOLVED IN THE THERANOS-WALGREENS RELATIONSHIP; CORRECT?

11:50AM  13     A.   YEAH, I MET WITH MS. HOLMES MAYBE TWO OR THREE TIMES AT

11:50AM  14     MOST.

11:50AM  15     Q.   OKAY.  NOW, WHEN YOU GOT YOUR ORIGINAL BRIEFING -- LET ME

11:50AM  16     JUST ORIENT MYSELF IN TERMS OF THE DATE -- DID YOU BEGIN

11:50AM  17     WORKING ON THE PARTNERSHIP IN EARNEST IN LATE 2013 OR EARLY

11:50AM  18     2014?

11:50AM  19     A.   IN EARLY 2014.

11:50AM  20     Q.   AND THERE WERE A FEW STORES OPEN AT THAT TIME; CORRECT?

11:50AM  21     A.   WHEN I TOOK OVER RESPONSIBILITY, THERE WERE THREE STORES

11:50AM  22     OPEN, TWO IN ARIZONA AND ONE IN CALIFORNIA.

11:50AM  23     Q.   AND DID YOU TRY AND GET A SENSE OF WHAT WAS GOING ON IN

11:50AM  24     THOSE STORES?

11:50AM  25     A.   YES, I DID.

11:50AM  1    Q.   AND DID YOU LEARN RELATIVELY EARLY IN YOUR DEALINGS WITH

11:50AM  2    THERANOS THAT A NUMBER OF BLOOD DRAWS WERE BEING CONDUCTED BY

11:50AM  3    VENOUS DRAW?

11:50AM  4    A.   YES, YES.  PART OF MY ONBOARDING WAS ALSO TO UNDERSTAND

11:50AM  5    FROM MY TEAM, OUR TEAM, THE WALGREENS TEAM, WHAT THE STATUS WAS

11:51AM  6    AT THE STORES, WHERE THEY STOOD, WHAT THEY WERE SEEING, AND

11:51AM  7    THEN THAT WAS PART OF MY LEARNING.

11:51AM  8    Q.   OKAY.  AND SO YOU LEARNED AT THAT POINT THAT THERE WERE

11:51AM  9    SOME BLOOD DRAWS THAT WERE BEING TAKEN BY FINGERSTICK; CORRECT?

11:51AM  10        AND I THINK YOU SAID THAT THERE WERE SOME DRAWS THAT WERE

11:51AM  11   BEING TAKEN BY VEIN, THAT WERE VENOUS DRAWS; CORRECT?

11:51AM  12   A.   THAT'S CORRECT.

11:51AM  13   Q.   BUT REALLY THERE ARE THREE TYPES OF BLOOD DRAWS; CORRECT?

11:51AM  14   THERE'S THE FINGERSTICK DRAW THAT YOU MENTIONED; THERE'S THE

11:51AM  15   TRADITIONAL VENOUS DRAW; AND THEN YOU CAN TAKE A MICROSAMPLE

11:51AM  16   DRAW FROM THE ARM AS WELL; CORRECT?

11:51AM  17   A.   YES.

11:51AM  18   Q.   AND THAT'S CONSIDERED A VENOUS DRAW; CORRECT?

11:51AM  19   A.   THAT'S CORRECT.

11:51AM  20   Q.   AND YOU LEARNED THAT PART OF THERANOS'S OPERATION IN THE

11:51AM  21   STORE WAS THAT THEY WERE TAKING CERTAIN SAMPLES FROM THE VEIN

11:51AM  22   AS MICROSAMPLES; CORRECT?

11:51AM  23   A.   THAT'S CORRECT.

11:51AM  24   Q.   AND THAT WAS PUBLICLY ANNOUNCED PRIOR TO THE, TO THE

11:52AM  25   PARTNERSHIP BEGINNING OPERATIONS; CORRECT?

11:52AM  1   A.   YES, THERE WERE VENOUS DRAWS THAT WERE AT PEDIATRIC LEVEL

11:52AM  2   DOSES, OR BLOOD DRAWS, THAT WERE PART OF THAT.

11:52AM  3   Q.   OKAY.  NOW, WHEN YOU BEGAN WORK ON THE PARTNERSHIP, DID

11:52AM  4   YOU SIT DOWN AND READ THE AGREEMENTS THAT WERE IN PLACE BETWEEN

11:52AM  5   THERANOS AND WALGREENS?

11:52AM  6   A.   I DID, SIR.

11:52AM  7   Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 1083.

11:52AM  8   A.   IS THAT IN WHICH BINDER?

11:52AM  9   Q.   I BELIEVE IT SHOULD BE IN VOLUME 2 OF THE TWO BINDERS THAT

11:52AM  10  YOU HAVE, BUT I CAN HELP YOU LOCATE IT IF YOU HAVE DIFFICULTY.

11:52AM  11  A.   YEAH.

11:52AM  12       THE CLERK:  THAT WAS PREVIOUSLY ADMITTED, COUNSEL.

11:53AM  13  BY MR. DOWNEY:

11:53AM  14  Q.   DO YOU HAVE THAT IN FRONT OF YOU?

11:53AM  15  A.   IS THAT WHAT IS ON THE SCREEN NOW?

11:53AM  16  Q.   IT IS, YES.

11:53AM  17  A.   YES.

11:53AM  18  Q.   AND DO YOU SEE THAT THIS IS AN EMAIL BETWEEN MR. MIQUELON,

11:53AM  19  THE WALGREENS CFO, AND MS. HOLMES.

11:53AM  20       DO YOU SEE THAT?

11:53AM  21  A.   I DO.

11:53AM  22  Q.   AND DO YOU SEE THAT HE SAYS THAT HE'S ATTACHING A

11:53AM  23  CONCEPTUAL FRAMEWORK?

11:53AM  24  A.   YES.

11:53AM  25  Q.   AND THIS WAS SENT IN SEPTEMBER OF 2013.

11:53AM 1         AND IS THAT ABOUT FIVE OR SIX MONTHS BEFORE YOU BEGAN

11:53AM 2    WORKING ON THE PARTNERSHIP?

11:53AM 3    A.   THAT'S CORRECT.

11:53AM 4    Q.   OKAY.  LET ME ASK YOU TO TAKE A LOOK AT THE FIRST

11:53AM 5    PARAGRAPH, WHICH IS ON PAGE 2 OF THE EXHIBIT.

11:53AM 6         AND I WANT TO LOOK AT THIS FIRST PARAGRAPH, ROMAN NUMERAL

11:53AM 7    I WHICH IS UP ON THE SCREEN.

11:54AM 8         AND DO YOU SEE THERE IN THE TERM SHEET, MR. MIQUELON

11:54AM 9    EXPRESSED THAT WALGREENS WAS WILLING TO COMMIT TO DEVELOPING

11:54AM 10   THERANOS LAB SERVICES AT 1500 LOCATIONS IN THE FIRST 12 MONTHS

11:54AM 11   AFTER THE START OF THE ROLLOUT?

11:54AM 12   A.   YES.

11:54AM 13   Q.   AND DO YOU SEE THAT HE WAS ALSO WILLING TO COMMIT TO AN

11:54AM 14   ADDITIONAL 1500 LOCATIONS IN THE FOLLOWING 12 MONTHS?

11:54AM 15   A.   I DO SEE THAT.

11:54AM 16   Q.   AND THE ROLLOUT THAT THAT CONTEMPLATES, THAT'S A BIG JOB;

11:54AM 17   RIGHT?

11:54AM 18   A.   THAT IS A BIG JOB.

11:54AM 19   Q.   FOR MANY OF THE REASONS THAT YOU TALKED ABOUT WHEN YOU

11:54AM 20   WERE ON DIRECT EXAMINATION WITH MR. SCHENK; RIGHT?  YOU HAVE TO

11:54AM 21   TRAIN PEOPLE; CORRECT?  OFTEN YOU HAVE TO BUILD OUT IN A

11:54AM 22   FACILITY; CORRECT?

11:54AM 23   A.   THAT'S CORRECT.

11:54AM 24   Q.   AND YOU HAVE TO FIGURE OUT HOW THE PROCESS IS GOING TO

11:54AM 25   WORK OF PATIENTS RELATING TO THE SERVICE; CORRECT?

11:54AM  1    A.   THAT'S CORRECT.

11:54AM  2    Q.   AND SO THIS COMMITMENT WAS A HUGE COMMITMENT ON THE PART

11:55AM  3    OF WALGREENS; CORRECT?

11:55AM  4    A.   YES, IT WAS.

11:55AM  5    Q.   AND WHO WAS WORKING ON THAT TYPE OF A COMMITMENT AROUND

11:55AM  6    THE TIME OF THE LAUNCH?

11:55AM  7    A.   AT THE TIME OF THE LAUNCH --

11:55AM  8    Q.   ON THE WALGREENS SIDE?

11:55AM  9    A.   I DO NOT KNOW EXACTLY WHO WAS WORKING ON IT AT THAT TIME,

11:55AM  10   BUT I KNOW THERE WERE SOME FOLKS, DR. ROSAN WAS ONE OF THEM,

11:55AM  11   THAT WAS INVOLVED, AND THERE WAS A SMALL TEAM LED BY

11:55AM  12   KIM ROMANSKI WHO WAS PART OF IT.

11:55AM  13   Q.   AND WHO WAS WORKING ON WHAT YOU LATER STARTED TO WORK ON,

11:55AM  14   WHICH WAS THE OPERATIONALIZATION OF THE PROGRAM?

11:55AM  15   A.   I HAD PUT IN A TEAM, A LARGER TEAM LED BY CASEY KOZLOWSKI,

11:55AM  16   WE MENTIONED HER NAME EARLIER, WHO LED THE TEAM WHO REPORTED TO

11:55AM  17   ME.

11:55AM  18   Q.   I DON'T MEAN TO INTERRUPT, BUT I MEANT BEFORE YOU BEGAN

11:55AM  19   WORK.

11:55AM  20   A.   OH.  AS I SAID, THE INDIVIDUALS THAT I JUST TALKED ABOUT,

11:55AM  21   DR. ROSAN AND KIM ROMANSKI AND HER TEAM WERE WORKING ON IT

11:55AM  22   BEFORE I STARTED.

11:55AM  23   Q.   OKAY.  AND THEN YOU CAME AT SOME POINT IN 2014 AND YOU PUT

11:56AM  24   IN PLACE A LARGER TEAM?

11:56AM  25   A.   THAT'S CORRECT.

11:56AM   1      Q.   LET ME ASK YOU NOW TO LOOK AT -- I WANT TO SHOW YOU A COPY

11:56AM   2      OF THE CONTRACT THAT WAS IN PLACE BETWEEN THERANOS AND

11:56AM   3      WALGREENS.  IT HAS ALSO BEEN PREVIOUSLY ADMITTED AND IT IS

11:56AM   4      EXHIBIT 1387.  AND IF YOU WANT TO LOOK AT THE ENTIRETY, IT

11:56AM   5      SHOULD BE IN THAT SAME NOTEBOOK.

11:56AM   6           SORRY.  I'M POINTING YOU TO THE WRONG EXHIBIT.

11:56AM   7           YES, OKAY.  1387, NOT 1837.

11:57AM   8           DO YOU SEE THAT?

11:57AM   9      A.   I DO.

11:57AM  10      Q.   AND IF YOU REVIEW THE ENTIRE DOCUMENT, DO YOU SEE THAT

11:57AM  11      THAT'S A LETTER AND IT WAS SIGNED BETWEEN ELIZABETH HOLMES AT

11:57AM  12      THE END ON THE LAST PAGE AND MARK VAINISI FROM WALGREENS.

11:57AM  13           DO YOU SEE THAT?

11:57AM  14      A.   I DO.

11:57AM  15      Q.   AND THIS WAS THE MOST RECENT AMENDMENT TO THE

11:57AM  16      THERANOS-WALGREENS MASTER SERVICES AGREEMENT; CORRECT?

11:57AM  17      A.   THAT'S I'M AWARE OF, YES.

11:57AM  18      Q.   AND THIS WAS ONE OF THE DOCUMENTS THAT YOU REVIEWED AT THE

11:57AM  19      TIME THAT YOU BECAME THE PERSON IN CHARGE OF OPERATIONALIZING

11:57AM  20      THE THERANOS-WALGREENS PARTNERSHIP; CORRECT?

11:57AM  21      A.   THAT'S CORRECT.

11:57AM  22      Q.   IF YOU LOOK AT THE SECOND FULL PARAGRAPH ON PAGE 1 OF THE

11:58AM  23      DOCUMENT, IT BEGINS THAT -- DO YOU SEE THE FIRST SENTENCE

11:58AM  24      THERE?  IT INDICATED IT WAS THE INTENTION OF THE PARTIES TO

11:58AM  25      DEVELOP A MUTUALLY BENEFICIAL STRATEGIC RELATIONSHIP THAT

11:58AM  1    FACILITATES THE SUCCESSFUL DEPLOYMENT OF THERANOS NATIONALLY,

11:58AM  2    ESTABLISHES WALGREENS AS THE NATIONAL PARTNER FOR LABORATORY

11:58AM  3    SERVICES THAT THERANOS IS ABLE TO PROVIDE, AND THERANOS AS

11:58AM  4    WALGREENS'S NATIONAL PARTNER FOR SUCH THERANOS SERVICES.

11:58AM  5        DO YOU SEE THAT?

11:58AM  6    A.   I DO.

11:58AM  7    Q.   AND THAT WAS REALLY THE PURPOSE OF THIS AGREEMENT, TO GIVE

11:58AM  8    SOME EXCLUSIVITY RIGHTS TO WALGREENS ON THE ONE HAND AND TO

11:58AM  9    HELP FACILITATE A NATIONAL ROLLOUT FOR THERANOS ON THE OTHER;

11:58AM  10   CORRECT?

11:58AM  11   A.   THAT'S CORRECT.

11:58AM  12   Q.   IS THERE ANY MENTION IN THIS DOCUMENT OF THE PERCENTAGE OF

11:58AM  13   DRAWS THAT WOULD BE ON FINGERSTICK?

11:58AM  14   A.   I DO NOT KNOW.  I WOULD HAVE TO READ THROUGH THE WHOLE

11:59AM  15   DOCUMENT.

11:59AM  16   Q.   OKAY.  IF -- IF THERE WERE NOT, DOES THAT SURPRISE YOU?

11:59AM  17   A.   IT DEPENDS ON THE CONTRACT, RIGHT?  SO IT'S NOT SIMPLY

11:59AM  18   JUST THERANOS.

11:59AM  19       DEPENDING ON HOW THE INDIVIDUALS AND THE TWO PARTIES

11:59AM  20   CONSTRUCTED THE CONTRACT, SOMETIMES IT'S A HIGHER LEVEL

11:59AM  21   CONTRACT AND THE DETAILS ARE THEN IN A SEPARATE SOW, OR

11:59AM  22   STATEMENT OF WORK, OR SERVICE LEVEL AGREEMENT.

11:59AM  23       SO I WOULD NOT BE SURPRISED IF ALL OF THOSE SPECIFICS ARE

11:59AM  24   NOT IN THIS MASTER SERVICES AGREEMENT.

11:59AM  25   Q.   WELL, DO YOU KNOW OF ANY AGREEMENT BETWEEN THERANOS AND

11:59AM   1    WALGREENS THAT CONTAINS A COMMITMENT ON THERANOS'S PART AS TO

11:59AM   2    THE PERCENTAGE OF BLOOD DRAWS THAT WILL BE VENOUS?

11:59AM   3    A.   I AM NOT AWARE OF THAT.

11:59AM   4    Q.   OKAY.  AND YOU UNDERSTAND THAT UNDER THIS CONTRACT,

11:59AM   5    WALGREENS PAID THERANOS AN INNOVATION FEE; CORRECT?

11:59AM   6    A.   I DO.

11:59AM   7    Q.   AND THE PURPOSE OF PAYING THERANOS THAT INNOVATION FEE WAS

12:00PM   8    TO ASSIST IT IN SCALING UP SO THAT THERE COULD BE A NATIONAL

12:00PM   9    ROLLOUT; CORRECT?

12:00PM  10    A.   THAT WAS PART OF IT, YES.

12:00PM  11    Q.   AND, OF COURSE, PART OF IT WAS TO OBTAIN THE EXCLUSIVITY

12:00PM  12    THAT WALGREENS OBTAINED UNDER THE AGREEMENT; CORRECT?

12:00PM  13    A.   CORRECT.

12:00PM  14    Q.   AND YOU TESTIFIED ON DIRECT THAT THERE WAS NO GUARANTEE,

12:00PM  15    CORRECT, THAT THERE WOULD BE A ROLLOUT NATIONALLY OR EVEN

12:00PM  16    BEYOND A CERTAIN NUMBER OF STORES; CORRECT?

12:00PM  17    A.   THAT'S CORRECT.

12:00PM  18    Q.   BUT YOU UNDERSTOOD THAT WHEN WALGREENS MADE THIS

12:00PM  19    COMMITMENT AT THE END OF 2014, IT WAS WALGREENS'S INTENTION TO

12:00PM  20    DO EVERYTHING IT COULD TO FACILITATE AND DRIVE A NATIONAL

12:00PM  21    ROLLOUT OVER THE NEXT TWO YEARS; CORRECT?

12:00PM  22    A.   WE HAD EVERY INTENTION TO GO TO A NATIONAL ROLLOUT, AGAIN,

12:00PM  23    IF IT WAS OPERATIONALLY FEASIBLE, THE METRICS WERE MADE, AND

12:00PM  24    THE ACTUAL SERVICE DELIVERED ON ITS PROMISE.

12:01PM  25    Q.   AND THE PROCESS OF DOING THOSE THINGS, AGAIN, THAT WAS A

12:01PM  1    HUGE TASK FOR WALGREENS TO PERFORM; CORRECT?

12:01PM  2    A.   ABSOLUTELY.  IT WAS A HUGE TASK FOR BOTH PARTIES.

12:01PM  3    Q.   NO QUESTION.  A HUGE TASK FOR THERANOS; CORRECT?

12:01PM  4    A.   YES.

12:01PM  5    Q.   AND THERANOS NEVER HAD ANY EXPERIENCE PRIOR TO THE

12:01PM  6    WALGREENS LAUNCH WITH REGARD TO ROLLING OUT STORES WHERE THERE

12:01PM  7    WOULD BE CONSUMER LAB SERVICES OFFERED; CORRECT?

12:01PM  8    A.   I CAN'T SPEAK TO WHAT THEIR EXPERIENCE WAS, BUT I CAN TELL

12:01PM  9    YOU IT WAS A HUGE UNDERTAKING FOR BOTH PARTIES.

12:01PM  10   Q.   RIGHT.  AND WALGREENS HAD SIGNIFICANT EXPERIENCE IN THAT

12:01PM  11   AREA; CORRECT?

12:01PM  12   A.   ABSOLUTELY.

12:01PM  13   Q.   AND WHATEVER THERANOS THOUGHT, YOU KNEW THIS WAS GOING TO

12:01PM  14   BE A HUGE TASK; CORRECT?

12:01PM  15   A.   CORRECT.

12:01PM  16   Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 3755 AND ASK IF

12:02PM  17   YOU CAN IDENTIFY WHAT THIS IS.

12:02PM  18   A.   YEP.  THIS IS SOMETHING CALLED A PROGRAM CHARTER, AND SO

12:02PM  19   FOR ANY TYPE OF PROJECT OR PROGRAM THAT WE AT WALGREENS WOULD

12:02PM  20   LAUNCH, THAT WE WOULD HAVE A DOCUMENT THAT STARTS TO SET FORTH

12:02PM  21   WHAT THE INTENTION WAS, WHAT WE'RE TRYING TO DO, HOW WE'RE

12:02PM  22   GOING TO DO IT.  IT'S AN ITERATIVE DOCUMENT, SO AS WE LEARN

12:02PM  23   MORE, WE UPDATE IT.

12:02PM  24        BUT THE IDEA HERE IS TO START TO DOCUMENT WHAT OUR PLAN

12:02PM  25   COULD LOOK LIKE.

12:02PM  1    Q.   OKAY.  AND IT EXIST IN SOME -- IN SOME FORM IT'S STORED

12:02PM  2    SOMEWHERE AND SOMEBODY HAS THE AUTHORITY TO MODIFY IT AS YOU GO

12:02PM  3    FORWARD?

12:02PM  4    A.   YES, SIR.

12:02PM  5    Q.   AND LET ME ASK YOU TO LOOK AT THE DATES THAT APPEAR

12:02PM  6    TOWARDS THE FRONT OF THE DOCUMENT.

12:03PM  7         DO YOU SEE THAT ON 3755, A LISTING OF DATES?

12:03PM  8    A.   ARE YOU REFERRING TO THE DOCUMENT VERSION CONTROL?

12:03PM  9    Q.   YES.

12:03PM  10   A.   YES, I DO.

12:03PM  11   Q.   AND THAT INDICATES DATES ON WHICH REVISIONS ARE MADE TO

12:03PM  12   THE PROGRAM CHARTER; CORRECT?

12:03PM  13   A.   THAT'S RIGHT.

12:03PM  14   Q.   LET ME ASK YOU TO LOOK AT -- WELL, WHAT DATE WAS THIS

12:03PM  15   VERSION CURRENT AS OF?

12:03PM  16   A.   ACCORDING TO THIS DOCUMENT, 3-5-2014.

12:03PM  17   Q.   AND WAS THAT AROUND THE TIME THAT YOU WERE GETTING

12:03PM  18   INVOLVED WITH THE PROGRAM?

12:03PM  19   A.   YES, SIR.

12:03PM  20   Q.   AND LET ME ASK YOU TO LOOK AT PAGE 2, THE EXECUTIVE

12:03PM  21   SUMMARY.

12:03PM  22        OH, YOUR HONOR, I MOVE THE ADMISSION OF 3755.

12:03PM  23             MR. SCHENK:  NO OBJECTION.

12:03PM  24             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:03PM  25        (GOVERNMENT'S EXHIBIT 3755 WAS RECEIVED IN EVIDENCE.)

| | | |
|---|---|---|
| 12:03PM | 1 | BY MR. DOWNEY: |
| 12:03PM | 2 | Q.   ON THE SECOND PAGE I'M INTERESTED IN DIRECTING YOUR |
| 12:04PM | 3 | ATTENTION TO THE TOP HALF OF THE DOCUMENT WHICH IS CAPTIONED |
| 12:04PM | 4 | EXECUTIVE SUMMARY. |
| 12:04PM | 5 | DO YOU SEE THAT? |
| 12:04PM | 6 | A.   I DO. |
| 12:04PM | 7 | Q.   AND THEN IN THE PARAGRAPH JUST AFTER THE FIRST SET OF |
| 12:04PM | 8 | BULLET POINTS IT SAYS, "THE OVERALL GOAL IS TO EXPAND TO 2500 |
| 12:04PM | 9 | STORES NATIONWIDE BY THE END OF FY16." |
| 12:04PM | 10 | FY REFERS TO FISCAL YEAR? |
| 12:04PM | 11 | A.   THAT'S RIGHT, FISCAL YEAR FOR WALGREENS. |
| 12:04PM | 12 | Q.   OKAY.  AND THE FISCAL YEAR FOR WALGREENS ACTUALLY ENDED IN |
| 12:04PM | 13 | THE MIDDLE OF THE CALENDAR YEAR; CORRECT? |
| 12:04PM | 14 | A.   IT DID.  THE FISCAL YEAR STARTS IN AUGUST AND THEN ENDS IN |
| 12:04PM | 15 | SEPTEMBER. |
| 12:04PM | 16 | Q.   OKAY.  SO WHEN THIS DOCUMENT SAYS THAT THE GOAL WAS TO |
| 12:04PM | 17 | EXPAND TO 2500 STORES NATIONWIDE BY THE END OF FISCAL YEAR '16, |
| 12:04PM | 18 | THAT WOULD MEAN THAT THE GOAL WAS TO EXPAND TO 2500 STORES BY |
| 12:04PM | 19 | SEPTEMBER OF 2016; CORRECT? |
| 12:04PM | 20 | A.   YEAH, LET ME JUST CORRECT MYSELF.  I REVERSED THE MONTHS. |
| 12:05PM | 21 | IT'S FROM SEPTEMBER 1ST THROUGH AUGUST 31ST OF THE FOLLOWING |
| 12:05PM | 22 | YEAR.  SO IT WOULD BE AUGUST 31ST. |
| 12:05PM | 23 | Q.   OKAY.  SO THE GOAL WAS TO EXPAND TO 2500 STORES BY |
| 12:05PM | 24 | SEPTEMBER 1ST OF 2016; CORRECT? |
| 12:05PM | 25 | A.   2016, CORRECT. |

12:05PM 1     Q.   I BEG YOUR PARDON.  NOW I'VE MISSTATED THE YEARS -- NO, I

12:05PM 2     HAVEN'T ACTUALLY.  LET ME TRY IT AGAIN AND WE'LL GET THE YEARS

12:05PM 3     STRAIGHT.

12:05PM 4          THE GOAL AS STATED IN THIS DOCUMENT WAS FOR THE THERANOS

12:05PM 5     PARTNERSHIP TO EXPAND TO 2500 STORES NATIONWIDE BY

12:05PM 6     SEPTEMBER 1ST, 2016; CORRECT?

12:05PM 7     A.   THAT'S CORRECT.  SO THE FISCAL YEAR -- JUST TO BE VERY

12:05PM 8     CLEAR, FISCAL YEAR '16 STARTED IN AUGUST OF 2015 -- OR

12:05PM 9     SEPTEMBER OF 2015 AND WENT TO AUGUST OF 2016.

12:05PM 10    Q.   OKAY.  AND THEN IT REFERENCES WHAT THE PLAN FOR FISCAL

12:05PM 11    YEAR '14 WAS.  DO YOU SEE THAT?

12:06PM 12    A.   I DO.

12:06PM 13    Q.   AND IT INDICATES THAT THE PLAN FOR FISCAL YEAR 2015 WAS TO

12:06PM 14    ROLL OUT DIAGNOSTIC TESTING SERVICES TO 40 STORES BY

12:06PM 15    AUGUST 1ST, 2014; CORRECT?

12:06PM 16    A.   THAT'S CORRECT.

12:06PM 17    Q.   AND THAT WAS REALLY THE PROJECT THAT YOU WERE WORKING ON

12:06PM 18    WITH MR. BALWANI THAT YOU WERE TALKING ABOUT IN YOUR DIRECT

12:06PM 19    EXAMINATION?

12:06PM 20    A.   YEAH.  THE PLAN WAS, WHEN I TOOK OVER, TO GET TO 40 STORES

12:06PM 21    BY THE END OF THAT FISCAL YEAR, AND WE HAD 41 STORES SOMETIME

12:06PM 22    BY SEPTEMBER OR OCTOBER OF THAT YEAR.  I CAN'T EXACTLY

12:06PM 23    REMEMBER.

12:06PM 24    Q.   OKAY.  NOW, THIS WAS -- HOW MUCH OF YOUR TIME WERE YOU

12:06PM 25    DEVOTING TO HELPING WITH THIS PARTNERSHIP?

12:06PM 1    A.   I HAD SEVERAL TEAMS REPORTING TO ME ON VARIOUS PROGRAMS,

12:06PM 2    SO IT'S HARD TO SAY FROM A PERCENTAGE STANDPOINT.  BUT THIS

12:06PM 3    WAS -- AS I MENTIONED EARLIER TODAY, IT'S A CORE PART OF WHAT

12:06PM 4    WE WERE TRYING TO DO.

12:06PM 5    Q.   IT WAS A SUBSTANTIAL PART OF YOUR TIME; CORRECT?

12:06PM 6    A.   IT WAS A SIZEABLE PORTION.

12:06PM 7    Q.   LET ME ASK YOU TO LOOK AT THE NEXT SET -- THE BOTTOM HALF

12:07PM 8    OF THAT DOCUMENT, WHICH IS LABELLED BUSINESS NEED/OPPORTUNITY.

12:07PM 9         DO YOU SEE THAT?

12:07PM 10   A.   YES, SIR.

12:07PM 11   Q.   AND IT SAYS, IF YOU READ THE FIRST SENTENCE UNDER

12:07PM 12   "OPPORTUNITY," IT INDICATES THAT THERE WAS A FORECASTED SIZE

12:07PM 13   FOR A MARKET OF $73 BILLION.

12:07PM 14        DO YOU KNOW WHAT THAT REFERS TO?

12:07PM 15   A.   YES.  THAT WAS THE MARKET SIZE OF THE LABORATORY MARKET

12:07PM 16   FOR THE U.S.

12:07PM 17   Q.   OKAY.  AND THEN IN THE SECOND PARAGRAPH IT SAYS, "THE

12:07PM 18   WALGREENS REVENUE OPPORTUNITY, AT A CAPTURE RATE OF 100 PERCENT

12:07PM 19   OF THE MARKET, IS 6.3 BILLION BASED ON CURRENT CONTRACT."

12:07PM 20        CAN YOU EXPLAIN THAT?

12:07PM 21   A.   THIS WAS WHAT THE OPPORTUNITY FOR US, FOR WALGREENS WAS,

12:07PM 22   TO CAPTURE PART OF THAT $73 BILLION.  IF WE WERE TO ACHIEVE

12:07PM 23   WHAT WAS STATED IN THE CONTRACT, I BELIEVE 1500 STORES, OR

12:08PM 24   WHATEVER THAT NATIONWIDE LAUNCH WAS.  AND SO THIS WAS REFERRING

12:08PM 25   TO THAT.

12:08PM  1    Q.   SO ADDING $6.3 BILLION TO WALGREENS'S REVENUE WOULD BE A

12:08PM  2    SUBSTANTIAL ACHIEVEMENT; IS THAT CORRECT?

12:08PM  3    A.   ABSOLUTELY.

12:08PM  4    Q.   AND THAT'S WHY -- I DON'T WANT TO EMBARRASS YOU, BUT YOU

12:08PM  5    WERE A SENIOR EXECUTIVE IN THE COMPANY?

12:08PM  6    A.   CORRECT.

12:08PM  7    Q.   AND THAT'S WHY IT WAS SO MUCH OF YOUR TIME; CORRECT?

12:08PM  8    A.   IT WAS, YES.

12:08PM  9    Q.   LET ME ASK YOU NEXT TO LOOK AT PAGE 5 OF THE DOCUMENT.

12:08PM  10        DO YOU SEE THE TOP PORTION OF THAT DOCUMENT, WHICH IS A

12:08PM  11   FINANCIAL OUTLOOK?

12:08PM  12   A.   I DO.

12:08PM  13   Q.   AND DO YOU SEE THAT IT PROJECTS A CERTAIN NUMBER OF

12:08PM  14   PATIENTS PER DAY FOR FISCAL YEAR '14 AND FISCAL YEAR '15?

12:09PM  15        DO YOU SEE THAT?

12:09PM  16   A.   I DO.

12:09PM  17   Q.   AND DO YOU SEE THAT FOR FISCAL YEARS, BOTH OF THOSE YEARS,

12:09PM  18   THE PROJECTION IS THAT FIVE PATIENTS A DAY WOULD COME INTO THE

12:09PM  19   STORE?

12:09PM  20   A.   THAT'S CORRECT.

12:09PM  21   Q.   DID YOU EVALUATE THAT METRIC WHEN YOU HAD THE 40 STORE

12:09PM  22   PILOT?

12:09PM  23   A.   WE DID.

12:09PM  24   Q.   DID YOU ACHIEVE FIVE PATIENTS PER STORE PER DAY?

12:09PM  25   A.   WE ACHIEVED 5.5, I BELIEVE, BY AUGUST OF 2014.

12:09PM 1    Q.   OKAY.  IF YOU LOOK -- AND THEN THE HOPE WAS AFTER THAT

12:09PM 2    THAT, THE NUMBER OF PATIENTS PER STORE PER DAY WOULD GROW;

12:09PM 3    CORRECT?

12:09PM 4    A.   THAT'S CORRECT.

