# EXHIBIT 16

<pre>
 1

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5

      UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
 6                                      )
                        PLAINTIFF,      )   SAN JOSE, CALIFORNIA
 7                                      )
              VS.                       )   VOLUME 23
 8                                      )
      ELIZABETH A. HOLMES,             )   OCTOBER 22, 2021
 9                                      )
                        DEFENDANT.      )   PAGES 4318 - 4576
10      _____)

11

                   TRANSCRIPT OF TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14

      FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                           BY:  JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
16                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17
                             BY:  ROBERT S. LEACH
18                                KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

      OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25            TRANSCRIPT PRODUCED WITH COMPUTER
</pre>

```
 1        A P P E A R A N C E S: (CONT'D)
 2

 3        FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                                   BY:  KEVIN M. DOWNEY
 4                                      LANCE A. WADE
                                        KATHERINE TREFZ
 5                                      PATRICK LOOBY
                                        J.R. FLEURMONT
 6                                      SEEMA ROPER
                                   725 TWELFTH STREET, N.W.
 7                                 WASHINGTON, D.C. 20005

 8                                 LAW OFFICE OF JOHN D. CLINE
                                   BY:  JOHN D. CLINE
 9                                 ONE EMBARCADERO CENTER, SUITE 500
                                   SAN FRANCISCO, CALIFORNIA 94111
10

11        ALSO PRESENT:           FEDERAL BUREAU OF INVESTIGATION
                                   BY:  ADELAIDA HERNANDEZ
12
                                   OFFICE OF THE U.S. ATTORNEY
13                                 BY:  LAKISHA HOLLIMAN, PARALEGAL
                                        MADDI WACHS, PARALEGAL
14
                                   WILLIAMS & CONNOLLY
15                                 BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

16                                 TBC
                                   BY:  BRIAN BENNETT, TECHNICIAN
17

18

19

20

21

22

23

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**SHANE WEBER**
DIRECT EXAM BY MR. LEACH                    P. 4358
CROSS-EXAM BY MR. CLINE                     P. 4406
REDIRECT EXAM BY MR. LEACH                  P. 4429


**JOHN BRYAN TOLBERT**
DIRECT EXAM BY MR. SCHENK                    P. 4433
CROSS-EXAM BY MR. DOWNEY                     P. 4523
REDIRECT EXAM BY MR. SCHENK                  P. 4566
RECROSS-EXAM BY MR. DOWNEY                   P. 4568

```
1                        INDEX OF EXHIBITS

2
                                     IDENT.      EVIDENCE
3       GOVERNMENT'S:

4       143                                       4362
        159                                       4366
5       162                                       4372
        167, REDACTED PAGE 1                      4380
6       174                                       4393
        5387D                                     4404
7       3790                                      4440
        4871                                      4449
8       3940                                      4456
        949                                       4458
9       4030                                      4463
        1346                                      4466
10      1348                                      4472
        1349                                      4472
11      3530                                      4516

12

13

        DEFENDANT'S:
14
        10561                                     4426
15

16

17

18

19

20

21

22

23

24

25
```

```
           1    SAN JOSE, CALIFORNIA                    OCTOBER 22, 2021

08:41AM    2                    P R O C E E D I N G S

08:41AM    3          (COURT CONVENED AT 8:41 A.M.)

08:41AM    4          (JURY OUT AT 8:41 A.M.)

08:41AM    5               THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

08:41AM    6    MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS PRESENT.

08:41AM    7          WE'RE OUTSIDE, EXCUSE ME, THE PRESENCE OF THE JURY.  I

08:41AM    8    WANTED TO TALK TO COUNSEL ABOUT A COUPLE OF MATTERS.

08:41AM    9          FIRST OF ALL, IN REGARDS TO EXHIBIT 5387, I THINK IT'S D,

08:41AM   10    WE -- I THINK WE ADMITTED THAT THE OTHER DAY.  WE DID THAT

08:41AM   11    OUTSIDE OF THE PRESENCE OF THE JURY, WHICH IS NOT PROPER.  WE

08:41AM   12    NEED TO DO THAT -- ANY EVIDENCE NEEDS TO BE INTRODUCED IN THE

08:41AM   13    JURY'S PRESENCE.

08:41AM   14          SO I NEGLECTED TO RECALL THAT, SO I'M GOING TO ASK

08:41AM   15    MS. VOLKAR AND MS. TREFZ TO COME FORWARD AGAIN WHEN THE JURY

08:41AM   16    COMES IN AND WE'LL GO THROUGH THAT PROCESS AGAIN.

08:42AM   17          I SEE MS. VOLKAR, AND I SEE MS. TREFZ HERE.

08:42AM   18          SO I THINK I HAVE THE EXHIBIT NUMBER RIGHT, IT IS D,

08:42AM   19    DAVID.

08:42AM   20          AND MS. VOLKAR, IF YOU WOULD BE SO KIND TO COME UP WHEN WE

08:42AM   21    HAVE OUR JURY IN, AND MS. TREFZ, THEN WE'LL DO THAT FORMALITY.

08:42AM   22          THE -- I THINK, MR. WADE, YOU WANTED TO TALK -- WHERE IS

08:42AM   23    MR. WADE?  THERE.

08:42AM   24          YOU WANTED TO TALK ABOUT BRYAN TOLBERT OR SOMETHING.

08:42AM   25               THE CLERK:  MR. DOWNEY.
```

```
08:42AM   1              THE COURT:  MR. DOWNEY.  I'M SORRY.

08:42AM   2              MR. DOWNEY:  YES.  AND MR. SCHENK AND I HAVE TALKED

08:42AM   3    ABOUT SOME OF THIS, AND I THINK -- LET ME SAY THAT I THINK WE

08:42AM   4    AGREE IN PART ON SOME ISSUES, BUT JUST TO ORIENT THE COURT

08:42AM   5    BEFORE THIS IS IN FRONT OF THE JURY BECAUSE ONE OF THE ISSUES

08:42AM   6    HAS A LITTLE BIT MORE TO CONSIDER WITH IT, ALTHOUGH THE COURT

08:42AM   7    MAY NOT WANT TO DECIDE UNTIL THE ISSUE IS LIVE.

08:42AM   8         FIRST OF ALL, I THINK ON ONE ISSUE ACTUALLY MR. SCHENK AND

08:42AM   9    I AGREE.  THERE'S AN EXHIBIT, WHICH IS EXHIBIT 1344, WHICH IS A

08:43AM  10    SERIES OF NOTES FROM A CONFERENCE CALL WHICH WE'LL HEAR A TAPE

08:43AM  11    OF DURING THE TESTIMONY OF MR. TOLBERT.

08:43AM  12         THE NOTES THEMSELVES, I THINK MR. SCHENK AND I AGREE, ARE

08:43AM  13    NOT ADMISSIBLE.  THE NOTES ARE HEARSAY.  OF COURSE HE CAN SHOW

08:43AM  14    THEM TO THE WITNESS TO TRY TO REFRESH THE WITNESS'S

08:43AM  15    RECOLLECTION.

08:43AM  16         AND THERE ARE CIRCUMSTANCES UNDER WHICH THEY COULD BECOME

08:43AM  17    ADMISSIBLE, BUT I DON'T ANTICIPATE THOSE.  SO I THINK THAT IS

08:43AM  18    LARGELY RESOLVED.

08:43AM  19              THE COURT:  OKAY.

08:43AM  20              MR. DOWNEY:  THE SECOND ISSUE IS IN CONNECTION WITH

08:43AM  21    EXHIBIT 3086.  THIS IS AN EMAIL WHICH ACTUALLY DOESN'T HAVE

08:43AM  22    PARTICULAR RELEVANCE TO MR. TOLBERT, I THINK.

08:43AM  23         THIS IS AN EMAIL SENT BY THERANOS TO ALL SHAREHOLDERS IN

08:43AM  24    JANUARY OF 2016 -- I'M SORRY, YOUR HONOR, THIS IS 3086.

08:43AM  25              THE COURT:  YES.
```

08:43AM 1        MR. DOWNEY:  THIS IS A SHAREHOLDER LETTER THAT WAS

08:43AM 2    SENT TO ALL SHAREHOLDERS.  IT ESSENTIALLY REPEATS THE

08:44AM 3    ALLEGATIONS OF "THE WALL STREET JOURNAL" ARTICLE WHICH HAS

08:44AM 4    ALREADY BEEN RULED INADMISSIBLE, SO IT'S ANOTHER LAYER OF

08:44AM 5    HEARSAY RELATED TO THAT, AND IT REPEATS THE ALLEGATIONS

08:44AM 6    CONTAINED IN THE CMS REPORT, WHICH AS YOUR HONOR KNOWS, HAS

08:44AM 7    BEEN ADMITTED IN PART, BUT NOT ADMITTED IN PART.

08:44AM 8        AND THEN IT OFFERS, ON A HEARSAY BASIS, THE COMPANY'S SORT

08:44AM 9    OF OWN DEFENSES FOR BOTH OF THOSE EVENTS.

08:44AM 10        I DON'T THINK -- THIS WITNESS IS NOT PARTICULARLY

08:44AM 11   IMPORTANT AS TO THAT, BUT I THINK IN ANY EVENT THERE ARE A

08:44AM 12   COUPLE OF OTHER ISSUES WITH IT.

08:44AM 13        I DON'T KNOW THAT HIS TESTIMONY MATTERS.

08:44AM 14        FIRST OF ALL, THIS IS ALL OUTSIDE OF THE SCOPE OF THE

08:44AM 15   CONSPIRACY.  AS YOUR HONOR KNOWS, THE INVESTOR CONSPIRACY ENDS

08:44AM 16   IN 2015, SO THIS DISCUSSION OF THESE MATTERS AFTER THE END OF

08:44AM 17   THE CONSPIRACY IS NOT REALLY RELEVANT TO THE CONSPIRACY

08:44AM 18   ALLEGATION DURING THE COURSE OF THE CASE.

08:45AM 19        THE SECOND ISSUE, YOUR HONOR, THERE'S SORT OF MULTIPLE

08:45AM 20   LAYERS OF HEARSAY IN HERE.  THERE'S QUOTES OF "THE WALL STREET

08:45AM 21   JOURNAL" QUOTING WITNESSES, AND THEN QUOTES OF OTHER WITNESSES,

08:45AM 22   NOT DIRECT QUOTES, BUT SUMMARIZED QUOTES OF WHAT REFUTES THOSE

08:45AM 23   ALLEGATIONS ON THE PART OF THE COMPANY.  SO IT'S JUST A MESS IN

08:45AM 24   TERMS OF THE HEARSAY ISSUES, FRANKLY.

08:45AM 25        AND I THINK TO SORT IT OUT EITHER NOW OR IN REALTIME WOULD

08:45AM 1    BE VERY DIFFICULT.

08:45AM 2        I THINK ALSO THIS IS KIND OF WHAT THE CASE -- SOME OF THIS

08:45AM 3    IS WHAT PART OF THE CASE IS ABOUT, AND I THINK TO TRY TO

08:45AM 4    INTRODUCE A DOCUMENT THAT IS A PAGE AND A HALF EMAIL, YOU KNOW,

08:45AM 5    POST CONSPIRACY DISCUSSING IT IS -- YOU KNOW, RAISES A LOT OF

08:45AM 6    403 ISSUES.

08:45AM 7        WHEN MR. TOLBERT, YOU KNOW, HAPPENED TO RECEIVE THIS

08:45AM 8    EMAIL, YOU KNOW, DOESN'T REALLY ADD VERY MUCH.

08:45AM 9            THE COURT:  THANK YOU.

08:45AM 10       MR. SCHENK?

08:45AM 11           MR. SCHENK:  I'LL START IN TURN WITH 1344,

08:46AM 12   MR. TOLBERT'S NOTES.  I DO NOT INTEND TO OFFER THAT DURING

08:46AM 13   MR. TOLBERT'S DIRECT TESTIMONY TODAY.

08:46AM 14       IT IS, THOUGH, SOMETHING THAT COULD BE READ TO THE JURY

08:46AM 15   UNDER 803(5).  IT WOULDN'T BE ADMITTED AND GO BACK, BUT IT IS

08:46AM 16   SOMETHING THAT IS ADMISSIBLE UNDER THAT RULE OF EVIDENCE SHOULD

08:46AM 17   IT BECOME RELEVANT AND NECESSARY.

08:46AM 18       IT'S NOTES OF A CALL THAT WE HAVE A RECORDING OF, SO WE

08:46AM 19   CAN PLAY THAT AND I THINK SATISFY THE CONTENT OF THE RECORDING

08:46AM 20   IN A DIFFERENT WAY.

08:46AM 21       BUT QUESTIONS OF MR. TOLBERT ABOUT HIS RECOLLECTION OF THE

08:46AM 22   RECALL, I'M SORRY, OF THE CALL OR HIS INTERPRETATION OF THE

08:46AM 23   CALL COULD BE -- COULD MAKE IT RELEVANT UNDER THAT RULE OF

08:46AM 24   EVIDENCE.

08:46AM 25       AGAIN, I DON'T INTEND TO OFFER IT.

08:46AM  1    BUT I WANT TO BE CLEAR THAT THE GOVERNMENT IS NOT

08:46AM  2    CONCEDING THAT IT'S NOT RELEVANT OR ADMISSIBLE, AND AGAIN,

08:46AM  3    ADMISSIBLE IS A LITTLE BIT DIFFERENT NOT TO GO BACK TO THE

08:46AM  4    JURY, BUT RATHER TO BE READ INTO EVIDENCE AS A MARKED EXHIBIT.

08:47AM  5    I DON'T THINK THE COURT NEEDS TO MAKE A DECISION ON THAT

08:47AM  6    NOW BECAUSE I DON'T ANTICIPATE THAT BECOMING NECESSARY.

08:47AM  7    BUT IF IT DOES, IT WOULD BE ON THAT BASIS THAT THE

08:47AM  8    GOVERNMENT WOULD SEEK TO HAVE THE DOCUMENT READ, OR AT LEAST

08:47AM  9    PORTIONS OF THE DOCUMENT READ TO THE JURY.

08:47AM 10    THE COURT:  THANK YOU.

08:47AM 11    MR. SCHENK:  ON 3086, YOUR HONOR, THIS IS A DOCUMENT

08:47AM 12    WHERE THERANOS SENDS AN EMAIL TO ALL SHAREHOLDERS AND THEN

08:47AM 13    MR. TOLBERT TAKES THAT EMAIL AND SHARES IT WITH OTHER

08:47AM 14    INDIVIDUALS AT HALL GROUP.

08:47AM 15    LULLING STATEMENTS ARE RELEVANT AFTER THE FACT.  IT'S

08:47AM 16    ADMISSIBLE ON THAT GROUND.

08:47AM 17    THE DEFENSE HAS INTRODUCED ON MANY OCCASIONS IN THIS TRIAL

08:47AM 18    POST INVESTMENT EVIDENCE.  THE COURT HAS HEARD TESTIMONY ABOUT

08:47AM 19    AN INDIVIDUAL NAMED DAVID HELFET, THE COURT HAS HEARD TESTIMONY

08:47AM 20    ABOUT THE SCIENTIFIC AND ADVISORY BOARD, THE COURT HAS HEARD

08:48AM 21    TESTIMONY ABOUT CHANNING ROBERTSON'S ROLE AFTER THE FACT.

08:48AM 22    IT CANNOT BE THAT THE DEFENSE IS ALLOWED TO INTRODUCE POST

08:48AM 23    INVESTMENT EVIDENCE TO SUGGEST THAT EITHER THE THERANOS

08:48AM 24    TECHNOLOGY WORKED OR THAT MS. HOLMES DIDN'T HAVE AN INTENT TO

08:48AM 25    DEFRAUD, BUT THAT THE GOVERNMENT IS PRECLUDED FROM OFFERING

POST INVESTMENT EVIDENCE.

I THINK THAT THE EVIDENCE DISPROVES THE EXISTENCE OF KNOWLEDGE, AND ALSO THIS PARTICULAR DOCUMENT BRAGS ABOUT A NEW LAB DIRECTOR NAMED DR. DAS.

DR. DAS WILL BE A WITNESS IN THIS TRIAL.  THERANOS LIKED HIM AND WANTED SHAREHOLDERS TO LIKE AND APPRECIATE THE WORK THAT HE'S GOING TO DO, AND THAT'S AN IMPORTANT THING FOR THE JURY TO KNOW WHEN DR. DAS TAKES THE STAND, THAT AT LEAST INITIALLY THAT THERANOS WAS VERY PROUD TO BRING DR. DAS WITHIN THE FOLD.

I THINK THAT I CAN AGREE NOT TO OFFER THIS IN DIRECT OF TOLBERT BECAUSE MOST OF HIS TESTIMONY IS GOING TO BE ABOUT THE DECISION TO MAKE THE INVESTMENT.

BUT IT CERTAINLY IS NOT THE CASE THAT THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING POST -- THE DATE HERE IS DECEMBER 31ST, 2013.  THAT'S WHEN THE WIRE WENT FROM HALL TO THERANOS.

POST DECEMBER 31ST, 2013 EVIDENCE IS CERTAINLY RELEVANT, AND THE DEFENSE HAS ARGUED TO THE COURT AND TO THE JURY THAT AFTER INVESTMENT EVIDENCE IS RELEVANT.

SO IT SHOULD NOT BE THE CASE THAT THE GOVERNMENT IS PRECLUDED FROM OFFERING EVIDENCE FOLLOWING AN INVESTMENT, ESPECIALLY EVIDENCE OF THIS SORT WHEN THE REPRESENTATIONS REGARDING CMS OR THE SIGNIFICANCE OF THE CMS INVESTIGATION, THE INDIVIDUALS WHO MIGHT BE SHARING INFORMATION, THE WHISTLE

08:49AM 1    BLOWERS AND THE WAY THAT THERANOS IS EXPLAINING THAT IS ALL

08:49AM 2    CERTAINLY RELEVANT.

08:49AM 3        IN OTHER CONTEXTS WE FOLLOWED THAT RULE.  ARTICLES, FOR

08:50AM 4    INSTANCE, AREN'T RELEVANT WHEN WE JUST WANT TO INTRODUCE THE

08:50AM 5    SPECIFIC ARTICLE.  THEY BECOME RELEVANT WHEN THERANOS SENDS

08:50AM 6    THAT ARTICLE TO SHAREHOLDERS SORT OF IN THE GUISE OF, YOU WANT

08:50AM 7    TO LEARN MORE ABOUT OUR TECHNOLOGY, READ THIS ARTICLE.

08:50AM 8        SO THINGS THAT MIGHT OTHERWISE BE EXCLUDABLE IN THIS CASE

08:50AM 9    BECOME RELEVANT ADMISSIBLE EVIDENCE WHEN THERANOS MAKES

08:50AM 10   REPRESENTATIONS TO SHAREHOLDERS THAT SHAREHOLDERS SHOULD RELY

08:50AM 11   ON THAT LULL THEM INTO BELIEVING THAT EVERYTHING IS STILL OKAY

08:50AM 12   AT THERANOS AND SORT OF IMPLICITLY DISCOURAGE SHAREHOLDERS FROM

08:50AM 13   CONTACTING LAW ENFORCEMENT THROUGH THOSE REPRESENTATIONS.

08:50AM 14       FOR ALL OF THOSE REASONS THIS IS RELEVANT AND ADMISSIBLE

08:50AM 15   EVIDENCE.

08:50AM 16       I CAN LIMIT MY QUESTIONS ON DIRECT TO AVOID THIS, BUT I

08:50AM 17   DON'T WANT THE COURT TO MAKE A RULING THAT THE GOVERNMENT'S

08:50AM 18   SHOULD BE PRECLUDED FROM OFFERING EVIDENCE OF THIS TYPE BECAUSE

08:50AM 19   OF THE DATE OR BECAUSE OF THE CONTENT.

08:50AM 20       THE COURT:  THANK YOU.

08:50AM 21       IS IT -- DO I HEAR YOU SAY THEN THAT YOUR INTENT IS NOT

08:51AM 22   SPECIFICALLY, AT LEAST INITIALLY, TO INTRODUCE THE DOCUMENT,

08:51AM 23   BUT RATHER TO PROBE THE ISSUES CONTAINED IN THE DOCUMENT?

08:51AM 24       MR. SCHENK:  I WOULD BE HAPPY TO LIMIT MR. TOLBERT'S

08:51AM 25   DIRECT UP THROUGH THE DATE OF THE INVESTMENT AND CUT IT OFF

08:51AM  1    THERE FOR TODAY'S PURPOSES.

08:51AM  2        I WOULD LIKE TO SEE THE KINDS OF QUESTIONS THAT THE

08:51AM  3    DEFENSE ASKS ON CROSS.  I WONDER IF THE DEFENSE IS GOING TO ASK

08:51AM  4    EVEN ONE QUESTION THAT CALLS ON EVENTS AFTER JANUARY 1, 2014.

08:51AM  5    THAT WOULD OPEN THE DOOR FOR THIS WITNESS.

08:51AM  6        BUT I DON'T WANT TO SUGGEST TO THE COURT THAT THE DOOR

08:51AM  7    NEEDS TO BE OPENED SORT OF FROM RIGHT NOW GOING FORWARD.

08:51AM  8            THE COURT:  SURE.

08:51AM  9            MR. SCHENK:  THEY'VE OPENED THE DOOR THROUGH

08:51AM  10   COUNTLESS WITNESSES WHEN THEY'VE TALKED ABOUT THE 2016/2017

08:51AM  11   EVENTS AT THERANOS AND THE DOOR IS OPENED, SO I DON'T WANT THE

08:51AM  12   COURT TO THINK I DON'T ALREADY BELIEVE I CAN GO THERE.

08:51AM  13       I JUST DON'T THINK IT'S NECESSARY TO GO THERE WITH

08:51AM  14   MR. TOLBERT.  LET'S SEE WHAT KIND OF QUESTIONS THAT THE DEFENSE

08:52AM  15   HAS.

08:52AM  16           THE COURT:  ALL RIGHT.

08:52AM  17           MR. DOWNEY:  YOUR HONOR, IF I MIGHT QUICKLY COMMENT?

08:52AM  18           THE COURT:  DO YOU WANT TO BE HEARD ABOUT DOORS,

08:52AM  19   MR. DOWNEY.

08:52AM  20           MR. DOWNEY:  FIRST OF ALL, LET ME JUST COMMENT ON

08:52AM  21   THE DATES.  I THINK IN MR. SCHENK'S FIRST COMMENT HE SAID 2013

08:52AM  22   AND HE MEANT 2015.

08:52AM  23       FIRST OF ALL, LULLING IS A COMPONENT OF A CONSPIRACY AND

08:52AM  24   CAN BE AN OVERT ACT IN FURTHERANCE OF A CONSPIRACY.

08:52AM  25       THIS WITNESS IS NOT RELEVANT TO ANY CONSPIRACY EVIDENCE

08:52AM  1    AFTER DECEMBER 31ST, 2015.

08:52AM  2         I'M NOT CERTAIN IF THERE'S A LOT OF EVIDENCE DURING THE

08:52AM  3    COURSE OF THE CONSPIRACY AFTER THE INVESTMENT.  WE CAN SEE WHAT

08:52AM  4    HAPPENS THERE.

08:52AM  5         BUT I CERTAINLY AGREE THAT EVIDENCE FROM AFTER

08:52AM  6    DECEMBER 31ST, 2015, WHICH IS THE TERMINATION OF THE

08:52AM  7    CONSPIRACY, OR SOME DATE IN 2015 BEFORE THAT, WON'T COME IN

08:52AM  8    THROUGH US OR THROUGH THEM.

08:52AM  9              THE COURT:  ALL RIGHT.  WELL, THIS IS A STAY TUNED

08:52AM 10    TYPE OF AN EVENT.  THANK YOU FOR HIGHLIGHTING THAT.

08:53AM 11              MR. DOWNEY:  YEAH.  AND I'LL JUST SAY, YOUR HONOR,

08:53AM 12    THIS IS A SIMPLER ISSUE, BUT THERE WILL BE A COUPLE OF

08:53AM 13    DOCUMENTS, AT LEAST MAYBE ONE, WHERE MR. TOLBERT'S NOTES WILL

08:53AM 14    BE SOUGHT TO INTRODUCE.  I'M NOT SURE WHAT THE LEVEL OF

08:53AM 15    FOUNDATION WILL BE THAT'S LAID IN CONNECTION WITH THEM, BUT

08:53AM 16    GENERALLY I DON'T THINK HANDWRITTEN NOTES OF AN INDIVIDUAL

08:53AM 17    EMPLOYEE OR TYPED NOTES OF AN INDIVIDUAL EMPLOYEE CONSTITUTE A

08:53AM 18    BUSINESS RECORD UNDER NINTH CIRCUIT LAW, SO I THINK WE'LL BE

08:53AM 19    OBJECTING TO THOSE.

08:53AM 20         1344 IS ONE EXAMPLE.

08:53AM 21         AGAIN, I'M NOT SURE THEY WILL BE OFFERED, BUT THEY ARE

08:53AM 22    AMONGST THE EXHIBITS THAT WE'VE BEEN PROFFERED.

08:53AM 23              THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM 24         ANYTHING FURTHER, MR. SCHENK, ON THAT?

08:53AM 25              MR. SCHENK:  JUST ON THAT LAST POINT.  803(5)

08:53AM  1   DOESN'T REQUIRE BUSINESS RECORDS, SO I WOULDN'T LAY THE

08:53AM  2   FOUNDATION THAT WAY SHOULD 1344 BE A DOCUMENT THAT IS ENTITLED

08:53AM  3   TO BE READ TO THE JURY, BUT NOT ADMITTED FOR DELIBERATION.

08:53AM  4        THE COURT:  ALL RIGHT.  THANK YOU.

08:53AM  5   I WANTED TO TALK ABOUT THE SHANE WEBER EXHIBIT.  THAT MAY

08:54AM  6   BECOME RELEVANT THIS MORNING I THINK.

08:54AM  7        MR. DOWNEY:  I THINK THAT'S RIGHT.

08:54AM  8        MR. SCHENK:  YES.

08:54AM  9        MR. DOWNEY:  THERE ARE SOME OTHER ISSUES RELATED TO

08:54AM  10  WHAT WOULD BE THE FOURTH WITNESS TODAY, IF WE GOT TO THE FOURTH

08:54AM  11  WITNESS.  I THINK WE BOTH HAVE UNCERTAINTY AS TO WHETHER WE

08:54AM  12  WILL OR WHETHER WE --

08:54AM  13       THE COURT:  LET'S TAKE THAT UP AFTER OUR BREAK AND

08:54AM  14  SEE WHERE WE ARE ON THAT.

08:54AM  15       MR. DOWNEY:  YEAH.  AND THEY'RE ALSO NOT LARGE

08:54AM  16  ISSUES.

08:54AM  17       THE COURT:  THANK YOU.

08:54AM  18  TURNING TO THE WEBER DOCUMENT THAT WE DISCUSSED YESTERDAY,

08:54AM  19  AND WE HAD SOME ROBUST DISCUSSION ABOUT WHETHER OR NOT THE

08:54AM  20  DOCUMENT ITSELF SHOULD BE ADMITTED, I LISTENED TO THE ARGUMENTS

08:54AM  21  AND I'VE REVIEWED THE DOCUMENT ITSELF.

08:54AM  22  I THINK MR. CLINE'S OBJECTION -- WHERE ARE YOU MR. CLINE?

08:55AM  23  THERE YOU ARE -- I THINK MR. CLINE'S OBJECTIONS WERE THE

08:55AM  24  PEJORATIVE NATURE OF THE TERMS THAT WERE USED DESCRIBED

08:55AM  25  THINGS -- YOU CAN COME FORWARD IF YOU WOULD LIKE.  THANK YOU --

08:55AM 1  WERE OTHERWISE OFFENSIVE AND APPROPRIATE UNDER A 403 ANALYSIS.

08:55AM 2      WHAT I HEARD YOU SAY SEVERAL TIMES WAS THAT IT WAS

08:55AM 3  PROFOUNDLY UNFAIR -- AND WE'RE TALKING ABOUT UNDER A 403

08:55AM 4  ANALYSIS, WHETHER OR NOT PREJUDICE IS UNFAIR.  EVERYTHING THAT

08:55AM 5  THE PROSECUTION ADVANCES AGAINST YOUR CLIENT OBVIOUSLY IS

08:55AM 6  PREJUDICIAL TO HER INTEREST.

08:55AM 7      THE QUESTION THAT WE'RE LOOKING AT UNDER 403 IS, IS THIS

08:55AM 8  UNFAIR PREJUDICE?  AND IF SO, IN WHAT MANNER, AND WHAT IS THE

08:55AM 9  REMEDY IF IT IS?

08:55AM 10      AND I HEARD YOU SAY SEVERAL TIMES THAT YOUR CONCERN IS

08:55AM 11  THAT THE JURY WOULD HAVE THIS DOCUMENT AND THEY WOULD REVIEW IT

08:55AM 12  IN THEIR DELIBERATIONS AND WOULD HAVE THOSE PEJORATIVE TERMS,

08:55AM 13  AS YOU PUT IT, IN FRONT OF THEM.  THEY COULD DRAW CONCLUSIONS,

08:55AM 14  PERHAPS UNFAIR AND INAPPROPRIATE CONCLUSIONS, ABOUT THIS ONE

08:56AM 15  WITNESS, MR. WEBER'S EVALUATION.

08:56AM 16      AND WHAT WE KNOW, AGAIN, THE CHRONOLOGY OF THIS, AS I

08:56AM 17  UNDERSTAND FROM BOTH OF YOU, WAS THAT THERANOS REACHED OUT TO

08:56AM 18  PFIZER FOR BUSINESS RELATIONSHIP PURPOSES.  THERE WAS A

08:56AM 19  CONFERENCE CALL.  I THINK THAT WAS IN NOVEMBER OF 2008,

08:56AM 20  NOVEMBER 13TH, 2008.

08:56AM 21      IS THAT RIGHT?

08:56AM 22          MR. CLINE:  YES.

08:56AM 23      JUST TO BACK UP A TINY BIT.  THERE HAD BEEN A BUSINESS

08:56AM 24  RELATIONSHIP FOR A COUPLE OF YEARS AT THIS POINT.

08:56AM 25      IN NOVEMBER 2008, DR. WEBER IS ASKED TO REVIEW A REPORT

08:56AM 1     THAT THERANOS HAD SUBMITTED THAT'S AROUND THE BEGINNING OF

08:56AM 2     NOVEMBER, NOVEMBER 6TH, I THINK, 2008, AND THEN ON THE 13TH, AS

08:56AM 3     YOUR HONOR SAYS, THERE WAS THIS CONFERENCE CALL WITH DR. WEBER

08:56AM 4     ON ONE HAND AND A NUMBER OF THERANOS PEOPLE, INCLUDING

08:56AM 5     MS. HOLMES, ON THE OTHER.

08:56AM 6         THE COURT:  THANK YOU.

08:56AM 7       AND THEN HE -- "HE" MR. WEBER -- THEN WAS ASSIGNED

08:57AM 8     APPARENTLY TO EVALUATE THE RELATIONSHIP.  THERE WERE 25

08:57AM 9     QUESTIONS, I THINK, THAT WERE POSED.  HE WROTE HIS REPORT ON,

08:57AM 10    AT LEAST WE HAVE IT ON DECEMBER 31, 2008.  THAT'S THE DOCUMENT

08:57AM 11    IN QUESTION HERE.

08:57AM 12        MR. CLINE:  YES.

08:57AM 13        THE COURT:  AND THEN THERE WAS A FOLLOW-UP CALL WITH

08:57AM 14    MS. HOLMES AND MR. WEBER I THINK SOMETIME IN JANUARY OF 2009.

08:57AM 15        MR. CLINE:  CORRECT.

08:57AM 16        THE COURT:  I THINK THOSE ARE THE SEMINAL DATES AS

08:57AM 17    FAR AS THIS DOCUMENT IS CONCERNED.

08:57AM 18      AND IT SEEMS TO ME, AS I REREAD THIS SEVERAL TIMES, THE

08:57AM 19    CRITICISMS THAT I THINK YOU RAISE, MR. CLINE, ABOUT THE

08:57AM 20    LANGUAGE, IT SEEMS TO ME THAT THOSE CRITICISMS ARE NOT REALLY

08:57AM 21    SPECIFIC TO MS. HOLMES, AND I KNOW YOU WERE TALKING ABOUT THEY

08:57AM 22    COULD BE INFERRED AS HIS COMMENT ABOUT HER VERACITY, HER

08:57AM 23    PERSONAL VERACITY.

08:57AM 24      BUT WHEN I LOOK AT THOSE, IT SEEMS THAT HIS COMMENTS, HE'S

08:58AM 25    REALLY TALKING ABOUT THE TECHNICAL RESPONSES --

08:58AM 1         MR. CLINE:  WELL --

08:58AM 2         THE COURT:  -- AND THAT SEEMS TO BE WHAT HE'S

08:58AM 3    REFERRING TO WHEN HE'S CRITICAL OF THAT.

08:58AM 4       GO AHEAD.

08:58AM 5         MR. CLINE:  I'M SORRY, YOUR HONOR.

08:58AM 6         THE COURT:  NO, NO.  YOU'RE EAGER TO SPEAK AND YOU

08:58AM 7    WANT TO STOP ME.

08:58AM 8         MR. CLINE:  I'M CHOMPING AT THE BIT HERE.

08:58AM 9       THERE ARE SORT OF TWO SETS OF RESPONSES HERE.  THERE ARE

08:58AM 10   THE RESPONSES TO THE ORAL QUESTIONS ON THE NOVEMBER 13TH CALL;

08:58AM 11   AND THEN THERE WRITTEN RESPONSES TO WHAT MR. FRENZEL SAID.

08:58AM 12      DR. WEBER IN HIS REPORT USES VERY SIMILAR LANGUAGE FOR

08:58AM 13   BOTH, EVASIVE -- I FORGET ALL OF THE DIFFERENT TERMS, BUT

08:58AM 14   THEY'RE PEJORATIVE TERMS AND I THINK THEY DO COMMENT ON THE

08:58AM 15   CREDIBILITY OF THE PERSON PROVIDING THE ANSWER.

08:58AM 16      ON THE NOVEMBER 13TH CALL, I BELIEVE DR. WEBER WILL

08:58AM 17   TESTIFY THAT ALTHOUGH THERE WERE A NUMBER OF THERANOS PEOPLE ON

08:58AM 18   THE LINE, MS. HOLMES DID ALL OF THE TALKING.

08:59AM 19        THE COURT:  RIGHT.

08:59AM 20        MR. CLINE:  SO WHEN HE SAYS THE ANSWERS ON THAT

08:59AM 21   NOVEMBER 13TH CALL WERE EVASIVE, DEFLECTIVE, WHATEVER TERMS HE

08:59AM 22   USES, HE'S TALKING ABOUT MS. HOLMES.  AND THAT IS A 403 ISSUE,

08:59AM 23   AND I THINK IT'S ALSO A 701 ISSUE ABOUT THE CREDIBILITY OF

08:59AM 24   MS. HOLMES.  AND I DON'T THINK THAT'S SHOULD COME IN.

08:59AM 25        THE COURT:  SURE.  WHAT IS INTERESTING ABOUT THE

08:59AM 1     DOCUMENT, ISN'T IT, THAT DESPITE HIS CRITICISMS AND USE OF

08:59AM 2     THOSE TERMS, HE DOES SUGGEST THAT THEY SHOULD ENGAGE IN SIX

08:59AM 3     MONTHS TO SEE IF WHETHER OR NOT EITHER THE TECHNOLOGY HAS

08:59AM 4     CHANGED OR THE CONVERSATION HAS CHANGED SUCH THAT PFIZER WOULD

08:59AM 5     HAVE GREATER COMFORT IN CONTINUING, RENEWING, WHATEVER, THE

08:59AM 6     BUSINESS RELATIONSHIP.

08:59AM 7          ONE OF HIS CRITICISMS WAS THAT THERE WERE TOO MANY, THERE

08:59AM 8     ARE TOO MANY COOKS IN THE KITCHEN, SO TO SPEAK, AND HE WANTS TO

08:59AM 9     NARROW IT DOWN TO ONE GROUP, ONE TEAM THAT THERANOS COULD THEN

09:00AM 10    CONTACT, AND HE SUGGESTS DOING THAT IN SIX MONTHS.

09:00AM 11         THAT SEEMS TO TEMPER SOMEWHAT THE COMMENTS THAT YOU'VE

09:00AM 12    MADE ABOUT THE PEJORATIVE NATURE OF THOSE TERMS.

09:00AM 13         IT SUGGESTS, LIKE YOUR MATH TEACHER -- BUT NOT YOU,

09:00AM 14    MR. CLINE, BECAUSE I KNOW YOU EXCELLED IN MATH.

09:00AM 15              MR. CLINE:  I MADE IT THROUGH SOPHOMORE COLLEGE

09:00AM 16    MATH, JUST SO YOU KNOW.

09:00AM 17              THE COURT:  YOUR MATH TEACHER WOULD SAY, SHOW ME

09:00AM 18    YOUR WORK.  YOU HAVE TO SHOW ME YOUR WORK.

09:00AM 19         AND I DON'T MEAN TO MAKE LIGHT OF THIS, BUT THAT'S

09:00AM 20    SOMEWHAT I THINK THE WAY THE COMMENTS CAN BE INFERRED, AND

09:00AM 21    SUPPORTING THAT IS THE FACT THAT THE DOOR ISN'T CLOSED.  LET'S

09:00AM 22    REGROUP IN SIX MONTHS AND LET'S SEE WHAT YOU COME UP WITH.

09:00AM 23         SO I THINK TEMPERS IT.

09:00AM 24         NOW, LET ME SAY THIS:  I UNDERSTAND YOUR CONCERN NOW ABOUT

09:00AM 25    HAVING THIS DOCUMENT ADMITTED SUCH THAT THE JURY COULD HAVE IT.

09:00AM 1    I CAPTURE YOUR 403 CONCERNS ABOUT THAT.

09:00AM 2        WHAT I'M GOING TO DO, MR. LEACH, IS I'M GOING TO ALLOW

09:01AM 3    THIS DOCUMENT TO BE MARKED AS AN EXHIBIT, AND WHAT I INTEND TO

09:01AM 4    DO -- AND YOU'RE GOING TO LAY A FOUNDATION, I PRESUME, FOR ALL

09:01AM 5    OF THIS.

09:01AM 6        MR. LEACH:  YES, YOUR HONOR.

09:01AM 7        THE COURT:  AND THEN I'M GOING TO ALLOW THIS TO BE

09:01AM 8    USED NOW AS A DEMONSTRATIVE.  YOU'LL BE ABLE TO DISPLAY THIS TO

09:01AM 9    THE JURY, YOU'LL BE ABLE TO QUESTION, ASSUMING THE FOUNDATION

09:01AM 10    IS LAID, AND YOU'LL BE ABLE TO EXAMINE ON THIS, AS WILL YOU,

09:01AM 11    MR. CLINE.

09:01AM 12        WHETHER OR NOT IT'S INTRODUCED AS A FORMAL EXHIBIT OR NOT,

09:01AM 13    I'M GOING TO RESERVE JUDGMENT ON THAT.

09:01AM 14        SO IT CAN BE USED, MAY BE USED, AS A DEMONSTRATIVE, BOTH

09:01AM 15    THIS MORNING AND BY COUNSEL, IF YOU WISH, IN ARGUMENT.  IN

09:01AM 16    FINAL ARGUMENT IF YOU WISH TO USE IT, IT WILL BE A

09:01AM 17    DEMONSTRATIVE.

09:01AM 18        BUT AT THIS POINT I'M NOT GOING TO ALLOW IT TO GO IN

09:01AM 19    EVIDENCE ABSENT ANY ADDITIONAL FOUNDATION.

09:01AM 20        NOW, THIS ALSO -- WE ALSO TALKED ON -- YOU TOUCHED ON A

09:01AM 21    702 OBJECTION IN REGARDS TO SOME OF THE SCIENTIFIC TERMS, AND I

09:02AM 22    THINK THE FACT THAT IT'S USED AS A DEMONSTRATIVE I THINK ALSO

09:02AM 23    ACTS PROPHYLACTICALLY ABOUT ELIMINATING THAT ISSUE ABOUT THE

09:02AM 24    JURY TO RECEIVE THIS AND THE 702 ISSUE.

09:02AM 25        MY SENSE IS, MR. LEACH, YOU'RE NOT GOING TO EXAMINE ON ANY

```
09:02AM   1         OF THOSE TOPICS.

09:02AM   2                    MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

09:02AM   3                    THE COURT:  SO I THINK THAT TAKES CARE OF THAT 702

09:02AM   4         ISSUE.

09:02AM   5            SO THAT'S THE COURT'S RULING ON THE DOCUMENT, AND WE'LL

09:02AM   6         SEE IF IT COMES IN FOR SOME OTHER PURPOSE.

09:02AM   7                    MR. LEACH:  THANK YOU, YOUR HONOR.

09:02AM   8                    MR. CLINE:  YOUR HONOR, ONE THING.

09:02AM   9                    THE COURT:  SURE.

09:02AM  10                    MR. CLINE:  I'M GUESSING WHAT MR. LEACH WILL DO IS

09:02AM  11         LAY A FOUNDATION AND THEN OFFER THE DOCUMENT AS A

09:02AM  12         DEMONSTRATIVE.

09:02AM  13                    THE COURT:  RIGHT.

09:02AM  14                    MR. CLINE:  MAY MY OBJECTION TO THAT BE NOTED SO I

09:02AM  15         DON'T HAVE TO GET UP IN FRONT OF THE JURY?

09:02AM  16                    THE COURT:  ABSOLUTELY, ABSOLUTELY.

09:02AM  17            YOU CAN GET UP IF YOU WANT, BUT I'LL NOTE YOUR OBJECTION

09:02AM  18         NOW IF YOU WANT.  YOUR OBJECTION IS PRESERVED.

09:03AM  19                    MR. CLINE:  ALL RIGHT.

09:03AM  20                    THE COURT:  ANYTHING FURTHER ON THAT, MR. LEACH?

09:03AM  21                    MR. LEACH:  I DON'T WANT TO COMPLICATE MATTERS

09:03AM  22         UNDULY, YOUR HONOR, BUT WOULD IT BE POSSIBLE TO OFFER THE FIRST

09:03AM  23         PAGE INTO EVIDENCE AND DISPLAY THE REMAINDER OF THE DOCUMENT?

09:03AM  24         I THINK THE THRUST OF MR. CLINE'S CONCERNS ARE LIMITED TO THE

09:03AM  25         COMMENTARY.
```

```
09:03AM   1              THE COURT:  THE FIRST PAGE IS --

09:03AM   2              MR. LEACH:  THE FIRST PAGE INCLUDES AN OVERVIEW, THE

09:03AM   3    RECOMMENDATIONS, AND THEN IT BEGINS THE REVIEW AND COMMENTS ON

09:03AM   4    THERANOS-PROVIDED INFORMATION.

09:03AM   5         I THINK MANY OF THE COMMENTS MR. CLINE IS RAISING ABOUT

09:03AM   6    THE EVASIVE NATURE OF THE RESPONSES AND THE POORLY PREPARED

09:03AM   7    SUMMARY ARE LIMITED TO PAGE 2 AND 3.

09:03AM   8              THE COURT:  WELL, RIGHT.  AND THAT'S A GOOD

09:03AM   9    QUESTION.

09:03AM  10         I NOTE THAT, AS I LOOK THROUGH THIS, I WAS LOOKING, WHEN

09:03AM  11    DOES THE -- FOR MR. CLINE'S POSITION, WHEN DOES THE BAD STUFF

09:03AM  12    START?

09:04AM  13              MR. CLINE:  WELL, THE FIRST BIT OF BAD STUFF IS ON

09:04AM  14    PAGE 1 WHERE DR. WEBER SAYS, "THERANOS HAS BEEN EXCESSIVELY

09:04AM  15    PUSHY IN ACCESSING NEW POINTS OF CONTACT ONCE TURNED DOWN.

09:04AM  16    THEIR MULTIPLE INTERACTIONS CAUSED UNDUE DISTRACTION FROM OUR

09:04AM  17    ONGOING WORK."

09:04AM  18         I MEAN, AGAIN, NONE OF THIS GETS CONVEYED TO MS. HOLMES.

09:04AM  19    IT'S QUITE A DIFFERENT PICTURE THAT GETS CONVEYED.

09:04AM  20         AND SO WE -- IF PAGE 1 COMES IN, I WILL SAY THAT PAGE 1,

09:04AM  21    ASSUMING A FOUNDATION CAN BE LAID, A BUSINESS RECORDS

09:04AM  22    FOUNDATION, I'M ASSUMING MR. LEACH CAN DO THAT, OTHERWISE

09:04AM  23    PAGE 1 IS OKAY.

09:04AM  24         BUT I WOULD ASK THAT, BEGINNING WITH "THERANOS HAS BEEN

09:04AM  25    EXCESSIVELY PUSHY" --
```

```
09:04AM   1              THE COURT:  THIS IS IN ITEM 3, I THINK.
09:04AM   2              MR. CLINE:  YES.  FROM THERE UNTIL THE END OF THAT
09:04AM   3    PARAGRAPH OUGHT TO BE REDACTED.
09:04AM   4          AND WITH THAT REDACTION AND WITH AN APPROPRIATE
09:05AM   5    FOUNDATION, WHICH, AGAIN, I'M SURE MR. LEACH WILL LAY, WE DON'T
09:05AM   6    HAVE A PROBLEM WITH PAGE 1 COMING IN.
09:05AM   7              THE COURT:  ALL RIGHT.
09:05AM   8              MR. LEACH:  I DON'T SHARE THE CONCERN ABOUT
09:05AM   9    EXCESSIVELY PUSHY AND UNDUE DISTRACTION, YOUR HONOR, BUT THAT
09:05AM  10    CERTAINLY IS A REASONABLE SOLUTION HERE.
09:05AM  11              THE COURT:  ALL RIGHT.  WELL, THANK YOU.  IF YOU CAN
09:05AM  12    REDACT THAT, I THINK YOU CAN --
09:05AM  13              MR. LEACH:  YES.
09:05AM  14              THE COURT:  -- THEN UPON THE PROPER FOUNDATION, THEN
09:05AM  15    PAGE 1, PAGE 1 OF THE REPORT OF EXHIBIT 167.
09:05AM  16              MR. LEACH:  I CAN'T DO THAT, BUT MY SUPERSTAR
09:05AM  17    PARALEGAL, LAKISHA HOLLIMAN, CAN DO THAT.
09:05AM  18              THE COURT:  WELL, WE'VE SEEN HER WORK, AND BOTH OF
09:05AM  19    THE TECHNICIANS' WORK AND WE'RE GRATEFUL FOR THEM.
09:05AM  20          OKAY.  GREAT.
09:06AM  21              MR. LEACH:  THANK YOU, YOUR HONOR.
09:06AM  22              THE COURT:  ALL RIGHT.  NOW I NEED TO TALK TO
09:06AM  23    COUNSEL ABOUT ANOTHER MATTER THAT HAS COME UP, AND I'M GOING TO
09:06AM  24    ASK MS. KRATZMANN TO HAND DOWN SOME -- TWO TO EACH SIDE.
09:06AM  25              THE CLERK:  (HANDING.)
```

| | |
|---|---|
| 09:06AM | 1 |

09:06AM 1    (PAUSE IN PROCEEDINGS.)

09:06AM 2         THE COURT:  THANK YOU.  I'VE SHARED WITH COUNSEL AN

09:06AM 3    EMAIL THAT MS. KRATZMANN RECEIVED.

09:06AM 4         MY THOUGHT IS TO -- AND THIS REGARDS THE ABILITY OF A

09:07AM 5    JUROR, A SITTING JUROR, AND MY THOUGHT IS TO -- WELL, FIRST OF

09:07AM 6    ALL, LET ME SUGGEST TO COUNSEL, I WANT TO ADDRESS THIS BEFORE

09:07AM 7    WE BEGIN ANY EVIDENCE THIS MORNING, AND WHAT I THOUGHT I WOULD

09:07AM 8    DO IS INVITE THE JUROR IN.

09:07AM 9         IF YOUR TEAM WANTS TO IDENTIFY ONE LAWYER, WE'LL GO IN

09:07AM 10   CHAMBERS AND SPEAK WITH THIS JUROR ABOUT THIS ISSUE ON THE

09:07AM 11   RECORD.

09:07AM 12        MR. DOWNEY:  THAT'S FINE WITH US, YOUR HONOR.

09:07AM 13        MR. SCHENK:  YES, YOUR HONOR.

09:07AM 14        THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL TAKE OUR

09:07AM 15   BREAK THEN BEFORE WE BEGIN EVIDENCE AND MS. KRATZMANN WILL

09:07AM 16   CONTACT YOU WHEN WE CAN BEGIN THAT.

09:07AM 17        MR. LEACH.

09:07AM 18        MR. LEACH:  YOUR HONOR, ONE OTHER MATTER WITH

09:07AM 19   RESPECT TO 167, AND I'M SORRY TO RAISE THIS NOW.

09:07AM 20        THE COURT:  YES.  NO, NO.

09:07AM 21        MR. LEACH:  I WAS CONVERSING WITH OUR TEAM, AND I

09:07AM 22   JUST WANT TO MAKE SURE THAT I UNDERSTAND THE COURT'S RULING.

09:07AM 23        WE WILL OFFER PAGE 1 WITH THE REDACTION INTO EVIDENCE, BUT

09:07AM 24   WE MAY STILL DISPLAY AS A DEMONSTRATIVE THE REMAINDER OF THE

09:07AM 25   DOCUMENT.

| | |
|---|---|
| 09:07AM | 1 |
| 09:08AM | 2 |
| 09:08AM | 3 |
| 09:08AM | 4 |
| 09:08AM | 5 |
| 09:08AM | 6 |
| 09:08AM | 7 |
| 09:08AM | 8 |
| 09:08AM | 9 |
| 09:08AM | 10 |
| 09:08AM | 11 |
| 09:08AM | 12 |
| 09:08AM | 13 |
| 09:08AM | 14 |
| 09:08AM | 15 |
| 09:08AM | 16 |
| 09:08AM | 17 |
| 09:08AM | 18 |
| 09:08AM | 19 |
| 09:08AM | 20 |
| 09:09AM | 21 |
| 09:09AM | 22 |
| 09:09AM | 23 |
| 09:09AM | 24 |
| 09:09AM | 25 |

1    THE COURT:  THAT'S CORRECT.

2    MR. LEACH:  AND IS IT NECESSARY TO REDACT THE

3  EXCESSIVELY PUSHY LANGUAGE AS TO THE DEMONSTRATIVE PORTION?

4    THE COURT:  NO, NO.  I'M LETTING THAT IN.  HE CAN

5  TALK ABOUT THAT.

6    MR. LEACH:  OKAY.

7    THE COURT:  HIS OBSERVATIONS -- "HIS" MR. WEBER'S --

8  OBSERVATIONS, THEY'RE HIS PERSONAL OBSERVATIONS, AND YOU CAN

9  CERTAINLY CROSS-EXAMINE HIM ON HIS FEELINGS ABOUT -- I VIEW

10  THIS AS THE SAME AS SOMEBODY TESTIFYING ABOUT THEIR -- WHICH A

11  WITNESS CAN DO WHEN THEY TALK TO SOMEONE -- DID THEY APPEAR

12  NERVOUS?  DID THEY APPEAR CALM?  WERE THEY EXCITED?

13    MR. CLINE:  WELL, YOUR HONOR, IT KIND OF DEFEATS THE

14  PURPOSE IF THE JURY IS SHOWN THE LANGUAGE AND THEN THE ADMITTED

15  DOCUMENT HAS THAT LANGUAGE REDACTED, THE JURY IS GOING TO KNOW

16  WHAT IS UNDER THE REDACTION AND THEY'RE GOING TO -- IF

17  ANYTHING, IT WILL HEIGHTEN THE IMPORTANCE OF IT.  SO I WOULD

18  ASK --

19    THE COURT:  OH, NO, I'M SORRY.

20    YOU'RE TALKING ABOUT THE BALANCE OF THE REPORT.  THAT'S

21  WHAT I THOUGHT YOU WERE TALKING ABOUT, MR. LEACH.

22    MR. LEACH:  YES.

23    THE COURT:  NOT PAGE 1.  PAGE 1 WILL BE ADMITTED

24  WITH THE REDACTIONS.  IT WON'T BE SHOWN WITH THE REDACTIONS.

25    THE BALANCE OF THE EXHIBIT THAT IS GOING TO BE A

09:09AM 1    DEMONSTRATIVE WILL HAVE THAT SAME LANGUAGE IN IT?

09:09AM 2              MR. CLINE:  THE SAME LANGUAGE IT CONTAINS NOW?

09:09AM 3              THE COURT:  CORRECT.

09:09AM 4              MR. CLINE:  SO THE DEMONSTRATIVE THAT HE'S GOING TO

09:09AM 5    PUT UP WILL NOT HAVE AN UNREDACTED PAGE 1 ON IT, IT WILL BE THE

09:09AM 6    REMAINING PAGES OF THE EXHIBIT.

09:09AM 7              THE COURT:  THE REMAINING PAGES WILL NOT BE

09:09AM 8    REDACTED.

09:09AM 9              MR. CLINE:  UNDERSTOOD.

09:09AM 10       BUT HERE'S WHAT I UNDERSTOOD MR. LEACH TO BE SAYING AND

09:09AM 11   WHAT I WANT TO MAKE SURE DOESN'T HAPPEN.  PAGE 1 IS GOING TO

09:09AM 12   COME IN WITH THAT REDACTION.

09:09AM 13             THE COURT:  CORRECT.

09:09AM 14             MR. CLINE:  MR. LEACH WILL BE PERMITTED TO PUT UP A

09:09AM 15   DEMONSTRATIVE.  THE DEMONSTRATIVE WILL NOT INCLUDE AN

09:09AM 16   UNREDACTED PAGE 1.

09:09AM 17             THE COURT:  THAT'S CORRECT.

09:09AM 18             MR. CLINE:  ALL RIGHT.

09:09AM 19             MR. LEACH:  I UNDERSTAND, YOUR HONOR.

09:09AM 20             THE COURT:  IT'S PAGE 2 ON, WHATEVER THEY ARE --

09:09AM 21             MR. CLINE:  YES.

09:09AM 22             MR. LEACH:  MAY BE DISPLAYED UNREDACTED?

09:09AM 23             THE COURT:  YES.

09:09AM 24             MR. LEACH:  BUT NOT COMING INTO EVIDENCE?

09:09AM 25             THE COURT:  RIGHT.

```
09:09AM   1              MR. CLINE:  THANK YOU.

09:10AM   2              THE COURT:  GREAT.

09:10AM   3              THE CLERK:  COURT IS IN RECESS.

09:10AM   4          (RECESS FROM 9:10 A.M. UNTIL 9:24 A.M.)

09:39AM   5          (THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS.)

09:39AM   6              THE COURT:  GOOD MORNING.

09:39AM   7              JUROR:  GOOD MORNING.

09:39AM   8              THE COURT:  WE ARE ON THE RECORD.  WE ARE IN MY

09:39AM   9      CHAMBERS WITH JUROR NUMBER 5.

09:39AM  10          ALSO PRESENT ARE MR. DOWNEY, MR. SCHENK, AND MY LAW CLERK

09:39AM  11      STAFF, AND OUR COURTROOM DEPUTY.

09:39AM  12          I WANTED TO HAVE THIS CONVERSATION WITH YOU, JUROR

09:39AM  13      NUMBER 5.  I'M GOING TO ADDRESS YOU AS JUROR NUMBER 5.

09:39AM  14          LET ME ASK YOU YOUR COMFORT ABOUT KEEPING YOUR MASK ON OR

09:39AM  15      OFF.  WHAT WOULD YOU LIKE?

09:39AM  16              JUROR:  I DON'T REALLY HAVE A PREFERENCE.

09:39AM  17              THE COURT:  OKAY.  SHALL WE KEEP THEM ON THEN?  IS

09:39AM  18      THAT WHAT YOU WOULD LIKE TO DO?

09:39AM  19              JUROR:  SURE.

09:39AM  20              THE COURT:  I CALLED YOU BACK HERE BECAUSE IT'S COME

09:39AM  21      TO MY ATTENTION THAT DURING THE TESTIMONY OF OUR CASE JUST

09:39AM  22      RECENTLY, THAT I THOUGHT I MAY HAVE OBSERVED, AND IT'S COME TO

09:39AM  23      MY ATTENTION, THAT YOU MAY HAVE BEEN ENGAGED IN SOMETHING ELSE

09:39AM  24      OTHER THAN LISTENING TO THE TESTIMONY.

09:39AM  25              LET ME BE SPECIFIC.  I THINK IT WAS SUDOKU OR ONE OF THOSE
```

```
09:39AM   1    NUMBER GAMES.

09:39AM   2              JUROR:  UH-HUH.

09:39AM   3              THE COURT:  AND I NEED TO ASK YOU ABOUT THAT, IF YOU

09:39AM   4    WERE, IN FACT, ENGAGED IN THAT.

09:39AM   5        AND I THINK YOU CAN APPRECIATE THE REASON WHY.  I NEED TO

09:39AM   6    KNOW WHETHER OR NOT YOU WERE FOCUSSED ON THE TRIAL AT HAND,

09:39AM   7    DISTRACTED, MISSED SOME TESTIMONY, AND THAT'S WHY I CALLED YOU

09:39AM   8    IN TO TALK TO YOU ABOUT THAT HERE.  I DIDN'T WANT TO DO THIS IN

09:39AM   9    FRONT OF YOUR COLLEAGUE JURORS, NOR IN THE PUBLIC SETTING,

09:39AM  10    ALTHOUGH THIS TRANSCRIPT IS GOING TO BE A PUBLIC TRANSCRIPT.

09:39AM  11        SO I JUST WANTED TO ASK YOU QUESTIONS ABOUT THAT, PLEASE.

09:39AM  12              JUROR:  SURE.  YEAH.  I DEFINITELY HAVEN'T MISSED

09:39AM  13    ANY TESTIMONY AT ALL, YEAH.

09:39AM  14              THE COURT:  OKAY.  WERE YOU -- WERE YOU -- AM I

09:39AM  15    CORRECT, WERE YOU PLAYING THIS SUDOKU?

09:39AM  16              JUROR:  I DO HAVE SUDOKU, BUT IT DOESN'T INTERFERE

09:39AM  17    WITH ME LISTENING.  I'M VERY FIDGETY, SO I NEED TO DO SOMETHING

09:39AM  18    WITH MY HANDS.  SO AT HOME I'LL CROCHET WHILE I'M WATCHING OR

09:39AM  19    LISTENING TO T.V.

09:39AM  20        OTHER THAN THAT, NO.

09:39AM  21              THE COURT:  SO WERE YOU PLAYING THE GAME WHILE

09:39AM  22    TESTIMONY WAS -- OR I DON'T KNOW IF THAT'S THE RIGHT TERM,

09:39AM  23    PLAYING THE SUDOKU OR FILLING OUT THE FORM -- WERE YOU ENGAGED

09:39AM  24    IN THAT WHILE TESTIMONY WAS GOING ON?

09:39AM  25              JUROR:  I DO DO IT INTERMITTENTLY THROUGH THE
```

```
09:39AM   1    TESTIMONY, BUT I'M FULLY ENGAGED.
09:39AM   2             THE COURT:  OKAY.  CAN YOU TELL ME HOW OFTEN YOU'VE
09:39AM   3    DONE THAT, AND CAN YOU TELL ME WHEN YOU'VE DONE THAT?
09:39AM   4             JUROR:  NOT TOO OFTEN.  SO I JUST HAVE IT THERE TO
09:39AM   5    HELP ME FIDGET BECAUSE I DON'T KNOW IF YOU NOTICE, I MOVE A LOT
09:39AM   6    IN THE SEAT, TOO.  I HAVE A HARD TIME SITTING STILL.
09:39AM   7             THE COURT:  RIGHT.  SO WHEN YOU'RE DOING THE GAME,
09:39AM   8    IT'S A -- YOU KNOW, YOU'RE FILLING OUT THAT GAME, HAVE YOU DONE
09:39AM   9    THAT EVERY DAY OF THE TRIAL?
09:39AM  10             JUROR:  NO.
09:39AM  11             THE COURT:  CAN YOU GIVE ME AN IDEA OF WHEN YOU'VE
09:39AM  12    DONE THAT AND HOW OFTEN, HOW LONG YOU DO IT DURING TESTIMONY?
09:39AM  13             JUROR:  PROBABLY -- MAYBE LIKE ONE GAME A TIME,
09:39AM  14    MAYBE.
09:39AM  15             THE COURT:  OKAY.  OKAY.
09:39AM  16             JUROR:  IF THAT DOESN'T -- I DON'T USUALLY FINISH
09:39AM  17    THEM, SO --
09:39AM  18             THE COURT:  I SEE.  AND IT LOOKS LIKE YOU TAKE --
09:39AM  19    YOU HAVE THE GAME PAPER, THE BOOK OUT THERE IN YOUR BINDER AND
09:39AM  20    YOU'RE FILLING IT OUT THEN.
09:39AM  21             JUROR:  YEAH, I HAVE THAT.  I HAVE IT ALONG WITH MY
09:39AM  22    NOTEBOOK.
09:39AM  23             THE COURT:  RIGHT.  RIGHT.
09:39AM  24             JUROR:  SO IF I LOOK AT IT AND I SEE IT A NUMBER, I
09:39AM  25    WRITE IT DOWN AND THEN I WRITE DOWN THE TESTIMONY.
```

01 09:39AM   THE COURT:  SO HAS THIS DISTRACTED YOU FROM
02 09:39AM LISTENING?
03 09:39AM   JUROR:  NO.
04 09:39AM   THE COURT:  HAVE YOU BEEN ABLE TO FOLLOW AND RETAIN
05 09:39AM EVERYTHING THAT IS GOING ON IN THE COURTROOM?
06 09:39AM   JUROR:  OH, YEAH, DEFINITELY.
07 09:39AM   THE COURT:  DO YOU HAVE ANY DOUBT ABOUT THAT?
08 09:39AM   JUROR:  NO.
09 09:39AM   THE COURT:  WHAT -- IF I ASKED YOU TO STOP DOING
10 09:39AM THIS, IS THAT SOMETHING THAT YOU CAN DO?
11 09:39AM   JUROR:  YEAH, THAT'S NOT A PROBLEM.
12 09:39AM   THE COURT:  WILL THAT AFFECT -- IF YOU DON'T PLAY
13 09:39AM THIS WHILE YOU'RE SITTING AS A JUROR, WILL THAT AFFECT YOUR
14 09:39AM ABILITY TO CONTINUE TO LISTEN AND ABSORB THE INFORMATION?
15 09:39AM   JUROR:  NO.
16 09:39AM   THE COURT:  YOU, YOU -- EXCUSE ME.  YOU SAID YOU GET
17 09:39AM FIDGETY, AND I KNOW SITTING A LONG TIME IS PROBABLY SOMETHING
18 09:39AM YOU DON'T DO AT WORK.
19 09:39AM   JUROR:  YEAH, I MOVE AROUND A LOT AT WORK.
20 09:39AM   THE COURT:  RIGHT.  AND ONE THING THAT MIGHT BE
21 09:39AM HELPFUL AND I MAY SUGGEST TO THE JURY, IF THAT BECOMES AN
22 09:39AM ISSUE, THEN LET ME KNOW AND WE'LL TAKE A STANDING BREAK.  I TRY
23 09:39AM TO DO THAT WHEN WE HAVE TRANSITIONS BECAUSE I KNOW IT'S TEDIOUS
24 09:39AM SITTING.
25 09:39AM   BUT LET ME GET BACK TO THIS.  JUROR NUMBER 5, I'M JUST

1    GOING TO BE VERY CANDID WITH YOU.  I DO HAVE VERY SERIOUS

2    CONCERNS WHEN I HEAR AND SEE THAT SOMEONE IS ENGAGED IN

3    SOMETHING ELSE OTHER THAN GIVING THEIR FULL ATTENTION TO THE

4    EVIDENCE IN THE CASE.  IT CAUSES ME GREAT CONCERN AS TO WHETHER

5    OR NOT THAT PERSON, YOU, CAN STILL SERVE AS A JUROR BECAUSE

6    YOU'VE ABSORBED EVERYTHING, YOU'VE LISTENED TO EVERYTHING, SUCH

7    THAT YOU CAN SHARE YOUR OPINIONS WITH YOUR FELLOW JURORS WHEN

8    YOU GO INTO A DELIBERATION ROOM.  THAT'S WHAT A JUROR MUST DO.

9         JUROR:  UH-HUH.

10        THE COURT:  AND IT'S UNFAIR TO BOTH SIDES IF A JUROR

11   WERE TO GO IN AND SAY, OH, GOSH, I GUESS I DIDN'T HEAR THAT

12   BECAUSE I WAS DISTRACTED DOING SOMETHING ELSE.

13        JUROR:  NO, I TOTALLY UNDERSTAND YOUR CONCERNS.

14        THE COURT:  YEAH.  RIGHT.  SO WHAT DO YOU THINK

15   ABOUT THAT?

16        JUROR:  I DON'T FEEL IT HAS AFFECTED ME AT ALL.  I'M

17   VERY GOOD AT RETAINING INFORMATION.

18     SO I DEFINITELY HEARD EVERYTHING THAT HAS BEEN SAID, THE

19   EVIDENCE THAT HAS BEEN PRESENTED, THE QUESTIONS THAT HAVE BEEN

20   ASKED IN REGARDS TO THE EVIDENCE AND THE ANSWERS.  SO I'M

21   REALLY -- I DON'T HAVE ANY --

22        THE COURT:  OKAY.  LET ME JUST SAY, I HAVE -- I

23   WATCH, I TRY TO WATCH EVERYTHING AND I DO PAY ATTENTION TO THE

24   JURORS, AND I'VE SEEN AND WATCHED YOU AND SEEN YOU IN THE CHAIR

25   AS WE MOVE AROUND AND WE MOVE THE JURORS AROUND BECAUSE I WANT

```
09:39AM   1    THE JURORS TO HAVE A FULL EXPERIENCE.  IT'S UNUSUAL THE WAY OUR
09:39AM   2    SEATING IS.
09:39AM   3              JUROR:  YEAH.
09:39AM   4              THE COURT:  BUT I DON'T WANT SOME JURORS TO BE STUCK
09:39AM   5    OUT IN THE OUTSIDE OF THE WELL.  I WANT TO ROTATE EVERYBODY SO
09:39AM   6    THAT THEY CAN OBSERVE EVERYTHING IN THE SAME WAY.
09:39AM   7        BUT I HAVE WATCHED YOU AND I HAVE NOTICED THAT YOU
09:39AM   8    SOMETIMES TURN YOUR CHAIR.  I'VE NOTICED THAT YOU TAKE NOTES.
09:39AM   9    I'M NOT GOING TO ASK YOU TO TELL ME ANYTHING ABOUT ANYTHING
09:39AM  10    YOU'VE HEARD OR YOUR THOUGHTS OR ANYTHING, I DO -- I HAVE
09:39AM  11    NOTICED THAT YOU'RE TAKING NOTES.
09:39AM  12        I'VE NOTICED THAT -- AND THIS IS THE SAME OF ALL JURORS --
09:39AM  13    THERE ARE TIMES WHEN I THINK WE ALL GET TIRED.  THE LAWYERS GET
09:39AM  14    TIRED, THE COURT GETS TIRED.  THE ONLY ONE THAT IS NOT TIRED IS
09:39AM  15    THE COURT REPORTER.  SHE HAS ENERGY LIKE CRAZY.
09:39AM  16        EVERYONE ELSE GETS A LITTLE FATIGUED, I UNDERSTAND THAT.
09:39AM  17    AND WE ALL HAVE OUR MECHANISMS OF FIGHTING THAT OFF, AND
09:39AM  18    HOPEFULLY THE BREAKS WILL DO THAT.
09:39AM  19        IS THIS SOMETHING THAT -- IS THERE SOMETHING THAT I CAN DO
09:39AM  20    TO HELP YOU WITH THIS?  I KNOW YOU USED THE TERM "FIDGETY," YOU
09:39AM  21    GET FIDGETY AND NERVOUS.  IS THERE SOMETHING --
09:39AM  22              JUROR:  NOT PARTICULARLY NERVOUS.  I'M FIDGETY AT
09:39AM  23    WORK AND VERY ACTIVE AND I'M WORKING BACK AND FORTH AND I'M
09:39AM  24    DOING THINGS, TEN THINGS AT ONE TIME.
09:39AM  25        AND JUST SITTING DOWN AND DOING THAT ONE THING AND HAVING
```

```
09:39AM   1        TO LISTEN, IT IS HARD FOR ME TO NOT MOVE AROUND.

09:39AM   2                  THE COURT:  OKAY.

09:39AM   3                  JUROR:  SO I'M ROCKING AND TAPPING MY TOES AND

09:39AM   4        MOVING MY FINGERS AND CRACKING MY HANDS A LOT BECAUSE I DON'T

09:39AM   5        KNOW WHAT TO DO WHEN I'M NOT DOING ALL OF THESE THINGS.

09:39AM   6                  THE COURT:  NO, I'VE SEEN YOU MOVE YOUR CHAIR.

09:39AM   7                  JUROR:  I GO BACK AND FORTH.

09:39AM   8                  THE COURT:  YOU ORIENT YOURSELF NORTH, WEST, SOUTH,

09:39AM   9        EAST, WEST.  I NOTICED THAT, AND THAT'S A SIGNAL TO ME SAYING,

09:39AM  10        GEE, I WOULD LIKE TO TAKE A BREAK, A STANDING BREAK AND THOSE

09:39AM  11        TYPES OF THINGS.

09:39AM  12            AGAIN, I'M JUST CONCERNS ABOUT WHETHER YOU'VE MISSED

09:39AM  13        SOMETHING.

09:39AM  14            AND WHEN YOU PLAY THE GAME, ARE YOU FOCUSSED ENTIRELY ON

09:39AM  15        THE GAME SUCH THAT EVERYTHING IS BLOCKED OUT?

09:39AM  16                  JUROR:  OH, NO, NO.

09:39AM  17                  THE COURT:  WHEN YOU PLAY THE GAME, ARE YOU ABLE TO

09:39AM  18        LISTEN AND --

09:39AM  19                  JUROR:  OH, YEAH.  LIKE I SAID, I DID HEAR

09:39AM  20        EVERYTHING AND I'M TAKING EVERYTHING IN AND I'M WRITING NOTES

09:39AM  21        ON THE SIDE.

09:39AM  22                  THE COURT:  SOME PEOPLE DOODLE I'M TOLD.

09:39AM  23                  JUROR:  YEAH, I DOODLE, TOO, YEAH.  AND, AGAIN, IT'S

09:39AM  24        TRYING TO KEEP MY HANDS BUSY BECAUSE MOST OF IS IT LIKE

09:39AM  25        SCRIBBLING THROUGHOUT THE PAGE.
```

09:39AM  1          THE COURT:  DOES THAT INTERFERE WITH YOUR ABILITY TO

09:39AM  2   PAY ATTENTION OR PAY ATTENTION?

09:39AM  3          JUROR:  NO.

09:39AM  4          THE COURT:  LET ME ASK, JUROR NUMBER 5, DO YOU HAVE

09:39AM  5   ANY DOUBT THAT YOU COULD CONTINUE TO BE A JUROR IN THIS CASE

09:39AM  6   AND PAY ATTENTION AND FOCUS ON THE EVIDENCE AT HAND?  ANY DOUBT

09:39AM  7   ABOUT YOUR ABILITY TO DO THAT?

09:39AM  8          JUROR:  NO, NO DOUBT.

09:39AM  9          THE COURT:  DO YOU FEEL THAT BECAUSE OF YOUR PLAYING

09:39AM  10  THE GAME -- AND HOW MANY TIMES WAS IT?  DID YOU TELL US?

09:39AM  11         JUROR:  I SAID MAYBE ONE GAME AT A TIME.

09:39AM  12         THE COURT:  HOW MANY DAYS?

09:39AM  13         JUROR:  MAYBE SEVEN TO TEN DAYS OVER THE COURSE.

09:39AM  14         THE COURT:  OKAY.  DO YOU THINK IN ANY OF THOSE

09:39AM  15  TIMES THAT YOU PLAYED THAT GAME -- AND HOW LONG DID YOU DO

09:39AM  16  THAT?  HOW LONG WERE YOU PLAYING IT WHEN YOU PLAYED IT?  WAS IT

09:39AM  17  FOR HOURS?  IS IT FOR MINUTES?

09:39AM  18         JUROR:  USUALLY JUST MINUTES.

09:39AM  19         THE COURT:  OKAY.  DO YOU FEEL THAT YOU'VE LOST

09:39AM  20  ANYTHING, THAT IS, MISSED ANY PIECE OF EVIDENCE AT ALL?

09:39AM  21         JUROR:  NO.  NO.

09:39AM  22         THE COURT:  OKAY.  ALL RIGHT.  I'M GOING TO ASK

09:39AM  23  THESE LAWYERS IF THEY HAVE ANY QUESTIONS FOR YOU.

09:39AM  24     OKAY?

09:39AM  25         JUROR:  YES.

09:39AM 1      THE COURT:  MR. SCHENK?

09:39AM 2      MR. SCHENK:  NOTHING FOR ME.

09:39AM 3      MR. DOWNEY:  I DON'T HAVE ANYTHING.  THANK YOU.

09:39AM 4      THE COURT:  ALL RIGHT.  ANY QUESTIONS FOR ME?

09:39AM 5      JUROR:  NO.

09:39AM 6      THE COURT:  OKAY.  AS I SAID, THE TRANSCRIPT IS

09:39AM 7   GOING TO BE PUBLIC.  I'M NOT GOING TO DISCUSS THIS WITH YOUR

09:39AM 8   FELLOW JURORS, AND YOU DON'T HAVE TO EITHER.  YOU CAN KEEP

09:39AM 9   PRIVATE WHAT WE'VE TALKED ABOUT HERE.

09:39AM 10     JUROR:  ALL RIGHT.

09:39AM 11     THE COURT:  THANK YOU VERY MUCH.  THANK YOU FOR YOUR

09:39AM 12  TIME.  I APPRECIATE IT.

09:39AM 13     JUROR:  YOU'RE WELCOME.

09:39AM 14   (PROCEEDINGS HELD OUT OF THE PRESENCE OF JUROR NUMBER 5.)

09:39AM 15     THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

09:39AM 16  JUROR NUMBER 5 HAS LEFT CHAMBERS.  COUNSEL REMAIN.

09:39AM 17    ANY COMMENTS?  MR. SCHENK?  MR. DOWNEY?

09:39AM 18     MR. SCHENK:  I THINK I WOULD LIKE TO SPEND A LITTLE

09:39AM 19  BIT OF TIME REFLECTING ON IT.  THE AMOUNT OF DAYS SEEMED LIKE A

09:39AM 20  HIGH NUMBER.  SEVEN TO TEN DAYS IS SEVERAL WEEKS OF THE TRIAL,

09:39AM 21  BUT THEN THE AMOUNT OF TIME EACH DAY SEEMED SMALL, AND SHE

09:39AM 22  CERTAINLY UNEQUIVOCALLY SAID SHE HAS CAPTURED THE TESTIMONY.

09:39AM 23  IT'S SOMETHING TO DISTRACT HER HANDS, BUT NOT HER MIND.

09:39AM 24    SO THERE'S A LITTLE BIT OF REFLECTING ON THE -- I DON'T

09:39AM 25  KNOW THAT I WOULD CALL IT TENSION BETWEEN THOSE POINTS, BUT

1    SOME THINGS RAISED CONCERNS AND SOME THINGS GAVE ME COMFORT,

2    AND I THINK I WOULD LIKE TO TALK TO MY TEAM AND JUST ALSO

3    REFLECT ON IT, IF THAT'S OKAY.

4            THE COURT:  MR. DOWNEY?

5            MR. DOWNEY:  YOUR HONOR, I ACTUALLY HAVE TO REQUEST

6    FOR A DISMISSAL.  SHE'S BEEN PLAYING A GAME WHICH IS, YOU KNOW,

7    AT A LEVEL OF DISTRACTION IT'S DIFFICULT FOR US TO MEASURE

8    BASED ON HER OWN COMMENTS.

9        WE DO KNOW THAT IT WAS SUFFICIENTLY NOTICEABLE TO ANOTHER

10   JUROR TO BRING IT TO OUR ATTENTION.

11       I THINK IT'S DIFFICULT FOR HER TO EVALUATE WHETHER SHE HAS

12   MISSED TESTIMONY OR EVIDENCE.  SHE KNOWS SHE'S HEARD WHAT SHE

13   HAS HEARD AND SHE KNOWS, OF COURSE, THAT SHE HAS MADE EVERY

14   EFFORT TO PAY ATTENTION.

15       BUT THAT'S, FRANKLY, IMPOSSIBLE FOR US TO EVALUATE.  SO TO

16   MY MIND IT FALLS IN THE SAME CATEGORY AS THE SLEEPING OR DOZING

17   OFF JUROR A LITTLE BIT, SO I HAVE TO REQUEST HER DISMISSAL.

18           THE COURT:  MR. SCHENK?

19           MR. SCHENK:  THE -- MY REVIEW LAST TIME WHEN WE HAD

20   A SIMILAR DISCUSSION OF THE CASES INVOLVING SLEEPING JURORS IS

21   WE DO NOT AUTOMATICALLY DISMISS THEM.  THERE'S INQUIRY INTO THE

22   AMOUNT OF TESTIMONY THAT THEY MISSED OR THE AMOUNT OF TIME THAT

23   THEY WERE SLEEPING, AND THE QUESTIONS THAT YOUR HONOR ASKED AND

24   THE RESPONSES THAT THEY ELICITED DIDN'T RAISE ANY OBVIOUS

25   CONCERNS REGARDING CHUNKS OF TESTIMONY THAT SHE MISSED.

09:39AM 1    BUT I SUPPOSE I GO BACK TO WHERE I STARTED, AND THAT IS IF

09:39AM 2    IT WOULD BE OKAY WITH THE COURT, I WOULD JUST LIKE TO REFLECT

09:39AM 3    ON IT FOR A LITTLE WHILE.  I DON'T KNOW THAT I'M IN A POSITION

09:39AM 4    NOW TO AGREE TO THE REQUEST TO DISMISS THE JUROR.

09:39AM 5        I DON'T THINK THE RECORD IS SUFFICIENT TO SAY IT'S OBVIOUS

09:39AM 6    THAT SHE MUST GO BASED ON AN EXPRESSION OF CHUNKS OF TESTIMONY

09:39AM 7    THAT WERE MISSED.

09:39AM 8        BUT, LOOK, I ACKNOWLEDGE WHAT MR. DOWNEY SAID AND THAT

09:39AM 9    IT'S VERY DIFFICULT TO KNOW EXACTLY HOW MUCH SHE MISSED, AND

09:39AM 10   WHEN SHE SAYS SHE WAS PLAYING THE GAME SEVEN TO TEN DAYS, I

09:39AM 11   HAVEN'T COUNTED, BUT MAYBE THAT'S HALF OF THE TRIAL DAYS.

09:39AM 12        THE COURT:  ALL RIGHT.  THANK YOU.

09:39AM 13        WELL, THAT'S A CONCERN THAT I HAVE.  SHE WAS VERY OPEN

09:39AM 14   ABOUT THE FACT THAT APPARENTLY THIS IS SOMETHING THAT SHE DOES

09:39AM 15   TO TAKE CARE OF HER FIDGETINESS, I THINK SHE SAID, BUT SHE TOLD

09:39AM 16   US THAT IT DOESN'T IMPACT HER ABILITY TO -- AT WORK, FOR

09:39AM 17   EXAMPLE.

09:39AM 18        AND THIS IS A DIFFERENT TYPE OF WORK.  BEING A JUROR IS A

09:39AM 19   DIFFERENT TYPE OF WORK AS WE KNOW.

09:39AM 20        INITIALLY I DID HAVE CONCERNS WHEN SHE TOLD US ABOUT

09:39AM 21   PLAYING THE GAME JUST A MINUTE OR TWO, AND I CAN UNDERSTAND

09:39AM 22   THAT.  IT'S VERY AKIN TO SOMEBODY DOODLING OR SOMETHING LIKE

09:39AM 23   THAT.

09:39AM 24        BUT I AGREE, WHEN SHE MENTIONED THE SEVEN TO TEN DAYS,

09:39AM 25   JUST THE ACCUMULATION OF THE TIME THERE -- AND I DON'T KNOW WHO

09:39AM  1    THE WITNESS WAS, WHO WAS -- WAS IT, YOU KNOW, WAS IT YOUR

09:39AM  2    DIRECT OR YOUR CROSS, YOU KNOW, THAT CAUSES ME SOME CONCERN

09:39AM  3    ABOUT HOW DO WE PARSE THAT OUT AND HOW DO YOU ASK SOMEBODY TO,

09:39AM  4    YOU KNOW, TELL ME WHAT YOU'VE MISSED IN THE EVIDENCE, YOU KNOW.

09:39AM  5    WE CAN'T GET THAT FROM HER.

09:39AM  6         I DO HAVE SOME CONCERNS.  BUT, MR. SCHENK -- AND IF I'M

09:39AM  7    GOING TO EXCUSE THIS JUROR, I'D LIKE TO DO IT BEFORE WE START

09:39AM  8    TODAY'S TESTIMONY, JUST TO GET IT DONE AND MOVE ON.

09:39AM  9         SO WHY DON'T -- MR. SCHENK, I CAN YOU GIVE SOME TIME TO

09:39AM 10    MEET, AND THEN MAY I CALL YOU BOTH BACK HERE IN ABOUT TEN

09:39AM 11    MINUTES?  IS THAT FINE?

09:39AM 12              MR. DOWNEY:  THAT'S FINE, YOUR HONOR.

09:39AM 13              THE COURT:  GREAT.  WHY DON'T YOU DISCUSS WITH YOUR

09:39AM 14    TEAMS.  I'LL BE HERE.  YOU CAN LET MS. KRATZMANN KNOW WHEN YOU

09:39AM 15    WANT TO COME BACK.

09:39AM 16              MR. SCHENK:  THANK YOU, YOUR HONOR.

09:39AM 17              THE COURT:  AND WE'LL FINISH THIS UP.

09:39AM 18         GREAT.  THANK YOU.  WE'RE OFF THE RECORD.  THANK YOU.

09:39AM 19         (RECESS FROM 9:39 A.M. UNTIL 9:54 A.M.)

09:54AM 20              THE COURT:  WE'RE BACK ON THE RECORD.  BOTH COUNSEL

09:54AM 21    ARE PRESENT.  JUROR NUMBER 5 IS NOT PRESENT.  COURT STAFF IS

09:54AM 22    PRESENT ALSO.

09:54AM 23         COUNSEL, YOU'VE HAD AN OPPORTUNITY TO TALK WITH YOUR

09:54AM 24    TEAMS.

09:54AM 25              MR. SCHENK?

09:54AM 1    MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR, FOR

09:54AM 2    GIVING US THAT TIME.

09:54AM 3         THE GOVERNMENT IS NOT GOING TO OPPOSE THE DEFENSE REQUEST

09:54AM 4    TO EXCUSE THIS JUROR.

09:54AM 5         I THINK THERE'S A LITTLE BIT OF UNCERTAINTY THE EXACT

09:54AM 6    AMOUNT OF TIME THAT SHE WAS DISTRACTED.  SHE SAID SEVEN TO TEN

09:54AM 7    DAYS SHE WAS PLAYING THE PUZZLES, AND SHE SAID A MINUTE OR TWO.

09:54AM 8    SO I DON'T KNOW IF THAT MEANS SEVEN TO TEN TOTAL MINUTES.

09:54AM 9         I DON'T THINK THAT'S PROBABLY ACCURATE.  I THINK THE

09:54AM 10   DISTRACTION WAS PROBABLY LONGER THAN THAT.

09:54AM 11        SO ONE OPTION WOULD BE TO ASK FURTHER QUESTIONS ON THE

09:54AM 12   TOTAL AMOUNT OF TIME OF DISTRACTION, BUT I DON'T THINK THAT'S

09:54AM 13   NECESSARY.

09:54AM 14        I APPRECIATE THE POINTS THAT MR. DOWNEY MADE AND THAT THE

09:54AM 15   COURT DEVELOPED THROUGH ITS QUESTIONING, AND THE GOVERNMENT IS

09:54AM 16   FINE WITH NOT OPPOSING THE REQUEST FROM THE DEFENSE.

09:54AM 17        THE COURT:  OKAY.  THANK YOU.

09:54AM 18   MR. DOWNEY, ANYTHING?

09:54AM 19        MR. DOWNEY:  I THINK, YOUR HONOR, I'VE SAID MY

09:54AM 20   PIECE.  IT'S A CONCERN FOR US, AND I APPRECIATE THE COURT'S

09:54AM 21   CONDUCTING THE QUESTIONING.

09:54AM 22        THE COURT:  ALL RIGHT.  THANK YOU.

09:54AM 23        THEN, MS. KRATZMANN, I AM GOING TO EXCUSE IT'S JUROR

09:54AM 24   NUMBER 5.  WE'LL EXCUSE HER, AND WE WILL ADVANCE THEN OUR

09:54AM 25   ALTERNATE WHO IS ALTERNATE JUROR NUMBER 3, I BELIEVE, WILL

09:54AM 1    REPLACE JUROR NUMBER 5.

09:54AM 2        AND IF YOU COULD THANK JUROR NUMBER 5 AND TELL HER THAT

09:54AM 3    SHE HAS BEEN EXCUSED.

09:54AM 4        WHEN WE COME OUT ON THE BENCH, I WILL INDICATE THAT JUROR

09:54AM 5    NUMBER 5 HAS BEEN EXCUSED, ALTERNATE NUMBER 3 HAS BEEN SEATED

09:54AM 6    TO REPLACE HER, AND THEN WE'LL PROCEED.

09:54AM 7        WE HAVE TWO ALTERNATES LEFT.

09:54AM 8        ALL RIGHT.  ANYTHING FURTHER, MR. SCHENK?

09:54AM 9            MR. SCHENK:  NO.  THANK YOU.

09:54AM 10           THE COURT:  MR. DOWNEY?

09:54AM 11           MR. DOWNEY:  NO, YOUR HONOR.

09:54AM 12           THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE OFF THE

09:54AM 13   RECORD.

09:54AM 14       (PAUSE IN PROCEEDINGS.)

09:54AM 15       (PROCEEDINGS HELD IN OPEN COURT.)

10:01AM 16       (JURY IN AT 10:01 A.M.)

10:01AM 17           THE COURT:  ALL RIGHT.  THANK YOU.  GOOD MORNING.

10:01AM 18   WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.  MS. HOLMES

10:01AM 19   IS PRESENT.

10:01AM 20       OUR JURY IS PRESENT.

10:01AM 21       THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN.

10:01AM 22       LET ME FIRST INDICATE THAT WE HAVE -- THE COURT HAS FOUND

10:01AM 23   GOOD CAUSE TO EXCUSE A JUROR, JUROR NUMBER 5, AND WE HAVE

10:01AM 24   ADVANCED THEN ALTERNATE JUROR NUMBER 3 TO JUROR NUMBER 5'S

10:01AM 25   POSITION.  THANK YOU VERY MUCH.

```
10:01AM    1         AND ALTERNATE JUROR NUMBER 3 WILL NOW BE A MEMBER OF THE
10:01AM    2    SITTING JURY IN THIS MATTER.
10:01AM    3         BEFORE WE CALL ANY ADDITIONAL WITNESSES, LADIES AND
10:01AM    4    GENTLEMEN OF THE JURY, LET ME JUST ASK YOU MY QUESTION AGAIN.
10:01AM    5         DURING OUR BREAK, HAVE ANY OF YOU HAD OCCASION TO COME
10:01AM    6    ACROSS ANY INFORMATION, COMMUNICATION, DONE ANY RESEARCH, OR IN
10:02AM    7    ANY OTHER WAY LEARNED ANYTHING ABOUT THIS CASE OUTSIDE OF THIS
10:02AM    8    COURTROOM?
10:02AM    9         IF SO, PLEASE RAISE YOUR HANDS.
10:02AM   10         I SEE NO HANDS.
10:02AM   11         THANK YOU VERY MUCH.  AND THANK YOU FOR YOUR CONTINUED
10:02AM   12    VIGILANCE IN FOLLOWING MY ADMONITION.
10:02AM   13         I KNOW IT CAN BE DIFFICULT AND IT PROBABLY CHANGES YOUR
10:02AM   14    LIFESTYLES ABOUT WHEN A ROOMMATE OR FAMILY MIGHT TURN THE
10:02AM   15    TELEVISION ON OR TURN A RADIO ON OR LOOK AT A NEWSPAPER AND YOU
10:02AM   16    LEAVE THE ROOM TO AVOID THINGS, AND I APPRECIATE YOUR EFFORT.
10:02AM   17    WE ALL APPRECIATE YOUR EFFORTS IN THAT REGARD.  SO THANK YOU.
10:02AM   18         ALL RIGHT.  LET'S TURN TO THE GOVERNMENT.
10:02AM   19         IS THERE ANOTHER WITNESS THAT YOU WOULD LIKE TO CALL,
10:02AM   20    MR. LEACH?
10:02AM   21              MR. LEACH:  YES, YOUR HONOR.
10:02AM   22         THE UNITED STATES CALLS SHANE WEBER.
10:02AM   23              THE COURT:  THANK YOU.  PLEASE COME FORWARD IF YOU
10:03AM   24    WOULD.  AND I'LL INVITE YOU TO WALK OVER HERE TO OUR COURTROOM
10:03AM   25    DEPUTY.  IF YOU WOULD FACE HER AND RAISE YOUR RIGHT HAND, SHE
```

10:03AM 1    **HAS A QUESTION FOR YOU.**

10:03AM 2          **(GOVERNMENT'S WITNESS, SHANE WEBER, WAS SWORN.)**

10:03AM 3              THE WITNESS:  YES.

10:03AM 4              THE COURT:  THANK YOU.

10:03AM 5       PLEASE HAVE A SEAT UP HERE, SIR.  I'LL INVITE YOU TO HAVE

10:03AM 6    A SEAT THERE.  MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

10:03AM 7    THE CHAIR AND THE MICROPHONE AS YOU NEED.

10:03AM 8       I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

10:03AM 9       THERE'S SOME FRESH WATER THERE FOR REFRESHMENT.  SHOULD

10:03AM 10   YOU NEED IT, HELP YOURSELF.

10:03AM 11      WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:03AM 12   AND THEN SPELL IT, PLEASE.

10:03AM 13             THE WITNESS:  MY NAME IS SHANE WEBER.  FIRST NAME

10:03AM 14   S-H-A-N-E.  WEBER WITH ONE B, W-E-B-E-R.

10:03AM 15             THE COURT:  THANK YOU.  COUNSEL.

10:04AM 16             MR. LEACH:  THANK YOU, YOUR HONOR.

10:04AM 17                      **DIRECT EXAMINATION**

10:04AM 18   BY MR. LEACH:

10:04AM 19   Q.   MR. WEBER, IF YOU ARE VACCINATED, WITH THE COURT'S

10:04AM 20   PERMISSION AND IF YOU ARE COMFORTABLE, YOU CAN TESTIFY WITHOUT

10:04AM 21   A MASK.

10:04AM 22      THANK YOU.

10:04AM 23      WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY CALLED

10:04AM 24   PFIZER?

10:04AM 25   A.   YES.

Case 5:18-cv-00258-JD Document 1027-3, Filed 01/18/22, Page 43 of 260

10:04AM  1    Q.   WHAT IS THE BUSINESS OF PFIZER?

10:04AM  2    A.   PFIZER IS A GLOBAL WORLDWIDE PHARMACEUTICAL COMPANY.

10:04AM  3    Q.   WHEN DID YOU WORK FOR PFIZER?

10:04AM  4    A.   I WORKED FOR PFIZER FROM 2008 THROUGH 2014.

10:04AM  5    Q.   AT A HIGH LEVEL, CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

10:04AM  6    AND PROFESSIONAL BACKGROUND BEFORE YOU JOINED PFIZER IN 2008.

10:04AM  7    A.   MY EDUCATIONAL BACKGROUND, I HAVE A BACHELOR'S OF ART IN

10:04AM  8    BIOCHEMISTRY AND MOLECULAR BIOLOGY FROM NORTHWESTERN

10:04AM  9    UNIVERSITY.

10:04AM 10         THEN I HAVE A PH.D. IN BIOPHYSICS FROM OREGON STATE

10:05AM 11    UNIVERSITY FROM THE DEPARTMENT OF BIOCHEMISTRY AND BIOPHYSICS

10:05AM 12    THERE.

10:05AM 13         THEN ACADEMICALLY I DID A -- I WAS A POST-DOCTORAL FELLOW

10:05AM 14    AT THE UNIVERSITY OF ROCHESTER UPSTATE NEW YORK IN RADIATION

10:05AM 15    BIOLOGY AND BIOPHYSICS.

10:05AM 16         FOLLOWING THESE EDUCATIONAL EXPERIENCES, I FIRST WENT TO

10:05AM 17    EASTMAN KODAK IN ROCHESTER, NEW YORK AS A SCIENTIST IN A

10:05AM 18    PROTEIN ENGINEERING LAB.

10:05AM 19         FOLLOWING THAT, I WAS AT A SMALL, MEDIUM SIZED TECHNOLOGY

10:05AM 20    COMPANY IN CONNECTICUT CALLED PACKARD INSTRUMENTS WHERE I WAS A

10:05AM 21    SENIOR ASSAY ANALYST IN BUSINESS DEVELOPMENT.

10:05AM 22         FOLLOWING THAT, I WENT TO MILLENNIUM PHARMACEUTICALS --

10:06AM 23    ACTUALLY, IN BETWEEN THERE WAS A SIX MONTH TIME WHERE I WAS AT

10:06AM 24    A SMALL STARTUP CALLED AGLIX IN NEW HAVEN, CONNECTICUT.

10:06AM 25         THEN I WENT TO -- THERE I WAS THE SENIOR PROGRAM MANAGER

10:06AM   1      AT GENOMICS.

10:06AM   2           FOLLOWING THAT, I WENT TO MILLENNIUM PHARMACEUTICALS IN

10:06AM   3      CAMBRIDGE, MASSACHUSETTS WHERE I WAS A SENIOR SCIENTIST II IN

10:06AM   4      THE TRACE GENOMIC MICROARRAY PROFILING FACILITY.

10:06AM   5           IN BETWEEN THERE, I -- AFTER MILLENNIUM, I WENT BACK TO

10:06AM   6      NEW JERSEY WHERE I WAS A DIRECTOR OF DIAGNOSTICS AND ASSAYS IN

10:06AM   7      ORTHOCLINICAL DIAGNOSTICS AT JOHNSON & JOHNSON.

10:06AM   8           AND FOLLOWING THEM, I CAME TO PFIZER AS A DIRECTOR OF

10:06AM   9      DIAGNOSTICS IN MOLECULAR MEDICINE.

10:06AM  10      Q.   THANK YOU.

10:06AM  11           I HEARD YOU SAY THAT YOU HAVE A PH.D. IN BIOPHYSICS FROM

10:06AM  12      OREGON STATE.

10:06AM  13      A.   I DO.

10:07AM  14      Q.   OKAY.  WOULD YOU PREFER THAT I ADDRESS YOU AS MR. WEBER OR

10:07AM  15      DR. WEBER?

10:07AM  16      A.   MR. WEBER WOULD BE FINE.

10:07AM  17      Q.   OKAY.  AND YOU'VE WORKED FOR A NUMBER OF PHARMACEUTICAL

10:07AM  18      AND BIOTECHNOLOGY COMPANIES?

10:07AM  19      A.   I HAVE.

10:07AM  20      Q.   AND YOU JOINED PFIZER IN 2008 AND LEFT IN 2014?

10:07AM  21      A.   YES.

10:07AM  22      Q.   WHAT ARE YOU DOING TODAY?

10:07AM  23      A.   TODAY I'M RETIRED.

10:07AM  24      Q.   I WANT TO FOCUS MY QUESTIONS, MR. WEBER, STARTING IN THE

10:07AM  25      2008 TIME PERIOD WHEN YOU WERE FIRST HIRED BY PFIZER.

10:07AM  1        WHAT WERE YOU HIRED TO DO?

10:07AM  2   A.   I WAS HIRED AS A DIRECTOR OF DIAGNOSTICS TO ENABLE

10:07AM  3   DIAGNOSTICS TO MOVE PFIZER'S CLINICAL PROGRAMS FORWARD.

10:07AM  4   Q.   AND WHEN YOU SAY "DIRECTOR OF DIAGNOSTICS," WHAT, WHAT ARE

10:07AM  5   DIAGNOSTICS?

10:07AM  6   A.   WELL, DIAGNOSTICS -- I DON'T DEFINE THEM.  THE FEDERAL

10:07AM  7   FOOD AND DRUG ADMINISTRATION DEFINES DIAGNOSTICS.

10:07AM  8        DIAGNOSTICS ARE THOSE REAGENTS, INSTRUMENTS, AND SYSTEMS

10:08AM  9   INTENDED FOR THE DIAGNOSIS OF DISEASE OR OTHER CONDITIONS,

10:08AM 10   INCLUDING HEALTH, FOR THE PURPOSE OF TREATING, MITIGATING,

10:08AM 11   CURING, OR PREVENTING DISEASE.

10:08AM 12        DIAGNOSTICS, SUCH PRODUCTS ARE INTENDED FOR THE

10:08AM 13   COLLECTION, EXAMINATION, AND EVALUATION OF SAMPLES FROM HUMANS,

10:08AM 14   AND SUCH PRODUCTS ARE CONSIDERED TO BE REGULATED AS DEVICES

10:08AM 15   UNDER SECTION 201(H) OF THE FEDERAL FOOD DRUG AND COSMETIC ACT,

10:08AM 16   AND THEY ALSO MAY BE REGULATED AS BIOLOGICS UNDER THE PUBLIC

10:08AM 17   SERVICE HEALTH ACT, AND THEY'RE BROADLY REGULATED AS SAFE FOR

10:08AM 18   INTENDED USE UNDER 21 CFR 860.7.

10:08AM 19   Q.   THANK YOU.

10:08AM 20        AND AS DIRECTOR OF DIAGNOSTICS AT PFIZER IN 2008, DID YOU

10:09AM 21   BECOME FAMILIAR WITH A COMPANY CALLED THERANOS?

10:09AM 22   A.   I DID.

10:09AM 23   Q.   IN YOUR ROLE AS DIRECTOR OF DIAGNOSTICS AT PFIZER, WERE

10:09AM 24   YOU ASKED TO REVIEW THERANOS'S TECHNOLOGY AND ITS POTENTIAL USE

10:09AM 25   BY PFIZER?

10:09AM   1    A.   I WAS.

10:09AM   2    Q.   YOU SHOULD HAVE A BINDER UP THERE AT THE WITNESS STAND, A

10:09AM   3    WHITE BINDER, AND I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO

10:09AM   4    WHAT HAS BEEN MARKED AS TRIAL EXHIBIT 143.

10:09AM   5         YOUR HONOR, I MOVE EXHIBIT 143 INTO EVIDENCE.  I

10:09AM   6    UNDERSTAND THERE'S A STIPULATION.

10:09AM   7              MR. CLINE:  NO OBJECTION.

10:09AM   8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:09AM   9         (GOVERNMENT'S EXHIBIT 143 WAS RECEIVED IN EVIDENCE.)

10:09AM   10   BY MR. LEACH:

10:09AM   11   Q.   DO YOU HAVE THAT IN FRONT OF YOU, SIR?

10:09AM   12   A.   I DO.

10:09AM   13   Q.   OKAY.  AND IF I COULD ASK MS. HOLLIMAN TO PLEASE ZOOM IN

10:09AM   14   ON THE TOP HALF OF THIS EMAIL.

10:10AM   15        MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM

10:10AM   16   ELIZABETH HOLMES TO TWO INDIVIDUALS NAMED AIDEN POWER AND

10:10AM   17   CRAIG LIPSET?

10:10AM   18   A.   IT DOES APPEAR TO BE SO.

10:10AM   19   Q.   WHO IS AIDEN POWER?

10:10AM   20   A.   AIDEN POWER IS THE VICE PRESIDENT IN CHARGE OF MOLECULAR

10:10AM   21   MEDICINE, WHICH IS A WORLDWIDE UNIT OF PFIZER.

10:10AM   22   Q.   OKAY.  WERE YOU PART OF THE MOLECULAR MEDICINE GROUP?

10:10AM   23   A.   I WAS.

10:10AM   24   Q.   OKAY.  AND THERE'S ANOTHER NAME, CRAIG LIPSET.  WHO IS

10:10AM   25   CRAIG LIPSET?

10:10AM  1    A.   CRAIG LIPSET WAS THE DIRECTOR OF CLINICAL INNOVATION AND

10:10AM  2    MOLECULAR MEDICINE.

10:10AM  3    Q.   WAS HE SOMEBODY THAT YOU WORKED WITH?

10:10AM  4    A.   YES, I WORKED WITH HIM.

10:10AM  5    Q.   OKAY.  HOW DID YOU GET THE ASSIGNMENT TO REVIEW THERANOS'S

10:10AM  6    TECHNOLOGY IN THIS LATE 2008 TIME PERIOD?

10:10AM  7    A.   AS I REMEMBER IT, THERE WAS AN EMAIL FROM CRAIG LIPSET TO

10:11AM  8    ME ASKING ME TO LOOK AT THE DIAGNOSTIC CAPABILITY OF THERANOS.

10:11AM  9    Q.   OKAY.  I WANT TO FOCUS ON -- AND THE DATE OF THIS IS

10:11AM 10    OCTOBER 11TH, 2008.

10:11AM 11         DO YOU SEE THAT?

10:11AM 12    A.   I DO.

10:11AM 13    Q.   AND IS THIS CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE

10:11AM 14    ASKED TO REVIEW THERANOS'S TECHNOLOGY?

10:11AM 15    A.   YES, I WAS ASKED AFTER THIS DATE.

10:11AM 16    Q.   OKAY.  I KNOW YOU'RE NOT ON THIS EMAIL, BUT I'D LIKE TO

10:11AM 17    DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH.

10:11AM 18         DO YOU SEE WHERE MS. HOLMES WROTE, "I AM VERY PLEASED TO

10:11AM 19    PRESENT YOU WITH THE FINAL DATA - SEE THE ATTACHED STUDY

10:11AM 20    REPORT."

10:11AM 21         DO YOU SEE THAT?  WE'RE IN THE THIRD PARAGRAPH, AND IT'S

10:11AM 22    HIGHLIGHTED ON THE SCREEN AS WELL.

10:11AM 23    A.   YES, I SEE THIS NOW.  "I AM VERY PLEASED," YES, I SEE THIS

10:11AM 24    THIRD PARAGRAPH.

10:11AM 25    Q.   OKAY.  AND SHE'S DRAWING ATTENTION TO AN ATTACHED STUDY

10:12AM  1    REPORT.

10:12AM  2            CAN I PLEASE ASK YOU TO LOOK AT PAGE 3 OF THIS DOCUMENT.

10:12AM  3    A.   YES.

10:12AM  4    Q.   DOES THIS APPEAR TO BE THE ATTACHED STUDY REPORT THAT

10:12AM  5    MS. HOLMES REFERRED TO IN THE EMAIL?

10:12AM  6    A.   IT WOULD SEEM TO BE SO.

10:12AM  7    Q.   OKAY.  AND DO YOU SEE THE LOGO AT THE TOP WITH THERANOS

10:12AM  8    REDEFINING HEALTH CARE?

10:12AM  9    A.   YES.

10:12AM  10   Q.   AND DO YOU SEE THE LABEL CONFIDENTIAL IN THE RIGHT CORNER

10:12AM  11   ON THE TOP PAGE?

10:12AM  12   A.   I DO.

10:12AM  13   Q.   OKAY.  THE TITLE OF THIS IS THERANOS ANGIOGENESIS STUDY

10:13AM  14   REPORT.

10:13AM  15           DO YOU SEE THAT?

10:13AM  16   A.   I DO.

10:13AM  17   Q.   IN THIS LATE 2008 TIME PERIOD, WERE YOU MADE AWARE OF WORK

10:13AM  18   BY PFIZER AND THERANOS RELATING TO AN ANGIOGENESIS PROGRAM?

10:13AM  19   A.   YES.

10:13AM  20   Q.   OKAY.  DO YOU SEE WHERE IT SAYS "PREPARED FOR

10:13AM  21   DR. AIDAN POWER, PFIZER, INC.?

10:13AM  22   A.   I DO.

10:13AM  23   Q.   AND DO YOU SEE THAT THERE'S, BENEATH THAT, A DOCUMENT

10:13AM  24   OUTLINE?

10:13AM  25   A.   I DO.

10:13AM   1    Q.   OKAY.  AND I'D LIKE TO FOCUS ON THE BULLET WITH

10:13AM   2    CONCLUSIONS.  DO YOU SEE THAT?  IT'S THE LAST BULLET UNDERNEATH

10:13AM   3    DOCUMENT OUTLINE.

10:13AM   4        AND MS. HOLLIMAN IS ZOOMING OUT ON THE SCREEN AND

10:13AM   5    HIGHLIGHTING THAT FOR US.

10:13AM   6        DO YOU SEE THAT?

10:13AM   7    A.   I SEE THAT.

10:13AM   8    Q.   OKAY.  COULD YOU NOW PLEASE TURN TO PAGE 26.

10:14AM   9    A.   OKAY, I SEE THIS.

10:14AM  10    Q.   OKAY.  DO YOU SEE THE THERANOS LOGO AT THE TOP WHERE IT

10:14AM  11    SAYS THERANOS REDEFINING HEALTH CARE?

10:14AM  12    A.   I DO.

10:14AM  13    Q.   AND DO YOU SEE THE HEADING CONFIDENTIAL TO THE RIGHT?

10:14AM  14    A.   I DO.

10:14AM  15    Q.   AND DO YOU SEE THAT THERE ARE A NUMBER OF CONCLUSIONS

10:14AM  16    LISTED?

10:14AM  17        AND IF WE COULD ZOOM OUT, MS. HOLLIMAN, SO WE CAN SEE

10:14AM  18    THERE ARE A NUMBER OF CONCLUSIONS LISTED HERE.

10:14AM  19        DO YOU SEE THAT?

10:14AM  20    A.   YES, I DO.

10:14AM  21    Q.   LET ME DRAW YOUR ATTENTION TO NUMBER 1.

10:14AM  22        DO YOU SEE WHERE IT SAYS, "THE THERANOS SYSTEM PERFORMED

10:14AM  23    WITH SUPERIOR PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN

10:14AM  24    A COMPLEX AMBULATORY ENVIRONMENT."

10:15AM  25        DO YOU SEE THAT?

10:15AM  1     A.   I DO.

10:15AM  2     Q.   AND DO YOU SEE NUMBER 5 UNDER TECHNICAL WHERE IT SAYS,

10:15AM  3     "INTER-SYSTEM ACCURACY IS EXCELLENT AND WAS DEMONSTRATED ON A

10:15AM  4     PLATFORM WITH SUPERIOR PERFORMANCE SPECIFICATIONS TO REFERENCE

10:15AM  5     METHODS"?

10:15AM  6     A.   I DO.

10:15AM  7     Q.   AND DO YOU SEE ANOTHER CONCLUSION, NUMBER 7, "GOOD

10:15AM  8     CORRELATIONS WERE SEEN TO VARIOUS COMMERCIALLY AVAILABLE

10:15AM  9     GOLD-STANDARDS"?

10:15AM 10     A.   I DO.

10:15AM 11     Q.   OKAY.  AND THIS IS IN A REPORT SENT BY MS. HOLMES TO

10:15AM 12     DR. POWER AND CRAIG LIPSET IN THE OCTOBER TIME PERIOD; IS THAT

10:15AM 13     FAIR?

10:15AM 14     A.   YES, AS I UNDERSTAND IT.

10:15AM 15     Q.   OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO WHAT WE

10:15AM 16     HAVE MARKED AS EXHIBIT 159, WHICH I'LL MOVE INTO EVIDENCE,

10:15AM 17     YOUR HONOR.  I UNDERSTAND THERE'S A STIPULATION.

10:15AM 18            MR. CLINE:  NO OBJECTION.

10:15AM 19            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM 20         (GOVERNMENT'S EXHIBIT 159 WAS RECEIVED IN EVIDENCE.)

10:16AM 21     BY MR. LEACH:

10:16AM 22     Q.   MR. WEBER, I'D LIKE TO START ON PAGES -- ON PAGE 4 OF THIS

10:16AM 23     DOCUMENT.

10:16AM 24         DO YOU SEE AN EMAIL FROM MS. HOLMES TO CRAIG LIPSET ON OR

10:16AM 25     ABOUT NOVEMBER 6TH, 2008?

10:16AM   1      A.   I DO.

10:16AM   2      Q.   OKAY.  AND NOW IF WE COULD SHOW BOTH THE BOTTOM PORTION OF

10:16AM   3   PAGE 3 AND THE TOP PORTION OF PAGE 5, MS. HOLLIMAN.

10:16AM   4        DO YOU SEE AT THE BOTTOM OF PAGE 3, MR. WEBER, THERE'S AN

10:16AM   5   EMAIL FROM CRAIG LIPSET TO MS. HOLMES, YOU, AND GARY FRENZEL?

10:17AM   6      A.   I DO.

10:17AM   7      Q.   OKAY.  AND IS THIS CONSISTENT WITH THE TIME PERIOD WHERE

10:17AM   8   YOU WERE ASKED TO REVIEW AND EVALUATE THERANOS'S TECHNOLOGY?

10:17AM   9      A.   IT IS.

10:17AM  10      Q.   OKAY.  AND NOW FOCUSSING ON THE EMAIL AT THE TOP OF

10:17AM  11   PAGE 4 -- I THINK WE HAVE PAGE 4 -- OR 3 AND 5 UP,

10:17AM  12   MS. HOLLIMAN.  IF WE CAN GET PAGE 4.

10:17AM  13        WONDERFUL.

10:17AM  14        IT APPEARS THAT MR. LIPSET WROTE, "GARY - PLEASE

10:17AM  15   COORDINATE WITH SHANE WEBER, WHO LEADS OUR DIAGNOSTICS GROUP

10:17AM  16   HERE IN NEW YORK.  WHEN A TIME IS SET, PLEASE LET ME KNOW AS I

10:17AM  17   WOULD LIKE TO JOIN IF MY CALENDAR PERMITS."

10:17AM  18        DO YOU SEE THIS LANGUAGE?

10:17AM  19      A.   I DO.

10:17AM  20      Q.   AND IS THIS MR. LIPSET ESSENTIALLY GIVING DIRECTION TO THE

10:17AM  21   FOLKS AT THERANOS TO DIRECT INFORMATION TO YOU FOR YOUR REVIEW?

10:17AM  22      A.   YES.

10:17AM  23      Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 1 OF

10:18AM  24   EXHIBIT 159.

10:18AM  25        MS. HOLLIMAN, IF WE CAN ZOOM IN ON THE BOTTOM EMAIL FROM

10:18AM   1    MR. WEBER.

10:18AM   2        IS THIS AN EMAIL FROM YOU TO GARY FRENZEL FOLLOWING UP ON

10:18AM   3    CRAIG LIPSET'S REQUEST?

10:18AM   4    A.   IT IS.

10:18AM   5    Q.   AND I DRAW YOUR ATTENTION TO THE THIRD PARAGRAPH, THE

10:18AM   6    THIRD AND FOURTH PARAGRAPHS.  YOU WRITE, "I AM INTERESTED MORE

10:18AM   7    BROADLY AS TO WHAT THE INSTRUMENT IS AND PLANNED TO BE AND NOT

10:18AM   8    JUST IN UNDERSTANDING THE PERFORMANCE AND UTILITY OF THE

10:18AM   9    THERANOS SYSTEM IN THE ONCOLOGY STUDY."

10:18AM  10        WHAT DID YOU MEAN BY THE "ONCOLOGY STUDY"?

10:18AM  11    A.   I'M REFERRING TO THE STUDY AS I REMEMBERED IT AND

10:18AM  12    UNDERSTOOD THAT WHAT'S IN THE DOCUMENT THAT WAS SUBMITTED IN

10:19AM  13    THE FINAL REPORT TO AIDEN POWER AND THE STUDY THAT WAS

10:19AM  14    UNDERNEATH THAT.

10:19AM  15    Q.   THE DOCUMENT THAT WE LOOKED AT EARLIER IN YOUR TESTIMONY?

10:19AM  16    A.   YES.

10:19AM  17    Q.   OKAY.  AND YOU WROTE, "I AM RESPONSIBLE FOR PLATFORMS FOR

10:19AM  18    WHICH PFIZER HAS A DIAGNOSTIC INTEREST AND FOR WHICH THERE IS A

10:19AM  19    CLINICAL VALIDATION."

10:19AM  20        WHAT DID YOU MEAN BY THAT?

10:19AM  21    A.   WHAT I MEANT BY THIS STATEMENT IS THAT WITH OUR CLINICAL

10:19AM  22    TRIALS IN ALL DISEASE AREAS, INCLUDING ONCOLOGY, WE WERE

10:19AM  23    LOOKING FOR DIAGNOSTIC CAPABILITIES THAT WOULD OPEN THE DOOR

10:19AM  24    FOR MORE EFFECTIVE INTAKE OF PATIENTS.

10:19AM  25        BUT THOSE ASSAYS NEED TO BE, YOU KNOW, FDA REGULATED AND

10:19AM 1    APPROVABLE AT A LEVEL THAT WE CAN INCLUDE THEM IN OUR CLINICAL

10:19AM 2    TRIALS.

10:19AM 3    Q.   YOU THEN WRITE IN THE FIFTH PARAGRAPH, "AS WE AGREED IN

10:19AM 4    OUR DISCUSSION, I WAS TO PROVIDE COPIES OF THE DOCUMENTS THAT I

10:19AM 5    AM WORKING OFF OF SO WE ARE ON THE SAME PAGE AND SOME QUESTIONS

10:20AM 6    OF INTEREST TO START OUR CONVERSATION ON THURSDAY."

10:20AM 7         WHAT WERE YOU GETTING AT THERE?

10:20AM 8    A.   WHAT I WAS GETTING AT WAS THAT IN MY NORMAL PRACTICE WHEN

10:20AM 9    I DO AN INTERACTION WITH A COMPANY, I TRY TO MAKE SURE THAT

10:20AM 10   WE'RE BOTH WORKING WITH THE SAME DECK OF CARDS SO THAT IT

10:20AM 11   DOESN'T CAUSE CONFUSION OR THAT I DON'T MISS SOMETHING.

10:20AM 12   Q.   AND THEN YOU WROTE, "FOR ME, THE GOAL IS TO UNDERSTAND THE

10:20AM 13   THERANOS SYSTEM.

10:20AM 14        "LET'S USE MY TELECONF CODES TO SAVE SOME THERANOS SOME

10:20AM 15   COSTS."

10:20AM 16        WERE YOU SETTING UP A CONFERENCE CALL WITH FOLKS AT

10:20AM 17   THERANOS SO YOU CAN GIVE THEM AN OPPORTUNITY TO DISCUSS THEIR

10:20AM 18   TECHNOLOGY WITH YOU?

10:20AM 19   A.   YES.

10:20AM 20   Q.   AND DOWN AT THE BOTTOM THERE IS SOME LANGUAGE, "I HAVE THE

10:21AM 21   THERANOS SUMMARY TO AIDEN POWER, THE INTRODUCTION TO THERANOS

10:21AM 22   SYSTEMS, THE INFORMED CONSENT AND THE IRB SUBMISSION.  I HAVE

10:21AM 23   READ THEM.  I ATTACH THESE SO WE ARE ALL WORKING OFF THE SAME

10:21AM 24   VERSIONS OF THE DOCUMENTS."

10:21AM 25        DO YOU SEE THAT LANGUAGE?

10:21AM  1    A.   I DO.

10:21AM  2    Q.   AND DID YOU ATTACH THOSE DOCUMENTS TO THE EMAIL THAT YOU

10:21AM  3    SENT TO MR. FRENZEL?

10:21AM  4    A.   I DID.  THESE ARE THE DOCUMENTS, AS I REMEMBER IT,

10:21AM  5    CRAIG LIPSET FORWARDED TO ME FROM THE INTERACTION THAT HE AND

10:21AM  6    AIDEN POWER WERE HAVING.

10:21AM  7    Q.   AND IF WE CAN CONTINUE TO THE NEXT PAGE, PAGE 2.  AND IF

10:21AM  8    WE CAN ZOOM IN ON THE TOP RIGHT UP TO "PLEASE," MS. HOLLIMAN.

10:21AM  9    RIGHT THERE.

10:21AM 10         MR. WEBER, YOU WROTE, "I HAVE ALSO READ U.S. PATENT," AND

10:21AM 11    THEN THERE'S A NUMBER.

10:21AM 12         DO YOU SEE THAT UP AT THE TOP?

10:22AM 13    A.   I DO.

10:22AM 14    Q.   WAS THAT A PATENT RELATING TO THERANOS?

10:22AM 15    A.   AS I REMEMBER IT, IT WOULD BE.

10:22AM 16    Q.   OKAY.  WHY DID YOU REVIEW THAT?

10:22AM 17    A.   THE REASON I WOULD REVIEW -- IN MY NORMAL PRACTICE I

10:22AM 18    REVIEW BOTH U.S. ISSUED PATENTS, WHICH IS A B LEVEL PATENT, AS

10:22AM 19    WELL AS A LEVEL PATENTS, AS WELL AS EUROPEAN OR WORLD TREATY

10:22AM 20    PATENTS.

10:22AM 21         PARTICULARLY I REVIEWED U.S. PATENTS BECAUSE THE U.S.

10:22AM 22    PATENT OFFICE DOES AN INDEPENDENT REVIEW OF THE TECHNOLOGY, AND

10:22AM 23    IN WHAT IS CALLED THE WRAPPER, THE DOCUMENTS ASSOCIATED WITH

10:22AM 24    THE PATENT, THE U.S. PATENT OFFICE PRESENTS WHAT THEY CONSIDER

10:22AM 25    PRIOR ART.

10:22AM    1     Q.   AND YOU MENTIONED SOMETHING ABOUT AN A PATENT AND A B

10:22AM    2     PATENT.

10:22AM    3          WHAT IS THE DISTINCTION THERE?

10:22AM    4     A.   THE DISTINCTION IS THAT A B PATENT ARE ISSUED PATENTS.  A

10:23AM    5     PATENTS ARE PATENTS THAT ARE IN THE PROCESS OF BEING REVIEWED.

10:23AM    6          SO THIS IS A B2, A FINAL ISSUED U.S. PATENT.

10:23AM    7     Q.   AND WAS THIS PART OF YOUR EFFORT TO UNDERSTAND THERANOS'S

10:23AM    8     TECHNOLOGY SO YOU COULD MAKE A RECOMMENDATION TO PFIZER?

10:23AM    9     A.   IT IS.

10:23AM   10     Q.   OKAY.  YOU ALSO WROTE, "WOULD YOU PLEASE SEND, PROVIDE, OR

10:23AM   11     ANSWER."

10:23AM   12          AND I DON'T WISH TO DISPLAY THEM, BUT ARE THERE A NUMBER

10:23AM   13     OF QUESTIONS LISTED BELOW THAT THAT YOU WERE SEEKING ANSWERS

10:23AM   14     FROM THERANOS ON?

10:23AM   15     A.   YES.

10:23AM   16     Q.   OKAY.  AND WHY WERE YOU -- AT A HIGH LEVEL, WHY WERE YOU

10:23AM   17     ASKING THESE TYPES OF QUESTIONS?

10:23AM   18     A.   IN MY NORMAL PROCESS OF INTERACTION AND DUE DILIGENCE WITH

10:23AM   19     COMPANIES, I HAVE A VERBAL DISCUSSION AND THEN FOLLOW WITH A

10:23AM   20     SET OF MORE DETAILED WRITTEN QUESTIONS.  THIS ALLOWS ME TO

10:23AM   21     UNDERSTAND THE DETAILS, AND IT'S A --

10:24AM   22     Q.   LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO EXHIBIT 162,

10:24AM   23     WHICH I'LL OFFER INTO EVIDENCE PURSUANT TO STIPULATION.

10:24AM   24               MR. CLINE:  NO OBJECTION.

10:24AM   25               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM   1          (GOVERNMENT'S EXHIBIT 162 WAS RECEIVED IN EVIDENCE.)

10:24AM   2              MR. LEACH:  AND I'M SORRY, MS. HOLLIMAN.  I MEANT TO

10:24AM   3    GO -- I NEED TO GO BACK TO EXHIBIT 159 BRIEFLY.

10:24AM   4    Q.   MR. WEBER, I WANT TO DRAW YOUR ATTENTION TO PAGE 5 OF

10:24AM   5    EXHIBIT 159.

10:24AM   6          AND IF WE COULD PLEASE ZOOM IN ON THE TOP HALF OF THIS

10:24AM   7    DOCUMENT, MS. HOLLIMAN.  DOWN A LITTLE.  THAT'S FINE FOR NOW.

10:24AM   8    THANK YOU.

10:24AM   9          MR. WEBER, IS THIS A DOCUMENT THAT YOU ATTACHED TO YOUR

10:24AM  10    EMAIL TO MR. FRENZEL TO MAKE SURE THAT YOU WERE WORKING OFF OF

10:25AM  11    ALL OF THE SAME DOCUMENTS?

10:25AM  12    A.   THE DOCUMENT THAT I ATTACHED TO THE EMAIL OF GARY FRENZEL

10:25AM  13    WOULD BE THE ONE THAT I RECEIVED FROM AIDEN POWER VIA

10:25AM  14    CRAIG LIPSET.

10:25AM  15          IF THIS IS THE DOCUMENT THAT CAME DIRECTLY FROM

10:25AM  16    CRAIG LIPSET, THEN IT WOULD BE.

10:25AM  17    Q.   OKAY.  AND DO YOU SEE THE HEADING THERANOS REDEFINING

10:25AM  18    HEALTH CARE AT THE TOP?

10:25AM  19    A.   I DO.

10:25AM  20    Q.   AND DO YOU SEE THE LABEL CONFIDENTIAL ON THE RIGHT?

10:25AM  21    A.   I DO.

10:25AM  22    Q.   AND THE TITLE OF THIS DOCUMENT IS THERANOS ANGIOGENESIS

10:25AM  23    STUDY:

10:25AM  24          REPORT PREPARED FOR DR. AIDAN POWER.

10:25AM  25          PFIZER.

10:25AM    1            DO YOU SEE THAT?

10:25AM    2    A.   I DO.

10:25AM    3    Q.   I WANT TO DRAW YOUR ATTENTION TO THE FOURTH PARAGRAPH THAT

10:25AM    4    IS DOWN ON THE BOTTOM ON THE SCREEN.

10:25AM    5            DO YOU SEE "FOR THIS ANGIOGENESIS PROGRAM, THERANOS WAS

10:26AM    6    ASKED TO DEVELOP MULTIPLEXED POINT-OF-CARE ASSAYS IN VEGF AND

10:26AM    7    PLGF FOR USE IN MONITORING PATIENT PHARMACODYNAMIC RESPONSE TO

10:26AM    8    ANTI-ANGIOGENESIS THERAPIES."

10:26AM    9            DO YOU SEE THAT?

10:26AM   10    A.   I DO.

10:26AM   11    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

10:26AM   12    A.   I UNDERSTOOD THAT TO MEAN, AT THE TIME THAT I REMEMBER IT,

10:26AM   13    THAT IN THIS STUDY THERANOS WAS ASKED TO DO THESE THINGS AND TO

10:26AM   14    MEASURE SOME SAMPLES.

10:26AM   15    Q.   AND VEGF AND PLGF, WHAT ARE THOSE?

10:26AM   16    A.   WELL, THESE ARE WELL-KNOWN ANALYTIC MOLECULES IN

10:26AM   17    ANGIOGENESIS, WHICH IS, YOU KNOW, CAPILLARY DEVELOPMENT.

10:26AM   18            AND THE VEGF IS THE VACULAR EPIDERMAL GROWTH FACTOR --

10:26AM   19    THIS IS THE LIGIN FOR THE VEGF RECEPTOR.  SO AS I REMEMBER IT,

10:27AM   20    THAT'S THE VASCULAR EPIDERMAL GROWTH FACTOR.

10:27AM   21    Q.   AND WAS THERANOS TASKED WITH DEVELOPING ASSAYS TO MEASURE

10:27AM   22    VEGF AND PLGF AS YOU UNDERSTOOD IT?

10:27AM   23    A.   AS I UNDERSTOOD IT, YES.

10:27AM   24    Q.   AND THERE'S ALSO A REFERENCE HERE TO VEGFR2.

10:27AM   25            DO YOU SEE THAT?

| | |
|---|---|
| 10:27AM | 1 |
| 10:27AM | 2 |
| 10:27AM | 3 |

10:27AM  1    A.   I DO.

10:27AM  2    Q.   AND IS THAT ANOTHER SUBSTANCE THAT THERANOS WAS ASKED TO

10:27AM  3    MEASURE?

10:27AM  4    A.   IT WAS.  THAT'S THE RECEPTOR FOR VEGFR -- VEGF RECEPTOR 2.

10:27AM  5    Q.   IF I COULD ASK YOU TO MOVE FORWARD TO PAGE 12, AND IF WE

10:27AM  6    COULD.

10:27AM  7         DO YOU SEE DOWN HERE AT THE BOTTOM THERE ARE A NUMBER OF

10:27AM  8    CONCLUSIONS LISTED?

10:27AM  9    A.   YES, I SEE NINE CONCLUSIONS LISTED.

10:27AM  10   Q.   OKAY.  AND THE FIRST ONE IS, "THE THERANOS SYSTEM

10:28AM  11   PERFORMED WITH EQUIVALENT OR SUPERIOR PERFORMANCE TO REFERENCE

10:28AM  12   ASSAYS WHILE RUNNING IN AN EXTREMELY RUGGED AMBULATORY

10:28AM  13   ENVIRONMENT."

10:28AM  14        DO YOU SEE THAT?

10:28AM  15   A.   I DO.

10:28AM  16   Q.   AND IF WE CAN CONTINUE TO PAGE 13.

10:28AM  17        DO THE CONCLUSIONS CONTINUE ON THIS PAGE?

10:28AM  18   A.   THEY DO.

10:28AM  19   Q.   OKAY.  AND DO YOU SEE THE FOURTH CONCLUSION, "INTER-SYSTEM

10:28AM  20   ACCURACY IS EXCELLENT"?

10:28AM  21   A.   I DO.

10:28AM  22   Q.   AND THE FIFTH CONCLUSION, "VEGFR2 ASSAY ACCURACY IS QUITE

10:28AM  23   GOOD FOR TNONC VENOUS SAMPLES."

10:28AM  24        DO YOU SEE THAT?

10:28AM  25   A.   I DO.

10:28AM  1    Q.  NOW, IF WE COULD PLEASE GO TO EXHIBIT 162.

10:28AM  2         IF WE CAN ZOOM IN, MS. HOLLIMAN, ON THE BOTTOM EMAIL.

10:29AM  3         MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM

10:29AM  4    GARY FRENZEL TO YOU ON NOVEMBER 11TH, 2008?

10:29AM  5    A.  IT DOES.

10:29AM  6    Q.  OKAY.  AND MR. FRENZEL WROTE, "HI SHANE, IT SEEMS THAT YOU

10:29AM  7    DID NOT HAVE THE FINAL REPORT.  I HAVE ATTACHED IT AND THE NDA

10:29AM  8    TO THIS EMAIL."

10:29AM  9         DO YOU UNDERSTAND NDA IS AN ACRONYM FOR NONDISCLOSURE

10:29AM 10    AGREEMENT?

10:29AM 11    A.  I DO.

10:29AM 12    Q.  "ELIZABETH IS WORKING ON SOME OTHER DOCUMENTS AND WE WILL

10:29AM 13    BE GETTING THEM TO YOU SOON.  LOOKING FORWARD TO THE MEETING ON

10:29AM 14    THURSDAY."

10:29AM 15         DO YOU SEE THAT?

10:29AM 16    A.  I DO.

10:29AM 17    Q.  AND IS THAT A REFERENCE TO A MEETING THAT YOU HAD ARRANGED

10:29AM 18    WITH MS. HOLMES AND OTHERS AT THERANOS TO DISCUSS THERANOS'S

10:29AM 19    TECHNOLOGY?

10:29AM 20    A.  YES, AS I REMEMBER IT.

10:29AM 21    Q.  OKAY.  PLEASE LOOK AT PAGE 3 OF THIS DOCUMENT.

10:30AM 22         IF YOU CAN GO ALL OF THE WAY DOWN PAST THE CONCLUSIONS,

10:30AM 23    MS. HOLLIMAN, THAT WOULD BE GREAT.

10:30AM 24         SITTING HERE TODAY, DO YOU HAVE A MEMORY OF RECEIVING THIS

10:30AM 25    EMAIL FROM MR. FRENZEL?

10:30AM  1    A.   AS I REMEMBER IT -- I'M NOT REMEMBERING RECEIVING THIS

10:30AM  2    EMAIL, BUT IN MY NORMAL COURSE, IT'S CLEAR THAT I RECEIVED IT.

10:30AM  3    Q.   OKAY.  AND IN THE -- IN YOUR NORMAL COURSE, WOULD IT BE

10:30AM  4    YOUR PRACTICE TO REVIEW WHATEVER MATERIALS A COMPANY SENT YOU

10:30AM  5    WHOSE TECHNOLOGY YOU WERE ASKED TO REVIEW?

10:30AM  6    A.   IN MY NORMAL COURSE, YES, I WOULD TRY TO REVIEW THOSE.

10:30AM  7    THIS -- I DON'T REMEMBER THIS PARTICULAR SET OF DOCUMENTS.

10:30AM  8    Q.   OKAY.  DO YOU SEE AT THE BOTTOM OF THIS REPORT THERE IS A

10:30AM  9    BULLET FOR CONCLUSIONS?

10:31AM  10   A.   I DO.

10:31AM  11   Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION TO PAGE 26 OF

10:31AM  12   THE EXHIBIT.

10:31AM  13        AND IF WE CAN ZOOM IN ON THE ENTIRETY OF THE CONCLUSIONS,

10:31AM  14   MS. HOLLIMAN.  IF WE CAN DISPLAY THE ENTIRETY OF THE TEXT.

10:31AM  15        MR. WEBER, DO YOU SEE THIS ITERATION OF THE REPORT HAS 13

10:31AM  16   CONCLUSIONS IN IT?

10:31AM  17   A.   I DO.

10:31AM  18   Q.   SO IT'S SLIGHTLY DIFFERENT FROM THE ONE THAT YOU ATTACHED

10:31AM  19   TO THE EMAIL THAT WE SAW TO GARY FRENZEL EARLIER?

10:31AM  20   A.   THE ATTACHMENT THAT I PUT INTO THE EMAIL TO GARY FRENZEL,

10:31AM  21   AS I REMEMBER IT, DOES NOT HAVE THESE ECONOMIC CONCLUSIONS IN

10:31AM  22   THE REPORT THAT I RECEIVED FROM CRAIG LIPSET AND AIDEN POWER.

10:32AM  23   Q.   OKAY.  BUT THE 13 CONCLUSIONS WERE IN THE INITIAL DOCUMENT

10:32AM  24   THAT WE SAW THAT MS. HOLMES SENT TO AIDAN POWER AND

10:32AM  25   CRAIG LIPSET, THE VERY FIRST ONE THAT WE LOOKED AT?

10:32AM  1    A.   CAN WE CONFIRM THAT AGAIN?  WHAT PAGE?

10:32AM  2    Q.   SURE.  IF I COULD DRAW YOUR ATTENTION TO 143, PAGE 26.

10:32AM  3    A.   YES, THEY ARE.

10:32AM  4    Q.   OKAY.  AFTER RECEIVING -- YOU'VE MADE REFERENCE TO A

10:32AM  5    MEETING OR A CONVERSATION THAT YOU HAD WITH MS. HOLMES AND THE

10:32AM  6    FOLKS FROM THERANOS ABOUT THERANOS'S TECHNOLOGY.

10:32AM  7         DID THAT HAPPEN?

10:32AM  8    A.   WE HAD A ONE HOUR TELECONFERENCE AT SOME DATE.

10:32AM  9    Q.   OKAY.  AS BEST YOU CAN TODAY, DESCRIBE THE SUBSTANCE OF

10:33AM 10    WHAT HAPPENED.

10:33AM 11    A.   IN THAT CONVERSATION THERE WERE -- MS. HOLMES, THE CEO OF

10:33AM 12    THERANOS, INTRODUCED HERSELF, AND THEN THERE WERE FIVE OR SIX

10:33AM 13    OTHER PEOPLE, DIRECTORS, WHO INTRODUCED THEMSELVES VERY

10:33AM 14    BRIEFLY.  I WAS NOT ABLE TO CATCH THE TITLES AND THE NAMES.

10:33AM 15         THERE WERE SIX QUESTIONS IN BROAD SCOPE THAT I HAD ASKED

10:33AM 16    NUMEROUS QUESTIONS AND ANGLES FROM, AND WE HAD THIS DISCUSSION.

10:33AM 17    BUT IT WAS ENTIRELY VOCALIZED BY MS. HOLMES.

10:33AM 18         AS I REMEMBER IT, NONE OF THE OTHER PEOPLE SPOKE.

10:33AM 19    Q.   AND WHEN YOU SAY "VOCALIZED BY MS. HOLMES," ARE YOU SAYING

10:33AM 20    THAT MS. HOLMES DID MOST OF THE TALKING ON THERANOS'S BEHALF ON

10:33AM 21    THIS CALL?

10:33AM 22    A.   YES.

10:33AM 23    Q.   AND WHAT WAS YOUR PURPOSE IN SPEAKING TO MS. HOLMES AND

10:34AM 24    MEMBERS OF HER TEAM ON THIS CALL?

10:34AM 25    A.   MY PURPOSE WAS TO GET A HOLISTIC UNDERSTANDING OF NOT JUST

10:34AM 1    WHERE THIS STUDY HAD DONE, BUT WHERE THERANOS'S ROADMAP WAS

10:34AM 2    GOING SO I COULD DETERMINE IF THERE WERE WAYS THAT -- IF THERE

10:34AM 3    WERE THERANOS TECHNOLOGIES THAT WOULD MATCH CLINICAL PROGRAM

10:34AM 4    NEEDS THAT WE ACTUALLY HAD ONGOING IN DEVELOPMENT AND IN

10:34AM 5    CLINICAL TRIALS.

10:34AM 6    Q.   AND WHEN YOU SAY "NOT JUST THIS STUDY," ARE YOU REFERRING

10:34AM 7    TO THE ANGIOGENESIS STUDY REPORT THAT YOU HAD RECEIVED?

10:34AM 8    A.   YES, I'M REFERRING TO THAT STUDY.

10:34AM 9    Q.   OKAY.  AND IN ADVANCE OF THIS PHONE CALL, DID YOU ALSO

10:34AM 10   SEND THERANOS WRITTEN DUE DILIGENCE QUESTIONS?

10:34AM 11   A.   AS I REMEMBER IT, MY WRITTEN DUE DILIGENCE QUESTIONS WOULD

10:34AM 12   HAVE FOLLOWED VERBAL CONVERSATIONS.  THAT'S MY NORMAL STANDARD

10:34AM 13   PRACTICE.

10:34AM 14   Q.   OKAY.  WELL, AFTER THIS PHONE CALL WITH MS. HOLMES, WHAT

10:35AM 15   DID YOU DO?

10:35AM 16   A.   I SENT A LIST OF QUESTIONS TO GARY FRENZEL FOR THEM TO

10:35AM 17   RESPOND TO AT THEIR DISCRETION.

10:35AM 18   Q.   OKAY.  AND WHAT HAPPENED AFTER THAT?

10:35AM 19   A.   AT SOME POINT, MAYBE A WEEK OR SO OR TWO WEEKS LATER --

10:35AM 20   YOU KNOW, IT'S A LONG TIME AGO -- I RECEIVED A LIST OF -- THAT

10:35AM 21   SET OF QUESTIONS WITH A SET OF ANSWERS TO THOSE QUESTIONS.

10:35AM 22   Q.   AND WITH ALL OF THE WRITTEN MATERIALS THAT YOU HAD

10:35AM 23   RECEIVED, THE PHONE CALL WITH MS. HOLMES AND HER TEAM AND THE

10:35AM 24   WRITTEN RESPONSES TO QUESTIONS, DID YOU PREPARE A REPORT WITH

10:35AM 25   RECOMMENDATIONS FOR PFIZER BASED ON YOUR ANALYSIS OF THERANOS'S

WEBER DIRECT BY MR. LEACH                                      4379

10:35AM  1    TECHNOLOGY?

10:35AM  2    A.   I DID.

10:35AM  3    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO WHAT HAS BEEN

10:35AM  4    MARKED AS EXHIBIT 167.

10:36AM  5        DO YOU RECOGNIZE THIS DOCUMENT?

10:36AM  6    A.   I DO.

10:36AM  7    Q.   WHAT IS THIS?

10:36AM  8    A.   THIS IS MY FINAL SUMMARY REPORT AND RECOMMENDATIONS TO

10:36AM  9    PFIZER ON THE USE OF THE THERANOS TECHNOLOGY.

10:36AM 10    Q.   DO YOU SEE THE DATE OF DECEMBER 31ST, OR 12-31-08 AT THE

10:36AM 11    TOP?

10:36AM 12    A.   I DO.

10:36AM 13    Q.   DID YOU PREPARE THIS DOCUMENT IN THE ORDINARY COURSE OF

10:36AM 14    PFIZER'S BUSINESS?

10:36AM 15    A.   I DID.

10:36AM 16    Q.   DID YOU PREPARE THIS AT OR AROUND THE TIME OF YOUR

10:36AM 17    DIAGNOSTICS REVIEW?

10:36AM 18    A.   I DID, FOLLOWED UP BY A COUPLE OF WEEKS SO I COULD FULLY

10:36AM 19    INTEGRATE ALL OF THE INFORMATION THAT I WAS OBTAINING NOT ONLY

10:36AM 20    FROM PFIZER, BUT FROM VARIOUS POINTS IN THE OUTSIDE WORLD AND

10:36AM 21    MY CONTACTS INTERNAL.

10:37AM 22    Q.   AND DID YOU PREPARE REPORTS LIKE THIS IN THE ORDINARY

10:37AM 23    COURSE OF YOUR BUSINESS?

10:37AM 24    A.   YES, THIS IS MY STANDARD PRACTICE.

10:37AM 25    Q.   OKAY.  SO THIS ISN'T A ONE-OFF EXAMPLE?

10:37AM  1    A.   NO.

10:37AM  2    Q.   OKAY.  AND DID PFIZER KEEP YOUR REPORT IN THE ORDINARY

10:37AM  3    COURSE OF ITS BUSINESS?

10:37AM  4    A.   IT WOULD HAVE.

10:37AM  5    Q.   OKAY.

10:37AM  6         YOUR HONOR, I OFFER PAGE 1 OF EXHIBIT 167 WITH -- AND I

10:37AM  7    ASK LEAVE TO REDACT EVERYTHING AFTER THE WORDS "DEMONSTRATED

10:37AM  8    CAPABILITY" IN THE MIDDLE OF THE PAGE IN THAT LAST -- IN THAT

10:37AM  9    PARAGRAPH CONSISTENT WITH OUR -- THE COURT'S RULINGS.

10:37AM 10              THE COURT:  ALL RIGHT.  MR. CLINE.

10:37AM 11              MR. CLINE:  WITH THAT REDACTION, NO OBJECTION TO

10:37AM 12    PAGE 1.

10:37AM 13              THE COURT:  ALL RIGHT.  THANK YOU.  THAT WILL BE

10:37AM 14    REDACTED AND THE PAGE WILL BE ADMITTED AND IT MAY BE PUBLISHED.

10:38AM 15         (GOVERNMENT'S EXHIBIT 167, REDACTED PAGE 1, WAS RECEIVED

10:38AM 16    IN EVIDENCE.)

10:38AM 17    BY MR. LEACH:

10:38AM 18    Q.   MR. WEBER --

10:38AM 19         AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM IN ON THE TOP

10:38AM 20    PORTION, EVERYTHING FROM THE TOP DOWN TO RECOMMENDATIONS.  NO,

10:38AM 21    THE ENTIRETY OF THAT PARAGRAPH.

10:38AM 22         WONDERFUL.  THANK YOU.

10:38AM 23         MR. WEBER, DO YOU SEE THE HEADING "DIAGNOSTICS REVIEW OF

10:38AM 24    THERANOS'S TECHNOLOGY AND FINAL RECOMMENDATIONS, SHANE WEBER"

10:38AM 25    AT THE TOP?

10:38AM   1    A.   I DO.

10:38AM   2    Q.   AND IS THAT A REFERENCE TO A REVIEW THAT YOU'D BEEN

10:38AM   3    CONDUCTING OF THERANOS'S TECHNOLOGY?

10:38AM   4    A.   IT IS.

10:38AM   5    Q.   OKAY.  IN THE FIRST PARAGRAPH, IN THE THIRD LINE TOWARDS

10:38AM   6    THE END, YOU WROTE -- WELL, FIRST, THE VERY FIRST SENTENCE

10:38AM   7    SAYS, "THERANOS SYSTEMS (THERANOS) PURPORTS TO HAVE A PATIENT

10:38AM   8    HOME USE IMMUNOASSAY IN VITRO DIAGNOSTIC DEVICE PLATFORM."

10:38AM   9         DO YOU SEE THAT?

10:38AM  10    A.   I DO.

10:39AM  11    Q.   AND IS THAT CONSISTENT WITH THE THERANOS PRODUCT?

10:39AM  12    A.   IT IS.

10:39AM  13    Q.   AND YOU WROTE, "THE PURPOSE OF THIS REVIEW WAS TO CLOSE

10:39AM  14    THE LOOP ON ALL PREVIOUS EFFORTS FOR THERANOS TO LOOK FOR

10:39AM  15    BUSINESS OPPORTUNITIES WITH PFIZER, AND TO MAKE FINAL

10:39AM  16    RECOMMENDATIONS REGARDING POTENTIAL FUTURE ATTEMPTS FOR

10:39AM  17    THERANOS TO ENGAGE DIFFERENT PARTS OF PFIZER IN THEIR

10:39AM  18    PLATFORM."

10:39AM  19         DO YOU SEE THAT?

10:39AM  20    A.   I DO.

10:39AM  21    Q.   IS THAT CONSISTENT WITH WHAT YOU UNDERSTOOD YOUR

10:39AM  22    ASSIGNMENT TO BE?

10:39AM  23    A.   IT WAS.

10:39AM  24    Q.   OKAY.

10:39AM  25         LET ME NEXT DRAW YOUR ATTENTION TO THE PARAGRAPH,

10:39AM 1    RECOMMENDATIONS.

10:39AM 2         DO YOU SEE THAT?

10:39AM 3    A.   I DO.

10:39AM 4    Q.   YOU WROTE, "THERANOS DOES NOT AT THIS TIME HAVE ANY

10:39AM 5    DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER."

10:39AM 6         DO YOU SEE THAT?

10:39AM 7    A.   I DO.

10:39AM 8    Q.   WAS THAT YOUR RECOMMENDATION?

10:39AM 9    A.   IT WAS.

10:39AM 10   Q.   AND WHY WAS THAT YOUR RECOMMENDATION?

10:39AM 11   A.   SO THERE WAS NO DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER

10:39AM 12   BECAUSE OUR INTERESTS WERE FOR MOLECULAR NUCLEIC ACID TESTS,

10:40AM 13   PARTICULARLY IN ONCOLOGY, AND THEY'RE FOR DIAGNOSTICS THAT ARE

10:40AM 14   READY TO USE IN A CLINICAL TRIAL AND SO THEY NEEDED TO BE

10:40AM 15   EITHER FDA APPROVED OR LABORATORY -- APPROVED LABORATORY

10:40AM 16   DEVELOPED TESTS UNDER THE CLIA LABORATORY PROCESS.

10:40AM 17        AND THE THERANOS PLATFORM WAS AN IMMUNOASSAY PLATFORM, SO

10:40AM 18   IT'S NOT NUCLEIC ACID.

10:40AM 19        AND IT ALSO WAS FOR HOME USE, AND WE NEEDED DIAGNOSTICS

10:40AM 20   THAT COULD BE USED AT PHYSICIAN'S CLINICAL INTAKE POINTS FOR

10:40AM 21   CLINICAL TRIALS.

10:40AM 22   Q.   YOU ALSO MADE REFERENCE TO DEVICES OR DIAGNOSTICS THAT ARE

10:40AM 23   READY FOR USE.

10:40AM 24        WAS IT YOUR JUDGMENT THAT THERANOS DIDN'T MEET THAT

10:40AM 25   STANDARD?

WEBER DIRECT BY MR. LEACH                                                    4383

10:40AM 1      A.   IT WAS.

10:40AM 2      Q.   OKAY.  YOU NEXT WROTE, "IT IS RECOMMENDED THAT NO FURTHER

10:40AM 3   FINANCIAL INVESTMENT OR CLINICAL SAMPLE RESOURCES BE EXTENDED

10:40AM 4   TO THERANOS."

10:41AM 5        WAS THAT YOUR RECOMMENDATION?

10:41AM 6      A.   IT WAS.

10:41AM 7      Q.   AND WHY WAS IT YOUR RECOMMENDATION?

10:41AM 8      A.   WELL, THAT RECOMMENDATION REALLY FOLLOWS FROM THE FIRST,

10:41AM 9   THAT IF THERE'S NO MATCH BETWEEN THE USE OF THERANOS TECHNOLOGY

10:41AM 10  AND PFIZER'S CLINICAL PROGRAMS, THERE WAS NO NEED FOR FURTHER

10:41AM 11  FINANCIAL INVESTMENT OR RELEASE OF CLINICAL SAMPLES FROM OTHER

10:41AM 12  PFIZER TRIALS.

10:41AM 13     Q.   IN PARAGRAPH NUMBER 3 YOU WROTE, "GOING FORWARD, THERANOS

10:41AM 14  SHOULD BE MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP."

10:41AM 15       IS THAT YOUR GROUP?

10:41AM 16     A.   IT IS, OR IT WAS.

10:41AM 17     Q.   YOU THEN WROTE, "A ONCE EVERY SIX MONTH PHONE CALL (OR AS

10:41AM 18  MAY BE REQUESTED BY THERANOS UPON A SIGNIFICANT IMPROVEMENT ON

10:41AM 19  THEIR PLATFORM) VIA SPECIFIED POINT OF CONTACTS ON BOTH SIDES

10:41AM 20  IS SUFFICIENT TO MONITOR AND DETERMINE IF THERANOS HAS ANY

10:41AM 21  DEMONSTRATED CAPABILITY."

10:41AM 22       DO YOU SEE THAT LANGUAGE?

10:41AM 23     A.   I DO.

10:41AM 24     Q.   AND WAS THAT YOUR RECOMMENDATION?

10:42AM 25     A.   IT WAS.

10:42AM  1    Q.   AND WHY WAS THAT YOUR RECOMMENDATION?

10:42AM  2    A.   THE WORLD CHANGES.  ONE NEVER KNOWS WHAT THE FUTURE MIGHT

10:42AM  3    BRING, AND SO A WAIT AND WATCH APPROACH SEEMED TO BE PRUDENT.

10:42AM  4    Q.   NOW IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND FOCUS ON THE

10:42AM  5    LAST PARAGRAPH DOWN AT THE BOTTOM OR THE -- EVERYTHING DOWN IN

10:42AM  6    THE FIRST PARAGRAPH.

10:42AM  7         THAT'S FINE.  THANK YOU, MS. HOLLIMAN.

10:42AM  8         MR. WEBER, DO YOU SEE WHERE YOU WROTE, "REVIEW AND

10:42AM  9    COMMENTS ON" - I THINK YOU MEANT "THERANOS PROVIDED

10:42AM 10    INFORMATION."

10:42AM 11    A.   I DO.

10:42AM 12    Q.   AND YOU WROTE, "THE TECHNICAL ASSESSMENT REVIEW PROCESS

10:42AM 13    CONSISTED OF EXAMINING THERANOS CONFIDENTIAL SUMMARY REPORTS,

10:42AM 14    READING THEIR PUBLIC PATENT PUBLICATIONS, HEARING THEIR STORY

10:42AM 15    IN A ONE HOUR TELECONFERENCE WITH QUESTIONS AND ANSWERS,

10:42AM 16    READING THEIR ANSWERS TO A WRITTEN SET OF TECHNICAL DUE

10:42AM 17    DILIGENCE QUESTIONS SUBMITTED TO THEM, SURVEYING THE WEB FOR

10:43AM 18    PUBLIC INFORMATION," AND THEN IT CONTINUES.

10:43AM 19         DO YOU SEE THAT?

10:43AM 20    A.   I DO.

10:43AM 21    Q.   AND IS THIS A FAIR SUMMARY OF THE WORK THAT YOU DID AND

10:43AM 22    CONSIDERED?

10:43AM 23    A.   YES, IT IS.

10:43AM 24         MR. LEACH:  YOUR HONOR, WITH THE COURT'S PERMISSION,

10:43AM 25    I WOULD LIKE TO DISPLAY AS A DEMONSTRATIVE PAGE 2 OF

10:43AM  1    EXHIBIT 167.

10:43AM  2              THE COURT:  YES.

10:43AM  3         ANY FURTHER COMMENT OTHER THAN WHAT YOU'VE MADE

10:43AM  4    PREVIOUSLY, MR. CLINE?

10:43AM  5              MR. CLINE:  NO FURTHER COMMENT.

10:43AM  6              THE COURT:  ALL RIGHT.  THANK YOU.  I'LL NOTE YOUR

10:43AM  7    COMMENTS.

10:43AM  8         IT MAY BE DISPLAYED, THANK YOU, AS A DEMONSTRATIVE.

10:43AM  9              MR. LEACH:  AND IF WE CAN PLEASE ZOOM IN,

10:43AM 10    MS. HOLLIMAN, ON THE TOP PORTION DOWN TO THE BOLDED LANGUAGE.

10:43AM 11         PERFECT.  THANK YOU.

10:43AM 12    Q.   MR. WEBER, YOU WROTE AT THE TOP UP HERE, "THE INTRODUCTION

10:43AM 13    TO THERANOS SYSTEMS SLIDE DECK DOES NOT CONTAIN SUFFICIENT

10:43AM 14    INFORMATION ON THEIR PLATFORM TO DEMONSTRATE IN VITRO

10:43AM 15    DIAGNOSTIC ASSAY OR PLATFORM CAPABILITY."

10:44AM 16         DO YOU SEE THAT LANGUAGE?

10:44AM 17    A.   I DO.

10:44AM 18    Q.   AND THE "INTRODUCTION TO THERANOS SYSTEMS SLIDE DECK," IS

10:44AM 19    THAT A REFERENCE TO A POWERPOINT THAT WAS PROVIDED TO YOU?

10:44AM 20    A.   AS I REMEMBER IT, THIS IS REFERRING TO THE POWERPOINT THAT

10:44AM 21    AIDAN POWER AND CRAIG LIPSET SENT TO ME.

10:44AM 22    Q.   OKAY.  AND WHY DID YOU BELIEVE THE THERANOS SYSTEMS SLIDE

10:44AM 23    DECK DID NOT CONTAIN SUFFICIENT INFORMATION ON THEIR PLATFORM

10:44AM 24    TO DEMONSTRATE IN VITRO DIAGNOSTIC ASSAY OR PLATFORM

10:44AM 25    CAPABILITY?

10:44AM  1    A.   I BELIEVED THIS BASED UPON MY EXTENSIVE EXPERIENCE DOING

10:44AM  2    ASSAY DEVELOPMENT, ASSAY QUALIFICATION, RECEIVER OPERATOR CURVE

10:44AM  3    ANALYSIS, THAT THERE WAS NOT SUFFICIENT INFORMATION IN THIS

10:44AM  4    REPORT TO CONVINCE ME THAT THEY WERE -- THAT THE THERANOS

10:44AM  5    SYSTEM WAS READY TO BE TAKEN FORWARD FOR CLINICAL USE THROUGH

10:44AM  6    AN FDA OR CLIA LABORATORY PROCESS.

10:44AM  7    Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED A POORLY PREPARED

10:45AM  8    SUMMARY DOCUMENT OF THEIR PLATFORM FOR HOME PATIENT USE WITH

10:45AM  9    ANTI-ANGIOGENIC THERAPIES."

10:45AM 10        DO YOU SEE THAT LANGUAGE?

10:45AM 11    A.   I DO.

10:45AM 12    Q.   AND WHAT WERE YOU REFERRING TO AS THE SUMMARY DOCUMENT?

10:45AM 13    A.   AS I REMEMBER IT, I'M REFERRING TO THE SUMMARY DOCUMENT ON

10:45AM 14    THE STUDY THAT WAS SENT TO ME VIA CRAIG LIPSET AND AIDAN POWER.

10:45AM 15    Q.   THERE'S THEN A NUMBER OF, OF NUMBERED ITEMS FURTHER BELOW.

10:45AM 16        FIRST OF ALL, BEFORE I GET TO THOSE, YOU WROTE, "A SMALL

10:45AM 17    NUMBER OF PATIENTS RECEIVING SUTENT" -- IS SUTENT A PFIZER

10:45AM 18    DRUG?

10:45AM 19    A.   IT IS A PFIZER DRUG.

10:45AM 20    Q.   AND WAS THAT THE SUBJECT OF THE ANGIOGENESIS PROGRAM IN

10:45AM 21    THE STUDY REPORT?

10:45AM 22    A.   IT IS AS I REMEMBER IT.

10:45AM 23    Q.   YOU WROTE ONE, "THERANOS SYSTEMS IN THE SLIDE DECK STATES

10:46AM 24    'HUGE VARIATION BETWEEN SUBJECTS, BOTH IN THE ABSOLUTE LEVELS

10:46AM 25    AND CHANGES OVER TIME VARY GREATLY.'  NO DISCUSSION OR RIGOROUS

10:46AM  1    GRAPHICAL MULTI-PARAMETER QUANTITATIVE ANALYSIS OF THE PATIENT

10:46AM  2    COHORT WAS DONE TO ELUCIDATE AND PROVIDE CLARITY OF CORRELATION

10:46AM  3    TO CLINICAL RESPONSE."

10:46AM  4        WHAT WERE YOU GETTING AT THERE?

10:46AM  5    A.   I WAS GETTING AT SEVERAL THINGS THERE.  WHAT I WAS GETTING

10:46AM  6    AT WAS THE ANALYSIS DIDN'T GET AT WHY WAS THIS HUGE VARIATION.

10:46AM  7    THERE WASN'T A MULTI PARAMETER APPROACH, WHICH IS OFTEN

10:46AM  8    REQUIRED FOR ONCOLOGY STUDIES IN ORDER TO UNDERSTAND WHAT WAS

10:46AM  9    GOING ON, AND THERE WASN'T A CORRELATION, AN ANALYSIS OF CLEAR

10:46AM  10   CORRELATION TO THE CLINICAL RESPONSE.

10:46AM  11   Q.   YOU THEN WROTE, "THERANOS UNCONVINCINGLY ARGUES --"

10:46AM  12       MR. CLINE:  YOUR HONOR, I APOLOGIZE TO MR. LEACH.

10:46AM  13       YOUR HONOR, APOLOGIES.

10:46AM  14       YOUR HONOR, THIS IS THE 702 ISSUE THAT I THOUGHT WE WERE

10:47AM  15   NOT GOING TO BE DISCUSSING.

10:47AM  16       THE COURT:  YES.  MR. LEACH, YOU DON'T INTEND TO GO

10:47AM  17   ANY FURTHER INTO DEFINITIONS OF THIS?  AND MAYBE YOU SHOULD

10:47AM  18   CLEAR UP WITH THE WITNESS ACCESSIBLE INFORMATION SUCH THAT IT

10:47AM  19   NEED NOT TOUCH ON ANY EXPERTISE.

10:47AM  20       MR. LEACH:  THANK YOU, YOUR HONOR.  THAT WAS NOT MY

10:47AM  21   INTENTION.

10:47AM  22   Q.   IS THIS A COMMENT, MR. WEBER, ON THE SLIDE DECK THAT WAS

10:47AM  23   PROVIDED TO YOU?

10:47AM  24   A.   IT WAS.

10:47AM  25   Q.   OKAY.  AND WITHOUT RELIANCE ON YOUR EXPERTISE, IS THE

10:47AM 1    THRUST OF YOUR COMMENT HERE THAT IT WASN'T PERSUASIVE TO YOU?

10:47AM 2    A.   IT WAS.

10:47AM 3    Q.   OKAY.  THE NEXT BULLET SAYS, "THERANOS UNCONVINCINGLY

10:47AM 4    ARGUES THE CASE FOR HAVING ACCOMPLISHED TASKS OF INTEREST TO

10:47AM 5    PFIZER."

10:47AM 6         DO YOU SEE THAT LANGUAGE?

10:47AM 7    A.   I DO.

10:47AM 8    Q.   AND WHAT IS THAT A REFERENCE TO?

10:47AM 9    A.   IT'S A REFERENCE TO THAT I WAS NOT ABLE TO SEE A CLEAR SET

10:48AM 10   OF GOALS THAT WERE ACCOMPLISHED BY THE STUDY.

10:48AM 11   Q.   YOU THEN WROTE, "THE NINE CONCLUSIONS IN THEIR SUMMARY

10:48AM 12   DOCUMENT ARE NOT BELIEVABLE BASED ON THE INFORMATION PROVIDED."

10:48AM 13        DO YOU SEE THAT?

10:48AM 14   A.   I DO.

10:48AM 15   Q.   AND THE SUMMARY DOCUMENT, IS THAT A REFERENCE TO THE STUDY

10:48AM 16   REPORT THAT YOU ATTACHED TO -- IN AN EMAIL TO MR. FRENZEL?

10:48AM 17        I GUESS WHAT DID YOU MEAN BY "STUDY REPORT" OR "SUMMARY

10:48AM 18   DOCUMENT"?

10:48AM 19   A.   THE SUMMARY DOCUMENT, AS I REMEMBER IT, IS ONE OF THE FOUR

10:48AM 20   DOCUMENTS THAT CRAIG LIPSET HAD FORWARDED TO ME TO ANALYZE.

10:48AM 21        SO THAT'S THE -- I'M REFERRING TO, AS I REMEMBER IT, THE

10:48AM 22   SUMMARY DOCUMENT.

10:48AM 23   Q.   OKAY.

10:48AM 24   A.   THE THERANOS SUMMARY DOCUMENT.

10:48AM 25   Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED NON-INFORMATIVE,

10:48AM  1    TANGENTIAL, DEFLECTIVE OR EVASIVE ANSWERS TO A WRITTEN SET OF

10:48AM  2    TECHNICAL DUE DILIGENCE QUESTIONS."

10:49AM  3        DO YOU SEE THAT?

10:49AM  4    A.   I DO.

10:49AM  5    Q.   AND WAS THAT YOUR CONCLUSION AT THE TIME?

10:49AM  6    A.   IT WAS.

10:49AM  7    Q.   AND WHAT DO YOU MEAN BY THE "DUE DILIGENCE QUESTIONS"?  IS

10:49AM  8    THAT A REFERENCE TO WRITTEN QUESTIONS THAT YOU HAD SUBMITTED TO

10:49AM  9    THERANOS?

10:49AM  10   A.   IT'S -- I'M REFERRING TO THE LIST OF QUESTIONS, TECHNICAL

10:49AM  11   DUE DILIGENCE QUESTIONS I SUBMITTED TO THERANOS VIA

10:49AM  12   GARY FRENZEL.

10:49AM  13   Q.   IF WE CAN ZOOM OUT, MS. HOLLIMAN, AND LOOK AT THE SECOND

10:49AM  14   PART OF THIS.

10:49AM  15       MR. WEBER, DO YOU SEE THE HEADING "THERAPEUTIC AREA

10:49AM  16   MOLECULAR MEDICINE LEAD INTEREST IN THERANOS OR A THERANOS-LIKE

10:49AM  17   HOME PATIENT IMMUNOASSAY IN VITRO DIAGNOSTIC PLATFORM"?

10:49AM  18   A.   I DO.

10:49AM  19   Q.   AND WHAT IS SUMMARIZED HERE IN THIS PORTION OF YOUR

10:49AM  20   REPORT?

10:49AM  21   A.   WHAT IS SUMMARIZED HERE IS THAT I REACHED OUT TO THE

10:49AM  22   CLINICAL LEADS WHO ARE RESPONSIBLE FOR ONCOLOGY STUDIES, AND SO

10:50AM  23   I'M RELYING ON THEM TO STATE THAT THERE IS NO CLINICAL

10:50AM  24   DEVELOPMENT INTEREST IN USING SUCH TYPE ASSAYS.

10:50AM  25   Q.   AND THE FEEDBACK THAT YOU GOT FROM YOUR COLLEAGUES WAS

| | | |
|---|---|---|
| 10:50AM | 1 | WHAT? |

10:50AM 1   WHAT?

10:50AM 2   A.   THERE WAS NO INTEREST.

10:50AM 3   Q.   PLEASE LOOK AT PAGE 3, WHICH WE'LL DISPLAY AS A

10:50AM 4   DEMONSTRATIVE.

10:50AM 5        DO YOU SEE ON PAGE 3 THE HEADING "DUE DILIGENCE QUESTIONS

10:50AM 6   VERBALLY ASKED TO THERANOS IN NOVEMBER 13TH TELECONFERENCE"?

10:50AM 7   A.   I DO.

10:50AM 8   Q.   AND THERE ARE SIX QUESTIONS LISTED HERE.

10:50AM 9        DO YOU SEE THAT?

10:50AM 10  A.   I SEE THIS.

10:50AM 11  Q.   ARE THOSE QUESTIONS THAT YOU WENT OVER WITH MS. HOLMES AND

10:50AM 12  HER TEAM IN A CONFERENCE CALL?

10:50AM 13  A.   THEY ARE.

10:50AM 14  Q.   YOU WROTE, "THERANOS VERBALLY PROVIDED OBLIQUE,

10:50AM 15  DEFLECTIVE, OR EVASIVE NON-INFORMATIVE ANSWERS TO THESE

10:51AM 16  TECHNICAL DUE DILIGENCE QUESTIONS BELOW."

10:51AM 17       WAS THAT YOUR JUDGMENT AT THE TIME?

10:51AM 18  A.   IT WAS.

10:51AM 19  Q.   WHY WAS THAT?

10:51AM 20  A.   THESE SIX QUESTIONS, I SPENT 50 MINUTES IN THE CALL

10:51AM 21  ASKING, PROBING, TRYING TO FIND UNDERSTANDING OF THE ROAD MAP

10:51AM 22  OF WHERE THESE QUESTIONS WOULD LEAD AND WHAT WAS POSSIBLE FROM

10:51AM 23  THERANOS.

10:51AM 24  Q.   OKAY.  ONE OF THE QUESTIONS WAS, "WHAT IS THE APPROXIMATE

10:51AM 25  ANTICIPATED COST OF THE DEVICE IF 100 WERE DESIRED FOR A

10:51AM   1      CLINICAL STUDY ENROLLMENT?"

10:51AM   2          DO YOU SEE THAT?

10:51AM   3      A.   I SEE THAT QUESTION.

10:51AM   4      Q.   AND WHY WERE YOU INTERESTED IN THAT?

10:51AM   5      A.   WHY I WAS INTERESTED IS IF WE COULD POTENTIALLY SEE IF WE

10:51AM   6      COULD FIND A MATCH, A WORLDWIDE CLINICAL TRIAL MIGHT ANTICIPATE

10:51AM   7      NEEDING 100 OF SUCH DEVICES, SO I WANTED TO KIND OF GET JUST A

10:52AM   8      DIRECTIONAL SCOPE OF WHAT THE COST WOULD BE.

10:52AM   9      Q.   AFTER PREPARING THIS -- WELL, FIRST, IS WHAT WE'RE LOOKING

10:52AM  10      AT IN EXHIBIT 167 YOUR FINAL REPORT, MR. WEBER?

10:52AM  11      A.   THIS IS MY FINAL REPORT.

10:52AM  12      Q.   OKAY.  AND WHAT DID YOU DO WITH IT?

10:52AM  13      A.   I FORWARDED IT TO MY DIRECT LINE MANAGER, HAKAN SAKUL, WHO

10:52AM  14      WAS THE GLOBAL HEAD OF DIAGNOSTICS FOR PFIZER; TO CRAIG LIPSET,

10:52AM  15      THE DIRECTOR OF CLINICAL INNOVATION, MY COLLEAGUE THERE IN

10:52AM  16      NEW YORK CITY; AND TO AIDAN POWER, THE HEAD OF MOLECULAR

10:52AM  17      MEDICINE.

10:52AM  18      Q.   DID YOUR SUPERVISORS AGREE WITH YOUR RECOMMENDATION?

10:52AM  19      A.   THEY DID.

10:52AM  20      Q.   OKAY.  DID YOU EVER HEAR --

10:52AM  21              THE COURT:  I'M SORRY, SIR.  I BEG YOUR PARDON.

10:52AM  22      COULD YOU PLEASE SPELL YOUR DIRECT MANAGER'S NAME AGAIN,

10:52AM  23      PLEASE.

10:52AM  24              THE WITNESS:  OH, YES.

10:52AM  25              MY DIRECT MANAGER IS HAKAN SAKUL.  IT'S H-A-K-A-N, SAKUL,

10:53AM  1        S-A-K-U-L.

10:53AM  2                THE COURT:  THANK YOU VERY MUCH.  PARDON ME,

10:53AM  3        MR. LEACH.

10:53AM  4        BY MR. LEACH:

10:53AM  5        Q.  AND YOUR UNDERSTANDING WAS THAT YOUR SUPERVISORS AGREED

10:53AM  6        WITH YOUR RECOMMENDATION?

10:53AM  7        A.  IT WAS.

10:53AM  8        Q.  AND DID YOU EVER HEAR -- DID YOU EVER CHANGE YOUR

10:53AM  9        RECOMMENDATION AT ANY POINT?

10:53AM 10        A.  NO, I DID NOT.

10:53AM 11        Q.  OKAY.  LET ME NEXT DRAW YOUR ATTENTION, PLEASE, TO WHAT WE

10:53AM 12        HAVE -- BEFORE I MOVE ON TO THE NEXT EXHIBIT, EXHIBIT 167 IS AN

10:53AM 13        INTERNAL PFIZER DOCUMENT, MR. WEBER?

10:53AM 14        A.  IT IS.

10:53AM 15        Q.  AND DID YOU EVER SHARE THAT WITH THERANOS?

10:53AM 16        A.  NO, I DID NOT.

10:53AM 17        Q.  LET ME PLEASE DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED

10:53AM 18        AS EXHIBIT 174.

10:53AM 19            AND I OFFER 174 INTO EVIDENCE PURSUANT TO STIPULATION.

10:53AM 20                MR. CLINE:  NO OBJECTION.  MAY I CHECK WITH

10:53AM 21        MR. LEACH FOR ONE SECOND?

10:54AM 22                THE COURT:  SURE.  OF COURSE.

10:54AM 23            (DISCUSSION OFF THE RECORD.)

10:54AM 24                MR. CLINE:  NO OBJECTION.

10:54AM 25                THE COURT:  174 IS ADMITTED.  IT MAY BE PUBLISHED.

10:54AM  1          (GOVERNMENT'S EXHIBIT 174 WAS RECEIVED IN EVIDENCE.)

10:54AM  2     BY MR. LEACH:

10:54AM  3     Q.   MR. WEBER, IS THIS AN EMAIL THAT YOU SENT TO AIDAN POWER

10:54AM  4     WITH A CC TO CRAIG LIPSET AND HAKAN SAKUL ON OR ABOUT

10:54AM  5     JANUARY 30TH, 2009?

10:54AM  6     A.   IT IS.

10:54AM  7     Q.   AND THIS IS AFTER YOU SUBMITTED YOUR REPORT RELATING TO

10:54AM  8     THERANOS TO YOUR SUPERIORS?

10:54AM  9     A.   IT WAS.

10:54AM  10    Q.   OKAY.  AND IS THIS A PHONE CALL THAT YOU HAD WITH

10:54AM  11    MS. HOLMES FOLLOWING YOUR REVIEW?

10:54AM  12    A.   IT WAS, YES.

10:54AM  13    Q.   YOU WROTE, "TODAY I SPOKE WITH ELIZABETH HOLMES, CEO,

10:55AM  14    THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT HAVE AT THIS

10:55AM  15    TIME A FORESEEABLE USE OF THE THERANOS IMMUNOASSAY DEVICE FOR

10:55AM  16    AT PATIENT SELF USE AT HOME BUT SHE AND I AGREED TO STAY IN

10:55AM  17    TOUCH EVERY SIX MONTHS."

10:55AM  18         DO YOU SEE THAT?

10:55AM  19    A.   I DO.

10:55AM  20    Q.   AND THAT HAPPENED DURING THE PHONE CALL?

10:55AM  21    A.   YES.

10:55AM  22    Q.   OKAY.  YOU SEEM TO PAUSE.  WHY DO YOU PAUSE?

10:55AM  23    A.   IT WAS A LONG TIME AGO, 13 YEARS.  BUT AS I REMEMBER IT, I

10:55AM  24    WOULD HAVE BROACHED AND TRIED TO MAKE AN ARRANGEMENT TO STAY IN

10:55AM  25    TOUCH ON A REGULAR BASIS JUST TO KEEP IN TOUCH.

10:55AM 1    Q.   CONSISTENT WITH THE FINAL RECOMMENDATION IN YOUR REPORT?

10:55AM 2    A.   YES, CONSISTENT WITH MY FINAL REPORT RECOMMENDATION.

10:55AM 3    Q.   AND YOU WROTE, "I WAS POLITE, CLEAR, CRISP AND PATIENTLY

10:56AM 4    FIRM AS SHE PUSHED BACK."

10:56AM 5        WHAT DID YOU MEAN BY THAT?

10:56AM 6    A.   WELL, WHAT I MEANT WAS I, AS A MESSENGER, AM DELIVERING A

10:56AM 7    PIECE OF INFORMATION AND A POINT OF VIEW THAT WAS NOT DESIRED,

10:56AM 8    AND SO I HAD TO BE CLEAR THAT THIS IS REALLY PFIZER'S INTENT.

10:56AM 9    Q.   YOU THEN WROTE, "SHE ASKED FOR OTHER NAMES AT PFIZER TO

10:56AM 10   APPROACH AND I POLITELY DEFLECTED."

10:56AM 11       WHY DID YOU POLITELY DEFLECT?

10:56AM 12   A.   WELL, I POLITELY DEFLECTED BECAUSE IN TERMS OF BUSINESS

10:56AM 13   INEFFICIENCIES, WE HAD MADE OUR DETERMINATION OF WHAT PFIZER'S

10:56AM 14   CLINICAL PATH NEEDS ARE AND THAT THERANOS'S IMMUNOASSAY SYSTEM

10:56AM 15   WAS NOT GOING TO FIT A MODULE IN THERE, AND SO I DID NOT WANT

10:56AM 16   MULTIPLE OTHER POINTS OF THE COMPANY BEING CONTACTED AND BEING

10:57AM 17   DISTRACTED FROM THEIR CLINICAL TRIAL DUTIES.

10:57AM 18   Q.   IN THE NEXT PARAGRAPH YOU WROTE, "I DID RECEIVE HER

10:57AM 19   CONFIRMATION THAT THERANOS HAS BEEN PAID IN FULL FOR THE

10:57AM 20   PREVIOUS ALLIANCE CONTRACT."

10:57AM 21       WHAT DID YOU MEAN BY "THE PREVIOUS ALLIANCE CONTRACT"?

10:57AM 22   A.   WHAT I MEANT, AS I REMEMBER IT, THAT WAS THE CONTRACT

10:57AM 23   UNDER WHICH THE STUDY THAT HAD BEEN DESCRIBED AND SUBMITTED TO

10:57AM 24   AIDAN POWER WAS FUNDED BY.

10:57AM 25   Q.   YOU THEN WROTE, "I HAD CONFIRMED THIS BEFORE HAND AND THAT

10:57AM   1      IT CAME OUT OF STRATEGIC ALLIANCE BUDGET AND NOT MM BUDGET."

10:57AM   2           IS MM A REFERENCE TO MOLECULAR MEDICINE?

10:57AM   3      A.   IT IS.

10:57AM   4      Q.   AND THAT'S YOUR GROUP?

10:57AM   5      A.   IT IS.

10:57AM   6      Q.   AND WHAT DID YOU MEAN BY THIS SENTENCE?

10:57AM   7      A.   I AM INFORMING MY VICE PRESIDENT OF MOLECULAR MEDICINE

10:57AM   8      THAT HE DID NOT HAVE TO WORRY THAT THERE WAS GOING TO BE OTHER

10:58AM   9      FURTHER CHARGES COME OUT OF -- SURPRISE CHARGES GOING INTO THIS

10:58AM   10     COMING NEW YEAR AND THAT EVERYTHING HAD BEEN PAID FOR UNDER THE

10:58AM   11     CONTRACT AND PFIZER HAD MET ITS CONTRACTUAL OBLIGATIONS OF

10:58AM   12     PAYING FOR THE WORK.

10:58AM   13     Q.   IN THE NEXT PARAGRAPH YOU WROTE, "AS STEVE FELSTEAD'S

10:58AM   14     CLINICAL R&D VISION BECOMES MORE OPERATIONALLY CLEAR, I CAN

10:58AM   15     REVISIT THERANOS IF THERE ARE NEW NEEDS WHICH ARISE THAT

10:58AM   16     THERANOS CAN SOLVE IF THEIR DEVICE IS PLAUSIBLY ABLE TO DO SO."

10:58AM   17          DO YOU SEE THAT LANGUAGE?

10:58AM   18     A.   I DO.

10:58AM   19     Q.   AND WHAT DID YOU MEAN BY THAT?

10:58AM   20     A.   WHAT I MEANT BY THAT IS THAT MOLECULAR MEDICINE COMING

10:58AM   21     INTO THIS YEAR OF 2009 HAD BEEN REORGANIZED INTO A NEW CLINICAL

10:58AM   22     R&D WORLDWIDE ORGANIZATION, AND STEVE FELSTEAD WAS THE GLOBAL

10:58AM   23     HEAD OF THAT OUT OF THE SANDWICH UNITED KINGDOM SITE, AND THAT

10:59AM   24     WAS SOMEWHAT NEW TO US, THERE WAS GOING TO BE NEW POTENTIAL

10:59AM   25     PROGRAMS, AND PERHAPS THERE MIGHT BE SOMETHING IN A CLINICAL

10:59AM   1      PROGRAM EFFORT THAT COULD USE AN IMMUNOASSAY AT HOME.

10:59AM   2      Q.   TO YOUR KNOWLEDGE, DID THAT EVER MATERIALIZE?

10:59AM   3      A.   NO, IT DID NOT.

10:59AM   4      Q.   SO WE'RE IN JANUARY OF 2009.  DO YOU SEE THAT AT THE TOP

10:59AM   5      OF THE EMAIL, MR. WEBER?

10:59AM   6      A.   I DO.

10:59AM   7      Q.   I'D LIKE TO DISPLAY FOR YOU AND DRAW YOUR ATTENTION TO

10:59AM   8      WHAT IS IN EVIDENCE AS EXHIBIT 291.

10:59AM   9           IF WE CAN ZOOM IN ON THE TOP EMAIL, MS. HOLLIMAN.

10:59AM  10           YOU ARE NOT ON THIS EMAIL, CORRECT, MR. WEBER?

10:59AM  11      A.   I AM NOT ON THIS EMAIL.

11:00AM  12      Q.   AND BEFORE MEETING WITH THE GOVERNMENT, HAD YOU EVER SEEN

11:00AM  13      THIS EMAIL?

11:00AM  14      A.   NO, I HAD NEVER SEEN THIS EMAIL BEFORE MEETING WITH THE

11:00AM  15      FEDERAL GOVERNMENT.

11:00AM  16      Q.   DO YOU SEE THAT THIS APPEARS TO BE AN EMAIL FROM

11:00AM  17      ELIZABETH HOLMES TO INDIVIDUALS AT WALGREENS?

11:00AM  18      A.   YES, I DO SEE THAT.

11:00AM  19      Q.   AND DO YOU SEE THAT ONE OF THE ATTACHMENTS IS "PFIZER

11:00AM  20      THERANOS SYSTEM VALIDATION FINAL REPORT.PDF."

11:00AM  21      A.   I SEE THAT.

11:00AM  22      Q.   DO YOU SEE THAT?

11:00AM  23           AND DO YOU SEE WHERE MS. HOLMES WROTE, "DEAR JAY, ALEX.

11:00AM  24           "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

11:00AM  25      DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

11:00AM  1     THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

11:00AM  2     SCHERING-PLOUGH, AFTER THEIR OWN TECHNICAL VALIDATION AND

11:00AM  3     EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD."

11:00AM  4         DO YOU SEE THAT LANGUAGE?

11:00AM  5     A.   I DO SEE THAT.

11:00AM  6     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8 OF THIS DOCUMENT.

11:01AM  7         IF WE CAN ZOOM IN ON THE TOP HALF ALL OF THE WAY DOWN TO

11:01AM  8     THE CONCLUSIONS, MS. HOLLIMAN.

11:01AM  9         DO YOU SEE THE PFIZER LOGO UP IN THE LEFT-HAND CORNER;

11:01AM 10     MR. WEBER?

11:01AM 11     A.   I DO.

11:01AM 12     Q.   DO YOU SEE THE THERANOS REDEFINING HEALTH CARE ON THE

11:01AM 13     RIGHT?

11:01AM 14     A.   I DO.

11:01AM 15     Q.   AND DO YOU SEE WHERE IT SAYS THERANOS ANGIOGENESIS STUDY

11:01AM 16     REPORT?

11:01AM 17     A.   I DO.

11:01AM 18     Q.   AND THEN THERE'S THE WORD PFIZER, INC. BENEATH THAT?

11:01AM 19     A.   I DO.

11:01AM 20     Q.   AND I'D LIKE TO NOW COMPARE THIS TO PAGE 3 OF EXHIBIT 143.

11:01AM 21         IF WE'RE ABLE TO SPLIT THE SCREEN, MS. HOLLIMAN?

11:02AM 22         ARE YOU ABLE TO SEE THAT ON THE SCREEN, MR. WEBER?

11:02AM 23     A.   YES, I DO SEE THE TWO PAGES.

11:02AM 24     Q.   OKAY.  PRIOR TO YOUR MEETINGS WITH THE GOVERNMENT, HAD YOU

11:02AM 25     EVER SEEN A VERSION OF THE THERANOS ANGIOGENESIS STUDY REPORT

11:02AM   1    WITH THE PFIZER LOGO ON IT?

11:02AM   2    A.   NO, I HAVE NOT SEEN THAT BEFORE EXCEPT FOR IN THE

11:02AM   3    INTERACTION WITH THE FEDERAL GOVERNMENT.

11:02AM   4         I HAVE NOT SEEN THIS BEFORE EXCEPT WITH THE INTERACTION

11:02AM   5    WITH THE FEDERAL GOVERNMENT.

11:02AM   6    Q.   OKAY.  DID YOU APPROVE USE OF THE PFIZER LOGO ON THE

11:02AM   7    DOCUMENT PROVIDED TO WALGREENS?

11:02AM   8    A.   I DID NOT.

11:02AM   9    Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER APPROVE USE OF

11:03AM  10    THE PFIZER LOGO ON THE DOCUMENT PROVIDED TO WALGREENS IN

11:03AM  11    EXHIBIT 29 -- EXHIBIT 291?

11:03AM  12    A.   I'M NOT AWARE OF ANY PFIZER APPROVAL FOR THE USE OF THE

11:03AM  13    PFIZER TRADEMARKED LOGO ON THIS DOCUMENT.

11:03AM  14    Q.   OKAY.  DOES IT DISAPPOINT YOU TO SEE THE PFIZER LOGO

11:03AM  15    APPLIED TO THIS?

11:03AM  16              MR. CLINE:  EXCUSE ME, YOUR HONOR.  OBJECTION TO

11:03AM  17    WHAT HE'S TALKING ABOUT.

11:03AM  18              THE COURT:  SUSTAINED.  SUSTAINED.

11:03AM  19    BY MR. LEACH:

11:03AM  20    Q.   DID YOU APPROVE USING THE PFIZER LOGO ON ANY VERSION OF

11:03AM  21    THE THERANOS ANGIOGENESIS STUDY REPORT?

11:03AM  22    A.   I DID NOT.

11:03AM  23    Q.   TO YOUR KNOWLEDGE, DID ANYBODY FROM PFIZER?

11:03AM  24    A.   NOT THAT I'M AWARE OF.

11:03AM  25    Q.   WOULD YOU HAVE APPROVED USING THE PFIZER LOGO ON THE

11:03AM  1    THERANOS ANGIOGENESIS STUDY REPORT?

11:03AM  2    A.   I WOULD NOT BE ABLE TO APPROVE THE USE OF A PFIZER LOGO ON

11:03AM  3    AN EXTERNAL DOCUMENT OF ANOTHER COMPANY.  THAT IS THE PURVIEW

11:04AM  4    OF PFIZER LEGAL AND TRADEMARK.

11:04AM  5    Q.   WOULD IT BE FAIR TO SAY, IN 2010 OR AFTER, THAT PFIZER

11:04AM  6    ENDORSED THERANOS'S TECHNOLOGY?

11:04AM  7    A.   NO.

11:04AM  8    Q.   WOULD IT BE FAIR TO SAY, IN 2010 OR AFTER, THAT PFIZER

11:04AM  9    COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

11:04AM  10   A.   NO.

11:04AM  11   Q.   CAN WE PLEASE GO TO PAGE 33 OF EXHIBIT 271, OR 291,

11:04AM  12   MS. HOLLIMAN.

11:04AM  13       AND IF WE CAN ZOOM IN ALL OF THE WAY DOWN TO CONCLUSION

11:04AM  14   NUMBER 10.

11:04AM  15       MR. WEBER, I'M DISPLAYING PAGE 33 OF EXHIBIT 291.

11:05AM  16       AND DO YOU HAVE THAT IN FRONT OF YOU?

11:05AM  17   A.   I DO.

11:05AM  18   Q.   OKAY.  AND DO YOU SEE THE PFIZER LOGO UP AT THE TOP OF THE

11:05AM  19   PAGE?

11:05AM  20   A.   I DO.

11:05AM  21   Q.   AND DO YOU SEE THE THERANOS LOGO TO THE RIGHT?

11:05AM  22   A.   I DO.

11:05AM  23   Q.   AND DO YOU SEE A NUMBER OF CONCLUSIONS THAT ARE LISTED IN

11:05AM  24   THIS DOCUMENT?

11:05AM  25   A.   I DO.

11:05AM  1    Q.   OKAY.  DID YOU APPROVE USE OF THE PFIZER LOGO ON THIS PAGE

11:05AM  2    OF THE DOCUMENT PROVIDED TO WALGREENS?

11:05AM  3    A.   NO, I DID NOT.

11:05AM  4    Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER DO THAT?

11:05AM  5    A.   NOT THAT I'M AWARE OF.

11:05AM  6    Q.   OKAY.  THIS SAYS -- THE FIRST CONCLUSION, "THE THERANOS

11:05AM  7    SYSTEM PERFORMED WITH SUPERIOR PERFORMANCE TO REFERENCE ASSAYS

11:05AM  8    WHILE RUNNING IN A COMPLEX AMBULATORY ENVIRONMENT."

11:05AM  9         DO YOU SEE THAT?

11:05AM  10   A.   I DO.

11:05AM  11   Q.   AND DO YOU AGREE WITH THAT?

11:05AM  12   A.   NO, I DO NOT.

11:05AM  13   Q.   TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER AGREE WITH THAT?

11:06AM  14   A.   NOT THAT I'M AWARE OF THAT.

11:06AM  15        MR. CLINE:  EXCUSE ME, YOUR HONOR.  I APOLOGIZE FOR

11:06AM  16   INTERRUPTING, MR. WEBER.

11:06AM  17        I THINK -- ASSUMING WE'RE GOING TO GO THROUGH THE WHOLE

11:06AM  18   LIST HERE, THIS IS 702 TERRITORY AND I OBJECT ON THAT BASIS.

11:06AM  19        THE COURT:  IS THE QUESTION GOING TO BE SIMILAR TO

11:06AM  20   THE ONE THAT YOU JUST ASKED, WHETHER OR NOT HE APPROVED IT OR

11:06AM  21   WHETHER --

11:06AM  22        MR. LEACH:  OR WHETHER OR NOT IT WAS HIS CONCLUSION,

11:06AM  23   HIS THOUGHTS AT THE TIME.

11:06AM  24        THE COURT:  RIGHT.  RIGHT.

11:06AM  25        NO, HE CAN TESTIFY ABOUT THAT.

11:06AM  1          THE OBJECTION IS OVERRULED ON 702 GROUNDS.

11:06AM  2     BY MR. LEACH:

11:06AM  3     Q.   DID YOU AGREE WITH THAT AT THE TIME, MR. WEBER, CONCLUSION

11:06AM  4     NUMBER 1?

11:06AM  5     A.   NO, I DID NOT AGREE WITH THIS CONCLUSION.

11:06AM  6     Q.   OKAY.  TO YOUR KNOWLEDGE, DID ANYONE FROM PFIZER -- DID

11:06AM  7     ANYONE FROM PFIZER TELL YOU THAT THEY AGREED WITH THAT

11:06AM  8     CONCLUSION?

11:06AM  9     A.   NO ONE FROM PFIZER TOLD ME THAT THEY AGREED WITH THIS

11:06AM  10    CONCLUSION AS I REMEMBER IT.

11:07AM  11    Q.   OKAY.  DID YOU EVER TELL ANYONE FROM THERANOS THAT THIS

11:07AM  12    WAS PFIZER'S CONCLUSION AFTER REVIEWING THERANOS'S TECHNOLOGY?

11:07AM  13    A.   NO, I DID NOT.

11:07AM  14    Q.   LET ME DRAW YOUR ATTENTION TO NUMBER 5.

11:07AM  15         DO YOU SEE WHERE IT SAYS, "INTER-SYSTEM ACCURACY IS

11:07AM  16    EXCELLENT AND WAS DEMONSTRATED ON A PLATFORM WITH SUPERIOR

11:07AM  17    PERFORMANCE SPECIFICATIONS TO REFERENCE METHODS."

11:07AM  18         DO YOU SEE THAT?

11:07AM  19    A.   I DO.

11:07AM  20    Q.   AND WAS THAT YOUR CONCLUSION?

11:07AM  21    A.   NO, IT WAS NOT.

11:07AM  22    Q.   TO YOUR KNOWLEDGE, WAS THAT THE CONCLUSION OF ANYBODY AT

11:07AM  23    PFIZER?

11:07AM  24    A.   NOT THAT I'M AWARE OF.  I'M NOT AWARE OF ANYONE AT PFIZER

11:07AM  25    THAT AGREED WITH THIS CONCLUSION, OR WOULD.

11:07AM   1      Q.   DID YOU EVER TELL SOMEBODY AT THERANOS THAT THIS WAS

11:07AM   2      PFIZER'S CONCLUSION?

11:07AM   3      A.   NO, I DID NOT.

11:07AM   4      Q.   ARE ANY OF THE CONCLUSIONS LISTED ON PAGE 29 CONCLUSIONS

11:07AM   5      THAT YOU HAD REACHED AFTER YOUR REVIEW OF THERANOS'S

11:07AM   6      TECHNOLOGY?

11:07AM   7      A.   NO, THEY ARE NOT.

11:08AM   8      Q.   TO YOUR KNOWLEDGE, AFTER 2010 DID PFIZER DO ANY WORK,

11:08AM   9      REVENUE GENERATING WORK WITH THERANOS?

11:08AM  10      A.   I'M NOT AWARE OF ANY REVENUE GENERATING WORK BY THERANOS

11:08AM  11      WITH PFIZER AT THAT TIME.

11:08AM  12      Q.   TO YOUR KNOWLEDGE, AFTER THIS ANGIOGENESIS PROGRAM, DID

11:08AM  13      THERANOS -- OR PFIZER PAY ANY MONEY TO THERANOS?

11:08AM  14      A.   I'M NOT AWARE OF ANY MONIES BEING PAID TO THERANOS OTHER

11:08AM  15      THAN FOR THAT ANGIOGENESIS STUDY.

11:08AM  16      Q.   THE ANGIOGENESIS STUDY THAT YOU WERE REVIEWING IN LATE

11:08AM  17      2008 AND THE EARLY PART OF 2009?

11:08AM  18      A.   YES.

11:08AM  19      Q.   TO YOUR KNOWLEDGE, DID PFIZER AND THERANOS HAVE ANY

11:08AM  20      MEANINGFUL BUSINESS DEALINGS AFTER 2008?

11:08AM  21      A.   TO MY AWARENESS AND -- THERE WAS NO FURTHER INTERACTION IN

11:09AM  22      ANY MEANINGFUL WAY BETWEEN THERANOS AND PFIZER.

11:09AM  23      Q.   DO YOU AGREE WITH THE STATEMENT THAT PFIZER VALIDATED

11:09AM  24      THERANOS'S TECHNOLOGY?

11:09AM  25      A.   NO, I DO NOT.

11:09AM 1   Q.   AND IS IT RIGHT THAT YOU CAME TO THE OPPOSITE CONCLUSION?

11:09AM 2   A.   I DID.

11:09AM 3            MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

11:09AM 4            THE COURT:  YES.

11:09AM 5       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:09AM 6            MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:09AM 7   THANK YOU.

11:09AM 8   THANK YOU, MR. WEBER.

11:09AM 9            THE COURT:  MR. CLINE, YOU'LL HAVE

11:09AM 10  CROSS-EXAMINATION?

11:09AM 11           MR. CLINE:  I WILL.

11:09AM 12           THE COURT:  LET'S, LET'S -- BEFORE WE TAKE THAT,

11:09AM 13  PLEASE, I THINK WE'LL TAKE OUR MORNING BREAK NOW, LADIES AND

11:09AM 14  GENTLEMEN, FOR ABOUT 30 MINUTES.

11:09AM 15      BEFORE WE DO THAT, MR. LEACH, THERE IS AN EXHIBIT THAT I

11:09AM 16  THINK WE NEED TO DEAL WITH.  I THINK IT'S 5387D, DAVID, AND I

11:09AM 17  BELIEVE THAT THAT WAS GOING TO BE OFFERED.

11:10AM 18           MR. LEACH:  YES, YOUR HONOR.  THE GOVERNMENT MARKED

11:10AM 19  DURING THE TESTIMONY OF JUSTICE OFFEN EXHIBIT 5387A.  IT

11:10AM 20  ADMITTED A NUMBER OF TEXT MESSAGES FROM 5387B.

11:10AM 21      IN THE COURSE OF VARIOUS WITNESS TESTIMONY, WE HAVE ALSO

11:10AM 22  INTRODUCED 5387C.

11:10AM 23      WE ARE NOW OFFERING 5387D, WHICH INCLUDES ALL OF A, ALL OF

11:10AM 24  B, AND ALL OF C, AND SOME ADDITIONAL MESSAGES THAT THE DEFENSE

11:10AM 25  HAS OFFERED.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 11:10AM | 1  | AT THIS TIME WE OFFER 5387D.                                |
| 11:10AM | 2  | THE COURT:  MS. TREFZ.                                       |
| 11:10AM | 3  | MS. TREFZ:  WE HAVE NO OBJECTION AT THIS POINT,             |
| 11:10AM | 4  | YOUR HONOR.  IT'S SUBJECT TO POTENTIAL OBJECTIONS TO PARTICULAR |
| 11:10AM | 5  | USES IF IT COMES UP.                                         |
| 11:10AM | 6  | THE COURT:  ALL RIGHT.  THANK YOU.                          |
| 11:10AM | 7  | THIS IS ADMITTED THEN.  5387D, DAVID, IS ADMITTED.  THANK   |
| 11:10AM | 8  | YOU FOR THE CLARIFICATION OF THAT.  THAT IS ADMITTED.  THAT |
| 11:11AM | 9  | EXHIBIT IS ADMITTED.                                         |
| 11:11AM | 10 | (GOVERNMENT'S EXHIBIT 5387D WAS RECEIVED IN EVIDENCE.)      |
| 11:11AM | 11 | MR. LEACH:  THANK YOU, YOUR HONOR.                          |
| 11:11AM | 12 | THE COURT:  SUBJECT TO ANY FURTHER COMMENT FROM THE         |
| 11:11AM | 13 | DEFENSE.                                                     |
| 11:11AM | 14 | ALL RIGHT.  LADIES AND GENTLEMEN, LET'S TAKE OUR BREAK.     |
| 11:11AM | 15 | SO 30 MINUTES, PLEASE, 30 MINUTES.                          |
| 11:11AM | 16 | SIR, YOU CAN STAND DOWN AND WE'LL SEE YOU BACK IN HALF AN   |
| 11:11AM | 17 | HOUR.                                                        |
| 11:11AM | 18 | THE WITNESS:  THANK YOU.                                     |
| 11:11AM | 19 | (JURY OUT AT 11:11 A.M.)                                     |
| 11:11AM | 20 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE              |
| 11:11AM | 21 | SEATED.                                                       |
| 11:11AM | 22 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.  THE      |
| 11:11AM | 23 | WITNESS, MR. WEBER, HAS LEFT THE COURTROOM.                 |
| 11:11AM | 24 | I JUST WANT TO CHECK WITH COUNSEL, ANYTHING BEFORE WE       |
| 11:11AM | 25 | BREAK, COUNSEL?                                              |

| | | |
|---|---|---|
| 11:11AM | 1 | MR. LEACH:  NO, YOUR HONOR. |
| 11:11AM | 2 | MR. CLINE:  NO, YOUR HONOR. |
| 11:11AM | 3 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:12AM | 4 | THE CLERK:  COURT IS IN RECESS. |
| 11:46AM | 5 | (LUNCH RECESS TAKEN AT 11:11 A.M.) |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 11:51AM | 1 | **AFTERNOON SESSION** |
| 11:51AM | 2 | (JURY IN AT 11:51 A.M.) |
| 11:51AM | 3 | THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE |
| 11:51AM | 4 | SEATED.  WE'RE BACK ON THE RECORD. |
| 11:51AM | 5 | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN. |
| 11:51AM | 6 | OUR JURY IS PRESENT, AND WE'LL JUST SUMMON THE WITNESS. |
| 11:51AM | 7 | MR. CLINE, YOU'LL HAVE CROSS-EXAMINATION. |
| 11:51AM | 8 | THANK YOU. |
| 11:51AM | 9 | MR. CLINE, YOU HAVE QUESTIONS? |
| 11:52AM | 10 | MR. CLINE:  I DO. |
| 11:52AM | 11 | **CROSS-EXAMINATION** |
| 11:52AM | 12 | BY MR. CLINE: |
| 11:52AM | 13 | Q.   MR. WEBER, YOU CAN TAKE OFF YOUR MASK IF YOU WOULD LIKE. |
| 11:52AM | 14 | A.   THANK YOU. |
| 11:52AM | 15 | Q.   MY NAME IS JOHN CLINE AND I'M A LAWYER FOR MS. HOLMES. |
| 11:52AM | 16 | YOUR HONOR, MAY I APPROACH? |
| 11:52AM | 17 | THE COURT:  YES. |
| 11:52AM | 18 | BY MR. CLINE: |
| 11:52AM | 19 | Q.   MR. WEBER, I'M GOING TO HAND YOU A BINDER, AND I MAY REFER |
| 11:52AM | 20 | YOU TO ITEMS IN THAT BINDER FROM TIME TO TIME (HANDING). |
| 11:52AM | 21 | A.   THANK YOU. |
| 11:52AM | 22 | Q.   MR. WEBER, IS IT FAIR TO SAY THAT YOUR INVOLVEMENT IN |
| 11:52AM | 23 | THERANOS WHILE YOU WERE AT PFIZER SPANNED ABOUT THREE MONTHS? |
| 11:52AM | 24 | A.   MY EXAMINATION OF THE DOCUMENTS AND ASSESSMENT SPANNED |
| 11:52AM | 25 | THREE, FOUR MONTHS. |

11:52AM  1    Q.   YOU WERE INTRODUCED TO THERANOS BY MR. LIPSET IN EARLY

11:52AM  2    NOVEMBER 2008; RIGHT?

11:52AM  3    A.   YES.

11:52AM  4    Q.   AND YOU HAD YOUR PHONE CALL WITH MS. HOLMES WHERE YOU

11:52AM  5    CONVEYED THE MESSAGE FROM PFIZER AT THE END OF JANUARY 2009;

11:52AM  6    RIGHT?

11:53AM  7    A.   YES, AS I REMEMBER IT.

11:53AM  8    Q.   ALL RIGHT.  SO THAT'S NOVEMBER, DECEMBER, AND JANUARY;

11:53AM  9    RIGHT?

11:53AM  10   A.   THREE MONTHS.

11:53AM  11   Q.   WE CAN AGREE THAT THAT'S THREE MONTHS?

11:53AM  12   A.   OKAY.

11:53AM  13   Q.   AND DURING THAT THREE MONTH PERIOD, YOU WERE THE DIRECTOR

11:53AM  14   OF THE DIAGNOSTICS GROUP WITHIN THE MOLECULAR MEDICINE GROUP AT

11:53AM  15   PFIZER; RIGHT?

11:53AM  16   A.   I WAS THE DIRECTOR OF DIAGNOSTICS IN MOLECULAR MEDICINE.

11:53AM  17   Q.   ALL RIGHT.  AND I THINK YOU TESTIFIED ON DIRECT THAT

11:53AM  18   MOLECULAR MEDICINE WAS A WORLDWIDE UNIT OF PFIZER.

11:53AM  19        DID I GET THAT RIGHT?

11:53AM  20   A.   YES.

11:53AM  21   Q.   AND WAS MOLECULAR MEDICINE PART, ITSELF PART OF SOME

11:53AM  22   LARGER BUSINESS UNIT AT PFIZER?

11:53AM  23   A.   YES.

11:53AM  24   Q.   AND WHAT WAS IT PART OF?

11:53AM  25   A.   IT WAS PART OF, IN '08, PART OF THE RESEARCH UNIT

11:53AM  1    WORLDWIDE, AND THEN IN JANUARY, AS I REMEMBER, WE MOVED

11:53AM  2    DIRECTLY INTO CLINICAL DEVELOPMENT OPERATIONS.

11:53AM  3    Q.   ALL RIGHT.  BUT IN ANY EVENT, THROUGHOUT THIS PERIOD

11:54AM  4    MOLECULAR MEDICINE WAS PART OF SOME LARGER BUSINESS UNIT;

11:54AM  5    RIGHT?

11:54AM  6    A.   YES.

11:54AM  7    Q.   AND WITHIN MOLECULAR MEDICINE, YOU'VE TESTIFIED THAT YOU

11:54AM  8    WERE PART OF THE DIAGNOSTIC GROUP; RIGHT?

11:54AM  9    A.   YES.

11:54AM 10    Q.   WERE THERE OTHER GROUPS WITHIN MOLECULAR MEDICINE AS WELL?

11:54AM 11    A.   THERE WERE.

11:54AM 12    Q.   HOW MANY ROUGHLY WERE THERE?

11:54AM 13    A.   MAYBE EIGHT.

11:54AM 14    Q.   ALL RIGHT.  SO DIAGNOSTIC WAS ONE OF ROUGHLY EIGHT GROUPS

11:54AM 15    WITHIN MOLECULAR MEDICINE, WHICH WAS PART OF A LARGER BUSINESS

11:54AM 16    UNIT?

11:54AM 17    A.   YES.

11:54AM 18    Q.   NOW, IT WAS MR. LIPSET WHO ASKED YOU TO GET INVOLVED WITH

11:54AM 19    THE THERANOS REVIEW; IS THAT RIGHT?

11:54AM 20    A.   YES.

11:54AM 21    Q.   AND MR. LIPSET AT THE TIME -- WE'RE TALKING NOVEMBER OF

11:54AM 22    2008 NOW -- HE WAS ANOTHER DIRECTOR WITHIN MOLECULAR MEDICINE;

11:54AM 23    RIGHT?

11:54AM 24    A.   YES.

11:54AM 25    Q.   SO HE WAS YOUR -- BASICALLY ON THE SAME LEVEL AS YOU IN

```
11:55AM   1     THE CORPORATE HIERARCHY?

11:55AM   2     A.   NO.  HE WAS ONE STEP HIGHER.

11:55AM   3     Q.   OH.  SO HE WAS -- WAS HE YOUR BOSS OR WAS HE JUST HIGHER

11:55AM   4     IN THE CORPORATE LADDER?

11:55AM   5     A.   HE WAS NOT MY BOSS.  HE WAS A PEER AT NEW YORK CITY.

11:55AM   6          HE WAS ONE OF THE COMMAND LEADERSHIP TEAM FOR MOLECULAR

11:55AM   7     MEDICINE UNDERNEATH AIDAN POWER, THE VICE PRESIDENT.

11:55AM   8     Q.   ALL RIGHT.  BUT HE WAS ONE LEVEL UP FROM YOU IN THE

11:55AM   9     CORPORATE STRUCTURE?

11:55AM  10     A.   YES.

11:55AM  11     Q.   AND BOTH YOU AND MR. LIPSET REPORTED TO DR. AIDAN POWER;

11:55AM  12     IS THAT RIGHT?

11:55AM  13     A.   CRAIG LIPSET REPORTED DIRECTLY TO AIDAN POWER.  I REPORTED

11:55AM  14     TO HAKAN SAKUL, WHO IS A PEER OF CRAIG LIPSET, AND THEN HAKAN

11:55AM  15     REPORTED TO CRAIG LIPSET.

11:55AM  16     Q.   ALL RIGHT.  AND DR. POWER WAS THE VICE PRESIDENT IN CHARGE

11:55AM  17     OF MOLECULAR MEDICINE; RIGHT?

11:56AM  18     A.   YES.

11:56AM  19     Q.   NOW, WHEN MR. LIPSET PUT YOU IN TOUCH WITH THERANOS -- AND

11:56AM  20     THIS WAS, AGAIN, EARLY NOVEMBER OF 2008; RIGHT?

11:56AM  21     A.   CORRECT.

11:56AM  22     Q.   WAS THAT YOUR FIRST CONTACT WITH THERANOS?

11:56AM  23     A.   YES.

11:56AM  24     Q.   IN FACT, AT THAT POINT IN NOVEMBER OF 2008, HAD YOU HEARD

11:56AM  25     OF THERANOS BEFORE?
```

11:56AM   1    A.   I CAN'T REMEMBER.  IT WAS A LONG TIME AGO.  THERANOS WAS

11:56AM   2    ONE OF MANY COMPANIES ON, YOU KNOW, THE BIOTECH WORLD.

11:56AM   3    Q.   OKAY.  SO THE SHORT ANSWER IS YOU DON'T RECALL WHETHER YOU

11:56AM   4    EVER HEARD OF THERANOS BEFORE AT THAT POINT?

11:56AM   5    A.   YES, I DO NOT REMEMBER WHETHER I HAD HEARD OF THERANOS

11:56AM   6    BEFORE THEN.

11:56AM   7    Q.   NOW, AS OF NOVEMBER 2008, YOU HAD BEEN AT PFIZER JUST A

11:56AM   8    FEW MONTHS; RIGHT?

11:56AM   9    A.   I HAD BEEN THERE SINCE MAY AS I REMEMBER IT, SO ABOUT

11:56AM  10    MAYBE FIVE MONTHS, FOUR MONTHS.

11:56AM  11    Q.   ALL RIGHT.  YOU WERE HIRED AT PFIZER IN MAY OF 2008;

11:56AM  12    RIGHT?

11:56AM  13    A.   YES, AS I REMEMBER IT.

11:57AM  14    Q.   NOW, AFTER MR. LIPSET INTRODUCED YOU TO THERANOS, HE

11:57AM  15    PROVIDED YOU SOME MATERIALS; RIGHT?

11:57AM  16    A.   YES.

11:57AM  17    Q.   AND MR. FRENZEL, GARY FRENZEL AT THERANOS, PROVIDED YOU

11:57AM  18    SOME MATERIALS; RIGHT?

11:57AM  19    A.   YES.

11:57AM  20    Q.   AND WE WENT THROUGH THOSE MATERIALS ON YOUR DIRECT

11:57AM  21    EXAMINATION; RIGHT?  AT LEAST SOME OF THEM?

11:57AM  22    A.   YES.

11:57AM  23    Q.   AND YOU LEARNED FROM REVIEWING THOSE MATERIALS THAT

11:57AM  24    THERANOS HAD BEEN WORKING WITH PFIZER AT THAT POINT FOR A

11:57AM  25    COUPLE OF YEARS; RIGHT?

11:57AM 1      A.   THAT'S MY UNDERSTANDING.

11:57AM 2      Q.   AND, OF COURSE, YOU HADN'T BEEN AT PFIZER DURING THAT

11:57AM 3   TIME, SO YOU HAD NO INVOLVEMENT WITH ANY OF THAT WORK; RIGHT?

11:57AM 4      A.   I HAD RECEIVED ALL OF THE DOCUMENTATION AND THE STUDIES,

11:57AM 5   SO I HAD THE BODY OF KNOWLEDGE THAT I WOULD NEED FOR AN

11:57AM 6   ASSESSMENT.

11:57AM 7      Q.   YEAH, THAT WASN'T QUITE MY QUESTION.

11:57AM 8      A.   OKAY.

11:57AM 9      Q.   YOU WEREN'T AT THERANOS DURING THE PERIOD THAT THIS WORK

11:57AM 10  WAS GOING ON, AND SO YOU WERE NOT INVOLVED IN IT PERSONALLY;

11:58AM 11  RIGHT?

11:58AM 12     A.   NO, I WAS NOT PERSONALLY INVOLVED IN IT.

11:58AM 13     Q.   THIS WAS AN ONCOLOGY STUDY THAT THERANOS HAD WORKED WITH

11:58AM 14  PFIZER ON; RIGHT?

11:58AM 15     A.   YES.

11:58AM 16     Q.   AND OVER THE YEARS THAT THERANOS HAD BEEN WORKING WITH

11:58AM 17  PFIZER BEFORE YOUR REVIEW, THERANOS HAD WORKED WITH A NUMBER OF

11:58AM 18  PFIZER SCIENTISTS; CORRECT?

11:58AM 19     A.   CORRECT.

11:58AM 20     Q.   NOW, AFTER YOU GOT INVOLVED, YOU HAD A, WHICH I THINK YOU

11:58AM 21  DESCRIBED ON DIRECT, A ROUGHLY ONE HOUR PHONE CALL WITH

11:58AM 22  MS. HOLMES AND OTHERS AT THERANOS; RIGHT?

11:58AM 23     A.   YES.

11:58AM 24     Q.   AND THAT WAS NOVEMBER 13TH, 2008; RIGHT?

11:58AM 25     A.   AS I REMEMBER IT FROM THE DOCUMENTS.

11:58AM   1    Q.   YES.  AND THAT'S -- YOU'RE FREE TO REFRESH YOUR

11:58AM   2    RECOLLECTION FROM THE DOCUMENT.

11:58AM   3         SO THAT WAS ABOUT A WEEK AFTER YOU GOT INVOLVED; RIGHT?

11:58AM   4    A.   YES -- WELL, YEAH.

11:58AM   5    Q.   AND THEN YOU EMAILED SOME QUESTIONS TO THERANOS; RIGHT?

11:59AM   6    A.   YES.

11:59AM   7    Q.   AND THAT WAS NOVEMBER 17TH, 2008; RIGHT?

11:59AM   8    A.   AS I REMEMBER IT.

11:59AM   9    Q.   ALL RIGHT.  SO NOW YOU'RE ROUGHLY TWO WEEKS INTO YOUR

11:59AM  10    INVOLVEMENT; RIGHT?

11:59AM  11    A.   YES.

11:59AM  12    Q.   AND YOU SENT THOSE QUESTIONS TO MR. FRENZEL AT THERANOS;

11:59AM  13    RIGHT?

11:59AM  14    A.   I DID.

11:59AM  15    Q.   AND HE RESPONDED IN LATE NOVEMBER.

11:59AM  16         DO YOU RECALL THAT?

11:59AM  17    A.   I DO.

11:59AM  18    Q.   NOW, YOU REVIEWED THERANOS'S PUBLICLY FILED PATENT,

11:59AM  19    PATENTS; CORRECT?

11:59AM  20    A.   YES.

11:59AM  21    Q.   DID YOU REVIEW BOTH APPLICATIONS AND FINAL PATENTS OR JUST

11:59AM  22    THE APPROVED PATENTS?

11:59AM  23    A.   I REVIEWED ALL PUBLICLY AVAILABLE APPLICATIONS AND

11:59AM  24    APPROVED PATENTS.

11:59AM  25    Q.   YOU DID NOT, I TAKE IT, VISIT THE THERANOS HEADQUARTERS OR

| | | |
|---|---|---|
| 11:59AM | 1 | UNIT IN CALIFORNIA; RIGHT? |
| 12:00PM | 2 | A.   NO, I DID NOT. |
| 12:00PM | 3 | Q.   AND YOU DID NOT PHYSICALLY EXAMINE THE THERANOS DEVICE; |
| 12:00PM | 4 | RIGHT? |
| 12:00PM | 5 | A.   NO, I DID NOT. |
| 12:00PM | 6 | Q.   PART OF YOUR PURPOSE IN CONDUCTING THIS REVIEW WAS TO |
| 12:00PM | 7 | DETERMINE WHETHER PFIZER HAD ANY CURRENT BUSINESS USE FOR |
| 12:00PM | 8 | THERANOS TECHNOLOGY; RIGHT? |
| 12:00PM | 9 | A.   I DID, OR I DO, YES, YES. |
| 12:00PM | 10 | Q.   THAT WAS PART OF YOUR PURPOSE; RIGHT? |
| 12:00PM | 11 |      AND IN THE COURSE OF MAKING THAT DETERMINATION, YOU TALKED |
| 12:00PM | 12 | WITH SOME OF YOUR COLLEAGUES IN MOLECULAR MEDICINE; RIGHT? |
| 12:00PM | 13 | A.   I DID. |
| 12:00PM | 14 | Q.   YOU TALKED WITH A COUPLE OF THERAPEUTIC AREA MOLECULAR |
| 12:00PM | 15 | MEDICINE LEADS; RIGHT? |
| 12:00PM | 16 | A.   YES. |
| 12:00PM | 17 | Q.   AND THAT'S -- ARE THEY COMMONLY REFERRED TO AS TAMML'S? |
| 12:00PM | 18 | A.   WE CALLED THEM TAMML'S. |
| 12:00PM | 19 | Q.   ALL RIGHT.  ONE WAS DR. ANDY WILLIAMS IN CALIFORNIA? |
| 12:00PM | 20 | A.   YES. |
| 12:00PM | 21 | Q.   AND ONE WAS DR. MICHAEL ROBBINS IN NEW YORK; RIGHT? |
| 12:01PM | 22 | A.   YES. |
| 12:01PM | 23 | Q.   AND THEY TOLD YOU THAT THEY HAD NO CURRENT OR FORESEEABLE |
| 12:01PM | 24 | INTEREST IN A PATIENT IN HOME IN VITRO IMMUNOASSAY DIAGNOSTIC |
| 12:01PM | 25 | IN ANY CLINICAL TRIAL; RIGHT? |

12:01PM   1    A.   YES.

12:01PM   2    Q.   AND YOU UNDERSTOOD THAT THAT'S WHAT THERANOS WAS OFFERING,

12:01PM   3    AN IMMUNOASSAY DEVICE FOR PATIENT IN HOME USE; CORRECT?

12:01PM   4    A.   THAT'S WHAT I LARGELY UNDERSTOOD FROM THE DOCUMENTATION

12:01PM   5    PROVIDED, BUT I ALSO HAD PROBED FURTHER FUTURE PATHS IN MY

12:01PM   6    VERBAL DISCUSSION WITH THEM.

12:01PM   7    Q.   RIGHT.  AND THAT'S THE UNDERSTANDING THAT YOU CAME TO;

12:01PM   8    CORRECT?

12:01PM   9    A.   I COULD NOT MAKE A DETERMINATION OF WHAT THEIR FUTURE

12:01PM  10    PATHS WERE, BUT I DID -- WAS ABLE TO DETERMINE THAT THEY HAD AN

12:01PM  11    IMMUNOASSAY PLATFORM THAT THEY WERE OFFERING FOR IN HOME USE AT

12:01PM  12    THAT TIME.

12:01PM  13    Q.   ALL RIGHT.  AND, IN FACT, ON THE VERY FIRST PAGE OF YOUR

12:01PM  14    OVERVIEW IN YOUR REPORT YOU SAY THERANOS PURPORTS TO HAVE A

12:02PM  15    PATIENT IN HOME USE IMMUNOASSAY IN VITRO DIAGNOSTIC DEVICE

12:02PM  16    PLATFORM; RIGHT?

12:02PM  17    A.   I DO.

12:02PM  18    Q.   AND YOU WERE ASSESSING WHETHER PFIZER HAD ANY CURRENT

12:02PM  19    BUSINESS USE FOR SUCH A PLATFORM; CORRECT?

12:02PM  20    A.   CORRECT.

12:02PM  21    Q.   YOU ALSO -- GOING BACK TO YOUR DISCUSSION WITH YOUR

12:02PM  22    COLLEAGUES IN MOLECULAR MEDICINE, YOU ALSO TALKED WITH PEOPLE

12:02PM  23    IN YOUR OWN DIAGNOSTIC GROUP; CORRECT?

12:02PM  24    A.   UM, UM, I CAN'T REMEMBER, BUT --

12:02PM  25    Q.   ALL RIGHT.  TAKE A LOOK IN EITHER BINDER AT EXHIBIT 167,

| | | |
|---|---|---|
| 12:02PM | 1 | PAGE 2. |
| 12:02PM | 2 | WE'RE NOT GOING TO PUT THAT UP.  WE DON'T NEED TO PUT THAT |
| 12:02PM | 3 | UP. |
| 12:02PM | 4 | I JUST WANT TO REFRESH YOUR RECOLLECTION DOWN TOWARD THE |
| 12:02PM | 5 | BOTTOM OF PAGE 2. |
| 12:02PM | 6 | A.   167, PAGE 2. |
| 12:02PM | 7 | Q.   DO YOU SEE THERE'S A REFERENCE THERE TO DIAGNOSTIC GROUP |
| 12:02PM | 8 | MOLECULAR MEDICINE INTEREST IN THERANOS? |
| 12:02PM | 9 | A.   YES. |
| 12:03PM | 10 | Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TALKED TO |
| 12:03PM | 11 | COLLEAGUES IN THE DIAGNOSTIC GROUP ABOUT WHETHER THEY HAD ANY |
| 12:03PM | 12 | CURRENT INTEREST IN THERANOS TECHNOLOGY? |
| 12:03PM | 13 | A.   YES. |
| 12:03PM | 14 | Q.   ALL RIGHT.  AND THEY TOLD YOU THAT THEIR -- AND YOU'RE |
| 12:03PM | 15 | WELCOME TO FOLLOW ALONG WITH ME HERE -- THAT THEIR DIAGNOSTIC |
| 12:03PM | 16 | ONCOLOGY ASSAY NEEDS WERE CURRENTLY FOR MOLECULAR NUCLEIC ACID |
| 12:03PM | 17 | TESTS RUN IN PHYSICIAN CARE SITES AS POINT OF CARE DECISIONS |
| 12:03PM | 18 | FOR PATIENT ENROLLMENT IN CLINICAL STUDIES; RIGHT? |
| 12:03PM | 19 | A.   YES. |
| 12:03PM | 20 | Q.   SO TO PUT THAT IN COMPREHENSIBLE ENGLISH, THEY WERE |
| 12:03PM | 21 | LOOKING FOR A DEVICE THAT WOULD PERFORM A DIFFERENT KIND OF |
| 12:03PM | 22 | TEST AND WOULD DO SO IN A POINT OF CARE, SO IN A DOCTOR'S |
| 12:03PM | 23 | OFFICE, FOR EXAMPLE, AND NOT IN HOME; RIGHT? |
| 12:03PM | 24 | A.   YES, IN A DOCTOR'S OFFICE FOR PATIENT ENROLLMENT, OR IT |
| 12:03PM | 25 | WOULD BE AT A MEDICAL CENTER. |

12:03PM  1    Q.   ALL RIGHT.  AND SOMETHING THAT DID A DIFFERENT KIND OF

12:04PM  2    TEST, NOT IMMUNOASSAY; RIGHT?

12:04PM  3    A.   YES, AN ENTIRELY DIFFERENT PLATFORM TECHNOLOGY.

12:04PM  4    Q.   SO BASED ON THE INFORMATION THAT YOU GATHERED, YOU

12:04PM  5    PREPARED THE REPORT THAT WE TALKED ABOUT; RIGHT?  YES?

12:04PM  6    A.   YES.

12:04PM  7    Q.   DATED DECEMBER 31ST, 2008; RIGHT?

12:04PM  8    A.   YES.

12:04PM  9    Q.   AND IN THE HEADING TO THAT REPORT, YOU SAY THAT IT'S YOUR

12:04PM 10    FINAL REPORT; RIGHT?

12:04PM 11    A.   IT IS.

12:04PM 12    Q.   AND AS FAR AS YOU'RE CONCERNED, THAT IS YOUR FINAL REPORT?

12:04PM 13    A.   IT WAS MY FINAL REPORT.

12:04PM 14    Q.   AND YOU ALSO PUT DOWN AT THE BOTTOM, SUBJECT TO ONGOING

12:04PM 15    MANAGEMENT REVIEW; RIGHT?

12:04PM 16    A.   YES.

12:04PM 17    Q.   AND THAT'S SOMETHING THAT YOU COMMONLY PUT; RIGHT?

12:04PM 18    A.   THAT I WOULD COMMONLY PUT ON THE APPROPRIATE DOCUMENTS.

12:04PM 19    Q.   YES.  AND YOU WOULD PUT THAT THERE BECAUSE IT'S TRUE,

12:04PM 20    RIGHT, IT'S SUBJECT TO ONGOING MANAGEMENT REVIEW; RIGHT?

12:04PM 21    A.   IT'S A SUBJECT FOR COMMUNICATION GOING FORWARD SO IT WAS A

12:04PM 22    LIVING DOCUMENT, SO AS A FINAL REPORT PEOPLE COULD BE AWARE OF

12:04PM 23    THAT DOCUMENT.

12:04PM 24    Q.   YES.

12:04PM 25    A.   IT COULD BE COMMUNICATED TO OTHER VICE PRESIDENTS IN THE

12:05PM  1    COMPANY.

12:05PM  2    Q.   UNDERSTOOD.  NOW, YOU SENT THIS REPORT TO YOUR BOSS'S

12:05PM  3    BOSS, DR. POWER; RIGHT?

12:05PM  4    A.   (NODS HEAD UP AND DOWN.)

12:05PM  5    Q.   YES?

12:05PM  6    A.   YES.

12:05PM  7    Q.   I'M SORRY.  I NEED YOU TO GIVE A VERBAL ANSWER.  I KNOW

12:05PM  8    WHAT YOU MEAN WHEN YOU NOD BUT IT DOESN'T SHOW UP ON THE

12:05PM  9    RECORD.

12:05PM  10   A.   I SEE.  THANK YOU.

12:05PM  11   Q.   AND YOU ALSO SENT IT TO MR. LIPSET?

12:05PM  12   A.   YES.

12:05PM  13   Q.   AND YOU SENT IT TO YOUR BOSS, DR. SAKUL; RIGHT?

12:05PM  14   A.   YES.

12:05PM  15   Q.   AND YOU DID NOT SEND THIS REPORT TO THERANOS; RIGHT?

12:05PM  16   A.   I DID NOT.

12:05PM  17   Q.   YOU DID NOT SEND THIS REPORT TO ELIZABETH HOLMES; RIGHT?

12:05PM  18   A.   I DID NOT.

12:05PM  19   Q.   YOU DID NOT SEND THIS REPORT TO MR. LIPSET; RIGHT?

12:05PM  20   A.   I DID SEND THE REPORT TO MR. LIPSET.

12:05PM  21   Q.   I'M SORRY, I GOT THE NAME WRONG.

12:05PM  22        MR. FRENZEL?

12:05PM  23   A.   OH.

12:05PM  24   Q.   MR. FRENZEL WAS AT THERANOS; RIGHT?

12:05PM  25   A.   YES.

12:05PM  1    Q.  AND YOU DID NOT SEND THIS REPORT TO HIM?

12:05PM  2    A.  I DID NOT.

12:05PM  3    Q.  AND YOU DID SEND IT TO MR. LIPSET, WHO WAS AT PFIZER;

12:05PM  4    CORRECT?

12:05PM  5    A.  YES, TO DR. LIPSET, YES, I SEND IT.  I DID NOT SEND IT TO

12:06PM  6    DOCTOR -- OR TO GARY FRENZEL.

12:06PM  7    Q.  ALL RIGHT.  I THINK I UNDERSTOOD YOU TO SAY IN YOUR DIRECT

12:06PM  8    EXAMINATION THAT -- IS IT DR. LIPSET?

12:06PM  9    A.  IT IS.

12:06PM 10    Q.  ALL RIGHT.  I'M SORRY.  I'VE BEEN CALLING HIM MR. LIPSET.

12:06PM 11         DR. LIPSET, DR. SAKUL, AND DR. POWER AGREED WITH YOUR

12:06PM 12    ASSESSMENT.

12:06PM 13         WAS THAT YOUR TESTIMONY ON DIRECT?

12:06PM 14    A.  YES.

12:06PM 15    Q.  ALL RIGHT.  YOU'VE MET WITH THE GOVERNMENT MORE THAN ONCE;

12:06PM 16    RIGHT?

12:06PM 17    A.  YES.

12:06PM 18    Q.  BEFORE YOUR TESTIMONY HERE?

12:06PM 19    A.  YES.

12:06PM 20    Q.  AND THE FIRST SUCH MEETING WAS IN FEBRUARY 2020 IN PERSON;

12:06PM 21    RIGHT?

12:06PM 22    A.  YES.

12:06PM 23    Q.  DO YOU REMEMBER RIGHT BACK BEFORE THE PANDEMIC MADE IT

12:06PM 24    IMPOSSIBLE TO HAVE IN-PERSON MEETINGS?

12:06PM 25    A.  YES, YES, I REMEMBER THAT NOW.

12:06PM 1    Q.   AND YOU MET IN NEW YORK CITY; RIGHT?

12:06PM 2    A.   YES.

12:06PM 3    Q.   IN THE OFFICES OF PFIZER'S LAWYERS; RIGHT?

12:07PM 4    A.   YES.

12:07PM 5    Q.   AND PRESENT THERE WERE MR. LEACH, THE PROSECUTOR WHO WAS

12:07PM 6    ASKING YOU QUESTIONS THIS MORNING; RIGHT?

12:07PM 7    A.   YES.

12:07PM 8    Q.   AND MR. BOSTIC WAS THERE.

12:07PM 9         DO YOU REMEMBER?

12:07PM 10   A.   I DON'T REMEMBER THE NAMES.

12:07PM 11   Q.   THIS GENTLEMAN SITTING HERE AT THE COUNSEL TABLE

12:07PM 12   (INDICATING)?

12:07PM 13   A.   I BELIEVE SO.

12:07PM 14   Q.   ALL RIGHT.  AND AT LEAST ONE FEDERAL AGENT WAS THERE;

12:07PM 15   RIGHT?

12:07PM 16   A.   YES.

12:07PM 17   Q.   AND PFIZER'S LAWYERS WERE THERE; RIGHT?

12:07PM 18   A.   YES.

12:07PM 19   Q.   AND, AND YOU UNDERSTOOD, OF COURSE, THAT IT WAS IMPORTANT

12:07PM 20   FOR YOU TO GIVE TRUTHFUL, COMPLETE ANSWERS TO THE QUESTIONS

12:07PM 21   THAT YOU WERE ASKED; RIGHT?

12:07PM 22   A.   YES.

12:07PM 23   Q.   AND IN THE COURSE OF THAT MEETING, YOU TOLD THE ASSEMBLED

12:07PM 24   MULTITUDE THAT YOUR FINAL ASSESSMENT WAS MET WITH SILENCE FROM

12:07PM 25   LIPSET, SAKUL, AND POWER, WHICH WAS NOT UNUSUAL.

12:07PM 1          DO YOU REMEMBER TELLING THEM THAT?

12:07PM 2     A.   NO, I DO NOT.

12:08PM 3     Q.   ALL RIGHT.  LET ME SEE IF I CAN HELP REFRESH YOUR

12:08PM 4     RECOLLECTION.

12:08PM 5          MAY I APPROACH?

12:08PM 6               THE COURT:  YES.

12:08PM 7     BY MR. CLINE:

12:08PM 8     Q.   I'M GOING TO HAND YOU A MEMORANDUM OF THAT INTERVIEW, AND

12:08PM 9     I'M GOING TO POINT YOU TO A PARTICULAR PORTION OF IT, BUT

12:08PM 10    YOU'RE WELCOME TO READ AS MUCH AS YOU WANT.

12:08PM 11         OKAY?

12:08PM 12              THE COURT:  DOES THE GOVERNMENT HAVE THIS?

12:08PM 13              MR. CLINE:  IT'S THEIR -- IT'S THEIR MEMO.

12:08PM 14              THE COURT:  MAYBE YOU CAN JUST REFERENCE WHAT YOU'RE

12:08PM 15    SHOWING THE WITNESS.

12:08PM 16              MR. CLINE:  YES.  IT'S THE FEBRUARY 26TH, 2020

12:08PM 17    INTERVIEW MEMORANDUM, PAGE 4.

12:08PM 18              MR. LEACH:  I DON'T HAVE A COPY, YOUR HONOR.

12:08PM 19              MR. CLINE:  I'LL GIVE HIM A COPY.

12:08PM 20              MR. LEACH:  IS HE REFRESHING HIM WITH THIS?

12:08PM 21              THE COURT:  YES.

12:08PM 22    BY MR. CLINE:

12:08PM 23    Q.   JUST READ THAT TO YOURSELF, MR. WEBER (HANDING).

12:09PM 24    A.   OKAY.  I'VE READ THIS COUPLE OF LINES HERE.

12:09PM 25    Q.   ALL RIGHT.  HAVE YOU HAD A CHANCE TO READ AS MUCH AS YOU

12:09PM  1    NEED TO READ TO UNDERSTAND THE CONTEXT?

12:09PM  2    A.   I THINK SO.

12:09PM  3    Q.   ALL RIGHT.  DOES THAT REFRESH YOUR RECOLLECTION THAT WHAT

12:09PM  4    YOU TOLD THE FEDERAL AGENT AND THE PROSECUTORS AND THE PFIZER

12:09PM  5    LAWYERS ON FEBRUARY 26TH, 2020 WAS THAT YOUR FINAL ASSESSMENT

12:09PM  6    WAS MET WITH SILENCE FROM LIPSET, SAKUL, AND POWER?

12:09PM  7    A.   WELL, I DON'T THINK THIS IS REALLY DESCRIBING THE FULL

12:09PM  8    SITUATION.  YOU KNOW, I SPOKE WITH THEM --

12:09PM  9    Q.   EXCUSE ME, MR. WEBER.  I'M SORRY TO INTERRUPT.

12:09PM 10        MY QUESTION IS, DOES THIS REFRESH YOUR RECOLLECTION THAT

12:09PM 11    ON FEBRUARY 26TH, 2020, YOU TOLD THE AGENT, THE PROSECUTOR, AND

12:09PM 12    OTHERS, THAT YOUR FINAL ASSESSMENT WAS MET WITH SILENCE FROM

12:09PM 13    LIPSET, SAKUL, AND POWER, WHICH WAS NOT UNUSUAL?

12:09PM 14    A.   UM, AS I SEE THIS NOW, APPARENTLY I REMEMBER THIS.

12:10PM 15    Q.   WELL, DO YOU OR DON'T YOU?

12:10PM 16    A.   YOU KNOW, IT'S A WRITTEN SET OF WORDS.  I MUST HAVE SAID

12:10PM 17    IT IF IT'S RECORDED DOWN.

12:10PM 18    Q.   ALL RIGHT.  GOOD ENOUGH.

12:10PM 19        NOW, YOU SPOKE TO MS. HOLMES ABOUT A MONTH AFTER YOUR --

12:10PM 20    YOU SENT YOUR REPORT TO THE PEOPLE AT PFIZER; RIGHT?

12:10PM 21    A.   YES.

12:10PM 22    Q.   JANUARY 30TH, 2009.

12:10PM 23        DOES THAT SOUND RIGHT?

12:10PM 24    A.   IT SOUNDS RIGHT.

12:10PM 25    Q.   ALL RIGHT.  CAN WE PUT UP EXHIBIT 174, WHICH I THINK IS IN

12:10PM  1    EVIDENCE.

12:10PM  2        DO YOU RECALL THIS, MR. WEBER, AS AN EMAIL THAT YOU WROTE?

12:10PM  3    A.   I'M TO BE LOOKING AT 174.

12:11PM  4    Q.   174.  IT'S IN BOTH BINDERS, SO EITHER ONE IS FINE.

12:11PM  5    A.   OH, THIS IS SOMETHING FROM THE ATTORNEY LEACH'S OFFICE.

12:11PM  6    I'M NOT --

12:11PM  7    Q.   I'M SORRY, GO TO THE NEXT PAGE.  THERE YOU GO.

12:11PM  8    A.   OH, OKAY.

12:11PM  9        YES, I SEE THIS DOCUMENT AND REMEMBER IT.

12:11PM  10   Q.   ALL RIGHT.  NOW, THIS IS AN EMAIL THAT YOU WROTE ON

12:11PM  11   JANUARY 30TH, 2009; RIGHT?

12:11PM  12   A.   YES.

12:11PM  13   Q.   AND YOU WROTE IT TO YOUR BOSS, DR. SAKUL; RIGHT?  YES?

12:11PM  14   A.   YES.

12:11PM  15   Q.   YOUR BOSS'S BOSS, DR. POWER; RIGHT?

12:11PM  16   A.   YES.

12:11PM  17   Q.   AND TO MR. -- OR DR. LIPSET?

12:11PM  18   A.   YES.

12:11PM  19   Q.   AND I ASSUME THAT YOU INTENDED THIS EMAIL TO BE AN

12:12PM  20   ACCURATE AND COMPLETE ACCOUNT OF YOUR CONVERSATION WITH

12:12PM  21   MS. HOLMES THAT DAY; RIGHT?

12:12PM  22   A.   YES.

12:12PM  23   Q.   AND WHAT YOU TOLD MS. HOLMES -- AND AGAIN, MS. HOLMES

12:12PM  24   DIDN'T HAVE THIS REPORT THAT YOU SPENT SO MUCH TIME ON DIRECT

12:12PM  25   TALKING ABOUT, RIGHT?  YOU DIDN'T SEND THAT TO HER?

12:12PM  1    A.   NO, I DIDN'T SEND THAT TO HER.

12:12PM  2    Q.   SO LET'S LOOK AT -- CAN WE PULL THAT BACK UP, 174.  MY

12:12PM  3    SCREEN -- OH, THERE IT IS.  OKAY.

12:12PM  4         CAN WE BLOW UP THE FIRST PARAGRAPH?

12:12PM  5              MS. TREFZ:  YOUR HONOR, I'M NOT SURE IF IT'S --

12:12PM  6              THE COURT:  APPARENTLY IT'S NOT ON THE MONITORS.

12:12PM  7         DID IT COME UP ON THE JURY MONITORS?

12:12PM  8              JUROR:  IT'S COMING.

12:12PM  9              THE CLERK:  YES?

12:12PM 10              THE COURT:  IT LOOKS LIKE IT'S ON.  OKAY.

12:12PM 11              MR. CLINE:  WE HAVE IT.

12:12PM 12    Q.   SO WHAT YOU WRITE TO YOUR BOSS, YOUR BOSS'S BOSS, AND TO

12:12PM 13    DR. LIPSET IS, "TODAY I SPOKE WITH ELIZABETH HOLMES, CEO,

12:13PM 14    THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT HAVE AT THIS

12:13PM 15    TIME A FORESEEABLE USE FOR THE THERANOS IMMUNOASSAY DEVICE FOR

12:13PM 16    AT PATIENT SELF USE AT HOME BUT SHE AND I AGREED TO STAY IN

12:13PM 17    TOUCH EVERY SIX MONTHS."

12:13PM 18         RIGHT?

12:13PM 19    A.   YES.

12:13PM 20    Q.   AND THAT EMAIL WRITTEN SHORTLY AFTER YOUR CONVERSATION

12:13PM 21    WITH MS. HOLMES TO YOUR BOSS AND YOUR BOSS'S BOSS WAS ACCURATE;

12:13PM 22    RIGHT?

12:13PM 23    A.   ACCURATE?  WELL, I GUESS YES.

12:13PM 24    Q.   I MEAN, YOU WEREN'T TRYING TO MISLEAD THEM, WERE YOU?

12:13PM 25    A.   NO.

12:13PM  1    Q.   NO.  YOU WERE TRYING TO TELL THEM WHAT YOU HAD TOLD

12:13PM  2    MS. HOLMES; RIGHT?

12:13PM  3    A.   YES, TRYING TO CLOSE THAT LOOP.

12:13PM  4    Q.   AND WHAT YOU TOLD MS. HOLMES THERE WAS CONSISTENT WITH

12:13PM  5    WHAT YOU HAD HEARD WHEN YOU TALKED TO YOUR COLLEAGUES IN THE

12:14PM  6    MOLECULAR MEDICINE SECTION; RIGHT?

12:14PM  7    A.   YES.

12:14PM  8    Q.   THE TAMML AND THE PEOPLE IN YOUR GROUP; RIGHT?

12:14PM  9    A.   YES, THE TAMML'S WERE THE ONCOLOGY REPRESENTATIVES WHO

12:14PM  10   WERE IN TOUCH WITH ALL ONCOLOGY CLINICAL TRIALS, YES.

12:14PM  11   Q.   YES.  AND THEN YOU TALKED TO YOUR OWN PEOPLE IN YOUR OWN

12:14PM  12   DIAGNOSTIC GROUP; RIGHT?

12:14PM  13   A.   YES.

12:14PM  14   Q.   AND THEY TOLD YOU THAT THEY WERE LOOKING FOR A DEVICE THAT

12:14PM  15   RAN A DIFFERENT KIND OF TEST AND THAT WAS MEANT FOR POINT OF

12:14PM  16   CAR, THAT IS, DOCTOR'S OFFICE TYPE USE; RIGHT?

12:14PM  17   A.   IT WAS MEANT FOR NOT NECESSARILY POINT OF CARE, BUT FOR

12:14PM  18   INTAKE OF PATIENTS INTO CLINICAL STUDIES.  SO IT WASN'T GOING

12:14PM  19   TO BE -- WE WERE LOOKING FOR DEVICES THAT WERE NOT GOING TO BE

12:14PM  20   USED IN THE HOME, THEY WERE USED IN A REGULATED MEDICAL

12:14PM  21   SITUATION.

12:14PM  22   Q.   ALL RIGHT.  AND AGAIN, YOUR UNDERSTANDING AT THE TIME WAS

12:14PM  23   THAT THERANOS -- WHAT THERANOS HAD IN MIND WAS A DEVICE THAT

12:14PM  24   WOULD BE USED IN THE HOME TO RUN IMMUNOASSAYS; RIGHT?

12:14PM  25   A.   THAT WAS MY UNDERSTANDING.  I HAD ASKED IN MY DUE

12:15PM  1    DILIGENCE QUESTIONS ABOUT SINGLE INPUT --

12:15PM  2    Q.   I'M NOT QUESTIONING ANY OF THAT.  THAT WAS JUST YOUR

12:15PM  3    UNDERSTANDING AT THE TIME; RIGHT?

12:15PM  4    A.   YES.

12:15PM  5    Q.   NOW, YOU CONFIRMED IN THAT CONVERSATION WITH MS. HOLMES,

12:15PM  6    AND I THINK YOU REFLECTED IN YOUR EMAIL, THAT PFIZER HAD PAID

12:15PM  7    THERANOS IN FULL; CORRECT?

12:15PM  8    A.   THAT WAS MY UNDERSTANDING OF WHAT I HAD ACCOMPLISHED BY

12:15PM  9    CHECKING ON THE FINANCES.

12:15PM  10   Q.   SO THE ANSWER IS YES?

12:15PM  11   A.   YES.

12:15PM  12   Q.   AND THE TOTAL AMOUNT WAS $900,000; RIGHT?

12:15PM  13   A.   I DID NOT KNOW WHAT THE AMOUNT OF MONEY WAS INVOLVED.

12:15PM  14   Q.   NOW, THIS JANUARY 30TH, 2009 CALL THAT IS MEMORIALIZED IN

12:15PM  15   EXHIBIT 174 HERE, THAT WAS YOUR LAST CONTACT WITH MS. HOLMES;

12:15PM  16   RIGHT?

12:15PM  17   A.   AS I REMEMBER IT, YES.

12:16PM  18   Q.   AND YOU DIDN'T SEE HER OR SPEAK WITH HER AGAIN UNTIL YOU

12:16PM  19   WALKED INTO THIS COURTROOM; RIGHT?

12:16PM  20   A.   YES.

12:16PM  21   Q.   NOW, TAKE A LOOK AT EXHIBIT 10561 IN THE BLACK NOTEBOOK.

12:16PM  22        ARE YOU THERE?

12:16PM  23   A.   YES.

12:16PM  24        MR. CLINE:  YOUR HONOR, I BELIEVE THIS IS ADMITTED

12:16PM  25   BY AGREEMENT, EXHIBIT 10561.

12:16PM  1          MR. LEACH:  THAT'S CORRECT, YOUR HONOR.

12:16PM  2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:16PM  3          (DEFENDANT'S EXHIBIT 10561 WAS RECEIVED IN EVIDENCE.)

12:16PM  4          MR. CLINE:  ALL RIGHT.  SO WE CAN PULL THAT UP.

12:16PM  5     Q.   THIS IS AN EMAIL, MR. WEBER, AN EMAIL EXCHANGE BETWEEN YOU

12:16PM  6     AND MR. FRENZEL OF THERANOS; RIGHT?

12:16PM  7     A.   YES.

12:16PM  8     Q.   AND IF YOU START AT THE BOTTOM, MR. FRENZEL WRITES TO YOU,

12:17PM  9     "HELLO SHANE.

12:17PM  10         "WE ARE IN THE PROCESS OF RELEASING OUR FERTILITY PANELS

12:17PM  11    AND RECALLED OUR DISCUSSION ON PREECLAMPSIA."

12:17PM  12         AM I PRONOUNCING THAT RIGHT?

12:17PM  13    A.   YOU ARE.

12:17PM  14    Q.   "ARE YOU STILL INTERESTED IN PURSUING THIS?  IF YOU HAVE

12:17PM  15    ANY FURTHER THOUGHTS AND WOULD LIKE TO DISCUSS, PLEASE LET ME

12:17PM  16    KNOW.

12:17PM  17         "GARY."

12:17PM  18         RIGHT?

12:17PM  19    A.   YES.

12:17PM  20    Q.   AND YOU WRITE BACK TO HIM; RIGHT?

12:17PM  21    A.   UH-HUH.

12:17PM  22    Q.   AND WOULD YOU READ YOUR EMAIL THERE AT THE TOP OF 10561

12:17PM  23    THAT YOU WROTE TO MR. FRENZEL?

12:17PM  24    A.   "HI GARY.

12:17PM  25         "THANKS FOR CONTACTING ME.

12:17PM   1          "PFIZER HAS NO INTEREST IN PREECLAMPSIA.

12:17PM   2          "BEST OF LUCK, YOU ARE ON TO SOMETHING GOOD.

12:17PM   3          "HAVE A NICE WEEKEND."

12:17PM   4     Q.   AND THAT WAS YOUR VERY LAST CONTACT WITH THERANOS; RIGHT?

12:17PM   5     A.   I THINK SO.  I DON'T REMEMBER ANY FURTHER CONTACTS.  THIS

12:18PM   6     WAS 12 YEARS AGO.  YES.

12:18PM   7     Q.   AND I UNDERSTAND YOUR MEMORY IS FALLIBLE, BUT TO THE BEST

12:18PM   8     OF YOUR RECOLLECTION, THIS IS YOUR LAST CONTACT WITH THERANOS;

12:18PM   9     RIGHT?

12:18PM  10     A.   YES.

12:18PM  11     Q.   AND AS FAR AS YOU KNOW -- BY THE WAY, YOU LEFT PFIZER IN

12:18PM  12     2014; RIGHT?

12:18PM  13     A.   YES.

12:18PM  14     Q.   AND I THINK YOU TOLD THE GOVERNMENT THAT YOU WERE

12:18PM  15     DOWNSIZED; IS THAT THE TERM YOU USED?

12:18PM  16     A.   IT CERTAINLY COULD HAVE BEEN A TERM I USED, YES.

12:18PM  17     Q.   AND PFIZER WAS GOING THROUGH A LOT OF CHANGES DURING THE

12:18PM  18     PERIOD THAT YOU WERE THERE; RIGHT?

12:18PM  19     A.   YES.

12:18PM  20     Q.   AND IN THE COURSE OF THOSE CHANGES, SOME NEW PEOPLE CAME

12:18PM  21     ON AND SOME PEOPLE WHO WERE THERE WERE LET GO; RIGHT?

12:18PM  22     A.   YES.

12:18PM  23     Q.   AND IS THAT WHAT HAPPENED WITH YOU?

12:18PM  24     A.   YES.

12:18PM  25     Q.   ALL RIGHT.  BETWEEN FEBRUARY 2009 AND YOUR DEPARTURE IN

12:18PM  1    2014, YOU WERE NOT INVOLVED IN ANY CONTACTS BETWEEN PFIZER AND

12:19PM  2    THERANOS TO THE BEST OF YOUR RECOLLECTION; RIGHT?

12:19PM  3    A.   YES.

12:19PM  4    Q.   AND AS FAR AS YOU KNEW, PFIZER AND THERANOS HAD FULLY

12:19PM  5    SEPARATED AFTER YOUR JANUARY 30TH, 2009 CONVERSATION WITH

12:19PM  6    MS. HOLMES; RIGHT?

12:19PM  7    A.   YES.

12:19PM  8    Q.   YOU'RE NOT AWARE OF ANY CONTACTS BETWEEN YOUR COLLEAGUE,

12:19PM  9    DR. LIPSET, AND THERANOS AFTER JANUARY 30TH, 2009; CORRECT?

12:19PM  10   A.   YES.

12:19PM  11   Q.   THAT'S CORRECT, YOU'RE NOT AWARE OF ANY?

12:19PM  12   A.   I'M NOT AWARE OF ANY FURTHER CONTACTS.

12:19PM  13   Q.   YOU'RE NOT AWARE OF ANY FURTHER CONTACTS BETWEEN YOUR

12:19PM  14   BOSS, DR. SAKUL, AND THERANOS AFTER JANUARY 30TH, 2009;

12:19PM  15   CORRECT?

12:19PM  16   A.   I MEAN, I VAGUELY REMEMBER MAYBE 2011 IN A GROUP

12:19PM  17   TELECONFERENCE THAT HAKAN HAD MENTIONED THE NAME THERANOS, I

12:19PM  18   DON'T REMEMBER WHAT, AND I SAID I HAD WRITTEN A REPORT.

12:19PM  19   Q.   OTHER THAN THAT, YOU DON'T RECALL ANY -- YOU'RE NOT AWARE

12:20PM  20   OF ANY CONTACT BETWEEN DR. SAKUL AND THERANOS AFTER JANUARY

12:20PM  21   30TH, 2009; RIGHT?

12:20PM  22   A.   YES, I'M NOT AWARE.

12:20PM  23   Q.   AND OTHER THAN THAT VAGUE RECOLLECTION FROM 2011, YOU'RE

12:20PM  24   NOT AWARE OF ANY CONTACTS ANYONE ELSE AT PFIZER HAD WITH

12:20PM  25   THERANOS AFTER JANUARY 30TH, 2009; RIGHT?

| | | |
|---|---|---|
| 12:20PM | 1 | A.   CORRECT. |
| 12:20PM | 2 | Q.   THANK YOU, YOUR HONOR. |
| 12:20PM | 3 | THAT'S ALL OF MY QUESTIONS. |
| 12:20PM | 4 | THE COURT:  REDIRECT? |
| 12:20PM | 5 | MR. LEACH:  THANK YOU, YOUR HONOR. |
| 12:20PM | 6 | **REDIRECT EXAMINATION** |
| 12:20PM | 7 | BY MR. LEACH: |
| 12:21PM | 8 | Q.   BRIEFLY.  GOOD AFTERNOON, MR. WEBER. |
| 12:21PM | 9 | IF WE COULD PLEASE DISPLAY EXHIBIT 174.  AND IF WE CAN |
| 12:21PM | 10 | ZOOM IN, PLEASE, ON THE TOP HALF, MS. HOLLIMAN. |
| 12:21PM | 11 | THANK YOU. |
| 12:21PM | 12 | MR. WEBER, YOU WERE ASKED -- EXCUSE ME, I'LL REMOVE MY |
| 12:21PM | 13 | MASK. |
| 12:21PM | 14 | YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT STATEMENTS YOU |
| 12:21PM | 15 | MADE IN AN INTERVIEW WITH THE GOVERNMENT BACK IN 2020 BEFORE |
| 12:21PM | 16 | THE PANDEMIC. |
| 12:21PM | 17 | DO YOU RECALL THAT LINE OF QUESTIONING? |
| 12:21PM | 18 | A.   I DO. |
| 12:21PM | 19 | Q.   OKAY.  I'VE PLACED ON THE SCREEN AN EMAIL THAT YOU SENT TO |
| 12:21PM | 20 | CRAIG LIPSET, HAKAN SAKUL, AND DR. POWER. |
| 12:21PM | 21 | DO YOU SEE THAT? |
| 12:21PM | 22 | A.   I DO. |
| 12:21PM | 23 | Q.   OKAY.  AT THE TIME THAT YOU SENT THIS EMAIL, WERE YOU |
| 12:21PM | 24 | SATISFIED THAT THEY HAD SUFFICIENT CONTEXT FOR WHAT YOU WERE |
| 12:21PM | 25 | WRITING ABOUT IN TERMS OF A THERANOS WRAP UP? |

12:21PM   1    A.   I DO.

12:22PM   2    Q.   AND SITTING HERE TODAY, DO YOU RECALL DISCUSSIONS WITH

12:22PM   3    THEM ABOUT THE SUBSTANCE OF YOUR REPORT?

12:22PM   4    A.   I DO.

12:22PM   5    Q.   OKAY.  WHEN YOU TOLD THE GOVERNMENT IT WAS INITIALLY MET

12:22PM   6    WITH SILENCE, WHAT DID YOU MEAN BY THAT?

12:22PM   7    A.   THAT THIS WAS A MATTER THAT THEY HAD SEEN MY REPORT AND

12:22PM   8    BRIEFLY HAD ASKED, DO YOU THINK THAT THERE'S ANYTHING ELSE TO

12:22PM   9    BE DONE?  I SAID NO, AND THEY WERE SILENT AND MOVED ON.

12:22PM  10        THESE ARE VERY BUSY PEOPLE.

12:22PM  11    Q.   OKAY.  BUT YOU WERE SATISFIED THAT THEY AGREED WITH YOUR

12:22PM  12    CONCLUSIONS?

12:22PM  13    A.   YES.

12:22PM  14    Q.   MR. CLINE ALSO ASKED YOU ABOUT EXHIBIT 10561, AND THERE

12:22PM  15    WAS A STATEMENT BY YOU IN FEBRUARY OF 2009 TO THE EFFECT OF YOU

12:22PM  16    WERE ON TO SOMETHING GOOD.

12:22PM  17        DO YOU RECALL THAT TESTIMONY?

12:22PM  18    A.   I DO.

12:22PM  19    Q.   OKAY.  DID YOU MEAN BY THAT THAT PFIZER HAD

12:22PM  20    COMPREHENSIVELY VALIDATED THERANOS'S TECHNOLOGY?

12:22PM  21    A.   NO.

12:22PM  22    Q.   DID THAT REFLECT YOUR AGREEMENT TO THE 13 CONCLUSIONS THAT

12:23PM  23    WE SAW LISTED IN THE THERANOS ANGIOGENESIS STUDY REPORT?

12:23PM  24    A.   NO.

12:23PM  25    Q.   OKAY.  YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT

12:23PM  1    INTERACTIONS OTHERS MAY HAVE HAD WITH THERANOS POST 2009.

12:23PM  2         DO YOU RECALL THOSE QUESTIONS?

12:23PM  3    A.   I DO.

12:23PM  4    Q.   OKAY.

12:23PM  5         MAY I HAVE ONE MOMENT, YOUR HONOR?

12:23PM  6             THE COURT:  YES.

12:23PM  7         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:23PM  8             MR. LEACH:  COULD WE PLEASE DISPLAY, MS. HOLLIMAN,

12:23PM  9    EXHIBIT 7753, WHICH IS IN EVIDENCE.

12:23PM 10         AND IF WE COULD GO TO THE ATTACHMENT, ATTACHMENT 2.

12:24PM 11    Q.   MR. WEBER, DO YOU SEE AN EXCEL SPREADSHEET ON YOUR SCREEN?

12:24PM 12    A.   I DO.

12:24PM 13    Q.   AND DO YOU SEE IN ROW 12 THERE'S A LINE FOR PFIZER?

12:24PM 14    A.   I DO.

12:24PM 15    Q.   AND DO YOU SEE THERE'S A $500,000 AMOUNT IN COLUMN B IN

12:24PM 16    THE YEAR 2007?

12:24PM 17    A.   I DO.

12:24PM 18    Q.   DO YOU SEE THERE'S A $400,000 ENTRY IN THE YEAR 2008?

12:24PM 19    A.   I DO.

12:24PM 20    Q.   OKAY.  DO THOSE TWO ADD UP TO 900,000?

12:24PM 21    A.   THEY DO.

12:24PM 22    Q.   OKAY.  AND I THINK YOU TESTIFIED ON CROSS-EXAMINATION THAT

12:24PM 23    YOU DON'T RECALL THE AMOUNT OF THE CONTRACT FOR THE ONCOLOGY OR

12:24PM 24    THE ANGIOGENESIS PROGRAM; IS THAT RIGHT?

12:24PM 25    A.   NO.

12:24PM 1     Q.   OKAY.  IF WE COULD MOVE FROM THE RIGHT, MS. HOLLIMAN, FROM

12:24PM 2     2008 ALL OF THE WAY UNTIL 2015.

12:25PM 3          MR. WEBER, DO YOU SEE ANY OTHER ENTRIES OTHER THAN THE TWO

12:25PM 4     AMOUNTS THAT ADDS UP TO 900,000 IN THE GRAND TOTAL?

12:25PM 5     A.   I DO NOT.

12:25PM 6     Q.   AND THAT'S ALL OF THE WAY UP THROUGH 2014?

12:25PM 7     A.   ACCORDING TO THIS EXCEL FILE, YES.

12:25PM 8     Q.   OKAY.

12:25PM 9          THANK YOU, YOUR HONOR.  I HAVE NO FURTHER QUESTIONS.

12:25PM 10              MR. CLINE:  NO FURTHER QUESTIONS.

12:25PM 11              THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:25PM 12              MR. LEACH:  HE MAY.  THANK YOU, YOUR HONOR.

12:25PM 13              MR. CLINE:  YES, YOUR HONOR.

12:25PM 14              THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.  YOU

12:25PM 15    CAN JUST LEAVE THOSE BINDERS THERE.  THANK YOU.

12:25PM 16         FOLKS, IF YOU WOULD LIKE TO STAND AND STRETCH WHILE WE DO

12:25PM 17    THE TRANSITION, FEEL FREE TO.

12:25PM 18         THE GOVERNMENT HAS ANOTHER WITNESS, I TAKE IT.

12:25PM 19              MR. SCHENK:  YES, YOUR HONOR.

12:25PM 20         THE UNITED STATES CALLED BRYAN TOLBERT.

12:26PM 21              THE COURT:  SIR, IF YOU COULD STAND THERE FOR JUST A

12:26PM 22    MOMENT RIGHT THERE AND FACE OUR COURTROOM DEPUTY.  SHE HAS A

12:26PM 23    QUESTION FOR YOU.

12:26PM 24         **(GOVERNMENT'S WITNESS, JOHN BRYAN TOLBERT, WAS SWORN.)**

12:26PM 25              THE WITNESS:  YES.

12:26PM  1           THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE

12:26PM  2   YOURSELF COMFORTABLE.

12:26PM  3       FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

12:26PM  4   I'LL ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE.

12:26PM  5       WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:26PM  6   AND THEN SPELL IT, PLEASE.

12:26PM  7           THE WITNESS:  CAN I TAKE MY MASK OFF?

12:27PM  8           THE COURT:  YOU KNOW, MR. SCHENK IS GOING TO ASK YOU

12:27PM  9   A QUESTION ABOUT THAT IN JUST A MOMENT.

12:27PM 10           THE WITNESS:  OKAY.  JOHN BRYAN TOLBERT.

12:27PM 11   T-O-L-B-E-R-T.

12:27PM 12           THE COURT:  THANK YOU.  MR. SCHENK.

12:27PM 13           MR. SCHENK:  THANK YOU, YOUR HONOR.

12:27PM 14                      **DIRECT EXAMINATION**

12:27PM 15   BY MR. SCHENK:

12:27PM 16   Q.  MR. TOLBERT, IF YOU ARE FULLY VACCINATED, AND WITH THE

12:27PM 17   COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT A MASK ON.

12:27PM 18       I WILL ALSO REMOVE MINE.  THANK YOU.

12:27PM 19       MR. TOLBERT, DO YOU WORK CURRENTLY FOR A COMPANY CALLED

12:27PM 20   HALL GROUP?

12:27PM 21   A.  I DO.

12:27PM 22   Q.  HOW LONG HAVE YOU WORKED FOR HALL GROUP?

12:27PM 23   A.  SINCE 1999.

12:27PM 24   Q.  DURING YOUR WORK AT HALL, DID YOU BECOME FAMILIAR WITH

12:27PM 25   ANOTHER COMPANY CALLED THERANOS?

12:27PM 1    A.   I DID.

12:27PM 2    Q.   AND THROUGH YOUR WORK AT HALL GROUP, DID YOU MAKE AN

12:27PM 3    INVESTMENT IN THERANOS IN LATE 2013?

12:27PM 4    A.   WE DID.

12:27PM 5    Q.   WAS THE INVESTMENT ABOUT $5 MILLION?

12:28PM 6    A.   CORRECT.

12:28PM 7    Q.   WE'LL COME BACK TO THAT IN A MOMENT.

12:28PM 8         I WONDER IF WE CAN NOW TURN TO YOUR EDUCATIONAL

12:28PM 9    BACKGROUND.  WOULD YOU DESCRIBE FOR THE JURY YOUR UNDERGRADUATE

12:28PM 10   AND ANY GRADUATE DEGREES THAT YOU HAVE?

12:28PM 11   A.   SURE.  I DID AN UNDERGRADUATE AND A BACHELOR'S OF SCIENCE

12:28PM 12   IN PSYCHOLOGY AT THE UNIVERSITY OF GEORGIA.

12:28PM 13        AND THEN AFTER THAT I WENT TO BYU, BRIGHAM YOUNG

12:28PM 14   UNIVERSITY, AND GOT A MASTER'S IN BUSINESS.

12:28PM 15   Q.   OKAY.  AND WHAT DO YOU CURRENTLY DO AT HALL GROUP?

12:28PM 16   A.   SO I WORK IN FINANCE AND INVESTMENTS, SO I DO SOME

12:28PM 17   CORPORATE FINANCE FUNCTIONS, AS WELL AS OVERSEE OUR INVESTMENTS

12:28PM 18   IN OTHER COMPANIES.

12:28PM 19   Q.   WHERE IS HALL LOCATED?

12:28PM 20   A.   WE'RE LOCATED IN DALLAS, TEXAS.

12:28PM 21   Q.   WHAT IS YOUR CURRENT TITLE?

12:28PM 22   A.   VICE PRESIDENT OF FINANCE.

12:28PM 23   Q.   HAVE YOU HAD THAT TITLE, THE VICE PRESIDENT OF FINANCE,

12:28PM 24   SINCE YOU STARTED AT HALL?

12:28PM 25   A.   I HAVE NOT.  SO I STARTED AS A FINANCIAL ANALYST AND HAVE

12:29PM  1    BEEN VICE PRESIDENT OF FINANCE MAYBE FOR TEN YEARS.

12:29PM  2    Q.   WHAT ARE THE RESPONSIBILITIES THAT YOU HAVE WITH YOUR

12:29PM  3    CURRENT JOB, THE VICE PRESIDENT OF FINANCE?

12:29PM  4    A.   SO, LIKE I SAID, I DO SOME CORPORATE FINANCE WORK, SO

12:29PM  5    BUDGETS AND CASH FLOWS, CORPORATE FINANCE.

12:29PM  6         AND THEN I ALSO OVERSEE OUR INVESTMENT OF -- OR OUR

12:29PM  7    PORTFOLIO OF INVESTMENTS IN PRIVATE COMPANIES.

12:29PM  8    Q.   AND WHAT ARE THE CIRCUMSTANCES UNDER WHICH HALL MAKES

12:29PM  9    INVESTMENTS IN PRIVATE COMPANIES?

12:29PM 10    A.   SO THERE ARE TIMES WHEN WE BECOME AWARE OF DIFFERENT

12:29PM 11    OPPORTUNITIES TO INVEST IN PRIVATE COMPANIES.  WE LOOK AT, YOU

12:29PM 12    KNOW, THOSE OPPORTUNITIES AS THEY COME UP AND ARE PRESENTED TO

12:29PM 13    US.  AND, YOU KNOW, WE DO THAT REGULARLY I GUESS.

12:29PM 14         BUT -- SO I GUESS WE, WE HAVE A REGULAR FLOW OF DEALS THAT

12:30PM 15    WE LOOK AT TO POTENTIALLY INVEST IN.

12:30PM 16    Q.   OKAY.  WOULD YOU SAY THAT THAT IS THE MAIN BUSINESS OF

12:30PM 17    HALL, INVESTMENT IN PRIVATE COMPANIES?

12:30PM 18    A.   IT IS NOT.

12:30PM 19    Q.   WHAT IS THE MAIN BUSINESS?

12:30PM 20    A.   SO THE MAIN BUSINESS OF HALL GROUP IS INVESTING IN REAL

12:30PM 21    ESTATE, OWNING AND DEVELOPING REAL ESTATE, AS WELL AS A

12:30PM 22    BUSINESS OF MAKING LOANS, CONSTRUCTION LOANS TO DIFFERENT REAL

12:30PM 23    ESTATE RELATED PROJECTS.

12:30PM 24    Q.   IS THE REAL ESTATE THAT HALL INVESTS IN OR WORKS WITH

12:30PM 25    LOCATED IN TEXAS OR IN OTHER PLACES?

12:30PM 1    A.   IT'S ALL OVER THE COUNTRY.

12:30PM 2    Q.   OKAY.  LET'S TURN TO THE PRIVATE COMPANY INVESTMENTS.

12:30PM 3         ARE THERE TIMES WHEN YOU, YOURSELF, MAKE THE DECISION ON

12:30PM 4    BEHALF OF HALL TO INVEST?

12:30PM 5    A.   YOU KNOW, THAT DECISION WOULD BE MADE PRIMARILY BETWEEN ME

12:30PM 6    AND MY BOSS, MR. HALL.  TOGETHER THAT DECISION WOULD BE MADE.

12:31PM 7    Q.   OKAY.  AND IS IT THROUGH THIS PROCESS, THE INVESTMENTS IN

12:31PM 8    PRIVATE COMPANIES, THAT YOU BECAME FAMILIAR WITH THERANOS?

12:31PM 9    A.   IT IS.

12:31PM 10   Q.   WHEN DID YOU FIRST BECOME FAMILIAR WITH THERANOS IF YOU

12:31PM 11   RECALL?

12:31PM 12   A.   IT WOULD BE -- IT WOULD HAVE BEEN IN THE FALL OF 2006.

12:31PM 13   Q.   AND HOW DID YOU FIRST BECOME FAMILIAR WITH IT?

12:31PM 14   A.   YOU KNOW, AS I RECALL, MR. HALL CAME TO ME ONE DAY AND

12:31PM 15   SAID THAT, YOU KNOW, HE HAD BECOME -- HE HAD RECEIVED SOME

12:31PM 16   INFORMATION ABOUT A POTENTIAL INVESTMENT IN A COMPANY ABOUT A

12:31PM 17   COMPANY CALLED THERANOS AND ASKED ME IF I WOULD TAKE A LOOK AT

12:31PM 18   IT.

12:31PM 19        SO WE DISCUSSED IT WHEN HE BROUGHT IT TO MY ATTENTION.

12:31PM 20   Q.   SO MR. HALL TASKED YOU WITH BEGINNING A PROCESS, IS IT

12:31PM 21   CALLED DUE DILIGENCE?

12:31PM 22   A.   CORRECT.

12:31PM 23   Q.   AND WHAT DID YOU DO AT THIS TIME?

12:31PM 24   A.   EXCUSE ME?

12:31PM 25   Q.   WHAT DID YOU DO?  WHAT WERE YOUR FIRST STEPS?

12:31PM  1    A.   SO, YOU KNOW, OUR FIRST STEPS WERE TO DO A GOOGLE SEARCH

12:32PM  2    TO SEE IF THERE WAS ANYTHING THAT WE COULD LEARN ABOUT IT.

12:32PM  3    THERE WASN'T MUCH AT THAT TIME.

12:32PM  4         AND SO WE SET UP A PHONE CALL, OR A SERIES OF PHONE CALLS,

12:32PM  5    TO HAVE SOME DISCUSSIONS ABOUT WHAT THE OPPORTUNITY WAS AND THE

12:32PM  6    PREMISE OF THE UNDERLYING COMPANY.

12:32PM  7    Q.   AND THESE EARLY CALLS, DID YOU SPEAK WITH SOMEONE AT

12:32PM  8    THERANOS?

12:32PM  9    A.   I DID.

12:32PM 10    Q.   AND WHO DID YOU SPEAK WITH?

12:32PM 11    A.   I SPOKE WITH ELIZABETH.

12:32PM 12    Q.   OKAY.

12:32PM 13         YOUR HONOR, MAY I APPROACH?

12:32PM 14              THE COURT:  YES.

12:32PM 15              MR. SCHENK:  (HANDING.)

12:32PM 16    Q.   MR. TOLBERT, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

12:32PM 17    I'LL ASK YOU TO OPEN THE BINDER AND NOW TURN TO TAB 3790.

12:33PM 18         DO YOU RECOGNIZE THIS DOCUMENT?

12:33PM 19    A.   I DO.

12:33PM 20    Q.   WHAT IS THIS?

12:33PM 21    A.   THIS IS AN EMAIL THAT I SENT TO MR. HALL IN OCTOBER OF

12:33PM 22    2006 REFERENCING SOME NOTES FROM A CONFERENCE CALL THAT WE HAD

12:33PM 23    HAD ABOUT THERANOS.

12:33PM 24    Q.   AND THERE'S A COUPLE OF PAGES AFTER THE EMAIL.  WHAT ARE

12:33PM 25    THOSE?

12:33PM 1   A.   THOSE WOULD HAVE BEEN MY NOTES THAT WERE ATTACHED TO THAT

12:33PM 2   EMAIL.

12:33PM 3   Q.   AND IS THIS THE CALL THAT YOU MENTIONED A MOMENT AGO WITH

12:33PM 4   MS. HOLMES?

12:33PM 5   A.   CORRECT.

12:33PM 6           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3790.

12:33PM 7           MR. DOWNEY:  YOUR HONOR, OBJECTION UNDER 801.

12:33PM 8           THE COURT:  801 OBJECTION.

12:33PM 9       ARE YOU OFFERING THIS FOR THE TRUTH?

12:33PM 10          MR. SCHENK:  I AM, YOUR HONOR, YES.

12:33PM 11          THE COURT:  CAN YOU LAY A FOUNDATION?

12:33PM 12          MR. SCHENK:  YES, YOUR HONOR.

12:33PM 13  Q.   WHEN YOU ARE PERFORMING YOUR DUE DILIGENCE, IS ONE OF THE

12:34PM 14  THINGS THAT YOU DO IN THAT PROCESS, AS IN THIS CASE, SPEAK TO

12:34PM 15  INDIVIDUALS THAT WORK AT THE COMPANY THAT YOU MAY INVEST IN?

12:34PM 16  A.   IT IS.

12:34PM 17  Q.   AND DO YOU TAKE NOTES ON THOSE CALLS?

12:34PM 18  A.   I DO.  SOMETIMES I DO.

12:34PM 19  Q.   AND IN THIS INSTANCE, DID YOU TAKE NOTES?

12:34PM 20  A.   YOU KNOW, I DID.  SO THIS WOULD REPRESENT -- SO THIS

12:34PM 21  DOCUMENT WOULD REPRESENT NOTES THAT I TOOK WHILE I WAS ON THE

12:34PM 22  CALL, AS WELL AS ADDITIONAL INFORMATION THAT HAD BEEN SENT TO

12:34PM 23  US.  SO KIND OF A COMBINATION OF THOSE TWO SOURCES.

12:34PM 24  Q.   I'M SORRY.  MULTIPLE SOURCES OF DUE DILIGENCE?

12:34PM 25  A.   CORRECT.

12:34PM  1    Q.   AND WOULD YOU PUT THAT ALL INTO ONE DOCUMENT?

12:34PM  2    A.   CORRECT.

12:34PM  3    Q.   AND THEN WOULD YOU MAKE SURE THAT THE CONTENT OF THAT

12:34PM  4    DOCUMENT ACCURATELY SUMMARIZED THE ORIGINAL SOURCES OF

12:34PM  5    INFORMATION?

12:34PM  6    A.   I WOULD.

12:34PM  7    Q.   AND THEN YOU WOULD SEND THE DOCUMENT, AS IN THIS CASE, TO

12:34PM  8    MR. HALL?

12:34PM  9    A.   THAT'S CORRECT.

12:34PM  10   Q.   AND WHY WOULD YOU SEND IT TO MR. HALL?

12:34PM  11   A.   SO THAT, SO THAT HE AND I COULD REVIEW IT AND WALK THROUGH

12:35PM  12   THE THINGS THAT I HAD HEARD ON THE CALL, OR THE SOURCES OF

12:35PM  13   INFORMATION AS A BASIS TO UNDERSTAND ABOUT THE COMPANY IF IT

12:35PM  14   WAS SOMETHING THAT WE WANTED TO INVEST IN.

12:35PM  15   Q.   AND THEN DID YOU USE THIS TYPE OF DOCUMENT AS A BASIS TO

12:35PM  16   INFORM YOUR DECISION WHETHER OR NOT TO INVEST?

12:35PM  17   A.   CORRECT.

12:35PM  18   Q.   WAS THIS DOCUMENT ALSO SAVED OR PRESERVED BY HALL SO THAT

12:35PM  19   YOU COULD GO BACK AND LOOK AT THE DOCUMENT IN THE FUTURE IF YOU

12:35PM  20   HAD ADDITIONAL QUESTIONS?

12:35PM  21   A.   I DON'T KNOW -- I MEAN, I'M SURE IT WAS.  BUT IF WE WOULD

12:35PM  22   HAVE REFERENCED TO THIS, IT WOULD HAVE JUST BEEN A REFERENCE TO

12:35PM  23   WHATEVER WAS ATTACHED TO THAT EMAIL.

12:35PM  24   Q.   THE ATTACHMENT?

12:35PM  25   A.   CORRECT.

12:35PM  1          MR. SCHENK:  THANK YOU.

12:35PM  2          YOUR HONOR, THE GOVERNMENT OFFERS 3790.

12:35PM  3          THE COURT:  I'LL ALLOW IT UNDER 803(6).

12:35PM  4          MR. SCHENK:  AND PERMISSION TO PUBLISH.

12:35PM  5          THE COURT:  YES.

12:35PM  6          (GOVERNMENT'S EXHIBIT 3790 WAS RECEIVED IN EVIDENCE.)

12:35PM  7  BY MR. SCHENK:

12:36PM  8  Q.   MR. TOLBERT, FIRST THE FROM LINE.  IS THAT YOUR EMAIL?

12:36PM  9  A.   THAT IS.

12:36PM 10  Q.   AND THE TO LINE, IS THAT THE BEGINNING OF THE EMAIL

12:36PM 11  ADDRESS FOR MR. HALL?

12:36PM 12  A.   IT IS.

12:36PM 13  Q.   SO IN OCTOBER OF 2006, YOU WROTE, "ATTACHED ARE MY NOTES

12:36PM 14  FROM THE CONFERENCE CALL RE: THERANOS YESTERDAY."

12:36PM 15          YOU'RE WAITING ON ADDITIONAL INFORMATION FROM THEM.  IS

12:36PM 16  THE "THEM" THERANOS?

12:36PM 17  A.   YOU KNOW, THAT "THEM" WOULD REFERENCE A COMBINATION OF

12:36PM 18  THERANOS AND CHRIS LUCAS, BOTH OF WHOM HAD SERVED AS SOURCES OF

12:36PM 19  INFORMATION ABOUT THE INVESTMENT.

12:36PM 20  Q.   AND WHO IS CHRIS LUCAS?

12:36PM 21  A.   SO CHRIS LUCAS, HE WAS AN INVESTOR IN THERANOS AND HE HAD

12:36PM 22  A FUND THAT WE INVESTED THROUGH.  WE WERE PART OF HIS FUND.

12:36PM 23  Q.   AND WHEN YOU SAY THAT "WE INVESTED THROUGH," WHO IS THE

12:36PM 24  "WE"?

12:36PM 25  A.   I MEAN THE HALL GROUP WOULD HAVE INVESTED THROUGH

12:36PM 1      CHRIS LUCAS'S FUND.

12:36PM 2      Q.   AND WHEN WAS THAT INVESTMENT MADE?

12:37PM 3      A.   THAT WOULD HAVE BEEN IN -- THAT WOULD HAVE BEEN THE

12:37PM 4      INVESTMENT THAT WE MADE IN LATE 2006.

12:37PM 5      Q.   SO HALL MADE AN INVESTMENT IN 2006, AND ALSO ONE IN 2013?

12:37PM 6      A.   CORRECT.

12:37PM 7      Q.   THE ONE IN 2006, THAT WAS THROUGH THIS INDIVIDUAL

12:37PM 8      CHRIS LUCAS?

12:37PM 9      A.   IT WAS THROUGH ONE OF HIS INVESTMENT FUNDS.

12:37PM 10     Q.   HOW ABOUT THE ONE IN 2013, WAS THAT ALSO THROUGH ONE OF

12:37PM 11     MR. LUCAS'S INVESTMENT FUNDS?

12:37PM 12     A.   IT WAS NOT.

12:37PM 13          IN 2013 WE HAD HAD SOME DISCUSSIONS WITH BOTH CHRIS AND

12:37PM 14     ELIZABETH TO SAY THAT OUR PREFERENCE WAS TO INVEST DIRECTLY IN

12:37PM 15     THERANOS AND NOT THROUGH A THIRD PARTY, AND SO IN 2013 WE

12:37PM 16     BECAME A DIRECT INVESTOR.

12:37PM 17     Q.   OKAY.  LET'S TURN NOW TO THE ATTACHMENT, PAGE 2 OF THE

12:37PM 18     EXHIBIT.

12:37PM 19          THERE ARE SOME CONTACTS AT THE TOP.

12:37PM 20          IF WE CAN FIRST JUST HAVE YOU EXPLAIN TO THE JURY WHO

12:37PM 21     THESE INDIVIDUALS ARE.

12:37PM 22          THE FIRST IS MS. HOLMES; IS THAT RIGHT?

12:38PM 23     A.   SO THE FIRST NAME IS ELIZABETH HOLMES.

12:38PM 24          THE SECOND NAME IS GARY NORDHEIMER.  GARY IS A FRIEND OF

12:38PM 25     MR. HALL, AND I THINK IS THE FIRST ONE THAT, THAT MADE MR. HALL

12:38PM  1    AWARE OF AN OPPORTUNITY TO INVEST IN THERANOS.  SO THEY'RE

12:38PM  2    FRIENDS.

12:38PM  3         AND HE HAD REACHED OUT TO MR. HALL, I BELIEVE, AND HAD

12:38PM  4    INDICATED THAT THERE WAS A POTENTIAL INVESTMENT OPPORTUNITY.

12:38PM  5         AS I UNDERSTAND IT, MR. NORDHEIMER WAS AN INVESTOR THROUGH

12:38PM  6    CHRIS LUCAS, AND HIS INVESTMENT FUND AS WELL, AND THAT'S THE

12:38PM  7    THIRD NAME ON THE LIST IS CHRIS LUCAS.

12:38PM  8    Q.   AND THAT'S THE GENTLEMAN THAT WE JUST SPOKE ABOUT WHO

12:38PM  9    OWNED THE FUND THAT THE 2006 INVESTMENT WAS MADE THROUGH?

12:38PM 10    A.   CORRECT.

12:38PM 11    Q.   NOW, IF WE CAN LOOK A LITTLE FURTHER DOWN, THERE'S A LIST

12:38PM 12    OF INVESTORS.

12:38PM 13         UNDER DONALD LUCAS, TOWARDS THE END OF THAT LINE, WE SEE

12:38PM 14    HE'S THE UNCLE OF CHRIS LUCAS WHO OWNS BLACK DIAMOND VENTURES.

12:39PM 15         FIRST, DO YOU KNOW WHO DONALD LUCAS IS?

12:39PM 16    A.   I DO.

12:39PM 17    Q.   AND WHO IS HE?

12:39PM 18    A.   SO DONALD LUCAS WAS ONE OF THE, I THINK, ORIGINAL

12:39PM 19    INVESTORS IN THERANOS, WAS THE CHAIRMAN OF THE BOARD, AND WAS A

12:39PM 20    WELL-KNOWN VENTURE CAPITALIST IN CALIFORNIA.

12:39PM 21    Q.   AND THE REFERENCE HERE, CHAIRMAN OF THE BOARD, THAT'S OF

12:39PM 22    THERANOS; IS THAT RIGHT?

12:39PM 23    A.   CORRECT.

12:39PM 24    Q.   OKAY.  AND CHRIS LUCAS OWNS BLACK DIAMOND VENTURES.  WHAT

12:39PM 25    IS BLACK DIAMOND VENTURES?

12:39PM  1      A.   SO BLACK DIAMOND VENTURES IS THE NAME OF THE FUND OR THE

12:39PM  2      COMPANY THAT CHRIS LUCAS OWNED THAT MADE THE INVESTMENT IN

12:39PM  3      THERANOS.

12:39PM  4           WE INVESTED IN BLACK DIAMOND VENTURES, WHO INVESTED IN

12:39PM  5      THERANOS.

12:39PM  6      Q.   IN 2006?

12:39PM  7      A.   IN 2006, CORRECT.

12:39PM  8      Q.   I SEE.  BUT THE 2013 INVESTMENT WAS NOT INTO BLACK DIAMOND

12:39PM  9      VENTURES?

12:39PM  10     A.   CORRECT.  THE 2013 INVESTMENT WAS DIRECTLY INTO THERANOS.

12:39PM  11     Q.   I SEE.  OKAY.

12:39PM  12          AND THEN THERE'S A FURTHER LIST OF INVESTORS, AND IF WE GO

12:39PM  13     DOWN TO THE PARAGRAPH AT THE BOTTOM -- FIRST, BEFORE I READ YOU

12:40PM  14     PARTS OF IT, I'M WONDERING WHAT WAS THE SOURCE, IF YOU RECALL,

12:40PM  15     OF THIS INFORMATION, THE PARAGRAPH THAT BEGINS "FIRST RAISE"?

12:40PM  16     A.   SO THIS PARAGRAPH WOULD REFERENCE MY NOTES FROM THAT

12:40PM  17     CONFERENCE CALL.

12:40PM  18     Q.   THE CONFERENCE CALL THAT MS. HOLMES WAS ON?

12:40PM  19     A.   CORRECT.  THE LIST OF INVESTORS ABOVE, I'M NOT A FAST

12:40PM  20     ENOUGH TYPIST TO HAVE GATHERED ALL OF THAT FROM THE CALL, SO AS

12:40PM  21     I REMEMBER, CHRIS LUCAS WOULD HAVE, OR SOMEBODY WOULD HAVE SENT

12:40PM  22     INFORMATION THAT WOULD HAVE LISTED WHO THE INVESTORS WERE AND I

12:40PM  23     WOULD HAVE CUT AND PASTE THAT LIST INTO THESE NOTES.

12:40PM  24     Q.   OKAY.

12:40PM  25     A.   BUT THE PARAGRAPH ON THE BOTTOM REPRESENTED MY NOTES FROM

12:40PM   1    THAT CALL.

12:40PM   2    Q.   IT READS, "THE FIRST RAISE WAS $16 MILLION.  THIS ROUND IS

12:40PM   3    $30 MILLION WITH A $125 MILLION PRE-MONEY VALUATION.  EXPECTS

12:40PM   4    THIS TO BE FINAL RAISE PRE-IPO."

12:41PM   5         WHAT DOES THAT MEAN?

12:41PM   6    A.   SO THAT MEANS ON THE CALL THERE WAS DISCUSSION ABOUT THE

12:41PM   7    FACT THAT THERE WOULD BE AN IPO LIKELY THAT WOULD COME AND THAT

12:41PM   8    THIS ROUND OF INVESTMENT WOULD BE ENOUGH TO CARRY THE COMPANY

12:41PM   9    THROUGH IPO.

12:41PM  10    Q.   AND WHAT IS AN IPO?

12:41PM  11    A.   AN INITIAL PUBLIC OFFERING WHERE A COMPANY WOULD FILE TO

12:41PM  12    GO PUBLIC ON ONE OF THE PUBLIC STOCK EXCHANGES.

12:41PM  13    Q.   OKAY.  HE -- IT CONTINUES, "THE IPO IS ANTICIPATED IN THE

12:41PM  14    FIRST QUARTER OF 2008.  EXPECT THE IPO TO BE VALUED AROUND

12:41PM  15    $1 BILLION."

12:41PM  16         WAS THAT COMMUNICATED DURING THIS CALL?

12:41PM  17    A.   THAT WOULD HAVE BEEN.

12:41PM  18    Q.   PARDON ME?

12:41PM  19    A.   THAT -- CORRECT, IT WOULD HAVE BEEN NOTED ON THE CALL.

12:41PM  20    Q.   OKAY.  "$30 MILLION TO BE USED FOR 1) MANUFACTURING -

12:41PM  21    MOVING FROM A MANUAL ASSEMBLY INFRASTRUCTURE TO A FULLY

12:41PM  22    AUTOMATED SYSTEM AND 2) CONTINUE TO FUND SUCCESSIVE ITERATIONS

12:42PM  23    OF THE TECHNOLOGY INCLUDING DECREASING AMOUNT OF BLOOD REQUIRED

12:42PM  24    IN THE PINPRICK AND NUMBER OF ASSAYS IN THE CARTRIDGE."

12:42PM  25         WHAT WAS YOUR UNDERSTANDING OF WHAT THERANOS DID?  WHAT

12:42PM 1    WAS THE TECHNOLOGY AT THIS POINT?

12:42PM 2    A.   SO MY UNDERSTANDING AT THIS TIME WAS THAT, YOU KNOW, THERE

12:42PM 3    WAS AN ABILITY TO TAKE A FINGER PRICK OF BLOOD AND PUT THAT

12:42PM 4    DROP OF BLOOD IN A CARTRIDGE.  IT WOULD HAVE BEEN PUT IN A

12:42PM 5    READER.  THAT READER COULD THEN GO AND DO DIFFERENT TESTS ON

12:42PM 6    THE BLOOD AND RETURN RESULTS.

12:42PM 7         YOU KNOW, THE EXPECTATION AT THIS TIME, AS THIS NOTES,

12:42PM 8    THAT PART OF THE INVESTMENT PROCEEDS WOULD BE USED TO KIND OF

12:42PM 9    FURTHER ADVANCE WHAT THAT TECHNOLOGY WAS ABLE TO DO, THE NUMBER

12:42PM 10   OF TESTS IT WOULD BE ABLE TO BE PERFORMED, OR, YOU KNOW, THE

12:42PM 11   AMOUNT OF BLOOD THAT WOULD BE REQUIRED.

12:42PM 12        IT WAS ALSO TO BE USED FOR MANUFACTURING.  AS I UNDERSTOOD

12:43PM 13   IT IN THESE EARLY DAYS, YOU KNOW, THERE WAS A MANUFACTURING

12:43PM 14   SYSTEM THAT THINGS WERE PUT TOGETHER BY HAND, AND THAT THE

12:43PM 15   INTENT WAS TO SCALE UP AND MEET WHAT WAS EXPECTED TO BE LARGE

12:43PM 16   DEMAND, THAT THERE WOULD HAVE TO BE SOME KIND OF AUTOMATED

12:43PM 17   MANUFACTURING SYSTEM BUILT.

12:43PM 18   Q.   WHAT DID YOU UNDERSTAND THERANOS MANUFACTURED?

12:43PM 19   A.   SO THERANOS MANUFACTURED THE CARTRIDGES THAT THE BLOOD

12:43PM 20   WOULD BE PLACED INTO, AS WELL AS THE READER THAT WOULD PERFORM

12:43PM 21   THE ACTUAL TESTS ON THE BLOOD ON THE CARTRIDGE.

12:43PM 22   Q.   IS "DEVICE" ANOTHER WORD FOR "READER" AS YOU'RE USING IT?

12:43PM 23   A.   CORRECT.

12:43PM 24   Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHETHER, IN 2006, THE

12:43PM 25   DEVICE WAS A MATURE TECHNOLOGY OR WHETHER IT WAS STILL GROWING,

12:43PM  1    DEVELOPING DIFFERENT GENERATIONS?

12:43PM  2    A.   YOU KNOW CERTAINLY, CERTAINLY MY UNDERSTANDING WAS THAT IT

12:44PM  3    WORKED AT THIS TIME.  YOU KNOW, THERE WERE PROJECTIONS THAT WE

12:44PM  4    HAD SEEN ABOUT DIFFERENT TRIALS AND DIFFERENT PHARMACEUTICAL

12:44PM  5    TRIALS THAT WOULD BE UNDERTAKEN, AND IN ORDER FOR THOSE TO BE

12:44PM  6    DONE, THERE HAD TO BE SOME KIND OF FUNCTIONING, YOU KNOW,

12:44PM  7    DEVICE OR READER SYSTEM.

12:44PM  8         THE EXPECTATION WAS THAT THAT WOULD CONTINUE TO ADVANCE

12:44PM  9    AND GET, YOU KNOW, MORE ROBUST OVER TIME.

12:44PM 10         BUT THERE WAS AT THIS TIME A FUNCTIONING PRODUCT.

12:44PM 11    Q.   IF YOU'LL TURN NOW TO THE NEXT PAGE, PAGE 3 OF THE

12:44PM 12    EXHIBIT.

12:44PM 13         AT THE TOP THERE'S A SUMMARY OF MS. HOLMES'S BACKGROUND.

12:44PM 14         DO YOU RECALL, WAS THAT DISCUSSED ON THE CALL?

12:44PM 15    A.   IT WAS.

12:44PM 16    Q.   AND THEN BELOW THAT THERE'S A SECTION CALLED FINANCIALS,

12:45PM 17    AND IT READS, "THE CURRENT BURN RATE $1 MILLION PER MONTH."

12:45PM 18         WHAT DOES THAT MEAN?

12:45PM 19    A.   THAT MEANS THAT THE COMPANY WAS SPENDING AROUND A MILLION

12:45PM 20    DOLLARS A MONTH IN OVERHEAD COSTS.

12:45PM 21    Q.   "$3 MILLION IN REVENUES SHOULD BE RECEIVED FOR 2 CONTRACTS

12:45PM 22    WHICH HAVE ALREADY BEEN SHIPPED.

12:45PM 23         "HAS SIGNED/IN NEGOTIATIONS CONTRACTS THROUGH 2007 FOR

12:45PM 24    $30-$50 MILLION.

12:45PM 25         "EXPECTS TO BE CASH FLOW POSITIVE BY THE FOURTH QUARTER OF

12:45PM 1    2007."

12:45PM 2        EXPLAIN TO ME THE SIGNIFICANCE OF THESE SIGNED CONTRACTS,

12:45PM 3    OR IN NEGOTIATION CONTRACTS AND CASH FLOW POSITIVE.

12:45PM 4    A.   CERTAINLY.  SO, YOU KNOW, AS WE HAD LOOKED AT FINANCIAL

12:45PM 5    PROJECTIONS AT THIS TIME, YOU KNOW, THAT WERE ANTICIPATED, YOU

12:45PM 6    KNOW, OUR UNDERSTANDING WAS THAT THERE WAS A SIGNIFICANT AMOUNT

12:45PM 7    OF REVENUES THAT WERE ALREADY IN PLACE BASED ON CONTRACTS THAT

12:46PM 8    HAD PRODUCT OUT THE DOOR TO THOSE COMPANIES, AS WELL AS, YOU

12:46PM 9    KNOW, SIGNIFICANT CONTRACTS THAT WERE SIGNED OR IN

12:46PM 10   NEGOTIATIONS, WHICH FELT LIKE, YOU KNOW, THAT WAS AN EXTREMELY

12:46PM 11   EXCITING PROSPECT.

12:46PM 12       AND THE LAST NOTE I MADE, "EXPECTS TO BE CASH FLOW

12:46PM 13   POSITIVE BY 4TH QUARTER 2007," SO THAT MEANS THAT THE CONTRACTS

12:46PM 14   THAT WOULD HAVE BEEN SHIPPED OR REVENUE WOULD HAVE BEEN

12:46PM 15   RECEIVED ON WOULD HAVE BEEN FOR MORE THAN ENOUGH CASH TO COVER

12:46PM 16   ALL OF THE OPERATIONAL EXPENSES SO THE COMPANY WOULD BE

12:46PM 17   PROFITABLE AT THAT POINT.

12:46PM 18   Q.   WERE THE STATEMENTS THAT YOU RECEIVED ABOUT GENERATION OF

12:46PM 19   REVENUE AND GOING CASH FLOW POSITIVE IN THE FOURTH QUARTER OF

12:46PM 20   2007 RELEVANT TO YOUR DUE DILIGENCE PROCESS?

12:47PM 21   A.   THEY WERE.

12:47PM 22   Q.   WHY?

12:47PM 23   A.   YOU KNOW, AS WE LOOK TO EVALUATE ANY INVESTMENT

12:47PM 24   OPPORTUNITY, YOU KNOW, THERE NEEDS TO BE A SYSTEM OR A BUSINESS

12:47PM 25   IN PLACE THAT CAN GENERATE ENOUGH MONEY TO MAKE THAT INVESTMENT

12:47PM  1    WORTHWHILE TO MAKE, AND, YOU KNOW, THESE PROJECTIONS WERE SUCH

12:47PM  2    THAT IT MEANT THAT OUR INVESTMENT WOULD INCREASE AND BE WORTH

12:47PM  3    SOMETHING MORE THAN WE INVESTED INTO IT IN THE FIRST PLACE.

12:47PM  4        AND SO THAT'S WHY THESE ARE IMPORTANT NUMBERS TO LOOK AT.

12:47PM  5    Q.   YOU RECEIVED THIS INFORMATION AROUND OCTOBER OF 2006; IS

12:47PM  6    THAT RIGHT?

12:47PM  7    A.   CORRECT.

12:47PM  8    Q.   AND THE PROJECTIONS WERE FOR 2007, THE NEXT YEAR?

12:47PM  9    A.   CORRECT.

12:47PM  10   Q.   IS THAT CLOSE IN TIME SO YOU WOULD EXPECT THEM TO BE MORE

12:47PM  11   ACCURATE, OR IS THAT FAR INTO THE FUTURE SO THAT YOU APPRECIATE

12:48PM  12   THAT THERE IS A LACK OF CERTAINTY?

12:48PM  13   A.   WELL, AND I GUESS MAYBE TO CLARIFY, AS I REMEMBER, AND I

12:48PM  14   DON'T -- AS I REMEMBER, THOSE PROJECTIONS WERE FOR 2007 AND

12:48PM  15   2008, SO FOR TWO YEARS.

12:48PM  16       AND, YOU KNOW, CERTAINLY THE FARTHER OUT IN THE FUTURE THE

12:48PM  17   PROJECTIONS ARE, THE MORE VARIABILITY THERE MAY BE INTO HOW

12:48PM  18   THOSE ARE ACTUALLY RECEIVED.

12:48PM  19       BUT WE FELT SOME COMFORT OR SOME EXCITEMENT AROUND, YOU

12:48PM  20   KNOW, THE FACT THAT THE 2007 PROJECTIONS REPRESENTED WHAT WE

12:48PM  21   BELIEVED WERE CONTRACTS THAT HAD BEEN SIGNED OR WERE DEEP IN

12:48PM  22   NEGOTIATIONS.

12:48PM  23       IN FACT, I BELIEVE THERE WAS ACTUALLY A LIST OF WHAT

12:48PM  24   THOSE, YOU KNOW, DIFFERENT CONTRACTS WERE.  SO IT FELT LIKE

12:48PM  25   THERE WAS SOME MEASURE OF CERTAINTY AROUND THOSE.

12:48PM   1    Q.   BECAUSE THE CONTRACTS ACTUALLY WERE SIGNED?

12:49PM   2    A.   SOME PORTION OF THEM HAD BEEN SIGNED.

12:49PM   3    Q.   OKAY.  IF YOU'LL TURN IN YOUR BINDER NOW TO 4871.

12:49PM   4         YOUR HONOR, THE GOVERNMENT OFFERS THIS BY STIPULATION.

12:49PM   5              MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

12:49PM   6              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:49PM   7         (GOVERNMENT'S EXHIBIT 4871 WAS RECEIVED IN EVIDENCE.)

12:49PM   8    BY MR. SCHENK:

12:49PM   9    Q.   MR. TOLBERT, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE

12:49PM  10    INFORMATION ON PAGE 8 OF THE DOCUMENT, BUT IF YOU COULD JUST

12:49PM  11    TAKE A MOMENT AND LOOK THROUGH THIS EXHIBIT AND EXPLAIN TO THE

12:49PM  12    JURY WHAT THIS EXHIBIT IS, 4871.

12:49PM  13    A.   SO THIS DOCUMENT REPRESENTS INFORMATION THAT WOULD HAVE

12:49PM  14    BEEN GIVEN TO US IN THAT DUE DILIGENCE PROCESS IN 2006.  IT

12:49PM  15    WOULD HAVE CONTAINED SOME DETAILED INFORMATION ABOUT, YOU KNOW,

12:49PM  16    WHO THE OFFICERS AND DIRECTORS OF THE COMPANY WERE, KIND OF

12:50PM  17    WHAT THE COMPANY DID, AS WELL AS THE FINANCIAL PROJECTIONS

12:50PM  18    THEN.

12:50PM  19    Q.   YOU RECEIVED THIS INFORMATION BEFORE YOU MADE A DECISION

12:50PM  20    TO INVEST IN 2006?

12:50PM  21    A.   CORRECT.

12:50PM  22    Q.   IF YOU'LL LOOK AT PAGE 8, THERE ARE SOME CHARTS AND THE

12:50PM  23    ONE THAT WE'RE LOOKING AT NOW, THE TOP IS CALLED THERANOS PLAN

12:50PM  24    '06, BASE FORECAST, AND THEN THERE IS INCOME STATEMENT WITH A

12:50PM  25    LINE FOR REVENUE.

12:50PM   1        DO YOU SEE THAT?

12:50PM   2   A.   I DO SEE THAT.

12:50PM   3   Q.   AND THEN WE SEE TIME GOING ACROSS THE COLUMNS ALONG THE

12:50PM   4   RIGHT.

12:50PM   5        IS THAT CORRECT?

12:50PM   6   A.   THAT IS CORRECT.

12:50PM   7   Q.   FROM THE THIRD QUARTER OF 2006 THROUGH THE FOURTH QUARTER

12:50PM   8   OF 2008?

12:50PM   9   A.   CORRECT.

12:50PM  10   Q.   IF YOU COULD EXPLAIN TO THE JURY, WHAT IS HAPPENING TO THE

12:50PM  11   REVENUE OVER THAT PERIOD OF TIME?

12:50PM  12   A.   SO THE REVENUE IN, YOU KNOW, Q4 OF '06 WHEN WE WERE HAVING

12:50PM  13   THESE DISCUSSIONS WAS ZERO, BUT, YOU KNOW, IT STARTS IN THE

12:51PM  14   BEGINNING OF 2007 TO BE -- I CAN'T TELL IF THAT'S A --

12:51PM  15   4.6 MILLION IN THE FIRST QUARTER GROWING TO 67 MILLION IN THE

12:51PM  16   FOURTH QUARTER OF '08, SO A SIGNIFICANT INCREASE IN REVENUE

12:51PM  17   OVER THAT PERIOD OF TIME.

12:51PM  18   Q.   YOU SAID THAT THE NUMBER FOR Q1 2007 IS ABOUT

12:51PM  19   $4.6 MILLION; IS THAT RIGHT?

12:51PM  20   A.   CORRECT.

12:51PM  21   Q.   AND CNA YOU EXPLAIN TO THE JURY THE CONVENTION THAT'S USED

12:51PM  22   FOR REVENUE AND IF THE ZEROS ARE ADDED?

12:51PM  23   A.   SO TYPICALLY ON THESE STATEMENTS, IN ORDER TO MAKE THE

12:51PM  24   NUMBERS EASY TO READ AND DEAL WITH, YOU TAKE OFF THE LAST THREE

12:51PM  25   ZEROS.  SO YOU DIVIDE IT BY 1,000.

TOLBERT DIRECT BY MR. SCHENK                                                    4451

12:51PM  1         SO THESE NUMBERS WOULD ALL HAVE HAD, YOU KNOW, THREE

12:51PM  2    ZEROS, OR HAVE BEEN IN THE MILLIONS OF DOLLARS.

12:51PM  3    Q.   OKAY.  AND NOW IF WE'LL LOOK AT THE BOTTOM OF THIS CHART

12:52PM  4    THAT YOU'RE LOOKING AT NOW, THE ROW CALLED NET INCOME, IT

12:52PM  5    BEGINS IN 2006 WITH NUMBERS THAT ARE IN PARENTHETICALS, BUT

12:52PM  6    THEN IT STOPS THAT AS WE MOVE ALONG IN TIME.

12:52PM  7         WHAT IS THAT INDICATING?

12:52PM  8    A.   SO THAT NET INCOME LINE REPRESENTS WHAT THE REVENUE AND

12:52PM  9    INCOME WAS, MINUS THE EXPENSES.  AND SO WHEN WE WERE

12:52PM 10    ANTICIPATING THIS INVESTMENT IN 2006, YOU CAN SEE THAT FOR THE

12:52PM 11    FOURTH QUARTER, THE COMPANY EXPECTED TO SPEND $5 MILLION MORE

12:52PM 12    THAN IT MADE.

12:52PM 13         SO THE NET INCOME WAS NEGATIVE $5 MILLION.

12:52PM 14         BUT OVER TIME, BASED ON WHAT THE PROJECTIONS FOR THEIR

12:52PM 15    REVENUE WAS, MINUS THOSE EXPENSES, GREW TO ABOUT $12 MILLION A

12:52PM 16    QUARTER.

12:52PM 17    Q.   AND WE SEE THE NUMBER BECOMING POSITIVE IN THE FOURTH

12:53PM 18    QUARTER OF 2007?

12:53PM 19    A.   CORRECT.

12:53PM 20    Q.   AND WAS THAT REFLECTED IN THE NOTES THAT WE LOOKED AT A

12:53PM 21    MOMENT AGO?

12:53PM 22    A.   CORRECT.  SO THAT WAS, THAT WAS WHAT THE DISCUSSION HAD

12:53PM 23    BEEN THAT -- AND IN '07 IS WHEN THINGS TURNED INTO A POSITIVE

12:53PM 24    CASH FLOW POSITION.

12:53PM 25    Q.   IN ADDITION TO THE PHONE CALL THAT YOU TALKED ABOUT AND

12:53PM   1    REVIEWING DOCUMENTS, AS PART OF DUE DILIGENCE, DID YOU ALSO GO

12:53PM   2    FROM TEXAS TO CALIFORNIA AT SOME POINT?

12:53PM   3    A.    I DID MAKE A TRIP TO CALIFORNIA.

12:53PM   4    Q.    DO YOU REMEMBER GENERALLY WHEN THAT WAS?

12:53PM   5    A.    I BELIEVE IT WAS EARLY NOVEMBER OF 2006.

12:53PM   6    Q.    WAS THAT BEFORE A DECISION REGARDING AN INVESTMENT WAS

12:53PM   7    MADE?

12:53PM   8    A.    IT WAS.

12:53PM   9    Q.    AND WHAT DID YOU DO IN CALIFORNIA?

12:53PM   10   A.    SO AS PART OF MY TRIP, I WENT TO DINNER WITH DON LUCAS AND

12:53PM   11   CHRIS LUCAS AND ELIZABETH HOLMES AND, YOU KNOW, WE SPENT, AS I

12:53PM   12   REMEMBER, A FEW HOURS AT DINNER THAT NIGHT TALKING ABOUT WHAT

12:54PM   13   THERANOS DID, TALKING ABOUT ELIZABETH'S VISION FOR THE COMPANY.

12:54PM   14         YOU KNOW, WE ALSO, I'M SURE, HEARD SOME FUN STORIES FROM

12:54PM   15   DON LUCAS, YOU KNOW, ABOUT HIS INVESTMENT CAREER.

12:54PM   16         BUT IT WAS MOSTLY FOCUSSED ON THERANOS AND WHAT THE

12:54PM   17   OPPORTUNITY WAS.

12:54PM   18   Q.    DID MS. HOLMES DESCRIBE TO YOU THE TECHNOLOGY?

12:54PM   19   A.    SHE DID.

12:54PM   20   Q.    AND DID THAT DESCRIPTION CHANGE YOUR UNDERSTANDING?

12:54PM   21         YOU DESCRIBED EARLIER THINKING THAT THEY HAD A READER THAT

12:54PM   22   TESTED BLOOD ON A CARTRIDGE DRAWN FROM A FINGERSTICK.

12:54PM   23         WAS THE DESCRIPTION THAT YOU RECEIVED DURING DINNER

12:54PM   24   CONSISTENT WITH THAT, OR DID YOU LEARN SOMETHING DIFFERENT?

12:54PM   25   A.    YEAH, I WOULD SAY IT DIDN'T, IT DIDN'T CHANGE IT THAT

12:54PM  1   MUCH.  IT AMPLIFIED IT.  I CAME AWAY WITH A MUCH BETTER

12:54PM  2   UNDERSTANDING OF WHAT IT WOULD DO AND WHAT THE VISION WAS FOR

12:54PM  3   WHERE IT MAY GO.

12:54PM  4        BUT THE BASIC THESIS WAS THE SAME.

12:55PM  5   Q.   AND DID YOU ALSO VISIT THERANOS HEADQUARTERS DURING THIS

12:55PM  6   TRIP?

12:55PM  7   A.   YOU KNOW, AS I RECALL I DID.  IT WAS EITHER THAT DAY

12:55PM  8   BEFORE DINNER OR MAYBE THE NEXT MORNING.  I DON'T REMEMBER.

12:55PM  9   Q.   DID YOU LOOK AT ANY OF THE DEVICES THAT THERANOS

12:55PM  10  MANUFACTURED?

12:55PM  11  A.   YOU KNOW, I DON'T RECALL KIND OF TAKING A TOUR AND SEEING

12:55PM  12  THE DEVICES.  I DO KNOW -- I MAY HAVE.  I JUST DON'T REMEMBER.

12:55PM  13       I DID COME HOME FROM THAT TRIP WITH A CARTRIDGE, AN EARLY

12:55PM  14  VERSION OF THE CARTRIDGE THAT HAD A PLACE WHERE THE FINGERSTICK

12:55PM  15  BLOOD WOULD GO IN.

12:55PM  16       SO AT SOME POINT, YOU KNOW, I SAW SOMETHING THAT WOULD

12:55PM  17  HAVE BEEN RELATED TO THOSE DEVICES.  BUT I, I DON'T REMEMBER

12:55PM  18  TAKING A TOUR.

12:55PM  19  Q.   DID MS. HOLMES GIVE YOU THAT CARTRIDGE?

12:55PM  20  A.   I DON'T REMEMBER IF SHE DID OR IF SOMEBODY ELSE DID WHILE

12:55PM  21  I WAS THERE.

12:55PM  22  Q.   WHEN YOU THEN RETURNED TO TEXAS, DID YOU MAKE A

12:55PM  23  RECOMMENDATION REGARDING AN INVESTMENT IN THERANOS?

12:55PM  24  A.   YOU KNOW, AT SOME POINT AFTER THAT I WOULD HAVE RECOUNTED,

12:56PM  25  YOU KNOW, THE EXPERIENCE THAT I HAD AND MY TAKEAWAYS FROM THAT,

12:56PM  1    AND AT SOME POINT AFTER THAT MR. HALL AND I MADE A DECISION TO

12:56PM  2    INVEST.

12:56PM  3    Q.    AND HOW MUCH DID YOU DECIDE TO INVEST?

12:56PM  4    A.    SO OUR INVESTMENT IN 2006 WAS $2 MILLION.

12:56PM  5    Q.    AND, AGAIN, THAT WAS THROUGH BLACK DIAMOND VENTURES; IS

12:56PM  6    THAT RIGHT?

12:56PM  7    A.    CORRECT.  SO IN ESSENCE WE JOINED CHRIS LUCAS'S FUND.  WE

12:56PM  8    COMMITTED $2 MILLION TO THAT FUND THAT WAS ULTIMATELY

12:56PM  9    AGGREGATED WITH OTHER INVESTORS, I BELIEVE, AND INVESTED INTO

12:56PM  10   THE COMPANY.

12:56PM  11   Q.    OKAY.  AND WAS THAT LATE 2006, OR SOMETIME AFTER THE

12:56PM  12   EVENTS THAT WE HAVE TALKED ABOUT IN 2006?

12:56PM  13   A.    YES, IT'S AFTER -- IT'S AFTER MY TRIP OUT.

12:56PM  14   Q.    I'D LIKE TO NOW TAKE A CHUNK OF TIME ALL AT ONCE WITH YOU.

12:56PM  15         FROM THIS TIME IN 2006 WHEN THIS INVESTMENT WAS MADE UNTIL

12:57PM  16   2013, HOW MUCH, IF ANY, COMMUNICATION DID YOU HAVE WITH

12:57PM  17   MS. HOLMES DURING THAT PERIOD OF TIME?

12:57PM  18   A.    NONE THAT I RECALL.

12:57PM  19   Q.    HOW ABOUT WITH ANYBODY FROM THERANOS?

12:57PM  20   A.    YOU KNOW, I DON'T RECALL ANY, ANY DIRECT COMMUNICATION

12:57PM  21   WITH ANYBODY AT THE COMPANY OVER THAT PERIOD OF TIME.

12:57PM  22   Q.    DID YOU RECEIVE ANY UPDATES AT ALL ABOUT YOUR INVESTMENT

12:57PM  23   IN THERANOS?

12:57PM  24   A.    I DID.

12:57PM  25         BECAUSE WE HAD INVESTED THROUGH CHRIS LUCAS'S, THROUGH

12:57PM   1    BLACK DIAMOND VENTURES, I HAD REGULAR CONVERSATIONS WITH

12:57PM   2    MR. LUCAS ABOUT, YOU KNOW, ABOUT OUR INVESTMENT, ABOUT HOW

12:57PM   3    THINGS WERE GOING.

12:57PM   4         YOU KNOW, AS I UNDERSTOOD, MR. LUCAS WAS A PRETTY REGULAR

12:57PM   5    VISITOR AT THE COMPANY HEADQUARTERS AND, YOU KNOW, MAY HAVE HAD

12:57PM   6    SOME PROJECTS THAT HE WAS WORKING ON.

12:57PM   7         ANYWAY, HE WAS A REGULAR SOURCE OF INFORMATION FOR US

12:57PM   8    THROUGH THOSE YEARS.

12:57PM   9    Q.   OKAY.  WERE THERE ANY OTHER SOURCES OF INFORMATION DURING

12:57PM  10    THAT PERIOD OF TIME?  DID YOU LOOK ON THE INTERNET OR ANY OTHER

12:58PM  11    PUBLIC SOURCES?

12:58PM  12    A.   YOU KNOW, CERTAINLY I WOULD HAVE LOOKED AT GOOGLE OR THE

12:58PM  13    INTERNET.

12:58PM  14         YOU KNOW, DURING THAT TIME, AS I RECALL, THERE WAS NOT

12:58PM  15    MUCH PUBLIC INFORMATION THAT WAS PUBLICLY AVAILABLE.

12:58PM  16         YOU KNOW, IN MY CONVERSATIONS WITH CHRIS, I THINK THAT WAS

12:58PM  17    BY DESIGN, OR I UNDERSTOOD IT WAS BY DESIGN, THAT THE COMPANY

12:58PM  18    DIDN'T WANT TO LOSE A COMPETITIVE ADVANTAGE BY HAVING, YOU

12:58PM  19    KNOW, LOTS OF INFORMATION OUT IN THE PUBLIC DOMAIN.

12:58PM  20    Q.   YOU WEREN'T SURPRISED THAT THERE WASN'T MORE IN THE PUBLIC

12:58PM  21    DOMAIN?

12:58PM  22    A.   NO.  IN FACT, I WAS ENCOURAGED BECAUSE IT FELT LIKE A --

12:58PM  23    IT DID FEEL LIKE A REVOLUTIONARY TECHNOLOGY THAT YOU WANTED TO

12:58PM  24    KIND OF PRESERVE AN ADVANTAGE.

12:58PM  25    Q.   OKAY.  WE SAW IN YOUR NOTES FROM 2006 THE IPO, AND I THINK

12:58PM    1    IT WAS THE FIRST QUARTER OF 2008.

12:58PM    2         DID YOU KNOW WHETHER THAT HAPPENED?

12:58PM    3    A.   IT DID NOT HAPPEN.

12:58PM    4    Q.   OKAY.  WE SAW IN YOUR NOTES THAT THE COMPANY WAS GOING TO

12:59PM    5    BECOME CASH FLOW POSITIVE AT ONE POINT.

12:59PM    6         DID YOU RECEIVE ANY INFORMATION ABOUT WHETHER THAT

12:59PM    7    HAPPENED?

12:59PM    8    A.   YOU KNOW, CHRIS AND I WOULD HAVE HAD SOME CONVERSATIONS

12:59PM    9    ABOUT THAT.  I DON'T RECALL WITH SPECIFICS, YOU KNOW, KNOWING

12:59PM   10    IF OR WHEN THE COMPANY BECAME CASH FLOW POSITIVE.

12:59PM   11    Q.   OKAY.  LET'S NOW TURN TO 2013, AND IF YOU'LL LOOK IN THAT

12:59PM   12    BINDER AT 3940.

12:59PM   13         MR. TOLBERT, IS THIS AN EMAIL FROM CHRIS LUCAS TO YOU

12:59PM   14    ABOUT THERANOS?

12:59PM   15    A.   IT IS.

12:59PM   16              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3940.

12:59PM   17              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

12:59PM   18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM   19         (GOVERNMENT'S EXHIBIT 3940 WAS RECEIVED IN EVIDENCE.)

01:00PM   20              MR. SCHENK:  THANK YOU.

01:00PM   21    Q.   FIRST LET'S NOTE THE TIME.  IT'S JULY NOW, THE END OF

01:00PM   22    JULY 2013.

01:00PM   23         CHRIS LUCAS SENDS YOU AN EMAIL AND THE SUBJECT IS THERANOS

01:00PM   24    NEW BOARD MEMBERS.

01:00PM   25         DO YOU SEE THAT?

01:00PM 1    A.   I DO.

01:00PM 2    Q.   "THERANOS LAUNCHED THEIR NEW WEBSITE THIS MORNING AND

01:00PM 3    ANNOUNCED NEW BOARD MEMBERS.

01:00PM 4         "SHE IS CLEARLY ASSEMBLING AN IMPRESSIVE GROUP.

01:00PM 5         "HOPEFULLY, THIS ALSO MEANS THAT WE WILL START RECEIVING

01:00PM 6    MORE COMMUNICATION FROM THE COMPANY."

01:00PM 7         FIRST, IS THIS THE TYPE OF INFORMATION THAT YOU WOULD

01:00PM 8    RECEIVE FROM MR. LUCAS OVER THE YEARS?

01:00PM 9    A.   CERTAINLY THIS KIND OF INFORMATION, OR ANYTHING THAT FELT

01:00PM 10   LIKE IT WAS NEWS OR DEVELOPMENT I FELT LIKE HE WOULD RELAY TO

01:00PM 11   ME.

01:00PM 12        SO, YOU KNOW, WE HAD HAD SOME CONVERSATIONS IN ADVANCE OF

01:00PM 13   JULY ABOUT, YOU KNOW, THE POSSIBILITY THAT THERE WOULD BE AN

01:00PM 14   ANNOUNCEMENT OF A BOARD.

01:00PM 15        AND SO, YOU KNOW, HE WAS, AS I REMEMBER, EXCITED TO HAVE

01:01PM 16   SOMETHING TO SEND TO ME THAT WAS PUBLIC THAT, YOU KNOW,

01:01PM 17   EVIDENCED SOME GREAT MOMENTUM ON THE COMPANY'S PART.

01:01PM 18   Q.   MR. LUCAS WROTE THAT, HOPEFULLY, THIS MEANS THAT WE WILL

01:01PM 19   START RECEIVING MORE INFORMATION FROM THE COMPANY.

01:01PM 20        WHAT DID YOU TAKE THAT TO MEAN?

01:01PM 21   A.   YOU KNOW, CHRIS AND I HAD HAD LOTS OF CONVERSATIONS OVER

01:01PM 22   THOSE INTERVENING YEARS ABOUT, YOU KNOW, JUST WANTING

01:01PM 23   INFORMATION, MORE FINANCIAL INFORMATION, AND MORE VISIBILITY AS

01:01PM 24   TO WHAT WAS GOING ON.

01:01PM 25        SO AS I RECALL, WE HAD SOME SPECIFIC CONVERSATIONS AROUND

01:01PM  1    THIS TIME THAT MAYBE THIS MEANT THERE WAS A DAY THAT THAT

01:01PM  2    CONVERSATION WOULD BECOME MORE FREQUENT, MORE OPEN.

01:01PM  3    Q.   AND DID YOU AGREE WITH THIS SENTIMENT, THAT THE COMPANY

01:01PM  4    HADN'T PROVIDED A LOT OF INFORMATION AND HOPEFULLY THEY WOULD

01:02PM  5    START TO PROVIDE MORE?

01:02PM  6    A.   CORRECT.

01:02PM  7    Q.   AND IS AN EXAMPLE OF THEM PROVIDING MORE INFORMATION A

01:02PM  8    PHONE CALL, FOR INSTANCE, BETWEEN YOU AND MS. HOLMES WHERE YOU

01:02PM  9    COULD LEARN MORE ABOUT THE COMPANY?  IS THAT THE KIND OF THING

01:02PM  10   THAT YOU WANTED?

01:02PM  11   A.   YOU KNOW, CERTAINLY THAT WOULD HAVE WELCOMED.  BECAUSE WE

01:02PM  12   WEREN'T A DIRECT INVESTOR AT THIS POINT, I WOULDN'T HAVE

01:02PM  13   EXPECTED THAT KIND OF DIRECT COMMUNICATION FROM THE COMPANY.

01:02PM  14        YOU KNOW, I WOULD HAVE EXPECTED SOME DIRECT COMMUNICATION

01:02PM  15   WITH CHRIS, WHO THEN WOULD HAVE KIND OF REFLECTED THAT TO US.

01:02PM  16   Q.   I SEE.

01:02PM  17        IF YOU'LL NOW TURN TO EXHIBIT 949.

01:02PM  18        IS THIS AN EMAIL CHAIN FROM AN EMPLOYEE AT CHRIS LUCAS'S

01:02PM  19   FUND, AND YOU, CONTAINING INFORMATION ABOUT THERANOS?

01:02PM  20   A.   THAT'S CORRECT.

01:02PM  21             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 949.

01:03PM  22             MR. DOWNEY:  NO OBJECTION.

01:03PM  23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:03PM  24        (GOVERNMENT'S EXHIBIT 949 WAS RECEIVED IN EVIDENCE.)

01:03PM  25   BY MR. SCHENK:

01:03PM  1      Q.   LET'S ACTUALLY START AT THE TOP OF THIS DOCUMENT,

01:03PM  2      MR. TOLBERT.

01:03PM  3           FIRST, THIS IS FROM SOMEONE NAMED ANA QUINTANA.

01:03PM  4           DO YOU KNOW WHO THAT IS?

01:03PM  5      A.   I DO.  SHE WORKS WITH CHRIS LUCAS AT BLACK DIAMOND

01:03PM  6      VENTURES.

01:03PM  7      Q.   SO SHE'S WRITING TO YOU IN AUGUST, SO A FEW DAYS LATER

01:03PM  8      FROM THAT EMAIL FROM MR. LUCAS, "PLEASE FIND THE SHAREHOLDER

01:03PM  9      LETTER BELOW.

01:03PM 10           THE SUBJECT LINE IS BLACK DIAMOND VENTURES THERANOS

01:03PM 11      SHAREHOLDER LETTER.

01:03PM 12           DO YOU SEE THAT?

01:03PM 13      A.   YES, I DO.

01:03PM 14      Q.   AND BELOW THIS EMAIL NOW, AT THE BOTTOM OF THIS FIRST

01:03PM 15      PAGE, MS. QUINTANA IS FORWARDING TO YOU ANOTHER EMAIL THAT

01:04PM 16      SAYS, "BELOW PLEASE FIND A SHAREHOLDER UPDATE LETTER FROM

01:04PM 17      THERANOS CEO ELIZABETH HOLMES."

01:04PM 18           DO YOU SEE THAT?

01:04PM 19      A.   I DO SEE THAT.

01:04PM 20      Q.   SO THAT'S AT THE VERY BOTTOM OF THIS FIRST PAGE.

01:04PM 21           NOW, IF YOU'LL TURN WITH ME TO PAGE 2.

01:04PM 22           THERE'S AN EMAIL FROM AND TO THERANOS FROM JULY OF 2013,

01:04PM 23      "DEAR SHAREHOLDER.

01:04PM 24           "IT IS WITH GREAT PLEASURE THAT I WRITE TO INFORM YOU OF

01:04PM 25      OUR UPCOMING CONSUMER LAUNCH."

01:04PM 1          DID YOU KNOW WHAT THAT WAS A REFERENCE TO?

01:04PM 2     A.   AT THIS TIME THERANOS WAS UNDERTAKING A CONSUMER LAUNCH

01:04PM 3     WHERE, IN PARTNERSHIP WITH DIFFERENT RETAIL ESTABLISHMENTS, TO

01:05PM 4     BE ABLE TO TAKE THEIR TECHNOLOGY DIRECTLY TO THE CONSUMER AND

01:05PM 5     PUT IT IN CLOSE PROXIMITY TO WHERE THE CONSUMERS WERE.

01:05PM 6     Q.   DO YOU KNOW IF, AT THIS TIME, YOU KNEW WHICH STORES OR

01:05PM 7     WHICH COMPANIES THERANOS WAS IN PARTNERSHIP WITH?

01:05PM 8     A.   YOU KNOW, AT THIS TIME IN JULY I DON'T BELIEVE THAT I KNEW

01:05PM 9     SPECIFICALLY.  CHRIS AND I HAD HAD SEVERAL CONVERSATIONS OVER

01:05PM 10    THE YEARS.

01:05PM 11         I SAY "OVER THE YEARS."  IN THOSE CONVERSATIONS THAT CHRIS

01:05PM 12    AND I WOULD HAVE HAD, I KNEW THAT THERE WAS A BUILDOUT BY SOME

01:05PM 13    MAJOR RETAIL CHAINS.  I THINK I KNEW THAT SAFEWAY WAS ONE OF

01:05PM 14    THOSE.  YOU KNOW, AND THERE WAS SPECULATION ABOUT WHO THE

01:05PM 15    OTHERS WOULD HAVE BEEN.

01:05PM 16         BUT I DON'T, I DON'T RECALL IF I KNEW KIND OF WHO AND

01:05PM 17    WHERE EXACTLY AT THIS POINT.

01:05PM 18    Q.   OKAY.  THE EMAIL CONTINUES.  "AS YOU ALL KNOW, WE HAVE

01:05PM 19    BEEN WORKING IN STEALTH MODE FOR SEVERAL YEARS TO PREPARE FOR

01:05PM 20    THIS."

01:05PM 21         WHAT IS STEALTH MODE A REFERENCE TO, IF YOU KNOW?

01:06PM 22    A.   YOU KNOW, I ASSUME IT'S, YOU KNOW, TRYING TO WORK BELOW

01:06PM 23    THE RADAR SO THAT YOU DON'T LOSE A COMPETITIVE ADVANTAGE BY

01:06PM 24    HAVING, YOU KNOW, OTHER PEOPLE KNOW THAT THE TECHNOLOGY IS

01:06PM 25    COMING AND IT'S GOING TO BE ROLLED OUT.

01:06PM 1    AND SO, YOU KNOW, IN PART THAT'S WHY I THINK -- OR AT

01:06PM 2    LEAST THAT'S WHY I HADN'T BEEN AS CONCERNED THROUGH THOSE YEARS

01:06PM 3    AT THE LACK OF INFORMATION THAT WE HAD BECAUSE IT FELT LIKE

01:06PM 4    THERE WAS A SPECIFIC PURPOSE THAT, YOU KNOW, WAS BEING

01:06PM 5    ANTICIPATED.

01:06PM 6        BUT TO ANSWER YOUR QUESTION, WORKING IN STEALTH MODE WAS

01:06PM 7    TO TRY TO DO IT SO THAT THEY COULD CAPITALIZE ON THE MARKET

01:06PM 8    WITHOUT A LOT OF COMPETITION AT THE MOMENT WHEN THEY LAUNCHED.

01:06PM 9    Q.   SO WAS THE LACK OF INFORMATION THAT YOU RECEIVED FROM AT

01:06PM 10   LEAST 2006 TO 2013 SOMETHING THAT YOU THOUGHT WAS INTENTIONAL,

01:07PM 11   INTENTIONAL BY THERANOS?

01:07PM 12   A.   I CERTAINLY THOUGHT THAT IT WAS INTENTIONAL THAT THEY WERE

01:07PM 13   TRYING TO KEEP THINGS UNDER WRAPS.

01:07PM 14   Q.   THE NEXT SENTENCE IS, "WITH THIS LAUNCH, WE WILL BEGIN

01:07PM 15   SENDING INFORMATION TO OUR SHAREHOLDERS THROUGH EMAIL BRIEFS."

01:07PM 16       WHAT DID THAT MEAN TO YOU?

01:07PM 17   A.   YOU KNOW, IT MEANT THAT, YOU KNOW, BECAUSE THEY HAD COME

01:07PM 18   TO A POINT IN TIME WHERE THEY ANTICIPATED BEING MORE PUBLIC

01:07PM 19   ABOUT THE PROGRESS THE COMPANY WAS MAKING WITH THE

01:07PM 20   SHAREHOLDERS, THAT THEY WOULD SEND OUT EMAILS DIRECTLY TO THE

01:07PM 21   SHAREHOLDERS WITH UPDATED INFORMATION.

01:07PM 22   Q.   AND IT CONTINUES.

01:07PM 23       OUR FIRST WEBSITE CONTENT IS UP TODAY.  THE BOARD IS

01:07PM 24   PUBLICLY LISTED AND THEY DID THEIR COMPANY'S FIRST PRESS

01:07PM 25   RELEASE.

01:07PM  1        DO YOU SEE THAT?

01:07PM  2   A.   I DO.

01:07PM  3   Q.   AND THEN ON THE NEXT PAGE AT THE BOTTOM, DO YOU SEE

01:08PM  4   INFORMATION REGARDING THE ADDITION OF MEMBERS OF THE BOARD OF

01:08PM  5   DIRECTORS?

01:08PM  6   A.   I DO.

01:08PM  7   Q.   "THERANOS ANNOUNCED TODAY THAT RICHARD KOVACEVICH AND

01:08PM  8   GENERAL JAMES MATTIS WERE APPOINTED TO ITS BOARD OF DIRECTORS."

01:08PM  9        DO YOU SEE THAT?

01:08PM 10   A.   I DO SEE THAT.

01:08PM 11   Q.   AND THEN FURTHER DOWN THERE'S SOME PRESS LINKS, A MARKET

01:08PM 12   WATCH AND A CNBC.

01:08PM 13        DO YOU SEE THAT?

01:08PM 14   A.   I DO.

01:08PM 15   Q.   WERE THERE OCCASIONS WHEN THERANOS SENT INFORMATION TO YOU

01:08PM 16   THAT INCLUDED LINKS TO ARTICLES IN THE PRESS?

01:08PM 17   A.   YOU KNOW, JUST TO BE CLEAR, THEY DIDN'T SEND IT TO ME

01:08PM 18   BECAUSE WE WERE NOT A DIRECT INVESTOR.  BUT THEY WOULD HAVE

01:08PM 19   SENT IT TO MR. LUCAS, AND MR. LUCAS WOULD HAVE FORWARDED IT TO

01:08PM 20   ME AND SO I WOULD HAVE RECEIVED THE LINKS.

01:08PM 21   Q.   YOU RECEIVED THIS THROUGH YOUR INVESTMENT IN BLACK DIAMOND

01:08PM 22   VENTURES?

01:08PM 23   A.   CORRECT.

01:08PM 24   Q.   AND DID YOU THINK THE CONTENT OF THESE ARTICLES THAT WAS

01:08PM 25   SENT ALONG TO INVESTORS WOULD BE ACCURATE?

01:09PM   1      A.   I DID.

01:09PM   2      Q.   IF YOU'LL NOW TURN TO EXHIBIT 4030, EXHIBIT 4030.

01:09PM   3           MR. TOLBERT, WHAT IS THIS DOCUMENT?

01:09PM   4      A.   THIS IS AN EMAIL THAT WE WOULD HAVE GOTTEN FROM

01:09PM   5      MR. LUCAS'S BLACK DIAMOND VENTURES ABOUT AN ANNUAL MEETING THAT

01:09PM   6      THEY WERE HAVING TO REVIEW THE INVESTMENTS THAT WERE MADE IN

01:09PM   7      THEIR FUND.

01:09PM   8      Q.   AND THEN THERE'S AN ATTACHMENT BEGINNING ON PAGE 3.

01:09PM   9           DO YOU RECOGNIZE THAT ATTACHMENT?

01:09PM  10      A.   CORRECT.  SO ONE OF THEIR PORTFOLIO INVESTMENT COMPANIES

01:09PM  11      WAS OBVIOUSLY THERANOS, AND SO THIS WAS A, YOU KNOW, AN UPDATE

01:10PM  12      ON THEIR INVESTMENT AT THERANOS THAT THEY FORWARDED ALONG IN

01:10PM  13      ANTICIPATION OF THEIR SHAREHOLDER MEETING.

01:10PM  14              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4030.

01:10PM  15              MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:10PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:10PM  17           (GOVERNMENT'S EXHIBIT 4030 WAS RECEIVED IN EVIDENCE.)

01:10PM  18      BY MR. SCHENK:

01:10PM  19      Q.   MR. TOLBERT, THE EMAIL IS FROM AN INDIVIDUAL NAMED

01:10PM  20      YASMIN IBARRA.

01:10PM  21           DO YOU KNOW WHO THAT IS?

01:10PM  22      A.   SHE WAS AN EMPLOYEE AT BLACK DIAMOND VENTURES.

01:10PM  23      Q.   AND ALSO LOOK AT THE ATTACHMENT STARTING ON PAGE 6.

01:10PM  24           ON PAGE 6 AT THE BOTTOM OF THE SLIDE, WELL, AT THE TOP IT

01:10PM  25      READS "NEWLY DEVELOPED WEBSITE."

01:10PM  1          DID YOU UNDERSTAND THAT THERANOS HAD RECENTLY UPDATED OR

01:10PM  2     DEVELOPED ITS WEBSITE?

01:10PM  3     A.   I DID.  I WOULD HAVE -- AS SOON AS THE WEBSITE WOULD HAVE

01:10PM  4     BEEN AVAILABLE, I WOULD HAVE LOOKED AT IT.

01:10PM  5     Q.   AT THE BOTTOM IT READS, "FOR THE FIRST TIME, THERANOS IS

01:10PM  6     INTRODUCING CLIA-CERTIFIED LABORATORY SERVICES WITH THE ABILITY

01:11PM  7     TO RUN ITS TEST ON MICRO-SAMPLES."

01:11PM  8          IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE THERANOS

01:11PM  9     TECHNOLOGY?

01:11PM  10    A.   IT IS.

01:11PM  11    Q.   AND IS THAT ALSO CONSISTENT WITH THE WAY THAT MS. HOLMES

01:11PM  12    EXPLAINED THE TECHNOLOGY TO YOU?

01:11PM  13    A.   YEAH.  I MEAN, I WILL SAY THAT WHEN -- SO WHEN THIS --

01:11PM  14    BEAR WITH ME.

01:11PM  15         WHEN THIS WAS SENT, THIS WAS NOVEMBER OF 2013, SO THE LAST

01:11PM  16    TIME I TALKED WITH MS. HOLMES AS I REMEMBER WAS IN 2006, SO

01:11PM  17    THAT WOULD HAVE BEEN A LOT OF YEARS BEFORE.

01:11PM  18         BUT THIS WAS CERTAINLY THE VISION THAT I FELT HAD BEEN

01:11PM  19    LAID OUT IN THE BEGINNING.

01:11PM  20    Q.   IN 2006, DID MS. HOLMES DESCRIBE THE TECHNOLOGY TO YOU?

01:11PM  21    A.   SHE DID.

01:11PM  22    Q.   AND ALSO HER VISION?

01:11PM  23    A.   CORRECT.

01:11PM  24    Q.   AND WAS THIS CONSISTENT WITH BOTH HER DESCRIPTION OF THE

01:11PM  25    TECHNOLOGY AND THE VISION?

01:11PM 1   A.   YEAH.  I MEAN, I DON'T REMEMBER HOW SPECIFICALLY IT LINED

01:11PM 2   UP, BUT I KNEW DIRECTIONALLY IT WAS.

01:11PM 3   Q.   AND DID YOU READ THIS AND WERE YOU SURPRISED THAT -- DID

01:12PM 4   THIS STRIKE YOU AS INCONSISTENT?

01:12PM 5   A.   NO.  I MEAN, IT CERTAINLY MADE SENSE, AND SO THAT'S WHERE

01:12PM 6   THINGS WERE HEADED.

01:12PM 7   Q.   OKAY.

01:12PM 8   A.   AND IN MY CONVERSATIONS WITH MR. LUCAS THROUGH THE YEARS,

01:12PM 9   THAT EVOLUTION OF WHERE THE TECHNOLOGY WAS HEADED, THIS MADE

01:12PM 10  PERFECT SENSE.

01:12PM 11  Q.   IF YOU'LL TURN NOW TO PAGE 7, THE NEXT PAGE.  THIS SLIDE

01:12PM 12  IN THE MIDDLE SAYS "THE LAB TEST, REINVENTED."

01:12PM 13       DO YOU SEE THAT?

01:12PM 14  A.   I DO.

01:12PM 15  Q.   AND THERE'S AN IMAGE OF A DEVICE CALLED A NANOTAINER.

01:12PM 16       DO YOU SEE THAT?

01:12PM 17  A.   I DO.

01:12PM 18  Q.   IS THAT ALSO CONSISTENT WITH THE WAY THAT YOU UNDERSTOOD

01:12PM 19  THAT THE THERANOS TECHNOLOGY TO BE BASED ON MS. HOLMES'S

01:12PM 20  STATEMENTS TO YOU AND HER DESCRIPTION OF THE VISION?

01:12PM 21  A.   IT IS.

01:12PM 22  Q.   IF YOU'LL NOW TURN TO PAGE 8.  UNDER "WELCOME TO

01:13PM 23  THERANOS," THERE'S SOME LANGUAGE.

01:13PM 24       IS THAT CLEAR ENOUGH FOR YOU TO READ?  CAN YOU SEE IT?

01:13PM 25  A.   I CAN.

| | | |
|---|---|---|

01:13PM  1

01:13PM  2    Q.  "THERANOS'S LABORATORY CAN ANALYZE SMALLER SAMPLES THAN

01:13PM  3    PREVIOUSLY POSSIBLE WITH SPEED AND THE HIGHEST LEVELS OF

01:13PM  4    ACCURACY.  IT'S EASIER ON YOUR PATIENTS AND HELPS YOU MAKE THE

01:13PM  5    BEST DIAGNOSIS AS FAST AS POSSIBLE."

01:13PM  6        I'M GOING TO ASK YOU, ACTUALLY, IF THIS IS CONSISTENT WITH

01:13PM  7    SOMETHING THAT YOU LEARNED A LITTLE BIT LATER.

01:13PM  8        BUT FOR NOW, DID I READ THAT CORRECTLY?

01:13PM  9    A.  YOU DID.

01:13PM 10    Q.  IF YOU'LL NOW TURN TO 1346.

01:13PM 11        IS 1346 ANOTHER EMAIL FROM MS. QUINTANA REGARDING YOUR

01:13PM 12    INVESTMENT IN THERANOS THROUGH BLACK DIAMOND VENTURES?

01:13PM 13    A.  IT IS.

01:14PM 14            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1346.

01:14PM 15            MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:14PM 16            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:14PM 17        (GOVERNMENT'S EXHIBIT 1346 WAS RECEIVED IN EVIDENCE.)

01:14PM 18    BY MR. SCHENK:

01:14PM 19    Q.  FIRST, AT THE VERY TOP WE SEE YOUR NAME ABOVE THE BLACK

01:14PM 20    LINE.

01:14PM 21        DO YOU SEE THAT?

01:14PM 22    A.  I DO.

01:14PM 23    Q.  AND EVEN THOUGH ON THE TO LINE IT JUST SAYS ANA QUINTANA,

01:14PM 24    DID YOU RECEIVE THIS EMAIL?

01:14PM 25    A.  CORRECT.  SHE SENT IT TO SEVERAL INVESTORS I THINK AND I

01:14PM  1    WAS ONE OF THOSE WHO WAS COPIED ON THAT.

01:14PM  2    Q.   THE DATE IS DECEMBER 18TH, 2013.

01:14PM  3         SO WE'RE COMING UP TOWARDS THE END OF THE YEAR.

01:14PM  4         SHE WRITES, "DEAR BLACK DIAMOND INVESTOR.  AN INVESTOR

01:14PM  5    CONFERENCE CALL HAS BEEN SCHEDULED FOR THIS FRIDAY,

01:14PM  6    DECEMBER 20TH, PROMPTLY STARTING AT 10:15 A.M. PACIFIC.  THE

01:14PM  7    CONFIDENTIAL UPDATE CALL WILL BE PRESENTED BY THERANOS'S CEO,

01:15PM  8    ELIZABETH HOLMES."

01:15PM  9         WAS THERE A CONFERENCE CALL ON DECEMBER 20TH?

01:15PM  10   A.   THERE WAS.

01:15PM  11   Q.   AND DID YOU PARTICIPATE IN THAT CALL?

01:15PM  12   A.   I DID.

01:15PM  13   Q.   AND WAS MS. HOLMES ALSO ON THE CALL?

01:15PM  14   A.   SHE WAS.

01:15PM  15   Q.   THE NEXT PARAGRAPH TALKS ABOUT THE THERANOS LAUNCH TO

01:15PM  16   CONSUMER HEALTH CARE THIS YEAR, THEY ARE RAPIDLY SCALING TO

01:15PM  17   ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE

01:15PM  18   HAVE TO SERVE AS THE ONLY CERTIFIED NATIONAL LABORATORY CAPABLE

01:15PM  19   OF RUNNING ANY OF ITS LABORATORY TESTS FROM A FEW TINY DROPLETS

01:15PM  20   OF BLOOD.

01:15PM  21        WAS THAT SOMETHING THAT WAS DISCUSSED ON THE CALL TWO DAYS

01:15PM  22   AFTER THIS EMAIL?

01:15PM  23   A.   IT WAS.

01:15PM  24   Q.   THE NEXT PARAGRAPH READS, "AS PART OF THIS INITIATIVE,

01:15PM  25   THEY'RE COMPLETING A SERIES OF FINANCIAL TRANSACTIONS WITH

01:15PM   1        STRATEGIC PARTNERS THAT PROVIDE ACCESS TO ADDITIONAL CAPITAL IN

01:15PM   2        ORDER TO ACCELERATE THEIR GROWTH."

01:15PM   3              AND THEN A SENTENCE OR TWO DOWN IT CONTINUES, "THE PRICE

01:16PM   4        PER SHARE OF THERANOS SERIES C-1 PREFERRED STOCK IN THE

01:16PM   5        TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013 IS $75

01:16PM   6        PER SHARE (PRE-SPLIT)."

01:16PM   7              DID YOU EVENTUALLY SEND MONEY TO THERANOS TO INVEST AT THE

01:16PM   8        END OF THIS YEAR?

01:16PM   9        A.   WE DID.  SO ON DECEMBER 31ST, WE DID MAKE AN INVESTMENT OF

01:16PM  10        $5 MILLION AT THE $75 SHARE LEVEL.

01:16PM  11        Q.   THAT'S MY QUESTION.  YOU BOUGHT AT $75 PER SHARE?

01:16PM  12        A.   CORRECT.

01:16PM  13        Q.   AND WERE THEY THE SERIES C-1?

01:16PM  14        A.   THEY WERE.

01:16PM  15        Q.   IN 2016, DO YOU RECALL WHAT THE SHARE PRICE WAS?

01:16PM  16        A.   YOU KNOW, SO THE 2 MILLION WE INVESTED WAS A LITTLE LESS

01:16PM  17        THAN $3 A SHARE.

01:16PM  18        Q.   AND NOW THEY'RE SELLING SHARES AT $75?

01:16PM  19        A.   CORRECT.

01:16PM  20        Q.   AND DID YOU UNDERSTAND THAT BETWEEN NOW -- IT READS THE

01:17PM  21        TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013, MEANT

01:17PM  22        THAT FROM THE CALL, WHICH WAS DECEMBER 20TH, YOU HAD ABOUT 10

01:17PM  23        OR 11 DAYS TO MAKE THE INVESTMENT?

01:17PM  24        A.   CORRECT.  AS I UNDERSTOOD IT, THE INVESTMENT WINDOW CLOSED

01:17PM  25        ON DECEMBER 31ST, AND SO THERE WAS A LIMITED AMOUNT OF TIME TO

01:17PM  1    REACT AND TO MAKE AN INVESTMENT DECISION.

01:17PM  2    Q.   OKAY.  SO YOU MENTIONED A MOMENT AGO THAT THERE WAS A

01:17PM  3    CALL, THE CALL HAPPENED ON DECEMBER 20TH; IS THAT RIGHT?

01:17PM  4    A.   THERE WAS A CALL.

01:17PM  5    Q.   AND DID YOU PARTICIPATE IN THIS CALL?

01:17PM  6    A.   I DID.

01:17PM  7    Q.   AND DID YOU RECORD THE CALL?

01:17PM  8    A.   I DID RECORD THE CALL.

01:17PM  9    Q.   AND WHEN DID YOU MAKE THE DECISION TO RECORD THE CALL?

01:17PM  10   A.   THE MORNING OF THE CALL, OR I GUESS AS THE CALL WAS

01:17PM  11   GETTING READY TO START.

01:17PM  12   Q.   WHY?  WHY DID YOU DECIDE TO RECORD THE CALL?

01:17PM  13   A.   YOU KNOW, SO MR. HALL AND I, THROUGH CONVERSATIONS THAT I

01:18PM  14   HAD HAD WITH CHRIS LUCAS, WE KNEW THAT THERE WAS A POTENTIAL

01:18PM  15   INVESTMENT OPPORTUNITY AND, YOU KNOW, WE HAD KIND OF DISCUSSED

01:18PM  16   THERANOS AND THE PROGRESS THAT THEY HAD MADE AND, YOU KNOW,

01:18PM  17   KIND OF ANTICIPATED WHAT A FURTHER INVESTMENT WOULD LOOK LIKE.

01:18PM  18        WE HAD ALSO HAD SOME FRUSTRATION THAT WE HADN'T, YOU KNOW,

01:18PM  19   THROUGH THOSE YEARS, HAD THE KIND OF FINANCIAL INFORMATION THAT

01:18PM  20   WE WOULD HAVE HAD FROM A NORMAL INVESTMENT.

01:18PM  21        AND SO MR. HALL AND I DISCUSSED DIFFERENT QUESTIONS THAT

01:18PM  22   WE WANTED TO ASK ELIZABETH, OR HEAR ASKED ON THIS CALL.

01:18PM  23        AND MR. HALL WAS GOING TO BE TRAVELLING POTENTIALLY, OR

01:18PM  24   NOT HAVE AN ABILITY TO BE ON THE CALL AND SO, YOU KNOW, THAT

01:18PM  25   MORNING, AS I THOUGHT ABOUT HOW TO CAPTURE THE INFORMATION ON

01:18PM 1    THE CALL, I'M NOT A VERY FAST TYPIST, AND SO I ELECTED TO

01:19PM 2    RECORD THE CALL TO MAKE SURE THAT I COULD RELAY TO MR. HALL ALL

01:19PM 3    OF THE PERTINENT INVESTMENT INFORMATION THAT WAS ON IT.

01:19PM 4    Q.   AND WHERE WERE YOU WHEN YOU WERE PARTICIPATING IN THE

01:19PM 5    CALL?

01:19PM 6    A.   I WAS IN MY OFFICE IN FRISCO, TEXAS.

01:19PM 7    Q.   DO YOU KNOW WHETHER MR. HALL -- WHERE WAS MR. HALL?  DO

01:19PM 8    YOU KNOW?

01:19PM 9    A.   DO YOU KNOW, HE WAS TRAVELLING, AND SO WHEN THE CALL

01:19PM 10   STARTED, I DIDN'T KNOW WHERE HE WAS OR EVEN IF HE WOULD BE ON

01:19PM 11   THE CALL.

01:19PM 12   Q.   DURING THE CALL, DID YOU LEARN WHETHER MR. HALL MADE IT TO

01:19PM 13   PARTICIPATE IN THE CALL?

01:19PM 14   A.   I DO.  HE ASKED A QUESTION, SO I ANTICIPATED HE WAS ON.

01:19PM 15   Q.   OKAY.  WHEN YOU HEARD HIM ASK A QUESTION ON THE CALL, DID

01:19PM 16   YOU SAY, WELL, I DON'T NEED THE TAPE ANYMORE, AND TURN OFF THE

01:19PM 17   TAPE?

01:19PM 18   A.   NO.  AT THAT POINT I WAS RECORDING AND I JUST CONTINUED TO

01:19PM 19   TYPE AND MAKE MY NOTES OF THE CALL, BUT CONTINUED TO RECORD IT.

01:19PM 20   Q.   AND AFTER THE CALL WAS OVER, DID YOU SAVE OR PRESERVE THE

01:20PM 21   TAPE?

01:20PM 22   A.   I DID.  I PUT THE TAPE IN MY DESK DRAWER AND THAT'S WHERE

01:20PM 23   IT STAYED.

01:20PM 24   Q.   AND AT SOME POINT, DID YOU THEN PRODUCE THAT TAPE TO THE

01:20PM 25   FEDERAL GOVERNMENT?

01:20PM  1      A.   I DIDN'T PRODUCE IT TO THE FEDERAL GOVERNMENT.

01:20PM  2           AT SOME POINT A FEW YEARS LATER WHEN I REMEMBERED I HAD

01:20PM  3      IT, I GAVE IT TO MY ATTORNEY AND I ASSUME THAT MY ATTORNEY MUST

01:20PM  4      HAVE PRODUCED IT.

01:20PM  5      Q.   AND HAVE YOU LISTENED TOD THAT RECORDING?

01:20PM  6      A.   I HAVE.

01:20PM  7      Q.   AND IN 2006, YOU SAID YOU HAD DINNER WITH MS. HOLMES?

01:20PM  8      A.   I DID.

01:20PM  9      Q.   AND DID YOU HAVE AN OPPORTUNITY TO OBSERVE HER VOICE AT

01:20PM 10      THAT DINNER?

01:20PM 11      A.   I DID.

01:20PM 12      Q.   AND WHEN YOU LISTENED TO THE RECORDING, DID YOU ALSO HAVE

01:20PM 13      AN OPPORTUNITY TO HEAR HER VOICE?

01:20PM 14      A.   I HEARD HER ON THE CALL.

01:20PM 15      Q.   AND DID YOU RECOGNIZE THE VOICE AS THE VOICE OF

01:20PM 16      MS. HOLMES?

01:20PM 17      A.   I DID.

01:20PM 18      Q.   DO YOU -- WHEN YOU LISTENED TO THE RECORDING, DO YOU

01:20PM 19      RECOGNIZE IT AS A RECORDING OF THIS DECEMBER 20TH, 2013 CALL?

01:21PM 20      A.   I DO.

01:21PM 21      Q.   AND DO YOU THINK THAT IT ACCURATELY RECORDS OR CAPTURES

01:21PM 22      THE CALL AS YOU HEARD IT THAT DAY?

01:21PM 23      A.   IT DOES.

01:21PM 24           MR. SCHENK:  SO THE RECORDING IS EXHIBITS 1348 AND

01:21PM 25      1349.

01:21PM  1        YOUR HONOR, AT THIS TIME THE GOVERNMENT WOULD OFFER 1348

01:21PM  2   AND 1349.

01:21PM  3             MR. DOWNEY:  NO OBJECTION, YOUR HONOR.

01:21PM  4             THE COURT:  THOSE EXHIBITS ARE ADMITTED.

01:21PM  5        (GOVERNMENT'S EXHIBITS 1348 AND 1349 WERE RECEIVED IN

01:21PM  6   EVIDENCE.)

01:21PM  7             THE COURT:  WHAT DO YOU INTEND TO DO WITH THOSE

01:21PM  8   EXHIBITS?

01:21PM  9             MR. SCHENK:  YOUR HONOR, I'VE TALKED TO THE DEFENSE

01:21PM 10   ABOUT 106 ISSUES.  WE'VE AGREED ON CLIPS TO PLAY.

01:21PM 11        SO WITH THE COURT'S PERMISSION, I WOULD LIKE TO PLAY A

01:21PM 12   HANDFUL OF CLIPS FROM 1348 AND 1349.

01:21PM 13             THE COURT:  THANK YOU.  DO YOU HAVE -- ARE YOU GOING

01:21PM 14   TO OFFER TRANSCRIPTS AT ALL OF THESE CALLS?

01:21PM 15             MR. SCHENK:  NO, YOUR HONOR.

01:21PM 16             THE COURT:  ALL RIGHT.  THANK YOU.

01:21PM 17        LADIES AND GENTLEMEN, WE'RE GOING TO -- YOU'RE NOW GOING

01:21PM 18   TO HEAR CLIPS, AS MR. SCHENK SAYS, FROM PHONE CALLS.

01:21PM 19        AND I'LL ASK YOU, MR. SCHENK, TO AUTHENTICATE THESE BEFORE

01:21PM 20   THE CLIP IS PLAYED, JUST THE DATE AND TIME, AND IF THEY RELATE

01:22PM 21   TO THE TESTIMONY THAT WE JUST HEARD.

01:22PM 22        YOU WILL NOT HAVE A TRANSCRIPT TO FOLLOW OF THESE, SO

01:22PM 23   PLEASE, LADIES AND GENTLEMEN, PLEASE LISTEN CLOSELY TO THE

01:22PM 24   CONVERSATIONS AND THE CONTENTS OF THE TAPES.

01:22PM 25        AND WHICH ONE WILL YOU PLAY FIRST?

01:22PM 1          GO AHEAD, MR. SCHENK.

01:22PM 2               MR. SCHENK:  THANK YOU.

01:22PM 3     Q.   MR. TOLBERT, ON THE FIRST CALL -- I'M SORRY, THE FIRST

01:22PM 4     EXHIBIT, 1348, I HAVE SEVEN CLIPS THAT I'D LIKE TO PLAY FOR

01:22PM 5     YOU, SO I'LL REFER TO THEM AS 1348-1 THROUGH 1348-7, AND THEN I

01:22PM 6     HAVE ONE CLIP ON 1349, SO THAT WILL JUST BE 1349-1.

01:22PM 7          JUST A COUPLE OF QUESTIONS BEFORE WE GET STARTED ON THAT.

01:22PM 8          DID MS. HOLMES KNOW THAT YOU WERE RECORDING?

01:22PM 9     A.   SHE DID NOT.

01:22PM 10    Q.   ON THE RECORDING WE CAN HEAR SOME TYPING.  HAVE YOU

01:22PM 11    NOTICED THAT?

01:22PM 12    A.   I HAVE.

01:22PM 13    Q.   WHO IS THAT?

01:22PM 14    A.   THAT'S ME TYPING.

01:22PM 15    Q.   THAT'S YOU TAKING NOTES DURING THE CALL?

01:23PM 16    A.   CORRECT.

01:23PM 17              MR. SCHENK:  OKAY.  SO THEN AGAIN WITH YOUR

01:23PM 18    PERMISSION, YOUR HONOR, WE'LL START WITH 1348-1.

01:23PM 19              THE COURT:  ARE YOU ASKING THAT THESE RECORDINGS

01:23PM 20    NEED NOT BE RECORDED BY THE COURT REPORTERS?

01:23PM 21              MR. SCHENK:  YES, I THINK THAT THAT'S FINE, BUT I

01:23PM 22    THINK I PROBABLY WOULD THEN APPEND TO THE TRANSCRIPT, APPEND TO

01:23PM 23    THE TRAIL TRANSCRIPT A TRANSCRIPT OF THE RECORDINGS, BUT I CAN

01:23PM 24    MEET AND CONFER WITH THE DEFENSE ON THAT.

01:23PM 25              THE COURT:  IF YOU'LL AGREE TO THAT, AN AGREED

01:23PM  1    TRANSCRIPT THAT COULD BE APPENDED, THAT WOULD BE ACCEPTABLE.

01:23PM  2    THEN OUR COURT REPORTERS NEED NOT TRANSCRIBE THESE CALLS.

01:23PM  3              MR. SCHENK:  YES, THANK YOU.

01:23PM  4              THE COURT:  DO YOU AGREE WITH THAT, MR. DOWNEY?

01:23PM  5              MR. DOWNEY:  WELL, I WOULD RATHER CONFER.  I HAD

01:23PM  6    ASKED IF THEY WOULD HAVE A TRANSCRIPT IN ADVANCE AND THEY SAID

01:23PM  7    NO, SO I GUESS IF IT'S AN ISSUE OF THE COURT REPORTERS

01:23PM  8    RECORDING THE TRANSCRIPT NOW.

01:24PM  9         I'M GOING TO TURN TO THE COURT REPORTER AND SEE IF IT'S

01:24PM 10    POSSIBLE TO RECORD THEM NOW.

01:24PM 11         (DISCUSSION OFF THE RECORD.)

01:24PM 12              THE COURT:  OUR COURT REPORTER SAYS SHE CAN TAKE

01:24PM 13    THESE DOWN.  I DON'T KNOW HOW FAST THE SPEAKING IS, BUT IF

01:24PM 14    THERE'S A PROBLEM WITH THIS, THE COURT REPORTER WILL LET US

01:24PM 15    KNOW AND OR WE CAN STOP OR WE CAN REPLAY IT.

01:24PM 16              MR. SCHENK:  YES.

01:24PM 17              MR. DOWNEY:  I SHOULD SAY ALSO, WE'LL HAVE NO

01:24PM 18    OBJECTION AT THE TIME THE JURY DELIBERATES TO RELISTENING TO

01:24PM 19    THE RECORDING.

01:24PM 20              THE COURT:  ALL RIGHT.  THANK YOU.  OKAY.  GO AHEAD,

01:24PM 21    MR. SCHENK.

01:24PM 22              MR. SCHENK:  THANK YOU VERY MUCH.

01:24PM 23         SO, MS. HOLLIMAN, IF WE COULD START WITH 1348-1.

01:24PM 24    Q.   I'LL PLAY THE WHOLE CLIP FOR YOU, AND SOMETIMES I MIGHT

01:24PM 25    HAVE SOME FOLLOW-UP QUESTIONS, AND SOMETIMES WE MIGHT JUST MOVE

01:24PM   1    TO THE NEXT CLIP.

01:24PM   2             THE COURT:  I'M SORRY, MR. SCHENK.  CAN YOU TELL US,

01:24PM   3    HOW LONG ARE THESE CLIPS?

01:24PM   4             MR. SCHENK:  THE LONGEST IS EIGHT MINUTES, BUT MOST

01:24PM   5    OF THEM ARE CLOSER TO TWO TO FOUR MINUTES.

01:25PM   6             THE COURT:  THAT'S HELPFUL.  THANK YOU.

01:25PM   7             MR. DOWNEY:  YOUR HONOR, MAY I JUST TALK TO

01:25PM   8    MR. SCHENK?

01:25PM   9             THE COURT:  YES, OF COURSE.

01:25PM  10         (DISCUSSION OFF THE RECORD.)

01:26PM  11             MR. DOWNEY:  YOUR HONOR, JUST THE APPROACH OF

01:26PM  12    PLAYING IT, I THOUGHT THAT OUR AGREEMENT WAS THAT WE WOULD PLAY

01:26PM  13    THE ENTIRE TAPE AND NOT BREAK IT UP, WHICH WAS THE SUBJECT OF

01:26PM  14    OUR 106 DISCUSSIONS.

01:26PM  15         I THINK MR. SCHENK HAD A DIFFERENT UNDERSTANDING, SO WE'RE

01:26PM  16    AT A LITTLE BIT OF A -- WE'LL NEED SOME GUIDANCE.

01:26PM  17             THE COURT:  OH.

01:26PM  18             MR. SCHENK:  YOUR HONOR, MY UNDERSTANDING IS THAT

01:26PM  19    THE DEFENSE IS REQUESTING THAT WE PLAY ALL -- THERE ARE EIGHT

01:26PM  20    TOTAL CLIPS, WE PLAY ALL EIGHT CLIPS, AND THEN I GO BACK AND

01:26PM  21    PLAY EACH ONE SEPARATELY AND ASK FOLLOW-UP QUESTIONS.

01:26PM  22         IN OUR MEET AND CONFER, MY UNDERSTANDING WAS THAT THE

01:26PM  23    DEFENSE WANTED TWO OF THE CLIPS TO BE PLAYED CONSECUTIVELY

01:26PM  24    BECAUSE IT CARRIES OVER.  THE LAST ONE OF 1348 AND THE FIRST

01:26PM  25    ONE OF 1349 ARE ABOUT THE SAME TOPIC.

01:26PM  1          SO I INTENDED TO DO THAT AND TO NOT SEPARATE THOSE TWO.

01:27PM  2          SO MY INTENTION WAS NOT TO PLAY ALL OF THEM AND THEN

01:27PM  3     REPLAY ALL OF THEM, BUT RATHER TO CAPTURE JUST THAT ONE.

01:27PM  4          BUT I MIGHT HAVE MISUNDERSTOOD DURING OUR MEET AND CONFER.

01:27PM  5              MR. DOWNEY:  YES, I APOLOGIZE.  I THINK WE DID NOT

01:27PM  6     CONNECT ON THAT.

01:27PM  7          I THINK WE VIEW THE ENTIRE CONVERSATION AS RELEVANT FOR

01:27PM  8     THE CONTEXT, AND I UNDERSTAND THAT, LIKE A DOCUMENT, THERE MAY

01:27PM  9     BE INDIVIDUAL PIECES OF IT THAT MR. SCHENK WANTS TO QUESTION

01:27PM 10     ABOUT, AND THAT'S OBVIOUSLY FAIR GAME.

01:27PM 11          AND HE'S GIVEN US SOME CLIPS WITH WHICH HE INTENDS TO DO

01:27PM 12     THAT.

01:27PM 13          SO I JUST WOULD HAVE THE RECORD REFLECT THAT I DIDN'T

01:27PM 14     CONSENT TO KIND OF SPLITTING THE TAPE UP AS IT'S PLAYED.

01:27PM 15              THE COURT:  ALL RIGHT.  BUT IT SOUNDS LIKE THE 1348

01:27PM 16     AND 1349 WILL BE PLAYED CONSECUTIVE FOR 106 PURPOSES AT LEAST

01:27PM 17     AS TO THAT.

01:27PM 18              MR. SCHENK:  YES.

01:27PM 19              THE COURT:  AND YOU DON'T HAVE ANY PROBLEM WITH THAT

01:27PM 20     OF COURSE.

01:27PM 21              MR. DOWNEY:  THAT'S FINE.

01:27PM 22              THE COURT:  ALL RIGHT.  WELL, THANK YOU FOR THIS.

01:27PM 23          I THINK, MR. SCHENK, WHY DON'T YOU PLAY THEM THE WAY THAT

01:27PM 24     YOU'VE INDICATED THAT YOU INTEND TO.  YOU'LL PLAY AND THEN

01:28PM 25     YOU'RE GOING TO EXAMINE, AND THEN PLAY AND THEN EXAMINE; IS

01:28PM   1    THAT RIGHT.

01:28PM   2              MR. SCHENK:  YES, YOUR HONOR.

01:28PM   3              THE COURT:  I THINK THAT MAKES SENSE TO PROCEED THAT

01:28PM   4    WAY.

01:28PM   5              MR. DOWNEY:  FAIR ENOUGH.

01:28PM   6              THE COURT:  THANK YOU.

01:28PM   7              MR. SCHENK:  PERMISSION TO PUBLISH?

01:28PM   8              THE COURT:  YES, PLEASE.

01:28PM   9              MR. SCHENK:  SO, MS. HOLLIMAN, IF WE COULD START

01:28PM  10    WITH 1348-1.

01:28PM  11         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

01:28PM  12         "MS. HOLMES:  ABSOLUTELY.  IT'S WONDERFUL TO SPEAK WITH

01:28PM  13    YOU ALL.  AND IT'S WONDERFUL TO -- TO BE IN A PLACE IN WHICH WE

01:28PM  14    CAN BEGIN TO TALK ABOUT THIS.  AS YOU ALL KNOW, WE HAVE BEEN

01:28PM  15    WORKING VERY HARD FOR A LONG TIME TO BUILD UP THIS

01:28PM  16    INFRASTRUCTURE.

01:28PM  17         "AND WHEN I STARTED THE COMPANY, WE KNEW THAT IT WOULD

01:28PM  18    TAKE US A LONG TIME TO BE ABLE TO ESTABLISH AN INFRASTRUCTURE

01:28PM  19    THAT COULD DO ANY LAB TEST THAT IS RUN IN A TRADITIONAL LAB

01:28PM  20    FROM A MICRO SAMPLE OR THESE TINY DROPLETS THAT WE TAKE NOW

01:28PM  21    FROM THE FINGER.

01:28PM  22         "AND WE THUS BUILT A BUSINESS AROUND OUR PARTNERSHIPS WITH

01:29PM  23    PHARMACEUTICAL COMPANIES AND OUR CONTRACTS WITH THE MILITARY

01:29PM  24    WHEREIN WE COULD DEPLOY OUR FRAMEWORK IN THE ONE CASE FOR

01:29PM  25    HELPING TO ACCELERATE CLINICAL TRIALS AND IN THE OTHER FOR

01:29PM 1   EXTREME USE CASE SITUATIONS IN TRAUMA AND OTHER AREAS WHERE

01:29PM 2   THERE WAS A VERY COMPELLING VALUE PROPOSITION.

01:29PM 3       "IN ORDER TO BUILD OUT OUR TEST MENU AND OUR

01:29PM 4   INFRASTRUCTURE TO BE ABLE TO GET TO THIS POINT, SEVERAL YEARS

01:29PM 5   AGO WE REALIZED THAT WE HAD CREATED AN INFRASTRUCTURE THAT

01:29PM 6   COULD, IN FACT, MAKE IT POSSIBLE TO GET RID OF PHLEBOTOMY OR

01:29PM 7   THE BIG TUBES OF BLOOD THAT ARE DRAWN FROM THE ARM IN ITS

01:29PM 8   ENTIRETY.

01:29PM 9       "AND WE BEGAN THIS WORK TO BE ABLE TO CREATE A FRAMEWORK

01:30PM 10  WHEREIN WORKING WITH INSURANCE COMPANIES, WORKING WITH

01:30PM 11  MEDICARE, WORKING WITH MEDICAID, WORKING WITH PHYSICIAN AND

01:30PM 12  HOSPITALS GROUPS, AND NOW RETAIL, WE COULD ESTABLISH WHAT HAS

01:30PM 13  THE OPPORTUNITY TO BE ULTIMATELY THE LARGEST LAB IN THE

01:30PM 14  COUNTRY.

01:30PM 15      "AND MOST IMPORTANTLY, TO CHANGE THE REALITY IN LAB

01:30PM 16  TESTING TODAY, WHICH IS THAT IT'S VERY PAINFUL AND 50 PERCENT

01:30PM 17  OF THE POPULATION DOESN'T DO IT IN TERMS OF COMPLIANCE WITH THE

01:30PM 18  REQUISITION FROM A PHYSICIAN TO DO A TEST BECAUSE THE FEAR OF

01:30PM 19  NEEDLES IS SUCH A GREAT PHOBIA.  AND EQUALLY THE FEAR OF HAVING

01:30PM 20  TO WAIT LONG PERIODS OF TIME FOR THE RESULTS DETERS MANY PEOPLE

01:30PM 21  FROM GETTING TESTED IN THE FIRST PLACE BECAUSE THEY DON'T WANT

01:30PM 22  TO BE SITTING AROUND WORRYING WHETHER THEY'RE POSITIVE WITH

01:31PM 23  SOMETHING OR NOT, FOR EXAMPLE."

01:31PM 24      MR. SCHENK:  THAT'S THE END OF 1348-1.

01:31PM 25      YOUR HONOR, I WONDER IF IT WOULD BE HELPFUL TO PROVIDE THE

01:31PM 1    COURT REPORTER A COPY OF THE TRANSCRIPT, EVEN IF WE'RE NOT

01:31PM 2    ATTACHING IT.

01:31PM 3            THE COURT:  IT WOULD BE.  I THINK IT WOULD BE, YES,

01:31PM 4    IF YOU HAVE ONE.

01:31PM 5            MR. SCHENK:  YES.

01:32PM 6        (DISCUSSION OFF THE RECORD.)

01:32PM 7            MR. SCHENK:  I HAVE A COPY FOR THE COURT.

01:32PM 8            THE COURT:  THAT WOULD BE HELPFUL.  THANK YOU.

01:32PM 9        I HAVE JUST BEEN INFORMED THAT OUR OVERFLOW ROOM, THE

01:32PM 10   REMOTE CONNECTION WE HAVE SOMEHOW IS DISCONNECTED, AND THEY'RE

01:32PM 11   ATTEMPTING TO REESTABLISH THAT.

01:32PM 12       SO MAYBE WE'LL TAKE OUR BREAK NOW, IF THAT'S CONVENIENT TO

01:32PM 13   EVERYONE.  WE'LL TAKE OUR BREAK.  LET'S TAKE 30 MINUTES.

01:32PM 14       THE OVERFLOW ROOM HAS A ZOOM CONNECTION.  APPARENTLY THE

01:32PM 15   ZOOM HAS DROPPED, AND IN FAIRNESS TO THE PUBLIC WHO ARE

01:32PM 16   WATCHING THIS TRIAL -- I AM INFORMED THERE ARE MEMBERS OF THE

01:32PM 17   PUBLIC IN THAT ROOM, AND IN FAIRNESS TO THEM, I THINK WE SHOULD

01:32PM 18   TRY TO GET THAT CONNECTION STARTED.

01:32PM 19       SO WE'LL TAKE OUR BREAK NOW.  30 MINUTES, I BELIEVE,

01:32PM 20   30 MINUTES, AND WE'LL SEE IF WE CAN GET THAT RESOLVED.

01:32PM 21       THANK YOU.  WE'LL BE IN RECESS FOR 30 MINUTES.

01:33PM 22           THE CLERK:  COURT IS IN RECESS.

01:33PM 23       (RECESS FROM 1:33 P.M. UNTIL 2:02 P.M.).

02:02PM 24       (JURY IN AT 2:02 P.M.)

02:02PM 25           THE COURT:  THANK YOU.  PLEASE BE SEATED.

02:02PM  1          WE'RE BACK ON THE RECORD.  WE'LL GET OUR WITNESS BACK.

02:02PM  2                MR. SCHENK:  YES, YOUR HONOR.

02:02PM  3                THE COURT:  BEFORE WE CONCLUDE FOR THE DAY, I'VE

02:02PM  4     GONE OVER OUR SCHEDULE AND I WANTED TO OFFER SOME CHANGES TO

02:02PM  5     OUR SCHEDULE AT THE END OF THE DAY TODAY FOR EVERYONE'S BENEFIT

02:02PM  6     AND ASK OUR JURY TO DO SOME RESEARCH WITH THEIR SCHEDULES OVER

02:02PM  7     THE WEEKEND.  BUT WE'LL SHARE THAT AT THE END OF THE DAY TODAY.

02:02PM  8                MR. SCHENK:  THANK YOU.

02:03PM  9          (PAUSE IN PROCEEDINGS.)

02:03PM 10                THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

02:03PM 11     ARE PRESENT.  MS. HOLMES IS PRESENT.  OUR JURY IS PRESENT.

02:03PM 12     MR. TOLBERT IS BACK ON THE STAND.

02:03PM 13          MR. SCHENK.

02:03PM 14                MR. SCHENK:  THANK YOU VERY MUCH.

02:03PM 15     Q.   MR. TOLBERT, I'LL REMIND YOU THAT YOU'RE STILL UNDER OATH.

02:03PM 16          BEFORE WE BROKE, I PLAYED FOR YOU THE FIRST CLIP.  IT'S

02:03PM 17     LABELLED 1348-1.

02:03PM 18          DO YOU RECALL THAT?

02:03PM 19     A.   I DO.

02:03PM 20     Q.   THE VOICE ON THE TAPE, DO YOU RECOGNIZE THAT VOICE?

02:03PM 21     A.   THAT WAS MS. HOLMES.

02:04PM 22     Q.   ON THAT, ON THAT SECTION, MS. HOLMES SAYS THAT WHEN SHE

02:04PM 23     STARTED THE COMPANY, SHE KNEW IT WOULD TAKE A LONG TIME TO

02:04PM 24     ESTABLISH AN INFRASTRUCTURE THAT COULD DO ANY LAB TESTS THAT

02:04PM 25     COULD DO ANY LAB TEST THAT IS RUN IN A TRADITIONAL LAB WITH A

02:04PM  1     MICRO SAMPLE OR THESE TINY DROPLETS THAT WE NOW TAKE FROM A

02:04PM  2     FINGER.

02:04PM  3          WHEN WE HEARD THAT, DID YOU DRAW ANY CONCLUSIONS ABOUT THE

02:04PM  4     CURRENT CAPABILITIES OF THE THERANOS TECHNOLOGY?

02:04PM  5     A.   WELL, MY UNDERSTANDING WAS THAT, YOU KNOW, WHEN THINGS HAD

02:04PM  6     STARTED IN 2006 OR WHEN WE HAD, YOU KNOW, THAT OPPORTUNITY TO

02:04PM  7     EXPLORE THINGS IN 2006, THAT WAS TRUE THAT THERE HAD BEEN A

02:04PM  8     PROGRESSION OF THINGS IN 2013 WHEN THE INVESTOR CALL WAS MADE.

02:04PM  9          SO MY UNDERSTANDING WAS THAT OVER THE YEARS THE

02:05PM  10    TECHNOLOGY, THEY HAD PERFECTED IT OR IMPROVED IT AND MADE LOTS

02:05PM  11    OF ADVANCES FROM BEING ABLE TO DO, YOU KNOW, SOME TEST, AND

02:05PM  12    BEING ABLE TO DO LOTS AND LOTS OF TESTS ON THE SAME DROP OF

02:05PM  13    BLOOD.

02:05PM  14    Q.   WAS THAT REPRESENTATION IMPORTANT TO YOU AND YOUR DECISION

02:05PM  15    TO INVEST LATER IN DECEMBER OF 2013?

02:05PM  16    A.   IT WAS.

02:05PM  17    Q.   WHY?

02:05PM  18    A.   WELL, YOU KNOW, IF THEY HAD SPENT SEVEN YEARS WORKING ON

02:05PM  19    BUILDING A DEVICE THAT COULD DO TESTS AND THEY COULDN'T DO ANY

02:05PM  20    MORE TESTS THAN THEY DID SEVEN YEARS PRIOR, THEN IT WOULD HAVE

02:05PM  21    BEEN CONCERNING BECAUSE THERE WOULDN'T HAVE BEEN A LOT OF

02:05PM  22    PROGRESS THAT WOULD HAVE BEEN MADE.

02:05PM  23          BUT MY UNDERSTANDING WAS THAT THINGS REALLY PROGRESSED AND

02:05PM  24    IT REALLY PRESENTED AN OPPORTUNITY TO ENGAGE IN THIS CONSUMER

02:05PM  25    ROLLOUT WHERE ANYBODY COULD GO TO THEIR DOCTOR AND GET AN ORDER

02:05PM 1    TO HAVE THE TEST DONE AND THAT TEST COULD BE DONE ON THIS

02:06PM 2    DEVICE.

02:06PM 3    Q.   LATER IN THAT SAME CLIP WHEN MS. HOLMES SAYS, "WE HAVE

02:06PM 4    THUS BUILT A BUSINESS AROUND OUR PARTNERSHIPS WITH

02:06PM 5    PHARMACEUTICAL COMPANIES AND OUR CONTRACTS WITH THE MILITARY

02:06PM 6    WHEREIN WE CAN DEPLOY OUR FRAMEWORK IN THE ONE CASE FOR HELPING

02:06PM 7    TO ACCELERATE CLINICAL TRIALS AND IN THE OTHER FOR EXTREME USE

02:06PM 8    CASE SITUATIONS IN TRAUMA AND OTHER AREAS WHERE THERE WAS A

02:06PM 9    VERY COMPELLING VALUE PROPOSITION."

02:06PM 10        DID YOU UNDERSTAND MS. HOLMES TO BE MAKING STATEMENTS

02:06PM 11   ABOUT THE WORK THAT THERANOS HAD DONE FIRST WITH PHARMACEUTICAL

02:06PM 12   COMPANIES AND SECOND WITH THE MILITARY?

02:06PM 13   A.   I DID.

02:06PM 14   Q.   AND WERE THOSE REPRESENTATIONS IMPORTANT WHEN YOU DECIDED

02:06PM 15   TO INVEST LATER THAT MONTH?

02:06PM 16   A.   THEY WERE.

02:06PM 17   Q.   WHY?

02:06PM 18   A.   WELL, IT REPRESENTED BUSINESS THAT THERANOS NEEDED TO HAVE

02:06PM 19   TO GENERATE REVENUE.  IF THEY HAD NOT HAD, YOU KNOW, AN ABILITY

02:06PM 20   TO DO WHAT THEY SET OUT TO DO, THEN THERE WOULDN'T HAVE BEEN A

02:07PM 21   REASON TO INVEST.

02:07PM 22   Q.   LATER ON IN THAT CLIP MS. HOLMES SAYS, "WE COULD ESTABLISH

02:07PM 23   WHAT HAS THE OPPORTUNITY TO BE ULTIMATELY THE LARGEST LAB IN

02:07PM 24   THE COUNTRY."

02:07PM 25        DID YOU UNDERSTAND THAT AT THIS TIME IN DECEMBER OF 2013

02:07PM 1    THERANOS WAS NOT YET THE LARGEST LAB IN THE COUNTRY?

02:07PM 2    A.   OH, I DIDN'T -- YOU KNOW, IN MY MIND I DIDN'T REALLY THINK

02:07PM 3    ABOUT THERANOS AS ITS OWN LAB.

02:07PM 4        I THOUGHT THAT THERE WERE THESE, YOU KNOW, DEVICES THAT A

02:07PM 5    DROP OF BLOOD WOULD BE, YOU KNOW, KIND OF TESTED ON SITE AND

02:07PM 6    SO, YOU KNOW, I GUESS MAYBE THINKING ABOUT ALL OF THOSE DEVICES

02:07PM 7    AS BEING CONNECTED AS A LABORATORY THAT WOULD HAVE MADE SENSE,

02:07PM 8    BUT I DIDN'T REALIZE, YOU KNOW, EXACTLY WHAT THAT -- I DIDN'T

02:07PM 9    THINK ABOUT THERANOS AS ONE BIG LAB.  I THOUGHT ABOUT IT AS

02:08PM 10   THIS DISTRIBUTED NETWORK OF, YOU KNOW, TESTING CAPABILITIES, IT

02:08PM 11   COULD KIND OF BE DEPLOYED ANYWHERE.

02:08PM 12   Q.   AND WHEN MS. HOLMES SAID THAT THEY HAD THE OPPORTUNITY TO

02:08PM 13   ULTIMATELY BE THE LARGEST LAB, DID YOU UNDERSTAND HER TO, IN

02:08PM 14   THAT INSTANCE, TO BE FORWARD LOOKING, SOMETHING THAT THEY HAD

02:08PM 15   NOT YET ACCOMPLISHED, BUT THAT THEY COULD ACCOMPLISH

02:08PM 16   POTENTIALLY IN THE FUTURE?

02:08PM 17   A.   WELL, I CERTAINLY THOUGHT THAT THERE WOULD BE CONTINUED

02:08PM 18   GROWTH OF CAPABILITIES, YOU KNOW, WELL INTO THE FUTURE.  I

02:08PM 19   DIDN'T THINK THAT THE TECHNOLOGY HAD FINISHED EVOLVING OR WAS

02:08PM 20   AT A PERFECT STATE.

02:08PM 21       YOU KNOW, I THOUGHT THAT IT REPRESENTED AN OPPORTUNITY TO

02:08PM 22   GO HAVE TESTS DONE, YOU KNOW, BY ANY, ANY CONSUMER OR BY, YOU

02:08PM 23   KNOW, ON THOSE PHARMACEUTICAL TRIALS OR IN MILITARY

02:08PM 24   APPLICATIONS.

02:08PM 25       SO, YOU KNOW, MY UNDERSTANDING WAS THAT THERE WAS

02:08PM  1    SIGNIFICANT CAPABILITY AT THIS MOMENT IN TIME, BUT THAT IT

02:09PM  2    WOULD CONTINUE TO PROGRESS AND BE PERFECTED.

02:09PM  3    Q.   OKAY.

02:09PM  4         YOUR HONOR, WITH PERMISSION I'LL NOW PUBLISH 1348-2.

02:09PM  5              THE COURT:   YES.

02:09PM  6    BY MR. SCHENK:

02:09PM  7    Q.   MR. TOLBERT, THE VOICE THAT WE'RE GOING TO HEAR IS ALSO

02:09PM  8    MS. HOLMES'S VOICE?

02:09PM  9    A.   I ASSUME IT WILL BE.

02:09PM 10    Q.   OKAY.  I'LL ASK YOU THAT WHEN THE CLIP IS OVER.

02:09PM 11    A.   OKAY.

02:09PM 12    Q.   THANK YOU.

02:09PM 13         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:09PM 14         "MS. HOLMES:  AND SO NOW IN THIS FRAMEWORK THAT WE HAVE

02:09PM 15    CREATED, WE'VE BUILT AN OPPORTUNITY FOR PEOPLE TO BE ABLE TO DO

02:09PM 16    THEIR TEST IN A WHOLE NEW WAY AND BECOME MORE COMPLIANT WITH

02:09PM 17    BEING ABLE TO GET ACCESS TO THIS LABORATORY DATA, WHICH IS

02:09PM 18    INCREDIBLY POWERFUL INFORMATION THAT DRIVES SO MUCH OF CLINICAL

02:09PM 19    DECISION MAKING AND IN DOING SO CREATES A RICHER DATA FRAMEWORK

02:09PM 20    FOR THE PURPOSE OF BEING ABLE TO BETTER CHARACTERIZE THE

02:10PM 21    PROGRESSION OF CERTAIN CONDITIONS BY VIRTUE OF THE FACT THAT

02:10PM 22    NOT ONLY ARE WE HELPING TO GET PEOPLE TESTED -- BECAUSE IT'S A

02:10PM 23    SMALL SAMPLE, WE CAN GET PEOPLE TESTED AT THE NEEDED

02:10PM 24    FREQUENCIES.

02:10PM 25         "AND BECAUSE NOW THE SAMPLE IS FRESH AND IT'S NOT, YOU

02:10PM   1    KNOW, A BIG SERIES OF TUBES OF BLOOD THAT ARE SITTING ON A

02:10PM   2    COUNTER AND EXPOSED TO TEMPERATURE, WE DON'T SUFFER THE RATES

02:10PM   3    OF DECAY OF KEY ANALYTES THAT HAPPEN WHEN YOU SHIP SAMPLES OFF

02:10PM   4    TO A CENTRAL LAB.

02:10PM   5        "AND THEN BY VIRTUE OF THE FACT THAT OUR ANALYTICAL

02:10PM   6    INFRASTRUCTURE IS STANDARDIZED SO WE DON'T HAVE THE VARIABILITY

02:10PM   7    THAT IS ASSOCIATED WITH TRADITIONAL LABORATORY TESTING.

02:10PM   8    MEANING, TODAY IF YOU GO TO A LAB IN SAN FRANCISCO AND YOU GO

02:10PM   9    TO A LAB IN L.A. ON THE SAME DAY FOR THE SAME VALUE, ONE COULD

02:11PM  10    REPORT A RESULT THAT IS, FOR EXAMPLE, ON A TEST LIKE HDL

02:11PM  11    CHOLESTEROL, PLUS OR MINUS 30 PERCENT FROM SOME STANDARD AND BE

02:11PM  12    CONSIDERED ACCURATE IN THE EYES OF REGULATORS.

02:11PM  13        "WHICH MEANS ON THE SAME DAY FOR A SINGLE TEST, BASED ON

02:11PM  14    THE FACT THAT EACH LAB IS CENTRALIZED AND HAS ITS OWN LAB

02:11PM  15    DIRECTOR AND HAS ITS OWN REFERENCE RANGE AND USES ITS OWN

02:11PM  16    EQUIPMENT WHICH IS DIFFERENT FROM WHAT OTHER LABS USE, YOU

02:11PM  17    COULD SEE A 60 PERCENT VARIANCE IN DATA.

02:11PM  18        "AND IF YOU START TO THINK ABOUT HOW THAT COMPOUNDS OVER

02:11PM  19    TIME, IT MAKES IT VERY DIFFICULT TO LOOK LONGITUDINALLY AT THE

02:11PM  20    PROGRESSION OF A CONDITION BY VIRTUE OF THE FACT THAT THERE'S

02:11PM  21    SO MUCH NOISE BETWEEN TIME POINTS.

02:11PM  22        "AND HERE BECAUSE THIS IS A SINGLE FRAMEWORK AND WE HAVE

02:12PM  23    BUILT THIS OUT IN SUCH A WAY IN WHICH WE HAVE A LESS THAN

02:12PM  24    5 PERCENT VARIANCE ON OUR TESTS, IF WE BEGIN TO SEE A CHANGE OF

02:12PM  25    30 PERCENT IN PATIENT VALUES OVER TIME, IT'S BECAUSE IT'S

02:12PM   1    CLINICAL.

02:12PM   2        "AND THIS IS A RICHNESS OF DATA FOR THE PHYSICIAN

02:12PM   3    COMMUNITY THAT HAS NOT BEEN ACCESSIBLE BEFORE.  AND IT ALLOWS

02:12PM   4    THE PHYSICIAN TO BEGIN LOOKING AT LABORATORY DATA IN THE SAME

02:12PM   5    WAY THAT PEOPLE TALK ABOUT LOOKING AT A TEST FOR PSA, FOR

02:12PM   6    CANCER, PROSTATE CANCER, CALLED PSA, WHICH THEY FOCUS MORE ON

02:12PM   7    THE RATE OF RANGE OR ITS VELOCITY THAN THEY DO ON ITS ABSOLUTE

02:12PM   8    CONCENTRATION AT ANY GIVEN POINT IN TIME.

02:12PM   9        "AND WE'RE GOING TO BE ABLE TO START PRESENTING THIS

02:12PM  10    LABORATORY INFORMATION IN THAT WAY SO THAT IT CAN BE USED MORE

02:12PM  11    TOWARDS EARLY DETECTION."

02:12PM  12    BY MR. SCHENK:

02:12PM  13    Q.   MR. TOLBERT, THAT'S THE END OF 1348-2.

02:13PM  14        DID YOU RECOGNIZE THE VOICE ON THAT RECORDING?

02:13PM  15    A.   I DID.  THAT WAS MS. HOLMES.

02:13PM  16    Q.   IN THAT PORTION WHEN MS. HOLMES SAYS THAT "BECAUSE NOW THE

02:13PM  17    SAMPLE IS FRESH AND IT'S NOT, YOU KNOW, A BIG SERIES OF TUBES

02:13PM  18    OF BLOOD THAT ARE SITTING ON A COUNTER AND EXPOSED TO

02:13PM  19    TEMPERATURE, WE DON'T SUFFER THE RATES OF DECAY OF KEY ANALYTES

02:13PM  20    THAT HAPPEN WHEN YOU SHIP SAMPLES OFF TO A CENTRAL LAB."

02:13PM  21        WHEN MS. HOLMES SAYS IT'S NOT "A BIG SERIES OF TUBES OF

02:13PM  22    BLOOD," DID YOU UNDERSTAND THAT TO BE A REPRESENTATION ABOUT

02:13PM  23    THE WAY THERANOS, AND THE VOLUME OF BLOOD THAT THERANOS

02:13PM  24    COLLECTS?

02:13PM  25    A.   I DID.

02:13PM  1    Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:13PM  2    A.   WELL, WHEN I GO TO THE DOCTOR AND HAVE A LAB TEST, THEY

02:13PM  3    DRAW LOTS OF VIALS OF BLOOD AND THOSE GET SHIPPED OFF TO A

02:13PM  4    CENTRAL LABORATORY SITE WHERE THEY GET TESTED.

02:13PM  5         YOU KNOW, MY UNDERSTANDING OF THERANOS IS THAT I WOULD

02:14PM  6    POTENTIALLY GO TO THE DOCTOR, OR WHEREVER, AND GIVE A FINGER

02:14PM  7    PRICK OF BLOOD AND THEY CAN RUN THOSE TESTS ON SITE WITHOUT

02:14PM  8    HAVING TO BE SHIPPED OFF BECAUSE BEING SHIPPED OFF CAUSE SOME

02:14PM  9    VARIABILITY IN THE RESULTS.

02:14PM  10        AND SO, YOU KNOW, IT FELT LIKE IT WAS A BIG ADVANTAGE TO

02:14PM  11   BE ABLE TO DO THAT TESTING KIND OF IN HOUSE OR ON SITE.

02:14PM  12   Q.   AND HOW ABOUT THE VOLUME ALSO?  FOR INSTANCE, WHEN YOU GO

02:14PM  13   TO YOUR DOCTOR AND YOU GET BLOOD DRAWN FROM THE VEIN IN YOUR

02:14PM  14   ARM, IS THE VOLUME DIFFERENT THAN WHAT YOU UNDERSTOOD THERANOS

02:14PM  15   TO BE OFFERING?

02:14PM  16   A.   SURE.  THAT'S ONE OF THE REASONS WHY I WAS SO EXCITED

02:14PM  17   ABOUT IT.  I -- WHEN I SEE THOSE FOUR OR FIVE VIALS OF BLOOD

02:14PM  18   COMING OUT, I START FEELING A LITTLE -- THE EFFECTS OF THAT.

02:14PM  19        THE IDEA OF BEING ABLE TO HAVE MY FINGER STUCK AND GIVE

02:14PM  20   THAT SAMPLE AND HAVE THOSE TESTS RUN FROM THAT SMALL SAMPLE

02:15PM  21   SIZE WAS INTRIGUING, AND, YOU KNOW, CERTAINLY SEEMED TO SPEAK

02:15PM  22   TO WHAT -- TO THE REFERENCE THAT HAD BEEN MADE THAT MORE AND

02:15PM  23   MORE PEOPLE WOULD DO MORE AND MORE TESTS BECAUSE IT WOULD BE

02:15PM  24   MUCH LESS INVASIVE.

02:15PM  25   Q.   IF THERANOS DREW THOSE BIG TUBES OR VIALS OF BLOOD FROM

02:15PM  1    THE VEIN IN THE ARM, WOULD YOU LOSE THIS ADVANTAGE THAT YOU

02:15PM  2    JUST DESCRIBED TO ME?

02:15PM  3    A.   CERTAINLY.

02:15PM  4    Q.   FURTHER ON IN THIS PORTION MS. HOLMES SAYS, "BECAUSE THIS

02:15PM  5    IS A SINGLE FRAMEWORK AND WE HAVE BUILT THIS OUT IN SUCH A WAY

02:15PM  6    IN WHICH WE HAVE A LESS THAN 5 PERCENT VARIANCE ON OUR TESTS,

02:15PM  7    IF WE BEGIN TO SEE A CHANGE OF 30 PERCENT IN PATIENT VALUES

02:15PM  8    OVER TIME, IT'S BECAUSE IT'S CLINICAL."

02:15PM  9         DID YOU UNDERSTAND MS. HOLMES TO BE MAKING REPRESENTATIONS

02:15PM  10   ABOUT THE VARIANCE IN THERANOS TEST RESULTS DEVICE TO DEVICE

02:15PM  11   BEING LESS THAN THE VARIANCE IN, LET'S SAY, ONE LAB TO ANOTHER

02:16PM  12   LAB WITH TRADITIONAL PHLEBOTOMY?

02:16PM  13   A.   I DID.

02:16PM  14   Q.   AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION

02:16PM  15   TO INVEST?

02:16PM  16   A.   IT WAS.   CERTAINLY IF, YOU KNOW, IF A NORMAL LAB COMPANY

02:16PM  17   HAD A 30 PERCENT OR GREATER VARIANCE AND I COULD GO IN AND HAVE

02:16PM  18   A LOT MORE CONFIDENCE THAT THE RESULTS DIDN'T HAVE THAT KIND OF

02:16PM  19   VARIANCE, I WOULD -- YOU KNOW, IT WOULD BE A MUCH MORE VALUABLE

02:16PM  20   TEST.

02:16PM  21        MY UNDERSTANDING FROM THE BEGINNING HAD ALSO BEEN THAT ONE

02:16PM  22   OF THE ADVANTAGES TO THE PHARMACEUTICAL COMPANIES IS WHEN THEY

02:16PM  23   DO THOSE DRUG TRIALS THAT, YOU KNOW, SOMEBODY TAKES A DRUG AND

02:16PM  24   THEN THEY MAY BE TESTED ONCE A WEEK OR ONCE A DAY.

02:16PM  25        BUT IF WE COULD NOW TEST, BECAUSE IT WAS IN A LOT LESS

02:16PM 1    INVASIVE WAY, THOSE TESTS COULD BE PERFORMED MUCH MORE

02:17PM 2    FREQUENTLY THAN WE -- I SAY "WE" -- THAT THERANOS WOULD HAVE

02:17PM 3    BEEN ABLE TO, YOU KNOW, CAPITALIZED ON DOING SOMETHING THAT

02:17PM 4    HADN'T BEEN DONE BEFORE.

02:17PM 5    Q.   OKAY.  WITH PERMISSION, YOUR HONOR, I WOULD NOW PLAY

02:17PM 6    1348-3.

02:17PM 7             THE COURT:  YES.

02:17PM 8         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:17PM 9         "MS. HOLMES:  WE HAVE LAUNCHED OUR RETAIL INFRASTRUCTURE.

02:17PM 10   WE ARE OPERATING NOW IN CALIFORNIA AND IN ARIZONA.  AND WE HAVE

02:17PM 11   OPENED OUR FIRST STORES AND HAVE PATIENTS COMING IN LIVE EVERY

02:17PM 12   DAY.  AND WE ARE WORKING TO EXPAND THAT AS FAST AS POSSIBLE.

02:17PM 13   THE SPEED WITH WHICH WE EXPAND IS CRITICAL IN THE CONTEXT OF

02:17PM 14   CAPTURING THE MARKET OPPORTUNITY THAT WE HAVE CREATED.

02:17PM 15        "AND WE'RE PUTTING A LOT OF RESOURCES INTO ESTABLISHING A

02:17PM 16   NATIONAL FOOTPRINT AS FAST AS WE CAN.  BUT THAT STARTS WITH

02:18PM 17   EXCELLENCE IN EACH LOCAL MARKET AND CAPTURING MARKET SHARE IN

02:18PM 18   EACH LOCAL MARKET, WHICH IS WHERE WE ARE FOCUSSED NOW.  AND AS

02:18PM 19   WE DO THAT, WE'RE LEVERAGING CAPITAL FROM OUR STRATEGIC

02:18PM 20   PARTNERS AND ALSO FROM EQUITY OPPORTUNITIES THAT WE HAVE ON THE

02:18PM 21   TABLE TO BE ABLE TO GROW VERY FAST.

02:18PM 22        "AND AS YOU ALL KNOW, WE HAVE RECENTLY ISSUED SHARES AT

02:18PM 23   $75 A SHARE.  AND FOR REFERENCE, THE INITIAL INVESTMENT IN

02:18PM 24   THERANOS THAT YOU ALL MADE WAS AT 82 CENTS.  AND SO WE ARE

02:18PM 25   ALREADY CREATING SIGNIFICANT VALUE.  AND OF COURSE, WE'RE --

02:18PM 1    WE'RE JUST GETTING STARTED IN THE CONTEXT OF BEING ABLE TO

02:18PM 2    ESTABLISH AND ROLL OUT THIS INFRASTRUCTURE.

02:19PM 3         AS WE GO FORWARD INTO 2014, IN ADDITION TO THE SPEED OF

02:19PM 4    SCALE PUTTING THE RESOURCES INTO THE BUSINESS TO BE ABLE TO

02:19PM 5    BUILD THE ORGANIZATIONS THAT ARE REQUIRED TO HANDLE THIS TYPE

02:19PM 6    OF CONSUMER TYPE BUSINESS IS ANOTHER CORE AREA OF FOCUS FOR US.

02:19PM 7    OBVIOUSLY, A GREAT CONTRAST IN THE CONTEXT OF A PHARMACEUTICAL

02:19PM 8    DEAL COULD BE VERY GREAT FINANCIALLY, BUT IT WAS VERY SMALL

02:19PM 9    RELATIVELY SPEAKING IN THE CONTEXT OF VOLUME.  AND NEXT TO WHAT

02:19PM 10   WE'RE FACING NOW, THERE'S, YOU KNOW, 7 MILLION PEOPLE IN THE

02:19PM 11   BAY AREA, 39 MILLION IN CALIFORNIA.  AND THAT SCALE IS VERY

02:19PM 12   DIFFERENT FROM THE SCALE ON WHICH WE'VE OPERATED IN THE PAST.

02:19PM 13        "SO WE'RE VERY FOCUSSED ON BEING ABLE TO ESTABLISH THE

02:20PM 14   OPERATIONAL FRAMEWORK TO BE ABLE TO HANDLE THAT TYPE OF VOLUME.

02:20PM 15   AND IT'S -- IT'S AN AREA THAT WE'RE SPENDING A LOT OF TIME ON

02:20PM 16   NOW.

02:20PM 17        "THE RETAIL INFRASTRUCTURE IS THE FOUNDATION FOR BEING

02:20PM 18   ABLE TO REACTIVATE A LOT OF THE PHARMACEUTICAL PROGRAMS THAT WE

02:20PM 19   DID THAT ALLOWED US TO BUILD THE BUSINESS FROM CASH FROM

02:20PM 20   OPERATIONS SINCE WE DID OUR SERIES C ROUND IN 2006.  AND

02:20PM 21   THERE'S A VERY STRONG SYNERGY BETWEEN THE ABILITY TO RUN

02:20PM 22   CLINICAL TRIALS AT RETAIL AND THE ABILITY TO SPEED AND ROLL IT

02:20PM 23   AND BETTER DEMONSTRATE THAT IT'S POSSIBLE TO DELIVER THERAPIES

02:20PM 24   IN A NEW WAY BY VIRTUE OF THE FACT THAT THIS TESTING CAN BE

02:20PM 25   DONE PRACTICALLY INSIDE A RETAIL PHARMACY WHERE THE DRUG IS

02:21PM  1    DELIVERED IN AND OF ITSELF.

02:21PM  2        "SO -- AND THE FOCUS ON THE PHARMACEUTICAL BUSINESS IS

02:21PM  3    STILL A SIGNIFICANT FOCUS FOR US AND WILL CONTINUE EFFECTIVELY

02:21PM  4    AS A BUSINESS UNIT AS WE NOW GROW AND WILL BE VERY SYNERGISTIC

02:21PM  5    WITH WHAT WE HAVE ESTABLISHED IN RETAIL.

02:21PM  6        "SO MAYBE -- CHRIS, LET ME PAUSE THERE AND JUST SEE OUT OF

02:21PM  7    WHAT I HAVE SAID SO FAR IF THERE'S ANY QUESTIONS ON ANYTHING WE

02:21PM  8    HAVE COVERED UP TO NOW."

02:21PM  9    BY MR. SCHENK:

02:21PM 10    Q.   MR. TOLBERT, THAT WAS THE END OF 1348-3.  WAS THAT

02:21PM 11    MS. HOLMES VOICE?

02:21PM 12    A.   YES, IT WAS.

02:21PM 13    Q.   AND WHEN MS. HOLMES SAYS "WE'RE LEVERAGING CAPITAL FROM

02:21PM 14    OUR STRATEGIC PARTNERS AND ALSO FROM EQUITY OPPORTUNITIES THAT

02:21PM 15    WE HAVE ON THE TABLE TO BE ABLE TO GROW VERY FAST," WHAT DID

02:21PM 16    YOU UNDERSTAND THAT TO BE SPEAKING TO?

02:22PM 17    A.   IF I REMEMBER RIGHT, THE WALGREENS PARTNERSHIP HAD BEEN

02:22PM 18    ANNOUNCED AND THERE WAS A POTENTIAL OF 8,000-PLUS RETAIL

02:22PM 19    LOCATIONS THAT NEEDED TO BE OUTFITTED, YOU KNOW, WITH EQUIPMENT

02:22PM 20    BUILDOUT AND PEOPLE, AND THAT THE PROCEEDS OF THIS FUND RAISE

02:22PM 21    THAT WAS UNDERWAY WOULD BE USED TO SCALE THAT OPPORTUNITY AGAIN

02:22PM 22    SO THAT, YOU KNOW, SO THAT THERE WEREN'T OTHER COMPETITORS THAT

02:22PM 23    WOULD COME IN AND TAKE ADVANTAGE OF UNDERSTANDING WHAT THERANOS

02:22PM 24    WAS DOING.

02:22PM 25    Q.   WHEN YOU JUST SAID THE PROCEEDS OF THIS FINANCIAL RAISE,

02:22PM 1      THIS FUND RAISING, DID YOU MEAN IF YOU INVESTED, THIS IS HOW

02:22PM 2      YOUR MONEY WOULD BE SPENT?

02:22PM 3      A.   CORRECT.  I THOUGHT THE INVESTMENT CASE, THE USE OF THE

02:22PM 4      PROCEEDS FROM OUR INVESTMENT THAT WE ULTIMATELY WOULD MAKE, AS

02:22PM 5      WELL AS OTHERS THAT WERE REFERENCED THERE BY STRATEGIC, BY

02:22PM 6      OTHER NOT JUST INVESTORS LIKE US, BUT BY RETAIL PARTNERS AND

02:23PM 7      OTHERWISE WOULD BE TO, YOU KNOW, TO SPEED THAT ROLLOUT AND TO

02:23PM 8      MAKE IT GO FASTER AND, YOU KNOW, KIND OF ACCOMPLISH WHAT IT WAS

02:23PM 9      DESIGNED TO ACCOMPLISH.

02:23PM 10     Q.   AND ARE YOU NOW DRAWING A DISTINCTION BETWEEN YOUR MONEY

02:23PM 11     BEING SPENT ON THE RETAIL ROLLOUT AS OPPOSED TO R&D AT

02:23PM 12     THERANOS, RESEARCH AND DEVELOPMENT TO ACTUALLY CREATE THE

02:23PM 13     TECHNOLOGY NECESSARY TO DO THE BLOOD TESTING?

02:23PM 14     A.   CORRECT.  IT FELT LIKE THE PROCEEDS OF THIS FUND RAISE

02:23PM 15     WERE NOT ABOUT PERFECTING THE TECHNOLOGY, ALTHOUGH I'M

02:23PM 16     CONFIDENT THAT THAT WOULD HAVE CONTINUED TO EVOLVE, BUT IT WAS

02:23PM 17     NOW AT A PLACE, RIGHT, WHERE THE COMPANY WAS OUT OF STEALTH

02:23PM 18     MODE, THEY ANNOUNCED THIS PARTNERSHIP, AND WE'RE GOING TO PUT

02:23PM 19     THESE, THIS CAPABILITY IN ALL OF THESE LOCATIONS JUST COSTS A

02:24PM 20     LOT OF MONEY TO PHYSICALLY DO THAT, AND SO THE POINT OF RAISING

02:24PM 21     THIS MONEY WAS TO BE ABLE TO ACCELERATE THAT DEPLOYMENT.

02:24PM 22     Q.   WAS THIS IMPORTANT IN YOUR DECISION TO INVEST, AND BY THIS

02:24PM 23     I MEAN THAT YOUR MONEY WOULD BE SPENT TO ACCELERATE THE

02:24PM 24     DEPLOYMENT THAT YOU JUST DESCRIBED?

02:24PM 25     A.   THAT'S CORRECT.  YOU KNOW, IF IT FELT TO US LIKE THE

TOLBERT DIRECT BY MR. SCHENK                4493

02:24PM  1    TECHNOLOGY STILL WAS IN ITS INFANCY OR DIDN'T WORK THE WAY IT

02:24PM  2    SEEMED TO, YOU KNOW, OUR INVESTMENT CONSIDERATION WOULD HAVE

02:24PM  3    BEEN A LOT DIFFERENT.

02:24PM  4    Q.   AND THAT SAME PORTION WHERE MS. HOLMES SAYS, "THE RETAIL

02:24PM  5    INFRASTRUCTURE IS THE FOUNDATION FOR BEING ABLE TO REACTIVATE A

02:24PM  6    LOT OF THE PHARMACEUTICAL PROGRAMS THAT WE DID THAT ALLOWED US

02:24PM  7    TO BUILD THE BUSINESS FROM CASH FROM OPERATIONS SINCE WE DID

02:24PM  8    OUR SERIES C ROUND IN 2006."

02:25PM  9         WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO,

02:25PM  10   BUILDING THE BUSINESS FROM CASH FROM OPERATIONS?

02:25PM  11   A.   WELL, MY UNDERSTANDING FROM THE TIME WE MADE OUR FIRST

02:25PM  12   INVESTMENT WAS THE BACKBONE OF THE BUSINESS HAD BEEN THESE

02:25PM  13   PHARMACEUTICAL TRIALS THAT THERANOS WAS ABLE TO HELP, AND SO

02:25PM  14   THERE WAS A LOT OF VALUE FOR THE PHARMACEUTICAL COMPANIES TO DO

02:25PM  15   THAT.

02:25PM  16        SO I HAD, YOU KNOW, ANTICIPATED FROM THAT FIRST INVESTMENT

02:25PM  17   THAT THE COMPANY HAD BEEN ABLE TO RECOGNIZE SIGNIFICANT AMOUNTS

02:25PM  18   OF CASH, PROFIT, TO BE ABLE TO REINVEST NOT ONLY IN R&D, BUT TO

02:25PM  19   KIND OF COVER ITS OWN OPERATIONAL BURN RATES.

02:25PM  20        AND THAT, YOU KNOW, WE WERE NOW AT A POINT WHERE THE

02:25PM  21   RETAIL FOCUS WOULD TAKE OVER.

02:25PM  22        BUT STILL, EVEN FROM DAY ONE AS I UNDERSTOOD IT, IT STILL

02:26PM  23   REPRESENTED A GREAT ADVANCEMENT FOR THESE PHARMACEUTICAL

02:26PM  24   COMPANIES BECAUSE NOW INSTEAD OF HAVING TO RECRUIT PATIENTS FOR

02:26PM  25   DRUG TRIALS TO COME TO SPECIFIC LOCATIONS, THEY COULD ENROLL

02:26PM  1      PEOPLE IN TRIALS THAT COULD JUST GO TO THEIR DOCTOR'S OFFICE OR

02:26PM  2      LOCAL PHARMACY.

02:26PM  3          AND SO IT REPRESENTED A GREAT GAIN AND EFFICIENCY FOR

02:26PM  4      THESE PHARMACEUTICAL COMPANIES TO CONTINUE AS WELL.

02:26PM  5      Q.   OKAY.  AND I WANT TO BE CLEAR, YOU SAID THAT YOU HAD AN

02:26PM  6      UNDERSTANDING THAT THERANOS WAS DOING SOME OF THIS

02:26PM  7      PHARMACEUTICAL WORK FROM BACK IN YOUR 2006 INVESTMENT AND ON,

02:26PM  8      SOMETIME AFTER THAT.

02:26PM  9          DID YOU GET THAT UNDERSTANDING IN PART FROM CHRIS LUCAS?

02:26PM 10      A.   CORRECT.  SO THOSE CONVERSATIONS THAT I HAD WITH CHRIS

02:26PM 11      OVER THE YEARS SUGGESTED THAT THOSE PHARMACEUTICAL TRIALS, YOU

02:26PM 12      KNOW, CONTINUED TO BE SOMETHING THAT THERANOS HAD AS A STAPLE

02:26PM 13      OF BUSINESS.

02:27PM 14      Q.   AND NOW ON THIS CALL, IS MS. HOLMES CONFIRMING THAT FOR

02:27PM 15      YOU, THAT THE PHARMACEUTICAL WORK WAS GENERATING CASH FOR

02:27PM 16      OPERATIONS?

02:27PM 17              MR. DOWNEY:  EXCUSE ME, YOUR HONOR.  OBJECTION,

02:27PM 18      YOUR HONOR, TO THOSE TWO STATEMENTS.

02:27PM 19          I THINK HE CAN CERTAINLY COMMENT ON HIS UNDERSTANDING,

02:27PM 20      WHICH HE HAS.

02:27PM 21          I THINK TO LINK STATEMENTS FROM TWO PEOPLE TOGETHER AND

02:27PM 22      TRY TO GET A CONFIRMATION IS INAPPROPRIATE.

02:27PM 23              THE COURT:  OVERRULED.

02:27PM 24              MR. SCHENK:  YOUR HONOR, WITH PERMISSION, I'LL NOW

02:27PM 25      TURN TO -- OH, I'M SORRY.  ONE MORE QUESTION.

1   Q.   ON 1348-3, WHAT WE HAVE JUST LISTENED TO, WHEN MS. HOLMES

2   SAYS "THE FOCUS ON THE PHARMACEUTICAL BUSINESS IS STILL A

3   SIGNIFICANT FOCUS FOR US," WHAT DID YOU TAKE THAT TO MEAN?

4   A.   JUST THAT FROM THE VERY BEGINNING, LIKE I DESCRIBED, I

5   THOUGHT PHARMACEUTICAL, THE PHARMACEUTICAL BUSINESS, YOU KNOW,

6   WAS A PROFITABLE OR A FOUNDATIONAL PART OF WHAT THERANOS WAS

7   DOING AND SO, YOU KNOW, I HAD NO INDICATION THAT THAT HAD NEVER

8   BEEN THE CASE.

9   Q.   AND WHEN SHE SAID IT IS STILL A SIGNIFICANT FOCUS AND YOU

10  HAD THIS CALL IN DECEMBER OF 2013 --

11  A.   DECEMBER OF 2013.

12  Q.   YES, I'M SORRY.  DID YOU THINK THAT THAT PHARMACEUTICAL

13  BUSINESS WAS STILL, IN DECEMBER OF 2013, A SIGNIFICANT FOCUS?

14  A.   I DID.

15          MR. SCHENK:  YOUR HONOR, WITH YOUR PERMISSION, I'LL

16  NOW PLAY 1348-4.

17          THE COURT:  YES.

18          MR. SCHENK:  THANK YOU.

19      (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

20      "QUESTIONER:  THANK YOU.  HI, ELIZABETH.  I GUESS I HAVE A

21  TWO-PART QUESTION.  FIRST OF ALL, IF YOU COULD JUST COVER

22  GENERALLY THE CURRENT CAPITALIZATION IN TERMS OF WHAT THE --

23  WHAT THE $75 A SHARE, WHAT THE CAPITALIZATION WOULD BE AND WHAT

24  YOU'RE LOOKING TO RAISE AND WHAT THE -- I TAKE IT FROM WHAT

25  YOU'VE SAID, BUT MAYBE YOU COULD GO INTO A LITTLE MORE OF THE

02:29PM  1    USE.  IS IT -- IS IT HEAVILY WEIGHTED TOWARD THE RETAIL BUILD

02:29PM  2    OUT WHICH YOU'RE LOOKING TO DO ON A NATIONAL BASIS AND HOW LONG

02:29PM  3    DO YOU EXPECT THE TIME-WISE TO DO THE BUILD OUT OF THE RETAIL

02:29PM  4    SIDE OF IT?

02:29PM  5        "MS. HOLMES:  ABSOLUTELY.  SO AND -- SO WHEN YOU ALL CAME

02:29PM  6    IN IN THE SERIES B AT PRE MONEY WAS ABOUT $20 MILLION VALUATION

02:29PM  7    OF THE COMPANY AND THAT WAS -- IT WAS PREVIOUSLY ASSOCIATED

02:29PM  8    WITH THE SERIES A PRICE OF 75 CENTS A SHARE.  NOW THE VALUATION

02:29PM  9    OF THE COMPANY IS -- IS JUST OVER $7 BILLION AND THAT'S AT THE

02:30PM  10   $75 A SHARE.

02:30PM  11       "AND THE RETAIL IS EXACTLY WHERE WE'RE FOCUSSING OUR

02:30PM  12   INVESTMENT AND THE -- IT'S REALLY NOW A QUESTION OF HOW FAST DO

02:30PM  13   WE SCALE, YOU KNOW, WHAT -- THE FACT THAT WE WILL SCALE IS A

02:30PM  14   GIVEN.  OUR RETAIL PARTNERS HAVE INVESTED HUNDREDS OF MILLIONS

02:30PM  15   OF DOLLARS IN BUILDING OUT THIS FRAMEWORK.  AND WE TOO HAVE

02:30PM  16   BEEN PREPARING FOR THIS FOR MANY YEARS NOW.  AND THE GOAL IS TO

02:30PM  17   BE ABLE TO BE NATIONAL VERY, VERY, VERY QUICKLY.

02:30PM  18       "SO THE IMMEDIATE FOCUS IS CALIFORNIA AND ARIZONA.

02:30PM  19   CERTAINLY, YOU KNOW, AS WE GO INTO 2014, ONE OF OUR GOALS FOR

02:30PM  20   2014 IS TO HAVE THOSE MARKETS AND BEACH HEADS IN TERMS OF

02:30PM  21   REALLY OWNING THE MARKETPLACE AND BEING ABLE TO EXPAND FROM

02:30PM  22   THEM.

02:30PM  23       "BUT THE ABILITY TO EXPAND THROUGHOUT RETAIL, ONCE YOU'VE

02:31PM  24   OPERATIONALIZED A GIVEN MARKET, IT IS -- IT'S NOT VERY

02:31PM  25   COMPLICATED.  AND, YOU KNOW, COMPANIES LIKE WALGREENS HAVE DONE

02:31PM  1     THIS VERY WELL IN AREAS LIKE THE FLU SHOT OR VACCINATION

02:31PM  2     BUSINESS WHERE THEY TRAINED ALL OF THEIR PHARMACISTS AND HAD IT

02:31PM  3     DEPLOYED NATIONALLY WITHIN, I THINK, ABOUT AN 18-MONTH PERIOD.

02:31PM  4          "AND THERE'S -- THERE'S A PARALLEL TO WHAT CAN BE DONE

02:31PM  5     HERE AND WE'RE WORKING TO DO THAT."

02:31PM  6     BY MR. SCHENK:

02:31PM  7     Q.   MR. TOLBERT, I'VE PLAYED FOR YOU NOW 1348-4.

02:31PM  8          DO YOU RECOGNIZE TWO INVOICES ON THIS PORTION?

02:31PM  9     A.   I DO.

02:31PM  10    Q.   AND WHO ARE THOSE INDIVIDUALS?

02:31PM  11    A.   THE FIRST INDIVIDUAL WAS CRAIG HALL, WHO IS MY BOSS, AND

02:31PM  12    THE SECOND WAS ELIZABETH HOLMES.

02:31PM  13    Q.   SO WAS THIS THE MOMENT YOU REALIZED MR. HALL DID MAKE IT

02:31PM  14    TO THE CALL?

02:31PM  15    A.   IT WAS.

02:31PM  16    Q.   AND I THINK YOU SAID YOU DIDN'T STOP THE RECORDING?

02:32PM  17    A.   I DID NOT.

02:32PM  18    Q.   AND DESCRIBE FOR THE JURY FOR A MOMENT THE STRUCTURE OF

02:32PM  19    THE CALL.  THE FIRST CLIPS WE HEARD MS. HOLMES TALKING, AND

02:32PM  20    THIS TIME WE HEARD A QUESTION.

02:32PM  21    A.   SO AT THE BEGINNING OF THE CALL, CHRIS LUCAS HAD JUST HAD

02:32PM  22    AN INTRODUCTORY COMMENT OR TWO AND THEN TURNED IT OVER TO

02:32PM  23    ELIZABETH.

02:32PM  24          YOU KNOW, SHE KIND OF WALKED THROUGH AN UPDATE OF WHERE

02:32PM  25    THE COMPANY WAS AND WHAT WAS GOING ON.

02:32PM   1            AND THEN AT THIS POINT, OR AT SOME POINT AROUND THIS TIME

02:32PM   2    ON THE CALL, IT OPENED UP FOR Q AND A, AND THIS WAS ONE OF THE

02:32PM   3    FIRST QUESTIONS.

02:32PM   4    Q.   SO THE FIRST PORTION THAT I'VE PLAYED FOR YOU BEFORE

02:32PM   5    MR. HALL, WAS THAT MS. HOLMES SPEAKING NOT IN RESPONSE TO

02:32PM   6    QUESTIONS, BUT RATHER GIVING, AS YOU SAID, I THINK AN OVERVIEW?

02:32PM   7    A.   CORRECT.

02:32PM   8    Q.   AND THEN THE INDIVIDUALS ON THE CALL HAD THE OPPORTUNITY

02:32PM   9    TO ASK QUESTIONS?

02:32PM  10    A.   CORRECT.

02:32PM  11    Q.   AND WHEN SHE RESPONDS TO MR. HOLMES'S QUESTION BY SAYING,

02:32PM  12    "IT'S REALLY NOW A QUESTION OF HOW WE SCALE.  YOU KNOW, THE

02:33PM  13    FACT THAT WE WILL SCALE IS A GIVEN."

02:33PM  14            WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:33PM  15    A.   WELL, WE KNEW THAT WALGREENS WAS A BIG OPPORTUNITY WITH

02:33PM  16    SOMETHING OVER 8,000 LOCATIONS.  I THINK AT THE TIME OF THIS

02:33PM  17    CALL THERE MAY HAVE BEEN, YOU KNOW, A DOZEN LOCATIONS OPENED OR

02:33PM  18    SOMETHING.

02:33PM  19            AND SO THE NEED TO GO FROM, YOU KNOW, 10 TO 8,000 IS

02:33PM  20    PRETTY SUBSTANTIAL.

02:33PM  21            SO IT FELT LIKE IT WAS GOING TO HAPPEN, IT'S JUST HOW FAST

02:33PM  22    CAN WE MAKE IT HAPPEN?  HOW FAST CAN WE GET IN ALL OF THESE

02:33PM  23    LOCATIONS?

02:33PM  24    Q.   AND WAS THAT SIGNIFICANT OR IMPORTANT IN YOUR DECISION TO

02:33PM  25    INVEST?

02:33PM  1    A.   IT WAS.  I MEAN, THAT -- YOU KNOW, THE OPPORTUNITY TO DO

02:33PM  2    THAT VOLUME OF TESTS, RIGHT, IF IT'S IN 8,000 LOCATIONS AND

02:33PM  3    REPRESENTED A SIGNIFICANT OPPORTUNITY, AND SO, YOU KNOW,

02:34PM  4    CERTAINLY IF, IF WE HAD THOUGHT THAT THOSE LOCATIONS WOULD NOT

02:34PM  5    BECOME OPERATIONAL, IT WOULD HAVE BEEN A BIG NEGATIVE FOR THE

02:34PM  6    INVESTMENT.

02:34PM  7              MR. SCHENK:  YOUR HONOR, WITH PERMISSION I'LL PLAY

02:34PM  8    1348-5.

02:34PM  9              THE COURT:  YES.

02:34PM  10         (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:34PM  11         "MEETING OPERATOR:  THANK YOU.  THE NEXT QUESTION COMES

02:34PM  12   FROM LARRY (INAUDIBLE).  PLEASE GO AHEAD.  LARRY, ARE YOU

02:34PM  13   THERE?

02:34PM  14         "QUESTIONER:  YES, I AM.

02:34PM  15         "HI ELIZABETH, THIS IS LARRY (INAUDIBLE).

02:34PM  16         "MS. HOLMES:  HI LARRY, HOW ARE YOU?

02:34PM  17         "QUESTIONER:  GOOD.  GOOD.  CONGRATULATIONS ON ALL OF THIS

02:34PM  18   PROGRESS.

02:34PM  19         "MS. HOLMES:  WELL, THANK YOU.

02:34PM  20         "QUESTIONER:  NOW, ELIZABETH, YOU MENTIONED THAT YOU MIGHT

02:34PM  21   HAVE SOME ADDITIONAL EQUITY ROUNDS THAT ARE COMING UP.  CAN YOU

02:34PM  22   GIVE ANY INDICATION OF HOW MUCH MONEY YOU WANT TO RAISE AND

02:34PM  23   WHAT MARKET CAPS YOU WOULD LIKE TO SEE YOURSELF ACHIEVE IN

02:34PM  24   THOSE ROUNDS?

02:34PM  25         "MS. HOLMES:  SURE.  ABSOLUTELY.  SO WE -- THIS RECENT

02:34PM 1    TRANSACTION AT $75 A SHARE IS ACTUALLY PART OF CONTRACTS THAT

02:35PM 2    WE HAVE WITH STRATEGIC ENTITIES AND PARTNERS WHO PREVIOUSLY HAD

02:35PM 3    AN EQUITY RELATIONSHIP WITH THERANOS AND HAD AN OPTION TO

02:35PM 4    EXERCISE TO INVEST ADDITIONAL CAPITAL BEFORE THE END OF 2013,

02:35PM 5    WHICH THEY LITERALLY JUST EXERCISED.  AND SO WE'RE WORKING

02:35PM 6    THROUGH THAT NOW, AS MANY OF YOU ALL KNOW IN SOME OF THE RECENT

02:35PM 7    SHAREHOLDER CONSENT AND -- AND THAT VALUATION THAT I PREVIOUSLY

02:35PM 8    MENTIONED IS ASSOCIATED WITH THOSE TRANSACTIONS.

02:35PM 9        "WE DO HAVE OFFERS ON THE TABLE RIGHT NOW FROM FINANCIAL

02:35PM 10   INSTITUTIONS THAT ARE IN THE SEVERAL HUNDRED MILLION DOLLAR

02:35PM 11   RANGE IN TERMS OF THE AMOUNT OF CAPITAL AND WE'RE CONSIDERING

02:35PM 12   THAT IN THE CONTEXT OF HOW WE -- HOW WE INVEST.  AND ALSO WE'RE

02:36PM 13   AWARE THAT CERTAIN SHAREHOLDERS HAVE SOME LIQUIDITY NEEDS.  AND

02:36PM 14   SO THE ABILITY TO PUT A LARGE AMOUNT OF CAPITAL INTO THE

02:36PM 15   COMPANY AND THEN WHEREIN AS RELEVANT AND AT THE RIGHT TIME FOR

02:36PM 16   THE BUSINESS ADDRESS THAT.  LIQUIDITY IS -- IS HOW WE'RE

02:36PM 17   LOOKING AT THAT AND THERE'S A VERY HIGH LIKELIHOOD THAT WE

02:36PM 18   WILL -- WE WILL DO TRANSACTIONS THAT ARE IN THE SEVERAL HUNDRED

02:36PM 19   MILLION DOLLAR RANGE.

02:36PM 20       "INSOFAR AS THE VALUATION, WE KNOW THAT IT IS HIGHER THAN

02:36PM 21   $75 A SHARE.  WE ARE HAVING NEGOTIATIONS RIGHT NOW ABOUT

02:36PM 22   EXACTLY WHAT PRICE WE PICK AND MORE IMPORTANTLY WHO WE PICK AS,

02:36PM 23   YOU KNOW, THE INVESTOR BASE HERE.

02:36PM 24       "AND SOME OF THIS IN TERMS OF WHAT THE ACTUAL PRICE PER

02:36PM 25   SHARE AND THEREFORE THE ASSOCIATED EQUITY CAPITALIZATION OF THE

02:36PM  1    COMPANY WILL BE IS GOING TO DEPEND ON HOW THAT PLAYS OUT, BUT

02:37PM  2    THAT'S SOMETHING THAT -- THAT IS GOING ON AS WE SPEAK AND --

02:37PM  3    AND WILL LIKELY BE EFFECTED EARLY IN Q1."

02:37PM  4         MR. SCHENK:  THAT'S THE END OF 1348-5.

02:37PM  5    Q.   MR. TOLBERT, DID WE HEAR A QUESTION AND MS. HOLMES'S VOICE

02:37PM  6    IN RESPONSE?

02:37PM  7    A.   WE DID.

02:37PM  8    Q.   AND MS. HOLMES MAKES A STATEMENT ABOUT THE AMOUNT OF MONEY

02:37PM  9    SHE INTENDED TO RAISE AND SHARE PRICE.

02:37PM  10        WAS THAT STUFF THAT WAS ALSO IMPORTANT TO YOU IN YOUR

02:37PM  11   DECISION TO INVEST?

02:37PM  12   A.   THEY WERE.  CERTAINLY TO THE EXTENT LIKE WE FELT LIKE IF

02:37PM  13   WE INVESTED, THERE WERE SEVERAL HUNDRED MILLION DOLLARS

02:37PM  14   ADDITIONAL INVESTMENT THAT WOULD COME THAT WOULD HELP

02:37PM  15   ACCOMPLISH THE DESIGNS OF THIS ROLLOUT THAT, YOU KNOW, IT WOULD

02:37PM  16   MAKE IT A LOT MORE CERTAIN THAT THERE WOULD BE A POSITIVE

02:37PM  17   OUTCOME TO IT.

02:37PM  18   Q.   SO IF THE -- AS YOU TESTIFIED A MOMENT AGO, IF THE

02:37PM  19   INVESTOR MONEY WOULD BE SPENT FOR THE WALGREENS ROLLOUT, IT WAS

02:37PM  20   IMPORTANT TO YOU THAT THERE WAS MORE MONEY COMING IN, NOT JUST

02:37PM  21   YOUR 5 MILLION?

02:37PM  22   A.   CORRECT.  YOU KNOW, THE ADDITIONAL MONEY THAT WOULD COME

02:38PM  23   IN JUST REPRESENTED ADDITIONAL SPEED AND CAPABILITY AND MORE

02:38PM  24   MARKETS THAT COULD BE SERVICED, PUT INTO SERVICE SOONER.

02:38PM  25   Q.   THANK YOU.

02:38PM  1          MR. SCHENK:  YOUR HONOR, WITH YOUR PERMISSION I'LL

02:38PM  2    NOW PLAY 1348-6.

02:38PM  3          THE COURT:  YES.

02:38PM  4     "QUESTIONER:  HI, ELIZABETH.  ALSO CONGRATULATIONS FROM

02:38PM  5    US.  THAT'S REMARKABLE WHAT YOU HAVE ACCOMPLISHED.

02:38PM  6     "AND JUST TO FOLLOW ON WHAT YOU WERE JUST DISCUSSING, I

02:38PM  7    ASSUME THAT WOULD ALL BE PRIVATE AND I'M WONDERING IF YOU SEE A

02:38PM  8    PUBLIC LIQUIDITY EVENT AT SOME POINT WHERE YOU GO OUT WITH AN

02:38PM  9    IPO.  I'M WONDERING ABOUT THAT.

02:38PM 10     "AND AS LONG AS I'M SPEAKING, I WAS -- I WAS ALSO CURIOUS

02:38PM 11    IF THERE'S A MILITARY ASPECT THAT YOU'RE GOING TO PURSUE.

02:38PM 12     "AND, AGAIN, SINCE I HAVE THE FLOOR, WITH REGARD TO

02:39PM 13    COMPETITION, CHRIS HAD MENTIONED THAT THERE DOESN'T APPEAR TO

02:39PM 14    BE ANY OUT THERE.  I'M WONDERING IF YOUR PATENT SIDE IS LOOKING

02:39PM 15    AT ANY CONCERNS THERE OR IF YOU THINK THERE'S ANY POSSIBILITY

02:39PM 16    FOR PATENT INFRINGEMENT OR -- OR OTHERS DOING SOMETHING SIMILAR

02:39PM 17    AND COMPETING WITH YOU.

02:39PM 18     "MS. HOLMES:  ABSOLUTELY.  AND I WILL START WITH THE FIRST

02:39PM 19    ONE.  SO THESE IMMEDIATE TRANSACTIONS WHEN WE'RE TALKING IN

02:39PM 20    DECEMBER, JANUARY, EARLY Q1 TIMEFRAME ARE ALL PRIVATE

02:39PM 21    TRANSACTIONS.

02:39PM 22     "WE HAVE PUT A CORPORATE STRUCTURE IN PLACE THAT POSITIONS

02:39PM 23    US TO BE ABLE TO PROCEED WITH FUTURE EQUITY RELATED EVENTS AND

02:39PM 24    RETAIN THE CONTROL TO REALIZE THE LONG-TERM VISION THAT WE

02:39PM 25    HAVE.  AND AS YOU KNOW, THIS COMPANY IS ABOUT BEING ABLE TO

02:40PM  1   CHANGE THE HEALTH CARE INDUSTRY.  AND THAT'S SOMETHING THAT,

02:40PM  2   YOU KNOW, WE PLAN ON DOING FOR THE NEXT 10, 20, 30, 40, 50,

02:40PM  3   60 YEARS.

02:40PM  4       "WE HAVE THE OPPORTUNITY TO CREATE AN INDUSTRY HERE AND

02:40PM  5   THAT'S WHAT THIS IS ABOUT.  SO WE HAVE ALWAYS BEEN VERY

02:40PM  6   LONG-TERM IN OUR MINDSET.  AND THE POTENTIAL FOR SOME TYPE OF

02:40PM  7   PUBLIC TRANSACTION, A PUBLIC OFFERING TRANSACTION DOWN THE ROAD

02:40PM  8   IS THERE.

02:40PM  9       "RIGHT NOW WE THINK THERE'S A LOT OF ADVANTAGES TO

02:40PM 10   CONTINUING TO OPERATE AS A PRIVATE COMPANY, ESPECIALLY IN THE

02:40PM 11   CONTEXT OF WHAT WE'VE JUST DONE WHERE WE MADE SOME VERY

02:40PM 12   DIFFICULT DECISIONS WHEN WE SIGNED OUR RETAIL CONTRACTS TO

02:40PM 13   EFFECTIVELY AGREE TO CONTRACTS THAT SAID WE COULDN'T TALK ABOUT

02:40PM 14   THIS BECAUSE THESE COMPANIES WERE PUTTING HUNDREDS OF MILLIONS

02:40PM 15   OF DOLLARS INTO THE INFRASTRUCTURE AND THEY HADN'T ANNOUNCED IT

02:40PM 16   TO THE STREET AND IT WAS MATERIAL AND PUBLIC INFORMATION AND

02:40PM 17   SOME OF IT STILL IS.

02:41PM 18       "AND SO -- AND SO WHAT WE GOT OUT OF THAT IS WE GOT A LEAD

02:41PM 19   TIME AND WE WERE ABLE TO LAUNCH AND -- AND REALLY SURPRISE THE

02:41PM 20   MARKET IN TERMS OF THE EXISTENCE OF THIS CAPABILITY AND THERE'S

02:41PM 21   A LOT OF POWER IN THAT FROM A MARKET OWNERSHIP STANDPOINT.  BUT

02:41PM 22   WE ARE -- WE ARE LOOKING AT LIQUIDITY OPTIONS AND AN IPO WOULD

02:41PM 23   BE ONE OF THEM.

02:41PM 24       "IN TERMS OF THE MILITARY ASPECT OF THIS, MILITARY IS A

02:41PM 25   BIG DEAL FOR US AND I CAN TELL YOU CONFIDENTIALLY A COUPLE OF

02:41PM  1    THE AREAS WHICH WE HAVE BEEN FOCUSSED THERE.

02:41PM  2         "ONE IS IN THE CONTEXT OF WORK IN THE MIDDLE EAST AND

02:41PM  3    SPECIFICALLY IN AFGHANISTAN.  THE SURVIVAL RATE OF OUR MEN AND

02:41PM  4    WOMEN IN THE FIELD WHEN THEY'RE HIT IS 98 PERCENT IF THEY GET

02:42PM  5    THROUGH THE DOORS OF AN EMERGENCY ROOM WITHIN 60 MINUTES FROM

02:42PM  6    THE POINT OF INJURY.  AND IF WE MISS THAT WINDOW THAT'S WHERE

02:42PM  7    THE BULK OF OUR FATALITIES OCCUR.

02:42PM  8         "AND SO THE ABILITY TO TAKE A TECHNOLOGY LIKE THIS AND PUT

02:42PM  9    IT IN FLIGHT, SPECIFICALLY ON A MEDEVAC, HAS THE POTENTIAL TO

02:42PM 10    CHANGE SURVIVAL RATES.  AND WHAT IT DOES IS IT MAKES IT

02:42PM 11    POSSIBLE TO BEGIN TRANSFUSION AND STABILIZATION IN PLACE.  AND

02:42PM 12    SO WE'RE BEEN DOING A LOT OF WORK THERE.

02:42PM 13         "WE HAVE ALSO BEEN DOING A LOT OF WORK FOR SPECIAL

02:42PM 14    OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE AREAS

02:42PM 15    WHERE NOT ONLY IS THERE NO CAPABILITY TO DO TESTING FOR CERTAIN

02:42PM 16    THINGS THAT NEED TO BE MEASURED, BUT IF SITUATIONS ARISE IN

02:42PM 17    WHICH THOSE TESTS ARE WARRANTED, THE MISSION IS ABORTED AND

02:43PM 18    PEOPLE ARE EVACUATED GENERALLY OUT OF CONTINENT.  AND SO WE'VE,

02:43PM 19    YOU KNOW, CREATED A DISTRIBUTED SYSTEM THAT CAN BE USED IN

02:43PM 20    REMOTE AREAS AND THAT IS -- THAT IS ANOTHER VENUE AND FOCUS FOR

02:43PM 21    US.  AND AS WE NOW REACH THIS STAGE IN OUR BUSINESS AND GOING

02:43PM 22    BACK TO THE COMMENT THAT I MADE EARLIER ON ORGANIZATION THAT

02:43PM 23    REALLY IS ANOTHER BUSINESS UNIT.

02:43PM 24         "AND SO THAT, THE PHARMACEUTICAL BUSINESS AND RETAIL ARE

02:43PM 25    THESE THREE UNITS THAT WE HAVE.  OBVIOUSLY TO BE ABLE TO DO

02:43PM  1    WHAT WE'VE JUST DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR

02:43PM  2    ONGOING PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD

02:43PM  3    FOCUS LIKE A LASER ON THIS AND EXECUTING ON THIS.

02:43PM  4        "AND THE SCALE OF THIS RETAIL INFRASTRUCTURE NOW IS WHERE

02:43PM  5    WE WILL CONTINUE TO FOCUS LIKE A LASER.  BUT AS WE GET THE

02:43PM  6    RESOURCES AND ORGANIZATIONS TO CAPTURE SOME OF THESE ADDITIONAL

02:44PM  7    OPPORTUNITIES IN PARALLEL, WE WILL PROCEED WITH THE

02:44PM  8    PHARMACEUTICAL AND MILITARY BUSINESS IN LEVERAGING SOME OF THIS

02:44PM  9    INFRASTRUCTURE AND THE RESOURCES FROM IT THAT WE'RE BUILDING

02:44PM  10   OUT NOW.  SO THAT, FOR THE LONG-TERM, WILL BE AN IMPORTANT

02:44PM  11   THING FOR US.  AND IT'S ALSO VERY SYMBOLIC BECAUSE IT'S OUR WAY

02:44PM  12   OF BEING ABLE TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY

02:44PM  13   WE CAN THERE."

02:44PM  14        MR. SCHENK:  THAT'S THE END OF 1348-6.

02:44PM  15        WITH THE COURT'S PERMISSION, I'LL CONTINUE PLAYING 1348-7

02:44PM  16   AND THEN 1349-1.  IT'S ALL A CONTINUATION.

02:44PM  17        THE COURT:  YES, PLEASE.

02:44PM  18   (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:44PM  19        "QUESTIONER:  INSOFAR AS COMPETITION IS CONCERNED, EXACTLY

02:45PM  20   THE REASON THAT WE WERE SO AGGRESSIVE ABOUT BEING IN SELF-MODE

02:45PM  21   WAS TO PRESERVE THE WINDOW FOR CAPTURING AS MUCH MARKET SHARE

02:45PM  22   AS POSSIBLE WITHOUT DIRECT COMPETITION.  WE HAVE NOT SEEN OTHER

02:45PM  23   COMPANIES DOING THIS THAT --"

02:45PM  24        MR. SCHENK:  AND THEN THAT'S THE END OF 1348-7.

02:45PM  25   Q.   MR. TOLBERT, DOES THE RECORDING CUT OFF AT THAT POINT?

02:45PM  1    A.   IT DOES.

02:45PM  2    Q.   AND THEN WHAT DID YOU DO?

02:45PM  3    A.   AND THEN I FLIPPED THE TAPE OVER AND STARTED RECORDING ON

02:45PM  4    THE SECOND SIDE OF THE TAPE.

02:45PM  5         MR. SCHENK:  OKAY.  MS. HOLLIMAN NOW, WITH THE

02:45PM  6    COURT'S PERMISSION, IF WE CAN PLAY 1349-1.

02:45PM  7         THE COURT:  YES.

02:45PM  8    (AUDIO PLAYED IN OPEN COURT ON THE RECORD.)

02:45PM  9    "MS. HOLMES:  -- LIKE, FOR EXAMPLE, THE ABILITY TO USE THE

02:45PM  10   CLOUD TO CONTROL A HEALTH DEVICE OR THE ABILITY TO RUN ANY

02:46PM  11   COMBINATION OF LAB TESTS ON, YOU KNOW, THESE DISTRIBUTED

02:46PM  12   DEVICES.  AND, OBVIOUSLY, WE HAVE COMPLIMENTED THOSE WITH A

02:46PM  13   VERY BROAD PORTFOLIO OF VERY NARROW CLAIMS, YEAH, BUT -- BUT WE

02:46PM  14   HAVE BEEN PREPARING FOR LITIGATION IN THE CONTEXT OF BEING ABLE

02:46PM  15   TO PROTECT THEM AND INTEND TO PROTECT THEM VERY AGGRESSIVELY.

02:46PM  16   "IN OUR CASE, IP LITIGATION IS NOT ABOUT LICENSING -- OR

02:46PM  17   IP PROSECUTION IS NOT ABOUT LICENSING, BUT IT'S ABOUT BEING

02:46PM  18   ABLE TO MAINTAIN OUR OWNERSHIP OF THIS SPACE.  WE HAVE A GREAT

02:46PM  19   LAWYER, DAVID BOIES, WHO JOINS US AT ALL OF OUR BOARD MEETINGS

02:46PM  20   WHO ALSO DOES OUR IP LITIGATION.  AND WE DID FILE A LAWSUIT

02:46PM  21   ABOUT A YEAR AND A HALF AGO OR TWO YEARS AGO AGAINST A PATENT

02:46PM  22   TROLL WHO HAD GONE TO SOME ELABORATE MEANS TO ATTEMPT TO STEAL

02:47PM  23   FROM AN INTELLECTUAL PROPERTY.

02:47PM  24   "AND OUR MAIN POINT THERE IS WE WILL NOT SETTLE ON ANY

02:47PM  25   INTELLECTUAL PROPERTY VIOLATION.  IN THAT CASE, THE SPECIFIC

02:47PM 1    PATENT IN QUESTION WAS -- WAS NOT -- WE HAVE THAT CONTENT

02:47PM 2    COVERED BY OTHER OF OUR PATENTS, BUT -- BUT SETTING THE

02:47PM 3    PRECEDENT THAT WE HAVE A ZERO TOLERANCE APPROACH TO

02:47PM 4    INTELLECTUAL PROPERTY VIOLATIONS OR PEOPLE TRYING TO THREATEN

02:47PM 5    US OR TRYING TO GET US TO SETTLE AND PAY THEM MONEY.  IT'S JUST

02:47PM 6    NOT SOMETHING THAT WE'RE GOING TO DO.

02:47PM 7         "AND I THINK ULTIMATELY AS WE GO FORWARD, OBVIOUSLY

02:47PM 8    CONTINUING TO BUILD OUT THE PORTFOLIO AND DEFENDING IT

02:47PM 9    AGGRESSIVELY ARE GOING TO BE TWO VERY IMPORTANT THINGS WHICH WE

02:47PM 10   WILL DO IN A BIG WAY.  BUT ULTIMATELY, OUR REAL STRATEGY HERE

02:47PM 11   IS THE SPEED OF EXECUTION AND THE WAY WE PRICE IN THE MARKET

02:47PM 12   WHICH IS A BIG DEAL.

02:48PM 13        "WE HAVEN'T TALKED ABOUT THIS DIRECTLY ON THIS CALL, BUT

02:48PM 14   WE ARE CHANGING THE COST STRUCTURE OF LABORATORY TESTING.  AND

02:48PM 15   THAT, YOU KNOW, ALSO HAS A COMPETITIVE ASPECT TO IT IN TERMS OF

02:48PM 16   WINNING AND OWNING THIS SPACE.  AND THEN DOING WHAT -- WHAT WE

02:48PM 17   LOVE AND TRY TO DO BEST, WHICH IS BEING ON VERSION 12 OF THIS

02:48PM 18   TYPE OF SYSTEM BY THE TIME ANYBODY ELSE CAN TRY TO BE ON

02:48PM 19   VERSION 1.  AND THAT'S A -- THAT'S AN ONGOING FOCUS FOR US

02:48PM 20   INTERNALLY."

02:48PM 21        "MEETING OPERATOR:  THERE ARE NO FURTHER QUESTIONS AT THIS

02:48PM 22   TIME.

02:48PM 23        "MR. LUCAS:  WELL, IF THERE'S ANYONE, PLEASE QUEUE UP WITH

02:48PM 24   DAWN IF THERE'S ANY OTHER QUESTIONS.

02:48PM 25        "ELIZABETH, JUST AS -- AS, YOU KNOW, AS AN OBSERVATION,

02:48PM  1    WHEN YOU PUBLISHED YOUR PRICES ON THE WEBSITE THAT ARE

02:48PM  2    SIGNIFICANTLY CLEARLY LOWER THAN -- THAN WHAT TYPICALLY LABS

02:49PM  3    CHARGE, HOW DOES THAT STRATEGY EVOLVE AND AS IT RELATES TO

02:49PM  4    MEDICAID OR MEDICARE AND SO FORTH?

02:49PM  5         "MS. HOLMES:  ABSOLUTELY.  AND I -- SO -- SO THERE'S --

02:49PM  6    THERE'S MULTIPLE ASPECTS OF THIS.  ONE IS OUR BELIEF THAT

02:49PM  7    ACCESS TO THIS LABORATORY INFORMATION, THIS BIOCHEMICAL

02:49PM  8    INFORMATION WHICH DRIVES MOST OF CLINICAL DECISIONS, IS A BASIC

02:49PM  9    HUMAN RIGHT AND IT SHOULD COST THE SAME NO MATTER WHO YOU ARE,

02:49PM 10    IF YOU'RE INSURED, YOU'RE UNINSURED, YOU'RE MEDICARE, YOU'RE

02:49PM 11    MEDICAID.  AND THAT -- THAT IS VERY DIFFERENT THAN THE WAY THAT

02:49PM 12    OTHER COMPANIES OPERATE IN THIS SPACE."

02:49PM 13         "MR. LUCAS:  OH, GOOD.  THANK YOU, ELIZABETH.

02:50PM 14         "MS. HOLMES:  WE ALSO BELIEVE THAT THE ABILITY TO CREATE A

02:50PM 15    TECHNOLOGY DRIVEN BUSINESS MODEL WHERE WE'RE GOING AFTER VOLUME

02:50PM 16    IN A BIG WAY AND MAKE THESE TESTS AVAILABLE AT REALLY LOW COSTS

02:50PM 17    AT THE SAME TIME HAS A GREAT POTENTIAL.

02:50PM 18         "AND IT'S ALSO DIFFERENT FROM WAYS PEOPLE HAVE OPERATED IN

02:50PM 19    THIS SPACE.  BECAUSE GENERALLY THE CONVERSATION IS, OH,

02:50PM 20    WE'VE -- YOU INVENTED THIS NEW TEST AND IT'S GOING TO BE REALLY

02:50PM 21    GOOD SO WE'RE GOING TO GO TRY TO CONVINCE MEDICARE TO PAY

02:50PM 22    $5,000 FOR THE TEST.  WE'RE TAKING THE SAME TESTS AND MAKING

02:50PM 23    THEM AVAILABLE FOR $30 AND WE'LL CONTINUE TO DO THAT.  WE ARE

02:50PM 24    THE FIRST COMPANY WHO HAS BILLED MEDICARE AND MEDICAID AT A

02:50PM 25    FRACTION OF WHAT THEY'RE WILLING TO REIMBURSE.  AND THAT'S VERY

02:50PM  1    INTERESTING BECAUSE WHAT HAPPENS AS A RESULT IS THAT THEY

02:50PM  2    SURVEY EVERY YEAR WHAT THEY'RE BEING BILLED AND REDUCE THEIR

02:51PM  3    REIMBURSEMENT THRESHOLDS ACCORDINGLY.

02:51PM  4         "AND SO IN THE CONTEXT OF THIS LOWER PRICING, THEIR

02:51PM  5    REIMBURSEMENT THRESHOLD WILL FALL AND WILL BE REDUCED OVER

02:51PM  6    TIME.  AND THE SAVINGS TO MEDICARE AND MEDICAID ARE SIGNIFICANT

02:51PM  7    AT -- IT'S PROJECTED TO BE AT LEAST $160 BILLION IN DIRECT OUT

02:51PM  8    OF POCKET SAVINGS OVER THE COURSE OF THE NEXT TEN YEARS.

02:51PM  9         "AND THERE ARE ADDITIONAL SAVINGS THAT COME WITH THE WAY

02:51PM 10    THAT IT CHANGES THE CARE PROCESS, MEANING WHAT'S HAPPENING

02:51PM 11    RIGHT NOW IN PALO ALTO IS THAT UNLIKE IN THE PAST WHERE I WOULD

02:51PM 12    GO SEE MY DOC.  THE DOC WOULD SAY, ELIZABETH, I HAVEN'T SEEN

02:51PM 13    YOU FOR A YEAR AND GO DO A TEST.

02:51PM 14         "I WOULD GO AND DO MY TEST AND COME BACK.  AND THE DOC

02:51PM 15    SAYS, OH, YOU KNOW, YOUR HEMOGLOBIN WAS SEVEN AND THAT MEANS

02:52PM 16    YOU'RE REALLY ANEMIC.  I DON'T KNOW WHAT KIND OF ANEMIA IT IS

02:52PM 17    SO I'M GOING TO PUT YOU ON THIS ANEMIA DRUG IMMEDIATELY AND GO

02:52PM 18    DO ANOTHER TEST SO I CAN FIGURE OUT WHAT KIND OF ANEMIA IT IS.

02:52PM 19         "SO I GO GET MY PRESCRIPTION, THE HEAVY DUTY DRUG.  AND IN

02:52PM 20    THE MEANTIME I DO MY SECOND LAB TEST AND I COME BACK FOR MY

02:52PM 21    THIRD OFFICE VISIT.  AND THE DOC SAYS, OH, IRON DEFICIENCY.

02:52PM 22    GET OFF THE DRUG AND TAKE SOME IRON PILLS.

02:52PM 23         "AND YOU HAVE THIS SIX-WEEK PROCESS WITH THREE OFFICE

02:52PM 24    VISITS, TWO LABS, ONE UNNECESSARY PRESCRIPTION.  AND BECAUSE WE

02:52PM 25    HAVE MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM

02:52PM 1    THESE TINY SAMPLES, THE PHYSICIAN CAN NOW SAY ON THE LAB FORM

02:52PM 2    IF, IN MY EXAMPLE, HEMOGLOBIN IS LOW, AUTOMATICALLY RUN IRON

02:52PM 3    AND B12 AND OTHER TESTS ON THE SAME SAMPLE BECAUSE BIG

02:52PM 4    DEDICATED TUBES OF BLOOD ARE NO LONGER REQUIRED TO RUN EACH OF

02:53PM 5    THOSE DIFFERENT ASSAY METHODOLOGIES WHICH REQUIRE THEIR OWN BIG

02:53PM 6    ANALYZERS IN A TRADITIONAL LAB.

02:53PM 7        "AND SO WE GET THESE LAB FORMS THAT SAY, OKAY, YOU KNOW,

02:53PM 8    IF THIS IS OUT OF RANGE, THEN RUN THIS.  AND ON THE SAME SAMPLE

02:53PM 9    IN THAT SAME WINDOW WHEN WE'RE PROCESSING THE SAMPLE, WE CAN DO

02:53PM 10   WHAT WE CALL THIS AUTOMATED REFLEX TO THOSE ADDITIONAL TESTS

02:53PM 11   AND THEN SEND THE DATA BACK TO THE DOC.  AND BECAUSE WE'VE

02:53PM 12   GENERATED THE DATA SO FAST, NAMELY, WITHIN HOURS, I, AS A

02:53PM 13   PATIENT, THEN COULD GO SEE MY DOC THAT AFTERNOON AND THE DOC

02:53PM 14   ALREADY HAS THE DATA.

02:53PM 15       "SO WE'RE STARTING TO SEE A SHIFT IN THE WORKFLOW WHERE,

02:53PM 16   FOR PEOPLE WHO HAVE PHYSICIANS, THEY'RE SENDING THE TESTS AHEAD

02:53PM 17   OF TIME AND THEN THEY'RE SEEING THE PATIENT.  AND THAT

02:53PM 18   SIGNIFICANTLY CHANGES SOME OF THE REDUNDANCY IN COSTS AROUND

02:53PM 19   VISITS THAT ARE ASSOCIATED WITH FOLLOW UP LAB TESTS AND/OR NOT

02:54PM 20   HAVING THE INFORMATION THAT IS NEEDED AT THE TIME A DIAGNOSIS

02:54PM 21   IS MADE.

02:54PM 22       "SO FROM A SAVINGS PERSPECTIVE TO MEDICARE AND MEDICAID

02:54PM 23   THAT IS A MUCH BIGGER DEAL THAN THE DIRECT OUT OF POCKET

02:54PM 24   SAVINGS THAT I PREVIOUSLY REFERENCED AND ULTIMATELY WILL LEAD

02:54PM 25   TO -- TO BETTER CARE IS THE GOAL."

02:54PM   1    BY MR. SCHENK:

02:54PM   2    Q.   MR. TOLBERT, FOR THE RECORD I'VE JUST PLAYED FOR YOU

02:54PM   3    1348-6, 1348-7, AND 1349-1.

02:54PM   4         ON EACH OF THOSE, DID YOU HEAR AND RECOGNIZE MS. HOLMES'S

02:54PM   5    VOICE?

02:54PM   6    A.   I DID.

02:54PM   7    Q.   AND IF WE COULD WORK THROUGH THEM BACKWARDS, SO THE MOST

02:54PM   8    RECENT ONE, 1349-1, DID YOU HEAR A GENTLEMAN ASK A QUESTION?

02:54PM   9    A.   I DID.

02:54PM  10    Q.   DID YOU RECOGNIZE THAT VOICE?

02:54PM  11    A.   I BELIEVE IT WAS CHRIS LUCAS.

02:54PM  12    Q.   IN MS. HOLMES'S RESPONSE SHE SAYS, "AND BECAUSE WE HAVE

02:55PM  13    MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM THESE

02:55PM  14    TINY SAMPLES."

02:55PM  15         DID YOU BELIEVE -- WHAT DID YOU TAKE THAT TO MEAN?

02:55PM  16    A.   WELL, I TOOK IT AT FACE VALUE, RIGHT?  THAT THERE WAS AN

02:55PM  17    OPPORTUNITY OUT OF A FINGERSTICK OF BLOOD TO RUN MULTIPLE TESTS

02:55PM  18    ON IT, AND TO RUN REFLECTS OF TESTS SO THAT IF TEST A SAID I

02:55PM  19    HAD A CERTAIN RESULT, THEN TEST B OR TEST C OR TEST D COULD BE

02:55PM  20    RUN.

02:55PM  21    Q.   AND WHEN SHE SAID THAT IT WAS POSSIBLE TO RUN ANY

02:55PM  22    COMBINATION OF THESE LAB TESTS, YOU SAID YOU TOOK IT AT FACE

02:55PM  23    VALUE.  DID YOU TRUST THAT SHE WAS TELLING YOU SOMETHING THAT

02:55PM  24    THERANOS CURRENTLY COULD DO, IT WAS A PRESENT CAPABILITY?

02:55PM  25    A.   I BELIEVE IT WAS A CAPABILITY THAT THEY HAD AT THAT POINT.

02:55PM   1    Q.   WHEN SHE SAID THAT "BIG DEDICATED TUBES OF BLOOD ARE NO

02:55PM   2    LONGER REQUIRED," WHAT DID YOU TAKE THAT TO MEAN?

02:55PM   3    A.   THAT THE TECHNOLOGY WAS AT A PLACE THAT A FINGERSTICK OF

02:56PM   4    BLOOD COULD BE USED TO DO THOSE TESTS AND THAT, YOU KNOW, IT

02:56PM   5    NEGATED THE NEED FOR THE BIG TUBES OF BLOOD.

02:56PM   6    Q.   AND SHE TALKED ABOUT SOMETHING THAT SHE CALLED AUTOMATED

02:56PM   7    REFLEX.

02:56PM   8         DID YOU UNDERSTAND WHAT SHE WAS TALKING ABOUT THERE?

02:56PM   9    A.   I DID.

02:56PM  10    Q.   AND WHAT DID YOU TAKE THAT TO MEAN?

02:56PM  11    A.   WELL, IF TEST A GIVES A CERTAIN RESULT, THEN TEST B OR

02:56PM  12    TEST C OR TEST D COULD HAVE BEEN RUN, AND, YOU KNOW, IN

02:56PM  13    RESPONSE TO WHAT TEST A SHOWED.

02:56PM  14    Q.   AND WHEN SHE SAID "WE CAN DO WHAT WE CALL THIS AUTOMATED

02:56PM  15    REFLEX," DID YOU UNDERSTAND THAT SHE WAS DESCRIBING REFLEX

02:56PM  16    TESTING AS A PRESENT CAPABILITY?

02:56PM  17    A.   I DID.

02:56PM  18    Q.   IF WE TURN BACK TO 1348-6.

02:56PM  19         DO YOU RECALL MS. HOLMES MAKING SOME STATEMENTS ABOUT THE

02:56PM  20    MILITARY?

02:56PM  21    A.   I DO.

02:56PM  22    Q.   AND I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THAT.

02:56PM  23         SHE SAYS, "IN TERMS OF A MILITARY ASPECT OF THIS, MILITARY

02:56PM  24    IS A BIG DEAL FOR US AND I CAN TELL YOU CONFIDENTIALLY A COUPLE

02:57PM  25    THE AREAS IN WHICH WE HAVE BEEN FOCUSSED THERE."

02:57PM 1    WHEN SHE SAID THE WORD THERE THAT SHE COULD TELL YOU

02:57PM 2    CONFIDENTIALLY, WHAT DID YOU TAKE THAT TO MEAN?

02:57PM 3    A.  THAT THIS IS INFORMATION THAT WASN'T PUBLIC AND THAT

02:57PM 4    WASN'T TO BE SHARED PUBLICLY, BUT THAT IT REPRESENTED

02:57PM 5    CAPABILITIES THAT THERANOS AND THE COMPANY HAD DEVELOPED AND

02:57PM 6    WERE, YOU KNOW, WERE OPERATIONAL AT THAT POINT.

02:57PM 7    Q.  AND WHEN SHE SAID, "ONE IS IN THE CONTEXT OF WORK IN THE

02:57PM 8    MIDDLE EAST AND SPECIFICALLY AFGHANISTAN," DID YOU TAKE THAT TO

02:57PM 9    MEAN THAT THERANOS HAD DONE WORK IN AFGHANISTAN?

02:57PM 10   A.  I DID.

02:57PM 11   Q.  AND SO WHEN SHE SAID "THE ABILITY TO TAKE A TECHNOLOGY

02:57PM 12   LIKE THIS AND PUT IT IN FLIGHT, SPECIFICALLY ON A MEDEVAC, HAS

02:57PM 13   THE POTENTIAL TO CHANGE SURVIVAL RATES," WHAT DID YOU TAKE THAT

02:57PM 14   TO MEAN?

02:57PM 15   A.  YOU KNOW, MY UNDERSTANDING FROM WHAT WE LISTENED TO WAS

02:57PM 16   THAT THE SOONER A TEST COULD BE ADMINISTERED TO FIGURE OUT, YOU

02:58PM 17   KNOW, HOW TO ADDRESS WHATEVER TRAUMATIC SITUATION THAT

02:58PM 18   HAPPENED, THAT SURVIVAL RATES WENT UP EXPONENTIALLY.

02:58PM 19   YOU KNOW, THIS IS SOMETHING THAT REALLY RESONATED WITH ME.

02:58PM 20   I HAVE A BROTHER WHO IS IN THE MARINES, AND HE DID A TOUR IN

02:58PM 21   AFGHANISTAN, SO THE THOUGHT THAT OUR SERVICE MEN AND WOMEN, IF

02:58PM 22   THEY GOT HURT, THERE WAS AN ABILITY TO, YOU KNOW, DO EVERYTHING

02:58PM 23   THAT WE COULD TO HELP THEM WAS SOMETHING THAT I THOUGHT

02:58PM 24   THERANOS WAS DOING.

02:58PM 25   Q.  SHE CONTINUES.  "AND WHAT IT DOES IS IT MAKES IT MAKES IT

02:58PM 1    POSSIBLE TO BEGIN TRANSFUSION AND STABILIZATION IN PLACE.  AND

02:58PM 2    SO WE HAVE BEEN DOING A LOT OF WORK THERE."

02:58PM 3         WHAT DID YOU UNDERSTAND THAT TO MEAN?

02:58PM 4    A.   SO I UNDERSTOOD THAT THERE HAD BEEN SIGNIFICANT WORK BEING

02:58PM 5    DONE TO DEPLOY THE THERANOS SYSTEM IN THEATRE AS IT WERE.

02:58PM 6    Q.   SHE SAYS, "WE HAVE ALSO BEEN DOING A LOT OF WORK FOR

02:58PM 7    SPECIAL OPERATIONS COMMAND IN THE CONTEXT OF MISSIONS IN REMOTE

02:59PM 8    AREAS WHERE NOT ONLY IS THERE NO CAPABILITY TO DO TESTING FOR

02:59PM 9    CERTAIN THINGS THAT NEED TO BE MEASURED, BUT IF SITUATIONS

02:59PM 10   ARISE IN WHICH THOSE TESTS ARE WARRANTED, THE MISSION IS

02:59PM 11   ABORTED AND PEOPLE ARE EVACUATED GENERALLY OUT OF CONTINENT."

02:59PM 12        WHAT DID YOU TAKE HER STATEMENTS ABOUT SPECIAL OPERATIONS

02:59PM 13   COMMAND?

02:59PM 14   A.   MY UNDERSTANDING WAS THAT THERANOS HAD BEEN, YOU KNOW,

02:59PM 15   WORKING WITH SPECIAL OPERATIONS COMMAND AND IT REPRESENTED A

02:59PM 16   PORTION OF THE BUSINESS THAT THEY HAD BEEN ENGAGED IN.

02:59PM 17        AND LIKE WE HEARD EARLIER, IT WASN'T THE PRIMARY FOCUS AT

02:59PM 18   THIS MOMENT IN TIME, BUT IT CERTAINLY REPRESENTED A CAPABILITY

02:59PM 19   AND A BUSINESS THAT THEY HAD PURSUED.

02:59PM 20   Q.   SHE SAYS, "AND SO WE'VE, YOU KNOW, CREATED A DISTRIBUTED

02:59PM 21   SYSTEM THAT CAN BE USED IN REMOTE AREAS AND THAT IS -- THAT IS

02:59PM 22   ANOTHER VENUE AND FOCUS FOR US."

02:59PM 23        WHAT DID YOU TAKE THAT TO MEAN?

03:00PM 24   A.   THAT THESE, YOU KNOW, DEPLOYMENTS IN MILITARY KIND OF

03:00PM 25   SITUATIONS WAS ONE OF THE THREE, YOU KNOW, BUSINESS UNITS THAT

03:00PM 1   HAD BEEN REPRESENTED TO KIND OF COMPLEMENT, YOU KNOW, THE

03:00PM 2   PHARMACEUTICAL BUSINESS AND THE CURRENT BIG RETAIL OPPORTUNITY

03:00PM 3   THAT WAS THE GENESIS FOR THIS CALL.

03:00PM 4   Q.   DID MS. HOLMES'S STATEMENTS ABOUT THE MILITARY PLAY A ROLE

03:00PM 5   IN YOUR DECISION TO INVEST?

03:00PM 6   A.   CERTAINLY THEY WOULD HAVE BEEN SUPPORTIVE TO AN INVESTMENT

03:00PM 7   DECISION TO PROCEED.

03:00PM 8   Q.   WHY?

03:00PM 9   A.   WELL, IF -- YOU KNOW, THIS WAS A SITUATION WHERE THERE WAS

03:00PM 10  AN INVESTMENT OPPORTUNITY THAT REPRESENTED A POTENTIAL TO MAKE

03:00PM 11  MONEY ON OUR INVESTMENT, BUT IT'S ALSO ONE THAT REPRESENTED AN

03:00PM 12  OPPORTUNITY TO DO GOOD AND TO, YOU KNOW, TO HELP CHANGE AN

03:00PM 13  INDUSTRY FOR THE BETTER.

03:00PM 14       AND SO, YOU KNOW, UNDERSTANDING THAT THERE WAS AN ABILITY

03:01PM 15  FOR, FOR WORK TO BE DONE WITH THE MILITARY TO HELP SERVICE MEN

03:01PM 16  AND WOMEN WHO WERE INJURED REPRESENTED, YOU KNOW, SOMETHING

03:01PM 17  THAT WAS AN EXCITING PART OF THE INVESTMENT BASIS FOR US.

03:01PM 18  Q.   AND MS. HOLMES SAYS, "AND IT'S ALSO VERY SYMBOLIC BECAUSE

03:01PM 19  IT'S OUR WAY TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY WE

03:01PM 20  CAN THERE."

03:01PM 21       DID YOU TAKE HER TO BE AGREEING WITH THE SENTIMENT THAT

03:01PM 22  YOU JUST EXPRESSED THAT YOU CAN MAKE MONEY, BUT YOU CAN ALSO DO

03:01PM 23  GOOD?

03:01PM 24  A.   YOU KNOW, CERTAINLY THAT'S WHAT I TOOK AWAY FROM THOSE

03:01PM 25  COMMENTS IS THAT, YOU KNOW, THERANOS WASN'T JUST ABOUT AN

03:01PM  1    OPPORTUNITY TO MAKE MONEY, BUT THAT IT WAS ABOUT -- IT WAS

03:01PM  2    ABOUT AN OPPORTUNITY TO MAKE MONEY, BUT TO DO SO IN A WAY THAT

03:01PM  3    WAS BENEFICIAL FOR LOTS AND LOTS AND LOTS OF PEOPLE.

03:01PM  4    Q.   AND THEN ON THE WHOLE OR IN GENERAL, WAS THIS CALL

03:01PM  5    IMPORTANT IN YOUR DECISION TO INVEST $5 MILLION?

03:01PM  6    A.   IT WAS.

03:01PM  7    Q.   WHY?

03:02PM  8    A.   WELL, YOU KNOW, LIKE I DESCRIBED BEFORE, AS WE, YOU KNOW,

03:02PM  9    HAD MADE AN INITIAL INVESTMENT AND HAD OVER TIME LEARNED ABOUT

03:02PM 10    WHAT THE COMPANY WAS DOING AND HAD SEEN THE PROGRESS THAT WE

03:02PM 11    FELT ALONG THE WAY, THIS FELT LIKE VALIDATION OF WHAT THAT

03:02PM 12    PROGRESS WAS.

03:02PM 13         BUT IT ALSO REPRESENTED A GREAT FUTURE OPPORTUNITY.  YOU

03:02PM 14    KNOW, THERE WOULD BE AN ABILITY TO SEE THIS ROLLOUT HAPPEN AND

03:02PM 15    TO HAVE, TO HAVE THE BENEFITS COME OUT OF THAT.

03:02PM 16         AND SO IT -- AND THIS CALL WAS CENTRAL TO, YOU KNOW, TO

03:02PM 17    OUR DECISION TO INVEST FURTHER FUNDS.

03:02PM 18    Q.   MR. TOLBERT, NOW, IF YOU'LL GO BACK TO THE BINDER IN FRONT

03:02PM 19    OF YOU AND TURN TO 3530.  3530.

03:02PM 20         YOUR HONOR, THE GOVERNMENT OFFERS 3530 BY STIPULATION.

03:02PM 21              MR. DOWNEY:  THAT'S CORRECT, YOUR HONOR.

03:03PM 22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:03PM 23         (GOVERNMENT'S EXHIBIT 3530 WAS RECEIVED IN EVIDENCE.)

03:03PM 24              MR. SCHENK:  THANK YOU, YOUR HONOR.

03:03PM 25    Q.   MR. TOLBERT, DO YOU RECOGNIZE THE DOCUMENT LOCATED AT

03:03PM 1    3530?

03:03PM 2    A.   I DO.

03:03PM 3    Q.   WHAT IS THIS DOCUMENT?

03:03PM 4    A.   THIS IS THE STOCK PURCHASE AGREEMENT THAT REPRESENTED THE

03:03PM 5    ABILITY TO PURCHASE STOCK IN 2013.

03:03PM 6    Q.   OKAY.  AND WAS THIS AN AGREEMENT THAT YOU ENTERED INTO

03:03PM 7    AFTER THAT CALL WHEN YOU INVESTED THE 5 MILLION THAT WE'VE BEEN

03:03PM 8    TALKING ABOUT?

03:03PM 9    A.   IT WAS.

03:03PM 10   Q.   AND DID YOU BUY IN SERIES C-1?

03:03PM 11   A.   CORRECT.

03:03PM 12   Q.   AND IF YOU'LL LOOK AT PAGE 5 OF THE EXHIBIT AT THE TOP IN

03:03PM 13   THAT FIRST PARAGRAPH.  IT SAYS, "AMENDED AND RESTATED SERIES

03:03PM 14   C-1 PREFERRED STOCK PURCHASE AGREEMENT."

03:03PM 15       SO DID YOU THINK THAT WHEN YOU WERE SIGNING THIS DOCUMENT,

03:03PM 16   YOU WERE BUYING THE SHARES OF SERIES C-1 STOCK WE'VE TALKED

03:03PM 17   ABOUT?

03:03PM 18   A.   I DID.

03:03PM 19   Q.   IF YOU WILL TURN TO PAGE 11 AT THE BOTTOM, 4.4, AND THEN

03:04PM 20   IT WILL CARRY ON OVER TO THE NEXT PAGE.

03:04PM 21       4.4 READS, "SPECULATIVE NATURE OF INVESTMENT.  SUCH

03:04PM 22   INVESTOR UNDERSTANDS AND ACKNOWLEDGES THAT THE COMPANY HAS A

03:04PM 23   LIMITED FINANCIAL AND OPERATING HISTORY AND THAT AN INVESTMENT

03:04PM 24   IN THE COMPANY IS," AND THEN IT CONTINUES ON THE NEXT PAGE,

03:04PM 25   "HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS.  SUCH

03:04PM  1      INVESTOR CAN BEAR THE ECONOMIC RISK OF SUCH INVESTOR'S

03:04PM  2      INVESTMENT AND IS ABLE, WITHOUT IMPAIRING SUCH INVESTOR'S

03:04PM  3      FINANCIAL CONDITION, TO HOLD THE SHARES AND THE CONVERSION

03:04PM  4      SHARES FOR AN INDEFINITE PERIOD OF TIME AND TO SUFFER A

03:04PM  5      COMPLETE LOSS OF SUCH INVESTOR'S INVESTMENT."

03:04PM  6           THIS SECTION HAS SOME REPRESENTATIONS ABOUT YOU OR HALL'S

03:04PM  7      GROUP ABILITY TO BEAR THE LOSS.

03:04PM  8           WERE THOSE ALL TRUE AT THE TIME YOU SIGNED THIS?

03:04PM  9      A.   THEY WERE TRUE.

03:05PM 10      Q.   AND EARLIER ON IN THIS SECTION IT TALKS ABOUT LIMITED

03:05PM 11      FINANCIAL AND OPERATING HISTORY.

03:05PM 12           DID YOU ALSO UNDERSTAND THAT TO BE TRUE?

03:05PM 13      A.   I DID.

03:05PM 14      Q.   AND DID YOU UNDERSTAND THAT ONE OF THE RISKS, OR ONE OF

03:05PM 15      THE SPECULATIVE ASPECTS OF THIS INVESTMENT WAS THAT INFORMATION

03:05PM 16      THAT MS. HOLMES WOULD PROVIDE TO YOU WOULD BE INACCURATE?  WAS

03:05PM 17      THAT A RISK THAT YOU UNDERSTOOD?

03:05PM 18      A.   THAT IS NOT.

03:05PM 19      Q.   4.5, ACCESS TO DATA IS JUST BELOW THE SECTION I READ TO

03:05PM 20      YOU.

03:05PM 21           IT SAYS THAT YOU HAD, "SUCH INVESTOR HAS HAD AN

03:05PM 22      OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE

03:05PM 23      OFFICERS OF THE COMPANY CONCERNING THE AGREEMENTS, THE EXHIBITS

03:05PM 24      AND SCHEDULES," AND IT CONTINUES.

03:05PM 25           DID YOU HAVE THE OPPORTUNITY TO ASK MS. HOLMES QUESTIONS?

03:05PM  1    A.   WE DID ON THAT CALL.

03:05PM  2    Q.   WE LISTENED TO THE CALL; IS THAT RIGHT?

03:05PM  3    A.   CORRECT.

03:05PM  4    Q.   WERE THE ANSWERS THAT SHE GAVE ON THAT CALL PUT INTO THIS

03:05PM  5    AGREEMENT?

03:05PM  6    A.   THE ANSWERS WERE NOT APPENDED TO THIS AGREEMENT, NO.

03:05PM  7    Q.   SO DID YOU UNDERSTAND THAT WHEN IT TALKS ABOUT YOU HAD THE

03:06PM  8    OPPORTUNITY TO ASK QUESTIONS, YOU RECEIVED ANSWERS TO THOSE,

03:06PM  9    AND THAT'S ALSO WHAT CAUSED YOU TO INVEST?

03:06PM 10    A.   CORRECT.

03:06PM 11    Q.   4.6 SAID ACCREDITED INVESTOR.  THAT'S JUST BELOW THE

03:06PM 12    SECTION THAT I JUST READ TO YOU.

03:06PM 13         "THE INVESTOR IS AN ACCREDITED INVESTOR WITHIN THE MEANING

03:06PM 14    OF REGULATION D."

03:06PM 15         HAVE YOU HEARD THAT PHRASE, AN ACCREDITED INVESTOR?

03:06PM 16    A.   I HAVE.

03:06PM 17    Q.   AND WERE YOU AND HALL GROUP AN ACCREDITED INVESTOR AT THE

03:06PM 18    TIME THAT YOU SIGNED?

03:06PM 19    A.   THEY WERE.  WE WERE.

03:06PM 20    Q.   WOULD YOU NOW TURN TO PAGE 24 OF THIS EXHIBIT.

03:06PM 21         ABOVE THE NAME ELIZABETH HOLMES, CHIEF EXECUTIVE OFFICER,

03:06PM 22    IS THERE A SIGNATURE?

03:06PM 23    A.   THERE IS.

03:06PM 24    Q.   AND IF YOU WILL TURN TO PAGE 32.

03:07PM 25         ON PAGE 32 UNDER SOMETHING CALLED HALL BLACK DIAMOND, IS

03:07PM  1    THAT YOUR SIGNATURE?

03:07PM  2    A.   THAT IS MY SIGNATURE.

03:07PM  3    Q.   AND ALSO DID YOU WRITE IN YOUR NAME AND DATE IT?

03:07PM  4    A.   I DID.

03:07PM  5    Q.   AND WHAT IS HALL BLACK DIAMOND?

03:07PM  6    A.   HALL BLACK DIAMOND IS THE ENTITY THAT WE USED TO INVEST

03:07PM  7    THE $5 MILLION.

03:07PM  8    Q.   AND JUST TO BE CLEAR, THE ADDRESS THAT WE'RE SEEING,

03:07PM  9    THAT'S NOT YOUR PERSONAL ADDRESS, THAT'S HALL GROUP'S ADDRESS;

03:07PM  10   IS THAT RIGHT?

03:07PM  11   A.   CORRECT.

03:07PM  12   Q.   AND THEN THERE'S A SIGNATURE ON THAT SAME PAGE ABOVE

03:07PM  13   ELIZABETH HOLMES, CHIEF EXECUTIVE OFFICER.

03:07PM  14        DO YOU SEE THAT?

03:07PM  15   A.   I DO.

03:07PM  16   Q.   THIS IS DATED 12/31/2013.  IS THAT THE DATE THAT YOU

03:07PM  17   SIGNED AND SENT A WIRE TRANSFER TO PURCHASE THESE SHARES?

03:07PM  18   A.   THAT IS THE DATE.

03:07PM  19        MR. SCHENK:  YOUR HONOR, WE WOULD ADMIT 4845,

03:08PM  20   PAGE 20, THE CUSTODIAN FROM THE FEDERAL RESERVE BANK.

03:08PM  21        THE COURT:  YES.

03:08PM  22   BY MR. SCHENK:

03:08PM  23   Q.   I THINK IT IS ALSO IN YOUR BINDER IF IT'S EASIER FOR YOU

03:08PM  24   TO SEE, MR. TOLBERT.

03:08PM  25   A.   IF YOU BLOW IT UP I CAN SEE IT.

03:08PM  1    Q.   OKAY.  IF WE COULD -- THAT'S GREAT.

03:08PM  2         ARE YOU FAMILIAR WITH TEXAS CAPITAL BANK?

03:08PM  3    A.   I AM.

03:08PM  4    Q.   AND THEN THERE IS, UNDER AMOUNT, 4,875,000.

03:08PM  5         DOES THAT AMOUNT LOOK FAMILIAR TO YOU?

03:08PM  6    A.   THAT IS.  THAT IS THE AMOUNT THAT WE SENT IN.

03:08PM  7    Q.   WE'VE BEEN TALKING, YOU AND I, ABOUT $5 MILLION.  THE WIRE

03:08PM  8    TRANSFER IS FOR A LITTLE OVER 4.8 MILLION.  CAN YOU EXPLAIN

03:08PM  9    THAT?

03:08PM  10   A.   I CAN.  SO, YOU KNOW, OUR FIRST INVESTMENT HAD BEEN

03:09PM  11   THROUGH CHRIS LUCAS'S INVESTMENT FUND, BLACK DIAMOND VENTURES.

03:09PM  12        YOU KNOW, OUR DESIRE WAS TO BE A DIRECT INVESTOR INTO THE

03:09PM  13   COMPANY SO THAT WE WOULD HAVE ACCESS OF THE DIRECT

03:09PM  14   COMMUNICATION FROM THE COMPANY TO ITS SHAREHOLDERS AND NOT RELY

03:09PM  15   ON CHRIS TO BE OUR SOLE SOURCE OF INFORMATION.

03:09PM  16        AND SO OUR AGREEMENT, THE AGREEMENT WE CAME TO WITH CHRIS

03:09PM  17   AND ELIZABETH AROUND THIS INVESTMENT WAS THAT WE WOULD PAY

03:09PM  18   CHRIS A COMMISSION TO BE A DIRECT INVESTOR AND TO NOT BE

03:09PM  19   INVESTED THROUGH HIS FUND.

03:09PM  20        AND SO THE $125,000 DIFFERENCE HERE REPRESENTS THE CASH

03:09PM  21   THAT WE PAID TO CHRIS FOR HIS COMMISSION ON THAT INVESTMENT.

03:09PM  22   Q.   I SEE.  A LITTLE FURTHER DOWN ON THIS DOCUMENT, THERE'S

03:09PM  23   SOMETHING CALLED HALL PHOENIX INWOOD LTD.

03:10PM  24        DO YOU SEE THAT?

03:10PM  25   A.   YES.

03:10PM 1    Q.   AND WHAT IS THAT?

03:10PM 2    A.   SO HALL PHOENIX INWOOD IS THE PRIMARY OPERATING COMPANY OF

03:10PM 3    HALL GROUP, AND HALL PHOENIX INWOOD WOULD HAVE WIRED THIS MONEY

03:10PM 4    ON BEHALF OF HALL BLACK DIAMOND TO --

03:10PM 5    Q.   TO WHERE?  WHERE DID THE WIRE GO?

03:10PM 6    A.   THE WIRE WOULD HAVE GONE TO THERANOS.  IT SAYS HERE ON THE

03:10PM 7    LINE IT WENT TO THEIR ACCOUNT AT COMERICA BANK.

03:10PM 8    Q.   OKAY.  I UNDERSTAND MULTIPLE PEOPLE WORK AT HALL GROUP.

03:10PM 9    DID YOU PUT IN PLACE OR INITIATE THE WIRE TRANSFER?

03:10PM 10   A.   I GAVE AUTHORIZATION FOR THE WIRE TO BE INITIATED, AND

03:10PM 11   THEN ONCE IT HAD BEEN INITIATED, I APPROVED IT.

03:10PM 12   Q.   OKAY.  AND HOW ABOUT THE AMOUNT, THE DOLLAR AMOUNT?  DID

03:10PM 13   YOU DECIDE THE AMOUNT THAT HALL GROUP WOULD INVEST IN THERANOS?

03:10PM 14   A.   I DID.  MR. HALL AND I HAD DISCUSSIONS ABOUT WHAT THAT

03:11PM 15   AMOUNT WOULD BE, AND, YOU KNOW, THE $5 MILLION THAT WE SETTLED

03:11PM 16   ON IS THE ONE THAT I INDICATED WE WOULD SEND, AND SO WE SENT

03:11PM 17   THAT AMOUNT.

03:11PM 18   Q.   OKAY.  AND DO YOU KNOW WHETHER ULTIMATELY MR. HALL LEFT IT

03:11PM 19   UP TO YOU TO DECIDE THE EXACT AMOUNT, OR MAYBE EVEN WHETHER YOU

03:11PM 20   INVESTED?

03:11PM 21   A.   HE DID.

03:11PM 22   Q.   OKAY.

03:11PM 23        YOUR HONOR, MAY I JUST HAVE ONE MOMENT?

03:11PM 24        THE COURT:  YES.

03:11PM 25        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:11PM  1              MR. SCHENK:  THANK YOU, YOUR HONOR.

03:11PM  2         NO FURTHER QUESTIONS AT THIS TIME.

03:11PM  3              THE COURT:  CROSS-EXAMINATION?

03:11PM  4              MR. DOWNEY:  YES, YOUR HONOR.

03:11PM  5              THE COURT:  FOLKS, FEEL FREE TO STAND UP AND STRETCH

03:11PM  6    WHILE WE DO THE TRANSITION IF YOU WOULD LIKE.

03:11PM  7         SAME WITH YOU, MR. TOLBERT, IF YOU WOULD LIKE TO STAND AND

03:11PM  8    STRETCH.

03:11PM  9              THE WITNESS:  THANK YOU, YOUR HONOR.

03:11PM 10         (STRETCHING.)

03:12PM 11                        **CROSS-EXAMINATION**

03:12PM 12    BY MR. DOWNEY:

03:12PM 13    Q.   GOOD AFTERNOON, MR. TOLBERT.  MY NAME IS KEVIN DOWNEY, AND

03:12PM 14    I REPRESENT MS. HOLMES.

03:12PM 15         I WANT TO START BY ASKING YOU ABOUT HOW THE RELATIONSHIP

03:12PM 16    WITH THERANOS BEGAN IN VERY SUMMARY FORM, BECAUSE I THINK WE'VE

03:12PM 17    HEARD ABOUT IT DURING THE COURSE OF YOUR DIRECT.

03:13PM 18         AS I UNDERSTAND IT, MR. HALL GOT A PHONE CALL FROM

03:13PM 19    SOMEBODY THAT INFORMED HIM ABOUT THERANOS AND A POTENTIAL

03:13PM 20    OPPORTUNITY TO INVEST; IS THAT RIGHT?

03:13PM 21    A.   I BELIEVE THAT'S CORRECT.

03:13PM 22    Q.   AND THAT TELEPHONE CALL CAME FROM DON LUCAS, DIDN'T IT?

03:13PM 23    A.   THAT -- I DON'T BELIEVE THAT'S CORRECT.

03:13PM 24    Q.   OKAY.  WELL, DO YOU KNOW -- DID THE TELEPHONE CALL COME

03:13PM 25    FROM GARY NORDHEIMER?

03:13PM  1      A.   I BELIEVE THAT'S CORRECT.

03:13PM  2      Q.   AND GARY NORDHEIMER WAS AN INDIVIDUAL WHO WAS AN INVESTOR

03:13PM  3      IN THERANOS; CORRECT?

03:13PM  4      A.   YOU KNOW, I DON'T KNOW IF HE WAS A PRIOR INVESTOR, BUT I

03:13PM  5      KNOW HE WAS CONTEMPLATING AN INVESTMENT IN 2006.

03:13PM  6      Q.   OKAY.

03:13PM  7      A.   AND SO HE CALLED MR. HALL TO PUT THE OPPORTUNITY ON HIS

03:13PM  8      RADAR SCREEN.

03:13PM  9      Q.   OKAY.  AND DID HE SUGGEST TO MR. HALL OR TO YOU THAT YOU

03:14PM 10      SPEAK WITH DON LUCAS ABOUT THE POTENTIAL OPPORTUNITY TO INVEST?

03:14PM 11      A.   HE MAY HAVE.  HE MAY HAVE REFERENCED THAT WITH MR. HALL.

03:14PM 12           I NEVER TALKED WITH MR. NORDHEIMER DIRECTLY AT THAT POINT.

03:14PM 13      Q.   SO THE CONVERSATION THAT MR. HALL WOULD HAVE HAD WITH

03:14PM 14      MR. LUCAS YOU'RE PERSONALLY NOT AWARE OF?

03:14PM 15      A.   I AM NOT.

03:14PM 16      Q.   SO MR. HALL GOT IN TOUCH WITH YOU AND ASKED YOU TO DO DUE

03:14PM 17      DILIGENCE; CORRECT?

03:14PM 18      A.   CORRECT.

03:14PM 19      Q.   AND THAT WOULD INVOLVE GETTING AS MUCH INFORMATION ABOUT

03:14PM 20      THE COMPANY AS YOU COULD GET; CORRECT?

03:14PM 21      A.   CORRECT.

03:14PM 22      Q.   DID YOU KNOW AT THE OUTSET THAT THE ARRANGEMENT WOULD BE

03:14PM 23      ONE THAT WOULD HAVE TO GO THROUGH, THROUGH A THIRD PARTY, OR

03:14PM 24      DID YOU THINK THIS MIGHT BE AN OPPORTUNITY WHERE YOU COULD

03:14PM 25      INVEST DIRECTLY IN THERANOS?

03:14PM  1    A.   NO.  MY UNDERSTANDING WAS THAT IT WAS AN INVESTMENT

03:14PM  2    THROUGH CHRIS LUCAS, YOU KNOW, THROUGH THAT SERIES OF

03:14PM  3    CONVERSATIONS THAT HE'S THE ONE THAT PRESENTED THE OPPORTUNITY

03:14PM  4    TO US AND SO THE INVESTMENT WOULD GO THROUGH THAT, THROUGH HIS

03:15PM  5    VEHICLE.

03:15PM  6    Q.   OKAY.  SO SOMEHOW THE OPPORTUNITY BECAME NOTICED -- THE

03:15PM  7    HALL GROUP BECAME AWARE OF THE OPPORTUNITY, MR. HALL SPOKE TO

03:15PM  8    SOMEONE ABOUT THE OPPORTUNITY, HE ASKED YOU TO DO DUE

03:15PM  9    DILIGENCE, AND YOU CALLED CHRIS LUCAS; IS THAT RIGHT?

03:15PM 10    A.   CORRECT.

03:15PM 11    Q.   AND THEN YOU HAD A -- I BELIEVE YOU HAD AT LEAST ONE OR

03:15PM 12    TWO TELEPHONE CONVERSATIONS WITH -- INVOLVING MR. LUCAS BEFORE

03:15PM 13    YOU WENT TO THERANOS?

03:15PM 14    A.   BEFORE I MADE THE TRIP TO THERANOS?

03:15PM 15    Q.   YES.

03:15PM 16    A.   CORRECT.

03:15PM 17    Q.   AND YOU TALKED ABOUT THOSE CONVERSATIONS THUS FAR,

03:15PM 18    EITHER -- MS. HOLMES WAS EITHER ON ONE OR TWO OF THOSE CALLS;

03:15PM 19    IS THAT RIGHT?

03:15PM 20    A.   CORRECT.

03:15PM 21    Q.   AND THEN YOU TOOK THE TRIP TO THERANOS AND YOU HAD THE

03:15PM 22    DINNER THAT YOU DESCRIBED; CORRECT?

03:15PM 23    A.   CORRECT.

03:15PM 24    Q.   AND IN ADDITION TO YOURSELF, MS. HOLMES, DON LUCAS, AND

03:15PM 25    CHRIS LUCAS WERE AT THAT DINNER; CORRECT?

03:16PM  1    A.   THEY BOTH WERE.

03:16PM  2    Q.   OKAY.  AND DID YOU, AT THAT DINNER, ASK FOR INFORMATION

03:16PM  3    FROM ALL THREE ABOUT THERANOS?

03:16PM  4    A.   YOU KNOW, CERTAINLY IN THE DISCUSSIONS WE HAD THAT NIGHT

03:16PM  5    ALL THREE OF THEM PARTICIPATED.

03:16PM  6    Q.   DID YOU LEARN THAT DON LUCAS WAS THE CHAIR OF THE BOARD OF

03:16PM  7    THERANOS?

03:16PM  8    A.   I DID.

03:16PM  9    Q.   AND DID YOU UNDERSTAND THAT CHRIS LUCAS WAS HIS NEPHEW?

03:16PM  10   A.   I DID.

03:16PM  11   Q.   AND DID YOU ASK, AT ANY POINT, YOURSELF TO SPEAK WITH

03:16PM  12   DON LUCAS TO HAVE A ONE-ON-ONE CONVERSATION ABOUT INFORMATION

03:16PM  13   THAT HE KNEW ABOUT THERANOS?

03:16PM  14   A.   I DID NOT.

03:16PM  15   Q.   OKAY.  DO YOU KNOW IF MR. HALL HAD THAT TYPE OF A

03:16PM  16   CONVERSATION?

03:16PM  17   A.   I DON'T REMEMBER.

03:16PM  18   Q.   OKAY.  SO YOU HAD A COUPLE OF CALLS, THE DINNER, AND THEN

03:16PM  19   YOU VISITED THE FACILITY THE NEXT MORNING; CORRECT?

03:16PM  20   A.   I BELIEVE THAT'S CORRECT.

03:16PM  21   Q.   OKAY.  AND THEN FROM THAT TIME FOR THE FOLLOWING SIX

03:17PM  22   YEARS, YOU'VE NEVER HAD ANY DIRECT CONTACT WITH THERANOS; IS

03:17PM  23   THAT RIGHT?

03:17PM  24   A.   CORRECT.

03:17PM  25   Q.   AND THEN YOU PARTICIPATED IN THE PHONE CALL, A PORTION OF

03:17PM 1    WHICH WE'VE HEARD THIS AFTERNOON; CORRECT?

03:17PM 2    A.   CORRECT.

03:17PM 3    Q.   AND THEN YOU MADE YOUR SECOND INVESTMENT DIRECTLY IN

03:17PM 4    THERANOS; CORRECT?

03:17PM 5    A.   THAT'S CORRECT.

03:17PM 6    Q.   SO THE ONLY CONTACTS THAT YOU HAD WITH MS. HOLMES DURING

03:17PM 7    THOSE SIX YEARS WERE -- SEVEN YEARS, WERE THOSE LIMITED

03:17PM 8    OCCASIONS; CORRECT?

03:17PM 9    A.   THAT'S CORRECT.

03:17PM 10   Q.   OKAY.  LET ME ASK YOU ABOUT THE CONTACT THAT YOU HAD WITH

03:17PM 11   MR. LUCAS IN THE INTERVENING PERIOD.

03:17PM 12       HOW OFTEN WOULD YOU TALK TO CHRIS LUCAS DURING THAT PERIOD

03:17PM 13   ABOUT THERANOS?

03:17PM 14   A.   YOU KNOW, AS I RECALL, I WOULD PROBABLY TALK TO HIM THREE

03:17PM 15   OR FOUR TIMES A YEAR.

03:17PM 16   Q.   OKAY.  SO YOU HAD A QUARTERLY CALL, LET'S SAY, WITH

03:17PM 17   MR. LUCAS?

03:17PM 18   A.   SOMETHING LIKE THAT.

03:17PM 19   Q.   AND YOUR CONVERSATIONS WITH CHRIS LUCAS WERE BECAUSE YOUR

03:18PM 20   INVESTMENT WAS THROUGH HIM; CORRECT?

03:18PM 21   A.   THAT'S CORRECT.

03:18PM 22   Q.   AND, IN FACT, YOU WERE PAYING HIM TO MANAGE THAT

03:18PM 23   INVESTMENT; CORRECT?

03:18PM 24   A.   CORRECT, WE DID HAVE A MANAGEMENT FEE THAT WE WERE PAYING

03:18PM 25   TO HIM.

03:18PM  1    Q.   AND SO A PERCENTAGE OF THE MONEY THAT YOU INVESTED WITH

03:18PM  2    THERANOS EACH YEAR YOU WERE PAYING TO HIM; CORRECT?

03:18PM  3    A.   WELL, YOU KNOW, TO BE CLEAR ABOUT IT, WE PAID HIM A

03:18PM  4    MANAGEMENT FEE FOR A CERTAIN PERIOD OF TIME, FOR TWO YEARS.

03:18PM  5    AND SO AS I RECALL, IT WAS TWO YEARS, AND SO THAT MANAGEMENT

03:18PM  6    FEE WE PAID TWO YEARS.

03:18PM  7         AND THEN AN ADDITIONAL SEVEN OR SIX YEARS, WHATEVER IT

03:18PM  8    WOULD BE, WE DID NOT PAY A MANAGEMENT FEE.

03:18PM  9    Q.   AND THE FEE THAT YOU PAID HIM IN THE FIRST TWO YEARS WAS A

03:18PM  10   PERCENTAGE OF THE AMOUNT THAT YOU HAD INVESTED; CORRECT?

03:18PM  11   A.   I BELIEVE THAT'S CORRECT.

03:18PM  12   Q.   AND DID YOU AT ANY TIME TRY TO CONTACT MS. HOLMES DURING

03:18PM  13   THAT PERIOD?

03:18PM  14   A.   NOT DIRECTLY TO MY RECOLLECTION.

03:18PM  15   Q.   OKAY.  DID YOU TRY TO CONTACT ANY THERANOS EMPLOYEE DURING

03:18PM  16   THAT TIME PERIOD?

03:19PM  17   A.   I DID NOT.

03:19PM  18   Q.   OKAY.  DID YOU ASK, THROUGH MR. LUCAS, FOR ANY FINANCIAL

03:19PM  19   STATEMENTS THAT THERANOS HAD GIVEN HIM?

03:19PM  20   A.   I DID.

03:19PM  21   Q.   AND DID HE PROVIDE YOU ANY FINANCIAL STATEMENTS?

03:19PM  22   A.   WELL, AS I RECALL, HE HAD NOT RECEIVED ANY FINANCIALS, SO

03:19PM  23   I NEVER RECEIVED ANY FROM HIM DURING THOSE INTERVENING YEARS.

03:19PM  24   Q.   AND HE TOLD YOU HE HAD NOT RECEIVED THEM?

03:19PM  25   A.   YOU KNOW, THAT WAS MY RECOLLECTION.  WHEN I WOULD ASK HIM

03:19PM 1    FOR FINANCIALS, HE WOULD SAY, I HAVEN'T RECEIVED ANYTHING

03:19PM 2    SPECIFICALLY FROM THE COMPANY.

03:19PM 3    Q.   OKAY.  DID HE TELL YOU WHETHER HE HAD BEEN GIVEN ANY

03:19PM 4    ACCESS TO INFORMATION FROM THE COMPANY FOR PURPOSES OF

03:19PM 5    PREPARING REVENUE PROJECTIONS?

03:19PM 6         MR. SCHENK:  OBJECTION.  HEARSAY.

03:19PM 7         THE COURT:  OVERRULED.

03:19PM 8    IF YOU KNOW.

03:19PM 9         THE WITNESS:  OH, CAN YOU --

03:19PM 10   BY MR. DOWNEY:

03:19PM 11   Q.   I'M ONLY ASKING WHAT YOU WERE TOLD.

03:19PM 12        DID MR. LUCAS TELL YOU THAT HE HAD BEEN GIVEN FINANCIAL

03:19PM 13   INFORMATION ABOUT THE COMPANY FOR PURPOSES OF PREPARING

03:20PM 14   FINANCIAL PROJECTIONS?

03:20PM 15   A.   I DON'T KNOW IF -- I DON'T RECALL HIM SAYING THAT HE HAD

03:20PM 16   RECEIVED INFORMATION TO PREPARE PROJECTIONS.

03:20PM 17        I KNEW THAT MR. LUCAS HAD TOLD ME THAT HE WAS, YOU KNOW,

03:20PM 18   AT THE COMPANY HEADQUARTERS A LOT, THAT HE WAS -- THERE WERE

03:20PM 19   SOME KIND OF PROJECTS THAT HE WAS INVOLVED IN THAT GAVE HIM

03:20PM 20   ACCESS TO INFORMATION, BUT I DIDN'T KNOW SPECIFICALLY WHAT THAT

03:20PM 21   WAS OR FOR WHAT PURPOSE IT WAS.

03:20PM 22   Q.   DID HE EVER TELL YOU SPECIFICALLY THAT I, CHRIS LUCAS,

03:20PM 23   HAVE PREPARED FINANCIAL PROJECTIONS FOR THE COMPANY?

03:20PM 24   A.   HE DID NOT.

03:20PM 25   Q.   DID YOU EVER, DURING THAT PERIOD, HAVE ANY FURTHER CONTACT

03:20PM  1    WITH MR. DON LUCAS?

03:20PM  2    A.   NOT DIRECTLY I DID NOT.

03:20PM  3    Q.   DID THE FACT THAT MR. LUCAS, MR. DON LUCAS WAS INVOLVED IN

03:21PM  4    THE INVESTMENT PLAY ANY ROLE IN THE HALL GROUP'S INITIAL

03:21PM  5    DECISION TO MAKE AN INVESTMENT?

03:21PM  6    A.   IT CERTAINLY WAS A POSITIVE.  YOU KNOW, WE -- YOU KNOW, I

03:21PM  7    BECAME AWARE OF WHO MR. LUCAS WAS AND OF HIS, YOU KNOW,

03:21PM  8    INVESTMENT BACKGROUND, AND SOME OF THE THINGS -- SOME OF THE

03:21PM  9    OPPORTUNITIES THAT HE HAD HELPED CULTIVATE ALONG, AND SO THAT

03:21PM 10    WAS, THAT WAS A POSITIVE.

03:21PM 11    Q.   YOU KNEW THAT HE HAD A REPUTATION AS A SAVVY INVESTOR IN

03:21PM 12    TECHNOLOGY; CORRECT?

03:21PM 13    A.   I DID.

03:21PM 14    Q.   AND YOU KNEW THAT HE HAD EXPERIENCE WITH A NUMBER OF

03:21PM 15    TECHNOLOGY COMPANIES THAT HAD GROWN FROM STARTUPS INTO WELL

03:21PM 16    RESPECTED NATIONAL COMPANIES; CORRECT?

03:21PM 17    A.   THAT'S CORRECT.

03:21PM 18    Q.   AND YOU KNEW THAT HE WAS AN INVESTOR IN THERANOS; CORRECT?

03:21PM 19    A.   I DID.

03:21PM 20    Q.   AND YOU KNEW THAT CHRIS LUCAS WAS AN INVESTOR IN THERANOS?

03:21PM 21    A.   I DID.

03:21PM 22    Q.   YOU WERE TASKED WITH PERFORMING DUE DILIGENCE DURING THIS

03:21PM 23    PERIOD; CORRECT?

03:22PM 24    A.   THAT'S CORRECT.

03:22PM 25    Q.   PRIOR TO THE FIRST INVESTMENT; CORRECT?

03:22PM  1      A.   CORRECT.

03:22PM  2      Q.   DID DON LUCAS TALK TO YOU AT ALL ABOUT THE DUE DILIGENCE

03:22PM  3   THAT HE HAD PERFORMED BEFORE HIS DECISION TO MAKE AN

03:22PM  4   INVESTMENT?

03:22PM  5      A.   NO, I HAD NO CONVERSATIONS WITH DON LUCAS, SO HE WOULDN'T

03:22PM  6   HAVE HAD AN OCCASION TO.

03:22PM  7      Q.   OKAY.  WELL, I THOUGHT YOU SAID HE WAS AT THE DINNER WITH

03:22PM  8   YOU.

03:22PM  9      A.   OH, AT THE DINNER.

03:22PM  10     Q.   IN 2006?

03:22PM  11     A.   OH, I THOUGHT YOU WERE TALKING ABOUT SUBSEQUENT OR AFTER

03:22PM  12  THAT.

03:22PM  13     Q.   NO.  I'M ASKING YOU NOW ABOUT YOUR INITIAL INVESTMENT

03:22PM  14  DECISION --

03:22PM  15     A.   OH, OKAY.

03:22PM  16     Q.   -- IN 2006.

03:22PM  17          DID HE PROVIDE ACCESS TO ANY OF THE DUE DILIGENCE THAT HE

03:22PM  18  HAD DONE?

03:22PM  19     A.   NO, HE DID NOT.  THERE WAS -- HE DIDN'T COMMUNICATE

03:22PM  20  ANYTHING TO ME OTHER THAN AT THE DINNER.  HE DIDN'T SEND ME ANY

03:22PM  21  ADDITIONAL INFORMATION.

03:22PM  22     Q.   OKAY.  DID HE TELL YOU, FOR EXAMPLE, THAT HE HAD PERFORMED

03:22PM  23  DUE DILIGENCE ON THE PATENT PORTFOLIO OF THE COMPANY?

03:22PM  24     A.   HE DID NOT.

03:23PM  25     Q.   NOW, AFTER SIX YEARS, I THINK YOU TESTIFIED ABOUT THE

03:23PM 1    CONTACT THAT HAD LED YOU TO WANT TO MAKE THE SECOND INVESTMENT,

03:23PM 2    AND THAT'S IN CONNECTION WITH THIS CALL AND YOUR CONVERSATIONS

03:23PM 3    WITH CHRIS LUCAS AROUND THAT TIME PERIOD; CORRECT?

03:23PM 4    A.   CORRECT.

03:23PM 5    Q.   HAD CHRIS LUCAS SAID TO YOU AT ANY POINT IN 2013, THE

03:23PM 6    OPPORTUNITY TO INVEST MIGHT PRESENT ITSELF DURING THE COURSE OF

03:23PM 7    THIS YEAR?

03:23PM 8    A.   AS I RECALL, IN SOME OF OUR -- IN SOME OF OUR PHONE CALLS

03:23PM 9    EARLIER IN THAT YEAR -- AND IT WASN'T JUST IN THAT YEAR, AT

03:23PM 10   OTHER TIMES OVER THAT PERIOD OF TIME HE HAD REFERENCED THAT

03:23PM 11   THERE MAY BE A FURTHER INVESTMENT OPPORTUNITY.

03:23PM 12       BUT CERTAINLY IN 2013 HE DID INDICATE THAT THERE WOULD

03:23PM 13   LIKELY BE ANOTHER INVESTMENT OPPORTUNITY COMING.

03:23PM 14   Q.   OKAY.  AND WHEN YOU HEARD THAT, DID YOU ASK ANY QUESTIONS

03:23PM 15   OF HIM ABOUT, YOU KNOW, WHAT THE OPPORTUNITY WOULD BE AND THE

03:24PM 16   STATE OF THERANOS'S BUSINESS?

03:24PM 17   A.   YEAH, CERTAINLY.  I WAS ALWAYS ASKING HIM ABOUT THE STATE

03:24PM 18   OF THERANOS'S BUSINESS BECAUSE IT FELT LIKE HE HAD ACCESS TO

03:24PM 19   INFORMATION AND I WAS TRYING TO ELICIT THAT FROM HIM.

03:24PM 20   Q.   OKAY.  SO THE STATE OF THE RELATIONSHIP UP UNTIL REALLY

03:24PM 21   THAT TELEPHONE CALL WAS YOU PERCEIVED HIM TO KNOW A LOT ABOUT

03:24PM 22   THERANOS; CORRECT?

03:24PM 23   A.   THAT'S CORRECT.

03:24PM 24   Q.   AND YOU WOULD ASK HIM QUESTIONS; CORRECT?

03:24PM 25   A.   THAT'S CORRECT.

03:24PM 1    Q.   AND HE WOULD PROVIDE YOU INFORMATION; CORRECT?

03:24PM 2    A.   THAT'S CORRECT.

03:24PM 3    Q.   AND THAT WOULD BE IN THESE QUARTERLY CALLS?

03:24PM 4    A.   YEAH, THAT WOULD BE IN THESE CALLS, THAT'S CORRECT.

03:24PM 5    Q.   OKAY.  DID HE PROVIDE ANY INFORMATION ABOUT THE TECHNOLOGY

03:24PM 6    OF THERANOS DURING THAT PERIOD IN THE NATURE OF ANY KIND OF AN

03:24PM 7    ANALYSIS OR WRITTEN PRESENTATION OF HOW THERANOS WAS PLANNING

03:24PM 8    TO ROLL OUT ITS TECHNOLOGY?

03:24PM 9    A.   NOT THAT I RECALL.

03:24PM 10   Q.   WOULD YOU HAVE BELIEVED THAT WAS RESPONSIVE TO YOUR

03:25PM 11   REQUEST FOR THE INFORMATION THAT YOU WERE SEEKING?

03:25PM 12   A.   I WOULD HAVE.

03:25PM 13   Q.   YOU HAD HEARD, I THINK, DURING THE COURSE OF THAT SEVEN

03:25PM 14   YEAR PERIOD SOME INFORMATION ABOUT THE PROSPECT THAT THERE

03:25PM 15   WOULD BE RETAIL PARTNERSHIPS WITH SOME LARGE RETAILERS;

03:25PM 16   CORRECT?

03:25PM 17   A.   THAT'S CORRECT.

03:25PM 18   Q.   AND IS THAT INFORMATION THAT YOU LEARNED THROUGH

03:25PM 19   CHRIS LUCAS AS WELL?

03:25PM 20   A.   THAT'S WHERE I WOULD HAVE LEARNED THAT.

03:25PM 21   Q.   AND IS IT FAIR TO SAY THAT IN THE TELEPHONE CALL THAT YOU

03:25PM 22   HAD IN DECEMBER OF 2013 THAT MS. HOLMES INDICATED THAT DURING

03:25PM 23   THAT PERIOD THAT WOULD FOLLOW THE INVESTMENT, THAT THE COMPANY

03:25PM 24   WOULD BE FOCUSSED INTENSELY ON THAT RETAIL OUTLET?

03:25PM 25   A.   I DID --

03:25PM  1   Q.   RETAIL ROLLOUT?

03:25PM  2   A.   THAT'S CORRECT.  I MEAN, THAT WAS THE CENTRAL FOCUS OF

03:26PM  3   WHAT THAT ADDITIONAL INVESTMENT OPPORTUNITY WAS ABOUT.

03:26PM  4   Q.   INDEED, MR. SCHENK PLAYED YOU SOME TAPES IN WHICH THERE

03:26PM  5   WERE REFERENCES TO THE PHARMACEUTICAL BUSINESS AND THE MILITARY

03:26PM  6   BUSINESS.

03:26PM  7        DO YOU RECALL THAT?

03:26PM  8   A.   I DO.

03:26PM  9   Q.   BUT DURING THE COURSE OF THE CALL, MS. HOLMES TOLD YOU

03:26PM  10  THAT, IN FACT, THERANOS WAS GOING TO PAUSE ITS WORK ON THOSE

03:26PM  11  BUSINESSES IN ORDER TO FOCUS ON THE RETAIL BUSINESS ROLLOUT;

03:26PM  12  CORRECT?

03:26PM  13  A.   YEAH.  I DON'T REMEMBER THE EXACT LANGUAGE, BUT I DO

03:26PM  14  REMEMBER THAT REFERENCE.

03:26PM  15  Q.   WELL, LET ME PLAY THAT PORTION OF THE TAPE FOR YOU.

03:26PM  16  A.   OKAY.

03:26PM  17            MR. DOWNEY:  YOUR HONOR, I'VE DIVIDED OUR CLIPS BY

03:26PM  18  LETTER JUST TO AVOID CONFUSION IN THAT REGARD.  SO I WILL OFFER

03:26PM  19  1348F.

03:27PM  20       "OBVIOUSLY TO BE ABLE TO DO."

03:27PM  21            THE COURT:  I BEG YOUR PARDON.  MR. SCHENK?

03:27PM  22            MR. SCHENK:  IS THIS SOMETHING THAT HAS ALREADY BEEN

03:27PM  23  PLAYED?

03:27PM  24            MR. DOWNEY:  THIS HAS ALREADY BEEN PLAYED.

03:27PM  25            THE COURT:  THAT WAS MY UNDERSTANDING.  CAN YOU JUST

| | | |
|---|---|---|
| 03:27PM | 1 | IDENTIFY FOR THE PARTIES WHERE IT IS? |
| 03:27PM | 2 | MR. DOWNEY:  ON THE TRANSCRIPT I HAVE, IT'S ON |
| 03:27PM | 3 | PAGE 6.  I DON'T HAVE THE TRANSCRIPT THAT THE GOVERNMENT |
| 03:27PM | 4 | PREPARED. |
| 03:27PM | 5 | THE COURT:  OH, I SEE. |
| 03:27PM | 6 | MR. DOWNEY:  YEAH. |
| 03:27PM | 7 | THE COURT:  CAN YOU JUST TAKE A MOMENT TO SHARE YOUR |
| 03:27PM | 8 | TRANSCRIPTS?  IS THAT POSSIBLE. |
| 03:27PM | 9 | (DISCUSSION OFF THE RECORD.) |
| 03:27PM | 10 | MR. DOWNEY:  ACTUALLY, I THINK I CAN IDENTIFY IT, |
| 03:27PM | 11 | YOUR HONOR. |
| 03:27PM | 12 | THE COURT:  SURE. |
| 03:28PM | 13 | (PAUSE IN PROCEEDINGS.) |
| 03:28PM | 14 | MR. DOWNEY:  MAY I CONFER WITH MR. SCHENK?  THIS |
| 03:28PM | 15 | DOESN'T MATCH. |
| 03:28PM | 16 | THE COURT:  YES, PLEASE. |
| 03:28PM | 17 | (DISCUSSION OFF THE RECORD.) |
| 03:29PM | 18 | MR. DOWNEY:  YOUR HONOR, I JUST WANT TO RETRIEVE |
| 03:29PM | 19 | MINE. |
| 03:29PM | 20 | THE COURT:  SURE. |
| 03:29PM | 21 | (PAUSE IN PROCEEDINGS.) |
| 03:30PM | 22 | MR. DOWNEY:  YOUR HONOR, I DON'T SEE IT ON THIS |
| 03:30PM | 23 | TRANSCRIPT EITHER, SO LET ME JUST HAVE ONE MORE MOMENT. |
| 03:30PM | 24 | THE COURT:  OF COURSE. |
| 03:31PM | 25 | (PAUSE IN PROCEEDINGS.) |

```
03:31PM   1              (DISCUSSION OFF THE RECORD.)

03:31PM   2              MR. DOWNEY:  YOUR HONOR, THIS WILL BE ON THE

03:31PM   3    TRANSCRIPT THAT WE GOT FROM THE GOVERNMENT ON PAGE 18 OF SIDE

03:32PM   4    A, STARTING AT LINE 19.

03:32PM   5              THE COURT:  THANK YOU.  AND YOU'D LIKE TO PLAY THAT

03:32PM   6    NOW?

03:32PM   7              MR. DOWNEY:  I'D LIKE TO PLAY IT.

03:32PM   8    Q.  BUT JUST TO REORIENT US TO WHERE WE WERE, MY QUESTION TO

03:32PM   9    YOU IS, MS. HOLMES TOLD YOU DURING THE COURSE OF THIS CALL THAT

03:32PM  10    THERANOS WOULD BE PUTTING A PAUSE ON ITS RETAIL AND MILITARY

03:32PM  11    BUSINESSES; CORRECT?

03:32PM  12    A.  I BELIEVE ON THE PHARMACEUTICAL AND RETAIL --

03:32PM  13    PHARMACEUTICAL AND MILITARY BUSINESSES.

03:32PM  14              MR. DOWNEY:  OKAY.  I'D LIKE TO JUST PLAY THAT

03:32PM  15    SECTION OF THE TAPE.

03:32PM  16              THE COURT:  SURE.

03:32PM  17         "MS. HOLMES:  OBVIOUSLY, TO BE ABLE TO DO WHAT WE JUST

03:32PM  18    HAVE DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR ONGOING

03:32PM  19    PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD FOCUS

03:32PM  20    LIKE A LASER ON THIS AND EXECUTING ON THIS.

03:32PM  21         "AND THE SCALE OF THIS RETAIL INFRASTRUCTURE NOW IS WHERE

03:32PM  22    WE WILL CONTINUE TO FOCUS LIKE A LASER.  BUT AS WE GET THE

03:33PM  23    RESOURCES AND ORGANIZATIONS TO CAPTURE SOME OF THESE ADDITIONAL

03:33PM  24    OPPORTUNITIES IN PARALLEL, WE WILL PROCEED WITH THE

03:33PM  25    PHARMACEUTICAL AND MILITARY BUSINESS IN LEVERAGING SOME OF THIS
```

03:33PM  1    INFRASTRUCTURE AND RESOURCES FROM IT THAT WE'RE BUILDING OUT

03:33PM  2    NOW.  SO THAT, FOR THE LONG-TERM, WILL BE AN IMPORTANT THING

03:33PM  3    FOR US.  AND IT'S ALSO VERY SYMBOLIC BECAUSE IT'S OUR WAY OF

03:33PM  4    BEING ABLE TO HELP MAKE A DIFFERENCE IN WHATEVER SMALL WAY WE

03:33PM  5    CAN THERE."

03:33PM  6    BY MR. DOWNEY:

03:33PM  7    Q.   WAS THAT MS. HOLMES'S VOICE THAT YOU JUST HEARD?

03:33PM  8    A.   IT WAS.

03:33PM  9    Q.   AND MAY I ASK YOU, DID YOU ASK ANY QUESTIONS DURING THE

03:33PM  10   CALL?

03:33PM  11   A.   I DID NOT.

03:33PM  12   Q.   DID YOU FOLLOW UP AT ALL ON THAT COMMENT TO FIND OUT WHAT

03:33PM  13   THE PAUSE WOULD BE OR HOW LONG IT WOULD BE?

03:33PM  14   A.   I DIDN'T.  I MEAN, AS I JUST LISTENED TO IT, IT DIDN'T

03:33PM  15   SOUND LIKE IT WAS A COMPLETE PAUSE.  IT SOUNDED LIKE IT WAS A

03:33PM  16   PAUSE THAT -- I DON'T REMEMBER THE EXACT WORDING -- BUT IT

03:34PM  17   WASN'T COMPLETE.

03:34PM  18        BUT, NO, I DID NOT FOLLOW UP WITH ANY SPECIFIC QUESTIONS

03:34PM  19   ABOUT THAT.

03:34PM  20   Q.   OKAY.  DID YOU FOLLOW UP AFTER THE CALL TO ASK TO SEE ANY

03:34PM  21   CONTRACTS OR OTHER AGREEMENTS BETWEEN THERANOS AND THE

03:34PM  22   MILITARY?

03:34PM  23   A.   I DID NOT.

03:34PM  24   Q.   DID YOU FOLLOW UP AFTERWARDS TO SEE ANY CONTRACTS OR OTHER

03:34PM  25   ARRANGEMENT THAT WERE IN PLACE WITH PHARMACEUTICAL COMPANIES?

03:34PM 1    A.   I DID NOT.

03:34PM 2    Q.   OKAY.  DURING THE COURSE OF THE CALL, MR. HALL DID ASK

03:34PM 3    SOME QUESTIONS; CORRECT?

03:34PM 4    A.   CORRECT.

03:34PM 5    Q.   DID ANY OF THE QUESTIONS THAT MR. HALL ASKED RELATE TO THE

03:34PM 6    MILITARY ASPECT OF THERANOS'S BUSINESS?

03:34PM 7    A.   YOU KNOW, I DON'T BELIEVE SO.  I MEAN, I'D HAVE TO LOOK

03:34PM 8    BACK AT THE TRANSCRIPT TO KNOW FOR SURE.

03:34PM 9    Q.   OKAY.

03:34PM 10   A.   BUT I DON'T BELIEVE.

03:34PM 11   Q.   DID, DID, DID -- DID MR. HALL, TO YOUR KNOWLEDGE, DO ANY

03:34PM 12   FOLLOWUP TO ASK FOR FURTHER INFORMATION FROM THERANOS AFTER THE

03:34PM 13   CALL ABOUT THOSE TWO BUSINESS UNITS?

03:35PM 14   A.   YOU KNOW, I -- HERE'S -- LET ME ANSWER YOUR QUESTION THIS

03:35PM 15   WAY.

03:35PM 16        SO PRIOR TO THIS CALL --

03:35PM 17   Q.   WELL, LET ME JUST GET AN ANSWER TO THE QUESTION I'VE

03:35PM 18   ASKED.

03:35PM 19        DO YOU KNOW -- AND IF YOU DON'T, IT'S FINE.  DID MR. HALL

03:35PM 20   FOLLOW UP TO ASK FOR MORE INFORMATION ABOUT THOSE TWO BUSINESS

03:35PM 21   UNITS?

03:35PM 22   A.   SO I KNOW MR. HALL HAD A FOLLOW-ON CONVERSATION WITH

03:35PM 23   ELIZABETH A FEW DAYS LATER.

03:35PM 24   Q.   OKAY.

03:35PM 25   A.   I DON'T KNOW IF HE SPECIFICALLY ASKED THOSE QUESTIONS OR

03:35PM  1    NOT.

03:35PM  2    Q.   OKAY.  AND WAS -- IS THE RECORDING OF THE CALL THE FIRST

03:35PM  3    TIME THAT YOU HAVE ANY RECORDED COMMUNICATION WITH THERANOS OR

03:35PM  4    ANYONE ELSE REFERENCING A MILITARY BUSINESS AT THERANOS?

03:35PM  5    A.   THAT'S THE FIRST RECORDING THAT I HAVE, PERIOD.

03:35PM  6    Q.   WELL, DID YOU HAVE ANY -- DID YOU RECEIVE ANY WRITTEN

03:35PM  7    INFORMATION IN ADVANCE OF THIS CALL ABOUT A MILITARY BUSINESS

03:35PM  8    AT THERANOS?

03:35PM  9    A.   NOT THAT I REMEMBER.

03:35PM  10   Q.   OKAY.  DID YOU KNOW THE PARTICULAR PHARMACEUTICAL

03:36PM  11   COMPANIES THAT THERANOS HAD WORKED WITH PRIOR TO 2013?

03:36PM  12   A.   NOT BY NAME.

03:36PM  13   Q.   OKAY.  DID YOU UNDERSTAND FROM MR. CHRIS LUCAS THAT THERE

03:36PM  14   HAD BEEN REFINEMENT AND DEVELOPMENT OF THE TECHNOLOGY PRIOR TO

03:36PM  15   2013?

03:36PM  16   A.   I DID.

03:36PM  17   Q.   AND DID HE GIVE PERIODIC UPDATES ON THAT DURING THE COURSE

03:36PM  18   OF THOSE YEARS?

03:36PM  19   A.   YOU KNOW, CERTAINLY IN OUR CONVERSATIONS I WOULD HAVE

03:36PM  20   ASKED HIM, OR WE WOULD HAVE HAD DISCUSSIONS ABOUT THE STATE OF

03:36PM  21   THE TECHNOLOGY.

03:36PM  22   Q.   OKAY.  AND DO YOU RECALL IF HE MENTIONED THAT THERE WERE

03:36PM  23   VARIOUS SERIES OF THE TECHNOLOGY THAT THERANOS HAD DEVELOPED?

03:36PM  24   A.   I DON'T REMEMBER SPECIFIC CONVERSATIONS ABOUT SERIES.

03:36PM  25   Q.   OKAY.  DO YOU RECALL WHEN THERE WAS A FIRST CONVERSATION

03:37PM 1    THAT THERE HAD BEEN A REFERENCE TO A THERANOS 1.0 DEVICE?

03:37PM 2    A.   I REMEMBER SEEING 1.0 --

03:37PM 3    Q.   YEAH.

03:37PM 4    A.   -- IN SOME OF THOSE EARLY MATERIALS THAT WE RECEIVED.

03:37PM 5    Q.   OKAY.  AND DO YOU KNOW WHAT SERIES THERANOS HAD DEVELOPED

03:37PM 6    TO BY 2013?

03:37PM 7    A.   I DON'T KNOW THE SPECIFICS SERIES NUMBER.

03:37PM 8    Q.   OKAY.  YOU DIDN'T HAVE THE DETAILED INFORMATION ABOUT

03:37PM 9    WHERE THEY WERE IN THE DEVELOPMENT OF THEIR TECHNOLOGY?

03:37PM 10   A.   WELL, I KNEW THE TECHNOLOGY HAD STARTED FROM A LIMITED SET

03:37PM 11   OF TESTS, OR A SMALL SET OF TESTS TO, YOU KNOW, I THINK AROUND

03:37PM 12   THIS 2013 TIMEFRAME THERE WERE THOUSANDS OF TESTS THAT COULD BE

03:37PM 13   RUN AND SO THAT REPRESENTED A SUBSTANTIAL IMPROVEMENT.

03:37PM 14        SO I DON'T KNOW IF IT WENT FROM 1.0 TO 12.0 OR 10.0, BUT

03:37PM 15   THERE WAS --

03:37PM 16   Q.   DID MS. HOLMES MAKE REFERENCE IN THE RECORDING WE JUST

03:37PM 17   HEARD TO THOUSANDS OF TESTS?

03:37PM 18   A.   SHE DID NOT.

03:37PM 19   Q.   DID SHE ASSOCIATE THERANOS'S DEVICE AT THAT TIME WITH

03:38PM 20   THOUSANDS OF TESTS?

03:38PM 21   A.   NOT ON THAT CALL.

03:38PM 22   Q.   OKAY.  NOW, YOU WERE ASKED QUESTIONS ABOUT THE PORTION OF

03:38PM 23   THIS CONVERSATION THAT RELATED TO QUESTIONING OF MS. HOLMES;

03:38PM 24   CORRECT?

03:38PM 25   A.   I'M SORRY, I DON'T UNDERSTAND.

03:38PM 1    Q.   WELL, THE PORTIONS OF THE CALL THAT HAVE BEEN PLAYED THUS

03:38PM 2    FAR ARE PORTIONS OF A CALL WHERE MS. HOLMES IS PRESENT ON THE

03:38PM 3    CALL; CORRECT?

03:38PM 4    A.   CORRECT.

03:38PM 5    Q.   BUT THEN THE TAPE CONTINUED; CORRECT?

03:38PM 6    A.   THAT'S CORRECT.

03:38PM 7    Q.   AND INDIVIDUALS ON THE CALL HAD THE OPPORTUNITY TO ASK

03:38PM 8    QUESTIONS OF CHRIS LUCAS; CORRECT?

03:38PM 9    A.   CORRECT.

03:38PM 10   Q.   AND DID YOU ASK ANY QUESTIONS OF CHRIS LUCAS DURING THAT

03:38PM 11   TIME?

03:38PM 12   A.   NOT ON THAT CALL.

03:38PM 13   Q.   DID MR. HALL ASK QUESTIONS OF CHRIS LUCAS DURING THAT

03:39PM 14   PERIOD?

03:39PM 15   A.   I THINK HE MAY HAVE ASKED A FOLLOWUP.

03:39PM 16   Q.   LET ME ASK THAT THE FOLLOWING SEGMENT OF 1349 BE PLAYED.

03:39PM 17        1349-A.

03:39PM 18        MR. SCHENK:  I'M SORRY.  IS THIS SOMETHING THAT HAS

03:39PM 19   BEEN PREVIOUSLY PUBLISHED?

03:39PM 20        MR. DOWNEY:  WELL, IT'S WITHIN THE RECORDING THAT HE

03:39PM 21   HAS ALREADY AUTHENTICATED, YES.

03:39PM 22        THE COURT:  OKAY.  THAT'S FINE.  THAT CAN BE PLAYED

03:39PM 23   NOW.

03:39PM 24        "MEETING OPERATOR:  THANK YOU.  THE NEXT QUESTION COMES

03:39PM 25   FROM CRAIG HALL.  PLEASE GO AHEAD."

03:39PM   1            MR. SCHENK:  I'M SORRY, YOUR HONOR.  OBJECTION.

03:39PM   2       THIS IS NOT SOMETHING THAT WAS PREVIOUSLY PLAYED FOR THE

03:39PM   3  JURY.  THIS IS A DIFFERENT PART OF 1349.  HEARSAY.

03:39PM   4            MR. DOWNEY:  IT'S PART OF THE SAME RECORDING.  THIS

03:39PM   5  IS JUST A SEGMENT THAT WE WISH TO PLAY FOR THE BENEFIT OF THE

03:39PM   6  JURY.

03:39PM   7            THE COURT:  WELL, LET'S SEE.  ALL RIGHT.  LET'S

03:40PM   8  IDENTIFY THIS SO I CAN FIND IT.

03:40PM   9       THIS IS IN 1349.  THIS IS SIDE B THEN?

03:40PM  10            MR. SCHENK:  YES, YOUR HONOR.

03:40PM  11            THE COURT:  AND DO YOU HAVE -- MR. DOWNEY, DO YOU

03:40PM  12  HAVE THE GOVERNMENT'S TRANSCRIPT THAT YOU COULD GUIDE ME TO?

03:40PM  13            MR. DOWNEY:  I DO, YOUR HONOR, AND IT WILL BE

03:40PM  14  TOWARDS THE BACK OF THE TRANSCRIPT.

03:40PM  15            MR. SCHENK:  YOUR HONOR, I BELIEVE IT'S ON PAGE 18,

03:40PM  16  LINE 6.

03:40PM  17            THE COURT:  YES.  THIS WAS NOT PLAYED PREVIOUSLY.

03:40PM  18            MR. DOWNEY:  IT WAS NOT PLAYED PREVIOUSLY, BUT IT IS

03:40PM  19  PART OF THE SAME RECORDING THAT MR. SCHENK PLAYED.

03:40PM  20            MR. SCHENK:  YOUR HONOR, WE MET ON 106 AND THIS WAS

03:40PM  21  NOT PRESENTED TO THE GOVERNMENT.

03:40PM  22            MR. DOWNEY:  I BEG YOUR PARDON, I THOUGHT IT WAS.

03:40PM  23            THE COURT:  LET ME LET YOU MEET AND CONFER FOR JUST

03:40PM  24  A MOMENT ABOUT THIS WHILE I LOOK AT THIS.  THANK YOU.

03:41PM  25            (DISCUSSION OFF THE RECORD.)

03:42PM  1          MR. SCHENK:  YOUR HONOR, WE STILL OBJECT ON HEARSAY,

03:42PM  2     AND I'M NOT SURE -- THIS HAS NOT BEEN PREVIOUSLY PLAYED FOR THE

03:42PM  3     JURY.  IT HASN'T BEEN MOVED INTO EVIDENCE YET, SO I THINK WE

03:42PM  4     HAVE TO GET OVER THAT HURDLE BEFORE IT COMES IN.

03:42PM  5          THE COURT:  IT ALSO SEEMS TO BE A DIFFERENT PARTY

03:42PM  6     SPEAKING.

03:42PM  7          MR. SCHENK:  YES, YOUR HONOR.

03:42PM  8          MR. DOWNEY:  IT IS THE PARTY THROUGH WHOM

03:42PM  9     MR. TOLBERT HAS TESTIFIED HE INVESTED AND RECEIVED INFORMATION

03:42PM 10     ABOUT THE COMPANY FOR THE PRIOR SEVEN YEARS, AND IT'S AN

03:43PM 11     EXCHANGE THAT COMPLETES THE CALL AND PURPORTS TO EXPLAIN

03:43PM 12     PORTIONS OF THE CALL THAT HAVE PREVIOUSLY -- IN WHICH

03:43PM 13     MS. HOLMES PREVIOUSLY PARTICIPATED AND --

03:43PM 14          THE COURT:  I SEE THAT.

03:43PM 15       BUT THE SPEAKER IS NOT MS. HOLMES.  IT'S SOMEBODY ELSE

03:43PM 16     ANSWERING A QUESTION --

03:43PM 17          MR. DOWNEY:  THAT'S CORRECT.

03:43PM 18          THE COURT:  -- THAT'S POSED ABOUT A DIFFERENT TOPIC.

03:43PM 19          MR. DOWNEY:  THAT'S CORRECT.

03:43PM 20          THE COURT:  AND I DON'T SEE THE 106 CONNECTION

03:43PM 21     THERE.  THAT'S MY PROBLEM.

03:43PM 22          MR. DOWNEY:  WELL, THIS WITNESS HAS BEEN TESTIFYING

03:43PM 23     ABOUT WHAT'S IMPORTANT TO HIS ENTITY AS AN INVESTOR.

03:43PM 24       THE QUESTION IS THE ONLY QUESTION THAT HIS ENTITY ASKS,

03:43PM 25     OTHER THAN THE ONE THAT HAS BEEN PLAYED.

03:44PM   1          THE COURT:  WELL, THE QUESTION IS TO -- AS I READ

03:44PM   2     THE TRANSCRIPT, MR. DOWNEY, I JUST DON'T SEE THE RELATIONSHIP

03:44PM   3     BETWEEN THAT AND THE QUESTION THAT HE'S PREVIOUSLY ASKED.  I

03:44PM   4     JUST DON'T SEE IT IN THE 106 CONTEXT.

03:44PM   5          MAYBE YOU CAN ASK SOME MORE QUESTIONS ABOUT THIS FOR

03:44PM   6     FOUNDATION.

03:44PM   7          MR. DOWNEY:  SURE.

03:44PM   8          THE COURT:  WELL, MR. LOOBY IS GOING TO GIVE YOU A

03:44PM   9     LIFELINE HERE.

03:44PM  10          MR. DOWNEY:  YOUR HONOR, IF THERE ARE PORTIONS OF

03:44PM  11     THIS -- WELL, LET ME EXPLAIN AGAIN FOR JUST ONE MOMENT.

03:44PM  12          I THINK THE WITNESS ALREADY TESTIFIED THAT THE ENTIRE TAPE

03:44PM  13     IS A TAPE RECORDING OF THE SAME CONVERSATION.  THE ONLY

03:44PM  14     VARIATION IS PARTICIPANTS GOING IN AND OUT.

03:44PM  15          THERE'S ONLY A PORTION OF THE TAPE FOR MS. HOLMES IS A

03:44PM  16     PARTICIPANT.

03:45PM  17          THE TAPE THEN CONTINUES AND THEN THERE'S A DISCUSSION,

03:45PM  18     WHICH IS A DISCUSSION OF INFORMATION THAT IS IMPORTANT TO

03:45PM  19     POTENTIAL INVESTORS, INCLUDING THE WITNESS'S GROUP, AS TO

03:45PM  20     WHETHER TO INVEST OR NOT AT THIS TIME.

03:45PM  21          I WOULD CERTAINLY THINK IT GOES TO MATERIALITY.

03:45PM  22          THERE'S NOT -- I DON'T KNOW IF THERE'S A HEARSAY CONCERN

03:45PM  23     OR WHAT THE CONCERN IS.  IT'S NOT A 106 CONCERN CERTAINLY.

03:45PM  24          THE COURT:  WELL, THE RELEVANCE OF THIS IS YOU'RE

03:45PM  25     TRYING TO SEE WHETHER OR NOT THIS INFORMATION WAS MATERIAL TO

| | | |
|---|---|---|
| 03:45PM | 1 | THIS WITNESS'S INVESTMENT? |
| 03:45PM | 2 | MR. DOWNEY:  THAT'S CORRECT. |
| 03:45PM | 3 | THE COURT:  AND MAYBE YOU SHOULD HAND THE WITNESS |
| 03:45PM | 4 | THE TRANSCRIPT AND SEE IF THAT ANSWER -- HE READS THE |
| 03:45PM | 5 | TRANSCRIPT AND THEN YOU CAN ASK THE QUESTION, AND IF IT WAS, |
| 03:45PM | 6 | THEN MAYBE YOU PLAY IT. |
| 03:45PM | 7 | MR. DOWNEY:  SURE. |
| 03:45PM | 8 | IS THERE A REASON, YOUR HONOR, WE CAN'T -- I DON'T |
| 03:46PM | 9 | UNDERSTAND THE BASIS ON WHICH WE WOULDN'T BE ABLE TO PLAY |
| 03:46PM | 10 | PORTIONS OF THE SAME CALL WHERE THE DISCUSSION IS ALL RELATED |
| 03:46PM | 11 | TO THE SAME THING. |
| 03:46PM | 12 | THE COURT:  WELL, WHAT YOU'VE TOLD ME IS THAT THE |
| 03:46PM | 13 | BASIS OF THIS COMING IN IS THAT YOU THINK IT'S MATERIAL TO |
| 03:46PM | 14 | THAT. |
| 03:46PM | 15 | BUT IF IT'S NOT MATERIAL, THEN IT'S NOT RELEVANT, IS IT? |
| 03:46PM | 16 | MR. DOWNEY:  THAT'S RIGHT. |
| 03:46PM | 17 | BUT THE GOVERNMENT WAS ALLOWED TO PLAY THE ENTIRE TAPES |
| 03:46PM | 18 | AND THEN HAVE THE DISCUSSION AFTER THE TAPE WAS PLAYED. |
| 03:46PM | 19 | THE COURT:  RIGHT.  BUT YOU'RE OFFERING THIS FOR -- |
| 03:46PM | 20 | I GUESS I'M JUST SAYING, SHOULDN'T WE FIND OUT WHETHER OR NOT |
| 03:46PM | 21 | THIS WAS MATERIAL TO HIS DECISION? |
| 03:46PM | 22 | MR. DOWNEY:  WELL, IT'S NOT ENTIRELY DEPENDENT ON |
| 03:46PM | 23 | HIS TESTIMONY.  IT'S CONTEMPORANEOUS EVIDENCE OF WHAT WAS |
| 03:46PM | 24 | IMPORTANT. |
| 03:46PM | 25 | THE COURT:  WELL, THEN WE'RE BACK TO THE 106 THEN. |

| | | |
|---|---|---|
| 03:46PM | 1 | WE'RE KIND OF GOING IN A CIRCLE HERE. |
| 03:46PM | 2 | MR. DOWNEY:  I DON'T THINK IT'S A 106 ISSUE. |
| 03:46PM | 3 | MR. SCHENK HAS HAD THE OPPORTUNITY TO, TO REVIEW IT.  I |
| 03:46PM | 4 | MEAN, WE CAN PLAY THE ENTIRE TAPE, WHICH I SUGGESTED BEFORE, |
| 03:46PM | 5 | BUT I JUST DON'T -- WE'VE ALREADY HEARD THE ONE QUESTION THAT |
| 03:46PM | 6 | THIS ENTITY ASKED. |
| 03:46PM | 7 | I JUST WANT TO PLAY THE OTHER ONE. |
| 03:46PM | 8 | THE COURT:  AND YOU'D LIKE TO PLAY FROM LINE 6 -- |
| 03:47PM | 9 | PAGE 18, LINE 6, THROUGH PAGE 20, LINE 22?  OR LESS THAN THAT? |
| 03:47PM | 10 | MR. DOWNEY:  YES -- PAGE 18, LINE 6, THROUGH PAGE |
| 03:47PM | 11 | 20, LINE 25. |
| 03:47PM | 12 | THE COURT:  DOWN TO THE BOTTOM. |
| 03:47PM | 13 | AND YOU HAVE QUESTIONS FOR THIS WITNESS REGARDING THIS |
| 03:47PM | 14 | COLLOQUY? |
| 03:47PM | 15 | MR. DOWNEY:  I DO. |
| 03:47PM | 16 | THE COURT:  SO IS IT POSSIBLE -- CAN YOU FRAME YOUR |
| 03:47PM | 17 | QUESTION AND THEN PLAY THE TAPE AND ASK HIM IF IT ANSWERS THE |
| 03:48PM | 18 | QUESTION. |
| 03:48PM | 19 | MR. DOWNEY:  WELL, I THINK I HAVE A SERIES OF |
| 03:48PM | 20 | QUESTIONS.  THE FIRST QUESTION WILL BE WHETHER THE VOICE THAT |
| 03:48PM | 21 | IS ASKING THE QUESTION IS, IN FACT, MR. HALL TO WHOM HE |
| 03:48PM | 22 | REPORTS. |
| 03:48PM | 23 | BUT THEN THE SECOND QUESTION WILL -- I DON'T PLAN TO |
| 03:48PM | 24 | QUESTION IN DETAIL HERE.  THIS WAS THE QUESTION -- |
| 03:48PM | 25 | THE COURT:  I'M NOT TRYING TO GIVE YOU TROUBLE HERE. |

03:48PM  1          MR. DOWNEY:  YES.

03:48PM  2          THE COURT:  WE'RE DISCUSSING WHETHER THIS IS AN

03:48PM  3  8 TRACK TAPE, A CASSETTE, OR A MICROCASSETTE.

03:48PM  4      BUT -- WELL, I'LL ALLOW THIS TO BE PLAYED.  IT'S LINE 6

03:48PM  5  THROUGH -- ON PAGE 18, THROUGH PAGE 20, LINE 25.

03:48PM  6      DO YOU HAVE THAT CUED UP ALREADY?

03:48PM  7          MR. DOWNEY:  YES.

03:48PM  8          THE COURT:  AND YOU'D LIKE TO PLAY THE ENTIRETY?

03:48PM  9  YOU HAVE THE EXAMINATION FOLLOWING THAT?

03:48PM 10          MR. DOWNEY:  YES.

03:48PM 11          THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL PLAY THAT.

03:48PM 12  THANK YOU.

03:48PM 13      "MEETING OPERATOR:  THANK YOU.  OUR NEXT QUESTION COMES

03:48PM 14  FROM CRAIG HALL.  PLEASE GO AHEAD.

03:48PM 15      "QUESTIONER:  HI, CHRIS.  I'M CONFUSED A LITTLE BIT ON THE

03:48PM 16  SHARE PRICING.  ELIZABETH TALKED FAIRLY QUICKLY ABOUT 13.4 OR 5

03:49PM 17  MILLION AND UP TO THAT NUMBER AT $15 A SHARE.  AND THEN 225

03:49PM 18  MILLION AT HIGHER SHARE PRICES ALL RELATED TO SOME STRATEGIC

03:49PM 19  PARTNER AGREEMENT.  AND THEN SHE TALKED ABOUT A SHARE SPLIT AND

03:49PM 20  EARLIER SHE TALKED ABOUT $75 IN SHARE.  SO IS THE $15 THE SAME

03:49PM 21  THING AS THE $75 AFTER THE MULTIPLE OR -- HOW DOES IT ALL

03:49PM 22  RELATE TO THE CAPITALIZATION AND KIND OF WHERE WE ARE NOW AT

03:49PM 23  WHAT IS BEING OFFERED HERE?  IT'S A LITTLE HARD FOR ME TO

03:49PM 24  FOLLOW THE BOUNCING BALL.

03:49PM 25      "MR. LUCAS:  SO, CRAIG, THANKS.  HI.  SO, YES, SHE RAN

03:49PM   1    THROUGH THOSE NUMBERS QUICKLY AND -- I WAS DOING THE MATH ALSO

03:49PM   2    IN MY HEAD.  SO TO BE CLEAR, WHEN THE -- WE'VE INVESTED TWICE

03:49PM   3    IN THERANOS, SERIES B AND SERIES C.  SERIES B WE INVESTED AT

03:50PM   4    ABOUT 90 CENTS A SHARE.  SERIES C WAS A LITTLE UNDER $3 PER

03:50PM   5    SHARE.  OKAY?  AND THAT RELATES TO THE $75 VALUE.  SO THAT'S

03:50PM   6    ALL PRE-SPLIT SHARES.  SO, IF YOU PAID $3, YOU KNOW, IN SERIES

03:50PM   7    C, THAT $3 IS NOW WORTH $75.

03:50PM   8         "WHAT THEY EFFECTED, AND THESE ARE IN SOME OF THE

03:50PM   9    DOCUMENTS I'VE SIGNED, IS A FIVE FOR ONE FORWARD SPLIT.  SO

03:50PM  10    THERE ARE FIVE TIMES AS MANY SHARES THAT THE COMPANY HAS AND

03:50PM  11    THAT WE OWN AND SO NOW THE PRICE IS AT $15 PER SHARE.  SO

03:50PM  12    THAT'S THE PRICE THAT SHE'S TALKING ABOUT.

03:50PM  13         "GOING FORWARD -- NOW, IF I WAS DOING THE MATH CORRECTLY,

03:50PM  14    SHE SAYS THERE'S ABOUT 13 MILLION SHARES THAT CAN BE EXERCISED

03:51PM  15    THIS YEAR.  AND SO IF YOU MULTIPLY 15 TIMES 13 THAT'S, YOU

03:51PM  16    KNOW, CLOSE TO $200 MILLION THAT SHE TALKED ABOUT.  THEN IF WE

03:51PM  17    GO FORWARD, SHE SAID NEXT YEAR THERE ARE A COUPLE HUNDRED

03:51PM  18    MILLION SHARES THAT ARE AUTHORIZED.

03:51PM  19         "SO I SHOULD SAY THAT ACTIONS THAT SHE'S TAKING JUST

03:51PM  20    COOPERATE-WISE IN THE DOCUMENTS THAT I HAVE BEEN SIGNING

03:51PM  21    RECENTLY, FIRST OFF, I SHOULD SAY SHE -- SHE HAS CONTROLLING

03:51PM  22    INTERESTS OF THE COMPANY.  SHE HAS A FIRM GRASP ON THE COMPANY.

03:51PM  23    OKAY?  LET THERE BE NO MISTAKE, BOTH IN HOW SHE LEADS IT AND

03:51PM  24    THEN LEGALLY AND CONTRACTUALLY.

03:51PM  25         "SHE HAS DONE SOME THINGS IN THOSE DOCUMENTS THAT ALLOWS

03:51PM  1    HER TO MAINTAIN CONTROL BECAUSE SHE IS CONCERNED ABOUT SOME

03:51PM  2    FOLKS THAT MAY END UP INVESTING IN THE COMPANY, A PARTNER AND

03:52PM  3    SO FORTH, WHERE, GEE, THEY AREN'T ACTING RESPONSIBLY AS A

03:52PM  4    PARTNER AND SO MAYBE SHE WOULD WANT TO CASH THEM OUT.  SO SHE

03:52PM  5    WOULD HAVE THE RIGHT TO DO THAT.

03:52PM  6        "SO LET THERE BE NO MISTAKE, JUST LIKE SOME OF THE OTHER

03:52PM  7    HIGH FLYING COMPANIES IN SILICON VALLEY, THE STRUCTURE IS IN

03:52PM  8    PLACE THAT EVEN AFTER THE COMPANY GOES PUBLIC -- AND THAT IS

03:52PM  9    WHY THE SPLIT AND SO FORTH AND DIFFERENT CLASSES OF STOCK --

03:52PM 10    THAT EVEN AFTER THE COMPANY GOES PUBLIC, SHE WILL MAINTAIN THE

03:52PM 11    ESSENTIAL CONTROL, WHICH HAS BEEN BRILLIANTLY PLANNED BY

03:52PM 12    THEMSELVES AND THEIR LAW FIRM.  AND HAVING SAID THAT, FOLLOWING

03:52PM 13    THE SAME PLAY BOOK AS SOME OF THE OTHER NOTABLE COMPANIES.

03:52PM 14        "I WOULD MAKE ANOTHER COMMENT JUST IN THIS FINANCING, AS

03:52PM 15    SHE SAID, THERE ARE A HOST OF HIGH PROFILE COMPANIES THAT ARE

03:52PM 16    INTERESTED IN INVESTING AT THAT HIGHER DOLLAR AMOUNT.  SO IT

03:53PM 17    GIVES ME CONFIDENCE THAT THIS IS BEING WELL-VETTED BY THE VERY

03:53PM 18    SOPHISTICATED MONEY.  AND AS YOU CAN IMAGINE, THE TOP TIER

03:53PM 19    BANKS AROUND THE COUNTRY ARE ALL OVER WANTING TO PARTICIPATE IN

03:53PM 20    THIS.

03:53PM 21        "SO HOPEFULLY, CRAIG, THAT ANSWERS WHAT YOU'RE ASKING.

03:53PM 22    AND IF NOT, PLEASE, YOU KNOW, ASK OR CALL ME, CERTAINLY."

03:53PM 23    BY MR. DOWNEY:

03:53PM 24    Q.  MR. TOLBERT, DO YOU RECOGNIZE THE VOICE OF THE PERSON WHO

03:53PM 25    ASKED THAT QUESTION AS CRAIG HALL?

03:53PM 1      A.   I DO.

03:53PM 2      Q.   AND DO YOU RECOGNIZE THE VOICE OF THE PERSON WHO ANSWERED

03:53PM 3      THAT QUESTION AS CHRIS LUCAS?

03:53PM 4      A.   I DO.

03:53PM 5      Q.   AND IN SUMMARY FORM, DID MR. HALL'S QUESTION RELATE TO THE

03:53PM 6      AMOUNT OF MONEY THAT THE HALL GROUP WOULD HAVE REALIZED ON THE

03:53PM 7      PROFIT IT HAD MADE THUS FAR?

03:53PM 8      A.   I THINK HIS QUESTION RELATED TO WHAT THE VALUE WAS THAT WE

03:54PM 9      WERE INVESTING, THAT OUR 2013 POTENTIAL INVESTMENT WOULD BE

03:54PM 10     MADE AT.

03:54PM 11     Q.   OKAY.  BUT HE DID NOT ASK ANY QUESTION OF MR. LUCAS EITHER

03:54PM 12     ABOUT THE PHARMA BUSINESS; CORRECT?

03:54PM 13     A.   NOT IN THAT INTERCHANGE.

03:54PM 14     Q.   AND HE DID NOT ASK MR. LUCAS ANY QUESTIONS ABOUT WHAT

03:54PM 15     MS. HOLMES HAD JUST SAID ABOUT THE MILITARY BUSINESS; CORRECT?

03:54PM 16     A.   NOT IN THAT INTERCHANGE.

03:54PM 17     Q.   AND ARE THERE ANY OTHER QUESTIONS THAT YOU ARE AWARE OF

03:54PM 18     THAT MR. HALL ASKED DURING THE COURSE OF THAT TAPE OR

03:54PM 19     CONVERSATION?

03:54PM 20     A.   I DON'T BELIEVE THERE'S ANY OTHERS.

03:54PM 21     Q.   OKAY.  HOW SOON AFTER THAT CONVERSATION DID THE HALL GROUP

03:54PM 22     DECIDE TO MAKE AN INVESTMENT IN THERANOS?

03:54PM 23     A.   SO I BELIEVE THAT PHONE CALL WAS ON DECEMBER 20TH.  WE

03:55PM 24     MADE THE INVESTMENT AND WIRED THE FUNDS ON DECEMBER 31ST, SO

03:55PM 25     THAT WOULD HAVE BEEN 11 DAYS.

03:55PM  1    Q.   DO YOU KNOW IN THAT INTERIM WHEN THE DECISION WAS MADE?

03:55PM  2    A.   NOT SPECIFICALLY.

03:55PM  3    Q.   AND AGAIN, BETWEEN THE 20TH OF DECEMBER AND THE 31ST OF

03:55PM  4    DECEMBER, DID YOU REQUEST ANY FURTHER INFORMATION -- YOU

03:55PM  5    PERSONALLY REQUEST ANY FURTHER INFORMATION OF THERANOS?

03:55PM  6    A.   NOT DIRECTLY.

03:55PM  7    Q.   WHEN YOU SAY "NOT DIRECTLY," DID YOU ASK FOR INFORMATION

03:55PM  8    INDIRECTLY?

03:55PM  9    A.   I THINK I PROBABLY HAD A CONVERSATION WITH CHRIS LUCAS --

03:55PM  10   WELL, I KNOW I HAD SEVERAL CONVERSATIONS WITH CHRIS AFTER THIS

03:55PM  11   PHONE CALL ON THE 20TH AND BEFORE THE 31ST, AND SO I WOULD HAVE

03:55PM  12   ASKED HIM FOR -- WE WOULD HAVE HAD ADDITIONAL DISCUSSION AND

03:55PM  13   THERE WOULD HAVE BEEN THINGS THAT I ASKED HIM FOR.

03:55PM  14   Q.   DID YOU ASK HIM TO GO AND GET DOCUMENTS, FOR EXAMPLE, FROM

03:55PM  15   THERANOS?

03:55PM  16   A.   I DON'T REMEMBER SPECIFICALLY.

03:55PM  17   Q.   OKAY.  DID YOU ASK HIM TO GET ANY OF THE CONTRACTS THAT

03:56PM  18   THERANOS HAD IN PLACE WITH RETAILERS, FOR EXAMPLE?

03:56PM  19   A.   I DID NOT ASK HIM THAT.

03:56PM  20   Q.   YOU HEARD DURING THE COURSE OF THE CALL SEGMENTS THAT

03:56PM  21   MR. SCHENK PLAYED TO YOU THAT THERE WAS REFERENCE TO STRATEGIC

03:56PM  22   PARTNERS MAKING AN INVESTMENT.

03:56PM  23        YOU HEARD THAT?  DO YOU RECALL THAT?

03:56PM  24   A.   I DID, YEP.

03:56PM  25   Q.   AND DO YOU KNOW WHAT HAD HAPPENED TO CHANGE THE TERMS OF

03:56PM  1    THOSE RELATIONSHIPS AND LED TO AN INVESTMENT AT THE END OF

03:56PM  2    2013?

03:56PM  3    A.   WELL, MY UNDERSTANDING FROM THOSE PERIODIC PHONE CALLS

03:56PM  4    WITH MR. LUCAS IS THAT THE COMPANY WAS MAKING GREAT PROGRESS

03:56PM  5    AND IT WAS EVIDENCED BY COMING OUT OF STEALTH MODE AND THE

03:56PM  6    ANNOUNCEMENT OF THE PARTNERSHIP WITH WALGREENS.

03:56PM  7         SO THOSE WERE THE THINGS THAT I THOUGHT KIND OF INDICATED

03:56PM  8    THAT THERE WAS MOMENTUM AROUND THOSE RELATIONSHIPS.

03:56PM  9    Q.   DID YOU KNOW ANYTHING ABOUT AGREEMENTS THAT WERE SIGNED IN

03:56PM 10    THAT WINDOW BETWEEN DECEMBER 20TH AND DECEMBER 31ST BETWEEN

03:57PM 11    RETAILERS AND THERANOS?

03:57PM 12    A.   I HADN'T SEEN SPECIFIC CONTRACTS.

03:57PM 13    Q.   AND YOU HADN'T ASKED FOR SPECIFIC CONTRACTS; RIGHT?

03:57PM 14    A.   NO.

03:57PM 15    Q.   AND DID YOU IN THAT PERIOD GO TO ONE OF THE WALGREENS

03:57PM 16    STORES WHERE, YOU KNOW, THE THERANOS OPERATION WAS IN PLACE?

03:57PM 17    A.   NOT IN 2013.

03:57PM 18    Q.   OKAY.  YOU WENT AT A LATER TIME; CORRECT?

03:57PM 19    A.   I DID GO AT A LATER TIME.

03:57PM 20    Q.   AND WHEN YOU WENT AT A LATER TIME, DID YOU HAVE AN ORDER

03:57PM 21    FROM YOUR PHYSICIAN FOR A BLOOD TEST?

03:57PM 22    A.   I DID.

03:57PM 23    Q.   AND WHEN YOU GAVE THAT ORDER TO THE PHLEBOTOMIST OR TO THE

03:57PM 24    PERSON AT WALGREENS, THEY TOLD YOU THAT YOUR BLOOD WOULD HAVE

03:57PM 25    TO BE DRAWN BY VENOUS DRAW; CORRECT?

03:57PM   1    A.   WELL, ON THE ORDER -- JUST TO BE CLEAR, ON THE ORDER THERE

03:57PM   2    WERE TWO OR THREE DIFFERENT TESTS THAT WERE NOTED, AND THEY

03:57PM   3    TOLD ME THAT FOR ONE OF THE TESTS THERE WOULD HAVE TO BE A

03:57PM   4    VENOUS DRAW DONE.

03:57PM   5    Q.   OKAY.  AND DID YOU THEN HAVE THE VENOUS DRAW DONE?

03:58PM   6    A.   I DID NOT.  I HAD THE FINGERSTICK DONE FOR THE PORTION

03:58PM   7    THAT I COULD DO THAT WAY.  BUT I DID NOT HAVE THE VENOUS DRAW

03:58PM   8    DONE.

03:58PM   9    Q.   SO YOU CANCELLED OUT ESSENTIALLY ONE OF THE ORDERS THAT

03:58PM  10    YOUR DOCTOR HAD FILLED OUT IN THE FORM FOR YOU; IS THAT RIGHT?

03:58PM  11    A.   CORRECT.

03:58PM  12    Q.   NOW, I THINK YOU HAD TESTIFIED THAT YOUR UNDERSTANDING IN

03:58PM  13    THIS CALL IN 2013 WAS THAT, YOU KNOW, THERANOS HAD MADE VENOUS

03:58PM  14    DRAWS NO LONGER NECESSARY.  IS THAT THE ESSENCE OF WHAT YOU

03:58PM  15    SAID TO MR. SCHENK?

03:58PM  16    A.   THAT'S WHAT I BELIEVED IN 2013.

03:58PM  17    Q.   AND SO WERE YOU SHOCKED WHEN YOU WENT IN 2015 AND HAD TO

03:58PM  18    HAVE A VENOUS DRAW?

03:58PM  19    A.   I WAS SURPRISED.

03:58PM  20    Q.   AND DID YOU CONTACT MR. CHRIS LUCAS AT THAT TIME?

03:58PM  21    A.   YOU KNOW, I DIDN'T -- I BELIEVE I DID HAVE A CONVERSATION

03:58PM  22    WITH CHRIS WHERE I REFERENCED THAT EXPERIENCE.

03:58PM  23    Q.   OKAY.  AND DID YOU CONTACT MS. HOLMES ABOUT THAT

03:58PM  24    EXPERIENCE?

03:58PM  25    A.   I DID NOT CALL MS. HOLMES.

03:58PM 1    Q.   AND DID YOU CALL ANYONE ELSE AT THERANOS ABOUT THAT

03:58PM 2    EXPERIENCE?

03:58PM 3    A.   I DID NOT.

03:58PM 4    Q.   I'D LIKE TO SHOW YOU A DOCUMENT THAT IS MARKED AS

03:59PM 5    EXHIBIT 1393.

03:59PM 6    A.   IS THAT ONE IN THE BINDER THAT I CURRENTLY HAVE OR IS THAT

03:59PM 7    IN THE --

03:59PM 8    Q.   IT SHOULD BE IN THE BINDER THAT YOU CURRENTLY -- LET ME --

03:59PM 9    ACTUALLY, I DON'T THINK I'VE GIVEN YOU YOUR BINDER YET, SO --

03:59PM 10        YOUR HONOR, MAY I APPROACH THE WITNESS?

03:59PM 11             THE COURT:   YES.

04:00PM 12        (PAUSE IN PROCEEDINGS.)

04:00PM 13             THE COURT:   MR. DOWNEY, LET ME JUST ASK YOU, SIR,

04:00PM 14   HOW MUCH LONGER DO YOU THINK YOU HAVE?

04:00PM 15             MR. DOWNEY:   MAYBE 15 TO 20 MINUTES.

04:00PM 16             THE COURT:   AND I'M JUST TRYING TO TIME THIS.

04:00PM 17        AND I THINK THIS IS AN OUT OF TOWN WITNESS.   IS THAT

04:00PM 18   RIGHT?

04:00PM 19             MR. DOWNEY:   I BELIEVE IT IS, YES.

04:00PM 20             MR. SCHENK:   YES.

04:00PM 21             THE COURT:   AND THEN, MR. SCHENK, WHAT DO YOU

04:00PM 22   THINK -- I'M TRYING TO SEE HOW MUCH TIME WE HAVE LEFT WITH THIS

04:00PM 23   WITNESS AND THEN I CAN ASK THE JURY WHETHER OR NOT IT'S,

04:01PM 24   THEY'RE WILLING TO STAY TO COMPLETE THIS WITNESS'S TESTIMONY

04:01PM 25   JUST BECAUSE OF THE TRAVEL.

04:01PM  1              MR. SCHENK:  MR. DOWNEY SAID 15 TO 20 MINUTES?  I

04:01PM  2    THINK IF WE WENT TO THE BOTTOM OF THE HOUR -- ONE QUESTION

04:01PM  3    REMAINS THAT WE HAD DISCUSSED THIS MORNING ABOUT TIMING AND

04:01PM  4    WHETHER DOCUMENTS AFTER A CERTAIN DATE WOULD COME IN, AND

04:01PM  5    THAT'S STILL UNKNOWN TO ME AND SO THAT MIGHT AFFECT IT.

04:01PM  6              MR. DOWNEY:  I DON'T THINK THAT WILL BE -- I DON'T

04:01PM  7    THINK THAT WILL EVENTUATE, YOUR HONOR.

04:01PM  8              THE COURT:  IT SOUNDS LIKE THAT'S NOT GOING TO BE AN

04:01PM  9    ISSUE.

04:01PM 10              MR. SCHENK:  I WOULD THINK I HAVE 15 MINUTES IN

04:01PM 11    REDIRECT, MAYBE LESS.

04:01PM 12              THE COURT:  IT SOUNDS LIKE WE WOULD BE GOING BEFORE

04:01PM 13    5:00 O'CLOCK, IF I WERE TO ASK THIS GOOD JURY IF THEY WOULD

04:01PM 14    STAY UNTIL 5:00 O'CLOCK.

04:01PM 15              MR. DOWNEY:  I THINK FOR CERTAIN, YOUR HONOR, YES.

04:01PM 16              THE COURT:  OKAY.  LET ME TURN TO THE JURY.

04:01PM 17         LADIES AND GENTLEMEN, I -- I WANT TO KNOW IF I CAN PRESS

04:01PM 18    ON YOU THIS AFTERNOON FOR ANOTHER 40 MINUTES OR SO TO FINISH

04:01PM 19    THIS WITNESS.

04:02PM 20         DOES ANYONE HAVE AN ISSUE WITH THAT?

04:02PM 21         THANK YOU SO MUCH.  I DON'T SEE ANY HANDS.  THAT'S VERY

04:02PM 22    GENEROUS OF YOU.

04:02PM 23              MR. DOWNEY:  AND I'LL TRY TO GO THROUGH IT QUICKLY.

04:02PM 24              THE WITNESS:  YOUR HONOR, CAN I SAY THANK YOU AS

04:02PM 25    WELL?

04:02PM  1            (LAUGHTER.)

04:02PM  2                  THE COURT:  TO OUR JURY, YES.

04:02PM  3                  MR. DOWNEY:  YOUR HONOR, I'VE PASSED UP THROUGH

04:02PM  4    MS. KRATZMANN A COPY FOR THE COURT.

04:02PM  5    Q.   MR. TOLBERT, CAN I ASK YOU TO LOOK AT EXHIBIT 1393 IN THAT

04:02PM  6    NOTEBOOK?

04:02PM  7                  MR. SCHENK:  YOUR HONOR, I DON'T HAVE THAT DOCUMENT.

04:03PM  8                  THE WITNESS:  I DON'T SEE THAT ONE.

04:03PM  9                  THE COURT:  IT DIDN'T GET IN HERE YET.

04:03PM 10                  MR. DOWNEY:  I'M SORRY.  IT'S NUMBERED TWICE, BUT

04:03PM 11    IT'S 7384.

04:03PM 12                  THE COURT:  THANK YOU.

04:03PM 13                  THE CLERK:  SO FOR THE RECORD, COUNSEL, THE EXHIBIT

04:03PM 14    IS 7384?

04:03PM 15                  MR. DOWNEY:  THAT'S CORRECT.

04:03PM 16            (PAUSE IN PROCEEDINGS.)

04:04PM 17    BY MR. DOWNEY:

04:04PM 18    Q.   HAVE YOU HAD AN OPPORTUNITY TO REVIEW THAT?

04:04PM 19    A.   I HAVE.

04:04PM 20    Q.   DO YOU RECOGNIZE THIS AS AN EMAIL EXCHANGE RELATED TO THE

04:04PM 21    INVESTMENT THAT THE HALL GROUP MADE IN THERANOS BETWEEN

04:04PM 22    YOURSELF AND OTHERS?

04:04PM 23    A.   I DO.

04:04PM 24                  MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

04:04PM 25    7384.

04:04PM  1          MR. SCHENK:  YOUR HONOR, TWO OBJECTIONS.  FIRST,

04:04PM  2    IT'S HEARSAY.  SECOND, IT IS AFTER THE DATE WE DISCUSSED,

04:04PM  3    12-31-2013.

04:04PM  4          MR. DOWNEY:  YOUR HONOR, I THINK THE EMAIL IS FROM

04:04PM  5    2014.  THE DATE WE DISCUSSED WAS THE END OF 2015.

04:05PM  6          THE COURT:  AND IS IT HEARSAY?

04:05PM  7          MR. DOWNEY:  WELL, I -- LET ME SEE.

04:05PM  8          THE COURT:  SURE.

04:05PM  9    BY MR. DOWNEY:

04:05PM  10   Q.   IS THIS AN EMAIL THAT WAS EXCHANGED DURING THE COURSE OF

04:05PM  11   BUSINESS OF THE HALL GROUP RELATED TO ITS INVESTMENTS IN

04:05PM  12   COMPANIES?

04:05PM  13   A.   IT WAS.

04:05PM  14   Q.   AND IS THERE A SYSTEM IN PLACE AT THE HALL GROUP TO

04:05PM  15   PRESERVE THE EMAILS THAT IT SENDS?

04:05PM  16   A.   THERE IS.

04:05PM  17   Q.   AND WAS THIS EMAIL -- EXCHANGE OF EMAILS, ARE THOSE

04:05PM  18   EMAILS, WHEN THEY ARE EXCHANGED, DO THEY -- ARE THEY GENERALLY

04:05PM  19   MADE AT OR NEAR THE TIME OF THE EVENTS THAT THEY REFER TO?

04:05PM  20   A.   YEAH, I GUESS I DON'T -- I DON'T UNDERSTAND THAT QUESTION,

04:05PM  21   SO --

04:05PM  22   Q.   WELL, DO THEY RELATE TO EVENTS THAT ARE CURRENT AT THE

04:05PM  23   TIME THAT IS EXCHANGED IN THE EMAIL?

04:05PM  24   A.   YES.

04:05PM  25   Q.   AND DO PERSONS AT THE HALL GROUP STRIVE FOR THE EMAILS TO

04:06PM  1    ACCURATELY REFLECT WHAT IS GOING ON?

04:06PM  2    A.   I BELIEVE SO.

04:06PM  3    Q.   OKAY.

04:06PM  4         MR. DOWNEY:  YOUR HONOR, I MOVE THE ADMISSION OF

04:06PM  5    7384.

04:06PM  6         MR. SCHENK:  YOUR HONOR, SAME OBJECTION.  IT'S FROM

04:06PM  7    MR. HALL'S AOL TO SOMEONE WHO DOESN'T WORK AT HALL, AND THE

04:06PM  8    INDIVIDUAL THAT IT'S SENT TO I THINK WAS NOT PART OF THE

04:06PM  9    ORDINARY BUSINESS OF THE HALL GROUP.  I THINK IT HAD TO DO WITH

04:06PM 10    A SPECIAL ARRANGEMENT THAT MR. HALL MADE WITH SOME OTHER

04:06PM 11    INDIVIDUAL.  THIS IS NOT A BUSINESS RECORD.

04:06PM 12         MR. DOWNEY:  YOUR HONOR, I WOULD JUST SAY COUPLE OF

04:06PM 13    THINGS.  FIRST, THIS WITNESS HAS ACTUALLY HIMSELF SIGNED AN

04:06PM 14    AUTHENTICATION OF DOCUMENTS THAT HAVE BEEN PRODUCED AS BUSINESS

04:06PM 15    RECORDS.

04:06PM 16        SECOND, THIS EMAIL GOES TO THIS WITNESS AT THE BUSINESS

04:06PM 17    ADDRESS, I BELIEVE, OF THE HALL GROUP.  AND SO IT WAS PRINTED,

04:06PM 18    I THINK, THERE.

04:06PM 19         THE COURT:  WELL, THERE'S -- LET ME JUST SAY, I

04:06PM 20    THINK THERE'S A FEW GAPS HERE AS FAR AS 803(6).

04:07PM 21        BUT -- AND THE QUESTION IS RELIABILITY.

04:07PM 22        WHY DON'T YOU JUST ASK -- I'LL ALLOW THIS TO COME IN BASED

04:07PM 23    ON YOU --

04:07PM 24         MR. DOWNEY:  WELL, I DON'T HAVE TO PUBLISH IT,

04:07PM 25    YOUR HONOR, IF THAT'S THE ISSUE.

04:07PM  1              THE COURT:  SURE.  WHY DON'T YOU JUST PROBE THIS AND

04:07PM  2     GET WHAT YOU NEED OUT OF IT.  MINE IT FOR WHAT YOU NEED AND

04:07PM  3     THEN WE CAN MOVE ON.

04:07PM  4              MR. DOWNEY:  OKAY.

04:07PM  5     Q.   DO YOU RECALL THAT MR. HALL LEFT TO TAKE A TRIP DURING THE

04:07PM  6     LATTER PART OF 2013 WHEN THIS INVESTMENT WAS UNDER

04:07PM  7     CONSIDERATION?

04:07PM  8     A.   I DO.

04:07PM  9     Q.   AND DO YOU RECALL THAT WHEN HE LEFT, THE HALL GROUP HAD

04:07PM  10    NOT YET MADE A DECISION AS TO WHETHER OR NOT TO INVEST?

04:07PM  11    A.   I DO.

04:07PM  12    Q.   AND DO YOU RECALL THAT HE ADVISED YOU THAT THERE WAS A

04:07PM  13    RANGE OF INVESTMENT AMOUNT AND YOU COULD SELECT THAT WHEN THE

04:07PM  14    INVESTMENT DECISION WAS MADE?

04:07PM  15    A.   THAT'S CORRECT.

04:07PM  16    Q.   AND DO YOU RECALL THAT HE TOLD YOU YOU COULD EVEN CHOOSE

04:07PM  17    NOT TO INVEST IF YOU THOUGHT THAT WAS APPROPRIATE?

04:08PM  18    A.   CORRECT.

04:08PM  19    Q.   AND SO WAS IT THE CASE THAT YOU PERSONALLY ULTIMATELY MADE

04:08PM  20    THE DECISION TO INVEST IN THERANOS?

04:08PM  21    A.   YEAH.  YOU KNOW, SO WE -- MY DISCUSSIONS WITH MR. HALL HAD

04:08PM  22    BEEN THAT WE WERE, THAT WE WERE GOING TO INVEST UP TO

04:08PM  23    $5 MILLION.

04:08PM  24         WHEN HE LEFT, HE ANTICIPATED THAT WE WERE GOING TO MAKE AN

04:08PM  25    INVESTMENT.  SO HE WOULD HAVE BEEN SURPRISED IF WE HAD NOT

04:08PM  1    INVESTED ANYTHING.

04:08PM  2         BUT I THINK YOU'RE ACCURATE THAT, YOU KNOW, IF I WOULD

04:08PM  3    HAVE CHOSEN NOT TO MAKE AN INVESTMENT, THAT WOULD HAVE BEEN

04:08PM  4    OKAY.

04:08PM  5    Q.   AND DO YOU RECALL THAT HE HAD A TECHNICAL ISSUE RELATED

04:08PM  6    TO -- THAT RAISED A CONCERN FOR HIM IN CONNECTION WITH THE

04:08PM  7    INVESTMENT?

04:08PM  8    A.   I'M NOT AWARE OF IT.  I MEAN, MY DISCUSSIONS WITH MR. HALL

04:08PM  9    HAD BEEN PRIMARILY AROUND THE FACT THAT WE WANTED TO BE A

04:08PM 10    DIRECT INVENTOR WITH THERANOS, AND SO I THINK THAT THE TECH

04:09PM 11    ISSUE THAT HE REFERS TO HERE IS A TECHNICAL ISSUE, AN ISSUE OF

04:09PM 12    WANTING TO MAKE SURE THAT WE WOULD BE A DIRECT INVESTOR OF THE

04:09PM 13    COMPANY.

04:09PM 14    Q.   DO YOU RECALL DISCUSSING WITH MR. HALL HIS VIEW OF

04:09PM 15    ANALYZING AND DILIGENCE THAT COULD BE DONE ON THE INVESTMENT?

04:09PM 16    A.   CERTAINLY WE HAD HAD LOTS OF DISCUSSIONS ABOUT HOW TO

04:09PM 17    ANALYZE THE OPPORTUNITY THAT, YOU KNOW, EXISTED.

04:09PM 18    Q.   OKAY.  DID HE TELL YOU THAT HE THOUGHT IT WAS A DEAL THAT

04:09PM 19    HAD HUGE POTENTIAL?

04:09PM 20    A.   CERTAINLY.  YEAH, IN THOSE DISCUSSIONS WE BOTH FELT LIKE

04:09PM 21    THERE WAS POTENTIAL.

04:09PM 22    Q.   OKAY.  AND DO YOU THINK THAT HE -- DO YOU RECALL HIM

04:09PM 23    HAVING THE VIEW THAT THE DEAL WAS REALLY HARD TO ANALYZE OR

04:09PM 24    UNDERSTAND?

04:09PM 25    A.   YOU KNOW, I KNOW HE REFERENCES THAT HERE.  YOU KNOW, I

04:09PM   1    KNOW THAT WE BOTH, OVER THOSE LOTS OF YEARS LIKE WE TALKED

04:09PM   2    ABOUT, HAD WISHED WE HAD MORE CONCRETE FINANCIAL INFORMATION.

04:10PM   3         AND, YOU KNOW, SO IT'S HARD TO -- I MEAN, I KNOW HE SAYS

04:10PM   4    HERE THAT IT'S HARD TO UNDERSTAND OR ANALYZE.

04:10PM   5         I DON'T KNOW SPECIFICALLY WHAT THINGS HE WAS TALKING

04:10PM   6    ABOUT.  BUT I WOULD AGREE THAT IT WAS HARD TO ANALYZE.

04:10PM   7    Q.   BUT YOUR BEST UNDERSTANDING AT THE TIME THAT YOU MADE THE

04:10PM   8    INVESTMENT WAS THAT THERANOS -- FIRST, THAT THERANOS WAS IN

04:10PM   9    RETAIL PARTNERSHIPS AND THOSE STORES WOULD ROLL OUT; CORRECT?

04:10PM  10    A.   CORRECT.

04:10PM  11    Q.   AND THEN IF THAT WAS SUCCESSFUL, THEY MIGHT RETURN TO

04:10PM  12    OTHER AREAS OF THEIR BUSINESS, INCLUDING THE PHARMACEUTICAL

04:10PM  13    BUSINESS AND THE MILITARY BUSINESS; CORRECT?

04:10PM  14    A.   WELL, LIKE I SAID, I DIDN'T REALIZE THAT WAS A COMPLETE

04:10PM  15    PAUSE, AND FROM THE LANGUAGE WE READ EARLIER, IT DIDN'T SEEM

04:10PM  16    LIKE A COMPLETE PAUSE.

04:10PM  17         BUT, YOU KNOW, I DID KNOW THAT RETAIL REPRESENTED A LARGE

04:10PM  18    ENOUGH OPPORTUNITY AND A LARGE ENOUGH INVESTMENT OF TIME AND

04:10PM  19    CAPITAL THAT IT WAS THE PRIMARY OPPORTUNITY AT THE MOMENT.

04:10PM  20    Q.   AND YOU THOUGHT THE FACT THAT WALGREENS HAD MADE A

04:10PM  21    DECISION TO ENTER INTO A RETAIL PARTNERSHIP WITH THERANOS WAS

04:11PM  22    SIGNIFICANT; CORRECT?

04:11PM  23    A.   I DID THINK IT WAS VERY SIGNIFICANT.

04:11PM  24    Q.   AND YOU THOUGHT THAT WALGREENS HAD LIKELY DONE A FAIR

04:11PM  25    AMOUNT OF DUE DILIGENCE IN CONNECTION WITH ITS DECISION TO DO

04:11PM 1    THAT; CORRECT?

04:11PM 2    A.   I WOULD HAVE BELIEVED THAT.

04:11PM 3    Q.   AND THAT WOULD HAVE BEEN IMPORTANT TO YOU IN MAKING YOUR

04:11PM 4    DECISION; CORRECT?

04:11PM 5    A.   IT WOULD HAVE FACTORED INTO IT.

04:11PM 6    Q.   AND YOU ALSO KNEW DURING THE PERIOD IN BETWEEN YOUR TWO

04:11PM 7    INVESTMENTS THAT DON LUCAS AND CHRIS LUCAS HAD SOME INVOLVEMENT

04:11PM 8    IN CONNECTION WITH THERANOS; CORRECT?

04:11PM 9    A.   I DID.

04:11PM 10   Q.   AND I THINK AS WE DISCUSSED BEFORE, DON LUCAS WAS A VERY

04:11PM 11   SOPHISTICATED INVESTOR AND A PERSON WITH A SUBSTANTIAL

04:11PM 12   REPUTATION AS A TECHNOLOGY INVESTOR; CORRECT?

04:11PM 13   A.   CORRECT.

04:11PM 14   Q.   AND THAT WAS IMPORTANT TO YOU IN MAKING YOUR DECISION;

04:11PM 15   CORRECT?

04:11PM 16   A.   THAT FACTORED INTO IT.

04:11PM 17   Q.   AND I THINK WE SAW DURING YOUR --

04:11PM 18   A.   NOW, LET ME SAY THIS.  SO, YOU KNOW, DON'S INVOLVEMENT

04:12PM 19   FACTORED IN A BIG WAY INTO OUR FIRST INVESTMENT.

04:12PM 20        AND TO THIS 2013 INVESTMENT, I DON'T REMEMBER WITH

04:12PM 21   CLARITY.  I KNOW AT SOME POINT HE STEPPED AWAY FROM THE

04:12PM 22   COMPANY, OR AT LEAST STEPPED FARTHER AWAY, AND SO I DON'T

04:12PM 23   REMEMBER EXACTLY WHEN IN THE TIMEFRAME, BUT CERTAINLY HIS

04:12PM 24   INVOLVEMENT -- OR HIS INVOLVEMENT I DON'T THINK WAS AS MUCH

04:12PM 25   AROUND THIS SECOND INVESTMENT AS IT WAS AROUND THE FIRST.

04:12PM   1    Q.   BUT YOU ASSUMED IN CONNECTION WITH THE RELATIONSHIP THAT

04:12PM   2    HALL GROUP HAD WITH THERANOS THROUGH THOSE YEARS THAT HE HAD

04:12PM   3    DONE -- HE HAD THE ABILITY TO EVALUATE THERANOS; CORRECT?

04:12PM   4    A.   I -- CORRECT.

04:12PM   5    Q.   AND YOU KNEW HE WAS CHAIRMAN OF THE BOARD; CORRECT?

04:12PM   6    A.   CORRECT.

04:12PM   7    Q.   AND YOU ASSUMED THE BOARD OF DIRECTORS HAD REGULAR

04:12PM   8    MEETINGS, FOR EXAMPLE; CORRECT?

04:12PM   9    A.   I DID ASSUME THAT.

04:12PM  10    Q.   AND THAT WOULD HAVE INFLUENCED YOU AS TO WHETHER THERANOS

04:12PM  11    WOULD HAVE CONTINUED ITS DEVELOPMENT THROUGH THOSE YEARS;

04:13PM  12    CORRECT?

04:13PM  13    A.   CORRECT.

04:13PM  14    Q.   AND I THINK MR. SCHENK SHOWED YOU A RELEASE THAT THERANOS

04:13PM  15    PUT OUT IN THE MIDDLE OF 2013 RELATED TO ITS BOARD; CORRECT?

04:13PM  16    A.   CORRECT.

04:13PM  17    Q.   AND IS IT SAFE TO SAY THAT RECOGNIZING THAT THEY HAD A

04:13PM  18    BOARD WITH PEOPLE WHO WERE WELL REGARDED WAS -- INFLUENCED YOU

04:13PM  19    IN CONNECTION WITH MAKING YOUR 2013 INVESTMENT?

04:13PM  20    A.   THAT CERTAINLY WOULD HAVE BEEN A POSITIVE, NOT A NEGATIVE.

04:13PM  21    Q.   OKAY.  IS THAT SOMETHING THAT YOU TYPICALLY EVALUATE IN

04:13PM  22    CONNECTION WITH MAKING INVESTMENTS?

04:13PM  23    A.   YOU KNOW, CERTAINLY WE LOOK AT MANAGEMENT TEAMS AND BOARD

04:13PM  24    OF DIRECTORS AND EXPERTISE THAT THEY HAVE.

04:13PM  25    Q.   OKAY.  AND IS IT FAIR TO SAY THAT YOU UNDERSTOOD THAT

04:13PM  1    THERANOS HAD A VERY SUBSTANTIAL PATENT PORTFOLIO?

04:13PM  2    A.   I DID.

04:13PM  3    Q.   AND DID THAT INFLUENCE YOUR DECISION TO MAKE AN INVESTMENT

04:13PM  4    IN 2013?

04:13PM  5    A.   YOU KNOW, I DON'T KNOW IN 2013.  IT CERTAINLY DID IN 2006.

04:14PM  6    Q.   OKAY.  DID YOU GAIN ANY MORE INFORMATION THAT YOU RECALL

04:14PM  7    IN THE PERIOD 2006 TO 2013 ABOUT THE PATENT PORTFOLIO?

04:14PM  8    A.   YOU KNOW, I BELIEVE IN MY CONVERSATIONS WITH CHRIS WE

04:14PM  9    WOULD HAVE REFERENCED ONCE OR TWICE THAT THERE WOULD HAVE BEEN

04:14PM 10    ONGOING PATENTS THAT WOULD HAVE BEEN APPLIED FOR AND GRANTED,

04:14PM 11    OR THAT THERE WERE -- THERE WAS A LOT OF WORK RELATIVE TO THE

04:14PM 12    INTELLECTUAL PROPERTY THAT WAS ONGOING.

04:14PM 13        IN FACT, I THINK IT WAS EVEN REFERENCED ON ONE OF THE

04:14PM 14    TAPES, ONE OF THE SEGMENTS OF THE TAPE THAT WE LISTENED TO.

04:14PM 15    Q.   OKAY.  BUT IT'S FAIR TO SAY THAT YOU, YOU -- IN MAKING THE

04:14PM 16    INVESTMENT, YOU VIEWED THIS AS A COMPANY THAT HAD A LOT OF

04:14PM 17    POTENTIAL FOR THE FUTURE; CORRECT?

04:14PM 18    A.   THAT'S CORRECT.

04:14PM 19    Q.   AND YOU WERE ATTRACTED TO ITS MISSION; CORRECT?

04:14PM 20    A.   I WAS, CORRECT.

04:14PM 21    Q.   AND YOU FELT THAT THE -- AS A RESULT OF ALL OF THE

04:14PM 22    INFORMATION THAT YOU HAD BEEN ABLE TO GATHER OVER THE YEARS,

04:14PM 23    THE INVESTMENT MADE SENSE; CORRECT?

04:14PM 24    A.   I DID.

04:14PM 25    Q.   AND YOU HAD THE ABILITY TO PARTICIPATE OR NOT PARTICIPATE

04:15PM  1    IN THE INVESTMENT; CORRECT?

04:15PM  2    A.   CORRECT.

04:15PM  3    Q.   MR. SCHENK SHOWED YOU THE LANGUAGE IN THE LEGAL DOCUMENTS

04:15PM  4    RELATED TO ACTUALLY MAKING THE INVESTMENT; CORRECT?

04:15PM  5    A.   THAT'S CORRECT.

04:15PM  6    Q.   ARE THOSE THE ONLY DOCUMENTS THAT YOU RECEIVED FROM

04:15PM  7    THERANOS IN THE WINDOW BETWEEN DECEMBER 20TH AND DECEMBER 31ST?

04:15PM  8    A.   I BELIEVE THEY ARE.

04:15PM  9    Q.   DID THOSE DOCUMENTS ACCURATELY DESCRIBE THE SOPHISTICATION

04:15PM  10   OF THE HALL GROUP AS INVESTORS?

04:15PM  11   A.   THEY DID.

04:15PM  12   Q.   AND WAS IT THE CASE THAT YOU HAD ASKED ALL OF THE

04:15PM  13   QUESTIONS THAT YOU WANTED TO ASK PRIOR TO THE TIME THAT YOU

04:15PM  14   MADE THE INVESTMENT?

04:15PM  15   A.   YOU KNOW, CERTAINLY WE HAD LOTS OF ADDITIONAL QUESTIONS

04:15PM  16   THAT WE WOULD HAVE LIKED TO HAVE ASKED, BUT WE FELT SATISFIED

04:15PM  17   THAT WE HAD ENOUGH INFORMATION TO MOVE FORWARD WITH THE

04:15PM  18   INVESTMENT.

04:15PM  19   Q.   OKAY.

04:15PM  20        YOUR HONOR, I THINK I MIGHT BE DONE, BUT ONE MOMENT?

04:15PM  21             THE COURT:  SURE.

04:16PM  22        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

04:16PM  23             MR. DOWNEY:  YOUR HONOR, THAT'S ALL FOR

04:16PM  24   CROSS-EXAMINATION.

04:16PM  25             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:16PM  1          THANK YOU, MR. DOWNEY.

04:16PM  2          MR. SCHENK.

04:16PM  3              MR. SCHENK:  YES.  THANK YOU.

04:16PM  4                    **REDIRECT EXAMINATION**

04:16PM  5     BY MR. SCHENK:

04:16PM  6     Q.   MR. TOLBERT, MR. DOWNEY ASKED YOU SOME QUESTIONS AND

04:16PM  7     PLAYED A PORTION OF A RECORDING THAT I PLAYED FOR YOU.  IT

04:16PM  8     WAS --

04:16PM  9          YOUR HONOR, FOR THE RECORD, IT'S AT LINE 22 ON PAGE 18 OF

04:16PM 10     SIDE A.

04:16PM 11          AND IN THIS SECTION I WANT TO GIVE YOU AN OPPORTUNITY TO

04:16PM 12     EXPAND.  YOU SAID, I DON'T THINK THAT THEY WERE PAUSING

04:16PM 13     EVERYTHING, ALL MILITARY AND ALL PHARMACEUTICAL WORK.

04:16PM 14          MS. HOLMES SAYS, "OBVIOUSLY, TO BE ABLE TO DO WHAT WE HAVE

04:17PM 15     JUST DONE, WE HAD TO PAUSE A LARGE NUMBER OF OUR ONGOING

04:17PM 16     PHARMACEUTICAL AND MILITARY PROGRAMS SO THAT WE COULD FOCUS

04:17PM 17     LIKE A LASER ON THIS AND EXECUTING ON THIS."

04:17PM 18          IS THERE MORE YOU WANTED TO TESTIFY ABOUT FOR THAT

04:17PM 19     CONCEPT?

04:17PM 20     A.   WELL, YOU KNOW WE, WE -- MY UNDERSTANDING WAS THAT THERE

04:17PM 21     WERE LOTS OF PHARMACEUTICAL CONTRACTS AND WORK GOING ON AND

04:17PM 22     THERE WAS A LARGE NUMBER OF, YOU KNOW, MILITARY DEPLOYMENT

04:17PM 23     APPLICATIONS.

04:17PM 24          AND SO WHEN IT SAID WE'RE PAUSING -- WHAT WAS THE LANGUAGE

04:17PM 25     AGAIN?

04:17PM   1    Q.   A LARGE NUMBER.

04:17PM   2    A.   -- A LARGE NUMBER, YOU KNOW, I DIDN'T TAKE THAT TO MEAN A

04:17PM   3    MAJORITY OR ALL OF THEM.

04:17PM   4         I JUST THOUGHT IT MEANT IF THERE WAS 100 GOING ON, MAYBE

04:17PM   5    WE WOULD PAUSE 30 OR 40, OR WHATEVER THE CASE MAY BE.

04:17PM   6         SO, YOU KNOW, I DIDN'T -- WHEN I HEARD THAT, I DIDN'T

04:17PM   7    THINK, OH, EVERYTHING HAS STOPPED EXCEPT FOR RETAIL.

04:17PM   8    Q.   WHEN MS. HOLMES SAID THAT THEY HAD TO PAUSE ONGOING

04:18PM   9    PHARMACEUTICAL WORK, DID YOU THINK THAT THERANOS HAD ONGOING

04:18PM  10    PHARMACEUTICAL WORK IN DECEMBER OF 2013?

04:18PM  11    A.   I BELIEVE THEY DID.

04:18PM  12    Q.   WHEN MS. HOLMES SAID THAT SHE HAD TO PAUSE ONGOING

04:18PM  13    MILITARY PROGRAMS, DID YOU THINK THAT THEY HAD ONGOING MILITARY

04:18PM  14    PROGRAMS IN DECEMBER OF 2013?

04:18PM  15    A.   I DID.

04:18PM  16    Q.   MR. DOWNEY ALSO ASKED YOU IF THERE WAS A TIME DURING THE

04:18PM  17    CALL WHERE MS. HOLMES SAID THAT THE TECHNOLOGY COULD DO

04:18PM  18    THOUSANDS OF TESTS.

04:18PM  19         DO YOU REMEMBER THAT QUESTION?

04:18PM  20    A.   I DO.

04:18PM  21    Q.   AND DO YOU RECALL MS. HOLMES SAYING, "AND BECAUSE WE HAVE

04:18PM  22    MADE IT POSSIBLE TO RUN ANY COMBINATION OF LAB TESTS FROM THESE

04:18PM  23    TINY SAMPLES, THE PHYSICIAN CAN NOW SAY ON THE LAB FORM IF IN

04:18PM  24    MY EXAMPLE HEMOGLOBIN IS LOW, AUTOMATICALLY RUN IRON AND B12

04:18PM  25    AND OTHER TESTS ON THE SAME SAMPLE BECAUSE BIG DEDICATED TUBES

04:18PM 1    OF BLOOD ARE NO LONGER REQUIRED TO RUN EACH OF THOSE DIFFERENT

04:18PM 2    ASSAY METHODOLOGIES WHICH REQUIRE THEIR OWN BIG ANALYZERS IN A

04:18PM 3    TRADITIONAL LAB."

04:19PM 4        DO YOU RECALL MS. HOLMES SAYING THAT?

04:19PM 5    A.   I DO.

04:19PM 6    Q.   AND INSTEAD OF MS. HOLMES SAYING THEY COULD RUN THOUSANDS

04:19PM 7    OF TESTS, THE QUESTION THAT MR. DOWNEY ASKED YOU, DID SHE SAY

04:19PM 8    THAT THEY COULD RUN ANY COMBINATION OF LAB TESTS FROM THESE

04:19PM 9    TINY SAMPLES?

04:19PM 10   A.   CORRECT.

04:19PM 11   Q.   THANK YOU.

04:19PM 12       NO FURTHER QUESTIONS, YOUR HONOR.

04:19PM 13           THE COURT:  MR. DOWNEY?

04:19PM 14                     **RECROSS-EXAMINATION**

04:19PM 15   BY MR. DOWNEY:

04:19PM 16   Q.   JUST TWO QUESTIONS I THINK.

04:19PM 17       YOU RECALL THE QUESTION AND ANSWER BETWEEN MR. HALL AND

04:19PM 18   MS. HOLMES THAT APPEARED ON THE TAPE?

04:19PM 19       YOU HAVE TO GIVE A VERBAL AUDIBLE ANSWER.

04:19PM 20   A.   YES, I DO REMEMBER.

04:19PM 21   Q.   AND DO YOU RECALL THAT MR. HALL ASKED, REALLY WHAT IS THE

04:19PM 22   PURPOSE OF THESE INVESTMENTS?

04:19PM 23       DO YOU RECALL THAT?

04:19PM 24   A.   I DO.

04:19PM 25   Q.   AND DO YOU RECALL THAT MS. HOLMES ANSWERED BY DESCRIBING

04:19PM 1    DEVELOPMENTS THAT WOULD TAKE PLACE IN CONNECTION WITH THE

04:19PM 2    RETAIL PROJECTS OF THERANOS?

04:20PM 3    A.   I DO.

04:20PM 4              MR. DOWNEY:  THAT'S ALL I HAVE, YOUR HONOR.

04:20PM 5              THE COURT:  THANK YOU.

04:20PM 6              MR. SCHENK:  NO FURTHER QUESTIONS.

04:20PM 7              THE COURT:  MAY THIS WITNESS BE EXCUSED?

04:20PM 8              MR. SCHENK:  YES.

04:20PM 9              MR. DOWNEY:  YES, YOUR HONOR.

04:20PM 10             THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.

04:20PM 11             THE WITNESS:  THANK YOU.

04:20PM 12             THE COURT:  YOU'RE WELCOME.  JUST LEAVE THAT THERE.

04:20PM 13   THANK YOU.

04:20PM 14        ALL RIGHT.  THANK YOU, LADIES AND GENTLEMEN.  WE'LL NOW

04:20PM 15   TAKE OUR WEEKEND BREAK.  THANK YOU FOR YOUR GENEROSITY OF GOING

04:20PM 16   OVER THIS.  THIS WITNESS WAS FROM OUT OF TOWN AND, AS HE SAID,

04:20PM 17   HE WAS GRATEFUL ALSO FOR THE ABILITY TO LEAVE ON A FRIDAY.

04:20PM 18        I DO WANT TO, BEFORE WE ADJOURN, I DID WANT TO TALK TO YOU

04:20PM 19   ABOUT A SCHEDULE CHANGE FOR -- THIS IS FOR EVERYONE'S BENEFIT.

04:20PM 20        I'D LIKE TO CAPTURE SOME TIME.  I'VE TALKED TO YOU ABOUT

04:20PM 21   OUR DEFAULT NOW IS 3:00 O'CLOCK.  I'M GOING TO THINK ABOUT 4:00

04:21PM 22   O'CLOCK.  I'LL ASK YOU TO CONSIDER THAT, PLEASE.

04:21PM 23        BUT I ALSO WANT TO ASK YOU TO WRITE THESE DATES DOWN

04:21PM 24   BECAUSE THIS MIGHT -- I'M GOING TO ASK YOU IF WE CAN MEET ON

04:21PM 25   THESE DATES IN ADDITION.

04:21PM 1    NEXT WEEK, THE 28TH.  WE DON'T MEET ON THURSDAYS, AS YOU

04:21PM 2    KNOW, AND WE'RE NOT MEETING ON THE 29TH.

04:21PM 3        I'M CURIOUS IF WE CAN MEET ON THE 28TH AT SOME TIME.  THAT

04:21PM 4    SOME TIME WOULD BE AFTER -- I THINK I HAVE SOME MATTERS IN THE

04:21PM 5    MORNING FROM 9:00 TO MAYBE 10:00 O'CLOCK, MAYBE 11:00 O'CLOCK,

04:21PM 6    SO IF WE CAN MEET MAYBE AT NOON FOR SOME TIME, I THINK THAT

04:21PM 7    MIGHT INTERFERE WITH ONE OF OUR JUROR'S TRAVEL TIME, THOUGH.

04:21PM 8        SO LET ME MOVE TO THE NEXT MONTH.  THAT IS NOVEMBER.

04:21PM 9        WE HAVE -- WE'RE NOT IN SESSION ON MONDAYS, AND I THINK I

04:21PM 10   TOLD YOU I HAVE AN AFTERNOON CALENDAR, TYPICALLY MONDAY

04:22PM 11   AFTERNOONS.  BUT I DO HAVE MONDAY MORNINGS AVAILABLE.  IF YOU

04:22PM 12   CAN CHECK WITH WHATEVER YOU NEED TO, YOUR EMPLOYERS AND OTHERS,

04:22PM 13   IF THERE'S A POSSIBILITY OF MEETING ON MONDAY MORNINGS.

04:22PM 14       AND THIS WOULD BE THE -- WE HAVE FIVE MONDAYS IN NOVEMBER,

04:22PM 15   AND IF YOU CAN CHECK YOUR SCHEDULES TO SEE IF IT'S PERMITTED

04:22PM 16   FOR YOU TO COME MONDAY MORNING FROM 9:00 TO NOON, THAT WOULD BE

04:22PM 17   HELPFUL.  I THINK 9:00 TO 1 :00.

04:22PM 18       COUNSEL, THIS IS FOR YOU ALSO OF COURSE.

04:22PM 19       I'M ALSO -- CURRENTLY WE'RE SCHEDULED TO BE HERE ON

04:22PM 20   NOVEMBER 24TH.  AS YOU ALL KNOW, NOVEMBER 25TH IS THE

04:22PM 21   THANKSGIVING HOLIDAY.

04:22PM 22       I'M WONDERING IF YOU WOULD AGREE TO SWAP NOVEMBER 18TH FOR

04:22PM 23   NOVEMBER 24TH.  THAT MIGHT BE SOMETHING THAT WOULD BE HELPFUL.

04:22PM 24   THAT IS, WE'LL MEET ON THE 18TH.  WE'RE NOT SCHEDULED TO MEET

04:22PM 25   ON THE 18TH NOW, BUT I CAN MAKE OURSELVES AVAILABLE, THIS COURT

| | | |
|---|---|---|
| 04:23PM | 1 | AVAILABLE, FOR THE 18TH IF PARTIES WISH TO.  WE DON'T HAVE TO |
| 04:23PM | 2 | MEET ON THE 24TH IF THAT'S CONVENIENT FOR FOLKS. |
| 04:23PM | 3 | I JUST WANT TO OFFER THOSE DATES OUT, AND THEN WE'LL THINK |
| 04:23PM | 4 | ABOUT THAT OVER THE WEEKEND, AND COUNSEL AS WELL, YOUR TEAMS. |
| 04:23PM | 5 | AND MONDAY WE'LL TAKE THOSE UP TO SEE IF WE CAN CAPTURE |
| 04:23PM | 6 | SOME ADDITIONAL TIME. |
| 04:23PM | 7 | I ALSO HAVE TO SAY ON THE 17TH, I THINK I'VE TOLD YOU |
| 04:23PM | 8 | THIS -- MAYBE NOT -- THE 17TH OF NOVEMBER I'M UNAVAILABLE FOR |
| 04:23PM | 9 | AN HOUR FROM 10:30 TO 11:30.  SO HOPEFULLY WE CAN GET A BREAK. |
| 04:23PM | 10 | NOVEMBER 17TH, THAT'S A WEDNESDAY. |
| 04:23PM | 11 | AND I BELIEVE THAT'S ALL THE CHANGES THAT I HAVE TO |
| 04:23PM | 12 | SUGGEST NOW. |
| 04:23PM | 13 | SO PLEASE THINK ABOUT THOSE THINGS.  WE'LL TALK ABOUT |
| 04:24PM | 14 | THOSE MONDAY. |
| 04:24PM | 15 | BEFORE YOU LEAVE, PLEASE DO NOT DISCUSS THIS CASE, DO NOT |
| 04:24PM | 16 | FORM ANY OPINIONS ABOUT ANYTHING ON THIS CASE UNTIL YOU HAVE |
| 04:24PM | 17 | BEEN ASSIGNED TO THAT TASK FOR YOUR FINAL DELIBERATIONS. |
| 04:24PM | 18 | DO NOT WATCH, DO ANY INVESTIGATION, WATCH OR LISTEN TO ANY |
| 04:24PM | 19 | NEWS CASTS, DO NOT READ ANYTHING OR DO ANYTHING THAT MIGHT |
| 04:24PM | 20 | CAUSE YOU ANY INFORMATION ABOUT THE CASE, EXCEPT WHAT YOU HEAR |
| 04:24PM | 21 | IN THE COURTROOM. |
| 04:24PM | 22 | THANK YOU VERY MUCH.  HAVE A GOOD WEEKEND. |
| 04:24PM | 23 | I THINK IT'S GOING TO BE -- I THINK IT'S GOING TO BE RAINY |
| 04:24PM | 24 | SUNDAY, RIGHT?  THAT'S WHAT I HEAR.  SO PLEASE USE CAUTION WHEN |
| 04:24PM | 25 | YOU'RE DRIVING. |

| | | |
|---|---|---|
| 04:24PM | 1 | MR. CLINE? |
| 04:24PM | 2 | MR. CLINE:  YOUR HONOR, I APOLOGIZE.  THIS MAY BE |
| 04:24PM | 3 | ONLY MY CONFUSION, BUT YOU MENTIONED POSSIBLY MEETING ON |
| 04:24PM | 4 | MONDAY, AND THEN YOU SAID JUST NOW THAT YOU WOULD TALK WITH US |
| 04:24PM | 5 | ON MONDAY. |
| 04:24PM | 6 | IS THERE SESSION ON MONDAY? |
| 04:24PM | 7 | THE COURT:  THERE'S NO SESSION ON MONDAY, NO.  WE'RE |
| 04:24PM | 8 | GOING TO TALK ABOUT -- MONDAYS WOULD BE IN NOVEMBER, |
| 04:25PM | 9 | NOVEMBER 1ST.  WE'RE GOING TO TALK ABOUT IT -- EXCUSE ME. |
| 04:25PM | 10 | WE'LL TALK ABOUT IT ON TUESDAY.  YES, WE'LL TALK ABOUT IT AT |
| 04:25PM | 11 | OUR NEXT SESSION. |
| 04:25PM | 12 | IT'S THE END OF THE WEEK, MR. CLINE.  GIVE ME A BREAK |
| 04:25PM | 13 | HERE. |
| 04:25PM | 14 | (LAUGHTER.) |
| 04:25PM | 15 | THE COURT:  ALL RIGHT.  THANKS EVERYONE.  HAVE A |
| 04:25PM | 16 | GOOD WEEKEND.  WE'LL SEE YOU. |
| 04:25PM | 17 | COUNSEL, IF YOU WOULD JUST REMAIN FOR A MOMENT. |
| 04:25PM | 18 | (JURY OUT AT 4:25 P.M.) |
| 04:25PM | 19 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 04:25PM | 20 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 04:25PM | 21 | WEEKEND.  ALL COUNSEL AND MS. HOLMES ARE PRESENT. |
| 04:25PM | 22 | I JUST WANT TO ASK, ANYTHING ELSE BEFORE WE LEAVE FOR THE |
| 04:26PM | 23 | WEEKEND, MR. SCHENK, FROM YOUR TEAM? |
| 04:26PM | 24 | MR. SCHENK:  YOUR HONOR, I'M NOT SURE IF THIS WAS |
| 04:26PM | 25 | UNCLEAR OR NOT. |

04:26PM 1     I JUST WANT THE RECORD TO REFLECT THAT THE RECORDINGS THAT

04:26PM 2     I PLAYED TODAY, I PROVIDED ALL OF THEM TO THE DEFENSE BEFORE

04:26PM 3     TODAY, AND I ONLY PLAYED RECORDINGS THAT I PROVIDED TO THEM, I

04:26PM 4     THINK IT WAS SEPTEMBER 23RD.  WE SENT A LIST OF WHAT WE

04:26PM 5     INTENDED TO PLAY.

04:26PM 6           AND THE DEFENSE, ABOUT A WEEK OR SO AGO, SENT US THEIR 106

04:26PM 7     ADDITIONS.  WE INCORPORATED EVERYTHING THAT THEY ASKED, AND

04:26PM 8     THEN THAT IS WHAT WAS PLAYED TODAY.

04:26PM 9           I THINK THAT THAT WAS CLEAR ON THE RECORD, BUT I JUST WANT

04:26PM 10    TO MAKE CLEAR.

04:26PM 11          THE COURT:  THANK YOU.

04:26PM 12       MR. DOWNEY.

04:26PM 13          MR. DOWNEY:  LET ME SAY TO MR. SCHENK, I APOLOGIZE

04:26PM 14    TO MR. SCHENK IF THAT IS THE CASE.

04:26PM 15          MY UNDERSTANDING IS THAT I PLAYED ONE CLIP WHICH WAS NOT

04:26PM 16    PART OF HIS TAPE AND WHICH OBVIOUSLY CAUSED SUBSTANTIAL

04:26PM 17    CONFUSION AND DELAY.

04:26PM 18          I BELIEVE IT IS THE CASE THAT WE SENT IT, BUT IF HE SAYS

04:26PM 19    IT IS NOT, I ACCEPT HIS WORD AND I APOLOGIZE.

04:27PM 20          THE COURT:  THANK YOU.  THANK YOU.  I APPRECIATE IT.

04:27PM 21          IT DID CAUSE A LITTLE HICCUP, BUT THIS JURY IS WONDERFUL

04:27PM 22    ABOUT GETTING DONE WHAT WE NEED TO GET DONE.  THANK YOU.

04:27PM 23       MR. DOWNEY, ANYTHING ELSE FROM YOUR TEAM?

04:27PM 24       MR. WADE?

04:27PM 25          MR. WADE:  I JUST WANT TO FLAG AND GET SOME GUIDANCE

04:27PM  1      FROM THE COURT.

04:27PM  2          THE MEMBERS OF OUR TEAM HAVE INDICATED THAT THE ECF IS

04:27PM  3      DOWN THIS WEEKEND, WHICH IS --

04:27PM  4              THE COURT:  WHAT'S WRONG WITH THAT?

04:27PM  5          (LAUGHTER.)

04:27PM  6              MR. WADE:  WHICH IS WELCOME NEWS TO I'M SURE MANY IN

04:27PM  7      THE COURTROOM.

04:27PM  8          WE INTEND TO MEET AND CONFER WITH THE GOVERNMENT ON THE

04:27PM  9      WITNESSES COMING UP.  I ASSUME IF THERE'S SOME MOTION THAT

04:27PM 10      COMES UP, SHOULD WE EMAIL IT THROUGH MS. KRATZMANN THIS

04:27PM 11      WEEKEND?

04:27PM 12          OUR HOPE IS THAT THERE ISN'T, BUT IN THE EVENT THAT WE

04:27PM 13      NEED TO PUT THE COURT ON NOTICE OF A PLEADING, SHOULD WE -- HOW

04:27PM 14      SHOULD WE DO THAT?  SHOULD WE DO IT ON THE WEEKEND AND FILE IT

04:27PM 15      WHEN THE ECF IS BACK UP?

04:27PM 16              THE COURT:  YEAH, I DON'T KNOW WHAT -- I CAN'T

04:28PM 17      REMEMBER IF IT'S DOWN ALL WEEKEND OR NOT.

04:28PM 18              THE CLERK:  IT IS ALL WEEKEND.

04:28PM 19              MR. WADE:  AND OBVIOUSLY IF WE DO IT, WE WANT TO GET

04:28PM 20      IT TO THE COURT AS QUICKLY AS WE CAN TO GIVE AS MUCH NOTICE AS

04:28PM 21      POSSIBLE.

04:28PM 22          THERE MAY NOT BE ISSUES.  WE'RE GOING TO MEET AND CONFER.

04:28PM 23              THE COURT:  I'M VERY CONFIDENT THERE WON'T BE.

04:28PM 24          (DISCUSSION OFF THE RECORD.)

04:28PM 25              THE CLERK:  6:00 A.M. SATURDAY, OCTOBER 23RD, TO

04:28PM 1    6:00 A.M. MONDAY, OCTOBER 25TH.

04:28PM 2        (PAUSE IN PROCEEDINGS.)

04:28PM 3            MR. WADE:  WHATEVER THE COURT'S PREFERENCE IS.  I

04:28PM 4    JUST --

04:29PM 5            THE COURT:  WELL, I DON'T THINK THERE'S ANYTHING

04:29PM 6    ELSE WE CAN DO.  ECF IS DOWN, SO YOU WON'T BE ABLE TO FILE IT,

04:29PM 7    ANYTHING ELSE YOU HAVE.

04:29PM 8        I THINK WE'RE AT THE MERCY OF ECF.  IF YOU FILE IT AT 6:00

04:29PM 9    A.M., YOU KNOW, WE'LL DO THE BEST WE CAN.  THAT'S ALL I CAN

04:29PM 10   TELL YOU.

04:29PM 11       YOU KNOW, WE'RE NOT IN SESSION ON MONDAY, SO SHOULD IT BE

04:29PM 12   NECESSARY, WE'LL JUST, WE'LL JUST -- JUST FILE IT WHEN YOU CAN

04:29PM 13   AND WE'LL DO WHAT WE CAN DO.

04:29PM 14           MR. WADE:  WOULD YOU LIKE US TO SEND A COURTESY COPY

04:29PM 15   TO THE COURT IF IT'S AVAILABLE BEFORE ECF GOES BACK UP?

04:29PM 16           THE COURT:  IS THERE -- LET ME ASK, IS THERE AN

04:29PM 17   EMAIL?  DO WE HAVE A GENERAL EMAIL THAT I CAN ACCESS?

04:29PM 18       (DISCUSSION OFF THE RECORD.)

04:30PM 19           THE COURT:  THANK YOU.  I THINK YOU CAN SEND IT TO

04:30PM 20   OUR COURT REPORTER AND SHE'LL GET IT TO ME.  IT SOUNDS LIKE

04:30PM 21   THAT.  BUT WHY DON'T YOU STICK AROUND AND SPEAK WITH HER.

04:30PM 22       THE CONDITION IS THAT YOU'RE GOING TO HAVE TO BE WITH HERE

04:30PM 23   AT 5:00 A.M.

04:30PM 24           MR. WADE:  THAT'S THE CONDITION WITH A LOT OF

04:30PM 25   AUDIOTAPES.  HOPEFULLY THAT WILL BE AN INCENTIVE WITHOUT HAVING

04:30PM  1    TO BURDEN ANYONE.

04:30PM  2         THANK YOU, YOUR HONOR.

04:30PM  3              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:30PM  4              MR. DOWNEY:  AS FOR NEXT WEEK, DO WE KNOW THAT THE

04:30PM  5    JUROR'S SCHEDULE WILL INCLUDE A THURSDAY SITTING OR --

04:30PM  6              THE COURT:  I'M SORRY.  SAY AGAIN?

04:31PM  7              MR. DOWNEY:  I THINK YOUR HONOR HAD BEGUN TO SAY TO

04:31PM  8    CHECK OUR SCHEDULE FOR THE AVAILABILITY OF THURSDAY, AND THEN

04:31PM  9    YOU COMMENTED ABOUT THE POTENTIAL TRAVEL SCHEDULE, AND I

04:31PM 10    UNDERSTAND WHY WE DID IT THAT WAY.  I JUST WANTED TO SEE IF WE

04:31PM 11    ALREADY KNOW.

04:31PM 12              THE COURT:  I THINK WE DO.  ONE OF OUR JURORS WHO'S

04:31PM 13    TRAVELLING, WHO HAS THE FUNERAL OUT OF TOWN, SIGNALLED THAT SHE

04:31PM 14    WAS NOT AVAILABLE.  I THINK SHE'S FLYING OUT THURSDAY.  SO

04:31PM 15    THAT'S NOT AVAILABLE.

04:31PM 16         (DISCUSSION OFF THE RECORD.)

04:31PM 17              THE COURT:  AND I'M ALSO INFORMED THAT THAT JUROR IS

04:31PM 18    NOT AVAILABLE MONDAY, THE 1ST, FOR A POSSIBLE MONDAY MEETING.

04:31PM 19         SO WE'VE GOT FOUR OTHER MONDAYS TO WORK WITH.

04:31PM 20              MR. DOWNEY:  GOOD ENOUGH.  THANK YOU, YOUR HONOR.

04:31PM 21              THE COURT:  ALL RIGHT.  HAVE A GOOD EVENING.

04:31PM 22              MR. SCHENK:  THANK YOU, YOUR HONOR.

04:31PM 23              THE CLERK:  COURT IS ADJOURNED.

04:31PM 24         (COURT ADJOURNED AT 4:31 P.M.)

        25

```
1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                    _____
                      IRENE RODRIGUEZ, CSR, CRR
17                    CERTIFICATE NUMBER 8076

18

19                    _____
                      LEE-ANNE SHORTRIDGE, CSR, CRR
20                    CERTIFICATE NUMBER 9595

21                    DATED:  OCTOBER 22, 2021

22

23

24

25
```