# EXHIBIT 17

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

   UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                    )
                  PLAINTIFF,         )  SAN JOSE, CALIFORNIA
7                                    )
          VS.                        )  VOLUME 36
8                                    )
   ELIZABETH A. HOLMES,              )  NOVEMBER 2, 2021
9                                    )
                  DEFENDANT.         )  PAGES 4903 - 5186
10  _____ )

11
                 TRANSCRIPT OF TRIAL PROCEEDINGS
12            BEFORE THE HONORABLE EDWARD J. DAVILA
                 UNITED STATES DISTRICT JUDGE
13
    A P P E A R A N C E S:
14
    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                         BY:  JOHN C. BOSTIC
                                JEFFREY B. SCHENK
16                         150 ALMADEN BOULEVARD, SUITE 900
                           SAN JOSE, CALIFORNIA 95113
17
                           BY:  ROBERT S. LEACH
18                              KELLY VOLKAR
                           1301 CLAY STREET, SUITE 340S
19                         OAKLAND, CALIFORNIA 94612

20      (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)


FOR DEFENDANT HOLMES:    WILLIAMS & CONNOLLY LLP
                         BY:  KEVIN M. DOWNEY
                              LANCE A. WADE
                              KATHERINE TREFZ
                              J.R. FLEURMONT
                              RICHARD CLEARY
                              SEEMA ROPER
                              PATRICK LOOBY
                         725 TWELFTH STREET, N.W.
                         WASHINGTON, D.C. 20005

                         LAW OFFICE OF JOHN D. CLINE
                         BY:  JOHN D. CLINE
                         ONE EMBARCADERO CENTER, SUITE 500
                         SAN FRANCISCO, CALIFORNIA 94111


ALSO PRESENT:            FEDERAL BUREAU OF INVESTIGATION
                         BY:  ADELAIDA HERNANDEZ

                         OFFICE OF THE U.S. ATTORNEY
                         BY:  LAKISHA HOLLIMAN, PARALEGAL
                              MADDI WACHS, PARALEGAL

                         WILLIAMS & CONNOLLY
                         BY:  TIMIKA ADAMS-SHERMAN, PARALEGAL

                         TBC
                         BY:  BRIAN BENNETT, TECHNICIAN


TELEPHONICALLY FOR
ROGER PARLOFF:           JOSHUA KOLTUN
                         DAVID KORZENIK

1 INDEX OF PROCEEDINGS

2
GOVERNMENT'S:
3

4 **LISA PETERSON**
CROSS-EXAM BY MR. WADE (RES.)                P. 4931
5 REDIRECT EXAM BY MR. LEACH                   P. 4982
RECROSS-EXAM BY MR. WADE                      P. 5016
6
**CONSTANCE CULLEN**
7 DIRECT EXAM BY MR. SCHENK                     P. 5018
CROSS-EXAM BY MR. CLINE                       P. 5048
8

9 **DANIEL MOSLEY**
DIRECT EXAM BY MR. SCHENK                     P. 5070
10 CROSS-EXAM BY MR. WADE                        P. 5154

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXHIBITS

2

                                            IDENT.        EVIDENCE

3     GOVERNMENT'S:

4     1992                                                4945
      200                                                 5029
5     201                                                 5032
      192                                                 5033
6     223                                                 5037
      259                                                 5039
7     262                                                 5042
      4163                                                5074
8     4173                                                5078
      3387                                                5086
9     3844                                                5116
      4202                                                5118
10    4221                                                5138
      4284                                                5141
11    4286                                                5145
      4303                                                5149
12    2172                                                5150

13

14    DEFENDANT'S:

15    14212                                               4942
      14076                                               4947
16    10588                                               4975
      10570                                               5050
17    10571                                               5052
      7079                                                5055
18    10572                                               5062
      10573                                               5064
19    10574                                               5066
      14129                                               5170
20    14130                                               5172
      14206                                               5175

21

22

23

24

25

08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:25AM
08:26AM
08:26AM
08:26AM
08:26AM
08:26AM
08:26AM
08:26AM

1    SAN JOSE, CALIFORNIA                     NOVEMBER 2, 2021

2                    P R O C E E D I N G S

3         (COURT CONVENED AT 8:25 A.M.)

4         (JURY OUT AT 8:25 A.M.)

5             THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE ON

6    THE RECORD IN THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.

7    MS. HOLMES IS PRESENT.

8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I THOUGHT WE

9    WOULD TAKE UP SOME MATTERS BEFORE THE JURY IS CALLED.

10        LET'S SEE.  LET ME JUST CALL OUT WHAT I HAVE ON MY NOTES

11   FOR AGENDA.  WE HAVE DOCKET 1103, WHICH IS A MOTION TO EXCLUDE

12   WITNESS PARLOFF; DOCKET 1116, WHICH IS A MOTION TO EXCLUDE

13   WITNESS INITIALS BB.  I THINK WE WERE GOING TO TALK ABOUT THOSE

14   TWO THINGS TODAY.

15        ANYTHING ELSE WE SHOULD ADD TO THE AGENDA FROM EITHER

16   SIDE?

17        MR. SCHENK?

18            MR. SCHENK:  GOOD MORNING.  YES, THANK YOU.

19        TODAY AFTER MS. PETERSON, THE NEXT WITNESS IS DR. CULLEN.

20   WE DON'T EXPECT DR. CULLEN TO TAKE TOO LONG.

21        AFTER DR. CULLEN, THE GOVERNMENT WILL CALL DANIEL MOSLEY.

22   MR. MOSLEY WAS AN INVESTOR.  MR. MOSLEY INVESTED IN ABOUT

23   OCTOBER OF 2014.

24        AND I MET AND CONFERRED WITH THE DEFENSE REGARDING CERTAIN

25   2015 DOCUMENTS.  MR. MOSLEY HAD EMAIL EXCHANGES WITH OTHER

08:26AM 1   POTENTIAL INVESTORS, ONE IN PARTICULAR, IN 2015.  AND I ASKED

08:26AM 2   THE DEFENSE IF THEY WERE PLANNING TO SEEK TO USE THOSE OR ADMIT

08:26AM 3   THOSE DURING CROSS, AND THEY, WHILE NOT IDENTIFYING SPECIFIC

08:26AM 4   DOCUMENTS FOR ME, SAID THAT THEY DID ANTICIPATE OFFERING

08:26AM 5   EVIDENCE FROM 2015.

08:26AM 6        AND I THINK WE WOULD BENEFIT FROM SOME GUIDANCE FROM THE

08:26AM 7   COURT ON THIS ISSUE OF COMMUNICATIONS BY INVESTORS AFTER

08:26AM 8   THEY'VE INVESTED, BUT NOT WITH THE DEFENDANT.

08:26AM 9        THE COURT WILL RECALL THAT WE TALKED ABOUT THE ISSUE WITH

08:27AM 10  REGARD TO POST-INVESTMENT CONDUCT THAT INVOLVES THE DEFENDANT,

08:27AM 11  THE DEFENDANT'S STATE OF MIND.

08:27AM 12       BUT I THINK THIS IS AN INSTANCE WHERE THE ONLY RELEVANCE

08:27AM 13  WOULD BE AN INVESTOR'S KNOWLEDGE AFTER THE INVESTOR INVESTED,

08:27AM 14  AND I THINK IT'S BEEN THE GOVERNMENT'S POSITION THROUGHOUT

08:27AM 15  TRIAL, AND WE MADE THIS ARGUMENT TO YOUR HONOR DURING

08:27AM 16  MR. TOLBERT'S TESTIMONY, THAT THE INVESTOR'S KNOWLEDGE AFTER,

08:27AM 17  IN THIS CASE SIX MONTHS OR SO AFTER, INVESTING JUST ISN'T

08:27AM 18  RELEVANT, AND INSTEAD OF RAISING THIS ISSUE THROUGH AN

08:27AM 19  OBJECTION AT THE MOMENT THE DOCUMENT WAS OFFERED, I HAVE COPIES

08:27AM 20  OF THE DOCUMENTS, AT LEAST SOME OF THE ONES THAT I'VE

08:27AM 21  IDENTIFIED.

08:27AM 22       I'D BE HAPPY TO PASS THOSE UP, AND WE CAN TAKE IT UP

08:27AM 23  WHENEVER IT IS CONVENIENT FOR THE COURT, A BREAK BEFORE

08:27AM 24  MR. MOSLEY OR NOW, WHATEVER WORKS FOR THE COURT.

08:27AM 25            THE COURT:  ALL RIGHT.  THANK YOU.  I'M HAPPY TO

08:27AM 1    RECEIVE THOSE JUST TO HAVE THEM IN ADVANCE.

08:27AM 2        MR. WADE, ARE YOU SPEAKING TO THIS?

08:28AM 3        ADRIANA.

08:28AM 4            MR. SCHENK:  (HANDING.)

08:28AM 5            MR. WADE:  I AM, YOUR HONOR.

08:28AM 6        MAYBE IT MAKES SENSE FOR THE COURT TO LOOK AT THE

08:28AM 7    DOCUMENTS.  WE CAN ADDRESS THESE DURING THE BREAK SO EVERYONE

08:28AM 8    IS ON THE SAME PAGE AND IT WOULD BE MOST EFFICIENT.

08:28AM 9        WE DON'T KNOW EXACTLY WHAT MR. MOSLEY WILL TESTIFY TO.

08:28AM 10       I DID INDICATE TO THE GOVERNMENT THAT WE MAY SEEK TO OFFER

08:28AM 11   THESE DOCUMENTS, AND OBVIOUSLY WE WOULD NEED TO LAY A

08:28AM 12   FOUNDATION FOR THEM TO BE ADMISSIBLE.

08:28AM 13       I'M NOT SURE IF THE GOVERNMENT'S POSITION IS THAT WITH

08:28AM 14   RESPECT TO THE INVESTOR CONSPIRACY, NO EVENTS RELATING TO THIS

08:28AM 15   SPECIFIC INVESTOR'S IDENTIFIED, OTHER THAN THOSE IDENTIFIED

08:28AM 16   SPECIFICALLY, IN THE INDICTMENT.

08:28AM 17       AND SUBSTANTIVE COUNTS ARE RELEVANT, BUT THEIR CONSPIRACY

08:28AM 18   COUNT IS OBVIOUSLY BROADER THAN THAT.  MAYBE TO THE EXTENT THAT

08:28AM 19   THEY'RE NARROWING THAT, THAT WOULD BE -- THAT WOULD CERTAINLY

08:28AM 20   BE RELEVANT FOR THE DEFENSE TO KNOW.

08:28AM 21       I THINK MR. MOSLEY, JUST TO GIVE THE COURT A LITTLE BIT OF

08:29AM 22   CONTEXT, I THINK YOU HEARD A LITTLE BIT THROUGH MS. PETERSON,

08:29AM 23   HE WAS A PARTNER AT CRAVATH IN NEW YORK.  A NUMBER OF HIS

08:29AM 24   CLIENTS ENDED UP INVESTING IN THERANOS, MANY OF THEM THROUGH AN

08:29AM 25   INTRODUCTION PROVIDED BY MR. MOSLEY.

08:29AM 1       MR. MOSLEY CONTINUED TO INTERACT WITH BOTH OF THOSE

08:29AM 2  INVESTORS AND HIS CLIENTS, THOSE INVESTORS WHO ARE HIS CLIENTS.

08:29AM 3       AND IN THIS CASE MR. SLACK, WHO IS A REPRESENTATIVE OF THE

08:29AM 4  OPPENHEIMER FAMILY, IT'S MR. OPPENHEIMER -- MR. SLACK IS NOT A

08:29AM 5  CLIENT OF MR. MOSLEY, BUT HE WAS A FRIEND OF      HENRY

08:29AM 6  KISSINGER, AND SECRETARY KISSINGER WAS A CLIENT OF --

08:29AM 7       THE COURT:  LET ME JUST -- I THINK WE JUST HEARD

08:29AM 8  SOMEBODY COUGH ON A TELEPHONE.

08:29AM 9       IF ANYONE WHO IS ON A PHONE, IF YOU WOULD PLEASE MUTE YOUR

08:30AM 10  PHONE, WE ALL HERE IN CALIFORNIA WOULD APPRECIATE IT.  THANK

08:30AM 11  YOU.

08:30AM 12       I'M SORRY, MR. WADE, FOR THE INTERRUPTION.

08:30AM 13       MR. WADE:  NO PROBLEM AT ALL, YOUR HONOR.

08:30AM 14       DR. KISSINGER WAS A CLIENT OF MR. MOSLEY, AND I BELIEVE AT

08:30AM 15  DR. KISSINGER'S REQUEST MR. MOSLEY WAS INTERACTING WITH

08:30AM 16  MR. SLACK OF THE OPPENHEIMER FAMILY.

08:30AM 17       THERE WERE A LOT OF INTERACTIONS THAT MR. MOSLEY HAS

08:30AM 18  THROUGHOUT THE FALL OF 2014 THAT I THINK ARE RELEVANT BOTH

08:30AM 19  BECAUSE HE PERSONALLY MAKES AN INVESTMENT DECISION, SOME OF HIS

08:30AM 20  CLIENTS MAKE INVESTMENTS, AND HE SORT OF IS PICKING INFORMATION

08:30AM 21  UP THROUGHOUT THE FALL.

08:30AM 22       AND SO SOME OF THOSE INTERACTIONS RELATED TO THE FINANCIAL

08:30AM 23  PROJECTIONS THAT THE COURT HAS HEARD EVIDENCE COME IN ABOUT,

08:30AM 24  AND SOME OF THE EMAILS THAT WE MAY SEEK TO OFFER REFLECT

08:30AM 25  MR. MOSLEY'S VIEW OF WHAT WAS REALISTIC IN TERMS OF THE

08:31AM 1    FINANCIAL NUMBERS AND THE PROJECTIONS THAT WERE PROVIDED AS

08:31AM 2    COMMUNICATED TO MR. SLACK.

08:31AM 3        SO IT REFLECTS MR. MOSLEY'S UNDERSTANDING OF INFORMATION

08:31AM 4    HE WAS OBTAINING ABOUT THE FINANCES OF THE COMPANY AS HE WAS

08:31AM 5    DEALING WITH THERANOS THROUGHOUT THE FALL OF 2014.

08:31AM 6        SO THAT'S A LITTLE BIT OF CONTEXT.

08:31AM 7            THE COURT:  IS THAT POST-INVESTMENT THEN?

08:31AM 8            MR. WADE:  IT'S POST-INVESTMENT, BUT WE THINK IT

08:31AM 9    REFLECTS HIS UNDERSTANDING AS TO LIMITATIONS ON THE

08:31AM 10   PROJECTIONS, WHICH IT'S HARD TO SEGREGATE JUST HIS INVESTMENT

08:31AM 11   DECISION HERE, YOUR HONOR, BECAUSE I THINK AS YOU'LL HEAR,

08:31AM 12   THERE ARE A LOT OF INTERACTIONS THAT MR. MOSLEY HAS STARTING IN

08:31AM 13   AUGUST OF 2014 AND CONTINUING THROUGHOUT THE FALL.

08:31AM 14       HE ULTIMATELY MAKES A PERSONAL INVESTMENT DECISION IN LATE

08:31AM 15   OCTOBER 2014, BUT THERE ARE -- THERE ARE A VARIETY OF

08:32AM 16   INTERACTIONS THAT HAPPEN THROUGHOUT THAT PERIOD, INCLUDING SOME

08:32AM 17   OF THE FINANCIAL PROJECTIONS AND THINGS RELATED TO THE COMPANY.

08:32AM 18       SO WHEN HE'S COMMUNICATING WITH MR. SLACK IN THE FUTURE,

08:32AM 19   WE THINK THAT'S EVIDENCE OF WHAT HE UNDERSTOOD EARLIER IN TIME

08:32AM 20   BECAUSE HE'S SUGGESTING THAT THERE ARE LIMITATIONS ON THE

08:32AM 21   ABILITY TO PROJECT FIVE YEARS OUT, FOR EXAMPLE, THAT

08:32AM 22   MR. BALWANI WOULD NOT BE IN A POSITION TO DO THAT, ET CETERA.

08:32AM 23       SO WE THINK THAT --

08:32AM 24            THE COURT:  I'M SORRY.  I APOLOGIZE.  BUT JUST SO I

08:32AM 25   CAN KEEP IT BEFORE I LOSE IT --

08:32AM  1           MR. WADE:  YEAH.

08:32AM  2           THE COURT:  -- SO HIS POST-INVESTMENT COMMENTS VIA

08:32AM  3   EMAIL AND OTHERS WOULD BE RELEVANT BECAUSE IT SHOWS HIS

08:32AM  4   CONTINUED THOUGHTS OR PROJECTIONS ABOUT HIS INVESTMENT IN 2014

08:32AM  5   LOOKING BACKWARDS?

08:32AM  6           I GUESS IS THAT HOW --

08:32AM  7           MR. WADE:  THERE'S NO INDICATION THAT HE GOT

08:32AM  8   ADDITIONAL INFORMATION ABOUT THE FINANCES AFTER HIS INVESTMENT

08:32AM  9   DECISION.

08:32AM  10          SO I THINK IT'S EVIDENCE OF WHAT HE UNDERSTOOD ABOUT THE

08:33AM  11   FINANCES AT THE TIME HE MADE THE INVESTMENT DECISION, BUT WE

08:33AM  12   CAN CERTAINLY -- IF THE UNDERSTANDING OF THAT IS NOT RIGHT, THE

08:33AM  13   WITNESS CAN CERTAINLY CLARIFY THAT.

08:33AM  14          IT WOULD BE, FOR EXAMPLE, IF I HAD INTERACTIONS WITH THE

08:33AM  15   COURT AND ONE OF MY COLLEAGUES WAS GOING TO COME OUT AND ARGUE

08:33AM  16   WITH YOU, AND ARGUE IN FRONT OF YOU AND I SAID TO ONE OF MY

08:33AM  17   COLLEAGUES, JUDGE DAVILA IS A VERY PLEASANT JUDGE, HE GIVES YOU

08:33AM  18   A CHANCE TO MAKE YOUR ARGUMENT, HE ASKS A LOT OF QUESTIONS,

08:33AM  19   HE'S WELL PREPARED.

08:33AM  20          EVEN THOUGH I'M COMMUNICATING THAT THREE MONTHS IN THE

08:33AM  21   FUTURE, THAT IS AN INDICATION OF THE INFORMATION I'VE OBTAINED

08:33AM  22   AS A RESULT OF MY EXPERIENCE, YOU KNOW, HERE TODAY.

08:33AM  23          AND SO I THINK IT'S SIMILAR EVIDENCE THAT RELATES TO THAT.

08:33AM  24          BUT MAYBE THE COURT CAN LOOK AT THE EMAILS AND I THINK

08:33AM  25   YOU'LL GET A SENSE OF, YOU KNOW, A SENSE OF THAT.

08:33AM 1          ONE OTHER ISSUE THAT I WANT TO FLAG FOR THE COURT WITH

08:33AM 2     RESPECT TO MR. MOSLEY.  HE IS A LAWYER, OR WAS A LAWYER AT THE

08:34AM 3     TIME THAT HE WAS INTERACTING.  HE HAS ASSERTED PRIVILEGE OVER A

08:34AM 4     LOT OF COMMUNICATIONS INVOLVING VARIOUS CLIENTS, AND I JUST

08:34AM 5     WANTED TO MAKE THE COURT AWARE OF THAT SO IT DIDN'T COME AS A

08:34AM 6     SURPRISE.

08:34AM 7          WE HAVE A SENSE OF WHERE THOSE ASSERTIONS ARE AND WE'RE OF

08:34AM 8     COURSE GOING TO DO OUR BEST TO STEER CLEAR OF ANYTHING OTHER

08:34AM 9     THAN JUST SORT OF PRIVILEGE LOG LEVEL INFORMATION AS BEST WE

08:34AM 10    CAN.

08:34AM 11         BUT I JUST WANTED TO RAISE THAT IN THE EVENT THAT IT COMES

08:34AM 12    UP DURING THE TESTIMONY OF MR. MOSLEY, BECAUSE THROUGHOUT THE

08:34AM 13    PERIOD WHERE HE'S CONSIDERING THE INVESTMENT, HE'S HAVING

08:34AM 14    PRIVILEGED COMMUNICATIONS WITH VARIOUS CLIENTS.

08:34AM 15              THE COURT:  SO IT SOUNDS LIKE YOUR EXAMINATION WOULD

08:34AM 16    SKIRT THOSE ISSUES SO IT DOESN'T HAVE TO BE RAISED TO THE

08:34AM 17    EXTENT THAT HIS TESTIMONY IS SOUGHT BY YOU.

08:34AM 18              MR. WADE:  IT WILL COME UP IN HIS TESTIMONY TO THE

08:35AM 19    EXTENT THAT HE IS HAVING COMMUNICATIONS, AND WHEN HE'S HAVING

08:35AM 20    COMMUNICATIONS, THE SUBSTANCE OF THOSE COMMUNICATIONS, YOU

08:35AM 21    KNOW, IT OBVIOUSLY WOULD NOT BE APPROPRIATE FOR US TO ASK ABOUT

08:35AM 22    GIVEN HE'S ASSERTED THE PRIVILEGE.

08:35AM 23         SO THERE ARE A COUPLE OF OCCASIONS WHERE A CERTAIN LEVEL

08:35AM 24    OF INFORMATION IS COMMUNICATED TO THIRD PARTIES.  FOR EXAMPLE,

08:35AM 25    HE MAY HAVE A COMMUNICATION WITH DR. KISSINGER, THE CONTENTS OF

08:35AM 1    WHICH WE DON'T REALLY KNOW, BUT THEN HE WILL COMMUNICATE A VERY

08:35AM 2    LIMITED PIECE OF INFORMATION TO MS. HOLMES LIKE, "I HAD A

08:35AM 3    CONVERSATION, I HOPE WE CAN MEET AGAIN IN THE FUTURE."  YOU

08:35AM 4    KNOW, NONE OF THE SUBSTANCE OF THE PRIVILEGE INFORMATION, BUT

08:35AM 5    IT'S CLEAR THAT HE IS HAVING A PRIVILEGED COMMUNICATION.

08:35AM 6        SO THE FACT OF THOSE COMMUNICATIONS WILL COME UP, BUT I

08:35AM 7    JUST WANTED TO ALERT THE COURT TO THE ISSUE SO NO ONE WAS

08:36AM 8    CAUGHT OFF GUARD.  AND WE'LL OF COURSE DO OUR BEST TO KIND OF

08:36AM 9    CAREFULLY NAVIGATE OUR WAY THROUGH THOSE ISSUES.

08:36AM 10        THE COURT:  SURE.  THANK YOU.  IT SOUNDS LIKE YOU'RE

08:36AM 11   NOT GOING TO BE CALLING UPON THE WITNESS OR THE COURT TO MAKE A

08:36AM 12   DECISION AS TO WHETHER OR NOT A PRIVILEGE SHOULD BE

08:36AM 13   APPROPRIATE.

08:36AM 14        MR. WADE:  WE DON'T INTEND TO DO THAT, YOUR HONOR.

08:36AM 15        THE COURT:  AND I'M INFORMED OF THAT.

08:36AM 16    IT SOUNDS LIKE YOUR CROSS WILL BE LENGTHY OF THIS WITNESS.

08:36AM 17        MR. WADE:  IT COULD BE.  YEAH, YEAH.

08:36AM 18        THE COURT:  OKAY.

08:36AM 19    MR. SCHENK, LET ME DRAW YOU BACK TO THE POST-INVESTMENT

08:36AM 20   COMMENT AND THE OBSERVATIONS, AS MR. WADE HAS INDICATED.

08:36AM 21        MR. SCHENK:  THANK YOU, YOUR HONOR.  TWO POINTS.

08:36AM 22        FIRST, THE GOVERNMENT IS NOT NARROWING THE CONSPIRACY

08:36AM 23   PERIOD, SIMPLY QUESTIONING THE RELEVANCE OF SPECIFIC DOCUMENTS

08:36AM 24   IN THE 2015 TIME PERIOD.

08:36AM 25        THE LINE THAT MR. WADE IS ATTEMPTING TO DRAW FOR THE

08:36AM 1    COURT, AND THAT IS 2015 STATEMENTS, THOUGHTS ARE RELEVANT IF

08:37AM 2    THEY WERE HELD BY THE WITNESS BEFORE HE INVESTED IS FAIR GAME

08:37AM 3    FOR CROSS.  IT JUST DOESN'T REQUIRE THE ADMISSION OF THESE

08:37AM 4    DOCUMENTS, AND THAT'S THE LINE THAT I'M ADVOCATING FOR.

08:37AM 5         IT'S APPROPRIATE FOR MR. WADE TO ASK THE WITNESS WHAT HE

08:37AM 6    KNEW IN 2014.  THAT DOES NOT REQUIRE MR. WADE TO DO IT BY

08:37AM 7    INTRODUCING DOCUMENTS FROM 2015 AND THEN SAYING, WAS THAT WHAT

08:37AM 8    YOU THOUGHT IN 2014?

08:37AM 9         THAT'S NOT NECESSARY, AND IT'S INTRODUCING IRRELEVANT

08:37AM 10   EVIDENCE.

08:37AM 11        WHAT IS RELEVANT IS, WHAT DID MR. MOSLEY THINK BEFORE HE

08:37AM 12   INVESTED?  AND I'M NOT OBJECTING TO THAT.  I THINK THAT THAT IS

08:37AM 13   APPROPRIATE.

08:37AM 14        BUT IT SHOULDN'T BE DONE THROUGH THE INTRODUCTION OF 2015

08:37AM 15   DOCUMENTS.

08:37AM 16        THE COURT:  SO, SO IF HE SAYS, WHAT WERE YOU

08:37AM 17   THINKING IN 2014 AND HE GETS A RESPONSE, CAN HE -- PARDON ME.

08:37AM 18   CAN HE ASK, DID YOU MEMORIALIZE THAT IN AN EMAIL IN 2015?  DID

08:37AM 19   YOU SAY THE SAME THING?  DID YOUR MIND CHANGE IN 2015?  YES OR

08:37AM 20   NO?  DID YOU MEMORIALIZE THAT IN SOME FASHION?  WITHOUT GETTING

08:38AM 21   THE DOCUMENT IN.

08:38AM 22        MR. SCHENK:  IF IN YOUR HONOR'S EXAMPLE THE TWO ARE

08:38AM 23   CONSISTENT, HE SAYS SOMETHING IN 2014 THAT'S MEMORIALIZED IN

08:38AM 24   2015, I SUPPOSE IF THE QUESTION IS, DID YOU WRITE THAT DOWN IN

08:38AM 25   AN EMAIL IN 2015, I DON'T HAVE AN OBJECTION TO IT.

08:38AM 1        WHAT CONCERNS ME IS TO SUGGEST THAT THIS OUT-OF-COURT

08:38AM 2   STATEMENT TO SOMEONE THAT MR. MOSLEY -- MR. WADE EXPLAINED THE

08:38AM 3   TENUOUS RELATIONSHIP.  IT'S NOT A CLIENT OF MR. MOSLEY'S, IT'S

08:38AM 4   A FRIEND OF A FRIEND, AND MR. MOSLEY SENDS AN EMAIL TO THIS

08:38AM 5   FRIEND OF A FRIEND.

08:38AM 6        I DON'T THINK THAT DOCUMENT NEEDS TO COME IN EVEN IF IT IS

08:38AM 7   CONSISTENT.  THIS AFTER-THE-FACT CONSISTENT STATEMENT IS

08:38AM 8   HEARSAY AND JUST NOT RELEVANT.

08:38AM 9          THE COURT:  SURE.

08:38AM 10      SO IF HIS OPINION OF THE INVESTMENT IN 2014 CONTINUED

08:38AM 11  THROUGH 2015, CAN'T YOU JUST ASK HIM THAT, MR. WADE?  DID YOUR

08:38AM 12  MIND CHANGE?

08:38AM 13      NO, IT DIDN'T.

08:38AM 14      AND YOU MEMORIALIZED THAT?  YOU WERE CONSISTENT IN THAT

08:38AM 15  OPINION?

08:38AM 16      YES, I WAS.

08:38AM 17      THANK YOU VERY MUCH.

08:38AM 18      WHY DO YOU NEED THE DOC?  AND I'LL LOOK AT THE DOCS.  I

08:39AM 19  DON'T KNOW, MAYBE THEY HAVE SOME OTHER INFORMATION, BUT --

08:39AM 20        MR. WADE:  IT MAY BE THAT THE QUESTIONING WILL

08:39AM 21  ADEQUATELY REVEAL IT.

08:39AM 22      BUT JUST TO MAKE THE EXAMPLE CONCRETE HERE, AS I SAID,

08:39AM 23  MR. MOSLEY IS COMMUNICATING WITH THERANOS AT DIFFERENT POINTS

08:39AM 24  IN TIME THROUGHOUT THE FALL.  HE ULTIMATELY MAKES A PERSONAL

08:39AM 25  INVESTMENT DECISION.  HE HAS MANY CLIENTS WHO MAKE INVESTMENT

08:39AM 1    DECISIONS IN THE FALL AND INTO THE LATE FALL.

08:39AM 2         ON FEBRUARY 5TH, 2015, HE COMMUNICATES WITH MR. SLACK, WHO

08:39AM 3    HE HAS BEEN COMMUNICATING WITH FREQUENTLY.  THERE ARE FREQUENT

08:39AM 4    COMMUNICATIONS AT THE REQUEST OF DR. KISSINGER.

08:39AM 5         ONE OF THE THINGS THEY ASK ABOUT ARE, MR. SLACK'S

08:39AM 6    COLLEAGUES ASK ABOUT ARE DETAILED PROJECTIONS.

08:39AM 7         AND IF YOU LOOK AT EXHIBIT 4380, MR. MOSLEY RESPONDS, "I

08:39AM 8    SUSPECT IT WILL BE VERY HARD FOR SUNNY TO GIVE MUCH RELIABLE

08:39AM 9    GUIDANCE ON A FIVE YEAR BASIS GIVEN HOW FAST THINGS ARE MOVING

08:40AM 10   AND THE VARIABLES.  I THINK IT WILL BE EASY TO GET SUNNY TO

08:40AM 11   EXPLAIN THE MARKET SHARE THEY ARE TARGETING AND THE VALUES

08:40AM 12   LIKELY GENERATED BY THAT SHARE."

08:40AM 13        SO THAT CLEARLY -- HE'S NOT -- HE'S INTERACTED WITH

08:40AM 14   MR. BALWANI ABOUT THESE FINANCIAL ISSUES.  THIS CLEARLY

08:40AM 15   REFLECTS HIS UNDERSTANDING AS TO THE LIMITATIONS ON THE

08:40AM 16   PROJECTIONS, AND THE NUMBER OF QUICKLY MOVING VARIABLES.

08:40AM 17        IN OTHER WORDS -- AND WE'LL SEE.  MAYBE IT WON'T BE

08:40AM 18   RELEVANT.  MAYBE HE'LL CONCEDE THAT THERE WAS A TREMENDOUS

08:40AM 19   AMOUNT OF UNCERTAINTY RELATED TO THE PROJECTIONS, AND MAYBE WE

08:40AM 20   DON'T NEED TO GET INTO THIS, BUT IF THE WITNESS SUPPORTS A VIEW

08:40AM 21   THAT DEPARTS FROM WHAT HE COMMUNICATES TO MR. SLACK, I THINK

08:40AM 22   IT'S APPROPRIATE IMPEACHMENT BY CONTRADICTION EVIDENCE.

08:40AM 23             THE COURT:  WELL, THERE'S A LOT OF OTHER INFORMATION

08:40AM 24   IN THIS EMAIL.  THE NEXT PARAGRAPH SPEAKS TO YOUR CLIENT AND

08:41AM 25   THINGS ABOUT HER.  I'M NOT SURE YOU WANTED THAT ALSO.

08:41AM 1      BUT IT SEEMS THAT THIS GIVES -- IT'S HIS OPINION OF WHAT

08:41AM 2   MR. BALWANI WOULD DO, COULD DO, AND SHOULD DO, AND I'M NOT SURE

08:41AM 3   THAT'S APPROPRIATE.  BUT LET'S LOOK AT THIS AS WE GET -- LET ME

08:41AM 4   LOOK AT THESE THINGS, THESE EMAILS, AND WE'LL -- I THINK IT'S

08:41AM 5   WISE TO TAKE IT UP AS YOU SUGGEST, MAYBE AT A BREAK PRIOR TO

08:41AM 6   THE WITNESS'S TESTIMONY.

08:41AM 7      MR. WADE:  SURE.

08:41AM 8      THE COURT:  GREAT.  THANK YOU.

08:41AM 9      I TALKED ABOUT THE OTHER ITEMS THAT I HAD ON MY AGENDA,

08:41AM 10  BUT ARE THERE ANY OTHER ITEMS THAT WE SHOULD DISCUSS THIS

08:41AM 11  MORNING?

08:41AM 12     MR. SCHENK:  NO, YOUR HONOR.

08:41AM 13     THE COURT:  OKAY.  I MENTIONED 1116, THAT WAS A

08:41AM 14  MOTION TO EXCLUDE WITNESS BB.  THAT'S ON THE TABLE NOW.  SHOULD

08:41AM 15  WE DEFER THAT?

08:41AM 16     GOOD MORNING, MR. BOSTIC.

08:41AM 17     MR. BOSTIC:  GOOD MORNING, YOUR HONOR.

08:41AM 18     IT'S THE GOVERNMENT'S REQUEST THAT WE TAKE THAT UP PERHAPS

08:41AM 19  TOMORROW.  THAT MOTION WAS FILED BY THE DEFENSE ON SATURDAY.

08:42AM 20  THIS WITNESS WILL NOT TESTIFY TODAY, AND MOST LIKELY NOT

08:42AM 21  TOMORROW EITHER.

08:42AM 22     THE GOVERNMENT WOULD LIKE TO FILE A WRITTEN RESPONSE TO

08:42AM 23  THE DEFENSE'S MOTION, AND IT INTENDS TO DO THAT SOMETIME TODAY.

08:42AM 24  SO OUR REQUEST, IF THE COURT IS AMENABLE, IS THAT WE TALK ABOUT

08:42AM 25  IT TOMORROW AT THIS TIME, OR POSSIBLY THURSDAY.

08:42AM   1                    THE COURT:  MS. TREFZ, GOOD MORNING.

08:42AM   2                    MS. TREFZ:  GOOD MORNING.

08:42AM   3          I'M HAPPY TO TALK ABOUT IT TOMORROW.

08:42AM   4          ONE THING I WOULD REQUEST IS THAT IF YOU GUYS HAVE UPDATED

08:42AM   5    INFORMATION, WE'VE ONLY GOT ONE 302 FROM ALMOST A YEAR AND A

08:42AM   6    HALF AGO OR MORE AT THIS POINT.  SO IF YOU DO HAVE UPDATED

08:42AM   7    INFORMATION, WE WOULD LOVE TO GET IT BEFORE WE DO THE ARGUMENT.

08:42AM   8                    MR. BOSTIC:  WE CAN DO THAT, YOUR HONOR.

08:42AM   9                    THE COURT:  GREAT.  OKAY.  THANK YOU.

08:42AM  10                    MS. TREFZ:  SURE.

08:42AM  11                    THE COURT:  SO WE'LL DEFER 1116 FOR TOMORROW MORNING

08:42AM  12    THEN.

08:42AM  13                    MS. TREFZ:  OKAY.

08:42AM  14                    THE COURT:  AND THEN I HAD 1103, WHICH WAS A MOTION

08:42AM  15    ABOUT MR. PARLOFF.

08:42AM  16          MR. CLINE, GOOD MORNING.

08:42AM  17                    MR. CLINE:  GOOD MORNING, YOUR HONOR.

08:42AM  18          JOHN CLINE FOR MS. HOLMES.

08:43AM  19          WOULD IT BE POSSIBLE FOR ME TO TAKE THIS OFF WHILE WE'RE

08:43AM  20    TALKING?

08:43AM  21                    THE COURT:  IT'S SO BECOMING, MR. CLINE, I'M NOT

08:43AM  22    SURE.

08:43AM  23          (LAUGHTER.)

08:43AM  24                    THE COURT:  SURE.  GO RIGHT AHEAD.

08:43AM  25                    MR. CLINE:  THANK YOU VERY MUCH.

08:43AM  1          YOUR HONOR, WE HAVE FILED 1103, WHICH IS A MOTION IN

08:43AM  2   LIMINE CONCERNING MR. PARLOFF'S TESTIMONY.  PROBABLY THE BEST

08:43AM  3   EXPRESSION OF OUR POSITION IS THE REPLY, WHICH IS 1117 FILED

08:43AM  4   YESTERDAY.

08:43AM  5          RELATED TO THIS IS 1102, WHICH IS OUR OBJECTIONS TO

08:43AM  6   MAGISTRATE JUDGE COUSINS'S ORDER QUASHING OUR SUBPOENA TO

08:43AM  7   MR. PARLOFF.

08:43AM  8          AND THE REASON THEY'RE RELATED IS THAT I THINK THE

08:43AM  9   PRINCIPAL CONCERN WITH THE SUBPOENA HAS TO DO WITH RELEVANCE OF

08:43AM  10  THE MATERIALS WE'RE SELECTING, AND IN OUR VIEW THE BROADER THE

08:43AM  11  SCOPE OF MR. PARLOFF'S TESTIMONY, THE MORE APPARENT THE

08:43AM  12  RELEVANCE OF THE MATERIALS THAT WE'RE SEEKING, AND THE REVERSE

08:43AM  13  IS TRUE AS WELL.

08:43AM  14         I THINK MR. PARLOFF'S LAWYERS, MR. KORZENIK AND

08:44AM  15  MR. KOLTUN, ARE ON THE PHONE SUPPOSEDLY TO ADDRESS THE SUBPOENA

08:44AM  16  ISSUE AS YOUR HONOR WANTS TO ADDRESS IT.

08:44AM  17              THE COURT:  OKAY.  THANK YOU.  IS THIS RELEVANT TO

08:44AM  18  TALK ABOUT THIS MORNING?

08:44AM  19              MR. CLINE:  WE DON'T HAVE TO.

08:44AM  20         MR. PARLOFF IS NOT COMING UNTIL WHEN?  NEXT WEEK.

08:44AM  21              MR. BOSTIC:  MR. PARLOFF IS NOT COMING THIS WEEK.

08:44AM  22  WE'RE HAPPY TO DISCUSS IT ANY TIME THE COURT WISHES.

08:44AM  23              THE COURT:  THANK YOU.  I'M COGNIZANT OF TIME.  IT'S

08:44AM  24  ABOUT QUARTER TILL THE HOUR, AND THIS MAY TAKE A LITTLE LONGER

08:44AM  25  THAN THAT.  MAYBE NOT.

08:44AM  1          MR. CLINE:  I THINK THIS WILL TAKE A LITTLE WHILE.

08:44AM  2     WE MAY WANT TO PUT IT OFF UNTIL TOMORROW MORNING.  I DON'T

08:44AM  3     THINK IT'S URGENT THAT WE DECIDE IT TODAY.

08:44AM  4          THE COURT:  DO YOU AGREE WITH THAT?

08:44AM  5          MR. KORZENIK:  YOUR HONOR, DAVID KORZENIK SPEAKING.

08:44AM  6      WE WILL BE AVAILABLE WHENEVER AT THE COURT'S CONVENIENCE

08:44AM  7     TO DISCUSS IT.  IT APPEARS THAT MUCH OF IT IS MOOT AT THIS

08:44AM  8     POINT.

08:44AM  9          THE COURT:  THANK YOU.  PLEASE STATE YOUR NAME

08:44AM 10     AGAIN.

08:44AM 11          MR. KORZENIK:  MY NAME IS DAVID KORZENIK, K-O-R-Z,

08:45AM 12     AS IN ZEBRA, E-N-I-K, AND WE'RE APPEARING ON BEHALF OF

08:45AM 13     JOURNALIST AND WITNESS ROGER PARLOFF.

08:45AM 14          THE COURT:  THANK YOU.  AND YOU'RE APPEARING

08:45AM 15     TELEPHONICALLY FOR THIS HEARING; IS THAT RIGHT?

08:45AM 16          MR. KORZENIK:  THAT'S CORRECT.

08:45AM 17          THE COURT:  MR. BOSTIC?

08:45AM 18          MR. BOSTIC:  THAT'S CORRECT, YOUR HONOR.

08:45AM 19      ON TIMING, YES, THIS WITNESS WILL TESTIFY POSSIBLY NEXT

08:45AM 20     WEEK AT THE EARLIEST, SO WHENEVER IT IS CONVENIENT FOR THE

08:45AM 21     COURT AND THE DEFENSE TO RAISE THIS ISSUE, WE'LL BE READY.

08:45AM 22          THE COURT:  OKAY.  THANK YOU.  I DID NOTE YOUR

08:45AM 23     OPPOSITION, WHICH IS 1115, AND THAT SEEMS TO LIMIT THE -- AT

08:45AM 24     LEAST IT INFORMS THE PARTIES THAT THE GOVERNMENT -- AS TO THE

08:45AM 25     LIMITS OF THE GOVERNMENT'S EXAMINATION OF THE WITNESS.

08:45AM 1    I WILL SAY, THOUGH, I DO HAVE AND I HAVE READ THAT, OF

08:45AM 2    COURSE, AND YOUR REPLY.  I DID HAVE SOME QUESTIONS, AND WHAT

08:45AM 3    WE'LL DISCUSS WHEN WE TALK ABOUT THIS, I THINK MR. BOSTIC, YOU

08:45AM 4    INFORM SIX BASIC AREAS OF INQUIRY, QUESTIONS I GUESS, IN YOUR

08:46AM 5    PLEADINGS, AND I THINK WHAT I'M FOCUSSED ON IS REALLY THE --

08:46AM 6    AND THANK YOU FOR THAT, FOR THAT LIMITATION.

08:46AM 7        I THINK THAT DOES TAKE CARE OF MANY ITEMS.

08:46AM 8        WHAT CONCERNS ME, THOUGH, IS WHEN YOU DESCRIBE THE

08:46AM 9    CONTEXTUAL NATURE OF THE EXAMINATION AND WHAT THAT MEANS, AND

08:46AM 10   THAT'S WHAT I'M GOING TO BE ASKING YOU ABOUT, WHAT DOES THAT

08:46AM 11   MEAN AND HOW MIGHT THAT TRAVEL INTO THE CONVERSATION, THE

08:46AM 12   EXAMINATION?  I JUST DON'T KNOW WHAT YOU HAD IN MIND ABOUT

08:46AM 13   THAT, BUT I -- YOU'LL TELL ME.

08:46AM 14       MR. CLINE:  AND, YOUR HONOR, WE AGREE THAT'S THE

08:46AM 15   ISSUE AT THIS POINT, AND WE'LL BE PREPARED TO DISCUSS IT AS

08:46AM 16   WELL.

08:46AM 17       THE COURT:  RIGHT.

08:46AM 18       AND IT MAY BE THAT, YOU KNOW, THE CONTEXT MEANS A

08:46AM 19   FOUNDATION, THAT'S ALL, DID YOU WRITE THE ARTICLE?  DID YOU

08:46AM 20   DO -- WERE YOU ASSIGNED A TASK?  DID YOU INVESTIGATE?  DID YOU

08:46AM 21   INTERVIEW?  DID YOU ASK THESE QUESTIONS?  DID SHE SAY -- WHAT

08:46AM 22   WERE HER ANSWERS?  THANK YOU VERY MUCH.

08:47AM 23       IS THAT THE CONTEXT?

08:47AM 24       MR. CLINE:  YOUR HONOR, THAT IS THE CONTEXT, AND

08:47AM 25   NONE OF IT IS OBJECTIONABLE.  IT'S THE BROADER ISSUES THAT

08:47AM 1    WE'LL BE PREPARED TO ADDRESS.

08:47AM 2          THE COURT:  RIGHT.  I THINK THERE WAS ANOTHER LINE

08:47AM 3    THAT COMES TO MIND, MR. BOSTIC, ABOUT THE REASONS WHY CERTAIN

08:47AM 4    QUESTIONS WERE ASKED AND OTHERS WERE NOT, AND THAT'S CONTEXTUAL

08:47AM 5    ALSO, BUT WE CAN TALK ABOUT THAT.

08:47AM 6        I JUST WANT TO GIVE YOU -- THAT'S WHERE I'M GOING TO NEED

08:47AM 7    SOME HELP FROM YOUR SIDE.

08:47AM 8          MR. BOSTIC:  I APPRECIATE THAT, YOUR HONOR.  WE'LL

08:47AM 9    BE READY TO DISCUSS IT.

08:47AM 10       JUST TO BRIEFLY PREVIEW IT FOR THE COURT, WHAT WE'RE

08:47AM 11   SEEKING TO HAVE MR. PARLOFF TESTIFY TO IS WHAT WE WOULD ASK ANY

08:47AM 12   WITNESS WHO IS TESTIFYING ABOUT A CONVERSATION THAT HE

08:47AM 13   PARTICIPATED IN.

08:47AM 14       SO THE CONTEXT WILL INCLUDE INFORMATION NECESSARY FOR THE

08:47AM 15   JURY TO PLACE THE SPECIFIC STATEMENTS THAT THEY'RE GOING TO

08:47AM 16   HEAR IN THE CONTEXT OF A SERIES OF CONVERSATIONS THAT LASTED

08:47AM 17   MANY HOURS.

08:47AM 18       WE DO NOT INTEND TO PLAY THE ENTIRETY OF THE RECORDINGS.

08:47AM 19   THAT WOULD TAKE MORE THAN A TRIAL DAY TO PUT IN FRONT OF THE

08:47AM 20   JURY.

08:47AM 21       SO INSTEAD WE WOULD LIKE THE JURY TO HAVE THE BENEFIT OF

08:47AM 22   MR. PARLOFF'S GENERAL STATEMENTS AND CONTEXTUAL INFORMATION

08:48AM 23   ABOUT HOW SPECIFIC STATEMENTS SPIT IN -- SORRY, FIT INTO THE

08:48AM 24   OVERALL CONVERSATIONS.  BUT WE'LL BE READY TO DISCUSS THAT.

08:48AM 25          THE COURT:  I SEE.  THANK YOU.

08:48AM 1       AND THE OTHER ISSUES THAT PERHAPS INTERESTS MR. PARLOFF'S

08:48AM 2   LAWYERS WHO ARE ON THE LINE IS TO WHETHER OR NOT THE

08:48AM 3   EXAMINATION WILL NECESSARILY CALL UPON OUTSIDE MATERIAL THAT I

08:48AM 4   THINK WAS THE FORM OF YOUR 17 SUBPOENA AND THOSE ISSUES.

08:48AM 5       MR. CLINE:  RIGHT.  AND I WILL READILY

08:48AM 6   ACKNOWLEDGE -- AND, AGAIN, WE CAN GET INTO THIS IN MORE

08:48AM 7   DETAIL -- THAT THE MORE THAT MR. PARLOFF IS SIMPLY

08:48AM 8   AUTHENTICATING TAPES AND RECOUNTING CONVERSATIONS THAT AREN'T

08:48AM 9   TAPED, AUTHENTICATING HIS ARTICLE, THE LESS RELEVANCE THE

08:48AM 10   MATERIALS HAVE.

08:48AM 11       THE BROADER THE SCOPE OF HIS TESTIMONY, THE MORE HE GETS

08:48AM 12   INTO HIS SUBJECTIVE REASONING ABOUT ALL OF THIS AND THAT, ALL

08:48AM 13   OF WHICH WE SAY IS IRRELEVANT, THE MORE THOSE MATERIALS BECOME

08:48AM 14   RELEVANT.

08:48AM 15       SO THAT'S THE CONNECTION BETWEEN THE TWO.  AND I DON'T

08:48AM 16   WANT TO SPEAK FOR MR. KORZENIK, BUT I THINK THAT'S PROBABLY THE

08:49AM 17   REASON WHY IN HIS OWN PLEADING HE SAYS BASICALLY THE TESTIMONY

08:49AM 18   IS GOING TO BE VERY CONSTRICTED.

08:49AM 19       THE COURT:  I THINK YOU'RE RIGHT.

08:49AM 20       AND THEN TO YOUR TEAM, MR. CLINE, IF THERE IS SUCH A

08:49AM 21   LIMITATION, OF COURSE YOU COULDN'T OPEN THAT DOOR ON

08:49AM 22   CROSS-EXAMINATION AND THEN SAY, OH, NOW WE NEED THAT MATERIAL.

08:49AM 23   IF MR. BOSTIC LIMITS HIS EXAMINATION, I'M TELLING YOU BASIC

08:49AM 24   THINGS, BUT I JUST WANT TO SET THE TABLE FOR YOU.

08:49AM 25       MR. CLINE:  IF THE TESTIMONY IS LIMITED AS WE THINK

08:49AM 1    IS APPROPRIATE, I WILL BE EXTRAORDINARILY CONSCIOUS OF DOOR

08:49AM 2    OPENING.

08:49AM 3            THE COURT:  OKAY.  ALL RIGHT.  THANKS VERY MUCH.

08:49AM 4    WE'LL TAKE -- WE'LL TAKE THIS UP.

08:49AM 5            MR. KORZENIK:  YOUR HONOR, JUST A QUESTION -- THIS

08:49AM 6    IS DAVID KORZENIK SPEAKING -- THAT YOU MAY BE -- WE SHOULD BE

08:49AM 7    AVAILABLE PERHAPS TOMORROW MORNING AT THIS TIME?

08:49AM 8            THE COURT:  WELL, IT MAY BE WE'LL DISCUSS THIS

08:49AM 9    TOMORROW MORNING.  IF YOU WOULD LIKE TO PHONE IN, WE'RE HAPPY

08:49AM 10   TO HEAR FROM YOU.

08:49AM 11           MR. KORZENIK:  OKAY.

08:50AM 12           THE COURT:  ALL RIGHT.

08:50AM 13           MR. KORZENIK:  IT SEEMS LIKE MUCH OF IT IS KIND OF

08:50AM 14   MOOT AT THIS POINT AND THAT THE RULING OF MAGISTRATE

08:50AM 15   JUDGE COUSINS WILL STAND, AND THAT REALLY THE RULE 17 ISSUES

08:50AM 16   AND OBJECTIONS THAT MR. CLINE IS RAISING HAVE KIND OF FALLEN BY

08:50AM 17   THE WAYSIDE.

08:50AM 18           MR. CLINE:  I THINK, YOUR HONOR, THAT'S A BIT OF AN

08:50AM 19   OVERSTATEMENT, BUT THAT MAY BE THE ULTIMATE OUTCOME.

08:50AM 20           MR. KORZENIK:  YEAH, BECAUSE I DON'T REALLY SEE HOW

08:50AM 21   ANY OF THESE OTHER INTERVIEWEES WOULD HAVE A BEARING ON ANY

08:50AM 22   KIND OF CONTEXT ISSUE, BROAD OR NARROW.

08:50AM 23           THE COURT:  WELL, WE'LL -- THANK YOU FOR YOUR

08:50AM 24   OBSERVATIONS.  WE'RE HERE ON THE WEST COAST AND I APPRECIATE

08:50AM 25   THE EAST COAST VIEW OF THINGS.

08:50AM 1          (LAUGHTER.)

08:50AM 2          THE COURT:  WE'RE GOING TO TAKE THIS UP TOMORROW

08:50AM 3     AGAIN, I THINK IN THE MORNING, SO WE'RE HAPPY TO HEAR ABOUT

08:50AM 4     YOUR THOUGHTS AGAIN THEN.  BUT THANKS FOR YOUR OBSERVATIONS.

08:51AM 5          IT MAY BE -- THIS IS WHAT HAPPENS IN A TRIAL WHEN YOU HAVE

08:51AM 6     GOOD LAWYERS WHO MEET AND CONFER AND RECOGNIZE ISSUES AND PARE

08:51AM 7     THEM DOWN, AND WE'LL HAVE THAT DISCUSSION TOMORROW, SIR.  AND

08:51AM 8     IF WE NEED SOME HELP FROM YOU, WE'LL BE HAPPY TO HEAR FROM YOU.

08:51AM 9     THANK YOU.

08:51AM 10          MR. KORZENIK:  I'LL BE AVAILABLE.

08:51AM 11          MR. BOSTIC:  THANK YOU.

08:51AM 12          MR. CLINE:  THANK YOU.

08:51AM 13          THE COURT:  LET ME -- I DO WANT TO ASK THE PARTIES A

08:51AM 14     QUESTION, OR FIRST GIVE SOME INFORMATION.

08:51AM 15          JUROR NUMBER 5, AS TO OUR SCHEDULE -- WE'RE GOING TO

08:51AM 16     DISCONNECT OUR FRIENDS FROM THE EAST COAST NOW.

08:51AM 17          MR. KORZENIK:  GOOD.

08:51AM 18          (DISCONNECTED.)

08:51AM 19          THE COURT:  AND FOR JUROR NUMBER 5, I BELIEVE ON

08:51AM 20     NOVEMBER 3RD, WE NEED TO END AT 3:00 P.M.

08:51AM 21          IS THAT RIGHT, MS. KRATZMANN?

08:51AM 22          THE CLERK:  YES, YOUR HONOR.

08:51AM 23          THE COURT:  AND THEN ALSO NOVEMBER 29TH IS A MONDAY,

08:52AM 24     AND WE'LL NEED TO START PERHAPS AT 10:00 A.M.  THERE'S SOME

08:52AM 25     TRAVEL WITH THIS WITNESS.  SHE'LL BE AT THE SAN JOSE AIRPORT AT

08:52AM 1    9:15.  SO WE'LL SHOOT FOR 10:00 O'CLOCK TO START ON

08:52AM 2    NOVEMBER 29TH.

08:52AM 3        AND IT MAY BE, MS. KRATZMANN, LET'S SEE IF WE CAN -- MAYBE

08:52AM 4    WE CAN MOVE OUR CRIMINAL CALENDAR THAT DAY TO DECEMBER 3RD IN

08:52AM 5    THE AFTERNOON.

08:52AM 6        THE CLERK:  YES, YOUR HONOR.

08:52AM 7        THE COURT:  AND THAT WOULD GIVE US THE ENTIRETY OF

08:52AM 8    THAT MONDAY IF I CAN DO THAT.  WE'LL FREE UP THAT AFTERNOON FOR

08:52AM 9    US.  I HOPE THAT WORKS FOR THE JURY.

08:52AM 10       I WANT TO ASK ANOTHER QUESTION REGARDING AN EMAIL THAT WAS

08:53AM 11   PROVIDED TO COUNSEL AT COUNSEL'S REQUEST LAST WEEK.  I THINK,

08:53AM 12   MR. DOWNEY, YOU MADE A REQUEST ABOUT RECEIVING A COPY OF AN

08:53AM 13   EMAIL.  I THINK WE PROVIDED IT TO THE GOVERNMENT AND TO YOU.

08:53AM 14       I JUST WANT TO ASK NOW, IS THERE ANYTHING YOU, MR. DOWNEY,

08:53AM 15   YOU WOULD LIKE TO DO WITH THE COURT OR ANYTHING YOU WANT TO DO

08:53AM 16   IN REGARDS TO THAT DOCUMENT THAT YOU RECEIVED?

08:53AM 17       MR. DOWNEY:  NO, YOUR HONOR, NOT AT THIS TIME.

08:53AM 18       WE'RE MINDFUL OF THE ISSUES THAT THE COURT HAS ADDRESSED

08:53AM 19   SEVERAL TIMES BEFORE WITH NOISE AND DISTRACTION, AND WE'LL KEEP

08:53AM 20   MONITORING IT AS WELL.

08:53AM 21       THE COURT:  OKAY.

08:53AM 22   MR. SCHENK, ANYTHING?

08:53AM 23       MR. SCHENK:  NO.  NOTHING FURTHER.  THANK YOU.

08:53AM 24       THE COURT:  THANK YOU.

08:53AM 25       SO IF THE PARTIES WANT TO RAISE ANYTHING WITH THE COURT,

08:53AM 1    OR YOU FEEL THAT THINGS DEVELOP TO A POINT WHERE IT'S IMPAIRING

08:53AM 2    YOUR ABILITY TO PRESENT YOUR CASE, YOU SHOULD LET ME KNOW.  YOU

08:53AM 3    HAVE AN OPEN INVITATION TO LET ME KNOW AND THEN WE CAN TAKE

08:53AM 4    THAT MATTER UP.  OTHERWISE I'LL ASSUME THAT IT'S A DISTRACTION,

08:54AM 5    BUT NOT TO THE POINT OF ANY NECESSARY COURT INTERVENTION.

08:54AM 6        IS THAT FAIR?

08:54AM 7            MR. SCHENK:  YES.  THANK YOU.

08:54AM 8            MR. DOWNEY:  YES, YOUR HONOR.

08:54AM 9            THE COURT:  ALL RIGHT.  THANK YOU.

08:54AM 10       ANYTHING ELSE WE SHOULD TAKE UP BEFORE WE -- BEFORE I STEP

08:54AM 11   DOWN AND MAYBE WE GET STARTED ON TIME?

08:54AM 12           MR. SCHENK:  NOTHING FURTHER.

08:54AM 13           MR. DOWNEY:  NOTHING FROM US, YOUR HONOR.

08:54AM 14           THE COURT:  OKAY.  GREAT.  THANK YOU VERY MUCH.

08:54AM 15       (RECESS FROM 8:54 A.M. UNTIL 9:11 A.M.)

09:11AM 16       (JURY IN AT 9:11 A.M.)

09:11AM 17           THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD IN

09:11AM 18   THE HOLMES MATTER.  ALL COUNSEL ARE PRESENT.  MS. HOLMES IS

09:11AM 19   PRESENT.

09:11AM 20       OUR JURY AND ALTERNATES ARE PRESENT.

09:11AM 21       IT'S NICE TO SEE YOU AGAIN.  I HOPE YOU ENJOYED THE TIME

09:11AM 22   OFF, THE LONG TIME OFF.

09:11AM 23       BEFORE WE BEGIN, LET ME ASK YOU THAT QUESTION, I KNOW YOU

09:11AM 24   HAVEN'T FORGOTTEN IT.  DURING THE BREAK, HAVE ANY OF YOU HAD

09:11AM 25   OCCASION TO EITHER SEE, HEAR, READ, OR HAVE DISCUSSIONS WITH

09:11AM 1    ANYONE ABOUT ANYTHING TO DO WITH THIS CASE, THAT IS, BY

09:11AM 2    READING, LISTENING, OR CONVERSATION WITH ANOTHER PERSON?

09:11AM 3         IF SO, PLEASE RAISE YOUR HAND.

09:11AM 4         I SEE NO HANDS.

09:11AM 5         THANK YOU AGAIN FOR YOUR CONTINUED VIGILANCE AND ADHERENCE

09:11AM 6    TO MY REQUEST.  I APPRECIATE THAT, AND I KNOW THE LAWYERS DO AS

09:11AM 7    WELL.  SO THANK YOU FOR THAT.

09:11AM 8         BEFORE WE BEGIN, I DO WANT TO TAKE UP WHAT HAS BEEN A

09:12AM 9    DISCUSSION WE'VE HAD BEFORE, AND THAT'S ABOUT NOISE IN THE

09:12AM 10   COURTROOM.  WE DID HAVE A HEARING THIS MORNING WHERE I NEEDED

09:12AM 11   SOME ASSISTANCE FROM THE LAWYERS AND PARTIES OUTSIDE OF THE

09:12AM 12   PRESENCE OF THE JURY, AND DURING THAT PROCEEDING, THERE WAS --

09:12AM 13   I JUST WANT TO SAY IT WAS AUDIBLE, THERE WAS TYPING THAT WAS

09:12AM 14   AUDIBLE TO THE COURT, PERHAPS TO COUNSEL AT THEIR TABLES.  I'M

09:12AM 15   NOT GOING TO ASK THEM THAT.  BUT IT WAS CERTAINLY AUDIBLE TO

09:12AM 16   THE COURT.

09:12AM 17        I HAVE MADE COMMENTS BEFORE ABOUT THIS, THAT UNNECESSARY

09:12AM 18   DISTRACTIONS IN THE COURTROOM DIMINISH THE QUALITY OF THE

09:12AM 19   PROCEEDINGS AND COULD POTENTIALLY INTERFERE WITH THE

09:12AM 20   PROCEEDINGS.

09:12AM 21        I THINK I SAID LAST WEEK THAT IF THAT PERSISTS, THERE ARE

09:12AM 22   GOING TO BE -- I'M GOING TO BE FORCED, CANDIDLY, TO ASK ANYONE

09:12AM 23   WITH A KEYBOARD WHO IS DOING TYPING TO GO TO OUR OVERFLOW ROOM

09:12AM 24   SO YOU CAN, THOSE WHO USE THOSE DEVICES CAN PARTICIPATE IN THE

09:12AM 25   TRIAL, OBSERVE THE TRIAL, AND CONTINUE TO PARTICIPATE IN THE

09:13AM  1    TRIAL IN THAT ROOM SUCH THAT THERE'S NO DISTRACTION IN THIS

09:13AM  2    ROOM.

09:13AM  3        I SAY THAT ON BEHALF OF ALL OF THE PARTIES HERE, AS WELL

09:13AM  4    AS OUR JURY WHO ARE -- AS THOSE WHO KNOW HAVE BEEN ATTENTIVE

09:13AM  5    THROUGHOUT THE PROCEEDINGS, AND I DO NOT WANT ANYTHING TO

09:13AM  6    INTERFERE WITH THE EXAMINATION OF THE WITNESSES OR THE JURORS'

09:13AM  7    ABILITY TO ACCURATELY FOLLOW THE PROCEEDINGS.

09:13AM  8        SO AGAIN, I'M REACHING OUT TO THOSE OF YOU, OUR FRIENDS IN

09:13AM  9    THE AUDIENCE WHO HAVE KEYBOARDS, IF YOU WOULD PLEASE, PLEASE

09:13AM  10   MONITOR YOUR TYPING IF YOU CAN.

09:13AM  11       AND IF YOU CAN'T, I INVITE YOU TO GO TO THE OVERFLOW ROOM

09:13AM  12   AND YOU CAN TYPE THERE AS YOU WISH WITHOUT ANY FEAR OF THE

09:13AM  13   NOISE IMPAIRING THE PROCEEDINGS.

09:13AM  14       I'M GOING TO ASK YOU TO SELF-POLICE THAT.  WE HAVE A

09:13AM  15   MEMBER FROM THE SHERIFF'S OFFICE, EXCUSE ME, THE MARSHAL'S

09:14AM  16   OFFICE HERE.  I'M GOING TO CONTINUE TO BE VIGILANT ON THAT SUCH

09:14AM  17   THAT THE PROCEEDINGS ARE NOT DISRUPTED.

09:14AM  18       AND I DO INDICATE THAT I COMPLETELY RESPECT THE PRESS AND

09:14AM  19   WHOEVER ELSE IS IN HERE, THE PUBLIC, AND TYPING, MAKING NOTES.

09:14AM  20   I DON'T WANT TO DISRUPT YOUR ABILITY TO CAPTURE YOUR WORK AND

09:14AM  21   DO YOUR WORK.

09:14AM  22       BUT I HOPE YOU WOULD BE EXPRESSING RECIPROCITY TO US, AND

09:14AM  23   ME, TO ALLOW US TO DO THE WORK THAT WE NEED TO DO.

09:14AM  24       SO THANK YOU VERY MUCH.  THANKS FOR THE BREAK.  THANK YOU

09:14AM  25   FOR LETTING ME COMMENT ON THAT.

| | |
|---|---|
| 09:14AM | 1 |   WE DO HAVE A WITNESS THAT NEEDS TO RETURN I THINK. |
| 09:14AM | 2 |   IS THAT MS. PETERSON? |
| 09:14AM | 3 |   MR. LEACH:  YES, YOUR HONOR. |
| 09:15AM | 4 |   THE COURT:  GOOD MORNING, MS. PETERSON. |
| 09:15AM | 5 |   THE WITNESS:  GOOD MORNING. |
| 09:15AM | 6 |   THE COURT:  PLEASE MAKE YOURSELF COMFORTABLE AGAIN. |
| 09:15AM | 7 | FEEL FREE TO REMOVE YOUR MASK. |
| 09:15AM | 8 |   THERE IS FRESH WATER THERE FOR YOUR REFRESHMENT IF YOU |
| 09:15AM | 9 | WOULD LIKE TO TAKE ADVANTAGE OF IT. |
| 09:15AM | 10 |   MAKE YOURSELF COMFORTABLE. |
| 09:15AM | 11 |   WHEN YOU ARE COMFORTABLE, I'LL ASK YOU TO PLEASE STATE |
| 09:15AM | 12 | YOUR NAME AGAIN, PLEASE. |
| 09:15AM | 13 |   THE WITNESS:  LISA PETERSON. |
| 09:15AM | 14 |   THE COURT:  THANK YOU.  AND I'LL REMIND YOU YOU ARE |
| 09:15AM | 15 | STILL UNDER OATH. |
| 09:15AM | 16 |   THE WITNESS:  YES. |
| 09:15AM | 17 |   THE COURT:  THANK YOU. |
| 09:15AM | 18 |   **(GOVERNMENT'S WITNESS, LISA PETERSON, WAS PREVIOUSLY** |
| 09:15AM | 19 | **SWORN.)** |
| 09:15AM | 20 |   MR. WADE:  MAY I PROCEED, YOUR HONOR? |
| 09:15AM | 21 |   THE COURT:  YES, THANK YOU. |
| 09:15AM | 22 |   **CROSS-EXAMINATION (RESUMED)** |
| 09:15AM | 23 | BY MR. WADE: |
| 09:15AM | 24 | Q.  THANK YOU. |
| 09:15AM | 25 |   GOOD MORNING, MS. PETERSON. |

Case 5:18-cr-00258-EJD Document 1702-11 Filed 01/18/22 Page 30 of 286
Case 5:18-cr-00258-EJD Document 1296 Filed 01/13/22 Page 31 of 286

09:15AM  1    A.   GOOD MORNING.

09:15AM  2    Q.   WHEN WE MET LAST WEEK, WE WERE ASKING -- OR WE WERE HAVING

09:15AM  3    SOME DISCUSSION RELATING TO THE INVESTMENT BY THE DEVOS FAMILY.

09:15AM  4         DO YOU RECALL THAT?

09:15AM  5    A.   YES.

09:15AM  6    Q.   AND I ASKED YOU DURING THAT DISCUSSION ABOUT A NUMBER OF

09:15AM  7    DIFFERENT DEVOS FAMILY MEMBERS WHO ARE A PART OF THE DIFFERENT

09:15AM  8    GENERATIONS THAT THE RDV CORPORATION SERVES.

09:16AM  9         DO YOU RECALL THAT?

09:16AM  10   A.   YES.

09:16AM  11   Q.   OKAY.  AND I JUST WANTED TO ASK WHETHER YOU ARE AWARE --

09:16AM  12   DO YOU RECALL I ASKED YOU ABOUT WHETHER YOU WERE AWARE OF

09:16AM  13   CERTAIN INTERACTIONS THAT MR. TUBERGEN HAD WITH CERTAIN MEMBERS

09:16AM  14   OF THE DEVOS FAMILY?

09:16AM  15        DO YOU RECALL THAT?

09:16AM  16   A.   YES, IN GENERAL.

09:16AM  17   Q.   AND I THINK YOU SAID THERE WERE PROBABLY SOME OF THOSE

09:16AM  18   CONVERSATIONS THAT YOU WERE NOT A PARTY TO; IS THAT RIGHT?

09:16AM  19   A.   CORRECT.

09:16AM  20   Q.   OKAY.  AND THERE WERE A COUPLE OF PEOPLE I'M NOT SURE I

09:16AM  21   ASKED YOU ABOUT.  ARE YOU AWARE WHETHER, WHETHER MR. TUBERGEN

09:16AM  22   DISCUSSED THE POTENTIAL THERANOS INVESTMENT WITH DICK DEVOS?

09:16AM  23   A.   I WASN'T PRIVY TO THOSE.  I DON'T KNOW.

09:16AM  24   Q.   OKAY.  HOW ABOUT WITH BETSY DEVOS?

09:16AM  25   A.   I WASN'T PRIVY TO THOSE.  BETSY IS NOT ON THE INVESTMENT

09:16AM  1   COMMITTEE THOUGH.

09:16AM  2   Q.   OKAY.

09:16AM  3   A.   DICK WAS.

09:16AM  4   Q.   AND DO YOU KNOW WHETHER -- DO YOU KNOW WHETHER

09:17AM  5   MR. TUBERGEN HAD DISCUSSIONS WITH THEM ABOUT THE THERANOS

09:17AM  6   INVESTMENT?

09:17AM  7   A.   DICK WAS ON THE INVESTMENT COMMITTEE, AND I'M AWARE AND

09:17AM  8   UNDERSTAND FROM MR. TUBERGEN THAT HE HAD LOTS OF DISCUSSIONS

09:17AM  9   AROUND THIS TRANSACTION WITH THE INVESTMENT COMMITTEE MEMBERS.

09:17AM  10  Q.   OKAY.  AND ARE YOU AWARE THAT IT WAS IMPORTANT TO DICK AND

09:17AM  11  BETSY DEVOS THAT RICK DEVOS BE INVOLVED IN THE DECISION?

09:17AM  12  A.   I'M NOT AWARE OF THEIR FEELINGS AROUND THAT.

09:17AM  13  Q.   OKAY.  WE ASKED -- YOU GAVE SOME TESTIMONY WITH RESPECT TO

09:17AM  14  SOME FINANCIAL PROJECTIONS THAT YOU RECEIVED FROM THE COMPANY.

09:17AM  15       DO YOU RECALL THAT TESTIMONY?

09:17AM  16  A.   YES.

09:17AM  17  Q.   OKAY.  LET'S PULL UP TRIAL EXHIBIT 1853, WHICH IS IN

09:17AM  18  EVIDENCE.

09:18AM  19       AND IT'S ON THE SCREEN.  YOU'RE WELCOME TO PULL UP THE

09:18AM  20  DOCUMENT.

09:18AM  21  A.   IS IT IN THIS ONE?

09:18AM  22  Q.   I BELIEVE IT'S IN THE WHITE BINDER, BUT IT'S ON THE

09:18AM  23  SCREEN.

09:18AM  24  A.   OKAY.

09:18AM  25  Q.   BUT I'M JUST GOING TO ASK A COUPLE OF QUICK QUESTIONS.

09:18AM  1    A.   YES.

09:18AM  2    Q.   DO YOU RECALL THIS WAS A TWO-PAGE DOCUMENT.  YOU CAN FLIP

09:18AM  3    TO THE SECOND PAGE?

09:18AM  4    A.   YES.

09:18AM  5             THE CLERK:  JUST A MOMENT, YOUR HONOR.  GIVE ME A

09:18AM  6    MOMENT TO COULD A RESET.

09:18AM  7             THE WITNESS:  WHAT'S THE NUMBER AGAIN?

09:18AM  8    BY MR. WADE:

09:18AM  9    Q.   1853.

09:18AM  10   A.   OKAY.

09:18AM  11   Q.   AND FOR THE RECORD, WE'RE JUST WAITING TO MAKE SURE THE

09:18AM  12   JURORS ARE ABLE TO SEE THE EXHIBITS.  WE'LL PAUSE FOR A MOMENT,

09:18AM  13   YOUR HONOR.

09:18AM  14            THE COURT:  THANK YOU.  THERE'S ONE MONITOR THAT IS

09:18AM  15   STILL PROBLEMATIC.

09:18AM  16            THE CLERK:  NO?  STILL NO?  GIVE ME ONE SECOND TO

09:18AM  17   RESTART.  GIVE ME ONE SECOND.

09:18AM  18       (PAUSE IN PROCEEDINGS.)

09:18AM  19            MR. WADE:  YOUR HONOR, I THINK ON ONE OCCASION WHEN

09:19AM  20   WE RESET THE T.V. OR RESET THE SCREEN, IT DID COME BACK.  MAYBE

09:19AM  21   WE CAN TRY THE OLD ON AND OFF.

09:19AM  22            THE COURT:  YOU HAVE A CUP OF WATER THERE, MR. WADE.

09:19AM  23   YOU'RE NOT SUGGESTING TO GET ANYWHERE CLOSE TO THAT MONITOR

09:19AM  24   WITH THE WATER?

09:19AM  25            MR. WADE:  I AM TEMPTED AT TIMES, YOUR HONOR.

09:19AM   1                    (LAUGHTER.)

09:19AM   2                    (PAUSE IN PROCEEDINGS.)

09:19AM   3                    THE COURT:  WHY DON'T YOU CHECK NOW, MS. KRATZMANN.

09:19AM   4                    THE CLERK:  IT WAS ON THIS MORNING.

09:19AM   5        I JUST HAVE TO THREATEN IT.

09:19AM   6                    (LAUGHTER.)

09:19AM   7                    THE COURT:  I THINK WE'RE ON NOW.  GREAT.  OKAY.

09:19AM   8                    MR. WADE:  AND I'LL ADD, YOUR HONOR, THE PLUMBING IS

09:19AM   9        WORKING TODAY, SO WE'RE REALLY ROLLING.

09:19AM  10                    THE COURT:  WOULD YOU KNOCK ON WOOD BEFORE YOU BEGIN

09:19AM  11        YOUR EXAMINATION.  THANK YOU.

09:19AM  12                    (KNOCKING.)

09:19AM  13        BY MR. WADE:

09:19AM  14        Q.   DO YOU HAVE 1853 IN FRONT OF YOU, MA'AM?

09:19AM  15        A.   YES.

09:19AM  16        Q.   OKAY.  AND YOU RECALL YOU GAVE SOME TESTIMONY WITH RESPECT

09:20AM  17        TO THIS DOCUMENT?

09:20AM  18        A.   YES.

09:20AM  19        Q.   AND DO YOU RECALL -- AND THIS WAS A DOCUMENT THAT WAS

09:20AM  20        PRODUCED BY RDV IN CONNECTION WITH LITIGATION?

09:20AM  21        A.   NO.  THIS WAS PART OF THE DILIGENCE BINDER THAT ELIZABETH

09:20AM  22        HAD GIVEN US.

09:20AM  23        Q.   RIGHT.  I'M SORRY I WASN'T CLEAR.

09:20AM  24        A.   WE DIDN'T PRODUCE THIS.

09:20AM  25        Q.   AND DO YOU SEE IF YOU GO TO THE FIRST -- WELL, EITHER

09:20AM   1    PAGE, IN THE CORNER DO YOU SEE THE RDV BATES LABEL DOWN IN THE

09:20AM   2    CORNER THERE (INDICATING)?

09:20AM   3    A.   YES.

09:20AM   4    Q.   AND IS IT YOUR UNDERSTANDING THAT THIS DOCUMENT WAS

09:20AM   5    PRODUCED BY RDV TO THE GOVERNMENT?

09:20AM   6    A.   OKAY.  YES.

09:20AM   7    Q.   OKAY.

09:20AM   8    A.   BUT WE DIDN'T PRODUCE WHAT IS ON THE PAGE.

09:20AM   9    Q.   YOU DIDN'T CREATE IT; CORRECT?

09:20AM  10    A.   CORRECT.

09:20AM  11    Q.   BUT IT CAME INTO THIS CASE BECAUSE RDV SENT IT TO THE

09:20AM  12    GOVERNMENT IN RESPONSE TO A SUBPOENA; IS THAT RIGHT?

09:20AM  13    A.   YES.

09:20AM  14    Q.   OKAY.  AND DO YOU RECALL WHETHER -- DID YOU GATHER

09:20AM  15    MATERIALS IN CONNECTION WITH RESPONDING TO THAT SUBPOENA?  WERE

09:21AM  16    YOU ASKED TO GATHER MATERIALS TO GIVE TO THE GOVERNMENT?

09:21AM  17    A.   THEY TOOK ALL OF OUR EMAILS, EVERYTHING THAT WAS IN OUR

09:21AM  18    EMAILS AND IN OUR DOCUMENT MANAGEMENT SYSTEM WENT TO THE

09:21AM  19    GOVERNMENT.

09:21AM  20    Q.   OKAY.  AND WAS THIS DOCUMENT IN YOUR DOCUMENT MANAGEMENT

09:21AM  21    SYSTEM?

09:21AM  22    A.   YES.

09:21AM  23    Q.   OKAY.  AND DO YOU RECALL YOUR TESTIMONY LAST WEEK THAT YOU

09:21AM  24    GAVE, YOU WERE GIVEN ACTUALLY ABOUT A FOOT OF DOCUMENTS WHEN

09:21AM  25    YOU FIRST GOT MATERIALS FROM THERANOS?

09:21AM   1      A.   YES.

09:21AM   2      Q.   DO YOU RECALL WHETHER, WHEN YOU GOT THIS, THIS DOCUMENT,

09:21AM   3      WHETHER IN ADDITION TO THESE TWO PAGES YOU ALSO RECEIVED A PRO

09:21AM   4      FORMA STATEMENT OF CASH?

09:21AM   5      A.   THE TWO FINANCIAL PAGES THAT WE RECEIVED ARE THE ONES THAT

09:21AM   6      YOU'RE LOOKING AT RIGHT HERE.

09:21AM   7      Q.   OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:21AM   8           YOUR HONOR, MAY I APPROACH?

09:21AM   9                THE COURT:  YES.

09:22AM  10                MR. WADE:  (HANDING.)

09:22AM  11      Q.   I'VE SHOWN YOU -- I'VE HANDED YOU WHAT HAS BEEN MARKED AS

09:22AM  12      EXHIBIT 14210.

09:22AM  13           DO YOU SEE THAT?

09:22AM  14      A.   WHERE AM I LOOKING?

09:22AM  15      Q.   DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU, 14210?

09:22AM  16      A.   YES.

09:22AM  17      Q.   DO YOU SEE THAT IN THE UPPER RIGHT-HAND CORNER?

09:22AM  18      A.   YES.

09:22AM  19      Q.   OKAY.  I'D LIKE YOU TO JUST LOOK AT THE SECOND PAGE.  DOES

09:22AM  20      THAT REFRESH YOUR RECOLLECTION THAT YOU ALSO RECEIVED FROM THE

09:22AM  21      COMPANY --

09:22AM  22      A.   OKAY.

09:22AM  23      Q.   I BELIEVE IT'S BATES LABELLED ON THE BOTTOM --

09:23AM  24      A.   THE BACK OF THE FIRST PAGE?

09:23AM  25      Q.   YES.  MFH 00482.  AND JUST READ IT TO YOURSELF, PLEASE.

09:23AM  1      A.   I DON'T RECALL THIS PAGE EXACTLY, NO.

09:23AM  2      Q.   OKAY.  THAT DOESN'T REFRESH YOUR RECOLLECTION THAT YOU

09:23AM  3   ALSO RECEIVED A PRO FORMA STATEMENT OF CASH FLOW FROM THE

09:23AM  4   COMPANY?

09:23AM  5      A.   NO.

09:23AM  6      Q.   OKAY.

09:23AM  7              MR. LEACH:  YOUR HONOR --

09:23AM  8              THE WITNESS:  THE TWO PAGES I REMEMBER VIVIDLY ARE

09:23AM  9   THE OTHER TWO PAGES.

09:23AM  10             THE COURT:  EXCUSE ME, MS. PETERSON.

09:23AM  11             MR. LEACH:  I OBJECT TO THE LINE OF QUESTIONING

09:23AM  12  USING A DOCUMENT NOT FROM THIS WITNESS TO TRY TO REFRESH HER

09:23AM  13  RECOLLECTION THAT SHE RECEIVED THIS.  I THINK IT'S IMPROPER

09:23AM  14  REFRESHING.

09:23AM  15             THE WITNESS:  I DON'T RECALL --

09:23AM  16             THE COURT:  MS. PETERSON, I'M SORRY.

09:23AM  17             THE WITNESS:  I'M SORRY.

09:23AM  18             THE COURT:  ANYTHING CAN BE USED TO REFRESH A

09:23AM  19  WITNESS'S RECOLLECTION, A SHOE, A SOCK, SO --

09:23AM  20             MR. WADE:  I'LL KEEP MY SHOES ON, YOUR HONOR.

09:24AM  21             THE COURT:  THANK YOU FOR THAT.  BUT I NOTE -- I

09:24AM  22  THINK I UNDERSTAND THE TENOR OF YOUR OBJECTION, MR. LEACH.

09:24AM  23       BUT YOU CAN PROCEED.

09:24AM  24             MR. WADE:  I DON'T HAVE ANY FURTHER QUESTIONS THAT

09:24AM  25  DIDN'T REFRESH THE WITNESS'S RECOLLECTION.

09:24AM   1                    THE COURT:  OKAY.

09:24AM   2        BY MR. WADE:

09:24AM   3        Q.   IF WE CAN PULL UP 14106, WHICH IS IN EVIDENCE.

09:24AM   4             DO YOU RECALL THIS EMAIL FROM MR. SCHIERBEEK?

09:24AM   5        A.   YES.

09:24AM   6        Q.   AND YOU GAVE SOME TESTIMONY WITH RESPECT TO THAT.

09:24AM   7             DO YOU RECALL THAT?

09:24AM   8        A.   YES.

09:24AM   9        Q.   AND I THINK YOUR TESTIMONY AT THE TIME WAS THAT

09:24AM  10        MR. SCHIERBEEK WAS NOT INVOLVED OR AUTHORIZED IN THE INVESTMENT

09:24AM  11        DECISION; CORRECT?

09:24AM  12        A.   MR. SCHIERBEEK DID NOT WORK ON THE THERANOS OPPORTUNITY AT

09:24AM  13        ALL, AND HE'S NOT PART OF THE INVESTMENT GROUP AND HE'S NOT ON

09:25AM  14        THE INVESTMENT COMMITTEE.

09:25AM  15        Q.   RIGHT.  AND I THINK YOU TESTIFIED TO THAT LAST WEEK.

09:25AM  16             DO YOU RECALL THAT?

09:25AM  17        A.   YES.

09:25AM  18        Q.   AND -- BUT HE IS A SENIOR PERSON WITHIN RDV; CORRECT?

09:25AM  19        A.   YES.

09:25AM  20        Q.   AND HE RUNS THE FINANCIAL OPERATION SIDE OF THE HOUSE;

09:25AM  21        CORRECT?

09:25AM  22        A.   NO.  HE RUNS THE FAMILY SERVICES SIDE OF THE HOUSE.

09:25AM  23        Q.   AND THAT'S THE SIDE THAT CONTROLS THE CASH I THINK YOU

09:25AM  24        TESTIFIED TO?

09:25AM  25        A.   IT HAS THE CASH, YES.

09:25AM 1    Q.   OKAY.  SO IF AN INVESTMENT DECISION IS ULTIMATELY MADE ON

09:25AM 2    THE INVESTMENT SIDE OF THE HOUSE, MR. SCHIERBEEK WOULD BE THE

09:25AM 3    PERSON WHO WOULD -- OR HIS OPERATION WOULD MAKE THE

09:25AM 4    ARRANGEMENTS TO PROVIDE THE CASH IN CONNECTION WITH THE

09:25AM 5    INVESTMENT?

09:25AM 6    A.   ONLY UPON A GREEN LIGHT FROM JERRY, RANDY IS HE ABLE TO

09:25AM 7    SEND THE MONEY.

09:25AM 8    Q.   RIGHT.  SO HIS -- THE COMMUNICATIONS THAT HE MIGHT HAVE

09:25AM 9    MIGHT RELATE TO, I'M GOING TO GIVE YOU A GREEN LIGHT, YOU

09:26AM 10   SHOULD GET THE CASH READY.  OR HERE'S A GREEN LIGHT, GET THE

09:26AM 11   CASH READY.

09:26AM 12       RIGHT?

09:26AM 13   A.   NO.  THAT DOESN'T HAPPEN UNTIL I GET THE GREEN LIGHT FROM

09:26AM 14   THE INVESTMENT COMMITTEE OR JERRY, AND THEN WE WORK WITH THAT

09:26AM 15   SIDE OF THE HOUSE TO ACTUALLY FUND THE INVESTMENT.

09:26AM 16       HE DOESN'T HAVE ANYTHING TO DO WITH INVESTMENT DECISIONS

09:26AM 17   UP UNTIL THE POINT WHERE WE'VE DECIDED TO GO AND THERE'S A WIRE

09:26AM 18   THAT HAS TO BE MADE.

09:26AM 19   Q.   OKAY.  I UNDERSTAND THAT.

09:26AM 20       MY QUESTION IS, BUT HE'S THE ONE WHO PROVIDES THE CASH AND

09:26AM 21   MAKES SURE THAT THERE'S CASH TO FUND THE INVESTMENT; CORRECT?

09:26AM 22   A.   HE JUST MANAGES THE BANK RELATIONSHIP TO WHICH WE HAVE TO

09:26AM 23   DO THE WIRE.

09:26AM 24   Q.   RIGHT.  IS THAT CASH THAT IS WIRED?

09:26AM 25   A.   YES, BUT THAT'S --

Case 5:18-cr-00258-EJD Document 1702-1 Filed 01/18/22 Page 39 of 285
Case 5:18-cr-00258-EJD Document 1296 Filed 01/13/22 Page 40 of 286
PETERSON CROSS BY MR. WADE (RES.)                                    4941

09:26AM  1    Q.   OKAY.

09:26AM  2    A.   -- NOT DONE UNTIL EVERYTHING IS AGREED TO, AND EITHER

09:26AM  3    MYSELF OR JERRY GIVES IT A GREEN LIGHT TO GO AHEAD AND WIRE THE

09:26AM  4    CASH.

09:26AM  5    Q.   OKAY.  IF THERE'S GOING TO BE --

09:26AM  6    A.   AND HE'S A SIGNOR ON DOCUMENTS.

09:26AM  7    Q.   IF THERE'S GOING TO BE -- RIGHT.

09:27AM  8         YOU RECALL THAT HE'S THE ONE WHO ACTUALLY SIGNED THE

09:27AM  9    INVESTMENT AGREEMENT; RIGHT?

09:27AM  10   A.   HE'S JUST A SIGNOR TO THE ENTITY THAT MADE THIS

09:27AM  11   INVESTMENT, YES.

09:27AM  12   Q.   HE SIGNED THE DOCUMENTS IN THIS CASE; RIGHT?

09:27AM  13   A.   HE'S --

09:27AM  14             MR. LEACH:  OBJECTION.  ASKED AND ANSWERED.

09:27AM  15             THE COURT:  WELL, YOU CAN ANSWER THE QUESTION.

09:27AM  16             THE WITNESS:  HE CAN ONLY SIGN UNLESS IT'S APPROVED

09:27AM  17   BY OTHER PEOPLE.

09:27AM  18   BY MR. WADE:

09:27AM  19   Q.   RIGHT.  OKAY.

09:27AM  20   A.   BUT, YES, HE HAS SIGNING AUTHORITY ON THAT PARTICULAR

09:27AM  21   ENTITY.  WE HAVE HUNDREDS OF ENTITIES.

09:27AM  22   Q.   I UNDERSTAND.  AND SO IF AN INVESTMENT DECISION IS MADE BY

09:27AM  23   MR. TUBERGEN, HE COULD TALK TO MR. SCHIERBEEK --

09:27AM  24   A.   UH-HUH.

09:27AM  25   Q.   -- TO MAKE ARRANGEMENTS TO PROVIDE THE CASH?

09:27AM  1    A.   NO.  NO.

09:27AM  2         THAT COMES OUT OF THE INVESTMENT GROUP.  THAT GREEN LIGHT

09:27AM  3    GOES FROM JERRY TO ME TO THE ACCOUNTING GROUP.

09:27AM  4              MR. WADE:  MAY I APPROACH, YOUR HONOR?

09:27AM  5              THE COURT:  YES.

09:27AM  6              MR. WADE:  (HANDING.)

09:28AM  7    Q.   DO YOU SEE I'VE PLACED IN FRONT OF YOU DOCUMENT 14212?

09:28AM  8    A.   YES.

09:28AM  9    Q.   AND THAT'S AN EMAIL BETWEEN MR. SCHIERBEEK AND MR. BRINKS

09:28AM 10    AND MR. LAMBERT ON OCTOBER 6TH, 2014 ON THE BOTTOM; CORRECT?

09:28AM 11    A.   YES.

09:28AM 12    Q.   AND THAT REFERENCES A THERANOS PRIVATE INVESTMENT;

09:28AM 13    CORRECT?

09:28AM 14    A.   IT REFERENCES TWO ACTIVE COINVESTMENTS THAT -- THEY'RE

09:28AM 15    TRYING TO DO CASH FLOW PLANNING.

09:28AM 16              MR. WADE:  I MOVE FOR THE ADMISSION OF 14212.

09:28AM 17              MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:28AM 18              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:28AM 19         (DEFENDANT'S EXHIBIT 14212 WAS RECEIVED IN EVIDENCE.)

09:29AM 20              MR. WADE:  LET'S BLOW --

09:29AM 21    Q.   DO YOU SEE IN THE BOTTOM EMAIL IT'S AN EMAIL ON

09:29AM 22    OCTOBER 6TH, 2014, FROM MR. SCHIERBEEK TO MR. BRINKS AND

09:29AM 23    MR. LAMBERT?

09:29AM 24         DO YOU SEE THAT?

09:29AM 25    A.   YES.

Case 5:18-cr-00258-EJD Document 1702-96 Filed 01/13/22 Page 42 of 286

09:29AM  1   Q.   AND WHO -- MR. BRINKS IS IN THE ACCOUNTING FUNCTION; IS

09:29AM  2   THAT RIGHT?

09:29AM  3   A.   YES, HE'S THE CONTROLLER, AND MR. LAMBERT AT THE TIME WAS

09:29AM  4   THE CFO.

09:29AM  5   Q.   AND DO MR. LAMBERT AND MR. BRINKS DEAL WITH WIRE TRANSFERS

09:29AM  6   AND CASH MANAGEMENT?

09:29AM  7   A.   YES, AND CASH FLOW PLANNING FOR THE FAMILY, YES.

09:29AM  8   Q.   OKAY.  AND DO YOU SEE THERE IN THE SECOND PARAGRAPH IT

09:29AM  9   SAYS, "THERE ARE TWO VERY 'ACTIVE' CO-INVESTMENTS (NOT IN OUR

09:29AM  10  CASH FLOW MODEL) THAT WILL LIKELY TAKE PLACE AT OR NEAR MONTH

09:29AM  11  END."

09:29AM  12      DO YOU SEE THAT?

09:29AM  13  A.   YES.

09:29AM  14  Q.   AND IT THEN SAYS, "THERANOS - PRIVATE CO-INVESTMENT

09:30AM  15  $100 MILLION."

09:30AM  16      CORRECT?

09:30AM  17  A.   YES.

09:30AM  18  Q.   AND THE DATE OF OCTOBER 6TH WAS THE DATE OF THE PHONE CALL

09:30AM  19  WITH MS. HOLMES; CORRECT?

09:30AM  20  A.   YES.

09:30AM  21  Q.   AND THAT WAS THE DATE THAT YOU PREPARED YOUR MEMO COMING

09:30AM  22  OUT OF THAT PHONE CALL; CORRECT?

09:30AM  23  A.   YES.

09:30AM  24  Q.   AND IT WAS BEFORE YOUR VISIT TO PALO ALTO; CORRECT?

09:30AM  25  A.   YES.

09:30AM   1    Q.   OKAY.  AND DO YOU KNOW WHETHER YOU HAD ANY COMMUNICATIONS

09:30AM   2    WITH MR. SCHIERBEEK IN CONNECTION WITH THIS?

09:30AM   3    A.   NO.

09:30AM   4         BUT THIS IS ALL CASH FLOW PLANNING.  THIS IS NOT UNCOMMON

09:30AM   5    AT ALL.  WE HAVE NINE DEALS IN THE HOPPER RIGHT NOW.  SOME GO,

09:30AM   6    SOME DON'T GO.

09:30AM   7         THEY'RE JUST TRYING TO UNDERSTAND HOW MUCH CASH IS

09:30AM   8    AVAILABLE GIVEN ALL OF THE ACTIVITY THAT WE WERE LOOKING AT AT

09:30AM   9    THE MOMENT.

09:30AM   10             MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER "NO."

09:30AM   11             THE COURT:  ALL RIGHT.  EVERYTHING AFTER THE

09:30AM   12   RESPONSE "NO" IS STRICKEN.  IT'S NONRESPONSIVE.

09:30AM   13   BY MR. WADE:

09:31AM   14   Q.   THE -- I DON'T HAVE ANY FURTHER QUESTIONS ABOUT THAT.  YOU

09:31AM   15   CAN SET THAT ASIDE.

09:31AM   16        ACTUALLY, I HAVE ONE MORE QUESTION.  DO YOU KNOW WHETHER

09:31AM   17   MR. TUBERGEN HAD ANY CONVERSATIONS WITH MR. SCHIERBEEK IN

09:31AM   18   CONNECTION WITH CASH FLOW PLANNING RELATING TO THERANOS?

09:31AM   19   A.   WE HAVE CASH FLOW PLANNING CONVERSATIONS ALL OF THE TIME.

09:31AM   20        AROUND THIS?  NO, I WASN'T PRIVY TO THOSE CONVERSATIONS.

09:31AM   21   Q.   OKAY.  MY QUESTION WAS, DO YOU KNOW WHETHER MR. TUBERGEN

09:31AM   22   HAD ANY COMMUNICATIONS WITH MR. SCHIERBEEK IN CONNECTION WITH

09:31AM   23   CASH FLOW PLANNING RELATING TO THE THERANOS INVESTMENT IN THIS

09:31AM   24   OCTOBER 6TH TIME PERIOD?

09:31AM   25   A.   I CAN ONLY SURMISE THAT THEY DID TALK ABOUT IT BECAUSE

09:31AM  1    HE'S TRYING TO FIGURE OUT HOW MUCH CASH DOES THE FAMILY HAVE IN

09:31AM  2    ORDER TO DO SOME OF THESE INVESTMENTS THAT WE WERE LOOKING AT.

09:31AM  3    Q.   RIGHT.  BUT YOU'RE NOT AWARE OF THOSE CONVERSATIONS AS YOU

09:31AM  4    SIT HERE TODAY?

09:31AM  5    A.   NO.

09:31AM  6    Q.   AND YOU WEREN'T A PART OF THOSE CONVERSATIONS; CORRECT?

09:31AM  7    A.   NOT AT THAT TIME, NO.

09:31AM  8    Q.   OKAY.  IF YOU COULD TURN TO DOCUMENT 1992.

09:32AM  9    A.   1992 OR 1192?

09:32AM  10   Q.   1992, WHICH I THINK IS PROBABLY IN THE BLACK BOOK.

09:32AM  11   A.   11 OR 19?  BECAUSE IT ONLY GOES TO 4.

09:32AM  12   Q.   1992.

09:32AM  13   A.   OKAY.

09:32AM  14   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:32AM  15   A.   YES.

09:32AM  16   Q.   AND IS THIS AN EMAIL BETWEEN YOU AND MR. DAMSTRA RELATING

09:33AM  17   TO YOUR POTENTIAL INVOLVEMENT IN THE THERANOS INVESTMENT?

09:33AM  18   A.   YES.

09:33AM  19           MR. WADE:  MOVE THE ADMISSION OF 1992.

09:33AM  20           MR. LEACH:  NO OBJECTION.

09:33AM  21           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:33AM  22       (GOVERNMENT'S EXHIBIT 1992 WAS RECEIVED IN EVIDENCE.)

09:33AM  23   BY MR. WADE:

09:33AM  24   Q.   AND DO YOU RECALL IN YOUR TESTIMONY LAST WEEK YOU TALKED

09:33AM  25   ABOUT HOW YOU HAD DISCUSSIONS WITH MR. TUBERGEN ON A PLANE RIDE

09:33AM  1    BACK FROM CHICAGO IN MID-SEPTEMBER ABOUT POSSIBLY WORKING ON

09:33AM  2    THE THERANOS INVESTMENT?

09:33AM  3    A.   YES.

09:33AM  4    Q.   AND DOES THIS EMAIL INDICATE THAT BETWEEN THAT DATE,

09:33AM  5    NOVEMBER 18TH, AND NOVEMBER 30TH, YOU HADN'T DONE ANY WORK ON

09:33AM  6    THE THERANOS INVESTMENT YET; IS THAT RIGHT?

09:33AM  7    A.   THAT DOESN'T INDICATE THAT, NO.

09:34AM  8    Q.   OKAY.  YOU WERE TRYING TO, THROUGH THIS EMAIL, TO OFFER

09:34AM  9    YOUR SERVICES AND GET INVOLVED IN THAT INVESTMENT; IS THAT

09:34AM  10   RIGHT?

09:34AM  11   A.   YES.  AS I MENTIONED LAST WEEK, BDT WASN'T MY

09:34AM  12   RELATIONSHIP, SO I WASN'T SURE WHO WAS GOING TO END UP WORKING

09:34AM  13   ON THIS ONE, AND I WANTED TO RAISE MY HAND.

09:34AM  14   Q.   OKAY.  AND YOU DIDN'T HAVE ANY ACTIVE PARTICIPATION WITH

09:34AM  15   MR. TUBERGEN BETWEEN THE PLANE RIDE THAT YOU HAD WITH HIM AND

09:34AM  16   THIS DATE; IS THAT CORRECT?

09:34AM  17   A.   I DON'T REMEMBER.

09:34AM  18   Q.   OKAY.  YOU CAN SET THAT ONE ASIDE.

09:34AM  19        CAN WE -- CAN I DRAW YOUR ATTENTION TO 14076.

09:35AM  20   A.   OKAY.

09:35AM  21   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:35AM  22   A.   YES.

09:35AM  23   Q.   AND DO YOU RECOGNIZE THIS TO BE A COVER LETTER FROM

09:35AM  24   MS. HOLMES TO MR. TUBERGEN THAT WAS ATTACHED TO THE BINDERS OF

09:35AM  25   INFORMATION THAT WERE SENT TO RDV?

09:35AM  1     A.   YES.

09:35AM  2               MR. WADE:  I MOVE THE ADMISSION OF 14076.

09:35AM  3               MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:35AM  4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:35AM  5          (DEFENDANT'S EXHIBIT 14076 WAS RECEIVED IN EVIDENCE.)

09:35AM  6               MR. WADE:  IF I CAN BLOW UP THE LAST SENTENCE IN THE

09:35AM  7     SECOND PARAGRAPH, "WE ALSO BELIEVE."

09:35AM  8     Q.   DO YOU SEE THERE DISCUSSION OR STATEMENTS BY MS. HOLMES

09:35AM  9     RELATING TO THE DESIRE TO TERM -- TO OBTAIN A LONG-TERM VISION

09:36AM 10     FOR THERANOS?

09:36AM 11          DO YOU SEE THAT?

09:36AM 12     A.   YES.

09:36AM 13     Q.   AND DO YOU SEE THAT THERE'S REFERENCE TO THE FACT THAT THE

09:36AM 14     COMPANY WANTS TO STAY PRIVATE OVER THE LONG-TERM?

09:36AM 15          DO YOU SEE THAT?

09:36AM 16     A.   YES.

09:36AM 17     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO THE PARAGRAPH

09:36AM 18     STARTING WITH "ONCE."

09:36AM 19          DO YOU SEE THAT?

09:36AM 20          AND DO YOU SEE THAT THEY -- THERE'S REFERENCE TO THE

09:36AM 21     WALGREENS CONTRACT IN THE FALL OF 2013.

09:36AM 22          DO YOU SEE THAT?

09:36AM 23     A.   YES.

09:36AM 24     Q.   AND THAT WAS IMPORTANT TO RDV; RIGHT?

09:36AM 25     A.   YES.

09:36AM 1     Q.   OKAY.  AND DO YOU SEE AT THE END THE LAST SENTENCE WHERE

09:36AM 2     IT SAYS, "ALL CURRENT RESOURCES ARE FOCUSSED ON THIS COMMERCIAL

09:36AM 3     LABORATORY BUSINESS"?

09:36AM 4          DO YOU SEE THAT?

09:36AM 5     A.   YES.

09:36AM 6     Q.   AND THEN IT SAYS, "FUTURE GROWTH IN THE PHARMACEUTICAL,

09:37AM 7     MILITARY, AND OTHER BUSINESS WILL FOLLOW THE SUCCESSFUL

09:37AM 8     ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

09:37AM 9     INFRASTRUCTURE NATIONWIDE."

09:37AM 10         DO YOU SEE THAT?

09:37AM 11    A.   I SEE THAT.

09:37AM 12         BUT I ALSO SEE TWO PARAGRAPHS UP WHERE IT SAYS,

09:37AM 13    "HISTORICALLY THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH

09:37AM 14    PHARMACEUTICAL AND MILITARY CLIENTS."

09:37AM 15              MR. WADE:  MOVE TO STRIKE THAT.

09:37AM 16              THE COURT:  THAT'S STRICKEN.

09:37AM 17    BY MR. WADE:

09:37AM 18    Q.   I DO NOTE OTHER REFERENCES TO THE HISTORICAL WORK OF THE

09:37AM 19    COMPANY ABOVE; CORRECT?  THERE WERE REFERENCES TO THE

09:37AM 20    HISTORICAL WORK THAT THE COMPANY HAD WITH MILITARY AND

09:37AM 21    PHARMACEUTICAL COMPANIES ABOVE; RIGHT?

09:37AM 22    A.   YES, AND THAT WAS VERY RELEVANT.

09:37AM 23    Q.   AND YOU SEE WHERE IT SAYS THAT ALL OF THAT WORK IS ON HOLD

09:37AM 24    BECAUSE THEY'RE FOCUSSED ON -- --

09:37AM 25    A.   THEY'RE COMMERCIALIZING.

09:37AM 1    Q.   THEY HAVE ALL OF THEIR EFFORTS FOCUSSED ON THE COMMERCIAL

09:37AM 2    LABORATORY BUSINESS.

09:37AM 3         DO YOU SEE THAT?

09:37AM 4    A.   YES.

09:37AM 5    Q.   AND DO YOU SEE ANYWHERE IN THIS LETTER THAT REFERS TO A

09:38AM 6    THERANOS DEVICE OR AN EDISON OR A MINILAB?

09:38AM 7    A.   THE WHOLE BINDER THAT THIS LETTER WAS ATTACHED TO WAS

09:38AM 8    REFERRING TO THE DEVICE.

09:38AM 9    Q.   RIGHT.  AND I'M ASKING YOU ABOUT THE LETTER.

09:38AM 10   A.   OKAY.

09:38AM 11   Q.   DO YOU HAVE THE LETTER IN FRONT OF YOU?

09:38AM 12   A.   YES.

09:38AM 13   Q.   AND THAT'S 14076?

09:38AM 14   A.   YES.

09:38AM 15   Q.   AND DO YOU SEE ANYWHERE WHERE IT REFERS TO A DEVICE?

09:38AM 16   A.   NOT SPECIFICALLY.  BUT IT WAS ATTACHED TO THE BINDER THAT

09:38AM 17   REFERENCED THE DEVICE AND EVERYTHING ELSE.

09:38AM 18   Q.   I UNDERSTAND.

09:38AM 19        DO YOU UNDERSTAND MY QUESTION IS, DO YOU SEE ANYWHERE IN

09:38AM 20   THE LETTER THAT REFERS TO THE DEVICE?

09:38AM 21   A.   NO.

09:38AM 22   Q.   OKAY.  AND, IN FACT, IT REFERS TO THERANOS AS A SENSORS

09:38AM 23   AND SOFTWARE COMPANY; CORRECT?

09:38AM 24   A.   YES.

09:38AM 25   Q.   CAN YOU GO TO 14 -- 18 -- I'M SORRY, LET ME START OVER --

09:39AM 1    4858, WHICH SHOULD BE IN THE WHITE BINDER.

09:39AM 2    A.   YES.

09:39AM 3    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

09:39AM 4    A.   YES.

09:39AM 5    Q.   OKAY.  AND DO YOU RECALL YOU PREPARED A MEMO IN

09:39AM 6    MID-OCTOBER RELATING TO YOUR DISCUSSIONS AND YOUR REVIEW OF THE

09:39AM 7    MATERIALS PROVIDED BY THERANOS.

09:39AM 8         DO YOU RECALL THAT?

09:39AM 9    A.   I DID TWO MEMOS, ONE BEFORE GOING TO PALO ALTO AND ONE

09:39AM 10   AFTER.

09:39AM 11   Q.   RIGHT.  DO YOU RECALL THE ONE -- THE ONE GOING BEFORE

09:39AM 12   PALO ALTO YOU PREPARED MAYBE OCTOBER 12TH TO 15TH, IN THAT

09:40AM 13   PERIOD?

09:40AM 14   A.   YES, I SUMMARIZED THE DUE DILIGENCE BINDERS AND OUR CALLS

09:40AM 15   WITH MS. HOLMES.

09:40AM 16   Q.   OKAY.  AND ON DIRECT EXAMINATION MR. LEACH WALKED YOU

09:40AM 17   THROUGH 4858, MANY OF THE SLIDES IN THAT.

09:40AM 18   A.   YES.

09:40AM 19   Q.   DO YOU RECALL THAT?

09:40AM 20        AND HE ASKED YOU QUESTIONS ABOUT DIFFERENT STATEMENTS IN

09:40AM 21   THOSE SLIDES; RIGHT?

09:40AM 22   A.   YES.

09:40AM 23   Q.   OKAY.  CAN YOU -- YOUR -- JUST FOR YOUR REFERENCE, WE

09:40AM 24   WON'T PUBLISH IT, BUT YOUR, YOUR MEMO, MID-OCTOBER MEMO IS AT

09:40AM 25   2073.  CAN YOU IDENTIFY ANY STATEMENT IN 2073 --

09:40AM 1    A.   THE FIRST MEMO OR THE SECOND ONE?

09:40AM 2    Q.   THE FIRST MEMO AT 2073, WHICH WILL BE IN FRONT OF YOU.

09:40AM 3    A.   YES.

09:40AM 4    Q.   AND I'M WONDERING IF YOU'RE AWARE OF ANY STATEMENT AT ALL

09:40AM 5    THAT COMES FROM THIS SLIDE DECK AND MADE IT INTO YOUR MEMO.

09:40AM 6    A.   THE MEMO CAME FROM EVERYTHING THAT I HAD READ AND

09:40AM 7    EVERYTHING THAT WE HAD HEARD HER SAY IN THE PHONE CALL.

09:40AM 8         I DIDN'T MAKE UP ANY OTHER STUFF.

09:41AM 9         PLUS WHATEVER WE COULD READ ON THE INTERNET.

09:41AM 10   Q.   RIGHT.  RIGHT.

09:41AM 11        DO YOU RECALL THAT A LOT OF THE STATEMENTS I THINK WE

09:41AM 12   ESTABLISHED DURING YOUR EXAMINATION LAST WEEK CAME OUT OF THE

09:41AM 13   FOR "FORTUNE" ARTICLE.

09:41AM 14        DO YOU RECALL THAT?

09:41AM 15   A.   NO, IT WASN'T A LOT.

09:41AM 16   Q.   SEVERAL?  DO YOU RECALL THAT?

09:41AM 17   A.   A FEW IN THE APPENDIX, YES.  I THOUGHT THAT WAS RELEVANT

09:41AM 18   FOR THE FAMILY TO KNOW WHAT SHE WAS SAYING IN THE MEDIA.

09:41AM 19   Q.   OKAY.  ARE YOU ABLE TO TRACK ANY STATEMENTS SPECIFICALLY

09:41AM 20   FROM THIS SLIDE DECK TO YOUR MEMO?

09:41AM 21   A.   NOT AT THE MOMENT, NO.

09:41AM 22        BUT EVERYTHING IN THAT MEMO CAME FROM THESE BINDERS OR A

09:41AM 23   CONVERSATION WITH HER.

09:41AM 24   Q.   RIGHT.  AND ARE YOU ABLE TO IDENTIFY -- I'VE REVIEWED THE

09:41AM 25   EXHIBIT AND I'VE REVIEWED YOUR MEMO.

09:41AM 1    CAN YOU -- AND I ASSUME YOU HAVE; CORRECT?

09:41AM 2        MR. LEACH:  OBJECTION.  COUNSEL IS TESTIFYING.

09:41AM 3        THE WITNESS:  IF YOU PUT SOME STUFF --

09:41AM 4        THE COURT:  EXCUSE ME, MS. PETERSON.

09:41AM 5    YOU WEREN'T TESTIFYING THERE --

09:41AM 6        MR. WADE:  NO.

09:41AM 7        THE COURT:  -- FOR THE BENEFIT OF THE JURY

09:41AM 8    INDICATING WHAT YOU'VE DONE.

09:41AM 9        THIS WAS FOUNDATIONAL?

09:41AM 10       MR. WADE:  THIS IS FOUNDATIONAL.

09:41AM 11   Q.  YOU'VE REVIEWED BOTH OF THESE DOCUMENTS; CORRECT?

09:42AM 12   A.  YES.

09:42AM 13   Q.  AND ARE YOU AWARE, IN REVIEWING THESE DOCUMENTS, OF ANY

09:42AM 14   STATEMENT THAT COMES FROM THIS SLIDE DECK THAT APPEARED IN

09:42AM 15   EXHIBIT 2073?

09:42AM 16   A.  THE ONLY WAY I PUT THE MEMO TOGETHER WAS BASED ON WHAT I

09:42AM 17   READ AND WHAT WE HEARD.

09:42AM 18   Q.  EVERYTHING THAT YOU READ AND HEARD; RIGHT?

09:42AM 19   A.  I DON'T KNOW IF IT WAS EVERYTHING THAT I READ AND HEARD,

09:42AM 20   BUT THE MEMO WAS BASED ON MY DILIGENCE OF THE BINDERS AND WHAT

09:42AM 21   WE HEARD ON THE PHONE CALL, YES.

09:42AM 22       WE WERE PREPPING THE FAMILY.  WE TALKED ABOUT THE

09:42AM 23   OPPORTUNITY AT LENGTH ON THE PLANE, AND THEN THEY HEARD MUCH OF

09:42AM 24   WHAT WAS IN THE MEMO, THEY HEARD IN PERSON WHEN WE WERE AT THE

09:42AM 25   MEETING IN PALO ALTO.

09:42AM   1    Q.  DO YOU -- BUT AS YOU SIT HERE TODAY, YOU'RE NOT AWARE OF

09:42AM   2    ANY STATEMENT THAT COMES FROM THE SLIDE DECK DIRECTLY INTO THE

09:42AM   3    MEMO LIKE THOSE "FORTUNE" STATEMENTS; IS THAT CORRECT?

09:42AM   4    A.  I DIDN'T MEMORIZE THE WHOLE FOOT OF PAPER TO TELL YOU WHAT

09:43AM   5    CAME FROM THERE IN MY MEMO OR NOT.

09:43AM   6    Q.  LET'S LOOK AT THE INCH OF PAPER.

09:43AM   7        IF I COULD TURN YOUR ATTENTION TO PAGE 51 OF THE SLIDE

09:43AM   8    DECK AT 12723.

09:43AM   9        DO YOU HAVE THAT IN FRONT OF YOU?  IT'S ON THE SCREEN

09:43AM  10    THERE AS WELL IF THAT'S EASIER.

09:43AM  11    A.  OKAY.

09:43AM  12    Q.  DO YOU SEE THAT TO BE A PICTURE OF THE THERANOS

09:43AM  13    HEADQUARTERS?

09:43AM  14    A.  YES.

09:43AM  15    Q.  IS THAT THE BUILDING THAT YOU WENT TO WHEN YOU WENT ON THE

09:43AM  16    VISIT WITH THE DEVOS FAMILY?

09:43AM  17    A.  I BELIEVE THAT'S THE NEW BUILDING.  WE WENT TO THE OLD

09:43AM  18    BUILDING.

09:43AM  19    Q.  YOU WENT TO THE OLD BUILDING?

09:44AM  20    A.  YES.

09:44AM  21    Q.  LET'S GO TO THE NEXT PAGE.  YOU DIDN'T GO -- DID YOU GO TO

09:44AM  22    NEWARK?

09:44AM  23    A.  NO.  WE ASKED.  THEY SAID WE COULDN'T GO THERE.

09:44AM  24    Q.  YOU COULDN'T LOOK AT THE MANUFACTURING EQUIPMENT?

09:44AM  25    A.  NO.

09:44AM 1    Q.   OKAY.

09:44AM 2    A.   IT WAS TOP SECRET.

09:44AM 3    Q.   OKAY.  DO YOU KNOW WHAT THIS IS IN THIS PICTURE?

09:44AM 4    A.   WE WERE TOLD THAT'S WHERE THEY MADE THE MACHINES.

09:44AM 5    Q.   OKAY.

09:44AM 6    A.   THE ANALYZER EQUIPMENT.

09:44AM 7    Q.   LET'S GO TO PAGE 54.

09:44AM 8         DO YOU SEE -- WAS THIS MATERIAL THAT YOU RECEIVED IN

09:44AM 9    CONNECTION WITH YOUR INVESTMENT?

09:44AM 10   A.   I BELIEVE SO.

09:44AM 11   Q.   IT WAS IN THE SLIDE DECK; RIGHT?

09:44AM 12   A.   YES.

09:44AM 13   Q.   DID YOU REVIEW IT?

09:44AM 14   A.   YES.

09:44AM 15   Q.   OKAY.  AND DID YOU CONSIDER THIS INFORMATION IN THE SLIDE

09:44AM 16   DECK?

09:44AM 17   A.   YES.

09:44AM 18   Q.   OKAY.  AND LET'S GO TO THE NEXT PAGE.

09:44AM 19        DO YOU CONSIDER THIS -- DO YOU SEE THIS, THAT IT IS MORE

09:44AM 20   OF THE SAME?  THESE ARE FEEDBACK FROM CUSTOMERS?

09:45AM 21        DO YOU SEE THAT?

09:45AM 22   A.   YES.  AND MY TAKEAWAY WAS THAT THE WORK THAT THEY WERE

09:45AM 23   DOING IN WALGREENS WAS WORKING.

09:45AM 24   Q.   OKAY.

09:45AM 25   A.   AND PEOPLE WERE SATISFIED.

09:45AM   1    Q.   OKAY.  AND YOU CONSIDERED THAT.

09:45AM   2         AND SIMILARLY, IF WE CAN GO TO SLIDE 57, THERE'S FEEDBACK

09:45AM   3    FROM PHYSICIANS.

09:45AM   4         DO YOU SEE THAT?

09:45AM   5         ACTUALLY, LET'S TURN OFF THAT PAGE AND GO UP ONE, PLEASE.

09:45AM   6         LET'S JUST LEAVE THAT DOWN.  IT'S NOT -- THERE'S SOME

09:45AM   7    NAMES THAT ARE NOT REDACTED.

09:45AM   8         BUT IF YOU CAN JUST HAVE IN FRONT OF YOU, DO YOU SEE THAT

09:45AM   9    THERE'S ALSO FEEDBACK ON SLIDE 57 FROM DIFFERENT PHYSICIANS WHO

09:45AM   10   GAVE REVIEWS OF THE WORK PERFORMED AT THERANOS?

09:45AM   11   A.   YES.

09:45AM   12   Q.   AND YOU CONSIDERED THAT IN CONNECTION WITH YOUR INVESTMENT

09:45AM   13   DECISION?

09:45AM   14   A.   YES, VERY RELEVANT.

09:45AM   15   Q.   OKAY.  NOW -- AND YOU RECOGNIZE THAT MANY OF THE COMMENTS

09:46AM   16   IN THERE REFERRED TO THE FAVORABLE PRICING THAT THERANOS HAD;

09:46AM   17   IS THAT RIGHT?

09:46AM   18   A.   THE FAVORABLE PRICING, AS WELL AS THE FACT THAT THE

09:46AM   19   FINGERSTICK TECHNOLOGY WORKED.  IT LENDED CREDIBILITY TO THAT,

09:46AM   20   YES.

09:46AM   21   Q.   I'M SORRY TO INTERRUPT.

09:46AM   22        BUT SOME PEOPLE LIKED THE FINGERSTICK TECHNOLOGY AS WELL;

09:46AM   23   RIGHT?

09:46AM   24   A.   YES.

09:46AM   25   Q.   AND SOME PEOPLE LIKED TO KNOW HOW MUCH THEY WERE GOING TO

09:46AM   1    PAY IN ADVANCE; RIGHT?

09:46AM   2    A.   YES.

09:46AM   3    Q.   AND SOME PEOPLE LIKED THE FACT THAT INSURED AND UNINSURED

09:46AM   4    WERE PAID -- WERE PAID THE SAME AMOUNT; RIGHT?

09:46AM   5    A.   YES.

09:46AM   6    Q.   OKAY.  LET'S GO TO EXHIBIT -- PAGE 73.

09:46AM   7         AND DO YOU SEE THIS IS A REFERENCE TO THE DIFFERENT

09:47AM   8    LOCATIONS WHERE THEY WERE PROVIDING SERVICES AT THAT TIME?

09:47AM   9    A.   THAT'S WHAT I WOULD HAVE ASSUMED, YES.

09:47AM  10    Q.   OKAY.  AND DO YOU SEE THAT MANY OF THE LOCATIONS PROVIDE

09:47AM  11    SERVICES FROM 6:00 A.M. TO 10:00 P.M.

09:47AM  12         DO YOU SEE THAT?

09:47AM  13    A.   YES.

09:47AM  14    Q.   AND ON SATURDAYS AND SUNDAYS?

09:47AM  15    A.   OKAY.

09:47AM  16    Q.   AND THAT CONVENIENCE WAS A PRETTY SIGNIFICANT FACTOR,

09:47AM  17    SIGNIFICANT PORTION OF THERANOS'S OFFERING.

09:47AM  18         DO YOU RECALL THAT?

09:47AM  19    A.   YES.

09:47AM  20    Q.   OKAY.  LET ME BRING YOU TO PAGE 44.

09:47AM  21         I'M SORRY, LET'S GO TO -- WELL, WE CAN GO TO 44.

09:47AM  22         DO YOU SEE THOSE ARE PICTURES OF THE THERANOS WELLNESS

09:47AM  23    CENTER?

09:47AM  24    A.   YES.

09:47AM  25    Q.   AND YOU DON'T SEE ANY DEVICES IN THE WELLNESS CENTER

Case 5:18-cr-00258-EJD Document 1296 Filed 01/18/22 Page 56 of 286

09:48AM  1     PICTURES, DO YOU?

09:48AM  2     A.   IN THEIR BUILDING THEY HAD SOMETHING JUST LIKE THIS WHERE

09:48AM  3     CHERI WAS TESTED AND WE WERE TOLD THAT THIS IS PRETTY MUCH WHAT

09:48AM  4     THEIR WELLNESS CENTERS LOOKED LIKE INSIDE OF WALGREENS.

09:48AM  5     Q.   RIGHT.  MY QUESTION WAS, DO YOU SEE ANY PICTURES OF THE

09:48AM  6     DEVICE IN THESE PHOTOS?

09:48AM  7     A.   NO.  BUT I SAW IT FIRST HAND.  I WASN'T RELYING ON THIS

09:48AM  8     PICTURE.  I WAS RELYING ON THE TOUR THAT WE GOT OF THE WELLNESS

09:48AM  9     CENTER INSIDE OF THEIR BUILDING.

09:48AM  10          MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER THE

09:48AM  11    INITIAL ANSWER, YOUR HONOR.

09:48AM  12          THE COURT:  WHAT WAS OBSERVED AT THE WELLNESS

09:48AM  13    CENTER -- EXCUSE ME, AT THE THERANOS BUILDING IS STRICKEN.

09:48AM  14          MR. WADE:  LET'S GO TO PAGE 90 OF THE EXHIBIT.

09:48AM  15    Q.   DID YOU READ THIS PAGE IN CONNECTION WITH YOUR INVESTMENT?

09:48AM  16    A.   I DON'T REMEMBER IT OFF THE TOP OF MY HEAD, BUT I'M SURE I

09:49AM  17    READ IT.  I READ EVERYTHING IN THE BINDERS AT THE TIME.  IT WAS

09:49AM  18    A LONG TIME AGO.

09:49AM  19    Q.   OKAY.  AND DO YOU SEE, DO YOU SEE WHERE IT SAYS PATIENTS

09:49AM  20    RECEIVE -- OR THAT DOCTORS WILL GET PATIENTS' RESULTS BACK IN

09:49AM  21    LESS THAN 48 HOURS ON AVERAGE?

09:49AM  22          DO YOU SEE THAT?

09:49AM  23    A.   YES.

09:49AM  24    Q.   AND DO YOU HAVE ANY SENSE FOR WHY IT WOULD TAKE 48 HOURS

09:49AM  25    IF THE DEVICE WAS IN THE WELLNESS CENTER?

09:49AM 1    A.   WELL, WE WERE TOLD THAT IT WOULDN'T TAKE THAT LONG.  IN

09:49AM 2    FACT, CHERI WAS TOLD THAT SHE WOULD HAVE EMAIL RESULTS RATHER

09:49AM 3    QUICKLY.

09:49AM 4    Q.   AND YOU DON'T KNOW WHEN SHE GOT HER RESULTS; RIGHT?

09:49AM 5    A.   I BELIEVE -- I KNOW SHE HAD THEM EMAILED THAT DAY, BUT I

09:49AM 6    DON'T KNOW WHAT THEY SAID.

09:49AM 7    Q.   BUT YOU SAID YOU WERE TOLD THAT, BUT YOU WERE ACTUALLY

09:49AM 8    TOLD RIGHT HERE THAT THE RESULTS WERE GIVEN LESS THAN 48 HOURS

09:49AM 9    ON AVERAGE.

09:49AM 10        DO YOU SEE THAT?

09:49AM 11   A.   ON AVERAGE.  BUT THAT'S NOT WHAT SHE WAS VERBALLY SAYING.

09:50AM 12   Q.   I'M JUST ASKING -- I HAVE A QUESTION WITH RESPECT TO

09:50AM 13   NUMBER 3.

09:50AM 14        DO YOU SEE THAT?

09:50AM 15   A.   OKAY.

09:50AM 16   Q.   DO YOU HAVE AN UNDERSTANDING AS TO WHY THAT STATEMENT SAYS

09:50AM 17   48 HOURS?

09:50AM 18   A.   NO.

09:50AM 19   Q.   OKAY.  I BELIEVE YOU TESTIFIED WITH RESPECT TO YOUR -- YOU

09:50AM 20   TESTIFIED WITH RESPECT TO YOUR BELIEF THAT THE TESTS WERE

09:50AM 21   PERFORMED ON THE DEVICES IN THE WALGREENS AT THE TIME THAT YOU

09:50AM 22   WENT TO THERANOS; IS THAT RIGHT?

09:50AM 23   A.   SAY THE QUESTION AGAIN.

09:50AM 24   Q.   YOU SAID THAT THE DEVICE -- YOU WERE OF THE VIEW, OR OF

09:50AM 25   THE UNDERSTANDING, THAT THE DEVICES WERE IN THE ACTUAL

09:50AM  1    WALGREENS LOCATIONS AT THE TIME THAT YOU MET WITH THERANOS?

09:50AM  2    A.   YES.   THERE WAS NO OTHER REASON TO THINK ANYTHING ELSE.

09:50AM  3    Q.   OKAY.   AND YOU TESTIFIED THAT YOU DID SOME INTERNET

09:51AM  4    RESEARCH; RIGHT?

09:51AM  5    A.   YES.

09:51AM  6    Q.   OKAY.   AND IN CONNECTION WITH THE INTERNET RESEARCH, DID

09:51AM  7    YOU GO TO THE FIRST PAGE OF THE THERANOS SITE?

09:51AM  8    A.   I DON'T KNOW.

09:51AM  9    Q.   OKAY.   DO YOU RECALL WHETHER YOU SAW A SITE THAT ON THE

09:51AM  10   FIRST PAGE OF THE THERANOS SITE SAYS THAT THE TESTS AT

09:51AM  11   WALGREENS ARE PERFORMED IN THE CLIA LAB?

09:51AM  12   A.   EVERYTHING THAT WAS TOLD TO US WAS -- SUGGESTED THAT

09:51AM  13   EVERYTHING THAT WAS BEING DONE WAS ON THE ANALYZER EQUIPMENT.

09:51AM  14   Q.   OKAY.

09:51AM  15   A.   WE DID NOT KNOW THAT THERE WAS VENOUS TESTING UNTIL WE

09:51AM  16   READ "THE WALL STREET JOURNAL" ARTICLE A YEAR LATER.

09:51AM  17        IT'S NOT WHAT WE HAD INVESTED IN.   IT'S NOT WHAT WE HAD

09:51AM  18   THOUGHT WE HAD INVESTED IN.

09:51AM  19             MR. WADE:  MOVE TO STRIKE, YOUR HONOR.

09:51AM  20             THE COURT:  OVERRULED.

09:51AM  21   BY MR. WADE:

09:51AM  22   Q.   THE -- MY QUESTION RELATED TO THE WEBSITE AND WHETHER YOU

09:51AM  23   SAW REFERENCES ON THE WEBSITE RELATING TO THE FACT THAT

09:52AM  24   WALGREENS TESTS WERE PERFORMED IN THE CLIA LAB.

09:52AM  25        DID YOU SEE THAT REFERENCE?

09:52AM 1    A.   I DON'T -- I CAN'T ANSWER THAT QUESTION.  I DON'T

09:52AM 2    REMEMBER.

09:52AM 3    Q.   SO YOU DON'T REMEMBER SEEING THAT REFERENCE; CORRECT?

09:52AM 4    A.   I DON'T REMEMBER SEEING THAT REFERENCE.

09:52AM 5         I'M JUST TELLING YOU WHAT WE KNEW AT THE TIME, WHICH WAS

09:52AM 6    THAT EVERYTHING WAS BEING DONE ON THE ANALYZER EQUIPMENT.

09:52AM 7         THERE WAS NEVER ANY CONVERSATION AROUND VENOUS DRAWS EVER.

09:52AM 8              MR. WADE:  MOVE TO STRIKE THE LAST PORTION.

09:52AM 9              THE WITNESS:  SORRY.

09:52AM 10              THE COURT:  EXCUSE ME.  WAIT FOR HIS QUESTION AND

09:52AM 11   THEN YOU CAN ANSWER IT.

09:52AM 12        THAT LAST RESPONSE IS STRICKEN.

09:53AM 13   BY MR. WADE:

09:53AM 14   Q.   NOW, IF I CAN DRAW YOUR ATTENTION TO 104, PAGE 104 OF THE

09:53AM 15   SAME EXHIBIT.

09:53AM 16        DO YOU HAVE THAT IN FRONT OF YOU?

09:53AM 17   A.   YES.

09:53AM 18   Q.   AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME QUESTIONS

09:53AM 19   ABOUT THIS?

09:53AM 20   A.   YES.

09:53AM 21   Q.   AND DO YOU RECALL THAT YOU GAVE TESTIMONY THAT YOU

09:53AM 22   BELIEVED THAT THIS WAS PREPARED BY PFIZER; CORRECT?

09:53AM 23   A.   YES.

09:53AM 24   Q.   OKAY.  DO YOU RECALL THAT, DO YOU RECALL THAT YOU MET WITH

09:53AM 25   THE GOVERNMENT IN 2017?

09:54AM  1    A.  YES.

09:54AM  2    Q.  OKAY.  AND DO YOU RECALL THAT IN THAT INTERVIEW YOU TOLD

09:54AM  3    THE GOVERNMENT THAT YOU DIDN'T KNOW WHO WROTE THE REPORT

09:54AM  4    INCLUDED IN THE SET WITH THE PFIZER LOGO?

09:54AM  5    A.  I DON'T RECALL SAYING THAT.

09:54AM  6    Q.  OKAY.  LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.

09:54AM  7        CAN YOU PULL THAT INTERVIEW UP.  IT'S 11249.

09:54AM  8        LET ME KNOW -- AND I'M LOOKING AT PAGE 2 OF 11249.

09:55AM  9        DO YOU HAVE THAT IN FRONT OF YOU?

09:55AM  10   A.  YES.

09:55AM  11   Q.  GO -- LOOK AT THE BOTTOM OF PAGE 2, LAST SENTENCE, AND

09:55AM  12   PLEASE JUST READ IT TO YOURSELF AND WAIT FOR MY QUESTION.

09:55AM  13       HAVE YOU READ THAT TO YOURSELF?

09:55AM  14   A.  YES.

09:55AM  15   Q.  AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU TOLD THE

09:55AM  16   GOVERNMENT THAT YOU DID NOT KNOW WHO WROTE THE REPORT INCLUDED

09:55AM  17   IN THE SET OF DOCUMENTS WITH PFIZER'S LOGO?

09:55AM  18   A.  THAT'S NOT EXACTLY HOW I RECALL IT, NO.

09:55AM  19   Q.  OKAY.

09:55AM  20   A.  I MEAN, I DON'T KNOW WHO ELSE WOULD HAVE WRITTEN IT BUT

09:55AM  21   PFIZER OR THERANOS.

09:55AM  22   Q.  WHEN YOU -- JUST SO WE'RE CLEAR, AND I'M SURE I KNOW THE

09:55AM  23   ANSWER TO THIS, BUT YOU TOLD THE TRUTH WHEN YOU MET WITH THE

09:55AM  24   GOVERNMENT; RIGHT?

09:56AM  25   A.  YES, OF COURSE.

09:56AM 1    Q.   AND THERE WERE AGENTS THERE TAKING NOTES?

09:56AM 2    A.   YES.

09:56AM 3    Q.   YES.

09:56AM 4         AND YOU WERE CAREFUL IN WHAT YOU SAID TO TRY TO MAKE SURE

09:56AM 5    THAT IT WAS ACCURATE; RIGHT?

09:56AM 6    A.   YES.

09:56AM 7    Q.   IF I CAN CALL YOUR ATTENTION -- NOW, THIS PFIZER DOCUMENT

09:56AM 8    THAT IS UP ON THE SCREEN, YOU DIDN'T SPECIFICALLY MENTION THAT

09:56AM 9    PFIZER DOCUMENT IN EITHER ONE OF YOUR MEMOS, DID YOU?

09:56AM 10   A.   NO.  BUT AS I SAID, PFIZER -- IN REVIEWING THAT, IT LENDED

09:56AM 11   CREDIBILITY.  I DIDN'T SUMMARIZE THIS PFIZER STUDY.  IT JUST

09:56AM 12   LENDED CREDIBILITY THAT THEY HAD DONE WORK WITH PFIZER AND

09:56AM 13   PFIZER WAS OKAYING THAT THE ANALYZER DID WORK.  THAT'S WHAT

09:56AM 14   THIS WAS -- THAT'S THE TAKEAWAY FROM THIS FOR US.

09:56AM 15            MR. WADE:  MOVE TO STRIKE EVERYTHING AFTER "NO."

09:56AM 16            THE COURT:  I WILL STRIKE THAT NOW.

09:56AM 17        BUT, MR. WADE, SOME OF YOUR QUESTIONS LEND THEMSELVES TO

09:57AM 18   AN EXPLANATION SO --

09:57AM 19            MR. WADE:  OKAY.  THANK YOU, YOUR HONOR.

09:57AM 20   Q.   IF YOU GO TO THE BOTTOM -- LET'S GO TO THE BOTTOM OF THE

09:57AM 21   PAGE.  THE VERY BOTTOM, I'M SORRY, NOT THE PARAGRAPH.  THE

09:57AM 22   FOOTER.

09:57AM 23        DO YOU SEE THE FOOTER?

09:57AM 24   A.   YES.

09:57AM 25   Q.   AND WHOSE ADDRESS IS THAT?

09:57AM  1      A.   I DON'T KNOW.

09:57AM  2      Q.   YOU DON'T KNOW WHOSE ADDRESS THAT IS?

09:57AM  3      A.   NOT OFF THE TOP OF MY HEAD, NO.

09:57AM  4      Q.   OKAY.  DO YOU SEE THAT IT'S A -- DO YOU SEE THE THERANOS

09:57AM  5      WEBSITE THERE?

09:57AM  6      A.   YES.

09:57AM  7      Q.   OKAY.  LET'S GO TO THE SECOND PAGE.  LET'S LOOK AT THAT

09:57AM  8      SAME LANGUAGE IN THE FOOTER.

09:57AM  9           DO YOU SEE THAT IS THERANOS'S WEBSITE THERE?

09:57AM 10      A.   YES.

09:57AM 11      Q.   AND DO YOU RECOGNIZE THAT TO BE THERANOS'S ADDRESS?

09:57AM 12      A.   I, I DON'T KNOW.

09:57AM 13      Q.   OKAY.  AND THAT FOOTER IS ON EVERY PAGE OF THIS REPORT;

09:57AM 14      RIGHT?

09:57AM 15           CORRECT?

09:58AM 16      A.   I DON'T KNOW.  I WOULD IMAGINE YES.  IT'S A LONG TIME AGO.

09:58AM 17      Q.   DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT WHEN THE

09:58AM 18      INVESTMENT COMMITMENT WAS MADE?

09:58AM 19      A.   YES.

09:58AM 20      Q.   OKAY.  AND IT WAS IN CONNECTION WITH A MEETING THAT

09:58AM 21      HAPPENED AT THERANOS ON OCTOBER 15TH; CORRECT?

09:58AM 22      A.   CORRECT.

09:58AM 23      Q.   AND ISN'T IT TRUE THAT A DECISION HAD BEEN MADE AT THE END

09:58AM 24      OF THAT MEETING TO INVEST A HUNDRED MILLION DOLLARS?

09:59AM 25      A.   THEY HAD TALKED ABOUT THAT BEING OUR COMMITMENT, YES.

09:59AM 1    Q.   AND SO THE DECISION -- MY QUESTION WAS THE DECISION HAD

09:59AM 2    BEEN MADE --

09:59AM 3    A.   I WOULDN'T SAY.

09:59AM 4            THE COURT:  MS. PETERSON, LET HIM FINISH HIS

09:59AM 5    QUESTION SO YOU'LL HAVE THE FULL BENEFIT OF IT.

09:59AM 6            THE WITNESS:  SORRY.

09:59AM 7    BY MR. WADE:

09:59AM 8    Q.   MY QUESTION IS THAT THE DECISION HAD BEEN MADE AT THE END

09:59AM 9    OF THAT MEETING TO INVEST $100 MILLION; CORRECT?

09:59AM 10   A.   THAT'S NOT A YES OR NO QUESTION FOR ME.

09:59AM 11   Q.   WELL, YOU RECALL GIVING TESTIMONY --

09:59AM 12   A.   THE FAMILY WAS VERY WELL --

09:59AM 13   Q.   THERE'S NO QUESTION PENDING RIGHT NOW.

09:59AM 14       DO YOU RECALL GIVING TESTIMONY IN A DEPOSITION?  WE TALKED

09:59AM 15   ABOUT THAT LAST WEEK; RIGHT?

09:59AM 16   A.   YES.

09:59AM 17   Q.   OKAY.  AND YOU RECALL THAT YOU WERE UNDER OATH?

09:59AM 18   A.   YES.

09:59AM 19   Q.   YES.  AND YOU RECALL THAT YOU WERE UNDER THE PAINS AND

09:59AM 20   PENALTIES OF PERJURY TO GIVE TRUTHFUL ANSWERS?

09:59AM 21       DO YOU RECALL THAT?

09:59AM 22   A.   YES.

09:59AM 23   Q.   COULD I DRAW YOUR ATTENTION TO 1125, PAGE 74.

10:00AM 24           THE COURT:  LET'S STOP FOR JUST A SECOND.

10:00AM 25       AND, FOLKS, LET'S TAKE TWO MINUTES TO STAND AND STRETCH,

10:00AM 1    PLEASE.  LET'S JUST TAKE A STRETCHING BREAK HERE.

10:00AM 2        (STRETCHING.)

10:01AM 3            MR. WADE:  WHILE WE TAKE A BREAK, YOUR HONOR, MAY I

10:01AM 4    CONFER WITH COUNSEL?

10:01AM 5            THE COURT:  YES, OF COURSE.

10:01AM 6        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:01AM 7            THE COURT:  THANK YOU.  MR. WADE.

10:01AM 8    BY MR. WADE:

10:01AM 9    Q.   DO YOU HAVE PAGE 74 IN FRONT OF YOU?

10:01AM 10   A.   PAGE 74 IS JUST THE "FORTUNE" ARTICLE.

10:01AM 11   Q.   I'M SORRY, 11253.  IT SHOULD BE YOUR DEPOSITION TESTIMONY.

10:01AM 12       DO YOU SEE THAT?

10:01AM 13   A.   OKAY.  YES.

10:02AM 14   Q.   DO YOU RECOGNIZE THAT TO BE YOUR DEPOSITION TESTIMONY?

10:02AM 15   A.   YES.

10:02AM 16   Q.   OKAY.  I WOULD DRAW YOURS, COUNSEL, AND THE COURT'S

10:02AM 17   ATTENTION TO PAGE 74, LINE 13.

10:02AM 18       YOU WERE ASKED, "SO THE DECISION HAD BEEN MADE AT THE END

10:02AM 19   OF THAT MEETING TO INVEST 100 MILLION?"

10:02AM 20       AND YOU ANSWERED, "CORRECT."

10:02AM 21       IS THAT RIGHT?

10:02AM 22   A.   OKAY.  YES.

10:02AM 23   Q.   OKAY.  DID I READ THAT CORRECTLY?

10:02AM 24   A.   YES, WE TALKED ABOUT THAT, YES.

10:02AM 25   Q.   OKAY.  OKAY.  AND THIS WAS -- THIS DECISION HAD BEEN MADE

10:02AM  1    BEFORE YOU CREATED YOUR SECOND MEMO; CORRECT?

10:02AM  2    A.   YES.

10:02AM  3    Q.   OKAY.  AND YOU DID NOT HAVE ANY SEPARATE MEETINGS OR

10:02AM  4    VERBAL COMMUNICATIONS WITH MR. DEVOS OR MR. TUBERGEN BEFORE

10:03AM  5    THEY MADE THAT COMMITMENT IN THAT MEETING ON THAT DAY; CORRECT?

10:03AM  6    A.   I DID NOT -- SAY IT AGAIN.

10:03AM  7    Q.   THERE WASN'T A SIDE MEETING THAT HAPPENED BEFORE THAT

10:03AM  8    COMMITMENT WAS MADE; RIGHT?

10:03AM  9    A.   THERE WERE LOTS OF DISCUSSIONS ON THE WAY TO THE MEETING

10:03AM 10    IN THE PLANE WHERE WE DISCUSSED EVERYTHING.

10:03AM 11         WE WENT THROUGH THE FIVE HOUR MEETING IN WHICH DOUG WAS

10:03AM 12    APART OF IT AND SO WAS RICK, WHO WERE BOTH ON THE INVESTMENT

10:03AM 13    COMMITTEE.  WE CAUCUSED OUTSIDE.  THEY TALKED ABOUT DOING 100

10:03AM 14    IN THE MEETING.  THAT WAS KIND OF WHERE THEY LANDED.

10:03AM 15         FROM THAT POINT FORWARD I NEEDED THE GREEN LIGHT FROM

10:03AM 16    JERRY IN ORDER TO MOVE FORWARD WITH CLOSING THE INVESTMENT.

10:03AM 17         SO, YES, HAD THEY DECIDED TO MOVE FORWARD -- DO THE WORK

10:03AM 18    AND PROCESS THAT WE GO THROUGH TO CLOSE ON A TRANSACTION, YES,

10:03AM 19    THAT WAS WHAT WAS DISCUSSED IN THE PARKING LOT BEFORE WE

10:03AM 20    DISBURSED.

10:03AM 21    Q.   OKAY.  LET ME BRING YOU BACK TO THE MEETING, OKAY?

10:04AM 22    A.   OKAY.

10:04AM 23    Q.   I'M FOCUSSED ON WHAT WAS HAPPENING IN THE MEETING INSIDE

10:04AM 24    OF THERANOS.

10:04AM 25    A.   YES.

10:04AM 1    Q.   AND I THINK WE JUST ESTABLISHED THAT THE DECISION TO MAKE

10:04AM 2    THE $100 MILLION INVESTMENT WAS MADE IN THE MEETING; CORRECT?

10:04AM 3    A.   YES, THAT'S WHAT WAS DISCUSSED.

10:04AM 4    Q.   OKAY.  AND THAT WAS BEFORE YOU PREPARED THE MEMO THAT YOU

10:04AM 5    REFERRED TO AFTER THE MEETING; CORRECT?

10:04AM 6    A.   CORRECT.  BUT THE EARLIER MEMO WAS VERY MUCH WHAT WAS IN

10:04AM 7    THE FINAL MEMO, WHICH WE HAD ALREADY DISCUSSED ON THE WAY

10:04AM 8    THERE.

10:04AM 9    Q.   OKAY.  I WASN'T ASKING -- I'M NOT ASKING YOU ABOUT THE

10:04AM 10   EARLIER MEMO.  I'M ASKING YOU SPECIFIC QUESTIONS.

10:04AM 11        OKAY?

10:04AM 12   A.   OKAY.

10:04AM 13   Q.   AND YOU WERE IN A MEETING AT THERANOS; CORRECT?

10:04AM 14   A.   YES.

10:04AM 15   Q.   AND THERE WAS DISCUSSION BACK AND FORTH.  WE TALKED ABOUT

10:04AM 16   IT LAST WEEK; RIGHT?

10:04AM 17   A.   YES, FOUR HOURS WORTH.

10:04AM 18   Q.   AND MEMBERS OF THE DEVOS INVESTMENT COMMITTEE WERE

10:04AM 19   PRESENT; CORRECT?

10:04AM 20   A.   YES.

10:04AM 21   Q.   YOU WERE PRESENT?

10:04AM 22   A.   YES.

10:04AM 23   Q.   AND MR. TUBERGEN WAS PRESENT?

10:04AM 24   A.   YES.

10:04AM 25   Q.   AND BEFORE THAT COMMITMENT WAS EXPRESSED IN THAT MEETING,

10:05AM  1   YOU DID NOT PROVIDE ANY INPUT IN A SIDE MEETING TO ANY OF THOSE

10:05AM  2   INVESTMENT COMMITTEE MEMBERS OR TO MR. TUBERGEN THAT DAY, DID

10:05AM  3   YOU?

10:05AM  4   A.   OTHER THAN THE THREE HOURS ON THE PLANE ON THE WAY THERE,

10:05AM  5   NO.

10:05AM  6   Q.   OKAY.  NOTHING IN THAT MEETING; CORRECT?

10:05AM  7   A.   NO.

10:05AM  8   Q.   OKAY.  IF WE CAN PULL UP 2098 WHICH I BELIEVE IS IN

10:05AM  9   EVIDENCE AND GO TO THE SECOND PAGE.

10:05AM  10      OKAY.  LET ME KNOW WHEN YOU HAVE 2098, PAGE 2 IN FRONT OF

10:06AM  11   YOU.

10:06AM  12   A.   OKAY.

10:06AM  13   Q.   DO YOU HAVE THAT IN FRONT OF YOU?

10:06AM  14   A.   YES.

10:06AM  15   Q.   OKAY.  AND DO YOU RECALL LAST WEEK WE WENT THROUGH CERTAIN

10:06AM  16   ASPECTS OF THIS EMAIL AND THERE WAS COMMUNICATION ABOUT THE

10:06AM  17   FACT THAT, THAT YOU WERE NOT INCLUDED ON AND THEN YOU WERE

10:06AM  18   LOOPED IN LATER.

10:06AM  19      DO YOU RECALL THAT?

10:06AM  20   A.   SAY THAT AGAIN.

10:06AM  21   Q.   LET ME JUST FOCUS ON THE DOCUMENT.

10:06AM  22      DO YOU SEE THAT THERE WERE COMMUNICATIONS BETWEEN

10:06AM  23   MS. HOLMES, MR. TUBERGEN, MR. BALWANI, AND DOUG DEVOS?

10:06AM  24      DO YOU SEE THAT?

10:06AM  25   A.   YES, YES.

1    Q.   AND THEN FURTHER UP THE EMAIL CHAIN YOU ARE LOOPED IN;

2    CORRECT?

3    A.   YES.

4    Q.   AND YOU SEE MR. TUBERGEN LOOPS YOU IN TO LET YOU -- TO

5    KEEP YOU POSTED.

6         DO YOU SEE THAT?

7    A.   YES.

8    Q.   AND WE DIDN'T FOCUS ON IT, BUT IF YOU GO -- IF YOU LOOK AT

9    THE BOTTOM OF THE FIRST PAGE, BOTTOM OF THE FIRST -- NOPE.  THE

10   HEADER JUST ON THE BOTTOM THERE, PLEASE.  THANK YOU.

11        DO YOU SEE THIS IS AN EMAIL FROM YOU TO MR. TUBERGEN ON

12   OCTOBER 20TH; CORRECT?

13   A.   YES.

14   Q.   AND LET'S LOOK AT THE EMAIL, WHICH IS ON THE TOP OF THE

15   SECOND PAGE.  AND DO YOU SEE THAT MR. TUBERGEN APOLOGIZES FOR

16   HAVING FAILED TO INCLUDE YOU PREVIOUSLY.

17        DO YOU SEE THAT?

18   A.   YES.

19   Q.   BUT HE WAS LOOPING YOU IN NOW; RIGHT?

20   A.   YES.

21   Q.   AND HE SAYS, "GOOD NEWS IS WE ARE IN AND I'M VERY

22   ENCOURAGED BY THIS DEAL."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   OKAY.  AND THIS IS ON OCTOBER 20TH; CORRECT?

10:07AM 1   A.   YES.

10:07AM 2   Q.   AND LET'S GO ONE EMAIL UP THE CHAIN.

10:07AM 3        YOU RESPOND; CORRECT?

10:07AM 4   A.   YES.

10:07AM 5   Q.   AND YOU SAY, "NO WORRIES.  I'LL DOCUMENT SOMETHING FOR THE

10:07AM 6   FILE THAT YOU CAN SIGN AS 'APPROVED.'"

10:07AM 7        CORRECT?

10:08AM 8   A.   YES.

10:08AM 9   Q.   OKAY.  IF YOU CAN GO TO 2166, WHICH I BELIEVE IS IN

10:08AM 10  EVIDENCE.

10:08AM 11  A.   YES.

10:08AM 12  Q.   AND IF I CAN CALL YOUR ATTENTION TO THE LAST PAGE.

10:08AM 13       THIS IS THE MEMO THAT WAS PREPARED FOR THE FILE AFTER THE

10:08AM 14  MEETING; CORRECT?

10:08AM 15  A.   YES.

10:08AM 16  Q.   AND DO YOU SEE THE SIGNATURES THERE?

10:08AM 17  A.   YES.

10:08AM 18  Q.   AND THERE'S NO DATE ON THE SIGNATURES; CORRECT?

10:08AM 19  A.   CORRECT.

10:08AM 20  Q.   OKAY.  THERE IS A LINE THAT CALLS FOR THE DATE THOUGH;

10:08AM 21  RIGHT?

10:08AM 22  A.   THIS WAS SENT TO JERRY ON THE 23RD OF OCTOBER, AND I HAVE

10:09AM 23  SPECIFICALLY ASKED BACK, ARE WE OKAY TO MOVE FORWARD TO

10:09AM 24  DOCUMENT THE DEAL, TO WHICH HE RESPONDED YES.

10:09AM 25  Q.   RIGHT.  DO YOU RECALL THAT WE JUST LOOKED AT THE EMAIL

10:09AM  1    THAT SAID THAT YOU DOCUMENT SOMETHING FOR THE FILE; RIGHT?

10:09AM  2    A.   YES, YES.

10:09AM  3    Q.   AND HE INFORMED YOU THAT THE DEAL WAS DONE; CORRECT?

10:09AM  4    A.   HE INFORMED ME THAT I WAS -- WE WERE IN, WHICH MEANT THAT

10:09AM  5    SHE HAD ACCEPTED US INTO THIS DEAL.

10:09AM  6         WE STILL HAD TO CLOSE IT.

10:09AM  7    Q.   OKAY.  THE -- I WANT TO CALL YOUR ATTENTION -- MY, MY --

10:09AM  8    THERE'S A BLANK FOR THE DATE AND THERE'S NO DATE IN THE BLANK;

10:09AM  9    CORRECT?

10:09AM  10   A.   CORRECT.

10:09AM  11   Q.   I WANT TO CALL YOUR ATTENTION TO THE SENTENCE IN THE

10:09AM  12   MIDDLE OF THE PARAGRAPH THAT SAYS "FURTHERMORE."

10:09AM  13        DO YOU SEE THAT?

10:10AM  14   A.   YES.

10:10AM  15   Q.   AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME QUESTIONS

10:10AM  16   ABOUT THIS?

10:10AM  17   A.   YES.

10:10AM  18   Q.   AND YOU TESTIFIED THAT YOU GOT THIS INFORMATION FROM

10:10AM  19   MS. HOLMES AND MR. BALWANI.

10:10AM  20        DO YOU RECALL THAT?

10:10AM  21   A.   SHE TALKED ABOUT THIS, YES.

10:10AM  22   Q.   OKAY.  ISN'T IT THE CASE THAT YOU ACTUALLY TOOK THIS

10:10AM  23   LANGUAGE DIRECTLY OUT OF THE "FORTUNE" ARTICLE?

10:10AM  24   A.   WE ASKED ABOUT THIS BECAUSE WE WANTED TO KNOW WHY THEY

10:10AM  25   DIDN'T HAVE TO HAVE FDA APPROVAL.

10:10AM   1     Q.   OKAY.  MY QUESTION IS, ISN'T IT THE CASE THAT YOU TOOK

10:10AM   2     THIS LANGUAGE DIRECTLY OUT OF THE "FORTUNE" ARTICLE?

10:10AM   3     A.   BUT WE ASKED ABOUT IT AND GOT AN ANSWER AND THIS WAS WHAT

10:10AM   4     THE ANSWER WAS.

10:10AM   5          MR. WADE:  MOVE TO STRIKE THE ANSWER.  I CAN ASK A

10:10AM   6     THIRD QUESTION.

10:10AM   7          THE WITNESS:  I DON'T KNOW.

10:10AM   8          THE COURT:  LISTEN TO HIS QUESTION AND HE'LL ASK YOU

10:10AM   9     ONE MORE TIME.

10:10AM  10          THE WITNESS:  OKAY.

10:10AM  11     BY MR. WADE:

10:10AM  12     Q.   ISN'T IT THE CASE THAT THAT LANGUAGE CAME DIRECTLY OUT OF

10:10AM  13     THE "FORTUNE" ARTICLE?

10:10AM  14     A.   IT MAY HAVE, BUT WE ASKED ABOUT IT SPECIFICALLY.

10:10AM  15     Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 1944.  IF WE CAN DO

10:10AM  16     THAT ON A SPLIT SCREEN.

10:11AM  17          YEAH, IF WE CAN CALL UP PAGE ENDING 5014 IN THE BOTTOM

10:11AM  18     CORNER, A DIFFERENT VERSION HERE.  PAGE 69 OF THE ARTICLE.

10:11AM  19     PAGE 6 OF 9.  I'M SORRY.  TOO MANY DIFFERENT PAGE NUMBERS.

10:11AM  20     PAGE 6 OF 9.  AND IF WE CAN BLOW UP THE PARAGRAPH STARTING WITH

10:11AM  21     "THERANOS" IN THE LEFT-HAND COLUMN.

10:11AM  22          ISN'T THAT ALMOST VERBATIM THE LANGUAGE OUT OF THE

10:12AM  23     "FORTUNE" ARTICLE?

10:12AM  24     A.   YES.  BUT AS I SAID, WE ASKED ABOUT THAT SPECIFICALLY AT

10:12AM  25     THE MEETING.  WE WANTED TO KNOW WHAT THE FDA REGULATIONS WERE,

10:12AM 1    AND THAT WAS THE ANSWER THAT WE WERE GIVEN.

10:12AM 2        AND THEN SHE TOLD US THAT THEY WERE MOVING TO DO FDA

10:12AM 3    APPROVAL ON EVERY TEST.

10:12AM 4    Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHY FDA APPROVAL WAS

10:12AM 5    NEEDED?

10:12AM 6    A.   SHE SAID IT WASN'T NEEDED.

10:12AM 7    Q.   OKAY.  BUT WHAT WAS YOUR UNDERSTANDING WHY THEY WERE

10:12AM 8    GETTING FDA APPROVAL?

10:12AM 9    A.   BECAUSE THEY MADE THEIR OWN ANALYZER EQUIPMENT.  THAT WAS

10:12AM 10   THE ANSWER THAT SHE GAVE.

10:12AM 11   Q.   RIGHT.  AND IN ORDER FOR THEM TO DISTRIBUTE THEIR ANALYZER

10:12AM 12   EQUIPMENT, THEY HAD TO GET FDA APPROVAL; CORRECT?

10:12AM 13   A.   THAT'S NOT WHAT THE -- SHE -- WE ASKED SPECIFICALLY, DO

10:12AM 14   YOU NEED FDA APPROVAL?

10:12AM 15       AND SHE SAID, NO, BECAUSE WE MAKE OUR OWN ANALYZER.

10:12AM 16       AND THEN SHE SAID WE'RE GOING TO TAKE IT ONE STEP FURTHER

10:12AM 17   AND APPROVE EVERY ONE OF OUR TESTS.

10:12AM 18   Q.   OKAY.  THAT WAS YOUR UNDERSTANDING IN THAT MEETING; RIGHT?

10:12AM 19   A.   YES.

10:12AM 20   Q.   OKAY.  AND DID YOU DO ANY RESEARCH TO MAKE SURE THAT YOU

10:12AM 21   UNDERSTOOD THAT CORRECTLY?

10:12AM 22   A.   NO.

10:12AM 23   Q.   OKAY.

10:12AM 24   A.   WE RELIED ON WHAT SHE SAID.

10:12AM 25   Q.   THIS STATEMENT -- THE STATEMENT THAT WE'RE REFERRING TO

| | | |
|---|---|---|
| 10:13AM | 1 | COMES DIRECTLY OUT OF THE ARTICLE; RIGHT? |
| 10:13AM | 2 | A.   YES. |
| 10:13AM | 3 | Q.   OKAY.  AND YOU SAID, YOU SAID LAST WEEK THAT YOU HAD NOTES |
| 10:13AM | 4 | OF THE MEETING -- |
| 10:13AM | 5 | A.   YES. |
| 10:13AM | 6 | Q.   -- THAT HAPPENED AT THERANOS? |
| 10:13AM | 7 | A.   YES. |
| 10:13AM | 8 | Q.   DO YOU STILL HAVE THOSE NOTES? |
| 10:13AM | 9 | A.   NO. |
| 10:13AM | 10 | Q.   DID YOU DESTROY THEM? |
| 10:13AM | 11 | A.   THEY TURNED INTO MY MEMO. |
| 10:13AM | 12 | Q.   OKAY. |
| 10:13AM | 13 | A.   THAT'S VERY TYPICAL FOR ME.  I WRITE STUFF OUT, I TYPE UP |
| 10:13AM | 14 | A MEMO, AND I TOSS THE NOTES AND PUT THE MEMO IN THE FILE. |
| 10:13AM | 15 | Q.   LET ME CALL YOUR ATTENTION TO 10588. |
| 10:13AM | 16 | AND WHILE WE'RE BRINGING THAT UP, DO YOU RECALL PREVIOUSLY |
| 10:13AM | 17 | TELLING THE GOVERNMENT THAT YOU DIDN'T TAKE NOTES IN THAT |
| 10:13AM | 18 | MEETING APART FROM THE NOTES IN THE FINANCIAL STATEMENTS? |
| 10:14AM | 19 | A.   I DON'T RECALL SAYING THAT, AND IT WAS A LONG MEETING. |
| 10:14AM | 20 | AND I DEFINITELY TOOK NOTES ON THE FINANCIALS, SO -- |
| 10:14AM | 21 | Q.   RIGHT.  SO DID YOU TAKE ANY -- DO YOU RECALL TELLING THE |
| 10:14AM | 22 | GOVERNMENT THAT YOU DIDN'T TAKE ANY NOTES OTHER THAN THE NOTES |
| 10:14AM | 23 | ON THE FINANCIAL STATEMENTS? |
| 10:14AM | 24 | A.   I DON'T RECALL SAYING THAT.  THE DETAILS IN THE MEMO CAME |
| 10:14AM | 25 | FROM THAT MEETING. |

10:14AM  1    Q.   DO YOU HAVE EXHIBIT 10588 IN FRONT OF YOU?

10:14AM  2    A.   YES.

10:14AM  3    Q.   OKAY.  AND DO YOU RECALL THAT MR. LEACH ASKED YOU SOME

10:14AM  4    QUESTIONS ABOUT THIS DOCUMENT?

10:14AM  5    A.   YES.

10:14AM  6    Q.   AND QUICKLY, YOU UNDERSTOOD THIS IS THE CONTRACTUAL

10:14AM  7    AGREEMENT BETWEEN THE PARTIES?

10:14AM  8    A.   YES.

10:14AM  9    Q.   A LEGALLY BINDING DOCUMENT; RIGHT?

10:14AM  10   A.   YES.

10:14AM  11   Q.   OKAY.  LET'S GO TO PAGE 7 OF THE DOCUMENT.  THERE MAY BE A

10:15AM  12   DIFFERENT VERSION OF THIS.

10:15AM  13        I MOVE EXHIBIT 10588 INTO EVIDENCE.

10:15AM  14        I THINK YOU WERE PREVIOUSLY SHOWN AN UNSIGNED VERSION.

10:15AM  15             MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:15AM  16             THE COURT:  10588 IS ADMITTED, AND IT MAY BE

10:15AM  17   PUBLISHED.

10:15AM  18        (DEFENDANT'S EXHIBIT 10588 WAS RECEIVED IN EVIDENCE.)

10:15AM  19   BY MR. WADE:

10:15AM  20   Q.   AND JUST SO THE RECORD IS CLEAR, YOU RECALL THAT MR. LEACH

10:15AM  21   SHOWED YOU I THINK A VERSION OF THIS DOCUMENT THAT WAS ATTACHED

10:15AM  22   TO AN EMAIL?

10:15AM  23   A.   YES.

10:15AM  24   Q.   AND DO YOU SEE THAT THIS DOCUMENT IS A VERSION THAT ON

10:15AM  25   PAGE BATES LABELLED 6816 IS ACTUALLY SIGNED BY MS. HOLMES?

10:15AM   1           IT'S ON THE SCREEN FOR YOU.

10:15AM   2    A.    OKAY.  YES.

10:15AM   3    Q.    OKAY.  THE -- LET'S GO TO PAGE 7.  LET'S GO TO

10:16AM   4    PARAGRAPH 4.4.

10:16AM   5           AND DO YOU SEE THERE THAT THERE'S AN ACKNOWLEDGEMENT BY

10:16AM   6    RDV THAT THIS IS A SPECULATIVE INVESTMENT?

10:16AM   7    A.    YES.

10:16AM   8    Q.    OKAY.  AND IT NOTES SPECIFICALLY THAT THE COMPANY HAS

10:16AM   9    LIMITED FINANCIAL AND OPERATING HISTORY.

10:16AM   10          DO YOU SEE THAT?

10:16AM   11   A.    I SEE THE NOTE, YES.

10:16AM   12   Q.    AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY

10:16AM   13   SPECULATIVE AND IT INVOLVES SUBSTANTIAL RISKS.

10:16AM   14          DO YOU SEE THAT?

10:16AM   15   A.    YES.

10:16AM   16   Q.    AND RDV ACKNOWLEDGED THAT WHEN IT MADE THIS INVESTMENT;

10:16AM   17   CORRECT?

10:16AM   18   A.    IT DID.  BUT WE ALSO RELIED ON WHAT WE HEARD.

10:17AM   19             MR. WADE:  MOVE TO STRIKE THE LAST PART, YOUR HONOR.

10:17AM   20             THE COURT:  THE LAST COMMENT IS STRICKEN.

10:17AM   21             MR. WADE:  AFTER "WE DID."

10:17AM   22             THE COURT:  YES.  IT'S STRICKEN, YES.

10:17AM   23             MR. WADE:  LET'S GO TO 4.5.

10:17AM   24   Q.    DO YOU SEE THAT THIS PARAGRAPH TALKS ABOUT ACCESS TO DATA?

10:17AM   25   A.    YES.

| | | |
|---|---|---|
| 10:17AM | 1 | Q. OKAY. AND IT TALKS ABOUT HOW THE INVESTOR HAD AN |
| 10:17AM | 2 | OPPORTUNITY TO ASK QUESTIONS OF, RECEIVE ANSWER FROM, AND |
| 10:17AM | 3 | REVIEW WHATEVER MATERIALS IT FELT THAT IT NEEDED TO; CORRECT? |
| 10:17AM | 4 | A. YES. |
| 10:17AM | 5 | Q. OKAY. AND IF YOU GO DOWN A FEW LINES, THERE'S A SENTENCE |
| 10:17AM | 6 | ON THE VERY RIGHT THAT STARTS WITH "SUCH." |
| 10:17AM | 7 | DO YOU SEE THAT? |
| 10:17AM | 8 | IT SAYS, "SUCH INVESTOR UNDERSTANDS THAT SUCH DISCUSSIONS, |
| 10:18AM | 9 | AS WELL AS ANY INFORMATION ISSUED BY THE COMPANY, WERE INTENDED |
| 10:18AM | 10 | TO DESCRIBE CERTAIN ASPECTS OF THE COMPANY'S BUSINESS AND |
| 10:18AM | 11 | PROSPECTS, BUT WERE NOT NECESSARILY A THOROUGH OR EXHAUSTIVE |
| 10:18AM | 12 | DESCRIPTION." |
| 10:18AM | 13 | DO YOU SEE THAT? |
| 10:18AM | 14 | A. YES. |
| 10:18AM | 15 | Q. OKAY. AND RDV AGREED TO THIS; RIGHT? |
| 10:18AM | 16 | A. YES. |
| 10:18AM | 17 | Q. OKAY. NOW, LET'S GO -- LET'S LOOK AT THE NEXT SENTENCE. |
| 10:18AM | 18 | DO YOU RECALL THAT THERE WAS A LOT OF DISCUSSION ABOUT |
| 10:18AM | 19 | PROJECTIONS; RIGHT? |
| 10:18AM | 20 | A. YES. |
| 10:18AM | 21 | Q. AND PROJECTIONS ARE FORWARD LOOKING STATEMENTS; RIGHT? |
| 10:18AM | 22 | A. YES. |
| 10:18AM | 23 | Q. AND SO THERE CAN BE A FAIR AMOUNT OF UNCERTAINTY |
| 10:18AM | 24 | ASSOCIATED WITH THOSE PROJECTIONS; RIGHT? |
| 10:18AM | 25 | A. THERE CAN BE. |

10:18AM 1    Q.   OKAY.  LET'S LOOK AT THE LANGUAGE HERE.

10:18AM 2         DO YOU SEE WHERE IT SAYS THAT "SUCH INVESTOR ACKNOWLEDGES

10:18AM 3    THAT ANY BUSINESS PLANS PREPARED BY THE COMPANY HAVE BEEN, AND

10:18AM 4    CONTINUE TO BE, SUBJECT TO CHANGE."

10:19AM 5         DO YOU SEE THAT?

10:19AM 6    A.   YES.

10:19AM 7    Q.   AND THAT MEANS THAT WHEN YOU INVEST IN A COMPANY, YOU

10:19AM 8    DON'T NECESSARILY GET TO MAKE ALL OF THE DECISIONS ABOUT HOW

10:19AM 9    IT'S RUN ON A DAY-TO-TO BASIS; RIGHT?

10:19AM 10   A.   CORRECT.

10:19AM 11   Q.   AND SOMETIMES THINGS CHANGE; RIGHT?

10:19AM 12   A.   YES.

10:19AM 13   Q.   OKAY.  AND THEN IT SAYS IT SPECIFICALLY ADDRESSES

10:19AM 14   PROJECTIONS.  DO YOU SEE?  AND IT SAYS, "ANY PROJECTIONS

10:19AM 15   INCLUDED IN SUCH BUSINESS PLANS OR OTHERWISE ARE NECESSARILY

10:19AM 16   SPECULATIVE IN NATURE, AND IT CAN BE EXPECTED THAT SOME OR ALL

10:19AM 17   OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS WILL NOT

10:19AM 18   MATERIALIZE OR WILL VARY SIGNIFICANTLY FROM ACTUAL RESULTS."

10:19AM 19        DO YOU SEE THAT?

10:19AM 20   A.   WE WERE SITTING IN AN OFFICE IN MID-OCTOBER WITH 150

10:19AM 21   MILLION OF REVENUE ON THE BOOKS AND A BREAK EVEN CASH FLOW.

10:19AM 22        IF THERE WAS -- IF THEY WERE GOING TO END WILDLY DIFFERENT

10:19AM 23   FROM THAT, THEY SHOULD HAVE SAID SO.  THERE WERE TWO MONTHS TO

10:19AM 24   GO IN THE YEAR.

10:19AM 25             MR. WADE:  I MOVE TO STRIKE THAT ANSWER, YOUR HONOR,

10:20AM   1        AS NONRESPONSIVE.

10:20AM   2                  THE COURT:  MS. PETERSON, I'M GOING TO ASK MR. WADE

10:20AM   3        TO REPEAT HIS QUESTION AGAIN, AND THEN JUST PLEASE LISTEN TO

10:20AM   4        HIS QUESTION AND SEE IF YOU CAN ANSWER.

10:20AM   5                  THE WITNESS:  OKAY.

10:20AM   6        BY MR. WADE:

10:20AM   7        Q.   OKAY.  DO YOU SEE HERE IN THE AGREEMENT THAT RDV SIGNED

10:20AM   8        WITH THE COMPANY THAT SAYS, "IT CAN BE EXPECTED THAT SOME OR

10:20AM   9        ALL OF THE ASSUMPTIONS UNDERLYING THE PROJECTIONS WILL NOT

10:20AM  10        MATERIALIZE OR WILL VARY SIGNIFICANTLY FROM THE ACTUAL

10:20AM  11        RESULTS"?

10:20AM  12             DO YOU SEE THAT?

10:20AM  13        A.   YES, I SEE THAT.

10:20AM  14        Q.   OKAY.  AND RDV AGREED TO THAT; CORRECT?

10:20AM  15        A.   YES.

10:20AM  16        Q.   OKAY.  AND DO YOU SEE BELOW IT -- I'M DONE WITH THIS

10:20AM  17        PARAGRAPH.

10:20AM  18             DO YOU SEE IN 4.6 IT REFERS TO AN ACCREDITED INVESTOR?

10:20AM  19        A.   YES.

10:20AM  20        Q.   OKAY.  AND YOU KNOW THERE ARE SPECIAL RULES THAT APPLY TO

10:20AM  21        ACCREDITED INVESTORS?

10:20AM  22             ARE YOU AWARE OF THAT?

10:20AM  23        A.   YES.

10:20AM  24        Q.   AND AS A GENERAL MATTER, IS IT FAIR TO SAY THAT THESE

10:20AM  25        ARE -- THIS IS A CERTIFICATION THAT YOU'RE SLIGHTLY MORE

10:21AM 1      SOPHISTICATED THAN A BEGINNING INVESTOR?

10:21AM 2      A.   YES.

10:21AM 3      Q.   AND OFTENTIMES IT'S BASED ON NET WORTH AND THE LIKE?

10:21AM 4      A.   YES.

10:21AM 5      Q.   OKAY.  AND THAT'S BECAUSE SOME -- FOR CERTAIN KINDS OF

10:21AM 6      TRANSACTIONS, THEY'RE COMPLICATED; RIGHT?

10:21AM 7      A.   YES.

10:21AM 8      Q.   AND BOTH PARTIES WANT TO ASSURE THAT THERE'S A LEVEL OF

10:21AM 9      SOPHISTICATION THAT EXISTS SO THAT PEOPLE UNDERSTAND THINGS;

10:21AM 10     RIGHT?

10:21AM 11     A.   YES.

10:21AM 12     Q.   OKAY.  AND RDV WAS AN ACCREDITED INVESTOR; CORRECT?

10:21AM 13     A.   YES.

10:21AM 14     Q.   OKAY.

10:21AM 15     A.   BUT YOU'RE TRYING TO MEASURE OUR SOPHISTICATION AS AN

10:21AM 16     INVESTOR WHEN WE WEREN'T GIVEN COMPLETE INFORMATION.

10:21AM 17            MR. WADE:  MOVE TO STRIKE THE LAST STATEMENT.

10:21AM 18            THE COURT:  THAT LAST PORTION IS STRICKEN.

10:21AM 19         AND, MS. PETERSON, JUST WAIT FOR HIS QUESTIONS AND THEN

10:21AM 20     YOU CAN ANSWER HIS QUESTIONS, PLEASE.

10:21AM 21            THE WITNESS:  OKAY.

10:21AM 22            MR. WADE:  LET'S GO TO 7.8.  IT'S ON PAGE 17.

10:22AM 23     Q.   DO YOU SEE THIS AGREEMENT?  DO YOU SEE THIS SECTION

10:22AM 24     "ENTIRE AGREEMENT"?

10:22AM 25     A.   YES.

10:22AM  1    Q.   AND THAT TALKS ABOUT HOW, "THIS AGREEMENT, INCLUDING THE

10:22AM  2    EXHIBITS ATTACHED HERETO, CONSTITUTE THE FULL AND ENTIRE

10:22AM  3    UNDERSTANDING AND AGREEMENT AMONG THE PARTIES WITH REGARD TO

10:22AM  4    ANY SUBJECTS HEREOF AND SUPERSEDE ANY PRIOR AGREEMENTS OR

10:22AM  5    UNDERSTANDINGS WITH RESPECT TO THE SUBJECT MATTER HEREOF."

10:22AM  6         DO YOU SEE THAT?

10:22AM  7    A.   YES.

10:22AM  8    Q.   AND RDV AGREED TO THAT; CORRECT?

10:22AM  9    A.   YES.

10:22AM  10   Q.   OKAY.  AND ULTIMATELY MR. SCHIERBEEK SIGNED THIS

10:22AM  11   AGREEMENT; CORRECT?

10:22AM  12   A.   YES, ON BEHALF OF DYNASTY II.

10:23AM  13   Q.   AND DO YOU RECALL THAT THE COMPANY PAID $17 A SHARE?

10:23AM  14   A.   YES.

10:23AM  15   Q.   AND SO JUST A COUPLE OF MORE QUESTIONS TO MAKE SURE THAT I

10:23AM  16   AM CLEAR.

10:23AM  17        WITHIN RDV, MR. TUBERGEN ORIGINATED THIS INVESTMENT;

10:23AM  18   CORRECT?

10:23AM  19   A.   YES.

10:23AM  20   Q.   AND HE BROUGHT IT BACK TO THE DEVOS FAMILY; CORRECT?

10:23AM  21   A.   YES.

10:23AM  22   Q.   AND SPECIFICALLY TO THE MEMBERS OF THE INVESTMENT

10:23AM  23   COMMITTEE; RIGHT?

10:23AM  24   A.   YES, TO THE MEMBERS OF THE G2.

10:23AM  25   Q.   AND IT WAS THOSE MEMBERS OF THE INVESTMENT COMMITTEE THAT

10:23AM  1    WERE EMPOWERED TO MAKE THE DECISION TO MAKE AN INVESTMENT ON

10:23AM  2    BEHALF OF RDV; CORRECT?

10:23AM  3    A.   YES.

10:23AM  4    Q.   OKAY.  AND ULTIMATELY THEY'RE THE ONES WHO MADE THAT

10:23AM  5    DECISION IN CONSULTATION WITH MR. TUBERGEN; RIGHT?

10:23AM  6    A.   YES.

10:23AM  7    Q.   AND THE PEOPLE WHO MADE THE DECISION WERE RICK DEVOS,

10:24AM  8    DOUG DEVOS, DAN DEVOS, AND DICK DEVOS; CORRECT?

10:24AM  9    A.   YES.

10:24AM 10           MR. WADE:  I HAVE NO FURTHER QUESTIONS AT THIS TIME,

10:24AM 11    YOUR HONOR.

10:24AM 12           THE COURT:  MR. LEACH, REDIRECT?

10:24AM 13           MR. LEACH:  YES, YOUR HONOR.  THANK YOU.

10:24AM 14       (PAUSE IN PROCEEDINGS.)

10:25AM 15           MR. LEACH:  MAY I INQUIRE, YOUR HONOR?

10:25AM 16           THE COURT:  YES, THANK YOU.

10:25AM 17                      **REDIRECT EXAMINATION**

10:25AM 18    BY MR. LEACH:

10:25AM 19    Q.   GOOD MORNING, MS. PETERSON.  WELCOME BACK.

10:25AM 20    A.   GOOD MORNING.

10:25AM 21    Q.   LET ME START WHERE MR. WADE CONCLUDED, WITH SOME QUESTIONS

10:25AM 22    ABOUT THE LEGAL DOCUMENTS THAT RDV SIGNED IN CONNECTION WITH

10:25AM 23    THE INVESTMENT, AND I THINK HE WALKED THROUGH SOME LANGUAGE

10:25AM 24    THAT THE GOVERNMENT HAD ALSO GONE THROUGH ABOUT RDV'S

10:25AM 25    ACCREDITED INVESTMENT STATUS AND THE NATURE OF THE INVESTMENT.

10:25AM  1         DO YOU RECALL THAT TESTIMONY?

10:25AM  2    A.   YES.

10:25AM  3    Q.   AND HE SHOWED YOU SOME LANGUAGE ABOUT THIS BEING THE

10:26AM  4    ENTIRE AGREEMENT.

10:26AM  5         DID YOU UNDERSTAND THAT TO MEAN THAT ANYTHING THAT

10:26AM  6    MS. HOLMES OR MR. BALWANI HAD SAID TO RDV TO INDUCE THE

10:26AM  7    INVESTMENT WAS, THEREFORE, NOT SOMETHING THAT YOU COULD RELY

10:26AM  8    ON?

10:26AM  9    A.   NO.

10:26AM 10    Q.   WHAT DID YOU UNDERSTAND THAT ENTIRE AGREEMENT LANGUAGE TO

10:26AM 11    MEAN?

10:26AM 12    A.   ANYTHING THAT WAS --

10:26AM 13              MR. WADE:  YOUR HONOR, I THINK THIS GOES INTO 701,

10:26AM 14    702.

10:26AM 15              THE COURT:  I DON'T THINK IT'S A 702 ISSUE.  I THINK

10:26AM 16    THERE WAS A LOT OF QUESTIONING ABOUT HER, WHAT SHE DID FOR THE

10:26AM 17    COMPANY.  I THINK WE KNOW THAT.

10:26AM 18         AND I DO THINK IT IS APPROPRIATE FOR HER TO ANSWER THE

10:26AM 19    FULSOMENESS OF WHAT SHE DID.

10:26AM 20         SO I'M GOING TO OVERRULE THE OBJECTION.

10:26AM 21              MR. WADE:  OKAY.

10:26AM 22    BY MR. LEACH:

10:26AM 23    Q.   WHAT WAS YOUR UNDERSTANDING, MS. PETERSON?

10:26AM 24    A.   EVERYTHING THAT WAS SAID TO US WE BELIEVE IS FAIR GAME FOR

10:26AM 25    US TO MAKE OUR INVESTMENT DECISION ON AND WHAT WE RELIED ON,

10:26AM  1    NOT JUST WHAT WE READ IN WRITING, BUT ALSO WHAT WE WERE TOLD.

10:26AM  2    Q.   WAS THERE ANYTHING IN THE DOCUMENT THAT YOU SAW THAT SAID

10:26AM  3    RDV SHOULD NOT RELY ON THE VERBAL REPRESENTATIONS BY MS. HOLMES

10:27AM  4    OR THE WRITTEN MATERIALS THAT YOU RECEIVED?

10:27AM  5    A.   NO.

10:27AM  6    Q.   OKAY.  HE ALSO ASKED YOU SOME QUESTIONS ABOUT THE

10:27AM  7    PROJECTIONS THAT WERE PROVIDED TO RDV, AND YOU UNDERSTAND THE

10:27AM  8    PROJECTIONS ARE FORWARD LOOKING; CORRECT?

10:27AM  9    A.   YES.

10:27AM 10    Q.   AND YOU HAD -- AND YOU REVIEWED THOSE PROJECTIONS

10:27AM 11    CAREFULLY; CORRECT?

10:27AM 12    A.   YES.

10:27AM 13    Q.   DID YOU IN ANY WAY DREAM THAT THERANOS WOULD HAVE -- AND

10:27AM 14    YOU RECALL THE PROJECTIONS WERE FOR 140 MILLION --

10:27AM 15    A.   YES.

10:27AM 16    Q.   -- IN 2014?  I THINK YOU VOLUNTEERED THAT NUMBER?

10:27AM 17    A.   YES.

10:27AM 18    Q.   DID YOU IN ANY WAY DREAM THE REVENUE FOR THAT YEAR WOULD

10:27AM 19    BE ZERO?

10:27AM 20    A.   NO.

10:27AM 21    Q.   DID YOU IN ANY WAY DREAM THAT THE REVENUE IN 2015 WOULD BE

10:27AM 22    LESS THAN $500,000?

10:27AM 23    A.   NO.

10:27AM 24    Q.   OKAY.  AND IT SEEMED LIKE YOU WANTED TO EXPLAIN WHY EVEN

10:27AM 25    THOUGH THESE ARE FORWARD LOOKING, YOU WERE STILL SURPRISED BY

10:27AM  1    NOT HITTING THE PROJECTIONS.

10:27AM  2        CAN YOU EXPLAIN?

10:28AM  3    A.   PROJECTIONS, IS N OUR WORLD, THEY SHOULD BE SOMEWHAT

10:28AM  4    CLOSE.  THERE'S DEFINITE RISK IN ACCEPTING PROJECTIONS.

10:28AM  5        BUT WE WERE TOLD THERE WAS 900 WAL-MART -- OR WALGREENS

10:28AM  6    STORES THAT WERE GOING TO OPEN THAT BACKED UP THE PROJECTIONS

10:28AM  7    FOR THE NEXT YEAR, ALONG WITH 300 SAFEWAY STORES.

10:28AM  8        IT WAS THAT THAT WE USED TO BASE OUR THOUGHT AROUND THE

10:28AM  9    PROJECTIONS, COULD THEY REACH THAT NUMBER.

10:28AM  10       EVEN IF THEY DIDN'T REACH THE $990 MILLION THAT THEY SAID

10:28AM  11   THEY WERE GOING TO DO FOR THE NEXT YEAR, EVEN IF THEY HAD

10:28AM  12   REACHED 300 MILLION, THAT WOULD HAVE BEEN A SUCCESSFUL DEAL FOR

10:28AM  13   US.

10:28AM  14       THEY WERE MOVING THE BALL FORWARD.

10:28AM  15       BUT THE FACT THAT THEY JUST DID ZERO TELLS US THAT WHAT

10:28AM  16   THEY WERE TELLING US WASN'T TRUE.

10:28AM  17   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT THE

10:28AM  18   "FORTUNE" ARTICLE THAT YOU WERE PROVIDED AT SOME POINT IN

10:28AM  19   SEPTEMBER OF '14.

10:29AM  20   A.   YES.

10:29AM  21   Q.   DO YOU RECALL THAT TESTIMONY?

10:29AM  22   A.   YES.

10:29AM  23   Q.   AND IF I COULD -- AND YOU WERE ASKED -- YOU GOT

10:29AM  24   INFORMATION FROM THE "FORTUNE" ARTICLE, FROM OTHER PUBLIC

10:29AM  25   SOURCES, FROM A CONVERSATION WITH MS. HOLMES, AND A MEETING

10:29AM  1    WITH MS. HOLMES AND MR. BALWANI IN PALO ALTO.

10:29AM  2         IS THAT A FAIR SUMMARY?

10:29AM  3    A.   YES.

10:29AM  4    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 455, OR 4858.

10:29AM  5    A.   OKAY.

10:29AM  6    Q.   DO YOU RECALL THIS TO BE THE POWERPOINT DECK AMONG THE

10:29AM  7    INVESTMENT MATERIALS THAT THERANOS PROVIDED TO RDV?

10:29AM  8    A.   YES.

10:29AM  9    Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 49.

10:30AM  10         AND IF WE COULD PLEASE DISPLAY THIS, MS. HOLLIMAN.

10:30AM  11         DO YOU SEE THE FIRST PAGE OF THIS SLIDE DECK ON THE

10:30AM  12   SCREEN, MS. PETERSON?

10:30AM  13   A.   YES.

10:30AM  14   Q.   AND IF WE COULD PLEASE GO TO PAGE 49.

10:30AM  15        DO YOU SEE THE TITLE "RECENT PRESS"?

10:30AM  16   A.   YES.

10:30AM  17   Q.   AND DO YOU SEE TO THE RIGHT AN IMAGE OF MS. HOLMES

10:30AM  18   UNDERNEATH THE HEADING "FORTUNE," "THIS CEO IS OUT FOR BLOOD"?

10:30AM  19   A.   YES.

10:30AM  20   Q.   AND DID YOU UNDERSTAND THIS TO BE THERANOS REFERRING YOU

10:30AM  21   TO THIS SPECIFIC ARTICLE AS PART OF THE UNIVERSE OF INFORMATION

10:31AM  22   THAT YOU SHOULD CONSIDER?

10:31AM  23   A.   YES.

10:31AM  24   Q.   IN YOUR MEETING IN PALO ALTO WITH MS. HOLMES, DID YOU ASK

10:31AM  25   HER QUESTIONS ABOUT SOME OF THE FACTS THAT WERE ASSERTED IN THE

10:31AM 1    ARTICLE?

10:31AM 2    A.   YES.

10:31AM 3    Q.   AND AT ANY POINT IN TIME, DID SHE SAY, DON'T RELY ON THAT

10:31AM 4    PIECE OF INFORMATION FROM THE PARLOFF ARTICLE, THAT'S NOT

10:31AM 5    RIGHT?

10:31AM 6    A.   NEVER, NO.

10:31AM 7    Q.   DID SHE SAY ANYTHING TO THE EFFECT OF THAT LINE ABOUT

10:31AM 8    THIRD PARTY -- US NOT USING THIRD PARTY DEVICES, THAT'S NOT

10:31AM 9    RIGHT, LET ME CORRECT YOUR UNDERSTANDING THERE?

10:31AM 10   A.   NO.

10:31AM 11   Q.   SHE HELD THAT OUT AS SOMETHING YOU SHOULD RELY ON; IS THAT

10:31AM 12   FAIR?

10:31AM 13   A.   YES.

10:31AM 14   Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT

10:31AM 15   FORWARD-LOOKING STATEMENTS IN THE POWERPOINT.

10:31AM 16        AND I THINK MR. WADE ASKED YOU ABOUT PAGE 19.

10:31AM 17        IF WE COULD DISPLAY THAT.

10:31AM 18        AND DO YOU SEE THERE TO BE SOME COST SAVINGS ESTIMATES

10:32AM 19   FROM 2014 TO 2023 IN THE LEFT GRAPH, AND THEN THE SAME PERIOD

10:32AM 20   IN THE RIGHT GRAPH?

10:32AM 21   A.   YES.

10:32AM 22   Q.   AND YOU UNDERSTOOD AT THE TIME THAT THESE WERE FORWARD

10:32AM 23   LOOKING PROJECTIONS?

10:32AM 24   A.   YES.

10:32AM 25   Q.   AND DO YOU SEE WHERE IT SAYS, FOR 2014, THERE'S AN E AFTER

10:32AM   1    THAT?

10:32AM   2    A.   YES.

10:32AM   3    Q.   AND THAT E CONTINUES ALL OF THE WAY OUT TO 2023.

10:32AM   4         DO YOU SEE THAT?

10:32AM   5    A.   YES.

10:32AM   6    Q.   AND IS THAT WHAT HELPED YOU UNDERSTAND THAT THESE WERE

10:32AM   7    FORWARD-LOOKING STATEMENTS?

10:32AM   8    A.   YES.

10:32AM   9    Q.   AND THE E STANDS FOR ESTIMATE?

10:32AM  10    A.   YES, AND THOSE YEARS HADN'T HAPPENED YET.

10:32AM  11    Q.   OKAY.  SO THERE WAS INFORMATION ON THIS SLIDE THAT TOLD

10:32AM  12    YOU THAT THIS SLIDE WAS FORWARD LOOKING?

10:32AM  13    A.   YES.

10:32AM  14    Q.   AND MR. WADE ALSO SHOWED YOU PAGE 20.  IF WE CAN PLEASE

10:32AM  15    LOOK AT THAT.

10:32AM  16         IS THIS ANOTHER EXAMPLE WHERE THE USE OF E'S NEXT TO

10:32AM  17    FUTURE TIME PERIODS INDICATED TO YOU THAT THIS WAS SLIDE WAS

10:32AM  18    FORWARD LOOKING?

10:32AM  19    A.   YES.

10:32AM  20    Q.   AND I THINK MR. WADE ALSO SHOWED YOU PAGE 40.

10:33AM  21         DO YOU SEE WHERE IT SAYS, "THERANOS'S FOOTPRINT UPON

10:33AM  22    NATIONAL DEPLOYMENT"?

10:33AM  23    A.   YES.

10:33AM  24    Q.   AND YOU UNDERSTOOD "UPON" TO REFER TO SOMETHING THAT WOULD

10:33AM  25    HAPPEN IN THE FUTURE?

10:33AM  1     A.   YES.

10:33AM  2     Q.   LET ME SHOW YOU SOME OTHER SLIDES.  IF WE COULD GO,

10:33AM  3     PLEASE, TO PAGE 3.

10:33AM  4          AND IN THE FIRST SUBSTANTIVE PARAGRAPH IT SAYS,

10:33AM  5     "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE

10:33AM  6     BLOOD TESTS FROM A FINGERSTICK."

10:33AM  7          DO YOU SEE THAT?

10:33AM  8     A.   YES.

10:33AM  9     Q.   AND I WANT TO FOCUS ON THE WORD "RUNS."

10:33AM 10          DID YOU UNDERSTAND THAT TO BE THE PRESENT TENSE?

10:33AM 11     A.   YES.

10:33AM 12     Q.   AND DID YOU UNDERSTAND THAT TO BE FORWARD LOOKING?

10:33AM 13     A.   NO.

10:33AM 14     Q.   DOES THIS SAY "WILL IN THE FUTURE RUN"?

10:34AM 15     A.   IT SAYS THEY'RE DOING IT NOW AND WILL CONTINUE TO DO IT IN

10:34AM 16     THE FUTURE, YES.

10:34AM 17     Q.   AND THAT'S WHAT YOU UNDERSTOOD AT THE TIME?

10:34AM 18     A.   YES.

10:34AM 19     Q.   IF WE COULD LOOK, PLEASE, AT --

10:34AM 20          OH, AND IN THE THIRD PARAGRAPH IT SAYS, "CURRENT AND PAST

10:34AM 21     CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL

10:34AM 22     COMPANIES, MIDSIZED BIO-PHARMAS, PROMINENT RESEARCH

10:34AM 23     INSTITUTIONS, HEALTH CARE PAYORS, AND U.S. AND FOREIGN

10:34AM 24     GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

10:34AM 25          DO YOU SEE THAT LANGUAGE?

10:34AM  1     A.   YES.

10:34AM  2     Q.   AND YOU UNDERSTOOD THESE TO BE STATEMENTS ABOUT WHAT WAS

10:34AM  3     CURRENT AND WHAT HAPPENED IN THE PAST; IS THAT RIGHT?

10:34AM  4     A.   YES.

10:34AM  5     Q.   AND SO WHEN YOU TESTIFIED THAT MS. HOLMES TOLD YOU THAT

10:34AM  6     THERANOS WAS USING THE ANALYZER ON MILITARY HELICOPTERS --

10:34AM  7     A.   YES.

10:34AM  8     Q.   -- YOU THOUGHT THAT THAT WAS SOMETHING THAT THERANOS HAD

10:34AM  9     DONE?

10:34AM 10     A.   YES.

10:34AM 11     Q.   LET'S LOOK AT PAGE 7, PLEASE.

10:34AM 12          DO YOU RECALL TESTIFYING ABOUT THE PROFICIENCY TESTING

10:35AM 13     RESULTS THAT THERANOS HELD OUT TO YOU?

10:35AM 14     A.   YES.

10:35AM 15     Q.   AND YOU BELIEVED THAT THESE WERE PROFICIENCY TESTING

10:35AM 16     RESULTS THAT WERE ACHIEVED IN THE PAST, NOT SOMETHING THAT WAS

10:35AM 17     GOING TO HAPPEN IN THE FUTURE; CORRECT?

10:35AM 18     A.   CORRECT, BASED ON THE DATES.

10:35AM 19     Q.   AND YOU BELIEVED THESE PROFICIENCY TESTING RESULTS RELATED

10:35AM 20     TO THE ANALYZER THAT YOU HAD SEEN?

10:35AM 21     A.   YES.

10:35AM 22     Q.   OKAY.  NOBODY TOLD YOU THAT THERANOS WASN'T USING THE

10:35AM 23     ANALYZER IN THE CLIA LAB IN 2011?

10:35AM 24     A.   NO.

10:35AM 25     Q.   AND NO ONE TOLD YOU THAT THERANOS WAS NOT USING THE

10:35AM  1    ANALYZER IN THE CLIA LAB IN 2012?

10:35AM  2    A.   NO.

10:35AM  3    Q.   OR 2013?

10:35AM  4    A.   NO.

10:35AM  5    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8.

10:35AM  6         DO YOU SEE WHERE IT SAYS, "THERANOS HAS BEEN

10:35AM  7    COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:35AM  8    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES"?

10:35AM  9    A.   YES.

10:35AM  10   Q.   AND DID YOU UNDERSTAND THAT TO BE A STATEMENT OF WHAT HAD

10:35AM  11   HAPPENED IN THE PAST?

10:36AM  12   A.   YES.

10:36AM  13   Q.   NOT SOMETHING THAT WAS FORWARD LOOKING?

10:36AM  14   A.   CORRECT, AND IT'S PERMANENTLY IN MY MEMO.

10:36AM  15   Q.   AND LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 28.

10:36AM  16        DO YOU SEE WHERE IT SAYS, "THERANOS RUNS ANY TEST

10:36AM  17   AVAILABLE IN CENTRAL LABS"?

10:36AM  18   A.   YES.

10:36AM  19   Q.   AND RUNS AS IN THE PRESENT TENSE?

10:36AM  20   A.   YES.

10:36AM  21   Q.   NOT IN THE FUTURE TENSE?

10:36AM  22   A.   CORRECT.

10:36AM  23   Q.   AND THAT'S SOMETHING THAT YOU UNDERSTOOD THERANOS WAS

10:36AM  24   DOING AT THE TIME?

10:36AM  25   A.   YES.

10:36AM  1    Q.   MR. WADE ALSO ASKED YOU ABOUT THAT LANGUAGE AT THE END,

10:36AM  2    "PROCESSES ALL SAMPLE TYPES."

10:36AM  3         DID YOU THINK THAT THAT REFERRED TO SAMPLES SUCH AS URINE

10:36AM  4    OR BLOOD OR SOME OTHER MATRIX?

10:36AM  5              MR. WADE:  OBJECT TO THE FORM OF THE QUESTION,

10:36AM  6    YOUR HONOR.

10:36AM  7              THE COURT:  ASKING HER UNDERSTANDING, YES,

10:36AM  8    SUSTAINED.

10:36AM  9    BY MR. LEACH:

10:36AM  10   Q.   WHAT WAS YOUR UNDERSTANDING OF WHAT THAT MEANT?

10:36AM  11   A.   I TOOK IT TO MEAN THAT IT PROCESSES ALL TYPES OF SAMPLES

10:37AM  12   THAT CAN DO ALL TYPES OF TESTS.

10:37AM  13   Q.   OKAY.  DID YOU IN ANY WAY THINK THAT IT RELATED TO VENOUS

10:37AM  14   DRAWS?

10:37AM  15   A.   NO.

10:37AM  16   Q.   DID MS. HOLMES EVER EXPLAIN TO YOU THAT WE -- WHEN WE SAID

10:37AM  17   THAT LANGUAGE, WE MEANT VENOUS DRAWS?

10:37AM  18   A.   NO, WE DIDN'T HEAR THAT UNTIL THE "JOURNAL" ARTICLE.

10:37AM  19   Q.   DID THE IDEA OF THE VENOUS DRAWS EVER COME UP IN YOUR

10:37AM  20   CONVERSATIONS WITH MS. HOLMES?

10:37AM  21   A.   NO.

10:37AM  22   Q.   MR. WADE ASKED YOU A NUMBER OF QUESTIONS ABOUT 14212.

10:37AM  23        IF I COULD USE THE ELMO FOR THIS, MS. KRATZMANN.

10:37AM  24              THE CLERK:  YES.

10:37AM  25   BY MR. LEACH:

10:37AM 1   Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS DOCUMENT,

10:37AM 2   MS. PETERSON?

10:37AM 3   A.   YES.

10:37AM 4   Q.   AND CAN YOU GIVE US THE CONTEXT FOR WHAT THIS IS?

10:37AM 5   A.   SO THIS IS BOB AND OUR CFO AND OUR CONTROLLER JUST TRYING

10:38AM 6   TO UNDERSTAND WHERE THE FAMILY STANDS WITH FREE CASH AT THE

10:38AM 7   MOMENT, BECAUSE I'M SURE THERE WERE LOTS OF OTHER INVESTMENTS,

10:38AM 8   INCLUDING THIS ONE THAT WE'RE LOOKING AT, AND WE'RE CONSTANTLY

10:38AM 9   TRYING TO CASH FLOW PLAN WHEN AND WHAT IS COMING.

10:38AM 10      IT DOESN'T MEAN ANYTHING MORE THAN THAT IT COULD HAPPEN.

10:38AM 11  Q.   WHEN YOU SAY, "IT DOESN'T MEAN ANYTHING MORE THAN WHAT

10:38AM 12  COULD HAPPEN," WHAT DO YOU MEAN BY THAT?

10:38AM 13  A.   THEY NEED TO BE PREPARED IF WE WERE TO DO SOMETHING LIKE

10:38AM 14  THIS, BUT IT DOESN'T MEAN THAT WE WERE DOING IT.

10:38AM 15  Q.   DOES THAT MEAN IN YOUR MIND ANYTHING THAT YOU LEARN IN

10:38AM 16  YOUR SUBSEQUENT DILIGENCE OR OUT IN THE MEETING IN PALO ALTO

10:38AM 17  HAD NO RELEVANCE TO YOU?

10:38AM 18  A.   THAT'S NOT IT AT ALL, NO.  WE COULD HAVE LEARNED SOMETHING

10:38AM 19  THAT WOULD HAVE STOPPED THAT INVESTMENT, YES.

10:38AM 20  Q.   OKAY.  MR. WADE ALSO ASKED YOU SOME QUESTIONS ABOUT 14076.

10:39AM 21      DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS LETTER?

10:39AM 22  A.   YES.

10:39AM 23  Q.   AND YOUR MEMORY IS THAT THIS IS THE LETTER THAT

10:39AM 24  ACCOMPANIED THE BINDERS OF MATERIALS THAT YOU REVIEWED?

10:39AM 25  A.   YES.

10:39AM  1    Q.   OKAY.  AND MR. WADE WAS ASKING YOU QUESTIONS ABOUT THE

10:39AM  2    PARAGRAPH BEGINNING "ONCE THE COMPANY WAS READY."

10:39AM  3        YOU WANTED TO FOCUS ON THE THIRD PARAGRAPH, "HISTORICALLY,

10:39AM  4    THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH PHARMACEUTICAL

10:39AM  5    AND MILITARY CLIENTS."

10:39AM  6        DO YOU RECALL BEING ASKED QUESTIONS ABOUT THE FIFTH

10:39AM  7    PARAGRAPH?

10:39AM  8    A.   YES.

10:39AM  9    Q.   OKAY.  AND WHAT WAS IT YOU WANTED TO SAY ABOUT THE THIRD

10:39AM 10    PARAGRAPH?

10:39AM 11    A.   THAT THEY HAD BEEN DOING WORK IN THE PAST, THAT SHE'S

10:39AM 12    SAYING IT RIGHT THERE IN HER LETTER, AND THAT WAS IMPORTANT TO

10:40AM 13    US.  WE REALLY RELIED ON THE FACT THAT THEY HAD BEEN DOING WORK

10:40AM 14    FOR PHARMACEUTICAL COMPANIES AND THE GOVERNMENT FOR YEARS.

10:40AM 15    Q.   I ALSO WANTED TO DRAW YOUR ATTENTION TO THE LAST PARAGRAPH

10:40AM 16    WHERE IT SAYS, "I AM HAPPY TO PROVIDE MORE BACKGROUND ON ANY OF

10:40AM 17    THE ABOVE, OR ANY OF THE MATERIALS ENCLOSED IN THIS PACKAGE.

10:40AM 18    THERANOS'S INVESTMENT DOCUMENTS ARE ENCLOSED HEREIN.  THE

10:40AM 19    ADDITIONAL MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS

10:40AM 20    DEVELOPED AND THE INITIAL MARKET OF COMMERCIAL LABORATORY

10:40AM 21    TESTING."

10:40AM 22        DO YOU SEE THAT LANGUAGE?

10:40AM 23    A.   YES.

10:40AM 24    Q.   AND DID YOU UNDERSTAND THAT TO BE MS. HOLMES REFERRING YOU

10:40AM 25    TO THE FOOT OF MATERIALS THAT RDV HAD RECEIVED?

10:40AM 1    A.   YES.

10:40AM 2    Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE -- YOU WERE

10:40AM 3    ALSO ASKED QUESTIONS ABOUT A DOCUMENT WITH THE PFIZER LOGO.

10:40AM 4         AND IF WE CAN CALL THAT UP AT EXHIBIT 4858, PAGE 1 OF 6,

10:41AM 5    MS. HOLLIMAN.

10:41AM 6         AND IF WE CAN GO TO PAGE -- I'M SORRY, PLEASE GO TO

10:41AM 7    PAGE 129.

10:41AM 8         DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS DOCUMENT?

10:41AM 9    A.   YES.

10:41AM 10   Q.   AND AT THE TIME YOU REVIEWED THIS, YOU WERE NOT A

10:41AM 11   SCIENTIST?

10:41AM 12   A.   CORRECT.

10:41AM 13   Q.   OKAY.  YOU WERE RELYING ON THE HIGH LEVEL CONCLUSIONS OF

10:41AM 14   THE DOCUMENT?

10:41AM 15   A.   YES.

10:41AM 16   Q.   AND YOU BELIEVED THESE TO BE THE CONCLUSIONS OF PFIZER,

10:41AM 17   NOT THERANOS?

10:41AM 18   A.   YES.

10:41AM 19   Q.   DID THE FACT THAT THE THERANOS ADDRESS WAS LISTED ON PAGES

10:41AM 20   OF THE DOCUMENT IN ANY WAY CHANGE YOUR MIND ABOUT THAT?

10:41AM 21   A.   NO, NOT WHEN PFIZER'S LOGO IS ON THE PAGE.

10:41AM 22   Q.   OKAY.  AND YOU DO NOT MAKE REFERENCE TO THE PFIZER REPORT

10:41AM 23   ITSELF IN THE RDV APPROVAL DOCUMENT.

10:42AM 24        WHY IS THAT?

10:42AM 25   A.   BECAUSE WE THOUGHT IT WAS ONE OF MANY PHARMACEUTICAL

10:42AM 1    COMPANIES THAT THEY WORKED WITH.  IT WAS, IT WAS THE TOTALITY

10:42AM 2    OF DOING WORK FOR 10 OUT OF THE 15 LARGEST PHARMACEUTICAL

10:42AM 3    COMPANIES THAT WE RELIED ON, THAT THEIR ANALYZER HAD BEEN

10:42AM 4    TESTED AND WORKED FOR THOSE COMPANIES IN THEIR CLINICAL TRIALS.

10:42AM 5    Q.  AND IF IT WERE THE CASE THAT THESE WERE NOT THE

10:42AM 6    CONCLUSIONS OF PFIZER, WOULD THAT HAVE BEEN RELEVANT TO YOU?

10:42AM 7    A.  YES.

10:42AM 8    Q.  OKAY.  HOW SO?

10:42AM 9    A.  WE, WE WANTED -- THERE'S, THERE'S A COUPLE OF THINGS THAT

10:42AM 10   WE REALLY RELIED ON, AND ONE OF THE BIGGEST THINGS WAS THE FACT

10:42AM 11   THAT THIRD PARTY PHARMACEUTICAL COMPANIES AND THE GOVERNMENT

10:42AM 12   WAS USING THE ANALYZER IN THE FIELD.

10:42AM 13        MR. WADE:  YOUR HONOR, MOVE TO STRIKE UNDER 602 FOR

10:42AM 14   THE ISSUES REFERRED TO PREVIOUSLY.

10:43AM 15      (PAUSE IN PROCEEDINGS.)

10:43AM 16        THE COURT:  PARDON ME.  IT APPEARS THAT SOMEONE MAY

10:43AM 17   BE TAKING PHOTOGRAPHS.

10:43AM 18      LET'S TAKE OUR BREAK NOW.  LET'S TAKE OUR BREAK, LADIES

10:43AM 19   AND GENTLEMEN.  I'M GOING TO TAKE A 30 MINUTE BREAK AND WE'LL

10:43AM 20   COME BACK IN 30 MINUTES.

10:43AM 21        MR. LEACH:  THANK YOU, YOUR HONOR.

10:43AM 22      (JURY OUT AT 10:43 A.M.)

10:44AM 23        THE COURT:  YOU CAN STAND DOWN, MS. PETERSON.  THANK

10:44AM 24   YOU.

10:44AM 25        PLEASE BE SEATED, LADIES AND GENTLEMEN.

10:44AM  1         ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT

10:44AM  2    THAT OUR JURY HAS LEFT, THE WITNESS HAS LEFT THE COURTROOM.

10:44AM  3         A GENTLEMAN WHO IS STANDING BY THE BACK DOOR THERE, SIR,

10:44AM  4    WHY DON'T YOU JUST COME UP TO THE FRONT HERE, IF YOU WOULD,

10:44AM  5    PLEASE.

10:44AM  6         THANK YOU.  YOU CAN STAND THERE.

10:45AM  7         SIR, IT COMES TO MY ATTENTION THAT YOU TOOK A PHOTOGRAPH

10:45AM  8    INSIDE OF THIS COURTROOM, AND MY COURTROOM DEPUTY INFORMS ME

10:45AM  9    THAT SHE TALKED WITH YOU ABOUT THIS AND THAT SHE ASKED YOU TO

10:45AM  10   DELETE THE PHOTOGRAPH.

10:45AM  11        IS THAT WHAT HAPPENED, SIR?

10:45AM  12             GENTLEMAN WITH PHONE:  THAT'S CORRECT.

10:45AM  13             THE COURT:  SIR, DID YOU SEE THE SIGNS OUT FRONT OF

10:45AM  14   THE COURTHOUSE HERE AND THE COURTROOM?

10:45AM  15             GENTLEMAN WITH PHONE:  I DID NOT.  I APOLOGIZE.

10:45AM  16             THE COURT:  THERE'S A SIGN THERE.  I'LL INVITE YOUR

10:45AM  17   ATTENTION TO IT, SIR.  IT INDICATES THAT THERE IS NO RECORDING,

10:45AM  18   NOR IS THERE PHOTO PHOTOGRAPHY OR VIDEO RECORDING OF THESE

10:45AM  19   PROCEEDINGS OF ANY, ANY TYPE.

10:45AM  20        DO YOU UNDERSTAND THAT, SIR?

10:45AM  21             GENTLEMAN WITH PHONE:  I DO.

10:45AM  22             THE COURT:  DO YOU HAVE ANY QUESTION ABOUT THAT THAT

10:45AM  23   YOU WANT TO ASK ME ABOUT?

10:45AM  24             GENTLEMAN WITH PHONE:  NO, YOUR HONOR.  THANK YOU.

10:45AM  25             THE COURT:  SIR, IT'S NOT PERMITTED, AND YOU MAY NOT

| | | |
|---|---|---|
| 10:45AM | 1 | DO THAT. |
| 10:45AM | 2 | IF IT COMES TO MY ATTENTION AGAIN, I'LL HAVE TO TAKE SOME |
| 10:45AM | 3 | ACTION.  I WON'T, BUT I'LL SUMMON THE PEOPLE WHO ARE |
| 10:45AM | 4 | RESPONSIBLE.  THEY'RE CALLED THE UNITED STATES MARSHAL, AND |
| 10:46AM | 5 | THEY'LL TAKE WHATEVER ACTION THAT THEY FEEL APPROPRIATE. |
| 10:46AM | 6 | DO YOU UNDERSTAND THAT, SIR? |
| 10:46AM | 7 | GENTLEMAN WITH PHONE:  UNDERSTOOD. |
| 10:46AM | 8 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, SIR. |
| 10:46AM | 9 | ANYTHING FURTHER BEFORE WE TAKE OUR BREAK? |
| 10:46AM | 10 | MR. DOWNEY:  NOT FROM US, YOUR HONOR. |
| 10:46AM | 11 | MR. LEACH:  NO, YOUR HONOR. |
| 10:46AM | 12 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 10:46AM | 13 | (RECESS FROM 10:46 A.M. UNTIL 11:22 A.M.) |
| 11:23AM | 14 | (JURY IN AT 11:23 A.M.) |
| 11:23AM | 15 | THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE |
| 11:23AM | 16 | RECORD.  OUR JURY IS PRESENT. |
| 11:23AM | 17 | COUNSEL AND MS. HOLMES ARE PRESENT. |
| 11:23AM | 18 | THE WITNESS IS BACK ON THE STAND. |
| 11:23AM | 19 | MR. WADE -- EXCUSE ME, MR. LEACH, DO YOU WANT TO CONTINUE |
| 11:23AM | 20 | WITH YOUR EXAMINATION? |
| 11:23AM | 21 | MR. LEACH:  BRIEFLY, YOUR HONOR.  THANK YOU. |
| 11:23AM | 22 | THE COURT:  THERE WAS A PENDING OBJECTION BEFORE WE |
| 11:23AM | 23 | WERE INTERRUPTED.  IT WAS BY MR. WADE ON 602 GROUNDS IN |
| 11:23AM | 24 | RESPONSE TO THE QUESTION. |
| 11:23AM | 25 | THE QUESTION WAS ASKING A FOLLOW-UP QUESTION OF HOW SO, |

11:24AM  1    THAT IS, THIS -- MS. PETERSON'S COMMENT ON PHARMACEUTICAL

11:24AM  2    COMPANIES.

11:24AM  3         I'M GOING TO OVERRULE THE OBJECTION.  SHE CAN ANSWER THE

11:24AM  4    QUESTION.

11:24AM  5         WHY DON'T YOU ASK THE QUESTION AGAIN, MR. LEACH.

11:24AM  6    BY MR. LEACH:

11:24AM  7    Q.   I BELIEVE WE WERE ASKING QUESTIONS, MS. PETERSON, ABOUT

11:24AM  8    THE PFIZER REPORT AS YOU UNDERSTOOD IT AND WHAT WAS MEANINGFUL

11:24AM  9    TO YOU IN CONNECTION WITH CONSIDERATION OF THE INVESTMENT, AND

11:24AM 10    IF YOU CAN JUST EXPLAIN YOUR THINKING FOR US, PLEASE?

11:24AM 11    A.   SURE.  THE PFIZER REPORT IN THERE WAS IMPORTANT -- WAS

11:24AM 12    VERY IMPORTANT TO US, BUT IT ALSO WAS ONE OF MANY THAT WE WERE

11:24AM 13    RELYING ON.

11:24AM 14         THE STATEMENT OF THEY WORKED FOR 10 OF THE TOP 15 WAS

11:24AM 15    SUPER IMPORTANT TO US.  IT LENDED CREDIBILITY TO THE ANALYZER

11:24AM 16    WORKING, AND IT WAS AN OUTSIDE INDEPENDENT THIRD PARTY THAT HAD

11:24AM 17    DONE WORK WITH THE ANALYZER AND THAT IT WORKED.

11:25AM 18    Q.   YOU ALSO WERE ASKED QUESTIONS ABOUT A COMPANY CALLED BDT.

11:25AM 19         DO YOU REMEMBER BEING ASKED ABOUT BDT?

11:25AM 20    A.   YES.

11:25AM 21    Q.   AND WHAT IS BDT AGAIN?

11:25AM 22    A.   BDT IS A PRIVATE EQUITY FIRM RUN BY BYRON TROTT.

11:25AM 23    Q.   DO YOU KNOW WHETHER BDT INVESTED IN THERANOS?

11:25AM 24    A.   NO.

11:25AM 25    Q.   DO YOU KNOW WHETHER BDT EVER CONSIDERED MAKING AN

11:25AM 1      INVESTMENT IN THERANOS?

11:25AM 2      A.   YES, THEY DID.

11:25AM 3      Q.   AND YOU WERE ALSO ASKED SOME QUESTIONS ABOUT WHETHER OR

11:25AM 4      NOT YOU VISITED A WALGREENS.

11:25AM 5           DO YOU RECALL BEING ASKED THOSE QUESTIONS?

11:25AM 6      A.   YES.

11:25AM 7      Q.   AND I UNDERSTOOD YOUR ANSWER YOU'RE IN MICHIGAN AND YOU

11:25AM 8      DID NOT TRAVEL TO ARIZONA TO VISIT ONE OF THE WALGREENS STORES

11:25AM 9      THERE?

11:25AM 10     A.   NO.   CORRECT.   AND WE ALSO HAD GONE INTO THE WELLNESS

11:25AM 11     CENTER AT THE BUILDING AND PRETTY MUCH GOT THE FEEL FOR WHAT IT

11:25AM 12     WAS, YES.

11:25AM 13     Q.   OKAY.

11:25AM 14          MAY I APPROACH, YOUR HONOR?

11:25AM 15               THE COURT:   YES.

11:26AM 16               MR. WADE:   (HANDING.)

11:26AM 17     Q.   MS. PETERSON, I'VE PLACED BEFORE YOU WHAT WE HAVE MARKED

11:26AM 18     AS EXHIBIT 2065.

11:26AM 19          DO YOU HAVE THAT IN FRONT OF YOU?

11:26AM 20     A.   WHAT YOU JUST HANDED ME?

11:26AM 21     Q.   YES.

11:26AM 22          DO YOU SEE UP AT THE TOP THAT THIS APPEARS TO BE AN EMAIL

11:26AM 23     FROM CHRISTIAN HOLMES TO SUNNY BALWANI AND ELIZABETH HOLMES?

11:26AM 24     A.   YES.

11:26AM 25     Q.   AND DO YOU SEE THE SUBJECT LINE WITH A REFERENCE TO BDT

11:26AM  1    AND WAG?

11:26AM  2    A.   YES.

11:26AM  3    Q.   AND IN YOUR EXPERIENCE, IS WAG AN ACRONYM FOR WALGREENS?

11:26AM  4    A.   YES.

11:26AM  5    Q.   AND THE DATE OF THIS IS OCTOBER 10TH, 2014.

11:26AM  6         IS THAT IN THE MONTH WHEN, WHEN RDV WAS CONSIDERING AN

11:27AM  7    INVESTMENT DECISION?

11:27AM  8    A.   YES.

11:27AM  9              MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 2065 INTO

11:27AM 10    EVIDENCE.

11:27AM 11              MR. WADE:  YOUR HONOR, I DON'T SEE ANY FOUNDATION OR

11:27AM 12    RELEVANCE TO THIS DOCUMENT FROM THIS WITNESS, AND HEARSAY.

11:27AM 13         (PAUSE IN PROCEEDINGS.)

11:27AM 14              THE COURT:  CAN YOU LAY A LITTLE MORE FOUNDATION ON

11:27AM 15    THIS, AND TELL ME HOW IT RELATES TO THE REDIRECT AGAIN.

11:27AM 16              MR. LEACH:  YOUR HONOR, THIS WITNESS WAS ASKED

11:27AM 17    QUESTIONS ABOUT WHETHER OR NOT RDV VISITED A WALGREENS IN THIS

11:27AM 18    TIME PERIOD.  THIS RELATES TO ANOTHER POTENTIAL INVESTOR IN THE

11:27AM 19    SAME TIME PERIOD.

11:27AM 20         IT'S NOT HEARSAY BECAUSE IT'S A STATEMENT OF AN AGENT.

11:27AM 21         IT'S ALSO 801(D)(2)(E), AND I THINK MR. EDLIN LAID A

11:28AM 22    FOUNDATION UNDER THE BUSINESS RECORD EXCEPTION.

11:28AM 23         I ALSO OFFER IT FOR THE NONHEARSAY PURPOSE FOR STATE OF

11:28AM 24    MIND TO THE RECIPIENT.

11:28AM 25              AND IT RELATES TO -- THE QUESTIONS WERE ASKED ABOUT THE

11:28AM   1    DILIGENCE AND WHAT SHE DID AND DIDN'T DO, AND THIS TOUCHES ON

11:28AM   2    THAT.

11:28AM   3              MR. WADE:  YOUR HONOR, I HATE TO DO THIS RIGHT AFTER

11:28AM   4    THE BREAK, BUT THIS IS THE FIRST THAT WE HAVE SEEN OF THIS

11:28AM   5    DOCUMENT.  I WOULD ASK FOR A SIDE-BAR ON THIS ISSUE BEFORE WE

11:28AM   6    GO INTO THIS.

11:28AM   7              THE COURT:  ALL RIGHT.  LET'S -- CAN YOU CONTINUE

11:28AM   8    YOUR EXAMINATION WITHOUT REFERENCE TO THIS DOCUMENT RIGHT NOW?

11:28AM   9              MR. LEACH:  I CAN, YOUR HONOR, YES.

11:28AM  10              THE COURT:  THANK YOU.  I APPRECIATE THAT.

11:28AM  11          AND THEN WE'LL REVISIT THIS.

11:28AM  12              MR. LEACH:  OKAY.

11:28AM  13    Q.   AND YOU UNDERSTOOD IN THIS TIMEFRAME THAT BDT WAS ALSO

11:28AM  14    CONSIDERING AN INVESTMENT IN THERANOS?

11:28AM  15    A.   YES.

11:28AM  16    Q.   AND HOW DID YOU GET THAT UNDERSTANDING?

11:28AM  17    A.   MY BOSS HAD LET ME KNOW THAT THEY WERE LOOKING AT IT.

11:28AM  18    Q.   LET ME SHIFT TOPICS.  LAST TOPIC OF EXAMINATION,

11:29AM  19    MS. PETERSON.

11:29AM  20          YOU WERE ASKED SOME QUESTIONS ABOUT YOUR APPROVAL

11:29AM  21    DOCUMENT, EXHIBIT 2166.

11:29AM  22          IF WE CAN PLEASE -- WHICH IS IN EVIDENCE.  IF WE CAN

11:29AM  23    PLEASE CALL THAT UP, MS. HOLLIMAN.  IF WE CAN GO TO PAGE 6.

11:29AM  24          ACTUALLY, IF WE CAN PLEASE GO TO THE NEXT PAGE,

11:29AM  25    MS. HOLLIMAN.  PAGE 7 OF THE DOCUMENT.  EXCUSE ME.

11:29AM  1              JUROR:  YOUR HONOR, IT'S NOT ON.

11:29AM  2              THE CLERK:  THAT ONE IS OUT AGAIN?

11:29AM  3         I'M GOING TO SHUT DOWN AND RESTART.

11:30AM  4         (PAUSE IN PROCEEDINGS.)

11:30AM  5              THE CLERK:  THE MONITOR IS ON, BUT IT'S NOT

11:30AM  6    PROJECTING.  IT'S BEYOND MY CONTROL.

11:30AM  7              THE COURT:  OH, BROTHER.

11:30AM  8              MR. LEACH:  YOUR HONOR, I CAN TRY TO CONTINUE MY

11:31AM  9    EXAMINATION WITHOUT THE DOCUMENT ON THE SCREEN, AND PERHAPS

11:31AM 10    DURING THE SIDE-BAR WE CAN WORK OUT THE TECHNICAL ISSUES.

11:31AM 11              THE COURT:  WE'LL TRY TO FIGURE IT OUT.  I DON'T

11:31AM 12    KNOW IF YOU HAVE THIS AVAILABLE FOR USE ON THE ELMO OR IF YOU

11:31AM 13    WANT TO GO THAT FAR.

11:31AM 14         OKAY.

11:31AM 15    BY MR. LEACH:

11:31AM 16    Q.   MS. PETERSON, DO YOU HAVE EXHIBIT 2166 IN FRONT OF YOU?

11:31AM 17    A.   IT'S ON THE SCREEN AT THIS POINT.

11:31AM 18    Q.   OKAY.  I THINK SOME OF THE JURORS DON'T HAVE IT, SO LET'S

11:31AM 19    WORK FROM THE HARD COPY IF WE CAN?

11:31AM 20    A.   OKAY.  YES.  YES.

11:31AM 21    Q.   THIS IS ENTITLED RDV APPROVAL DOCUMENT.

11:31AM 22         WHY DID YOU PREPARE THIS?

11:31AM 23    A.   WE PREPARE THESE FOR EVERY INVESTMENT THAT WE DO.  WE NEED

11:31AM 24    TO HAVE THIS COMPLETED BEFORE WE CAN WIRE THE MONEY AND CLOSE

11:31AM 25    THE DOCUMENTS.

11:31AM  1   Q.   IS THIS AN IMPORTANT PART OF YOUR PROCESS?

11:31AM  2   A.   YES.

11:31AM  3   Q.   AND IS IT IMPORTANT, WHEN PREPARING THIS, TO MEMORIALIZE

11:31AM  4   WHAT YOU UNDERSTOOD ARE THE SALIENT FACTS RELATING TO THE

11:31AM  5   INVESTMENT?

11:31AM  6   A.   CORRECT.  IT PUTS IT IN WRITING.

11:31AM  7   Q.   HALFWAY DOWN THE LINE THERE'S A RECOMMENDATION AND IT SAYS

11:32AM  8   R&D INVESTMENT GROUP RECOMMENDS A $100 MILLION INVESTMENT IN

11:32AM  9   THE EQUITY OF THERANOS.

11:32AM 10        DO YOU SEE THAT LANGUAGE?

11:32AM 11   A.   YES.

11:32AM 12   Q.   AND WHAT IS THE RDV INVESTMENT GROUP?

11:32AM 13   A.   THAT'S THE GROUP THAT I WORK FOR.

11:32AM 14   Q.   AND SO THE GROUP THAT INCLUDES YOU?

11:32AM 15   A.   YES.

11:32AM 16   Q.   OKAY.

11:32AM 17        I HAVE NOTHING FURTHER BEYOND EXHIBIT 2065, YOUR HONOR.

11:32AM 18            THE COURT:  OKAY.  WELL, LET'S TAKE THAT UP BEFORE

11:32AM 19   WE -- LET ME -- WHY DON'T WE HAVE -- I THINK IT WOULD BE MORE

11:32AM 20   EFFICIENT TO HAVE A SIDE-BAR IN THE JURY ROOM.  SO WE'LL TAKE

11:32AM 21   JUST A MOMENT.

11:32AM 22        LADIES AND GENTLEMEN, I NEED TO SPEAK WITH THE LAWYERS

11:32AM 23   OUTSIDE OF YOUR PRESENCE, SO WE'LL DO THAT.  THIS WON'T TAKE

11:32AM 24   LONG.

11:32AM 25        MS. PETERSON, IF YOU COULD JUST REMAIN THERE, PLEASE.

11:32AM  1           THE WITNESS:  OKAY.

11:32AM  2           THE COURT:  WHILE WE'RE GONE, PLEASE DO NOT DISCUSS

11:32AM  3  AMONGST YOURSELVES, LADIES AND GENTLEMEN OF THE JURY, ANYTHING.

11:32AM  4           YOU CAN STAND AND STRETCH, OF COURSE, BUT DO NOT DISCUSS

11:32AM  5  ANYTHING ABOUT THIS CASE.

11:33AM  6           AND I'LL SEE COUNSEL IN THE BACK JUST NOW.

11:33AM  7           (SIDE-BAR CONFERENCE ON THE RECORD.)

11:51AM  8           THE COURT:  OKAY.  LET'S GO ON THE RECORD.

11:51AM  9           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  MR. LEACH IS

11:51AM 10  PRESENT.  MR. WADE IS PRESENT.

11:51AM 11           THIS IS IN REGARDS TO 2065, WHICH IS -- IT LOOKS LIKE IT'S

11:51AM 12  AN EMAIL STRING.

11:51AM 13           MR. LEACH?

11:51AM 14           MR. LEACH:  YOUR HONOR, DURING MS. PETERSON'S

11:51AM 15  CROSS-EXAMINATION, THE DEFENSE ASKED A NUMBER OF QUESTIONS

11:51AM 16  ABOUT WHETHER RDV WENT TO A WALGREENS AS PART OF DUE DILIGENCE

11:51AM 17  AND WHETHER IT WOULD HAVE LEARNED THAT THERE WERE DEVICES IN

11:51AM 18  THE STORES OR HOW THE BLOOD WAS DRAWN BY GOING TO A WALGREENS.

11:51AM 19           THIS COMMUNICATION, WHICH IS CONTEMPORANEOUS, SUGGESTS

11:51AM 20  THAT FOLKS WITHIN THERANOS WERE MAKING ARRANGEMENTS FOR WHAT

11:51AM 21  SHOULD HAPPEN IF ANOTHER INVESTOR WENT INTO WALGREENS AND

11:51AM 22  TAKING STEPS TO CONCEAL THAT THERE WERE VENOUS DRAWS BEING

11:51AM 23  DONE.

11:51AM 24           THIS IS NOT HEARSAY.  CHRISTIAN HOLMES IS AN AGENT OF

11:51AM 25  ELIZABETH HOLMES.  HE REPORTS DIRECTLY TO HER.

11:51AM    1          IT IS ALSO A, WE WOULD ARGUE, A STATEMENT OF A

11:51AM    2    COCONSPIRATOR IN FURTHERANCE OF THE CONSPIRACY.

11:51AM    3          THERE'S NO ISSUE WITH AUTHENTICATION.  WE STIPULATED THAT

11:51AM    4    THE DOCUMENTS WITH THE TS BATES PREFIX ARE AUTHENTIC.

11:51AM    5          I THINK THIS IS -- IN ADDITION, DAN EDLIN LAID A

11:51AM    6    FOUNDATION FOR THE USE OF EMAIL TO COORDINATE DEMOS, SO I THINK

11:51AM    7    THERE'S A BUSINESS RECORDS EXCEPTION.

11:51AM    8          FINALLY, WE WOULD OFFER IT FOR MS. HOLMES'S KNOWLEDGE OF

11:51AM    9    WHAT WOULD HAPPEN IF AN INVESTOR WENT INTO WALGREENS TO TRY TO

11:51AM   10    GET THEIR BLOOD TESTED.

11:51AM   11          THERE'S A LINE IN HERE THAT SAYS ASSUMPTIONS HERE ARE FROM

11:51AM   12    EAH, THAT'S ELIZABETH HOLMES, SO THAT WE MUST NOT DO A VENOUS

11:51AM   13    DRAW FOR THIS VERY IMPORTANT INVESTOR.

11:51AM   14          I THINK IT'S DIRECTLY RELEVANT TO THE DILIGENCE THAT RDV

11:51AM   15    IS BEING ACCUSED OF NOT DOING, AND IT SHOULD COME IN AT THIS

11:51AM   16    TIME.

11:51AM   17          THE COURT:  THANK YOU.  WHO WAS THE -- WHO, AS TO

11:51AM   18    THE 801(D)(2)(E), WHO IS THE COCONSPIRATOR?  THIS IS FROM

11:51AM   19    CHRISTIAN HOLMES AND HE'S NOT A COCONSPIRATOR.  HE'S NOT IN THE

11:51AM   20    INDICTMENT ANYWAY.

11:51AM   21          MR. LEACH:  HE'S NOT IN THE INDICTMENT, YOUR HONOR,

11:51AM   22    BUT THAT DOESN'T MEAN THE EXCEPTION CAN'T APPLY TO HIM.

11:51AM   23          BUT HE'S ALSO AN AGENT.

11:51AM   24          MR. WADE:  A FEW POINTS.  ONE, THIS IS WELL OUTSIDE

11:51AM   25    OF THE SCOPE OF CROSS.  THEY TESTIFIED THAT THEY DIDN'T GO TO A

11:51AM  1    WALGREENS.

11:51AM  2         THE IDEA THAT THAT SOMEHOW OPENS THE DOOR ON REDIRECT AS

11:51AM  3    TO ANYTHING THAT EVER HAPPENED WITHIN A WALGREENS WITH RESPECT

11:51AM  4    TO ANYONE I THINK IS, YOU KNOW, IS WAY OUTSIDE OF THE SCOPE OF

11:51AM  5    THE DIRECT.  THIS IS THE FIRST THAT WE HAVE HEARD OF THE

11:51AM  6    DOCUMENT.  IT OPENS UP A WHOLE NEW SET OF ISSUES THROUGH THIS

11:51AM  7    WITNESS, AND IT WOULD REQUIRE EXPLORATION.

11:51AM  8         IT'S ALSO -- THE 801(D)(2)(E) EXCEPTION DOESN'T -- SO IT'S

11:51AM  9    NOT APPROPRIATE FOR THIS WITNESS.

11:51AM 10         I CAN SORT OF PARK THAT THERE BECAUSE NOW ALL OF A SUDDEN

11:51AM 11    WE HAVE SOME WHOLE NEW ISSUE THAT IS WELL OUTSIDE OF THE SCOPE

11:51AM 12    OF ANY OF THE EXAMINATION THAT, YOU KNOW, I DON'T EVEN KNOW

11:51AM 13    WHAT TO DO.

11:51AM 14         WE DIDN'T HAVE NOTICE THAT THIS MIGHT COME IN.  WE ASK --

11:51AM 15    IF THE COURT IS GOING TO LET IT IN, WE WOULD ASK FOR THE COURT

11:51AM 16    TO TAKE A RECESS AND ALLOW US TO PREPARE TO CONFRONT THE

11:51AM 17    WITNESS ON THIS DOCUMENT BECAUSE WE'RE NOT PRESENTLY PREPARED

11:51AM 18    TO DO THAT.

11:51AM 19         THE 801(D)(2)(E) ISSUE, AS THE COURT WELL KNOWS, UNDER THE

11:51AM 20    COURT LOCAL RULES AND THE NEW RULES OF EVIDENCE, THERE IS A

11:51AM 21    NOTICE PROVISION THAT IS REQUIRED AND THIS WAS NOT NOTICED AS

11:51AM 22    801(D)(2)(E), AND I DON'T THINK THAT THEY CAN MAKE THE

11:51AM 23    THRESHOLD SHOWING TO DO THAT.

11:51AM 24         SO IT WOULD BE FUNDAMENTALLY UNFAIR TO DROP THIS INTO THIS

11:51AM 25    EXAMINATION AT THIS TIME.

11:51AM 1      I'LL ADD THAT WITH RESPECT TO BDT, THE WITNESS TESTIFIED

11:51AM 2   THAT SHE DIDN'T HAVE ANY INTERACTIONS WITH BDT ABOUT THERANOS.

11:51AM 3   SO A HEARSAY STATEMENT CAME IN RELATING TO THAT, BUT APART FROM

11:51AM 4   THAT, WHICH I CHOSE NOT TO OBJECT TO, BUT APART FROM THAT, SHE

11:51AM 5   HAS NO FIRSTHAND KNOWLEDGE OF ANYTHING RELATING TO BDT.

11:51AM 6      SO THERE ARE MULTIPLE LEVELS OF FACTS THAT IT WOULD BE

11:51AM 7   FUNDAMENTALLY UNFAIR TO DEAL WITH IT THROUGH THIS WITNESS.

11:51AM 8           THE COURT:  MR. LEACH?

11:51AM 9           MR. LEACH:  YOUR HONOR, THE DEFENSE INJECTED BDT

11:51AM 10  INTO THE CROSS-EXAMINATION.  THERE WAS 15 MINUTES OF CROSS

11:51AM 11  ABOUT HOW DID THIS INVESTMENT COME TO RDV'S ATTENTION.  DID YOU

11:51AM 12  GO TO THE CONFERENCE?  DID YOU KNOW THAT MS. HOLMES SPOKE AT

11:51AM 13  THE CONFERENCE?

11:51AM 14     THIS IS CONTEMPORANEOUS WITH THE RDV INVESTMENT AND RIGHT

11:51AM 15  AFTER THAT CONFERENCE.

11:51AM 16     SO -- AND THE SUGGESTION WAS MADE THAT IF RDV HAD BEEN

11:51AM 17  MORE DILIGENT, HAD THEY GONE TO A WALGREENS, THAT THEY WOULD

11:51AM 18  HAVE FIGURED OUT EVERYTHING THAT THERE IS TO KNOW ABOUT HOW THE

11:51AM 19  BLOOD WAS DRAWN AND VENOUS DRAWS, AND THIS WOULD SUGGEST THAT

11:51AM 20  DID NOT HAPPEN, AND IT WAS DIRECTLY RELEVANT TO THE

11:51AM 21  CROSS-EXAMINATION.

11:51AM 22     THIS IS REDIRECT, SO I'M NOT AWARE OF A NOTICE.  THIS HAS

11:51AM 23  BEEN ON OUR EXHIBIT LIST FOR SOME PERIOD OF TIME, AND I THINK

11:51AM 24  IT TIES DIRECTLY TO THE IMPLICATION THAT DEFENSE WAS TRYING TO

11:51AM 25  RAISE IN THE CROSS-EXAMINATION WITH THIS WITNESS.

11:51AM 1      MR. WADE:  WE ASKED WHETHER THEY WENT TO A

11:51AM 2  WALGREENS, AND SHE DID NOT.

11:51AM 3      THE IDEA THAT THEN ANYTHING THAT HAPPENS -- THAT OPENS THE

11:51AM 4  DOOR TO ANYTHING THAT THAT HAPPENS WITHIN A WALGREENS IS WELL

11:51AM 5  OUTSIDE OF THE SCOPE.

11:51AM 6      AGAIN, IF THE COURT DECIDES TO DO THAT, I WOULD JUST, FOR

11:51AM 7  THE RECORD, ASK FOR AN ADJOURNMENT FOR THE DAY SO THAT WE CAN,

11:51AM 8  SO WE CAN COME BACK.

11:51AM 9      IT'S NOT MY PREFERENCE, BUT THIS IS AN ISSUE THAT IS

11:51AM 10 TOTALLY UNRELATED TO THIS WITNESS, AND THE IDEA THAT WE WOULD

11:51AM 11 BE ON NOTICE BECAUSE IT'S AMONG THE, I DON'T KNOW, 10,000

11:51AM 12 DOCUMENTS THAT THEY PUT ON THEIR EXHIBIT LIST IS JUST NOT TRUE.

11:51AM 13     THE COURT:  SO, MR. LEACH, YOU'D LIKE TO EXAMINE

11:51AM 14 THIS WITNESS ON THE ISSUE OF BDT BECAUSE MR. WADE DID ASK SOME

11:51AM 15 QUESTIONS ABOUT IT.  HE ASKED SOME QUESTIONS ABOUT WALGREENS.

11:51AM 16 THERE WAS THIS COLLOQUY ABOUT DO YOU SEE THE PHOTOGRAPH, AND

11:51AM 17 THEN SHE VOLUNTEERED.  I CAN'T REMEMBER IF I STRUCK IT OR NOT,

11:51AM 18 BUT SHE VOLUNTEERED, WELL, THAT'S NOT -- WE LOOKED AT THE -- WE

11:51AM 19 SAW THE LAB AS IT WAS SET UP WITH THE EDISON INSIDE OF

11:51AM 20 THERANOS.  SO THAT LINE OF QUESTIONING.

11:51AM 21     AND THIS, I'M JUST TRYING TO CAPTURE AGAIN, THE -- WHAT

11:51AM 22 YOU'RE ATTEMPTING TO DO ABOUT THIS WITH BDT, TO ASK THIS

11:51AM 23 WITNESS ABOUT BDT?

11:51AM 24     MR. LEACH:  IT'S HONESTLY, IT'S AN APPROPRIATE TIME

11:51AM 25 TO ADMIT THE EXHIBIT BECAUSE IT RELATES TO THE SUBJECT MATTER

11:51AM 1    OF THE CROSS-EXAMINATION.

11:51AM 2         I DON'T HAVE ADDITIONAL -- SIGNIFICANT ADDITIONAL

11:51AM 3    QUESTIONS OF THIS WITNESS BEYOND WHY YOU DIDN'T GO TO A

11:51AM 4    WALGREENS, DID YOU NONETHELESS KNOW ABOUT VENOUS DRAWS.

11:51AM 5         SO I DON'T HAVE MORE THAN THAT ON THIS PARTICULAR

11:51AM 6    DOCUMENT.  BUT THERE'S NO REASON THAT THIS DOCUMENT COULDN'T

11:51AM 7    COME IN NOW OR, FRANKLY, ANY OTHER TIME GIVEN THE STIPULATION

11:51AM 8    TO AUTHENTICITY AND THE ABSENCE OF A HEARSAY ISSUE.

11:51AM 9         THE COURT:  THANK YOU.  SO IS THE, IS THE -- IS

11:51AM 10   THIS -- THIS SEEMS TO INDICATE THE PROTOCOL THAT IS USED FOR

11:51AM 11   VENOUS DRAWS AT THE WALGREENS, IS THAT WHAT THIS STATES?

11:51AM 12        MR. LEACH:  YES.  IT'S AN INSTRUCTION ON WHAT

11:51AM 13   HAPPENS IF A BDT -- IF A REPRESENTATIVE OF BDT, A POTENTIAL

11:51AM 14   INVESTOR ASKS FOR A TEST THAT REQUIRES A VENOUS DRAW, AND

11:51AM 15   THERE'S SCENARIO 1 WITH A CASE A AND A CASE B; AND SCENARIO 2,

11:51AM 16   IF BDT ORDERS TESTS THAT CAN ALL BE DONE ON FINGERSTICK.

11:51AM 17        SO IT'S A ROAD MAP FOR THE FOLKS WITHIN THERANOS IF BDT

11:51AM 18   ORDERS A TEST REQUIRED OF VENOUS DRAW TO DO IT IN A WAY THAT

11:51AM 19   WON'T BRING TO ATTENTION THAT IT'S A VENOUS DRAW.

11:51AM 20        THE COURT:  RIGHT.  OKAY.  I'M JUST CURIOUS ABOUT

11:51AM 21   THE TIMING UNDER THIS WITNESS, AND I KNOW THERE WAS

11:51AM 22   CONVERSATION ABOUT BDT AND ALL OF THAT.  I'M NOT CERTAIN THAT

11:51AM 23   THAT'S -- I GUESS THAT THE TIMING IS RIGHT TO GET THIS IN

11:51AM 24   THROUGH THIS WITNESS AT THIS TIME, NOTWITHSTANDING THE FACT

11:51AM 25   THAT THERE WAS BDT MENTIONED.

11:51AM  1      I DO SEE THAT IT LOOKS LIKE THAT THIS -- AT THE BOTTOM IT

11:51AM  2   SAYS IT'S FROM SUNNY BALWANI.

11:51AM  3      WHAT DOES THAT MEAN?

11:51AM  4          MR. LEACH:  I THINK THE BOTTOM EMAIL IS FROM

11:51AM  5   SUNNY BALWANI, BUT THE TOP EMAIL WITH THE SUBSTANCE OF THE ROAD

11:51AM  6   MAP IS FROM CHRISTIAN HOLMES --

11:51AM  7          THE COURT:  RIGHT.

11:51AM  8          MR. LEACH:  -- TO SUNNY BALWANI AND MS. HOLMES.

11:51AM  9      AND ANOTHER RESPONSE TO THE HEARSAY IS THAT THIS GOES TO

11:51AM  10   HER STATE OF MIND AT THE TIME THAT SHE'S SOLICITING INVESTMENTS

11:51AM  11   FROM BOTH BDT AND RDV.

11:51AM  12          MR. WADE:  YOUR HONOR, MIGHT I SUGGEST GIVEN WE HAVE

11:51AM  13   THE JURY HERE, I THINK THERE ARE OTHER ISSUES, JUST IN THE

11:51AM  14   INTEREST OF EFFICIENCY WITH THE TRIAL TIME, MR. MOSLEY IS GOING

11:51AM  15   TO TESTIFY.  THERE'S GOING TO BE A LOT OF DISCUSSION ABOUT BDT

11:51AM  16   WITH MR. MOSLEY.  I EXPECT THAT MR. MOSLEY IS GOING TO CARRY

11:51AM  17   OVER.

11:51AM  18      WHY DON'T WE WAIT AND RAISE THIS ISSUE, GIVE US A CHANCE

11:51AM  19   TO READ THIS AND GIVE IT SOME CONTEXT.

11:51AM  20      THE OTHER THING THAT CONCERNS ME SLIGHTLY WITH THIS,

11:51AM  21   YOUR HONOR, IS THAT IT BRINGS IN A WHOLE ANOTHER AREA OF

11:51AM  22   ISSUES, AND THERE'S A POTENTIAL MINI TRIAL ISSUE RELATING TO

11:51AM  23   BDT AS A POTENTIAL INVESTOR.

11:51AM  24      AND IF THE GOVERNMENT DECIDES THAT THEY WANT TO OPEN THE

11:51AM  25   DOOR WITH RESPECT TO CERTAIN BDT INTERACTIONS AS A POTENTIAL

11:51AM   1    INVESTOR, THAT POTENTIALLY OPENS THE DOOR TO A WHOLE OTHER SET

11:51AM   2    OF EVIDENCE.

11:51AM   3        AND RATHER THAN DOING THIS ON THE FLY WHEN WE'RE TRYING TO

11:51AM   4    FINISH UP WITH A WITNESS WHO IS NOT NECESSARY FOR THE ADMISSION

11:51AM   5    OF THIS DOCUMENT, WHY DON'T WE CLOSE THIS WITNESS, KEEP GOING,

11:51AM   6    AND ADDRESS THIS ISSUE WHEN WE'RE NOT HOLDING A JURY OUTSIDE.

11:51AM   7            THE COURT:  WELL, I APPRECIATE THAT.

11:51AM   8        BUT BDT WAS MENTIONED.  SO I UNDERSTAND THE TIMING OF IT.

11:51AM   9        MR. LEACH SAYS, WELL, THAT WAS MENTIONED.

11:51AM  10        IT COMES IN FOR NOT SO MUCH, AT LEAST AS I UNDERSTAND IT

11:51AM  11    NOW, FOR THE FLOW OF THIS WITNESS'S TESTIMONY BUT RATHER IT

11:51AM  12    COMES IN AS TO -- THIS EMAIL DOES TALK ABOUT WHAT EAH,

11:51AM  13    ELIZABETH HOLMES'S, PROTOCOL, AND WHAT SHE THINKS SHOULD HAPPEN

11:51AM  14    IN THAT.  IT'S INSTRUCTIVE FROM HER.

11:51AM  15        I UNDERSTAND WHY -- I THINK I UNDERSTAND WHY MR. LEACH

11:51AM  16    WOULD SEEK TO INTRODUCE IT NOW BECAUSE THE BDT WAS RAISED ON

11:51AM  17    YOUR EXAMINATION AND SUCH THAT THE JURY WOULD NOT HAVE -- WOULD

11:51AM  18    HAVE A FULL STORY ABOUT BDT AT LEAST AS TO THIS.

11:51AM  19        THE TIMING OF IT, THOUGH, IS -- THERE'S CONVERSATION ABOUT

11:51AM  20    BDT.

11:51AM  21        I COULD SEE HOW THIS WOULD COME IN.  AND LET ME JUST STATE

11:51AM  22    AS A SEPARATE NOTE, I HAVE BEEN TAKING NOTES ABOUT THE EVIDENCE

11:51AM  23    AND THE STATEMENTS FROM VARIOUS PARTIES.

11:51AM  24        I HAVE NOT -- YOU HAVE NOT ASKED ME TO MAKE A FINDING AS

11:51AM  25    TO WHETHER OR NOT A PRIMA FACIE CASE OF CONSPIRACY HAS BEEN

11:51AM  1    SHOWN SUCH THAT STATEMENTS CAN BE ENTERED.

11:51AM  2         I THINK THIS IS THE FIRST TIME THAT THAT HAS COME UP IN

11:51AM  3    THE TRIAL WHERE, MR. LEACH, YOU MENTIONED IT COULD COME IN AS A

11:51AM  4    STATEMENT OF A COCONSPIRATOR IN FURTHERANCE OF UNDER

11:51AM  5    801(D)(2)(E).

11:51AM  6         I'VE TAKEN NOTES.  I DON'T KNOW IF YOU WANT TO KNOW MY

11:51AM  7    OPINION ABOUT IT.  IT SEEMS TO ME THAT THERE HAS BEEN AT LEAST

11:51AM  8    FOR PRIMA FACIE SHOWING, IT SEEMS LIKE SOME OF THE STATEMENTS

11:51AM  9    AND THE EVIDENCE THAT HAS COME IN DOES ESTABLISH AT LEAST FOR

11:51AM  10   EVIDENTIARY PURPOSES A PRIMA FACIE CASE.

11:51AM  11        I DON'T KNOW IF YOU WANT TO COMMENT.  I'M NOT TRYING TO

11:51AM  12   TAKE US DOWN A SIDE ROAD BUT --

11:51AM  13             MR. WADE:  I'D LIKE TO ADDRESS THAT MORE

11:51AM  14   THOUGHTFULLY, FRANKLY, YOUR HONOR, RATHER THAN DOING IT ON THE

11:51AM  15   FLY WITH RESPECT TO THIS ISSUE.

11:51AM  16        OF COURSE, THERE'S A NOTICE CONCERN THAT COMES WITH

11:51AM  17   801(D)(2)(E) --

11:51AM  18             THE COURT:  RIGHT.

11:51AM  19             MR. WADE:  -- THAT THE NORTHERN DISTRICT TAKES VERY

11:51AM  20   SERIOUSLY, AND I KNOW THE COURT DOES AS WELL.  THIS WAS NOT

11:51AM  21   NOTICED UNDER 801(D)(2)(E), AND THAT IS NOW ALSO A REQUIREMENT

11:51AM  22   UNDER THE FEDERAL RULES OF EVIDENCE.  THEY ACTUALLY -- THE

11:51AM  23   NORTHERN DISTRICT WAS ACTUALLY A LITTLE IN FRONT OF THE RULES

11:51AM  24   COMMITTEE ON THAT.

11:51AM  25        SO I THINK IT WOULD BE UNFAIR TO CONCLUDE ON THIS WITHOUT

11:51AM  1   NOTICE.  ARGUABLY IT'S EXCLUDABLE AS OFFERED UNDER THAT AS A

11:51AM  2   RESULT OF THE LACK OF NOTICE, BUT AT A MINIMUM, I WOULD LIKE TO

11:51AM  3   HAVE THE OPPORTUNITY TO ADDRESS THAT.

11:51AM  4        AGAIN, THIS WITNESS OFFERS NO TESTIMONY ON THIS.  BDT WAS

11:51AM  5   ADDRESSED, BUT IT WASN'T ADDRESSED IN CONNECTION WITH

11:51AM  6   WALGREENS.  IT WAS ADDRESSED IN CONNECTION WITH A CONFERENCE.

11:51AM  7   SHE DIDN'T HAVE ANY INTERACTIONS OR KNOWLEDGE OF BDT APART FROM

11:51AM  8   WHAT MR. LEACH JUST PULLED OUT ON REDIRECT, WHICH HE CAN'T OPEN

11:51AM  9   HIS OWN DOOR.

11:51AM 10        I ASKED QUESTIONS ABOUT WHETHER SHE HAD INTERACTIONS WITH

11:51AM 11   BDT OR WHETHER SHE KNEW ABOUT INTERACTIONS, WHETHER SHE WAS

11:51AM 12   THERE, AND HER ANSWER UNDER ALL OF THAT WAS NO.

11:51AM 13        SO I THINK IT'S A HUGE STRETCH TO PUT THIS IN.  IT DOESN'T

11:51AM 14   NEED TO COME IN NOW.  I'D LIKE THE OPPORTUNITY TO, YOU KNOW, TO

11:51AM 15   CONSIDER THIS AND ADDRESS THIS OUTSIDE OF THE CONTEXT GIVEN

11:51AM 16   THAT WE DIDN'T GET NOTICE AND IT'S BEING OFFERED AS A

11:51AM 17   COCONSPIRATOR EXCEPTION.

11:51AM 18        THE COURT:  WELL, AMONGST OTHERS, BUT THERE ARE

11:51AM 19   OTHER REASONS WHY MR. LEACH PROFFERS THIS.  HE DID OFFER IT FOR

11:51AM 20   THAT PURPOSE.

11:51AM 21        BUT I DO -- I SEE SOME RELEVANCE AS TO THIS.  WHETHER OR

11:51AM 22   NOT TIMING IS APPROPRIATE NOW TO INTRODUCE IT -- YOU KNOW,

11:51AM 23   MR. LEACH, I'M GOING TO SUSTAIN THE OBJECTION AS TO THIS

11:51AM 24   WITNESS.  I JUST DON'T THINK THE TIMING IS RIGHT AND THE

11:51AM 25   FOUNDATION IS THERE TO GET THIS IN NOW.

11:51AM  1      I MADE MY COMMENTS ABOUT AT LEAST GENERALLY FINDING THE

11:51AM  2   EVIDENCE SHOWS BASED UPON TEXT MESSAGES, AND I DON'T HAVE ALL

11:51AM  3   OF MY NOTES HERE, BUT I'VE MADE NOTES ABOUT ASPECTS OF

11:51AM  4   CONVERSATIONS AND OTHERS THAT COULD SHOW A PRIMA FACIE CASE OF

11:51AM  5   A CONSPIRACY IN FURTHERANCE OF DURING THE CHARGING PERIOD,

11:51AM  6   WHICH WOULD THEN OPEN THE DOOR FOR OTHER HEARSAY STATEMENT OR

11:51AM  7   OTHER STATEMENTS OF THE PARTIES.  I JUST WANT TO LET YOU KNOW

11:51AM  8   THAT, AND I'M DOING THIS OUTSIDE OF THE PRESENCE OF THE JURY,

11:51AM  9   OF COURSE, JUST TO KEEP YOU APPRISED OF THAT.

11:51AM 10      BUT ALL OF THE NOTICE AND ALL OF THE OTHER RULES, OF

11:51AM 11   COURSE, APPLY.

11:51AM 12      BUT SINCE YOU RAISED IT, MR. LEACH, TALKING ABOUT THIS, I

11:51AM 13   THOUGHT I WOULD GIVE YOU AT LEAST THE BENEFIT OF MY THOUGHTS ON

11:51AM 14   THAT, RIGHT OR WRONG, BUT I JUST WANTED TO SHARE THAT WITH YOU.

11:51AM 15           MR. LEACH:  THANK YOU, YOUR HONOR.

11:51AM 16           THE COURT:  SO YOU CAN EXPLORE BDT.  IT WAS TALKED

11:51AM 17   ABOUT.

11:51AM 18      I JUST THINK GETTING THE DOCUMENT IN NOW THROUGH THIS

11:51AM 19   WITNESS IS NOT APPROPRIATE AT THIS TIME.

11:51AM 20      SO AT THIS TIME I'LL SUSTAIN THE OBJECTION.  I'LL DO IT

11:51AM 21   OUT THERE IN FRONT OF THE JURY.

11:51AM 22           MR. LEACH:  OKAY.

11:51AM 23           MR. WADE:  OKAY.  THANK YOU, YOUR HONOR.

11:51AM 24           MR. LEACH:  THANK YOU, YOUR HONOR.

11:51AM 25      (END OF DISCUSSION AT SIDE-BAR.)

11:52AM  1           THE COURT:  ALL RIGHT.  THANK YOU FOR YOUR PATIENCE.

11:52AM  2   WE'RE BACK ON THE RECORD.

11:52AM  3       ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

11:52AM  4       AS TO THE OBJECTION, I'LL SUSTAIN THE OBJECTION AT THIS

11:52AM  5   TIME.  THANK YOU.

11:52AM  6       MR. LEACH, YOU CAN ASK ANY OTHER QUESTIONS THAT YOU HAVE.

11:52AM  7           MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:52AM  8   THANK YOU, MS. PETERSON.

11:52AM  9           THE COURT:  ALL RIGHT.

11:52AM  10          MR. WADE:  ONE OR TWO QUESTIONS, YOUR HONOR.

11:52AM  11  BRIEFLY.

11:52AM  12                    **RECROSS-EXAMINATION**

11:52AM  13  BY MR. WADE:

11:52AM  14  Q.  MS. PETERSON, IF WE COULD JUST PULL UP BRIEFLY 14210.  I'M

11:53AM  15  SORRY, 1853.  EXHIBIT 1853, WHICH IS IN EVIDENCE.

11:53AM  16      DO YOU RECALL JUST BEING ASKED SOME QUESTIONS ABOUT THIS

11:53AM  17  ONCE AGAIN?

11:53AM  18  A.  YES.

11:53AM  19  Q.  AND I'M SORRY, CAN WE PULL THIS ONE DOWN.

11:53AM  20      DO WE -- I JUST WANT TO MAKE SURE THAT WE HAVE 1853 UP.

11:53AM  21      IS THAT CORRECT?

11:53AM  22      I'M SORRY.  I THOUGHT WE HAD THE WRONG DOCUMENT UP THERE

11:53AM  23  FOR A SECOND.

11:53AM  24      OKAY.  DO YOU RECALL BEING ASKED QUESTIONS ABOUT THIS

11:53AM  25  DOCUMENT?

| | | |
|---|---|---|
| 11:53AM | 1 | A.   YES. |
| 11:53AM | 2 | Q.   AND I JUST WANT TO GO TO THE SECOND PAGE.  THIS RELATED -- |
| 11:53AM | 3 | I'M SORRY.  BACK TO THE FIRST PAGE FOR ONE SECOND. |
| 11:53AM | 4 | AND THIS RELATED TO THE REVENUE PROJECTIONS OF 140 MILLION |
| 11:53AM | 5 | FOR 2014. |
| 11:53AM | 6 | DO YOU SEE THAT? |
| 11:53AM | 7 | A.   YES. |
| 11:53AM | 8 | Q.   OKAY.  I JUST WANT TO GO TO THE SECOND PAGE AGAIN. |
| 11:53AM | 9 | AND DO YOU SEE THE DEFERRED REVENUE THAT YOU CIRCLED |
| 11:53AM | 10 | THERE? |
| 11:53AM | 11 | A.   YES. |
| 11:53AM | 12 | Q.   AND THAT'S $168,808; CORRECT? |
| 11:54AM | 13 | A.   YES. |
| 11:54AM | 14 | MR. WADE:  NO FURTHER QUESTIONS, YOUR HONOR. |
| 11:54AM | 15 | THE COURT:  MR. LEACH? |
| 11:54AM | 16 | MR. LEACH:  NOTHING FURTHER, YOUR HONOR.  THANK YOU. |
| 11:54AM | 17 | THE COURT:  MAY THIS WITNESS BE EXCUSED? |
| 11:54AM | 18 | MR. LEACH:  YES. |
| 11:54AM | 19 | MR. WADE:  YES, YOUR HONOR. |
| 11:54AM | 20 | THE COURT:  THANK YOU. |
| 11:54AM | 21 | MS. PETERSON, YOU'RE EXCUSED. |
| 11:54AM | 22 | DOES THE UNITED STATES HAVE ANOTHER WITNESS? |
| 11:55AM | 23 | MR. SCHENK:  YES, YOUR HONOR. |
| 11:55AM | 24 | THE UNITED STATES CALLS CONSTANCE CULLEN. |
| 11:55AM | 25 | THE COURT:  GOOD MORNING.  IF YOU COULD APPROACH OUR |

| | | |
|---|---|---|
| 11:55AM | 1 | COURTROOM DEPUTY.  AND AS YOU FACE HER, IF YOU'D RAISE YOUR |
| 11:55AM | 2 | RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 11:55AM | 3 | **(GOVERNMENT'S WITNESS, CONSTANCE CULLEN, WAS SWORN.)** |
| 11:55AM | 4 | THE WITNESS:  YES. |
| 11:55AM | 5 | THE COURT:  LET ME INVITE YOU TO HAVE A SEAT UP HERE |
| 11:55AM | 6 | AND MAKE YOURSELF COMFORTABLE. |
| 11:55AM | 7 | FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. |
| 11:55AM | 8 | THERE'S SOME FRESH WATER THERE FOR YOUR CONVENIENCE IF YOU |
| 11:55AM | 9 | WISH. |
| 11:55AM | 10 | THE WITNESS:  THANK YOU. |
| 11:55AM | 11 | THE COURT:  WHEN YOU ARE COMFORTABLE, IF WOULD YOU |
| 11:55AM | 12 | PLEASE STATE YOUR NAME AND SPELL IT, PLEASE.  I'LL ENCOURAGE |
| 11:55AM | 13 | YOU TO SPEAK DIRECTLY INTO THE MICROPHONE. |
| 11:55AM | 14 | THE WITNESS:  YES.  MY NAME IS CONSTANCE CULLEN. |
| 11:55AM | 15 | C-O-N-S-T-A-N-C-E.  C-U-L-L-E-N. |
| 11:56AM | 16 | THE COURT:  THANK YOU. |
| 11:56AM | 17 | MR. SCHENK. |
| 11:56AM | 18 | MR. SCHENK:  THANK YOU, YOUR HONOR. |
| 11:56AM | 19 | **DIRECT EXAMINATION** |
| 11:56AM | 20 | BY MR. SCHENK: |
| 11:56AM | 21 | Q.   DR. CULLEN, IF YOU ARE FULLY VACCINATED AND WITH THE |
| 11:56AM | 22 | COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT A MASK ON IF YOU'RE |
| 11:56AM | 23 | COMFORTABLE. |
| 11:56AM | 24 | A.   YES. |
| 11:56AM | 25 | Q.   THANK YOU.  I WILL DO THE SAME. |

11:56AM   1          DID YOU USED TO WORK FOR A COMPANY CALLED SCHERING-PLOUGH?

11:56AM   2     A.   YES.

11:56AM   3     Q.   AND WHEN YOU WORKED THERE, DID YOU HAVE THE OPPORTUNITY TO

11:56AM   4     WORK WITH ANOTHER COMPANY CALLED THERANOS?

11:56AM   5     A.   YES.

11:56AM   6     Q.   DO YOU REMEMBER ABOUT WHAT YEAR THAT WAS?

11:56AM   7     A.   YES.  IT WAS 2009.

11:56AM   8     Q.   WOULD YOU MIND PULLING THE MICROPHONE A LITTLE BIT CLOSER

11:56AM   9     TO YOU?

11:56AM  10     A.   SURE.  IT WAS 2009.

11:56AM  11     Q.   THANK YOU.  WE'LL COME BACK TO THAT IN JUST A MOMENT.

11:56AM  12          WILL YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND, PLEASE,

11:56AM  13     FOR THE JURY?

11:56AM  14     A.   YES.  I HAVE A PH.D. IN MOLECULAR IMMUNOLOGY AND A

11:56AM  15     BACHELOR'S DEGREE IN MICROBIOLOGY.

11:56AM  16     Q.   THANK YOU.

11:56AM  17          AND WE KNOW YOU WORKED FOR SCHERING-PLOUGH.  WHEN WAS

11:56AM  18     THAT?  WHEN DID YOU WORK FOR SCHERING?

11:56AM  19     A.   I BEGAN WORKING FOR SCHERING-PLOUGH IN 1996, AND MY

11:57AM  20     SERVICE ENDED IN 2016.

11:57AM  21     Q.   FROM 1996 TO 2016?

11:57AM  22     A.   YES.

11:57AM  23     Q.   AND --

11:57AM  24     A.   I'M SORRY, I JUST WANTED TO CLARIFY.  SCHERING-PLOUGH WAS

11:57AM  25     ACQUIRED BY MERCK AT THE END OF 2009.

11:57AM  1    Q.   SO YOU'RE INCLUDING A PERIOD OF TIME WHEN YOU WERE DOING

11:57AM  2    THE SAME OR SIMILAR WORK, BUT NOW FOR A COMPANY CALLED MERCK?

11:57AM  3    A.   CORRECT.

11:57AM  4    Q.   I SEE.  MUCH OF YOUR TESTIMONY TODAY IS GOING TO FOCUS ON

11:57AM  5    THE TIMEFRAME FROM ABOUT 2009 TO 2010.

11:57AM  6         WOULD YOU TELL THE JURY WHAT YOU WERE DOING FOR

11:57AM  7    SCHERING-PLOUGH AND MERCK AT THAT TIME?

11:57AM  8    A.   YES.  I WAS THE DIRECTOR OF WHAT IS CALLED THE

11:57AM  9    BIOANALYTICAL LABORATORY.  SO MY LABORATORY WAS RESPONSIBLE FOR

11:57AM  10   DEVELOPING AND VALIDATING ASSAYS FOR MEASUREMENT OF DRUG

11:57AM  11   LEVELS, WHAT WE CALL BIOMARKERS, SO MARKERS OF DRUG EFFICACY

11:58AM  12   AND DRUG ANTIBODIES IN THE CASE OF DEVELOPMENT OF PROTEIN-BASED

11:58AM  13   THERAPEUTICS.

11:58AM  14   Q.   OKAY.  WOULD YOU MIND EXPLAINING THAT LAST PART?

11:58AM  15   PROTEIN-BASED, WHAT IS THAT?

11:58AM  16   A.   SO THERE ARE ESSENTIALLY TWO BASIC CATEGORIES OF DRUGS.

11:58AM  17   ONE IS REFERRED TO GENERALLY IN THE FIELD AS SMALL MOLECULES,

11:58AM  18   SO ASPIRIN IS THE CLASSIC EXAMPLE OF A SMALL MOLECULE DRUG.

11:58AM  19        THE OTHER CATEGORY OF DRUG IS WHAT WE CALL LARGE

11:58AM  20   MOLECULES, SO THOSE TEND TO BE PROTEIN-BASED MONOCLONAL

11:58AM  21   ANTIBODY.  A WELL-KNOWN EXAMPLE OF A PROTEIN-BASED DRUG WOULD

11:58AM  22   BE HUMIRA.

11:58AM  23   Q.   YOU ALSO DESCRIBED PART OF YOUR JOB BEING TO DETERMINE THE

11:58AM  24   EFFICACY OF DRUGS.

11:58AM  25        WHAT DOES THAT MEAN?

11:58AM 1    A.   SO ONE USES A VARIETY OF DIFFERENT MEASUREMENTS TO

11:58AM 2    DETERMINE WHETHER A DRUG IS WORKING IN THE PATIENT POPULATION

11:58AM 3    THAT IT IS BEING TESTED IN.

11:59AM 4         SOME OF THOSE TESTS ARE MEASURING THE ACTUAL DRUG LEVELS

11:59AM 5    IN PATIENT BLOOD SAMPLES OR MEASURING OTHER WELL-KNOWN

11:59AM 6    CHARACTERIZED MARKERS OF THEIR DISEASE STATE.

11:59AM 7    Q.   YOU SAID YOU BECAME FAMILIAR WITH A COMPANY CALLED

11:59AM 8    THERANOS.  WAS THAT AROUND THE 2009 TIMEFRAME?

11:59AM 9    A.   YES, IT WAS.

11:59AM 10   Q.   DO YOU REMEMBER THE CIRCUMSTANCES WHEN -- WHAT CAUSED YOU

11:59AM 11   TO BECOME FAMILIAR WITH THERANOS?

11:59AM 12   A.   SURE.  YES.  SO WITHIN SCHERING-PLOUGH MY BOSS HAD ASKED

11:59AM 13   ME TO EVALUATE THE TECHNOLOGY.  THIS WAS DONE AT THE REQUEST OF

11:59AM 14   THE HEAD OF OUR EARLY CLINICAL RESEARCH ORGANIZATION, AND THEY

11:59AM 15   WERE INTERESTED IN THIS TECHNOLOGY BECAUSE THE CLAIM WAS THAT

11:59AM 16   IT WOULD FACILITATE AND EXPEDITE TESTING OF DRUGS IN CLINICAL

11:59AM 17   TRIALS.

11:59AM 18   Q.   CAN WE FILL IN SOME NAMES.  YOU FIRST STARTED BY SAYING

12:00PM 19   YOUR BOSS.

12:00PM 20   A.   YES.

12:00PM 21   Q.   AND WHO IS THAT PERSON?

12:00PM 22   A.   HIS NAME IS STEVE FARRAND.

12:00PM 23   Q.   DO YOU MIND SPELLING THE LAST NAME FOR US, PLEASE?

12:00PM 24   A.   F-A-R-R-A-N-D.

12:00PM 25   Q.   OKAY.  AND I THINK IN YOUR DESCRIPTION YOU DESCRIBED

12:00PM  1    ANOTHER INDIVIDUAL.  WHO WAS THAT?

12:00PM  2    A.   HIS NAME WAS JIM MCLEOD, M-C-C-L-E-O-D, I THINK.

12:00PM  3    Q.   OKAY.  AND WHAT WAS MR. MCLEOD'S ROLE AGAIN IN YOU

12:00PM  4    BECOMING INVOLVED IN THERANOS?

12:00PM  5    A.   YES.  SO HE WAS THE LEADER OF WHAT WE CALLED AN EARLY

12:00PM  6    CLINICAL RESEARCH AND EXPERIMENTAL MEDICINE GROUP.

12:00PM  7         SO THAT GROUP WAS CHARGED WITH THE EARLIEST CLINICAL

12:00PM  8    STUDIES, AND TO MAKE INITIAL ASSESSMENTS OF WHETHER OR NOT THE

12:00PM  9    DRUGS WERE GOING TO BE GOOD ENOUGH TO BE PURSUED IN ADDITIONAL

12:00PM 10    CLINICAL STUDIES.

12:00PM 11    Q.   I SEE.

12:00PM 12         NOW, IF YOU WOULD EXPLAIN TO ME WHERE YOU FIT INTO THIS?

12:00PM 13    YOU DESCRIBED MR. MCLEOD'S ROLE.  HOW DID YOU GET INTO THIS

12:01PM 14    THERANOS WORK?

12:01PM 15    A.   SO, I MEAN, THE REQUEST WAS MADE, AS I MENTIONED, BY MY

12:01PM 16    BOSS AND JIM MCCLEOD.  THEY WERE INTERESTED IN EVALUATING THE

12:01PM 17    TECHNOLOGY.  BECAUSE MY LABORATORY HAD HISTORICALLY DONE

12:01PM 18    SIMILAR TYPES OF ASSAYS, THEY ASKED ME TO PARTICIPATE IN

12:01PM 19    EVALUATING THE TECHNOLOGY.

12:01PM 20    Q.   OKAY.  AND WHAT DOES "EVALUATING THE TECHNOLOGY" MEAN?

12:01PM 21    A.   SO WE ACTUALLY DID BETA TESTING.  WE HAD RECEIVED TWO

12:01PM 22    INSTRUMENTS FROM THERANOS.

12:01PM 23         IN ADDITION, I TRAVELLED WITH A GROUP OF COLLEAGUES ON A

12:01PM 24    DUE DILIGENCE VISIT TO THE THERANOS SITE.

12:01PM 25    Q.   OKAY.  AND WERE THOSE TWO SEPARATE PROJECTS, WHAT YOU

12:01PM   1    DESCRIBED AS BETA TESTING, AND THEN THE TRAVEL TO THERANOS?

12:01PM   2    A.   YES.

12:01PM   3    Q.   AND WHAT WORK WAS DONE THAT CAUSED YOU TO TRAVEL TO

12:01PM   4    THERANOS?  WHAT WAS THAT PROJECT?

12:01PM   5    A.   IT WASN'T NECESSARILY RELATED TO THE WORK.  IT WAS JUST A

12:02PM   6    PART OF EVALUATION OF ANY NEW TECHNOLOGY THAT MIGHT BE BROUGHT

12:02PM   7    INTO THE COMPANY.

12:02PM   8    Q.   I SEE.  SO THERANOS PROVIDED SOME DEVICES TO YOU; IS THAT

12:02PM   9    RIGHT?

12:02PM  10    A.   THAT'S CORRECT.

12:02PM  11    Q.   AND WHERE WERE YOU?  WHAT STATE WERE YOU IN WHEN THAT

12:02PM  12    HAPPENED?

12:02PM  13    A.   IN NEW JERSEY.

12:02PM  14    Q.   SO THERANOS PROVIDED SOME DEVICES TO YOU IN NEW JERSEY,

12:02PM  15    AND YOU ALSO HAD THE OPPORTUNITY TO TRAVEL TO CALIFORNIA; IS

12:02PM  16    THAT RIGHT?

12:02PM  17    A.   THAT'S CORRECT.

12:02PM  18    Q.   THANK YOU.

12:02PM  19         YOUR HONOR, MAY I APPROACH?

12:02PM  20             THE COURT:  YES.

12:02PM  21             MR. SCHENK:  THANK YOU (HANDING).

12:02PM  22    Q.   DR. CULLEN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

12:02PM  23    I'LL ASK YOU TO OPEN IT AND TURN TO TAB 188.

12:02PM  24         YOUR HONOR, THE GOVERNMENT OFFERS 188 PURSUANT TO A

12:02PM  25    STIPULATION OF THE PARTIES.

12:02PM 1          MR. CLINE:  NO OBJECTION.

12:02PM 2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:02PM 3          (GOVERNMENT'S EXHIBIT 188 WAS RECEIVED IN EVIDENCE.)

12:02PM 4    BY MR. SCHENK:

12:02PM 5    Q.   DR. CULLEN, THE EXHIBIT AT 188 SHOULD ALSO IN A MOMENT

12:03PM 6    APPEAR ON THE SCREEN IN FRONT OF YOU, AND WHICHEVER ONE IS

12:03PM 7    EASIER FOR YOU TO FOLLOW ALONG WITH, FEEL FREE.

12:03PM 8          IN THE EMAIL THAT WE'RE LOOKING AT, IF WE LOOK FROM THE

12:03PM 9    BOTTOM UP, IT LOOKS LIKE IT'S AN EMAIL FROM MS. HOLMES TO YOU

12:03PM 10   IN FEBRUARY OF 2009.

12:03PM 11         DO YOU SEE THAT?

12:03PM 12   A.   YES.

12:03PM 13   Q.   AND MS. HOLMES REFERENCES A CALL WITH JIM MCLEOD.

12:03PM 14         THAT'S THE INDIVIDUAL THAT YOU WERE JUST SPEAKING OF?

12:03PM 15   A.   THAT'S CORRECT.

12:03PM 16   Q.   AND SHE ASKS FOR A CONVENIENT TIME TO TALK TO YOU.

12:03PM 17         DO YOU SEE THAT?

12:03PM 18   A.   YES.

12:03PM 19   Q.   AND THEN IN THE TOP EMAIL, ANOTHER EMAIL FROM MS. HOLMES

12:03PM 20   TO YOU, NOW WE'RE AT THE BEGINNING OF MARCH OF 2009, AND

12:03PM 21   MS. HOLMES SAYS, "TAKE A LOOK AT THE ATTACHED PER OUR

12:03PM 22   CONVERSATION.

12:03PM 23         "IF WE GO DOWN THIS PATH, THERE ARE TWO SETS OF DOCUMENTS

12:03PM 24   THAT WILL COMPLEMENT THIS SUMMARY - ONE IS A DETAILED PROTOCOL

12:03PM 25   FOR RUNNING THESE EXPERIMENTS.  THE OTHER IS THE CARTRIDGE

12:03PM  1    INSERTS."

12:04PM  2         HELP ME UNDERSTAND THE REFERENCE TO A DETAILED PROTOCOL

12:04PM  3    FOR RUNNING THESE EXPERIMENTS.

12:04PM  4    A.   SO A PROTOCOL IS JUST ESSENTIALLY A WRITTEN DOCUMENT THAT

12:04PM  5    DICTATES WHAT YOU'RE GOING TO DO TO EVALUATE THE INSTRUMENT OR

12:04PM  6    THE TECHNOLOGY THAT YOU'RE TESTING.  IT GENERALLY COMES WITH A

12:04PM  7    PREDETERMINED ACCEPTANCE CRITERIA AGAINST WHICH YOU EVALUATE

12:04PM  8    THE RESULTS ONCE THEY'RE AVAILABLE.

12:04PM  9    Q.   I SEE.  AND IF YOU'LL TURN TO THE SECOND PAGE, THE

12:04PM  10   ATTACHMENT, IS THIS THE BEGINNING OF THE PROTOCOL?

12:04PM  11   A.   YES.

12:04PM  12   Q.   AND IN THE HEADING SECTION ON THE SECOND LINE THERE'S A

12:04PM  13   REFERENCE TO CRP, IL-6, AND TNF-A MULTIPLEX.

12:04PM  14        DO YOU SEE THAT?

12:04PM  15   A.   YES, I DO.

12:04PM  16   Q.   HELP ME UNDERSTAND, WHAT IS THAT A REFERENCE TO?

12:05PM  17   A.   SO CRP STANDS FOR C REACTIVE PROTEIN, IL-6 STANDS FOR

12:05PM  18   INTERLEUKIN 6, AND TNF-A STANDS FOR TUMOR NECROSIS FACTOR

12:05PM  19   ALPHA.

12:05PM  20        THOSE ARE MARKERS OF INFLAMMATION THAT PEOPLE OFTEN

12:05PM  21   MEASURE TO UNDERSTAND WHETHER OR NOT A PATIENT IS HAVING AN

12:05PM  22   INFLAMMATORY RESPONSE, AND IN OUR CASE WHETHER OR NOT A DRUG

12:05PM  23   THAT WAS DELIVERED TO A PATIENT WAS EFFICACIOUS IN REDUCING

12:05PM  24   THESE INFLAMMATORY MARKERS.

12:05PM  25   Q.   OKAY.  AND THEN THE WORK MULTIPLEX, WHAT DOES THAT MEAN?

12:05PM  1    A.   SO MULTIPLEX MEANS THAT INSTEAD OF DEVELOPING EACH OF

12:05PM  2    THOSE THREE TESTS INDIVIDUALLY, ONE COULD DEVELOP THEM

12:06PM  3    SIMULTANEOUSLY SUCH THAT A SINGLE SAMPLE WOULD BE SUFFICIENT TO

12:06PM  4    MEASURE ALL THREE.

12:06PM  5    Q.   I SEE.

12:06PM  6         A MOMENT AGO YOU TOLD ME THAT THERE WERE SORT OF TWO

12:06PM  7    PROJECTS THAT SCHERING-PLOUGH WAS DOING.  ONE WAS A BETA TEST

12:06PM  8    AND THERE WAS ANOTHER ONE.

12:06PM  9         WHICH ONE IS THIS?

12:06PM  10   A.   THIS WOULD HAVE BEEN THE VALIDATION, SO INDEPENDENT OF THE

12:06PM  11   BETA TEST.

12:06PM  12   Q.   OKAY.  SO THE BETA TEST, IS THAT THE ONE WHERE THERANOS

12:06PM  13   SENT DEVICES TO NEW JERSEY?

12:06PM  14   A.   THAT'S CORRECT.

12:06PM  15   Q.   AND THEN WHAT IS HAPPENING HERE?  WHERE ARE THE DEVICES

12:06PM  16   AND WHERE IS THE WORK BEING DONE?

12:06PM  17   A.   ON THIS PARTICULAR DOCUMENT?

12:06PM  18   Q.   YES, MA'AM.

12:06PM  19   A.   SO THIS -- THE WORK THAT WAS DONE IN SUPPORT OF THIS

12:06PM  20   PROTOCOL WAS COMPLETED AT THERANOS.

12:06PM  21   Q.   OKAY.  THESE -- ARE THEY CALLED ASSAYS THE CRH, IL-6?

12:06PM  22   A.   YES, SOMETIMES WE REFER TO THEM AS ASSAYS.

12:06PM  23   Q.   SO WHERE WOULD THESE ASSAYS THEN PHYSICALLY BE WHILE THE

12:06PM  24   WORK IS BEING DONE?

12:07PM  25   A.   THEY WOULD HAVE BEEN IN THERANOS.

1    Q.   OKAY.  AND I THINK YOU DESCRIBED MULTIPLEX AS A REFERENCE

2    TO A CARTRIDGE.

3    A.   CORRECT.  THAT WAS OUR LIMITED UNDERSTANDING OF THE

4    TECHNOLOGY WAS THAT ALL THREE OF THESE ASSAYS COULD BE

5    INCORPORATED ONTO A SINGLE CARTRIDGE.

6    Q.   AND WHERE WOULD THAT CARTRIDGE BE?

7    A.   WITHIN THE INSTRUMENT AT THERANOS.

8    Q.   OKAY.

9    A.   YES.

10   Q.   AND THEN HELP ME UNDERSTAND WHAT ROLE SCHERING-PLOUGH WAS

11   PLAYING IN THAT, NOT THE BETA TESTING, BUT IN THIS VALIDATION?

12   A.   NO ROLE OTHER THAN REVIEW OF DOCUMENTS.

13   Q.   OKAY.  IF YOU COULD NOW TURN TO THE NEXT PAGE, IT'S

14   PAGE 3.  THERE'S A PARAGRAPH UNDER ESTIMATED SCHEDULE.

15        DO YOU SEE THAT?

16   A.   YES.

17   Q.   AND IT SAYS THAT THE "STANDARD THERANOS INSTRUMENT

18   RUN-TIME WILL BE ACCELERATED.  THE TOTAL NUMBER OF CARTRIDGES

19   PROVIDED WILL BE ABOUT 2700," AND THEN IT REPEATS THESE ASSAYS;

20   IS THAT RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   "UP TO TEN ADDITIONAL INSTRUMENTS WILL BE SHIPPED.  THE

23   TOTAL EXPECTED RUNTIME IS AROUND ONE MONTH.  THE TOTAL HUMAN

24   CAPITAL COMMITMENT WILL ONLY BE FIVE DAYS OVER THE ENTIRE

25   PROGRAM DURATION AS IT ONLY TAKES UP TO TEN MINUTES TO PREPARE

12:08PM  1    AND LOAD A SAMPLE ON A SINGLE INSTRUMENT, AFTER WHICH THE

12:08PM  2    INSTRUMENTS RUN ON THEIR OWN."

12:08PM  3        SO THERE'S A REFERENCE HERE TO THE TOTAL EXPECTED RUN TIME

12:08PM  4    BEING ONE MONTH.

12:08PM  5        WHAT DOES THAT MEAN?

12:08PM  6    A.   I BELIEVE THAT THAT WOULD BE IN REFERENCE TO THE AMOUNT OF

12:08PM  7    TOTAL TIME THAT IT WOULD TAKE TO EXECUTE THE PROTOCOL.

12:08PM  8    Q.   SO THIS VALIDATION WORK THAT THERANOS WAS DOING IN

12:08PM  9    CALIFORNIA WOULD TAKE ONE MONTH?

12:08PM  10   A.   CORRECT.

12:08PM  11   Q.   AND THERE'S ALSO A REFERENCE TO CARTRIDGES AND INSTRUMENTS

12:09PM  12   IN THOSE FIRST COUPLE OF SENTENCES.

12:09PM  13       WHAT IS THAT A REFERENCE TO?

12:09PM  14   A.   SO THE CARTRIDGES WERE DISPOSABLES THAT WERE REQUIRED IN

12:09PM  15   ORDER TO RUN THE INSTRUMENT AND GET THE RESULTS.

12:09PM  16       AND THEN, I'M SORRY, COULD YOU REPEAT THE SECOND HALF OF

12:09PM  17   YOUR QUESTION?

12:09PM  18   Q.   YES.  THERE'S A REFERENCE TO UP TO TEN ADDITIONAL

12:09PM  19   INSTRUMENTS WILL BE SHIPPED.

12:09PM  20   A.   RIGHT.  SO THE INSTRUMENT IS IN REFERENCE TO THE ACTUAL

12:09PM  21   THERANOS MACHINE INTO WHICH THE CARTRIDGES ARE PLACED.

12:09PM  22   Q.   OKAY.  AND FOR THIS VALIDATION, AGAIN, WHERE WERE THE

12:09PM  23   INSTRUMENTS?

12:09PM  24   A.   THE INSTRUMENTS WERE IN THERANOS.

12:09PM  25   Q.   OKAY.  THE ASSAYS THAT WE'VE TALKED ABOUT ON THE CARTRIDGE

12:09PM   1   INTO THE DEVICE, THAT ALL HAPPENED AT THERANOS?

12:09PM   2   A.   CORRECT.

12:09PM   3   Q.   THAT DID NOT HAPPEN AT SCHERING-PLOUGH?

12:09PM   4   A.   THAT IS CORRECT.

12:09PM   5   Q.   THERE WERE, I THINK YOU TESTIFIED, TWO SEPARATE

12:09PM   6   INSTRUMENTS THAT WERE SHIPPED TO SCHERING-PLOUGH FOR DIFFERENT

12:09PM   7   WORK.

12:09PM   8   A.   THAT IS CORRECT.

12:09PM   9   Q.   OKAY.  WE'LL GET TO THAT IN A MOMENT.

12:09PM  10       IF YOU WOULD NOW TURN TO TAB 200 IN YOUR BINDER.

12:10PM  11       YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 200 PURSUANT TO

12:10PM  12   STIPULATION?

12:10PM  13           MR. CLINE:  NO OBJECTION.

12:10PM  14           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:10PM  15       (GOVERNMENT'S EXHIBIT 200 WAS RECEIVED IN EVIDENCE.)

12:10PM  16   BY MR. SCHENK:

12:10PM  17   Q.   DR. CULLEN, THIS IS A DOCUMENT LABELLED SERVICES

12:10PM  18   AGREEMENT.

12:10PM  19       DO YOU SEE THAT?

12:10PM  20   A.   YES, I DO.

12:10PM  21   Q.   AND IS THIS AN AGREEMENT BETWEEN SCHERING AND THERANOS

12:10PM  22   REGARDING THE VALIDATION THAT WE'VE TALKED ABOUT?

12:10PM  23   A.   IT IS AN AGREEMENT BETWEEN SCHERING AND THERANOS.

12:10PM  24       WHAT I'M NOT CLEAR ABOUT IS WHETHER THIS WAS DOCUMENTING

12:10PM  25   THE VALIDATION.

12:10PM 1    Q.   OKAY.  IN NUMBER 1, PROJECT, IT SAYS -- IS SPRI, IS THAT

12:10PM 2    SCHERING-PLOUGH?

12:10PM 3    A.   YES, IT STANDS FOR SCHERING-PLOUGH RESEARCH INSTITUTE,

12:10PM 4    WHICH WAS THE DIVISION WITHIN SCHERING-PLOUGH.

12:10PM 5    Q.   OKAY.  THE SERVICES INCLUDING, BUT NOT LIMITED TO,

12:10PM 6    COMPREHENSIVE VALIDATION OF THE THERANOS -- IS THAT WORD

12:11PM 7    CYTOKINE?

12:11PM 8    A.   YES, CYTOKINE.

12:11PM 9    Q.   WHAT IS THE THERANOS CYTOKINE PANEL?

12:11PM 10   A.   SO IT WOULD HAVE BEEN THE THREE ANALYTES THAT WERE

12:11PM 11   PREVIOUSLY DISCUSSED.  SO TUMOR NECROSIS FACTOR, INTERLEUKIN-6,

12:11PM 12   AND C REACTIVE PROTEIN.

12:11PM 13   Q.   OKAY.  SO DOES THAT CLARIFY FOR US WHICH TYPE OF WORK THIS

12:11PM 14   AGREEMENT APPLIED TO?

12:11PM 15   A.   YES.

12:11PM 16   Q.   OKAY.  AT THE BOTTOM, NUMBER 4, THERE'S A PAYMENT TERMS

12:11PM 17   SECTION.

12:11PM 18        DO YOU SEE THAT?

12:11PM 19   A.   YES.

12:11PM 20   Q.   AND THE PAYMENT IS $279,000?

12:11PM 21   A.   YES.

12:11PM 22   Q.   IS THAT MONEY THAT SCHERING-PLOUGH WAS PAYING TO THERANOS,

12:11PM 23   OR THE OTHER WAY AROUND?

12:11PM 24   A.   YES, SCHERING-PLOUGH WOULD HAVE PAID THAT TO THERANOS.

12:11PM 25   Q.   WHY?  WHAT WORK WAS THERANOS DOING THAT WAS BENEFICIAL OR

12:12PM   1     WORTH PAYING FOR?

12:12PM   2     A.   IT WOULD HAVE BEEN TO COVER THE COST OF THE VALIDATION FOR

12:12PM   3     THOSE THREE, THREE ANALYTES.

12:12PM   4     Q.   THE THREE ANALYTES THAT WERE RUN AT THERANOS ON THERANOS

12:12PM   5     MACHINES?

12:12PM   6     A.   CORRECT.

12:12PM   7     Q.   GOT IT.   OKAY.

12:12PM   8          IF YOU'LL TURN NOW TO PAGE 13 ON THIS DOCUMENT.   WE SEE AN

12:12PM   9     INVOICE HERE FROM THERANOS BILLING SCHERING-PLOUGH.

12:12PM  10          DO YOU SEE THAT?

12:12PM  11     A.   YES.

12:12PM  12     Q.   AND THE AMOUNT IS $279,000?

12:12PM  13     A.   THAT'S CORRECT.

12:12PM  14     Q.   AND LISTED NEXT TO IT WE SEE A REFERENCE TO THOSE

12:12PM  15     CARTRIDGES, THE ROUGHLY 2700 MULTIPLEX CARTRIDGES; IS THAT

12:12PM  16     CORRECT?

12:12PM  17     A.   CORRECT.

12:12PM  18     Q.   SO THAT IS WHAT -- IS THAT WHAT SCHERING-PLOUGH WAS PAYING

12:12PM  19     FOR?

12:12PM  20     A.   YES.

12:12PM  21     Q.   IF WE CAN NOW TURN TO TAB 201.

12:13PM  22          YOUR HONOR, THE GOVERNMENT OFFERS 201 PURSUANT TO

12:13PM  23     STIPULATION.

12:13PM  24               MR. CLINE:  NO OBJECTION.

12:13PM  25               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:13PM  1          (GOVERNMENT'S EXHIBIT 201 WAS RECEIVED IN EVIDENCE.)

12:13PM  2     BY MR. SCHENK:

12:13PM  3     Q.   AND IF WE CAN START ON THE SECOND PAGE OF THIS EXHIBIT.

12:13PM  4          DR. CULLEN, THERE'S AN EMAIL FROM MS. HOLMES TO JIM MCLEOD

12:13PM  5     AND YOU ON APRIL 15TH, 2009.

12:13PM  6          DO YOU SEE THAT?

12:13PM  7     A.   YES, I DO.

12:13PM  8     Q.   SHE WRITES, "DEAR JIM.

12:13PM  9          "IN FOLLOW UP TO OUR DISCUSSIONS WITH CONNIE" -- THAT'S

12:13PM  10    YOU?

12:13PM  11    A.   CORRECT.

12:13PM  12    Q.   -- "WE HAVE CEMENTED A COMPREHENSIVE VALIDATION PROGRAM ON

12:13PM  13    ONE OF OUR MULTIPLEXED CYTOKINE PANELS.  I HAVE ATTACHED THE

12:13PM  14    INVOICE AND PROGRAM OVERVIEW TO THIS EMAIL."

12:13PM  15         DO YOU SEE THAT?

12:13PM  16    A.   YES.

12:13PM  17    Q.   AND THEN IN THE NEXT PARAGRAPH SHE THEN WRITE, "WE DID OF

12:13PM  18    COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE IN GREAT

12:13PM  19    DETAIL.  WE WILL PRESENT THE RESULTS OF THE VALIDATION BY YOUR

12:13PM  20    VISIT IN MAY.  WE CAN THEN USE THAT VISIT TO DISCUSS THE DATA

12:13PM  21    AND THE BEST WAYS TO CREATE VALUE IN ONGOING PROGRAMS GIVEN THE

12:14PM  22    ABILITY TO COLLECT HIGHER INTEGRITY DATA, FASTER."

12:14PM  23         THERE'S A REFERENCE HERE TO A VISIT IN MAY.

12:14PM  24    A.   YES.

12:14PM  25    Q.   AND WHAT IS THAT IN REGARDS TO?

12:14PM  1    A.   SO THAT WAS THE DUE DILIGENCE VISIT.

12:14PM  2    Q.   AND WHAT DO YOU MEAN BY THAT?  WHAT DUE DILIGENCE?

12:14PM  3    A.   SO DUE DILIGENCE IS A GROUP OF INDIVIDUALS WITH VARYING

12:14PM  4    SUBJECT MATTER EXPERTISE GO TO VISIT IN PERSON A SITE FOR WHICH

12:14PM  5    WE ARE EVALUATING TECHNOLOGY OR CONSIDERING USING THE

12:14PM  6    TECHNOLOGY.

12:14PM  7    Q.   AND WERE YOU PART OF THE INDIVIDUALS THAT WENT TO

12:14PM  8    THERANOS?

12:14PM  9    A.   I WAS.

12:14PM 10    Q.   OKAY.  IF WE COULD NOW TURN TO 192, EXHIBIT 192.

12:14PM 11         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 192 PURSUANT TO

12:14PM 12    STIPULATION.

12:14PM 13              MR. CLINE:  NO OBJECTION.

12:14PM 14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:14PM 15         (GOVERNMENT'S EXHIBIT 192 WAS RECEIVED IN EVIDENCE.)

12:14PM 16    BY MR. SCHENK:

12:14PM 17    Q.   DR. CULLEN, THIS APPEARS TO BE A CALENDAR INVITE.  IT WAS

12:14PM 18    SENT AT THE END OF MARCH 2009, BUT FOR A MEETING MAY 5TH, 2009.

12:15PM 19         DO YOU SEE THAT?

12:15PM 20    A.   YES.

12:15PM 21    Q.   AND THERE'S A LIST OF PARTICIPANTS FROM SCHERING-PLOUGH.

12:15PM 22         IS YOUR NAME ONE OF THEM?

12:15PM 23    A.   YES.

12:15PM 24    Q.   AND A LITTLE BIT FURTHER DOWN, IT LOOKS LIKE THERE'S A

12:15PM 25    LIST OF REQUESTED AGENDA ITEMS FROM SCHERING-PLOUGH.

12:15PM  1        IS THAT RIGHT?

12:15PM  2   A.   CORRECT.

12:15PM  3   Q.   DO YOU MIND JUST BRIEFLY SUMMARIZING FOR THE JURY WHAT

12:15PM  4   THESE ARE?  WHAT WAS SCHERING-PLOUGH INTERESTED IN DISCUSSING

12:15PM  5   AT THIS MAY 2009 MEETING AT THERANOS?

12:15PM  6   A.   RIGHT.  SO WE WERE INTERESTED IN UNDERSTANDING HOW

12:15PM  7   THERANOS WOULD APPROACH THE VALIDATION OF THE ASSAYS, TIMING.

12:15PM  8   WE WERE ALSO INTERESTED IN THE DEVELOPMENT OF PROPRIETARY

12:15PM  9   ASSAYS THAT WOULD BE EXCLUSIVE TO SCHERING-PLOUGH AS OPPOSED TO

12:15PM  10  THE ALREADY AVAILABLE CYTOKINE PANELS THAT THERANOS HAD.

12:15PM  11       AND THEN UNDERSTANDING MORE OF THE TECHNICAL DETAILS WITH

12:15PM  12  RESPECT TO THE MULTIPLEXING, WHICH IS BEING ABLE TO MEASURE

12:16PM  13  MULTIPLE ANALYTES SIMULTANEOUSLY.

12:16PM  14       WE WERE INTERESTED IN COMPUTER SYSTEM VALIDATION BECAUSE

12:16PM  15  THAT IS A REQUIREMENT FOR PROVIDING THESE DATA FOR

12:16PM  16  CONSIDERATION BY THE FOOD AND DRUG ADMINISTRATION,

12:16PM  17  UNDERSTANDING PATIENT CONFIDENTIALITY, AND THE LAST ITEM ON THE

12:16PM  18  LIST IS WHAT IS CALLED INCURRED SAMPLE REANALYSIS.

12:16PM  19       THIS IS ALSO A REQUIREMENT OF THE FOOD AND DRUG

12:16PM  20  ADMINISTRATION TO SHOW THE REPRODUCIBILITY OF THE ASSAYS THAT

12:16PM  21  ARE VALIDATED.

12:16PM  22  Q.   THANK YOU.

12:16PM  23       IF YOU WOULD TURN TO THE NEXT PAGE, PAGE 2 OF THIS

12:16PM  24  EXHIBIT.

12:16PM  25       IS THIS AN AGENDA FROM THE MAY MEETING?

12:16PM   1    A.   YES, IT IS.

12:16PM   2    Q.   AND, AGAIN, YOU ATTENDED THIS MEETING IN PERSON?

12:16PM   3    A.   I DID.

12:16PM   4    Q.   AND DID MS. HOLMES ATTEND IN PERSON?

12:16PM   5    A.   YES, SHE DID.

12:16PM   6    Q.   WAS THAT THE FIRST TIME THAT YOU MET MS. HOLMES IN PERSON?

12:16PM   7    A.   YES.

12:16PM   8    Q.   AND WHAT DO YOU RECALL FROM THIS MEETING?  DID YOU ASK

12:17PM   9    QUESTIONS DURING THE MEETING?

12:17PM  10    A.   YES, I ASKED A LOT OF QUESTIONS.  MY RECOLLECTION IS THAT

12:17PM  11    THE ANSWERS TO THE QUESTIONS WERE NOT NECESSARILY FORTHCOMING.

12:17PM  12    SO I WAS DISSATISFIED, QUITE HONESTLY, WITH THE RESPONSE TO THE

12:17PM  13    QUESTIONS IN THAT THERE WAS INSUFFICIENT TECHNICAL DETAIL FOR

12:17PM  14    US TO BE ABLE TO EVALUATE THE TECHNOLOGY.

12:17PM  15    Q.   WHAT DO YOU MEAN WHEN YOU SAY "INSUFFICIENT DETAIL"?

12:17PM  16    A.   SO WHEN A SPONSOR, SUCH AS SCHERING-PLOUGH, USES A

12:17PM  17    TECHNOLOGY IN SUPPORT OF THEIR DRUG DEVELOPMENT EFFORTS, WHICH

12:17PM  18    EVENTUALLY GETS SUBMITTED TO THE FOOD AND DRUG ADMINISTRATION,

12:17PM  19    WE ARE EXPECTED TO BE ABLE TO UNDERSTAND AND BE SUPPORTIVE FROM

12:17PM  20    A SCIENTIFIC PERSPECTIVE OF THE TECHNOLOGY THAT WE USE TO

12:17PM  21    MEASURE THOSE ANALYTES.

12:18PM  22    Q.   WHEN YOU ASKED QUESTIONS DURING THE MEETING, DO YOU RECALL

12:18PM  23    WHETHER MS. HOLMES WAS THE ONE THAT ANSWERED OR OTHER EMPLOYEES

12:18PM  24    FROM THERANOS?

12:18PM  25    A.   ALMOST EXCLUSIVELY MS. HOLMES WAS THE ONE WHO ANSWERED THE

12:18PM 1    QUESTIONS, IRRESPECTIVE OF TO WHOM THE QUESTION WAS ADDRESSED.

12:18PM 2    Q.   WHAT DO YOU MEAN BY THAT?

12:18PM 3    A.   I MEAN THAT ON A COUPLE OF OCCASIONS I ATTEMPTED TO ASK

12:18PM 4    QUESTIONS OF OTHER THERANOS STAFF WHO WERE IN THE MEETING AND

12:18PM 5    IT -- THE RESPONSE WAS INTERRUPTED BY MS. HOLMES.

12:18PM 6    Q.   WHY DID YOU TRY TO DIRECT SOME QUESTIONS TO OTHER THERANOS

12:18PM 7    EMPLOYEES?

12:18PM 8    A.   BECAUSE THEY WERE BROUGHT INTO THE MEETING AS SUBJECT

12:18PM 9    MATTER EXPERTS, AND ALSO, QUITE HONESTLY, I WANTED TO TRY TO

12:18PM 10   GET ADDITIONAL INFORMATION WHICH, AS I MENTIONED, DID NOT SEEM

12:18PM 11   TO BE FORTHCOMING.

12:18PM 12   Q.   WHAT DO YOU MEAN WHEN YOU SAY INFORMATION WAS NOT

12:18PM 13   FORTHCOMING?

12:18PM 14   A.   I MEAN THAT THERE WERE NO DIRECT ANSWERS TO QUESTIONS, AND

12:19PM 15   THE QUESTIONS ARE FAIRLY TECHNICAL, SO THE ANSWERS SHOULD BE

12:19PM 16   FAIRLY TECHNICAL AND DIRECT.

12:19PM 17       AND SO, YOU KNOW, THERE WERE WHAT I DESCRIBE AS CAGEY

12:19PM 18   RESPONSES OR ATTEMPTS TO REDIRECT TO OTHER TOPICS OF

12:19PM 19   DISCUSSION.

12:19PM 20   Q.   NOW, I APPRECIATE THE MEETING WAS IN 2009.

12:19PM 21       DO YOU HAVE A SENSE OF THE TOPICS, THE KINDS OF QUESTIONS

12:19PM 22   THAT WERE DISCUSSED?  WE'VE TALKED ABOUT THE AGENDA ITEMS.

12:19PM 23   A.   RIGHT.

12:19PM 24   Q.   BUT WHAT MADE IT INTO THE ACTUAL MEETING?

12:19PM 25   A.   CERTAINLY WE DISCUSSED THE VALIDATION AND HOW THE SOFTWARE

12:19PM  1    REDUCES THE DATA, BECAUSE THAT WAS OF CRITICAL CONCERN TO US,

12:19PM  2    AND WE CERTAINLY DISCUSSED, OR TRIED TO DISCUSS OR GET DETAILED

12:20PM  3    INFORMATION ON HOW THE INSTRUMENT ACTUALLY WORKED FROM A

12:20PM  4    TECHNICAL PERSPECTIVE.

12:20PM  5    Q.   OKAY.  DO YOU REMEMBER WHETHER AT THE END OF THE MEETING

12:20PM  6    YOU EXPRESSED YOUR CONCERNS THAT YOU'VE JUST DESCRIBED TO US?

12:20PM  7    YOU USED THE WORD "CAGEY."  DID YOU SAY AT THE END OF THE

12:20PM  8    MEETING, I FEEL THIS WAY ABOUT THIS MEETING?  DO YOU HAVE THAT

12:20PM  9    RECOLLECTION?

12:20PM  10   A.   I DID NOT SAY IT AT THE MEETING.  I SHARED MY THOUGHTS

12:20PM  11   PRIVATELY WITH SOME OF MY COLLEAGUES.

12:20PM  12   Q.   WHY DIDN'T YOU SAY IT AT THE MEETING?

12:20PM  13   A.   UM, IT'S AWKWARD.

12:20PM  14   Q.   OKAY.  IF YOU'LL NOW TURN TO EXHIBIT 223 IN YOUR BINDER.

12:20PM  15        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 223 PURSUANT TO

12:20PM  16   STIPULATION.

12:20PM  17             MR. CLINE:  NO OBJECTION.

12:20PM  18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:20PM  19        (GOVERNMENT'S EXHIBIT 223 WAS RECEIVED IN EVIDENCE.)

12:20PM  20   BY MR. SCHENK:

12:20PM  21   Q.   DR. CULLEN, WE'VE NOW MOVED INTO JUNE OF 2009, AND IF WE

12:21PM  22   START AT THE BOTTOM, THERE'S AN EMAIL FROM YOU TO SOMEONE NAMED

12:21PM  23   GARY FRENZEL.

12:21PM  24        DO YOU SEE THAT?

12:21PM  25   A.   YES, I DO.

12:21PM 1     Q.   DID MR. FRENZEL WORKS AT THERANOS?

12:21PM 2     A.   YES, HE DID.

12:21PM 3     Q.   AND YOU WRITE -- AND THE MEETING THAT YOU JUST TALKED

12:21PM 4     ABOUT, THAT WAS IN MAY?

12:21PM 5     A.   CORRECT.

12:21PM 6     Q.   SO WE'RE INTO THE NEXT MONTH; IS THAT RIGHT?

12:21PM 7     A.   THAT IS CORRECT.

12:21PM 8     Q.   AND YOU'RE ASKING MR. FRENZEL TO CHECK IN AND GET AN ASSAY

12:21PM 9     DEVELOPMENT UPDATE FOR THE TEAM?

12:21PM 10    A.   YES.

12:21PM 11    Q.   AND WHAT IS "THE TEAM" A REFERENCE TO?

12:21PM 12    A.   SO THE TEAM WOULD HAVE BEEN MYSELF, JIM MCLEOD, WHO AS I

12:21PM 13    MENTIONED WAS THE HEAD OF OUR EARLY CLINICAL RESEARCH, AND

12:21PM 14    OTHERS WHO WOULD HAVE PARTICIPATED ON THE DUE DILIGENCE

12:21PM 15    MEETING.

12:21PM 16    Q.   I SEE.  AND WHEN YOU'RE ASKING FOR SOMETHING CALLED AN

12:21PM 17    ASSAY DEVELOPMENT UPDATE, WHAT WERE YOU LOOKING FOR?

12:21PM 18    A.   SO I WAS LOOKING ON PROGRESS AGAINST THE PROTOCOL THAT YOU

12:21PM 19    HAD MENTIONED OR SHOWN EARLIER.

12:21PM 20    Q.   I SEE.  AND A MOMENT AGO YOU SAID AT THE MEETING IN

12:22PM 21    PALO ALTO, YOU FELT THAT THERANOS WAS LESS THAN FORTHCOMING; IS

12:22PM 22    THAT FAIR?

12:22PM 23    A.   YES.

12:22PM 24    Q.   AND WHY, IF THAT WAS YOUR IMPRESSION, DID YOU WRITE A

12:22PM 25    MONTH LATER ASKING FOR MORE INFORMATION ON ASSAY DEVELOPMENT?

12:22PM  1    A.  BECAUSE SCHERING-PLOUGH HAD PAID $279,000 FOR THIS WORK.

12:22PM  2    WE HAD EXPECTED TO RECEIVE IT AT THAT MAY DUE DILIGENCE

12:22PM  3    MEETING, AND WE DID NOT.

12:22PM  4    Q.  ABOVE THIS EMAIL, MR. FRENZEL FORWARDS IT TO MS. HOLMES.

12:22PM  5        DO YOU SEE THAT, FORWARDS YOUR EMAIL TO MS. HOLMES?

12:22PM  6    A.  YES.

12:22PM  7    Q.  IF YOU'LL NOW TURN TO TAB 259.

12:22PM  8        YOUR HONOR, THE GOVERNMENT OFFERS 259 PURSUANT TO

12:22PM  9    STIPULATION.

12:22PM  10           MR. CLINE:  NO OBJECTION.

12:22PM  11           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:22PM  12       (GOVERNMENT'S EXHIBIT 259 WAS RECEIVED IN EVIDENCE.)

12:22PM  13   BY MR. SCHENK:

12:22PM  14   Q.  THE FIRST DOCUMENT IN 259 AT THE BOTTOM APPEARS TO BE AN

12:22PM  15   EMAIL FROM MR. FRENZEL TO YOU.

12:23PM  16       DO YOU SEE THAT?

12:23PM  17   A.  YES.

12:23PM  18   Q.  AND LET ME NOTE THAT THIS IS NOW IN DECEMBER.  THE EMAIL

12:23PM  19   THAT WE WERE JUST TALKING ABOUT WAS IN JUNE; IS THAT RIGHT?

12:23PM  20   A.  THAT'S RIGHT.

12:23PM  21   Q.  SO ABOUT SIX MONTHS LATER, MR. FRENZEL WRITES, "HI

12:23PM  22   CONNIE."

12:23PM  23       THE SUBJECT WAS VALIDATION REPORT?

12:23PM  24   A.  UH-HUH.

12:23PM  25   Q.  WAS THAT A YES?

12:23PM   1    A.   YES.

12:23PM   2    Q.   "HI CONNIE, I WAS ASKED TO SEND THIS REPORT ON TO YOU, AND

12:23PM   3    IF YOU CAN FORWARD TO THE PROPER PEOPLE.  AFTER YOU AND YOUR

12:23PM   4    GROUP HAVE AN OPPORTUNITY TO GO THROUGH IT, LET US KNOW IF YOU

12:23PM   5    WOULD LIKE TO ARRANGE A PHONE CONFERENCE TO DISCUSS THE

12:23PM   6    RESULTS."

12:23PM   7         DO YOU SEE THAT?

12:23PM   8    A.   I DO.

12:23PM   9    Q.   AND THEN ABOVE THIS EMAIL, MR. FRENZEL FORWARDS IT ALMOST

12:23PM  10    TWO MONTHS LATER, THE END OF JANUARY 2010, TO SOMEONE NAMED

12:23PM  11    DENNIS YAM.

12:23PM  12         DO YOU SEE THAT?

12:23PM  13    A.   YES.

12:23PM  14    Q.   LET'S GO NOW TO THE ATTACHMENT.  LET'S START ON PAGE 3.

12:23PM  15         WHAT IS THIS DOCUMENT?  WHAT ARE WE LOOKING AT?

12:23PM  16    A.   SO THIS WAS THE VALIDATION REPORT THAT THERANOS HAD

12:23PM  17    PROVIDED.

12:23PM  18    Q.   OKAY.  THE REPORT THAT YOU MENTIONED EXPECTING TO SEE IN

12:24PM  19    MAY AND WRITING ABOUT IN JUNE?

12:24PM  20    A.   CORRECT.

12:24PM  21    Q.   OKAY.  AND ON THIS PAGE, IF WE COULD ZOOM OUT, IN THE

12:24PM  22    UPPER LEFT CORNER, DO YOU SEE THERANOS'S LOGO?

12:24PM  23    A.   I DO.

12:24PM  24    Q.   IN THE UPPER RIGHT CORNER, DO YOU SEE A SCHERING-PLOUGH

12:24PM  25    LOGO?

12:24PM  1    A.   I DO NOT.

12:24PM  2    Q.   IF WE COULD NOW TURN TO PAGE 5.  THERE IS DATA ON PAGE 5.

12:24PM  3         DO YOU SEE THAT?

12:24PM  4    A.   YES.

12:24PM  5    Q.   AND IS THIS SCHERING-PLOUGH DATA?

12:24PM  6    A.   NO.

12:24PM  7    Q.   WHO GENERATED THIS DATA?

12:24PM  8    A.   THERANOS.

12:24PM  9    Q.   ON PAGE 19, IF YOU'LL TURN TO PAGE 19, THERE'S A SECTION

12:24PM  10   ENTITLED CONCLUSIONS.

12:24PM  11        DO YOU SEE THAT?

12:24PM  12   A.   I DO.

12:24PM  13   Q.   AND WHOSE CONCLUSIONS ARE THESE?

12:24PM  14   A.   THOSE WOULD HAVE BEEN THERANOS'S CONCLUSIONS SINCE THEY

12:24PM  15   WROTE THE REPORT.

12:24PM  16   Q.   DID -- LET ME FOCUS YOUR ATTENTION ON THE VERY FIRST

12:24PM  17   SENTENCE OF THE CONCLUSIONS.  IT READS, "THE THERANOS'S IL-6,

12:25PM  18   TNF-A, AND CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE ACCURATE

12:25PM  19   AND PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED

12:25PM  20   CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED."

12:25PM  21        IS THAT A CONCLUSION THAT YOU REACHED?

12:25PM  22   A.   NO.

12:25PM  23   Q.   TO YOUR KNOWLEDGE, IS THAT A CONCLUSION THAT ANYBODY AT

12:25PM  24   SCHERING-PLOUGH REACHED?

12:25PM  25   A.   NO.

12:25PM   1    Q.  WHEN YOU RECEIVED THIS DOCUMENT, YOU SAW THAT THE FIRST

12:25PM   2    PAGE OF THIS EXHIBIT WAS MR. FRENZEL SENDING THIS TO YOU IN

12:25PM   3    DECEMBER, DID YOU WRITE HIM BACK AND SAY, I AGREE WITH THESE

12:25PM   4    CONCLUSIONS?

12:25PM   5    A.  NO.

12:25PM   6    Q.  WAS THERE EVER AN OCCASION WHEN YOU SAID THESE CONCLUSIONS

12:25PM   7    ARE ACCURATE?

12:25PM   8    A.  NO.

12:25PM   9    Q.  TO YOUR KNOWLEDGE, WAS THERE EVER AN OCCASION WHEN ANYBODY

12:25PM  10    AT SCHERING-PLOUGH SAID THIS DOCUMENT OR THESE CONCLUSIONS ARE

12:25PM  11    ACCURATE?

12:25PM  12    A.  NO.

12:25PM  13    Q.  WOULD YOU NOW TURN TO PAGE 262?  I'M SORRY, EXHIBIT 262.

12:26PM  14        YOUR HONOR, THE GOVERNMENT OFFERS 262 TO PURSUANT TO

12:26PM  15    STIPULATION.

12:26PM  16              MR. CLINE:  NO OBJECTION.

12:26PM  17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:26PM  18        (GOVERNMENT'S EXHIBIT 262 WAS RECEIVED IN EVIDENCE.)

12:26PM  19    BY MR. SCHENK:

12:26PM  20    Q.  YOU'LL SEE THIS IS A CONTINUATION OF A PRIOR EMAIL CHAIN.

12:26PM  21    IF YOU START ON THE PAGE 2, THERE IS THAT EMAIL FROM

12:26PM  22    MR. FRENZEL TO YOU IN DECEMBER WITH A VALIDATION REPORT.

12:26PM  23        DO YOU SEE THAT?

12:26PM  24    A.  YES.

12:26PM  25    Q.  AND NOW IF WE COME BACK TO THE FIRST PAGE OF THIS EXHIBIT

12:26PM  1    AT THE BOTTOM, A FEW DAYS LATER, ON THE 9TH OF DECEMBER,

12:26PM  2    MR. FRENZEL FOLLOWS UP.

12:26PM  3        "HI CONNIE, I JUST WANTED TO MAKE SURE THAT YOU RECEIVED

12:26PM  4    THIS REPORT.  WE ARE LOOKING FORWARD TO DISCUSSING IT WITH

12:26PM  5    YOU."

12:26PM  6        AND THEN YOU RESPOND ON THAT SAME DAY, "I'M SORRY FOR THE

12:27PM  7    SLOW RESPONSE.  I DID RECEIVE THE REPORT, I'D ACTUALLY LIKE TO

12:27PM  8    DEFER OUR DISCUSSIONS UNTIL JANUARY.  WE ARE TOTALLY SWAMPED

12:27PM  9    WITH THE MERGER WITH MERCK."

12:27PM  10       IS MERCK THE MERGER THAT YOU REFERENCED AT THE BEGINNING

12:27PM  11   OF YOUR TESTIMONY?

12:27PM  12   A.   THAT'S CORRECT.

12:27PM  13   Q.   AND DO YOU RECALL HAVING THIS CONVERSATION?  YOU

12:27PM  14   REFERENCED DEFERRING A DISCUSSION UNTIL JANUARY.

12:27PM  15       DO YOU RECALL IN JANUARY HAVING THAT CONVERSATION WITH

12:27PM  16   MR. FRENZEL?

12:27PM  17   A.   NO.

12:27PM  18   Q.   DO YOU RECALL, AT ANY POINT AFTER DECEMBER OF 2009, HAVING

12:27PM  19   FURTHER CONVERSATIONS WITH THERANOS WHERE YOU SAID ANYTHING

12:27PM  20   POSITIVE ABOUT THAT VALIDATION REPORT?

12:27PM  21   A.   NO.

12:27PM  22   Q.   WOULD YOU NOW TURN TO EXHIBIT 291.

12:27PM  23       YOUR HONOR, 291 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION

12:27PM  24   TO PUBLISH?

12:27PM  25            THE COURT:  YES.

```
12:27PM   1              MR. SCHENK:  THANK YOU.

12:27PM   2       Q.   DR. CULLEN, I'M SHOWING YOU THIS EMAIL.  YOU'RE NOT ON IT.

12:27PM   3            AT THE TOP, IT'S TO EMPLOYEES AT WALGREENS, PEOPLE AT

12:28PM   4   WALGREENS.COM EMAIL ADDRESSES.

12:28PM   5            DO YOU SEE THAT?

12:28PM   6       A.   I DO.

12:28PM   7       Q.   THIS EMAIL WAS SENT IN APRIL OF 2010.

12:28PM   8            AND DO YOU SEE THE THIRD ATTACHMENT?

12:28PM   9       A.   THIRD ATTACHMENT?  NO.  I'M SORRY.

12:28PM  10       Q.   UNDER THE SUBJECT?

12:28PM  11       A.   OH.  OH, YES, I DO.

12:28PM  12       Q.   THE THIRD ATTACHMENT READS THERANOS MULTIPLEXED PANEL

12:28PM  13   VALIDATION REPORT UNDERSCORE SCHERING-PLOUGH.

12:28PM  14            DO YOU SEE THAT?

12:28PM  15       A.   I DO.

12:28PM  16       Q.   AND THEN MS. HOLMES WRITES DEAR -- I'M SORRY.  SHE WRITES,

12:28PM  17   "DR. JAY, ALEX.

12:28PM  18            "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

12:28PM  19   DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

12:28PM  20   THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

12:28PM  21   SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

12:28PM  22   EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD."

12:28PM  23            DID I READ THAT RIGHT?

12:29PM  24       A.   THAT'S CORRECT.

12:29PM  25       Q.   THE VALIDATION REPORT THAT YOU AND I HAVE SPOKEN ABOUT,
```

12:29PM  1    WOULD YOU CALL THAT SCHERING-PLOUGH'S OWN TECHNICAL VALIDATION?

12:29PM  2    A.  NO.

12:29PM  3    Q.  WE ALSO HAVE TALKED ABOUT SOME BETA TESTING.  WOULD YOU

12:29PM  4    DESCRIBE FOR THE JURY WHAT THAT WAS?

12:29PM  5    A.  YES.  BETA TESTING WAS WE HAD TWO INSTRUMENTS IN THE

12:29PM  6    LABORATORY AND WE HAD A VOLUNTEER FROM THE LAB PROVIDE A BLOOD

12:29PM  7    SAMPLE AND WE MEASURED C REACTIVE PROTEIN.

12:29PM  8        TO MY RECOLLECTION IT WAS A SINGLE DETERMINATION.

12:29PM  9    Q.  WHAT DOES THAT MEAN, A SINGLE DETERMINATION?

12:29PM 10    A.  IT MEANS WE TESTED ONE SAMPLE ONCE.

12:29PM 11    Q.  THE PHRASE IN THIS EMAIL THAT I HIGHLIGHTED FOR YOU,

12:29PM 12    SCHERING-PLOUGH'S OWN TECHNICAL VALIDATION, YOU SAID THAT WOULD

12:29PM 13    NOT BE ACCURATE FOR THE REPORT, THE VALIDATION REPORT?

12:29PM 14    A.  THAT IS CORRECT.

12:29PM 15    Q.  WOULD THAT BE ACCURATE FOR THE BETA TESTING?

12:30PM 16    A.  NO, IT WOULD NOT.

12:30PM 17    Q.  WHY?

12:30PM 18    A.  TOO FEW SAMPLES, NO PROTOCOL WITH PREDEFINED ACCEPTANCE

12:30PM 19    CRITERIA.

12:30PM 20    Q.  IF YOU'LL TURN TO IN EXHIBIT 291, PAGE 34 OF THE EXHIBIT.

12:30PM 21        DO YOU SEE A COPY OF THE THERANOS MULTIPLEXED VALIDATION

12:30PM 22    AND A REFERENCE AGAIN TO IL-6, TNF-ALPHA, AND CRP?

12:30PM 23    A.  I DO.

12:30PM 24    Q.  AND AGAIN, IS THIS THE VALIDATION REPORT THAT YOU HAVE

12:30PM 25    TESTIFIED ABOUT PREVIOUSLY FROM TODAY?

12:30PM   1       A.   YES.

12:30PM   2       Q.   AND IN THE UPPER LEFT-HAND CORNER, WHAT DO YOU SEE?

12:30PM   3       A.   I SEE THE SCHERING-PLOUGH LOGO.

12:30PM   4       Q.   OKAY.

12:30PM   5            IF I COULD, MS. HOLLIMAN, IF IT'S POSSIBLE IF WE COULD

12:30PM   6       BRING UP 259, PAGE 3, AND EXHIBIT 291, PAGE 34 AT THE SAME

12:31PM   7       TIME.

12:31PM   8            THE DOCUMENT ON THE LEFT, DR. CULLEN, IS 259, PAGE 3.

12:31PM   9            IS THAT THE VERSION THAT WAS EMAILED TO YOU BY

12:31PM  10       MR. FRENZEL?

12:31PM  11       A.   YES.

12:31PM  12       Q.   AND WHAT I'M SHOWING ON THE RIGHT, IS THAT A VERSION THAT

12:31PM  13       WAS SENT AT LEAST IN THE EMAIL TO WALGREENS?

12:31PM  14       A.   I DON'T KNOW WHAT DOCUMENT WOULD HAVE BEEN SENT TO

12:31PM  15       WALGREENS.

12:31PM  16       Q.   IN EXHIBIT 291 THAT I'VE SHOWED YOU, THOUGH, IS THAT --

12:31PM  17       A.   YES, YES.

12:31PM  18       Q.   -- IT IS THAT SAME DOCUMENT; IS THAT RIGHT?

12:31PM  19       A.   YES.

12:31PM  20       Q.   AND MS. HOLLIMAN, IF WE COULD ALSO BRING UP 259, PAGE 19,

12:31PM  21       AND 291, PAGE 51.

12:31PM  22            DR. CULLEN, A MOMENT AGO I READ FOR YOU THE CONCLUSION

12:31PM  23       SECTION IN THE VALIDATION REPORT THAT WAS SENT TO

12:32PM  24       SCHERING-PLOUGH.

12:32PM  25            DO YOU RECALL THAT?

12:32PM  1    A.   YES.

12:32PM  2    Q.   AND THAT'S APPEARING NOW AT THE TOP OF THE SCREEN, THAT

12:32PM  3    THE THERANOS MULTIPLEXED ASSAYS WERE SHOWN TO GIVE ACCURATE AND

12:32PM  4    PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE

12:32PM  5    LOTS.

12:32PM  6         DO YOU SEE THAT?

12:32PM  7    A.   YES.

12:32PM  8    Q.   AND I THINK YOU TOLD US THAT WAS NOT A SCHERING-PLOUGH

12:32PM  9    CONCLUSION; IS THAT RIGHT?

12:32PM  10   A.   THAT IS CORRECT.

12:32PM  11   Q.   AND IN EXHIBIT 291, THE VERSION THAT WAS ATTACHED TO THE

12:32PM  12   WALGREENS EMAIL, THE FIRST SENTENCE OF THE CONCLUSIONS NOW

12:32PM  13   READS, "THE THERANOS IL-6, TNF-ALPHA, CRP ASSAYS MULTIPLEX HAS

12:32PM  14   BEEN SHOWN TO GIVE MORE ACCURATE AND PRECISE RESULTS FOR THREE

12:32PM  15   INDEPENDENTLY CALIBRATED CARTRIDGE LOTS AND ALL OF THE MANY

12:32PM  16   INSTRUMENTS USED THAN CURRENT 'GOLD STANDARD' REFERENCE

12:32PM  17   METHODS."

12:32PM  18        DID I READ THAT RIGHT?

12:32PM  19   A.   YES.

12:32PM  20   Q.   IT MAY GO WITHOUT SAYING, BUT YOU DID NOT APPROVE THE

12:32PM  21   VERSION ON TOP, THE ONE THAT WAS SENT TO YOU; IS THAT CORRECT?

12:33PM  22   A.   THAT'S CORRECT.

12:33PM  23   Q.   AND THE ENHANCED CONCLUSION, IS THAT SOMETHING THAT YOU

12:33PM  24   WOULD AGREE WITH?

12:33PM  25   A.   NO.

12:33PM  1    Q.   IS THAT SOMETHING THAT, TO YOUR KNOWLEDGE, ANYBODY FROM

12:33PM  2    SCHERING-PLOUGH AGREED WITH?

12:33PM  3    A.   NO.

12:33PM  4              MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

12:33PM  5              THE COURT:  YES.

12:33PM  6         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:33PM  7              MR. SCHENK:  THANK YOU.  NO FURTHER QUESTIONS.

12:33PM  8              THE COURT:  MR. CLINE, DO YOU HAVE

12:33PM  9    CROSS-EXAMINATION?

12:33PM  10             MR. CLINE:  I DO.

12:33PM  11                      **CROSS-EXAMINATION**

12:33PM  12   BY MR. CLINE:

12:33PM  13   Q.   DR. CULLEN, GOOD AFTERNOON.

12:34PM  14   A.   GOOD AFTERNOON.

12:34PM  15   Q.   MY NAME IS JOHN CLINE AND I'M ONE OF THE LAWYERS FOR

12:34PM  16   MS. HOLMES.

12:34PM  17        LET ME START BY TAKING CARE A LITTLE BIT OF ADMINISTRATIVE

12:34PM  18   STUFF HERE.

12:34PM  19             YOUR HONOR, MAY I APPROACH THE WITNESS?

12:34PM  20             THE COURT:  YES.

12:34PM  21   BY MR. CLINE:

12:34PM  22   Q.   DR. CULLEN, I'M GOING TO HAND YOU ANOTHER BINDER --

12:34PM  23   A.   OKAY.

12:34PM  24   Q.   -- WHICH HAS SOME OTHER EXHIBITS IN IT THAT I WILL BE

12:34PM  25   REFERRING YOU TO AS WE GO ALONG (HANDING.)

12:34PM  1          DR. CULLEN, LET ME START WITH THAT BETA TESTING THAT

12:34PM  2     MR. SCHENK MENTIONED TO YOU.  THAT'S WHERE YOU GOT THE ACTUAL

12:34PM  3     PHYSICAL MACHINES FROM THERANOS?

12:34PM  4     A.   CORRECT.

12:34PM  5     Q.   AND HOW MANY DID YOU GET?  YOU GOT TWO?

12:34PM  6     A.   MY RECOLLECTION IS THAT WE GOT TWO.

12:34PM  7     Q.   ALL RIGHT.  AND YOU RAN ONE ASSAY, ONE SAMPLE?

12:35PM  8     A.   CORRECT.

12:35PM  9     Q.   WAS IT ON ONE MACHINE?  TWO MACHINES?

12:35PM 10     A.   I DON'T RECALL IF IT WAS ON ONE OR TWO MACHINES.

12:35PM 11     Q.   ALL RIGHT.  AND THE -- YOU AND YOUR TEAM THOUGHT THAT THE

12:35PM 12     DEVICE WORKED WELL; CORRECT?

12:35PM 13     A.   YES.

12:35PM 14     Q.   AND YOU THOUGHT IT APPEARED TO PROVIDE ACCURATE RESULTS;

12:35PM 15     RIGHT?

12:35PM 16     A.   AS FAR AS WE COULD TELL.

12:35PM 17     Q.   THAT WAS YOUR THOUGHT AT THE TIME, THOUGH, THAT IT

12:35PM 18     APPEARED TO PROVIDE ACCURATE RESULTS?

12:35PM 19     A.   AS FAR AS WE COULD TELL.

12:35PM 20     Q.   YES.  AND YOU WERE -- YOU AND YOUR TEAM WERE IMPRESSED

12:35PM 21     WITH ITS SENSITIVITY; CORRECT?

12:35PM 22     A.   WE WERE IMPRESSED WITH THE SENSITIVITY.

12:35PM 23     Q.   ALL RIGHT.  SO LET ME NOW TURN TO THE SECOND PART OF WHAT

12:35PM 24     YOU TESTIFIED ABOUT, WHICH IS THE, THE VALIDATION PART.

12:35PM 25          OKAY?

12:35PM  1    A.   OKAY.

12:35PM  2    Q.   IF YOU COULD GO TO EXHIBIT 10570 IN THE BINDER THAT I'VE

12:35PM  3    JUST HANDED YOU.

12:36PM  4         DO YOU SEE THAT?  DID YOU FIND THAT, DR. CULLEN?

12:36PM  5    A.   I DID.

12:36PM  6    Q.   ALL RIGHT.  AND THAT IS AN EMAIL FROM YOU -- I'M SORRY,

12:36PM  7    FROM MS. HOLMES TO YOU, WITH VARIOUS PEOPLE COPIED; RIGHT?

12:36PM  8    A.   CORRECT.

12:36PM  9         MR. CLINE:  YOUR HONOR, I THINK WE'VE AGREED THAT

12:36PM  10   THIS IS ADMISSIBLE, SO I'LL OFFER 10570.

12:36PM  11        MR. SCHENK:  THAT'S CORRECT.

12:36PM  12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:36PM  13   (DEFENDANT'S EXHIBIT 10570 WAS RECEIVED IN EVIDENCE.)

12:36PM  14        MR. CLINE:  ALL RIGHT.  IF WE CAN PUT THAT UP,

12:36PM  15   PLEASE.  THAT'S FINE.

12:36PM  16   Q.   NOW, THE SUBJECT LINE ON THIS IS FOLLOW UP TO OUR CALL.

12:36PM  17        DO YOU SEE THAT?

12:36PM  18   A.   YES.

12:36PM  19   Q.   AND THE DATE OF THIS IS NOVEMBER THE 12TH, 2008.

12:36PM  20   A.   CORRECT.

12:36PM  21   Q.   DOES THIS HELP YOU RECALL THAT YOUR INITIAL COMMUNICATION

12:36PM  22   WITH MS. HOLMES WAS IN LATE 2008?

12:37PM  23   A.   I MEAN, I CAN'T DISAGREE WITH THE EMAIL, BUT I DON'T

12:37PM  24   RECALL THAT.

12:37PM  25   Q.   ALL RIGHT.  I RECOGNIZE THAT THIS WAS A LONG TIME AGO.

12:37PM  1    A.   RIGHT.

12:37PM  2    Q.   I'M JUST ASKING YOU TO GIVE YOUR BEST --

12:37PM  3    A.   SURE.

12:37PM  4    Q.   -- ESTIMATE.  LET'S PUT IT THAT WAY.

12:37PM  5         AND THE SUBJECT IS FOLLOW UP TO OUR CALL.

12:37PM  6         MS. HOLMES SAYS, "CONNIE.

12:37PM  7         "GREAT TO CONNECT."

12:37PM  8         SUGGESTING THAT THE TWO OF YOU HAVE HAD SOME SORT OF A

12:37PM  9    PHONE CALL; RIGHT?

12:37PM  10   A.   CORRECT.

12:37PM  11   Q.   AND THEN SHE SAYS, "WE HAVE ATTACHED SEVERAL REPORTS FROM

12:37PM  12   PROGRAMS WE HAVE DONE WITH OTHER PHARMACEUTICAL COMPANIES."

12:37PM  13        DO YOU SEE THAT?

12:37PM  14   A.   YES.

12:37PM  15   Q.   AND THEN I'M NOT GOING TO ASK YOU TO GO THROUGH ALL OF THE

12:37PM  16   ATTACHMENTS, BUT THERE'S AN ATTACHMENT FROM, FOR EXAMPLE,

12:37PM  17   SOMETHING FROM NOVARTIS, THERE'S AN ATTACHMENT WITH SOMETHING

12:37PM  18   FROM GSK.

12:37PM  19        DO YOU SEE THAT?

12:37PM  20   A.   YES.

12:37PM  21   Q.   AND YOU RECOGNIZE NOVARTIS AND GSK AS MAJOR PHARMACEUTICAL

12:37PM  22   COMPANIES; CORRECT?

12:37PM  23   A.   I DO.

12:37PM  24   Q.   AND DO YOU RECALL, SITTING HERE TODAY, IF YOU LOOKED

12:37PM  25   THROUGH THESE REPORTS WHEN MS. HOLMES SENT THEM TO YOU?

12:38PM  1   A.   I BELIEVE THAT I DID.

12:38PM  2   Q.   OKAY.  NOW, LET'S GO TO 10571.

12:38PM  3        AGAIN, YOUR HONOR, THIS IS ONE THAT WE AGREE CAN BE

12:38PM  4   ADMITTED.

12:38PM  5            MR. SCHENK:  CORRECT.

12:38PM  6            MR. CLINE:  SO I'LL OFFER 10571.

12:38PM  7            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:38PM  8        (DEFENDANT'S EXHIBIT 10571 WAS RECEIVED IN EVIDENCE.)

12:38PM  9   BY MR. CLINE:

12:38PM 10   Q.   NOW, DR. CULLEN, IF YOU LOOK DOWN AT THE VERY BOTTOM OF

12:38PM 11   THIS EXHIBIT, YOU'LL SEE THAT THAT'S THE NOVEMBER 12TH, 2008

12:38PM 12   EMAIL THAT WE WERE TALKING ABOUT.

12:38PM 13        DO YOU SEE THAT?

12:38PM 14   A.   YES.

12:38PM 15   Q.   AND THEN MOVING UP THE PAGE AND FORWARD IN TIME, THERE'S

12:38PM 16   AN EMAIL FROM YOU TO MS. HOLMES.

12:38PM 17        DO YOU SEE THAT?

12:38PM 18   A.   CORRECT, YES, I DO.

12:38PM 19   Q.   DECEMBER 10TH, 2008.

12:38PM 20        AND IT'S COPIED A MS. CAROLYN BALKENHOL.

12:39PM 21        DO YOU SEE THAT?

12:39PM 22   A.   YES.

12:39PM 23   Q.   AND MR. FRENZEL.

12:39PM 24        DO YOU SEE THAT?

12:39PM 25   A.   YES.

12:39PM 1    Q.   AND DO YOU RECALL THAT THEY WERE BOTH THERANOS EMPLOYEES

12:39PM 2    WHO WERE PART OF THE EFFORT TO INTERACT WITH SCHERING-PLOUGH?

12:39PM 3    A.   I REMEMBER GARY FRENZEL.  I DO NOT REMEMBER

12:39PM 4    CAROLYN BALKENHOL.

12:39PM 5    Q.   AND IN THAT EMAIL FROM YOU TO ELIZABETH HOLMES, YOU SAY,

12:39PM 6    "ELIZABETH.

12:39PM 7         "I WAS WONDERING IF YOU COULD PROVIDE YOUR VALIDATION

12:39PM 8    REPORTS ON ANY OF THESE ASSAYS?"

12:39PM 9         AND THAT REFERS TO THE REPORTS THAT WE WERE JUST TALKING

12:39PM 10   ABOUT; CORRECT?

12:39PM 11   A.   CORRECT.

12:39PM 12   Q.   AND GSK AND NOVARTIS?

12:39PM 13   A.   (NODS HEAD UP AND DOWN.)

12:39PM 14   Q.   I'M SORRY.  I NEED AN AUDIBLE ANSWER.

12:39PM 15   A.   THAT'S CORRECT.

12:39PM 16   Q.   AND YOU SAY, "THE REPORTS THAT YOU PROVIDED SHOWED

12:39PM 17   CORRELATIONS BETWEEN YOUR ASSAYS AND CORRESPONDING COMMERCIAL

12:39PM 18   ASSAYS WHICH IS IMPORTANT, BUT I WAS MORE INTERESTED IN THE

12:39PM 19   VALIDATION REPORTS FOR YOUR ASSAYS."

12:39PM 20        DO YOU SEE THAT?

12:39PM 21   A.   YES, I DO.

12:39PM 22   Q.   AND THEN THE TOP EMAIL DATED DECEMBER 13TH, 2008 IS FROM

12:40PM 23   MS. BALKENHOL TO YOU, COPYING MR. FRENZEL AND MS. HOLMES.

12:40PM 24        DO YOU SEE THAT?

12:40PM 25   A.   YES, I DO.

| | | |
|---|---|---|
| 12:40PM | 1 | Q. AND MS. BALKENHOL ATTACHES A TOTAL OF FOUR VALIDATION |
| 12:40PM | 2 | SUMMARY REPORTS; CORRECT? |
| 12:40PM | 3 | A. CORRECT. |
| 12:40PM | 4 | Q. AND YOU HAD ASKED FOR TWO OF THEM, AND I GUESS |
| 12:40PM | 5 | MS. BALKENHOL OR SOMEBODY AT THERANOS DECIDED TO PUT IN TWO |
| 12:40PM | 6 | MORE; RIGHT? |
| 12:40PM | 7 | A. CORRECT. |
| 12:40PM | 8 | Q. YES. |
| 12:40PM | 9 | AND DID YOU, DR. CULLEN, REVIEW THESE SUMMARY REPORTS WHEN |
| 12:40PM | 10 | YOU HAD SEEN THEM? |
| 12:40PM | 11 | A. I PROBABLY REVIEWED THE INFLAMMATORY ONES. I CAN'T SAY |
| 12:40PM | 12 | FOR SURE WHETHER I REVIEWED THE OTHER TWO REPORTS. |
| 12:40PM | 13 | Q. SO THE INFLAMMATORY ONE IS WHICH ONE? |
| 12:40PM | 14 | A. SORRY. INTERLEUKIN-6 AND TUMOR NECROSIS FACTOR ALPHA. |
| 12:40PM | 15 | Q. SO THE IL-6 AND TNF-ALPHA? |
| 12:41PM | 16 | A. CORRECT. |
| 12:41PM | 17 | Q. SO LET'S GO FORWARD NOW TO EXHIBIT 7079, OR ACTUALLY |
| 12:41PM | 18 | YOU'RE PROBABLY GOING BACKWARDS, 7079. FORWARD IN TIME, |
| 12:41PM | 19 | BACKWARDS IN THE BOOK. |
| 12:41PM | 20 | ARE YOU WITH ME? |
| 12:41PM | 21 | A. YES. |
| 12:41PM | 22 | MR. CLINE: YOUR HONOR, I THINK 7079 WE'VE AGREED |
| 12:41PM | 23 | CAN BE ADMITTED, SO I'LL OFFER IT. |
| 12:41PM | 24 | MR. SCHENK: YES. |
| 12:41PM | 25 | THE COURT: IT'S ADMITTED. IT MAY BE PUBLISHED. |

12:41PM  1          (DEFENDANT'S EXHIBIT 7079 WAS RECEIVED IN EVIDENCE.)

12:41PM  2     BY MR. CLINE:

12:41PM  3     Q.   NOW, DR. CULLEN, THIS IS AN EMAIL FROM MS. HOLMES TO

12:41PM  4     MR. MCLEOD AND YOU; RIGHT?

12:41PM  5     A.   THAT'S CORRECT.

12:41PM  6     Q.   WAS MR. MCLEOD, WAS HE YOUR BOSS AT THE TIME?  A

12:42PM  7     COLLEAGUE?  WHERE DID YOU --

12:42PM  8     A.   NO.  HE WAS MY BOSS'S COLLEAGUE, I GUESS.

12:42PM  9     Q.   ALL RIGHT.

12:42PM 10     A.   SO HE WAS LEADING THE EARLY CLINICAL MEDICINE GROUP.

12:42PM 11     Q.   OKAY.  SO IN THE NO DOUBT COMPLICATED CORPORATE STRUCTURE

12:42PM 12     OF SCHERING-PLOUGH, HE WAS ABOVE YOU, BUT SORT OF TO THE SIDE?

12:42PM 13     A.   CORRECT.

12:42PM 14     Q.   SO, MS. HOLMES SAYS, "DEAR JIM.

12:42PM 15          "IN FOLLOW UP TO OUR DISCUSSIONS WITH CONNIE" -- AND

12:42PM 16     CONNIE IS YOU; RIGHT?

12:42PM 17     A.   THAT'S CORRECT.

12:42PM 18     Q.   -- "WE HAVE CEMENTED A COMPREHENSIVE VALIDATION PROGRAM ON

12:42PM 19     ONE OF OUR MULTIPLEXED CYTOKINE" -- AM I PRONOUNCING THAT

12:42PM 20     RIGHT?

12:42PM 21     A.   CYTOKINE.

12:42PM 22     Q.   -- "CYTOKINE PANELS.  I HAVE ATTACHED THE INVOICE AND

12:42PM 23     PROGRAM OVERVIEW TO THIS EMAIL."

12:42PM 24          AND IN THE NEXT PARAGRAPH MS. HOLMES SAYS, "WE DID OF

12:43PM 25     COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE IN GREAT

1    DETAIL."

2         AND THAT WAS TRUE; RIGHT?

3    A.   I DON'T KNOW HOW TRUE IT WAS.  THEY PROVIDED A VALIDATION

4    PROTOCOL WHICH WAS SHOWN EARLIER.  IT'S NOT -- I MEAN, IT HIT

5    THE REQUIREMENTS.

6         BUT AT THE END OF THE DAY, THE EXECUTION WOULD NOT HAVE

7    BEEN IN ALIGNMENT WITH FDA OR HEALTH AUTHORITY REQUIREMENTS FOR

8    VALIDATION.

9    Q.   WELL, LET ME ASK YOU THIS:  YOU AND MS. HOLMES, OR YOU AND

10   OTHERS AT THERANOS HAD DISCUSSED THIS VALIDATION PROTOCOL

11   BEFORE IT WAS SENT TO MR. MCLEOD; RIGHT?

12   A.   I DON'T KNOW WHETHER OR NOT WE DISCUSSED IT PRIOR TO IT

13   BEING SENT TO MCLEOD.

14        WE WOULD HAVE DISCUSSED IT AS PEERS PRIOR TO THIS EMAIL IF

15   THAT'S WHAT YOU'RE ASKING.

16   Q.   THAT'S WHAT I'M ASKING.

17   A.   OKAY.

18   Q.   YOU AND EITHER MS. HOLMES OR SOMEONE ELSE AT THERANOS HAD

19   DISCUSSED THIS VALIDATION PROTOCOL BEFORE IT WAS SENT TO --

20   BEFORE THIS EMAIL; RIGHT?

21   A.   CORRECT.

22   Q.   OKAY.  SO LET'S -- AND I TAKE IT THAT AT LEAST IN ANY SORT

23   OF EMAIL FORM OR IN ANY SORT OF COMMUNICATION WITH MS. HOLMES,

24   YOU DID NOT, UPON RECEIVING THIS EMAIL, SAY, THAT'S AN

25   INADEQUATE VALIDATION PROTOCOL; RIGHT?

12:44PM  1    A.   THAT'S CORRECT, WITH RESPECT TO THE PROTOCOL.

12:44PM  2    Q.   ALL RIGHT.  SO LET'S MOVE FORWARD THROUGH THIS A LITTLE

12:44PM  3    BIT.

12:44PM  4         IF YOU CAN FLIP TO THE NEXT PAGE.  ARE YOU WITH ME?

12:44PM  5    A.   YES.

12:44PM  6    Q.   AND THAT'S THE -- AT LEAST A SORT OF DRAFT OF THE INVOICE

12:44PM  7    THAT WE LOOKED AT BEFORE; RIGHT?

12:44PM  8    A.   CORRECT.

12:44PM  9    Q.   AND IF YOU GO OVER TO THE SECOND PAGE OF THE INVOICE, THE

12:44PM  10   THIRD PAGE OF THE EXHIBIT --

12:45PM  11        CAN WE BLOW UP THE VERY TOP, PLEASE?  THAT'S FINE.

12:45PM  12        THE INVOICE SAYS, "KEY PROJECT OBJECTIVE."

12:45PM  13        DO YOU SEE THAT?

12:45PM  14   A.   YES.

12:45PM  15   Q.   AND CAN YOU JUST READ THAT TO US, PLEASE?

12:45PM  16   A.   YES.  "COMPREHENSIVE VALIDATION OF THE THERANOS CYTOKINE

12:45PM  17   PANEL UNDER FDA/ICH GUIDELINES, ACCORDING TO THE FULL

12:45PM  18   VALIDATION PROTOCOL BELOW.  PROJECT SUCCESS CRITERIA INCLUDE

12:45PM  19   ANALYSIS OF BLINDED SAMPLES PROVIDED BY SCHERING-PLOUGH."

12:45PM  20   Q.   ALL RIGHT.  AND ON THIS VERSION OF THE INVOICE, THE

12:45PM  21   EXPECTED START DATE IS APRIL 15TH, 2009.

12:45PM  22        DO YOU SEE THAT?

12:45PM  23   A.   YES, I DO.

12:45PM  24   Q.   AND THE EXPECTED END DATE IS TO BE DETERMINED; RIGHT?

12:45PM  25   A.   CORRECT.

12:45PM  1    Q.   AND SIMILARLY, THE TOTAL DURATION OF SERVICES IS TO BE

12:45PM  2    DETERMINED; CORRECT?

12:45PM  3    A.   CORRECT.

12:45PM  4    Q.   AND THEN IF WE GO TO THE NEXT PAGE, WE FIND THE THERANOS

12:46PM  5    SYSTEM FULL VALIDATION PROTOCOL, WHICH I BELIEVE YOU TESTIFIED

12:46PM  6    ABOUT BEFORE; CORRECT?

12:46PM  7    A.   CORRECT.

12:46PM  8    Q.   SO NOW LET'S GO TO EXHIBIT 200.

12:46PM  9         AND BY THE WAY, THIS VALIDATION PROTOCOL THAT YOU'VE

12:46PM  10   TESTIFIED ABOUT, THAT WAS THE VALIDATION PROTOCOL THAT GOVERNED

12:46PM  11   THE VALIDATION PORTION OF SCHERING-PLOUGH'S INTERACTIONS WITH

12:46PM  12   THERANOS; CORRECT?

12:46PM  13   A.   CORRECT.

12:46PM  14   Q.   ALL RIGHT.  SO LET'S GO TO EXHIBIT 200, WHICH I THINK

12:46PM  15   YOU'VE ALREADY TESTIFIED ABOUT, AND WHICH IS IN EVIDENCE.

12:46PM  16        THIS IS THE SERVICES AGREEMENT BETWEEN SCHERING-PLOUGH AND

12:46PM  17   THERANOS; RIGHT?

12:46PM  18   A.   CORRECT.

12:46PM  19   Q.   SO THIS IS THE AGREEMENT THAT GOVERNS THE RELATIONSHIP

12:46PM  20   BETWEEN THE TWO COMPANIES WITH RESPECT TO THE VALIDATION;

12:46PM  21   RIGHT?

12:46PM  22   A.   CORRECT.

12:46PM  23   Q.   AND AS I THINK MR. SCHENK POINTED OUT ON DIRECT, IF YOU

12:47PM  24   LOOK ON PAGE 1, THE FIRST NUMBERED PARAGRAPH, IN DESCRIBING THE

12:47PM  25   PROJECT, THIS AGREEMENT SAYS, "PROVIDER WILL PROVIDE TO

12:47PM 1     SCHERING-PLOUGH SERVICES INCLUDING BUT NOT LIMITED TO

12:47PM 2     COMPREHENSIVE VALIDATION OF THE THERANOS CYTOKINE PANEL UNDER

12:47PM 3     FDA/ICH GUIDELINES-SCHERING-PLOUGH 001 AS FURTHER DESCRIBED IN

12:47PM 4     ATTACHMENT C (INVOICE)."

12:47PM 5          DO YOU SEE THAT?

12:47PM 6     A.   YES, I DO.

12:47PM 7     Q.   AND THIS AGREEMENT WAS SIGNED BY MR. MCLEOD; CORRECT?

12:47PM 8     A.   THAT'S MY UNDERSTANDING, YES.

12:47PM 9     Q.   ALL RIGHT.  SO IF YOU -- IF WE MOVE FORWARD IN THIS, LET'S

12:47PM 10    GO TO PAGE 9.

12:47PM 11         MS. HOLMES SIGNS FOR THERANOS; CORRECT?

12:48PM 12    A.   CORRECT.

12:48PM 13    Q.   AND MR. MCLEOD SIGNS FOR SCHERING-PLOUGH; RIGHT?

12:48PM 14    A.   CORRECT.

12:48PM 15    Q.   AND IT LOOKS LIKE THEY BOTH SIGN APRIL 29TH, 2009; RIGHT?

12:48PM 16    A.   YES.

12:48PM 17    Q.   SO PRESUMABLY THAT APRIL 15TH, 2009 START DATE IS NOW

12:48PM 18    INOPERATIVE?

12:48PM 19    A.   CORRECT.

12:48PM 20    Q.   AND IF WE GO A FEW PAGES FURTHER, PAGE 13 OF EXHIBIT 200,

12:48PM 21    WE NOW FIND AN INITIALLED VERSION OF THE INVOICE.

12:48PM 22         DO YOU SEE THAT?

12:48PM 23    A.   YES, I DO.

12:48PM 24    Q.   AND THE INVOICE DATE IS APRIL 29TH, 2009; RIGHT?

12:48PM 25    A.   I SEE 30 APRIL 2009.

12:48PM 1    Q.   LOOK AT THE --

12:48PM 2    A.   OH, THE DATE.  I'M SORRY.  I THOUGHT YOU WERE REFERRING TO

12:49PM 3    THE SIGNATURE.

12:49PM 4    Q.   OKAY.  BUT YOU SEE THE DATE APRIL 29TH, 2009?

12:49PM 5    A.   I DO.

12:49PM 6    Q.   AND THE INITIAL IS A LITTLE BIT HARD TO MAKE OUT, BUT DOES

12:49PM 7    IT LOOK TO YOU LIKE MR. MCLEOD'S INITIAL THERE?

12:49PM 8    A.   YES.

12:49PM 9    Q.   WHICH SUGGESTS TO YOU THAT HE HAD REVIEWED AND APPROVED

12:49PM 10   THIS, I TAKE IT?

12:49PM 11   A.   I WOULD GUESS SO.

12:49PM 12          MR. SCHENK:  OBJECTION.  CALLS FOR SPECULATION.

12:49PM 13          THE COURT:  IF YOU KNOW?  DO YOU KNOW?

12:49PM 14          THE WITNESS:  I DON'T KNOW.

12:49PM 15   BY MR. CLINE:

12:49PM 16   Q.   ALL RIGHT.  I DON'T WANT YOU TO SPECULATE.

12:49PM 17        AND IF YOU LOOK OVER ON THE NEXT PAGE OF THIS INVOICE, YOU

12:49PM 18   SEE, "KEY PROJECT OBJECTIVE"?

12:49PM 19   A.   YES, I DO.

12:49PM 20   Q.   AND THAT'S THE SAME KEY PROJECT OBJECTIVE THAT YOU READ A

12:49PM 21   MOMENT AGO; IS THAT RIGHT?

12:49PM 22   A.   YES.

12:49PM 23   Q.   AND WHICH IS "COMPREHENSIVE VALIDATION OF THE THERANOS

12:49PM 24   CYTOKINE PANEL UNDER FDA/ICH GUIDELINES, ACCORDING TO ATTACHED

12:49PM 25   FULL VALIDATION PROTOCOL."

12:49PM  1            DO YOU SEE THAT?

12:50PM  2    A.   CORRECT, YES.

12:50PM  3    Q.   AND THE START DATE, THE EXPECTED START DATE IS NOW

12:50PM  4    MAY 1ST, 2009.

12:50PM  5            DO YOU SEE THAT?

12:50PM  6    A.   I DO.

12:50PM  7    Q.   AND THE END DATE IS STILL TBD?

12:50PM  8    A.   CORRECT.

12:50PM  9    Q.   AND THE TOTAL DURATION IS TBD; RIGHT?

12:50PM  10   A.   CORRECT.

12:50PM  11   Q.   NOW, MAY 1ST, 2009 WAS JUST FOUR DAYS BEFORE YOU ACTUALLY

12:50PM  12   VISITED THERANOS; CORRECT?

12:50PM  13   A.   CORRECT.

12:50PM  14   Q.   SO REALISTICALLY, THIS WAS NOT GOING TO BE DONE BEFORE YOU

12:50PM  15   VISITED; RIGHT?

12:50PM  16   A.   ONE OF THE, ONE OF THE SELLING FEATURES OF THE TECHNOLOGY

12:50PM  17   WAS SPEED.

12:50PM  18            BUT IN MY ESTIMATION, NO, IT COULD NOT HAVE BEEN COMPLETED

12:50PM  19   IN FOUR DAYS.

12:50PM  20   Q.   ALL RIGHT.  I MEAN, IT TOOK 14 DAYS JUST TO GET THIS

12:50PM  21   INVOICE UPDATED; RIGHT?  SO IT'S UNLIKELY THAT THIS PROJECT IS

12:50PM  22   GOING TO BE ACCOMPLISHED IN FOUR DAYS; RIGHT?

12:50PM  23   A.   CORRECT.

12:50PM  24   Q.   NOW, IF YOU -- IF WE CONTINUE WITH EXHIBIT 200, YOU SEE

12:50PM  25   THAT IT INCLUDES THE THERANOS SYSTEM FULL VALIDATION PROTOCOL;

12:51PM  1      RIGHT?

12:51PM  2          DO YOU SEE THAT?

12:51PM  3      A.   CORRECT.

12:51PM  4      Q.   AND AGAIN, THAT WAS THE PROTOCOL THAT WAS ATTACHED TO THAT

12:51PM  5      APRIL 15TH, 2009 EMAIL; RIGHT?

12:51PM  6      A.   THAT'S CORRECT.

12:51PM  7      Q.   NOW, IT IS INCLUDED IN THE AGREEMENT BETWEEN THE PARTIES

12:51PM  8      HERE; RIGHT?

12:51PM  9      A.   CORRECT.

12:51PM  10     Q.   NOW, LET'S GO FORWARD TO EXHIBIT 10572.

12:51PM  11         I THINK WE AGREED ON THIS, DIDN'T WE?

12:51PM  12             MR. SCHENK:  YES.

12:51PM  13             MR. CLINE:  I'LL OFFER 10572.

12:51PM  14             MR. SCHENK:  NO OBJECTION.

12:51PM  15             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:51PM  16         (DEFENDANT'S EXHIBIT 10572 WAS RECEIVED IN EVIDENCE.)

12:51PM  17     BY MR. CLINE:

12:51PM  18     Q.   NOW, YOU'VE TESTIFIED THAT YOU AND SEVERAL OF YOUR

12:51PM  19     COLLEAGUES FROM SCHERING-PLOUGH VISITED THERANOS ON MAY 5TH,

12:51PM  20     2009; RIGHT?

12:52PM  21     A.   CORRECT.

12:52PM  22     Q.   AND THIS IS THE AGENDA FOR THAT MEETING; CORRECT?

12:52PM  23     A.   CORRECT.

12:52PM  24     Q.   AND THIS WAS, I TAKE IT, SHARED AMONG THE PARTICIPANTS SO

12:52PM  25     YOU WOULD KNOW SORT OF THE ROADMAP OF WHERE YOU WERE GOING FOR

12:52PM   1    THE DAY?

12:52PM   2    A.   CORRECT.

12:52PM   3    Q.   DID MR. -- LOOKING DOWN AT THE BOTTOM NOW, DID MR. MCLEOD

12:52PM   4    JOIN BY PHONE, DO YOU RECALL?

12:52PM   5    A.   I DON'T RECALL.

12:52PM   6    Q.   OKAY.  NOW, ACCORDING TO THE AGENDA, YOU WERE STARTING AT

12:52PM   7    8:00 O'CLOCK AND YOU'RE ENDING AT 4:30 OR AFTER.

12:52PM   8         DO YOU SEE THAT?

12:52PM   9    A.   YES.

12:52PM  10    Q.   IS IT YOUR RECOLLECTION THAT THIS MEETING LASTED PRETTY

12:52PM  11    MUCH A FULL DAY?

12:52PM  12    A.   YES.

12:52PM  13    Q.   AND THE COLLEAGUES FROM SCHERING-PLOUGH WHO CAME WITH YOU,

12:52PM  14    IF I SCAN THEIR QUALIFICATIONS QUICKLY, IT LOOKS LIKE THEY ALL

12:52PM  15    EITHER HAD PH.D.'S OR WERE MEDICAL DOCTORS, OR BOTH; RIGHT?

12:53PM  16    A.   CORRECT.

12:53PM  17    Q.   NOW, I THINK YOU TESTIFIED THAT YOU DIDN'T FEEL AS THOUGH

12:53PM  18    YOU HAD RECEIVED THE INFORMATION THAT YOU NEEDED OR DIRECT

12:53PM  19    ANSWERS TO THE TECHNICAL QUESTIONS THAT YOU ASKED; CORRECT?

12:53PM  20    A.   CORRECT.

12:53PM  21    Q.   BUT I THINK YOU ALSO TESTIFIED THAT YOU DID NOT VOICE

12:53PM  22    THOSE CONCERNS TO MS. HOLMES OR TO THERANOS OUT OF POLITENESS

12:53PM  23    OR AWKWARDNESS OR SOME REASON LIKE THAT; CORRECT?

12:53PM  24    A.   CORRECT.

12:53PM  25    Q.   YOU VOICED THEM TO YOUR COLLEAGUES, BUT NOT TO THERANOS?

12:53PM 1    A.   CORRECT.

12:53PM 2    Q.   AND THERE'S A FOLLOW-ON EMAIL JUNE 16TH OF 2009, WHICH I

12:53PM 3    THINK YOU TALKED ABOUT ON DIRECT, TO MR. FRENZEL WHERE YOU'RE

12:53PM 4    ASKING HIM TO SORT OF GIVE ME A STATUS REPORT.

12:53PM 5         APART FROM THAT, ARE YOU AWARE OF ANY EMAILS FROM

12:53PM 6    SCHERING-PLOUGH ON ONE HAND TO THERANOS ON THE OTHER ASKING FOR

12:54PM 7    MORE INFORMATION?

12:54PM 8    A.   I AM NOT.

12:54PM 9    Q.   NOW, IF WE COULD GO TO 10573.

12:54PM 10        AND I BELIEVE THIS IS -- WE'VE AGREED TO ADMIT THIS?

12:54PM 11            MR. SCHENK:  YES.

12:54PM 12            MR. CLINE:  I'LL OFFER 10573.

12:54PM 13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:54PM 14        (DEFENDANT'S EXHIBIT 10573 WAS RECEIVED IN EVIDENCE.)

12:54PM 15   BY MR. CLINE:

12:54PM 16   Q.   AND IT MAY BE THAT THIS IS IDENTICAL TO AN EXHIBIT THAT

12:54PM 17   YOU HAVE ALREADY LOOKED AT?

12:54PM 18   A.   YES.

12:54PM 19   Q.   BUT IT'S NOW DECEMBER OF 2009, AND MR. FRENZEL IS EMAILING

12:54PM 20   YOU THE VALIDATION REPORT; CORRECT?

12:54PM 21   A.   THAT'S CORRECT.

12:54PM 22   Q.   AND HE SENDS IT TO YOU DECEMBER 3RD, 2009.  THE SUBJECT

12:54PM 23   LINE IS VALIDATION REPORT.

12:54PM 24        AND THEN A FEW DAYS LATER, DECEMBER 9TH, 2009, HE WRITES

12:55PM 25   TO YOU AGAIN AND SAYS, "I JUST WANTED TO MAKE SURE THAT YOU

12:55PM 1    RECEIVED THIS REPORT.  WE ARE LOOKING FORWARD TO DISCUSSING IT

12:55PM 2    WITH YOU."

12:55PM 3        RIGHT?

12:55PM 4    A.   CORRECT.

12:55PM 5    Q.   NOW, AT ABOUT THIS TIME, SCHERING-PLOUGH WAS IN THE

12:55PM 6    PROCESS OF MERGING WITH OR BEING ACQUIRED BY MERCK; IS THAT

12:55PM 7    RIGHT?

12:55PM 8    A.   THAT'S CORRECT.

12:55PM 9    Q.   AND YOU WERE VERY BUSY WITH THAT PROCESS; CORRECT?

12:55PM 10   A.   CORRECT.

12:55PM 11   Q.   AND ULTIMATELY YOU ENDED UP WITH A POSITION AT MERCK;

12:55PM 12   RIGHT?

12:55PM 13   A.   THAT'S CORRECT.

12:55PM 14   Q.   AND WAS IT A PROMOTION FROM THE POSITION THAT YOU HAD

12:55PM 15   PREVIOUSLY HELD AT SCHERING-PLOUGH?

12:55PM 16   A.   IT WAS NOT A PROMOTION, BUT THEY DID MAKE ME RESPONSIBLE

12:55PM 17   FOR THE COMBINED GROUP BETWEEN THE SCHERING-PLOUGH AND THE

12:55PM 18   MERCK ORGANIZATIONS.

12:55PM 19   Q.   THAT SOUNDS LIKE A BIG COMPANY.  NO PROMOTION, BUT MORE

12:55PM 20   RESPONSIBILITY?

12:55PM 21   A.   I EVENTUALLY GOT THE PROMOTION.

12:55PM 22   Q.   OKAY.  GLAD TO HEAR IT.

12:56PM 23       SO IF WE GO NOW TO EXHIBIT 262, WHICH I THINK IS IN

12:56PM 24   EVIDENCE.  SORRY TO BE MOVING YOU BACK AND FORTH.

12:56PM 25       AND 262, I THINK, IS IN THE GOVERNMENT'S BINDER, BUT WE'LL

12:56PM  1    PUT IT UP ON THE SCREEN SO THAT YOU CAN SEE IT.

12:56PM  2        YOU WRITE BACK QUICKLY TO MR. FRENZEL AFTER HE SENDS THAT

12:56PM  3    DECEMBER 9TH EMAIL AND YOU SAY, "I'M SORRY FOR THE SLOW

12:56PM  4    RESPONSE.  I DID RECEIVE THE REPORT.  I'D ACTUALLY LIKE TO

12:56PM  5    DEFER OUR DISCUSSIONS UNTIL JANUARY.  WE ARE TOTALLY SWAMPED

12:56PM  6    WITH THE MERGER WITH MERCK."

12:56PM  7        DO YOU SEE THAT?

12:56PM  8    A.   THAT'S CORRECT, YES.

12:56PM  9    Q.   AND, IN FACT, THAT'S WHAT WAS GOING ON; RIGHT?

12:56PM  10   A.   THAT'S CORRECT.

12:56PM  11   Q.   SO LET'S GO FORWARD NOW TO 10574.

12:57PM  12       AND AGAIN, YOUR HONOR, I BELIEVE WE HAVE AGREED THAT THIS

12:57PM  13   CAN BE ADMITTED.

12:57PM  14            MR. SCHENK:  YES, NO OBJECTION.

12:57PM  15            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:57PM  16       (DEFENDANT'S EXHIBIT 10574 WAS RECEIVED IN EVIDENCE.)

12:57PM  17   BY MR. CLINE:

12:57PM  18   Q.   ALL RIGHT.  SO LET ME -- LET'S START WITH THE BOTTOM EMAIL

12:57PM  19   THERE.

12:57PM  20       WE'RE NOW IN MARCH OF 2010; RIGHT?

12:57PM  21   A.   CORRECT.

12:57PM  22   Q.   AND MS. HOLMES WRITES TO YOU.  THE SUBJECT IS FOLLOW UP.

12:57PM  23       AND SHE SAYS "CONNIE --

12:57PM  24       "CAROLYN LET ME KNOW YOU TWO CONNECTED" -- THAT WOULD BE

12:57PM  25   CAROLYN BALKENHOL, DO YOU EXPECT?

12:57PM  1    A.   I WOULD EXPECT.

12:57PM  2    Q.   -- "I AM REALLY LOOKING FORWARD TO OUR NEXT CONVERSATION.

12:57PM  3    PLEASE LET ME KNOW IF THERE IS ANYTHING WE CAN DO FROM OUR END

12:57PM  4    TO HELP FACILITATE THINGS MOVING FORWARD IN THE MEANTIME."

12:57PM  5         THEN SHE SAYS CONGRATULATIONS ON YOUR NEW ROLE WHERE YOU

12:57PM  6    HAD MORE RESPONSIBILITY BUT NO PROMOTION, "I WAS HAPPY TO HEAR

12:57PM  7    ABOUT IT."

12:57PM  8    A.   YES.

12:57PM  9    Q.   AND YOU WRITE BACK THE NEXT DAY AND SAY "HI ELIZABETH.

12:58PM  10        "THANKS FOR THE NOTE BELOW.  THINGS WILL SETTLE DOWN

12:58PM  11   EVENTUALLY.  IN THE MEANTIME, I'VE ASKED A SCIENTIST FROM MY

12:58PM  12   GROUP (DON LEE) TO REACH OUT TO GARY TO DISCUSS THE SPECIFICS

12:58PM  13   OF THE VALIDATION."

12:58PM  14        DO YOU SEE THAT?

12:58PM  15   A.   I DO.

12:58PM  16   Q.   NOW, WOULD IT BE DR. LEE, THE SCIENTIST?

12:58PM  17   A.   IT WAS NOT DR. LEE.

12:58PM  18   Q.   MR. LEE?

12:58PM  19   A.   MR. LEE.

12:58PM  20   Q.   DID MR. LEE REACH OUT TO GARY, DO YOU KNOW?

12:58PM  21   A.   I DON'T KNOW.

12:58PM  22   Q.   AND I TAKE IT YOU HAD SO MUCH GOING ON, I TAKE IT YOU

12:58PM  23   DIDN'T FOLLOW UP ON THIS?

12:58PM  24   A.   THAT'S CORRECT.

12:58PM  25   Q.   AND MS. HOLMES SIX DAYS LATER WRITES AGAIN AND SHE SAYS,

12:58PM 1    "THANKS CONNIE.  PLEASE LET ME KNOW IF THERE IS ANYTHING WE CAN

12:58PM 2    DO ON OUR END TO HELP FACILITATE THIS."

12:58PM 3         RIGHT?

12:58PM 4    A.   CORRECT.

12:58PM 5    Q.   AND IS IT FAIR TO SAY THAT, FROM THE BEST OF YOUR

12:58PM 6    RECOLLECTION SITTING HERE TODAY, THAT THAT'S THE LAST

12:58PM 7    COMMUNICATION THAT YOU HAD WITH MS. HOLMES?

12:58PM 8    A.   THAT'S PROBABLY CORRECT, BUT I CAN'T SAY FOR SURE.

12:58PM 9    Q.   ALL RIGHT.  YOU WERE ASKED ON DIRECT IF YOU HAD EVER TOLD

12:59PM 10   ANYONE AT THERANOS THAT THE REPORT THAT WAS SENT TO YOU BY

12:59PM 11   MR. FRENZEL IN DECEMBER WAS, WAS ACCURATE, GOOD, BAD, WHATEVER.

12:59PM 12        AND THE ANSWER WAS THAT YOU HAD NOT TOLD ANYONE AT

12:59PM 13   THERANOS THAT; RIGHT?

12:59PM 14   A.   THAT'S CORRECT.

12:59PM 15   Q.   YOU SIMILARLY DIDN'T TELL ANYONE AT THERANOS THAT THERE

12:59PM 16   WERE ANY PROBLEMS WITH THE REPORT; RIGHT?

12:59PM 17   A.   THAT IS CORRECT.

12:59PM 18   Q.   YOU JUST DIDN'T RESPOND AT ALL IN THE END; RIGHT?

12:59PM 19   A.   THAT IS CORRECT.

12:59PM 20   Q.   ALL RIGHT.

12:59PM 21        THAT'S ALL OF MY QUESTIONS, YOUR HONOR.

12:59PM 22        THANK YOU, YOUR HONOR.

12:59PM 23        THANK YOU, DR. CULLEN.

12:59PM 24             THE COURT:  MR. SCHENK?

12:59PM 25             MR. SCHENK:  NO FURTHER QUESTIONS.

| | | |
|---|---|---|
| 12:59PM | 1 | THE COURT: MAY THIS WITNESS BE EXCUSED? |
| 12:59PM | 2 | MR. SCHENK: YES. |
| 12:59PM | 3 | MR. CLINE: YES. |
| 12:59PM | 4 | THE COURT: YOU'RE EXCUSED. |
| 12:59PM | 5 | THE WITNESS: THANK YOU. |
| 12:59PM | 6 | THE COURT: YOU'RE WELCOME. |
| 12:59PM | 7 | FOLKS, FEEL FREE TO STAND AND STRETCH FOR A MOMENT WHILE |
| 01:00PM | 8 | WE GET READY FOR THE NEXT WITNESS. |
| 01:01PM | 9 | (PAUSE IN PROCEEDINGS.) |
| 01:01PM | 10 | THE COURT: ARE WE BREAKING AT 1:30? IS THAT RIGHT? |
| 01:01PM | 11 | MS. TREFZ: YES. |
| 01:01PM | 12 | THE COURT: SO, LADIES AND GENTLEMEN, WE'LL TAKE OUR |
| 01:01PM | 13 | NEXT BREAK AT 1:30, AT THE BOTTOM OF THE HOUR. |
| 01:01PM | 14 | BUT I THINK THAT THE GOVERNMENT HAS A WITNESS TO CALL IN |
| 01:01PM | 15 | THE INTERIM. |
| 01:01PM | 16 | MR. SCHENK: YES. |
| 01:01PM | 17 | YOUR HONOR, THE UNITED STATES CALLS DANIEL MOSLEY. |
| 01:01PM | 18 | THE COURT: SIR, IF YOU WOULD JUST COME FORWARD |
| 01:01PM | 19 | HERE, AND IF YOU WOULD FACE OUR COURTROOM DEPUTY WHILE YOU |
| 01:01PM | 20 | RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU. |
| 01:01PM | 21 | **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS SWORN.)** |
| 01:01PM | 22 | THE WITNESS: YES. |
| 01:02PM | 23 | THE COURT: PLEASE HAVE A SEAT UP HERE, SIR. MAKE |
| 01:02PM | 24 | YOURSELF COMFORTABLE. |
| 01:02PM | 25 | THE WITNESS: THANK YOU. |

01:02PM   1              THE COURT:  YOU'RE WELCOME.

01:02PM   2         FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

01:02PM   3              THE WITNESS:  OKAY.

01:02PM   4              THE COURT:  AND WHEN YOU ARE COMFORTABLE, I'LL

01:02PM   5    ENCOURAGE YOU TO SPEAK DIRECTLY INTO THE MICROPHONE, AND PLEASE

01:02PM   6    STATE YOUR NAME.

01:02PM   7              THE WITNESS:  OKAY.  DANIEL LYNN MOSLEY.

01:02PM   8              THE COURT:  THANK YOU.  COULD YOU SPELL THAT FOR US,

01:02PM   9    PLEASE.

01:02PM  10              THE WITNESS:  M-O-S-L-E-Y.

01:02PM  11              THE COURT:  THANK YOU.

01:02PM  12         MR. SCHENK.

01:02PM  13                         **DIRECT EXAMINATION**

01:02PM  14    BY MR. SCHENK:

01:02PM  15    Q.   THANK YOU.

01:02PM  16         MR. MOSLEY, IF YOU ARE FULLY VACCINATED, AND WITH THE

01:02PM  17    COURT'S PERMISSION, YOU MAY TESTIFY WITHOUT YOUR MASK ON.

01:02PM  18    A.   OKAY.  THANK YOU.

01:02PM  19    Q.   ONE HOUSEKEEPING THING.  I THINK YOUR MIDDLE NAME WAS

01:02PM  20    LYNN; IS THAT RIGHT?

01:02PM  21    A.   LIN.

01:02PM  22    Q.   AND COULD YOU SPELL THAT?

01:02PM  23    A.   L-Y-N-N.

01:02PM  24    Q.   AND DANIEL IS THE USUAL SPELLING?

01:02PM  25    A.   YES, D-A-N-I-E-L.

01:02PM  1    Q.   THANK YOU, SIR.

01:03PM  2         GOOD AFTERNOON, MR. MOSLEY.

01:03PM  3         IN AROUND 2013 DID YOU INVEST IN A COMPANY CALLED

01:03PM  4    THERANOS?

01:03PM  5    A.   YES, I DID.

01:03PM  6    Q.   ABOUT HOW MUCH WAS THAT INVESTMENT?

01:03PM  7    A.   JUST A LITTLE UNDER $6 MILLION.

01:03PM  8    Q.   WE'LL COME BACK TO THAT IN A MOMENT.

01:03PM  9         WOULD YOU NOW DESCRIBE FOR THE JURY YOUR EDUCATIONAL

01:03PM  10   BACKGROUND?

01:03PM  11   A.   I GRADUATED COLLEGE AT THE UNIVERSITY OF ALABAMA; LAW

01:03PM  12   SCHOOL AT THE UNIVERSITY OF ALABAMA; AND I GOT A MASTER'S IN

01:03PM  13   TAX LAW FROM NEW YORK UNIVERSITY.

01:03PM  14   Q.   AND AFTER YOU GOT YOUR LLM, DID YOU BECOME A PRACTICING

01:03PM  15   ATTORNEY?

01:03PM  16   A.   YES.

01:03PM  17   Q.   WHERE DID YOU WORK?

01:03PM  18   A.   INITIALLY AT A FIRM IN NEW YORK CITY, SULLIVAN & CROMWELL.

01:03PM  19   Q.   AND AFTER SULLIVAN & CROMWELL, DID YOU GO TO ANOTHER LAW

01:03PM  20   FIRM?

01:03PM  21   A.   I WENT TO CRAVATH, SWAINE & MOORE, ALSO IN NEW YORK CITY.

01:03PM  22   Q.   HOW LONG DID YOU WORK FOR THE CRAVATH LAW FIRM?

01:04PM  23   A.   I WAS AT CRAVATH FROM FEBRUARY OF 1984 UNTIL FEBRUARY OF

01:04PM  24   2018.

01:04PM  25   Q.   OKAY.  AND AFTER 2018, DID YOU CONTINUE WORKING?

01:04PM  1    A.   YES, I DID.

01:04PM  2    Q.   WHERE DID YOU WORK AFTER THAT?

01:04PM  3    A.   BDT & COMPANY.

01:04PM  4    Q.   AND WHAT IS BDT INITIALS FOR?

01:04PM  5    A.   BYRON D. TROTT.

01:04PM  6    Q.   OKAY.  WHEN YOU PRACTICED LAW AT CRAVATH, WHAT TYPE OF LAW

01:04PM  7    DID YOU PRACTICE?

01:04PM  8    A.   TRUSTS AND ESTATES.

01:04PM  9    Q.   AND IN YOUR TIME WORKING ON TRUSTS AND ESTATES, DID YOU

01:04PM  10   ALSO GAIN EXPERIENCE REVIEWING VARIOUS CORPORATE DOCUMENTS?

01:04PM  11   A.   YES, I DID.

01:04PM  12   Q.   AND WHEN WOULD THAT COME UP?  WHEN WOULD YOU, IN PRACTICE

01:04PM  13   IN TRUSTS AND ESTATES, HAVE OR GAIN EXPERIENCE WITH CORPORATE

01:04PM  14   DOCUMENTS?

01:04PM  15   A.   WELL, IF -- YOU KNOW, IF A CLIENT WAS MAKING A CORPORATE

01:04PM  16   INVESTMENT AND ASKED FOR MY ADVICE ON THE CORPORATE -- LEGAL

01:04PM  17   ASPECTS OF THE INVESTMENT OR -- IT CAME UP ON A REGULAR BASIS.

01:05PM  18   Q.   OKAY.  NOW, LET'S TURN TO YOUR EXPERIENCE WITH THERANOS.

01:05PM  19        WHEN DID YOU FIRST BECOME FAMILIAR WITH THERANOS?

01:05PM  20   A.   I BELIEVE IT WAS JULY OF 2013.

01:05PM  21   Q.   YOU SAID 2013?

01:05PM  22   A.   OF 2014, I'M SORRY.

01:05PM  23   Q.   OKAY.  IN JULY OF 2014, YOU THINK YOU FIRST BECAME

01:05PM  24   FAMILIAR WITH THERANOS?

01:05PM  25   A.   YES.

01:05PM   1    Q.   AND HOW SO?

01:05PM   2    A.   THROUGH A CLIENT OF MINE, DR. HENRY KISSINGER.

01:05PM   3    Q.   DR. KISSINGER WAS A CLIENT OF YOURS AT THAT TIME IN JULY

01:05PM   4    OF 2014?

01:05PM   5    A.   YES, HE WAS.

01:05PM   6    Q.   AND DO YOU KNOW ROUGHLY HOW LONG HE HAD BEEN A CLIENT OF

01:05PM   7    YOURS?

01:05PM   8    A.   PROBABLY FOR WELL OVER 15 YEARS, MAYBE 20 YEARS.  FOR A

01:05PM   9    VERY LONG TIME.

01:05PM  10    Q.   OKAY.  AND YOU SAID IT WAS THROUGH DR. KISSINGER THAT YOU

01:05PM  11    BECAME FAMILIAR WITH THERANOS.

01:05PM  12         DESCRIBE THAT CIRCUMSTANCE TO US.  WHAT DO YOU RECALL?

01:05PM  13    A.   WELL, DR. KISSINGER EXPLAINED TO ME THAT HE WAS ON THE

01:05PM  14    BOARD OF THERANOS AND THAT, YOU KNOW, THAT IT WAS A VERY

01:05PM  15    INTERESTING COMPANY.

01:06PM  16         AND HE SAID, YOU KNOW, IT WOULD BE TERRIFIC IF YOU WOULD

01:06PM  17    TAKE THE TIME TO LEARN ABOUT THE COMPANY AND GIVE ME YOUR VIEWS

01:06PM  18    ON IT.

01:06PM  19    Q.   OKAY.  AND WHAT DID YOU DO IN RESPONSE TO THAT WHEN HE

01:06PM  20    MADE THAT REQUEST?

01:06PM  21    A.   AS I REMEMBER, HE SAID, I'LL PUT YOU IN TOUCH WITH

01:06PM  22    ELIZABETH HOLMES, WHO IS THE PERSON WHO FOUNDED THE COMPANY.

01:06PM  23    Q.   GREAT.

01:06PM  24         YOUR HONOR, MAY I APPROACH?

01:06PM  25              THE COURT:   YES.

01:06PM  1              MR. SCHENK:  (HANDING.)

01:06PM  2              THE WITNESS:  THANK YOU.

01:06PM  3              MR. SCHENK:  SURE.

01:06PM  4              THE COURT:  YOUR COLLEAGUE OPPOSITE HAS THIS?

01:06PM  5              MR. SCHENK:  YES.

01:06PM  6              MR. WADE:  WE DO, YOUR HONOR.

01:06PM  7        BY MR. SCHENK:

01:06PM  8        Q.  MR. MOSLEY, I'VE HANDED YOU A BINDER.  IF YOU WILL TURN IN

01:06PM  9        THE BINDER TO EXHIBIT 4163.

01:07PM 10        A.  I HAVE IT.

01:07PM 11        Q.  IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN JULY OF

01:07PM 12        2014?

01:07PM 13        A.  YES.

01:07PM 14              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4163.

01:07PM 15              MR. WADE:  NO OBJECTION.

01:07PM 16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:07PM 17        (GOVERNMENT'S EXHIBIT 4163 WAS RECEIVED IN EVIDENCE.)

01:07PM 18        BY MR. SCHENK:

01:07PM 19        Q.  MR. MOSLEY, I AM -- COULD WE BRING THAT -- OH, OKAY.

01:07PM 20        THANK YOU.

01:07PM 21           MR. MOSLEY, I'M SHOWING YOU AN EMAIL SENT IN JULY FROM YOU

01:07PM 22        TO MS. HOLMES.  YOU WRITE THAT "IT WAS A PLEASURE SPEAKING WITH

01:07PM 23        YOU YESTERDAY."

01:07PM 24           DO YOU RECALL A CONVERSATION WITH MS. HOLMES A DAY PRIOR

01:07PM 25        TO THIS EMAIL?

01:07PM  1    A.   GENERALLY, YES.

01:07PM  2    Q.   WHEN YOU SAY "GENERALLY," WHAT DO YOU MEAN?

01:07PM  3    A.   I MEAN, I DON'T REMEMBER SPECIFICALLY EXACTLY WHAT WAS

01:07PM  4    SAID, BUT I DO REMEMBER HAVING A CONVERSATION WITH ELIZABETH

01:07PM  5    THE DAY BEFORE.

01:07PM  6    Q.   OKAY.  YOU CONTINUE, "ONCE I RECEIVE THE PRIVATE PLACEMENT

01:08PM  7    MEMORANDUM, I WILL GIVE YOU A CALL OR SEND YOU AN EMAIL TO FIND

01:08PM  8    A TIME TO GET A BRIEFING FROM EITHER YOU OR SOMEONE ON YOUR

01:08PM  9    STAFF."

01:08PM  10        WHAT DID YOU MEAN BY THAT?

01:08PM  11   A.   WELL, I MEANT AFTER I GOT THE DOCUMENTS THAT WOULD EXPLAIN

01:08PM  12   A LOT OF THINGS ABOUT THE COMPANY, THAT I WOULD FOLLOW UP WITH

01:08PM  13   ELIZABETH TO FIND A TIME TO TALK MORE ABOUT WHAT I HAD READ OR

01:08PM  14   LEARNED FROM THOSE DOCUMENTS.

01:08PM  15   Q.   AND ARE YOU FAMILIAR WITH DOCUMENTS CALLED A PRIVATE

01:08PM  16   PLACEMENT MEMORANDUM?

01:08PM  17   A.   YES.

01:08PM  18   Q.   WHAT WERE YOU LOOKING FOR WHEN YOU REQUESTED THAT

01:08PM  19   DOCUMENT?

01:08PM  20   A.   WELL, GENERALLY A PRIVATE PLACEMENT MEMORANDUM IS A

01:08PM  21   DOCUMENT PREPARED BY A COMPANY WHEN IT IS RAISING FUNDS THAT

01:08PM  22   LAYS OUT A LOT OF INFORMATION ABOUT THE COMPANY.

01:08PM  23   Q.   AND WHY WERE YOU ASKING TO GAIN INFORMATION FROM

01:08PM  24   MS. HOLMES ABOUT THERANOS, FOR WHAT PURPOSE?

01:08PM  25   A.   WELL, AS I MENTIONED, DR. KISSINGER HAD ASKED ME, HE SAID

01:08PM  1     IT WOULD BE TERRIFIC IF YOU WOULD TAKE THE TIME TO GET TO KNOW

01:09PM  2     ELIZABETH AND GET TO KNOW THE COMPANY AND GIVE ME YOUR VIEWS ON

01:09PM  3     IT.

01:09PM  4     Q.   YOU TOLD US AT THE BEGINNING OF YOUR TESTIMONY THAT YOU

01:09PM  5     WERE AN INVESTOR EVENTUALLY IN THERANOS.

01:09PM  6     A.   YES.

01:09PM  7     Q.   WAS THAT IN MIND AT THIS TIME?  WERE YOU REQUESTING THESE

01:09PM  8     DOCUMENTS TO EVALUATE A PERSONAL INVESTMENT OPPORTUNITY?

01:09PM  9     A.   NO, BECAUSE I DIDN'T, I DIDN'T REALLY KNOW ANYTHING ABOUT

01:09PM  10    THE COMPANY, SO I COULDN'T HAVE DEVELOPED ANY VIEW.

01:09PM  11    Q.   OKAY.  YOU CONTINUE WITH A STATEMENT ABOUT SOMEBODY NAMED

01:09PM  12    GREG PENNER.

01:09PM  13         DO YOU SEE THAT?

01:09PM  14    A.   I DO.

01:09PM  15    Q.   YOU SAY THAT HE'S ROB WALTON'S SON-IN-LAW AND IS THE

01:09PM  16    CURRENT VICE CHAIR OF WAL-MART?

01:09PM  17    A.   RIGHT.

01:09PM  18    Q.   HE WOULD LIKE TO REVIEW THE PPM.  IS THE PRIVATE PLACEMENT

01:09PM  19    MEMORANDUM ALSO KNOWN AS THE PPM?

01:09PM  20    A.   YES.

01:09PM  21    Q.   AND THEN YOU PROVIDE SOME CONTACT INFORMATION.

01:09PM  22         DO YOU SEE THAT?

01:09PM  23    A.   I DO.

01:09PM  24    Q.   AND WHY DID YOU SEND MS. HOLMES CONTACT INFORMATION FOR

01:09PM  25    MR. PENNER?

01:09PM 1    A.  WELL, IN MY -- AS I REMEMBER, IN MY INITIAL CONVERSATION

01:09PM 2    WITH ELIZABETH, SHE SUGGESTED THAT SHE WAS LOOKING FOR A FEW

01:10PM 3    INVESTORS THAT WERE, YOU KNOW, HIGH QUALITY FAMILIES THAT WOULD

01:10PM 4    HAVE A GOOD LONG-TERM RELATIONSHIP WITH THE COMPANY.

01:10PM 5    Q.  OKAY.  AND WHAT DID YOU UNDERSTAND THAT TO MEAN?  I THINK

01:10PM 6    YOU USED THE WORD "HIGH QUALITY"?

01:10PM 7    A.  WELL, YOU KNOW, PERHAPS FAMILIES AND COMPANIES THAT WERE

01:10PM 8    ENGAGED IN COMMERCE IN THE U.S., AND IT MIGHT BE HELPFUL TO

01:10PM 9    HAVE THEM SUPPORTIVE OF THERANOS.

01:10PM 10   Q.  OKAY.  DID SHE EXPLAIN WHY, DO YOU RECALL?

01:10PM 11   A.  I DON'T RECALL.

01:10PM 12   Q.  OKAY.  HOW ABOUT WHAT THERANOS DID?  AND LET'S TRANSITION

01:10PM 13   FROM THE KINDS OF PEOPLE YOU MIGHT INTRODUCE HER TO.

01:10PM 14       DID YOU HAVE ANY UNDERSTANDING AT THIS POINT OF THE

01:10PM 15   TECHNOLOGY OR THE BUSINESS LINE THAT THERANOS WAS INVOLVED IN?

01:10PM 16   A.  YOU KNOW, I THINK I KNEW FROM DR. KISSINGER THAT IT WAS

01:10PM 17   BLOOD TESTING.

01:10PM 18   Q.  OKAY.

01:10PM 19   A.  AND I'M QUITE SURE HE TOLD ME IT WAS SORT OF REVOLUTIONARY

01:10PM 20   IN ITS APPROACH.

01:10PM 21   Q.  AND HOW -- FORGIVE ME.

01:11PM 22       HOW ABOUT THE PHONE CALL THAT YOU HAD WITH MS. HOLMES?  DO

01:11PM 23   YOU REMEMBER THE SUBJECT OF THE LINE OF BUSINESS OR THE

01:11PM 24   TECHNOLOGY COMING UP?

01:11PM 25   A.  I DON'T REMEMBER SPECIFICALLY, BUT I SUSPECT THAT IT

01:11PM  1    ABSOLUTELY DID COME UP.  I SUSPECT IT CAME UP.

01:11PM  2    Q.   OKAY.  YOU JUST DON'T HAVE A SPECIFIC RECOLLECTION?

01:11PM  3    A.   I DON'T HAVE A SPECIFIC.

01:11PM  4    Q.   THANK YOU.

01:11PM  5         IF YOU'LL NOW TURN TO THE NEXT TAB, IT'S 4173.

01:11PM  6         IS THIS A LETTER THAT MS. HOLMES SENT TO YOU?

01:11PM  7    A.   IT IS.

01:11PM  8    Q.   IN AUGUST OF 2014, THE NEXT MONTH?

01:11PM  9    A.   CORRECT.

01:11PM 10         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

01:11PM 11         MR. WADE:  NO OBJECTION.

01:11PM 12         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:11PM 13    (GOVERNMENT'S EXHIBIT 4173 WAS RECEIVED IN EVIDENCE.)

01:11PM 14         MR. SCHENK:  THANK YOU.

01:11PM 15    Q.   MR. MOSLEY, THIS LETTER WAS SENT TO YOU BY MS. HOLMES ON

01:11PM 16    AUGUST 18TH, 2014.

01:11PM 17         AND IT BEGINS, "DEAR DAN.

01:11PM 18         "IT IS WITH GREAT PLEASURE I WRITE THIS LETTER AND ENCLOSE

01:11PM 19    THIS PACKAGE FOR YOU."

01:12PM 20         WHAT IS THAT A REFERENCE TO, "ENCLOSE THIS PACKAGE"?

01:12PM 21    A.   I THINK THERE WERE A NUMBER OF DOCUMENTS ATTACHED TO IT

01:12PM 22    THAT HAD A FAIR AMOUNT OF INFORMATION ON THE COMPANY.

01:12PM 23    Q.   AND DO YOU REMEMBER HOW YOU RECEIVED THIS?  AND WHAT I

01:12PM 24    MEAN IS BY EMAIL OR BY PAPER COPY?

01:12PM 25    A.   I BELIEVE IT WAS PAPER COPY.

01:12PM   1   Q.   OKAY.

01:12PM   2   A.   BUT I DON'T REMEMBER WHETHER IT CAME BY FEDEX OR REGULAR

01:12PM   3   MAIL.

01:12PM   4   Q.   YOU SAID THAT THERE WERE A NUMBER OF DOCUMENTS ATTACHED TO

01:12PM   5   IT.

01:12PM   6        DO YOU HAVE A RECOLLECTION OF -- DID THE DOCUMENTS FIT IN

01:12PM   7   A SMALL PACKAGE OR WAS IT BINDERS OF MATERIAL?

01:12PM   8   A.   IT WAS A FAIR AMOUNT OF MATERIAL.  IT WAS SOME RATHER

01:12PM   9   THICK PRESENTATIONS ON THE COMPANY (INDICATING).

01:12PM  10   Q.   OKAY.  AND FOR THE RECORD, YOU HELD UP YOUR FINGERS.

01:12PM  11        CAN YOU ESTIMATE ROUGHLY ABOUT THE SIZE OF THE STACK?

01:12PM  12   A.   I DON'T REMEMBER SPECIFICALLY, BUT I THINK IT WAS AT LEAST

01:12PM  13   THAT MUCH, SOMETHING IN THAT ORDER (INDICATING).

01:12PM  14             THE COURT:  WELL, LET'S GET YOUR BEST ESTIMATE OF

01:12PM  15   HOW THICK THAT IS.

01:12PM  16             THE WITNESS:  WELL, I THINK IT WAS AT LEAST THREE

01:13PM  17   INCHES.

01:13PM  18             THE COURT:  GREAT.  THANK YOU.

01:13PM  19             MR. SCHENK:  THANK YOU FOR NOT MAKING ME ESTIMATE

01:13PM  20   THAT, YOUR HONOR.

01:13PM  21   Q.   THE NEXT PARAGRAPH CONTINUES, "BY WAY OF BACKGROUND."

01:13PM  22        DO YOU SEE THAT?

01:13PM  23   A.   I SEE THAT.

01:13PM  24   Q.   MS. HOLMES SAYS SHE FOUNDED THE COMPANY TO MAKE A

01:13PM  25   DIFFERENCE IN THE WORLD AND SHE'S RETAINED MAJORITY CONTROL OF

01:13PM 1      THE SHARES IN ORDER TO REALIZE THAT VISION FOR THE LONG-TERM.

01:13PM 2           SHE CONTINUES WITH THE PHRASE "VERY LONG-TERM MISSION."

01:13PM 3           IT CONTINUES, "WE HAVE BENEFITTED GREATLY FROM THE ABILITY

01:13PM 4      TO EXECUTE, SHIFT, TRANSFORMATIONAL AND DISRUPTIVE TECHNOLOGY."

01:13PM 5           AND FINALLY, IN THIS PARAGRAPH, "THE COMPANY PLANS TO BE

01:13PM 6      PRIVATE FOR THE LONG-TERM."

01:13PM 7           DO YOU REMEMBER READING THIS AND LEARNING ABOUT THE

01:13PM 8      COMPANY?  AND BY "THIS" I MEAN THE LETTER.

01:13PM 9      A.   I CERTAINLY REMEMBER READING THE LETTER AND READING THAT

01:13PM 10     PARAGRAPH, BUT I THINK THAT WAS ALL CONSISTENT WITH WHAT

01:13PM 11     ELIZABETH TOLD ME IN PREVIOUS CONVERSATIONS.

01:14PM 12     Q.   OKAY.  TWO PARAGRAPHS DOWN THERE'S A SENTENCE, OR A

01:14PM 13     PARAGRAPH, THAT BEGINS WITH THE WORD "HISTORICALLY."

01:14PM 14          DO YOU SEE THAT?

01:14PM 15     A.   YES.

01:14PM 16     Q.   "HISTORICALLY THERANOS'S WORK WAS FOCUSSED ON CONTRACTS

01:14PM 17     WITH PHARMACEUTICAL AND MILITARY CLIENTS."

01:14PM 18          WHAT DID THAT MEAN TO YOU, AND PARTICULARLY THE WORD

01:14PM 19     "HISTORICALLY"?

01:14PM 20     A.   WELL, IT MEANS THAT UP UNTIL THIS POINT THEY'VE FOCUSSED

01:14PM 21     MAINLY ON THEIR CONTRACTS, WHICH MEANS BINDING AGREEMENTS, AND

01:14PM 22     TO DO WORK WITH PHARMACEUTICAL AND MILITARY CLIENTS.

01:14PM 23     Q.   WAS THAT IMPORTANT TO YOU?  AND BY "THAT" I MEAN THAT

01:14PM 24     THERE HAD BEEN WORK WITH PHARMACEUTICAL AND MILITARY CLIENTS?

01:14PM 25     A.   IT WAS IMPORTANT.

01:14PM  1    Q.   WHY?

01:14PM  2    A.   WELL, I -- OBVIOUSLY THE PHARMACEUTICAL CLIENTS ARE,

01:14PM  3    THEY'RE BIG COMPANIES, VERY SOPHISTICATED COMPANIES, AND

01:14PM  4    OBVIOUSLY THEY'RE IN A POSITION TO MAKE JUDGMENTS ABOUT

01:14PM  5    TECHNOLOGY.

01:14PM  6        AND THE U.S. MILITARY ALSO IS A VERY BIG, SOPHISTICATED

01:14PM  7    ORGANIZATION THAT WOULD ALSO HAVE PRESUMABLY ACCESS TO EXPERTS

01:15PM  8    TO MAKE JUDGMENTS.

01:15PM  9    Q.   THE -- THERE'S A PARAGRAPH TWO DOWN.

01:15PM  10        IT BEGINS, "ONCE THE COMPANY."

01:15PM  11        DO YOU SEE THAT?

01:15PM  12   A.   YES.

01:15PM  13   Q.   "ONCE THE COMPANY WAS READY TO LAUNCH ITS COMMERCIAL

01:15PM  14   LABORATORY AND ANNOUNCED ITS NATIONAL CONTRACT WITH WALGREENS

01:15PM  15   IN FALL OF 2013, THERANOS BEGAN OPERATING IN THE CONSUMER,

01:15PM  16   PHYSICIAN, AND HOSPITAL LABORATORY TESTING BUSINESS IN THE

01:15PM  17   UNITED STATES, WITH PLANS FOR INTERNATIONAL EXPANSION."

01:15PM  18        WHEN THE PHRASE "ONCE THE COMPANY WAS READY" WAS USED,

01:15PM  19   WHAT DID THAT MEAN TO YOU?

01:15PM  20   A.   IT WOULD NORMALLY MEAN TO ME THAT WHEN THE TECHNOLOGY HAD

01:15PM  21   SORT OF PROVEN ITSELF AND WAS CAPABLE OF BEING ROLLED OUT TO

01:15PM  22   THE NEW CONSUMERS AND SUCH, THAT'S WHEN IT WAS READY.

01:15PM  23   Q.   AND WHEN YOU READ THIS, DID YOU THINK THAT THERANOS HAD

01:15PM  24   PREMATURELY LAUNCHED WITH CONSUMERS?

01:16PM  25   A.   I DON'T THINK I THOUGHT ONE WAY OR THE OTHER.  I DIDN'T

01:16PM 1     KNOW ENOUGH HONESTLY.

01:16PM 2     Q.   I'M SORRY.  YOU WEREN'T THINKING ABOUT THAT YET?

01:16PM 3     A.   I WASN'T THINKING ABOUT THAT.

01:16PM 4     Q.   OKAY.  WILL YOU NOW TURN TO THE NEXT PAGE, PAGE 2.

01:16PM 5          THE SECOND PARAGRAPH DOWN, IT READS, "THERANOS HAS GROWN

01:16PM 6     FROM CASH FROM ITS CONTRACTS FOR SOME TIME."

01:16PM 7          DO YOU SEE THAT?

01:16PM 8     A.   I DO.

01:16PM 9     Q.   AND WHAT DID THAT MEAN TO YOU?  DO YOU RECALL THAT?

01:16PM 10    A.   WHAT IT WOULD MEAN TO ME IS THAT UP UNTIL THAT POINT THEY

01:16PM 11    HAD RECEIVED CASH FROM THE CONTRACTS THAT THEY HAD IN PLACE AND

01:16PM 12    THAT IT HELPED THEM SUPPORT THE COMPANY AS IT GREW.

01:16PM 13    Q.   OKAY.  AND NOW ABOUT THREE PARAGRAPHS DOWN THERE'S A

01:16PM 14    PARAGRAPH THAT BEGINS, "WITH THIS LETTER."

01:16PM 15         DO YOU SEE THAT?

01:16PM 16    A.   YES.

01:16PM 17    Q.   "WITH THIS LETTER AND AS PROMISED ON OUR CALL, I WOULD

01:16PM 18    LIKE TO FORMALLY EXTEND TO YOU THE INVITATION TO PARTICIPATE IN

01:16PM 19    THIS EQUITY TRANSACTION TO WHATEVER EXTENT YOU ARE INTERESTED."

01:16PM 20         WHAT DID THAT MEAN?

01:17PM 21    A.   I THINK AT SOME POINT IN OUR CONVERSATIONS I SAID TO

01:17PM 22    ELIZABETH, THIS SOUNDS LIKE A VERY INTERESTING IDEA AND A VERY

01:17PM 23    EXCITING COMPANY AND IT'S SOMETHING THAT I MIGHT LIKE

01:17PM 24    PERSONALLY TO INVEST IN.

01:17PM 25    Q.   DO YOU RECALL WHEN THAT HAPPENED?  YOU DESCRIBED FOR THE

01:17PM  1    JURY ORIGINALLY REACHING OUT TO MS. HOLMES BECAUSE OF YOUR

01:17PM  2    RELATIONSHIP WITH DR. KISSINGER; IS THAT RIGHT?

01:17PM  3    A.   RIGHT.

01:17PM  4    Q.   BUT AT SOME POINT IT TRANSITIONED OR PIVOTED TO YOUR

01:17PM  5    EVALUATING AN INVESTMENT OPPORTUNITY FOR YOURSELF?

01:17PM  6    A.   YOU KNOW, I DON'T KNOW IF IT PIVOTED IN THE SENSE THAT I

01:17PM  7    WAS STILL LOOKING AT IT WITH AN INTENT TO TELL DR. KISSINGER

01:17PM  8    WHAT I THOUGHT ABOUT IT, AND I THINK MY COMMENT WAS SIMPLY

01:17PM  9    THAT, YOU KNOW, IT REALLY DOES SOUND EXCITING AND THAT'S

01:17PM  10   SOMETHING THAT WOULD PERSONALLY INTEREST ME.

01:17PM  11       SO, I MEAN, IT WAS JUST A -- PROBABLY UP UNTIL THAT POINT

01:17PM  12   IT WAS JUST SORT OF A, A COMMENT ABOUT HOW INTERESTING I FOUND

01:17PM  13   IT, AND THAT I MIGHT FIND IT PERSONALLY INTERESTING AS AN

01:17PM  14   INVESTMENT.

01:17PM  15   Q.   I SEE.  SO YOUR WORK FOR DR. KISSINGER DIDN'T STOP?

01:18PM  16   A.   IT DID NOT.

01:18PM  17   Q.   YOU PURSUED BOTH AT THE SAME TIME; IS THAT FAIR?

01:18PM  18   A.   WELL, I DON'T REALLY HONESTLY KNOW WHETHER I WAS PURSUING

01:18PM  19   AN INVESTMENT AT THAT POINT.  I WAS REALLY DOING WHAT

01:18PM  20   DR. KISSINGER HAD ASKED ME.

01:18PM  21       AND, YOU KNOW, YOU CAN'T READ SOMETHING WITHOUT THINKING

01:18PM  22   ABOUT IT IN A BROADER SCOPE.

01:18PM  23   Q.   I SEE.  OKAY.

01:18PM  24       AND NOW THE LAST PARAGRAPH READS, "I AM HAPPY TO PROVIDE

01:18PM  25   MORE BACKGROUND ON ANY OF THE ABOVE, OR ANY OF THE MATERIALS

01:18PM 1    ENCLOSED IN THIS PACKAGE.  THERANOS'S INVESTMENT DOCUMENTS ARE

01:18PM 2    ENCLOSED HEREIN.  THE ADDITIONAL MATERIALS FOCUS ON THE

01:18PM 3    INFRASTRUCTURE THERANOS HAS DEVELOPED AND INITIAL MARKET OF

01:18PM 4    COMMERCIAL LABORATORY TESTING THAT THERANOS HAS ENTERED."

01:18PM 5         AND I WANT TO FOCUS YOUR ATTENTION ON THE USE OF THE WORD

01:18PM 6    "HAS."

01:18PM 7         MS. HOLMES WRITES THAT "THE ADDITIONAL MATERIALS FOCUS ON

01:18PM 8    THE INFRASTRUCTURE THERANOS HAS DEVELOPED."

01:18PM 9         WHAT DID THAT MEAN TO YOU?

01:18PM 10   A.   REALLY JUST THAT -- I DON'T KNOW WHAT TO SAY OTHER THAN

01:19PM 11   THEY WERE MAKING GREAT PROGRESS IN HAVING DEVELOPED THE

01:19PM 12   TECHNOLOGY AND INFRASTRUCTURE AROUND IT.

01:19PM 13   Q.   AND THE SECOND PART OF THAT SENTENCE CONTINUES, "AND

01:19PM 14   INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT THERANOS

01:19PM 15   HAS ENTERED."

01:19PM 16        WHAT DID THAT MEAN TO YOU?

01:19PM 17   A.   I THINK I THOUGHT THAT REFERRED TO THE FACT THAT THEY HAD

01:19PM 18   ENTERED INTO AN ARRANGEMENT WITH WALGREENS TO BEGIN TESTING.

01:19PM 19   Q.   WERE YOU AWARE OF THAT AT OR AROUND THIS TIME?

01:19PM 20   A.   I WAS.  I THINK -- I BELIEVE THERE WAS AN ARTICLE IN "THE

01:19PM 21   WALL STREET JOURNAL" THAT PRECEDED THIS THAT DESCRIBED THAT IN

01:19PM 22   SOME DETAIL.

01:19PM 23   Q.   OKAY.  SOMETIME AROUND THIS TIME, YOU THINK YOU BECAME

01:19PM 24   AWARE OF IT?

01:19PM 25   A.   RIGHT.  AND I THINK ELIZABETH MAY HAVE -- PROBABLY HAD

01:19PM  1     ALSO DESCRIBED IT TO ME AS WELL.

01:19PM  2     Q.   OKAY.  DO YOU KNOW WHAT THEY WERE DOING WITH WALGREENS,

01:19PM  3     WHAT THERANOS WAS DOING WITH WALGREENS?

01:19PM  4     A.   WELL, I KNOW WHAT I KNEW FROM "THE WALL STREET JOURNAL"

01:20PM  5     ARTICLE, AND THE MATERIALS THAT WERE INCLUDED WITH THIS PACKAGE

01:20PM  6     HAD INFORMATION ABOUT IT, AND I THINK I KNEW SOMETHING ABOUT IT

01:20PM  7     FROM CONVERSATIONS WITH ELIZABETH.

01:20PM  8     Q.   AND IN A BROAD SENSE AT LEAST, WHAT WAS IT?

01:20PM  9     A.   WELL, IT WAS OFFERING, YOU KNOW, TESTING WHERE PEOPLE

01:20PM  10    COULD GO INTO WALGREENS AND HAVE THEIR BLOOD TESTED AND GET THE

01:20PM  11    RESULTS BACK.

01:20PM  12    Q.   BLOOD TESTING?

01:20PM  13    A.   BLOOD TESTING.

01:20PM  14    Q.   OKAY.  COULD I ASK YOU NOW TO TURN BACK IN YOUR BINDER TO

01:20PM  15    EXHIBIT 3387.  IT'S A LARGE EXHIBIT, AND INITIALLY I WOULD LIKE

01:20PM  16    YOU TO JUST LOOK THROUGH IT AND TELL ME IF THIS IS SOME OF THE

01:20PM  17    MATERIALS THAT WERE INCLUDED WITH THE LETTER THAT WE JUST READ.

01:21PM  18    A.   YES, I DO BELIEVE TO THE BEST OF MY RECOLLECTION THIS WAS

01:21PM  19    SOME OF THE MATERIAL, OR MAYBE ALL OF THE MATERIAL, THAT WAS IN

01:21PM  20    THAT PACKAGE.

01:21PM  21    Q.   OKAY.

01:21PM  22         YOUR HONOR, THE GOVERNMENT OFFERS 3387.

01:21PM  23              MR. WADE:  NO OBJECTION.

01:21PM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:21PM  25         (GOVERNMENT'S EXHIBIT 3387 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   CAN WE START WITH PAGE 128.  THERE'S PAGE NUMBERS AT THE

BOTTOM IN THE MIDDLE, MR. MOSLEY.

A.   OKAY.  OKAY.

Q.   THIS IS ENTITLED CERTIFICATE OF DESIGNATION OF SERIES C-2

PREFERRED STOCK.

     DO YOU SEE THAT?

A.   I DO.

Q.   WHAT IS THAT?

A.   IT'S A CERTIFICATE THAT IS NORMALLY ADOPTED BY A BOARD OF

DIRECTORS OF A COMPANY TO AUTHORIZE A PARTICULAR CLASS OF STOCK

OR PARTICULAR SERIES OF STOCK.

Q.   AND THIS ONE IS CALLED C-2; IS THAT RIGHT?

A.   THAT'S CORRECT.

Q.   EVENTUALLY WHEN YOU PURCHASED STOCK IN THERANOS, WHICH

SERIES DID YOU BUY?

A.   C-2.

Q.   ON THIS PAGE THERE'S A NUMBER 2, LIQUIDATION RIGHTS.

     DO YOU SEE THAT?

A.   I DO.

Q.   AND ON THIS PAGE AND THROUGHOUT THE DOCUMENT, THERE IS

SOME UNDERLINING IN IT.

     DO YOU SEE THAT?

A.   I DO.

Q.   AND WHOSE UNDERLINING IS THAT?

01:22PM   1     A.   IT'S MINE.

01:22PM   2     Q.   AND WHAT WERE YOU DOING?  DESCRIBE FOR THE JURY THE

01:22PM   3     PROCESS HERE.  YOU RECEIVED THESE DOCUMENTS AND NOW WE SEE

01:22PM   4     UNDERLINING.

01:22PM   5          WHAT WAS HAPPENING?

01:22PM   6     A.   WELL, I WAS READING THE DOCUMENTS AND, YOU KNOW,

01:22PM   7     UNDERLINING THINGS THAT WERE OF PARTICULAR IMPORTANCE FROM MY

01:22PM   8     STANDPOINT.

01:22PM   9     Q.   IMPORTANT TO WHAT?

01:22PM   10    A.   WELL, IMPORTANT TO IN THIS CASE UNDERSTANDING WHAT THE C-2

01:22PM   11    PREFERRED STOCK WAS AND WHAT RIGHTS IT HAD.

01:22PM   12    Q.   AND WHEN WE'RE LOOKING THROUGH THESE DOCUMENTS, ARE WE --

01:23PM   13    WERE THESE DOCUMENTS THAT YOU RELIED UPON TO MAKE YOUR

01:23PM   14    INVESTMENT IN THERANOS?

01:23PM   15    A.   THEY'RE SOME OF THE DOCUMENTS THAT I RELIED UPON, YES.

01:23PM   16    Q.   YOU SAID THEY'RE SOME OF.  WHAT DO YOU MEAN?

01:23PM   17    A.   WELL, I THINK THERE WERE OTHER DOCUMENTS THAT I ULTIMATELY

01:23PM   18    RECEIVED BEFORE I ULTIMATELY MADE MY INVESTMENTS.

01:23PM   19    Q.   I SEE.  THESE DOCUMENTS, IN ADDITION TO OTHER DOCUMENTS?

01:23PM   20    A.   THAT'S CORRECT.

01:23PM   21    Q.   WHAT IS THIS LIQUIDATION RIGHTS TELLING US, AND HELP ME

01:23PM   22    UNDERSTAND WHY YOU UNDERLINED THINGS?

01:23PM   23    A.   WELL, IT'S REALLY SAYING IF THE -- IF THERE WAS A PROBLEM

01:23PM   24    WITH THE COMPANY, IF SOMETHING WENT THE WRONG DIRECTION, IN

01:23PM   25    WHAT ORDER -- AND THERE WERE ASSETS TO BE DISTRIBUTED TO THE

01:23PM 1    STOCKHOLDERS, AFTER PAYING OFF DEBT OBVIOUSLY, IF THERE WAS

01:23PM 2    MONEY TO BE DISTRIBUTED TO THE STOCKHOLDERS, WHAT ORDER WOULD

01:23PM 3    THAT MONEY BE DISTRIBUTED AMONG THE VARIOUS SERIES OR CLASSES

01:23PM 4    OF STOCK.

01:24PM 5    Q.   AND IN WHICH RANKING OR WHAT PREFERRED STATUS WOULD C-2

01:24PM 6    HAVE?

01:24PM 7    A.   WELL, C-2 WOULD BE ENTITLED TO GET BACK ITS FACE AMOUNT,

01:24PM 8    DESIGNATED AMOUNT BEFORE ANY PREVIOUS CLASS OF PREFERRED STOCK.

01:24PM 9        SO IT WOULD BE FIRST IN THE ORDER OF RECEIVING PROCEEDS IN

01:24PM 10   THE EVENT OF A LIQUIDATION OF THE COMPANY.

01:24PM 11   Q.   I SEE.  SO C-2 WOULD GET PROCEEDS BEFORE SERIES B, FOR

01:24PM 12   INSTANCE?

01:24PM 13   A.   THAT IS CORRECT.

01:24PM 14   Q.   AND TO USE B AS AN EXAMPLE, DID YOU KNOW WHO OWNED MUCH OF

01:24PM 15   SERIES B?

01:24PM 16   A.   I DON'T THINK I KNEW.

01:24PM 17   Q.   OKAY.  ON THE NEXT PAGE, PAGE 129, THERE'S A SECTION

01:24PM 18   ENTITLED MANDATORY REDEMPTION.

01:24PM 19       DO YOU SEE THAT?

01:24PM 20   A.   I DO.

01:24PM 21   Q.   AND WHAT IS THAT?

01:24PM 22   A.   IT'S A, IT'S A CLAUSE THAT ESSENTIALLY SAID THAT THE

01:24PM 23   COMPANY COULD, AT ITS OPTION AT ANY PARTICULAR TIME IT CHOSE,

01:25PM 24   CHOOSE TO BUY IN OR REPURCHASE THE C -2 PREFERRED SHARES AT A

01:25PM 25   PRICE PER SHARE THAT THEY DETERMINED IN GOOD FAITH BY THE BOARD

01:25PM 1    AS BEING FAIR MARKET VALUE.

01:25PM 2    Q.   OKAY.  AND YOU UNDERLINED SOME LANGUAGE IN THAT AS WELL.

01:25PM 3    WHY DID YOU DO THAT?

01:25PM 4    A.   TO ME IT WAS A LITTLE -- IT WAS AN UNUSUAL -- IT WAS AN

01:25PM 5    UNUSUAL PROVISION, AND THAT'S WHY I UNDERLINED IT.

01:25PM 6    Q.   OKAY.  WHY DO YOU SAY IT WAS UNUSUAL?

01:25PM 7    A.   WELL, IT WAS UNUSUAL BECAUSE NORMALLY IF YOU WERE

01:25PM 8    INVESTING IN THE STOCK OF A COMPANY, IT WOULD BE VERY UNUSUAL

01:25PM 9    TO SAY THAT THE COMPANY'S BOARD COULD GO OUT AND DECIDE AT SOME

01:25PM 10   LATER DATE WHAT THEY THOUGHT THE FAIR MARKET VALUE OF THE STOCK

01:25PM 11   THAT YOU OWNED WAS AND THEN ELECT TO BUY IT FROM YOU, AND IN

01:25PM 12   PARTICULAR THIS ALLOWED THEM TO NOT BUY PRO RATA ACROSS ALL OF

01:25PM 13   THE SHARES, BUT THEY COULD COME TO ONE SHAREHOLDER AND SAY

01:26PM 14   WE'RE LIQUIDATING YOUR SHARES.

01:26PM 15   Q.   AT SOME POINT IN THE FUTURE, DID YOU HAVE A CONVERSATION

01:26PM 16   WITH MS. HOLMES ABOUT THIS MANDATORY REDEMPTION PROVISION?

01:26PM 17   A.   I DID.

01:26PM 18   Q.   AND DID YOU END UP CREATING A SEPARATE ARRANGEMENT WITH

01:26PM 19   MS. HOLMES REGARDING THE APPLICATION OF THE MANDATORY

01:26PM 20   REDEMPTION PROVISION?

01:26PM 21   A.   YES, I RECEIVED A LETTER OR A SHORT DOCUMENT FROM

01:26PM 22   ELIZABETH WITH REGARD TO THIS PROVISION.

01:26PM 23   Q.   GREAT.  OKAY.  WE'LL GET TO THAT DOCUMENT IN A MOMENT.

01:26PM 24        YOUR HONOR, I'M GOING TO TRANSITION INTO ANOTHER TOPIC.

01:26PM 25   I'M HAPPY TO START IT OR TAKE OUR BREAK.

01:26PM  1           THE COURT:  WHY DON'T WE TAKE OUR BREAK NOW.  WE'RE

01:26PM  2   CLOSE ENOUGH TO THE BOTTOM OF THE HOUR.

01:26PM  3       LET'S TAKE OUR AFTERNOON 30 MINUTE BREAK, PLEASE,

01:26PM  4   30 MINUTES.

01:26PM  5           THE WITNESS:  THANK YOU.

01:26PM  6       (JURY OUT AT 1:26 P.M.)

01:27PM  7           THE COURT:  YOU CAN STAND DOWN NOW, SIR.  THANK YOU.

01:27PM  8           THE WITNESS:  CAN I GO OUT THIS DOOR?

01:27PM  9           THE COURT:  YOU CAN GO OUT THE DOOR YOU CAME IN.

01:27PM 10   THANK YOU.

01:27PM 11       PLEASE BE SEATED.  THANK YOU.

01:27PM 12       ALL RIGHT.  THE RECORD SHOULD REFLECT THAT THE JURY HAS

01:27PM 13   LEFT FOR THEIR AFTERNOON BREAK AND THE WITNESS HAS LEFT THE

01:27PM 14   COURTROOM.

01:27PM 15       I JUST WANT TO CHECK IN, ANYTHING BEFORE WE BREAK,

01:27PM 16   MR. SCHENK?

01:27PM 17           MR. SCHENK:  YOUR HONOR, WE RAISED THE ISSUE THIS

01:27PM 18   MORNING ABOUT THE 2015 DOCUMENTS.  I ANTICIPATE THAT WE'LL GET

01:27PM 19   TO THAT THIS AFTERNOON, OR AT LEAST NOW COULD BE A CONVENIENT

01:27PM 20   TIME TO DISCUSS THAT IF THE COURT IS IN A POSITION TO HAVE

01:27PM 21   FURTHER DISCUSSIONS.

01:27PM 22           THE COURT:  OKAY.  DO YOU THINK WE'LL GET TO THIS?

01:28PM 23   IS THIS GOING TO COME IN THROUGH YOUR DIRECT?

01:28PM 24           MR. SCHENK:  NO, IT WILL NOT.

01:28PM 25           THE COURT:  I SEE.

| | | |
|---|---|---|
| 01:28PM | 1 | MR. WADE: I'M NOT SURE HOW MUCH LONGER MR. SCHENK |
| 01:28PM | 2 | HAS. I THINK -- I CAN CERTAINLY AVOID THAT TOPIC. WE CAN |
| 01:28PM | 3 | DISCUSS IT IN THE MORNING IF THAT'S -- OR AFTER COURT. IT |
| 01:28PM | 4 | DEPENDS ON -- |
| 01:28PM | 5 | THE COURT: ALL RIGHT. WELL, LET'S DO THAT. LET'S |
| 01:28PM | 6 | TAKE OUR BREAK AND WE'LL DEFER DISCUSSION. |
| 01:28PM | 7 | IF IT DOES -- IF MR. SCHENK ENDS AND YOU BEGIN YOUR |
| 01:28PM | 8 | CROSS-EXAMINATION, YOU DON'T NEED TO GO INTO THIS THIS |
| 01:28PM | 9 | AFTERNOON I TAKE IT? |
| 01:28PM | 10 | MR. WADE: I DON'T THINK SO. I THINK, BASED ON THE |
| 01:28PM | 11 | TIMING AS I SEE IT, I THINK WE CAN AVOID GOING INTO THAT, YEAH. |
| 01:28PM | 12 | THE COURT: ALL RIGHT. FAIR ENOUGH. THANK YOU. |
| 01:28PM | 13 | MR. WADE: THANK YOU, YOUR HONOR. |
| 01:28PM | 14 | THE CLERK: COURT IS IN RECESS. |
| 01:28PM | 15 | (RECESS FROM 1:28 P.M. UNTIL 2:03 P.M.) |
| 02:03PM | 16 | (JURY IN AT 2:03 P.M.) |
| 02:03PM | 17 | THE COURT: PLEASE BE SEATED. WE'RE BACK ON THE |
| 02:03PM | 18 | RECORD. ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN. OUR |
| 02:03PM | 19 | JURY IS PRESENT. OUR WITNESS IS ON THE STAND. |
| 02:03PM | 20 | I'M SORRY, MR. SCHENK. |
| 02:03PM | 21 | I JUST WANTED TO LET EVERYONE KNOW THAT IT SEEMS WARM TO |
| 02:03PM | 22 | ME IN THE COURTROOM, AND I DON'T KNOW WHAT THAT HAS TO DO WITH |
| 02:03PM | 23 | OUR ISSUE LAST WEEK WITH WATER, BUT WE'RE TRYING TO GET THAT -- |
| 02:04PM | 24 | THE TEMPERATURE ADJUSTED A LITTLE BIT SO IT CAN COOL OFF A |
| 02:04PM | 25 | LITTLE BIT HERE. SO I APOLOGIZE FOR THE INCONVENIENCE. |

02:04PM  1         IF ANY MEMBER OF THE JURY, IF IT BECOMES UNTENABLE OR A

02:04PM  2    PROBLEM, PLEASE LET ME KNOW AND RAISE YOUR HAND, AND WE'LL DO

02:04PM  3    WHAT WE CAN.

02:04PM  4         OTHERWISE -- OR ANY PARTY, TOO.  PLEASE LET ME KNOW.

02:04PM  5         ALL RIGHT.  THANK YOU.

02:04PM  6         MR. SCHENK, YOU'D LIKE TO CONTINUE?

02:04PM  7              MR. SCHENK:  YES.  THANK YOU.

02:04PM  8    Q.   GOOD AFTERNOON AGAIN, MR. MOSLEY.

02:04PM  9    A.   HELLO.

02:04PM  10   Q.   WHEN WE FINISHED OFF WE WERE LOOKING AT EXHIBIT 3387.

02:04PM  11        DO YOU RECALL THAT?

02:04PM  12   A.   I DO.

02:04PM  13   Q.   AND I THINK YOU TESTIFIED THAT THESE WERE AMONG THE

02:04PM  14   DOCUMENTS THAT YOU REVIEWED AND ASSISTED IN YOUR DECISION TO

02:04PM  15   INVEST IN THERANOS?

02:04PM  16   A.   YES.

02:04PM  17   Q.   AND WOULD YOU TURN TO PAGE 144 OF THIS EXHIBIT,

02:04PM  18   EXHIBIT 3387.

02:04PM  19   A.   YES.

02:04PM  20   Q.   EXHIBIT PAGE 144, MS. HOLLIMAN, PLEASE.

02:05PM  21        DO YOU SEE THAT DOCUMENT?

02:05PM  22   A.   I DO.

02:05PM  23   Q.   AND WHAT ARE WE LOOKING AT?

02:05PM  24   A.   THESE ARE SOME HANDWRITTEN NOTES THAT ARE IN MY

02:05PM  25   HANDWRITING.

02:05PM   1      Q.   OKAY.  AND DID YOU TAKE THESE NOTES WHILE YOU WERE

02:05PM   2      REVIEWING THE MATERIALS THAT WE'RE LOOKING AT, OR ON A PHONE

02:05PM   3      CALL?

02:05PM   4           DO YOU RECALL?

02:05PM   5      A.   I DON'T HONESTLY KNOW.  I DON'T REMEMBER.

02:05PM   6      Q.   OKAY.  THESE ARE NOTES ABOUT THERANOS, BUT YOU DON'T

02:05PM   7      REMEMBER THE CIRCUMSTANCES OF TAKING THEM?

02:05PM   8      A.   THAT'S CORRECT.

02:05PM   9      Q.   OKAY.  LET'S WALK THROUGH SOME OF THEM AND IF YOU CAN HELP

02:05PM  10      US WITH THE HANDWRITING.

02:05PM  11           WHAT IS NUMBER 1?

02:05PM  12      A.   IT SAYS PENETRATION ASSUMED IN 2015, AND THE HASH MARK

02:05PM  13      MEANS NUMBERS TO ME.

02:05PM  14      Q.   OKAY.

02:05PM  15      A.   AND --

02:05PM  16      Q.   I'M SORRY?

02:05PM  17      A.   DO YOU WANT ME TO READ THE REST OF 1?

02:05PM  18      Q.   SURE.  WHY DON'T YOU READ IT AND THEN I'LL ASK YOU

02:05PM  19      QUESTIONS.

02:05PM  20      A.   SURE.  FIRST LOCATION IN PALO ALTO IN 2012.

02:06PM  21           AND THEN NOW.

02:06PM  22           AND THEN P/S MEANS PARTNERSHIP WITH WALGREENS FALL OF

02:06PM  23      2013.

02:06PM  24           AND THEN THE NEXT IS NOW IN 30 WALGREENS, AND UNDER THAT

02:06PM  25      IT SAYS 29 ARIZONA, 1 PALO ALTO.

02:06PM   1          AND THEN IT SAYS WALGREENS IN 10,000 STORES IN 10

02:06PM   2   COUNTRIES.

02:06PM   3          AND THEN IT SAYS COLLABORATIONS WITH 3 HOSPITAL GROUPS.

02:06PM   4          AS REFERENCE LABS.

02:06PM   5          QUOTE, "MASSIVE UNDERTAKING."

02:06PM   6   Q.   THANK YOU.  LET'S GO TO THE TOP, PENETRATION ASSUMED IN

02:06PM   7   2015 NUMBERS.

02:06PM   8          WHAT IS THAT A REFERENCE TO?

02:06PM   9   A.   IT WOULD BE A REFERENCE TO WHAT THE -- WHAT WERE THE

02:06PM  10   ASSUMPTIONS BAKED INTO THE FINANCIAL NUMBERS.

02:06PM  11   Q.   DID MS. HOLMES PROVIDE YOU FINANCIAL NUMBERS BEFORE YOU

02:06PM  12   INVESTED?

02:06PM  13   A.   I BELIEVE THERE ARE FINANCIAL NUMBERS IN THIS BOOK, OR I

02:06PM  14   CERTAINLY HAD FINANCIAL NUMBERS BEFORE I INVESTED.

02:06PM  15   Q.   OKAY.  I'LL SHOW THOSE TO YOU IN A MOMENT, BUT WHAT ARE

02:07PM  16   YOU TALKING ABOUT -- YOU USED THE WORD "BAKED IN."  WHAT WERE

02:07PM  17   YOU REFERRING TO?

02:07PM  18   A.   WELL, I MEANT THE FINANCIAL -- THE ASSUMPTIONS THAT WERE

02:07PM  19   USED IN COMING TO THE FINANCIAL NUMBERS.

02:07PM  20   Q.   OKAY.  AND WHAT IS "PENETRATION" A REFERENCE TO?

02:07PM  21   A.   IT WOULD MEAN THE DEGREE OF ADOPTION INTO THE MARKET.  SO

02:07PM  22   SAYING, YOU KNOW, 30 WALGREENS WOULD BE AN EXAMPLE OF WHAT PART

02:07PM  23   OF THE MARKET THE COMPANY WAS THEN SERVICING.

02:07PM  24   Q.   I SEE.  SO YOU WROTE IN HERE THAT AT THIS POINT THERE WERE

02:07PM  25   30 WALGREENS LOCATIONS THAT WERE OFFERING THERANOS BLOOD

02:07PM 1    TESTING SERVICES?

02:07PM 2    A.   YES.

02:07PM 3    Q.   AND PENETRATION ASSUMED IN 2015 NUMBERS.

02:07PM 4         IS THAT A STATEMENT ABOUT INCREASED WALGREENS ADOPTION?

02:07PM 5    A.   I, I DON'T KNOW.  I DON'T REMEMBER.

02:07PM 6    Q.   OKAY.  BUT PENETRATION OR ADOPTION BY WALGREENS OF

02:08PM 7    THERANOS WAS RELEVANT TO THE 2015 FINANCIAL PROJECTIONS?

02:08PM 8    A.   WELL, IT HAD TO, BECAUSE ONE LINE WAS OBVIOUSLY FROM

02:08PM 9    PHARMACIES, ONE -- AS I REMEMBER IN THE FINANCIAL STATEMENTS,

02:08PM 10   ONE LINE WAS IN SOME WAY DESIGNATED AS REVENUE FROM PHARMACY --

02:08PM 11   WALGREENS PHARMACIES.

02:08PM 12   Q.   I SEE.  SO THE NUMBER OF WALGREENS LOCATIONS WOULD

02:08PM 13   DETERMINE OR HAVE AN EFFECT ON THE AMOUNT OF REVENUE THAT

02:08PM 14   THERANOS GENERATED FROM WALGREENS?

02:08PM 15   A.   PRESUMABLY, YES.

02:08PM 16   Q.   I SEE.  AND THEN FURTHER DOWN YOU WRITE ABOUT HOSPITAL

02:08PM 17   GROUPS AND REFERENCE LABS.

02:08PM 18        WHAT IS THAT A REFERENCE TO?

02:08PM 19   A.   IT WAS A REFERENCE TO MY UNDERSTANDING THAT THEY WERE

02:08PM 20   CURRENTLY WORKING WITH THREE HOSPITAL GROUPS, COLLABORATIONS

02:08PM 21   MEANT THEY WERE WORKING WITH THREE HOSPITAL GROUPS, AND

02:09PM 22   PRESUMABLY THAT MEANT AS REFERENCE LABS OR, OR -- I DON'T

02:09PM 23   REALLY KNOW EXACTLY WHAT THAT MEANT HONESTLY.

02:09PM 24   Q.   OKAY.  YOU HAD AN UNDERSTANDING, I THINK YOU SAID, THAT

02:09PM 25   THEY WERE WORKING WITH, THERANOS WAS WORKING WITH THREE

02:09PM   1     HOSPITAL GROUPS?

02:09PM   2     A.   THAT'S CORRECT.

02:09PM   3     Q.   BUT YOU, YOU DON'T REMEMBER EXACTLY WHAT THAT WORK

02:09PM   4     INVOLVED; IS THAT FAIR?

02:09PM   5     A.   I DON'T THINK I KNEW A LOT OF DETAIL.

02:09PM   6     Q.   OKAY.  IF YOU'LL NOW TURN TO PAGE 275 IN THIS EXHIBIT.

02:09PM   7     A.   OKAY.

02:09PM   8     Q.   AND THIS DOCUMENT IS PART OF THE BINDER AND IT'S LABELED

02:09PM   9     MEMO:  IMPLICATIONS OF THERANOS'S WORK FOR GLOBAL HEALTH,

02:09PM  10     PUBLIC POLICY, AND THOSE IN NEED.

02:09PM  11          DO YOU SEE THAT?

02:09PM  12     A.   I DO.

02:09PM  13     Q.   OKAY.  AND NOW IF YOU'LL LOOK AT THAT FIRST PARAGRAPH, IT

02:10PM  14     READS, "HEADQUARTERED IN PALO ALTO, THERANOS IS A CONSUMER

02:10PM  15     HEALTHCARE TECHNOLOGY COMPANY.  THERANOS'S CLINICAL LABORATORY

02:10PM  16     OFFERS COMPREHENSIVE LABORATORY TESTS FROM SAMPLES AS SMALL AS

02:10PM  17     A FEW DROPS OF BLOOD AT UNPRECEDENTED LOW PRICES."

02:10PM  18          IS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING AT

02:10PM  19     THE TIME ABOUT WHAT THERANOS DID?

02:10PM  20     A.   YES.

02:10PM  21     Q.   IF YOU'LL TURN TO THE SECOND PAGE OF THIS MEMO, WHICH IS

02:10PM  22     276, PAGE 276, AT THE TOP THERE'S A PARAGRAPH THAT BEGINS

02:10PM  23     "THERANOS."

02:10PM  24          DO YOU SEE THAT?

02:10PM  25     A.   YES.

02:10PM 1    Q.   IT READS, "THERANOS HAS BUILT A CERTIFIED LABORATORY

02:10PM 2    INFRASTRUCTURE POWERED BY THERANOS DEVICES THAT MAKE IT

02:10PM 3    POSSIBLE TO RUN ANY LABORATORY TEST FROM A MICRO-SAMPLE OF

02:10PM 4    BLOOD (TAKEN FROM A FINGER-STICK) OR OTHER" -- I'M SORRY, "OR

02:11PM 5    OTHER ANY OTHER FLUID (NASAL SWABS, THROAT SWABS, URINE)," IT

02:11PM 6    CONTINUES, "THERANOS'S TESTS ARE CAPABLE OF GENERATING RESULTS

02:11PM 7    IN LESS THAN AN HOUR FROM THE TIME A SAMPLE IS PROCESSED."

02:11PM 8         DO YOU SEE THAT?

02:11PM 9    A.   YES.

02:11PM 10   Q.   IN THAT FIRST SENTENCE, THERE IS SOME UNDERLINING.  IS

02:11PM 11   THAT YOUR HANDWRITING?

02:11PM 12   A.   YES, IT IS.

02:11PM 13   Q.   AND IT TALKS ABOUT THERANOS'S INFRASTRUCTURE THAT'S

02:11PM 14   POWERED BY THERANOS DEVICES.

02:11PM 15        WAS THAT YOUR UNDERSTANDING, THAT THERANOS USED THERANOS

02:11PM 16   DEVICES TO TEST BLOOD?

02:11PM 17   A.   IT WAS.

02:11PM 18   Q.   AND DID YOU KNOW WHETHER THERANOS USED DEVICES

02:11PM 19   MANUFACTURED BY THIRD PARTIES TO TEST BLOOD?

02:11PM 20   A.   I DID NOT.

02:11PM 21   Q.   YOU DID NOT KNOW THAT?

02:11PM 22   A.   I DID NOT KNOW.

02:11PM 23   Q.   IT CONTINUES, "DEVICES THAT MAKE IT POSSIBLE TO RUN ANY

02:11PM 24   LAB TEST FROM A MICRO-SAMPLE TAKEN FROM A FINGERSTICK."

02:11PM 25        IS THAT ALSO CONSISTENT WITH YOUR UNDERSTANDING AT THE

02:11PM  1    TIME?

02:11PM  2    A.   IT IS.

02:11PM  3    Q.   THERANOS PERFORMED BLOOD TESTING THAT COULD DO ANY LAB

02:11PM  4    TEST FROM A MICRO-SAMPLE AND THAT MICRO-SAMPLE WAS TAKEN FROM A

02:12PM  5    FINGERSTICK.

02:12PM  6         IS THAT WHAT YOU UNDERSTOOD THIS TECHNOLOGY TO BE AT THE

02:12PM  7    TIME THAT YOU WERE CONSIDERING THIS INVESTMENT?

02:12PM  8    A.   YES, WITH THE EXCEPTION THAT OBVIOUSLY SOME OF THESE TYPES

02:12PM  9    OF FLUID SAMPLES WOULDN'T HAVE BEEN TAKEN BY A FINGERSTICK LIKE

02:12PM  10   A SWAB, A THROAT SWAB.  THAT'S THE ONLY THING.

02:12PM  11        BUT THE BLOOD, THE BLOOD DRAWS IN MY UNDERSTANDING WERE BY

02:12PM  12   A FINGERSTICK.

02:12PM  13   Q.   SO YOUR UNDERSTANDING WAS WHEN THEY WERE TESTING BLOOD, IT

02:12PM  14   WAS BLOOD DRAWN FROM A FINGER, BUT THEY MIGHT ALSO HAVE THE

02:12PM  15   ABILITY TO TEST --

02:12PM  16   A.   OTHER.

02:12PM  17   Q.   FORGIVE ME.

02:12PM  18        -- FLUIDS OR OTHER SAMPLES FROM OTHER PARTS OF THE BODY?

02:12PM  19   A.   THAT'S CORRECT.

02:12PM  20   Q.   THANK YOU.

02:12PM  21        IF YOU WILL NOW TURN TO PAGE 278.  THIS SECTION OF YOUR

02:12PM  22   MATERIALS LOOKS LIKE IT'S A GROUP OF POWERPOINT SLIDES.

02:12PM  23        DO YOU RECALL THAT?

02:12PM  24   A.   I DO.

02:12PM  25   Q.   AND DID YOU ALSO REVIEW THESE POWERPOINT SLIDES BEFORE YOU

02:12PM  1    MADE THE DECISION TO INVEST $6 MILLION?

02:12PM  2    A.   I DID.

02:12PM  3    Q.   THE SLIDE THAT IS NUMBERED 279, THE NEXT PAGE.

02:13PM  4    A.   YES.

02:13PM  5    Q.   MS. KRATZMANN, CAN YOU CLEAR THE SCREEN.  THANK YOU.

02:13PM  6         ON 279 THERE'S AN IMAGE OF A CHILD AND THE PHRASE

02:13PM  7    "GOODBYE, BIG BAD NEEDLE."

02:13PM  8         DO YOU SEE THAT?

02:13PM  9    A.   I DO.

02:13PM  10   Q.   MR. MOSLEY, I THINK -- THE SCREEN IS A TOUCH SCREEN AND

02:13PM  11   YOUR BINDER MIGHT BE MAKING IMAGES.

02:13PM  12   A.   OH.  SORRY ABOUT THAT.

02:13PM  13   Q.   NO PROBLEM.  THANK YOU.

02:13PM  14        WHAT DID "GOODBYE, BIG BAD NEEDLE" MEAN TO YOU?

02:13PM  15   A.   IT MEANT THAT THEY COULD DO A BLOOD DRAW WITHOUT HAVING TO

02:13PM  16   USE A LARGE NEEDLE.

02:13PM  17   Q.   AND WHERE WOULD THE BLOOD BE TAKEN USING THE LARGE NEEDLE?

02:13PM  18   DID YOU HAVE AN IDEA?

02:13PM  19   A.   IT WOULD BE TAKEN FROM A VEIN.

02:13PM  20   Q.   OKAY.  WOULD YOU TURN TO 280, 2-8-0.

02:13PM  21        ON THIS SLIDE IT SAYS THAT "THERANOS'S PROPRIETARY,

02:13PM  22   PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A

02:14PM  23   FINGER-STICK AND TESTS FROM MICRO-SAMPLES OF OTHER MATRICES,

02:14PM  24   AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN

02:14PM  25   CURRENTLY POSSIBLE."

02:14PM 1          DO YOU SEE THAT?

02:14PM 2     A.   I DO.

02:14PM 3     Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING AT THE

02:14PM 4     TIME THAT YOU WERE CONSIDERING MAKING AN INVESTMENT WHAT THE

02:14PM 5     THERANOS TECHNOLOGY WAS?

02:14PM 6     A.   IT WAS.

02:14PM 7     Q.   AND DO YOU UNDERSTAND THAT THERANOS HAD ITS OWN TECHNOLOGY

02:14PM 8     THAT RAN THESE COMPREHENSIVE BLOOD TESTS?

02:14PM 9     A.   I DID.

02:14PM 10    Q.   IT CONTINUES, "THERANOS IS THE WORLD'S FIRST AND ONLY

02:14PM 11    CLIA-CERTIFIED LABORATORY RUNNING ITS TESTS ON MICRO-SAMPLES,"

02:14PM 12    AND CONTINUES, "CURRENT AND PAST CLIENTS INCLUDE 10 OF THE TOP

02:14PM 13    15 MAJOR PHARMACEUTICAL COMPANIES, MIDSIZED BIO-PHARMAS,

02:14PM 14    PROMINENT RESEARCH INSTITUTIONS, HEALTH CARE PAYORS, AND U.S.

02:14PM 15    AND FOREIGN GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

02:14PM 16         WAS THAT WORK THAT THERANOS HAD DONE WITH THESE

02:15PM 17    ORGANIZATIONS, WAS THAT IMPORTANT TO YOU?

02:15PM 18    A.   IT WAS.

02:15PM 19    Q.   WHY?

02:15PM 20    A.   OBVIOUSLY THE PHARMACEUTICAL COMPANIES ARE EXTREMELY

02:15PM 21    SOPHISTICATED AND CAPABLE OF MAKING JUDGMENTS ABOUT THE

02:15PM 22    TECHNOLOGY.

02:15PM 23    Q.   AND THE RELATIONSHIP THAT THERANOS HAD WITH THESE, WITH

02:15PM 24    THESE COMPANIES, DID THAT SAY SOMETHING TO YOU ABOUT THE

02:15PM 25    THERANOS TECHNOLOGY?

| | | |
|---|---|---|
| 02:15PM | 1 | A. I WOULD REGARD IT AS AN ENDORSEMENT THAT THEY HAD |
| 02:15PM | 2 | CONFIDENCE IN THE TECHNOLOGY. |
| 02:15PM | 3 | Q. OKAY. IF YOU'LL TURN NOW TO PAGE 285. |
| 02:15PM | 4 | THIS SLIDE IS LABELLED VALIDATION OF THERANOS TESTS. |
| 02:15PM | 5 | DO YOU SEE THAT? |
| 02:15PM | 6 | A. I DO. |
| 02:15PM | 7 | Q. IT READS, "THERANOS HAS BEEN COMPREHENSIVELY VALIDATED |
| 02:15PM | 8 | OVER THE COURSE OF THE LAST SEVEN YEARS BY 10 OF THE 15 LARGEST |
| 02:15PM | 9 | PHARMACEUTICAL COMPANIES, WITH HUNDREDS OF THOUSANDS OF ASSAYS |
| 02:15PM | 10 | PROCESSED." |
| 02:15PM | 11 | IS THIS A LITTLE BIT MORE THE POINT THAT YOU WERE JUST |
| 02:15PM | 12 | MAKING TO ME ABOUT VALIDATION THROUGH THIS EXTERNAL WORK? |
| 02:15PM | 13 | A. YES. |
| 02:15PM | 14 | Q. THERE'S AN IMAGE AT THE BOTTOM, JOHNS HOPKINS MEDICINE. |
| 02:16PM | 15 | DO YOU SEE THAT? |
| 02:16PM | 16 | A. I DO. |
| 02:16PM | 17 | Q. AND IT READS ABOVE THAT, "EXCERPTS FROM JOHNS HOPKINS DUE |
| 02:16PM | 18 | DILIGENCE AND TECHNOLOGY VALIDATION." |
| 02:16PM | 19 | WAS THAT THE WORK WITH JOHNS HOPKINS, WAS THAT IMPORTANT |
| 02:16PM | 20 | TO YOU? |
| 02:16PM | 21 | A. IT WAS. |
| 02:16PM | 22 | Q. WHY? |
| 02:16PM | 23 | A. ONCE AGAIN, IT'S A VERY LARGE, VERY RESPECTED, |
| 02:16PM | 24 | SOPHISTICATED HOSPITAL SYSTEM, AND THE FACT THAT THEY HAD |
| 02:16PM | 25 | VALIDATED THE TECHNOLOGY WAS OBVIOUSLY IMPORTANT. |

02:16PM 1    Q.   AND YOU THOUGHT THAT JOHNS HOPKINS HAD VALIDATED THE

02:16PM 2    TECHNOLOGY?

02:16PM 3    A.   I DID.

02:16PM 4    Q.   WOULD YOU TURN NOW TO PAGE 299.

02:16PM 5         THIS SLIDE READS "SAME TESTS, A WHOLE NEW APPROACH.

02:16PM 6         "THE ACTIONABLE INFORMATION YOU NEED, 1/1,000 THE SIZE OF

02:16PM 7    A TYPICAL BLOOD DRAW."

02:16PM 8         THEN THERE ARE SOME IMAGES.

02:16PM 9         IT READS, "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

02:16PM 10   LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

02:16PM 11        IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:17PM 12   CAPABILITIES OF THE TECHNOLOGY WHEN YOU INVESTED?

02:17PM 13   A.   YES.

02:17PM 14   Q.   AT THE BOTTOM IT READS THAT "THERANOS PROVIDES THE HIGHEST

02:17PM 15   LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

02:17PM 16   AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

02:17PM 17   ACCURACY AND PRECISION."

02:17PM 18        WAS IT RELEVANT TO YOU THAT THERANOS SAID THAT IT ENSURED

02:17PM 19   THE HIGHEST LEVELS OF ACCURACY AND PRECISION?

02:17PM 20   A.   YES.

02:17PM 21   Q.   AND WHY DID THAT MATTER?

02:17PM 22   A.   WELL, IT WAS A STATEMENT THAT THEY HAD THE HIGHEST LEVEL

02:17PM 23   OF PRECISION, WHICH WAS OBVIOUSLY IMPORTANT, HIGHEST LEVEL OF

02:17PM 24   ACCURACY.

02:17PM 25   Q.   WHY?  FORGIVE ME, IT MIGHT BE OBVIOUS, BUT WHY WAS

02:17PM 1    ACCURACY IN BLOOD TESTING IMPORTANT TO YOU WHEN YOU WERE

02:17PM 2    CONSIDERING INVESTING?

02:17PM 3    A.   WELL, YOU KNOW, FROM AN ECONOMIC STANDPOINT, THE COMPANY

02:17PM 4    WOULD OBVIOUSLY DO A LOT BETTER IF IT HAD A HIGHLY EFFECTIVE

02:17PM 5    TEST, TECHNOLOGY WITH HIGH ACCURACY.

02:17PM 6    Q.   OKAY.  THANK YOU.

02:17PM 7         IF YOU'LL TURN TO 301, PAGE 301.  THIS SLIDES READS "A NEW

02:18PM 8    STANDARD IN QUALITY."

02:18PM 9         DO YOU SEE THAT?

02:18PM 10   A.   I DO.

02:18PM 11   Q.   AND IT SAYS THAT "BY SYSTEMATICALLY CONTROLLING AND

02:18PM 12   STANDARDIZING OUR PROCESSES, THERANOS OFFERS TESTS WITH THE

02:18PM 13   HIGHEST LEVELS OF ACCURACY."

02:18PM 14        ARE THERE -- ARE WE NOW LOOKING AT MULTIPLE INSTANCES IN

02:18PM 15   THIS SLIDE DECK WHERE YOU SEE REPRESENTATIONS ABOUT THE

02:18PM 16   ACCURACY OF THERANOS TESTS?

02:18PM 17   A.   YES.

02:18PM 18   Q.   WOULD YOU NOW TURN TO PAGE 303.  303 IS ENTITLED NEW

02:18PM 19   POSSIBILITIES IN LAB, AND ON THE LEFT SIDE IT SAYS, "ALL 1,000

02:18PM 20   PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE THROUGH

02:18PM 21   THERANOS.

02:18PM 22        "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

02:18PM 23   LABORATORIES."

02:18PM 24        IS THAT ALSO CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:19PM 25   TESTS THAT THERANOS COULD RUN IN ITS LAB?

02:19PM  1    A.    IT WAS.

02:19PM  2    Q.    WOULD YOU NOW TURN TO PAGE 304.

02:19PM  3          304 READS "FASTER RESULTS.  FASTER ANSWERS."

02:19PM  4          AND IT CONTINUES, "THERANOS'S MICRO-SAMPLE ANALYSIS IS

02:19PM  5    PERFORMED AT AMAZING SPEEDS, SO WE CAN REPORT RESULTS FASTER

02:19PM  6    THAN PREVIOUSLY POSSIBLE."

02:19PM  7          WHAT DID THAT MEAN TO YOU?

02:19PM  8    A.    IT JUST MEANT THAT THE RESULTS OF THE BLOOD TESTS COULD BE

02:19PM  9    RECEIVED IN A SHORTER PERIOD OF TIME.

02:19PM  10   Q.    ON THERANOS'S ANALYSIS OR THERANOS'S USE OF MICRO-SAMPLES?

02:19PM  11   A.    THAT'S CORRECT.

02:19PM  12   Q.    AND IF THERANOS WAS ACTUALLY USING CONVENTIONAL MACHINES,

02:19PM  13   THE TYPES OF MACHINES THAT OTHER LABS USED, WOULD YOU THINK IT

02:19PM  14   WOULD BE ANY FASTER, THAT THERE WOULD BE AN ADVANTAGE TO USING

02:20PM  15   THERANOS?

02:20PM  16   A.    I THOUGHT THIS MEANT THERE WAS A REAL ADVANTAGE TO USING

02:20PM  17   THERANOS MACHINES.

02:20PM  18   Q.    WHY?

02:20PM  19   A.    BECAUSE THEY WERE FASTER.

02:20PM  20   Q.    IF YOU'LL NOW TURN TO PAGE 320.

02:20PM  21         ON THIS SLIDE WE SEE RECENT PRESS, AND THERE'S AN IMAGE OF

02:20PM  22   "FORTUNE" MAGAZINE.

02:20PM  23         AND TO THE LEFT OF THAT IMAGE, A SECOND LINE READS "THIS

02:20PM  24   CEO IS OUT FOR BLOOD."

02:20PM  25         DO YOU SEE THAT?

02:20PM 1    A.   I SEE IT.

02:20PM 2    Q.   WERE THERE INSTANCES SUCH AS THIS WHEN YOU LEARNED

02:20PM 3    INFORMATION ABOUT THERANOS NOT JUST FROM THE BINDER OF

02:20PM 4    MATERIAL, BUT FROM OTHER SOURCES?

02:20PM 5    A.   YES.

02:20PM 6    Q.   AND WAS THIS ARTICLE, THIS "FORTUNE" ARTICLE, ONE OF THOSE

02:20PM 7    INSTANCES?

02:20PM 8    A.   YES.

02:20PM 9    Q.   AND WHAT DID YOU THINK ABOUT YOUR ABILITY TO RELY ON THE

02:20PM 10   ARTICLE BY THERANOS SENDING IT TO YOU?

02:20PM 11       DO YOU UNDERSTAND?

02:20PM 12   A.   WELL, I ASSUMED -- I ASSUMED THAT THE COMPANY AGREED WITH

02:21PM 13   WHAT WAS STATED IN THE ARTICLE.

02:21PM 14   Q.   WHY DID YOU MAKE THAT ASSUMPTION?

02:21PM 15   A.   PROBABLY TWO REASONS.  ONE, I ASSUMED THAT ELIZABETH HAD

02:21PM 16   COOPERATED IN THE ARTICLE, AND MAYBE THE COMPANY HAD

02:21PM 17   COOPERATED; AND, TWO, BY SENDING IT TO ME, THE COMPANY WAS

02:21PM 18   SAYING THIS IS A GOOD DESCRIPTION OF THE COMPANY.

02:21PM 19   Q.   OKAY.  AND DO YOU RECALL WHETHER YOU THEN, IN FACT, FOUND

02:21PM 20   THE "FORTUNE" ARTICLE AND READ IT OR IF IT WAS SENT TO YOU?  DO

02:21PM 21   YOU HAVE A RECOLLECTION?

02:21PM 22   A.   I DEFINITELY READ IT.  I DON'T KNOW HOW I PULLED IT TO

02:21PM 23   READ IT, BUT I DID READ THE ARTICLE.

02:21PM 24   Q.   OKAY.  WOULD YOU NOW TURN TO PAGE 333.

02:21PM 25       ON THIS SLIDE WE SEE SIX IMAGINES, AND I'D LIKE TO DRAW

02:21PM 1    YOUR ATTENTION TO THE BOTTOM MIDDLE IMAGE.

02:21PM 2         IF WE CAN ZOOM IN ON THE TEXT OF THE BOTTOM MIDDLE --

02:22PM 3    A.   OKAY.

02:22PM 4    Q.   -- IMAGE.

02:22PM 5         DO YOU SEE THAT?

02:22PM 6    A.   SURE.

02:22PM 7    Q.   IT READS, "OUR CERTIFIED LABS PERFORM PRECISE TESTS ON A

02:22PM 8    SAMPLE 1/1,000TH THE SIZE OF A TYPICAL BLOOD DRAW.  NO MORE BIG

02:22PM 9    VIALS TO FILL.  NO MORE SEARCHING FOR A GOOD VEIN."

02:22PM 10        WHAT DID THAT MEAN TO YOU?

02:22PM 11   A.   IT MEANT TO ME THAT THEY WERE ABLE TO DO THE TEST WITH A

02:22PM 12   VERY SMALL AMOUNT OF BLOOD THAT DID NOT REQUIRE FILLING UP

02:22PM 13   LARGE TUBES WITH BLOOD.

02:22PM 14   Q.   IF YOU WILL NOW TURN TO 354.

02:22PM 15        THIS SLIDE IS ABOUT AUTOMATED REFLEX TESTING.

02:22PM 16        DO YOU SEE THAT?

02:22PM 17   A.   YES.

02:22PM 18   Q.   "ORDER REFLEX TESTS DIRECTLY FROM THE THERANOS LAB ORDER

02:23PM 19   FORM.

02:23PM 20        "IMMEDIATE FOLLOW-ON TESTING."

02:23PM 21        WERE YOU FAMILIAR WITH THIS CONCEPT OF AUTOMATED REFLEX

02:23PM 22   TESTING WHEN YOU WERE DECIDING TO INVEST?

02:23PM 23   A.   I WAS.  AT SOME POINT I SORT OF CAME TO UNDERSTAND WHAT I

02:23PM 24   THOUGHT IT MEANT.

02:23PM 25   Q.   AND WHAT WAS THAT UNDERSTANDING?

02:23PM 1    A.   IT WAS THE FACT THAT IN REQUESTING A LAB TEST, YOU COULD

02:23PM 2    SAY IF THIS PARTICULAR TEST COMES OUT IN A PARTICULAR WAY, YOU

02:23PM 3    WOULD BE ASKING AT THE SAME TIME THAT FOLLOW-ON TESTS WOULD BE

02:23PM 4    DONE THAT WOULD BE HELPFUL IN DETERMINING THE MEANING OF THE

02:23PM 5    FIRST TEST.

02:23PM 6    Q.   AND DID YOU UNDERSTAND THAT THAT WAS SOMETHING THAT

02:23PM 7    THERANOS WAS CURRENTLY CAPABLE OF DOING?

02:23PM 8    A.   YES.

02:23PM 9    Q.   WOULD YOU TURN TO PAGE 419.

02:24PM 10   ARE YOU FAMILIAR WITH A DOCUMENT THAT IS BEGINNING ON

02:24PM 11   PAGE 419?

02:24PM 12   A.   YES.

02:24PM 13   Q.   THIS DOCUMENT HAS THE PFIZER LOGO IN THE UPPER LEFT

02:24PM 14   CORNER, AND THE THERANOS LOGO IN THE UPPER RIGHT.

02:24PM 15   DO YOU SEE THAT?

02:24PM 16   A.   I DO.

02:24PM 17   Q.   AND IT READS, "THERANOS ANGIOGENESIS STUDY REPORT, PFIZER

02:24PM 18   INC."

02:24PM 19   AND THEN IF WE ZOOM OUT, ON THE BOTTOM THERE IS SOME

02:24PM 20   HIGHLIGHTING.

02:24PM 21   WHERE DID THE HIGHLIGHTING COME FROM?

02:24PM 22   A.   IT'S MY HIGHLIGHTING.

02:24PM 23   Q.   AND DID YOU READ THIS BEFORE YOU MADE THE DECISION TO

02:24PM 24   INVEST?

02:24PM 25   A.   I DID.

02:24PM 1    Q.   AND LATER DID YOU WRITE A MEMO WHERE YOU SUMMARIZED YOUR

02:24PM 2    UNDERSTANDING OF THERANOS?

02:24PM 3    A.   I DID.

02:24PM 4    Q.   AND DID YOU INCLUDE SOME INFORMATION THAT YOU LEARNED FROM

02:24PM 5    THE PFIZER REPORT IN THAT MEMO?

02:24PM 6    A.   I DID.

02:24PM 7    Q.   WAS THIS PFIZER REPORT IMPORTANT TO YOU IN YOUR DECISION

02:24PM 8    TO INVEST?

02:24PM 9    A.   IT WAS.

02:24PM 10   Q.   WHY?

02:24PM 11   A.   AS I MENTIONED EARLIER, IT'S A -- PFIZER IS A VERY LARGE

02:25PM 12   PHARMACEUTICAL COMPANY THAT IS HIGHLY SOPHISTICATED AND HAS A

02:25PM 13   LARGE SCIENTIFIC STAFF, AND I BELIEVED THAT IF THEY HAD REACHED

02:25PM 14   THE CONCLUSIONS STATED IN THIS REPORT, THAT WAS A VERY GOOD

02:25PM 15   VALIDATION OF THE COMPANY.

02:25PM 16   Q.   WHO DID YOU THINK WROTE THIS REPORT?

02:25PM 17   A.   PFIZER.

02:25PM 18   Q.   WHY DID YOU THINK THAT?

02:25PM 19   A.   ONE, IT'S GOT THE PFIZER LOGO ON THE TOP LEFT OF IT, AND I

02:25PM 20   THINK THAT IS ON EVERY PAGE.

02:25PM 21        AND THERE ARE CERTAIN PARTS OF THE STUDY THAT CERTAINLY I

02:25PM 22   WOULD HAVE THOUGHT THAT PFIZER WAS THE ONLY ONE THAT WOULD HAVE

02:25PM 23   KNOWN THE INFORMATION THAT IS INCLUDED IN THE STUDY.

02:25PM 24   Q.   OKAY.  IF WE COULD ZOOM OUT ON THIS PAGE AND THEN ZOOM IN

02:25PM 25   AT THE VERY BOTTOM OF THIS DOCUMENT.  NEXT TO THE PAGE NUMBER

02:26PM 1    THERE'S AN ADDRESS.

02:26PM 2         DO YOU SEE THAT?  IT IS SAYS 3200 HILLVIEW, PALO ALTO.

02:26PM 3         DO YOU SEE WHERE I AM?

02:26PM 4    A.   I SEE IT.

02:26PM 5    Q.   AND IT HAS A PHONE NUMBER AND A WEBSITE, THERANOS.COM.

02:26PM 6         DO YOU SEE THAT?

02:26PM 7    A.   I DO.

02:26PM 8    Q.   AND DO YOU KNOW WHAT IS LOCATED, OR WHAT WAS LOCATED AT

02:26PM 9    THAT ADDRESS, 3200?

02:26PM 10   A.   I DON'T KNOW FOR SURE, BUT I THINK IT WAS THERANOS'S

02:26PM 11   HEADQUARTERS AT ONE POINT.

02:26PM 12   Q.   FORGIVE ME.  AT ONE POINT?

02:26PM 13   A.   YEAH.

02:26PM 14   Q.   THIS DOCUMENT HAD THERANOS'S ADDRESS, WEBSITE, PHONE

02:26PM 15   NUMBER ON IT.  DID THAT MAKE YOU THINK THAT PFIZER DID NOT

02:26PM 16   WRITE THIS DOCUMENT?

02:26PM 17   A.   IT DID NOT.

02:26PM 18   Q.   WHY?  WHY DIDN'T -- I MEAN, YOU SAW THE THERANOS WEBSITE.

02:26PM 19   WHY DIDN'T THAT CHANGE YOUR MIND ABOUT WHO DRAFTED THE

02:26PM 20   DOCUMENT?

02:26PM 21   A.   WELL, THERE IS -- YOU GET TO THE BACK OF THE DOCUMENT AND

02:26PM 22   THERE ARE A LOT OF CONCLUSIONS ABOUT THE TECHNOLOGY, AND THEY

02:26PM 23   CERTAINLY READ AS THIRD PARTY CONCLUSIONS.

02:27PM 24   Q.   WHAT DO YOU MEAN, "THEY READ AS THIRD PARTY CONCLUSIONS"?

02:27PM 25   A.   WELL, THEY READ, TO ME, TO BE STATEMENTS EFFECTIVELY BY

02:27PM 1    SOMEBODY OTHER THAN THERANOS ABOUT THE TECHNOLOGY, THERANOS'S

02:27PM 2    TECHNOLOGY.

02:27PM 3    Q.   OKAY.  IF YOU'LL NOW TURN TO PAGE 510.

02:27PM 4    A.   OKAY.

02:27PM 5    Q.   WHAT ARE WE LOOKING AT HERE?

02:27PM 6    A.   A CAP TABLE.

02:27PM 7    Q.   WHAT IS A CAP TABLE?

02:28PM 8    A.   IT'S NORMALLY A TABLE SHOWING THE STOCK THAT A COMPANY HAD

02:28PM 9    ISSUED AND AT WHAT PRICE AND THE AMOUNT OF PROCEEDS THAT HAD

02:28PM 10   COME TO THE COMPANY AS A RESULT OF ISSUING THAT STOCK.

02:28PM 11   Q.   PROCEEDS THAT HAD COME TO THE COMPANY BY ISSUING THE

02:28PM 12   STOCK, WHAT DOES THAT MEAN?

02:28PM 13   A.   WELL, ISSUING MEANS REALLY A COMPANY SELLING STOCK.  SO

02:28PM 14   THIS WOULD BE AN INDICATION OF THE SHARES SOLD AT DIFFERENT

02:28PM 15   DATES FOR DIFFERENT AMOUNTS AND HOW MUCH CAME TO THE COMPANY AS

02:28PM 16   A RESULT OF THE PROCEEDS OF THOSE SALES.

02:28PM 17   Q.   OKAY.  AND THEN THE COLUMN SECOND FROM THE LEFT, PER SHARE

02:28PM 18   PRICE, WHAT DOES THAT MEAN?

02:28PM 19   A.   IT -- WHEN THEY SOLD IN THAT PARTICULAR SERIES, THE PRICE

02:28PM 20   PER SHARE THAT WAS PAID BY THE PURCHASERS OF THE STOCK.

02:28PM 21   Q.   AND WHICH SERIES DID YOU END UP PURCHASING?

02:28PM 22   A.   THE SERIES C-2.

02:28PM 23   Q.   SO DOES THAT MEAN THAT YOU PAID $17 PER SHARE?

02:29PM 24   A.   IT DOES.

02:29PM 25   Q.   THE VALUATION DATE IS 2013.

02:29PM 1      WHEN DID YOU INVEST, THOUGH?

02:29PM 2   A.   I THINK IT WAS AROUND THE END OF OCTOBER.

02:29PM 3   Q.   OF?

02:29PM 4   A.   2014.

02:29PM 5   Q.   IT WAS IN 2014.  THE PRICE DIDN'T CHANGE, YOU STILL GOT

02:29PM 6   THE 2013 PRICE?

02:29PM 7   A.   THAT IS CORRECT.

02:29PM 8   Q.   IF YOU'LL NOW TURN TO PAGE 512.

02:29PM 9      WE TALKED ABOUT THIS A MOMENT AGO.  YOU SAID YOU RECEIVED

02:29PM 10  SOME FINANCIAL INFORMATION FROM THE COMPANY WHEN YOU WERE

02:29PM 11  REVIEWING THE INVESTMENT OPPORTUNITY.

02:29PM 12     IS THIS SOME OF THE FINANCIAL INFORMATION THAT YOU WERE

02:29PM 13  REFERRING TO?

02:29PM 14  A.   YES.

02:29PM 15  Q.   IT'S CALLED A PROJECTED STATEMENT OF INCOME, AND IT HAS

02:29PM 16  TWO PERIODS, THE PERIOD ENDING 12/31/2014 AND THEN 12/31/2015.

02:29PM 17     DO YOU SEE THAT?

02:30PM 18  A.   I DO.

02:30PM 19  Q.   AND THIS DOCUMENT I THINK YOU SAID WAS PART OF MATERIALS

02:30PM 20  THAT MS. HOLMES SENT TO YOU WITH THAT COVER LETTER.  THAT COVER

02:30PM 21  LETTER WAS IN AUGUST OF 2014; IS THAT RIGHT?

02:30PM 22  A.   YES.

02:30PM 23  Q.   AND SO WOULD YOU HAVE BEEN REVIEWING THIS PROJECTED

02:30PM 24  STATEMENT OF INCOME ROUGHLY IN AUGUST OF 2014?

02:30PM 25  A.   YES.

02:30PM  1    Q.   AND IT PROJECTS REVENUE BY THE END OF THIS YEAR, 2014,

02:30PM  2    FROM LAB SERVICES FOR U.S. RETAIL PHARMACIES AT $42 MILLION.

02:30PM  3         DO YOU SEE THAT?

02:30PM  4    A.   YES.

02:30PM  5    Q.   AND IT INCLUDES REVENUE FROM PHYSICIANS OFFICES,

02:30PM  6    HOSPITALS, REVENUE FROM PHARMACEUTICAL SERVICES FOR A TOTAL

02:30PM  7    REVENUE OF $140 MILLION.

02:30PM  8         DO YOU SEE THAT?

02:30PM  9    A.   I DO.

02:30PM  10   Q.   WHEN YOU WERE LOOKING AT THOSE NUMBERS IN AUGUST OF 2014,

02:30PM  11   AND THE PROJECTION IS FOR THE YEAR ENDING DECEMBER 31, 2014,

02:30PM  12   DID THAT SAY ANYTHING TO YOU ABOUT THE RELIABILITY OF THESE

02:30PM  13   PROJECTIONS?

02:30PM  14   A.   IT, IT DID.  BY DEFINITION THEY COULD NOT BE WHAT I MIGHT

02:31PM  15   CALL HARD NUMBERS, OR FINAL NUMBERS, FOR THE ACTUAL REVENUE IN

02:31PM  16   THAT PARTICULAR YEAR SINCE THE YEAR HAD NOT YET BEEN COMPLETED.

02:31PM  17   Q.   OKAY.  AND HOW ABOUT THE LIKELIHOOD THAT THOSE NUMBERS

02:31PM  18   ARE, WHILE NOT HARD NUMBERS, ARE CLOSE TO ACCURATE?  DID IT SAY

02:31PM  19   ANYTHING ABOUT THAT?

02:31PM  20   A.   YES, IT WOULD HAVE PROBABLY INDICATED TO ME THAT THEY WERE

02:31PM  21   PRETTY GOOD NUMBERS BECAUSE ROUGHLY THREE QUARTERS OF THE YEAR

02:31PM  22   HAD ALREADY PASSED, AND I WOULD EXPECT THAT PART OF THE NUMBERS

02:31PM  23   TO BE BASED ON ACTUAL, AND ONLY THE BALANCE OF THE YEAR WHICH

02:31PM  24   HAD NOT YET OCCURRED TO BE BASED ON PROJECTED.

02:31PM  25   Q.   SO KNOWING THAT THESE WERE NOT YET HARD NUMBERS, WOULD IT

02:31PM  1    HAVE SURPRISED YOU IF THERANOS HAD VERY LITTLE REVENUE IN 2014

02:31PM  2    GIVEN THESE PROJECTIONS?

02:31PM  3    A.   IT WOULD HAVE.

02:31PM  4    Q.   WHY?

02:31PM  5    A.   BECAUSE AS I SAY, I WOULD HAVE EXPECTED THESE NUMBERS TO

02:32PM  6    BE PRETTY ACCURATE FOR THE FIRST THREE QUARTERS OF THE YEAR,

02:32PM  7    AND THREE QUARTERS OF THE YEAR HAD PASSED, AND I WOULD HAVE

02:32PM  8    EXPECTED THEM TO BE A GOOD FAITH ESTIMATE FOR THE BALANCE OF

02:32PM  9    THE YEAR BASED ON THE FIRST THREE QUARTERS OF THE YEAR.

02:32PM  10   Q.   OKAY.  AND NOW LET'S TURN TO THE 2015 NUMBERS.  LET'S HAVE

02:32PM  11   THAT SAME CONVERSATION FOR 2015 NUMBERS.

02:32PM  12        TALK TO ME ABOUT YOUR VIEW ON THE RELIABILITY OF NUMBERS

02:32PM  13   THAT ARE NOW PROJECTED OUT LET'S SAY 15 MONTHS, 16 MONTHS INTO

02:32PM  14   THE FUTURE?

02:32PM  15   A.   I WOULD HAVE CONSIDERED THEM FAR LESS RELIABLE BECAUSE NO

02:32PM  16   PART OF THAT YEAR HAD OCCURRED YET.

02:32PM  17   Q.   OKAY.  AND WHAT ABOUT THAT SAME QUESTION, IF IN 2015 THERE

02:32PM  18   WAS VERY LITTLE REVENUE, WOULD THAT HAVE SURPRISED YOU GIVEN

02:32PM  19   THE PROJECTION OF NEARLY A BILLION DOLLARS OF REVENUE?

02:32PM  20   A.   IT, IT WOULD HAVE SURPRISED ME BECAUSE THREE QUARTERS OF

02:32PM  21   2014 HAD ALREADY OCCURRED AND SO THE COMPANY WOULD HAVE SOME

02:33PM  22   VISIBILITY WITH THREE QUARTERS OF THAT YEAR HAVING OCCURRED,

02:33PM  23   SOME VISIBILITY NOT ONLY INTO THE FOURTH QUARTER OF 2014, BUT

02:33PM  24   PRESUMABLY, YOU KNOW, INTO 2015.

02:33PM  25   Q.   SO IS IT FAIR THAT SORT OF THE ACCURACY OF THE NUMBERS

02:33PM 1      DECREASES OVER TIME?  THE FURTHER OUT YOU GET, THE LESS

02:33PM 2      RELIABLE YOU VIEW THE NUMBERS TO BE?

02:33PM 3      A.   ABSOLUTELY.

02:33PM 4      Q.   BUT THERE'S STILL, IS IT FAIR TO SAY, A BALLPARK?  IF

02:33PM 5      YOU'RE IN 2014, IN AUGUST, PROJECTING NUMBERS FOR 2015, DO YOU

02:33PM 6      VIEW THE PROJECTIONS TO SORT OF BE, LET'S SAY, A FEW STANDARD

02:33PM 7      DEVIATIONS FROM A BALLPARK?

02:33PM 8      A.   YOU KNOW, I PROBABLY WOULDN'T SAY THEY WERE THAT ACCURATE.

02:33PM 9          I WOULD JUST SAY THAT THEY ARE WHAT THE COMPANY THOUGHT

02:33PM 10     THEY COULD DO FOR THAT YEAR, OR WHAT THEY WERE SAYING THEY

02:33PM 11     THOUGHT THEY COULD DO FOR THAT YEAR.

02:33PM 12     Q.   AND A MOMENT AGO YOU USED THE PHRASE A GOOD FAITH

02:33PM 13     ESTIMATE.  WHAT DID YOU MEAN BY THAT?

02:33PM 14     A.   IT WAS A JUDGMENT THAT THEY WERE BASED ON A -- THAT IF

02:34PM 15     NUMBERS WERE -- I WOULD EXPECT PROJECTIONS TO BE ARRIVED AT IN

02:34PM 16     GOOD FAITH, WHICH MEANS THAT THEY WOULD BE BASED ON THE

02:34PM 17     INFORMATION THAT WAS AVAILABLE AT THAT TIME AND A REASONABLE

02:34PM 18     AND FAIR JUDGMENT OF WHAT THAT PORTRAYED FOR THE FUTURE.

02:34PM 19     Q.   OKAY.  THANK YOU.

02:34PM 20          WOULD YOU NOW TURN TO PAGE 516.

02:34PM 21          DO YOU RECOGNIZE THIS DOCUMENT?

02:34PM 22     A.   I DO.

02:34PM 23     Q.   AND IS THIS -- I THINK EARLIER YOU REFERENCED AN ARTICLE

02:34PM 24     IN "THE WALL STREET JOURNAL" ABOUT THE LAUNCH WITH WALGREENS;

02:34PM 25     IS THAT RIGHT?

02:34PM   1      A.   YES.

02:34PM   2      Q.   IS THAT THIS ARTICLE?

02:34PM   3      A.   YES, IT IS.

02:34PM   4      Q.   DID YOU -- DO YOU REMEMBER IF YOU READ THE ARTICLE AT THE

02:34PM   5      TIME?

02:34PM   6      A.   I DID.

02:34PM   7      Q.   AND THERE'S SOME HIGHLIGHTS IN IT.  ARE THOSE YOUR

02:34PM   8      HIGHLIGHTS?

02:34PM   9      A.   THEY ARE.

02:34PM   10     Q.   AND IF WE COULD NOW ZOOM IN THE SECOND COLUMN FURTHER

02:34PM   11     DOWN, IT'S THE SIXTH FULL PARAGRAPH IN THE SECOND COLUMN, IT

02:35PM   12     BEGINS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB TRIPS."

02:35PM   13          DO YOU SEE THAT?

02:35PM   14     A.   JUST ONE SECOND.  IN THE SECOND COLUMN?

02:35PM   15     Q.   IN THE SECOND COLUMN.

02:35PM   16     A.   ONE, TWO, THREE, FOUR, FIVE.

02:35PM   17          YES, I DO.

02:35PM   18          MR. SCHENK:  MS. HOLLIMAN, IF WE CAN ZOOM OUT INTO

02:35PM   19     THE SECOND COLUMN.  FURTHER DOWN, THE SIXTH FULL PARAGRAPH

02:35PM   20     DOWN, THERE'S A PARAGRAPH THAT BEGINS -- IT'S ACTUALLY THREE

02:35PM   21     PARAGRAPHS UP FROM THE BOTTOM.  MAYBE THAT'S EASIER.

02:35PM   22     Q.   IT SAYS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB

02:35PM   23     TRIPS BECAUSE IT CAN RUN ANY COMBINATION OF TESTS, INCLUDING

02:35PM   24     SETS OF FOLLOW-ON TESTS."

02:35PM   25          DO YOU SEE THAT?

02:35PM   1     A.   I DO.

02:35PM   2     Q.   AND WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

02:35PM   3     THERANOS TECHNOLOGY WHEN YOU WERE CONSIDERING INVESTING?

02:35PM   4     A.   IT WAS.

02:35PM   5     Q.   WOULD YOU NOW TURN TO PAGE 523.

02:36PM   6          WE SEE ANOTHER IMAGE OF THE "FORTUNE" ARTICLE AT 523.

02:36PM   7          DID MS. HOLMES PROVIDE YOU WITH THIS "FORTUNE" ARTICLE

02:36PM   8     BEFORE YOU DECIDED TO INVEST?

02:36PM   9     A.   I THINK THAT IT MAY HAVE BEEN, AT LEAST THE COVER MAY HAVE

02:36PM  10     BEEN IN THE MATERIALS, BUT I DON'T KNOW FOR SURE.

02:36PM  11     Q.   OKAY.  DO YOU THINK THAT YOU READ IT BEFORE YOU DECIDED TO

02:36PM  12     INVEST?

02:36PM  13     A.   I HAD ABSOLUTELY READ IT BEFORE I INVESTED.

02:36PM  14     Q.   ALL RIGHT.  IF YOU WILL NOW TURN TO EXHIBIT 3844.

02:36PM  15          DO YOU SEE THIS DOCUMENT?

02:36PM  16     A.   IT HAS JOHNS HOPKINS AT THE TOP?

02:36PM  17     Q.   YES?

02:36PM  18     A.   YES.

02:36PM  19     Q.   WAS THIS DOCUMENT ALSO PROVIDED TO YOU WHEN YOU WERE

02:36PM  20     CONSIDERING MAKING AN INVESTMENT?

02:37PM  21     A.   IT WAS.

02:37PM  22          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3844.

02:37PM  23          MR. WADE:  NO OBJECTION.

02:37PM  24          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:37PM  25          (GOVERNMENT'S EXHIBIT 3844 WAS RECEIVED IN EVIDENCE.)

02:37PM  1     BY MR. SCHENK:

02:37PM  2     Q.   IN THE POWER POINTS THAT WE LOOKED AT, WE SAW THE LOGOS

02:37PM  3     FROM THE JOHNS HOPKINS MEDICAL SCHOOL.

02:37PM  4          DO YOU RECALL THAT?

02:37PM  5     A.   I DO.

02:37PM  6     Q.   AND THERE WAS SOME DISCUSSION ABOUT VALIDATION WORK.

02:37PM  7          WAS THIS SOME SUPPORTING MATERIAL THAT YOU RECEIVED

02:37PM  8     REGARDING THE WORK JOHNS HOPKINS HAD DONE?

02:37PM  9     A.   IT WAS.

02:37PM 10     Q.   DO YOU KNOW WHAT JOHNS HOPKINS DID TO VALIDATE OR TO

02:37PM 11     INVESTIGATE THE THERANOS TECHNOLOGY?

02:37PM 12     A.   I THINK I WAS -- I THINK I WAS AWARE THAT THEY HAD TESTED

02:37PM 13     AT LEAST, OR HAD SEEN THE THERANOS MACHINES TESTED.

02:37PM 14     Q.   AND DO YOU REMEMBER --

02:37PM 15     A.   I SAID I THINK THEY HAD REVIEWED THE TECHNOLOGY AND SEEN

02:37PM 16     THE EQUIPMENT IN USE.

02:37PM 17     Q.   DO YOU REMEMBER WHERE YOU LEARNED THAT OR WHERE YOU GOT

02:38PM 18     THAT FROM?

02:38PM 19     A.   I DON'T KNOW.

02:38PM 20     Q.   OKAY.  WOULD YOU NOW TURN TO 4202.

02:38PM 21          IS 4202 AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES IN

02:38PM 22     SEPTEMBER OF 2014 REGARDING A VISIT THAT YOU TWO MIGHT HAVE?

02:38PM 23     A.   YES.

02:38PM 24               MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4202.

02:38PM 25               MR. WADE:  NO OBJECTION.

02:38PM  1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:38PM  2          (GOVERNMENT'S EXHIBIT 4202 WAS RECEIVED IN EVIDENCE.)

02:38PM  3   BY MR. SCHENK:

02:38PM  4   Q.  IF WE CAN START ON PAGE 2 OF THIS EXHIBIT, THE EMAIL ON

02:38PM  5   THE BOTTOM FROM YOU TO MS. HOLMES, IT'S DATED SEPTEMBER 2ND,

02:38PM  6   2014.

02:38PM  7          DO YOU SEE THAT?

02:38PM  8   A.  YES.

02:38PM  9   Q.  NOW, IN SEPTEMBER YOU'RE THANKING MS. HOLMES FOR THE

02:39PM  10  EXTENSIVE MATERIALS ON THERANOS.

02:39PM  11         IS THAT A REFERENCE TO AT LEAST SOME OF THE MATERIALS THAT

02:39PM  12  YOU AND I JUST TALKED ABOUT?

02:39PM  13  A.  YES, IT IS.

02:39PM  14  Q.  YOU "ENJOYED READING THE MATERIALS AND CAN'T TELL YOU HOW

02:39PM  15  APPRECIATIVE AND THANKFUL I AM FOR THE OPPORTUNITY TO BECOME

02:39PM  16  ONE OF YOUR SHAREHOLDERS."

02:39PM  17         WAS THAT ACCURATE?  DID YOU FEEL HONORED OR APPRECIATIVE

02:39PM  18  TO BECOME A POTENTIAL SHAREHOLDER?

02:39PM  19  A.  ABSOLUTELY.

02:39PM  20  Q.  WHY?

02:39PM  21  A.  WELL, IT'S -- THIS IS A COMPANY THAT HAD ENORMOUS

02:39PM  22  POTENTIAL TO DO GOOD THINGS FOR PEOPLE, AND IT WAS ALSO LIKELY

02:39PM  23  TO BE VERY FINANCIALLY SUCCESSFUL, SO YOU WOULD BE APPRECIATIVE

02:39PM  24  OF THAT OPPORTUNITY.

02:39PM  25  Q.  AND YOU SAID IT HAD THE OPPORTUNITY TO BE ENORMOUSLY

02:39PM  1   SUCCESSFUL FINANCIALLY TO DO GREAT THINGS.

02:39PM  2        WHERE DID YOU GET THAT IMPRESSION?

02:39PM  3   A.   YOU KNOW, LARGELY PROBABLY FROM ALL OF THE MATERIALS THAT

02:39PM  4   WERE INCLUDED IN THAT PACKAGE, AS WELL AS THE "FORTUNE" ARTICLE

02:40PM  5   AND SUCH.

02:40PM  6   Q.   SO THIS POTENTIAL THAT YOU'RE REFERRING TO, IS THAT AN

02:40PM  7   ASSUMPTION BASED ON THE ACCURACY OF THE MATERIALS THAT YOU

02:40PM  8   RECEIVED?

02:40PM  9   A.   YES.

02:40PM  10  Q.   YOU WROTE A SENTENCE OR TWO LATER THAT YOU PREPARED AN

02:40PM  11  OUTLINE OVER THE WEEKEND WITH YOUR THOUGHTS AND ANALYSIS WHICH

02:40PM  12  YOU'RE SENDING TO DR. KISSINGER; IS THAT RIGHT?

02:40PM  13  A.   THAT'S RIGHT.

02:40PM  14  Q.   AND WHY DID YOU PREPARE THE MEMO THAT IS REFERENCED HERE?

02:40PM  15  A.   WELL, AS I STATED EARLIER, WHEN DR. KISSINGER FIRST

02:40PM  16  BROUGHT UP THE COMPANY AND ELIZABETH TO ME, HE SAID IT WOULD BE

02:40PM  17  VERY HELPFUL TO ME IF YOU WOULD TALK TO ELIZABETH, LEARN ABOUT

02:40PM  18  THE COMPANY, AND GIVE ME YOUR THOUGHTS.

02:40PM  19       AND SO THE MEMO WAS REALLY MY HAVING GONE THROUGH THE

02:40PM  20  MATERIALS AND HAD CONVERSATIONS AND PULLING TOGETHER MY

02:40PM  21  THOUGHTS.

02:40PM  22  Q.   AND DID THE MEMO SERVE TWO PURPOSES OR JUST ONE?  WAS IT

02:40PM  23  SOMETHING THAT WAS USED ONLY FOR DR. KISSINGER, OR WAS IT ALSO

02:41PM  24  GATHERING YOUR THOUGHTS ON THE THERANOS INVESTMENT?

02:41PM  25  A.   WELL, IT WAS, IT WAS REALLY FOR DR. KISSINGER AT HIS

02:41PM  1    REQUEST AND I, I GUESS YOU COULD SAY THAT IT HAD A DUAL PURPOSE

02:41PM  2    OF PULLING TOGETHER MY OWN THOUGHTS ABOUT THE COMPANY.

02:41PM  3    Q.   OKAY.  AND WHEN YOU DRAFTED THIS MEMO, HAD YOU DECIDED

02:41PM  4    WHETHER TO INVEST?  HAD YOU MADE THAT DECISION?

02:41PM  5    A.   AT THAT POINT I HAD NOT.

02:41PM  6    Q.   ABOVE THIS EMAIL THAT YOU AND I ARE READING RIGHT NOW, YOU

02:41PM  7    FOLLOW UP WITH ANOTHER EMAIL SAYING THAT YOU SEE THAT YOU,

02:41PM  8    MS. HOLMES, IS GOING TO BE SPEAKING AT BYRON TROTT'S

02:41PM  9    CONFERENCE, IT LOOKS LIKE IN MAYBE TWO WEEKS, A WEEK AND A

02:41PM  10   HALF, TUESDAY, SEPTEMBER 16TH IN CHICAGO.

02:41PM  11        DO YOU SEE THAT?

02:41PM  12   A.   I DO.

02:41PM  13   Q.   DID YOU GO TO THIS CONFERENCE IN CHICAGO?

02:41PM  14   A.   I DID.

02:41PM  15   Q.   DID SHE GO?

02:41PM  16   A.   SHE DID.

02:41PM  17   Q.   AND DID YOU MEET MS. HOLMES THERE?

02:42PM  18   A.   I DID.

02:42PM  19   Q.   AND DID YOU INTRODUCE MS. HOLMES TO OTHER INDIVIDUALS THAT

02:42PM  20   YOU THOUGHT MIGHT BE INTERESTED IN THERANOS AS WELL?

02:42PM  21   A.   WE DID.  I DID MEET WITH ELIZABETH AND SOME OF THE

02:42PM  22   INDIVIDUALS THAT I THOUGHT MIGHT HAVE AN INTEREST IN LOOKING AT

02:42PM  23   THE COMPANY.

02:42PM  24   Q.   AND WHY, WHY DID YOU -- WELL, LET ME ASK, DID YOU CREATE

02:42PM  25   THIS OPPORTUNITY FOR AN INTRODUCTION OR MEETING FOR MS. HOLMES

02:42PM  1    TO MEET SOME OF THESE OTHER INDIVIDUALS?

02:42PM  2    A.   I THINK I DID, YES.

02:42PM  3    Q.   AND WHY DID YOU DO THAT?

02:42PM  4    A.   WELL, BECAUSE I THOUGHT THE COMPANY HAD ENORMOUS POTENTIAL

02:42PM  5    FOR GOOD IN THE WORLD, BEING ABLE TO DO THIS KIND OF TESTING AS

02:42PM  6    DESCRIBED, AND I OBVIOUSLY HAD CLIENTS THAT, YOU KNOW, WOULD

02:42PM  7    HAVE A SIMILAR VIEW TO MINE THAT THIS WAS BOTH A GOOD

02:42PM  8    INVESTMENT OPPORTUNITY, AS WELL AS A VERY GOOD THING TO BACK

02:42PM  9    BECAUSE OF THE POTENTIAL GOOD IN THE WORLD.

02:42PM  10   Q.   WHEN YOU ARRANGED THESE MEETINGS, DID YOU TELL THESE

02:42PM  11   CLIENTS THAT YOU WERE VOUCHING FOR THE TECHNOLOGY OR FOR THE

02:43PM  12   INVESTMENT?

02:43PM  13   A.   NO.  I BASICALLY TOLD THE INDIVIDUALS I INTRODUCED THAT

02:43PM  14   ELIZABETH IS SOMEBODY THAT I HAD COME ACROSS.  I WAS IMPRESSED

02:43PM  15   WITH HER IDEA AND TECHNOLOGY, AND THIS IS SOMEBODY THAT I

02:43PM  16   THOUGHT THEY WOULD ENJOY MEETING.

02:43PM  17   Q.   IF WE COULD NOW TURN TO 4 -- WELL, I'M SORRY.

02:43PM  18        DO YOU KNOW THE NAMES OF SOME -- WHEN YOU SAY "THESE

02:43PM  19   INDIVIDUALS," CAN YOU FILL IN THAT BLANK FOR US?

02:43PM  20   A.   WELL, THERE'S A REFERENCE TO MEMBERS OF THE WALTON FAMILY;

02:43PM  21   THERE WERE ALSO MEMBERS OF THE DEVOS FAMILY; AND I BELIEVE

02:43PM  22   MEMBERS OF THE COX FAMILY.

02:43PM  23   Q.   AND THE THREE GROUPS OF PEOPLE THAT YOU JUST REFERENCED,

02:43PM  24   WERE THEY CLIENTS OF YOURS?

02:43PM  25   A.   THEY WERE.

02:43PM  1    Q.  DO YOU RECALL IF THREE SEPARATE MEETINGS HAPPENED IN

02:43PM  2    CHICAGO, OR DID EVERYBODY GET TOGETHER?  OR TOO LONG AGO AND

02:44PM  3    YOU DON'T REMEMBER?

02:44PM  4    A.  I DON'T REALLY REMEMBER, BUT I HAVE SOME -- I BELIEVE THEY

02:44PM  5    WERE LIKELY SEPARATE.

02:44PM  6    Q.  DID YOU PARTICIPATE IN SOME OF THESE MEETINGS?

02:44PM  7    A.  I PROBABLY SAT IN ON THEM.

02:44PM  8    Q.  DID MS. HOLMES SPEAK DURING THESE MEETINGS?

02:44PM  9    A.  YES.

02:44PM  10   Q.  DID MS. HOLMES DESCRIBE THE TECHNOLOGY OR THERANOS DURING

02:44PM  11   THESE MEETINGS?

02:44PM  12   A.  YES.

02:44PM  13   Q.  DID YOU LEARN SOMETHING DURING THESE MEETINGS THAT WAS

02:44PM  14   VASTLY DIFFERENT THAN THE IMAGE THAT WE JUST TALKED ABOUT

02:44PM  15   THROUGH THESE POWERPOINT SLIDES, THROUGH THE MATERIALS THAT

02:44PM  16   WERE SENT TO YOU?

02:44PM  17   A.  NO.

02:44PM  18   Q.  WAS THE DESCRIPTION THAT YOU WERE OBSERVING CONSISTENT

02:44PM  19   WITH THE UNDERSTANDING THAT YOU AND I JUST TALKED ABOUT WITH,

02:44PM  20   FOR INSTANCE, EXHIBIT 3387?

02:44PM  21   A.  YES.

02:44PM  22   Q.  COULD WE NOW TURN TO EXHIBIT 4197?

02:44PM  23       YOUR HONOR, 4197 HAS ALREADY BEEN ADMITTED.

02:44PM  24       PERMISSION TO PUBLISH?

02:44PM  25           THE COURT:  YES.

02:44PM   1              MR. SCHENK:  THANK YOU.

02:45PM   2      Q.   MR. MOSLEY, WHAT ARE WE --

02:45PM   3      A.   GIVE ME ONE SECOND IF YOU WOULD.

02:45PM   4           OKAY.

02:45PM   5      Q.   WHAT ARE WE LOOKING AT HERE?

02:45PM   6      A.   IT'S A LETTER DATED SEPTEMBER THE 2ND, 2014, FROM ME TO

02:45PM   7      DR. KISSINGER.

02:45PM   8      Q.   AND IS THERE AN ATTACHMENT?

02:45PM   9      A.   THERE IS.

02:45PM  10      Q.   LET'S TURN TO PAGE 2.

02:45PM  11           WHAT IS THE ATTACHMENT THAT BEGINS ON PAGE 2?

02:45PM  12      A.   THIS IS THE MEMO THAT I REFERRED TO EARLIER HAVING WRITTEN

02:45PM  13      FOR DR. KISSINGER WITH MY THOUGHTS AND ANALYSIS ABOUT THE --

02:45PM  14      REALLY THOUGHTS ABOUT THE COMPANY.

02:45PM  15      Q.   ABOUT THERANOS?

02:45PM  16      A.   ABOUT THERANOS.

02:45PM  17      Q.   DESCRIBE FOR THE JURY THE SOURCES OF INFORMATION.  YOU

02:45PM  18      WROTE A MEMO THAT DESCRIBED YOUR THOUGHTS ON THERANOS.

02:45PM  19           WHERE DID YOU GET THE INFORMATION THAT YOU USED TO WRITE

02:45PM  20      THIS MEMO?

02:45PM  21      A.   IT WAS A COMBINATION OF THE MATERIALS THAT YOU'VE ALREADY

02:46PM  22      ASKED ME ABOUT, THE PACKAGE THAT CAME TO ME IN AUGUST, PROBABLY

02:46PM  23      THE "FORTUNE" ARTICLE, AND THEN THE PFIZER REPORT AND THE

02:46PM  24      JOHNS HOPKINS PIECE OF PAPER.

02:46PM  25      Q.   HOW ABOUT CONVERSATIONS WITH MS. HOLMES?  DO YOU KNOW IF

02:46PM  1    THAT WAS A SOURCE OF INFORMATION FOR YOU WHEN YOU WROTE THIS

02:46PM  2    MEMO?

02:46PM  3    A.   IT LIKELY WAS.  BUT I THINK IF YOU READ THIS, MOST OF THE

02:46PM  4    INFORMATION IN HERE IS DIRECTLY TRACEABLE TO THE MATERIALS.

02:46PM  5    Q.   OKAY.  WHERE WERE YOU LIVING, IN WHAT CITY, WHEN YOU WROTE

02:46PM  6    THIS MEMO?

02:46PM  7    A.   WHEN I WROTE THE MEMO I WAS LIVING IN CONNECTICUT.

02:46PM  8    Q.   DID YOU TRAVEL TO A WALGREENS IN ARIZONA AS PART OF YOUR

02:46PM  9    ANALYSIS HERE?

02:46PM  10   A.   I DID NOT.

02:46PM  11   Q.   AND HOW ABOUT A WALGREENS IN PALO ALTO?  DID YOU TRAVEL

02:46PM  12   THERE BEFORE YOU WROTE THE MEMO?

02:46PM  13   A.   I DID NOT.

02:46PM  14   Q.   I'M GOING TO ASK YOU A COUPLE OF QUESTIONS ABOUT THE

02:46PM  15   CONTENT OF THE MEMO.

02:46PM  16        ON PAGE 2 THERE'S A SECTION BELOW WHAT IS ON THE SCREEN

02:47PM  17   NOW.  NUMBER 1 IS "QUALITY OF THE TECHNOLOGY."

02:47PM  18        DO YOU SEE THAT?

02:47PM  19   A.   I DO.

02:47PM  20   Q.   YOU WRITE, "THERE IS SUBSTANTIAL DATA AND OTHER

02:47PM  21   INFORMATION ATTESTING TO THE QUALITY, PERFORMANCE, AND

02:47PM  22   RELIABILITY OF THE THERANOS TECHNOLOGY AND EQUIPMENT.  THERE

02:47PM  23   DOES NOT SEEM" -- I'M SORRY.

02:47PM  24        "THERE DOES NOT APPEAR TO BE ANY SIGN OF ANY QUESTION

02:47PM  25   ABOUT THE QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S BLOOD

02:47PM 1    TESTING TECHNOLOGY.  THE INFORMATION SUPPORTING THESE

02:47PM 2    CONCLUSIONS IS SUBSTANTIAL."

02:47PM 3         DID YOU FEEL THAT WAY IN SEPTEMBER OF 2014?

02:47PM 4    A.   I DID.

02:47PM 5    Q.   AND THEN THE BULLET POINTS THAT FOLLOW, THERE ARE ABOUT A

02:47PM 6    HALF DOZEN OF THEM, ARE THEY EXAMPLES OF THE MATERIALS THAT

02:47PM 7    SUPPORT THIS CONCLUSION THAT YOU REACHED?

02:47PM 8    A.   THEY ARE.

02:47PM 9    Q.   SO THE FIRST ONE IS THAT CLIA CERTIFICATION; IS THAT

02:47PM 10   RIGHT?

02:47PM 11   A.   THAT'S CORRECT.

02:47PM 12   Q.   AND THE SECOND ONE IS INSPECTIONS BY REGULATORS, THE

02:48PM 13   NEW YORK DEPARTMENT OF HEALTH?

02:48PM 14   A.   THAT'S CORRECT.

02:48PM 15   Q.   AND THE THIRD IS THIS STATEMENT ABOUT THERANOS HAVING

02:48PM 16   WORKED WITH 10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES.

02:48PM 17        DO YOU SEE THAT?

02:48PM 18   A.   I DO.

02:48PM 19   Q.   AND THEN THERE'S A REFERENCE THERE TO WORK WITH

02:48PM 20   GLAXOSMITHKLINE?

02:48PM 21   A.   YES.

02:48PM 22   Q.   WORK WITH PFIZER?

02:48PM 23   A.   YES.

02:48PM 24   Q.   AND WORK WITH SCHERING-PLOUGH?

02:48PM 25   A.   YES.

02:48PM  1    Q.   WOULD YOU HAVE GOTTEN THAT FROM THE MATERIALS THAT YOU AND

02:48PM  2    I JUST SPENT SOME TIME LOOKING AT?

02:48PM  3    A.   I BELIEVE SO.

02:48PM  4    Q.   THE NEXT BULLET IS ABOUT WORK WITH HOSPITAL GROUPS.

02:48PM  5         DO YOU SEE THAT?

02:48PM  6    A.   I DO.

02:48PM  7    Q.   AND IT CONTINUES, THE DUE DILIGENCE, ON THE NEXT PAGE, THE

02:48PM  8    TOP OF PAGE 3, THE DUE DILIGENCE AND TECHNOLOGY REVIEW PREPARED

02:48PM  9    BY JOHNS HOPKINS, AND THEN YOU QUOTE IT.

02:48PM  10        DO YOU SEE THAT?

02:48PM  11   A.   I DO.

02:48PM  12   Q.   THE NEXT BULLET IS ABOUT WALGREENS; AND THEN THE FINAL ONE

02:48PM  13   IS "THE MOST EXTENSIVE EVIDENCE SUPPLIED REGARDING THE

02:48PM  14   RELIABILITY OF THE THERANOS TECHNOLOGY AND ITS APPLICATION IS A

02:48PM  15   STUDY REPORT PREPARED BY PFIZER BASED ON A CLINICAL CANCER

02:49PM  16   TREATMENT TRIAL."

02:49PM  17        DO YOU SEE THAT?

02:49PM  18   A.   I DO.

02:49PM  19   Q.   AND DID YOU THINK THAT AT THE TIME, THAT THE PFIZER

02:49PM  20   REPORT, AMONG ALL OF THESE INSTANCES OF PROOF, WAS THE MOST

02:49PM  21   EXTENSIVE EVIDENCE?

02:49PM  22   A.   THAT WAS MY JUDGMENT AT THE TIME.

02:49PM  23   Q.   WHY WAS THAT YOUR VIEW?

02:49PM  24   A.   WELL, IT'S A LENGTHY REPORT, IT'S MORE THAN 20 PAGES LONG,

02:49PM  25   AND IT GOES INTO A LOT OF DETAIL, AND IT OBVIOUSLY TO ME WAS A

02:49PM 1    DEMONSTRATION THAT THE EQUIPMENT COULD WORK WELL IN THE FIELD

02:49PM 2    WHEN BEING OPERATED BY UNSOPHISTICATED PARTIES, AND IT COULD

02:49PM 3    PRODUCE GOOD QUALITY RESULTS AND COULD TRANSMIT THOSE RESULTS

02:49PM 4    BACK TO THE THERANOS SERVERS, COMPUTER SERVERS.

02:49PM 5    Q.   DID YOU REACH THOSE CONCLUSIONS BY READING THE PFIZER

02:49PM 6    REPORT THAT YOU WERE PROVIDED?

02:49PM 7    A.   I DID.

02:49PM 8    Q.   THE NEXT SECTION, SECTION B, IS A SUMMARY OF THE PFIZER

02:50PM 9    STUDY; IS THAT RIGHT?

02:50PM 10   A.   THAT IS CORRECT.

02:50PM 11   Q.   IN THE FIRST PARAGRAPH YOU DESCRIBE THAT THE PRIMARY TRIAL

02:50PM 12   SITE WAS WITH SOMETHING CALLED TENNESSEE ONCOLOGY.

02:50PM 13        DO YOU SEE THAT?

02:50PM 14   A.   I DO.

02:50PM 15   Q.   DID YOU, AS PART OF THIS DRAFTING OF THE MEMO, DID YOU

02:50PM 16   CONTACT TENNESSEE ONCOLOGY?

02:50PM 17   A.   I DID NOT.

02:50PM 18   Q.   WHY?

02:50PM 19   A.   I, YOU KNOW, ACCEPTED THAT -- YOU KNOW, I THOUGHT THE

02:50PM 20   REPORT HAD BEEN WRITTEN BY PFIZER, AND TO ME THAT WAS

02:50PM 21   SUFFICIENT VALIDATION OF THE CONTENTS TO THE PAPER.

02:50PM 22   Q.   FORGIVE ME.

02:50PM 23        TWO PARAGRAPHS DOWN IT BEGINS, "THE CONCLUSIONS IN THE

02:50PM 24   PFIZER STUDY REPORT ARE EXTRAORDINARILY COMPLIMENTARY AND

02:50PM 25   VALIDATE THE THERANOS TECHNOLOGY AND ITS APPLICATIONS.

02:50PM  1          "SOME OF THE PRINCIPAL CONCLUSIONS FROM THE STUDY REPORT

02:50PM  2   ARE AS FOLLOWS."

02:50PM  3          AND THEN YOU SPEND ANOTHER ABOUT HALF DOZEN BULLETS

02:51PM  4   QUOTING CONCLUSIONS.

02:51PM  5          DID YOU THINK THAT THE CONCLUSIONS THAT YOU WERE QUOTING

02:51PM  6   WERE PFIZER'S CONCLUSIONS?

02:51PM  7   A.   I DID.

02:51PM  8   Q.   IF YOU HAD KNOWN THAT THOSE WERE THERANOS'S CONCLUSIONS,

02:51PM  9   WOULD THAT HAVE CHANGED YOUR OPINION?

02:51PM 10   A.   IT WOULD.

02:51PM 11   Q.   WHY?

02:51PM 12   A.   WELL, BECAUSE, AS I SAID, PFIZER IS A VERY LARGE

02:51PM 13   SOPHISTICATED PHARMACEUTICAL COMPANY WITH THE EXPERTISE TO

02:51PM 14   RENDER AN IMPORTANT JUDGMENT ABOUT THIS TECHNOLOGY.

02:51PM 15   Q.   IF YOU'LL TURN NOW TO PAGE 5 OF THIS DOCUMENT.

02:51PM 16          THIS IS UNDER A SECTION THAT WAS ENTITLED "THE THERANOS

02:51PM 17   BUSINESS APPROACH," AND I WANT TO ASK YOU QUESTIONS ABOUT THE

02:51PM 18   SECOND AND THIRD BULLETS.

02:51PM 19   A.   OKAY.

02:51PM 20   Q.   THE SECOND BULLET READS, "THE WORK WITH PHARMA COMPANIES

02:51PM 21   (WHICH WERE UNDOUBTEDLY REQUIRED TO SIGN CONFIDENTIALITY

02:51PM 22   AGREEMENTS) PROVIDED VALIDATION OF THE TECHNOLOGY AND

02:51PM 23   APPROACH."

02:51PM 24          WHAT DID YOU MEAN BY THAT, AND IN PARTICULAR THE

02:52PM 25   "UNDOUBTEDLY REQUIRED TO SIGN CONFIDENTIALITY AGREEMENTS"?

02:52PM  1    A.   I DON'T -- AT THIS MOMENT, I CAN'T TELL YOU EXACTLY WHAT I

02:52PM  2    MEANT BY THAT.

02:52PM  3    Q.   YOU DON'T RECALL?

02:52PM  4    A.   I DON'T RECALL.

02:52PM  5    Q.   OKAY.  THE NEXT BULLET, "A COMBINATION OF," AND THEN YOU

02:52PM  6    HAVE FOUR SUBPARTS.

02:52PM  7         "THE PRICING OF TESTS BY THERANOS, THE SPEED OF THE

02:52PM  8    DELIVERY OF RESULTS, THE RELIABILITY OF THE TEST RESULTS, AND

02:52PM  9    THE ABILITY TO PERFORM A VAST ARRAY OF TESTS."

02:52PM  10        THERE'S ANOTHER 4.  "THE ABILITY TO PERFORM A VAST NUMBER

02:52PM  11   OF TESTS WITH ONLY A FEW DROPS OF BLOOD REQUIRING JUST A FINGER

02:52PM  12   PRICK, WILL MAKE THERANOS'S APPROACH DISRUPTIVE AND EXTREMELY

02:52PM  13   HARD TO COUNTER BY ITS COMPETITORS."

02:52PM  14        DO YOU RECALL WHAT YOU MEANT BY THIS?

02:52PM  15   A.   EXACTLY WHAT IT SAYS, THAT I THOUGHT IT WAS -- YOU KNOW,

02:52PM  16   FOR ALL OF THE REASONS THAT ARE LISTED THERE, THAT IT WAS

02:52PM  17   EXTREMELY DISRUPTIVE AND WOULD BE HARD TO REPLICATE BY ITS

02:53PM  18   COMPETITORS.

02:53PM  19   Q.   AND IF THE -- IF SOME OF THESE ASSUMPTIONS, YOU KNOW, YOUR

02:53PM  20   ROMAN NUMERALS I THROUGH V, IF THEY WEREN'T TRUE, WOULD THAT

02:53PM  21   MAKE THE TECHNOLOGY LESS DISRUPTIVE OR EASIER TO COUNTER?

02:53PM  22   A.   YES.

02:53PM  23   Q.   SO, FOR INSTANCE, IF THE TECHNOLOGY AND THE RESULTS WERE

02:53PM  24   NOT RELIABLE, IT MIGHT BE LESS DISRUPTIVE?

02:53PM  25   A.   YES.

02:53PM 1      Q.   IF THE TECHNOLOGY DIDN'T HAVE THE ABILITY TO PERFORM A

02:53PM 2      VAST ARRAY OF TESTS, IT MIGHT BE LESS DISRUPTIVE?

02:53PM 3      A.   YES.

02:53PM 4      Q.   IT MIGHT BE EASIER TO COUNTER BY ITS COMPETITORS?

02:53PM 5      A.   YES.

02:53PM 6      Q.   IF WE CAN NOW GO TO PAGE 7.

02:53PM 7           ON PAGE 7, SECTION 4 IS "CURRENT AND PROJECTED FINANCIAL

02:53PM 8      RESULTS."

02:53PM 9           ARE YOU SUMMARIZING HERE SOME OF THE FINANCIAL INFORMATION

02:53PM 10     THAT YOU AND I HAD A CONVERSATION ABOUT A FEW MINUTES AGO?

02:54PM 11     A.   YES.

02:54PM 12     Q.   IN A YOU WRITE, "FOR CALENDAR YEAR 2014, THERANOS IS

02:54PM 13     PROJECTING $140 MILLION OF REVENUE WITH A NET LOSS OF 3

02:54PM 14     MILLION."

02:54PM 15          AND THEN YOU BREAK OUT THE REVENUE.

02:54PM 16          DID YOU GET THIS INFORMATION FROM THAT DOCUMENT THAT YOU

02:54PM 17     AND I LOOKED AT EARLIER?

02:54PM 18     A.   I DID.

02:54PM 19     Q.   AND THEN YOU DO THE SAME FOR 2015, THE PROJECTED REVENUE

02:54PM 20     AND THE BREAKOUT.

02:54PM 21          SO DID YOU ALSO GET THIS INFORMATION FROM THAT DOCUMENT

02:54PM 22     THAT YOU AND I LOOKED AT?

02:54PM 23     A.   YES, I DID.

02:54PM 24     Q.   FINALLY, IN V(B) TOWARDS THE BOTTOM OF THIS PAGE, YOU

02:54PM 25     WRITE, "ELIZABETH HOLMES OWNS ALL OF THE CLASS B COMMON SHARES,

02:54PM  1    WHICH REPRESENT ALMOST 50 PERCENT OF THE VALUE OF THE COMPANY.

02:54PM  2    THE CLASS B SHARES HAVE 100 VOTES PER SHARE, AS COMPARED TO THE

02:54PM  3    CLASS A SHARES THAT HAVE ONE VOTE PER SHARE."

02:54PM  4        WHAT DOES THAT MEAN?

02:54PM  5    A.  WELL, IT MEANS THAT THE CLASS B COMMON SHARES HAVE 100

02:55PM  6    TIMES THE VOTE OF THE CLASS A COMMON SHARE.

02:55PM  7    Q.  WAS THAT IMPORTANT TO YOU OR SOMETHING THAT YOU NOTICED?

02:55PM  8    A.  IT WAS.

02:55PM  9    Q.  WHY?

02:55PM 10    A.  IT MEANT THAT ELIZABETH WOULD BE ABSOLUTELY IN CONTROL OF

02:55PM 11    THE COMPANY EVEN AFTER ALL OF THE PREFERRED SHARES THAT HAD

02:55PM 12    BEEN SOLD AND THAT WERE CONVERTIBLE INTO COMMON STOCK, THEY

02:55PM 13    WERE CONVERTIBLE INTO CLASS B SHARES -- OR CONVERTIBLE INTO

02:55PM 14    CLASS A SHARES RATHER, BUT SHE WOULD STILL HAVE ABSOLUTE

02:55PM 15    CONTROL OF THE COMPANY.

02:55PM 16    Q.  AND IN YOUR MIND, WAS MS. HOLMES MAINTAINING CONTROL OF

02:55PM 17    THE COMPANY A GOOD THING?

02:55PM 18    A.  IT WAS.

02:55PM 19    Q.  WHY?

02:55PM 20    A.  WELL, SHE WAS OBVIOUSLY THE VISIONARY THAT HAD CREATED

02:55PM 21    THIS COMPANY AND DEVELOPED THE TECHNOLOGY, AND HAVING HER IN

02:55PM 22    CONTROL OF THE COMPANY WAS A GOOD THING.

02:55PM 23    Q.  AND WHEN YOU REACHED THAT OPINION OR THAT CONCLUSION, WERE

02:55PM 24    YOU RELYING ON THE ACCURACY OF THE MATERIALS THAT WERE PROVIDED

02:55PM 25    TO YOU TO REACH THAT CONCLUSION?

02:55PM 1      A.   YES.

02:56PM 2      Q.   EARLIER WE LOOKED AT SOME OF THE DOCUMENTS THAT TALKED

02:56PM 3      ABOUT THE PRIORITY THAT INDIVIDUALS, INDIVIDUAL SHAREHOLDERS

02:56PM 4      WOULD GET PAID BACK AND YOU DESCRIBED THAT TO ME.

02:56PM 5           DO YOU REMEMBER?

02:56PM 6      A.   I DO.

02:56PM 7      Q.   AND WAS CLASS B A LOWER PRIORITY?  WOULD THE C-1 AND C-2

02:56PM 8      GET PAID BEFORE B?

02:56PM 9      A.   YES, BECAUSE THE CLASS B SHARES ARE COMMON SHARES, AND

02:56PM 10     COMMON SHARES RECEIVE ASSETS AND LIQUIDATION ONLY AFTER ALL OF

02:56PM 11     THE PREFERRED SHARES RECEIVE THEIR STATED VALUE.

02:56PM 12     Q.   I SEE.  SO THE SHARES THAT YOU'RE REFERRING TO HERE THAT

02:56PM 13     MS. HOLMES HELD HAD A LOWER PRIORITY AT LIQUIDATION, BUT HAD

02:56PM 14     MORE VOTING POWER?

02:56PM 15     A.   THAT IS CORRECT.

02:56PM 16     Q.   GOT IT.

02:56PM 17          IF YOU'LL NOW TURN TO PAGE 9.

02:57PM 18          IN THIS SECTION YOU TALK ABOUT, "QUESTIONS, CONCERNS AND

02:57PM 19     RISKS."

02:57PM 20          THERE ARE FIVE OF THEM; IS THAT RIGHT?

02:57PM 21     A.   THAT IS CORRECT.

02:57PM 22     Q.   WAS ONE OF THE RISKS IDENTIFIED THAT THE FOUNDER WOULD NOT

02:57PM 23     BE ACCURATE IN HER DESCRIPTIONS OF THE COMPANY TO YOU?

02:57PM 24     A.   IT'S NOT ONE OF THE RISKS LISTED HERE.

02:57PM 25     Q.   WHY DIDN'T YOU WRITE THAT AS ONE OF THE RISKS?

02:57PM 1     A.   I DIDN'T -- I REALLY DIDN'T AT THE TIME BELIEVE THAT IT

02:57PM 2     WAS A RISK.

02:57PM 3     Q.   THE, THE SECOND RISK, YOU WRITE IN THAT SECOND SENTENCE,

02:57PM 4     "IN PARTICULAR, GIVEN THAT THERANOS IS CURRENTLY IN ROUGHLY 30

02:57PM 5     WALGREENS PHARMACIES, IT WOULD BE HELPFUL TO KNOW HOW MANY

02:57PM 6     PHARMACY LOCATIONS ARE ASSUMED IN THE 2015 PROJECTIONS."

02:57PM 7          HELP ME UNDERSTAND THE QUESTION OR THE RISK THAT YOU WERE

02:57PM 8     IDENTIFYING THERE.

02:57PM 9     A.   WELL, IT WAS -- YOU KNOW, OBVIOUSLY 140 TO 990 MILLION WAS

02:57PM 10    A VERY SUBSTANTIAL, AS I SAY.

02:57PM 11         AND IN MAKING A JUDGMENT ABOUT HOW LARGE THE OPPORTUNITY

02:58PM 12    IS, IT WOULD BE HELPFUL TO KNOW HOW MANY OF THE WALGREENS WERE

02:58PM 13    EXPECTED TO HAVE THERANOS FACILITIES IN 2015 THAT WOULD GET YOU

02:58PM 14    TO THAT KIND OF REVENUE NUMBER, WHICH WOULD THEN TELL YOU

02:58PM 15    PERHAPS HOW YOU COULD EXTRAPOLATE TO WHAT THE REVENUE MIGHT BE

02:58PM 16    WHEN IT WAS FULLY ROLLED OUT IF IT WERE IN ALL OF THE

02:58PM 17    WALGREENS.

02:58PM 18    Q.   DID YOU THINK THAT ONE OF THE RISKS RELATIVE TO WALGREENS

02:58PM 19    PENETRATION WAS THAT WALGREENS MISUNDERSTOOD OR DID NOT

02:58PM 20    APPRECIATE THE THERANOS TECHNOLOGY?  DID YOU THINK THAT THAT

02:58PM 21    WAS ONE OF THE RISKS?

02:58PM 22    A.   WELL, YOU KNOW, I REALIZED THAT WALGREENS WAS TESTING IT

02:58PM 23    IN 30 PHARMACIES, AND THERE, YOU KNOW, WOULD ALWAYS BE A RISK

02:59PM 24    THAT THEY WOULD NOT ROLL IT OUT TO ALL OF THE PHARMACIES.  I

02:59PM 25    DID REALIZE THAT THAT WAS A RISK.

02:59PM 1    Q.   AND DID YOU HAVE FURTHER THOUGHTS ON THE REASONS WHY

02:59PM 2    WALGREENS MIGHT NOT ROLL IT OUT?  IF THEY WERE IN 30, YOU

02:59PM 3    UNDERSTOOD IT WASN'T GUARANTEED.  DID YOU HAVE A THOUGHT ON THE

02:59PM 4    KINDS OF THINGS THAT MIGHT AFFECT A ROLLOUT?

02:59PM 5    A.   AT THE TIME I HAD NO REASON TO THINK THAT WALGREENS WOULD

02:59PM 6    NOT CONTINUE WITH THE ROLLOUT.

02:59PM 7    Q.   WHY DO YOU SAY THAT?

02:59PM 8    A.   ALL OF THE INFORMATION ABOUT THE ACCURACY OF THE TEST, THE

02:59PM 9    VAST ARRAY OF THE TEST, THE PRICING OF THE TEST, THE SPEED AT

02:59PM 10   WHICH THE TEST RESULTS COULD BE DELIVERED, ALL OF THOSE MADE ME

02:59PM 11   EXPECT OR COME TO THE CONCLUSION THAT IT WAS LIKELY AT THAT

02:59PM 12   TIME THAT THEY WOULD CONTINUE TO ROLL OUT.

02:59PM 13   Q.   I SEE.  THE THINGS THAT YOU FOUND ATTRACTIVE ABOUT

02:59PM 14   THERANOS, YOU THOUGHT WALGREENS WOULD AS WELL?

02:59PM 15   A.   THAT'S CORRECT.

02:59PM 16   Q.   THE NEXT C, THE CONCERN OR QUESTION YOU RAISE IS WHY

03:00PM 17   THERANOS IS NOW WILLING TO SELL ADDITIONAL SHARES AND WISHES TO

03:00PM 18   RAISE ADDITIONAL CASH THEY COULD LIKELY BORROW.

03:00PM 19        SO YOU'RE WONDERING ABOUT THE EQUITY RAISED.  WHAT WERE

03:00PM 20   YOU GETTING AT HERE?

03:00PM 21   A.   WELL, WHEN YOU, WHEN YOU RAISE ADDITIONAL EQUITY, YOU

03:00PM 22   DILUTE THE OWNERSHIP OF ALL OF THE PEOPLE WHO INVESTED IN THE

03:00PM 23   COMPANY BEFORE THAT.

03:00PM 24        SO TYPICALLY COMPANIES ARE RELUCTANT TO RAISE MORE EQUITY

03:00PM 25   THAN THEY NEED CASH FLOW BECAUSE OF THAT POTENTIAL FOR

03:00PM  1     DILUTION.

03:00PM  2     Q.   AND WHY WAS THIS LISTED AS A QUESTION OR A CONCERN OR A

03:00PM  3     RISK?

03:00PM  4     A.   IT WAS LISTED AS A QUESTION BECAUSE THE 2015 PROJECTION

03:00PM  5     NUMBER SHOWED IT MAKING A PROFIT, WHICH WOULD HAVE BEEN AN

03:00PM  6     INDICATION TO ME THAT PERHAPS IT DIDN'T NEED ADDITIONAL CAPITAL

03:00PM  7     GOING FORWARD.

03:00PM  8     Q.   I SEE.  D YOU WRITE ABOUT A FAIRLY UNUSUAL PROVISION.

03:01PM  9     IS -- WHAT IS THIS UNUSUAL PROVISION THAT YOU'RE WRITING ABOUT?

03:01PM  10    A.   IT'S THE PROVISION YOU ASKED ME ABOUT EARLIER.

03:01PM  11    Q.   THE MANDATORY REDEMPTION?

03:01PM  12    A.   WELL, THAT ALLOWED THE COMPANY TO MAKE A DECISION AND

03:01PM  13    HAVE -- ALLOWED THE BOARD TO HAVE THE FAIR MARKET VALUE OF THE

03:01PM  14    SHARES DETERMINED, AND THEN THE COMPANY COULD CHOOSE TO REDEEM

03:01PM  15    SHARES FROM ONE OR MORE SHAREHOLDERS AT THAT PRICE.

03:01PM  16    Q.   YOU LIST HERE SOME QUESTIONS.  DO YOU REMEMBER GETTING

03:01PM  17    ANSWERS TO THESE QUESTIONS BEFORE YOU DECIDED TO INVEST?

03:01PM  18    A.   I GOT ASSURANCE BEFORE I INVESTED FROM ELIZABETH THAT THIS

03:01PM  19    WOULD NOT BE EXERCISED IN MY CASE, OR IN THE CASE OF ANY OF MY

03:01PM  20    CLIENTS THAT ULTIMATELY, YOU KNOW, THROUGH THEIR OWN PROCESS

03:01PM  21    DECIDED TO INVEST.

03:01PM  22    Q.   AND BY THAT YOU'RE REFERRING TO D, THE MANDATORY

03:02PM  23    REDEMPTION?

03:02PM  24    A.   THAT IS CORRECT.

03:02PM  25    Q.   AND HOW ABOUT THE OTHER FOUR THAT YOU LIST HERE?  DO YOU

03:02PM  1    REMEMBER HAVING FOLLOW-UP CONVERSATIONS OR ADDITIONAL

03:02PM  2    OPPORTUNITIES TO GET SOME CLARIFICATION ON THESE ISSUES BEFORE

03:02PM  3    YOU INVESTED, OR DO THESE REMAIN OUTSTANDING QUESTIONS?

03:02PM  4    A.  BY THE OTHER FOUR, YOU MEAN A, B, C AND E?

03:02PM  5    Q.  YES, SIR.

03:02PM  6    A.  I DON'T REMEMBER GETTING -- YOU KNOW, I GOT ADDITIONAL

03:02PM  7    MATERIALS, BUT I DON'T REMEMBER SPECIFICALLY ON EACH ONE OF

03:02PM  8    THESE POINTS GETTING ADDITIONAL INFORMATION, I DON'T.

03:02PM  9    Q.  SO NOTWITHSTANDING THESE OUTSTANDING QUESTIONS, YOU STILL

03:02PM  10   INVESTED?

03:02PM  11   A.  I DID.

03:02PM  12   Q.  WHY?

03:02PM  13   A.  BECAUSE I THOUGHT IT WAS A VERY, VERY ATTRACTIVE

03:02PM  14   OPPORTUNITY TO SUPPORT SOMETHING THAT WAS GOING TO ACHIEVE A

03:02PM  15   VERY, VERY GOOD RESULT FOR PEOPLE.

03:02PM  16   Q.  SO YOU IDENTIFIED SOME QUESTIONS, BUT THEY WERE NOT

03:02PM  17   OBSTACLES TO ULTIMATELY INVESTING?

03:03PM  18   A.  THEY WERE NOT.

03:03PM  19   Q.  OKAY.  IF YOU WOULD NOW TURN TO EXHIBIT 5387D IN YOUR

03:03PM  20   BINDER.

03:03PM  21       YOUR HONOR, 5387D IS TEXT MESSAGES THAT WERE PREVIOUSLY

03:03PM  22   ADMITTED.  I WOULD NOW SEEK PERMISSION TO PUBLISH TWO MESSAGES

03:03PM  23   ON PAGE 16 OF THIS EXHIBIT 5387D.

03:03PM  24       THERE ARE TWO MESSAGES ON THE BOTTOM OF PAGE 16, IF THE

03:03PM  25   COURT SEES 11/20/13 AT 3:38, AND THE ONE JUST AFTER THAT.

03:03PM  1          THE COURT:  THANK YOU.  THESE HAVE BEEN ADMITTED,

03:03PM  2     AND THEY MAY BE PUBLISHED AGAIN.

03:03PM  3          MR. SCHENK:  THANK YOU, YOUR HONOR.

03:03PM  4      MS. HOLLIMAN, IF WE CAN BRING UP PAGE 16 OF EXHIBIT 5387D.

03:04PM  5     AND THE TWO MESSAGES ON THE BOTTOM OF THAT PAGE, IF WE CAN

03:04PM  6     EXPAND THEM.  THANK YOU.

03:04PM  7     Q.   THE FIRST ONE MS. HOLMES WRITES ON NOVEMBER 20TH, 2013 TO

03:04PM  8     MR. BALWANI, "AM PLANNING ON INCLUDING ALL WE SENT DST,

03:04PM  9     INCLUDING THE PFIZER REPORT.  LET ME KNOW IF U DISAGREE."

03:04PM  10         SHE CONTINUES, "ALSO THE HOSPITAL LIST."

03:04PM  11         MR. MOSLEY, YOU'VE TALKED A LITTLE BIT ABOUT THE

03:04PM  12    IMPORTANCE OF THE PFIZER REPORT TO YOUR DUE DILIGENCE, OR YOUR

03:04PM  13    EXAMINATION OF THE INVESTMENT.

03:04PM  14         WHEN YOU WERE READING THE PFIZER REPORT, CAN YOU REMIND

03:04PM  15    THE JURY WHO YOU THOUGHT AUTHORED THE PFIZER REPORT?

03:04PM  16    A.   PFIZER.

03:04PM  17    Q.   WOULD YOU NOW TURN IN YOUR BINDER TO 4221, EXHIBIT 4221.

03:05PM  18    A.   OKAY.

03:05PM  19    Q.   MR. MOSLEY, IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND

03:05PM  20    MS. HOLMES ABOUT A TRIP TO CALIFORNIA AND ABOUT YOUR MEMO?

03:05PM  21    A.   ARE YOU REFERRING TO THE TOP EMAIL?

03:05PM  22    Q.   THE TRIP TO CALIFORNIA APPEARS IN THE MIDDLE EMAIL ON THE

03:05PM  23    FIRST PAGE, AND THERE'S A REFERENCE TO YOUR MEMO IN THAT EMAIL

03:05PM  24    AS WELL.

03:06PM  25    A.   YES, I SEE THE EMAIL.

03:06PM 1        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4221.

03:06PM 2        MR. WADE:  NO OBJECTION.

03:06PM 3        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:06PM 4        (GOVERNMENT'S EXHIBIT 4221 WAS RECEIVED IN EVIDENCE.)

03:06PM 5    BY MR. SCHENK:

03:06PM 6    Q.   MR. MOSLEY, IF WE START ON PAGE 2, YOU WRITE TO MS. HOLMES

03:06PM 7    ON SEPTEMBER 18TH OF 2014 THAT YOU SENT THE BLANK CONFIDENTIAL

03:06PM 8    DISCLOSURE AGREEMENT TO BOTH THE COX FAMILY AND JERRY TUBERGEN

03:06PM 9    FROM THE DEVOS FAMILY.

03:06PM 10        DO YOU SEE THAT?

03:06PM 11   A.   I DO.

03:06PM 12   Q.   AND DO YOU REMEMBER WHY YOU DID THAT?

03:06PM 13   A.   BECAUSE THE -- YOU KNOW, I UNDERSTOOD THAT OBVIOUSLY ALL

03:06PM 14   OF THE -- I HAD DISCUSSED -- I HAD EXECUTED A NONDISCLOSURE

03:06PM 15   AGREEMENT, OR A CONFIDENTIAL DISCLOSURE AGREEMENT, WHICH MEANT

03:06PM 16   THAT I WAS NOT ALLOWED TO GIVE ANY OF THE INFORMATION THAT I

03:06PM 17   HAD RECEIVED TO ANYBODY ELSE WITHOUT THE CONSENT OF THE

03:07PM 18   COMPANY.

03:07PM 19        AND WHAT I WAS SAYING HERE WAS THAT BEFORE I WOULD PASS

03:07PM 20   ALONG ANY INFORMATION THAT I HAD LEARNED TO THESE INDIVIDUALS,

03:07PM 21   I WOULD FIRST GET THEM TO SIGN A CONFIDENTIAL DISCLOSURE

03:07PM 22   AGREEMENT.

03:07PM 23   Q.   I SEE.

03:07PM 24   A.   JUST CARRYING OUT MY OBLIGATIONS.

03:07PM 25   Q.   I SEE.  IF WE TURN TO PAGE 1, IN THE MIDDLE OF THE PAGE

03:07PM  1    YOU WRITE AN EMAIL TO MS. HOLMES ON SEPTEMBER 25TH.  YOU'RE

03:07PM  2    LOOKING FORWARD TO GETTING OUT TO CALIFORNIA TO SEE HER AND

03:07PM  3    MEET HER TEAM.

03:07PM  4         DID THAT EVENTUALLY HAPPEN?

03:07PM  5    A.   IT DID.

03:07PM  6    Q.   YOU TALK ABOUT AN INDIVIDUAL NAMED ANDREAS.

03:07PM  7         DO YOU SEE THAT?

03:07PM  8    A.   YES, I DO.

03:07PM  9    Q.   FROM THE STAVROS FOUNDATION?

03:07PM 10    A.   YES.

03:07PM 11    Q.   AND THEN THERE'S A REFERENCE IN THE NEXT PARAGRAPH TO

03:07PM 12    GREG PENNER.  WE SAW THAT NAME EARLIER; IS THAT RIGHT?

03:07PM 13    A.   THAT'S CORRECT.

03:07PM 14    Q.   AND THEN MR. TUBERGEN FROM THE DEVOS FAMILY, OR FROM RDV;

03:08PM 15    IS THAT RIGHT?

03:08PM 16    A.   YES.

03:08PM 17    Q.   AND THEN FINALLY, YOU SAY THAT DR. KISSINGER HAS MENTIONED

03:08PM 18    OTHER FAMILIES THAT DR. KISSINGER KNOWS AS POSSIBLE INVESTOR

03:08PM 19    CANDIDATES.  YOU REFERENCE A MEMO THAT YOU PREPARED, OR A

03:08PM 20    SUMMARY, AND DISCUSS SHARING IT.

03:08PM 21         WHAT MEMO IS THAT THAT YOU'RE REFERRING TO?

03:08PM 22    A.   I BELIEVE IT WAS THE MEMO THAT I PREPARED FOR

03:08PM 23    DR. KISSINGER.

03:08PM 24    Q.   THE ONE THAT YOU AND I JUST REVIEWED?

03:08PM 25    A.   YES, YES.

03:08PM   1    Q.   OKAY.  AND WHAT WAS YOUR QUESTION HERE?  WHAT WERE YOU

03:08PM   2    WONDERING?

03:08PM   3    A.   I'M NOT SURE.  WHAT LANGUAGE ARE YOU REFERRING TO?

03:08PM   4    Q.   I'LL BE MORE SPECIFIC.

03:08PM   5         YOU WRITE THAT YOU TOLD DR. KISSINGER THAT YOU WERE

03:08PM   6    COMFORTABLE SHARING THE MEMO WITH THESE OTHER FAMILIES THAT

03:08PM   7    DR. KISSINGER KNEW, BUT ONLY IF SOMETHING HAPPENED FIRST; IS

03:08PM   8    THAT RIGHT?

03:08PM   9    A.   YES.

03:08PM  10    Q.   WHY WAS --

03:08PM  11    A.   I HAD WRITTEN THE MEMO TO DR. KISSINGER FOR DR. KISSINGER,

03:09PM  12    AND I SAID I WAS OKAY IF HE WANTED TO SHOW IT WITH SOMEBODY,

03:09PM  13    BUT ONLY IF IT HAD BEEN CLEARED WITH ELIZABETH THAT THAT WAS

03:09PM  14    OKAY.

03:09PM  15    Q.   DO YOU -- FORGIVE ME.

03:09PM  16         DO YOU KNOW WHETHER THAT HAPPENED?  DO YOU REMEMBER

03:09PM  17    RECEIVING NOTICE FROM MS. HOLMES THAT YOU COULD SHARE THE MEMO?

03:09PM  18    A.   I BELIEVE I DID GET -- I WOULD NOT HAVE ULTIMATELY SAID TO

03:09PM  19    DR. KISSINGER, YOU CAN SEND IT TO SOMEBODY ELSE, WITHOUT

03:09PM  20    GETTING HER CONSENT.

03:09PM  21    Q.   OKAY.  THANK YOU.

03:09PM  22         IF YOU'LL NOW TURN TO 4284.

03:09PM  23         MR. MOSLEY, IS THIS A COUPLE OF EMAILS BETWEEN YOU AND

03:09PM  24    MS. HOLMES WHERE YOU TELL HER THAT YOU WILL INVEST AND THE

03:09PM  25    AMOUNT?

03:09PM 1    A.   YES.

03:09PM 2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4284.

03:10PM 3              MR. WADE:  NO OBJECTION.

03:10PM 4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:10PM 5         (GOVERNMENT'S EXHIBIT 4284 WAS RECEIVED IN EVIDENCE.)

03:10PM 6    BY MR. SCHENK:

03:10PM 7    Q.   MR. MOSLEY, AT THE BOTTOM OF THIS EMAIL YOU -- THE BOTTOM

03:10PM 8    EMAIL, FORGIVE ME.  YOU WRITE, "ELIZABETH.

03:10PM 9         "IT WAS GOOD TO SEE YOU ON FRIDAY."

03:10PM 10        WHAT WAS THAT A REFERENCE TO?

03:10PM 11   A.   I THINK IT WAS A REFERENCE TO MY HAVING BEEN OUT AT

03:10PM 12   THERANOS IN CALIFORNIA ON FRIDAY, THE PREVIOUS FRIDAY.

03:10PM 13   Q.   SO IN OCTOBER OF 2014, DID YOU TRAVEL TO CALIFORNIA TO

03:10PM 14   MEET WITH MS. HOLMES?

03:10PM 15   A.   YES, I DID.

03:10PM 16   Q.   AND WHAT WAS THE PURPOSE OF THAT TRIP?

03:10PM 17   A.   I THINK THE PURPOSE OF THE TRIP WAS TO INTRODUCE

03:10PM 18   INDIVIDUALS AT THE STAVROS NIARCHOS FOUNDATION THAT WANTED TO

03:10PM 19   MEET WITH ELIZABETH SO THAT THEY COULD DO THEIR OWN ANALYSIS AS

03:10PM 20   TO WHETHER IT WAS SOMETHING OF INTEREST TO THEM.

03:10PM 21   Q.   AND THEN WHY DID YOU GO?  IF THE PURPOSE WAS FOR

03:11PM 22   MS. HOLMES TO MEET OTHER INDIVIDUALS, WHAT BROUGHT YOU TO

03:11PM 23   CALIFORNIA?

03:11PM 24   A.   THE FACT THAT, YOU KNOW, THEY HAD NEVER MET HER, AND

03:11PM 25   REALLY PRIMARILY TO DO THE INTRODUCTION.

03:11PM  1    Q.   OKAY.  DO YOU REMEMBER MS. HOLMES TALKING DURING THIS

03:11PM  2    MEETING?

03:11PM  3    A.   I DO.

03:11PM  4    Q.   AND DO YOU REMEMBER HER TALKING ABOUT THE TECHNOLOGY OR

03:11PM  5    ABOUT THERANOS?

03:11PM  6    A.   AS I REMEMBER, WE HAD A LONG CONVERSATION ABOUT THERANOS

03:11PM  7    AND THE TECHNOLOGY.

03:11PM  8    Q.   AND DURING THAT MEETING, DO YOU REMEMBER LEARNING ANYTHING

03:11PM  9    THAT WAS DIFFERENT, THAT WAS SIGNIFICANTLY DIFFERENT THAN ALL

03:11PM 10    OF THE MATERIALS YOU AND I HAVE SPENT THIS AFTERNOON REVIEWING?

03:11PM 11    DID YOU LEARN THAT THE TECHNOLOGY WAS ACTUALLY SOMETHING

03:11PM 12    DIFFERENT, OR DID SOMETHING DIFFERENT?

03:11PM 13    A.   I DID NOT.

03:11PM 14    Q.   WAS THERE -- WERE THE REPRESENTATIONS THAT YOU HEARD IN

03:11PM 15    THIS MEETING LARGELY CONSISTENT WITH YOUR UNDERSTANDING OF THE

03:11PM 16    TECHNOLOGY WHEN YOU LEFT CONNECTICUT TO GO TO THIS MEETING?

03:11PM 17    A.   IT WAS.

03:11PM 18    Q.   AT THE BOTTOM -- I'M SORRY.  CLOSE TO THE BOTTOM OF THE

03:11PM 19    EMAIL, THERE'S A PARAGRAPH THAT BEGINS, "AS WE DISCUSSED."

03:12PM 20         DO YOU SEE THAT?

03:12PM 21    A.   YES.

03:12PM 22    Q.   "AS WE DISCUSSED, I WILL SPEAK WITH DAVID ABOUT THE

03:12PM 23    CONCERN WITH THE MANDATORY REDEMPTION CLAUSE IN THE CERTIFICATE

03:12PM 24    OF INCORPORATION."

03:12PM 25         WHO IS DAVID?

03:12PM  1    A.   THAT WAS A REFERENCE TO DAVID BOIES.

03:12PM  2    Q.   AND DID YOU SPEAK WITH MR. BOIES?

03:12PM  3    A.   I DID.

03:12PM  4    Q.   IS THIS A REFERENCE TO THE MANDATORY REDEMPTION THAT YOU

03:12PM  5    AND I TALKED ABOUT?  YOU PUT IT AS ONE OF YOUR QUESTIONS OR

03:12PM  6    CONCERNS?

03:12PM  7    A.   IT IS.

03:12PM  8    Q.   OKAY.  AND THEN THE LAST PARAGRAPH, "PERSONALLY, I WOULD

03:12PM  9    BE DELIGHTED AND HONORED TO BE PART OF YOUR FIRST CLOSING.  MY

03:12PM  10   HOPE WOULD BE TO INVEST $6 MILLION, WHICH I WOULD PROPOSE TO

03:12PM  11   INVEST THROUGH AN LLC WHOLLY OWNED BY ME AND TRUSTS FOR MY

03:12PM  12   THREE DAUGHTERS, SO THAT IT WILL LIMIT THE NUMBER OF YOUR

03:12PM  13   SEPARATE SHAREHOLDERS RESULTING FROM MY INVESTMENT TO ONE."

03:12PM  14        YOU DECIDED ON AN INVESTMENT AMOUNT OF $6 MILLION; IS THAT

03:12PM  15   RIGHT?

03:12PM  16   A.   I DID.

03:12PM  17   Q.   HOW DID YOU PICK THAT NUMBER?  WHERE DID THAT COME FROM?

03:13PM  18   DO YOU KNOW?

03:13PM  19   A.   I DON'T REALLY REMEMBER.  YOU KNOW, JUST HAVING THOUGHT

03:13PM  20   ABOUT IT AND THOUGHT ABOUT MY PERSONAL FINANCIAL SITUATION, I

03:13PM  21   THOUGHT IT WAS SOMETHING THAT I COULD AFFORD TO INVEST.

03:13PM  22   Q.   OKAY.  ABOVE THIS EMAIL, MS. HOLMES RESPONDS TO YOU

03:13PM  23   THANKING YOU FOR THE EMAIL, AND SHE WRITES, "WE HAVE SPENT A

03:13PM  24   LOT OF TIME ON HOW WE'RE SIZING THIS TRANSACTION AND WHO WE'RE

03:13PM  25   BRINGING IN, AND I CAN HEREIN CONFIRM THE ALLOCATIONS FOR YOU,

03:13PM   1    ANDREAS, AND THE COX'S IN ADDITION TO THE DEVOS COMMITMENT AT

03:13PM   2    THE NUMBERS BELOW.  WE WILL FOLLOW UP TOMORROW ON PAPERWORK

03:13PM   3    THERE."

03:13PM   4         YOU WROTE THAT YOU'RE DELIGHTED AND HONORED, AND

03:13PM   5    MS. HOLMES RESPONDS THAT THEY HAVE SPENT A LOT OF TIME

03:13PM   6    DETERMINING THE ALLOCATIONS.

03:13PM   7         DID YOU FEEL GRATEFUL THAT THE $6 MILLION THAT YOU WANTED

03:13PM   8    TO INVEST WAS ACCEPTED?

03:13PM   9    A.   I DID.

03:13PM  10    Q.   WHY?

03:13PM  11    A.   WELL, AS I SAY, YOU KNOW, I THOUGHT IT WAS, YOU KNOW, VERY

03:14PM  12    EXCITING TECHNOLOGY, AND I THOUGHT IT WAS A VERY INTERESTING

03:14PM  13    COMPANY, AND I THOUGHT THAT IT WOULD BOTH BE A GOOD INVESTMENT

03:14PM  14    AND ALSO SOMETHING THAT WAS SORT OF -- NOT SORT OF -- IT WAS

03:14PM  15    SOMETHING THAT WAS GOOD FOR EVERYBODY.

03:14PM  16    Q.   WHY DO YOU SAY THAT, "GOOD FOR EVERYBODY"?

03:14PM  17    A.   WELL, IT'S GOOD FOR PEOPLE BECAUSE THEY WOULD BE ABLE TO

03:14PM  18    GET BETTER BLOOD TESTING, GET THE RESULTS QUICKER, PAY LESS FOR

03:14PM  19    THE TESTING, AND I THOUGHT IT WOULD IMPROVE MEDICAL TREATMENT.

03:14PM  20    Q.   ALL OF THESE ADVANTAGES, THAT THE RESULTS WERE QUICKER,

03:14PM  21    THE PRICE, WAS THAT BASED ON A BELIEF THAT THE INFORMATION THAT

03:14PM  22    YOU HAD BEEN PROVIDING ABOUT THERANOS WAS ACCURATE?

03:14PM  23    A.   IT WAS.

03:14PM  24    Q.   WOULD YOU TURN NOW TO 4286.

03:15PM  25         IS THIS AN EMAIL FROM MR. BALWANI TO YOU, CC'ING

03:15PM  1    MS. HOLMES, INCLUDING SOME INVESTMENT DOCUMENTS?

03:15PM  2    A.   YES.

03:15PM  3         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4286.

03:15PM  4         MR. WADE:  THE COURT'S INDULGENCE FOR ONE MOMENT.

03:15PM  5    (PAUSE IN PROCEEDINGS.)

03:15PM  6         MR. WADE:  NO OBJECTION.

03:15PM  7         THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

03:15PM  8    (GOVERNMENT'S EXHIBIT 4286 WAS RECEIVED IN EVIDENCE.)

03:16PM  9    BY MR. SCHENK:

03:16PM  10   Q.   MR. MOSLEY, MR. BALWANI SENDS YOU INVESTMENT DOCUMENTS

03:16PM  11   HERE, AND IT'S OCTOBER 24TH, 2014.

03:16PM  12        DO YOU SEE THAT?

03:16PM  13   A.   I DO.

03:16PM  14   Q.   AND IF I COULD NOW DRAW YOUR ATTENTION TO PAGE 60 OF THIS

03:16PM  15   DOCUMENT.  THERE'S SOME SECTIONS IN IT THAT I WOULD LIKE TO ASK

03:16PM  16   YOU ABOUT.

03:16PM  17        FIRST, ARE YOU FAMILIAR WITH THIS DOCUMENT AS A WHOLE, THE

03:16PM  18   DOCUMENT THAT WE'RE LOOKING AT?

03:16PM  19   A.   YES, I AM.

03:16PM  20   Q.   AND WHAT IS IT GENERALLY?

03:16PM  21   A.   IT'S A STOCK PURCHASE AGREEMENT FOR C-2 SHARES.

03:16PM  22   Q.   C-2 SHARES IN THERANOS?

03:16PM  23   A.   THAT'S CORRECT.

03:16PM  24   Q.   NOW, IF ON PAGE 60 YOU'LL LOOK AT, THERE'S A SECTION THAT

03:16PM  25   I'D LIKE TO ASK YOU ABOUT, 4.3, INVESTMENT EXPERIENCE.

03:16PM  1            DO YOU SEE THAT?

03:16PM  2       A.   YES.

03:16PM  3       Q.   AND IT TALKS ABOUT THE EXPERIENCE OF THE PURCHASER.

03:16PM  4            IS THAT YOU?

03:17PM  5       A.   IT IS.

03:17PM  6       Q.   AND WAS THIS ACCURATE WHEN YOU SIGNED IT?  IN OTHER WORDS,

03:17PM  7       DID YOU HAVE THIS RELEVANT INVESTMENT EXPERIENCE?

03:17PM  8       A.   I DID.

03:17PM  9       Q.   AND 4.4 REFERENCES THE SPECULATIVE NATURE OF THE

03:17PM 10       INVESTMENT.

03:17PM 11            IT SAYS THAT THE INVESTOR, THAT'S YOU, UNDERSTANDS AND

03:17PM 12       ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

03:17PM 13       OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

03:17PM 14       HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS.

03:17PM 15            DID YOU UNDERSTAND THAT WHEN YOU INVESTED?

03:17PM 16       A.   YES, I DID.

03:17PM 17       Q.   DID YOU BELIEVE THAT ONE OF THE RISKS WAS THE INFORMATION

03:17PM 18       PROVIDED TO YOU WOULD NOT BE ACCURATE?

03:17PM 19       A.   I WAS NOT THINKING ABOUT THAT IN REFERENCE TO THIS

03:17PM 20       REFERENCE, TO THIS STATEMENT.

03:17PM 21       Q.   WHY NOT?  WHAT WERE YOU THINKING ABOUT WHEN YOU SAW THAT

03:17PM 22       THE INVESTMENT WAS SPECULATIVE?

03:17PM 23       A.   WELL, JUST RECOGNIZING THAT, YOU KNOW, IT WAS NEW

03:17PM 24       TECHNOLOGY AND SOMETHING COULD HAPPEN THAT WOULD NOT MAKE IT AS

03:17PM 25       DISRUPTIVE OR AS EFFECTIVE AS I THOUGHT IT WOULD BE.

03:18PM  1    Q.   DID YOU UNDERSTAND THAT THOSE WERE SOME OF THE RISKS THAT

03:18PM  2    YOU WERE FACING, BUT ACCURACY MIGHT NOT BE ONE OF THE RISKS?

03:18PM  3    A.   I THOUGHT I WAS FACING THOSE RISKS.

03:18PM  4         BUT I THINK YOU'RE ASKING ME, DID I THINK RISK WAS THAT I

03:18PM  5    HAD INACCURATE INFORMATION?  NO.

03:18PM  6    Q.   YES, SIR.

03:18PM  7    A.   I DID NOT THINK THAT I HAD INACCURATE INFORMATION.

03:18PM  8    Q.   OKAY.  THAT SAME PARAGRAPH CONTINUES THAT YOU UNDERSTOOD

03:18PM  9    THAT THERE WAS THE POSSIBILITY THAT YOU WOULD SUFFER A COMPLETE

03:18PM  10   LOSS OF YOUR INVESTMENT.

03:18PM  11        DID YOU UNDERSTAND THAT WHEN YOU --

03:18PM  12   A.   I DID.

03:18PM  13   Q.   -- INVESTED?

03:18PM  14   A.   I DID.

03:18PM  15   Q.   AND THAT DIDN'T STOP YOU FROM INVESTING?

03:18PM  16   A.   IT DID NOT.

03:18PM  17   Q.   WHY DIDN'T IT?

03:18PM  18   A.   IT WAS A RISK I WAS WILLING TO TAKE BASED ON WHAT I KNEW.

03:18PM  19   Q.   WHAT DO YOU MEAN, "BASED ON WHAT YOU KNEW"?

03:18PM  20   A.   BASED ON ALL OF THE INFORMATION THAT WE HAVE GONE THROUGH

03:18PM  21   IN MY MEMORANDUM TO DR. KISSINGER WHICH SORT OF EXPLAINED MY

03:18PM  22   VIEWS OF THE COMPANY.

03:18PM  23   Q.   THE NEXT SECTION, 4.5, IS CALLED ACCESS TO DATA, AND IT

03:18PM  24   READS "THAT THE INVESTOR HAS HAD AN OPPORTUNITY TO ASK

03:19PM  25   QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE OFFICERS OF THE

03:19PM  1    COMPANY."

03:19PM  2         WAS THAT TRUE?  DID YOU HAVE AN OPPORTUNITY TO ASK

03:19PM  3    QUESTIONS?

03:19PM  4    A.   I DID.

03:19PM  5    Q.   THE QUESTIONS THAT YOU ASKED AND THE ANSWERS THAT YOU

03:19PM  6    RECEIVED, THEY DIDN'T MAKE THEIR WAY INTO THIS AGREEMENT; IS

03:19PM  7    THAT RIGHT?

03:19PM  8    A.   I'M NOT SURE WHAT YOU MEAN.

03:19PM  9    Q.   SO YOU SAID THAT YOU HAD THE OPPORTUNITY TO ASK QUESTIONS?

03:19PM  10   A.   I DID.

03:19PM  11   Q.   AND DID YOU MEMORIALIZE THE QUESTIONS AND THEN MAKE THEM

03:19PM  12   SECTIONS IN THIS AGREEMENT?

03:19PM  13   A.   I DID NOT.

03:19PM  14   Q.   SO DID YOU UNDERSTAND THAT WHILE YOU WERE SIGNING THIS

03:19PM  15   AGREEMENT, THINGS THAT LED YOU TO INVEST EXISTED OUTSIDE OF THE

03:19PM  16   AGREEMENT?

03:19PM  17   A.   I DID.

03:19PM  18   Q.   4.6 IS AN ACCREDITED INVESTOR.  WAS THAT TRUE WHEN YOU

03:19PM  19   SIGNED IT?  YOU WERE AN ACCREDITED INVESTOR?

03:19PM  20   A.   IT WAS TRUE.

03:19PM  21   Q.   AND THAT'S A TERM THAT YOU'RE FAMILIAR WITH?

03:19PM  22   A.   YES, I AM.

03:19PM  23   Q.   WOULD YOU TURN NOW TO 4303.

03:20PM  24        MR. MOSLEY, IS THIS AN EMAIL FROM YOU TO MS. HOLMES

03:20PM  25   ATTACHING SOME SIGNATURE PAGES?

03:20PM  1      A.   IT WAS.

03:20PM  2               MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4303.

03:20PM  3               MR. WADE:  NO OBJECTION.

03:20PM  4               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:20PM  5          (GOVERNMENT'S EXHIBIT 4303 WAS RECEIVED IN EVIDENCE.)

03:20PM  6      BY MR. SCHENK:

03:20PM  7      Q.   MR. MOSLEY, IT LOOKS LIKE YOU SENT ON YOUR WHAT IS CALLED

03:20PM  8      A MASTER SIGNATURE PAGE, AS WELL AS THAT OF SOMEONE NAMED

03:20PM  9      ANDREAS; IS THAT RIGHT?

03:20PM  10     A.   THAT IS CORRECT.

03:20PM  11     Q.   WHY DID YOU SEND ANDREAS'S SIGNATURE PAGE IN ADDITION TO

03:20PM  12     YOURS?

03:20PM  13     A.   BECAUSE ANDREAS TOLD ME THAT HE HAD INDEPENDENTLY DECIDED

03:20PM  14     TO MAKE AN INVESTMENT AND ASKED ME IF I WOULD TAKE HIS

03:20PM  15     SIGNATURE PAGE AND PASS IT ALONG WITH MINE TO THE COMPANY.

03:20PM  16     Q.   DID YOU ENCOURAGE HIM TO INVEST?

03:20PM  17     A.   NO.

03:20PM  18     Q.   IF YOU'LL LOOK NOW AT PAGE 2 OF THIS DOCUMENT.

03:21PM  19          IS THAT YOUR SIGNATURE?

03:21PM  20     A.   YES, IT IS.

03:21PM  21     Q.   AND YOUR -- AT THE TIME YOUR WORK ADDRESS?

03:21PM  22     A.   THAT IS CORRECT.

03:21PM  23     Q.   AND IS THIS THE SIGNATURE PAGE TO THE DOCUMENT THAT WE

03:21PM  24     WERE JUST LOOKING AT, THE ACCREDITED INVESTOR DOCUMENT?

03:21PM  25     A.   IT IS.

03:21PM   1    Q.   IF YOU WILL NOW TURN TO EXHIBIT 2172, WHICH WOULD BE

03:21PM   2    TOWARDS THE BEGINNING OF THAT BINDER.

03:21PM   3    A.   I HAVE IT.

03:21PM   4    Q.   MR. MOSLEY, WHAT ARE WE LOOKING AT HERE?

03:21PM   5    A.   IT IS A SIGNED PIECE OF PAPER FROM THERANOS SIGNED BY

03:22PM   6    ELIZABETH HOLMES.

03:22PM   7    Q.   AND IS THIS IN REGARDS TO THE REDEMPTION, THE MANDATORY

03:22PM   8    REDEMPTION ISSUE THAT YOU AND I HAVE SPOKEN ABOUT?

03:22PM   9    A.   IT IS.

03:22PM   10            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2172.

03:22PM   11            MR. WADE:  NO OBJECTION.

03:22PM   12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:22PM   13        (GOVERNMENT'S EXHIBIT 2172 WAS RECEIVED IN EVIDENCE.)

03:22PM   14    BY MR. SCHENK:

03:22PM   15    Q.   IN THIS DOCUMENT, MS. HOLMES WRITES, "THIS WILL CONFIRM

03:22PM   16    WITH RESPECT TO THE SERIES C-2 PREFERRED STOCK FOR WHICH YOUR

03:22PM   17    CLIENTS ARE SUBSCRIBING AT THIS TIME, IF THE COMPANY EXERCISES

03:22PM   18    ITS RIGHT PURSUANT TO SECTION 6 OF THE STOCK'S CERTIFICATE TO

03:22PM   19    REDEEM ANY OR ALL OF SUCH SHARES, THE PRICE PER SHARE SHALL NOT

03:22PM   20    BE LESS THAN $17."

03:22PM   21        DO YOU SEE THAT?

03:22PM   22    A.   I DO.

03:22PM   23    Q.   "YOU AND YOUR CLIENTS WILL HOLD THE EXISTENCE OF THIS

03:22PM   24    LETTER AND ITS CONTENTS AS PERTAINS TO EACH OF THEM IN

03:22PM   25    CONFIDENCE."

03:22PM   1          IT'S DATED OCTOBER 31ST, 2014.

03:23PM   2          WAS THAT THE DATE THAT YOU INVESTED?

03:23PM   3     A.   UM --

03:23PM   4     Q.   I CAN SHOW YOU THE DOCUMENT IF YOU DON'T --

03:23PM   5     A.   YES, YOU CAN SHOW ME THE DOCUMENT.

03:23PM   6     Q.   OKAY.  THE REFERENCE TO "YOUR CLIENTS" IN HERE, WHAT DID

03:23PM   7     YOU UNDERSTAND THAT TO MEAN?

03:23PM   8     A.   WELL, AS A -- YOU KNOW, AS A LAWYER, OBVIOUSLY YOU HAVE A

03:23PM   9     DUTY TO YOUR CLIENTS, AND I HAD INTRODUCED VARIOUS PEOPLE TO

03:23PM  10     THE COMPANY, AND THEY WERE LOOKING AT THE COMPANY.

03:23PM  11          AND I WOULD NEVER -- KNOWING THAT I HAD CLIENTS LOOKING AT

03:23PM  12     THE COMPANY AND WHO MIGHT INVEST IN THE COMPANY, I WOULD NEVER

03:23PM  13     OBTAIN SOME PROTECTION FOR MYSELF THAT I THOUGHT WAS IMPORTANT

03:23PM  14     WITHOUT INCLUDING MY CLIENTS.

03:23PM  15     Q.   YOU UNDERSTOOD THAT SOME OF YOUR CLIENTS ALSO INVESTED IN

03:23PM  16     THERANOS?

03:23PM  17     A.   I THINK AT THE TIME I THOUGHT SOME OF MY CLIENTS WOULD

03:23PM  18     INVEST.

03:23PM  19          I DON'T KNOW AT THE TIME WHETHER ANY OF THEM HAD, BUT I

03:23PM  20     THOUGHT THAT THEY WERE INTERESTED AND THEY MIGHT WELL INVEST.

03:23PM  21     Q.   OKAY.  DID YOU ENCOURAGE ANY OF YOUR CLIENTS TO INVEST?

03:24PM  22     A.   NO.

03:24PM  23     Q.   IF YOU DIDN'T ENCOURAGE THEM, WHY DID YOU GET THIS BENEFIT

03:24PM  24     OR PROTECTION FOR THEM?

03:24PM  25     A.   WELL, THE SAME THING I JUST SAID.  YOU KNOW, I WOULD FEEL

03:24PM  1    LIKE I HAD NOT DONE THE RIGHT THING HAD I GOTTEN THIS

03:24PM  2    PROTECTION FOR MYSELF AND IF LATER MY CLIENTS CHOSE TO INVEST

03:24PM  3    IN THE COMPANY AND THEY DID NOT HAVE THE BENEFIT OF THE SAME

03:24PM  4    PROTECTION.

03:24PM  5        AND SO WHEN I ASKED FOR IT, I ASKED FOR IT TO INCLUDE ME,

03:24PM  6    AS WELL AS ANY OF MY CLIENTS THAT MIGHT DECIDE TO INVEST.

03:24PM  7    Q.   THANK YOU.  IF YOU'LL NOW TURN TO 4845, 4845.

03:24PM  8        YOUR HONOR, THIS HAS BEEN ADMITTED PREVIOUSLY.  PERMISSION

03:24PM  9    TO PUBLISH PAGE 23?

03:24PM 10           THE COURT:  YES.

03:24PM 11           MR. SCHENK:  THANK YOU.

03:25PM 12    Q.   LET ME KNOW WHEN YOU'RE THERE, MR. MOSLEY.

03:25PM 13    A.   I'M THERE.

03:25PM 14    Q.   DO YOU SEE THE DOCUMENT AT PAGE 23 OF 4845?

03:25PM 15    A.   I DO.

03:25PM 16    Q.   AND WHEN YOU MADE THE INVESTMENT IN THERANOS, DID YOU BANK

03:25PM 17    WITH JPMORGAN CHASE?

03:25PM 18    A.   I DID.

03:25PM 19    Q.   AND WHERE WERE YOU, IN WHAT STATE, WHEN YOU INITIATED THE

03:25PM 20    WIRE TRANSFER?

03:25PM 21    A.   I WAS IN MY OFFICE IN NEW YORK.

03:25PM 22    Q.   THE AMOUNT THAT WE SEE HERE IS JUST UNDER $6 MILLION.

03:26PM 23        DO YOU SEE THAT?

03:26PM 24    A.   I DO.

03:26PM 25    Q.   AND DO YOU KNOW WHAT EXPLAINS THE DISCREPANCY?  YOU WROTE

03:26PM 1    AN EMAIL THAT YOU WERE GOING TO INVEST 6 MILLION, AND THIS IS

03:26PM 2    JUST UNDER THAT.

03:26PM 3    A.   THIS IS THE DOLLAR AMOUNT THAT ROUNDED OUT, AT $17 A

03:26PM 4    SHARE, TO AN EVEN NUMBER OF SHARES.

03:26PM 5    Q.   I SEE.  OKAY.

03:26PM 6         AND THE BENEFICIARY AT THE BOTTOM IS THERANOS.

03:26PM 7         DO YOU SEE THAT?

03:26PM 8    A.   I DO.

03:26PM 9    Q.   MR. MOSLEY, WHEN YOU WERE DESCRIBING YOUR CLIENTS OR

03:26PM 10   OTHERS THAT YOU KNEW WERE CONTEMPLATING AN INVESTMENT AT THE

03:26PM 11   SAME TIME AS YOU, DID YOU KNOW WHETHER MR. TROTT OR BDT WAS

03:26PM 12   CONTEMPLATING AN INVESTMENT?

03:26PM 13   A.   I DID NOT KNOW.

03:26PM 14   Q.   YOU DID NOT KNOW WHETHER THEY WERE?

03:26PM 15   A.   I DID NOT.

03:26PM 16        MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

03:26PM 17        THE COURT:  YES.

03:26PM 18   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

03:27PM 19        MR. SCHENK:  THANK YOU, YOUR HONOR.

03:27PM 20   NO FURTHER QUESTIONS.

03:27PM 21        THE COURT:  CROSS-EXAMINATION?

03:27PM 22        MR. WADE:  I DO, YOUR HONOR.  MAYBE NOW WOULD BE A

03:27PM 23   GOOD TIME FOR A STANDING BREAK.

03:27PM 24        THE COURT:  YES.  FOLKS, PLEASE STAND AND STRETCH.

03:27PM 25        (STRETCHING.)

03:27PM  1          THE COURT:  I THINK WE SAID WE WOULD GO UNTIL

03:27PM  2   4:00 O'CLOCK TODAY.  I DON'T THINK I SUGGESTED 5:00 O'CLOCK FOR

03:27PM  3   TODAY.  I THINK IT'S 4:00 O'CLOCK.

03:27PM  4          MR. WADE:  4:00 O'CLOCK, YES.  ANOTHER 30 MINUTES I

03:27PM  5   THINK.

03:27PM  6          THE COURT:  RIGHT.

03:27PM  7      (STRETCHING.)

03:29PM  8                      **CROSS-EXAMINATION**

03:29PM  9   BY MR. WADE:

03:29PM  10  Q.   GOOD AFTERNOON, MR. MOSLEY.

03:29PM  11  A.   GOOD AFTERNOON.

03:29PM  12  Q.   MY NAME IS LANCE WADE.  I'M A LAWYER, AND I REPRESENT

03:29PM  13  MS. HOLMES.

03:29PM  14      I'M GOING TO ASK YOU A FEW QUESTIONS TODAY, AND WE'LL

03:29PM  15  PROBABLY GO INTO TOMORROW A BIT.

03:29PM  16      I'D LIKE TO START BY ASKING YOU A LITTLE MORE ABOUT YOUR

03:29PM  17  PRIOR OCCUPATION.  YOU'RE NOW A RECOVERING LAWYER; IS THAT

03:29PM  18  RIGHT?

03:29PM  19  A.   THAT IS CORRECT.

03:29PM  20  Q.   OKAY.  AND BEFORE YOU TRANSITIONED CAREERS, YOU WORKED AT

03:29PM  21  THE LAW FIRM OF CRAVATH, SWAINE & MOORE IN NEW YORK CITY?

03:29PM  22  A.   I DID.

03:29PM  23  Q.   AND IF I CAN ASK YOU TO BE IMMODEST IF I MIGHT -- I KNOW

03:29PM  24  IT MAY NOT BE HOW YOU WERE RAISED -- IS IT FAIR TO SAY THAT

03:29PM  25  CRAVATH IS ONE OF THE PREEMINENT LAW FIRMS IN THE WORLD?

03:29PM  1      A.   I BELIEVE IT IS.

03:29PM  2      Q.   IT'S BEEN AROUND FOR ABOUT 200 YEARS?

03:29PM  3      A.   THAT'S CORRECT.

03:29PM  4      Q.   ONE OF THE OLDEST LAW FIRMS IN THE UNITED STATES?

03:30PM  5      A.   THAT IS CORRECT.

03:30PM  6      Q.   AND IT REPRESENTS ITSELF AS HAVING THE MOST ACCOMPLISHED

03:30PM  7      LAWYERS ACROSS ALL PRACTICE AREAS.  IS THAT -- DO YOU THINK

03:30PM  8      THAT'S A FAIR ASSESSMENT?

03:30PM  9      A.   YOU KNOW, "MOST" IS AN EXTREME STATEMENT.  I WOULD SAY

03:30PM 10      EXTREMELY ACCOMPLISHED, YES.

03:30PM 11      Q.   AND IN PARTICULAR, YOU WORKED IN THE TRUSTS AND ESTATES

03:30PM 12      GROUP AT CRAVATH; CORRECT?

03:30PM 13      A.   I DID.

03:30PM 14      Q.   AND THAT'S A PARTICULARLY WELL REGARDED GROUP, IS IT NOT?

03:30PM 15      A.   I BELIEVE IT WAS.

03:30PM 16      Q.   AND YOU WORKED THERE FOR, WAS IT A LITTLE OVER 30 YEARS;

03:30PM 17      IS THAT RIGHT?

03:30PM 18      A.   THAT IS CORRECT.

03:30PM 19      Q.   AND DURING THAT TIME, YOU SERVICED ANY NUMBER OF PROMINENT

03:30PM 20      FAMILIES THROUGHOUT THE COUNTRY?

03:30PM 21      A.   I DID.

03:30PM 22      Q.   ON VARIOUS TRUSTS AND ESTATES MATTERS; IS THAT RIGHT?

03:30PM 23      A.   THAT'S CORRECT.

03:30PM 24      Q.   AND NOW YOU'VE, YOU'VE MOVED ON AND YOU WORK AT BDT?

03:31PM 25      A.   THAT IS CORRECT.

03:31PM 1    Q.   AND WHAT KIND OF SERVICES DO YOU PROVIDE AT BDT?

03:31PM 2    A.   I'M INVOLVED IN THE MANAGEMENT OF THE FIRM, I RUN THE

03:31PM 3    NEW YORK OFFICE.  WE ADVISE AND WORK WITH, YOU KNOW, HIGH NET

03:31PM 4    WORTH FAMILIES, AND I DO THAT TYPE OF WORK.

03:31PM 5    Q.   AND YOU'VE WORKED WITH A LOT OF VERY HIGH NET WORTH

03:31PM 6    FAMILIES IN YOUR WORK IN TRUSTS AND ESTATES PRACTICE AT

03:31PM 7    CRAVATH; IS THAT CORRECT?

03:31PM 8    A.   I DID.

03:31PM 9    Q.   AND YOU WOULD CREATE TRUSTS FOR THE FAMILIES, AMONG OTHER

03:31PM 10   THINGS?

03:31PM 11   A.   YES.

03:31PM 12   Q.   AND OCCASIONALLY REVIEW DOCUMENTS AND THE LIKE?

03:31PM 13   A.   YES.

03:31PM 14   Q.   AND YOU OCCASIONALLY WOULD INVEST YOURSELF; CORRECT?

03:31PM 15   A.   YEAH.  AS I HAD EXTRA FUNDS, I INVESTED FOR MY OWN

03:31PM 16   PERSONAL ACCOUNT, YES.

03:31PM 17   Q.   AND SO YOU HAVE SOME EXPERIENCE IN THE INVESTING WORLD

03:31PM 18   BEYOND JUST THE THERANOS INVESTMENT; IS THAT FAIR?

03:32PM 19   A.   I DO, YES.

03:32PM 20   Q.   IN FACT, THERE'S -- I BELIEVE THE ENTITY THROUGH WHICH YOU

03:32PM 21   INVESTED HERE IS CALLED MOSLEY FAMILY HOLDINGS; IS THAT

03:32PM 22   CORRECT?

03:32PM 23   A.   THAT'S CORRECT.

03:32PM 24   Q.   AND THAT'S AN ENTITY THAT YOU SET UP FOR INVESTMENT

03:32PM 25   PURPOSES; IS THAT CORRECT?

03:32PM   1    A.    THAT IS CORRECT.

03:32PM   2    Q.    OKAY.  AND THE CLIENTS -- THERE ARE A NUMBER OF PEOPLE WHO

03:32PM   3    ARE YOUR CLIENTS WHO YOU INTERACTED WITH IN CONNECTION WITH

03:32PM   4    THERANOS; IS THAT RIGHT?

03:32PM   5    A.    YEAH.  I WOULD SAY A SMALL NUMBER OF MY CLIENTS I

03:32PM   6    INTERACTED WITH IN CONNECTION WITH THERANOS.

03:32PM   7    Q.    OKAY.  AND YOU HAVE A LOT OF CLIENTS?  YOU HAD A LOT OF

03:32PM   8    CLIENTS?

03:32PM   9    A.    I HAD A LOT OF CLIENTS.

03:32PM   10   Q.    OKAY.  AND AMONG THE PEOPLE WHO YOU INTERACTED WITH WERE

03:32PM   11   MEMBERS OF THE WALTON FAMILY; CORRECT?

03:32PM   12   A.    THAT IS CORRECT.

03:32PM   13   Q.    AND THOSE ARE HEIRS OF THE WAL-MART FORTUNE, IF YOU WILL?

03:32PM   14   A.    THEY ARE, THEY ARE DECEDENTS OF SAM WALTON.

03:33PM   15   Q.    AND THE PEOPLE WHO YOU INTERACTED THERE WERE ROB WALTON;

03:33PM   16   CORRECT?

03:33PM   17   A.    CORRECT.

03:33PM   18   Q.    AND THAT WOULD BE SAM WALTON'S SON; IS THAT RIGHT?

03:33PM   19   A.    THAT IS CORRECT.

03:33PM   20   Q.    AND AT THE TIME OF THE THERANOS INVESTMENT, HE WAS THE

03:33PM   21   CHAIRMAN OF THE BOARD OF WAL-MART; IS THAT CORRECT?

03:33PM   22   A.    YES, I BELIEVE THAT'S CORRECT.

03:33PM   23   Q.    AND YOU INTERACTED WITH GREG PENNER; CORRECT?

03:33PM   24   A.    I DID.

03:33PM   25   Q.    AND GREG PENNER AT THE TIME WAS THE VICE CHAIRMAN OF

03:33PM 1    WAL-MART CORPORATION; CORRECT?

03:33PM 2    A.   I BELIEVE HE WAS.

03:33PM 3    Q.   AND HE'S NOW THE CHAIRMAN OF WAL-MART CORPORATION;

03:33PM 4    CORRECT?

03:33PM 5    A.   HE IS.

03:33PM 6    Q.   AND HE IS THE SON-IN-LAW OF ROB WALTON?

03:33PM 7    A.   THAT'S CORRECT.

03:33PM 8    Q.   SO KIND OF THE THIRD GENERATION IF YOU WILL?

03:33PM 9    A.   THIRD GENERATION STARTING WITH SAM WALTON, YES.

03:33PM 10   Q.   OKAY.  AND IN ADDITION TO THAT, YOU INTERACTED A BIT WITH

03:33PM 11   ALICE WALTON AS WELL; CORRECT?

03:33PM 12   A.   I DID.

03:33PM 13   Q.   AND ALICE WALTON IS ALSO AN HEIR OF SAM WALTON; CORRECT?

03:33PM 14   A.   SHE IS ONE OF -- SHE IS ROB WALTON'S SISTER.

03:34PM 15   Q.   OKAY.  THAT'S ONE SET OF CLIENTS WHO YOU INTERACTED WITH

03:34PM 16   ON THERANOS; CORRECT?

03:34PM 17   A.   THAT'S CORRECT.

03:34PM 18   Q.   AND DO YOU RECALL THAT THEY INVESTED COLLECTIVELY ABOUT

03:34PM 19   $150 MILLION?

03:34PM 20   A.   I BELIEVE -- YOU KNOW, I WASN'T INVOLVED IN THEIR DECISION

03:34PM 21   AS TO HOW MUCH TO INVEST, BUT I THINK -- THAT'S WHAT I BELIEVE

03:34PM 22   THEY DID INVEST.

03:34PM 23   Q.   OKAY.

03:34PM 24   A.   I CERTAINLY HAVE HEARD THAT.

03:34PM 25   Q.   OKAY.  AND YOU ALSO INTERACTED A BIT WITH THE DEVOS

03:34PM 1      FAMILY; CORRECT?

03:34PM 2      A.   THAT IS CORRECT.

03:34PM 3      Q.   AND YOU'VE DONE WORK FOR THE DEVOS FAMILY FOR A LONG TIME

03:34PM 4      AS WELL; CORRECT?

03:34PM 5      A.   YES.

03:34PM 6      Q.   DECADES?

03:34PM 7      A.   UH, YES.

03:34PM 8      Q.   AND THEY HAVE A FAMILY OFFICE.  ARE YOU AWARE OF THAT?

03:34PM 9      A.   THEY DO, YES.

03:34PM 10     Q.   AND THAT'S RDV CORPORATION?

03:34PM 11     A.   THAT IS CORRECT.

03:34PM 12     Q.   AND THAT IS RUN BY A GENTLEMAN NAMED JERRY TUBERGEN;

03:34PM 13     CORRECT?

03:34PM 14     A.   AT THE TIME IT WAS, YES.

03:34PM 15     Q.   AND MR. TUBERGEN WAS A PERSON WHO YOU INTERACTED WITH IN

03:34PM 16     CONNECTION WITH THERANOS; CORRECT?

03:35PM 17     A.   YES.

03:35PM 18     Q.   DID YOU INTERACT WITH ANY OF THE DEVOS FAMILY MEMBERS

03:35PM 19     THEMSELVES WITH RESPECT TO THERANOS?

03:35PM 20     A.   YOU KNOW, I MAY HAVE AT ONE POINT HAD A CONVERSATION

03:35PM 21     CASUALLY WITH ONE OR MORE OF THEM BECAUSE THEY ASKED ME ABOUT

03:35PM 22     IT, BUT PRIMARILY I INTERACTED WITH -- I JUST INTRODUCED

03:35PM 23     JERRY TUBERGEN TO ELIZABETH HOLMES AND THE COMPANY.

03:35PM 24     Q.   OKAY.  WE'LL COME BACK TO SOME OF THE SPECIFICS.

03:35PM 25     A.   SURE.

03:35PM  1      Q.   BUT THAT WAS -- THOSE WERE CLIENTS OF YOURS; RIGHT?

03:35PM  2      A.   THE DEVOS FAMILY WERE CLIENTS OF MINE.

03:35PM  3      Q.   AND YOU'RE AWARE THAT THEY INVESTED $100 MILLION IN

03:35PM  4      THERANOS; CORRECT?

03:35PM  5      A.   YOU KNOW, I WASN'T INVOLVED, BUT I DO -- THAT IS THE

03:35PM  6      NUMBER THAT I HAVE HEARD THAT THEY INVESTED, YES.

03:35PM  7      Q.   OKAY.  AND YOU ALSO INTERACTED WITH MEMBERS OF THE COX

03:35PM  8      FAMILY IN CONNECTION WITH THERANOS AS WELL; RIGHT?

03:35PM  9      A.   YES, I ALSO INTRODUCED MEMBERS OF THE COX FAMILY TO

03:35PM 10      THERANOS.

03:35PM 11      Q.   AND, AND IS THE COX FAMILY, IS THAT THE TED TURNER FAMILY?

03:36PM 12      IS THAT --

03:36PM 13      A.   NO, IT'S NOT.

03:36PM 14      Q.   OKAY.  TELL ME WHAT THE COX FAMILY IS?

03:36PM 15      A.   THEY OWN COX CABLE, COX ENTERPRISES.

03:36PM 16      Q.   IS THAT BASED IN ATLANTA?

03:36PM 17      A.   YES, IT IS.

03:36PM 18      Q.   AND YOU INTERACTED THERE WITH ALEX TAYLOR; IS THAT

03:36PM 19      CORRECT?

03:36PM 20      A.   THAT IS CORRECT.

03:36PM 21      Q.   AND JOHN DYER?

03:36PM 22      A.   THAT IS CORRECT.

03:36PM 23      Q.   AND IS THAT A CLIENT OF YOURS?  THOSE ARE CLIENTS OF

03:36PM 24      YOURS?

03:36PM 25      A.   YES, THE COX FAMILY WERE CLIENTS OF MINE.

03:36PM  1    Q.   OKAY.  IN ADDITION TO THAT, YOU HAD SOME DEALINGS WITH

03:36PM  2    MR. DRACOPOULOS; IS THAT RIGHT?

03:36PM  3    A.   THAT IS CORRECT.

03:36PM  4    Q.   AND HIS FIRST NAME IS ANDREAS?

03:36PM  5    A.   THAT IS CORRECT.

03:36PM  6    Q.   AND WHO IS MR. DRACOPOULOS?

03:36PM  7    A.   HE IS A RELATIVE OF THE LATE STAVROS NIARCHOS.

03:36PM  8    Q.   IS THAT THE GREEK SHIPPING MAGNATE?

03:36PM  9    A.   IT IS.

03:36PM  10   Q.   AND HE WAS A CLIENT OF YOURS FOR A PERIOD OF TIME BEFORE

03:37PM  11   YOU STARTED INTERACTING WITH THERANOS; IS THAT RIGHT?

03:37PM  12   A.   HE WAS.

03:37PM  13   Q.   AND YOU INTERACTED WITH JOHN ELKANN A BIT AS WELL, DID YOU

03:37PM  14   NOT?

03:37PM  15   A.   YES, I DID AT SOME POINT.

03:37PM  16   Q.   AND IS JOHN ELKANN A CLIENT OF YOURS?

03:37PM  17   A.   NO, HE IS NOT.

03:37PM  18   Q.   AND DO YOU KNOW HOW YOU CAME TO INTERACT WITH JOHN ELKANN

03:37PM  19   AS A RESULT OF THERANOS MATTERS?

03:37PM  20   A.   HE WAS A MEMBER OF A FAMILY THAT DR. KISSINGER HAD HAD A

03:37PM  21   LONG ASSOCIATION WITH, AND I THINK -- I DON'T REALLY KNOW, BUT

03:37PM  22   I SUSPECT THAT DR. KISSINGER MAY HAVE INTRODUCED HIM TO

03:37PM  23   ELIZABETH AND THERANOS.

03:37PM  24   Q.   OKAY.  AND IS -- AND DID DR. KISSINGER ASK YOU TO INTERACT

03:37PM  25   WITH MR. ELKANN?

03:37PM  1      A.   NO.

03:38PM  2      Q.   DO YOU KNOW WHO MR. ELKANN IS, WHAT HIS BACKGROUND IS?

03:38PM  3      A.   HE IS A MEMBER OF THE -- I DO KNOW THAT HE'S A MEMBER OF

03:38PM  4      THE ANGNELLI FAMILY FROM ITALY.

03:38PM  5      Q.   AND IS THAT THE FIAT RELATED FAMILY?

03:38PM  6      A.   IT IS.

03:38PM  7      Q.   OKAY.  AND, OF COURSE, YOU INTERACTED WITH DR. KISSINGER;

03:38PM  8      RIGHT?

03:38PM  9      A.   YES, I DID.

03:38PM  10     Q.   I THINK YOU SAID HE'S BEEN A CLIENT OF YOURS FOR DECADES?

03:38PM  11     A.   FOR A VERY LONG TIME.

03:38PM  12     Q.   OKAY.  AND IN ADDITION TO MR. DRACOPOULOS, IS THERE A

03:38PM  13     FOUNDATION THAT HE'S AFFILIATED WITH?

03:38PM  14     A.   YES.

03:38PM  15     Q.   AND WHAT IS THAT FOUNDATION?

03:38PM  16     A.   THE STAVROS NIARCHOS FOUNDATION.

03:38PM  17     Q.   AND YOU REPRESENTED THAT FOUNDATION AS WELL?

03:38PM  18     A.   I DID NOT.

03:38PM  19     Q.   YOU DID NOT?

03:38PM  20     A.   I DID NOT.

03:38PM  21     Q.   AND YOU'VE ALSO DONE LEGAL WORK FOR BDT; CORRECT?

03:38PM  22     A.   AT THIS POINT I DON'T THINK I HAD PERSONALLY DONE ANY WORK

03:39PM  23     FOR BDT WHATSOEVER.

03:39PM  24     Q.   OKAY.  I THINK I FAILED TO ASK WITH RESPECT TO

03:39PM  25     MR. DRACOPOULOS, YOU'RE AWARE THAT HE INVESTED $25 MILLION?

03:39PM   1    A.   YES.

03:39PM   2    Q.   AND ARE YOU AWARE THAT MR. ELKANN INVESTED $5 MILLION?

03:39PM   3    A.   ONLY BECAUSE SOMEBODY SAID IT AT SOME POINT.

03:39PM   4    Q.   OKAY.  AND MR. -- DR. KISSINGER, HE HAD SOME TRUSTS;

03:39PM   5    CORRECT?

03:39PM   6    A.   YES.

03:39PM   7    Q.   AND YOU'RE THE TRUSTEE OF SOME OF THOSE TRUSTS; CORRECT?

03:39PM   8    A.   I AM.

03:39PM   9    Q.   AND ONE OF HIS -- THE TRUSTS THAT YOU'RE A TRUSTEE FOR

03:39PM   10   INVESTED $3 MILLION; CORRECT?

03:39PM   11   A.   I THINK THAT'S RIGHT.

03:39PM   12   Q.   OKAY.  AND YOU'RE, OF COURSE, AWARE THAT IN CONNECTION

03:39PM   13   WITH SOME OF THESE MATTERS, YOU HAD ATTORNEY-CLIENT

03:39PM   14   COMMUNICATIONS; RIGHT?

03:39PM   15          MR. SCHENK:  OBJECTION.  RELEVANCE.

03:40PM   16          MR. WADE:  I JUST WANT TO SET THE FRAME SO THE

03:40PM   17   WITNESS UNDERSTANDS WHAT I'M NOT ASKING FOR WHEN I ASK

03:40PM   18   QUESTIONS.

03:40PM   19       I DON'T WANT ANY PRIVILEGED COMMUNICATIONS.  THAT'S THE

03:40PM   20   POINT.

03:40PM   21          THE COURT:  OKAY.  MAYBE YOU SHOULD PREFACE YOUR

03:40PM   22   QUESTION LIKE THAT.

03:40PM   23          MR. WADE:  SURE.

03:40PM   24   Q.   RECOGNIZING THAT YOU'RE A LAWYER AND YOU HAVE YOUR ETHICAL

03:40PM   25   OBLIGATIONS, I DON'T WANT TO -- WHEN I ASK YOU QUESTIONS THAT

03:40PM  1    RELATE TO ANY OF THESE CLIENTS, I'M NOT SEEKING ANY -- THE

03:40PM  2    CONTENTS OF ANY ATTORNEY-CLIENT COMMUNICATIONS.  OKAY?

03:40PM  3    A.   I UNDERSTAND.

03:40PM  4    Q.   OKAY.  AND IF THERE'S EVER ANY UNCERTAINTY THAT YOU HAVE

03:40PM  5    IN YOUR MIND AS TO WHETHER ANY OF THE QUESTIONS THAT I SEEK

03:40PM  6    CALL FOR SUCH INFORMATION, I ASSURE YOU IT'S NOT INTENTIONAL.

03:40PM  7    BUT LET'S BE CAUTIOUS THERE.  OKAY?

03:40PM  8    A.   I UNDERSTAND.

03:40PM  9    Q.   OKAY.

03:40PM 10          THE COURT:  SO TO THAT REGARD, SIR, IF YOU FEEL YOU

03:40PM 11    NEED TO EXERCISE A PRIVILEGE, YOU SHOULD DO SO.

03:40PM 12          THE WITNESS:  OKAY.  THANK YOU.

03:41PM 13    BY MR. WADE:

03:41PM 14    Q.   I BELIEVE IN YOUR DIRECT EXAMINATION YOU TESTIFIED THAT

03:41PM 15    YOU WERE ASKED BY DR. KISSINGER TO LOOK INTO THERANOS A BIT; IS

03:41PM 16    THAT RIGHT?

03:41PM 17    A.   THAT'S CORRECT.

03:41PM 18    Q.   NOW, YOU'RE AWARE THAT DR. KISSINGER WAS ON THE BOARD OF

03:41PM 19    THERANOS; RIGHT?

03:41PM 20    A.   YES.

03:41PM 21    Q.   WITHOUT REVEALING ANY PRIVILEGED COMMUNICATIONS, DO YOU

03:41PM 22    KNOW WHY IT IS THAT HE WAS ASKING YOU TO LOOK INTO THIS FROM AN

03:41PM 23    INVESTMENT STANDPOINT?

03:41PM 24          MR. SCHENK:  SPECULATION.

03:41PM 25          THE COURT:  SUSTAINED.

03:41PM  1    BY MR. WADE:

03:41PM  2    Q.   DO YOU KNOW WHY DR. KISSINGER -- DO YOU HAVE AN

03:41PM  3    UNDERSTANDING, BASED ON YOUR COMMUNICATIONS WITH DR. KISSINGER,

03:41PM  4    WHY IT WAS THAT HE WAS ASKING YOU TO DO THIS?

03:42PM  5    A.   HE SIMPLY WANTED MY VIEWS ON THE COMPANY AND -- AND ON THE

03:42PM  6    COMPANY IN GENERAL.

03:42PM  7    Q.   OKAY.  COULD I CALL YOUR ATTENTION TO EXHIBIT --

03:42PM  8         MAY I APPROACH, YOUR HONOR?

03:42PM  9             THE COURT:  YES.

03:42PM 10    BY MR. WADE:

03:42PM 11    Q.   (HANDING.)

03:42PM 12         I'VE HANDED YOU A COUPLE MORE BINDERS.  I KNOW YOU HAVE A

03:43PM 13    GROWING COLLECTION UP THERE.

03:43PM 14    A.   I DO.

03:43PM 15    Q.   I GUESS THAT'S THE LIFE OF A LAWYER, RIGHT?

03:43PM 16         COULD I ASK YOU TO TURN YOUR ATTENTION TO EXHIBIT 4162.

03:43PM 17         DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

03:43PM 18    A.   I DO.

03:43PM 19    Q.   AND DO YOU RECOGNIZE THIS -- THE ATTACHMENT TO THIS

03:43PM 20    LETTER?  HAVE YOU SEEN THIS LETTER BEFORE?

03:43PM 21    A.   I DON'T REMEMBER.

03:44PM 22    Q.   DO YOU RECALL THAT IN JULY OF 2014, MR. -- THE

03:44PM 23    STAVROS NIARCHOS FOUNDATION ASKED YOU TO ENGAGE WITH THERANOS

03:44PM 24    ABOUT THE POTENTIAL INVESTMENT BY THE FOUNDATION?

03:44PM 25    A.   COULD YOU RESTATE THAT?  I DIDN'T QUITE UNDERSTAND THE

03:44PM  1    QUESTION.

03:44PM  2    Q.   YES.  DO YOU RECALL BEING ASKED BY THE STAVROS NIARCHOS

03:44PM  3    FOUNDATION TO ENGAGE WITH THERANOS IN CONNECTION WITH A

03:44PM  4    POSSIBLE INVESTMENT BY THE FOUNDATION IN THERANOS?

03:44PM  5    A.   I DON'T REMEMBER BEING ASKED TO BE ENGAGED IN THE SENSE OF

03:45PM  6    TO REPRESENT THEM AS A LAWYER IN CONNECTION WITH IT.  IS THAT

03:45PM  7    WHAT YOU'RE ASKING?

03:45PM  8    Q.   DO YOU RECALL BEING ASKED BY THE FOUNDATION TO ENGAGE IN

03:45PM  9    ANY WAY WITH THE POTENTIAL INVESTMENT IN THERANOS?

03:45PM  10   A.   YES, I THINK THEY ASKED ME TO PARTICIPATE IN THE

03:45PM  11   INTRODUCTION TO ELIZABETH HOLMES AND TO THE COMPANY.

03:45PM  12   Q.   OKAY.  AND AT THE TIME, HAD YOU MET MS. HOLMES?

03:45PM  13   A.   ON JULY THE 14TH, I HAD NOT.

03:45PM  14   Q.   OKAY.

03:45PM  15        I'LL MOVE THE ADMISSION OF 4162.

03:45PM  16            MR. SCHENK:  YOUR HONOR, FOUNDATION.  HEARSAY.

03:45PM  17            THE COURT:  CAN YOU LAY A LITTLE MORE FOUNDATION ON

03:45PM  18   THIS?

03:45PM  19            MR. WADE:  I CAN SKIP THE DOCUMENT.  I WAS JUST

03:45PM  20   DOING IT FOR THE CLARITY OF THE WITNESS.

03:45PM  21            THE COURT:  SURE.

03:45PM  22   BY MR. WADE:

03:45PM  23   Q.   DO YOU RECALL WHAT THE FOUNDATION ASKED YOU TO DO IN JULY

03:45PM  24   OF 2014?

03:45PM  25   A.   THEY ASKED ME TO HELP INTRODUCE THEM TO ELIZABETH HOLMES

03:45PM  1    AND THE COMPANY.

03:45PM  2    Q.   OKAY.  AND AT THIS POINT, THIS WAS BEFORE YOU HAD HAD ANY

03:46PM  3    OF THE INTERACTIONS RELATING TO THE KISSINGER ASSIGNMENT I

03:46PM  4    BELIEVE; ISN'T THAT RIGHT?

03:46PM  5    A.   NO.  I BELIEVE IT WAS -- YOU KNOW, I COULD BE WRONG ABOUT

03:46PM  6    THIS, BUT I BELIEVE IT WAS AFTER DR. KISSINGER HAD ASKED ME TO

03:46PM  7    BEGIN LOOKING AT THERANOS AND GIVE HIM MY VIEWS.

03:46PM  8    Q.   OKAY.  AND WAS THIS A MEETING THAT WAS FACILITATED -- OR

03:46PM  9    AN ENGAGEMENT BY YOU THAT WAS FACILITATED BY DR. KISSINGER?

03:46PM  10   A.   I'M NOT SURE WHAT YOU MEAN BY THAT.

03:46PM  11   Q.   DID DR. KISSINGER ASK YOU TO ENGAGE ON THIS?

03:46PM  12   A.   YOU KNOW, I THINK I MAY HAVE KNOWN THAT HE WANTED TO LET

03:46PM  13   SOME OF THE PEOPLE THAT HE HAD HAD A LONG ASSOCIATION WITH KNOW

03:46PM  14   ABOUT THIS OPPORTUNITY, AND I DON'T REMEMBER SPECIFICALLY, BUT

03:46PM  15   HE MIGHT WELL HAVE SAID TO ME, CAN YOU HELP ME IN TALKING TO

03:47PM  16   PEOPLE AT THE NIARCHOS FOUNDATION.

03:47PM  17   Q.   AND YOU HAD NOT DONE -- THE NIARCHOS FOUNDATION WAS NOT A

03:47PM  18   CLIENT OF YOURS AT THE TIME?

03:47PM  19   A.   I DON'T BELIEVE SO.  ANDREAS DRACOPOULOS WAS A CLIENT AND

03:47PM  20   HE WAS THE CO-CEO OF THE FOUNDATION.

03:47PM  21        I DON'T REMEMBER WHETHER I, YOU KNOW, I CERTAINLY DIDN'T

03:47PM  22   THINK OF THEM AS A CLIENT.  BUT I MIGHT WELL HAVE GIVEN HIM

03:47PM  23   ADVICE, OR SOMEBODY ELSE.  BUT I REALLY DON'T HAVE A COMPLETE

03:47PM  24   RECOLLECTION OF EVERYTHING.

03:47PM  25   Q.   OKAY.  WELL, WE'LL GO THROUGH SOME DOCUMENTS AND SEE IF WE

03:47PM  1    CAN REFRESH YOU.

03:47PM  2    A.   OKAY.  SURE.

03:47PM  3    Q.   THE NEXT, THE NEXT COMMUNICATION -- IF I COULD TURN YOUR

03:47PM  4    ATTENTION TO 4163, WHICH I BELIEVE IS IN EVIDENCE.

03:47PM  5           THE CLERK:  CORRECT.

03:48PM  6           MR. WADE:  PERMISSION TO PUBLISH?

03:48PM  7           THE COURT:  YES.

03:48PM  8    BY MR. WADE:

03:48PM  9    Q.   AND THIS IS RIGHT AROUND THE TIME WHEN YOU'RE BEING

03:48PM  10   ENGAGED WITH -- BY DR. KISSINGER FOR THE ASSIGNMENT THAT YOU

03:48PM  11   DISCUSSED; IS THAT RIGHT?

03:48PM  12   A.   YES, IT WAS.

03:48PM  13   Q.   AND AMONG THE FIRST THINGS THAT YOU DID, YOU HAD AN

03:48PM  14   INITIAL CONVERSATION WITH MS. HOLMES; IS THAT RIGHT?

03:48PM  15   A.   THAT IS CORRECT.

03:48PM  16   Q.   AND WAS THAT A BRIEF CONVERSATION?

03:48PM  17   A.   I DON'T REMEMBER HOW LONG THE CONVERSATION WAS.

03:48PM  18   Q.   IT WAS THE FIRST ONE THAT YOU HAD HAD WITH HER; IS THAT

03:48PM  19   RIGHT?

03:48PM  20   A.   IT WAS.

03:48PM  21   Q.   OKAY.  YOU HADN'T MET HER BEFORE; IS THAT RIGHT?

03:48PM  22   A.   NO, I HAD NOT.

03:48PM  23   Q.   OKAY.  IN THE SHORT TIME, IT LOOKS LIKE WITHIN THE NEXT

03:48PM  24   DAY YOU WERE REACHING OUT TO MEMBERS OF THE WALTON FAMILY;

03:48PM  25   CORRECT?

03:48PM    1    A.   I DON'T KNOW HOW MUCH TIME WAS IN BETWEEN MY CONVERSATION

03:49PM    2    WITH HER AND REACHING OUT TO GREG PENNER.  I DON'T KNOW HOW

03:49PM    3    MUCH TIME.

03:49PM    4    Q.   YOU SEE WHERE IT SAYS, "AS WE SPOKE YESTERDAY, I REACHED"?

03:49PM    5    A.   ALL RIGHT.  THEN MAYBE IT MEANS THE NEXT DAY.

03:49PM    6    Q.   OKAY.  SO YOU PRETTY QUICKLY REACHED OUT TO THE WALTON

03:49PM    7    FAMILY; CORRECT?

03:49PM    8    A.   YES.

03:49PM    9    Q.   AND MR. PENNER IS ACTUALLY -- HE RUNS A PRIVATE EQUITY

03:49PM   10    FUND AS WELL?

03:49PM   11    A.   YES, HE RUNS HIS PRIVATE INVESTMENT FIRM BY THE NAME OF

03:49PM   12    MADRONE.

03:49PM   13    Q.   AND THAT'S BASED SOMEWHERE HERE IN SILICON VALLEY?

03:49PM   14    A.   IT IS.

03:49PM   15    Q.   OKAY.  AND YOU REACHED OUT TO HIM IMMEDIATELY AND YOU WERE

03:49PM   16    WORKING TO FACILITATE PUTTING MS. HOLMES IN CONTACT WITH

03:49PM   17    MR. PENNER; CORRECT?

03:49PM   18    A.   I -- YES.

03:49PM   19    Q.   OKAY.  CAN I CALL YOUR ATTENTION TO 14129.

03:50PM   20    A.   IS THAT IN VOLUME 2?  IT IS.

03:50PM   21    Q.   I BELIEVE IT IS, YES.

03:50PM   22    A.   OKAY.

03:50PM   23    Q.   DO YOU HAVE THAT ONE IN FRONT OF YOU?

03:50PM   24    A.   I DO.

03:50PM   25    Q.   AND DO YOU SEE THAT'S A FOLLOW-UP EMAIL TO THIS CHAIN

03:50PM   1    ABOUT A WEEK LATER?

03:50PM   2    A.   YES.

03:50PM   3         MR. WADE:  MOVE THE ADMISSION OF 14129.

03:50PM   4         MR. SCHENK:  NO OBJECTION.

03:50PM   5         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:50PM   6    (DEFENDANT'S EXHIBIT 14129 WAS RECEIVED IN EVIDENCE.)

03:50PM   7    BY MR. WADE:

03:50PM   8    Q.   AND DO YOU SEE THE BOTTOM EMAIL THERE, IT'S THE SAME EMAIL

03:50PM   9    THAT WE WERE JUST LOOKING AT?

03:50PM  10    A.   THAT'S CORRECT.

03:50PM  11    Q.   AND LET'S FOCUS ON THE EMAIL UP THE CHAIN.

03:51PM  12    A.   UH-HUH.

03:51PM  13    Q.   AND DO YOU INFER FROM THIS EMAIL THAT ABOUT A WEEK HAD

03:51PM  14    PASSED AND MS. HOLMES APPEARS TO NOT HAVE FOLLOWED UP WITH

03:51PM  15    MR. PENNER?

03:51PM  16    A.   YES.

03:51PM  17    Q.   AND YOU WERE FOLLOWING UP TO CHECK IN?

03:51PM  18    A.   WELL, I POINTED OUT THAT I HADN'T RECEIVED THE MATERIALS

03:51PM  19    AND WAS LOOKING OUT FOR THEM, AND THAT GREG PENNER WAS DOING

03:51PM  20    THE SAME.

03:51PM  21    Q.   RIGHT.  YOU PROVIDED AN INTRODUCTION TO MR. PENNER, AND HE

03:51PM  22    HAD NOT GOTTEN THE BINDERS; RIGHT?

03:51PM  23    A.   THAT IS CORRECT.

03:51PM  24    Q.   AND YOU HADN'T GOTTEN THEM EITHER; IS THAT CORRECT?

03:51PM  25    A.   THAT IS CORRECT.

03:51PM  1   Q.   AND DO YOU SEE IN THAT SECOND LINE IT SAYS, "ROB WALTON

03:51PM  2   RAN INTO ONE OF YOUR BOARD MEMBERS OVER THE WEEKEND AT THE

03:51PM  3   GROVE"?

03:51PM  4   A.   YES.

03:51PM  5   Q.   AND WHAT IS THE GROVE?  DO YOU KNOW?

03:51PM  6   A.   YOU KNOW, I'M NOT -- I'M CERTAINLY BY NO MEANS AN EXPERT

03:51PM  7   ON THE GROVE, BUT I THINK IT'S A GROUP OF PEOPLE THAT GET

03:51PM  8   TOGETHER IN CALIFORNIA ON A PERIODIC BASIS.

03:51PM  9   Q.   AND IS IT MOSTLY PROMINENT FAMILIES?

03:52PM 10   A.   IT IS, PROMINENT INDIVIDUALS.

03:52PM 11   Q.   PROMINENT INDIVIDUALS, PRESIDENTS AND SENATORS AND THE

03:52PM 12   LIKE?

03:52PM 13   A.   RIGHT.

03:52PM 14   Q.   AND ARE YOU AWARE -- WITHOUT REVEALING PRIVILEGED

03:52PM 15   INFORMATION, ARE YOU AWARE OF WHO MR. WALTON SPOKE WITH AT THE

03:52PM 16   GROVE ABOUT THERANOS?

03:52PM 17   A.   NO.

03:52PM 18   Q.   OKAY.  AND IT APPEARED, AS A RESULT OF THESE INTERACTIONS,

03:52PM 19   THAT MR. WALTON AND MR. PENNER WERE EAGER TO RECEIVE

03:52PM 20   INFORMATION ABOUT THERANOS; CORRECT?

03:52PM 21   A.   THAT'S SORT OF WHAT IS IMPLIED HERE, YES.

03:52PM 22   Q.   AND GIVEN THAT YOU HAD PROVIDED THE INTRODUCTION, YOU WERE

03:52PM 23   TRYING TO ENCOURAGE THAT ALONG; IS THAT RIGHT?

03:52PM 24   A.   WELL, I OBVIOUSLY POINTED OUT THE FIRST THING WAS THAT I

03:52PM 25   HAD NOT RECEIVED THE MATERIALS, AND THEN I NOTED THAT NEITHER

03:52PM  1    HAD GREG PENNER.

03:52PM  2    Q.   AND WERE YOU EAGER IN THIS PERIOD TO RECEIVE THE

03:53PM  3    MATERIALS?

03:53PM  4    A.   I WAS LOOKING FORWARD TO RECEIVING THE MATERIALS.

03:53PM  5    Q.   OKAY.  IF I CAN -- DO YOU KNOW WHEN YOU NEXT SPOKE TO

03:53PM  6    MS. HOLMES?

03:53PM  7    A.   I DON'T.

03:53PM  8    Q.   AND CAN YOU -- LET'S LOOK AT 14130.  AND I CAN JUST ASK,

03:53PM  9    DOES THIS REFRESH YOUR RECOLLECTION THAT YOU NEXT SPOKE WITH

03:53PM  10   MS. HOLMES IN MID-AUGUST OF 2014?

03:53PM  11   A.   YOU KNOW, IT'S A MESSAGE SLIP FROM CRAVATH SAYING THAT

03:53PM  12   ELIZABETH HOLMES HAD CALLED, AND IT SAYS "PLEASE CALL HER ON

03:53PM  13   MONDAY" IS WHAT I'M LOOKING AT IF I'M ON THE RIGHT -- 14130?

03:54PM  14   Q.   YEAH.

03:54PM  15        I MOVE THE ADMISSION OF 14130?

03:54PM  16             THE COURT:  ANY OBJECTION?

03:54PM  17             MR. SCHENK:  NO OBJECTION.

03:54PM  18             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:54PM  19        (DEFENDANT'S EXHIBIT 14130 WAS RECEIVED IN EVIDENCE.)

03:54PM  20   BY MR. WADE:

03:54PM  21   Q.   THIS IS A MESSAGE SLIP FROM YOUR SECRETARY?

03:54PM  22   A.   UM, SHE WASN'T ACTUALLY MY SECRETARY, BUT SHE WAS IN THE

03:54PM  23   SUITE THAT I WAS LOCATED.

03:54PM  24   Q.   OKAY.  SO AN ASSISTANT WHO WAS HELPING SUPPORT YOU?

03:54PM  25   A.   YES.

03:54PM  1    Q.   AND SHE WAS ASKING FOR YOU TO CALL MS. HOLMES; CORRECT?

03:54PM  2    A.   YEAH, IT APPEARS TO BE AN INDICATION THAT ELIZABETH HAD

03:54PM  3    CALLED ME AND LEFT A TELEPHONE NUMBER AND SAID PLEASE CALL ME

03:54PM  4    ON MONDAY.

03:54PM  5    Q.   AND DO YOU RECALL WHEN THE NEXT INTERACTION WAS?

03:54PM  6    A.   I DON'T SPECIFICALLY RECALL.

03:54PM  7    Q.   OKAY.  LET'S TAKE A LOOK AT 4173.

03:55PM  8    A.   I'M THERE.

03:55PM  9    Q.   AND THAT'S IN EVIDENCE.

03:55PM  10        PERMISSION TO PUBLISH, YOUR HONOR?

03:55PM  11            THE COURT:  YES.

03:55PM  12   BY MR. WADE:

03:55PM  13   Q.   AND I THINK MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT

03:55PM  14   THIS.

03:55PM  15        DO YOU RECALL?

03:55PM  16   A.   I DO.

03:55PM  17   Q.   AND THIS WAS THE COVER CORRESPONDENCE FOR THE BINDERS THAT

03:55PM  18   YOU RECEIVED; IS THAT RIGHT?

03:55PM  19   A.   I BELIEVE IT WAS.

03:55PM  20   Q.   OKAY.  AND I'M GOING TO OFFER -- I ONLY HAVE ONE COPY,

03:55PM  21   THANKFULLY, OF THIS.

03:55PM  22        YOUR HONOR, I'VE GIVEN THE GOVERNMENT NOTICE.

03:55PM  23        YOUR HONOR, I BELIEVE THIS IS JUST THE FULL BINDER SET, SO

03:55PM  24   IF HE ADMITS IT, WE'LL JUST DISPLAY IT ELECTRONICALLY TO SAVE

03:56PM  25   PAPER.

03:56PM 1                    THE COURT:  ALL RIGHT.

03:56PM 2              YOU HAVE A COPY OF THIS, MR. SCHENK?

03:56PM 3                    MR. SCHENK:  I HAVE AN ELECTRONIC COPY, YES.

03:56PM 4                    THE COURT:  OKAY.  THAT'S FINE.

03:56PM 5                    MR. WADE:  AND I HAVE AN ELECTRONIC COPY IF THE

03:56PM 6       COURT WOULD LIKE ONE, TOO.

03:56PM 7                    THE COURT:  THAT'S FINE.  GO AHEAD.

03:56PM 8                    MR. WADE:  MAY I APPROACH?

03:56PM 9                    THE COURT:  YES.

03:56PM 10                   MR. WADE:  (HANDING.)

03:56PM 11                   THE WITNESS:  THANK YOU.

03:56PM 12      BY MR. WADE:

03:56PM 13      Q.   NOW, I'VE HANDED YOU THREE VOLUMES OF DOCUMENTS.  I THINK

03:56PM 14      IF YOU, IF YOU LOOK AT THEM, YOU'LL NOTICE THAT THEY'RE BATES

03:56PM 15      LABELLED WITH THE MOSLEY BATES LABEL.

03:56PM 16          AND DO YOU RECOGNIZE THIS TO BE THE COMPLETE COLLECTION OF

03:56PM 17      MATERIALS THAT WAS SENT TO YOU BY?

03:57PM 18      A.   IT PROBABLY IS.  I CAN'T -- I MEAN, THAT WAS SEVEN YEARS

03:57PM 19      AGO AND I CAN'T -- BUT IT LOOKS LIKE -- IT LOOKS LIKE WHAT I

03:57PM 20      THINK I RECEIVED.

03:57PM 21      Q.   OKAY.

03:57PM 22                   MR. WADE:  MOVE THE ADMISSION OF 4173 -- I'M SORRY,

03:57PM 23      OF --

03:57PM 24                   THE COURT:  4173?

03:57PM 25                   MR. WADE:  I'M SORRY.

03:57PM  1    Q.   CAN YOU IDENTIFY THE EXHIBIT THAT I JUST -- IT'S ON THE

03:57PM  2    BINDER COVER.

03:57PM  3    A.   IT'S TX 14206.

03:57PM  4    Q.   14206.

03:57PM  5         MOVE THE ADMISSION OF 14206.

03:57PM  6              THE COURT:  14206?  I'M SORRY, MR. SCHENK?

03:57PM  7              MR. SCHENK:  NO OBJECTION.

03:57PM  8              THE COURT:  14206 CONSISTS OF THREE BINDERS?

03:57PM  9              MR. WADE:  THREE BINDERS, YES.

03:57PM  10             THE COURT:  THANK YOU.  IT'S ADMITTED, AND YOU CAN

03:57PM  11   PUBLISH THEM AS YOU EXAMINE.

03:57PM  12        (DEFENDANT'S EXHIBIT 14206 WAS RECEIVED IN EVIDENCE.)

03:57PM  13   BY MR. WADE:

03:57PM  14   Q.   LET ME GO BACK TO THE LETTER, 4173.

03:57PM  15        NOW, THESE BINDERS WERE SENT TO YOU, AND WHEN YOU HAD

03:58PM  16   DISCUSSIONS WITH MS. HOLMES, DID YOU MAKE ANY SPECIFIC REQUESTS

03:58PM  17   FOR MATERIALS?

03:58PM  18   A.   YOU KNOW, I DON'T REMEMBER WHETHER I ASKED FOR DOCUMENTS

03:58PM  19   OR SHE -- INFORMATION, OR SHE SAID, I'VE GOT A PACKAGE OF

03:58PM  20   MATERIALS I'LL SEND YOU.  I DON'T REMEMBER.

03:58PM  21   Q.   OKAY.  IN ANY EVENT, THE DOCUMENTS CAME IN IN EARLY

03:58PM  22   AUGUST.

03:58PM  23        DO YOU RECALL THAT?  OR MID-AUGUST?  I APOLOGIZE.

03:58PM  24   A.   YOU KNOW, I HAVE GENERALLY A RECOLLECTION THAT THAT'S WHEN

03:58PM  25   THEY CAME AND IT'S CONSISTENT WITH THE LETTER.

03:58PM 1      Q.   AND IF WE LOOK AT THE LAST PARAGRAPH OF THE LETTER -- I'M

03:58PM 2      SORRY, ON THE SECOND PAGE, THE LAST FINAL PARAGRAPH.

03:58PM 3           DO YOU SEE IT SAYS, "I AM HAPPY TO PROVIDE MORE BACKGROUND

03:58PM 4      ON ANY OF THE ABOVE, OR ANY OF THE MATERIALS ENCLOSED IN THIS

03:58PM 5      PACKAGE."

03:58PM 6           DO YOU SEE THAT?

03:58PM 7      A.   I DO SEE IT.

03:58PM 8      Q.   AND SO YOU UNDERSTOOD AT THE TIME THAT YOU GOT THESE

03:58PM 9      MATERIALS THAT THERE WAS AN OPEN INVITATION FOR YOU TO GO AND

03:58PM 10     SEEK OTHER INFORMATION; RIGHT?

03:58PM 11     A.   I DID.

03:58PM 12     Q.   AND IF THERE WAS ANYTHING WITHIN THE MATERIALS THAT YOU

03:58PM 13     THOUGHT WAS UNCLEAR, THAT YOU HAD AN INVITATION TO GO BACK TO

03:59PM 14     MS. HOLMES AND ASK FOR CLARITY ON THOSE MATERIALS; RIGHT?

03:59PM 15     A.   I DID.

03:59PM 16     Q.   AND YOU WOULD HAVE FELT FREE TO DO SO AT THIS POINT; IS

03:59PM 17     THAT FAIR?

03:59PM 18     A.   I WOULD HAVE.

03:59PM 19          MR. WADE:  OKAY.

03:59PM 20          YOUR HONOR, NOW MIGHT BE A GOOD TIME TO BREAK.  I WAS

03:59PM 21     GOING TO SHIFT, OR GO DEEPER INTO A TOPIC.

03:59PM 22          THE COURT:  YOU'RE RESTRAINING YOUR ENTHUSIASM FOR

03:59PM 23     STARTING THE BINDERS.

03:59PM 24          (LAUGHTER.)

03:59PM 25          MR. WADE:  I SEE THE WITNESS'S ENTHUSIASM AS WELL,

03:59PM 1       YOUR HONOR.

03:59PM 2              THE COURT:  LET'S DO THAT.  LET'S TAKE OUR EVENING

03:59PM 3       BREAK NOW, LADIES AND GENTLEMEN.  WE'LL RESUME AGAIN AT 9:00

03:59PM 4       O'CLOCK, 9:00 O'CLOCK TOMORROW MORNING, PLEASE.

03:59PM 5          LET ME REMIND YOU OF THE ADMONITION.  IT REMAINS IN PLACE.

03:59PM 6       YOU'VE BEEN DOING SO WONDERFULLY WITH IT.

03:59PM 7          PLEASE DO REFRAIN FROM COMING INTO CONTACT AS BEST YOU CAN

03:59PM 8       WITH ANY INFORMATION, ANY VERBAL INFORMATION, ANY RADIO,

03:59PM 9       TELEVISION, SOCIAL MEDIA, OR ANYTHING ELSE, INCLUDING

03:59PM 10      CONVERSATIONS, ANYTHING TO DO WITH THIS CASE.

03:59PM 11         I'LL ASK YOU TOMORROW MORNING IF YOU WERE ABLE TO, ONCE

04:00PM 12      AGAIN, SUCCESSFULLY ACCOMPLISH THAT.

04:00PM 13         HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.

04:00PM 14         LET ME SAY, I THINK -- I JUST WANT TO GO OVER -- MONDAY,

04:00PM 15      NOVEMBER 29TH, PLEASE RECALL WE'RE GOING TO START MONDAYS, I

04:00PM 16      THINK TWO MONDAYS FROM NOW, ON THE 29TH, I'M HOPING THAT WE CAN

04:00PM 17      BEGIN PROBABLY AROUND 10:00 O'CLOCK, I THINK, BUT WE'LL GET

04:00PM 18      MORE INFORMATION ON THAT AS WE GET CLOSER.

04:00PM 19             THE CLERK:  TOMORROW IS 3:00.

04:00PM 20             THE COURT:  AND TOMORROW IS 3:00 O'CLOCK, YES,

04:00PM 21      TOMORROW WE END AT 3:00 O'CLOCK.

04:00PM 22         LET ME ASK COUNSEL WHILE THE WITNESS IS HERE, IS IT LIKELY

04:00PM 23      WE'LL FINISH THIS WITNESS'S EXAMINATION TOMORROW?

04:00PM 24             MR. WADE:  I WOULD EXPECT SO, YES, YOUR HONOR.

04:00PM 25             THE COURT:  DO YOU AGREE WITH THAT, MR. SCHENK?

04:00PM 1          MR. SCHENK:  I DO.

04:00PM 2          THE WITNESS:  THANK YOU.

04:00PM 3          THE COURT:  THAT'S HELPFUL INFORMATION.

04:00PM 4      HAVE A GOOD EVENING, LADIES AND GENTLEMEN.  WE'LL SEE YOU

04:00PM 5  TOMORROW MORNING.

04:00PM 6      YOU CAN STAND DOWN, SIR.  THANK YOU.

04:01PM 7      (JURY OUT AT 4:01 P.M.)

04:01PM 8          MR. WADE:  IF YOU WANT TO LEAVE THOSE THERE,

04:01PM 9  MR. MOSLEY, WE'LL KEEP THEM IN SAFEKEEPING.  THE COURT HAS

04:01PM 10 MARSHALS.

04:01PM 11         THE COURT:  THEY MAY GET LOST, MR. MOSLEY.  HOPE

04:01PM 12 SPRINGS ETERNAL.

04:01PM 13     WE'LL SEE YOU TOMORROW AT 9:00 O'CLOCK.

04:01PM 14         THE WITNESS:  THANK YOU, YOUR HONOR.

04:01PM 15         THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

04:01PM 16     THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

04:01PM 17 DAY, MR. MOSLEY HAS LEFT THE COURTROOM, AND ALL COUNSEL AND

04:01PM 18 MS. HOLMES REMAIN PRESENT.

04:02PM 19     I'M GOING TO CHECK ON THE HVAC.  GOSH, IT GETS WARM HERE

04:02PM 20 IN THE AFTERNOON.  WE'LL SEE WHAT WE CAN DO TO ACCOMPLISH

04:02PM 21 RECTIFYING THAT.

04:02PM 22     I ALSO WANTED TO SHARE WITH COUNSEL, MS. KRATZMANN

04:02PM 23 RECEIVED A COMMENT FROM THE JURORS THAT THEY APPARENTLY

04:02PM 24 REQUESTED THAT -- I'M JUST GOING TO READ THIS -- IF WHEN THE

04:02PM 25 BLOWUP OF AN EXHIBIT, IF THEY CAN RAISE IT HIGHER SO TEXT IS

04:02PM 1      NOT AT THE BOTTOM.

04:02PM 2              I'M SURE YOUR I.T. PEOPLE KNOW WHAT THAT MEANS.

04:02PM 3                  MR. WADE:  THANK YOU.

04:02PM 4                  THE COURT:  I'LL JUST PASS THAT ON.  THAT'S FROM THE

04:02PM 5      JURORS.

04:02PM 6                  MR. SCHENK:  THANK YOU.

04:02PM 7                  THE COURT:  ANYTHING ELSE THEN BEFORE WE LEAVE FOR

04:02PM 8      THE EVENING?

04:02PM 9              MR. SCHENK?

04:02PM 10                 MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

04:02PM 11             JUST BRIEFLY.  I KNOW WE HAVE A BUSY SCHEDULE FOR TOMORROW

04:02PM 12     MORNING'S SESSION, SOME OF THE DISCUSSIONS WE WERE HAVING TODAY

04:02PM 13     WE PUNTED, AND I THINK ONE OF THE THINGS WE WERE THINKING ABOUT

04:02PM 14     TALKING ABOUT WAS THE MOSLEY 2015 DOCUMENTS.

04:03PM 15             I ASSUME WE CAN DEAL WITH THEM NOW VERY QUICKLY.  THE

04:03PM 16     COURT HAS SEEN THE DIRECT.  MR. MOSLEY -- I DIDN'T COVER 2015

04:03PM 17     WITH HIM, AND MR. MOSLEY HIMSELF SAID THAT THE FINANCIAL

04:03PM 18     PROJECTIONS IN 2015 WERE LESS RELIABLE BECAUSE THEY WERE

04:03PM 19     FURTHER INTO THE FUTURE.

04:03PM 20             SO THE COURT WILL RECALL MR. WADE SAID THIS EVIDENCE, THE

04:03PM 21     2015 DOCUMENTS, MIGHT BE APPROPRIATE IMPEACHMENT IF THE WITNESS

04:03PM 22     DOES NOT RECALL HAVING THE OPINION THAT PROJECTIONS INTO THE

04:03PM 23     FUTURE ARE CHALLENGING.

04:03PM 24             WE ARE NOT FACED WITH THAT SITUATION, AND IT NOW SEEMS TO

04:03PM 25     ME CLEAR THAT THE COURT CAN EXCLUDE THIS TYPE OF EVIDENCE, AND

04:03PM 1    I DON'T THINK WE NEED TO TAKE TIME, MUCH MORE TODAY, OR ANY

04:03PM 2    TOMORROW.

04:03PM 3                MR. WADE:  I NOTED THE SAME THING MR. SCHENK DID

04:03PM 4    WITH RESPECT TO THE TESTIMONY, AND I THINK WHAT I WOULD ASK IS

04:03PM 5    MAYBE JUST TO HAVE A CHANCE TO LOOK AT IT IN THE TRANSCRIPT.

04:03PM 6        I THINK, I THINK MAYBE I WOULD ASK SOME QUESTIONS AROUND

04:04PM 7    THE TOPIC, BUT IT MAY WELL BE I DON'T NEED TO PUT IN A COUPLE

04:04PM 8    OF THOSE EMAILS.

04:04PM 9        BUT I'LL LOOK BACK AT IT, AND I'LL ADVISE MR. SCHENK IF I

04:04PM 10   FEEL OTHERWISE.

04:04PM 11               THE COURT:  OKAY.

04:04PM 12               MR. WADE:  I DON'T NECESSARILY OTHERWISE SEE THE

04:04PM 13   EXAMINATION GOING INTO THAT TIME PERIOD, AND IF WE'RE NOT GOING

04:04PM 14   TO GO INTO THOSE COMMUNICATIONS, THEN WE MAY HAVE THE RECORD WE

04:04PM 15   NEED ON THAT.

04:04PM 16       THERE IS ONE OTHER -- THAT RELATE TO, I THINK, TWO OR

04:04PM 17   THREE OF THE EMAILS THAT MR. SCHENK HANDED UP TO THE COURT.

04:04PM 18       THERE IS ANOTHER EMAIL THAT MR. -- OR ANOTHER DOCUMENT,

04:04PM 19   EMAIL AND ATTACHMENT I THINK THAT RELATES TO TEST RESULTS THAT

04:04PM 20   MR. MOSLEY RECEIVED AT A WALGREENS, AT A THERANOS CENTER AT A

04:04PM 21   WALGREENS, WHICH WAS IN 2015.

04:04PM 22       AND I THINK THAT WOULD BE -- I DON'T THINK WE ADDRESSED

04:05PM 23   THAT THIS MORNING.  IF WE DID, I DON'T RECALL.

04:05PM 24               THE COURT:  I DON'T RECALL DISCUSSING A TEST RESULT

04:05PM 25   FROM MR. MOSLEY.

04:05PM 1          MR. WADE:  YEAH.  I THINK THAT DOCUMENT WOULD BE

04:05PM 2    ADMISSIBLE IN THE SAME WAY THAT MANY OTHER DOCUMENTS OF PATIENT

04:05PM 3    TEST RESULTS HAVE BEEN, YOU KNOW, ADMISSIBLE IN THIS CASE.

04:05PM 4          THE GOVERNMENT HAS OFFERED MANY OF THEM, HAS SUGGESTED

04:05PM 5    THEY'RE PROBATIVE OF ACCURACY AND RELIABILITY.

04:05PM 6          AS THE COURT KNOWS, WE SUGGESTED OTHERWISE IN MOTIONS

04:05PM 7    PRACTICE AT SOME LENGTH, AND WHILE IT HAS PROBABLY LIMITED

04:05PM 8    PROBATIVE VALUE, THERE HAVE BEEN OTHER TEST RESULTS THAT HAVE

04:05PM 9    COME IN FROM OTHER WITNESSES, AND WE THINK IT'S ONLY FAIR THAT

04:05PM 10   MR. MOSLEY BE PERMITTED TO TALK ABOUT HIS WHICH WERE, AS I

04:05PM 11   UNDERSTAND IT, ACCURATE OR CONSISTENT WITH HIS OTHER TEST

04:05PM 12   RESULTS.

04:05PM 13          THE COURT:  SO YOU INTEND TO ASK THE WITNESS, THIS

04:05PM 14   WITNESS, MR. MOSLEY, WHETHER HE WENT TO A WALGREENS, TOOK A

04:06PM 15   TEST USING THE THERANOS EQUIPMENT, FINGERSTICK, VENOUS,

04:06PM 16   WHATEVER IT IS, AND IF HE RECEIVED A TEST RESULT, AND WHAT THAT

04:06PM 17   TEST RESULT WAS?

04:06PM 18          MR. WADE:  ESSENTIALLY.  AND THAT HE FOUND IT TO BE

04:06PM 19   CONSISTENT WITH PRIOR TEST RESULTS THAT HE'S RECEIVED.

04:06PM 20      HE RECEIVED A FINGERSTICK TEST AT WALGREENS.

04:06PM 21          THE COURT:  IS THERE A COMPARATOR AT THE TIME PERIOD

04:06PM 22   THAT YOU WOULD COMPARE IT TO, OR --

04:06PM 23          MR. WADE:  I BELIEVE HIS STATEMENTS ARE THAT HE SENT

04:06PM 24   THEM TO HIS DOCTOR, I THINK.  I MAY HAVE CONFUSED HIS TEST

04:06PM 25   RESULTS WITH ANOTHER WITNESS'S.

| | | |
|---|---|---|
| 04:06PM | 1 | THE COURT: OKAY. |
| 04:06PM | 2 | MR. WADE: BUT I THINK HE SENT THEM TO HIS DOCTOR. |
| 04:06PM | 3 | I THINK HE SAID IT WAS A CHOLESTEROL TEST, AND I THINK THEY |
| 04:06PM | 4 | WERE BASICALLY CONSISTENT WITH OTHER CHOLESTEROL TESTS. |
| 04:06PM | 5 | THE COURT: MR. SCHENK? |
| 04:06PM | 6 | MR. SCHENK: THIS MORNING I HANDED UP FOUR DOCUMENTS |
| 04:06PM | 7 | TO YOUR HONOR. MR. MOSLEY AND ACTUALLY HIS DAUGHTER'S TEST |
| 04:06PM | 8 | RESULTS WERE PART OF THAT STACK, SO THE COURT HAS THE DOCUMENT |
| 04:06PM | 9 | THAT MR. WADE IS REFERRING TO. |
| 04:06PM | 10 | I WOULD SUGGEST THAT WE WAIT AND SEE. I MAY HAVE |
| 04:07PM | 11 | RELEVANCE OBJECTIONS DEPENDING ON THE FOUNDATION THAT IS |
| 04:07PM | 12 | ESTABLISHED. |
| 04:07PM | 13 | I'M NOT SURE IT IS PROBATIVE OF THE ACCURACY OF THERANOS |
| 04:07PM | 14 | TESTS, BUT I THINK WE NEED TO WAIT AND SEE THE QUESTIONS AND |
| 04:07PM | 15 | WHAT MR. MOSLEY UNDERSTOOD WAS OCCURRING THROUGH THIS PROCESS. |
| 04:07PM | 16 | I -- IT IS OF A DIFFERENT SORT THAN MY 2015 OBJECTIONS. |
| 04:07PM | 17 | THE COURT: RIGHT. |
| 04:07PM | 18 | MR. SCHENK: MY 2015 OBJECTIONS WERE HIS KNOWLEDGE |
| 04:07PM | 19 | IN '15 WAS NOT RELEVANT FOR INVESTMENT. |
| 04:07PM | 20 | THIS IS DIFFERENT AND I DON'T OBJECT ON THE SAME GROUNDS, |
| 04:07PM | 21 | BUT I'D LIKE TO WAIT AND SEE THE QUESTIONS. |
| 04:07PM | 22 | THE COURT: ALL RIGHT. WELL, LET'S DO THAT. |
| 04:07PM | 23 | LET ME JUST SAY, IN THE SPIRIT OF FULL DISCLOSURE, AFTER |
| 04:07PM | 24 | YOUR DIRECT, MY QUESTION ASKING WHETHER WE WOULD FINISH WITH |
| 04:07PM | 25 | THE WITNESS TOMORROW, MR. MOSLEY, WAS PREDICATED ON THE FACT |

04:07PM  1    THAT THERE IT SOUNDS LIKE THERE WAS NO FORAY INTO 2015, AND SO

04:07PM  2    I WAS THINKING THAT YOU PROBABLY WOULDN'T GO INTO WHAT YOU

04:07PM  3    WOULD -- WHAT WE TALKED ABOUT THIS MORNING BECAUSE THERE WAS NO

04:08PM  4    REASON TO.

04:08PM  5        BUT I APPRECIATE YOUR OBSERVATIONS.

04:08PM  6        YOU'RE GOING TO THINK ABOUT IT OVERNIGHT.  THAT'S PROBABLY

04:08PM  7    A GOOD THING.

04:08PM  8        TOMORROW I THINK WE'RE TALKING ABOUT SOME OTHER WITNESSES

04:08PM  9    THAT ARE NOT EVEN GOING TO BE TESTIFYING THIS WEEK.  SO I'D

04:08PM 10    LIKE TO -- AS I UNDERSTAND IT, I THINK.

04:08PM 11            MR. SCHENK:  I THINK THAT BB MAY TESTIFY THIS WEEK.

04:08PM 12            THE COURT:  OKAY.

04:08PM 13            MR. SCHENK:  I THINK IT'S MR. PARLOFF THAT WOULD

04:08PM 14    NOT.

04:08PM 15            THE COURT:  OKAY.  THANK YOU.  LET'S START OUR

04:08PM 16    CONVERSATION TOMORROW ON BB AND SEE WHERE WE GO WITH THAT.

04:08PM 17        I DON'T WANT TO INVEST TIME, NOT THAT PARLOFF IS NOT

04:08PM 18    IMPORTANT, BUT IT'S NOT IMPORTANT FOR THIS WEEK'S SCHEDULE, AND

04:08PM 19    I'D LIKE TO KEEP US GOING FORWARD AS BEST WE CAN.

04:08PM 20        SO LET'S DO THAT.

04:08PM 21        AND WHEN THE FOLKS CALL IN, OUR DEAR FRIENDS FROM THE EAST

04:08PM 22    COAST CALL IN, WE CAN KIND OF TELL THEM THAT THEY'RE KIND OF IN

04:08PM 23    A HOLDING PATTERN, AND LET'S SEE WHAT WE CAN GET ACCOMPLISHED

04:08PM 24    TOMORROW AT ABOUT 8:15 IF THAT WORKS.

04:08PM 25            MR. SCHENK:  YES, YOUR HONOR.

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 04:08PM  | 1  | THE COURT:  OKAY.                                            |
| 04:09PM  | 2  | MR. WADE:  THE ONLY -- THE COURT'S INDULGENCE FOR           |
| 04:09PM  | 3  | ONE SECOND?                                                  |
| 04:09PM  | 4  | THE COURT:  SURE.                                            |
| 04:09PM  | 5  | (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)        |
| 04:09PM  | 6  | MR. WADE:  THE ONE ISSUE JUST TO ADDRESS, I DON'T          |
| 04:09PM  | 7  | KNOW WHAT THE GOVERNMENT'S SCHEDULE IS WITH RESPECT TO      |
| 04:09PM  | 8  | MR. PARLOFF, BUT MR. CLINE HAS A COMMITMENT TO ANOTHER COURT |
| 04:09PM  | 9  | AND WILL NOT BE HERE ON THURSDAY.                           |
| 04:09PM  | 10 | THE COURT:  OH, SOMETHING THAT IS MORE IMPORTANT            |
| 04:09PM  | 11 | THAN THIS COURT, MR. WADE?                                   |
| 04:09PM  | 12 | MR. WADE:  I QUESTIONED IT EXTENSIVELY AND I WOULD          |
| 04:09PM  | 13 | WELCOME THE CROSS-EXAMINATION OF HIM.                        |
| 04:09PM  | 14 | (LAUGHTER.)                                                  |
| 04:09PM  | 15 | MR. WADE:  BUT I THINK IT WAS SET AT A TIME WHERE WE        |
| 04:09PM  | 16 | THOUGHT WE WERE DARK.                                        |
| 04:09PM  | 17 | THE COURT:  YES.                                             |
| 04:09PM  | 18 | MR. WADE:  WE WERE DARK ON THURSDAYS.  SO HE WON'T          |
| 04:09PM  | 19 | BE HERE.                                                     |
| 04:09PM  | 20 | I ONLY RAISE THAT BECAUSE I DON'T THINK HE WOULD BE IN A    |
| 04:09PM  | 21 | POSITION TO ADDRESS IT ON THURSDAY, AND SO I JUST WANTED TO BE |
| 04:09PM  | 22 | CLEAR WITH THE COURT.                                        |
| 04:09PM  | 23 | I DON'T KNOW WHAT THE TIMING OF THE GOVERNMENT IS WITH      |
| 04:09PM  | 24 | THAT WITNESS.                                                |
| 04:09PM  | 25 | MR. SCHENK:  WE WERE AWARE OF MR. CLINE'S CONFLICT.        |

04:09PM 1    WE KNEW THAT DR. CULLEN WAS MR. CLINE'S WITNESS AND WE MADE

04:09PM 2    SURE SHE TESTIFIED ON A DAY THIS WEEK THAT MR. CLINE WAS

04:10PM 3    AVAILABLE.

04:10PM 4        I KNOW THAT -- I THINK WHAT MR. WADE IS GETTING AT IS, ARE

04:10PM 5    WE GOING TO DISCUSS MR. PARLOFF ON THURSDAY OR WAIT UNTIL THE

04:10PM 6    FOLLOWING WEEK, TUESDAY I THINK?

04:10PM 7                MR. WADE:  THAT'S CORRECT.

04:10PM 8                THE COURT:  RIGHT.  ARE WE AVAILABLE ON THE MONDAY,

04:10PM 9    ADRIANA, THE 8TH?

04:10PM 10                THE CLERK:  WE DO HAVE A CALENDAR, YOUR HONOR, IN

04:10PM 11    THE AFTERNOON.

04:10PM 12                THE COURT:  COULD WE TALK IN THE MORNING?

04:10PM 13                THE CLERK:  YOU'RE AVAILABLE IN THE MORNING.

04:10PM 14                THE COURT:  ARE YOU BACK, MR. WADE, ON THE 8TH?

04:10PM 15                MR. WADE:  MR. CLINE WOULD BE BACK TO DEAL WITH THAT

04:10PM 16    ISSUE, YES.

04:10PM 17                THE COURT:  OKAY.

04:10PM 18                MR. CLINE:  THAT WOULD BE FINE.

04:10PM 19                THE COURT:  OKAY.  SO MAYBE WE CAN DO IT THEN, I

04:10PM 20    THINK, ON A MONDAY MORNING.

04:10PM 21        MR. BOSTIC, DOES THAT WORK FOR YOU?

04:10PM 22                MR. BOSTIC:  THAT'S CERTAINLY FINE FOR THE

04:10PM 23    GOVERNMENT, YOUR HONOR.  MR. PARLOFF WILL NOT TESTIFY BEFORE

04:10PM 24    THE 9TH.

04:10PM 25        AM I REMEMBERING CORRECTLY THAT TRIAL IS NOT IN SESSION ON

04:10PM  1      THE 8TH?

04:10PM  2              THE COURT:  THAT'S RIGHT.

04:10PM  3              MR. BOSTIC:  OKAY.  THE GOVERNMENT COULD CERTAINLY

04:11PM  4      BE AVAILABLE TO ARGUE THE ISSUE ON THAT DAY, THOUGH.

04:11PM  5              THE COURT:  IF, IF -- RIGHT.  OKAY.

04:11PM  6          THAT'S AN ALTERNATIVE, I THINK.  WE CAN JUST COME IN THE

04:11PM  7      MORNING, OR WHATEVER TIME WORKS FOR THE PARTIES THAT DAY, AND

04:11PM  8      WE CAN TALK ABOUT MR. PARLOFF.

04:11PM  9              MR. CLINE:  THAT'S FINE, YOUR HONOR.

04:11PM  10             THE COURT:  OKAY.  LET'S KEEP THAT AS A BACK-UP

04:11PM  11     SCHEDULE.  THANK YOU.  I APPRECIATE IT.  I APPRECIATE YOUR -- I

04:11PM  12     KNOW WE'RE NOT IN SESSION THAT DAY, BUT -- WITH THE JURY.  BUT

04:11PM  13     IF WE CAN GET SOME WORK DONE, I WOULD APPRECIATE IT.

04:11PM  14             MR. BOSTIC:  GREAT.

04:11PM  15             MR. WADE:  THANK YOU, YOUR HONOR.

04:11PM  16             THE COURT:  GREAT.  THANK YOU.

04:11PM  17         I THINK THAT'S IT.  I THINK THAT'S ALL I HAVE.  THANK YOU.

04:11PM  18         OKAY.  HAVE A GOOD EVENING.

04:11PM  19             MR. SCHENK:  THANK YOU, YOUR HONOR.

04:11PM  20             THE CLERK:  COURT IS ADJOURNED.

04:11PM  21         (COURT ADJOURNED AT 4:11 P.M.)

         22

         23

         24

         25

```
 1
 2
 3                    CERTIFICATE OF REPORTERS
 4
 5
 6
 7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
 8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10   HEREBY CERTIFY:
11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13   ABOVE-ENTITLED MATTER.
14
15
16        _____
          IRENE RODRIGUEZ, CSR, CRR
17        CERTIFICATE NUMBER 8076
18
          _____
19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20
21        DATED:  NOVEMBER 2, 2021
22
23
24
25
```