12:09PM 5    Q.   AND THAT WOULD HAPPEN WITH MARKETING AND WORD OF MOUTH AND

12:09PM 6    SO FORTH; CORRECT?

12:09PM 7    A.   THAT'S CORRECT.

12:09PM 8    Q.   BY THE WAY, WHEN WE TALK ABOUT THE PRODUCT THAT WAS BEING

12:09PM 9    OFFERED BY WALGREENS AND THE EFFORT TO GENERATE INTEREST IN IT,

12:09PM 10   WERE THERE OTHER SERVICES THAT OFFERED A FINGERSTICK DRAW FOR

12:10PM 11   PURPOSES OF CLINICAL BLOOD TESTING?

12:10PM 12   A.   YEAH, WE HAD SOME STORES THAT ACTUALLY PROVIDED GLUCOSE

12:10PM 13   TESTING OR HEMOGLOBIN AIC TESTING FOR DIABETES, AND SO WE DID,

12:10PM 14   NOT ALL OF THE STORES, BUT SOME STORES DID HAVE THAT AS AN

12:10PM 15   OFFERING.

12:10PM 16       AND THOSE POINT OF CARE TESTING WERE PRIMARILY

12:10PM 17   DIRECTIONAL.  IT WAS SOMETHING THAT YOU WOULD TAKE HOME, YOUR

12:10PM 18   DIABETES METER, THINGS OF THAT NATURE, AND WE WOULD DO THAT FOR

12:10PM 19   THE PATIENT AT THE STORE.

12:10PM 20       AGAIN, IT IS NOT A MECHANISM WHEREBY YOU CAN MAKE A

12:10PM 21   DIAGNOSIS OF THOSE PARTICULAR TESTS, BUT IT GIVES THE PATIENT

12:10PM 22   AN IDEA OF WHERE THEY STAND.

12:10PM 23       AND SO IF THEY SEE ANY TYPE OF UNUSUAL NUMBERS, THEN THEY

12:10PM 24   CAN GO AND SEE THEIR PROVIDER FOR ANY TYPE OF FURTHER

12:10PM 25   EVALUATION.

12:10PM 1    Q.   SO THAT'S, FOR EXAMPLE, SOMETHING THAT SOME OF US ARE

12:10PM 2    UNFORTUNATELY FAMILIAR WITH, THAT IF YOU SUFFER FROM A

12:11PM 3    PARTICULAR DISEASE THAT REQUIRES YOU TO MONITOR YOUR GLUCOSE,

12:11PM 4    YOU NEED THAT TYPE OF A METER OR SOMETHING THAT COULD PERFORM

12:11PM 5    MONITORING OF ONE ANALYTE IN YOUR BLOOD; CORRECT?

12:11PM 6    A.   THAT'S RIGHT.

12:11PM 7    Q.   BUT THERE WAS NO SERVICING THAT WAS OFFERING A BROAD RANGE

12:11PM 8    OF ASSAYS WITH FINGERSTICK BLOOD DRAW, WAS THERE?

12:11PM 9    A.   NO, SIR.

12:11PM 10   Q.   SO PART OF THE EXCITEMENT ABOUT THERANOS THAT YOU SAW WAS

12:11PM 11   THAT THAT WAS BEING OFFERED WITHIN WALGREENS; CORRECT?

12:11PM 12   A.   THAT'S CORRECT.

12:11PM 13   Q.   AND AT THE TIME THAT YOU JOINED, ABOUT 60 PERCENT OF THE

12:11PM 14   PATIENTS WHO CAME IN WERE HAVING THEIR BLOOD DRAWN BY

12:11PM 15   FINGERSTICK; CORRECT?

12:11PM 16   A.   BASED ON THE NUMBERS THAT WE SAW, YES.

12:11PM 17   Q.   OKAY.  AND AS YOU UNDERSTOOD IT, THERANOS WAS WORKING TO

12:11PM 18   INCREASE THAT PERCENTAGE OF PATIENTS; CORRECT?

12:11PM 19   A.   YEAH.  THEY WERE WORKING ON REDUCING THAT VENOUS DRAW TO,

12:11PM 20   YOU KNOW, LESS THAN 10 PERCENT.

12:11PM 21   Q.   AND DID YOU UNDERSTAND THAT IF A PATIENT CAME IN AND HAD

12:12PM 22   TO BE TESTED BY VENOUS DRAW FOR EVEN ONE ANALYTE IN THEIR

12:12PM 23   BLOOD, THAT WOULD NECESSITATE A VENOUS DRAW?

12:12PM 24   A.   THAT IS CORRECT.

12:12PM 25   Q.   AND DOES THAT RELATE TO THE COMMENTS THAT MR. BALWANI WAS

12:12PM  1    MAKING TO YOU ABOUT THE CONFIGURATION OF CARTRIDGES?

12:12PM  2    A.   I DON'T KNOW WHAT HE WAS STATING.

12:12PM  3         WHAT HE WAS TELLING ME WAS, AS I STATED EARLIER, THAT THEY

12:12PM  4    WERE STILL TRYING TO DETERMINE THE PATTERNS OF THE PRESCRIBING,

12:12PM  5    THEY WERE STILL TRYING TO UNDERSTAND HOW TO MAKE SURE THAT THE

12:12PM  6    CARTRIDGES WERE READY.

12:12PM  7         HE ALSO STATED THAT INITIALLY THERE ARE SOME PHYSICIANS

12:12PM  8    THAT WILL TEST TO MAKE SURE THAT THE VALUES THAT THEIR PATIENTS

12:12PM  9    ARE RECEIVING FROM A FINGERSTICK VERSUS A VENOUS DRAW ARE THE

12:12PM  10   SAME.

12:12PM  11        AND SO THOSE ARE THE REASONS THAT HE PROVIDED THROUGHOUT

12:12PM  12   ALL OF OUR DISCUSSIONS.

12:12PM  13   Q.   AND DID YOU KNOW THAT DURING THE COURSE OF CONTRACT

12:13PM  14   NEGOTIATIONS BETWEEN THERANOS AND WALGREENS, THE PARTIES HAD

12:13PM  15   EXCHANGED A SUBSTANTIAL AMOUNT OF DATA TRYING TO FIGURE OUT

12:13PM  16   WHICH TESTS WOULD BE COMMONLY ORDERED?

12:13PM  17   A.   I'M NOT AWARE OF THAT.

12:13PM  18   Q.   LET'S RETURN TO MARCH OF 2014.

12:13PM  19   A.   UH-HUH.

12:13PM  20   Q.   I WANT TO ASK YOU ABOUT ONE ELEMENT OF THE COST THAT YOU

12:13PM  21   SAID WOULD MAKE THE USE OF VENOUS DRAWS UNATTRACTIVE FOR

12:13PM  22   WALGREENS, AND THAT WAS PHLEBOTOMISTS.

12:13PM  23        DO YOU RECALL THAT?

12:13PM  24   A.   THAT'S CORRECT.

12:13PM  25   Q.   BUT UNDER THE TERMS OF THE AGREEMENT, IT'S ACTUALLY

12:13PM   1     THERANOS THAT BORE THE COSTS OF PHLEBOTOMISTS, ISN'T IT?

12:13PM   2     A.   ABSOLUTELY CORRECT.

12:13PM   3     Q.   AND THEY CONTINUED TO PAY THAT COST OVER TIME?

12:13PM   4     A.   CORRECT.

12:13PM   5     Q.   WERE YOU ALSO INVOLVED IN THE NEGOTIATIONS BETWEEN

12:13PM   6     THERANOS AND THIRD PARTY PAYORS, LIKE INSURERS, TO INSURE THAT

12:14PM   7     PATIENTS WOULD GET COVERAGE FOR THERANOS SERVICES?

12:14PM   8     A.   NO.  THE WALGREENS TEAM WAS NOT INVOLVED IN THAT.

12:14PM   9     Q.   LET ME ASK YOU TO LOOK AT PAGES 12 AND 13 OF THIS CHARTER

12:14PM  10     DOCUMENT.

12:14PM  11          DO YOU SEE AT THE BOTTOM -- I'M INTERESTED IN THE SEGMENT

12:14PM  12     THAT CARRIES OVER THAT IS LABELLED OPERATIONAL READINESS.

12:14PM  13     A.   I DO.

12:14PM  14     Q.   AND THIS LISTS MANY OF THE ITEMS THAT YOU DETAILED ON YOUR

12:14PM  15     DIRECT EXAMINATION; CORRECT?  THESE ARE THINGS THAT HAVE TO BE

12:14PM  16     DONE IN ORDER FOR A STORE TO OPEN AND AN INFRASTRUCTURE TO BE

12:14PM  17     ESTABLISHED?

12:14PM  18     A.   YEAH.  THESE ARE SOME OF THE ISSUES I THINK.  CONSTRUCTION

12:14PM  19     IS NOT IN HERE, AND ZONING AND DESIGNING AND ALL OF THOSE

12:14PM  20     THINGS ARE NOT IN HERE.  BUT THESE ARE SOME OF THOSE ITEMS.

12:15PM  21     Q.   OKAY.  AND IN THIS EVALUATION OF OPERATIONAL READINESS,

12:15PM  22     THERE'S NO REFERENCE TO HOW THE BLOOD IS BEING DRAWN BY

12:15PM  23     PATIENTS WHO USE THE SERVICE, IS THERE?

12:15PM  24     A.   NO.

12:15PM  25     Q.   LET ME ASK YOU TO LOOK AT PAGE 21 OF THE CHARTER DOCUMENT.

12:15PM 1          BY THE WAY, WAS THIS A THERANOS OR WAS THIS AN INTERNAL

12:15PM 2    WALGREENS DOCUMENT?

12:15PM 3    A.   THIS WAS AN INTERNAL WALGREENS DOCUMENT.

12:15PM 4    Q.   OKAY.  LET ME ASK YOU TO LOOK AT PAGE 21.

12:15PM 5          AND IF YOU LOOK AT THE TOP HALF OF THE PAGE, IT INDICATES

12:15PM 6    THE KEY PROGRAM RISKS.

12:15PM 7          DO YOU SEE THAT?

12:15PM 8    A.   YES, SIR.

12:15PM 9    Q.   AND IT INDICATES -- THE FIRST RISK IT IDENTIFIES IS THAT

12:15PM 10   THERANOS DEVICES AND TESTS HAVE TO OBTAIN REGULATORY APPROVALS.

12:16PM 11         AND THAT WAS TRUE; CORRECT?

12:16PM 12   A.   ABSOLUTELY.

12:16PM 13   Q.   AND SOME OF THOSE REGULATORY APPROVALS WERE OBTAINED

12:16PM 14   BEFORE YOUR WORK WITH THERANOS; CORRECT?

12:16PM 15   A.   YES.

12:16PM 16   Q.   AND THERE HAD BEEN CERTIFICATION OF FACILITIES AS CLIA

12:16PM 17   LABS; CORRECT?

12:16PM 18   A.   YES.

12:16PM 19   Q.   BUT YOU UNDERSTOOD THAT THERANOS WAS STILL SEEKING

12:16PM 20   REGULATORY APPROVALS FROM THE FDA ON OTHER ISSUES?

12:16PM 21   A.   THEY WERE SEEKING APPROVAL ON FDA FOR TESTS AND THINGS OF

12:16PM 22   THAT NATURE.

12:16PM 23   Q.   AND THEN THIS GOES ON TO LIST FIVE ADDITIONAL RISKS THAT

12:16PM 24   ATTACH TO THE PROGRAM, AND THEY INCLUDED ABILITY TO SECURE

12:16PM 25   FAVORABLE PAYOR CONTRACTS.

12:16PM 1        DO YOU SEE THAT?

12:16PM 2   A.   YES.

12:16PM 3   Q.   AND WHAT DOES THAT REFER TO?

12:16PM 4   A.   THE IDEA HERE WAS THAT THERANOS WAS WORKING ON ENSURING

12:16PM 5   THAT THE THERANOS LAB SERVICES ARE REIMBURSED BY CERTAIN

12:16PM 6   PAYORS, IN THIS CASE HCSC, WHICH IS THE FOR BLUE CROSS, BLUE

12:16PM 7   SHIELD, UNITED, AND WELLPOINT.

12:16PM 8   Q.   SO THOSE ARE ISSUES THAT HAD TO BE RESOLVED BETWEEN

12:17PM 9   THERANOS AND THOSE INSURERS?

12:17PM 10  A.   YES.  AS I STATED, WE AT WALGREENS WERE NOT INVOLVED IN

12:17PM 11  THAT WORK.

12:17PM 12  Q.   AND THIRD, IT REFERS TO DEVELOPING PRODUCTIVE PROVIDER

12:17PM 13  RELATIONSHIPS.

12:17PM 14       WHAT DOES THAT REFER TO?

12:17PM 15  A.   THIS IS REFERRING TO THE PROVIDERS ARE THE PHYSICIANS, THE

12:17PM 16  PRESCRIBERS, THE ONES WHO ARE ORDERING THE LAB TESTS, AND TO

12:17PM 17  ENSURE THAT THERE ARE GOOD RELATIONSHIPS WITH THEM SO THEY

12:17PM 18  UNDERSTAND WHAT THIS NEW SERVICE IS AND THEY UNDERSTAND WHAT

12:17PM 19  THE PATIENT WILL RECEIVE, AND HOW IT WORKS.

12:17PM 20       AND SO THAT STRATEGY, AGAIN, WAS PART OF THERANOS'S TEAM'S

12:17PM 21  STRATEGY TO GO DO.

12:17PM 22  Q.   AND THE FOURTH ITEM WAS TO ENSURE THAT THERANOS DELIVERS

12:17PM 23  WHAT IS NEEDED, INCLUDING I.T. SYSTEMS FOR THE PILOT.

12:17PM 24       WHAT DOES THAT REFER TO?

12:17PM 25  A.   WELL, THERE WERE CERTAIN SYSTEMS THAT -- AGAIN, THE ENTIRE

12:17PM 1    SERVICE WAS NOT ON A WALGREENS PLATFORM.  IT WAS ON A THERANOS

12:18PM 2    I.T. PLATFORM.

12:18PM 3        AND SO THE CHECK IN OF THE PATIENT, THE IPAD THAT I

12:18PM 4    REFERRED TO FOR PATIENT EVALUATION OF THE SERVICE, ALL OF THOSE

12:18PM 5    THINGS WERE BUILT BY THERANOS AND DELIVERED BY THEM SO WE CAN

12:18PM 6    ACTUALLY EXECUTE THE MODEL.

12:18PM 7    Q.  AND THAT'S SOMETHING THAT YOU CONTINUED TO MONITOR DURING

12:18PM 8    YOUR MEETINGS --

12:18PM 9    A.  ABSOLUTELY, YES.

12:18PM 10   Q.  -- WITH PEOPLE AT THERANOS?

12:18PM 11   A.  YES, ABSOLUTELY.

12:18PM 12   Q.  AND THEN THE NEXT ITEM IS DIRECT PATIENT TRAFFIC FOR LAB

12:18PM 13   SERVICES.

12:18PM 14       AND IT LOOKS LIKE THAT INVOLVES MARKETING AND WORKING WITH

12:18PM 15   PRESCRIBERS AND PAYORS TO GENERATE INTEREST.

12:18PM 16       DO YOU SEE THAT?

12:18PM 17   A.  I DO.

12:18PM 18   Q.  AND THE LAST SAYS THE ABILITY TO LEVERAGE FIELD SALES

12:18PM 19   FORCE TO FOCUS ON THE PROJECT BETA INITIATIVE.

12:18PM 20       WHAT DOES THAT REFER TO?

12:18PM 21   A.  SO PROJECT BETA WAS AN INTERNAL TERM FOR THE THERANOS

12:18PM 22   PARTNERSHIP.  OBVIOUSLY ONCE WE STARTED TO LAUNCH IT, WE

12:19PM 23   REMOVED THE PROJECT BETA TERM.  IT WAS JUST A NICKNAME, IF YOU

12:19PM 24   WANT TO CALL IT THAT, THAT WE USED AT WALGREENS.

12:19PM 25       SO WHAT WE WERE TRYING TO DO WAS INDICATE THAT AS WE OPEN

12:19PM 1    STORES, WE NEED TO HAVE SUPPORT AT THE FIELD LEVEL.  SO IF

12:19PM 2    STORES HAVE ANY QUESTIONS, IF BOTH THE THERANOS TEAM AND/OR THE

12:19PM 3    WALGREENS TEAM HAD ANY ISSUES OR CONCERNS OR QUESTIONS, THAT

12:19PM 4    THERE WOULD BE A FIELD TEAM THAT COULD SUPPORT THEM, THAT COULD

12:19PM 5    POTENTIALLY EVEN VISIT THE STORE TO ADDRESS AN ISSUE, AND

12:19PM 6    THAT'S WHAT WE'RE FOCUSSING ON.

12:19PM 7    Q.    OKAY.  NOW, AS OF THE TIME THAT THIS DOCUMENT WAS CURRENT

12:19PM 8    IN MARCH OF 2014, MANY, MANY PEOPLE AT WALGREENS KNEW THAT A

12:19PM 9    CERTAIN PERCENTAGE OF THERANOS BLOOD DRAWS WERE VENOUS;

12:19PM 10   CORRECT?

12:19PM 11   A.    THERE WAS A GOOD NUMBER THAT KNEW.

12:19PM 12   Q.    AND THAT WAS NOT, HOWEVER, IDENTIFIED AS A KEY PROGRAM

12:19PM 13   RISK IN THE PROGRAM CHARTER, WAS IT?

12:19PM 14   A.    NO, NOT FROM THIS PARTICULAR DOCUMENT.

12:19PM 15   Q.    OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 1673.

12:20PM 16   A.    OKAY.

12:20PM 17   Q.    IS THIS AN EMAIL THAT YOU SENT TO A LARGE NUMBER OF

12:20PM 18   INDIVIDUALS BOTH FROM WALGREENS AND A FEW FROM THERANOS?

12:20PM 19   A.    YES.

12:20PM 20   Q.    AND ARE YOU DISCUSSING HERE THE EXPANSION OF THERANOS

12:20PM 21   STORES?

12:20PM 22   A.    THE EMAIL WAS TO INFORM THE RELEVANT FOLKS ON THE TEN

12:20PM 23   STORES THAT ARE NOW LIFE IN PHOENIX.

12:21PM 24            MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

12:21PM 25   1673.

12:21PM  1          MR. SCHENK:  NO OBJECTION.

12:21PM  2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:21PM  3          (GOVERNMENT'S EXHIBIT 1673 WAS RECEIVED IN EVIDENCE.)

12:21PM  4   BY MR. DOWNEY:

12:21PM  5   Q.  IF YOU SEE THE FIRST PARAGRAPH, IT STATES THAT -- IT

12:21PM  6   REITERATES THAT IN SEPTEMBER OF 2013, THERANOS AND WALGREENS

12:21PM  7   HAD ANNOUNCED THEIR PARTNERSHIP; CORRECT?

12:21PM  8   A.  YES.

12:21PM  9   Q.  AND THEN IN THE SECOND PARAGRAPH IT NOTES THAT ON THAT

12:21PM 10   DATE, WHICH IS APRIL 15TH, 2014, EIGHT ADDITIONAL THERANOS

12:21PM 11   CENTERS HAD OPENED IN PHOENIX; CORRECT?

12:21PM 12   A.  CORRECT.

12:21PM 13   Q.  AND IT INDICATES THAT THERANOS HAD PROVIDED THE

12:21PM 14   PHLEBOTOMISTS THE SUPPORT TO WALGREENS PERSONNEL; CORRECT?

12:21PM 15   A.  YES.

12:21PM 16   Q.  AND THEN IT ANNOUNCED BELOW THAT, ANTICIPATED THE

12:21PM 17   ADDRESSES THAT WOULD BE THE ADDRESSES FOR THE LOCATIONS;

12:22PM 18   CORRECT?

12:22PM 19   A.  YES.

12:22PM 20   Q.  ALL RIGHT.  AND THEN IT STATES AT THE BOTTOM OF THAT PAGE

12:22PM 21   WHAT YOU CAN SAY AND WHAT YOU CANNOT SAY.

12:22PM 22       DO YOU SEE THAT?

12:22PM 23   A.  I DO.

12:22PM 24   Q.  ALL RIGHT.  AND IF YOU LOOK UNDER "WHAT YOU CAN NOT SAY,"

12:22PM 25   THE SECOND BULLET POINT SAYS, "FUTURE MARKET EXPANSIONS PLANS

12:22PM   1    OUTSIDE OUR NORTHERN CALIFORNIA OR PHOENIX MARKET.  ONLY

12:22PM   2    MENTION OUR RELATIONSHIP AND THAT THE COMPANIES PLAN TO OFFER

12:22PM   3    THE SERVICE AT WALGREENS LOCATIONS NATIONWIDE."

12:22PM   4        DO YOU SEE THAT?

12:22PM   5    A.   I DO.

12:22PM   6    Q.   AND THE REASON WHY YOU WROTE THIS EMAIL IS BECAUSE

12:22PM   7    WALGREENS WAS MAKING AN ANNOUNCEMENT THAT WOULD GENERATE SOME

12:22PM   8    ATTENTION WHERE INDIVIDUALS IN WALGREENS MIGHT BE ASKED ABOUT

12:22PM   9    IT; CORRECT?

12:22PM  10    A.   CORRECT.  IT WAS JUST TO MAKE SURE THAT PEOPLE HAVE THE

12:22PM  11    RELEVANT FACTS.

12:22PM  12    Q.   AND THERE MIGHT BE SOME INFORMATION THAT YOU DIDN'T WANT

12:22PM  13    THE WALGREENS PERSONNEL TO BE TALKING ABOUT PUBLICLY; CORRECT?

12:23PM  14    A.   PUBLICLY OR INTERNALLY BECAUSE THEY WERE JUST NOT INFORMED

12:23PM  15    OF WHAT WAS GOING ON.

12:23PM  16    Q.   SO YOU IN ESSENCE WERE TELLING THEM THAT THIS IS AN

12:23PM  17    ACCURATE DESCRIPTION OF WHERE WE ARE WITH THERANOS AND SAY

12:23PM  18    THIS, BUT DON'T SAY ANYTHING MORE?

12:23PM  19    A.   CORRECT.

12:23PM  20    Q.   OKAY.  AND THIS WAS AS OF MID-APRIL; CORRECT?

12:23PM  21    A.   THIS WAS APRIL 15TH.

12:23PM  22    Q.   OKAY.  NOW, YOU REVIEWED DURING THE COURSE OF YOUR DIRECT

12:23PM  23    EXAMINATION WITH MR. SCHENK THE MINUTES AND POWERPOINTS OF A

12:23PM  24    SERIES OF MEETINGS BETWEEN MAY AND I THINK THE FALL, PERHAPS

12:23PM  25    EARLY WINTER OF 2014.

12:23PM 1       DO YOU RECALL THAT?

12:23PM 2    A.   YES.

12:24PM 3    Q.   I WANT TO REDIRECT YOUR ATTENTION TO SOME OF THE SAME

12:24PM 4    EXHIBITS.  AND THE FIRST IS EXHIBIT 1755, WHICH IS ALREADY IN

12:24PM 5    EVIDENCE.

12:24PM 6    A.   1755 IS NOT IN MY BINDER.

12:24PM 7    Q.   DO YOU STILL HAVE A WHITE BINDER?

12:24PM 8    A.   YES.

12:24PM 9    Q.   YES, IT SHOULD BE IN YOUR BINDER.

12:24PM 10   A.   I HAVE IT.

12:24PM 11   Q.   AND DO YOU SEE ON THE FIRST PAGE THAT THIS IS THE MINUTES

12:25PM 12   OF A MAY 28TH MEETING BETWEEN WALGREENS PERSONNEL AND THERANOS

12:25PM 13   PERSONNEL?

12:25PM 14   A.   YES.

12:25PM 15   Q.   DO YOU SEE THAT?

12:25PM 16       IF YOU GO TO PAGE 7 OF THE EXHIBIT -- AND JUST TO REORIENT

12:25PM 17   US, THIS IS A RECORD OF WHAT WAS SAID DURING THE COURSE OF

12:25PM 18   THESE MEETINGS BETWEEN THE TWO COMPANIES; CORRECT?

12:25PM 19   A.   THAT'S CORRECT.

12:25PM 20   Q.   OKAY.  IF YOU LOOK AT THE TOP OF PAGE 7, THE FIRST

12:25PM 21   PARAGRAPH, IT SAYS, "NICOLE LEITER STATED THAT CHALLENGES ARE

12:25PM 22   WHAT WE EXPECT IN A PILOT."

12:25PM 23       WHO IS NICOLE LEITER?

12:25PM 24   A.   NICOLE LEITER AT THE TIME HAD ARIZONA OPERATIONS FOR

12:25PM 25   WALGREENS.

12:25PM  1    Q.   AND THE SECOND SENTENCE SAYS, "THE CHALLENGE IS HOW TO

12:25PM  2    REACT QUICKLY TO ADDRESS THE GAPS."

12:26PM  3         DO YOU SEE THAT?

12:26PM  4    A.   I DO.

12:26PM  5    Q.   AND THE LAST SENTENCE OF THAT PARAGRAPH SAYS, "PER NIMESH,

12:26PM  6    40 IS IN THE BAG, WE NEED TO THINK ABOUT SCALE."

12:26PM  7         DO YOU SEE THAT?

12:26PM  8    A.   I DO.

12:26PM  9    Q.   AND THIS DOCUMENT IS AS OF MAY 28TH, 2015?  OR 2014?

12:26PM 10    A.   THAT'S CORRECT.

12:26PM 11    Q.   ALL RIGHT.  I WANT TO LOOK AT ANOTHER SET OF THOSE

12:26PM 12    MINUTES.

12:26PM 13         LET ME ASK YOU TO LOOK AT THE EXHIBIT 1884.

12:27PM 14    A.   I HAVE IT.

12:27PM 15    Q.   IS THIS ANOTHER SET OF PARTNERSHIP MEETING MINUTES

12:27PM 16    REFLECTING WHAT HAPPENED IN MEETINGS BETWEEN THERANOS AND

12:27PM 17    WALGREENS?

12:27PM 18    A.   YES.

12:27PM 19            MR. DOWNEY:  YOUR HONOR, I THINK 1884 IS IN EVIDENCE

12:27PM 20    ALREADY, BUT IF NOT, I WOULD MOVE ITS ADMISSION.

12:27PM 21            MR. SCHENK:  IT IS IN EVIDENCE.

12:27PM 22            THE COURT:  THANK YOU, MR. SCHENK.

12:27PM 23    BY MR. DOWNEY:

12:27PM 24    Q.   LET ME DIRECT YOUR ATTENTION TO PAGE 5.

12:27PM 25         I WANT TO IN PARTICULAR ADDRESS YOUR ATTENTION TO THE

12:27PM  1    BULLET POINT THAT BEGINS, "THERANOS EXPERIENCE SURVEY SUMMARY

12:28PM  2    RESULTS."

12:28PM  3         DO YOU SEE THE REFERENCE TO EXPERIENCE SURVEY?

12:28PM  4    A.   I DO.

12:28PM  5    Q.   AND WHAT IS AN EXPERIENCE SURVEY IN THIS CONTEXT?

12:28PM  6    A.   THIS IS WHAT I REFERRED TO EARLIER ABOUT THE PATIENT

12:28PM  7    EXPERIENCE WHEN THEY WERE GIVEN THE IPAD AND THEY WOULD ANSWER

12:28PM  8    A FEW QUESTIONS AFTER THEY RECEIVED THE SERVICE.  THIS IS WHAT

12:28PM  9    THIS IS REFERRING TO.

12:28PM  10   Q.   OKAY.  AND THIS INDICATES THAT "THERANOS EXPERIENCE SURVEY

12:28PM  11   SUMMARY RESULTS ARE OFF THE CHARTS."

12:28PM  12        DO YOU SEE THAT?

12:28PM  13   A.   YES, I DO.

12:28PM  14   Q.   AND DOES THAT REFLECT THAT THERE WAS SATISFACTION WITH THE

12:28PM  15   THERANOS SERVICES IN THE WALGREENS STORES AS OF THIS DATE?

12:28PM  16   A.   YES.

12:28PM  17   Q.   LET ME ASK YOU TO LOOK IN THAT SAME DOCUMENT AT PAGE 8.

12:29PM  18        NOW, ONE OF THE CONSIDERATIONS IN EVALUATING THE

12:29PM  19   PARTNERSHIP WAS HOW QUICKLY PATIENTS COULD GET THEIR TEST

12:29PM  20   RESULTS; CORRECT?

12:29PM  21   A.   THAT'S RIGHT.

12:29PM  22   Q.   BUT THE LABS DURING THIS PHASE OF THE ARRANGEMENT WERE

12:29PM  23   LOCATED OFF SITE; CORRECT?

12:29PM  24   A.   THE LABS WERE OFF SITE, CORRECT.

12:29PM  25   Q.   DO YOU RECALL HOW QUICKLY THERANOS WAS ABLE TO TURN AROUND

12:29PM  1    THE RESULTS AFTER THEY WERE SENT TO THE THERANOS LAB?

12:29PM  2    A.  I THINK, IF I REMEMBER CORRECTLY, IT WAS WITHIN 48 HOURS

12:29PM  3    THE RESULTS WERE COMING THROUGH.

12:29PM  4    Q.  LET ME ASK YOU TO LOOK AT THE FIFTH BULLET POINT AT THE

12:29PM  5    TOP OF THIS DOCUMENT BEGINNING "THERANOS CAN TURN AROUND."

12:30PM  6        DO YOU SEE THAT?

12:30PM  7    A.  YES.

12:30PM  8    Q.  AND SO THERE MIGHT BE AN ADDITIONAL TIME OF ONE HOUR, BUT

12:30PM  9    THAT WOULD BE BECAUSE PRESUMABLY OF THE TRANSPORT OR THE

12:30PM  10   STORAGE; CORRECT?

12:30PM  11   A.  YEAH.  AGAIN, ONCE IT LEFT THE WALGREENS STORE, THERANOS

12:30PM  12   CONTROLLED THE SAMPLE, THE TESTING, AND THEN THE RESULTS BACK

12:30PM  13   TO THE APPROPRIATE PROVIDER.

12:30PM  14       SO IT'S HARD FOR US TO UNDERSTAND EXACTLY WHAT WAS CAUSING

12:30PM  15   SOME OF THOSE DELAYS, BUT, YES, THEY WOULD BE IN CONTROL OF

12:30PM  16   THAT.

12:30PM  17   Q.  ALL RIGHT.  LET ME ASK YOU TO LOOK AT THE BOTTOM OF THAT

12:30PM  18   SAME PAGE ON PAGE 8.

12:30PM  19       WAS IT A TYPICAL DISCUSSION IN THESE MEETINGS AS TO WHAT

12:30PM  20   FUTURE PLANS FOR EXPANSION WERE?

12:30PM  21   A.  ABSOLUTELY.  YOU KNOW, WHENEVER WE HAD THESE PARTNERSHIP

12:30PM  22   MEETINGS, THERE WERE TWO PURPOSES, TWO OR THREE -- TWO MAIN

12:30PM  23   PURPOSES FOR THESE PARTNERSHIP MEETINGS.

12:30PM  24       ONE WAS TO DEVELOP THE PARTNERSHIP AND DEVELOP THE

12:30PM  25   RELATIONSHIP; BUT SECOND IS TO DISCUSS NOT ONLY THE STATUS OF

12:31PM  1    THE CURRENT NATURE OF THE PARTNERSHIP AND HOW THE SERVICE IS

12:31PM  2    GOING, BUT ALSO TO DISCUSS WHAT OUR FUTURE PLANS COULD BE.  YOU

12:31PM  3    KNOW, WHERE SHOULD WE BE THINKING?  HOW SHOULD WE BE THINKING

12:31PM  4    ABOUT IT?

12:31PM  5        AND SO THIS TYPE OF DISCUSSION IS NOT UNIQUE TO THIS

12:31PM  6    PARTICULAR DATE.  IT IS A COMMON DISCUSSION THAT WE HAD.

12:31PM  7    Q.   OKAY.  LET ME ASK YOU TO LOOK ON PAGE 9, WHICH IS A

12:31PM  8    CONTINUATION OF THAT SECTION.  AND I'D ASK YOU TO LOOK AT THE

12:31PM  9    BULLET POINT THAT BEGINS, INITIAL GOAL FOR FISCAL YEAR WAS 500

12:31PM  10   STORES.

12:31PM  11       DO YOU SEE THAT?

12:31PM  12   A.   YES, SIR.

12:31PM  13   Q.   AND UNDERNEATH THAT, IT SAYS WE NEED TO REDEFINE THIS

12:31PM  14   GOAL.

12:31PM  15       DO YOU SEE THAT?

12:31PM  16   A.   YES.

12:31PM  17   Q.   AND THEN UNDERNEATH THAT THERE'S A BULLET POINT THAT TALKS

12:31PM  18   ABOUT A NATIONWIDE GOAL.

12:32PM  19       DO YOU SEE THAT?

12:32PM  20   A.   YES.

12:32PM  21   Q.   AND THAT INDICATES THE GOAL -- A GOAL MIGHT BE 2000 TO

12:32PM  22   2500 STORES NATIONWIDE.

12:32PM  23       DO YOU SEE THAT?

12:32PM  24   A.   YES.

12:32PM  25   Q.   AND DO YOU RECALL IN THE ORIGINAL AGREEMENT, OR ACTUALLY

12:32PM  1    IN THE AGREEMENT THAT WAS SIGNED AT THE END OF DECEMBER 2013,

12:32PM  2    THE PROPOSAL WAS THAT THERE WOULD BE 3000 STORES ROLLED OUT.

12:32PM  3        DO YOU RECALL THAT?

12:32PM  4    A.  I DON'T RECALL THAT, BUT, YES.

12:32PM  5    Q.  OKAY.  SO THE PROJECTION OF 2000 TO 2500 STORES WAS A

12:32PM  6    REDUCTION IN WHAT WAS DESCRIBED IN THAT DECEMBER 2013

12:32PM  7    AGREEMENT; CORRECT?

12:32PM  8    A.  IF THE NUMBER WAS REDUCED, YES.

12:32PM  9        AGAIN, AS I MENTIONED EARLIER, WHENEVER DISCUSSIONS OF

12:32PM 10    LAUNCH ARE HAD, WE LOOK AT ALL OF THE VARIABLES OF BOTH

12:32PM 11    PARTIES, IN THIS CASE THERANOS AS WELL AS WALGREENS, AND WE

12:32PM 12    CHANGE THOSE NUMBERS BASED ON WHAT WE'RE SEEING, THE RESULTS

12:33PM 13    THAT WE'RE EXPERIENCING, THE PATIENT EXPERIENCE THAT YOU TALKED

12:33PM 14    ABOUT THAT WE ARE SEEING.

12:33PM 15        SO WHAT YOU'RE SEEING IS REALLY THOSE TYPES OF INPUTS

12:33PM 16    GOING INTO WHAT THE NUMBER OF LAUNCHES SHOULD BE.

12:33PM 17        NATIONWIDE LAUNCH?  YES.  WE HAD EVERY INTENTION AS

12:33PM 18    WALGREENS TO LAUNCH NATIONWIDE.

12:33PM 19        BUT AGAIN, HOW WE LAUNCH, WHAT WE DO, HOW WAS WE GO IS

12:33PM 20    DEPENDENT ON MANY, MANY VARIABLES THAT I SPOKE ABOUT EARLIER.

12:33PM 21    Q.  OKAY.  BUT AS OF AUGUST OF 2014, THIS 2500 WAS YOUR

12:33PM 22    PROJECTION; CORRECT?

12:33PM 23    A.  CORRECT.

12:33PM 24    Q.  ALL RIGHT.  I WANT TO ASK YOU A LITTLE BIT MORE ABOUT THE

12:34PM 25    PATIENT FEEDBACK FEATURE OF THE SERVICES.

12:34PM 1        WHAT DO YOU GENERALLY REMEMBER ABOUT THE FEEDBACK THAT THE

12:34PM 2   COMPANIES RECEIVED AS TO THEIR EXPERIENCE IN THERANOS SERVICE

12:34PM 3   CENTERS IN WALGREENS STORES?

12:34PM 4   A.   YEAH.  I -- WHAT I REMEMBER IS THAT THE SERVICE LEVELS

12:34PM 5   WERE BETWEEN 4 AND 5 ON A SCALE OF 1 TO 5.

12:34PM 6        SO PATIENTS WERE SATISFIED WITH THE SERVICES THAT THEY

12:34PM 7   WERE RECEIVING.  I QUITE HONESTLY DON'T REMEMBER THE QUESTIONS

12:34PM 8   THAT WERE ASKED.  BUT GENERALLY SPEAKING, THE EXPERIENCE WAS

12:34PM 9   GOOD.

12:34PM 10  Q.   OKAY.  AND THAT WAS A POSITIVE ASPECT OF THE PARTNERSHIP I

12:34PM 11  ASSUME?

12:34PM 12  A.   IT IS, YES.

12:34PM 13  Q.   BECAUSE ULTIMATELY THAT'S THE MOST IMPORTANT THING;

12:34PM 14  CORRECT?

12:34PM 15  A.   IT'S ONE OF THE MOST IMPORTANT THINGS, RIGHT.

12:34PM 16       YOU KNOW, PATIENT EXPERIENCE, ALONG WITH SOME OF THE OTHER

12:35PM 17  METRICS, ARE ALL IMPORTANT.

12:35PM 18       AND WE HAVE TO BALANCE THAT, WHETHER IT'S THE COST OF THE

12:35PM 19  BUILD OUT, THE PATIENT WAIT TIME, THE VENOUS DRAW, OR ALL OF

12:35PM 20  THOSE THINGS THAT WE AS BOTH PARTNERS DETERMINED WERE THE KEY

12:35PM 21  TO SUCCESS HAD TO BE EVALUATED.

12:35PM 22  Q.   WELL, DID YOU GET A LOT OF FEEDBACK THAT THE PATIENTS WERE

12:35PM 23  CONCERNED ABOUT THE FORM OF THE BLOOD DRAW?

12:35PM 24  A.   I DON'T REMEMBER ANYTHING SPECIFIC THAT CAME TO ME WHERE A

12:35PM 25  PATIENT HAD STATED ANYTHING ABOUT THE DRAW.

12:35PM 1   Q.   OKAY.  LET ME ASK YOU TO LOOK AT EXHIBIT 2394.  WE MIGHT

12:35PM 2   BE BACK TO YOUR OTHER NOTEBOOK NOW.

12:36PM 3        DO YOU SEE THAT?

12:36PM 4   A.   I DO HAVE 2394.  IT'S A -- CAN YOU JUST CONFIRM WHICH

12:36PM 5   DOCUMENT, BECAUSE I DON'T SEE IT ON THE SCREEN.

12:36PM 6   Q.   I DON'T THINK I'VE YET MOVED IT INTO EVIDENCE.

12:36PM 7            THE CLERK:  HUH-UH.

12:36PM 8   BY MR. DOWNEY:

12:36PM 9   Q.   CAN I ASK YOU, IF YOU LOOK AT IT IN THE NOTEBOOK, WHAT IT

12:36PM 10  IS?  ARE YOU ABLE TO FIND IT?

12:36PM 11  A.   YES.  IT IS IN THE WHITE BINDER, AND IT IS FEBRUARY 17TH,

12:36PM 12  2015, WALGREENS-THERANOS PARTNERSHIP MEETING SLIDE DECK.

12:36PM 13  Q.   OKAY.  AND IS THIS SOMETHING THAT WAS PREPARED AS PART OF

12:36PM 14  THE SERIES OF MEETINGS BETWEEN THERANOS AND WALGREENS

12:36PM 15  CONCERNING THE RELATIONSHIP BETWEEN THE TWO COMPANIES?

12:36PM 16  A.   YES.

12:36PM 17            MR. DOWNEY:  LET ME MOVE THE ADMISSION OF 2394.

12:36PM 18            MR. SCHENK:  NO OBJECTION.

12:36PM 19            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:37PM 20       (GOVERNMENT'S EXHIBIT 2394 WAS RECEIVED IN EVIDENCE.)

12:37PM 21  BY MR. DOWNEY:

12:37PM 22  Q.   LET ME ASK YOU TO LOOK AT EXHIBIT 2394, PAGE 7.

12:37PM 23       DO YOU SEE THAT?

12:37PM 24  A.   YES, I DO.

12:37PM 25  Q.   AND IS THIS A REFLECTION OF THE AVERAGE PATIENT EXPERIENCE

12:37PM 1    IN THERANOS SERVICE CENTERS AS OF JANUARY 2015?

12:37PM 2    A.   YES, AS OF JANUARY 2015, IT'S VERY CONSISTENT WITH WHAT I

12:37PM 3    REMEMBER.

12:37PM 4    Q.   AND DID THE PATIENTS USING THE SERVICE RATE IT AT ABOUT

12:37PM 5    4.81 PERCENT -- I'M SORRY, 4.81?

12:37PM 6    A.   YEAH.

12:37PM 7    Q.   THE OVERALL EXPERIENCE 4.81.

12:37PM 8         DO YOU SEE THAT?

12:37PM 9    A.   I DO.

12:37PM 10   Q.   AND DO YOU SEE THAT THE CHECK IN PROCESS WAS THE PROCESS

12:38PM 11   THAT THE PATIENTS WERE THE LEAST HAPPY WITH IN THEIR AGGREGATE

12:38PM 12   SCORES.

12:38PM 13        DO YOU SEE THAT?

12:38PM 14   A.   I DO.

12:38PM 15   Q.   AND DO YOU SEE THAT THE FACILITIES RATED AT ABOUT 4.79.

12:38PM 16        DO YOU SEE THAT?

12:38PM 17   A.   I DO.

12:38PM 18   Q.   AND DO YOU SEE THAT THE SKILL OF THE TECHNICIAN WAS ABOUT

12:38PM 19   4.86?

12:38PM 20   A.   CORRECT.

12:38PM 21   Q.   AND SO THESE WERE PRETTY GOOD RESULTS FOR A NEW VENTURE,

12:38PM 22   WEREN'T THEY?

12:38PM 23   A.   YES.  NO, THIS WAS VERY GOOD.

12:38PM 24   Q.   I HAVE A SLIDE I WANT TO SHOW YOU IN THAT SAME DECK, WHICH

12:38PM 25   IS PAGE 10 AND PAGE 11.

12:38PM   1         I DON'T KNOW IF YOU CAN SEE THIS WITHOUT THE COLOR

12:38PM   2    COORDINATION, BUT THIS IS A QUESTION THAT WAS POSED TO PATIENTS

12:38PM   3    WHO VISITED A THERANOS SERVICE CENTER; CORRECT?

12:38PM   4    A.   YES.

12:38PM   5    Q.   AND DO YOU SEE THAT ABOUT 82 AND A HALF PERCENT OF

12:39PM   6    PATIENTS WERE DEFINITELY COMING BACK WAS THEIR INDICATION AFTER

12:39PM   7    THEY'VE HAD AN EXPERIENCE AT THERANOS SERVICE CENTERS?

12:39PM   8    A.   YES.

12:39PM   9    Q.   AND ABOUT 15 PERCENT SAID THAT THEY WERE LIKELY TO RETURN;

12:39PM  10    CORRECT?

12:39PM  11    A.   I'M ASSUMING THAT ALL OF THE COLORS ARE EXACTLY THE SAME.

12:39PM  12    Q.   YEAH.  AND THE NUMBER WHO SAID THAT THEY WOULD NOT RETURN

12:39PM  13    WAS A VERY, VERY SMALL PERCENTAGE; CORRECT?

12:39PM  14    A.   YES.

12:39PM  15    Q.   LESS THAN 1 PERCENT; CORRECT?

12:39PM  16    A.   YES.

12:39PM  17    Q.   AND IN ADDITION TO ASKING FOR A RATING OF THE THERANOS

12:39PM  18    SERVICE CENTERS, DID YOU ALSO ASK PEOPLE FOR COMMENTS ON HOW

12:39PM  19    THE FACILITIES WERE OPERATING?

12:39PM  20    A.   YEAH.  I DON'T REMEMBER EXACTLY, BUT I COULD BELIEVE THAT

12:39PM  21    THERE WAS A COMMENT SECTION FREE FORM AT THE END.

12:39PM  22    Q.   OKAY.  LET ME ASK YOU TO LOOK AT PAGE 14, AND WE'LL START

12:40PM  23    WITH THE BAD NEWS FIRST.

12:40PM  24         THIS IS THE PAGE THAT IS LABELLED "HERE'S WHAT PEOPLE ARE

12:40PM  25    COMPLAINING ABOUT."

| | | |
|---|---|---|
| 12:40PM | 1 | A.   I SEE IT. |
| 12:40PM | 2 | Q.   AND THESE ARE COMMENTS THAT WERE MADE BY INDIVIDUAL |
| 12:40PM | 3 | PATIENTS AT -- WHO CAME TO A THERANOS SERVICE CENTER. |
| 12:40PM | 4 | DO YOU SEE THAT? |
| 12:40PM | 5 | A.   YES. |
| 12:40PM | 6 | Q.   AND MANY OF THOSE COMMENTS RELATE TO SERVICE ISSUES; |
| 12:40PM | 7 | CORRECT? |
| 12:40PM | 8 | A.   YES, IT SEEMS SO. |
| 12:40PM | 9 | Q.   AND THINGS LIKE DIFFICULTY CHECKING IN; CORRECT? |
| 12:40PM | 10 | A.   YEAH, THAT WAS ONE OF THE REASONS. |
| 12:40PM | 11 | Q.   OKAY.  AND SOME PEOPLE DIDN'T LIKE THE LAYOUT OF THE |
| 12:40PM | 12 | FACILITY AS IN THE LAST COMMENT. |
| 12:40PM | 13 | DO YOU SEE THAT? |
| 12:41PM | 14 | A.   YES. |
| 12:41PM | 15 | Q.   BUT NONE OF THESE PEOPLE COMPLAINED ABOUT THE KIND OF |
| 12:41PM | 16 | BLOOD DRAW THAT THEY GOT; RIGHT? |
| 12:41PM | 17 | A.   NOT IN THESE COMMENTS, NO. |
| 12:41PM | 18 | Q.   OKAY.  AND IF YOU LOOK AT THE PRIOR TWO PAGES, I'M SAVING |
| 12:41PM | 19 | THE GOOD NEWS FOR LAST, THERE'S ANOTHER SECTION "HERE'S WHAT |
| 12:41PM | 20 | PEOPLE ARE SAYING," AND THESE ARE THE POSITIVE COMMENTS THAT |
| 12:41PM | 21 | PEOPLE EXPERIENCED; CORRECT? |
| 12:41PM | 22 | A.   CORRECT. |
| 12:41PM | 23 | Q.   AND THESE ARE ALL VERY POSITIVE COMMENTS ABOUT THEIR |
| 12:41PM | 24 | EXPERIENCE AT A THERANOS SERVICE CENTER WITHIN WALGREENS; |
| 12:41PM | 25 | CORRECT? |

12:41PM 1    A.   YES.

12:41PM 2    Q.   AND I ASSUME THAT YOU RECEIVED THESE COMMENTS AS A

12:41PM 3    POSITIVE SIGN OF HOW THE PARTNERSHIP WAS DOING?

12:41PM 4    A.   YEAH, PATIENT EXPERIENCE WAS ONE OF THE METRICS THAT WE

12:41PM 5    WERE MEASURING, SO ABSOLUTELY.

12:41PM 6    Q.   AND SOMETIMES PEOPLE COMMENTED THAT ALL ASPECTS OF THE

12:42PM 7    SERVICE WERE GREAT AS IN THE SECOND TO LAST COMMENT ON THE

12:42PM 8    BOTTOM OF PAGE 13.

12:42PM 9        DO YOU SEE THAT WHERE IT SAYS "THERANOS IS SO MUCH BETTER

12:42PM 10   THAN QUEST DIAGNOSTICS.  I WAS IN AND OUT IN UNDER 10 MINUTES,

12:42PM 11   THE STAFF WAS COURTEOUS AND THE ACTUAL BLOOD DRAWING WAS WAY

12:42PM 12   LESS SCARY THAN WHAT I AM USED TO."

12:42PM 13       DO YOU SEE THAT?

12:42PM 14   A.   I DO.

12:42PM 15   Q.   AND YOU CONTINUED TO GET POSITIVE FEEDBACK ON THE SERVICES

12:42PM 16   PROVIDED IN THE THERANOS SERVICE CENTERS THROUGHOUT YOUR TIME

12:42PM 17   WORKING ON THIS PARTNERSHIP; CORRECT?

12:42PM 18   A.   YEAH, THE SERVICE CENTER LEVELS WERE, AS I SAID, BETWEEN 4

12:42PM 19   AND 5.

12:42PM 20   Q.   AND WHEN YOU SAY SERVICE LEVELS, I JUST WANT TO BE CLEAR,

12:42PM 21   THAT MEANS THE ENTIRE EXPERIENCE OF THE PATIENT WHEN THEY USE

12:42PM 22   THE FACILITY; CORRECT?

12:42PM 23   A.   YES.  MY APOLOGIES.  WHAT I'M REFERRING TO IS THE SERVICE

12:43PM 24   EXPERIENCE THAT WE WERE MEASURING THROUGH THE IPADS AND THE

12:43PM 25   QUESTIONNAIRE.

12:43PM   1    Q.   NOW, I WANT TO ASK YOU ABOUT THE RELATIONSHIP AS IT

12:43PM   2    EVOLVED OVER TIME BETWEEN WALGREENS AND THERANOS.

12:43PM   3         AM I RIGHT THAT THE LEADERSHIP OF WALGREENS CHANGED IN

12:43PM   4    AUGUST OF 2014?

12:43PM   5    A.   AT SOME TIME AFTER THE MERGER, SOME OF THE LEADERSHIP

12:43PM   6    CHANGED.

12:43PM   7    Q.   OKAY.  AND MR. MIQUELON, FOR EXAMPLE, LEFT?

12:43PM   8    A.   CORRECT.

12:43PM   9    Q.   AND DID DR. ROSAN STAY AT THERANOS -- OR AT WALGREENS AT

12:43PM   10   THAT POINT?

12:43PM   11   A.   YOU KNOW, I DON'T KNOW.  I DON'T REMEMBER THE EXACT TIME.

12:43PM   12   Q.   AND AUGUST OF 2014 IS THE TIME PERIOD THAT WE LOOKED AT

12:43PM   13   WHERE YOU STARTED TO RAISE CONCERNS ABOUT THE NUMBER OF STORES

12:44PM   14   THAT WOULD OPEN; CORRECT?

12:44PM   15   A.   WHEN YOU SAY "RAISE CONCERNS," I'M NOT SURE.

12:44PM   16   Q.   WELL, I THINK YOU INDICATED THAT THE PLAN WAS TO OPEN A

12:44PM   17   CERTAIN NUMBER, BUT THAT YOU MIGHT HAVE TO OPEN A LESSER

12:44PM   18   NUMBER; CORRECT?

12:44PM   19   A.   THAT'S RIGHT.

12:44PM   20   Q.   AND DO YOU RECALL THAT WE LOOKED AT THE NUMBERS PROJECTING

12:44PM   21   THAT THE NUMBER OF STORES WOULD GO DOWN FROM 3000 TO 2000 OR

12:44PM   22   2500 NATIONWIDE?

12:44PM   23   A.   YEAH, WHAT WE -- JUST TO BE VERY CLEAR, IN APRIL OF 2014,

12:44PM   24   ABOUT A MONTH, MONTH AND A HALF AFTER I TOOK OVER, WE GAVE THE

12:44PM   25   EXECUTIVE TEAM, THE EXECUTIVE COMMITTEE, A FULL VIEW AS TO

12:44PM 1    WHERE WE WERE AND WHAT WE WERE GOING TO MEASURE FOR FURTHER

12:44PM 2    SCALE, AND THAT WE WOULD MONITOR THAT.

12:44PM 3          BASED ON THOSE RESULTS, WE WOULD CONTINUE TO EXPAND.

12:44PM 4          AND IF WE ARE NOT SEEING THE RESULTS, WE WILL SLOW DOWN

12:44PM 5    THE ROLLOUT.

12:44PM 6          AGAIN, THE INTENTION WAS ALWAYS TO GO NATIONWIDE.  WE

12:44PM 7    WOULD NEVER GO INTO A PARTNERSHIP WITH A COMPANY LIKE THERANOS

12:44PM 8    WHO HAS DEVELOPED SOMETHING INNOVATIVE LIKE THIS TO NOT GO

12:45PM 9    NATIONWIDE.

12:45PM 10         BUT IN ORDER FOR US TO GO NATIONWIDE, WE, AS BOTH

12:45PM 11   COMPANIES, AGREED UPON WHAT THE METRICS WERE, WHAT THE

12:45PM 12   EXPERIENCE SHOULD LOOK LIKE, WHAT THE COST SHOULD BE, YOU KNOW,

12:45PM 13   WHAT ARE CERTAIN ATTRIBUTES LIKE THE VENOUS DRAW OR HOW WE

12:45PM 14   TRAIN.

12:45PM 15         AS WE HIT THOSE MEASURES AND BOTH COMPANIES ARE SATISFIED,

12:45PM 16   WE WILL CONTINUE TO EXPAND, AND THAT'S WHAT WE EXPLAINED TO THE

12:45PM 17   EXECUTIVE TEAM.

12:45PM 18   Q.   AND THE DECISION AS TO WHETHER OR NOT THERANOS WOULD

12:45PM 19   EXPAND IN WALGREENS STORES DID NOT LIE WITH YOU, DID IT?

12:45PM 20   A.   I WAS ONE OF THE INDIVIDUALS THAT WOULD BE GIVING INPUT

12:45PM 21   INTO THAT DECISION.

12:45PM 22   Q.   BUT IT WAS THE EXECUTIVE TEAM THAT WOULD ULTIMATELY MAKE

12:45PM 23   THAT DECISION; CORRECT?

12:45PM 24   A.   BASED ON THE INFORMATION THAT I PROVIDE THEM AND BASED

12:45PM 25   ON WHAT THE INFORMATION IS THAT I TELL THEM ON HOW THE PROJECT

12:45PM  1    WAS GOING.

12:45PM  2    Q.   WELL, YOU WERE THE GUY ON THE GROUND; CORRECT?

12:45PM  3    A.   I WAS THE GUY ON THE GROUND.

12:45PM  4    Q.   AND SO YOU'RE GIVING THEM INFORMATION AND ADVICE, ET

12:45PM  5    CETERA?

12:45PM  6    A.   YES.  MY TEAM AND I ARE BOTH GIVING INFORMATION, AND WE'RE

12:46PM  7    DOING IT TOGETHER WITH THE THERANOS TEAM.

12:46PM  8         AS YOU NOTED, MR. BALWANI WAS RIGHT THERE WITH ME AT THE

12:46PM  9    EXECUTIVE COMMITTEE MEETINGS.  AND SO WE ARE PROVIDING A STATUS

12:46PM  10   TOGETHER AS A PARTNER IN THIS TOGETHER.

12:46PM  11   Q.   AND SO -- AND YOU REPORTED TO THEM, I ASSUME, THAT THE

12:46PM  12   PATIENTS WHO WERE USING THE SERVICE CENTER SEEMED TO BE PRETTY

12:46PM  13   HAPPY; CORRECT?

12:46PM  14   A.   YES.

12:46PM  15   Q.   AND YOU REPORTED TO THEM THAT ALTHOUGH THE LEVEL OF VENOUS

12:46PM  16   DRAW WAS NOT AT THE LEVEL YOU WANTED, IT HAD DECREASED OVER

12:46PM  17   TIME; CORRECT?

12:46PM  18   A.   IT HOVERED AROUND BETWEEN 43, 40 TO 39 PERCENT IS WHAT WE

12:46PM  19   SAW AND EXPERIENCED, AND WHATEVER THE RESULTS WERE AT THE TIME,

12:46PM  20   THAT'S WHAT WE REPORTED TO THE EXECUTIVE TEAM.

12:46PM  21   Q.   SO, SO 65 PERCENT OR 55 PERCENT OR SO OF PATIENTS WERE

12:46PM  22   GETTING THE FINGERSTICK; CORRECT?

12:46PM  23   A.   THAT'S CORRECT.

12:46PM  24   Q.   AND THE REMAINING WERE PATIENTS WHO NEEDED SOME TESTS THAT

12:47PM  25   REQUIRED A VENOUS DRAW, CORRECT, THE 43 PERCENT THAT YOU

12:47PM   1    REFERENCED?

12:47PM   2    A.    YES.

12:47PM   3    Q.    AND THEY MIGHT NEED A BLOOD TEST IN WHICH 10 OR 11 ASPECTS

12:47PM   4    OF THEIR BLOOD WERE BEING TESTED; CORRECT?

12:47PM   5    A.    THAT COULD BE A POSSIBILITY, YES.

12:47PM   6    Q.    AND IF ANY ONE OF THOSE ANALYTES NEEDED A VENOUS TEST,

12:47PM   7    THEN THE PATIENT HAD TO HAVE A VENOUS TEST; CORRECT?

12:47PM   8    A.    YES.  THAT WAS THE DECISION TO MAKE SURE THAT THE PATIENT

12:47PM   9    EXPERIENCE WAS RIGHT, SO THE PATIENT HAS NOT -- EITHER HAS A

12:47PM  10    VENOUS DRAW PLUS A FINGERSTICK AT THE SAME TIME.

12:47PM  11    Q.    OKAY.  NOW, IF I GO -- YOU NO LONGER ARE AFFILIATED WITH

12:47PM  12    WALGREENS?

12:47PM  13    A.    I AM NOT, SIR.

12:47PM  14    Q.    BUT IF I GO INTO A WALGREENS TODAY, CAN I GET MY BLOOD

12:47PM  15    TESTED?

12:47PM  16    A.    IT DEPENDS ON WHAT YOU'RE ASKING FOR BLOOD TESTED.

12:47PM  17          SO THERE ARE STORES THAT COULD BE DOING THAT.  IT'S HARD

12:47PM  18    FOR ME TO SPEAK AT THAT.  I'M NOT THERE ANYMORE.

12:47PM  19    Q.    WELL, YOU KNOW THAT LAB CORP. HAS OPENED FACILITIES IN

12:48PM  20    WALGREENS STORES?

12:48PM  21    A.    YES.

12:48PM  22    Q.    AND YOU KNOW THAT THE METHOD OF DRAWING BLOOD IN THOSE

12:48PM  23    LAB CORP. CENTERS IN WALGREENS STORES IS VENOUS?

12:48PM  24    A.    THAT IS CORRECT.

12:48PM  25    Q.    SO WALGREENS MADE THE DECISION TO OPEN FACILITIES IN ITS

12:48PM 1    STORES THAT OFFERED ONLY VENOUS BLOOD DRAWS; CORRECT?

12:48PM 2    A.   THAT WAS THEIR DECISION.

12:48PM 3    Q.   AND THAT WAS AT SOME POINT AFTER YOUR DEPARTURE?

12:48PM 4    A.   YEAH.

12:48PM 5    Q.   DID THERE COME A TIME IN THE SUMMER OF 2014 WHERE YOU HAD

12:48PM 6    AN OPPORTUNITY TO INTERACT WITH THE CHIEF MEDICAL OFFICER OF

12:48PM 7    WALGREENS ABOUT THERANOS?

12:48PM 8    A.   I CAN'T TELL YOU EXACTLY WHAT TIME.  DR. LEIDER AND I

12:49PM 9    INTERACTED ALL OF THE TIME ON VARIOUS ISSUES INCLUDING

12:49PM 10   THERANOS.

12:49PM 11   Q.   AND JUST TO BE CLEAR, DR. LEIDER WAS DR. HARRY LEIDER?

12:49PM 12   A.   HARRY LEIDER.

12:49PM 13   Q.   AND HE WAS THE CHIEF MEDICAL OFFICER AT WALGREENS;

12:49PM 14   CORRECT?

12:49PM 15   A.   THAT IS CORRECT.

12:49PM 16   Q.   AND WALGREENS HAD GOTTEN SOME INFORMATION THAT CAUSED IT

12:49PM 17   TO WANT TO LOOK AT DATA ABOUT THERANOS BLOOD TESTS; CORRECT?

12:49PM 18   A.   CAN YOU BE MORE SPECIFIC EXACTLY?  AGAIN, I SPOKE TO HIM

12:49PM 19   ABOUT A LOT OF THINGS.

12:49PM 20   Q.   WELL, LET ME ASK YOU --

12:49PM 21   A.   YEAH.

12:49PM 22   Q.   -- DO YOU RECALL WHAT OCCASIONED YOUR INTERACTIONS WITH

12:49PM 23   DR. LEIDER ABOUT THERANOS?

12:49PM 24   A.   WELL, THERE WERE A LOT OF DIFFERENT OCCASIONS.  WE GAVE

12:49PM 25   HIM STATUS ON WHAT WAS GOING ON.

12:49PM 1          THERE WAS AN INCIDENT THAT OCCURRED THAT ONE OF OUR NURSE

12:49PM 2     PRACTITIONERS, ONE OF THE NURSE PRACTITIONERS FROM TAKE CARE

12:49PM 3     CLINICS HAD VOICED A CONCERN, AND SO I BROUGHT DR. LEIDER IN,

12:49PM 4     AND AS WELL AS DR. CARROLL, WHO IS THE CHIEF MEDICAL OFFICER

12:49PM 5     FOR CLINICS.

12:49PM 6          AND SO THAT WAS A TOPIC OF DISCUSSION THAT WE HAD.

12:50PM 7     Q.   AND THE NATURE OF THE DISCUSSION THAT YOU HAD WAS, WAS THE

12:50PM 8     QUESTION OF WHETHER THERANOS TESTS WERE SUFFICIENTLY ACCURATE;

12:50PM 9     IS THAT RIGHT?

12:50PM 10    A.   THAT'S RIGHT.

12:50PM 11    Q.   AND SO YOU BROUGHT THOSE GENTLEMEN IN BECAUSE THEY HAD

12:50PM 12    MEDICAL EXPERTISE; CORRECT?

12:50PM 13    A.   CORRECT, AND DR. LEIDER WAS A FORMER LAB DIRECTOR.

12:50PM 14    Q.   AND YOU RAISED THAT -- THE QUESTIONS THAT HAD BEEN POSED

12:50PM 15    TO YOU WITH THERANOS; CORRECT?

12:50PM 16    A.   YES.  WHAT I DID WAS I HAD BOTH PAT CARROLL, DR. CARROLL,

12:50PM 17    AND HARRY LEIDER, DR. LEIDER, AS WELL AS MR. BALWANI, AND THEY

12:50PM 18    HAD A CONFERENCE CALL WITH SEVERAL OF THE FOLKS OVER AT

12:50PM 19    THERANOS.

12:50PM 20    Q.   AND MR. BALWANI BROUGHT SEVERAL OF THE SCIENTISTS INTO THE

12:50PM 21    PROCESS BECAUSE THE QUESTIONS WERE ABOUT MEDICAL ISSUES AND

12:50PM 22    SCIENTIFIC ISSUES?

12:50PM 23    A.   THAT IS MY UNDERSTANDING.

12:50PM 24    Q.   OKAY.  AND WHAT WAS THE OUTCOME OF THAT PROCESS?

12:50PM 25    A.   THE OUTCOME WAS THAT BOTH DR. CARROLL AND DR. LEIDER WERE

12:50PM  1     SATISFIED WITH THE ANSWERS THAT THEY RECEIVED.

12:50PM  2     Q.   OKAY.

12:51PM  3     A.   AND WE ADDRESSED THE ISSUES WITH THE NURSE PRACTITIONER.

12:51PM  4              MR. DOWNEY:  OKAY.  YOUR HONOR, MAY I JUST HAVE A

12:51PM  5     MOMENT?

12:51PM  6              THE COURT:  SURE.

12:51PM  7          (PAUSE IN PROCEEDINGS.)

12:51PM  8     BY MR. DOWNEY:

12:51PM  9     Q.   ONE MORE SUBJECT, MR. JHAVERI.

12:51PM  10         I WANT TO ASK YOU, YOU MENTIONED ON YOUR DIRECT

12:51PM  11    EXAMINATION THAT YOU BECAME AWARE OF AN ARTICLE CRITICAL OF

12:51PM  12    THERANOS IN 2015; CORRECT?

12:51PM  13    A.   THAT'S CORRECT.

12:51PM  14    Q.   AND AFTER THAT, JOURNALISTS BEGAN RAISING QUESTIONS WITH

12:52PM  15    YOU ABOUT WHY WALGREENS WAS IN A PARTNERSHIP WITH THERANOS;

12:52PM  16    CORRECT?

12:52PM  17    A.   I DID NOT SPEAK TO ANY OF THE JOURNALISTS.

12:52PM  18    Q.   WELL, LET ME ASK YOU TO TAKE A LOOK AT EXHIBIT 7660, AND

12:52PM  19    I'LL GIVE YOU A MINUTE TO REVIEW THIS.

12:52PM  20    A.   YES.

12:52PM  21    Q.   IN THE FIRST PARAGRAPH, A QUOTATION IS ATTRIBUTED TO YOU

12:52PM  22    BY THIS JOURNALIST.

12:52PM  23         DO YOU SEE THAT?

12:52PM  24    A.   I DO.

12:52PM  25    Q.   AND WAS THIS -- WERE YOU -- DOES THIS REFRESH YOUR

12:53PM  1    RECOLLECTION THAT THAT'S A STATEMENT THAT YOU MADE IN 2016?

12:53PM  2    A.   YES, THE STATEMENT WAS MADE IN THE CONTEXT.

12:53PM  3         THIS INTERVIEW WAS ABOUT WALGREENS'S MOVE INTO HEALTH CARE

12:53PM  4    SERVICES, AND SO THAT'S WHAT THE TOPIC WAS WITH THE ECONOMIST

12:53PM  5    AND SO THEY ASKED ME A COUPLE OF QUESTIONS ABOUT THERANOS

12:53PM  6    PARTNERSHIP, AND THE QUOTE THAT I MADE WAS ACTUALLY IN

12:53PM  7    REFERENCE TO IF NURSE PRACTITIONERS WERE RECEIVING ANY TYPE OF

12:53PM  8    INCORRECT RESULTS OR INACCURATE RESULTS, WOULD WE KNOW?

12:53PM  9    Q.   OKAY.  AND WHEN YOU WERE DEPOSED, OR WHEN YOU ASKED THAT

12:53PM  10   QUESTION, YOU SAID, TRUST ME, IF THE RESULTS WERE NOT THERE, WE

12:53PM  11   WOULD HEAR --

12:53PM  12        MR. SCHENK:  YOUR HONOR, OBJECTION.  IT'S NOT IN

12:53PM  13   EVIDENCE.

12:53PM  14   BY MR. DOWNEY:

12:53PM  15   Q.   I'M JUST ASKING, DOES THIS REFRESH YOUR RECOLLECTION AS TO

12:53PM  16   WHAT YOU SAID?

12:54PM  17   A.   YES.

12:54PM  18   Q.   AND TELL US WHAT YOU SAID IN RESPONSE TO THOSE INQUIRIES.

12:54PM  19        THE COURT:  YOU CAN ANSWER.

12:54PM  20        THE WITNESS:  OKAY.  WHAT THEY -- BASED ON THE

12:54PM  21   INQUIRY, WHAT I SAID WAS -- AGAIN, THE ASK WAS IF NURSE

12:54PM  22   PRACTITIONERS RECEIVED ANY TYPE OF INACCURATE RESULTS FOR THEIR

12:54PM  23   PATIENTS, WOULD YOU KNOW AND WOULD THEY TELL YOU?

12:54PM  24        AND MY COMMENT WAS DIRECTLY, TRUST ME, IF THERE WAS

12:54PM  25   SOMETHING INACCURATE, WE WOULD KNOW.

12:54PM   1          JUST LIKE THE ONE I SPOKE ABOUT EARLIER WHERE THEY WERE --

12:54PM   2     THEY INFORMED US THAT THEY POTENTIALLY THOUGHT THERE WAS A BAD

12:54PM   3     RESULT.

12:54PM   4          SO THAT WAS MY REFERENCE.

12:54PM   5     BY MR. DOWNEY:

12:54PM   6     Q.   AND WHEN YOU SAID "WE WOULD KNOW," THAT WAS A RHETORICAL

12:54PM   7     STATEMENT; CORRECT?  YOU WERE SAYING WE HAVEN'T HEARD THAT;

12:54PM   8     CORRECT?

12:54PM   9     A.   NO.  WHAT I WAS REFERRING TO IN ALL OF OUR FIELD

12:54PM  10     OPERATIONS -- LET ME TAKE A STEP BACK HERE.

12:54PM  11          WHETHER IT'S IN THE PHARMACY OR IN THE TAKE CARE CLINICS,

12:54PM  12     WE HAVE A LEVEL OF MANAGEMENT THAT GOES ALL OF THE WAY TO THE

12:55PM  13     TOP.

12:55PM  14          AND SO WHAT I WAS REFERRING TO SPECIFICALLY HERE IS IF A

12:55PM  15     NURSE PRACTITIONER HAD A CONCERN ABOUT SOME TYPE OF RESULT,

12:55PM  16     THAT THEY WOULD RAISE IT TO THEIR MANAGEMENT AND THAT IT WOULD

12:55PM  17     COME TO US OR TO THE APPROPRIATE TEAM THAT WAS ACTUALLY RUNNING

12:55PM  18     THAT PARTICULAR PROJECT.

12:55PM  19     Q.   UNDERSTOOD.

12:55PM  20     A.   SO THAT'S WHAT I WAS REFERRING TO HERE.

12:55PM  21     Q.   UNDERSTOOD.

12:55PM  22          DURING YOUR DIRECT EXAMINATION YOU WERE SHOWN AND YOU READ

12:55PM  23     A SERIES OF TEXTS BETWEEN MR. BALWANI AND MS. HOLMES.

12:55PM  24          DO YOU RECALL THAT?

12:55PM  25     A.   YES, SIR.

12:55PM  1    Q.   AND YOU SAW SOME DISCUSSION IN THOSE TEXTS ABOUT CVS;

12:55PM  2    CORRECT?

12:55PM  3    A.   YES, SIR.

12:55PM  4    Q.   AND CVS IS A SIGNIFICANT COMPETITOR TO WALGREENS; CORRECT?

12:55PM  5    A.   YES.

12:55PM  6    Q.   AND DID YOU KNOW IN 2015 THAT THERANOS WAS TALKING TO CVS

12:55PM  7    ABOUT A POTENTIAL PARTNERSHIP?

12:55PM  8    A.   I DID NOT SPEAK TO ANYONE IN DETAIL ABOUT CVS OR ANYTHING

12:55PM  9    LIKE THAT.  THAT WAS NOT MY PURVIEW.

12:55PM  10   Q.   AND DID YOU HAVE ANY KNOWLEDGE THAT THERANOS WAS PURSUING

12:56PM  11   A PARTNERSHIP WITH CVS?

12:56PM  12   A.   WHAT I KNEW WAS EARLY ON WHEN THERANOS WAS LOOKING FOR A

12:56PM  13   PARTNER, THEY HAD SPOKEN TO SEVERAL CHAINS, SAFEWAY BEING ONE

12:56PM  14   OF THEM, CVS, AND WALGREENS.

12:56PM  15   Q.   AND THAT WAS IN 2010?

12:56PM  16   A.   WHENEVER I -- IT WAS SOMETIME IN 2013, 2014 WHEN I BECAME

12:56PM  17   MORE INVOLVED IN THE PROJECT.

12:56PM  18   Q.   YOU LEARNED THAT IN 2013 AND 2014?

12:56PM  19   A.   RIGHT.

12:56PM  20   Q.   BUT WHAT YOU JUST REFERENCED IS KNOWLEDGE ABOUT WHAT HAD

12:56PM  21   HAPPENED IN 2010; CORRECT?

12:56PM  22   A.   YEAH.  I DON'T KNOW THE TIMEFRAME, SIR, TO BE HONEST.

12:56PM  23   Q.   WHENEVER THE WALGREENS-THERANOS INITIAL AGREEMENT HAD BEEN

12:56PM  24   MADE; CORRECT?

12:56PM  25   A.   CORRECT.

| | | |
|---|---|---|
| 12:56PM | 1 | Q. AND DID YOU KNOW ANYTHING ABOUT CONVERSATIONS BETWEEN CVS |
| 12:56PM | 2 | AND THERANOS IN 2015? |
| 12:56PM | 3 | A. I DON'T KNOW THE DETAILS OF THAT. |
| 12:56PM | 4 | Q. DID YOU KNOW THAT THERANOS WAS PURSUING A POTENTIAL |
| 12:56PM | 5 | PARTNERSHIP WITH CVS BECAUSE OF -- WELL, DID YOU KNOW THAT THEY |
| 12:56PM | 6 | WERE PURSUING THAT TYPE OF PARTNERSHIP? |
| 12:57PM | 7 | A. NO. |
| 12:57PM | 8 | Q. ALL RIGHT. |
| 12:57PM | 9 | YOUR HONOR, JUST ONE MOMENT. |
| 12:57PM | 10 | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.) |
| 12:57PM | 11 | MR. DOWNEY: YOUR HONOR, I JUST WANT TO QUICKLY |
| 12:57PM | 12 | INTRODUCE TWO DOCUMENTS AND I'LL BE DONE. |
| 12:57PM | 13 | Q. I KNOW YOU TESTIFIED YOU DIDN'T HAVE MUCH CONTACT WITH |
| 12:57PM | 14 | MS. HOLMES. BUT ON OCCASION YOU EMAILED HER; IS THAT CORRECT? |
| 12:57PM | 15 | A. I DID. |
| 12:57PM | 16 | Q. AND I WANT TO SHOW YOU AN EMAIL BETWEEN YOU AND |
| 12:57PM | 17 | MS. HOLMES. I WANT TO SHOW YOU A DOCUMENT AND ASK YOU IF IT'S |
| 12:57PM | 18 | AN EMAIL BETWEEN YOU AND MS. HOLMES, AND THAT'S EXHIBIT 7454. |
| 12:58PM | 19 | YEAH. |
| 12:58PM | 20 | A. IS THAT IN VOLUME 1, SIR? |
| 12:58PM | 21 | Q. IT SHOULD BE IN VOLUME 2 OF THE BLACK BINDERS. |
| 12:58PM | 22 | A. I HAVE IT. |
| 12:58PM | 23 | Q. AND CAN YOU TELL ME WHAT THIS IS? |
| 12:58PM | 24 | A. YES. THIS IS MR. BALWANI HAD FORWARDED TO MYSELF AND |
| 12:58PM | 25 | BRAD WASSON WHO, AS I MENTIONED, WAS MY BOSS AT THE TIME, A |

12:59PM  1    LINK TO THE "FORTUNE" MAGAZINE ARTICLE THAT MS. HOLMES WAS ON

12:59PM  2    THE COVER OF.

12:59PM  3    Q.    OKAY.

12:59PM  4    A.    AND I HAD SENT AN EMAIL TO MS. HOLMES CONGRATULATING HER.

12:59PM  5    Q.    WELL, LET ME MOVE THE ADMISSION OF 7454.

12:59PM  6              MR. SCHENK:  NO OBJECTION.

12:59PM  7              THE COURT:  INCLUDING THE SECOND PAGE?  YOU WANT THE

12:59PM  8    SECOND PAGE?

12:59PM  9              MR. DOWNEY:  I DON'T NEED THE SECOND PAGE.  LET'S

12:59PM  10   SAY 7454A.

12:59PM  11             THE COURT:  ALL RIGHT.

12:59PM  12       ANY OBJECTION TO THAT?

12:59PM  13             MR. SCHENK:  YOUR HONOR, I THINK THE WHOLE THING

12:59PM  14   SHOULD GO IN.  I'M NOT SURE IT'S SEPARATE.  I THINK IT'S ALL

12:59PM  15   PART OF THE EMAIL FROM --

12:59PM  16             THE COURT:  WELL, THAT'S MY INQUIRY.

12:59PM  17             MR. DOWNEY:  I DON'T OBJECT TO IT COMING IN, BUT I

12:59PM  18   DIDN'T ATTACH THE ENTIRE ARTICLE, SO I CAN TRY TO AMEND THAT IN

12:59PM  19   THE FUTURE.

12:59PM  20             THE COURT:  WELL, THIS WHAT I HAVE.

12:59PM  21             MR. DOWNEY:  YES.

12:59PM  22             THE COURT:  YOU WANT WHAT I'M HOLDING?

12:59PM  23             MR. DOWNEY:  YES.

12:59PM  24             THE COURT:  YOU WANT BOTH SIDES?

12:59PM  25             MR. DOWNEY:  THAT'S FINE, YOUR HONOR, YES.

| | | |
|---|---|---|
| 12:59PM | 1 | THE COURT:  ANY OBJECTION? |
| 12:59PM | 2 | MR. SCHENK:  NO.  THANK YOU. |
| 12:59PM | 3 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 12:59PM | 4 | (DEFENDANT'S EXHIBIT 7454 WAS RECEIVED IN EVIDENCE.) |
| 01:00PM | 5 | BY MR. DOWNEY: |
| 01:00PM | 6 | Q.   SO THIS IS AN ARTICLE ABOUT MS. HOLMES THAT MR. BALWANI |
| 01:00PM | 7 | FORWARDED TO YOU; CORRECT? |
| 01:00PM | 8 | A.   CORRECT. |
| 01:00PM | 9 | Q.   AND THEN YOU WROTE TO MS. HOLMES; CORRECT? |
| 01:00PM | 10 | A.   I DID. |
| 01:00PM | 11 | Q.   AND YOU SENT HER GOOD WISHES IN YOUR FIRST PARAGRAPH; |
| 01:00PM | 12 | CORRECT? |
| 01:00PM | 13 | A.   YES. |
| 01:00PM | 14 | Q.   AND THEN YOU SAY IN THE SECOND PARAGRAPH, "I AM SURE SUNNY |
| 01:00PM | 15 | AND CHRISTIAN ARE KEEPING YOU IN THE LOOP." |
| 01:00PM | 16 | CORRECT? |
| 01:00PM | 17 | A.   YES. |
| 01:00PM | 18 | Q.   AND CHRISTIAN IS A REFERENCE TO CHRISTIAN HOLMES; CORRECT? |
| 01:00PM | 19 | A.   YES. |
| 01:00PM | 20 | Q.   AND THAT'S MS. HOLMES'S BROTHER WHO ALSO WORKED AT |
| 01:00PM | 21 | THERANOS? |
| 01:00PM | 22 | A.   CORRECT. |
| 01:00PM | 23 | Q.   AND YOU SAID, "TEAMS ARE WORKING WELL TOGETHER AND A LOT |
| 01:00PM | 24 | OF PROGRESS BEING MADE.  SEE YA SOON." |
| 01:00PM | 25 | CORRECT? |

01:00PM 1    A.   CORRECT.

01:00PM 2    Q.   AND LET ME ASK YOU TO LOOK AT 7471.

01:01PM 3    A.   YES, SIR.

01:01PM 4    Q.   IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN SEPTEMBER

01:01PM 5    OF 2014?

01:01PM 6    A.   IT IS.

01:01PM 7    Q.   AND THE ATTACHMENT IS AN ANNOUNCEMENT RELATED TO A LIST OF

01:01PM 8    HONOREES?

01:01PM 9    A.   YES.

01:01PM 10        MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

01:01PM 11   7471.

01:01PM 12        MR. SCHENK:  NO OBJECTION.

01:01PM 13        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:01PM 14   (DEFENDANT'S EXHIBIT 7471 WAS RECEIVED IN EVIDENCE.)

01:01PM 15   BY MR. DOWNEY:

01:01PM 16   Q.   IF YOU JUST FOCUS ON THE ADDRESS AT THE BOTTOM -- AT THE

01:01PM 17   TOP, RATHER, INDICATING IT'S FROM YOU TO MS. HOLMES, YOU SENT

01:01PM 18   THIS IN SEPTEMBER OF 2014; CORRECT?

01:01PM 19   A.   CORRECT.

01:01PM 20   Q.   AND THIS IS A LITTLE BIT AFTER -- A COUPLE OF WEEKS AFTER

01:01PM 21   THE MEETINGS THAT YOU HAD WITH MR. BALWANI WHERE YOU INDICATED

01:01PM 22   YOU MIGHT BE SCALING DOWN THE NUMBER OF STORES; CORRECT?

01:01PM 23   A.   THAT'S CORRECT.

01:01PM 24   Q.   OKAY.  AND IN THIS EMAIL, YOU SEND GOOD WISHES TO HER

01:02PM 25   AGAIN; CORRECT?

01:02PM  1   A.   YES.

01:02PM  2   Q.   AND IN THE SECOND SENTENCE YOU SAID, "AS YOU KNOW WE ARE

01:02PM  3   MAKING GREAT PROGRESS IN OUR PARTNERSHIP."

01:02PM  4        CORRECT?

01:02PM  5   A.   YES.

01:02PM  6             MR. DOWNEY:  NOTHING FURTHER, YOUR HONOR.

01:02PM  7             THE COURT:  ANY REDIRECT?

01:02PM  8             MR. SCHENK:  YES, YOUR HONOR.

01:02PM  9             THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH,

01:02PM 10   PLEASE FEEL FREE.

01:02PM 11             JUROR:  CAN I USE THE RESTROOM?

01:02PM 12             THE COURT:  WHY DON'T WE TAKE A BREAK.  WHY DON'T WE

01:02PM 13   DO THAT?

01:02PM 14        SORRY, MR. SCHENK.  LET'S TAKE A BREAK.  20 MINUTES.

01:02PM 15             MS. TREFZ:  IF WE CAN DO 20 MINUTES, THAT WOULD BE

01:02PM 16   IT FOR THE REST OF THE DAY.

01:02PM 17             THE COURT:  LET'S DO 20 MINUTES.

01:02PM 18        YOU CAN STAND DOWN, SIR, AND WE CAN TAKE A BREAK FOR

01:02PM 19   20 MINUTES.

01:03PM 20        (JURY OUT AT 1:03 P.M.)

01:03PM 21             THE COURT:  YOU CAN WAIT OUTSIDE, SIR.  YOU CAN GO.

01:03PM 22   THANK YOU.

01:03PM 23        ALL RIGHT.  THANK YOU.

01:03PM 24        THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

01:03PM 25   BREAK AND THE WITNESS HAS LEFT THE COURTROOM AND ALL COUNSEL

01:03PM 1     AND MS. HOLMES ARE PRESENT ONCE AGAIN.

01:03PM 2          IT'S ABOUT TEN AFTER 1:00.  I KNOW THERE'S THE 1:30

01:03PM 3     HEARING.  I DON'T KNOW, SHOULD WE -- COUNSEL HERE IN THE

01:04PM 4     COURTROOM, DID YOU INTEND TO -- ANY COUNSEL HERE IN THE

01:04PM 5     COURTROOM, DID YOU INTEND TO JOIN OR ASSIST YOUR COLLEAGUES IN

01:04PM 6     THAT MATTER?

01:04PM 7          MR. BOSTIC:  FOR THE GOVERNMENT, YOUR HONOR, JUST

01:04PM 8     ME, I THINK, AND I WOULDN'T ASK THAT TRIAL PROCEEDINGS BE

01:04PM 9     STOPPED.  I THINK THEY SHOULD CONTINUE IF THE OTHER PARTIES ARE

01:04PM 10    AMENABLE TO IT.

01:04PM 11         THE COURT:  THAT WAS MY INQUIRY.  THANK YOU,

01:04PM 12    MR. BOSTIC.

01:04PM 13         MR. DOWNEY:  FOR THE DEFENSE, YOUR HONOR, MR. CLINE

01:04PM 14    IS GOING TO ATTEND THE 1:30 HEARING AND THE DEFENSE IS FINE

01:04PM 15    WITH PROCEEDING.

01:04PM 16         THE COURT:  YOU HAVE FULL TRUST AND CONFIDENCE IN

01:04PM 17    MR. CLINE?

01:04PM 18        (LAUGHTER.)

01:04PM 19         THE COURT:  THE RECORD WILL REFLECT THAT THERE WAS

01:04PM 20    NO RESPONSE TO THAT.  THERE WAS NO RESPONSE BUT LAUGHTER I

01:04PM 21    THINK IS WHAT I HEARD.

01:04PM 22        ALL RIGHT.  THANK YOU.

01:04PM 23         MR. DOWNEY:  I HAVE COMPLETE CONFIDENCE IN HIM.

01:04PM 24         THE COURT:  I'M SURE YOU DO.  THANK YOU.  LET'S TAKE

01:04PM 25    OUR BREAK.  THANK YOU.

01:05PM   1            THE CLERK:  COURT IS IN RECESS.

01:05PM   2            (RECESS FROM 1:05 P.M. UNTIL 1:32 P.M.)

01:32PM   3            (JURY IN AT 1:32 P.M.)

01:32PM   4            THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

01:32PM   5    RECORD.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR

01:32PM   6    JURY IS PRESENT.

01:32PM   7            MR. JHAVERI IS BACK ON THE STAND.

01:32PM   8            MR. SCHENK, YOU HAVE SOME REDIRECT?

01:32PM   9            MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

01:32PM   10                     **REDIRECT EXAMINATION**

01:32PM   11   BY MR. SCHENK:

01:32PM   12   Q.  GOOD AFTERNOON AGAIN, MR. JHAVERI.

01:32PM   13   A.  GOOD AFTERNOON.

01:32PM   14   Q.  I WOULD LIKE TO COVER A COUPLE OF THE TOPICS THAT YOU

01:32PM   15   DISCUSSED WITH MR. DOWNEY AND JUST MAKE SURE I UNDERSTAND YOUR

01:32PM   16   ANSWERS, IF THAT'S OKAY.

01:32PM   17   A.  SURE.

01:32PM   18   Q.  THE FIRST TOPIC I WANT TO TALK ABOUT IS TOWARDS THE

01:32PM   19   BEGINNING OF YOUR CROSS-EXAMINATION, YOU TALKED ABOUT THE

01:32PM   20   NUMBER OF TIMES THAT YOU MET MS. HOLMES AS OPPOSED TO YOUR

01:32PM   21   INTERACTIONS WITH MR. BALWANI.

01:32PM   22            DO YOU RECALL THAT TESTIMONY?

01:32PM   23   A.  YES.

01:32PM   24   Q.  ON ONE OF THE OCCASIONS THAT YOU MET MS. HOLMES, WAS IT

01:32PM   25   DURING A DEMONSTRATION OF THE THERANOS TECHNOLOGY?

01:33PM  1     A.   YES, IT WAS AT THEIR CORPORATE OFFICE.

01:33PM  2     Q.   IN PALO ALTO?

01:33PM  3     A.   IN PALO ALTO.

01:33PM  4     Q.   AND WHAT DO YOU RECALL ABOUT THAT?

01:33PM  5     A.   WE HAD A -- IT WAS A MEET AND GREET WITH BOTH LEADERSHIP

01:33PM  6     TEAMS AND WE WERE IN THE CONFERENCE ROOM.  MS. HOLMES AND

01:33PM  7     MR. BALWANI GAVE US A LITTLE BIT MORE OF OVERVIEW OF THE

01:33PM  8     SERVICE AND WHAT THEY WERE TRYING TO DO.

01:33PM  9          AND THEN WE WENT, AFTER THAT, TO ACTUALLY GET OUR BLOOD

01:33PM 10     TESTED.  AND SO WE WENT IN THE ROOM NEXT DOOR AND THEY DID A

01:33PM 11     FINGERSTICK ON US, A COUPLE OF US THAT WANTED TO GET IT DONE.

01:33PM 12     I DID GET IT DONE FOR ME.

01:33PM 13          AND THEN THEY ALSO HAD A BLACK MACHINE THAT WAS ON THE

01:33PM 14     TABLE THERE THAT THEY SHOWED US.

01:33PM 15          AND THAT'S ABOUT IT.  THAT WAS MY MEETING WITH HER.

01:33PM 16     Q.   AND WHEN YOU SAID THE MACHINE ON THE TABLE, DID YOU

01:33PM 17     UNDERSTAND THAT TO BE THE THERANOS PROCESSING UNIT, THE

01:33PM 18     THERANOS TECHNOLOGY?

01:33PM 19     A.   THE THERANOS TECHNOLOGY, THAT'S CORRECT.

01:33PM 20     Q.   DID YOU UNDERSTAND THAT THE DEMONSTRATION THAT YOU WERE

01:33PM 21     RECEIVING WOULD MIMIC OR MIRROR A PATIENT EXPERIENCE, WHAT THEY

01:34PM 22     WERE GIVING TO YOU WAS WHAT A WALGREENS PATIENT WOULD

01:34PM 23     EXPERIENCE?

01:34PM 24     A.   CORRECT.  THEY SHOWED US THE FINGERSTICK, THE NANOTAINER

01:34PM 25     AND HOW THEY EXTRACTED THE BLOOD, AND SO IT WAS THE EXPERIENCE

01:34PM  1    THAT POTENTIALLY A PATIENT WOULD SEE.

01:34PM  2    Q.   THANK YOU.

01:34PM  3         MS. KRATZMANN, COULD I HAVE THE ELMO.  THANK YOU.

01:34PM  4         I'D LIKE TO SHOW YOU EXHIBIT 1387.  I BELIEVE YOU WERE

01:34PM  5    SHOWN THIS BY MR. DOWNEY.

01:34PM  6         DO YOU RECALL YOUR TESTIMONY ABOUT THIS DOCUMENT?

01:34PM  7    A.   YES, SIR.

01:34PM  8    Q.   AND AN AMENDED OR A REVISED SERVICES AGREEMENT?

01:34PM  9    A.   YES.

01:34PM 10    Q.   AND I THINK THAT MR. DOWNEY ASKED YOU IF, ANYWHERE IN THIS

01:35PM 11    DOCUMENT, THERE WAS DISCUSSION OF THE PERCENT OF VENOUS DRAWS.

01:35PM 12         DO YOU RECALL THAT TESTIMONY?

01:35PM 13    A.   YES, SIR.

01:35PM 14    Q.   AND I THINK YOU SAID I'D HAVE TO LOOK THROUGH IT, BUT I

01:35PM 15    DON'T RECALL FOR SURE.

01:35PM 16         IS THAT RIGHT?

01:35PM 17    A.   CORRECT.

01:35PM 18    Q.   AND MR. DOWNEY, I THINK, SAID WOULD IT -- WOULD YOU BE

01:35PM 19    SURPRISED IF IT WASN'T IN THE DOCUMENT.

01:35PM 20         DO YOU RECALL THAT?

01:35PM 21    A.   YES, SIR.

01:35PM 22    Q.   WAS VENOUS DRAW AN IMPORTANT METRIC THAT WALGREENS WAS

01:35PM 23    TRACKING, REGARDLESS OF WHETHER IT'S IN THIS DOCUMENT OR NOT?

01:35PM 24    A.   YES, IT WAS.

01:35PM 25    Q.   WAS THE ACCURACY OF THERANOS TESTS IMPORTANT TO WALGREENS?

01:35PM  1   A.   CRITICALLY IMPORTANT.

01:35PM  2   Q.   IS ACCURACY IN THERE?

01:35PM  3   A.   NOT THAT I KNOW OF.

01:35PM  4   Q.   BUT IT'S STILL SOMETHING THAT IS IMPORTANT TO WALGREENS?

01:35PM  5   A.   CORRECT.

01:35PM  6   Q.   NOW I'M SHOWING YOU 3755, ALREADY ADMITTED, THAT

01:36PM  7   MR. DOWNEY SHOWED YOU, AND IN THIS DOCUMENT IT TALKS ABOUT, IF

01:36PM  8   YOU RECALL, SOME LANGUAGE ABOUT THERE BEING 2500 STORES AND

01:36PM  9   THAT BEING THE GOAL FOR AUGUST OF 2016.

01:36PM 10        DO YOU RECALL THAT?

01:36PM 11   A.   YES, SIR.

01:36PM 12   Q.   WHAT ASSUMPTIONS WERE BAKED INTO THAT GOAL?

01:36PM 13   A.   THE ASSUMPTIONS, AGAIN, AS I MENTIONED EARLIER, IS

01:36PM 14   OPERATIONALIZING THE SERVICE, AND PART OF THAT WAS HITTING ON

01:36PM 15   THE METRICS THAT WE HAD DEFINED, EVERYTHING FROM PATIENT

01:36PM 16   EXPERIENCE TO WAIT TIMES TO VENOUS DRAWS, AS WELL AS COST OF

01:36PM 17   THE BUILDOUT.

01:36PM 18        BUT THOSE WERE SOME OF THE BIGGER THINGS THAT REALLY

01:37PM 19   INFORMED US ON WHEN TO LAUNCH, HOW TO LAUNCH, AND HOW MUCH TO

01:37PM 20   LAUNCH.

01:37PM 21   Q.   SO EVEN THOUGH THE DOCUMENT HAS 2500 STORES AS A GOAL,

01:37PM 22   THAT WASN'T GUARANTEED, OR IT WASN'T EVER EXPRESSED TO THERANOS

01:37PM 23   THAT THAT WAS GUARANTEED; IS THAT RIGHT?

01:37PM 24   A.   I PERSONALLY HAD NEVER SAID THAT IT WAS GUARANTEED.

01:37PM 25        AND, AGAIN, WHETHER IT WAS BRAD WASSON OR KERMIT CRAWFORD,

01:37PM  1    THEY WOULD EXPECT ME TO PROVIDE THE RIGHT INFORMATION TO MAKE

01:37PM  2    THOSE DECISIONS.

01:37PM  3    Q.   I'D LIKE TO SHOW YOU, THIS IS PAGE 12 OF THAT SAME

01:37PM  4    EXHIBIT, EXHIBIT 3755.  AND ON PAGE 12 WE SEE OPERATIONAL

01:37PM  5    READINESS.

01:37PM  6         DO YOU SEE THAT?

01:37PM  7    A.   YES, SIR.

01:37PM  8    Q.   MR. DOWNEY ASKED YOU IF VENOUS DRAWS, OR THE PERCENT OF

01:37PM  9    VENOUS DRAWS, WAS LISTED IN OPERATIONAL READINESS, AND I THINK

01:38PM  10   YOU SAID IT WAS NOT LISTED THERE.  IS THAT RIGHT?

01:38PM  11   A.   THAT'S RIGHT.

01:38PM  12   Q.   AND WAS VENOUS DRAWS STILL SOMETHING THAT WAS IMPORTANT TO

01:38PM  13   WALGREENS, EVEN THOUGH IT WAS NOT LISTED ON OPERATIONAL

01:38PM  14   READINESS?

01:38PM  15   A.   YES, IT WAS.

01:38PM  16   Q.   AND HOW ABOUT THE ACCURACY OF THERANOS BLOOD TESTS?  IS

01:38PM  17   THAT LISTED IN OPERATIONAL READINESS?

01:38PM  18   A.   NO, SIR.

01:38PM  19   Q.   AND WAS THE ACCURACY OF THERANOS BLOOD TESTS STILL

01:38PM  20   NEVERTHELESS IMPORTANT TO WALGREENS?

01:38PM  21   A.   YES.

01:38PM  22   Q.   NOW I'M SHOWING YOU WHAT HAS BEEN ADMITTED AS 1884.  THESE

01:38PM  23   ARE MEETING MINUTES.

01:38PM  24        DO YOU RECALL THIS DISCUSSION WITH MR. DOWNEY?

01:38PM  25   A.   YES, SIR.

01:38PM  1    Q.   AND NUMBER 6 WAS "MOSTLY IMPROVED PATIENT EXPERIENCE."

01:39PM  2         MR. DOWNEY ASKED YOU SOME QUESTIONS ON A FEW DOCUMENTS

01:39PM  3    ABOUT THE EXPERIENCE THAT PATIENTS HAD, AND YOU TESTIFIED THAT

01:39PM  4    IT WAS MEASURED ON A SCALE OF 1 OR 0 TO 5 AND THAT THERE WERE

01:39PM  5    MOSTLY 4 AND 5'S; IS THAT RIGHT?

01:39PM  6    A.   THAT'S CORRECT.

01:39PM  7    Q.   WHEN IN THE VISIT, OR WHEN IN THE PATIENT'S EXPERIENCE DO

01:39PM  8    THEY GIVE THAT FEEDBACK?  WHEN DOES THE PATIENT FILL OUT THE

01:39PM  9    SURVEY?

01:39PM 10    A.   IT WAS AT THE END OF THE FULL SERVICE.  THAT'S WHEN THE

01:39PM 11    IPAD WAS GIVEN TO THEM, AND THAT'S WHEN THEY FILL IT OUT.

01:39PM 12    Q.   DO THEY HAVE THEIR TEST RESULTS BY THE TIME THEY'RE

01:39PM 13    FILLING OUT THAT SURVEY?

01:39PM 14    A.   NO, SIR.

01:39PM 15    Q.   SO IF A PATIENT, LET'S SAY, WAS PREGNANT BUT WAS TOLD THAT

01:39PM 16    THEY WERE NOT PREGNANT BY A TEST FROM THERANOS, THAT MIGHT

01:39PM 17    AFFECT THEIR OPINION OR THEIR IMPRESSION OF THE EXPERIENCE?

01:39PM 18    A.   IT COULD.

01:39PM 19    Q.   BUT THAT WOULD NOT BE CAPTURED IN A SURVEY TAKEN AT THE

01:39PM 20    END OF THEIR VISIT TO THE THERANOS AT WALGREENS?

01:40PM 21    A.   NO.  THE RESULTS WERE NOT AVAILABLE TO THE PATIENT AT THE

01:40PM 22    TIME OF THE SURVEY.

01:40PM 23    Q.   ALSO WITHIN THOSE SAME MEETING MINUTES, MR. DOWNEY READ

01:40PM 24    YOU A LINE ABOUT ONE HOUR TURN AROUND TIME ONCE THE SAMPLE

01:40PM 25    REACHED THE THERANOS LAB.

01:40PM  1          DO YOU RECALL THAT TESTIMONY?

01:40PM  2     A.   YES, SIR.

01:40PM  3     Q.   FIRST OF ALL, WHERE DID THIS INFORMATION COME FROM THAT IT

01:40PM  4     TOOK AN HOUR?  WHERE WOULD THE SOURCE HAVE BEEN?

01:40PM  5     A.   THAT INFORMATION COMES FROM THERANOS.

01:40PM  6     Q.   AND DID SOMEONE FROM THERANOS EVER TELL YOU THAT IF

01:40PM  7     THERANOS DEVICES FAILED QUALITY CONTROL CHECKS, THEY COULDN'T

01:40PM  8     BE USED AT THAT POINT AND THAT THAT WOULD AFFECT THE TURN

01:40PM  9     AROUND TIME?  DID THEY EXPLAIN THAT TO YOU?

01:40PM  10    A.   I DON'T RECALL EVER HAVING THAT INFORMATION.

01:41PM  11    Q.   AND PRESUMABLY THAT WOULD AFFECT AN HOUR, ONE HOUR TURN

01:41PM  12    AROUND TIME; IS THAT RIGHT?

01:41PM  13    A.   CORRECT.

01:41PM  14    Q.   I'M NOW SHOWING YOU WHAT WAS ADMITTED AS 2394.  THIS IS

01:41PM  15    THE 12TH PAGE OF THAT EXHIBIT, SOME SURVEY RESPONSES OR SCORES.

01:41PM  16         DO YOU SEE THAT?

01:41PM  17    A.   YES, SIR.

01:41PM  18    Q.   AND IT'S BROKEN OUT ABOUT SORT OF THE STAGE IN THE

01:41PM  19    PROCESS, THE INDIVIDUAL'S EXPERIENCE WITH THAT STAGE; IS THAT

01:41PM  20    RIGHT?

01:41PM  21    A.   THAT'S RIGHT.

01:41PM  22    Q.   AND DOES THAT ROUGHLY TRACK HOW THE IPAD ASKED FOR

01:41PM  23    RESPONSES AT THE VARIOUS STAGES?

01:42PM  24    A.   CAN YOU ASK THAT QUESTION AGAIN, SIR?

01:42PM  25    Q.   SURE.  YOU SAID THE PATIENT WOULD FILL OUT THEIR SURVEY

01:42PM 1    RESPONSES ON AN IPAD.  THE KINDS OF QUESTIONS THAT THE PATIENT

01:42PM 2    WAS ASKED TO ANSWER, DID THEY FIT INTO THESE CATEGORIES?

01:42PM 3    A.   YES, THAT'S CORRECT.

01:42PM 4    Q.   SO WAS THERE ANY CATEGORY ABOUT THE ACCURACY OF THE TEST?

01:42PM 5    A.   I DON'T RECALL HAVING ANYTHING LIKE THAT.

01:42PM 6    Q.   AND WOULD THE PATIENT KNOW ANYTHING ABOUT THE ACCURACY OF

01:42PM 7    THE TEST WHEN THEY'RE COMPLETING THIS?

01:42PM 8    A.   NO.  AS I STATED, THE RESULTS ARE NOT YET AVAILABLE TO

01:42PM 9    THEM.  THEY HAD JUST TAKEN -- THE BLOOD WAS JUST DRAWN AT THAT

01:42PM 10   POINT.

01:42PM 11   Q.   AT THIS TIME DURING YOUR TESTIMONY, MR. DOWNEY ALSO ASKED

01:42PM 12   YOU IF YOU KNEW WHETHER THE FORM OF THE BLOOD TEST, WHETHER IT

01:42PM 13   WAS A FINGERSTICK OR VEIN DRAW, MATTERED TO PATIENTS, IF THAT

01:42PM 14   WAS SOMETHING THAT PATIENTS CARED ABOUT.

01:42PM 15        DO YOU RECALL THAT TESTIMONY?

01:42PM 16   A.   YES.

01:42PM 17   Q.   DID WALGREENS AND THERANOS DISCUSS ADVERTISING THE PATIENT

01:42PM 18   EXPERIENCE, WHAT THE PATIENTS WOULD EXPERIENCE IF THEY CAME TO

01:43PM 19   A THERANOS AT A WALGREENS?

01:43PM 20   A.   YES.  WE, WE HAD AN ENTIRE PLAN TO MARKETING BOTH FROM A

01:43PM 21   SCIENCE STANDPOINT, FROM A COMMUNICATIONS STANDPOINT, AND HOW

01:43PM 22   THAT EXPERIENCE WOULD LOOK.

01:43PM 23   Q.   AND DID YOU MARKET OR ADVERTISE THE FINGERSTICK NATURE OF

01:43PM 24   THE TEST?

01:43PM 25   A.   YES.  IF YOU RECALL, THE SIGNAGE HAD A PICTURE OF A SMALL

01:43PM 1    AMOUNT OF BLOOD, AND THE LANGUAGE THAT WE USED WAS A SMALLER

01:43PM 2    TEST, AND THE IDEA WAS THAT IT WOULD USE A SMALL AMOUNT OF

01:43PM 3    BLOOD, AND IT WAS A PAINLESS, EFFICIENT TEST.

01:43PM 4         SO THAT'S WHAT WE USED FOR MARKETING.

01:43PM 5    Q.   DID WALGREENS THINK THAT IT WAS WORTH SPENDING MONEY ON

01:43PM 6    ADVERTISING TO MARKET THE FINGERSTICK?

01:43PM 7    A.   YES.

01:43PM 8    Q.   I THINK I MAY HAVE SAID THAT THE SLIDE I JUST SHOWED YOU

01:44PM 9    WAS PAGE 12.  IT WAS ACTUALLY PAGE 7.  I'M NOW SHOWING YOU

01:44PM 10   PAGE 12, BOTH OF EXHIBIT 2394.

01:44PM 11        SO ON EXHIBIT 2394, PAGE 12, I'M SHOWING YOU A SLIDE THAT

01:44PM 12   MR. DOWNEY SHOWED YOU THAT HAS WHAT PATIENTS WERE SAYING AND

01:44PM 13   QUOTES FROM PATIENTS.

01:44PM 14        DO YOU RECALL THIS TESTIMONY?

01:44PM 15   A.   YES.

01:44PM 16   Q.   FIRST OF ALL, WHO PREPARED THIS SLIDE?

01:44PM 17   A.   I BELIEVE THIS WAS PREPARED BY THE THERANOS TEAM.

01:44PM 18   Q.   WHEN THERANOS PREPARED THIS SLIDE, DID THEY THEN DECIDE

01:44PM 19   THE CONTENT, WHAT KINDS OF FEEDBACK TO PROVIDE TO WALGREENS?

01:44PM 20   A.   YEAH.  WE DIDN'T -- WALGREENS'S TEAM DID NOT HAVE ACCESS

01:44PM 21   TO ANY OF THE RAW DATA FROM THE SURVEY RESULTS.

01:45PM 22        THE RESULTS WERE THEN RECAPPED FOR US THROUGH THE THERANOS

01:45PM 23   TEAM.

01:45PM 24        SO THIS WOULD BE INFORMATION THAT THEY SAW ON SURVEYS AND

01:45PM 25   THEN THEY PRESENTED THAT TO US.

01:45PM 1    Q.  MR. DOWNEY ASKED YOU SOME QUESTIONS ABOUT SOMEONE NAMED

01:45PM 2    DR. LEIDER.

01:45PM 3        DO YOU REMEMBER THAT TESTIMONY?

01:45PM 4    A.  YES, SIR.

01:45PM 5    Q.  AND I THINK YOU TESTIFIED THAT THERE WAS A DISCUSSION

01:45PM 6    INVOLVING YOURSELF, MR. BALWANI, DR. LEIDER, MAYBE SOME OTHERS,

01:45PM 7    AND THAT AT THE END OF THE CALL YOU THOUGHT THAT DR. LEIDER, OR

01:45PM 8    MAYBE THE PARTICIPANTS GENERALLY, WERE SATISFIED WITH THE

01:45PM 9    COMMENTS THAT WERE MADE ABOUT, WAS IT THE ACCURACY OF TESTS?

01:45PM 10   A.  YES.  IT WAS AROUND THE ACCURACY OF A PARTICULAR TEST, I

01:45PM 11   DON'T RECALL WHICH TEST IT WAS, THAT WAS BROUGHT UP BY ONE OF

01:45PM 12   THE NURSE PRACTITIONERS.

01:45PM 13       AND SO DR. CARROLL, WHO OVERSEES THE NURSE PRACTITIONERS,

01:45PM 14   HAD RAISED THAT TO US, TO ME, SO I BROUGHT IN DR. LEIDER AND

01:46PM 15   DR. CARROLL AND INFORMED MR. BALWANI OF THIS, AND THAT'S WHAT

01:46PM 16   CAUSED THE MEETING TO OCCUR.

01:46PM 17       MR. BALWANI, DR. LEIDER, DR. CARROLL, AND THERANOS'S TEAM

01:46PM 18   WAS ON THE PHONE, AND SO THEY HAD A CONFERENCE CALL TO DISCUSS

01:46PM 19   WHAT HAPPENED, WHY THIS HAPPENED.

01:46PM 20       AND I WAS NOT IN THE MEETING AS I WAS RUNNING ANOTHER

01:46PM 21   MEETING AT THE TIME, AND SO WHAT I WAS TOLD WAS THAT THEY WERE

01:46PM 22   SATISFIED WITH WHAT WAS TOLD TO THEM BY THE THERANOS TEAM.

01:46PM 23   Q.  I SEE.  YOU WEREN'T THERE, YOU JUST HEARD DR. LEIDER

01:46PM 24   AFTERWARDS SAY, WHATEVER IT IS THAT I HEARD SATISFIED ME?

01:46PM 25   A.  THAT'S CORRECT.

01:46PM 1    Q.   DO YOU KNOW WHETHER WALGREENS WAS GIVEN ACCESS TO RAW TEST

01:46PM 2    DATA TO BE SATISFIED, TO REACH THAT CONCLUSION THAT THEY WERE

01:46PM 3    SATISFIED?

01:46PM 4    A.   FOR THAT PARTICULAR ISSUE I DO NOT REMEMBER.

01:46PM 5    Q.   DO YOU KNOW WHETHER THEY WERE GIVEN THE THERANOS

01:46PM 6    TECHNOLOGY, A BOX TO UP OPEN AND LOOK INSIDE AND TO REACH THE

01:46PM 7    CONCLUSION THAT THEY SHOULD BE SATISFIED?

01:47PM 8    A.   I'M NOT AWARE OF THAT.

01:47PM 9    Q.   I'M NOW GOING TO SHOW YOU 7454 THAT WAS ALSO ADMITTED.

01:47PM 10        THIS WAS AN EMAIL THAT YOU SENT TO MS. HOLMES AFTER

01:47PM 11   MR. BALWANI SENT YOU AN ARTICLE, AN ARTICLE THAT APPEARED IN

01:47PM 12   "FORTUNE" MAGAZINE, AND IF YOU LOOK ON THIS COVER UNDER THAT

01:47PM 13   HEADING, "AIM TO REVOLUTIONIZE HEALTH CARE," THERE'S A

01:47PM 14   JOURNALIST'S NAME.

01:47PM 15        DO YOU SEE THAT?

01:47PM 16   A.   LET ME SEE IF I CAN READ IT.

01:47PM 17   Q.   I'M HAPPY TO READ IT TO YOU.  I'M JUST WONDERING IF YOU

01:48PM 18   SEE IT AT LEAST GENERALLY.

01:48PM 19   A.   OH, BY ROGER PARLOFF?

01:48PM 20   Q.   YES, CORRECT.

01:48PM 21        WHEN MR. BALWANI SENT YOU THIS ARTICLE, DID YOU ASSUME

01:48PM 22   THAT THE CONTENTS, THE DESCRIPTIONS ABOUT THERANOS WERE

01:48PM 23   ACCURATE?

01:48PM 24   A.   YES.

01:48PM 25   Q.   AND WHEN YOU THEN RESPONDED TO MS. HOLMES AND COMPLIMENTED

01:48PM 1    HER ON THIS COVERAGE, DID YOU ASSUME THAT THE DESCRIPTIONS IN

01:48PM 2    THE ARTICLE ABOUT THERANOS WERE ACCURATE?

01:48PM 3    A.   YES.

01:48PM 4    Q.   YOU ALSO AT THIS TIME SENT AN EMAIL, THE EXHIBIT NUMBER

01:48PM 5    WAS 7471, IN SEPTEMBER OF 2014 WHERE YOU WERE COMPLIMENTARY TO

01:48PM 6    MS. HOLMES.

01:48PM 7         DO YOU RECALL THAT?

01:48PM 8    A.   YES.

01:48PM 9    Q.   AND WHEN YOU SENT THAT EMAIL, WERE YOU STILL ACTING UNDER

01:48PM 10   THE ASSUMPTION THAT MS. HOLMES HAD BEEN HONEST WITH YOU DURING

01:48PM 11   ALL OF YOUR INTERACTIONS WITH HER AND WITH THERANOS?

01:48PM 12   A.   YES.

01:48PM 13            MR. SCHENK:  THANK YOU, YOUR HONOR.

01:48PM 14            MR. DOWNEY:  YOUR HONOR, JUST VERY BRIEFLY.

01:49PM 15                    **RECROSS-EXAMINATION**

01:49PM 16   BY MR. DOWNEY:

01:49PM 17   Q.   MR. JHAVERI, YOU TESTIFIED ON REDIRECT ABOUT THE

01:49PM 18   DEMONSTRATION THAT YOU HAD RECEIVED OF THERANOS TECHNOLOGY.

01:49PM 19        DO YOU RECALL THAT?

01:49PM 20   A.   YES, SIR.

01:49PM 21   Q.   AND THERE WERE VARIOUS TIMES THAT YOU HAD ACTUALLY TRIED

01:49PM 22   TO GET A BLOOD DRAW IN CONNECTION WITH THOSE -- WITH THERANOS?

01:49PM 23   A.   YES.

01:49PM 24   Q.   AND SOMETIMES YOU GOT A DRAW THAT WAS A FINGERSTICK;

01:49PM 25   CORRECT?

01:49PM  1    A.   CORRECT.

01:49PM  2    Q.   AND SOMETIMES YOU GOT A VENOUS DRAW; CORRECT?

01:49PM  3    A.   THAT'S CORRECT.

01:49PM  4    Q.   AND PART OF THAT WAS AN EVALUATION OF HOW THE PROGRAM WAS

01:49PM  5    RUNNING, WHETHER THE SERVICE WAS GOOD, ET CETERA?

01:49PM  6    A.   YEAH.  PART OF THAT WAS FOR ME TO EXPERIENCE WHAT A

01:50PM  7    PATIENT WILL EXPERIENCE, AND SO I DID HAVE A LAB ORDER SENT IN

01:50PM  8    FOR ME AT ONE OF THE STORES BECAUSE I WANTED TO EXPERIENCE WHAT

01:50PM  9    A PATIENT WOULD WALK IN AND EXPERIENCE THEMSELVES, AND SO THAT

01:50PM  10   WAS THE REASON.

01:50PM  11   Q.   AND YOUR PERSONAL EXPERIENCE OF THOSE SERVICES WAS

01:50PM  12   POSITIVE; CORRECT?

01:50PM  13   A.   YES.

01:50PM  14   Q.   YOU WERE ASKED ABOUT WHETHER THERE WAS AN EXPECTATION AT

01:50PM  15   WALGREENS THAT THE TESTS BE ACCURATE; CORRECT?

01:50PM  16        AND YOU UNDERSTOOD THAT, OF COURSE, THE BLOOD TESTS, THAT

01:50PM  17   THERANOS WOULD MAKE EVERY EFFORT FOR THE BLOOD TESTS TO BE

01:50PM  18   ACCURATE; CORRECT?

01:50PM  19   A.   I WOULD ASSUME SO, YES.

01:50PM  20   Q.   NO ONE WOULD WANT TO OFFER INACCURATE BLOOD TESTS;

01:50PM  21   CORRECT?

01:50PM  22   A.   I WOULDN'T THINK SO, YES.

01:50PM  23   Q.   YOU WERE ASKED BY MR. SCHENK ABOUT DEVICES FAILING QUALITY

01:50PM  24   CONTROL.

01:50PM  25        DO YOU RECALL THAT?

01:50PM 1      A.   YES.

01:50PM 2      Q.   YOU WOULD HOPE, WOULD YOU NOT, IF A DEVICE FAILED QUALITY

01:51PM 3      CONTROL, THAT IT WOULD NOT BE USED FOR TESTING THAT DAY;

01:51PM 4      CORRECT?

01:51PM 5      A.   I WOULD HOPE THAT WOULD BE THE CASE, YES.

01:51PM 6      Q.   AND YOUR EXPECTATION IS THAT THE THERANOS LAB WOULD REMOVE

01:51PM 7      THAT DEVICE FROM TESTING FOR THE DAY; CORRECT?

01:51PM 8      A.   YES, THAT WOULD BE MY ASSUMPTION.

01:51PM 9      Q.   AND YOU WOULD WANT THEM TO MAKE SURE THAT THE DEVICE WAS

01:51PM 10     NOT USED AGAIN IN TESTING UNTIL IT HAD PASSED QUALITY CONTROL;

01:51PM 11     CORRECT?

01:51PM 12     A.   CORRECT.

01:51PM 13     Q.   YOU TALKED ABOUT YOUR INTERACTIONS WITH DR. LEIDER AND THE

01:51PM 14     THERANOS TEAM.

01:51PM 15          DO YOU RECALL THAT?

01:51PM 16     A.   YES.

01:51PM 17     Q.   DO YOU KNOW WHETHER HE WAS GIVEN CORRELATION DATA RELATED

01:51PM 18     TO THERANOS TESTS?

01:51PM 19     A.   AGAIN, I DO NOT KNOW WHAT WAS PROVIDED TO HIM DURING THAT

01:51PM 20     CALL.

01:51PM 21     Q.   OKAY.  YOU WERE ASKED ABOUT WHETHER DR. LEIDER OR OTHERS

01:51PM 22     AT WALGREENS WERE GIVEN A THERANOS DEVICE.

01:51PM 23          DO YOU RECALL THAT?

01:51PM 24     A.   YES.

01:51PM 25     Q.   DO YOU KNOW WHETHER DR. ROSAN WAS GIVEN A THERANOS DEVICE?

01:51PM  1    A.   I DO NOT KNOW THAT.

01:52PM  2    Q.   OKAY.  MR. SCHENK ASKED YOU ABOUT THE ARTICLE THAT YOU

01:52PM  3    FORWARDED TO MS. HOLMES.

01:52PM  4         DO YOU RECALL THAT?

01:52PM  5    A.   YES, SIR.

01:52PM  6    Q.   AND DO YOU RECALL AS YOU SIT HERE TODAY THE CONTENTS OF

01:52PM  7    THAT ARTICLE?

01:52PM  8    A.   I COULDN'T STATE EXACTLY WHAT WAS IN THE ARTICLE.

01:52PM  9    Q.   OKAY.  FAIR ENOUGH.

01:52PM 10         THANK YOU.

01:52PM 11              MR. SCHENK:  NOTHING FURTHER.

01:52PM 12              THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:52PM 13              MR. SCHENK:  YES, YOUR HONOR.

01:52PM 14              THE COURT:  MR. DOWNEY, MAY THIS WITNESS BE EXCUSED?

01:52PM 15              MR. DOWNEY:  YES, SIR.

01:52PM 16              THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

01:52PM 17    MUCH.

01:52PM 18              THE WITNESS:  THANK YOU.

01:52PM 19              THE COURT:  YOU'RE WELCOME.  YOU CAN JUST LEAVE ALL

01:52PM 20    OF THE BINDERS AND THINGS THERE.

01:52PM 21              THE WITNESS:  THANK YOU.

01:52PM 22              THE COURT:  THE GOVERNMENT HAS ANOTHER WITNESS?

01:52PM 23              MR. SCHENK:  YES, YOUR HONOR.  THE UNITED STATES

01:53PM 24    CALLS DR. SUNIL DHAWAN.

01:53PM 25              THE COURT:  ALL RIGHT.  THANK YOU.

01:53PM  1          (PAUSE IN PROCEEDINGS.)

01:53PM  2              THE COURT:  GOOD AFTERNOON, SIR.  IF YOU WOULD STAND

01:53PM  3      THERE FOR JUST A MOMENT, OUR COURTROOM DEPUTY WILL BE WITH YOU

01:53PM  4      IN JUST A SECOND.

01:53PM  5          IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE HER, SHE

01:53PM  6      HAS A QUESTION FOR YOU.

01:53PM  7          **(GOVERNMENT'S WITNESS, SUNIL DHAWAN, WAS SWORN.)**

01:54PM  8              THE WITNESS:  YES.

01:54PM  9              THE COURT:  THANK YOU, SIR.  PLEASE HAVE A SEAT

01:54PM 10      HERE.  PLEASE MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

01:54PM 11      THE CHAIR AND MICROPHONE AS YOU NEED.

01:54PM 12          I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

01:54PM 13              WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:54PM 14      AND THEN SPELL IT, PLEASE.

01:54PM 15              THE WITNESS:  SUNIL S. DHAWAN.  S-U-N-I-L, S, LAST

01:54PM 16      NAME IS D-H-A-W-A-N.

01:54PM 17              THE COURT:  THANK YOU.

01:54PM 18          COUNSEL.

01:54PM 19              MR. SCHENK:  THANK YOU, YOUR HONOR.

01:54PM 20                          **DIRECT EXAMINATION**

01:54PM 21      BY MR. SCHENK:

01:54PM 22      Q.   GOOD AFTERNOON, DR. DHAWAN.

01:54PM 23          IF YOU ARE FULLY VACCINATED, AND WITH THE COURT'S

01:54PM 24      PERMISSION, YOU CAN REMOVE YOUR MASK AND TESTIFY WITHOUT THE

01:54PM 25      MASK IF YOU WOULD LIKE.

01:54PM  1   A.   SURE.

01:54PM  2   Q.   DR. DHAWAN, HOW ARE YOU CURRENTLY EMPLOYED?

01:54PM  3   A.   AT THE CENTER FOR DERMATOLOGY IN FREMONT AND MILPITAS,

01:55PM  4   CALIFORNIA.

01:55PM  5   Q.   DO YOU MIND PULLING THE MICROPHONE JUST A LITTLE BIT

01:55PM  6   CLOSER?

01:55PM  7   A.   SURE.  FREMONT AND MILPITAS, CALIFORNIA.

01:55PM  8   Q.   AT THE CENTER FOR DERMATOLOGY?

01:55PM  9   A.   YES.

01:55PM 10   Q.   AND WHAT DO YOU DO THERE?

01:55PM 11   A.   I'M A DERMATOLOGIST AND RUN A CLINICAL TRIAL PRACTICE.

01:55PM 12   Q.   AND WHAT IS THAT, THE CLINICAL TRIAL PRACTICE?

01:55PM 13   A.   WE RUN CLINICAL TRIALS FOR LARGE AND SMALL DRUG COMPANIES

01:55PM 14   AND DEVICE COMPANIES AND ARTIFICIAL INTELLIGENCE DEVICES,

01:55PM 15   THINGS LIKE THAT IN DERMATOLOGY.

01:55PM 16   Q.   AND HOW LONG HAVE YOU HAD THAT PRACTICE?

01:55PM 17   A.   I'VE BEEN IN PRACTICE FOR 32 YEARS IN DERMATOLOGY, AND

01:55PM 18   18 YEARS IN CLINICAL RESEARCH PRACTICE.

01:55PM 19   Q.   AND WHEN DID YOU GET YOUR MEDICAL DEGREE?

01:55PM 20   A.   AT THE UNIVERSITY OF SOUTHERN CALIFORNIA IN 1983.

01:55PM 21   Q.   OKAY.  AND DID YOU WORK SOMEWHERE AFTER YOU GRADUATED FROM

01:55PM 22   MEDICAL SCHOOL AND BEFORE YOUR PRACTICE?

01:55PM 23   A.   I WAS IN TRAINING TWICE.  I TRAINED IN INTERNAL MEDICINE

01:55PM 24   AND THEN WORKED FOR A YEAR IN BETWEEN, AND THEN DID A RESIDENCY

01:55PM 25   IN DERMATOLOGY.

01:55PM  1    Q.   OKAY.  AT YOUR CURRENT MEDICAL PRACTICE, DO YOU HAVE

01:56PM  2    EXPERIENCE RUNNING LAB TESTS?

01:56PM  3    A.   YES, WE DO.

01:56PM  4    Q.   WOULD YOU DESCRIBE THAT FOR US?

01:56PM  5    A.   IT'S HISTOPATHOLOGY CURRENTLY, COMPLEX HISTOPATHOLOGY

01:56PM  6    BASED ON THE CLIA REQUIREMENTS.

01:56PM  7    Q.   WHAT IS HISTOPATHOLOGY?

01:56PM  8    A.   ANALYZING SLIDES THAT HAVE BEEN PREPARED FROM BIOPSY

01:56PM  9    SPECIMENS THAT ARE TAKEN FROM PATIENTS.

01:56PM  10   Q.   SO A PATIENT IS BIOPSIED, THAT SUBSTANCE IS PUT ON A

01:56PM  11   SLIDE, AND THEN YOU LOOK AT THE SLIDE UNDER A MICROSCOPE?

01:56PM  12   A.   YES.

01:56PM  13   Q.   DO YOU KNOW SOMEONE NAMED SUNNY BALWANI?

01:56PM  14   A.   YES, I DO.

01:56PM  15   Q.   AND HOW DO YOU KNOW HIM?

01:56PM  16   A.   HE WAS A PATIENT OF MINE FOR ALMOST, I THINK, 15 YEARS IF

01:56PM  17   I REMEMBER CORRECTLY.

01:56PM  18   Q.   DID -- DURING THE COURSE OF TREATING MR. BALWANI, DID HE

01:56PM  19   TELL YOU WHERE HE WORKED?

01:57PM  20   A.   INITIALLY HE WAS DOING SOME STARTUPS FROM WHAT I RECALL,

01:57PM  21   AND THEN HE TOLD ME, I THINK SOMETIME IN '14 OR '15, THAT HE

01:57PM  22   WAS WORKING AT THERANOS.

01:57PM  23   Q.   IN 2014 OR 2015?

01:57PM  24   A.   MY RECOLLECTION, YES.

01:57PM  25   Q.   OKAY.  WAS THERE A POINT IN TIME WHEN MR. BALWANI ASKED IF

01:57PM  1    YOU WANTED TO WORK FOR THERANOS?

01:57PM  2    A.   HE ASKED IF I WOULD TAKE ON THE ROLE AS A LAB DIRECTOR, OR

01:57PM  3    A MEDICAL DIRECTOR.

01:57PM  4    Q.   MR. BALWANI ASKED IF YOU WOULD SERVE AS THE LAB DIRECTOR

01:57PM  5    AT THERANOS?

01:57PM  6    A.   FOR A LIMITED LENGTH OF TIME.

01:57PM  7    Q.   OKAY.  THE JOB WOULD BE FOR A LIMITED PERIOD OF TIME?

01:57PM  8    A.   AS WAS TOLD TO ME, YES.

01:57PM  9    Q.   AND DID MR. BALWANI TELL YOU WHY THERANOS NEEDED A LAB

01:57PM 10    DIRECTOR?

01:57PM 11    A.   I BELIEVE THAT EITHER THE PREVIOUS LAB DIRECTOR HAD

01:58PM 12    LEFT -- THAT'S WHAT I WAS LED TO BELIEVE.

01:58PM 13    Q.   YOU SAID "LED TO BELIEVE."  BY MR. BALWANI?

01:58PM 14    A.   YES.

01:58PM 15    Q.   DID HE TELL YOU ANYTHING ABOUT THE CIRCUMSTANCES?  DID HE

01:58PM 16    TELL YOU --

01:58PM 17    A.   NO.

01:58PM 18    Q.   DID HE TELL YOU THE PRIOR LAB DIRECTOR'S NAME?

01:58PM 19    A.   I CAN'T RECALL.

01:58PM 20    Q.   HE MAY HAVE, YOU JUST DON'T REMEMBER?

01:58PM 21    A.   I DON'T REMEMBER.

01:58PM 22    Q.   LET'S TURN --

01:58PM 23         ACTUALLY, YOUR HONOR, MAY I APPROACH?

01:58PM 24              THE COURT:  YES.

01:58PM 25              MR. SCHENK:  THANK YOU.

01:58PM  1           (HANDING.)

01:58PM  2      Q.   DR. DHAWAN, CAN I ASK YOU TO TURN TO EXHIBIT 2219 IN YOUR

01:58PM  3      BINDER.

01:58PM  4           YOUR HONOR, I BELIEVE -- THE GOVERNMENT IS OFFERING THIS

01:58PM  5      BASED ON A STIPULATION BETWEEN THE PARTIES.

01:58PM  6                MR. WADE:  CORRECT, YOUR HONOR.

01:58PM  7                THE COURT:  THANK YOU, MR. WADE.

01:58PM  8           IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:59PM  9           (GOVERNMENT'S EXHIBIT 2219 WAS RECEIVED IN EVIDENCE.)

01:59PM 10                MR. SCHENK:  THANK YOU.

01:59PM 11                THE WITNESS:  I'M SORRY.  I SEE 2214.  MAYBE I'M

01:59PM 12      MISSING SOMETHING.

01:59PM 13      BY MR. SCHENK:

01:59PM 14      Q.   THE 9 MIGHT LOOK LIKE A 4.  LET'S GO WITH THAT EXHIBIT.

01:59PM 15      IT ALSO IS ON THE SCREEN IN FRONT OF YOU.

01:59PM 16      A.   YEAH, I DON'T SEE IT IN HERE.

01:59PM 17           YEAH, I SEE IT ON THE SCREEN.  SORRY.  YES.

01:59PM 18      Q.   WE CAN GO ON THE SCREEN IF THAT'S NOT WORKING FOR YOU.

01:59PM 19      A.   NO, THAT'S FINE.

01:59PM 20      Q.   SO IS THIS AN EMAIL EXCHANGE BETWEEN YOURSELF AND

01:59PM 21      MR. BALWANI IN NOVEMBER OF 2014?

01:59PM 22      A.   YES.

01:59PM 23      Q.   AND IF WE COULD START ON PAGE 2 AT THE BOTTOM.  IT LOOKS

01:59PM 24      LIKE ON NOVEMBER 14TH, 2014, MR. BALWANI WROTE TO YOU, "SUNIL.

01:59PM 25           "THANKS FOR TAKING MY CALL.

01:59PM  1          "THE TIME COMMITMENT IS VERY MINIMAL.  THIS WILL BE MOSTLY

02:00PM  2     AN ON CALL CONSULTING ROLE AND I AM EXTREMELY CONFIDENT THAT IT

02:00PM  3     WON'T INTERFERE WITH YOUR WORK OR WITH YOUR FAMILY LIFE.  I AM

02:00PM  4     ATTACHING THE REQUIREMENTS HERE.  PLEASE LET ME KNOW IF YOU

02:00PM  5     WILL BE ABLE TO DO THIS OR PERHAPS SOMEONE ELSE YOU KNOW.  THIS

02:00PM  6     WILL BE 1-3 MONTHS," AND THEN IT CONTINUES ON THE NEXT PAGE,

02:00PM  7     "ROLE."

02:00PM  8          DO YOU SEE THAT?

02:00PM  9     A.   YES.

02:00PM 10     Q.   AND THEN AT THE BOTTOM OF THAT NEXT PAGE, IT LOOKS LIKE

02:00PM 11     MR. BALWANI INCLUDED SOME CLIA REGULATIONS.

02:00PM 12          DO YOU RECALL THAT?

02:00PM 13     A.   YES.  I MEAN, BASED ON THIS EMAIL, YES.

02:00PM 14     Q.   AND WAS THIS THE TIMEFRAME WE WERE JUST TALKING ABOUT?

02:00PM 15     THE PERIOD OF TIME IS NOVEMBER OF 2014, AND MR. BALWANI IS

02:00PM 16     ASKING YOU IF YOU COULD SERVE IN A ROLE AT THERANOS?

02:00PM 17     A.   YES.

02:00PM 18     Q.   ABOVE THE EMAIL I JUST READ TO YOU, ON THE SECOND PAGE YOU

02:00PM 19     RESPOND TO MR. BALWANI, "SUNNY.

02:01PM 20          "I CAN DO THIS - WHAT IS NEXT STEP?"

02:01PM 21          IS THAT RIGHT?

02:01PM 22     A.   YES.

02:01PM 23     Q.   WHEN YOU AGREED TO BE THE LAB DIRECTOR, WHAT DID YOU

02:01PM 24     UNDERSTAND THERANOS DID?

02:01PM 25     A.   LAB -- DRAWING BLOOD AND RUNNING LAB TESTS.

02:01PM  1     Q.   DO YOU KNOW ON WHAT DEVICES THEY TESTED BLOOD?

02:01PM  2     A.   GENERALLY WHAT I HAD SEEN ON -- IN THE INTERNET AND

02:01PM  3     GOOGLING THE MATERIAL, YES.

02:01PM  4     Q.   AND WHAT DID YOU LEARN?

02:01PM  5     A.   I MEAN, I LEARNED IT WAS SUPPOSED TO BE A NOVEL, NEW

02:01PM  6     METHOD OF RUNNING BLOOD TESTS ON A NEW PLATFORM.

02:01PM  7     Q.   WHEN YOU WERE THINKING ABOUT TAKING THIS JOB TO WORK AT

02:01PM  8     THERANOS, YOU OBTAINED INFORMATION ABOUT WHAT THERANOS DID BY

02:01PM  9     LOOKING ON GOOGLE?

02:01PM  10    A.   BASICALLY, YES.

02:01PM  11    Q.   AND HOW ABOUT IN YOUR CONVERSATIONS WITH MR. BALWANI?  DID

02:01PM  12    HE DESCRIBE TO YOU WHAT THERANOS DID AND WHAT YOUR JOB WOULD

02:01PM  13    BE?

02:01PM  14    A.   BASED ON THE EMAIL IS ESSENTIALLY WHAT OUR DISCUSSION WAS

02:02PM  15    AND THERE WAS NO -- I BELIEVE WE HAD ONE SHORT CONVERSATION

02:02PM  16    ABOUT IT.

02:02PM  17    Q.   OKAY.  AND NOW IF WE CAN GO TO THE FIRST PAGE OF THIS

02:02PM  18    EXHIBIT, AT THE VERY TOP THERE'S AN EMAIL FROM MR. BALWANI TO

02:02PM  19    YOU, NOVEMBER 19TH, 2014, AND HE WRITES IN THAT SECOND

02:02PM  20    PARAGRAPH, "WE HAVE ALL PAPERWORK IN PLACE AND I WILL HAVE ONE

02:02PM  21    OF THE COURIERS BRING IT BY YOUR OFFICE TOMORROW A.M. FOR YOUR

02:02PM  22    SIGNATURE."

02:02PM  23         DO YOU RECALL WHETHER THAT HAPPENED?  DID MR. BALWANI

02:02PM  24    BRING PAPERWORK TO YOU AND YOU SIGNED AND BECAME LAB DIRECTOR?

02:02PM  25    A.   I DON'T EXACTLY RECALL THE DATE, BUT I BELIEVE WE HAD A

02:02PM   1   TIMEFRAME AROUND THAT TIME.  BUT I'D HAVE TO GO BACK AND LOOK

02:02PM   2   AT THE RECORDS.

02:02PM   3   Q.  YOU DON'T REMEMBER EXACTLY THE DATE, BUT GENERALLY AROUND

02:02PM   4   THIS TIME?

02:02PM   5   A.  GENERALLY, YES.

02:02PM   6   Q.  OKAY.  IF YOU COULD NOW TURN IN YOUR BINDER TO 2248.

02:03PM   7        YOUR HONOR, THE GOVERNMENT IS OFFERING THIS EXHIBIT

02:03PM   8   PURSUANT TO STIPULATION.

02:03PM   9            MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:03PM  10            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:03PM  11        (GOVERNMENT'S EXHIBIT 2248 WAS RECEIVED IN EVIDENCE.)

02:03PM  12            THE WITNESS:  I APOLOGIZE.  I HAVE 2275, AND I'M

02:03PM  13   SORRY, 2275 AND 2239.  I JUST DON'T HAVE 22 --

02:03PM  14   BY MR. SCHENK:

02:03PM  15   Q.  YOU DON'T HAVE 2248?

02:03PM  16   A.  IT'S NOT IN THIS SEQUENCE THAT I'M LOOKING AT, SO I'M

02:03PM  17   SORRY.  2248, I DO NOT HAVE THAT HERE.

02:03PM  18   Q.  AND IT'S ON THE SCREEN IN FRONT OF YOU.  LET ME KNOW IF --

02:03PM  19   A.  YEAH, I SEE IT.

02:03PM  20            THE COURT:  HE'S GOING TO SWAP BINDERS WITH THE

02:03PM  21   CLERK.

02:03PM  22            MR. SCHENK:  THANK YOU VERY MUCH.

02:03PM  23   Q.  NOW WE'RE LOOKING AT 2248.  IT'S AN EMAIL TO YOU.

02:04PM  24        FIRST OF ALL, THAT'S YOUR EMAIL ADDRESS, BUT REDACTED; IS

02:04PM  25   THAT RIGHT?

02:04PM  1    A.   YES, YES.

02:04PM  2    Q.   WHAT I'M LOOKING AT ON THE SCREEN?

02:04PM  3    A.   YES.

02:04PM  4    Q.   THANK YOU.  THE CONTENT SAYS, "HI DR. DHAWAN.

02:04PM  5         "ATTACHED PLEASE FIND AN EXECUTED COPY OF THE CONSULTING

02:04PM  6    AGREEMENT FOR YOUR RECORDS."

02:04PM  7         AND I WANT TO ASK YOU SOME QUESTIONS ABOUT THE CONSULTING

02:04PM  8    AGREEMENT, SO LET'S TURN TO PAGE 2.

02:04PM  9         AND IN THE FIRST PARAGRAPH IT WAS ENTERED INTO AS OF, AND

02:04PM 10    THEN THERE'S A DATE, NOVEMBER 19TH, 2014.

02:04PM 11         IS THAT CONSISTENT WITH YOUR RECOLLECTION OF WHEN YOU

02:04PM 12    BECAME AN EMPLOYEE AT THERANOS?

02:04PM 13    A.   YES.

02:04PM 14    Q.   AND IF WE COULD TURN NOW TO PAGE 6.

02:04PM 15         THERE'S SOME SIGNATURES ON PAGE 6.

02:04PM 16         FIRST, IS THAT YOUR SIGNATURE?

02:04PM 17    A.   YES.

02:04PM 18    Q.   AND THEN IS THERE A SIGNATURE ABOVE THE NAME

02:05PM 19    SUNNY BALWANI?

02:05PM 20    A.   YES, THAT -- I ASSUME THAT'S HIS SIGNATURE, YEAH.

02:05PM 21    Q.   THERE'S A SIGNATURE ABOVE THAT?

02:05PM 22    A.   YES, YES, YES.

02:05PM 23    Q.   AND THEN IF YOU'LL TURN TO THE NEXT PAGE, PAGE 7,

02:05PM 24    EXHIBIT A, THE FIRST IS YOUR PRINCIPAL COMPANY CONTACT IS

02:05PM 25    SUNNY BALWANI, PRESIDENT, COO.

02:05PM  1          DO YOU SEE THAT?

02:05PM  2     A.   YES.

02:05PM  3     Q.   AND WAS MR. BALWANI YOUR PRINCIPAL CONTACT DURING THE TIME

02:05PM  4     YOU WORKED AT THERANOS?

02:05PM  5     A.   YES.

02:05PM  6     Q.   UNDER NUMBER 2, THE SERVICES, IT LISTS THE SERVICES AND IT

02:05PM  7     SAYS, "SERVING AS A LABORATORY DIRECTOR AND CLINICAL CONSULTANT

02:05PM  8     OF THERANOS'S CLIA LABORATORY IN CALIFORNIA AND FULFILLING THE

02:05PM  9     DUTIES OF A CALIFORNIA-LICENSED AND CLIA-QUALIFIED CLINICAL

02:05PM  10    LABORATORY DIRECTOR AND CLINICAL CONSULTANT."

02:05PM  11         IS THAT CONSISTENT WITH WHAT YOUR ROLE AT THERANOS WAS?

02:05PM  12    A.   YES.

02:05PM  13    Q.   AND UNDER COMPENSATION, IT SAYS THAT YOU WILL BE PAID

02:06PM  14    $5,000 PER MONTH.

02:06PM  15         IS THAT THE INITIAL PAYMENT OFFER THAT YOU RECEIVED FROM

02:06PM  16    THERANOS?

02:06PM  17    A.   YES.

02:06PM  18    Q.   WAS THERE A POINT IN TIME WHEN YOU TALKED TO MR. BALWANI

02:06PM  19    ABOUT CONVERTING THAT FROM CASH TO STOCK OPTIONS?

02:06PM  20    A.   YES.

02:06PM  21    Q.   AND WHAT DO YOU RECALL ABOUT THAT?

02:06PM  22    A.   I ASKED IF THAT COULD BE DONE, AND I THINK HE SAID IT

02:06PM  23    COULD BE.

02:06PM  24    Q.   AND DID YOU EVER CASH ANY CHECKS YOU RECEIVED FROM

02:06PM  25    THERANOS?

02:06PM  1    A.   NO.

02:06PM  2    Q.   HOW ABOUT OPTIONS?  DO YOU RECALL RECEIVING OPTIONS?

02:06PM  3    A.   I RECEIVED AN OPTION, I BELIEVE THEY'RE CALLED RSU'S.

02:06PM  4    Q.   RSU'S?

02:06PM  5    A.   I BELIEVE.  I'D HAVE TO GO BACK AND LOOK AT MY RECORDS.

02:06PM  6    BUT THERE WERE SOME OPTIONS GRANTED TO ME.

02:06PM  7    Q.   OKAY.  NOW I'D LIKE TO TALK TO YOU ABOUT A CHUNK OF TIME.

02:06PM  8         IN NOVEMBER OF 2014, YOU SIGNED THIS CONTRACT AND BECAME A

02:06PM  9    LAB DIRECTOR AT THERANOS; IS THAT RIGHT?

02:06PM  10   A.   YES.

02:06PM  11   Q.   NOW, TALK TO ME ABOUT NOVEMBER OF 2014 THROUGH ABOUT JUNE

02:07PM  12   OR JULY OF 2015, SO SEVEN OR EIGHT MONTHS, SOMETHING LIKE THAT.

02:07PM  13        SO I FIRST WANT TO KNOW, WHAT TYPE OF WORK DID YOU DO?

02:07PM  14   DID YOU GO TO THERANOS EVERY DAY?

02:07PM  15   A.   NO.

02:07PM  16   Q.   HOW MANY TIMES DID YOU GO TO THERANOS DURING THAT PERIOD

02:07PM  17   OF TIME THAT I JUST OUTLINED?

02:07PM  18   A.   SO THIS IS GOING BACK SIX YEARS.

02:07PM  19        SO MY RECOLLECTION IS WE VISITED THE LAB.  I CAN'T TELL

02:07PM  20   YOU THE NUMBER OF TIMES, BUT IT WASN'T VERY MANY.  I BELIEVE I

02:07PM  21   WENT.  AND THEN I WENT AGAIN, AND THAT WAS ABOUT IT.

02:07PM  22   Q.   SO TWO TIMES?

02:07PM  23   A.   PROBABLY.  I'D HAVE TO LOOK BACK AT MY RECORDS.

02:07PM  24   Q.   AND SO THAT'S TWO TIMES DURING THE COURSE OF TIME I

02:07PM  25   OUTLINED FOR YOU?

02:07PM 1    A.   YES.  I BELIEVE UNTIL AUGUST.

02:07PM 2    Q.   UNTIL AUGUST OF 2015?

02:07PM 3    A.   YES.

02:07PM 4    Q.   OKAY.  WE'LL TAKE THAT SEPARATELY IN A MOMENT.

02:07PM 5         DURING THIS PERIOD OF TIME, DID YOU SEE THE THERANOS

02:07PM 6    TECHNOLOGY, A DEVICE OR SOMETHING?

02:07PM 7    A.   ON ONE TOUR OF THE LAB, I BELIEVE I DID.  BUT THIS IS

02:08PM 8    GOING BACK QUITE SOME TIME.

02:08PM 9    Q.   OKAY.  DO YOU REMEMBER WHO GAVE YOU THAT TOUR?

02:08PM 10   A.   SUNNY AND OTHER STAFF MEMBERS IN THE LAB.

02:08PM 11   Q.   DO YOU RECALL DURING THE TOUR IF MR. BALWANI DESCRIBED TO

02:08PM 12   YOU WHAT YOU WERE LOOKING AT AND WHAT THE DEVICE WAS?

02:08PM 13   A.   HE NAMED THEM.

02:08PM 14   Q.   DO YOU RECALL WHAT HE CALLED THEM?

02:08PM 15   A.   WELL, ONE WAS A SIEMENS DEVICE, AND I DON'T RECALL THE

02:08PM 16   OTHER PART OF THE CONVERSATION.

02:08PM 17   Q.   ONE -- I'M SORRY -- YOU SAID WAS?

02:08PM 18   A.   SIEMENS.

02:08PM 19   Q.   OKAY.  AND HOW ABOUT DEVICES -- DID MR. BALWANI SAY HE WAS

02:08PM 20   SHOWING YOU ANY DEVICES THAT WERE MANUFACTURED BY THERANOS?

02:08PM 21   A.   I DON'T RECALL.

02:08PM 22   Q.   OKAY.  DURING THIS PERIOD OF TIME, NOVEMBER TO JUNE OR

02:08PM 23   JULY, AGAIN, DID YOU HAVE ANY OCCASION TO INTERACT WITH A

02:08PM 24   PATIENT?  DID A PATIENT CALL YOU AND ASK QUESTIONS ABOUT THEIR

02:08PM 25   LAB RESULTS?

02:08PM  1    A.   NO.

02:08PM  2    Q.   DID A DOCTOR EVER CALL YOU AND ASK QUESTIONS ABOUT THEIR

02:08PM  3    LAB RESULTS?

02:09PM  4    A.   NO.

02:09PM  5    Q.   DID YOU EVER INTERACT WITH EMPLOYEES OF THERANOS THAT

02:09PM  6    WORKED IN THE LAB?

02:09PM  7    A.   NO.

02:09PM  8    Q.   THERE WASN'T ONE TIME THAT YOU SPOKE TO A THERANOS

02:09PM  9    EMPLOYEE THAT WORKED IN THE LAB?

02:09PM 10    A.   I DON'T RECALL ANY CONVERSATIONS IN THAT LENGTH OF TIME

02:09PM 11    OTHER THAN BEFORE AUGUST, I BELIEVE.

02:09PM 12    Q.   WAS THERE A TIME WHEN SOMEONE WORKED IN THE LAB AND HAD A

02:09PM 13    QUESTION ABOUT WHETHER THEY SHOULD REPORT A RESULT?  THEY DID A

02:09PM 14    BLOOD TESTS AND ACHIEVED A RESULT AND THEY WONDERED WHETHER

02:09PM 15    THIS RESULT SHOULD BE REPORTED?  DID THAT EVER HAPPEN WHERE

02:09PM 16    SOMEONE CAME TO YOU WITH THAT QUESTION?

02:09PM 17    A.   I GOT NO CONTACT THAT I CAN RECALL FROM SOMEONE BY EMAIL

02:09PM 18    OR BY PHONE.

02:09PM 19    Q.   WAS THERE AN OCCASION WHEN THE THERANOS -- DO YOU KNOW THE

02:09PM 20    CONCEPT OF QUALITY CONTROL, QC?

02:09PM 21    A.   YES.  WE HAVE TO IMPLEMENT THAT IN WHAT WE DO CURRENTLY.

02:09PM 22    Q.   YOU DO THAT AT YOUR DERMATOLOGY?

02:10PM 23    A.   WE HAVE TO, YEAH.

02:10PM 24    Q.   AND WAS THERE EVER A TIME WHEN SOMEONE AT THERANOS CALLED

02:10PM 25    YOU WITH QUESTIONS REGARDING THE QC WORK THAT THERANOS WAS

02:10PM  1    DOING?

02:10PM  2    A.   NO.

02:10PM  3    Q.   CAN YOU ESTIMATE FOR ME HOW MANY HOURS YOU WORKED FOR

02:10PM  4    THERANOS DURING THIS PERIOD OF TIME?  I DON'T MEAN EACH WEEK, I

02:10PM  5    JUST MEAN TOTAL.

02:10PM  6    A.   I'D HAVE TO LOOK -- THINK BACK TO MY SCHEDULE OR -- IT

02:10PM  7    CAN'T HAVE BEEN MORE THAN FIVE OR TEN, AND MAYBE NOT -- I MEAN,

02:10PM  8    IT JUST WAS NOT A LOT.

02:10PM  9    Q.   MAYBE FIVE OR TEN TOTAL HOURS --

02:10PM  10   A.   YEAH.

02:10PM  11   Q.   -- FROM NOVEMBER 2014 THROUGH JUNE OR JULY OF 2015?

02:10PM  12   A.   YEAH.

02:10PM  13   Q.   DO YOU KNOW -- LET'S TURN NOW TO AUGUST OF 2015.

02:11PM  14   A.   YES, YES.

02:11PM  15   Q.   DO YOU KNOW WHETHER THE FDA DID AN INSPECTION AT THERANOS

02:11PM  16   IN AUGUST OF 2015?

02:11PM  17   A.   I WAS NEVER TOLD ABOUT -- OR I DON'T RECALL BEING TOLD

02:11PM  18   ANYTHING ABOUT AN FDA INSPECTION IN AUGUST OF 2015.

02:11PM  19   Q.   FROM NOVEMBER OF 2014 THROUGH AUGUST NOW OF 2015, DID YOU

02:11PM  20   EVER HIRE ANYONE TO WORK IN THE LAB?

02:11PM  21   A.   NO.

02:11PM  22   Q.   DURING THAT SAME PERIOD OF TIME, DID YOU EVER FIRE ANYONE

02:11PM  23   THAT WORKED IN THE LAB?

02:11PM  24   A.   NO.

02:11PM  25   Q.   DO YOU KNOW WHO MADE THE HIRING DECISIONS OR THE FIRING

02:11PM  1    DECISIONS AT THE LAB?

02:11PM  2    A.   I WAS NEVER TOLD THAT.

02:11PM  3    Q.   IF YOU'LL TURN IN YOUR BINDER TO 2663.

02:12PM  4         YOUR HONOR, THE GOVERNMENT OFFERS 2663 PURSUANT TO

02:12PM  5    STIPULATION OF THE PARTIES.

02:12PM  6              MR. WADE:   THAT'S CORRECT, YOUR HONOR.

02:12PM  7              THE COURT:   IT'S ADMITTED BY STIPULATION, AND IT MAY

02:12PM  8    BE PUBLISHED.

02:12PM  9              MR. SCHENK:   THANK YOU.

02:12PM  10        (GOVERNMENT'S EXHIBIT 2663 WAS RECEIVED IN EVIDENCE.)

02:12PM  11   BY MR. SCHENK:

02:12PM  12   Q.   NOW WE'RE IN AUGUST OF 2015.

02:12PM  13        AUGUST 4TH, SOMEONE NAMED LANGLY GEE IS SENDING AN EMAIL

02:12PM  14   TO YOU AND ANOTHER INDIVIDUAL NAMED DANIEL YOUNG.

02:12PM  15        DO YOU SEE THAT?

02:12PM  16   A.   YES.

02:12PM  17   Q.   AND MR. GEE WRITES, "HI DR. DHAWAN:

02:12PM  18        "MY NAME IS LANGLY GEE AND I AM THE QA/QC MANAGER FOR

02:12PM  19   THERANOS, INC."

02:12PM  20        HAD YOU MET MR. GEE BEFORE THIS DATE?

02:12PM  21   A.   I DON'T -- NO, I DON'T REMEMBER MEETING HIM BEFORE THIS

02:12PM  22   DATE.

02:12PM  23   Q.   AND DOES IT SEEM LIKE HE'S INTRODUCING HIMSELF TO YOU?

02:12PM  24   A.   YES.

02:12PM  25   Q.   AND IN THE SECOND PARAGRAPH HE WRITES, "I WAS GIVEN YOUR

02:12PM   1    EMAIL ADDRESS FROM DANIEL YOUNG AND I AM TO BEGIN SENDING YOU

02:13PM   2    DOCUMENTS FOR YOUR SIGNATURE."

02:13PM   3         THERE'S A REFERENCE TO AN INDIVIDUAL NAMED DANIEL YOUNG.

02:13PM   4         DO YOU REMEMBER MEETING HIM AT THIS TIME?  WAS HE A KNOWN

02:13PM   5    NAME TO YOU?

02:13PM   6    A.   I DON'T RECALL MEETING HIM.

02:13PM   7    Q.   HE SAYS THAT HE'S GOING TO BEGIN SENDING DOCUMENTS TO YOU

02:13PM   8    FOR YOUR SIGNATURE.

02:13PM   9         DO YOU RECALL THAT HAPPENING?  DO YOU RECALL BEING SENT

02:13PM  10    DOCUMENTS FROM THERANOS THAT NEEDED YOUR SIGNATURE?

02:13PM  11    A.   YES.

02:13PM  12    Q.   THE EMAIL CONTINUES, "MY FIRST SET OF SEVEN DOCUMENTS

02:13PM  13    (VALIDATION, SOP'S AND EMPLOYEE TRAINING) HAS TO DO WITH

02:13PM  14    THERANOS'S NEW LAUNCH OF T-CELL, B CELL, NK-CELL ASSAY."

02:13PM  15         DO YOU SEE THAT?

02:13PM  16    A.   YES.

02:13PM  17    Q.   DO YOU HAVE EXPERIENCE WITH SOP'S?

02:13PM  18    A.   WE USE THEM IN OUR CLINICAL TRIAL PRACTICE, AND WE HAVE

02:13PM  19    SOME FOR OUR PRACTICE AS WELL.

02:13PM  20    Q.   "THESE DOCUMENTS WILL ARRIVE IN YOUR EMAIL TODAY THROUGH

02:13PM  21    THE DOCUSIGN APPLICATION.  PLEASE REVIEW THESE DOCUMENTS AND I

02:14PM  22    HAVE SET UP A SPECIFIC PAGE ON EACH DOCUMENT FOR YOU TO

02:14PM  23    ELECTRONICALLY SIGN, PRINT NAME AND DATE."

02:14PM  24         AND IT CONTINUES, "ONCE YOU RECEIVE THE EMAIL, YOU WILL

02:14PM  25    HAVE 30 DAYS TO REVIEW THE DOCUMENTS AND SEND THEM BACK TO ME.

02:14PM 1    GOING FORWARD THERE WILL BE AT LEAST ANOTHER 300-400 MORE

02:14PM 2    DOCUMENTS FOR YOUR REVIEW.  I WOULD LIKE TO ASK YOUR OPINION AS

02:14PM 3    TO HOW YOU WOULD LIKE THEM SENT, IE, ALL AT ONCE, 50 PER WEEK.

02:14PM 4    PLEASE ADVISE."

02:14PM 5        DO YOU RECALL THIS EMAIL BEING FOLLOWED UP WITH DOCUMENTS

02:14PM 6    THAT YOU NEEDED TO SIGN?

02:14PM 7    A.   YES.

02:14PM 8    Q.   IF WE CAN TURN NOW TO 2760.

02:14PM 9        YOUR HONOR, THE GOVERNMENT OFFERS THIS PURSUANT TO

02:14PM 10   STIPULATION OF THE PARTIES.

02:14PM 11           MR. WADE:  THAT'S CORRECT.

02:14PM 12           THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:14PM 13   BE PUBLISHED.

02:14PM 14           MR. SCHENK:  THANK YOU.

02:14PM 15       (GOVERNMENT'S EXHIBIT 2760 WAS RECEIVED IN EVIDENCE.)

02:14PM 16   BY MR. SCHENK:

02:14PM 17   Q.   AND IF WE CAN START ON THE SECOND PAGE OF THIS EMAIL

02:15PM 18   CHAIN.

02:15PM 19       WE HAVE NOW MOVED INTO SEPTEMBER.

02:15PM 20       MR. BALWANI IS WRITING YOU AN EMAIL SEPTEMBER 9, 2015.

02:15PM 21       DO YOU SEE THAT?

02:15PM 22   A.   YES.

02:15PM 23   Q.   AND IN IT I WANT TO DRAW YOUR ATTENTION -- WELL, FIRST,

02:15PM 24   THE PARAGRAPH THAT BEGINS, "THE ISSUANCE," IS THAT TALKING

02:15PM 25   ABOUT THE STOCK OPTIONS THAT WE TALKED ABOUT A MOMENT AGO?

02:15PM  1    A.   YES.

02:15PM  2    Q.   AND THE SECOND PARAGRAPH -- I'M SORRY, THE PARAGRAPH AFTER

02:15PM  3    THAT IT BEGINS, "I ALSO NEED," IS WHERE I WANT TO ASK YOU SOME

02:15PM  4    QUESTIONS.

02:15PM  5         "I ALSO NEED YOUR HELP ON AN ADDITIONAL MATTER.  WE HAVE A

02:15PM  6    LAB AUDIT COMING UP ON 9-22 AT 9:00 A.M. (THESE HAPPEN ONCE

02:15PM  7    EVERY TWO YEARS), AND WANTED TO SEE IF YOU CAN BE PRESENT FOR

02:15PM  8    AT LEAST THE FIRST PART OF IT.  I HAVE A VERY CAPABLE TEAM THAT

02:15PM  9    HAS TAKEN CARE OF ALL OF THE DETAILS AS ALWAYS, BUT WOULD LIKE

02:15PM 10    TO HAVE YOU HERE FOR THE FIRST PART OR SO AND THE INTRODUCTION

02:15PM 11    OF OUR TEAM.  IN PREPARATION FOR THE LAB AUDIT, I WILL

02:15PM 12    PERSONALLY WALK YOU THROUGH ALL OF THE LATEST UPDATES WITH OUR

02:16PM 13    TEAM -- WE HAVE HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE

02:16PM 14    SURE LAB IS FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY

02:16PM 15    HICKUPS, BUT AS ALWAYS, WANT YOU TO BE FAMILIAR WITH IT.

02:16PM 16         "LET ME KNOW IF I CAN GET AN HOUR FROM YOU THIS WEEK IN

02:16PM 17    THE A.M. OR AFTER WORK, AN HOUR NEXT WEEK ANYTIME AT YOUR

02:16PM 18    CONVENIENCE, AND THEN SOME TIME ON 9/229, 9:00 A.M.  AS ABOVE,

02:16PM 19    I CAN PLAN TO HAVE MY TEAM PICK UP AND DROP YOU OFF FOR ALL OF

02:16PM 20    THESE DATES SO YOU DON'T HAVE TO WORRY ABOUT COMMUTE."

02:16PM 21         ON 9-22, SEPTEMBER 22ND, DID YOU GO TO THERANOS FOR AN

02:16PM 22    AUDIT OR INSPECTION?

02:16PM 23    A.   YES.

02:16PM 24    Q.   AND WAS THAT AN INSPECTION CONDUCTED BY CMS?

02:16PM 25    A.   YES.

02:16PM 1    Q.   IN ADVANCE OF THAT DID YOU SIGN DOCUMENTS AT THERANOS?

02:17PM 2    A.   WHATEVER WAS SENT TO ME, YES.

02:17PM 3    Q.   OKAY.  LET'S NOW GO UP IN THE CHAIN.  AND IT LOOKS LIKE

02:17PM 4    YOU'RE TALKING ABOUT SCHEDULE ON THE FIRST PAGE OF THIS EMAIL.

02:17PM 5        DO YOU TALK ABOUT CONFIRMING ON THE 22ND AND THEN IT LOOKS

02:17PM 6    LIKE YOU SAY TOMORROW AT 6:00 P.M. FOR SIGNING AND WALKTHROUGH.

02:17PM 7        DO YOU SEE THAT?

02:17PM 8    A.   YES.

02:17PM 9    Q.   AND SO IS IT POSSIBLE THAT YOU SIGNED THE DOCUMENTS AND

02:17PM 10   ALSO MAYBE HAD A WALKTHROUGH IN ADVANCE OF THE INSPECTION?

02:17PM 11   A.   YES.  IT'S GOING BACK SIX YEARS, BUT YES.

02:17PM 12   Q.   OKAY.  COULD YOU NOW TURN TO 2772.

02:17PM 13       YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 2772 PURSUANT TO

02:17PM 14   STIPULATION.

02:17PM 15             MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:17PM 16             THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:18PM 17   BE PUBLISHED TO THE JURY.

02:18PM 18             MR. SCHENK:  THANK YOU.

02:18PM 19       (GOVERNMENT'S EXHIBIT 2772 WAS RECEIVED IN EVIDENCE.)

02:18PM 20   BY MR. SCHENK:

02:18PM 21   Q.   A COUPLE OF DAYS LATER NOW SEPTEMBER 15TH, 2015, AND

02:18PM 22   THERE'S AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI.  AND

02:18PM 23   LET'S START WITH HIS EMAIL TO YOU.  HE WRITES, "THANKS FOR

02:18PM 24   DROPPING BY.

02:18PM 25       "I NEED A COUPLE OF HOURS FROM YOU THIS COMING WEEKEND.

02:18PM   1    UNFORTUNATELY I HAVE CLOSE TO 300 SOP'S THAT NEED SIGNING.  I

02:18PM   2    CAN HAVE TEAM SEND THIS OUT 50 AT A TIME EACH DAY THIS WEEK

02:18PM   3    ELECTRONICALLY AS THAT MIGHT BE EASIER.  SORRY FOR THE LAST

02:18PM   4    MINUTE ON THIS I WAS TRYING TO FIND A WAY TO AVOID DOING THIS

02:18PM   5    MANUALLY...THANKS IN ADVANCE."

02:18PM   6         SO THIS WAS SENT ON MONDAY, SEPTEMBER 14TH, AND HE ASKS IF

02:18PM   7    YOU'RE AVAILABLE THAT COMING WEEKEND, SO FIVE, SIX, SEVEN DAYS

02:18PM   8    LATER; IS THAT RIGHT?

02:18PM   9    A.   YES.

02:18PM  10    Q.   AND YOU RESPOND, "SUNNY.

02:18PM  11         "LET'S DO THIS ON SATURDAY -- I CAN SIGN AT YOUR

02:19PM  12    FACILITY."

02:19PM  13         SO IS IT SUGGESTED IN THIS EMAIL OR DO YOU HAVE A

02:19PM  14    RECOLLECTION OF GOING TO THE FACILITY TO SIGN THESE DOCUMENTS?

02:19PM  15    A.   I BELIEVE I WENT TO THE FACILITY.

02:19PM  16              MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

02:19PM  17              THE COURT:  YES.

02:19PM  18              MR. SCHENK:  (HANDING.)

02:19PM  19              MR. WADE:  WITH THE COURT'S INDULGENCE.

02:19PM  20              THE COURT:  OKAY.

02:20PM  21    BY MR. SCHENK:

02:20PM  22    Q.   DR. DHAWAN, I'VE HANDED YOU A BINDER THAT CONTAINS

02:20PM  23    ADMITTED EXHIBITS.

02:20PM  24         THESE EXHIBITS WERE ADMITTED, I BELIEVE, BY STIPULATION OF

02:20PM  25    THE PARTIES, YOUR HONOR, DURING DR. ROSENDORFF'S TESTIMONY.

02:20PM   1          THE BINDER IS LABELLED VALIDATION REPORTS.  IT CONTAINS 59

02:20PM   2   TABS.  I'VE COUNTED TO SAVE YOU THE TIME.

02:20PM   3          WHAT I'M GOING TO ASK YOU TO DO, DR. DHAWAN, IS TO LOOK AT

02:20PM   4   THE FIRST PAGE OF EACH TAB AND TELL ME IF YOU SIGNED THAT

02:20PM   5   DOCUMENT ON 9-19-2015, SEPTEMBER 19TH, 2015.

02:20PM   6          AND IF I COULD JUST SHOW ONE OF THEM, WHICH IS AN ADMITTED

02:20PM   7   EXHIBIT FOR THE JURY, 9387.

02:21PM   8               THE COURT:  YES, THAT CAN BE PUBLISHED.

02:21PM   9               MR. SCHENK:  THANK YOU, YOUR HONOR.

02:21PM  10               THE WITNESS:  THE ONES WHERE I SIGNED, THAT'S MY

02:21PM  11   SIGNATURE.

02:21PM  12   BY MR. SCHENK:

02:21PM  13   Q.  SO, FOR INSTANCE, ON THE SCREEN AT THE VERY BOTTOM THAT

02:21PM  14   SIGNATURE NEXT TO THE DATE 9-19, THAT'S YOUR SIGNATURE?

02:21PM  15   A.  YES, SIR.

02:21PM  16   Q.  SO IF YOU WOULD TAKE A MINUTE NOW AND LOOK AT EACH

02:21PM  17   INDIVIDUAL REPORT IN THERE AND TELL ME IF YOU FIND ANY THAT YOU

02:21PM  18   DID NOT SIGN ON 9-19-2015.

02:21PM  19          (PAUSE IN PROCEEDINGS.)

02:21PM  20               THE WITNESS:  NO.  THESE ARE ALL OF MY SIGNATURES.

02:22PM  21   BY MR. SCHENK:

02:22PM  22   Q.  CAN I ASK YOU TO LOOK AT TAB 99086.

02:23PM  23   A.  I'M SORRY, CAN YOU SAY THAT AGAIN.  I'M LOOKING FOR IT.

02:23PM  24   Q.  THE TAB NUMBER?

02:23PM  25   A.  YEAH.

02:23PM  1    Q.   9086?

02:23PM  2    A.   YES.

02:23PM  3    Q.   AND DID YOU SIGN THAT ONE ON 9-19-2015?

02:23PM  4    A.   THAT WAS THE ONLY ONE THAT DOESN'T HAVE MY SIGNATURE.

02:23PM  5    SORRY, I MISSED THAT.  THE REST OF THEM DO.

02:23PM  6    Q.   SO OF THE 59 EXHIBITS IN HERE --

02:23PM  7    A.   I'M SORRY, I MISSED ONE.  I'M SORRY.

02:23PM  8    Q.   -- 58 OF THEM YOU SIGNED ON SEPTEMBER 19TH, 2015?

02:24PM  9    A.   YES.

02:24PM  10   Q.   AND I WANT TO TALK TO YOU A LITTLE BIT ABOUT THAT DATE

02:24PM  11   9-19-2015.  WAS THAT A SATURDAY?  IT LOOKS LIKE A --

02:24PM  12   A.   YES.

02:24PM  13   Q.   AND WHEN YOU WERE AT THERANOS SIGNING THESE DOCUMENTS, HOW

02:24PM  14   CLOSELY DID YOU READ THEM?

02:24PM  15   A.   I REVIEWED THE FIRST PAGES AND I SPENT PROBABLY MANY HOURS

02:24PM  16   THERE.

02:24PM  17   Q.   AND DID YOU TALK TO MR. BALWANI OR OTHER PEOPLE AT

02:24PM  18   THERANOS TO GET COMFORTABLE WITH THE CONTENTS?

02:24PM  19   A.   YES.  I ASKED IF ADAM ROSENDORFF HAD REVIEWED THESE AND

02:24PM  20   SIGNED THEM, AND IT LOOKED LIKE HIS SIGNATURE WAS EVERYWHERE

02:24PM  21   AND SO I WAS ESSENTIALLY COSIGNING AGAIN.

02:24PM  22   Q.   AND DID IT MATTER TO YOU THAT SOMEONE NAMED

02:24PM  23   ADAM ROSENDORFF HAD SIGNED THE DOCUMENT BEFORE YOU?

02:24PM  24   A.   HE WAS, I BELIEVE, THE PREVIOUS LAB DIRECTOR.

02:24PM  25   Q.   HE WAS THE LAB DIRECTOR THAT YOU CAME IN TO REPLACE?

02:24PM  1    A.   RIGHT, OR WORK FOR THE THREE MONTHS THAT I WAS SUPPOSED TO

02:24PM  2    WORK, YES.

02:24PM  3    Q.   AND WHY DID HIS SIGNATURE PROVIDE COMFORT TO YOU?

02:25PM  4    A.   HE MIGHT HAVE EVEN BEEN THERE, MY ASSUMPTION WAS, FOR A

02:25PM  5    SIGNIFICANT AMOUNT OF TIME AND HAD BEEN WORKING THERE SO IT

02:25PM  6    GAVE ME SOME REASSURANCE THAT THERE HAD BEEN SOME SUPERVISION

02:25PM  7    BEFORE MY TIME OF ARRIVAL.

02:25PM  8    Q.   ON THE EXHIBIT THAT WE'RE LOOKING AT ON THE SCREEN, THIS

02:25PM  9    ONE IS 9387, IT LOOKS LIKE IT'S A VALIDATION DOCUMENT FOR A

02:25PM 10    CERTAIN ELISA ASSAY ON THE EDISON 3.X.

02:25PM 11         DO YOU SEE THAT?

02:25PM 12    A.   YES.

02:25PM 13    Q.   AND WHEN YOU SIGNED THIS DOCUMENT, HAD YOU EVER SEEN THE

02:25PM 14    EDISON DEVICE RUN THIS ASSAY?

02:25PM 15    A.   I HAD NOT SEEN IT RUN THE ASSAY, NO.

02:25PM 16    Q.   HAD YOU EVER SEEN THE EDISON DEVICE RUN ANY ASSAY?

02:26PM 17    A.   I WAS NEVER SHOWN THE EDISON DEVICE RUNNING AN ASSAY.

02:26PM 18    Q.   DO YOU RECALL WHEN YOU WERE REVIEWING THOSE DOCUMENTS DID

02:26PM 19    YOU EVER FIND A DOCUMENT AND MAKE A COMMENT AND SAY, YOU KNOW

02:26PM 20    WHAT, WE SHOULD CHANGE THIS AND THIS SHOULD BE DIFFERENT?  DID

02:26PM 21    THAT EVER HAPPEN AT ANY POINT THAT DAY?

02:26PM 22    A.   IT DID NOT HAPPEN THAT DAY.

02:26PM 23    Q.   HOW ABOUT OTHER DAYS?  WAS THERE A DAY THAT I'M NOT

02:26PM 24    FOCUSSED ON RIGHT NOW WHERE YOU READ A VALIDATION REPORT OR AN

02:26PM 25    SOP THAT YOU SAID I WANT THIS TO READ DIFFERENTLY?  DO YOU

02:26PM 1    RECALL THAT?

02:26PM 2    A.   YEAH, I DON'T RECALL EVER DOING THAT.

02:26PM 3    Q.   CAN I ASK YOU TO LOOK -- I'M SORRY TO JUMP.  YOU CAN PUT

02:26PM 4    THAT BINDER ASIDE -- LOOK AT THE ORIGINAL BINDER 3041.

02:27PM 5         YOUR HONOR, THE GOVERNMENT OFFERS THIS DOCUMENT BY

02:27PM 6    STIPULATION.

02:27PM 7              MR. WADE:  THAT'S CORRECT, YOUR HONOR.

02:27PM 8              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:27PM 9    BE PUBLISHED.

02:27PM 10        (GOVERNMENT'S EXHIBIT 3041 WAS RECEIVED IN EVIDENCE.)

02:27PM 11   BY MR. SCHENK:

02:27PM 12   Q.   I'M SORRY.  DR. DHAWAN, DID YOU SIGN THIS DOCUMENT IN

02:27PM 13   DECEMBER OF 2015?

02:27PM 14   A.   I DON'T RECALL THE EXACT DATE, BUT THAT WOULD BE MY

02:27PM 15   DOCUSIGN SIGNATURE, YES.

02:27PM 16   Q.   AND THE DOCUMENT IS AN SOP FOR REPORTING CRITICAL VALUES.

02:27PM 17        DO YOU SEE THAT?

02:27PM 18   A.   YES.

02:27PM 19   Q.   AND DO YOU HAVE EXPERIENCE WITH CRITICAL VALUES?  DO YOU

02:27PM 20   KNOW WHAT THAT PHRASE MEANS?

02:27PM 21   A.   YEAH.  WHEN I WAS IN TRAINING AND WHEN I WAS DOING

02:27PM 22   INTERNAL MEDICINE WE WOULD RECEIVE AND SEE CRITICAL VALUES

02:27PM 23   CURRENTLY FOR BLOOD TESTS.

02:27PM 24   Q.   SURE.  SO YOU HAVE SOME EXPERIENCE WITH IT IN YOUR

02:27PM 25   PRACTICE AND IN YOUR EDUCATION?

02:27PM  1    A.   YES, RIGHT.

02:27PM  2    Q.   DURING THE TIME THAT YOU WORKED AT THERANOS, WAS THERE AN

02:27PM  3    OCCASION WHEN YOU AS LAB DIRECTOR NEEDED TO REPORT OUT A

02:28PM  4    CRITICAL VALUE?

02:28PM  5    A.   I WAS NEVER GIVEN ANY CRITICAL VALUES TO LOOK AT.

02:28PM  6    Q.   THE ENTIRE TIME YOU WERE AT THERANOS YOU NEVER WERE SHOWN

02:28PM  7    ONE CRITICAL VALUE?

02:28PM  8    A.   NO.

02:28PM  9    Q.   AND I JUST WANT TO CONFIRM UNDER YOUR SIGNATURE ON THIS

02:28PM  10   DOCUMENT THERE'S A JOB TITLE.

02:28PM  11        DO YOU SEE THAT?

02:28PM  12   A.   YES.

02:28PM  13   Q.   YOUR JOB TITLE IS LABORATORY DIRECTOR; IS THAT RIGHT?

02:28PM  14   A.   YES.

02:28PM  15   Q.   AND WOULD YOU NOW TURN TO 2791.

02:28PM  16        THE GOVERNMENT OFFERS 2791 BY STIPULATION?

02:28PM  17             MR. WADE:  THAT'S CORRECT.

02:28PM  18             THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:28PM  19   BE PUBLISHED.

02:28PM  20             MR. SCHENK:  THANK YOU.

02:28PM  21        (GOVERNMENT'S EXHIBIT 2791 WAS RECEIVED IN EVIDENCE.)

02:28PM  22   BY MR. SCHENK:

02:29PM  23   Q.   ON THIS DOCUMENT, FIRST THE EMAIL IS DATED MONDAY,

02:29PM  24   SEPTEMBER 21ST, 2015.

02:29PM  25        WE SAW EARLIER A REFERENCE TO SEPTEMBER 22ND.  WAS THE

02:29PM 1   22ND THE DAY OF THE CMS INSPECTION THAT WE WERE TALKING ABOUT?

02:29PM 2   A.   YES.

02:29PM 3   Q.   SO THE DAY BEFORE SOMEONE NAMED MONA RAMAMURTHY SENT YOU

02:29PM 4   THIS EMAIL AND ATTACHES SOME DOCUMENTS.

02:29PM 5        DO YOU SEE THAT?

02:29PM 6   A.   YES.

02:29PM 7   Q.   AND IT SAYS "DEAR DR. DHAWAN.

02:29PM 8        "CONGRATULATIONS.  IT IS WITH GREAT PLEASURE THAT I WRITE

02:29PM 9   TO PRESENT YOU THESE TERMS OF EMPLOYMENT TO JOIN THE THERANOS

02:29PM 10  TEAM."

02:29PM 11       DID YOU THINK THAT YOU HAD BEEN WORKING AT THERANOS FOR

02:29PM 12  QUITE A WHILE BEFORE THIS DATE?

02:29PM 13  A.   AS A CONSULTANT BASED ON THE ORIGINAL AGREEMENT.

02:29PM 14  Q.   OKAY.  AND WAS THIS CHANGING YOUR STATUS?

02:29PM 15  A.   ACCORDING TO THIS, YES.

02:30PM 16  Q.   IF YOU'LL TURN TO THE NEXT PAGE.

02:30PM 17       IT SAYS AT THE TOP, "DEAR SUNIL.

02:30PM 18       "ON BEHALF OF THERANOS INC. (THE COMPANY), I AM PLEASED TO

02:30PM 19  CONFIRM THE TERMS OF YOUR EMPLOYMENT AS LABORATORY DIRECTOR

02:30PM 20  REPORTING TO SUNNY BALWANI."

02:30PM 21       AND THEN BELOW THERE'S A PARAGRAPH THAT BEGINS YOUR START

02:30PM 22  DATE.  DO YOU SEE THAT?

02:30PM 23  A.   YES.

02:30PM 24  Q.   YOUR START DATE WITH THE COMPANY IS JUNE 1ST, 2015; IS

02:30PM 25  THAT RIGHT?

02:30PM  1     A.   YES.

02:30PM  2     Q.   THAT'S WHAT IT SAYS?

02:30PM  3     A.   YES.

02:30PM  4     Q.   THEY SENT YOU A DOCUMENT ON SEPTEMBER 21ST THAT SAID YOUR

02:30PM  5     START DATE WAS JUNE 1ST; IS THAT RIGHT?

02:30PM  6     A.   YES.

02:30PM  7     Q.   AND BY THIS POINT YOU HAD ALREADY SIGNED AT LEAST ALL

02:30PM  8     THOSE VALIDATION REPORTS IN THE BINDER THAT WE HAD JUST TALKED

02:31PM  9     ABOUT?

02:31PM  10    A.   YES.

02:31PM  11    Q.   THE NEXT DATE SEPTEMBER 22ND WAS THE INSPECTION.

02:31PM  12         WERE YOU PRESENT FOR THE INSPECTION?

02:31PM  13    A.   YES, THAT MORNING.

02:31PM  14    Q.   AND DESCRIBE THAT TO THE JURY.  WHAT WAS YOUR EXPERIENCE

02:31PM  15    THAT DAY?

02:31PM  16    A.   I WAS IN THE ROOM WHEN THE INSPECTORS WALKED IN, I WAS

02:31PM  17    INTRODUCED, AND THEN THE INSPECTORS SAT WITH THE LAB TEAM AND

02:31PM  18    MR. BALWANI, IF MY RECOLLECTION IS CORRECT.

02:31PM  19         AND THEN AFTER ABOUT AN HOUR, I THINK, I WAS ASKED TO STEP

02:31PM  20    OUT BECAUSE THERE WAS NO QUESTIONS ASKED OF ME.  AND I WAS

02:31PM  21    THERE I THINK ANOTHER HOUR UNTIL PROBABLY BETWEEN 8:00 AND

02:31PM  22    10:00, 10:30, MAYBE 11:00 MAX, AND I WAS NOT ASKED ANY

02:31PM  23    QUESTIONS, AND I WAS NOT INQUIRED OF IN ANY WAY.

02:32PM  24    Q.   DID YOU TALK TO MS. HOLMES THAT DAY?

02:32PM  25    A.   I RECALL MEETING HER IN THE HALLWAY.

02:32PM  1    Q.   YOU SAID MEETING.  WAS THAT THE FIRST TIME YOU MET

02:32PM  2    MS. HOLMES?

02:32PM  3    A.   YES.

02:32PM  4    Q.   YOU SIGNED ON IN NOVEMBER OF 2014 AND SEPTEMBER 21ST,

02:32PM  5    2015, WAS THE FIRST TIME YOU MET MS. HOLMES?

02:32PM  6    A.   YES.

02:32PM  7    Q.   AND HOW ABOUT THE SECOND DAY?  DO YOU KNOW WHETHER THE

02:32PM  8    INSPECTION CARRIED OVER THE NEXT DAY?

02:32PM  9    A.   IT DID FROM MY RECOLLECTION, BUT I WAS NOT ASKED TO COME

02:32PM  10   BACK.

02:32PM  11   Q.   YOU DIDN'T GO THAT DAY?

02:32PM  12   A.   NO.  I ASKED WHETHER I NEEDED TO BE THERE, AND THEY SAID

02:32PM  13   NO, NO NEED FOR ME TO BE THERE.

02:33PM  14            MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

02:33PM  15            THE COURT:  YES.

02:33PM  16            MR. SCHENK:  (HANDING.)

02:33PM  17       YOUR HONOR, I WOULD LIKE TO SHOW THE WITNESS SOME TEXT

02:33PM  18   MESSAGES.  THESE ARE EXHIBIT 5387B.  B WAS ALREADY PREVIOUSLY

02:33PM  19   ADMITTED.  THESE ARE THREE PAGES FROM -- THE PAGE NUMBERS ARE

02:33PM  20   26, 27, AND 28.

02:33PM  21            THE COURT:  YES.  THANK YOU.

02:33PM  22            MR. SCHENK:  AND PERMISSION TO PUBLISH?

02:33PM  23            THE COURT:  YES.

02:33PM  24            MR. SCHENK:  THANK YOU.

02:33PM  25   Q.   DR. DHAWAN, I'M SHOWING YOU TEXT MESSAGES THAT WERE SENT

02:34PM  1    BETWEEN MR. BALWANI AND MS. HOLMES ON THESE TWO DAYS THAT WE'RE

02:34PM  2    TALKING ABOUT, SEPTEMBER 22ND AND SEPTEMBER 23RD OF 2015.

02:34PM  3         YOU WERE NOT ON THESE TEXT MESSAGES; IS THAT RIGHT?

02:34PM  4    A.   NO.

02:34PM  5    Q.   OKAY.  MR. BALWANI STARTS, "CAN YOU SEE HIM?

02:34PM  6    A.   "YES, I CAN."

02:34PM  7    Q.   "VERY HOSTILE SO FAR.  THEY SAY HAVE COMPLAINTS."

02:34PM  8         AND DO YOU MIND READING THE NEXT ONE?

02:34PM  9    A.   "THEY SHOULD KNOW THE ENTIRE LAB INDUSTRY IS AND WILL BE

02:34PM  10   SEEDLING EVERYONE THEY CAN GET TO FILE COMPLAINTS."

02:34PM  11   Q.   AND THEN IF YOU CAN CONTINUE THE NEXT TWO.

02:34PM  12   A.   "I'M SURE TYLER IS ONE AS THEY PROB GOT FROM NY.  ADAM IS

02:34PM  13   THE OTHER -- FROM CA AND THOSE EXACTLY PLAY TO LAB INDUSTRY

02:34PM  14   COMMENTARY TO HURT US."

02:34PM  15        AND THEN, "JC HIMSELF PLAYING LITERALLY OFF LAB COMMENTS

02:34PM  16   IS LIKELY THE OTHER."

02:34PM  17   Q.   "GARY IS TRYING TO BE PRO THERANOS."

02:35PM  18   A.   "YES."

02:35PM  19   Q.   AND WOULD YOU CONTINUE.

02:35PM  20   A.   OH, YES, SORRY.

02:35PM  21        "HMFR.

02:35PM  22        "PRAYING LITERALLY NONSTOP.

02:35PM  23        "DO YOU WANT ME TO STEP OUT OF FDA CALL?

02:35PM  24        "NO.

02:35PM  25        "OFF CAN TALK ANY TIME.

02:35PM 1        "DON'T WORRY.  WE WILL RESUME AT 1.  LUNCH BREAK NOW.

02:35PM 2        "CALL IF YOU WANT TO TALK."

02:35PM 3   Q.   THANK YOU.

02:35PM 4        AND NOW WE'LL TURN TO THE NEXT PAGE, PAGE 27.

02:35PM 5        MR. BALWANI WRITES, "OUR VALIDATION REPORTS ARE TERRIBLE.

02:35PM 6   REALLY PAINFUL GOING THRU THIS PROCESS.  SAME ISSUES FDA

02:35PM 7   POINTED OUT?"

02:35PM 8        MS. HOLMES RESPONDS, "CAN WE GET SOMEONE HERE TO

02:35PM 9   SUPPLEMENT/UPDATE/HELP EXPLAIN?

02:35PM 10       "OR IS THE FEEDBACK COMING FROM FDA."

02:35PM 11       MR. BALWANI RESPONDS "NO."

02:35PM 12       MS. HOLMES WRITES, "WE CAN PROVIDE OUR FDA SUBMISSION

02:35PM 13  DATA."

02:35PM 14       AND MR. BALWANI RESPONDS, "NOT FROM FDA.  NOTHING TO DO

02:36PM 15  WITH FDA."

02:36PM 16       AND THEN MS. HOLMES WRITES, "WILL MAKE SURE ALL TEAMS ARE

02:36PM 17  REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO

02:36PM 18  SUPPORT."

02:36PM 19       MR. BALWANI, "GOING BAD SO FAR.  PRAY.

02:36PM 20       "DANIEL HAS NOTHING READY.

02:36PM 21       "TOLD ME EVERYTHING IS IN THE BINDERS.

02:36PM 22       "NOT THERE."

02:36PM 23       MS. HOLMES, "PRAYING.

02:36PM 24       "AT MY DESK.

02:36PM 25       "TELL ME HOW I CAN HELP.

02:36PM 1          "I'M COMING THERE."

02:36PM 2          AND THEN ON PAGE 28, THE FINAL TEXT IN THIS SET FROM

02:36PM 3     MS. HOLMES.

02:36PM 4          "PRAYING CONTINUALLY."

02:36PM 5          DR. DHAWAN, DURING THE INSPECTION, DID YOU HAVE ANY IDEA

02:36PM 6     WHETHER THE INSPECTION WAS GOING WELL OR NOT GOING WELL?

02:36PM 7     A.   I WAS NOT IN THE GROUP WHERE THE INSPECTION WAS HAPPENING,

02:36PM 8     I WAS SITTING IN THE BACK.

02:36PM 9     Q.   SO THERE --

02:36PM 10    A.   I WAS SITTING FAR -- NOT VERY CLOSE TO WHERE THE ACTUAL

02:37PM 11    INSPECTORS WERE SITTING.

02:37PM 12    Q.   AND YOU DIDN'T KNOW WHETHER MS. HOLMES OR MR. BALWANI WERE

02:37PM 13    PRAYING DURING THE INSPECTION, THAT WAS NOT SOMETHING THAT YOU

02:37PM 14    WERE AWARE OF?

02:37PM 15    A.   I DIDN'T -- I WAS NOT AWARE OF THAT, NO.

02:37PM 16    Q.   IF YOU COULD NOW GO BACK TO YOUR BINDER, IT'S TAB 2548.

02:37PM 17         YOUR HONOR, THE GOVERNMENT OFFERS 2548 PURSUANT TO

02:37PM 18    STIPULATION?

02:37PM 19              MR. WADE:  CORRECT, YOUR HONOR.

02:37PM 20              THE COURT:  IT'S ADMITTED BY STIPULATION, AND IT MAY

02:37PM 21    BE PUBLISHED.

02:37PM 22         (GOVERNMENT'S EXHIBIT 2548 WAS RECEIVED IN EVIDENCE.)

02:37PM 23    BY MR. SCHENK:

02:37PM 24    Q.   AND IF WE CAN START AT THE VERY BOTTOM.  THERE'S AN

02:37PM 25    OCTOBER 19TH, 2015 EMAIL, AND IT READS, "COULD YOU PLEASE

02:38PM 1    CONTACT ME AS A MATTER OF URGENCY.  OUR CONVERSATION WILL BE ON

02:38PM 2    A BACKGROUND BASIS.  I WILL NOT QUOTE YOU OR EVEN SAY WE HAVE

02:38PM 3    BEEN IN CONTACT.  BUT IT IS IMPERATIVE THAT WE SPEAK?"

02:38PM 4         AND THEN THE EMAIL ABOVE IS FROM YOU FORWARDING THIS TO

02:38PM 5    MR. BALWANI; IS THAT RIGHT?

02:38PM 6    A.   YES.

02:38PM 7    Q.   AND YOU WRITE, "SUNNY.

02:38PM 8         "FYI.

02:38PM 9         "I TALKED TO THIS GUY SUPERFICIALLY -- TOLD HIM TO CALL

02:38PM 10   YOU ALL DIRECTLY FOR INFO.

02:38PM 11        "CALL ME FOR DETAILS."

02:38PM 12        WHO WAS "THIS GUY"?

02:38PM 13   A.   I BELIEVE HE WAS A REPORTER FROM THE FINANCIAL TIMES.

02:38PM 14   Q.   AND MR. BALWANI THEN RESPONDS TO YOU AT THE TOP.

02:38PM 15        "THANKS, WILL SPEAK IN THE A.M.  THANKS FOR THE HELP AND

02:38PM 16   STICKING BY.  APPRECIATE IT?

02:38PM 17        "IN FUTURE, JUST DON'T ANSWER ANY QUESTIONS AS THEY WILL

02:38PM 18   TRAP YOU OR MISQUOTE YOU.  WE ARE TRYING TO GET ON TOP OF THE

02:39PM 19   SITUATION AND RELEASE OUR STATEMENTS TO REFUTE THE FALSEHOODS,

02:39PM 20   BUT THIS STUFF TAKES TIME."

02:39PM 21        MR. BALWANI TALKS ABOUT "THE SITUATION" IN THIS EMAIL.

02:39PM 22        WAS -- DID YOU HAVE SEPARATE CONVERSATIONS WITH

02:39PM 23   MR. BALWANI ABOUT WHATEVER IT IS THAT HE'S REFERRING TO AS "THE

02:39PM 24   SITUATION"?

02:39PM 25   A.   NO.

02:39PM   1     Q.   DID MR. BALWANI BRIEF YOU AT ANY POINT ABOUT WHAT HE WAS

02:39PM   2     CONCERNED ABOUT, WHAT WAS HAPPENING, WHAT SITUATION HE WAS

02:39PM   3     TRYING TO GET ON TOP OF?

02:39PM   4     A.   WE DID NOT HAVE A DIRECT CONVERSATION ABOUT THE SITUATION,

02:39PM   5     BUT I HAD BEEN NOW READING IN THE MEDIA ABOUT WHAT WAS

02:39PM   6     HAPPENING.

02:39PM   7     Q.   OKAY.  SO -- I'M SORRY TO INTERRUPT YOU.

02:39PM   8          YOU LEARNED ABOUT INFORMATION IN THE MEDIA, BUT NOT FROM

02:39PM   9     THE PERSON THAT WAS YOUR POINT OF CONTACT AT THE TIME?

02:39PM  10     A.   NO, I DID NOT LEARN FROM HIM.

02:39PM  11     Q.   OKAY.  WOULD YOU TURN TO TAB 2972.

02:40PM  12          YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 2972 BY

02:40PM  13     STIPULATION.

02:40PM  14               THE COURT:  IT'S ADMITTED BY STIPULATION AND MAY BE

02:40PM  15     PUBLISHED.

02:40PM  16          (GOVERNMENT'S EXHIBIT 2972 WAS RECEIVED IN EVIDENCE.)

02:40PM  17     BY MR. SCHENK:

02:40PM  18     Q.   DR. DHAWAN, NOW WE'VE MOVED INTO NOVEMBER OF 2015.

02:40PM  19     DANIEL YOUNG IS WRITING YOU AN EMAIL AND IN IT DR. YOUNG

02:40PM  20     WRITES, "DEAR DR. DHAWAN:

02:40PM  21          "I AM TRYING TO SCHEDULE A MEETING TO REVIEW OUR MONTHLY

02:40PM  22     QC DATA FOR SEPTEMBER AND OCTOBER.  ARE YOU ABLE TO JOIN IN

02:40PM  23     THIS WEDNESDAY BY PHONE?  IF SO, WHAT TIME(S)."

02:40PM  24          MY QUESTION WAS THAT SOMETHING YOU DID BEFORE?  HAD YOU

02:40PM  25     REVIEWED MONTHLY QC DATA WITH DR. YOUNG BEFORE THIS?

02:40PM 1      A.   NO, I HAD NOT.

02:40PM 2      Q.   DO YOU KNOW WHETHER YOU EVEN DID IT ON THIS OCCASION,

02:40PM 3   WHETHER THIS CALL HAPPENED?

02:41PM 4      A.   I DON'T THINK I DID.  I JUST DON'T RECALL NOW GOING BACK

02:41PM 5   SIX YEARS.

02:41PM 6      Q.   I'D LIKE YOU NOW TO TURN TO 3217.

02:41PM 7           YOUR HONOR, AT THIS TIME THE GOVERNMENT MOVES PAGE 1 OF

02:41PM 8   3217 INTO EVIDENCE.

02:41PM 9                MR. WADE:  NO OBJECTION TO PAGE 1.

02:41PM 10               THE COURT:  PAGE 1 OF EXHIBIT 3217 IS ADMITTED, AND

02:41PM 11  IT MAY BE PUBLISHED.

02:41PM 12               MR. SCHENK:  THANK YOU, YOUR HONOR.

02:41PM 13          (GOVERNMENT'S EXHIBIT 3217, PAGE 1, WAS RECEIVED IN

02:41PM 14  EVIDENCE.)

02:41PM 15  BY MR. SCHENK:

02:41PM 16     Q.   DR. DHAWAN, ON THIS DOCUMENT, ON THIS EMAIL SOMEONE NAMED

02:41PM 17  HEATHER KING IS SENDING YOU AN EMAIL.

02:41PM 18          DO YOU KNOW WHO HEATHER KING WAS?

02:41PM 19     A.   I BELIEVE SHE WAS, AS WRITTEN HERE, THE GENERAL COUNSEL

02:41PM 20  FOR THERANOS.

02:41PM 21     Q.   AND DO YOU KNOW IF YOU HAD MET HER OR WAS THIS THE FIRST

02:41PM 22  INTERACTION YOU HAD WITH HER?  DO YOU RECALL?

02:41PM 23     A.   MY RECOLLECTION IS THAT SHE WAS AT THE INSPECTION.  I

02:41PM 24  BELIEVE SHE WAS THERE.

02:41PM 25     Q.   OKAY.

02:41PM   1    A.  BUT THERE WERE A LOT OF PEOPLE THERE THAT I DIDN'T

02:42PM   2    RECOGNIZE SO.

02:42PM   3    Q.  I'M SORRY.  THE SUBJECT IS CMS NOTICE ON IMPOSITION OF

02:42PM   4    SANCTIONS.

02:42PM   5        DO YOU SEE THAT?

02:42PM   6    A.  YES.

02:42PM   7    Q.  AND UNTIL THIS DATE, JULY OF 2016, AND WE GO BACK TO THE

02:42PM   8    SEPTEMBER 21ST, 2015 DATE, DID YOU KNOW DURING THAT PERIOD OF

02:42PM   9    TIME WHETHER THE INSPECTION, THE CMS INSPECTION HAD GONE WELL

02:42PM  10    OR HAD GONE POORLY?

02:42PM  11    A.  I, I HAD -- NO ONE HAD INFORMED ME EITHER WAY.

02:42PM  12    Q.  SO WAS THIS EMAIL THE WAY YOU LEARNED THAT THERE WERE SOME

02:42PM  13    CHALLENGES RESULTING FROM THE INSPECTION?

02:42PM  14    A.  YES.

02:43PM  15            MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

02:43PM  16            THE COURT:  YES.

02:43PM  17        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:43PM  18    BY MR. SCHENK:

02:43PM  19    Q.  DR. DHAWAN, WAS THERE A MOMENT WHEN THAT YOU STOPPED BEING

02:43PM  20    THE LAB DIRECTOR AT THERANOS?

02:43PM  21    A.  I AM NOT SURE WHAT THAT DATE WAS HONESTLY.

02:43PM  22        I'M -- MY ASSUMPTION WAS THAT AFTER OCTOBER I BELIEVE THAT

02:43PM  23    THEY HAD HIRED SOMEONE ELSE AND -- BUT, AGAIN, I'M GOING BACK

02:43PM  24    SIX YEARS, AND I'LL HAVE TO LOOK AT AND REVIEW ALL OF THE

02:43PM  25    RECORDS.

02:43PM   1            BUT THERE WAS NO FORMAL TERMINATION NOTICE OR ANYTHING

02:43PM   2   LIKE THAT THAT WAS GIVEN TO ME, BUT I -- THEY JUST -- I WAS NOT

02:43PM   3   RECEIVING ANY MORE COMMUNICATIONS, SO MY ASSUMPTION WAS THAT MY

02:43PM   4   TIME WAS OVER, YOU KNOW, WHATEVER CONSULTING JOB I HAD TO DO

02:43PM   5   WAS OVER AT THAT POINT.

02:43PM   6   Q.   YOU JUST SAID A MOMENT AGO OCTOBER.  WHICH YEAR WAS THAT?

02:43PM   7   A.   2015.  IT WOULD HAVE BEEN AFTER THE INSPECTION.

02:43PM   8   Q.   AFTER THE INSPECTION, THE NEXT MONTH?

02:44PM   9   A.   RIGHT.

02:44PM  10   Q.   BUT YOU DIDN'T RECEIVE A DOCUMENT, THAT WAS JUST YOUR

02:44PM  11   ASSUMPTION?

02:44PM  12   A.   YES.

02:44PM  13   Q.   THANK YOU.

02:44PM  14            THANK YOU, YOUR HONOR.  NO FURTHER QUESTIONS.

02:44PM  15            THE COURT:  CROSS-EXAMINATION.

02:44PM  16            MR. WADE:  MAYBE THE JURY WANTS TO STRETCH FOR A

02:44PM  17   MINUTE, YOUR HONOR.

02:44PM  18            THE COURT:  WOULD YOU LIKE TO STAND UP AND STRETCH,

02:44PM  19   LADIES AND GENTLEMEN.

02:44PM  20            WE'RE GOING TO END AT 3:00 O'CLOCK.  I SHOULD TELL YOU

02:44PM  21   JUST A POINT OF CLARIFICATION, I HAVE TO TELL YOU THAT OUR

02:44PM  22   CLOCK IN THE COURTROOM IS ABOUT FIVE MINUTES -- I THINK IT'S

02:44PM  23   ABOUT FIVE MINUTES FAST, BUT FEEL FREE TO STAND AND STRETCH IF

02:44PM  24   YOU WOULD LIKE.

02:45PM  25            (PAUSE IN PROCEEDINGS.)

02:45PM  1          THE COURT:  MR. WADE.

02:45PM  2          MR. WADE:  THANK YOU, YOUR HONOR.

02:45PM  3                    **CROSS-EXAMINATION**

02:45PM  4  BY MR. WADE:

02:45PM  5  Q.  GOOD AFTERNOON.  MY NAME IS LANCE WADE, AND I REPRESENT

02:45PM  6  ELIZABETH HOLMES.  I'D LIKE TO ASK YOU A FEW QUESTIONS.

02:45PM  7          YOUR HONOR, MAY I APPROACH?

02:45PM  8          THE COURT:  YES.

02:46PM  9  BY MR. WADE:

02:46PM  10  Q.  (HANDING.)

02:46PM  11          I'VE HANDED YOU A BINDER OF DOCUMENTS.  I MAY REFER TO

02:46PM  12  SOME DOCUMENTS IN THAT BINDER, AND I MAY REFER TO SOME IN THE

02:46PM  13  WHITE BINDER.  OKAY?  I'LL TRY TO KEEP CLEAR WHICH IS WHICH.

02:46PM  14          DR. DHAWAN, I'M NOT SURE IT CAME THROUGH IN YOUR -- IN

02:46PM  15  SOME OF YOUR DIRECT TESTIMONY, BUT IS IT FAIR TO SAY THAT

02:46PM  16  YOU'RE A HIGHLY TRAINED PROFESSIONAL?

02:46PM  17  A.  YES, I HAVE POST GRADUATE TRAINING, YES.

02:46PM  18  Q.  COULD YOU JUST WALK THROUGH YOUR -- THE TRAINING THAT YOU

02:46PM  19  RECEIVED IN CONNECTION WITH THE PRACTICE OF MEDICINE?

02:46PM  20  A.  I DID MY M.D., AND THEN I DID INTERNAL MEDICINE RESIDENCY,

02:46PM  21  AND THEN FINISHED A DERMATOLOGY RESIDENCY.

02:46PM  22  Q.  AND YOU'VE HAD A SUCCESSFUL PRACTICE IN THE BAY AREA FOR A

02:46PM  23  NUMBER OF YEARS?

02:46PM  24  A.  YES.

02:46PM  25  Q.  BOTH AS A BUSINESS PERSON AND AS A PRACTICING PHYSICIAN?

02:47PM  1    A.   YES.

02:47PM  2    Q.   AND THAT'S HOW YOU CAME TO KNOW MR. BALWANI?

02:47PM  3    A.   YES.

02:47PM  4    Q.   AND PRIOR TO THAT MORNING IN SEPTEMBER OF 2015 THAT YOU

02:47PM  5    TALKED ABOUT, YOU HADN'T INTERACTED WITH MS. HOLMES PREVIOUSLY;

02:47PM  6    IS THAT CORRECT?

02:47PM  7    A.   NO.

02:47PM  8    Q.   AND YOUR INTERACTIONS WITH HER WERE JUST LIMITED TO A FEW

02:47PM  9    MINUTES IN LENGTH?

02:47PM  10   A.   THEY WERE LIMITED TO SAYING HELLO.

02:47PM  11   Q.   JUST A GREETING?

02:47PM  12   A.   THAT'S BASICALLY IT.

02:47PM  13   Q.   MR. BALWANI, YOU UNDERSTOOD, WAS THE PRESIDENT AND CHIEF

02:47PM  14   OPERATING OFFICER OF THERANOS?

02:47PM  15   A.   YES, THAT WAS HIS -- YEAH.

02:47PM  16   Q.   AND YOU KNEW THAT FROM YOUR RELATIONSHIP WITH HIM PRIOR TO

02:47PM  17   ANY WORK CONNECTION TO THERANOS?

02:47PM  18   A.   I DON'T RECALL WHEN HE TOLD ME THAT, BUT IT WAS ON, I

02:47PM  19   BELIEVE SOME EMAIL TRAILS, BUT I'LL HAVE TO LOOK BACK.

02:48PM  20   Q.   BUT YOU UNDERSTOOD THAT HE'S ONE OF THE TOP TWO EXECUTIVES

02:48PM  21   IN THE COMPANY?

02:48PM  22   A.   MY ASSUMPTION WAS THAT HE WAS ONE OF THE HIGHER

02:48PM  23   EXECUTIVES, YES.

02:48PM  24   Q.   AND IN ADDITION TO THAT ROLE, HE WAS ACTUALLY, AT THE TIME

02:48PM  25   HE WAS INTERACTING WITH YOU, RUNNING THE LABORATORY FROM AN

02:48PM  1    OPERATIONAL STANDPOINT; CORRECT?

02:48PM  2    A.   I CAN'T COMMENT ON THAT BECAUSE I WAS NEVER TOLD THAT HE

02:48PM  3    WAS RUNNING THE LABORATORY, I WAS NEVER GIVEN THAT.  BUT IT WAS

02:48PM  4    MY ASSUMPTION, YES.

02:48PM  5    Q.   OKAY.  HE SEEMED TO BE KNOWLEDGEABLE BASED UPON YOUR

02:48PM  6    INTERACTIONS WITH HIM?

02:48PM  7    A.   BASED UPON MY INTERACTIONS WITH HIM, YES.

02:48PM  8    Q.   AND AT THE TIME THAT MR. BALWANI CAME TO YOU TO MAKE

02:48PM  9    INQUIRIES ABOUT GETTING YOUR ASSISTANCE AS THE LAB DIRECTOR AT

02:48PM 10    THERANOS, DO YOU RECALL THAT HE ACTUALLY ASKED IF EITHER YOU

02:48PM 11    KNEW SOMEONE WHO WOULD MEET THE QUALIFICATIONS OR WHETHER YOU

02:48PM 12    YOURSELF WOULD MEET THE QUALIFICATIONS TO BE LAB DIRECTOR?

02:49PM 13    A.   HE ASKED ME THAT QUESTION, YES.

02:49PM 14    Q.   IN NOVEMBER OF 2014 DID YOU UNDERSTAND THAT HE WAS IN A

02:49PM 15    BIT OF A PINCH AND NEEDED SOMEONE ON SHORT NOTICE?

02:49PM 16    A.   I NEVER USED THOSE WORDS.

02:49PM 17    Q.   YOU HAD TALKED ABOUT THE PRIOR LAB DIRECTOR.

02:49PM 18         DID YOU COME TO LEARN THAT THERE WERE SOME INTEGRITY

02:49PM 19    ISSUES THAT WOULD RESULT IN HIS NEED TO SEPARATE FROM THE

02:49PM 20    COMPANY ON SHORT NOTICE?

02:49PM 21    A.   I WAS NEVER TOLD THAT.

02:49PM 22    Q.   OKAY.  BUT YOU UNDERSTOOD BASED ON YOUR INTERACTIONS WITH

02:49PM 23    MR. BALWANI THAT THERE WAS A NEED TO GET SOMEONE IN QUICKLY?

02:49PM 24    A.   HE NEVER SAID QUICKLY, BUT THERE WAS A NEED TO GET SOMEONE

02:49PM 25    IN.

02:49PM   1          MY IMPRESSION WAS BASED ON THAT ONE EMAIL THAT -- I'M

02:49PM   2   FORGETTING WHERE IT IS NOW -- THAT THEY NEEDED SOMEONE FOR A

02:50PM   3   SHORT AMOUNT OF TIME, AND THAT WAS ALL I WAS TOLD.

02:50PM   4   Q.   AND YOU MENTION THAT EMAIL.  LET'S TAKE A LOOK AT THAT

02:50PM   5   EMAIL.  IT'S IN YOUR WHITE BINDER.  IT'S EXHIBIT 2219 WHICH IS

02:50PM   6   IN EVIDENCE.

02:50PM   7          DO YOU SEE THAT DOCUMENT UP ON YOUR SCREEN?

02:50PM   8   A.   YES, SIR.

02:50PM   9   Q.   AND THIS IS THE EMAIL THAT YOU'RE REFERRING TO?

02:51PM  10   A.   ARE YOU ASKING ABOUT HIS POSITION OR THE EMAIL THAT HE

02:51PM  11   SENT ME ABOUT WHAT I'M SUPPOSED TO DO?

02:51PM  12   Q.   I HAD ASKED YOU ABOUT WHETHER THERE WAS SOME URGENCY IN

02:51PM  13   BRINGING SOMEONE IN, AND I THINK YOU MENTIONED YOU SURMISED

02:51PM  14   THAT FROM THE EMAIL.

02:51PM  15          WAS THIS THE EMAIL THAT YOU WERE REFERRING TO?

02:51PM  16   A.   YES, I WOULD -- THIS IS THE ONLY -- IF THAT'S THE EMAIL

02:51PM  17   THAT WAS SENT, YES.

02:51PM  18   Q.   AND IF YOU, IF YOU LOOK ON THE BOTTOM OF THE FIRST PAGE --

02:51PM  19   I'M SORRY.  LET ME GO TO THE BOTTOM OF THE SECOND PAGE.  I

02:51PM  20   THINK MR. SCHENK ASKED YOU A COUPLE OF QUESTIONS ABOUT THIS.

02:51PM  21          DO YOU SEE THAT EMAIL WHERE MR. BALWANI IS MAKING INQUIRY

02:51PM  22   OF WHETHER YOU OR ANYONE ELSE YOU KNOW WOULD MEET THE

02:51PM  23   REQUIREMENTS THAT WERE NECESSARY TO STEP IN AS CLINICAL LAB

02:51PM  24   DIRECTOR; RIGHT?

02:51PM  25   A.   YES.

02:52PM  1    Q.   AND YOU RESPONDED THAT YOU COULD DO THIS?

02:52PM  2    A.   BASED ON WHAT HE WAS ASKING, YES.

02:52PM  3    Q.   AND YOU ASKED FOR SOME INFORMATION ABOUT WHAT WAS REQUIRED

02:52PM  4    FROM A QUALIFICATION STANDPOINT IN THAT EMAIL THERE?

02:52PM  5    A.   YES.

02:52PM  6    Q.   AND YOU HAD SERVED AS A LAB DIRECTOR IN YOUR OWN LAB;

02:52PM  7    RIGHT?

02:52PM  8    A.   YES.

02:52PM  9    Q.   AND WITHIN YOUR OWN LAB, HOW MANY PEOPLE WORKED IN YOUR

02:52PM  10   LAB?

02:52PM  11   A.   INCLUDING THE PEOPLE RUNNING OR DOING THE DOCUMENTATION,

02:52PM  12   TWO OR THREE.

02:52PM  13   Q.   TWO OR THREE.

02:52PM  14        AND IS IT FAIR TO SAY FOR THE MOST PART THAT THEY RAN THE

02:52PM  15   LAB AND YOU SUPERVISED THE LAB?

02:52PM  16   A.   YES.

02:52PM  17   Q.   AND THEY WOULD PREPARE THE DOCUMENTATION, YOU WOULD REVIEW

02:52PM  18   IT AND SIGN IT?

02:52PM  19   A.   YES.

02:52PM  20   Q.   IN A WAY THAT WAS SIMILAR TO SOME OF THE THINGS THAT YOU

02:52PM  21   DID OR HAD DONE AT THERANOS; IS THAT RIGHT?

02:52PM  22   A.   YES, THEY WOULD GIVE ME DOCUMENTS TO SIGN, YES.

02:52PM  23   Q.   AND YOU WERE RELYING UPON THEM TO PREPARE THE DOCUMENTS

02:53PM  24   BUT YOU WOULD REVIEW THEM BEFORE YOU WOULD SIGN THEM; IS THAT

02:53PM  25   RIGHT?

02:53PM   1    A.   I WOULD RELY ON THEM TO PREPARE THEM CORRECTLY, YES.

02:53PM   2    Q.   DO YOU RECALL THAT AFTER MR. BALWANI HAD THIS EXCHANGE

02:53PM   3    WITH YOU, AS REFERENCED IN EXHIBIT 2219, THAT HE PUT YOU IN

02:53PM   4    TOUCH WITH THERANOS'S REGULATORY COUNSEL, MR. ARINGTON?

02:53PM   5    A.   I DON'T RECALL HAVING A CONVERSATION -- THIS IS GOING BACK

02:53PM   6    SIX YEARS, SO I DON'T RECALL HAVING A CONVERSATION WITH

02:53PM   7    MR. ARINGTON AT THE TIME, BUT IF I DID, I DID.

02:53PM   8    Q.   WHY DON'T WE TAKE A LOOK AT EXHIBIT 13961, WHICH SHOULD BE

02:53PM   9    IN YOUR BLACK BINDER.

02:54PM  10         DO YOU HAVE IT THERE, DR. DHAWAN?

02:54PM  11    A.   YEAH.

02:54PM  12    Q.   AND DO YOU RECOGNIZE THIS TO BE AN EMAIL BETWEEN YOU AND

02:54PM  13    BRAD ARINGTON OF THERANOS DISCUSSING SOME REGULATORY ISSUES IN

02:54PM  14    NOVEMBER OF 2014?

02:54PM  15    A.   YES, I SEE THAT EMAIL RIGHT THERE, YES.

02:54PM  16         MR. WADE:  I MOVE THE ADMISSION OF 13961.

02:54PM  17         MR. SCHENK:  NO OBJECTION.

02:54PM  18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:54PM  19         (DEFENDANT'S EXHIBIT 13961 WAS RECEIVED IN EVIDENCE.)

02:55PM  20    BY MR. WADE:

02:55PM  21    Q.   ONCE WE HAVE THE EMAIL UP, WE'LL GO TO THE LAST EMAIL ON

02:55PM  22    THE BOTTOM OF THE CHAIN, AND I THINK IT'S THE FOURTH PAGE.

02:55PM  23    IT'S MR. ARINGTON'S EMAIL TO YOU ON NOVEMBER 21ST, 2014.

02:55PM  24         I'LL DO THE ELMO WITH THIS ONE.

02:55PM  25         DO YOU SEE THAT EMAIL?

02:55PM  1    A.   YES.

02:55PM  2    Q.   AND DO YOU RECALL IN THIS TIME PERIOD -- DO YOU RECALL

02:55PM  3    MR. ARINGTON WAS THE SENIOR REGULATORY COUNSEL AT THERANOS?

02:55PM  4    A.   YES, THAT'S WHAT IS WRITTEN HERE.

02:56PM  5    Q.   AND HE WAS A LAWYER WHOSE JOB IT WAS TO DOT THE I'S AND

02:56PM  6    CROSS THE T'S FROM FROM A REGULATORY STANDPOINT?  WAS THAT YOUR

02:56PM  7    UNDERSTANDING?

02:56PM  8    A.   YES.

02:56PM  9    Q.   OKAY.  AND HE WAS REACHING OUT TO YOU TO GATHER SOME

02:56PM 10    INFORMATION IN THIS EMAIL TO MAKE SURE THAT YOU MET THE

02:56PM 11    REGULATORY QUALIFICATIONS TO SERVE IN THIS POSITION; IS THAT

02:56PM 12    RIGHT?

02:56PM 13    A.   YES.

02:56PM 14    Q.   AND OVER A FEW DAYS IT LOOKS LIKE YOU EXCHANGED EMAILS AND

02:56PM 15    PHONE CALLS WHERE MR. ARINGTON MADE SURE THAT YOU MET ALL OF

02:56PM 16    THE REQUIREMENTS.

02:56PM 17         DO YOU RECALL THAT?

02:56PM 18    A.   YES.

02:56PM 19    Q.   AND YOU PROVIDED HIM THE INFORMATION THAT HE NEEDED IN

02:56PM 20    ORDER TO MAKE SURE THAT YOU MET THE REQUIREMENTS?

02:56PM 21    A.   YES.

02:56PM 22    Q.   OKAY.  AND THEN A SHORT TIME LATER SOME PAPERWORK WAS

02:56PM 23    PREPARED.

02:56PM 24         DO YOU RECALL THAT?  FORMALLY PUTTING YOU ON THE CLIA

02:56PM 25    LICENSE?

02:56PM 1    A.   YEAH.  THIS IS AGAIN GOING BACK SIX YEARS, BUT IF I COULD

02:56PM 2    SEE THE DOCUMENTS THAT YOU HAVE.

02:56PM 3    Q.   YES.

02:56PM 4    A.   I RECALL SOMETHING BEING DONE TO THAT EFFECT.

02:57PM 5    Q.   WE'LL GET TO THE DOCUMENTS EITHER TODAY OR TOMORROW

02:57PM 6    MORNING.

02:57PM 7    A.   UH-HUH.

02:57PM 8    Q.   DO YOU RECALL ABOUT THE SAME TIME THERE WAS ANOTHER LAB

02:57PM 9    DIRECTOR THAT WAS ADDED TO THE LICENSE AT THERANOS?

02:57PM 10   A.   I DON'T RECALL THAT.

02:57PM 11   Q.   DO YOU RECALL A WOMAN BY THE NAME OF LYNETTE SAWYER, WHO

02:57PM 12   IS A PH.D., SERVING AS A LAB DIRECTOR AT THERANOS DURING THIS

02:57PM 13   SAME PERIOD?

02:57PM 14   A.   I DON'T RECALL HER NAME.

02:57PM 15   Q.   OKAY.  LET'S SEE IF WE CAN REFRESH YOUR RECOLLECTION ON

02:57PM 16   THIS.

02:57PM 17        LET'S TAKE A LOOK AT EXHIBIT 2553.

02:58PM 18        DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

02:58PM 19   A.   YES.

02:58PM 20   Q.   AND THE FIRST PAGE IS COVER CORRESPONDENCE.

02:58PM 21        BUT DO YOU SEE THE SECOND PAGE OR THE THIRD PAGE IS AN

02:58PM 22   APPLICATION FOR RENEWAL OF THE CLIA LABORATORY LICENSE?

02:58PM 23        DO YOU SEE THAT?

02:58PM 24   A.   YES.

02:58PM 25   Q.   OKAY.  AND IS THAT YOUR SIGNATURE ON THIS DOCUMENT?

02:58PM   1     A.   YES.

02:58PM   2              MR. WADE:  YOUR HONOR, I MOVE THE ADMISSION OF

02:58PM   3     EXHIBIT 2553.

02:58PM   4              MR. SCHENK:  JUST ONE MOMENT, YOUR HONOR, PLEASE.

02:58PM   5          (PAUSE IN PROCEEDINGS.)

02:59PM   6              THE COURT:  THE ENTIRETY OF THIS DOCUMENT, MR. WADE?

02:59PM   7              MR. WADE:  I'M GOING TO GET TO OTHER PIECES OF IT,

02:59PM   8     SO I'LL MOVE THE ADMISSION OF IT NOW.

02:59PM   9              MR. SCHENK:  NO OBJECTION.

02:59PM  10              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:59PM  11          (GOVERNMENT'S EXHIBIT 2553 WAS RECEIVED IN EVIDENCE.)

02:59PM  12     BY MR. WADE:

02:59PM  13     Q.   AND UP ON YOUR SCREEN DO YOU SEE THE THIRD PAGE OF

02:59PM  14     EXHIBIT 2553 THAT I REFERENCED PREVIOUSLY?

02:59PM  15     A.   YES.

02:59PM  16     Q.   AND DO YOU SEE THAT THERE ARE TWO LAB DIRECTORS WHO ARE

02:59PM  17     IDENTIFIED FOR THERANOS ON THIS CERTIFICATE?

02:59PM  18     A.   YES.

02:59PM  19     Q.   OKAY.  AND DO YOU HAVE ANY FAMILIARITY WITH RESPECT TO

02:59PM  20     WHAT MS. -- I'M SORRY, DR. SAWYER WAS DOING AT THERANOS?

02:59PM  21     A.   I NEVER MET DR. SAWYER.

02:59PM  22     Q.   YOU NEVER MET HER SO IT MAY HAVE BEEN SHE WAS DOING

02:59PM  23     SEPARATE FUNCTIONS FROM THE FUNCTIONS YOU PERFORMED AT

02:59PM  24     THERANOS; IS THAT FAIR?

02:59PM  25     A.   YES, BUT I NEVER MET HER.

03:00PM 1     Q.   OKAY.  ARE YOU AWARE IN CONNECTION WITH YOUR REVIEW OF

03:00PM 2     POLICIES THAT DR. SAWYER SIGNED MANY POLICIES EARLIER IN YOUR

03:00PM 3     TENURE BEFORE I THINK IN THAT GAP WHERE YOU WERE TOLD WHERE YOU

03:00PM 4     DIDN'T RECEIVE ANY COMMUNICATIONS FROM THE COMPANY?

03:00PM 5     A.   CAN YOU RE-ASK THAT QUESTION.  I'M SORRY, I DIDN'T

03:00PM 6     UNDERSTAND.

03:00PM 7     Q.   YES.  IT WASN'T A VERY GOOD QUESTION.

03:00PM 8         LET ME JUST SHOW YOU A DOCUMENT.  TAKE A LOOK AT 10531.

03:00PM 9     A.   YES.

03:00PM 10    Q.   THIS IS A DOCUMENT THAT WAS SIGNED BY DR. SAWYER.

03:01PM 11        DO YOU SEE THAT?

03:01PM 12    A.   YES.

03:01PM 13    Q.   AND DID YOU HAVE AN OCCASION TO REVIEW THIS PARTICULAR

03:01PM 14    DOCUMENT WHEN YOU WERE WORKING WITH THERANOS?

03:01PM 15    A.   I DON'T RECALL EVER SEEING THIS DOCUMENT.

03:01PM 16    Q.   OKAY.

03:01PM 17        MOVE THE ADMISSION OF 10531.

03:01PM 18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:01PM 19        (DEFENDANT'S EXHIBIT 10531 WAS RECEIVED IN EVIDENCE.)

03:01PM 20    BY MR. WADE:

03:01PM 21    Q.   DO YOU SEE A DOCUSIGN THERE FOR DR. SAWYER?

03:01PM 22    A.   YES.

03:01PM 23    Q.   AND THIS IS FOR A MAY 5TH, 2015 DOCUMENT?

03:01PM 24    A.   YES.

03:01PM 25    Q.   AND THAT'S WHEN SHE SIGNED IT.  IT WAS ACTUALLY EFFECTIVE

| | | |
|---|---|---|
| 03:01PM | 1 | EARLIER. |
| 03:01PM | 2 | DO YOU SEE THAT? |
| 03:01PM | 3 | A.   YES. |
| 03:01PM | 4 | Q.   OKAY. |
| 03:01PM | 5 | THE COURT:  SHOULD WE STOP NOW? |
| 03:01PM | 6 | MR. WADE:  NOW IS A GOOD TIME TO STOP. |
| 03:01PM | 7 | THE COURT:  WE'LL TAKE OUR EVENING RECESS NOW, |
| 03:01PM | 8 | LADIES AND GENTLEMEN.  PLEASE RECALL THAT WE'RE GOING TO RESUME |
| 03:02PM | 9 | TOMORROW AT 9:00 A.M., 9:00 A.M., PLEASE.  AND WE WILL STOP AT |
| 03:02PM | 10 | 1:00 P.M., 1:00 P.M. TOMORROW AFTERNOON. |
| 03:02PM | 11 | IN THE INTERIM, PLEASE REMEMBER THE ADMONITION NOT TO DO |
| 03:02PM | 12 | ANY INVESTIGATION, VISIT ANY PLACE, OR IN ANY OTHER WAY TRY TO |
| 03:02PM | 13 | BECOME FAMILIAR WITH THIS CASE OR ANYTHING TO DO WITH IT BY ANY |
| 03:02PM | 14 | INDEPENDENT RESEARCH. |
| 03:02PM | 15 | PLEASE AVOID ANY MEDIA, INCLUDING SOCIAL MEDIA AND OTHER |
| 03:02PM | 16 | CONTACT WITH YOUR FRIENDS AND FAMILY IN THIS REGARD. |
| 03:02PM | 17 | BUT WE'LL SEE YOU TOMORROW MORNING AT 9:00 A.M.  THANK YOU |
| 03:02PM | 18 | VERY MUCH. |
| 03:02PM | 19 | AND YOU CAN STAND DOWN, SIR.  THANK YOU. |
| 03:02PM | 20 | THE WITNESS:  CAN I ASK YOU A QUESTION? |
| 03:02PM | 21 | THE COURT:  WELL, JUST A SECOND.  LET'S JUST LET THE |
| 03:02PM | 22 | JURY GO AND THEN YOU CAN ASK A QUESTION. |
| 03:02PM | 23 | THE WITNESS:  I'M SORRY. |
| 03:02PM | 24 | THE COURT:  NO, NOT AT ALL. |
| 03:03PM | 25 | (JURY OUT AT 3:03 P.M.) |

03:03PM  1                  THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  DOCTOR?

03:03PM  2                  THE WITNESS:  I HAVE TO BE HERE FROM 9:00 TO 1:00?

03:03PM  3                  THE COURT:  YES, 9:00 TO 1:00 TOMORROW.

03:03PM  4                  THE WITNESS:  I HAVE PATIENTS.

03:03PM  5                  THE COURT:  9:00 O'CLOCK TO 1:00.

03:03PM  6                  THE WITNESS:  THAT'S ALL I WANTED TO KNOW.  THANK

03:03PM  7      YOU.

03:03PM  8                  MR. WADE:  WE'LL BE DONE BEFORE 1:00.  HOPEFULLY

03:03PM  9      WELL BEFORE 1:00.

03:03PM  10                  THE WITNESS:  DO YOU HAVE ANY GUESS?  I HAVE PEOPLE

03:03PM  11     VERY ANXIOUS WAITING TO SEE ME AND I'M TRYING TO BE -- TRYING

03:03PM  12     TO ALLAY THEIR ANXIETIES.

03:03PM  13                  THE COURT:  WELL, WE'LL BE FINISHED BY 1:00 O'CLOCK

03:03PM  14     REGARDLESS.

03:03PM  15                  THE WITNESS:  THAT WOULD BE GREAT.  THANK YOU.

03:04PM  16                  THE COURT:  ALL RIGHT.  THANK YOU.

03:04PM  17          THE RECORD SHOULD REFLECT THAT THE WITNESS HAS LEFT FOR

03:04PM  18     THE DAY AND THE JURY HAS LEFT FOR THE DAY.

03:04PM  19          ALL COUNSEL AND MS. HOLMES IS PRESENT.

03:04PM  20          ANYTHING FURTHER?

03:04PM  21                  MR. SCHENK:  NO, YOUR HONOR.

03:04PM  22                  MR. WADE:  NO, YOUR HONOR.

03:04PM  23          I WOULD JUST NOTE THE COLORS OF YOUR TIE AND FOR

03:04PM  24     MR. BOSTIC'S BENEFIT IT'S NOT HALLOWEEN, SO GO GIANTS.

03:04PM  25                  THE COURT:  THANK YOU, SIR.  THANK YOU VERY MUCH.  I

03:04PM   1        APPRECIATE IT.

03:04PM   2             WE'LL SEE YOU TOMORROW.  THANK YOU.

03:04PM   3                  THE CLERK:  COURT IS ADJOURNED.

03:04PM   4        (COURT ADJOURNED AT 3:04 P.M.)

          5

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076
17

18

19   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595
20

21        DATED:  OCTOBER 14, 2021

22

23

24

25